


**ORIGINAL**

RECEIVED & FILED

'06 MAY -1 P2:21

Gregory J. Walch
Nevada Bar Number 4780
Email: GWalch@Nevadafirm.com
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone:    702/791-0308
Facsimile:    702/791-1912

*Attorney for Gregory J. Walch and Shauna M. Walch,
Trustees of the Gregory J. and Shauna M. Walch
Family Trust*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>USA COMMERCIAL MORTGAGE COMPANY,<br><br>Debtor. | Case No.: 06-10725-LBR<br>Chapter 11<br><br>**JOINDER IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER GRANTING DEBTOR ADDITIONAL TIME TO FILE ITS STATEMENTS AND SCHEDULES**<br><br>Date of Hearing:  May 3, 2006<br>Time of Hearing:  9:30 a.m.<br>Place: Courtroom No. 1, Third Floor<br>       Foley Federal Building<br>       300 Las Vegas Blvd., S.<br>       Las Vegas, NV 89101<br><br>Judge: Hon. Linda Riegle |

    Gregory J. Walch and Shauna M. Walch, Co-Trustees of the Gregory J. and Shauna M. Walch Family Trust (the "Trust"), by and through their undersigned attorney, hereby join in the OPPOSITION TO MOTION FOR ORDER GRANTING DEBTOR ADDITIONAL TIME TO FILE ITS STATEMENTS AND SCHEDULES filed by Jones Vargas and Janet L. Chubb, Esq., on behalf of numerous direct lenders and docketed by the Clerk as Docket Number 53 (the "Opposition") for the reasons set forth in the Opposition and for the following additional reasons:

    1.  As set forth in the Declaration of Gregory J. Walch attached hereto as Exhibit 1, Debtor has refused to disclose the status of the 107 loans arranged by Debtor (the "Loan

01969-00/78444.doc

Status"), and more specifically the status of the four loans made by the Trust and serviced by Debtor after numerous requests by the Trust to do so as required by the service agreement entered into between the Trust and USA Commercial Mortgage in early 2005;

2. The Loan Status should be readily available and confirmed by now, and Las Vegas Review Journal articles both Friday, April 28, 2006, and Sunday, April 30, 2006, make it clear that Debtor has made the Loan Status available to the Nevada Mortgage Lending Division of the Nevada Department of Business and Industry. See RJ articles attached to the Declaration of Gregory J. Walch as tab 2. The individual lenders for which USA Commercial Mortgage arranged and serviced loans are entitled to the same information.

## Conclusion

For the reasons set forth above and in the Opposition, the Trust opposes Debtor's request to delay filing statements and schedules and requests that the Loan Status be made available to the Trust and other individual lenders immediately.

Dated this __1st__ day of __May__, 2006.

_____
Gregory J. Walch, Esq.
Nevada Bar Number 4780
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone: 702/791-0308
Facsimile: 702/791-1912

*Attorney for Gregory J. Walch and Shauna M. Walch, Trustees of the Gregory J. and Shauna M. Walch Family Trust*

01969-00/78444.doc

# EXHIBIT

# 1

```
1   Gregory J. Walch
    Nevada Bar Number 4780
2   Email: GWalch@Nevadafirm.com
    400 South Fourth Street, Third Floor
3   Las Vegas, Nevada 89101
    Telephone:    702/791-0308
4   Facsimile:    702/791-1912

5   Attorney for Gregory J. Walch and Shauna M. Walch,
    Trustees of the Gregory J. and Shauna M. Walch
6   Family Trust
```

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| In re:<br><br>USA COMMERCIAL MORTGAGE COMPANY,<br><br>Debtor. | Case No.: 06-10725-LBR<br>Chapter 11<br><br>**DECLARATION OF GREGORY J. WALCH IN SUPPORT OF JOINDER IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER GRANTING DEBTOR ADDITIONAL TIME TO FILE ITS STATEMENTS AND SCHEDULES**<br><br>Date of Hearing:    May 3, 2006<br>Time of Hearing:    9:30 a.m.<br>Place: Courtroom No. 1, Third Floor<br>Foley Federal Building<br>300 Las Vegas Blvd., S.<br>Las Vegas, NV 89101<br><br>Judge: Hon. Linda Riegle |
|---|---|

    1. I am an attorney licensed to practice law in the State of Nevada and am a co-trustee of the Gregory J. and Shauna M. Walch Family Trust ("the Trust"). I am submitting this declaration in support of the Trust's JOINDER IN OPPOSITION TO DEBTOR'S MOTION FOR ORDER GRANTING DEBTOR ADDITIONAL TIME TO FILE ITS STATEMENTS AND SCHEDULES ("Extension of Time Request"), and make this declaration based upon my personal knowledge.

