Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

and

Lenard E. Schwartzer
Nevada Bar No. 0399
Jeanette E. McPherson
Nevada Bar No. 5423
Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146-5308
Telephone:  (702) 228-7590
Facsimile:  (702) 892-0122
E-Mail:  bkfilings@s-mlaw.com

Proposed Attorneys for Debtor and Debtor-in-Possession

**E-Filed on May 3, 2006**

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>USA COMMERCIAL MORTGAGE COMPANY,<br><br><div align="right">Debtor.</div> | Case Nos. BK-S-06-10725  LBR<br><br>Chapter 11<br><br>**MOTION AUTHORIZING DEBTOR, PURSUANT TO 11 U.S.C. § 105 AND § 363(b)(1), TO ACCEPT LOAN PAYMENT PROCEEDS AND PROVIDE PARTIAL RELEASES OR FULL RELEASES IN CONNECTION WITH THE SALE OF PROPERTIES SECURING LOANS ORIGINATED BY THE DEBTOR TO THIRD-PARTY BORROWERS, AND TO RATIFY PARTIAL RELEASES PREVIOUSLY PROVIDED BY THE DEBTOR**<br><br>Date:  OST Pending<br>Time:  OST Pending |

/ / /

/ / /

P:\USA Commercial Mortgage\USA Commercial Mortgage Company\Pleadings\Motion to Approve Transactions In Ordinary Course.DOC

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    USA Commercial Mortgage Company ("Debtor"), by and through its counsel Lenard E.

2    Schwartzer, Esq. of Schwartzer & McPherson Law Firm, hereby files this Motion Authorizing

3    Debtor, Pursuant To 11 U.S.C. § 105 and § 363(b)(1), To Accept Loan Payment Proceeds And

4    Provide Partial Releases Or Full Releases In Connection With The Sale Of Properties Securing

5    Loans Originated By The Debtor To Third-Party Borrowers, And To Ratify Partial Releases

6    Previously Provided By The Debtor (the "Motion").  This Motion is made and based upon 11

7    U.S.C. §§ 105, 363, the Points and Authorities set forth herein, including the pleadings on file, and

8    any argument presented at the time of the hearing on this Motion.

9    As set forth herein, the Debtor  requests that this Motion be granted to satisfy Debtor's critical and

10   immediate need to assure its borrowers and other interested parties for real estate transactions on

11   the secured loans originated by the Debtor, that the Debtor is able to satisfy its contractual

12   obligations in connection with real estate closings, to accept loan payment proceeds, and provide

13   the partial releases or full releases required in connection with the sale to bona fide purchasers of

14   properties securing such loans.  The Debtor believes that most, if not all, of the actions that Debtor

15   is required to take in connection with these real estate closings are ordinary course of business

16   transactions, but the parties to these closings, including borrowers, purchasers, title companies and

17   senior lenders, have been questioning whether the Debtor has the ability and authority to

18   participate in these closings.  Therefore, Debtor has filed this Motion to seek assurance for

19   interested parties that the actions taken and to be taken in the future by the Debtor in connection

20   with these closings are authorized by the Bankruptcy Code and the Court.  The Debtor further

21   requests ratification by the Court of any partial releases already provided by the Debtor

22   postpetition for any of the loans outlined in this Motion.

23                              **POINTS AND AUTHORITIES**

24                              <u>**Factual Background**</u>

25   1.    Prior to the Petition Date, Mesirow Financial Interim Management, LLC ("MFIM") was

26   employed by the Debtors (defined below) to serve as financial advisors to evaluate restructuring

27   alternatives, including filing a petition for relief under Chapter 11 of the Bankruptcy Code for

28   USA Securities, LLC, USA Capital Reality Advisors, LLC, USA Commercial Mortgage

- 2 -

1    Company, USA Capital Diversified Trust Deed Fund, LLC, and USA Capital First Trust Deed

2    Fund, LLC (collectively, the "Debtors").

3        2.    Pursuant to a resolution entered into by each of the Debtors, in the event of a bankruptcy

4    filing, Thomas Allison was appointed as the sole Manager of the four Debtors who are limited

5    liability companies (USA Securities, USA Realty, Diversified Fund, and First Deed Fund), and as

6    the president of Debtor USA Commercial Mortgage Company, with full authority to oversee the

7    restructuring and reorganization of the Debtors' unified business enterprise and to make all

8    business and financial decisions for the Debtors, including taking control of all bank accounts and

9    other assets of these Debtors. Thomas Allison's subsequent interim appointment as the chief

10    restructuring officer of each of the Debtors was approved by this Court on April 19, 2006.

11        3.    Following their engagement by the Debtors, MFIM spent considerable time evaluating,

12    examining and analyzing the Debtors' books and records, financial data, cash management

13    system, loan portfolios, mortgages, agreements and all other documents made available to MFIM.

14        4.    The Debtors' business operations are best described as originating, underwriting,

15    brokering and servicing commercial loans or fractional interests therein, including accepting loan

16    payments arising from the sale of secured properties and releasing collateral in connection with

17    such sales and loan payments.

18        5.    Approximately 3,600 investors have made individual investments in loans originated by

19    the Debtor, and these investors have participated in fractional interests in loans on various real

20    estate construction projects and other real property developments. At the time that these investors

21    contracted to participate as lenders of fractional interests in these loans, they also entered into an

22    individual Loan Servicing Agreement (the "Investor Servicing Agreements") with the Debtor

23    whereby they authorized and empowered the Debtor, on behalf of each investor, to execute and

24    deliver instruments of satisfaction or cancellation and partial releases or full releases (or related

25    authorizations) in connection with paid loans and the collateral securing the paid loans (the

26    "Investor Authorizations"). A true and correct copy of one of the Loan Servicing Agreements

27    executed by one of the investors is attached hereto as **Exhibit "A"** and incorporated herein.

