1  Annette W. Jarvis, Utah Bar No. 1649
   RAY QUINNEY & NEBEKER P.C.
2  36 South State Street, Suite 1400
   P.O. Box 45385                                    **E-FILED ON MAY 9, 2006**
3  Salt Lake City, Utah 84145-0385
4  Telephone: (801) 532-1500
   Facsimile: (801) 532-7543
5  Email: ajarvis@rqn.com

6  and

7  Lenard E. Schwartzer
   Nevada Bar No. 0399
8  Jeanette E. McPherson
   Nevada Bar No. 5423
9  Schwartzer & McPherson Law Firm
10 2850 South Jones Boulevard, Suite 1
   Las Vegas, Nevada  89146-5308
11 Telephone:  (702) 228-7590
   Facsimile:  (702) 892-0122
12 E-Mail:  bkfilings@s-mlaw.com
   Proposed Attorneys for Debtors and Debtors-in-Possession
13

14                   **UNITED STATES BANKRUPTCY COURT**

                          **DISTRICT OF NEVADA**

15 | In re:                                          | Case No. BK-S-06-10725 LBR |
16 | USA COMMERCIAL MORTGAGE COMPANY,                 | Case No. BK-S-06-10726 LBR |
   |                                          Debtor. | Case No. BK-S-06-10727 LBR |
17 |                                                  | Case No. BK-S-06-10728 LBR |
   | In re:                                           | Case No. BK-S-06-10729 LBR |
18 | USA CAPITAL REALTY ADVISORS, LLC,                |                            |
   |                                          Debtor. | Chapter 11                 |
19 | In re:                                           |                            |
   | USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,     | **Jointly Administered Under** |
20 |                                          Debtor. | **Case No. BK-S-06-10725 LBR** |
21 | In re:                                           |                            |
   | USA CAPITAL FIRST TRUST DEED FUND, LLC,          | **EMERGENCY MOTION FOR ORDER** |
22 |                                          Debtor. | **TO COMPEL FIDELITY NATIONAL TITLE** |
23 | In re:                                           | **INSURANCE COMPANY TO MAKE** |
   | USA SECURITIES, LLC,                             | **DISBURSEMENTS FROM LOAN FUNDS** |
24 |                                          Debtor. | **BEING HELD BY FIDELITY AS** |
   | Affects:                                         | **DISBURSEMENT AGENT (AFFECTS USA** |
25 | ☐ All Debtors                                    | **COMMERCIAL MORTGAGE COMPANY)** |
   | ☒ USA Commercial Mortgage Company                |                            |
26 | ☐ USA Securities, LLC                            | Date:  OST Requested       |
27 | ☐ USA Capital Realty Advisors, LLC               | Time:  OST Requested       |
   | ☐ USA Capital Diversified Trust Deed Fund, LLC   |                            |
28 | ☐ USA First Trust Deed Fund, LLC                 |                            |

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Debtor, USA Commercial Mortgage Company ("USACM" or "Debtor"), by and through

2    its counsel, Ray Quinney & Nebeker P.C. and Schwartzer & McPherson Law Firm, hereby files

3    this Emergency Motion To Compel Fidelity National Title Insurance Company To Make

4    Disbursements From Loan Funds Being Held By Fidelity As Disbursement Agent (the

5    "Emergency Motion").  This Emergency Motion is made and based upon 11 U.S.C. §§ 105 and

6    363(c)(1), the Points and Authorities set forth herein, including the pleadings on file, and any

7    argument presented at the time of the hearing on this Emergency Motion.

8    As set forth herein, the Debtor requests that this Emergency Motion be granted to prevent

9    further damages to Debtor as servicer for various investors ("Servicer") and to the borrowers (the

10    "Borrowers") on five loans originated by Debtor (the "Five Loans") from the unilateral decision

11    by Fidelity National Title Insurance Company ("Fidelity") to stop making disbursements on the

12    Five Loans from loan funds being held by Fidelity as disbursement agent because of the filing of

13    Debtor's Chapter 11 petition.  Fidelity's unilateral refusal to disburse is not only damaging the

14    Debtor and the Borrowers, but it is also a violation of the automatic stay because Fidelity is

15    exercising control inconsistent with the terms of its Disbursement Agreements over interest

16    reserves that are used to pay interest payments on the Five Loans from which the Debtor is

17    authorized to deduct its servicing fee.  Finally, Fidelity's unilateral refusal to disburse is also

18    causing damage to the projects that secure the Five Loans.  One of Debtor's affiliates, USA

19    Capital First Trust Deed Fund, LLC, also a Chapter 11 debtor, is an investor in four of the Five

20    Loans.  Fidelity's actions are damaging the collateral securing these loans and the interests of

21    debtor USA Capital First Trust Deed Fund, LLC, in these loans.

22    **POINTS AND AUTHORITIES**

23    **Factual Background**

24    1.    The Debtor filed its voluntary petition for relief under Chapter 11 of Title 11 of the

25    United States Bankruptcy Code on April 13, 2006 (the "Petition Date").  The Debtor continues to

26    operate its business and possess its property as a debtor-in-possession pursuant to Bankruptcy

27    Code §§ 1107 and 1108.

28    2.    Prior to the Petition Date, Mesirow Financial Interim Management, LLC ("MFIM")

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  was employed by the Debtors (defined below) to serve as financial advisors to evaluate

2  restructuring alternatives, including filing petitions for relief under Chapter 11, Title 11 of the

3  United States Code, for USA Commercial Mortgage Company, USA Securities, LLC ("USA

4  Securities"), USA Capital Realty Advisors, LLC ("USA Realty"), USA Capital Diversified Trust

5  Deed Fund, LLC ("Diversified Fund"), and USA Capital First Trust Deed Fund, LLC ("First Deed

6  Fund") (collectively, the "Debtors").

7         3.      Pursuant to a resolution entered into by each of the Debtors, in the event of a

8  bankruptcy filing, Thomas Allison was appointed as the sole Manager of the four Debtors who are

9  limited liability companies (USA Securities, USA Realty, Diversified Fund, and First Deed Fund),

10  and as the president of Debtor USA Commercial Mortgage Company, with full authority to

11  oversee the restructuring and reorganization of the Debtors' unified business enterprise and to

12  make all business and financial decisions for the Debtors, including taking control of all bank

13  accounts and other assets of these Debtors.  Thomas Allison's subsequent interim appointment as

14  the chief restructuring officer of each of the Debtors was approved by this Court on April 19,

15  2006.

16         4.      Following their engagement by the Debtors, MFIM spent considerable time

17  evaluating, examining and analyzing the Debtors' books and records, financial data, cash

18  management system, loan portfolios, mortgages, agreements and all other documents made

19  available to MFIM.

20         5.      The Debtors' business operations are best described as originating, underwriting,

21  brokering and servicing commercial loans or fractional interests therein.  Included among those

22  business operations are establishing contractual relationships with third party disbursement agents

23  for the purpose of holding loan proceeds on construction loans funded by Debtor as Servicer and

24  then disbursing such construction loan funds as construction proceeds in accordance with

25  customary disbursement procedures.

26         6.      Approximately 3,600 investors have made individual investments in loans

27  originated by the Debtor, and these investors have participated in fractional interests in loans on

28  various real estate construction projects and other real property developments.  At the time that

these investors contracted to participate as lenders of fractional interests in these loans, they also entered into an individual Loan Servicing Agreement (the "Investor Servicing Agreements") with the Debtor whereby they authorized and empowered the Debtor as Servicer, on behalf of each investor, to execute and deliver all documents customary and consistent with loan servicing practices (the "Investor Authorizations").   A true and correct copy of one of the Loan Servicing Agreements executed by one of the investors is attached hereto as Exhibit "A" and incorporated herein.

7.     This Loan Servicing Agreement is dated June 17, 2004, and is between the Debtor and Charles B. Anderson Trustee of the Charles B. Anderson Trust as Lender.  Among other powers, Debtor is authorized pursuant to Sections 2(e)(1), (2) & (3) of this Loan Servicing Agreement to do the following:  "(e)  Without limiting the generality of anything contained herein, Lender [investor] hereby authorizes and empowers USA [Commercial Mortgage Company], on Lender's [investor's] behalf, to:  (1) execute and deliver demands for payoff and beneficiary's / lender's statements of condition and the like; (2) execute and deliver any and all instruments [of] satisfaction or cancellation, or of partial or full release, discharge, or reconveyance, or authorizations in connection therewith, with respect to any Loans paid in full and with respect to the related real or personal property securing such Loans; (3) execute and deliver any and all other documents with respect to any Loans that are customary and consistent with loan servicing practices pertaining to such loans . . . ."

8.     Pursuant to Section 11 of this Loan Servicing Agreement, Debtor was also granted a limited power of attorney to act on behalf of the investors in connection with the loans covered by the Loan Servicing Agreement, as follows:  "With respect to each loan, Lender [investor] hereby agrees that USA [Commercial Mortgage Company] shall have full power and authority, and Lender [investor] hereby appoints USA [Commercial Mortgage Company] as its true and lawful attorney-in-fact to (a) hold the original note(s), and (b) to do all things and take all actions on behalf of Lender which are necessary or convenient to effectuate this Agreement and its intent and to protect Lender's interest under any note, deed of trust, guaranty, security agreement or other document pertaining to any Loan."

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

4

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

9.    Two other groups of investors totaling approximately 3,200 investors own membership interests in the Diversified Fund and the First Trust Deed Fund.  The Diversified Fund and the First Trust Deed Fund are sometimes collectively referred to as the "Funds."  The 3,200 investors in the Funds own membership interests in the two Funds which in turn hold commercial loans, or shares of commercial loans along with other investors, including the individual investors noted above.  The Funds are managed by USA Realty Advisors, LLC ("USARA"), and the Debtor serves as the servicing agent.

