1   Annette W. Jarvis, Utah Bar No. 1649
    RAY QUINNEY & NEBEKER P.C.
2   36 South State Street, Suite 1400
    P.O. Box 45385
3   Salt Lake City, Utah 84145-0385
    Telephone: (801) 532-1500
4   Facsimile: (801) 532-7543
    Email: ajarvis@rqn.com
5
6   and

7   Lenard E. Schwartzer
    Nevada Bar No. 0399
8   Jeanette E. McPherson
    Nevada Bar No. 5423
9   Schwartzer & McPherson Law Firm
    2850 South Jones Boulevard, Suite 1
10  Las Vegas, Nevada  89146-5308
    Telephone:  (702) 228-7590
11  Facsimile:  (702) 892-0122
    E-Mail:  bkfilings@s-mlaw.com
12  Attorneys for Debtors

13              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEVADA
14

| 15  In re: | Case Nos. BK-S-06-10725 LBR |
| 16  USA COMMERCIAL MORTGAGE COMPANY, | Case Nos. BK-S-06-10726 LBR |
|                                  Debtor. | Case Nos. BK-S-06-10727 LBR |
| 17  In re: | Case Nos. BK-S-06-10728 LBR |
| 18  USA CAPITAL REALTY ADVISORS, LLC, | Case Nos. BK-S-06-10729 LBR |
|                                  Debtor. | Chapter 11 |
| 19  In re: | |
| 20  USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, | Jointly Administered Under Case No. BK-S-06-10725 LBR |
| 21                               Debtor. | SECOND SUPPLEMENTAL DECLARATION OF THOMAS J. |
| 22  In re:  USA CAPITAL FIRST TRUST DEED FUND, LLC, | ALLISON IN SUPPORT OF DEBTORS' MOTIONS [AFFECTS ALL DEBTORS] |
| 23                               Debtor. | |
| 24  In re:  USA SECURITIES, LLC, | Date of Hearing:  May 18, 2006 Time of Hearing: 9:30 a.m. |
| 25                               Debtor. | |
| 26  Affects: ☒  All Debtors | |
| 27  ☐  USA Commercial Mortgage Company ☐  USA Securities, LLC ☐  USA Capital Realty Advisors, LLC | |
| 28  ☐  USA Capital Diversified Trust Deed Fund, LLC | |

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1

☐ USA First Trust Deed Fund, LLC

I, Thomas J. Allison, hereby declare, verify and state as follows:

1.    I make this Second Supplemental Declaration as additional support for various motions of USA Commercial Mortgage Company ("USACM") and its four affiliates who filed bankruptcy petitions in this Court on April 13, 2006 (collectively, the "Debtors"), including the "Motion for Order Authorizing Reimbursement of Due Diligence Expenses of Potential Post-Petition Lender" (the "Due Diligence Expenses Motion") and the "Motion Authorizing Debtor, Pursuant to 11 U.S.C. § 105 and § 363(b)(1), to Accept Loan Payment Proceeds and Provide Partial Releases or Full Releases in Connection With the Sale of Properties Securing Loans Originated by the Debtor to Third Party Borrowers, and to Ratify Partial Releases Previously Provided by the Debtor" (the "Partial Releases Motion").   My Second Supplemental Declaration is based upon personal knowledge and the facts set forth herein.

2.    It appears that as of April 13, 2006 (the "Petition Date"), USACM was acting as the loan servicer for approximately 115 separate loans (the "Serviced Loans") having a combined outstanding loan balance of approximately $962 million.   Attached as Exhibit A to the Supplemental Declaration of Thomas J. Allison dated May 2, 2006 that was e-filed with the Court on May 2, 2006 (Docket No. 130), is a spreadsheet created under my direction by the Mesirow team providing preliminary information for each of the Serviced Loans, including the loan name, whether the loan is performing or non-performing, number of investors, origination date, outstanding balance, unpaid interest, and the percentage of the loan held by two of the Debtors in these related bankruptcy cases, USA Capital First Trust Deed Fund, LLC ("Capital First") and USA Capital Diversified Trust Deed Fund, LLC ("Diversified") (collectively the "Funds"), by USACM, and by other "Direct Lenders" (as defined below).

3.    I have directed that the Mesirow team review the loan files for each of the Serviced Loans.  Based on that review, it appears that the vast majority of the Serviced

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590   Fax: (702) 892-0122

Loans are secured by a trust deed on a commercial real estate project (the "Projects"), many of which are construction loans for construction Projects that are not yet completed.

4.    It appears that as of the Petition Date approximately 62 of the Serviced Loans were delinquent in the payment of interest or otherwise could be considered non-performing (the "Nonperforming Loans").  The Nonperforming Loans represent 72% percent in outstanding loan balance of the Serviced Loans.

5.    There are approximately 3,600 investors (the "Direct Lenders") whose names appear as a "Lender" in the loan documents for one or more of the Serviced Loans. The two Funds are included among the Direct Lenders.

6.    Prior to April 2006, USACM regularly made interest payments to Direct Lenders each month regardless of whether the particular Serviced Loans relating to each Direct Lender were performing or nonperforming.  For example, during the first three months of 2006, USACM collected on average approximately $5.3 million per month in interest payments on the Serviced Loans but paid out on average approximately $9.7 million per month to the Direct Lenders.  It appears that a large portion of the Direct Lenders received monthly payments from USACM prior to the Petition Date that such Direct Lenders were not entitled to receive (because they were invested, at least in part, in one or more Nonperforming Loans), and thus such Direct Lenders owe a debt in an amount which is yet to be determined for the amounts overpaid to them.

7.    Capital First has an interest as a Direct Lender in 53 of the Serviced Loans -- in 45 loans it owns only a fractional interest along with other Direct Lenders, and in 8 loans it is the sole Direct Lender.  Further, of the 53 total Serviced Loans in which Capital First has an interest, 29 (55% in number) are Nonperforming Loans.

