agreed to permit her to remain in the house for a few months after the closing date. It is questionable whether this alleged oral agreement is enforceable; it does not appear to be for a definite term. Further, given that any such agreement to allow the Prakopes to remain in the house after the closing would presumably constitute a portion of the consideration to be paid by the Luhrs for the Property, the parol evidence rule would prevent the Prakopes from introducing testimony concerning its existence. 3–5 Warren's Weed New York Real Property § 24.01.

Moreover, the benefit to Mrs. Prakope of a sale to the Luhrs, even if they honor their oral agreement, is slight indeed, if it exists at all. As a practical matter, sale by the Trustee would not take place immediately in any event. A minimum of twenty days notice of the sale is required (*see* Fed. R. Bankr.P.2002(a)(2)), and it is likely given the value of this asset that a longer notice period would be required so that the Trustee can properly advertise the sale and market the Property. Nor is it likely that the closing would occur immediately after the sale of the Property. During this period, from the time this motion for permission to sell the Property is granted, to the closing of a sale by the Trustee (which is likely to be at least 60 days) Mrs. Prakope will remain in possession of the Property.

On the other hand, the sale of the Property by the Trustee will result in payment of administrative costs and may result in a small distribution to unsecured creditors of the estate. A sale is therefore a benefit to the estate. *See In re Gillissie*, 215 B.R. 370, 380 (Bankr.N.D.Ill.1997) (holding payment to creditors of a dividend from the sale of property is a benefit to the estate); *In re Ivey*, 10 B.R. 230, 232–33 (Bankr.N.D.Ga.1981).

The benefit to Mrs. Prakope of the possibility that the Luhrs may allow her to remain in the Property for a few more months does not outweigh the benefit to the estate and its creditors from the sale of the Property. The requirements of § 363(h)(3), therefore, have been met.

For all of the foregoing reasons, there is no material fact to be tried, and summary judgment should be entered permitting the Trustee to sell the Property pursuant to section 363(h) of the Code.

Plaintiff is directed to settle an order and a judgment consistent with this opinion.



# In re BUILDERS CAPITAL AND SERVICES, INC., Debtor.

Thomas J. Gaffney, Chapter 7 Trustee of Builders Capital and Services, Inc., Plaintiff,

v.

Ilga Rubino, William Gordon, Diane Gordon, Mike Fox, Carl J. Galante, Elaine Canner, Sylvia Wiesenfeld, Sid Barshter, Susan Marsch, Frank E. Bork III, Frank Strigl, Eric Billes, Ronald Cohen, and Martin Rothschild, Defendants.

Bankruptcy No. 01–13929B.
Adversary No. 02–1261B.

United States Bankruptcy Court,
W.D. New York.

Dec. 1, 2004.

**Background:** Conflicting claims were asserted by Chapter 7 trustee and by investors in mortgages and mortgage notes

acquired by debtor's principal using commingled investor funds.

**Holdings:** The Bankruptcy Court, Carl L. Bucki, J., held that:

(1) mortgages taken by one of the principals in investment company operated as Ponzi scheme, in connection with investments made from pooled account into which funds from various investors had been commingled, as purported agents for certain investors, created no legal interest for benefit of any named **investor**;

(2) any constructive trust imposed on notes and mortgages had to be imposed for benefit of all investors, and not for benefit of any specific investor(s); and

(3) bankruptcy court would not impose constructive trust on mortgage and mortgage notes for benefit of any particular investor, or for benefit of all investors generally, but would allow these assets to be administered by Chapter 7 trustee.

Summary judgment for trustee.

**1. Mortgages ⚖=76**

Under New York law, mortgages taken by one of the principals in investment company operated as Ponzi scheme, in connection with investments made from pooled account into which funds from various investors had been commingled, as purported agents for certain investors, created no legal interest for benefit of any named investor, where principal lacked authority to act as agent of investors or of investment company itself.

**2. Mortgages ⚖=76**

Under New York law, mortgage may be rendered ineffective due to lack of authority of person executing or taking the mortgage on behalf of mortgagor or mortgagee.

**3. Bills and Notes ⚖=327**

Under New York law, where mortgage notes acquired by principal of investment company operated as Ponzi scheme, in connection with investments made from pooled account into which funds from various investors had been commingled, were never delivered into possession of investors or their duly authorized agent, investors never became "holders" of these instruments, and thus could not qualify as "holders in due course"; accordingly, any interest that they had in notes were subject to defenses, including equitable rights of trustee of investment company's Chapter 7 estate and equitable rights of other investors. N.Y.McKinney's Uniform Commercial Code §§ 3–202(1), 3–302, 3–306(b).

See publication Words and Phrases for other judicial constructions and definitions.

