Thomas J. Gilloon, Esq.
State Bar No. 000578
Las Vegas, Nevada 89101
Phone: 702-388-7185
Fax: 702-388-0108
mcknightlaw@cox.net

**Efiled on May 23, 2006.**

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

In re:
USA COMMERCIAL MORTGAGE COMPANY,

    Debtor.

In re:
USA CAPITAL REALTY ADVISORS, LLC.,

    Debtor.

In re:
USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC.,

    Debtor.

In re:
USA CAPITAL FIRST TRUST DEED FUND, LLC.,

    Debtor.

In re:
USA SECURITIES, LLC.,

    Debtor.

Affects:
  Q All Debtors
  Q USA Commercial Mortgage Company
  Q USA Securities, LLC
  Q USA Capital Realty Advisors, LLC
  Q USA Capital Diversified Trust Deed Fund, LLC
  Q USA First Trust Deed Fund, LLC

Case No. BK-S-06-10725-LBR
Case No. BK-S-06-10726-LBR
Case No. BK-S-06-10727-LBR
Case No. BK-S-06-10728-LBR
Case No. BK-S-06-10729-LBR

Chapter 11

**Jointly Administered Under
Case No. BK-S-06-10725-LBR**

Date: June 21, 2006
Time: 9:30 a.m.

## MOTION DIRECTING PAYMENTS TO DIRECT LENDERS

COMES NOW Richard McKnight, Esq., Co-Trustee of the McKnight 2000 Family Trust dated 4/20/00, by and through his attorney, Thomas J. Gilloon, Esq., of the Law Offices of Richard

Page 1 of 8

1 McKnight, and moves, pursuant to the provisions of 28 U.S.C. 105, for entry of an order for
2 immediate payment of all sums due under any note secured by deed of trust payable to direct lenders.
3 This motion is made and based on the pleadings and papers on file herein.

4  DATED this 23rd day of May, 2006.

6  THE LAW OFFICES OF RICHARD MCKNIGHT, P.C.

8  By: /s/   Thomas J. Gilloon
    Thomas J. Gilloon, Esq.
9    State Bar No. 000578
    330 S. Third St., #900
10   Las Vegas, NV 89101
    Attorneys for Movant

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
DIRECTING PAYMENTS TO DIRECT LENDERS**

A. <u>The Money Due The Direct Lenders Is Not Property Of The Estate.</u>

The McKnight 2000 Family Trust holds fractional interests in six (6) promissory notes secured by deeds of trust which the Debtor In Possession services under a Loan Servicing Agreement. The McKnight 2000 Family Trust investments total five hundred thousand ($ 500,000) dollars in their principal amount. Ex. "A." Five of the notes directly reflect the fractional interests held by the McKnight Trust and designate the McKnight Family Trust among the payees. Ex. B-F. A copy of the standard Loan Servicing Agreement between USA Commercial Mortgage Company ("USA") is attached. Ex. G." In the case of a December 22, 2005 investment in a second deed of trust payable by 5252 Orange, LLC, the McKnight Family Trust obtained its interest by an Assignment of Beneficial Interest In Deed of Trust from USA Capital recorded January 17, 2006. Ex."H."

The DIP Performance Evaluation reflects that four of the six loans in which the McKnight Trust invested are rated as performing (5252 Orange, LLC, Del Valle Capital, Gateway Stone Associates,

1  Castaic Partners III ). Ex. "I." The evaluation of the Eagle Meadows loan is misleading in the extreme.
2  According to the documentation provided to Richard McKnight, original amount of the loan was
3  $35,630,000. Ex. "J." The Performance Evaluation reflects a loan balance of $31,050,000 - a reduction
4  of $4,580,000 in the principal balance. Unpaid interest is listed as $9,019 - the lowest amount listed in
5  the amount of interest unpaid. The Roam Development Loan is the only loan on which there is a
6  significant interest arrearage and even that assertion is questionable. Movant is informed that Roam
7  Development has funds available to bring its loan current and is prepared to do so. Thus all of the
8  McKnight Trust loans should properly be deemed performing loans. Nor has the DIP presented any
9  evidence that the McKnight Trust received any preferential payments in connection with any of these
10 loans.

11         The attempt by the Debtor In Possession to create a property interest in the notes listed where
12 none properly exists must fail. The essence of the DIP argument is that the DIP should be permitted to
13 continue to seize payments due the direct lenders because USA Commercial Mortgage Company
14 allegedly commingled some funds in the past. The argument ignores two critical facts. First, the Debtor is
15 not the owner of either a legal or beneficial interest in the notes and holds only a contractual right to
16 service the loans. Second, any money it receives under the loans is to be paid to the investors, not the
17 Debtor. Section 2(c)(i) of the Loan Servicing Agreement sets out that payment obligation in explicit
18 terms.

