# LOAN AGREEMENT

This Loan Agreement, dated as of December 7, 2005, is entered into by and among **Lerin Hills, LTD.**, a Texas limited partnership ("Borrower"), and those persons listed on **Exhibit "A"** attached hereto ("Lender").

## SECTION 1: DEFINITIONS AND ACCOUNTING TERMS.

1.1   Defined Terms. As used in this Agreement, the following terms shall have the meanings set forth respectively after each:

"**Agreement**" means this Loan Agreement.

"**Assignment of Permits, Licenses, Franchises and Authorizations**" means the Assignment of Permits, Licenses, Franchises and Authorizations executed by Borrower.

"**Assignment of Rents**" means the Assignment of Rents contained in the Deed of Trust.

"**Business Day**" means any Monday, Tuesday, Wednesday, Thursday, or Friday on which banks in the State of Nevada are open for business.

"**Control Account**" means Disbursement Agent's account in which the Control Account Funds shall be held.

"**Control Account Escrow Agreement**" means the Control Account Escrow Agreement and Security Agreement by and between Borrower, Lender and Disbursement Agent of even date herewith.

"**Control Account Funds**" means the portion of the Loan funds held in the Control Account at any time, together with interest accrued thereon, any additions thereto made pursuant to this Agreement, and any and all investments and reinvestments of any such sums now or hereafter made.

"**Debt**" means any indebtedness of the Borrower other than indebtedness owed to trade creditors incurred in the ordinary course of business and payable in 180 days or less.

"**Deed of Trust**" means the Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing of even date herewith, executed by Borrower in favor of Lender with respect to the Property or portions thereof, either as originally executed or as it may from time to time be supplemented, modified or amended.

"**Default Rate**" shall have the meaning set forth in the Note.

1

"**Disbursement**" means each of the disbursements by Lender of the Proceeds of the Loan or other funds (including the Control Account Funds) pursuant to this Agreement.

"**Disbursement Agent**" means Project Disbursement Group, Inc., or any other licensed construction control company approved by Lender which may at any time hold any portion of the Control Account Funds pursuant to this Agreement.

"**Disbursement Schedule**" means the schedule for Disbursements attached hereto as **Exhibit "B."**

"**Effective Date**" means the date the Deed of Trust is recorded in the Official Records of Kendall County, Texas.

"**Environmental Indemnity**" means the Environmental and Accessibility Indemnity Agreement executed by Borrower and the Guarantor.

"**Financing Statement**" means financing statement of even date herewith executed by Borrower in favor of Lender with respect to the Personal Property.

"**Governmental Agency**" means any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, court, administrative tribunal or public utility.

"**Guarantor**" means J. Abel Godines.

"**Guaranty**" means the Guaranty executed by the Guarantor in favor of Lender guarantying the obligations of Borrower in the Loan Documents, either as originally executed or as it may from time to time be supplemented, modified or amended.

"**Improvements**" means any and all improvements now existing or hereafter constructed on the Real Property.

"**Interest Reserve**" means that portion of the Loan Amount allocated to interest reserve pursuant to Section 3.3 below.

"**Laws**" means, collectively, all federal, state and local laws, rules, regulations, ordinances and codes.

"**Lender**" means collectively, those persons and entities listed on **Exhibit "A"** attached hereto and any other persons or entities who may be added to that list pursuant to an amendment to the Note.

"**Loan**" means the loan to be made by Lender to Borrower pursuant to Section 3 hereof.

2

"**Loan Documents**" means, collectively, this Agreement, the Note, the Security Documents, the Environmental Indemnity, the Guaranty and the Project Assignments, in each case either as originally executed or as the same may from time to time be supplemented, modified or amended, together with any other documents or instruments which may at any time be executed by Borrower in connection with the Loan.

"**Lot**" means a single parcel of the Real Property used for one (1) single family home.

"**Maturity Date**" means the date which is twelve (12) months after the Deed of Trust is recorded.

"**Note**" means the promissory note of even date herewith, in the original principal amount of $12,900,000.00, executed by Borrower in favor of Lender to evidence the Loan, either as originally executed or as it may from time to time be supplemented, modified or amended.

"**NRS**" means the Nevada Revised Statutes, as amended from time to time.

"**Operation**" means the operation of Borrower's business on the Property, including the operation, sales, leasing, running and maintenance of the Property and the Improvements.

