1

```
 1              UNITED STATES BANKRUPTCY COURT

 2                   DISTRICT OF NEVADA

 3                   LAS VEGAS, NEVADA

 4   In re:  USA COMMERCIAL MORTGAGE    )   MAY 3, 2006
     COMPANY,                          )   E-Filed:  06/01/06
 5                                     )
              Debtor.                  )   Case No.
 6                                     )   BK-S-06-10725-LBR
     _____)   Chapter 11
 7   In re:  USA CAPITAL REALTY        )
     ADVISORS, LLC,                    )
 8                                     )
              Debtor.                  )   Case No.
 9                                     )   BK-S-06-10726-LBR
     _____)   Chapter 11
10   In re:  USA CAPITAL DIVERSIFIED   )
     TRUST DEED FUND, LLC,             )
11                                     )
              Debtor.                  )   Case No.
12                                     )   BK-S-06-10727-LBR
     _____)   Chapter 11
13   In re:  USA CAPITAL FIRST TRUST   )
     DEED FUND, LLC,                   )
14                                     )
              Debtor.                  )   Case No.
15                                     )   BK-S-06-10728-LBR
     _____)   Chapter 11
16   In re:  USA SECURITIES, LLC,      )
                                       )
17            Debtor.                  )   Case No.
                                       )   BK-S-06-10729-LBR
18   _____)   Chapter 11

19              PARTIAL TRANSCRIPT OF PROCEEDINGS
                             OF
20          (06-10725) MOTION FOR JOINT ADMINISTRATION
                 WITHOUT SUBSTANTIVE CONSOLIDATION
21                           AND
                    MOTION FOR ORDER UNDER
22          11, USC, SECTIONS 105(A), 345, AND 363
     APPROVING DEBTORS PROPOSED CASH MANAGEMENT PROCEDURES
23       AND INTERIM USE OF CASH IN ACCORDANCE WITH
                   PROPOSED CASH BUDGET
24                           AND
                    ORDER SHORTENING TIME
25       RE: MOTION TO EXTEND DEADLINE TO FILE
     STATEMENTS AND SCHEDULES OR PROVIDE REQUIRED INFORMATION
```

```
 1                          AND
              FINAL HEARING RE: ORDER RE STIPULATION
 2            RE SETOFF AND BANK OF AMERICA ACCOUNTS
                           AND
 3                 ORDER SHORTENING TIME
            RE: MODIFIED MOTION OF THE DEBTOR PURSUANT TO
 4              11, USC, SECTIONS 363(B) AND 105(A)
            FOR AUTHORITY TO PAY ADDITIONAL PREPETITION WAGES
 5                   TO SEVEN KEY EMPLOYEES
                           AND
 6            (06-10726) MOTION FOR JOINT ADMINISTRATION
                WITHOUT SUBSTANTIVE CONSOLIDATION
 7                          AND
                   MOTION FOR ORDER UNDER
 8            11, USC, SECTIONS 105(A), 345, AND 363
            APPROVING DEBTOR'S PROPOSED CASH MANAGEMENT PROCEDURES
 9            AND INTERIM USE OF CASH IN ACCORDANCE WITH
                     PROPOSED CASH BUDGET
10                          AND
                   ORDER SHORTENING TIME
11          RE: MOTION TO EXTEND DEADLINE TO FILE SCHEDULES
                 OR PROVIDE REQUIRED INFORMATION
12                          AND
                   ORDER SHORTENING TIME
13              RE: MODIFIED MOTION OF THE DEBTOR
            PURSUANT TO 11, USC, SECTIONS 363(B) AND 105(A)
14          FOR AUTHORITY TO PAY ADDITIONAL PREPETITION WAGES
                     TO SEVEN KEY EMPLOYEES
15                          AND
              (06-10727) MOTION FOR JOINT ADMINISTRATION
16                WITHOUT SUBSTANTIVE CONSOLIDATION
                           AND
17                 MOTION FOR ORDER UNDER
              11, USC, SECTIONS 105(A), 345, AND 363
18          APPROVING DEBTOR'S PROPOSED CASH MANAGEMENT PROCEDURES
              AND INTERIM USE OF CASH IN ACCORDANCE WITH
19                   PROPOSED CASH BUDGET
                           AND
20                 ORDER SHORTENING TIME
            RE: MOTION TO EXTEND DEADLINE TO FILE SCHEDULES
21               OR PROVIDE REQUIRED INFORMATION
                           AND
22                 ORDER SHORTENING TIME
              RE: MODIFIED MOTION OF THE DEBTOR
23          PURSUANT TO 11, USC, SECTIONS 363(B) AND 105(A)
            FOR AUTHORITY TO PAY ADDITIONAL PREPETITION WAGES
24                   TO SEVEN KEY EMPLOYEES
                           AND
25            (06-10728) MOTION FOR JOINT ADMINISTRATION
                WITHOUT SUBSTANTIVE CONSOLIDATION
```

3

```
 1                          AND
                    MOTION FOR ORDER UNDER
 2          11, USC, SECTIONS 105(A), 345, AND 363
        APPROVING DEBTOR'S PROPOSED CASH MANAGEMENT PROCEDURES
 3          AND INTERIM USE OF CASH IN ACCORDANCE WITH
                      PROPOSED CASH BUDGET
 4                          AND
                    ORDER SHORTENING TIME
 5      RE: MOTION TO EXTEND DEADLINE TO FILE SCHEDULES
              OR PROVIDE REQUIRED INFORMATION
 6                          AND
                    ORDER SHORTENING TIME
 7          RE: MODIFIED MOTION OF THE DEBTOR
        PURSUANT TO 11, USC, SECTIONS 363(B) AND 105(A)
 8      FOR AUTHORITY TO PAY ADDITIONAL PREPETITION WAGES
                  TO SEVEN KEY EMPLOYEES
 9                          AND
            (06-10729) MOTION FOR JOINT ADMINISTRATION
10            WITHOUT SUBSTANTIVE CONSOLIDATION
                            AND
11                  MOTION FOR ORDER UNDER
            11, USC, SECTIONS 105(A), 345, AND 363
12      APPROVING DEBTOR'S PROPOSED CASH MANAGEMENT PROCEDURES
          AND INTERIM USE OF CASH IN ACCORDANCE WITH
13                    PROPOSED CASH BUDGET
                            AND
14                  ORDER SHORTENING TIME
        RE: MOTION TO EXTEND DEADLINE TO FILE SCHEDULES
15            OR PROVIDE REQUIRED INFORMATION
                            AND
16                  ORDER SHORTENING TIME
            RE: MODIFIED MOTION OF THE DEBTOR
17      PURSUANT TO 11, USC, SECTIONS 363(B) AND 105(A)
        FOR AUTHORITY TO PAY ADDITIONAL PREPETITION WAGES
18                TO SEVEN KEY EMPLOYEES
                        VOLUME 1
19          BEFORE THE HONORABLE LINDA B. RIEGLE
              UNITED STATES BANKRUPTCY JUDGE
20
                  Wednesday, May 3, 2006
21
                        9:30 a.m.
22

23  Court Recorder:              Helen C. Smith

24

25  Proceedings recorded by electronic sound recordings; transcript
    produced by transcription service.
```

4

```
 1   APPEARANCES:

 2   For the Debtors and          LENARD E. SCHWARTZER, ESQ.
     Debtors in Possession:       Schwartzer & McPherson Law Firm
 3                                 2850 South Jones Boulevard
                                   Suite 1
 4                                 Las Vegas, Nevada 89146

 5                                 ANNETTE W. JARVIS, ESQ.
                                   Ray, Quinney & Nebeker, P.C.
 6                                 36 South State Street
                                   Suite 1400
 7                                 Salt Lake City, Utah 84145

 8   For the United States        SCOTT A. FARROW, ESQ.
     Trustee:                      Office of the United States Trustee
 9                                 Department of Justice
                                   300 Las Vegas Boulevard South
10                                 Suite 4300
                                   Las Vegas, Nevada
11
     For Wells Fargo Bank:        CANDACE C. CARLYON, ESQ.
12                                 Shea & Carlyon, Ltd.
                                   233 South Fourth Street
13                                 Suite 200
                                   Las Vegas, Nevada 89101
14
     For the Creditors,           WILLIAM L. McGIMSEY, ESQ.
15   Jerry McGimsey and           William L. McGimsey, P.C.
     Other membership             601 East Charleston Boulevard
16   Interest Holders:            Las Vegas, Nevada 89104

17
     For Nevada State Bank,       GERALD M. GORDON, ESQ.
18   Robert Buckalew Family,      Gordon & Silver, Ltd.
     Trust, Joan Buckalew,        3960 Howard Hughes Parkway
19   Trustee, Kevin Higgins,      Ninth Floor
     and Ana Marie Higgins:       Las Vegas, Nevada 89109
20
     For Joseph Donnolo,          JANET L. CHUBB, ESQ.
21   Loretta Donnolo,             Jones Vargas
     and Mark Donnolo:            100 West Liberty
22                                 Twelfth Floor
                                   Reno, Nevada 89501
23
     For Dr. and                  ROBERT C. LEPOME, ESQ.
24   Mrs. Stanley Alexandar,      330 South Third Street
     et al.:                      Suite 1100-B
25                                 Las Vegas, Nevada 89101
```

5

```
 1   For the Canepa Group:        LAUREL E. DAVIS, ESQ.
                                  Lionel, Sawyer & Collins
 2                                300 South Fourth Street
                                  Suite 1700
 3                                Las Vegas, Nevada 89101

 4   For the Interim Committee    FRANK A. MEROLA, ESQ.
     of Concerned Investors:      EVE KARASIK, ESQ.
 5                                Stutman, Treister & Glatt,
                                    A Professional Corporation
 6                                1901 Avenue of the Stars
                                  Twelfth Floor
 7                                Los Angeles, California 90067

 8   For the Group of Direct      ROBERT R. KINAS, ESQ.
     investors, including         Snell & Wilmer, LLP.
 9   Zipkins and Ovcas:           3800 Howard Hughes Parkway
                                  Suite 1000
10                                Las Vegas, Nevada 89109

11   For Five Direct Lenders:     DAVID A. COLVIN, ESQ.
                                  Marquis & Aurbach
12                                10001 Park Run Drive
                                  Las Vegas, Nevada 89145
13
     For a Group of Direct        JAY L. MICHAELSON, ESQ.
14   Investors:                   Michaelson, Susi & Michaelson
                                  7 West Figueroa Street
15                                Second Floor
                                  Santa Barbara, California 93101
16

17   For Fortress:                JOEL SAMUELSON
                                  Sidley Austin
18

19

20

21

22

23

24

25
```

6

```
 1                        I N D E X

 2
                                                          Voir
 3    Witness              Direct   Cross   Redirect   Recross  Dire

 4

 5    THOMAS J. ALLISON

 6    (By Ms. Jarvis)       10                116

 7    (By Mr. Lepome)               67

 8    (By Mr. Gordon)               74

 9    (By Mr. Michaelson)           81

10    (By Ms. Carlyon)              87

11    (By Mr. Merola)               89

12    (By Ms. Chubb)                99

13    (By Mr. Kinas)               106

14    (By Ms. Davis)               108

15    (By Mr. Farrow)              113

16

17

18

19

20

21

22

23

24

25
```

```
1          (Court convened at 09:48:38 a.m.)

2          (Partial transcript.)

3               THE COURT:  Be seated.  Okay.  In the USA Capital

4     cases.

5          (Colloquy not on the record.)

6               THE COURT:   Appearances for the attorneys, please.

7               MR. SCHWARTZER:   Lenard Schwartzer and Annette Jarvis

8     on behalf of all the debtors and debtors in possession in this

9     case.

10        Your Honor, Ms. Jarvis has -- a pro hac vice application

11    has been filed and granted in this case.

12              THE COURT:  Okay.

13              MR. LePOME:  Robert LePome representing Dr. and

14    Mrs. Stanley Alexander and 15 others that are owners of the

15    deeds of trust.

16              MR. FARROW:  Good morning, your Honor.  Scott Farrow,

17    United States Department of Justice, representing the U.S.

18    Trustee.

19              MS. DAVIS:  Good morning, your Honor.  Laurel Davis on

20    behalf of the Canepa Group who've been specifically identified

21    in our request for notice filed yesterday.

22              MS. CARLYON:  Good morning, your Honor.

23    Candace Carlyon of the law firm of Shea & Carlyon on behalf of

24    Wells Fargo Bank and, also, as proposed local counsel for the

25    Interim Committee of Concerned Investors solely with regard to
```

1    the pleading filed yesterday.

2            MR. MEROLA:  Good morning, your Honor.  With your

3    permission, Frank Merola and Eve Karasik, members of Stutman,

4    Treister & Glatt, Professional Corporation, on behalf of the

5    Interim Committee of Concerned Investors.

6            MR. KINAS:  Good morning, your Honor.  Robert Kinas of

7    Snell & Wilmer for a group of direct lenders, including the

8    Zipkins and the Ovcas.

9            MR. COLVIN:  Good morning, your Honor.  David Colvin

10   of Marquis & Aurbach representing five direct lenders.

11           MR. GORDON:  Good morning, your Honor.  Gerald Gordon

12   and Gregory Garman of Gordon & Silver on behalf of this

13   proceeding of the Robert Buckalew Family Trust and also the

14   Higgins Family who we appeared on behalf of at the last hearing.

15      As we set forth in our pleadings, we're in the process of

16   forming an ad hoc committee of direct investors -- or, direct

17   lenders I should say, and we'll be filing the appropriate

18   2019(a) verified statement.

19           MR. MICHAELSON:  Good morning, your Honor.

20   Jay Michaelson, Michaelson, Susi & Michaelson, for a group of

21   direct investors located in Santa Barbara.

22           MR. McGIMSEY:  Good morning.  William McGimsey on

23   behalf of Jerry McGimsey and other membership interest holders

24   in U.S. Capital Diversified Trust Deed Fund.

25           MS. CHUBB:  Good morning.  Janet Chubb of Jones Vargas

1    for Joe and Loretta Donnolo, Mark Donnolo, Elizabeth and

2    Michael Souza, J.B. Partain, and other people.

3              MR. BENINCASA:  Good morning, your Honor.  I'm not an

4    attorney, but I'd like to represent myself, Joshua Benincasa and

5    Flocerfida Benincasa.

6         (Colloquy not on the record.)

7              THE COURT RECORDER:  Last name, please.

8              MR. BENINCASA:  Benincasa.

9              THE COURT RECORDER:  If you could spell it for the

10    record.

11             MR. BENINCASA:  B-e-n-i-n-c-a-s-a.

12             THE COURT:  Okay.  Thank you.

13             MR. BENINCASA:  Thank you.

14             THE CLERK:  No.  It's 702 --

15             MS. NEWARK:  Narrah Newark --

16             THE CLERK:  -- 388 --

17             MS. NEWARK:  -- representing Herbert Lumm (phonetic).

18             THE CLERK:  -- 6647.

19        (Thereupon, the requested portion to be transcribed

20        was concluded at 09:15:17 a.m.)

21        (Testimony of Thomas J. Allison at 11:15:37 a.m.)

22             THE CLERK:  All rise.  Bankruptcy court is now in

23    session.

24             THE COURT:  Be seated.  Okay.  On the motion for cash

25    management.

1          MS. JARVIS:  If I could call Mr. Allison to the stand.

2          THE COURT:  Yes.

3          THE CLERK:  Mr. Allison.

4          THE COURT:  In the connection we'll consider the

5    setoff and bank-account motion as well in these -- at least the

6    oppositions was related to these in some extent.

7          THE CLERK:  Remain standing and raise your right hand.

8    Thereupon --

9                    THOMAS J. ALLISON

10   was called as a witness by the Debtor and Debtor in Possession,

11   and having been first duly sworn, testified as follows:

12         THE WITNESS:  I do.

13         THE CLERK:  Would you state your name and spell your

14   last name for the record.

15         THE WITNESS:  Thomas J. Allison, A-l-l-i-s-o-n.

16         THE CLERK:  Thank you.  Be seated.

17                    DIRECT EXAMINATION

18   BY MS. JARVIS:

19      Q.   Mr. Allison, can you explain what your position is in

20   this case.

21   A.   Ms. Jarvis, I am the chief restructuring officer, and I am

22   essentially the CEO of USA Commercial Mortgage and its

23   affiliated entities.

24   Q.   Why don't you give us some of your educational and

25   experience background.

A.   I have a -- my undergraduate degree was in 1973 from DePaul University.  I have a BSc in accounting.  I have an MBA from DePaul University.  I received that in 1979.

I became a banker in 1979 with the First National Bank of Chicago.  I was a banker at First Chicago from 1979 to 1985.

During that time, I was a team leader and led a very complex portfolio of loans for First Chicago, including -- at one point in time, my portfolio included Chrysler Corp., Chrysler Credit Corp., and Chrysler Finance Corp., along with Massey Ferguson, Lex Corp. (phonetic), Lex Credit Corp. (phonetic).

Several -- those were some of the major restructurings in the early 1980s.  I've been focussed on -- my focus in the restructuring group is working with finance companies.  After leaving First Chicago, I started a restructuring practice for Coopers & Lyburn (phonetic) in 1980 -- in -- in January of 1986.

In 1988 the partners of Arthur Andersen talked me into starting a restructuring practice for Arthur Andersen.  I ran the restructuring practice for Arthur Andersen from 1988 until Arthur Andersen's demise in 2002.

I then became a leader in Huron Consulting Group. I started the restructuring group in 2002 and was one of the founding partners at Huron Consulting.  I subsequently have recently joined Mesirow Financial as an executive vice president and senior managing director.

1  Q.   And is the focus of your work now actually being a

2  restructuring officer or restructuring companies?

3  A.   Yes, it is.

4  Q.   With respect to -- you became the restructuring officer on

5  the day the bankruptcy was filed; is that correct?

6  A.   That's correct.

7  Q.   And what have you done with respect to the former officers

8  of the company?

9  A.   Well, after -- after I was appointed, my first act was to

10  terminate Mr. Milanowski and Mr. Hantges along with

11  all the brokers at -- at USA Commercial Mortgage.

12  Q.   Who is currently on the board of Commercial Mortgage?

13  A.   Mark Olson (phonetic) and Joe Milanowski.

14  Q.   And do you have any reporting functions or do they have any

15  control over the decisions that you make in this case?

16  A.   They have no control over the decisions that I make.

17  Q.   And are you considering recruiting new outside board

18  members for the board?

19  A.   Yes, I am.

20  Q.   And why is that?

21  A.   I'd like to have an independent board to report to and a

22  board that could be formed from people that have experience in

23  the finance and restructuring industry so I can have a good,

24  credible sounding board to -- to -- as I go through and

25  facilitate the restructure of this company.

1  Q.   Now, you can see before you the chart, the organizational

2  chart that --

3  A.   Actually, no --

4  Q.   -- Mr. Schwartzer --

5  A.   -- I can't, but that's --

6  Q.   Oh, you can't see it in your --

7           THE COURT:  Is that monitor working?

8           THE CLERK:  Whoops.  No.  None of --

9           THE COURT:  Not that monitor --

10          THE CLERK:  -- (indiscernible).

11          THE COURT:  -- his monitor.

12          MR. MEROLA:  Your Honor, while we work out the

13  technical, at this point I'd like to assert an objection to

14  hearsay, but we're willing to stipulate to Mr. Allison's

15  qualifications as an expert witness solely to the extent he

16  needs to incorporate hearsay into his testimony, and we have a

17  complete record.

18          THE COURT:  Okay.

19          THE CLERK:  Judge, this is not working today.  I

20  think (indiscernible).

21      (Colloquy not on the record.)

22          THE COURT:  Do you have another clean copy by any

23  chance?  I'm sorry about this.

24          MS. JARVIS:  Yeah.  Well --

25      (Colloquy not on the record.)

```
 1   BY MS. JARVIS:

 2   Q.   Let me just ask you.  You saw the organizational chart

 3   that Mr. Schwartzer used earlier.

 4   A.   Yes, I did, Ms. Jarvis.

 5   Q.   Do you have any --

 6   A.   Okay.  We're --

 7   Q.   Is it on?

 8   A.   Yeah.

 9   Q.   Oh.  All right.  Okay.

10        MR. SCHWARTZER:  Your Honor, do you want us to

11   introduce this into evidence?

12        THE COURT:  Yes, please.

13        MS. JARVIS:  We'll mark this as Exhibit 1.

14        THE COURT:  Okay.  This is the same thing that we

15   had --

16        MS. JARVIS:  Yes.  This is the same thing that

17   Mr. Schwartzer used.

18        THE COURT:  Okay.  Fine.

19   BY MS. JARVIS:

20   Q.   You heard the explanation that Mr. Schwartzer gave with

21   respect to how these companies work.  Is there anything else

22   that you would like to add to that?

23   A.   Well, I think that what needs to be very clear is the

24   interdependence.  What -- what this chart shows at -- at the

25   very bottom is the borrowers which are the underlying 114
```

1  credits that exist.

2       Essentially, this is the -- this chart, let us just say

3  it's very complex in how it lays out.  I've tried to simplify

4  this company's business in terms of the investments and -- so we

5  can understand where each loan is.

6       The borrowers as -- as -- as scheduled on the bottom in

7  reality are the key assets of the estate, and in order to get

8  the recovery to all the people that are in this room and all the

9  investors, the ultimate recovery's going to be -- going to be

10 tied to our ability to successfully work out the nonperforming

11 loans and monetize them along with collecting the performing

12 loans.

13 Q.   Let me put up -- can you see this?

14 A.   It's --

15 Q.   It --

16 A.   Could we turn it on --

17 Q.   It's sideways?  The other way?  Oh.

18 A.   Actually, no.  One -- one -- one more turn to the -- it's

19 -- you got it sideways.

20          UNIDENTIFIED SPEAKER:  Clockwise one turn.

21          MS. JARVIS:  (Indiscernible).

22          THE WITNESS:  There.

23          UNIDENTIFIED SPEAKER:  There.

24          THE WITNESS:  Perfect.

25      (Colloquy not on the record.)

1          MS. JARVIS:  We will mark this, your Honor, as

2     Exhibit 2, but because I wrote -- the handwritten parts on this

3     chart were written by me in order to use the terminology that we

4     discussed this morning so we could all understand it, so --

5          THE COURT:  Okay.

6     BY MS. JARVIS:

7     Q.   Okay.  Can you now see this chart, Mr. Allison?

8     A.   Yes, I can.

9          MS. JARVIS:  And we'll mark this as Exhibit 2.

10    BY MS. JARVIS:

11    Q.   What does this chart explain?

12         THE COURT:  Do I have a copy of this?  This is a

13    different chart, isn't it?

