Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

and

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com

Attorneys for Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR<br><br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | Date: June 5, 2006<br>Time: 9:30 a.m. |
| In re:<br>USA SECURITIES, LLC,<br>Debtor. | **REPLY IN SUPPORT OF APPLICATION FOR AN ORDER AUTHORIZING THE EMPLOYMENT OF HILCO REAL ESTATE LLC/HILCO REAL ESTATE APPRAISAL, LLC AS DEBTORS' REAL ESTATE APPRAISER AND IN RESPONSE TO OBJECTIONS (AFFECTS ALL DEBTORS)** |
| Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA First Trust Deed Fund, LLC | |

1

Debtors USA Commercial Mortgage Company ("USACM"), USA Securities, LLC ("USA Securities"), USA Capital Realty Advisors, LLC ("USA Realty"), USA Capital Diversified Trust Deed Fund ("USA Diversified"), and USA Capital First Trust Deed Fund ("USA First") (collectively referred to as "Debtors"), by and through their counsel, hereby file this Reply in Support of Application for an Order Authorizing the Employment of Hilco Real Estate LLC/Hilco Real Estate Appraisal, LLC as Debtors' Real Estate Appraiser and in Response to Objections. The Application is supported by the Declaration of Jeffrey W. Linstrom, the Declarations of Thomas J. Allison on file in this case (including the Third Supplemental Declaration of Thomas J. Allison filed concurrently herewith), the arguments set forth below, and other relevant items of record before this Court in the Debtors' bankruptcy cases.

## STATEMENT OF FACTS

1. The jointly administered Debtors, including USACM, filed voluntary petitions for relief on April 13, 2006 (the "Petition Date").

2. Prior to the Petition Date, USACM was primarily in the business of originating, brokering, and servicing commercial real estate loans and fractional interests therein.[1]

3. On the Petition Date, Thomas J. Allison ("Allison") of Mesirow Interim Financial Management, LLC ("Mesirow") became the President of USACM and the Manager of the four remaining Debtors captioned above who are limited liability companies and his employment as chief restructuring officer has been authorized for an interim period through July 27, 2006.

4. As of the petition date, USACM was the loan servicer for approximately 115 commercial loans having a combined outstanding balance of approximately $962 million (the "Serviced Loans"), nearly all of which are secured by various real estate projects or developments.[2]

---

[1] USACM has not originated or brokered any new loans since the Petition Date, and will not do so without Court approval.

[2] The loan documents and other records of USACM indicate that there are approximately 3,600 investors (the "Direct Lenders") whose names appear as a "Lender" for one or more of the Serviced Loans. Typically, there are dozens or even hundreds of Direct Lenders on a particular loan, with each lender having only a small fractionalized share. Among the Direct Lenders are

2

5.      Since the Petition Date, the Debtors, under their new management, have worked diligently to begin analyzing and unraveling the problems the Debtors face which have arisen as a result of past business practices and irregularities in servicing the loans. As part of that process, Allison has directed Mesirow, as well as Debtors' attorneys, to review the loan files for each of the 115 loans at issue. That review indicates, among other things, as follows:

      a.      Each of the loans is secured by a trust deed on commercial real estate, except for two loans that may have been made on an unsecured basis and one loan for which the security interest may not have been properly perfected. One of approximately 99 discrete commercial real estate projects/developments serves as collateral for each of the Serviced Loans that is secured (in some instances more than one loan is secured by the same real estate).

      b.      As of May 26, 2006, it appears that 50 of the Serviced Loans are non-performing (i.e. they were delinquent in the payment of interest or otherwise could be considered non-performing), 53 were performing, 9 had been repaid, and the status of 3 had not been determined due to bankruptcy, foreclosures, change of ownership, etc. As a result, the non-performing loans represent approximately 43% of the Serviced Loans.

      c.      However, the interest reserves that are currently being used to keep the interest payments current on several of the performing loans (e.g., the Bundy project/development) will run out in the next few months thereby turning more of the Serviced Loans from performing to non-performing.

      d.      Of the 99 commercial real estate projects/developments that serve as collateral for the Serviced Loans, the loan files do not contain appraisals for approximately 23 of those projects/developments, and approximately 32 of the appraisals were obtained prior to the year 2005.

      e.      The appraisals were provided by a number of different entities. Therefore,

---

two of the other Debtors, USA Diversified and USA First (collectively, the "Funds"). USA Diversified has approximately 1,900 LLC members and USA First has approximately 1,300 members (collectively, the "Fund Members"). There is substantial overlap among the Direct Lenders and the Fund Members.

