Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

and

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146-5308
Telephone:  (702) 228-7590
Facsimile:  (702) 892-0122
E-Mail:  bkfilings@s-mlaw.com

Attorneys for Debtors and Debtors-in-Possession

**E-FILED on June 9, 2006**

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>　　　　　　　　　　　　　　Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>　　　　　　　　　　　　　　Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>　　　　　　　　　　　　　　Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>　　　　　　　　　　　　　　Debtor. | Date:  OST Requested for June 21, 2006<br>Time:  OST Requested |
| In re:<br>USA SECURITIES, LLC,<br>　　　　　　　　　　　　　　Debtor. | **MOTION FOR EMERGENCY INTERIM AND PERMANENT ORDERS AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING (AFFECTS ALL DEBTORS)** |
| Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA First Trust Deed Fund, LLC | |

/ / /

/ / /

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Debtors USA Commercial Mortgage Company ("USACM"), USA Securities, LLC ("USA Securities"), USA Capital Realty Advisors, LLC ("USA Realty"), USA Capital Diversified Trust Deed Fund ("USA Diversified"), and USA Capital First Trust Deed Fund ("USA First") (collectively referred to as "Debtors"), by and through their counsel, hereby file this Motion for Emergency Interim and Permanent Orders Authorizing the Debtors to Obtain Post-Petition Financing (the "DIP Financing Motion"). This DIP Financing Motion is supported by the Declarations of Thomas J. Allison to be filed in this case the arguments set forth below, and other relevant items of record before this Court in the Debtors' bankruptcy cases.

## RELIEF REQUESTED

The Debtors propose obtaining a post-petition financing facility with CapitalSource Finance, LLC ("CapitalSource"). The Debtors are seeking emergency authority on June 21, 2006 to be able to borrow sufficient funds to ensure that the Debtor can maintain its operations and to make such loans as are necessary to protect the value of the loan portfolio until a final hearing can be held on July 25, 2006. As is more fully described below, the agreement makes available to the Debtors a revolving credit facility of up to $15,000,000. The borrowing is to be secured by a first priority security interest in all existing and after acquired (pre-petition and post-petition) tangible and intangible assets of the Debtors. In addition, CapitalSource shall have a ten (10) business day right of first offer on all of Debtors' remaining funding for the original construction budget with respect to existing loans as of the petition date, subject in each instance to bankruptcy court approval. Each additional loan to fund future construction on existing loans will prime prior advances under the existing loan or loans, but will not participate in the collateral for the revolving credit facility. CapitalSource, on a case by case basis, shall also have the sole discretion to fund new loan originations generated by USACM on terms and conditions acceptable to CapitalSource.

## STATEMENT OF FACTS

### BACKGROUND

1.      The jointly administered Debtors, including USACM, filed voluntary petitions for relief on April 13, 2006 (the "Petition Date").

2.      Prior to the Petition Date, USACM was primarily in the business of originating,

brokering, and servicing commercial real estate loans including fractional interests therein.

USACM has not originated or brokered any new loans since the Petition Date.

3.    On the Petition Date, Thomas J. Allison ("Allison") of Mesirow Interim Financial Management ("Mesirow") became the President of USACM and the Manager of the four other jointly administered Debtors who are limited liability companies.  In an order entered April 19, 2006, this Court authorized the Debtors' employment of Allison as the Chief Restructuring Officer for an interim period until July 27, 2006.

4.    As of the petition date, USACM was the loan servicer for approximately 115 commercial loans having a combined outstanding balance of approximately $962 million (the "Serviced Loans"), nearly all of which are secured by various real estate projects or developments.

5.    The loan documents and other records of USACM indicate that there are approximately 3,600 investors (the "Direct Lenders") whose names appear as a "Lender" for one or more of the Serviced Loans.  Typically, there are dozens or up to hundreds of Direct Lenders on a particular loan, with each lender having only a small fractionalized interest.  Among the Direct Lenders are two of the Debtors, USA Diversified and USA First (the "Funds") and it appears that the Funds have an interest in many of the Serviced Loans.  USA Diversified has approximately 1,900 LLC members and USA First has approximately 1,300 members (collectively, the "Fund Members").  There is substantial overlap among the Direct Lenders and the Fund Members.

6.    At the time that the investors contracted to participate as lenders of fractional interests in the Serviced Loans, they also executed individual loan servicing agreements (the "Loan Servicing Agreement") whereby they authorized and empowered USACM, on behalf of each investor, to obtain the necessary documents to effectuate and secure the Serviced Loans, as well as to service the Secured Loans.

7.    Since the Petition Date, Debtors new management has worked diligently to review the loan files for each of the 115 Serviced Loans.  Specifically, Allison and his Mesirow team are thoroughly investigating and evaluating the Debtors' files and records to determine, among other things, what portion of the funds held by USACM represent unpaid servicing and loan origination fees, which investors have been overpaid as a result of USACM's pre-petition practice of making

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

regular monthly interest payments regardless of the status of the underlying loan, and which investors have been underpaid, including investors to whom principal repayments were not remitted when collateral was released pre-petition.

