Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER, P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

and

Lenard E. Schwartzer
Nevada Bar No. 0399
Jeanette E. McPherson
Nevada Bar No. 5423
Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146-5308
Telephone:  (702) 228-7590
Facsimile:  (702) 892-0122
E-Mail:  bkfilings@s-mlaw.com
Attorneys for Debtors and Debtors-in-Possession

**E-FILED ON JUNE 9, 2006**

**SCHWARTZER & McPHERSON LAW FIRM**
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case Nos. BK-S-06-10725 LBR<br>Case Nos. BK-S-06-10726 LBR<br>Case Nos. BK-S-06-10727 LBR<br>Case Nos. BK-S-06-10728 LBR<br>Case Nos. BK-S-06-10729 LBR |
| In re:<br><br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | Chapter 11 |
| In re:<br><br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br><br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | **MOTION FOR AUTHORITY TO FORBEAR  AND TO PROVIDE FURTHER FUNDING FOR CERTAIN OUTSTANDING LOANS [AFFECTS DEBTOR USA COMMERCIAL MORTGAGE COMPANY, DEBTOR USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, AND DEBTOR USA CAPITAL FIRST TRUST DEED FUND, LLC]** |
| In re:<br><br>USA SECURITIES, LLC,<br>Debtor. | |
| Affects:<br>☐ All Debtors<br>☒ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☒ USA Capital Diversified Trust Deed Fund, LLC<br>☒ USA First Trust Deed Fund, LLC | Date of Hearing:  OST Requested<br>Time of Hearing:  OST Requested |

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

USA COMMERCIAL MORTGAGE COMPANY ("USACM"), USA DIVERSIFIED TRUST DEED FUND, LLC ("Diversified Trust Deed Fund"), and USA FIRST TRUST DEED FUND, LLC ("First Trust Deed Fund") (collectively the "Debtors"), by and through their counsel hereby file this Motion for Authority to Forbear and to Provide Further Funding for Certain Outstanding Loans (the "Motion"). This Motion is made and based upon 11 U.S.C. §§ 105 and 363, Fed.R.Bankr. P. 6004, and the Points And Authorities set forth herein, along with any pleadings on file and argument at the time of hearing this Motion.

## POINT AND AUTHORITIES

### General Factual Background

1. Debtors USA Securities, LLC, USA Capital Realty Advisors, LLC, USACM, Diversified Trust Deed Fund, and First Trust Deed Fund (collectively the "Five Debtors") filed for relief under Chapter 11 the Bankruptcy Code on April 13, 2006 (the "Petition Date"). The Five Debtors continue to operate their businesses and possess their property as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

2. Prior to the Petition Date, Mesirow Financial Interim Management, LLC ("MFIM") was employed by the Five Debtors to serve as financial advisors to evaluate restructuring alternatives for the Five Debtors. After the filing of the bankruptcy petitions for the Five Debtors, Thomas Allison of MFIM was approved by this Court on April 19, 2006, as the chief restructuring officer of each of the Five Debtors on an interim basis. Following their engagement by the Five Debtors, MFIM has spent considerable time evaluating, examining and analyzing the Five Debtors' books and records, financial data, cash management system, loan portfolios, and loan documents, and negotiating with various lenders on issues relating to their individual loans.

3. The Five Debtors' business operations are best described as originating, underwriting, brokering and servicing commercial loans or fractional interests therein, including accepting loan payments arising from the sale of secured properties and releasing collateral in connection with such sales and loan payments.

4. Approximately 3,600 Direct Lenders have undivided fractional interests in the various loans serviced by USACM (the "Loan Portfolio") relating to various real estate

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

construction projects and other real property developments.  At the time that these Direct Lenders contracted to participate as lenders of fractional interests in the Loans, they also entered into an individual Loan Servicing Agreement (the "Servicing Agreements") with USACM whereby they authorized and empowered USACM, on behalf of each Direct Lender, to undertake various servicing functions in connection with the Loan Portfolio (the "Direct Lender Authorizations").  A true and correct copy of one of the representative Loan Servicing Agreements is attached hereto as **Exhibit "A"** and incorporated herein.  Among other powers, Debtor USACM as Servicer is authorized pursuant to Section 2(e) of this Loan Servicing Agreement to do the following:

> (e)  Without limiting the generality of anything contained herein, [Direct] Lender hereby authorizes and empowers USA [Commercial Mortgage Company], on [Direct] Lender's behalf, to:  (1) execute and deliver demands for payoff and beneficiary's/lender's statements of condition and the like; (2) execute and deliver any and all instruments [of] satisfaction or cancellation, or of partial or full release, discharge, or reconveyance, or authorizations in connection therewith, with respect to any Loans paid in full and with respect to the related real or personal property securing such Loans; (3) execute and deliver any and all other documents with respect to any Loans that are customary and consistent with loan servicing practices pertaining to such loans; (4) consent to modifications of the Loans if the effect of any such modification will not materially or adversely affect the security provided by the real or personal property in connection therewith; (5) institute foreclosure proceedings (judicial or non-judicial), obtain a deed-in-lieu thereof, engage in settlement discussions, and enter into forbearance and other settlement-related agreement (which agreements may contain provisions that release or waive claims against a Borrower or Guarantor); and (6) take title in the name of [Direct] Lender (in proportion to its interest in the Loan) to any real property upon a foreclosure or delivery of a deed-in-lieu thereof.

5.      Two groups of investors totaling approximately 3,200 investors own membership interests in the Diversified Trust Deed Fund and the First Trust Deed Fund (collectively the "Funds").  The 3,200 investors in the Funds own membership interests in the two Funds, which in turn are Direct Lenders in the Loan Portfolio along with other Direct Lenders.  USACM is also a Direct Lender in some of the Loans in the Loan Portfolio.

6.      Pursuant to the Direct Lender Authorizations, it has been USACM's customary practice, consistent with industry standards, to engage in settlement discussions and to enter into forbearance and other settlement-related agreements, including agreements for the release of excess collateral and for the sale of collateral for full value, when such actions did not materially

1   or adversely affect the collateral for a particular Loan in the Loan Portfolio and such actions

2   enhanced the likelihood of repayment of such Loan.  Such actions were taken by USACM on

3   behalf of the Direct Lenders pursuant to the Direct Lender Authorizations.

4          7.     Following the Petition Date, as part of its servicing activities, USACM has

5   continued to engage in settlement discussions with the Borrowers on certain Loans in the Loan

6   Portfolio, including discussions about the feasibility of requested forbearance and other

7   settlement-related agreements, such as agreements for the release of excess collateral and for the

8   sale of collateral for full value.  It is USACM's belief that these settlement discussions are

9   transactions in the ordinary course of business that USACM may enter into without notice or a

10   hearing pursuant to 11 U.S.C. § 363(c)(1).  However, there may be some question as to whether or

11   not Debtor USACM has the authority in the ordinary course of business to enter into and

12   implement forbearance and other settlement-related agreements that arise from such settlement

13   discussions.  Thus, Debtors request the Court's approval for the following agreements that the

14   Debtors would like to enter into as a result of settlement discussions with the following Borrowers

15   on the following nonperforming loans ("Nonperforming Loans") and performing loans

16   ("Performing Loans").

