# EXHIBIT M

Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

and

Lenard E. Schwartzer
Nevada Bar No. 0399
Jeanette E. McPherson
Nevada Bar No. 5423
Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com
Attorneys for Debtors

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case Nos. BK-S-06-10725 LBR<br>Case Nos. BK-S-06-10726 LBR<br>Case Nos. BK-S-06-10727 LBR<br>Case Nos. BK-S-06-10728 LBR<br>Case Nos. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | SECOND SUPPLEMENTAL DECLARATION OF THOMAS J. ALLISON IN SUPPORT OF DEBTORS' MOTIONS [AFFECTS ALL DEBTORS] |
| In re:<br>USA SECURITIES, LLC,<br>Debtor. | Date of Hearing: May 18, 2006<br>Time of Hearing: 9:30 a.m. |
| Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC | |

1

| ☐ USA First Trust Deed Fund, LLC | |

I, Thomas J. Allison, hereby declare, verify and state as follows:

1. I make this Second Supplemental Declaration as additional support for various motions of USA Commercial Mortgage Company ("USACM") and its four affiliates who filed bankruptcy petitions in this Court on April 13, 2006 (collectively, the "Debtors"), including the "Motion for Order Authorizing Reimbursement of Due Diligence Expenses of Potential Post-Petition Lender" (the "Due Diligence Expenses Motion") and the "Motion Authorizing Debtor, Pursuant to 11 U.S.C. § 105 and § 363(b)(1), to Accept Loan Payment Proceeds and Provide Partial Releases or Full Releases in Connection With the Sale of Properties Securing Loans Originated by the Debtor to Third Party Borrowers, and to Ratify Partial Releases Previously Provided by the Debtor" (the "Partial Releases Motion"). My Second Supplemental Declaration is based upon personal knowledge and the facts set forth herein.

2. It appears that as of April 13, 2006 (the "Petition Date"), USACM was acting as the loan servicer for approximately 115 separate loans (the "Serviced Loans") having a combined outstanding loan balance of approximately $962 million. Attached as Exhibit A to the Supplemental Declaration of Thomas J. Allison dated May 2, 2006 that was e-filed with the Court on May 2, 2006 (Docket No. 130), is a spreadsheet created under my direction by the Mesirow team providing preliminary information for each of the Serviced Loans, including the loan name, whether the loan is performing or non-performing, number of investors, origination date, outstanding balance, unpaid interest, and the percentage of the loan held by two of the Debtors in these related bankruptcy cases, USA Capital First Trust Deed Fund, LLC ("Capital First") and USA Capital Diversified Trust Deed Fund, LLC ("Diversified") (collectively the "Funds"), by USACM, and by other "Direct Lenders" (as defined below).

3. I have directed that the Mesirow team review the loan files for each of the Serviced Loans. Based on that review, it appears that the vast majority of the Serviced

2

Loans are secured by a trust deed on a commercial real estate project (the "Projects"), many of which are construction loans for construction Projects that are not yet completed.

4. It appears that as of the Petition Date approximately 62 of the Serviced Loans were delinquent in the payment of interest or otherwise could be considered non-performing (the "Nonperforming Loans"). The Nonperforming Loans represent 72% percent in outstanding loan balance of the Serviced Loans.

5. There are approximately 3,600 investors (the "Direct Lenders") whose names appear as a "Lender" in the loan documents for one or more of the Serviced Loans. The two Funds are included among the Direct Lenders.

6. Prior to April 2006, USACM regularly made interest payments to Direct Lenders each month regardless of whether the particular Serviced Loans relating to each Direct Lender were performing or nonperforming. For example, during the first three months of 2006, USACM collected on average approximately $5.3 million per month in interest payments on the Serviced Loans but paid out on average approximately $9.7 million per month to the Direct Lenders. It appears that a large portion of the Direct Lenders received monthly payments from USACM prior to the Petition Date that such Direct Lenders were not entitled to receive (because they were invested, at least in part, in one or more Nonperforming Loans), and thus such Direct Lenders owe a debt in an amount which is yet to be determined for the amounts overpaid to them.

7. Capital First has an interest as a Direct Lender in 53 of the Serviced Loans -- in 45 loans it owns only a fractional interest along with other Direct Lenders, and in 8 loans it is the sole Direct Lender. Further, of the 53 total Serviced Loans in which Capital First has an interest, 29 (55% in number) are Nonperforming Loans.

8. Diversified has an interest as a Direct Lender in 23 of the Serviced Loans -- in 16 loans it owns only a fractional interest along with other Direct Lenders, and in 7 Serviced Loans it is the sole investor. Further, of the 23 total loans in which Diversified has an interest, 20 (87% in number) are Nonperforming Loans.

