STUTMAN, TREISTER & GLATT, P.C.
FRANK A. MEROLA
(CA State Bar No. 136934)
EVE H. KARASIK
(CA State Bar No. 155356)
CHRISTINE M. PAJAK
(CA State Bar No. 217173), Members of
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600
E-mail:    fmerola@stutman.com
           ekarasik@stutman.com
           cpajak@stutman.com

SHEA & CARLYON, LTD.
JAMES PATRICK SHEA
(Nevada State Bar No. 000405)
CANDACE C. CARLYON, ESQ.
(Nevada State Bar No. 002666)
SHLOMO S. SHERMAN, ESQ.
(Nevada State Bar No. 009688)
233 South Fourth Street, Second Floor
Las Vegas, Nevada 89101
Telephone: (702) 471-7432
E-mail:    jshea@sheacarlyon.com
           ccarlyon@sheacarlyon.com
           ssherman@sheacarlyon.com

Counsel for the Official Committee Of
Equity Security Holders Of USA Capital First Trust Deed Fund, LLC

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY<br>    Debtor | ) BK-S-06-10725-LBR<br>) Chapter 11<br>) |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>    Debtor | ) BK-S-06-10726-LBR<br>) Chapter 11<br>) |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>    Debtor | ) BK-S-06-10727-LBR<br>) Chapter 11<br>) |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>    Debtor. | ) BK-S-06-10728-LBR<br>) Chapter 11<br>) |
| In re:<br>USA SECURITIES, LLC,<br>    Debtor. | ) BK-S-06-10729-LBR<br>) Chapter 11<br>) |
| Affects<br>☒ All Debtors<br>☐ USA Commercial Mortgage Co.<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed<br>☐ USA First Trust Deed Fund, LLC | )<br>)<br>)<br>) Date: June 21, 2006<br>) Time: 9:30 a.m.<br>) Place: Courtroom #1<br>) |

**OPPOSITION TO MOTION FOR EMERGENCY, INTERIM AND PERMANENT ORDERS AUTHORIZING THE DEBTORS TO OBTAIN POST PETITION FINANCING (AFFECTS ALL DEBTORS)**

SHEA & CARLYON, LTD.
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

Page 1 of 20

396593v5

**TO THE HONORABLE LINDA B. RIEGLE, UNITED STATES BANKRUPTCY JUDGE:**

The Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC (the "First Trust Deed Committee"), by and through its undersigned counsel, hereby opposes the Motion for Emergency, Interim and Permanent Orders Authorizing the Debtors to Obtain Post Petition Financing (the "Financing Motion") filed by USA Commercial Mortgage Company ("USACMC"), on behalf of itself and its affiliated debtors (each, a "Debtor" and, collectively, the "Debtors").

This Opposition is made and based upon the Points and Authorities attached hereto, the pleadings, papers and records on file in this action, and any evidence and oral argument to be considered at the time of the hearing of the Financing Motion.

DATED this 19th day of June, 2006.

/s/ Eve H. Karasik

FRANK A. MEROLA (CA State Bar No. 136934),
EVE H. KARASIK (CA State Bar No. 155356),
and
CHRISTINE M. PAJAK (CA State Bar No. 217173), Members of
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600

and

CANDACE C. CARLYON
Shea & Carlyon, Ltd.
233 S. Fourth Street, Suite 200
Las Vegas, NV 89101
Telephone: (702) 471-7432
COUNSEL FOR THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
OF USA CAPITAL FIRST TRUST DEED FUND, LLC

396593v5

## POINTS AND AUTHORITIES

### I.     FACTUAL BACKGROUND

1. On May 10, 2006, the Office of the United States Trustee appointed the First Trust Deed Committee. The First Trust Deed Committee represents the interests of the Equity Holders of USA Capital First Trust Deed Fund, LLC ("First Trust Deed Fund").

2. On May 18, 2006, this Court considered and denied the Debtors' Motion to Approve Due Diligence expenses in connection with a proposed debtor in possession financing from lender Fortress Capital.

3. In addition, this Court has cautioned Debtors' counsel on numerous occasions regarding the pitfalls of *de facto* substantive consolidation. On the first day of the case, the Court directed the Debtors' professionals to record charges in such a way as to track charges appropriate to each estate. Numerous reminders of this requirement have been given, including statements by the Court, the Office of the United States Trustee and counsel for the First Trust Deed Committee.

