1    GORDON & SILVER, LTD.                          E-FILED ON  6/19/06
     GERALD M. GORDON, ESQ.
2    Nevada Bar No. 229
     E-mail: gmg@gordonsilver.com
3    BRIGID M. HIGGINS, ESQ.
     Nevada Bar No. 5990
4    E-mail: bmh@gordonsilver.com
     GREGORY E. GARMAN, ESQ.
5    Nevada Bar No. 6654
     E-mail: geg@gordonsilver.com
6    3960 Howard Hughes Pkwy., 9th Floor
     Las Vegas, Nevada 89109
7    Telephone (702) 796-5555
     Facsimile (702) 369-2666
8    Attorneys to the Official Committee
     of Holders of Executory Contract Rights Through
9    USA Commercial Mortgage Company

10                    **UNITED STATES BANKRUPTCY COURT**

11                       **FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| 12  In re:<br>USA COMMERCIAL MORTGAGE COMPANY, | Case Nos.:<br>BK-S-06-10725-LBR |
| 13 | BK-S-06-10726-LBR<br>BK-S-06-10727-LBR |
|            Debtor. | BK-S-06-10728-LBR |
| 14  In re:<br>USA CAPITAL REALTY ADVISORS, LLC, | BK-S-06-10729-LBR |
| 15 | |
|            Debtor. | |
| 16  In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, | JOINTLY ADMINISTERED<br>Chapter 11 |
| 17 | |
|            Debtor. | |
| 18  In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC, | **THE OFFICIAL COMMITTEE** |
| 19 | **OF DIRECT LENDERS<br>OPPOSITION TO DEBTORS'** |
|            Debtor. | **MOTION FOR AUTHORITY** |
| 20  In re:<br>USA SECURITIES, LLC, | **TO FORBEAR AND TO<br>PROVIDE FURTHER** |
| 21 | **FUNDING FOR CERTAIN<br>OUTSTANDING LOANS** |
|            Debtor. | |
| 22  Affects:<br>☒ All Debtors | |
| 23  ☐ USA Commercial Mortgage Company<br>☐ USA Capital Realty Advisors, LLC | |
| 24  ☒ USA Capital Diversified Trust Deed Fund, LLC<br>☒ USA Capital First Trust Deed Fund, LLC | |
| 25  ☐ USA Securities, LLC | Date:  June 21, 2006<br>Time: 9:30 a.m. |

26

27    ///

28

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

100933-001/406885.doc

The Official Committee of Holders of Executory Contract Rights through USA Commercial Mortgage Company (the "Official Committee of Direct Lenders"), by and through its counsel, the law firm of Gordon & Silver, Ltd. ("G&S"), hereby submits its Opposition (the "Opposition") to the <u>Motion For Authority To Forbear And To Provide Further Funding For Certain Outstanding Loans</u> (the "Funding Motion") filed by USA Commercial Mortgage Company ("USA Mortgage"), USA Diversified Trust Deed Fund, LLC ("Diversified Fund") and USA First Trust Deed Fund, LLC ("First Trust Deed Fund" and together with USA Mortgage and the Diversified Fund, the "Debtors").

This Opposition is made and based on the points and authorities which follow, the pleadings and papers contained in the Court's file, judicial notice of which is hereby requested, and any evidence or oral argument presented at the time of the hearing in this matter.

WHEREFORE, the Official Committee of Direct Lenders respectfully requests that the Court deny the Motion in its entirety and for such other and further relief as is just and proper.

DATED this 19 day of June, 2006.

GORDON & SILVER, LTD.

By: _____
GERALD M. GORDON, ESQ.
BRIGID M. HIGGINS, ESQ.
GREGORY M. GARMAN, ESQ.

## POINTS AND AUTHORITIES

### I.
### STATEMENT OF FACTS

1.  On April 13, 2006 (the "Petition Date"), the Debtors (along with USA Securities, LLC and USA Capital Realty Advisors, LLC) all filed their voluntary Chapter 11 petitions for relief in this Court. [Docket No. 1]

2.  On May 10, 2006, the U.S. Trustee filed his <u>Notice of Appointment</u> of the Official Direct Lender Committee pursuant to 11 U.S.C. §§ 1102(a)(1) and (2). [Docket No. 202].

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

100933-001/406885.doc

2

1    Official Committees were also formed for the Diversified Fund and the First Trust Deed Fund,

2    and for the unsecured creditors of USA Mortgage. [Docket Nos. 201, 203, 204].

3        3.    The Official Committee of Direct Lenders represents approximately 3,600 parties

4    (other than Debtors) to the extent these parties have individually lent monies directly (the "Direct

5    Lenders") to various borrowers, for which USA Mortgage was as of the petition date, only a loan

6    servicer.[1]  Borrowers, to the extent they have received loans from Direct Lenders, are hereinafter

7    collectively referred to as the "Direct Borrowers," and their loans, collectively, as the "Direct

8    Loans."

9        4.    On June 9, 2006, the Debtors filed the Motion which requested authority to take

10    certain actions related to various Direct Loans as follows:

11        (ii) to release 7.6 acres of land (what the Debtors refer to as "Excess Collateral")
            of a total of 12 acres of land taken as security for the "Franklin/Stratford Loan"
12        which borrower then intends to sell; to use proceeds from 2.51 acres of those
            released acres to partially pay the general contractor.  The only lenders on the
13        loans were the Diversified Fund and the First Trust Deed Fund.

14        (ii) to authorize USA Mortgage to fund $125,000 loan advance to the
15        "Boise/Gowan Loan" as an "additional direct lender" and to share "pari passu in
            the existing collateral for the Boise/Gowan Loan and [to] be repaid on a pari
16        passu basis with the current 17 Direct Lenders for the Boise/Gowan Loan."  See
            Motion, p. 10, ll. 16-19.  The loan advance purportedly will be used to complete
17        the engineering and initial development of the Boise/Gowan Project and pay
            property taxes which are currently due on the Boise/Gowan Project.  See Motion,
18        p. 10, ll. 7-9.  According to the Debtors, the Guarantors on the Boise/Gowan
19        Loan are Thomas Hantges, Joseph Milanowski and Robert Russell.

20        (iii) to authorize USA Mortgage to issue partial releases on the three last
21        condominiums in Phase I of a multi-phase project for sales price of $500,000 per
            unit taken as security for the Amesbury Project.  According to the Motion, there
22        are 398 Direct Lenders for the Amesbury Loan.  The Amesbury Project is non-
            performing and matured on June 30, 2005.  See Motion, p. 11, ll. 17-23.
23
24        (iv) to authorize forbearance on four loans, HFA Monaco Loan, HFA Clear Lake
            Loan, HFA Clear Lake-2[nd] Loan, and HFA Windham/Asylum Loan (together the
25        "HFA Non-Performing Loans"), from direct lenders to companies related to
26        Homes For America Holdings, Inc. ("HFAH").  According to the Debtors, the

27    _____
[1] While the Diversified Fund and the First Trust Deed Fund fit within the definition of Direct Lenders, the investors
in both Funds are represented by separate committees and are most able to present their own positions regarding the
28    proposed requests of the Debtors.

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

100933-001/406885.doc

HFA Forbearance Loans are all non-performing. Moreover, according to the Debtors, records for the collateral assignment documents for one of the loans, HFA Windham/Asylum Loan, are incomplete. See Motion, p. 15, ll. 18-21. In addition to the four HFA Forbearance Loans, three other direct loans ("HFA Paid Loans") were made to two HFAH affiliates, HFA Riviera and HFA North Yonkers. See Motion, p. 16, ll. 7-11. According to Debtors, the HFA Paid Loans were paid in full in May, 2006, by the HFAH borrowers prior to their stated maturity dates. The proceeds were paid to USA Mortgage. Apparently, USA MORTGAGE made "arrangements" with the HFAH borrowers to make these early payments in full on the HFA Paid Loans in exchange for agreeing to forbear (upon Court approval) from declaring a default or from exercising remedies on the HFA Non-Performing Loans until January 1, 2007. See Motion, p. 16, ll. 12-17.

5.      On June 9, 2006, Debtors filed the Ex Parte Application For Order Shortening Time To Hear Motion For Authority To Forbear And To Provide Further Funding For Certain Outstanding Loans (the "Funding Application ") requesting that the Motion be heard on an order shortened time. [Docket No. 593].

6.      On June 12, 2006, the Official Committee of Direct Lenders filed an Omnibus Opposition to the Funding Application, as well as various other motions filed by Debtors and requested on shortened time. [Docket No. 601].

7.      On June 12, 2006, the Court entered the Order Shortening Time on the Motion setting the hearing date for June 21, 2006 at 9:30 a.m.. [Docket No. 607].

8.      More than 5 days after filing the Motion, on June 14, 2006, the Debtors filed the Fourth Supplemental Declaration of Thomas J. Allison In Support of Debtors' Motions. [Docket No. 648].

**II.**
**LEGAL ARGUMENT**

A.      **DEBTORS FAIL TO PROVIDE SUFFICIENT DOCUMENTATION TO JUSTIFY EXERCISE OF THEIR "BUSINESS JUDGMENT".**

Debtors request the Court approve significant actions which directly impact certain Direct Lenders loans and deeds of trust. Debtors do so under the guise of exercising their business judgment not only on their own behalf but on that of the Direct Lenders to the various loans and deeds of trust. Yet, continuing in their self-serving and selective silence, Debtors fail to include any of the loan documents related to the Boise/Gowan Loan, the Amesbury Loan or

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

100933-001/406885.doc

4

1    the HFAH Loans or one shred of evidence related to the status of the loans, the value of the

2    projects, or the identities of the Direct Lenders on the loans.[2]  Without such documentation or

3    evidence, it is impossible for the Direct Lenders, the Official Committee of Direct Lender or this

4    Court to determine whether USA Mortgage is exercising it business judgment in the requested

5    modifications.  The Official Committee of Direct Lenders expects that the Debtors have analyzed

6    the documents, the status of the loans, and the value of the projects in exercising their business

7    judgment.   It is time for the Debtors to share this information with the Official Committee of

8    Direct Lenders and the Direct Lenders.  Other than the Funds with regard to Franklin/Stafford

9    Loan for which the Funds are the direct lenders, none of the Direct Lenders to the other loans

10   have been provided notice of the Motion.

11   **B.    USA MORTGAGE DOES NOT HAVE THE AUTHORITY TO ENTER THE**
         **REQUESTED MODIFICATIONS WITHOUT CONSENT FROM AND NOTICE**
12       **TO EACH OF THE AFFECTED DIRECT LENDERS.**

13          Debtors did not notify the various individual Direct Lenders on the Boise/Gowan Loan,

14   the Amesbury Loan or the HFAH Loans of the requested modifications and forbearances.

