# EXHIBIT "D"

# LOAN AGREEMENT 

This Loan Agreement, dated as of September 28, 2004, is entered into by and among Castaic Partners, LLC, a California limited liability company ("Borrower"), and those persons listed on Exhibit "A" attached hereto ("Lender").

## SECTION 1: DEFINITIONS AND ACCOUNTING TERMS.

1.1    Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth respectively after each:

"Agreement" means this Loan Agreement.

"Assignment of Permits, Licenses, Franchises and Authorizations" means the Assignment of Permits, Licenses, Franchises and Authorizations executed by Borrower.

"Assignment of Rents" means the Assignment of Rents contained in the Deed of Trust.

"Business Day" means any Monday, Tuesday, Wednesday, Thursday, or Friday on which banks in the State of Nevada are open for business.

"Control Account" means Disbursement Agent's account in which the Control Account Funds shall be held.

"Control Account Escrow Agreement" means the Control Account Escrow Agreement and Security Agreement by and between Borrower, Lender and Disbursement Agent of even date herewith.

"Control Account Funds" means the portion of the Loan funds held in the Control Account at any time, together with interest accrued thereon, any additions thereto made pursuant to this Agreement, and any and all investments and reinvestments of any such sums now or hereafter made.

"Debt" means any indebtedness of the Borrower other than indebtedness owed to trade creditors incurred in the ordinary course of business and payable in 180 days or less.

"Deed of Trust" means the Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing of even date herewith, executed by Borrower in favor of Lender with respect to the Property or portions thereof, either as originally executed or as it may from time to time be supplemented, modified or amended.

"Default Rate" shall have the meaning set forth in the Note.

"Disbursement" means each of the disbursements by Lender or Disbursement Agent of the

1

Proceeds of the Loan or other funds (including the Control Account Funds) pursuant to this Agreement.

"**Disbursement Agent**" means Project Disbursement Group, Inc., a Nevada corporation, or any other licensed construction control company approved by Lender which may at any time hold any portion of the Control Account Funds pursuant to this Agreement.

"**Disbursement Schedule**" means the schedule attached hereto as **Exhibit "B"**.

"**Effective Date**" means the date the Deed of Trust is recorded in the Official Records of Los Angeles County, California.

"**Environmental Indemnity**" means the Environmental and Accessibility Indemnity Agreement executed by Borrower and the Guarantor.

"**Financing Statement**" means financing statement of even date herewith executed by Borrower in favor of Lender with respect to the Personal Property.

"**Governmental Agency**" means any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, court, administrative tribunal or public utility.

"**Guarantor**" means William Barkett.

"**Guaranty**" means the Unconditional Guaranty executed by the Guarantor in favor of Lender, either as originally executed or as it may from time to time be supplemented, modified or amended.

"**Improvements**" means any and all improvements now existing or hereafter constructed on the Real Property.

"**Interest Reserve**" means that portion of the Control Account Funds allocated to interest reserve pursuant to Section 3.3 below.

"**Laws**" means, collectively, all federal, state and local laws, rules, regulations, ordinances and codes.

"**Lender**" means collectively, those persons and entities listed on **Exhibit "A"** attached hereto and any other persons or entities who may be added to that list pursuant to an amendment to the Note.

"**Loan**" means the loan to be made by Lender to Borrower pursuant to Section 3 hereof.

"**Loan Documents**" means, collectively, this Agreement, the Note, the Security Documents, the Environmental Indemnity, the Guaranty and the Project Assignments, in each case either as

2

originally executed or as the same may from time to time be supplemented, modified or amended, together with any other documents or instruments which may at any time be executed by Borrower in connection with the Loan.

"**Maturity Date**" means the date which is twenty-four (24) months after the Deed of Trust is recorded.

"**Note**" means the promissory note of even date herewith, in the original principal amount of Eighteen Million Five Hundred Thousand Dollars ($18,500,000), executed by Borrower in favor of Lender to evidence the Loan, either as originally executed or as it may from time to time be supplemented, modified or amended.

"**NRS**" means the Nevada Revised Statutes, as amended from time to time.

"**Operation**" means the operation of Borrower's business on the Property, including the operation, sales, leasing, running and maintenance of the Property and the Improvements.

"**Permitted Exceptions**" means the matters identified in **Exhibit "C"** attached hereto and made part hereof.

"**Person**" means any entity, whether an individual, trustee, corporation, partnership, trust, unincorporated organization or otherwise.

"**Personal Property**" means all present and future personal property (including the Project Documents) of Borrower of every kind and nature, whether tangible or intangible, now or hereafter located at, upon or about the Property, or used or to be used in connection with or relating or arising with respect to the Property and/or the Project, including but not limited to the property described in the Deed of Trust.

"**Project**" means the project for the development of, and construction of improvements on, the Property, as such exists at any time.

"**Project Assignments**" means, the Assignment of Permits, Licenses, Franchises and Authorizations, and such other assignments, as Lender shall require.

"**Property**" means, collectively, the Real Property, the Personal Property and any other buildings, structures, or improvements now or hereafter located on all or any portion of the Real Property.

"**Real Property**" means the real property and interests in real property described in **Exhibit "D"**.

"**Security Agreement**" means the Security Agreement contained herein and in the Deed of Trust.

"**Security Documents**" means the Deed of Trust, the Assignments, the Financing Statements and any other mortgage, deed of trust, assignment of leases, security agreement or assignment executed to secure the Note, either as originally executed or as they may from time to time be supplemented, modified or amended.

"**Title Company**" means Fidelity National Title Company.

"**Title Policy**" means the Lender's policy of title insurance and endorsements thereto required by this Agreement as a condition of the first Disbursement.

"**USA**" means USA Commercial Mortgage Company, a Nevada corporation, the mortgage company which arranged the Loan.

"**Use**" means ownership, use, development, construction, maintenance, management, operation or occupancy.

1.2    Use of Defined Terms. Any defined term used in the plural shall refer to all members of the relevant class, and any defined term used in the singular shall refer to any number of the members of the relevant class. Any reference to the Loan Documents and other instruments, documents and agreements shall include such Loan Documents and other instruments, documents and agreements as originally executed or as the same may be supplemented, modified or amended.

1.3    Accounting Terms. All accounting terms not specifically defined in this Agreement shall be construed in conformity with, and all financial data required to be submitted by this Agreement shall be prepared in conformity with, generally accepted accounting principles applied on a consistent basis.

1.4    Exhibits. All exhibits to this Agreement, either as now existing or as the same may from time to time be supplemented, modified or amended, are incorporated herein by this reference.

## SECTION 2: RECITALS.

Borrower has applied to Lender for a Loan to acquire the Property, including acquiring the interests of certain other people who have an option to acquire the Property. Lender is willing to make the Loan to Borrower on the terms and conditions contained in this Agreement and the other Loan Documents.

## SECTION 3: THE LOAN.

3.1    Amount of the Loan. Subject to the terms and conditions set forth in this Agreement, Lender agrees to make a loan ("Loan") to Borrower in a principal amount of Eighteen Million Five Hundred Thousand Dollars ($18,500,000) (the "Loan Amount"), the disbursement of which by Lender is subject to the terms and conditions of the Loan Documents. The Loan Amount shall be disbursed in accordance with Lender's instructions to the Title Company. From and after the Effective Date, the entire Loan Amount (whether paid to, or on behalf of, Borrower or held by the

Disbursement Agent) shall bear interest at the rate set forth in the Note until fully repaid to Lender.

3.2    Increase in Loan Amount. From the Effective Date through and including March, 2006, Lender and USA shall have the exclusive right, but not the obligation, to increase the Loan Amount to an amount not to exceed Twenty-Two Million Dollars ($22,000,000). All amounts added to the Loan Amount after the Effective Date shall be advanced by Lender for the following purposes: (i) to pay the loan fees due with regard to such advance, and (ii) to fund the Interest Reserve (defined below). Upon each increase in the Loan Amount, Borrower shall execute amendments to the Note and the Deed of Trust which shall memorialize the increase in the Loan Amount, the change in the identity of persons and entities which comprise Lender and their respective undivided interests in the Loan. Upon the recordation of the amendment(s) to the Deed of Trust, the Title Company shall issue to Lender, at Borrower's expense, an endorsement or endorsements to the Title Policy which shall (i) insure the continued priority of the Deed of Trust, and that the additional advance is secured thereby, (ii) reflect the increase in the face amount of the policy corresponding to the increase in the Loan Amount, and (iii) set forth the change in the identity of the insured lenders and their respective undivided interests in the Loan. Upon any such additional advance, a portion thereof shall be deposited into the Interest Reserve (defined below) for the Loan. Nothing herein shall be deemed to be a commitment by Lender or USA to fund to Borrower any more than the initial Loan Amount.

3.3    Interest Reserve. From the Loan Amount, Lender shall cause the Title Company to disburse to Disbursement Agent a total of up to $3,680,000 to be held as interest reserve for the benefit of Lender (the "Interest Reserve"), to be disbursed in accordance with **Exhibit "B"**, below. Disbursement Agent's only function shall be to hold and disburse the Interest Reserve in accordance with the Control Account Escrow Agreement. As additional advances are made as provided in Section 3.2 above, a portion of such advances, the amount of which to be reasonably determined by Lender, shall be deposited into the Interest Reserve. Interest accrued on the Note Amount shall be paid from a portion of the Interest Reserve upon presentation of a monthly interest statement by Lender, without the necessity of any instruction or request from Borrower. Except as provided in this paragraph, the funds in the Interest Reserve shall never be used for any other purpose without the express written consent of Lender. Depletion of the Interest Reserve shall not release Borrower from any of Borrower's obligations under the Loan Documents, including but not limited to the obligation to pay interest accruing under the Note. After depletion of the Interest Reserve, or so long as any Event of Default has occurred and is continuing, all interest payments under the Note shall be made by Borrower using its own funds; provided that Lender, at its option and in its sole discretion, may obtain disbursements from the Interest Reserve notwithstanding such Event of Default. Upon the occurrence of an Event of Default, the entire balance of the Interest Reserve shall be paid to Lender upon demand and applied to the then outstanding balance of the Loan.

3.4    Prepayment. Borrower agrees that all loan fees and any prepaid finance charges are fully earned as of the date they are paid and will not be subject to refund upon any early payment hereof (whether voluntarily or as a result of default). Subject to the foregoing, Borrower may prepay the Loan, in full or in part, at any time.

3.5    Security. The indebtedness evidenced by the Note, and all other indebtedness and

obligations of Borrower under the Loan Documents, shall be secured by the Security Documents. The Environmental Indemnity and the Guaranty and the respective obligations of any of Borrowers and the Guarantor under each shall be unsecured.

