Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

and

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com

Attorneys for Debtors and Debtors-in-Possession

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR<br><br>Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR<br><br>Date: June 5, 2006<br>Time: 9:30 a.m.<br><br>**FIFTH SUPPLEMENTAL DECLARATION OF THOMAS J. ALLISON IN SUPPORT OF DEBTORS' MOTIONS (AFFECTS ALL DEBTORS)** |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>Debtor. | |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | |
| In re:<br>USA SECURITIES, LLC,<br>Debtor. | |
| Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA First Trust Deed Fund, LLC | |

1

I, Thomas J. Allison, hereby declare, verify and state as follows:

1. I make this Fifth Supplemental Declaration as additional support for various motions of USA Commercial Mortgage Company ("USACM") and its four affiliates who filed bankruptcy petitions in this Court on April 13, 2006 (collectively, the "Debtors"), including the following: (a) Debtors Motion for Order Approving Continued Use of Cash Through July 29, 2006 Pursuant to the Second Revised Budget (docket no. 407, filed May 30, 2006) (the "Motion to Use Cash"); (b) Debtors' Motion for Emergency Interim and Permanent Orders Authorizing the Debtors to Obtain Post-Petition Financing (docket no. 588, filed June 9, 2006) (the "DIP Financing Motion"); (c) Motion for Authority to Forbear and to Provide Further Funding for Certain Outstanding Loans (docket no. 592, filed June 9, 2006) (the "Forbearance and Funding Motion"), (d) the Motion to Remove Fertitta Enterprises as Member of Official Committee of Holders of Executory Contract Right (docket no. 562, filed June 9, 2006) (the "Non-Representative Committee Member Motion"); and (e) Debtors' Motion for Order Approving Agreement with Investment Partners (docket 575, filed June 9, 2006) (the "Investment Partners Motion"). My Fifth Supplemental Declaration is based upon personal knowledge and the facts set forth herein.

**THE MOTION TO USE CASH AND THE DIP FINANCING MOTION**

2. Primarily due to the number of currently non-performing loans and the immediate need to preserve assets serviced by the estate and to recover assets for the estates and after developing and operating under a budget for the last sixty days in this bankruptcy case, I have determined that, in order for the Debtors to continue to operate in chapter 11, an immediate post-petition credit facility is critical to maintain the Debtors' operations in order to maximize the value in this case for the benefit of creditors and investors and to provide a variety of options for reorganizing these Debtors under a plan of reorganization. Accordingly, I considered several sources of post-petition financing that might be available to the Debtors and I began negotiations with several debtor-in-possession lenders ("DIP Lenders") for a post-petition loan.

3. While I made a diligent effort, I have been unable to obtain financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or solely in exchange for the grant of a special administrative expense priority pursuant to

2

section 364(c)(l) of the Bankruptcy Code. I also negotiated diligently to limit the collateral package proposed to secure the proposed financing and, to date, have been unable to procure a better financing option from any other source than the DIP Lender.

4. After good faith, extensive and arm's length negotiations with at least 9 potential DIP Lenders and after the Court denied the up front due diligence fee requested by the initial lender selected by the Debtors, I renegotiated the DIP financing being offered by potential lenders to eliminate any up front due diligence fees and selected CapitalSource as the lender from whom to obtain the post-petition financing facility, subject to Court approval.

5. After comparing several term sheets that were submitted to the Debtors, I selected CapitalSource from among the other potential DIP Lenders because in my business judgment, the financing facility offered by CapitalSource had the most favorable terms and CapitalSource was willing to proceed forward on an expedited time table that I deemed essential for the Debtors.

6. The negotiations with CapitalSource culminated in a term sheet dated June 9, 2006 to provide post-petition financing on the terms and conditions set forth therein (the "Financing Facility").

