# EXHIBIT "1"

Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

**E-FILED on May 30, 2006**

and

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone:  (702) 228-7590
Facsimile:  (702) 892-0122
E-Mail:  bkfilings@s-mlaw.com

Attorneys for Debtors and Debtors-in-Possession

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br><div align=right>Debtor.</div> | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br><div align=right>Debtor.</div> | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR<br><br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br><div align=right>Debtor.</div> | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br><div align=right>Debtor.</div> | **MOTION FOR ORDER APPROVING CONTINUED USE OF CASH THROUGH JULY 29, 2006 PURSUANT TO SECOND REVISED BUDGET** |
| In re:<br>USA SECURITIES, LLC,<br><div align=right>Debtor.</div> | **(AFFECTS ALL DEBTORS)** |
| Affects:<br>☒  All Debtors<br>☐  USA Commercial Mortgage Company<br>☐  USA Securities, LLC<br>☐  USA Capital Realty Advisors, LLC<br>☐  USA Capital Diversified Trust Deed Fund, LLC<br>☐  USA First Trust Deed Fund, LLC | Date:  June 21, 2006<br>Time:  9:30 a.m. |

1

USA Commercial Mortgage Company ("USA"), USA Securities, LLC, USA Capital Realty Advisors, LLC, USA Capital Diversified Trust Deed Fund, LLC, and USA Capital First Trust Deed Fund, LLC (collectively, the "Debtors") hereby move the Court for an order approving the Debtors' continued use of cash through the week ending July 29, 2006, pursuant to a second revised cash budget which the Debtors will file on or before June 5, 2006.

**POINTS AND AUTHORITIES**

**Facts**

1. The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on April 13, 2006. By order entered June 9, 2006, the Court approved the joint administration of the Debtors' bankruptcy cases.

2. On April 14, 2006, the Debtors filed their Motion for Order Approving Debtors' Proposed Cash Management Procedures and Interim Use of Cash (the "Cash Motion"), attached hereto as **Exhibit "1",** which sought, among other things, approval of the Debtors' limited use of cash for a limited 90-day period, through approximately July 15, 2006, as set forth in the cash budget (the "Initial Budget") attached as Exhibit A to the Cash Motion.

3. On April 19, 2006, the Court entered an Interim Order approving the Cash Motion and the Debtors' interim use of cash for the purposes and on the terms set forth in the Cash Motion and the Initial Budget until May 3, 2006, when the Cash Motion was to be considered further at a hearing.

4. Several objections to the Cash Motion were filed on or before the May 3, 2006 hearing date.

5. On May 2, 2006, the Debtors filed a Reply Brief (the "Reply"), attached hereto as **Exhibit "2"** and a Supplemental Declaration of Thomas J. Allison (the "Supplemental Declaration"), attached as **Exhibit "3"**, in support of the Motion, including a revised cash budget (the "First Revised Budget") attached as Exhibit B to the Supplemental Declaration.

6. At the May 3, 2006 hearing, the Court approved the Cash Motion and the limited use of cash to the extent and for the purposes reflected in the First Revised Budget through July 16, 2006. The Court's order granting this relief was entered on May 22, 2006 (the "Cash Usage

2

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   Order").

2           7.      Although the Debtors' authority to use cash pursuant to the Cash Usage Order

3   presently expires on July 16, 2006, the Debtors will have a continuing need to use cash beyond

4   that date to complete the loan and investor account reconciliations and analyses, and the other

5   important administrative tasks they are performing, as described in the Cash Motion, the Reply,

6   and the Supplemental Declaration.  Future hearings in the Debtors cases have been set for June 5,

7   2006, June 21, 2006, and July 25, 2006, and the Debtors understand that the Court is not available

8   to conduct any hearings in these cases between June 21, 2006 and July 25, 2006.  Therefore, in

9   order for the Debtors to have authority to use cash after July 16, 2006 and through the next

10  available hearing date of July 25, 2006 hearing,[1] the Debtors request that the Court approve the

11  additional use of cash to the extent and for the purposes set forth in the second revised budget (the

12  "Second Revised Budget") which the Debtors will file on or before June 5, 2006.

13          8.      The Initial Budget and the Revised Budget contemplated that only one official

14  committee would be formed in the Debtors' cases.  Subsequently, however, four separate official

15  committees have been appointed in these cases, and although it first appeared that three of the

16  committees intended to share one set of professionals, it now appears that each of the four

17  committees intends to hire its own separate professionals.  Thus, with four separate committees

18  and separate sets of professionals serving each committee, the administrative costs that the

19  Debtors' estates must bear will be substantially increased and the Debtors will need to

20  substantially revise various aspects of their cash budget for the coming weeks.  Therefore,

21  although the Debtors need to file this motion at this time to ensure that it will be heard on June 21,

22  2006, the Debtors have not yet completed their work on the Second Revised Budget and will file it

23  by no later than June 5, 2006.

24

25

26  _____

27  [1] This motion requests authority to use cash through the week ending July 29, 2006, to provide a few extra days after
    the July 25, 2006 hearing to allow for the entry of any order respecting further cash usage that may be entered based
    on the Court's rulings at the July 25, 2006 hearing. July 25, 2006 is also the hearing at which the Court will consider
28  the continued employment of Thomas Allison, Mesirow Financial and Debtors' counsel.

3

1

2

3

4

5

6

7

8

9

10

11

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF LAW

The legal basis for the present motion is set forth in the Cash Motion, the Reply, the Supplemental Declaration, and also in other documents on file with the Court, including USA's Motion to Temporarily Hold Funds Pending a Determination of the Proper Recipients ("Motion to Hold Funds") attached hereto as **Exhibit "4"** and filed May 8, 2006, which are documents incorporated herein by reference.  As with the original Cash Motion, this motion seeks only permission to use funds the Debtors are contractually entitled to collect and use.  The Debtors are not seeking permission to use any funds being held in the separate DIP Investor Account, and are only seeking to use funds in the separate DIP Collection Account to the extent approved by the Court and to the extent that Debtors have contractual rights to collect servicing fees and other fees and costs.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that Court approve the continuing use of cash in the Debtors' estates through the week ending July 29, 2006, to the extent and for the purposes set forth in the Second Revised Budget to be filed by the Debtors by June 5, 2006.

Respectfully submitted this 30th day of May, 2006.

_/s/    LENARD E. SCHWARTZER_
Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146

and

Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385

4

# EXHIBIT "1"

Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

**E-FILED ON APRIL 14, 2006**

and

Lenard E. Schwartzer
Nevada Bar No. 0399
Jeanette E. McPherson
Nevada Bar No. 5423
Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com
Attorneys for Debtors

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>USA COMMERCIAL MORTGAGE COMPANY,<br><br>Debtor. | Case Nos. BK-S-06-10725 LBR<br>Case Nos. BK-S-06-10726 LBR<br>Case Nos. BK-S-06-10727 LBR<br>Case Nos. BK-S-06-10728 LBR<br>Case Nos. BK-S-06-10729 LBR |
| In re:<br><br>USA CAPITAL REALTY ADVISORS, LLC,<br><br>Debtor. | Chapter 11 |
| In re:<br><br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br><br>Debtor. | **MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 345, AND 363 APPROVING DEBTORS' PROPOSED CASH MANAGEMENT PROCEDURES AND INTERIM USE OF CASH IN ACCORDANCE WITH PROPOSED CASH BUDGET** |
| In re:<br><br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br><br>Debtor. | |
| In re:<br><br>USA SECURITIES, LLC,<br><br>Debtor. | |
| Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA First Trust Deed Fund, LLC | Date:<br>Time: |

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

C:\temp\OLK2S\Motion Re Cash Management v3 - 041406.DOC

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    USA Commercial Mortgage Company ("USACM"), on behalf of itself and its affiliated

2    debtors, which are USA Securities, LLC ("USAS"), USA Capital Realty Advisors, LLC

3    ("USARA"), USA Capital Diversified Trust Deed Fund, LLC ("Diversified Fund"), and USA

4    Capital First Trust Deed Fund, LLC ("First Deed Fund") (collectively, the "Debtors"), hereby

5    moves the Court for an order under 11 U.S.C. §§ 105(a), 345, and 363 approving the Debtors'

6    proposed cash management procedures and interim use of cash in accordance with the proposed

7    cash budget for the first 90 days of this case, which budget is attached hereto as **Exhibit A**.  This

8    Motion seeks immediate entry of an order approving cash management procedures and the use of

9    cash for the later of the first 7 days of the case or until a hearing on interim use of cash is held and,

10    after notice and a hearing, a further order approving the cash management procedures and the use

11    of cash for the first 90 days of the case.   In support of this Motion, USACM represents as follows:

## FACTUAL BACKGROUND

13    1.    The Declaration of Thomas J. Allison ("Allison") provides background information

14    concerning the Debtors, their current status and problems (including substantial commingling of

15    funds, which is also discussed below), and the pressing need for the limited use of cash to preserve

16    the value of the loan portfolio serviced by USACM for the benefit of all creditors of and investors

17    in the Debtors as a unified enterprise.

18    2.    Allison, who upon the filing of the bankruptcy petitions was installed as the new,

19    independent management for each of the Debtors, now serves as the sole Manager of the four

20    Debtors who are limited liability companies (USAS, USARA, Diversified Fund, and First Deed

21    Fund), and as the president of the corporate debtor USACM, with full authority to oversee the

22    restructuring and reorganization of the Debtors' unified business enterprise.  Prior to the petition

23    date, Allison and other restructuring professionals from Mesirow Financial had an opportunity,

24    although limited, to investigate the facts and circumstances surrounding the Debtors, their joint

25    business enterprise, and their books and records.  Therefore, although the representations and

26    conclusions stated in this Motion and in the related papers filed herewith are of necessity

27    preliminary in nature, the Debtors, acting through Allison as their new chief restructuring officer,

28    strongly believe that the relief requested in this Motion is warranted and is in the best interest of

C:\temp\OLK2S\Motion Re Cash Management v3 - 041406.DOC

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    all parties in interest.

2        3.        As of the bankruptcy petition date, USACM was the servicer for a loan portfolio of

3    approximately 100 open commercial mortgage loans (the "Loan Portfolio"). A substantial portion

4    of the loans in the Loan Portfolio have been divided into fractionalized shares that are held by

5    many different noteholders. The noteholders of the loans in the Loan Portfolio fall into three main

6    categories: (1) Diversified Fund holds a 100% interest in some of the loans, and only

7    fractionalized shares in some others; (2) First Deed Fund holds a 100% interest in some of the

8    loans, and only fractionalized shares in some others; and (3) various groups of individual investors

9    hold 100% interests in some of the loans, and only fractionalized shares in many others. Of the

10   approximately 100 loans in the Loan Portfolio, approximately 20 are owned 100% by Diversified

11   Fund and/or First Deed Fund (collectively, the "Funds"), approximately 30 others are owned

12   100% by various groups of investors not including the Funds, and the remaining approximately 50

13   loans are held in fractional shares by one or both of the Funds along with various groups of

14   individual investors.

15       4.        There are approximately 1,900 members owning the membership interests in the

16   Diversified Fund, approximately 1,300 members owning the membership interests in the First

17   Deed Fund, and approximately 3,600 direct investors (other than the Funds) who own fractional

18   shares of various loans in the Loan Portfolio, with substantial overlap among the members of the

19   Funds and the individual investors holding direct investments in loans within the Loan Portfolio.

20   In other words, a substantial number of the 3,600 individual investors who directly hold the

21   portions of the Loan Portfolio that are not owned by either of the Funds are the same individuals

22   who also invested indirectly in the Loan Portfolio by purchasing membership interests in one or

23   both of the Funds.

24       5.        Prior to April 2006, the individual holders of the direct interests in the notes in the

25   Loan Portfolio and the individual owners of the membership interests in the Funds (collectively,

26   the "Investors"), received interest payments from the Debtors each month—whether or not the

27   interest payments had been collected from the borrowers on the loans in the Loan Portfolio.

28   Furthermore, it appears that when borrowers paid down principal or paid off loans within the Loan

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Portfolio, the principal payments received by USACM as loan servicer were not returned to the

2    borrowers but were held and used in some cases to fund interest payments to Investors holding

3    interests in non-performing loans.

4         6.     Based on payments made to Investors whether or not they were entitled to receive

5    payments, and based on loans being paid off and collateral being released without the loan-payoff

6    amounts being remitted to Investors, many or most of the Investors probably owe money to or are

7    owed money by the Debtors, or both.  However, because the Debtors' financial records did not

8    accurately match the receipts of loan payments and disbursements of funds to Investors, and

9    because funds were commingled in various accounts, it is difficult to determine the actual amounts

10   owed to and/or owed by each Investor.  Under new management, the Debtors believe that the cash

11   management procedures proposed in this Motion affords the Debtors the best chance of sorting out

12   these issues as quickly as possible under the circumstances, and of preserving the value of the

13   Loan Portfolio for the benefit of all Investors.

14        7.     Some of the loans in the Loan Portfolio are construction and/or development loans

15   in which there are ongoing funding commitments.  If remaining committed amounts are not

16   funded for these loans, collecting the outstanding loan balance on these loans for the benefit of

17   Investors may become much more difficult.  It appears that such loans are held in the portion of

18   the Loan Portfolio held by the Funds as well as in the portion held only by the direct Investors.

19        8.     It appears that non-performing loans exist in the portion of the Loan Portfolio held

20   by the Funds as well as in the portion held only by the direct Investors.  Limited collection activity

21   appears to have taken place on these non-performing loans.  Collecting the outstanding interest

22   and matured principal is a top priority in preserving value for all Investors.

23        9.     It appears that prior to April 2006, USACM as servicer for the entire Loan Portfolio

24   did not carefully distinguish between the loans that were held directly by the Funds and the loans

25   in which the Funds had no interest.  USACM and the other Debtors apparently treated all Investors

26   and the entire Loan Portfolio as if they were part of a single business enterprise.

27        10.    As servicer for the entire Loan Portfolio, USACM was contractually entitled to

28   collect a serving fee from the incoming loan payments, but apparently did not regularly collect the

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  fee.

2  11.    Although separate bank accounts exist for each of the five Debtors, funds received

3  by the Debtors from interest, loan payments and loan payoffs were commingled primarily into a

4  "Collection Trust Account" held in the name of USACM, and funds from this bank account were

5  used to make monthly interest payments to Investors as well as to fund the ongoing operations and

6  overhead of the Debtors' joint business enterprise.  The separate bank accounts of the Funds were

7  used as disbursement vehicles for interest payments to the Fund investors.  USACM maintains

8  operational bank accounts for operating expenses, loan closings and other business purposes.  The

9  bank accounts of the other Debtors were rarely used. A list of bank accounts is attached as **Exhibit**

10 **B**.  **Exhibit C** is a diagram which shows how the Debtors used a collection account and an

11 investor account to collect from all borrowers no matter which party had made the loan and no

12 matter which entity was making the loans.

### PROPOSED CASH MANAGEMENT PROCEDURES

14     In order to preserve the value of the Loan Portfolio for the benefit of all Investors, and to

15 provide the Debtors, which are under new management, with a limited period of time and limited

16 funds to promptly investigate and sort out the issues that need to be immediately addressed

17 relating to the Loan Portfolio and the accounts of each of the Investors, the Debtors proposed the

18 following cash management procedures:

19     a.    The Debtors will establish a new, Debtor-In-Possession bank account (the "DIP

20 Collection Account") at Wells Fargo Bank that will have the ability to accept "lock-box"

21 payments from the borrows on the loans within the Loan Portfolio (the "Borrowers").

22     b.    The Debtors will maintain the so-called "Collection Trust Account" of USACM at

23 Wells Fargo Bank (the "Collection Account") to facilitate the continuing receipt of wire transfer

24 payments from the Borrowers.  This account receives all interest and principal payments from the

25 loans for which USACM serves as servicing agent.  Most of these payments are made

26 electronically by the borrowers.  Closing this account would require all borrowers to alter or

27 modify their wiring instructions which could result in delays in expected cash flow, as well as

28 miscommunication on the application of funds received.  Loan Payments, loan payoffs, and all

C:\temp\OLK28\Motion Re Cash Management v3 - 041406.DOC

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   other amounts existing or received into the Collection Account will be transferred promptly to the

2   DIP Collection Account.  As of the petition date, Wells Fargo will be instructed to reject all

3   checks, wires and ACHs presented for payment from this account and the Debtors will cease all

4   electronic payments from this account.

5         c.     The Debtors will maintain detailed records concerning the source (including

6   identification of the specific borrow and specific loan to which the payment relates, if applicable)

7   of each payment coming into the Collection Account and the DIP Collection Account.

8         d.     USACM maintains an operating account at Wells Fargo Bank from which ADP

9   will draw the necessary payroll funds on April 17.  In addition, that account is set up to receive

10   certain wire transfers.  While the Debtors will open a separate "DIP Operating Account" from

11   which the business and administrative expenses of the Debtors will be paid, it will not be possible

12   to transfer the ADP ACH payment to a new account prior to the payroll date.  Accordingly, the

13   Debtors request permission to allow existing operating account at Wells Fargo to remain open,

14   with instructions to the bank to refuse to honor checks, and allow the deposit of funds for this

15   current payroll cycle and the ACH withdrawal by ADP.  It is anticipated that the transfer of ADP

16   instructions to the DIP Operating Account will be completed before the following payroll cycle,

17   allowing the closure of the existing operating account.

18         e.     All other bank accounts that exist in the name of any of the Debtors will be closed,

19   and the funds will be transferred to a respective DIP Account, so that each Debtor maintains a DIP

20   account.  The only bank accounts which are anticipated to have funds for these Debtors will be the

21   DIP Collection Account, the Collection Account, and the DIP Operating Account (collectively the

22   "DIP Accounts").

23         f.     The aggregate amount of the line items in the cash budget attached hereto as

24   **Exhibit A** (the "Budget") for each week will be transferred from the DIP Collection Account to

25   the DIP Operating Account, to be used only for payment of the expenses and costs set forth in the

26   Budget to the extent approved by the Court.  The Budget anticipates that operating expenses will

27   be required in order to (a) continue servicing the loan portfolio; (b) analyze and investigate the

28   amounts owed to or from each Investor; (c) collect amounts due from borrowers including

1  commencing foreclosure proceedings or other collection expenses.  These necessary activities will

2  inure to the benefit of all Investors in maintaining the value of the Loan Portfolio and in

3  determining the proper amounts due to and from all Investors.

4      g.      All rights, if any, of the Investors, including indirect rights as members of the

5  Funds and direct rights as holders of other notes (or fractional interests in notes) in the Loan

6  Portfolio or in the proceeds thereof will attach to the DIP Accounts except that the amounts in the

7  Court-approved budget may be transferred to the DIP Operating Account as set forth above for the

8  benefit of all Investors.

