# EXHIBIT A

**USA Commercial Mortgage Company, et al.**
13-Week Cash Forecast
($ in thousands)

## USA Commercial Mortgage

| 13-Week Cash Forecast — Week Ending | 6/4/2006 | 6/11/2006 | 6/18/2006 | 6/25/2006 | 7/2/2006 | 7/9/2006 | 7/16/2006 | 7/23/2006 | 7/30/2006 | 8/6/2006 | 8/13/2006 | 8/20/2006 | 8/27/2006 | Total 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Collections** | | | | | | | | | | | | | | |
| **Loan Collections** | | | | | | | | | | | | | | |
| Origination Fees | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Collection of Pre-Paid Interest from Borrowers | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Interest Income from Collections Account | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Reimbursed Expenses from USA Capital Realty | 0.0 | 0.0 | 0.0 | 125.0 | 0.0 | 125.0 | 0.0 | 0.0 | 125.0 | 125.0 | 0.0 | 0.0 | 0.0 | 250.0 |
| **Loan Servicing Collections** | | | | | | | | | | | | | | |
| Estimated Servicing Fees | 316.6 | 0.0 | 11.8 | 0.0 | 69.4 | 307.9 | 307.9 | 0.0 | 0.0 | 0.0 | 307.9 | 0.0 | 0.0 | 944.2 |
| Outstanding Origination, Extension and Closing Fees | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 250.0 |
| **Total Cash Collections Operating Accounts** | $316.6 | $0.0 | $11.8 | $0.0 | $90.3 | $125.0 | $307.9 | $0.0 | $0.0 | $125.0 | $307.9 | $0.0 | $0.0 | $1,194.2 |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| Origination Expenses | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Loan Servicing Expenses | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $400.0 | $0.0 | $0.0 | $0.0 | $800.0 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Salaries & Wages | 0.0 | 60.0 | 0.0 | 45.0 | 0.0 | 45.0 | 0.0 | 45.0 | 0.0 | 45.0 | 0.0 | 45.0 | 0.0 | 285.0 |
| Payroll Related Benefits | 7.4 | 10.2 | 0.0 | 7.7 | 7.7 | 7.7 | 7.7 | 7.7 | 0.0 | 14.0 | 7.7 | 7.7 | 0.0 | 68.4 |
| Rent | 49.0 | 0.0 | 0.0 | 0.0 | 0.0 | 46.0 | 0.0 | 0.0 | 0.0 | 49.0 | 0.0 | 0.0 | 0.0 | 147.0 |
| Office Operating Disbursements | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 195.0 |
| Other Operating Disbursements | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 260.0 |
| **Total Operating Disbursements** | $91.4 | $105.2 | $35.0 | $87.7 | $90.3 | $87.7 | $87.7 | $87.7 | $435.0 | $143.0 | $35.0 | $87.7 | $435.0 | $1,755.4 |
| **Bankruptcy Related Disbursements** | | | | | | | | | | | | | | |
| Professional Fees (see schedule for detail) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $2,596.2 | $0.0 | $0.0 | $0.0 | $2,596.2 |
| Trustee Fees | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 9.0 | 0.0 | 0.0 | 0.0 | 9.0 | 18.0 |
| **Other** | | | | | | | | | | | | | | |
| Employee Retention Costs | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 45.0 | 0.0 | 0.0 | 45.0 | 285.0 |
| Noticing Agent | 0.0 | 112.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 14.0 | 7.7 | 7.7 | 7.7 | 69.4 |
| Appraisal Fees | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 49.0 | 0.0 | 0.0 | 0.0 | 147.0 |
| **Post-Petition Financing** | | | | | | | | | | | | | | |
| Fees for Post-Petition Financing | 0.0 | 0.0 | 100.0 | 0.0 | 100.0 | 0.0 | 0.0 | 0.0 | 100.0 | 15.0 | 15.0 | 15.0 | 15.0 | 284.5 |
| Lender Expenses | 0.0 | 0.0 | 0.0 | 150.0 | 200.0 | 0.0 | 0.0 | 0.0 | 0.0 | 20.0 | 20.0 | 20.0 | 20.0 | 330.0 |
| **Total Bankruptcy Related Disbursements** | $0.0 | $112.5 | $100.0 | $319.4 | $200.0 | $0.0 | $0.0 | $109.0 | $2,659.8 | $0.0 | $0.0 | $0.0 | $0.0 | $1,755.4 |
| **Total Cash Disbursements Operating Accounts** | $91.4 | $217.7 | $135.0 | $407.1 | $387.7 | $87.7 | $87.7 | $544.0 | $2,811.7 | $87.7 | $87.7 | $87.7 | $0.0 | $5,318.7 |
| **NET CHANGE IN CASH** | ($91.4) | $98.9 | ($23.2) | ($187.7) | ($409.7) | ($162.7) | $272.9 | ($87.7) | ($544.0) | ($2,086.7) | $272.9 | ($87.7) | ($444.0) | ($4,079.8) |

### Cash Position - USA Commercial Mortgage Estate

| Week Ending | 6/4/2006 | 6/11/2006 | 6/18/2006 | 6/25/2006 | 7/2/2006 | 7/9/2006 | 7/16/2006 | 7/23/2006 | 7/30/2006 | 8/6/2006 | 8/13/2006 | 8/20/2006 | 8/27/2006 | Total 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cash and Cash Equivalents at Beginning of Period | $1,377.3 | $1,286.0 | $1,384.9 | $1,361.7 | $1,174.0 | $394.3 | $601.7 | $874.6 | $787.0 | $243.0 | $243.0 | ($82,443.8) | ($82,170.8) | $1,377.3 |
| Pre-Petition Cash (net) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Net (Decrease) Increase in Cash and Cash Equivalents | (91.4) | 98.9 | (23.2) | (187.7) | (409.7) | (162.7) | 272.9 | (87.7) | (544.0) | (2,686.7) | 272.9 | (87.7) | (444.0) | (4,079.8) |
| Total Cash DIP Operating Account at End of Period | $1,285.9 | $1,384.9 | $1,361.7 | $1,174.0 | $764.3 | $3,495.2 | $3,757.6 | $787.0 | $243.0 | ($2,443.8) | ($82,170.8) | ($82,258.5) | ($82,702.5) | ($2,702.5) |
| Incurred and Unpaid Professional Fees (see schedule for detail) | ($797.1) (a) | ($996.6) | ($1,273.7) | ($1,766.3) | ($2,893.5) | ($4,020.0) | ($4,282.5) | ($4,035.5) | ($4,362.4) | ($827.0) | ($827.0) | 0.0 | 0.0 | ($5,288.4) |
| DIP Operating Account Less Unpaid Professional Fees | $2,080.1 | $2,380.5 | $2,635.0 | $3,232.8 | $4,120.0 | $2,141.1 | $3,918.6 | $2,141.1 | $2,565.9 | $2,565.9 | $2,565.9 | $2,585.0 | $2,585.0 | $2,585.0 |
| Estate Funds in Collections Account (see schedule for detail) | $10,308.8 | $10,308.8 | $10,308.8 | $10,529.9 | $10,529.9 | $10,529.9 | $10,529.9 | $10,529.9 | $10,529.9 | $10,766.9 | $10,766.9 | $10,766.9 | $10,766.9 | $10,766.9 |
| **Total USA Commercial Mortgage Estate Cash Balance** (reduced by unpaid professional fees) | $9,511.7 | $9,313.2 | $8,987.6 | $8,512.5 | $8,061.5 | $7,638.4 | $7,648.9 | $7,266.9 | $6,490.5 | $6,464.5 | $6,455.0 | $6,144.9 | $5,478.5 | $5,478.5 |

