# EXHIBIT "A"

EXHIBIT "A"



J. Stephen Peek, Esq.
Nevada Bar No. 1758
Fred D. Gibson, III, Esq.
Nevada Bar No. 1474
Brent C. Eckersley, Esq.
Nevada Bar No. 6962
Hale Lane Peek Dennison and Howard
2300 West Sahara, Suite 800, Box 8
Las Vegas, Nevada 89102
Phone No. (702) 222-2500
Fax No. (702) 365-6940
Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

ROLLAND P. WEDDELL and SPECTRUM FINANCIAL GROUP, LLC,

Plaintiffs,

vs.

USA COMMERCIAL MORTGAGE COMPANY, a Nevada Corporation; HOUSING PARTNERS, LLC; AMBLAMO, LLC; USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC; USA INVESTMENT PARTNERS, LLC; THOMAS A. HANTGES; JOSEPH MILANOWSKI; RICHARD KROPP; SALVATORE J. REALE; ROBERT FRANCIS TOMLJENOVICH,

Defendants.

Case No.: CV-S-01-0355-KJD-LRL

**FOURTH AMENDED COMPLAINT**

Plaintiffs Rolland P. Weddell and Spectrum Financial Group, LLC, hereby complain and allege as follows:

**PARTIES, JURISDICTION AND VENUE**

1. This action arises under Title 18 of the United States Code, as described more fully herein. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a). The remaining claims are related proceedings under 28 U.S.C. § 157(c)(1).

2. The venue of this action is proper pursuant to 28 U.S.C. § 1409.

364

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

3.     Principle Centered, Inc. ("PCI") is a Nevada corporation with its principal place of business in Clark County, Nevada. PCI filed a Voluntary Petition for Chapter 11 relief on March 2, 2001, Case No. BK-S-01-11719RCJ in the United States Bankruptcy Court, District of Nevada, in Las Vegas, Nevada. PCI's bankruptcy was converted to Chapter 7 on or about May 1, 2002.

4.     American Destination II, LLC ("Destination II") is a Nevada limited liability company, having filed a Voluntary Petition for Chapter 11 relief on March 2, 2001, Case No. BK-S-01-11720RCJ in the United States Bankruptcy Court, District of Nevada, in Las Vegas, Nevada. Destination II's bankruptcy was converted to Chapter 7 on or about May 1, 2002. Destination II is a subsidiary of PCI.

5.     American Enchantment II, LLC ("Enchantment II") is a Nevada limited liability company, having filed a Voluntary Petition for Chapter 11 relief on March 2, 2001, Case No. BK-S-01-11721RCJ in the United States Bankruptcy Court, District of Nevada, in Las Vegas, Nevada. Enchantment II's bankruptcy was converted to Chapter 7 on or about May 1, 2002. Enchantment II is a subsidiary of PCI.

6.     American Harmony II, LLC ("Harmony II") is a Nevada limited liability company, having filed a Voluntary Petition for Chapter 11 relief on March 2, 2001, Case No. BK-S-01-11722RCJ in the United States Bankruptcy Court, District of Nevada, in Las Vegas, Nevada. Harmony II's bankruptcy was converted to Chapter 7 on or about May 1, 2002. Harmony II is a subsidiary of PCI.

7.     American Inspiration, LLC ("Inspiration") is a Nevada limited liability company, having filed a Voluntary Petition for Chapter 11 relief on March 2, 2001, Case No. BK-S-01-11723RCJ in the United States Bankruptcy Court, District of Nevada, in Las Vegas, Nevada. Inspiration's bankruptcy was converted to Chapter 7 on or about May 1, 2002. Inspiration is a subsidiary of PCI.

8.     American Imagination, LLC ("Imagination") is a Nevada limited liability company, having filed a Voluntary Petition for Chapter 11 relief on March 2, 2001, Case No. BK-S-01-11724RCJ in the United States Bankruptcy Court, District of Nevada, in Las Vegas, Nevada.

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

Imagination's bankruptcy was converted to Chapter 7 on or about May 1, 2002. Imagination is a subsidiary of PCI.

9. Rolland P. Weddell ("Weddell") is an individual residing in Carson City, Nevada.

10. Spectrum Financial Group, LLC ("Spectrum") is a Delaware Limited Liability Company doing business in the State of Nevada as Spectrum Financial Group II, LLC.

11. Weddell and Spectrum are successors in interest to all claims PCI, Destination II, Enchantment II, Harmony II, Inspiration, and Imagination may have related to or arising from the subject matter of this action.

12. USA Commercial Mortgage Company ("USA") is a Nevada corporation, with its principal place of business in Clark County, Nevada, which does business as USA Capital, and is now the lender/beneficiary with respect to two loans described herein, known as the Somerset First and the Black Mountain Working Capital Loan.

13. Housing Partners, LLC ("Housing Partners") is a Nevada Limited Liability Company, with its principal place of business in Clark County, Nevada, which is an affiliate of USA, Hantges, and Milanowski.

14. Amblamo, LLC ("Amblamo") is a Nevada Limited Liability Company, with its principal place of business in Clark County, Nevada and its sole member is Paul Hamilton ("Hamilton"), an employee of USA, and was previously USA. Amblamo is now the lender/beneficiary with respect to the First and Third View Loans as described herein.

15. Thomas A. Hantges ("Hantges") is an individual who resides in Clark County, Nevada and is the chief executive officer of USA, which was formerly the sole member of Amblamo, and a member of Housing Partners.

16. Joseph D. Milanowski ("Milanowski") is an individual who resides in Clark County, Nevada and is the president and treasurer of USA, which was formerly the sole member of Amblamo, and a member of Housing Partners.

17. Richard Kropp ("Kropp") is an individual who resides in Clark County, Nevada.

18. Salvatore J. Reale ("Reale") is an individual who, upon information and belief, resides in the State of California.

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

19. Robert Francis Tomljenovich ("Tomljenovich") is an individual who, upon information and belief, is a citizen of Canada and whose residence is unknown.

## GENERAL ALLEGATIONS

20. American Communities constructed single-family homes in and around Clark County, Nevada and had been engaged in the business of constructing single-family homes since 1996.

21. PCI constructed single-family homes in and around Clark County, Nevada, and began doing so in April 2000, acting on its own and through its subsidiaries Destination II, Enchantment II, Harmony II, Imagination and Inspiration. Each of the five (5) 90% owned subsidiaries owns or owned its own residential real estate development project.

22. USA is in the business of being a mortgage broker and is licensed as such.

23. American Communities began obtaining acquisition and development loans through USA in 1997, through contact with Hantges, Milanowski, and Kropp.

24. During the time from 1997 to the present, USA, through Housing Partners, Amblamo, Hantges, Milanowski, and Kropp, has engaged in a pattern of improper, unlawful, and misleading business practices with respect to American Communities and its related entities, PCI and its related entities and others as fully described below, which have caused the Plaintiffs substantial damage.

***A. Proposed Inco Merger***

25. Up until late 1998, American Communities was financially healthy, paying off its loans from USA in a timely manner and, in some cases, ahead of time.

26. In late 1998, American Communities determined that it needed to raise additional equity capital, to accommodate its growth and increased cash flow requirements, and discussed the matter with Kropp, in his capacity as a vice-president of USA.

27. In November 1998, American Communities presented a package to various investors seeking $5,000,000.00 of equity and received a generally favorable response from potentially interested parties.

28. Regarding the package presented to investors in November, 1998, American Communities received a positive response from Remington Financial Group of Philadelphia that

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

included a letter of interest and terms sheet. *See* Letter of Interest and Terms Sheet from Remington Financial Group, attached hereto as **Exhibit "1"**.

29. In December of 1998, while American Communities was still seeking equity financing, Hantges, the chief executive officer and a member of the board of directors of USA, as well as a 67% owner thereof, approached American Communities with an unsolicited proposal to merge American Communities with Inco Homes ("Inco").

30. Hantges was a member of Inco's board of directors and a major shareholder of Inco in December 1998, when he made this proposal to American Communities, and USA was also a lender to Inco. Further, Milanowski had worked with Inco's chief financial officer, David Fogg. Thus, Hantges, Milanowski and USA had substantial information regarding the financial status of Inco.

31. Hantges and Milanowski presented American Communities with several beneficial aspects of a possible merger with Inco, including that Inco was a public company listed with NASDAQ, had a positive net worth of about $2,500,000.00, had a solid Southern California base of operations, and was carrying a net operating loss ("NOL") for tax purposes which was still available to be used to offset income for several more years, all of which convinced American Communities to pursue a merger with Inco.

32. Milanowski further prepared a book that included Inco's financial statements and Milanowski's analysis of Inco's financial condition. This book indicated that Inco was in good financial shape.

