Marc A. Levinson (California Bar No. 57613)
Jeffery D. Hermann (California Bar No. 90445)
Lynn Trinka Ernce (California Bar No. 179212)
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, CA  95814-4497
Telephone:  (916) 447-9200
Facsimile:  (916) 329-4900
Email:    malevinson@orrick.com; jhermann@orrick.com
          lernce@orrick.com

Bob L. Olson (Nevada Bar No. 3783)
Anne M. Loraditch (Nevada Bar No. 8164)
BECKLEY SINGLETON, CHTD.
530 Las Vegas Boulevard South
Las Vegas, NV 89101
Telephone:  (702) 385-3373
Facsimile:  (702) 385-5024
Email:    bolson@beckleylaw.com; aloraditch@beckleylaw.com

Attorneys for the Official Committee of Equity Security Holders of
USA Capital Diversified Trust Deed Fund, LLC

E-filed on July 27, 2006

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>                                        Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>                                        Debtor. | |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>                                        Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725-LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>                                        Debtor. | Date:   August 4, 2006<br>Time:   9:30 a.m.<br>Place:  Courtroom #1 |
| In re:<br>USA SECURITIES, LLC,<br>                                        Debtor. | **DIVERSIFIED FUND<br>COMMITTEE'S LIMITED<br>OPPOSITION TO MOTION TO<br>DISTRIBUTE FUNDS** |

US_WEST:260056390.7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Affects:
- ☐  All Debtors
- ☒  USA Commercial Mortgage Company
- ☐  USA Securities, LLC
- ☐  USA Capital Realty Advisors, LLC
- ☒  USA Capital Diversified Trust Deed Fund, LLC
- ☒  USA First Trust Deed Fund, LLC

(Affects indicated Debtors)

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND FACTS ................................................................................... 3

    A.    The Direct Lender Business Model ........................................................ 3

    B.    The Fund Business Model ....................................................................... 4

    C.    The Servicing Agreements ...................................................................... 5

    D.    USA Mortgage Ignored The Representations It Made In The Prospectus............. 6

    E.    Monies Were Diverted From Diversified To USA Mortgage............................. 7

    F.    Over $24 Million Was Diverted From Fourteen Hundred Sold Out Direct Lenders .......................................................................................................... 8

    G.    Diversified Monies Were Used To Fund Real Estate Development Activities Of The Principals And Affiliates Of USA Mortgage ........................... 9

    H.    The Financial Demise Of USA Mortgage............................................ 10

    I.    State Of The Debtors' Books And Records ......................................... 10

III.  ARGUMENT ................................................................................................... 11

    A.    Under The Proposed Distribution Scheme, Similarly Situated Direct Lenders Would Receive Greatly Disparate Treatment ......................... 11

    B.    The Debtors' Have Erroneously Calculated The Over-Distribution To Diversified ............................................................................................ 13

    C.    The Direct Lenders Are Properly Characterized As Unsecured Creditors .......... 13

    D.    Even If The Direct Lenders Are Not Properly Characterized As Creditors, The Court May Nonetheless Compel An Equitable Distribution Based Upon Equitable Considerations ........................... 17

    E.    The Substantial Risks Of Over-Distribution Warrant Conservatism In The Distribution........................................................................................... 19

IV.   RELIEF REQUESTED ................................................................................... 20

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Bayer Corp.* v. *Mascotech, Inc. (In re Autostyle Plastics, Inc.),*
   269 F.3d 726 (6th Cir. 2001) ..................................................................... 13, 14

*Bear* v. *Coben (In re Golden Plan of Ca., Inc.),*
   829 F.2d 705 (9th Cir. 1986) ........................................................................ 16

*In re Bullion Reserve of N. Am,*
   836 F.2d 1214 (9th Cir. 1988) ......................................................... 15, 16, 17, 19

*Foothill Capital Corp.* v. *Clare's Food Mkt. (In re Coupon Clearing Serv.),*
   113 F.3d 1091 (9th Cir. 1997) ..................................................................... 14, 15

*Greiner* v. *Wilke (In re Staff Mortgage & Inv. Corp.),*
   625 F.2d 281 (9th Cir. 1980) ........................................................................ 19

*In re Lemons & Assocs. Inc.,*
   67 B.R. 198 (Bankr. D. Nev. 1986) ......................................................... 17, 18, 19

*Mirant Mid-Atlantic, LLC* v. *Morgantown OL1 LLC (In re Mirant Corp.),*
   327 B.R. 262 (Bankr. N.D. Tex. 2005) ........................................................... 14

*Nielson* v. *Chang (In re First T.D. & Inv. Inc.),*
   253 F.3d 520 (9th Cir. 2001) ........................................................................ 19

*In re Pacific Express, Inc.,*
   69 B.R. 112 (B.A.P. 9th Cir. 1986) ................................................................ 14

*In re Pinetree Ptrs, Ltd.,*
   87 B.R. 481 (Bankr. N.D. Ohio 1988) ............................................................ 14

*Sender* v. *Bronze Group, Ltd. (In re Hedged-Investments Assocs.),*
   380 F.3d 1292 (10th Cir. 2004) .................................................................. 13, 14

*Vanguard Airlines, Inc.* v. *Int'l Aero Components, Inc. (In re Vanguard Airlines, Inc.),*
   298 B.R. 626 (Bankr. W.D. Mo. 2003) ........................................................... 14

## FEDERAL STATUTES

Bankruptcy Code section 553(a) ................................................................... 13

**TO THE HONORABLE LINDA B. RIEGLE, UNITED STATES BANKRUPTCY JUDGE:**

The Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC ("Committee") appointed in the chapter 11 case of USA Capital Diversified Trust Deed Fund, LLC ("Diversified") submits its limited opposition to the Debtors' Motion To Distribute Funds and To Grant Ordinary-Course Releases and Distribute Proceeds (as supplemented on July 17th, the "Distribution Motion").  In support thereof, the Committee is filing concurrently herewith the Declaration Of Michael A. Tucker In Support Of Diversified Fund Committee's Limited Opposition To Motion To Distribute Funds ("Tucker Declaration"), which is incorporated by reference herein, and represents as follows:

## I.    INTRODUCTION

1.    The Committee requests that the Court limit the amount of the proposed $64.7 million interim distribution, none of which would go to Diversified, and almost all of which would be made to direct lenders, in order to prevent the possibility of the 1,900 investors in Diversified (and approximately 1,400 sold out direct lenders) from bearing the entire burden of the multi-million dollar fraudulent scheme perpetuated by the principals of the Debtors while thousands of "fat and happy" (and equally innocent) direct lenders are paid in full for their original investment, together with 100% of prepetition and even post-petition interest.  Limiting the distribution will preserve one of the strongest policies of the Bankruptcy Code, namely that similarly situated creditors and interest holders receive equal distributions from the bankruptcy estate.

