Marc A. Levinson (California Bar No. 57613)
Jeffery D. Hermann (California Bar No. 90445)
Lynn Trinka Ernce (California Bar No. 179212)
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, CA 95814-4497
Telephone: (916) 447-9200
Facsimile: (916) 329-4900
Email:   malevinson@orrick.com; jhermann@orrick.com
lernce@orrick.com

Bob L. Olson (Nevada Bar No. 3783)
Anne M. Loraditch (Nevada Bar No. 8164)
BECKLEY SINGLETON, CHTD.
530 Las Vegas Boulevard South
Las Vegas, NV 89101
Telephone: (702) 385-3373
Facsimile: (702) 385-5024
Email:   bolson@beckleylaw.com; aloraditch@beckleylaw.com

Attorneys for the Official Committee of Equity Security Holders of
USA Capital Diversified Trust Deed Fund, LLC

E-filed on July 27, 2006

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL Mortgage COMPANY,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725-LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | **DECLARATION OF MICHAEL A. TUCKER IN SUPPORT OF DIVERSIFIED FUND COMMITTEE'S LIMITED OPPOSITION TO MOTION TO DISTRIBUTE FUNDS** |
| In re:<br>USA SECURITIES, LLC,<br>Debtor. | Date:    August 4, 2006<br>Time:    9:30 a.m.<br>Place:    Courtroom #1 |

Affects:
☐  All Debtors                                                    (Affects indicated Debtors)
☒  USA Commercial Mortgage Company
☐  USA Securities, LLC
☐  USA Capital Realty Advisors, LLC
☒  USA Capital Diversified Trust Deed Fund, LLC
☒  USA First Trust Deed Fund, LLC

I, Michael A. Tucker, hereby declare, verify and state as follows:

1.      I am a Senior Managing Director with FTI Consulting, Inc. ("FTI"), a financial advisory services firm specializing in reorganization, litigation and related consulting services. I joined FTI in 2002 upon FTI acquiring PricewaterhouseCoopers LLP's Business Recovery Services group where I was a Partner and had been employed for 17 years.

2.      FTI was retained by the Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC ("Diversified Committee") on June 9, 2006 to perform financial advisory services for the Diversified Committee in the chapter 11 cases stated above.

3.      Subsequent to FTI's retention FTI has analyzed loans owed to USA Capital Diversified Trust Deed Fund, LLC ("Diversified Fund") and related party transactions; reviewed past and current financials of the Debtors including the Schedules of Assets and Liabilities, the Statement of Financial Affairs and Monthly Operating Reports; performed various analyses and provided feedback regarding issues and numerous motions filed in this case; and participated in meetings with the Debtors, the Diversified Committee and other official committees, the U.S. Trustee, borrowers on the USACM loans and other parties in interest and professionals hired by the same.

4.      The Diversified Committee is concurrently filing its Limited Opposition to the Debtors' Motion To Distribute Funds and To Grant Ordinary-Course Releases and Distribute Proceeds ("Distribution Motion"). I make this Declaration in support of such Limited Opposition to the Distribution Motion.

5.      On April 13, 2006 ("Petition Date") USA Commercial Mortgage Company ("USACM"), Diversified Fund, USA Capital First Trust Deed Fund LLC ("First Trust Fund"), USA Capital Realty Advisors, LLC ("USARA") and USA Securities, LLC filed for Chapter 11.

- 2 -

US_WEST:260063507.5

1   USACM is in the sub-prime, commercial mortgage business, servicing a loan portfolio of

2   approximately 115 commercial loans (the "Loan Portfolio") at the Petition Date that are primarily

3   owned by First Trust Fund, Diversified Fund (the First Trust Fund and Diversified Fund are

4   sometimes collectively be referred to as the "Funds") and various Direct Lenders.  USACM used

5   the monies raised by Diversified Fund, First Trust Fund, and from Direct Lenders to fund

6   USACM loans.  Approximately 1,900 investors are invested in Diversified Fund, approximately

7   1,300 investors are invested in First Trust Fund while approximately 3,600 individuals and

8   entities are Direct Lenders.

9         6.    Prior to the creation of the Diversified Fund and the First Trust Deed Fund, the

10   business model of USACM appeared to consist of the arranging of real property secured loans for

11   Direct Lenders.  Those Direct Lenders were offered investments in loans generally described by

12   USACM in an offering document of a page or two in length.  Direct Lenders would choose

13   between the different loans being offered, would determine a dollar amount to invest, and would

14   be included as a lender within the promissory note signed by the borrower (typically by reference

15   to an exhibit to the promissory note containing the identities of all the investors) and would be

16   listed as a beneficiary on the mortgage or deed of trust (again by way of an exhibit) that would

17   typically be recorded against the property.  The loans were typically for a term of one or two

18   years and were for a much higher rate of interest than the investors could obtain through more

19   traditional investments.

20         7.    The Direct Lenders would enter into a servicing agreement with USACM which

21   would govern all of the loans in which the Direct Lenders participated.  Under the typical

22   servicing agreement, USACM would be entitled to retain origination fees and points charged to

23   the borrowers, late fees, extension fees, default interest and other fees and expenses paid or

24   reimbursed by the borrower.  In addition, USACM would be entitled to a servicing fee consisting

25   of a portion of the monthly interest to be paid by the borrower of between one and three percent

26   per annum of the principal balance of the loan, with the difference between this servicing fee and

27   the actual rate of interest paid by the borrowers, paid to the Direct Lenders.

28

8.      While the direct involvement of the Direct Lenders in the initial documentation of the loans provided the appearance of safety and security for the Direct Lenders with respect to any competing claim to the proceeds of the loans made by USACM or its creditors, it was cumbersome in many respects for both the Direct Lenders and USACM.

9.      For USACM, this business model had high administrative costs and in some cases, meant months-long delays when individual signatures of Direct Lenders were needed.  It involved loan-by-loan reporting and money management.  When Direct Lenders sold out of loans and new Direct Lenders entered the loans, USACM's policy was to record amendments to the mortgages or deeds of trust.  USACM likely made similar arrangements for swapping out the exhibit to the promissory note identifying the Direct Lenders and changing the beneficiaries of title policies and the like.  The costs of attracting investor monies, including sales commissions and the costs of investor communications as to each loan was likely high.  Because of the need to fund monthly interest payments to the Direct Lenders, loan terms had to involve monthly payments from the borrowers.

10.     For Direct Lenders, the business model put the Direct Lenders in the position of making choices as to which loans to participate in, how much to invest among the different loans, what term to choose, etc.  The Direct Lenders also obtained no diversification of their exposure to the risk of default on their loans (although the Direct Lenders may have perceived only a negligible risk of default since USACM failed to share the news that loans were not performing), and the liquidity of their investments was dependent upon the timing of the repayment of the loans by the borrowers.

11.     The creation of the Diversified Fund in 2000 provided distinct operating advantages to USACM and was a more attractive investment vehicle to certain investors.

12.     The Diversified Fund was created as a $200 million fund and was offered to Nevada residents commencing in May, 2000.  I believe that the current capitalization of the Diversified Fund is approximately $150 million.

- 4 -

13. Attached hereto as Exhibit "A" is a true and correct copy of the first 14 pages of a prospectus for the Diversified Fund dated as of June 2, 2003, which I obtained from the books and records of USACM (the "Prospectus").

14. According to the Prospectus: (i) USACM had sold $121,524,500 worth of units in the Fund prior to that date; (ii) investors were not offered a fixed rate of return but rather a "flow-through" of the profits generated by the Diversified Fund through the Diversified Fund acting as a Direct Lender in loans generated by USACM; (iii) Diversified Fund would invest only in loans secured by first deeds of trust upon real property; (iv) loan-to-value ratios for the loans in which Diversified Fund would become a Direct Lender would not exceed 75% and may be as low as 60%; and (v) loan diversification restrictions would be imposed upon the loans invested in by the Diversified Fund such that no loan would exceed $20 million, no loan would exceed 15% of all loans outstanding at any time, and no more than 25% of the loans outstanding at any time would be made to a single borrower or an affiliate of such borrower.

15. The advantages of the Fund business model to USACM were obvious: (i) the coordination in the timing between loan originations and fund-raising was less of an issue since monies in the Diversified Fund were available to immediately fund a loan or to fill a gap in the funding of other loans involving many individual Direct Lenders; (ii) loan closings could occur with just one signature (typically of Mr. Milanowski) and without having to involve funding from dozens of investors; (iii) decisions as to loan administration and workouts/foreclosures of troubled loans could be made solely by USACM without input or the necessity of obtaining approval from dozens of individual Direct Lenders; (iv) Diversified Fund was free of the requirement that each loan generate monthly interest to be distributed to Direct Lenders and USACM could now make loans with deferred repayment terms; (v) greater access to greater amounts of investor monies; and (vi) perhaps most significantly, greater "flexibility" in the handling of the affairs and monies of the Diversified Fund as a result of the above and the generally lower level of scrutiny associated with this business model.

16. The advantages to the investors in Diversified Fund were also obvious: (i) as the name implies, their investments were diversified over a portfolio of loans such that the impact of

- 5 -

1    a loan default would be much less within the Diversified Fund than if the investor were to become

2    a Direct Lender in a defaulted loan;  (ii) for those investors that did not relish searching out the

3    best loans being offered for direct investment, the investor was freed from the responsibility of

4    choosing loans or dollar amounts to be allocated among several loans;  (iii) investors could invest

5    any amount over $25,000 at any time, regardless of whether acceptable loans were being offered

6    for direct investment at the time;  (iv) greater liquidity in that Diversified Fund investors could

7    redeem some or all of their investment without regard to the timing of the repayment of a single

8    loan as in the case of the Direct Lender business model.

9          17.    According to the Debtors Motion for Order Approving Debtors' Proposed Cash

10   Management Procedures and Interim Use of Cash in Accordance with Proposed Cash Budget

11   ("Cash Motion") Docket # 407, the Funds and Direct Lenders own fractional shares of various

12   loans in the Loan Portfolio, with substantial overlap among the members of the Funds and the

13   Direct Lenders.  In other words, a substantial number of the 3,600 Direct Lenders are the same

14   individuals who also invested indirectly in the Loan Portfolio by purchasing membership interest

15   in one or both of the Funds.

16         18.    The accounting of the Funds' interests in loans is treated as if each of the Funds is

17   an individual lender.  In other words, the Funds are two large Direct Lenders in addition to the

18   individual Direct Lenders.

19         19.    Based on the Loan Summary provided by the Debtors as of April 27, 2006, the

20   total amount of the Loan Portfolio is approximately $962.1 million, of which Diversified Fund is

21   owed $107.9 million, First Trust Fund is owed $66.1 million, Direct Lenders are owed $784.2

22   million, USACM is owed $3.1 million and the owner of $.8 million is yet to be determined.

23         20.    According to the Cash Motion, USACM maintained a bank account generally

24   referred to as the Collection Trust Account (the "Collection Account") prior to the filing date.

25   The Collection Account served as the lone bank account to facilitate the collection of principal,

26   interest and fees on loans due from the respective borrowers. Consequently, since cash is a

27   fungible commodity and because borrower receipts were commingled, all borrower payments lost

28   their characterization on a loan by loan basis upon deposit into the Collection Account. This lack

of a loan by loan characterization is a critically important issue when considering disbursements from the Collection Account.

21.     Regarding disbursements from the Collection Account, the Cash Motion states that "funds from this bank account were used to make monthly interest payments to Investors as well as to fund the ongoing operations and overhead of the Debtors' joint business enterprise." Therefore, it is impossible to state with any degree of certainty that a particular borrower payment (i.e. principal, interest or fees) was actually used for a specific payment to Direct Lenders or a specific payment for operational expenses.

