LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

E-filed on July 27, 2006

3993 Howard Hughes Parkway, 6th Floor
Las Vegas, Nevada 89169-0961
Facsimile No.: (702) 949-8321
Telephone: (702) 949-8320

40 North Central Avenue, Suite 1900
Phoenix, Arizona 85004-4429
Facsimile (602) 734-3824
Telephone (602) 262-5311

Rob Charles, Nevada State Bar No. 6593
Susan M. Freeman, Arizona State Bar No. 004199

Attorneys for Official Committee of Unsecured
Creditors of USA Commercial Mortgage Company

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>      Debtor. | BK-S-06-10725-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>      Debtor. | BK-S-06-10726-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>      Debtor. | BK-S-06-10727-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>      Debtor. | BK-S-06-10728-LBR<br>Chapter 11 |
| In re:<br>USA SECURITIES, LLC,<br>      Debtor. | BK-S-06-10729-LBR<br>Chapter 11 |
| Affects<br>☒ All Debtors<br>☐ USA Commercial Mortgage Co.<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed<br>☐ USA First Trust Deed Fund, LLC | Date:     August 4, 2006<br>Time:     9:30 a.m. |

**Response to Motion To Distribute Funds And To
Grant Ordinary-Course Releases And Distribute Proceeds**

The Official Unsecured Creditors' Committee for USA Commercial Mortgage

Company (the "UC Committee") appointed in the above-captioned bankruptcy cases (the

"Chapter 11 Cases") responds to Debtors' Motion To Distribute Funds And To Grant

Ordinary Course Releases And Distribute Proceeds  (the "Distribution Motion") [DE 847].

The UC Committee agrees a significant  distribution is appropriate and differs with

Debtors in part on sums that should be held back at this time from the interim distribution.

203874.1



**Background**

1.      The UC Committee represents the interests of those individuals who assert general unsecured claims against USA Commercial Mortgage Company ("USA Commercial").

2.      The Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC (the "Diversified Committee") represents the interests of those persons who invested in USA Capital Diversified Trust Deed Fund, LLC ("USA Diversified") (the "Diversified Investors").

3.      The Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC (the "FTDF Committee") represents the interests of those persons who invested in USA Capital First Trust Deed Fund, LLC ("USA First") (the "First Investors")

4.      The fourth principal constituency in these cases is the Official Committee of Holders of Executory Contract Rights through USA Commercial Mortgage Company (the "Direct Lender Committee"), which represents perhaps 3,600 parties-in-interest (the "Direct Lenders") that have individually lent monies directly to various borrowers, for which USA Commercial is the loan servicer.

5.      USA First and USA Diversified were each Direct Lenders (together with Direct Lenders, the "Lenders").

6.      **Business of USA Commercial.**  USA Commercial agreed to service Loans for Lenders under similar forms of Loan Servicing Agreements ("LSA").  At the risk of over-generalizing, USA Commercial underwrote and through its affiliate USA Securities, LLC offered loan opportunities to investors.  USA Commercial located the Lenders, pooled their funds, and documented the Loans as Direct Loans.  Through the LSA, USA Commercial agreed to collect amounts due on Loans for Lenders, deduct contractual servicing and other fees, and remit payment to the Lenders with an accounting.  Loans were to be documented with at least a promissory note made by the Borrower(s), secured by at least a deed of trust properly recorded as a lien upon the applicable property.  The

203874.1



1 promissory notes were made payable to the order of several Direct Lenders, including at

2 times the Funds, with each Lender's interest stated as a percentage.

3       7.      USA Commercial or its affiliates further facilitated requests for transfer of

4 Loan interests.  Investors interested in selling interests in Loans were matched with

5 investors interested in buying interests in Loans, and transfers accomplished through the

6 vehicle of the Investor Account previously described to the Court, and now the subject of

7 an interpleader action, No. 06-01167-lbr, filed to sort out completing claims to

8 undistributed funds.

9       8.      Ultimately, as events now show, Lenders, including the Funds, lacked any

10 control over collection of Loans, and were passive investors receiving reports and checks.

11 USA Commercial commingled all the money it received from Lenders and from

12 Borrowers, as well as from other sources, and chose how much of that money it would use

13 to repay Lenders.

