

E-filed on July 27, 2006

3993 Howard Hughes Parkway, 6th Floor
Las Vegas, Nevada 89169-0961
Facsimile No.: (702) 949-8321
Telephone: (702) 949-8320

40 North Central Avenue, Suite 1900
Phoenix, Arizona 85004-4429
Facsimile (602) 734-3824
Telephone (602) 262-5311

Rob Charles, Nevada State Bar No. 6593
Susan M. Freeman, Arizona State Bar No. 004199

Attorneys for Official Committee of Unsecured
Creditors of USA Commercial Mortgage Company

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>            Debtor. | BK-S-06-10725-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>            Debtor. | BK-S-06-10726-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>            Debtor. | BK-S-06-10727-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>            Debtor. | BK-S-06-10728-LBR<br>Chapter 11 |
| In re:<br>USA SECURITIES, LLC,<br>            Debtor. | BK-S-06-10729-LBR<br>Chapter 11 |
| Affects<br>☒ All Debtors<br>☐ USA Commercial Mortgage Co.<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed<br>☐ USA First Trust Deed Fund, LLC | Date:    August 4, 2006<br>Time:    9:30 a.m. |

**Declaration Of Edward M. Burr In Support Of in Support of Motion To Distribute Funds And To Grant Ordinary-Course Releases And Distribute Proceeds**

I, Edward M. Burr, hereby declare under penalty of perjury that:

1. I am a principal with Sierra Consulting Group, LLC ("Sierra"). Sierra is one of the leading providers of restructuring advisory and litigation support services in the Southwest. Sierra is a leading national consulting firm comprised of experienced CPAs and other financial professionals. I submit this declaration on behalf of the Response of the Official Unsecured Creditors' Committee for USA Commercial Mortgage Company

203938.1

(the "Committee") to Debtors' Motion To Distribute Funds And To Grant Ordinary Course Releases And Distribute Proceeds (the "Distribution Motion"). Except as otherwise noted, I have personal knowledge of the matters set forth herein.

2. The Committee has retained the services of Sierra as of July 14, subject to this Court's approval.

3. I have investigated information concerning the Distribution Motion from the filings with this Court, particularly the schedules and statements of financial affairs and amendments, and from data provided by Susan Smith of Mesirow Financial.

## USA Commercial

4. **Overview of Financial Condition.** According to the Schedules of Assets and Liabilities filed by USA Commercial as Amended [DE 784, 682], USA Commercial's balance sheet in bankruptcy looks like this:

4.1. **Personal Property.** USA Commercial has about $122.5 million in scheduled assets, of which the largest components are $80 million in accounts receivable, the largest of which is $58.4 million owed by USA Investment Partners LLC ("IP"); and $39.5[1] million of interest improperly paid to Direct Lenders and the Funds.

4.2. **Claims.** USA Commercial has $61.5 million in scheduled claims, of which the largest components are $46.8 million in unremitted principal, including $27 million owed to Direct Lenders, $19 million owed to USA Diversified, and approximately $400,000 owed to USA First; and $14.5 million in other unsecured claims. It is important for the Court and interested parties to recognize that payment to unsecured creditors benefits ordinary creditors and the victims of diverted principal; and conversely, that direct lenders are not the only victims of prior management's schemes.

4.3. **Unremitted Principal.** Despite the euphemism, Debtor's records now indicate that prior to bankruptcy, USA Commercial's prior management took about

---

[1] Loan Status Report of July 25, 2006. In the amended Schedule F, USA Commercial indicated this figure was $41.7 million. The change may be due in part to recharacterization of prepaid interest to principal on loans where all principal was diverted.

2

203938.1

$46.8 million of principal collected, including abut $19 million of principal on Diversified Loans, failed to pay it to the Lenders and Funds on the applicable Loans, and instead used the principal funds in other ways.

5. **Improperly Paid Interest.** One of the ways that USA Commercial misused funds from creditors, including principal paid by Borrowers but not remitted to those Borrowers' Lenders, was to pay interest to Direct Lenders and Funds at a time when the Borrowers on the applicable loans had not done so. As indicated, Debtor's records now indicate the sum of such payments is about $39.5 million.

6. The unremitted principal and improperly paid interest are only illustrations of the control over funds that USA Commercial exercised in fact on the numerous Loans it arranged for the Lenders it solicited, despite Lender-Borrower Loan documentation and LSA language limiting USA Commercial's role to a servicing role only.

