ELECTRONICALLY FILED
August 2, 2006

STUTMAN, TREISTER & GLATT, P.C.
FRANK A. MEROLA
(CA State Bar No. 136934)
EVE H. KARASIK
(CA State Bar No. 155356)
CHRISTINE M. PAJAK
(CA State Bar No. 217173)
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
Email: fmerola@stutman.com
       ekarasik@stutman.com
       cpajak@stutman.com

SHEA & CARLYON, LTD.
JAMES PATRICK SHEA
(Nevada State Bar No. 000405)
CANDACE C. CARLYON
(Nevada State Bar No. 002666)
SHLOMO S. SHERMAN
(Nevada State Bar No. 009688)
233 South Fourth Street, Second Floor
Las Vegas, Nevada 89101
Telephone: (702) 471-7432
Facsimile: (702) 471-7435
Email: jshea@sheacarlyon.com
       ccarlyon@sheacarlyon.com
       ssherman@sheacarlyon.com

Counsel for the Official Committee Of Equity Security
Holders Of USA Capital First Trust Deed Fund, LLC

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | BK-S-06-10725-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | BK-S-06-10726-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>Debtor. | BK-S-06-10727-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | BK-S-06-10728-LBR<br>Chapter 11 |
| In re:<br>USA SECURITIES, LLC,<br>Debtor. | BK-S-06-10729-LBR<br>Chapter 11 |
| Affects<br>☐ All Debtors<br>☒ USA Commercial Mortgage Co.<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☒ USA Capital Diversified Trust Deed<br>☒ USA First Trust Deed Fund, LLC | Date: August 4, 2006<br>Time: 9:30 a.m. |

**OMNIBUS REPLY BY THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF USA CAPITAL FIRST TRUST DEED FUND, LLC TO THE RESPONSES AND OPPOSITIONS FILED AGAINST THE DEBTORS' MOTION TO DISTRIBUTE FUNDS AND TO GRANT ORDINARY-COURSE RELEASES AND DISTRIBUTE PROCEEDS (AFFECTS DEBTORS USA COMMERCIAL MORTGAGE COMPANY, USA CAPITAL FIRST TRUST DEED FUND, LLC AND USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC)**

401863v4

The Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC (the "FTDF Committee") appointed in the above-captioned bankruptcy cases (the "Chapter 11 Cases"), by and through its undersigned counsel, files this omnibus reply (the "Reply") in response to the various oppositions and other responses (collectively, the "Responses") filed against the "Debtors' Motion To Distribute Funds And To Grant Ordinary-Course Releases And Distribute Proceeds" (the "Motion to Distribute")[1] and the "Supplement to Debtors' Motion to Distribute Funds" (the "Supplement"), filed by USA Commercial Mortgage Company ("USACM"), USA Capital First Trust Deed Fund, LLC (the "FTD Fund") and USA Capital Diversified Trust Deed Fund, LLC ("Diversified" and, together with FTD Fund, the "Funds"), certain of the above-captioned debtors and debtors and possession (the "Debtors").

This Response is based on the Memorandum of Points and Authorities attached hereto; the pleadings, papers, and records on file in this action; and any argument to be entertained at the time of the hearing on the Motion to Distribute.

/s/ *signature*

FRANK A. MEROLA (CA State Bar No. 136934),
EVE H. KARASIK (CA State Bar No. 155356), and
CHRISTINE M. PAJAK (CA State Bar No. 217173),
Members of
STUTMAN, TREISTER & GLATT, P.C.

and

CANDACE C. CARLYON
SHEA & CARLYON, LTD.

COUNSEL FOR THE OFFICIAL COMMITTEE
OF EQUITY SECURITY HOLDERS OF
USA CAPITAL FIRST TRUST DEED FUND, LLC

---

[1] Terms not otherwise defined herein shall have the same meanings ascribed to them in the Motion to Distribute.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

1. As reflected in the "Response Of The Official Committee Of Equity Security Holders Of USA Capital First Trust Deed Fund, LLC To Debtors' Motion To Distribute Funds And To Grant Ordinary-Course Releases And Distribute Proceeds" [Docket No. 1000] (the "FTDF Committee Response"), the FTDF Committee generally supports the Debtors' Motion to Distribute Funds.

## II.

## DISCUSSION

### A. With Appropriate Safeguards, Interim Distributions To Investors Do Not Prejudice the Rights of Any Party In Interest.

