Thomas J. Gilloon, Esq.,
Nevada Bar No. 000578
330 S. Third Street #900
Las Vegas, Nevada 89101
Phone: 702-388-7185
Fax: 702-388-0108
mcknightlaw@cox.net

**Efiled on August 3, 2006.**

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>                                    Debtor. | Case No. BK-S-06-10725-LBR<br>Case No. BK-S-06-10726-LBR<br>Case No. BK-S-06-10727-LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC.,<br>                                    Debtor. | Case No. BK-S-06-10728-LBR<br>Case No. BK-S-06-10729-LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC.,<br>                                    Debtor. | Chapter 11<br>**Jointly Administered Under<br>Case No. BK-S-06-10725-LBR** |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC.,<br>                                    Debtor. | Date: August 4, 2006<br>Time: 9:30 a.m. |
| In re:<br>USA SECURITIES, LLC.,<br>                                    Debtor. | **OPPOSITION TO THE RESPONSE OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF USA CAPITAL FIRST TRUST DEED FUND, LLC TO DEBTORS MOTION TO DISTRIBUTE FUNDS AND TO GRANT ORDINARY -COURSE RELEASES AND DISTRIBUTE PROCEEDS (AFFECTS ALL DEBTORS)** |
| Affects:<br>  ❑ All Debtors<br>  ❑ USA Commercial Mortgage Company<br>  ❑ USA Securities, LLC<br>  ❑ USA Capital Realty Advisors, LLC<br>  ❑ USA Capital Diversified Trust Deed Fund, LLC<br>  ❑ USA First Trust Deed Fund, LLC | |

Page 1 of 9

W:\2006\2377usa.ch11\Reply to Equity Comm response TG 08-07-06.wpd                                                                August 3, 2006 (3:09pm)

The McKnight 2000 Family Trust and the Richard McKnight SEP-IRA, by and through its counsel, Thomas J. Gilloon, Esq., of the Law Offices of Richard McKnight, P.C., files this opposition to the relief requested in the response of the Equity Security Holders Committee ("ESH") to the Debtors' Motion to Distribute Funds And To Grant Ordinary-Course Releases And Distribute Funds and the Supplement to Debtor's Motion to Distribute Funds with respect to any further withholding. This Opposition is based on the Memorandum Of Points And Authorities attached hereto, the pleadings, papers and records on file in this action, and the oral argument at the hearing on the motions.

DATED this 3rd day of August 2006.

LAW OFFICES OF RICHARD McKNIGHT, P.C.

By:  /s/  Thomas J. Gilloon
Thomas J. Gilloon, Esq.,
Nevada Bar No. 000578
330 S. Third St., #900
Las Vegas, NV 89101
Attorneys for McKnight 2000 Family Trust
and Richard McKnight SEP-IRA

**MEMORANDUM OF POINTS AND AUTHORITIES**

A. The ESH Request For Holding Back Additional Funds Is Improper and Violates The Contractual Rights Of The Direct Lenders.

At pages 6 and 7 of the ESH Committee's Response To Debtors' Motion to Distribute Funds And To Grant Ordinary Course Releases, the ECH quietly slips in a request that the Debtor hold back an 'appropriate' amount to pay costs of administration of the estate including fees and cost for the Direct Lenders Committee, and also 'collection costs, as well as a fair share of the costs of administering the consolidated bankruptcy case.' Any such order operates to the extreme detriment of the Direct Lenders holding performing loans who have essentially financed this bankruptcy from the outset. This request is made despite the ESH Committee's acknowledgment that the Debtor's collection account already contains over $90 million, leaving a working balance after the proposed distribution of nearly $30 million. The Debtor's Third Revised Budget filed on July 19, 2006 projects

that the Debtor already proposes to make cash payments to bankruptcy professionals of $7,897,200 in the month of September alone. There is plainly no need for any additional withholding, particularly with respect to the FTDF whose counsel have somehow generated billings of $800,000 through June 30,2006.

