Filed
8/4/06
Electronically

| | | |
|---|---|---|
| 1 | STUTMAN, TREISTER & GLATT, P.C. | SHEA & CARLYON, LTD. |
| 2 | FRANK A. MEROLA | JAMES PATRICK SHEA |
| | (CA State Bar No. 136934) | (Nevada State Bar No. 000405) |
| 3 | EVE H. KARASIK | CANDACE C. CARLYON |
| | (CA State Bar No. 155356) | (Nevada State Bar No. 002666) |
| 4 | CHRISTINE M. PAJAK | SHLOMO S. SHERMAN |
| | (CA State Bar No. 217173) | (Nevada State Bar No. 009688) |
| 5 | 1901 Avenue of the Stars, 12th Floor | 233 South Fourth Street, Second Floor |
| | Los Angeles, CA 90067 | Las Vegas, Nevada 89101 |
| 6 | Telephone: (310) 228-5600 | Telephone: (702) 471-7432 |

1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600
E-mail:    fmerola@stutman.com
              ekarasik@stutman.com
              cpajak@stutman.com

233 South Fourth Street, Second Floor
Las Vegas, Nevada 89101
Telephone: (702) 471-7432
E-mail:    jshea@sheacarlyon.com
              ccarlyon@sheacarlyon.com
              ssherman@sheacarlyon.com

*Counsel for the Official Committee of Equity Security Holders of
USA Capital First Trust Deed Fund, LLC*

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY<br>    Debtor | )<br>)<br>)<br>) | BK-S-06-10725-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>    Debtor | )<br>)<br>)<br>) | BK-S-06-10726-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>    Debtor | )<br>)<br>)<br>) | BK-S-06-10727-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>    Debtor. | )<br>)<br>)<br>) | BK-S-06-10728-LBR<br>Chapter 11 |
| In re:<br>USA SECURITIES, LLC,<br>    Debtor. | )<br>)<br>)<br>) | BK-S-06-10729-LBR<br>Chapter 11 |
| Affects<br>☐ All Debtors<br>☒ USA Commercial Mortgage Co.<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed<br>☒ USA First Trust Deed Fund, LLC | )<br>)<br>)<br>)<br>)<br>)<br>) | Date: August 16, 2006<br>Time: 9:30 a.m. |

## OPPOSITION OF THE OFFICIAL COMMITTEE OF SECURITY EQUITY HOLDERS OF USA CAPITAL FIRST TRUST DEED FUND, LLC TO STANDARD PROPERTY DEVELOPMENT, LLC'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY (AFFECTS USA COMMERCIAL MORTGAGE CO. AND USA FIRST TRUST DEED FUND, LLC)

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

401949v1

1    The Official Committee of Equity Security Holders of USA Capital First Trust Deed

2    Fund, LLC (the "FTDF Committee") appointed in the above-captioned bankruptcy cases (the

3    "Chapter 11 Cases") hereby files its Opposition (the "Opposition") to Standard Property

4    Development, LLC's Motion for Relief From the Automatic Stay (the "Motion").

5
        This Opposition is made and based on the pleadings, papers and records on file in the

6    Chapter 11 Cases, the exhibits and points and authorities attached hereto, and any evidence

7    and oral argument to be presented at the time of the hearing of Motion.

8
9        DATED this 4$\frac{TH}{}$ day of August, 2006.

10
11                                        SHEA & CARLYON, LTD.

12
13                                        JAMES PATRICK SHEA
                                          (Nevada State Bar No. 000405)
14                                        CANDACE C. CARLYON
                                          (Nevada State Bar No. 002666
15                                        SHLOMO S. SHERMAN
                                          (Nevada State Bar No. 009688)
16                                        233 South Fourth Street, Second Floor
17                                        Las Vegas, Nevada 89101

18                                        and

19
                                          STUTMAN, TREISTER & GLATT, P.C.
20                                        FRANK A. MEROLA
                                          (CA State Bar No. 136934)
21                                        EVE H. KARASIK
                                          (CA State Bar No. 155356)
22                                        CHRISTINE M. PAJAK
                                          (CA State Bar No. 217173)
23                                        1901 Avenue of the Stars, 12th Floor
24                                        Los Angeles, CA 90067

25
26
27

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

28                                        2

401949v1

# POINTS AND AUTHORITIES

## I.

## BACKGROUND

Standard Property Development, LLC ("Standard"), is a borrower under a loan originated by USA Commercial Mortgage Co. ("USACM"). The funds loaned were invested by numerous individuals and entities (collectively, the "Direct Lenders"), including USA Capital First Trust Deed Fund, LLC ("FTDF").

On July 17, 2006 (approximately three months post-petition), Standard took the extraordinary measure of initiating a lawsuit in a Florida State Court (the "Florida Action") against the Direct Lenders (except FTDF).

Standard seeks relief from the Automatic Stay to name USACM and FTDF as defendants in the Florida Action, as well as to serve notice on the construction control agent that interest reserve payments should not longer be forwarded to USACM. Neither request is supported by the facts or the law.

## II.

## LEGAL ARGUMENT

**A.**    **Movant Has no State Law Basis for Assertion of Claims Against FTDF (or against any of the Direct Lenders)**

1.    Under the Loan Agreement

As set forth in the Construction Loan Agreement (the "Loan Agreement") (Exhibit B to the Motion), the Standard loan was in the original principal amount of $8,240,000 (§3.1). Section 3.2 of the Loan Agreement states:  "through...January 31, 2007, Lender and USA

shall have the exclusive right, but not the obligation, to increase the Loan Amount to an amount not to exceed …$17,750,000… ."    Standard admits that its dealings were not with any individual lenders (including FTDF); rather, monies were borrowed "from USA, as agent for a group of actual lenders…" (Motion, p. 2.)

Standard **admits that the promised funding of $8,400,000 was advanced on March 15, 2006.**    Affidavit of George Venturella filed in support of the Motion ("Venturella Declaration"), at ¶ 6.

Standard conveniently fails to disclose this fact to this Court, instead referencing the execution of a promissory note in the "original principal amount" of $17,750,000 in an apparent attempt to establish, inferentially, an "obligation" by both USACM and the various Direct Lenders (including FTDF) to loan monies in excess of $8,400,000.    See, e.g., Venturella Declaration at ¶ 5.  In fact, the Promissory Note attaches a list of lenders and the amounts loaned, **totaling $8,400,000.**[1]    The Promissory Note also references the Loan Agreement.

The contract in this case is explicit on the issue of whether advances in excess of the original $8,400,000 are required-and, explicitly, they are not.  The "Loan Amount" is defined in § 3.1 of the Loan Agreement as $8,400,000.  With regard to increases in that amount, § 3.2 states the parties' agreement that Lenders and USACM have the "exclusive right, but not the obligation, to increase the Loan Amount…"

---

[1]    Debtor's files indicate that there was an additional advance in March of 2006, evidenced by a filed "First Amendment to Mortgage, executed by Standard, and listing individual lenders with amounts aggregating $9,640,000.  See Exhibit "A" hereto.

