ELECTRONICALLY FILED
August 16, 2006

1 | STUTMAN, TREISTER & GLATT, P.C.          SHEA & CARLYON, LTD.
FRANK A. MEROLA                          JAMES PATRICK SHEA
2 | (CA State Bar No. 136934)                (Nevada State Bar No. 000405)
EVE H. KARASIK                           CANDACE C. CARLYON
3 | (CA State Bar No. 155356)                (Nevada State Bar No. 002666)
CHRISTINE M. PAJAK                       SHLOMO S. SHERMAN
4 | (CA State Bar No. 217173)                (Nevada State Bar No. 009688)
1901 Avenue of the Stars, 12th Floor     233 South Fourth Street, Second Floor
5 | Los Angeles, California 90067            Las Vegas, Nevada 89101
Telephone: (310) 228-5600                Telephone: (702) 471-7432
6 | Facsimile: (310) 228-5788                Facsimile: (702) 471-7435
Email: fmerola@stutman.com               Email: jshea@sheacarlyon.com
7 |        ekarasik@stutman.com                    ccarlyon@sheacarlyon.com
cpajak@stutman.com                       ssherman@sheacarlyon.com
8 |
Counsel for the Official Committee Of Equity Security
9 | Holders Of USA Capital First Trust Deed Fund, LLC

10 |               UNITED STATES BANKRUPTCY COURT
11 |                     DISTRICT OF NEVADA

12 | In re:                                            )   BK-S-06-10725-LBR
USA COMMERCIAL MORTGAGE COMPANY,                   )   Chapter 11
13 |             Debtor.                              )
14 | In re:                                            )   BK-S-06-10726-LBR
USA CAPITAL REALTY ADVISORS, LLC,                  )   Chapter 11
15 |             Debtor.                              )
16 | In re:                                            )   BK-S-06-10727-LBR
USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,      )   Chapter 11
17 |             Debtor.                              )
18 | In re:                                            )   BK-S-06-10728-LBR
USA CAPITAL FIRST TRUST DEED FUND, LLC,            )   Chapter 11
19 |             Debtor.                              )
20 | In re:                                            )   BK-S-06-10729-LBR
USA SECURITIES, LLC,                               )   Chapter 11
             Debtor.                              )
21 | Affects                                           )
☐ All Debtors                                      )
22 | ☒ USA Commercial Mortgage Co.                     )   Date: August 31, 2006
☐ USA Securities, LLC                              )   Time: 9:30 a.m.
23 | ☐ USA Capital Realty Advisors, LLC                )
☒ USA Capital Diversified Trust Deed               )
24 | ☒ USA First Trust Deed Fund, LLC                  )

25 |     OPPOSITION BY THE OFFICIAL COMMITTEE OF EQUITY SECURITY
26 | HOLDERS OF USA CAPITAL FIRST TRUST DEED FUND, LLC TO MOTION FOR
PAYMENT OF PROCEEDS OF NOTES SECURED BY DEEDS OF TRUST WITHOUT
27 |     REDUCTION FOR NETTING (AFFECTS DEBTORS USA COMMERCIAL
MORTGAGE COMPANY, USA CAPITAL FIRST TRUST DEED FUND, LLC AND USA
28 |     CAPITAL DIVERSIFIED TRUST DEED FUND, LLC)

402258v1

1        The Official Committee of Equity Security Holders of USA Capital First Trust

2  Deed Fund, LLC (the "FTDF Committee") appointed in the above-captioned bankruptcy cases

3  (the "Chapter 11 Cases"), by and through its undersigned counsel, files this objection (the

4  "Objection") to the "Motion For Payment Of Proceeds Of Notes Secured By Deeds Of Trust

5  Without Reduction For Netting" [Docket No. 1061] as amended by the Notice of Errata to such

6  motion [Docket No. 1080] (together, the "Netting Motion").

7        This Objection is based on the Memorandum of Points and Authorities attached

8  hereto; the pleadings, papers, and records on file in this action; and any argument to be

9  entertained at the time of the hearing on the Netting Motion.

10

11  _____

12  FRANK A. MEROLA (CA State Bar No. 136934),
     EVE H. KARASIK (CA State Bar No. 155356), and

13  CHRISTINE M. PAJAK (CA State Bar No. 217173),
     Members of

14  STUTMAN, TREISTER & GLATT, P.C.

15  and

16  CANDACE C. CARLYON
     SHEA & CARLYON, LTD.

17

18  COUNSEL FOR THE OFFICIAL COMMITTEE
     OF EQUITY SECURITY HOLDERS OF

19  USA CAPITAL FIRST TRUST DEED FUND, LLC

20

21

22

23

24

25

26

27

28

402258v1                    2

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2        For the reasons stated in the "Response Of The Official Committee Of Equity

3 Security Holders Of USA Capital First Trust Deed Fund, LLC To Debtors' Motion To Distribute

4 Funds And To Grant Ordinary-Course Releases And Distribute Proceeds" [Docket No. 1000]

5 (the "FTDF Response")[1] and the "Omnibus Reply By The Official Committee Of Equity

6 Security Holders Of USA Capital First Trust Deed Fund, LLC To The Responses And

7 Oppositions Filed Against The Debtors' Motion To Distribute Funds And To Grant Ordinary-

8 Course Releases And Distribute Proceeds" [Docket No. 1084] ("FTDF Reply")[2], which are

9 incorporated herein by reference, the FTDF Committee hereby opposes the Netting Motion.

10        As described in the FTDF Response and FTDF Reply, the dispute over the monies

11 that the Debtors withhold from interim distributions is for another day. At this time, the FTDF

12 Committee currently opposes any effort to restrict the rights of the Debtors (including, but not

13 limited to, any rights under §502(d), recoupment, or setoff). The FTDF Committee believes that

14 these issues will likely be determined through the confirmation process; however, if it becomes

15 necessary to engage in full-blown litigation regarding such rights, a party seeking to require the

16 Debtors to pay over disputed funds is not appropriately brought by a "Motion to Compel

17 Payment." The FTDF Committee, therefore, requests that the present motion be denied. This is

18 also appropriate as no prejudice will inure to any party as a result. With the withheld funds

19 segregated into a separate account (which monies cannot be used by any party without further

20 Court authorization), the rights of parties in interest with respect to these retained funds will not

21 be prejudiced in any way.

22        Moreover, no time limitation exists as to when a party in interest may assert rights

23 in property held by a debtor in possession under Bankruptcy Code section 541(d), and therefore,

24 nothing requires the Court to make this determination today. In fact, any premature

25 determination may unduly foreclose reorganization possibilities.