    2. The Trust is a direct lender in four loans arranged by USA Commercial Mortgage ("UCM") over the past 13 months (the "Loans"). I executed on behalf of the Trust a Loan Servicing Agreement between the Trust and UCM, which provided, among other things, that

01969-00/78445.doc

1  UCM would collect interest and, if applicable, principal owed by the borrowers to the Trust on a
2  monthly basis from each of the Loans, charge a service fee of up to 3% per annum (netting the
3  Trust between 12% and 12.5% yield), and distribute the payment to the Trust and other direct
4  lenders.  A copy of the Loan Servicing Agreement is attached at tab 1.

5       3.  As set forth in the Loan Servicing Agreement, UCM is to keep records showing the
6  payments by borrowers on the Loans and make such records available upon request during
7  business hours.  Since the petition date in this proceeding, the Trust has inquired of Debtor's
8  post-petition manager, bmc, on at least three occasions about the status of the Loans.  Bmc
9  refuses to disclose the information, and now seeks to further delay required disclosures.  The
10 Trust, and presumably similarly situated individual lenders, needs the information to determine
11 what actions are necessary to collect any amounts that may be past due on the Loans.  For
12 example, one of the Trust's loans (to Roam Development Group L.P., a Texas limited
13 partnership) was for a condominium conversion near Galveston, Texas.  I called the complex
14 April 25, 2006, and was told that apartments were being converted to condominiums as the
15 apartments were vacated by renters and about ½ have been sold as condominiums.  In my
16 reading of the deed of trust, such sales would result in the right of beneficiaries to, at a minimum,
17 accelerate partial payment of principal under the note.  To my knowledge, no reconveyance of
18 the security interest has been given.  Yet sales continue while Mr. Allison's group seeks to keep
19 the information from the Trust and other lenders.  Under the circumstances, asking for patience
20 as Mr. Allison did in yesterday's Las Vegas Review Journal article, attached at tab 2, is asking
21 the court to allow Debtor to perpetuate UCM's, and now Debtor's, ongoing compromise of
22 lender/beneficiary rights.

23      4.  The Loan status should be readily available and confirmed by now, and Las Vegas
24 Review Journal articles both Friday, April 28, 2006, and Sunday, April 30, 2006, make it clear
25 that Debtor has made the Loan status available to the Nevada Mortgage Lending Division of the
26 Nevada Department of Business and Industry.   See RJ articles attached hereto at Tab 2.

27
28

01969-00/78445.doc

5. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this __1st__ day of __May__, 2006.

_____
Gregory J. Walch, Esq.

400 South Fourth Street, Third Floor, Las Vegas, Nevada 89101
(702) 791-0308 – Fax (702) 791-1912

- 3 -

01969-00/78445.doc

# EXHIBIT

# 1

# LOAN SERVICING AGREEMENT

This Loan Servicing Agreement ("Agreement") is made as of the 7th day of March, 2004, between USA Commercial Mortgage Company ("USA") and Gregory J. Walch Trustee of the Gregory J. Walch and Shauna M. Walch Family Trust dated 11/12/04 ("Lender").

**RECITALS**

A.  USA is a mortgage broker and loan servicer in Clark County, Nevada.

B.  Lender lends, or wishes to lend, money to various borrowers (the term "Borrower" includes single and married persons, corporations, trusts, partnerships and all other legal entities) from time to time, which loans are arranged by USA and are secured by interests in real and/or personal property.