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

P:\USA Commercial Mortgage\USA Commercial Mortgage Company\Pleadings\Motion to Approve Transactions In
Ordinary Course.DOC

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    6.    This Loan Servicing Agreement is dated June 17, 2004, and is between the Debtor and

2  Charles B. Anderson Trustee of the Charles B. Anderson Trust as Lender (this Lender is an

3  investor in the 5252 Orange Loan, the 60th Street Venture Loan, the Bay Pompano Beach Loan,

4  and the Gramercy Court Loan referred to in this Motion).  Among other powers, Debtor is

5  authorized pursuant to Section 2(e)(1), (2) & (3) of this Loan Servicing Agreement to do the

6  following:  "(e)  Without limiting the generality of anything contained herein, Lender [investor]

7  hereby authorizes and empowers USA [Commercial Mortgage Company], on Lender's

8  [investor's] behalf, to:  (1) execute and deliver demands for payoff and beneficiary's / lender's

9  statements of condition and the like; (2) execute and deliver any and all instruments [of]

10  satisfaction or cancellation, or of partial or full release, discharge, or reconveyance, or

11  authorizations in connection therewith, with respect to any Loans paid in full and with respect to

12  the related real or personal property securing such Loans; (3) execute and deliver any and all other

13  documents with respect to any Loans that are customary and consistent with loan servicing

14  practices pertaining to such loans . . . ."

15    7.    Two other groups of investors totaling approximately 3,200 investors own membership

16  interests in USA Capital Diversified Trust Deed Fund, LLC ("Diversified Trust Deed Fund") and

17  USA Capital First Trust Deed Fund, LLC ("First Trust Deed Fund").  The Diversified Trust Deed

18  Fund and the First Trust Deed Fund are sometimes collectively referred to as the "Funds".  The

19  3,200 investors in the Funds own membership interests in the two Funds which in turn hold

20  commercial loans, or shares of commercial loans along with other investors, including the

21  individual investors noted above.  The Funds are managed by USA Realty Advisors, LLC

22  ("USARA"), and the Debtor serves as the servicing agent.

23    8.    In the past, the Debtor received cash from investors including cash from the Funds and

24  deposited these monies into an investor account.  From this account, the Debtor funded the

25  commercial loans it originates and underwrites.  These loans are not owned by the Debtor except

26  in a few cases where the Debtor owns a fractionalized interest in the commercial loan.  The Debtor

27  received a loan origination fee on each commercial loan it originated and funds with investors'

28  money.

9.          As the borrowers pay interest on their commercial loans or repay principal, the
funds are deposited by the Debtor into a collection account. In the past, it appears that interest was
disbursed to the investors and the Funds each month. The investors received their contractual
interest payment regardless of whether or not the underlying borrower made payments on their
loans. There was no distinction in the treatment of the 3,600 investors who hold fractional
interests in specific loans and the 3,200 investors who own membership interests in the Funds. All
are identified and treated the same. All have been paid interest in the same manner, without
tracing, and irrespective of the source of the funds.

10.          Pursuant to the Investor Authorizations, it has been Debtor's customary practice,
consistent with industry standards, to provide partial releases or full releases for a real estate
closing involving the sale of a portion or all of the real property securing one of the loans
originated by the Debtor in exchange for receipt of the loan payment proceeds to which the Debtor
is entitled arising out of such closing. Debtor's execution of partial releases or full releases and
other documentation on behalf of the investors who own fractional interests in the secured loan is
performed on behalf of the investors pursuant to the Investor Authorizations.

11.  Following the Petition Date, Debtor has continued to receive requests for partial releases
and full releases in connection with regularly scheduled closings involving various secured loans
originated by the Debtor. It is the Debtor's belief that providing partial releases and full releases
consistent with the terms of the loan documentation for a secured loan originated by the Debtor is
a transaction in the ordinary course of business that the Debtor (as a debtor in possession
authorized to operate its business under 11 U.S.C. § 1108) may enter into without notice or a
hearing pursuant to 11 U.S.C. § 363(c)(1). However, the parties to these closings, including
purchasers of real property, the borrowers on the secured loans, title and escrow companies, and
senior lenders, continue to raise questions about the Debtor's authorization to provide partial
releases and full releases and to accept the loan repayment proceeds from such closings to which
the Debtor is entitled under the terms of the loan documentation.

12.   Debtor and the investors will be severely damaged if these regularly scheduled closings
are delayed or canceled because of concerns by the parties to these closing about the Debtor's

- 5 -

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   authorization to participate in the closings on behalf of the investors. If the closings do not occur
2   and the sales of property fall through, the investors will lose sale proceeds which would otherwise
3   be paid to Debtor (as the servicer for the investors) in partial or full repayment of the secured loans
4   originated by Debtor. Debtor could also be charged with postpetition breaches of contract by its
5   borrowers and by senior lenders. Debtor's investors could lose confidence in Debtor's ability to
6   carry on with its normal operations and protect the interests of the investors. Debtor's long-term
7   reorganization prospects could be damaged (to the benefit of Debtor's competitors) if Debtor is
8   perceived to be unable to routinely participate in closings and provide the necessary partial
9   releases and full releases and other documentation necessary to complete the closings and receive
10  its share of the sale proceeds.