10.    In the past, the Debtor received cash from investors including cash from the Funds and deposited these monies into an investor account.  From this account, the Debtor funded the commercial loans it originated and underwrote, including the Five Loans.  These loans are not owned by the Debtor except in a few cases where the Debtor owns a fractionalized interest in the commercial loan.  The Debtor received a loan origination fee on each commercial loan it originated and funds with investors' money.

11.    As the various borrowers pay interest on their commercial loans or repay principal, the funds are deposited by the Debtor into a collection account.  In the past, it appears that interest was disbursed to the investors and the Funds each month.  The investors received their interest payment regardless of whether or not the underlying borrower made payments on their loans.  There was no distinction in the treatment of the 3,600 investors who hold fractional interests in specific loans and the 3,200 investors who own membership interests in the Funds.  All are identified and treated the same.  All have been paid interest in the same manner, without tracing, and irrespective of the source of the funds.

12.    Pursuant to the Investor Authorizations, Debtor originated the Five Loans as follows to the following Borrowers:  (a) Meadow Creek Partners, LLC (the "Meadow Creek Loan") (Origination Date: February 23, 2006; Current outstanding loan balance: $8,250,000); (b) Binford Medical Investors, LLC (the "Binford Medical Loan") (Origination Date: August 31, 2005; Principal Amount: $8,375,000; Current outstanding loan balance: $7,450,000); (c) ComVest Capital (the "ComVest Capital Loan") (Origination Date: January 11, 2006; Current outstanding loan balance:  $4,125,000); Palm Harbor One (the "Palm Harbor One Loan") (Origination Date:

December 14, 2005; Current outstanding loan balance: $28,480,000), and Brookmere, LLC and Lord & Essex Matteson, LLC (the "Brookmere Loan") (Origination Date: October 29, 2003; Current outstanding loan balance: $5,929,393)

13.    In connection with the originations of the Five Loans, and pursuant to the Investor Authorizations, Debtor as Servicer entered into contractual arrangements (the "Fidelity Construction Disbursement Agreements") with Construction Disbursement Services of Fidelity National Title Insurance Company ("Fidelity") for Fidelity to act as the disbursement agent for the Five Loans originated by Debtor.

14.    A true and correct copy of the Fidelity Construction Disbursement Agreement for the Brookmere Loan (the "Brookmere Loan Disbursement Agreement") is attached hereto as Exhibit "B" and incorporated herein.  This Construction Disbursement Agreement is dated April of 2005, and is between the Debtor, Borrowers Brookmere, LLC and Lord & Essex Matteson, LLC, and Fidelity as Disbursement Agent.

15.    Pursuant to the Investor Authorizations and the terms of the Fidelity Construction Disbursement Agreements, Debtor funded loan proceeds for the Five Loans by forwarding to Fidelity certain loan funds intended for construction funding and for interest reserves for the Five Loans.

16.    Pursuant to the Investor Authorizations and the terms of the Fidelity Construction Disbursement Agreements, it has been Debtor's customary practice, consistent with industry standards, to provide periodic disbursement authorizations to Fidelity for construction funding consistent with the disbursement terms of the executed loan documents for the Five Loans.  The actions taken by the Debtor in providing disbursement authorizations to Fidelity are taken pursuant to the Investor Authorizations on behalf of the investors who own fractional interests in each of the Five Loans.

17.    Article II, Section (d)(4) of the Brookmere Loan Disbursement Agreement prepared by Fidelity clearly states:  "On the Disbursement Date, if (i) all the terms and conditions of the Loan Agreement and this Agreement have been complied with by Borrower, (ii) no Default or Event of Default exists under the Loan Agreement, (iii) [USA as Servicer] has approved the

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Request for Disbursement and sent to CDS [Fidelity] Instructions to Disburse, and (iv) CDS [Fidelity] has received the Disbursement from [USA as Servicer] and all of the documents and information required herein, **then CDS [Fidelity] shall disburse the requested Disbursement** (less any required Retainage and less amounts payable to and advanced by [USA as Servicer] to the Contractors entitled to payments thereunder)." (Emphasis added).

18.    In those cases where USA as Servicer has approved the Request for Disbursement and sent to Fidelity the required Instructions to Disburse, and Fidelity has received the disbursement amount from USA as Servicer and all other required documents and information, then Fidelity is obligated to comply with the terms of the Fidelity Construction Disbursement Agreements and immediately make the required disbursements both to the Borrowers and to Debtor as Servicer for interest payments from interest reserves.

19.    There is no provision in the Brookmere Loan Disbursement Agreement authorizing Fidelity to discontinue disbursements as a result of a bankruptcy filing by the Debtor.

20.    Article III, Section (a) of the Brookmere Loan Disbursement Agreement also provides:  "CDS [Fidelity] further agrees to indemnify, hold harmless and defend [USA as Servicer] and its successors and assigns from and against any and all claims, losses, costs or damages, including attorney's fees, caused by, incurred or resulting from CDS's [Fidelity's] gross negligence and/or intentional misconduct in connection with any activities performed by CDS [Fidelity] pursuant to this Agreement."  It is Debtor's view that Fidelity's failure to disburse constitutes gross negligence as well as a serious breach of contract.

21.    Until the filing of Debtor's bankruptcy petition on April 13, 2006, Fidelity was regularly disbursing the funded loan proceeds for the Five Loans pursuant to draw requests submitted to Fidelity by the Borrowers for the respective construction projects for the Five Loans, based upon approvals from the Borrowers and the Debtor.

22.    Following the Petition Date, Fidelity unilaterally stopped disbursing the funded loan proceeds for the Five Loans, and has refused to make disbursements either to or on behalf of the borrowers for the Five Loans or to the Debtor as Servicer from the interest reserves for the interest payments on the Five Loans.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

23.    Fidelity's unilateral actions are causing significant damages to the Borrowers and to the Debtor.  For example, the Binford Medical Loan has been severely impacted by Fidelity's refusal to disburse.

24.    The Binford Medical Loan is being used for the construction of a medical office building in Indianapolis, Indiana (the "Binford Medical Building Project").   This building is the first of five medical office buildings that are planned for eventual construction by Binford Medical.  See, Declaration of Ken Schmidt in Support of Emergency Motion for Order to Compel Fidelity National Title Insurance Company to Make Disbursements from Loan Funds Being Held by Fidelity as Disbursement Agent (the "Ken Schmidt Declaration") being filed contemporaneously herewith, at ¶ 3.

25.    Fidelity is currently holding approximately $1,990,000 in the loan proceeds from the Binford Medical Loan that were funded by Debtor as Servicer.  Ken Schmidt Declaration at ¶ 5.

26.    The contractor on the Binford Medical Building Project submitted Draw Request No. 7 in the amount of $275,200 to Fidelity on April 3, 2006.  Draw Request No. 7 is for the balance of the steel erection for the Binford Medical Building Project.  Ken Schmidt Declaration at ¶ 7.

27.    Fidelity has not paid Draw Request No. 7 for the Binford Medical Building Project.  Debtor is ready to approve the disbursement on Draw Request No. 7 as soon as Fidelity completes the inspection of the progress of construction on the Binford Medical Building Project that Fidelity performs as part of its disbursement duties.  Ken Schmidt Declaration at ¶ 8.

28.    Ken Schmidt, Managing Member of Borrower Binford Medical Developers, LLC, has made repeated requests to Harry Westfall and Rita Bennett, Fidelity's disbursement officers, for Fidelity to pay the April 3, 2006 draw request, but Fidelity has not done so.   Ken Schmidt has been advised by Fidelity that Fidelity will honor Draw Request No. 7 and future draw requests upon receipt of an order from this Court.  Ken Schmidt Declaration at ¶ 9.

29.    The contractor on the Binford Medical Building Project is rapidly approaching the deadline for mechanic's liens to be filed by his unpaid subcontractors.  The contractor has

demanded that the amount of the April 3, 2006 draw request be disbursed to him immediately, or the Binford Medical Building Project is in jeopardy of being shut down. Ken Schmidt Declaration at ¶ 10.

30.    If the Binford Medical Building Project is shut down and delayed, Binford Medical faces the prospect of legal action and resulting legal fees from the contractor and the subcontractors as well as from tenants who will be delayed in being able to move into the Binford Medical Building Project. Binford Medical's interest charges will also increase if the Binford Medical Building Project is shut down and delayed. Ken Schmidt Declaration at ¶ 11.

31.    Debtor's attorneys have contacted Fidelity's attorney and demanded that Fidelity begin making disbursements on the Five Loans.  See, Declaration of Douglas Monson in Support of Emergency Motion for Order to Compel Fidelity National Title Insurance Company to Make Disbursements from Loan Funds Being Held by Fidelity as Disbursement Agent and in Support of Motion for Expedited Hearing (the "Doug Monson Declaration") being filed contemporaneously herewith, at ¶ 2.

32.    Notwithstanding the demands by Debtor's attorneys, Fidelity has not responded, and Fidelity has not agreed to begin disbursements on the Five Loans. Doug Monson Declaration at ¶ 3.

33.    The only reason that Fidelity has given the Debtor for Fidelity's unilateral decision to stop making disbursements on the Five Loans was Fidelity's concern that there may be a precedent set for the return of loan proceeds to investors at the hearing scheduled for May 18, 2006, on the Debtor's Motion for Order Authorizing the Return to Investors of Certain Escrowed Funds Intended for the Bundy Canyon Project (the "Bundy Canyon Motion") that was e-filed in Bankruptcy Case No. BK-S-06-10725 on April 27, 2006.  Doug Monson Declaration at ¶ 4.