8.    Diversified has an interest as a Direct Lender in 23 of the Serviced Loans -- in 16 loans it owns only a fractional interest along with other Direct Lenders, and in 7 Serviced Loans it is the sole investor.  Further, of the 23 total loans in which Diversified has an interest, 20 (87% in number) are Nonperforming Loans.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590   Fax: (702) 892-0122

9. The extent of the Nonperforming Loans problem is substantially the same for the Funds in their capacity as Direct Lenders as it is for other Direct Lenders. Because most of the Nonperforming Loans have one or both of the Funds as Direct Lenders along with other Direct Lenders, the administrative and servicing activities, appraisals, collection activities and foreclosure proceedings will benefit both the Funds and the other Direct Lenders.

10. Capital First has approximately 1,300 members owning membership interests in that LLC entity, and Diversified has approximately 1,900 members owning membership interests in that LLC entity (collectively, the "Fund Members").

POST-PETITION LOAN

11. I have determined in my business judgment that it is in the best interests of the Debtors to obtain post-petition, debtor-in-possession financing (the "Post-Petition Loan") for purposes of, among other things, assisting in the funding of the Debtors' operational expenses and administrative expenses, given the number and magnitude of Nonperforming Loans that must be collected, and providing a source of additional loan funds (if approved by the Court) for certain of the Serviced Loans where the funding to date for construction loans is less than the full construction budgets prepared by the Borrowers for the completed construction projects (the "Projects") being built by such Borrowers (the "Construction Budget Shortfalls") and where such funding is necessary or appropriate to maintaining and protecting the value of the collateral securing these certain Serviced Loans.

12. As a result of that determination, I have negotiated with several debtor-in-possession lenders for a Post Petition Loan. I have selected Fortress Credit Corp. ("Fortress") from among several other debtor-in-possession lenders as the lender from whom the Debtors should obtain a Post-Petition Loan (after Court approval) because the draft Term Sheet of Fortress was, in my business judgment, more favorable than those proposed by other debtor-in-possession lenders.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

13. When the Due Diligence Expenses Motion was filed on May 8, 2006, the negotiations with Fortress were not yet completed. The parties anticipated that the terms in the draft Term Sheet that was under consideration at that time might change prior to the issuance of a firm commitment from Fortress, which was expected prior to the time the Due Diligence Expenses Motion was set for hearing.

14. A Commitment Letter (the "Commitment Letter") signed by Fortress and dated May 12, 2006, has been delivered to me on behalf of the Debtors. As contemplated by the Due Diligence Expenses Motion, a copy of the Commitment Letter was attached as Exhibit "1" to the "Notice of Commitment Letter for DIP Financing" that was e-filed with the Court on May 16, 2006, as Docket No. 254. A true and correct additional copy of the Commitment Letter is attached hereto as Exhibit A and is incorporated herein.

15. In my negotiations with Fortress, before Fortress was willing to commit additional time and resources to evaluating a potential Post-Petition Loan, Fortress stated that it would require that the Debtor agree (with Court approval) to reimburse Fortress for actual expenses (including Fortress's reasonable attorney fees) incurred by Fortress in connection with completion of due diligence and other matters associated with the potential Post-Petition Loan. Fortress has asked that the Debtors provide a cash deposit (the "Deposit") in the amount of $150,000, to be applied by Fortress toward actual expenses incurred or to be incurred in completing due diligence for the potential Post-Petition Loan. The amount of the Deposit was previously included in the Budget that was attached as Exhibit B to the Supplemental Declaration of Thomas Allison dated May 2, 2006 that was e-filed with the Court on May 2, 2006 (Docket No. 130). Indeed, while Fortress has delivered a Commitment Letter to the Debtors, the Commitment remains conditioned on the payment of the Deposit and the completion of due diligence (including legal due diligence) which the Deposit will allow for and facilitate. As set forth in the Commitment Letter, if the Deposit is not approved by the Court on May 18, 2006 and paid

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    to Fortress by May 19, 2006, the Commitment Letter will terminate.  See, Exhibit A

2    attached hereto.

3        16.    In exchange for Debtors' agreement to seek approval for the Deposit to

4    reimburse the due diligence expenses of Fortress, Fortress has agreed that if Fortress

5    concludes, for any reason, not to proceed with the Post-Petition Loan, Fortress will deliver

6    to the Debtors copies of all written work-product created by Fortress in its due diligence

7    review of the potential Post-Petition Loan (excluding documents protected by

8    attorney/client or attorney work product privileges).

9        17.    It is my business judgment that the payment of due diligence expenses to a

10   debtor-in-possession lender is customary for debtor-in-possession financing transactions,

11   and that the amount of the Deposit is a reasonable estimate of the amount of due diligence

12   expenses that will reasonably be incurred by Fortress.

13       18.    It is my business judgment that there are at least three valid business reasons

14   for obtaining the Post-Petition Loan for the Debtors:  (a) Debtors may need additional

15   sources of funds to pursue all necessary collection actions with respect to Nonperforming

16   Loans, given the number and amount of Nonperforming Loans which are currently not

17   generating cash to pay servicing fees to fund these actions; (b) Debtors may need

18   additional liquidity to fund administrative and operational expenses in the event that the

19   timing of payments on the Serviced Loans from which Debtors' servicing fees and other

20   contractual costs and fees are deducted (and which the Court has approved as funding

21   sources) are irregular and/or disrupted and do not match the funding requirements for the

22   timely payment of Debtors' administrative and operational expenses; and (c) Debtors need

23   a source of funding for additional loans to the Borrowers with Construction Budget

24   Shortfalls to allow such Borrowers to complete their Construction Projects if the Debtors

25   determine that additional funding is necessary or appropriate to preserve value of the

26   underlying collateral of the Serviced Loans for the Direct Lenders, the Funds, the Fund

27   Members, and USACM and such funding is then approved by the Court.

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

## FUNDING ADMINISTRATIVE AND OPERATIONAL EXPENSES

19.     Mesirow, with assistance from USACM's personnel and attorneys, is engaging in a loan-by-loan credit and collateral evaluation, arranging for appropriate appraisals and checks on collateral, and commencing collection activities on Nonperforming Loans (including foreclosures, if necessary, and collections on guarantees) and determining the most appropriate way to bring each Nonperforming Loan to a performing status.   These tasks are critical tasks that must be accomplished in order to analyze and safeguard the interests of all Direct Lenders (including the interests of the Funds as Direct Lenders) and Fund Members.