**4. Mortgages ⚖=76**

Where payees designated in mortgage notes as alleged agents for certain investors in Ponzi scheme did not stand in agency relationship with any of investors named, investors acquired none of the rights of principal under provision of the New York Uniform Commercial Code (UCC) dealing with notes made payable to one person as agent for another. N.Y.McKinney's Uniform Commercial Code § 3–117(a).

**5. Trusts ⚖=102(1), 103(1)**

New York law generally recognizes a constructive trust upon showing of four factors: (1) a confidential or fiduciary relation; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment.

**6. Trusts ⚖=358(1)**

Under New York law, where funds used by one of the principals of investment company operated as Ponzi scheme, acting

P.O. Box 557340
Las Vegas, NV 89155-7340

Ex "B"

without authority, in order to acquire mortgage notes and mortgages came from pooled account into which funds from various investors had been commingled, and could not be traced to any specific investor, any constructive trust imposed on notes and mortgages had to be imposed for benefit of all investors, and not for benefit of any specific investor(s).

**7. Bankruptcy ⟳2125, 2543, 2547**

Prior to enforcing any constructive trust, bankruptcy court had to weigh all other equitable considerations.

**8. Bankruptcy ⟳2538**

Investment company operated as Ponzi scheme had equitable interest in mortgage notes and mortgages acquired by one of its principals using commingled funds of various investors, which interest became asset of company's Chapter 7 estate and subject to trustee's administration. Bankr.Code, 11 U.S.C.A. § 541(a).

**9. Bankruptcy ⟳2125**

Like imposition of constructive trust, bankruptcy is an inherently equitable proceeding.

**10. Bankruptcy ⟳2543, 2547**
   **Trusts ⟳91**

Constructive trust is formula through which conscience of equity finds expression, and where equity is better served by bankruptcy administration, equity commands rejection of constructive trust.

**11. Bankruptcy ⟳2543**

In involuntary Chapter 7 case that was filed against investment company operated as Ponzi scheme, bankruptcy court would not impose constructive trust on mortgage and mortgage notes for benefit of any particular investor, or for benefit of all investors generally, but would allow these assets to be administered by Chapter 7 trustee; disputed notes and mortgages were funded from accounts that were not exclusively traceable to any particular investor, and even if court were to enforce constructive trust for benefit of all investors, that remedy would sacrifice the crafted protections that bankruptcy process provided, not just for investors, but for benefit of all creditors, all of whom were victims of debtor's fraud.

---

Thomas J. Gaffney, Buffalo, NY, for Trustee.

Harter, Secrest & Emery, Raymond L. Fink, of counsel, Buffalo, NY, for Trustee/Plaintiff.

Watson, Bennett, Colligan, Johnson & Schechter, LLP, Mark R. Walling, of counsel, Buffalo, NY, for Ilga Rubino.

Bouvier, O'Connor, John P. Luhr, of counsel, Buffalo, NY, for Sylvia Wiesenfeld.

CARL L. BUCKI, Bankruptcy Judge.

The present dispute involves conflicting claims of ownership in notes secured by mortgages given to an ostensible agent for investors of the debtor. Both the debtor and certain investors now claim rights to the underlying obligations. To resolve this dispute, the court must turn to basic principles of agency law and equity.

While it conducted business, Builders Capital & Services, Inc., ("Builders Capital") purported to provide investment opportunities to its customers. In concept, the company would pool the money of investors for the purpose of funding short term construction loans. In reality, Builders Capital operated a Ponzi scheme. While promising to generate high yields, the principal officers caused the company to squander its resources on frivolous expenditures and imprudent loans. As a

Ex "B"

consequence, earnings soon became insufficient to satisfy income expectations. In order to fulfill the promised distribution of high interest, Builders Capital induced other customers to invest additional sums of money. For the short term, these new investments provided the cash that the debtor needed to maintain its operations and to fund distributions. Eventually, however, the scheme collapsed. When Builders Capital stopped paying interest, several investors commenced litigation in state court. The state court then appointed a temporary receiver. Meanwhile, three creditors filed an involuntary bankruptcy petition. Pursuant to that petition, this court granted an order for relief under chapter 7 of the Bankruptcy Code on August 9, 2001.

The three principals of Builders Capital were William S. Gordon, David Corbett and Lawrence Schiff. Ultimately, each was convicted of criminal charges arising from his participation with the debtor. For purposes of the present decision, the court does not need to examine the details of their fraudulent activity. It suffices to note that numerous investors have incurred financial loss. Nonetheless, upon the filing of the involuntary petition, the debtor still held claim to significant assets. As with other failed ventures of this type, the liquidation of those assets fell to a chapter 7 trustee, who must work toward a fair and equitable distribution for the benefit of creditors. Although each particular investor has suffered personally, the trustee owes a duty to all creditors to maximize the recovery of assets for the estate.