19         Until the total amount due under each note is paid in full:

20         (i)     Proceed diligently to collect all payments due under the terms of the note and *promptly pay the proper parties*, when and if due, principal interest, late charges, insurance and
21                 other specified fund.

22 (Emphasis added).  Further, in *In re Lendvest Mortg., Inc.*, 119 B.R. 199 ( 9th Cir.BAP (Cal.),1990),
23 the Ninth Circuit Court of Appeals stated that if a transfer of funds from an investor to a debtor is
24 effectively a sale of a note secured by deed of trust, then "the funds are effectively *removed* from the
25 rest of the estate." 119 B.R. , *at 200* (emphasis added). In *Lendvest*, unlike the present case, the
26 debtor had guaranteed payments from the borrower. In this case, the debtor did not sign any guarantees.

27         The decision by the Ninth Circuit Court of Appeals in *In re Golden Plan of California, Inc.*,

829 F.2d 705 (9th Cir., 1986), which likewise involved a bankrupt loan brokerage company, demonstrates that the investors who purchased fractional interests in notes secured by deeds of trust from the loan broker are the owners of the fractional interests, not the loan broker, and that the investor are entitled to the payments due them under the notes, and to possession of the notes in question. In *Golden Plan*, the bankruptcy court resolved the question of the right of trust deed investors to take possession of the notes secured by deed of trusts which they had purchased from the broker on the bankruptcy trustee's motion for special instructions.  The bankruptcy court had divided the investors into four categories of Golden Plan investors. Category A consisted of one or more investors who were original named payees and beneficiaries on the notes and trust deeds, regardless of whether or not they were in possession of the assigned instruments. Category B consisted of one investor who received a 100% interest in a note and trust deed, regardless of possession. Category C consisted of investors who received fractional interests in a note and trust deed and took possession of the assigned instruments. Category D consisted of investors who received fractional interests in a note and trust deed and did not have possession of the instrument assigned to them.

   The bankruptcy court determined that investors in categories A, B, and C (the "Fox investors") had ownership interests in the instruments while investors in category D (the "Bear investors") held only un-perfected security interests. *Id., at 707-708*. The bankruptcy court conditioned the release of the notes in question to the Fox investors on payment of a surcharge for administrative expenses. The bankruptcy court ruled that the Bear investors held only unsecured loans. The investors filed an action in the District Court challenging the bankruptcy court decision.  The district court affirmed the bankruptcy court's categorization of investor groups and imposition of fees on the Fox Investors. *Id.,* at 708. On appeal to the Ninth Circuit, the bankruptcy court ruling on the Fox investors' status as owners was not even an issue in the appeal. *Id., at 708, fn. 1*. The Ninth Circuit, however, held that the district court's determination that the transactions at issue were loans from the Bear investors to Golden Plan was clearly erroneous, however. *Id., at* 709.

   The Ninth Circuit decision was based principally on the documentary evidence consisting of the promissory note, assignment of note secured by deed of trust, and written instructions from the investors

1  that clearly set forth and limited the responsibilities of the debtor s the loan servicing agent. The court

2  also emphasized, however, that the presence or absence of a guarantee of repayment was particularly

3  significant in its decision. *Id*., at 709-710. Like the debtor in *Golden Plan*, USA Commercial Mortgage

4  did not guarantee payment of any of the notes, nor is it required to repurchase any of the notes in

5  question. The only guarantees given with respect to the loans in question were given by the principals in

6  the entities to whom the loans were made, not the Debtor. Thus, this case is clearly distinguishable from

7  *In re Sprint Mortgage Bankers Corp., 164 B.R. 224 (Bankr. E.D.N.Y.,1994)*, the principal case cited

8  by the DIP in support of the current motion,. The existence of a guarantee by the principal of the

9  mortgage broker was also crucial to the outcome in *Sprint*. *Id*., at 228-229.

10       In this case, the only provision that might alter the obligation of the broker to pay over the funds

11  due the note holders is the language of Section 2(c)(iii) which gives USA an option to pay off any lender

12  at any time. That section reads as follows:

13       In its sole discretion, USA may pay off any lender at any time by paying the then
    outstanding balance of Lenders=interest in the principal of the Loa, plus all accrued interest and
14  any prepayment penalty or fee, if applicable. Any Lender so paid off shall concurrently execute
    and deliver therewith to USA an assignment, in a form acceptable to USA, of all of such
15  Lender=s[sic] right, title and interest in the Loan (including all documents evidencing the Loan)
    and in the deed of trust securing the Loan.

16  

17  The Ninth Circuit in *Golden Plan, however,* held that a similar "advancing " provision did not alter the

18  economic risk and "did not alter the nature of the transactions at issue as sales." *Id*., at 710. The

19  provision at issue there provided that the broker was authorized either to forward the payments including

20  the applicable late charges when received from the borrower or to advance payments to the investor but

21  permitted the loan servicing agent to retain all late charges that were due.