"**Permitted Exceptions**" means the matters identified in **Exhibit "C"** attached hereto and made part hereof.

"**Person**" means any entity, whether an individual, trustee, corporation, partnership, trust, unincorporated organization or otherwise.

"**Personal Property**" means all present and future personal property (including the Project Documents) of Borrower of every kind and nature, whether tangible or intangible, now or hereafter located at, upon or about the Property, or used or to be used in connection with or relating or arising with respect to the Property and/or the Project, including but not limited to the property described in the Deed of Trust.

"**Project**" means the project for the development of, and construction of improvements on, the Property, as such exists at any time.

"**Project Assignments**" means, collectively, the Assignment of Permits, Licenses, Franchises and Authorizations, the Assignment of Engineer's Contract, Improvement Plans, Specifications and Drawings and such other assignments as Lender shall require.

"**Project Documents**" means, collectively, all agreements, documents, instruments and materials of whatever kind or nature relating to the Project, including but not limited to: (a) the improvement plans and all other plans, specifications and drawings relating to the Project, (b) all approvals, consents, licenses and permits issued, or to be issued, by any Governmental Agency in connection with the Project, (c) the engineer's contract, architect's contract and any and all construction contracts, and all other agreements relating to the Project between Borrower and any

3

contractor, subcontractor, independent project manager or supervisor, architect, engineer, laborer or supplier of materials, and (d) any take-out, refinancing or permanent loan commitment issued to Borrower with respect to the Property.

**"Property"** means, collectively, the Real Property, the Personal Property and any other buildings, structures, or improvements now or hereafter located on all or any portion of the Real Property.

**"Real Property"** means the real property and interests in real property described in **Exhibit "D"**.

**"Request for Disbursement"** means a written request for a Disbursement signed by a designated representative on behalf of Borrower, in the form approved by Lender.

**"Security Agreement"** means the Security Agreement contained herein and in the Deed of Trust.

**"Security Documents"** means the Deed of Trust, the Assignments, the Financing Statements and any other mortgage, deed of trust, assignment of leases, security agreement or assignment executed to secure the Note, either as originally executed or as they may from time to time be supplemented, modified or amended. Borrower shall enter into a separate Assignment of MUD (Municipal Utility District) Rights in connection with the Project.

**"Title Company"** means Chicago Title Insurance Company.

**"Title Policy"** means the Lender's policy of title insurance and endorsements thereto required by this Agreement as a condition of the first Disbursement.

**"USA"** means USA Commercial Mortgage Company, a Nevada corporation, the mortgage company which arranged the Loan.

**"Use"** means ownership, use, development, construction, maintenance, management, operation or occupancy.

1.2     Use of Defined Terms. Any defined term used in the plural shall refer to all members of the relevant class, and any defined term used in the singular shall refer to any number of the members of the relevant class. Any reference to the Loan Documents and other instruments, documents and agreements shall include such Loan Documents and other instruments, documents and agreements as originally executed or as the same may be supplemented, modified or amended.

1.3     Accounting Terms. All accounting terms not specifically defined in this Agreement shall be construed in conformity with, and all financial data required to be submitted by this Agreement shall be prepared in conformity with, generally accepted accounting principles applied on a consistent basis.

4

1.4     Exhibits. All exhibits to this Agreement, either as now existing or as the same may from time to time be supplemented, modified or amended, are incorporated herein by this reference.

## SECTION 2: RECITALS.

Borrower has applied to Lender for a Loan to acquire the Real Property and to fund related costs associated with the debt for the Project. Lender is willing to make the Loan to Borrower on the terms and conditions contained in this Agreement and the other Loan Documents.

## SECTION 3: THE LOAN.

3.1     Amount of the Loan. Subject to the terms and conditions set forth in this Agreement, Lender agrees to make an initial advance of the loan ("Loan") to Borrower in a principal amount of Ten Million Dollars ($10,000,000.00) (the "Loan Amount"), Lender's disbursement of which is subject to the terms and conditions of the Loan Documents. The Loan Amount shall be disbursed in accordance with Lender's instructions to the Title Company. From and after the date that the Borrower has signed the Loan Documents and the Lender has deposited with the Title Company the amount needed to close the Loan, the Loan Amount shall bear interest at the rate set forth in the Note until fully repaid to Lender.