14         MS. JARVIS:  Yeah.  Can you see it up at your --

15         THE COURT:  No.

16         MS. JARVIS:  -- on your screen?

17         THE COURT:  My screen's not working.

18         MS. JARVIS:  Oh-oh.

19         THE COURT:  Or how -- John (phonetic).  Can John get

20    my screen working?

21       (Colloquy not on the record.)

22         THE COURT:  Can you get John.

23         THE CLERK:  Yeah.  (Indiscernible).

24         THE COURT:  I need my screen working.

25         THE CLERK:  (Indiscernible).

17

```
1        (Colloquy not on the record.)

2            THE COURT:  What --

3            THE CLERK:  Is --

4            THE COURT:  Did you (indiscernible)?

5            THE CLERK:  -- it on?

6            THE COURT:  Yeah.  What --

7            THE CLERK:  John was just in here.

8            THE COURT:  Right.  What do I need?

9            THE CLERK:  (Indiscernible).  I don't

10   (indiscernible).

11       (Colloquy not on the record.)

12           THE COURT:  Nope.  Whoops.  Oops.  A little mood

13   lighting in here.  Well, that doesn't work.  All right.  I have

14   totally messed this system up.  We're going to take a break so

15   we can fix this because you're seeing my picture on your screen

16   now, right?  No?

17           MR. SCHWARTZER:  No.

18           UNIDENTIFIED SPEAKER:  No.  We're okay.

19           THE COURT:  Oh, okay.

20           UNIDENTIFIED SPEAKER:  It's perfect.

21           THE COURT:  John, you need to come around and get --

22           UNIDENTIFIED SPEAKER:  Okay.

23           THE COURT:  -- my screen to work.

24       (Colloquy not on the record.)

25           THE COURT:  Anybody got a 16-year-old we can --
```

```
 1        (Colloquy not on the record.)

 2             THE COURT:  We need to get what -- I don't have

 3   what's on this screen.  I want -- it's on there, and I need

 4   to --

 5        (Colloquy not on the record.)

 6             THE COURT:  They've got something on the overhead, but

 7   the overhead's not working, either.

 8        (Colloquy not on the record.)

 9             UNIDENTIFIED SPEAKER:  Your Honor, since you have a

10   technical person there, the people in the back are still having

11   trouble hearing.  Maybe we can make it a little louder.

12             THE COURT:  Oh, I just -- it's a microphone problem.

13             UNIDENTIFIED SPEAKER:  Okay.  Thank you.

14             THE COURT:  Who are they -- is it the witness they

15   can't hear?

16             MS. CARLYON:  Witness?  Yes, the witness.

17             THE COURT:  So he needs to get closer to his

18   microphone.

19             MS. CARLYON:  Thank you.

20             THE COURT:  And you need to --

21             THE WITNESS:  Is this better?

22             UNIDENTIFIED SPEAKER:  Yes.

23        (Colloquy not on the record.)

24             THE WITNESS:  Okay.

25             UNIDENTIFIED SPEAKER:  Okay.
```

```
 1              THE WITNESS:  Okay.
 2         (Colloquy not on the record.)
 3              THE COURT:  I want the exhibit that's being shown
 4    there.
 5         (Colloquy not on the record.)
 6              THE COURT:  Is that still on your monitors?
 7              MS. CARLYON:  Yes.
 8              THE COURT:  Okay.
 9              MS. CARLYON:  It's yellow, but it's still here.
10         (Colloquy not on the record.)
11              THE WITNESS:  It was better as yellow.
12         (Colloquy not on the record.)
13              UNIDENTIFIED SPEAKER:  And you won't see that here.
14              THE COURT:  Well, anyplace.  On this screen, I don't
15    care, but just get those to work now, and we'll just deal with
16    it.  I'll just get a copy.
17         (Colloquy not on the record.)
18              THE COURT:  Can --
19              UNIDENTIFIED SPEAKER:  I think theirs is working.
20         (Colloquy not on the record.)
21              THE COURT:  Is yours working?
22              UNIDENTIFIED SPEAKER:  Ours is working.
23         (Colloquy not on the record.)
24              UNIDENTIFIED SPEAKER:  Yes.  We --
25              THE COURT:  Is the witness' --
```

```
1              UNIDENTIFIED SPEAKER:  We --

2              THE COURT:  -- working?

3              THE WITNESS:  Yes, your Honor.

4              THE COURT:  Okay.  Does anyone have an extra copy for

5    me?

6         (Colloquy not on the record.)

7              THE WITNESS:  Ms. Jarvis, can we make a copy for the

8    Judge?

9              MS. JARVIS:  Yes.

10             THE COURT:  Do you have an extra?

11             MS. JARVIS:  I don't.  I don't have an extra.

12             MS. CARLYON:  That's the one that was on the screen.

13   The witness (indiscernible).

14             MS. JARVIS:  Yeah.  No.  I'm sorry.  Your Honor, I

15   don't have an extra because I've written --

16             THE COURT:  Okay.

17             MS. JARVIS:  -- on this.

18             THE COURT:  Eileen, can you go make a copy?

19             THE CLERK:  Yeah.

20             THE COURT:  I'm sorry, everybody.  I had no idea the

21   system wasn't going to work.

22        (Colloquy not on the record.)

23             MR. SCHWARTZER:  I guess they'll have to do another

24   seminar on how to operate (indiscernible).

25             THE COURT:  No.  It's us.
```

1          (Colloquy not on the record.)

2              THE COURT:  Well, there's nothing there now.  Can you

3     just put a piece of paper on the --

4          (Colloquy not on the record.)

5              THE COURT:  Mr. Schwartzer, could you just put a

6     paper on your screen just so you test here?

7              MR. SCHWARTZER:  Yes.

8          (Colloquy not on the record.)

9              THE COURT:  Not your secret, no, just something we

10     could test with.

11         (Colloquy not on the record.)

12             THE COURT:  There we go.  My screen works.  Does

13     everybody else's?

14             UNIDENTIFIED SPEAKER:  Ours (indiscernible).

15             UNIDENTIFIED SPEAKER:  Yeah.

16             UNIDENTIFIED SPEAKER:  (Indiscernible).

17         (Colloquy not on the record.)

18             THE COURT:  What about witness'?

19             THE WITNESS:  Mine works.

20             THE COURT:  Okay.

21             UNIDENTIFIED SPEAKER:  Oh, yeah.

22             UNIDENTIFIED SPEAKER:  (Indiscernible).

23         (Colloquy not on the record.)

24             THE COURT:  Okay.  Now, we just need to get -- now we

25     just need to get the exhibit back.

1        (Colloquy not on the record.)

2             THE COURT:  Can you get it on that screen?

3             THE CLERK:  That one (indiscernible).

4             THE COURT:  Oh, is that screen --

5             THE CLERK:  (Indiscernible).

6             THE COURT:  Yeah.  Can you get that screen to work

7    (indiscernible)?

8        (Colloquy not on the record.)

9             UNIDENTIFIED SPEAKER:  (Indiscernible) screen to work.

10   Oh, boy.  That's a good question.  I (Indiscernible) think we

11   know where the controls are for that.

12       (Colloquy not on the record.)

13            UNIDENTIFIED SPEAKER:  Well, let me run and get Vickie

14   (phonetic).  She (indiscernible).

15            THE COURT:  Well, she doesn't know how to do it

16   either, so we couldn't get the projection to work.  We couldn't

17   get anything working this morning.

18       (Colloquy not on the record.)

19            THE COURT:  So that's all right.

20       (Colloquy not on the record.)

21            THE COURT:  Okay.  All right.  Thank you.  So you can

22   put it back on the screen, and -- of course, it's too small for

23   anybody to read, anyway, but that's all right.

24       (Colloquy not on the record.)

25            THE WITNESS:  Your Honor, I apologize for the --

```
1              MS. JARVIS:  It's certainly (indiscernible).

2              THE WITNESS:  -- the size of this, but I wanted

3    to --

4              MS. JARVIS:  It's the wrong way.

5              THE WITNESS:  -- reflect all 114 loans on one piece of

6    paper, so I had to compress the type.

7              THE COURT:  I know you guys are saving money, but --

8         (Colloquy not on the record.)

9              THE WITNESS:  And, your Honor, this is for

10   illustrative purposes.

11             THE COURT:  Okay.

12        (Colloquy not on the record.)

13             MS. JARVIS:  I'll hand this up, then, to be marked as

14   Exhibit 2.

15             THE COURT:  Yes, please.

16             THE CLERK:  I have (indiscernible).

17             THE COURT:  You have it?

18        (Colloquy not on the record.)

19             THE COURT:  Okay.  Go ahead.  I'm sorry.

20   BY MS. JARVIS:

21   Q.   Mr. Allison, did you or did you direct your staff to

22   create this document?

23   A.   I directed my staff -- they have better eyes than I do --

24   to -- to create this chart.

25   Q.   And what does it show?
```

1    A.    This chart is on extension of the first exhibit.    The

2    first exhibit shows, essentially, the ownership interests in USA

3    Commercial Mortgage.

4          When we distill down the first -- USA Commercial Mortgage

5    into its essential parts, USA Commercial Mortgage was the -- the

6    cog in the wheel, if you will, that originated loans on one

7    side, and those loans are -- are -- are all shown on the -- on

8    the left-hand side of this column.

9          On the right-hand column is essentially what I would call

10   the loan participants, whether it be First Trust Deed Fund which

11   are fund members as we decided this morning, or Diversified

12   Trust Deed Fund which are fund members along with what we're now

13   styling as direct investors.

14              THE COURT:  Lenders.

15              THE WITNESS:  Direct lenders.  Excuse me.

16              THE COURT:  And I apologize, but I think -- the only

17   reason I thought it may helpful to use that is because

18   everybody's in their mind has invested money, so that's why I

19   think a lender might be a little easier.

20              THE WITNESS:  And, your Honor, I -- I appreciate the

21   distinction because what we tried to do -- what -- what this

22   sheet attempts to do is take and -- and fully depict for you --

23   and let me move over to the left-hand side of the column, and I

24   apologize again for the -- the  smallness of the type.

25         What the -- what the columns after the -- the -- the

1   columns at the top, FD, First Trust Deed Fund, Diversified

2   Trust Deed Fund, Real Estate Invest -- Real Estate Group, and

3   then we have -- and then we have the direct investors on the far

4   -- on the far column, and so --

5           THE COURT:  IND (phonetic) --

6           THE WITNESS:  IND.

7           THE COURT:  -- is direct lenders?

8           THE WITNESS:  IND --

9           MS. JARVIS:  Okay.  And so --

10          THE WITNESS:  -- is the individual investors.

11          THE COURT:  Okay.

12  BY MS. JARVIS:

13  Q.    So, Mr. Allison, those five groups listed on the

14  right-hand side are what would be the investors or lenders, and

15  they're reflected across the tops of the columns on the

16  left-hand side --

17  A.    That's correct.

18  Q.    -- is that correct?

19  A.    That's correct.  First Trust Deed Fund, Diversified Trust

20  Deed Fund, Real Estate Group, REG, and then Investment Partners

21  and individuals.  So those are -- those are the -- in Commercial

22  Mortgage are the -- are the -- are the categories.

23  Q.    Okay.

24  A.    So as you can see, as we -- as each loan is syndicated,

25  each loan has a varying participation by -- by each group.

1          Amsbury Hatteras Point (phonetic), for example, has a

2    participation from, essentially, all investors.  And as you can

3    see, some -- some loans are 100 percent owned by -- or 100

4    percent invested into by individual investors while in -- in

5    most cases there's a participation that exists from each of the

6    Commercial Mortgage groups along with individual investors.

7    Q.   And the Hatteras Point that you mentioned, is that the

8    starred loan that's up near the top?

9    A.   Yes, it is, your -- Ms. Jarvis.

10   Q.   And in that case, you have all five groups that have

11   participated in that.

12   A.   That's correct.

13   Q.   And did Commercial Mortgage also, at times, fund itself?

14   Was it a lender?

15   A.   Yes, it is, and -- and I think I've given you Exhibit 2 to

16   evidence that.

17   Q.   You heard my explanation of how the funds worked with

18   respect to being lenders as well, and I think you indicated to

19   me that I did not quite have it correct, so could you correct

20   what I said to the Judge.

21   A.   Sure.  Ms. Jarvis, just to correct and -- and be very

22   clear, each of the funds you have going through real estate

23   advisers became a --

24          THE COURT:  And I appreciate you talking to me, but

25   I --

1          THE WITNESS:  Okay.

2          THE COURT:  We need you in the microphone, so --

3          THE WITNESS:  Direct -- became a direct investor or a

4    direct participant in a -- in a pari passu position with the

5    individual investors in each loan.

6          THE COURT:  Run that by me again.

7          THE WITNESS:  So --

8          THE COURT:  I'm sorry.

9          THE WITNESS:  Okay.  In -- in each of the loans --

10         THE COURT:  Uh-huh.

11         THE WITNESS:  -- as you can see on -- on the columns

12   on the left where there are, for example, First Trust Deed Fund

13   on the first loan, thirty-fifty (phonetic), San Fernando, First

14   Trust Deed Fund has an 11-percent participation in it.

15      Real Estate Investment Group -- Real Estate Group has a

16   participation in it, and individual investors have the majority

17   of the participation.

18      But when we look at the deed of trust, we would see that

19   they would be in a pari -- each -- each of the -- either the

20   fund or the investors are all listed pari passu on various -- on

21   lines assigning each deed of trust.

22         THE COURT:  You mean they're not listed as having

23   that percentage interest?

24         THE WITNESS:  They're listed as having a percentage

25   interest in the loan, and, actually, what I've done is provided

1   -- to provide you, your Honor, a sample of one of the loan

2   documents with the participants in the loan and -- and just

3   evidence that both funds and Commercial Mortgage would be a pari

4   passu participant in certain loan transactions.

5           MS. JARVIS:  Your Honor, if I could -- and, again, I

6   just have one copy of this, so let me just put it down here and

7   let them show it, and then I'll hand it up to you.

8           THE COURT:  Okay.

9           MS. JARVIS:  And this is simply the front page

10  (indiscernible) of this.

11          THE WITNESS:  You -- the -- you're bleeding -- it's

12  bleeding through because of the pages underneath it,

13  Ms. Jarvis.

14  BY MS. JARVIS:

15  Q.   Oh.  Yeah.  Okay.  Let me take it off.  (Indiscernible).

16  A.   Yeah.

17  Q.   Okay.  Right there.  Okay.  Let me fix this.  Sorry.  I

18  need my nine-year-old to help me on these technological issues.

19      (Colloquy not on the record.)

20          UNIDENTIFIED SPEAKER:  Counterclockwise one.

21          UNIDENTIFIED SPEAKER:  Counterclockwise it one.

22      (Colloquy not on the record.)

23          UNIDENTIFIED SPEAKER:  There.

24  BY MS. JARVIS:

25  Q.   Yeah.  Okay.  That's just the first page, and then I'll put

1   up the last page so you can see.

2              UNIDENTIFIED SPEAKER:  Good.  That's great.

3              MS. JARVIS:  Okay.  I'm getting better.

4              UNIDENTIFIED SPEAKER:  Yeah.

5              MR. SCHWARTZER:  If you look -- if you look at No.

6   260, your Honor, you'll see the --

7              THE WITNESS:  Could you leave that down for a second,

8   Ms. Jarvis.

9         (Colloquy not on the record.)

10             THE WITNESS:  You can see Investors 259 is USA Capital

11  First Trust Deed Fund is a $965,000 direct investor in the loan,

12  and USA Commercial Mortgage, Investor No. 260, is a $325,000

13  participant in that loan.

14        So each -- as you can see with the individual investors,

15  they're in a pari passu position in this North Yonkers loan.

16        So the way that -- the way that each of the -- and I've

17  reviewed many of the loan documents, and this is the way

18  they've been evidenced is the funds being pari passu

19  participants in each of the loans.

20             MS. JARVIS:  Your Honor, if I may, I'll hand this up

21  and have this marked as Exhibit --

22             THE COURT:  Okay.

23             MS. JARVIS:  -- 3.  Let me now hand up -- this

24  actually was submitted as Exhibit 8, Mr. Allison's declaration,

25  and if I could hand it up --

1          UNIDENTIFIED SPEAKER:  That's okay.

2          MS. JARVIS:  -- and have it marked as Exhibit --

3          MR. GORDON:  Your Honor, may we just have -- obviously

4    he's testifying at this time, but I assume that the declaration

5    is his direct testimony, and I would stipulate to the admission

6    of his declaration and testimony -- his direct, plus the

7    attachments, and he can identify those if necessary.

8          MS. JARVIS:  Your Honor, we just want to add we're not

9    going to go over what's in there.  We want to just add to it to

10   make sure that those in the courtroom today have a complete

11   understanding --

12         THE COURT:  Okay.

13         MS. JARVIS:  -- of this.

14         THE COURT:  So that's fine.

15      (Colloquy not on the record.)

16         MS. JARVIS:  And this, by the way, your Honor, this

17   has been -- Mr. Allison's declaration has been posted on the Web

18   site, again, so that this is information available.  I'm just

19   going to put the first page of this.

20         THE WITNESS:  Thank you, Ms. Jarvis.  What -- what

21   this does is -- obviously, it's a little bolder print than the

22   last exhibit that we put up, your Honor, but this goes to each

23   of the loans.

24      And if we -- Ms. Jarvis could slide it over a little bit to

25   the right.  Yeah.  Just a little bit more so we can show the

1    loans are performing or nonperforming.

2        What we've done -- and I've -- and I've created a loan

3    class from my banking days, your Honor, of categories in loans

4    of performing and nonperforming.

5        Performing loans are those that are paying interest

6    currently.   Nonperforming are those that are delinquent.

7        And I also have a watch list which are performing loans

8    which may -- which look like they're about to exhaust interest

9    reserve and may go nonperforming.

10       So, essentially, what I've done is gone through, and I've

11   conducted a fairly extensive loan review in the two-and-a-half

12   weeks that I've been involved as the -- as the CRO to determine

13   the perform -- excuse me -- the performance of each of the loans

14   where each of the loans stands in terms of its -- its relative

15   position and the interdependence of each of those loans in terms

16   of which loans are to -- which loans are to related parties

17   where investment partners may be a principal underneath the loan

18   or -- or where there are multiple loans to one party.

19           MS. JARVIS:  And --

20           THE COURT:  Just one question.  I'm sorry.  When you

21   said the interest reserve was depleted, are you saying that in

22   some cases no payments were yet due by the borrower, but there

23   was money put aside to pay interest on some of these loans?

24       (Colloquy not on the record.)

25           THE WITNESS:  Yes, your Honor.  On some of the loans

1    there was, for example, land development loans where there's no

2    revenue, and the Bundy Canyon loans would probably be a pretty

3    good example of that.

4         One of the earlier Bundy Canyon loans is nonperforming.

5    It's nonperforming because it's exhausted its interest rate

6    reserve.

7              THE COURT:  So we have no idea on those loans whether

8    or not the borrowers are capable of --

9              THE WITNESS:  There's no --

10              THE COURT:  -- making --

11              THE WITNESS:  There's no revenue on -- on the Bundy

12    Canyon loans.  It's a land amalgamation.

13         That's the -- that's the -- you'll -- you'll see a motion

14    later.  That's why I stopped -- want to stop the last

15    transaction on Bundy from -- from being consumated.

16         But until the land's put together -- it's authorized for

17    development -- there would be no revenue off of -- off of that

18    land.

19         So to the extent that -- that the -- when the interest

20    rates are -- reserves are exhausted, there wouldn't -- there

21    would not be an ability for the Bundy's, for example, to

22    service ongoing interest.  There's no revenue attached to it

23    until the land is subsequently liquidated.

24    BY MS. JARVIS:

25    Q.   And, Mr. Allison, generally, what was the status of the

1    loan portfolio at the time that you became the CEO?

2    A.    Well, what I did is create a loan portfolio, Ms. Jarvis.

3    There were -- we had loan documentation for the original loans,

4    but we didn't -- what we -- you're seeing now in the construct

5    of performing, nonperforming loans, date of origination, amount

6    outstanding, interest, interest and participations, we -- we

7    basically built this from scratch.

8         So the work that we're doing -- work that we've done over

9    the past two-and-a-half weeks is to -- to create, essentially,

10   the portfolio that a third party can understand in terms of

11   looking at -- looking at the loan portfolio now and

12   understanding it, whether it's nonperforming, performing.

13        The next step along the path, and we have a motion up to

14   retain an appraisal firm, and I want to get a current appraisal

15   of each of the loans so I can understand what the true value of

16   the loans are today.

17        And, also, what I've been trying to do is unwind the

18   interdependence.  Several of loans which -- several of the

19   loans are grouped into individual developers where they may

20   have performing and nonperforming loans.

21        So I have started to meet with the -- the individual

22   developers or borrowers to -- to -- to understand what their

23   intents are to repay loans, and I've served that process

24   already.

25   Q.    And by number and amount, how many of the loan portfolio

34

1    was nonperforming at the time that you became the CEO?

2    A.    Approximately 60 percent was nonperforming.

3    Q.    And what progress have you made with respect to those

4    nonperforming loans in the last two-and-a-half weeks?

5    A.    In the last two-and-a-half weeks I -- I can tell you I've

6    collected 2.1 million dollars of delinquent interest and have

7    collected one delinquent loan that was in arrears of interest

8    for a year that -- and that loan has been paid back.  It's 4.9

9    million dollars of principal and $800,000 of delinquent

10   interest.

11   Q.    And have you established procedures going forward to

12   collect these loans?

13   A.    Yes, I have.  I'm -- I'm meeting with our -- I'm meeting

14   with our problem loans and scheduled meetings on an aggressive

15   basis to aggressively collect our money.

16         One of the things that I -- that was evident at the

17   company was that there really wasn't a formalized collection

18   effort, and I've instituted that since I've become -- became the

19   CEO.

20   Q.    And have you also been interfacing with regulatory

21   agencies?

22   A.    Yes, Ms. Jarvis.  I meet frequently with Ms. Eckard

23   (phonetic) of the mortgage lending division, and I meet

24   frequently with the members of the SEC.

25   Q.    And is part of what you're doing providing information to

1  these agencies?

2  A.    Yes, I am.

3  Q.    And are these agencies satisfied with the information that

4  they've received, to your knowledge?

5  A.    Both agencies have told me that they're -- they're very

6  pleased with where we're at, and that we've -- they believe

7  we've made substantial progress, and that we're probably three

8  to six months ahead of where they thought that we'd be at this

9  point in time.

10  Q.    On the collections, is it possible that all the investors

11  or all the lenders in this case will be paid in full?