3

1  it is uncertain if the appraisals are based on common valuation methods or common criteria.

2          f.      Former principals of the Debtors are investors in 42 of the Serviced Loans,

3  and of that number, 16 are non-performing loans as of May 26, 2006.

4          g.      Many of the projects/developments are in various stages of development

5  and many of them are not yet completed. *See* Third Declaration of Thomas J. Allison.

6      6.      The Debtors maintain operating accounts, which are separate from the Debtor-in-

7  Possession Collection Account,[3] for use in facilitating their business operations and administrative

8  duties.

9      7.      On May 22, 2006, the Court entered an order approving the Debtors' motion

10 requesting limited authority to use cash of the Debtors to fund limited activities of the Debtors

11 pursuant to a revised cash budget through July 16, 2006. This initial time period of cash use was

12 requested by the Debtors in order to enable USACM, which has the right and obligation under its

13 servicing agreements with the Direct Lenders and under Nevada state law, to perform appropriate

14 loan-by-loan and investor-by-investor analyses and reconciliations. One of the items contained in

15 the revised cash budget[4] is an expenditure of $300,000 for appraisal fees.

16     8.      On May 8, 2006, the Debtors filed an Application for an Order Authorizing

17 Employment of Hilco Real Estate LLC/Hilco Real Estate Appraisal, LLC as Debtors Real Estate

18 Appraisers (the "Hilco Application") (docket no. 172) seeking the employment of Hilco Real

19 Estate, LLC and Hilco Real Estate Appraisal, LLC (collectively referred to as "Hilco") to provide,

20 at Debtors' request, the following types of real estate appraising and related services to the

21 Debtors in connection with the real estate that secures the Serviced Loans:

22         a.      Valuations of all of the real estate serving as collateral for the loans made

---

[3] USACM is holding payments that have been collected and continue to be collected from the borrowers on behalf of the Direct Lenders (including the Funds) in a new, post-petition Debtor-in-Possession Collection Account (the "DIP Collection Account"). No funds from any other sources have been commingled with or placed in the DIP Collection Account since the Petition Date.

[4] The revised cash budget is attached as an exhibit to the Supplemental Declaration of J. Thomas Allison. In addition, the Debtors plan to file second revised cash budget no later than June 5, 2006 that will also contain a proposed expenditure for appraisal fees in the amount of $300,000.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

by the Debtors;

   b. Consulting and advisory services in connection with assisting the Debtors in maximizing the value of their estates, and

   c. Serving as the Debtors' real estate disposition agent in connection with any designated property that the Debtors may gain control or ownership of in connection with the workout of any defaulted loans during their chapter 11 cases.

 9. On May 24, 2006, the Canepa Group filed an objection to the Hilco Application on the grounds that (a) the expenditure of $300,000 for new appraisals on the loans may not be necessary, (b) the Debtors should not be permitted to surcharge the Direct Lenders for any shortfall in estate funds to satisfy the appraisal fees, and (c) until USACM successfully cures and assumes each one of the executory loan servicing agreements, it cannot rely on them as property of the estate and cannot use the loan servicing and other fees to fund administrative expenses such as the appraisals.

 10. On May 26, 2006, the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC (the "First Trust Deed Committee"), filed a limited objection to the Hilco Application. The First Trust Deed Committee does not object to the retention of Hilco to perform the first two types of services generally described in paragraph 14 a and b above, but it does object to Hilco's retention to perform the disposition services generally outlined in paragraph 14c above.

 11. On May 26, 2006, the Official Committee of Holders of Executory Contract Rights through USA Commercial Mortgage Company (the "Official Direct Lender Committee") filed an objection to the Hilco Application on the following grounds: (a) the appraisal of performing loans is not necessary; (b) Hilco should not be retained to provide expert witness fees, consulting fees and advisory service fees, and (c) Hilco should not be retained to provide disposition services.