8.     Furthermore, that review has indicated, among other things, that each of the loans is collateralized by a trust deed on commercial real estate, except for two loans that may have been made on an unsecured basis and one loan for which the security interest may not have been properly perfected.  One of approximately 99 discrete commercial real estate projects/developments serves as collateral for each of the Serviced Loans that is secured (in some instances more than one loan is secured by the same real estate).

9.     Moreover, as of May 26, 2006, it appears that 50 of the Serviced Loans are non-performing (i.e. they were delinquent in the payment of interest or otherwise could be considered non-performing), 53 are currently performing, 9 have been repaid, and the status of 3 have not been classified due to bankruptcy, foreclosure, change of ownership, or other reasons.  As a result, the non-performing loans represent approximately 43% of the Serviced Loans.

10.     The Debtors have initiated and accelerated measures to collect unpaid interest on the nonperforming loans, and to implement improved loan servicing procedures for all of the Serviced Loans.  Even with implemented operational enhancements, the regular payment streams to USACM as servicer of the Serviced Loans have been disrupted because of the filing of the Debtors' bankruptcy petitions.  Additionally, the regular payment stream has diminished due to the large number of nonperforming loans.  Therefore, the Debtors cannot reasonably rely on a regular stream of income in payment of the servicing fees and other contractual costs and fees that will be used to fund the Debtors operational budgets.

11.     On June 9, 2006, the Debtors' filed a revised budget (the "Budget") with the Court. This Budget outlines, among other things, the administrative costs and collection costs that are anticipated to be incurred by the Debtors to analyze the Serviced Loans and to preserve and increase the value of the Serviced Loans for the Debtors, the Direct Lenders, and the Fund Members through August 27, 2006.  The Budget includes the professional fees.  Those fees include payment for counsel to the four committees (instead of one committee) that were

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  appointed.  Payment of counsel for four committees was an unanticipated expense that will require

2  additional sources of funds for the Debtors to operate in Chapter 11.

3         12.    The Serviced Loans include construction loans for the development of commercial

4  real estate.  There are approximately nineteen (19) of the Serviced Loans which have construction

5  budget shortfalls (the "Construction Budget Shortfall").  The total amount of the Construction

6  Budget Shortfall for construction or acquisition of these 19 Serviced Loans (the "Shortfall Loans")

7  is approximately $49,000,000.  However, the foregoing amount does not include funding for any

8  required interest reserve that is part of the Construction Budget Shortfall.

9         18.    The Debtors understand that the borrowers for the Shortfall Loans requested loan

10  funding for only a portion of the construction budgets because they wanted to avoid payment of

11  interest on the total requisite sum for completion from the inception of the Shortfall Loans.  The

12  Debtors understand that the borrowers for the Shortfall Loans are building their projects in stages,

13  and seeking additional loan funding for the future stages of their projects from USACM.

14         13.    The projects secured by the Shortfall Loans are not completed projects.  The

15  Debtors' understand that most, if not all, of the Borrowers for the Shortfall Loans will need

16  additional loan funding of up to the amount of the Construction Budget Shortfalls to complete

17  their projects.

18         14.    USACM will not extend financing for the Shortfall Loans without specific prior

19  approval from this Court after notice to all lenders in each Shortfall Loan.  USAMC will make a

20  determination whether to seek Court approval to fund a particular Construction Budget Shortfall

21  from the Financing Facility based upon appraisals and other customary due diligence lending and

22  collection standards.  The lending and collection standards will be applied to each Shortfall Loan,

23  including whether or not the particular Shortfall Loan is a nonperforming loan.

24         15.    Debtors recently obtained court approval to engage Hilco Real Estate LLC/Hilco

25  Real Estate Appraisal, LLC to evaluate all of the real estate collateral securing the Serviced Loans.

26  These appraisals will assist Debtors in their due diligence determination as to whether it should

27  seek court approval to fund a particular Construction Budget Shortfall.

28  **THE TERMS OF THE PROPOSED FINANCING FACILITY**

16.     In order to continue to operate in chapter 11, a post-petition credit facility is critical.  The Debtors considered sources of post-petition financing available to it and negotiated with several debtor-in-possession lenders ("DIP Lenders") for a post-petition loan.

17.     After good faith, extensive and arm's length negotiations with several potential DIP Lenders, the Debtors selected CapitalSource as the lender from whom the Debtors desire to obtain the post-petition financing facility (after Court approval).

18.     The negotiations with CapitalSource culminated in a term sheet dated June 9, 2006 to provide post-petition financing on the terms and conditions set forth therein, a copy of which is attached hereto as **Exhibit "A"** (the "Financing Facility"),

19.     The Debtors selected CapitalSource from among the other potential DIP Lenders because the Financing Facility, in Debtors' business judgment, had the most favorable terms.