17          **Request for Release of Excess Collateral for Franklin/Stratford Loan**

18          8.     On March 30, 2005, USACM as Servicer originated a loan (the "Franklin/Stratford

19   Loan") to Borrower Franklin/Stratford Investments, LLC, an Idaho limited liability company

20   ("Franklin/Stratford").  Sections 3.1 and 3.2 of the Franklin/Stratford Loan Agreement dated

21   March 30, 2005 (the "Franklin/Stratford Loan Agreement") provide that the original principal

22   amount of the Franklin/Stratford Loan was to be $2,500,000, and the Direct Lenders for the

23   Franklin/Stratford Loan and USACM as Servicer had the "exclusive right, but not the obligation,

24   to increase the Loan Amount to an amount not to exceed Six Million Two Hundred Thousand

25   Dollars ($6,200,000)."  Exhibit "B" to the Franklin/Stratford Loan Agreement contained an

26   approved construction budget for the Franklin/Stratford Project of $6,200,000.  <u>See,</u> Declaration

27   of Robert Russell in Support of Debtors' Motion to Forbear and to Provide Further Funding for

28   Certain Outstanding Loans as it Relates to Franklin/Stratford Investment, LLC dated June 8, 2006

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

that is being e-filed with the Court contemporaneously with this Motion (the "Russell Franklin/Stratford Declaration") at ¶ 2.  Robert A. Russell is the Guarantor of the Franklin/Stratford Loan.

9.      The Franklin/Stratford Loan is being used for the construction of three warehouse buildings totaling 48,478 square feet on twelve acres of land in Meridian, Idaho (the "Franklin/Stratford Project").  7.6 acres of the land (the "Excess Collateral") will not be used in conjunction with the three buildings, and Franklin/Stratford plans to sell the Excess Collateral.  See, Russell Franklin/Stratford Declaration at ¶ 3.

10.      Since March 30, 2005, there have been nine amendments to the Franklin/Stratford Loan Agreement, and the Loan Amount has been increased pursuant to these amendments.  The most recent amendment, the Ninth Amendment to Loan Documents (the "Ninth Amendment") is dated March 17, 2006, and increased the Loan Amount to $5,225,000.  There are only two Direct Lenders of the Franklin/Stratford Loan under the Ninth Amendment, and those two Direct Lenders are the Funds (i.e., Debtor First Trust Deed Fund for $4,215,000 (80.67%) of the current principal balance, and Debtor Diversified Trust Deed Fund for $1,010,000 (19.33%) of the current principal balance).  There are no non-Debtor Direct Lenders for the Franklin/Stratford Loan.  The $5,225,000 current principal balance of the Franklin/Stratford Loan has all been disbursed to Franklin/Stratford.  See, Russell Franklin/Stratford Declaration at ¶ 4.

11.      The Franklin/Stratford Project land was acquired by Franklin/Stratford for the price of approximately $4.01 per square foot.  Two parcels of the Excess Collateral have been placed under contract to sell, one a 2.51 acre parcel at the price of approximately $7.70 per square foot, and one a 1.168 acre parcel at $8.00 per square foot.  Franklin/Stratford has also received substantial interest in the remaining vacant lots for the Excess Collateral, with interest expressed in the frontage lots on Franklin Street in the range of $8.00 or greater per square foot, and interest expressed in the remaining interior lot at the $6.27 per square foot range.  See, Russell Franklin/Stratford Declaration at ¶ 5.

12.      Franklin/Stratford contracted to construct the three buildings for the Franklin/Stratford Project with Petra, Inc. ("Petra"), of Boise, Idaho.  The total cost of

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   construction is $2,326,789.9.  $1,441,853.26 has been paid to date, with a remaining balance due

2   of $864,936.67.  The three buildings are very close to completion.  Petra is now over two months

3   in arrears in the construction payments that are owed to Petra, and Petra is preparing to file

4   mechanic's liens on the Franklin/Stratford Project and pull off the job site.  See, Russell

5   Franklin/Stratford Declaration at ¶ 6.

6          13.    If Petra liens the Franklin/Stratford Project and pulls off the job site, the result will

7   be three uncompleted buildings.  If this occurs, Franklin/Stratford will have great difficulty selling

8   the three uncompleted buildings for their full value to pay off the Franklin/Stratford Loan for two

9   reasons:  (a) the buildings are not yet completed; and (b) there would be liens filed on the

10  Franklin/Stratford Project.  These actions will also irreparably damage the reputation of the

11  Franklin/Stratford Project and would ruin Franklin/Stratford's marketing efforts.  In essence, the

12  Franklin/Stratford Project marketing would be halted and the Franklin/Stratford Project, although

13  almost fully funded, would be thrown into default.  The total cost of construction for the

14  Franklin/Stratford Project ($2,326,789.93) is within the Building Shell amount for construction on

15  the Exhibit "B" Approved Budget in the Franklin/Stratford Loan Agreement ($2,390,250.00).

16  See, Russell Franklin/Stratford Declaration at ¶ 7.

17         14.    Prior to the Petition Date, USACM as Servicer had funded only $5,225,000 on the

18  Franklin/Stratford Loan, and had not exercised its right to increase the Loan Amount the

19  additional $975,000.00 which the Direct Lenders and USACM had the exclusive right to fund.

20  Franklin/Stratford contends that without these funds, it cannot pay the general contractor.  See,

21  Russell Franklin/Stratford Declaration at ¶ 8.

22         15.    Franklin/Stratford has requested that the net proceeds from the soon to be closed

23  sale of 2.51 acres of the Excess Collateral be released from the trust deed lien on the

24  Franklin/Stratford Project and instead disbursed to the general contractor for the Franklin/Stratford

25  Project, rather than being used as a partial principal repayment of the Franklin/Stratford Loan.

26  Franklin/Stratford will then pay the remaining balance of approximately $119,063.33 owed to the

27  general contractor from existing cash resources held in Franklin/Stratford's accounts.  Allowing

28  this to occur will mean that all of the dollars from the sale of 2.51 acres of the Excess Collateral

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    will remain in the Franklin/Stratford Project as equity and will not be distributed to any other party

2    than the general contractor.  The additional amounts needed to pay the general contractor are not

3    due to any cost overruns.  This proposal will also make it unnecessary for the Direct Lenders

4    and/or Debtor USACM to determine whether or not to exercise the right to increase the Loan

5    Amount up to the full $6,200,000 referred to in the Franklin/Stratford Loan Agreement.  See,

6    Russell Franklin/Stratford Declaration at ¶ 9.

7        16.    The land sale of 2.51 acres of the Excess Collateral is set to close on June 19, 2006.

8    The price of the land under this sale is $810,000.00.  The net proceeds of this land sale after real

9    estate commissions and costs of sale will be approximately $745,000.00.  See, Russell

10    Franklin/Stratford Declaration at ¶ 9.

11        17.    Although the proceeds from the sale of this 2.51 acres of the Excess Collateral

12    would ordinarily be applied to pay down the Franklin/Stratford Loan, these proceeds are needed to

13    preserve the value of all of the Franklin/Stratford Loan collateral.  Using these proceeds to help

14    pay the general contractor and keeping the Franklin/Stratford Project intact is much more

15    favorable to all parties and does not reduce the collateral value for the Franklin/Stratford Loan as

16    the dollars are remaining in the Franklin/Stratford Project.  All of the sale proceeds from the sale

17    of the Excess Collateral are being used to complete the Franklin/Stratford Project and to protect

18    and enhance the value of the remaining collateral.  This process will enable Franklin/Stratford to

19    be able to sell the soon to be completed buildings and pay off the Franklin/Stratford Loan.  The

20    anticipated time frame for the sale of the buildings and pay off of the Franklin/Stratford Loan is by

21    the end of the first quarter of 2007.  See, Russell Franklin/Stratford Declaration at ¶ 10.  The

22    current maturity date of the Franklin/Stratford Loan is March 31, 2007.