3

9. The extent of the Nonperforming Loans problem is substantially the same for the Funds in their capacity as Direct Lenders as it is for other Direct Lenders. Because most of the Nonperforming Loans have one or both of the Funds as Direct Lenders along with other Direct Lenders, the administrative and servicing activities, appraisals, collection activities and foreclosure proceedings will benefit both the Funds and the other Direct Lenders.

10. Capital First has approximately 1,300 members owning membership interests in that LLC entity, and Diversified has approximately 1,900 members owning membership interests in that LLC entity (collectively, the "Fund Members").

## POST-PETITION LOAN

11. I have determined in my business judgment that it is in the best interests of the Debtors to obtain post-petition, debtor-in-possession financing (the "Post-Petition Loan") for purposes of, among other things, assisting in the funding of the Debtors' operational expenses and administrative expenses, given the number and magnitude of Nonperforming Loans that must be collected, and providing a source of additional loan funds (if approved by the Court) for certain of the Serviced Loans where the funding to date for construction loans is less than the full construction budgets prepared by the Borrowers for the completed construction projects (the "Projects") being built by such Borrowers (the "Construction Budget Shortfalls") and where such funding is necessary or appropriate to maintaining and protecting the value of the collateral securing these certain Serviced Loans.

12. As a result of that determination, I have negotiated with several debtor-in-possession lenders for a Post Petition Loan. I have selected Fortress Credit Corp. ("Fortress") from among several other debtor-in-possession lenders as the lender from whom the Debtors should obtain a Post-Petition Loan (after Court approval) because the draft Term Sheet of Fortress was, in my business judgment, more favorable than those proposed by other debtor-in-possession lenders.

4

13. When the Due Diligence Expenses Motion was filed on May 8, 2006, the negotiations with Fortress were not yet completed. The parties anticipated that the terms in the draft Term Sheet that was under consideration at that time might change prior to the issuance of a firm commitment from Fortress, which was expected prior to the time the Due Diligence Expenses Motion was set for hearing.

14. A Commitment Letter (the "Commitment Letter") signed by Fortress and dated May 12, 2006, has been delivered to me on behalf of the Debtors. As contemplated by the Due Diligence Expenses Motion, a copy of the Commitment Letter was attached as Exhibit "1" to the "Notice of Commitment Letter for DIP Financing" that was e-filed with the Court on May 16, 2006, as Docket No. 254. A true and correct additional copy of the Commitment Letter is attached hereto as Exhibit A and is incorporated herein.

15. In my negotiations with Fortress, before Fortress was willing to commit additional time and resources to evaluating a potential Post-Petition Loan, Fortress stated that it would require that the Debtor agree (with Court approval) to reimburse Fortress for actual expenses (including Fortress's reasonable attorney fees) incurred by Fortress in connection with completion of due diligence and other matters associated with the potential Post-Petition Loan. Fortress has asked that the Debtors provide a cash deposit (the "Deposit") in the amount of $150,000, to be applied by Fortress toward actual expenses incurred or to be incurred in completing due diligence for the potential Post-Petition Loan. The amount of the Deposit was previously included in the Budget that was attached as Exhibit B to the Supplemental Declaration of Thomas Allison dated May 2, 2006 that was e-filed with the Court on May 2, 2006 (Docket No. 130). Indeed, while Fortress has delivered a Commitment Letter to the Debtors, the Commitment remains conditioned on the payment of the Deposit and the completion of due diligence (including legal due diligence) which the Deposit will allow for and facilitate. As set forth in the Commitment Letter, if the Deposit is not approved by the Court on May 18, 2006 and paid

5

to Fortress by May 19, 2006, the Commitment Letter will terminate. See, Exhibit A attached hereto.

16. In exchange for Debtors' agreement to seek approval for the Deposit to reimburse the due diligence expenses of Fortress, Fortress has agreed that if Fortress concludes, for any reason, not to proceed with the Post-Petition Loan, Fortress will deliver to the Debtors copies of all written work-product created by Fortress in its due diligence review of the potential Post-Petition Loan (excluding documents protected by attorney/client or attorney work product privileges).

17. It is my business judgment that the payment of due diligence expenses to a debtor-in-possession lender is customary for debtor-in-possession financing transactions, and that the amount of the Deposit is a reasonable estimate of the amount of due diligence expenses that will reasonably be incurred by Fortress.

18. It is my business judgment that there are at least three valid business reasons for obtaining the Post-Petition Loan for the Debtors: (a) Debtors may need additional sources of funds to pursue all necessary collection actions with respect to Nonperforming Loans, given the number and amount of Nonperforming Loans which are currently not generating cash to pay servicing fees to fund these actions; (b) Debtors may need additional liquidity to fund administrative and operational expenses in the event that the timing of payments on the Serviced Loans from which Debtors' servicing fees and other contractual costs and fees are deducted (and which the Court has approved as funding sources) are irregular and/or disrupted and do not match the funding requirements for the timely payment of Debtors' administrative and operational expenses; and (c) Debtors need a source of funding for additional loans to the Borrowers with Construction Budget Shortfalls to allow such Borrowers to complete their Construction Projects if the Debtors determine that additional funding is necessary or appropriate to preserve value of the underlying collateral of the Serviced Loans for the Direct Lenders, the Funds, the Fund Members, and USACM and such funding is then approved by the Court.