4. The Debtors have filed two budgets in support of their motion for use of cash collateral set for hearing on June 21. The revised 13-week Cash Flow Forecast (the "Amended Forecast") demonstrates that the Debtors have sufficient funds from servicing and other fees to operate the Debtors for the requested period through the end of July.[1]

5. On June 9, the Debtors filed the Financing Motion with the attached Term Sheet with Capital Source, which was the first time that the First Trust Deed Committee was apprised of the Term Sheet. The First Trust Deed Committee is informed and believes that the Debtors are negotiating an amended Term Sheet with another lender at this time. However, the First Trust Deed Committee has not yet received a copy of the new Term Sheet. The First Trust Deed Committee has raised its concerns with the Capital Source Term Sheet with the Debtors on several occasions in person, via telephone and through detailed emails. As of the

---

[1] The Debtors shared a further amended forecast on June 16, 2006. Per the further Amended Forecast the Debtors have nearly $600K in cash at the close of July 2006.

*SHEA & CARLYON, LTD.*
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

Page 3 of 20

396593v5

date of this email, the Debtors have not definitively responded to these concerns. Furthermore, no loan documents have been filed with the Debtors as of the date of this Opposition.

## II. LEGAL ARGUMENT

**A.    Legal Standard.**

6.    In considering a post-petition financing transaction under Bankruptcy Code section 364, "the court acts in its informed discretion." See 11 U.S.C. §§ 364 (b) and (c) ("*may* authorize . . . "). The movant bears the burden of satisfying the requirements of Bankruptcy Code section 364. See In re Mosello, 195 B.R. 277 (Bankr. S.D.N.Y. 1996); RTC v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3rd Cir. 1994). In addition to satisfying the express requirements of Bankruptcy Code section 364(c) ("no other financing available" and "adequate protection"), most courts require the debtor to demonstrate that the requested lending decision is "an exercise of its basic business judgment consistent with their fiduciary duties." See e.g. In re Ames Department Store, Inc., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990); In re LTV Steel Company, Inc., 201 W.L. 1822360, *3 (N.D. Ohio 2001).

7.    Further, the statutory requirements for a request for financing secured by a senior or equal lien pursuant to §364(d) are even more stringent. The debtor may obtain credit or incur debt "secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee if unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. Furthermore, "the trustee has the burden of proof on the issue of adequate protection." 11. U.S.C. § 364(d)(2).

8.    As set forth below, the Debtors have failed to satisfy the requisite statutory requirements necessary to obtain the DIP Financing requested pursuant to the Financing Motion.

SHEA & CARLYON, LTD.
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

B.  **The Court Should Not Approve the Proposed DIP Financing under Bankruptcy Code Section 364**

9.  The Debtors set forth the three part test that must be satisfied in order for a debtor to obtain debtor in possession financing under section 364(c) of the Bankruptcy Code: (1) the debtor must be unable to obtain unsecured credit under section 364(b)(1) by allowing a lender only an administrative claim; (ii) the credit transaction must be necessary to preserve the assets of the estates; and (iii) the terms of the transaction must be fair and reasonable, given the circumstances of the debtor and the proposed lender.[2] See Financing Motion at page 10. The Debtors have failed to submit any evidence in support of the Financing Motion, including the evidence necessary to satisfy the three part test. Further, for the reasons described below, the Proposed DIP Financing is not in the best interests of the First Trust Deed Fund, and the Debtors have failed to demonstrate that the Proposed DIP Financing is a necessity for these estates.

1.  **The Proposed DIP Financing is Not in the Best Interest of USA Capital First Trust Deed Fund, LLC as it Would Unfairly Shift the Administrative Burden of the Reorganization**

10. As the Court is keenly aware, significant issues have been raised in the USACMC case with regard to what constitutes "property of the estate." Absent judicial determination to the contrary, it currently appears that the proceeds of outstanding loans as to which USACMC is the servicing agent may not, by and large, constitute property of the estate. Rather, ownership of these funds may be vested in the various lenders, comprised mainly of

---

[2] In the Financing Motion and even though the "Collateral Security" includes a "priming lien", the Debtors provide that they do not believe that the proposed $15 million financing will require approval under section 364(d) of the Bankruptcy Code and accordingly do not discuss that section in this context. Financing Motion, page 12. To the extent priming is required, the Debtors have not demonstrated that they have satisfied the requirements of section 364(d) of the Bankruptcy Code set forth above and as addressed, in part, below in the context of providing additional funding to existing borrowers.