15   Debtors are requesting the Court approve the impairment of an existing deed of trust which

16   serves as collateral for certain Direct Lenders, issuing of partial releases on matured loans, and

17   accepting payoffs on certain Direct Lenders' loans in consideration for forbearing on other

18   unrelated Direct Lenders' loans.  It is inconceivable that Debtors can take such actions without

19   the consent, and at the very least the noticing, of the affected Direct Lenders.  More specifically,

20   the Debtors are requesting approval to take action that they are not authorized to take under

21   either the representative Loan Servicing Agreement or the Nevada Revised Statutes governing

22   ───────────────
     [2] Fed. R. Bankr. P. 9017 establishes the rule for evidence on motions in bankruptcy proceedings. Fed. R. Bankr. P.
23   9017 incorporates Rule 43 of the Federal Rules of Civil Procedure Rule 43(e) provides:

              When a motion is based on facts not appearing of record the court may hear the matter on
24            affidavits presented by the respective parties, but the court may direct that the matter be heard
              wholly or partly on oral testimony or deposition.

25   Fed. R. Civ. P. 9017(e)(emphasis added).

26   As noted, there is no evidence in the record to support the Debtors' claims of the exercise of their business judgment
     related to the requested relief.   Moreover, pursuant to the Local Rules of Practice for the United States District
27   Court for the District of Nevada, LR 9014, USA Mortgage was required to marshal its evidence and submit it in
     conjunction with the Motion.  Based on the absolute lack of evidence, the Official Committee of Direct Lenders
28   objects to the Motion.

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

100933-001/406885.doc                                                      5

1    mortgage brokers, Nevada Revised Statute ("NRS") 645B.

2        In the Motion, Debtors claim authority under 11 U.S.C. §363(c)(1) to take the requested

3    action claiming it is in the ordinary course of the Debtors' business to complete such requested

4    forbearances and releases.  Initially, Debtors provide no evidentiary support for this statement.

5    Additionally, as the requested actions are not authorized under the Loan Servicing Agreement or

6    Nevada law, Debtors appear to be claiming that because they violated the contracts, their

7    fiduciary duties and the law pre-petition such action should be authorized post-petition.

8        USA Mortgage continues to request the imposition of its rights under the Loan Servicing

9    Agreements without accepting the obligations under those same documents, namely, payment of

10   loan proceeds to the Direct Lenders.

11       **1.    The Representative Loan Servicing Agreement And NRS 645B.**

12       Attached to the Motion is a representative Loan Servicing Agreement.  USA Mortgage

13   claims that it is empowered to take the actions requested in the Motion by virtue of Section 2(e)

14   of the representative Loan Servicing Agreement which provides:

> Without limiting the generality of anything contained herein,
> Lender hereby authorizes  and empowers USA, on Lender's
> behalf, to: (1) execute and deliver demands for payoff and
> beneficiary's/lender's statements of condition and like; (2) execute
> and deliver any and all instruments if satisfaction or cancellation,
> or of partial or full release, discharge, or reconveyance, or
> authorizations in connection therewith, with respect to any Loans
> paid in full and with respect to the related real or personal
> property securing such Loans; (3) execute and deliver any and all
> other documents with respect to any Loans that are customary
> and consistent with loan servicing practices pertaining to such
> loans; (4) consent to modifications of the Loans if the effect of
> any such modification will not materially or adversely affect the
> security provided by the real or personal property in connection
> therewith;  (5) institute foreclosure proceedings (judicial or non-
> judicial), obtain deed-in-lieu thereof, engage in settlement
> discussions, and enter into forbearance and other settlement-
> related agreements (which agreements may contain provisions
> that release or waive claims against a Borrower or Guarantor);
> and (6) take title in the name of Lender (in proportion to its
> interest in the Loan) to any real property upon a foreclosure or
> delivery of a deed-in-lieu thereof. Notwithstanding the foregoing
> or any other provision contained herein, USA may not permit any

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

100933-001/406885.doc                6

modification to any Loan that would change the interest rate, forgive the payment of any principal or interest (expressly excluding late charges or the difference between default and non-default interest), change the outstanding principal amount, or extend the maturity date, without Lender's prior consent; provided, however, if Lender fails to grant or deny its consent within three (3) business days after notice from USA, Lender shall be deemed to have conclusively given its consent.[3]

See representative Loan Servicing Agreement attached as Exhibit "A" to the Motion, §2(e).

In Section 11 of the representative Loan Servicing Agreement, a lender grants a power of attorney to USA Mortgage to "(a) hold the original note(s), and (b) to do all things and take all actions on behalf of Lender which are necessary or convenient to effectuate this Agreement and its intent and to protect Lender's interest under any note, deed of trust, guaranty, security agreement or other document pertaining to the Loan."  See representative Loan Servicing Agreement, §11.  Debtors are using this power of attorney to take certain requested actions in the Motion.  However, pursuant to NRS §645B.330:

> 1. A mortgage broker or mortgage agent shall not engage in any act or transaction on behalf of a private investor pursuant to a power of attorney unless:
>
> (a) The power of attorney is executed for the sole purpose of providing services for not more than one specific loan in which the private investor owns a beneficial interest; and
>
> (b) The provisions of the power of attorney:
>
>> (1) Have been approved by the commissioner;
>> (2) Expressly prohibit the mortgage broker and his mortgage agents from engaging in any act or transaction that subordinates the priority of a recorded deed of trust unless, before such an act or transaction, the mortgage broker obtains written approval for the subordination from the private investor;
>> (3) Expressly prohibit the mortgage broker and his mortgage agents from using or releasing any money in which the private investor owns a beneficial interest with regard to the specific loan for a purpose that is not directly related to providing services for the loan unless, before any such money is used or released for another purpose, the mortgage broker obtains written approval from the private investor to use or release the money for the other purpose; and

---

[3] Debtors failed to include the underline portion of Section 2(e).

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

100933-001/406885.doc

7

(4) Expressly provide that the power of attorney is effective only for the term of the specific loan unless the mortgage broker obtains written approval from the private investor to extend the term of the power of attorney to provide services for not more than one other loan and the written approval:

(I) Identifies the loan for which the power of attorney was executed; and

(II) Identifies the loan for which the written approval is being given.

NRS 645B.330.

## 2. Boise/Gowan Loan.[4]

Debtors first request relates to the Boise/Gowan Loan. Debtors request authority for USA Mortgage to fund $125,000 loan advance to the "Boise/Gowan Loan" as an "additional direct lender" and to share "pari passu in the existing collateral for the Boise/Gowan Loan and [to] be repaid on a pari passu basis with the current 17 Direct Lenders for the Boise/Gowan Loan." See Motion, p. 10, ll. 16-19. Debtors claim that USA Mortgage has the right to advance $125,000 to the borrower, Boise/Gowan 93, LLC, in its individual capacity pursuant to Section 3.2 of the Boise/Gowan Loan Agreement, yet shockingly fail to even provide a copy of the agreement. See Motion, p. 10, ll. 10-12. The loan advance purportedly will be used to complete the engineering and initial development of the Boise/Gowan Project and pay property taxes which are currently due on the Boise/Gowan Project. See Motion, p. 10, ll. 7-9. According to the Debtors, the Guarantors on the Boise/Gowan Loan are Thomas Hantges, Joseph Milanowski and Robert Russell. Boise/Gowan was disclosed to Direct Lenders as a "joint venture between USA Investment Partners, and Robert Russell/AD Development Group." See Exhibit N to Supplemental Declaration of Scott K. Canepa In Support of Motion For Relief From Automatic Stay To Terminate Loan Servicing Agreement For Direct Loan To Boise/Gowan, LLC ("Supplemental Canepa Declaration") [Docket No. 636]. Additionally, the initial disclosure to

---

[4] On the Franklin/Stratford Loan, the Diversified Fund and the First Trust Deed Fund are the sole lenders. As such, the Official Committee of Direct Lenders does not take a position on the Franklin/Stratford Loan except to state that the representative Loan Servicing Agreement does not authorize such action. Pursuant to the representative Loan Servicing Agreement, USA MORTGAGE is only authorized to modifications that do not "materially or adversely affect the security provided by the real or personal property in connection therewith". Releasing real property collateral certainly materially and adversely affects the security provided by the real property in connection with a loan.

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

100933-001/406885.doc

8

1    Direct Lenders on the Boise/Gowan Loan states that Mr. Hantges and Mr. Milanowski are
2    principals of the borrower. Id.

3         According to the Debtors, the maturity date of the Boise/Gowan Loan is August 31,
4    2006, less than 3 months away. Debtors intend on funding the proposed $125,000 loan from the
5    operating account, however, the Debtor is not authorized to use funds in the operating account to
6    make direct loans and the status of the ownership of the monies in the operating account has not
7    been determined. Moreover, based on the Final Order Conditioning Mortgage Broker's License
8    issued by the Department of Business And Industry -Division of Mortgage Lending, as a
9    condition to USA Mortgage broker's license USA Mortgage "may only make loans secured by
10   liens on real property funded by institutional investors." See Supplemental Canepa Declaration
11   Exhibit "K." [Docket 636].

12        Unbelievably, the Debtors take the position that USA Mortgage has the authority to take
13   such action under the representative Loan Servicing Agreement without seeking the consent of
14   or notice to the Direct Lenders on the Boise/Gowan Loan. The Debtors are mistaken and its
15   decisions are obviously contrary to at least one of the Direct Lenders, Scott Canepa, on the
16   Boise/Gowan Loan. While Debtors seek to lend more money on a pari passu basis to
17   Boise/Gowan, a Direct Lender of the Boise/Gowan Loan has requested relief from the automatic
18   stay to change the loan servicing agent, terminate the Loan Servicing Agreement and revoke his
19   power of attorney. [Docket Nos. 292 and 636]. Mr. Allison's untimely declaration filed in
20   support of the Motion illustrates the fundamental differences between the Direct Lenders and the
21   Debtors. [Docket No. 648]. In the declaration, Mr. Allison states that "in my business judgment,
22   Canepa's requested relief cannot be considered in isolation, but must take into account the impact
23   it will have on other loans originated by USA Mortgage, as well as all investors whose loans are
24   being serviced by USA Mortgage." [Docket No. 648]. Given Mr. Allison's position that he
25   clearly does not represent the interests of the individual Direct Lenders, the Debtors must bring
26   individual Direct Lenders into the process and the Direct Lenders must be allowed to protect
27   their own individualized interests. Without a minimum requirement of notice and an opportunity
28   to be heard on requests such as the Motion, the Direct Lenders do not have the ability to protect

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

100933-001/406885.doc

9

1    their own interests.  Cutting through all the verbage, Mr. Allison is seeking to lend an additional

2    $125,000 to Mr. Hantges and Mr. Milanowski with the new loan to subordinate the exiting loan

3    of the Direct Lenders.