     3.6   <u>Exit Fee</u>.     At the time the Loan is repaid, and as a condition to the reconveyance of the Deed of Trust, Borrower shall pay to USA, as a deferred additional Loan Fee, one and one half percent of the gross sale price (or prices) for all of the Real Property

## SECTION 4: <u>CONDITIONS TO DISBURSEMENTS</u>.

     4.1   <u>Initial Advance Conditions</u>.  The obligation of Lender to initially close the Loan is subject to the following conditions precedent:

     (a)   Borrower shall, at its sole expense, deliver or cause to be delivered to Lender, in form and substance satisfactory to Lender:

          (i)     the original Note;

          (ii)    the original Deed of Trust;

          (iii)   the original Financing Statement;

(Remainder of page deliberately left blank.)

(iv)    the original Guaranty;

(v)    the original Environmental Indemnity;

(vi)    the original Control Account Escrow Agreement, executed by Borrower, Lender and Disbursement Agent;

(vii)    the original Assignment of Permits, Licenses, Franchises and Authorizations executed by Borrower;

(viii)    certificate of consent of Borrower, authorizing the execution, delivery and performance of the Loan Documents to be executed by a specified authorized officer on behalf of Borrower;

(ix)    an ALTA form of extended coverage of lender's policy of title insurance, or evidence of a commitment therefor, issued by an insurer satisfactory to Lender, together with such endorsements and binders thereto as may be required by Lender pursuant to Section 6.6 hereof, in a policy amount of not less than the face amount of the Note, insuring the Deed of Trust to be a valid lien upon the Property, and showing the Property to be subject only to the Permitted Exceptions;

(x)    an appraisal of the Real Property certified to Lender, performed by an appraiser acceptable to Lender;

(xi)    certified copies of, or certificate evidencing, all insurance policies required to be delivered pursuant to this Agreement;

(xii)    copies of all permits and approvals by Governmental Agencies necessary to construct the Improvements (if available);

(xiii)    current Financial Statements of Borrower and the Guarantor;

(xiv)    copies of any proposed, or approved final Covenants, Conditions and Restrictions recorded or to be recorded on the Project;

(xv)    a Phase I Hazardous Waste Survey, prepared by an entity approved by Lender, in form and substance acceptable to, and approved by, Lender;

(xvi)    such additional agreements, certificates, reports, approvals, instruments, documents, financing statements, consents and opinions as Lender may reasonably request; including, without limitation, a soils report for the Real Property (including, without limitation, all determinations required by Lender with respect to hazardous waste [as such term is defined in the Environmental Indemnities] and water located on the Real Property).

7

(b)    Lender shall have reviewed and approved the Permitted Exceptions;·

(c)    Borrower has acquired fee title to all of the Real Property;

(d)    The Deed of Trust shall have been recorded in the Official Records of the County in which the Property is located as a first priority lien;

(e)    The Financing Statement shall have been filed for record with the California Secretary of State.

4.2    Future Advance Conditions.  The obligation of Lender to make any additional advances pursuant to Section 3.2 above is subject to following conditions:

(a)    The representations and warranties of Borrower contained in all of the Loan Documents shall be correct on and as of the date of the advance as though made on and as of that date and no Event of Default (or event which, with the giving of notice and/or the passage of time, would become an Event of Default) shall have occurred and be continuing;

(b)    Borrower shall, at its sole expense, deliver or cause to be delivered to Lender, in form and substance satisfactory to Lender:

(i)    from the title insurer who has issued the Title Policy, such endorsements, binders or modifications thereto as Lender may require; and

(ii)    such additional agreements, certificates, reports, approvals, instruments, documents, consents or opinions as Lender may reasonably request.

# SECTION 5: REPRESENTATIONS AND WARRANTIES BY BORROWER.

5.1    Formation, Qualification and Powers of Borrower.  Borrower is a limited liability company duly formed and validly existing under the laws of the State of California and has all requisite power and authority to conduct its business, to own its properties, and to execute, deliver and perform all of its obligations under the Loan Documents.

5.2    Authority and Compliance with Instruments and Government Regulations .  The execution, delivery and performance by Borrower of all of its obligations under each Loan Document have been duly authorized by all necessary action and do not and will not:

(a)    require any consent or approval not heretofore obtained of any Person holding any security or interest or entitled to receive any security or interest in Borrower;

(b)    violate any provision of any organizational document or certificate of Borrower;

(c)    result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, right of others or other encumbrance of any nature, other than

8

under the Loan Documents, upon or with respect to any property now owned or leased or hereafter acquired by Borrower;

(d)    violate any provision of any Law, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Borrower or the Property, which violation would have a material, adverse impact thereon;

(e)    result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under, any indenture or loan or credit agreement or any other agreement, lease or instrument to which Borrower is a party or by which Borrower or any property of Borrower, is bound or affected; and Borrower is not in default in any respect that is materially adverse to the interest of Lender or that would have any material adverse effect on the financial condition of Borrower or the conduct of its business under any Law, order, writ, judgment, injunction, decree, determination, award, indenture, agreement, lease or instrument described in Sections 5.2(d) and 5.2(e).

5.3    <u>Execution of the Guaranty by the Guarantor</u>.    The execution and delivery of the Guaranty:

(a)    have been duly authorized by all necessary action;

(b)    do not require the consent, authorization or approval of any Governmental Agency or Person;

(c)    will not result in the creation of any lien or other claim of any nature upon or with respect to the property of the Guarantor, other than as may be set forth in the Guaranty; and

(d)    will not violate any provision of any Law having applicability to the Guarantor, in a manner which would have a material, adverse impact on any Guarantor; and, when executed and delivered, the Guaranty will constitute the legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms.

5.4    <u>No Governmental Approvals Required</u>.    No authorization, consent, approval, order, license, exemption from, or filing, registration or qualification with, any Governmental Agency is or will be required to authorize, or is otherwise required in connection with:

(a)    the execution, delivery and performance by Borrower and the Guarantor of the Loan Documents; or

(b)    the creation of the liens, security interests or other charges or encumbrances described in the Security Documents; except that filing and/or recording may be required to perfect Lender's interest under the Security Documents.

5.5    <u>Binding Obligations</u>.    The Loan Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Borrower and the Guarantor, as the case may

9

be, enforceable against them in accordance with their respective terms.

5.6    Financial Statements.  Borrower and the Guarantor have furnished to Lender a copy of recent financial statements relating to Borrower's and the Guarantor's financial condition and Borrower represents and warrants to Lender that such financial statements present fairly the financial position of Borrower and the Guarantor as at the date thereof.

5.7    No Material Adverse Change.  Borrower represents and warrants to Lender that there has been no material adverse change in the condition, financial or otherwise, of Borrower or the Guarantor since the date of the financial statements described in Section 5.6; since that date, neither Borrower nor the Guarantor have entered into any material transaction not disclosed in such financial statements; neither Borrower nor the Guarantor have any material liabilities or contingent liabilities not reflected or disclosed in such financial statements; and there are no material mortgages, deeds of trust, pledges, liens, security interests, claims, charges, right of others or encumbrances (including liens or retained security titles of conditional vendors) of any nature whatsoever on any property of Borrower or the Guarantor, and no material indebtedness, not disclosed in such financial statements.

5.8    Tax Liability.  Borrower and the Guarantor have filed all tax returns (federal, state and local) required to be filed and have paid all taxes shown thereon to be due and all property taxes due, including interest and penalties, if any.  Borrower and the Guarantor have established and are maintaining necessary reserves for tax liabilities, if any.

5.9    Compliance with Law.  Borrower and Guarantor are in compliance in all material respects with all Laws and other requirements applicable to their business and have obtained all authorizations, consents, approvals, orders, licenses and exemptions from, and have accomplished all filings, registrations or qualifications with, any Governmental Agency that is necessary for the transaction of their business.

5.10    Compliance with Requirements.  Throughout the term of the Loan, Borrower shall comply with all applicable covenants, conditions and restrictions, Laws and other requirements, and all necessary approvals, consents, licenses and permits of any Governmental Agency have been regularly and finally received with respect thereto, including without limitation each of the following as applicable:

(a)    all zoning, land use and planning requirements;

(b)    subdivision and/or parcel map requirements, including without limitation Requirements of applicable Law regarding subdivisions, parcel maps and the division of land into lots or parcels;

(c)    environmental requirements and preparation and approval of any necessary environmental impact statements or reports;

(d)    all requirements regarding the provision of all necessary utilities to the Real Property

10

including the irrevocable allocation to the Property of sufficient domestic and fire protection water service to the Property;

(e)     all requirements imposed by any public utility in connection with the supply of utilities to the Property; and

(f)     all requirements imposed in connection with any approval, consent, license or permit issued or required by any Governmental Agency in connection with the Project.

5.11    <u>Litigation</u>.  There are no actions, suits or proceedings pending or, to the best of Borrower's or any Guarantor's knowledge, threatened against or affecting Borrower or the Guarantor or any property of Borrower or the Guarantor before any court or Governmental Agency that would have a material adverse affect on the Property, or Borrower's or the Guarantor's ability to perform their respective obligations under the Loan Documents.

5.12    <u>Title to Property</u>.  Borrower has good and merchantable title to all of its property and assets as disclosed in the financial information provided Lender and at the time of the recordation of the Security Documents shall have good and merchantable title to the Property, and there shall be no mortgages, liens, pledges or other encumbrances of any character on the Property, other than the Security Documents and Permitted Exceptions, without prior consent of Lenders.

5.13    <u>Subsidiaries: Divisions: Joint Ventures.</u>  As of the date hereof, Borrower (a) has no other Subsidiaries; (b) has no divisions; and (c) is not engaged in any joint venture or partnership with any other Person.

5.14    <u>ERISA</u>.  The Borrower, Guarantor and each Subsidiary are in compliance in all Material respects with all applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  Neither a Reportable Event nor a Prohibited Transaction has occurred and is continuing with respect to any Plan; no notice of intent to terminate a Plan has been filed, nor has any Plan been terminated; no circumstances exist which constitute grounds entitling the PBGC to institute proceedings to terminate, or appoint a trustee to administer, a Plan, nor has the PBGC instituted any such proceedings; neither the Borrower nor any Commonly Controlled Entity has completely or partially withdrawn from a Multiemployer Plan; the Borrower and each Commonly Controlled Entity have met their minimum funding requirements under ERISA with respect to all of their Plans and the present value of all vested benefits under each Plan exceeds the fair market value of all Plan assets allocable to such benefits, as determined on the most recent valuation date of the Plan and in accordance with the provisions of ERISA; and neither the Borrower nor any Commonly Controlled Entity has incurred any liability to the PBGC under ERISA.

## SECTION 6: <u>AFFIRMATIVE AND NEGATIVE COVENANTS</u>.

Until payment of the Note in full and performance of all obligations of Borrower under the Loan Documents, unless Lender otherwise consents in writing:

6.1     <u>Compliance with Requirements</u>.  Borrower shall comply with all conditions,

covenants, restrictions, leases, easements, reservations, rights and rights-of-way and all applicable Laws and other requirements relating to the Property and the Project, and obtain all necessary approvals, consents, licenses and permits of any Governmental Agency, including without limitation those set forth in Section 5.10.