7. The Financing Facility contemplates three separate financing components, the availablility of which are tied to the Court's approval of the initial revolving credit piece: (a) a revolving credit facility in favor of the Debtors of up to $15,000,000 (only up to $3,000,000 of which will be requested to be used on an interim basis); (b) at the request of the Debtors to fund certain unfunded amounts, a ten (10) business day right of first offer in favor of CapitalSource on the Debtors' remaining funding for the original construction budget with respect to existing loans as of the petition date, subject in each instance to bankruptcy court approval; and (c) CapitalSource's right, at its sole discretion and on a case by case basis, to fund new loan originations generated by USACM on terms and conditions acceptable to CapitalSource.

8. On June 9, 2006, and on the same date as the Term Sheet was signed, the DIP Financing Motion was filed seeking court approved for the proposed post-petition financing facility from CapitalSource Finance, LLC ("CapitalSource"). A true and correct copy of the Financing Facility is attached to the DIP Financing Motion as Exhibit A.

9. The United States Trustee (the "UST"), the Committee of Equity Security Holders

3

of USA Capital First Trust Deed Fund, LLC (the "First Trust Deed Committee"), (b) the Committee of Holders of Executory Contract Rights Through USA Commercial Mortgage Company (the "Executory Contracts Committee"), (c) the committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC (the "Diversified Trust Deed Committee"), and (d) the Unsecured Creditors' Committee for USA Commercial Mortgage Company (the "Unsecured Creditors Committee") (collectively referred to as the "Committees"), have each filed responses and expressed concerns with respect to the DIP Financing Motion.

10. After reviewing the specific concerns expressed by the UST and the Committees, it appears that their two main concerns are that the DIP Motion (a) fails to provide sufficient details relating to the terms of the Financing Facility, and (b) does not establish that post-petition financing is needed by the Debtors.

11. As a result of the concerns expressed by the UST and the Committees, and after consultation with the Committees, I have agreed that at the June 21, 2006 hearing, I will only seek court approval on behalf of the Debtors for interim financing under the revolving credit line in an amount *up to* $3,000,000 from the date of the hearing to July 25, 2006. I have further agreed on behalf of the Debtors with the Committees as follows:

  a. The Debtors will not draw any amounts under the revolving credit line without prior notice to and written approval of the First Trust Deed Fund Member Committee and the Diversified Trust Deed Fund Member Committee;

  b. The loan documentation relating to the revolving credit line will be entered into only in the form agreeable to the DIP Lender, the Debtors, the First Trust Deed Fund Member Committee and the Diversified Trust Deed Fund Member Committee ;

  c. Prior to the final hearing on the DIP financing, to the extent the Debtors make any draws on the revolving credit line (subject to the foregoing restrictions), the monies obtained shall only be used to the extent necessary to avoid immediate and irreparable harm to the Debtors to pay for the operating and administrative expenses that are set forth in the 13 week

4

revised cash budget that is attached hereto as Exhibit A[1], or to fund the $125,000 loan advance from USACM to Boise/Gowan 93, LLC, if approved by the Court in connection with the Forbearance and Funding Motion, in an aggregate principal amount not to exceed $3 million.

12. The revolving credit line will be secured by a first priority security interest in all existing and after acquired (pre-petition and post-petition) tangible and intangible assets of the Debtors.

13. In my best business judgment, the revolving credit of up to $3,000,000 from CapitalSource is needed, and in fact could result in immediate and irreparable harm to the Debtors if it is not obtained, for the following reasons:

   a. Debtors need additional sources of funds to pursue necessary collection actions with respect to non-performing loans, given the number and amount of non-performing loans. As of May 26, 2006, it appears that 50 of the Serviced Loans are non-performing (i.e. they were delinquent in the payment of interest or otherwise could be considered non-performing), 53 are currently performing, 9 have been repaid, and the status of 3 have not been classified due to bankruptcy, foreclosure, change of ownership, or other reasons. As a result, the non-performing loans represent approximately 43% of the Serviced Loans. With respect to these non-performing loans, I plan to direct my legal counsel to send out demand letters, start collection actions, file complaints to bring property back into the estate, or commence foreclosure proceedings. In that regard, a motion to employ ordinary course professionals will be filed on behalf of the Debtors in the next few weeks seeking court approval to hire local counsel to commence two or more foreclosure proceedings. However, in order to move forward to employ such ordinary course professionals and to convince them to move forward on the process of foreclosure once the application for their retention is filed, adequate funding must be assured