9                          **CONCLUSION**

10     Based on the foregoing, the Debtors respectfully request this Court to approve the Debtors'

11  proposed cash management procedures and interim use of cash in accordance with the proposed

12  budget, for such purposes and on such terms as set forth herein.

13     Respectfully submitted this ___ day of April, 2006.

14

15                          _____
                            Annette W. Jarvis, Utah Bar No. 1649
16                          RAY QUINNEY & NEBEKER P.C.
                            36 South State Street, Suite 1400
17                          P.O. Box 45385
                            Salt Lake City, Utah 84145-0385
18
19                          and
20
                            Lenard E. Schwartzer
21                          Nevada Bar No. 0399
                            Jeanette E. McPherson
22                          Nevada Bar No. 5423
                            Schwartzer & McPherson Law Firm
23                          2850 South Jones Boulevard, Suite 1
                            Las Vegas, Nevada  89146-5308
24
25                          Attorneys for Debtors
26
27
28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# EXHIBIT A

USA Commercial Mortgage Company, et al.
13-Week Cash Forecast
($ in thousands)

13-Week Cash Forecast

| | | | | | | | Week Ending | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4/22/2006 | 4/29/2006 | 5/6/2006 | 5/13/2006 | 5/20/2006 | 5/27/2006 | 6/3/2006 | 6/10/2006 | 6/17/2006 | 6/24/2006 | 7/1/2006 | 7/8/2006 | 7/15/2006 |
| **Cash Receipts** | | | | | | | | | | | | | |
| *USA Commercial Mortgage - Wells Fargo* | | | | | | | | | | | | | |
| Loan Closing Fees | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $900.0 | $0.0 | $0.0 |
| Extension Fees | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Other Income | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 26.6 | 0.0 | 0.0 |
| Total Cash Receipts (USA/CMC - Wells Fargo) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $926.6 | $0.0 | $0.0 |
| *USA Commercial Mortgage - LaSalle* | | | | | | | | | | | | | |
| Loan Closing Fees - Perm | $25.0 | $0.0 | $7.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Appraisal revenue - Perm | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Cash Receipts (USA/CMC - LaSalle) | $25.0 | $0.0 | $7.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| *Collections Trust Account* | | | | | | | | | | | | | |
| Estimated Interest Return | $0.0 | $0.0 | $0.0 | $5,895.7 | $0.0 | $0.0 | $0.0 | $5,623.2 | $0.0 | $0.0 | $0.0 | $0.0 | $5,648.8 |
| Expected Returned Principal | 0.0 | 0.0 | 0.0 | 4,828.0 | 0.0 | 0.0 | 26,950.0 | 0.0 | 10,679.1 | 23,663.7 | 0.0 | 0.0 | 0.0 |
| Expected Outstanding Fee Return | 0.0 | 0.0 | 0.0 | 146.3 | 0.0 | 0.0 | 222.8 | 0.0 | 314.0 | 332.0 | 0.0 | 0.0 | 0.0 |
| Expected Outstanding Interest Return | 0.0 | 0.0 | 0.0 | 813.2 | 0.0 | 0.0 | 994.5 | 0.0 | 57.4 | 20.4 | 0.0 | 0.0 | 0.0 |
| Expected Cash Collections | $0.0 | $0.0 | $0.0 | $11,683.2 | $0.0 | $0.0 | $28,077.2 | $5,623.2 | $11,050.6 | $24,024.1 | $0.0 | $0.0 | $5,648.8 |
| Total Cash Receipts - Filed Entities | $25.0 | $0.0 | $7.0 | $11,683.2 | $0.0 | $0.0 | $28,077.2 | $5,623.2 | $11,050.6 | $24,024.1 | $926.6 | $0.0 | $5,648.8 |
| **Cash Disbursements** | | | | | | | | | | | | | |
| *USA Commercial Mortgage - Wells Fargo* | | | | | | | | | | | | | |
| Total Swing Expense | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $6.9 | $0.0 | $0.0 |
| *Administrative Expenses* | | | | | | | | | | | | | |
| Salaries & Wages | 203.6 | 0.0 | 80.0 | 0.0 | 77.8 | 0.0 | 0.0 | 80.0 | 0.0 | 77.8 | 0.0 | 80.0 | 0.0 |
| Payroll Related Benefits | 14.5 | 0.0 | 27.9 | 0.0 | 14.5 | 0.0 | 13.4 | 14.5 | 0.0 | 14.5 | 13.4 | 14.5 | 0.0 |
| Rent | 0.0 | 0.0 | 57.1 | 0.0 | 0.0 | 0.0 | 57.1 | 0.0 | 0.0 | 0.0 | 57.1 | 0.0 | 0.0 |
| Total Legal | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 3.9 | 3.9 | 3.9 | 3.9 |
| Total Other Administrative Expenses | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 |
| Total Administrative Expenses | $258.0 | $40.0 | $205.0 | $40.0 | $132.3 | $40.0 | $110.5 | $134.5 | $40.0 | $136.2 | $114.4 | $138.4 | $43.9 |
| Total Other Expense | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $2.9 | $0.0 | $0.0 | $0.0 |
| Total Cash Disbursements (USA CMC - Wells Fargo) | $258.0 | $40.0 | $205.0 | $40.0 | $132.3 | $40.0 | $110.5 | $134.5 | $40.0 | $136.2 | $124.1 | $138.4 | $43.9 |
| *USA Capital Realty Advisers* | | | | | | | | | | | | | |
| Marketing | $3.7 | $3.7 | $3.7 | $3.7 | $3.7 | $3.7 | $3.7 | $3.7 | $3.7 | $3.7 | $3.7 | $3.7 | $3.7 |
| Total Legal | 5.7 | 5.7 | 5.7 | 5.7 | 5.7 | 5.7 | 5.7 | 5.7 | 5.7 | 5.7 | 5.7 | 5.7 | 5.7 |
| Total Other | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 |
| Total Cash Disbursements (USA Capital Realty) | $12.1 | $12.1 | $12.1 | $12.1 | $12.1 | $12.1 | $12.1 | $12.1 | $12.1 | $12.1 | $12.1 | $12.1 | $12.1 |
| Total Cash Disbursements - Filed Entities | $270.1 | $52.1 | $217.1 | $52.1 | $144.4 | $52.1 | $122.6 | $146.6 | $52.1 | $148.3 | $136.2 | $150.5 | $55.0 |
| **Net Change in Cash USA Commercial Mortgage Related Entities** | | | | | | | | | | | | | |
| Total Cash Receipts | $25.0 | $0.0 | $7.0 | $11,683.2 | $0.0 | $0.0 | $28,077.2 | $5,623.2 | $11,050.6 | $24,024.1 | $926.6 | $0.0 | $5,648.8 |
| Total Cash Disbursements | 270.1 | 52.1 | 217.1 | 52.1 | 144.4 | 52.1 | 122.6 | 146.6 | 52.1 | 148.3 | 136.2 | 150.5 | 56.0 |
| Net Change in Cash Before Bankruptcy Related Fees | ($245.1) | ($52.1) | ($210.1) | $11,631.1 | ($144.4) | ($52.1) | $27,954.6 | $5,476.6 | $10,998.5 | $23,875.8 | $790.3 | ($150.5) | $5,593.8 |

USA Commercial Mortgage Company, et al.
13-Week Cash Forecast
($ in thousands)

**13-Week Cash Forecast**

| | 4/22/2006 | 4/29/2006 | 5/6/2006 | 5/13/2006 | 5/20/2006 | 5/27/2006 | 6/3/2006 | 6/10/2006 | 6/17/2006 | 6/24/2006 | 7/1/2006 | 7/8/2006 | 7/15/2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Week Ending | | | | | | |
| **Bankruptcy Related Costs** | | | | | | | | | | | | | |
| Debtor Professional Fees | | | | | | | | | | | | | |
| Financial Advisor Fees & Expenses | $160.6 | $160.6 | $151.8 | $148.8 | $145.9 | $119.6 | $119.8 | $119.6 | $119.8 | $119.8 | $119.8 | $119.8 | $119.8 |
| Legal Counsel Fees & Expenses | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 |
| Local Counsel | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 |
| PR Firm | 1.3 | 1.3 | 1.3 | 0.0 | 0.0 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| Other Professionals | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Committee Professionals | | | | | | | | | | | | | |
| Legal Counsel Fees & Expenses | 0.0 | 0.0 | 0.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 |
| Financial Advisor Fees & Expenses | 0.0 | 0.0 | 0.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 |
| Total Bankruptcy Professional Fees | $228.5 | $228.5 | $219.7 | $266.7 | $263.3 | $237.2 | $237.2 | $237.2 | $237.2 | $237.2 | $237.2 | $237.2 | $237.2 |
| Cash Payment for Bankruptcy Professional Fees | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $541.4 | $0.0 | $0.0 | $0.0 | $0.0 | $803.5 | $0.0 |
| Other | | | | | | | | | | | | | |
| Employee Retention Costs | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Noticing Agent | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 15.0 | 0.0 | 0.0 | 0.0 | 15.0 | 0.0 | 0.0 |
| Other (security) | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 |
| Post-Petition Financing | | | | | | | | | | | | | |
| Post-Petition Financing | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Fees for Post-Petition Financing | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Legal Counsel Fees & Expenses | 0.0 | 0.0 | 250.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Bankruptcy Related Fees | $10.0 | $10.0 | $260.0 | $10.0 | $10.0 | $10.0 | $566.4 | $10.0 | $10.0 | $10.0 | $25.0 | $813.5 | $10.0 |
| NET CHANGE IN CASH | ($255.1) | ($62.1) | ($470.1) | $11,621.1 | ($154.4) | ($62.1) | $27,388.2 | $5,466.6 | $10,988.5 | $23,865.8 | $765.3 | ($964.0) | $5,593.8 |
| **CASH** | | | | | | | | | | | | | |
| Total Cash and Cash Equivalents at Beginning of Period | $10,154.2 [a] | $9,899.1 | $9,837.0 | $9,366.9 | $20,988.0 | $20,833.6 | $20,771.5 | $48,159.7 | $53,626.3 | $64,614.8 | $88,480.6 | $89,245.9 | $88,281.9 |
| Pre-Petition Cash Payments | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Net (Decrease) Increase in Cash and Cash Equivalents | (255.1) | (62.1) | (470.1) | 11,621.1 | (154.4) | (62.1) | 27,388.2 | 5,466.6 | 10,988.5 | 23,865.8 | 765.3 | (964.0) | 5,593.8 |
| Total Cash and Cash Equivalents at End of Period | $9,899.1 | $9,837.0 | $9,366.9 | $20,988.0 | $20,833.6 | $20,771.5 | $48,159.7 | $53,626.3 | $64,614.8 | $88,480.6 | $89,245.9 | $88,281.9 | $93,865.7 |

Notes:
(a) Cash Balance as of 4/12/06

3 of 3

# EXHIBIT B

**Debtor Bank Accounts**

| Company Name | Bank | Bank Account # | Account Type | Bank Phone # | Account Purpose |
|---|---|---|---|---|---|
| USA Capital Diversified Trust Deed Fund, LLC | Nevada State Bank | 552010670 | Analyzed Business Checking | (702) 383-0009 | General Operating Account |
| USA Capital Diversified Trust Deed Fund, LLC | Nevada State Bank | 85904514 | Accessor US Govt MM Fund | (702) 383-0009 | Money Market Account |
| USA Capital First Trust Deed Fund, LLC | Nevada State Bank | 552024218 | Analyzed Business Checking | (702) 383-0009 | General Operating Account |
| USA Capital Realty Advisors, LLC | Community Bank of Nevada | 10303691 | CB Business Account | (702) 222-9800 | General Operating Account |
| USA Commercial Mortgage Company | Wells Fargo | 083-4610149 | Choice IV Commercial Checking | (800) 225-5935 | General Operating Account/Payroll |
| USA Commercial Mortgage Company-Exclusive Account | Wells Fargo | 5627688186 | Basic Business Checking | (800) 225-5935 | Pass-through Permanent Loans |
| USA Commercial Mortgage Company | LaSalle Bank | 5800349150 | Basic Business Checking | (312) 904-6100 | Permanent Loan Brokers/Closing Fees |
| USA Commercial Mortgage Company | BankOne | 634912067 | Checking Trust for HMA | (800) 404-4111 | HMA Investor Payments |
| USA Commercial Mortgage Company dba USA Capital | CitiBank | 500078217 | CitiBusiness | (877) 528-0990 | Citibank Credit Line Interest Payment |

C:\temp\OLK6E\Filing Entities Bank Account List

# EXHIBIT C



# USA Commercial Mortgage Company

# USA Commercial Mortgage Company
# Loan Servicing Cash Management System



Privileged and Confidential



# USA Commercial Mortgage Company



Privileged and Confidential

# EXHIBIT "2"

Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

**E-FILED ON MAY 2, 2006**

and

Lenard E. Schwartzer
Nevada Bar No. 0399
Jeanette E. McPherson
Nevada Bar No. 5423
Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com

Proposed Attorneys for Debtor and Debtor-in-Possession

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case Nos. BK-S-06-10725-lbr |
| USA COMMERCIAL MORTGAGE COMPANY, | Chapter 11 |
| Debtor. | **REPLY BRIEF IN SUPPORT OF MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 345, AND 363 APPROVING DEBTORS' PROPOSED CASH MANAGEMENT PROCEDURES AND INTERIM USE OF CASH IN ACCORDANCE WITH PROPOSED CASH BUDGET** |
| | Hearing Date:  May 3, 2006 |
| | Hearing Time: 9:30 a.m. |

/ / /

/ / /

/ / /

/ / /

1

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

USA Commercial Mortgage Company ("USACM"), on behalf of itself and its affiliated debtors, which are USA Securities, LLC, USA Capital Realty Advisors, LLC, USA Capital Diversified Trust Deed Fund, LLC, and USA Capital First Trust Deed Fund, LLC (collectively, the "Debtors"), submits this Brief in support of the Debtors' Motion for Order Under 11 U.S.C. §§ 105(a), 345, and 363 Approving Debtors' Proposed Cash Management Procedures and Interim Use of Cash in Accordance With Proposed Cash Budget (the "Motion") and in reply to the objections to the Motion that have been filed.

### INTRODUCTION

The Debtors filed this Motion for permission to use cash collected by the Debtors in its "Collection Account," meaning the account in which payments from Borrowers are collected, in accordance with and as limited by the Budget attached to the Motion, as modified in the Revised Budget attached to the Supplemental Declaration of Thomas J. Allison (the "Supplemental Allison Declaration"). For clarification, the money the Debtors collected pre-petition in the Investors Account, meaning money that was collected to fund new loans, is not implicated by this Motion as this Motion does not propose to use any cash held in that account.

As explained to the Court at the initial hearing, the 90-day Revised Budget is limited solely to accomplishing two things. First, the Revised Budget includes costs, including professional and attorneys fees, associated with administering the loan portfolio, including monitoring and collecting monthly payments, negotiating and providing documentation necessary to collect these payments, and taking all necessary enforcement actions on non-performing loans. The taking of these actions are mandated by the Loan Servicing Agreements entered into between USACM and each investor, and are necessary to preserve each investor's rights in the loans in question. Further, as set forth more fully below, the expenditures projected in the Revised Budget do not exceed the sum of the servicing and other contractual fees and costs that the Debtors are allowed to assess against and collect from the investors and the other amounts the Debtors are entitled to collect directly from borrowers and other sources.

Second, the Revised Budget includes costs, including professional and attorneys fees, associated with administering the case, including sorting out claims of investors in light of the fact

2

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   that the past practice of the Debtors has been to make interest payments to all investors whether or

2   not money was collected on the underlying loan.  These practices have resulted in some investors

3   being paid more than they were entitled to under their contracts and some investors being paid less

4   than they were entitled to under their contracts.  Because many individual investors invested in

5   more than one loan and invested both in direct loans and through the USA Capital First Trust

6   Deed Fund, LLC and the USA Diversified Trust Deed Fund, LLC (collectively the "Funds"),

7   numerous investors fall into both the categories of having been both overpaid and underpaid with

8   respect to the different loans in which they invested.  Further, in order to keep up the interest

9   payments, USACM, on many occasions, paid its own money to investors -- money that USACM

10  was entitled to collect as servicing and other fees and costs and as to which it needs to now

11  recover from investors that were wrongfully paid.   It is critical that the Debtors make this analysis

12  so that no money is paid post-petition to investors who are not entitled to receive the money and in

13  order to preserve offset rights USACM has against investors both on its own account and for the

14  account of other investors.  The keeping of appropriate account records is required by the Loan

15  Servicing Agreements entered into between USACM and each investor as part of servicing these

16  loans, and such records are necessary to insure proper distribution of funds.

17         As set forth more fully below, the expenditures in the Revised Budget do not require

18  USACM to use any funds collected on behalf of investors beyond the amounts it is entitled to

19  retain by contract and by statute for servicing and related contractual fees and costs that the

20  Debtors are allowed to assess against the investors, thus making this portion of the money

21  collected clearly property of the estate under Section 541 of the Bankruptcy Code that can be used

22  by the Debtors as requested in the Motion.

23                              **STATEMENT OF FACTS**

24         Every investor, including the Funds and investors investing directly or through the Funds,

25  whether investing directly or through the Funds, signed a Loan Servicing Agreement with

26  USACM.  The Loan Servicing Agreement provides that USACM is authorized and instructed to

27  "keep appropriate accounting records on each note and the sums collected thereon," [LSA ¶ 2(b)],

28  to "[p]roceed diligently to collect all payments due under the terms of the note and promptly pay

3

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   the proper parties, when and if due, principal, interest, late charges, insurance and other specified

2   funds," [LSA ¶ 2(c)(i) (emphasis added)] , and to "[p]rovide the Lender with regular statements

3   regarding loan collections . . . ." [LSA ¶ 2(d)].

4        The Loan Servicing Agreement also requires USACM to "take steps to collect" payments

5   when "the Borrower fails to make any payment to USA." [LSA ¶ 2(c) (ii)] This includes, but is

6   not limited to, authorization to obtain "representation for Lender in litigation and bankruptcy

7   proceedings as deemed necessary or appropriate by USA in its business judgment to fully protect

8   the interests of the Lender, *and of all Lenders in the loan.*" [LSA ¶ 2(c) (ii) (emphasis added)].

9        In paragraph 4, the Loan Servicing Agreement goes on to set forth the obligations and

10  rights of USACM in the event legal proceedings are instituted.  This provision provides that legal

11  proceedings instituted under this agreement "may be pursued in USA's name only or as agent for

12  Lender," thus granting to USACM the sole standing to bring actions to collect on the loans in

13  question.  [LSA ¶ 4]  Further, USA is granted the right to "retain attorneys on Lender's behalf"

14  and the investor (or "Lender"), "[u]pon demand by USA . . . agrees to promptly pay, either in

15  advance or to reimburse USA, for its pro rata portion of the out-of-pocket expenses incurred,

16  including attorney's fees, trustee's fees and foreclosure costs.  In the event that Lender fails to pay

17  such sums to USA upon demand or request thereof, or if USA elects to advance such sums, USA

18  may, in its discretion, advance such fees, including trustee's fees, attorney's fees, and costs of

19  foreclosure; provided, however that any fees advance by USA shall be paid back from the

20  proceeds of the foreclosure (whether by reinstatement or sale), or from any other monies collected

21  with respect to such Loan before any payments are made to Lender."  [LSA ¶ 4].