Notes:
a. Includes April and May
Prepared by MFIM, LLC

Preliminary Numbers Subject to Revision

**USA Commercial Mortgage Company, et al.**
13-Week Cash Forecast
($ in thousands)

| Additional Accounts | 6/4/2006 | 6/11/2006 | 6/18/2006 | 6/25/2006 | 7/2/2006 | 7/9/2006 | 7/16/2006 | 7/23/2006 | 7/30/2006 | 8/6/2006 | 8/13/2006 | 8/20/2006 | 8/27/2006 | Total 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **USA Capital Realty Advisors - DIP Operating Account** | | | | | | | | | | | | | | |
| Beginning Cash Balance | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 |
| Management Fees Collected (DTEF) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 125.0 | 0.0 | 0.0 | 0.0 | 125.0 | 0.0 | 0.0 | 0.0 | 250.0 |
| Expense Reimbursement due USA CMC | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (125.0) | 0.0 | 0.0 | 0.0 | (125.0) | 0.0 | 0.0 | 0.0 | (250.0) |
| Ending Cash Balance | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 | $122.7 |
| **USA Securities - DIP Operating Account** | | | | | | | | | | | | | | |
| Cash Balance USA Securities | $21.8 | $21.8 | $21.8 | $21.8 | $21.8 | $21.8 | $21.8 | $21.8 | $21.8 | $21.8 | $21.8 | $21.8 | $21.8 | $21.8 |
| **Diversified Trust - DIP Operating Account** | | | | | | | | | | | | | | |
| Beginning Cash Balance DTDF | $698.2 | $698.2 | $698.2 | $698.2 | $698.2 | $698.2 | $698.2 | $511.2 | $511.2 | $371.2 | $246.2 | $246.2 | $246.2 | $698.2 |
| Cash Payment for Professional Fees [a] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Management Fees Paid by DTDF | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (125.0) | 0.0 | (140.0) | (125.0) | 0.0 | 0.0 | (160.0) | (160.0) |
| Ending Cash Balance DTDF | $698.2 | $698.2 | $698.2 | $698.2 | $698.2 | $698.2 | $511.2 | $511.2 | $371.2 | $246.2 | $246.2 | $246.2 | $86.2 | $538.2 |
| **First Trust - DIP Operating Account** | | | | | | | | | | | | | | |
| Beginning Balance FTDF | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $246.2 | $246.2 | $246.2 | $86.2 | $0.0 |
| Cash Payment for Professional Fees [a] | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | (180.0) | 0.0 | 0.0 | (160.0) | (340.0) |
| Ending Cash Balance FTDF | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $246.2 | $246.2 | $246.2 | $86.2 | $86.2 |
| **Collections Account** | | | | | | | | | | | | | | |
| Beginning Balance Collections Account (Investor Funds) | $60,797.2 | $71,168.1 | $72,943.4 | $72,943.4 | $72,943.4 | $72,943.4 | $72,943.4 | $76,512.2 | $76,512.2 | $76,512.2 | $76,512.2 | $76,512.2 | $0.0 | $60,797.2 |
| Estimated Interest Due Investors | 4,037.5 | 59.0 | 0.0 | 0.0 | 0.0 | 0.0 | 3,876.7 | 0.0 | 0.0 | 0.0 | 3,876.7 | 0.0 | 0.0 | 11,849.9 |
| Expected Principal Return | 6,650.0 | 1,728.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8,378.1 |
| Total Account Collections | $10,687.5 | $1,787.1 | $0.0 | $0.0 | $0.0 | $0.0 | $3,876.7 | $0.0 | $0.0 | $0.0 | $3,876.7 | $0.0 | $0.0 | $20,228.0 |
| Distribution to Investors | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | (3,568.8) | (76,512.2) | $0.0 | (80,080.9) |
| Service Fees to USA CMC | (316.6) | (11.8) | 0.0 | 0.0 | 0.0 | 0.0 | (307.9) | 0.0 | 0.0 | 0.0 | (307.9) | 0.0 | 0.0 | (944.2) |
| Total Disbursements | ($316.6) | ($11.8) | $0.0 | $0.0 | $0.0 | $0.0 | ($307.9) | $0.0 | $0.0 | $0.0 | ($3,876.7) | ($76,512.2) | $0.0 | ($81,025.2) |
| Ending Balance Collections Account (Investor Funds) | $71,168.1 | $72,943.4 | $72,943.4 | $72,943.4 | $72,943.4 | $72,943.4 | $76,512.2 | $76,512.2 | $76,512.2 | $76,512.2 | $76,512.2 | $0.0 | $0.0 | $0.0 |
| **Investors Account** | | | | | | | | | | | | | | |
| Beginning Balance Collections Account (Estate Funds) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $10,308.8 | $10,529.9 | $10,529.9 | $10,529.9 | $10,529.9 | $10,766.9 | $10,766.9 | $10,766.9 | $0.0 |
| Interest Income to Estate [b] | 0.0 | 0.0 | 0.0 | 0.0 | 10,308.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 10,308.8 |
| Transfer of Income Interest to Estate | 0.0 | 0.0 | 0.0 | 0.0 | 221.1 | 0.0 | 0.0 | 0.0 | 0.0 | 237.0 | 0.0 | 0.0 | 0.0 | 458.1 |
| Transfer of Pre-Paid Interest Collected from Borrowers | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Ending Balance Collections Account (Estate Funds) | $0.0 | $0.0 | $0.0 | $0.0 | $10,529.9 | $10,529.9 | $10,529.9 | $10,529.9 | $10,529.9 | $10,766.9 | $10,766.9 | $10,766.9 | $10,766.9 | $10,766.9 |
| Ending Balance Collections Account (Total) | $71,168.0 | $81,476.9 | $83,252.2 | $83,252.2 | $83,473.3 | $87,042.1 | $87,042.1 | $87,042.1 | $87,042.1 | $10,766.9 | $10,766.9 | $10,766.9 | $10,766.9 | $10,766.9 |
| **Investors Account** | | | | | | | | | | | | | | |
| Cash Balance Investors Account | $1,877.1 | $1,877.1 | $1,877.1 | $1,877.1 | $1,877.1 | $1,877.1 | $1,877.1 | $1,877.1 | $1,877.1 | $1,877.1 | $1,877.1 | $1,877.1 | $1,877.1 | $1,877.1 |
| **Executory Contract Committee Cash Due [a]** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 160.0 | 0.0 | 0.0 | 0.0 | 160.0 | 320.0 |

Notes:
a. Source of payment for investor and fund committees will be via surcharge or some other source yet to be determined.
b. Assumes investment in a Bank of America Money Market Fund at 3.25%.