33. Kropp drafted a memorandum to American Communities, opining that American Communities would benefit from the Inco merger and providing suggestions for how that merger should actually proceed. This memorandum further convinced American Communities to pursue the Inco merger.

34. The merger between American Communities and Inco was officially announced in mid-April, 1999. *See* Announcement of Merger of Inco with American Communities, attached hereto as **Exhibit "2"**.

35. However, as American Communities discovered in late May in the course of its due diligence investigation, Inco was still public but had been delisted by NASDAQ, had a deficit net

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

worth, and was losing about $300,000.00 per month in Southern California, which facts Hantges and USA knew or should have known.

36. Based upon Hantges', Milanowski's, and Kropp's representations about the anticipated benefits of the Inco merger and the access to the capital markets which would become available as a result thereof, American Communities ceased all efforts to find equity capital from sources other than Inco.

37. Based upon Hantges', Milanowski's and Kropp's representations about the anticipated benefits of the Inco merger and the access to the capital markets which would become available as a result thereof, American Communities acquired nearly 800 new lots for home construction in three Las Vegas communities, Harmony, Imagination (sometimes referred to as Somerset), and Inspiration (located in Green Valley Ranch), which it would not otherwise have acquired.

38. At a time when American Communities was already experiencing serious difficulties with cash flow and based upon Hantges', Milanowski's and Kropp's representations about the benefits of the Inco merger, loans totaling in excess of $12 million for the acquisition and development of these new lots were made to American Communities through USA in 1999, with substantial fees in excess of $500,000 paid to USA in connection therewith. The interest rates and loan fees for these and all subsequent loans from USA were much higher than those previously obtained by American Communities from USA.

39. Hantges collected a $400,000 real estate commission on the sale of Inspiration from R.V. Jones Company, another USA borrower, from American Communities, which amount was added to the sale price paid by American Communities, thus adding to the amount of money required to be borrowed and the amount of the fees paid to USA for brokering the loans.

40. Hantges encouraged American Communities to purchase these nearly 800 new lots under the pretense that the lots would be brought into the newly merged company at market value, which, if it exceeded the basis, would create additional equity on the balance sheet of the merged company and additional preferred stock in the merged company for the Porters.

41. During discussions with Inco, USA and Hantges presented American Communities with the $5,000,000.00 American Communities Working Capital Loan at 5.0 points and 15% interest,

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

secured by a blanket junior deed of trust on all properties owned by American Communities. However, when the documents for the American Communities Working Capital Loan were prepared and presented to American Communities, shortly before the scheduled closing, they showed 5.0 points and an interest rate of 20.5%, significantly higher than on previous loans to American Communities by USA. *See* Documents Evidencing American Communities Working Capital Loan, attached hereto as Exhibit "3".

42. Documents related to the American Communities Working Capital Loan were signed on April 16, 1999, the loan actually closed and was funded on April 20, 1999, and the first advance of $2 million under the American Communities Working Capital Loan was made at the same time.

43. The remaining amount of the American Communities Working Capital Loan was advanced as follows: $1 million in May of 1999, $1,465,000 in August of 1999, and $535,000 in early October of 1999.

44. Hantges and USA had represented that the American Communities Working Capital Loan would be repaid out of the closings of homes as they were sold by American Communities, by payment to USA of the amount of the loan proportionately allocated to those lots being sold. However, the loan documents, which were provided to American Communities shortly before the scheduled closing, provide that lots being sold by American Communities to home buyers could be released from the deed of trust securing the American Communities Working Capital Loan only on payment to USA of the entire net proceeds of that sale until the entire principal, interest, penalties and late charges under the related note and deed of trust are paid in full. These provisions "front-loaded" the repayment, and thus the American Communities Working Capital Loan became the only source of operating capital for American Communities, since it was not receiving any funds at all from home closings as a result of the "sweeping" of such funds by USA.

45. Hantges induced the Porters to purchase a large portion of Hantges' stock of Inco out of the proceeds of the first advance under the American Communities Working Capital Loan. This Inco stock was held by Hantges personally as well as by Institutional Equity Partners, LLC ("IEP"), an entity which Inco's public filings show was owned 67% by Hantges, but which is shown by current Secretary of State records to have USA as its only member. *See* Closing Statement for the First

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

$2,000,000.00 draw of the American Communities Working Capital Loan, attached hereto as **Exhibit "4"**. Hantges told the Porters this acquisition of his Inco stock allowed them to acquire a larger share of ownership than the treasury shares of Inco stock to be delivered as a result of the proposed merger, that this would lead to substantial gains to the Porters as the price of Inco stock would go up after the merger, and that Hantges was making a sacrifice by agreeing to sell his shares to the Porters. In addition, it would avoid creating a change of ownership problem which would cause the merged company to lose the ability to use Inco's NOL, one of the major perceived benefits of the merger.

46. Hantges induced the Porters to pay $3.00 per share for his Inco stock, even though the market price was just over $2.00 per share at the time the purchase took place, and IEP had acquired its shares in December 1997 for $1.50 per share.

47. USA conditioned the funding of the American Communities Working Capital Loan on the purchase of the Inco stock owned by Hantges, and the Porters purportedly bought a total of 229,121 shares of Inco stock out of the proceeds of the first advance under the American Communities Working Capital Loan, 24,999 of which was purchased from Hantges and 204,122 of which was purchased from IEP. The total price was $687,363.00, which Hantges charged to the first advance on the American Communities Working Capital Loan. As a result of the above, the proceeds from the American Communities Working Capital Loan available to the company were diminished. *See* Documents Evidencing Purchase of Inco Stock by the Porters from Hantges and IEP, attached hereto as **Exhibit "5"**.

48. Plaintiffs are informed and believe that Hantges and USA did not disclose to the American Communities Working Capital Loan Beneficiaries that a portion of the proceeds of that loan was used to make payments to Hantges and IEP for Inco stock purportedly sold to the Porters.

49. Because Hantges caused the funds to be advanced from the American Communities Working Capital Loan brokered by USA and made by various lenders, and because the American Communities Working Capital Loan was still outstanding and has since been assumed by Destination II, Enchantment II, Harmony II, Imagination, and Inspiration, subsidiaries of PCI, there has been more than $240,061.00 of additional financing charges incurred for the purchase of the stock. *See*

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

Assumption Agreement for American Communities Working Capital Loan, attached hereto as **Exhibit "6"**.

50. IEP never transferred the Inco stock to the Porters or American Communities, and Inco's transfer agent has no record of the transaction. In April of 2000, in connection with a Debt Restructuring Agreement discussed in detail below, the Porters transferred all right, title, and interest they had in the Inco stock purportedly purchased from Hantges and IEP to Housing Partners, and the parties acknowledged that, to the best of their knowledge, the Porters were never issued a stock certificate for the shares and were informed by Inco that the transfer was never registered on the books of Inco.

51. After learning of Inco's true state of affairs, in June of 1999, American Communities did not complete the merger. *See* Correspondence from American Communities to Inco, attached hereto as **Exhibit "7"**.

52. After terminating the proposed merger, American Communities was in imminent financial jeopardy, since it had taken on the $5 million American Communities Working Capital Loan with onerous terms and payment provisions, used a substantial portion of the proceeds of the American Communities Working Capital Loan to acquire what turned out to be worthless Inco stock, and acquired nearly 800 new lots and $12 million of additional debt in connection therewith. Hantges, Milanowski, and USA induced American Communities to take these actions and based upon their representations about the benefits to be obtained from the imminent merger with Inco, a company that was on the brink of bankruptcy. Inco filed a petition for bankruptcy under Chapter 11 on October 15, 1999.

53. American Communities' financial situation had deteriorated due to the actions discussed above, so it was forced to rely on USA's and Hantges' representations that USA would adequately fund American Communities' capital needs although the remaining amount available under the American Communities Working Capital Loan was dwindling.

54. In the summer of 1999, AMRESCO Builders' Group ("AMRESCO") offered to infuse $2,000,000.00 in equity into American Communities in exchange for a 50% interest in American Communities.

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

55. Upon learning of the proposal, Hantges and the Porters met via conference call with the Porters and the managing director of AMRESCO.

56. At this meeting, Hantges informed the managing director of AMRESCO that USA would like to become American Communities' partner instead of AMRESCO and offered to provide American Communities with $2,000,000.00 in true equity in exchange for a 50% ownership interest in American Communities.

57. As a result of Hantges' representation, AMRESCO ceased its talks with American Communities regarding a possible investment in American Communities.

58. Contrary to Hantges' representation, USA never made any equity contributions to American Communities.

59. Instead of providing American Communities with equity contributions. USA, through Hantges, created a loan from Housing Partners (the "Housing Partners Loan"), of which Hantges and Milanowski are also members. *See* Documents Evidencing Housing Partners Loan, attached hereto as Exhibit "8".