2.    The investors in the Funds were the more conservative, choosing to spread the risk among a number of loans made by their particular Fund rather than to lend to one borrower, who might default.  Their investment was analogous to an investor who chooses to invest in a mutual fund rather than to invest in one or two stocks for fear that individual stocks may be poor investment choices.

3.    It appears that the principals of USA Mortgage made the type of loans for the 1,300-investor First Trust Deed Fund that were promised in the prospectus distributed to potential investors, namely loans:  (i) secured by first trust deeds; (ii) with conservative loan-to-value

1    ratios; (iii) to third parties and not to insiders; and (iv) not concentrated with any affiliated

2    borrowers. Amazingly, while the same promises were made in the prospectus distributed to

3    potential investors in Diversified, almost none were kept. Thus, of the approximately $108

4    million in principal amount of outstanding Diversified loans, the seven largest, aggregating $95

5    million (about 88%) are: (i) not secured by trust deeds on real property; (ii) have a zero loan-to-

6    value ratio since there is no collateral; (iii) were made to insiders of USA Mortgage and to their

7    affiliates; and (iv) are highly concentrated, with the principal amount of one of the insider loans

8    approximating $55 million (or just over half of the Diversified loan portfolio).

9          4.    A number of the loans made by Diversified were repaid by the borrowers prior

10    to bankruptcy, but the $19 million in proceeds were confiscated by USA Mortgage and paid to

11    direct lenders to perpetuate the myth that all of the loans made by the USA Mortgage family were

12    performing, and thus to keep the new investments rolling in - a Ponzi scheme. The Ponzi scheme

13    also was funded by $11.4 million hijacked by USA Mortgage from the $55 million unsecured

14    loan made by Diversified to the company owned by the principals of USA Mortgage.

15          5.    Not all of the direct lenders avoided victimization, as USA Mortgage diverted

16    about $24 million payable to over 1,400 direct lenders (the "Sold Out direct lenders") to fund its

17    need for Ponzi dollars.

18          6.    Thus, while the Distribution Motion proceeds on the general assumption that the

19    direct lenders are exactly that, third party owners of loans that do not constitute property of the

20    estate, the Committee believes that the unique facts here compel a conclusion that the relationship

21    between the Debtors and direct lenders is more properly characterized as a creditor/borrower

22    relationship wherein USA Mortgage borrowed funds from the direct lenders or, alternatively, that

23    the loans should constitute property of the estate(s) in order to avoid manifest injustice and

24    disparate treatment of otherwise similarly situated creditors.

25          7.    In this limited opposition, Diversified asserts that, while a significant distribution

26    may be appropriate at this time, the Court should establish a far larger holdback amount in order

27    to enable Diversified to further research the facts and the law and then to present to the Court its

28    case for equalizing the ultimate distribution to all investors in the USA Mortgage Ponzi scheme

1   (perhaps including substantive consolidation of the Debtors and certain non-debtor entities such

2   as Investment Partners).  The Committee believes that fiscal conservatism requires a distribution

3   limited to 90% of the amounts proposed by the Debtors on account of interest payments and 25%

4   of the amounts of principal repayments.

5          8.      The Committee is not, of course, requesting that the Court adjudicate the proper

6   characterization and treatment of the direct lenders in the context of the Distribution Motion.

7   Rather, the Committee requests that the Court retain the option of later deciding the issue, and not

8   foreclose that option now by sanctioning a massive interim distribution of funds to persons who

9   could "take the money and run" and no longer be subject to the Court's jurisdiction.  Needless to

10  say, any such recovery efforts would be expensive, time-consuming and, in some cases

11  impractical and/or impossible.[1]

12                    **II.      BACKGROUND FACTS**

13  **A.      *The Direct Lender Business Model***

14         9.      Prior to the creation of the two Funds, the USA Mortgage business model

15  consisted of its arranging of investments in real property secured loans described in an offering

16  document of a page or two in length.  Investors would choose between the loans offered, would

17  determine a dollar amount to invest, would be included as a lender within the promissory note

18  signed by the borrower (typically by reference to an exhibit to the promissory note containing the

19  identities of all the investors) and would be listed as a beneficiary on the deed of trust (again by

20  way of an exhibit) that would be recorded against the borrower's real property.

21         10.     The direct lenders and USA Mortgage would enter into a standard form of Loan

22  Servicing Agreement ("Servicing Agreement") that governed all of their loans.  The Servicing

23  Agreements enumerated the entitlement of USA Mortgage to fees and dictated the arrangements

24  by which the loans would be serviced.

25  _____

26  [1] A joint due diligence request by all four committees was transmitted to the Debtors on July 10th.  When
    provided, the requested information will shed much light on the characterization and other issues raised
27  herein.  Without such information, it is impossible for the parties to litigate or the Court to determine such
    issues.  The Committee has been informed that the Debtors are working to comply with the joint request,
28  but no documents in response thereto have been provided to date.

11.     This business model had high administrative costs and, in some cases, meant months-long delays when individual signatures of direct lenders were needed.  It involved loan-by-loan reporting and money management and, when direct lenders sold out of loans and new direct lenders entered the loans, USA Mortgage was obligated to record amendments to the mortgages or deeds of trust and to make other changes.