22.     The Distribution Motion is based upon what I consider to be an attempt to track the flow of funds in the Collection Account on a loan by loan basis. Such an analysis requires that an assumption be made with regard to the timing of borrower receipts and investor payments in order to perform the "matching" of a particular receipt to the payments made or not made to Direct Lenders on that specific loan. For example, if a borrower payment on a particular loan was received in a month, the Debtors have assumed that any subsequent payments to Direct Lenders came from those proceeds. However, in reality the original cash receipt may have been used the following day to fund USACM overhead or even payments to Direct Lenders involved in other loans. And the subsequent payments to Direct Lenders may have been covered by subsequent borrower receipts from other loans. It is simply not possible to determine with any degree of certainty which particular loans have funds that are not accounted for. At best, it is an exercise based on the period of time one chooses to analyze.

23.     The Debtor's calculations of borrower payments still in the collection account (approximately $9 million) versus those payments deemed not to be in the collection account (approximately $24 million) as of the Petition Date is entirely dependent upon various assumptions.  First, the Debtor assumes that all money in the Collection Account belongs to Direct Lenders instead of any of the cash belonging to USACM as a result of operations, loans, servicing fees, loan origination fees or other sources of USACM cash collections.  Due to the fungible nature of cash, as noted above, it is impossible to determine whether or not that assumption is valid.  The $9 million in the Collection Account at the Petition Date has not been

- 7 -

1  recognized as a potential asset of the Debtor with the Debtor proposing to distribute these

2  prepetition collections in full.

3        24.    The Debtors have made assumptions related to choosing which borrower's

4  principal payments are deemed to be "in" or "not in" the Collection Account.  For instance, two

5  borrowers, Roam Development and Del Valle Isleton each made principal payments to the

6  Collection Account on February 28, 2006, yet only Del Valle Isleton's payments are deemed by

7  the Debtors to be in the Collection Account on that day.  Thus, one group of Direct Lenders is to

8  be paid in full under the Distribution Motion (subject to offset) while the other exactly situated

9  group of Direct Lenders receives nothing and is treated as an unsecured creditor.

10        25.    Similar questions arise in connection with the Debtors' calculation for these two

11  borrowers for other payments such as Del Valle's payment on February 23, 2006, being deemed

12  in the Collection Account while Roam Development's other February 2006 payments (on

13  2/27/06, 2/24/06, 2/15/06 and 2/13/06) being deemed not in the Collection Account.  See these

14  borrowers' prepetition payment histories below where the Debtors made determinations as to

15  whether payments are deemed "in" or "not in" the Collection Account.  Based on the past records

16  of USACM, one cannot determine with any degree of certainty if it was Del Valley or Roam

17  Development's funds that are not in the Collection Account.

| | | Del Valle | | Roam Development | |
|---|---|---|---|---|---|
| Date | Borrower Principal Payments | Deemed to be "IN" Collection Account | Deemed to be "NOT in" Collection Account | Deemed to be "IN" Collection Account | Deemed to be "NOT in" Collection Account |
| 2/13/06 | 121,037 | | | | 422,571 |
| 2/15/06 | 73,374 | | | | 73,374 |
| 2/23/06 | 280,000 | 280,000 | | | |
| 2/24/06 | 74,736 | | | | 74,736 |
| 2/27/06 | 73,116 | | | | 73,116 |
| 2/28/06 | 20,000 | 20,000 | | | |
| 2/28/06 | 20,000 | 20,000 | | | |
| 2/28/06 | 90,966 | | | | 90,966 |
| 3/1/06 | 20,000 | 20,000 | | | |
| 3/8/06 | 127,861 | | | 127,861 | |
| 3/15/06 | 20,000 | 20,000 | | | |
| 3/16/06 | 83,311 | | | 83,311 | |
| 3/24/06 | 20,000 | 20,000 | | | |

- 8 -

26.     Commencing sometime in 2003, and possibly earlier, USACM began paying Direct Lenders interest payments each month, whether or not the interest payments had been collected from the borrowers on the loans in the Loan Portfolio.  In other words, USACM was "advancing" money to Direct Lenders.  Furthermore, according to the Cash Motion, when borrowers paid down principal or paid off loans within the Loan Portfolio, the principal payments received by USACM as loan servicer were not returned to the Direct Lenders as principal payments but, were held and used in some cases to fund interest payments to Direct Lenders holding interests in non-performing loans.

27.     Fiesta Stoneridge is but one example of a loan where the borrower did not pay interest and the Direct Lenders received interest payments nonetheless.  Fiesta Stoneridge was a $10 million loan funded by 100 Direct Lenders on September, 22, 2003 at an annual interest rate of 13% per year.  Fiesta Stoneridge actually owes $2,484,337 to the Direct Lenders as of April 30, 2006, which is almost two years of unpaid interest.  At the same time, the 100 Direct Lenders had $2,368,514 of interest prepaid to them by USACM as of the Petition Date even though USACM has not received the interest payment from Fiesta Stoneridge.

28.     As of the Petition Date many of the Direct Lenders owe money to USACM (pre-payments of interest) or are owed money by USACM (principal not remitted), or both. Furthermore, because the financial records of the Debtors did not accurately match the receipts of loan payments and disbursements of cash to Direct Lenders, and because cash was commingled in the Collection Account, the Debtors' financial advisors had to recreate the accounting records for each loan in the Loan Portfolio based on existing accounting records and any other documentation that could be found.  The Debtors' financial advisors have represented that this is an ongoing process (as of July 25, 2006).  For example, it is our understanding from discussions with the Debtors that borrower payments have not been properly split between principal and interest.  If a borrower payment has been treated as all principal, when in reality some of it should have been treated as interest, it would result in the principal balance per the accounting records to be overstated.

US_WEST:260063507.5

29.    According to the USACM financial schedules filed with the Court, as of the Petition Date, the total amount of advances to Direct Lenders was $41,702,978. The source of the funds used by USACM for the advances has not specifically been identified. However, according to the Debtors' presumptive and preliminary calculations, as of the Petition Date, approximately $24 million of principal payments received from borrowers was not in the USACM "Collection Trust Account" and had not been remitted to Direct Lenders ("Diverted Principal"). Although the source of the advances has not been specifically identified it appears the Diverted Principal was used to fund Ponzi payments to Direct Lenders.

30.    The lack of payments from non-performing loans serviced by USACM was not visible to the Direct Lenders because the Direct Lenders kept receiving payments as if the loans were performing.

31.    Commencing in January of 2003, USACM began using the Diversified Fund as a source of funds for the Collection Account and potentially even earlier in connection with other transactions such as the Sheraton loan as discussed later.

32.    On January 8, 2003, USACM received $11,425,000 from Diversified Fund funds that was recorded as an advance on the 10-90 Inc. loan, a loan made by Diversified Fund discussed later in this Declaration. USACM's specific use of the funds has not yet been determined. However, the funds went straight to the USACM Collection Account, the account used for payments to Direct Lenders.

33.    The Diversified Fund was further used as a piggy bank, between February and December of 2004 when USACM received 20 payments from 17 different borrowers that totaled $18,914,005 that should have been remitted to Diversified Fund. Per the Debtors' financial advisors, the checks were actually cut by USACM at one point, but there were never distributed and were ultimately cancelled. As of the Petition Date, USACM still has not remitted the $18,914,005 to Diversified Fund. USACM's specific use of the funds has not yet been determined; but again the cash would have been in the Collection Account.

US_WEST:260063507.5

34.     According to the Hold Funds report provided by the Debtors as of the Petition Date there is approximately $24 million of Diverted Principal which does not include the $18.9 million owed to Diversified.  The detail of the $24 million is as follows:

| | Borrower | Direct Lenders | Amount Diverted | Number of Payments | Time Period |
|---|---|---|---|---|---|
| 1. | Beau Rivage Homes | 157 | 22,208 | 1 | 9/15/2005 |
| 2. | Bay Pompano Beach | 407 | 7,398,013 | 20 | 12/7/2005 - 1/23/2006 |
| 3. | Cabernet | 65 | 900,000 | 1 | 1/13/2006 |
| 4. | Universal Hawaii | 127 | 5,040,827 | 1 | 1/13/2006 |
| 5. | Beastar | 84 | 3,073,694 | 1 | 1/24/2006 |
| 6. | Copper Sage Commerce Center | 28 | 417,750 | 2 | 1/30/2006 and 3/17/2006 |
| 7. | Roam Development | 291 | 422,571 | 5 | 2/13/2006 - 2/28/2006 |
| 8. | Lake Helen Partners | 35 | 7,646 | 1 | 2/17/2006 |
| 9. | Freeway 101 | 57 | 3,750,000 | 1 | 2/21/2006 |
| 10. | Oak Shores II | 176 | 3,000,000 | 1 | 2/27/2006 |
| | | 1427 | 24,032,709 | 34 | |

35.     Of the 10 loans comprising the $24 million of Diverted Principal, four of the loans have been paid in full as of the Petition Date with no remaining outstanding balance due. These four loans (funded by a total of approximately 296 lenders) account for $12.3 million of the Diverted Principal.  Below is a summary of background information on each of the four fully paid loans:

- The **Beastar loan** originated in May 2005 with a maximum loan amount of $7.325 million. There were two December 2005 principal payments totaling $4.2 million and a final payment in full of $3.125 million in January 2006. Of the final payment, $3.074 million was deemed diverted.

- The **Copper Sage** loan originated in June 2004 with a maximum loan amount of $4 million. During the period of December 2005 through March 2006, 5 principal payments were made totaling $3.82 million. A final payment in full for $179,106 was received post petition on June 22, 2006. Of the final two prepetition payments (all of the January 2006 payment and a small portion of the March 2006 payment), $417,750 was deemed diverted.

- The **Freeway 101** loan originated in August 2004 with a maximum loan amount of $4.5 million. One principal payment for $750,000 was received in February 2005. A final payment in full for $3.75 million was received in February 2006 of which the entire amount was deemed diverted.

- 11 -

- The **Universal Hawaii** loan originated in August 2004 with a maximum loan amount of $8.75 million. Two payments were made near the end of May 2005 totaling $3.584 million and a final payment in full for $5.166 million in January 2006. Of the final payment, $5.041 million was deemed diverted.

36.    The remaining 6 loans (funded by a total of 1,131 lenders) represent borrowers with balances still outstanding (partial pays) and account for the remaining $11.7 million in Diverted Principal.  Below is a brief summary of the 6 partially paid loans:

- **Bay Pompano Beach** - $14.7 million principal outstanding. Diverted Principal of $7.4 million.
- **Beau Rivage Homes** - $66,199 principal outstanding. Diverted Principal of $22,208.
- **Cabernet** - $3.0 million principal outstanding. Diverted principal of $900,000.
- **Lake Helen Partners** - $3.16 million principal outstanding. Diverted Principal of $7,646.
- **Oak Shores II** - $12.15 million principal outstanding. Diverted Principal of $3.0 million.
- **Roam Development** - $26.566 million principal outstanding. Diverted Principal of $422,571.

37.    Based on preparation of the "Timeline of Diverted Payments" (Attached hereto as Exhibit "A"), it appears that there was a consistent pattern of diversion all the way back to 2003. It also clearly demonstrates that the timing of the bankruptcy filing was simply an arbitrary matter. In other words, whenever the Debtors' management decided to stop diverting principal payments, a bankruptcy filing would have been necessary. By way of example, had the filing date occurred on February 1, 2006 instead of April 12, 2006, the Freeway 101 payment of $3.75 million that was received on February 21, 2006 and diverted would have presumably been captured by the debtor-in-possession estate and preserved for future disposition. However, because the filing arbitrarily occurred on April 12th, these funds are not available. The Freeway 101 Lenders are therefore disadvantaged purely due to the unlucky timing of the filing.

38.    The diversion of principal was obviously intentionally hidden from the Direct Lenders since, even though a loan would pay off in full, the Direct Lenders would still receive

monthly interest payments as if the loan were still outstanding and the borrower was continuing to make monthly payments.