14       9.      **Servicing and Other Fees.**  USA Commercial was entitled to compensation

15 from the Lenders.  For example, the LSA with Patrick F. Fenlon and Angela B. Fenlon

16 dated November 9, 2005,[1] attached as Exhibit E to the Declaration of Scott Canepa filed

17 on May 18, 2006 [DE 293] provides:

18       Compensation to USA For Loan Servicing.  Lender authorizes USA
         to retain monthly, as compensation for services performed hereunder, (a)
19       one-twelfth (1/12th) of its annual servicing fee, which shall not exceed three
         percent (3%) per annum of the maximum principal amount of each of the
20       Loans, (b) any late charges collected from the Borrower pursuant to the
         terms of the Note, and (c) [] default interest collected from the Borrower
21       pursuant to the terms of the Note.  Notwithstanding the foregoing, it is
         agreed and acknowledged that USA derives the bulk of its revenues from
22       charging loan fees ("points") to the Borrower.  Certain Borrowers, however,
         may prefer to pay a higher rate of interest in exchange for a reduction in loan
23       fees payable in advance to USA, the higher interest rate comprising a
         deferred loan fee.  USA will notify Lender when such a case arises, and
24       advise Lender of what portion of the interest is payable to USA as a deferred
         loan fee.

25

26

27
───────────────
[1] The form indicates it was revised 3/04.  It has a typed 2004 date and 2005 was
28 interlineated.  It may be the form used by USA Capital since August 2004.

3                                        203874.1

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1       10.     With respect to legal proceedings, LSA ¶ 4 provides that USA may retain

2   attorneys on a Lender's behalf when necessary in USA's business judgment. the Lender

3   will pay in advance or reimburse USA for the "pro rata share of out-of-pocket expenses

4   incurred, including attorney's fees, trustee's fees and foreclosure costs."  Such

5   reimbursement may be collected from "monies collected with respect to such Loan, before

6   any payments are made to Lender."

7   **USA Commercial**

8       11.    **Overview of Financial Condition.**  According to the Schedules of Assets

9   and Liabilities filed by USA Commercial as Amended [DE 784, 682], USA Commercial's

10  balance sheet in bankruptcy looks like this:

11      a.    **Personal Property.**  USA Commercial has about $122.5 million in

12  scheduled assets, of which the largest components are $80 million in accounts receivable,

13  the largest of which is $58.4 million owed by USA Investment Partners LLC ("IP"); and

14  $39.5[2] million of interest improperly paid to Direct Lenders and the Funds.

15      b.    **Claims.**  USA Commercial has $61.5 million in scheduled claims, of

16  which the largest components are $46.8 million in unremitted principal,  including $27

17  million owed to Direct Lenders, $19 million owed to USA Diversified, and about

18  $400,000 owed to USA First; and $14.5 million in other unsecured claims.  It is important

19  for the Court and interested parties to recognize that payment to unsecured creditors

20  benefits ordinary creditors and the victims of diverted principal; and conversely, that direct

21  lenders are not the only victims of prior management's schemes.

22      c.    **Unremitted Principal.**  Despite the euphemism, Debtor's records

23  now indicate that prior to bankruptcy, USA Commercial's prior management took about

24  $46.8 million of principal collected, including abut $19 million of principal on Diversified

25

26  ---

27  [2] Loan Status Report of July 25, 2006.  In the amended Schedule F, USA Commercial indicated this figure was $41.7 million.  The change may be due in part to recharacterization of prepaid interest to principal on loans where all principal was

28  diverted.

4

203874.1



1  Loans, failed to pay it to the Lenders and Funds on the applicable Loans, and instead used

2  the principal funds in other ways.

3         12.    **Improperly Paid Interest.**  One of the ways that USA Commercial misused

4  funds from creditors, including principal paid by Borrowers but not remitted to those

5  Borrowers' Lenders, was to pay interest to Direct Lenders and Funds at a time when the

6  Borrowers on the applicable loans had not done so.  As indicated, Debtor's records now

7  indicate the sum of such payments is about $39.5 million.

8         13.    The unremitted principal and improperly paid interest are only illustrations

9  of the control over funds that USA Commercial exercised in fact on the numerous Loans it

10  arranged for the Lenders it solicited, despite Lender-Borrower Loan documentation and

11  LSA language limiting USA Commercial's role to a servicing role only.

12  **Administration of the Estates**

13         14.    **Mounting Professional Fees.**  According to Debtors' most recent forecast

14  [DE 906], USA Commercial's operation is approximately break even before professional

15  fees, with USA First and USA Diversified each charged significant management fees.  In

16  addition, in July 2006, according to the most recent forecast, the five estates will be

17  incurring enormous professional fees:

| Debtor | Professional | Weekly Amount |
|---|---|---|
| Five Debtors | Mesirow | $140,000 |
|  | Ray Quinney | 75,000 |
|  | Schwartzer | 25,000 |
|  | PR Firm | 800 |
|  | Other Legal | 0 |
| USA Commercial | Lewis and Roca | 25,000 |
|  | Sierra | 25,000 |
| USA First | Stutman/Shea & Carlyon | 60,000 |
|  | Alvarez & Marsal | 30,000 |
| USA Diversified | Orrick/Beckley | 60,000 |
|  | FTI | 50,000 |
| Direct Lenders | Gordon & Silver | 60,000 |
|  |  | $550,000 |