### Administration of the Estates

7. **Mounting Professional Fees.** According to Debtors' most recent forecast [DE 906], USA Commercial's operation is approximately break even before professional fees, with USA First and USA Diversified each charged significant management fees. In addition, in July 2006, according to the most recent forecast, the five estates will be incurring enormous professional fees:

| Debtor | Professional | Weekly Amount |
|---|---|---|
| Five Debtors | Mesirow | $140,000 |
| | Ray Quinney | 75,000 |
| | Schwartzer | 25,000 |
| | PR Firm | 800 |
| | Other Legal | 0 |
| USA Commercial | Lewis and Roca | 25,000 |
| | Sierra | 25,000 |
| USA First | Stutman/Shea & Carlyon | 60,000 |
| | Alvarez & Marsal | 30,000 |
| USA Diversified | Orrick/Beckley | 60,000 |
| | FTI | 50,000 |
| Direct Lenders | Gordon & Silver | 60,000 |
| | | $550,800 |

203938.1

8.  By the end of July, 2006, the total of such professional fees is forecasted to be about $7,257,700. The total is forecast to increase approximately $500,000 per week from July into October, and then about $462,000 per week in October. Included within this accrual is a forecast of $60,000 per week for the Direct Lenders' Committee counsel, with a total of $540,000 for the period through July 2006.

9.  **Appraisals**. With this Court's approval, Debtors were authorized to employ Hilco Real Estate LLC/Hilco Real Estate Appraisal, LLC ("Hilco") as Debtor's Real Estate Appraiser at an aggregate cost of $300,000 for the initial appraisal work. Debtors have indicated that the Hilco appraisal costs can be allocated loan by loan.

10. **Post-Petition Collections**. Tom Allison of Mesirow has achieved significant success as Debtors' chief restructuring officer in collecting loans. Debtor explains that starting with $9 million in the Collection Account on the petition date, after depositing collections net of a 1% service fee, "the balance in the Collection Account as of June 30, 2006 was approximately $93 million, including approximately $14 million in interest collected post-petition on nonperforming loans and approximately $60 million collected post-petition in loan principal repayments."[2]

11. **Collection of Interest.** It is implicit in the scheme of Debtors' prior management that funds used to pay interest on non-performing Loans to Lenders came from other sources. Further, performing Loans should have no material discrepancy between interest collected from Borrowers and paid to Lenders. As Debtors collected sums due from Borrowers on nonperforming Loans after the petition date, a portion of the interest the Debtors received was necessarily applicable to periods where USA Commercial had prepaid the Lenders.

12. Debtors' records indicate that Debtors collected about $14 million of past due interest through June 30, 2006, and that about $13 million of this amount is applicable to periods where USA Commercial had prepaid the Lenders.

---

[2] Distribution Motion ¶ 6.

4

203938.1

13. Debtors' post-petition collection of about $60 million in principal includes a number of Loans that were paid in full. As to those paid-in-full Loans, no further payments from the applicable Borrowers will be forthcoming.

14. **Debtors' Accounting – Loan #.** Debtors' accounting system assigns a unique Loan # to each Loan to a particular Borrower.

15. **Vesting Names.** Debtors' accounting system assigned a unique Account # to each person or entity that executed a LSA. These are also called Vesting Names. Debtors have explained that they believe that each Lender, assigned an Account # by Vesting Name, signed only one LSA.

16. **Client #.** Debtors' accounting system grouped several Account # or Vesting Names into a Client #. This grouping related to the person or entity that received statements and payments or was a representatives for the several Vesting Names. Generally, the Client # reflected Vesting Names for various capacities in which a person invested, *e.g.* the person individually, the person's partnership, the person's family trust, and the person's IRA or 401(k).

17. **Debtors' Accounting – Investor Confidentiality.** Debtors provided the Committees with data containing fields for Loan #, Vesting Names, and Client #. In order to protect Lender privacy, Debtors coded the Vesting Names and Client #s. Thus, the Committees can not identify individual Lenders or accounts from the data, and also can not examine whether the vesting names in an Account # are unique or legally identical.

18. **Alternatives For Netting Prepaid Interest – Loan by Loan.** There are at least three alternatives for netting prepaid interest received by Lenders from funds collected by Debtors.

19. In the simplest example, USA Commercial may have paid the Lenders on Loan A interest due in January 2006 at the time Borrower A's payment was due, but before Borrower A made the payment (necessarily paid with money from another Lender or due to another Lender or from USA Commercial's own funds it was not using to keep its own vendors and other unsecured creditors current). If USA Commercial has now

5

203938.1

1 collected the interest due on Loan A for January 2006, it would keep the funds, so that the Lenders would not be double paid; and it would remit future payments on the Loan A, net of servicing fees, to the Lenders.