2. To avoid a myriad of lawsuits before any distributions are made to investors, the Debtors have proposed offsets to be made on an investor-by-investor basis and have agreed that the characterization of any such retained funds would be determined at a later date. The Debtors estimate that these funds will total approximately $28 million, a significant holdback of funds. The dispute over these monies that the Debtors withhold from distribution is for another day. Those funds should be segregated into a separate account and not be used by any party until a proper determination has been made. With these safeguards in place, interim distributions can be made immediately to investors without prejudicing the rights of any party in interest to assert their rights in the retained funds. The limited oppositions filed by the Kantor Group and Direct Lender Committee also support this interim relief so that a significant distribution may be made to investors with all rights reserved. See "Official Committee of Direct Lenders' Limited Opposition to Motion to Distribute Funds and to Grant Ordinary-Course Releases and Distribute Proceeds filed by the Official Committee of Holders of Executory Contract Rights through USA Commercial Mortgage Company" (the "Direct Lender Committee Limited Opposition") [Docket No. 1042], p. 2; 11-12; Limited Objection to the Kantor Group to Debtors' Motion to Distribute Funds and to Grant Ordinary-Course Releases and Distribute

401863v4                                                  3

Proceeds filed by the Kantor Group [Docket No. 985], p.3; 5.

## B. Meaningful Distributions Should Be Made to FTDF Members.

3. Distributions should be made to all investors, including those persons (the "FTDF Members") who have invested in USA Capital First Trust Deed Fund, LLC (the "FTD Fund"). In fact, no party has opposed distributions to FTDF Members.[2]

4. Given the amounts the Debtors intend to offset across the various investments of the FTD Fund and the proposed holdback of $800,000 as a reserve for pre-petition and post-petition claims, the FTD Fund will have only an estimated $1 million to distribute to its members. Any further holdbacks, such as those proposed by the Diversified Committee and the Unsecured Creditors' Committee, will result in no meaningful distribution to FTDF Members and are unwarranted.

5. Specifically, the complaints by the Unsecured Creditors' Committee that additional amounts need to be withheld to account for possible offsets across different vesting names does not affect the FTD Fund. The FTD Fund invested only as a single entity, and no additional amounts should be held back from the FTD Fund.

6. Furthermore, unlike other Direct Lenders, the FTD Fund is a debtor-in-possession that is subject to the continuing oversight of the bankruptcy court. If the Court ultimately determines that additional monies can be recovered by the Debtors' other estates, FTD Fund's assets are readily available and will be easy targets. No basis exists to further surcharge or delay the distributions to the FTD Fund anymore.

---

[2] While Highland Capital opposed distributions to investors of Diversified, no party has opposed distributions to the FTD Fund. See "Opposition to Debtor's Motion to Distribute Funds and to Grant Ordinary-Course Releases and Distribute Proceeds" [Docket No. 991], filed by Creditors, Prospect High Income Fund, ML CBO IV (Cayman) Ltd., PAMCO Cayman, Ltd., PAM Capital Funding, L.P., Highland Crusader Fund, Ltd., and PCMG Trading Partners XXII, L.P. ("Highland Capital"). Furthermore, although Highland Capital has asserted against a claim against the FTD Fund, it appears that Highland Capital only asserts a claim against Diversified, and the FTDF Committee has objected to its proof of claim.

C.  **Interim Distributions Should be Made To Investors Without Any Further Holdbacks Other Than Necessary to Pay for the Administrative Expenses of These Estates.**

7.  The attempts by the Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC (the "Diversified Committee") and the Official Committee of Unsecured Creditors of USA Commercial Mortgage Company (the "Unsecured Creditors' Committee"), at this early stage, to recharacterize all loans and proceeds as property of the Debtors' estates is premature.  Moreover, the record is far from complete.  Neither the Diversified Committee nor the Unsecured Creditors' Committee has alleged any unequivocal grounds that would require the further holdbacks that they have requested.[3]

8.  In other words, the Diversified Committee would like to hold hostage an approximate $24 million reserve, for an unknown amount of time, on top of the $28 million that the Debtors have already proposed to hold back, *without any evidentiary support*.  If such a large reserve were granted, the Diversified Committee could hold up plan discussions and the ultimate exit from these cases until it is satisfied with its due diligence.  Establishing an arbitrary reserve for an unknown period of time, based on mere speculation, unfairly prejudices numerous investors who depend on the income their USA Capital investments provide to them.