The pretext advanced for holding additional funds is that each of the Direct Lenders are somehow contractually bound to pay "attorney's fees, trustees fees and the foreclosure costs" under the language of the 'standard' loan servicing agreement. The loan files of the McKnight 2000 Family Trust do not contain a signed copy of any such loan servicing agreement, standard or otherwise. Given the shoddy loan underwriting practices of USCM, it may indeed be possible that such a standard form agreement may have been signed by McKnight. A March 7, 2004 Loan Servicing Agreement signed Gregory J. Walch as Trustee of the Gregory J. Walch and Shauna M. Walch Family Trust, however, has been filed with the Court and makes it clear that the appraisals are to be obtained at the expense of the *Borrower*, not the Direct Lenders. Ex. "A". The suggestion that the Direct Lenders are thus 'contractually bound' to pay for all appraisals in the chapter 11 is thus simply wrong. The cost of any appraisals should be added to the amount of the *loan to the borrower*, not charged against the interest of any Direct Lender. Nor has there been any determination that the costs of appraisals may be surcharged against the Direct Lenders as an administrative expense. The Court's order allowed the appraisal fees to be paid as an administrative cost. It made no reference whatsoever to surcharging *any* party. Ex. "B."

The only document in the possession of the McKnight 2000 Family Trust with respect to payment of *attorney's fees* in connection with a loan that has actually been signed is a single Special Power of Attorney executed in connection with its 5252 Orange, L.L.C. Loan. Ex. "C."  Simply put, the McKnight Family 2000 Trust simply does not consent to the representation of its interests by counsel for the Direct Lenders Committee or with respect to any other loan. Section 4 of that Walch agreement does that direct attorney's fees be treated as advances under the loan to be recovered first from the Borrower, but chargeable against the lender's interest subsequently. That section refers generally to foreclosure proceedings, however,  not fees incurred by USA in its own bankruptcy.

The suggestion that the ESH somehow has standing to run up an enormous bill for legal fees under the original loan serving agreements for services rendered in connection with this bankruptcy simply because it has been authorized to retain bankruptcy counsel is in fact nothing more than an attempt by the ESH to claim that it has sort of 'derivative standing' to assert claims that may properly be asserted only by the Debtor. As the Fourth Circuit Court of Appeals stated recently in *In re Baltimore Emergency Services II, Corp.*, 432 F.3d 557 (Fourth Cir., 2005).

> A creditors' committee [or secured creditor] may acquire standing to pursue the debtor's claims if (1) the committee [or creditor] has the consent of the debtor in possession or trustee, and (2) the court finds that suit by the committee [or creditor] is (a) in the best interest of the bankruptcy estate, and (b) is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings.

*Id.,* at *561* (citing *In re Commodore Int'l, Ltd.*, 262 F.3d 96, 100 (2d Cir.2001). Thus, the ESH is simply flat wrong in stating that the Direct lender's are 'contractually obligated' to pay for attorney's fees incurred in fruitlessly attempting to pursue claims, whether those claims are guarantee actions, deficiency actions, or any other litigation without first obtaining the Court's approval.

Further, the last thing that any of the Direct Lenders or the Debtor needs is committee counsel needlessly bird-dogging ordinary foreclosure proceedings or unnecessarily interfering with the Debtor's exercise of its business judgment. While the appointment of the ESH and other committees and approval of the various law firms as counsel to advise those committees was likely proper given the potential for conflicts, the committees have not been given carte blanche authority to pursue litigation on behalf of the Debtor that can at present be conducted *only* by the Debtor. The decision in *Baltimore Emergency Services* makes it clear that the Court retains control of the conduct of any litigation on behalf of the estate. If the Debtor wishes to engage litigation counsel that does not have insurmountable conflicts, a proper application to the court should be made for that purpose.

Moreover, were it not for the automatic stay provisions of 11 U.S.C. §362, virtually all of the loan servicing agreements between the Direct lenders and the Debtor would unquestionably have been cancelled on thirty days notice given pursuant to paragraph 8 of the 'standard' Loan Servicing Agreement immediately after the Debtor's commingling of funds and advances on non-performing loans were disclosed. Paragraph 3 of the 'standard' Loan Servicing Agreement specifically gives the holders

of beneficial interests in a loan the right to act on their own behalf upon approval by the holders of 51% of the fractional interests in the note. The text of that section of the agreement is as follows:

> Pursuant to NAC 645B.073, in the event of default, foreclosure or other matters that require action, if for any reason USA fails to act on Lenders behalf as authorized herein, then Lender may, with approval of fifty-one percent (51%) or more of all of the holders of the beneficial interest of record in the Loan, act on behalf of all such holders of the beneficial interest of record. These actions may include, but are not limited to:
>
> (a) the designation of the mortgage broker, servicing or other person to act on behalf of the holders of the beneficial interests in the loan: and
>
> (b) the sale, encumbrance or lease of real property owned by the holders resulting from a foreclosure or the receipt of a deed in lieu of foreclosure.