Pursuant to § 8.15(a) of the Loan Agreement, "[t]he laws of the State of Nevada, without regard to its choice of law provisions, shall govern the construction and enforcement of the Loan Documents."

According to Nevada law, where, as here, a contract is clear on its face, interpretation is a matter of law, and the court will enforce the contract as written. See, e.g., Chwialkowski v. Sachs, 834 P.2d 404, 406-07 (Nev. 1992) (summary judgment was appropriate, since an unambiguous contract is construed from the language of the document); Ellison v. Calif. State Auto. Assn., 797 P.2d 975, 977 (Nev. 1990) ("It has long been the policy in Nevada that absent some countervailing reason, contracts will be construed from the written language and enforced as written"). Compare Stratosphere Litigation L.L.C. v. Grand Casinos, Inc., 298 F.3rd 1137, 1143-44 (9th Cir. 2002) ("Whether a contract is ambiguous is a question of law to be reviewed de novo.").

The Florida complaint acknowledges this fact. Paragraph 12 of the Florida Complaint asserts that:

> ...Notwithstanding the prior commitments of Milanowski, and other duly authorized agents and representatives of USA Capital (itself the duly authorized agent and representative of the Direct Lenders)...the final sentence of paragraph 3.2 of the Construction Loan Agreement provides:
> Nothing herein shall be deemed to be a commitment by Lender or USA to fund to Borrower any more than the Initial Loan Amount...."

As Standard should well be aware, the allegation that prior oral promises were made which contradict the later written terms of an agreement are simply not provable under Nevada law. "When parties reduce their contract to writing, all oral negotiations and agreements are merged in the writing, and the instrument must be treated as containing the

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

5

401949v1

1    whole contract... ." Daly v. Del E. Webb Corp., 609 P.2d 319, 361-62, quoting Gage v.

2    Phillips, 21 Nev. 150, 153 (1891). Courts are not free to modify or vary the terms of an

3    unambiguous agreement. See, e.g., Kaldi v. Farmer's Ins. Exch., 21 P.3rd 16, 21 (Nev. 2001),

4
5    citing State ex rel. List v. Courtesy Motors, 590 P.2d 163, 165 (1979). "The court is not at

6    liberty, either to disregard words used by the parties, descriptive of the subject matter or of

7    any material incident, or to insert words which the parties have not made use of." Reno Club,

8    Inc. v. Young Inv. Co., 182 P.2d 1011, 1017 (Nev. 1947). In that case, as in the instant case,

9    the provision at issue "appears to be in ordinary and plain language. Its meaning seems clear."

10
11   Id. at 1014. Further, no different interpretation is mandated by the Promissory Note, which

12   (1) references the Loan Agreement; (2) provides that interest accrues only on the outstanding

13   portion of the Note Amount; and (3) attaches a list of lenders and loan amounts, totaling $8.4

14   million. Any interpretation of the agreements which would hold that any amounts in excess of

15   $8.4 million were required to be loaned would contradict the express terms of the Loan

16   Agreement. The long-standing Nevada principles of construction of contracts are to the

17
18   contrary – the court should construe provisions to be consistent with each other, and to give

19   meaning to each part. See, e.g., S.C. Fogus v. Ward and Harrison, 10 Nev. 269 (1875).

20        Extrinsic evidence is not admissible to contradict an express contract term. Kaldi, 21

21   P.3d at 21; Daly, 609 P.2d at 320. Nor is such evidence admissible under the guise of

22   "explaining" the meaning of a provision which is clear on its face. Kaldi, 21 P.2d at 21; Geo.

23
24   B. Smith Chemical v. Simon, 555 P.2d 216, 216 (Nev. 1976).

25        In Kaldi, appellants argued that, although the contract provided Farmer's the right to

26   terminate the agency contract without cause, there was an unwritten term which required

27

28

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

6

401949v1

1    cause for termination.  The Nevada Supreme Court disagreed, affirming the dismissal of the

2    complaint, since Kaldi's efforts were to introduce parol or other extrinsic evidence, the effect

3    of which would be to contradict a clear term of the written agreement.  The court

4
     distinguished this issue from a contract that is silent on a particular issue, or that incorporates
5
     words that are capable of different meanings (citing as an example business days versus
6
7    calendar days).  Further, the court noted that the contract in question "prohibits separate oral

8    contracts and requires that all changes, alterations or modifications to the Agreement to be in

9    writing and signed by all parties." 21 P.3d at 22.  A similar provision prohibiting oral

10   amendments, modifications, or waivers also appear in the Loan Agreement at § 8.10.

11
         2.    Even if the Loan Agreement Was Not Clear, USACM Had no Authority to
12               Promise Additional Funding on Behalf of the Lenders

13       As set forth above, the Loan Agreement provides that "Lender and USA shall have the

14
     exclusive right, but not the obligation to increase the loan amount."  Thus, the Loan
15
16   Agreement itself provides that any increase in funding would require the joint decision of

17   USACM and the lenders.  USACM is without authority to unilaterally commit the Lenders to

18   provide additional funds.

19       In addition, every lender who participates in loans serviced by USACM, including

20
     FTDF, executes a Loan Servicing Agreement ("LSA") authorizing USACM to act as servicing
21
22   agent for such loan or loans on the lender's behalf.  A true and correct copy of FTDF's LSA is

23   attached hereto as Exhibit "B".  Regarding the scope of USACM's authority pursuant to the

24   LSA, the LSA provides in ¶ 2(e) that "[n]otwithstanding the foregoing or any other provision

25   contained herein, USA may not permit any modification to any Loan that would ... change the

26

27

28

*SHEA & CARLYON, LTD.*
*233 S. Fourth Street, Suite 200*
*Las Vegas, Nevada 89101*
*(702) 471-7432*

401949v1

outstanding principal amount ... without Lender's prior consent." This language alone would render invalid any promises by USACM that would purport to increase or to otherwise change the outstanding principal amount without FTDF's express approval.

Moreover, the regulations set forth in NAC 645B.260 expressly provides that "[a]ll decisions regarding the funding of investments in mortgages must be made by the investor." There is no countermanding agreement or grant of authority of any nature that would permit USACM to unilaterally obligate FTDF to increase its funding in any given project.

**B.    Relief From Stay is Not Warranted Under Applicable Bankruptcy Law**

1.    Standard Can and Should Avail Itself of the Claims Process

Standard has taken the extraordinary step of filing a complaint in a distant state court against approximately 137 individuals and entities who are direct lenders on the Standard loan. This step was taken notwithstanding the fact that the only party with whom Standard dealt was USACM, a debtor before this Court. The complaint seeks to adjudicate issues relative to the loan negotiated by, and documents executed by, USACM. USACM is also the sole notice party on behalf of the "Lenders" under the loan documents. The Loan Agreement further provides that the loan documents are governed by Nevada law, and that Nevada is the sole venue for the filing of any action. See Loan Agreement, § 8.15.