26

27

[1] A true and correct copy of the FTDF Response is attached hereto as Exhibit "1".

28

[2] A true and correct copy of the FTDF Reply is attached hereto as Exhibit "2".

402258v1                3

1            As the rights of parties in interest have been reserved with respect to these

2    withheld funds, the Netting Motion should be denied without prejudice.

3            For the reasons stated above, the FTDF Committee requests that the Netting

4    Motion be denied without prejudice.

5

6    Respectfully submitted this 16th day of August, 2006.

7

8

9    FRANK A. MEROLA (CA State Bar No. 136934),
     EVE H. KARASIK (CA State Bar No. 155356), and
10   CHRISTINE M. PAJAK (CA State Bar No. 217173),
     Members of
11   STUTMAN, TREISTER & GLATT, P.C.
     1901 Avenue of the Stars, 12th Floor
12   Los Angeles, CA  90067
     Telephone:  (310) 228-5600
13

14   and

15
     CANDACE C. CARLYON
16   SHEA & CARLYON, LTD.
     233 S. Fourth Street, Suite 200
17   Las Vegas, NV  89101
     Telephone:  (702) 471-7432
18   COUNSEL FOR THE OFFICIAL COMMITTEE
     OF EQUITY SECURITY HOLDERS OF
19   USA CAPITAL FIRST TRUST DEED FUND, LLC

20

21

22

23

24

25

26

27

28

402258v1                              4

# EXHIBIT 1

ELECTRONICALLY FILED
August 2, 2006

1  STUTMAN, TREISTER & GLATT, P.C.         SHEA & CARLYON, LTD.
   FRANK A. MEROLA                         JAMES PATRICK SHEA
2  (CA State Bar No. 136934)               (Nevada State Bar No. 000405)
   EVE H. KARASIK                          CANDACE C. CARLYON
3  (CA State Bar No. 155356)               (Nevada State Bar No. 002666)
   CHRISTINE M. PAJAK                      SHLOMO S. SHERMAN
4  (CA State Bar No. 217173)               (Nevada State Bar No. 009688)
   1901 Avenue of the Stars, 12th Floor    233 South Fourth Street, Second Floor
5  Los Angeles, California 90067           Las Vegas, Nevada 89101
   Telephone:  (310) 228-5600              Telephone:  (702) 471-7432
6  Facsimile:  (310) 228-5788              Facsimile:  (702) 471-7435
   Email:  fmerola@stutman.com             Email:  jshea@sheacarlyon.com
7          ekarasik@stutman.com                    ccarlyon@sheacarlyon.com
           cpajak@stutman.com                      ssherman@sheacarlyon.com
8
   Counsel for the Official Committee Of Equity Security
9  Holders Of USA Capital First Trust Deed Fund, LLC

10                    UNITED STATES BANKRUPTCY COURT
                             DISTRICT OF NEVADA
11

| | | |
|---|---|---|
| 12 | In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>    Debtor. | ) ) ) | BK-S-06-10725-LBR<br>Chapter 11 |
| 13 | In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>    Debtor. | ) ) ) | BK-S-06-10726-LBR<br>Chapter 11 |
| 14 | | | |
| 15 | In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>    Debtor. | ) ) ) | BK-S-06-10727-LBR<br>Chapter 11 |
| 16 | | | |
| 17 | In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>    Debtor. | ) ) ) | BK-S-06-10728-LBR<br>Chapter 11 |
| 18 | | | |
| 19 | In re:<br>USA SECURITIES, LLC,<br>    Debtor. | ) ) ) | BK-S-06-10729-LBR<br>Chapter 11 |
| 20 | | | |
| 21 | Affects<br>☐ All Debtors<br>☒ USA Commercial Mortgage Co. | ) ) ) | Date:  August 4, 2006<br>Time:  9:30 a.m. |
| 22 | ☐ USA Securities, LLC | ) | |
| 23 | ☐ USA Capital Realty Advisors, LLC<br>☒ USA Capital Diversified Trust Deed | ) ) | |
| 24 | ☒ USA First Trust Deed Fund, LLC | ) | |

25      **OMNIBUS REPLY BY THE OFFICIAL COMMITTEE OF EQUITY SECURITY**
        **HOLDERS OF USA CAPITAL FIRST TRUST DEED FUND, LLC TO THE**
26      **RESPONSES AND OPPOSITIONS FILED AGAINST THE DEBTORS' MOTION TO**
        **DISTRIBUTE FUNDS AND TO GRANT ORDINARY-COURSE RELEASES AND**
27      **DISTRIBUTE PROCEEDS (AFFECTS DEBTORS USA COMMERCIAL MORTGAGE**
        **COMPANY, USA CAPITAL FIRST TRUST DEED FUND, LLC AND USA CAPITAL**
28      **DIVERSIFIED TRUST DEED FUND, LLC)**

401863v4

1    The Official Committee of Equity Security Holders of USA Capital First Trust

2    Deed Fund, LLC (the "FTDF Committee") appointed in the above-captioned bankruptcy cases

3    (the "Chapter 11 Cases"), by and through its undersigned counsel, files this omnibus reply (the

4    "Reply") in response to the various oppositions and other responses (collectively, the

5    "Responses") filed against the "Debtors' Motion To Distribute Funds And To Grant Ordinary-

6    Course Releases And Distribute Proceeds" (the "Motion to Distribute")[1] and the "Supplement to

7    Debtors' Motion to Distribute Funds" (the "Supplement"), filed by USA Commercial Mortgage

8    Company ("USACM"), USA Capital First Trust Deed Fund, LLC (the "FTD Fund") and USA

9    Capital Diversified Trust Deed Fund, LLC ("Diversified" and, together with FTD Fund, the

10   "Funds"), certain of the above-captioned debtors and debtors and possession (the "Debtors").

11    This Response is based on the Memorandum of Points and Authorities attached

12   hereto; the pleadings, papers, and records on file in this action; and any argument to be

13   entertained at the time of the hearing on the Motion to Distribute.