C.  Lender wishes to retain the services of USA in connection with making and servicing a loan or loans ("Loan" or "Loans" as the context requires), including all Loans heretofore or hereafter placed by Lender through USA, all upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Services in Connection with Arranging the Loans. USA will perform the following services in connection with arranging each Loan:

    (a)  Obtain a promissory note or notes secured by the trust deed referred to in Section 1(b) below, executed by Borrower in a form customarily used by USA and approved by USA's counsel.

    (b)  Obtain a deed of trust, assignment of rents and security agreement executed by Borrower in form customarily used by USA and approved by USA's counsel, and cause the same to be properly recorded.

    (c)  Obtain one or more personal or corporate guaranties, if applicable and as determined by USA to be necessary, executed by such guarantors, as USA shall deem appropriate, in form customarily used by USA.

    (d)  If USA deems it appropriate or necessary, obtain, at Borrower's expense, an appraisal of the property to be encumbered, prepared and executed by an appraiser reasonably satisfactory to USA.

    (e)  Obtain from a reputable title insurance company, at Borrower's expense, a fully-paid ALTA lender's policy of title insurance, showing Lender as an insured, in an amount at least equal to the initial principal amount of the note and showing as exceptions only those items approved by USA and its counsel.

    (f)  Cause the Borrower to obtain, where applicable, casualty insurance policies in amounts at least equal to the principal amount of the note or the full insurable value of the improvements on the

v.1 Rev. 8/04

1

encumbered real property, whichever is less, containing a mortgage or loss payee clause naming Lender, or USA (as agent for Lender), as an additional insured or loss payee.

(g) Obtain from the Borrower and each guarantor such recent financial statements and information as USA shall deem appropriate.

(h) Obtain, with respect to any and all encumbrances of record to which Lender's deed of trust will be subject, documentation verifying the principal balance thereof within a reasonable time prior to the making of the Loan and specifying any then existing defaults thereunder.

(i) Obtain such other documents in connection with the Loan, as USA may deem appropriate in order to protect the Lender's interest.

(j) All documents which USA obtains from borrower in connection with arranging or servicing any Loan, so long as such Loan is outstanding, shall be kept on file in USA's corporate office and be available to Lender upon request. Notwithstanding the foregoing, USA shall have no obligation or responsibility to obtain any original documents in connection with any Loan serviced by USA, but not arranged or originated by USA.

(k) Prepare and deliver to escrow closing instructions to effectuate the Loan closing in accordance with the Loan Agreement and the Fee Agreement.

2. Services of USA in Connection with Servicing the Loans. Subject to and in accordance with the terms and conditions set forth in this Agreement, and all applicable laws, Lender instructs and authorizes USA to, and USA will perform the following services in connection with servicing each of the Loans:

(a) Verify, where applicable, that the property encumbered by Lender's deed of trust is insured (at the Borrower's expense) by a sufficient casualty insurance policy and that Borrower has sufficient liability insurance coverage. USA will hold for the Lender's account such policies and renewals thereof.

(b) Keep appropriate accounting records on each note and the sums collected thereon, which records will reflect the amounts collected as to principal, interest and late charges, and, if applicable, insurance, taxes and other specified amounts. Those records will be available for review by the Lender during regular business hours at USA's corporate office.

(c) Until the total amount due under each note is paid in full:

(i) Proceed diligently to collect all payments due under the terms of the note and promptly pay the proper parties, when and if due, principal, interest, late charges, insurance and other specified funds.

(ii) In the event the Borrower fails to make any payment to USA as required by the terms of the note, USA will take steps to collect the payment including but not limited to delivering default notices, commencing and pursuing foreclosure procedures, and obtaining representation for Lender in litigation and bankruptcy proceedings as deemed necessary or appropriate by USA in its business judgment to fully protect the interests of the Lender, and of all Lenders in the loan.

v.1 Rev. 8/04                                      2

(iii)  In its sole discretion, USA may pay off any Lender at any time by paying the then outstanding balance of Lender's interest in the principal of the Loan, plus all accrued interest and any prepayment penalty or fee, if applicable. Any Lender so paid off shall concurrently execute and deliver therewith to USA an assignment, in a form acceptable to USA, of all of such Lender's right, title, and interest in the Loan (including all documents evidencing the Loan) and in the deed of trust securing the Loan.