11      13.   The following descriptions of specific loans for which the Debtor has received
12  postpetition requests for partial or full releases provide examples of the issues now confronting the
13  Debtor. The Debtor originated a $5,800,000 secured loan to The Gardens, LLC, a Florida limited
14  liability company, on March 24, 2004. The Mortgage securing The Gardens loan encumbers
15  certain time share intervals. The partial release provision in the Mortgage securing The Gardens
16  loan provides that the borrower is entitled to a partial release of a time share interval in exchange
17  for payment to the Debtor of $3,550 for each time share interval to be released. Consistent with
18  the stated terms of this ordinary course of business transaction, following the Petition Date, Debtor
19  has been providing partial releases in exchange for the receipt of the agreed upon partial release
20  price for each time share interval to be released. Debtor requests ratification by the Court of the
21  partial releases already provided to this borrower and authorization by the Court to continue to
22  provide partial releases for closings on The Gardens Loan consistent with the terms of the secured
23  loan documentation.

24      14.   The Debtor originated a $2,500,000 secured loan to University Estates, Inc., an Ohio
25  corporation, on April 11, 2005 (later increased to $3,050,000, with the maximum loan amount
26  increased to $5,075,000). The partial release provisions in the Mortgage securing the University
27  Estates loan provide that the borrower is entitled to a partial release of a lot encumbered by the
28  Mortgage in exchange for payment to the Debtor of $37,600 per lot or acre. Debtor requests

– 6 –

1    authorization by the Court to provide partial releases for closings on the University Estates loan

2    consistent with the terms of the secured loan documentation.

3       15.   The Debtor originated a $32,000,000 secured loan to Bay Pompano Beach, LLC, a

4    Florida limited liability company, on June 20, 2005. The Mortgage securing the Bay Pompano

5    Beach loan encumbers various individual condominium units. The partial release provisions in the

6    Mortgage securing the Bay Pompano Beach loan provide that the borrower is entitled to a partial

7    release of an individual condominium unit in exchange for payment to the Debtor of 90% of the

8    net proceeds from the sale of a condominium unit, subject to the following minimum sale prices:

9    $150,253 for a Unit in The Skiff, $180,323 for a Unit in The Ketch, $208,453 for a Unit in The

10    Sloop, $218,153 for a Unit in The Schooner, $256,953 for a Unit in The Clipper, and $260,833 for

11    a Unit in The Windward. Debtor requests authorization by the Court to provide partial releases

12    for closings on the Bay Pompano Beach loan consistent with the terms of the secured loan

13    documentation.

14       16.   The Debtor originated a $3,700,000 secured loan to 60th Street Venture, LLC, a

15    California limited liability company, on December 22, 2005. The Deed of Trust securing the 60th

16    Street Venture loan encumbers various individual condominium units. The partial release

17    provisions in the Deed of Trust securing the 60th Street Venture loan provide that the borrower is

18    entitled to a partial release of an individual condominium unit in exchange for payment to the

19    Debtor of 100% of the net proceeds from the sale of a condominium unit, subject to the following

20    minimum sale prices: $238,500 for an "A" Unit, $261,000 for a "B" Unit, $288,000 for a "C"

21    Unit, $281,880 for a "D" Unit, and $332,235 for an "E" Unit. However, the Debtor's Deed of

22    Trust securing the 60th Street Venture loan is a junior deed of trust subject to the senior lien of

23    Bank of America, and the Debtor executed a Subordination and Intercreditor Agreement that was

24    recorded on December 30, 2005 with the San Diego County Recorder's Office in favor of Bank of

25    America, N.A. Pursuant to the Bank of America Subordination Agreement, the Debtor agreed that

26    all proceeds of the sale of any condominium unit would be applied to the senior lien of Bank of

27    America until the Bank of America senior debt is paid in full, and the Debtor further agreed that it

28    would issue a partial reconveyance of the Debtor's junior Deed of Trust in connection with each

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

- 7 -

1   condominium unit closing without payment of any portion of the sale proceeds until such time as

2   the Bank of America senior debt is paid in full. Several closings for sales of condominium units in

3   the 60th Street Venture project have been scheduled for April 28, 2006, and May 4, 2006, and

4   Bank of America and the borrower has assured the Debtor that the Bank of America senior debt is

5   still unpaid and have requested partial reconveyances from the Debtor for these closings. The

6   balance on the Bank of America senior debt after the April 28, 2006 and May 4, 2006 scheduled

7   closings is estimated at $7,721,948. Debtor requests ratification by the Court of the partial

8   releases already provided to this borrower and Bank of America and authorization by the Court to

9   continue to provide partial releases for closings on the 60th Street Venture loan consistent with the

10  terms of the secured loan documentation, including the terms of the Bank of America

11  Subordination Agreement.

12      17.     The Debtor originated a $3,800,000 secured loan to 5252 Orange, LLC, a California

13  limited liability company, on December 22, 2005. The Deed of Trust securing the 5252 Orange

14  loan encumbers various individual condominium units. The partial release provisions in the Deed

15  of Trust securing the 5252 Orange loan provide that the borrower is entitled to a partial release of

16  an individual condominium unit in exchange for payment to the Debtor of 100% of the net

17  proceeds from the sale of a condominium unit, subject to the following minimum sale prices:

18  $218,250 for an "A" Unit, and $234,400 for a "B" Unit. However, the Debtor's Deed of Trust

19  securing the 5252 Orange loan is a junior deed of trust subject to the senior lien of Bank of