34.    The Bundy Canyon Motion addresses a completely separate issue from the disbursement issues for the Five Loans for which Fidelity is acting as disbursement agent. The funds involved in the Bundy Canyon Motion had been deposited with a title company in an escrow account, but the loan had not been closed or funded when Debtor's Chapter 11 bankruptcy petition was filed, and the Debtor determined to not complete the loan transaction, so the loan was

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    never consummated.  Doug Monson Declaration at ¶ 5.

2        35.    As stated in the Bundy Canyon Motion, "[i]n the event that a loan is not

3    consummated, Nevada law requires the funds held in the Escrow Account to be returned to the

4    investors.  Nev. Rev. Stat. 645B.175(2)(b)."  Because the Bundy Canyon loan was not

5    consummated, the Bundy Canyon Motion explains that the Bundy Canyon funds were never

6    funded to a disbursement agent such as Fidelity, and were in a position to be returned to the

7    investors on an unfunded loan.  The Bundy Canyon Motion does not have any impact on the Five

8    Loans, which have been consummated, with the associated loan funds having been sent by Debtor

9    as Servicer to Fidelity, which is acting as disbursement agent.  Doug Monson Declaration at ¶ 6.

10        36.    Debtor's actions consistent with the terms of the loan documentation for the Five

11    Loans in continuing to provide disbursement authorizations to Fidelity are clearly transactions in

12    the ordinary course of business that the Debtor (as a debtor in possession authorized to operate its

13    business under 11 U.S.C. § 1108) may enter into without notice or a hearing pursuant to 11 U.S.C.

14    § 363(c)(1).

15        37.    The Borrowers, the Debtor, and the investors in the Five Loans are being severely

16    damaged by Fidelity's unilateral decision to freeze all disbursement actions on the Five Loans.  If

17    the disbursements to contractors performing construction services on the Five Loans are not made

18    immediately, the construction work on the Five Loans will cease.  The construction delays will

19    impair the Borrowers' ability to repay the Five Loans, and the repayments of the Five Loans for

20    the benefit of the investors will be delayed or possibly even lost.  The Borrowers may even

21    attempt to make administrative claims against the Debtor to cover their losses, even though it is

22    clear that it is Fidelity, not the Debtor, that is in breach of contract.  The investors in the Five

23    Loans could lose confidence in Debtor's ability to carry on with its normal operations and protect

24    the interests of the investors in the Five Loans.  Debtor's long-term reorganization prospects could

25    be damaged if these funded loan proceeds continue to be frozen unilaterally by Fidelity while the

26    construction projects languish and contractors and subcontractors halt their construction activities

27    and begin to file mechanic's liens and take other collection actions.

28        38.    The Debtor is entitled to collect its servicing fee from interest payments made on

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

the Five Loans.  Fidelity is holding the interest reserves and not disbursing them to Debtor as

Servicer as demanded by Debtor.  Fidelity is therefore exercising control over property of the

Debtor's bankruptcy estate because the portion of the unpaid interest payments that is attributable

to Debtor's servicing fee is property of the Debtor's bankruptcy estate.

39.    Debtor First Trust Deed Fund (which is a Chapter 11 debtor-in-possession under

Bankruptcy Case No. BK-S-06-10728 LBR) is an investor in four of the Five Loans, and owns the

following:  (a) 17% of the Binford Medical Loan; (b) 17% of the ComVest Capital Loan; (c) 34%

of the Brookmere Loan; and (d) 0.87% of the Meadow Creek Loan.  Fidelity's unilateral decision

to stop disbursing on these Loans is causing damage to the collateral that secures Debtor First

Trust Deed Fund's interests in these Loans.

## **MEMORANDUM OF LAW**

Debtor is engaged in the business of originating, underwriting, brokering and servicing

commercial loans or fractional interests therein.  As part of that business, Debtor routinely enters

into disbursement agreements with third-party disbursement agents such as title company.  In this

case, Debtor entered into disbursement agreements with Fidelity for the Five Loans.  Consistent

with those disbursement agreements, Debtor has been providing disbursement authorizations to

Fidelity for construction funding consistent with the disbursement terms of the executed loan

documents on the Five Loans, and also providing disbursement authorization to Fidelity for

Fidelity to pay to the Debtor as Servicer the monthly interest payments on the Five Loans from the

interest reserves being held by Fidelity.

As a result of the filing of the Debtor's Chapter 11 Petition, Fidelity has unilaterally

stopped making any disbursements on the Five Loans, notwithstanding Debtor's demands that

Fidelity begin making the approved disbursements.  Fidelity's unilateral refusal to disburse is

causing severe distress for the Borrowers, and is damaging Debtor's ongoing business operations.

Section 105(a) of the Bankruptcy Court allows this Court to "issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

11 U.S.C. § 105(a).  Under Section 105(a) of the Bankruptcy Code, the Court has expansive

equitable powers to fashion any order or decree that is the interest of preserving or protecting the

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    value of the debtor's assets.  *See, Chinician v. Campolongo (In re Chinichian),* 784 F.2d 1440,

2    1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as

3    necessary pursuant to the purposes of the Bankruptcy Code.")

4        Section 363(c)(1) of the Bankruptcy Code provides that a debtor in possession authorized

5    to operate its business under 11 U.S.C. § 1108 "may enter into transactions, including the sale or

6    lease of property of the estate, **in the ordinary course of business**, without notice or a hearing,

7    and may use property of the estate in the ordinary course of business without notice or a hearing."

8    (Emphasis added).  While the Bankruptcy Code and the legislative history of Section 363(c) do

9    not offer guidance as to what constitutes "ordinary course of business," the Ninth Circuit has

10   stated that the courts interpreting this section have provided helpful and persuasive guidelines

11   under two tests:  "(1) [the] vertical dimension or creditor's expectation test and (2) [the] horizontal

12   dimension test."  *Burlington Northern Railroad Co. v. Dant & Russell, Inc. (In re Dant & Russell,*

13   *Inc.),* 853 F.2d 700, 704 (9th Cir. 1988).

14       The horizontal dimension test measures "an industry-wide perspective in which the

15   debtor's business is compared to other like businesses.  In this comparison, the test is whether the

16   postpetition transaction is of a type that other similar businesses would engage in as ordinary

17   business."  *Id.*  Under the horizontal dimension test, "a transaction occurs in the debtor-in-

18   possession's ordinary course of business when there is a showing that the transaction is the sort

19   occurring in the day-to-day operation of debtor's business."  *Id.*

20       Under the vertical dimension test, a transaction is viewed from the vantage point of a

21   hypothetical creditor, and inquiry is made whether the transaction subjects such creditor to

22   economic risks of a nature different from those he or she accepted when he or she decided to

23   extend credit to the debtor.  *Id.* at 705.  Under this test, some transactions by their very size or

24   nature are not within the day-to-day operations of the debtor's business and are therefore

25   considered to be extraordinary and not ordinary course of business transactions.  *Id.*  The debtor-

26   in-possession's prepetition business activities are compared to its postpetition transactions under

27   the vertical dimension or creditor's expectation test to determine if the postpetition transactions

28   are in the ordinary course of business.  *Id.*

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1      Under either the horizontal dimension test or the vertical dimension test, providing

2   disbursement instructions and approvals for the Five Loans originated by Debtor are clearly in the

3   "ordinary course of business" for the Debtor.  Providing such disbursement instructions and

4   approvals and otherwise acting to facilitate the ongoing construction funding for the projects for

5   which the Five Loans were originated is clearly the sort of activity that mortgage servicing

6   businesses engage in on a daily basis.  Likewise, Debtor was routinely engaging in these same

7   activities during its prepetition existence on behalf of the investors pursuant to the Investor

8   Authorizations, including authorizing the payment to Debtor as Servicer of interest payments from

9   the interest reserves.  These activities are not extraordinary, but are the type that are customarily

10  expected of mortgage servicers representing individual investors such as the Debtor.

11      Even if there was a question whether any of the transactions outlined above were

12  extraordinary, such that the "ordinary course of business" authorization of Section 363(c)(1) might

13  not apply to a particular transaction,  Section 363(b)(1) of the Bankruptcy Code provides the

14  necessary authority for the Court to authorize these transactions.  Section 363(b)(1) provides that a

15  debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary

16  course of business, property of the estate."  "Section 363 of the [Bankruptcy] Code seems on its

17  face to confer upon the bankruptcy judge virtually unfettered discretion to authorize the use, sale

18  or lease, other than in the ordinary course of business, of property of the estate."  *Committee of*

19  *Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1069 (2nd Cir. 1983).

20  To approve the use, sale or lease of property other than in the ordinary course of business, there

21  must be "a sound business purpose [that] justifies such actions."  *In re Montgomery Ward Holding*

22  *Corp.,* 242 B.R. 147, 153 (D. Del. 1999).  Under the circumstances outlined above, the Debtor's

23  decision to provide the necessary disbursement instructions and approvals and other

24  documentation and assistance necessary to facilitate the ongoing construction activities

25  contemplated for the Five Loans originated by the Debtor is fully supported by the "business

26  judgment test" which is the standard for approval of transactions under Section 363(b)(1).  *Id.*

27  The Debtor's business judgment that it needs to provide these disbursement instructions and

28  approvals in order to preserve the collateral for the Five Loans and in order to have the interest

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   payments made from the interest reserves (all of which preserve the Debtor's business and

2   reputation) is reasonable and justified under the circumstances and clearly meets the business

3   judgment test.