20.     Mesirow is preparing a ledger for each loan as requested by the SEC and the Nevada Mortgage Lending Division.  These ledgers will allow Direct Lenders to determine the status of each Serviced Loan in their portfolios.

21.     Mesirow is preparing an account reconciliation for each Direct Lender and for each Fund Member (to the extent there are Fund Members who are not also Direct Lenders).  These reconciliations will indicate amounts due to the Direct Lender on account of each Service Loan in their portfolios, as well as amounts that have been overpaid on Nonperforming Loans.  Principal payments received by USACM but not remitted will also be indicated.  The reconciliations for the Fund Members will indicate the positions of the respective Funds with regard to each Serviced Loan in their portfolios, as well as the Fund Members' percentage ownership interests in the Funds.

22.     In its Limited Opposition to the Partial Releases Motion, the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC (the "First Trust Deed Committee") has requested that "USACM be required to report monthly to the Court the following:  (i) the sale proceeds that USACM actually received in connection with the proposed sales and an accounting for such funds on a per loan basis; and (ii) the sale proceeds that were distributed to any first priority lender and the amount outstanding on any related first priority loan after such payments."  I have instructed my

7

staff and my attorneys to include these monthly reports as requested by the First Trust Deed Committee as part of the monthly Operating Reports to be filed by the Debtors with the Court.

23.    Mesirow is instituting appropriate internal financial and accounting controls and loan servicing audit trails so that the problems that resulted in the Debtors' bankruptcy filings will not recur.  Mesirow is also attempting to trace all transactions with non-debtor insiders or affiliated entities; and Mesirow will follow up to enforce and collect any insider or affiliate debts owed the Debtors.

24.    The Debtors' Revised Budget (the "Budget"), which was attached as Exhibit B to the Supplemental Declaration of Thomas J. Allison that was e-filed on May 2, 2006 (Docket No. 130), outlines the Budget that the Debtors have prepared for payment of the administrative costs and collection costs that must be undertaken by the Debtors to preserve and increase value for the Debtors, the Direct Lenders, and the Fund Members. However, the Budget only contemplated the appointment of one creditors committee for the five Debtors, so it is possible that the professional fees associated with payment for counsel to the four committees that were just appointed by the United States Trustee will be even higher than those contemplated by the Budget, requiring additional sources of funds for the Debtors to operate in Chapter 11.

25.    If the Court approves the payment of the Deposit, the Deposit will be paid from the sources outlined in and in accordance with the Budget.  The Debtors are not asking that other funds being held by the Debtors be used to pay the Deposit, but only that the Deposit be paid from those funding sources outlined in the Budget and previously approved by the Court.

LIQUIDITY CONCERNS

26.    Mesirow has initiated measures for collecting unpaid interest on the Nonperforming Loans, as well as implementing improved loan servicing procedures. However, even with these operational changes, the regular payment streams of payments

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

being made to USACM as Servicer of the Serviced Loans have been disrupted because of the filing of the bankruptcy petitions for the Debtors. Moreover, interest is not being paid on a regular basis on the large number of Nonperforming Loans. Therefore, the Debtors cannot currently count on a regular stream of payments being made to USACM as Servicer from which the servicing fees and other contractual costs and fees that will be used to fund the Budget will be deducted.

27.    The Debtors are in need of additional liquidity in the form of the Post-Petition Loan in order to be able to timely pay their administrative expenses and operational expenses as they are incurred on a regular basis, as contemplated by the Budget. To the extent that there are insufficient funds on hand on any particular date from the funds which the Court has authorized the Debtors to use for payment of administrative and operational expenses incurred to collect unpaid interest and principal on the Serviced Loans, the Debtors can draw on the Post-Petition Loan in order to cover any such insufficiency.

## FUNDING FOR CONSTRUCTION BUDGET SHORTFALLS

28.    Attached hereto as <u>Exhibit B</u> and incorporated herein is a list prepared by Mesirow of thirty (30) of the Serviced Loans which have Construction Budget Shortfalls. The amount of the Construction Budget Shortfall for each of these 30 Serviced Loans (the "Shortfall Loans") is listed on <u>Exhibit B</u>. The total amount of the Construction Budget Shortfalls is $73,122,216.

29.    I believe that the Borrowers for the Shortfall Loans requested loan funding for only a portion of the construction budgets for their various Projects because they wanted to avoid having to pay interest from the inception of the Shortfall Loans on the full amount of the loan funds needed to cover their entire construction budgets for their completed Projects. I believe that the Borrowers for the Shortfall Loans are planning to build their Projects in stages, and are looking to obtain additional loan funding for the future stages of their Projects from USACM.

30.     The Projects for which the Shortfall Loans are being used for construction purposes are not completed Projects. It is my business judgment that most, if not all, of the Borrowers for the Shortfall Loans will need additional loan funding of up to the amount of the Construction Budget Shortfalls for each Shortfall Loan in order to complete their Projects.

31.     It is my business judgment that the value of the collateral for the Shortfall Loans will be preserved and greatly enhanced for the benefit of the Direct Lenders, the Funds, the Funds Members, and the Debtors if the Projects can be completed as contemplated by their Borrowers. A completed construction project that is a candidate for a sale to an investor or a take-out loan from a permanent financing source is much more likely to generate the funds needed to pay off the Shortfall Loans than an uncompleted construction project that is likely to be encumbered with mechanic's liens and embroiled in other litigation.

32.     It is my belief that USAMC does not have the obligation, but has the right, with Court approval, to fund additional loan funds in the amount of the Construction Budget Shortfalls for each of the Shortfall Loans. It is my business judgment that USAMC should seek Court approval to use some of the proceeds from the Post-Petition Loan to fund the Construction Budget Shortfalls for most, if not all, of the Shortfall Loans. USAMC will make its determination whether or not to seek Court approval to fund a particular Construction Budget Shortfall from the Post-Petition Loan based upon appraisals and other customary due diligence lending standards to be applied by the Debtor to each Shortfall Loan and each Project, including whether or not the particular Shortfall Loan is a Nonperforming Loan.