The chapter 7 trustee commenced the present adversary proceeding to determine the rights of the bankruptcy estate to eight disputed mortgages. Each of these mortgages had been given to secure the repayment of loans that the debtor had advanced from commingled funds in the debtor's possession. In each instance, however, the note and mortgage identified the lender as "William S. Gordon or Diane Gordon, as agents for" one or more named individuals who had invested money with Builders Capital. William S. Gordon is one of the principals of Builders Capital, and Diane Gordon is his daughter. In his complaint, the trustee seeks judgment declaring that the disputed notes and mortgages are property of the debtor's estate, and that the defendants hold only unsecured claims with no interest in the disputed obligations. Named as defendants are William Gordon, Diane Gordon, and each of the individuals for whom William and Diane Gordon purported to serve as agents.

Of the fourteen defendants in this adversary proceeding, eleven have defaulted. William S. Gordon filed an answer which denies certain of the allegations, but otherwise does not seek judgment for the defendants. Ilga Rubino and Sylvia Weisenfeld, both of whom were investors, filed more extensive answers with counterclaims. Essentially, these counterclaims seek a declaration that the mortgage loans are not property of the estate, but are instead held in trust for the benefit of the named investors. After the completion of some discovery, the trustee filed his present motion for summary judgment. Ilga Rubino then filed a cross-motion for summary judgment, and Sylvia Weisenfeld has joined in that motion.

Ilga Rubino exemplifies the sad state of investors in this case. In 1998, a friend introduced Mrs. Rubino to David Corbett, who gave her a copy of the prospectus or offering memorandum for Builders Capital. Based upon that memorandum and upon her communications with Corbett, Rubino understood that Builders Capital would arrange construction loans for which she would be designated as mortgagee.

and that she could anticipate a rate of return of approximately 13 %. Without performing any independent investigation or due diligence, Rubino relied upon the debtor's representations and endorsed to the debtor a check in the amount of $130,000. Builders Capital then commingled these funds into its general account and issued a letter confirming Rubino's investment. Thereafter, she received quarterly reports indicating the accrual and reinvestment of interest. The reports, however, did not show any allocation of her investment among particular mortgages. In truth, payments on the mortgages were also commingled into the debtor's general account. Eventually, Rubino inquired about the specific application of her money. In January of 2000, Builders Capital provided her with a list and copies of the mortgages that were purportedly attributable to her investment. Each note and mortgage listed the lender as "William S. Gordon or Diane Gordon as agent for" a group of investors that included Ilga Rubino. At no time did Rubino execute any agency agreement with, or even a power of attorney in favor of either of the Gordons. Despite the unauthorized designation of mortgagee, Rubino made no further inquiry about her investment until the spring of 2001, after Builders Capital had stopped all dividends. Mrs. Rubino asserts that by reason of the debtor's bankruptcy, she risks the loss of her entire life savings.

Joining in the Rubino motion, Sylvia Weisenfeld has filed only limited papers that fail to assert any distinguishing circumstances that might impact her own rights. Like Rubino, Weisenfeld invested her personal assets into the same type and form of program. Accordingly, the court will apply the same treatment to the claims of both Rubino and Weisenfeld.

The trustee contends that the disputed mortgages are property of the bankruptcy estate and that the nature and substance of the transactions compel a conclusion that the defendants hold an investment in the debtor, rather than a participation in any particular loan. In suggesting this outcome, the trustee directs the court's attention to the following facts: that the defendants infused funds that Builders Capital then held in commingled bank accounts until disbursed to borrowers or for payment of expenses; that the defendants did not know how their funds were being used or to whom their funds were lent; that Builders Capital allowed its investors to withdraw principal without regard to the status, maturity date, or other disposition of any particular loan; that the defendants performed no underwriting or credit analysis with regard to any borrower; that all investors shared risks for the entire pool of loans; and that investors looked to Builders Capital rather than to specific mortgagees for payment of principal and periodic interest.

Ilga Rubino responds that the disputed notes and mortgages grant rights to William and Diane Gordon as agents for specified individuals. Rubino contends, therefore, that the notes and mortgages cannot constitute property of the bankruptcy estate, but instead belong only to the designated beneficiaries.

With its unique facts, the present dispute is readily distinguishable from the various cases that the parties have cited. For example, the trustee urges comparison with decisions that have found investments to be in the nature of loans to the debtor rather than a participation in loans to a third party. *See In re Sprint Mortgage Bankers Corp.*, 164 B.R. 224 (Bankr. E.D.N.Y.1994), *aff'd* 177 B.R. 4 (E.D.N.Y. 1995). Alternatively, the trustee would rely on a precedent that disregarded the form of participation under circumstances where the debtor had committed fraud and

Clark County Law Library
309 South Third Street, Suite [illegible]

Ex "B"

improper business practices. *In re Corporate Financing, Inc.*, 221 B.R. 671 (Bankr. E.D.N.Y.1998). On the other hand, Rubino cites decisions that a bankruptcy estate did not include an investor's participating interest in a note and mortgage. *See In re Fidelity Standard Mortgage Corp.*, 36 B.R. 496 (Bankr.S.D.Fla.1983). None of these cases, however, involved notes and mortgages given to a purported agent acting without authority from the investor. Therein lies the distinguishing factor that compels the present ruling.