22  / / /

23  B. The Debtor has No Interest In Funds Identifiable To The Direct Loans.

24       The Debtor's assertion of some sort of 'equitable" interest in the promissory notes that secure

25  these loans is also plainly prohibited by the language of 11 U.S.C. §541(B)(1) which states as follows:

26       (b) Property of the estate does not include--

27       (1) any power that the debtor may exercise solely for the benefit of an entity other than the

28  Page 5 of 8

debtor.

As noted above, the only cognizable right the Debtor has in the property is the contract right to service the mortgage for the benefit of the investors, not itself. USA has only a *contractual right* to collect a 1% servicing fee as the money due the direct lenders is paid. Under paragraph 8 of the standard Loan Servicing Agreement, the Direct Lenders in fact have the right to terminate that Loan Servicing Agreement on thirty days notice if USA Commercial Mortgage Company fails to perform obligations under that Agreement. A sample Loan Servicing Agreement is attached. Ex. "G." The text of that termination clause is as follows:

> Lender may, by 30 days written notice to USA, terminate this agreement, and the power of attorney granted, under Section 9 of this Agreement, if USA fails to perform its obligations hereunder.

Paragraph 3 of the Loan Servicing Agreement, however, gives the holder of a beneficial interest in the loan the right to act on behalf of the direct lenders upon approval by 51% of the holders of the fractional interests in the note. The text of that section of the agreement is as follows:

> Pursuant to NAC 645B.073, in the event of default, foreclosure or other matters that require action, if for any reason USA fails to act on Lenders behalf as authorized herein, then Lender may, with approval of fifty-one percent (51%) or more of all of the holders of the beneficial interest of record in the Loan, act on behalf of all such holders of the beneficial interest of record. These actions may include, but are not limited to:
> (a)   the designation of the mortgage broker, servicing or other person to act on behalf of the holders of the beneficial interests in the loan: and
> (b)   the sale, encumbrance or lease of real property owned by the holders resulting from a foreclosure or the receipt of a deed in lieu of foreclosure.

/ / /

/ / /

The assertion by the DIP that it has some "property interest" in any funds received in payment of the loans made by the investors in this case flies in the face of the plain language and in fact runs counter to the decision in *In re Lemons & Associates, Inc*., 67 B.R. 198 (Bkrtcy.D.Nev.,1986) on which the Debtor relies. In *Lemons,* Judge Jones recognized that "[w]here the debtor had been in possession of trust property, the bankruptcy trustee holds such property subject to the outstanding interests of the beneficiaries. *Id*., at 209 In this case, unlike the facts presented in *Lemons*, the investors invested in

1  plainly identifiable loans to specific borrowers and took identifiable land as collateral. Thus, none of the
2  tracing problems that complicated the administration in the *Lemons* bankruptcy case which the court
3  cited in justifying imposition of a constructive trust are presented here and there is no reason that
4  payments to investors should not continue.

C. <u>The DIP Lacks Standing To Assert The Claims Of The Investors Whose Money May have Been Diverted</u>.

In *In re Inner City Management, Inc*., 304 B.R. 250, it was held that abankruptcy trsutee does not have standing to assert a claim based on injury to third parties in the absence of an assignment of a claim from the injured party. The Court stated as follows:

> To have standing to pursue a claim against nondebtor third parties, the trustee must allege that the debtor was harmed in a manner that is distinct form the harm suffered by the estate's creditors. "[W]hen creditors have... a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so." Hirsch, 72 F.3d at 1093. "Where claims belong solely to the creditors and involve misconduct on the part of the debtor against creditors, i.e., 'when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors.' "

*Id*., at 254.  The court also emphasized that this was particularly true where the debtor had participated in the wrong committed against the third party.  Thus, the justification offered for delaying the release of funds to investors, determining whether funds were paid to investors, lacks any merit whatsoever. The DIP may ultimately be a witness in a proceeding brought by a disgruntled investor, but it cannot be a plaintiff particularly where as here its only source of authority with respect to the funds in question is to pay the money in its possession to the investors in the first place.

## **CONCLUSION**

There are presently several motions seeking relief by various investors that are pending before the court, including motions for relief from stay to permit individual investors or groups of investors to terminate their Loan Servicing Agreements with the Debtor entirely. Regardless of the outcome of those motions, the fact remains that the DIP is holding funds that are not property of the estate. The DIP should properly be ordered to immediately pay all sums that become due the McKnight Trust and other parties that made direct loans to borrowers immediately.

DATED this 23rd day of May, 2006.

THE LAW OFFICES OF RICHARD MCKNIGHT, P.C.

By: /s/ Thomas J. Gilloon
Thomas J. Gilloon, Esq.
State Bar No. 000578
330 S. Third St., #900
Las Vegas, NV 89101
Attorneys for Movant