3.2     Increase in Loan Amount. From the Effective Date through and including November 1, 2007, Lender and USA shall have the exclusive right, but not the obligation, to increase the Loan Amount to an amount not to exceed Twelve Million Nine Hundred Thousand Dollars ($12,900,000) pursuant to the Disbursement Schedule attached hereto as Exhibit "B.". All amounts that Lender may advance after the Effective Date shall increase the Loan Amount and be used for the following purposes: (i) to pay loan fees and closing costs in connection therewith, and (ii) to fund the Interest Reserve (defined below). Upon each increase in the Loan Amount, Borrower shall execute amendments to the Note and the Deed of Trust which shall memorialize the increase in the Loan Amount, the change in the identity of the persons and entities which comprise Lender and their respective undivided interests in the Loan. Upon the recordation of the amendment(s) to the Deed of Trust, the Title Company shall issue to Lender, at Borrower's expense, an endorsement or endorsements to the Title Policy which shall (i) insure the continued priority of the Deed of Trust and that the additional advance is secured thereby, (ii) reflect the increase in the face amount of the policy corresponding to the increase in the Loan Amount, and (iii) set forth the change in the identity of the insured lenders and their respective undivided interests in the Loan. Upon any such additional advance, a portion thereof shall be deposited into the Interest Reserve (defined below) for the Loan. Nothing herein shall constitute a commitment by Lender or USA to fund to Borrower any more than the initial Loan Amount.

3.3     Interest Reserve. A portion of the Loan Amount, to be reasonably determined by Lender, shall be disbursed by the Title Company to the Disbursement Agent to be held as interest reserve for the benefit of Lender (the "Interest Reserve"). Disbursement Agent's only function shall be to hold and disburse the Interest Reserve in accordance with the Control Account Escrow Agreement. As additional advances are made as provided in Section 3.2 above, a portion of such advances, the amount of which to be reasonably determined by Lender, shall be deposited into the

5

Interest Reserve. Interest accrued on the Note Amount shall be paid from a portion of the Interest Reserve upon presentation of a monthly interest statement by Lender, without the necessity of any instruction or request from Borrower. Except as provided in this paragraph, the funds in the Interest Reserve shall never be used for any other purpose without the express written consent of Lender. Depletion of the Interest Reserve shall not release Borrower from any of Borrower's obligations under the Loan Documents, including but not limited to the obligation to pay interest accruing under the Note. After depletion of the Interest Reserve, or so long as any Event of Default has occurred and is continuing, all interest payments under the Note shall be made by Borrower using its own funds; provided that Lender, at its option and in its sole discretion, may obtain disbursements from the Interest Reserve notwithstanding such Event of Default. Upon the occurrence of an Event of Default, the entire balance of the Interest Reserve shall be paid to Lender upon demand and applied to the then outstanding balance of the Loan.

3.4    Prepayment. Borrower agrees that all loan fees and any prepaid finance charges are fully earned as of the date they are paid and will not be subject to refund upon any early payment hereof (whether voluntarily or as a result of default). Subject to the foregoing, Borrower may prepay the Loan, in full or in part, at any time; provided, however, that if Borrower prepays the Note within the first one hundred twenty (120) days after the Effective Date (whether voluntarily or as a result of default), then Borrower shall pay to Lender a prepayment fee equal to all interest which would accrue on the full Note Amount during said one hundred twenty (120) day period, less all interest previously paid.

3.5    Security. The indebtedness evidenced by the Note, and all other indebtedness and obligations of Borrower under the Loan Documents, shall be secured by the Security Documents. The obligations of Guarantor under the Environmental Indemnity obligations and the Guaranty shall be unsecured.

3.6    Partial Releases. So long as no Event of Default has occurred and is continuing, Lender shall release an individual Lot or multiple Lots from the lien and operation of the Deed of Trust upon satisfaction in Lender's sole discretion of the following requirements:

(a)    the payment to Lender, from the sale or refinance proceeds, a release price equal to 100% of the net proceeds from the sale of such Lot ("Release Price"); provided, however, that the net proceeds shall be based on a minimum gross sales price per Lot of $53,000.00; and

(b)    Borrower pays all costs and expenses in connection with such release and reconveyance, including the cost of any title insurance endorsements requested by Lender; and

(c)    the Lot to be released and the remaining Lots are legal parcels of land pursuant to applicable Texas law.