12  A.    There's a strong probability that that's the case.  Yes.  I

13  -- my -- from looking at the loans and looking at the fact that

14  they haven't been tended to, the evidence I -- that I can just

15  give you is my opinion in the first two weeks I've -- the first

16  two-and-a-half weeks of my tenure is that, you know, we've

17  collected 2.1 million dollars of past-due interest.

18       We've -- we've put some pressure on and have collected a

19  past-due loan.  We monetized it in full.  The loan was

20  not -- there was no interest or principal paid in a year.

21       To the extent that we have a secured deed of interest, and

22  we have a -- and we -- we had the ability to foreclose on it,

23  what we're doing is taking the efforts necessary -- the efforts

24  necessary to monetize this portfolio.

25       And by monetizing the portfolio, it's my hope that if the

1   evidence of the first two weeks holds true, that we'll be able

2   to get the investors back both their principal and interest.

3            MS. JARVIS:  Let me mark this as Exhibit 5?

4            THE CLERK:  4.

5            MS. JARVIS:  4.

6        (Colloquy not on the record.)

7            THE CLERK:  It would be 4.

8            UNIDENTIFIED SPEAKER:  Okay.  4.

9            UNIDENTIFIED SPEAKER:  (Indiscernible).

10           THE COURT:  No.  I think we had this -- this was one

11  that you didn't get, this --

12           THE CLERK:  That was 3?

13           THE COURT:  No, that was --

14           THE CLERK:  Yeah.  This is Exhibit 4.

15           THE COURT:  4.

16           THE CLERK:  This has Exhibit 5.  Do we need copies of

17  Exhibit (indiscernible).

18           THE COURT:  Here.  You gave me 3, this one.  This is 3

19  you gave me.

20           THE CLERK:  Yeah.  So do you want to have that?

21           THE COURT:  Yeah.  Um-hm.

22  BY MS. JARVIS:

23  Q.   Okay.  Mr. Allison, may I refer you to the chart that I

24  marked as Exhibit 5.  Can you explain what the investor account

25  is.

1   A.    The investor account -- as we go through the accounts, I

2   think it's -- if we walk through USA Commercial Mortage's

3   service agent, this is the -- so if I can step back for a

4   second.

5        USA Commercial Mortgage is the servicing agent, and it's

6   the -- it's the company that's in the middle of Exhibit 2.  What

7   this chart provides for is that principal and interest are --

8   are collected through the -- from the borrowers we collect

9   principal and interest.  They go into a collection account.

10  Q.    And let me just interrupt for a second.  That's after the

11  loans have been originated.  The loans are in place.  Then the

12  collections made on those loans go into the collection account.

13  Is that --

14  A.    That's correct.

15  Q.    -- correct?

16  A.    The investor account is when moneys were solicited from

17  investors and brought into the company.

18       For example, if we wanted to do Bundy Canyon 5, the -- the

19  origination team would say we have a secured -- we have a loan

20  and would you like to buy a fraction -- would you like to invest

21  in a fractional piece of a property.

22       And the investors then would invest their -- would --

23  would put their money into an account, and that investor -- for

24  an investment, and that money would be amalgamated to -- and

25  when the -- when the 8.9 million dollars was fully syndicated,

1    it would then go to -- to become an investment.

2    Q.   So let me just summarize.  So in the investor account is

3    where moneys went prior to the time that loans were originated.

4    A.   Yes, that's correct.

5    Q.   And you referred to the Bundy Canyon.  There is a motion

6    pending with respect to --

7    A.   That's correct.

8    Q.   -- those issues.  Okay.

9              THE COURT:  No.  And in that trust account, was that

10   money collected from people who were direct lenders only or was

11   it money from people who were going to become members in the

12   fund as well?

13             THE WITNESS:  I'm sorry, your Honor.  Could you

14   identify which account you're speaking of.

15             THE COURT:  The investor trust account.

16             THE WITNESS:  The investor account was where moneys

17   would -- came in for -- that was our source of cash to initiate

18   loans.

19             UNIDENTIFIED SPEAKER:  Okay.

20             THE COURT:  From direct lenders only.

21             THE WITNESS:  From direct lenders only or --

22             THE COURT:  Which could include the fund as a whole.

23             THE WITNESS:  Yes.

24             THE COURT:  Okay.  But there were separate accounts.

25   If somebody wanted to become a member, they just -- the money

1    just came in.

2              THE WITNESS:  The money came in --

3              THE COURT:  Okay.

4              THE WITNESS:  -- and it was -- it was (indiscernible)

5    accounts trade in the investor account.

6    BY MS. JARVIS:

7    Q.   So, in other words, your testimony is that the investor

8    account included everything to fund a loan which might come from

9    the direct lenders as well as from the funds as --

10   A.   That's correct.

11   Q.   -- lenders.

12             THE COURT:  But if an individual member wanted to

13   become a member, was there -- I guess it wasn't a separate

14   account.  It just came in and was immediately put in the fund --

15             THE WITNESS:  Right.  Then --

16             THE COURT:  -- account.

17             THE WITNESS:  Again, what we're looking at, your

18   Honor, is USA Commercial Mortgage, which is the circle in the

19   middle of our previous exhibit.

20        When the members of each of the -- the funds were

21   solicited for their moneys, that was through each of the fund

22   solicitations.  When we moved money into direct investments, it

23   went through USA Commercial Mortgage as servicing agent.

24             THE COURT:  Okay.  So, again, that wouldn't have been

25   -- anybody who wanted to become a member of the fund, who became

1    a member of the fund, that money wouldn't be in the investor

2    trust account except to the extent that it --  that individual

3    person's money would not be in that account.

4                    THE WITNESS:  No.  There would have been --

5                    THE COURT:  Just the funds money was.

6                    THE WITNESS:  The funds money would be --

7                    THE COURT:  Right.

8                    THE WITNESS:  -- in that account.

9                    THE COURT:  Okay.

10   BY MS. JARVIS:

11   Q.    And is there currently funds in the investor fund account?

12   A.    Yes.  I believe there are.

13   Q.    And are those funds subject to disputes between investors?

14   A.    Yes, they are.

15   Q.    And can you explain that.

16   A.    The -- our --

17   Q.    There are two objections that are on file by different

18   investors to the cash management motion.

19         One of them claims money out of the investor account as a

20   party that was going to acquire an assignment of a loan, the

21   other to claim money out of the investor account because they

22   had intended to assign the loan over, and there were some

23   bounced checks.

24   A.    Sure.

25   Q.    Can you explain a little bit about that background.

1    A.    Right.  And that's -- one of the things that happened at

2    USA Commercial Mortgage is that previous management allowed for

3    investors to trade out of various loans.

4         At the time of the filing, there were investors that had --

5    may have had a check in or out of the -- and may be investing

6    into USA Commercial Mortgage or trading out of one of the direct

7    loans.

8         Those -- some of those investors were caught at the time of

9    the filing where they have a -- where they either had a release

10   on their collateral and a check was being mailed to them, or in

11   the other case where some were investing into the account.

12        But one -- the one that we're speaking of directly is one

13   that was -- where the check was about to the paid, and it was

14   caught up in the data filing.

15   Q.    Now, the cash management motion does not propose to use any

16   money from the investor account; is that correct?

17   A.    That's correct.

18   Q.    And that will remain?  I mean, it is your intent that that

19   will remain in tact, pending further order of the Court.

20   A.    That's correct.  And, again, as we go through the circle

21   here, the -- the investors put money in through the investor

22   account as well as as we collected money, both principal and

23   interest, that should have been remitted to the investors as it

24   was collected.

25   Q.    Now, you've created another account called the DIP

1    Operating Account; is that correct?

2    A.    That's correct.

3    Q.    And can you explain what that account is.

4    A.    Essentially, the debtor-in-possession account takes our

5    collections and puts them into the debtor-in-possession

6    account.

7    Q.    But the debtor-in-possession collection account is where

8    collections are made from the principal and interest of

9    borrowers; is that --

10    A.    That's correct.

11    Q.    And the operating of the account, the DIP operating

12    account, only -- is that only used for paying the operations of

13    the post-petition debtors?

14    A.    That's correct.

15    Q.    Okay.  Now, has any money been moved from the collection

16    account to the operating account since the filing of bankruptcy?

17    A.    From the operating account to the -- no.

18    Q.    No.  From -- yeah.  From the collection account to the

19    operating account.  And is it your understanding that

20    Commercial Mortgage has rights to certain fees that it can be

21    paid from the collection account?

22    A.    That's correct.

23    Q.    And is the cash management motion, does that propose only

24    to transfer those fees or those rights from the collection

25    account to the operating account for the debtors' use?

1  A.   That's correct.  What we're -- what we're proposing to do

2  is to use the loan-servicing fee as servicing agent to

3  administer this estate, and those -- we're entitled to several

4  categories of fees that would be -- that would be part of our --

5  what we plan to administer the estate with.

6       Those would be the revenues that we would use to

7  administer this estate, and those include administration fees

8  which are half to up to three percent per annum on each of the

9  loans.

10      So we -- we'd use those fees along with any fees that we

11  took which are late fees or if we have to renew a -- a

12  transaction.  Those are fees that we would contemplate using to

13  -- to operate this estate.

14 Q.   So other than the fees that Commercial Mortgage is

15 entitled to that you're asking to be transferred to the

16 operating account to use for operating these debtors, you are

17 not proposing to move or transfer any other amounts in the

18 collection accounts?

19 A.   No, your Honor -- no, Ms. Jarvis.  My intent is to keep

20 those moneys segregated as I become successful and bring back

21 delinquent interest and bring principal back into the estate.

22 We're segregating and identifying it by loan that's collected.

23 Q.   So every amount that's collected you have accounted for

24 with respect to which loan it is attributable to and what

25 amounts were paid.

1   A.   That's correct.

2   Q.   I'd like to take you now through the budget that has been

3   attached to -- the revised budget to the cash management motion.

4         MS. JARVIS:  And maybe I could also get this marked as

5   an exhibit.  I'd like to have this marked as Exhibit 6 I believe

6   is where we're at.

7         THE CLERK:  And what's the name of the document?

8         MS. JARVIS:  (Indiscernible)?

9         THE CLERK:  What is the name of the document?

10        MS. JARVIS:  It's Revised Budget.

11        THE CLERK:  Do you (indiscernible) to go out and make

12  copies of this, Ms. Jarvis?

13        MS. JARVIS:  And I do have some extra copies, your

14  Honor.  If you don't have your copy, would you like me to hand

15  one up?

16        THE COURT:  Wasn't it attached to the reply?  It must

17  have been.

18        MS. JARVIS:  Yes.  It -- well, it was attached to

19  Mr. Allison's supplemental declaration.

20        THE COURT:  Oh.  I don't see it in front of me, so if

21  you have an extra copy, that would be great.

22    (Colloquy not on the record.)

23        THE COURT:  Oh.  I do have it.  Well -- I do have it.

24  Sorry.  So if anybody else needs this, they could have it.

25        MS. JARVIS:  I think it might be helpful simply to

1    walk through the categories on the budget and have

2    Mr. Allison explain what is involved in this budget.

3    BY MS. JARVIS:

4    Q.   Mr. Allison, the first category is the loan origination

5    fees.  Can you explain what is -- and this is on the revenue

6    side of what is being collected in this budget.  Can you

7    explain what that --

8    A.   Well, loan origination --

9    Q.   -- entails.

10   A.   -- fees, Ms. Jarvis, tied to the origination of new loans

11   along with collection and loan-closing fees and reimbursed

12   expenses from USA Capital Realty.

13       The loan-service collections are the estimated service fee

14   -- estimated service fees that we would collect along with any

15   outstanding loan origination and closing fees that we would

16   anticipate collecting.

17       The -- so moving through that -- essentially, maybe if we

18   looked --

19   Q.   Let me ask you a question here.  The debtor has not

20   originated any loans since the filing, has it?

21   A.   That's correct.

22   Q.   And so where do these loan origination fees come from?

23   A.   They'll be -- well, first of all, we do have in our cash

24   flows in July that we would start originating new loans again.

25       We are -- one of the things that USA Commercial Mortgage is

1   experiencing is that there are people coming in, even with a

2   Chapter 11, and asking us to originate new loans.

3        And that's -- we're seeing that -- that from a business

4   standpoint, developers want -- want the product that we offer,

5   so we did put into this projection the ability to originate a

6   new -- new loans in the middle of July.

7   Q.   Okay.

8   A.   With respect --

9   Q.   That also -- would you anticipate that if that occurs,

10  that would be subject to Court approval?

11  A.   Yes, your Honor -- yes, Ms. Jarvis, and, also, it would be

12  subject to having a DIP financer involved because we would not

13  be sourcing funds from the public, but we'd be using a warehouse

14  credit facility from an institutional lender to provide us the

15  liquidity to make these loans.

16  Q.   And would it also be subject to regulatory approval?

17  A.   Yes, it would.

18  Q.   And do you currently have a license to continue --

19  A.   Yes, I do.  I have a conditional license from the State to

20  continue in operation as long as I don't use individuals' money.

21  And to the extent that I originate loans and do it with

22  institutional money, I have a conditional approval from the

23  State to continue in business.

24  Q.   Okay.  Is the origination fees that are then indicated in

25  here, are these origination fees that may have come from either

1  loans originated prior to bankruptcy or projected in the future

2  if you are allowed to originate loans?

3  A.    Yes.  The loan origination fee on the top line would be new

4  loans that would be originated assuming that we'd have the

5  ability to -- the -- we'd -- that the Court would give us the

6  approval and -- for debtor-in-possession financing, the approval

7  to continue in business.

8      What we're doing is forecasting out by mid July that we

9  could continue to -- we could -- the debtor would be

10  rehabilitated in terms of books, records, and procedures, that

11  we could then continue on with the core business of the debtor

12  which would be to -- to continue to originate secured loan

13  transactions only through -- only sourcing them through --

14  sourcing the funds through a commercial lender.

15  Q.   And there is the line item on -- you mentioned the

16  estimated-service fees.  Can you explain why they're estimated.

17  A.    Well, the -- the -- we're looking at our loan portfolio,

18  and, essentially, what I did was take our performing loans and

19  estimate that -- the amount of fees that we would generate off

20  of our performing loans to -- to -- to give us the fees to

21  continue to operate in our business.

22      I tried to build this projection in a very conservative

23  basis which doesn't take into account collecting the collection

24  of past-due principal or interest or the collection of -- of --

25  of late fees.

1    This is -- this projection was based on the collection of

2  -- of service fees from our performing portfolio.

3  Q.   When you estimated the service fees, did you estimate it at

4  a one-percent servicing fee?

5  A.   Yes.

6  Q.   And that was despite the --

7  A.   One percent per annum.

8  Q.   But are there rights that Commercial Mortgage has with

9  respect to higher servicing fees with respect to serving the

10  investors?

11  A.   Yes.  We have the right to charge up to three percent per

12  annum on -- on -- on the vast majority of our loans.

13  Q.   But you -- in making this conservative, you used only the

14  one percent.

15  A.   Yes, Ms. Jarvis.

16  Q.   Okay.  And as you indicated, then, if your collections

17  improve as far as turning nonperforming loans into performing

18  loans, will the service fees that can be collected in this

19  budget also increase?

20  A.   Yes.  Oh.  Again, if we look at the fact that 60 percent --

21  when you look at the fact that 60 percent of the loan portfolio

22  is nonperforming at this time to the extent that we're able to

23  -- through some focused discussions with the delinquent lenders

24  to get them performing again, that should definitely enhance the

25  -- the cash flow.

1    Q.    And then with respect to the outstanding origination

2    extension and closing fees that you've included, these are fees

3    that -- it is your understanding -- are also allowed to

4    Commercial Mortgage?

5    A.    That's correct.

6    Q.    So all of these fees, again, are not -- they're simply

7    contractual rights that -- I mean, from your understanding,

8    what you've included in this budget was only property which

9    belongs to Commercial Mortgage under its contracts.

10    A.    That's correct.

11    Q.    With respect to the reimbursed expenses from USA Capital

12    Realty, can you explain that a little bit further.

13    A.    Sure.  USA Capital Realty is one of our debtor entities,

14    and we are entitled to a service fee from USA Capital Realty,

15    and that's -- that's how that fee is put in at $120,000 in -- in

16    -- in the first week.

17    Q.    Is it actually titled a management fee?

18    A.    Yes, it is.

19    Q.    And with respect to the management requirements, when this

20    talks about reimbursed expenses, was it -- is this reimbursed

21    expenses for fulfilling the management requirements of USA

22    Capital Realty?

23    A.    That's right.  That's a contractual obligation that USA

24    Capital Realty has with USA Commercial Mortgage.

25    Q.    Okay.  And are you collecting the entire amount of the

1    management fee that USA Capital Realty would be entitled to in

2    this budget?

3    A.    No.

4    Q.    Let's move to the disbursement side.  Maybe you could just

5    quickly, so we can kind of run through this quickly, just

6    explain, generally, what the categories are in the disbursement

7    side as to what is included in this budget.

8    A.    Very -- to -- to make -- to make this quick, sellers --

9    sellers and wages are $85,000 paid every two weeks.  Payroll and

10   payroll benefits are another 14.5 thousand dollars payable every

11   two weeks.  In addition, once a month there's a health plan

12   that's $11,000 for the employees.  So those are the key focuses

13   of the budget.

14        Office operating disbursements have been running on

15   average $10,000 a month, and the dreaded other category of

16   operating expenses, an amalgamation of various equipment leases

17   and insurance and -- and taxes that the debtor has to pay that

18   we -- we've done an analytic on the month -- on a week-by-week

19   basis.

20        Essentially, some of these payments we've made on a

21   monthly basis, but we've shown -- we've depicted it what we

22   think would be -- with the run rates week by week.

23   Q.    Let me ask you about professional fees.  You have a line

24   for professional fees in this budget; is that right?

25   Do you see that?

1    A.    That's correct.

2    Q.    Okay.  Now, you are not asking for approval of any

3    professional fees in this as part of this cash management

4    motion, are you?

5    A.    No.  The intent here is to put a placeholder in for

6    professional fees.

7    Q.    So this is just to do a cash flow to make sure that this --

8    the company would cash flow properly with these projected

9    expenses.

10   A.    Well, the intent was to take it for the first -- first 90

11   days of the case and to make sure that the debtor had enough

12   money to operate given -- given the limited amount of -- given

13   what we're taking in as revenues from our -- from being the

14   servicing agent and collecting the fees from each of -- each

15   month on -- on the loans we service.

16   Q.    And you understand, do you not, that no professional fees

17   can be paid unless the Court approves that?

18   A.    I'm very well aware of that, Ms. Jarvis.

19   Q.    There also are fees for post-petition financing.  Do you

20   see that line?

21   A.    Yes, I do.  That's $150,000.

22   Q.    Now, again, are you -- you are not seeking approval to pay

23   that amount as part of this cash management motion, are you?

24   A.    No, I'm not.  It's a placeholder.  We've been in

25   discussions with a -- a very significant lender from -- in -- in

1   this space.  What they would want is a work fee to get to a

2   commitment as $150,000, and I put that in as a placeholder.

3   Q.   And so you understand, do you not, that nothing will be

4   paid out unless Court approval is obtained?

5   A.   I agree.  That is -- I thoroughly understand that, and,

6   again, this was to make sure that the estate could be able to

7   absorb the cost of -- of the work fee.

8   Q.   Maybe you can explain why is it that you are looking at DIP

9   financing at this juncture.

10  A.   There's three reasons.  First, I'd like to have money.  I'd

11  like to have funds reserved to enforce the delinquent loans.

12       To the extent that I have to aggressively seek collection

13  actions to collect the delinquent loans and bring them back and

14  recoup the money for our investors, I'd like to have liquidity

15  -- working capital liquidity to do that, to employ whatever

16  resources I need in terms of legal and other -- and other teams

17  I may need to recoup.

18       So that's the first part, is a working capital line.  I may

19  not need it, but to the extent that I do, I wanted to have

20  incremental liquidity to -- to enforce the delinquent loans.

21       The second is there's $65,000,000 of unfunded commitments

22  that exist on the loan portfolio at this date.  To not fund

23  those -- in some instances, and I've reviewed several of them,

24  to not provide the incremental funding necessary to -- to -- to

25  finish out the projects could result in -- in damage to the

1    investors that have -- have started the projects out.

2        So to the extent that a project is up and we need -- we

3    need incremental moneys to finish a phase, we -- we've -- we've

4    been in discussion with several institutional lenders to provide

5    the liquidity to finish out the projects and protect the

6    investment -- the investors' investment in the stages that have

7    been already completed.

8        And then the final phase -- the final stage of

9    debtor-in-possession financing is to provide incremental

10   liquidity so that we can go out and originate new transactions

11   as the debtor rehabilitates himself.

12   Q.   And from your -- I mean, in your opinion from -- as the

13   CEO, do you believe that this company can be reorganized?

14   A.   Yes.  I believe that there's a demand for this product,

15   Ms. Jarvis, the -- the product of providing the -- the -- the

16   first-tier money for land development and for -- for building

17   development.

18       The product has a demand.  The product has a high yield to

19   it.  And in my negotiations with -- with several of -- several

20   sophisticated lenders in New York, they've indicated a -- a

21   willingness to lend into the situation and provide what's called

22   a warehouse credit facility so that the debtor could be --

23   originate loans, collect its fee on the loan origination side,

24   and enjoy spread income between the amount that we would charge

25   the -- the underlying new transaction and what we'd pay to our

1    investors.

2         So there could be a rehabilitated entity that would be

3    viable and have a reasonable income, and it would be an -- and,

4    also, I think it would be a valuable economic entity to the

5    extent that I'm not successful in collecting these loans, that

6    there could be a distributive ownership to -- to the creditors

7    that haven't been paid in full.

8    Q.    So you believe that maintaining the intrinsic value of this

9    company is important to the current investors?

10   A.    Yes, I do, Ms. Jarvis.  I think it's fundamental to

11   maximizing the recovery of this estate.

12   Q.    Okay.  And that value, then, would be available to

13   investors and creditors -- or, it's your intent to make that

14   value available to investors and creditors to, hopefully, get

15   them all paid in full; is that correct?

16   A.    That's my intention, Ms. Jarvis, to get these creditors

17   paid -- investors paid in full.

18   Q.    Let me ask you one other question about the sources of

19   cash.  Are there ever potential sources of cash under

20   Commercial Mortgage's contractual rights that are not included

21   in this budget in the receipts?

22   A.    There are -- there are the recoveries that we're seeking to

23   make.  USA Commercial Mortgage has on its balance sheet over

24   $50,000,000 of -- over -- it's a $57,000,000 receivable from USA

25   Investment Partners.

1          I am in the process of negotiating with Mr. Milanowski who

2     is the CEO of US Investment Partners to secure my loan -- to

3     secure with properties that are in Investment Partners my

4     receivables so that as investment -- so by -- that would give me

5     a direct way to attach the properties, Investment Partners, that

6     could secure a loan, and then it could monetize it and recoup

7     the $47,000,000 loan purse and the $57,000,000 loan that exists

8     at Commercial Mortgage.