 12. On May 26, 2006, certain Direct Lenders filed an objection to the Hilco Application on the following grounds: (a) Debtors fail to substantiate the need to hire an appraiser; (b) Debtors do not fully explain the requested services or the costs; (c) Debtors propose an inappropriate payment structure for the valuation reports; (d) Debtors should not be bound to

5

the appraiser for disposition services; and (e) Debtors fail to explain how they will pay for the appraiser.

## MEMORANDUM OF LAW

### I. THE HILCO APPLICATION SHOULD BE GRANTED

Some parties in interest have objected to the Debtors' Application to employ Hilco, in whole or in part, on the grounds that are set forth in paragraphs 9 through 12 above, some of which overlap. Notwithstanding these objections, it is necessary and in the best interests of the Debtors' estates to approve the contract to employ Hilco to provide real estate appraisal and related services. Indeed, without such appraisals it will be extremely difficult, if not impossible, for Debtors' current management to determine how best to proceed in connection with each of the Serviced Loans. Accordingly, Debtors respond to each of the objections as follows.

**A. Sufficient Information is Provided to Substantiate the Need to Hire an Appraiser and Obtain New Appraisals.**

One of the objections to the Hilco Application is that insufficient information has been provided to substantiate the need to hire an appraiser and to obtain new appraisals at this time. The need for reliable updated valuation information, however, is amply supported by the Hilco Application, the Third Supplemental Declaration of Thomas J. Allison and other matters of record as more fully discussed below.

First, these appraisals are necessary to assess the status of the Serviced Loans and to make decisions or recommendations relating to the preservation and protection of the real property collateral securing those. As noted above, as of the petition date, USACM was the servicer of approximately 115 separate loans that may involve as many as 6,800 direct or indirect investors. In order to determine how to proceed in connection with each Serviced Loan it is first necessary to know whether each loan is undersecured or oversecured. Only then can a proper decision be made as to whether the property should be foreclosed, whether a loan extension be should be considered, whether there is sufficient equity in the property such that another lender may want to re-finance the loan, or whether another alternative may be appropriate.

Second, the Debtors are considering which projects/developments may merit the initiation

6

of a foreclosure proceeding. However, until an updated valuation can be obtained on the collateral it is difficult to know whether foreclosure is the best course of action. Furthermore, obtaining an updated appraisal is prudent business practice prior to proceeding with any large commercial foreclosure.

Third, it is important that the estate have current appraisals on all of the properties based on common valuation methods. In this case, the appraisals that are contained in the loan files were done by a number of different entities and they likely utilized different valuation methods and parameters in setting forth the value(s) contained therein. It would be beneficial to the estate to have appraisals on all of the properties that have been done by a single appraisal firm using common valuation methods and parameters. Moreover, some of the appraisals contain values that are premised on the completion of various phases of the project/development. Accordingly, these appraisals may not be accurate because the project/development has not been completed to the extent contemplated by the appraisal. Furthermore, many of the appraisals were done prior to the year 2005, and thus may now be inaccurate because of changing market conditions in the intervening period.

Fourth, appraisals are needed for the development of a plan of reorganization, as well as the preparation of the accompanying disclosure statement. It will be very difficult to propose a plan of reorganization and to file a complete and accurate disclosure statement without knowing the current status of each Serviced Loan, as well as the current value of the properties securing those loans.

Fifth, the Debtors are receiving many requests for information from parties in interest about the properties/developments and the status of the Serviced Loans. The Debtors and their management and counsel would like to be able to provide as accurate, complete and up to date information as possible in response to those inquiries.

Sixth, in order to engage in meaningful negotiations with delinquent borrowers regarding the resumption of interest payments, or the completion of the principal payments, management must have available to it current and reliable appraisals of the underlying properties.