20.     The significant provisions of the Financing Facility are as follows:[1]

    a.  <u>Amount</u>.  The maximum amount of advances under the revolving credit portion of the Financing Facility (the "Revolving Credit Facility") during the term shall be $15,000,000.

    b.  <u>Repayment Terms.</u>  Advances under the Revolving Credit Facility shall be paid in full by Debtors at the earlier of:  (i) the end of the Term, (ii) acceleration after the occurrence of an Event of Default, or (iii) termination of CapitalSource's commitments to lend under the Revolving Credit Facility in accordance with the terms of the loan documents.

    c.  <u>Term</u>.  The term of the Revolving Credit Facility shall be the earliest to occur of (i) twelve (12) months from the date of closing, (ii) the date on which an order of the Bankruptcy Court confirming a plan of reorganization with respect to Debtors is entered on the docket, (iii) the sale of the business, or (iv) acceleration of maturity by CapitalSource due to the occurrence of an event of default.

    d.  <u>Interest</u>.  Interest on the outstanding balance of the Revolving Credit Facility shall be payable monthly in arrears at an annual rate equal to the 30 day LIBOR as quoted on Telerate Page 3750 plus 3.00%, subject to a floor on LIBOR equal to LIBOR as of the closing date.

    e.  <u>Fees</u>.  Fees shall include:  (i) a collateral management fee of 0.042% per month on the Revolver Maximum Loan Amount, which shall be payable in

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

---

[1] This summary is qualified in its entirety by reference to the provisions of the Financing Facility, and to the extent there is any discrepancy between the summary and the specific terms of the Financing Facility, the terms of the Financing Facility shall govern.

monthly arrears; (ii) a unused line fee of 0.042% per month of the (a) Revolver Maximum Loan Amount less (b) the average outstanding loan balance during such month, which shall be payable in monthly arrears, (iii) on the date of closing, a commitment fee of 1.00% of the Revolver Maximum Loan Amount, (iv) in the event that CapitalSource provides a commitment to Debtors for financing their exit from bankruptcy, a commitment fee of .50% of the maximum of such proposed credit facility, and (v) upon maturity, an exit fee equal to 0.50% of the Revolver Maximum Loan Amount.

f.  <u>Future Funding Obligations</u>.  CapitalSource shall have a ten (10) business day right of first offer on all of Debtors future funding obligations with respect to existing loans as of the petition date, and subject in each instance to bankruptcy court approval.  Subject to bankruptcy court order, each additional DIP loan will prime prior advances under the existing loan or loans, but will not participate in the collateral for the Revolving Credit Facility.  The additional DIP Loans will be term loans, with origination fees of 1.50% of the face amount, and interest rates of **no more than** LIBOR plus 7.50%, with all of CapitalSource's expense to be reimbursed and other terms and conditions as customary for loans of similar risk profile and tenor.  (Emphasis added).

g.  <u>New Originations</u>.  CapitalSource shall, on a case by case basis, in its sole and absolute discretion, consider funding new loan originations generate by Debtors on terms and conditions acceptable to CapitalSource.

h.  <u>Collateral Security</u>.  To secure the Revolving Credit Facility and advances made by CapitalSource to and obligations of Debtors to CapitalSource, CapitalSource will receive a duly perfected, first priority security interest in, and priming lien on, all of the existing and after acquired (pre-petition and post-petition) tangible and intangible assets of Debtors including, without limitation, real estate holdings, patents, trade names, and avoidance actions and any proceeds from avoidance actions recovered or voided under chapter 5 of the Bankruptcy Code.  All obligations of Debtors under the Revolving Credit Facility and Overadvance Facility shall be (i) secured: (a) pursuant to Section 364(d) of the Bankruptcy Code, by a first priority, senior priming perfected lien on, and security interest in, all property of Debtors that is subject to any valid, duly perfected lien of any party, (b) pursuant to Section 364(c) of the Bankruptcy Code, by a first priority, perfected lien on, and security interest in, all property of Debtors that is not subject to any valid duly perfected lien of any party; and (ii) accorded priority under Section 364(c) of the Bankruptcy Code over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code. The foregoing notwithstanding, however, the security shall be subject to a carve-out for certain professional fees and U.S. Trustee fees.

i.  <u>Loan Documents</u>.  Debtors shall execute and deliver such loan documents and assurances as are reasonable and customary for similar loans, and as CapitalSource may reasonably require in connection with the Closing.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

j.   Closing.  The Closing of the Revolving Credit Facility will occur on a date that is mutually satisfactory to the parties, but if it does not occur on or before June 30, 2006, this proposal shall expire and (except for such provisions which survive) shall have no further force or effect, unless extended in writing by CapitalSource.

k.   Costs and Expenses.  Costs associated with establishing the Revolving Credit Facility, including CapitalSource's out-of-pocket costs and expenses associated with due diligence relating to the transaction, professional fees, referral fees, recording fees, search fees and filing fees shall not be required to be paid by Debtors unless the financing on substantially the same terms as contemplated in the Financing Facility is approved by the Court.

## APPROVAL OF THE FINANCING FACILITY IS WARRANTED

21.    Ample justification exists for the approval of the proposed Financing Facility under 11 U.S.C. §§ 364(c) and (d) of the Bankruptcy Code.  It is the Debtors' business judgment that there are at least six valid business reasons for obtaining the Financing Facility for the Debtors:

a.   Debtors need additional sources of funds to pursue necessary collection actions with respect to non-performing loans, given the number and amount of non-performing loans;

b.   Debtors need liquidity to fund administrative and operational expenses because of the irregularity of payments on the Serviced Loans from which Debtors' servicing fees and other contractual costs and fees are paid (and which the Court has approved as funding sources);

c.   Debtors need a source of funding for the Shortfall Loans to complete the construction projects, but only if Debtors determine that additional funding is necessary or appropriate to preserve or enhance the value of the underlying collateral for the Serviced Loans for the Direct Lenders, the Funds, the Fund Members, and USACM, and Court approval is obtained after specific notice to all parties in interest. [2]