23        18.    The value of  the remaining vacant land parcels for the Franklin/Stratford Project,

24    based on current sales (including the 1.168 acre parcel currently under contract), is approximately

25    $1,573,000.00.  This should net, prior to loan payoff, approximately $1,525,000 to

26    Franklin/Stratford for payment towards the Franklin/Stratford Loan when the parcels are sold.

27    See, Russell Franklin/Stratford Declaration at ¶ 11.  See also, Declaration of Gary Buentgen in

28    Support of Debtors' Motion to Forbear and to Provide Further Funding for Certain Outstanding

1    Loans as it Relates to Franklin/Stratford Investment, LLC dated June 8, 2006 that is being e-filed

2    with the Court contemporaneously with this Motion (the "Buentgen Declaration") at ¶ 4.  The net

3    proceeds from the sale of the remaining 5.09 acres of the Excess Collateral will not be released,

4    but will be applied to repayment of the Franklin/Stratford Loan.

5           19.    The buildings for the Franklin/Stratford Project are being marketed at a price

6    totaling approximately $4,870,000.  This should net Franklin/Stratford approximately $4,530,000

7    for payment towards the Franklin/Stratford Loan after payment of commissions and other costs of

8    sale.  See, Russell Franklin/Stratford Declaration at ¶ 12; Buentgen Declaration at ¶ 5.

9           20.    These building sales and the land sales should net, prior to loan payoff,

10   approximately $6,055,000 to Franklin/Stratford for payment towards the Franklin/Stratford Loan.

11   The value prior to commissions and closing costs is approximately $6,443,000.00.  The existing

12   Franklin/Stratford Loan balance is $5,225,000 plus May accrued interest.  The equity in the

13   completed Franklin/Stratford Project should be approximately $1,218,000.00 before payment of

14   commissions and closing costs, or approximately $830,000.00 after payment of commissions and

15   closing costs.  See, Russell Franklin/Stratford Declaration at ¶ 12.

16          21.    The purpose of this Motion as it relates to the Franklin/Stratford Loan is to prevent

17   serious damage to the Franklin/Stratford Project.  If the warehouses are not completed and sold,

18   the loss will impact not only Franklin/Stratford but the Direct Lenders for the Franklin/Stratford

19   Loan and Debtor USACM by substantially harming the value of the collateral for the

20   Franklin/Stratford Loan.  The Franklin/Stratford Project is nearly complete, but the $5,225,000 in

21   loan funds advanced pursuant to the Ninth Amendment to the Franklin/Stratford Loan have been

22   used up, and the Franklin/Stratford Project has been threatened with a substantial mechanics lien

23   from the general contractor because the contractor has not been fully paid.  An already planned

24   sale of a 2.51 acres of the Excess Collateral securing the Franklin/Stratford Loan will yield

25   sufficient funds, along with an additional contribution from Borrower Franklin/Stratford, to pay

26   the general contractor's bill and complete construction of the warehouse buildings in the

27   Franklin/Stratford Project.   The subsequent sale of the completed warehouse buildings and the

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  balance (5.09 acres) of the Excess Collateral should then generate net sale proceeds sufficient to

2  pay off the Franklin/Stratford Loan in full.

3       22.    Because the Franklin/Stratford Project contains some Excess Collateral that is in

4  the process of being sold, the Franklin/Stratford Project itself can generate most of the funds

5  needed to pay off the general contractor and to complete the Franklin/Stratford Project without the

6  need for the Funds as Direct Lenders or USACM as Servicer to advance any new monies as

7  additional Loan Amounts to Franklin/Stratford.  It is the Debtors' business judgment that the net

8  proceeds from the sale of the 2.51 acres of the Excess Collateral should be released to help pay the

9  general contractor for the Franklin/Stratford Loan.

10      **Additional $125,000 Loan Advance from Debtor USACM to Borrower Boise/Gowan**

11      23.    On August 26, 2005, USACM as Servicer originated a loan (the "Boise Gowan

12  Loan") to Borrower Boise/Gowan 93 LLC, an Idaho limited liability company ("Boise/Gowan").

13  Sections 3.1 and 3.2 of the Boise/Gowan Loan Agreement dated August 26, 2005 (the

14  "Boise/Gowan Loan Agreement") provide that the original principal amount of the Boise/Gowan

15  Loan was to be $2,150,000, and the Direct Lenders for the Boise/Gowan Loan **and** USACM as

16  Servicer had until August 1, 2006, the "exclusive right, but not the obligation, to increase the Loan

17  Amount to an amount not to exceed Two Million Five Hundred Fifty Thousand Dollars

18  ($2,550,000)."  Exhibit "B" to the Boise/Gowan Loan Agreement contained an approved

19  construction budget for the Boise/Gowan Project of $2,550,000.  The Guarantors of the

20  Boise/Gowan Loan are Robert A. Russell (the Manager of Borrower of Boise/Gowan), Thomas A.

21  Hantges, and Joseph D. Milanowski.

22      24.    The Boise/Gowan Loan is being used for the purchase and initial development (for

23  further development) of an approximately 93 acre parcel of unimproved land in Boise, Idaho,

24  adjacent to the Boise Municipal Airport (the "Boise/Gowan Project").

25      25.    Since August 26, 2005, there have been two amendments to the Boise/Gowan Loan

26  Agreement, and the Loan Amount has been increased pursuant to these amendments.  The most

27  recent amendment, the Second Amendment to Loan Documents (the "Second Amendment") is

28  dated February 21, 2006, and increased the Loan Amount to $2,425,000.  There are 17 Direct

Lenders of the Boise/Gowan Loan under the Second Amendment. The Funds are not Direct

Lenders under the Boise/Gowan Loan. The $2,425,000 current principal balance of the

Boise/Gowan Loan has all been disbursed to Boise/Gowan.

26. The Boise/Gowan Project is 95% funded. Boise/Gowan has requested an

additional $125,000 loan advance from Debtor USACM, which would bring the total Loan

Amount for the Boise/Gowan Loan to the $2,550,000 approved construction budget on Exhibit

"B" to the Boise/Gowan Loan Agreement. The additional $125,000 loan advance will be used by

Borrower Boise/Gowan to complete the engineering and initial development of the Boise/Gowan

Project and pay the property taxes which are currently due on the Boise/Gowan Project.

27. Debtor USACM is agreeable (subject to Court approval) to provide the requested

additional $125,000 loan advance to Borrower Boise/Gowan, which Debtor USACM has the right

to advance in its individual capacity pursuant to Section 3.2 of the Boise/Gowan Loan Agreement.

Debtor USACM proposes to document the additional $125,000 loan advance pursuant to a Third

Amendment to Loan Documents and other loan documentation and loan requirements (including

the consents of the Guarantors and title insurance for the additional $125,000 loan advance)

consistent with the existing loan documentation for the Boise/Gowan Loan. The additional

$125,000 loan advance by Debtor USACM as an additional Direct Lender for the Boise/Gowan

Loan would share pari passu in the existing collateral for the Boise/Gowan Loan and would be

repaid on a pari passu basis with the current 17 Direct Lenders for the Boise/Gowan Loan.