## FUNDING ADMINISTRATIVE AND OPERATIONAL EXPENSES

19. Mesirow, with assistance from USACM's personnel and attorneys, is engaging in a loan-by-loan credit and collateral evaluation, arranging for appropriate appraisals and checks on collateral, and commencing collection activities on Nonperforming Loans (including foreclosures, if necessary, and collections on guarantees) and determining the most appropriate way to bring each Nonperforming Loan to a performing status. These tasks are critical tasks that must be accomplished in order to analyze and safeguard the interests of all Direct Lenders (including the interests of the Funds as Direct Lenders) and Fund Members.

20. Mesirow is preparing a ledger for each loan as requested by the SEC and the Nevada Mortgage Lending Division. These ledgers will allow Direct Lenders to determine the status of each Serviced Loan in their portfolios.

21. Mesirow is preparing an account reconciliation for each Direct Lender and for each Fund Member (to the extent there are Fund Members who are not also Direct Lenders). These reconciliations will indicate amounts due to the Direct Lender on account of each Service Loan in their portfolios, as well as amounts that have been overpaid on Nonperforming Loans. Principal payments received by USACM but not remitted will also be indicated. The reconciliations for the Fund Members will indicate the positions of the respective Funds with regard to each Serviced Loan in their portfolios, as well as the Fund Members' percentage ownership interests in the Funds.

22. In its Limited Opposition to the Partial Releases Motion, the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC (the "First Trust Deed Committee") has requested that "USACM be required to report monthly to the Court the following: (i) the sale proceeds that USACM actually received in connection with the proposed sales and an accounting for such funds on a per loan basis; and (ii) the sale proceeds that were distributed to any first priority lender and the amount outstanding on any related first priority loan after such payments." I have instructed my

staff and my attorneys to include these monthly reports as requested by the First Trust Deed Committee as part of the monthly Operating Reports to be filed by the Debtors with the Court.

23. Mesirow is instituting appropriate internal financial and accounting controls and loan servicing audit trails so that the problems that resulted in the Debtors' bankruptcy filings will not recur. Mesirow is also attempting to trace all transactions with non-debtor insiders or affiliated entities; and Mesirow will follow up to enforce and collect any insider or affiliate debts owed the Debtors.

24. The Debtors' Revised Budget (the "Budget"), which was attached as <u>Exhibit B</u> to the Supplemental Declaration of Thomas J. Allison that was e-filed on May 2, 2006 (Docket No. 130), outlines the Budget that the Debtors have prepared for payment of the administrative costs and collection costs that must be undertaken by the Debtors to preserve and increase value for the Debtors, the Direct Lenders, and the Fund Members. However, the Budget only contemplated the appointment of one creditors committee for the five Debtors, so it is possible that the professional fees associated with payment for counsel to the four committees that were just appointed by the United States Trustee will be even higher than those contemplated by the Budget, requiring additional sources of funds for the Debtors to operate in Chapter 11.

25. If the Court approves the payment of the Deposit, the Deposit will be paid from the sources outlined in and in accordance with the Budget. The Debtors are not asking that other funds being held by the Debtors be used to pay the Deposit, but only that the Deposit be paid from those funding sources outlined in the Budget and previously approved by the Court.

<u>LIQUIDITY CONCERNS</u>

26. Mesirow has initiated measures for collecting unpaid interest on the Nonperforming Loans, as well as implementing improved loan servicing procedures. However, even with these operational changes, the regular payment streams of payments

8

being made to USACM as Servicer of the Serviced Loans have been disrupted because of the filing of the bankruptcy petitions for the Debtors. Moreover, interest is not being paid on a regular basis on the large number of Nonperforming Loans. Therefore, the Debtors cannot currently count on a regular stream of payments being made to USACM as Servicer from which the servicing fees and other contractual costs and fees that will be used to fund the Budget will be deducted.

27. The Debtors are in need of additional liquidity in the form of the Post-Petition Loan in order to be able to timely pay their administrative expenses and operational expenses as they are incurred on a regular basis, as contemplated by the Budget. To the extent that there are insufficient funds on hand on any particular date from the funds which the Court has authorized the Debtors to use for payment of administrative and operational expenses incurred to collect unpaid interest and principal on the Serviced Loans, the Debtors can draw on the Post-Petition Loan in order to cover any such insufficiency.