396593v5

SHEA & CARLYON, LTD.
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

direct lenders, and the two funds, First Trust Deed Fund, LLC and USA Capital Diversified Trust Deed Fund, LLC ("Diversified Trust Deed Fund", and collectively, the "Funds").

11. However, the Debtors propose a joint borrowing under $15 million credit line as to which each of the Debtors would pledge all of their respective assets (see page 7, paragraph h, the Financing Motion) in order to secure advances made which "will be used to pay (i) operating expenses, limited capital expenditures and other amounts for general, corporate and ordinary course purposes of Borrower[3] as approved by Lender and (ii) such other administrative expenses as may be authorized under the Financing Order, including ongoing administrative expenses associated with the chapter 11 case of Borrower (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the District of Nevada...". See Exhibit A to Financing Motion, at page 1.

12. The impact of such proposal would be to unfairly place upon the First Trust Deed Fund estate the burden of repaying monies utilized for operations and administrative expenses by all Debtors, particularly USACMC. This is especially inequitable in that First Trust Deed Fund, as a lender under various deeds of trust, already pays a servicing fee of at least 1% to USACMC. In addition, although Debtors have not yet moved for assumption or rejection of any executory contracts, there is an operating agreement contract between First Trust Deed Fund and Debtor USA Capital Realty Advisors, LLC, whereby an additional 1% fee is purportedly charged for "management" of the First Trust Deed Fund.[4]

13. The effect of the proposed financing would be to create a prohibited *de facto* substantive consolidation of the case, at least for administrative claims purposes. For example, monies utilized to fund administrative expenses in the USACMC case *via* the proposed line of credit would be then owed by, and repayable from all assets of, the First Trust

---

[3] All five Debtors are referred to collectively as "Borrower."

[4] In the context of the case, it is unclear what "management" services are being provided, above and beyond the services provided by USACMC on behalf of all lenders.

SHEA & CARLYON, LTD.
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

396593v5

Page 6 of 20

Deed Fund. This is particularly egregious in that, while the First Trust Deed Fund appears to be a solvent entity, the other Debtors appear to be insolvent or are less solvent. No grounds for such substantive consolidation have been demonstrated.

14. "Because of the dangers in forcing creditors of one debtor to share on a parity with creditors of a less solvent debtor [courts] have stressed that substantive consolidation 'is no mere instrument of procedural convenience…but a measure vitally affecting substantive rights.'" In re Augie/Restivo Baking Co. Ltd., 860 F.2d 515, 518, quoting In re Flora Mir Candy Corp. v. R.S. Dickson & Co., 432 F.2d 1060, 1062 (2d Cir. 1970); Chemical Bank New York Trust Co. v. Kheel, 369 F.2d 845, 847 (2d Cir. 1966). Accord, In re Crown Mach & Welding, Inc., 100 B.R. 25, 27 (Bankr. D. Mont. 1989), quoting Flora Mir, 432 F.2d at 1062; Chemical Bank 369 F.2d at 847. "In the final analysis the main requirement for substantive consolidation is that the rights of no creditor or interested party be prejudiced." In re Stevenson, 153 B.R. 52, 53-54 (Bankr. D. Ohio 1993).

15. The Debtors' proposal would inequitably transfer separate administration expenses of each Debtor into secured first priority debt upon which all Debtors are jointly liable. Such result is neither appropriate nor equitable. It appears that Debtors' professionals, faced with potential administrative shortfalls, wish to "hedge their bets" in order to increase the pool of assets available to pay such expenses. The burden of such a shift would fall disproportionately upon the Funds whose assets <u>are property of their respective estates</u>, if the Direct Lenders are successful in asserting that their loan repayments are not payment of the estate.[5]

---

[5] The following pleadings contain assertions by the Direct Lenders that post-petition payments made by borrowers on account of Direct Lender loans are not property of the estate: Direct Lenders' Motions…to Compel Debtor to Continue to Forward Lender Payments to Direct Lenders, (Chubb, Docket #215); Opposition to Debtor's Motion to Temporarily Hold Funds Pending a Determination of The Proper Recipients (Lepome, Docket # 281); Limited Opposition to Motion to Temporarily Hold Funds (Corison, Docket # 285); Motion to Direct Payments to Direct Lenders (Mcknight, Docket # 323); Opposition to Debtor's Motion to Temporarily Hold Funds (Canepa Group, Docket # 345); Kiven's Opposition to Debtors' Motion to Temporarily Hold Funds (Docket # 366); Direct Lenders' Opposition to Debtors' Motion to Temporarily Hold Funds (Chubb, Docket # 377);