4            The representative Loan Servicing Agreement and USA Mortgage authority under that

5    agreement is governed by applicable laws.  One of the applicable laws is NRS 645B.330 which

6    specifically provides, in pertinent part, that a mortgage broker shall not engage in a transaction

7    pursuant to a power of attorney unless the power of attorney expressly prohibits the mortgage

8    broker from subordinating the priority of the deed of trust of the individual lender, "unless before

9    such an act or transaction, the mortgage broker obtains written approval for the subordination

10   from the private investor."  NRS 645B.330(1).  Debtors' request clearly violates this provision.

11   To the extent, Debtors are paid pari passu with the Direct Lenders portions of the Direct Lenders'

12   loan will be subordinate to the proposed USA Mortgage loan.

13           Moreover, the terms of the Loan Servicing Agreement only authorize modifications of

14   the loans that "will not materially or adversely affect the security provided by the real or personal

15   property in connection therewith."  Notwithstanding Debtors' arguments to the contrary, granting

16   USA Mortgage a pari passu deed of trust with the Direct Lenders deed of trust on the

17   Boise/Gowan project, materially and adversely affects the Direct Lenders security on the

18   Boise/Gowan Loan.

19           Without their consent, the Direct Lenders on the Boise/Gowan Loan should not be forced

20   to bear the risk of USA Mortgage "business judgment" that the $125,000 additional advance is

21   prudent.

22       **3.      Amesbury Loan.**

23           Debtors next request authorization for USA Mortgage to issue partial releases on the

24   three last condominiums in Phase I of a multi-phase project for sales price of $500,000 per unit

25   taken as security for the Amesbury Project.  According to the Motion, there are 398 Direct

26   Lenders for the Amesbury Loan.  Also according to the Debtors, the Amesbury Project is non-

27   performing and matured approximately one year ago on June 30, 2005.  See Motion, p. 11, ll. 17-

28   23.  Once again, the Debtors fail to provide one piece of documentation to support their request,

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

100933-001/406885.doc                                            10

1   including the year and a half old appraisal which Debtors claim to rely on in exercising their

2   business judgment.  Once again, the Debtors failed to notice the Direct Lenders involved in the

3   Amesbury Loan.  This may in fact be a worthwhile transaction, but it requires a full explanation

4   to the Direct Lenders on the Amesbury Loan as to the facts and the effect of this under applicable

5   Massachusetts law and their concurrence as required under the Loan Servicing Agreement and

6   applicable law.

7           Notwithstanding whether the requested authorization is prudent or not, USA Mortgage

8   simply does not have the authority under the representative Loan Servicing Agreement to take

9   the requested action without consent from all 398 of the individual Direct Lenders on the

10  Amesbury Loan.  According to the Debtors, the Amesbury Loan matured on June 30, 2005.

11  Pursuant to NRS 645B.330, a mortgage broker shall not engage in a transaction pursuant to a

12  power of attorney unless the power of attorney "[e]xpressly provides that the power of attorney is

13  effective only for the term of the specific loan unless the mortgage broker obtains written

14  approval from the private investor to extend the term of the power of attorney to provide services

15  for not more than one other loan and the written approval".   Thus, the power of attorney under

16  any Loan Servicing Agreement the Direct Lenders on the Amesbury Loan may have signed

17  expired on June 30, 2005.  USA Mortgage does not claim to have received extensions on the

18  powers of attorney from the individual Direct Lenders on the Amesbury Loan.  The Debtors no

19  longer have authority to take the requested action without consent from all of the Direct Lenders

20  on the Amesbury Loan.  USA Mortgage has been authorized by the State of Nevada to continue

21  in business post-petition despite it admitted violations of Nevada law.  this does not mean that

22  USA Mortgage has carte blanche to violate anew Nevada law post-petition and have this Court

23  condone such conduct.

24          Finally, USA Mortgage clearly intends on immediately taking its loan servicing fees from

25  any proceeds received from the proposed sales of the three units (which amounts USA Mortgage

26  fails to disclose), but USA Mortgage will hold any remaining funds in the "Collection Account"

27  and will not distribute any monies to the Direct Lenders from those proceeds.  The Direct Lender

28  Committee reiterates its objection to the continued warehousing of the Direct Lenders' proceeds.

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

100933-001/406885.doc

11

4.    **The HFAH Loans.**

In the last and most outrageous of all of the Debtors requests authorization to forbear on four HFA Non-Performing Loans (HFA Monaco Loan[5], HFA Clear Lake Loan, HFA Clear Lake-2nd Loan, and HFA Windham/Asylum Loan) from direct lenders to companies related to Homes For America Holdings, Inc. ("HFAH")[6].  According to the Debtors, the HFA Non-Performing Loans are all non-performing.  Moreover, according to the Debtors, records for the collateral assignment documents for one of the loans, HFA Windham/Asylum Loan, are incomplete. See Motion, p. 15, ll. 18-21.  In addition to the four HFA Forbearance Loans, three other direct loans (the HFA Paid Loans) were made to two HFAH affiliates, HFA Riviera and HFA North Yonkers. See Motion, p. 16, ll. 7-11. According to Debtors, the HFA Paid Loans were paid in full in May, 2006, by the HFAH borrowers prior to their stated maturity dates.  The proceeds were paid to USA Mortgage.  Apparently, USA Mortgage made "arrangements" with the HFAH borrowers to make these early payments in full on the HFA Paid Loans in exchange for agreeing to forbear (upon Court approval) from declaring a default or from exercising remedies on the HFA Forbearance Loans until January 1, 2007. See Motion, p. 16, ll. 12-17.

Thus, to the detriment of certain Direct Lenders on the HFA Non-Performing Loans, USA Mortgage made "arrangements" to forbear for the benefit of other Direct Lenders on the HFA Paid Loans.[7]  This "arrangement" typifies Debtors complete lack of understanding or ignorance of the positions of the Direct Lenders and their individual rights under their loan

[5] Again, the sole lender on the HFA Monaco Loan is the Diversified Fund and therefore, the Official Committee of Direct Lenders takes no position on the prudence of its consent to the requested action.

[6] According to the First Trust Deed Fund's 10-Q dated September 30, 2005, HFAH is involved in joint ventures with USA Investment Partners, LLC.  USA Investment Partners, LLC is an affiliate of the First Trust Deed Fund's manager, USA Capital Realty. See First Trust Deed Fund 10-Q attached hereto as Exhibit "1", p. 17. According to the Voluntary Petition filed by USA Capital Realty, Mr. Milanowski is it sole manager and a member. [Docket No. 1, In re USA Capital Realty, LLC, Bk. Case 06-10726]. Additionally, USA Capital Realty, LLC identified Mr. Hantges as a principal of that limited liability company in its Motion of the Debtors Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code For Authorization to Pay Prepetition Wages, Compensation and Employee Benefits [Docket No. 6, p. 5, ll. 25-26, In re USA Capital Realty, LLC, Bk. Case 06-10726].

[7] Although most certainly USA MORTGAGE has not released any of the proceeds from the HFA Paid Loans to their Direct Lenders.  Almost as certain, USA MORTGAGE has taken its loan servicing proceeds from the HFA Paid Loans and USA MORTGAGE has not provided an accounting to the Direct Lenders of the HFA Paid Loans of the amounts collected.

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

100933-001/406885.doc

12

1  documents.    The Debtors treat the Direct Lenders and the individual loans as fungible

2  commodities, which they are not.    The Debtors continue to make decisions on the Direct

3  Lenders' loans on a macro-basis and apparently solely for the best interests of USA Mortgage

4  and its far-fetched scheme of reorganizing it as a viable lender, rather than on an individualized

5  basis as required under the Loan Servicing Agreement and according to USA Mortgage fiduciary

6  responsibilities.

7          The Debtors fail to provide any of the loan documentation related to the HFA Non-

8  Performing Loans. According to the Debtors, one of the loans, the HFAH-Asylum Loan matures

9  on June 16, 2006, which is prior to the hearing on the Motion.  Pursuant to NRS 645B.330, by

10  the hearing date on the Motion, the Debtor will no longer be authorized to take action under the

11  Loan Servicing Agreement as the power of attorney will be expired.  Without a valid power of

12  attorney, the USA Mortgage will be required to obtain consent from all of the Direct Lenders on

13  the HFAH-Asylum Loan.    Consent of the Direct Lenders on the HFAH-Asylum Loan is

14  particularly imperative as the Debtor apparently failed to complete the documentation for that

15  loan. See Motion, p. 15, ll. 18-21, p. 16, ll. 23-24.  The HFA Clear Lake 2nd Loan matures on

16  July 1, 2006, ten days after the hearing on the Motion.  Finally, according to the Debtors, the

17  HFA Clear Lake Loan originally matured on January 7, 2006, and was extended to January 7,

18  2007.  Debtors failed to provide any evidence that the original powers of attorney granted in

19  Loan Servicing Agreements related to the HFA Clear Lake Loan were extended pursuant to NRS

20  645B.

21  **C.    DEBTORS' REQUEST TO WAIVE BANKRUPTCY RULE 6004(g) SHOULD BE DENIED.**

22

23          Finally, after filing this Motion on shortened time and failing to notice affected individual

24  Direct Lenders, Debtors request that the Court waive the automatic ten-day stay imposed by

25  Bankruptcy Rule 6004(g) and to any order issued related to the Motion and that any such order

26  be immediately effective.  This will effectively take away appeal rights of all parties as the

27  Debtor will immediately take the requested action.  There is no evidence that the Debtors should

28  not be required to wait the ten-day period imposed by Bankruptcy 6004(g), especially since the

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

100933-001/406885.doc

13

1    very parties (the Direct Lenders) which will be affected by this waiver have no idea that this

2    action is being taken.

### III.
### CONCLUSION

WHEREFORE, the Official Direct Lender Committee respectfully requests that the Court

deny the Motion in its entirety and for such other relief that is just and proper.

DATED this ____ day of June, 2006.

GORDON & SILVER, LTD.

By: _____
GERALD M. GORDON, ESQ.
BRIGID M. HIGGINS, ESQ.
GREGORY E. GARMAN, ESQ.