6.2    <u>Sale or Other Encumbrances.</u>  Borrower specifically agrees that:

(a)    In order to induce Lender to make the Loan, Borrower agrees that if the Property or any part thereof or any interest therein, shall be sold, assigned, transferred, conveyed, pledged, mortgaged or encumbered with financing other than that secured hereby or otherwise alienated by Borrower whether voluntarily or involuntarily or by operation of law, except as shall be specifically hereinafter permitted or without the prior written consent of Lender, then Lender, at its option, may declare the Note, including the prepayment fee, if applicable, secured hereby and all other obligations hereunder, to be forthwith due and payable. Except as shall be otherwise specifically provided herein, (a) a change in the legal or equitable ownership of the Property whether or not of record, or (b) a change in the form of entity or ownership (including the hypothecation or encumbrance thereof) of the stock or any other ownership interest in Borrower shall be deemed a transfer of an interest in the Property; provided, however, that any transfer of the Property or any interest therein to an entity which controls, is controlled by or is under common control with Borrower shall not be considered a transfer hereunder. In connection herewith, the financial stability and managerial and operational ability of Borrower is a substantial and material consideration to Lender in its agreement to make the loan to Borrower secured hereby. The transfer of an interest in the Property may materially alter and reduce Lender's security for the indebtedness secured hereby. Moreover, Lender has agreed to make its loan based upon the presumed value of the Property and the Rents and Profits (as such are defined in the Deed of Trust) thereof. Therefore, it will be a diminution of Lender's security if junior financing, except as shall be permitted by Lender, or if other liens or encumbrances should attach to the Property.

(b)    Borrower may request Lender to approve a sale or transfer of the Property to a party who would become the legal and equitable owner of the Property and would assume any and all obligations of Borrower under the Loan Documents (the "Purchaser"). Lender shall not be obligated to consider or approve any such sale, transfer or assumption or request for the same. However, upon such request, Lender may impose limiting conditions and requirements to its consent to an assumption.

(c)    In the event ownership of the Property, or any part thereof, becomes vested in a person or persons other than Borrower, the Lender may deal with such successor or successors in interest with reference to the Note or the Deed of Trust in the same manner as with Borrower, without in any way releasing, discharging or otherwise affecting the liability of Borrower under the Note, the Deed of Trust or the other Loan Documents. No sale of Borrower's interest in the Property, no forbearance on the part of Lender, no extension of the time for the payment of the Deed of Trust indebtedness or any change in the terms thereof consented to by Lender shall in any way whatsoever operate to release, discharge, modify, change or affect the original liability of the Borrower herein, either in whole or in part. Any deed conveying the Property, or any part thereof, shall provide that the grantee thereunder assume all of Borrower's obligations under the Note, the

Deed of Trust and all other Loan Documents. In the event such deed shall not contain such assumption, Lender shall have all rights reserved to it hereunder in the event of a default or if Lender shall not elect to exercise such rights and remedies, the grantee under such deed shall nevertheless be deemed to have assumed such obligations by acquiring the Property or such portion thereof subject to the Deed of Trust. Nothing contained in this section shall be construed to waive the restrictions against the transfer of the Property contained in Section 6.2(a).

6.3    Removal of Personalty. Borrower shall not:

(a)    install in or otherwise use in connection with the Project any materials, equipment or fixtures under any security agreements or similar agreements however denominated whereby the right is reserved or accrues to anyone to remove or repossess any such items or whereby any Person other than Lender reserves or acquires a lien upon such items; or

(b)    remove or permit the removal of any fixtures or personalty located on the Property or used in connection with the Project, except for tools and construction equipment intended for use in connection with the construction of other improvements, unless actually replaced by an article of equal suitability and value, owned by Borrower free and clear of any lien or security interest other than the Security Documents.

6.4    Payment of Taxes, Assessments and Charges. Borrower shall pay, prior to delinquency, all taxes, assessments, charges and levies imposed by any Governmental Agency which are or may become a lien affecting the Property or any part thereof, including without limitation assessments on any appurtenant water stock; except that Borrower shall not be required to pay and discharge any tax, assessment, charge or levy that is being actively contested in good faith by appropriate proceedings, as long as Borrower has established and maintains reserves adequate to pay any liabilities contested pursuant to this Section in accordance with generally accepted accounting principles and, by reason of nonpayment, none of the property covered by the Security Documents or the lien or security interest of Lender is in danger of being lost or forfeited.

6.5    Insurance. The Borrower shall at all times maintain the following policies of insurance:

(a)    prior to completion of the Improvements, builder's "all risk" insurance ("completed value" form), including "course of construction" coverage, covering the Improvements and any Personal Property;

(b)    from and after completion of the Improvements, property "all risk" insurance covering the Improvements and any Personal Property;

(c)    commercial general liability insurance in favor of the Borrower (and naming the Lender as an additional insured) in an aggregate amount not less than $2,000,000 (or such greater amount as may be specified by the Lender from time to time) combined single limit; and

(d)    such other insurance as may be required by applicable Laws (including worker's

13

compensation and employer's liability insurance) or as the Lender may reasonably require from time to time (including "all risk" insurance with respect to any other improvements now or in the future located on the Real Property and comprehensive form boiler and machinery insurance, if applicable, rental loss insurance and business interruption insurance).

The Borrower shall also cause any contractor and each subcontractor employed on the Property to maintain a policy of commercial general liability insurance and, upon request by the Lender, shall cause the Architect and any engineer engaged in connection with the Project to maintain a policy of professional liability insurance, in each case for such periods and in such amounts as the Lender may reasonably require from time to time.

Each policy of builder's-risk and all-risk insurance required by this Section 6.5 shall be in an amount not less than the full replacement cost of the property covered by such policy, shall contain a "waiver of coinsurance" provision, a "full replacement cost" endorsement, a "Mortgagee Loss Payable" clause, and a "Betterments" or "Building Ordinance" endorsement, and shall insure the Property against flood loss risk to the maximum available policy amount if the Real Property is located in a "Flood Hazard Area" (as determined by the Federal Emergency Management Agency). Each policy of commercial general liability insurance required by this Section shall cover personal injury, property liability, and contractual liability, including coverage for Borrower's indemnity obligations under the Loan Documents, and shall name Lender as an "additional insured". The commercial general liability insurance shall also cover completed operations, and such insurance shall be primary and non-contributing with any other insurance available to the Lender. All insurance policies shall be in form and substance and issued by insurers reasonably satisfactory to the Lender, and shall contain such deductible and such endorsements as the Lender may reasonably require. Each policy shall require thirty (30) day written notice to Lender prior to any cancellation thereof. As a condition to funding the Loan, Borrower shall provide to Lender an ACORD 27 form certificate evidencing such policies. Upon request by the Lender from time to time, the Borrower shall deliver to the Lender originals or copies of all such insurance policies.

6.6    <u>Title Insurance Endorsements</u>. Borrower shall deliver or cause to be delivered to Lender, in form and substance satisfactory to Lender, CLTA endorsement numbers 100, 100.29, 101.3 and 116 to the Title Policy and such other endorsement and binders as Lender may from time to time reasonably require.

6.7    <u>Books and Records</u>. Borrower shall: (a) maintain full and complete books of account and other records reflecting the results of its operations (in conjunction with any other business as well as specifically with respect to the Project) in accordance with generally accepted accounting principles applied on a consistent basis; and (b) permit Lender and its agents, at any time and from time to time, upon twenty-four (24) hours telephonic notice to Borrower, to inspect and copy all of such books and records, including without limitation any books and records pertaining to the Project.

6.8    <u>Entry and Inspection</u>. Lender and its agents shall, at all time, upon twenty-four (24) hours telephonic notice to Borrower, have the right of entry and free access to the Project and the right to inspect all work done, labor performed, and materials furnished in and about the Project. If, at any time, Lender determines, in its sole discretion, that regular inspections of the Project are

14

required, the Borrower shall allow free access to such inspector. Such inspection shall be performed at Borrower's expense, with the actual cost thereof, reasonably incurred, to be paid by Borrower upon seventy-two (72) hours notice from Lender.

6.9    Physical Security of Project. Borrower shall take appropriate measures to protect the physical security of the Project and the Property.

6.10    Reporting and Requirements. Borrower shall cause to be delivered to Lender, in form and detail satisfactory to Lender:

(a)    promptly upon Borrower's learning thereof, notice of:

(i)    any litigation affecting or relating to Borrower, and/or the Guarantor, and the Property or the Project;

(ii)    any dispute between Borrower and any Governmental Agency relating to the Property or the Project, the adverse determination of which would adversely affect the Property or the Project;

(iii)    any threat or commencement of proceedings in condemnation or eminent domain relating to the Property;

(iv)    any Event of Default or event which, with the giving of notice and/or the passage of time, could become and Event of Default; and

(v)    any change in the Manager of Borrower, as defined in Borrower's Operating Agreement.

(b)    as soon as available, and in any event within thirty (30) calendar days after the end of each month during the term of the Loan, a status report for the Project for the month most recently ended (which status report shall contain an itemized breakdown of the progress of construction, sales of Lots, the gross revenues and all costs and expenses with respect to the Project for such month), in reasonable detail and prepared in accordance with generally accepted accounting principles applied on a consistent basis, and certified as accurate by an officer of Borrower;

(c)    as soon as available, and in any event within forty-five (45) calendar days after the close of each fiscal quarter of Borrower and each of the Guarantor, quarterly financial statements applicable to Borrower and each of the Guarantor, all in reasonable detail and prepared in accordance with generally accepted accounting principles applied on a consistent basis;

(d)    as soon as available, and in any event within ninety (90) calendar days after the close of each fiscal year of Borrower, annual financial statements applicable to Borrower, all in reasonable detail and prepared in accordance with generally accepted accounting principles applied on a consistent basis;

(e)    as soon as available, and in any event within ninety (90) calendar days after the close of each fiscal year of the Guarantor, annual financial statements applicable to the Guarantor, all in reasonable detail and prepared in accordance with generally accepted accounting principles applied on a consistent basis;

(f)    promptly upon receipt thereof, any audited financial information applicable to Borrower or the Guarantor; and

(g)    such other information relating to Borrower, Guarantor, the Property and/or the Project as Lender may reasonably request from time to time, including without limitation (i) tax returns, to be provided concurrently with the filing thereof with the relevant government authority or (ii) if Borrower or Guarantor receive an extension from the relevant governmental authority for filing a tax return, satisfactory evidence of such extension.

6.11    Surveys. Borrower agrees to furnish Lender all of the following:

(a)    a perimeter survey of the Property (a copy of the Subdivision Map of the Property shall satisfy this requirement); and

(b)    upon request by Lender, immediately upon completion of the foundations of any of the Improvements, a survey made and certified by a licensed engineer or surveyor showing the locations of the Improvements located on the Property and showing that the Improvements are located entirely within the Property lines and do not encroach upon any easement, or breach or violate any Law or any covenant, condition or restriction of record, or any building or zoning ordinance.