---

1 The revised cash budget is very conservative and includes revenues only from those loans that I believe there is a

5

now to be able to move this process forward in a prompt manner. Further, given that collection costs are difficult to project, I want to make certain that there are sufficient funds available so that all of the necessary actions can be taken with respect to the non-performing loans and that Borrowers will know they cannot avoid payment by merely waiting until the Debtors run out of cash in the future.

b. The Debtors need liquidity to fund the administrative and operational expenses that are set forth in the revised budget because of the irregularity of payments on the loans from which Debtors' servicing fees and other contractual costs and fees are paid (and which the Court has approved as funding sources). While I have initiated and accelerated measures to collect unpaid interest on the nonperforming loans, and implemented improved loan servicing procedures for all of the loans being serviced by USACM, even with these operational enhancements, the regular payment streams to USACM as servicer of the loans has been disrupted because of the filing of the Debtors' bankruptcy petitions. I further believe, based on my extensive interaction with borrowers, that the lack of immediate DIP financing to insure adequate collection efforts, will only work to accelerate this disruption of regular payment streams further. Additionally, the regular payment stream has diminished due to the large number of nonperforming loans. Accordingly, the cash collections that are set forth in the revised budget are only projections. As a result, it is entirely possible the Debtors will not realize the full cash collections that are currently contemplated in the budget and are needed to fund the Debtors operational budget.

c. Currently the Mesirow team and its attorneys are diligently working to thoroughly investigate and evaluate the Debtors' files and records to

---

substantial likelihood of collection during the budget period.

6

determine, among other things, what portion of the funds held by USACM represent unpaid servicing and loan origination fees, which investors have been overpaid as a result of USACM's pre-petition practice of making regular monthly interest payments regardless of the status of the underlying loan, and which investors have been underpaid, including investors to whom principal repayments were not remitted when collateral was released pre-petition, and to propose the distribution of monies held in the Collection Account or to be collected in the future to investors in an appropriate manner under the law. I want to make certain that the Debtors have the requisite funds to accomplish these tasks which I believe in my business judgment are necessary to safeguard the interests of all Direct Lenders (including the interests of the Funds as Direct Lenders) and Fund Members.

d. The revised budget that is attached hereto as Exhibit A, contemplates that none of the pre-paid interest that is collected from borrowers will be used to fund any of the disbursements contained in the budget during the interim period covered by the interim DIP financing request. This line item was a major source of projected cash collections in prior budgets, but due to concerns expressed by the Committees, I have agreed that the collection of such funds will now be held in the Collection Account pending a determination by the Court as to the allowed use of such funds, which will be sought either in connection with a plan of reorganization or by separate motion filed after further discussion with the Committees. However, the deletion of these funds as a source of cash on the revised budget which the Debtors could use to fund operating and administrative expenses makes it more likely that the Debtors will not have a sufficient cash to fund the disbursements that are contained in the revised budget. The Debtors cannot wait until they run out of cash to seek DIP financing because then the Debtors will not be able to adequately perform under its servicing agreements, which are major assets of this estate.

7

    e. In the Forbearance and Funding Motion, it was originally contemplated that the $125,000 loan advance to Boise/Gowan 93 LLC would be made from USACM's existing operating funds. However, the Executory Contract Committee, as well as Scott Canepa, have objected to using existing operating funds to funding of the $125,000 loan to Boise/Gowan 93 LLC. Accordingly, if the DIP Financing Motion is not approved, USACM may not be able to fund the additional $125,000 needed to complete the Boise/Gowan Project, and this will result in the filing of mechanic's liens on the property, and the accrual of unpaid property taxes.