22       In addition to the right given in paragraph 4 to require the investors to pay for the costs of

23  collection, including attorney's fees, by payments directly to USACM or by offset against

24  amounts that would otherwise be payable to investors, the Loan Servicing Agreement provides for

25  an annual servicing fee to be paid to USACM.  In paragraph 5, the Loan Servicing Agreements

26  provide, in addition to loan origination fees (that USACM is entitled to collect directly from

27  borrowers, along with certain other fees such as loan extension fees and exit fees), for an annual

28  servicing fee, payable on a monthly basis, which in some earlier Loan Servicing Agreements was

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

4

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  stated as not to exceed 1% per annum of the maximum principal amount of each loan and in later

2  Loan Servicing Agreements was stated as not to exceed 3% per annum of the maximum principal

3  amount of each loan.  [LSA, ¶ 5]   While USACM had been collecting some servicing fees in the

4  past, prior to the bankruptcy petition date it was not collecting the full servicing fee to which it

5  was entitled.  It some instances, it was not accruing or collecting any servicing fee, and in other

6  instances it was accruing only 0.5% or 1.0% of the loan balances but not collecting the accrued

7  amounts.  In any event, USACM was not collecting the full amount of the annual loan servicing

8  fees it was entitled to collect under the Loan Servicing Agreements.  A principal reason USACM

9  was not diligent in collecting loan servicing fees prior to the petition date was that in order to

10  make interest payments every month to all investors, USACM paid out what it was entitled to take

11  as a servicing fee to investors when not enough money was collected to make the interest

12  payments.  Consequently, USACM has the right to collect the uncollected servicing fees from past

13  or future monies collected on behalf of those investors that have received overpayments from

14  USACM's own money.  The Debtors' cash management motion proposes to use past due,

15  currently owed, and future servicing fees, which are property of USACM, along with enforcing its

16  right to hire attorneys and obtain payment or reimbursement of the same from the lenders, to fund

17  the operations of these Debtors in accordance with the Revised Budget.

18      Finally, paragraph 5 of the Loan Servicing Agreement also allows USA to keep all late

19  charges and default interest collected from the borrowers.  As noted above, late charges are

20  referenced in paragraph 2(c)(i) with respect to USACM's obligation to make certain that the

21  amounts collected are paid to the "proper parties," which, because of paragraph 5, means

22  USACM.  Paragraph 5 also allows USACM to assist lenders in finding potential buyers for their

23  interests and charge a 5% assignment fee based on the remaining balance of the lender's undivided

24  interest in the note, and to charge and keep all extension fees in the event an extension with a

25  borrower is negotiated. [LSA ¶5]  These funds are also property of USACM and will be used to

26  fund the operations of these Debtors in these bankruptcy cases.

27      In addition to the fees allowed USACM under the Loan Servicing Agreements with

28  investors, USA Capital Realty Advisors, LLC ("USACRA") is entitled to be paid a monthly

5

1    management fee pursuant to the Second Amended and Restated Operating Agreement of USA

2    Capital First Trust Deed Fund, LLC (the "First Trust Deed Agreement") and the Operating

3    Agreement of USA Capital Diversified Trust Deed Fund, LLC (the "Diversified Trust Deed

4    Agreement").  This fee amounts to an annual fee of 1% of the funds managed under the

5    Diversified Trust Deed Agreement, and an annual fee of 1.5% of the funds managed under the

6    First Trust Deed Agreement.  As Manager, USACRA is required, under paragraph 3.1 of the First

7    Trust Deed Agreement and under paragraph 3.01 of the Diversified Trust Deed Agreement, to

8    "prosecute . . . compromise . . . or adjust any and all claims . . . for . . . the Company," to "employ,

9    at the expense of the Company, such agents, employees, independent contractors, attorneys, and

10   accountants, as the Manager deems reasonable and necessary for any Company purpose, to

11   "enforce loan documents" and to "retain such advisors and professionals . . . and do all other

12   things that are, in the sole business judgment of the Manager, necessary or appropriate to

13   effectuate any of the foregoing."  In accordance with this contractual right to collect this fee and in

14   furtherance of its duties as the Manager of these two funds, the Revised Budget includes

15   management fees paid by the Funds to USACRA from cash currently on hand, which is then

16   contributed by USACRA to USACM to reimburse USACM for carrying out the duties of

17   USACRA in enforcing and administering the loans in which the Funds are invested.

18          The Supplemental Declaration of Thomas J. Allison sets forth certain other relevant facts

19   in support of this Motion and is incorporated by reference herein.

20                                          **ARGUMENT**

21   **I.    FUNDS SUFFICIENT TO COVER THE REVISED BUDGET ARE PROPERTY OF
             USACM'S ESTATE AND MAY PROPERLY BE USED BY USACM IN**
22   **ACCORDANCE WITH THE MOTION.**

23

24          Property of the estate includes "all legal or equitable interests of the debtor in property" as

25   of the bankruptcy petition date.  11 U.S.C. § 541(a).  While USACM in its capacity as loan

26   servicer is holding and collecting certain funds on behalf of the loan investors, the portion of those

27   funds representing the full contractual servicing fees and other fees which USACM is entitled to

28   collect and funds which can be used to pay for attorneys fees and other costs of collection on the

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

6

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    non-performing loans clearly are property of the estate under Section 541(a) which can be used, in

2    accordance with Revised Budget, to administer the estate, enforce the loans, and create appropriate

3    accounting records for each note and the sums collected on each note, all of which is allowed and

4    required of USACM under the Loan Servicing Agreements.

5        In the case of *In re Mortgage Funding Inc.,* 48 B.R. 152 (Bankr. Ct. D. Nev. 1985), the

6    Court denied motions for relief from the stay brought by investors who funded loans to borrowers

7    serviced by the debtor, a mortgage broker.  In that case, the debtor was entitled to "retain" the

8    "difference between the higher return on the assigned note and the lower return on the new note"

9    as a "servicing fee." *Id.* at 153.  The Court found that the "debtor has an interest in the assigned

10   notes and deeds of trust" to the extent that "servicing fee" and that "the debtor's limited interest in

11   the assigned notes and deeds of trust passed to the debtor's estate on the date the petition was

12   filed." *Id.* at 155-156.  Consequently, the Court held that "the trustee shall retain the difference

13   between the amounts collected on the assigned notes and the amounts paid on the notes issued by

14   the debtor, for the benefit of the estate." *Id.* at 156.

15       In connection with the Motion, the Debtors are asking for permission to use funds

16   collected on behalf of investors only to the extent of the "debtor's limited interest" in the funds

17   collected.  This money is property of the estate pursuant to Section 541(a) and is properly used for

18   administrative and collection purposes as proposed in the motion.  Moreover, USACM has other

19   sources of funds, including deferred loan origination fees for loans closed pre-petition (USACM

20   has not originated any new loans since the petition date and will not do so without Court approval)

21   and other loan fees, such as loan extension fees and loan exit fees, that USACM is entitled to

22   collect directly from borrowers.  One of the Debtors, USA Capital Realty Advisors, is also entitled

23   to charge its contractual management fee to the two Funds it manages, as explained above.  The

24   Revised Budget proposes to use approximately $4.2 million in cash over a three-month period.

25   When combined with the Debtors' sources of funds other than those collected on behalf of the

26   loan investors, the monthly loan servicing fee of 1/12 of 1% or 3% of the outstanding loan

27   balances which USACM is entitled to retain from loan payments it collects as loan servicer is

28   adequate to cover the expenditures set forth in the Motion and Revised Budget.  As such, the

7

1    Motion seeks to use only what is clearly property of the Debtor's estate and should be granted.

2    **II.    THE RELIEF REQUESTED IN THE MOTION IS CONSISTENT WITH THE NEVADA STATUTE GOVERNING TRUST FUNDS HELD BY MORTGAGE BROKERS.**

3

4

5    Even if the funds in question are eventually determined to be funds held in trust by

6    USACM as a mortgage broker under Nev. Rev. Stat. § 645B.175, the use of cash as requested in

7    the Motion complies with that statute. Nev. Rev. Stat. § 645B.175 (5) (a) provides that monies

8    held in trust by a mortgage broker must be released to investors only after "the deduction and

9    payment of any fee or service charge due the mortgage broker." Thus, as this statute applies

10   under the current circumstances, the statute acknowledges and allows for USACM, as the

11   mortgage broker, to take money out of the collection account to pay its own contractually allowed

12   fees and charges. Since USACM is not seeking by its Motion to use any monies USACM has

13   collected as loan servicer on behalf of loan investors other than the statutorily allowed amounts,

14   the relief requested in the Motion complies with the statute.[1]

15   **III.    REPLY TO SPECIFIC OBJECTIONS FILED.**

16   Several objections to the Motion have been filed as of May 1, 2006, and others may be

17   filed. The Loan Investors and/or Fund Members making the objections appear to fall into two

18   main categories: (1) investors claiming a right to funds in the USACM "Investors Account" (funds

19   which the Debtors are *not* seeking to use pursuant to the Motion) due to certain recent assignments

20   made just prior to the Petition Date of certain interests in Serviced Loans; and (2) investors who

21   have an interest in one or more Nonperforming Loans who actually owe money to USACM for

22   monthly overpayments they received from USACM to which they were not entitled. Each of the

23   _____

24   1  While this will be addressed in more detail in the Debtors' Motion to Temporarily Hold All Funds Pending a
     Determination of the Proper Recipients, the Debtors would further note that Nev. Rev. Stat. § 645B.175 (5)(b) also

25   prohibits a mortgage broker from releasing money held in trust to "any investor who owns a beneficial interest in the
     loan, unless the amount described in paragraph (a) is also released to every other investor who owns a beneficial

26   interest in the loan." Thus, while objections raised by individual investors to the Motion argue for an immediate
     distribution of funds held on account of their fractionalized interests in a loan, under this statute, such a distribution

27   cannot be made until distributions can be made to every investor in a loan, including to investors owing money to the
     estate for prior improper distributions and to the Funds as investors.

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

8

1  specific objections that appears on the Court's docket in the USACM case as of May 1, 2006 is

2  addressed briefly below.  The status of a particular loan as performing or nonperforming, the

3  amount of interest in arrears, and other information about specific loans referred to below, is given

4  in the spreadsheet attached as Exhibit A to the Supplemental Allison Declaration.

5         1.    <u>Alexander Objection</u>.  Pursuant to an objection filed April 25, 2006, the Stanley

6  Alexander Trust, Stanley Alexander, and Florence Alexander (collectively, the "Alexanders")

7  assert that they invested approximately $1.8 million in loans brokered or to be brokered by

8  USACM.  Apparently, $100,000 of those funds was invested in a check that cleared the day before

9  the Petition Date.  To the extent any of the Alexanders' funds invested prior to the Petition Date

10  was in USACM's "Investors Trust" account on the Petition Date, the Alexanders' objection is not

11  a proper objection to the Motion.  As explained above and in the Motion, the Debtors' Motion

12  does not request authority to use any of the funds held in the "Investors Trust" account as of the

13  Petition Date, and USACM will continue to hold such funds pursuant to Nevada state law and

14  other applicable law pending a determination by this Court as to the proper disposition of such

15  funds.  To the extent the Alexanders' objection alleges that USACM has no interest in loan

16  payments collected by USACM on loans in which they may have a small fractional interest, and

17  that the promissory notes should be released to them for collection, the objection lacks merit.  As

18  explained above, USACM has a contractual right as well as a contractual and statutory duty to

19  service the loans on behalf of Alexanders and all other Loan Investors holding fractional interests

20  in those same loans, and the contractual servicing fee and other fees to which USACM is entitled

21  to collect from Alexanders and others under the LSAs is property of USACM's bankruptcy estate.

22  Furthermore, of the loans listed on Exhibit E to the Alexanders' objection, the following are

23  currently Nonperforming Loans: (1) Marquee Hotel Palms; (2) Placer Vineyards; (3) One Point

24  St., LLC (aka "HFA – North Yonkers"); (4) Roam Investment (Development); (5) Rivera Homes;

25  and (6) HFA – Clear Lake.  Thus, to the extent the Alexanders received interest payments to

26  which they were not entitled on their investments in Nonperforming Loans, they owe a debt to

27  USACM for the overpayments.

28         2.    <u>Benincasa Objection</u>.  Focerfida Benincasa and Jasper Benincasa Jr. (the

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   "Benincasas") filed an objection on April 27, 2006.  Apparently, the Benincasas made their one

2   and only investment through USACM by investing $110,000 with a check deposited to USACM's

3   "Investors Trust" account that cleared one day prior to the Petition Date.  As stated above, to the

4   extent the funds were in the "Investors Trust" account on the Petition Date, the Benincasas'

5   objection is not a proper objection to the Motion.[2]  To the extent the funds were invested in one of

6   the Serviced Loans as of the Petition Date, USACM is entitled to charge the servicing fee and

7   other fees set forth in the LSA, and such amounts are property of the estate.

8           3.      Objection of Sandler, Gackenbach, Steins, and Rowley.  An objection to the

9   Motion was filed April 27, 2006 by the Sandler Revocable Trust ("Sandler"), Gackenbach

10  Revocable Trust and David Gackenbach IRA (collectively, "Gackenbach"), Susan Stein Trust and

11  Susan Gackenbach IRA (collectively, "Susan Stein"), various Jay Stein trusts and IRA

12  (collectively, "Jay Stein"), and the Rowley Living Trust ("Rowley").  In the objection, the

13  objectors admit that USACM is entitled to use funds for the purposes set forth in the Motion to the

14  extent of the servicing fee USACM is entitled to collect.  This is all that is sought in the Motion.

15  Further, the objection argues that what "should be Debtors' first and most immediate priority is

16  determining the performing or non-performing status of each loan in the portfolio."  Objection at

17  3.  This is exactly what USACM is doing, and is part of the budgeted amount and part of the

18  services contemplated under the LSAs for which USACM is entitled to collect its contractual fees.

19  In fact, USACM has determined that the objectors, who each signed a Declaration that is part of

20  the Exhibit A attached to the objection, have each invested in at least one Nonperforming Loan

21  and thus may owe a debt to USACM for interest overpayments.  The Nonperforming Loans

22  referred to in the objectors' Declarations include: (1) Shamrock Tower, LP (which is $1.5 million

23  _____

24  2 USACM is aware that approximately $1.9 million in new funds from investors was deposited into the "Investors

25  Trust" account shortly before the Petition Date, and that such funds were intended to be used to purchase assignments
    of interests in some of the Serviced Loans that certain Loan Investors desired to sell and assign.  Apparently, the

26  Petition Date intervened after the assignment documents were executed and the checks were issued to the
    sellers/assignors but before the checks cleared.  USACM understands that the assignees (such as, apparently, the

27  Alexanders and the Benincasas) and the assignors (such as the Ronnings, as discussed below) may have competing
    claims to the funds in the "Investors Trust" account.  USACM will not disburse any funds from that account until the

28  competing claims are determined by the Court.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

P:\USA Commercial Mortgage\Pleadings\Cash Management Motion\RQNDOCS-#872589-v1-
Reply_Brief_in_Support_of_Motion_to_Approve_Cash_Management_and_Use_Cash (2)- final.DOC

1   in arrears); (2) Gramercy Court Ltd. ($750,000 in arrears); (3) Palm Harbor One, LLC ($20,000

2   arrearage); (4) Fox Hills 216, LLC ($299,000 arrearage); (4) Fox Hills 185, LLC ($675,000

3   arrearage); (5) Oak Mesa Investors, LLC ($3.6 million arrearage); and (6) Marlton Square

4   Associates, LLC ($975,000 arrearage).

5           4.      Objection of Buckalew Trust and Higgins Trust.      The Buckalew Trust and

6   Higgins Trust filed an objection on April 28, 2006.  The objectors falsely alleged that the relief

7   requested in the Motion violates Nevada mortgage broker laws (Nev. Rev. Stat. §§ 645B.165 to

8   .175), and that the Motion seeks in effect "the Court's blessing to continue violating Nevada law

9   post-petition."  Objection at 8.  To the contrary, the Motion clearly explains that under the

10  Debtors' cash management proposal, payments collected on Serviced Loans will go in to the DIP

11  Collection Account and remain segregated there from any amounts belonging to USACM and

12  from any amounts received for new investments (if any) with USACM, all in full compliance with

13  Nev. Rev. Stat. § 645B.175(4).  Under the statute and to the extent approved by this Court

14  pursuant to the Motion, USACM is then entitled to deduct and transfer to its DIP Operating

15  Account (as requested in the Motion) the full amount of "any fee or service charge due to the

16  mortgage broker."  Id. § 645B.175(5).   The objection acknowledges that USACM is entitled to

17  use "monies . . . for any loan servicing fees" pursuant to the Motion.  See Objection at 9.  As

18  explained above, the limited amounts set forth in the Revised Budget do not exceed the contractual

19  servicing fees to which USACM is entitled under the LSAs.  Moreover, the Buckalew Trust is

20  invested in the One Point Street, LLC loan (aka "HFA-North Yonkers"), which is a

21  Nonperforming Loan having approximately $3.7 million in unpaid interest due as of March 31,

22  2006.  Thus, the Buckalew Trust may owe a debt to USACM for the monthly payments of interest

23  to which the Buckalew Trust was not entitled.  The objection does not indicate what investment

24  was made by the Higgins Trust and, as Merisow has not yet completed its work in preparing

25  investor-by-investor account reconciliations, USACM cannot at this time readily determine

26  whether the Higgins Trust invested in any Nonperforming Loans.