**USA Commercial Mortgage Company, et al.**
13-Week Cash Flow Forecast
($ in thousands)

13-Week Cash Forecast — Week Ending

| Supplemental Schedules - Professional Fees | 6/4/2006 | 6/11/2006 | 6/18/2006 | 6/25/2006 | 7/2/2006 | 7/9/2006 | 7/16/2006 | 7/23/2006 | 7/30/2006 | 8/6/2006 | 8/13/2006 | 8/20/2006 | 8/27/2006 | Total 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Debtor Professional Fees (as Incurred)** | | | | | | | | | | | | | | |
| Financial Advisor Fees & Disbursements | 200.0 | 200.0 | 180.0 | 165.0 | 140.0 | 140.0 | 140.0 | 140.0 | 140.0 | 100.0 | 100.0 | 100.0 | 100.0 | $1,845.0 |
| Legal Counsel Fees & Disbursements | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 650.0 |
| Local Counsel | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 16.7 | 216.7 |
| PR Firm | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 9.8 |
| Other Legal Professionals | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 65.0 |
| **Committee Professionals (as Incurred)** | | | | | | | | | | | | | | |
| **Unsecured Creditors Committee** | | | | | | | | | | | | | | |
| Legal Counsel Fees & Disbursements | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 325.0 |
| Financial Advisor Fees & Disbursements | 0.0 | 0.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 275.0 |
| Weekly Accrual for USA CMC Professional Fees | $297.4 | $297.4 | $302.4 | $287.4 | $262.4 | $262.4 | $262.4 | $262.4 | $262.4 | $222.4 | $222.4 | $222.4 | $222.4 | $3,386.4 |
| Cash Payment for USA CMC Professional Fees | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $2,586.2 | $0.0 | $0.0 | $0.0 | $2,586.2 |
| **Equity Security Holders of USA Capital FTDF** | | | | | | | | | | | | | | |
| Legal Counsel Fees & Disbursements | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 325.0 |
| Financial Advisor Fees & Disbursements | 0.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 300.0 |
| Weekly Accrual for FTDF Professional Fees | $25.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $625.0 |
| Cash Payment for FTDF Professional Fees | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $180.0 | $0.0 | $0.0 | $0.0 | $0.0 | $180.0 |
| **Equity Security Holders of USA Capital DTDF** | | | | | | | | | | | | | | |
| Legal Counsel Fees & Disbursements | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 325.0 |
| Financial Advisor Fees & Disbursements | 0.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 300.0 |
| Weekly Accrual for DTDF Professional Fees | $25.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $625.0 |
| Cash Payment for DTDF Professional Fees | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $140.0 | $160.0 | $160.0 | $0.0 | $0.0 | $460.0 |
| **Holders of Executory Contract Rights** | | | | | | | | | | | | | | |
| Legal Counsel Fees & Disbursements | 0.0 | 0.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 275.0 |
| Financial Advisor Fees & Disbursements | 0.0 | 0.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 275.0 |
| Weekly Accrual for Executory Contract Professional Fees | $0.0 | $0.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $550.0 |
| Cash Payment for Executory Committee Professional Fees | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $160.0 | $160.0 | $0.0 | $0.0 | $320.0 |
| **Total Accrual Amount for Bankruptcy Professional Fees** | $347.4 | $397.4 | $452.4 | $437.4 | $412.4 | $412.4 | $412.4 | $412.4 | $412.4 | $372.4 | $372.4 | $372.4 | $372.4 | $5,186.4 |
| **Total Cash Payment for Bankruptcy Professional Fees** | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $320.0 | $2,906.2 | $320.0 | $0.0 | $0.0 | $3,546.2 |

# EXHIBIT B

# Funding Summary



| Loan Name | Construction/ Development Requirements | Use of Funds | Risks of Not Funding | No of Investors | DTF | CFT | CM | IP | Total Held by Investors | Loan to Related Party | Hilco Appraisal Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Binford Medical Developers | $925,000 | Completion of construction of a 47,000 sq. ft. office building; currently approximately 36% complete | Liens would be filed which would prevent sale of office space. | 92 | 17.2% | | | | 82.8% | No | 6/23/2006 |
| Boise/Gowen 93 | $125,000 | Completion of engineering and development on property as well as payment of property taxes; currently project is approximately 95% funded | Liens would be filed which would negatively impact value of collateral upon sale or refinancing. | 17 | | | | | 100.0% | Yes | 6/23/2006 (1) |
| Columbia Managing Partners | $890,000 | Completion of development and construction of 8 town homes; currently approximately 5% finished | Liens would be filed and project would stall. | 1 | | 100.0% | | | | No | 6/23/2006 |
| ComVest Capital | $226,866 | Completion of conversion of 36 apartment units into condominium units; currently approximately 45% complete | Liens would be filed and project would not be completed. | 56 | | 17.8% | | | 82.2% | No | 6/23/2006 |
| Copper Sage Commerce Center Phase II | $6,647,372 | Completion of development and construction of 124,000 sq. ft. of warehouse space for sale; no fundings to date outside of interest | Project would not be started and borrower would be forced to find financing elsewhere. | 51 | | 1.8% | | | 98.2% | Yes | 6/30/2006 (1) |
| Cornman Toltec 160, LLC | $175,000 | Completion of mapping process in order to sell land to a homebuilder; no funds disbursed to date for mapping fees | Mapping process would not be completed which could jeopardize sale to a homebuilder. | 96 | | 0.1% | | | 99.9% | Yes | 6/23/2006 (1) |

Ownership of Loan

1. Borrower is a joint venture with USAIP owning 50%.

Prepared by MFIM, LLC

PRELIMINARY INFORMATION, SUBJECT TO REVISION, MAY NOT BE RELIABLE

# Funding Summary



| Loan Name | Construction/ Development Requirements | Use of Funds | Risks of Not Funding | No of Investors | Ownership of Loan | | | | | Total Held by Investors | Loan to Related Party | Hilco Appraisal Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | DTF | CFT | CM | IP | | | | |
| Franklin - Stratford Investments, LLC | $852,607 | Completion of balance of construction on 3 buildings; building 1 is 97% complete, building 2 is 94% complete, building 3 is 72% complete | Liens would be filed which would prevent sale of office space. | 2 | 19.3% | 80.7% | | | | No | 6/23/2006 |
| Gateway Stone | $1,638,958 | Completion of entitlements on approximately 213 acres of land; approximately 20% of entitlement costs have been funded to date | Entitlements would not be finished which would jeopardize sale and/or refinancing of property. | 161 | 0.8% | | | | 99.2% | No | 6/30/2006 |
| Gramercy Court Condos | $1,931,961 | Completion of balance of condo conversions; project was 91% complete as of 1/06 | Liens would be filed and future sales would not close. | 332 | 13.1% | | | | 86.9% | No | 6/16/2006 |
| J. Jireh's Corporation | $275,000 | Completion of engineering and re-zoning of approximately 85 acres; approximately 5% of re-zoning funds have been disbursed | Engineering and re-zoning would not be completed which would negatively affect value of property. | 105 | 3.0% | | | | 97.0% | No | 6/16/2006 |
| La Hacienda Estate, LLC | $1,070,629 | Completion of entitlement and pre-development of 623 acres of land; approximately 15% of pre-development costs have been disbursed | Land would not be entitled which would negatively affect value of property upon sale and/or refinancing. | 83 | 0.8% | | | | 99.2% | No | 6/23/2006 |
| Meadow Creek Partners, LLC | $10,261,462 | Completion of infrastructure and pre-development of approximately 202 acres; currently approximately 38% complete | Liens would be filed which would negatively affect ability to sell lots, most of which are under contract. | 103 | 0.9% | | | | 99.1% | No | 6/23/2006 |