60. USA utilized the funding of the Housing Partners Loan to make direct payments on outstanding American Communities' loans from USA and to cover American Communities' operating expenses, as the American Communities Working Capital Loan was already fully funded. Very little of the proceeds of the Housing Partners loan were ever funded to American Communities, and instead the money was paid out of USA/Housing Partners' bank accounts, not those of American Communities.

61. USA/Housing Partners initially represented that the Housing Partners advances would be USA's equity contribution to American Communities, but Hantges had American Communities sign a $1,000,000.00 Note based on his representation that it was only be for the purpose of limiting USA's regulatory exposure in having an interest in a developer for whom it was brokering loans.

62. Pursuant to NRS 645B.185, any interest of USA or its general partner, officer, or director, in a debtor such as American Communities must be disclosed to the investor(s) in a written disclosure form signed and dated by the investor(s) and USA. Plaintiffs are informed and believe that no such interest of USA in American Communities was disclosed to USA's investors.

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

63. USA/Housing Partners later stated that it would treat the Housing Partners Loan as an unsecured loan and that it was not equity.

64. Although USA later took the position that it had made no equity contributions to American Communities, but only another loan, Hantges and Milanowski had begun conducting themselves as though USA were a partner in American Communities.

65. Hantges and Milanowski began holding weekly meetings with American Communities' staff. These meetings occurred at USA's offices.

66. Hantges and Milanowski often directed Plaintiffs Robert Porter and Cheryl Porter, the members of American Communities, to leave these meetings or forbade them from attending these meetings.

67. These meetings were held to inform Hantges, Milanowski, and USA of the day-to-day business of the company.

68. During these meetings, Hantges and Milanowski required American Communities' employees to update them on the status of construction on American Communities' projects. Hantges and Milanowski also questioned whether there were any pending subcontractor or trade issues during these meetings.

69. As the meetings progressed, Hantges and Milanowski began to direct American Communities' business decisions. For instance, they forbade American Communities from working with many subcontractors and ordered them to find replacement subcontractors. They also began to order American Communities to rebid construction projects, even if with a less reputable subcontractor.

70. Hantges and Milanowski instructed American Communities' employees to take all of their direction from Hantges and Milanowski and not from Robert Porter or Cheryl Porter.

71. During 1999, Hantges and Milanowski began directing Robert Porter and Cheryl Porter to leave the meetings on a more regular basis.

72. After directing the Porters to leave these meetings, Hantges and Milanowski discussed with American Communities' employees their plan to foreclose on all of American Communities' properties, take over all of American Communities' projects and replace all of the subcontractors.

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

73. Hantges and Milanowski stated that they desired to shut down American Communities as a business, lay off all but a few "core" employees, get rid of the Porters, restart the company under a different name, and avoid paying subcontractors who had worked on the projects.

74. After the Debt Restructuring Agreement was entered and PCI and its subsidiaries were formed in April 2000, Hantges and Milanowski stopped holding the weekly meetings.

75. Hantges met and/or spoke with many of the subcontractors with whom American Communities did business, and assured them that USA was a "partner" of American Communities, and stood behind American Communities' financial obligations, including accord agreements reached with subcontractors to pay money owed them.

76. Hantges and USA also negotiated with Paragon Homes on behalf of American Communities with respect to certain disputed charges, but this led to an agreement to pay Paragon more than had even been claimed. USA was also a lender to Paragon and the agreement Hantges negotiated thus benefited Paragon and USA by arranging for payment to Paragon by Black Mountain of over $250,000 out of the proceeds of the Black Mountain Working Capital Loan described below, further reducing the proceeds of that loan available for Black Mountain's use.

77. Hantges and USA also induced American Communities to manage the development of certain properties.

78. Two of the properties that Hantges induced American Communities to become involved with were Desert Pride and Eagle Ranch, California properties developed by Inco but taken by deed in lieu of foreclosure by USA.

79. Another property in which American Communities became involved because of Hantges was the Red Hills Condominiums in Las Vegas, Nevada, for which Hantges had American Communities sign a Management Agreement. This property was originally owned by the R.V. Jones Co., to which USA was a lender but with respect to which, Hantges and USA were acting as a partner or officer, directing the course of the development. *See* Management Agreement Regarding Red Hills Condominiums, attached hereto as **Exhibit "9"**.

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

80. Regarding Red Hills Condominiums, under the Management Agreement, American Communities was to be paid a 6 % management fee, but USA had the fees paid directly to it. American Communities received little direct fee income from this project.

81. American Communities was to have been provided an advance fee payment of $200,000 on or about September 7, 1999, however USA applied approximately $170,000 of this amount to the Housing Partners Loan.

82. At the end of January, 2000, Hantges informed the Porters that USA would no longer make any cash advances to American Communities, while continuing to sweep the proceeds from home closings, and that American Communities' only remaining option would be to deed all its assets to USA.

83. In or about October, 2000, USA began soliciting buyers for properties owned by the Plaintiffs despite the fact that USA did not own the properties and had no authority to act as agent for Plaintiffs.

84. USA's actions served to decrease the price of the Plaintiffs' properties on the open market because it inspired public speculation regarding Plaintiffs' financial status. When the Plaintiffs demanded that USA cease all efforts to sell their property, Thomas Rondeau ("Rondeau"), attorney for USA, asserted that USA's actions were not improper, partially because USA anticipated that it would own the properties in the future following foreclosure. See Correspondence from Thomas Rondeau to Elissa Cadish, attached hereto as **Exhibit "10"**.

***B. Improper Default for Loans Issued to the American Black Mountain Limited Partnership***

85. On April 2, 1998, Black Mountain was formed for the purpose of developing property known as the View at Black Mountain, located in Clark County, Nevada.

86. Townhouse Vistas, Inc. ("Townhouse Vistas") and Waukegan Home Investors, Inc. ("Waukegan") are the general partners of Black Mountain. The Black Mountain Vistas Limited Partnership ("Black Mountain Vistas"), an Illinois limited partnership, is the limited partner of Black Mountain. *See* Partnership Agreement for the American Black Mountain Limited Partnership, attached hereto as **Exhibit "11"**.

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

87. The officers of Townhouse Vistas are the Porters, and its stock is owned by American Communities.

88. Waukegan and Black Mountain Vistas are entities owned by PC Residential, an Illinois entity, which agreed to fund the development of the View and be a partner therein.

89. On March 16, 1998, USA brokered a loan between Black Mountain, as the borrower, and a group of various investors, as the beneficiaries and/or lenders, for $1,875,000.00 at 12.75% interest, referred to herein as the First View Loan. The First View Loan was for acquisition and development of Unit I at the View. ***See*** Documents Evidencing the First View Loan, attached hereto as **Exhibit "12"**.

90. On August 28, 1998, USA brokered a loan between Black Mountain, as the borrower, and a group of various investors, as the beneficiaries and/or lenders, for $1,950,000.00 at 13.25% interest, referred to herein as the Second View Loan. The Second View Loan was a land loan for Units 2, 3 and 4 at the View. In February of 1999, when the Fourth View Loan was closed, the Second View Loan was paid down to $1,075,000, and Unit 2 was released from the deed of trust securing the Second View Loan. ***See*** Documents Evidencing the Second View Loan, attached hereto as **Exhibit "13"**. In February 2000, the Second View Loan was increased to $1,250,000 to pay additional fees and interest to USA.

91. On January 11, 1999, USA brokered a loan between Black Mountain, as the borrower, and a group of various investors, as the beneficiaries and/or lenders, for $660,000.00 at 12.50% interest, referred to herein as the Third View Loan. The Third View Loan was used for development and construction of 6 model homes. ***See*** Documents Evidencing the Third View Loan, attached hereto as **Exhibit "14"**.

92. On February 5, 1999, USA brokered a loan between Black Mountain, as the borrower, and a group of various investors, as the beneficiaries and/or lenders, for $1,900,000.00 at 12.50% interest, referred to herein as the Fourth View Loan. The Fourth View Loan was an acquisition and development loan for Unit 2 at the View. ***See*** Documents Evidencing the Fourth View Loan, attached hereto as **Exhibit "15"**.

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

93.    The First View Loan became due and owing on March 16, 1999, with a remaining balance on the loan of $195,000.

94.    On November 8, 1999, USA, as trustee for the beneficiaries, recorded a Notice of Default and Election to Sell Under Deed of Trust ("NOD") for the First View Loan in Book 991108, Instrument No. 002989, Official Records, Clark County, Nevada. *See* Notice of Default for the First View Loan, attached hereto as **Exhibit "16"**.

95.    The Second View Loan became due and owing on September 10, 1999.

96.    On October 11, 1999, USA, as trustee for the beneficiaries, recorded a NOD for the Second View Loan in Book 991011, Instrument No. 00305, Official Records, Clark County, Nevada. *See* Notice of Default for the Second View Loan, attached hereto as **Exhibit "17"**.