12.     Investors were compelled to decide which loans to fund, how much to invest among the different loans, what term to choose, etc.  The investors also obtained no diversification of their exposure to the risk of default on their loans, and the liquidity of their investments was dependent upon the timing of the repayment of the loans by "their" borrowers.

**B.      *The Fund Business Model***

13.     The creation of the $200 million Diversified Fund in May 2000 provided distinct operating advantages to USA Mortgage and was a more attractive investment vehicle to certain investors.  Attached as Exhibit A to the Tucker Declaration[2] are relevant pages of the Diversified prospectus dated June 2, 2003 ("Prospectus"), which provide, among other things, that: (i) Diversified would invest only in loans secured by first deeds of trust upon real property; (ii) loan-to-value ratios for such loans would not exceed 75% and may be as low as 60%; (iii) no loans would be made to USA Mortgage or any affiliate thereof; (iv) loan diversification restrictions would be imposed such that no loan would exceed $20 million, no loan would exceed 15% of all loans outstanding at any time, and no more than 25% of the loans outstanding at any time would be made to a single borrower or an affiliate of such borrower.[3]

14.     The advantages of the Fund business model to USA Mortgage were obvious: (i) the coordination in the timing between loan originations and fund-raising was minimized since monies in Diversified were available to immediately fund a loan or to fill a gap in the funding of

---

[2] Although this Limited Opposition does not request a ruling on the legal theories set forth herein and therefore does not purport to support with competent, admissible evidence, all of the factual assertions herein, most of which are non-controversial facts known to all active participants in the case.  These assertions generally are supported by the Tucker Declaration filed concurrently herewith.  The Tucker declaration contains additional facts and additional detail not included herein because of the Local Rule page limitations.

[3] Prospectus, page 11, "General Standards for Mortgage Loans," page 12, "Loan-to-Value Ratios," page 13, "No Loans to Manager" and page 13, "Loan Diversification."

1   other loans involving many individual direct lenders; (ii) loan closings could occur with just one

2   signature (typically that of Mr. Milanowski) and without coordination of funding from dozens of

3   investors; (iii) decisions as to loan administration, workouts and foreclosures could be made

4   without input or the necessity of obtaining approval from numerous individual direct lenders; (iv)

5   Diversified was free of the requirement that each loan generate monthly interest payments to be

6   distributed to direct lenders; (v) elimination of loan-by-loan reporting[4] and money management;

7   (vi) greater access to greater amounts of investor monies; and (vii) perhaps most significantly, a

8   generally lower level of scrutiny and resulting greater "flexibility" in the handling of

9   Diversified's affairs and monies.

10      15.    The advantages to the investors also were obvious:  (i) as the name implies, their

11   investments were diversified over a portfolio of loans; (ii) for those investors that did not relish

12   searching out the best loans being offered, there was no obligation to choose loans or dollar

13   amounts to be allocated among several loans; (iii) investors could invest any amount at any time,

14   regardless of whether particular loans were being offered at the time; and (iv) greater liquidity in

15   that Diversified investors could redeem some or all of their investment without regard to the

16   timing of the repayment of a single loan.

17   C.    *The Servicing Agreements*

18      16.    Each direct lender was required to execute a standard form of Servicing

19   Agreement governing the loan servicing arrangements between such lender and USA Mortgage.

20   Since the two Funds were direct lenders, they too executed a Servicing Agreement.  The

21   Servicing Agreement signed by direct lenders was fairly standard, with some differences in the

22   statement of the amount of servicing fees earned by USA Mortgage.

23      17.    Under section 2(e) of the Servicing Agreement, the direct lender authorized USA

24   Mortgage to, among other things, execute and deliver releases, discharges, reconveyances and the

25   like with respect to the loans and the collateral for the loans (notwithstanding that the promissory

26

27   [4] Fund investors were typically provided with a quarterly summary sheet describing, in a sentence or two,
     the loans that were outstanding during the quarter.  As described below, the December 31, 2005 statement,
28   like other statements provided to Fund Investors by USA Mortgage, was blatantly false.

1    notes and the deeds of trust stood in the name of the direct lenders) and to institute foreclosure

2    and enforcement proceedings.  USA Mortgage could unilaterally agree to forbearance or workout

3    agreements that waived rights of the direct lenders and provided releases to borrowers and

4    guarantors, and could agree to modifications that would not materially affect the security of the

5    collateral for the loan.  As to modifications and other matters requiring the consent of each of the

6    direct lenders, section 2(e) of the Servicing Agreement provides that any direct lender that fails to

7    refuse such consent within three business days after notice from USA Mortgage is conclusively

8    presumed to have given its consent.  USA Mortgage generally provided the consent for the Funds.

9    Under section 1(j) of the Servicing Agreement, USA Mortgage was to retain all original loan

10   documents and the Committee understands that, in fact, USA Mortgage retained the original of all

11   promissory notes and deeds of trust.  Section 2(c)(iii) of the Servicing Agreement provides that

12   USA Mortgage could pay off direct lenders at any time and under section 11, each direct lender

13   granted USA Mortgage a very broad power of attorney.

14        18.    In short, the Servicing Agreements afforded USA Mortgage expansive authority to

15   do almost anything it wished in connection with the handling of the loans "purchased" by the

16   direct lenders, and those things that USA Mortgage did not have the specific authority to do

17   unilaterally, were subject to an unrealistic "scream or be deemed to consent" provision.  Thus,

18   even though the documentation of the transaction between USA Mortgage and the direct lenders

19   spoke in terms of a sale of interests in loans, as a result of the Servicing Agreement, each direct

20   lender granted USA Mortgage virtually unfettered dominion and control over the "purchased"

21   loans and agreed that USA Mortgage could "pay off" the direct lender's interest in the loan at any

22   time. As discussed below, USA Mortgage eventually exercised that dominion and control in a

23   manner consistent only with the fact that USA Mortgage in reality retained ownership of the

24   subject loans.