39.    For example, in the Universal Hawaii loan (principal amount of $5,066,413) where USACM put 127 Direct Lenders into a single loan, USACM received payment in full on January 13, 2006.  Rather than notifying the 127 Direct Lenders of the payment in full in January 2006, USACM took the money and continued to pay the 127 investors monthly interest checks in February 2006 and March 2006.  The receipt of those monthly interest checks conveyed to those 127 Direct Lenders that their loan remained outstanding and continued to generate monthly interest.

40.    Based on the notion that USACM was advancing payment to Direct Lenders at the Petition Date without notifying Direct Lenders of non-performing loans and the unknown use of a substantial amount of funds from January 2003, the operations of USACM are extremely suspect and likely constitute a form of a Ponzi scheme, as previously discussed.

41.    Despite the promises and representations contained in the Diversified Fund Prospectus, USACM did not adhere to the requirements of the Prospectus.  A prime example of these underwriting violations is described in the following five loans.

42.    **10-90 Inc. Loan** - At the Petition Date Diversified Fund owned 100% of the 10-90, Inc. loan which is a non-performing loan with a current investment of $55,113,781 and an interest receivable of $21,063,341 totaling $76,177,122.  The 10-90. Inc. loan is the largest loan in the entire USACM portfolio.

43.    The borrower for the 10-90, Inc. loan was 10-90, Inc. ("10-90").  However, it appears 10-90 was used as a pass through to USA Investment Partners LLC ("IP") since 10-90 borrowed funds from Diversified Fund then 10-90 lent the funds to IP.  Furthermore, the 10-90/IP loan was formally transferred from 10-90 to IP on January 1, 2005.

44.    The 10-90, Inc./IP loan was a revolving loan that originated in April of 2002 and was last drawn on in February 2005.  Between April 2002 and February 2005 it appears the loan proceeds were used as a substantial source of funds for IP.  The primary members of IP are Tom Hantges and Joe Milanowski.  Through IP, Tom Hantges and Joe Milanowski were using a

- 13 -

1    substantial portion of Diversified's funds (the 10-90, Inc. loan) as a source of funds for projects

2    and other deals of IP and IP related entities.

3         45.     The 10-90, Inc./IP loan is currently a non-performing loan that is secured by the

4    assignment of IP's membership interest in Ashby USA, LLC, Capital Land Investors, LLC and

5    Random Developments, LLC. The 10-90, Inc./IP loan is not secured by first deeds of trust that

6    encumber the relevant real property or real property interest or by second deeds of trust or other

7    real property.

8         46.     This virtually unsecured loan to the principals of USACM accounts for

9    approximately 50% of the total assets in the Diversified Fund portfolio. This loan by itself

10    violates all three of the diversification requirements (no loan to exceed $20 million, no loan to

11    exceed 15% of loan portfolio, and loans to a single borrower including affiliates will not exceed

12    25% of the portfolio), violates the first priority deed of trust collateral requirement, violates the

13    loan-to-value requirement (loan must not exceed 75% of the value of the real property collateral),

14    and violates the no loans to USACM or any of its affiliates requirement.

15         47.     **Epic loan** - The second largest loan in the Diversified Fund is not a loan, rather it

16    is what is left after a 2002 foreclosure on the real property collateral. According to the Loan

17    Summary as of April 27, 2006 the Epic loan has a listed principal amount of $18,915,000.

18    Diversified Fund purchased the property at the foreclosure sale, but USACM vested management

19    and control of the property (a Palm Springs condominium resort property) in an affiliate of

20    USACM by the name of Tree Moss, LLC. In February, 2006, USACM caused Diversified Fund

21    to quitclaim the subject property to Tree Moss, LLC for what appears to be no consideration.

22         48.     **Sheraton Hotel loan** - The third largest loan in the Diversified Fund is not a loan

23    either. According to the Loan Summary as of as of April 27, 2006 the Sheraton Hotel loan has a

24    listed principal amount of $6,845,000.

25         49.     This loan was originally funded in 1999 by Direct Lenders other than Diversified

26    Fund. For reasons presently unknown, the decision was made by USACM in 2001 to transfer the

27    loan to the Diversified Fund. This process took almost six months due to the requirement that

28    each individual Direct Lender execute documentation transferring their interest in the loan.

Interestingly, the loan went into default shortly thereafter. In 2002, Diversified Fund took enforcement action, eventually foreclosing upon the Salt Lake City airport hotel that collateralized the loan, and purchased the property at the foreclosure sale.

50. However, USACM vested management and control of the property in another USACM affiliate, USA Investors VI, LLC. USA Investors VI, LLC operated the property for several years and sold it to a third party in 2005. Although it appears that the net sales proceeds were placed into the Diversified Fund operating account, and the "loan balance" was reduced by the amount of the net sales proceeds, it is unclear what happened to the monies placed into the Diversified Fund account and a large "principal balance" remained on the books. At this point, there is no loan and the former collateral for the loan has been sold.

51. **Colt loans -** The fourth largest loan in the Diversified Fund is actually a series of non-performing loans relating to the redevelopment of the historic Colt arms factory in Hartford, Connecticut. At the Petition Date Diversified Fund owned 100% of the following three Colt loans:

    a. Colt CREC Building loan with a current investment of $3,718,777 and an interest receivable of $923,496 totaling $4,642,273 due to Diversified Fund;

    b. Colt DIV added #1 loan with a current investment of $1,500,000 and an interest receivable of $470,625 totaling $1,970,625 due to Diversified Fund;

    c. 100% of the Colt DIV added #2 loan with a current investment of $3,100,000 and an interest receivable of $670,375 totaling $3,770,375 due to Diversified Fund.

52. Furthermore, at the Petition Date Diversified Fund owned 42.8% of the Colt Gateway loan with a current investment of $2,393,657 (Diversified Fund's percent ownership) offset by an advancement of interest from USACM of $328,220 resulting in $2,065,437 due to Diversified Fund.

53. The borrower on the Colt loans in each case is Colt Gateway, LLC, an entity in which USACM affiliate Investment Partners is a member.

US_WEST:260063507.5

54. Unfortunately, the three Colt loans that are 100% owned by Diversified Fund are undocumented and unsecured. Loan documents apparently prepared in 2003 have never been executed by the borrower and the loan documents apparently do not contemplate a deed of trust.

55. **Fiesta Development McNaughton loan** – Another example of violating the lending criteria noted in the Prospectus. At the Petition Date Diversified Fund owned 100% of the Fiesta Development McNaughton loan with a current investment of $6,000,000 and an interest receivable of $976,444 totaling $6,976,444 due to Diversified Fund. The Fiesta Development McNaughton loan is a "bullet loan" (no interest is due until maturity, at which point all principal and interest is due and payable) that is the fifth largest loan in Diversified Fund's portfolio. The loan is not secured by first deeds of trust that encumber the relevant real property or real property interest or by second deeds of trust or other real property.

56. The borrower is Fiesta Development and the guarantor is Richard Ashby. Investment Partners and possibly other USACM affiliates have ownership interests in Ashby and Fiesta-related entities and development projects.

57. The mismanagement of the loan origination activities of Diversified Fund by USA Mortgage regarding the above described 100% owned loans, is summarized as follows:

| Loan | Principal | Performing ? | Portfolio Diversification? | Insider Loan? | Secure ? | LTV<75%? |
|------|-----------|--------------|----------------------------|---------------|----------|----------|
| 10-90, Inc. | $55mm | No | Fail | Fail | Fail | Fail |
| Epic Resorts | $18.9mm | No | Fail | Fail | Fail | Fail |
| Sheraton Hotel | $6.8mm | No | Fail | Fail | Fail | Fail |
| Colt DIV #1 (no loan documentation) | $1.5mm | No | OK | Fail | Fail | Fail |
| Colt DIV #2 (no loan documentation) | $3.1mm | No | OK | Fail | Fail | Fail |
| CREC – Colt (no loan documentation) | $3.7mm | No | OK | Fail | Fail | Fail |
| Fiesta McNaughton | $6mm | Yes | OK | Fail | Fail | Fail |
|  | $95mm |  |  |  |  |  |

58.     The investor statement distributed to investors in the Diversified Fund by USA Mortgage on December 31, 2005, a true and correct copy of which is attached hereto as Exhibit "C", is directly at odds with the foregoing chart. For example, the 10-90, Inc. loan is described as "[s]ecured by 3 master planned communities in Southern California totaling approximately 6,500 lots" and the Fiesta McNaughton loan is described as "[s]ecured by approximately 800 acres for development of a master planned community located in Coachella, California.

59.     USACM and USACM-related entities are involved in various real estate development activities. Furthermore, it appears some of the loans in the Loan Portfolio pertain to these real estate development activities. These development activities were conducted in a series of affiliated companies typically owned by Messrs. Milanowski and Hantges, the owners of USACM, or their affiliates. The identified related entities and relationships are discussed below.

60.     **Investment Partners** - Investment Partners seemed to have an involvement in many of the loans in the Loan Portfolio. As discussed above, Investment Partners is the direct borrower in the 10-90, Inc. loan, the single largest loan in the Loan Portfolio by far. Investment Partners was also an equity participant in many of the borrowers (or entities that had ownership interests in the borrowers) that obtained loans from USACM. Based on our limited research it appears Investment Partners (excluding the HFA loans) is involved in approximately 24 loans that have an approximate outstanding loan balance of $210 million as of June 30, 2006. Given there are 115 loans with a total balance outstanding of approximately $850 million as of June 30, 2006, Investment Partners is involved in 21% of the total number of loans, and 25% of the total outstanding amount of the loans.

61.     **USA Investors VI** - This is an entity that is owned substantially by Investment Partners. As discussed above, the Sheraton Hotel property was given to USA Investors VI after foreclosure of the Diversified Fund loan and purchase at the foreclosure sale by Diversified Fund. I am investigating other involvement of this entity in the real estate activities of USACM.

62.     **HMA Sales, LLC** - This is an entity that is nominally 50% owned by Investment Partners although, by virtue of certain arrangements with Allen Abolafia, the holder of a 45%

- 17 -

member interest, Investment Partners may have a much greater stake in profits. HMA Sales, LLC is the owner of the Royal Hotel which reportedly is in the process of being sold.

63. **Tree Moss Partners, LLC** - Tree Moss appears to be wholly owned by HMA Sales, LLC. Tree Moss is the entity that was given the Epic Resorts property after the foreclosure in 2002 by Diversified Fund and which obtained title to that property for no apparent consideration in February of 2006. The extent of the other real estate activities of Tree Moss is presently unknown.

64. **David Fogg** - Mr. Fogg and Mr. Hantges were both officers and shareholders of a real estate development company by the name of Inco Homes which filed bankruptcy in Riverside, California in 1999. Mr. Fogg is also the principal of 10-90, Inc., the original borrower in the 10-90, Inc. loan transaction. For reasons unknown at the present time, Mr. Fogg's company apparently borrowed money from Diversified Fund and immediately transferred that money to Investment Partners or to entities designated by Investment Partners. Mr. Fogg is also involved in other Investment Partners transactions.

65. **Richard Ashby/Fiesta Development** - Mr. Ashby is a Southern California real estate developer and a principal in Fiesta Development. He and Fiesta Development are involved in at least eight outstanding loans in the USACM portfolio, involving $63 million in principal amount. Three of these loans have been designated as performing by the Debtors and five as non-performing. Mr. Ashby personally guaranteed six of the eight loans.

66. Investment Partners has equity interests in at least three of the development projects of Fiesta and Ashby, the Stoneridge Project, the Oak Valley Project and the Roripaugh Ranch project. Based on the funding of the 10-90 loan, some monies received by Investment Partners in the $55 million 10-90, Inc. loan were used to finance the equity participation in these and other development projects.