26         15.    By the end of July, 2006, the total of such professional fees is forecasted to

27  be about $7,257,700.  The total is forecast to increase about $500,000 per week from July

28  into October, and then about $462,000 per week in October.  Included within this accrual

203874.1

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1      is a forecast of $60,000 per week for the Direct Lenders' Committee counsel, with a total

2      of $540,000 for the period through July 2006.

3          16.    **Appraisals**.  With this Court's approval [DE 747], Debtors were authorized

4      to employ Hilco Real Estate LLC/Hilco Real Estate Appraisal, LLC ("Hilco") as Debtor's

5      Real Estate Appraiser at an aggregate cost of $300,000 for the initial appraisal work.

6      Debtors have indicated that the Hilco appraisal costs can be allocated loan by loan.

7          17.    **Post-Petition Collections**.  Tom Allison of Mesirow has achieved

8      significant success as Debtors' chief restructuring officer in collecting loans.  Debtor

9      explains that starting with $9 million in the Collection Account on the petition date, after

10     depositing collections net of a 1% service fee, "the balance in the Collection Account as of

11     June 30, 2006 was approximately $93 million, including approximately $14 million in

12     interest collected post-petition on nonperforming loans and approximately $60 million

13     collected post-petition in loan principal repayments."[3]

14         18.    **Collection of Interest.**  It is implicit in the scheme of Debtors' prior

15     management that funds used to pay interest on non-performing Loans to Lenders came

16     from other sources.  Further, performing Loans should have no material discrepancy

17     between interest collected from Borrowers and paid to Lenders.  As Debtors collected

18     sums due from Borrowers on nonperforming Loans after the petition date, a portion of the

19     interest the Debtors received was necessarily applicable to periods where USA

20     Commercial had prepaid the Lenders.

21         19.    Debtors' records indicate that Debtors collected about $14 million of past

22     due interest through June 30, 2006, and that about $13 million of this amount is applicable

23     to periods where USA Commercial had prepaid the Lenders.

24         20.    Debtors' post-petition collection of about $60 million in principal includes a

25     number of Loans that were paid in full.  As to those paid-in-full Loans, no further

26     payments from the applicable Borrowers will be forthcoming.

27

28     [3] Distribution Motion ¶ 6.

203874.1



1   21.   **Debtors' Accounting – Loan #.**  Debtors' accounting system assigns a

2   unique Loan # to each Loan to a particular Borrower.

3   22.   **Vesting Names.**  Debtors' accounting system assigned a unique Account #

4   to each person or entity that executed a LSA.  These are also called Vesting Names.

5   Debtors have explained that they believe that each Lender, assigned an Account # by

6   Vesting Name, signed only one LSA.

7   23.   **Client #.**  Debtors' accounting system grouped several Account # or Vesting

8   Names into a Client #.  This grouping related to the person or entity that received

9   statements and payments or was a representatives for the several Vesting Names.

10  Generally, the Client # reflected Vesting Names for various capacities in which a person

11  invested, *e.g.* the person individually, the person's partnership, the person's family trust,

12  and the person's IRA or 401(k).

13  24.   **Debtors' Accounting – Investor Confidentiality.**  Debtors provided the

14  Committees with data containing fields for Loan #, Vesting Names, and Client #.  In order

15  to protect Lender privacy, Debtors coded the Vesting Names and Client #s.  Thus, the

16  Committees can not identify individual Lenders or accounts from the data, and also can

17  not examine whether the vesting names in an Account # are unique or legally identical.

18  25.   **Distribution Motion.**  By the Distribution Motion, Debtors fundamentally

19  seek two things – (a) authority to distribute funds now and on an ongoing basis from the

20  Collection Account to Lenders after netting prepaid interest received by each Lender

21  against funds available for distribution to each Lender, and (b) authority to grant releases

22  to Borrowers according to the terms of the applicable loan documents.