20. Consider four investors (or Account #) managed under one Client # who invested in 22 Loans, described on Exhibit A attached, which I prepared. As to some Loans, no funds or not enough funds were collected to recover the prepaid interest, and as to other Loans, more funds were collected. In this example, Lender Vesting Account # 1001452 would receive a distribution of $289,263.89, and all of the Lenders would receive a distribution of $528,607.10.

21. **Alternative – Vesting Name or Account #**. As an alternative, funds could be netted Lender (vesting name) by Lender (vesting name), after netting Loan by Loan.

22. In the attached example, Lender 1001452 who received a total of $550,576.47 in prepaid interest on eight Loans would have the prepaid interest netted against $200,000 collected for that Lender on Loan 111207. All of the four Lenders in this example would receive a total distribution of $239,343.20, thus recovering about $289,263.89 of prepaid interest.

23. **Alternative – Legally Mutual Entities**. A third alternative would expand the scope of netting from Vesting Name or Account ID to other mutual entities within a Client #. I was asked to assume, for example, obligations of an individual owner may be offset against the obligations of that individual in a joint and several account, the obligations of a spouse may be offset against an obligation of the spouse's community property account, or the obligations of an individual may be offset against the obligations of that individual's revocable *inter vivos* trust, and to analyze the potential netting on such bases.

24. Debtors' records do not contain enough information to identify, much less analyze, such relationships. However, the Client ID grouping includes such categories, although it may be over-inclusive in identifying such relationships and others. So, the



obligations of all Lenders in the same Client ID might be netted on a temporary basis for distribution purposes at this time.

25. In the example, netting on a Client ID basis for Client # 1003300 would result in no distribution to the Lender Vesting #s, thus holding back an additional $239,343.20 in prepaid interest for recovery by the estate in excess of the netting by Vesting Name alternative.

26. **Overall Impact of the Alternatives**. Debtors' data indicates that of the $93 million in the Collection Account, the following amounts would be distributed under each Netting alternative, and so the following sums would be withheld:

| Alternative | Distribution | Withholding |
| --- | --- | --- |
| By Client # (Grouping) | $66,834,445 | $ 26,200,000 |
| By Account # (Vesting Name) | $68,157,783 | $ 24,800,000 |
| By Loan # (Loan by Loan) | $80,473,001 | $ 12,500,000 |

27. Accordingly, netting on the most conservative (Loan by Loan) basis results in about $12.3 million more distributed to Lenders than does netting on a Vesting Name (Lender) basis. It is not possible to quantify the risk that netting by Vesting Name omits legally valid offsets, but if Client # is a surrogate for a broader offset, the difference is only $1.3 million in this proposed distribution.

28. **Servicing Fees**. USA Commercial agreed to service Loans for Lenders under similar forms of Loan Servicing Agreements ("LSA"). USA Commercial was entitled to compensation from the Lenders. For example, the LSA with Patrick F. Fenlon and Angela B. Fenlon dated November 9, 2005, attached as Exhibit E to the Declaration of Scott Canepa filed on May 18, 2006 [DE 293] provides:

> Compensation to USA For Loan Servicing. Lender authorizes USA to retain monthly, as compensation for services performed hereunder, (a) one-twelfth (1/12th) of its annual servicing fee, which shall not exceed three percent (3%) per annum of the maximum principal amount of each of the Loans, (b) any late charges collected from the Borrower pursuant to the terms of the Note, and (c) [] default interest collected from the Borrower pursuant to the terms of the Note. Notwithstanding the foregoing, it is agreed and acknowledged that USA derives the bulk of its revenues from charging loan fees ("points") to the Borrower. Certain Borrowers, however, may prefer to pay a higher rate of interest in exchange for a reduction in loan

203938.1

fees payable in advance to USA, the higher interest rate comprising a deferred loan fee. USA will notify Lender when such a case arises, and advise Lender of what portion of the interest is payable to USA as a deferred loan fee.

29. The Court will note that the form of LSA has a date on the bottom indicating it was revised in 8/04. The date of the agreement is typed 2004 in the form and then handwritten 2005 in the example provided to this Court. Thus, we assume that since some time in 2004, new investors agreed to be charged up to 3% as a servicing fee.

30. A quick review of the June 30, 2006 Loan Summary indicates that over $500,000,000 of loans were originated in 2005 and 2006. Even if only half, $250,000,000 were subject to a 3% servicing fee instead of a 1% fee, this would be another $5,000,000 in servicing fee income for USACM per year.

31. It seems that a cost effective work plan can be made potentially even using temps to review 7,000 LSAs to determine which document is 3% vs. 1%. Then those with a 3% fee should be able to have that fee entered in their database, or however they calculate servicing fees, or have a deduction from the individual lender statement.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED July 27, 2006.

/s/ Edward M. Burr
Edward M. Burr

203938.1