9.  The Diversified Committee asserts that the Debtors engaged in a Ponzi scheme prior to the Petition Date.  Simply repeating "Ponzi" numerous times does not make it true.[4]  There are many other facts, not presented by the Diversified Committee and Unsecured

---

[3] The Diversified Committee has requested that any order approving the Motion to Distribute limit distributions to 90% of the amounts proposed by the Debtors on account of interest and 25% of the amounts proposed by the Debtors on account of principal payments.  See "Diversified Fund Committee's Limited Opposition to Motion to Distribute Funds" (the "Diversified Committee Opposition") [Docket No. 987] ¶60.  The Unsecured Creditors' Committee has requested that any order approving the Motion to Distribute required the Debtors to either (a) holdback 15%-30% of both principal and interest from the funds to be distributed, or (b) "determine the amount of interest that has been paid on each loan, and hold back that amount from any principal distribution, effectively treating the interest payments as applied to principal."  See "Response to Motion to Distribute Fund and to Grant Ordinary-Court Releases and Distribute Proceeds" (the "Unsecured Creditors' Committee Response") [Docket No. 995], p. 17.

[4] This is not your classic Ponzi scheme, in which funds from new investors are needed to make trumped up returns to old investors.  See In <u>In re United Energy Corp.</u>, 944 F.2d 589, 590, fn.

401863v4                                                                5

Creditors' Committee, that compel a contrary determination as set forth below and support the FTDF Committee's recommendation that the interim distributions be made at this time with no further holdbacks other than necessary to pay the administrative expenses of these estates.

        **1.**      **Investors in Diversified Were Well-Informed of the Risks of Investing.**

10.    While the Diversified Committee presents an extended discussion of the improprieties committed by former management, there is a factual and legal disconnect between the allegations in the Diversified Opposition and the request that other investors and FTD Fund should be chargeable with the injury which occurred.

11.    In this regard, the Diversified Committee fails to disclose the numerous and significant risks which were disclosed to their investors throughout the Prospectus. The Diversified Committee's characterization of investment in Diversified as the safer, more conservative investment path is simply inaccurate. Among the disclosures which were made to the investors in the Diversified Prospectus was that:

> **Investing in our membership units involves a high degree of risk. See "Risk Factors" beginning on page 36 to read about risks that each investor should carefully consider before acquiring our membership units. Investors must be prepared to bear the economic risk of their investment for an indefinite period of time and be able to withstand a total loss of their investment.**

See "Declaration of Michael A. Tucker in Support of Diversified Fund Committee's Limited Opposition to Motion to Distribute Funds" (the "Tucker Declaration"), Exhibit "A" (Prospectus), cover page (emphasis in original).

12.    In addition, the substantial role that would be played by Mr. Hantges and Mr. Millanowski was clearly disclosed. The Prospectus stated that Diversified would be

---

1 (9th Cir. 1991) (defining a Ponzi scheme). Nothing in these cases suggest that new money that was supposed to be invested in specific loans was diverted to pay returns to old investors. It currently appears that individual direct lenders and the FTD Fund properly received a fractional interest in loans secured by deeds of trust when they made their investments. No facts to the contrary have ever been asserted.

401863v4                6

managed by USA Capital Realty Advisors, LLC. "Our manager is wholly owned by USA Investment Partners, LLC, a Nevada limited liability company. USA Investment Partners, LLC is managed by USA Commercial Mortgage Company, a Nevada corporation, and is controlled by Thomas A. Hantges, Joseph D. Milanowksi and Paul S. Hamilton." See Tucker Declaration, Exhibit "A" (Prospectus), p. 1. Investors were warned that: "Our manager is solely responsible for management and the selection of loans made or purchased by us. …. As a result, investors should only invest in our membership units if they are willing to grant our manager such broad discretion. …Our manager is also subject to conflicts of interest and may engage in competitive activities." See Tucker Declaration, Exhibit "A" (Prospectus), p. 3. Investors were also cautioned that: "Since our manager is solely responsible for our management, investors should only invest in our membership units if they are willing to entrust our manager to make all decisions regarding our operations." Prospectus, p. 39.[5]

       13. In addition, Diversified investors were warned of numerous specific risks relative to the fund, including (but by no means limited to):

- As of December 31, 2002, we had approximately $32.4 million of impaired or non-performing loans in our loan portfolio. [This represented approximately 1/3 of the outstanding equity investments.] Prospectus, p. 11, 38.

- Of the seven impaired or non-performing loans as of December 31, 2002, we have started foreclosure with respect to one loan in the approximate amount of $10 million and will be required to obtain relief from the bankruptcy of a debtor involving a loan in the approximate amount of $11 million. The remaining five loans total approximately $11.4 million. As to one of these, the developer abandoned the project and M.P.D.D. Ranch, LLC, an entity managed by one of our affiliates, assumed the role of developer for the purposes of completing the project. Prospectus, p. 11.

- We may elect to leverage our loan portfolio by obtaining a revolving credit facility from a third party lender, to be used primarily, but not exclusively, to fund new loan opportunities that arise prior to the maturity of then-existing mortgage loans. Prospectus, p. 22.