Any power of attorney, general or special, would most certainly have been revoked as well.

It is also highly questionable whether such a loan servicing agreement is even enforceable given the provisions of Nevada law with respect to the use of a power of attorney by mortgage brokers. N.R.S. §645B.330 (1)(b) prohibits a mortgage broker from engaging in any number of act or transaction under a power of attorney unless certain restrictions are observed. N.R.S. §645B.330 (1)(b) provides as follows:

> 1. A mortgage broker or mortgage agent shall not engage in any act or transaction on behalf of a private investor pursuant to a power of attorney unless:
>
> (a) The power of attorney is executed for the sole purpose of providing services for not more than one specific loan in which the private investor owns a beneficial interest; and
>
> (b) The provisions of the power of attorney:
>
> (1) Have been approved by the commissioner;
>
> (2) Expressly prohibit the mortgage broker and his mortgage agents from engaging in any act or transaction that subordinates the priority of a recorded deed of trust unless, before such an act or transaction, the mortgage broker obtains written approval for the subordination from the private investor;
>
> (3) Expressly prohibit the mortgage broker and his mortgage agents from using or releasing any money in which the private investor owns a beneficial interest with regard to the specific loan for a purpose that **is not directly related to providing services for the loan unless, before any such money is used or released for another purpose, the mortgage broker obtains written approval from the private investor to use or release the money for the other purpose**; and
>
> (4) **Expressly provide that the power of attorney is effective only for the term of the specific loan unless the mortgage broker obtains written approval from the private investor to extend the term of the power of attorney to provide services for not more than one other loan and the written approval**:

(emphasis added). Subsection (2) of N.R.S. §645B.330 in fact states that a mortgage broker and investor cannot agree to alter or waive the provisions of that section by contract or other agreement. A contract that purports to waive any protections of the statute with respect to the use of a power of attorney is declared *void*:

> A mortgage broker or mortgage agent shall not act as the attorney in fact or the agent of a private investor with respect to the giving of written approval pursuant to paragraph (b) of subsection 1. A private investor and a mortgage broker or mortgage agent may not agree to alter or waive the provisions of this section by contract or other agreement. Any such contract or agreement is void and must not be given effect to the extent that it violates the provisions of this section.

This provision of state law is a direct prohibition against the practice of incurring legal fees without the prior investor consent of the investor. Thus, unless the ESH can show that the power of attorney was ever approved by the commissioner or that it has obtained prior permission to provide any services that are not *directly related* to the loan, the Direct Lenders are *not* legally bound to pay the fees in this bankruptcy.

In this regard, the Court should note that 28 U.S.C. § 959(b) limits a debtor's authority to conduct business in the ordinary course by mandating compliance with applicable state law. The statute provides as follows:

> Except as provided in section 1166 of title 11 [relating to abandonments, mergers, and restructuring in railroad reorganizations], a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager *according to the requirements of the valid laws of the State* in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

(Emphasis added). In *In re White Crane Trading Co., Inc.*, 170 B.R. 694, the bankruptcy court held that the Debtor must observe state consumer protection statutes in the operation of its business. Section 959 is directly applicable to the facts of this case as it relates to surcharging the Direct Lenders for attorneys fees incurred by the Debtor or the ESH. If Nevada law prohibits payment of attorney's fees under a power of attorney without the investor's prior permission, what is the source for the Court's authority to do so?

B. <u>The Debtor's Recoupment Analysis Is Only Partially Correct And The Court Should Preserve All Rights The Direct Lenders Have To Challenge The Amounts Due Them As Holders Of Fractional Interest Under Any Deed Of Trust</u>.