Standard now seeks relief from the automatic stay to directly name USACM, and also to name FTDF as a participant in the loan to Standard, in its Florida state court litigation. The justification given is that such relief will enable Standard "to liquidate all related claims involving all of the Direct Lenders, including the two applicable Debtors, in one forum." Motion, p. 7. Standard describes the Circuit Court of the Ninth Judicial Circuit in and for

1   Orange County, Florida, as "a forum in which they will eventually appear and in a locale in

2   which these Debtors voluntarily chose to appear." Id.  This statement constitutes a blatant

3   misrepresentation of the loan documents.  To the contrary, it was Standard which agreed that

4   it:

5

6         **...(i) SUBMITS TO PERSONAL JURISDICTION IN THE STATE OF
      NEVADA OVER ANY SUIT, ACTION OR PROCEEDING BY ANY**

7         **PERSON ARISING FROM OR RELATING TO THE NOTE, THIS
      INSTRUMENT OR ANY OTHER OF THE LOAN DOCUMENTS, (ii)**

8         **AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY
      BE BROUGHT IN ANY STATE OR FEDERAL COURT OF**

9         **COMPETENT JURISDICTION SITTING IN CLARK COUNTY,
      NEVADA...(iii) SUBMITS TO THE JURISDICTION OF SUCH**

10        **COURTS, AND (iv) TO THE FULLEST EXTENT PERMITTED BY
      LAW, AGREES THAT IT WILL NOT BRING ANY ACTION , SUIT**

11        **OR PROCEEDING IN ANY OTHER FORUM....**

12

13  Loan Agreement § 8.15 (emphasis in original).

14        Assuming that Standard actually seeks a common forum to litigate its disputes (rather

15  than a contrived device designed to intimidate the various individuals already hard hit by the

16  consequences of this case), the available forum is clearly recognizable—the United States

17  Bankruptcy Court, District of Nevada.  Compare In re Rannd Resources, Inc., 175 B.R. 393

18

19  (D.C. Nev. 1994).  There, Judge Pro denied a request for abstention based upon the filing of a

20  state court action in Nye County, Nevada, holding that "more complete relief can be afforded

21  in this federal Adversary proceeding."  Id. at 396.  The court noted that certain essential

22  parties were absent from the state court proceeding, and referenced with approval the

23  Bankruptcy Court's denial of a motion for relief from the automatic stay.  Id.

24

25

26

27

28

401949v1

1    2.    A Consideration of the "Curtis Factors" Indicates That Stay Relief Should be
            Denied

2

3    Standard recites a list of factors which may be considered by this Court in determining

4    whether to lift the stay to permit state court litigation to go forward.  These are derived from

5    the bankruptcy court decision in In re Curtis, 40 B.R. 795 (Bankr. D. Utah 1984).  Debtor also

6    cites to In re Plumberex Specialty Products, Inc., 311 B.R. 551 (Bankr. C.D. Ca. 2004).  In

7
     each of those cases, the motion for relief from stay was *denied* by the bankruptcy court.
8
         In Curtis, the court engaged in a discussion of the laudatory role of the automatic stay:
9

10           The automatic stay is, of course, one of the fundamental debtor protections
             under the Bankruptcy Code. ...  The automatic stay is intended 'to prevent a
11           chaotic and uncontrolled scramble for the debtor's assets in a variety of
             uncoordinated proceedings in different courts.  The stay insures that the
12           debtor's affairs will be centralized, initially, in a single forum in order to
             prevent conflicting judgments from different courts and in order to harmonize
13           all of the creditors' interests with one another."

14
     40 B.R. at 798.  The court noted that the automatic stay implements two goals – preventing
15

16   the dissipation of the assets of the debtor's estate, and enabling the debtor to avoid a

17   multiplicity of claims arising in different forums.  Id.  In denying the motion, the court

18   discussed at length the fact that the bankruptcy courts are inherently charged with, and capable

19
     of, the expeditious resolution of claims against debtors.  Id. at 799-800.  However, "[t]he
20
     most important factor in determining whether to grant relief from the automatic stay to permit
21

22   litigation against the debtor in another forum is the effect of such litigation on the

23   administration of the estate.  Even slight interference with the administration may be enough

24   to preclude relief in the absence of a commensurate benefit."  Id. at 806.  Here, the proposal to

25   require the two debtors to be named as defendants in an action in a distant venue, in a case

26

27

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

28                                              10

401949v1

1    involving hundreds of parties, in which the plaintiff seeks to require the debtor to advance

2    funds, would clearly create significant hardship, expense, and disruption to the estates.  No

3    benefit, commensurate or otherwise, would inure to the Debtors if the motion were granted.

4
5          In Plumberex, the court considered a motion for relief from stay where a federal

6    district court judgment had been entered and was on appeal.  The court denied the motion,

7    discussing key "Curtis factors" which it believed to be dispositive.  The court held that the

8    federal patent infringement action "is connected to, and would interfere with, the bankruptcy

9    case."  311 B.R. at 561.  In this case, the basis of the underlying action is the claim that

10   USACM is required to fund approximately $8 million to Standard.  In the meantime, a dispute

11
12   rages as to what, if any, assets are actually property of the estate of USACM.  In addition, the

13   Florida Action is clearly based upon allegations relating solely to the actions of USACM.

14   (See Complaint, Exhibit F to Venturella Declaration.)

15         In Plumberex, the bankruptcy court next noted that the movant essentially sought to

16   bring a new cause of action against the debtor, another factor which militated against granting

17
18   the relief.  Here, the complaint was filed post-petition, such that any concern regarding

19   substantial discovery and trial preparation having been expended pre-petition in another forum

20   is clearly not present.

21         Finally, the bankruptcy court in Plumberex also found that, "[n]ot only do the interests

22   of judicial economy support a denial of relief from the stay, but the cost of protracted

23
24   litigation of a separate proceeding in a non-bankruptcy forum would prejudice the interests of

25   other creditors of the estate."  Such is also the case here.  The Debtors are already paying for

26   the fees and expenses of Debtors' counsel, Debtors' local counsel, Debtors' financial advisors

27

28

*SHEA & CARLYON, LTD.*
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

11

401949v1

1    and CRO, USACM's special counsel in Nevada, and committee professionals for four

2    separate committees.  Granting the motion would necessitate both USACM and FTDF hiring

3    additional counsel admitted to practice in the state of Florida.  Indeed, as discussed above, if

4
     Standard is to be permitted to pursue its clearly frivolous claims in any court, the only court in
5
     which it should do so is this one.
6

7            3.      Relief Should Further be Denied Because the Complaint Involves Issues
                     Uniquely Within the Purview of This Court.
8

9            As discussed above, the basic allegation of the Florida Action is a purported lending

10   commitment which, it is asserted, predated the written contract to the contrary.  At its heart,

11   Standard alleges the existence of an executory contract with USACM, directly and as agent

12   for the Direct Lenders.  Pursuant to 11 U.S.C. §365(a) the debtor may, with certain exceptions

13
     not implicated in this instance, "assume or reject any executory contract…of the debtor."  The
14
     consequences of such rejection, including the allowance and characterization of any resulting
15
     claims, are again peculiarly a matter of bankruptcy law and jurisdiction.
16

17           C.      The Court Should Not Grant Relief to Interfere With the Payment of
                     Interest
18

19           The Loan Agreement provides for an establishment of an Interest Reserve, with

20   monthly interest payments to be billed by USACM and paid from the Interest Reserve.  See

21   Loan Agreement, §§ 3.3, 3.4(e).[2]  There is no provision for the Borrower to control payments

22   of interest reserve funds; to the contrary, the funds may be accessed in full by USACM upon

23
     Borrower's default.
24

25

26   _____
     [2]   There is also reference to a separate "Control Account Escrow Agreement," but a copy of that document has
27   not been furnished.