14

15   _____

16   FRANK A. MEROLA (CA State Bar No. 136934),
     EVE H. KARASIK (CA State Bar No. 155356), and

17   CHRISTINE M. PAJAK (CA State Bar No. 217173),
     Members of

18   STUTMAN, TREISTER & GLATT, P.C.

19   and

20   CANDACE C. CARLYON

21   SHEA & CARLYON, LTD.

22   COUNSEL FOR THE OFFICIAL COMMITTEE
     OF EQUITY SECURITY HOLDERS OF

23   USA CAPITAL FIRST TRUST DEED FUND, LLC

24

25

26

27   _____

28   [1]   Terms not otherwise defined herein shall have the same meanings ascribed to them in the
         Motion to Distribute.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

1.     As reflected in the "Response Of The Official Committee Of Equity Security Holders Of USA Capital First Trust Deed Fund, LLC To Debtors' Motion To Distribute Funds And To Grant Ordinary-Course Releases And Distribute Proceeds" [Docket No. 1000] (the "FTDF Committee Response"), the FTDF Committee generally supports the Debtors' Motion to Distribute Funds.

### II.

### DISCUSSION

**A.     With Appropriate Safeguards, Interim Distributions To Investors Do Not Prejudice the Rights of Any Party In Interest.**

2.     To avoid a myriad of lawsuits before any distributions are made to investors, the Debtors have proposed offsets to be made on an investor-by-investor basis and have agreed that the characterization of any such retained funds would be determined at a later date. The Debtors estimate that these funds will total approximately $28 million, a significant holdback of funds. The dispute over these monies that the Debtors withhold from distribution is for another day. Those funds should be segregated into a separate account and not be used by any party until a proper determination has been made. With these safeguards in place, interim distributions can be made immediately to investors without prejudicing the rights of any party in interest to assert their rights in the retained funds. The limited oppositions filed by the Kantor Group and Direct Lender Committee also support this interim relief so that a significant distribution may be made to investors with all rights reserved. See "Official Committee of Direct Lenders' Limited Opposition to Motion to Distribute Funds and to Grant Ordinary-Course Releases and Distribute Proceeds filed by the Official Committee of Holders of Executory Contract Rights through USA Commercial Mortgage Company" (the "Direct Lender Committee Limited Opposition") [Docket No. 1042], p. 2; 11-12; Limited Objection to the Kantor Group to Debtors' Motion to Distribute Funds and to Grant Ordinary-Course Releases and Distribute

401863v4                                              3

1   Proceeds filed by the Kantor Group [Docket No. 985], p.3; 5.

2        **B.    Meaningful Distributions Should Be Made to FTDF Members.**

3        3.    Distributions should be made to all investors, including those persons (the

4   "FTDF Members") who have invested in USA Capital First Trust Deed Fund, LLC (the "FTD

5   Fund"). In fact, no party has opposed distributions to FTDF Members.[2]

6        4.    Given the amounts the Debtors intend to offset across the various

7   investments of the FTD Fund and the proposed holdback of $800,000 as a reserve for pre-

8   petition and post-petition claims, the FTD Fund will have only an estimated $1 million to

9   distribute to its members. Any further holdbacks, such as those proposed by the Diversified

10  Committee and the Unsecured Creditors' Committee, will result in no meaningful distribution to

11  FTDF Members and are unwarranted.

12       5.    Specifically, the complaints by the Unsecured Creditors' Committee that

13  additional amounts need to be withheld to account for possible offsets across different vesting

14  names does not affect the FTD Fund. The FTD Fund invested only as a single entity, and no

15  additional amounts should be held back from the FTD Fund.

16       6.    Furthermore, unlike other Direct Lenders, the FTD Fund is a debtor-in-

17  possession that is subject to the continuing oversight of the bankruptcy court. If the Court

18  ultimately determines that additional monies can be recovered by the Debtors' other estates, FTD

19  Fund's assets are readily available and will be easy targets. No basis exists to further surcharge

20  or delay the distributions to the FTD Fund anymore.

---

[2]  While Highland Capital opposed distributions to investors of Diversified, no party has
opposed distributions to the FTD Fund. See "Opposition to Debtor's Motion to Distribute
Funds and to Grant Ordinary-Course Releases and Distribute Proceeds" [Docket No. 991],
filed by Creditors, Prospect High Income Fund, ML CBO IV (Cayman) Ltd., PAMCO
Cayman, Ltd., PAM Capital Funding, L.P., Highland Crusader Fund, Ltd., and PCMG
Trading Partners XXII, L.P. ("Highland Capital"). Furthermore, although Highland Capital
has asserted against a claim against the FTD Fund, it appears that Highland Capital only
asserts a claim against Diversified, and the FTDF Committee has objected to its proof of
claim.

401863v4                                    4

C.    **Interim Distributions Should be Made To Investors Without Any Further Holdbacks Other Than Necessary to Pay for the Administrative Expenses of These Estates.**

7.    The attempts by the Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC (the "Diversified Committee") and the Official Committee of Unsecured Creditors of USA Commercial Mortgage Company (the "Unsecured Creditors' Committee"), at this early stage, to recharacterize all loans and proceeds as property of the Debtors' estates is premature. Moreover, the record is far from complete. Neither the Diversified Committee nor the Unsecured Creditors' Committee has alleged any unequivocal grounds that would require the further holdbacks that they have requested.[3]

8.    In other words, the Diversified Committee would like to hold hostage an approximate $24 million reserve, for an unknown amount of time, on top of the $28 million that the Debtors have already proposed to hold back, *without any evidentiary support.* If such a large reserve were granted, the Diversified Committee could hold up plan discussions and the ultimate exit from these cases until it is satisfied with its due diligence. Establishing an arbitrary reserve for an unknown period of time, based on mere speculation, unfairly prejudices numerous investors who depend on the income their USA Capital investments provide to them.

9.    The Diversified Committee asserts that the Debtors engaged in a Ponzi scheme prior to the Petition Date. Simply repeating "Ponzi" numerous times does not make it true.[4] There are many other facts, not presented by the Diversified Committee and Unsecured

---

[3]    The Diversified Committee has requested that any order approving the Motion to Distribute limit distributions to 90% of the amounts proposed by the Debtors on account of interest and 25% of the amounts proposed by the Debtors on account of principal payments. See "Diversified Fund Committee's Limited Opposition to Motion to Distribute Funds" (the "Diversified Committee Opposition") [Docket No. 987] ¶60. The Unsecured Creditors' Committee has requested that any order approving the Motion to Distribute required the Debtors to either (a) holdback 15%-30% of both principal and interest from the funds to be distributed, or (b) "determine the amount of interest that has been paid on each loan, and hold back that amount from any principal distribution, effectively treating the interest payments as applied to principal." See "Response to Motion to Distribute Fund and to Grant Ordinary-Court Releases and Distribute Proceeds" (the "Unsecured Creditors' Committee Response") [Docket No. 995], p. 17.