(iv)  In its sole discretion, USA may waive late payment charges, assumption fees, charges for returned checks due to insufficient funds, or other fees which may be collected in the ordinary course of servicing the Loans.

(d)  Provide the Lender with regular statements regarding loan collections, but in no event less frequently than quarterly.

(e)  Without limiting the generality of anything contained herein, Lender hereby authorizes and empowers USA, on Lender's behalf, to: (1) execute and deliver demands for payoff and beneficiary's / lender's statements of condition and the like; (2) execute and deliver any and all instruments if satisfaction or cancellation, or of partial or full release, discharge, or reconveyance, or authorizations in connection therewith, with respect to any Loans paid in full and with respect to the related real or personal property securing such Loans; (3) execute and deliver any and all other documents with respect to any Loans that are customary and consistent with loan servicing practices pertaining to such loans; (4) consent to modifications of the Loans if the effect of any such modification will not materially or adversely affect the security provided by the real or personal property in connection therewith; (5) institute foreclosure proceedings (judicial or non-judicial), obtain a deed-in-lieu thereof, engage in settlement discussions, and enter into forbearance and other settlement-related agreements (which agreements may contain provisions that release or waive claims against a Borrower or Guarantor); and (6) take title in the name of Lender (in proportion to its interest in the Loan) to any real property upon a foreclosure or delivery of a deed-in-lieu thereof. Notwithstanding the foregoing or any other provision contained herein, USA may not permit any modification to any Loan that would change the interest rate, forgive the payment of any principal or interest (expressly excluding late charges or the difference between default and non-default interest), change the outstanding principal amount, or extend the maturity date, without Lender's prior consent; provided, however, if Lender fails to grant or deny its consent within three (3) business days after notice from USA, Lender shall be deemed to have conclusively given its consent.

3.  <u>Rights of Lender if USA Fails to Act.</u>  Pursuant to NAC 645B.073, in the event of default, foreclosure, or other matters that require action, if for any reason USA fails to act on Lender's behalf as authorized herein, then Lender may, with approval of fifty-one percent (51%) or more of all of the holders of the beneficial interest of record in the Loan, act on behalf of all such holders of beneficial interest of record. These actions may include, but are not limited to:

(a)  the designation of the mortgage broker, servicing agent or other person to act on behalf of the holders of the beneficial interests in the loan; and

(b)  the sale, encumbrance or lease of real property owned by the holders resulting from a foreclosure or the receipt of a deed in lieu of a foreclosure.

v.1 Rev. 8/04

4.  **Legal Proceedings.**  USA will assist the Lender in any necessary foreclosure proceedings to protect the Lender's interest in the note and deed of trust. Where necessary, in USA's business judgment, USA may retain attorneys on Lender's behalf. Any legal proceeding instituted by USA pursuant to this Agreement may be pursued in USA's name only or as agent for Lender. Upon demand by USA, Lender agrees to promptly pay, either in advance or to reimburse USA, for its pro rata portion of the out-of-pocket expenses incurred, including attorney's fees, trustee's fees and foreclosure costs. In the event that Lender fails to pay such sums to USA upon demand or request thereof, or if USA elects to advance such sums, USA may, in its discretion, advance such fees, including trustee's fees, attorney's fees, and costs of foreclosure; provided, however, that any fees advanced by USA shall be paid back from the proceeds of the foreclosure (whether by reinstatement or sale), or from any other monies collected with respect to such Loan, before any payments are made to Lender. In the event of any litigation concerning the Loan, Lender hereby appoints USA as its agent to accept service of any summons and complaint, naming Lender as a party.

5.  **Compensation to USA for Loan Servicing.**  Lender authorizes USA to retain monthly, as compensation for services performed hereunder, (a) one-twelfth (1/12th) of its annual servicing fee, which shall not exceed three percent (3%) per annum of the maximum principal amount of each of the Loans, (b) any late charges collected from the Borrower pursuant to the terms of the Note, and (c) and default interest collected from the Borrower pursuant to the terms of the Note. Notwithstanding the foregoing, it is agreed and acknowledged that USA derives the bulk of its revenues from charging loan fees ("points") to the Borrower. Certain Borrowers, however, may prefer to pay a higher rate of interest in exchange for a reduction in loan fees payable in advance to USA, the higher interest rate comprising a deferred loan fee. USA will notify Lender when such a case arises, and advise Lender of what portion of the interest is payable to USA as a deferred loan fee.