20  America, and Debtor executed a Subordination and Intercreditor Agreement that was recorded on

21  December 30, 2005 with the San Diego County Recorder's Office in favor of Bank of America,

22  N.A. Pursuant to the Bank of America Subordination Agreement, the Debtor agreed that all

23  proceeds of the sale of any condominium unit would be applied to the senior lien of Bank of

24  America until the Bank of America senior debt is paid in full, and the Debtor further agreed that it

25  would issue a partial reconveyance of the Debtor's junior Deed of Trust in connection with each

26  condominium unit closing without payment of any portion of the sale proceeds until such time as

27  the Bank of America senior debt is paid in full. Several closings for sales of condominium units in

28  the 5252 Orange project have been scheduled for April 28, 2006, May 1, 2006, and May 5, 2006,

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

- 8 -

1    and Bank of America and the borrower have assured the Debtor that the Bank of America senior

2    debt is still unpaid and have requested partial reconveyances from the Debtor for these closings.

3    The balance on the Bank of America senior debt after the April 28, 2006 and May 1, 2006

4    scheduled closings is estimated at $2,909,990. Debtor requests ratification by the Court of the

5    partial releases already provided to this borrower and Bank of America and authorization by the

6    Court to continue to provide partial releases for closings on the 5252 Orange loan consistent with

7    the terms of the secured loan documentation, including the terms of the Bank of America

8    Subordination Agreement.

9         18.    The Debtor originated a $1,500,000 secured loan to 5055 Collwood, LLC, a California

10   limited liability company, on February 24, 2006. The Deed of Trust securing the 5055 Collwood

11   loan encumbers various individual condominium units. The partial release provisions in the Deed

12   of Trust securing the 5055 Collwood loan provide that the borrower is entitled to a partial release

13   of an individual condominium unit in exchange for payment to the Debtor of 100% of the net

14   proceeds from the sale of a condominium unit, subject to the following minimum sale prices:

15   $265,500 for a Floor Plan A, 1 bedroom/1 bath Unit, $346,500 for a Floor Plan B, 2 bedroom/2

16   bath Unit, and $427,500 for a Floor Plan C, 3 bedroom/2 bath Unit. In addition, the Debtor's

17   Deed of Trust securing the 5055 Collwood loan is a junior deed of trust subject to the senior lien

18   of Comerica Bank, and Debtor executed a Subordination Agreement on February 24, 2006, that

19   was recorded on March 6, 2006 with the San Diego County Recorder's Office in favor of

20   Comerica Bank. Pursuant to the Comerica Bank Subordination Agreement, the Debtor agreed that

21   all proceeds of the sale of any condominium unit would be applied to the senior lien of Comerica

22   Bank until the Comerica Bank senior debt is paid in full, and the Debtor further agreed that it

23   would issue a partial reconveyance of the Debtor's junior Deed of Trust in connection with each

24   condominium unit closing without payment of any portion of the sale proceeds until such time as

25   the Comerica Bank senior debt is paid in full. Several closings for sales of condominium units in

26   the 5055 Collwood project have been scheduled for April 28, 2006, and the borrower has assured

27   the Debtor that the Comerica Bank senior debt is still unpaid and has requested partial

28   reconveyances from the Debtor for these closings. The balance on the Comerica Bank senior debt

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

- 9 -

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    after the April 28, 2006 scheduled closings is estimated at $9,925,863. Debtor requests

2    ratification by the Court of the partial releases already provided to this borrower and Comerica

3    Bank and authorization by the Court to continue to provide partial releases for closings on the

4    5055 Collwood loan consistent with the terms of the secured loan documentation, including the

5    terms of the Comerica Bank Subordination Agreement.

6        19.    The Debtor originated a $10,462,500 secured loan (with possible increases to

7    $37,250,000) to Gramercy Court, Ltd., a Texas limited partnership, on June 25, 2004. The Deed

8    of Trust securing the Gramercy Court loan encumbers certain individual condominium units. The

9    partial release provision for the Deed of Trust securing the Gramercy Court loan provides that the

10   borrower is entitled to a partial release of an individual condominium unit in exchange for

11   payment to the Debtor of 100% of the net proceeds from the sale of a condominium unit (and

12   assurance that the loan to value ratio based on the remaining balance of the Gramercy Court loan

13   and appraised value of the remaining collateral after the sale shall not fall below 75%), subject to

14   the following minimum sale prices: $144,855 for a Type 1 Unit, $155,030 for a Type 2 Unit,

15   $189,810 for a Type 3 Unit, $199,615 for a Type 4 Unit, $223,850 for a Type 5 Unit, $235,135 for

16   a Type 6 Unit, $223,370 for a Type 7 Unit, and $230,695 for a Type 8 Unit. Debtor received

17   $203,325.95 from the sale of a Gramercy Court unit on April 19, 2006, following the Petition

18   Date, which may have been the proceeds from a postpetition sale and partial release of a Gramercy

19   Court unit. Debtor requests ratification by the Court of any partial releases already provided to

20   Gramercy Court, Ltd. and authorization by the Court to continue to provide partial releases for

21   closings on the Gramercy Court project consistent with the terms of the secured loan

22   documentation.

23       20.    The Debtor originated a $6,925,000 secured loan to Opaque Land Development, LLC, a

24   Nevada limited liability company, on November 5, 2003. On April 27, 2006, the Debtor received

25   a wire transfer in the amount of $5,867,134.46, which Debtor was advised represents a full payoff

26   of the Opaque Land Development loan. Debtor requests authorization by the Court to accept the

27   full payoff and provide a full release for the Opaque Land Development loan (once the Debtor has

28   verified that all amounts owed on the Opaque Land Development loan have been paid) consistent

- 10 -

1   with the terms of the secured loan documentation.