4          Fidelity's unilateral refusal to disburse is also a violation of the automatic stay.  Under 11

5   U.S.C. § 362(a)(3), the filing of Debtor's Chapter 11 bankruptcy petition automatically operates as

6   a stay, applicable to all entities, including Fidelity, of "any act to obtain possession of property of

7   the estate or of property from the estate or to exercise control over property of the estate."  Fidelity

8   is exercising control inconsistent with the terms of the Fidelity Construction Disbursement

9   Agreements over the interest reserves that are used to pay interest payments on the Five Loans

10  from which the Debtor is authorized to deduct its servicing fee.  The portion of the interest

11  payment that is attributable to Debtor's servicing fee is property of the Debtor's bankruptcy estate,

12  and Fidelity is violating the automatic stay by failing to disburse the interest payments after

13  Debtor has made demand for the interest payments to be made to Debtor as Servicer.

14         Fidelity's unilateral actions are also causing damage to the projects that secure the Five

15  Loans.  Fidelity's refusal to disburse is damaging the collateral securing these loans and the

16  interests of debtor First Trust Deed Fund in four of the Five Loans.

17         The Debtor requests emergency authority to exercise its powers on behalf of the investors

18  under the Investor Authorizations and to continue to provide to Fidelity the necessary

19  disbursement instructions and authorizations for the Five Loans that are consistent with the terms

20  of the loan documents for the Five Loans.  To the extent that Fidelity continues to refuse to

21  disburse, the Debtor further requests that this Court order Fidelity to comply with the

22  disbursement instructions and authorizations given to Fidelity by the Debtor, including the

23  instructions to pay interest payments on the Five Loans from the interest reserves.  The Debtor

24  reserves the right to seek sanctions and other monetary damages against Fidelity in the future for

25  the damages caused to the Debtor and to the Borrowers by Fidelity's unilateral actions.

26  / / /

27  / / /

28  / / /

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1

**CONCLUSION**

2        Based upon the foregoing, it is respectfully requested that this Emergency Motion To

3   Compel Fidelity National Title Insurance Company To Make Disbursements From Loan Funds

4   Being Held By Fidelity As Disbursement Agent be granted.

5        DATED this 9th day of May, 2006.

6

7                                    /s/ Jeanette E. McPherson
                                     Lenard E. Schwartzer, Esq.
8                                    Jeanette E. McPherson, Esq.
                                     Schwartzer & McPherson Law Firm
9                                    2850 South Jones Blvd., Suite 1
                                     Las Vegas, Nevada 89146
10                                   Proposed Attorneys for Debtors
                                     and Debtors-in-Possession
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# EXHIBIT "A"

# LOAN SERVICING AGREEMENT

This Loan Servicing Agreement ("Agreement") is made as of the __17__ day of **June**, 2004, between USA Commercial Mortgage Company ("USA") and **Charles B. Anderson Trustee of the Charles B. Anderson Trust,** (Lender")

## RECITALS

A.     USA is a mortgage broker and loan servicer in Clark County, Nevada.

B.     Lender lends, or wishes to lend, money to various borrowers (the term "Borrower" includes single and married persons, corporations, trusts, partnerships and all other legal entities) from time to time, which loans are arranged by USA and are secured by interests in real and/or personal property.

C.     Lender wishes to retain the services of USA in connection with making and servicing a loan or loans (Loan" or "Loans" as the context requires), including all Loans heretofore or hereafter placed by Lender through USA, all upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     <u>Services in Connection with Arranging the Loans</u>.  USA will perform the following services in connection with arranging each Loan:

(a)     Obtain a promissory note or notes secured by the trust deed referred to in Section 1(b) below, executed by Borrower in a form customarily used by USA and approved by USA's counsel.

(b)     Obtain a deed of trust, assignment of rents and security agreement executed by Borrower in form customarily used by USA and approved by USA's counsel, and cause the same to be properly recorded.

(c)     Obtain one or more personal or corporate guaranties, if applicable and as determined by USA to be necessary, executed by such guarantors, as USA shall deem appropriate, in form customarily used by USA.

(d)     If USA deems it appropriate or necessary, obtain, at Borrower's expense, an appraisal of the property to be encumbered, prepared and executed by an appraiser reasonably satisfactory to USA.

(e)     Obtain from a reputable title insurance company, at Borrower's expense, a fully-paid ALTA lender's policy of title insurance, showing Lender as an insured, in an amount at least equal to the initial principal amount of the note and showing as exceptions only those items approved by USA and its counsel.

(f)     Cause the Borrower to obtain, where applicable, casualty insurance policies in amounts at least equal to the principal amount of the note or the full insurable value of the improvements on the encumbered real property, whichever is less, containing a mortgage or loss payee clause naming Lender, or

USA (as agent for Lender), as an additional insured or loss payee.

       (g)    Obtain from the Borrower and each guarantor such recent financial statements and information as USA shall deem appropriate.

       (h)    Obtain, with respect to any and all encumbrances of record to which Lender's deed of trust will be subject, documentation verifying the principal balance thereof within a reasonable time prior to the making of the Loan and specifying any then existing defaults thereunder.

       (i)    Obtain such other documents in connection with the Loan, as USA may deem appropriate in order to protect the Lender's interest.

       (j)    All documents which USA obtains from borrower in connection with arranging or servicing any Loan, so long as such Loan is outstanding, shall be kept on file in USA's corporate office and be available to Lender upon request. Notwithstanding the foregoing, USA shall have no obligation or responsibility to obtain any original documents in connection with any Loan serviced by USA, but not arranged or originated by USA.

       (k)    Prepare and deliver to escrow closing instructions to effectuate the Loan closing in accordance with the Loan Agreement and the Fee Agreement.

    2.    <u>Services of USA in Connection with Servicing the Loans</u>.   Subject to and in accordance with the terms and conditions set forth in this Agreement, and all applicable laws, Lender instructs and authorizes USA to, and USA will perform the following services in connection with servicing each of the Loans:

       (a)    Verify, where applicable, that the property encumbered by Lender's deed of trust is insured (at the Borrower's expense) by a sufficient casualty insurance policy and that Borrower has sufficient liability insurance coverage. USA will hold for the Lender's account such policies and renewals thereof.

       (b)    Keep appropriate accounting records on each note and the sums collected thereon, which records will reflect the amounts collected as to principal, interest and late charges, and, if applicable, insurance, taxes and other specified amounts. Those records will be available for review by the Lender during regular business hours at USA's corporate office.

       (c)    Until the total amount due under each note is paid in full:

           (i)    Proceed diligently to collect all payments due under the terms of the note and promptly pay the proper parties, when and if due, principal, interest, late charges,  insurance and other specified funds.

           (ii)    In the event the Borrower fails to make any payment to USA as required by the  terms of the note, USA will take steps to collect the payment including but not limited to delivering default notices, commencing and pursuing foreclosure procedures, and obtaining representation for Lender in litigation and bankruptcy proceedings as deemed necessary or appropriate by USA in its business judgment to fully protect the interests of the Lender, and of all Lenders in the loan.

(iii)    In its sole discretion, USA may pay off any Lender at any time by paying the then outstanding balance of Lender's interest in the principal of the Loan, plus all accrued interest and any prepayment penalty or fee, if applicable. Any Lender so paid off shall concurrently execute and deliver therewith to USA an assignment, in a form acceptable to USA, of all of such Lender's right, title, and interest in the Loan (including all documents evidencing the Loan) and in the deed of trust securing the Loan.

(iv)    In its sole discretion, USA may waive late payment charges, assumption fees, charges for returned checks due to insufficient funds, or other fees which may be collected in the ordinary course of servicing the Loans.

(d)    Provide the Lender with regular statements regarding loan collections, but in no event less frequently than quarterly.

(e)    Without limiting the generality of anything contained herein, Lender hereby authorizes and empowers USA, on Lender's behalf, to: (1) execute and deliver demands for payoff and beneficiary's / lender's statements of condition and the like; (2) execute and deliver any and all instruments if satisfaction or cancellation, or of partial or full release, discharge, or reconveyance, or authorizations in connection therewith, with respect to any Loans paid in full and with respect to the related real or personal property securing such Loans; (3) execute and deliver any and all other documents with respect to any Loans that are customary and consistent with loan servicing practices pertaining to such loans; (4) consent to modifications of the Loans if the effect of any such modification will not materially or adversely affect the security provided by the real or personal property in connection therewith; (5) institute foreclosure proceedings (judicial or non-judicial), obtain a deed-in-lieu thereof, engage in settlement discussions, and enter into forbearance and other settlement-related agreements (which agreements may contain provisions that release or waive claims against a Borrower or Guarantor); and (6) take title in the name of Lender (in proportion to its interest in the Loan) to any real property upon a foreclosure or delivery of a deed-in-lieu thereof. Notwithstanding the foregoing or any other provision contained herein, USA may not permit any modification to any Loan that would change the interest rate, forgive the payment of any principal or interest (expressly excluding late charges or the difference between default and non-default interest), change the outstanding principal amount, or extend the maturity date, without Lender's prior consent; provided, however, if Lender fails to grant or deny its consent within three (3) business days after notice from USA, Lender shall be deemed to have conclusively given its consent.

3.    <u>Rights of Lender if USA Fails to Act</u>.    Pursuant to NAC 645B.073, in the event of default, foreclosure, or other matters that require action, if for any reason USA fails to act on Lender's behalf as authorized herein, then Lender may, with approval of fifty-one percent (51%) or more of all of the holders of the beneficial interest of record in the Loan, act on behalf of all such holders of beneficial interest of record. These actions may include, but are not limited to:

(a)    the designation of the mortgage broker, servicing agent or other person to act on behalf of the holders of the beneficial interests in the loan; and

(b)    the sale, encumbrance or lease of real property owned by the holders resulting from a foreclosure or the receipt of a deed in lieu of a foreclosure.