33.     USACM has filed a Motion seeking authority to engage an outside appraisal firm to evaluate all of the real estate collateral securing the Serviced Loans. These appraisals will assist USACM in its due diligence determination whether or not to fund a particular Construction Budget Shortfall for a particular Project.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

## OBJECTIONS TO PARTIAL RELEASES MOTION

34.    The Serviced Loan repayments that the Debtor is receiving from the Borrowers as contemplated by the Partial Releases Motion are being held in a separate bank account established by USAMC, and Mesirow is keeping accurate accounting records to account for such loan repayments on a Serviced Loan by Serviced Loan basis.   The servicing fees and other contractual fees and costs that the Court has authorized to be used by the Debtors are being deducted from these loan repayments and are being deposited into a separate Debtor-in-Possession bank account, and are not being commingled with the net Serviced Loan repayments that are held in a separate account.

Executed this 17th day of May, 2006.

Thomas J. Allison

11

# EXHIBIT "A"

Fortress Credit Corp
1345 Avenue of the Americas
46th Floor
New York, New York 10105
(212)798-6100
Facsimile: (212) 798-6099
Attention: Constantine Michael Dakolias and Joseph Tansey

---

COMMITMENT LETTER

May 12, 2006

**USA Commercial Mortgage Company, et al – Debtor-in-Possession Credit Facility**

Reference is made to that certain Term Sheet dated as of April 21, 2006, executed by USA Commercial Mortgage Company; USA Capital Realty Advisors, LLC; USA Securities, LLC; USA Capital First Trust Deed Funding, LLC, and USA Capital Diversified Trust Deed Funding, LLC, all jointly and severally, as Debtors-in-Possession in Case Nos. BK-S-06-10725, BK-S-06-10726, BK-S-06-10727, BK-S-06-10728 and BK-S-06-10729 (joint administration proposed under Case No. BK-S-06-10725), filed April 13, 2006, in the United States Bankruptcy Court for the District of Nevada (Las Vegas Division) executed by Borrowers on May 2, 2006, and by Fortress Credit Corp. on May 3, 2006 (the "Term Sheet"). A copy of the Term Sheet executed by Fortress Credit Corp and by Borrowers is attached to this Commitment Letter and is incorporated and made a part hereof, as though set forth in full herein. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Term Sheet.

As you know, Fortress has commenced its due diligence activities notwithstanding that Borrowers have not yet paid the Initial Deposit. Such activities have including reviewing Borrowers' files in Las Vegas, interviewing certain of Borrowers' employees and site visits to ten (10) properties representing loans with aggregate stated unpaid principal balances of approximately $107 million. Based upon such preliminary due diligence activities, and subject to the terms and conditions set forth herein and in the Term Sheet, DIP Lenders are pleased to issue this Commitment to make the DIP Revolving Loan described in the Term Sheet, as contemplated by the section of the Term Sheet captioned "Commitment" appearing at page 11 of the Term Sheet. Accordingly, the Term Sheet is now a Commitment to make the DIP Loan subject to the occurrence and satisfaction of the conditions precedent set forth therein, excluding from said conditions precedent item 12 ("such other conditions as Fortress may determine").

We note that because of the timing of the hearings as ordered by the Bankruptcy Court, the following dates are now deemed inserted in the Term Sheet for purposes of this Commitment.

| Term Sheet Caption: | Date: |
|---|---|
| Closing Date | July 7, 2006 |

**Other Terms and Conditions**

LA1 785309v 2

(Condition #2)

| | |
|---|---|
| Approval of Term Sheet | June 5, 2006 |
| Approval of Final Financing Order | June 23, 2006 |
| Closing | July 7, 2006 |
| Final Financing Order | June 23, 2006 |

Exclusivity                                    10 days following Bankruptcy Court
                                               Approval of Term Sheet

Termination                                    June 5, 2006

(Termination Date and Bankruptcy
Court Approval of Term Sheet and
Commitment Letter)

Acceptance                                     May 19, 2006

This Commitment will become effective upon your acceptance hereof, Bankruptcy Court approval of your payment to Fortress of the Initial Deposit, and actual payment of the Initial Deposit, all on or before May 18, 2006. If such acceptance is not received, Bankruptcy Court approval of payment of the Initial Deposit is not obtained, or payment of the Initial Deposit is not effected, by the close of business on May 18, 2006, the Term Sheet will terminate and this Commitment Letter will be of no further force or effect.

Very truly yours,

Fortress Credit Corp.

By: _____
     Constantine Michael Dakolias

Its: _____
     Chief Credit Officer

AGREED AND ACCEPTED AS OF THIS
_____ DAY OF MAY, 2006:

2

LA1 785309v 2

USA COMMERCIAL MORTGAGE COMPANY, LLC

USA SECURITIES, LLC

USA CAPITAL REALTY ADVISORS, LLC

USA CAPITAL FIRST TRUST DEED FUNDING, LLC

USA CAPITAL DIVERSIFIED TRUST DEED FUNDING, LLC

By:    _____

      Name:  Thomas J  Allison
      Title:   Chief Executive Officer of all such entities

3

*Confidential — For Discussion Purposes Only — Not a Commitment to Lend*

Fortress Credit Corp
1345 Avenue of the Americas
46th Floor
New York, New York 10105
(212)798-6100
Facsimile: (212) 798-6099
Attention: Constantine Michael Dakolias and Joseph Tansey

_____

TERM SHEET

April 24, 2006

USA Commercial Mortgage Company, et al – Debtor-in-Possession Credit Facility

*The terms and conditions summarized below do not represent a financing commitment from Fortress. Such terms and conditions are intended as a summary outline of a commitment which is conditioned in all respects upon completion of due diligence, negotiation of definitive documentation and final approval by Fortress, and do not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation satisfactory in form and substance to Fortress. This Term Sheet is not a commitment to make a loan and Fortress shall not be under any obligation to do so. Rather, upon acceptance of this Term Sheet and payment of the required deposit, this Term Sheet shall evidence the intention of Fortress to commence its due diligence and its internal financing approval process. Any provision of financial accommodations under such debtor-in-possession credit facility shall be further subject to the terms and conditions as set forth below, and Bankruptcy Court approval.*

I.    **General Terms**

Borrowers:          USA Commercial Mortgage Company; USA Capital Realty
                    Advisors, LLC; USA Securities, LLC; USA Capital First Trust
                    Deed Funding, LLC, and USA Capital Diversified Trust Deed
                    Funding, LLC, all jointly and severally, as Debtors-in-Possession in
                    Case Nos. BK-S-06-10725, BK-S-06-10726, BK-S-06-10727, BK-
                    S-06-10728 and BK-S-06-10729 (joint administration proposed
                    under Case No. BK-S-06-10725), filed April 13, 2006, in the
                    United States Bankruptcy Court for the District of Nevada (Las
                    Vegas Division).