In the view of this court, the notes and mortgages are properly assets of the bankruptcy estate. Like all of the other investors, the designated beneficiaries enjoy only an equitable interest in the notes and mortgages. As a fiduciary for all creditors, the trustee may properly administer these assets for the benefit of every claimant.

## Analysis

[1] An interest in property may be either legal or equitable in nature. Accordingly, section 541(a) of the Bankruptcy Code states the general rule, that a bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." In the present instance, the disputed notes and mortgages fail to designate Builders Capital as a mortgagee. For this reason, the trustee can claim no legal interest in these instruments. At most, he enjoys only an equitable right. The essential premise of Rubino's argument is that she holds a legal position that supercedes any equitable rights of the trustee. Despite a purported grant of rights to an agent for Rubino, however, the lack of an agency relationship belies the creation of a legal interest in any mortgage or note.

[2] "A mortgage may be rendered ineffective because of the absence of authority of the person executing *or taking* the mortgage on behalf of the mortgagor *or mortgagee.*" 77 N.Y. Jur. 2d *Mortgages* § 53, (2003) (emphasis added). The investors may have designated Builders Capital to serve as their agent, but they did not establish any such relationship with either William or Diane Gordon. In an affidavit submitted in support of her cross-motion, Ilga Rubino acknowledges that she "did not authorize either William or Diane Gordon as my specific agent." Nor do any of the investment agreements even suggest such an agency relationship. Essentially, therefore, the disputed mortgages grant a lien to purported agents who lack any authority to act in that capacity. Failing to designate an extant mortgagee, the mortgages create no legal interest for the benefit of any named investor.

Rubino argues alternatively that even if William or Diane Gordon did not serve as her agents, they qualify as subagents for her true agent, Builders Capital. Again, no written instrument creates any such subagency relationship. To the contrary, William Gordon represents that he designated himself and his daughter as agents without any written authority from Builders Capital, in order to handle and control any discharge of lien. The purported subagency could never fulfill this purpose, however, because New York's Statute of Frauds would render invalid any discharge of lien without written authority from an agent's principal. N.Y. Gen. Oblig. Law § 5–703 (McKinney 2001). With respect to the acceptance of delivery of the disputed mortgages, William and Diane Gordon lacked authority to serve either as an agent of Builders Capital or as agent of any investor. As a consequence, no individual investor could acquire a legal interest in any mortgage ostensibly given to William and Diane Gordon as agent.

[3] The defects of a mortgage do not necessarily speak to the validity of any

P.O. Box 557340
Las Vegas, NV 89155-7340

note that the mortgage may secure. Despite their lack of a legal interest in the disputed mortgages, Rubino and Weisenfeld may also assert rights under the disputed notes. These notes, however, were never delivered into their possession or into the possession of their duly authorized agent. Hence, Rubino and Weisenfeld never became holders of the instruments. N.Y. U.C.C. § 3–202(1) (McKinney 2001). Not being holders, Rubino and Weisenfeld cannot qualify as holders in due course under N.Y. U.C.C. § 3–302. 2 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 17.3 (4th ed.1995). Thus, their interests are subject to defenses, N.Y. U.C.C. § 3–306(b), and to the claims of third parties, N.Y. U.C.C. § 3–306(a). Included among these claims are any equitable rights of the chapter 7 trustee and of any of the other investors.

[4] As with the mortgage instruments, the disputed notes designate the payee as "William S. Gordon or Diane Gordon, as agent" for a specified investor. In this form, the notes grant such rights as are defined by the following text of U.C.C. § 3–117: "An instrument made payable to a named person with the addition of words describing him (a) as agent or officer of a specified person is payable to his principal but the agent or officer may act as if he were the holder ...." In the present instance, however, William or Diane Gordon held the disputed notes pursuant to a purported agency relationship that simply did not exist. Thus, these purported agents have no principal to whom the notes can be payable. Not being principals of any valid agency relationship with William or Diane Gordon, Rubino and Weisenfeld can hold none of the rights granted to a principal under U.C.C. § 3–117(a).

Neither the debtor nor any individual investor holds a valid legal interest in the disputed notes and related mortgages.[1] Instead, the present controversy becomes a dispute among equitable interests and a choice between equitable remedies.