For purposes of this section, the term "net proceeds" means the gross sales price less the release price required by the Wachovia Loan and customary closing costs and escrow fees; provided, however, that if a real estate commission is payable to Borrower or an affiliate of Borrower, then no more then two percent (2%) of the gross sales price shall be deducted to determine the net

6

proceeds, regardless of the actual commission payable to Borrower or its affiliate. The number of planned Lots for the Project can not be changed without the prior written consent of Lender, which consent may be conditioned upon a modification to the Release Price.

    3.8    <u>Subordination.</u> Borrower agrees and acknowledges that the Deed of Trust securing this Loan is a second position lien on the Property behind that certain Deed of Trust of Wachovia Bank, National association in the principal amount of $20,000,000 ("Wachovia Loan"), and that during the Term of this Loan, the Deed of Trust shall not be subordinated to any other mortgage, lien, security interest or other encumbrance other than the Wachovia Loan, and that in no event shall Borrower seek or obtain additional subordinate financing for the Project, or an increase in the Wachovia Loan or cause the Property to be pledged, mortgaged or encumbered with financing other than the Deed of Trust and the Wachovia Loan. The assignment documents provided to Lender by Borrower as additional security for the Loan shall be subject to the assignment rights of Wachovia Bank in connection with the Wachovia Loan.

    3.9    <u>Leases for Grazing Rights</u>. Upon the prior written consent of Lender, Borrower shall have the right to enter into leases for portions of the Property provided such leases do not interfere with the development of the Property and such leases are for a term of no longer than one (1) year.

    3.10    <u>Extension of Loan</u>. If the first deed of trust loan Wachovia Bank is not paid in full by the Maturity Date, Borrower may request a one time renewal and extension of the term of the Note for one (1) year so long as the following conditions have been satisfied, in Lender's sole discretion:

    (a)    No Event of Default has occurred and is then continuing;

    (b)    Borrower executes and delivers to Lender an Amendment to the Note which extends the Maturity Date and adds or modifies such term as and conditions as Lender deems necessary or appropriate;

    (c)    Borrower pays all of Lenders' costs and expenses incurred in processing and documenting such renewal, including any applicable extension fees; and

    (d)    Lender is satisfied, or has received such assurances as it deems necessary, regarding the then current financial condition of the Borrower and the Guarantor, and regarding the condition of the Property and the progress of the Project.

## SECTION 4: CONDITIONS TO DISBURSEMENTS.

    4.1    <u>Initial Advance Conditions</u>. The obligation of Lender to initially close the Loan is subject to the following conditions precedent:

    (a)    Borrower shall, at its sole expense, deliver or cause to be delivered to Lender, in form and substance satisfactory to Lender:

7

(i) the original Note;

(ii) the original Deed of Trust;

(iii) the Financing Statement;

(iv) the original Guaranty;

(v) the original Environmental Indemnity;

(vi) the original Control Account Escrow Agreement, executed by Borrower, Lender and Disbursement Agent;

(vii) the original Assignment of Permits, Licenses, Franchises and Authorizations, and the Assignment of MUD Rights and other assignments required by Lender, each executed by Borrower;

(viii) a certificate of consent of Borrower, authorizing the execution, delivery and performance of the Loan Documents to be executed by a specified authorized officer on behalf of Borrower;

(ix) the certificates of consent of the Guarantor, authorizing the execution, delivery and performance of the Guaranty to be executed by a specified authorized officer on behalf of each Guarantor;

(x) a TLTA form of extended coverage of lender's policy of title insurance, or evidence of a commitment therefor, issued by an insurer satisfactory to Lender, together with such endorsements and binders thereto as may be required by Lender pursuant to Section 6.6 hereof, in a policy amount of not less than the face amount of the Note, insuring the Deed of Trust to be a valid lien upon the Property, and showing the Property to be subject only to the Permitted Exceptions;

(xi) an appraisal of the Real Property certified to Lender, performed by an appraiser acceptable to Lender;

(xii) certified copies of, or certificate evidencing, all insurance policies required to be delivered pursuant to this Agreement;

(xiii) copies of all permits and approvals by Governmental Agencies necessary to construct the Improvements (if available);

(xiv) current Financial Statements of Borrower and the Guarantor;

(xv) evidence, in form and substance acceptable to Lender, of the availability and

8

        sufficiency of all utilities to the Project;

(xvi) copies of any proposed, or approved final Covenants, Conditions and Restrictions recorded or to be recorded on the Project;

(xvii) a Phase I Environmental Survey, prepared by an entity approved by Lender, in form and substance acceptable to, and approved by, Lender;

(xviii) such additional agreements, certificates, reports, approvals, instruments, documents, financing statements, consents and opinions as Lender may reasonably request; including, without limitation, a soils report for the Real Property (including, without limitation, all determinations required by Lender with respect to hazardous waste [as such term is defined in the Environmental Indemnities] and water located on the Real Property).