9     Q.    So you intend to progress -- or, to aggressively pursue

10    collection of these debts that are due to Commercial Mortgage?

11    A.    That's correct.  And I'm -- and I've been in negotiations

12    with Mr. Milanowski.  And at the -- at the present time, we've

13    exchanged security agreements, and we're in the process of

14    finalizing the collateralization of -- of  those -- of specific

15    assets to secure this receivable.

16    Q.    Let me ask you then.  Now, we've gone through these kind of

17    line items.  In putting this budget together, what did you

18    intend to accomplish with the expenditures that are included in

19    this budget, generally?

20    A.    Well, my intent -- first of all, my intent in this budget

21    was to show the Court that the estate could be solvent during

22    the first 90 days of the case, and that the estate could

23    continue to fund -- fund itself from its -- from its

24    loan-servicing fees and other fees it's entitled to from -- from

25    its normal course of business.

1  Q.   Okay.  And what are the tasks that are -- when you

2  budgeted time in for professionals, for, you know, employees,

3  for yourself, and Mesirow, what tasks are you slated to

4  accomplish during this 90-day period?

5  A.   Well, obviously there are a lot.  If I can go through a

6  priority of tasks, and I also put Ray Quinney in as one of the

7  professionals that -- they were tasked with helping us out as

8  well as Mr. Schwartzer.

9       There is a lot of work here to -- to be done, and, you

10  know, we could go through, you know, a day between negotiations

11  with a delinquent lender and -- or delinquent borrower and say

12  listen, I need, you know -- what are the strategies we need to

13  foreclose on, I want my money, to -- to developing an

14  infrastructure within the company to effectively collect

15  interest and -- and have a focused collection effort to working

16  with Mr. -- to meeting with Mr. Milanowski to secure 47 -- to

17  secure my $57,000,000 receivable that's due from Investment

18  Partners.

19       So the tasks at hand -- my -- my first and primary task is

20  to focus on the delinquent -- my -- my nonperforming loans and

21  turn them into -- either monetize them either through

22  foreclosure or forcing them to repay, but I want to monetize the

23  delinquent loans.

24       There's $50,000,000 of interest that hasn't been

25  collected on a $965,000,000 portfolio.  That needs to stop, and

1    it -- because they're secure loans, we need to collect that

2    interest.  And -- and there -- by the same token, there is

3    $50,000,000 of principal payments that were not remitted to

4    investors that need to be collected and -- and put together.

5        So my initial -- my initial intent is to understand where

6    each investor is in terms of his position, whether he's been

7    overpaid, underpaid, and we've got a team of people sorting that

8    out as well as we have a team of people focused on putting the

9    books and records and statements and schedules -- statement of

10   financial affairs in proper order and then also working these

11   loans aggressively to get them into a performing state so that

12   we can monetize this -- monetize them as quickly as possible.

13   Q.   In your review of these loans, is it your observation that

14   most investors or the majority of investors invested in more

15   than one loan?

16   A.   Yes.  I'd say the average is 2 to 3 loans with some

17   investors up to 20 loans.

18   Q.   And so when you look at the number of investors you're

19   dealing with, if you separated them out, about how many

20   investors --

21   A.   Well --

22   Q.   -- would that be?

23   A.   -- if we just -- let me just -- if I can go back and say

24   this.  There's 3600 direct lenders that we -- if we're going

25   through the category.

1          If we look at the direct lenders at 3600, those 3600

2     direct lenders have, by average, invested in more than one

3     loan.  When we looked at that, I think 1100 have just one loan

4     as the direct investment.  The -- the balance of the 36 have

5     investments in multiple loans.

6          So as we go through and look at transaction by

7     transaction, we almost have to create a T account for each of

8     the loans the investor's involved with.  So it's actually not

9     3600 investors.  It's -- it's some multiple thereof, maybe two

10    to three to four times when we're touching an investor.

11    Q.   So when you're creating, you know, the records to look at

12    what each investor has, you're actually dealing with more like

13    maybe 10,000 investors?

14    A.   More than that.  I think it's at least 10,000 times when --

15    when you go through it because the -- each investor has a

16    multiple of accounts that's one to two to three times, so it's

17    at least 10,000, if not more, Ms. Jarvis.

18    Q.   Now, when you put together this budget, there are

19    potentially other -- as we talked about, for instance, on the

20    servicing fees.  There's potentially taking more servicing fees.

21         Did you intend, in putting together this budget, to limit

22    the use of cash by Commercial Mortgage to only that what you

23    felt was necessary?

24    A.   Yes.

25    Q.   Let me ask you a little bit more about the overpayments,

1    and maybe you can just explain what you mean by some investors

2    that have been overpaid.

3    A.    Thank you.    That's an excellent point.    It's -- I'm going

4    to go back to repeat something from earlier.    USA Commercial

5    Mortgage paid every investor interest every month until we were

6    retained, and -- and the reason that I think we were all

7    retained is that they ran out of cash.

8         There's 4.2 million dollars of cash that they collected

9    from -- from the borrowers for March rents.    The amount of

10   money that had to go out was $9,000,000.    They didn't have

11   money in the estate any -- to -- to make those interest

12   payments.

13              THE COURT:    And just to be clear, when you mean

14   investors, you mean both direct lenders and fund members.

15              THE WITNESS:    Yes.

16              THE COURT:    Everybody received payments every month.

17              THE WITNESS:    That's correct.    So to the extent that

18   there wasn't enough money to pay them, then it became, well,

19   we're -- how long and how prevalent was the situation.

20         And, essentially, as in our investigation, some loans

21   hadn't paid interest in three years.    You know, yet, they had

22   been -- yet, the investors had been receiving interest.    In some

23   other cases the loan had been fully collected from the borrower,

24   and the collateral had been released.

25         So as we've gone through and have done our investigation,

1    we continue to refine our numbers as -- as these categories go

2    through.

3        But, essentially, what happened at USA Commercial

4    Mortgage is it paid -- it paid the investors interest

5    regardless of whether the underlying borrower paid the interest

6    to USA Commercial Mortgage, and it ran out of cash.

7    BY MS. JARVIS:

8    Q.   So when you talk about being overpaid, you're talking

9    about an investor who was paid their interest even though there

10   was no interest collected on their underlying loan or the loan

11   that they had an interest in.

12   A.   That's correct.  The nonperforming -- I characterized the

13   loans as nonperforming as those loans that have not paid

14   interest.

15   Q.   So --

16   A.   So over 60 percent of the loan portfolio was -- was either

17   delinquent or hadn't paid interest in a long period of time.

18   Q.   So when you look at this list that we looked at earlier

19   that had performing and nonperforming loans, are you saying

20   that everybody that had an interest in the nonperforming loan

21   was overpaid?

22   A.   They were paid -- yes.  They were paid interest when they

23   weren't entitled to -- the interest was never collected from the

24   underlying -- underlying lender.

25   Q.   And where did the money come from that made those

1    overpayments?  To what -- and, obviously, this is preliminary.

2    I know you're just starting to look at this, but from what you

3    know to date, where do you think the money came with -- from to

4    pay -- make these overpayments?

5    A.    Your Honor -- Ms. Jarvis, as you go through it there --

6    there are two numbers that have almost a direct correlation to

7    them, the amount of interest that's delinquent from the

8    borrower -- from our borrowers which is about $49,000,000 and

9    the amount of principal that was collected of $50,000,000 and

10   not remitted to the investors.  It's almost a one-to-one ratio.

11        And, essentially, what happened, at some point in time

12   previous management starting diverting principal payment --

13   principal payments from investors as they were collected,

14   continued to pay them interest on the loan, but used the

15   proceeds from the release of collateral to continue to fund the

16   business.

17   Q.    So are there some amounts of notes or loans for which

18   they've been completely paid off and there have been collateral

19   releases?

20   A.    Yes.

21   Q.    And how much is that?

22   A.    It -- in our investigation at this point, it indicates it's

23   about $18,000,000 of principal that was collected from various

24   borrowers, security liens that had been released, and those

25   moneys not released to -- not returned to the investors that

1    were rightfully entitled to receive those moneys.

2    Q.   So with respect to those lenders as opposed to the group

3    that have been overpaid, those lenders would have been

4    underpaid.

5    A.   That's correct.

6    Q.   And you currently, then, would not have an interest in a

7    secured mortgage; is that correct?

8    A.   That's correct.  The collateral has been released.

9    Q.   Okay.  Were there also partial releases of collateral?

10   A.   Yes, there were.  There was approximately $32,000,000 of

11   partial releases of collateral where the -- the loan continued

12   to either be a performing loan or a nonperforming loan, both

13   categories, where security -- where various stages of

14   development of the project where they -- where management

15   allowed for the release of a part of the security that was under

16   the project.

17        And the security was -- the principal was paid to USA

18   Commercial Mortgage, not remitted to its proper investors, and

19   the security interest in that partial -- in that development was

20   -- was released.

21   Q.   And is it your intent, then, to also rectify these

22   problems in making sure that these investors get paid in full?

23   A.   Yes.

24   Q.   And you're looking at a variety of possibilities with

25   respect to generating enough money to make sure that these

1  investors as well are paid; is that correct?

2  A.   That's -- that's correct.  And -- and why I'm going

3  through -- since there -- there are ongoing projects that may

4  need -- may need incremental funding or may need -- or where

5  there's an -- the importance is that some of these projects are

6  -- there's an interdependency from Loan A to Loan B to Loan C.

7      Several developers have multiple loans.  Some of the loans

8  are in the position where they're perform -- one -- I met with

9  one where he has a performing loan.

10     He has a loan that needs an incremental $6,000,000 to

11 finish off the project.  He has another loan that -- that I know

12 that we've partially released collateral behind, but he wants --

13 he's looking for a global solution.

14     So to the extent that it's important that we keep the

15 loans together because in order to negotiate a successful

16 settlement and monetize to -- to get the best result for the

17 investors I have to treat that borrower, even though he

18 has -- there's discreet notes that are out there, I'm treating

19 that borrower -- he needs certain things from USA Commercial

20 Mortgage, and we need things from him.  So in order to maximize

21 value, we're -- we're looking at global workouts.

22 Q.   Was it also some of Commercial Mortgage's own money that

23 went to overpay investors?

24 A.   Yes.  They diverted -- they, essentially, took their cash

25 that would have been used for their servicing fees and -- and

1    diverted their own capital into continuing operations by

2    continue -- they continued -- USA Commercial Mortgage exhausted

3    its own capital, its own loan-servicing fees in the payment of

4    the interest to the investors.

5    Q.    And have you and your staff looked at the various loans, to

6    the extent there was information provided, of the objectors to

7    this motion?

8    A.    Yes, I have.

9    Q.    And with respect to those objectors, in your review of the

10   loans that they are into, are there any of them that are not in

11   at least one nonperforming loan?

12   A.    No.  As I went through the list of all the objectors, they

13   at least have one or more than one nonperforming loan in -- that

14   -- where we would have overpaid them interest for some period of

15   time or paid them interest they weren't entitled to for some

16   period of time.

17   Q.    Okay.  With respect to these loans, on average, how many --

18   do you know how many lenders or direct or fund lenders there are

19   on average in each individual loan?

20   A.    The average should be 2- to 300 investors per transaction.

21   Some had up to 4- to 500, but the majority had 2- to 300

22   investors, which would include -- which may include Commercial

23   Mortgage, either of the two funds, or Realty Advisors or

24   Investment Partners as a -- as a direct investor.

25   Q.    And what problems will be created for the 200, 300

1   investors if one investor could break off -- I mean, if it was

2   even allowed -- with respect to collection problems?

3   A.   It would be chaos.  What we're trying to do is -- if we go

4   through and -- and look at the interdependence of each of these

5   loans and look at the solution of restructuring this loan

6   portfolio and maximizing its value, if we were to allow one

7   investor to break off, utter chaos would occur.

8        We would not be able to effectively act as agent to go

9   back in and restructure these loans and monetize them on a

10  prudent basis.

11  Q.   And if you do not receive approval for the cash management

12  motion today and the budget, what would be the result?

13  A.   This estate wouldn't be able to survive.  The -- the -- if

14  we weren't able to operate the company as we've outlined, it

15  would be very difficult for this debtor to reorganize himself --

16  or, itself, and we'd be facing a -- I think we'd be facing a --

17  very dire consequences for the investors.

18  Q.   And is there anything else you think that is relevant for

19  the Court to know with respect to the approval of this cash

20  management motion?

21  A.   The only thing I would implore is that as we look at the

22  loans, and we look at where there -- there at their secured

23  loans, they -- the underlying properties there, we've -- we've

24  engaged an appraisal firm subject to Court approval.

25       We're going to be marking and evaluating the proposal --

1    the value of the loans and marking them to where they're at

2    currently in terms of the value of the underlying assets that

3    secure those loans.

4        If we have the time to do a workout strategy and look at

5    the loans as a -- as a bank would and as a workout officer

6    would, we should be able to maximize the recovery for all

7    investors.

8        If we take this and -- and tear it apart and look at it

9    fractionally as each one investor having its individual right,

10   we won't have the ability to to -- to employ strategies to

11   maximize the value for the entire estate and return a -- return

12   investors money on a -- maximize the return to all investors.

13   Q.   And as a former bank officer, you've done this kind of

14   work before with respect to portfolios; is that correct?

15   A.   That's correct.  I've done it with portfolios as a bank

16   officer, and I've done it subsequently as a CRO for some major

17   companies, including Com Disco (phonetic) which had a

18   $12,000,000,000 lease portfolio spread around -- spread around

19   the world and -- and monetizing that portfolio for its

20   investors, and the result there was we got 100 percent of the

21   investment back for -- for the creditors and -- and even got a

22   dividend for equity.

23             MS. JARVIS:  That's all I have, your Honor.

24             THE COURT:  Okay.  Cross?  I mean, are there any

25   other questions?

```
 1            MR. SCHWARTZER:  May I approach the witness?

 2            THE COURT:  Yes.

 3            THE CLERK:  Oh, there is water (indiscernible).

 4            THE WITNESS:  Oh, thank you.  Thank you.

 5            MR. LEPOME:  You said I could cross, your Honor?

 6            THE COURT:  Yes.

 7                         CROSS-EXAMINATION

 8   BY MR. LEPOME:

 9   Q.   Attorney Robert Lepome.  I represent a dozen we'll call

10   them groups, either they're married or friends, what have you,

11   many millions of dollars that I'm representing here, and I have

12   a number of questions.  I may know the answer, and I think you

13   know the answer to many of them, but they wanted me to voice

14   them.

15        First of all, why have you made an appraisal on the

16   performing loans?

17   A.   The -- as I'm looking at a loan portfolio, there are

18   several loans -- there are several investors -- or,

19   several -- excuse me -- several of the borrowers have multiple

20   loans.

21        (Colloquy not on the record.)

22            THE WITNESS:  And to the extent that I am looking at

23   an interdependence where there may be a greater value in one

24   loan than in others and -- or I need to get the workout done, I

25   need to have an idea to appraise all -- each transaction to have
```

1  a good idea where it's at, and several of the performing loans

2  are on my watch list, and they may be running out of interest

3  reserve shortly.

4      So to the extent that I need to look at where they're at is

5  in case they run out of interest reserve, I need to be able to

6  protect my downside and understand where my values are so I can

7  formulate an effective strategy to -- to deal with each of the

8  -- the borrowers.

9  Q.   All right.  Another question is with regard to

10  Mr. Milanowski and other insiders, are they provided personal

11  guarantees.  Did you view those?

12  A.   There are -- Mr. Milanowski and Mr. Hantges provided

13  multiple personal guarantees.

14  Q.   And now I'll ask you another question.  In the event you

15  get an appraisal which is less than the actual loan amount, how

16  do you intend to proceed?

17  A.   It depends if it's a performing loan or a nonperforming

18  loan, but to the extent that I -- I know -- I have to know

19  where my collateral is at and what the value of the loan is at

20  the -- at that time.

21      The fact is that some of the loans -- if the loan may not

22  be fully secured, then I plan to advise the people that are in

23  that note of the status of each of these loans.

24  Q.   All right.  I'll just -- I have to ask this in a nondirect

25  way.  In Imperial and many others that I've been involved with,

1    I've tried to convince the people in your shoes to do the

2    appraisals and then to bid the appraised amount in the event of

3    foreclosure so that they would comply with Nevada's deficiency

4    statute.  Are you familiar with the statute?

5    A.   Yes.

6    Q.   Do you intend to do that?

7    A.   Yes.

8    Q.   Because in Imperial and all the others, they bid the full

9    amount on the loan, thereby, releasing the individuals, because

10   when you get the collateral -- and it's deemed to be the full

11   payment on the loan.  Are you familiar with that?

12   A.   Yeah.

13   Q.   All right.  You mentioned certain people, investors who

14   were underpaid and overpaid.  Isn't it true that in order to

15   really determine whether someone's underpaid or overpaid you

16   have to look at the underlying value and see how a loan works

17   out in the end?

18   A.   What we have to do -- and that's really what we're asking

19   for time from the Court to look at each of the loans, the -- the

20   progress that we're -- we intend to make by June 15th.

21        When we interviewed the appraisal firms, I wanted all of

22   our loans appraised in the next 30 days so that I could have

23   that information available by June 15th and -- and along with an

24   understanding of the position of each individual investor in its

25   -- in his various loans.

70

1   Q.    Okay.  Also with regard to an overpaid or underpaid

2   situation as denominated by yourself, these individuals might

3   owe money to another investor, not to US Capital.  Is that a

4   fair statement?

5   A.    The --

6   Q.    In other words, they got other investors' money.  They

7   didn't get any money from the --

8   A.    Well, USA Commercial Mortgage was the -- was the group

9   that overpaid, that -- that paid the interest, and US -- the USA

10  Commercial Mortgage was the -- what made the decision to pay an

11  investor interest when it didn't collect the interest on the

12  underlying loan.

13  Q.    From which account did they make this payment?

14  A.    They made the payment from their disbursement account.

15  Q.    Not from the collection --

16  A.    I mean from the collection account.  Excuse me.

17  Q.    That's what I meant, the collection account.  So where'd

18  they get the money from the collection account?

19  A.    From the underlying borrowers or what they funded into it.

20  Q.    Okay.  So if we follow the money, it wasn't the debtors'

21  money, was it?  It was the borrowers' money.

22            MR. MEROLA:  Objection.  It calls for a legal

23  conclusion.

24            THE COURT:  Sustained.  And this really goes beyond

25  where we need to be today.  I mean, that's going to be --

1          MR. LEPOME:  All right.

2          THE COURT:  -- an issue.  I'm sure it's going to be

3    facing us at some point.

4          MR. LEPOME:  Thank you, your Honor.

5    BY MR. LEPOME:

6    Q.   There have been a couple of documents filed in the case.  I

7    want to see if you were familiar with them.  One of them was

8    Document No. 116, an affidavit of Mark Gross (phonetic), and

9    it's very, very, very short, and I'll read  it.

10         "I'm the president of USA Loan Services.  USA Loan

11   Services has no connection, whatsoever, with the debtor.

12         US Loan Services has the ability to service the existing

13   107 loans of USA Capital and its subsidiary company and can

14   assimilate them into our 4500-loan portfolio without difficulty,

15   although, we may wish to interview one individual in the

16   collection department of USA Capital for a potential position

17   with our firm.

18         I cannot imagine how anyone can justify more than five

19   employees at USA Capital, much less 32 employees."

20         How do you respond to that?

21   Q.   I -- I'm not familiar with the individual, and I'm not

22   sure how he could come to the conclusion without understanding

23   our company.

24   Q.   Okay.  This company that I've referred to took over

25   Globals (phonetic) and many other failed institutions just like

1  this, took over their loan portfolio.

2            MR. MEROLA:  Objection.

3            MR. LEPOME:  Why did --

4            MR. MEROLA:  Hearsay.  Assumes facts not in

5  evidence.

6            MS. CARLYON:  And relevance.

7            THE COURT:  Sustained.

8            MR. LEPOME:  I'll represent to the Court that the

9  individual can say that --

10            THE COURT:  Well --

11            MR. LEPOME:  -- and can -- if he were --

12            THE COURT:  -- sustained.

13            MR. LEPOME:  -- here in court today.

14            THE COURT:  You can't do that.

15            MR. LEPOME:  Thank you, your Honor.

16  BY MR. LEPOME:

17  Q.   I'll ask a different question.  Why does it take 32 people

18  to -- of the old and of the present employees, why does it take

19  32 people to continue on salary?

20  A.   The -- each of the 32 people are working in -- between a --

21  in employee accounting.  Our computer service department are --

22  are critical to the operation of the company.

23       I went through and I've already terminated the brokers.

24  I've terminated certain people in IT.  I've been -- I cut back

25  on the employees since I've been there.

1          I'll continue to look at -- look at the employee level and

2    the head count, but the current head count is -- is working in

3    providing valuable service to the debtor at the moment.

4    Q.    Your preliminary budget that you provided was that over 13

5    weeks it would require, approximately, 4.3 million dollars.  Is

6    that still your estimate?

7    A.    Yes.

8    Q.    Have you been able to reduce that in view of the progress

9    you've made that in some aspects would require six weeks, but

10   you've been able to do it in three weeks?

11   A.    It's -- it's my estimate as to where I believe the -- the

12   estate's going to be today.  We're continuing to work hard, and

13   this is an estimate.

14         We're two-and-a-half weeks into the case.  We've been

15   working at a -- at a fever pitch to -- to accomplish a variety

16   of different fronts which includes loan collection, sorting out

17   where each of the loans are, categorizing properly.

18         So we are -- we are fully deploying our people to -- and

19   focusing them on loan collection, to put the systems in place so

20   we have an infrastructure and have a debtor that we can

21   reorganize.

22   Q.    The last thing my clients wanted to know, on these

23   appraisals, have you sought to get a competitive price from

24   each appraiser?

25   A.    Yes.

1          MR. LEPOME:  We have no more -- no further questions.

2          THE COURT:  Okay.  Thank you.  Anyone else?

3                    CROSS-EXAMINATION

4    BY MR. GORDON:

5    Q.   Mr. Allison, I appreciate the effort that was done in the

6    last couple weeks with regard to the budget.  It is

7    substantially different than what was previously presented and

8    much more defined.

9          I just want to make -- understand very clearly with regard

10   to the budget that you are basically estimating for the 13 weeks

11   that based on your projected income versus the projected

12   expenses for the administrative period, that you're going to

13   show a net of, approximately, $123,000.  That's what you're

14   projecting.