Seventh, as noted above, it is known that former principals of the Debtors have an interest

7

1  in a significant number of the Serviced Loans at issue.  Moreover, insiders may have connections
2  that are not yet known with respect to other Serviced Loans.  Given the irregularities that occurred
3  in the pre-petition management of the Debtors, the Debtors' new post-petition management
4  believes that it would be prudent to ascertain the validity and accuracy of appraisals obtained on
5  properties in which the former principals of the Debtors have or may have connections.

6  Eighth, in reviewing the Serviced Loans, the Debtors have determined that at least 21 of
7  the loan files contain no appraisals.  Accordingly, in these instances it is necessary to obtain an
8  initial appraisal on those properties.

9  Ninth, it is in the best interest of the Debtors' estates to retain Hilco to provide the
10 appraisal and consulting services because of their experience and qualifications, and because they
11 offered to provide the services at the most economical price.  In addition, the Debtors were also
12 able to obtain a better economic deal by negotiating for a base price that covered comprehensive
13 appraisal services, as opposed to contracting for appraisals on a project-by-project basis.

14 Finally, it is important that Allison have the requisite discretion to determine which type of
15 appraisal is necessary on the projects/developments securing the Serviced Loans.  It simply would
16 not be possible for Allison to obtain specific approval from each of the objecting parties before
17 going forward with each and every appraisal he determines is necessary.  Given that Allison's
18 employment was approved through July 27, 2006, and he and the Mesirow team are working
19 diligently to assess and preserve the value of the Serviced Loans, and to submit a report and
20 recommendation to the Court regarding the proper distribution of the funds collected and held in
21 the DIP Collection Account within that time frame, long delays in obtaining the necessary
22 appraisals would prove devastating to those efforts.

23  **B.    Some Leval of Appraisal May be Necessary Even on Performing Loans.**

24 Another objection was that appraisals should not be obtained on performing loans.  This is
25 problematic because the Debtors need to have current and accurate information on <u>all</u> of the
26 projects/developments securing the Serviced Loans for the reasons set forth above.  In addition,
27 even though a loan is currently a performing loan, it could become a non-performing loan.
28 Indeed, the interest reserves that are being used to keep the interest payments current on several of

the performing loans (e.g. the Bundy project/development) will run out in the next few months thereby turning some of the Serviced Loans from a performing to a non-performing loan. Furthermore, on those loans which are performing and are not likely to become non-performing in the near future, it is anticipated that only a desk top valuation will be necessary, as opposed to a full written appraisal.

### C. Debtors Have Explained the Requested Services or the Costs.

Another objection is that the Debtors have not fully explained the requested services or the costs. However, as explained in the Hilco Application, Hilco will be paid a base fee of $300,000 which will include at least a desk-top valuation review of all the real estate projects/developments serving as collateral for the Serviced Loans and a full written valuation report on up to 40 of those projects/developments.[5] An additional fee of $5,000 has been negotiated for any full written valuation beyond the 40 already contemplated. The Hilco Agreement also provides for the payment of expert witness, consulting and advisory fees at various hourly rates.

The costs for the appraisals are currently contained in the revised cash budget which was approved by the Court. These costs will be paid from funds that are or will be in the Debtors' operating accounts, which consist of servicing and other fees collected by the Debtors and other sources of revenue as set forth in the revised budget.[6] The appraisal fees will not be paid with funds from the DIP Collection Account.

In addition, the Debtors are aware of the concerns expressed by parties in interest with respect to the appraisal and consulting fees and will make every effort to minimize or exclude those costs where possible. Accordingly, the Debtors do not anticipate that a full fledged appraisal

---

[5] A "desk-top" valuation is a limited report based on information obtained from a Hilco representative or contractor respecting the property. Hilco will also utilize information in Debtors' files and do their own research which may include comparative sales, proprietary comparative sales, and interviews with local real estate participants regarding local market conditions.