---

[2] A completed construction project that is a candidate for a sale or permanent financing is much more likely to generate the funds needed to pay off the Shortfall Loans in full than an uncompleted construction project that is likely to be encumbered with mechanic's liens and embroiled in litigation.

d.  To provide USACM the ability to originate new loans for the purpose of
generating income for payment to the Debtors' creditors and to assist the
Debtors in their efforts to reorganize and maintain viable and ongoing
business operations;

e.  To have the necessary funds to permit the Debtors to accomplish the
various tasks that are necessary to analyze and safeguard the interests of all
Direct Lenders (including the interests of the Funds as Direct Lenders) and
Fund Members; and

f.  The Debtors are unable to obtain unsecured credit for the desired funding.

## EMERGENCY AND INTERIM APPROVAL SHOULD BE GRANTED

22.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing (the "Final
Hearing") on a motion to obtain credit pursuant to 11 U.S.C. § 364 may not be commenced earlier
than 15 days after the service of such motion.  Upon request, however, the Court is empowered to
conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the
extent necessary to avoid immediate and irreparable harm to the debtor's estate.

23.     Pursuant to Bankruptcy Rules 4001(b) and 4001(c), the Debtors request that the
Court conduct an expedited emergency/interim hearing on the DIP Financing Motion and authorize
the Debtors from and after the entry of the interim order (the "Interim Order") through a final
hearing on July 25, 2006, to obtain credit under the Financing Facility in the amount in accordance
with the Budget.

## NOTICE

24.     Upon filing this Motion was served on all parties on Master Service List for
Limited Notice #2 Dated June 9, 2006 (the "Master Service List").  Following the interim hearing,
which Debtors have requested be scheduled for June 21, 2006 at 9:30 a.m., the Debtors will also
send notice of the entry of the Interim Order and notice of the final hearing on the DIP Financing
Motion to all the parties on the Master Service List.

/ / /

/ / /

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1

## MEMORANDUM OF LAW

2

**I.        STANDARD UNDER 11 U.S.C. § 364(C)**

3          Section 364(c) of the Bankruptcy Code authorizes a debtor-in-possession to obtain post-

4     petition credit:

5                    If the trustee is unable to obtain unsecured credit allowable under
                     section 503(b)(1) of this title as an administrative expense, the court,
6                    after notice and a hearing, may authorize the obtaining of credit or
                     the incurring of debt –
7

8                    (1)      with priority over any or all administrative expenses of the
                     kind specified in section 503(b) or 507(b) of this title;
9

10                   (2)      secured by a lien on property of the estate that is not
                     otherwise subject to a lien; or
11

12                   (3)      secured by a junior lien on property of the estate that is
                     subject to a lien.
13     11 U.S.C. § 364(c).

14          Courts have articulated a three-part test to determine whether a debtor-in-possession is

15     entitled to financing under section 364(c) of the Bankruptcy Code: (1) the debtor must be unable

16     to obtain unsecured credit under section 364(b)(1) by allowing a lender only an administrative

17     claim; (ii) the credit transaction must be necessary to preserve the assets of the estate; and (iii) the

18     terms of the transaction must be fair, reasonable and adequate, given the circumstances of the

19     debtor/borrower and the proposed lender.  See e.g., In re Aqua Assocs., 123 B.R. 192, 195-96

20     (Bankr. E.D. Pa. 1991); In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y.

21     1990).

22          Given the Debtors' current financial status, and based upon its discussions with the other

23     potential DIP Lenders, the Debtors believe that unsecured financing was unavailable to it.  The

24     Debtors are unable to obtain credit that is not secured and has not been granted superpriority

25     administrative claim status.  In its attempts to obtain post-petition financing, the Debtors had

26     discussions with other potential DIP Lenders, all of which stated that any credit facility would

27     have to be secured and be granted superpriority status and priming liens.  Thus, the Debtors can

28     show "by a good faith effort that credit was not available without" the protections of section

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   364(c).  <u>In re Snowshoe Co., Inc.</u>, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no

2   duty to seek credit from every possible lender before concluding that such credit is unavailable");

3   <u>see also</u> <u>In re Plabell Rubber Prods., Inc.</u>, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992); <u>Anchor</u>

4   <u>Sav. Bank FSB v. Sky Valley, Inc.</u>, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); <u>Ames Dep't Stores</u>,

5   115 B.R. at 40 (debtors' discussions with four lenders satisfied the requirement of section 364 that

6   the debtors were unable to obtain comparable financing on an unsecured basis).

7          As described above, the Financing Facility is essential to the success of the Debtors' cases.

8   Without the Financing Facility, the Debtors may not have sufficient income to perform all of the

9   administrative tasks and investigative analyses that need to be completed with respect to the

10  Serviced Loans, and will not have sufficient funds to fund the Construction Budget Shortfalls that

11  are necessary to maintain, protect and enhance the value of the collateral securing the Shortfall

12  Loans.  For these reasons and others, access to credit under the Financing Facility is critical to the

13  Debtors' operations and necessary to preserve and maximize the assets of the Debtors' estate.

14         The Debtors, in the exercise of their prudent business judgment and consistent with their

15  fiduciary duties, have also concluded that the terms of the Financing Facility are fair and

16  reasonable under the circumstances.  As noted above, the Debtors had discussions with other

17  potential DIP Lenders regarding the terms of debtor-in-possession financing facilities.  The terms

18  proposed by CapitalSource are in the Debtors' business judgment the most favorable among all

19  those proposed by the other DIP Lenders.