28. The Boise/Gowan Loan is a Performing Loan. Debtors' records reflect that there is

currently $25,260 of Interest Outstanding on the Boise/Gowan Loan, but the disbursement agent

for the Boise/Gowan Loan has sufficient funds in the interest reserve for the Boise/Gowan Loan to

cover this amount. The maturity date of the Boise/Gowan Loan is August 31, 2006. Borrower

Boise/Gowan has received considerable interest in purchasing portions or all of the Boise/Gowan

Project, and Borrower Boise/Gowan anticipates that it will be able to sell the Boise/Gowan Project

in the near future for far in excess of the principal balance (including the contemplated $125,000

additional loan advance) of the Boise/Gowan Loan.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    29.    It is USACM's business judgment that the $125,000 additional loan advance

2    should be made from USACM's existing operating funds to avoid the filing of mechanic's liens on

3    the Boise/Gowan Project and to pay off property taxes on the Boise/Gowan Project in order to

4    enhance Boise/Gowan's ability to quickly sell the completed Boise/Gowan Project and repay the

5    Boise/Gowan Loan.

6    **Partial Releases for Three Amesbury Loan Condominium Units**

7    30.    On December 18, 2002, USACM as Servicer originated a loan (the "Amesbury

8    Loan") to Borrower Amesburyport Corporation, a Massachusetts corporation ("Amesburyport").

9    Under the Amesbury Loan Agreement dated December 18, 2002 (the "Amesbury Loan

10    Agreement"), the original principal amount of the Amesbury Loan was $21,750,000.  The

11    Guarantor of the Amesbury Loan is William H. Sullivan.

12    31.    The Amesbury Loan was made to Amesburyport for the renovation of nine old

13    factory buildings located in Amesbury, Massachusetts, which is approximately 50 miles north of

14    Boston, Massachusetts, and conversion of the buildings into condominium units.  The current

15    outstanding principal on the Amesbury Loan is $18,672,455, with unpaid interest and fees owing

16    of approximately $5,803,787 (this number is preliminary only and includes default interest and

17    late fees).  There are 393 Direct Lenders for the Amesbury Loan.  Diversified Trust Deed Fund is

18    a Direct Lender in the Amesbury Loan with a 15.18% undivided interest in the Amesbury Loan.

19    First Trust Deed Fund is also a Direct Lender in the Amesbury Loan with a 1.72% undivided

20    interest in the Amesbury Loan.  USACM is also a Direct Lender in the Amesbury Loan with a

21    0.25% undivided interest in the Amesbury Loan.  The Amesbury Loan is a Nonperforming Loan,

22    both because of the unpaid interest on the Amesbury Loan and because the Amesbury Loan

23    matured on June 30, 2005.

24    32.    The last three condominiums from Phase I of the Amesbury Project are currently

25    under contract at list price.  All of the other condominiums in Phase I have been sold.

26    Amesburyport has requested that USACM as Servicer consent to the sales of the last three

27    condominium units and issue Partial Releases for these units.  The estimated net proceeds from

28    these sales are approximately $500,000 per unit, for an estimated return to USACM as Servicer of

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  approximately $1,500,000 for the three units. These sale prices reflect pricing at $318 per square

2  foot to $330 per square foot. An appraisal by Joseph J. Blake and Associates, Inc. performed

3  during March 2005 in support for Phase II of this project (which has not yet been built) indicated

4  the pricing on comparable properties in the Amesbury, Massachusetts area to be $196 per square

5  foot to $305 per square foot. The pending sales appear to be at pricing that is at the top of the

6  comparable range.

7          33.     Once the last three condominium units are sold, the remaining collateral for the

8  Amesbury Loan has an estimated value that is less than the remaining amount that would be due

9  on the Amesbury Loan. Deficiency claims against the Guarantor of the Amesbury Loan will also

10  be pursued, but the possible recovery from the Guarantor is currently uncertain.

11          34.     It is USACM's business judgment that as Servicer, it should consent to the sales of

12  the last 3 condominium units in Phase I of the Amesbury Project and issue Partial Releases for

13  these 3 units in exchange for net sale proceeds for these 3 units. Even though the Amesbury Loan

14  is a Nonperforming Loan, and it appears that the Amesbury Loan may not be fully collectible, it is

15  prudent to realize the top of the price range for these three condominiums that are currently under

16  contract, rather than allow the current sales contracts to fall through. If these sales are not timely

17  closed, the Direct Lenders on the Amesbury Loan may not only lose full price sales, but it is

18  Debtor USACM's judgment that failed sale transactions will impair the ability to sell these three

19  units for full price in the future.

20          35.     All loan payment proceeds that Debtor USACM receives as Servicer on the

21  Amesbury Loan for these three condominium units will be held in the segregated collection

22  account (the "Collection Account") that has been opened up by USACM, and all loan payment

23  proceeds shall be accounted for by USACM separately on a loan by loan basis (provided, that

24  USACM will not separately segregate the loan payment proceeds in separate subaccounts of the

25  Collection Account, but all loan payment proceeds shall be deposited into a single Collection

26  Account).

27          36.     The Collection Account funds will not be commingled with any operating funds of

28  any of the Debtors or any of their affiliates, and USACM shall only transfer from the Collection

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  Account to USACM's separate operating account the amounts that were approved by this Court

2  for transfer to Debtor USACM pursuant to the Second Order Approving Debtors' Proposed Cash

3  Management Procedures and Cash Usage that was entered by this Court on May 22, 2006 as

4  Docket No. 315, or such amounts that are approved by this Court for transfer to the Debtors by

5  any separate Order entered in the future.

6       37.    All liens, rights and interests that the Direct Lenders have in any collateral that is

7  being released as a result of Debtor USACM providing Partial Releases for the remaining three

8  condominium units for Phase I of the Amesbury Project shall attach to the Amesbury Loan

9  payment proceeds that USACM receives as Servicer and that are deposited into the segregated

10  Collection Account, and Debtor USACM's contractual rights and any other rights to collect

11  servicing fees and other fees from the loan payment proceeds that USACM receives as Servicer

12  shall also attach to such loan payment proceeds as they are deposited into the segregated

13  Collection Account.  Debtor USACM will also provide as part of its monthly operating reports to

14  be filed with the Court the amounts of the actual Amesbury Loan payment proceeds that Debtor

15  USACM as Servicer actually receives in connection with the Partial Releases given on these three

16  condominium units for the Amesbury Loan.

17  <u>**Authorization to Forbear on Four HFA Loans**</u>

18  <u>**HFA Monaco Loan**</u>

19       38.    On December 19, 2003, Debtor Diversified Trust Deed Fund as a 100% Direct

20  Lender entered into a loan (the "HFA Monaco Loan") to HFAH-Monaco, LLC, a Florida limited

21  liability company ("HFA Monaco").  The HFA Monaco Loan is evidenced by a Loan Agreement

22  (the "HFA Monaco Loan Agreement"), dated December 19, 2003 between HFA Monaco, as

23  Borrower, and Debtor Diversified Trust Deed Fund, as Lender.

24       39.    The HFA Monaco Loan is secured by a first lien Trust Deed on real property and

25  improvements, dated December 19, 2003 and recorded in Lee County, Florida (the "HFA Monaco

26  Trust Deed").

27       40.    The maturity date of the HFA Monaco Loan was originally December 19, 2004.