## FUNDING FOR CONSTRUCTION BUDGET SHORTFALLS

28. Attached hereto as Exhibit B and incorporated herein is a list prepared by Mesirow of thirty (30) of the Serviced Loans which have Construction Budget Shortfalls. The amount of the Construction Budget Shortfall for each of these 30 Serviced Loans (the "Shortfall Loans") is listed on Exhibit B. The total amount of the Construction Budget Shortfalls is $73,122,216.

29. I believe that the Borrowers for the Shortfall Loans requested loan funding for only a portion of the construction budgets for their various Projects because they wanted to avoid having to pay interest from the inception of the Shortfall Loans on the full amount of the loan funds needed to cover their entire construction budgets for their completed Projects. I believe that the Borrowers for the Shortfall Loans are planning to build their Projects in stages, and are looking to obtain additional loan funding for the future stages of their Projects from USACM.

9

30. The Projects for which the Shortfall Loans are being used for construction purposes are not completed Projects. It is my business judgment that most, if not all, of the Borrowers for the Shortfall Loans will need additional loan funding of up to the amount of the Construction Budget Shortfalls for each Shortfall Loan in order to complete their Projects.

31. It is my business judgment that the value of the collateral for the Shortfall Loans will be preserved and greatly enhanced for the benefit of the Direct Lenders, the Funds, the Funds Members, and the Debtors if the Projects can be completed as contemplated by their Borrowers. A completed construction project that is a candidate for a sale to an investor or a take-out loan from a permanent financing source is much more likely to generate the funds needed to pay off the Shortfall Loans than an uncompleted construction project that is likely to be encumbered with mechanic's liens and embroiled in other litigation.

32. It is my belief that USAMC does not have the obligation, but has the right, with Court approval, to fund additional loan funds in the amount of the Construction Budget Shortfalls for each of the Shortfall Loans. It is my business judgment that USAMC should seek Court approval to use some of the proceeds from the Post-Petition Loan to fund the Construction Budget Shortfalls for most, if not all, of the Shortfall Loans. USAMC will make its determination whether or not to seek Court approval to fund a particular Construction Budget Shortfall from the Post-Petition Loan based upon appraisals and other customary due diligence lending standards to be applied by the Debtor to each Shortfall Loan and each Project, including whether or not the particular Shortfall Loan is a Nonperforming Loan.

33. USACM has filed a Motion seeking authority to engage an outside appraisal firm to evaluate all of the real estate collateral securing the Serviced Loans. These appraisals will assist USACM in its due diligence determination whether or not to fund a particular Construction Budget Shortfall for a particular Project.

## OBJECTIONS TO PARTIAL RELEASES MOTION

34. The Serviced Loan repayments that the Debtor is receiving from the Borrowers as contemplated by the Partial Releases Motion are being held in a separate bank account established by USAMC, and Mesirow is keeping accurate accounting records to account for such loan repayments on a Serviced Loan by Serviced Loan basis. The servicing fees and other contractual fees and costs that the Court has authorized to be used by the Debtors are being deducted from these loan repayments and are being deposited into a separate Debtor-in-Possession bank account, and are not being commingled with the net Serviced Loan repayments that are held in a separate account.

Executed this 17th day of May, 2006.

_____
Thomas J. Allison

EXHIBIT "B"

Exhibit B

PRELIMINARY INFORMATION, CANNOT BE RELIED UPON

USA Capital
Construction Budget Shortfall
05/16/06

| Loan | Amount |
|---|---|
| Binford | $925,000 |
| Boise Gowan | $125,000 |
| Bundy $2.5m | $200,000 |
| Bundy $5m | $750,000 |
| Bundy $7.5m | $800,000 |
| Bundy 8.9m | $8,900,000 |
| Castaic Partners III | $325,000 |
| Columbia Managing | $890,000 |
| Comvest | $375,000 |
| Cornman Toltec | $175,000 |
| Copper Sage Phase II | $7,750,000 |
| Eagle Meadows | $4,580,000 |
| Elizabeth May | $1,200,000 |
| Foxhill 216 | $3,020,000 |
| Franklin Stratford | $975,000 |
| Gateway Stone | $3,045,000 |
| Gramercy | $2,216,216 |
| J Jireh | $275,000 |
| La Hacienda | $1,645,000 |
| Lerin Hills | $2,550,000 |
| Meadow Creek Partners | $11,700,000 |
| Ocean Atlantic | $500,000 |
| Palm Harbor | $520,000 |
| Preserve | $596,000 |
| Rio Rancho | $3,850,000 |
| Slade | $225,000 |
| So Cal Land 2nd | $200,000 |
| Standard Property | $8,110,000 |
| The Gardens Phase II | $6,500,000 |
| University Estates | $200,000 |
| Total | $73,122,216 |

Prepared by MFIM, LLC