SHEA & CARLYON, LTD.
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

396593v5

16. Procedurally, the Court should not consider a matter which would effectuate substantive consolidation absent notice of both scope and content as is reasonably likely to reach the affected constituents and reasonably inform the recipients of the nature of the proceeding. Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.), 810 F.2d 270, 278 (D.C. Cir. 1987). One of the defects found in that case was that individual notice to each of the creditors by mail was not given. Id. at 279. In this case, the detrimental effect of pledging the assets of each estate for the operational and bankruptcy reorganization expenses of the others is likely to cause harm to each of the creditors of the more solvent estates. However, as reflected by the Financing Motion at page 9, the Financing Motion was served upon the Limited Notice List, with the Debtors contemplating the "final hearing" to be served on the entire Master Service List.[6]

### 2. The Debtors Have Not Demonstrated the Necessity Of The Proposed Borrowing For Payment Of Operational And Administrative Expenses

17. The fundamental problem with the Debtors' request for financing is the failure to tie the request to specific needs of specific Debtors. This is illustrated by a review of the Debtors' description of the purposes of the Financing Motion as well as other pleadings on file, and testimony provided by the Debtors at previous hearings. Paragraph 21 of the Financing Motion sets forth a purported justification for approval of the proposed financing. Five business uses of the funds are set forth. Three of them-referenced as (a), (b) and (e), appear to relate solely to cost of operations and professional fees. Each is discussed in turn.

---

Opposition to Debtors' Motion to Temporarily Hold Funds (Garman, Docket #384); Mountain West Mortgage, LLC's Joinder in Oppositions to Debtors' Motion to Temporarily Hold Funds (Guymon, Docket # 396); Official Committee of Direct Lenders Omnibus Response to Individual Direct Lenders Request For Relief (Garman, docket # 406).

[6] As discussed below, the concept of "interim" and "final" approval appears to be misleading, in that the Debtors have not specified any need for cash in a timeframe which would permit complete notice in the ordinary course to all creditors; conversely, the proposed financing assumes court approval by June 30th, creates obligations immediately upon the effectiveness of the term sheet (i.e., upon interim approval); and does not limit the Debtors' ability to draw on the line of credit pending final approval.

SHEA & CARLYON, LTD.
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

396593v5

Page 8 of 20

      a. <u>Debtors need additional sources of funds to pursue necessary collection actions with respect to non-performing loans, given the number and amount of non-performing loans (Financing Motion, page 8.)</u>

18. To date, Debtors have not articulated, via budget or otherwise, what expenses are associated with collection efforts. Particularly troubling is the fact that each of the loans includes serving and management fees which are intended to cover overhead in connection with both the servicing and collection of loans. Additional provisions exist in the various servicing agreements with respect to out of pocket costs. See, e.g., Loan Servicing Agreement, Exhibit 1 to Direct Lender's Motions to 1) Compel Debtor to Continue to Forward Lender Payments to DIRECT LENDERS; and (2) to Delay or Prohibit Appraisals on Performing Loans (Docket No. 215), at ¶¶1(d) (appraisal fees), 4 (legal fees). Further, the Debtors' Amended Forecast does not support the purported need for outside financing, except for payment of professional fees and costs.

      b. <u>The Debtors need liquidity to fund administrative and operational expenses because of the irregularity of payments on the Serviced Loans from which the Debtors' servicing fees and other contractual costs and fees are paid (and which the Court has approved as funding sources). (Financing Motion, page 8.)</u>

19. The irregularity of payments has never been discussed before and is not described in any detail in the Financing Motion. Indeed, no mention of this was made at prior hearings where use of cash was an issue, and the Debtors stated unequivocally that they could fund their operations with servicing and other fees that they are entitled to collect under applicable agreements. Again, this statement is not supported by the Debtors' Amended Forecast, except for the need to pay the professionals in these cases. What is the historical irregularity, if any? How much irregularity is projected? How much funding is needed, if any, to address this issue? The Financing Motion is void of the necessary information to evaluate this purported ground for the financing need.