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

14

100933-001/406885.doc

# EXHIBIT 1

10-Q 1 d10q.htm FORM 10-Q

<u>**Table of Contents**</u>

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended: September 30, 2005

OR

☐ **TRANSITION REPORT PURSUANT SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from: _____ To _____

Commission file number: 333-59362

# USA Capital First Trust Deed Fund, LLC
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Nevada** | **88-0491003** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **4484 South Pecos Road, Las Vegas, Nevada** | **89121** |
| (Address of principal executive offices) | (Zip Code) |

**(702) 734-2400**
(Registrant's telephone number, including area code)

---

(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.): Yes ☐ No ☒

### Applicable Only to Issuers Involved in Bankruptcy Proceedings During the Preceding Five Years

Check whether the registrant filed all documents and reports required to be filed by Section 12, 13 or 15(d) of the Exchange Act after the distribution of securities under a plan confirmed by court. YES ☐ NO ☒

**Table of Contents**

**USA CAPITAL FIRST TRUST DEED FUND, LLC**

**FORM 10-Q**

**TABLE OF CONTENTS**

| | PAGE |
|---|---|
| **PART I – FINANCIAL INFORMATION** | **1** |
| ITEM 1. FINANCIAL STATEMENTS | 1 |
|     USA CAPITAL FIRST TRUST DEED FUND, LLC | 1 |
|     Balance Sheets | 1 |
|     Statements of Operations (Unaudited) | 2 |
|     Statements of Cash Flows (Unaudited) | 3 |
| ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 10 |
| ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 20 |
| ITEM 4. CONTROLS AND PROCEDURES | 20 |
| **PART II – OTHER INFORMATION** | **22** |
| ITEM 1. LEGAL PROCEEDINGS | 22 |
| ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS | 22 |
| ITEM 3. DEFAULTS UPON SENIOR SECURITIES | 23 |
| ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 23 |
| ITEM 5. OTHER INFORMATION | 23 |
| ITEM 6. EXHIBITS | 23 |
| **SIGNATURES** | **24** |

– i –

Table of Contents

## PART I – FINANCIAL INFORMATION

ITEM 1.   FINANCIAL STATEMENTS.

### USA CAPITAL FIRST TRUST DEED FUND, LLC

#### Balance Sheets

|  | (Unaudited) September 30, 2005 | December 31, 2004 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 9,836,528 | $ 4,002,283 |
| Investments in mortgage loans, net of allowance for loan losses of $560,000 and $500,000 respectively | 59,175,229 | 45,875,697 |
| Unsecured advance to affiliate | 160,000 | 560,000 |
| Interest and other receivable | 616,001 | 484,045 |
|  | $69,787,758 | $50,922,025 |
| **LIABILITIES AND MEMBERS' EQUITY** | | |
| Liabilities: | | |
| Accounts payable and accrued expenses | $        — | $        169 |
| Management fee payable | 311,116 | — |
| Due to affiliate | 246,069 | 246,069 |
|  | 557,185 | 246,238 |
| Commitments and contingencies | — | — |
| Members' equity | 69,230,573 | 50,675,787 |
|  | $69,787,758 | $50,922,025 |

**See Notes to Financial Statements**

– 1 –

Table of Contents

### USA CAPITAL FIRST TRUST DEED FUND, LLC

### Statements of Operations
### (Unaudited)

| | For the Nine Months Ended September 30, 2005 | For the Nine Months Ended September 30, 2004 | For the Three Months Ended September 30, 2005 | For the Three Months Ended September 30, 2004 |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Interest income from investments in mortgage loans | $ 5,181,722 | $ 1,510,811 | $ 1,912,281 | $   812,983 |
| Other income | 4,509 | 6,789 | 1,642 | 6,660 |
| | 5,186,231 | 1,517,600 | 1,913,923 | 819,643 |
| **Expenses:** | | | | |
| Management fees to Manager | 556,167 | 197,209 | 219,818 | 108,929 |
| Provision for loan losses | 60,000 | — | — | — |
| Expense related to real estate held for sale | 6,100 | — | 2,500 | — |
| Other | — | 27 | — | — |
| | 622,267 | 197,236 | 222,318 | 108,929 |
| *Net income* | $ 4,563,964 | $ 1,320,364 | $ 1,691,605 | $   710,714 |

**See Notes to Financial Statements**

-- 2 --

Table of Contents

## USA CAPITAL FIRST TRUST DEED FUND, LLC

### Statements of Cash Flows
### (Unaudited)

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | **2005** | **2004** |
| Cash flows from operating activities: | | |
| Interest received | $ 5,054,071 | $ 1,221,758 |
| Cash paid for management fee | (245,051) | (122,701) |
| Cash paid to vendors | (6,065) | (27) |
| *Net cash provided by operating activities* | 4,802,955 | 1,099,030 |
| Cash flows from investing activities: | | |
| Purchase of investments in mortgage loans | (41,553,950) | (38,121,057) |
| Proceeds from sale of mortgage loans | 1,185,000 | — |
| Proceeds from loan payoff | 25,440,478 | 8,814,158 |
| Mortgage loans purchased and held for sale | 1,568,939 | — |
| *Net cash (used in) investing activities* | (13,359,533) | (29,306,899) |
| Cash flows from financing activities: | | |
| Proceeds from issuance of membership units | 18,411,453 | 29,745,000 |
| Members' redemptions | (1,320,194) | (309,621) |
| Member distributions, net of reinvestments | (3,100,436) | (677,802) |
| Repayment from affiliate | 400,000 | — |
| *Net cash provided by financing activities* | 14,390,823 | 28,757,577 |
| Increase in cash | 5,834,245 | 549,708 |
| Cash, beginning of period | 4,002,283 | 500,758 |
| Cash, end of period | $ 9,836,528 | $ 1,050,466 |
| The following is a reconciliation of net income to net cash provided by operations: | | |
| Net income | $ 4,563,964 | $ 1,320,364 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Increase (Decrease) in loan loss provision | 60,000 | — |
| (Increase) Decrease in interest receivable | (131,956) | (295,842) |
| Increase (Decrease) in management fee payable | 311,116 | 74,508 |
| Increase (Decrease) in accounts payable and accrued expenses | (169) | — |
| Net cash provided by operating activities | $ 4,802,955 | $ 1,099,030 |

**See Notes to Financial Statements**

– 3 –

Table of Contents

**USA CAPITAL FIRST TRUST DEED FUND, LLC**

**Statements of Cash Flows (continued)**
**(Unaudited)**

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2005 | 2004 |
| Supplemental schedule of non-cash activities: | | |
| Real estate held for sale acquired through foreclosure | $          — | $          — |
| Reinvestment of members' distributions | $    1,445,568 | $    223,703 |

**See Notes to Financial Statements**

-- 4 --

Table of Contents

USA CAPITAL FIRST TRUST DEED FUND, LLC

### Notes to Financial Statements

**Note 1. Financial statement presentation**

The financial statements have been prepared in accordance with Securities and Exchange Commission requirements for interim financial statements. Therefore, they do not include all of the information and footnotes required by accounting principles generally accepted in the United States for annual financial statements. These financial statements should be read in conjunction with the financial statements and notes thereto contained in the USA Capital First Trust Deed Fund, LLC (the "Company") Annual Report on Form 10-K for the year ended December 31, 2004 as filed with the Securities and Exchange Commission on April 15, 2005.

The results of operations for the interim periods shown in this report are not necessarily indicative of results to be expected for the full year. In the opinion of management, the information contained herein reflects all adjustments necessary to make the results of operations for the interim periods a fair statement of such operations. All such adjustments are of a normal recurring nature.

**Note 2. Financial instruments and concentration of credit risk**

Financial instruments with concentration of credit risk include cash and loans secured by first trust deeds.

At September 30, 2005, approximately 44 % of the Company's total portfolio value was invested in mortgage loans that were secured by real property located in either Arizona or Texas. (See Note 3.) As a result of this geographical concentration of collateral for the Company's mortgage loans, a downturn in the local real estate markets in Arizona and/or Texas could have a material adverse effect on the Company.

At September 30, 2005, approximately 29 % of the Company's portfolio (approximately $17 million) was not supported with independent appraisals of the underlying collateral. In these cases, management utilized alternative methods to determine the sufficiency of the loan to value ratios, such as a broker's opinion of value or other similar information. In the event of default, if management's estimates of value are incorrect, the ability to recover the loans through foreclosure could have a material adverse effect on the Company.

Additionally, at September 30, 2005, approximately 34% of the Company's total portfolio value was in loans to eight separate loans controlled by three different principals. Because the Company has a significant concentration of credit risk with these three borrowers, a default by any of these borrowers could have a material adverse effect on the Company.

– 5 –

**Table of Contents**

**USA CAPITAL FIRST TRUST DEED FUND, LLC**

**Notes to Financial Statements (cont.)**

**Note 3. Investment in mortgage loans**

Investments in mortgage loans at September 30, 2005, consist of:

| Loan type by mortgage | Number of loans | Balance | Average interest rate | Portfolio percentage |
|---|---|---|---|---|
| Acquisition | 14 | $ 7,933,342 | 13.40% | 13.30% |
| Bridge | 11 | 15,540,652 | 12.80% | 26.10% |
| Construction | 8 | 7,434,249 | 12.40% | 12.40% |
| Development | 6 | 19,197,064 | 12.40% | 32.10% |
| Acquisition and development | 10 | 9,629,922 | 12.70% | 16.10% |
| | 49 | 59,735,229 | 12.74% | 100.00% |
| Less allowance for loan losses | | (560,000) | | |
| | | $59,175,229 | | |

| Loan type by real property | Number of loans | Balance | Portfolio percentage |
|---|---|---|---|
| Residential | 14 | $17,119,220 | 28.70% |
| Commercial | 12 | 11,374,171 | 19.00% |
| Mixed use | 3 | 4,195,060 | 7.00% |
| Unimproved land | 20 | 27,046,778 | 45.30% |
| | 49 | 59,735,229 | 100.00% |
| Less allowance for loan losses | | (560,000) | |
| | | $59,175,229 | |

Investments in mortgage loans at December 31, 2004 consists of:

| Loan type by mortgage | Number of loans | Balance | Average interest rate | Portfolio percentage |
|---|---|---|---|---|
| Acquisition | 12 | $ 9,146,603 | 13.53% | 19.72% |
| Bridge | 9 | 17,596,167 | 12.98% | 37.94% |
| Construction | 5 | 3,986,333 | 12.31% | 8.60% |
| Development | 5 | 10,646,594 | 12.52% | 22.96% |
| Acquisition and development | 2 | 5,000,000 | 12.95% | 10.78% |
| | 33 | 46,375,697 | 12.86% | 100.00% |
| Less allowance for loan losses | | (500,000) | | |
| | | $45,875,697 | | |

– 6 –

Table of Contents

USA CAPITAL FIRST TRUST DEED FUND, LLC

Notes to Financial Statements (cont.)