6.12    Management of Property and Project. Borrower shall not enter into any agreement providing for the management, leasing or operation of the Property or the Project without the prior written consent of the Lender.

6.13    Defense of Vested Right, Modification of Vested Rights. Borrower shall at all times, at its own cost and expense take, pursue and assert all such actions and defenses as are necessary to perfect, maintain and protect its vested development rights with respect to the Property. Should Borrower fail to do so, Lender may do so either in its own name or the name of the Borrower, and all unrecovered fees, costs and expenses incurred by Lender in connection therewith shall be payable by Borrower to Lender on demand, shall bear interest at the Default Rate specified in the Note, and shall be secured by the Deed of Trust. Borrower shall not modify, amend, cancel, terminate or otherwise alter any development rights or entitlements with respect to the Property, without Lender's prior written consent, which consent shall not be unreasonably withheld.

6.14    No Gifting. Until this Loan has been fully repaid, Borrower agrees not to transfer more than a total of five percent (5%) of its assets unless receiving full consideration therefore without the written permission of Lender.

6.15    ERISA Reports. As soon as possible, and in any event within thirty (30) days after

the Borrower knows or has reason to know that any circumstances exist that constitute grounds entitling the PBGC to institute proceedings to terminate a Plan subject to ERISA with respect to the Borrower or any Commonly Controlled Entity, and promptly but in any event within two (2) Business Days of receipt by the Borrower or any Commonly Controlled Entity of notice that the PBGC intends to terminate a Plan or appoint a trustee to administer the same, and promptly but in any event within five (5) Business Days of the receipt of notice concerning the imposition of withdrawal liability with respect to the Borrower or any Commonly Controlled Entity, the Borrower will deliver to the Lender a certificate of the chief financial officer of the Borrower setting forth all relevant details and the action which the Borrower proposes to take with respect thereto.

      6.16    <u>Debt.</u>   Borrower shall not create, incur, assume, or suffer to exist, or permit any Subsidiary to create, incur, assume, or suffer to exist, any Debt, except:

          (a)      Debt of the Borrower under this Agreement or the Note;

          (b)      Debt of the Borrower subordinated on terms satisfactory to the Lender to the Borrower's Liabilities;

          (c)      Accounts payable to trade creditors for goods or services which are not aged more than forty-five (45) days from the billing date and current operating liabilities (other than for borrowed money) which are not more than thirty (30) days past due, in each case incurred in the ordinary course of business, as presently conducted, and paid within the specified time, unless contested in good faith and by appropriate proceedings; Debt of the Borrower or any Subsidiary secured by purchase-money Liens permitted by Section 8.1(i).

      6.17    <u>Guaranties, Etc.</u>   Borrower shall not assume, guaranty, endorse, or otherwise be or become directly or contingently responsible or liable, or permit Borrower, Guarantor or any Subsidiary to assume, guaranty, endorse, or otherwise be or become directly or contingently responsible or liable (including, but not limited to, an agreement to purchase any obligation, stock, assets, goods, or services, or to supply or advance any funds, assets, goods, or services, or an agreement to maintain or cause such Person to maintain a minimum working capital or net worth, or otherwise to assure the creditors of any Person against loss) for obligations of any Person, except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

## SECTION 7: <u>EVENTS OF DEFAULT AND REMEDIES UPON DEFAULT.</u>

      7.1     <u>Events of Default.</u>   The occurrence of any one or more of the following, whatever the reason therefor, shall constitute an Event of Default hereunder:

      (a)     Borrower shall fail to pay when due any installment of principal or interest on the Note or any other amount owing under this Agreement or the other Loan Documents; or

      (b)     Borrower or Guarantor shall fail to perform or observe any term, covenant or agreement contained in any of the Loan Documents on its part to be performed or observed, other

than the failure to make a payment covered by Section 7.1(a), and such failure shall continue uncured as of ten (10) calendar days after the occurrence of such failure; provided, however, that if Borrower has commenced to cure the default within said 10-day period and is diligently pursuing such cure, but the default is of such a nature that it cannot be cured within 10 days, then the cure period shall be extended for the number of days necessary to complete the cure, but in no event shall the total cure period be longer than 30 days (the cure period set forth in this Section 7.1(b) shall not apply to any other Events of Default); or

(c)    any representation or warranty in any of the Loan Documents or in any certificate, agreement, instrument or other document made or delivered pursuant to or in connection with any of the Loan Documents proves to have been incorrect in any material respect when made; or

(d)    Borrower (which term shall include any entity comprising Borrower) is dissolved or liquidated, or otherwise ceases to exist, or all or substantially all of the assets of Borrower or any Guarantor are sold or otherwise transferred without Lender's written consent; or

(e)    Borrower or any Guarantor is the subject of an order for relief by the bankruptcy court, or is unable or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors; or Borrower or any Guarantor applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer (the "Receiver"); or a Receiver is appointed without the application or consent of Borrower or any Guarantor, as the case may be, and the appointment continues undischarged or unstayed for sixty (60) calendar days; or Borrower or any Guarantor institutes or consents to any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, custodianship, conservatorship, liquidation, rehabilitation or similar proceedings relating to it or to all or any part of its property under the laws of any jurisdiction; or any similar proceeding is instituted without the consent of Borrower or any Guarantor, as the case may be, and continues undismissed or unstayed for sixty (60) calendar days; or any judgment, writ, attachment, execution or similar process is issued or levied against all or any part of the Property of Borrower or any Guarantor, and is not released, vacated or fully bonded within sixty (60) calendar days after such issue or levy; or

(f)    there shall occur a material adverse change in the financial condition of Borrower or any Guarantor from their respective financial conditions as of the date of the Note, as determined by Lender in its reasonable discretion, and Lender reasonably believes that such adverse change shall jeopardize (i) Lender's ability to collect the amounts due under the Note, as they become due, or (ii) Lender's ability to foreclose on the Mortgaged Property; or

(g)    any Loan Document, at any time after its execution and delivery and for any reason other than the agreement of Lender or the satisfaction in full of all indebtedness and obligations of Borrower under the Loan Documents, ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction; or Borrower or any trustee, officer, director, shareholder or partner of any entity comprising Borrower or any Guarantor claims that any Loan Document is ineffective or unenforceable, in whole or in part, or denies any or further liability or obligation under any Loan Document unless all indebtedness and obligations of Borrower thereunder have been fully paid and performed; or

18

(h)      all or a substantial portion of the Property is condemned, seized or appropriated by any Governmental Agency; or

(i)      Borrower is dissolved or liquidated, or otherwise ceases to exist, or all or substantially all of the assets of Borrower or Guarantor are sold or otherwise transferred without Lender's written consent; or

(j)      any lien or security interest created by any Security Document, at any time after the execution and delivery of that Security Document and for any reason other than the agreement of Lender or the satisfaction in full of all indebtedness and obligations of Borrower under the Loan Documents, ceases or fails to constitute a valid, perfected and subsisting lien of the priority required by this Agreement or security interest in and to the Property purported to be covered thereby, subject only to the Permitted Exceptions; or

(k)      any default occurs in any loan document or other agreement by and between Borrower and Lender or by Borrower in favor of Lender with reference to the Loan or otherwise, or any default occurs in any loan document regarding any loan or other obligation secured by the Property or any portion thereof.

7.2    <u>Remedies Upon Default</u>. Upon the occurrence of any Event of Default, Lender may, at its option, do any or all of the following:

(a)      declare the principal of all amounts owing under the Note, this Agreement and the other Loan Documents and other obligations secured by the Security Documents, together with interest thereon, and any other obligations of Borrower to Lender, to be forthwith due and payable, regardless of any other specified maturity or due date, without notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind or character, and without the necessity of prior recourse to any security;

(b)      take possession of the Property and, at Lender's option, let contracts for, or otherwise proceed with finishing the Improvements and paying the cost thereof; and if Lender advances its own funds for such purposes, such funds shall be considered advanced under the Note and shall be secured by the Security Documents, notwithstanding that such advances may cause the total amount advanced under the Note to exceed the face amount of the Note or the amount committed to be advanced pursuant to this Agreement, and Borrower shall immediately upon demand reimburse Lender therefor, together with interest thereon as if such advances were advances under the Note, from the date of such advance until the date of reimbursement (nothing contained in this Section 7.2(b) or elsewhere in this Loan Agreement shall be construed to make Lender a "mortgagee in possession" unless and until Lender actually takes possession of the Property either in person or through an agent or receiver);

(c)      terminate any right of Borrower to receive any additional advance;

(d)      terminate all rights of Borrower and obligations of Lender under the Loan Documents;

(e)    exercise its right and power to sell, or otherwise dispose of, the Personal Property, or any part thereof, and for that purpose may take immediate and exclusive possession of the Personal Property, or any part thereof, and with or without judicial process to the extent permitted by law, enter upon any premises on which the Personal Property or any part thereof may be situated and remove the same therefrom without being deemed guilty of trespass and without liability for damages thereby occasioned, or at Lender's option Borrower shall assemble the Personal Property and make it available to the Lender at the place and the time designated in the demand; and

(f)    exercise any and all of its rights under the Loan Documents, including but not limited to the right to take possession of and foreclose on any security, and exercise any other rights with respect to any security, whether under the Security Documents or any other agreement or as provided by Law, all in such order and in such manner as Lender in its sole discretion may determine.

All demands upon, defaults declared against, or remedies exercised against any Guarantor shall be exercised as to all Guarantors, unless prohibited by applicable law (such as bankruptcy law).

7.3    Cumulative Remedies; No Waiver.    All remedies of Lender provided for herein are cumulative and shall be in addition to any and all other rights and remedies provided in the other Loan Documents or provided by Law from time to time.    The exercise of any right or remedy by Lender hereunder shall not in any way constitute a cure or waiver of any default hereunder or under any of the other Loan Documents, nor invalidate any notice of default or any act done pursuant to any such notice, nor prejudice Lender in the exercise of any rights hereunder or under the Loan Documents.    No waiver by Lender of any default by Borrower hereunder shall be implied from any omission by Lender to take action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default expressly made the subject of the waiver.    Any such express waiver shall be operative only for the time and to the extent therein stated.    Any waiver of any covenant, term or condition contained herein shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition.    The consent or approval by Lender to or of any act by Borrower requiring further consent or approval shall not be deemed to waive or render unnecessary consent or approval to or of any subsequent act.

## SECTION 8: MISCELLANEOUS.

8.1    Performance by Lender.    In the event that Borrower shall default in or fail to perform any of its obligations under the Loan documents, Lender shall have the right, but not the duty, without limitation upon any of Lender's rights pursuant thereto, to perform the same, and Borrower agrees to pay to Lender, within seventy-two (72) hours after demand therefor, all costs and expenses incurred by Lender in connection therewith, including without limitation actual attorneys' fees reasonably incurred, together with interest thereon from the date of expenditure at the Default Rate.