14. Court approval will also be sought by the Debtors at the June 21, 2006 hearing for the Debtors to be able to request additional funding of certain projects, at the Debtors' discretion, from CapitalSource, which shall have a ten (10) business day right of first offer on all of Debtors' remaining funding for the original construction budget with respect to existing loans as of the petition date, subject in each instance to separate bankruptcy court approval. I negotiated for this provision as part of the operating line of credit in order to have a source of funding these loans at a reasonable cost of funds to protect the existing lenders in these loans, to protect the estate against possible litigation claims if these projects are not funded, and to generate further income for the estate.

15. Each additional loan to fund future construction on existing loans will prime prior advances under the existing loan or loans, but the collateral securing each loan will be limited to the specific real estate securing that loan.

16. There are approximately seventeen (17) of the loans that are being serviced by USACM which have construction budget shortfalls (the "Construction Budget Shortfall"). The total amount of the Construction Budget Shortfall for construction or acquisition of these 17 loans (the "Shortfall Loans") is approximately $41,500,000. However, the foregoing amount does not include funding for any required interest reserve that is part of the Construction Budget Shortfall. A summary of the Shortfall Loans is attached here to as Exhibit B.

17. The Direct Lenders are involved in 14 of these loans, USA Capital Diversified Trust Deed Fund is involved in one of these loans, and USA Capital First Trust Deed Fund is

8

involved in 11 of these loans.

18. I understand that the borrowers for the Shortfall Loans requested loan funding for only a portion of the construction budgets because they wanted to avoid payment of interest on the total requisite sum for completion from the inception of the Shortfall Loans. I further understand that the borrowers for the Shortfall Loans are building their projects in stages, and seeking additional loan funding for the future stages of their projects from USACM.

19. The projects secured by the Shortfall Loans are not completed projects. I understand that most, if not all, of the Borrowers for the Shortfall Loans will need additional loan funding of up to the amount of the Construction Budget Shortfalls to complete their projects.

20. I will not extend financing for the Shortfall Loans without specific prior approval from this Court after notice to all lenders in each Shortfall Loan. I will make a determination whether to seek Court approval to fund a particular Construction Budget Shortfall from the Financing Facility based upon appraisals and other customary due diligence lending and collection standards. The lending and collection standards will be applied to each Shortfall Loan, including whether or not the particular Shortfall Loan is a nonperforming loan.

21. Court approval was recently obtained for the Debtors to engage Hilco Real Estate LLC/Hilco Real Estate Appraisal, LLC to evaluate all of the real estate collateral securing the loans being serviced by USACM. These appraisals will assist me in my determination as to whether to seek court approval to fund a particular Construction Budget Shortfall.

22. In my best business judgment, the funding of the Shortfall Loans is needed, and in fact could result in immediate and irreparable harm to the Debtors if it is not obtained, for the following reasons:

  a. Failure to provide this funding will result in the reduction of the value of the collateral securing the Shortfall Loans and/or the attachment of mechanics or other liens prior to those held by the direct lenders or the investors in these Shortfall Loans. Preliminary information indicates that failure to provide the remaining funding requirements for the Shortfall Loans could decrease the value of the collateral securing the Shortfall Loans from 14% to 100%. Based on the foregoing, funding for the Shortfall Loans is

9

necessary to maintain, protect and enhance the value of the collateral securing the Shortfall Loans.

    b. I was able to negotiate a more favorable interest rate for funding the Shortfall Loans to the extent CapitalSource was also given the opportunity to provide the revolving line of credit to the Debtors under the terms set forth in the Financing Facility. To the extent the Court does not approve the Financing Facility, it is my business judgment that I will be unlikely to obtain financing for the Shortfall Loans at the same or a better interest rate than as currently set forth in the Financing Facility.

    c. I would like to seek court approval at the July 25, 2006 hearing (after notice to proper parties in interest) to fund those Shortfall Loans that I believe need immediate additional funding, and in that regard I would like to begin working with CapitalSource to reduce the funding needed for these Shortfall Loans to a Commitment Letter. However, I will not be able to obtain a Commitment Letter from CapitalSource to fund any of the Shortfall Loans that I believe need immediate financing without first obtaining approval that CapitalSource can be the source of that funding.