27          5.      Eight Separate Objections Filed May 1, 2006 by Attorney Robert LePome for

28  Various Investors.  On May 1, 2006, attorney Robert LePome filed eight separate objections on

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

11

1    behalf of various investors, including Richard Williams, Carole Talan, and Hans Prakelt (USACM

2    docket no. 94); Church of the Movement of Spiritual Inner Awareness (docket no. 95); Nancy

3    Golden (docket no. 96); Marilyn Molitch, Matthew Molitch, and Molitch 97 Trust (docket no. 97);

4    Phillips Family Trust, Frances Phillips, and Stephen Phillips (docket no. 98); Spectrum Capital,

5    LLC (docket no. 99); Bosworth Family Trust, Crosbie Ronning, Wild Water Ltd. Partnership, and

6    Grable Ronning (docket no. 100); and Patrick Davis IRA, Susan Davis, and Patrick Davis (docket

7    no. 101).  It appears that each of these objections raises similar legal issues, although USACM has

8    not yet had time to review in detail these objections to determine that status of the investments

9    made by these investors.  The form of these objections is nearly identical to the Alexanders'

10   objection discussed above, which was also filed by attorney Robert LePome, and it appears that at

11   least some of these objectors have both fractional interests in Serviced Loans as well as claims to

12   funds held in the "Investors Trust" account, as the Alexanders do.  However, there is an important

13   distinction between the Alexanders' position (and that of the Benincasas, above) and the position

14   of the Ronnings (and possible others of these May 1, 2006 objections):  while the Alexanders have

15   a claim on the "Investors Trust" account based on their status as an assignee/purchaser of a

16   fractionalized loan interest just prior to the Petition Date, the Ronnings apparently have a claim on

17   the same "Investors Trust" account based on their status as an assignor/seller of a fractionalized

18   loan interest just prior to the Petition Date.  Although, as noted above in connection with the

19   Alexanders' and the Benincasas' objections, the competing claims to the funds in the "Investors

20   Trust" account are not relevant in considering the relief requested by the Motion, the competing

21   claims of Mr. LePome's clients do highlight a conflict of interest between assignees and assignors

22   of loan interests having competing claims on the "Investors Trust" account.  USACM will attempt

23   to determine the status of the loan interests held by the investors objecting in these eight

24   objections and present such information at the hearing on the Motion.

25          Each of Mr. LePome's clients also attempts in the objections to unilaterally terminate the

26   powers of attorney appointing USACM to act with regards to their individal investments.  These

27   powers of attorney give USACM specific valuable rights and should be considered as property of

28   the estate.  *Computer Communications, Inc. v. Codex Corp. (In re Computer Communications,*

12

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   *Inc.)*, 824 F.2d 725, 729  (9th Cir. 1987) (although the definition of property under Section 541

2   neither explicitly includes or excludes contract rights, the definition does include "all legal or

3   equitable interests of the debtor in the property as of the commencement of the case." )(quoting 11

4   U.S.C. §541(a)(1)); *see also In re Minoco Group of Companies, Ltd.*, 799 F.2d 517, 519 (9th Cir.

5   1986) (holding that insurance contracts are also considered to be property of the estate).  Because

6   the powers of attorney should be considered as property of the estate, the objecting parties' efforts

7   to unilaterally terminate them are a violation of the automatic stay.  *See Codex*, 824 F.2d at 731

8   ("Codex violated the automatic stay statue by terminating its contract unilaterally rather than

9   applying for relief from the bankruptcy court."); *see also In re Bobbit*, 174 B.R. 548, 554 (Bankr.

10  N.D. Cal. 1993) ("[U]nilateral termination of a contract by a creditor requires relief from the

11  automatic stay.").  Actions in violation of the stay are void.  Moreover, even if objectors could

12  properly terminate their powers of attorney granted to USACM, the servicing rights they granted

13  to USACM under their Loan Servicing Agreements are similar to (but broader than) those

14  addressed in the power of attorney agreement, and cannot be terminated without 30 days' advance

15  notice.

16       6.    Objection by Attorney Janet Chubb on Behalf of Unidentified Investors.   On May

17  1, 2006, attorney Janet Chubb filed an objection to the Motion on behalf of "numerous direct

18  lenders who are named beneficiaries . . . of certain loans which were originated and serviced" by

19  USACM.  Objection at 1.  In form and substance, the objection is similar to other objections

20  discussed and responded to above.  Furthermore, the objection fails to reveal the names of any of

21  Ms. Chubb's clients on whose behalf the objection is filed.  In addition, it does not appear that Ms.

22  Chubb has filed with the Court the verified statement required by Fed. R. Bankr. P. 2019(a) when

23  an entity or committee (other than an official committee appointed under 11 U.S.C. § 1102 or

24  1114) is representing more than one creditor or equity security holder.  The objection does indicate

25  that the numerous (but unidentified) objectors represented by Ms. Chubb "use David A. Souza's

26  loan in the Oak Mesa project as a representative example of the loan process."  Objection at 2.

27  Although it is not clear whether David A. Souza is in fact one of the numerous objectors

28  represented by Ms. Chubb, USACM has determined that the Serviced Loan in which Mr. Souza

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

13

has a fractional interest, the Oak Mesa / Oak Valley loan (aka "Fiesta Oak Valley"), is a Nonperforming Loan having delinquent unpaid interest of approximately $3.6 million.  Thus, to the extent Mr. Souza (or any of the "numerous" but unidentified objectors having an interest in this loan) received monthly interest payments from USACM while the borrower was not making interest payments to USACM, Mr. Souza owes a debt to USACM for the amount of the overpaid interest.

7.    <u>Objection of Richard McKnight.</u>    The final objection to the Motion that appeared on the USACM electronic docket on May 1, 2006, is an objection by the Richard and Sheila McKnight Family Trust and the Richard McKnight SEP-IRA (collectively, "McKnight").  In form and substance, the McKnight objection is similar to many of the other objections discussed and responded to above.  The Serviced Loans listed on the last page of the objection in which McKnight has an interest includes the following Nonperforming Loans:  (1) Roam Development; and (2) Eagle Mountain Development.  To the extent McKnight received monthly interest payments from USACM while the borrowers on the Nonperforming Loans were not making interest payments to USACM, McKnight owes a debt to USACM for the amount of the overpaid interest.

**CONCLUSION**

The proposed use of USACM's portion of the funds held in the Collection Account allows USACM to fulfill its obligations under the Loan Servicing Agreement, including creating the proper accounting records to make sure that any payments made are made to the "proper" parties and allowing for the enforcement of loans and the preservation of collateral for the benefit of substantially all of the investors.  This proposed use is appropriate, given that this involves only the Debtors' property under Section 541(a) of the Bankruptcy Code, is in compliance with Nev. Rev. Stat. § 645B.175, and is consistent with general equitable principles allowing for surcharging similar funds for administrative purposes only.  Further, the granting of this Motion is in the best interests of all of the investors and the Debtors' creditors because, absent funding for USACM to take the actions proposed in accordance with the Revised Budget, the individual investors and the investors in the Funds, nearly all of which have only small fractional interests in certain loans, will

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

14

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    not be able to promptly and adequately protect their fractionalized interests, the majority of which

2    appear to be in non-performing loans.  This problem is highlighted by the fact that virtually all of

3    the investors objecting to this Motion have invested in non-performing loans, which need the

4    immediate servicing and collection attention of USACM in order for their rights to be preserved.

5    Further, in the Loan Servicing Agreement, each individual investor recognized and, in essence,

6    agreed to not advance their fractionalized interest in a loan in a way that would harm the other

7    owners of the loan.  All investors agreed that only USACM, not any of them individually, could

8    sue on behalf of all owners of the loan.  All investors agreed that attorneys could be retained

9    where as may be deemed "necessary or appropriate by USA" to fully protect the interests" not

10   only of themselves as a Lender, but "of all Lenders in the loan."  This agreement on the part of the

11   investors is in accordance with the prohibition found in Nev. Rev. Stat. § 645B.175 (5) (b), which

12   requires equal treatment of all investors in a loan with respect to distributions allowed.  Protecting

13   the interests of *"all Lenders"* in each loan is exactly what USACM is proposing to do under the

14   Motion and Revised Budget in accordance with its contracts and *out of its own money*.  USACM

15   should be allowed to do so over the objections of a minority of investors, allegedly holding

16   fractionalized interests of some of these loans, where the claims of these investors to proceeds of

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

15

1  the loans, net of USACM's contractually entitled fees, is not being affected.  To do otherwise

2  severely prejudices the silent majority of investors whose rights, along with the vocal minority, are

3  being fully protected by USACM in accordance with their contracts and Nevada law.

4        DATED this 2nd day of May, 2006.

5                              Annette W. Jarvis, Utah Bar No. 1649
                              RAY QUINNEY & NEBEKER P.C.
6                              36 South State Street, Suite 1400
                              P.O. Box 45385
7                              Salt Lake City, Utah 84145-0385

8
                              and
9
10                              /s/ Jeanette E. McPherson
                              Lenard E. Schwartzer, Esq.
11                              Jeanette E. McPherson, Esq.
                              Schwartzer & McPherson Law Firm
12                              2850 South Jones Boulevard, Suite 1
                              Las Vegas, Nevada  89146-5308
13
14                              Proposed Attorneys for Debtor and Debtor-In-
                              Possession
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

16

# EXHIBIT "3"

1   Annette W. Jarvis, Utah Bar No. 1649
    RAY QUINNEY & NEBEKER P.C.
2   36 South State Street, Suite 1400
    P.O. Box 45385
3   Salt Lake City, Utah 84145-0385
    Telephone: (801) 532-1500
4   Facsimile: (801) 532-7543
    Email: ajarvis@rqn.com
5
6   and
7   Lenard E. Schwartzer
    Nevada Bar No. 0399
8   Jeanette E. McPherson
    Nevada Bar No. 5423
9   Schwartzer & McPherson Law Firm
    2850 South Jones Boulevard, Suite 1
10  Las Vegas, Nevada 89146-5308
    Telephone: (702) 228-7590
11  Facsimile: (702) 892-0122
    E-Mail: bkfilings@s-mlaw.com
12  Attorneys for Debtors

13                  UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF NEVADA
14

15  In re:                                    Case Nos. BK-S-06-10725-lbr

16  USA COMMERCIAL MORTGAGE COMPANY,          Chapter 11
         Debtor.
17                                            SUPPLEMENTAL DECLARATION OF
                                              THOMAS J. ALLISON IN SUPPORT OF
18                                            DEBTORS' MOTIONS

19
                                              Hearing Date: May 3, 2006
20                                            Hearing Time: 9:30 a.m.

21

22      I, Thomas J. Allison, hereby declare, verify and state as follows:

23      1.    I make this Declaration as supplemental support for various motions of USA

24  Commercial Mortgage Company ("USACM") and its four affiliates who filed bankruptcy

25  petitions in this Court on April 13, 2006 (collectively, the "Debtors"), including the motion

26  seeking approval of the proposed cash management procedures and limited use of cash

27

28

_(left margin, vertical text)_ SCHWARTZER & McPHERSON LAW FIRM  2850 South Jones Boulevard, Suite 1  Las Vegas, Nevada 89146-5308  Tel: (702) 228-7590  Fax: (702) 892-0122

1

(the "Motion"). My Declaration is based upon personal knowledge and the facts set forth herein.

## THE SERVICED LOANS

2.    It appears that as of April 13, 2006 (the "Petition Date"), USACM was acting as the loan servicer for 115 separate loans (the "Serviced Loans") having a combined outstanding loan balance of approximately $962 million. Attached hereto as Exhibit A is spreadsheet created under my direction by the Mesirow team providing preliminary information for each of the Serviced Loans, including the loan name, whether the loan is performing or non-performing, number of investors, origination date, outstanding balance, unpaid interest, and the percentage of the loan held by each of the two "Funds" (as defined below), by USACM, and by other "Loan Investors" (as defined below).

3.    I have directed that the Mesirow team review the loan files for each of the Serviced Loans. Based on that review, it appears that each loan is secured by a trust deed on commercial real estate, except for two loans that may have been made on an unsecured basis and one loan for which the security interest may not have been properly perfected. The loan files indicate that one of approximately 93 discrete commercial real estate projects/developments serves as collateral for each the Serviced Loans that is secured (in some instances more than one loan is secured by the same real estate). USACM intends to seek authority to engage an outside appraisal firm to evaluate all of the real estate collateral securing the Serviced Loans.

4.    It appears that as of the Petition Date approximately 62 of the Serviced Loans were delinquent in the payment of interest or otherwise could be considered non-performing (the "Nonperforming Loans"). The Nonperforming Loans represent 54% percent in number, and 72% percent in outstanding loan balance, of the Serviced Loans.

5.    There are approximately 3,600 investors (the "Loan Investors") who names appear as a "Lender" in the documents for one or more of the Serviced Loans. Among the

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590    Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590   Fax: (702) 892-0122

Loan Investors are two of the Debtors in these related bankruptcy cases, USA Capital First Trust Deed Fund, LLC ("Capital First") and USA Capital Diversified Trust Deed Fund, LLC ("Diversified") (collectively, the "Funds").

6.      Prior to April 2006, USACM regularly made interest payments to Loan Investors each month regardless of whether the particular loans relating to each Loan Investor were performing or nonperforming. For example, during the first three months of 2006, USACM collected on average approximately $5.3 million per month in interest payments on the Serviced Loans but paid out on average approximately $9.7 million per month to the Loan Investors. In order to make these interest payments, USACM at times deferred the collection of its service fee.

7.      More than 60% of the Loan Investors invested in more than one of the Serviced Loans. Further, although Mesirow has not completed its investor-by-investor analysis of the loans in which each investor is listed as a "Lender" in a loan agreement, it appears likely that for a substantial portion of the Loan Investors who invested only in a single loan, that loan may be a Nonperforming Loan. The practical result of these facts is that a large portion of the Loan Investors received monthly payments from USACM that they were not entitled to receive (because they were invested, at least in part, in one or more Nonperforming Loans), and thus such investors owe a debt to USACM for the amounts overpaid to them.

<u>THE FUNDS</u>

8.      Capital First has an interest as a Loan Investor in 53 of the Serviced Loans -- in 45 loans it owns only a fractional interest along with other Loan Investors, and in 8 loans it is the sole investor. In other words, 90% in number of the Serviced Loans in which Capital First has an interest are loans in which other Loan Investors also have an interest. Further, of the 53 total loans in which Capital First has an interest, 29 (55% in number) are Nonperforming Loans.

3

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590   Fax: (702) 892-0122

9.      Diversified has an interest as a Loan Investor in 23 of the Serviced Loans -- in 16 loans it owns only a fractional interest along with other Loan Investors, and in 7 loans it is the sole investor.  In other words, 70% in number of the Serviced Loans in which Capital First has an interest are loans in which other Loan Investors also have an interest.  Further, of the 23 total loans, 20 (87% in number) are Nonperforming Loans.

10.      The extent of the nonperforming loan problem is substantially the same for the Funds in their capacity as Loan Investors as it is for other Loan Investors.  Because most of the Nonperforming Loans have one or both of the Funds as investors along with other Loan Investors, the administrative and servicing activities, appraisals, collection activities and foreclosure proceedings will benefit both the Funds and the other Loan Investors.

11.      All of the Funds' loans are serviced by USACM and are part of the Serviced Loans, as noted above.  No distinctions were made in how monthly payments were remitted to the Funds (for further distribution to their members) versus remittances to other Loan Investors.  Each of the Funds is and was treated as a single Loan Investor and the monthly payments were made to it as if it were a single Loan Investor.

12.      Capital First has approximately 1,300 members owning membership interests in that LLC entity, and Diversified has approximately 1,900 members owning membership interests in that LLC entity (collectively, the "Fund Members").  Mesirow has not yet completed its analysis of the extent to which particular Fund Members may have membership interests in both of the Funds, nor the extent to which particular Fund Members may also be Loan Investors, but it appears that there may be substantial overlap.

CRUCIAL WORK COMMENCED AND NEEDED DURING 90-DAY PERIOD

13.      As set forth in the Motion, there are certain critical tasks that Mesirow, with assistance from USACM's personnel and attorneys, must accomplish during the first 90 days of the Debtors' bankruptcy cases in order to analyze and safeguard the investments of

4

1  all Loan Investors and Fund Members. Such tasks include, but are not limited to, those

2  discussed below.

3      14.    Mesirow is engaging in a loan-by-loan credit and collateral evaluation,

4  arranging for appropriate appraisals and checks on collateral, and commencing collection

5  activities on Nonperforming Loans and determining the most appropriate way to bring

6  each loan to a performing status. If foreclosures are necessary, USACM will commence

7  such actions as it deems necessary as authorized in the Loan Servicing Agreement that

8  USACM obtained from each of the Loan Investors at the time each investor first invested

9  through USACM. Most of the delinquent loans received little or no collection efforts prior

10  to the Petition Date, and USACM's new management intends to demonstrate to these

11  borrowers that such delinquency will not be tolerated and that appropriate collection and

12  foreclosure activities and other remedies, including collection on guarantees, will be

13  pursued.

14      15.    Mesirow is preparing a ledger for each loan as requested by the SEC and the

15  Nevada Mortgage Lending Division. These ledgers will allow Loan Investors to determine

16  the status of each loan in their portfolios.

17      16.    Mesirow is preparing an account reconciliation for each Loan Investor and

18  for each Fund Member (to the extent there are Fund Members who are not also Loan

19  Investors). These reconciliations will indicate amounts due to the Loan Investors on

20  account of each loan in their portfolios, as well as amounts that have been overpaid on

21  Nonperforming Loans. Principal payments received by USACM but not remitted will also

22  be indicated. The reconciliations for the Fund Members will indicate the positions of the

23  respective Funds with regard to each loan in their portfolios, as well as the Fund Members'

24  percentage ownership interests in the Funds.

25      17.    Mesirow is instituting appropriate internal financial and accounting controls

26  and loan servicing audit trails so that the problems that resulted in the Debtors' bankruptcy

27  filings will not recur.

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590   Fax: (702) 892-0122

5

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

18.    Mesirow is attempting to trace all intercompany transactions so that any dealings with insiders or affiliates are publicly disclosed and investors will have knowledge of such dealings to inform their decisions respecting their investments. Mesirow will follow up to enforce and collect any intercompany, insider, or affiliate debts owed the Debtors.

19.    Each of these activities is necessary and vital to each Loan Investor and Fund Members. Because only in rare cases does any one investor hold more than a small fractional share of any particular loan, the costs to any one Loan Investor of collecting payments from the borrowers on Nonperforming Loans and otherwise monitoring and enforcing the Lenders' rights under the loan agreements would be prohibitive, and borrowers are not likely to cooperate with such fractionalized collection efforts in any event.

20.    There is a significant intercompany receivable owed to USACM (and possibly to other Debtors) by USA Investment Partners, LLC ("IP"), which is a non-debtor entity related to USACM. It appears that the amount of the receivable exceeds $58 million, and that this obligation owed by IP to the Debtors is unsecured and was not formally documented. At my direction, USACM's bankruptcy counsel has prepared documents intended to properly document and secure this obligation of IP, and I believe I am close to obtaining IP's agreement to execute these documents for the benefit of the Debtors, the Loan Investors, and the Fund Members.

21.    During the first two weeks of the case, Mesirow has initiated measures for collecting unpaid interest on the Nonperforming Loans. Meetings have been held with four borrowers regarding the payment of approximately $13 million of past-due interest, and $2.1 million in past-due interest has been collected since the Petition Date. In addition, loan servicing procedures have been established and implemented with the management of USACM. These procedures allow for the identification and pursuit of

6

1  delinquent loans. These efforts benefit the Funds and other Loan Investors due to their

2  investment in Nonperforming Loans.