Prepared by MFIM, LLC

PRELIMINARY INFORMATION, SUBJECT TO REVISION, MAY NOT BE RELIABLE

# Funding Summary



| Loan Name | Construction/ Development Requirements | Use of Funds | Risks of Not Funding | No of Investors | DTF | CFT | CM | IP | Total Held by Investors | Loan to Related Party | Hilco Appraisal Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ocean Atlantic | $87,700 | Completion of pre-development of approximately 130 acres of land; approximately 85% of pre-development expenses have been disbursed | Pre-development would not be finished which could affect ability to obtain a development loan. | 32 | | | | | 100.0% | No | 6/23/2006 |
| Rio Rancho Executive Plaza, LLC | $3,131,991 | Completion of development and construction of 48,000 sq. ft. of office space in 5 buildings; currently approximately 5% complete | Construction would stop and collateral would be jeopardized as an executed lease would be lost. | 32 | | 3.1% | | | 96.9% | No | 6/16/2006 |
| Southern California Land 2nd | $200,000 | Completion of entitlement process on approximately 25 acres of land; no entitlement costs have been disbursed to date | Entitlements would not be finished which would jeopardize sale and/or refinancing of property. | 33 | | 1.3% | | | 98.8% | Yes | 6/30/2006 (1) |
| Standard Property Development | $7,281,158 | Conversion of 167 hotel units into condominium units; no conversion costs have been disbursed to date | Conversion would not be completed and value of collateral would be jeopardized as a result. | 115 | | 7.0% | | | 93.0% | No | 6/16/2006 |
| The Gardens Phase II | $5,740,000 | Completion of construction of 27 timeshare units; no construction funds drawn to date | Project would not start and borrower would be forced to find financing elsewhere. | 1 | | 100.0% | | | | No | 6/23/2006 |

1. Borrower is a joint venture with USAIP owning 75%.

Prepared by MFIM, LLC

PRELIMINARY INFORMATION, SUBJECT TO REVISION, MAY NOT BE RELIABLE

# EXHIBIT C

# CONSTRUCTION LOAN AGREEMENT

This Construction Loan Agreement, dated as of August 26, 2005, is entered into by and among Boise/Gowan 93 LLC, an Idaho limited liability company ("Borrower"), and those persons and entities listed on **Exhibit "A"** attached hereto (collectively, "Lender").

## SECTION 1: DEFINITIONS AND ACCOUNTING TERMS.

1.1    Defined Terms.    As used in this Agreement, the following terms shall have the meanings set forth respectively after each:

**"Actual Line Item Cost"** means, with respect to each line item in the Approved Budget, the actual cost reasonably determined by Lender or Borrower required to complete all matters included in such line item.

**"Agreement"** means this Construction Loan Agreement.

**"Approved Budgets"** means the budgets for all Project Costs approved by Lender as provided herein. The Approved Budgets showing the amounts allocated for all Project Costs are attached hereto as **Exhibit "B."**

**"Approved Line Item Cost"** means, with respect to each line item in the Approved Budgets, the amount allocated to that line item under the Approved Budgets.

**"Assignment of Architect's Contract, Plans and Drawings"** means the assignment by Borrower of its agreement with the architect, to be executed by Borrower.

**"Assignment of Construction Contract"** means the assignment by Borrower of its agreement with the Contractor, to be executed by Borrower.

**"Assignment of Engineer's Contract, Improvement Plans, Specifications and Drawings"** means the Assignment of Improvement Plans, Specifications and Drawings executed by Borrower.

**"Assignment of Permits, Licenses, Franchises and Authorizations"** means the Assignment of Permits, Licenses, Franchises and Authorizations executed by Borrower.

**"Assignment of Rents"** means the Assignment of Rents contained in the Deed of Trust.

**"Business Day"** means any Monday, Tuesday, Wednesday, Thursday, or Friday on which banks in the State of Nevada are open for business.

**"Change Order"** means a change in the Improvement Plans or in their implementation.

**"Completion of Construction"** means: (i) the improvements have been constructed in

1

accordance with the Improvement Plans and all applicable Laws; (ii) a valid notice of completion has been filed for record in the County Recorder's Office for the county in which the Property is located; (iii) all inspections by Governmental Agencies have been completed; (iv) all necessary certificates and approvals have been obtained; and (v) the period for filing mechanic's and materialmen's liens has expired without any such liens having been filed or recorded.

"**Control Account**" means Disbursement Agent's account in which the Control Account Funds shall be held.

"**Contractor**" means the general contractor to be selected by Borrower before any money is released to pay construction costs which Lender has approved in writing.

"**Control Account Escrow Agreement**" means the Control Account Escrow Agreement and Security Agreement by and between Borrower, Lender and Disbursement Agent of even date herewith.

"**Control Account Funds**" means the portion of the Loan funds held in the Control Account at any time, together with interest accrued thereon, any additions thereto made pursuant to this Agreement, and any and all investments and reinvestments of any such sums now or hereafter made.

"**Debt**" means any indebtedness of the Borrower other than indebtedness owed to trade creditors incurred in the ordinary course of business and payable in 180 days or less.

"**Deed of Trust**" means the Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing of even date herewith, executed by Borrower in favor of Lender with respect to the Property or portions thereof, either as originally executed or as it may from time to time be supplemented, modified or amended.

"**Default Rate**" shall have the meaning set forth in the Note.

"**Disbursement**" means each of the disbursements by Lender or Disbursement Agent of the Proceeds of the Loan or other funds (including the Control Account Funds) pursuant to this Agreement.

"**Disbursement Agent**" means Project Disbursement Group, Inc., or any other licensed construction control company approved by Lender which may at any time hold any portion of the Control Account Funds pursuant to this Agreement.

"**Disbursement Schedule**" means the schedule for Disbursements attached hereto as **Exhibit "C."**

"**Effective Date**" means the date the Deed of Trust is recorded in the Official Records of Ada County, Idaho.

"**Environmental Indemnity**" means the Environmental and Accessibility Indemnity

2

Agreement executed by Borrower and the Guarantors.

**"Events of Default"** means each of those events so designated in Section 7.1 of this Agreement.

**"Excess Cost"** means, with respect to any line item in the Approved Budgets, the amount, if any, by which the Actual Line Item Cost for such line item exceeds the Approved Line Item Cost for such line item.

**"Financing Statement"** means financing statement of even date herewith executed by Borrower in favor of Lender with respect to the Personal Property.

**"Governmental Agency"** means any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, court, administrative tribunal or public utility.

**"Guarantors"** means, collectively, Robert A. Russell, Thomas A. Hantges and Joseph D. Milanowski.

**"Guaranty"** means the Unconditional Repayment and Completion Guaranty executed by the Guarantors in favor of Lender, either as originally executed or as it may from time to time be supplemented, modified or amended.

**"Hard Costs"** means Project Costs for labor, services, material, and equipment used in or rendered directly on the construction of the Improvements.

**"Improvement Plans"** means the final, approved, and initialed improvement plans and specifications for the Project identified in **Exhibit "D"** as accepted by Lender.

**"Improvements"** means any and all improvements now existing or hereafter constructed on the Real Property.

**"Initial Advance"** means the amount of the Loan that is disbursed to or on behalf of Borrower at the initial closing of the Loan.

**"Interest Reserve"** means that portion of the Control Account Funds allocated to interest reserve pursuant to Section 3.3 below.

**"Laws"** means, collectively, all federal, state and local laws, rules, regulations, ordinances and codes.

**"Lender"** means, collectively, those persons and entities listed on Exhibit "A" attached hereto and any other persons or entities who may be added to that list pursuant to an amendment to the Note.

"**Lender's Agent**" means USA Commercial Mortgage Company, or any other Agent appointed by Lender pursuant hereto.

"**Loan**" means the loan to be made by Lender to Borrower pursuant to Section 3 hereof.