97.    The Third View Loan became due and owing on January 12, 2000, but USA characterized it as being in default in or about September of 1999 because of alleged unpaid interest to the beneficiaries and accelerated the due date, even though the interest had been paid by USA through the Housing Partners Loan.

98.    On September 29, 1999, USA, as trustee for the beneficiaries, recorded a NOD for the Third View Loan in Book 990929, Instrument No. 00046, Official Records, Clark County, Nevada. *See* Notice of Default for the Third View Loan, attached hereto as **Exhibit "18"**.

99.    The Fourth View Loan became due and owing on February 5, 2000, but USA characterized it as being in default in or about September of 1999 because of alleged unpaid interest and accelerated the due date for the loans, even though the interest had been paid by USA through the Housing Partners Loan.

100.    On September 29, 1999, USA, as trustee for the beneficiaries, recorded a NOD for the Fourth View Loan in Book 990929, Instrument No. 00045, Official Records, Clark County, Nevada. *See* Notice of Default for the Fourth View Loan, attached hereto as **Exhibit "19"**.

101.    On or about November 30, 1999, USA, as attorney in fact for the beneficiaries, and Black Mountain executed Loan Modification Agreements for the First View Loan, the Second View Loan, the Third View Loan and the Fourth View Loan. *See* Loan Modification Agreements for the

Hale Lane Peck Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

First View Loan, the Second View Loan, the Third View Loan, and the Fourth View Loan, attached hereto as **Exhibits "20", "21", "22" and "23"**.

102. The Loan Modification Agreements for all of the View Loans indicated that USA would rescind the NOD recorded with respect to those loans as soon as possible, and that all interest, late charges and trustee's fees and expenses through November 30, 1999 on all of the View Loans would be paid out of the proceeds of an additional $1,500,000 loan from USA which did not close until February of 2000, as discussed below.

103. Pursuant to the Loan Modification Agreement for the First View Loan, USA, as attorney in fact for the beneficiaries, agreed to extend the loan until December 1, 2000.

104. Pursuant to the Loan Modification Agreement for the Second View Loan, the term of the loan was extended until November 30, 2000. It also stated that on December 1, 1999, the principal balance of the Second View Loan would be increased to $1,250,000.00 with the additional $175,000.00 to be "applied to the extension fee of $62,500 payable to USA, and to interest reserve."

105. Pursuant to the Loan Modification Agreement for the Third View Loan, USA, as attorney in fact for the beneficiaries, agreed to extend the loan until January 12, 2001.

106. Pursuant to the Loan Modification Agreement for the Fourth View Loan, USA, as attorney in fact for the beneficiaries, agreed to extend the loan until February 5, 2001.

107. In February of 2000, USA brokered a $1,500,000.00 working capital loan to Black Mountain (the "Black Mountain Working Capital Loan). *See* Documents Evidencing the Black Mountain Working Capital Loan, attached hereto as **Exhibit "24"**. In addition, a deed of trust in the amount of $329,000, providing additional security for the American Communities Working Capital Loan, was executed and recorded with respect to Black Mountain, further encumbering the View.

108. Upon brokering the Black Mountain Working Capital Loan, and as contemplated by the Loan Modification Agreements, USA required Black Mountain to pay USA/Housing Partners $326,026.63 in interest payments, including $170,028.87 in "default" interest and penalties on the First, Second, Third and Fourth View Loans out of the closing of the Black Mountain Working Capital Loan.

109.    However, after paying these substantial amounts out of otherwise needed working capital, American Communities, the Porters, Black Mountain, and Townhouse Vistas learned that interest on all four View loans had never been delinquent because USA had arranged for its affiliate, Housing Partners, to make the interest payments to the beneficiaries on these loans each month. This is shown by a spreadsheet later provided to American Communities by USA Commercial. *See* American Communities Interest and Other Items Advanced, attached hereto as **Exhibit "25"**.

110.    USA/Housing Partners paid interest to the beneficiaries of all View loans from September of 1999 through January of 2000 and beyond.

111.    American Communities and the Porters were aware that USA/Housing Partners had been paying some of their debts, purportedly as equity contributions.

112.    Neither Black Mountain, American Communities nor the Porters were aware that USA and Housing Partners had been paying the interest on the View loans to the beneficiaries.

113.    Pursuant to NRS 645B.250, as a mortgage broker, USA is not permitted to make payments to its investors when the borrowers themselves fail to do so. Pursuant to NRS 645B.950, any violation of this provision constitutes a misdemeanor.

114.    These interest payments and all other bills paid for American Communities by USA/Housing Partners were presented to the Porters and American Communities, not as equity but as debt advances under the Housing Partners Loan.

115.    In total, Black Mountain expended a cumulative total of nearly $500,000.00 in resolving the default issues (including default interest, fees and costs) with USA, out of the proceeds of the Black Mountain Working Capital Loan, although there was no default because the beneficiaries had received every payment due them.

116.    PCI loaned monies to Black Mountain from February 2000 through November 21, 2001, in the amount of $416,477.20, which loans were designated as unsecured. The loans from PCI were used by Black Mountain to pay interest on construction loans, provide working capital for Black Mountain and to pay subcontractors, suppliers and material men for work done on Black Mountain.

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

### C. *Exit Fee Provisions*

117. In January of 2000, the Porters, Weddell and Spectrum formed PCI to take over and develop American Communities' ongoing projects other than the View.

118. In order to continue to develop these projects, PCI needed to renegotiate the terms of American Communities' debts with USA, consisting of loans relating to the Harmony, Imagination (also called Somerset), and Inspiration (also called Green Valley Ranch) projects acquired in anticipation of the Inco merger, the American Communities Working Capital Loan, and the Housing Partners Loan. Thus, a Debt Restructuring Agreement was entered on April 21, 2000 to accomplish this (the "Debt Restructuring Agreement"). *See* the Debt Restructuring Agreement, attached hereto as **Exhibit "26"**.

119. The parties to the Debt Restructuring Agreement include, *inter alia*, American Communities, the Porters, PCI, Spectrum, Weddell, USA, and Housing Partners.

120. Included in the loans addressed in the Debt Restructuring Agreement were three loans to American Communities originally brokered by USA that contained exit fee provisions (the "Mezzanine Loans") as follows:

(a) On February 12, 1999, USA brokered a loan between American Communities, as the borrower, and a group of various investors including Defendant Reale, as the beneficiaries and/or lenders, for $800,000.00 (the "Harmony Second"). The provisions of the Loan Agreement for the Harmony Second provided that, at the sole discretion of the lender, American Communities was to pay an exit fee of $750.00 to USA upon the sale of each of the 105 lots located in the project. See Documents Evidencing the Harmony Second Loan, attached hereto as **Exhibit "27"**.

(b) On May 7, 1999, USA brokered a loan between American Communities, as the borrower, and Mary Petersen and Robert Allen Tyndall, Trustees of the Petersen Living Trust of 1992, as the beneficiaries and/or lenders, for $2,550,000.00 (the "Green Valley Ranch Second"). The provisions of the Loan Agreement for the Green Valley Ranch Second provided that, at the sole discretion of the lender, American Communities was to pay an exit fee of $1,500.00 to USA upon the sale of each of the lots in the development to which this loan relates, unless the loan was fully repaid

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

by February 14, 2000. See Documents Evidencing the Green Valley Ranch Second Loan, attached hereto as **Exhibit "28"**.

(c) On May 14, 1999, USA brokered a loan between American Communities, as the borrower, and Defendant Reale, as the beneficiary and/or lender, for $1,925,000.00 (the "Somerset Second"). The provisions of the Loan Agreement for the Somerset Second provided that, at the sole discretion of the lender, American Communities was to pay to USA an exit fee of 1% of the gross sale price from the sale of each of the lots in the development to which this loan relates. See Documents Evidencing the Somerset Second Loan, attached hereto as **Exhibit "29"**.

121. Plaintiffs are informed and believe that Reale is a lieutenant in the Gotti crime family, who was at one time John Gotti's man at John F. Kennedy International Airport in New York, and has been convicted of loan sharking. *See* Articles Involving Salvatore Reale, attached hereto as **Exhibit "30"**.

122. Plaintiffs are informed and believe that Reale is a significant investor with USA.

123. On January 18, 2001, in the evening after dark, a large, imposing, muscular man dressed in a suit, identifying himself only as "Bobby" and believed to be Defendant Tomljenovich, came to the door of the Porters' residence, claiming to have been sent by Hantges to be sure that the Porters were fine and healthy. Tomljenovich also provided one of Hantges' business cards. The Porters had never met Tomljenovich, nor have they seen him since this incident, although Tomljenovich's description matches that of a gentleman who arrived with Hantges at the PCI offices a few days earlier and waited in the lobby area while Hantges met with Weddell. The Porters felt threatened by this behavior on the part of Hantges and Tomljenovich, and have filed a Suspicious Incident Report with the Henderson Police Department and the FBI in this regard.