25   **D.**    *USA Mortgage Ignored The Representations It Made In The Prospectus.*

26        19.    Despite the promises contained in the Prospectus, USA Mortgage did virtually

27   whatever it wanted with the monies invested by the Diversified investors.  As is discussed at

28

some length in the Tucker Declaration,[5] the result is that Diversified's top seven loans, all 100% owned by Diversified, fail in almost every respect to comport with the promises of the Prospectus (diversification, no loans to insiders, secured by first deeds of trust on real property, loan-to-value ratio less than 75%, etc.) as is graphically demonstrated by the following table.

| Loan | Principal in millions | Performing? | Diverse? | Insider Loan | Secured? | LTV < 75%? |
|---|---|---|---|---|---|---|
| **10-90, Inc.** | $55 | No | No | Yes | No | No |
| **Epic Resorts** | $18.9 | No | No | Yes | No | No |
| **Sheraton Hotel** | $6.8 | No | No | Yes | No | No |
| **Colt DIV #1** (no loan documentation) | $1.5 | No | Yes | Yes | No | No |
| **Colt DIV #2** (no loan documentation) | $3.1 | No | Yes | Yes | No | No |
| **CREC – Colt** (no loan documentation) | $3.7 | No | Yes | Yes | No | No |
| **Fiesta McNaughton** | $6 | Yes | Yes | Yes | No | No |
| **Total** | $95 | | | | | |

**E.    *Monies Were Diverted From Diversified To USA Mortgage.***

20.    In January 2003, USA Mortgage began using Diversified as its piggy bank when it caused an advance in the amount of $11,425,000 on the 10-90, Inc. loan to be made directly to the USA Mortgage collections trust account, obviously for the purpose of paying the direct lenders out of that single-purpose account.  As per the Diversified schedules, repayments of Diversified

---

[5] The sheer length of the sordid description of the manner in which the principal of USA Mortgage violated the promises of the Prospectus prevents inclusion of that discussion within this limited opposition because of page limitations.  However, this is an essential component of the fraud on investors, and the Committee believes the Tucker Declaration is essential reading on these issues.

1    loans in the amount of $18,914,005 were confiscated by USA Mortgage between February and

2    December of 2004, undoubtedly for the purpose of paying direct lenders whose borrowers failed

3    to pay interest.  In return, Diversified received an accounting entry on USA Mortgage's books.

4    **F.**    ***Over $24 Million Was Diverted From Fourteen Hundred Sold Out Direct Lenders.***

5         21.    While it appears that Diversified was the primary source of Ponzi dollars during

6    2003 and 2004, Diversified was sufficiently depleted during 2005 that USA Mortgage had to turn

7    elsewhere for its source of Ponzi funding.

8         22.    Presumably emboldened by its unchallenged multi-year looting of Diversified, and

9    fortified by the fact that direct lenders rarely made inquiries regarding their loans so long as they

10    received their monthly interest checks, USA Mortgage began using principal repayments received

11    from borrowers to fund the ever-increasing burden of making monthly interest payments to direct

12    lenders on non-performing loans.  The direct lenders in loans that had been repaid by the

13    borrowers received continuing monthly interest checks, no doubt leading them to believe that

14    their loans were still outstanding and were still generating monthly interest payments.

15         23.    For example, USA Mortgage received payment in full on the $5.6 million

16    Universal Hawaii loan.  Rather than notifying the 127 direct lenders in that loan of that fact and

17    paying them their $5.6 million plus interest, USA Mortgage took the money for itself (no doubt to

18    be used as Ponzi dollars) and continued to send investors their monthly interest checks, thereby

19    conveying to those direct lenders that their loan remained outstanding and was generating

20    monthly interest.  Today, these investors are unsecured creditors.

21         24.    Including the Universal Hawaii loan, the Sold Out direct loans that were paid in

22    full and presumably re-distributed as Ponzi dollars aggregate $12.2 million, involving 296 direct

23    lenders, and are as follows: Beastar, LLC ($3.1M); Copper Sage Commerce Center, LLC

24    ($420k); Freeway 101 ($3.8M) and Universal Hawaii ($5M).  Another approximately $11.8

25    million of principal was repaid on an additional six loans (involving 1,131 direct lenders)

26    representing partial paydowns of principal.  Aggregating these ten loans, over 1,400 direct lenders

27

28

1    were sold out of $24 million of principal repayments.[6]  Ironically, these were the smart direct

2    lenders because their loans were repaid in full or in part.

3        25.    That the monies payable to the 1,400 Sold Out direct lenders were randomly

4    confiscated is demonstrated vividly by the fact that loan proceeds for other loans that were repaid

5    by borrowers during the same time frame were fully remitted to other direct lenders.  Whether a

6    direct lender in a repaid loan became a successful and richly-rewarded investor, or lost absolutely

7    everything, was not the result of greater investment skill, greater diligence or greater legal rights,

8    but instead was a matter of pure happenstance and serendipity.

9    **G.    *Diversified Monies Were Used To Fund Real Estate Development Activities Of The Principals And Affiliates Of USA Mortgage.***

10

11        26.    Because the Committee's professionals have concentrated their examination of the

12    Debtors' affairs on matters and assets directly involving Diversified, the Committee has less

13    information on USA Mortgage's real estate development activities that did not directly involve

14    the loans in the portfolio in which Diversified had no direct interest.  It is clear, though, that over

15    time the lending activities of USA Mortgage became secondary to the real estate development

16    activities of the insiders of USA Mortgage, and eventually, the lending activities of USA

17    Mortgage became more about providing a source of funds for in-house real estate development

18    than about making a profit for direct lenders, including the Funds.

19        27.    Based on the preliminary information available to the Committee (after one month

20    of inquiries and analysis), of the loans outstanding on the Petition Date, non-debtor USA

21    Mortgage affiliates were direct borrowers in 24 loans, with outstanding loan balances of $210

22    million.  Given that USA Mortgage is servicing 115 loans with a total outstanding of

23    approximately $850 million as of June 30, 2006, these insider loans represent 21% of the total

24    loans and 25% of the total outstanding dollar amount of the loan portfolio.

25

26

27    [6] The number of direct lenders involved in the sold out or partially sold out loans is the aggregate for the
      sold out loans, and has not been adjusted for those direct lenders, if any, who invested in more than one of

28    the ten loans.