67. **Homes For America** - Homes For America ("HFA") is a real estate developer that operates throughout the United States. Affiliates of HFA are borrowers in the USACM portfolio in at least six loans. Investment Partners owns equity interests in the project being developed by HFA, the Colt Gateway Project in Hartford, Connecticut.

- 18 -

68.     Based on our review of the loan files, the loan files fail to provide even the minimum amount of information necessary to understand basic facts about the loan.  For instance, the loan file for the 10-90, Inc. loan contained only the loan documents originated at the inception of the loan, plus the documents by which the parties agreed in 2003, that there was no need for the involvement of 10-90, Inc. and that 10-90, Inc. would assign its interest as lender to Diversified Fund so that Diversified Fund would thereafter be the direct lender to Investment Partners.  For instance the loan file for the 10-90 Inc. loan contains only 17 basic loan transaction documents.  This for a $55 million loan, largest by far in the Debtors' Loan Portfolio.

69.     As discussed above, USACM transferred loans among Direct Lenders and the Funds, and transferred loans among the Funds.  USACM transferred real estate owned among its affiliates for no apparent consideration (as in the case of the foreclosed Epic Resorts property being transferred to Tree Moss, LLC)  The quantity and velocity of monies transferred from one USACM affiliate to another (as in the case of the $58 million book entry indicating that USACM transferred such amounts to IP, the $11.4 million transfer from Diversified Fund to the USACM Collection Account in January, 2003, the $55 million transferred from Diversified Fund to IP under the guise of the 10-90, Inc. loan) and the poor state of the books and records of USACM (discussed above), makes it very difficult and exorbitantly expensive to sort out the true nature of the affairs among the USACM affiliates.

70.     These estates could be overwhelmed by the administration costs associated with litigation of disputes among Debtors and Direct Lenders and the need to recreate the USACM books and records in connection with such litigation.

71.     All of this will detract from the main goal of collecting the loans and distributing the monies to creditors as efficiently and as quickly as possible.

72.     According to the Debtor's bankruptcy schedules, at the Petition Date Diversified Fund had Accounts Receivable from USACM in the amount of $18,914,005.  At the Petition Date according to Diversified Fund's Loan Summary provided by the Debtor, Diversified Fund owes USACM $4,574,199 for the advancement of payments that were not paid by the borrowers.   The net result of offsetting the $18,914,005 due to Diversified Fund from USACM with the

US_WEST:260063507.5

1    $4,574,199 due to USACM from Diversified Fund would be an outstanding amount due to

2    Diversified Fund from USACM of $14,339,806 ($18,914,005 - $4,574,199).

3        73.    The $18,914,005 owed to Diversified Fund from USACM is a result of borrower

4    payments received by USACM that were not remitted to Diversified Fund.  The payments that

5    were not remitted to Diversified Fund were received by USACM between February and

6    December of 2004.  Furthermore, the $18,914,005 is comprised of 20 payments received from 17

7    different borrowers.

8        74.    As mentioned above, the $4,574,199 owed to USACM is a result of payments by

9    USACM from monies not paid by the borrowers.  Of the amounts advanced, $936,897 was for

10   advancements of principal payments and $3,637,302 was for the advancement of interest

11   payments.  Moreover, the amount advanced to Diversified Fund pertains to 21 loans and is the net

12   of the total amount advanced ($4,698,529) against the total amount of Diversified Fund funds in

13   the "Collection Account" as of the Petition Date ($124,330) for the 21 loans.

14       75.    Currently the calculation of the aggregate dollar amount of the proposed

15   distribution does not take into account the offset of prepetition receivables with prepetition

16   payables between the USACM and the Direct Lenders.

17       76.    In my opinion, the prepetition amounts owed and due between the Direct Lenders

18   and USACM should be offset prior to a calculation of distributions.

19       77.    Based on the above facts, in my opininion there should be an appropriate holdback

20   of the funds proposed to be distributed by the Debtor and the distribution should be an interim

21   distribution rather than a permanent schedule for future distributions.  With the goal of caution

22   and fiscal conservation, I believe an appropriate amount of hold back would be accomplished if

23   the distribution were limited to 90% of the amounts proposed by the Debtors on account of

24   interest payments of 25% of the amounts of principal repayments.

25       78.    If called as a witness, I could and would testify hereto.

26

27

28

79.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief. Executed this 27th day of July, 2006, at Phoenix, Arizona.

Michael A. Tucker

US_WEST:260063507.5

**EXHIBIT A**

**PROSPECTUS**                                                     **FOR NEVADA RESIDENTS ONLY**

# USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

CONTINUOUS OFFERING OF UP TO $200,000,000 IN MEMBERSHIP UNITS
3,139.02 UNITS REMAINING FOR PROCEEDS OF UP TO $78,475,500
MINIMUM INVESTMENT: $25,000, OR ONE UNIT

USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC makes or purchases entire or fractional interests in acquisition, development, construction, bridge or interim loans secured by first deeds of trust, among other things, on undeveloped land and residential and commercial developments located primarily in the United States. Our manager is USA Capital Realty Advisors, LLC. The loans will be arranged by USA Commercial Mortgage Company, which is a licensed mortgage broker under the laws of the State of Nevada and does business as USA Capital.

We have conducted a continuous offering of our membership units since May 2000 and have placed an aggregate of 4,860.98 units as of March 31, 2003. This Prospectus relates to the offer and sale of the remaining 3,139.02 units, including units to be issued under our distribution reinvestment plan. Prospective investors may only purchase whole units with a minimum subscription of one unit, or $25,000. Fractional units may be purchased only by investors who already own membership units and elect to reinvest their periodic distributions of income, subject to restrictions described in this Prospectus, or by investors who are permitted by our manager, in its sole discretion, to contribute pre-existing loans equal to the amount of such loans. Our manager may increase the maximum number of units offered at any time.

Since there is no public market for the membership units and since we do not expect a public market to develop, an investment in our membership units is illiquid. Further, our membership units are subject to restrictions to transfer imposed by federal and state securities laws and by our operating agreement. See "Risk Factors – Risks Related to an Investment in Our Membership Units" and "Summary of Operating Agreement." This offering also involves certain ERISA risks that should be considered by tax-exempt employee benefit plans. See "ERISA Considerations." All income we generate will be taxed to our members (other than tax-exempt entities) as ordinary income, regardless whether it is distributed in cash or reinvested. See "Federal Income Tax Consequences." In addition, we may elect to leverage our loan portfolio by obtaining a revolving credit facility from a third party lender. See "Leveraging the Portfolio."

|  | PRICE TO INVESTORS | COMMISSIONS[1] | NET PROCEEDS[2] |
|---|---|---|---|
| Minimum Investment Amount | $ 25,000 | $ 0 | $ 25,000 |
| Units Outstanding as of March 31, 2003 | 121,524,500 | 0 | 121,524,500 |
| Maximum Offered by this Prospectus | 78,475,500 | 0 | 78,475,500 |
| Maximum Offering Amount | $ 200,000,000 | $ 0 | $ 200,000,000 |

[1] Our membership units will be offered and sold by individuals who are licensed by the Nevada Securities Division as our issuer agents. Our manager shall pay a commission of not more than one percent (1%) of each unit sold. There is no firm commitment to purchase or sell any of our membership units.

[2] The net proceeds are calculated without including organizational and offering expenses, including, without limitation, legal and accounting expenses, reproduction costs, selling expenses and filing fees paid to the Nevada Securities Division. Our manager will pay all such expenses and will not seek reimbursement for such expenses.

---

**Investing in our membership units involves a high degree of risk. See "Risk Factors" beginning on page 36 to read about risks that each investor should carefully consider before acquiring our membership units. Investors must be prepared to bear the economic risk of their investment for an indefinite period of time and be able to withstand a total loss of their investment.**

**Substantial fees will be paid to our manager and its affiliates who are subject to certain conflicts of interest. See "Management – Compensation and Related Party Transactions" and "Management – Conflicts of Interest."**

**This Prospectus constitutes an offer only to bona fide residents of the State of Nevada who meet certain minimum investor suitability standards. See "Terms of the Offering – Investor Suitability Standards."**

---

USA CAPITAL REALTY ADVISORS, LLC

THE DATE OF THIS PROSPECTUS IS JUNE 2, 2003.

# TABLE OF CONTENTS

                                                                                                    PAGE No.

SUMMARY OF THE OFFERING ................................................................................................. 1
TERMS OF THE OFFERING ..................................................................................................... 5
    Use of Proceeds........................................................................................................................ 5
    Investor Suitability Standards ................................................................................................. 6
    Subscription Agreements; Admission to as a Member ........................................................... 6
    Restrictions on Transfer .......................................................................................................... 7
    Election to Receive Monthly Cash Distributions................................................................... 8
PLAN OF DISTRIBUTION ........................................................................................................ 8
BUSINESS ..................................................................................................................................... 9
    Overview .................................................................................................................................. 9
    Mortgage Loans ....................................................................................................................... 9
    Lending Standards and Policies .............................................................................................. 11
    Collateral for Loans ................................................................................................................ 15
    Loan Repayment ...................................................................................................................... 16
    Enforcement of Security Interests .......................................................................................... 17
    Competition.............................................................................................................................. 18
    Regulations .............................................................................................................................. 18
    Environmental Issues .............................................................................................................. 19
    Properties ................................................................................................................................. 20
    Legal Proceedings ................................................................................................................... 20
LEVERAGING THE PORTFOLIO ............................................................................................ 22
MANAGEMENT ........................................................................................................................... 23
    Manager ................................................................................................................................... 23
    Fiduciary Responsibility of Our Manager ............................................................................. 24
    Affiliates of Our Manager....................................................................................................... 25
    Legal Proceedings Involving Affiliates of Our Manager ...................................................... 26
    Compensation and Related Party Transactions ...................................................................... 27
    Conflicts of Interest................................................................................................................. 29
    Removal of USA Capital Realty Advisors, LLC as our Manager .......................................... 31
MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF
    OPERATIONS........................................................................................................................ 33
    Accounting Policies ................................................................................................................ 33
    Results of Operations .............................................................................................................. 33
UNIT OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT............... 35
RISKS FACTORS.......................................................................................................................... 36
    Risks Related to an Investment in Our Membership Units..................................................... 36
    Risks Related to the Offering.................................................................................................. 37
    Risks Related to USA Capital Diversified Trust Deed Fund .................................................. 38
    Risks Related to Our Industry ................................................................................................. 43
    Risks Particular to Development and Construction Loans ...................................................... 45
    Tax-Related Risks ................................................................................................................... 47
DISTRIBUTION POLICY .......................................................................................................... 48
SUMMARY OF OPERATING AGREEMENT ........................................................................... 49
FEDERAL INCOME TAX CONSEQUENCES ......................................................................... 54
ERISA CONSIDERATIONS ....................................................................................................... 63
EXPERTS ....................................................................................................................................... 63
EXHIBIT A – Audited Financial Statements of USA Capital Diversified Trust Deed Fund, LLC ............ A-1
EXHIBIT B – Operating Agreement........................................................................................... B-1
EXHIBIT C – Form of Distributions Notice............................................................................... C-1
EXHIBIT D – Form of Withdrawal Notice ................................................................................. D-1

## SUMMARY OF THE OFFERING

The following information is only a brief summary of the offering, and is qualified in its entirety by the information appearing elsewhere in this Prospectus. A thorough examination of the entire Prospectus, including the section entitled "Risk Factors," our financial statements, a copy of which is attached hereto as **Exhibit A**, and our operating agreement, a copy of which is attached hereto as **Exhibit B**, is recommended before investing in our membership units.