23  26.   **Reservation of Rights.**  Debtors explain that they view the distribution as

24  interim, even though they seek authority to pay the full amount of principal where it has

25  been collected on various loans, and even though Debtors do not propose to holdback for

26  any surcharges:

27          Debtors seek to make the distributions requested herein without
            waiving any rights or arguments respecting the calculation of the amounts
28          distributed, the right to collect servicing fees and other fees provided under

203874.1



1
2
3
4

the Servicing Agreements and other applicable agreements, the right to net all amounts that may be owed to and from a Direct Lender, and all other rights and arguments. Specifically, without limiting the foregoing, Debtors reserve any rights they may have to recover from any Direct Lender or Fund Member to the extent the Direct Lender or Fund Member receives a distribution pursuant to this motion that is ultimately determined to be greater than such Direct Lender or Fund Member had a right to receive.

5
6
7
8
9
10
11
12
13
14

27.    **Alternatives For Netting Prepaid Interest – Loan by Loan.**  There are at least three alternatives for netting prepaid interest received by Lenders from funds collected by Debtors.  In the simplest example, USA Commercial may have paid the Lenders on Loan A interest due in January 2006 at the time Borrower A's payment was due, but before Borrower A made the payment (necessarily paid with money from another Lender or due to another Lender or from USA Commercial's own funds it was not using to keep its own vendors and other unsecured creditors current).  If USA Commercial has now collected the interest due on Loan A for January 2006, it would keep the funds, so that the Lenders would not be double paid; and it would remit future payments on the Loan A, net of servicing fees, to the Lenders.

15
16
17
18
19
20

28.    Consider four investors (or Account #) managed under one Client # who invested in 22 Loans, described on Exhibit A attached.  As to some Loans, no funds or not enough funds were collected to recover the prepaid interest, and as to other Loans, more funds were collected.  In this example, Lender Vesting Account # 1001452 would receive a distribution of $289,263.89, and all of the Lenders would receive a distribution of $528,607.10.

21
22
23

29.    **Alternative – Vesting Name or Account #**.  As an alternative, funds could be netted Lender (vesting name) by Lender (vesting name), after netting Loan by Loan. This is what the Debtors advocate in the Motion.

24
25
26
27
28

30.    In the attached example, Lender 1001452 who received a total of $550,576.47 in prepaid interest on eight Loans would have the prepaid interest netted against $200,000 collected for that Lender on Loan 111207.  All of the four Lenders in this

203874.1



1  example would receive a total distribution of $239,343.20, thus recovering about

2  $289,263.89 of prepaid interest.

3       31.    **Alternative – Legally Mutual Entities**.  A third alternative would expand

4  the scope of netting from Vesting Name or Account ID to other mutual entities within a

5  Client #.  As explained below, for example, obligations of an individual owner may be

6  offset against the obligations of that individual in a joint and several account, the

7  obligations of a spouse may be offset against an obligation of the spouse's community

8  property account, or the obligations of an individual may be offset against the obligations

9  of that individual's revocable *inter vivos* trust.  Debtors' records do not contain enough

10 information to identify, much less analyze, such relationships.  However, the Client ID

11 grouping includes such categories, although it may be over-inclusive in identifying such

12 relationships and others.  So, the obligations of all Lenders in the same Client ID might be

13 netted on a temporary basis for distribution purposes at this time.

14       32.    In the example, netting on a Client ID basis for Client #1003300 would

15 result in no distribution to the Lender Vesting #s, thus holding back an additional

16 $239,343.20 in prepaid interest for recovery by the estate in excess of the netting by

17 Vesting Name alternative.

18       33.    **Overall Impact of the Alternatives**.  Debtors' data indicates that of the $93

19 million in the Collection Account, the following amounts would be distributed under each

20 Netting alternative, and so the following sums would be withheld:

| Alternative | Distribution | Withholding |
|---|---|---|
| By Client # (Grouping) | $66,834,445 | $ 26,200,000 |
| By Account # (Vesting Name) | $68,157,783 | $ 24,800,000 |
| By Loan # (Loan by Loan) | $80,473,001 | $ 12,500,000 |

24       34.    Accordingly, netting on the most conservative (Loan by Loan) basis results

25 in about $12.3 million more distributed to Lenders than does netting on a Vesting Name

26 (Lender) basis.  It is not possible to quantify the risk that netting by Vesting Name omits

27 legally valid offsets, but if Client # is a surrogate for a broader offset, the difference is

28 only $1.3 million in this proposed distribution.

203874.1



## Discussion

In summary, the UC Committee advocates as follows:

• Distributions should not prejudice Debtors' ability to recover allocable costs – such as appraisal costs or fees directly incurred collecting a loan, or to surcharge Lenders for the expenses of administration, particularly expenses of the Direct Lenders Committee. Debtors have made no provision to recover those expenses, and a holdback should be imposed now, at least where Debtors propose to distribute principal and there will be no additional distributions on such a Loan to surcharge later.  It can be considered a holdback for a court-imposed supplemental percentage service fee.