- Distribution Policy – We make distributions to members only from cash that is available for distribution. Prospectus, p. 48.

---

[5] The Prospectus warned investors that management was subject to conflicts of interest at least 10 times.

- Due to the number of impaired or non-performing loans as of December 31, 2002, the allocation of resources to enforce or preserve our interests may adversely affect our cash available for distribution to members. Prospectus, p. 38.

14. In sum, when investing in Diversified, Diversified investors were fully informed of the great risks associated in making these investments. There is no reason that the realization of these risks should now be borne by all investors who invested through USACM.

### 2. As A SEC Regulated Company, the FTD Fund Had Certain Reporting and Audit Requirements that the FTDF Members Relied Upon In Making Their Investments.

15. Unlike Diversified, the FTD Fund is a public company regulated by the U.S. Securities and Exchange Commission ("SEC"). FTDF Members invested in the FTD Fund because of the strict reporting and audit requirements of the SEC. There appears to have been very little, if any, fraud in this entity. In fact, the Diversified Opposition even concedes this fact in noting that "[i]t appears that the principals of [USACM] made the type of loans for the 1,300-investor [FTD Fund] that were promised in the prospectus . . . ." See Diversified Opposition, ¶3.

16. It, therefore, appears that the protections of a SEC investment was crucial in these cases and the fraud did not occur across-the-board as the Diversified Committee suggests.

### 3. The Alleged Fraud Was Not Widespread.

17. By and large, it appears that the center of the alleged fraud focused on Diversified. For example, evidence suggests that funds from Diversified were utilized for the real estate development projects of insiders and not to attract new investors. For example, the largest loan, in which Diversified invested, is the loan made to 10-90, Inc. According to the Tucker Declaration, 10-90, Inc. appears to be a pass through to USA Investment Partners LLC ("IP"), whose primary members are Tom Hantges and Joe Milanokski, and this loan was used as a source of funds for the numerous deals of IP and IP related entities. See Tucker Declaration, ¶¶ 42-46. The FTDF Fund expects that many of the other Diversified transactions at issue will have similar factual circumstances. While Diversified might have been pilfered by the Debtors' insiders for their personal real estate development ventures, this fraud was not pervasive.

18. In fact, of those loans with serious fraud – 10-90, Inc. Loan, Epic Loan,

Sheraton Hotel Loan, Colt Loans and Fiesta Development McNaughton Loans – 100% of these loans are in the Diversified portfolio. See id. at ¶¶42-57.

19. According to the Tucker Declaration, with respect to the diversion of principal payments, other than amounts pilfered directly from Diversified, principal payments from only ten loans out of the portfolio of 115 loans, less than 10%, were not remitted to individual direct lenders. See id. at ¶34.[6]

20. Based on the "Notice of Filing of Loan Summary as of June 30, 2006" [Docket No. 976] (the "June 30 Loan Summary"), investors in only 49 loans were the recipients of so-called "pre-paid" interest.

21. As the June 30 Loan Summary indicates, the Debtors have made substantial progress in collecting the interest that was previously advanced to investors from the borrowers, themselves. Currently, only 32 loans are still affected by this advanced interest, and the Debtors have made progress by collecting some of this interest on 10 of these loans. See June 30 Summary. In the end, it may be possible that a significant portion of the advanced interest payments may be ultimately collected from the borrowers.

22. There is no evidence at this time hat the alleged fraud was widespread. Given this lack of equivocal evidence, no basis exists to hold back anymore than the approximate $28 million reserve to accomplish the investor-by-investor setoff proposed by the Debtors, other than as necessary to pay for the administrative expenses of these cases.

**4.    The Legal Authority Cited By Diversified is Easily Distinguishable.**

23. Not only do the facts not provide unequivocal support for the Diversified Committee's theory but the case law cited by the Diversified Committee also provides little support.

---

[6] The FTDF Committee notes that the number of loans with diverted principal as set forth in the Tucker Declaration differs from the figures footnoted in the Notice of Filing Loan Summary as of June 30, 2006, filed with the Court on July 25, 2006 and also differs from the Schedule of Assets and Liabilities filed by USA Commercial Mortgage Company ("USACM").

24. In <u>Foothill Capital Corp. v. Clare's Food Mkt. (In re Coupon Clearing Serv.)</u>, 113 F.3d 1091 (9th Cir. 1997), one of the questions that the Court examined in determining the ownership of the coupon proceeds was whether a trust relationship existed between a coupon clearinghouse and the retailers it serviced. One of the key facts that the Court relied upon in ruling that no trust relationship existed was that the clearinghouse was required to make payments to the retailers on a fixed schedule regardless of when the clearinghouse was paid by the manufacturers. <u>Id.</u> at 1101. As a secondary factor, the court also found that the entire risk of loss was not borne by the retailers, but rather that the risk of loss was shared generally by the retailers and the clearinghouse. <u>Id.</u> 1101-02.