The McKnight 2000 Family Trust joins in the July 28, 2006 Official Committee Of Direct Lenders Limited Opposition to the Debtors' Motion to Distribute Funds And To Grant Ordinary-Course Releases And Distribute Funds and particularly the contention that recoupment is an equitable defense that may only be asserted in an adversary proceeding. Further, there is a strong argument to be made that the Debtor's recoupment theory fails because the Debtor is balancing the books on only *one* side of the transaction, i.e., the obligations of the holders of non-performing loans are not being balanced against the obligations that the Debtor owes to them. In *Ferguson v. Lion Holdings, Inc.*, 312 F.Supp.2d 484 (S.D.N.Y.,2004), the bankruptcy court stated that under non-bankruptcy law "a legal ground upon which a party can postpone paying a sum to another party until the *net liability* between the parties is *finally* determined." *Id., at 503 (emphasis added).* The Court cited *In re Malinowski*, 156 F.3d 131 (2d Cir.1998) with respect to New York law:

> Recoupment means a deduction from a money claim through a process whereby cross demands arising out of the same transaction are allowed to compensate one another and the balance only to be recovered. *Of course, such a process does not allow one transaction to be offset against another, but only permits a transaction which is made the subject of suit by plaintiff to be examined in all its aspects, and judgment to be rendered that does justice in view of the one transaction as a whole*.

*Ferguson* , *supra*, at 503 (emphasis added). Preserving the legal rights of the Direct Lenders to a complete accounting is the only way to protect their valuable rights.

The Court will note that much of the initial revenue that has kept the Debtor in operation during this bankruptcy has been interest income earned on funds received from the performing loans post-petition, *many of which are owned by the Direct Lenders*. The Debtor's argument for seizing, sequestering or attaching funds as it has, rather than promptly paying the loan proceeds over to the Direct Lenders as it is required to do under state law, is essentially that certain of the Direct Lenders were not *in equity* entitled to the advance payments they received. That same reasoning applies equally to the recoupment argument that the Trustee now advances, however. Not only are the post-petition payments money which is held in trust for the Direct Lenders under state law, it is money that is not property of the estate. Logically, the Debtor is *not* entitled to keep the interest earned on the withheld funds. Before any accounting between the parties can be complete, that right must be recognized as

1  well. To hold otherwise is to create a pure windfall for the Debtor at the expense of the Direct Lenders.

2  It should be noted for the record that the McKnight 2000 Family Trust and the Richard
3  McKnight SEP/IRA, which has a $100,000 investment in the Roam Development Group loan, do not
4  agree with the USACM June 30, 2006 reconciliation. The McKnight records show $21,386.10 due
5  from USA while the USA records show only $20,505 due, for a difference of $881.10.Two of the
6  McKnight Loans are listed as non-performing, but in at least one of those instances counsel is informed
7  that the dispute involves a title company's unwillingness to release funds from an interest reserve held by
8  a title company rather than an *actual* default in the payments due under the loan. This discrepancy is
9  noted simply to emphasis that the accounting calculation of the alleged 'overpayments' may be quite
10 different than the actual economic and legal substance of all of these overpayments. The discrepancy,
11 however, illustrates the need for a *complete* accounting on both sides of the ledger before any
12 determinations are made concerning surcharges for attorneys fees or any cost of administration.

## CONCLUSION

14 The foregoing analysis makes it abundantly clear that there is no economic justification or legal
15 basis for withholding another penny from the amount the Debtor proposes to distribute. Thus, the ESH
16 Committee request should be denied in its entirety. Further, if the Court grants the Motion to Distribute
17 Funds And To Grant Ordinary-Course Releases And Distribute Funds, its order must make clear that
18 the distribution of funds is made without prejudice to any right the Direct Lenders may assert to recover
19 on either liquidated or unliquidated claims which they are entitled to assert against the estate. Further,
20 the Court's order should provide that no determination has been made with respect to *any* surcharge
21 for legal fees, appraisals or other costs of administration.

22 DATED this 3rd day of August 2006.

23                                                LAW OFFICES OF RICHARD McKNIGHT, P.C.

25                                                By:    /s/    Thomas J. Gilloon
                                                        Thomas J. Gilloon, Esq.,
26                                                      Nevada Bar No. 000578
                                                        330 S. Third St., #900
27                                                      Las Vegas, NV 89101

| | |
|---|---|
| 1 | Attorneys for McKnight 2000 Family Trust and Richard McKnight SEP-IRA |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | Page 9 of 9 |