28                                                    12

*SHEA & CARLYON, LTD.*
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

401949v1

1   Apparently Standard seeks to halt interest reserve payments because it seeks to offset

2   such funds against its claimed damages.  However, Standard contractually waived any right of

3   offset.  The Promissory Note states, at ¶ 10 on p. 4: "Waivers.  Borrower waives any right of

4
    offset it now has or may hereafter have against the Lender hereof and its successors and

5
    assigns...."

6

7   The FTDF Committee submits that it is inappropriate to grant relief from the stay to

8   encourage interference with the recovery of monies loaned by the Direct Lenders; particularly

9   where no basis for doing so has been demonstrated.

10
                                    **III.**

11

12                              **CONCLUSION**

13  For the reasons stated above, based on the foregoing, the FTDF Committee

14  respectfully requests (1) that the Motion be denied; and (2) that the Court grant such other and

15  further relief as the Court finds appropriate.

16  DATED this 4th day of August, 2006.

17

18                                      SHEA & CARLYON, LTD.

19

20                                      JAMES PATRICK SHEA
                                        CANDACE C. CARLYON
21                                      SHLOMO S. SHERMAN
                                        233 South Fourth Street, Second Floor
22                                      Las Vegas, Nevada 89101
23                                      and
                                        STUTMAN, TREISTER & GLATT, P.C.
24                                      FRANK A. MEROLA
25                                      EVE H. KARASIK
                                        CHRISTINE M. PAJAK
26                                      1901 Avenue of the Stars, 12th Floor
                                        Los Angeles, CA 90067
27

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

401949v1

# EXHIBIT "A"

Prepared by and Return To:
Brian M. Jones, Esquire
Shutts & Bowen LLP
300 S. Orange Avenue, Suite 1000
Orlando, Florida 32801

# FIRST AMENDMENT TO MORTGAGE

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Mortgagor hereby agrees to the execution, delivery, and recording of this Amendment to that certain Mortgage (the "Mortgage") dated February 27, 2006, executed in favor of those persons listed on Exhibit "A"as Mortgagees.  The Mortgage was recorded on March 15, 2006 as Document No. 20060173321 in Book 8533, Page 0782 in the Official Records of Orange County, State of Florida.

Said Mortgage is hereby amended to add a new **Exhibit "A"** (in the form attached hereto) thereto to reflect the present Mortgagees.

Said Mortgage affects the real property described on **Exhibit "B"** hereto.

Dated this ___20___ day of March, 2006.


**MORTGAGOR:**     **Standard Property Development, LLC**

By: _____
George Venturella, Manager

**BENEFICIARY:**     **USA Commercial Mortgage Company, Attorney-in-Fact**

By: _____
Joseph D. Milanowski, President

Documentary stamp taxes in the amount of $62,125.00 and intangible tax in the amount of $35,500.00 were paid on the Mortgage recorded in OR Book 8533, Page 782, Public Records of Orange County, Florida, and no additional consideration has been paid and no further documentary stamp taxes or intangible taxes are due.

1

STATE OF NEVADA    )
                        ) ss
COUNTY OF CLARK   )

    This document was executed and acknowledged before me on this ___20___ day of March, 2006 by Joseph D. Milanowski, as President of USA Commercial Mortgage Company.

                                Amanda Stes
                                Notary Public
                                (My commission expires: _1-16-0c_)

(additional notary follows)

STATE OF _____)
                       ) ss.
COUNTY OF _____)

    On _____, 2006, before me, _____, a Notary Public in and for said State, personally appeared **George Venturella,** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

                                (Seal)

_____
    Signature

2

MORTGAGOR:                         Standard Property Development, LLC

                                   By: _____
                                        Steve Parmee, Director


STATE OF FLORIDA                   )
                                   )
COUNTY OF ORANGE                   )


        The foregoing instrument was acknowledged before me this 22nd day of March, 2006 by
Steve   Parmee.     He  is  (✓)  personally   known   to   me   or   ( )  has/have   produced
_____ as identification.


(NOTARY SEAL)                      _____
                                   Notary Public, State of Florida
                                   Print Name:  _ALEXANDRA LION_
                                   Commission No.: DD 0384932
                                   My Commission Expires: 1/9/2009

ALEXANDRA LION
Comm# DD0384932
Expires 1/9/2009
Bonded thru (800)432-4254
Florida Notary Assn., Inc.

EXHIBIT "A"

LENDER

| | NAMES | AMOUNT |
|---|---|---|
| 1 | Premiere Holdings Inc. Defined Benefit Pension Plan & Trust | $50,000 |
| 2 | Anne E. Abrams Trustee of the Abrams Living Trust dtd 10/23/96 | $50,000 |
| 3 | Sidney R. Adams and Lisa Adams Investment Account | $60,000 |
| 4 | August J. Amaral Inc. a Nevada corporation | $100,000 |
| 5 | Charles B. Anderson Trustee of the Charles B. Anderson Trust | $100,000 |
| 6 | First Savings Bank Custodian for Edwin E. Arnold IRA | $50,000 |
| 7 | Louise M. Barker a widower | $50,000 |
| 8 | Harriet Bender Trustee of The Bender Family Trust By-Pass Trust dated 7/30/92 | $100,000 |
| 9 | Robert B. Bender & Paula S. Bender husband & wife as joint tenants with right of survivorship | $250,000 |
| 10 | Land Exchange Accommodators | $300,000 |
| 11 | Peter A. Bolino & Fabiola A. Bolino Trustees of the Bolino Family Revocable Trust dated 3/6/95 | $60,000 |
| 12 | James R. Bonfiglio & Donna M. Bonfiglio General Partners of the Broadwalk Investments Limited Partnership | $100,000 |
| 13 | Jerome Bresson Trustee of the Jerome Bresson Revocable Trust dated 12/1/89 | $100,000 |
| 14 | Michael T. Bridges Trustee of the Bridges Family Trust | $100,000 |
| 15 | William L. Brogan & Dyxeen L. Brogan husband and wife as joint tenants with right of survivorship | $50,000 |
| 16 | Charles R. Brooks and Wendy S. Brooks husband and wife as joint tenants with right of survivorship | $50,000 |
| 17 | Howard D. Brooks & Doreen C. Brooks Trustees of the Brooks Living Trust dated 6/30/97 | $50,000 |
| 18 | Richard L. Cadieux & Clara M. Cadieux husband & wife as joint tenants with right of survivorship | $100,000 |
| 19 | Peter W. Capone & Deidre D. Capone husband & wife as joint tenants with right of survivorship | $50,000 |
| 20 | James B. Cardwell & Reba Jo Cardwell Trustees of the Cardwell Family Trust | $495,000 |
| 21 | James B. Cardwell Trustee of the Cardwell Charitable Trust | $339,000 |
| 22 | Reba Jo Cardwell a married woman dealing with her sole and separate property | $100,000 |
| 23 | Tracy Cavin Trustee Of The Tracy Cavin Family Trust UTD 11/10/03 | $60,000 |
| 24 | Bernard Cohen and Elaine Cohen Trustees of the Bernard Cohen Trust dated 3/24/88 | $50,000 |