[4]    This is not your classic Ponzi scheme, in which funds from new investors are needed to make trumped up returns to old investors. See In In re United Energy Corp., 944 F.2d 589, 590, fn.

1 Creditors' Committee, that compel a contrary determination as set forth below and support the

2 FTDF Committee's recommendation that the interim distributions be made at this time with no

3 further holdbacks other than necessary to pay the administrative expenses of these estates.

### 1. Investors in Diversified Were Well-Informed of the Risks of Investing.

6       10.     While the Diversified Committee presents an extended discussion of the

7 improprieties committed by former management, there is a factual and legal disconnect between

8 the allegations in the Diversified Opposition and the request that other investors and FTD Fund

9 should be chargeable with the injury which occurred.

10       11.     In this regard, the Diversified Committee fails to disclose the numerous

11 and significant risks which were disclosed to their investors throughout the Prospectus.   The

12 Diversified Committee's characterization of investment in Diversified as the safer, more

13 conservative investment path is simply inaccurate.  Among the disclosures which were made to

14 the investors in the Diversified Prospectus was that:

> **Investing in our membership units involves a high degree of risk.  See "Risk Factors" beginning on page 36 to read about risks that each investor should carefully consider before acquiring our membership units.  Investors must be prepared to bear the economic risk of their investment for an indefinite period of time and be able to withstand a total loss of their investment.**

20 See "Declaration of Michael A. Tucker in Support of Diversified Fund Committee's Limited

21 Opposition to Motion to Distribute Funds" (the "Tucker Declaration"), Exhibit "A" (Prospectus),

22 cover page (emphasis in original).

23       12.     In addition, the substantial role that would be played by Mr. Hantges and

24 Mr. Millanowski was clearly disclosed.  The Prospectus stated that Diversified would be

---

27 1 (9th Cir. 1991) (defining a Ponzi scheme).  Nothing in these cases suggest that new money that was supposed to be invested in specific loans was diverted to pay returns to old investors.  It currently appears that individual direct lenders and the FTD Fund properly received a fractional interest in loans secured by deeds of trust when they made their investments.  No facts to the contrary have ever been asserted.

1    managed by USA Capital Realty Advisors, LLC. "Our manager is wholly owned by USA

2    Investment Partners, LLC, a Nevada limited liability company. USA Investment Partners, LLC

3    is managed by USA Commercial Mortgage Company, a Nevada corporation, and is controlled

4    by Thomas A. Hantges, Joseph D. Milanowksi and Paul S. Hamilton." See Tucker Declaration,

5    Exhibit "A" (Prospectus), p. 1. Investors were warned that: "Our manager is solely responsible

6    for management and the selection of loans made or purchased by us. .... As a result, investors

7    should only invest in our membership units if they are willing to grant our manager such broad

8    discretion. ...Our manager is also subject to conflicts of interest and may engage in competitive

9    activities." See Tucker Declaration, Exhibit "A" (Prospectus), p. 3. Investors were also

10   cautioned that: "Since our manager is solely responsible for our management, investors should

11   only invest in our membership units if they are willing to entrust our manager to make all

12   decisions regarding our operations." Prospectus, p. 39.[5]

13          13.    In addition, Diversified investors were warned of numerous specific risks

14   relative to the fund, including (but by no means limited to):

15   • As of December 31, 2002, we had approximately $32.4 million of impaired or
16     non-performing loans in our loan portfolio. [This represented approximately
       1/3 of the outstanding equity investments.] Prospectus, p. 11, 38.

17
18   • Of the seven impaired or non-performing loans as of December 31, 2002, we
       have started foreclosure with respect to one loan in the approximate amount of
19     $10 million and will be required to obtain relief from the bankruptcy of a
       debtor involving a loan in the approximate amount of $11 million. The
20     remaining five loans total approximately $11.4 million. As to one of these,
       the developer abandoned the project and M.P.D.D. Ranch, LLC, an entity
21     managed by one of our affiliates, assumed the role of developer for the
       purposes of completing the project. Prospectus, p. 11.
22
23   • We may elect to leverage our loan portfolio by obtaining a revolving credit
       facility from a third party lender, to be used primarily, but not exclusively, to
24     fund new loan opportunities that arise prior to the maturity of then-existing
       mortgage loans. Prospectus, p. 22.
25
26   • Distribution Policy – We make distributions to members only from cash that
       is available for distribution. Prospectus, p. 48.
27

28   [5] The Prospectus warned investors that management was subject to conflicts of interest at least
        10 times.

401863v4                                    7

1  • Due to the number of impaired or non-performing loans as of December 31,
2    2002, the allocation of resources to enforce or preserve our interests may
     adversely affect our cash available for distribution to members. Prospectus, p.
3    38.

4    14.    In sum, when investing in Diversified, Diversified investors were fully

5  informed of the great risks associated in making these investments. There is no reason that the

6  realization of these risks should now be borne by all investors who invested through USACM.

7    2.    **As A SEC Regulated Company, the FTD Fund Had Certain**
            **Reporting and Audit Requirements that the FTDF Members**
8           **Relied Upon In Making Their Investments.**

9    15.    Unlike Diversified, the FTD Fund is a public company regulated by the

10 U.S. Securities and Exchange Commission ("SEC"). FTDF Members invested in the FTD Fund

11 because of the strict reporting and audit requirements of the SEC. There appears to have been

12 very little, if any, fraud in this entity. In fact, the Diversified Opposition even concedes this fact

13 in noting that "[i]t appears that the principals of [USACM] made the type of loans for the 1,300-

14 investor [FTD Fund] that were promised in the prospectus . . . ." See Diversified Opposition, ¶3.

15   16.    It, therefore, appears that the protections of a SEC investment was crucial

16 in these cases and the fraud did not occur across-the-board as the Diversified Committee

17 suggests.

18   3.    **The Alleged Fraud Was Not Widespread.**

19   17.    By and large, it appears that the center of the alleged fraud focused on

20 Diversified. For example, evidence suggests that funds from Diversified were utilized for the

21 real estate development projects of insiders and not to attract new investors. For example, the

22 largest loan, in which Diversified invested, is the loan made to 10-90, Inc. According to the

23 Tucker Declaration, 10-90, Inc. appears to be a pass through to USA Investment Partners LLC

24 ("IP"), whose primary members are Tom Hantges and Joe Milanokski, and this loan was used as

25 a source of funds for the numerous deals of IP and IP related entities. See Tucker Declaration,

26 ¶¶ 42-46. The FTDF Fund expects that many of the other Diversified transactions at issue will

27 have similar factual circumstances. While Diversified might have been pilfered by the Debtors'

28 insiders for their personal real estate development ventures, this fraud was not pervasive.