Should Lender desire to sell all or any part of its interest in the note and deed of trust, USA will assist Lender in finding potential buyers and completing the necessary documentation for the transaction. A fee of 5% of the remaining balance of Lender's undivided interest in the note amount will be deducted from the selling price and paid to USA on all such assignments for which USA locates the Assignee.

In the event an extension of a Loan is negotiated, USA shall be entitled to charge a fee therefor from the Borrower pursuant any separate fee agreement between USA and the Borrower.

6.  **USA's Right to Delegate.**  Notwithstanding anything contained herein, USA may in its sole discretion delegate specific loan arranging and servicing obligations to credit bureaus, real estate tax service companies, real estate brokers or agents, appraisers, attorneys, trustees, or others, provided that USA shall remain responsible for all action taken or not taken by such companies, agents, representatives, and others throughout the term of this Agreement.

7.  **No Legal Advice.**  Lender acknowledges that USA will not act as Lender's attorney or provide legal advice to Lender, and that Lender is encouraged to seek independent counsel in connection with any questions Lender may have concerning this agreement, any Loan, USA's form loan documents, or any other matter.

8.  **Termination.**  Lender may, by 30 days written notice to USA, terminate this agreement, and the power of attorney granted, if one is granted, under Section 11 of this Agreement, if USA fails to perform its obligations hereunder.

9. **Lender's Registration.** Lender(s) name as listed in the first paragraph of this Agreement is the exact form for registration of Lender's interest and for reference to Lender in the Loan Documents.

10. **Integration Clause.** This Agreement contains the entire agreement between the parties hereto and cannot be modified except by a written amendment signed by both parties. The invalidity of any portion of this agreement shall in no way affect the balance thereof. This Agreement shall remain in effect until Lender's interest in all notes and deeds of trust with respect to Loans arranged and/or serviced by USA is completely liquidated (unless sooner terminated in accordance with the terms hereof).

11. **Limited Power of Attorney.** With respect to each loan, Lender hereby agrees that USA shall have full power and authority, and Lender hereby appoints USA as its true and lawful attorney-in-fact to (a) hold the original note(s), and (b) to do all things and take all actions on behalf of Lender which are necessary or convenient to effectuate this Agreement and its intent and to protect Lender's interest under any note, deed of trust, guaranty, security agreement or other document pertaining to any Loan. Upon USA's request, Lender hereby agrees to execute and deliver, in the presence of a notary public, a "Declaration of Agency and Limited Power of Attorney", in a form consistent with Chapter 645B of the Nevada Revised Statutes, pursuant to which Lender shall further evidence the appointment of USA as Lender's true and lawful attorney-in-fact to undertake the duties of USA hereunder. No one shall be required to look beyond such Declaration of Agency and Limited Power of Attorney for evidence of USA's authority hereunder. All Declarations of Agency and Limited Powers of Attorney may include the language: This document may be executed with counterpart signature pages, and the document with all counterpart signature pages shall constitute one and the same instrument.

12. **Notices.** All notices, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been given (i) when personally delivered, or (ii) on receipt, when deposited with a recognized overnight courier service such as Federal Express or DHL, or (iii) three (3) business days after the date when deposited in the United States mail and sent postage prepaid by registered or certified mail, return receipt requested, addressed as follows:

If to USA:   USA Commercial Mortgage Company
             4484 S. Pecos Road
             Las Vegas, Nevada 89121-5030
             Attention:

If to Lender:



             Attention:

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

13. **Governing Law.** This Agreement shall be construed in accordance with the laws of the State of Nevada, without regard to the conflict of laws or rules thereof, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws,

v.1 Rev. 8/04

5

14. <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

15. <u>Attorney's Fees.</u> In the event any party hereto brings an action to enforce any of the provisions of this Agreement, the party against whom judgment is rendered in such action shall be liable to the other for reimbursement of its costs, expenses and attorneys' fees, including such costs, expenses and fees as may be incurred on appeal,

16. <u>Successors and Assigns.</u> This Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors and assigns.