2       21.    The Debtor originated a $25,700,000 secured loan to Roam Development Group, L.P., a

3   Texas limited partnership, on March 23, 2005. The Deed of Trust securing the Roam

4   Development loan encumbers certain individual condominium units. The partial release provision

5   for the Deed of Trust securing the Roam Development loan provides that the borrower is entitled

6   to a partial release of an individual condominium unit in exchange for payment to the Debtor of

7   90% of the net proceeds from the sale of a condominium unit (provided that Roam Development

8   Group, L.P. as borrower is authorized to release the first 89 units of the Roam Development

9   project without paying any partial release price to Debtor, as shown on Exhibit "F" to the Roam

10  Development Loan Agreement), subject to the following minimum sale prices: $93,470 for the

11  Champions Unit Type, $81,942 for the Augusta Unit Type, $88,152 for the Pebble Beach Unit

12  Type, $115,560 for the St. Andrews Unit Type, $125,235 for the Doral Unit Type, $130,755 for

13  the Bayhill Unit Type, and $144,210 for the Pinehurst Unit Type. Debtor received $127,812.79

14  from the sale of a Roam Development unit on April 21, 2006, following the Petition Date, which

15  may have been the proceeds from a postpetition sale and partial release of a Roam Development

16  unit. Debtor requests ratification by the Court of any partial releases already provided to Roam

17  Development Group, L.P. and authorization by the Court to continue to provide partial releases for

18  closings on the Roam Development Group project consistent with the terms of the secured loan

19  documentation.

20                          **MEMORANDUM OF LAW**

21      Debtor is engaged in the business of originating, underwriting, brokering, and servicing

22  commercial loans or fractional interests therein. As part of that business, Debtor routinely

23  receives requests for partial releases or full releases of the collateral that secures the loans that the

24  Debtor has originated. The Debtor routinely provides the requested partial releases or full releases

25  and other related documentation in exchange for loan payments from the borrowers arising from

26  such sales. In the case of subordinated loans, the Debtor routinely provides the requested partial

27  releases in exchange for assurances that the net proceeds of closings on the Debtor's collateral are

28  being paid to the senior lenders to reduce the balances of the senior liens. As a result of the filing

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

- 11 -

1   of the Debtor's Chapter 11 Petition, some of the parties to these closings have questioned the

2   Debtor's authority to participate in the closings and to provide the requested partial releases or full

3   releases and related documentation and to accept loan repayment proceeds from the closings. The

4   hesitancy of the parties to these closings to go forward is beginning to have an impact on the

5   Debtor's ongoing business operations.

6        Section 105(a) of the Bankruptcy Court allows this Court to "issue any order, process, or

7   judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

8   11 U.S.C. § 105(a). Under § 105(a), the Court has expansive equitable powers to fashion any

9   order or decree that is the interest of preserving or protecting the value of the debtor's assets. *See,*

10   *Chinician v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105

11   sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes

12   of the Bankruptcy Code.")

13        Section 363(c)(1) of the Bankruptcy Code provides that a debtor in possession authorized

14   to operate its business under 11 U.S.C. § 1108 "may enter into transactions, including the sale or

15   lease of property of the estate, **in the ordinary course of business**, without notice or a hearing,

16   and may use property of the estate in the ordinary course of business without notice or a hearing."

17   (Emphasis added). While the Bankruptcy Code and the legislative history of § 363(c) do not offer

18   guidance as to what constitutes "ordinary course of business," the Ninth Circuit has stated that the

19   courts interpreting this section have provided helpful and persuasive guidelines under two tests:

20   "(1) [the] vertical dimension or creditor's expectation test and (2) [the] horizontal dimension test."

21   *Burlington Northern Railroad Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d

22   700, 704 (9th Cir. 1988).

23        The horizontal dimension test measures "an industry-wide perspective in which the

24   debtor's business is compared to other like businesses. In this comparison, the test is whether the

25   postpetition transaction is of a type that other similar businesses would engage in as ordinary

26   business." *Id.* Under the horizontal dimension test, "a transaction occurs in the debtor-in-

27   possession's ordinary course of business when there is a showing that the transaction is the sort

28   occurring in the day-to-day operation of debtor's business." *Id.*

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

P:\USA Commercial Mortgage\USA Commercial Mortgage Company\Pleadings\Motion to Approve Transactions In
Ordinary Course.DOC

1    Under the vertical dimension test, a transaction is viewed from the vantage point of a

2  hypothetical creditor, and inquiry is made whether the transaction subjects such creditor to

3  economic risks of a nature different from those he or she accepted when he or she decided to

4  extend credit to the debtor. *Id.* at 705. Under this test, some transactions by their very size or

5  nature are not within the day-to-day operations of the debtor's business and are therefore

6  considered to be extraordinary and not ordinary course of business transactions. *Id.* The debtor-

7  in-possession's prepetition business activities are compared to its postpetition transactions under

8  the vertical dimension or creditor's expectation test to determine if the postpetition transactions

9  are in the ordinary course of business. *Id.*

10    Under either the horizontal dimension test or the vertical dimension test, providing partial

11  releases or full releases in connection with closings of loans originated by Debtor are clearly in the

12  "ordinary course of business" for the Debtor. Providing such releases and otherwise acting to

13  facilitate closings on properties encumbered by a mortgage lender's lien is clearly the sort of

14  activity that mortgage servicing businesses engage in on a daily basis. Likewise, Debtor was

15  routinely engaging in these same activities during its prepetition existence on behalf of the

16  investors pursuant to the Investor Authorizations. These activities are not extraordinary, but are

17  the type that are customarily expected of mortgage servicers representing individual investors such

18  as the Debtor.