4.    <u>Legal Proceedings</u>.    USA will assist the Lender in any necessary foreclosure proceedings to

protect the Lender's interest in the note and deed of trust. Where necessary, in USA's business judgment, USA may retain attorneys on Lender's behalf. Any legal proceeding instituted by USA pursuant to this Agreement may be pursued in USA's name only or as agent for Lender. Upon demand by USA, Lender agrees to promptly pay, either in advance or to reimburse USA, for its pro rata portion of the out-of-pocket expenses incurred, including attorney's fees, trustee's fees and foreclosure costs. In the event that Lender fails to pay such sums to USA upon demand or request thereof, or if USA elects to advance such sums, USA may, in its discretion, advance such fees, including trustee's fees, attorney's fees, and costs of foreclosure; provided, however, that any fees advanced by USA shall be paid back from the proceeds of the foreclosure (whether by reinstatement or sale), or from any other monies collected with respect to such Loan, before any payments are made to Lender. In the event of any litigation concerning the Loan, Lender hereby appoints USA as its agent to accept service of any summons and complaint, naming Lender as a party.

5.    Compensation to USA for Loan Servicing. Lender authorizes USA to retain monthly, as compensation for services performed hereunder, (a) one-twelfth (1/12th) of its annual servicing fee, which shall not exceed one percent (1%) per annum of the maximum principal amount of each of the Loans, (b) any late charges collected from the Borrower pursuant to the terms of the Note, and (c) and default interest collected from the Borrower pursuant to the terms of the Note. Notwithstanding the foregoing, it is agreed and acknowledged that USA derives the bulk of its revenues from charging loan fees ("points") to the Borrower. Certain Borrowers, however, may prefer to pay a higher rate of interest in exchange for a reduction in loan fees payable in advance to USA, the higher interest rate comprising a deferred loan fee. USA will notify Lender when such a case arises, and advise Lender of what portion of the interest is payable to USA as a deferred loan fee.

Should Lender desire to sell all or any part of its interest in the note and deed of trust, USA will assist Lender in finding potential buyers and completing the necessary documentation for the transaction. A fee of 5% of the remaining balance of Lender's undivided interest in the note amount will be deducted from the selling price and paid to USA on all such assignments for which USA locates the Assignee.

In the event an extension of a Loan is negotiated, USA shall be entitled to charge a fee therefor from the Borrower pursuant any separate fee agreement between USA and the Borrower.

6.    USA's Right to Delegate. Notwithstanding anything contained herein, USA may in its sole discretion delegate specific loan arranging and servicing obligations to credit bureaus, real estate tax service companies, real estate brokers or agents, appraisers, attorneys, trustees, or others, provided that USA shall remain responsible for all action taken or not taken by such companies, agents, representatives, and others throughout the term of this Agreement.

7.    No Legal Advice. Lender acknowledges that USA will not act as Lender's attorney or provide legal advice to Lender, and that Lender is encouraged to seek independent counsel in connection with any questions Lender may have concerning this agreement, any Loan, USA's form loan documents, or any other matter.

8.    Termination. Lender may, by 30 days written notice to USA, terminate this agreement, and the power of attorney granted, if one is granted, under Section 9 of this Agreement, if USA fails to perform its obligations hereunder.

9.    Lender's Registration.  Lender(s) name as listed in the first paragraph of this Agreement is the exact form for registration of Lender's interest and for reference to Lender in the Loan Documents.

10.    Integration Clause.  This Agreement contains the entire agreement between the parties hereto and cannot be modified except by a written amendment signed by both parties.  The invalidity of any portion of this agreement shall in no way affect the balance thereof.  This Agreement shall remain in effect until Lender's interest in all notes and deeds of trust with respect to Loans arranged and/or serviced by USA is completely liquidated (unless sooner terminated in accordance with the terms hereof).

11.    Limited Power of Attorney.  With respect to each loan, Lender hereby agrees that USA shall have full power and authority, and Lender hereby appoints USA as its true and lawful attorney-in-fact to (a) hold the original note(s), and (b) to do all things and take all actions on behalf of Lender which are necessary or convenient to effectuate this Agreement and its intent and to protect Lender's interest under any note, deed of trust, guaranty, security agreement or other document pertaining to any Loan.  Upon USA's request, Lender hereby agrees to execute and deliver, in the presence of a notary public, a "Declaration of Agency and Limited Power of Attorney", in a form consistent with Chapter 645B of the Nevada Revised Statutes, pursuant to which Lender shall further evidence the appointment of USA as Lender's true and lawful attorney-in-fact to undertake the duties of USA hereunder.  No one shall be required to look beyond such Declaration of Agency and Limited Power of Attorney for evidence of USA's authority hereunder.  All Declarations of Agency and Limited Powers of Attorney may include the language: This document may be executed with counterpart signature pages, and the document with all counterpart signature pages shall constitute one and the same instrument.

12. Notices.  All notices, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been given (i) when personally delivered, or (ii) on receipt, when deposited with a recognized overnight courier service such as Federal Express or DHL, or (iii) three (3) business days after the date when deposited in the United States mail and sent postage prepaid by registered or certified mail, return receipt requested, addressed as follows:

    If to USA:          USA Commercial Mortgage Company
                        4484 S. Pecos Road
                        Las Vegas, Nevada 89121-5030
                        Attention:

    If to Lender:


                        Attention:

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

13.    Governing Law.  This Agreement shall be construed in accordance with the laws of the State of Nevada, without regard to the conflict of laws or rules thereof, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws,

14.     Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

15.     Attorney's Fees. In the event any party hereto brings an action to enforce any of the provisions of this Agreement, the party against whom judgment is rendered in such action shall be liable to the other for reimbursement of its costs, expenses and attorneys' fees, including such costs, expenses and fees as may be incurred on appeal,

16.     Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors and assigns.

17.     Headings. Sections headings used in this Agreement are for convenience only and shall not affect the meaning or interpretation of this Agreement.

18.     Authority. Each party represents and warrants to the other party that it is duly authorized to execute, deliver and perform this Agreement.

IN WITNESS WHEREOF, the parties hereto have signed, sealed, acknowledged and delivered this instrument the day and year first above written.

LENDER: **Charles B. Anderson Trustee of the Charles B. Anderson Trust**

By: _____

Name: **Charles B. Anderson**

Title:  **Trustee**

By: _____

Name: _____

Title: _____

USA COMMERCIAL MORTGAGE COMPANY:

By: _____

Joseph D. Milanowski, President

# EXHIBIT "B"



# Fidelity National Title®
### Insurance Company

## CONSTRUCTION DISBURSEMENT AGREEMENT

### PROJECT:

### <u>LENDER</u>

USA CAPITAL
4484 SOUTH PECOS ROAD
LAS VEGAS, NEVADA 89121
PHONE:    702-734-2400
FAX:        702-734-0163
E-MAIL:    trondeau@usacapitalcorp.com
THOMAS RONDEAU, ESQ.

### <u>BORROWER</u>

BROOKMERE, LLC AND LORD & ESSEX MATTESON, LLC
1135 MITCHELL ROAD
AURORA, ILLINOIS  60504
PHONE:    630-896-2300
FAX:        630-892-3233
EMAIL:    jpoppjr@lordandessex.com
JOHN J. POPP, JR.

### <u>DISBURSEMENT AGENT</u>

CONSTRUCTION DISBURSEMENT SERVICES
Fidelity National Financial Companies
40 N. CENTRAL AVE., SUITE 2850
PHOENIX, ARIZONA 85004
PHONE:    602-343-7578
FAX:        602-343-7564
E-MAIL:    harry.westfall@fnf.com
HARRY WESTFALL, MANAGER

# ARTICLE I

**I.**

### a) Purpose

The Construction Disbursement Services of FIDELITY NATIONAL TITLE INSURANCE COMPANY , a Florida corporation ("CDS") is hereby employed to act as disbursing agent in order to provide a mechanism for disbursement of construction loan funds in the original principal amount of $700,000 (the "Loan") for the construction of a residential and commercial master-planned community (the "Improvements") on the property legally described on Exhibit A attached hereto (the "Land") (which Land, together with the Improvements to be built thereon, are sometimes hereinafter referred to as the "Project"), as provided in that certain Loan Agreement between USA Capital ("Lender") and Brookmere, LLC and Lord & Essex, LLC ("Borrower"), dated as of April, 2005 (which, collectively with that certain Construction Loan Addendum executed of even date therewith by and between Lender and Borrower, is hereinafter collectively referred to as the "Loan Agreement"), and does hereby agree with Lender and Borrower that it will disburse the proceeds of the Loan (the "Funds") as provided herein. All capitalized terms which are set forth and not otherwise defined herein shall have those meanings ascribed to such terms in the Loan Agreement.

# ARTICLE II

**II.**

### a) Deposit of Funds

Funds may be deposited by Lender into an account designated by CDS for the purposes herein by wire transfer pursuant to the wiring instructions attached as Exhibit B (the "Wiring Instructions") or may be deposited into such account in the form of a check. Funds deposited by check will not be available for payment by CDS until such check has cleared and the Funds are deemed available in CDS's account. All amounts deposited by Lender with CDS shall be held by CDS for the benefit of Lender until disbursed by CDS.

Borrower and Lender have read the **NOTICE OF RIGHT TO EARN INTEREST ON DEPOSITED FUNDS** attached hereto as Exhibit C, and Borrower acknowledges and understands Lender's right to earn interest on the Funds it deposits with CDS for the period prior to the further disbursement of such funds by CDS as provided herein.

### b) Inspections

Borrower shall permit Lender, CDS and it their representatives and agents to enter upon the Land at all times and to inspect the Improvements and all materials to be used in the construction thereof, and shall cooperate and cause Lord & Essex Matteson, LLC (the "General Contractor") to cooperate in connection therewith. In the event Lender, CDS and/or their representatives and/or agents enter upon the Land to make inspections, Borrower will indemnify and hold such parties harmless with respect to injuries incurred or suffered by such parties. Neither Borrower nor any third party shall be entitled to rely upon any Inspection or review undertaken by CDS.