DIP Lender(s):      Fortress Credit Corp. and its affiliates, designees and participants
                    (collectively, "Fortress"), and third parties reasonably acceptable to
                    Fortress (collectively with Fortress, the "DIP Lenders").

DIP Agent:          Fortress, in such capacity as DIP Agent.

LA1 777500v 4

| | |
|---|---|
| DIP Revolving Loan: | DIP Lenders to provide Borrowers with a $25,000,000 revolving credit facility (the "DIP Loan") as limited by the Collateral Maintenance Covenants (as defined below). |
| Minimum Advance: | $1,000,000 |
| Maximum    Committed Amount: | $25,000,000. |
| Use of Proceeds: | To pay (i) operating expenses, limited capital expenditures and other amounts for general corporate and ordinary course purposes of the Borrowers as approved by DIP Agent and DIP Lenders and (ii) such other administrative payments as may be authorized under the Final Financing Order (as defined below), including ongoing administrative expenses associated with the chapter 11 case, all as authorized by the DIP Loan. |
| Operating Budget: | The operating budget, subject to the approval of the DIP Agent and the DIP Lenders, to consist of the Borrowers' estimated projected cash flow position on a rolling 13-week basis, commencing as of the Closing of the DIP Loan (the "Budget") and to include, on a line-item basis, projected weekly cash receipts and expenditures and a weekly reconciliation report which compares the actual cash flow results (receipts and disbursements) against the prior week's cash flow projections (receipts and disbursements, indicating the cumulative percentage variance, if any, of actual results versus projections for such week as set forth therein, together with management's explanation for such variance, such variance not to exceed 5% on a cumulative basis). Upon approval of DIP Agent and the DIP Lenders to the Budget, any subsequent changes to the Budget may be made only on approval of the DIP Agent and DIP Lenders.    Budget to include monthly reimbursement of the reasonable fees and expenses of the professionals of DIP Agent and DIP Lenders. |
| Maturity,    One Extension,    Extension Fee: | The DIP Loan to be repaid in full in immediately available funds on the Maturity Date, to be defined as the earlier of (i) twelve (12) months after the initial loan closing, subject to one six-month extension upon payment of an Extension Fee in an amount equal to one percent of the Maximum Committed Amount, and subject to satisfaction of customary conditions for the extension of a revolving credit facility of like size and nature to the DIP Loan, (ii) conversion of any of the Borrowers' chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, and (iii) confirmation of Borrowers' plan of reorganization and Borrowers' emergence from Chapter 11 on the effective date of such plan (the "Maturity Date"). |

2

| | |
|---|---|
| Interest: | Interest shall be payable in cash on the outstanding amount of the DIP Loan monthly in arrears on the first business day of each month at a rate equal to LIBOR + 3.50% per annum. |
| Default Interest: | Upon the occurrence and during the continuance of any event of default under the DIP Loan and at the election of the DIP Lenders, interest to be payable on the outstanding amount of the DIP Loan at 3.0% above the then applicable interest rate. |

3

| | |
|---|---|
| Closing Date: | The date of the closing of the DIP Loan is expected to be 30 days after the execution of this Term Sheet, but in no event shall such closing occur later than [*****], 2006, or such other date as Borrowers and DIP Lenders may agree in writing (the "Closing" or "Closing Date"). |
| Origination Fee: | Borrowers shall authorize DIP Lenders to withhold from the original proceeds of the DIP Loan a non-refundable origination fee discount of 1.50% of the Maximum Committed Amount, which shall be fully earned at the initial loan closing. |
| Unused Facility Fee: | 50 basis points (0.50%) of Maximum Committed Amount per annum on the unused amount of the Maximum Committed Amount payable monthly in arrears during the term of the DIP Loan based on the average outstanding balance of the DIP Loan during the preceding month. |
| Collateral Management Fee: | $10,000 per calendar quarter or portion thereof, payable to DIP Agent on Closing Date and on first day of each calendar quarter thereafter until the DIP Loan is fully repaid. |
| Nature of Fees: | All fees shall be paid in immediately available funds on their respective due dates and shall be fully earned when due and shall be non-refundable when paid. |
| ROFO on Future Funding Obligations, Additional DIP Loans: | Fortress to have a ten (10) business day right of first offer on all of Borrowers' future funding obligations with respect to existing loans as of the Petition Date (the aggregate amount of which Borrowers have identified as being $68,106,500), and Fortress will consider funding such future advances on a loan by loan basis, in Fortress' sole and absolute discretion and subject in each instance to Bankruptcy Court approval (each such funding by Fortress, an "Additional DIP Loan"). It is understood that, pursuant to Bankruptcy Court order, each Additional DIP Loan will prime prior advances under the existing loan or loans, but will not participate in collateral for the DIP Loan. The Additional DIP Loans will be term loans, with expected origination fees of between one and two percent of face amount, interest rates of between LIBOR plus 3.00% and LIBOR plus 10.00%, depending on the particular risks involved, with all of DIP Lenders' expenses to be reimbursed, and other terms and conditions as customary for loans of similar risk profile, amount and tenor. |

## II.    Additional Terms

| | |
|---|---|
| Amortization: | None – aggregate principal amount due on Maturity Date. |
| Optional Prepayment: | Borrowers to have the right to voluntarily repay any or all advances under the DIP Loan at any time without premium or penalty in |