[5, 6] Ilga Rubino argues that the underlying obligations have become the corpus of a constructive trust that inures to her benefit. I accept the rationale for this argument, but with different consequences for the defendants. The problem for Rubino and Weisenfeld is that the beneficiaries of the trust would include all investors, not just those named on a particular instrument. Because all of the relevant transactions occurred in New York State, the law of New York will define the terms of any constructive trust. Although "constructive trust doctrine is not rigidly limited," *Simonds v. Simonds*, 45 N.Y.2d 233, 241, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978), New York law generally recognizes a constructive trust upon a showing of four factors: "(1) a confidential or fiduciary relation, (2) a promise, express or implied, (3) a transfer made in reliance on that promise, and (4) unjust enrichment." *Bankers Security Life Insurance Society v. Shakerdge*, 49 N.Y.2d 939, 940, 428 N.Y.S.2d 623, 406 N.E.2d 440 (1980). All of the investors enjoyed a fiduciary relationship with Builders Capital, which promised to all the same investment opportunity. Even if they might be deemed to have acted as subagents of Builders Capital, William and Diane Gordon owed identical duties to every investor. In reliance upon the promises of Builders Capital and of its agents, each investor transferred funds to Builders Capital. Each of these transfers enriched Builders Capital unjust-

---

1. Because the present dispute involves only the rights of the trustee as against investors, the court need not now decide rights as against any mortgagor, whether under a theory of equitable mortgage or otherwise.

Clark County Law Library
309 South Third Street

Ex "B"

ly. Essentially, therefore, each of the investors is similarly entitled to assert a constructive trust with respect to the proceeds of his or her own investment. In the present instance, however, no particular investment can be traced to any particular mortgage.

Although individual investors provided capital to the debtor, Builders Capital never segregated those investments but commingled them into its general accounts. The disputed loans were funded from moneys that the debtor held on deposit in its own name. Without authority from the debtor, William Gordon then prepared documents designating mortgagees other than Builders Capital. Nonetheless, Builders Capital continued to administer the loans. Borrowers repaid the loans directly to Builders Capital, which again deposited receipts into commingled accounts for use by Builders Capital to meet all of its obligations, without regard for the source of those funds. Consequently, any constructive trust must arise for the benefit of all investors and no individual investor may assert a preeminent claim to any of the disputed notes.[2]

[7] Although investors collectively share grounds to assert a constructive trust, a more difficult issue is whether a constructive trust should be enforced. Before enforcement of any constructive trust, this court must weigh all other equitable considerations. Chief among these considerations are the equitable interests of the trustee.

[8] As successor to Builders Capital, the chapter 7 trustee also holds an equitable interest in the disputed notes and mortgages. An equitable interest is an interest recognized in equity. Under New York law, such recognition occurs "whenever necessary to satisfy the demands of justice." *Latham v. Father Divine*, 299 N.Y. 22, 27, 85 N.E.2d 168 (1949). In the present instance, the notes were funded from accounts in the debtor's name. Thus, the debtor held a legal interest in the money which Gordon used to fund the improper notes given to purported agents acting without authority. After the moneys were misapplied, the debtor retained a continuing equitable interest in the disputed notes and mortgages, for the purpose of enabling the debtor to effect a proper distribution of proceeds. Indeed, the debtor exercised its equitable rights after execution of the notes and mortgages, during the time that it continued to service the underlying obligations. To the extent that Builders Capital could best fulfill its responsibilities to investors, the "demands of justice" would recognize an equitable interest to administer the notes and mortgages. Pursuant to 11 U.S.C. § 541(a), this equitable interest became an asset of the debtor's bankruptcy estate and is subject to the trustee's administration.[3]

[9, 10] The parties to this dispute assert competing claims in equity. Like the imposition of a constructive trust, bankruptcy is an inherently equitable proceeding. Seeking to do equity, this bankruptcy court must select the more appropriate process for distribution of proceeds from

---

2. This conclusion accords fully with the maxim: *Prima pars aequitatis aequalitas* (The first part of equity is equality).

3. Counsel have presented argument regarding the application of 11 U.S.C. § 541(d). That section applies, however, only to instances in which the debtor holds only legal title and not an equitable interest. Here, the opposite circumstance occurs. The debtor holds no legal title to the notes and mortgages. Nonetheless, in furtherance of its duty to investors, the debtor retains an equitable interest with respect to the proper management of these assets.

*Ex "B"*

disputed notes and mortgages. In deciding whether the disputed obligations are to remain an asset of the bankruptcy estate or are to become the corpus of a trust for the benefit of select investors, the court must fulfill the underlying goals of equity. As Justice Cardozo stated in *Beatty v. Guggenheim Exploration Company*, 225 N.Y. 380, 386, 122 N.E. 378 (1919), "[a] constructive trust is the formula through which the conscience of equity finds expression." But where equity is better served by a bankruptcy administration, equity commands rejection of a constructive trust. To do equity, therefore, this court must balance the likely impact of a constructive trust against the consequences of bankruptcy administration.