(b) Lender shall have reviewed and approved the Permitted Exceptions;

(c) Borrower has acquired fee title to all of the Real Property;

(d) The Deed of Trust shall have been recorded in the Official Records of the County in which the Property is located as a second priority lien (subject to Wachovia Bank's first deed of trust);

(e) The Financing Statement shall have been filed for record with the Texas Secretary of State.

    4.2    Future Advance Conditions. Any obligation of Lender or USA to make any additional advances pursuant to Section 3.2 above, should Lender or USA so elect, in their sole and absolute discretion, is subject to following conditions:

(a) The representations and warranties of Borrower contained in all of the Loan Documents shall be correct on and as of the date of the advance as though made on and as of that date and no Event of Default (or event which, with the giving of notice and/or the passage of time, would become an Event of Default) shall have occurred and be continuing;

(b) Borrower shall, at its sole expense, deliver or cause to be delivered to Lender, in form and substance satisfactory to Lender:

(i) from the title insurer who has issued the Title Policy, such endorsements, binders or modifications thereto as Lender may require; and

(ii) such additional agreements, certificates, reports, approvals, instruments, documents, consents or opinions as Lender may reasonably request.

## SECTION 5: REPRESENTATIONS AND WARRANTIES BY BORROWER.

5.1     **Formation, Qualification and Powers of Borrower.** Borrower is a partnership duly formed and validly existing under the laws of the State of Texas and has all requisite power and authority to conduct its business, to own its properties, and to execute, deliver and perform all of its obligations under the Loan Documents.

5.2     **Authority and Compliance with Instruments and Government Regulations.** The execution, delivery and performance by Borrower of all of its obligations under each Loan Document have been duly authorized by all necessary action and do not and will not:

(a)     require any consent or approval not heretofore obtained of any Person holding any security or interest or entitled to receive any security or interest in Borrower;

(b)     violate any provision of any organizational document or certificate of Borrower;

(c)     result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, right of others or other encumbrance of any nature, other than under the Loan Documents, upon or with respect to any property now owned or leased or hereafter acquired by Borrower;

(d)     violate any provision of any Law, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Borrower or the Property, which violation would have a material, adverse impact thereon;

(e)     result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under, any indenture or loan or credit agreement or any other agreement, lease or instrument to which Borrower is a party or by which Borrower or any property of Borrower, is bound or affected; and Borrower is not in default in any respect that is materially adverse to the interest of Lender or that would have any material adverse effect on the financial condition of Borrower or the conduct of its business under any Law, order, writ, judgment, injunction, decree, determination, award, indenture, agreement, lease or instrument described in Sections 5.2(d) and 5.2(e).

5.3     **Execution of the Guaranty by the Guarantor.** The execution and delivery of the Guaranty:

(a)     have been duly authorized by all necessary action;

(b)     do not require the consent, authorization or approval of any Governmental Agency or Person;

(c)     will not result in the creation of any lien or other claim of any nature upon or with respect to the property of the Guarantor, other than as may be set forth in the Guaranty; and

10

    (d)    will not violate any provision of any Law having applicability to the Guarantor, in a manner which would have a material, adverse impact on any Guarantor; and, when executed and delivered, the Guaranty will constitute the legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms.

5.4    No Governmental Approvals Required. No authorization, consent, approval, order, license, exemption from, or filing, registration or qualification with, any Governmental Agency is or will be required to authorize, or is otherwise required in connection with:

    (a)    the execution, delivery and performance by Borrower and the Guarantor of the Loan Documents; or

    (b)    the creation of the liens, security interests or other charges or encumbrances described in the Security Documents; except that filing and/or recording may be required to perfect Lender's interest under the Security Documents.

5.5    Binding Obligations. The Loan Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Borrower and the Guarantor, as the case may be, enforceable against them in accordance with their respective terms.

5.6    Financial Statements. Borrower and the Guarantor have furnished to Lender a copy of recent financial statements relating to Borrower's and the Guarantor's financial condition and Borrower represents and warrants to Lender that such financial statements present fairly the financial position of Borrower and the Guarantor as at the date thereof.