15   A.   That's correct.

16   Q.   So you're showing that the operations during this period of

17   time from an administrative standpoint will be positive and not

18   negative.

19   A.   That's correct.

20   Q.   Okay.  And with regard to the estimated-service fees, am I

21   correct that when you testified, you stated those were from

22   performing loans only that you anticipated that would be

23   received?

24   A.   That's correct.

25   Q.   Okay.  Do you have that document in front of you?

1    A.    Yes.

2    Q.    If you'll go to the second page of that exhibit.

3              THE COURT:  Which exhibit?  Which number?

4              MR. GORDON:  I'm sorry.  This would be the

5    budget.

6              THE COURT:  The budget.

7              MR. GORDON:  The 13-week.

8              THE COURT:  Okay.  Thank you.

9    BY MR. GORDON:

10   Q.    You show on the second page certain items.  I ask you to

11   look at collections and disbursements for trust and funds, and

12   you show estimated interest collections for USA CRA.  Can you

13   tell me what that is, just for the record.

14   A.    That's USA Commercial Realty.

15   Q.    And that's estimated -- what do you mean estimated

16   interest collections?

17   A.    Those are estimated collections.  Potentially, they could

18   come in from -- for that particular -- where they're in -- where

19   CRA has an investment.

20   Q.    Okay.  And then the next one you have is USA CMC.  That

21   would be the same?

22   A.    That's correct.

23   Q.    And then you show estimated collections for DTEF, and

24   that's the Diversified Fund.

25   A.    That's correct.

1    Q.    And you're showing total collections of interest

2    collections during the 13-week period of 2,417,000.

3    A.    That's correct.

4    Q.    And the next item you show is First Trust Fund, and you

5    show 1,157,000.

6    A.    That's correct.

7    Q.    Okay.  And the final item there is others, and what would

8    be for -- what do you mean by others?  Can you define that for

9    us.

10    A.    They -- those are the investors.

11    Q.    Those are the direct lenders.

12    A.    Right.

13    Q.    Okay.  And that's 16,424,000.

14    A.    Correct.

15    Q.    Okay.  And going down the page, you show cash balance --

16    or, cash positions trust account, and the trust account is what

17    you're referring to as that account where the payments are going

18    to go from the various borrowers on the loans; is that correct?

19    A.    Yes.

20    Q.    And you show cash balance DTDF.  That would be the

21    Diversified Trust?

22    A.    Correct.

23    Q.    And over the 13 weeks you show -- well, there's no total

24    balance that I don't show here, but you're showing collections

25    during that period of time; is that correct?

1    A.   The Diversified Trust -- the cash balance Diversified

2    Trust Fund is 829 on Week 1.  There are management fees that are

3    -- that are -- Diversified Trust Fund is paying to Commercial

4    Mortgage for its loan service --

5    Q.   Correct.

6    A.   -- under its loan servicing contract.

7    Q.   And so what does Week 2 show, the 723?  How does that

8    relate to the 829?

9    A.   That -- that's a reduction.  That shows the loan service

10   fee that would be paid.

11   Q.   So at the end of the period 07/30/2006, there would be

12   512,000 in that account.

13   A.   That's correct.

14   Q.   Okay.  And --

15   A.   That's assuming that -- that all the loans stay static.  We

16   don't recover any additional loans.

17   Q.   Correct.  I understand that.  And the cash balance

18   collections trust, at the end of the 07/30 you're showing

19   $99,568,900; is that correct?

20   A.   That's correct.

21   Q.   And what does that represent?

22   A.   That's cash -- that's -- that's the collection of both

23   principal and interest that we've collected in the account.

24   Q.   Okay.  And the next item, cash balance Investors Trust,

25   1,877,000 at the end, what does that represent?

1   A.   That's -- that -- as you can see, that line stays static

2   throughout and --

3   Q.   Right.

4   A.   -- that's the -- that's the -- that's the balance in

5   Investors Trust.

6   Q.   Okay.  Are you showing on this budget any distributions of

7   collections on any of these loans to any of the direct lenders

8   or the funds as direct lenders?

9   A.   No, not on this budget.

10  Q.   Okay.

11  A.   This is -- this budget was meant to be a placeholder and

12  not to show distributions.  Those will be subject to the Court

13  approval.

14  Q.   Do you anticipate during this period of time seeking Court

15  approval to make distributions?

16  A.   Potentially, yes.  I would -- as soon as we can get things

17  sorted out, and when we get the statement of schedules put --

18  put together on June 15th, hopefully, we can get -- get --

19  resume interest payments once we have an agreement of the

20  interrelationship of -- of various -- various investors.

21  Q.   And that would include principal payments also to --

22  A.   Yeah.

23  Q.   -- the extent that their performing loan's being paid off.

24  A.   Yes.  Or to the extent that collected on delinquent loans

25  which aren't contemplated in this, and -- and have -- and being

1  able to collect them and pay them off.

2  Q.   I understand.  And I believe two weeks ago the Court

3  basically stated if you intend to keep the funds, bring the

4  motion on.  Do you remember that admonition from the Court?

5  A.   Yes.

6  Q.   And you understand that admonition?

7  A.   Yes, I do.  And, again, the intent of this budget is -- is

8  to show that we can -- that, you know, what our operation is

9  going to be in terms of collecting -- collecting the investors'

10  money, both principal and interest, as well as the fact that we

11  can survive on our own service fees.

12  Q.   Okay.  You testified earlier and I -- it's illuded to in

13  the pleadings you filed yesterday, last evening, the --

14  concerning the $57,000,000, the approximate sum owed from USA

15  Investment Partners.  Have you been able to determine what the

16  source of those funds were that were lent?

17  A.   No.  It's one of the things that we're tracing.  What I did

18  is, you know, we actually -- the receivable one, we looked at it

19  on the books at March -- to be clear, it's a work in progress.

20       When we saw the receivable as of March 31st, it was

21  $47,000,000.  And as my team has been in working and trying to

22  trace the number, we got -- it's now up to $57,000,000.

23       And I can tell you it's still a work in process, but my

24  intent is to try and find more than enough -- I want to try and

25  collateralize that -- that receivable with more than a

1  one-to-one security interest so that I have some certainty that

2  -- that this debtor is going to be able to capture the moneys

3  that -- that were -- that we'll be able to capture the moneys

4  for Investment Partners.

5  Q.   Are you looking into what the sources, have any idea,

6  because, obviously, the 57,000,000 seems a bit -- a very high

7  number for this type of company to generate and then lend.

8  A.   I -- I -- I thoroughly agree, and we're -- it's under

9  investigation.

10  Q.   Finally, there was statements made by counsel at the last

11  hearing that at the time that -- the commencement of the

12  bankruptcy there was approximately 12,000,000 which would have

13  been in the trust account at that time, moneys available.

14  Can you clarify that or expand on that or --

15  A.   Well, the $12,000,000 that was in the account was a

16  variety of different -- was basically an amalgamation of all the

17  cash that had been collected, and what we've tried to do is

18  refine -- and part of these numbers is to refine where the

19  moneys were at and -- and -- and -- on line and form.

20  Q.   Well --

21  A.   And we'll continue to do that.  And as we continue to

22  collect money, we're actually segregating it by loan.  You

23  know, for example, a loan that paid off last week, we've got

24  both principal and interest segregated.

25  Q.   Was that a performing loan?

1    A.    No.  It was a (indiscernible).

2              MR. GORDON:  Thank you.

3              THE COURT:  Okay.  Anything else?

4         (Colloquy not on the record.)

5                        CROSS-EXAMINATION

6    BY MR. MICHAELSON:

7    Q.    Mr. Allison, I'm Jay Michaelson.  I represent a number of

8    direct lenders.  I'm still confused about the service fees and

9    what use is going to be made of those.

10        To better illustrate that, why don't we set up a

11   hypothetical.  Let's say that there is a loan, $10,000,000,

12   performing, and so that on May 1st -- and interest is

13   12 percent, so that on May 1st, $100,000 came in and went into

14   your DIP account.

15        What is your understanding of the service fees to which USA

16   Commercial Capital is -- or, Commercial Mortgage is entitled to?

17   A.    It -- it -- depending upon your -- depending upon the

18   loan, there's a one-percent per-annum loan-service fee.  For

19   example, a loan may be at -- the -- the borrower may be paying

20   to USA Commercial Mortgage an interest rate of 13 percent.  The

21   note is at 12 percent that the investors have.

22        The difference being -- between the two is the loan-service

23   fee that -- that USA Commercial Mortgage has in administering

24   that loan.  That's a one-percent per-annum fee.

25   Q.    Do all of the loans, as far as you know, have a one-percent

1  annual fee?

2  A.    The -- all of the loans have varying fees to them, and

3  they had subsequently been modified, and we have the right to

4  charge, in many instances, up to three percent.

5  Q.    All right.  Well, let's assume that it's a one-percent

6  annual fee, and this $100,000 comes in on May 1st.  Does your

7  budget contemplate taking that fee in advance?

8  A.    I'm not sure I understand your point.

9  Q.    Well, it's an annual fee.

10  A.    No.  It's a fee that's collected.  It's -- it's part of

11  the -- the one percent would be collected on -- it -- on a

12  monthly basis.

13  Q.    Okay.  So --

14  A.    So, for example, if -- if the loan -- if the fee is --  if

15  the interest rate the borrower is paying is 13 percent per month

16  -- or, 13 percent per annum -- and let's do it in 12s.  It's

17  easier.

18      That means if we do it at 12 percent and 11 percent is

19  remitted to -- 11 percent is remitted to the investors, and the

20  investors have an 11-percent note, there's one percent per

21  annum, and that one percent's paid monthly.  That one -- that

22  one percent divided by 12 is paid monthly.  So we're getting

23  one-twelfth each month of that one percent.

24  Q.    Okay.  So that I could ensure my client who has a direct

25  loan, a fractional interest in this note and deed of trust, that

1  when that $100,000 comes in on May 1st for interest, that, at

2  most, you're going to be taking your one percent monthly fee --

3  A.   Right.

4  Q.   -- annualized.

5  A.   It's --

6  Q.   Is that correct?

7  A.   -- an annualized fee, not one percent per month.  It's one

8  percent per annum.

9  Q.   Okay.

10  A.   So, essentially, one-twelfth would be taken each month, not

11  one percent each month.

12  Q.   That clarifies it.  The other concern -- now, I do

13  represent multiple clients, and as you've pointed out, many of

14  those clients have multiple investments.  Some of them -- I've

15  just reviewed it quickly, some performing, some are

16  nonperforming.

17      In order to properly advise my client, and I'm sure every

18  other counsel in this courtroom has the same problem, the most

19  important thing we need to know, at least initially, is what is

20  the status -- a specific status of a loan.

21      For example, you say there are performing loans that are --

22  there is an interest reserve.  So that's a specific fact and,

23  you know, that we would like to know.  There are loans, as

24  you've indicated, where the principal has been paid off.

25      So it sounds like you've developed a tremendous amount of

1    information with regard to these loans.  Is that a fair

2    statement?

3    A.    That's correct.

4    Q.    Are you in a position to, at least preliminarily, release

5    that information to these direct lenders so that we can better

6    advise our clients about their rights?

7    A.    Well, actually, what we've put on the -- we've put

8    the -- Exhibit A is on the Web site as of today so that

9    each -- so that people would understand whether they're in a

10   performing or nonperforming loan.

11   Q.    That's the first step, of course.

12   A.    Right.  And as we continue to refine down each of the

13   positions, we'll be in communication with the investors under

14   each of those loans.

15        The reason that it -- that it's premature to do that,

16   again, when we started looking at loans that are secured versus

17   unsecured -- or, we found two loans that are unsecured thus far

18   in the portfolio that were supposed to be secured loans.

19        We -- we initially found $12,000,000 of -- of principal

20   that was unremitted where the liens have been fully released.

21   We're now up to $18,000,000.

22        Now, in two-and-a-half weeks, while we've developed a fair

23   body of knowledge, it's still a work in progress.  Excuse me.

24        We're still -- we're still developing a fact base, and

25   what I'm trying to do is not -- as we discussed earlier, is

1    it's -- is we're continuing to learn facts.  It's premature to

2    -- to tell -- tell an investor this is your final position

3    because we're still learning what the true position is.

4    Q.    Well, if a loan is unsecured, it wouldn't be premature to

5    tell those lenders that they don't have any collateral.

6    A.    True.

7    Q.    Okay.  And that's what we're really looking for, is as

8    much information as quickly as we possibly --

9    A.    And in my view and -- and to reemphasize what I've told

10   anybody that I've talked to, and I've talked to several direct

11   investors, as many as I possibly can in the -- in the past two

12   half weeks, and the phones have been overwhelming.

13        We -- our call center's had over 1,000 calls each week

14   from -- to BMC, and people have been innovative enough to get my

15   cell phone number.

16        And, you know, we'll share information as it becomes

17   available, but I just am hesitant to share information that --

18   that's not -- that's partial information.

19   Q.    What is your cell phone number?

20   A.    If you wouldn't mind telling me yours first.

21   Q.    No.  But I think probably just for your benefit, wouldn't

22   it make sense to release as much and specific information as you

23   can as you -- or, as you get it to reduce the burden on your

24   staff?

25   A.    It's -- it's our intention to do so, and I just want to

1    emphasize that we're neutral.  We're on this as transparent as

2    humanly possible as we continue to mail -- to amass and

3    understand facts.

4        We have been -- and -- and what's new is a creditors'

5    committee -- or, an investor committee is informed.  We'll be

6    communicating with them.

7        We're going to continue to use the Web site to post

8    information weekly.  We've tried to put newletters and

9    information on the Web site each week and continue to find ways

10   to channel a communication path to the investors.

11       Again, as we're -- as we go through the strategy of

12   collecting loans and going through the transaction of recouping

13   these investments, recovering the -- the nonperforming loans and

14   getting them performing and getting them paid again, we'll be

15   sharing that information as -- as quickly as humanly possible.

16   Q.   And going back to our little hypothetical in terms of the

17   interest that comes in on a performing loan, it is my

18   understanding that other than the one-percent fee which you're

19   taking out on a monthly basis, the balance of those funds will

20   be held until there's a determination by this Court as to who's

21   entitled to those funds; is that correct?

22   A.   That's correct.

23            MR. MICHAELSON:  Okay.  That's all I have.  Thank

24   you, your Honor.

25            THE COURT:  All right.  Anyone else?

1           MS. CARYLON:  (Indiscernible).

2                        CROSS-EXAMINATION

3    BY MS. CARLYON:

4    Q.   Mr. Allison, I just have a couple of questions with regard

5    to the motion for final approval of the Wells Fargo

6    stipulation.  There have been a couple of documents filed

7    framed as objections, but I think they're more concerns as to

8    the background.

9           Pre-petition, the debtor, USA, had several accounts at

10   Wells Fargo; is that correct?

11   A.   That's correct.

12   Q.   They had separately investor trust accounts, a collection

13   account, and an operating account; is that correct?

14   A.   I believe so.

15   Q.   And post-petition you have transferred these accounts to

16   Bank of America; is that correct?

17   A.   That's correct.

18   Q.   And the setoff authorized on an interim basis by this

19   Court was exercised against the operating account.  Is that

20   consistent with your understanding?

21   A.   I believe that's correct.

22   Q.   And the balance of the funds, including all of the funds in

23   the investor trust account, were transferred at your direction

24   to Bank of America; is that correct?

25   A.   That's correct.

1    Q.    And as a courtesy to the debtor, Wells Fargo has kept the

2    collection account opened for receipts; is that correct?

3    A.    Yes.

4    Q.    And that's because it's essentially a lockbox arrangement

5    into which payments are automatically credited --

6    A.    That's correct.

7    Q.    -- is that correct?  And Wells Fargo has, on an interim

8    basis, arranged to wire those funds to Bank of America as they

9    come in; is that correct?

10    A.    Yes.

11    Q.    And then I assume that as you have the opportunity to do

12    so, you will give payment information for the new Bank of

13    America account to those borrowers; is that correct?

14    A.    That's correct.

15            MS. CARLYON:  Thank you.  I have nothing further.

16            THE COURT:  Okay.

17                        CROSS-EXAMINATION

18    BY MR. MEROLA:

19    Q.    Mr. Allison, because it's going to come up eventually and

20    someone will try to use it against one of us, you and I know

21    each other; is that correct?

22    A.    That's correct, Mr. Merola.

23    Q.    And you're a member of the Turn Around Management

24    Association (phonetic); is that correct?

25    A.    I'm a former chairman of the Turn Around Management

1  Association.

2  Q.   And I have served on the board of directors of the Turn

3  Around Management Association with you when you were chairman

4  and with you as another director.

5  A.   Yes, that's correct.

6  Q.   And we've known each other about 15 years; is that --

7  A.   Yes.

8  Q.   -- correct?

9  A.   That is correct.

10  Q.   And we've worked together, I think, once.

11  A.   It's -- that's also correct.

12  Q.   Okay.

13  A.   That was when I had darker hair, too.

14  Q.   And I was much thinner.  Sitting through the presentation

15  today, I'm left with the conclusion that you seem to think that

16  these debtors are more interrelated than most people think; is

17  that correct?

18  A.   Yes.  There's a -- there's a definite interrelation as we

19  go through -- what -- what's not visible readily for -- that one

20  borrow -- one developer may have multiple loans.  And -- and in

21  -- in doing a workout strategy, when I'm in talking to one

22  individual, I'm not talking about just Loan A.  I'm talking

23  about his entire portfolio loans.  There's that interdependency.

24      There's also the interdependency with respect to the

25  investors.  The investors are in multiple loans, and,

1   unfortunately, what previous management did was create a series

2   of debtor and creditor relationships that exist between USA

3   Commercial Mortgage where we've over -- we've paid interest that

4   we haven't collected to some investors, and we have not remitted

5   proceeds from principal payments to other investors.

6        So we have a very complex series of transactions that

7   exist both on the -- on the loan side as well as on the

8   investor side.

9   Q.   But the real genesis of this interrelationship between

10  these entities is the fact that there is one portfolio of

11  loans; is that correct?

12  A.   That's correct.

13  Q.   And so regardless of whether you're a direct lender or a

14  fund member, you have a fractional interest of some kind -- and

15  let's not put on the legal niceties -- in the same 115 loans.

16  A.   That's correct.

17  Q.   And the primary objective you've articulated on behalf of

18  the debtor in possession is to maximize the value and get

19  control of those 115 loans.

20  A.   Yes.  That's my intention.

21  Q.   And there are going to be conflicts between investors, if

22  nothing else, in terms of priorities about what you try to fix

23  first; is that correct?

24  A.   That's correct as well.

25  Q.   Based on your initial analysis, does it appear that those

1  conflicts are between investors in different guises or is it

2  entity to entity at this point?

3  A.    The way I look at the -- Mr. Merola, if I can look at this

4  very straight forward, there are 114 loans in this portfolio.

5  The ultimate recovery from First Trust Deed Fund, Diversified

6  Trust Deed Fund, and the direct investors comes from the

7  maximization of that portfolio.

8      The conflicts -- the first and foremost thing we have to do

9  is look at the loan portfolio itself and maximize its value.  By

10 maximizing it's value, we're going to maximize the recovery to

11 First Trust Deed Fund, Diversified Trust Deed Fund, and the

12 direct investors.

13 Q.   There are going to be situations where a direct lender

14 wants a result, and the same person is also a fund member that

15 wants a different result.

16 A.    That potentially could happen.

17 Q.   And rather than talking about individual investors and

18 individual loans, you're working on a matrix that will show us

19 the person and its affiliates, about where they're invested all

20 over the board.

21 A.    That's correct.

22 Q.   And something new came out today that I wasn't clear on,

23 and maybe I somehow missed it.  In addition to the two LLCs,

24 both Commercial Mortgage Funding and Capital Realty Advisors

25 have served as direct lenders in some of these loans.

1    A.    That's correct.

2    Q.    And do we know why?

3    A.    They were -- they had moneys, and I'm -- to the best of my

4    knowledge, in talking to Mr. Milanowski, there were -- they were

5    used to fill out a subscription of a various -- of various

6    loans.  We just say Commercial Mortgage may have -- if there was

7    an $8,000,000 loan and there were at 7.7 million dollars, they

8    would fill -- round out the -- the balance of the subscription

9    for a transaction.

10    Q.    And Commercial Mortgage Funding and Commercial Realty

11    Advisors do not have what we've called either direct lenders or

12    fund members invested in them; is that correct?

13    A.    That's correct.

14    Q.    But in the unfortunate event that either direct lenders or

15    fund members were not paid in full, it is possible that they

16    would have creditor claims against, among other entities, those

17    entities; is that correct?

18    A.    Yes.  That's correct.

19    Q.    So, consequently, keeping separate the direct investment of

20    the other debtor entities will eventually emerge to the benefit

21    of all of the creditors.

22    A.    That's correct.

23    Q.    There's intercompany debt between these entities; is that

24    correct?

25    A.    Yes.

1  Q.   And are you making an effort to reconcile that

2  intercompany debt?

3  A.   Yeah.  We're still -- Mr. Merola, we're still sorting that

4  out, but there -- we're tracing the cash at the moment.

5  Q.   You mentioned in one of your testimony, I don't remember if

6  it was your direct or your cross, that you've worked on Com

7  Disco which was a big leasing case.

8  A.   Yes.

9  Q.   And you've also worked in cases where there were broken

10  financings or investor schemes; is that correct?

11  A.   Yes, I have.

12  Q.   Is it common in those situations to look to third-party

13  claims to satisfy creditors?

14  A.   We looked -- in looking to -- in looking to situations,

15  we're looking at third-party claims, for example, Investment

16  Partners in this case, to potentially satisfy claims as -- as a

17  potential source of cash.

18  Q.   Well, so, for example, we might have guarantees from

19  insiders on some of these transactions.

20  A.   That's correct.  And it's -- then it's a third-party

21  source of cash that I would be looking to monetize.

22  Q.   Are you aware as to whether any of the directors and

23  officers has filed a bankruptcy yet?

24  A.   No, not to my knowledge.

25  Q.   Was there director and officer liability and omission

1  insurance?

2  A.    No, there was not.

3  Q.    Was there an auditor for the entities that published

4  financial statements?

5  A.    Yes.

6  Q.    Was there a different auditor for the two LLCs?

7  A.    There was an -- there was a different auditor for the LLC,

8  and there was a different auditor for USA Commercial Mortgage.

9  Q.    Was there an underwriter for the LLC that issued

10  securities?