[6] Some objectors also asserted that alleged defaults under the Loan Servicing Agreements should be cured before the Debtors can use loan servicing and other contractual fees to fund administrative expenses, including appraisal fees. This is not an objection to the Debtors' retention of Hilco but to the Debtors' entitlement to collect and use the fees, which was already addressed and ruled on by the Court in connection with Debtors' separate motion to use cash.

will be needed on every loan, and in particular on performing loans in which valid appraisal information is contained in the loan files. Rather, with respect to those properties which secure performing loans that do not appear to have a risk of becoming non-performing in the near future, or appear to have been the subject of recent or otherwise relatively reliable appraisals, the Debtors acknowledge that those properties may require a less rigorous valuation report. In those instances, the Debtors plan to request that Hilco produce a reliable valuation report based on information that is publicly available, without the need for a time consuming and expensive site inspection. In that regard, the criteria that will be used in determining whether a project/development merits a full written valuation includes: (a) the current status of the Serviced Loan, i.e., whether it is performing or non-performing; (b) in the case of Serviced Loan that is performing, whether it is likely to become a non-performing loan in the near future; (c) whether an appraisal is contained in the loan file; (d) the date the appraisal was obtained; (e) the apparent reliability of the appraisal, (f) whether any significant development has occurred on the project/development since the appraisal was obtained, (g) whether former principals of the Debtors have an interest in the Serviced Loan, (h) whether the appraised collateral secures several of the Serviced Loans, and (i) whether the value of the collateral impacts or is impacted by other pieces of collateral.

**D.    Debtors Propose an Appropriate Payment Structure for the Appraisals.**

Another objection asserts that the Hilco Application proposes an inappropriate payment structure. Rather than paying Hilco in three monthly installments of $100,000 each, the objector proposes that progress payments be made based on the work completed by the appraiser. However, it is anticipated that most, if not all, of the appraisals to be done by Hilco will be completed in July of this year. Accordingly, paying Hilco in three monthly installments will be substantially the same as progress payments.

**E.    Whether the Direct Lenders Should be Surcharged for the Appraisal Fees Can Be Determined Later.**

Some of the objections assert that certain loans, and in particular those Serviced Loans in which the Direct Lenders have an interest, should not be surcharged for any of the appraisal fees that are incurred in connection with obtaining an appraisal. That is an issue that can be decided

another day.  Right now, the costs for the appraisal is one of the approved items in the revised cash budget and the funds to pay for those costs will come from the Debtors' operating accounts and not from the DIP Collection Account.  Nevertheless, the Debtors reserve their right at a later time to surcharge each Serviced Loan for the costs of the appraisal to the extent the Debtors deem they are entitled to do so under applicable law or the Loan Servicing Agreement.

**F.    Hilco Should Be Retained to Provide Expert Witness, Consulting and Advisory Services to the Extent Necessary.**

Another objection is that it is premature to retain Hilco to provide expert witness, consulting and advisory services at this time.  However, it makes no sense to employ any other entity to perform these services, and undoubtedly in the near future, a representative from Hilco will be needed to testify in court about one of the new appraisals or to provide consultation services to the Debtors.  To request such approval in the future on an expedited basis makes no sense and will only result in unnecessary delay and expense to the estate.

Finally, the Hilco Application contemplates that with respect to the expert witness, consulting and advisory service fees, Hilco will keep contemporaneous time records and compensation will only be provided in accordance with the procedures set forth in Sections 330 and 331 of the Bankruptcy Code, the applicable Federal Rules of Bankruptcy Procedure, the local rules of this Court and any other orders entered by this Court.  Accordingly, to the extent any party in interest has an objection to any of the expert witness, consulting or advisory fees, they will have the opportunity to object to those fees when the application to pay them is filed with the Court.

**G.    Hilco Will Not Be Retained to Provide Disposition Services At This Time.**

Another objection is that Hilco should not be retained to provide the disposition services that are currently contemplated in the Hilco Application.  The Debtors have agreed with Hilco and other parties in interest that it will not seek approval at this time to employ Hilco to provide disposition services.  Accordingly, this objection has now become moot.  In connection therewith, the agreement between Hilco and the Debtors will be amended to remove the references to the disposition services.

/ / /

11

## CONCLUSION

Based on the foregoing, USACM respectfully requests that the Court grant the Hilco Application as modified herein.

Respectfully submitted this 2nd day of June, 2006.

/s/ Jeanette E. McPherson
Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146

and

Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Attorneys for Debtors and Debtors-in-Possession