20         The various fees required by the Bank under the Financing Facility are reasonable and

21  appropriate under the circumstances.  Indeed, courts routinely authorize similar lender incentives

22  beyond the explicit liens and other rights specified in section 364.  See <u>In re Defender Drug</u>

23  <u>Stores, Inc.</u>, 145 B.R. 312, 316 (Bankr. 9th Cir. (BAP) 1992) (authorizing credit arrangement under

24  section 364, including a lender "enhancement fee").

25         The Financing Facility also provides generally that the security interests in the assets of the

26  Debtors and the administrative priority granted to CapitalSource are subject to the Carve out, as

27  set forth in the Financing Facility.  In <u>Ames Dept Stores</u>, the bankruptcy court found that such

28  "carve-outs" are not only reasonable, but are necessary to insure that official committees and the

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1 debtor's estate will be assured of the assistance of counsel.  <u>Ames Dept Stores</u>, 115 B.R. at 40.

2 **II.    STANDARD UNDER 11 U.S.C. § 364(d)**

3       Section 364(d)(1) governs the incurrence of post-petition debt secured by senior or priming

4 liens and provides as follows:

5           The court, after notice and a hearing, may authorize the obtaining of credit
            or the incurring of debt secured by a senior or equal lien on  property of
6           the estate that is subject to a lien only if –

7                (A)  the trustee is unable to obtain such credit otherwise; and

8
                 (B) there is adequate protection of the interest of the holder of the
9                lien on the property of the estate on which such senior or equal lien
                 is proposed to be granted.
10

11 11 U.S.C. § 364(d).

12       As set forth above, the Debtors have been unable to obtain post-petition financing

13 on an unsecured basis, or indeed, without offering terms largely similar to those

14 contained in the Financing Facility.

15       Furthermore, the Debtors do not believe that the revolving credit portion of the

16 Financing Facility will require a priming lien, and therefore, the Debtors do not believe

17 that the requirements of section 364(d)(1)(B) are implicated at this time.  However, the

18 Financing Facility does contemplate the possibility of priming liens if other advances are

19 made by CapitalSource.  To the extent that occurs, Debtors will discuss the requirements

20 of section 364(d)(1)(B) more fully at that time.

21       Finally, bankruptcy courts routinely defer to a debtor's business judgment on most

22 business decisions, including the decision to borrow money.  <u>See</u> <u>Group of Institutional Investors</u>

23 <u>v. Chicago Mil. St. P. & Pac. Ry.</u>, 318 U.S. 523, 550 (1943); <u>In re Simasko Prod, Co.</u>, 47 B.R.

24 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this

25 Court."); <u>In re Lifeguard Indus., Inc.</u>, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).  As one court

26 has noted, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and

27 increase its costs, interfere with the Bankruptcy Code's provision for private control of

28 administration of the estate, and threaten the court's ability to control a case impartially."

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    <u>Richmond Leasing Co. v. Capital Bank, N.A.</u>, 762 F.2d 1303, 1311 (5th Cir. 1985).

2            In general, bankruptcy courts often defer to a debtor-in-possession's business judgment

3    regarding the need for and the proposed use of funds, unless such decision is arbitrary and

4    capricious.  <u>In re Curlew Valley Assocs.</u>, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981).  Courts

5    generally will not second-guess a debtor-in-possession's business decisions when those decisions

6    involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of

7    his authority under the Code."  <u>Curlew Valley</u>, 14 B.R. at 513-14 (footnotes omitted).

8            The Debtors have exercised sound business judgment in determining that a post-petition

9    credit facility is appropriate and have satisfied the legal prerequisites to borrow under the

10   Financing Facility.  The terms of the Financing Facility are fair and reasonable and are in the best

11   interests of the Debtors' estates.  Accordingly, the Debtors request authority to enter into the

12   Financing Facility and to borrow funds from the Bank, on the secured, administrative "superpriority"

13   basis described above, pursuant to 11 U.S.C. §§ 364(c) and (d) of the Bankruptcy Code, and take the

14   other actions contemplated and requested herein.

## CONCLUSION

16           Based on the foregoing, the Debtors respectfully request that the Court (a) grant, on an

17   interim basis, the Motion for Approval of Post-Petition Financing to ensure that the Debtor has

18   sufficient funds to remain in operation and protect the value of the loan portfolio pending a final

19   hearing on July 25, 2006 and (b) grant the Motion on a final basis on July 25, 2006.