28  HFA Monaco and Debtor Diversified Trust Deed Fund entered into two Loan Extension

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Agreements in which the maturity date of the HFA Monaco Loan was extended to December 19, 2006. However, the HFA Monaco Loan is a Nonperforming Loan in that interest payments have not been made as required by the HFA Monaco Loan Agreement and are past due. The amount owed by HFA Monaco on the HFA Monaco Loan, according to the records of Debtor USACM, is the principal sum of $4,000,000, plus interest as of May 26, 2006 in the amount of $1,279,500, plus any other costs and fees that are due and owing.

## HFA Clear Lake Loan

41.     On January 6, 2005, Debtor USACM originated a loan (the "HFAH Clear Lake Loan") to HFAH Clear Lake, LLC, a Florida limited liability company ("HFAH Clear Lake"). The HFAH Clear Lake Loan is evidenced by a Loan Agreement (the "HFAH Clear Lake Loan Agreement"), dated January 6, 2005. There are 207 Direct Lenders for the HFAH Clear Lake Loan. The HFAH Clear Lake Loan is secured by a first lien Trust Deed on real property and improvements, dated January 6, 2005 and recorded in Palm Beach County, Florida on January 21, 2005 (the "HFAH Clear Lake Trust Deed").

42.     The maturity date of the HFAH Clear Lake Loan was originally January 7, 2006. HFAH Clear Lake entered into a Loan Extension Agreement in which the maturity date of the HFAH Clear Lake Loan was extended to January 7, 2007. However, the HFAH Clear Lake Loan is a Nonperforming Loan in that interest payments have not been made as required by the HFAH Clear Lake Loan Agreement and are past due.

43.     The amount owed by HFAH Clear Lake on the HFAH Clear Lake Loan, according to the records of Debtor USACM, is the principal sum of $16,050,000, plus interest as of May 26, 2006 in the amount of $2,642,136, plus any other costs and fees that are due and owing.

## HFA Clear Lake-2nd Loan

44.     On June 24, 2005, USACM originated a second loan (the "HFAH Clear Lake 2nd Loan") to HFAH Clear Lake. The HFAH Clear Lake 2nd Loan is evidenced by a Loan Agreement (the "HFAH Clear Lake 2nd Loan Agreement"), dated June 24, 2005. There are 36 Direct Lenders for the HFAH Clear Lake 2nd Loan. The HFAH Clear Lake 2nd Loan is secured by a second lien Trust Deed on the same real property and improvements that secures the HFAH Clear Lake Loan,

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

as evidenced by a Mortgage (Second Position) dated June 24, 2005 and recorded in Palm Beach County, Florida on July 28, 2005 (the "HFAH Clear Lake 2nd Trust Deed").

45.    The HFAH Clear Lake 2nd Loan matures on July 1, 2006.  However, the HFAH Clear Lake 2nd Loan is a Nonperforming Loan in that interest payments have not been made as required by the HFAH Clear Lake 2nd Loan Agreement and are past due.

46.    The amount owed by HFA Clear Lake on the HFAH Clear Lake 2nd Loan, according to the records of Debtor USACM, is the principal sum of $2,750,000, plus interest as of May 26, 2006 in the amount of $386,233, plus any other costs and fees that are due and owing.

**HFA Windham/Asylum Loan**

47.    On August 30, 1999, Enterprise Capital, Inc., now known as Independence Bank, an entity unrelated to the Debtors, made a loan to Windham Mills Development Corporation ("Windham"), secured by a Mortgage on real property owned by Windham (the "Windham Loan").  On or about September 24, 2004, at a time when the Windham Loan was in default, Homes for America Holdings, Inc. ("HFAH") purchased all of the rights of Independence Bank in the Windham Loan, including all collateral documents.  On or about November 15, 2004, USACM originated a loan (the "HFAH Windham/Asylum Loan") to enable HFAH to purchase the position of Independence Bank in the Windham Loan.  The HFAH Loan was funded by 74 non-Debtor Direct Lenders (the "HFAH-Asylum Direct Lenders").  Although it was the intention of USACM and the HFAH-Asylum Direct Lenders to obtain collateral assignments of all of the rights of HFAH in the Windham Loan, the records of USACM on the HFAH Windham/Asylum Loans are incomplete.

48.    According to the records of Debtor USACM, the HFAH Windham/Asylum Loan matures on June 16, 2006.  However, the HFAH Windham/Asylum Loan is a Nonperforming Loan in that interest payments have not been made and are past due.  The amount owed by HFAH on the HFAH Windham/Asylum Loan, according to the records of USACM, is the principal sum of $5,550,000, plus interest as of May 26, 2006 in the amount of $951,580, plus any other costs and fees that are due and owing.

/ / /

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**Recent Postpetition Repayment of Three Other HFA Loans**

49.     USACM also originated three other loans to HFAH or its affiliates, which loans were funded by non-Debtor Direct Lenders and by First Trust Deed Fund.  In May of 2006, these three HFA loans were paid in full by the borrowers, prior to the stated maturity of these loans, and the loan repayment proceeds were delivered to USACM as Servicer.  Specifically, HFA Riviera repaid in full a loan owed to 90 non-Debtor Direct Lenders by paying the principal sum of $5,000,000, plus interest in the amount of $767,361.  HFA North Yonkers (One Point Street, Inc.) repaid in full a loan owed to Debtor First Trust Deed Fund as a Direct Lender and 298 other non-Debtor Direct Lenders by paying the principal sum of $24,000,000, plus interest in the amount of $4,168,403.  HFA Riviera also repaid in full a loan owed to 99 non-Debtor Direct Lenders by paying the principal sum of $8,000,000, plus interest in the amount of $2,698,080.

50.     In connection with the arrangements for the HFA borrowers to make these early payments in full, USACM as Servicer agreed, dependent upon approval of the Court (if such action were deemed to not be an ordinary course of business transaction), to forbear from declaring a default and to forbear from exercising remedies on the HFA Monaco Loan, the HFAH Clear Lake, the HFAH Clear Lake 2nd Loan and the HFAH Windham/Asylum Loan (the "Four HFA Loans"), until January 1, 2007, even though the Four HFA Loans are Nonperforming Loans. No claims are being released or waived against the Borrowers or any Guarantors of the Four HFA Loans.  The Borrowers for the Four HFA Loans requested this forbearance to facilitate the refinancing of the Four HFA Loans or the sale of the collateral for the Four HFA Loans to allow them to be repaid, which these Borrowers hope to have accomplished by the end of 2006.

51.     It is the business judgment of First Trust Deed Fund and USACM that the requested forbearance should be given, with any additional terms (such as completing the documentation of the HFAH Windham/Asylum Loan, if necessary) for such forbearance to be imposed as determined by First Trust Deed Fund and USACM  in their business judgment (provided, that no claims will be released or waived against the Borrowers or any Guarantors of the Four HFA Loans in connection with such forbearance).

/ / /

1

**Memorandum of Law**

2      Debtors are engaged in the business of originating, underwriting, brokering and servicing

3   commercial loans or fractional interests therein.  As part of that business, Debtors routinely

4   receive requests for loan modifications, forbearances, releases of collateral, and additional

5   funding, which all facilitate the completion and sale of construction projects that permit the related

6   loans to be repaid.  After review and analysis of these requests, the Debtors routinely provided the

7   requested loan modifications, forbearances, releases of collateral, and additional funding that made

8   economic sense and helped achieve the ultimate goal of completion and sale of the secured

9   construction projects.