20. Moreover, testimony provided by the Debtors also demonstrates no need for additional financing. In connection with the hearing on Debtors' "Motion for Order Under

SHEA & CARLYON, LTD.
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

396593v5

11 U.S.C. §105(A), 345 and 363 Approving Debtors' Proposed Cash Management Procedures and Interim Use of Cash in Accordance With the Proposed Cash Budget" held on May 3, 2006, Mr. Allison testified as to the Debtors' proposed used of cash. In questioning by his own attorney, Mr. Allison testified as follows:

| | |
|---|---|
| Question [by Ms. Jarvis]: | …[I]s it your understanding that Commercial Mortgage has rights to certain fees that, it can be paid from the collection account? |
| Answer [by Mr. Allison]: | That is correct. |
| Question: | And…the cash management motion, does that propose only to transfer those fees…from the collection account to the operating account for the debtors' use? |
| Answer: | **That is correct. What we're proposing to do is to use the loan-servicing fee as servicing agent to administer this estate, and those - - we're entitled to several categories of fees that would be - - that would be part of our - - what we plan to administer the estate with.** <br><br> . . . <br> **So…we'd use those fees along with any fees that we took which are late fees or if we have to renew a - - transaction. Those are the fees that we would contemplate using to - - to operate this estate.** |
| Question: | …you are not proposing to move or transfer any other amounts in the collection accounts? |
| Answer: | No, your honor - - no, Ms. Jarvis. My intent is to keep those moneys segregated as I become successful and bring back delinquent interest and bring principal back into the estate. We're segregating and identifying it by loan that's collected. |

SHEA & CARLYON, LTD.
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

396593v5

Id. at pages 42-43.[7]

This position was reiterated under questioning by Mr. Gordon:

> Question: Mr. Allison, I appreciate the effort that was done in the last couple weeks with regard to the budget. It is substantially different that what was presented and much more defined.
>
> I just wanted to make - - understand very clearly with regard to the budget that you are basically estimating for the 13 weeks that based on your projected income versus the projected expenses for the administrative period, that you're going to show a net of, approximately, $123,000. That's what you're projecting.
>
> Answer: That's correct.
>
> Question: So you're showing that the operations during this period of time from an administrative standpoint will be positive and not negative.
>
> Answer: That's correct.
>
> Question: Okay. And with regard to the estimated-service fees, am I correct that when you testified, you stated those were from performing loans only that you anticipated that would be received?
>
> Answer: That's correct.

Id. at page 74, lines 9-24.

    e.    <u>To have the necessary funds to permit the Debtors to accomplish the various tasks that are necessary to analyze and safeguard the interests of all Direct Lenders (including the interests of the Funds as Direct Lenders) and Fund Members. (Financing Motion, Page 8)</u>

    21.    Again, the Debtors have not demonstrated the need for such funding, nor articulated the "various tasks" to be performed for which the servicing fees and cash on hand is

---

[7] The First Trust Deed Committee requests that the Court take judicial notice of that transcript, which appears as Docket No. 431 in this proceeding.

SHEA & CARLYON, LTD.
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

396593v5

insufficient. Further, the Debtors have done no analysis of the impact of the proposed financing upon ultimate distribution to investors and other creditors. The First Trust Deed Committee suggests that it is inappropriate to incur massive loan origination, due diligence, and financing charges in order to obtain "liquidity" for payment of administrative expenses, i.e., payment of professionals in this case. Here, as in any case, the professionals appointed by the Court undertake the risk that, if the case is unsuccessful, there will be insufficient funds to pay their fees. "Chapter 11 cases which lack viable chances of reorganization may place the fees of counsel at risk." In re Berg, 268 B.R. 250, 260 (Bankr. D. Mont. 2001), citing, e.g., In re Mflex Corp, 172 B.R. 854, 857 (Bankr. W.D. Tex. 1994); In re Offield, 128 B.R. 548, 550 (Bankr. W.D. Mo. 1991); In re Lederman Enterprises, Inc., 143 B.R. 772, 775 (D.C. D. Colo. 1992). Also, as discussed above, Mr. Allison's testimony as well as the most recent budget filed with this Court do not indicate the need for financing to cover operational expenses.

**C.      The Debtors' Proposal to Borrow Money to Fund Additional Loans is Unsupported, Premature, and Contrary to the Interests of the Creditors and Investors.**

22.     The Debtors offer two additional grounds purportedly justifying the financing request:

i.      The Debtors need a source of funding for the Shortfall Loans to complete the construction projects, but only if Debtors determine that additional funding is necessary or appropriate to preserve or enhance the value of the underlying collateral for the Serviced Loans for the Direct Lenders, the Funds, the Fund Members, and USACM, and Court approval is obtained after specific notice to all parties in interest. (Financing Motion, page 8.); and

ii.     To provide USACM the ability to originate new loans for the purpose of generating income for payment to the Debtors' creditors and to assist the Debtors in their efforts to reorganize and maintain viable and ongoing business operations. (Financing Motion, page 9.)