Note 3. Investment in mortgage loans – *continued*

| Loan type by real property | Number of loans | Balance | Portfolio percentage |
|---|---|---|---|
| Residential | 3 | $ 1,704,084 | 3.67% |
| Commercial | 10 | 9,900,833 | 21.35% |
| Mixed use | 3 | 8,846,594 | 19.08% |
| Unimproved land | 17 | 25,924,186 | 55.90% |
| | 33 | 46,375,697 | 100.00% |
| Less allowance for loan losses | | (500,000) | |
| | | $45,875,697 | |

The following is a schedule by geographic location of investment in mortgage loans as of September 30, 2005 and December 31, 2004:

| | September 30, 2005 | | | December 31, 2004 | | |
|---|---|---|---|---|---|---|
| | Number of loans | Balance | Portfolio percentage | Number of loans | Balance | Portfolio percentage |
| Arizona | 4 | $12,336,065 | 20.70% | 3 | $ 6,575,000 | 14.18% |
| California | 15 | 6,518,000 | 10.90% | 14 | 15,548,186 | 33.53% |
| Florida | 6 | 7,205,717 | 12.00% | 4 | 6,938,584 | 14.96% |
| Idaho | 1 | 1,900,000 | 3.20% | — | — | 0.00% |
| Illinois | 2 | 3,227,060 | 5.40% | 1 | 4,476,594 | 9.65% |
| Indiana | 1 | 855,000 | 1.40% | — | — | 0.00% |
| Kansas | 1 | 1,000,000 | 1.70% | — | — | 0.00% |
| Massachusetts | 1 | 156,000 | 0.30% | — | — | 0.00% |
| Michigan | 1 | 510,000 | 0.90% | 1 | 295,000 | 0.64% |
| Nevada | 4 | 4,329,513 | 7.20% | 3 | 656,000 | 1.41% |
| New Mexico | 2 | 2,076,452 | 3.50% | 3 | 3,245,833 | 7.00% |
| New York | 1 | 890,000 | 1.50% | — | — | 0.00% |
| Ohio | 1 | 4,675,000 | 7.80% | — | — | 0.00% |
| Texas | 9 | 14,056,422 | 23.50% | 4 | 8,640,500 | 18.63% |
| | 49 | 59,735,229 | 100.00% | 33 | 46,375,697 | 100.00% |
| Less allowance for loan losses | | (560,000) | | | (500,000) | |
| | | $59,175,229 | | | $45,875,697 | |

– 7 –

Table of Contents

USA CAPITAL FIRST TRUST DEED FUND, LLC

Notes to Financial Statements (cont.)

**Note 3. Investment in mortgage loans – *continued***

The following is a schedule of contractual maturities of investments in mortgage loans as of September 30, 2005:

| | |
|---|---:|
| 2005 | $23,215,480 |
| 2006 | 35,394,749 |
| 2007 | 1,125,000 |
| | 59,735,229 |
| Less allowance for loan losses | (560,000) |
| | $59,175,229 |

This does not necessarily indicate when the investments in mortgage loans will be realized in cash, as loans may be extended, become delinquent or be foreclosed upon during the normal course of operations.

At December 31, 2004, the Company had one loan that was non-performing (more than 120 days past due on interest payments or past due on principal) totaling approximately $4.7 million. This loan was collateralized by two properties. The Company started foreclosure proceedings in December 2004. The first collateralized property was foreclosed on and subsequently sold in July 2005 to a third party. (See note 5.) The second collateralized property was scheduled for foreclosure sale in May 2005, but prior to the sale, the borrower put the entity into bankruptcy. USA Capital Realty Advisors, LLC (the "Manager") is pursuing appropriate remedies on behalf of the Company in bankruptcy court.

**Note 4. Management fees and related party transactions**

The operating agreement provides for a management fee to the Manager equal to 1.5% annually of net assets. For the three months ended September 30, 2005, the Company accrued management fees payable of approximately $ 226,000.

During the three month period ended September 30, 2005, the Manager incurred approximately $55,000 and paid $16,000 in legal and accounting expenses on behalf of the Company.

USA Securities, LLC, a company related by common control, raised 85% of the Company's membership units totaling approximately $3,355,000 for the three months ended September 30, 2005. The Manager paid the commission fees associated with raising the funds.

During the three month period ended September 30, 2005, the Company purchased approximately $4.4 million in mortgage loans from USA Capital Diversified Trust Deed Fund, LLC ("Diversified"), a company related by common management. These transactions were recorded at the original principal balances and, accordingly, no gain or loss was recognized.

At September 30, 2005, the Company had approximately $195,000 invested in mortgage loans with Wasco Investments, LLC, a company that has common ownership and significant joint investments with Tanamera Resort Partners, LLC ("Tanamera"), an affiliate of the Manager.

– 8 –

Table of Contents

USA CAPITAL FIRST TRUST DEED FUND, LLC

Notes to Financial Statements (cont.)

**Note 4. Management fees and related party transactions (continued)**

At September 30, 2005, the Company had approximately $314,000 invested in mortgage loans with Castaic Partners, a company that has common ownership and significant joint investments with Tanamera.

At September 30, 2005, the Company had approximately $4,940,000 invested in mortgage loans with Homes for America Holdings, LLC, a company with joint investments with Tanamera.

At September 30, 2005, the Company had approximately $200,000 and $2,076,000 invested in mortgage loans with Fiesta Development, LLC and Interstate Commerce, LLC, respectively, companies with joint investments with USA Investment Partners, LLC, an affiliate of the Manager.

**Note 5. Other real estate held for sale**

At certain times during the six months ended September 30, 2005 and the year ended December 31, 2004 the Company held properties with a total carrying value of approximately $1.5 million and $0, respectively, which were acquired through foreclosure and recorded as investments in other real estate held for sale. This Company sold its real estate for sale in July of 2005 leaving a balance at September 30, 2005 of $0.

**Note 6. Unsecured advance to affiliate**

The Company purchased entire or fractional interests in acquisition, development, construction and bridge loans secured by first deeds of trust on undeveloped land, residential and commercial developments from Diversified, an affiliate related by common management. (See note 4.) In July 2004, the Company's manager had permitted Diversified to retain the amount collected on its investment in mortgage loan that was assigned to the Company. The amount includes 12% interest and is reflected in the account unsecured advance to affiliate. At September 30, 2005, the balance of the unsecured advance, including accrued interest expense, was approximately $199,000.

– 9 –

Table of Contents

ITEM 2.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.

*Forward-Looking Statements*

Certain statements contained herein constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, codified at Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Such forward-looking statements may be identified by the use of terminology such as "believe," "may," "will," "expect," "anticipate," "intend," "designed," "estimate," "should" or "continue" or the negatives thereof or other variations thereon or comparable terminology. Such forward-looking statements involve known or unknown risks, uncertainties and other factors which may cause our actual results, performance or achievements, or industry results, to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements.

Such factors include, but are not limited to, the following: strict regulation and changes in regulations imposed by regulatory authorities; competition we face or may face in the future; our ability to continue to raise proceeds from our offering of membership units; our ability to identify investments; the risk of default by our borrowers; our dependence on key employees; potential fluctuations in our quarterly results; ramifications of the current investigation by the United States Securities and Exchange Commission ("SEC"); general economic and business conditions and other factors detailed from time to time in our reports filed with the SEC.

*Overview*

We were organized on February 16, 2001. As of September 30, 2005, we issued, net of redemptions and including reinvestments, 13,865.0997 units representing a capitalization of $69,325,499. We suspended the sale of our membership units, including reinvestments, on September 2, 2005, and as of the date of this report, have not resumed our selling efforts. The proceeds from the sale of membership units have primarily been used to purchase fractional interests in or to otherwise invest in mortgage loans in the United States. Although we may also invest up to 10% of our loan portfolio in loans secured by real property located outside of the United States, as of the date of this report, we have only invested in loans secured by real property located within the United States. USA Capital Realty Advisors, LLC, our manager, has and will continue to select mortgage loans for us, and assist us by obtaining, processing and managing these loans.

We do not anticipate hiring any employees, acquiring any fixed assets such as office equipment or furniture or incurring material office expenses during the next 12 months as we will be utilizing our manager's personnel and office equipment. Other than the asset management and loan servicing fee we pay our manager, we will not pay our manager any overhead or other compensation for providing us with its personnel and equipment.

*Accounting Policies*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires our manager to make estimates and assumptions that will affect reported amounts of assets, liabilities and the disclosure of contingent liabilities. Due to the inherent uncertainty of such estimates, our actual results may differ and our estimates and assumptions may require revision in future periods. We will apply key accounting policies with respect to revenue

– 10 –

Table of Contents

recognition, the impairment of mortgage loans, the allowance for loan losses, the fair value of financial instruments, the lack of distinction between comprehensive income and net income and income taxes.

**Revenue Recognition.** Interest income on our mortgage loans accrues by the effective interest method. Interest revenue will generally be suspended when a loan is impaired or non-performing. A loan will be considered non-performing when the payment of principal or interest is 120 days past due. A loan will be deemed impaired when, based on current information and events, it is probable that we will be unable to collect all amounts due according to the terms of the loan. We will not hold loans for resale, prepare loan documents or service any loans. As a result, there will be no revenues from loan fees, collection fees or similar charges.

**Allowances for Loan Losses.** When deemed necessary, we set an allowance for possible credit losses on mortgage loans. Additions to the reserve are based on an assessment of certain factors including, but not limited to, estimated future losses on the loans and general economic conditions. Actual losses on loans will be recorded as a charge-off or reduction of the loan loss reserve. Subsequent recoveries of loan amounts previously charged off are recorded as an increase to the allowance or are included in income when the property is sold. (See also Methodologies for Determining Allowance for Loan Losses below.)

**Fair Value of Financial Instruments.** The carrying amounts of cash, interest receivables, prepaid expenses and other current assets due from affiliates, accounts payable and accrued expenses and amounts due the manager will approximate fair value due to their short maturities. The carrying value of investments in mortgage loans, net of the allowance for the loan losses, approximates fair value due to their short-term maturities and underlying collateral. Fair value for loans that are delinquent and/or in foreclosure are indeterminable at this time as no ready market exists for these loans, but fair value may be significantly below the carrying value.