8.2    Actions.    Provided Borrower has not promptly so acted, Lender shall have the right to commence, appear in, and defend any action or proceeding purporting to affect the rights or duties of the parties hereunder or the payment of any funds, and in connection therewith Lender may pay necessary expenses, employ counsel, and pay reasonable attorneys' fees.    Borrower agrees to pay

20

to Lender within seventy-two (72) hours after demand therefor, all costs and expenses incurred by Lender in connection therewith, including without limitation actual attorneys' fees reasonably incurred, together with interest thereon from the date of expenditure at the Default Rate.

8.3    _Advances Obligatory._    Anything herein to the contrary notwithstanding, it is specifically understood and agreed that any advances made by Lender pursuant to this Agreement, including but not limited to all funds advanced by Lender, shall be deemed advanced by Lender under an obligation to do so, regardless of the person or entity to whom such advance is made. Advances made in the reasonable exercise of Lender's judgment that such are necessary to complete the Improvements or to protect its security are to be deemed obligatory advances hereunder and are to be secured by the Note and Deed of Trust, and such security shall relate back to the original recording of the Deed of Trust.

8.4    _Nonliability of Lender._    Borrower acknowledges and agrees that:

(a)    any inspections of the Property or the construction of the Improvements made by or through Lender are for purposes of administration of the Loan only and Borrower is not entitled to rely upon the same with respect to the quality, adequacy or suitability of materials or workmanship, conformity to the plans therefor, state of completion or otherwise; Borrower shall make its own inspections of such construction to determine that the quality of the Improvements and all other requirements of such construction are being performed in a manner satisfactory to Borrower and in conformity with the Improvement Plans and all applicable Laws; and Borrower shall immediately notify Lender, in writing, should the same not be in conformity with the plans therefor and all applicable laws;

(b)    by accepting or approving anything required to be observed, performed, fulfilled or given to Lender pursuant to the Loan Documents, including any certificate, statement of profit and loss or other financial statement, survey, appraisal, lease or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance or approval thereof shall not constitute a warranty or representation to anyone with respect thereto by Lender;

(c)    Lender neither undertakes nor assumes any responsibility or duty to Borrower to select, review, inspect, supervise, pass judgment upon or inform Borrower of any matter in connection with the Project, including without limitation matters relating to the quality, adequacy or suitability of: (i) any plans or specifications, (ii) architects, contractors, subcontractors and materialmen employed or utilized in connection with the construction of the Improvements, or the workmanship of or the materials used by any of them, or (iii) the progress or course of any construction and its conformity or nonconformity with the plans therefor; and Borrower shall rely entirely upon its own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or information supplied to Borrower by Lender in connection with such matters is for the protection of Lender only and neither Borrower nor any third party is entitled to rely thereon;

(d)    Lender owes no duty of care to protect Borrower against negligent, faulty, inadequate

21

or defective building or construction;

(e)    the relationship of Borrower and Lender under the Loan Documents is, and shall at all times remain, solely that of borrower and lender, and Lender neither undertakes nor assumes any responsibility or duty to Borrower or to any other Person with respect to the Property or Loan, except as expressly provided in the Loan Documents; and notwithstanding any other provision of the Loan Documents: (i) Lender is not, and shall not be construed as, a partner, joint venturer, alter-ego, manager, controlling person or an insider or other business associate or participant of any kind of Borrower, and Lender does not intend to ever assume such status; (ii) Lender's activities in connection with the Loan Documents shall not be "outside the scope of the activities of a lender of money" under Nevada law, as amended or recodified from time to time, and Lender does not intend to ever assume any responsibility to any Person for the quality, suitability, safety or condition of the Property or Improvements; and (iii) Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Borrower; and

(f)    Lender shall not be directly or indirectly liable or responsible for any loss, claim, cause of action, liability, indebtedness, damage or injury of any kind or character to any Person or property arising from any construction on, or occupancy or use of, any of the Property, whether caused by, or arising from: (i) any defect in any building, structure, soil condition, grading, fill, landscaping, or other improvements thereon or in any on-site or off-site improvement or other facility therein or thereon; (ii) any act or omission of Borrower or any of Borrower's agents, employees, independent contractors, licensees or invitees; (iii) any accident in or on any of the Property or any fire, flood or other casualty or hazard thereon; (iv) the failure of Borrower, any of Borrower's licensees, employees, invitees, agents, independent contractors or other representatives to maintain any of the Property in a safe condition; and (v) any nuisance made or suffered on any part of the Property.

8.5    <u>No Third Parties Benefitted</u>.  This agreement is made for the purpose of defining and setting forth certain obligations, rights and duties of Borrower, Lender and USA in connection with the Loan.  It shall be deemed a supplement to the Note and the Security Documents, and shall not be construed as a modification of the Note or the Security Documents, except as provided herein. It is made for the sole protection of Borrower, Lender, and USA and their successors and assigns. No other Person shall have any rights of any nature hereunder of by reason hereof.

8.6    <u>Indemnity</u>.  Borrower indemnifies Lender against, and holds Lender harmless from, any and all losses, damages (whether general, punitive or otherwise), liabilities, claims, cause of action (whether legal, equitable or administrative), judgments, court costs and legal or other expenses, including attorneys' fees, which Lender may suffer or incur as a direct or indirect consequence of: (a) Lender's performance of this Agreement or any of the Loan Documents, including, without limitation, Lender's exercise or failure to exercise any rights, remedies or powers in connection with this Agreement or any of the Loan Documents but excluding charges and assessments by Governmental Agencies imposed upon the Lender in the normal course of the Lender's business such as taxes and regulatory fees; (b) Borrower's failure to perform any of Borrower's obligations as and when required by this Agreement or any of the other Loan Documents, including without limitation any failure, at any time, of any representation or warranty

of Borrower to be true and correct and any failure by Borrower to satisfy any condition; (c) any claim or cause of action of any kind by any Person to the effect that Lender is in any way responsible or liable for any act or omission by Borrower, whether on account of any theory or derivative liability or otherwise, including but not limited to any claim or cause of action for fraud, misrepresentation, tort or willful misconduct; (d) any act or omission by Borrower, any contractor, subcontractor or material supplier, engineer, architect, or any other Person with respect to any of the Property or Improvements; or (e) any claim or cause of action of any kind by any Person which would have the effect of denying Lender the full benefit or protection of any provision of this Agreement or the Loan Documents but excluding charges and assessments by Governmental Agencies imposed upon Lender in the normal course of Lender's business such as taxes and regulatory fees. Lender's rights of indemnity shall not be directly or indirectly limited, prejudiced, impaired or eliminated in any way by any finding or allegation that Lender's conduct is active, passive or subject to any other classification or that Lender is directly or indirectly responsible under any theory of any kind, character or nature for any act or omission by Borrower or any other Person. Notwithstanding the foregoing, Borrower shall not be obligated to indemnify Lender with respect to any intentional tort or act of negligence which Lender is personally determined by the judgment or a court of competent jurisdiction (sustained on appeal, if any) to have committed. Borrower shall pay any indebtedness arising under this indemnity to Lender immediately within seventy-two (72) hours after demand therefor by Lender together with interest thereon from the date such indebtedness arises until paid at the Default Rate. Borrower's duty to defend and indemnify Lender shall survive the release and cancellation of the Note and the release and reconveyance or partial release and reconveyance of the Deed of Trust.

8.7    <u>Commissions</u>. Borrower hereby indemnifies Lender from the claim of any Person for a commission or fee in connection with the Loan.

8.8    <u>Lenders' Representative</u>. The persons and entities which comprise Lender hereby collectively appoint USA Commercial Mortgage Company ("USA") to administer the Loan on their behalf, to make all necessary demands on Borrower and to execute and deliver all approvals and notices to be given by Lender hereunder.

8.9    <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, except that, as provided herein, Borrower may not assign its rights or interest or delegate any of its duties under this Agreement or any of the other Loan Documents without prior written consent of Lender.

8.10    <u>Amendments; Consents</u>. No amendment, modification, supplement, termination or waiver of any provision of this Agreement or any of the other Loan Documents, and no consent to any departure by Borrower therefrom, may in any event be effective unless in writing signed by Lender, and then only in the specific instance and for the specific purpose given.

8.11    <u>Costs, Expenses and Taxes</u>. Borrower shall pay to Lender, within seventy-two (72) hours after demand therefor:

(a)     the actual attorneys' fees and out-of-pocket expenses incurred by Lender in

connection with the negotiation, preparation, execution, delivery and administration of this Agreement and any other Loan Documents and any matter related thereto;

(b)    the actual costs and expenses of Lender in connection with any modification of any Loan Document or in connection with the enforcement of this Agreement and any other Loan Document and any matter related thereto, including the actual fees and out-of-pocket expenses, reasonably incurred, of any legal counsel, independent public accountants and other outside experts retained by Lender; and

(c)    all costs, expenses, fees, premiums and other charges relating or arising with respect to the Loan Documents or any transactions contemplated thereby or the compliance with any of the terms and conditions thereof, including without limitation the Disbursement Agent's fee, appraisal fees, inspection fees, cost review fees, recording fees, filing fees, release or reconveyance fees, title insurance premiums, and the cost of realty tax service for the term of the Loan.

All sums paid or expended by Lender under the terms of this Agreement and the other Loan Documents shall be considered to be a part of the Loan. Except as otherwise specifically stated herein, all such sums shall be secured by the Security Documents, shall bear interest from the date of expenditure as if such sums were advances under the Note, and shall be immediately due and payable by Borrower within seventy-two (72) hours after demand therefor.

8.12    Survival of Representations and Warranties.  All representations and warranties of Borrower and Guarantor contained herein or in any other Loan Document shall survive the making of the Loan and execution and delivery of the Note, and are material and have been or will be relied upon by Lender, notwithstanding any investigation made by Lender or on behalf of Lender. For the purpose of the foregoing, all statements contained in any certificate, agreement, financial statement, or other writing delivered by or on behalf of Borrower or Guarantor pursuant hereto or to any other Loan Document or in connection with the transactions contemplated hereby or thereby shall be deemed to be representations and warranties of Borrower or Guarantor contained herein or in the other Loan Documents, as the case may be.

8.13    Notices.  All notices to be given pursuant to this Agreement shall be sufficient if given by personal services, by guaranteed overnight delivery service, by telex, telecopy or telegram or by being mailed postage prepaid, certified or registered mail, return receipt requested, to the described addresses of the parties hereto as set forth below, or to such other address as a party may request in writing. Any time period provided in the giving of any notice hereunder shall commence upon the date of personal service, the day after delivery to the guaranteed overnight delivery service, the date of sending the telex, telecopy or telegram or two (2) days after mailing certified or registered mail.