23. Any additional requests for court approval of the terms set forth in the Financing Facility will be raised at the final hearing on July 25, 2006.

## THE FORBEARANCE AND FUNDING MOTION

24. On June 9, 2006, the Debtors filed the Forbearance and Funding Motion in which it seeks court approval to forbear and to provide further funding on certain outstanding loans more particularly described below.

25. On August 26, 2005, USACM as Servicer originated a loan to Borrower Boise/Gowan 93 LLC, an Idaho limited liability company. Sections 3.1 and 3.2 of the Boise/Gowan Loan Agreement dated August 26, 2005 (the "Boise/Gowan Loan Agreement") provide that the original principal amount of the Boise/Gowan Loan was to be $2,150,000, and the Direct Lenders for the Boise/Gowan Loan **and** USACM as Servicer had until August 1, 2006, the "exclusive right, but not the obligation, to increase the Loan Amount to an amount not to exceed

10

Two Million Five Hundred Fifty Thousand Dollars ($2,550,000)." A true and correct copy of the Boise/Gowan Loan Agreement is attached hereto as Exhibit "C" and incorporated herein.

26. Since August 26, 2005, there have been two amendments to the Boise/Gowan Loan Agreement, and the loan amount on the loan to Boise/Gowan 93, LLC has been increased pursuant to these amendments. The most recent amendment, the Second Amendment to Loan Documents is dated February 21, 2006, and increased the loan amount to $2,425,000. The $2,425,000 current principal balance of the loan to Boise/Gowan 93, LLC has all been disbursed to Boise/Gowan 93, LLC.

27. The rest of my factual statements and opinions relating to the loan to Boise/Gowan 93, LLC are contained in my Fourth Supplemental Declaration filed on June 14, 2006.

28. On December 18, 2002, USACM as Servicer originated a loan (the "Amesbury Loan") to Borrower Amesburyport Corporation, a Massachusetts corporation ("Amesburyport"). The Amesbury Loan was made to Amesburyport for the renovation of nine old factory buildings located in Amesbury, Massachusetts, and conversion of the buildings into condominium units.

29. The last three condominiums from Phase I of the Amesbury Project are currently under contract at list price. All of the other condominiums in Phase I have been sold. Amesburyport has requested that USACM as Servicer consent to the sales of the last three condominium units and issue Partial Releases for these units. The estimated net proceeds from these sales are approximately $500,000 per unit, for an estimated return to USACM as Servicer of approximately $1,500,000 for the three units. The pending sales appear to be at pricing that is at the top of the comparable range for other condominium units in the area.

30. Once the last three condominium units are sold, the remaining collateral for the Amesbury Loan has an estimated value that is less than the remaining amount that would be due on the Amesbury Loan. Deficiency claims against the Guarantor of the Amesbury Loan will also be pursued, but the possible recovery from the Guarantor is currently uncertain.

31. It is my best business judgment that USACM as Servicer should consent to the sales of the last 3 condominium units in Phase I of the Amesbury Project and issue Partial Releases for these 3 units in exchange for net sale proceeds for these 3 units. Even though the Amesbury Loan is a nonperforming loan, and it appears that the Amesbury Loan may not be fully

11

collectible, it is prudent to realize the top of the price range for these three condominiums that are currently under contract, rather than allow the current sales contracts to fall through. If these sales are not timely closed, the Direct Lenders on the Amesbury Loan may not only lose full price sales, but it is my business judgment that failed sale transactions will impair the ability to sell these three units for full price in the future.