### COSTS OF ESSENTIAL ACTIVITIES / REVISED BUDGET

22.    The Revised Budget, a copy of which is attached hereto as <u>Exhibit B</u>, has been carefully constructed to allow USACM to provide the limited services necessary in administering the Debtors' bankruptcy estates, with a particular focus on servicing the loans to preserve or increase the value of the underlying collateral and on reconciling the individual accounts of the Loan Investors and Fund Members – all for the benefit of the investors and the Debtors. Mesirow and Debtors' counsel are undertaking a monumental effort to obtain and present the correct loan and investor information to the parties in interest and to maximize the value of the Serviced Loans and underlying collateral, in order to maximize the return that ultimately will be made to investors and creditors according to their respective legal and/or equitable entitlements.

23.    While USACM's brokers and principal insiders have been terminated, USACM's accounting department, IT department and loan servicing department are needed in order to obtain the necessary information from the systems to prepare the Loan Ledgers, the Investor Statements, and loan and collection activity histories to date. Payroll is estimated to be $85,000 twice a month.

24.    Operating costs include the electricity, rent, office supplies and other costs to keep the USACM offices open during this period for the benefit of all of the Debtors, Loan Investors, and Fund Members.

25.    Other budgeted costs include the costs of bankruptcy administration, such as for a noticing agent, for bankruptcy counsel and professionals and some costs of official committees that may be appointed in the Debtors' cases.

26.    The Debtors intend to pursue their motion for joint administration or for at least joint noticing to reduce the unnecessary and duplicative costs of separate

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590    Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite I
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  administration.  For example, a recent noticing required that packages of information,

2  including a Notice of Commencement of the Cases (including notice of the May 17, 2006

3  meeting of creditors) and notices of hearings set for May 3, 2006 and May 18, 2006, were

4  mailed to approximately 8,000 Loan Investors, Fund Members, creditors, and other parties

5  in interest.  As for the notices, because separate notices of hearing were required to be filed

6  in each of the 5 cases of the Debtors, 5 separate notices of hearing that were identical

7  except for the case caption were  mailed to each of the approximately 8,000 recipients.

8  The mailing by BMC was estimated to cost $48,000, but if duplicate notices could have

9  been eliminated, the cost for the noticing would have been closer to $20,000.

10      27.    Because of the substantial overlap among the Loan Investors and Fund

11  Members, the common nonperforming loan problems of the Funds and the other Loan

12  Investors, and the common informational and accounting needs of the Loan Investors and

13  Fund Members, I believe it would be unnecessary and duplicative to have separate official

14  committees for USACM and the Funds.  Further, based on my examination of the financial

15  status of the Debtors, while recognizing that this is in the purview of the U.S. Trustee, I

16  believe that the expense of three or more separate committees would make it impossible

17  for the Debtors to reorganize or even to realize the maximize the value of the Serviced

18  Loans, most of which are held jointly by Loan Investors, including the Funds.  The

19  Revised Budget does not include expenses for any more that one committee with

20  appropriate professionals.  In the event that more than one committee is appointed, the

21  Revised Budget will need to be increased.

22      28.    Attached hereto as Exhibit C is a copy of an executed Loan Servicing

23  Agreement ("LSA") that is typical of the LSAs entered into by USACM and each of the

24  Loan Investors.  The "annual loan servicing fee," according to paragraph 5 of the attached

25  LSA, is not to exceed "three percent (3%) per annum of the maximum principal amount of

26  each of the Loans."  I understand that at some point in the past USACM's standard form of

27  LSA included a nearly identical provision except that the annual loan servicing fee was not

28

to exceed 1% of each loan, and that USACM's standard form of LSA was changed in 2004 to increase the percentage from 1% to 3%. The Revised Budget only includes the annual loan servicing fees at the 1% per annum level even though USACM will be entitled to, and will collect, the higher percentage servicing fee where contractually allowed.

29.     In addition to servicing fees, USACM is entitled to collect and keep late fees, default interest, origination fees, deferred origination fees, extension fees, exit fees, past uncollected servicing fees, and out-of-pocket costs and expenses incurred, including attorney's fees, trustee's fees and foreclosure costs pursuant to the LSA and the loan origination agreements. Expected origination fees for loans originated prior to the bankruptcy filing, deferred origination fees, extension fees and exit fees have been included in the Revised Budget. The Revised Budget does not include past uncollected servicing fees, which are still in the process of being determined, or any out-of-pocket costs and expenses incurred, which USACM may seek to collect at a later time.

30.     In addition to the fees allowed USACM under the Loan Servicing Agreements with investors, USA Capital Realty Advisors, LLC ("USACRA") is entitled to be paid a monthly management fee pursuant to the Second Amended and Restated Operating Agreement of USA Capital First Trust Deed Fund, LLC (the "First Trust Deed Agreement") and the Operating Agreement of USA Capital Diversified Trust Deed Fund, LLC (the "Diversified Trust Deed Agreement"). This fee amounts to an annual fee of 1% of the funds managed under the Diversified Trust Deed Agreement, and an annual fee of 1.5% of the funds managed under the First Trust Deed Agreement. Management fees payable from cash on hand at the Funds on the petition date is included in the Revised Budget.

31.     The expenditures included in the Revised Budget do not exceed the contractual fees that the Debtors are entitled to collect and expect to collect within the budgeted period, as more fully described herein and in the Revised Budget.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590   Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

## POTENTIAL CONSEQUENCES IF THE MOTION IS NOT APPROVED

32.    USACM cannot operate on the funds available in the current DIP Operating Account (which is separate from the Collection Account). USACM needs access to funds which are currently held in the Collection Account or are to be paid into the Collection Account by borrowers to the extent of the servicing fees and other contractual costs and fees to which it is entitled in order to operate and administer its estate. The current funds in the DIP Operating Account, which account has not received any funds from the Collection Account since the bankruptcy filing, are sufficient to fund only this week's payroll and expenses. Without USACM's accounting, IT and loan servicing staff, it will not be possible to obtain sufficient information regarding the loans and investor accounts, to prepare the Ledgers and Account Reconciliations, to collect the past due interest, or to determine what steps have been and need to be taken to collect the Nonperforming Loans.

33.    If the Revised Budget is not approved, the professionals necessary to guide the Debtors through these complex proceedings, to satisfy the informational requirements of the Court, the SEC and the Nevada Mortgage Lending Division, and to enforce the collection of the Nonperforming Loans to return the maximum amounts of interest and principal back to the investors in due course will not be able to continue working, and all of these efforts will come to a halt. The delinquent borrowers will no doubt be less willing to bring their loans current if there is no oversight of these loans.

34.    Apart from the enormous practical difficulties, I believe that I may not be allowed under the USACM form loan agreement, which was used for many or most of the Serviced Loans and which recognizes USACM as the loan servicer, or under the governing Nevada statute, to allow an individual Loan Investor holding only small fractionalized interest in a Serviced Loan to attempt to collect directly from the borrower the fractional share of any loan payments owing. Even if this could be allowed, it would be inefficient and costly to Loan Investors as a whole. I believe the most cost-effective and efficient

1   way to collect on these loans is to allow USACM to collect on these loans for the benefit

2   of all Loan Investors in the loan as provided in and agreed to in the Loan Servicing

3   Agreements.

4    Executed this 2nd day of May, 2006.

5

6    Thomas J. Allison

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**Exhibit A**

Exhibit A

Page 1 of 3

| Performance Evaluation (4-27-06)* | Loan Name | No of Investors | Origination Date | Outstanding Loan Amount | Unpaid Interest as of 3/31/2006 less April collections | DTF | CFT | CM | Total Held by Investors |
|---|---|---|---|---|---|---|---|---|---|
| Performing | 3685 San Fernando Road Partners | 83 | 8/2/05 | 7,350,000 | - | | 1.12% | | 98.54% |
| Performing | 5055 Collwood, LLC | 33 | 2/24/06 | 1,500,000 | | | | | 100.00% |
| Performing | 5252 Orange, LLC | 66 | 12/22/05 | 3,800,000 | | | | | 100.00% |
| Performing | 60th Street Venture, LLC | 49 | 12/22/05 | 3,700,000 | | | | | 100.00% |
| Non-Performing | 6425 Gess, LTD | 286 | 4/14/05 | 26,500,000 | 1,946,126 | | 2.63% | 0.25% | 97.37% |
| Non-Performing | Amesbury/Hatters Point | 393 | 12/16/02 | 18,552,955 | 1,837,338 | 15.18% | 1.72% | | 82.31% |
| Non-Performing | Anchor B, LLC | 50 | 5/31/05 | 5,835,422 | 578,273 | | 33.36% | | 66.64% |
| Non-Performing | Ashby Financial $7,200,000 | 73 | 5/3/04 | 7,200,000 | 1,665,600 | 2.08% | | | 97.92% |
| Non-Performing | B & J Investments[1] | 1 | 9/29/99 | 653,125 | 477,034 | | | | 100.00% |
| Non-Performing | BarUSA/$15,300,000 | 221 | 11/24/03 | 15,300,000 | 544,617 | | | 0.07% | 99.93% |
| Non-Performing | Bay Pompano Beach | 407 | 6/20/05 | 16,285,686 | 20,413 | 0.47% | 1.20% | | 98.33% |
| Non-Performing | Beastar, LLC[1] | 84 | 5/2/05 | 3,125,000 | | | 5.93% | | 94.07% |
| Non-Performing | Beau Rivage Homes/$8,000,000 | 157 | 1/2/03 | 432,349 | 202,076 | | | | 99.38% |
| Performing | Binford Medical Developers | 92 | 8/31/05 | 7,450,000 | - | | 17.25% | | 82.75% |
| Performing | Boise/Gowen 93 | 17 | 8/26/05 | 2,425,000 | | | | | 100.00% |
| Performing | Brookmere/Matteson $27,050,000 | 229 | 10/29/03 | 5,929,393 | - | | 34.20% | | 65.80% |
| Performing | Bundy Canyon $1,050,000 | 1 | 1/6/06 | 1,050,000 | | | | | 100.00% |
| Performing | Bundy Canyon $2,500,000 | 34 | 5/2/05 | 2,300,000 | | | | | 100.00% |
| Performing | Bundy Canyon $5,000,000 | 43 | 9/28/05 | 4,250,000 | | | | 0.71% | 99.29% |
| Non-Performing | Bundy Canyon $5,725,000 | 53 | 1/14/05 | 5,725,000 | 60,282 | | | | 100.00% |
| Performing | Bundy Canyon $7,500,000 | 83 | 8/17/05 | 6,700,000 | | | | | 100.00% |
| Performing | Bundy Canyon $8.9 | 117 | 4/5/06 | 8,900,000 | | | | | 100.00% |
| Performing | BySynergy, LLC $4,434,446 | 3 | 2/3/06 | 4,434,446 | | 51.48% | 35.34% | 13.18% | 100.00% |
| Performing | Cabernet | 65 | 2/17/05 | 3,000,000 | | | | | 100.00% |
| Non-Performing | Castaic Partners II, LLC | 57 | 7/11/05 | 5,600,000 | 137,553 | | 7.59% | | 92.41% |
| Performing | Castaic Partners III, LLC | 65 | 9/22/05 | 4,675,000 | - | | 0.53% | 1.07% | 98.40% |
| Performing | Charlevoix Homes, LLC | 40 | 4/3/06 | 3,400,000 | | | | | 100.00% |
| Performing | Clear Creek Plantation | 36 | 3/15/05 | 2,900,000 | - | | 3.45% | | 96.55% |
| Performing | Cloudbreak LV | 2 | 12/17/03 | 3,800,000 | - | 0.49% | 99.51% | | 0.00% |
| Non-Performing | Colt DIV added #1[1] | 1 | Undetermined | 1,500,000 | 736,776 | 100.00% | | | |
| Non-Performing | Colt DIV added #2[1] | 1 | Undetermined | 3,100,000 | 1,078,165 | 100.00% | | | |
| Non-Performing | Colt Gateway | 3 | 1/17/03 | 3,514,069 | 3,220,735 | 42.53% | | | 57.47% |
| Non-Performing | Colt Second TD | 1 | 8/19/03 | 1,000,000 | 484,412 | | | | |
| Performing | Columbia Managing Partners | 1 | 9/1/05 | 2,210,000 | - | 100.00% | 100.00% | 100.00% | |
| Performing | ComVest Capital | 56 | 1/11/06 | 4,125,000 | - | | 17.82% | | 82.18% |
| Performing | Copper Sage Commerce Center Phase II | 51 | 3/1/06 | 3,550,000 | - | | | 1.83% | 98.17% |
| Non-Performing | Copper Sage Commerce Center, LLC | 28 | 6/9/04 | 179,106 | 9,226 | | | | 99.38% |
| Performing | Comman Toltec 160, LLC | 96 | 6/24/05 | 6,375,000 | - | | | 0.08% | 99.92% |
| Non-Performing | Cottonwood Hills, LLC | 21 | 6/14/05 | 4,000,000 | 48,222 | | 25.00% | | 75.00% |
| Non-Performing | CREC Building Colt[1] | 1 | Undetermined | 3,718,777 | 1,650,349 | 100.00% | | | |

* Preliminary Analysis as of 04/27/2006.

Prepare by MFIM, LLC

Exhibit A

| Performance Evaluation (4-27-06)* | Loan Name | No of Investors | Origination Date | Outstanding Loan Amount | Unpaid Interest as of 3/31/2006 less April collections | DTF | CFT | CM | Total Held by Investors |
|---|---|---|---|---|---|---|---|---|---|
| Performing | Del Valle - Livingston | 239 | 8/25/05 | 19,250,000 | - | | 0.67% | | 99.33% |
| Performing | Del Valle Isleton | 76 | 3/22/05 | 6,520,000 | - | | 2.90% | | 97.10% |
| Non-Performing | Eagle Meadows Development | 295 | 10/19/05 | 31,050,000 | 9,019 | | 11.76% | | 88.24% |
| Performing | Elizabeth May Real Estate | 147 | 2/24/06 | 10,050,000 | - | | 1.19% | | 98.81% |
| Non-Performing | EPIC Resorts[1] | 1 | Undetermined | 18,915,000 | undetermined | 100.00% | | | |
| Non-Performing | Fiesta Development $6.6 | 1 | 11/14/05 | 6,600,000 | - | | 100.00% | | |
| Non-Performing | Fiesta Development McNaughton[1] | 1 | 1/10/05 | 6,000,000 | undetermined | 100.00% | | | |
| Performing | Fiesta Murrieta | 69 | 4/14/05 | 6,500,000 | - | | | 1.46% | 98.54% |
| Non-Performing | Fiesta Oak Valley | 227 | 6/15/04 | 20,500,000 | 3,597,750 | | | 0.05% | 99.95% |
| Non-Performing | Fiesta USA/Stoneridge | 100 | 9/22/03 | 10,000,000 | 2,376,004 | | | | 100.00% |
| Performing | Fiesta/Beaumont $2.4m | 36 | 9/17/04 | 2,400,000 | - | | | | 100.00% |
| Performing | Foxhill 216, LLC | 300 | 2/23/06 | 25,980,000 | - | | 0.10% | | 99.90% |
| Non-Performing | Franklin - Stratford Investments, LLC | 2 | 3/30/05 | 5,225,000 | 17,873 | 19.33% | 80.67% | | 0.00% |
| Non-Performing | Freeway 101[1] | 57 | 8/9/04 | 3,750,000 | 38,750 | | | | 100.00% |
| Performing | Gateway Stone | 161 | 11/18/05 | 13,185,000 | - | | 0.76% | | 99.24% |
| Non-Performing | Gilroy | 59 | 11/23/04 | 4,950,000 | 309,031 | | 5.56% | | 94.44% |
| Performing | Glendale Tower Partners | 95 | 6/9/05 | 6,500,000 | - | | | 1.32% | 98.68% |
| Non-Performing | Golden State Investments II | 37 | 6/27/05 | 2,850,000 | 95,032 | | 8.77% | | 91.23% |
| Performing | Goss Road | 20 | 11/2/04 | 1,000,000 | - | | | 0.25% | 99.75% |
| Non-Performing | Gramercy Court Condos | 332 | 6/25/04 | 34,884,500 | 749,341 | 13.10% | | | 86.90% |
| Non-Performing | Harbor Georgetown | 103 | 8/16/04 | 8,800,000 | 333,402 | 5.80% | | | 94.20% |
| Non-Performing | Hasley Canyon | 114 | 3/3/04 | 11,700,000 | 1,287,450 | | | | 100.00% |
| Performing | Hespena II | 65 | 4/1/05 | 4,250,000 | - | | | | 100.00% |
| Non-Performing | HFA- Clear Lake | 207 | 1/6/05 | 16,000,000 | 2,404,286 | 0.88% | | | 98.81% |
| Non-Performing | HFA- North Yonkers | 298 | 1/11/05 | 24,000,000 | 3,710,069 | | 3.71% | | 96.08% |
| Non-Performing | HFA - Riviera 2nd | 99 | 4/29/04 | 8,000,000 | 2,478,080 | | | | 100.00% |
| Non-Performing | HFA- Windham | 74 | 11/15/04 | 5,550,000 | 893,767 | | | | 100.00% |
| Non-Performing | HFA-Clear Lake 2nd | 36 | 6/24/05 | 2,750,000 | 347,275 | | | 0.29% | 99.71% |
| Non-Performing | HFAH/Monaco | 1 | 12/19/03 | 4,000,000 | 1,236,000 | | 100.00% | | |
| Non-Performing | Huntsville | 116 | 3/31/04 | 10,475,000 | 813,061 | 5.96% | 4.77% | | 89.27% |
| Performing | I-40 Gateway west | 46 | 1/11/05 | 4,530,000 | - | | | | 92.27% |
| Performing | I-40 Gateway West, LLC 2nd | 23 | 3/1/06 | 1,065,000 | - | | | | 100.00% |
| Non-Performing | Interstate Commerce Center Phase II | 2 | 8/11/04 | 1,855,606 | 20,375 | 13.72% | 86.28% | | 0.00% |
| Non-Performing | Interstate Commerce Center | 4 | 2/20/04 | 2,391,355 | 114,357 | 98.72% | | 1.28% | 0.00% |
| Performing | J. Jireh's Corporation | 105 | 9/2/05 | 8,825,000 | - | | 3.00% | | 97.00% |
| Performing | La Hacienda Estate, LLC | 83 | 11/11/04 | 6,255,000 | - | | | 0.80% | 99.20% |
| Non-Performing | Lake Helen Partners | 35 | 12/7/04 | 3,129,499 | 38,953 | 7.26% | 27.56% | 0.90% | 64.28% |
| Non-Performing | Lenn Hills | 130 | 12/7/05 | 10,350,000 | 129,167 | | | | 100.00% |
| Non-Performing | Margarita Annex | 105 | 7/26/04 | 12,000,000 | 255,667 | | 25.67% | | 74.33% |

* Preliminary Analysis as of 04/27/2006.