"**Loan Documents**" means, collectively, this Agreement, the Note, the Security Documents, the Environmental Indemnity, the Guaranty and the Project Assignments, in each case either as originally executed or as may from time to time be supplemented, modified or amended, together with any other documents or instruments which may at any time be executed by Borrower in connection with the Loan.

"**Maturity Date**" means the date which is twelve (12) months after the Deed of Trust is recorded.

"**Mortgaged Property**" means the Property together with the Personal Property.

"**Note**" means the promissory note of even date herewith, in the original principal amount of Two Million One Hundred Fifty Thousand Dollars ($2,150,000) executed by Borrower in favor of Lender to evidence the Loan, either as originally executed or as it may from time to time be supplemented, modified or amended.

"**NRS**" means the Nevada Revised Statutes, as amended from time to time.

"**Offsite Materials**" means any materials to be used in connection with the construction of the Improvements stored at a location other than the Property.

"**Offsite Supplier**" means a supplier of Offsite Materials.

"**Operation**" means the operation of Borrower's business on the Property, including the operation, sales, leasing, running and maintenance of the Property and the Improvements.

"**Overrun Account**" means a noninterest-bearing account established with Lender into which Borrower shall deposit the Excess Cost, if any, for each line item of the Approved Budgets.

"**Permitted Exceptions**" means the matters identified in **Exhibit "E"** attached hereto and made part hereof.

"**Person**" means any entity, whether an individual, trustee, corporation, partnership, trust, unincorporated organization or otherwise.

"**Personal Property**" means all present and future personal property (including the Project Documents) of Borrower of every kind and nature, whether tangible or intangible, now or hereafter located at, upon or about the Property, or used or to be used in connection with or relating or arising with respect to the Property and/or the Project, including but not limited to the property described in the Deed of Trust.

4

"**Project**" means the project for the development of, and construction of Improvements on, the Property, as such exists at any time, in accordance with the Improvement Plans.

"**Project Assignments**" means, collectively, the Assignment of Permits, Licenses, Franchises and Authorizations, the Assignment of Engineer's Contract, Improvement Plans, Specifications and Drawings, the Assignment of Construction Contract, the Assignment of Architect's Contract, Plans and Drawings, and such other assignments as Lender shall require.

"**Project Cost Allocation**" means the portion of the total Project Costs allocated to a particular item in the Approved Budgets.

"**Project Costs**" means all of the costs to complete the Project.

"**Project Documents**" means, collectively, all agreements, documents, instruments and materials of whatever kind or nature relating to the Project, including but not limited to: (a) the improvement plans and all other plans, specifications and drawings relating to the Project, (b) all approvals, consents, licenses and permits issued, or to be issued, by any Governmental Agency in connection with the Project, (c) the engineer's contract, architect's contract and any and all construction contracts, and all other agreements relating to the Project between Borrower and any contractor, subcontractor, independent project manager or supervisor, architect, engineer, laborer or supplier of materials, and (d) any take-out, refinancing or permanent loan commitment issued to Borrower with respect to the Property.

"**Property**" means, collectively, the Real Property, the Improvements, and any other buildings, structures, or improvements now or hereafter located on all or any portion of the Real Property.

"**Real Property**" means the real property and interests in real property described in **Exhibit "F"**.

"**Request for Disbursement**" means a written request for a Disbursement signed by a designated representative on behalf of Borrower, in the form approved by Lender.

"**Security Agreement**" means the Security Agreement contained herein and in the Deed of Trust.

"**Security Documents**" means the Deed of Trust, the Project Assignments, the Financing Statements and any other mortgage, deed of trust, assignment of leases, security agreement or assignment executed to secure the Note, either as originally executed or as they may from time to time be supplemented, modified or amended.

"**Title Company**" means Chicago Title Insurance Company and its agent, Fidelity National Title.

"**Title Policy**" means the Lender's policy of title insurance and endorsements thereto

required by this Agreement as a condition of the first Disbursement.

**"Undisbursed Construction Funds"** means, as of any time of determination, the sum of the undisbursed portion of the Loan Amount (i.e., that portion that has never been advanced by Lender) and the Control Account Funds.

**"USA"** means USA Commercial Mortgage Company, a Nevada corporation, the mortgage company which arranged the Loan.

**"Use"** means ownership, use, development, construction, maintenance, management, operation or occupancy.

1.2    Use of Defined Terms.    Any defined term used in the plural refers to all members of the relevant class, and any defined term used in the singular shall refer to any number of the members of the relevant class.  Any reference to the Loan Documents and other instruments, documents and agreements shall include such Loan Documents and other instruments, documents and agreements as originally executed or as the same may be supplemented, modified or amended.

1.3    Accounting Terms.    All accounting terms not specifically defined in this Agreement shall be construed in conformity with, and all financial data required to be submitted by this Agreement shall be prepared in conformity with, generally accepted accounting principles applied on a consistent basis.

1.4    Exhibits.    All exhibits to this Agreement, either as now existing or as the same may from time to time be supplemented, modified or amended, are incorporated herein by this reference.

## SECTION 2: RECITALS.

Borrower has applied to Lender for a Loan to acquire and develop the Real Property.  Lender is willing to make the Loan to Borrower on the terms and conditions contained in this Agreement and the other Loan Documents.

## SECTION 3: THE LOAN.

3.1    Amount of the Loan.    Subject to the terms and conditions set forth in this Agreement, Lender agrees to make a loan ("Loan") to Borrower in a principal amount of Two Million One Hundred Fifty Thousand Dollars ($2,150,000) (the "Loan Amount"), Lender's disbursement of which is subject to the terms and conditions of the Loan Documents.  The Loan Amount shall be disbursed in accordance with Lender's instructions to the Title Company.  From and after the date that the Borrower has signed the Loan Documents and the Lender has deposited with the Title Company the amount needed to close the Loan, the Loan Amount shall bear interest at the rate set forth in the Note until fully repaid to Lender.

3.2    Increase in Loan Amount.    From the Effective Date through and including August

6

1, 2006, Lender and USA shall have the exclusive right, but not the obligation, to increase the Loan Amount to an amount not to exceed Two Million Five Hundred Fifty Thousand Dollars ($2,550,000). All amounts that Lender may advance after the Effective Date shall increase the Loan Amount and be used for the following purposes: (i) to pay loan fees and closing costs in connection therewith, (ii) to fund the Interest Reserve (defined below), and (iii) to pay Project Costs in accordance with the Approved Budgets. Upon each increase in the Loan Amount, Borrower shall execute amendments to the Note and the Deed of Trust which shall memorialize the increase in the Loan Amount, the change in the identity of the persons and entities which comprise Lender and their respective undivided interests in the Loan. Upon the recordation of the amendment(s) to the Deed of Trust, the Title Company shall issue to Lender, at Borrower's expense, an endorsement or endorsements to the Title Policy which shall (i) insure the continued priority of the Deed of Trust and that the additional advance is secured thereby, (ii) reflect the increase in the face amount of the policy corresponding to the increase in the Loan Amount, and (iii) set forth the change in the identity of the insured lenders and their respective undivided interests in the Loan. Upon any such additional advance, a portion thereof shall be deposited into the Interest Reserve (defined below) for the Loan. Nothing herein shall constitute a commitment by Lender or USA to fund to Borrower any more than the initial Loan Amount.