124. Besides the Loan Agreements described above, the transactions for the origination of the Mezzanine Loans were documented by Promissory Notes Secured by Deeds of Trust (collectively, the "Promissory Notes") and Deeds of Trust, Assignments of Rents, Security Agreements and Fixture Filings (collectively, the "Deeds of Trust").

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

125. Although USA brokered the Mezzanine Loans between American Communities and the various loan beneficiaries, USA was not nor has it ever been a party to any of these three loans or any of the loan documents related thereto.

126. American Communities and the beneficiaries of the Mezzanine Loans contracted to preclude any other person or entity from having any rights of any nature under the respective loan agreements.

127. On April 24, 2000, as a condition to execution of the Debt Restructuring Agreement, the beneficiaries of the Harmony Second, with USA acting as their attorney-in-fact and drafting all appropriate documents, assigned to Tom Gonzales ("Gonzales") 100% of their interest in the Deed of Trust, "the same being the entire interest in the Deed of Trust," together with all agreements executed in connection with the loan secured by the Deed of Trust, including the Loan Agreement, the Promissory Note and the Guaranty. This assignment was recorded at the Recorder's Office, Clark County, Nevada. *See* Documents Evidencing the Assignment of the Harmony Second to Gonzales, attached hereto as **Exhibit "31"**.

128. On April 27, 2000, as a condition to execution of the Debt Restructuring Agreement, the beneficiaries of the Green Valley Ranch Second, with USA drafting all appropriate documents, assigned to USA, which assigned to Housing Partners, which assigned to Gonzales 100% of their interest in the Deed of Trust, "the same being the entire interest in the Deed of Trust," together with all agreements executed in connection with the loan secured by the Deed of Trust, including the Loan Agreement and the Promissory Note. This assignment was recorded at the Recorder's Office, Clark County, Nevada. *See* Documents Evidencing the Assignment of the Green Valley Ranch Second to Gonzales, attached hereto as **Exhibit "32"**.

129. On April 27, 2000, as a condition to execution of the Debt Restructuring Agreement, the beneficiary of the Somerset Second, with USA acting as his attorney-in-fact and drafting all appropriate documents, assigned to Cindy Barden ("Barden") 100% of his interest in the Deed of Trust, "the same being the entire interest in the Deed of Trust," together with all agreements executed in connection with the loan secured by the Deed of Trust, including the Loan Agreement and the Promissory Note. This assignment was recorded at the Recorder's Office, Clark County, Nevada. *See*

Documents Evidencing the Assignment of the Somerset Second to Barden, attached hereto as **Exhibit "33"**.

130. As the assignee of the beneficiaries of the Harmony Second and the Green Valley Ranch Second, Gonzales holds the sole power and discretion to enforce the provisions of those Deeds of Trust, including payment of the exit fees to USA.

131. As the assignee of the beneficiary of the Somerset Second, Barden holds the sole power and discretion to enforce the provisions of that Deed of Trust, including payment of the exit fees to USA.

132. Gonzales and Barden did not enforce the exit fee provisions contained in the Mezzanine Loans on any future lot sales.

133. On September 11, 2000, Gonzales amended the Deed of Trust for the Harmony Second to eliminate the exit fee provisions. *See* First Amendment to the Deed of Trust for the Harmony Second, attached hereto as **Exhibit "34"**.

134. Both Gonzales and Barden expressed their willingness to amend the Deeds of Trust for the Green Valley Ranch Second and the Somerset Second to eliminate the exit fee provisions in those loans.

135. The Debt Restructuring Agreement, to which USA is a party, defines the term "Lender" to include, *inter alia*, "any person or legal entity who holds a beneficial interest in any deed of trust securing any of the Loans [affected by this Agreement]."

136. In addressing the purchase of the Mezzanine Loans by Gonzales and Barden, the Debt Restructuring Agreement states that the purchasers "shall receive an assignment of beneficial interest in deed of trust *[sic]* and an assignment of the note and of all the loan documents evidencing the loan. The parties understand that the purchasers aforesaid do not wish to pay off the loans, but to acquire the current Lenders' right, title, and interest in and to them."

137. Thus, the parties to the Debt Restructuring Agreement, including USA, agreed that the intent was to transfer all beneficial interest in the deeds of trust securing the Mezzanine Loans, and all rights in connection therewith, to Gonzales and Barden.

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

138. Even if the exit fees were owed to USA as it claims, USA could not collect them because it failed to comply with NRS 645B.165, which requires fees paid to a mortgage broker to obtain a loan to be paid out of the escrow on closing of the loan, and thus precludes payment of such fees out of the closing of sales to home buyers at a much later point in time. Violation of this provision constitutes a felony under NRS 645B.960, since the amount involved is more than $1,000.

139. In connection with the Debt Restructuring Agreement, Housing Partners agreed to forgive the Housing Partners Loan, then asserted to have a balance of $1,676,798.70, and an Endorsement was provided by Housing Partners exonerating and releasing all obligations of American Communities and of any guarantors of the Housing Partners Loan.

140. In a Complaint filed December 13, 2000 in the District Court, Clark County, Nevada, USA and Housing Partners asserted that they were defrauded by American Communities and the Forters as to their true financial status in early 1999, and seek as damages the full amount of the Housing Partners Loan which was purportedly forgiven due to the alleged fraud (the "Housing Partners Litigation").

141. In the Complaint filed in the Housing Partners Litigation, USA and Housing Partners assert that "plaintiff Housing Partners, LLC was compelled to, and did, advance sums to keep the accounts [for the American Communities loans] current and prevent default." A copy of the Complaint is attached as **Exhibit "35"**. In spite of such alleged efforts to keep the loans current, USA recorded Notices of Default with respect to American Communities' loans.

142. In February of 2001, American Communities received a Form 1099 from Housing Partners for the forgiven Housing Partners Loan, although Housing Partners is asserting in the Housing Partners Litigation that it is still owed this amount. A copy of the Form 1099 is attached as **Exhibit "36"**.

***D. Failure to Comply with Debt Restructuring Agreement***

143. On August 16, 1999, American Communities, as the borrower, and Sterling USA, Inc., formerly known as Samoth USA, Inc. ("Sterling"), as the beneficiary and lender, with USA as lender's agent for Sterling, entered into a Construction Loan Agreement, under which Sterling loaned American Communities $1,635,000.00 for development of the lots in its Somerset project (also known

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

as Imagination), one of the projects acquired in anticipation of the Inco merger. *See* Loan Agreement and Guaranty for the Construction Loan, attached hereto as **Exhibit "37"**.

144. Pursuant to the Construction Loan Agreement, and based on the anticipated Inco merger and the access to capital markets that would occur as a result thereof, the Porters agreed to personally guarantee the loan.

145. In connection with the Construction Loan Agreement, American Communities executed a Promissory Note Secured by Deed of Trust dated August 16, 1999 (the "Sterling Promissory Note"). *See* the Sterling Promissory Note, attached hereto as **Exhibit "38"**.

146. Pursuant to Paragraph 3 of the Sterling Promissory Note, the principal balance and all accrued and unpaid interest were due on the Maturity Date, defined as one year after the date on which the deed of trust securing the Note was recorded.

147. The Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated August 16, 1999 which secures the Sterling Promissory Note (the "Somerset First"), was recorded on August 19, 1999. *See* Documents Evidencing the Somerset First, attached hereto as **Exhibit "39"**.

148. The Maturity Date for the Sterling Promissory Note was August 19, 2000.

149. Pursuant to the Debt Restructuring Agreement, USA, as lender's agent for Sterling, agreed as follows with respect to the Somerset First: "USA shall extend the loan when it comes due for one year (until on or about August 16, 2001), in accordance with the terms of the Loan Documents. If necessary, USA shall extend the loan for an additional period, up to April 1, 2002."

150. Sterling received substantial consideration in exchange for this agreement, in the form of an assumption fee of 1% of the construction loan principal, additional guarantors for the construction loan, and having the construction loan brought current. The additional guarantors are PCI, Weddell, and Spectrum.

151. On or about April 21, 2000, as contemplated and required by the Debt Restructuring Agreement, Imagination, a wholly owned subsidiary of PCI, assumed the Somerset First. *See* Assumption Agreement for Somerset First, attached hereto as **Exhibit "40"**.

152. Beginning April 21, 2000, the monthly interest payments required by the construction loan documents were paid to USA, in accordance with the terms of the above-described agreements.

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

153. On or about September 19, 2000, Sterling recorded a Notice of Breach and Election to Sell (the "Notice of Default") in Book 20000919, as Instrument No. 01352 of the official records of the Recorder of Clark County, Nevada. *See* the Sterling Notice of Default, attached hereto as **Exhibit "41"**.