28.     Such real estate development activities were conducted through a series of affiliated companies typically owned by Messrs. Milanowski and Hantges or by persons with whom they did business.  Those pervasive extracurricular development activities and ambitions are described detail in the Tucker Declaration, and the Committee believes that the same is required reading to a complete understanding of the causes of the financial demise of USA Mortgage and the motivation of its principals to continue the Ponzi scheme.

**H.     *The Financial Demise Of USA Mortgage.***

29.     The direct lenders, including the Funds, provided the life blood of the real estate development ambitions of USA Mortgage, it principals and their affiliates. These real estate development activities and ambitions no doubt provided a very strong motivation for USA Mortgage to undertake responsibility for repayment of the loans made by the direct lenders even when the borrowers were incapable of doing so, and a strong motivation to keep the scheme afloat by reassuring direct lenders that all was well with USA Mortgage through the receipt by the direct lenders of monthly interest checks in order to prevent or forestall a "run on the bank."

30.     As in the case of any well-run Ponzi scheme, the financial distress of USA Mortgage was covered up by the flow of monies into the pockets of the unknowing direct lenders. The investment by USA Mortgage affiliates of large amounts of cash in illiquid real estate development projects, the making of loans by USA Mortgage on real estate development projects that could not realistically generate monthly cash flow to cover monthly interest payments, the making of loans to cover cash flow shortages experienced in such real estate development projects, and borrower defaults on the high-risk, high-interest-rate loans that populated the USA Mortgage portfolio, no doubt all played a role in the cash flow shortage experienced by USA Mortgage.

**I.     *State Of The Debtors' Books And Records***

31.     While Committee professionals have not reviewed all of the Debtors' books and records, they have reviewed files for loans involving Diversified, many of which fail to provide even the minimum amount of information necessary to understand basic facts about the loan. For instance, the loan file for the defaulted $55 million 10-90, Inc. loan, the largest by far in the

1   Debtors' portfolio, contains only 17 basic loan transaction documents in a file of less than two

2   inches.

3          32.    As discussed by Debtors' counsel at the July 25th hearing, the books and records

4   of USA Mortgage are in a desperate condition, and Mesirow has had to recreate almost all

5   account records, in some cases without the availability of historical records.

6          33.    Absent proper characterization of the direct lenders as unsecured creditors and a

7   substantive consolidation of some or all of the Debtors and certain non-debtor entities (such as

8   Investment Partners), these chapter 11 estates could be overwhelmed by the administrative costs

9   associated with litigation of disputes among the two Funds, USA Mortgage and the direct lenders

10  and the need to recreate the USA Mortgage books and records[7] for the purposes of that litigation.

11  All of this would detract from the main goal of collecting the loans and making distributions to

12  creditors as soon as possible.

13                        **III.    ARGUMENT**

14  A.   *Under The Proposed Distribution Scheme, Similarly Situated Direct Lenders Would*
         *Receive Greatly Disparate Treatment.*

15

16         34.    The Distribution Motion is premised on the assumption that the direct lenders are

17  the outright owners of interests in the loans, and that there is no issue as to whether the direct

18  lenders should be more properly characterized as creditors of USA Mortgage that received

19  ineffectual and illusory appearances of ownership of interests in loans.[8]  Based on such

20  assumption, the Distribution Motion proposes that direct lenders receive 100% of the interest

---

[7] The costs of sorting out the affairs of the Debtors could be exorbitant as they bear upon the following issues, among others:  (i) allocating accounts receivable and accounts payable among the USA Mortgage affiliates and the direct lenders; (ii) resolving discrepancies in the ownership interests of direct lenders in particular loans; (iii) determining which amounts were overpaid or underpaid to direct lenders; (iv) calculating amounts owing by direct lenders for servicing fees and other fees allegedly earned by USA Mortgage; (v) resolving disputes over offsetting claims of direct lenders associated with the claims of mismanagement and fraud leveled against USA Mortgage; (vi) determining whether direct lenders should be permitted to terminate USA Mortgage as the servicer on their loans in favor of a third party servicer; and (vii) deciding whether and on what terms USA Mortgage can assume the Servicing Agreements with as executory contracts.

[8] The Court has not yet ruled on whether the direct lenders' loans are property of the estate or on whether the Debtors operated as a Ponzi scheme.  Nor has it been asked to consider the consequences that would result from such rulings.  The Distribution Motion presumes that the Court has made its decisions on these issues, each of which will affect the ultimate outcome of these cases.

1   collected by USA Mortgage both before and after the petition date and 100% of principal repaid

2   after the petition date (subject of certain offsets as discussed in the Distribution Motion).  The

3   Sold Out direct lenders would receive nothing under the proposed distribution as they are mere

4   unsecured creditors.

5        35.    In the event that this Court were to later determine that the claims of direct lenders

6   are creditor claims against the Debtors, certain direct lenders would receive, by way of the

7   Distribution Motion, far more than their pro rata distribution as creditors of the Debtors.

8   Certainly, the direct lenders that receive 100% of their principal and interest will receive more

9   than a creditor's pro rata share.

10       36.    Using the Universal Hawaii loan as an illustration of the foregoing, prior to the

11  borrower repaying all of the principal and interest on such loan, the 127 direct lenders enjoyed all

12  of the rights and benefits, and had legal documentation saying all the right things about their

13  ownership of the Universal Hawaii loan, as did the direct lenders whose loans were paid or will

14  be paid by borrowers post-petition.  Yet the moment that USA Mortgage chose to exercise its

15  total dominion and control over proceeds of the Universal Hawaii loan, the Universal Hawaii

16  direct lenders instantly became unsecured creditors.  This despite the fact that the Universal

17  Hawaii direct lenders were merely the random victims of fraud.  The reasoning underlying the

18  Distribution Motion must be that the plight of the Universal Hawaii Sold Out direct lenders

19  should not in any way affect those lucky enough not to fall prey to a similar looting.