| | |
|---|---|
| Fund Objectives ............. | USA Capital Diversified Trust Deed Fund, LLC is a Nevada limited-liability company that makes or purchases entire or fractional interests in acquisition, development, construction, bridge or interim loans secured by first deeds of trust, among other things, on undeveloped land and residential and commercial developments located primarily in the United States. The membership units offered hereby represent membership interests in USA Capital Diversified Trust Deed Fund. |
| Manager ......................... | Our manager is USA Capital Realty Advisors, LLC, a Nevada limited-liability company, located at 4484 South Pecos Road, Las Vegas, Nevada 89121. |
| Prior Experience.............. | USA Capital Realty Advisors, LLC was formed to serve as our manager. Our manager is wholly-owned by USA Investment Partners, LLC, a Nevada limited-liability company. USA Investment Partners, LLC is managed by USA Commercial Mortgage Company, a Nevada corporation, and is controlled by Thomas A. Hantges, Joseph D. Milanowski and Paul S. Hamilton. Thomas A. Hantges, Joseph D. Milanowski and Paul S. Hamilton, the officers and controlling stockholders of USA Commercial Mortgage Company, possess substantial prior experience in the mortgage industry. |
| The Offering; Capitalization................ | We have conducted a continuous offering of our membership units since May 2000. As of March 31, 2003, we have placed an aggregate of 4,860.98 membership units, net of redemptions, that represent net capital contributions of $121,524,500. As a result, pursuant to this Prospectus, we are offering up to 3,139.02 membership units, representing an aggregate offering amount of $78,475,500.<br><br>Our manager may increase the maximum number of units offered at any time in its sole discretion. In this regard, our manager has increased this offering from $125,000,000, or 5,000 units, to $200,000,000, or 8,000 units, as of May 30, 2003. |
| Units Outstanding ........... | As of March 31, 2003, there are 4,860.98 membership units, net of redemptions, issued and outstanding held by approximately 1,082 members. |
| Use of Proceeds................ | The proceeds from this offering shall be used to make or purchase entire or fractional interests in acquisition, development, construction, bridge or interim loans secured by first deeds of trust on undeveloped land and residential and commercial developments located primarily in the United States. A small portion of the proceeds may be set aside for cash reserves, in such amounts to be determined in the sole discretion of our manager, to meet our unexpected cash needs. |
| Term................................. | We shall continue until terminated by our manager, in its sole discretion, or by vote of members holding 75% of our outstanding membership units. See "Summary of Operating Agreement – Winding Up." |
| Compensation to Our Manager and Its Affiliates ..................... | Our manager and its affiliates will receive substantial fees and other compensation related to our operations. See "Management – Compensation and Related Party Transactions." Our manager will be entitled to an asset management fee and an early withdrawal fee. In addition, USA Commercial Mortgage Company will be entitled to receive commissions for its mortgage broker services payable by the relevant borrower, and USA Commercial Real Estate Group will be entitled to real estate commissions on the resale of any property by us. |

| | |
|---|---|
| Mortgage Loan Portfolio........................... | Loans made or purchased by us will be secured by whole or fractional interests in first deeds of trust on undeveloped land and residential and commercial developments located primarily in the United States. In addition, these loans may be secured by second deeds of trust on other property and personal guaranties from the principals of the relevant borrower. We will continue to make loans during the course of this offering. See "Business – Lending Standards and Policies." |
| | At March 31, 2003, we had 37 mortgage loans outstanding in the aggregate principal amount of $110,593,377. From our inception, we have made or purchased an aggregate of 60 mortgage loans in the aggregate principal amount of $189,372,236. All of our outstanding mortgage loans have been made pursuant to certain pre-determined investment guidelines. A summary of our mortgage loan portfolio, including the type, number, outstanding balance, interest rate, term, type of underlying real property or real property interest and geographic concentration of the underlying real property or real property interest of our mortgage loans, may be found in the section entitled, "Business – Mortgage Loans." |
| Mortgage Broker.............. | USA Commercial Mortgage Company, a Nevada corporation doing business as USA Capital, will serve as our mortgage broker. |
| Leveraging the Portfolio . | We may elect to leverage our loan portfolio by obtaining a revolving credit facility from a third party lender. This credit facility will be used primarily, but not exclusively, to fund new loan opportunities that arise prior to the maturity of then-existing mortgage loans. This credit facility would be repaid primarily from loan payoffs as then-existing loans mature. We would assign portions or all of our loan portfolio as security for this credit facility. The total amount outstanding under this credit facility will not at any time exceed 25% of our total loan portfolio. |
| | Although we may be able to increase our yield through borrowings under this credit facility, we will be exposed to additional risks and possible adverse tax consequences as a result of borrowing under this proposed credit facility. See "Leveraging the Portfolio," "Risk Factors" and "Federal Income Tax Consequences." |
| Distribution Policy........... | We make distributions to members only from cash that is available for distribution. Our operating agreement defines the term, "cash available for distribution," to mean the total cash revenues generated by our operations (including proceeds from the sale or refinancing of assets) during any calendar month, less all of our cash expenditures for debt service and accrued operating expenses, depreciation and amortization during such month, including a reasonable amount to be set aside for reserves to be determined by our manager. Cash available for distribution will be determined by computing the net income during the calendar month on the accrual basis. |
| | During the years ended December 31, 2002 and 2001, we authorized distributions to members of $11,429,712 and $5,704,993, respectively, where of such distributions, $3,891,112 and $2,315,378, respectively, were reinvested by members. With respect to the distributions authorized in the year ended December 31, 2001, $460,595 were paid in the year ended December 31, 2002. The distributions to members for the years ended December 31, 2002 and 2001 represented annual returns of 11.96% per annum and 12.74% per annum, respectively. See "Distribution Policy." |
| | Members may elect to receive either periodic cash distributions of our income or apply such distributions towards the purchase of additional fractional membership units: A member may purchase additional fractional membership units only if: |

- The investor remains qualified to purchase membership units;

- There is an effective registration statement on file with the Nevada Securities Division with respect to our membership units; and

- Our membership units are registered under the Securities Act of 1933, as

amended, or the Securities Act, or exempt from such registration available.

Members may make their election to either receive or reinvest their distributions upon their initial subscription for our membership units. This election is irrevocable for one year and, afterwards, may be changed on an annual basis on written notice of at least 30 days to our manager. Notwithstanding the election made by a member, our manager, in its sole and absolute discretion, reserves the right to commence making cash distributions at any time to ERISA investors in order for us to remain exempt from the ERISA plan asset regulations. See "Distribution Policy," "ERISA Considerations" and "Summary of Operating Agreement."

| | |
|---|---|
| Risks Related to an Investment in Our Membership Units ........ | There is no public market for our membership units and we do not expect a public market to develop. In addition, there are substantial restrictions on transferability of our membership units under federal and state securities laws and under our operating agreement. Further, our members may not withdraw for one year and may, thereafter, withdraw subject to certain conditions and to the availability of funds. See "Risk Factors – Risks Related to an Investment in Our Membership Units." |
| Risks Related to the Offering ..................... | Since we are proposing to conduct an offering of up to $78,475,500 of our membership units without the assistance of an underwriter, there is no assurance that we will successfully complete this offering. In addition, due to the absence of an underwriter, investors will not be able to rely upon an underwriter with respect to the verification of the statements made in this prospectus. Further, due to our reliance on the intrastate exemption from registration provided by Section 3(a)(11) of the Securities Act and the narrow interpretation of the same, we may lose the benefit of this exemption from registration if one of our investors or a significant portion of our operations are deemed to be located outside of the State of Nevada. |
| | In terms of our access to proceeds, since we are not required to meet a minimum offering amount, all invested funds will become immediately available to us. In this regard, our manager will have substantial discretion in applying the proceeds from this offering. See "Risk Factors – Risks Related to the Offering" |
| Risks Related to USA Capital Diversified Trust Deed Fund ............ | Our manager is solely responsible for our management and for the selection of loans made or purchased by us. In managing our operations, our manager will rely on its experience in the real estate market and appraisals to determine the fair market value of the underlying real property. As a result, investors should only invest in our membership units if they are willing to grant our manager such broad discretion. In addition, the compensation payable to our manager and its affiliates was not established with the benefit of arm's-length negotiations and may not be on terms favorable to us. Our manager is also subject to conflicts of interests and may engage in competitive activities. See "Risk Factors – Risks Related to USA Capital Diversified Trust Deed Fund." |
| | Our loans are generally structured to require interest only payments during the term of the loan and a balloon payment of the principal at the end of the term. In addition, a substantial number of loans have been made in states located in the southwest United States, such as Nevada and California. The lack of geographic diversity may expose us to economic downturns in these regions. Further, our loans will not be insured or guaranteed by a federal owned or guaranteed mortgage company and, if guaranteed by a third party, may be subject to laws that limit our ability to recover from a third party guarantor. See "Risk Factors – Risks Related to USA Capital Diversified Trust Deed Fund." |

| | |
|---|---|
| Risks Related to the Industry ..................... | The mortgage lending industry is highly competitive as we will compete with other persons, entities, institutional lenders and others engaged in the mortgage lending business that have greater resources and greater experience than us. In addition, we must comply with all applicable state regulations governing the making of loans to borrowers in such states, such as usury laws and laws related to the advertising and marketing of loans. See "Risk Factors – Risks Related to the Industry."

In addition to competitive forces and regulatory matters, the profitability of the loans we make or purchase are exposed to fluctuations in interest rates, contamination of the underlying real property by hazardous substances and damage caused by unanticipated events, such as acts of terrorism, war, earthquakes, floods, mudslides, acts of God or other similar events. See "Risk Factors – Risks Related to the Industry." |
| Risks Particular to Development and Construction Loans........ | We may invest a substantial portion of the proceeds from this offering in loans related to the development or construction of residential and commercial property. These loans possess additional risks compared to those loans secured by properties with completed improvements. For example, the development of residential property and the construction of offices or retail shops for a commercial property may be adversely affected by a depressed real estate market, higher interest rates, increased cost of materials, shortage of labor, the inability to obtain permits or entitlements necessary to complete the development or construction and other factors that traditionally affect construction. See "Risk Factors – Risks Particular to Development and Construction Loans." |
| Tax-Related Risks ........... | We expect that we will be treated as a partnership for federal income tax purposes. Investors should consult their own tax advisors regarding the consequences that might be associated with their investment in our membership units. See "Federal Income Tax Consequences." |
| Reports to Members........ | We will provide to members annual audited financial statements and tax returns. |
| Investor Suitability........... | Our membership units are offered exclusively to certain individuals, ERISA plans, individual retirement accounts, or IRAs, and other prospective investors who are bona fide Nevada residents and who meet certain minimum standards of income and/or net worth. Only investors who meet these investor suitability standards may be admitted as members. See "Terms of the Offering – Investor Suitability Standards." |
| Additional Information..... | During this offering, prospective investors and their professional advisors, if any, are invited to ask questions of our manager concerning the terms and conditions of this offering and to obtain any additional information that we possess or can acquire without unreasonable effort or expense as may be necessary to verify the accuracy of the information furnished in this Prospectus. Our contact information is as follows:

USA Capital Diversified Trust Deed Fund, LLC
c/o USA Capital Realty Advisors, LLC
4484 South Pecos Road
Las Vegas, Nevada 89121
Telephone: (702) 734-2400 |

## TERMS OF THE OFFERING

We have conducted a continuous offering of our membership units since May 2000. As of March 31, 2003, we have placed, net of redemptions, an aggregate of 4,860.98 membership units, representing net capital contributions of $121,524,500. Due to an increase in the aggregate offering amount to $200,000,000, representing 8,000 membership units, we are offering the remaining 3,139.02 membership units, representing an offering amount of $78,475,500, pursuant to this offering. This offering includes membership units to be issued under our distribution reinvestment plan. This offering will close on the earlier to occur of one year from the date of this Prospectus or upon the sale of all of our membership units offered hereunder; provided, however, our manager may elect to extend this offering, in its sole and absolute discretion. In addition, our manager may increase the maximum number of membership units offered at any time.