• Debtors should reserve sums from distribution to pay servicing fees at 3% where applicable.

• As to the netting method, the Committee agrees that netting should be at least on a Vesting Name basis, that is not simply Loan by Loan.  Further, funds should be withheld on a netting by Client # basis for this interim distribution, so that the parties can investigate the legal issues and determine whether there are sound legal grounds for broader offsets.  The UC Committee recognizes that the difference between netting by Vesting Name and by Client # is about $1.3 million in this case.  The amount is significant, but still comparatively small for this interim distribution.  If the Court decides to allow distribution by Vesting Name for this interim distribution, it should not be precedential for future distributions.

• Further, in light of the possibility that the Debtors will be substantively consolidated under a reorganization plan and the Lenders will be reclassified as equity investors or creditors, an additional portion of the distributions of principal and interest should be held back from distribution.  That will help to assure that additional money will not need to be spent later trying to recover the funds back to enable a pro rata distribution to all unsecured creditors.

203874.1

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1

2

3

• Given the complexity of the foregoing issues, if the Court allows Debtors to make distributions, the Court should authorize only one interim distribution now, and consider further distributions at a later hearing with more data.

4

5

**I.    Debtors Have Made No Provision To Recover Expenses of Administration, Including Appraisal Costs**

6

7

8

9

10

Debtors have incurred at least $300,000 in appraisal costs through employment of Hilco as authorized by this Court.  This was a flat fee allocable to all of the loans, with additional amounts charged for upgraded appraisals for certain properties.  Debtors have not made any effort to recover the Hilco appraisal costs from the proceeds they propose to distribute.  Debtors have the authority to do so and should exercise it.

11

12

13

More significantly, Debtors have already accrued over $7 million in professional fees in these cases, including $480,000 in the aggregate ($60,000 per week) for counsel for the Direct Lenders Committee.  Debtors have not made any proposal with respect to recovering expenses of administration from Lenders.

14

15

16

17

18

19

20

21

22

23

Debtors report that $60 million in principal collections is included in the sums they propose to distribute.  On loans where the current proposed distribution is the final payment on the Loan, failure to recover the cost of the Hilco appraisal or legal fees and other amounts that could have been surcharged means that someone other than the fully paid Lenders will bear that cost.  That could be the unsecured creditors, or it could be the Lenders whose loans remain outstanding after the interim distribution, imposing a disproportionate share of the costs on those other Lenders.  The Court should withhold money to enable the possibility of what is effectively a Court-imposed supplemental service fee to be imposed later, after notice and a hearing, to cover these costs.

24

**II.    Debtors Should Withhold Up To An Additional 2% Management Fee on 2005 and 2006 Loans Pending Further Order Of This Court**

25

26

27

Debtors explain that more recent Loan Servicing Agreements, since some time in 2005 and thereafter, authorize Debtors to charge a loan servicing fee of "up to 3%."  As indicated above and on the form, it may have been used since August 2004.  Debtors ask

28

11

203874.1



the Court to let them charge only 1% across the board on this distribution for convenience purposes.

The difference may be significant.  A quick review of the June 30, 2006 Loan Summary indicates that over $500,000,000 of loans were originated in 2005 and 2006. Even if only half, $250,000,000 were subject to a 3% servicing fee instead of a 1% fee, this would be another $5,000,000 in servicing fee income for USA Commercial per year.

Debtors say that their concession is without prejudice to further proceedings.  Yet as to loans where the current distribution is a full payoff, no additional sums would be payable to the Lenders, and Debtors would have no practical means to recover the additional service fee, if it is properly payable.  Conversely, holding the difference as to those Lenders whose agreements provide for the up to 3% fee pending resolution of this issue preserves both the Committee's and the parties' respective rights as to the issue.

III.    **The Diversified and UC Committees Believe That Debtors' View of Netting Is Too Narrow**

A.    **Loan By Loan Netting Is A Given**

When a Lender received a payment from USA Commercial for a particular month's interest, the Lender no longer had a claim to that payment.  Now, when USA Commercial has finally collected that payment from the Lender's Borrower, the sum is not properly payable to the Lender.[4]  This is, in essence, Loan by Loan netting.  Based upon Debtor's figures through June 30, 2006, this results in $12,500,000 being withheld from the Lenders, a substantial portion of which is prepaid interest for the USA Commercial estate.

B.    **Vesting Name Netting Is Required, at the Least**

Netting improperly-paid interest from collections by Vesting Name allows each Lender to in effect repay applicable prepaid interest without coming out of pocket.  The source of such netting is the relationship between USA Commercial and the applicable Lender under their respective LSA.  USA Commercial has an obligation to pay the Lender

---

[4] As Mr. LePome explains with respect to payments collected from Borrowers, "The Debtor has certain rights of course.  It can and has continued to reimburse itself for the funds that it advanced to the borrowers."  Partial Opposition … [DE 905] at 5.