25. Here, nothing in the servicing agreements between USACM and individual direct lenders require USACM to make interest payments to investors regardless of whether the underlying borrower paid. In fact, the only obligation that USACM had to any direct lender was the obligation to remit payments it had actually received from borrowers. Direct lenders, not USACM, bore the entire risk of loss. Furthermore, the "Special Power of Attorney" that each direct lender executed with USACM provided for the establishment of a trust relationship and applicable Nevada state law also requires a mortgage loan servicer to hold monies in "trust". <u>See</u> Direct Lender Committee Limited Opposition, p. 5. <u>See also</u> NRS §645B.175.

26. Similarly, in <u>In re Bullion Reserve of North America</u>, 836 F.2d 1214 (9th Cir. 1988), the debtor ("BRNA") purported to be in the business of buying bullion, selling it to the public, and storing it for purchasers (through a subsidiary). BRNA did not actually buy all the bullion that it represented it would. Rather, it simply deposited the funds it received in a bank account and bought only a portion of bullion that was supposed to buy. Shortly before the debtor filed for bankruptcy, a member of BRNA's program requested and received "his" bullion. The trustee sued for a preferential transfer. It affirming the lower court's ruling that a preferential transfer had been made, the Ninth Circuit Court of Appeals held that the bullion was property of the estate, finding that no trust relationship ever existed between BRNA and the member. <u>Id.</u> at 1218.

401863v4                                    10

27. Once again, In re Bullion is easily distinguishable from the facts of these cases. There is no evidence that monies invested by direct lenders, other than possibly Diversified, was used for any other purpose than making investments in "hard money" loans. Investors received *identifiable* partial interests in loans secured by deeds of trust. As a result, direct lenders, who invested through USACM, are not all similarly situated. Unlike coupon proceeds or gold, which are really just fungible commodities, creating little differentiation in the claims asserted by its investors/creditors, investors in USA Capital loans have very different portfolios that depend, not on luck, but on the particular loan in which they invested. The Diversified Committee has yet to assert any rationale that would support pooling these assets together for the benefit of all so-called "like investors".

28. Also, it is clear that these cases are not similar to the facts presented in In re Lemons & Assoc., 67 B.R. 198 (Bankr. D. Nev. 1986). Unlike Lemons, USACM (i) never guaranteed a rate of return to investors regardless of the performance of the underlying note; (ii) never paid rates to investors that exceeded the interest rates paid on the underlying loans; (iii) never oversubscribed participations in loans; and (iv) never used new investor money to pay returns to old investors. Simply put, the type and breadth of fraud in Lemons was pervasive and affected nearly every investor. The same is not true in these cases, and no facts suggest that the remedy applied in Lemons should be applied here.

29. Given the fact that the Diversified Committee and Unsecured Creditors Committee are unable to assert any definitive facts or law to support their allegations that all assets should be pooled into the Debtors' estates to be distributed to all investors on a pro rata basis, no holdbacks further than the holdbacks made for investor-by-investor offsets should be required on the Debtors' proposed distributions, other than those necessary to pay for the costs that USACM has incurred in these chapter 11 cases. Investors should not have to wait for the Diversified Committee to finish its fishing expedition before they receive meaningful interim distributions that are rightfully due to them.

401863v4

11

## III.

## CONCLUSION

As set forth herein and in the FTDF Committee Response, the FTDF Committee supports (i) the Debtors making distributions to investors, including the FTDF Members, as set forth in the Motion to Distribute but urges the Court to require the Debtors to hold back sufficient funds to be distributed to cover the administrative expenses that USACM has incurred for (a) appraisals and (b) collection costs as well as the fair share of the costs incurred in administering these bankruptcy cases.

Respectfully submitted this 2nd day of August, 2006.

_/s/ Christine M. Pajak_

FRANK A. MEROLA (CA State Bar No. 136934),
EVE H. KARASIK (CA State Bar No. 155356), and
CHRISTINE M. PAJAK (CA State Bar No. 217173),
Members of
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600

and

CANDACE C. CARLYON
SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, NV 89101
Telephone: (702) 471-7432
COUNSEL FOR THE OFFICIAL COMMITTEE
OF EQUITY SECURITY HOLDERS OF
USA CAPITAL FIRST TRUST DEED FUND, LLC

401863v4

12