| | | |
|---|---|---|
| 25 | Gareth A. R. Craner Trustee of The Gareth A. R. Craner Trust Dtd 6/01/02 | $50,000 |
| 26 | Richard N. Dahlke a married man dealing with his sole & separate property | $50,000 |
| 27 | Monica J. Della an unmarried woman | $50,000 |
| 28 | First Savings Bank Custodian For George A. Di Gioia IRA | $85,000 |
| 29 | Patrick J. Doyle and Jill M. Doyle Trustees of the Doyle Family Trust dated 9/23/1999 | $50,000 |
| 30 | Charles B. Dunn IV Trustee of the Charles B. Dunn IV Trust dated 8/12/05 | $50,000 |
| 31 | William Dupin & Penny Dupin husband & wife as joint tenants with right of survivorship | $50,000 |
| 32 | Ellis L. Elgart and Sivia V. Elgart Trustees of the Ellis L. Elgart Revocable Living Trust dated 7/8/02 | $50,000 |
| 33 | Sagrario T. Evers Trustee of the Sagrario T. Evers Living Trust dated 5/1/01 | $50,000 |
| 34 | Joseph A. Farrah & Emily T. Farrah Trustees of the Farrah Family Trust dated 9/18/03 | $50,000 |
| 35 | Dionisio A. Fernandes MD and Fiola Fernandes husband and wife Joint Tenants with Right of Survivorship | $50,000 |
| 36 | Seymour Frank a married man dealing with his sole and separate property | $50,000 |
| 37 | Anthony Fruscione and Lyda Fruscione Trustees of The Fruscione Family Trust dated 11/21/2005. | $50,000 |
| 38 | Theodore J. Fuller and Joan L. Fuller Trustee of the Fuller Family Trust dated 5/29/97 | $50,000 |
| 39 | Ronald G. Gardner Trustee of the Ronald G. Gardner Trust | $200,000 |
| 40 | First Savings Bank custodian for Richard W. Gilmour IRA | $50,000 |
| 41 | Theodora Gottwald an unmarried woman | $50,000 |
| 42 | William Harrison Goulding and Elizabeth R. Goulding husband & wife as joint tenants with right of survivorship | $50,000 |
| 43 | David W. Grace & Denise Grace Trustees of the David W. Grace & Denise Grace Family Trust dated 10/18/96 | $50,000 |
| 44 | Jeff Hacker an unmarried man | $50,000 |
| 45 | James W. Hale Sr. an unmarried man | $50,000 |
| 46 | Joanne A. Halvorson a married woman dealing with her sole & separate property | $50,000 |
| 47 | Christian K. Hartmann & Katharina Hartmann Trustees of the Hartmann 1997 Trust U/A dated 1/29/97 | $90,000 |
| 48 | Raymond G. Hawkins an unmarried man | $200,000 |
| 49 | Diane H. Higgins a married woman dealing with her sole and separate property | $100,000 |
| 50 | Robert Hitchins an unmarried man | $50,000 |

| | | |
|---|---|---|
| 51 | John A. Hoglund & Patricia O. Hoglund husband & wife as joint tenants with right of survivorship | $50,000 |
| 52 | John M. Hoover & Suzanne J. Hoover Trustees of the Hoover Family 1985 Trust dated 4/3/85 | $125,000 |
| 53 | Richard Houlihan a single man | $50,000 |
| 54 | Milton P Kaplan MD TTEE FBO the Milton P Kaplan Profit Sharing Plan Dtd 10/1/77 | $50,000 |
| 55 | G. Robert Knoles and Christina G. Knoles husband and wife as joint tenants with the rights of survivorship | $50,000 |
| 56 | Patrice A. Labossiere a single woman dealing with her sole and separate property | $50,000 |
| 57 | Renee Leff-Kaplan a married woman dealing with her sole and separate property | $50,000 |
| 58 | F. Ted Lemons | $50,000 |
| 59 | James E. Lofton & Denise G. Lofton husband & wife as joint tenants with right of survivorship | $50,000 |
| 60 | Mary Council Mayfield Trustee of the Hazel R. Council Trust dated 9/23/05 | $50,000 |
| 61 | Rudy Leroy McTee & Sharon Kaye McTee Trustees of the R & S McTee 1995 Trust dated 4/20/95 | $50,000 |
| 62 | Joseph E. Mele a married man dealing with his sole and separate property | $100,000 |
| 63 | Don D. Meyer an unmarried man & Dennis E. Hein an unmarried man as joint tenants with right of survivorship | $50,000 |
| 64 | Michaelian Holdings LLC a Nevada limited liability company | $100,000 |
| 65 | Mahendra C. Mody a single man | $75,000 |
| 66 | Monighetti Inc. a Nevada corporation | $50,000 |
| 67 | Wesley L. Monroe & Jeannie M. Monroe as joint tenants with right of survivorship | $200,000 |
| 68 | Daniel D. Newman Trustee of the Daniel D. Newman Trust dated 11/1/92 | $50,000 |
| 69 | Roger Noorthoek an unmarried man | $50,000 |
| 70 | Robert L. Ogren Trustee for the benefit of the Robert L. Ogren Trust dated 6/30/92 | $100,000 |
| 71 | Philip A. Palmintere & Nanci S. Palmintere Trustees of the Palmintere Revocable Trust dated 6/19/98 | $50,000 |
| 72 | Mojave Canyon Inc. a Nevada Corporation; J.B. Partain President | $125,000 |
| 73 | First Savings Bank Custodian For C. Nicholas Pereos IRA | $50,000 |
| 74 | Beaux Pontak and Denise Pontak husband and wife as Joint Tenants With Right of Survivorship | $50,000 |
| 75 | Stephanie K. Resley an unmarried woman | $50,000 |
| 76 | Larry L. Rieger & Patsy R. Rieger Trustees of the Larry L. Rieger & Patsy R. Rieger Revocable Trust dated 8/14/91 | $50,000 |