     18.    In fact, of those loans with serious fraud -- 10-90, Inc. Loan, Epic Loan,

401863v4                                    8

1    Sheraton Hotel Loan, Colt Loans and Fiesta Development McNaughton Loans – 100% of these

2    loans are in the Diversified portfolio. See id. at ¶¶42-57.

3            19.    According to the Tucker Declaration, with respect to the diversion of

4    principal payments, other than amounts pilfered directly from Diversified, principal payments

5    from only ten loans out of the portfolio of 115 loans, less than 10%, were not remitted to

6    individual direct lenders. See id. at ¶34.[6]

7            20.    Based on the "Notice of Filing of Loan Summary as of June 30, 2006"

8    [Docket No. 976] (the "June 30 Loan Summary"), investors in only 49 loans were the recipients

9    of so-called "pre-paid" interest.

10           21.    As the June 30 Loan Summary indicates, the Debtors have made

11   substantial progress in collecting the interest that was previously advanced to investors from the

12   borrowers, themselves. Currently, only 32 loans are still affected by this advanced interest, and

13   the Debtors have made progress by collecting some of this interest on 10 of these loans. See

14   June 30 Summary. In the end, it may be possible that a significant portion of the advanced

15   interest payments may be ultimately collected from the borrowers.

16           22.    There is no evidence at this time hat the alleged fraud was widespread.

17   Given this lack of equivocal evidence, no basis exists to hold back anymore than the approximate

18   $28 million reserve to accomplish the investor-by-investor setoff proposed by the Debtors, other

19   than as necessary to pay for the administrative expenses of these cases.

20           **4.    The Legal Authority Cited By Diversified is Easily
                      Distinguishable.**

21

22           23.    Not only do the facts not provide unequivocal support for the Diversified

23   Committee's theory but the case law cited by the Diversified Committee also provides little

24   support.

25

26   _____

27   [6]  The FTDF Committee notes that the number of loans with diverted principal as set forth in
        the Tucker Declaration differs from the figures footnoted in the Notice of Filing Loan
        Summary as of June 30, 2006, filed with the Court on July 25, 2006 and also differs from the
28      Schedule of Assets and Liabilities filed by USA Commercial Mortgage Company
        ("USACM").

24.      In <u>Foothill Capital Corp. v. Clare's Food Mkt. (In re Coupon Clearing</u>
<u>Serv.)</u>, 113 F.3d 1091 (9th Cir. 1997), one of the questions that the Court examined in
determining the ownership of the coupon proceeds was whether a trust relationship existed
between a coupon clearinghouse and the retailers it serviced. One of the key facts that the Court
relied upon in ruling that no trust relationship existed was that the clearinghouse was required to
make payments to the retailers on a fixed schedule regardless of when the clearinghouse was
paid by the manufacturers. <u>Id.</u> at 1101. As a secondary factor, the court also found that the
entire risk of loss was not borne by the retailers, but rather that the risk of loss was shared
generally by the retailers and the clearinghouse. <u>Id.</u> 1101-02.

25.      Here, nothing in the servicing agreements between USACM and
individual direct lenders require USACM to make interest payments to investors regardless of
whether the underlying borrower paid. In fact, the only obligation that USACM had to any
direct lender was the obligation to remit payments it had actually received from borrowers.
Direct lenders, not USACM, bore the entire risk of loss. Furthermore, the "Special Power of
Attorney" that each direct lender executed with USACM provided for the establishment of a trust
relationship and applicable Nevada state law also requires a mortgage loan servicer to hold
monies in "trust". <u>See</u> Direct Lender Committee Limited Opposition, p. 5. <u>See also</u> NRS
§645B.175.

26.      Similarly, in <u>In re Bullion Reserve of North America</u>, 836 F.2d 1214 (9th
Cir. 1988), the debtor ("BRNA") purported to be in the business of buying bullion, selling it to
the public, and storing it for purchasers (through a subsidiary). BRNA did not actually buy all
the bullion that it represented it would. Rather, it simply deposited the funds it received in a
bank account and bought only a portion of bullion that was supposed to buy. Shortly before the
debtor filed for bankruptcy, a member of BRNA's program requested and received "his" bullion.
The trustee sued for a preferential transfer. It affirming the lower court's ruling that a
preferential transfer had been made, the Ninth Circuit Court of Appeals held that the bullion was
property of the estate, finding that no trust relationship ever existed between BRNA and the
member. <u>Id.</u> at 1218.

1    27.    Once again, In re Bullion is easily distinguishable from the facts of these

2    cases. There is no evidence that monies invested by direct lenders, other than possibly

3    Diversified, was used for any other purpose than making investments in "hard money" loans.

4    Investors received *identifiable* partial interests in loans secured by deeds of trust. As a result,

5    direct lenders, who invested through USACM, are not all similarly situated. Unlike coupon

6    proceeds or gold, which are really just fungible commodities, creating little differentiation in the

7    claims asserted by its investors/creditors, investors in USA Capital loans have very different

8    portfolios that depend, not on luck, but on the particular loan in which they invested. The

9    Diversified Committee has yet to assert any rationale that would support pooling these assets

10    together for the benefit of all so-called "like investors".

11    28.    Also, it is clear that these cases are not similar to the facts presented in In

12    re Lemons & Assoc., 67 B.R. 198 (Bankr. D. Nev. 1986). Unlike Lemons, USACM (i) never

13    guaranteed a rate of return to investors regardless of the performance of the underlying note; (ii)

14    never paid rates to investors that exceeded the interest rates paid on the underlying loans; (iii)

15    never oversubscribed participations in loans; and (iv) never used new investor money to pay

16    returns to old investors. Simply put, the type and breadth of fraud in Lemons was pervasive and

17    affected nearly every investor. The same is not true in these cases, and no facts suggest that the

18    remedy applied in Lemons should be applied here.

19    29.    Given the fact that the Diversified Committee and Unsecured Creditors

20    Committee are unable to assert any definitive facts or law to support their allegations that all

21    assets should be pooled into the Debtors' estates to be distributed to all investors on a pro rata

22    basis, no holdbacks further than the holdbacks made for investor-by-investor offsets should be

23    required on the Debtors' proposed distributions, other than those necessary to pay for the costs

24    that USACM has incurred in these chapter 11 cases.    Investors should not have to wait for the

25    Diversified Committee to finish its fishing expedition before they receive meaningful interim

26    distributions that are rightfully due to them.