17. <u>Headings.</u> Sections headings used in this Agreement are for convenience only and shall not affect the meaning or interpretation of this Agreement.

18. <u>Authority.</u> Each party represents and warrants to the other party that it is duly authorized to execute, deliver and perform this Agreement.

IN WITNESS WHEREOF, the parties hereto have signed, sealed, acknowledged and delivered this instrument the day and year first above written.

LENDER: Gregory J. Walch Trustee of the Gregory J. Walch and Shauna M. Walch Family Trust dated 11/12/04

By: _____
Name: Gregory J. Walch
Title: Trustee

By: _____
Name: _____
Title: _____


USA COMMERCIAL MORTGAGE COMPANY

By: _____
    Joseph D. Milanowski, President

v.1 Rev. 8/04

6

# EXHIBIT

# 2

# reviewjournal.com

 PRINTTHIS

Apr. 28, 2006
Copyright © Las Vegas Review-Journal

## Most of lender's loans overdue

### Companies with ties to executives got loans

By JOHN G. EDWARDS
REVIEW-JOURNAL

About 58 percent of the loans at USA Capital, a private lender with $950 million in assets that filed for bankruptcy two weeks ago, are delinquent by two months or more and many of the delinquents loans were made to companies partly owned by USA Capital executives, a state official said Thursday.

Mortgage Lending Commissioner Scott Bice said 62 of 107 loans at USA Capital are delinquent. Of those, 47 loans were made to entities owned in part by the former owner-operators of USA Capital, Bice said.

The commissioner said he received the count of bad loans from Thomas Allison, interim chief restructuring officer at USA Capital.

USA Capital is one of 30 Nevada private lenders that is licensed to raise money from individual investors for short-term, high-yield loans secured by real estate. The borrowers typically are developers, home builders and others who provide real estate as security for the loans.

Many of the loans USA made in the last 12 months were made to projects in which USA Capital's partners owned a stake, Bice said.

It is illegal under Nevada law for private lenders such as USA Capital to use investor money they raised to make loans to themselves unless the lenders' ownership interest in the project was disclosed to investors, Bice said.

Bice said his examiner found documents that disclosed the ownership interest of USA Capital's owners in the real estate projects, but he didn't know whether investors saw those disclosure statements.

Bice, who has been getting 80 phone calls daily about USA Capital, said many investors said they did not get information that USA Capital's owners were borrowing from the company.

"Eighty percent of the people I talk to really don't know what they invested in," Bice said.

Some of the individuals also had made investments in Harley Harmon Mortgage, Interstate Mortgage Group

and Global Express Capital, private lenders that failed in recent years. Yet, these individuals still entrusted funds to USA Capital, he said.

Bice said he is preparing to attach conditions on the license held by USA Capital that would prevent the private lender from using investor funds to make any new loans. Any additional loans at this point would need to be financed by institutional lenders.

Allison said he has been speaking with three large institutional investors that are willing to provide a $100 million line of credit to USA Capital.

"We're open for business, and we are continuing to evaluate new opportunities," Allison said Wednesday.

Allison said he hopes to reorganize the company, work out the problem loans and bring USA Capital out of Chapter 11 bankruptcy. Industry insiders, speaking on condition of anonymity, say they question whether USA Capital would be viable, because the bankruptcy filing damaged the company's credibility.

Bice said he decided not to revoke or suspend USA Capital's license, because that would prevent the company, now under Allison's control, from servicing loans. Suspending or revoking the license because of insolvency at USA Capital would force the private lender into liquidation, which Bice said he wants to avoid.

"Frankly, a fire sale at this point is not in the best interest of the investors," Bice said.

Bice said it had been 16 months since the Mortgage Lending Division sent examiners to review USA Capital's financial books and records.

State law requires annual financial reviews of mortgage lenders, but he said he has been allowed to hire only seven examiners. As a result, the division has to set priorities for examinations, Bice said.I

In addition to private lenders, the division has responsibility for regulating a separate kind of mortgage brokers who help people finance or refinance homes using money from lenders such as banks.