19    Even if there was a question whether any of the transactions outlined above were

20  extraordinary, such that the "ordinary course of business" authorization of § 363(c)(1) might not

21  apply to a particular transaction,  § 363(b)(1) provides the necessary authority for the Court to

22  authorize these transactions. Section 363(b)(1) provides that a debtor in possession, "after notice

23  and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

24  estate." "Section 363 of the [Bankruptcy] Code seems on its face to confer upon the bankruptcy

25  judge virtually unfettered discretion to authorize the use, sale or lease, other than in the ordinary

26  course of business, of property of the estate." *Committee of Equity Sec. Holders v. Lionel Corp.*

27  *(In re Lionel Corp.),* 722 F.2d 1063, 1069 (2nd Cir. 1983).

28    To approve the use, sale or lease of property other than in the ordinary course of business,

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

- 13 –

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  there must be "a sound business purpose [that] justifies such actions." *In re Montgomery Ward*
2  *Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999). Under the circumstances outlined above, the
3  Debtor's decision to provide the partial releases and full releases and other documentation and
4  assistance necessary to complete closings for the sale of property securing loans originated by the
5  Debtor is fully supported by the "business judgment test" which is the standard for approval of
6  transactions under Section 363(b)(1). *Id.* The Debtor's business judgment that it needs to satisfy
7  the ordinary commercial expectations of parties to closings by providing the required
8  documentation in order to preserve the Debtor's business and reputation is reasonable and justified
9  under the circumstances and clearly meets the business judgment test.

10  The Debtor requests authority to exercise its powers on behalf of the investors under the
11  Investor Authorizations and accept loan payment proceeds and provide the necessary partial
12  releases or full releases and other related documentation required in connection with the sale to
13  bona fide purchasers of properties securing loans originated by the Debtor for the loans outlined
14  above, as well as for other loans that have been originated by the Debtor. The Debtor further
15  requests ratification by the Court of any partial releases already provided by the Debtor
16  postpetition for any of the loans outlined in this Motion.

17  **CONCLUSION**

18  Based upon the foregoing, it is respectfully requested this Motion Authorizing Debtor,
19  Pursuant To 11 U.S.C. § 105 and § 363(b)(1), To Accept Loan Payment Proceeds And Provide
20  Partial Releases Or Full Releases In Connection With The Sale Of Properties Securing Loans
21  Originated By The Debtor To Third-Party Borrowers, And To Ratify Partial Releases Previously
22  Provided By The Debtor be granted.

23  DATED: May 3, 2006.

24  Lenhard E. Schwartzer, Esq.
25  Jeanette E. McPherson, Esq.
26  Schwartzer & McPherson Law Firm
     2850 South Jones Blvd., Suite 1
27  Las Vegas NV 89146
     Proposed Attorneys for Debtor
28  and Debtor-in-Possession

- 14 -

# EXHIBIT "A"

# LOAN SERVICING AGREEMENT

This Loan Servicing Agreement ("Agreement") is made as of the **17** day of **June**, 2004, between USA Commercial Mortgage Company ("USA") and **Charles B. Anderson Trustee of the Charles B. Anderson Trust,** (Lender")

## RECITALS

A.      USA is a mortgage broker and loan servicer in Clark County, Nevada.

B.      Lender lends, or wishes to lend, money to various borrowers (the term "Borrower" includes single and married persons, corporations, trusts, partnerships and all other legal entities) from time to time, which loans are arranged by USA and are secured by interests in real and/or personal property.

C.      Lender wishes to retain the services of USA in connection with making and servicing a loan or loans (Loan" or "Loans" as the context requires), including all Loans heretofore or hereafter placed by Lender through USA, all upon the terms and conditions hereinafter set forth.

        NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

        1.      <u>Services in Connection with Arranging the Loans</u>.  USA will perform the following services in connection with arranging each Loan:

                (a)      Obtain a promissory note or notes secured by the trust deed referred to in Section 1(b) below, executed by Borrower in a form customarily used by USA and approved by USA's counsel.

                (b)      Obtain a deed of trust, assignment of rents and security agreement executed by Borrower in form customarily used by USA and approved by USA's counsel, and cause the same to be properly recorded.

                (c)      Obtain one or more personal or corporate guaranties, if applicable and as determined by USA to be necessary, executed by such guarantors, as USA shall deem appropriate, in form customarily used by USA.

                (d)      If  USA deems it appropriate or necessary, obtain, at Borrower's expense, an appraisal of the property to be encumbered, prepared and executed by an appraiser reasonably satisfactory to USA.

                (e)      Obtain from a reputable title insurance company, at Borrower's expense, a fully-paid ALTA lender's policy of title insurance, showing Lender as an insured, in an amount at least equal to the initial principal amount of the note and showing as exceptions only those items approved by USA and its counsel.

                (f)      Cause the Borrower to obtain, where applicable, casualty insurance policies in amounts at least equal to the principal amount of the note or the full insurable value of the improvements on the encumbered real property, whichever is less, containing a mortgage or loss payee clause naming Lender, or

USA (as agent for Lender), as an additional insured or loss payee.

   (g) Obtain from the Borrower and each guarantor such recent financial statements and information as USA shall deem appropriate.