**c) Third Party Deliveries**

In carrying out its disbursement obligations under this Construction Disbursement Agreement (the "Agreement"), CDS shall be responsible for determining, prior to Lender depositing an advance of Funds (a "Disbursement") with CDS, that the Borrower and/or General Contractor have delivered to CDS and/or obtained such acknowledgments, invoices, indemnities, affidavits, releases, bills of sale and/or Lien Waivers (as hereinafter defined) as CDS deems necessary to carry out its responsibilities under this Agreement. Lender agrees to provide reasonable assistance to CDS in securing such items. CDS and Lender shall determine:

(1)　　the proper form of lien waivers under applicable state law (the "Applicable Law");

(2)　　from the list provided to CDS by Lender, Borrower and/or General Contractor, as updated from time to time, of the Contractors, subcontractors, suppliers, material men, vendors and/or other entities or persons performing services and/or providing supplies and/or equipment to the Project, those which are entitled to protection under Applicable Law;

(3)　　the adequacy and completeness of all lien waivers (including the authority of the entities and/or persons executing such waivers) submitted to CDS in connection with a Disbursement and whether satisfactory lien waivers have been delivered by all Contractors, subcontractors, suppliers, material men, vendors and/or other entities or persons then-entitled to protection under Applicable Law. In carrying out the responsibilities set forth in this subsection, CDS shall be responsible for determining whether the amounts set forth in the invoices and/or information submitted by the Borrower with each Disbursement are consistent with the corresponding amounts set forth in the Application and Certificate for Payment Summary provided by the General Contractor and set forth on AIA forms G702 and G703 (the "AIA Forms G702 & G703") or their equivalent; and

(4)　　the appropriate Contractors, subcontractors, suppliers, material men, vendors and/or other entities and/or persons to receive checks in connection with each Disbursement, and that the amounts of such checks are consistent with the corresponding amounts set forth on AIA Forms G702 & G703 and the "Instruction to Disburse," a sample of which form is attached hereto as <u>Exhibit E</u>.

**d) Disbursement Procedures and Requests for Disbursement of Loan Proceeds**

(1)　　<u>Limitations on Requests for Disbursement</u>. Subject to the limitations and conditions set forth in this Agreement and in the Loan Agreement, Lender shall provide Disbursements from time to time to pay approved costs to construct the Improvements. No more than 15 requests for Disbursement of Loan Proceeds by the Borrower (each a "Request for Disbursement"), the form of which is set forth in <u>Exhibit D</u> attached hereto, shall be made to Lender during the term of this Agreement, and such Requests for Disbursement shall not be made more frequently than 1 time(s) monthly.

(2)　　<u>Sworn Construction Cost Statement</u>. Borrower shall submit to Lender and to CDS an itemized, certified statement of actual and estimated costs of the Project,

signed and sworn to by Borrower, the General Contractor and the Project Architect (the "Sworn Construction Cost Statement"), and shall advise Lender and CDS of the name of each Contractor known to Borrower. If requested by Lender or CDS , Borrower shall also furnish to Lender and CDS a copy of each contract with each of the Contractors. Borrower shall keep CDS and Lender advised at all times of the names of all Contractors, and of the type of work, material or services and of the dollar amount covered by each of their respective contracts with Borrower. It is understood and agreed that only Contractors whose names, contract descriptions and, after a request therefore, contracts, have been furnished to Lender shall be entitled to receive Disbursements under this Agreement.

(3)   Initial Disbursement; Subsequent Disbursements.  Upon satisfaction of the conditions precedent to the initial Disbursement set forth herein and in the Loan Agreement, Borrower shall submit to Lender and copy to CDS an initial Request for Disbursement, the proceeds of which shall be used to pay the items set forth therein. Also prior to the initial Disbursement, Borrower shall submit to CDS and Lender copies of each of the following:

(i)     General Contractor's contract;
(ii)    Loan Agreement;
(iii)   List of all known subcontractors;
(iv)    Subcontractors' contract if requested;
(v)     List of General Contractor's known major suppliers to the Project;
(vi)    List of subcontractors' known major suppliers to the Project;
(vii)   Cost break-down of approved Soft Costs to be funded.

After the advance of the initial Disbursement and subject to the provisions set forth herein and in the Loan Agreement, Borrower may obtain additional Disbursements of the Loan from time to time to pay direct costs incurred in connection with the construction, equipping and furnishing of the Improvements; provided, however, that notwithstanding any provision of this Agreement or the Loan Agreement to the contrary, Lender shall have no obligation to make any Disbursement to pay for costs other than Eligible Site Work Costs prior to the date on which the foundation of the Project is completed as evidenced by: (i) the issuance of a so-called "foundation endorsement" to the title policy for the Project (the "Title Policy") insuring that the foundation(s) of the structure(s) under construction on the Land do not encroach onto adjoining lands or onto that portion of the Land subject to any easement shown on the Title Policy, and that the location of said foundation(s) does not violate any covenants, conditions or restrictions or plat building line disclosed by the Title Policy or municipal setback requirements, or as close an equivalent endorsement as is available, and (ii) certification from the Project Architect that the foundation has been completed or substantially completed in accordance with the Plans.

(4)   General Procedure for Obtaining Disbursements.  Upon Lender's receipt of invoices from the General Contractor for which the General Contractor seeks reimbursement, Lender shall, so often as is provided in Section 2.d(1), above, prepare a form of Request for Disbursement, and shall send such Request for Disbursement to Borrower for execution. Upon Borrower's review, approval and execution of the Request for Disbursement, Borrower shall submit such Request

for Disbursement to Lender and a copy to CDS at least ten (10) business days prior to the date on which the requested Disbursement is to be made (the "Disbursement Date"). Along with the Request for Disbursement, Borrower shall also simultaneously submit to Lender and/or CDS (as indicated below) each of the following:

(i) AIA Forms G702 & G703, or their equivalents (to Lender and CDS);

(ii) Invoices and any such other supporting evidence as may be requested by Lender to establish the cost or value of the Improvements for which Disbursements are to be and have been made, or as may be required by the Loan Agreement (to Lender and, upon request, to CDS);

(iii) An unconditional lien release upon payment ("Lien Waiver") in such form as prescribed or in such other form as Lender may from time to time require, executed by each Contractor and evidencing payment for all work done and materials supplied for which an advance was made from the preceding Disbursement (to Lender and CDS);

(iv) Copies of any Notices to Owner which Borrower has received pursuant to state law (to Lender and CDS);

(v) Evidence that all conditions of this Agreement and the Loan Agreement required to be satisfied prior to such Disbursement have been satisfied or waived;

(vi) Such additional information, affidavits, certificates, invoices and other documents as may be required by Lender and/or CDS for making the Disbursement, including without limitation, a certificate executed by Borrower's inspecting architect or engineer stating that all work and improvements specified in the Request for Disbursement have been inspected and approved.; and

(vii) Copies of any change orders to the General Contractor's contract for the Project which have been approved by Lender.

Additionally, prior to any Disbursement of Funds by CDS, CDS will obtain from the title agent a verbal date-down to the Title Policy issued by the title agent. CDS shall give notice to Lender of any intervening liens or other such matters which appear therein. If available, CDS shall cause the title agent to issue a date-down endorsement which modifies the effective date of the Title Policy to be, at CDS's election, the plant date or the Disbursement Date and does not disclose any intervening liens or other matters unacceptable to Lender. Upon the demand of Lender, Borrower shall immediately cause any such liens or other matters to be satisfied of record or bonded, or shall immediately make other arrangements with respect to the discharge thereof satisfactory to Lender. CDS shall not make a Disbursement until any such lien or matter is removed from the record or until CDS has received from Lender written approval to do so.

On the Disbursement Date, if (i) all the terms and conditions of the Loan Agreement and this Agreement have been complied with by Borrower, (ii) no Default or Event of Default exists under the Loan Agreement, (iii) Lender has approved the Request for

Disbursement and sent to CDS Instructions to Disburse, and (iv) CDS has received the Disbursement from Lender and all of the documents and information required herein, then CDS shall disburse the requested Disbursement (less any required Retainage and less amounts payable to and advanced by Lender to the Contractors entitled to payments there under). Lender will inform CDS of any advance by Lender direct to Contractors.

(5)     Payment of Disbursements.   CDS is authorized to make Disbursements, as approved by Lender and upon the receipt by CDS of Lender's Instruction to Disburse, to the parties listed and in the amounts set forth in such Instruction to Disburse under the terms and conditions described therein.

(6)     Required Documentation.   The provisions of this Agreement requiring submission of the documents specified in Section 2.d(4) shall not apply with respect to Disbursements to be made for the items listed below, which may be disbursed in full upon submission of a fully executed Request for Disbursement listing such items, and/or the following special documentation, if any, to Lender (unless said advance is made to Lender), or as otherwise provided by the Loan Agreement:

| ITEM | SPECIAL DOCUMENTATION |
|---|---|
| Lender charges (interest, Fees, etc.) | None |
| Attorney's fees (including Lender's Counsel) and Inspecting Architect's fees | Copy of Statement |
| Real estate taxes on the Project and Land | Copy of Bill |
| Insurance Premiums | Copy of Statement |
| Equipment Costs | Copy of Invoice |
| Other indirect (non-construction) items | As specified by Lender and Title Lender |

If Borrower directly pays certain costs of construction, and Lender approves, Lender may direct CDS to advance the proceeds of Disbursements, advanced for payment of such construction costs, directly to Borrower as reimbursement for such payment; provided, however, that all of the other requirements of this Agreement, including, but not limited to, the presentation of Lien Waivers with respect thereto, are fulfilled. All documents required to be delivered by Borrower to Lender and/or CDS pursuant to this Agreement shall be in form and content acceptable to Lender.