4

LA1 777500v6

|  | minimum increments to be agreed upon, but subject to payment of the Unused Facility Fee for the balance of the remaining stated term of the DIP Loan. Prepayment of Additional DIP Loans shall be in accordance with their respective terms and may include customary make-whole provisions. |
|---|---|
| Mandatory Prepayments: | Mandatory prepayments of the DIP Loan shall be made upon the occurrence of certain events (e.g., asset dispositions and insurance claims), equity issuances, changes of control and other circumstances to be negotiated and subject to approval of the DIP Agent and DIP Lenders. |
| Security: | To secure all of the obligations under the DIP Loan, DIP Agent, for the benefit of the DIP Lenders, to receive, pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the Final Financing Order and the definitive DIP Loan documents, valid, enforceable, and fully perfected security interests in and liens upon all prepetition and postpetition assets of the Borrowers, whether now existing or hereafter acquired or arising (collectively, the "DIP Collateral"), which liens shall have the priority set forth below.  DIP Collateral to include any proceeds from avoidance actions recovered or voided under chapter 5 of the Bankruptcy Code).  DIP Collateral subject to carve-out of customary administrative expenses expressly approved by the Bankruptcy Court, in amounts to be negotiated. |
|  | Liens and security interests with respect to DIP Collateral not to be subject to challenge and to attach and become valid and perfected immediately upon entry of the Final Financing Order (as defined below) without the requirement of any further action by DIP Agent or DIP Lenders.  DIP Collateral to be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens in existence as of the petition date, if any, and other permitted liens and encumbrances acceptable to DIP Agent and DIP Lenders. |
|  | All obligations of Borrowers under and with respect to the DIP Loan (the "DIP Obligations") to enjoy superpriority administrative expense status under Section 364(c)(1) with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code, subject to the carve-out as authorized and approved by DIP Agent and the DIP Lenders under the Budget. |
| Representations and Warranties: | The documentation for the DIP Loan and related collateral matters shall contain such representations and warranties as are customary |

5

for DIP loan transactions and investments of a similar size and nature, including but not limited to representations regarding due organization, enforceability, litigation and claims, environmental, taxes, other debts, leases and material contracts, affiliate transactions, compliance with laws, and no brokers.

**Financial Covenants:** The documentation for the DIP Loan shall contain customary financial covenants for DIP loan transactions and investments of a similar size and nature and will be set to a discount (in an amount to be negotiated and acceptable to DIP Agent and DIP Lenders) of Borrowers' monthly cash flow projections submitted to the Bankruptcy Court.

**Collateral Maintenance Covenants:** Borrowers shall at all times maintain a minimum of $1,000,000 in cash.

**Negative Covenants:** The documentation for the DIP Loan shall contain negative covenants of Borrowers customary for loan transactions and investments of a similar size and nature, including, but not limited to, the following:

1. No debt other than the DIP Loan (except as may be expressly permitted in the DIP Loan Agreement);

2. No liens except existing liens acceptable to Fortress and the liens securing the DIP Loan;

3. No changes in the operations of Borrowers;

4. No capital expenditures above specified levels;

5. No transactions with or payments to affiliates, subsidiaries, equity owners or related parties;

6. No changes in structure or jurisdiction of organization;

7. No new loans made by Borrowers; and

8. No mergers or acquisitions or sales of assets outside the ordinary course of business.

**Affirmative Covenants:** The documentation for the DIP Loan shall include affirmative covenants of Borrowers, customary for loan transactions and investments of a similar size and nature including, but not limited to, covenants requiring Borrowers to:

1. In addition to updating the Budget on a weekly basis, provide monthly financial statements, monthly compliance

6

certificates, annual audits, projections, copies of material agency and litigation filings, copies of all pleadings and documents filed in the bankruptcy case as well as other information that DIP Agent or DIP Lenders may request from time to time;

2. Maintain adequate hazard, property & casualty, and business interruption insurance;

3. Protect its intellectual property; and

4. Provide DIP Lenders access to Borrowers' information.

Defaults:

The DIP Loan shall include Events of Default customary for DIP loan transactions of a similar size and nature, including, but not limited to:

1. Failure to pay interest and principal when due with respect to any portion of the DIP Loan;

2. Failure to comply with or observe covenants, including compliance with the Budget taking into account authorized variances;

3. Default under other debt (as may be permitted under the DIP Loan Agreement);

4. Material Adverse Change;

5. Misrepresentation or breach of warranty;

6. Dismissal of any of the Borrowers' bankruptcy cases, conversion of any of the Borrowers' bankruptcy cases to a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner in any of the Borrowers' bankruptcy cases with any powers to operate or manage the financial affairs of one or more Borrowers.

7. The Bankruptcy Court enters a final order that in any way modifies the Final Financing Order without consent of DIP Agent and the DIP Lenders, or the Final Financing Order ceases to be in full force and effect.

8. Borrowers file a motion or other pleading with the Bankruptcy Court seeking to obtain additional financing *pari passu* or senior to the DIP Loan.

9. The entry of any order of the Bankruptcy Court confirming

7

any plan of reorganization that does not contain a provision for termination of the DIP Loan and repayment in full in cash of all of the DIP Obligations under the DIP Loan on or before the effective date of such plan.

10.    Such other defaults as are customary for loan transactions and investments of a similar size and nature.

The DIP Loan and each DIP Lender's interest therein shall be freely transferable by the DIP Lenders to their affiliates and to other financial institutions.

**Remedies on Default:**    Final Financing Order to provide that, upon the occurrence and during the continuation of an Event of Default under the DIP Loan, the DIP Agent, at the direction of the DIP Lenders, may declare the principal of and accrued interest on the outstanding borrowings to be immediately due and payable along with acceleration of the other DIP Obligations and terminate, as applicable, any further commitment to lend to the Borrowers.