[11] In the present context, a constructive trust is an inappropriate remedy for at least three reasons. First, similarly injured investors comprise essentially the entire list of scheduled creditors. Therefore, a constructive trust for the benefit of Rubino and Weisenfeld would accord special rights at the expense of others who are similarly injured. Second, potential trust beneficiaries are unable to trace the funding for any particular mortgage to any particular investor. Into commingled accounts, the debtor deposited all invested funds as well as any proceeds from invested funds. Thus, a constructive trust would distribute assets not to any identifiable source, but to individuals who managed to attach an identification to assets that derived collectively from many investors. Third, in comparison to the bankruptcy process, a constructive trust provides a less assuredly equitable methodology for the administration of assets. Because a constructive trust is an imposed remedy, there is no documentary direction for distribution of any trust corpus. Thus, the court would face many potential issues involving the equity of any ultimate distribution. For example, should the constructive trust apply to the gross recovery from particular mortgage loans or to recoveries net of other expenses? If the distribution is net of expenses, should those expenses include a *pro rata* share of all costs of administration in this bankruptcy proceeding? Because constructive trusts are equitable remedies, equity commands a fair and equitable result. When assets are distributed outside bankruptcy, parties must address the uncertainties of a constructive trust as they discern an appropriate standard of distribution. Within bankruptcy, however, the statutory scheme of distribution presumptively fulfills this objective.

Even if this court were to enforce a constructive trust for the benefit of all investors, that remedy would sacrifice the crafted protections that the bankruptcy process provides not just for investors, but for the benefit of all creditors. Under the difficult circumstances of this case, the better course of equity will treat the disputed notes and mortgages as assets of the bankruptcy estate. Ultimately, therefore, the trustee should distribute those assets in accord with the requirements of 11 U.S.C. § 726.

I agree with the reasoning of the Bankruptcy Appellate Panel for the Ninth Circuit in *In re Golden Triangle Capital, Inc.*, 171 B.R. 79, 82 (9th Cir. BAP 1994):

> Thus, if property is excludable from the estate because of state constructive trust law, in order to assert control over the property, the debtor must demonstrate that bankruptcy's policy of ratable distribution outweighs the constructive trust beneficiary's right to the *res*....
> In the event that circumstances warrant the remedy of a constructive trust, however, this equitable remedy must be weighed against bankruptcy's equitable policy of ratable distribution, to which

Ex "B"

end the point in time when the remedy is imposed may become critical.

In the present instance where the disputed notes and mortgages were funded from accounts that are not exclusively traceable to any particular investor, this court will decline to recognize a constructive trust for the benefit of specific creditors. Any allocation of recovery to a particular investor will inevitably deny the same recovery to other similarly entitled creditors. Further, a constructive trust may jeopardize the claims of general creditors, none of whom chose the investment risks that were knowingly made by the beneficiaries of any constructive trust. Weighing these results against the inherent fairness of bankruptcy administration, this court finds that a distribution under the Bankruptcy Code will achieve the most equitable result. Accordingly, the court will grant judgment declaring the disputed notes and mortgages to be assets of the bankruptcy estate.

The imposition of a constructive trust for the benefit of a particular creditor is not necessarily inconsistent with bankruptcy administration. Unique and egregious circumstances may justify a constructive trust for the benefit of an injured party with respect to assets in which other creditors should rightly share no interest. In the present context, however, no extraordinary considerations compel the equitable relief sought by Rubino and Weisenfeld. Here, a constructive trust for their benefit would accord special rights at the expense of others who are equally entitled to share the limited assets of the bankruptcy estate. Consequently, such a trust would violate what Judge Duberstein identified as one of the strongest policies of the Bankruptcy Code, namely "that similarly situated investors receive equal distributions from the debtor's estate." *In re Corporate Financing, Inc.*, 221 B.R., at 682.

This court recognizes the severe hardship that fraud has inflicted upon Ilga Rubino and Sylvia Weisenfeld. Unfortunately, however, all of the investors have suffered similarly unjustified loss. Under these difficult circumstances, equity commands that every investor share both pain and an equal prospect for recovery. Bankruptcy Court serves inherently as a court of equity. The Court of Appeals has recently acknowledged that the exercise of equitable authority allows a court "to treat all the fraud victims alike (in proportion to their investments) and order a *pro rata* distribution. Courts have favored *pro rata* distribution of assets where, as here, the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders." *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88–89 (2nd Cir. 2002).

For the reasons stated herein, this court will grant the trustee's motion for summary judgment and will deny the defendants' cross motions.

So ordered.



---

In re ADELPHIA COMMUNICATIONS CORP., et al., Debtors.

Adelphia Communications Corp., et al., Plaintiffs,

v.

John J. Rigas, et al., Defendants.

Bankruptcy No. 02–41729(REG).

Adversary No. 02–08051 (REG).

United States Bankruptcy Court, S.D. New York.

Dec. 2, 2004.