5.7    No Material Adverse Change. Borrower represents and warrants to Lender that there has been no material adverse change in the condition, financial or otherwise, of Borrower or the Guarantor since the date of the financial statements described in Section 5.6; since that date, neither Borrower nor the Guarantor have entered into any material transaction not disclosed in such financial statements; neither Borrower nor the Guarantor have any material liabilities or contingent liabilities not reflected or disclosed in such financial statements; and there are no material mortgages, deeds of trust, pledges, liens, security interests, claims, charges, right of others or encumbrances (including liens or retained security titles of conditional vendors) of any nature whatsoever on any property of Borrower or the Guarantor, and no material indebtedness, not disclosed in such financial statements.

5.8    Tax Liability. Borrower and the Guarantor have filed all tax returns (federal, state and local) required to be filed and have paid all taxes shown thereon to be due and all property taxes due, including interest and penalties, if any. Borrower and the Guarantor have established and are maintaining necessary reserves for tax liabilities, if any.

5.9    Compliance with Law. Borrower and Guarantor are in compliance in all material respects with all Laws and other requirements applicable to their business and have obtained all authorizations, consents, approvals, orders, licenses and exemptions from, and have accomplished all filings, registrations or qualifications with, any Governmental Agency that is necessary for the

transaction of their business.

5.10   Compliance with Requirements. Throughout the term of the Loan, Borrower shall comply with all applicable covenants, conditions and restrictions, Laws and other requirements, and all necessary approvals, consents, licenses and permits of any Governmental Agency have been regularly and finally received with respect thereto, including without limitation each of the following as applicable:

(a)   all zoning, land use and planning requirements;

(b)   subdivision and/or parcel map requirements, including without limitation Requirements of applicable Law regarding subdivisions, parcel maps and the division of land into lots or parcels;

(c)   environmental requirements and preparation and approval of any necessary environmental impact statements or reports;

(d)   all requirements regarding the provision of all necessary utilities to the Real Property including the irrevocable allocation to the Property of sufficient domestic and fire protection water service to the Property;

(e)   all requirements imposed by any public utility in connection with the supply of utilities to the Property; and

(f)   all requirements imposed in connection with any approval, consent, license or permit issued or required by any Governmental Agency in connection with the Project.

5.11   Litigation. There are no actions, suits or proceedings pending or, to the best of Borrower's or any Guarantor's knowledge, threatened against or affecting Borrower or, the Guarantor (except the divorce proceeding of Guarantor, the details of which have been disclosed to Lender in writing) or any property of Borrower or the Guarantor before any court or Governmental Agency that would have a material adverse affect on the Property, or Borrower's or the Guarantor's ability to perform their respective obligations under the Loan Documents.

5.12   Title to Property. Borrower has good and merchantable title to all of its property and assets as disclosed in the financial information provided Lender and at the time of the recordation of the Security Documents shall have good and merchantable title to the Property, and there shall be no mortgages, liens, pledges or other encumbrances of any character on the Property, other than the Security Documents and Permitted Exceptions, without prior consent of Lenders.

5.13   Subsidiaries: Divisions: Joint Ventures. As of the date hereof, Borrower (a) has no other Subsidiaries; (b) has no divisions; and (c) is not engaged in any joint venture or partnership with any other Person.

5.14 ERISA. The Borrower, Guarantor and each Subsidiary are in compliance in all Material respects with all applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Neither a Reportable Event nor a Prohibited Transaction has occurred and is continuing with respect to any Plan; no notice of intent to terminate a Plan has been filed, nor has any Plan been terminated; no circumstances exist which constitute grounds entitling the PBGC to institute proceedings to terminate, or appoint a trustee to administer, a Plan, nor has the PBGC instituted any such proceedings; neither the Borrower nor any Commonly Controlled Entity has completely or partially withdrawn from a Multiemployer Plan; the Borrower and each Commonly Controlled Entity have met their minimum funding requirements under ERISA with respect to all of their Plans and the present value of all vested benefits under each Plan exceeds the fair market value of all Plan assets allocable to such benefits, as determined on the most recent valuation date of the Plan and in accordance with the provisions of ERISA; and neither the Borrower nor any Commonly Controlled Entity has incurred any liability to the PBGC under ERISA.

5.15 Timing of Representations and Warranties. The foregoing representations and warranties are deemed made and shall be trued, correct and complete as of the date of this Agreement, as of the closing of the Loan as herein contemplated and as of the date of each an every additional advance or principal made hereunder or governed hereby.