11        MS. JARVIS:  Your Honor, I would object.  I think

12  we're getting --

13        THE CLERK:  I'm sorry, Counsel, (indiscernible).

14        THE COURT:  Oh, I think we are.

15        UNIDENTIFIED SPEAKER:  (Indiscernible).

16        THE COURT:  Everybody --

17        MR. MEROLA:  Well --

18        THE COURT:  -- needs to get out of here --

19        MR. MEROLA:  -- what I'm trying to get to --

20        THE COURT:  -- at some reasonable hour.

21        MR. MEROLA:  What I'm trying to get to, your Honor --

22  and I'm happy to cut it off.

23  BY MR. MEROLA:

24  Q.    What I'm trying to get to is there's an interrelationship

25  of creditor relationships in these entities, regardless of which

1   entity you specifically gave your money to.

2   A.   That's correct.

3   Q.   And there are common causes of action that direct lenders

4   and fund members will have against some of these third-party

5   defendants.

6           MS. JARVIS:  Your Honor, object.  That asked for a

7   legal conclusion.

8           MR. MEROLA:  Withdrawn.  I apologize.

9           THE COURT:  All right.

10  BY MR. MEROLA:

11  Q.   Let's talk a little about the budget, and I want to make

12  sure, like many of the people who direct advisors to the

13  investors are very concerned about this, and I thought the

14  hypothetical that was asked was very clarifying, so I want to

15  make sure I understand it.

16      The direct investors have a note with a specified

17  interest provision to which they are entitled; is that correct?

18  A.   Yes.

19  Q.   But the borrower pays the debtor an amount of interest in

20  excess of that amount because of fees; is that correct?

21  A.   That's correct.

22  Q.   Is the differential between the interest in the note and

23  the interest paid by the debtor under any document property of

24  the direct investor?

25  A.   No.

1  Q.    So that is money that belongs to the debtor for its use; is

2  that correct?

3  A.    That's correct.

4  Q.    And under the budget you proposed, the only money that the

5  debtor is using is the money generated by those fees.

6  A.    That's correct.

7  Q.    You are not taking any money out of principal on account of

8  fees that were accrued but unpaid; is that correct?

9  A.    That is correct.

10  Q.    You're only taking money out of fees paid and when earned;

11  is that correct?

12  A.    Yes.

13  Q.    And the amount that you collect on account of principal and

14  interest is held in a single segregated account for the benefit

15  of investors.

16  A.    That's correct.

17  Q.    Now, this is where it gets tough because some of those

18  investors are going to be people that have no problems anywhere

19  with a debt (indiscernible) entitled to that money,

20  theoretically.

21  A.    Correct.

22  Q.    Some of those investors are going to be entitled to some of

23  their money, but they might have gotten overpaid elsewhere; is

24  that correct?

25  A.    That's correct.

1   Q.   Some of those poor investors invested their money, and the

2   deed was paid off, so there is no money to come in for them; is

3   that correct?

4   A.   Yes.

5   Q.   And then, finally, the guys with the black hats ride in.

6   Some of the insiders were direct investors, weren't they?

7   A.   Yes.

8   Q.   And some of the insiders were substantial direct

9   investors, weren't they?

10  A.   Well, they were -- some of the insiders were investors,

11  yes.  But in -- and that's -- they also were on Investment

12  Partners where they may have had the equity stake.

13  Q.   So they're both -- in some cases they're both --

14  A.   An investor and an equity holder.

15  Q.   So they're in the LLC, and they're also an investor.

16  A.   Yes.

17  Q.   So some of those funds that are being put in impound for

18  the benefit of either direct lenders or fund members might be

19  earmarked, at least initially, for the benefit of insiders.

20          MS. JARVIS:  Your Honor, I would object to the

21  characterization.  I don't think we've agreed to to earmark, you

22  know --

23          THE COURT RECORDER:  Could counsel speak into

24  one of the microphones, please.

25          MS. JARVIS:  So I think it's mischaracterizing

1    the testimony.

2              THE COURT:  (Indiscernible) microphone.  You could be

3    seated.

4              MR. JARVIS:  I'm sorry.  I think it's

5    mischaracterizing his testimony.  I think he said this

6    is segregated.  We haven't earmarked anything for anyone.

7              MR. MEROLA:  I apologize, your Honor.  I don't mean to

8    misconstrue the testimony.

9    BY MR. MEROLA:

10   Q.   My understanding of the testimony is that the money was

11   segregated, and in the single account there would be an

12   accounting as to which loan each payment came in on account of,

13   and then, after that, you have a schedule that would tell you

14   because it came in this loan it is for the benefit of these

15   direct lenders which may include some of the funds.

16   A.   That's correct.

17   Q.   Okay.  When you prepared your budget, did you make any

18   assumption about administrative costs to this estate other than

19   for the debtor and debtor in possession?

20   A.   I think we carved some money out for creditors committee as

21   well.

22   Q.   And in making that assumption, how many creditors

23   committees did you assume?

24   A.   One.

25   Q.   And what is your view of the cost to the estate if there is

1   more than one creditors committee?

2   A.   The -- the -- as you can see, the estate is pretty tight in

3   cash flow as it currently exists.  For this estate to have

4   multiple committees would overburden the estate and potentially

5   render it insolvent.

6   Q.   One minute, please.

7        (Colloquy not on the record.)

8            MR. MEROLA:  Thank you, your Honor.  No more --

9            THE COURT:  Okay.

10           MR. MEROLA:  -- questions.

11           THE COURT:  Ms. Chubb.

12           MS. CHUBB:  Thank you.

13                          CROSS-EXAMINATION

14   BY MS. CHUBB:

15   Q.   So have you come across in your inspection of the records

16   any moneys that were collected but not loaned out and not

17   returned?

18   A.   I'm sorry.  I don't understand your question.

19   Q.   Have you found moneys, in looking at the records, where

20   people paid moneys in, they weren't loaned out on the loan that

21   they were solicited for, and they weren't returned to the direct

22   lenders?

23   A.   There's a couple of instances where that could happen.  For

24   example, what one of the -- one of the motions we have up is to

25   return the Bundy Canyon money, and that would be an example

1    where the loan was solicited, the funds were put in trust --

2    Q.    Um-h'm.

3    A.    -- held in escrow, and not -- and then were not disbursed

4    yet.  That was part where the Chapter 11 occurred.

5        Bundy Canyon, the two -- the 70-percent holders of

6    Bundy Canyon were Mr. Milanowski and Mr. Hantges.  I decided

7    not to go forward with that loan, and we're seeking to return

8    those moneys to investors.  So that's one example.

9        There are also, at the time of the bankruptcy, individual

10   cases where individuals had either -- went to invest into a

11   certain -- into a transaction or were getting -- or where they

12   -- where they may not have been -- they were -- that the

13   collateral release form, he had -- they hadn't been assigned on

14   the note.

15       So there were some investors that were caught in-between

16   where they either may have been investing or they may have opted

17   out of one of those -- asked to be paid out of one of the loans,

18   and they may have been caught in the bankruptcy.

19   Q.    And what does caught in the bankruptcy mean?  Are they

20   going --

21   A.    The -- their --

22   Q.    -- to get their money back?

23   A.    Their -- they had -- individuals may have had moneys that

24   were -- a check had been cut.

25   Q.    Um-h'm.

1   A.   And the check was to -- was -- and it was -- was caught in

2   the bankruptcy and returned as a pre-petition claim.

3   Q.   So they would just be claimants?  How does that money --

4   A.   Until the Court -- until the Court gives me some guidance

5   on how to treat those individuals, we've identified that class

6   of creditors.

7   Q.   You've identified them --

8   A.   We've identified the individuals, and we've identified the

9   money.  But until we have authority to disburse --

10  Q.   Okay.

11  A.   -- that money has been set aside.

12  Q.   Okay.  Do you know if the debtor is going to ask that that

13  money be disbursed?

14  A.   That'll be subject to a future motion.

15  Q.   Okay.  Are all of the Bundy loans listed in -- are all

16  those moneys being repaid or were there Bundy loans --

17  A.   No.  There's --

18  Q.   -- before?

19  A.   There were previous Bundy notes, and those -- those loans

20  are fully funded, and they're secured.

21  Q.   Okay.  Thank you.  Did you testify that there's $12,000,000

22  in the collection trust fund now?

23  A.   No, that was at the time.  There was $12,000,000 at the

24  time of the filing -- at the time of the filing.

25  Q.   And how much is there now?

1    A.    I don't know at this moment.

2    Q.    There's more --

3    A.    Yes.

4    Q.    -- I assume.  Okay.  And how much in pre-petition fees

5    does the debtor intend to collect out of that account as part of

6    the budget?  I mean, things that were -- you think were owed for

7    fees at the time of the filing?

8    A.    We're still -- we're still evaluating that.  I can't --

9    Q.    You don't have --

10   A.    -- give you a number.

11   Q.    -- any idea?

12   A.    I can't give you a number at this point in time.

13   Q.    And that's not set forth in the budget.  So you've just

14   taken moneys available and moneys that you need to spend, and

15   it's not -- it hasn't been cross-referenced, so we don't know

16   how much of pre-petition fees would be paid out, right?

17   A.    I'm -- I'm not sure where you're going, pre-petition fees.

18   Q.    Well, at the time of the filing what if USA Commercial --

19   what if the debtor had not taken fees that it was owed?  Are you

20   proposing to take those now?

21   A.    The debtor may -- the debtor may not have taken some fees

22   and maybe owed fees by, for example, a late fee by a borrower,

23   and we'll be seeking to enforce fees that -- that we should have

24   enforced from various borrowers who we continue to have a

25   lending relationship.

1    Q.    Were there pre-petition servicing fees that were still in

2    the collection account at the time of filing?  Do you know?

3    A.    Not -- I -- I don't know the answer to that.

4    Q.    Okay.  So you don't know -- actually, how much will be

5    left of that collection account from -- how much are you going

6    to eat into what was there at the time of the filing by the end

7    of your budget?

8    A.    The budget --

9    Q.    So if we started with --

10    A.    The budget is -- is not to eat into it, but to continue to

11    operate on -- on -- on current fundings.

12    Q.    So that'll be just as it was at the time of the filing.

13    You're not going to use any moneys out of there that were there

14    at the time of the filing?

15    A.    We're -- we're not going to use moneys that were principal

16    and interest that were collected on behalf of investors.

17    Q.    Okay.  So you're not taking out any money that would

18    belong to direct lenders to pay fees to the debtor, right?

19    A.    We're segregating those moneys out.  We're segregating

20    direct investors' principal and interest out, and we're not

21    touching those moneys.

22    Q.    Okay.  And with respect to the appraisals, will there be a

23    surcharge against direct lenders on performing loans for those

24    appraisals?

25    A.    The -- the -- the cost of the loan -- the cost of the

1    appraisals will be -- will be charged throughout the estate.

2    Q.   Any idea -- oh, throughout the estate?

3    A.   Yeah.

4    Q.   So direct lenders don't have any idea what they might have

5    to pay out.

6    A.   There's no surcharge.

7    Q.   There will be no surcharge.

8          MS. JARVIS:  Your Honor, I would object.  This motion

9    is not yet on file with the Court, and it will be addressed at

10    that time.

11          THE COURT:  All right.

12          MS. CHUBB:  All right.

13    BY MS. CHUBB:

14    Q.   Can you tell me what liens have been released without

15    paying the direct lenders?  You said there was about

16    18,000,000.  Are those identifiable?

17    A.   At this time I -- I -- we're still working to identify

18    totally amount -- the amount of loans that have been released.

19    Q.   Well, do you know which loans we're talking about?

20    A.   There are -- yes.  There are several loans that are in

21    that category.

22    Q.   Can you just tell me which loans they are?  There's a

23    great concern about this as you can imagine.

24          THE COURT:  Well, but how is that relevant to today's

25    hearing?

```
 1              MS. CHUBB:  I'm just trying to find out where the
 2    client's --
 3              THE COURT:  Can't you --
 4              MS. CHUBB:  -- money is.
 5              THE COURT:  -- inquire later?
 6              MS. CHUBB:  Yes.
 7              THE WITNESS:  I -- I would be happy to answer --
 8    BY MS. CHUBB:
 9    Q.   Okay.
10    A.   -- on -- as soon as I can --
11    Q.   Okay.
12    A.   -- refer.  I don't have the records up here to go
13    through --
14    Q.   Okay.  This is relevant --
15    A.   -- it transaction by transaction.
16    Q.   -- to today's hearing.  How much money can you borrow by
17    monetizing the accounts receivable that are due to the debtor?
18    You talked about borrowing money.  How much can you borrow?
19    A.   Well, I'm not borrowing off -- what we're -- what we're
20    seeking to -- again, that motion is not filed, but we're in
21    discussion with lenders to provide us a working -- a facility of
22    $100,000,000.
23    Q.   100,000,000.  Okay.  And is there some reason why that
24    money can't be used instead of any money that comes in on direct
25    loans for operating the debtor in possession?
```

1    A.    What we're planning to use to operate the debtor in

2    possession is loan administration fees and service fees that the

3    debtor is entitled to under each of the loan contracts.

4    Q.    Okay.  In the hypothetical that was given to you, that was

5    one percent.  Are there other fees that you'll be collecting

6    that the direct lenders wouldn't -- would essentially be using

7    to support the operation of the reorganization?

8    A.    Could you -- if you're talking about am I touching direct

9    -- the -- the fees that USA Commercial Mortgage would be using

10   -- will be collecting that it's entitled to as loan servicing

11   agent are the fees we're using to administer the estate.

12        The interest that is due to the direct investors is being

13   held for the benefit of the direct investors.

14             MS. CHUBB:  Okay.  Thank you very much.

15             THE COURT:  Okay.  Thank you.

16                          CROSS-EXAMINATION

17   BY MR. KINAS:

18   Q.    I guess it's a good afternoon.  Rob Kinas for some of the

19   direct lenders.  I'll be brief, but I have a few questions.

20        You've mentioned on the post-petition principal and

21   interest payments that come in, are you going to put those just

22   in the DIP account or are you intending to establish separate

23   accounts, escrow accounts, for each one of the loans for the

24   principal and interest?

25   A.    At this time I'm planning to keep them in the DIP account,

1  but the account -- you have an accounting -- in counting for

2  each of them separately rather than have the estate incur the

3  costs of opening up separate escrow accounts for each one.

4  Q.   Some of the loans have interest reserves.  If those

5  payments come from the interest reserves, are they going to

6  flow into the DIP account?

7  A.   Yes.  They'll go through the -- the -- the cash management

8  system.

9  Q.   And is it your present intent to charge a servicing fee as

10  to those funds that come in from the reserve account?

11  A.   I'm going to charge a -- we'll be -- we'll be collecting

12  moneys in accordance with each loan, the extent that each of the

13  loans has a -- each of the loans as a loan service -- or, loan

14  administration fee that's intrinsic to each of the loans.  We'll

15  be collecting that fee that's due to the -- due to Commercial

16  USA, Commercial Mortgage.

17      That is not the amount of interest that is due to each of

18  your clients.  There is a difference between the two amounts.

19  Q.   Okay.  Earlier there was some questions and answers

20  regarding the setoff on the Wells Fargo stipulation.  A couple

21  follow-ups on that.

22      The new post-petition accounts that you have established

23  are not subject to that setoff; is that correct?

24  A.   That's correct.  They're at a separate bank.

25  Q.   As --

1   A.    Bank of  America.

2   Q.    As to the pre-petition accounts that are subject to the

3   setoff, are you aware of the source of funds that were in those

4   accounts?

5   A.    They're USA Commercial's funds.  I haven't checked on --

6   they're -- they're under USA Commercial Mortgage.

7   Q.    Would it be correct that the funds that were subject to the

8   setoff were not direct-lender funds?

9   A.    They're USA Commercial Mortgage's funds.

10          MR. KINAS:   That's all I have.   Thank you.

11          THE COURT:   Okay.  Ms. Davis?

12                  CROSS-EXAMINATION

13  BY MS. DAVIS:

14  Q.    Good afternoon.  I'm Laurel Davis.  I represent some of the

15  direct lenders.  I apologize.  I have the same cold problem that

16  the Judge does.  I will be very brief in my questions.  I just

17  have a few follow-up questions.

18      With respect to the insider loan transactions that were

19  briefly hit upon in earlier counsel's examination, you

20  mentioned that you had just negotiated on -- or are in the

21  process of negotiating a $57,000,000 workout of an account

22  receivable.

23      You mentioned that you are working on a security agreement

24  and some collateral for that loan -- or, for that workout

25  arrangement.  Could you identify the collateral.  Is it personal

1  property, real estate, or a combination?

2  A.   It's a -- it's real estate.  It's real property.  We're

3  going to be -- we're appraising that real property at the --

4  we've retained -- the appraisal firm that we've retained, I've

5  asked to -- its first priority is to get a value of the real

6  estate that is being pledged as collateral.

7      It's a variety of different types of real estate, real

8  property, and it goes from raw land that's subject to

9  development to potentially a hotel that is owned by Investment

10 Partners.

11 Q.   And with respect to the follow-up questions on the

12 investors' interests in direct loans and their equity

13 partnership interest in the LLC, is there any overlap between

14 the collateral for this workout and their other interests in the

15 loan portfolio?

16 A.   No.  This is -- this is a -- these are -- what we're

17 securing the Commercial Mortgage receivable with is -- is -- is

18 assignable interests in -- in real property that we can take a

19 first lien position on.

20 Q.   Great.  And then focusing specifically on the insiders,

21 Mr. Hantges and Mr. Milanowski and anyone else you would

22 consider to be an insider, of the 114 loan portfolio, can you

23 identify the number of loans in which they are either a direct

24 investor or otherwise participating in the loans?

25 A.   There are -- the way I would characterize it, and the way I

1  look at it, is that there are 49 loans in the portfolio that

2  Investment Partners has an equity interest in.

3  Q.   And so you would characterize the insider loans as only

4  those loans in which that entity holds an interest?

5  A.   Yes.

6  Q.   So Mr. Hantges doesn't have a direct lender investment in

7  any of his loans?

8  A.   He may, but I haven't looked at if he's a direct-line

9  participant in any of the loans.  I -- I don't know that fact.

10  I haven't -- I haven't had many direct discussions with

11  Mr. Hantges.

12  Q.   And with respect to Mr. Milanowski, would you say the same

13  is true?

14  A.   Yes.

15  Q.   Okay.  So your focus on insider transactions thus far has

16  been with respect to the other entities and the LLC; is that --

17  A.   Yes.

18  Q.   And you've mentioned that you have ongoing work.  Is one of

19  the components of your ongoing work going to include a further

20  examination of the insider connections?

21  A.   Yes.

22  Q.   Okay.  Just a couple more follow-up questions.  I was a

23  little confused about how you're handling the post-petition

24  payments on the direct loans.

25       Are you collecting those and putting them in the DIP

1  account or are they going into the trust account?

2  A.   Well, they go into the trust account first and then into

3  the DIP account, but we're holding those moneys in -- we're

4  holding the moneys that we collect until we have authorization

5  from the Court to disburse.

6  Q.   So from the perspective of segregating the funds on a

7  loan-by-loan basis, are you doing that internally by books and

8  records?

9  A.   Yes.  Through internal accounting systems we can identify

10  what principal and interest we're collecting.

11  Q.   Okay.  And will there at some point in time be a schedule

12  on a loan-by-loan basis with respect to all this relevant

13  information?

14  A.   Yes, ma'am.

15  Q.   One final question.  You identified one loan as recently

16  having been paid off.  Do you recall the name of that loan?

17  A.   Opaque.

18  Q.   I'm sorry?

19  A.   The loan was called Opaque.

20  Q.   Opaque?  O-p-a --

21  A.   Yeah.  Like opaque.

22  Q.   Okay.  And then, finally, you identified two loans that you

23  have discovered appear to be unsecured?

24  A.   Yes.

25  Q.   Do you recall the names of those two loans?

1   A.    I don't have the list in front of me.

2              MR. JARVIS:  Your Honor, I would --

3              MS. DAVIS:  Could counsel provide that information to

4   me?

5              MS. JARVIS:  I would object to the relevance of

6   this --

7              THE COURT:  So why don't we just -- you could provide

8   that later.

9              MS. DAVIS:  Yeah.

10             MS. JARVIS:  Okay.

11             MS. DAVIS:  I'm just following up on some other

12  questions.

13             THE COURT:  All right.

14             MS. DAVIS:  Thank you very much.

15             THE COURT:  Oh, no.  Thank you.  Anyone else?

16  Okay.  Mr. Farrow.

17             MR. FARROW:  Thank you, your Honor.  Some just quick

18  follow-ups with respect to the testimony.  Scott Farrow with the

19  U.S. Department of Justice.  I represent the United States

20  Trustee and a few questions for Mr. Allison.

21                            CROSS-EXAMINATION

22  BY MR. FARROW:

23  Q.    In your chart -- the list, performing/nonperforming loans,

24  is there a date element to it?  So, in other words, do you

25  characterize any loan that hasn't received interest within so

1    many days as nonperforming and, if so, what's the time frame?

2    A.    Well, first of all, I'm looking at the nonperforming loans

3    as where they're delinquent, where they -- a month or more than

4    a month in -- in delinquency.  Performing loans are those that

5    are paying current interest.

6    Q.    So if it's more than 30 days due, it would be considered

7    nonperforming.

8    A.    Correct.

9    Q.    Okay.  Looking at your budget, you project new loan

10    origination fees starting on July -- the week of July 16th of

11    approximately $900,000; is that correct?

12    A.    Yes.

13    Q.    If you don't do new loans and get origination fees, this

14    budget results in negative numbers, does it not?

15    A.    Yes, it does.  That's correct.

16    Q.    About the tune of just under $800,000 (indiscernible).

17    A.    Correct.

18    Q.    You're projecting over the 13 weeks professional fees of

19    2.181 million dollars; is that right?

20    A.    Yes.

21    Q.    Does that include your fee or are you listed under the

22    salaries?

23    A.    No.  I'm -- that includes my fee as well.

24    Q.    Okay.  You earlier testified that you thought there were

25    approximately 3600 direct lenders; is that right?

1    A.    Yes.

2    Q.    Do you have a number for how many fund members you believe

3    there?

4    A.    Approximately 3200.

5    Q.    Now, do you have confidence with respect to the fees you're

6    going to collect to operate, that they are, in fact, due and

7    owing, and let me give you the hypothetical before I ask you to

8    answer that question.

9          You've earlier testified that interest was paid where no

10   interest was collected; is that correct?

11   A.    Yes.

12   Q.    Were fees paid on interest that was not collected although

13   it was paid out?

14   A.    Well, essentially, what the debtor did prior to my coming

15   on board is take all of the -- take whatever moneys they

16   collected and paid it to all of the investors.  It -- it did

17   that until it ran out of cash.