20           Respectfully submitted this 9th day of June, 2006.

21                                             <u>/s/      LENARD E. SCHWARTZER</u>
                                               Lenard E. Schwartzer, Nevada Bar No. 0399
22                                             Jeanette E. McPherson, Nevada Bar No. 5423
                                               SCHWARTZER & MCPHERSON LAW FIRM
23                                             2850 South Jones Boulevard, Suite 1
                                               Las Vegas, Nevada  89146
24
25                                             and

26                                             Annette W. Jarvis, Utah Bar No. 1649
                                               RAY QUINNEY & NEBEKER P.C.
27                                             36 South State Street, Suite 1400
                                               P.O. Box 45385
28                                             Salt Lake City, Utah 84145-0385

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# EXHIBIT "A"



One North Franklin, Suite 1800
Chicago, IL 60606
Phone: (312) 706-2100
Fax: (312) 368-3626
Web Address: www.capitalsource.com

June 9, 2006

*VIA TELECOPY*

Mr. Thomas J. Allison
Chief Executive Officer
USA Commercial Mortgage Company, et al
4484 South Pecos Road
Las Vegas, NV 89121

Dear Mr. Allison:

CapitalSource Finance LLC ("Lender") is pleased to submit this proposal to establish debtor-in-possession financing for USA Commercial Mortgage Company, USA Capital Realty Advisors, LLC, USA Securities, LLC, USA Capital First Trust Deed Fund, LLC, and USA Capital Diversified Trust Deed Fund, LLC (all jointly and severally as debtors-in-possession, and collectively, "Borrower") in the form of a $15,000,000 revolving credit facility (the "Revolving Credit Facility" or, the "DIP Loan"). The proceeds of the DIP Loan will be used pay (i) operating expenses, limited capital expenditures and other amounts for general corporate and ordinary course purposes of Borrower as approved by Lender and (ii) such other administrative expenses as may be authorized under the Financing Order, including ongoing administrative expenses associated with the chapter 11 case of Borrower (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), all as authorized by the DIP Loan, pursuant to an operating budget (in form and substance acceptable to Lender) for Borrower, during the Bankruptcy Case. The terms and conditions pursuant to which Lender proposes to provide the DIP Loan are as set forth below:

## REVOLVING CREDIT FACILITY

| | |
|---|---|
| **Revolver Maximum Loan Amount:** | Subject to the following sentence, the maximum amount of advances available under the Revolving Credit Facility during the Term (as defined below) shall be $15,000,000 (the "Revolver Maximum Loan Amount"). The final Revolver Maximum Loan Amount shall be determined subsequent to Lender's on-site due diligence and the amount available to Borrower from time to time under the Revolving Credit Facility shall be based upon a rolling 13-week cash flow budget updated regularly and acceptable to Lender. |

This is not a commitment to extend credit in any form and remains subject to due diligence, credit approval, and documentation. No oral communications between the parties shall be deemed to supersede this letter or indicate any commitment to extend credit in any form. There shall be no obligation on the part of Lender to extend credit until such time as final and definitive documents satisfactory to Lender in its sole discretion have been executed by all parties to such documents.
60471626_3

*USA Commercial Mortgage Company, et al*                                        *Page 2*

| | |
|---|---|
| **Repayment Terms:** | Advances under the Revolving Credit Facility shall be paid in full by Borrower to Lender at the earlier of: (i) the end of the Term, (ii) acceleration after the occurrence of an Event of Default, or (iii) termination of Lender's commitments to lend under the Revolving Credit Facility in accordance with the terms of the loan documents. |
| **Term:** | The term of the Revolving Credit Facility (the "Term") shall be the earliest to occur of (i) twelve (12) months from the date of Closing, (ii) the date on which an order of the Bankruptcy Court confirming a plan of reorganization with respect to Borrower is entered on the docket, (iii) the sale of the business, or (iv) acceleration of maturity by Lender due to the occurrence of an Event of Default as specified in the loan documents. |

**Interest and Fees:**

(i) Interest on the outstanding balance of the Revolving Credit Facility shall be payable monthly in arrears at an annual rate equal to the 30-Day LIBOR ("LIBOR") as quoted on Telerate Page 3750 plus 3.00%, subject to a floor on LIBOR equal to LIBOR as of the closing date. Interest on the outstanding balance of the Revolving Credit Facility shall be calculated on the basis of the actual number of days elapsed in a 360-day year. Collections of cash by Lender under the Revolving Credit Facility shall be credited to Borrower's obligations thereunder on a daily basis, subject to four business-days clearance days.

(ii) Borrower shall pay Lender a Collateral Management Fee of 0.042% per month on the Revolver Maximum Loan Amount, which shall be payable monthly in arrears.

(iii) Borrower shall pay Lender an Unused Line Fee of 0.042% per month of (a) the Revolver Maximum Loan Amount less (b) the average outstanding loan balance during such month, which shall be payable monthly in arrears.

(iv) On the date of Closing, Borrower shall pay Lender a Commitment Fee of 1.00% of the Revolver Maximum Loan Amount. In addition, in the event that Lender provides a commitment to Borrower for financing of Borrower's exit from the Bankruptcy Case, Borrower shall pay to Lender a commitment fee of .50% of the maximum of such proposed credit facility upon issuance of such commitment.

(v) Upon Maturity, Borrower shall pay lender an Exit Fee equal to 0.50% of the Revolver Maximum Loan Amount.