10      Following the filing of the Debtors' Chapter 11 Petitions, the borrowers for the

11   Franklin/Stratford Loan, the Boise Gowan Loan, the Amesbury Loan, and the Four HFA Loans,

12   made the requests outlined above for forbearances, releases of excess collateral, issuance of partial

13   releases, or additional funding for these Loans.  The Debtors have reviewed and analyzed these

14   requests and concluded that they make economic sense, and that they will help facilitate the

15   payment of these Loans.  It is the Debtors' business judgment that the requested transactions, to

16   the extent that they are not in the ordinary course of Debtors' business, should be approved by the

17   Court.

18      Section 105(a) of the Bankruptcy Court allows this Court to "issue any order, process, or

19   judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

20   11 U.S.C. § 105(a).  Under Section 105(a) of the Bankruptcy Code, the Court has expansive

21   equitable powers to fashion any order or decree that is the interest of preserving or protecting the

22   value of the debtor's assets.  *See, Chinician v. Campolongo (In re Chinichian),* 784 F.2d 1440,

23   1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as

24   necessary pursuant to the purposes of the Bankruptcy Code.")

25      Section 363(c)(1) of the Bankruptcy Code provides that a debtor in possession authorized

26   to operate its business under 11 U.S.C. § 1108 "may enter into transactions, including the sale or

27   lease of property of the estate, in the ordinary course of business, without notice or a hearing, and

28   may use property of the estate in the ordinary course of business without notice or a hearing."

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   (Emphasis added).  While the Bankruptcy Code and the legislative history of Section 363(c) do

2   not offer guidance as to what constitutes "ordinary course of business," the Ninth Circuit has

3   stated that the courts interpreting this section have provided helpful and persuasive guidelines

4   under two tests:  "(1) [the] vertical dimension or creditor's expectation test and (2) [the] horizontal

5   dimension test." *Burlington Northern Railroad Co. v. Dant & Russell, Inc. (In re Dant & Russell,*

6   *Inc.),* 853 F.2d 700, 704 (9th Cir. 1988).

7          The horizontal dimension test measures "an industry-wide perspective in which the

8   debtor's business is compared to other like businesses.  In this comparison, the test is whether the

9   postpetition transaction is of a type that other similar businesses would engage in as ordinary

10  business." *Id.*  Under the horizontal dimension test, "a transaction occurs in the debtor-in-

11  possession's ordinary course of business when there is a showing that the transaction is the sort

12  occurring in the day-to-day operation of debtor's business." *Id.*

13         Under the vertical dimension test, a transaction is viewed from the vantage point of a

14  hypothetical creditor, and inquiry is made whether the transaction subjects such creditor to

15  economic risks of a nature different from those he or she accepted when he or she decided to

16  extend credit to the debtor. *Id.* at 705.  Under this test, some transactions by their very size or

17  nature are not within the day-to-day operations of the debtor's business and are therefore

18  considered to be extraordinary and not ordinary course of business transactions. *Id.*  The debtor-

19  in-possession's prepetition business activities are compared to its postpetition transactions under

20  the vertical dimension or creditor's expectation test to determine if the postpetition transactions

21  are in the ordinary course of business. *Id.*

22         Under either the horizontal dimension test or the vertical dimension test, Debtor USACM's

23  use of its authority under the Direct Lender Authorizations, and the decisions and consents of

24  Debtor First Trust Deed Fund and Debtor Diversified Trust Deed Fund on their own behalf, to

25  grant forbearances, to release excess collateral, and to issue partial releases, can all be viewed as

26  acts done in the "ordinary course of business" for such Debtors.  Granting limited forbearances

27  and releasing excess collateral and issuing partial releases in order to facilitate the completion of

28  construction projects that are not fully funded and to enhance the prospects of repayment of loans

Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    are the types of activities that mortgage servicing businesses engage in on a daily basis.  Likewise,

2    Debtors were routinely engaged in these same activities on a prepetition basis.

3            Even if these transactions were viewed to be extraordinary, such that the "ordinary course

4    of business" authorization of Section 363(c)(1) might not apply to a particular transaction,  Section

5    363(b)(1) of the Bankruptcy Code provides the necessary authority for the Court to authorize these

6    transactions.  Section 363(b)(1) provides that a debtor in possession, "after notice and a hearing,

7    may use, sell, or lease, other than in the ordinary course of business, property of the estate."

8    "Section 363 of the [Bankruptcy] Code seems on its face to confer upon the bankruptcy judge

9    virtually unfettered discretion to authorize the use, sale or lease, other than in the ordinary course

10    of business, of property of the estate."  *Committee of Equity Sec. Holders v. Lionel Corp. (In re*

11    *Lionel Corp.),* 722 F.2d 1063, 1069 (2nd Cir. 1983).

12            To approve the use, sale or lease of property other than in the ordinary course of business,

13    there must be "a sound business purpose [that] justifies such actions."  *In re Montgomery Ward*

14    *Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999).  Under the circumstances outlined above, the

15    Debtors' business judgments to provide the requested limited forbearances, to release excess

16    collateral, to issue partial releases, and to provide additional loan funding for the Boise/Gowan

17    Loan, as outlined above, is fully supported by the "business judgment test" which is the standard

18    for approval of transactions under Section 363(b)(1).  *Id.*

19            It is the Debtors' business judgment that the value of the collateral for the

20    Franklin/Stratford Loan and the Boise Gowan Loan will be preserved and greatly enhanced for the

21    benefit of all parties if their related Projects can be completed as contemplated by their Borrowers

22    in order to allow them to be sold at full market value.  A completed construction project that is a

23    candidate for a sale to an investor or a take-out loan from a permanent financing source is much

24    more likely to generate the funds needed to pay off these loans than an uncompleted construction

25    project that is likely to be encumbered with mechanic's liens and embroiled in other litigation.

26    See, Second Supplemental Declaration of Thomas J. Allison dated May 17, 2006 that was e-filed

27    with the Court on May 17, 2006 (Docket No. 267) ("Second Supplemental Allison Declaration")

28    at ¶ 31.  Granting this Motion will also eliminate a potential source of contention or litigation

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    between the Debtors and the Borrowers on the Franklin/Stratford Loan and the Boise/Gowan Loan

2    regarding whether or not there are additional funding obligations to these Borrowers.

3          It is also the Debtors' business judgment that the partial releases for the sale of the last

4    three condominium units for the Amesbury Loan should be accepted, and the net sales proceeds

5    accepted as partial repayment of the Amesbury Loan.  Finally, it is the Debtors' business judgment

6    that granting the limited forbearance requested for the Four HFA Loans will enhance the

7    likelihood of those Loans being repaid before the end of 2006.

8          Bankruptcy Rule 6004(g) provides that "[a]n order authorizing the use, sale, or lease of

9    property other than cash collateral is stayed until the expiration of 10 days after entry of the order,

10   unless the court orders otherwise."  Because of the immediate need to preserve value for the Loans

11   outlined above, the Debtors also request that the Court order that the automatic 10- day stay under

12   Bankruptcy Rule 6004(g) not apply to any Order granting this Motion, and that such Order be

13   effective immediately upon entry of such Order.