23.     The Debtors indicate that they are not at this time seeking court approval for additional loan originations. However, the term sheet attached to the Financing Motion

SHEA & CARLYON, LTD.
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

396593v5

Page 12 of 20

indicates that, upon approval, Capital Source will have a "right of first offer" on all future funding obligations. Further, and more troubling, the term sheet provides that "each Additional DIP Loan will prime prior advances under the existing loan or loans…" The term sheet further provides that "[t]he Additional DIP Loans will be term loans, with origination fees of 1.50% of the face amount, and interest rates of no more than allowed LIBOR plus 7.50%, with all of Lender's expenses to be reimbursed and other terms and conditions as customary for loans of similar risk profile and tenor." Thus, a close review of the term sheet illustrates that Debtors are proposing that they offer Capital Source the opportunity to make additional loans to existing borrowers, with such loans to prime the loans of the Direct Lenders and the Funds. As discussed below, such priming loans are clearly inappropriate.

24. Further, the pre-approval of such future financing terms is sought without any disclosure as to the specifics of such additional loans, and without any discussion of Debtors' efforts to find substitute lenders to make such loans without the necessity of priming existing loans. The First Trust Deed Committee believes that, as to such projects "in process", the Debtors should explore the viability of exit financing from third party lenders which would completely pay off existing loan facilities and move the loans to other lenders who have the ability to continue to fund.

25. The Debtor[8] has not attempted to satisfy any of the Section 364(d) requirements. Indeed, the Debtors do not identify what properties will be the subject of such loans, nor the value of the underlying collateral.[9] The Debtors do not identify the current amount of debt on the properties to be encumbered by "priming loans," nor specify how existing loans will be repaid. See, supra, page 4 (Bankruptcy Code section 364(d) standard). However,

---

[8] The term "Debtor" is utilized on the supposition that the new loans would be made by USACMC, although this is not specified in the Financing Motion.

[9] This Court previously approved the hiring of an appraisal firm to conduct appraisals on all of the collateral for the various loans serviced by USACMC. While a significant number of those appraisals should be in hand by now, only five such appraisals have been provided by the Debtors in response to information requests from the First Trust Deed Committee.

SHEA & CARLYON, LTD.
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

396593v5

Page 13 of 20

approval of the current Term Sheet creates substantive rights in the proposed lender with respect to such future transactions, including the right to repayment of all expenses and due diligence fees in connection with such requests. Further, the purported "need" to fund additional construction loans is utilized by the Debtors as a justification for the current funding proposal. Logically, if the Debtors cannot satisfy the requirements for such borrowing, the Court should neither pre-approve related expenses nor permit the Debtors to bootstrap the funding request by reference to some future, unspecified, and unjustified "need" for further borrowings for the purpose of making new "priming" loans.

26. Pursuant to section 364(d) of the Bankruptcy Code, the Debtors have the affirmative burden of proving adequate protection of the existing liens. However, the Debtors make no effort to meet their burden of demonstrating adequate protection of the interests of existing lenders. See, e.g., In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3rd Cir. 1994). In that case, the debtor requested that the court approve super priority financing to complete construction, arguing that, although the secured creditor was currently undersecured, a combination of turnover of cash, third party guaranties, and increased valuation through the construction would suffice to afford adequate protection. The court rejected each argument in turn. First, the court noted that offering payments from collateral already pledged to the existing creditor adds nothing to compensate for the loss of priority. Second, the court found that a third party guaranty was insufficient under the facts of that case, both because of the existing guaranty and because the value of the guaranty, i.e. the net worth of the proposed guarantor, was not demonstrated. Finally, the court held that projections of future value based upon construction was not sufficient to adequately protect the creditor, where there was no demonstration that any increase in value would be sufficient to compensate for the loss caused by the priming lien.

27. Similarly, in In re Mosello, 296 B.R. 277 (Bankr. S.D.N.Y.) aff'd, 104 F.3d 352 (2d Cir. 1996), the debtor, a developer, argued that the loan would result in an increase in value sufficient to compensate for the loss of priority to existing lenders. The court rejected the argument, finding that the argued increase in value was too speculative to meet the burden

396593v5

SHEA & CARLYON, LTD.
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

of demonstrating adequate protection. The court noted that the debtor's proposal placed all of the risk of error in the debtor's projections on the existing lenders, who had rejected the debtor's proposal. See also, In re James River Assoc's, 148 B.R. 790, 797 (E.D. Va. 1992), ( rejecting the Debtors' proposal for a priming lien both because there was a lack of equity cushion for existing lenders and because the proposed repayment structure was speculative);. In re Phoenix Steel Corp., 39 B.R. 218, 233 (D.C.D. Delaware 1984), (finding that the debtor had failed to meet its burden of proving adequate protection and denied the request for a priming lien.)