## Results of Operations

### Nine Months Ended September 30, 2005 and 2004

During the nine months ended September 30, 2005, we generated revenues of $5,186,231, compared to $1,517,600 during the nine months ended September 30, 2004. During the nine months ended September 30, 2005, our revenue consisted of $5,181,722 in interest earned from investments in mortgage loans and $4,509 in other income. We deducted an allowance for loan losses from the amount of our investments in mortgage loans in the amounts of $60,000 and $0, for the nine months ended September 30, 2005 and the nine months ended September 30, 2004, respectively. For the nine months ended September 30, 2005, other income consisted primarily of early redemption fees paid by investors withdrawing from the Company prior to the expiration of their applicable holding period. During the nine months ended September 30, 2004, our revenues consisted of $1,510,811 in interest earned from investments in mortgage loans and $6,789 in other income. The increase in revenue during the nine months ended September 30, 2005 from the nine months ended September 30, 2004 resulted from the interest earned on the additional mortgage loan investments in our mortgage loan portfolio.

During the nine months ended September 30, 2005, we incurred expenses of $622,267, compared to $197,236 during the nine months ended September 30, 2004. During the nine months ended September 30, 2005, we incurred management fees payable to our manager in the amount of $556,167, as opposed to $197,209 in the nine months ended September 30, 2004. During the nine months ended September 30, 2005, we also incurred $60,000 in provision for loan losses and $6,100 in expenses related

– 11 –

**Table of Contents**

to real estate held for sale. The increase in expenses during the nine months ended September 30, 2005 from the nine months ended September 30, 2004 reflects the additional management fees incurred as a result of additional assets under management as the management fee is proportional to the total assets under management. At September 30, 2005, the Company had total assets of $69,787,758, which is a 92% increase in total assets from $36,341,913 as of September 30, 2004.

The average weighted interest rate earned on our mortgage loans decreased slightly as of September 30, 2005, as compared to September 30, 2004, to 12.74% down from 12.90%. This decrease is due to the continuous change in the mix of mortgage loans, which is driven by the short-term nature of our mortgage loan investments and the replacement of higher interest rate loans with lower interest rate loans.

During the nine months ended September 30, 2005 and 2004, we generated a net income of $4,563,964 and $1,320,364, respectively. The increase in net income during the nine months ended September 30, 2005 from the nine months ended September 30, 2004 reflects the $3,668,631 increase in revenues offset by the $425,031 increase in expenses, and is primarily due to the expansion of investments in mortgage loans.

*Three Months Ended September 30, 2005 and 2004*

During the three months ended September 30, 2005, we generated revenues of $1,913,923, compared to $819,643 during the three months ended September 30, 2004. During the three months ended September 30, 2005, our revenue consisted of $1,912,281 in interest earned from investments in mortgage loans and $1,642 in other income. For the three months ended September 30, 2005, other income consisted primarily of early redemption fees paid by investors withdrawing from the Company prior to the expiration of their applicable holding period. Revenue for the three months ended September 30, 2004 was $812,983 in interest earned from investments in mortgage loans and $6,669 in other income.

During the three months ended September 30, 2005, we incurred expenses of $222,318, compared to $108,929 during the three months ended September 30, 2004. For the three months ended September 30, 2005, we incurred $219,818 in management fees payable to our manager and $2,500 in expense related to real estate held for sale. All expenses for the three months ended September 30, 2004 were management fees to our manager. The increase in expenses during the three months ended September 30, 2005 from the three months ended September 30, 2004 reflects the additional management fees incurred as a result of an increase in assets under management. The Manager waived $40,000 in management fees during the three months ended September 30, 2005.

During the three months ended September 30, 2005 and 2004, we generated net income of $1,691,605 and $710,714, respectively. The increase in net income during the three months ended September 30, 2005 from the three months ended September 30, 2004 reflects the $1,094,280 increase in revenues, offset by the $113,398 increase in expenses.

***Return on Equity and Assets***

Our average return on assets for the nine months ended September 30, 2005 was 9.8% per annum, compared to 10.2% per annum for the nine months ended September 30, 2004, primarily due to a decline in the average return on investments in mortgage loans from 12.7% during the nine months ended September 30, 2004 to 12.2% during the nine months ended September 30, 2005. A portion of this

– 12 –

Table of Contents

decline is due to the fact that one loan in the portfolio is non-performing and has been not been accruing interest since November of 2004.

Since we are currently funded exclusively with equity from our members, we believe the return on equity is similar to the return on assets. For the nine months ended September 30, 2005, the average return on equity was 9.9%, compared to an average return on equity of 10.3% for the nine months ended September 30, 2004.

Preferred distributions paid to the members during the nine months ended September 30, 2005 averaged 9.9% per annum on invested capital as compared to preferred distributions paid to members of 8.0% during the nine months ended September 30, 2004. The lower distribution percentage for 2004 is skewed to the low end, primarily because of the rapid growth in assets during the first nine months of 2005, particularly the third quarter.

We sell three classes of membership interest: Class A, Class B, and Class C, where each class is entitled to different preferred distribution percentages of 9.0%, 10.0%, and 11.0%, respectively. As of September 30, 2005, our members had invested 29.6% of the capital in Class A units, 16.7% in Class B units and 53.7% in Class C units for a blended preferred distribution percentage of 10.24%. As of September 30, 2004, our members had invested 43.6% of the capital in Class A units, 11.6% in Class B units and 44.8% in Class C units for a blended preferred distribution percentage of 10.01%. Since sales of new units have been suspended, as Class A and Class B units are potentially redeemed, the percentage of our investment in Class C units will increase, which will increase the blended preferred distribution percentage.

### Loan Portfolio Composition

**Fractional Interests in Loans.** Our loan portfolio consists largely of fractionalized or partial interests in whole loans, which are either new originations, or routinely purchased from third parties. As of September 30, 2005, our fractional interests in loans, versus whole interests in loans, were as follows:

|                              | Principal Amount | %     |
|------------------------------|-----------------:|------:|
| Fractional interests in loans | $45,629,164     | 76.4% |
| Whole loans                  | $14,106,061      | 23.6% |
| **Total**                    | **$59,735,225**  | **100%** |

The figures stated above represent fractional interests in 44 mortgage loans, as compared to 5 whole loans. On average, as of September 30, 2005, our fractional interest of each loan represented approximately 10.6% of each corresponding whole loan. Further, as of September 30, 2005, only one of our fractionalized interests in loans was potentially non-performing in our estimation. We believe that when loans are adequately collateralized, fractional interests do not add any further risk. In fact, by investing in many fractionalized large loans, we may actually decrease our monetary exposure to any one loan, further diversifying our loan portfolio.

**Loan Concentrations.** As of September 30, 2005, approximately 44% of the principal amount of our investments in mortgage loans were located in Arizona or Texas (20.70% and 23.50%, respectively). Further, 10.90% and 12.00% of our mortgage loans are collateralized by property located in California and Florida, respectively. If there were to be a downturn in the real estate market in any area where we have a

– 13 –

Table of Contents

geographical concentration of collateral underlying our loans, if appropriate, we would reevaluate the loans collateralized by real estate located in such area, and consider geographic concentration, along with other factors related to each such loan, in determining whether to make an appropriate allowance for loan losses.

As of September 30, 2005, approximately 33.5% of our total loan portfolio was represented by 8 loans to three borrowers. Although each of these 8 loans is collateralized by separate property, some of these loans share a common guarantor. The 49 loans in our loan portfolio are represented by a total of 34 borrowers. The amounts committed on the outstanding loans to these top three borrowers will begin to decrease over the next three to six months as the underlying collateral is sold by the borrowers, or the loans are refinanced with other lenders. However, we are currently not subject to any loan diversification requirements.

Also as of September 30, 2005, approximately 45.3% of our total loan portfolio consisted of 20 loans on unimproved land representing $27,046,778, which is a reduced concentration from 11 loans on unimproved land representing $18,446,702 or 52.8% of the total loan portfolio at September 30, 2004. The percentage of the total loan portfolio allocated to residential loans, whether bridge loans, construction loans, or development loans increased to $17,119,216, or 28.7% of the total loan portfolio at September 30, 2005 from $2,325,000 or 6.7% of the total loan portfolio at September 30, 2004.

Loans on unimproved land are typically considered riskier than loans on other types of collateral because of the longer lead time necessary for the underlying collateral to be sold or refinanced. We may seek to reduce our exposure to loans on unimproved land in the future, as other types of collateral become more attractive for the type of financing we provide. However, while we have reduced the percentage of our exposure to loans on unimproved land over the past twelve months, and may do so in the future, such loans typically command higher interest rates and should remain a significant portion of the total loan portfolio for us for the foreseeable future.

**Payment of Principal and Interest.** As of September 30, 2005, all of our 49 loans were subject to "balloon" or similar repayment requirements. However, 18 of the 49 loans outstanding as of September 30, 2005 were subject to partial release provisions should a portion of the collateral be refinanced or sold prior to maturity. These 18 loans totaled $20,188,392 and represented 33.8% of our $59,735,225 loan portfolio at September 30, 2005. Many of the loans in our portfolio are repaid from the sale, lease or refinance of the real property that secures the loan. For example, as of September 30, 2005, we had 14 loans that were development or construction loans, representing 44.3% of the loan portfolio. The borrowers use the proceeds of development loans to finance the cost of entitling and subdividing, and/or improving raw land, or in the case of construction loans, to complete improvements for residential dwellings or commercial buildings. In these cases, the loan is generally repaid from the sale of the entitled and subdivided land to other developers or homebuilders, or the sale or refinancing of individual residential dwellings, or commercial buildings, which is why short-term loans with "balloon" payments are suitable under our investment guidelines. To the extent that the value of the collateral underlying a given loan supports such loan, and there is an expectation that the borrower will be able to make the "balloon payment."

Most of our mortgage loans have interest reserves provided for in the loan budget. "Interest reserve" is a pre-arranged budget line item in each loan which is available to the borrower to make its scheduled interest payments under the loan documents. Like any other line item under the loan budget (such as grading or framing), the interest is funded by us, or a participating lender, on an ongoing basis in accordance with the loan documents. Consistent with industry practice, interest becomes due and

– 14 –

Table of Contents

accrues under the terms of the loan documents, and it is recorded as income on our statement of operations. Correspondingly, with respect to the interest reserve, the amount of the interest accrued on a loan reduces the budget line item for the interest reserve under the loan, and increases the amount due at maturity under the loan. The interest reserves are included in the total amount of a loan when the loan is underwritten. As a result, the interest reserve is treated as part of the amount due when determining the amount to be repaid while conducting the initial risk analysis.