**BORROWER'S ADDRESS:**             Castaic Partners, LLC
                                    7541 Eads Avenue, Suite F
                                    La Jolla, California 92037
                                    Attn. William J. Barkett

**LENDER'S ADDRESS:**                       USA Commercial Mortgage Company
                                            4484 South Pecos Road
                                            Las Vegas, Nevada 89121
                                            Attn: Joe Milanowski

8.14    <u>Further Assurances</u>.  Borrower shall, at its sole expense and without expense to Lender, do such further acts and execute and deliver such further documents as Lender from time to time may require for the purpose of assuring and confirming unto Lender the rights hereby created or intended now or hereafter so to be, or for carrying out the intention or facilitating the performance of the terms of any Loan Document, or for assuring the validity of any security interest or lien under any Security Document.

8.15    <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.

(a)    The laws of the State of Nevada, without regard to its choice of law provisions, shall govern enforcement of the Loan Documents.

(b)    BORROWER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (i) SUBMITS TO PERSONAL JURISDICTION IN THE STATE OF NEVADA OVER ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THE NOTE, THIS INSTRUMENT OR ANY OTHER OF THE LOAN DOCUMENTS, (ii) AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN CLARK COUNTY, NEVADA, (iii) SUBMITS TO THE JURISDICTION OF SUCH COURTS, AND, (iv) TO THE FULLEST EXTENT PERMITTED BY LAW, AGREES THAT IT WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY FORUM OTHER THAN CLARK COUNTY, NEVADA (BUT NOTHING HEREIN SHALL AFFECT THE RIGHT OF LENDER TO BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM). BORROWER FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO THE BORROWER AT THE ADDRESS FOR NOTICES DESCRIBED IN SECTION 8.13 HEREOF, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

(c)    BORROWER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THE INDEBTEDNESS SECURED HEREBY OR ANY CONDUCT, ACT OR OMISSION OF

LENDER, TRUSTEE OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER, TRUSTEE OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

8.16    Severability of Provisions.  Any provision in any Loan Document that is held to be inoperative, unenforceable or invalid shall be inoperative, unenforceable or invalid without affecting the remaining provisions, and to this end the provisions of all Loan Documents are declared to be severable.

8.17    Assignment or Sale of Participation by Lender; Advertising.  Lender may, at any time, sell, transfer, assign or grant participation in the Loan and in the Loan Documents and Lender may forward to its Partners or to such participant and prospective participant all documents and information relating to the Loan and to Borrower, whether furnished by Borrower or otherwise, as Lender determines necessary or desirable.  Lender and USA may also reasonably divulge and advertise the making of the Loan and the amount thereof.

8.18    Headings.  Section headings in this Agreement are included for convenience of reference only and are not part of this Agreement for any other purpose.

8.19    Time of the Essence.  Time is of the essence with respect to all duties and obligations of Borrower under any Loan Document.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

BORROWER:        Castaic Partners, LLC

By: _____

William J. Barkett, Manager

LENDER:

By: _____        By: _____

26

## EXHIBIT "A"

### LENDERS

| NAMES | AMOUNT |
|---|---|
| 1. Charles B. Anderson Trustee of the Charles B. Anderson Trust | $100,000 |
| 2. Rita P. Anderson, Trustee FBO Rita P. Anderson Trust | $100,000 |
| 3. Patrick J. Anglin, an unmarried man | $50,000 |
| 4. Delana D. Arnold, a married woman dealing with her sole & separate property | $50,000 |
| 5. Robert J. Asselin & Mary E. Asselin Trustees of the 1994 Robert Asselin & Mary Asselin Family Trust | $50,000 |
| 6. Peter L. Backes Trustee of the Peter L. Backes Trust | $50,000 |
| 7. Robert Baker & Miriam Baker, husband & wife, as joint tenants with right of survivorship | $50,000 |
| 8. David Barker & Lisa Barker, husband & wife, as joint tenants with right of survivorship | $50,000 |
| 9. Steven Barker, an unmarried man | $50,000 |
| 10. Robert M. Barnes & Violet M. Barnes, as husband & wife, joint tenants with right of survivorship | $50,000 |
| 11. First Savings Bank Custodian For Ann Marie Berglund IRA | $50,000 |
| 12. Wayne K. Bisbee & Mae M. Bisbee, husband & wife, as joint tenants with right of survivorship | $50,000 |
| 13. Charles E. Borom & Lanna G. Borom, husband & wife, as joint tenants with right of survivorship | $50,000 |
| 14. Helena A. Bova, a single woman | $75,000 |
| 15. Raymond Brahy & Rita Brahy, husband & wife, as joint tenants with right of survivorship | $50,000 |
| 16. Marshall J. Brecht & Janet L. Brecht Trustees of the Marshall J. Brecht Trust dated 2/5/86 | $100,000 |
| 17. Janet Buckalew Trustee of the Buckalew Trust | $100,000 |
| 18. Fertitta Enterprises, Inc. | $5,000,000 |
| 19. First Savings Bank Custodian For Leonard E. Cady IRA | $50,000 |
| 20. Ralph F. Cameron Trustee of the Cameron Survivors Trust dated 12/22/97 For the Benefit of his children John Cameron & Katherine Cameron-Hoffman | $50,000 |
| 21. Daniel Carlton & Takeko Carlton Trustees for the Daniel O. Carlton & Takeko Carlton Revocable Trust dated 4/30/97 | $50,000 |
| 22. Eric N. Cartagena, an unmarried man | $50,000 |
| 23. Maurice A. Cauchois & Jacqueline M. Cauchois Trustees of the M & J Cauchois Family Trust dated 2/25/93 | $70,000 |
| 24. Harold F. Clark Jr., a single man | $50,000 |
| 25. Jack R. Clark & Linda C. Reid, husband & wife, as joint tenants with right of survivorship | $50,000 |

27

| 26. | Shirley M. Collins Trustee as her sole & separate property under the Collins Family Trust dated 1/29/93 | $100,000 |
| 27. | Iris G. Corley Trustee of the Iris G. Corley Trust dated 9/19/84 | $50,000 |
| 28. | Bruce H. Corum Trustee of the Credit Shelter Trust | $200,000 |
| 29. | Fernando Cuza & Kristi Cuza, husband & wife, as joint tenants with right of survivorship | $250,000 |
| 30. | Maureen DaCosta, a single woman | $150,000 |
| 31. | Wen Dai & Zhimin Chen, husband & wife as joint tenants with the right of survivorship | $50,000 |
| 32. | Joseph Davis & Marion Sharp Co-Trustees of the Davis Family Trust | $100,000 |
| 33. | Pat Davis & Susan Davis, husband & wife, as joint tenants with right of survivorship | $100,000 |
| 34. | Rena F. De Hart Trustee of the A. Robert De Hart Trust C dated 1/21/93 | $68,000 |
| 35. | James D. Dery & Ann R. Dery, husband & wife | $50,000 |
| 36. | Linda Patrucco Doerr Trustee of the Doerr Family Trust dated 9/12/02 | $140,000 |
| 37. | Pat A. Dolce, a married man | $75,000 |
| 38. | First Savings Bank Custodian For Daniel Drubin IRA | $165,000 |
| 39. | Cynthia Deann Dutt & Wayne A. Dutt Trustees of the C. Deann Dutt Trust | $40,000 |
| 40. | Wayne A. Dutt & Cynthia Deann Dutt Trustees of the Wayne A. Dutt Trust | $250,000 |
| 41. | Mark L. Eames & Sandy K. Eames, husband & wife, as joint tenants with right of survivorship | $50,000 |
| 42. | Edward D. Earl, an unmarried man | $100,000 |
| 43. | First Savings Bank Custodian For Mary H. Earp IRA | $50,000 |
| 44. | Robert D. Earp, a married man dealing with his sole & separate property | $50,000 |
| 45. | Falkenborg Family LLC, Marguerite Falkenborg Manager | $100,000 |
| 46. | Marguerite Falkenborg Trustee of the Marguerite Falkenborg 2000 Trust dated 6/20/00 | $100,000 |
| 47. | Sierra West, Inc., a Nevada corporation | $100,000 |
| 48. | Julia Farrah Trustee of the Julia Farrah Revocable Living Trust dated 10/8/92 | $50,000 |
| 49. | William H. Favro & Carol M. Favro Trustees of the Favro Trust dated 9/14/00 | $50,000 |
| 50. | First Trust Company of Onaga Custodian for Arlene J. Fine IRA | $50,000 |
| 51. | First Trust Company of Onaga custodian for the benifit of Lewis Fine IRA | $140,000 |
| 52. | Dennis Flier Trustee of the Dennis Flier, Inc. Defined Benefit Trust dated 6/29/87 | $50,000 |
| 53. | Jeannine M. Gahring, Trustee of the Jeannine M. Gahring Revocable Trust dated 6/27/97 | $50,000 |
| 54. | Leonard Georges & Jean Georges Co-Trustees of the Georges 1987 Trust dated 12/23/87 | $100,000 |
| 55. | Barry J. Goldstein & Patricia B. Goldstein joint tenants with right of survivorship | $50,000 |

28

| | | |
|---|---|---|
| 56. | Robin B. Graham Trustee of the Graham Family Marital Trust B dated 2/13/97 | $200,000 |
| 57. | William R. Gresher & Sandra C. Gresher Trustees of the Gresher Family Trust dated 10/18/02 | $50,000 |
| 58. | Thomas B. Harrison & Marguerite F. Harrison Trustees of the Harrison Family Trust dated 7/27/99 | $80,000 |
| 59. | Barrett C. Hart Trustee of the Hart Living Trust dated 8/30/99 | $50,000 |
| 60. | Michael Hedlund & Carol Hedlund, as husband & wife, joint tenants with right of survivorship | $100,000 |
| 61. | Robert L. Herpst Trustee of the Herpst Family Trust dated 8/16/90 | $100,000 |
| 62. | Marilyn Hilborn Trustee of the Marilyn Hilborn Trust dated 11/18/93 | $50,000 |
| 63. | Hoffman Family Investments LP, an Iowa limited partnership | $50,000 |
| 64. | Delwin C. Holt, an unmarried man | $50,000 |
| 65. | Evelyn A. Ives Trustee of the Melvin J. Ives & Evelyn A. Ives Bypass Trust dated 1/6/93 | $50,000 |
| 66. | Evelyn A. Ives Trustee of the Mevin J. Ives & Evelyn A. Ives QTIP Trust | $50,000 |
| 67. | Roger L. Janssen & Maxine D. Worth, husband & wife as joint tenants with right of survivorship | $50,000 |
| 68. | Delbert T. Johnston, Jr. & Rebecca J. Johnston Trustees of the Johnston Estate Revocable Trust dated 5/17/94 | $50,000 |
| 69. | F.R. Inc. dba Bombard Electric, a Nevada corporation | $250,000 |
| 70. | Kenneth Kefalas & Debbie Kefalas Trustees of the Kefalas Trust dated 7/3/97 | $250,000 |
| 71. | Christina M. Kehl, an unmarried woman | $50,000 |
| 72. | Daniel J. Kehl, a married man dealing with his sole & separate property | $200,000 |
| 73. | Kevin A. Kehl, a married man dealing with his sole & separate property | $200,000 |
| 74. | Robert J. Kehl & Ruth Ann Kehl, husband & wife, as joint tenants with right of survivorship | $500,000 |
| 75. | James Klega & Shirley Klega, Trustees of the James & Shirley Klega Trust dated 06/22/95 | $50,000 |
| 76. | David W. Knobel & Anna S. Knobel Trustees of the 1996 Knobel Trust dated 9/5/96 | $100,000 |
| 77. | David Kravitz & Mable R. Kravitz Trustees of the Kravitz Family Revocable Trust Under Agreement dated 12/9/99 | $50,000 |
| 78. | Jester, a Nevada Limited Partnership, Robert M. Lampert General Partner | $50,000 |
| 79. | Raymond Nunez & Sandra L. Lawson Trustees of the The Raymond & Sandra Nunez Family Trust | $100,000 |
| 80. | James W. Lehr & Julie Anne Lehr, husband & wife, as joint tenants with right of survivorship | $50,000 |
| 81. | Gerald Lewis & Judith J. Lewis, husband & wife, as joint tenants with right of survivorship | $50,000 |
| 82. | James H. Lidster & Phyllis M. Lidster Trustees of the James H. Lidster Family Trust dated 1/20/92 | $50,000 |