32. On December 19, 2003, Debtor USA Capital Diversified Trust Deed Fund, LLC as a 100% Direct Lender entered into a loan (the "HFA Monaco Loan") to HFAH-Monaco, LLC, a Florida limited liability company ("HFA Monaco"). The HFA Monaco Loan is secured by a first lien Trust Deed on real property and improvements, dated December 19, 2003 and recorded in Lee County, Florida (the "HFA Monaco Trust Deed"). The maturity date of the HFA Monaco Loan has been extended to December 19, 2006. However, the HFA Monaco Loan is a nonperforming loan in that interest payments have not been made as required and are past due.

33. On January 6, 2005, USACM originated a loan (the "HFAH Clear Lake Loan") to HFAH Clear Lake, LLC, a Florida limited liability company ("HFAH Clear Lake"). The HFAH Clear Lake Loan is secured by a first lien Trust Deed on real property and improvements, dated January 6, 2005 and recorded in Palm Beach County, Florida on January 21, 2005 (the "HFAH Clear Lake Trust Deed"). The maturity date of the HFAH Clear Lake Loan has been extended to January 7, 2007. However, the HFAH Clear Lake Loan is a nonperforming loan in that interest payments have not been made as required and are past due.

34. On June 24, 2005, USACM originated a second loan (the "HFAH Clear Lake 2nd Loan") to HFAH Clear Lake. The HFAH Clear Lake 2nd Loan is secured by a second lien Trust Deed on the same real property and improvements that secures the HFAH Clear Lake Loan, as evidenced by a Mortgage (Second Position) dated June 24, 2005 and recorded in Palm Beach County, Florida on July 28, 2005 (the "HFAH Clear Lake 2nd Trust Deed"). The HFAH Clear Lake 2nd Loan matures on July 1, 2006. The HFAH Clear Lake 2nd Loan is a Nonperforming Loan in that interest payments have not been made as required and are past due.

35. The business records of USACM indicate that on August 30, 1999, Enterprise Capital, Inc., now known as Independence Bank, an entity unrelated to the Debtors, made a loan to Windham Mills Development Corporation ("Windham"), secured by a Mortgage on real property

12

owned by Windham (the "Windham Loan"). The business records of USACM indicate that on or about September 24, 2004, at a time when the Windham Loan was in default, Homes for America Holdings, Inc. ("HFAH") purchased all of the rights of Independence Bank in the Windham Loan, including all collateral documents. On or about November 15, 2004, USACM originated a loan (the "HFAH Windham/Asylum Loan") to enable HFAH to purchase the position of Independence Bank in the Windham Loan. According to the records of USACM, the HFAH Windham/Asylum Loan matures on June 16, 2006. However, the HFAH Windham/Asylum Loan is a nonperforming loan in that interest payments have not been made and are past due.

36. USACM also originated three other loans to HFAH or its affiliates. In May of 2006, these three HFA loans were paid in full by the borrowers through a refinancing, prior to the stated maturity of these loans, and the loan repayment proceeds were delivered to USACM as Servicer. Specifically, HFA Riviera repaid in full a loan owed to 90 non-Debtor Direct Lenders by paying the principal sum of $5,000,000, plus interest in the amount of $767,361. HFA North Yonkers (One Point Street, Inc.) repaid in full a loan owed to Debtor First Trust Deed Fund as a Direct Lender and 298 other non-Debtor Direct Lenders by paying the principal sum of $24,000,000, plus interest in the amount of $4,168,403. HFA Riviera also repaid in full a loan owed to 99 non-Debtor Direct Lenders by paying the principal sum of $8,000,000, plus interest in the amount of $2,698,080.