Prepare by MFIM, LLC

Exhibit A

| Performance Evaluation (4-27-06)* | Loan Name | No of Investors | Origination Date | Outstanding Loan Amount | Unpaid Interest as of 3/31/2006 less April collections | DTF | CFT | CM | Total Held by Investors |
|---|---|---|---|---|---|---|---|---|---|
| Non-Performing | Marlton Square | 272 | 8/11/05 | 30,000,000 | 975,000 | | 0.39% | 0.89% | 98.71% |
| Non-Performing | Marlton Square 2nd | 108 | 8/11/05 | 6,000,000 | 204,000 | | | | 100.00% |
| Non-Performing | Marquis Hotel | 169 | 3/29/05 | 13,500,000 | 2,515,500 | | | 0.71% | 99.29% |
| Performing | Meadow Creek Partners, LLC | 103 | 2/23/06 | 8,250,000 | | | 0.87% | | 99.13% |
| Non-Performing | Midvale Marketplace, LLC | 49 | 6/30/05 | 4,075,000 | 205,298 | | 7.61% | | 92.39% |
| Performing | Mountain House Business Park | 202 | 6/10/04 | 16,800,000 | | 0.30% | 5.21% | 0.17% | 94.33% |
| Non-Performing | Oak Shores II | 176 | 6/6/05 | 12,150,000 | 132,907 | 0.07% | 1.49% | | 98.44% |
| Performing | Ocean Atlantic | 32 | 11/1/05 | 2,700,000 | | | | | 100.00% |
| Performing | Ocean Atlantic $9,425,000 | 105 | 1/23/06 | 8,925,000 | | | 14.61% | | 85.39% |
| Non-Performing | Opaque/Mt. Edge $7,350,000 | 95 | 11/5/03 | 4,827,970 | 813,163 | | | | 100.00% |
| Non-Performing | Palm Harbor One | 309 | 12/14/05 | 28,480,000 | 14,723 | | 5.60% | | 94.40% |
| Non-Performing | Placer Vineyards | 343 | 12/10/04 | 31,500,000 | 1,567,682 | | | | 100.00% |
| Non-Performing | Placer Vineyards 2nd | 118 | 12/10/04 | 6,500,000 | 349,556 | | | | 100.00% |
| Performing | Preserve at Gallena, LLC | 73 | 10/6/05 | 4,393,250 | | | | 0.11% | 99.89% |
| Non-Performing | Redwood Properties $269,641[1] | 1 | 11/15/05 | 269,641 | undetermined | | | | 100.00% |
| Performing | Rio Rancho Executive Plaza, LLC | 32 | 1/17/06 | 2,250,000 | | | 3.11% | | 96.89% |
| Non-Performing | Riviera - Homes for America Holdings, L.L.C. | 90 | 6/24/05 | 5,000,000 | 637,500 | | | | 100.00% |
| Non-Performing | Roam Development Group | 291 | 3/23/05 | 26,251,945 | 173,806 | | 2.37% | | 97.63% |
| Non-Performing | Saddleback[1] | 1 | Undetermined | 375,000 | 9,849 | | | | 0.00% |
| Non-Performing | Shamrock Tower, LP | 87 | 8/5/04 | 10,500,000 | 1,590,927 | 100.02% | 31.43% | | 68.57% |
| Non-Performing | Sheraton Hotel[1] | 1 | Undetermined | 6,845,000 | 896,084 | | | | -0.02% |
| Performing | Slade Development | 40 | 12/5/05 | 3,525,000 | | | | 1.42% | 98.58% |
| Performing | Southern California Land 2nd | 33 | 8/3/05 | 2,800,000 | | | | 1.25% | 98.75% |
| Performing | Standard Property Development | 115 | 2/27/06 | 9,640,000 | | | 6.96% | | 93.04% |
| Performing | SVRB $4,500,000 | 67 | 4/27/05 | 1,424,082 | | | | | 100.00% |
| Performing | SVRB 2nd $2,325,000 | 25 | 4/27/05 | 2,325,000 | | | | | 90.32% |
| Non-Performing | Tapia Ranch | 179 | 9/28/04 | 22,000,000 | 595,433 | | 1.43% | | 98.57% |
| Non-Performing | Ten-Ninety, Ltd./$4,150,000 | 18 | 12/30/02 | 4,150,000 | 1,775,764 | 20.48% | | | 79.52% |
| Non-Performing | Ten-Ninety[1] | 1 | Undetermined | 55,113,781 | undetermined | 100.00% | 100.00% | | |
| Performing | The Gardens Phase II | 1 | 3/31/06 | 2,500,000 | | | | | 100.00% |
| Performing | The Gardens, LLC $2,425,000 | 34 | 8/15/05 | 1,961,000 | | | 1.52% | 4.01% | 94.47% |
| Non-Performing | The Gardens, LLC Timeshare | 51 | 3/24/04 | 5,300,000 | 250,458 | 5.43% | 31.03% | | 63.53% |
| Non-Performing | Universal Hawaii[1] | 127 | 8/6/04 | 5,166,413 | undetermined | | 100.00% | | |
| Non-Performing | University Estates | 1 | 4/11/05 | 3,835,400 | 1,763 | | | | 100.00% |
| Performing | Urban Housing Alliance - 435 Lofts | 110 | 7/13/05 | 8,150,000 | | | 0.37% | 0.40% | 99.23% |
| Non-Performing | Wasco Investments | 86 | 11/23/04 | 6,450,000 | 407,535 | | 3.02% | | 96.98% |
| | | 10,546 | | $962,064,768 | $49,068,852 | | | | |

[1] Status of these loans is undetermined due to bankruptcy, foreclosures, change of ownership, etc. More research is being performed.

* Preliminary Analysis as of 04/27/2006.

Prepare by MFIM, LLC

**Exhibit B**

**USA Commercial Mortgage Company, et al.**
13-Week Cash Forecast
($ in thousands)

13-Week Cash Forecast

| | Week Ending | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 5/7/2006 | 5/14/2006 | 5/21/2006 | 5/28/2005 | 6/4/2006 | 6/11/2006 | 6/18/2006 | 6/25/2006 | 7/2/2006 | 7/9/2006 | 7/16/2006 | 7/23/2006 | 7/30/2006 | 13 Weeks |
| **Cash Collections** | | | | | | | | | | | | | | |
| **USA Commercial Mortgage** | | | | | | | | | | | | | | |
| Loan Origination Fees | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $900.0 | $0.0 | $0.0 | $900.0 |
| Total Other Collections | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 14.1 | 0.0 | 0.0 | 14.1 |
| Permanent Loan Closing Fees | 7.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 7.0 |
| Reimbursed Expenses from USA Capital Realty | 120.0 | 105.6 | 0.0 | 0.0 | 0.0 | 105.6 | 0.0 | 0.0 | 0.0 | 105.6 | 0.0 | 0.0 | 0.0 | 436.9 |
| **Loan Servicing Collections** | | | | | | | | | | | | | | |
| Estimated Service Fees | 475.3 [a] | 430.9 | 0.0 | 37.5 | 17.8 | 457.1 | 8.0 | 11.3 | 0.0 | 0.0 | 480.1 | 0.0 | 10.3 | 1,928.3 |
| Outstanding Origination, Extension and Closing Fees | 146.3 | 0.0 | 0.0 | 0.0 | 222.8 | 36.5 | 277.5 | 320.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1,003.1 |
| **Total Cash Collections Operating Accounts** | $748.7 | $536.6 | $0.0 | $37.5 | $240.6 | $599.2 | $285.5 | $331.3 | $0.0 | $105.6 | $1,394.1 | $0.0 | $10.3 | $4,289.4 |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| **Origination Disbursements** | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $6.5 | $0.0 | $0.0 | $6.5 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Salaries & Wages | 85.0 | 85.0 | 85.0 | 0.0 | 0.0 | 85.0 | 0.0 | 85.0 | 0.0 | 85.0 | 0.0 | 85.0 | 0.0 | 510.0 |
| Payroll Related Benefits | 14.5 | 14.5 | 14.5 | 11.0 | 11.0 | 14.5 | 0.0 | 14.5 | 11.0 | 14.5 | 0.0 | 14.5 | 0.0 | 108.7 |
| Rent | 0.0 | 0.0 | 0.0 | 57.0 | 57.0 | 0.0 | 0.0 | 0.0 | 47.0 | 0.0 | 0.0 | 0.0 | 0.0 | 104.7 |
| Office Operating Disbursements | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 130.0 |
| Other Operating Disbursements | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 325.0 |
| **Total Operating Disbursements** | $134.5 | $134.5 | $134.5 | $103.0 | $103.0 | $134.5 | $35.0 | $134.5 | $93.0 | $134.5 | $41.5 | $134.5 | $35.0 | $1,184.2 |
| **Bankruptcy Related Disbursements** | | | | | | | | | | | | | | |
| Professional Fees (see schedule for detail) | $0.0 | $0.0 | $0.0 | $0.0 | $541.4 | $0.0 | $0.0 | $0.0 | $765.9 | $0.0 | $0.0 | $0.0 | $843.7 | $2,181.0 |
| Trustee Fees | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 9.0 | 9.0 |
| **Other** | | | | | | | | | | | | | | |
| Employee Retention Costs | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Noticing Agent | 0.0 | 0.0 | 0.0 | 32.0 | 0.0 | 0.0 | 25.0 | 0.0 | 30.0 | 0.0 | 0.0 | 0.0 | 0.0 | 112.0 |
| Appraisal Fees | 0.0 | 0.0 | 50.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 100.0 | 0.0 | 0.0 | 0.0 | 100.0 | 300.0 |
| Other (security) | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 130.0 |
| **Post-Petition Financing** | | | | | | | | | | | | | | |
| Fees for Post-Petition Financing | 150.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 150.0 |
| Legal Counsel Fees & Disbursements | 0.0 | 50.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 5.0 | 0.0 | 0.0 | 100.0 |
| **Total Bankruptcy Related Disbursements** | $160.0 | $142.0 | $60.0 | $110.0 | $145.0 | $10.0 | $35.0 | $10.0 | $905.9 | $10.0 | $15.0 | $10.0 | $962.7 | $2,982.0 |
| **Total Cash Disbursements Operating Accounts** | $294.5 | $177.0 | $194.5 | $145.0 | $654.4 | $144.5 | $70.0 | $144.5 | $998.9 | $144.5 | $56.5 | $144.5 | $997.7 | $4,166.2 |
| **NET CHANGE IN CASH** | $454.2 | $359.6 | ($194.5) | ($107.5) | ($413.8) | $454.8 | $215.5 | $186.9 | ($998.9) | ($38.9) | $1,337.6 | ($144.5) | ($987.4) | $123.1 |
| **Cash Position - DIP Accounts** | | | | | | | | | | | | | | |
| Total Cash and Cash Equivalents at Beginning of Period | $278.6 [b] | $732.8 | $1,092.4 | $897.9 | $790.4 | $376.6 | $831.4 | $1,046.9 | $1,233.8 | $234.9 | $196.0 | $1,533.6 | $1,389.1 | $278.6 [b] |
| Pre-Petition Cash Payments | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Net (Decrease) Increase in Cash and Cash Equivalents | 454.6 | 359.6 | (194.5) | (107.5) | (413.8) | 454.8 | 215.5 | 186.9 | (998.9) | (38.9) | 1,337.6 | (144.5) | (987.4) | 123.1 |
| Total Cash and Cash Equivalents at End of Period | $732.8 | $1,092.4 | $897.9 | $790.4 | $376.6 | $831.4 | $1,046.9 | $1,233.8 | $234.9 | $196.0 | $1,533.6 | $1,389.1 | $401.7 | $401.7 |

Notes:
(a) Includes April collections of service fees
(b) Opening Cash Balance as of 5/2/06 less $150,000 for Wells Fargo account offset

**USA Commercial Mortgage Company, et al.**
13-Week Cash Forecast
*($ in thousands)*

13-Week Cash Forecast

Week Ending

| Additional Schedules | 5/7/2006 | 5/14/2006 | 5/21/2006 | 5/28/2006 | 6/4/2006 | 6/11/2006 | 6/18/2006 | 6/25/2006 | 7/2/2006 | 7/9/2006 | 7/16/2006 | 7/23/2006 | 7/30/2006 | Total 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **USA Capital Realty Advisors** | | | | | | | | | | | | | | |
| Beginning Cash Balance | $122.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $122.7 |
| Management Fees Collected (DTDF) | 0.0 | 105.6 | 0.0 | 0.0 | 0.0 | 105.6 | 0.0 | 0.0 | 0.0 | 105.6 | 0.0 | 0.0 | 0.0 | 316.9 |
| Expense Reimbursement due USA CMC | (120.0) | (105.6) | 0.0 | 0.0 | 0.0 | (105.6) | 0.0 | 0.0 | 0.0 | (105.6) | 0.0 | 0.0 | 0.0 | (436.9) |
| Ending Cash Balance | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 | $2.7 |
| **Collections and Disbursements for Trusts and Funds** | | | | | | | | | | | | | | |
| Estimated Interest Collections for USA CRA | $0.0 | $4.0 | $0.0 | $0.0 | $0.0 | $4.4 | $0.0 | $0.0 | $0.0 | $0.0 | $4.8 | $0.0 | $0.0 | $13.2 |
| Estimated Interest Collections for USA CMC | 0.0 | 18.4 | 0.0 | 0.0 | 20.1 | 0.0 | 0.6 | 0.6 | 0.0 | 0.0 | 21.2 | 0.0 | 0.0 | 60.3 |
| Estimated Interest Collections for DTDF | 0.0 | 738.7 | 0.0 | 0.0 | 0.0 | 805.9 | 0.0 | 0.0 | 0.0 | 0.0 | 872.5 | 0.0 | 0.0 | 2,417.6 |
| Estimated Interest Collections for FTDF | 0.0 | 345.3 | 0.0 | 6.7 | 11.4 | 373.2 | 14.1 | 1.6 | 0.0 | 0.0 | 398.0 | 0.0 | 9.4 | 1,157.6 |
| Estimated Interest Collections for Others | 473.8 | 4,711.7 | 0.0 | 491.1 | 211.2 | 4,989.7 | 97.5 | 144.8 | 0.0 | 0.0 | 5,191.8 | 0.0 | 124.7 | 16,424.2 |
| Expected Principal Return | 4,828.0 | 0.0 | 0.0 | 22,000.0 | 4,950.0 | 179.1 | 10,500.0 | 16,285.7 | 0.0 | 0.0 | 0.0 | 0.0 | 5,600.0 | 64,342.8 |
| **Total Trust Account Collections** | $5,301.8 | $5,818.2 | $0.0 | $22,505.8 | $5,172.5 | $6,352.4 | $10,612.2 | $16,432.7 | $0.0 | $0.0 | $6,486.2 | $0.0 | $5,734.1 | $84,415.9 |
| Interest Paments to DTDF Investors | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Interest Payments to FTDF Investors | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Interest Payments to Direct Investors | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Service Fees to USA CMC | 475.3 | 430.9 | 0.0 | 37.5 | 17.8 | 457.1 | 8.0 | 11.3 | 0.0 | 0.0 | 480.1 | 0.0 | 10.3 | 1,928.3 |
| **Total Interest Disbursements** | $475.3 | $430.9 | $0.0 | $37.5 | $17.8 | $457.1 | $8.0 | $11.3 | $0.0 | $0.0 | $480.1 | $0.0 | $10.3 | $1,928.3 |
| Management Fees Paid by DTDF | 0.0 | 105.6 | 0.0 | 0.0 | 0.0 | 105.6 | 0.0 | 0.0 | 0.0 | 105.6 | 0.0 | 0.0 | 0.0 | 316.9 |
| Management Fees Paid by FTDF | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Cash Position - Trust Accounts (week end)** | | | | | | | | | | | | | | |
| Cash Balance DTDF | $929.1 | $723.4 | $723.4 | $723.4 | $723.4 | $617.8 | $617.8 | $617.8 | $617.8 | $512.2 | $512.2 | $512.2 | $512.2 | |
| Cash Balance FTDF | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| Cash Balance Collections Trust | 21,907.7 | 27,295.1 | 27,295.1 | 49,763.4 | 54,918.1 | 60,813.4 | 71,417.6 | 87,839.0 | 87,839.0 | 67,839.0 | 93,845.2 | 93,845.2 | 99,568.9 | |
| Cash Balance Investors Trust | 1,877.1 | 1,877.1 | 1,877.1 | 1,877.1 | 1,877.1 | 1,877.1 | 1,877.1 | 1,877.1 | 1,877.1 | 1,877.1 | 1,877.1 | 1,877.1 | 1,877.1 | |
| **Debtor Professional Fees (as incurred)** | | | | | | | | | | | | | | |
| Financial Advisor Fees & Disbursements | $160.0 | $160.0 | $155.0 | $150.0 | $145.0 | $130.0 | $130.0 | $130.0 | $130.0 | $130.0 | $130.0 | $130.0 | $130.0 | $1,810.0 |
| Legal Counsel Fees & Disbursements | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 650.0 |
| Local Counsel | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 216.7 |
| FR Firm | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 10.0 |
| Other Legal Professionals | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 162.5 |
| **Committee Professionals** | | | | | | | | | | | | | | |
| Legal Counsel Fees & Disbursements | 0.0 | 0.0 | 0.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 250.0 |
| Financial Advisor Fees & Disbursements | 0.0 | 0.0 | 0.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 250.0 |
| **Accrual Amount for Bankruptcy Professional Fees** | $240.0 | $240.0 | $235.0 | $280.0 | $274.9 | $259.9 | $259.9 | $259.9 | $259.9 | $259.9 | $259.9 | $259.9 | $259.9 | $3,349.1 |
| **Cash Payment for Bankruptcy Professional Fees** | $0.0 | $0.0 | $0.0 | $0.0 | $541.4 | $0.0 | $0.0 | $0.0 | $795.9 | $0.0 | $0.0 | $0.0 | $843.7 | $2,181.0 |

**Exhibit C**

# LOAN SERVICING AGREEMENT

This Loan Servicing Agreement ("Agreement") is made as of the _____9ᵗʰ_____ day of _____NoVEmBER_____, 2004, between USA Commercial Mortgage Company ("USA") and **Patrick F. Fenlon and Angela B. Fenlon, husband and wife as joint tenants with the rights of survivorship** ("Lender")

## RECITALS

A.    USA is a mortgage broker and loan servicer in Clark County, Nevada.

B.    Lender lends, or wishes to lend, money to various borrowers (the term "Borrower" includes single and married persons, corporations, trusts, partnerships and all other legal entities) from time to time, which loans are arranged by USA and are secured by interests in real and/or personal property.

C.    Lender wishes to retain the services of USA in connection with making and servicing a loan or loans ("Loan" or "Loans" as the context requires), including all Loans heretofore or hereafter placed by Lender through USA, all upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Services in Connection with Arranging the Loans</u>.  USA will perform the following services in connection with arranging each Loan:

(a)    Obtain a promissory note or notes secured by the trust deed referred to in Section 1(b) below, executed by Borrower in a form customarily used by USA and approved by USA's counsel.