3.3    Interest Reserve.    The Title Company shall disburse a portion of the Loan Amount, as reasonably determined by Lender, to the Disbursement Agent to be held as interest reserve for the benefit of Lender (the "Interest Reserve"). Disbursement Agent shall hold and disburse the Interest Reserve in accordance with the Control Account Escrow Agreement. As additional advances are made, as provided in Section 3.2 above, a portion of such advances, the amount of which shall be reasonably determined by Lender, shall be deposited into the Interest Reserve. Interest accrued on the Note Amount shall be paid from the Interest Reserve upon presentation of a monthly interest statement by Lender, without the necessity of any instruction or request from Borrower. Except as provided in this paragraph, the funds in the Interest Reserve shall never be used for any other purpose without the express written consent of Lender. Depletion of the Interest Reserve shall not release Borrower from any of Borrower's obligations under the Loan Documents, including but not limited to the obligation to pay interest accruing under the Note. After depletion of the Interest Reserve, or so long as any Event of Default has occurred and is continuing, all interest payments under the Note shall be made by Borrower using its own funds; provided that Lender, at its option and in its sole discretion, may obtain disbursements from the Interest Reserve notwithstanding such Event of Default. Upon the occurrence of an Event of Default, the entire balance of the Interest Reserve shall be paid to Lender upon demand and applied to the then outstanding balance of the Loan.

3.4    Disbursements.

(a)    The Initial Advance shall be made in accordance with instructions that Lender shall deliver to the Title Company.

(b)    Construction Disbursements. Except as otherwise provided herein, the Loan funds remaining from the Initial Advance shall be held in the Control Account, and disbursed therefrom in accordance with this Agreement. Disbursement Agent, upon satisfaction of the

7

requirements of the Disbursement Schedule, shall then disburse such funds from the Control Account for the payment of such costs. The funds disbursed by the Lender to the Control Account shall thereafter comprise the Control Account Funds. Unless Lender otherwise agrees:

(i)     the principal amount of each Disbursement shall not be less than Twenty-Five Thousand Dollars ($25,000), or a lesser amount equal to the Undisbursed Construction Funds:

(ii)    no more than two Disbursements shall be made in any calendar month;

(iii)   Disbursements shall be made in accordance with the terms of the Disbursement Schedule and the Control Account Escrow Agreement;

(iv)    Disbursement Agent shall make no Disbursement from the Control Account Funds for any cost expended or incurred by Borrower on any real property (x) not owned by Borrower, or (y) on which the Deed of Trust is not a first priority lien.

The proceeds of the Loan shall be used solely to pay or reimburse Borrower for Project Costs described in the Approved Budgets and the Disbursement Schedule. The total amount disbursed for each item of Project Cost described in the Approved Budgets shall not exceed the applicable amounts set forth in the Approved Budgets. If Borrower is not required to pay, for any reason, any amount earned by any contractor, subcontractor, materialman, supplier or any other Person who has furnished labor, services, equipment, or material to the Project, then Borrower shall not request a Disbursement for such amount until such time as Borrower is required to pay such amounts.

(c)     Procedure for Disbursement. Not later than 10:00 a.m. Pacific Time, at least five (5) Business Days before a proposed Disbursement is to be made, Disbursement Agent shall have received a Request for Disbursement which shall indicate the amount of the Disbursement. Upon compliance with all of the above-referenced conditions and the conditions set forth in Section 4 and the Disbursement Schedule, Disbursement Agent shall cause disbursement to be made from the Control Account in the manner provided herein on the date requested. Lender may, at its option and in its sole discretion, waive any such conditions as to any Disbursement, provided that any such waiver shall not constitute a waiver of any such conditions as to any subsequent Disbursements.

(d)     Lender's Obligation. Notwithstanding anything to the contrary contained herein or in any other Loan Document, the execution of this Agreement by Borrower shall, and hereby does, constitute an irrevocable direction and authorization to so disburse the funds to the Control Account. No further direction or authorization from Borrower shall be necessary to warrant Disbursement and such Disbursement shall satisfy the obligations of Lender hereunder and the amount hereof shall be, and continue to be, secured by the Deed of Trust and the other Security Documents, regardless of the disposition of such funds by Borrower or Contractor.

(e)     Interest Reserve. The total interest reserve portion of the Control Account Funds shall be $300,000. Disbursement Agent shall pay an amount for interest from the Interest Reserve Account as billed by Lender monthly. Borrower shall pay the remainder of the accrued

8

interest for each month directly from its own funds.

(f)    Excess Costs; Loan Balancing.  As a material condition of the Loan and a condition precedent to the duty of Disbursement Agent to make any Disbursement, Borrower shall pay when invoiced all Project Costs.  Except for the payment of interest from the Interest Reserve Account and the payment of expenses, charges, costs, and fees pursuant to Section 6.14 and 8.11 hereof, Disbursement Agent may disburse proceeds of the Loan only when the Loan is "in balance." The Loan shall be "in balance" only at such times as Borrower has invested sufficient funds to the payment of Project Costs so that, in Lender's sole judgment, the remaining Control Account Funds will be sufficient to fully complete and operate the Improvements and pay all Project Costs therefor as they are incurred.  The determination as to whether the Loan is "in balance" may be made by the Lender at any time, including with each request for a Disbursement.  Borrower shall, within five (5) days after notice from Lender that the Loan is not "in balance," deposit with Disbursement Agent for the benefit of Lender, in cash, the amount necessary to put the Loan "in balance." Any amounts which Borrower deposits to put the Loan "in balance" shall be the next funds disbursed by Disbursement Agent, subject to the terms and conditions of this Agreement.

(g)    Reserves.  Regardless of anything contained herein to the contrary, at any time Borrower is in default hereunder, Lender may, at its option, direct Disbursement Agent to establish reserves from the undisbursed portion of the Control Account Funds in such amounts which, in Lender's sole discretion, are necessary to complete the Improvements and sufficient to pay or satisfy or comply with, in whole or in part, (i) any lien or claim relating to, or prejudicial to, the liens or security interests of Lender; (ii) any expenditure or allocation of funds shown on the Approved Budgets; and (iii) interest yet to accrue on the Loan prior to the Maturity Date.  The aggregate amount of any such reserves shall be deducted from the Control Account Funds otherwise available for advance.

3.5    Approved Budgets.  Attached hereto as **Exhibit "B"** are line-item budgets for the construction of the Improvements.  Borrower represents and warrants that said budgets are based on information deemed reliable by Borrower and represent Borrower's best estimate of all required Project Costs.  The Approved Budgets shall include funds for construction costs and permit costs. Unless Lender otherwise consents in writing, Borrower shall not supplement, modify, or amend the Approved Budgets.  During the term of the Loan, Borrower may submit revised budgets to Lender for approval, in Lender's sole discretion.  Disbursement Agent shall disburse the Control Account Funds to Borrower in strict accordance with the Approved Budgets.  In the event Borrower requests a Disbursement which exceeds the line item therefor in the existing Approved Budget, then such excess payment shall be made only according to Section 6.7 hereof.  With the approval of Lender on each occasion, Borrower may reallocate amounts from line items in which it will have a cost savings to the "Contingency" line item of the Approved Budgets.  Said funds may then be used as provided in Section 6.7 hereof.

3.6    Security.  The indebtedness evidenced by the Note, and all other indebtedness and obligations of Borrower under the Loan Documents, shall be secured by the Security Documents. The Environmental Indemnity and the Guaranties and the respective obligations of any of Borrowers and the Guarantors under each shall be unsecured.