154. The Notice of Default asserted that Imagination was in default under the Somerset First as a result of failure to pay the full principal amount of the construction loan on the asserted maturity date of August 20, 2000.

155. Sterling also notified others with whom American Communities, PCI, and Imagination, as well as the Guarantors, do business, that American Communities and Imagination were in default under the construction loan, which statement was false.

156. Sterling instructed Nevada Construction Services to suspend all disbursements of the construction loan and remit to it all funds now held by Nevada Construction Services in its control disbursement account, thus holding up payments to subcontractors who worked on the construction project being funded with the construction loan.

157. Imagination notified USA and Sterling of the impropriety of their actions in light of their express agreement in the Debt Restructuring Agreement to extend the Maturity Date for the Somerset First until at least August 16, 2001 and, thus, that the amounts claimed to be in default were not yet due. *See* Correspondence from counsel for Imagination to USA/Sterling Regarding the Obligation to Extend the Construction Loan, attached hereto as **Exhibit "42"**.

158. Instead, USA and Sterling informed American Communities that it would extend the construction loan only if certain additional fees and costs not contemplated by the Debt Restructuring Agreement were paid, pursuant to USA's "normal terms and conditions," and also that Imagination pay the foreclosure costs and penalties incurred by Sterling in its wrongful and inappropriate institution of foreclosure proceedings. *See* Proposed Extension Agreement Sent by USA to American Communities, attached hereto as **Exhibit "43"**.

159. Additionally, Hantges informed William Schilz ("Schilz"), one of the members of Spectrum, that USA was aware of its obligation to extend the construction loan but would continue to refuse to do so unless PCI and Imagination helped USA regarding the View Loans, which were in

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

default as described above. However, PCI and Imagination have no obligation regarding the View loans, and have no ownership interest in Black Mountain, the borrower under those loans.

160. Although USA signed the Debt Restructuring Agreement on behalf of Sterling, USA never informed Sterling about the existence of the Debt Restructuring Agreement or that Sterling had any obligation to extend the construction loan, thus leading to the recording of the notice of default by Sterling.

161. Because of the improper refusal of USA and Sterling to extend the construction loan as promised, American Communities, Imagination, the Porters, PCI, Weddell and Spectrum were forced to file suit against USA and Sterling in the District Court, Clark County, Nevada.

162. As a result of the litigation initiated by the plaintiffs against USA and Sterling, USA purchased the loan from Sterling and paid Sterling a substantial amount of default interest and related foreclosure fees because Sterling incorrectly insisted that the loan was in default.

163. Upon purchase of the loan, becoming the beneficiary of the Somerset First, USA rescinded the Notice of Default filed by Sterling but now claims that PCI is responsible for the improper default fees charged by Sterling which occurred due to USA's failure to inform Sterling about its obligation to extend the construction loan. USA asserts, without support, that PCI was obligated to inform USA that it needed the extension, although the Debt Restructuring Agreement contains no such requirement, and indicates that USA bore an obligation to extend the loan.

164. As a result of the actions of USA and Sterling with respect to the improper recording of a NOD and pursuit of foreclosure, as well as initiation of the litigation over the exit fees and recording a writ of attachment and *lis pendens* with respect thereto, USA has interfered with the business and reputation of the Plaintiffs.

165. On November 30, 1999, USA brokered a loan between American Communities, as the borrower, and the Green Valley Ranch Beneficiaries as the beneficiaries and/or lenders, for the acquisition and development of the Inspiration project, with the loan known as the Green Valley Ranch First. *See* Documents Evidencing the Green Valley Ranch First, attached hereto as **Exhibit "44"**. In addition, Inspiration assumed the Green Valley Ranch First. *See* Assumption Agreement for Green Valley Ranch First, attached hereto as **Exhibit "45"**.

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

166. As part of the Debt Restructuring Agreement, USA agreed to advance additional development funds for the Inspiration project by expanding or replacing the Green Valley Ranch First.

167. USA failed to honor its obligation under the Debt Restructuring Agreement to advance the additional development funds, even though PCI requested that they do so.

168. On February 12, 1999, USA brokered a loan between American Communities, as the borrower, and the Harmony First Beneficiaries, as the beneficiaries and/or lenders, for the development of the Harmony project, with the loan known as the Harmony First. *See* Documents Evidencing the Harmony First, attached hereto as **Exhibit "46"**. Harmony II assumed the Harmony First. *See* Assumption Agreement for Harmony First, attached hereto as **Exhibit "47"**.

169. In connection with entering the Debt Restructuring Agreement, and based on the representations and agreements by Housing Partners and USA, for itself and as agent for the lenders, contained therein, PCI, Spectrum, and Weddell agreed to become additional guarantors for the Harmony First, Green Valley Ranch First, and Somerset First, as well as for the American Communities Working Capital Loan. *See* Guaranties Executed by PCI, Spectrum, and Weddell with Respect to these Loans, attached hereto as **Exhibit "48"**.

170. PCI, Spectrum, and Weddell would not have agreed to these guaranties had they known that USA and Housing Partners would later fail to comply with numerous obligations undertaken in connection with the Debt Restructuring Agreement.

171. The Harmony First Beneficiaries, Sterling (as original beneficiary of the Somerset First), the American Communities Working Capital Loan Beneficiaries and the Green Valley Ranch First Beneficiaries all lent money to American Communities, which loans were assumed by PCI and/or its 100% owned affiliates in April, 2000.

172. Weddell and Spectrum loaned monies to PCI, Destination II, Enchantment II, Harmony II, Imagination and Inspiration, jointly and severally, from April 2000 through December 2000, in the collective amount of $9,500,000.00, which loans were designated as unsecured. The loans from Spectrum and Weddell were used by PCI and each of its subsidiaries to pay interest on construction loans, for some or all of the Debtor related entities, provide working capital for PCI and its five (5) subsidiaries and to pay subcontractors, suppliers and material men for work done on some or all of the projects owned by PCI's

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

five (5) subsidiaries, including but not limited to the Harmony project, the Imagination (Somerset) project and the Inspiration (Green Valley Ranch) project.

***E. Improper Investigations Regarding Weddell***

173. At some point in early 2001, Hantges and USA commenced improper investigation and intrusion into the private life of Weddell. Hantges hired Duane Isenberg of the Advantage Group ("Isenberg") and Michael Levin ("Levin"), a former FBI agent, to inquire about Weddell's past.

174. Hantges and USA first hired Isenberg in January of 2001 to investigate a matter that did not involve Weddell or Plaintiffs.

175. On February 12, 2001, Hantges contacted Isenberg by telephone and by e-mail, requesting that Isenberg commence an investigation on both Weddell and Gonzales. E-mail Correspondence from Thomas A. Hantges to Duane Isenberg, dated February 12, 2001, attached hereto as **Exhibit "49"**; Advantage Group Case Management Form, attached hereto as **Exhibit "50"**.

176. Hantges and USA were interested in having Isenberg and Levin do background checks on Weddell and Gonzales.

177. Hantges also desired to convince authorities to reopen a 20-year-old criminal case in Churchill County, Nevada against Weddell. He planned to use Isenberg to prod authorities into re-prosecuting Weddell.

178. In 1983, Weddell had been charged with homicide in Churchill County, Nevada. ***See*** Investigative Summary by Advantage Group, dated March 6, 2001, attached hereto as **Exhibit "51"**.

179. However, all charges against Weddell were dismissed on June 14, 1985 due to inadequate evidence linking Weddell to the crime. ***See*** Ex. 59; Letter from Rolland P. Weddell to Duane Isenberg, dated March 9, 2001, attached hereto as **Exhibit "52"**.

180. Despite the lack of evidence and the dismissal of the charges, Hantges and USA tried to have the case reopened.

181. Hantges and Isenberg were interested in having a grand jury impaneled in Churchill County. ***See*** Email from Thomas A. Hantges to Duane Isenberg, dated May 27, 2001, attached hereto as **Exhibit "53"**.

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

182. On April 3, 2001, Isenberg met with Churchill County's district attorney, sheriff, and undersheriff to convince them to reopen the Churchill County homicide case. *See* Correspondence from Duane Isenberg to Arthur E. Mallory, dated May 23, 2001, attached hereto as **Exhibit "54"**.

183. The purpose of Isenberg's meeting with the Churchill County officials was to convince the district attorney that "the individuals who were originally charged, could be re-prosecuted for this crime." *See* Ex. 54.

184. Isenberg corresponded with the district attorney on May 23, 2001, informing him that he had placed his "investigation on-hold *[sic]*" until he received the district attorney's position "regarding the status of the prosecution of this matter." *See id.*

185. On or about May 30, 2001, Churchill County's district attorney responded to Isenberg's inquiry, informing him that Weddell would not be re-prosecuted in the Churchill County matter as jeopardy had attached. *See* Correspondence from Arthur E. Mallory to Duane R. Isenberg, dated May 30, 2001, attached hereto as **Exhibit "55"**.