20       37.    While such tunnel vision logic may be applicable to the victims of ordinary street

21  crime, in the context of the USA Mortgage Ponzi scheme, it completely ignores the myriad of

22  relevant factors discussed herein and that, unlike in the case of street crime, this Court is a court

23  of equity that can ameliorate the inequity of some suffering the full blow of fraud and similarly

24  situated parties escaping any ill effect whatsoever.

25       38.    A far better conclusion to reach with respect to the Universal Hawaii direct lenders

26  is that they were really unsecured creditors all along, as are all the direct lenders, and that it was

27  just a matter of if and when that status would become apparent.  The difference between the

28  Universal Hawaii direct lenders and the direct lenders that may receive 100% of their principal

1  plus interest is mere serendipity in the timing of the payment of their respective "purchased"

2  loans.

3  **B.    *The Debtors' Have Erroneously Calculated The Over-Distribution To Diversified.***

4         39.    The Distribution Motion correctly proposes that the interim distribution to those

5  direct lenders that received Ponzi dollars from USA Mortgage be reduced by the amounts of such

6  over-distributions on the theories of offset and recoupment.

7         40.    However, the Debtors have improperly failed to consider the $18.9 million of

8  diverted principal repayments made on Diversified loans in February through December 2004 in

9  concluding that Diversified continues to be over-distributed.

10        41.    Bankruptcy Code section 553(a) entitles Diversified to receive the benefit of the

11  $18.9 million in prepetition principal diversions to offset the Ponzi dollars it received prior to

12  bankruptcy.  Not only would it be an injustice to fail to consider that Diversified was a source of

13  Ponzi dollars as well as a recipient of Ponzi dollars, there is no rational theory of offset or

14  recoupment that allows only one party to offset.

15  **C.    *The Direct Lenders Are Properly Characterized As Unsecured Creditors.***

16        42.    The Committee well understands that the Court cannot, should not and will not

17  adjudicate the proper characterization and proper treatment of the direct lenders in the context of

18  the Distribution Motion.  Nor should the Court ignore the issue in the context of the Distribution

19  Motion, particularly in light of the request for authority to distribute $64.7 million.

20        43.    Bankruptcy courts have the responsibility and the authority to closely examine the

21  relationship between a debtor and those making claims against it, and to determine the proper

22  characterization of that relationship, taking into account all relevant factors, even in the face of

23  seemingly clear legal documentation.  Thus, all manner of leases, title transfer arrangements and

24  the like can be characterized by bankruptcy courts as disguised security interests.  Similarly,

25  transactions that on their face purport to be secured transactions for the benefit of equity holders

26  of a debtor can be characterized by the Bankruptcy Courts as capital contributions.  *Bayer Corp.*

27  *v. Mascotech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726 (6th Cir. 2001); *see also Sender v.*

28  *Bronze Group, Ltd. (In re Hedged-Investments Assocs.)*, 380 F.3d 1292, 1298 (10th Cir. 2004).

1    Bankruptcy courts applying a recharacterization analysis have stated that their power to do so

2    stems from their equitable powers to test the validity of debt. *See AutoStyle*, 269 F.3d at 747; *see*

3    *also Mirant Mid-Atlantic, LLC v. Morgantown OL1 LLC (In re Mirant Corp.)*, 327 B.R. 262, 268

4    (Bankr. N.D. Tex. 2005); *Vanguard Airlines, Inc. v. Int'l Aero Components, Inc. (In re Vanguard*

5    *Airlines, Inc.)*, 298 B.R. 626, 637 (Bankr. W.D. Mo. 2003).  Judicial statements to the contrary

6    have found no support in the case law.[9]

7           *(a)*       *The Ninth Circuit's Decision In Clares Food Supports Recharacterization.*

8           44.     In *Foothill Capital Corp. v. Clare's Food Mkt. (In re Coupon Clearing Serv.)*,

9    113 F.3d 1091 (9th Cir. 1997), the issue was the ownership interests in cents-off coupons taken in

10    by grocers and delivered to the debtor ("CCS"), a coupon clearing house that would submit the

11    coupons to manufacturers for cash.  In order to determine that ownership, the court was required

12    to properly characterize the true nature of the relationship between the debtor and the grocers that

13    had submitted the subject coupons.  The Ninth Circuit commenced its analysis with the "Service

14    Agreements" between the CCS and the grocers[10], but clearly did not consider itself limited by the

15    Service Agreements, also considering the actual course of dealings between the parties[11],

16    supermarket industry practices and coupon clearinghouse industry practices[12], the allocation of

17    risk of loss between the parties[13], the degree of control that the grocers had in the collections

18    process undertaken by CCS[14], and other factors other than the express wording of the Service

19    Agreements.

---

[9]  Twenty years ago, in *In re Pacific Express, Inc.*, 69 B.R. 112 (B.A.P. 9th Cir. 1986) the Ninth Circuit BAP implied that the bankruptcy court lacked the power to recharacterize a third party's relationship with a debtor. This conclusion has not been adopted by any other court other than *In re Pinetree Ptrs, Ltd.*, 87 B.R. 481 (Bankr. N.D. Ohio 1988).

[10]  *In re Coupon Clearing Service*, 113 F.3d at 1098-98.  In agreeing that the language of the contract was not determinative in establishing the true character of the relationship between the parties, the Ninth Circuit said: "We find this case distinguishable as in *Telesphere Communications, Inc.* the business documents defining the relationship between the parties supported the existence of an agency relationship, while the conduct of the parties suggested otherwise."

[11]  *Id.* at 1098.

[12]  *Id.* at 1095.

[13]  *Id.* at 1101.

[14]  *Id.* at 1099, 1100.

45.     The Service Agreements were in almost all ways consistent with the characterization that the grocers retained CCS to handle property of the grocers and to remit to the grocers the proceeds of that property.  These contracts were much like the Servicing Agreements between the direct lenders and USA Mortgage whereby USA Mortgage contracted to manage the collection of the property of the direct lenders (the loans) and remit the proceeds to the direct lenders.