Prospective investors may only purchase whole membership units with a minimum subscription of one unit, or $25,000. Fractional membership units may be purchased only by investors who already own membership units and elect to reinvest their periodic distributions of income, subject to restrictions described in this Prospectus, or by investors who are permitted by our manager, in its sole discretion, to contribute pre-existing loans equal to the amount of such loans.

We are conducting our continuous offering pursuant to the intrastate exemption provided by Section 3(a)(11) of the Securities Act and pursuant to the registration of this offering with the Nevada Securities Division. Accordingly, although we have not registered our offering with the Securities and Exchange Commission, we have registered our offering with the Nevada Securities Division. Due to our reliance on Section 3(a)(11) of the Securities Act, our offering is strictly limited to bona fide residents of Nevada. The Nevada Securities Division does not recommend or endorse the purchase of our membership units, nor has the Nevada Securities Division passed upon the accuracy of the information set forth herein. Further, this Prospectus does not constitute an offer to sell or a solicitation of any offer to buy with respect to any other person who is not a bona fide resident of Nevada or who fails to meet the specified investor suitability standards.

### USE OF PROCEEDS

The proceeds from the sale of our membership units will be used approximately as set forth below. The figures set forth below are only estimates, and actual use of proceeds will vary.

| PROPOSED USE | PRIOR OFFERINGS | % | MAXIMUM AMOUNT | % | TOTAL | % |
|---|---|---|---|---|---|---|
| Organizational and Offering Expenses..... | $        0 | 0.0% | $        0 | 0.0% | $        0 | 0.0% |
| Mortgage Loans............. | 120,916,878 | 99.5% | 78,083,123 | 99.5% | 199,000,000 | 99.5% |
| Reserves and Working Capital ......... | 607,622 | 0.5% | 392,377 | 0.5% | 1,000,000 | 0.5% |
| TOTAL | $121,524,500 | 100.0% | $78,475,500 | 100.0% | $200,000,000 | 100.0% |

Since our manager has paid and will pay our organizational and offering expenses, we anticipate that a substantial portion of the proceeds from the sale of our membership units will be applied toward mortgage loans. Depending on the nature of each project, our loans may be used to fund the acquisition of property and pay development costs, costs to construct infrastructure improvements or costs to construct improvements. Typical development costs include costs to secure permits and entitlements and to resolve land use issues, architects' and engineers' fees and expenses, costs to secure utility services and

other costs needed to prepare the property for the construction of improvements. Costs to construct infrastructure improvements generally relate to grading, roads, sewers, sidewalks, lights and utility conduits. The costs to construct infrastructure or building improvements may include both "hard costs," such as the cost of materials, supplies and labor, and "soft costs," such as marketing and promotional costs, legal, accounting and other consultants' costs, cost of permits and construction management fees.

In addition to mortgage loans, we may set aside a portion of the proceeds for cash reserves, in such amounts to be determined in the sole discretion of our manager, to meet our unexpected cash needs. The actual amount set aside for reserves may be at a higher or lower percentage than that set forth above.

INVESTOR SUITABILITY STANDARDS

Each investor who is admitted as a member must be a bona fide resident of the State of Nevada, meet certain eligibility standards described below and execute a Subscription Agreement, a copy of which has been provided with this Prospectus. By executing the Subscription Agreement, each prospective investor makes certain representations and warranties, upon which our manager will rely in accepting subscriptions. Each prospective investor must read the Subscription Agreement carefully.

In order to qualify as a bona fide resident of the State of Nevada, the prospective investor must have the investor's principal residence in Nevada, or if the investor is a trust, that the principal office of such trust is located in Nevada. In addition to this residency requirement, each prospective investor must meet certain investor suitability criteria. As a result of these criteria, each investor must either:

1. Have a net worth (exclusive of home, furnishings and automobile) of at least $50,000 and an annual gross income of at least $50,000;

2. Have a net worth (exclusive of home, furnishings and automobile) of at least $100,000; or

3. If such investor is a fiduciary account, such as a qualified person or profit sharing plan or an IRA, have the requirements of either (1) or (2) above met by either the fiduciary account itself or by the donor or plan participant who directly or indirectly supplies the funds for investment.

SUBSCRIPTION AGREEMENTS; ADMISSION TO AS A MEMBER

In order to purchase our membership units, prospective investors are required to complete the Subscription Agreement and return the same to our manager. Additional copies of the Subscription Agreement may be obtained from USA Capital Realty Advisors, LLC, whose address is 4484 South Pecos Road, Las Vegas, Nevada 89121, and whose telephone number is (702) 734-2400.

By submitting the signed Subscription Agreement to our manager with payment for the purchase of our membership units, each prospective investor:

1. Agrees to be bound by our operating agreement;

2. Grants a special and limited power of attorney to our manager; and

3. Represents and warrants that the investor meets the relevant suitability standards and is eligible to purchase our membership units.

Each Subscription Agreement is non-cancelable and irrevocable and any subscription funds are non-refundable for any reason, except with the prior written consent of our manager.

By executing the Subscription Agreement, a prospective investor unconditionally and irrevocably agrees to purchase the number of membership units shown thereon on a "when issued basis." Accordingly, upon executing the Subscription Agreement, an investor is not yet an owner of our membership units or a member. Membership units will be issued when the payment representing the purchase price for the prospective investor's subscription is received and the prospective investor is admitted as a member by our manager. All Subscription Agreements from prospective investors will be accepted or rejected by our manager within 15 days after receipt of such Subscription Agreements. During the period prior to a prospective investor's admission as a member, the prospective investor's subscription is irrevocable and the subscription funds received by our manager shall be held by our manager for the account of each such investor in a non-interest bearing subscription account.

In lieu of cash payment for our membership units, our manager may, in its sole discretion, permit a prospective investor to contribute entire or fractional interests in pre-existing loans that are secured by first deeds of trust in exchange for membership units. Any such loans that are contributed must not be in default at the time of contribution, shall satisfy the lending guidelines contained herein and must have been originated by our manager or its affiliates. The amount of membership units sold to a prospective investor in exchange for the contribution of pre-existing loans shall be equal to the then-outstanding principal loan balance, together with any accrued but unpaid interest, or a proportionate share of such loan balance with respect to the contribution of a fractional loan interest.

To facilitate our record keeping, prospective investors will only be admitted as members on the first and sixteenth day of each month. Our manager reserves the right to reject any subscription submitted for any reason. If accepted, a prospective investor will become a member without any further action by any person.

After having subscribed for at least one membership unit ($25,000), an investor may at any time, and from time to time, subscribe to purchase additional membership units so long as the offering is open. If an investor purchases any additional membership units on a day other than the first day of the month, each item of our income, gain, loss, deduction or credit for such month shall be prorated on a per diem basis.

Our manager reserves the right at any time, in its sole discretion, to cease soliciting for the sale of membership units and to cease admitting investors as members if it believes that suitable loan opportunities are not available.

RESTRICTIONS ON TRANSFER

As a condition to this offering, restrictions have been placed upon the ability of investors to resell or otherwise dispose of any membership units purchased hereunder, including, without limitation, the following:

1. No member may resell or otherwise transfer any membership units without the prior written consent of our manager, which consent may be withheld in its sole discretion. See "Summary of Operating Agreement – Limitations on Transferability."

2. Our membership units may not be sold or transferred unless our membership units are registered under the Securities Act and any applicable state securities statutes, or an exemption from such registration is available.

3. During the period that our membership units are being offered and sold in this offering and for a period of nine months from the date of the last sale of our membership units in

our continuous offering, no membership units may be sold or otherwise transferred to any person who is not a bona fide resident of the State of Nevada.

Notations regarding these limitations shall be made in our records with respect to all membership units offered hereby. The foregoing steps will also be taken in connection with the issuance of any new instruments for any membership units which are presented to our manager for transfer during the nine-month period described in subparagraph (3) above.

### ELECTION TO RECEIVE MONTHLY CASH DISTRIBUTIONS

Upon subscription for our membership units, an investor must elect whether to receive periodic cash distributions or have such cash distributions reinvested in exchange for additional membership units. Cash distributions may be reinvested as long as our membership units are registered with the Nevada Securities Division and either registered under the Securities Act or exempt from registration thereunder. This election, once made, is irrevocable for one year. An investor may not change the election prior to the first anniversary of the investor's admission as a member of USA Capital Diversified Trust Deed Fund, even if the investor's circumstances subsequently change.

Commencing on the first anniversary after an investor's admission as a member and on each anniversary thereafter, an investor may elect to reinvest cash distributions rather than receive cash distributions, and vice-versa, to the extent the investor has provided prior written notice of 30 days of such election to our manager, where a form of such notice is attached hereto as **Exhibit C**. Notwithstanding the foregoing, our manager reserves the right, at any time, to immediately commence making monthly cash distributions to ERISA plan investors who previously reinvested distributions in order to ensure that we remain exempt from the Plan Asset Regulations pursuant to the "significant participation" exemption. See "ERISA Considerations."

Income allocable to investors who elect to reinvest their distributions will be applied toward the purchase of fractional membership units in the amount of such income. The reinvested distributions will be retained by us for investing in further mortgage loans or other purposes. The income from reinvested distributions will be allocated among all investors; however, investors who reinvest will be credited with a larger proportionate share of such earnings than investors who receive monthly distributions since the number of membership units owned by investors who reinvest (and their capital accounts) will increase over time.

### PLAN OF DISTRIBUTION

Our membership units will be offered and sold by individuals who are licensed by the Nevada Securities Division as our issuer agents. These individuals will receive a commission payable by our manager, which commission shall not exceed one percent of each membership unit sold. There is no firm commitment to purchase any membership units, and there is no assurance that the maximum amount of this offering will be received.

# BUSINESS

## OVERVIEW

We are a Nevada limited-liability company that makes or purchases entire or fractional interests in acquisition, development, construction, bridge or interim loans. These loans are secured by first deeds of trust on undeveloped land and residential and commercial developments located in the United States and may also be secured by second deeds of trust on other property and personal guarantees from the principals of the relevant borrower. The loans will be arranged by USA Commercial Mortgage Company, which is a licensed mortgage broker under the laws of the State of Nevada and does business as USA Capital. See "Management – Affiliates of Our Manager."

We were formed through the filing of our articles of organization with the Nevada Secretary of State on February 3, 2000 and are governed by our operating agreement dated as of February 10, 2000, a copy of which is attached hereto as **Exhibit B**. See "Summary of Operating Agreement." In its sole discretion, our manager may elect to conduct our operations under a fictitious firm name.

## MORTGAGE LOANS

Since our organization and through March 31, 2003, we have made or purchased a total of 60 mortgage loans in the aggregate principal amount of $189,372,236. As of March 31, 2003, we had 37 mortgage loans outstanding in the aggregate principal amount of $110,593,377 as follows: nine acquisition loans in the aggregate principal amount of $13,161,928, one development loan in the aggregate principal amount of $21,829,501, eleven construction loans in the aggregate principal amount of $37,765,803, and sixteen bridge loans in the aggregate principal amount of $37,836,145. All of our outstanding mortgage loans have been made pursuant to certain pre-determined investment guidelines. See "Business – Lending Standards and Policies."

Loans that are classified as "acquisition" are loans where the funds were used to help a borrower acquire the collateral property; "development" loans are for the development of land on which residential or commercial properties are to be built (*i.e.*, sewer, water, roads, etc.); "construction" loans are for the vertical construction of residential or commercial properties (*i.e.*, concrete, framing, roofing, etc.); "bridge" loans are for the refinance of existing property of the borrower whether land, residential, or commercial buildings, whether or not the funds are used for acquisition. A portion of the funds may be used for renovation of the existing structures. Loans that include acquisition, development, and construction components are classified as "construction" loans.