203874.1



1  sums paid by applicable Borrowers, and the Lender has received prepayment of interest on

2  nonperforming Loans from funds improperly obtained by USA Commercial.  Vesting

3  Names netting results in $24,800,000 being withheld from the Lenders.

4      Certain Lenders will argue that they owe nothing to USA Commercial, as USA

5  Commercial simply paid the debts of Borrowers to the Lenders, and so USA Commercial

6  has no basis to withhold across the Loans.[5]  The simplest problem with this position is that

7  it demonstrates that the prepaid Lenders received fraudulent transfers from USA

8  Commercial.

9      Under 11 U.S.C. § 548, and applicable state fraudulent transfer law,

10  •    A transfer made by a debtor is avoidable if

11  •    Made within one year of the petition date,

12  •    While the debtor was insolvent, unless

13  •    The debtor received reasonably equivalent value in exchange for the transfer.

14      A transfer on account of the obligation of another, where the debtor receives no

15  value, is a classic constructive fraudulent transfer.[6]

16  **C.    Holding Additional Sums Using Client # Netting Protects The**
        **Ability of USA Commercial To Recover Prepaid Interest Via**
17      **Offset**

18      If one investor has two Vesting Names (Account #s) under separate Client #s, then

19  neither Loan by Loan nor Vesting Name netting will recover interest prepaid to the Lender

20  via offset.  Nor is complete identity of account owners required for offset.  For example,

21  obligations owed by an individual may be offset against obligations owed to joint and

22

23

---

24  [5] Mr. LePome explains, "The Direct Lenders owe the Debtors nothing."  Partial
    Opposition … [DE 905] at 6.
25  [6] *In re Rodriguez*, 895 F.2d 725 (11th Cir. 1990) (parent corporation's payment of its
    insolvent subsidiary's debt); *In re Fair Oaks, Ltd.*, 168 B.R. 397, 400, 402 (9th Cir. BAP
26  1994) (debtor did not receive fair value when its property was liened for affiliated insider's
    debt, so secured party was not a bona fide encumbrancer for value); *In re Butcher*, 58 B.R.
27  128 (Bankr. E.D. Tenn. 1986) (debtor's payment of debt of entity owned by his son's trust
    to satisfy lien on property owned by third party); *see also In re Video Depot, Ltd.*, 127
28  F.3d 195 (9th Cir. 1997) (in action to avoid subsidiary corporation's payment of its
    owner's debt, discussion of initial transferee).

203874.1



1    several owners.[7]  The obligations owed by a spouse may be offset against obligations to

2    the spouse's community.[8]  The obligations owed by an individual may be offset against

3    obligations to the individual's revocable *inter vivos* trust.[9]  In some cases an obligation

4    owed by a partnership can be offset against obligations to one of the partners.[10]  Using

5    Client # netting in order to hold additional sums temporarily while Debtors refine their

6    data results in $26,200,000, an additional $1,300,000 over Vesting Names netting, being

7    withheld from the Lenders.

8         As indicated above, certain Lenders argue that no money they previously received

9    can be recovered by USA Commercial, because they were owed the money and received it

10   in good faith in the ordinary course.  There are sound authorities for the Court to authorize

11   such recoveries, by offset and by direct action, and they certainly justify withholding funds

12   until further briefing and argument when the issue is expressly before the Court and ripe

13   for decision.  These authorities include:

14        1.      As discussed above, the payments received by Lenders may be

15   avoidable constructive fraudulent transfers.[11]  The Lenders were the initial transferees of

16   USA Commercial's payments, and may not benefit from the good faith defense of 11

17   U.S.C. § 550(b).

18        2.      The payments may be avoidable as intentionally fraudulent.  USA

19   Commercial may have intentionally paid the Lenders, knowing they were not entitled to

20   interest payments because their Borrowers had not performed on the applicable Loans.

21   Such payments were apparently intended to hinder or delay various and probably

22   numerous Lenders and other creditors, making them avoidable under 11 U.S.C.

23   § 548(a)(1)(A).