| 77 | Seymour H. Rosenberg Trustee of the Seymour H. Rosenberg Revocable Trust dated 11/20/03 | $50,000 |
| 78 | First Savings Bank Custodian For Robert A. Schell IRA | $50,000 |
| 79 | Karl O. Schelling a married man dealing with his sole & separate property | $50,000 |
| 80 | Walter E. Seebach Trustee of the Walter E. Seebach Living Trust dated 11/1/85 | $75,000 |
| 81 | First Savings Bank Custodian For James W. Shaw IRA | $60,000 |
| 82 | Michael Shubic | $25,000 |
| 83 | Tommie W. Sisk a divorced man | $50,000 |
| 84 | Donald J. Smith & Shirley M. Smith Trustees of the Donald J. Smith & Shirley M. Smith Trust | $100,000 |
| 85 | Terrance H. Smith a single man | $100,000 |
| 86 | First Trust Co. of Onaga Custodian For Robert Speckert IRA | $100,000 |
| 87 | Jennifer Chong Stalder Trustee of the Chong Chu Stalder Trust dated 4/19/90 | $50,000 |
| 88 | Nicholas A. Steinmetz & Cynthia M. Steinmetz Trustees of the 2001 Steinmetz Family Trust | $50,000 |
| 89 | Gordon N. Stimpson & Marjorie I. Stimpson Co-Trustees of The Stimpson Family Trust Dated 5/9/00 | $50,000 |
| 90 | Bertha M. Strauss an unmarried woman | $70,000 |
| 91 | Leonard L. Teachenor & Therese M. Teachenor Trustees of the Leonard and Therese Teachenor Trust dated 2/12/01 | $50,000 |
| 92 | Cal Terrill & Judy Terrill Trustees of the Terrill Family Revocable Living Trust dated 3/11/02 | $50,000 |
| 93 | Jack S. Tiano Trustee for An Accountancy Corporation Profit Sharing Plan & Trust dated 02/28/1997 | $50,000 |
| 94 | William E. Trappman and Carol B. Trappman husband and wife as joint tenants with the rights of survivorship | $50,000 |
| 95 | Carol A. Tripp a married woman dealing with her sole and separate property | $50,000 |
| 96 | T-2 Enterprises LLC. Manager  Warren W. Tripp | $75,000 |
| 97 | T-3 Enterprises LLC. Manager Warren W. Tripp | $50,000 |
| 98 | Tripp Enterprises Inc. a Nevada corporation | $100,000 |
| 99 | Warren W. Tripp Trustee of the Tripp Enterprises Inc. Restated Profit Sharing Plan | $50,000 |
| 100 | Warren W. Tripp a married man dealing with his sole & separate property | $100,000 |
| 101 | Gary E. Tucker & Linda L. Tucker husband & wife as joint tenants with right of survivorship | $50,000 |
| 102 | George Turner an unmarried man | $120,000 |
| 103 | Robert H. Turner & Nancy A. Turner Trustees of the 1994 Turner Family Trust dated 9/23/94 | $100,000 |

Standard Property Amend1 ($1.4M)                    Page 4 of 5

| | | |
|---|---|---|
| 104 | USA Capital First Trust Deed Fund | $671,000 |
| 105 | Malden Ventures Ltd. Defined Benefit Pension Plan | $50,000 |
| 106 | Marsha G. Vieira an unmarried woman | $250,000 |
| 107 | Tobias Von Euw Trustee of the Tobias Von Euw Revocable Trust dated 11/23/04 | $80,000 |
| 108 | Robert R. Wade Trustee of the Robert R. Wade Revocable Trust dated 5/22/01 | $70,000 |
| 109 | Scott E. Wagner an unmarried man | $80,000 |
| 110 | David C. Wahl and Margaret A. Wahl husband and wife as joint tenants with the right of survivorship | $50,000 |
| 111 | Darren E. Watson A single man transfer on death to Linda L. Watson | $50,000 |
| 112 | Kurt Weber & Patricia Weber Husband and wife as joint tenants with right of survivorship | $50,000 |
| 113 | Bruce H. Womble & R. Joanne Womble Trustees of the Womble Living Trust dtd 2/3/98 | $100,000 |
| 114 | Robert R. Wright & Betty M. Wright Trustees of the Wright Trust | $50,000 |
| 115 | Zawacki a California LLC | $50,000 |
| | TOTAL | $9,640,000 |

EXHIBIT "B"

## LEGAL DESCRIPTION

A portion of Lot 2, VISTA CENTRE REPLAT, according to the Plat thereof recorded in Plat Book 18, Pages 117 through 121, Public Records of Orange County, Florida, described as follows:

Begin at the Southwest corner of said Lot 2 and run North 89°50'45" East along the South line of said Lot 2 for a distance of 354.96 feet; thence run North 00°09'15" West for a distance of 220.30 feet; thence run South 89°59'52" East for a distance of 135.00 feet; thence run North 00°00'08" East for a distance of 370.00 feet to the Southerly Right-of-Way line of Palm Parkway; thence run North 89°59'52" West along said Southerly Right-of-Way line for a distance of 237.82 feet to the point of curvature of a curve concave Northerly having a radius of 1403.40 feet and a central angle of 10°00'00"; thence run Westerly along the arc of said curve and said Southerly Right-of-Way line for a distance of 244.94 feet; thence run North 79°59'52" West along said Right-of-Way line for a distance of 33.82 feet; thence leaving said Right-of-Way line run South 00°09'49" West along the Westerly line of said Lot 2 for a distance of 241.49 feet; thence run South 89°50'11" East along said Westerly line for a distance of 28.31 feet; thence run South 00°24'42" West along said Westerly line for a distance of 200.67 feet; thence run South 00°14'27" West along said Westerly line for a distance of 176.23 feet to the Point of Beginning.

ORLDOCS 10379957 1
Standard Property Development



# SHUTTS
## &
# BOWEN
## LLP

ATTORNEYS AND COUNSELLORS AT LAW

Direct Dial: (407) 835-6759

E-MAIL ADDRESS:
alion@shutts-law.com

April 28, 2006

**VIA FEDERAL EXPRESS**

Maggie Stone
Legal Department
USA Commercial Mortgage Company
4484 South Pecos Road
Las Vegas, NV 89121

        Re:    **Standard Property Development, LLC Loan from USA Capital**

Dear Maggie:

        Enclosed with this correspondence is the ***original recorded*** First Amendment to Mortgage for Mortgagor, Standard Property Development, LLC and Beneficiary, USA Capital Mortgage Company.

        If you have any questions regarding the foregoing please do not hesitate to contact me.

                                Sincerely,

                                *Alexandra Lion*

                                Alexandra Lion
                                Assistant to Brian M. Jones, Esq.