27

28

1

**III.**

2

**CONCLUSION**

3            As set forth herein and in the FTDF Committee Response, the FTDF Committee

4   supports (i) the Debtors making distributions to investors, including the FTDF Members, as set

5   forth in the Motion to Distribute but urges the Court to require the Debtors to hold back

6   sufficient funds to be distributed to cover the administrative expenses that USACM has incurred

7   for (a) appraisals and (b) collection costs as well as the fair share of the costs incurred in

8   administering these bankruptcy cases.

9

10

11  Respectfully submitted this 2nd day of August, 2006.

12

13

14  FRANK A. MEROLA (CA State Bar No. 136934),
    EVE H. KARASIK (CA State Bar No. 155356), and
15  CHRISTINE M. PAJAK (CA State Bar No. 217173),
    Members of
16  STUTMAN, TREISTER & GLATT, P.C.
    1901 Avenue of the Stars, 12th Floor
17  Los Angeles, CA 90067
    Telephone: (310) 228-5600
18

19  and

20  CANDACE C. CARLYON
    SHEA & CARLYON, LTD.
21  233 S. Fourth Street, Suite 200
    Las Vegas, NV 89101
22  Telephone: (702) 471-7432
    COUNSEL FOR THE OFFICIAL COMMITTEE
23  OF EQUITY SECURITY HOLDERS OF
    USA CAPITAL FIRST TRUST DEED FUND, LLC
24

25

26

27

28

401863v4                              12

# EXHIBIT 2

ELECTRONICALLY FILED
July 27, 2006

| | | |
|---|---|---|
| 1 | STUTMAN, TREISTER & GLATT, P.C.<br>FRANK A. MEROLA | SHEA & CARLYON, LTD.<br>JAMES PATRICK SHEA |
| 2 | (CA State Bar No. 136934)<br>EVE H. KARASIK | (Nevada State Bar No. 000405)<br>CANDACE C. CARLYON |
| 3 | (CA State Bar No. 155356)<br>CHRISTINE M. PAJAK | (Nevada State Bar No. 002666)<br>SHLOMO S. SHERMAN |
| 4 | (CA State Bar No. 217173)<br>1901 Avenue of the Stars, 12th Floor | (Nevada State Bar No. 009688)<br>233 South Fourth Street, Second Floor |
| 5 | Los Angeles, California 90067<br>Telephone:  (310) 228-5600 | Las Vegas, Nevada 89101<br>Telephone:  (702) 471-7432 |
| 6 | Facsimile:  (310) 228-5788<br>Email:  fmerola@stutman.com | Facsimile:  (702) 471-7435<br>Email:  jshea@sheacarlyon.com |
| 7 | ekarasik@stutman.com<br>cpajak@stutman.com | ccarlyon@sheacarlyon.com<br>ssherman@sheacarlyon.com |

|   |   |
|---|---|
| 8 | |
| 9 | Counsel for the Official Committee Of Equity Security<br>Holders Of USA Capital First Trust Deed Fund, LLC |

10

11

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| 12 | In re:<br>USA COMMERCIAL MORTGAGE COMPANY, | ) | BK-S-06-10725-LBR<br>Chapter 11 |
| 13 | Debtor. | ) | |
| 14 | In re:<br>USA CAPITAL REALTY ADVISORS, LLC, | ) | BK-S-06-10726-LBR<br>Chapter 11 |
| 15 | Debtor. | ) | |
| 16 | In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, | ) | BK-S-06-10727-LBR<br>Chapter 11 |
| 17 | Debtor. | ) | |
| 18 | In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC, | ) | BK-S-06-10728-LBR<br>Chapter 11 |
| 19 | Debtor. | ) | |
| 20 | In re:<br>USA SECURITIES, LLC, | ) | BK-S-06-10729-LBR<br>Chapter 11 |
| | Debtor. | ) | |

| | | |
|---|---|---|
| 21 | Affects<br>☐ All Debtors | ) |
| 22 | ☒ USA Commercial Mortgage Co.<br>☐ USA Securities, LLC | ) | Date:  August 4, 2006<br>Time:  9:30 a.m. |
| 23 | ☐ USA Capital Realty Advisors, LLC | ) |
| 24 | ☒ USA Capital Diversified Trust Deed<br>☒ USA First Trust Deed Fund, LLC | ) |

25

26

27

28

**RESPONSE OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY
HOLDERS OF USA CAPITAL FIRST TRUST DEED FUND, LLC TO DEBTORS'
MOTION TO DISTRIBUTE FUNDS AND TO GRANT ORDINARY-COURSE
RELEASES AND DISTRIBUTE PROCEEDS (AFFECTS DEBTORS USA
COMMERCIAL MORTGAGE COMPANY, USA CAPITAL FIRST TRUST DEED
FUND, LLC AND USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC)**

398964v2

1    The Official Committee of Equity Security Holders of USA Capital First Trust

2  Deed Fund, LLC (the "FTDF Committee") appointed in the above-captioned bankruptcy cases

3  (the "Chapter 11 Cases"), by and through its undersigned counsel, files this response (the

4  "Response") to the "Debtors' Motion To Distribute Funds And To Grant Ordinary-Course

5  Releases And Distribute Proceeds" (the "Motion to Distribute")[1] and the "Supplement to Debtors'

6  Motion to Distribute Funds" (the "Supplement"), filed by USA Commercial Mortgage Company

7  ("USACM"), USA Capital First Trust Deed Fund, LLC (the "FTDF") and USA Capital

8  Diversified Trust Deed Fund, LLC ("Diversified" and, together with FTDF, the "Funds"), certain

9  of the above-captioned debtors and debtors and possession (the "Debtors").

10    This Response is based on the Memorandum of Points and Authorities attached

11  hereto; the pleadings, papers, and records on file in this action; and any argument to be

12  entertained at the time of the hearing on the Motion to Distribute.

13

14  _____

15  FRANK A. MEROLA (CA State Bar No. 136934),
EVE H. KARASIK (CA State Bar No. 155356), and
CHRISTINE M. PAJAK (CA State Bar No. 217173),

16  Members of

17  STUTMAN, TREISTER & GLATT, P.C.

18  and

19  CANDACE C. CARLYON

20  SHEA & CARLYON, LTD.

21  COUNSEL FOR THE OFFICIAL COMMITTEE
OF EQUITY SECURITY HOLDERS OF

22  USA CAPITAL FIRST TRUST DEED FUND, LLC

23

24

25

26

27

28    [1]  Terms not otherwise defined herein shall have the same meanings ascribed to them in the
Motion to Distribute.