**Find this article at:**
http://www.reviewjournal.com/lvrj_home/2006/Apr-28-Fri-2006/business/7090966.html

☐ Check the box to include the list of links referenced in the article.

# reviewjournal.com

 PRINTTHIS

Apr. 30, 2006
Copyright © Las Vegas Review-Journal

## Turnaround pro calls for patience at USA Capital

### Interim chief restructuring officer aims to right lender

By JOHN G. EDWARDS
REVIEW-JOURNAL

Thomas Allison, the interim chief restructuring officer for USA Capital, said he feels a little like a sheriff, albeit a sheriff dressed in pinstriped suits who speaks softly like the banker he once was.

"I'm here as the new sheriff in town," said Allison. "My job right now is to rectify the past and look to the future, turning this business around."

The owners of USA Capital, the $950 million asset private lender that filed for bankruptcy protection two weeks ago, selected Allison to help turn around the insolvent company. Bankruptcy Judge Linda Riegle appointed Allison to run the insolvent private lending company, primarily for the benefit of 3,600 individual investors who plowed cash into mortgage loans originated at USA Capital.

Allison is urging investors to be calm and patient.

"We're taking the steps that are necessary to turn this business around. What we need is some patience now," Allison said. "I understand the angst of the investors. People are going to lose some of their money, but they're not going to lose all of their money."

USA Capital was paying interest on all its loans, although many were delinquent. Before Allison's appointment, USA Capital filed monthly reports with the Mortgage Lending Division, falsely showing that all of its borrowers were making timely loan payments.

USA Capital filed for bankruptcy court protection, because it got to the point where it didn't have the cash to make these interest payments, Allison said.

Allison said he intends to restore the company to financial health, continue operations and bring it out of Chapter 11 bankruptcy as an ongoing concern.

Chapter 11 allows for businesses to reorganize, unlike Chapter 7 bankruptcy, which provides for a liquidation of assets for the benefit of creditors.

Allison cited his and his firm's track record of resuscitating big, troubled businesses. He is executive vice president of Mesirow Financial, the Chicago-based turnaround company that helped United Airlines emerge

from bankruptcy as an operating business in February. Mesirow is helping Delta Air Lines with its Chapter 11 bankruptcy.

For a company more similar to USA Capital, Allison pointed to Illinois-based Comdisco Holding Co., a $15 billion leasing company. He helped Comdisco successfully shed bankruptcy in 2002.

Allison started his career dealing with problem loans at First National Bank of Chicago. He served as the partner-in-charge of Arthur Andersen's restructuring practice. He is founder and former chairman of the Association for Certified Turnaround Professionals.

"We're open for business, and we are continuing to evaluate new opportunities," Allison said. "We're working very hard to straighten this business out. We're working very hard to get the investor's money back."

Some industry insiders wonder how USA Capital will be able to raise money from investors, given the credibility the company lost when it filed for bankruptcy.

Private lenders such as USA Capital solicit money from individual investors and use that money to make high-yield, short-term mortgage loans to developers, home builders and others with real estate to secure the loan.

Investors are attracted by the double-digit interest they can earn on these loans and by the relative security of having real estate as collateral, but the loans have risks. The Mortgage Lending Division this week disclosed that 62 of the 107 loans at USA Capital are two months or more behind in payments.

The owners of USA Capital owned stakes in many of the projects that are delinquent, Mortgage Lending Commissioner Scott Bice said.

The next level of protection is the real estate that secures the loans.

Allison said the loans he has reviewed had appraisals suggesting the value of the real estate exceeded the loan amount when the loans were funded. He said he intends to ask the judge for authority to retain Hilco Appraisal Services to reappraise the collateral. If approved, Hilco will be directed to complete the appraisals within 30 days, he said.

Allison said he is working hard and fast to restore USA Capital to financial health. He hopes to file a bankruptcy reorganization plan within a year, but first he intends to sort through the accounts and determine who owns what interest in which loans.

"We're taking time out to sort out each of the investor's positions," he said.

**Find this article at:**
http://www.reviewjournal.com/lvrj_home/2006/Apr-30-Sun-2006/business/7074347.html

☐ Check the box to include the list of links referenced in the article.