   (h) Obtain, with respect to any and all encumbrances of record to which Lender's deed of trust will be subject, documentation verifying the principal balance thereof within a reasonable time prior to the making of the Loan and specifying any then existing defaults thereunder.

   (i) Obtain such other documents in connection with the Loan, as USA may deem appropriate in order to protect the Lender's interest.

   (j) All documents which USA obtains from borrower in connection with arranging or servicing any Loan, so long as such Loan is outstanding, shall be kept on file in USA's corporate office and be available to Lender upon request. Notwithstanding the foregoing, USA shall have no obligation or responsibility to obtain any original documents in connection with any Loan serviced by USA, but not arranged or originated by USA.

   (k) Prepare and deliver to escrow closing instructions to effectuate the Loan closing in accordance with the Loan Agreement and the Fee Agreement.

  2. <u>Services of USA in Connection with Servicing the Loans</u>. Subject to and in accordance with the terms and conditions set forth in this Agreement, and all applicable laws, Lender instructs and authorizes USA to, and USA will perform the following services in connection with servicing each of the Loans:

   (a) Verify, where applicable, that the property encumbered by Lender's deed of trust is insured (at the Borrower's expense) by a sufficient casualty insurance policy and that Borrower has sufficient liability insurance coverage. USA will hold for the Lender's account such policies and renewals thereof.

   (b) Keep appropriate accounting records on each note and the sums collected thereon, which records will reflect the amounts collected as to principal, interest and late charges, and, if applicable, insurance, taxes and other specified amounts. Those records will be available for review by the Lender during regular business hours at USA's corporate office.

   (c) Until the total amount due under each note is paid in full:

     (i) Proceed diligently to collect all payments due under the terms of the note and promptly pay the proper parties, when and if due, principal, interest, late charges, insurance and other specified funds.

     (ii) In the event the Borrower fails to make any payment to USA as required by the terms of the note, USA will take steps to collect the payment including but not limited to delivering default notices, commencing and pursuing foreclosure procedures, and obtaining representation for Lender in litigation and bankruptcy proceedings as deemed necessary or appropriate by USA in its business judgment to fully protect the interests of the Lender, and of all Lenders in the loan.

(iii)    In its sole discretion, USA may pay off any Lender at any time by paying the then outstanding balance of Lender's interest in the principal of the Loan, plus all accrued interest and any prepayment penalty or fee, if applicable. Any Lender so paid off shall concurrently execute and deliver therewith to USA an assignment, in a form acceptable to USA, of all of such Lender's right, title, and interest in the Loan (including all documents evidencing the Loan) and in the deed of trust securing the Loan.

(iv)    In its sole discretion, USA may waive late payment charges, assumption fees, charges for returned checks due to insufficient funds, or other fees which may be collected in the ordinary course of servicing the Loans.

(d)    Provide the Lender with regular statements regarding loan collections, but in no event less frequently than quarterly.

(e)    Without limiting the generality of anything contained herein, Lender hereby authorizes and empowers USA, on Lender's behalf, to: (1) execute and deliver demands for payoff and beneficiary's / lender's statements of condition and the like; (2) execute and deliver any and all instruments if satisfaction or cancellation, or of partial or full release, discharge, or reconveyance, or authorizations in connection therewith, with respect to any Loans paid in full and with respect to the related real or personal property securing such Loans; (3) execute and deliver any and all other documents with respect to any Loans that are customary and consistent with loan servicing practices pertaining to such loans; (4) consent to modifications of the Loans if the effect of any such modification will not materially or adversely affect the security provided by the real or personal property in connection therewith; (5) institute foreclosure proceedings (judicial or non-judicial), obtain a deed-in-lieu thereof, engage in settlement discussions, and enter into forbearance and other settlement-related agreements (which agreements may contain provisions that release or waive claims against a Borrower or Guarantor); and (6) take title in the name of Lender (in proportion to its interest in the Loan) to any real property upon a foreclosure or delivery of a deed-in-lieu thereof. Notwithstanding the foregoing or any other provision contained herein, USA may not permit any modification to any Loan that would change the interest rate, forgive the payment of any principal or interest (expressly excluding late charges or the difference between default and non-default interest), change the outstanding principal amount, or extend the maturity date, without Lender's prior consent; provided, however, if Lender fails to grant or deny its consent within three (3) business days after notice from USA, Lender shall be deemed to have conclusively given its consent.

3.    Rights of Lender if USA Fails to Act.    Pursuant to NAC 645B.073, in the event of default, foreclosure, or other matters that require action, if for any reason USA fails to act on Lender's behalf as authorized herein, then Lender may, with approval of fifty-one percent (51%) or more of all of the holders of the beneficial interest of record in the Loan, act on behalf of all such holders of beneficial interest of record. These actions may include, but are not limited to:

(a)    the designation of the mortgage broker, servicing agent or other person to act on behalf of the holders of the beneficial interests in the loan; and
(b)    the sale, encumbrance or lease of real property owned by the holders resulting from a foreclosure or the receipt of a deed in lieu of a foreclosure.