(7)     Failure to Provide Required Documentation.   If Lender shall determine, in its sole discretion, that proper documentation to support a given Disbursement, as required by this Agreement, has not been furnished, Lender may at its option, withhold payment of all or such portion of such Disbursement as shall not be so supported by proper documentation, and shall promptly notify Borrower of the

discrepancy in or omission of such documentation. Until such time as such discrepancy or omission is corrected to the satisfaction of Lender, it shall have the right to withhold such amount.

(8)     Stored Materials.  Disbursements may be made for stored materials only if: (i) such materials are securely stored on the Land or in a bonded warehouse acceptable to Lender in the vicinity of the Land and are available for inspection by Lender or its agents, and (ii) the Borrower has been billed for such stored materials. Lender shall be named as a loss payee on the insurance with respect to any such stored materials, and the amounts, coverages, insurers, loss payable clauses, and other aspects of such insurance shall be satisfactory to Lender. If the materials are stored in a bonded warehouse, the receipts issued by the warehouseman shall be issued in the name of Lender and held by Lender or CDS, to be released only as the materials are to be used by the General Contractor.

(9)     Amount of Disbursements; Retainage.  Borrower may obtain advances for disbursement to Contractors only to the extent of the amount currently due to each Contractor for work satisfactorily completed or materials actually incorporated into the Project by such Contractor, less a retainage (the "Retainage") equal to the sum of (i) the retainage permitted to be withheld pursuant to such Contractor's contract, plus (ii) ten percent (10%) of the amount currently due to such Contractor for construction costs ("Hard Costs"). Borrower agrees that all sums requested hereunder for advance to each Contractor shall not exceed that amount. For purposes herein, "Soft Costs" are defined as marketing, administrative and other non-construction costs related to the development and marketing of the Project. Lender shall not be required to make the final advance for the payment of the full amount of each Contractor's contract until Lender is satisfied that all of the work covered by such Contract has been completed in accordance with the approved Plans, and that all requirements herein and in the Loan Agreement have been fully complied with. At the time of the final Disbursement, Lender may deposit the Retainage with CDS, unless Lender elects otherwise due to an Event of Default under the Loan Documents by Borrower, as defined in the Loan Agreement, and determined by Lender. CDS shall be responsible for determining how long to hold all or any portion of the Retainage deposited with it by Lender; *provided*, however, that in no event shall CDS hold such Retainage beyond (i) the expiration of all lien periods under applicable law or such time as CDS has received all necessary lien waivers from Contractors, subcontractors, suppliers, material men and vendors entitled to protection under applicable lien laws, whichever occurs first, and (ii) the settlement of all disputes as to the proper completion of work with respect to the Improvements or as to the amount due any Contractor or supplier who has performed work or provided materials. Upon the passage of such periods and/or settlements of such disputes, if any, or upon such earlier time as CDS shall elect, CDS shall disburse such Retainage to the Contractors, subcontractors, suppliers, material men, and venders and/or other entities or persons entitled thereto and return any excess funds remaining to Lender. Borrower shall have no right, title or interest in or to the Retainage whether held by Lender or CDS, nor shall Borrower have any right to direct the application of such Retainage. The Retainage may be disbursed to the General Contractor and subcontractors and/or material suppliers on a single check made

out jointly to all such parties. CDS shall not disburse any retainage without an Instruction to Disburse from Lender.

(10)  <u>Partial Denial of a Request for Disbursement</u>.  If a Request for Disbursement is not approved in its entirety, Lender shall not be obligated to disburse any disapproved portion of the Disbursement until resolution of each basis for disapproval is made to the satisfaction of Lender.

## **ARTICLE III**

**III.**

### a)  **Limitation of CDS's Liability**

CDS's liability to Lender for negligence or errors committed in the performance of its disbursement obligations under this Agreement shall be limited to that portion, if any, of the Disbursement proceeds not disbursed in accordance with Instruction to Disburse received from Lender pursuant to a Request for Disbursement or other authorized manner, <u>plus</u> the cost of defending Lender in any claims or action arising out of such improper or erroneous Disbursements. CDS further agrees to indemnify, hold harmless and defend Lender and its successors and assigns from and against any and all claims, losses, costs or damages, including attorney's fees, caused by, incurred or resulting from CDS's gross negligence and/or intentional misconduct in connection with any activities performed by CDS pursuant to this Agreement. CDS and Lender hereby agree to cooperate with each other and any title insurer in the handling of any claims arising from the construction disbursement process.

The proceeds of the Loan shall be funded as directed by Lender in the Instruction to Disburse. Should a Request for Disbursement reflect increases or changes in the costs of construction from those figures originally understood by Lender, CDS shall have no liability to Borrower, General Contractor or Lender for any consequences resulting there from if Lender's Instruction to Disburse reflects such increases or changes. CDS shall further have the right to rely on the information provided by Borrower and General Contractor as to the identities of all parties furnishing labor, materials or services to the project and CDS shall not have any liability to Borrower, General Contractor or Lender for any consequences resulting from any errors or omissions in said disclosures or identities.

CDS and Lender acknowledge and agree that the obligations of Fidelity National Title Insurance Company ("FNTIC"), when FNTIC acts as title agent to Lender in connection with the Project, are separate, distinct and independent from the disbursement and escrow obligations of CDS pursuant to this Agreement.

### b)  **Lack of Funds**

If written statements are furnished to CDS that funds available under the Loan are not sufficient to complete construction, CDS shall not be obligated to continue disbursing Funds hereunder until necessary funds are deposited with or committed to CDS by Borrower or Lender, or until CDS is directed, in writing by the Borrower and Lender, to disburse only a stipulated portion of the Funds which are subsequently requested via a Request for Disbursement.

### c) Fees and Expenses

The Borrower agrees that it shall be solely responsible for the payment of all fees and expenses of CDS in performing its disbursement duties and obligations under this Agreement, which fees shall include a one time set up fee of $ 300.00 and a fee of $650.00 for each Disbursement; provided, however, that the fee owed to CDS for the disbursement costs associated with equipment only, without any associated construction or non-construction costs, shall be $135.00 per such Disbursement, without any attendant set up fee. CDS's fees shall be included in each Disbursement from Lender.

### d) Notices

All notices, consents, approvals or other instruments required or permitted to be given by any party to this Agreement shall be in writing and given by hand delivery, facsimile, e-mail, express overnight delivery service or by mail and shall be deemed to have been delivered upon receipt. Notices shall be provided to the parties at the addresses shown in Article 1.

### e) Communication by CDS

CDS may desire to inquire and communicate directly with various parties named in the information provided by Lender, General Contractor or Borrower to CDS or who give notice (a "Notice to Owner" or "Preliminary Lien Notice") regarding a lien or preliminary lien against the Land and/or the Improvements. Borrower, General Contractor and Lender do hereby authorize CDS to make such inquiries and authorize those parties to furnish the information requested by CDS.

### f) Applicable Law

Applicable Law shall be the law of the state in which the Land is situated except that this Agreement shall be construed according to the law of the State of Arizona.

### g) Successors and Assigns

This Agreement shall inure to the benefit of, and be binding on, the parties hereto and their respective successors and assigns.

### h) Waiver

No failure or delay on the part of Lender in exercising any right, power or privilege hereunder, and no course of dealing between Lender and either Borrower or CDS shall operate as a waiver thereof. Neither this Agreement nor any provision hereof may be modified, waived, discharged or terminated orally, but only by a written instrument signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

### i)  Severability

All provisions of this Agreement are severable, and if any provision shall be held invalid or unenforceable, the validity and enforceability of the remaining provisions shall in no way be affected.

### j)  Counterparts

This Agreement may be executed in one or more counterparts, all of which together shall constitute one and the same instrument.

### k)  Termination

This Agreement may be terminated by either Lender or CDS upon thirty (30) days advance written notice to the other party.

## ARTICLE IV

IV.

### Exhibits

The following exhibits are attached hereto and made a part hereof:

A   -   Legal Description of the Land

B   -   Wire Transfer Instructions

C   -   Notice of Right to Earn Interest on Deposited Funds

D       Request for Disbursement

E   -   Instructions to Disburse

Dated this          day of April, 2005,

**BORROWER:**                    Brookmere, LLC

BY:

TYPED NAME:          JOHN J. POPP, JR.

TITLE:                    MEMBER

**BORROWER:**                    Lord & Essex, LLC

BY:

TYPED NAME:          JOHN J. POPP, JR.

TITLE:                    MANAGING MEMBER

**LENDER:**                    USA Capital

BY:

TYPED NAME:          Joseph D. Milanowski

TITLE:                    President

**CDS:**                    FIDELITY NATIONAL TITLE INSURANCE COMPANY
                    Construction Disbursement Services

BY:

TYPED NAME:          Harry C. Westfall

TITLE:                    AVP, Manager and Sales

Page 11 of 18

REVIEWED AND ACKNOWLEDGED AND AGREE TO BY GENERAL
CONTRACTOR

**GENERAL CONTRACTOR:**          LORD & ESSEX MATTESON LLC

BY: _____
                              Signature

TYPED NAME:              JOHN J. POPP, JR.

TITLE:
                    MANAGING MEMBER

## EXHIBIT A

### Legal Description of the Land

**BROOKMERE, LLC**

LOTS C1-A, C1-B, C1-C, C1-D, C1-E, C1-F, C1-G, C1-H, C2-A, C2-B, C2-C, C2-D, C2-E, C2-F, C3-A, C3-B, C3-C, C3-D, C4, C4-A, C4-B, T1, THAT PORTION OF 203RD STREET LYING NORTH OF AND ADJOINING LOT T-1 AND NORTH OF AND ADJOINING LOTS C4-A AND C4-B, AND THAT PORTION OF POST AVENUE EAST OF AND ADJOINING LOT T-1 NORTH OF A LINE 275.61 FEET NORTH OF THE SOUTH LINE OF LOT T-1 IN THE PLAT OF BROOKMERE SUBDIVISION BEING A RESUBDIVISION OF PART OF MATTESON COMMONS SUBDIVISION IN THE EAST 1/2 OF SECTION 16, TOWNSHIP 35 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN THE VILLAGE OF MATTESON, COOK COUNTY, ILLINOIS RECORDED AUGUST 28, 2003 AS DOCUMENT 0324019012.

PERMANENT INDEX NUMBERS:

31-16-203-002-0000
31-16-203-003-0000
31-16-203-004-0000
31-16-203-005-0000
31-16-203-007-0000
31-16-401-009-0000
31-16-401-011-0000
31-16-401-012-0000

**LORD & ESSEX MATTESON, LLC**

LOTS 1, 1A, 2, 3, 4, 5, 6, 7 IN THE PLAT OF BROOKMERE SUBDIVISION BEING A RESUBDIVISION OF PART OF MATTESON COMMONS SUBDIVISION IN THE EAST 1/2 OF SECTION 16, TOWNSHIP 35 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN THE VILLAGE OF MATTESON, COOK COUNTY, ILLINOIS RECORDED AUGUST 28, 2003 AS DOCUMENT 0324019012.

PERMANENT INDEX NUMBERS:

31-16-203-002-0000
31-16-203-003-0000
31-16-203-004-0000
31-16-203-005-0000
31-16-203-007-0000
31-16-401-009-0000
31-16-401-011-0000
31-16-401-012-0000

Excepting therefrom the following described property:

**PARCEL 1:**

All of Lot 5 and that part of Lot 3 in Brookmere Subdivision, being a resubdivision of part of Matteson Commons Subdivision in the East Half of Section 16, Township 35 North, Range 13 East of the Third Principal Meridian, in the Village of Matteson, Cook County, Illinois, according to the plat thereof recorded August 28, 2003 as Document No. 0324019012, described as follows:

Beginning at the southeast corner of said Lot 3; thence North 81 degrees 30 minutes 17 seconds West along the southerly line of said Lot 3 for a distance of 552.94 feet to the southwest corner of said Lot 3; thence northeast 400.17 feet along the west line of said Lot 3, being on a curve concave to the east, having a radius of 610.00 feet and a chord bearing North 23 degrees 03 minutes 06 seconds East, 393.03 feet to a point of compound curvature; thence continuing northeast 237.98 feet along the northwesterly line of said Lot 3, being on a curve concave to the southeast, having a radius of 11,379.16 feet and a chord bearing North 42 degrees 26 minutes 39 seconds East, 237.97 feet; thence South 15 degrees 53 minutes 25 seconds East, 238.24 feet; thence South 39 degrees 51 minutes 50 seconds East, 77.80 feet; thence South 39 degrees 51 minutes 50 seconds East, 50.40 feet; thence South 81 degrees 30 minutes 36 seconds East, 127.06 feet to the east line of said Lot 3, being on the west line of Matteson Avenue; thence South 08 degrees 29 minutes 22 seconds West along the west line of Matteson Avenue, 275.67 feet to the point of beginning.

**PARCEL 2:**

Lots 1 to 146 in First Resubdivision of Lot 4 in Brookmere, being a subdivision of Lot 4 in Brookmere Subdivision in the East ½ of Section 16, Township 35 North, Range 13 East, of the third principal meridian in the Village of Matteson as per plat recorded August 4, 2004 as Document No. 0421744046, Cook County, Illinois.

## EXHIBIT B

## WIRE TRANSFER INSTRUCTIONS

FIDELITY NATIONAL TITLE INSURANCE COMPANY
**Construction Disbursement Services**
40 N. Central Ave., Suite 2850
Phoenix, AZ 85004
T) 602-343-7578
F) 602-343-7564

WIRING INSTRUCTIONS

BANK:              Bank One, N.A.
                   201 N. Central Ave., 21st Floor
                   Phoenix, AZ  85004

ROUTING NO.        122100024

BENEFICERY:        FIDELITY NATIONAL TITLE INSURANCE COMPANY
                   Construction Disbursement Services

ACCOUNT NO.        665217436

**Telephone advise**

**Harry Westfall @ 602-343-7578**
**Or**
**Rita Bennett @ 602-343-7579**

<u>EXHIBIT C</u>

# FIDELITY NATIONAL TITLE INSURANCE COMPANY
# NOTICE OF RIGHT TO EARN INTEREST ON DEPOSITED FUNDS

---

## NOTICE OF RIGHT TO EARN INTEREST ON DEPOSITED FUNDS

INTEREST MAY BE EARNED ON ALL DEPOSITED FUNDS BY PROVIDING THE ESCROW OFFICER WHO IS HANDLING YOUR TRANSACTION WITH A WRITTEN REQUEST TO PLACE THE ESCROWED FUNDS INTO AN INTEREST-BEARING ACCOUNT; <u>THE ESCROW AGENT'S CHARGE TO SET UP SUCH AN ACCOUNT IS $50.00.</u> YOUR FUNDS WILL EARN INTEREST AT THE PREVAILING RATE OF INTEREST PAID BY THE FEDERALLY INSURED FINANCIAL INSTITUTION WHERE YOUR FUNDS ARE DEPOSITED. FOR EXAMPLE, IN A TYPICAL TRANSACTION A $1,000.00 DEPOSIT FOR A THIRTY (30) DAY PERIOD WITH A PREVAILING INTEREST RATE OF 2.8% PER ANNUM WOULD EARN $2.10. YOU WILL NEED TO SIGN REQUIRED FORMS TO OPEN THIS ACCOUNT. FOR MORE INFORMATION ON DEPOSITING FUNDS IN AN INTEREST-BEARING ACCOUNT CONTACT YOUR ESCROW OFFICER OR IF YOU ARE UNABLE TO REACH YOUR ESCROW OFFICER, YOU MAY CONTACT THE ESCROW DEPARTMENT OF FIDELITY NATIONAL TITLE INSURANCE COMPANY, AS FOLLOWS:

FIDELITY NATIONAL TITLE INSURANCE COMPANY
CONSTRUCTION DISBURSEMENT SERVICES
40 N. Central Ave., Suite 2850
Phoenix, Arizona 85004
PHONE: 602-343-7578

## EXHIBIT D

### REQUEST FOR DISBURSEMENT

PROJECT NAME:

DATE:

REQUISITION NUMBER:

TO:                              FINANCIAL CORPORATION        (LENDER)

FROM:                              (Borrower)

The undersigned authorized representative of the Borrower hereby requests, pursuant to that certain Construction Loan Disbursement Agreement dated as of         , 200    , that Lender Financial Corporation ("Lender ") deliver to FIDELITY NATIONAL TITLE INSURANCE COMPANY , Construction Disbursement Services ("CDS"), and authorize the disbursement of, the following dollar amount for the development work at the above-referenced site for the period beginning         , 200    and ending         , 200    .

Borrower has attached substantiation of all the following hard costs (A.I.A. forms G702 and G703 or their equivalent) and soft costs.

HARD COSTS:

General Contractor:
      Application for payment: per A.I.A. G702 & G703 or equivalent  $
      (Less Retainage (10%))  -$
      Sub-Total of Hard Costs  $
      (Less previous payments)  -$
      Total net construction draw  $

SOFT COSTS: (Reimbursable)
  $
  $
  $
  $
  $
CDS Disbursement Fee  $

Subtotal of Soft Costs  $

Total Disbursement Request  $

Borrower / Approval: _____  Date:

        Name:                              Title:

LENDER Approval: _____  Date:

        Name:                              Title:

## EXHIBIT E
## INSTRUCTIONS TO DISBURSE

# (*LENDER*)
**(LENDING DIVISION)**
(0000 W. SMITH LANE, Suite 109)
(Tempe, AZ 85282)
((000) 000-0000)

[Date]

<u>VIA FACSIMILE</u>

Fidelity National Title Insurance Company
Attention: Harry Westfall
40 N. Central Ave., Suite 2850
Phoenix, Arizona   85004

RE:    Construction Draw # 0 (0th GC Draw w/ equipment)
       Job Name
       City, State   (Lender File Number)

Dear Harry:

Pursuant to that certain Construction Loan Disbursement Agreement dated as of _____, 200__ (the "Disbursement Agreement") by and among *SSS Company Financial Corporation* ("Lender"), _____ ("Borrower"), _____ ("General Contractor") and Fidelity National Insurance Company – Construction Disbursement Services ("CDS"), *LENDER* has approved a Request for Disbursement (the "Request") (a copy of which is attached hereto) in the amount of $_____ (the "Disbursement Amount").

*LENDER* will transfer the Disbursement Amount to_____, N.A., ABA Routing No. 000000000, c/o_____, for further credit to Fidelity National Title Escrow Account No. 0000000000, Construction Disbursement Services.

Please disburse the Disbursement Amount as follows:

| Amount | Payee and Method of Payment | |
|---|---|---|
| $ | Disburse to _____ | via _____ |
| $ | Disburse to _____ | via _____ |
| $ | Disburse to _____ | via _____ |
| $ | Disburse to _____ | via _____ |
| $ | Disburse to CDS_____ | via Check_____. |

Upon the satisfaction of CDS's responsibilities under the Disbursement Agreement, CDS is authorized to disburse the Disbursement Amount in accordance with the instructions set forth in this letter.

If you have any questions, please do not hesitate to contact me at 602-224-8544.

*LENDER* Financial Corporation--

By: _____
JANE JONES
Assistant Vice President
Closing Department Manager