## III.    Other Terms

**Conditions Precedent:**    The Closing shall be subject to various conditions precedent customary for loan transactions and investments of a similar size and nature, including but not limited to:

1    Full, immediate and complete access to all of Borrowers' books and records, including collateral files;

2.    Satisfactory completion of legal and collateral due diligence and transaction structuring, including due diligence concerning the Borrowers' bankruptcy process and the receipt of all required court approvals for the DIP Loan, including approval of this Term Sheet by no later than May [*****], 2006, approval of the Final Financing Order by no later than [*****], 2006, and closing of the transactions contemplated thereby by no later than [*****], 2006;

3    Satisfactory completion of business due diligence, including but not limited to (i) a review of Borrowers' books and records by an independent third party, retained by DIP Agent and acceptable to Borrowers, (ii) review of Borrowers' material agreements, including but not limited to collective bargaining and pension agreements, (iii) review of Borrowers' cash flow projections and the underlying assumptions and (iv) review of mortgage collateral, including without limitation status as valid perfected

8

mortgage liens, lender's right of access to underlying properties pursuant to the applicable loan documents in order to verify, among other things, environmental and structural condition, and verification of outstanding principal balance of loans;

4.  Execution of definitive agreements, instruments, mortgages, and documents related to the DIP Loan (including without limitation the Final Financing Order), each satisfactory in form and substance to Fortress in its sole and absolute discretion, including a satisfactory cash management system;

5.  The absence of any material adverse change in the business or financial condition of Borrowers or the capital markets from the date of this DIP Term Sheet until the Closing;

6.  Satisfactory completion of the investment committee approval process of Fortress;

7.  Satisfactory security in all relevant jurisdictions;

8.  Completion, receipt and review by the DIP Agent of all lien search reports and lien perfection documentation as may be satisfactory to the DIP Agent with respect to the DIP Collateral and satisfactory perfection of Lender's security interest in the underlying collateral supporting the DIP Loan, including cash, marketable securities, litigation claims, mortgage collateral and real estate;

9.  Receipt of satisfactory legal opinions;

10.  Reimbursement in full in cash of all of DIP Lenders' fees, costs and expenses;

11.  No litigation commenced which has not been stayed by the Bankruptcy Court and which, if successful, would have a material adverse impact on the Borrowers, their business or ability to repay the DIP Loan, or which would challenge the transactions under consideration; and

12.  Such other conditions as Fortress may determine.

**Final Financing Order:**    A financing order in form and substance acceptable to DIP Agent and DIP Lenders to be entered on the docket of the Bankruptcy Court by no later than May [*****,] 2006 ("Final Financing Order"), such order to include, without limitation, provisions (i) modifying the automatic stay to the extent necessary to permit or

9

effectuate the terms of the Final Financing Order and DIP Loan documents, (ii) providing for automatic relief from such stay to permit the enforcement of DIP Agent's and the DIP Lenders' remedies under the DIP Loan, (iii) prohibiting the incurrence of debt with priority equal to or greater than that of the DIP Agent or the DIP Lenders, and (iv) prohibiting any granting or imposition of liens other than the permitted liens and other liens acceptable to DIP Agent.

Expenses:

An initial expense deposit of $150,000 (the "Initial Deposit") in cash shall be paid to Fortress upon execution hereof in accordance with the approval procedures set forth below (the "Deposit"). Such Deposit will be applied by Fortress toward completion of due diligence and other matters with respect to this transaction, including, but not limited to legal (including reasonable fees and expenses of Sidley Austin LLP, counsel to the DIP Agent), compliance audits, appraisals, consulting, and travel expenses, whether or not the transactions contemplated herein are consummated. In the event that the costs, fees and expenses incurred by Fortress in connection with its due diligence and any other matters relating to this transaction exceed the amount of the Deposit, the Borrowers hereby agree to promptly reimburse Fortress for such reasonable costs, fees and expenses in the amount of such excess, whether or not the transactions contemplated herein shall have been, or are, consummated (and Fortress may request additional expense advances hereunder). If Fortress concludes for any reason (in its sole and absolute discretion) not to proceed with the transactions contemplated hereby, Fortress will notify Borrowers and will promptly return the balance of the Deposit by Borrowers, after deducting all costs and expenses (including without limitation fees and costs of consultants and attorneys involved in the drafting of this proposed Term Sheet, long form documentation and the due diligence process actually incurred by Fortress in connection with its review and documentation of this transaction). The Deposit will not be segregated and may be commingled with other funds of Fortress, and Borrowers will not be entitled to receive interest on the Deposit if returned to Borrowers.

Exclusivity:

For a period of ten (10) days following acceptance of this Term Sheet, neither Borrowers nor any affiliate shall (nor will they permit its officers, directors, agents, brokers, representatives or affiliates to), directly or indirectly, solicit, initiate, engage in or encourage any negotiations or discussions with respect to any offer or proposal to make an investment, loan or other commitment of capital for Borrowers with the potential effect of reducing or

eliminating the financing contemplated by this Term Sheet.

**Procedural Terms:** This Term Sheet is not a commitment to make a loan or an investment and Fortress shall not be under any obligation to do so. Rather, upon acceptance of this Term Sheet and payment of the required Deposit, this Term Sheet shall evidence the intention of Fortress to commence its due diligence and its internal financing approval process, and shall evidence Borrowers' agreement to pay and reimburse Fortress as provided herein, whether or not any financing is ultimately consummated.

**Commitment:** Within ten (10) days of the execution of this Term Sheet by Borrowers and Fortress, and Borrowers having provided Fortress with immediate and full access to all bankruptcy pleadings and documentation and evidence of outstanding principal balance of selected major loans to Fortress' satisfaction in its sole and absolute discretion, Fortress will either terminate this Term Sheet or advise Borrowers in writing that this Term Sheet is now a Commitment to make the DIP Loan subject to the occurrence and satisfaction of each of the Conditions Precedent set forth above.

**Termination:** Except for the obligation of Borrowers to reimburse Fortress for its fees and expenses, indemnification and the obligations of Borrowers under the exclusivity provisions above (all of which obligations shall survive the expiration of this Term Sheet), this Term Sheet automatically shall expire and be of no further force or effect as of May [*****], 2006 (the "Termination Date") or upon the occurrence of any of the following events:

1.    Borrowers fail timely to obtain Bankruptcy Court approval to, or otherwise execute this Term Sheet by May [*****], 2006;

2.    Prior to any such acceptance, Fortress notifies Borrowers that this Term Sheet is withdrawn;

3.    Fortress notifies Borrowers that the results of its due diligence are unsatisfactory for any reason; or

4.    Fortress notifies Borrowers that it has decided not to proceed with the transaction for any reason in its sole and absolute discretion.

**Indemnification:** Borrowers hereby agree to indemnify and hold harmless Fortress and each of the DIP Lenders and each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors and representatives (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and

11

LA1 777309v.4

expenses (including, without limitation, fees and disbursements of counsel and other authorized agents and representatives), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by Borrowers, any of their respective directors, security holders or creditors (including any official committee), an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to Borrowers, any of their affiliates or any of their respective security holders or creditors for or in connection with the transactions contemplated hereby, except for direct damages (as opposed to special, indirect, consequential or punitive damages, including, without limitation, any loss of profits, business or anticipated savings) determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

**Confidentiality:**     Except as required by law or in connection with the implementation of this Term Sheet, the terms hereof will be kept strictly confidential by the Borrowers and may only be disclosed to the Borrowers' affiliates, legal counsel, financial advisors, financing sources and consultants who have been informed of, and agree to abide by, the confidentiality of this Term Sheet. To the extent that any disclosure becomes legally required, Fortress shall be notified promptly and before the required disclosure is made

**Governing Law, Waiver of Jury Trial:**     This Term Sheet shall be governed by the laws and rules applicable to Borrowers' federal bankruptcy proceedings, including the United States Bankruptcy Code (11 U.S.C. § 101 et seq.), the Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Nevada. The definitive transaction documents will be governed by such law and the laws of the State of New York applicable to contracts made and to be performed in that State. EACH PARTY HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY OR ANY CLAIM OR CAUSE OF ACTION ARISING IN CONNECTION WITH THIS TERM

12

SHEET, THE DIP LOAN OR ANY OTHER RELATED
FINANCING, WHETHER ARISING IN CONTRACT, TORT OR
OTHERWISE.

**Acceptance:**   Borrowers shall promptly seek Bankruptcy Court approval to
execute this Term Sheet and to become bound by the terms hereof
(including provisions for expense reimbursement), such
Bankruptcy Court order to be signed, filed and entered on the
docket within fifteen (15) days of the date hereof, and in any event
by no later than May [*****], 2006.  Upon entry of an order
approving Borrowers' execution of this Term Sheet, the expense
reimbursement advance shall be promptly wired to Fortress upon
further instruction.  If such Bankruptcy Court order is not entered
on or before such date, unless such date is extended by Fortress in
writing in its sole and absolute discretion, this Term Sheet shall
automatically terminate and be without further effect.

If Borrowers determine in good faith that Bankruptcy Court
approval is not required to execute this Term Sheet, then with the
consent of DIP Agent (such consent to be granted or withheld in
DIP Agent's sole and absolute discretion), Borrowers shall accept
such terms by returning a fully executed copy hereof by facsimile
to (212) 798-6099, attention Constantine Michael Dakolias and
Joseph Tansey, email addresses ddakolias@fortressinv.com, and
jtansey@fortressinv.com, c/o Fortress Credit Corp, with a copy to
counsel for Fortress, attention Joel G. Samuels and Marc I.
Hayutin, facsimile number (213) 896-6600, e-mail addresses
jsamuels@sidley.com, and mhayutin@sidley.com, and wiring the
expense advance to Fortress's account pursuant to further
instruction. All notices, notifications, amendments, extensions and
waivers hereunder must be signed and in writing to be effective.
The provisions herein under the headings Indemnification,
Governing Law, Exclusivity, Confidentiality, Procedural Terms
and Expenses are binding and shall survive the termination of this
Term Sheet.

**Miscellaneous:**   This summary of terms and conditions does not purport to
summarize all of the conditions, covenants, representations,
warranties and other provisions which would be contained in
definitive credit documentation for the DIP Loan contemplated
hereby.

13

AGREED AND ACCEPTED:

FORTRESS CREDIT CORP.

By: _____
Name: Constantine Michael Dakolias
Title: Chief Credit Officer

USA COMMERCIAL MORTGAGE
COMPANY, LLC
USA CAPITAL REALTY ADVISORS,
LLC

USA CAPITAL FIRST TRUST DEED
FUNDING, LLC

USA CAPITAL DIVERSIFIED TRUST
DEED FUNDING, LLC

By: _____
Name: Thomas J. Allison
Title: Chief Executive Officer of
all such entities

14

LA1 777500v4

# EXHIBIT "B"

Exhibit B                                    PRELIMINARY INFORMATION, CANNOT BE RELIED UPON

USA Capital
Construction Budget Shortfall
05/16/06

| Loan | Amount |
|------|--------|
| Binford | $925,000 |
| Boise Gowan | $125,000 |
| Bundy $2.5m | $200,000 |
| Bundy $5m | $750,000 |
| Bundy $7.5m | $800,000 |
| Bundy 8.9m | $8,900,000 |
| Castaic Partners III | $325,000 |
| Columbia Managing | $890.000 |
| Comvest | $375,000 |
| Cornman Toltec | $175,000 |
| Copper Sage Phase II | $7,750,000 |
| Eagle Meadows | $4,580,000 |
| Elizabeth May | $1,200,000 |
| Foxhill 216 | $3,020,000 |
| Franklin Stratford | $975,000 |
| Gateway Stone | $3,045,000 |
| Gramercy | $2,216,216 |
| J Jireh | $275,000 |
| La Hacienda | $1,645,000 |
| Lerin Hills | $2,550,000 |
| Meadow Creek Partners | $11,700,000 |
| Ocean Atlantic | $500,000 |
| Palm Harbor | $520,000 |
| Preserve | $596,000 |
| Rio Rancho | $3,850,000 |
| Slade | $225,000 |
| So Cal Land 2nd | $200,000 |
| Standard Property | $8,110,000 |
| The Gardens Phase II | $6,500,000 |
| University Estates | $200,000 |
| **Total** | **$73,122,216** |

Prepared by MFIM, LLC