**Background:** Seeking recovery of some $3.2 billion, Chapter 11 debtor-cable televi-

APR 27 2006 2:29PM    RONNING                                    775-832-0682              p.12

## USA COMMERCIAL MORTGAGE COMPANY-INVESTORS TRUST ACCOUNT                                3005

| Vendor ID | Name | Payment Number | Check Date | Document Number |
|---|---|---|---|---|
| THE WILD | The Wild Water LP | 00000825 | 4/7/2006 | 3005 |

| Our Voucher Number | Date | Amount | Amount Paid | Discount | Net Amount Paid |
|---|---|---|---|---|---|
| ASGMT FIESTA MURR | 4/7/2006 | $50,000.00 | $50,000.00 | $0.00 | $50,000.00 |

REC'D APR 18 2006

ENT'D APR 20 2006

                $50,000.00        $50,000.00        $0.00        $50,000.00

---

3005

**USA COMMERCIAL MORTGAGE COMPANY**
INVESTORS TRUST ACCOUNT
4484 S PECOS RD
LAS VEGAS, NV 89121
(702) 734-2400

WELLS FARGO BANK, N.A.
LAS VEGAS, NV 89119
94-7074-3212

DATE 4/7/2006            AMOUNT $50,000.00

PAY  Fifty Thousand Dollars And 00 Cents

TO THE ORDER OF

The Wild Water LP
Grable Ronning
P.O. Box 9288
Incline Village NV   89452

⑁003005⑁  ⑁321270742⑁ 0465657146⑁

---

LAS VEGAS NV 890
11 APR 2006 PM

NOTATION ON CHECK
"REFER to MAKER"
WILL BE AVAILABLE
NEXT WEEK per
ERIC RONNING

894524 9288

EX "C"

# ROBERT C. LEPOME

ATTORNEY AT LAW
THE PHOENIX BUILDING   SUITE 1100B
330 SOUTH THIRD STREET
LAS VEGAS, NEVADA 89101
TELEPHONE (702) 385-5509
FAX (702) 385-3417
www.robertlepome.com

ROBERT C. LEPOME*
*ALSO ADMITTED IN NEW YORK

QUINTIN M. DOLLENTE JR.**
**ALSO ADMITTED IN HAWAII

May 12, 2006

Matthew C. Zirzow, Esq.
Thomas H. Fell, Esq.
Gordon & Silver
3960 Howard Hughes Pkwy. 9th Floor
Las Vegas, NV 89109

Re:   USA Capital Chapter 11 Bankruptcy
      BK-S-06-10725-LBR

Dear Mr. Zirzow and Mr. Fell:

As you probably already know, I represent several investors in the USA Capital bankruptcy. You are receiving this letter because you too represent one or more investors.

In my review of the facts concerning USA Capital and many years of experience as a Mortgage Broker and in Bankruptcies involving Mortgage Brokers, it does not appear that a reorganization will be successful in this bankruptcy. My basis for this belief is that it is not likely that the Debtor will find a lending institution to lend over $100 Million when there are no assets to pledge nor is there goodwill. Essentially, all that the Debtor can offer to do is to broker new loans with the $100,000,000.00. There is no reason why such an investor cannot use Consolidated Mortgage, Vestin Mortgage, One Cap Mortgage, or a dozen others. Even if the investor did make the loans, the cash-flow will not save USA Capital. Finally, the Court, if it wished to save Capital as a going concern must find "good faith". The owners of Capital cannot meet this burden. We all know the facts.

I believe the path each and every investor should take is that new Powers of Attorney be executed by each investor in favor of U.S. Loan Services. They took over Global's loans when Global went under and are well equipped to handle the loan servicing of the USA Capital loans. I have met with the President of U.S. Loan Services and he has agreed to charge a .75% servicing fee which will leave .25% which can be used to reimburse our clients for their attorney fees and costs. If there


Ex "D"

Page 2
Letter regarding USA Capital Chapter 11 Bankruptcy
May 12, 2006

is any "surplus" after all reimbursements are made and our clients made whole, the remainder can be used to help those who would receive less than our clients.

It would seem better to have new fully executed powers of attorney for our standby use. It is better to have them and not need them than to need them and not have them.

If we work together, we can divide the mailing by alphabet so that no attorney has to send out more than 200 letters. It is probable that we should have one letter which is endorsed or signed by all investor's attorneys. Such a letter should be ready for signature and mailing as soon as we have all the Schedules filed - which date is fast approaching. Please contact me to discuss and let me know your feelings on this matter.

                                            Very truly yours,

                                            Robert C. LePome, Esq.

RCL/ss

cc:     Franklin C. Adams, Esq.
        Kelly J. Brinkman, Esq.
        Candace Carlyon, Esq.
        Janet L. Chubb, Esq.
        CiCi Cunningham, Esq.
        Laurel E. Davis, Esq.
        Edward J. Hanigan, Esq.
        Robert R. Kinas, Esq.
        Nicholas J. Santoro, Esq.
        Bradley J. Stevens, Esq.
        Peter Susi, Esq.
        Caryn S. Tijsseling, Esq.

Ex "D"

## THE WILD WATER LIMITED PARTNERSHIP DEEDS OF TRUST

| Maturity Date | Funding Date | Payoff Date | Original Amount | Current Amount Invested | Property Name | Per Diem Rate | Interest Rate | Annual Amount |
|---|---|---|---|---|---|---|---|---|
| 03/01/06 | 08/06/04 | | 50,000.00 | 29,522.36 | Universal Hawaii/Cabernet | $9.84 | 12.00% | $3,591.60 |
| 04/15/06 | 04/15/05 | *** | 50,000.00 | 50,000.00 | Fiesta Murrieta | $16.67 | 12.00% | $6,084.55 |
| 04/29/06 | 04/29/05 | | 50,000.00 | 15,823.13 | Rio Bravo $4.5M (SVRB) | $5.27 | 12.00% | $1,923.55 |
| 05/25/06 | 05/25/05 | | 50,000.00 | 50,000.00 | Oak Shores (Valley) II | $16.67 | 12.00% | $6,084.55 |
| 06/28/06 | 06/28/05 | | 50,000.00 | 50,000.00 | Cornman Toltec 160, LLC | $16.67 | 12.00% | $6,084.55 |
| 07/18/06 | 07/18/05 | | 50,000.00 | 50,000.00 | Castaic Partners II LLC | $17.36 | 12.50% | $6,336.40 |
| 09/05/06 | 03/07/05 | | 50,000.00 | 50,000.00 | Roam Development Group | $16.67 | 12.00% | $6,084.55 |
| 02/23/07 | 02/23/06 | | 50,000.00 | 50,000.00 | Elizabeth May | $16.67 | 12.00% | $6,084.55 |
| 03/29/07 | 03/29/06 | | 50,000.00 | 50,000.00 | Foxhill 216, LLC | $17.36 | 12.50% | $6,336.40 |
| | | | $450,000.00 | $395,345.49 | | $133.18 | | $48,610.70 |

***Principal Payoff check #3005 dated 04/07/06 from USA did not clear bank, USA Wells Fargo funds verified as available, but frozen in Chapter 11

## GRABLE B. RONNING DEEDS OF TRUST

| Maturity Date | Funding Date | Payoff Date | Original Amount | Current Amount Invested | Property Name | Per Diem Rate | Interest Rate | Annual Amount |
|---|---|---|---|---|---|---|---|---|
| 03/01/06 | 08/06/04 |  | $100,000.00 | $59,044.71 | Universal Hawaii/Cabernet | $19.68 | 12.00% | $7,183.20 |
| 04/15/06 | 04/15/05 | *** | $100,000.00 | $100,000.00 | Fiesta Murrieta | $33.33 | 12.00% | $12,165.45 |
| 04/29/06 | 04/29/05 |  | $100,000.00 | $31,646.26 | Rio Bravo (SVRB) | $10.55 | 12.00% | $3,850.75 |
| 05/25/06 | 05/25/05 |  | $100,000.00 | $100,000.00 | Oak Shores (Valley) II | $33.33 | 12.00% | $12,165.45 |
| 06/15/06 | 12/15/04 |  | $85,000.00 | $85,000.00 | Placer Vineyards | $29.51 | 12.50% | $10,771.15 |
| 06/28/06 | 06/28/05 |  | $100,000.00 | $100,000.00 | Cornman Toltec 160, LLC | $33.33 | 12.00% | $12,165.45 |
| 07/18/06 | 07/18/05 |  | $100,000.00 | $100,000.00 | Castaic Partners II LLC | $34.72 | 12.50% | $12,672.80 |
| 09/05/06 | 03/07/05 |  | $100,000.00 | $100,000.00 | Roam Development Group | $33.33 | 12.00% | $12,165.45 |
|  |  |  | $785,000.00 | $675,690.97 |  | $227.78 |  | $83,139.70 |

***Principal Payoff check #3002 dated 04/07/06 from USA did not clear bank, USA Wells Fargo funds verified as available, but frozen in Chapter 11

## BOSWORTH 1988 TRUST DEEDS OF TRUST

| Maturity Date | Funding Date | Payoff Date | Original Amount | Current Amount Invested | Property Name | Per Diem Rate | Interest Rate | Annual Amount |
|---|---|---|---|---|---|---|---|---|
| 06/15/06 | 12/15/04 | | 50,000.00 | 50,000.00 | Placer Vineyards | $17.36 | 12.50% | $6,336.40 |
| 01/25/07 | 03/27/06 | | 50,000.00 | 50,000.00 | Margarita Annex | $16.67 | 12.00% | $6,084.55 |
| | | | $100,000.00 | $100,000.00 | | $34.03 | | $12,420.95 |