## SECTION 6: AFFIRMATIVE AND NEGATIVE COVENANTS.

Until payment of the Note in full and performance of all obligations of Borrower under the Loan Documents, unless Lender otherwise consents in writing:

6.1 Compliance with Requirements. Borrower shall comply with all conditions, covenants, restrictions, leases, easements, reservations, rights and rights-of-way and all applicable Laws and other requirements relating to the Property and the Project, and obtain all necessary approvals, consents, licenses and permits of any Governmental Agency, including without limitation those set forth in Section 5.10.

6.2 Sale or Other Encumbrances. Borrower specifically agrees that:

(a) In order to induce Lender to make the Loan, Borrower agrees that if the Property or any part thereof or any interest therein, shall be sold, assigned, transferred, conveyed, pledged, mortgaged or encumbered with financing other than that secured hereby or otherwise alienated by Borrower whether voluntarily or involuntarily or by operation of law, except as shall be specifically hereinafter permitted or without the prior written consent of Lender, then Lender, at its option, may declare the Note, including the prepayment fee, if applicable, secured hereby and all other obligations hereunder, to be forthwith due and payable. Except as shall be otherwise specifically provided herein, (a) a change in the legal or equitable ownership of the Property whether or not of record, or (b) a change in the form of entity or ownership (including the hypothecation or encumbrance thereof) of the stock or any other ownership interest in Borrower shall be deemed a transfer of an interest in the Property; provided, however, that any transfer of the Property or any interest therein to an entity which controls, is controlled by or is under common control with Borrower shall not be considered a transfer hereunder. In connection herewith, the financial stability

and managerial and operational ability of Borrower is a substantial and material consideration to Lender in its agreement to make the loan to Borrower secured hereby. The transfer of an interest in the Property may materially alter and reduce Lender's security for the indebtedness secured hereby. Moreover, Lender has agreed to make its loan based upon the presumed value of the Property and the Rents and Profits (as such are defined in the Deed of Trust) thereof. Therefore, it will be a diminution of Lender's security if junior financing, except as shall be permitted by Lender, or if other liens or encumbrances should attach to the Property.

(b)    Borrower may request Lender to approve a sale or transfer of the Property to a party who would become the legal and equitable owner of the Property and would assume any and all obligations of Borrower under the Loan Documents (the "Purchaser"). Lender shall not be obligated to consider or approve any such sale, transfer or assumption or request for the same. However, upon such request, Lender may impose limiting conditions and requirements to its consent to an assumption.

(c)    In the event ownership of the Property, or any part thereof, becomes vested in a person or persons other than Borrower, the Lender may deal with such successor or successors in interest with reference to the Note or the Deed of Trust in the same manner as with Borrower, without in any way releasing, discharging or otherwise affecting the liability of Borrower under the Note, the Deed of Trust or the other Loan Documents. No sale of Borrower's interest in the Property, no forbearance on the part of Lender, no extension of the time for the payment of the Deed of Trust indebtedness or any change in the terms thereof consented to by Lender shall in any way whatsoever operate to release, discharge, modify, change or affect the original liability of the Borrower herein, either in whole or in part. Any deed conveying the Property, or any part thereof, shall provide that the grantee thereunder assume all of Borrower's obligations under the Note, the Deed of Trust and all other Loan Documents. In the event such deed shall not contain such assumption, Lender shall have all rights reserved to it hereunder in the event of a default or if Lender shall not elect to exercise such rights and remedies, the grantee under such deed shall nevertheless be deemed to have assumed such obligations by acquiring the Property or such portion thereof subject to the Deed of Trust. Nothing contained in this section shall be construed to waive the restrictions against the transfer of the Property contained in Section 6.2(a).

6.3    Removal of Personalty. Borrower shall not:

(a)    install in or otherwise use in connection with the Project any materials, equipment or fixtures under any security agreements or similar agreements however denominated whereby the right is reserved or accrues to anyone to remove or repossess any such items or whereby any Person other than Lender reserves or acquires a lien upon such items; or

(b)    remove or permit the removal of any fixtures or personalty located on the Property or used in connection with the Project, except for tools and construction equipment intended for use in connection with the construction of other improvements, unless actually replaced by an article of equal suitability and value, owned by Borrower free and clear of any lien or security interest other than the Security Documents.