18   Q.    Okay.

19   A.    So, essentially, what I -- what I'm -- what -- what we've

20   built up is a budget that looks perspectively at properly

21   accounting for and properly taking the fees that are entitled --

22   that we're entitled to and were negotiated as part of our

23   contractual right when the transactions were originated.

24   Q.    Well, where my question goes is if, for example, in the

25   hypothetical you talked about taking one-twelfth of one percent

1    on a going-forward basis as the fee.

2         My question is is do you have confidence that the

3    debtor didn't already take the annual fee in prior

4    disbursements?

5    A.    No.  Those fees were collected on a monthly basis.  As

6    interest was collected -- the loans were structured where the

7    fees would be taken on a monthly basis.

8    Q.    So you do have confidence that the debtor hasn't already

9    prepaid itself for annual fees.

10   A.    That's correct.

11              MR. FARROW:  Okay.  Thank you.  No more questions.

12              THE COURT:  Okay.  Thank you.  All right.  Let me

13   just -- so we save time, is there any opposition -- oh.

14   You're excused.  Excuse me.

15              THE WITNESS:  Thank you, your Honor.

16              THE COURT:  I'm so sorry.

17              MS. JARVIS:  Your Honor, if I could just

18   (indiscernible) --

19              THE COURT:  Oh.  Did you want to redirect?

20              MS. JARVIS:  -- clarify just a couple --

21              THE COURT:  Okay.

22              MS. JARVIS:  -- of things.  Okay?

23                        REDIRECT EXAMINATION

24   BY MS. JARVIS:

25   Q.    Mr. Allison, you were asked about past-due servicing or

1  servicing fees that would have been due to Commercial Mortgage

2  prior to the filing of bankruptcy that may not have been

3  collected.  Many of those past-due fees are included in the

4  budget; is that correct?

5  A.  That's correct.

6  Q.  And let me just clarify -- let me mark -- this was

7  actually attached to your -- because we have a lot of questions

8  about it.

9       This was attached to your declaration that we filed that we

10  have marked the loan servicing agreement that you attached just

11  so we can make sure everybody understands what we're talking

12  about with this -- with respect to this servicing fee.

13            THE CLERK:  And this is No. 7.  Is this one copy or is

14  this several copies.

15            MS. JARVIS:  This is one copy.

16  BY MS. JARVIS:

17  Q.  Okay.  This is -- I'm going to show you what we are having

18  marked as Exhibit 7.  Do you recognize this agreement?

19  A.  Yes, I do.

20  Q.  Okay.  And is it your understanding that this agreement was

21  signed by each of the investors that invested with Commercial

22  Mortgage either directly or through the funds?

23  A.  Yes.

24  Q.  Okay.  Let me show you what is --

25            THE COURT:  Well, let me clarify.  If an investor

1    invested money -- if a member invested money with the fund, he

2    wouldn't have a loan-servicing agreement with Commercial

3    Mortgage.  The fund would, but not the individual, correct?

4              THE WITNESS:  The individuals would have signed this

5    as well, your Honor.

6              THE COURT:  Even though they were just a member of the

7    fund?

8              THE WITNESS:  Yes, your Honor.

9    BY MS. JARVIS:

10   Q.   Let me show you what is on Page 4, and if you could look at

11   Paragraph 5.  Do you see that?

12   A.   Yeah.

13   Q.   Is this what you were talking about with respect to the

14   loan-servicing fee?

15   A.   Yes, Ms. Jarvis.

16   Q.   And in this case, it indicates it's three percent; is that

17   correct?

18   A.   That's correct.

19   Q.   And in some cases it's one percent?

20   A.   Yes.

21   Q.   But it's always at least one percent.

22   A.   It's always -- it's at least one percent, and we built a

23   budget up on one percent where we have the right to charge three

24   percent.

25   Q.   And so this is the fee that we're talking about when we

1    talk about the servicing fee; is that correct?

2    A.    Yes.

3    Q.    Yeah.   Let me also -- you indicated that you are

4    collecting these fees as it comes in for the performing loans.

5    With respect to the nonperforming loans, is Commercial Mortgage

6    then accruing the amounts that would be owed under the servicing

7    fee?

8    A.    Yes, we are.

9    Q.    So if those amounts then are collected, if your collection

10   efforts are successful, then those amounts would be available to

11   be collected at the time those nonperforming loans become

12   performing loans.

13   A.    That's correct.

14   Q.    Let me ask you just as a final question you've been asked a

15   lot of questions today about, you know, that you infer certain

16   parties having claims to other -- to certain funds.

17        You are not, in any way, testifying that any specific

18   party, direct loans, funds, have any specific claims to the

19   funds because you're not from a legal point of view, are you?

20   A.    No.   I'm -- I don't have a legal -- I'm not a lawyer.

21   Q.    And you were simply trying to explain how things, you

22   know, worked from a business point of view.

23   A.    That's correct.

24        MS. JARVIS:  Okay.   Thank you.   That's all I have,

25   your Honor.

1          THE COURT:  Okay.  Thank you.  You may step down.

2          THE WITNESS:  Thank you, your Honor.

3      (Thereupon, the portion requested to be transcribed

4      concluded at 01:25:03 p.m.)

5      (Thereupon, portion requested be transcribed

6      commenced at 02:44:19 p.m.)

7          THE CLERK:  Bankruptcy court is now in session.

8          THE COURT:  Be seated.  Okay.  You'll be happy to

9  know the projector's now working, so --

10          UNIDENTIFIED SPEAKER:  Yeah.

11          MR. SCHWARTZER:  I want to know -- there's still

12  something it won't do, your Honor.  We can't get it to rotate

13  the right way, so if you had a document -- or just

14  (indiscernible) --

15          MS. CHUBB:  Actually, she should use --

16  use this one.  Use this one (indiscernible) --

17          MR. SCHWARTZER:  Turn that one?

18          MS. CHUBB:  It will show what the problem is.

19          MR. SCHWARTZER:  Now I did something.

20          MS. CHUBB:  You broke it.

21          MR. SCHWARTZER:  I broke it.  That's how quickly

22  (indiscernible).

23          MS. CHUBB:  Okay.  Use this one because this is the

24  problem when they have them like this.

25      (Colloquy not on the record.)

120

1    MR. SCHWARTZER:  If you have a document that's

2  lengthwise, you can't rotate it so it's lengthwise on the

3  display.

4    THE COURT:  I heard that's a problem.  I don't know --

5  and, you know --

6    MR. SCHWARTZER:  So --

7    THE COURT:  -- and the systems they were supposed

8  to --

9    MR. SCHWARTZER:  And we have -- in our first exhibit,

10  if you recall, Exhibit No. 1, was that type of document, so they

11  still have work to do, your Honor.

12    THE COURT:  I know.  Apparently, when they upped the

13  systems, we were told it was going to work great, and, hey, it's

14  the government.  What can I say?

15    MR. SCHWARTZER:  Well, it worked a little bit.

16    THE COURT:  Okay.  On the administrative

17  consolidation --

18    MS. CHUBB:  Joint administration?

19    THE COURT:  Sorry.  Joint administration.  I'm so

20  sorry.

21    MS. CHUBB:  How badly do you want to consolidate?

22    THE COURT:  No.

23    MS. CHUBB:  No.

24    THE COURT:  That would cause a big fight.

25    MS. CHUBB:  Yeah, it would.

121

```
1            THE COURT:  What's the --

2            MR. SCHWARTZER:  Your Honor.

3            THE COURT:  -- kind of pros and cons both ways --

4            MR. SCHWARTZER:  Okay.

5            THE COURT:  -- on this one?

6            MR. SCHWARTZER:  I think joint administration, the

7    best thing about it is that it limits the number of papers that

8    have to be filed.  And that if you have joint administration,

9    we'll just order one case to be the lead case, and everything

10   will be filed under one docket.

11       But I understand, from the Court's experience with that

12   issue, that it becomes difficult when you have issues that only

13   affect the side issues.

14       And what we would suggest as part of the joint

15   administrative order and case management order that we do the

16   same -- a provision that we've used before which is we have four

17   or five entities on the docket and then we have six boxes.

18       One box will be affects all debtors, and then we have

19   boxes for each of the debtors.  So if it only affects one of the

20   debtors, the attorney filing it should check off only the debtor

21   it's filed in.

22            THE COURT:  But how does that get translated to the

23   docket sheet?

24            MR. SCHWARTZER:  Okay.  What I would then suggest is

25   as part of the case administration order is it always is going
```

to be filed in the lead case.  But if you check off that it

affects one of the -- one but not all of the other debtors, it

also will be filed in that docket.

So if you're saying I have something that only affects USA

Capital Securities, I would file it in the lead case, and I

would file it in the USA Securities case.  That way someone who

is only interested in USA Securities might only look there.

What we want to do is avoid -- and this is actually -- a

part of it is the expense problem on our side as counsel.  Even

though it's just a press of a button, we know, from my

experience from the other night, filing the motion with regard

to the attorney -- the pay -- the $10,000 in pay, my staff

people have to spend about five minutes downloading it in each

case.

So when you do five cases, what's a five-minute job

becomes a half-an-hour job.  Somebody has to pay for that

paralegal to sit there to do that.

It's an expense, and it doesn't benefit anybody because it

would be in the lead case.  And in this case, USA Commercial

Mortgage is the only borrower who's been paying payroll.

We think that would be the best solution as far as that going.

In addition --

THE COURT:  Is there also a space -- and I should

know this -- but since I don't upload documents, isn't there

also ability for you to put in the docket entry which debtor it

1    affects as well?  I mean, you could add text to the pull down,

2    can you not?

3              MR. SCHWARTZER:  Yes, you can.  You can.  In the

4    title of the document you can say which party it's on behalf of.

5        I'm trying to think.  The problem with that is -- and this

6    is -- maybe someone else -- you know, I really should have my

7    paralegal here, Angela (phonetic), because 95 percent of what's

8    downloaded is done by a paralegal, not by an attorney.

9        I think you could pick the name of the debtors, but

10   there's no way of picking all debtors.  Now, maybe I could

11   speak to Marianne about whether we could have something that

12   allows you to say on behalf of all debtors you file this.

13             Clearly, in the title of the motion we could write

14   debtors in the plural --

15             THE COURT:  Right.

16             MR. SCHWARTZER:  -- motion and in that way be

17   helpful.

18       I think you're always going to have the problem that, one,

19   you're going to have fairly sophisticated counsel who have

20   bothered to read the joint administration order and case

21   management order and do it correctly, and there will be less

22   sophisticated counsel and pro pers who don't read that order and

23   will not do it correctly, and I don't have a solution for that

24   latter problem, your Honor.

25             THE COURT:  Well, why don't we do -- and let's kind of

1    get to the nitty gritty.  If we jointly administer, what do we

2    do about -- well, let me ask.

3        What's the U.S. Trustee's intent vis-a-vis committees or

4    committee?

5        (Colloquy not on the record.)

6            MR. FARROW:  Your Honor, if my ears looked chewed on,

7    it's because they have been.  I've heard from probably everybody

8    in the room at least once.

9        At this point the intent of the United States Trustee is to

10   appoint at least one, and probably three, committees, as much as

11   people are going to groan about that, due to the potential

12   conflicts and the differences of opinion.  Those would be the

13   committees in the three main -- or, a committee in each of the

14   three main cases.

15       We'll have final determination of that by May 8, and we'll

16   have our committee appointments down by the 10th.  The reason is

17   was because we gave people time to respond, and we have received

18   numerous responses.

19       We did solicit everybody on the 20 largest, and we've

20   gotten a plethora of telephone calls since then, and anybody

21   who's asked, we've sent a solicitation package out to.  So we

22   will have at least one, probably three committees.

23           THE COURT:  So if we have joint administration, how

24   does that affect -- how we do the commercials on the -- as

25   opposed to putting it in each individual case?  I mean, if there

1   are committee for separate -- you mean a committee for separate

2   debtor or separate --

3            MR. FARROW:  No, there would be --

4            THE COURT:  -- interests in the broader sense?

5            MR. FARROW:  No.  The committees are for separate

6   debtors.

7            THE COURT:  For separate debtors.

8            MR. FARROW:  So I don't think it matters whether you

9   jointly administer the case because I don't think the duties of

10  -- for example, that if you have joint administration, it

11  doesn't mean the professionals get to just prepare one fee

12  application that says here's all my time, and I'm only putting a

13  file into one case, and I'm not going to tell you what time I

14  spent on each individual cases.

15       I think they are required to still provide an allocation

16  and demonstrate benefit for the services rendered to each of the

17  debtors if they are representing multiple debtors because it's

18  not substantive consolidation, and I think the same would be

19  true with respect to the committee and their professionals as

20  well.

21           THE COURT:  Because the biggest problem I see is I'm

22  going to have hundreds and hundreds and hundreds, probably, of

23  motions to attempt to cut off the servicing agreement, and

24  that's only going to affect Commercial Mortgage.

25           MR. FARROW:  One of the possibilities is that -- and I

1    discussed this with debtors' counsel -- is that they are willing

2    to, and will because they're going to have to, look at the

3    docket as motions are filed.

4        If they believe it is in the wrong case or it affects a

5    different case than what is said or they filed it in every case

6    and it only affects one case, that they'd be willing to prepare

7    and send out a notice to that party saying you filed in this

8    case, we believe it only applies to this case, and if you don't

9    respond in 30 days, that's how it's going to be treated, and use

10   that as an opportunity with this case management order that

11   we're talking about today to say that's what happens, so that at

12   the end of the day we can get the dockets correct so we get the

13   right motions in the right dockets.

14           THE COURT:  Well, as it works under joint

15   administration now, the orders always provide that there's just

16   one docket sheet kept.

17       And I appreciate Mr. Schwartzer's suggestion to, in

18   essence, keep, okay, if it really is only one debtor, keep a

19   separate docket sheet, but doesn't that kind of belie the

20   whole --

21           MR. FARROW:  Your -- it's going to be -- people are

22   going to get it wrong no matter what you do.  I do like the

23   joint administration idea.  It seems to me with the boxes, I

24   like that idea.

25       And with respect to the check boxes, if the debtor believes

1    that it's checked inappropriately, you know, because I suspect

2    we'll see a lot of -- it's all the cases, even though it has no

3    relevance to the other four cases, the debtor could then use

4    this methodology to say no, it only relates to one case, and

5    we're going to treat it as it relates to one case for purposes

6    of addressing those motions.

7            THE COURT:  Okay.  Any other comments on joint

8    administration as opposed to -- and let me tell you what my

9    idea is.

10       If we didn't do joint administration, we could certainly

11   make life easy by just saying one no -- if the pleading lists

12   all five cases, you just send out one notice that says this

13   relates to all five cases, we're sending you one copy.  You only

14   need to send one copy, so we could ameliorate those concerns.

15           MS. CARLYON:  Your Honor, I echo Mr. Schwartzer's

16   comments that it makes sense to have joint administration.  I

17   echo his comments that there's an increased expense of

18   attempting both to file things in each case and to search for

19   things and print them up in each case.

20       We've already had the problem of debtors counsel using a

21   joint caption but then filing it in all five cases because,

22   then, as you print out the documents, you can't tell which file

23   it belongs in, and we're going to have the same problem that we

24   had in ABT of people filing things that look the same and aren't

25   quite the same.

1         So having everything filed in one place makes a lot of

2    sense to me.  Having a requirement that you put in the title of

3    the document, paren, affects all debtors, or, paren, affects the

4    following debtors, and list them would make a ton of sense

5    because then from the electronic docket, if you wanted to, you

6    could sort --

7              THE COURT:  Do a search?

8              MS. CARLYON:  -- those items.  In the long run, if

9    there's any way that the clerk's office could set up a program

10   to track that and print it separately, that would be great.  I

11   don't know if they can or not.  Perhaps BMC could, and that

12   would be great.

13        But in the short run, to me, it makes so much sense to

14   have one docket, but just put in and just type it in,

15   parenthetically, which case or cases it applies to.

16             THE COURT:  You know, I neglected to have Marianne

17   here and I meant to.  Does anybody know if that's physically --

18   can you physically do -- one can physically do that, right?

19             THE CLERK:  Yes.  Yes.

20             THE COURT:  You can add that in?  Okay.

21             MS. CARLYON:  Yes.

22             MR. FARROW:  Yeah.  You can add text --

23             MS. CARLYON:  Yes.

24             MR. FARROW:  -- to any motion.

25             THE CLERK:  Yes.

1          MS. CARLYON:  Right.  There's a blank that

2   you can add a narrative description at the end of the drop-down

3   menu --

4          THE COURT:  Okay.

5          MS. CARLYON:  -- for anything.  I, unfortunately,

6   have had the personal pleasure of doing that on more than one

7   occasion.

8          THE COURT:  I know everybody's been doing their own

9   training and has their own password, but --

10          MR. GORDON:  Your Honor, we would agree with that.

11   We're dealing in our office with our staff now having to

12   download five times, but slash up her files and yelling at us

13   about it.

14          And in what Mr. Lepome did, and I -- it was he listed on

15   his caption each of the individuals and below that affects all

16   debtors or filled in the circle.  If we're all being served with

17   it, and we note it relates to one debtor versus another, then we

18   can deal with that.  Obviously -- and et cetera.

19          I would point out, though, that there are inherent

20   conflicts between these debtors, and as the rule provides and it

21   says for joint administration, it says an order directing joint

22   administration -- I'm sorry.

23          It says prior to entering an order, the Court shall give

24   consideration to protecting creditors at different estates

25   against potential conflicts of interest.

1          And I think as long as we do it in this manner, and we

2     understand that there may be conflicts, and that may arise with

3     regard to retention agreements later on or who's retained as

4     U.S. Trustee, Mr. Farrow said we may have to give time based on

5     -- or (indiscernible) time based on who you do for which debtor,

6     and, ultimately, that will come out as we go.

7          But right now, from a paper standpoint, if we can have one

8     joint case with the understanding that if it affects a specific

9     debtor, that we're given that direction so we can deal with

10    that, or if we want to file something which affects a specific

11    debtor or two debtors, let's do it.

12              THE COURT:  Okay.

13              MR. GORDON:  I'm agreeable with that.

14              THE COURT:  Okay.  Any other comments?  All right.

15    I'll go ahead and order joint administration.  As part of that

16    order, then we'll also have a special procedures order.

17         So the caption must be -- and Mr. Schwartzer had suggested

18    this procedure.  I think he knows at the first hearing where he

19    did all the caption and affects.

20              MR. SCHWARTZER:  Right.

21              THE COURT:  I'm the one that says I don't want you to

22    do it just yet because I'm a little concerned about joint

23    administration.  I think that's fine, but I think also in the

24    drop-down menu everybody must put whether it affects all debtors

25    or a particular debtor.

1          I don't think it's wise to also docket it in the case it

2    also affects because then we may or may not have a complete

3    docket in another case, and I think that it sounds --

4          MR. SCHWARTZER:  More confusing.

5          THE COURT:  -- like a good idea, but I'm afraid it

6    might lead to confusion in the long run.

7          I don't know if we have the ability to search on

8    particular debtors, but, you know -- and everybody's going to be

9    very careful about linking documents.  Linking is going to be

10   very, very important in this case when you link oppositions, et

11   cetera.

12         We, you know -- we do -- our clerk staff does a QC, but

13   it's going to be impossible for them to really QC this kind of

14   thing.

15         To the extent that, without too much cost, BMC could work

16   with the clerk's office on this so we have a clean docket, that

17   would be a great idea.  I'm not going to order that, I'm just

18   going to suggest that.

19         All right.  So I'll allow joint administration.  Now, let's

20   shift ahead a little bit to our special procedures order.

21         MR. FARROW:  Your Honor, before we --

22         THE COURT:  Yeah.  I'm sorry.

23         MR. FARROW:  -- finish that, just to be clear, you're

24   ordering the joint administration, but you're not today

25   addressing the potential conflict issues.

1          THE COURT:  No.  I am --

2          MR. FARROW:  Those are reserved.

3          THE COURT:  That's exactly right.

4          MR. FARROW:  Okay.

5          THE COURT:  Exactly right.  I fully understand there

6    may be potential conflicts at which time they'll have to be

7    addressed and either appropriate actions taken.

8          Okay.  On procedures and no particular order.  All

9    right.  First let's talk about -- we just talked about how

10   matters are captioned.  We've dealt with that.  They're going to

11   be captioned at the click of the -- and they'll be a USA

12   Commercial Mortgage.  Will that be the lead case?  Everybody

13   agrees?

14       I don't know if that's the lowest number.  Was that the

15   lowest number?

16         MR. SCHWARTZER:  No.

17         THE CLERK:  It is.

18         THE COURT:  It is.  Okay.

19         MS. CARLYON:  It's the first one filed.

20         MR. SCHWARTZER:  No.

21         UNIDENTIFIED SPEAKER:  (Indiscernible).

22         THE COURT:  So it's not on the lowest number, but I

23   think it's the most appropriate to put it in.  And all

24   pleadings after this shall be filed in this case.

25       What do we do about pleadings that were filed before this

1    date?  Well, it'll be filed in all the cases, so we could still

2    rely on US Commercial, can't we, because it would have been

3    filed in all cases.

4        If there's anything that applies to just one debtor, I

5    need -- could you -- someone to ferret it out and see whether or

6    not there is something that applies to just that one debtor?  I

7    guess it will just be on calendar as it is, correct?  It applies

8    to one debtor?

9            MR. SCHWARTZER:  Your Honor, what we'll have is an

10   order -- the joint administration will say from the date the

11   order's entered --

12           THE COURT:  Right.

13           MR. SCHWARTZER:  -- all things have to be filed in USA

14   Commercial --

15           THE COURT:  Right.

16           MR. SCHWARTZER:  -- Mortgage case, so it'll just be

17   from the date the order is entered.

18           THE COURT:  Right.  And then all captions must include

19   which debtors are affected, either all debtors or a particular

20   debtor or debtors.

21       Okay.  Now, let's go skip -- anything else on captioning,

22   filing?  I don't think so.  All right.  Let's go --

23           MS. CARLYON:  So, your Honor --

24           THE COURT:  Um-h'm.

25           MS. CARLYON:  -- instead of saying the captions must

1    include the narrative description of the filing --

2            THE COUR RECORDER:  I'm sorry, Counsel.  Could

3    you come to one of the microphones.  Thank you.

4            MS. CARLYON:  I'm sorry.  Just to make it clear,

5    instead of saying the captions must include, we want to say the

6    narrative description of the filing because captions don't make

7    it --

8            THE COURT:  Right.

9            MS. CARLYON:  -- on the ECF.

10           THE COURT:  Exactly.  So captions -- it must also be

11   on the caption checked so if people can look at it and see it

12   when they see it, and then as well the narrative description.

13       Okay.  Next thing, the calendaring.  Let's talk about

14   dates first, and then we'll talk about how things proceed.

15   We now have set May 18.  The next is June 2nd.  The next date

16   after that was --

17           THE CLERK:  June the 21st.

18           THE COURT:  -- June the 21st.  Okay.  I'm not going to

19   be available from June 25th to July 24th.  I planned a vacation

20   long -- in the days I thought I'd have another judge and before

21   USA Capital.

22       So maybe -- and, of course, another judge could hear it,

23   but I would think you'd rather not have somebody else hear

24   things in this case.

25           MR. SCHWARTZER:  Well, where are you going on

1    vacation, your Honor?  Maybe we can have the hearing there.

2            THE COURT:  I'm going to Africa.

3            MR. SCHWARTZER:  Works for me.

4            UNIDENTIFIED SPEAKER:  We'll be there.

5            THE COURT:  So I'm going to follow the trail of

6    Dr. Livingston and Mr. Stanley.

7        Okay.  So with that in mind, maybe we should move the 21st

8    hearing to the 22nd.  That gives us one more day in there?  Have

9    you already set things?

10            MR. SCHWARTZER:  Your Honor, I'll be in --

11            THE COURT:  Oh, you're --

12            MR. SCHWARTZER:  -- at a wedding on the 22nd.

13            THE COURT:  Okay.  All right.  We'll leave it the

14    21st then.  And then we have one set --

15            THE CLERK:  And, Judge, at the top of the motion

16    calendar (indiscernible) --

17            THE COURT:  That should not have been done that way.

18            THE CLERK:  Pardon me?

19            THE COURT:  That shouldn't be done that way.

20            THE CLERK:  No. That's our motion day.

21            THE COURT:  Well, maybe we can get Judge Markell to

22    hear it or --

23            THE CLERK:  How much time?  Do we need the whole --

24            THE COURT:  Oh, we'll need the whole morning.

25            THE CLERK:  Because I have something --

136

```
1                THE COURT:  I would even say --

2                THE CLERK:  I also have you doing Chapter 7s at

3      11:00.

4                THE COURT:  Well, we haven't set the motion calendar

5      yet, have we?  Why can't we just move it?

6                THE CLERK:  No.  I'm just saying that that's what's

7      there.

8                THE COURT:  So move the motion calendar.  Move the --

9                THE CLERK:  So move it to the 22nd?

10               THE COURT:  Yeah.

11               THE CLERK:  Will you be here on the 22nd?

12               THE COURT:  Yeah.

13               THE CLERK:  Okay.

14               THE COURT:  Move the Chapter 11 calendar.

15               MS. CHUBB:  So it's at 2:30.  That's what you set

16      before, your Honor?

17               THE COURT:  It was at 2:30?  I think we should leave

18      the whole day for it.

19               THE CLERK:  No.  Everything was at 9:30.

20         (Colloquy not on the record.)

21               THE COURT:  I think it was 2:30, but that's all right.

22               THE CLERK:  It was 2:30.

23               THE COURT:  Let's make it the whole day.  Move

24      everything else to the Thursday.

25               THE CLERK:  The only thing is we have scheduling
```

137

1    conferences at (indiscernible).

2            THE COURT:  They won't take long.

3            THE CLERK:  Okay.

4            THE COURT:  Or we'll get somebody else to hear them.

5    And then we have July 27th.  We could move that to the 25th

6    because I'll be back in time, and I could prepare for that that

7    weekend.

8        So do you want to move the 27th to the 25th?  Does that

9    work for everybody?

10            MS. JARVIS:  Yeah.  Your Honor, that actually would

11    work better for us because Mr. Allison is not available on the

12    27th, so --

13            THE COURT:  Okay.  And so we'll move it to the 25th.

14            THE CLERK:  And do you want all day, Judge?

15            THE COURT:  All day.  Well, you could set some things

16    in the afternoon.

17            THE CLERK:  Okay.

18            MS. CHUBB:  9:30 again?

19            THE COURT:  Yes.  Is it better -- let me ask this.  Is

20    it better, since we have out-of-state people, if we make it

21    later?  No.  We'll never get done.  9:30 is better.

22        All right.  Now, next is the way I see these days are that

23    these are the omnibus hearing days.  If someone files a motion,

24    they can use one of these omnibus days.  If the motion is filed

25    such that there's 25-days' notice given, they can just pick the

138

1    date.

2        If it's less than 25 days, you must seek an order

3    shortening time.  I will not grant you an order shortening time

4    unless in ten-days' notice, absent dire emergencies, somebody's

5    dying, and I don't mean somebody just needs some money.  So you

6    can do it, but I'm rarely going to grant motions on order

7    shortening times in less than ten days.

8        Now, you know, right now we're in the beginning of the

9    case.  You may have a -- well, no, you're still within your ten

10   days, so you're okay on the 18th.

11       MS. JARVIS:  So it's okay for the funeral but not for

12   the mortgage?

13       THE COURT:  That's right.  The point is when you set

14   these things on shortened time, nobody has time to really look

15   at it.

16       Everybody comes rushing in here -- like all the mounds of

17   pleadings that was spent today and after everybody had a chance

18   to really listen to what's happening, it was obvious that a lot

19   of the -- you know, you had time to talk to people and

20   understand, and a lot of the wind went out of the sails, and I

21   think people understood.

22       Things on shortened time don't save time.  I've discovered

23   that 18 years now.  Every time I have something on shortened

24   time, it always has to get continued because people aren't

25   prepared.  I'm not -- maybe I'm not prepared.

1    People, you need time to prepare adequately.  So I'm

2    rarely going to grant orders shortening time.  Orders

3    shortening time should be limited, in any case, in no event

4    less than ten days.  Most things in this case should be on

5    30-days' notice.

6            MR. FARROW:  Your Honor, with respect to the order

7    shortening time, the request to do so is supposed to state

8    cause, and I have seen the cause be because there's an omnibus

9    hearing date coming up.  I'm not -- I don't suspect that's

10   cause.

11           THE COURT:  Thank you very much.  That's not going to

12   be cause.

13           UNIDENTIFIED SPEAKER:  (Indiscernible).

14           THE COURT:  You're going to have to tell me why it has

15   to be this date as opposed to the next date since we've set them

16   30 days apart now.

17       All right.  Oppositions will need to be filed either ten

18   days after the motion is served, if it's on 20 days, or three

19   days before the hearing, three business days before the hearing,

20   if it's on shortened time.  Anybody have a -- do those times

21   make sense for people?

22       Replies should be done by noon the day before.  Everybody

23   must give a courtesy copy to the Court.  I appreciate the fact

24   we're on ECF, but as you can see, what we have to -- if it takes

25   you five minutes to download, we don't have the staff to

1    download.

2        You can certainly -- when you file the motion, you could

3    mail it to us.  Just mail it attention Court Services.  If it's

4    on shortened time, obviously, get it sooner.

5        This is specially important to these lengthy motions with

6    exhibits, so everybody must supply a courtesy copy.  I may be

7    inclined if I don't get courtesy copies not to hear the motion.

8        If a motion is filed, there'll be no countermotions without

9    either seeking an order shortening time so it's heard that time,

10   or, more importantly, just saying it's separately.

11       So there's no countermotions.  I think that just

12   confuses the docket too much.  It doesn't give people enough

13   time to respond.

14       In general, most of these cases really aren't

15   countermotions.  I mean, there's something that's a

16   countermotion to everything, but they're really a separate

17   grounds for (indiscernible), so there'll be no countermotions.

18       If you've want to file your own motion, file it, and get a

19   date for the hearing.  And the mere fact that the motion this

20   was related to is filed that date may not be sufficient, unless

21   you can show it's an absolute nexus.

22       The only absolute nexus I could see is a motion to say -- a

23   motion not to pay Mr. Gustafson (phonetic) today where the

24   countermotion would be, you know, motion to pay Mr. Gustafson,

25   but you still would have to file it separately.

1        Okay.  What else do we need to discuss procedural so that

2    we have this as smooth as possible?  Anybody?

3        Oh, look who just walked in the door, Ms. Marianne.  Wait.

4        (Colloquy not on the record.)

5            MS. CARLYON:  The noon the day before, is that going

6    to be only if there's an OST because our -- we, I mean --

7            THE COURT:  Yes.  Only if there's an OST.

8            MS. CARLYON:  -- you have a local rule.  Yeah

9    Otherwise, it's just the regular rule.

10           THE COURT:  The regular rule.  Correct.  Correct.

11       Ms. Street is here.  We're doing joint administration,

12   and the question was if people file a motion -- this is going to

13   be joint administration.

14       If people file a motion, it's going to one case.  If they

15   want it to apply to one debtor, can they -- in the drop-down

16   menu it would be motion to this stay, can they then put re: U.S.

17   Commercial only?

18           MS. STREET:  They can.

19           THE COURT:  Okay.

20           MS. STREET:  They have the ability to add that

21   information to the docket.

22           THE COURT:  Okay.  Good.  All right.  Anything  else?

23   Do you want to set some dates after July?

24       Oh, I know what I wanted to do was now that we know there's

25   some big motions coming, let's just set those right now rather

1    than deal with an order shortening time.  I want to make sure we

2    have time to hear them.

3         (Colloquy not on the record.)

4              UNIDENTIFIED SPEAKER:  Your Honor --

5              THE COURT:  Let me ask this.  Do you think we need

6    some additional dates in June, for example?

7              MR. SCHWARTZER:  Well, we're going to be filing -- it

8    might have been filed already -- a motion to hold the funds

9    pending further order of the Court, and we were asking -- I'm

10   sure my office was filing it with the application for an order

11   shortening time to have it heard on May 18th.  If you want it to

12   be heard on --

13             THE COURT:  I think --

14             MR. SCHWARTZER:  -- June 2nd, we could do that.

15             THE COURT:  Yeah.  I think we should do that

16   separately, so let's go ahead and set that because that's --

17             MR. SCHWARTZER:  I don't have the exact title to

18   that, but --

19             THE COURT:  Right.

20             MR. SCHWARTZER:  But that's --

21             THE COURT:  You're going to be filing it by the end of

22   this week, though?

23             MR. SCHWARTZER:  Yes.

24             THE COURT:  Okay.

25             MR. SCHWARTZER:  And what we'll do is we'll just plan

143

1    on noticing it for June 2nd.

2              THE COURT:  June 2nd.

3              MR. SCHWARTZER:  Now, we also -- I know on May 18th we

4    have some other motions.  We have a motion to limit notice --

5              THE COURT:  Yes.

6              MR. SCHWARTZER:  -- which we think that -- which we'll

7    be sending out to everybody.  So what I want to do is also send

8    a notice of the motion to hold the funds to everybody, so that's

9    why we --

10             THE COURT:  That's fine.

11             MR. SCHWARTZER:  -- want to file it today, too.  But

12   we'll -- a lot of these noticing issues will be solved by

13   limiting notice because we're basically cut down from 7,000

14   people, hopefully, to 2- to 300.

15             THE COURT:  Although, on something to --

16             MR. SCHWARTZER:  Planned things will be have to be --

17             THE COURT:  Well, and I would think, quite frankly, on

18   a motion to not pay, I think you have to send it to all the

19   direct lenders.

20             MR. SCHWARTZER:  That's the one we're doing --

21             THE COURT:  Okay.

22             MR. SCHWARTZER:  -- and that definitely is going to be

23   mailed out to everybody.

24             THE COURT:  Okay.  Okay.

25             MS. CHUBB:  Your Honor, I think I --

144

```
1              THE COURT:  Sorry.

2              MR. CHUBB:  -- I believed that the stack motion would

3    be set on the 18th.  So even though I was here yesterday, I

4    think my staff filed a motion to pay and asked to have it set on

5    the 18th, but I presume --

6              THE COURT:  So let's move that to June 2nd if

7    you've --

8              MS. CHUBB:  Yeah.  I think --

9              THE COURT:  -- filed that already.

10             MS. CHUBB:  Yeah.

11             THE COURT:  Okay.  I know you had a comment,

12   Mr. LePome.

13             MR. LEPOME:  Your Honor, a very small comment.  My

14   secretary works from 9:00 o'clock until 3:00 o'clock.  We

15   download everything, everything.

16         What, do we need to petition the congress to get you

17   someone who can download because courtesy copies are going to be

18   a burden, too.  We want you to be able to download and then have

19   someone on staff to be able to do that.

20             THE COURT:  Well, you know, that's fine to say one

21   person, but I've got -- there are thousands -- there are 600

22   docket -- or, no.  I'm sorry.  Three hundred docket entries

23   already.

24             MR. LEPOME:  All right.  I understand.  So you'd have

25   bushel baskets.
```

1          THE COURT:  Yeah.  There are, as of yesterday --

2          MR. LEPOME:  I just wanted to get that comment in at

3    the request of my staff.

4          THE COURT:  Okay.  There's 117 docket entries already

5    in this one case.

6          MR. LEPOME:  I know.  We've downloaded them all.

7    We've got them.

8       (Colloquy not on the record.)

9          THE COURT:  And, you know, on one hand I could  make

10   an exception and say, okay, if it's a five-page pleading I'll

11   read it online.  But, quite frankly, if I want to get -- well,

12   it's up to you.  If you want me to fully consider what you've

13   got to say, then I suggest you get me a courtesy copy.

14         MR. LEPOME:  All right.  We'll use big type now, too.

15         THE COURT:  All right.  Thank you.

16      (Colloquy not on the record.)

17         MS. JARVIS:  Your Honor?

18         THE COURT:  Yeah.

19         MS. JARVIS:  One other motion that will be coming up

20   -- and this is kind of in a two-phase motion as we mentioned.

21   We have been looking for DIP financing, and that'll be filed

22   kind of in two phases because there is -- in the budget you saw

23   the $150,000.

24      That's kind of the preliminary, you know, due diligence

25   amount that we would ask to be paid, you know, and then later

1    ask for the, you know, the approval of the DIP financing, so it

2    would be done in two stages.

3         That would need to -- once we get something, you know,

4    agreed to, we would probably want a pretty quick hearing just on

5    the first phase of it, the 150,000.

6              THE COURT:  Well, but the -- I don't disagree.  I know

7    you've got to do a quick hearing.

8         But you know what's going to happen?  Everybody's going to

9    be here screaming I have to have time to look at it, and it

10   would have continued, anyway, so I suggest that you just have to

11   tell your lender now or never.

12        Now, what I could suggest is we could add another day in

13   June -- for example, June 16th -- and then I know the next date

14   is only three days later, but that would give you the chance to

15   have an extra day in June to hear it, or maybe June 12th,

16   something like that.

17             MR. SAMUELSON:  Your Honor, Joel Samuelson (phonetic)

18   of Sidley Austin for Fortress (phonetic).  We have made --

19             THE COURT:  Mystery lender?

20             MR. SAMUELSON:  Mystery lender.  The process that's

21   contemplated in the terms you've been working on contemplates

22   the payment of $150,000, what Mr. Allison called a work fee.  We

23   call them due diligence fee.

24        That is supposed to be paid up front as the price for us to

25   do the due diligence so that we don't do the due diligence first

1    and then expend all the resources, including my coming here and

2    all of that, and then find out that the deal is opposed or your

3    Honor won't approve it or we don't like it or whatever.  It's

4    supposed to be done ahead of  time.

5         And it seems to me that having an order shortening time so

6    that that aspect can be considered and approved on May 18th, or

7    even earlier than that, so that we can do our work -- which has

8    already started.

9         We're not saying we're not going to do anything in the

10   interim, but it's very hard for me to tell Fortress go -- you

11   know, go gang busters with no money and have all of the risk.

12   We're not supposed to have that risk.  That's why you have this

13   due diligence fee.

14        So that's why what we contemplate is that there will be a

15   quick hearing on approval of the payment of the due diligence

16   fee that will not bind anybody to anything other than the

17   payment of the fee.

18             THE COURT:  Well, that's a pretty big deal.

19             MR. SAMUELSON:  Yes, it is.

20             THE COURT:  I mean, this whole crowd, I can tell you,

21   is going to be coming storming in on that one.

22             MR. SAMUELSON:  I understand, and we're not saying it

23   should be ex parte right now.  We understand it has to be on

24   notice of a hearing.  But if you wait 25 days just for the

25   approval of the payment of the fee --

1    THE COURT:  Okay.  Well, I haven't seen that motion

2  coming yet.  Is that motion going to be filed by tomorrow?

3    MS. JARVIS:  Your Honor, I think we're talking about

4  something that probably wouldn't get done on the ten-day notice,

5  you know, not that we would propose to do on it, and --

6    THE COURT:  This is much bigger (indiscernible) this.

7  150,000 is no small change in this case.

8    MS. JARVIS:  Right.  I agree, and I think we would

9  try --

10    THE COURT:  And we're going to have to know that this

11  lender is going to come up with something.  We have to know what

12  the lender's proposing and what kind of deal, what the --

13  whether or not -- what the 150,000's going to get us.

14    MS. JARVIS:  And we are certainly working towards if

15  we can get something done by the end of this week, we'll file it

16  again, and, and, you know, we'd ask that the Court would consider

17  having just that initial aspect of it heard on May 18th.

18    THE COURT:  If you get it filed so you have ten days,

19  all right, but no less than ten days.  It's not getting heard.

20    MS. JARVIS:  I agree, your Honor.  Thank you.

21    THE COURT:  So that means you've got to file it by --

22  you got to file it by Monday.

23    MS. JARVIS:  Thank you, your Honor.

24    THE COURT:  Oh, by the way, your motion to not pay

25  Bradley (phonetic) -- what was that group called, the --

1            MS. JARVIS:  Oh, the Bundy -- the --

2            THE COURT:  Bundy loan.

3            MS. JARVIS:  Yeah.  The Bundy loan.  Yes.

4            THE COURT:  I saw a motion for an order shortening

5    time, but I've never seen an actual order.  So, apparently, it

6    didn't get uploaded or it's lost or something.  I've never seen

7    the order.

8            MS. JARVIS:  Okay.  We will take care of that.  I

9    think we have asked for that to be --

10            THE COURT:  That can be heard on the 18th.

11            MS. JARVIS:  -- heard on the 18th.  Yes.

12            THE COURT:  Because it was filed last week, but no

13    orders ever surfaced.

14            MS. JARVIS:  Okay.  We will take care of that, your

15    Honor.

16            THE COURT:  Okay.  All right.  So we have May 18th.

17    Should we -- does it make sense to add another day in June, and

18    my thinking that it probably is.  The 16th, 15th, what --

19        (Colloquy not on the record.)

20            THE COURT:  It's only three days before the other

21    hearing, but --

22        (Colloquy not on the record.)

23            MR. SCHWARTZER:  The 15th?  The 15th works.

24            THE COURT:  Okay.  I've got Goeden on my calendar for

25    November -- or, June 15th at 9:30.  Didn't we resolve all the

150

1    Goeden matters, Mr. Lepome?

2            MR. LEPOME:  Pretty well.

3            THE COURT:  Oh, maybe that's just the wrap-up on

4    stuff.

5            MR. LEPOME:  Yeah.  Maybe -- yeah.  It's got to

6    (indiscernible) --

7            MR. SCHWARTZER:  Is that in the adversary proceedings

8    or in the case?

9            THE COURT:  It must be in the case.

10           MR. SCHWARTZER:  Oh.  Thank you.

11           THE COURT:  I don't know.

12           MR. SCHWARTZER:  Because we still have a pending

13   adversary against Mr. Goeden and Mr. (indiscernible).

14           THE COURT:  Oh.

15           MR. SCHWARTZER:  And the trustee, I understood, still

16   had a 727 adversary pending against Mr. Goeden that we were

17   tracking.

18           THE COURT:  Okay.  So the 15th won't work unless you

19   don't think there are many matters set for that day.

20           MR. SCHWARTZER:  I think if we have the 2nd and the

21   21st, adding the 15th would just be a good safety gap, but it

22   shouldn't take -- it shouldn't be an all-day hearing.

23           THE COURT:  Okay.  All right.

24           THE CLERK:  What time (indiscernible).

25           THE COURT:  The 15th, I guess.  How many matters are

1    on the 15th for that?

2              THE CLERK:  I'm looking right now, Judge.

3         (Colloquy not on the record.)

4              THE CLERK:  I have a motion to amend judgment and

5    order pursuant to something, so I just have the one --

6              THE COURT:  Okay.  So let's say 10:00 o'clock then.

7              THE CLERK:  There is a scheduling conference on that

8    one adversary.

9              THE COURT:  Okay.  So we can say 10:00 then.

10             THE CLERK:  Did you say 10:00 o'clock?

11             THE COURT:  Yeah.

12             THE CLERK:  For USA.

13             THE COURT:  Yes.  Now, do you want to set some dates

14   -- yeah.  We better set some dates after July so that -- or do

15   you want to wait until June to see what dates we're going to

16   set?

17        What's easier for people's schedules?  I would suspect

18   it's easier to set them now.  Okay?  So do you want to go with

19   basically every two weeks?

20             THE CLERK:  Judge, on the 15th how much time did you

21   want to (indiscernible) you only have to 1:30 because 1:30 you

22   have Chapter 13s.

23             THE COURT:  Right.  That's fine.

24             THE CLERK:  Is that okay?

25             THE COURT:  Um-hm.  Okay.  So we've got July 25th.  So

1   we can go August 4th.  Does that work?  I have an afternoon

2   motion -- we have to make that one at 1:30.  I've got my Chapter

3   11s in the morning.  And then how about August 17th?  Does that

4   work?

5        (Colloquy not on the record.)

6            THE COURT:  No?

7            MR. SCHWARTZER:  Mr. Allison and I both won't be

8   available that day.

9            THE COURT:  18th is bad, too?

10           MR. SCHWARTZER:  What day of the week does that come

11  up?

12           THE CLERK:  That's a Friday.

13           THE COURT:  That's a Friday.

14           MR. SCHWARTZER:  I'll be gone --

15           THE COURT:  Okay.  So --

16           MR. SCHWARTZER:  -- Wednesday, Thursday, Friday of

17  that week.

18           THE COURT:  16th, are you gone then?  The 16th works?

19  Okay.  That's only ten days apart, but, you know, we can always

20  take these off if there's -- I mean, the worse-case basis you

21  have a hearing, there's nobody here.

22           THE CLERK:  Judge, that's a motion calendar in the

23  afternoon, but we can put the motion calendar on for the 17th in

24  the morning.

25           THE COURT:  All I see is a motion calendar at 9 --

1          (The Court concluded at 03:21:32 p.m.)

2                          *  *  *  *  *

1      I certify that the foregoing is a correct transcript from

2  the electronic sound recording of the proceedings in the

3  above-entitled matter.

4

/s/ Biljana Dokic                        06/01/06

5  _____        _____

6  Biljana Dokic, Transcriptionist              Date