This is not a commitment to extend credit in any form and remains subject to due diligence, credit approval, and documentation. No oral communications between the parties shall be deemed to supersede this letter or indicate any commitment to extend credit in any form. There shall be no obligation on the part of Lender to extend credit until such time as final and definitive documents satisfactory to Lender in its sole discretion have been executed by all parties to such documents.
60471626_3

*USA Commercial Mortgage Company, et al*                                                          Page 3

| | |
|---|---|
| **Maximum Additional DIP Loans / ROFO of Future Funding Obligations:** | Lender to have a ten (10) business day right of first offer on all of Borrower's future funding obligations with respect to existing loans as of the Petition Date (the aggregate amount of which Borrowers has identified as being $68,106,500), and Lender will consider funding such future advances on a loan by loan basis, in Lender's sole and absolute discretion and subject in each instance to Bankruptcy Court approval (each such funding by Lender, an "Additional DIP Loan"). It is understood that, pursuant to Bankruptcy Court order, each Additional DIP Loan will prime prior advances under the existing loan or loans, but will not participate in collateral for the DIP loan. The Additional DIP Loans will be term loans, with origination fees of 1.50% of the face amount, and interest rates of no more than LIBOR plus 7.50%, with all of Lender's expenses to be reimbursed and other terms and conditions as customary for loans of similar risk profile and tenor. |
| **New Originations:** | Lender shall, on a case by case basis, in its sole and absolute discretion, consider funding new loan originations generated by Borrower on terms and conditions acceptable to Lender. |
| **Optional Prepayments:** | Borrower shall have the right to voluntarily repay any or all advances under the DIP Loan at any time without premium or penalty in minimum increments to be agreed upon, but subject to payment of the Unused Line Fee for the balance of the remaining stated term of the DIP Loan and may include customary make-whole provisions. |
| **Mandatory Prepayments:** | Mandatory prepayments of the DIP Loan shall be made upon occurrence of certain events (e.g., asset dispositions and insurance claims), equity issuances, changes of control and other circumstances to be negotiated and subject to approval of the Lender. |

## GENERAL TERMS

| | |
|---|---|
| **General Terms:** | The definitive credit documentation to be provided to Borrower relating to the Loan shall contain certain representations, warranties, right of first refusal rights, covenants, prepayment fees, and other terms and conditions consistent with those customarily found in similar financings and such other terms and conditions as shall be agreed upon by Borrower and Lender. |

This is not a commitment to extend credit in any form and remains subject to due diligence, credit approval, and documentation. No oral communications between the parties shall be deemed to supersede this letter or indicate any commitment to extend credit in any form. There shall be no obligation on the part of Lender to extend credit until such time as final and definitive documents satisfactory to Lender in its sole discretion have been executed by all parties to such documents.
60471626_3

*USA Commercial Mortgage Company, et al*                                              *Page 4*

| | |
|---|---|
| **Collateral and Security:** | To secure the DIP Loan and advances made by Lender to and obligations of Borrower to Lender, Lender will receive a duly perfected, first priority security interest in, and priming lien on, all of the existing and after acquired (pre-petition and post-petition) tangible and intangible assets of Borrower including, without limitation, real estate holdings, patents, trade names, and avoidance actions and any proceeds from avoidance actions recovered or voided under chapter 5 of the Bankruptcy Code. All obligations of Borrower under the DIP Loan and Overadvance Facility (the "Obligations") shall be (a) secured: (i) pursuant to Section 364(d) of the Bankruptcy Code, by a first priority, senior priming perfected lien on, and security interest in, all property of Borrower that is subject to any valid, duly perfected lien of any party; (ii) pursuant to Section 364(c) of the Bankruptcy Code, by a first priority, perfected lien on, and security interest in, all property of Borrower that is not subject to any valid, duly perfected lien of any party; and (b) accorded priority under Section 364(c) of the Bankruptcy Code over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code. The foregoing notwithstanding, however, the security shall be subject to a carve-out for certain professional fees and U.S. Trustee's fees. |
| **Default Interest Rate:** | From and after the occurrence of an Event of Default, a default rate of interest of an additional three percent per annum over the rate otherwise applicable shall be payable on demand on the outstanding principal balance of the DIP Credit Facility. |
| **Loan Documents:** | Borrower shall execute and deliver to Lender such loan and security agreements, notes, mortgages, deeds of trust, instruments, documents, certificates, opinions, environmental indemnities, fraud guaranties, third party reports and assurances as are reasonable and customary for similar loans, and as Lender may reasonably require in connection with the Closing. |

**This is not a commitment to extend credit in any form and remains subject to due diligence, credit approval, and documentation. No oral communications between the parties shall be deemed to supersede this letter or indicate any commitment to extend credit in any form. There shall be no obligation on the part of Lender to extend credit until such time as final and definitive documents satisfactory to Lender in its sole discretion have been executed by all parties to such documents.**
60471626_3

*USA Commercial Mortgage Company, et al*                                              Page 5

**Closing
Conditions:**
(i) Prior to Closing, there shall be no material change in Borrower's business or general financial condition; (ii) There shall be no material default in any of Borrower's obligations under any contract; (iii) Borrower shall be in compliance with all applicable laws; (iv) Lender shall receive an opinion from Borrower's counsel satisfactory to Lender; (v) Borrower shall maintain and pay for a Lock Box Account mutually satisfactory to Borrower and Lender for Borrower's cash collections; (vi) Lender shall receive all items typically required in connection with similar commercial real estate mortgages (including without limitation third party reports which include but are not limited to title insurance, appraisal, environmental report and survey); (vii) execution of all loan documents, which are acceptable to Lender; and (viii) Lender and its advisors shall have the right to perform due diligence prior to Closing to determine the liquidity of Borrower's accounts receivable, inventory, M&E and real estate, and the general financial and operational state of Borrower; (ix) An order from the Bankruptcy Court approving the DIP Credit Facility (the "Financing Order"); (x) The DIP Loan shall be cross-defaulted to other debt; (xi) Lender shall be satisfied with its due diligence review of Borrower and its subsidiaries, which shall include, but not be limited to, a review of the collateral files, relevant financial information and other materials relevant to the Closing. In connection with the Closing, Lender is hereby authorized to file UCC-1 Financing Statements for the Borrower as debtor. Following the Closing, Lender shall have the right to conduct periodic due diligence to assess the on-going collateral value of Borrower's accounts receivable, inventory, M&E, and real estate.

**Closing:**
The closing of the DIP Loan will occur on a date that is mutually satisfactory to Borrower and Lender; however, if the Loan does not close on or before June 30, 2006, this proposal shall expire and (except for such provisions which survive) shall have no further force or effect, unless extended in writing by Lender.

This is not a commitment to extend credit in any form and remains subject to due diligence, credit approval, and documentation. No oral communications between the parties shall be deemed to supersede this letter or indicate any commitment to extend credit in any form. There shall be no obligation on the part of Lender to extend credit until such time as final and definitive documents satisfactory to Lender in its sole discretion have been executed by all parties to such documents.
60471626_3

*USA Commercial Mortgage Company, et al*                                                      *Page 6*

**Costs and**       Costs associated with establishing the DIP Loan, including Lender's out-of-
**Expenses:**      pocket costs and expenses associated with due diligence relating to the
transaction, professional fees, referral fees, recording fees, search fees and filing
fees shall not be required to be paid by Borrower unless the financing on
substantially the same terms as contemplated in this letter is approved by the
Bankruptcy Court. At Closing, Borrower shall reimburse lender for all costs
incurred related to the transaction, including, without limitation, all costs and
expenses described above.

In consideration of the foregoing, until the transaction proposed herein is
consummated, this term sheet expires or a determination is made by Lender not
to pursue such transaction, Borrower agrees to negotiate exclusively with
Lender regarding any financing the purpose of which is substantially the same
as that of the proposed transaction. Borrower further represents and warrants to
Lender that it has not contracted with, or does it know of, any broker [other than _____
_____ to be paid by Borrower] who has participated in the Loan or the transactions
contemplated herein.

**Transaction**      Borrower will not disclose the contents of this letter (or that Borrower and Lender
**Confidential:**      are having any discussions related to a possible Loan including the status thereof,
termination thereof, any decision on Borrower's or Lender's part to no longer
consider any such Loan or any terms, conditions, or other facts with respect thereof)
to any third party, including, without limitation, any financial institution or
intermediary, without Lender's prior written consent, other than to Borrower's
officers and advisors on a need-to-know basis. Borrower agrees to inform all such
persons who receive information concerning this letter that such information is
confidential and may not be disclosed to any other person. In connection with the
requested Loan, Borrower understands that Lender will continue to make financial,
legal and collateral investigations and determinations.

**Right of First**      Borrower agrees to grant Lender the exclusive right for 45 days from closing to
**Refusal:**      purchase the loan portfolio of Borrower and provide Lender with customary bid
procedures, break-up fees, expense reimbursement and bid protection.

**Expiration:**      If Lender does not receive this accepted term sheet on or before June 9, 2006, this term
sheet shall automatically expire.

This is not a commitment to extend credit in any form and remains subject to due diligence, credit approval, and documentation.
No oral communications between the parties shall be deemed to supersede this letter or indicate any commitment to extend credit in
any form. There shall be no obligation on the part of Lender to extend credit until such time as final and definitive documents
satisfactory to Lender in its sole discretion have been executed by all parties to such documents.
60471626_3

*USA Commercial Mortgage Company, et al*                                                   *Page 7*

By signing this letter, Borrower agrees to indemnify Lender, its managers, officers, and principals and hold each of them harmless against any and all losses, liabilities and claims arising out of or by reason of any investigation, litigation, or other proceeding brought or threatened relating to any loan made or proposed to be made, including without limitation the claims of any brokers or anyone claiming a right to any fees in connection with the Loan. If the terms and conditions set forth above are satisfactory, please sign the enclosed copy of this letter and return it to my attention. Please call me at 312-706-2127 should you have any questions or comments. This letter replaces our previous letters.

Very Truly Yours,

John T. Todd

CapitalSource Finance LLC

The foregoing is accepted and agreed to:

By:

Name:  MARK L. OLSON

Title:  CHIEF OPERATING OFFICER

Date:  6-9-06

This is not a commitment to extend credit in any form and remains subject to due diligence, credit approval, and documentation. No oral communications between the parties shall be deemed to supersede this letter or indicate any commitment to extend credit in any form. There shall be no obligation on the part of Lender to extend credit until such time as final and definitive documents satisfactory to Lender in its sole discretion have been executed by all parties to such documents.
60471626_3