## CONCLUSION

15         The Debtors request that the Motion be granted, and that the Court authorize them to take

16   the actions outlined above with respect to the Franklin/Stratford Loan (release of excess

17   collateral), the Boise/Gowan Loan (an additional loan advance of $125,000 by Debtor USACM),

18   the Amesbury Loan (issue partial releases for the remaining 3 condominium units in Phase I and

19   accept the net sales proceeds associated therewith), and the Four FHA Loans (limited forbearance

20   until January 1, 2007), based upon the Debtors' business judgments that these actions are in the

21   best interests of all concerned parties.

22         DATED: June 9, 2006

23                                              /s/      JEANETTE E. MCPHERSON
24                                              Lenard E. Schwartzer, Nevada Bar No. 0399
                                                Jeanette E. McPherson, Esq., Nevada Bar No. 5423
25                                              SCHWARTZER & MCPHERSON LAW FIRM
                                                2850 South Jones Boulevard, Suite 1
26                                              Las Vegas NV  89146
                                                Attorneys for Debtors and Debtors-in-Possession
27

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# EXHIBIT "A"

# LOAN SERVICING AGREEMENT

This Loan Servicing Agreement ("Agreement") is made as of the __17__ day of **June**, 2004, between USA Commercial Mortgage Company ("USA") and **Charles B. Anderson Trustee of the Charles B. Anderson Trust,** (Lender")

## RECITALS

A.    USA is a mortgage broker and loan servicer in Clark County, Nevada.

B.    Lender lends, or wishes to lend, money to various borrowers (the term "Borrower" includes single and married persons, corporations, trusts, partnerships and all other legal entities) from time to time, which loans are arranged by USA and are secured by interests in real and/or personal property.

C.    Lender wishes to retain the services of USA in connection with making and servicing a loan or loans (Loan" or "Loans" as the context requires), including all Loans heretofore or hereafter placed by Lender through USA, all upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Services in Connection with Arranging the Loans</u>.  USA will perform the following services in connection with arranging each Loan:

(a)    Obtain a promissory note or notes secured by the trust deed referred to in Section 1(b) below, executed by Borrower in a form customarily used by USA and approved by USA's counsel.

(b)    Obtain a deed of trust, assignment of rents and security agreement executed by Borrower in form customarily used by USA and approved by USA's counsel, and cause the same to be properly recorded.

(c)    Obtain one or more personal or corporate guaranties, if applicable and as determined by USA to be necessary, executed by such guarantors, as USA shall deem appropriate, in form customarily used by USA.

(d)    If  USA deems it appropriate or necessary, obtain, at Borrower's expense, an appraisal of the property to be encumbered, prepared and executed by an appraiser reasonably satisfactory to USA.

(e)    Obtain from a reputable title insurance company, at Borrower's expense, a fully-paid ALTA lender's policy of title insurance, showing Lender as an insured, in an amount at least equal to the initial principal amount of the note and showing as exceptions only those items approved by USA and its counsel.

(f)    Cause the Borrower to obtain, where applicable, casualty insurance policies in amounts at least equal to the principal amount of the note or the full insurable value of the improvements on the encumbered real property, whichever is less, containing a mortgage or loss payee clause naming Lender, or

USA (as agent for Lender), as an additional insured or loss payee.

        (g)    Obtain from the Borrower and each guarantor such recent financial statements and information as USA shall deem appropriate.

        (h)    Obtain, with respect to any and all encumbrances of record to which Lender's deed of trust will be subject, documentation verifying the principal balance thereof within a reasonable time prior to the making of the Loan and specifying any then existing defaults thereunder.

        (i)    Obtain such other documents in connection with the Loan, as USA may deem appropriate in order to protect the Lender's interest.

        (j)    All documents which USA obtains from borrower in connection with arranging or servicing any Loan, so long as such Loan is outstanding, shall be kept on file in USA's corporate office and be available to Lender upon request. Notwithstanding the foregoing, USA shall have no obligation or responsibility to obtain any original documents in connection with any Loan serviced by USA, but not arranged or originated by USA.

        (k)    Prepare and deliver to escrow closing instructions to effectuate the Loan closing in accordance with the Loan Agreement and the Fee Agreement.

    2.    <u>Services of USA in Connection with Servicing the Loans</u>.  Subject to and in accordance with the terms and conditions set forth in this Agreement, and all applicable laws, Lender instructs and authorizes USA to, and USA will perform the following services in connection with servicing each of the Loans:

        (a)    Verify, where applicable, that the property encumbered by Lender's deed of trust is insured (at the Borrower's expense) by a sufficient casualty insurance policy and that Borrower has sufficient liability insurance coverage. USA will hold for the Lender's account such policies and renewals thereof.

        (b)    Keep appropriate accounting records on each note and the sums collected thereon, which records will reflect the amounts collected as to principal, interest and late charges, and, if applicable, insurance, taxes and other specified amounts. Those records will be available for review by the Lender during regular business hours at USA's corporate office.

        (c)    Until the total amount due under each note is paid in full:

            (i)    Proceed diligently to collect all payments due under the terms of the note and promptly pay the proper parties, when and if due, principal, interest, late charges, insurance and other specified funds.

            (ii)    In the event the Borrower fails to make any payment to USA as required by the terms of the note, USA will take steps to collect the payment including but not limited to delivering default notices, commencing and pursuing foreclosure procedures, and obtaining representation for Lender in litigation and bankruptcy proceedings as deemed necessary or appropriate by USA in its business judgment to fully protect the interests of the Lender, and of all Lenders in the loan.

(iii)    In its sole discretion, USA may pay off any Lender at any time by paying the then outstanding balance of Lender's interest in the principal of the Loan, plus all accrued interest and any prepayment penalty or fee, if applicable. Any Lender so paid off shall concurrently execute and deliver therewith to USA an assignment, in a form acceptable to USA, of all of such Lender's right, title, and interest in the Loan (including all documents evidencing the Loan) and in the deed of trust securing the Loan.

(iv)    In its sole discretion, USA may waive late payment charges, assumption fees, charges for returned checks due to insufficient funds, or other fees which may be collected in the ordinary course of servicing the Loans.

(d)    Provide the Lender with regular statements regarding loan collections, but in no event less frequently than quarterly.

(e)    Without limiting the generality of anything contained herein, Lender hereby authorizes and empowers USA, on Lender's behalf, to: (1) execute and deliver demands for payoff and beneficiary's / lender's statements of condition and the like; (2) execute and deliver any and all instruments if satisfaction or cancellation, or of partial or full release, discharge, or reconveyance, or authorizations in connection therewith, with respect to any Loans paid in full and with respect to the related real or personal property securing such Loans; (3) execute and deliver any and all other documents with respect to any Loans that are customary and consistent with loan servicing practices pertaining to such loans; (4) consent to modifications of the Loans if the effect of any such modification will not materially or adversely affect the security provided by the real or personal property in connection therewith; (5) institute foreclosure proceedings (judicial or non-judicial), obtain a deed-in-lieu thereof, engage in settlement discussions, and enter into forbearance and other settlement-related agreements (which agreements may contain provisions that release or waive claims against a Borrower or Guarantor); and (6) take title in the name of Lender (in proportion to its interest in the Loan) to any real property upon a foreclosure or delivery of a deed-in-lieu thereof. Notwithstanding the foregoing or any other provision contained herein, USA may not permit any modification to any Loan that would change the interest rate, forgive the payment of any principal or interest (expressly excluding late charges or the difference between default and non-default interest), change the outstanding principal amount, or extend the maturity date, without Lender's prior consent; provided, however, if Lender fails to grant or deny its consent within three (3) business days after notice from USA, Lender shall be deemed to have conclusively given its consent.

3.    Rights of Lender if USA Fails to Act.    Pursuant to NAC 645B.073, in the event of default, foreclosure, or other matters that require action, if for any reason USA fails to act on Lender's behalf as authorized herein, then Lender may, with approval of fifty-one percent (51%) or more of all of the holders of the beneficial interest of record in the Loan, act on behalf of all such holders of beneficial interest of record. These actions may include, but are not limited to:

(a)    the designation of the mortgage broker, servicing agent or other person to act on behalf of the holders of the beneficial interests in the loan; and
(b)    the sale, encumbrance or lease of real property owned by the holders resulting from a foreclosure or the receipt of a deed in lieu of a foreclosure.

4.    Legal Proceedings.    USA will assist the Lender in any necessary foreclosure proceedings to

protect the Lender's interest in the note and deed of trust. Where necessary, in USA's business judgment, USA may retain attorneys on Lender's behalf. Any legal proceeding instituted by USA pursuant to this Agreement may be pursued in USA's name only or as agent for Lender. Upon demand by USA, Lender agrees to promptly pay, either in advance or to reimburse USA, for its pro rata portion of the out-of-pocket expenses incurred, including attorney's fees, trustee's fees and foreclosure costs. In the event that Lender fails to pay such sums to USA upon demand or request thereof, or if USA elects to advance such sums, USA may, in its discretion, advance such fees, including trustee's fees, attorney's fees, and costs of foreclosure; provided, however, that any fees advanced by USA shall be paid back from the proceeds of the foreclosure (whether by reinstatement or sale), or from any other monies collected with respect to such Loan, before any payments are made to Lender. In the event of any litigation concerning the Loan, Lender hereby appoints USA as its agent to accept service of any summons and complaint, naming Lender as a party.

5.  Compensation to USA for Loan Servicing. Lender authorizes USA to retain monthly, as compensation for services performed hereunder, (a) one-twelfth (1/12th) of its annual servicing fee, which shall not exceed one percent (1%) per annum of the maximum principal amount of each of the Loans, (b) any late charges collected from the Borrower pursuant to the terms of the Note, and (c) and default interest collected from the Borrower pursuant to the terms of the Note. Notwithstanding the foregoing, it is agreed and acknowledged that USA derives the bulk of its revenues from charging loan fees ("points") to the Borrower. Certain Borrowers, however, may prefer to pay a higher rate of interest in exchange for a reduction in loan fees payable in advance to USA, the higher interest rate comprising a deferred loan fee. USA will notify Lender when such a case arises, and advise Lender of what portion of the interest is payable to USA as a deferred loan fee.

Should Lender desire to sell all or any part of its interest in the note and deed of trust, USA will assist Lender in finding potential buyers and completing the necessary documentation for the transaction. A fee of 5% of the remaining balance of Lender's undivided interest in the note amount will be deducted from the selling price and paid to USA on all such assignments for which USA locates the Assignee.

In the event an extension of a Loan is negotiated, USA shall be entitled to charge a fee therefor from the Borrower pursuant any separate fee agreement between USA and the Borrower.

6.  USA's Right to Delegate. Notwithstanding anything contained herein, USA may in its sole discretion delegate specific loan arranging and servicing obligations to credit bureaus, real estate tax service companies, real estate brokers or agents, appraisers, attorneys, trustees, or others, provided that USA shall remain responsible for all action taken or not taken by such companies, agents, representatives, and others throughout the term of this Agreement.

7.  No Legal Advice. Lender acknowledges that USA will not act as Lender's attorney or provide legal advice to Lender, and that Lender is encouraged to seek independent counsel in connection with any questions Lender may have concerning this agreement, any Loan, USA's form loan documents, or any other matter.

8.  Termination. Lender may, by 30 days written notice to USA, terminate this agreement, and the power of attorney granted, if one is granted, under Section 9 of this Agreement, if USA fails to perform its obligations hereunder.

9.      Lender's Registration.  Lender(s) name as listed in the first paragraph of this Agreement is the exact form for registration of Lender's interest and for reference to Lender in the Loan Documents.

10.      Integration Clause.  This Agreement contains the entire agreement between the parties hereto and cannot be modified except by a written amendment signed by both parties.  The invalidity of any portion of this agreement shall in no way affect the balance thereof.  This Agreement shall remain in effect until Lender's interest in all notes and deeds of trust with respect to Loans arranged and/or serviced by USA is completely liquidated (unless sooner terminated in accordance with the terms hereof).

11.      Limited Power of Attorney.  With respect to each loan, Lender hereby agrees that USA shall have full power and authority, and Lender hereby appoints USA as its true and lawful attorney-in-fact to (a) hold the original note(s), and (b) to do all things and take all actions on behalf of Lender which are necessary or convenient to effectuate this Agreement and its intent and to protect Lender's interest under any note, deed of trust, guaranty, security agreement or other document pertaining to any Loan.  Upon USA's request, Lender hereby agrees to execute and deliver, in the presence of a notary public, a "Declaration of Agency and Limited Power of Attorney", in a form consistent with Chapter 645B of the Nevada Revised Statutes, pursuant to which Lender shall further evidence the appointment of USA as Lender's true and lawful attorney-in-fact to undertake the duties of USA hereunder.  No one shall be required to look beyond such Declaration of Agency and Limited Power of Attorney for evidence of USA's authority hereunder.  All Declarations of Agency and Limited Powers of Attorney may include the language: This document may be executed with counterpart signature pages, and the document with all counterpart signature pages shall constitute one and the same instrument.

12. Notices.  All notices, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been given (i) when personally delivered, or (ii) on receipt, when deposited with a recognized overnight courier service such as Federal Express or DHL, or (iii) three (3) business days after the date when deposited in the United States mail and sent postage prepaid by registered or certified mail, return receipt requested, addressed as follows:

        If to USA:          USA Commercial Mortgage Company
                            4484 S. Pecos Road
                            Las Vegas, Nevada 89121-5030
                            Attention:

        If to Lender:


                            Attention:

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

13.      Governing Law.  This Agreement shall be construed in accordance with the laws of the State of Nevada, without regard to the conflict of laws or rules thereof, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws,

14.     Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

15.     Attorney's Fees. In the event any party hereto brings an action to enforce any of the provisions of this Agreement, the party against whom judgment is rendered in such action shall be liable to the other for reimbursement of its costs, expenses and attorneys' fees, including such costs, expenses and fees as may be incurred on appeal,

16.     Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors and assigns.

17.     Headings. Sections headings used in this Agreement are for convenience only and shall not affect the meaning or interpretation of this Agreement.

18.     Authority. Each party represents and warrants to the other party that it is duly authorized to execute, deliver and perform this Agreement.

IN WITNESS WHEREOF, the parties hereto have signed, sealed, acknowledged and delivered this instrument the day and year first above written.

LENDER: **Charles B. Anderson Trustee of the Charles B. Anderson Trust**

By:

Name:**Charles B. Anderson**

Title: **Trustee**

By:

Name:

Title:

USA COMMERCIAL MORTGAGE COMPANY:

By:

Joseph D. Milanowski, President