28. In this case, the speculative nature of the proposed transactions is multifold. The Debtors do not identify the collateral; the existing lenders; the existing loans; the status of payments on existing loans; the amount to be funded in new, priming, loans; the source of repayment of both existing and new loans; nor the need for such additional financing. Further, the Debtors make no effort to demonstrate that they have explored refinancing of existing obligations (either through Capital Source or through other lenders) in order to pay off current lenders without incurring additional risk and delay. For all of these reasons, any consideration of future, "priming" loans (including any "first right of refusal" or similar right; any agreement to pay fees or expenses incurred in connection with future loans; and any justification of the current Financing Motion by reference to such future loans) is premature and should be rejected by this Court.

**D.    There is No Evidence that the Proposed DIP Financing Terms and Conditions are Fair and Reasonable.**

29. The Proposed Financing Motion is supported by no evidence that the terms and conditions of the financing are fair and reasonable. Nor is there any evidence that the financing was adequately marketed. Until ample evidence is provided that demonstrates that the terms and conditions of the proposed financing are fair and reasonable and the best available in the current market, the Financing Motion should be denied.

In the event the Court elects to consider approval of the proposed financing at this time, there are certain provision in the Term Sheet that the First Trust Deed Committee

believes must be revised or eliminated as well as certain essential terms that are missing and must be added to the Term Sheet, as follows:

    1.    <u>Interest and Fees</u>: The Term Sheet provides for an Exit Fee equal to 0.50% of the Revolver Maximum Loan Amount upon maturity. It is neither necessary nor reasonable to pay the proposed Exit Fee.

    2.    <u>ROFO for Additional Loans</u>: The Term Sheet provides the lender with a right of first refusal for up to $68M of additional funds for additional loans to borrowers at specified terms. It is premature and overreaching to provide the right of first refusal for this funding. There may be other lenders willing to make available more favorable financing. Further, it may be in the estates' best interest to sell these loans to a third party.

    3.    <u>Mandatory Prepayments</u>: All asset disposition proceeds among other proceeds must be paid to the lender to satisfy obligations under the proposed financing. In these cases, the mandatory payment programs are fundamentally unfair; for example, if a loan of 100% made by the First Trust Deed Fund is paid off under the Term Sheet, all proceeds of such loan must be paid out to satisfy the obligations to the lender under the financing, with such payment thereby benefiting the estates as a whole. On the other had, the First Trust Deed Fund will only receive a small, pro rata benefit of the payment which it otherwise would have received in full.

    4.    <u>Collateral and Security</u>: The Term Sheet provides for a host of collateral for the lender. The lender should not receive avoiding power causes of action and intra-company receivables. Further there is no carve out for investor funds in the Collection Account and the Investor Account. In addition, there is no detail in the proposed fee carve out for professional fees and costs.

    5.    <u>Closing Conditions</u>: Among many of the closing conditions are the lock box requirement and cross default requirement. The lock box should not include investor interest or principal. The cross default provision should not permit the lender to accelerate or exercise other remedies merely because certain of the portfolio includes non-performing loans including performing loans that later are deemed nonperforming.

SHEA & CARLYON, LTD.
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

396593v5

6. <u>Costs and Expenses</u>: The Term Sheet provides that due diligence fees and costs will be back-ended. Rather than provide for these costs up front because the Court has refused to approve them, these charges have been back-ended and should not be allowed.

The Term Sheet also includes a negotiation exclusivity provision. Given the facts that the Debtors are in chapter 11 and, moreover, that Debtors are negotiating with another potential lender now, the exclusivity provision should be eliminated.

7. <u>Portfolio Right of First Refusal</u>: The Term Sheet gives the lender the exclusive right of 45 days from closing to serve as the stalking horse with bid protections for a purchase of the portfolio. The lender should not automatically become the stalking horse. Rather a proposed purchaser with the proposal with best terms and conditions should be stalking horse.

8. <u>Additional Provisions</u>: The Term Sheet does not include certain essential provisions that must be included in any final version:

    a. <u>Surcharge</u> - any final financing agreement must include some mechanism to charge back costs of administration pro rata to the Direct Lenders. The Funds should not be required specifically to carry the costs of these cases.

    b. <u>Reporting</u> - The Debtors must be required to provide weekly reports to the Committees including a weekly cash report that shows budget to actual for the prior week.

**E. The Debtors' Request for Approval of the Financing Motion on Shortened Time and Limited Notice is Inappropriate**

30. Finally, the Debtors' request to hear this motion on approximately seven business days' notice is not well taken. This Court previously cautioned Debtors' counsel on this very subject, in connection with a prior funding request involving another prospective lender, saying: "[Y]ou know what's going to happen? Everybody's going to be here screaming[.] I have to have time to look at it, and it would have to be continued, anyway..." Transcript of hearing, May 3, 2006, at p. 147. In discussing a proposal to preapprove a $150,000 due diligence fee (versus this motion, seeking unlimited due diligence reimbursement

SHEA & CARLYON, LTD.
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

396593v5

and additional fees in excess of $150,000), the Court stated: "$150,000 is no small change in this case." Id. at 148. Speaking generically, the Court cautioned: "Things on shortened time don't save time. I've discovered that 18 years now. Every time I have something on shortened time, it always has to get continued.... People, you need time to prepare adequately. So I'm rarely going to grant orders shortening time." Id. at 138-39.

31.  Despite this Court's warning, Debtors' counsel filed **five separate** motions late in the day on June 9 (the last possible date for requesting an order shortening time on ten days' notice for the June 21 calendar). The First Trust Deed Committee counsel consented to the hearings on shortened time on certain of the motions, but expressly disapproved of the request with respect to the Financing Motion. The purported justification for the request for Order Shortening Time, as set forth in the application and affidavit of Lenard Schwartzer, is that: "The current budget (with four Official committees) reflects that administrative expenses will exceed loan servicing fees by mid-July, 2006." However, this does not appear to be the case. First, the Amended Forecast includes the starting cash balance of approximately $1.4 million, which provides more than enough when combined with servicing fee collections to cover the alleged extra funding requirements in the short term. Secondly, a part of this need is driven by the Debtors filing (originally on shortened time) a request for interim compensation procedures. That request, which fails to set forth any proposal for the allocation and payment from the Debtors' separate estates of the fees incurred on an estate-by-estate basis, nevertheless requests monthly fee payments. The urgency of the financing motion may solely be to obtain payment of professional fees in shorter course than as provided by 11 U.S.C. §331. Payment of professional fees should not form the basis for the financing urgency, particularly when there is no similar urgency in resuming distributions to investors.

F.  **The Debtors' Request for "Interim" Approval of the Financing Motion is Unsupported and Inconsistent with Fed. R. Bankr.P. 4001(c).**

32.  Fed.R.Bankr.P. 4001(c)(2) provides that, as to any financing motion heard on less than 15 days' notice, the Court can grant interim approval "only to the extent

SHEA & CARLYON, LTD.
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

396593v5

Page 18 of 20

necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Debtors do not attempt to demonstrate the extent to which such interim approval is necessary under this standard. As discussed above, the only evidence of the Debtors' cash needs is the Amended Forecast. However, that Amended Forecast indicates that the Debtors will have sufficient cash on hand through the next Omnibus hearing date.

33. Additionally, the term sheet attached to the Financing Motion requires court approval by June 30. Apparently, the Debtors seeks to approve all of the Lender's fees and expenses at the "Interim" hearing. (The total of such amounts is not specified and, in fact, is not subject to a cap.) It is submitted that the Debtors cannot demonstrate a need to approve such expenses on an "Interim" basis, when no justification within the scope of Rule 4001(c)(2) for the "Interim Financing" has been shown.

### III. CONCLUSION

34. For the reasons stated above, the First Trust Deed Committee respectfully requests that the Financing Motion be denied, and that the Court issue such other relief as may be just and proper.

DATED this 19th day of June, 2006.

/s/ Eve H. Karasik

FRANK A. MEROLA (CA State Bar No. 136934),
EVE H. KARASIK (CA State Bar No. 155356), and
CHRISTINE M. PAJAK (CA State Bar No. 217173), Members of
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600

CANDACE C. CARLYON
Shea & Carlyon, Ltd.
233 S. Fourth Street, Suite 200
Las Vegas, NV 89101
Telephone: (702) 471-7432
COUNSEL FOR THE
OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
OF USA CAPITAL FIRST TRUST DEED FUND, LLC

SHEA & CARLYON, LTD.
233 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 471-7432

396593v5

Page 19 of 20