### Interest Rates and Loan Maturities

We are in the business of making short-term loans secured by first deeds of trust or mortgages on real property with the equity invested by our members. We do not currently have any credit facilities, nor do we plan to borrow any money in the near future, therefore we incur no interest expense. As such, all interest earned by us is equivalent to a "net yield" for the Company.

Our average loan portfolio grew significantly from $16,232,802 during the nine months ended September 30, 2004 to an average loan portfolio of $56,707,657 for the nine months ended September 30, 2005. This was an increase in the average loan portfolio of nearly 250%. Growth in the average loan portfolio will decrease significantly in the future, as we have currently suspended sales of any new membership units.

During the nine months ended September 30, 2005, net interest earnings on our loan portfolio averaged 12.2%, which is a decrease of 50 basis points from the average net interest earnings on our loan portfolio of 12.7% for the nine months ended September 30, 2004. At September 30, 2005, the weighted average interest rate on the loans in our portfolio was 12.7%, which is 20 basis points lower that the weighted average interest rate on the loans in our portfolio of 12.9% at September 30, 2004.

The loans that we invest in are short-term in nature with original maturities generally of two years or less, and typically no more than one year. As of September 30, 2005, the weighted average maturity for the loans in our loan portfolio was 4.8 months. Of our total loan portfolio at September 30, 2005, $53,217,225 or 90.3% was due within twelve months, and all of the loans in the portfolio were due within eighteen months. Because of the nature of the projects on which we make loans, we may renew the loans in the portfolio as they come due from time to time. The decision on whether or not to renew or extend a loan depends on a variety of factors which may include but are not limited to the underlying collateral value at the time of the renewal request, whether or not the loan is performing, the current financial status of the borrower or guarantor and other similar factors.

### Methodologies for Determining Allowance for Loan Losses

We do not make any specific allowance for loan losses based on our historical loss information as each loan is reviewed independently based on the particular facts and circumstances related to such loan. Despite our limited operating history, we have not incurred a significant amount of loss to date. Through our manager and affiliates, we have access to a great deal of experience related to loan loss analysis, which we rely on in determining our allowance for loan losses.

We evaluate each individual loan to determine whether or not it is impaired (*i.e.*, whether we will not collect all amounts due according to the contractual terms of the loan agreement). If it is determined that the loan is impaired, we evaluate whether or not an allowance for loan losses needs to be recorded.

– 15 –

Table of Contents

To determine the amount of any allowance for loan losses, we compare the loan amount to the estimated value of the underlying collateral. The loan amount is equal to the current principal balance, plus any accrued but unpaid interest. The value of the underlying collateral is determined first by one or a combination of valuation methodologies, as discussed below. Further, the value of the underlying collateral may be adjusted to reflect the status of the project by factors including, but not limited to, completion of improvements, progress of the development plan versus original underwriting and sales or offers on the property and comparable properties in the area. In addition, we consider the estimated sales and marketing costs that may be necessary to dispose of the underlying collateral. Finally, the value of the underlying collateral is discounted for the estimated time it will take to dispose of such collateral. Once the value of the underlying collateral is estimated, it can then be compared to the loan amount to consider if an allowance for loan loss is appropriate.

For the three months ended September 30, 2005, management has determined that no additional allowance for loan loss is necessary. Currently one loan in the portfolio is considered impaired, with the borrower having filed for bankruptcy to stay the foreclosure of the property. A recent appraisal shows the value of the collateral is approximately equal to the carrying value of the loan. The servicer is in discussion with the borrower to sell, or allow the lender to foreclose on the property. It is expected that the disposition of the property will be completed in the next three to six months. While not non-performing as of September 30, 2005, the borrower failed to come to an agreement to extend or pay off a second loan prior to its due date. We are comfortable that the valuation of the property is well in excess of the carrying value of the loan, and the borrower is aggressively seeking to refinance the loan with another lender. It is expected that this loan will be repaid by the end of the year.

We reviewed the underlying collateral value of the other loans in our portfolio, where such review may include but is not limited to examining the original valuations, and any current information that may change those valuations, the financial status of the borrower and guarantor, the project status versus business plan, general market factors in the areas in which we have loaned, and any other such factors. Given that analysis, we are comfortable that no further allowance for loan loss needs to be recorded as of September 30, 2005.

### Related Party Transactions

In accordance with our operating agreement, we are obligated to pay our manager 1.5% per annum of our assets under management, payable monthly at a rate of 0.125% of our assets under management. We accrued management fees of approximately $220,000 for the three months ended September 30, 2005. In addition, during the three months ended September 30, 2005, our manager incurred approximately $55,000 and paid $16,000 in legal and accounting expenses on our behalf. Our manager also paid the commission fees associated with selling our membership units.

Our membership units are sold by USA Securities, LLC ("USA Securities"), an NASD member related to us by common control. USA Securities receives a selling commission of up to 3.0% of each unit sold. For the three months ended September 30, 2005, USA Securities sold 85% of the membership units sold during that period totaling approximately $3,355,000. The terms of this arrangement were not determined by arms length negotiation.

Since our inception, we have purchased loans from USA Capital Diversified Trust Deed Fund, LLC ("Diversified"), an entity that is also managed by USA Capital Realty Advisors, LLC, our manager. This has allowed us to keep our cash invested when investments in newly originated loans have not been available. All the loans have been purchased from Diversified at par. For the nine month period ended September 30, 2005 we purchased interests in 10 loans from Diversified for approximately $16.9 million. Of the

– 16 –

**Table of Contents**

approximately $40.1 million in loans that we have purchased from Diversified, approximately 45% of the loan amount has been repaid. At September 30, 2005, loans purchased from Diversified represent 36.9% of the total loan portfolio.

We have made loans to Wasco Investments, LLC and Castaic Partners II, LLC, which loans represent approximately 5.4% of the total loan portfolio. The principal of Wasco Investments, LLC and Castaic Partners II, LLC is involved with a separate joint venture with Tanamera Resort Partners, LLC, which is an affiliate of our manager. The loans are on terms no more generous than those provided to other borrowers on similar loans.

We have made three loans to entities controlled by Homes for America Holdings, which loans represent approximately 8.3% of the total loan portfolio. Homes for America Holdings is involved with separate joint ventures with Tanamera Resort Partners, LLC, and USA Investment Partners, LLC, which are affiliates of our manager. The loans are on terms no more generous than those provided to other borrowers on similar loans.

We made a loan to Fiesta Development, LLC, which loan represents approximately 0.3% of our total loan portfolio. Fiesta Development, LLC and its affiliates are involved with several separate joint ventures with USA Investment Partners, LLC, an affiliate of our manager. The loan is on terms no more generous than those provided to other borrowers on similar loans.

We made loans to Interstate Commerce Center, LLC, and Interstate Commerce Center II, LLC, which loans represent approximately 3.5% of the total loan portfolio. The principal of Interstate Commerce Center, LLC, and Interstate Commerce Center II, LLC is involved with separate joint ventures with USA Investment Partners, LLC, which is an affiliate of our manager. The loans are on terms no more generous than those provided to other borrowers on similar loans.

*Valuation Methodologies*

As of September 30, 2005, there were 17 loans in our loan portfolio for which we did not have independent written appraisals, totaling approximately $17.3 million, and representing 28.9% of our total loan portfolio. With respect to the 17 loans, we relied on alternative methods of valuation as follows:

- With respect to two loans representing $4,050,000 in our loan portfolio, an opinion of value from a third-party real estate broker who is familiar with the values of comparable properties in the area was used.

- We used current, valid purchase and sale agreements, and letters of intent to purchase from independent non-affiliated third parties for the same underlying collateral as the valuation basis for six loans representing an aggregate of $5,213,000 in our loan portfolio.

- For two loans representing an aggregate of $2,076,452 in our portfolio, we used the projected sales price based on previous sales in the same project (collateral) to non-affiliated third-party buyers.

- For seven loans representing an aggregate of $5,920,000 in our portfolio, we used a variety of valuation methods, which may include but are not limited to comparable sales of

– 17 –

Table of Contents

similarly situated property, acquisition and development cost, projected cash flow based on sales or leasing, and other such valuation methods.

We acknowledge that our practice of not always obtaining independent appraisals at the time of a loan's funding can potentially create additional risk, as compared to loans supported by independent appraisals. Appraisals have been scheduled for several of these loans to support the conclusions arrived at by the alternative valuation methods. If such appraisals suggest the need to adjust the allowance for loan losses, we will make the appropriate adjustments.

### *Impaired and Non-Performing Loans*

As of September 30, 2005, we have one loan that is non-performing. A loan is considered non-performing if it is more than 120 days past due on any payment of interest or principal. When a loan is deemed non-performing, we stop accruing interest on such loan. The current status of the non-performing loan is as follows:

- One loan with a principal amount of $3,131,061, with an interest rate of 14.0% matured on October 31, 2004. No interest has been accrued on the loan since its maturity. At September 30, 2005, the borrower had filed for bankruptcy in order to stay the foreclosure sale. A recent appraisal shows the value of the collateral is approximately equal to the carrying value of the loan. The servicer is in discussions with the borrower to sell, or allow the lender to foreclose on the property. It is expected that the disposition of the property will be completed in the next three to six months. This loan is also considered impaired.

As of September 30, 2005, 2 of our 49 loans were deemed impaired. A loan is impaired if we have serious doubts as to the ability of a borrower to comply with the present loan repayment terms. When we deem loans impaired, we will consider whether or not we need to record an allowance for loan losses. The loan described above is considered impaired, as well as non-performing. The current status of the other impaired loan is as follows:

- One loan with a principal amount of $4,500,000 and an interest rate of 13.0% was due August 13, 2005. At September 30, 2005, the borrower failed to come to an agreement to extend or pay off the loan prior to its due date. We are comfortable that the valuation of the property is well in excess of the carrying value of the loan, and the borrower is aggressively seeking to refinance the loan with another lender. It is expected that this loan will be repaid by the end of the year.

### *Liquidity and Capital Resources*

Since our inception, our principal operating resource has been the payment of interest on loans by our borrowers, and our principal capital resource has been the proceeds from our registered offering of membership units. Although not required to do so, our manager has paid most of our operational and regulatory expenses, including accounting, legal and administrative expenses and fees to date. In addition, our manager has paid all commissions fees related to the sale of our membership units. As of September 30, 2005 we have issued in the aggregate, net of redemptions and including reinvestments, 13,865.0997 units, representing a capitalization of $69,325,498.50. These numbers reflect the suspension of our sale of membership units, including reinvestments, as of September 2, 2005. Although we are not selling membership units at this time, we continue to invest in mortgage loans with interest earned from investments in loans, proceeds from the sale of loans and loan payoffs. As of September 30, 2005, we have redeemed an aggregate of 894.0718 units, where 152.44.38 of such units were redeemed in the three months ended September 30, 2005.

– 18 –

Table of Contents

At September 30, 2005, we held $9,836,528 of cash, compared to $4,002,283 of cash held as of December 31, 2004. The $5,834,245 increase in cash resulted primarily from loan payoffs, and secondarily from proceeds from the offering prior to the suspension of sales, without readily available loans in which to reinvest. Our assets consist primarily of our investments in mortgage loans which mature within 12 months. As a result, although we maintain positive working capital, the working capital concept may not be particularly meaningful as it relates to our operations. As of September 30, 2005, our members' equity was $69,230,573, compared to $50,675,787 as of December 31, 2004. The increase in members' equity during the nine months ended September 30, 2005 resulted primarily from the proceeds of the registered offering of our units. With the current suspension of sales, the liquidity and working capital of the Company will be influenced primarily by loan payoffs, investments in new loans, interest received on loan investments, and distributions to the members.

During the nine months ended September 30, 2005 and 2004, our operating activities provided net cash of $4,802,955 and $1,099,030, respectively. During the nine months ended September 30, 2005, the interest received from our mortgage loan investments of $5,054,071 was offset by the cash paid for management fees of $245,051 and the cash paid to vendors of $6,065. During the nine months ended September 30, 2004, the interest received from our mortgage loan investments of $1,221,758 was offset by the cash paid for management fees of $122,701 and the cash paid to vendors of $27. With the suspension of sales, the cash provided from operating activities will begin to stabilize as the portfolio size stabilizes. In addition, though short-term rates in the market are generally increasing, the rates on the types of loans the Company generally invests in have not had significant increases.

During the nine months ended September 30, 2005 and 2004, our investing activities used net cash of $13,359,533 and $29,306,899, respectively. During the nine months ended September 30, 2005, we invested in mortgage loans in the aggregate amount of $41,553,950, while we invested in mortgage loans in the aggregate amount of $38,121,057 in the nine months ended September 30, 2004. During the nine months ended September 30, 2005, we received proceeds from the sale of mortgage loans in the amount of $1,185,000. During the nine months ended September 30, 2005 and 2004, we received proceeds from loan payoffs in the amount of $25,440,748 and $8,814,158, respectively. This increase in loan payoffs is due to the stabilization of our operations, as many of the loans we had invested in the past few years have come to term, and also due to the overall increase in our loan portfolio.

During the nine months ended September 30, 2005 and 2004, our financing activities provided net cash of $14,390,823 and $28,757,577, respectively. During the nine months ended September 30, 2005 and 2004, we received proceeds of $18,411,453 and $29,745,000, respectively, from our registered offering of units. During the same periods, we issued distributions, net of reinvestments, of $3,100,435 and $677,802, respectively, and redeemed $1,320,194 and $309,621, respectively, in membership units. The $4,546,004 aggregate distributions were paid during the nine months ended September 30, 2005 against the $4,563,964 in net income, where $1,445,569 was reinvested in the Company through our distribution reinvestment program, which was suspended as of September 2, 2005. During the nine months ended September 30, 2005, we also were repaid for advances to affiliate in the amount of approximately $400,000. The net cash provided by financing activities for the nine months ended September 30, 2005 reflects proceeds from our offering of membership units, less distributions to members and member redemptions.

We have not maintained and do not maintain any off-balance sheet arrangements, where such arrangements include any transactions, agreements or other contractual arrangements to which an unconsolidated entity is a party and where we have an obligation under a guarantee contract, a retained or contingent interest in assets transferred to unconsolidated entity, any obligation under a contract that

– 19 –

Table of Contents

would be accounted for as a derivative instrument or any obligation arising out of a variable interest in an unconsolidated entity.

## ITEM 3.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.

Since we invest in mortgage loans and make distributions of preferred returns to our members, we will be exposed to market risk related primarily to changes in interest rates. The exposure to interest rate risk relates to the relationship between the interests rates earned from our mortgage loans and the preferred returns payable to our investors. Generally, we will invest in mortgage loans that will have an initial term of between one and three years and we will provide investors with fixed preferred returns over the course of the investors' relevant holding period. We rely upon our management to adapt to prevailing interest rates by adjusting the interest rates we charge on our mortgage loan investments, to the extent possible, and the preferred returns we agree to pay to our investors. Since the rates we earn from our mortgage loan investments and the preferred returns we agree to pay to our investors are fixed through the relevant term of the mortgage loan or the holding period of an investment, our exposure to changes in interest rates is minimized. However, although we have the ability to adjust the preferred returns payable to our investors in light of the interest rates we charge on our mortgage loans, the changes in interest rates and other market conditions, we may be faced with the situation where the actual interest rates earned on our mortgage loans fall below the preferred returns payable to investors. This situation would occur if we agree to pay to our investors preferred returns that exceed the interest rates on our mortgage loans. To the extent that the interest rates earned on our mortgage loans are less than the preferred returns payable to investors, we may not have sufficient cash available for distribution to satisfy the preferred returns payable to investors.

In addition, as of September 30, 2005, we have not entered into any lines of credit, credit facilities or other loan agreements, have not dealt in any foreign currencies and do not own any options, futures, swaps or other derivative instruments.

## ITEM 4.    CONTROLS AND PROCEDURES.

### Evaluation of Disclosure Controls

We evaluated the effectiveness of our disclosure controls and procedures as of the nine months ended September 30, 2005. This evaluation was done with the participation of our manager.

– 20 –

Table of Contents

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 are recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file under the Securities Exchange Act of 1934 is accumulated and communicated to our management, as appropriate to allow timely decisions regarding required disclosure.

### Limitations on the Effectiveness of Controls

Our management does not expect that our disclosure controls and procedures or our internal controls over financial reporting will prevent all error and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, but not absolute, assurance that the objectives of a control system are met. Further, any control system reflects limitations on resources, and the benefits of a control system must be considered relative to its costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within us have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of a control. The design of a control system is also based upon certain assumptions about the likelihood of future events, there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and may not be detected.

### Conclusions

Based on this evaluation, we concluded that, subject to the limitations noted above, our disclosure controls and procedures are effective to ensure that information we are required to disclose in reports that we file or submit under the Securities Exchange Act of 1934 are recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms.

### Changes in Internal Controls

There were no changes in our internal controls over financial reporting that occurred during our last fiscal quarter, *i.e.*, the quarter ended September 30, 2005, that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting. During the course of the nine months ended September 30, 2005, we have experienced increased efficiencies in our disclosure controls and procedures as a result of the allocation of additional staff and resources.

– 21 –

Table of Contents

## PART II – OTHER INFORMATION

**ITEM 1.    LEGAL PROCEEDINGS.**

As disclosed in our prior report filed on Form 10-Q with the SEC on August 22, 2005, the SEC is currently conducting an investigation of the operations of the Company, the Manager, USA Securities, USA Commercial Mortgage Company, a company related to us by common ownership, and Diversified. The SEC is investigating possible violations of the antifraud, registration, reporting, transfer agent, broker-dealer and other provisions of federal securities laws by these entities. The SEC has subpoenaed documents and information from the Company and its related entities. As requested by the SEC's by it letter dated July 28, 2005, these entities continue to preserve and retain, until further notice, all documents and electronic data, in their possession. USA Securities, the Company and their affiliates are cooperating in the investigation.

**ITEM 2.    UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS.**

The following table reports the redemptions of units made by USA Capital First Trust Deed Fund in the three months ended September 30, 2005:

| Period | Total Number of Units Purchased | Average Price Paid per Unit | Total Number of Units Purchase as Part of Publicly Announced Plans or Programs[1] | Maximum Number of Units that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| July 1, 2005 to July 31, 2005 | Class A 70.171<br>Class B 0.000<br>Class C 0.000<br>*Total 70.171* | $5,000 | Class A 70.171<br>Class B 0.000<br>Class C 0.000<br>*Total 70.171* | Subject to our Manager's approval and restrictions in the Company's operating agreement, all investors may redeem their units. |
| August 1, 2005 to August 31, 2005 | Class A 30.707<br>Class B 0.000<br>Class C 2.000<br>*Total 32.707* | $5,000 | Class A 30.707<br>Class B 0.000<br>Class C 2.000<br>*Total 32.707* | Subject to our Manager's approval and restrictions in the Company's operating agreement, all investors may redeem their units. |
| September 1, 2005 to September 30, 2005 | Class A 45.163<br>Class B 0.000<br>Class C 4.403<br>*Total 49.566* | $5,000 | Class A 45.163<br>Class B 0.000<br>Class C 4.403<br>*Total 49.566* | Subject to our Manager's approval and restrictions in the Company's operating agreement, all investors may redeem their units. |
| **Total** | **Total 152.444** | **$5,000** | **Total 152.444** | |

[1]    All redemptions are made pursuant to the Company's operating agreement, which allows investors to redeem their units only if the Company's manager approves such redemption. Redemptions are further limited by the terms of the Company's operating agreement, including an aggregate redemption limit of ten percent (10%) per year. Further, if a member desires to redeem units other than at the end of such member's holding period, such member must pay an early redemption fee equal to 5% of the member's

– 22 –

Table of Contents

investment amount, where 75% of such early redemption fee is paid to our manager and 25% of such early redemption fee is paid to the Company.

ITEM 3.    DEFAULTS UPON SENIOR SECURITIES.

Not applicable.

ITEM 4.    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

Not applicable.

ITEM 5.    OTHER INFORMATION.

Not applicable.

ITEM 6.    EXHIBITS.

31.1    Certifications Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

31.2    Certifications Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

32.1    Certifications Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350).

– 23 –

__Table of Contents__

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

USA CAPITAL FIRST TRUST DEED FUND, LLC

By: **USA CAPITAL REALTY ADVISORS, LLC**
Its: Manager

| | |
|---|---|
| By: /s/ Joseph D. Milanowski | November 14, 2005 |
| Joseph D. Milanowski* | Date |
| Its: Manager | |

\* Joseph D. Milanowski executes this report as the principal executive officer and principal financial officer of the registrant.

-- 24 --