| | | |
|---|---|---|
| 83. | Anna Lieblein, an unmarried woman & John Drakoules, an unmarried man | $200,000 |
| 84. | Steve Lindquist Trustee of the Steve Lindquist Charitable Remainder Unit Trust dated 9/9/96 | $50,000 |
| 85. | Henri L. Louvigny & Marcelle A. Louvigny Co-Trustees For The Benefit of the Henry L. Louvigny & Marcelle A. Louvigny Family Trust dated 10/18/84 | $50,000 |
| 86. | Michael C Maroko & Haviva Maroko Trustees of the Michael C Maroko & Haviva Maroko 2001 Revocable Intervivos Trust dated 12/19/01 | $100,000 |
| 87. | Don P. Marshall Trustee of the Don P. Marshall Trust dated 7/18/95 | $50,000 |
| 88. | Morris Massry, a married man | $200,000 |
| 89. | Michael R. McCartney & Teresa R. McCartney, husband & wife, as joint tenants with right of survivorship | $50,000 |
| 90. | Barbara McClaflin Trustee of the Revocable Living Trust Agreement of Barbara Fay McClaflin | $50,000 |
| 91. | Mechek, Inc., a Nevada corporation | $100,000 |
| 92. | Linda Merialdo Trustee of the Linda Merialdo Living Trust | $200,000 |
| 93. | Alain Michael & Dawn Levy Michael Trustees of the Michael Family Trust dated 12/4/03 | $80,000 |
| 94. | Harold L. Miller Trustee of the Art-Kay Family Trust | $50,000 |
| 95. | First Savings Bank Custodian for George J. Motto IRA | $50,000 |
| 96. | Larry J. Newman & Elsie D. Newman Trustees of the Newman Family Trust dated 9/30/97 | $50,000 |
| 97. | Marvin Lynn Nicola Trustee of the Marvin Lynn Nicola Faimly Trust dated 6/13/78 | $50,000 |
| 98. | Stanley M. Novara & Frances O. Novara, as joint tenants with right of survivorship | $75,000 |
| 99. | Henry J. Obermuller & Mengia K. Obermuller Trustees of the Henry & Mengia Obermuller Trust dated 9/14/90 | $50,000 |
| 100. | Varnell O. Padgett & Dorothy A. Padgett Trustees of the Padgett Family Trust dated 3/25/03 | $50,000 |
| 101. | Anthony Pasqualotto & Alicia Pasqualotto Trustees of the Anthony Pasqualotto & Alicia Pasqualotto 1997 Trust | $50,000 |
| 102. | Jennefer C. Peele Trustee of the Peele Spousal Trust dated 2/10/87 | $50,000 |
| 103. | Nicholas Perrone Trustee of the Nicholas Perrone Trust dated 7/12/99 | $300,000 |
| 104. | Andrew Peterson & Sharon Peterson Trustees of the Andrew R. Peterson & Sharon Peterson 1991 Living Trust dated 11/22/91 | $50,000 |
| 105. | Lynda L. Pinnell Trustee of the Lynda L. Pinnell Living Trust dtd 7/24/00 | $50,000 |
| 106. | Stephen Polacheck Trustee of the Polacheck & Associates, Inc. Profit Sharing Plan dated 2/20/73 | $100,000 |
| 107. | Leonard J. Ramos & Claudia C. Ramos Trustees of the Ramos Family Trust dated 8/27/97 | $50,000 |
| 108. | Larry L. Rieger & Patsy R. Rieger Trustees of the Larry L. Rieger & Patsy R. Rieger Revocable Trust dated 8/14/91 | $150,000 |
| 109. | Mary Ellen Russell, an unmarried woman | $50,000 |

| | | |
|---|---|---|
| 110. | Randy M. Sanchez & Sharon Sanchez Trustees of the Sanchez Living Trust dated 10/13/03 | $50,000 |
| 111. | William E. Schnadt & Janet E. Schnadt Trustees of the Schnadt Trust dated 6/18/93 | $50,000 |
| 112. | First Savings Bank Custodian For A. Andrew Schwarzman IRA | $54,000 |
| 113. | Alice Shepherd, a single woman | $50,000 |
| 114. | Robert G. Sikorski | $110,000 |
| 115. | Herbert Slovis, a single man & Julie B. Slovis, a single woman as joint tenants with right of survivorship | $100,000 |
| 116. | Rocklin/Redding LLC | $800,000 |
| 117. | Michael R. Sparks & Muriel S. Sparks Co-Trustees of the Sparks Family Trust dated 2/26/93 | $50,000 |
| 118. | Robert Speckert Trustee of the Robert S. Speckert Rev. Living Trust dated 6/11/92 | $50,000 |
| 119. | Shiqi Charlie Sun & Jianzhen Jean Sun, husband & wife, as joint tenants with right of survivorship | $50,000 |
| 120. | Shirley J. Sutton Trustee of the Shirley J. Sutton Trust | $50,000 |
| 121. | Leland K. Swanson & Lena M. Swanson Trustees of the Swanson Family Trust dated 9/14/94 | $150,000 |
| 122. | Basil Thacker & Jill M. Thacker, husband & wife, as joint tenants with right of survivorship | $50,000 |
| 123. | Daryl D. Thompson Trustee of the Thompson 1993 Trust dated 1/26/93 | $475,000 |
| 124. | Douglas Tichenor & Susan Tichenor, husband & wife, as joint tenants with right of survivorship | $50,000 |
| 125. | Patricia L. Tiede, an unmarried woman | $50,000 |
| 126. | Gary E. Tucker & Linda L. Tucker, husband & wife, as joint tenants with right of survivorship | $50,000 |
| 127. | USA Capital First Trust Deed Fund | $233,000 |
| 128. | Gilbert Van Damme Trustee of the Van Damme Family Trust | $300,000 |
| 129. | Lloyd F. Van Sickle Trustee of the The Van Sickle Family Trust dated 5/20/99 | $100,000 |
| 130. | Marc Winard & Ann Winard Trustees of the Marc & Ann Winard Family Trust dated 6/22/95 | $100,000 |
| 131. | LK Wolfe Family, LP, a Nevada limited partnership | $50,000 |
| 132. | Richard D. Wood Trustee of the Wood Living Trust dated 10/1/99 | $50,000 |
| 133. | Percy & Ruth Young | $90,000 |
| 134. | Joseph G. Zappulla & Carol A. Zappulla, husband & wife, as joint tenants with right of survivorship | $125,000 |
| 135. | Zawacki, a California LLC | $100,000 |
| 136. | Terry Zimmerman Trustee of the Terry A. Zimmerman Revocable Living Trust dated 9/4/90 | $300,000 |
| 137. | David A. Zook Trustee of the Zook Revocable Living Trust for the benefit of Emily J. Zook | $55,000 |
| 138. | David A. Zook Trustee of the Zook Revocable Living Trust for the benefit of Kathryn E. Zook | $55,000 |

| | | |
|---|---|---|
| 139. | Osvaldo Zunino Trustee of the Osvaldo Zunino Living Trust dtd 12/18/98 | $70,000 |
| 140. | Raymond J. Zurfluh, Jr. & Shirley J. Zurfluh, husband & wife, as joint tenants with right of survivorship | $75,000 |
| | TOTAL | $18,500,000 |

## EXHIBIT "B"

## DISBURSEMENT SCHEDULE

All disbursements after the closing are governed by Section 3.2 of the Loan agreement. All disbursements after closing are for Interest Reserve. Month X means X months after closing.

| DATE | AMOUNT |
|------|--------|
| Closing | $18,500,000 |
| Month 1 | $ 96,000 |
| Month 2 | $ 203,000 |
| Month 3 | $ 204,000 |
| Month 4 | $ 207,000 |
| Month 5 | $ 209,000 |
| Month 6 | $ 211,000 |
| Month 7 | $ 213,000 |
| Month 8 | $ 216,000 |
| Month 9 | $ 218,000 |
| Month 10 | $ 221,000 |
| Month 11 | $ 223,000 |
| Month 12 | $ 225,000 |
| Month 13 | $ 228,000 |
| Month 14 | $ 230,000 |
| Month 15 | $ 233,000 |
| Month 16 | $ 235,000 |
| Month 17 | $ 238,000 |
| Month 18 | $ 240,000 |
| **TOTAL:** | **$22,000,000** |

## EXHIBIT "C"

<u>PERMITTED EXCEPTIONS</u>

Items 1 through 5 and 7 through 9 (with all taxes and assessments paid current), 10 through 19, 22, 23, 26, 28, 29, and 31 through 42, as shown on that Preliminary Report dated as of October 1, 2004 issued by Fidelity National Title Company under Order No. 9727916-B.

## EXHIBIT "D"

## DESCRIPTION OF REAL PROPERTY

The land referred to herein is situated in the County of Los Angeles, State of California and is described as follows:

Parcel A:

The East one-half of the Northwest Quarter of the Northeast Quarter of Section 29, Township 5 North, Range 16 West, San Bernardino Base and Meridian, according to the official plat thereof.

Parcel B:

The Northwest Quarter of the Northwest Quarter of the Northeast Quarter of Section 29, Township 5, Range 16 West, San Bernardino Base and Meridian according to the official plat thereof.

Parcel C:

The Southeast Quarter of the Northwest Quarter of Section 29, Township 5 North, Range 16 West, San Bernardino Base and Meridian according to the official plat thereof.

Parcel D:

The Southwest Quarter of the Northwest Quarter of Section 29, Township 5 North, Range 16 West, San Bernardino Base and Meridian, according to the official plat thereof.

Except therefrom the West 200 feet thereof.

Also except therefrom the right in and to one-half of the oil, gas, hydrocarbon and mineral substances lying in and under and that may be produced, saved, sold or removed from said parcels of land or any part thereof and the proceeds, rents, royalties, as excepted and retained by grantor in that certain grant deed from Rosemary Clau, a single woman, Clarence R. Bailey, Sr. and Pearl P. Bailey, husband & wife, Leona B. McDowell, an unmarried woman, Frederick Leo McDowell, a single man, Alvin Robert McDowell, a single man, and Paul DeWitt McDowell, a single man, mother and sons, as grantors, to Robert T. Rosenfeld and Dorothy P. Rosenfeld, husband and wife, as community property, as to an undivided 37 1/2 percent interest; Donald T. Rosenfeld, a married man, as his sole and separate property, as to an undivided 37 1/2 percent interest; Andrew W. Weiner and Cyrene Weiner, husband and wife, as community property, as to an undivided 15 percent interest; Charles A. Hirschman and Lucille A. Hirschman, husband and wife, as community property as to an undivided 5 percent interest; Herbert Press and Hillicent Press, husband and wife, as community property as to an undivided 5 percent interest, as Grantors dated April 23, 1968 and recorded concurrently herewith as reserved in deed recorded May 10, 1968 as Instrument No. 1203.

Parcel E:

The East half of the Northeast Quarter of the Northwest Quarter of Section 29, Township 5 North, Range 16 West, San Bernardino Base and Meridian.

Except therefrom that portion described as follows:

Beginning with a line at the Northwest corner of Section 29, Township 5 North, Range 16 West, San Bernardino Base and Meridian; thence running Easterly along the North line of said Section 29, 1995.67 feet; thence South 0°08' East 70.78 feet to the true point of beginning; thence South 88°44' East 50.00 feet; thence South 1°16' West 80.00 feet; thence North 88°44' West 50.00 feet; thence North 1°16' East 80.00 feet to the true point of beginning.

Also except therefrom an undivided one-half interest in all oil, gas, minerals and other hydrocarbon substances in and under said land lying below a depth of 500 feet from the surface thereof; but with no right of surface entry, as reserved by Anna R. Schwartz and Reserl W. Keen, a married woman, as her sole and separate property, in deed recorded June 20, 1968 as Instrument No. 1109.

Parcel E-1:

A non-exclusive easement over the Northerly 60 feet of the West half of the Northeast Quarter of the Northwest Quarter of Section 29, Township 5 North, Range 16 West, San Bernardino Base and Meridian, for reasonable roadway purposes only for the grantees herein, their heirs, transferees, successors, assigns and their subsequent grantees and without liability on the part of grantors herein for the maintenance of the same.

Parcel F:

The Southwest Quarter of the Northwest Quarter of the Northeast Quarter of Section 29, Township 5 North, Range 16 West, San Bernardino Base and Meridian, according to the official plat of said land filed in the District Land Office on April 22, 1880.

Except therefrom an undivided one-half interest in all oil, gas, minerals and other hydrocarbon substances in and under said land lying below a depth of 500 feet from the surface thereof; but with no right of surface entry, as provided in the deed recorded May 10, 1968 as Instrument No. 1197.

Parcel G:

The Southeast Quarter of the Southwest Quarter of Section 21, Township 5 North, Range 16 West, San Bernardino Base and Meridian, according to the plat of the survey of said land on file in the Bureau of Land Management.

Parcel H:

The Northwest Quarter of Section 28, Township 5 North, Range 16 West, San Bernardino Range,

according to the official plat of the survey of said land on file in the Bureau of Land Management.

Parcel I:

The East half of the Northeast Quarter of Section 29, Township 5 North, Range 16 West, San Bernardino Meridian, according to the official plat of the survey of said land on file in the Bureau of Land Management.

Except from all of the above described Parcels G. H and I those portions of the Southeast Quarter of the Southwest Quarter of Section 21 and the Northwest Quarter of Section 28 and the East half of the Northeast Quarter of Section 29, all in Township 5 North, Range 16 West, San Bernardino Meridian, according to the official survey of said land on file in the Bureau of Land Management described as follows:

Commencing at the Northwest Quarter of said Section 28; thence Easterly along the Northerly line of said Section North 89° 16' 37" East, 541.21 feet to the true point of beginning; thence continuing Easterly along said Northerly line North 89° 16' 37" East, 780.00 feet to the Southwest corner of the Southeast Quarter of the Southwest Quarter of said Section 21; thence leaving said Northerly line Northerly along the Westerly line of the Southeast Quarter of the Southwest Quarter of said Section 21, North 4° 59' 29" East, 650.00 feet; thence leaving said Westerly line North 89° 05' 10" East, 330.00 feet; thence South 50° 53' 54" East, 619.62 feet; thence North 89° 16' 37" East, 200.00 feet; thence South 0° 43' 23" East 249.94 feet to said Northerly line; thence Westerly along said Northerly line South 89° 16' 37" West, 500.00 feet; thence leaving said Westerly line South 0° 43' 23" East, 250.00 feet; thence South 89° 16; 37" West, 700.00 feet; thence South 0° 43' 23" East, 450.00 feet; thence South 18° 45' 23" West, 1181.34 feet; thence South 89° 16' 37" West, 1061.90 feet; thence North 0° 43' 23" West, 730.29 feet; thence North 35° 53' 48" East, 1349.87 feet to the true point of beginning.

Except therefrom an undivided one-half interest in and to all oil, gas and/or other variable minerals in and under said land now known, or hereafter discovered, together with leasehold rights, bonus payments or royal ties derived therefrom as reserved by Wiley R. Price, Jr. and Kay C. Price, Co-Trustees of the Price 1985 Trust dated December 6, 1985, as reserved in deed recorded November 21, 1986 as Instrument No. 86-1616128.

Parcel J:

The Northwest Quarter of the Southwest Quarter of Section 28, and the North half of the Southeast Quarter of Section 29, all in Township 5 North, Range 16 West, San Bernardino Meridian, according to the official plat of the survey of said land on file in the Bureau of Land Management.

Parcel K:

The West half of the Northeast Quarter of Section 28, Township 5 North, Range 16 West, San Bernardino Meridian, according to the official plat of survey of said land on file in the Bureau of Land Management.

Except therefrom the above described Parcels J and K, an undivided one-half interest in and to all oil, gas, and/or other variable minerals in and under said land now known, or hereafter discovered, together with leasehold rights, bonus payments, or royalties derived therefrom as reserved by Wiley R. Price, Jr. and Kay C. Price, Co-Trustees of the Price 1985 Trust dated December 6, 1985, as reserved in deed recorded November 21, 1986 as Instrument No. 86-161628.

Parcel L:

The Southwest Quarter of the Northeast Quarter of Section 29; Township 5 North, Range 16 West, of the San Bernardino Meridian, according to the official plat of said land.

Except therefrom the interest coveyed by Matthew Montgomery, to William H. Smith, by deed recorded October 23, 1940 in Book 17958 Page 56, official records, which recited "The Deed conveys the oil and gas rights only."

Parcel M:

The West one-half of the Southeast one-quarter of the Southeast one-quarter of Section 30, Township 5 North, Range 16 West San Bernardino Base and Meridian, containing twenty acres more or less.

Except therefrom an undivided 1/2 interest to all of the minerals rights to said property, as granted to Carl Fred Sperber and Elaine K. Sperber, his wife, as joint tenants, and recorded June 24, 1968 as Instrument No. 2732.

Parcel N:

That portion of the East 1/2 of the Northeast 1/4 of the Northwest 1/4 of Section 29 Township 5 North, Range 16 West, San Bernardino Base and Meridian, bounded as follows:

Beginning at a point on the North line of said section distant Easterly from the Northeast corner of said Section 1995.67 feet; thence South 0° 06' East 70.78 feet to the true point of beginning; thence South 88° 44' East 50 feet; thence South 1° 16' West 80 feet; thence 88° 44' West 50 feet; thence North 1° 16' East 80 feet to the true point of beginning.

Parcel O:

The Southwest Quarter of the Southeast Quarter of Section 30 in Township 5 North, Range 16 West, San Bernardino Meridian, according to the official plat of the survey of said land filed in the District Land Office on April 22, 1880.

Except 10 percent of all oil, gas and other hydrocarbon substances in and under said land with the right to extract and remove the same but without the right of surface entry upon said land or the right to use or occupy any part of said land and upon the express condition that in the exercise of the reserved right, no entry shall be made under or beneath said land at a depth of 500 feet from the

surface thereof, nor shall any derrick or the drilling of any well under the land be located upon any part of the surface thereof, as reserved by Deed recorded August 11, 1965 in Book D3011 Page 737, official records.

Parcel P:

The Northwest Quarter of the Southwest Quarter of Section 29 and the Northeast Quarter of the Southeast Quarter of Section 30, all in Township 5 North, Range 16 West, San Bernardino Meridian, according to the official plat of said land filed in the District Land Office April 22, 1880.

Except therefrom all oil, gas, minerals and other hydrocarbon substances lying below a depth of 500 feet from the surface of said property, but with no right of surface entry as reserved in deeds recorded December 28, 1984 as Instrument No. 84-1516941 to 84-1516948 inclusive.

Parcel Q:

Non-exclusive easements for road, equestrian trail, storm drains and slope purposes, as described in each document, in Exhibit "A", and depicted in Exhibit "B", and recorded July 20, 2001, as Instrument No's 01-1275077 and 01-1275078.

Parcel R:

The West 30 acres of the Southwest one-quarter of the Southwest one-quarter of Section 29, Township 5 North, Range 16 West, San Bernardino Base and Meridian.

Parcel S:

The East one-half of the Southeast one-quarter for the Southwest one-quarter and the Northeast one-quarter of the Southwest one-quarter of Section 29, Townshio 5 North, Range 16 West, San Bernardino Base and Meridian.

Parcel T:

The West half of the East half of the Southeast Quarter of the Southeast Quarter of Section 30, in Township 5 North, Range 16 West, San Bernardino Meridian, according to the official plat of said land filed in the District Land Office on April 22, 1880.

Parcel U:

The East one-half of the East one-half of the Southeast one-quarter of the Southeast one-quarter of Section 30, Township 5 North, Range 16 West, San Bernardino Meridian, according to the official plat of said land filed in the District Land Office, April 22, 1880.

Parcel V:

The South half of the Southeast one-fourth of Section 29, Township 5 North, Range 16 West, San Bernardino Meridian, according to the official plat of said land, filed in the District Land Office on April 22, 1880.

APN's: 2865-005-2, 3, 6, 8, 5, 17, 18, 19, 20, 21, 24, 25; 3244-23-17; 3244-24-11,013; 2865-006-001,013 and 014