37. In connection with the arrangements for the HFA borrowers to make these early payments in full, USACM as Servicer agreed, dependent upon approval of the Bankruptcy Court (if such action were deemed to not be an ordinary course of business transaction), to forbear from declaring a default and to forbear from exercising remedies on the HFA Monaco Loan, the HFAH Clear Lake, the HFAH Clear Lake 2nd Loan and the HFAH Windham/Asylum Loan (the "Four HFA Loans"), until January 1, 2007, even though the Four HFA Loans are nonperforming loans. No claims are being released or waived against the Borrowers or any Guarantors of the Four HFA Loans. The Borrowers for the Four HFA Loans requested this forbearance to facilitate the refinancing of the Four HFA Loans or the sale of the collateral for the Four HFA Loans to allow them to be repaid, which these Borrowers have indicated they hope to have accomplished by the end of 2006.

13

38. It is my best business judgment that the requested forbearance for the Four HFA Loans should be given, with any additional terms (such as completing the documentation of the HFAH Windham/Asylum Loan, if necessary) for such forbearance to be imposed as determined by me in my business judgment (provided, that no claims will be released or waived against the Borrowers or any Guarantors of the Four HFA Loans in connection with such forbearance).

**THE NON-REPRESENTATIVE COMMITTEE MEMBER MOTION**

39. On June 9, 2006, Debtors filed the Non-Representative Committee Member Motion pursuant to which it seeks to remove Fertitta Enterprises as a member of the Executory Contracts Committee.

40. With regard to the Non-Representative Committee Member Motion, the document attached as Exhibit B thereto is a true and correct copy of the preliminary Loan Summary prepared as of May 26, 2006 by the Mesirow team under my direction (the "Loan Summary"). The Loan Summary, which was filed with the Court on May 31, 2006, provides several columns of preliminary information for each loan serviced by USACM.

41. Attached as Exhibit C to the Non-Representative Committee Member Motion is a true and correct copy of a spreadsheet entitled "Hasley Canyon" (the "Hasley Canyon Spreadsheet") obtained from records kept in the course of USACM's regular pre-petition business activity that lists, among other things, the names of the direct lenders on the Hasley Canyon (a/k/a Los Valles Land & Golf, LLC) loan, the amount invested by each direct lender, and a percentage rate of interest for each direct lender. The Hasley Canyon Spreadsheet shows an interest rate of 17.0% for all direct lenders on the Hasley Canyon loan except for Fertitta Enterprises, Inc. ("Fertitta"), which is listed with a higher interest rate of 18.0%.

42. Attached as Exhibit D to the Non-Representative Committee Member Motion is a true and correct copy of a spreadsheet entitled "Tapia Ranch" (the "Tapia Ranch Spreadsheet") obtained from records kept in the course of USACM's regular pre-petition business activity that lists, among other things, the names of the direct lenders on the Tapia Ranch (a/k/a Castaic Partners, LLC) loan, the amount invested by each direct lender, and a percentage rate of interest for each direct lender. The Tapia Ranch Spreadsheet shows an interest rate of 12.50% for all direct lenders on the Tapia Ranch loan except for Fertitta Enterprises, Inc. ("Fertitta"), which is

listed with a higher interest rate of 13.0%.

43. Attached as Exhibit E to the Non-Representative Committee Member Motion is a true and correct copy of the "Agreement" executed by Fertitta and USACM purporting to grant Fertitta a 26.35% share of USACM's exit fee pertaining to the Hasley Canyon loan. The Agreement is dated March 10, 2004, but states that the loan agreement and promissory note for the Hasley Canyon loan were dated earlier, on March 3, 2004.

44. Attached as Exhibit F to the Non-Representative Committee Member Motion is a true and correct copy of the "Agreement" executed by Fertitta and USACM purporting to grant Fertitta a 22.73% share of USACM's exit fee pertaining to the Tapia Ranch loan. The Agreement is dated September 28, 2004, but states that the promissory note for the Tapia Ranch loan was dated earlier, on September 24, 2004.

45. Upon learning of the higher interest rates for Fertitta according to the Hasley Canyon Spreadsheet and the Tapia Ranch Spreadsheet, I directed Mesirow to review additional records kept in the course of USACM's pre-petition business activity to verify whether Fertitta actually received interest payments calculated at higher rates on the Hasley Canyon and Tapia Ranch loans in comparison to other direct lenders on those loans. Attached hereto as Exhibit D is a summary spreadsheet prepared by Mesirow under my direction verifying that for the sample months of January, February, and March, 2006, Fertitta did in fact receive interest payments calculated at an 18% annual interest rate on the Hasley Canyon loan and at a 13% annual interest rate on the Tapia Ranch loan, and that other direct lenders on those same loans received lower interests rates of 17.0% and 12.5%, respectively. Additionally, copies of Interest Statements sent by USACM to Fertitta and to a sampling of other direct lenders in the Hasley Canyon and Tapia Ranch loans interest payments for February 2006 and October 2006 obtained from USACM's business records are attached hereto as Exhibit E, verifying that Fertitta received higher rates of interest than was paid to other direct lenders on those two loans, consistent with the Hasley Canyon Spreadsheet and the Tapia Ranch Spreadsheet.

46. USACM's pre-petition business records and accounting systems indicate that Fertitta received approximately $2.1 million in interest payments from USA that had not been collected from the borrowers. Based on Mesirow'w reconstruction of the loan records and

allocation of payments to interest, fees and principal according to the loan documents, the amount of pre-paid interest to Fertitta as re-calculated by Mesirow is approximately $588,000.

47. For the reasons stated above, based on my business judgment as the Chief Restructuring Officer of these Debtors and of USACM in particular, Fertitta does not adequately represent the interests of the direct lenders who are the true creditors of USACM because their principal repayments were diverted pre-petition and who have the most to lose or gain by the success of the Debtors' reorganization efforts.

**THE INVESTMENT PARTNERS MOTION**

48. On June 9, 2006, the Debtors filed the Investment Partners Motion in which it seeks court approval of the agreement that was entered into with Investment Partners.

49. With respect to the Investment Partners Motion, the investigation into the complex financial and business transactions pre-petition is ongoing and the Debtors are unsure of the final allocation between the Debtors of the amounts identified and included in the Promissory Note and Security Agreement owing by Investment Partners which are the subject of the Investment Partners Motion.

50. As evidenced by the pre-petition books and records of the Debtors, significant funds were distributed from USA to Investment Partners resulting in a large receivable owing USA.

51. Investment Partners transferred the funds it received from the Debtors to various entities, including but not limited to the limited liability companies identified in the Security Agreement in which Investment Partners was a member.

52. Investment Partners advanced these funds to various entities to fund the construction of various developments. When completed, these developments would then be sold and the funds previously advanced by Investment Partners would be presumably be repaid.

53. Based on my due diligence conducted on the Investment Partners assets to date, I believe that the greatest value for these developments is obtained when they are sold upon completion, so that the Debtors decision not to pursue immediate collection of the debts owing results in increased benefit to the Debtors' estates by maximizing the return to the respective LLC.

54. Furthermore, several of the development projects funded by Investment Partners

are near completion and will be sold in the next 60-90 days. By agreeing not to immediately pursue collection and having the Promissory Note and Security Agreement in place, I believe the Debtors will maximize the value of the collateral securing the repayment of the Promissory Note and likewise maximize the recovery to the Debtors' estates both under the Promissory Note and Security Agreement and on any other claims the Debtors' estates may have and independently pursue against Investment Partners.

55. To best my knowledge, Investment Partners has no real property assets which could provide additional security for the amounts owing Debtors, under the Promissory Note or otherwise. Indeed, Investment Partners' only assets, to my best knowledge, are its membership interests in various limited liability companies, including those identified in the Security Agreement. In negotiating this Promissory Note and Security Agreement, I have been careful not to affect the Debtors' rights to pursue any other claims the Debtors or any of them may have against Investment Partners.

Executed this 20th day of June, 2006.

_____
Thomas J. Allison

880048 01