(b)    Obtain a deed of trust, assignment of rents and security agreement executed by Borrower in form customarily used by USA and approved by USA's counsel, and cause the same to be properly recorded.

(c)    Obtain one or more personal or corporate guaranties, if applicable and as determined by USA to be necessary, executed by such guarantors, as USA shall deem appropriate, in form customarily used by USA.

(d)    If USA deems it appropriate or necessary, obtain, at Borrower's expense, an appraisal of the property to be encumbered, prepared and executed by an appraiser reasonably satisfactory to USA.

(e)    Obtain from a reputable title insurance company, at Borrower's expense, a fully-paid ALTA lender's policy of title insurance, showing Lender as an insured, in an amount at least equal to the initial principal amount of the note and showing as exceptions only those items approved by USA and its counsel.

v.1 Rev. 8/04                                    1

(f)     Cause the Borrower to obtain, where applicable, casualty insurance policies in amounts at least equal to the principal amount of the note or the full insurable value of the improvements on the encumbered real property, whichever is less, containing a mortgage or loss payee clause naming Lender, or USA (as agent for Lender), as an additional insured or loss payee

(g)     Obtain from the Borrower and each guarantor such recent financial statements and information as USA shall deem appropriate.

(h)     Obtain, with respect to any and all encumbrances of record to which Lender's deed of trust will be subject, documentation verifying the principal balance thereof within a reasonable time prior to the making of the Loan and specifying any then existing defaults thereunder.

(i)     Obtain such other documents in connection with the Loan, as USA may deem appropriate in order to protect the Lender's interest

(j)     All documents which USA obtains from borrower in connection with arranging or servicing any Loan, so long as such Loan is outstanding, shall be kept on file in USA's corporate office and be available to Lender upon request.    Notwithstanding the foregoing, USA shall have no obligation or responsibility to obtain any original documents in connection with any Loan serviced by USA, but not arranged or originated by USA.

(k)     Prepare and deliver to escrow closing instructions to effectuate the Loan closing in accordance with the Loan Agreement and the Fee Agreement.

2.    Services of USA in Connection with Servicing the Loans.    Subject to and in accordance with the terms and conditions set forth in this Agreement, and all applicable laws, Lender instructs and authorizes USA to, and USA will perform the following services in connection with servicing each of the Loans:

(a)     Verify, where applicable, that the property encumbered by Lender's deed of trust is insured (at the Borrower's expense) by a sufficient casualty insurance policy and that Borrower has sufficient liability insurance coverage.  USA will hold for the Lender's account such policies and renewals thereof

(b)     Keep appropriate accounting records on each note and the sums collected thereon, which records will reflect the amounts collected as to principal, interest and late charges, and, if applicable, insurance, taxes and other specified amounts.  Those records will be available for review by the Lender during regular business hours at USA's corporate office.

(c)     Until the total amount due under each note is paid in full:

(i)     Proceed diligently to collect all payments due under the terms of the note and promptly pay the proper parties, when and if due, principal, interest, late charges, insurance and other specified funds

(ii)     In the event the Borrower fails to make any payment to USA as required by the terms of the note, USA will take steps to collect the payment including

but not limited to delivering default notices, commencing and pursuing foreclosure procedures, and obtaining representation for Lender in litigation and bankruptcy proceedings as deemed necessary or appropriate by USA in its business judgment to fully protect the interests of the Lender, and of all Lenders in the loan.

       (iii)    In its sole discretion, USA may pay off any Lender at any time by paying the then outstanding balance of Lender's interest in the principal of the Loan, plus all accrued interest and any prepayment penalty or fee, if applicable. Any Lender so paid off shall concurrently execute and deliver therewith to USA an assignment, in a form acceptable to USA, of all of such Lender's right, title, and interest in the Loan (including all documents evidencing the Loan) and in the deed of trust securing the Loan.

       (iv)    In its sole discretion, USA may waive late payment charges, assumption fees, charges for returned checks due to insufficient funds, or other fees which may be collected in the ordinary course of servicing the Loans.

       (d)    Provide the Lender with regular statements regarding loan collections, but in no event less frequently than quarterly.

       (e)    Without limiting the generality of anything contained herein, Lender hereby authorizes and empowers USA, on Lender's behalf, to: (1) execute and deliver demands for payoff and beneficiary's / lender's statements of condition and the like; (2) execute and deliver any and all instruments if satisfaction or cancellation, or of partial or full release, discharge, or reconveyance, or authorizations in connection therewith, with respect to any Loans paid in full and with respect to the related real or personal property securing such Loans; (3) execute and deliver any and all other documents with respect to any Loans that are customary and consistent with loan servicing practices pertaining to such loans; (4) consent to modifications of the Loans if the effect of any such modification will not materially or adversely affect the security provided by the real or personal property in connection therewith; (5) institute foreclosure proceedings (judicial or non-judicial), obtain a deed-in-lieu thereof, engage in settlement discussions, and enter into forbearance and other settlement-related agreements (which agreements may contain provisions that release or waive claims against a Borrower or Guarantor); and (6) take title in the name of Lender (in proportion to its interest in the Loan) to any real property upon a foreclosure or delivery of a deed-in-lieu thereof. Notwithstanding the foregoing or any other provision contained herein, USA may not permit any modification to any Loan that would change the interest rate, forgive the payment of any principal or interest (expressly excluding late charges or the difference between default and non-default interest), change the outstanding principal amount, or extend the maturity date, without Lender's prior consent; provided, however, if Lender fails to grant or deny its consent within three (3) business days after notice from USA, Lender shall be deemed to have conclusively given its consent.

       3.    **Rights of Lender if USA Fails to Act**.    Pursuant to NAC 645B.073, in the event of default, foreclosure, or other matters that require action, if for any reason USA fails to act on Lender's behalf as authorized herein, then Lender may, with approval of fifty-one percent (51%) or more of all of the holders of the beneficial interest of record in the Loan, act on behalf of all such holders of beneficial interest of record. These actions may include, but are not limited to:

v.1 Rev. 8/04           3

(a)    the designation of the mortgage broker, servicing agent or other person to act on behalf of the holders of the beneficial interests in the loan; and

(b)    the sale, encumbrance or lease of real property owned by the holders resulting from a foreclosure or the receipt of a deed in lieu of a foreclosure.

4.    Legal Proceedings    USA will assist the Lender in any necessary foreclosure proceedings to protect the Lender's interest in the note and deed of trust. Where necessary, in USA's business judgment, USA may retain attorneys on Lender's behalf. Any legal proceeding instituted by USA pursuant to this Agreement may be pursued in USA's name only or as agent for Lender. Upon demand by USA, Lender agrees to promptly pay, either in advance or to reimburse USA, for its pro rata portion of the out-of-pocket expenses incurred, including attorney's fees, trustee's fees and foreclosure costs. In the event that Lender fails to pay such sums to USA upon demand or request thereof, or if USA elects to advance such sums, USA may, in its discretion, advance such fees, including trustee's fees, attorney's fees, and costs of foreclosure; provided, however, that any fees advanced by USA shall be paid back from the proceeds of the foreclosure (whether by reinstatement or sale), or from any other monies collected with respect to such Loan, before any payments are made to Lender. In the event of any litigation concerning the Loan, Lender hereby appoints USA as its agent to accept service of any summons and complaint, naming Lender as a party.

5.    Compensation to USA for Loan Servicing    Lender authorizes USA to retain monthly, as compensation for services performed hereunder, (a) one-twelfth (1/12th) of its annual servicing fee, which shall not exceed three percent (3%) per annum of the maximum principal amount of each of the Loans, (b) any late charges collected from the Borrower pursuant to the terms of the Note, and (c) and default interest collected from the Borrower pursuant to the terms of the Note. Notwithstanding the foregoing, it is agreed and acknowledged that USA derives the bulk of its revenues from charging loan fees ("points") to the Borrower. Certain Borrowers, however, may prefer to pay a higher rate of interest in exchange for a reduction in loan fees payable in advance to USA, the higher interest rate comprising a deferred loan fee. USA will notify Lender when such a case arises, and advise Lender of what portion of the interest is payable to USA as a deferred loan fee.

Should Lender desire to sell all or any part of its interest in the note and deed of trust, USA will assist Lender in finding potential buyers and completing the necessary documentation for the transaction. A fee of 5% of the remaining balance of Lender's undivided interest in the note amount will be deducted from the selling price and paid to USA on all such assignments for which USA locates the Assignee.

In the event an extension of a Loan is negotiated, USA shall be entitled to charge a fee therefor from the Borrower pursuant any separate fee agreement between USA and the Borrower.

6.    USA's Right to Delegate.    Notwithstanding anything contained herein, USA may in its sole discretion delegate specific loan arranging and servicing obligations to credit bureaus, real estate tax service companies, real estate brokers or agents, appraisers, attorneys, trustees, or others, provided that USA shall remain responsible for all action taken or not taken by such companies, agents, representatives, and others throughout the term of this Agreement.

7    No Legal Advice    Lender acknowledges that USA will not act as Lender's attorney or provide legal advice to Lender, and that Lender is encouraged to seek independent counsel in connection with any

questions Lender may have concerning this agreement, any Loan, USA's form loan documents, or any other matter

8.    Termination.  Lender may, by 30 days written notice to USA, terminate this agreement, and the power of attorney granted, if one is granted, under Section 11 of this Agreement, if USA fails to perform its obligations hereunder.

9    Lender's Registration.  Lender(s) name as listed in the first paragraph of this Agreement is the exact form for registration of Lender's interest and for reference to Lender in the Loan Documents.

10.    Integration Clause.  This Agreement contains the entire agreement between the parties hereto and cannot be modified except by a written amendment signed by both parties.  The invalidity of any portion of this agreement shall in no way affect the balance thereof.  This Agreement shall remain in effect until Lender's interest in all notes and deeds of trust with respect to Loans arranged and/or serviced by USA is completely liquidated (unless sooner terminated in accordance with the terms hereof)

11.    Limited Power of Attorney.  With respect to each loan, Lender hereby agrees that USA shall have full power and authority, and Lender hereby appoints USA as its true and lawful attorney-in-fact to (a) hold the original note(s), and (b) to do all things and take all actions on behalf of Lender which are necessary or convenient to effectuate this Agreement and its intent and to protect Lender's interest under any note, deed of trust, guaranty, security agreement or other document pertaining to any Loan  Upon USA's request, Lender hereby agrees to execute and deliver, in the presence of a notary public, a "Declaration of Agency and Limited Power of Attorney", in a form consistent with Chapter 645B of the Nevada Revised Statutes, pursuant to which Lender shall further evidence the appointment of USA as Lender's true and lawful attorney-in-fact to undertake the duties of USA hereunder.  No one shall be required to look beyond such Declaration of Agency and Limited Power of Attorney for evidence of USA's authority hereunder  All Declarations of Agency and Limited Powers of Attorney may include the language: This document may be executed with counterpart signature pages, and the document with all counterpart signature pages shall constitute one and the same instrument.

12 Notices.  All notices, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been given (i) when personally delivered, or (ii) on receipt, when deposited with a recognized overnight courier service such as Federal Express or DHL, or (iii) three (3) business days after the date when deposited in the United States mail and sent postage prepaid by registered or certified mail, return receipt requested, addressed as follows:

If to USA:        USA Commercial Mortgage Company
                  4484 S. Pecos Road
                  Las Vegas, Nevada 89121-5030
                  Attention:


If to Lender:



                  Attention:

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice

13.    Governing Law. This Agreement shall be construed in accordance with the laws of the State of Nevada, without regard to the conflict of laws or rules thereof, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws,

14    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

15.    Attorney's Fees. In the event any party hereto brings an action to enforce any of the provisions of this Agreement, the party against whom judgment is rendered in such action shall be liable to the other for reimbursement of its costs, expenses and attorneys' fees, including such costs, expenses and fees as may be incurred on appeal,

16.    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors and assigns.

17.    Headings. Sections headings used in this Agreement are for convenience only and shall not affect the meaning or interpretation of this Agreement.

18.    Authority. Each party represents and warrants to the other party that it is duly authorized to execute, deliver and perform this Agreement

IN WITNESS WHEREOF, the parties hereto have signed, sealed, acknowledged and delivered this instrument the day and year first above written

LENDER: Patrick F. Fenlon and Angela B. Fenlon, husband and wife as joint tenants with the rights of survivorship

By: _____
Name: Patrick F. Fenlon
Title: Husband

By: _____
Name: Angela B. Fenlon
Title: Wife

USA COMMERCIAL MORTGAGE COMPANY

By: _____
Joseph D. Milanowski, President

6

v.1 Rev. 8/04

# EXHIBIT "4"

Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

and

Lenard E. Schwartzer
Nevada Bar No. 0399
Jeanette E. McPherson
Nevada Bar No. 5423
Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146-5308
Telephone:  (702) 228-7590
Facsimile:  (702) 892-0122
E-Mail:  bkfilings@s-mlaw.com
Proposed Attorneys for Debtors and Debtors-in-Possession

**E-FILED ON MAY 8, 2006**

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

### UNITED STATES BANKRUPTCY COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br><br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | Chapter 11 |
| In re:<br><br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>Debtor. | **DEBTORS' MOTION TO TEMPORARILY HOLD FUNDS PENDING A DETERMINATION OF THE PROPER RECIPIENTS, AND MEMORANDUM OF POINTS AND AUTHORITIES (AFFECTS ALL DEBTORS)** |
| In re:<br><br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | |
| In re:<br><br>USA SECURITIES, LLC,<br>Debtor. | Date:  June 5, 2006<br>Time:  9:30 a.m. |
| Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA First Trust Deed Fund, LLC | |

1

Debtors, USA Commercial Mortgage Company ("USACM"), USA Securities, LLC ("USA Securities"), USA Capital Realty Advisors, LLC ("USA Realty"), USA Capital Diversified Trust Deed Fund ("USA Diversified"), and USA Capital First Trust Deed Fund ("USA First") (collectively referred to as "Debtors"), by and through their counsel, Ray Quinney & Nebeker P.C. and Schwartzer & McPherson Law Firm, hereby file this Motion To Temporarily Hold Funds Pending A Determination Of The Proper Recipients, And Memorandum Of Points And Authorities (the "Motion").  This Motion requests an Order from the Court permitting USACM to temporarily hold funds USACM has collected and continues to collect from borrowers in its capacity as the loan servicer on approximately 115 commercial loans, pending a further order of the Court to be entered on or after July 25, 2006 (the date the Court is scheduled to conduct a further hearing on this matter).[1]  This Motion is supported by the Supplemental Declaration of Thomas J. Allison in Support of Debtors' Motions (the "Supplemental Allison Declaration") filed May 2, 2006, and the Memorandum of Points and Authorities set forth, the pleadings on file, and any oral argument at the time of the hearing of this Motion.

This Motion seeks limited authority to continue to collect and hold loan payments and loan payoffs (net of amounts permitted to be used pursuant to the Cash Motion) in USACM's separate "DIP Collection Account" (defined below) until the hearing scheduled for July 25, 2006, pending completion of Mr. Allison's investigation, analysis, and report to the Court recommending the proper disbursement of the funds, and until the Court thereafter orders that distributions of the funds begin to the proper recipients.

The Court recently granted Debtors' motion to approve cash management procedures and Debtors' limited use of cash (the "Cash Motion"), pursuant to a revised cash budget for a period of approximately ninety (90) days after commencement of Debtors' bankruptcy cases, in order to allow Debtors to preserve the value of the loan portfolio being serviced by USACM and to accomplish other key account reconciliation and loan servicing activities for the benefit of all

---

[1] Debtors expect to complete initial investigations, analyses, and reconciliations in these cases by July 16, 2006, and to make a report to the Court and investors regarding this matter prior to the hearing scheduled for July 25, 2006.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

investors. Pursuant to the present Motion, USACM requests authority to continue to hold and collect funds in its capacity as the loan servicer on behalf of investors during the initial phase of these cases until a hearing scheduled for July 25, 2006 takes place, and thereafter until the Court orders the disposition of the funds to the proper recipients. Accordingly, USACM also seeks this Court's order that it not be required to disburse or distribute any funds to investors until USACM, through new management, is able to thoroughly investigate and evaluate the Debtors' files and records and determine, among other things, what portion of the funds held by USACM represent unpaid servicing and loan origination fees, which investors have been overpaid as a result of USACM's pre-petition practice of making regular monthly interest payments regardless of the status of the underlying loan, and which investors have been underpaid, including investors to whom principal repayments were not remitted when collateral was released pre-petition.

Further complicating this investigative effort is that apparent fact, as described below, that more than 60% of the Debtors' investors were invested in more than one loan. Thus, any individual investor may have been overpaid on a non-performing loan, on the one hand, and may have been under-paid or properly paid on a performing loan, on the other. Until the Debtors are able to determine the individual status of each investor in each loan and the net amounts due to or from investors on all loans in the portfolio, it makes no sense to distribute funds only to be required at a later date to seek disgorgement from investors for post-petition payments that should not have been made. Indeed, the Debtors have an equitable interest in the funds until a determination is made by the Court as to their ultimate disposition in this case. That disposition is not a foregone conclusion because, until the affairs of the Debtors are sorted out, the Debtors cannot tell which of the possible precedents with respect to distributions to investors it should advocate in order to insure a fair and equitable treatment of investors, nor can the Court make such a determination except on complete and fully presented facts. Because the full and complete facts are not yet known, and given the current situation, the only approach that is in accordance with the governing contracts and the law, and the only equitable approach which will benefit all investors fairly, is to permit the Debtors to hold funds and make no disbursements to investors until the new management of the Debtors has sorted out the full underlying facts and, depending on the facts

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

3

1  found, has sought appropriate relief from this Court, which will be addressed at the hearing

2  scheduled for July 25, 2006.

**POINTS AND AUTHORITIES**

**Factual Summary**

5       The facts supporting this motion are set forth in the Supplemental Allison Declaration and

6  in the entire record in these cases.  The key facts are summarized below.

7       The Debtors filed voluntary petitions for relief on April 13, 2006 (the "Petition Date").

8  Prior to the Petition Date, USACM was primarily in the business of originating, brokering, and

9  servicing commercial real estate loans and fractional interests therein.  Under prior management,

10  pre-petition irregularities occurred in servicing the loans.  On the Petition Date, Thomas J. Allison

11  ("Allison") of Mesirow Interim Financial Management became the President of USACM and the

12  Manager of the four remaining Debtors who are limited liability companies.  In an order entered

13  April 19, 2006, this Court authorized the Debtors' employment of Allison as the Chief

14  Restructuring Officer for an interim period until July 27, 2006.

15       Under their new management since the Petition Date, the Debtors have worked hard to

16  begin analyzing and unraveling the problems the Debtors face arising from past business practices

17  and irregularities.  USACM has not originated or brokered any new loans since the Petition Date,

18  and will not do so without Court approval.  USACM continues to be the loan servicer for

19  approximately 115 commercial loans having a combined outstanding balance of approximately

20  $962 million (the "Serviced Loans"), nearly all of which are secured by various real estate projects

21  or developments.  The loan documents and other records of USACM indicate that there are

22  approximately 3,600 investors (the "Direct Lenders")[2] whose names appear as a "Lender" for one

23  or more of the Serviced Loans.  Typically, there are dozens or even hundreds of Direct Lenders on

24  a particular loan, with each lender having only a small fractionalized share.  Among the Direct

25  Lenders are two of the other Debtors, USA Capital Diversified Fund, LLC ("Diversified") and

26

27  ───────────────

28  [2] Although the Supplemental Allison Declaration used the term "Loan Investors" for this group, the Court at the hearing held May 3, 2006 on the Cash Motion expressed a preference for the term "Direct Lenders."

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

USA Capital First Trust Deed Fund, LLC ("Capital First") (collectively, the "Funds").  Diversified has approximately 1,900 LLC members and Capital First has approximately 1,300 members (collectively, the "Fund Members").  There is substantial overlap among the Direct Lenders and the Fund Members.

As of the Petition Date, a significant portion of the Serviced Loans were delinquent in the payment of interest or otherwise could be considered non-performing (the "Nonperforming Loans").  Further, a significant portion of the Serviced Loans were made to borrowers affiliated with the former senior management of the Debtors.  Despite the fact that many of the borrowers were not making monthly payments on their loans as required by the relevant loan documents, USACM continued to pay regular monthly interest to each of the Direct Lenders (including the Funds, who in turn made regular monthly payments to the Fund Members) whether or not USACM had actually collected payments from the borrowers.  The Debtors have claims against each Direct Lender and Fund Member who received overpayments from USACM or the Funds.  No interest payments have been made to the Direct Lenders or the Fund Members since the Petition Date.

The Debtors are holding payments that have been collected and continue to be collected from the borrowers on behalf of the Direct Lenders (including the Funds) in a new, post-petition Debtor-in-Possession DIP Collection Account (the "DIP Collection Account") pursuant to the Cash Motion.  No funds from any other sources have been commingled with or placed in the DIP Collection Account since the Petition Date.  The Debtors maintain operating accounts separate from the DIP Collection Account for use in facilitating their business operations and administrative duties.  At a hearing on the Cash Motion held May 3, 2006, the Court granted approval of the Debtors' motion requesting limited authority to use cash of the Debtors to fund limited activities of the Debtors pursuant to a revised  cash budget through July 16, 2006.  This initial time period of cash use was requested by the Debtors in order to enable USACM, which has the right and obligation under its servicing agreements with the Direct Lenders and under Nevada state law, to perform appropriate loan-by-loan and investor-by-investor analyses and reconciliations to determine the extent and effect of the overpayments, underpayments, and

SCHWARTZER & McPHERSON LAW FIRM<br>2850 South Jones Boulevard, Suite 1<br>Las Vegas, Nevada 89146-5308<br>Tel: (702) 228-7590 · Fax: (702) 892-0122

1   collateral releases.  The present Motion requests that pending the results of this investigation and

2   pending further order of the Court, the Debtors be allowed to temporarily hold all funds collected,

3   net of the funds authorized to be used in accordance with the Cash Motion.

4                                          **Memorandum of Law**

5   **A.      Various Rights to Funds in the DIP Collection Account Must Be Determined Before
         Any Distributions to Investors Can Be Made.**

6

7              A large portion of the Direct Lenders and Fund Members received monthly interest

8   payments that they were not entitled to receive because they were invested (directly or indirectly)

9   in loans that were not paying interest.  USACM potentially has a claim against each Direct Lender

10  who received overpayments from USACM.  Moreover, even if USACM did not have direct claims

11  for such overpayments, Direct Lenders who did not receive all of the payments to which they were

12  entitled on account of the Serviced Loans may have claims against USACM.  USACM, having the

13  right and the obligation under its servicing agreements with the Direct Lenders and under Nevada

14  state law to perform appropriate loan-by-loan and investor-by-investor analyses and

15  reconciliations to determine the extent of the overpayments and underpayments, should be entitled

16  to hold the funds in the DIP Collection Account, make a recommendation to the Court regarding

17  the disposition of the funds, and obtain a Court determination before being required to release the

18  funds.  To the extent the Debtors may have claims against certain Direct Lenders and Fund

19  Members, it would be impracticable and inequitable to require USACM to immediately release

20  funds to those Direct Lenders (including the Funds) who claim an interest in the funds and then

21  require the Debtors to later sue those same Direct Lenders and Fund Members to retrieve the funds

22  to the extent it is ultimately determined that they were overpaid.

23             Furthermore, USACM may have a claim on the a portion of the funds in the DIP

24  Collection Account beyond the amounts requested for use in the Cash Motion due to the fact that

25  USACM did not collect the full amount of servicing fees and other contractual fees it was entitled

26  to charge to and collect from the Direct Lenders, including the Funds.  USACM should be allowed

27  to continue to hold and collect funds in the DIP Collection Account from the borrowers on the

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Serviced Loans for the limited period requested by this Motion so that USACM may determine the

2    extent of USACM's interest in the funds.

3         In the analogous context of a receivership, the Nevada Supreme Court, in *Ex Rel. Irving*

4    *National Bank v. District Court*, 217 P. 962 (1923), concluded that parties were protected by

5    maintaining property in the hands of a receiver pending determination of rights to the property.   In

6    *Irving National Bank*, a receiver was appointed to take control of property of an insolvent mining

7    company.  The appointed receiver seized the property in contravention of an attempted levy and

8    sale by Irving National Bank, a judgment creditor of the insolvent.  Several days later, the receiver

9    issued a receiver's certificate in the amount of $15,000, which certificate became a first lien on the

10   property.  Irving National Bank petitioned the court, seeking to enjoin the receiver and for return

11   of the property.

12        The *Irving National Bank* court observed that while in the hands of the receiver, any

13   claims to the property would be preserved: "It is a well-established rule that the receiver's

14   possession is subject to all valid and existing liens upon the property at the time of his

15   appointment, and does not divest a lien previously acquired in good faith." *Id.* at 963 (citations

16   omitted).  The Court further noted that pending resolution of the competing claims to the property,

17   the property should remain in the hands of the receiver: "'This exclusive possession of the receiver

18   . . . does not interfere with or disturb any preexisting liens, preferences or priorities, but simply

19   prevents their execution *by holding all property intact until the relative rights of all parties can be*

20   *determined*.'"  *Id.* at 964 (quoting *Pelletier v. Greenville Lumber Co.*, 31 S.E. 855) (emphasis

21   added).  In the instant case, too, USACM should be authorized to retain funds in its possession

22   until a determination of the relative rights of parties can be made.  This principle is particularly

23   applicable in a situation such as the present one where the competing claims are many, the

24   underlying records voluminous, and the legal and equitable interests in the funds held by USACM

25   on the Petition Date and in the loans serviced by USACM (including the proceeds of such loans)

26   are unclear.

27   / / /

28   / / /

Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

7

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    **B.      USACM Has Contractual and Statutory Obligations Not to Release the Funds Until**
2    **the Rightful Ownership Is Established.**

3           Under the Loan Servicing Agreement that each Direct Lender entered into with USACM,

4    USACM is required, among other things, to keep appropriate accounting records and ensure that

5    the loan payments it collects as servicer are paid out only to the "proper parties" entitled to receive

6    such payments.  *See* Loan Servicing Agreement ¶ 2(c)(i).  Under its new management, USACM is

7    working hard to review, verify, and establish appropriate accounting records that will accurately

8    reflect the proper amounts owed to or from each Direct Lender (including the Funds) with respect

9    to each of the Serviced Loans, for the benefit of all Direct Lenders and Fund Members.  Further,

10   since the Petition Date, USACM under its new management has begun to aggressively collect

11   past-due amounts owed on the Nonperforming Loans for the benefit of all Direct Lenders having

12   an interest in one or more of the Nonperforming Loans, which includes both of the Funds and

13   nearly all other Direct Lenders as well.

14           USACM also has a statutory duty under Nevada law respecting mortgage brokers to ensure

15   that no payments it collects as mortgage servicer are released to any owners of fractional interests

16   in a particular Serviced Loan unless the same amount "is also released to every other investor who

17   owns a beneficial interest in the loan."  Nev. Rev. Stat. § 645B.175(5).  Thus, although some

18   investors holding an interest in a particular loan may believe they are entitled to have the loan

19   payments released immediately to them, it is in the best interests of other investors in that same

20   loan, and is statutorily required, to allow USACM to hold all collected amounts for the limited

21   period requested in the Motion so that the respective rights of all parties may be clarified before

22   any disbursements are made.  Under the statute, USACM is not authorized to release fractional

23   loan payments to only those investors, if any, who may be invested solely in performing loans,

24   because other investors in the same performing loans may have invested also in non-performing

25   loans and thus cannot be paid until the analyses and reconciliations are completed.

26   / / /

27   / / /

28   / / /

**C.    Until Various Rights to Funds in the DIP Collection Account are Determined, the Debtors have an Equitable Interest in the Notes and Mortgages to Administer Them, Making the Funds Property of the Estate as to Which No Immediate Distribution Should be Required.**

In *In re Builders Capital Services, Inc.*, 317 B.R. 603 (Bankr. W.D.N.Y. 2004), the court determined that a mortgage servicer/debtor had an "equitable interest" in notes and mortgages to administer them, thus rendering the notes and mortgages property of the estate.  In *Builders Capital*, debtor solicited investors to provide funds which would be pooled for the purpose of funding short term construction loans.  Investors' funds were commingled, and subsequently loaned to construction borrowers.   As part of the transaction, investors were required to appoint Builders Capital, the debtor, as agent under the notes and accompanying mortgages.  When interest or other payments were made by borrowers on the loans, those funds, too, were commingled with the debtor's operating funds.  Based on several articulated factors and equitable considerations, the court concluded that the notes and mortgages were property of the estate and characterized the controversy between investors and the trustee over the notes and mortgages as "a dispute among equitable interests and a choice between equitable remedies."  *Id*. at 609.   The court concluded that "[t]o the extent that Builders Capital could best fulfill its responsibilities to investors, the 'demands of justice' would recognize an equitable interest to administer the notes and mortgages."  *Id*. at 612.

In this case, where there has been substantial commingling of the Debtors funds and of the Direct Lenders' (including the Funds') funds pre-petition, and where the "demands of justice" make it necessary for the Debtors to exercise control over the funds to "best fulfill its responsibilities to investors," this Court should also recognize an "equitable interest" of the Debtors in the funds "to administer the notes and mortgages" pending a determination by the Court as to the ultimate disposition of the funds made after this initial administration by the Debtors.  Further, while the *Builders Capital* case ended up with a determination of a pro rata sharing of the proceeds of the notes and mortgages among the investors, the Debtors have made no determination as to whether similar circumstances exist in this case, or whether this approach is warranted and should be advocated by the Debtors under the facts and the equities of the case

P:\USA Commercial Mortgage\Pleadings\Hold Funds Motion\Motion to Temporarily Hold Funds.DOC/870629

1    when considering the interests of all Direct Lenders and Fund Members.  The Debtors are merely

2    seeking recognition of their equitable interests in these funds to hold these funds pending a

3    determination by the Court as to their ultimate disposition.

4    **D.    Under Certain Circumstances, Direct Lenders May Be Deemed to Be Creditors of
     USACM rather than Lenders on Particular Loans and the Loans May be Deemed to Be
5    Property of USACM's Estate.**

6

7         It may be that the substance of the transactions and interrelations among USACM, the

8    other Funds and other Debtors, the Direct Lenders, and the Fund Members created a situation

9    under the law in which the Direct Lenders (including the Funds) as well as the Fund Members

10   should be treated as lenders to USACM rather than lenders to the underlying borrowers on the

11   Serviced Loans.  The Debtors are aware that under certain circumstances, the case precedents have

12   concluded that the true economic substance of the overall transaction will prevail over the form of

13   the transaction according to the transaction documents.  The Debtors have made no determination

14   as to whether such circumstances exist in this case, or whether this approach is warranted and

15   should be advocated by the Debtors under the facts and the equities of the case when considering

16   the interests of all Direct Lenders and Fund Members, but the Debtors believe it would be unwise

17   and inequitable to immediately distribute funds held in the DIP Collection Account before such a

18   determination is made.

19         Numerous decisions have considered whether a given transaction between an investor and

20   a debtor mortgage broker constitutes a true mortgage participation or, in fact, a loan to the debtor.

21   *See, e.g., In re Corporate Financing, Inc.*, 221 B.R. 671 (Bankr. E.D.N.Y. 1998); *In re Sprint*

22   *Mortgage Bankers Corp.*, 164 B.R. 224 (Bankr. E.D.N.Y. 1994).  In *Sprint Mortgage*, investors

23   sought on summary judgment a determination of their rights to certain notes and proceeds of notes

24   secured by deeds of trust on real property.  The debtor made loans as a mortgage broker to various

25   third parties with funds obtained from private investors.  The private investors in that case

26   invested funds and obtained assignments of mortgage notes and deeds of trust.   After considering

27   the effect of 11 U.S.C. §541(d) and after articulating and weighing the factors to consider in

28   determining whether the transaction were "true mortgage participations" or loans to the debtor, the

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

10

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    *Sprint Mortgage* court determined that the transactions at issue were loans by the participants, and

2    thus the mortgages were property of the debtor.  *See also In re The Woodson Co.*, 813 F.2d 266,

3    271 (9th Cir. 1987).

4         Among the factors considered in the *Sprint Mortgage* case in determining if an alleged

5    mortgage participation is most likely a loan were whether the transaction included a guarantee of

6    payment, whether the terms of the underlying obligation were different than the terms of the

7    agreement with the investor, and the substance of the relationship between the investor and the

8    debtor.   Based on the facts currently known to the Debtors' new management, it is possible that

9    the results of the new management's investigation could lead to the conclusion that the

10   investments by investors possess the earmarks of loans, rather than mortgage participations,

11   making the loans property of the estate and the claims of Direct Lenders and Fund Members

12   unsecured claims against the Debtors.  This would result in a pro rata sharing of assets in the loan

13   portfolio with other Direct Lenders and Fund Members.  However, the Debtors' new management

14   do not yet possess information necessary to make an informed decision as to whether this would

15   be an equitable result for which they should advocate.  In the interim, and pending the gathering of

16   information to determine whether the factors relied on in these cases are present, the Debtors are

17   simply requesting to be able to hold the funds so as to maintain the status quo pending a

18   determination by the Court as to the proper distribution of the funds in this case.

19   **E.    The Debtors May Have Equitable Claims or Liens on the Collateral for the Benefit of
         All Direct Lenders, Warranting a Temporary Freeze on the Distribution of any Proceeds.**
20

21        Due to pre-petition irregularities in the accounting and loan servicing practices of

22   USACM, the extent of insider loans in the portfolio of the Serviced Loans, and other significant

23   problems under USACM's prior management, one possible equitable result under applicable law

24   may be that USACM could be deemed to have equitable claims or liens on all of the collateral

25   securing the Serviced Loans on behalf of all Direct Lenders and Fund Investors, entitling all Direct

26   Lenders and Fund Investors to a pro-rata share in the ultimate distributions to be made from the

27   DIP Collection Account and from the Debtors' estate.  *See, e.g., In re Lemons & Assocs., Inc.*, 67

28   B.R. 198 (Bankr. Nev. 1986).  The Debtors have made no determination as to whether such

1   circumstances exist in this case, or whether this approach is warranted and should be advocated by

2   the Debtors under the facts and the equities of the case when considering the interests of all Direct

3   Lenders and Fund Members, but the Debtors believe it would be unwise and inequitable to

4   immediately distribute funds held in the DIP Collection Account before such a determination is

5   made.

6           Indeed, facts may ultimately be adduced which would compel the Court to distribute

7   available funds to investors on a pro rata basis on the theory that all investors are essentially

8   similarly situated and should share equally the burden of the Debtors' pre-bankruptcy

9   irregularities.  Such was the result in *In re Lemons & Associates, Inc.*, 67 B.R. 198 (Bankr. Nev.

10  1986).  The *Lemons* Court noted that the concept of equal sharing was "one of the strongest

11  policies behind bankruptcy law" and recognized that where, "from an equitable point of view," the

12  results of which investor received interests in actual performing notes was essentially "fortuitous,"

13  the Court concluded that "pro rata distribution will be the rule when necessary to achieve an

14  equitable result" because in that circumstance, "[e]quality is equity.'" *Id.* 212-214.  *See also In re*

15  *Builders Capital Services, Inc.*, 317 B.R. 603, 612 (Bankr. W.D.N.Y. 2004) (the court concluded

16  that "under these difficult circumstances, equity commands that every investor share both the pain

17  and an equal prospect for recovery.").

18          The new management of the Debtors may conclude, among other things, that there is an

19  inability to trace or that such tracing would be completely inequitable, given that principal

20  payments were accepted by the Debtors pre-petition and collateral released without any payment

21  to the enumerated lenders on the loans involved. The distinctions among the Direct Lenders and

22  Fund Investors are not readily apparent at this point in time, and, at the end of the day, the Court

23  may well determine that all investors should be treated pro rata, as the Court in *Lemons* ultimately

24  determined.

25                                  **CONCLUSION**

26          Based on the foregoing, the Supplemental Allison Declaration, and all matters of record in

27  the Debtors' bankruptcy cases, USACM requests that the Court grant a limited period of time,

28  until the July 25, 2006 hearing and until the Court thereafter enters an appropriate order, during

Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   which USACM may continue to hold and collect all amounts it collects in the DIP Collection

2   Account as servicer of the Serviced Loans (net of amounts in the DIP Collection Account the

3   Debtors are permitted to transfer to an operating account pursuant to the Cash Motion), pending

4   the Debtors' prompt investigation and analysis of the issues addressed herein and the Debtors'

5   prompt preparation of the loan and investor accounting and reconciliation information for the

6   benefit of all Direct Lenders (including the Funds) and Fund Members, as detailed in the

7   Supplemental Allison Declaration.  On or before July 25, 2006, the Debtors will file a report with

8   the Court respecting these issues and will make a further motion to or pleading with the Court with

9   respect to the relief the Debtors will be requesting based on the findings in the report.

10          DATED this 8th day of May, 2006.

11

12                                              /s/ Jeanette E. McPherson
                                                Lenard E. Schwartzer, Esq.
13                                              Jeanette E. McPherson, Esq.
                                                Schwartzer & McPherson Law Firm
14                                              2850 South Jones Blvd., Suite 1
                                                Las Vegas, Nevada 89146
15                                              Proposed Attorneys for Debtors
                                                and Debtors-in-Possession
16

17

18

19

20

21

22

23

24

25

26

27

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

13