9

3.7     Repayment of the Loan. The Loan shall be evidenced by the Note, shall bear interest at the rate set forth in the Note from the date set forth in Section 3.1 hereof, and shall be repaid per the terms of the Note. The principal balance outstanding under the Note, and all accrued and unpaid interest not sooner paid when due under the Note, and all other indebtedness and obligations of Borrower owing under any and all of the Loan Documents shall be due and payable in full on the Maturity Date.

3.8     Prepayment.     Borrower agrees that all loan fees and any prepaid finance charges are fully earned as of the date they are paid and will not be subject to refund upon any early payment hereof (whether voluntarily or as a result of default). Subject to the foregoing, Borrower may prepay the Loan, in full or in part, at any time; provided, however, that if Borrower repays the Loan within the first nine (9) months after the Effective Date (whether voluntarily or as a result of default), then Borrower shall pay to Lender a prepayment fee equal to all interest which would accrue on the full Loan Amount during said nine (9) month period, less all interest previously paid. Notwithstanding anything to the contrary hereunder, Lender shall receive a minimum of nine (9) months' interest on the full Loan Amount.

3.9     Effective Date. Borrower and Lender agree that the date of the Loan Documents is for reference purposes only and the effective date ("Effective Date") of the delivery and the transfer to Lender of the security under the Loan Documents and of Borrower's and Lender's obligations under the Loan Documents is the date of recordation of the Deed of Trust in the office of the County Recorder of the county where the Property is located.

3.10     Yield Protection. If, after the date of this Agreement, the adoption of any law or any governmental or quasi-governmental rule, regulation, policy, guideline or directive (whether or not having the force of law), or any change therein, or any change in the interpretation or administration thereof, or the compliance of the Lender therewith,

(a)     subjects the Lender to any tax, duty, charge or withholding on or from payments due from Borrower (excluding taxation of the overall net income of the Lender), or changes the basis of taxation of payments to the Lender in respect of its Loans or other amounts due it hereunder; or

(b)     imposes or increases or deems applicable any reserve, assessment, insurance charge, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, the Lender; or

(c)     imposes any other condition the result of which is to increase the cost to the Lender of making, funding or maintaining advances or reduces any amount receivable by the Lender in connection with advances, or requires the Lender to make any payment calculated by reference to the amount of advances held or interest received by it, by an amount deemed material by the Lender;

then, within fifteen (15) days of demand by the Lender, the Borrower shall pay the Lender that portion of such increased expense incurred (including, in the case of clause (c), any reduction in the

rate of return on capital to an amount below that which it could have achieved but for such law, rule, regulation, policy, guideline or directive and after taking into account the Lender's policies as to capital adequacy) or reduction in an amount received which the Lender determines is attributable to making, funding and maintaining the Loans.

## SECTION 4:  CONDITIONS TO DISBURSEMENTS.

4.1     Initial Advance Conditions.     The obligation of Lender to initially close the Loan is subject to the following conditions precedent:

(a)     Borrower shall, at its sole expense, deliver or cause to be delivered to Lender, in form and substance satisfactory to Lender:

(i)     the original Note;

(ii)     the original Deed of Trust;

(iii)     the original Financing Statement;

(iv)     the original Guaranty;

(v)     the original Environmental Indemnity;

(vi)     the original Control Account Escrow Agreement, executed by Borrower, Lender and Disbursement Agent;

(vii)     the original Assignment of Permits, Licenses, Franchises and Authorizations executed by Borrower;

(viii)     the original Assignment of Architect's Contract, Plans and Drawings;

(ix)     the original Assignment of Engineer's Contract, Improvement Plans, Specifications and Drawings;

(x)     the original Assignment of the Construction Contract and consent thereto executed by the Contractor;

(xi)     a certificate of consent of Borrower, authorizing the execution, delivery and performance of the Loan Documents to be executed by a specified authorized officer on behalf of Borrower;

(xii)     an ALTA form of extended coverage lender's policy of title insurance, or evidence of a commitment therefor, issued by an insurer

satisfactory to Lender, together with such endorsements and binders thereto as may be required by Lender pursuant to Section 6.16 hereof, in a policy amount of not less than the face amount of the Note, insuring the Deed of Trust to be a valid lien upon the Property, and showing the Property to be subject only to the Permitted Exceptions;

(xiii) an appraisal of the Real Property certified to Lender, performed by an appraiser acceptable to Lender;

(xiv) certified copies of, or certificate evidencing, all insurance policies required to be delivered pursuant to this Agreement;

(xv) copies of all permits and approvals by Governmental Agencies necessary to construct the Improvements (if available);

(xvi) current Financial Statements of Borrower and the Guarantors;

(xvii) evidence, in form and substance acceptable to Lender, of the availability and sufficiency of all utilities to the Project;

(xviii) copies of any proposed, or approved final Covenants, Conditions and Restrictions recorded or to be recorded on the Project;

(xix) a Phase I Hazardous Waste Survey, prepared by an entity approved by Lender, in form and substance acceptable to, and approved by, Lender; and

(xx) such additional agreements, certificates, reports, approvals, instruments, documents, financing statements, consent and opinions as Lender may reasonably request; including, without limitation, a soils report for the Real Property (including, without limitation, all determinations required by Lender with respect to hazardous waste (as such term is defined in the Environmental Indemnities) and water located on the Real Property).

The Assignment of Architect's Contract, Plans and Drawings, Assignment of Engineer's Contract, Improvement Plans, Specifications and Drawings, and the original Assignment of Construction Contract and consent thereto executed by the Contractor may be delivered after the loan closes, but no money will be disbursed from the Control Account until these documents have been executed and delivered.

(b)     Lender shall have reviewed and approved the Permitted Exceptions;

(c)     Borrower has acquired fee title to all of the Property free and clear of all liens and encumbrances which are not Permitted Exceptions;

12

(d)     The Deed of Trust shall have been recorded in the Official Records of the County in which the Property is located as a first priority lien;

(e)     The Financing Statement shall have been filed for record with the Idaho Secretary of State.

4.2     Any Disbursement.    The obligation of Lender to make any Disbursement (including the first Disbursement) is subject to the terms and conditions of the Disbursement Schedule and, in addition, the following conditions precedent:

(a)     the representations and warranties of Borrower contained in all of the Loan Documents shall be correct on and as of the date of the advance as though made on and as of that date and no Event of Default (or event which, with the giving of notice and/or the passage of time, would become an Event of Default) shall have occurred and be continuing;

(b)     Borrower shall have received  (i) valid and enforceable partial or complete lien releases or waivers, as may be appropriate, from all Persons who have furnished labor, services, equipment, or material to the Project, accompanied by a written accounting signed by such Persons showing all amounts owed to such Persons, except that Borrower shall not be required to pay any claim for labor, service, equipment, or material that is being contested in good faith by appropriate proceedings as long as no claim of lien has been recorded, or, if a claim of lien has been recorded, within ten (10) days thereafter Borrower either has obtained and recorded a surety bond, in form and substance satisfactory to Lender, sufficient to release the Property from the lien or from any action brought to foreclose the lien, or has caused the title insurer who has issued the Title Policy to issue, in form and substance satisfactory to Lender, an endorsement to the policy insuring the priority of the lien of the Deed of Trust over the claim of lien, and (ii) an invoice or receipt with respect to each payment made on account of labor, service, equipment, or material furnished to the Project in sufficient detail so that the particular nature of the labor, service, equipment, or material may be identified;

(c)     the construction of the Improvements shall in all respects conform to the Improvement Plans and all applicable Laws and other requirements;

(d)     Lender has received copies of all permits and approvals by Governmental Agencies necessary to construct the Improvements that have been obtained as of the date of Lender's request therefor;

(e)     Lender has received and approved line-item budgets for the costs to be paid and such Approved Budgets have been forwarded to the Disbursement Agent;

(f)     Borrower shall, at its sole expense, deliver or cause to be delivered to Lender, in form and substance satisfactory to Lender:

(i)     from the title insurer who has issued the Title Policy, such endorsements, binders, or modifications thereto as Lender may require;

13

(ii)    a Request for Disbursement, certifying the matters set forth in Sections 4.2(a, b, and c) above;

(iii)    (A) an itemization of the amounts requested and/or of all amounts previously expended in connection with the Improvements, in either case identified to the corresponding item in the Approved Budgets, and, if demanded by Lender, (B) a certificate signed by an inspector acceptable to Lender verifying the matters set forth in Sections 4.2 (b and c); and

(iv)    such additional agreements, certificates, reports, approvals, instruments, documents, consents, or opinions as Lender may reasonably request.

(g)    Lender is reasonably satisfied, based upon periodic inspections and such other information as Lender deems relevant, that (i) the progress of construction of the Improvements is as represented by Borrower, and (ii) construction of the Improvements conforms to the Improvement Plans and all applicable Laws and other requirements;

(h)    All conditions to the making of the first Disbursement have been satisfied, and Lender does not waive any of these conditions even though one or more Disbursements may have been made prior to the satisfaction of all such conditions.

4.3    <u>Final Disbursement of Hard Costs</u>.  With respect to each line item of the Approved Budgets which is subject to retention of Loan Funds as set forth in the Disbursement Schedule, the obligation of Lender to make the final Disbursement is subject to Lender's receiving satisfactory evidence that the following conditions precedent have been satisfied:

(a)    The Improvements shall have been completed according to the Improvement Plans and all applicable permits, Laws, and other requirements of all Governmental Agencies and public utility companies, and Borrower and Contractor shall deliver to Lender a certificate to this effect;

(b)    Borrower shall, at its sole expense, deliver or cause to be delivered to Lender an endorsement to Lender's ALTA form extended coverage to lender's policy of title insurance, or evidence of a commitment therefor satisfactory to Lender, in form and substance and issued by an insurer satisfactory to Lender, insuring the Deed of Trust to be a valid first position lien upon the Property, and showing the Property to be subject only to the Permitted Exceptions and such other exceptions as shall have been approved in writing by Lender pursuant to this Agreement (the "Endorsement");

(c)    If demanded by Lender, and required by Title Company, Borrower shall deliver or cause to be delivered to Lender a copy of the ALTA survey prepared by Borrower, at Borrower's sole expense, if the title insurer requires such in connection with the issuance of the Endorsement, which survey shall be satisfactory to Lender and shall (i) show compliance of the Property with any and all setbacks and other restrictions applicable to the Property pursuant to the requirements of any Governmental Agency or any applicable covenants, conditions, or other private restrictions; (ii) show all easements, licenses, and other rights of way; (iii) show no encroachments

14

onto the Property or from the Property onto adjoining property; and (iv) certify the legal description of the Property as insured in the Endorsement;

        (d)    Any portion of the Improvements requiring inspection or certification by municipal or other Governmental Agencies shall have been inspected and certified as complete, and all other necessary permits, approvals, and certificates shall have been duly issued;

        (e)    All conditions for Completion of Construction, as defined in Section 1.1, shall have been satisfied;

        (f)    Borrower shall have delivered to Lender, if appropriate, a list of all of the Personal Property, providing a general description of such Property, together with all other information reasonably required by Lender;

        (g)    Borrower shall deliver to Lender a copy of any recorded covenants, conditions, and restrictions, in a form previously approved by Lender; and

        (h)    Borrower shall deliver to Lender such instruments and documents as Lender may require, including without limitation, supplemental security agreements and form UCC-1 and/or UCC-2 financing statements, in order to extend or perfect Lender's first priority security interest in and to the Personal Property, together with evidence satisfactory to Lender that all such Personal Property has been paid for in full and is owned by Borrower, and that Lender's security interest in and to such Personal Property is a valid first priority security interest;

Provided that, notwithstanding the satisfaction of the conditions in this Section 4.3, Lender may withhold the final Disbursement until the expiration of forty-five (45) days after the recording of a valid notice of completion (or, if no notice of completion has been recorded, ninety-five (95) days after actual completion) to assure that there can be no claims for mechanic's or materialmen's liens against the Property with respect to the construction of the Improvements, or until Lender receives assurance satisfactory to it that there are and will be no such liens. Lender agrees that a CLTA Form 101.2 endorsement to the Title Policy, in form and substance reasonably satisfactory to Lender, shall satisfy this requirement.

    4.4    <u>Cost Overruns</u>.  In the event that, for any reason, the actual cost reasonably determined by Lender or Borrower to assure completion of all matters included in any line item in the Approved Budgets exceeds the amount allocated to such line item, Lender shall have no obligation to make further Disbursements until Borrower has paid or otherwise provided for the overrun as required under Section 6.7(c). Amounts deposited by Borrower in the Overrun Account for any line item shall be held by Lender as collateral and disbursed by Lender prior any further Disbursement for that line item; provided, however, that Lender shall have no obligation to Borrower to supervise or otherwise see to the proper application of such amounts following disbursement.

    4.5    <u>Offsite Materials</u>.  In the event that any Disbursement Request includes the cost of Offsite Materials, such Disbursement Request shall include each of the following:

(a)     evidence that Borrower has paid for the Offsite Materials;

(b)     if the Offsite Materials are stored at the facility of an Offsite Supplier, a written statement from the Offsite Supplier that Borrower has paid for the Offsite Materials, that they have been segregated from other materials in the facility, and have been marked with Borrower's name. Such statement shall also acknowledge (i) Lender's right to enter the facility at reasonable times to inspect or remove the Offsite Materials, and (ii) Lender's first priority security interest in the Offsite Materials;

(c)     if the Offsite Materials are stored in a place other than the facility of the Offsite Supplier, a written statement from the bailee or other custodian acknowledging (i) Lender's right to enter the storage site at reasonable times to inspect or remove the Offsite Materials, and (ii) Lender's first priority security interest in the Offsite Materials;

(d)     Certificates of insurance showing the Offsite Materials to be insured as required hereunder and showing Lender as co-insured; and

(e)     evidence that Borrower has paid all personal property taxes applicable to the Offsite Materials.

Lender need not make Disbursements for any Offsite Materials until Lender has inspected and approved the Offsite Materials.

## SECTION 5: REPRESENTATIONS AND WARRANTIES BY BORROWER.

5.1     <u>Formation, Qualification and Powers of Borrower.</u>  Borrower is a limited liability company duly formed and validly existing under the laws of the State of Idaho. Borrower has all requisite power and authority to conduct its business, to own its properties, and to execute, deliver and perform all of its obligations under the Loan Documents.

5.2     <u>Authority and Compliance with Instruments and Government Regulations.</u> Borrower has duly authorized by all necessary action the execution, delivery and performance of all of its obligations under each Loan Document, and the same do not and will not:

(a)     require any consent or approval not heretofore obtained of any Person holding any security or interest or entitled to receive any security or interest in Borrower;

(b)     violate any provision of any organizational document or certificate of Borrower;

(c)     result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, right of others or other encumbrance of any nature, other than under the Loan Documents, upon or with respect to any property now owned or leased or hereafter acquired by Borrower;