186. Isenberg denies pursuing the matter any further after receiving this letter.

187. Hantges informed Isenberg that Levin would be working with him regarding the investigation.

188. Levin, a former FBI agent who became a private investigator upon leaving the FBI, informed Isenberg that he could assist in the investigation because he knew "guys" at the FBI who had access to databases of the National Crime Information Center ("NCIC") that could be used to gain access to confidential records concerning Weddell and others.

189. Levin further informed Isenberg that he would have to "take care of his guys" in order to get this information, meaning that he would be required to pay them to perform this illegal task.

190. Levin also informed Isenberg that he was going to propose a contingency fee to Hantges regarding all cases involving Plaintiffs because he felt that there was too much money in these cases to allow USA to collect it all.

191. When Isenberg learned of Levin's ability to access NCIC databases for a fee and Levin's contingency scheme concerning some of USA's lawsuits against Plaintiffs, he informed Hantges that he would not work any further with Levin.

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

192. Despite Isenberg's refusal to work with Levin, Isenberg's investigation into Weddell's past continued.

193. Hantges spoke with Isenberg during this investigation, referencing confidential information that he had illegally received from Levin and requesting that Isenberg follow up on some of this information.

194. Hantges also directly complained to Isenberg about having to pay for the information obtained from Levin, particularly when some of it ultimately proved to be incorrect.

195. Isenberg questioned several of Weddell's neighbors over the course of his investigation and discussed Weddell's criminal history with these neighbors. *See* Supplemental Report, dated March 14, 2001, attached hereto as **Exhibit "56"**; Addresses Surrounding Roland *[sic]* Weddell, attached hereto as **Exhibit "57"**.

196. While Isenberg denies that the investigation included interviewing Weddell's neighbors about Weddell's criminal history, his investigation notes prove that Weddell's neighbors were both informed and interrogated regarding Weddell's past. *See* Ex. 62; Telephone Conversation Notes from Isenberg, dated March 7, 2001, attached hereto as **Exhibit "58"**.

197. Isenberg and the Advantage Group performed this questioning at Hantges' instruction and for the benefit of Hantges, Milanowski, Kropp, USA and the remaining Defendants.

198. The FBI arrested Levin on June 14, 2001 in Long Island, New York for paying government employees to secure confidential files from the NCIC and selling those files to organized and white-collar crime figures. *See* Article from the Las Vegas Review-Journal entitled "Classified Documents: Informant Was the Key to Stings," attached hereto as **Exhibit "59"**.

199. Almost as soon as he was arrested, Levin agreed to help the FBI obtain evidence against the people who supplied him the information and the people who obtained the information from him. *See id.*

200. In total, three government employees have been arrested and charged thus far in connection with Levin's scheme. All three are accused of providing files to Levin at the cost of $100.00 apiece. *See id.*

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

(a) First, James J. Hill ("Hill"), a communications security manager at the FBI's Las Vegas office implicated himself on June 14, 2001 in a taped conversation with Levin. Hill is suspected of providing the majority of the NCIC files that Levin obtained.

(b) Mary Ellen Weeks ("Weeks"), an employee of the Las Vegas Municipal Court Intake Services Office, implicated herself on June 18, 2001 upon being contacted by Levin.

(c) Finally, also on June 18, 2001, Maria Emeterio ("Emeterio"), an office investigator with the Nevada Attorney General's office, revealed her involvement upon being contacted by Levin.

201. Plaintiffs have learned that Levin was requesting NCIC and NCJIS information about Weddell, among others.

202. In fact, Plaintiffs received proof that Emeterio had pulled Weddell's NCJIS record, which was in the Advantage Group's files. *See* NCJIS Report of Rolland P. Weddell, attached hereto as **Exhibit "60"**. The NCJIS is a Nevada database containing the same type of information as the NCIC.

203. Hill pulled Weddell's FBI information and NCIC records as well. *See* Records of Hills Searches, attached hereto as **Exhibit "61"**.

204. Weddell's NCIC records were pulled by an employee of the Las Vegas Municipal Court (thought to be Weeks) and by an employee of the Nevada Highway Patrol (thought to be Emeterio's boyfriend). Ex. 69.

205. Defendants undertook these activities and others during the pendency of litigation between Plaintiffs and Defendants in order to economically and personally injure the Plaintiffs and to hurt Weddell's reputation and his personal and professional lives.

206. The Plaintiffs have been forced to sue USA for all of the improper activities described above and will be forced to incur attorney's fees and costs regarding prosecution of this action.

///

///

///

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

**FIRST CLAIM FOR RELIEF**

**(Federal RICO - 18 U.S.C. § 1962(c))**

**PLAINTIFFS:** All

**DEFENDANTS:** Hantges; Milanowksi; Kropp; Reale; Tomljenovich

207. Plaintiffs reallege the allegations of Paragraphs 1 through 206 as if set forth fully herein.

208. Hantges is associated with an association in fact enterprise consisting of Hantges, Milanowski, Kropp, Reale and Tomljenovich; Hantges is also employed by or associated with USA, Housing Partners and Amblamo in that Hantges is the chief executive officer of USA, which was formerly the sole member of Amblamo, and is a member of Housing Partners.

209. Milanowski is associated with an association in fact enterprise consisting of Hantges, Milanowski, Kropp, Reale and Tomljenovich; Milanowski is also associated with USA, Housing Partners and Amblamo in that Milanowski is the president and treasurer of USA, which was formerly the sole member of Amblamo, and is a member of Housing Partners.

210. Kropp is associated with an association in fact consisting of Hantges, Milanowski, Kropp, Reale and Tomljenovich; Kropp is also associated with USA, Housing Partners and Amblamo in that Kropp is a vice-president for USA, which was formerly the sole member of Amblamo, and is employed by Hantges and Milanowski, who are members of Housing Partners.

211. Reale is associated with an association in fact consisting of Hantges, Milanowski, Kropp, Reale and Tomljenovich; Reale is also associated with USA, Amblamo, and Housing Partners in that Reale is a major lender to USA, which was formerly the sole member of Amblamo, and is closely associated with Hantges and Milanowski, who are members of Housing Partners.

212. Tomljenovich is associated with an association in fact consisting of Hantges, Milanowski, Kropp, Reale and Tomljenovich; Tomljenovich is also associated with USA, Amblamo and Housing Partners in that he is an employee and/or agent of USA, which was formerly the sole member of Amblamo, and is closely associated with Hantges and Milanowski, who are members of Housing Partners.

213. These Defendants engaged in the collection of extensions of credit by extortionate

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

means by sending an individual to the Porters' residence who threatened violence against the Porters in relation to the Porters', American Communities', and PCI's relationship with USA in violation of 18 U.S.C. § 894(a).

214. These Defendants engaged in the extortionate collection of debt by sending an individual to the Porters' residence who threatened violence against the Porters in relation to the Porters', American Communities', and PCI's relationship with USA in violation of NRS 205.322(1).

215. These Defendants engaged in intimidating and threatening of a potential witness with intent to hinder, delay or prevent communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense by sending an individual to the Porters' residence who threatened violence against the Porters in relation to the Porters', American Communities', and PCI's relationship with USA in violation of 18 U.S.C. § 1512(b)(3).

216. These Defendants engaged in interference with commerce by threats or violence by sending an individual to the Porters' residence who threatened violence against the Porters in relation to the Porters', American Communities', and PCI's relationship with USA in violation of 18 U.S.C. § 1951.

217. These Defendants transported, transmitted or transferred in interstate commerce goods, securities or money worth $5,000.00 or more, knowing the same to have been taken by fraud in violation of 18 U.S.C. § 2314.

218. These Defendants utilized the mails and the wires in furtherance of their scheme to defraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively, in the following manner:

(a) When making statements relating to the beneficial aspects of merging American Communities with Inco, Defendants USA, Hantges, Milanowski and Kropp made misrepresentations that were material to American Communities' decision to enter an agreement to merge with Inco and pursue the merger;

(b) When making statements relating to the beneficial aspects of merging American Communities with Inco, Defendants USA, Hantges, Milanowski and Kropp made misrepresentations that were material to American Communities' decision to enter an agreement to merge with Inco and

pursue the merger, American Communities' decision to purchase the Inco stock held by Hantges and IEP, American Communities' decision to cease efforts to find equity capital sources, and American Communities' decision to acquire approximately 800 new lots for home construction;

(c) When making statements relating to the sale of Inco securities, Defendants USA, Hantges, Milanowski and Kropp made misrepresentations and omissions that were material to the purchase or sale of securities, American Communities' decision to purchase the Inco stock held by Hantges and IEP, American Communities' decision to cease efforts to find equity capital sources, and American Communities' decision to acquire approximately 800 new lots for home construction;

(d) When making statements relating to USA's desire to become an equity partner of American Communities, Defendants USA, Hantges, Milanowski and Kropp made misrepresentations and omissions that caused American Communities to cease efforts to find equity elsewhere;

(e) When making statements asserting that the Housing Partners Loan would be an equity contribution to American Communities when it was always intended by Defendants to be debt, Defendants USA, Housing Partners, Hantges, Milanowski and Kropp made misrepresentations and omissions that caused American Communities to acquire additional debt and to cease efforts to find equity elsewhere;

(f) When making statements that American Communities was to receive a fee of approximately $400,000.00 for assisting in the development of the Desert Pride project, Defendants USA, Hantges, Milanowski and Kropp made misrepresentations and omissions that caused American Communities to assume the management responsibilities of Desert Pride;

(g) When making statements that all four View Loans were in default for nonpayment of interest when USA/Housing Partners had been paying the interest unbeknownst to Plaintiffs, and in violation of Nevada law, Defendants USA, Housing Partners, Hantges, Milanowski and Kropp made misrepresentations and omissions that caused American Communities to expend nearly $500,000.00 for resolution of the false default issues;

(h) When making statements that the Debt Restructuring Agreement would resolve all issues between USA and American Communities regarding the loans that the agreement covered, that all interest in the deeds of trust securing the Harmony Second, Green Valley Ranch Second, and

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

Somerset Second were being conveyed to Gonzales and Barden, and by intentionally failing to disclose that they believed there was a continuing obligation to USA with respect to the exit fees, and then asserting that USA was entitled to exit fees under these loans covered by the Debt Restructuring Agreement and the deeds of trust securing them, Defendants USA, Hantges, Milanowski and Kropp made misrepresentations and omissions that caused Plaintiffs to expend substantial sums of money defending the baseless litigation filed by USA and caused Weddell and Spectrum to provide substantial funding to PCI and its subsidiaries;

(i) When making statements that USA would extend the construction loan without further action on the part of the plaintiffs when it never intended to extend the loan or inform Sterling of the obligation to extend the loan, and that it was entering the Debt Restructuring Agreement with the authority of the lenders for the affected loans including Sterling, and that no further fees would be required for the extension and/or by omitting to state that an extension fee would be charged, Defendants USA, Hantges, Milanowski and Kropp made misrepresentations and omissions that caused PCI and American Communities to incur additional expenses by filing legal action against USA and Sterling in District Court, Clark County, Nevada and caused Weddell and Spectrum to provide substantial funding to PCI and its subsidiaries; and

(j) When making statements that USA, under the Debt Restructuring Agreement, would advance additional development funds for the Inspiration project, by expanding or replacing the Green Valley Ranch First loan, Defendants USA, Hantges, Milanowski, and Kropp made misrepresentations and omissions that caused PCI and American Communities to enter into the Debt Restructuring Agreement with USA and caused PCI, Spectrum, and Weddell to agree to become additional guarantors for the loans secured by first deeds of trust on the Harmony, Inspiration, and Imagination projects, as well as for the American Communities Working Capital Loan and caused Weddell and Spectrum to provide substantial funding to PCI and its subsidiaries, which they would not have agreed to do without Defendants' promise to advance additional development funds.

219. The above acts constitute a "pattern of racketeering activity", as contemplated by 18 U.S.C. §§ 1961(1) and (5).

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

220. The activities of the enterprise affect interstate commerce in that the transactions at issue in this action involved use of the instrumentalities of interstate commerce, including the mails and wires, and USA, Housing Partners, Amblamo, American Communities and PCI are involved in interstate commerce.

221. These Defendants participated in the conduct of the enterprise through a pattern of racketeering, they have violated Section 1962(c), and such conduct has become these Defendants' regular way to conduct their business.

222. By reason of these Defendants' participation in the conduct of the enterprise through a pattern of racketeering, all Plaintiffs have been directly and proximately injured thereby.

223. The conduct of these Defendants was willful, malicious, and fraudulent. As a result of such conduct, Plaintiffs are entitled to punitive damages in an amount to be determined at trial.

224. Pursuant to 19 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages and recovery of their attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**

**(Federal RICO - 18 U.S.C. § 1962(d))**

**PLAINTIFFS:** All

**DEFENDANTS:** USA; Housing Partners; Amblamo;

Hantges; Milanowski; Kropp; Reale; Tomljenovich

225. Plaintiffs reallege the allegations of Paragraphs 1 through 224 as if set forth fully herein.

226. Defendants USA, Housing Partners, Amblamo, Hantges, Milanowski, Kropp, Reale and Tomljenovich conspired and agreed to perform the above-mentioned acts and to violate 18 U.S.C. §§ 1962(c).

227. Due to the actions of these Defendants, in violation of 18 U.S.C. § 1962(d), all Plaintiffs have been damaged in an amount to be determined at trial.

228. The conduct of these Defendants was willful, malicious, and fraudulent. As a result of such conduct, Plaintiffs are entitled to punitive damages in an amount to be determined at trial.

Hale Lane Peck Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

229. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages and recovery of their attorneys' fees and costs.

**THIRD CLAIM FOR RELIEF**

**(State RICO - NRS 207.400(1)(c))**

**PLAINTIFFS:** All

**DEFENDANTS**: Hantges; Milanowski; Kropp; Reale; Tomljenovich

230. Plaintiffs reallege the allegations of Paragraphs 1 through 229 as if set forth fully herein.

231. Hantges is associated with an association in fact enterprise consisting of Hantges, Milanowski, Kropp, Reale and Tomljenovich; Hantges is also employed by or associated with USA, Housing Partners and Amblamo in that Hantges is the chief executive officer of USA, which was formerly the sole member of Amblamo, and is a member of Housing Partners.

232. Milanowski is associated with an association in fact enterprise consisting of Hantges, Milanowski, Kropp, Reale and Tomljenovich; Milanowski is also associated with USA, Housing Partners and Amblamo in that Milanowski is the president and treasurer of USA, which was formerly the sole member of Amblamo, and is a member of Housing Partners.

233. Kropp is associated with an association in fact consisting of Hantges, Milanowski, Kropp, Reale and Tomljenovich; Kropp is also associated with USA, Housing Partners and Amblamo in that Kropp is a vice-president for USA, which was formerly the sole member of Amblamo, and is employed by Hantges and Milanowski, who are members of Housing Partners.

234. Reale is associated with an association in fact consisting of Hantges, Milanowski, Kropp, Reale, and Tomljenovich; Reale is also associated with USA, Amblamo, and Housing Partners in that Reale is a major lender to USA, which was formerly the sole member of Amblamo, and is closely associated with Hantges and Milanowski, who are members of Housing Partners.

235. Tomljenovich is associated with an association in fact consisting of Hantges, Milanowski, Kropp, Reale, and Tomljenovich; Tomljenovich is also associated with USA, Amblamo and Housing Partners in that he is either an employee and/or agent of USA, which was formerly the

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

sole member of Amblamo, and is closely associated with Hantges and Milanowski, who are members of Housing Partners.

236. These Defendants took property under circumstances not amounting to robbery from the Porters by taking proceeds from the American Communities Working Capital Loan for the purchase of Inco stock and never delivering said stock to the Porters in violation of NRS 207.360(9).

237. These Defendants engaged in the collection of extensions of credit by extortionate means by sending an individual to the Porters' residence who threatened violence against the Porters in relation to the Porters', American Communities', and PCI's relationship with USA in violation of NRS 205.322 and NRS 207.360(12).

238. These Defendants committed grand larceny by intentionally taking property valued at more than $250.00 in the form of Weddell's confidential criminal records, in violation of NRS 205.220(1)(a) and NRS 207.360(16).

239. These Defendants received and possessed stolen goods valued at more than $250.00 by requesting that Levin obtain Weddell's confidential criminal records from corrupt government workers and paying for this information on gaining possession of same, in violation of NRS 207.360(24).

240. These Defendants obtained possession of money valued at more than $250.00 rightfully belonging to Plaintiffs through false pretenses by selling Inco stock to the Porters and charging the purchase to the American Communities Working Capital Loan, based on representations of the great value of this stock and the positive financial condition of Inco, in violation of NRS 207.360(26).

241. These Defendants obtained possession of money valued at more than $250.00 rightfully belonging to Plaintiffs through false pretenses by having the 3% management fee for Red Hills Condominiums be paid directly to USA instead of to American Communities, and not accounting for the use of those funds, in violation of NRS 207.360(26).

242. These Defendants obtained possession of money valued at more than $250.00 rightfully belonging to Plaintiffs through false pretenses by characterizing the four View loans as being in default for delinquent interest payments when USA/Housing Partners was making the interest payments and reimbursing itself for these payments, and this required payment of substantial amount of money to address the purported defaults, in violation of NRS 207.360(26).