46.     Failing to find either an agency relationship or a trust relationship, the Court concluded that CCS had "rights to receive and retain the coupon proceeds, to commingle the coupon proceeds with its general operating funds, to use the coupon proceeds in its operations and to apply the coupon proceeds to any payments made to the [grocers]." *Id.* at 1103.  The Court further stated:  "Both the Service Agreements and the conduct of the parties indicate that CCS had rights in the coupon proceeds beyond mere possession" and "CCS had the sole and exclusive right to the amounts due from the manufacturers . . . " *Id.*  In sum, the Ninth Circuit, following the lead of the bankruptcy court, characterized the true nature of the relationship in a manner that was in many ways contrary to the operative legal documentation between the parties.

     **(b)**     ***The Ninth Circuit's Decision in Bullion Reserve Also Supports The Committee's Position That The Direct Lenders' Interests Should Be Recharacterized.***

47.     In the case of *In re Bullion Reserve of N. Am*, 836 F.2d 1214 (9th Cir. 1988), the Ninth Circuit dealt with another investment scheme gone awry.  There, the debtor purported to purchase gold bullion and to arrange the physical storage of the same with the monies contributed by investors.  The debtor did in fact purchase and store gold bullion, but in quantities far less than ought to have been purchased with the monies received from investors.  The court characterized the arrangement as a Ponzi scheme.  *Id.* at 1219, fn. 8.  One investor, Bozek, demanded physical possession of the bullion purchased with his monies and actually received such bullion before the bankruptcy case was filed.  However, the bankruptcy trustee claimed that he had received an avoidable preference.  Bozek protested, contending that he was a third party owner of property in the debtor's possession, rather than a creditor.  Such argument was bolstered by documentation he had received from the debtor showing that he had bought and paid for the bullion.  The debtor

1    could hardly quibble with the ownership contention since it had complied with Bozek's request

2    that his gold be delivered to him.  *See id* at 1218.

3        48.    Despite his documentation of ownership and his receipt of "his property" upon

4    demand, the Ninth Circuit characterized Bozek's relationship with the debtor as that of an

5    unsecured creditor.  In its analysis, the Ninth Circuit paid no attention to the provisions of the

6    contract between the parties or to the actual course of dealing between the parties (that was

7    entirely consistent with the investor as the owner of the gold), and instead focused almost

8    exclusively upon the state of affairs within the debtor's business to conclude that it was a

9    fraudulent business whose contracts should be given no weight in determining the proper

10    characterization of the relationship at issue.  At page 1218, the court stated:

11        Our reasoning in *Graulty* applies here, BRNA was a fraudulent business of the type
        Congress did not intent to protect under § 547(c)(2).  Moreover, it would be inequitable to
12        allow Bozek to obtain a 100% recovery on his claim while relegating other defrauded
        program participants to general unsecured creditor status in BRNA's bankruptcy
13        proceeding.  Equity requires that all these creditors share equally in whatever assets are
14        available.

15        49.    Thus, the Ninth Circuit essentially ignored the terms of the contracts and the actual

16    course of dealing between the parties in determining that the proper characterization of the Ponzi

17    victims is compelled by overriding equitable considerations to be that of equally situated

18    unsecured creditors of the debtor[15].

19        *(c)    Clares Foods and Bullion Reserve Recap.*

20        50.    The facts herein are in many ways similar to those in *Clares Foods*.  The direct

21    lenders claim ownership of the loans, which is consistent with not only the original expectations

22    of the parties, but also is consistent with the overall provisions of the Servicing Agreements.  In

23    *Clares Foods*, the grocers claimed ownership of the coupons, consistent with the intentions of the

24    parties and the general provisions of the Service Agreements between them.  In both cases there

25

26    _____

    [15] Direct lenders may argue that *Bear v. Coben (In re Golden Plan of Ca., Inc.)*, 829 F.2d 705 (9th Cir.
27    1986) advocates a strict reading of the agreements between the parties to determine the relationship
    examination of extrinsic factors.  While neither *Clares Foods* nor *Bullion Reserve* discussed or sought to
28    distinguish *Golden Plan*, clearly the extent to which both cases looked beyond the terms of the contracts
    involved indicates that *Golden Plan* is no longer the law of the Ninth Circuit.

1    are provisions of the Servicing Agreements (in USA Mortgage) and Service Agreements (in

2    *Clares Foods*) that indicate substantial erosion of the outright ownership intention of the parties

3    (language of assignment for collection in some of the Service Agreements in *Clares Foods* and

4    delegation of virtually all rights to the loans to USA Mortgage).

5          51.    But *Clares Foods* did not involve a debtor that systematically defrauded the other

6    parties before the court, and apparently represents the thinking of the Ninth Circuit when dealing

7    with an *honest* debtor.  The Committee submits that in dealing with a debtor that has perpetrated a

8    massive fraud upon its creditors and other constituencies, the thinking of the Ninth Circuit, as

9    evidenced by *Bullion Reserve*, is much more focused upon the equality of the result for similarly

10    situated creditors and pays little or no attention to the legal contracts or the course of dealing with

11    the debtor, either one of which or both may simply be instrumentalities or manifestations of the

12    debtor's fraud.

13          52.    Under the reasoning of *Bullion Reserve*, the Court should focus almost exclusively

14    upon the manner of doing business of USA Mortgage and the Ponzi scheme and other fraud

15    perpetrated by USA Mortgage to determine an equitable means of distribution of whatever is left

16    that benefits equally all similarly situated creditors.  Thus, under *Bullion Reserve*, the Court could

17    and should conclude that the direct lenders, like the more unlucky yet similarly situated direct

18    lenders that were "sold out" of their loans, should share as unsecured creditors.

19    **D.**    ***Even If The Direct Lenders Are Not Properly Characterized As Creditors, The***

20        ***Court May Nonetheless Compel An Equitable Distribution Based Upon Equitable Considerations.***

21          53.    The case of *In re Lemons & Assocs. Inc.*, 67 B.R. 198 (Bankr. D. Nev. 1986),

22    illustrates the policy that, in appropriate circumstances, similarly situated investors should receive

23    equal distributions from a bankruptcy estate notwithstanding differences in their individual

24    circumstances with respect to the debtor.  *See id.* at 212.

25          54.    As the Court is no doubt intimately aware of the facts and holding in the *Lemons*

26    case, suffice it to say that some of the facts in *Lemons* are very different, and that the audacity of

27    the fraudulent scheme perpetrated on the loan investors in *Lemons* was of a greater order of

28    magnitude than is present in the case of USA Mortgage.  By comparison, the audacity of the

1    original Ponzi scheme was a far greater order of magnitude than the scheme involved in *Lemons*

2    (involving no real business at all, just an investment idea never implemented).

3      55. Fraudulent investment schemes are evolutionary, and with greater information

4    quantity and velocity available in today's connected world resulting in greater public scrutiny of

5    investment opportunities that seem too good to be true, and with greater governmental regulation,

6    the perpetrators of such schemes (or those, such as USA Mortgage, that find themselves in the

7    position of having to resort to such schemes in the context of a previously legitimate and

8    profitable investment business now in decline) must evolve and take on greater sophistication to

9    succeed in their schemes.  Thus, it is no surprise that crude fraudulent investment schemes that

10   may have been viable in simpler times are no longer viable, and levels of sophistication in such

11   investment schemes involving seemingly greater protection of the financial expectations of

12   investors are necessary for such schemes to be viable today.

13     56. However, the result is the same.  Despite the ever-evolving and sophisticated

14   assurances and protections offered to investors in order to assure them that they will actually

15   receive their promised outsized investment returns, fraudulent investment schemes continue to

16   proliferate and result in great financial hardship to those who bought into them.

17     57. Thus, despite the easily articulated differences in the workings of the *Lemons*

18   scheme compared to the USA Mortgage scheme, and despite the likely protestations that the

19   direct lenders received far greater assurances and legal rights than any *Lemons* investor ever had,

20   the compelling similarity of the cases is the financial harm inflicted by the two schemes and the

21   fact that, almost purely by chance, similarly situated investors were either spared altogether from

22   financial loss or felt the full blow of the scheme.  Against this template, the easily identified

23   differences in the method of operation of the two schemes are of no consequence.  It is not the

24   mechanics of the scheme that should govern, but the end result.  The inequity and inequality in

25   treatment that Judge Jones found a way to address in *Lemons* is the same inequity and inequality

26   that needs to be addressed here.  There, the court ruled that investors who could demonstrate

27   substance to their purchase of specific loans were in fact owners of the loans promised to them by

28   Lemons, Inc. But Judge Jones went on to find that such ownership was subject to the equitable

1  claims of those investors who could not demonstrate substance to their purchase or could not

2  identify specific loans.  The result was a pro-rata distribution of all loan proceeds.[16]

3    58.    As demonstrated above, Ninth Circuit cases decided after *Lemons* probably would

4  have provided Judge Jones with a far greater tool to address that inequity and inequality than was

5  available to him in 1986 – fairly clear directions and standards for properly characterizing the

6  investors in a case as unsecured creditors both in the case of honest debtors (*Clares Foods*) and

7  debtors engaged in fraudulent investment schemes (*Bullion Reserve*).

8  **E.    *The Substantial Risks Of Over-Distribution Warrant Conservatism In The Distribution.***

9    59.    Sometimes the obvious bears repeating:  Once the interim distribution is made,

10  some of the funds may never be recovered, even if lawsuits in courts throughout the state and the

11  West are successfully prosecuted.

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23

24  [16] Certain direct lenders may raise an argument that *Nielson v. Chang (In re First T.D. & Inv. Inc.)*
253 F.3d 520, 531 (9th Cir. 2001) overruled *Lemons* because even if the direct lenders are found to be
25  creditors, they are secured creditors entitled to the benefit of the loans, even without possession of the
promissory notes underlying the loans. *See Greiner v. Wilke (In re Staff Mortgage & Inv. Corp.)*, 625 F.2d
26  281, 283 (9th Cir. 1980).  *First T.D. & Inv.* turned on a unique provision of a California statute passed by
the California legislature to specifically overturn the result of *Staff Mortgage*.  The Servicing Agreements
27  between the direct lenders and USA Mortgage are governed by Nevada law.  The Committee is unaware
of any similar provision under Nevada law excusing the secured party from taking  possession of the
28  promissory note in order to perfect their security interest.

1

## IV.    RELIEF REQUESTED

2      60.    The Committee acknowledges that an interim distribution ought to be made, but

3   it counsels fiscal conservatism in the making of such distribution.  The Committee requests that

4   any order approving the Distribution Motion limit distributions to 90% of the amounts proposed

5   by the Debtors on account of interest and 25% of the amounts of principal payments.  These cases

6   are moving very quickly, and the Committee and other parties in interest will know much more in

7   a month or two and will be better prepared to support or oppose future distributions.

8      61.    The Committee further requests that any order of the Court approving a

9   distribution to direct lenders approve a distribution to Diversified after an appropriate credit is

10  given to Diversified for its uncontested $18.9 million prepetition claim.

11     Respectfully submitted this 27th day of July 2006.

12

13  _____
    MARC A. LEVINSON (California Bar No. 57613)

14  JEFFERY D. HERMANN (California Bar No. 90445)
    LYNN TRINKA ERNCE (California Bar No. 179212)

15  ORRICK, HERRINGTON & SUTCLIFFE LLP
    400 Capitol Mall, Suite 3000

16  Sacramento, CA  95814-4497
    Telephone:  (916) 447-9200

17
    and

18
    BOB L. OLSON (Nevada Bar No. 3783)

19  ANNE M. LORADITCH (Nevada Bar No. 8164)
    BECKLEY SINGLETON, CHTD.

20  530 Las Vegas Boulevard South
    Las Vegas, NV 89101

21  Telephone: (702) 385-3373

22  COUNSEL FOR THE OFFICIAL COMMITTEE OF
    EQUITY SECURITY HOLDERS OF USA CAPITAL

23  DIVERSIFIED TRUST DEED FUND, LLC

24

25

26

27

28

US_WEST:260056390.7                           - 20 -