It is important to note that the following information reflects our loan portfolio as of March 31, 2003 and should not be viewed as an indication of the characteristics of our future loans. As our manager has sole discretion for the initial selection, evaluation and negotiation of our mortgage loans and in making exceptions to our investment criteria, our mortgage loan portfolio may contain loans with different loan-to-value ratios, interest rates and terms.

The following is a table that provides summary information as to our loan portfolio at March 31, 2003. All percentages of our loan portfolio are approximate percentages and, due to rounding, may not add up to 100%.

| TYPE OF MORTGAGE LOAN | NUMBER OUT-STANDING | AGGREGATE BALANCE OUT-STANDING | % OF LOAN PORTFOLIO | RANGE OF INTEREST RATES | WEIGHTED AVERAGE OF INTEREST RATES | RANGE OF REMAINING TERM (MONTHS) | WEIGHTED AVERAGE OF REMAINING TERM (MONTHS) |
|---|---|---|---|---|---|---|---|
| Acquisition | 9 | $13,161,928 | 11.6% | 12.0%-14.0% | 12.7% | 2.9-11.8 | 7.4 |
| Bridge | 16 | $37,836,145 | 34.2% | 8.0-18.0% | 12.6% | 0.1-11.8 | 6.2 |
| Construction | 11 | $37,765,803 | 34.1% | 11.0%-14.0% | 12.7% | 0.0-14.6 | 5.9 |
| Development | 1 | $21,829,501 | 19.7% | 20.0% | 20.0% | 6.5 | 6.5 |
| TOTAL | 37 | $110,593,377 | 100.0% | 8.0%-18.0% | 14.1% | 0.0-14.6 | 6.3 |

Our outstanding mortgage loans are secured by a wide range of real property or real property interests. As discussed herein, all of our loans are and will be secured by, among other things, first deeds of trust that encumber the underlying real property or real property interest. The following table provides a summary of the types of real property or real property interests that secure our mortgage loans at March 31, 2003.

| TYPE OF REAL PROPERTY OR REAL PROPERTY INTEREST | NUMBER OF LOANS | AGGREGATE BALANCE OUTSTANDING | % OF LOAN PORTFOLIO |
|---|---|---|---|
| Residential Subdivisions | 11 | $27,093,321 | 24.5% |
| Commercial Property | 15 | $46,448,255 | 42.0% |
| Unimproved Land | 11 | $37,051,801 | 33.5% |
| TOTAL | 37 | $110,593,377 | 100.0% |

As for the geographic concentration of the real property underlying our outstanding mortgage loans, we have mortgage loans secured by real property located in eleven states. The following table lists the geographic location of such real property and the related number, aggregate balance outstanding and portfolio percentage of our outstanding mortgage loans at March 31, 2003.

| STATE | NUMBER OF LOANS | AGGREGATE BALANCE OUTSTANDING | % OF LOAN PORTFOLIO |
|---|---|---|---|
| California | 17 | $56,389,641 | 51.0% |
| Nevada | 7 | $8,882,603 | 8.0% |
| Arizona | 3 | $7,540,905 | 6.8% |
| Florida | 2 | $3,026,096 | 2.7% |
| Texas | 2 | $3,578,372 | 3.2% |
| New York | 1 | $10,073,587 | 9.1% |
| Utah | 1 | $9,985,000 | 9.0% |
| Massachusetts | 1 | $8,917,400 | 8.1% |
| Connecticut | 1 | $1,700,000 | 1.5% |
| New Mexico | 1 | $402,673 | 0.4% |
| Tennessee | 1 | $97,100 | 0.1% |
| TOTAL | 37 | $110,593,377 | 100.0% |

–10–

As for the performance of our outstanding mortgage loans, there were no mortgage loans that were greater than 120 days past maturity at December 31, 2001. However, as of December 31, 2002, we had approximately $32.4 million of impaired or non-performing loans in our loan portfolio. Our manager has evaluated the collectability of these mortgage loans in light of the types and dollar amounts of loans in our loan portfolio, adverse situations that may effect the borrower's ability to repay, prevailing economic conditions and underlying collateral. As a result of such evaluation, our manager believes that the underlying values of assets securing the non-performing mortgage loans at December 31, 2002 are sufficient to realize the carrying value. Accordingly, we have not made an allowance for loan losses with respect to these mortgage loans.

Of the seven impaired or non-performing loans in our loan portfolio at December 31, 2003, we have started foreclosure proceedings with respect to one loan in the approximate amount of $10 million and will be required to obtain relief from the bankruptcy proceedings of a debtor involving a loan in the approximate amount of $11 million. The remaining five loans have been classified as non-performing and total approximately $11.4 million. With respect to previously impaired loans, during the year ended December 31, 2001, the developer for one of the properties for which we had made a mortgage loan effectively abandoned the project due to issues that are unrelated to the viability of the project. In this regard, M.P.D.D. Ranch, LLC, an entity managed by one of our affiliates, assumed the role of developer for the purposes of completing the project. During the year ended December 31, 2002, the project was completed and our loan was paid in full.

## LENDING STANDARDS AND POLICIES

### General Standards for Mortgage Loans

We make or purchase entire or fractional interests in acquisition, development, construction, bridge or interim loans secured by first deeds of trust on undeveloped land and residential and commercial developments located in the United States. These loans may also be secured by second deeds of trust on other property and personal guarantees from the principals of the relevant borrower. Since our loans will not be insured or guaranteed by any governmental agency or private mortgage insurance company, our manager selects our loans pursuant to certain investment guidelines relating to the real property that secures the loans. The following investment guidelines are subject to change in the sole discretion of our manager.

1.    **Priority of Deeds of Trust**. All of our loans are and will be secured by first deeds of trust that encumber the relevant real property or real property interest and may also be secured by second deeds of trust on other property. In some states, a mortgage is used to create a security interest in real property, rather than a deed of trust. For purposes of this Prospectus, the terms "deed of trust" and "mortgage" mean both a deed of trust and a mortgage.

A mortgage has two parties: a borrower called the "mortgagor" and a lender called the "mortgagee." The mortgagor gives the mortgagee a lien on the property as security for the loan or, in some states, the mortgagor conveys legal title of the property to the mortgagee until the loan is repaid but retains equitable title and the right of possession to the property so long as the loan is not in default. In contrast, a deed of trust has three parties: a borrower-grantor called the "trustor," a third party grantee called the "trustee," and a lender-creditor called the "beneficiary." The trustor grants the property, irrevocably until the debt is paid, "in trust, with power of sale" to the trustee to secure payment of the obligation. The trustee's authority is governed by law, the express provisions of the deed of trust and the directions of the beneficiary.

2.    **Geographic Area of Lending Activity**. We will make loans secured by real property located primarily in the United States. However, in the sole discretion of our manager, we may invest up to 10% of our loan portfolio in loans secured by real property located outside of the United States.

3.    **Loan-to-Value Ratios.**  Our loans will generally not exceed certain loan-to-value percentages, based on the value of the underlying property as determined by an independent written appraisal at the time the loan is made or by our manager based on other factors.

We will generally receive an appraisal for each property on which we will make a mortgage loan; provided, however, our manager may, in its sole discretion, elect to forego the use of an appraisal and base the valuation of such property on other factors. Generally, appraisers retained by us will be certified by the American Institute of Real Estate Appraisers. We may use appraisals from individuals who hold other credentials, such as those who meet the minimum qualifications prescribed by local laws or who commercial lenders in the state in which the property is situated generally use. Our manager will review each appraisal report. Any real property appraisal supporting a loan will be maintained in our manager's records for at least five years, and will be made available for inspection and duplication at the request of any investor.

| TYPE OF PROPERTY/LOAN | MAXIMUM LOAN TO VALUE RATIO |
|---|---|
| Residential Subdivisions (loans to land developers and residential builders) | 75% |
| Commercial Property (including but not limited to multi-unit residential property, office buildings, industrial and warehouse facilities, retail stores, shopping centers, motels, self-storage facilities, and senior housing) | 75% |
| Unimproved Land | 60% |

These loan-to-value ratios may be increased if, in the sole discretion of our manager, a particular loan is supported by credit adequate to justify a higher loan-to-value ratio or if mortgage insurance is obtained. It is important to note that our manager does not anticipate obtaining or requiring the borrowers to maintain mortgage insurance. In addition, the maximum loan-to-value ratio for unimproved land may be increased, in our manager's discretion, to 75% if the unimproved land is already entitled, a tentative map has been approved for the unimproved land or our manager believes that the borrower is likely to secure key entitlements.

Appraisals and loan-to-value ratios may be determined for construction loans upon the assumption that all of the improvements for which the loan is being sought are completed. Finally, our maximum loan-to-value ratios will not apply to purchase-money financing offered by us to sell any real estate owned, which is acquired through foreclosure, or to refinance an existing loan that is in default at the time of maturity. In such cases, our manager will be free to accept any reasonable financing terms that it deems to be in our best interests, in its sole discretion.

4.    **Terms of Loans.**  Although loans will generally have a term of between one and three years, we may make loans with a shorter maturity if our manager believes, in its sole discretion, that the loans represent a sound investment opportunity. Most loans will require payments of interest only during the loan term, and the borrower will have to make a substantial "balloon payment" at the end of the term. Many borrowers do not have funds sufficient to make this balloon payment and, consequently, must refinance or sell the underlying property. See "Risks Factors – Risks Related to USA Capital Diversified Trust Deed Fund."

5.    **Escrow Conditions.**  Loans will be funded through an escrow account handled by either a qualified title insurance or escrow company or other qualified company performing similar functions.

The escrow agent will be instructed not to disburse any of our funds out of the escrow for purposes of funding the loan until:

- Satisfactory title insurance coverage has been obtained for all loans, with the title insurance policy naming us as the insured and providing title insurance in an amount equal to the principal amount of the loan. Title insurance insures only the validity and priority of our deed of trust, and does not insure us against loss by reason of other causes, such as diminution in the value of the property, over-appraisals, borrower's defaults, etc.

- Satisfactory fire and casualty insurance has been obtained for all loans, which insurance shall name us as loss payee in an amount equal to the principal amount of our loan. Fire insurance will not be required where a loan is secured by unimproved land.

**6.    Absence of Mortgage Insurance.**  Our manager does not intend to arrange for mortgage insurance, which would afford some protection against loss if we foreclosed on a loan and there were insufficient equity in the property to repay all sums owed.

**7.    Fund as Payee.**  All loan documents (notes, deeds of trust, etc.) and insurance policies will name us as payee and beneficiary. Loans will not be written in the name of our manager or any other nominee, although loans that we purchase or loans that are contributed by investors in exchange for our membership units will originally be written in the name of the original lender or investor. Such loans will be assigned to us when they are purchased or contributed.

**8.    No Loans to Manager.**  No loans will be made by us to our manager or to any of its affiliates, except for any financing extended as part of a sale of real estate owned as a result of foreclosure. See "Management — Conflicts of Interest" and "Compensation and Related Party Transactions."

**9.    Purchase of Loans from Manager or Affiliates.**  Pre-existing loans, or fractional interests of such loans, that are secured by first deeds of trust may be purchased from our manager, its affiliates or other third parties; provided, however, that any such loan is not in default and otherwise satisfies our lending guidelines. The purchase price to us for any such loan will be equal to the then-outstanding principal balance of the loan, together with any accrued but unpaid interest, or a proportionate share of the loan balance with respect to the purchase of a fractional loan interest.

**10.    Loan Diversification.**  Since we have reached a minimum capitalization of $100 million, we will apply the following loan diversification restrictions on a going forward basis:

- No loan (or interest in a loan) will exceed $20 million;

- No one loan, or interest in a loan, will exceed 15% of all of our loans outstanding at the time of the loan; and

- No more than 25% of our loans outstanding at any time will be made to a single borrower, together with any affiliates of such borrower.

As of March 31, 2003, our loan portfolio consisted of 37 mortgage loans in the aggregate amount of $110,593,377. With the exception of one loan in the principal amount of $21,829,501, there are no mortgage loans in our loan portfolio that exceed 15% of the aggregate principal amount of our loan portfolio or that are made to a single borrower representing 25% of the aggregate principal amount of our loan portfolio.

**12.    Loan Participations.** We may purchase fractional interests in loans (sometimes referred to as loan participations), so long as the loan otherwise meets our lending criteria. With respect to new loans, we may fund such loans by ourselves or we may participate in the funding of such loans with:

- Another mortgage fund or investment vehicle that we or our affiliates have formed or manage; or

- Other investors that are clients of USA Commercial Mortgage Company or their affiliates.

If we participate in funding a new loan with clients of USA Commercial Mortgage Company or their affiliates, then we and such parties shall have fractional interests in such loan equal to the relative amounts that they have funded.

**13.    Reserve Fund.** Our manager may, in its sole discretion, establish a contingency reserve fund for the purpose of covering our unexpected cash needs. The amount of this reserve fund, if any, would be established by our manager. This reserve fund may be held in cash, bank accounts, certificates of deposit, money market accounts, short-term bankers acceptances, publicly traded bond funds or other liquid assets. The yield from investments of reserve funds may not be as high as the yield that would result if such reserve funds were invested in loans. While portions of the reserve fund may be used by our manager to fund investor redemptions, the principal purpose of the reserve fund will be for other unexpected cash flow needs, not for such redemptions, and our manager shall not be required to exhaust reserve funds to meet requested redemptions.

**14.    Leasehold Financing.** We may also make loans that are secured by first deeds of trust that encumber leasehold interests in undeveloped land and residential and commercial developments located in the United States. In leasehold loans, the borrower does not own the land but rather has the right to occupy and develop the land under a long-term ground lease with the owner of the land. The security for the loan would be the borrower's leasehold interest in the land (*i.e.*, the right to occupy and use the land under the terms of the ground lease), rather than a fee interest in the land. Loans secured by leasehold interests pose additional risks than loans secured by fee interests in land. See "Risk Factors — Risks Related to USA Capital Diversified Trust Deed Fund."

**Credit Evaluations; Guarantors**

Our manager may consider the income level and general creditworthiness of a borrower to determine a borrower's ability to repay our loan according to its terms. It is important to note that such considerations are subordinate to a determination that the appraised value of the property, which may be on an "as constructed" basis with respect to a construction loan, is sufficient to satisfy the loan-to-value ratios described above or such other loan-to-value ratios as our manager deems appropriate for any particular loan. Therefore, we may make loans to borrowers who are in default under their other obligations for the purposes of debt consolidation or who do not have sources of income that would be sufficient to qualify for loans from other lenders such as banks or savings and loan associations. In addition, some, but not all, of our loans will also be guaranteed by persons or entities other than the borrower. Our manager will exercise its business judgment in deciding which of our loans will also be guaranteed.

**Sale of Loans**

We will invest in mortgage loans for investment and do not expect to engage in real estate operations in the ordinary course of business (except as may be required if we foreclose on a property on which we have invested in a mortgage loan and take over ownership and management of the property). We do not presently intend to invest in mortgage loans primarily for the purpose of reselling such loans in

**EXHIBIT B**

USA Commercial Mortgage Company
USA Capital Diversified Trust Deed Fund
Timeline of Diverted Payments
Schedule Based on Preliminary Information that Cannot be Relied Upon

Prepared by FTI Consulting

10 Borrowers with Principal Not in Collection Account

| Date of Principal Payment from Borrower | Grand Total | Bay Pompano Beach | Beastar | Beau Rivage Homes | Cabernet | Copper Sage Commerce Center | Freeway 101 | Lake Helen Partners | Oak Shores II | Roam Development Group | Universal Hawaii | 10-90, Inc. | A/R due from USACM to Diversified |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/8/2003[1] | 11,425,000 | | | | | | | | | | | 11,425,000 | |
| 2/29/2004[2] | 306,395 | | | | | | | | | | | | 306,395 |
| 3/31/2004[2] | 8,890,629 | | | | | | | | | | | | 8,890,629 |
| 4/30/2004[2] | 3,903,201 | | | | | | | | | | | | 3,903,201 |
| 5/31/2004[2] | 1,586,019 | | | | | | | | | | | | 1,586,019 |
| 6/30/2004[2] | 60,140 | | | | | | | | | | | | 60,140 |
| 12/31/2004[2] | 4,178,747 | | | | | | | | | | | | 4,178,747 |
| 9/15/2005 | 22,208 | | | 22,208 | | | | | | | | | |
| 12/7/2005 | 209,970 | 209,970 | | | | | | | | | | | |
| 12/8/2005 | 220,664 | 220,664 | | | | | | | | | | | |
| 12/9/2005 | 134,500 | 134,500 | | | | | | | | | | | |
| 12/13/2005 | 723,459 | 723,459 | | | | | | | | | | | |
| 12/14/2005 | 620,963 | 620,963 | | | | | | | | | | | |
| 12/15/2005 | 217,382 | 217,382 | | | | | | | | | | | |
| 12/16/2005 | 585,676 | 585,676 | | | | | | | | | | | |
| 12/19/2005 | 646,051 | 646,051 | | | | | | | | | | | |
| 12/20/2005 | 232,153 | 232,153 | | | | | | | | | | | |
| 12/27/2005 | 633,190 | 633,190 | | | | | | | | | | | |
| 12/28/2005 | 839,947 | 839,947 | | | | | | | | | | | |
| 12/29/2005 | 164,042 | 164,042 | | | | | | | | | | | |
| 12/30/2005 | 138,603 | 138,603 | | | | | | | | | | | |
| 1/3/2006 | 352,702 | 352,702 | | | | | | | | | | | |
| 1/5/2006 | 314,133 | 314,133 | | | | | | | | | | | |
| 1/10/2006 | 179,634 | 179,634 | | | | | | | | | | | |
| 1/12/2006 | 176,351 | 176,351 | | | | | | | | | | | |
| 1/13/2006 | 5,940,827 | | | | 900,000 | | | | | | 5,040,827 | | |
| 1/18/2006 | 305,236 | 305,236 | | | | | | | | | | | |
| 1/19/2006 | 615,219 | 615,219 | | | | | | | | | | | |
| 1/23/2006 | 88,138 | 88,138 | | | | | | | | | | | |
| 1/24/2006 | 3,073,694 | | 3,073,694 | | | | | | | | | | |
| 1/30/2006 | 415,592 | | | | | 415,592 | | | | | | | |
| 2/13/2006 | 110,380 | | | | | | | | | 110,380 | | | |
| 2/15/2006 | 73,374 | | | | | | | | | 73,374 | | | |
| 2/17/2006 | 7,646 | | | | | | | 7,646 | | | | | |
| 2/21/2006 | 3,750,000 | | | | | | 3,750,000 | | | | | | |
| 2/24/2006 | 74,736 | | | | | | | | | 74,736 | | | |
| 2/27/2006 | 3,073,116 | | | | | | | | 3,000,000 | 73,116 | | | |
| 2/28/2006 | 90,966 | | | | | | | | | 90,966 | | | |
| 3/17/2006 | 2,158 | | | | | 2,158 | | | | | | | |
| Total $ | 54,382,840 | 7,398,013 | 3,073,694 | 22,208 | 900,000 | 417,750 | 3,750,000 | 7,646 | 3,000,000 | 422,571 | 5,040,827 | 11,425,000 | 18,925,131 |

Notes:

General Note: For purposes of this analysis, the most recent borrower principal payments are assumed to be in the collection account. Working back chronologically, FTI was able to create the above timeline.

1) Represents funding of 10-90, Inc. loan by Diversified Fund that did not actually go to the borrower but was instead diverted into USACM's Collection Account.

2) Represents monthly total of various borrower principal payments not remitted to lender.

**EXHIBIT C**

# USA Capital

## USA Capital Diversified Trust Deed Fund
### Update – December 31, 2005

Through December 31, 2005, approximately $155 million has been invested in the USA Capital Diversified Trust Deed Fund. There are currently 21 loans in the Fund. Following are currently in the Fund:

| *Description of Loan:* | *Description of Collateral:* |
|---|---|
| Huntsville | First Deed of Trust on approximately 38 acres of land, for the development of a retail center on Interstate Highway 45 in Huntsville, Texas. |
| Mountain House | First deed of trust on approximately 40 acres of undeveloped land planned for residential development located near the corner of Highway 205 and Mountain House Road near Tracy, California in San Joaquin County. |
| The Garden Timeshare | First deed of trust on 3.5 acres of land to be developed into 164 timeshare units in Orlando, Florida. |
| Interstate Commerce Center | First deed of trust on approximately 4 acres of land for the construction of 3 industrial buildings with 55,200 square feet of commercial space in Albuquerque, New Mexico. |
| Oak Shores II | First deed of trust on approximately 400 acres mapped for 343 lots with significant amount of lake frontage and lake views of Lake Nacimiento in San Luis Obispo County, California. |
| Cloudbreak | First deed of trust on 150-unit apartment complex, with the first floor housing a 118-bed back-to-work program that is operated by a non-profit organization located in Las Vegas, Nevada. |
| Hatter's Point | First deed of trust on 5-acre site with 9 old factory buildings being renovated into 80 "age-restricted" condominiums located in Amesbury, Massachusetts – 45 miles north of Boston. |
| Epic Resorts – Marquis Villas | First leasehold deed of trust on 63 condominium units in Palm Springs, California to be sold as timeshares. |
| Colt Gateway | First deed of trust on the historic Colt Arms factory in Hartford, Connecticut. The property consists of approximately 800,000 square feet of space on approximately 17 acres. |
| Colt Gateway- CREC building | First deed of trust on a 55,000 square foot office building in the historic Colt Arms factory in Hartford, Connecticut. The property is completed and is 100% leased. |
| Interstate Commerce Center II | First deed of trust on approximately 5.7 net acres of land for a four building office/warehouse development totaling 66,000 sq. ft of building in Albuquerque, New Mexico. |

## USA Capital
**(702) 734-2400**
**4484 S. Pecos**
**Las Vegas, Nevada  89121**

# USA Capital

| | |
|---|---|
| Bay Pompano Beach | First Mortgage on approximately 13.5 acres with a 276 unit apartment complex, commonly knows as Windward Lakes Apartments in Pompano Beach, Florida. |
| Ten-Ninety | First deed of trust on approximately 200 acres to be developed into approximately 310 single family lots located in Fontana, California |
| By Synergy | First deed of trust on 58 acres of land to be developed into 106 single-family home sites located in Sedona, Arizona. |
| Ashby Financial | First deed of trust on approximately 77 acres for development into single- family residential lots in Riverside County, California. |
| Fiesta McNaughton | Secured by approximately 800 acres for development of a master planned community located in Coachella, California. |
| Lake Helen Partners | First mortgage on 6 pieces of property in Lake Helen, Florida. The combined acreage is approximately 73 acres, plus an additional 36 residential lots. In addition, First mortgage on 5,500 square feet of commercial space in St. Augustine, Florida |
| Hampton Inn- Salt Lake City Airport Hotel | First deed of trust on 103- room luxury suite hotel and convention center located near the airport in Salt Lake City, Utah. |
| Franklin-Stratford | First deed of trust on approximately 16 acres of land zoned for industrial development located at in the Honor Park Subdivision in Meridian, Idaho, a suburb of Boise, Idaho. |
| HFA-Clear Lake | First Deed of Trust on approximately 11 acres of land including 180-unit lake front apartment buildings in West Palm Beach, Florida. |
| 10-90 | Secured by 3 master-planned communities in Southern California totaling approximately 6,500 lots. |