24   _____

25   [7] *See Couture v. Pawtuckey Credit Union*, 765 A.2d 831 (R.I. 2001); *Masotti v. Bristol Sav. Bank*, 43 Conn. Supp. 360, 653 A.2d 836 (Conn. Super. 1994).
[8] *Crisler v. Citizens Fidelity Bank and Trust Co.*, 723 S.W.2d 857 (Ky. App. 1986) (where
26   husband and wife are joint liable on mortgage, bank had right to setoff default against funds in wife's savings account).
27   [9] *Soto v. First Gibraltar Bank, FSB San Antonio*, 868 S.W.2d 400 (Tex. App. 1993).
[10] *Rochelle v. United States*, 521 F.2d 844 (5th Cir. 1975).
28   [11] 11 U.S.C. § 548(a)(1)(B); § 544.

203874.1

LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

1    3.    To the extent USA Commercial obtained funds from Lenders to pay

2    other Lenders using commingled money it fully controlled (despite contractual

3    obligations), it is possible that the transactions may be characterized as a Ponzi scheme,

4    and the Lenders recharacterized as unsecured creditors.  Ponzi scheme payments to some

5    investors are avoidable as preferences, and such payments are also avoidable as fraudulent

6    transfers to the extent they represent interest or profit in excess of the principal amounts

7    invested.[12]

8    4.    The payments may also be recoverable on restitution grounds.  Mr.

9    LePome cites cases for the proposition that restitution claims may be defeated by a

10    creditor who takes money, even money paid by mistake or fraudulently misappropriated

11    from victims, in good faith to satisfy a debt, deeming the recipient a "bona fide creditor."[13]

12    The "bona fide creditor" defense is not accepted by all courts, and has not been decided in

13    this Circuit or District.  Other courts have refused to allow a "bona fide creditor" to prevail

14    over an innocent party where the creditor could not show it had changed its position in

15    reliance on the payment.[14]

16    5.    Bankruptcy courts have repeatedly allowed bankruptcy estates to

17    recover payments wrongfully made to innocent investors in Ponzi scheme cases, for

18    _____

19    [12] *E.g. Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995) (Ponzi scheme transferees must return profit in excess of investment to extent constructive fraud, and all of transferred funds to extent of actual fraud); *In re United Energy Corp.*, 944 F.2d 589, 595

20    n. 6, 597 (9th Cir. 1991); *First Federal of Michigan v. Barrow*, 878 F.2d 912, 917-18 (6th Cir. 1989) (funds of mortgage servicing company like USA Commercial, in commingled

21    account, held to be property of servicing company's bankruptcy estate and payments to investors and first mortgage holders held to be avoidable preferences).

22    [13] Partial Opposition … [DE 905] at 4-5.
    [14] *E.g. Wilson v. Newman*, 463 Mich. 435, 617 N.W. 2d 318 (Mich. 2000) (Michigan

23    Supreme Court held that payments made under mistake of fact may be recovered from a third party creditor where the creditor has not changed its position in reliance on the

24    payment); *Mfrs. Hanover Trust Co. v. Chem. Bank*, 160 A.D.2d 113, 559 N.Y.S.2d 704 (N.Y. App. Div. 1990); *St. Paul Fed. Sav. & Loan Ass'n v. Avant*, 482 N.E.2d 1050, 1057

25    (Ill. App. 1985) (granting the plaintiff restitution where both plaintiff and defendant were defrauded by a third party, holding that although defendant took the payment in goof

26    faith and without notice of the fraud, it failed to show detrimental reliance); *Grand Lodge, A.O.U.W. of Minn. v. Towne*, 161 N.W. 403, 405 (Minn. 1917) (holding, in successive-

27    fraud case, that defendant/payee "has no right to the money as against plaintiff, and his retention of it is against conscience unless by the payment defendant's position has been

28    irrevocably changed to his loss").

15                                                                                              203874.1



1 distribution under a plan to innocent victims of the scheme whose funds were taken, as

2 noted above.  Funds in commingled bank accounts under a debtor's control are deemed

3 property of its estate for purposes of avoidance actions.[15]  USA Commercial has a

4 sufficient possessory interest in the property obtained by fraud and transferred to recipients

5 to sue for recovery, even when commingled funds are not considered wholly owned by the

6 estate.[16]

7         6.    Pre-judgment attachment or setoff.  To the extent the bankruptcy

8 estate has its own causes of action or those of its creditors to assert against Lenders to

9 recover funds under 11 U.S.C. §§ 544, 547, 548 or common law restitution, the Court may

10 authorize the exercise of pre-judgment attachment of Lenders' assets.[17]

11     In sum, there are legitimate legal grounds on which USA Commercial may recover

12 against Lenders upon presentation of evidence and full briefing by parties in interest.

13 Holding back funds on a broader, Client # basis, helps to preserve a source of recovery of

14 such claims.

15 **IV.    The Court Should Not Authorize Principal Distributions at This Time Without an Additional Holdback, at Least for Distributions That Exceed the Amount a Lender Would Receive if All Interest Payments are Reclassified as Principal Payments.**

17     Interest payments may be more readily subject to avoidance than principal

18 payments if the Court finds a Ponzi scheme.  As a practical matter, however, interim

19 distributions of interest on Loans where unpaid principal remains are less problematic than

20 distributions on fully paid Loans because repayment of principal means the applicable

---

[15] *E.g. In re Bullion Reserve of North America*, 836 F.2d 1214, 1217 (9th Cir. 1988).
[16] *E.g. In re M&L Bus. Mach. Co., Inc.*, 160 B.R. 851, 857 (Bankr. D. Colo. 1993) (debtor has possessory right to funds given voluntarily by investors), *aff'd*, 167 B.R. 219, 221 (D. Colo. 1994) (untraced, commingled funds which debtor obtained by fraud are property of the estate); *In re National Liquidators, Inc.*, 232 B.R. 915, 918 (Bankr. S.D. Ohio 1998) (payments to investors in Ponzi scheme are transfers of a debtor's interest in the estate).
[17] N.R.S. § 31.013 (court may, after notice and hearing, order the issuance of a writ of attachment in an action on a contract, or in a case where the court "finds that extraordinary circumstances exist which will make it improbable for the plaintiff to reach the property of the defendant by execution after the judgment has been entered.").

203874.1



1  Lenders will have no further collections or distributions against which surcharges and

2  offsets can be made.

3  An evaluation of how much money to distribute to Lenders before the legal issues

4  are tried and determined must thoughtfully balance the desire of Lenders for prompt

5  payment against the need to avoid the risk of prejudice to unsecured creditors.  The UC

6  Committee recognizes the value of arguments made by Lenders to recover at least their

7  principal.  To balance these competing concerns, the UC Committee recommends one of

8  the following alternatives:

9  A.  The UC Committee recommends an additional holdback of 15%-30% on this

10  basis from interest distributions, and from principal distributions, or

11  B.  The UC Committee alternatively recommends that Mesirow should determine

12  the amount of interest that has been paid on each loan, and hold back that amount from

13  any principal distribution, effectively treating the interest payments as applied to principal

14  (after holding back the other amounts set forth in this joint response).

15  **V.    Debtors Should Invite Lenders To Authorize Additional Netting**

16  More than one Lender has asked the parties to provide for final resolution of the

17  issues facing Lenders in these cases.  The Court will recall the plea of Donna Cangelosi at

18  a previous hearing, asking the Court to resolve everything here and now, and not subject

19  her to a collection lawsuit later based on one or more loans held in any capacity.  Many

20  Lenders may well not want an interim distribution now and a bill or collection lawsuit

21  later.  Debtors should provide all Lenders to whom they are allowed to send any

22  distribution with a notice indicating the possibility of further claims and litigation,

23  including for surcharges and recovery of prepaid interest.  This will provide Lenders with

24  the opportunity to decline receipt of the funds and resolve all of their issues now, not

25  piecemeal, or at least a fair warning that the distributed money should prudently be held by

26  the recipient Lender.

27

28

203874.1

**LEWIS AND ROCA LLP LAWYERS**

1

**VI.    The Court Should Not Authorize Ongoing Distributions At This Time**

2  We understand that Debtors are withdrawing the request that the Court now

3  authorize ongoing distributions in favor of a future hearing after Debtors develop the data

4  for the period through July 2006 and address other issues raised in this response, including

5  the reservation for expenses of administration/surcharge.

6  **VII.   The UC Committee Does Not Oppose Debtors' Request For Authority To Provide Ordinary Course Releases (Within Limits)**

7  USA Commercial seeks authority generally to accept Loan payment proceeds and

8  provide the necessary partial releases or full releases required in connection with the sale

9  to bona fide purchasers of properties securing serviced Loans in accordance with the terms

10  and values set forth in applicable Loan documents and if the Loan is a performing loan.

11  The proceeds received would be disbursed pursuant to the orders of this Court.  These

12  requests appear reasonable.

13  **Conclusion**

14  The UC Committee recommends that Debtors be authorized to make interim

15  distributions, and hold back funds, as explained herein, and granted authority to Debtors to

16  administer the performing Loans.

17  Dated July 27, 2006.

18  **LEWIS AND ROCA LLP**

19

20  By /s/ RC (#006593)

21  Susan M. Freeman, AZ 4199 (pro hac vice)
Rob Charles, NV 6593

22  *Attorneys for Official Unsecured Creditors' Committee of USA Commercial Mortgage Company*

23

24

25

26

27

28

18

203874.1