Enclosure

ORLDOCS 10384060 1
300 SOUTH ORANGE AVENUE SUITE 1000 • P.O. BOX 4956 • ORLANDO FLORIDA 32802-4956 • TELEPHONE (407) 423-3200 • FACSIMILE (407) 425-8316 • www.shutts-law.com

MIAMI        FORT LAUDERDALE        WEST PALM BEACH        ORLANDO        TALLAHASSEE        AMSTERDAM        LONDON

# EXHIBIT "B"

# LOAN SERVICING AGREEMENT

This Loan Servicing Agreement ("Agreement") is made as of the _____ day of_____, 2003, between USA Commercial Mortgage Company ("USA") and_____ USA Capital First Trust Deed Fund_____("Lender").

## RECITALS

A.   USA is a mortgage broker and loan servicer in Clark County, Nevada.

B.   Lender lends, or wishes to lend, money to various borrowers (the term "Borrower" includes single and married persons, corporations, trusts, partnerships and all other legal entities) from time to time, which loans are arranged by USA and are secured by interests in real and/or personal property.

C.   Lender wishes to retain the services of USA in connection with making and servicing a loan or loans (Loan" or "Loans" as the context requires), including all Loans heretofore or hereafter placed by Lender through USA, all upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   <u>Services in Connection with Arranging the Loans</u>. USA will perform the following services in connection with arranging each Loan:

(a)   Obtain a promissory note or notes secured by the trust deed referred to in Section 1(b) below, executed by Borrower in a form customarily used by USA and approved by USA's counsel.

(b)   Obtain a deed of trust, assignment of rents and security agreement executed by Borrower in form customarily used by USA and approved by USA's counsel, and cause the same to be properly recorded.

(c)   Obtain one or more personal or corporate guaranties, if applicable and as determined by USA to be necessary, executed by such guarantors, as USA shall deem appropriate, in form customarily used by USA.

(d)   If  USA deems it appropriate or necessary, obtain, at Borrower's expense, an appraisal of the property to be encumbered, prepared and executed by an appraiser reasonably satisfactory to USA.

(e)   Obtain from a reputable title insurance company, at Borrower's expense, a fully-paid ALTA lender's policy of title insurance, showing Lender as an insured, in an amount at least equal to the initial principal amount of the note and showing as exceptions only those items approved by USA and its counsel.

(f)   Cause the Borrower to obtain, where applicable, casualty insurance policies in amounts at least equal to the principal amount of the note or the full insurable value of the improvements on the

encumbered real property, whichever is less, containing a mortgage or loss payee clause naming Lender, or USA (as agent for Lender), as an additional insured or loss payee.

(g)    Obtain from the Borrower and each guarantor such recent financial statements and information as USA shall deem appropriate.

(h)    Obtain, with respect to any and all encumbrances of record to which Lender's deed of trust will be subject, documentation verifying the principal balance thereof within a reasonable time prior to the making of the Loan and specifying any then existing defaults thereunder.

(i)    Obtain such other documents in connection with the Loan, as USA may deem appropriate in order to protect the Lender's interest.

(j)    All documents which USA obtains from borrower in connection with arranging or servicing any Loan, so long as such Loan is outstanding, shall be kept on file in USA's corporate office and be available to Lender upon request.    Notwithstanding the foregoing, USA shall have no obligation or responsibility to obtain any original documents in connection with any Loan serviced by USA, but not arranged or originated by USA.

(k)    Prepare and deliver to escrow closing instructions to effectuate the Loan closing in accordance with the Loan Agreement and the Fee Agreement.

2.    <u>Services of USA in Connection with Servicing the Loans</u>.    Subject to and in accordance with the terms and conditions set forth in this Agreement, and all applicable laws, Lender instructs and authorizes USA to, and USA will perform the following services in connection with servicing each of the Loans:

(a)    Verify, where applicable, that the property encumbered by Lender's deed of trust is insured (at the Borrower's expense) by a sufficient casualty insurance policy and that Borrower has sufficient liability insurance coverage.    USA will hold for the Lender's account such policies and renewals thereof.

(b)    Keep appropriate accounting records on each note and the sums collected thereon, which records will reflect the amounts collected as to principal, interest and late charges, and, if applicable, insurance, taxes and other specified amounts.    Those records will be available for review by the Lender during regular business hours at USA's corporate office.

(c)    Until the total amount due under each note is paid in full:

(i)    Proceed diligently to collect all payments due under the terms of the note and promptly pay the proper parties, when and if due, principal, interest, late charges, insurance and other specified funds.

(ii)    In the event the Borrower fails to make any payment to USA as required by the terms of the note, USA will take steps to collect the payment including but not limited to delivering default notices, commencing and pursuing foreclosure procedures, and obtaining representation for Lender in litigation and bankruptcy proceedings as deemed necessary or appropriate by USA in its business judgment to

fully protect the interests of the Lender, and of all Lenders in the loan.

          (iii)    In its sole discretion, USA may pay off any Lender at any time by paying the then outstanding balance of Lender's interest in the principal of the Loan, plus all accrued interest and any prepayment penalty or fee, if applicable. Any Lender so paid off shall concurrently execute and deliver therewith to USA an assignment, in a form acceptable to USA, of all of such Lender's right, title, and interest in the Loan (including all documents evidencing the Loan) and in the deed of trust securing the Loan.

          (iv)    In its sole discretion, USA may waive late payment charges, assumption fees, charges for returned checks due to insufficient funds, or other fees which may be collected in the ordinary course of servicing the Loans.

     (d)    Provide the Lender with regular statements regarding loan collections, but in no event less frequently than quarterly.

     (e)    Without limiting the generality of anything contained herein, Lender hereby authorizes and empowers USA, on Lender's behalf, to: (1) execute and deliver demands for payoff and beneficiary's / lender's statements of condition and the like; (2) execute and deliver any and all instruments if satisfaction or cancellation, or of partial or full release, discharge, or reconveyance, or authorizations in connection therewith, with respect to any Loans paid in full and with respect to the related real or personal property securing such Loans; (3) execute and deliver any and all other documents with respect to any Loans that are customary and consistent with loan servicing practices pertaining to such loans; (4) consent to modifications of the Loans if the effect of any such modification will not materially or adversely affect the security provided by the real or personal property in connection therewith; (5) institute foreclosure proceedings (judicial or non-judicial), obtain a deed-in-lieu thereof, engage in settlement discussions, and enter into forbearance and other settlement-related agreements (which agreements may contain provisions that release or waive claims against a Borrower or Guarantor); and (6) take title in the name of Lender (in proportion to its interest in the Loan) to any real property upon a foreclosure or delivery of a deed-in-lieu thereof. Notwithstanding the foregoing or any other provision contained herein, USA may not permit any modification to any Loan that would change the interest rate, forgive the payment of any principal or interest (expressly excluding late charges or the difference between default and non-default interest), change the outstanding principal amount, or extend the maturity date, without Lender's prior consent; provided, however, if Lender fails to grant or deny its consent within three (3) business days after notice from USA, Lender shall be deemed to have conclusively given its consent.

     3.    <u>Rights of Lender if USA Fails to Act</u>.    Pursuant to NAC 645B.073, in the event of default, foreclosure, or other matters that require action, if for any reason USA fails to act on Lender's behalf as authorized herein, then Lender may, with approval of fifty-one percent (51%) or more of all of the holders of the beneficial interest of record in the Loan, act on behalf of all such holders of beneficial interest of record. These actions may include, but are not limited to:

          (a)    the designation of the mortgage broker, servicing agent or other person to act on behalf of the holders of the beneficial interests in the loan; and

          (b)    the sale, encumbrance or lease of real property owned by the holders resulting

from a foreclosure or the receipt of a deed in lieu of a foreclosure.

4.    Legal Proceedings.    USA will assist the Lender in any necessary foreclosure proceedings to protect the Lender's interest in the note and deed of trust. Where necessary, in USA's business judgment, USA may retain attorneys on Lender's behalf. Any legal proceeding instituted by USA pursuant to this Agreement may be pursued in USA's name only or as agent for Lender. Upon demand by USA, Lender agrees to promptly pay, either in advance or to reimburse USA, for its pro rata portion of the out-of-pocket expenses incurred, including attorney's fees, trustee's fees and foreclosure costs. In the event that Lender fails to pay such sums to USA upon demand or request thereof, or if USA elects to advance such sums, USA may, in its discretion, advance such fees, including trustee's fees, attorney's fees, and costs of foreclosure; provided, however, that any fees advanced by USA shall be paid back from the proceeds of the foreclosure (whether by reinstatement or sale), or from any other monies collected with respect to such Loan, before any payments are made to Lender. In the event of any litigation concerning the Loan, Lender hereby appoints USA as its agent to accept service of any summons and complaint, naming Lender as a party.

5.    Compensation to USA for Loan Servicing.   Lender authorizes USA to retain monthly, as compensation for services performed hereunder, (a) one-twelfth (1/12th) of its annual servicing fee, which shall not exceed three percent (3%) per annum of the maximum principal amount of each of the Loans, (b) any late charges collected from the Borrower pursuant to the terms of the Note, and (c) and default interest collected from the Borrower pursuant to the terms of the Note. Notwithstanding the foregoing, it is agreed and acknowledged that USA derives the bulk of its revenues from charging loan fees ("points") to the Borrower. Certain Borrowers, however, may prefer to pay a higher rate of interest in exchange for a reduction in loan fees payable in advance to USA, the higher interest rate comprising a deferred loan fee. USA will notify Lender when such a case arises, and advise Lender of what portion of the interest is payable to USA as a deferred loan fee.

Should Lender desire to sell all or any part of its interest in the note and deed of trust, USA will assist Lender in finding potential buyers and completing the necessary documentation for the transaction. A fee of 5% of the remaining balance of Lender's undivided interest in the note amount will be deducted from the selling price and paid to USA on all such assignments for which USA locates the Assignee.

In the event an extension of a Loan is negotiated, USA shall be entitled to charge a fee therefor from the Borrower pursuant any separate fee agreement between USA and the Borrower.

6.    USA's Right to Delegate.    Notwithstanding anything contained herein, USA may in its sole discretion delegate specific loan arranging and servicing obligations to credit bureaus, real estate tax service companies, real estate brokers or agents, appraisers, attorneys, trustees, or others, provided that USA shall remain responsible for all action taken or not taken by such companies, agents, representatives, and others throughout the term of this Agreement.

7.    No Legal Advice.   Lender acknowledges that USA will not act as Lender's attorney or provide legal advice to Lender, and that Lender is encouraged to seek independent counsel in connection with any questions Lender may have concerning this agreement, any Loan, USA's form loan documents, or any other matter.

8.    Termination.   Lender may, by 30 days written notice to USA, terminate this agreement, and the

power of attorney granted, if one is granted, under Section 11 of this Agreement, if USA fails to perform its obligations hereunder.

9.    Lender's Registration.  Lender(s) name as listed in the first paragraph of this Agreement is the exact form for registration of Lender's interest and for reference to Lender in the Loan Documents.

10.    Integration Clause.  This Agreement contains the entire agreement between the parties hereto and cannot be modified except by a written amendment signed by both parties.  The invalidity of any portion of this agreement shall in no way affect the balance thereof.  This Agreement shall remain in effect until Lender's interest in all notes and deeds of trust with respect to Loans arranged and/or serviced by USA is completely liquidated (unless sooner terminated in accordance with the terms hereof).

11.    Limited Power of Attorney.  With respect to each loan, Lender hereby agrees that USA shall have full power and authority, and Lender hereby appoints USA as its true and lawful attorney-in-fact to (a) hold the original note(s), and (b) to do all things and take all actions on behalf of Lender which are necessary or convenient to effectuate this Agreement and its intent and to protect Lender's interest under any note, deed of trust, guaranty, security agreement or other document pertaining to any Loan.  Upon USA's request, Lender hereby agrees to execute and deliver, in the presence of a notary public, a "Declaration of Agency and Limited Power of Attorney", in a form consistent with Chapter 645B of the Nevada Revised Statutes, pursuant to which Lender shall further evidence the appointment of USA as Lender's true and lawful attorney-in-fact to undertake the duties of USA hereunder.  No one shall be required to look beyond such Declaration of Agency and Limited Power of Attorney for evidence of USA's authority hereunder.  All Declarations of Agency and Limited Powers of Attorney may include the language: This document may be executed with counterpart signature pages, and the document with all counterpart signature pages shall constitute one and the same instrument.

12.  Notices.  All notices, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been given (i) when personally delivered, or (ii) on receipt, when deposited with a recognized overnight courier service such as Federal Express or DHL, or (iii) three (3) business days after the date when deposited in the United States mail and sent postage prepaid by registered or certified mail, return receipt requested, addressed as follows:

        If to USA:        USA Commercial Mortgage Company
                          4484 S. Pecos Road
                          Las Vegas, Nevada 89121-5030
                          Attention:

        If to Lender:

                          Attention:

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

13.    Governing Law.  This Agreement shall be construed in accordance with the laws of the State of

Nevada, without regard to the conflict of laws or rules thereof, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws,

14.   Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

15.   Attorney's Fees.  In the event any party hereto brings an action to enforce any of the provisions of this Agreement, the party against whom judgment is rendered in such action shall be liable to the other for reimbursement of its costs, expenses and attorneys' fees, including such costs, expenses and fees as may be incurred on appeal,

16.   Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors and assigns.

17.   Headings.  Sections headings used in this Agreement are for convenience only and shall not affect the meaning or interpretation of this Agreement.

18.   Authority.  Each party represents and warrants to the other party that it is duly authorized to execute, deliver and perform this Agreement.

IN WITNESS WHEREOF, the parties hereto have signed, sealed, acknowledged and delivered this instrument the day and year first above written.

LENDER: USA Capital First Trust Deed Fund

By: _____
Name: _____ Tom D. Milanowski
Title: ____ Manager

By: _____
Name: _____
Title: _____

USA COMMERCIAL MORTGAGE COMPANY:

By: _____
      Joseph D. Milanowski, President