398964v2                                    2

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### BACKGROUND

1.    On July 7, 2006, the Debtors filed the Motion to Distribute seeking two different types of relief: (i) Court authority to make distributions to investors, including distributions to Fund Members and (ii) Court authority for the Debtors to grant ordinary-course releases and distribute related proceeds.

**A.    Distributions to Investors.**

2.    As the Debtors have explained in numerous pleadings filed with the Court, USACM, prior to the Petition Date, made regular monthly payments to investors regardless of whether the underlying loan was performing.  As a result, it appears that some investors may have been overpaid.

3.    Pursuant to the Motion to Distribute, the Debtors seek Court authority to recover pre-petition overpayments against payments currently due to investors on an investor-by-investor basis, as opposed to a loan-by-loan basis.[2]  Specifically, payments would be offset based on an investor's "vesting name", not by a customer's identification number.[3]

4.    As the Funds, themselves, are direct lenders, their estates would receive distributions to the extent that monies are available after USACM has made the applicable offsets.  In addition, the Debtors also request Court authority to make monthly distributions to Fund Members to the extent that monies are available in the respective Fund.

5.    While the Motion to Distribute indicates that the Debtors would make an initial distribution followed by subsequent monthly distributions, the FTDF Committee now

---

[2] For example, suppose Investor A invested in 2 different loans – Loan #1 and Loan #2. Before the Petition Date, Investor A was overpaid $50 with respect to Loan #1 and did not receive any overpayments with respect to Loan #2.  After the Petition Date, the Debtors still did not collect anything with respect to Loan #1 but collected $200 on Loan #2.  Under the Motion to Distribute, the Debtors are seeking Court authority to pay Investor A $150.

[3] Investors use an investment vehicle – i.e., a "vesting name" – to make investments through USACM.  Some investors have multiple vesting names, such as "John Doe" and "John Doe IRA", that are all tied to the same contact name, which the Debtors have tracked by using a customer identification number.

1  understands that the Debtors anticipate modifying their request for relief. The Debtors have

2  indicated that, after the initial distribution, no subsequent distribution would be made to investors

3  until a continued hearing is held on subsequent distributions, which would be scheduled for the

4  August 31, 2006 omnibus hearing date.

5         6.     Pursuant to the Supplement, USACM anticipates that the aggregate

6  amount of the initial distribution is approximately $64.7 million, which includes a distribution to

7  FTDF of approximately $1.8 million. According to the Supplement, after making adjustments

8  for applicable offsets, no monies would be distributed to Diversified.

9      **B.**    **Request to Grant "Ordinary Course" Releases.**

10         7.     The Motion to Distribute also seeks authority to grant partial and full

11  releases to borrowers and to disburse funds that the Debtors receive in the Collection Account

12  from loan payment proceeds in connection with the partial release or full release on loans.

13         8.     The Debtors set forth a mechanism, by which they would be authorized to

14  unilaterally grant partial releases to borrowers, which is identical to the procedures set forth in

15  the Partial Release Order previously entered by this Court, and distribute related proceeds to

16  investors. The Partial Release Order authorized the Debtors to grant releases on nine specific

17  loans and, now, the Debtors seek authority to apply these procedures to other loans, as needed,

18  on a going forward basis.

19

20                             **II.**

21                        **ARGUMENT**

22      **A.**    **The FTDF Committee Supports Distributions to Investors, Subject To Adequate Amounts Being Held Back to Pay for Necessary Expenses.**

23         9.     The FTDF Committee strongly supports the Debtors' request to distribute

24  funds to investors. Investors have not received distributions on their investments for several

25  months, causing great hardship to many. As the Debtors' budget indicates that the Collection

26  Account now holds over $90 million, nothing justifies withholding distributions to investors at

27  this time.

28

1    10.    Distributions to investors, however, should not be made in a vacuum.

2  They should be carefully crafted to take into consideration the many concerns and expenses of

3  these bankruptcy cases.

4    **1.    FTDF Committee Supports The Debtors' Request to Offset Pre-Petition Overpayments Against Payments Currently Due To Investors On An Investor-By-Investor Basis.**

5

6    11.    As this Court is aware, it appears that many investors were overpaid prior

7  to the Petition Date. It makes little sense for USACM to make distributions to investors who

8  owe an obligation back to the Debtors' estates. Allowing distributions to go forward without

9  making offsets on an investor-by-investor basis would likely result in a myriad of lawsuits.

10  Despite receiving a larger distribution, individual investors would now face the additional

11  expense of hiring counsel to defend their interests in numerous lawsuits. Moreover, this

12  litigation would likely involve the pursuit of pre-judgment attachments against investors to

13  ensure that sufficient funds are available to satisfy any resulting judgment. Thus, the practical

14  effect of not allowing offsets for overpayments could have a very real and detrimental economic

15  impact on investors and may result in little, if any, funds being retained by investors.

16    12.    Offsetting on an investor-by-investor basis ensures that USACM will be

17  able to recover a larger amount of overpayments, as opposed to offsetting on a "loan-by-loan"

18  basis, and would minimize investors' risk of being sued.

19    13.    The FTDF Committee also supports offsetting by an investor's vesting

20  name as opposed to an investor's client identification number. An investor makes investments

21  through its vesting name – i.e., "John Doe" or "John Doe IRA". The Debtors, however, group

22  investors by their contact information under a client identification number. In other words, if

23  different vesting names all have the same contact information, such names would be grouped

24  under one client identification number. While offsets might be legally appropriate across some

25  vesting names, this may not be the case across other vesting names.

26    14.    The FTDF Committee understands that offsetting overpayments based on

27  a customer identification number, not vesting name, would result in the Debtors retaining a

28  maximum amount of $3 million. Given this relatively small figure and taking into consideration

398964v2                                    5

1    that there are likely legally separate entities among the vesting names that could not be included

2    in the offsets (thereby reducing the $3 million figure) as well as the time and expense of

3    determining whether offsets can be legally made across different vesting names, the FTDF

4    Committee supports the Debtors' method of offsetting by vesting name, on an investor-by-

5    investor basis.

6

7    **2.    The Debtors Should Make Appropriate Holdbacks Before Distributing Funds to Investors.**

8         15.    As currently contemplated, distributions will be made without regard as to

9    how USACM will pay for the fees and expenses it has incurred in maximizing the value of loans

10   that it services on behalf of the Direct Lenders.  Under the standard loan servicing agreement,

11   USACM is entitled to seek from each Direct Lender its pro rata share of "attorney's fees, trustee's

12   fees and the foreclosure costs" and may holdback payments on investors' loans until such

13   payments have been made.  See Loan Servicing Agreement, § 4. In other words, Direct Lenders

14   are contractually obligated to pay for all appraisals and collection costs, including attorney fees.

15   In addition, USACM should also hold back the appropriate amount to cover the costs of its

16   administration of these bankruptcy cases, including fees and costs incurred by counsel for the

17   Direct Lender Committee

18         16.    While, at this time, no determination is being made as to whether these

19   expenses will ultimately be shared by the Direct Lenders on a pro rata basis, it is appropriate, in

20   connection with an interim distribution, to withhold these amounts to ensure that such a "fair

21   share" allocation is not precluded, as a practical matter, by making distributions to investors.

22

23   **3.    The FTDF Committee Supports Distributions to Fund Investors.**

24         17.    The FTDF Committee joins the Debtors' request to make distributions to

25   Fund Members.  As explained in the Motion to Distribute, this Court has the authority to order

26   distributions to Fund Members prior to plan confirmation.  See Motion to Distribute, p. 12-14.

27         18.    As this Court is aware, this is not a typical bankruptcy case.  Thousands of

28   individuals have been adversely affected . As the Debtors stressed in their Motion to Distribute:

it would be inequitable for the Debtors to make distributions to
some, not all, investors. As the Debtors have repeatedly
emphasized, it is their goal to pay investors – all investors, not just
the Direct Lenders. If only Direct Lenders receive distributions
from the Collection Account but money is not also released from
the Funds to the Fund Members, the approximately 3,200 Fund
Members will be adversely affected. The Fund Members, like
their Direct Lender counterparts, rely and depend on their monthly
distribution they expect to receive from the Funds. It is now over
four months since Fund Members have received a distribution, and
many are now suffering the consequences of losing their only
source of income. To the extent the Funds will hold excess cash,
there is simply no reason why these monies should not be made
available to the Fund Members.

Motion to Distribute, p. 13 (lines 15-24).

19.     In fact, the Debtors anticipate making an approximate $1.8 million distribution to FTDF. With a holdback of $800,000 (i) to cover the fees and expenses of the FTDF Committee professionals through the end of June 30, 2006 and (ii) to establish a reserve for the current amount of outstanding pre-petition claims[4], the FTDF Committee expects that about $1 million will be available for distributions to FTDF Members.

**4.     The FTDF Committee Supports Continuing Monthly Distributions.**

20.     The FTDF Committee also supports the Debtors' request to make ongoing monthly distributions to investors, subject to the Debtors withholding the appropriate amounts as described above. The Debtors have completed their forensic accounting and now have accurate records. Nothing should prevent ongoing distributions to investors. Moreover, it is critical that investors, who have come to rely on monthly distributions, receive those distributions in a timely manner, subject to the appropriate holdbacks.

---

[4] According to FTDF's schedule of assets and liabilities, FTDF has $226,000 in unsecured claims (which the FTDF Committee reserves its right to contest). In addition, approximately 27 claims have been filed against FDTF. The FTDF Committee will shortly be filing an objection to the vast majority of these claims and scheduling a hearing on such objection for August 31, 2006, which, if sustained, would result in only $25,000 in additional unsecured (non-scheduled) claims being asserted against the FTDF estate.

398964v2                              7

21.     The FTDF Committee, however, has no objection to the Debtors' proposal to bifurcate the relief requested in the Motion to Distribute so as to go forward on the initial distribution portion on August 4, 2006 and continuing the hearing on subsequent, monthly distributions until August 31, 2006.   In fact, continuing the hearing on ongoing distributions should not affect future distributions as the hearing would be held prior to the Debtors making its next monthly distribution (should the Court approve ongoing distributions).

22.     In sum, the FTDF Committee supports the relief requested in the Debtors' Motion to Distribute but urges the Court to require the Debtors to hold back sufficient funds to be distributed to cover the costs that USACM has incurred for (i) appraisals and (ii) collection costs as well as a fair share of the costs incurred in administering these bankruptcy cases.

**B.     The FTDF Committee Supports the Debtors' Request to Grant "Ordinary Course" Releases and Distribute Proceeds, Subject to the Debtors Applying Holdbacks to Any Such Distributions.**

23.     As noted above, the Debtors seek authority to grant ordinary-course releases and distribute related proceeds.  With respect to granting "ordinary-course" releases, the Debtors' proposed mechanism is identical to the relief granted in the Partial Releases Order.  As the FTDF Committee supported the Partial Releases Order, the FTDF Committee does not oppose the Debtors' request to grant ordinary-course partial and full releases as set forth in the Motion to Distribute.

24.     With respect to the Debtors' request to distribute proceeds that they receive in connection with granting such releases to borrowers, the FTDF Committee believes that any such distributions should also be subject to the holdbacks as described above.

398964v2                                          8

1    For the reasons stated above, the FTDF Committee supports (i) the Debtors

2   making distributions to investors, including the Fund Members, as set forth in the Motion to

3   Distribute but urges the Court to require the Debtors to hold back sufficient funds to be

4   distributed to cover the costs that USACM has incurred for (a) appraisals and (b) collection costs

5   as well as the fair share of the costs incurred in administering these bankruptcy cases; and (ii) the

6   Debtors' proposed mechanism to grant ordinary-course releases and distribute related proceeds,

7   provided that any such distributions of proceeds are also subject to holdbacks as set forth herein.

8

9   Respectfully submitted this 27th day of July, 2006.

10

11

12   FRANK A. MEROLA (CA State Bar No. 136934),
     EVE H. KARASIK (CA State Bar No. 155356), and
13   CHRISTINE M. PAJAK (CA State Bar No. 217173),
     Members of
14   STUTMAN, TREISTER & GLATT, P.C.
     1901 Avenue of the Stars, 12th Floor
15   Los Angeles, CA  90067
     Telephone:  (310) 228-5600
16
17   and

18
     CANDACE C. CARLYON
19   SHEA & CARLYON, LTD.
     233 S. Fourth Street, Suite 200
20   Las Vegas, NV  89101
     Telephone:  (702) 471-7432
21   COUNSEL FOR THE OFFICIAL COMMITTEE
     OF EQUITY SECURITY HOLDERS OF
22   USA CAPITAL FIRST TRUST DEED FUND, LLC
23

24

25

26

27

28

398964v2                              9