4.    Legal Proceedings.    USA will assist the Lender in any necessary foreclosure proceedings to

protect the Lender's interest in the note and deed of trust. Where necessary, in USA's business judgment, USA may retain attorneys on Lender's behalf. Any legal proceeding instituted by USA pursuant to this Agreement may be pursued in USA's name only or as agent for Lender. Upon demand by USA, Lender agrees to promptly pay, either in advance or to reimburse USA, for its pro rata portion of the out-of-pocket expenses incurred, including attorney's fees, trustee's fees and foreclosure costs. In the event that Lender fails to pay such sums to USA upon demand or request thereof, or if USA elects to advance such sums, USA may, in its discretion, advance such fees, including trustee's fees, attorney's fees, and costs of foreclosure; provided, however, that any fees advanced by USA shall be paid back from the proceeds of the foreclosure (whether by reinstatement or sale), or from any other monies collected with respect to such Loan, before any payments are made to Lender. In the event of any litigation concerning the Loan, Lender hereby appoints USA as its agent to accept service of any summons and complaint, naming Lender as a party.

5.    Compensation to USA for Loan Servicing. Lender authorizes USA to retain monthly, as compensation for services performed hereunder, (a) one-twelfth (1/12th) of its annual servicing fee, which shall not exceed one percent (1%) per annum of the maximum principal amount of each of the Loans, (b) any late charges collected from the Borrower pursuant to the terms of the Note, and (c) and default interest collected from the Borrower pursuant to the terms of the Note. Notwithstanding the foregoing, it is agreed and acknowledged that USA derives the bulk of its revenues from charging loan fees ("points") to the Borrower. Certain Borrowers, however, may prefer to pay a higher rate of interest in exchange for a reduction in loan fees payable in advance to USA, the higher interest rate comprising a deferred loan fee. USA will notify Lender when such a case arises, and advise Lender of what portion of the interest is payable to USA as a deferred loan fee.

Should Lender desire to sell all or any part of its interest in the note and deed of trust, USA will assist Lender in finding potential buyers and completing the necessary documentation for the transaction. A fee of 5% of the remaining balance of Lender's undivided interest in the note amount will be deducted from the selling price and paid to USA on all such assignments for which USA locates the Assignee.

In the event an extension of a Loan is negotiated, USA shall be entitled to charge a fee therefor from the Borrower pursuant any separate fee agreement between USA and the Borrower.

6.    USA's Right to Delegate.    Notwithstanding anything contained herein, USA may in its sole discretion delegate specific loan arranging and servicing obligations to credit bureaus, real estate tax service companies, real estate brokers or agents, appraisers, attorneys, trustees, or others, provided that USA shall remain responsible for all action taken or not taken by such companies, agents, representatives, and others throughout the term of this Agreement.

7.    No Legal Advice. Lender acknowledges that USA will not act as Lender's attorney or provide legal advice to Lender, and that Lender is encouraged to seek independent counsel in connection with any questions Lender may have concerning this agreement, any Loan, USA's form loan documents, or any other matter.

8.    Termination. Lender may, by 30 days written notice to USA, terminate this agreement, and the power of attorney granted, if one is granted, under Section 9 of this Agreement, if USA fails to perform its obligations hereunder.

9.    Lender's Registration.  Lender(s) name as listed in the first paragraph of this Agreement is the exact form for registration of Lender's interest and for reference to Lender in the Loan Documents.

10.    Integration Clause.  This Agreement contains the entire agreement between the parties hereto and cannot be modified except by a written amendment signed by both parties. The invalidity of any portion of this agreement shall in no way affect the balance thereof. This Agreement shall remain in effect until Lender's interest in all notes and deeds of trust with respect to Loans arranged and/or serviced by USA is completely liquidated (unless sooner terminated in accordance with the terms hereof).

11.    Limited Power of Attorney.  With respect to each loan, Lender hereby agrees that USA shall have full power and authority, and Lender hereby appoints USA as its true and lawful attorney-in-fact to (a) hold the original note(s), and (b) to do all things and take all actions on behalf of Lender which are necessary or convenient to effectuate this Agreement and its intent and to protect Lender's interest under any note, deed of trust, guaranty, security agreement or other document pertaining to any Loan. Upon USA's request, Lender hereby agrees to execute and deliver, in the presence of a notary public, a "Declaration of Agency and Limited Power of Attorney", in a form consistent with Chapter 645B of the Nevada Revised Statutes, pursuant to which Lender shall further evidence the appointment of USA as Lender's true and lawful attorney-in-fact to undertake the duties of USA hereunder. No one shall be required to look beyond such Declaration of Agency and Limited Power of Attorney for evidence of USA's authority hereunder. All Declarations of Agency and Limited Powers of Attorney may include the language: This document may be executed with counterpart signature pages, and the document with all counterpart signature pages shall constitute one and the same instrument.

12. Notices.  All notices, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been given (i) when personally delivered, or (ii) on receipt, when deposited with a recognized overnight courier service such as Federal Express or DHL, or (iii) three (3) business days after the date when deposited in the United States mail and sent postage prepaid by registered or certified mail, return receipt requested, addressed as follows:

If to USA:        USA Commercial Mortgage Company
                  4484 S. Pecos Road
                  Las Vegas, Nevada 89121-5030
                  Attention:

If to Lender:


                  Attention:

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

13.    Governing Law.  This Agreement shall be construed in accordance with the laws of the State of Nevada, without regard to the conflict of laws or rules thereof, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws,

affect the meaning or interpretation of this Agreement.

18.    Authority.    Each party represents and warrants to the other party that it is duly authorized to execute, deliver and perform this Agreement.

IN WITNESS WHEREOF, the parties hereto have signed, sealed, acknowledged and delivered this instrument the day and year first above written.

LENDER: **Charles B. Anderson Trustee of the Charles B. Anderson Trust**

By:

Name: **Charles B. Anderson**

Title: **Trustee**

By:

Name:

Title:

USA COMMERCIAL MORTGAGE COMPANY: