*"Exhibit A"*

Parsons, Behle & Latimer                                    E-Filed on August 2, 2006
Nancy L. Allf, Bar No. 0128
Timothy P Thomas, Bar No. 5148
411 E. Bonneville Ave. #100
Las Vegas, NV 89101
(702) 599-6000
nallf@parsonsbehle.com

Robert C. LePome, Esq.
330 S. Third St. #1100B
Las Vegas, NV 89101
(702) 385-5509
Nevada Bar #1980
robert@robertlepome.com

Attorneys for Alexander et, al.

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | | |
|---|---|---|
| In re:<br><br>USA COMMERCIAL MORTGAGE COMPANY<br>    Debtor | ) ) ) ) ) | BK-S-06-10725-LBR<br>Chapter 11 |
| In re:<br><br>USA CAPITAL REALTY ADVISORS, LLC,<br>    Debtor | ) ) ) ) ) | BK-S-06-10726-LBR<br>Chapter 11 |
| In re:<br><br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>    Debtor | ) ) ) ) ) | BK-S-06-10727-LBR<br>Chapter 11 |
| In re:<br><br>USA CAPITAL FIRST TRUST DEED FUND,<br>LLC,<br>    Debtor | ) ) ) ) ) | BK-S-06-10728-LBR<br>Chapter 11 |
| In re:<br><br>USA SECURITIES, LLC,<br>    Debtor | ) ) ) ) ) | BK-S-06-10729-LBR<br>Chapter 11 |
| Affects:<br> ■ All Debtors | ) ) | |

☐ USA Commercial Mortgage Co.    }
☐ USA Securities, LLC    }
☐ USA Capital Realty Advisors, LLC    }
☐ USA Capital Diversified Trust Deed }
☐ USA First Trust Deed Fund, LLC    }
_____    }

DATE: August 31, 2006
TIME:  9:30 A.M.

## CERTIFICATE OF MAILING

I, Toni Rios, hereby certify that the MOTION FOR PAYMENT OF PROCEEDS OF

NOTES SECURED BY DEEDS OF TRUST WITHOUT REDUCTION FOR NETTING

document was forwarded to

I, Toni Rios, hereby certify that a true and correct copy of the aforegoing was

forwarded to:

FRANKLIN C. ADAMS franklin.adams@bbklaw.com, arthur.johnston@bbklaw.com

NANCY L ALLF nallf@parsonsbehle.com,
klawrence@parsonsbehle.com;tthomas@parsonsbehle.com;ecf@parsonsbehle.com

BMC GROUP, INC. evrato@bmcgroup.com,
ecf@bmcgroup.com;jmiller@bmcgroup.com;jbartlett@bmcgroup.com

KELLY J. BRINKMAN kbrinkman@gooldpatterson.com,

THOMAS R BROOKSBANK brooksbanktl@sbcglobal.net, kaya1@sbcglobal.net

MATTHEW Q. CALLISTER mqc@callister-reynolds.com, maggie@callister-reynolds.com

CANDACE C CARLYON ltreadway@sheacarlyon.com,
ccarlyon@sheacarlyon.com;bankruptcyfilings@sheacarlyon.com;rsmith! @sheacarlyon.com

ROB CHARLES rcharles@lrlaw.com, cjordan@lrlaw.com

MICHAEL W. CHEN yvette@ccfirm.com

KEVIN B. CHRISTENSEN kbchrislaw@aol.com,

JANET L. CHUBB tbw@jonesvargas.com

JEFFREY A. COGAN jeffrey@jeffreycogan.com, sarah@jeffreycogan.com

WILLIAM D COPE cope_guerra@yahoo.com, cope_guerra@yahoo.com

CICI CUNNINGHAM bankruptcy@rocgd.com

LAUREL E. DAVIS bklsclv@lionelsawyer.com,
ldavis@lionelsawyer.com;gbagley@lionelsawyer.com;ldavisesq@aol.com

THOMAS H. FEL! L BA! NKRUPTCY NOTICES@GORDONSILVER.COM

SCOTT D. FLEMING sfleming@halelane.com,
dbergsing@halelane.com,ecfvegas@halelane.com

GREGORY E GARMAN bankruptcynotices@gordonsilver.com

WADE B. GOCHNOUR wgochnour@hwmlvlaw.com, donnat@hwmlvlaw.com

CARLOS A. GONZALEZ carlos.gonzalez2@usdoj.gov,
Darlene.Ruckard@usdoj.gov;Eunice.Jones@usdoj.gov;Sue.Knight@usdoj.gov

GERALD M GORDON bankruptcynotices@gordonsilver.com

TALITHA B. GRAY bankruptcynotices@gordonsilver.com

MARJORIE A. GUYMON bankruptcy@goldguylaw.com, ddias@goldguylaw.com

EDWARD J. HANIGAN ! haniganlaw@earthlink.net, haniganlaw1@earthlink.net

XANNA R. HARDMAN xanna.hardman@gmail.com,

STEPHEN R HARRIS noticesbh&p@renolaw.biz

CHRISTOPHER D JAIME cjaime@waltherkey.com, kbernhar@waltherkey.com

EVAN L. JAMES ejameslv@earthlink.net, kbchrislaw@aol.com

ANNETTE W JARVIS ,

TY E. KEHOE TyKehoeLaw@aol.com

ROBERT R. KINAS rkinas@swlaw.com,
mstrand@swlaw.com;jlustig@swlaw.com;chaines@swlaw.com;imccord@swlaw.com

NILE LEATHAM ! nleatham@klnevada.com, ckishi@klnevada.com;ban! kruptcy@
klnevada.com

ROBERT C. LEPOME robert@robertlepome.com, susan@robertlepome.com

REGINA M. MCCONNELL rmcconnell@kssattorneys.com,

WILLIAM L. MCGIMSEY lawoffices601@lvcoxmail.com,

RICHARD MCKNIGHT mcknightlaw@cox.net,
gkopang@lawlasvegas.com;cburke@lawlasvegas.com,sforemaster@lawlasvegas.com

JEANETTE E. MCPHERSON bkfilings@s-mlaw.com

JEANETTE E. MCPHERSON bkfilings@s-mlaw.com

SHAWN W MILLER bankruptcyfilings@sheacarlyon.com,
smiller@sheacarlyon.com;aboehmer@sheacarlyon.com;ltreadway@sheacarlyon.com;rsmith@sh
eacarlyon.com

DAVID MINCIN! mcknightlaw@cox.net,
gkopang@lawlasvegas.com;dmincin@lawlasvegas.com,cburke@lawlasvegas.com,sforemaster@
lawlasvegas.com

JOHN F MURTHA jmurtha@woodburnandwedge.com

ERVEN T. NELSON erv@rlbolick.com, susan@rlbolick.com

BOB L. OLSON ecffilings@beckleylaw.com,
bolson@beckleylaw.com;dgriffis@beckleylaw.com

DONNA M. OSBORN jinouye@marquisaurbach.com,
dosborn@marquisaurbach.com;tszostek@marquisaurbach.com;kgallegos@MarquisAurbach.com

DONALD T. POLEDNAK sandplegal@yahoo.com, spbankruptcy@yahoo.com

PAUL C RAY info@johnpeterlee.com

SUSAN! WILLIAMS SCANN &! nbsp &nb sp sscann@deanerlaw.com,
palexander@deanerlaw.com    .

LENARD E. SCHWARTZER bkfilings@s-mlaw.com

SHLOMO S. SHERMANssherman@sheacarlyon.com,
:aboehmer@sheacarlyon.com;bankruptcyfilings@sheacarlyon.com
ltreadway@sheacarlyon.com;mmallet@sheacarlyon.com;rsmith@sheacarlyon.com

JEFFREY G. SLOANE gjklepel@yahoo.com, rmcconnell@kssattorneys.com

PETER SUSI cheryl@msmlaw.com, msm@msmlaw.com

JEFFREY R. SYLVESTER jeff@sylvesterpolednak.com, David@sylvesterpolednak.com

CARYN S. TIJSSELING cst@beesleymatteoni.com, aha@beesleymatteoni.com

U.S. TRUSTEE - LV - 11 USTPRegion17.lv.ecf@usdoj.gov,

JOAN C WRIGHT jwright@allisonmackenzie.com, jbrooks@allisonmackenzie.com

MATTHEW C. ZIRZOW bankruptcynotices@gordonsilver.com

by electronic service on the 1st day of August, 2006 and to the following by

regular mail on the 1st day of August, 2006

EVAN BEAVERS
1625 HIGHWAY 88, #304
MINDEN, NV 89423

JOSHUA D BRYSK
LAW OFFICES OF JAMES G SCHWARTZ
7901 STONERIDGE DRIVE, SUITE 401
PLEASANTON, CA 94588

FRANK A ELLIS
510 S 9TH ST
LAS VEGAS, NV 89101

ANNETTE W JARVIS
POB 45385
36 SOUTH STATE STREET, #1400
SALT LAKE CITY, UT 84145-0385

REID W. LAMBERT
WOODBURY & KESLER, P.C.
265 EAST 100 SOUTH, SUITE 300
SALT LAKE CITY, UT 84111

ELIZABETH R. LOVERIDGE
WOODBURY & KESLER, P.C.
265 EAST 100 SOUTH, SUITE 300
SALT LAKE CITY, UT 84111

RICHARD J. MASON
1! 30 PINETREE LANE
RIVERWOODS, IL 60015

BRECK E. MILDE
60 South Market St, Suite 200
San Jose, CA 95113

DOUGLAS M MONSON
RAY QUINNEY & NEBEKER P.C.
36 SOUTH STATE STREET
SUITE 1400
PO BOX 45385
SALT LAKE CITY, UT 84145-0385

RAY QUINNEY & NEBEKER P.C.
36 SOUTH STATE STREET, SUITE 1400
P.O. BOX 45385
SALT LAKE CITY, UT 84145

NICHOLAS J SANTORO
400 S FOURTH ST 3RD FLOOR
LAS VEGAS, NV 89101

MICHAEL M. SCHMAHL
MCGUIREWOODS LLP
77 W. WACKER DRIVE, SUITE 4100
CHICAGO, IL 60601

JAMES G SCHWARTZ
7901 STONERIDGE DR #401
PLEASANTON, CA 94588

SCHWARTZER & MCPHERSON LAW FIRM
2850 S. JONES BLVD., #1
LAS VEGAS, NV 89146

PATRICIA K. SMOOTS
318 N GROVE
OAK PARK, IL 60302

BRADLEY J STEVENS
3300 N CENTRAL AVE
PHOENIX, AZ 85012

BRADLEY J STEVENS
3300 N CENTRAL AVE #1800
PHOENIX, AZ 85012

THOMAS W STILLEY
1000 SW BROADWAY #1400
PORTLAND, OR 97205

STEVEN C STRONG
RAY QUINNEY & NEBEKER P.C.
36 SOUTH STATE STREET
SUITE 1400
SALT LAKE CITY, UT 84145-0385

STUTMAN, TREISTER & GLATT PROFESSIONAL CORPORATION
1901 AVENUE OF THE STARS, 12TH FLR
LOS ANGELES, CA 90067

GREGORY J WALCH
400 S FOURTH ST 3RD FLOOR
LAS VEGAS, NV 89101

RUSSELL S. WALKER
265 EAST 100 SOUTH SUITE 300
SALT LAKE CITY, UT 84111

WILLIAM E WINFIELD
POB 9100
OXNARD, CA 93031

MARION E. WYNNE
WILKINS, BANKESTER, BILES & WYNNE, P.A.
POST OFFICE BOX 1367
FAIRHOPE, AL 36533-1367

/s/ Toni Rios
Employee of Robert C. LePome, Esq.

*"Exhibit B"*

Annette W. Jarvis, Utah Bar No. 1649
Steven C. Strong, Utah Bar No. 6340
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com

Attorneys for Debtors and Debtors-in-Possession

**E-FILED on July 7, 2006**

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

## UNITED STATES BANKRUPTCY COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>USA COMMERCIAL MORTGAGE COMPANY,<br><br>                                          Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br><br>USA CAPITAL REALTY ADVISORS, LLC,<br><br>                                          Debtor. | Chapter 11 |
| In re:<br><br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br><br>                                          Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br><br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br><br>                                          Debtor. | **DEBTORS' MOTION TO<br>DISTRIBUTE FUNDS AND TO<br>GRANT ORDINARY-COURSE<br>RELEASES AND DISTRIBUTE<br>PROCEEDS** |
| In re:<br><br>USA SECURITIES, LLC,<br><br>                                          Debtor. | **(AFFECTS USA COMMERCIAL<br>MORTGAGE, USA CAPITAL<br>DIVERSIFIED TRUST DEED FUND,<br>AND USA CAPITAL FIRST TRUST<br>DEED FUND)** |
| Affects:<br>☐  All Debtors<br>☒  USA Commercial Mortgage Company<br>☐  USA Capital Realty Advisors, LLC<br>☒  USA Capital Diversified Trust Deed Fund, LLC<br>☒  USA Capital First Trust Deed Fund, LLC<br>☐  USA Securities, LLC | Date:  August 4, 2006<br>Time:  1:30 p.m. |

- 1 -

1    USA Commercial Mortgage Company ("USA"), USA Capital Diversified Trust Deed

2    Fund, LLC ("Diversified Fund"), and USA Capital First Trust Deed Fund, LLC ("FTD Fund")

3    (collectively, the "Debtors") respectfully move this Court for an order authorizing USA to

4    distribute certain funds held in USA's collection account to direct lenders, and authorizing

5    Diversified Fund and FTD Fund to further distribute certain funds to their respective fund

6    members.  This motion is supported by the Points and Authorities set forth below, declarations of

7    Mr. Allison on file in these cases, and the entire record before the Court.

8    The Points and Authorities set forth below establish a factual and legal basis for the

9    distributions that the Debtors seek to make.  The actual amounts sought to be distributed are still

10    being reconciled and determined by the Debtors' post-petition management, and will be supplied

11    shortly in a supplemental filing to be made by the Debtors in support of this motion.

12    **POINTS AND AUTHORITIES**

13    A.   SUMMARY OF RELEVANT FACTS

14    1.    Debtors commenced their respective bankruptcy cases by filing voluntary petitions for

15    relief under chapter 11 of the Bankruptcy Code on April 13, 2006 (the "Petition Date").  The cases

16    are being jointly administered, along with the chapter 11 cases of two other affiliates of the

17    Debtors (as captioned above), pursuant to an order of this Court.

18    2.    Prior to the Petition Date, USA primarily was in the business of originating, brokering,

19    and servicing commercial real estate loans and fractional interests therein.  USACM has not

20    originated or brokered any new loans since the Petition Date.

21    3.    As of the Petition Date, USA was the loan servicer for approximately 115 commercial

22    loans having a combined outstanding balance of approximately $962 million (the "Serviced

23    Loans"), most of which were secured by various real estate projects or developments.

24    4.    There are approximately 3,600 loan investors (the "Direct Lenders") whose names

25    appear as a "Lender" for one or more of the Serviced Loans.  Typically, there are dozens or even

26    hundreds of Direct Lenders on a particular loan, with each lender having a small fractionalized

27    interest.  Among the Direct Lenders are two of the Debtors, Diversified Fund and FTD Fund

28    (collectively, the "Funds").  Diversified Fund has approximately 1,900 members and FTD Fund

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 - Fax: (702) 892-0122

1    has approximately 1,300 members.  The Fund members, who hold equity ownership interests in

2    the Funds (which are limited liability companies), are sometimes collectively referred to

3    hereinafter as "Fund Members."

4        5.    Each Direct Lender entered into a loan servicing agreement ("Servicing Agreement")

5    with USA authorizing USA to service the loans on behalf of the Direct Lender and to collect

6    certain loan servicing fees and other fees as compensation for USA's services.  The Servicing

7    Agreements authorize USA to retain an "annual servicing fee [] which shall not exceed" either one

8    percent or three percent (depending on which version of the Servicing Agreement was executed)

9    of the "maximum principal amount" of each of the Serviced Loans.  *See* Servicing Agreement ¶ 5

10    (a sample Servicing Agreement is attached hereto as Exhibit A). Because of the practical

11    difficulties of having hundreds of Direct Lenders on some loans and having both the one percent

12    servicing fee and the three percent servicing fee in effect for the same loan (depending on which

13    form of Servicing Agreement was entered into by each Direct Lender on the loan), USA's post-

14    petition management has adopted the conservative position of currently collecting only a one

15    percent servicing fee from all loan payments received post-petition.  USA does not waive the

16    right, however, to collect servicing fees to the full extent allowed by the various Servicing

17    Agreements.

18        6.    As of the Petition Date, USA held approximately $9 million in its loan servicing

19    collection account.  After the Petition Date, USA established a debtor-in-possession collection

20    account (the "Collection Account") and transferred the funds from the pre-petition collection

21    account to the new, post-petition Collection Account.  Pursuant to certain orders of this Court

22    respecting the use of cash, USA has been transferring certain funds from the Collection Account

23    (primarily loan servicing fees) to its operating account for use in administering these cases and in

24    operating the Debtors' business.  Under its new management, USA has continued and indeed

25    accelerated its efforts to collect payments owed on the Serviced Loans, and the balance in the

26    Collection Account as of June 30, 2006 was approximately $93 million, including approximately

27    $14 million in interest collected post-petition on nonperforming loans and approximately $60

28    million collected post-petition in loan principal repayments.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

7.    In USA's pre-petition loan servicing system, USA assigned a unique account number to each Direct Lender for each discrete legal "vesting" name through which the Direct Lender invested. For example, "John Doe" would have a different account number and is considered a different vesting name than "John Doe IRA" or "John Doe, Trustee of the Doe Family Trust." John Doe may have invested individually in several loans, and his interest in each loan would be under the same account number, but he also may have invested in loans through other legal vesting names, and each distinct vesting name would have a distinct account number. All of the vesting names for which John Doe is the principal contact person would be grouped under a single customer ID number.

8.    As discussed in prior testimony and prior filings in this Court, USA's post-petition management determined that USA's pre-petition loan servicing records were incomplete, inaccurate, and unreliable. USA's post-petition management, primarily through the services of Mesirow Financing Interim Management, LLC ("Mesirow"), has undertaken the substantial task of reconstructing and reconciling the loan servicing records on a loan-by-loan and lender-by-lender basis primarily based on source accounting documents and governing loan documents. As a result of these efforts, USA recently has been able to produce Direct Lender Statements showing, as of the Petition Date, the position of each Direct Lender with respect to each of the Serviced Loans in which the Direct Lender invested. These Direct Lender Statements as of the Petition Date have been or will be mailed out to each Direct Lender on or about July 7, 2006. A sample Direct Lender Statement is attached hereto as Exhibit B. USA currently is in the process of updating, reconciling and posting post-petition servicing and collection activities through June 30, 2006, and intends to mail out to the Direct Lenders, on or about July 14, 2006, Direct Lender Statements that will be updated as of June 30, 2006. Although USA has made reasonable efforts to ensure the accuracy of the information reflected in the Direct Lender Statements, the Direct Lender Statements remain subject to revision and correction.

9.    USA has also prepared Fund Member Statements for each of the Fund Members indicating the share ownership held by the Fund Member in the relevant Fund, and the net book value of the Fund Member's ownership as of the Petition Date. A sample Direct Lender Statement

- 4 -

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

is attached hereto as <u>Exhibit C</u>.  It is important to note that the net book value of each Fund is <u>not</u> the actual market value of the Fund's assets (including its interests in the Serviced Loans), which may be substantially less.  Although USA has made reasonable efforts to ensure the accuracy of the information reflected in the Fund Member Statements, the Fund Member Statements remain subject to revision and correction.

10.    According to Debtors' bankruptcy schedules filed with the Court, the scheduled unsecured claims against the FTD Fund total approximately $226,000, and the scheduled unsecured claims against the Diversified Fund total approximately $886,000.  Prior to the hearing date on this motion, the Debtors will provide an estimate of the administrative claims accrued by the Funds in these cases through June 30, 2006.

11.    On May 3, 2006, USA filed its Motion Authorizing Debtor to Accept Loan Payment Proceeds and Provide Partial or Full Releases in Connection With the Sale of Properties Securing Loans Originated by Debtor to Third-Party Borrowers, and to Ratify Partial Releases Previously Provided by the Debtor (the "Partial Releases Motion") (Docket No. 135).  The Partial Releases Motion sought authorization, pursuant to 11 U.S.C. § 105 and 11 U.S.C. § 363(b)(1), for USA to exercise its powers on behalf of Direct Lenders on nine specified loans (the "Nine Loans") to accept loan payment proceeds and provide the necessary partial releases or full releases required in connection with the sale to bona fide purchasers of properties securing the Nine Loans.

12.    The Partial Releases Motion was granted, and the order of approval was entered July 6, 2006, as Docket No. 829 (the "Partial Releases Order").  The Partial Releases Order addressed only the Nine Loans, and did not address USA's authority to grant releases and collect and distribute funds respecting other Serviced Loans.

B.    DETAILS OF PROPOSED DISTRIBUTIONS AND OTHER RELIEF REQUESTED

USA seeks permission to distribute promptly to Direct Lenders a substantial portion of the funds currently held in the Collection Account.  USA intends to provide an estimate of the aggregate dollar amount of the proposed distribution in a supplemental filing on or before July 14, 2006.  The aggregate proposed distribution amount will be the sum of the amounts proposed to be distributed to each Direct Lender by account number (legal vesting name), which in turn will be

the net of the amounts shown on Line 12 of the Direct Lender Statement(s) for each Direct Lender by account number. For example, if a particular Direct Lender invested in five different loans under a single vesting name, the amounts (which may be positive or negative) shown on Line 12 of each of the five Direct Lender Statements for that vesting name will be netted together and the resulting amount, if positive, will be distributed to the Direct Lender.

The Funds also seek permission to distribute promptly a portion of the funds that will become property of their respective estates after the distributions proposed above are received by the Funds in their capacity as Direct Lenders. Each Fund would reserve amounts sufficient to pay scheduled claims against their respective estates and estimated unpaid administrative expenses of the estate, and would distribute the excess amount pro rata to Fund Members in accordance with the share ownership indicated on the Fund Member Statements.

USA seeks authority also to make monthly distributions on a regular basis, after distributions approved pursuant to this motion have been made, to Direct Lenders from loan payments made to USA as servicer by the borrowers on such loans, after deducting USA's servicing fees and other fees and costs it is entitled to charge and after netting amounts that may still be owed from those Direct Lenders on a vesting-name basis as indicated on Line 12 of the Direct Lender Statement(s) for each such Direct Lender. Similarly, the Funds seek authority to make monthly distributions on a regular basis, after distributions approved pursuant to this motion have been made, to Fund Members based on their pro rata share of funds available for distribution in excess of appropriate reserves for scheduled claims and administrative expenses.

Finally, as explained below, USA seeks authority generally to accept loan payment proceeds and provide the necessary partial releases or full releases required in connection with the sale to bona fide purchasers of properties securing Serviced Loans in accordance with the terms and values set forth in applicable loan documents and if the loan is a performing loan and, further, to disburse funds that USA will receive in the Collection Account in connection with such partial or full releases to the Direct Lenders to which such loan payment proceeds are due and payable, consistent with the disbursement terms of this motion.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Debtors seek to make the distributions requested herein without waiving any rights or

2    arguments respecting the calculation of the amounts distributed, the right to collect servicing fees

3    and other fees provided under the Servicing Agreements and other applicable agreements, the right

4    to net all amounts that may be owed to and from a Direct Lender, and all other rights and

5    arguments. Specifically, without limiting the foregoing, Debtors reserve any rights they may have

6    to recover from any Direct Lender or Fund Member to the extent the Direct Lender or Fund

7    Member receives a distribution pursuant to this motion that is ultimately determined to be greater

8    than such Direct Lender or Fund Member had a right to receive.

9    C.    MEMORANDUM OF LAW

10    The legal grounds for key aspects of the relief sought in this motion are set forth below.

11    1.    Basis for Netting of Interest Advances Made to a Direct Lender by USA on a

12    Particular Loan Against Amounts Received Later from the Borrower.

13    Line 7 of the Direct Lender Statement is the Direct Lender's proper share, net of a 1%

14    servicing fee, of the interest paid to USA by the borrower since the inception of the specific loan

15    in question. Line 8 is the amount of interest actually remitted or advanced by USA to the Direct

16    Lender on account of the loan. As set forth on the record in these cases, USA regularly made

17    monthly interest payments to Direct Lenders whether or not the underlying borrower had made

18    payments to USA as servicer. USA's bankruptcy schedules indicate that approximately [$41

19    million] in such interest advances were made by USA to Direct Lenders. Line 9 of the Direct

20    Lender Statement is the difference between Line 7 and Line 8, and to the extent Line 9 is a

21    negative number, it indicates the amount of such interest advanced (i.e., pre-paid) to a particular

22    Direct Lender on a particular loan. For sound legal and equitable reasons, USA is entitled to net

23    the amount that may be "due from" a Direct Lender as shown on Line 9 against amounts collected

24    from the borrower on the subject loan.

25    Recoupment is an equitable doctrine that permits USA to adjust the distributions to Direct

26    Lenders to account for the proposed netting within each particular loan. The justification for the

27    doctrine of recoupment is that it is essentially a defense to a debtor's or creditor's claim rather than

28    a mutual obligation. Although recoupment requires that the obligations arise out of the same

transaction, the Ninth Circuit Court of Appeals has noted that "transaction" in this context is a word of "flexible meaning" and may include a "series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Newbery Corp. v. Fireman's Fund*, 95 F.3d 1392, 1402 (9th Cir. 1996) (quoting *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610 (1926)). "In applying this standard, courts have permitted a variety of obligations to be recouped against each other, requiring only that the obligations be sufficiently interconnected so that it would be unjust to insist that one party fulfill its obligation without requiring the same of the other party." *In re Madigan*, 270 B.R. 749, 755 (9th Cir. BAP 2001) (citations omitted); *see also In re TLC Hospitals, Inc.*, 224 F.3d 1008, 1011 (9th Cir. 2000) (holding that Medicare transactions spanning several years are a single transaction for recoupment purposes). Accordingly, USA has a sound doctrinal basis for recouping interest overpayments made to Direct Lenders.

Section 254 of the Restatement of Trusts provides further support. This section provides,

> If the trustee has made a payment out of trust property to one of several beneficiaries to which the beneficiary was not entitled, such beneficiary is personally liable for the amount of such overpayment, and his beneficial interest is subject to a charge for the repayment thereof, unless he has so changed his position that it is inequitable to compel him to make repayment.

Thus, to the extent USA made interest overpayments to a Direct Lender, such Direct Lender can be charged for the repayment thereof.

The Bankruptcy Code also supports this result. Section 502(d) provides, in relevant part:

> [T]he court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d). A Direct Lender who received interest payments from USA in excess of amounts USA collected from the borrower on the subject loan is "an entity from which property is recoverable" under section 550 of the Bankruptcy Code (addressing the liability of a transferee of an avoidable transfer) and also "a transferee of a transfer avoidable under" section 547 (addressing

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

- 8 -

1   preferential transfers) to the extent the interest was paid within 90 days prior to the Petition Date,

2   and likely also under section 544(b) (incorporating state fraudulent transfer law) and/or section

3   548 (the federal bankruptcy fraudulent transfer statute) to the extent USA did not receive

4   reasonably equivalent value for such transfers and was insolvent.

5          Accordingly, because a Direct Lender who received interest overpayments from USA is a

6   transferee of an avoidable transfer and an entity from which property is recoverable under the

7   Bankruptcy Code, any claim of that Direct Lender must be disallowed unless and until the Direct

8   Lender returns the amount transferred. *See In re America West Airlines, Inc.*, 217 F.3d 1161, 1168

9   (9th Cir. 2000) ("502(d) operates to disallow claims of transferers who do not surrender their

10  avoidable transfer.") (citation omitted); *In re Parker North America Corp.*, 24 F.3d 1145, 1156

11  (9th Cir. 1994) (502(d) "requires the bankruptcy court to disallow claims asserted by a creditor

12  who has received a preferential transfer unless the creditor disgorges the perference payments.").

13  "Claim" is defined by the Bankruptcy Code as a "right to payment," whether "liquidated,

14  unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

15  secured or unsecured," *see* 11 U.S.C. § 101(5), and a Direct Lender arguably has a contingent

16  "claim" against USA for amounts held on the Direct Lender's behalf in the Collection Account.

17  Whether or not Section 502(d) applies literally in this situation, at a minimum it provides

18  analogous support for USA's right to withhold the distribution of funds to the Direct Lender

19  unless and until the interest overpayments due to USA from the Direct Lender are netted against

20  amounts to be distributed to the Direct Lender.

21         Finally, in applying equitable and legal doctrines to the unique circumstances presented in

22  the Debtors' case, practical considerations cannot be ignored. If the proposed netting is not

23  permitted, the end result would be protracted litigation involving up to 3,600 Direct Lenders. This

24  would require individual Direct Lenders to hire counsel and defend their position in multiple

25  lawsuits. In pursuing these lawsuits, the Debtors may need to seek pre-judgment attachment of the

26  Direct Lenders' assets to ensure that sufficient funds are available to pay any resulting judgment.

27  These lawsuits would have to be filed promptly and pursued vigorously to ensure that Direct

28  Lenders' assets would not be dissipated or sheltered away. Therefore, not allowing the Debtors to

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

- 9 -

1  net or "true-up" amounts owed to and from a Direct Lender in a particular loan would ultimately

2  cost the Direct Lenders as a whole, as well as other creditors of the Debtors' estates (including

3  Fund Members as contingent creditors), much more than simply allowing USA to net these

4  amounts prior to making distributions.

5      2.   Basis for Netting Amounts Owed to or from a Direct Lender Under a Specific

6          Vesting Name on Various Loans.

7      The motion also seeks to net amounts owed to or from a Direct Lender on a particular loan,

8  as set forth on Line 12 of the Direct Lender Statement, against amounts owed to or from the Direct

9  Lender on other loans on a per-vesting-name basis.[1]  This additional level of netting is necessary

10  and appropriate for all of the reasons stated above in support of loan-by-loan netting.  Direct

11  Lenders who invested only in performing loans (if there are any such Direct Lenders) would not

12  be harmed by this approach.  Furthermore, the vast majority of Direct Lenders, who are invested

13  in both performing and non-performing loans, would benefit by this type of netting.  For example,

14  one Direct Lender having a substantial investment in a wide array of performing and non-

15  performing loans, Donna Cangelosi, appeared pro se before this Court at the hearing held June 15,

16  2006, and expressed a strong preference that her interests in her various loans be sorted out

17  together under the jurisdiction of this Court.  Distributing an amount owed to a Direct Lender on

18  one loan while suing that same Direct Lender for an amount owed to USA on another loan not

19  only makes no sense, but would result in chaos in these cases and would likely result in a greatly

20  diminished return to all investors (Direct Lenders and Fund Members) and creditors in these cases,

21  as litigation costs would substantially eat away the return to investors and creditors.

22      As noted above, the recoupment doctrine espoused in the Ninth Circuit is broad enough to

23  permit USA to recoup an amount owed by a lender on one loan against an amount owed to the

24  same lender on another loan.  The requirement that the amounts to be netted under recoupment

25

26  ---

[1] Debtors understand that three of the four official committees in these cases favor netting on an even
27  broader basis, that is, on a "customer ID" basis as explained in paragraph 7 of the Facts section above.
Debtors do not oppose netting on a broader basis to the extent practical and legally justifiable, and are
28  currently evaluating the complicated factual and legal issues concerning whether certain vesting names
identified within the same Customer ID number can properly be combined for netting purposes without
unduly delaying a distribution to Direct Lenders.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1 must arise from the same "transaction" is met in this case, as the "flexible meaning" of the term

2 "transaction" includes a series of many separate occurrences connected by a logical relationship.

3 *Newbery Corp.*, 95 F.3d at 1402. A Direct Lender typically invested in loans through USA by

4 means of a single Servicing Agreement that applied to all of loans of the Direct Lender, and the

5 Direct Lender received regular monthly interest payments from USA with respect to all loans in

6 the lender's portfolio (usually in one combined check) whether or not the underlying loans were

7 performing or nonperforming. Thus, interest payments overpaid on one loan of a Direct Lender

8 and interest or principal payments underpaid on another loan of that same lender are logically

9 connected and part of the same transaction between USA and the Direct Lender. Furthermore, it is

10 important to emphasize the equities in these cases. It makes little sense for an investor to receive a

11 distribution when it owes an obligation to USA. Recoupment was designed to net out these

12 differences and ensure that no party is unjustly enriched. *See, e.g., In re B&L Oil Co.*, 782 F.2d

13 155, 159 (10th Cir. 1986) (holding that recoupment is appropriate to prevent the unjust enrichment

14 and emphasizing that "bankruptcy courts apply recoupment as an equitable doctrine").

15     Similarly, Section 502(d) applies equally to lender-by-lender netting as it does to loan-by-

16 loan netting. The Direct Lender is an "entity from which property is recoverable" under Section

17 550 and a "transferee of a transfer avoidable" under sections 544, 547, and/or 548 in either case,

18 and such lender's claim for recovery of loan payments should be denied unless and until the

19 netting across the various loans in the Direct Lender's portfolio is accomplished.

20     3.     Basis for the Funds to Make Distributions to the Fund Members

21     Pursuant to this motion, the Debtors seek authority to make distributions to all investors,

22 including the Fund Members as well as the Direct Lenders. While distributions from a debtor's

23 estate typically do not occur until plan confirmation, this Court has the power to order such

24 distributions in light of the extraordinary circumstances of these cases. Several courts have

25 allowed pre-confirmation distributions. *See, e.g., In re Realty Associates Sec. Corp.*, 58 F. Supp.

26 220 (E.D.N.Y. 1944) (citing several other cases, including eleven non-reported cases, that allowed

27 pre-confirmation distributions*); In re Industrial Office Bldg. Corp.*, 171 F.2d 890 (3rd Cir. 1949).

28

- 11 -

1       In *Realty Associates*, after finding that the debtor had liquid assets in excess of the debtor's

2   working capital needs and after providing for a reasonable reserve, the court authorized an interim

3   distribution to the debtor's bondholders before a plan of reorganization had even been proposed.

4   *See Realty Assocs.*, 58 F. Supp. at 221 (emphasizing that where debtor has sufficient assets to

5   continue its business, "[t]here is no reason why a distribution should not be made at this time to

6   bondholders, who have as yet received nothing on the principal of their claims."). The Court of

7   Appeals for the Third Circuit applied the reasoning of this decision in affirming the power of the

8   lower court to order interim distributions to bondholders prior to plan confirmation. *See In re*

9   *Industrial Office Bldg. Corp.*, 171 F.2d at 893. In particular, the Third Circuit found that the

10  interim distributions were not only "warranted by the circumstances" but would not have a

11  negative impact on making reorganization either "impractical' or infeasible. *Id.* In sum, the Third

12  Circuit found that, "on the facts presented, were we to make a de novo finding, we would conclude

13  as did the court below that distributions to the bondholders were proper." *Id.*

14      While *Realty Associates* and *Industrial Office* pre-date the enactment of the Bankruptcy

15  Code, they have never been overturned and have been cited with approval by later courts. *See*

16  *e.g., In re Conroe Forge & Mfg. Corp.*, 82 B.R. 781, 784 (Bankr. W.D. Pa. 1988) (while ruling

17  that distribution of proceeds was improper in this case, court held that the issue to be decided was

18  whether such a distribution would be in the "best interests of all parties in interest"). Relying on

19  the analysis in *Conroe*, a later court authorized the distribution of a debtor's sale proceeds to a

20  holder of an undisputed secured claim. *See In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934

21  (Bankr. S.D. Tex. 1988). In that case, the court found no reason to withhold proceeds until

22  confirmation of a plan to a party who was entitled to receive them at some point in the future. *Id.*

23  at 944. The court reasoned that such a distribution would not dictate the subsequent terms of a

24  plan of reorganization nor endanger creditor protections and, accordingly, was in the "best

25  interests of all parties in interest." *Id.* at 943.

26      Similarly, there is no reason why interim distributions should not be made to the Fund

27  Members in these cases. First, the distribution to Fund Members would be made only to the extent

28  the relevant Fund holds excess cash. While the Debtors do not have the final accounting for the

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    anticipated distributions from the Collection Account to the Funds, the Debtors believe that such

2    distributions may exceed the respective amount of unsecured claims of the Funds—just under

3    $226,000 and $886,000 for the First Fund and Diversified Fund as reflected on their respective

4    Schedules of Assets and Liabilities filed with the Court—and the Funds' estimated administrative

5    claims and expenses accrued through June 30, 2006. If reserves for unsecured claims and

6    estimated administrative claims and expenses are adequate, the Fund Members should not have to

7    wait until plan confirmation to receive distributions that are rightfully due to them.

8         Second, the proposed interim distributions will not dictate the future terms of a plan of

9    reorganization for the Funds. Importantly, the Debtors are not seeking permission to liquidate the

10   only assets of the Funds and distribute the proceeds to Fund Members. In fact, the Funds currently

11   operate as going concerns and will continue to generate more revenue as they receive monthly

12   interest and principal payments from the Serviced Loans in which they have invested. The

13   payment of the interim distributions does not foreclose any reorganization possibilities for the

14   Funds. All plan options remain open to the Funds.

15        Third, it would be inequitable for the Debtors to make distributions to some, not all,

16   investors. As the Debtors have repeatedly emphasized, it is their goal to pay investors—all

17   investors, not just the Direct Lenders. If only Direct Lenders receive distributions from the

18   Collections Account but money is not also released from the Funds to the Fund Members, the

19   approximately 3,200 Fund Members will be adversely affected. The Fund Members, like their

20   Direct Lender counterparts, rely and depend on their monthly distributions they expect to receive

21   from the Funds. It is now over four months since Fund Members have received a distribution, and

22   many are now suffering the consequences of losing their only source of income. To the extent the

23   Funds will hold excess cash, there is simply no reason why these monies should not be made

24   available to the Fund Members.

25        Finally, no case law in the Ninth Circuit requires a contrary result. The Bankruptcy

26   Appellate Panel for the Ninth Circuit, in *In re Air Beds, Inc.*, 92 B.R. 419 (9th Cir. BAP 1988),

27   recognized that while pre-confirmation distributions generally were not appropriate, they could be

28   made in "extraordinary circumstances." *See Air Beds*, 92 B.R. at 422 (citing *In re Conroe Forge*

- 13 -

1   *& Mfg. Corp.*, 82 B.R. 781, 784 (Bankr. W.D. Pa. 1988).  In *Air Beds*, the debtor failed to make

2   this requisite showing.  Specifically, the court ruled that, "[t]here is no showing why the retention

3   of the proceeds by the debtor in possession, in its capacity as trustee, with a lien attaching to the

4   funds, would not protect the IRS pending confirmation of a plan and a distribution under the plan

5   as contemplated by the Bankruptcy Code." *Id.* at 424.  While the facts of Air Beds may not have

6   supported an interim distribution to the IRS, the facts of these cases support the interim

7   distribution to the Fund Members, many of whom rely on the expected distributions for their

8   living expenses.

9          In sum, the Diversified Fund and the FTD Fund hereby request that the Court authorize

10  them, upon setting aside adequate reserves for unsecured creditors and administrative claimants, to

11  make interim distributions to Fund Members to the extent that monies are available in the

12  respective Fund after providing for such reserves.

13          4.    Basis for Granting Partial or Full Releases and Distributing Net Proceeds to Direct

14                Lenders.

15         As noted in the Fact section above, this Court recently entered the Partial Releases Order

16  respecting the Nine Loans.  USA now seeks authority pursuant to 11 U.S.C. §§ 105 and 363(b)(1)

17  to exercise its powers on behalf of the Direct Lenders on all of the other Serviced Loans (the

18  "Other Loans").  USA further seeks authorization from the Court to disburse the funds that the

19  Debtor receives in the Collection Account from loan payment proceeds in connection with partial

20  releases or full releases on the Other Loans to the Direct Lenders to which such loan payment

21  proceeds are due and payable, consistent with the disbursement terms of this Motion and

22  consistent with the Partial Releases Order, as follows:

23         (a)    USA would be authorized to accept loan payment proceeds and provide the

24  necessary partial releases or full releases and other related documentation required in connection

25  with the sale to bona fide purchasers of properties securing the Other Loans upon the following

26  conditions:  (i) the partial releases or full releases must be in accordance with the governing loan

27  documents; (ii) the loan for which a partial release is requested must be a performing loan at the

28  time that the partial release is given; (iii) USA must either receive commercially reasonable

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

- 14 -

1   assurances from the borrower requesting the partial release or full release that the requested partial

2   release or full release is in accordance with the governing loan documents and there are no

3   defenses available to USA to the request for the partial release or full release, or USA through

4   independent due diligence consistent with commercially reasonable practices prior to the release

5   must satisfy itself that the requested partial release or full release is in accordance with the

6   governing loan documents and there are no defenses available to USA to the request for the partial

7   release or full release; and

8       (b)    All loan payment proceeds that USA receives as loan servicer pursuant to the

9   requests for partial releases and full releases shall be held in the Collection Account, and all loan

10  payment proceeds shall be accounted for by USA separately on a loan-by-loan basis (provided,

11  that USA is not required to separately segregate the loan payment proceeds in separate sub-

12  accounts of the Collection Account, but all loan payment proceeds shall be deposited into a single

13  Collection Account); and

14      (c)    The Collection Account funds shall not be commingled with any operating funds of

15  USA or any of its affiliates, and USA shall only transfer from the Collection Account to USA's

16  separate operating account amounts approved pursuant to orders of this Court concerning USA's

17  use of cash; and

18      (d)    All liens, rights and interests that the Direct Lenders and any other third party,

19  including the Funds, have in any collateral that is being released as a result of USA providing

20  partial releases or full releases shall attach to the loan payment proceeds that USA receives as loan

21  servicer and that are deposited into the segregated Collection Account with the same priority,

22  validity and enforceability that existed prior to such release, and USA's contractual rights and any

23  other rights to collect servicing fees and other fees from the loan payment proceeds that USA

24  receives as loan servicer shall also attach to such loan payment proceeds as they are deposited into

25  the segregated Collection Account with the same priority, validity and enforceability that existed

26  prior to such release; and

27      (e)    USA will provide as part of its monthly operating reports to be filed with the Court

28  the following information: (i) the actual loan payment proceeds and other funds that USA actually

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

- 15 -

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   receives in connection with the partial releases and full releases given to borrowers on any loan

2   and an accounting for such funds on a loan by loan basis; and (ii) for any loan where there is a

3   senior lienholder and a subordination agreement, the amount of the sale proceeds that are

4   distributed to any senior lender on such loan pursuant to such subordination agreement and the

5   resulting amount outstanding on the loan to such senior lender after such loan proceeds are

6   distributed to such senior lender; and

7          (f)       No borrower is entitled to rely upon any partial release or full release that was

8   executed by the Debtors' former management prior to the Petition Date to be effective for any sale

9   of collateral that occurred after the Petition Date, but such borrower must instead apply to USA for

10   a new partial release or full release to be issued in compliance with the conditions outlined herein;

11   and

12          (g)       To the extent, if any, that partial releases and full releases have been issued by USA

13   after the Petition Date for any of the Other Loans that are consistent with the conditions outlined

14   above, USA requests that such releases be approved and ratified by the Court; and

15          (h)       The loan payment proceeds that are paid by borrowers or other parties in exchange

16   for any partial releases or full releases that are authorized by the Court shall be paid to USA as

17   loan servicer and such payments shall be applied and accounted for as described in subparagraphs

18   (b), (c) and (e) above and in accordance with the governing documents.

19          USA further seeks authority to disburse the funds that USA receives in the Collection

20   Account from loan payment proceeds in connection with partial releases or full releases on the

21   Other Loans to the Direct Lenders to which such loan payment proceeds are due and payable,

22   consistent with the disbursement terms of this Motion.

23          The limited relief requested with respect to ordinary-course of business releases of

24   collateral in full compliance with governing loan documents is important to USA, because

25   although it is in bankruptcy, it has ongoing duties and obligations to provide loan servicing on

26   behalf of the Direct Lenders, and its ability to act promptly for the benefit of Direct Lenders is

27   severely hampered if it must file a motion and wait 30 days for a hearing each time a borrower

28   requests to re-pay a loan principal amount in exchange for a proper release of collateral.  USA

1  believes these types of activities described above are most likely "in the ordinary course of

2  business" pursuant to Section 363(c) and therefore, that Court approval may not be necessary.

3  However, out of an abundance of caution and given the unique circumstances of this case, USA

4  seeks an order granting authority for these loan servicing activities.  Significantly, this motion

5  seeks not merely authority to grant collateral releases consistent with the same conditions

6  previously approved by this Court in the Partial Releases Order, but also to distribute the proceeds

7  of such releases to the appropriate Direct Lenders.

8  D.      CONCLUSION

9          WHEREFORE, Debtors respectfully request that this Court enter an order granting the

10  relief requested in this motion, as specifically set forth in Sections B and C above.

11          Respectfully submitted this 7th day of July, 2006.

13          /s/      JEANETTE E. MCPHERSON
            Lenard E. Schwartzer, Nevada Bar No. 0399
14          Jeanette E. McPherson, Nevada Bar No. 5423
            SCHWARTZER & MCPHERSON LAW FIRM
15          2850 South Jones Boulevard, Suite 1
            Las Vegas, Nevada  89146

16
17          and

18          Annette W. Jarvis, Utah Bar No. 1649
            Steven C. Strong, Utah Bar No. 6340
19          RAY QUINNEY & NEBEKER P.C.
            36 South State Street, Suite 1400
20          P.O. Box 45385
            Salt Lake City, Utah 84145-0385
21

22

23

24

25

26

27

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

- 17 -

# Exhibit A

# LOAN SERVICING AGREEMENT

This Loan Servicing Agreement ("Agreement") is made as of the __13th__ day of_____ February ___, 2006, between USA Commercial Mortgage Company ("USA") and

**REDACTED**                              ("Lender").          **REDACTED**

## RECITALS

A.    USA is a mortgage broker and loan servicer in Clark County, Nevada.

B.    Lender lends, or wishes to lend, money to various borrowers (the term "Borrower" includes single and married persons, corporations, trusts, partnerships and all other legal entities) from time to time. which loans are arranged by USA and are secured by interests in real and/or personal property.

C.    Lender wishes to retain the services of USA in connection with making and servicing a loan or loans ("Loan" or "Loans" as the context requires), including all Loans heretofore or hereafter placed by Lender through USA, all upon the terms and conditions hereinafter set forth

NOW, THEREFORE, for good and valuable consideration. the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Services in Connection with Arranging the Loans</u>. USA will perform the following services in connection with arranging each Loan:

(a)    Obtain a promissory note or notes secured by the trust deed referred to in Section 1(b) below, executed by Borrower in a form customarily used by USA and approved by USA's counsel.

(b)    Obtain a deed of trust, assignment of rents and security agreement executed by Borrower in form customarily used by USA and approved by USA's counsel, and cause the same to be properly recorded.

(c)    Obtain one or more personal or corporate guaranties, if applicable and as determined by USA to be necessary, executed by such guarantors, as USA shall deem appropriate, in form customarily used by USA.

(d)    If USA deems it appropriate or necessary, obtain, at Borrower's expense. an appraisal of the property to be encumbered, prepared and executed by an appraiser reasonably satisfactory to USA.

(e)    Obtain from a reputable title insurance company, at Borrower's expense, a fully-paid ALTA lender's policy of title insurance, showing Lender as an insured, in an amount at least equal to the initial principal amount of the note and showing as exceptions only those items approved by USA and its counsel.

v.1 Rev. 8/04

1

   (f)  Cause the Borrower to obtain, where applicable, casualty insurance policies in amounts at least equal to the principal amount of the note or the full insurable value of the improvements on the encumbered real property, whichever is less, containing a mortgage or loss payee clause naming Lender, or USA (as agent for Lender), as an additional insured or loss payee.

   (g)  Obtain from the Borrower and each guarantor such recent financial statements and information as USA shall deem appropriate.

   (h)  Obtain, with respect to any and all encumbrances of record to which Lender's deed of trust will be subject, documentation verifying the principal balance thereof within a reasonable time prior to the making of the Loan and specifying any then existing defaults thereunder.

   (i)  Obtain such other documents in connection with the Loan, as USA may deem appropriate in order to protect the Lender's interest.

   (j)  All documents which USA obtains from borrower in connection with arranging or servicing any Loan, so long as such Loan is outstanding, shall be kept on file in USA's corporate office and be available to Lender upon request. Notwithstanding the foregoing, USA shall have no obligation or responsibility to obtain any original documents in connection with any Loan serviced by USA, but not arranged or originated by USA.

   (k)  Prepare and deliver to escrow closing instructions to effectuate the Loan closing in accordance with the Loan Agreement and the Fee Agreement.

  2.  <u>Services of USA in Connection with Servicing the Loans</u>. Subject to and in accordance with the terms and conditions set forth in this Agreement, and all applicable laws, Lender instructs and authorizes USA to, and USA will perform the following services in connection with servicing each of the Loans:

   (a)  Verify, where applicable, that the property encumbered by Lender's deed of trust is insured (at the Borrower's expense) by a sufficient casualty insurance policy and that Borrower has sufficient liability insurance coverage. USA will hold for the Lender's account such policies and renewals thereof.

   (b)  Keep appropriate accounting records on each note and the sums collected thereon, which records will reflect the amounts collected as to principal, interest and late charges, and, if applicable, insurance, taxes and other specified amounts. Those records will be available for review by the Lender during regular business hours at USA's corporate office.

   (c)  Until the total amount due under each note is paid in full:

     (i)  Proceed diligently to collect all payments due under the terms of the note and promptly pay the proper parties, when and if due, principal, interest, late charges, insurance and other specified funds.

       (ii)    In the event the Borrower fails to make any payment to USA as required by the terms of the note, USA will take steps to collect the payment including but not limited to delivering default notices, commencing and pursuing foreclosure procedures, and obtaining representation for Lender in litigation and bankruptcy proceedings as deemed necessary or appropriate by USA in its business judgment to fully protect the interests of the Lender, and of all Lenders in the loan.

       (iii)    In its sole discretion, USA may pay off any Lender at any time by paying the then outstanding balance of Lender's interest in the principal of the Loan, plus all accrued interest and any prepayment penalty or fee, if applicable. Any Lender so paid off shall concurrently execute and deliver therewith to USA an assignment, in a form acceptable to USA, of all of such Lender's right, title, and interest in the Loan (including all documents evidencing the Loan) and in the deed of trust securing the Loan.

       (iv)    In its sole discretion, USA may waive late payment charges, assumption fees, charges for returned checks due to insufficient funds, or other fees which may be collected in the ordinary course of servicing the Loans.

    (d)    Provide the Lender with regular statements regarding loan collections, but in no event less frequently than quarterly.

    (e)    Without limiting the generality of anything contained herein, Lender hereby authorizes and empowers USA, on Lender's behalf, to: (1) execute and deliver demands for payoff and beneficiary's / lender's statements of condition and the like; (2) execute and deliver any and all instruments if satisfaction or cancellation, or of partial or full release, discharge, or reconveyance, or authorizations in connection therewith, with respect to any Loans paid in full and with respect to the related real or personal property securing such Loans; (3) execute and deliver any and all other documents with respect to any Loans that are customary and consistent with loan servicing practices pertaining to such loans; (4) consent to modifications of the Loans if the effect of any such modification will not materially or adversely affect the security provided by the real or personal property in connection therewith; (5) institute foreclosure proceedings (judicial or non-judicial), obtain a deed-in-lieu thereof, engage in settlement discussions, and enter into forbearance and other settlement-related agreements (which agreements may contain provisions that release or waive claims against a Borrower or Guarantor); and (6) take title in the name of Lender (in proportion to its interest in the Loan) to any real property upon a foreclosure or delivery of a deed-in-lieu thereof. Notwithstanding the foregoing or any other provision contained herein, USA may not permit any modification to any Loan that would change the interest rate, forgive the payment of any principal or interest (expressly excluding late charges or the difference between default and non-default interest), change the outstanding principal amount, or extend the maturity date, without Lender's prior consent; provided, however, if Lender fails to grant or deny its consent within three (3) business days after notice from USA, Lender shall be deemed to have conclusively given its consent.

v.1 Rev. 8/04

3.    <u>Rights of Lender if USA Fails to Act.</u>    Pursuant to NAC 645B.073, in the event of default, foreclosure, or other matters that require action, if for any reason USA fails to act on Lender's behalf as authorized herein, then Lender may, with approval of fifty-one percent (51%) or more of all of the holders of the beneficial interest of record in the Loan, act on behalf of all such holders of beneficial interest of record. These actions may include, but are not limited to:

> (a)    the designation of the mortgage broker, servicing agent or other person to act on behalf of the holders of the beneficial interests in the loan; and
>
> (b)    the sale, encumbrance or lease of real property owned by the holders resulting from a foreclosure or the receipt of a deed in lieu of a foreclosure.

4.    <u>Legal Proceedings.</u>    USA will assist the Lender in any necessary foreclosure proceedings to protect the Lender's interest in the note and deed of trust. Where necessary, in USA's business judgment, USA may retain attorneys on Lender's behalf. Any legal proceeding instituted by USA pursuant to this Agreement may be pursued in USA's name only or as agent for Lender. Upon demand by USA, Lender agrees to promptly pay, either in advance or to reimburse USA, for its pro rata portion of the out-of-pocket expenses incurred, including attorney's fees, trustee's fees and foreclosure costs. In the event that Lender fails to pay such sums to USA upon demand or request thereof, or if USA elects to advance such sums, USA may, in its discretion, advance such fees, including trustee's fees, attorney's fees, and costs of foreclosure; provided, however, that any fees advanced by USA shall be paid back from the proceeds of the foreclosure (whether by reinstatement or sale), or from any other monies collected with respect to such Loan, before any payments are made to Lender. In the event of any litigation concerning the Loan, Lender hereby appoints USA as its agent to accept service of any summons and complaint, naming Lender as a party.

5.    <u>Compensation to USA for Loan Servicing.</u>    Lender authorizes USA to retain monthly, as compensation for services performed hereunder, (a) one-twelfth (1/12th) of its annual servicing fee, which shall not exceed three percent (3%) per annum of the maximum principal amount of each of the Loans, (b) any late charges collected from the Borrower pursuant to the terms of the Note, and (c) and default interest collected from the Borrower pursuant to the terms of the Note. Notwithstanding the foregoing, it is agreed and acknowledged that USA derives the bulk of its revenues from charging loan fees ("points") to the Borrower. Certain Borrowers, however, may prefer to pay a higher rate of interest in exchange for a reduction in loan fees payable in advance to USA, the higher interest rate comprising a deferred loan fee. USA will notify Lender when such a case arises, and advise Lender of what portion of the interest is payable to USA as a deferred loan fee.

Should Lender desire to sell all or any part of its interest in the note and deed of trust, USA will assist Lender in finding potential buyers and completing the necessary documentation for the transaction. A fee of 5% of the remaining balance of Lender's undivided interest in the note amount will be deducted from the selling price and paid to USA on all such assignments for which USA locates the Assignee.

In the event an extension of a Loan is negotiated, USA shall be entitled to charge a fee therefor from the Borrower pursuant any separate fee agreement between USA and the Borrower.

v.1 Rev. 8/04

4

6.    USA's Right to Delegate.    Notwithstanding anything contained herein, USA may in its sole discretion delegate specific loan arranging and servicing obligations to credit bureaus, real estate tax service companies, real estate brokers or agents, appraisers, attorneys, trustees, or others, provided that USA shall remain responsible for all action taken or not taken by such companies, agents, representatives, and others throughout the term of this Agreement.

7.    No Legal Advice.    Lender acknowledges that USA will not act as Lender's attorney or provide legal advice to Lender, and that Lender is encouraged to seek independent counsel in connection with any questions Lender may have concerning this agreement, any Loan, USA's form loan documents, or any other matter.

8.    Termination.    Lender may, by 30 days written notice to USA, terminate this agreement, and the power of attorney granted, if one is granted, under Section 11 of this Agreement, if USA fails to perform its obligations hereunder.

9.    Lender's Registration.    Lender(s) name as listed in the first paragraph of this Agreement is the exact form for registration of Lender's interest and for reference to Lender in the Loan Documents.

10.    Integration Clause.    This Agreement contains the entire agreement between the parties hereto and cannot be modified except by a written amendment signed by both parties. The invalidity of any portion of this agreement shall in no way affect the balance thereof. This Agreement shall remain in effect until Lender's interest in all notes and deeds of trust with respect to Loans arranged and/or serviced by USA is completely liquidated (unless sooner terminated in accordance with the terms hereof).

11.    Limited Power of Attorney.    With respect to each loan, Lender hereby agrees that USA shall have full power and authority, and Lender hereby appoints USA as its true and lawful attorney-in-fact to (a) hold the original note(s), and (b) to do all things and take all actions on behalf of Lender which are necessary or convenient to effectuate this Agreement and its intent and to protect Lender's interest under any note, deed of trust, guaranty, security agreement or other document pertaining to any Loan. Upon USA's request, Lender hereby agrees to execute and deliver, in the presence of a notary public, a "Declaration of Agency and Limited Power of Attorney", in a form consistent with Chapter 645B of the Nevada Revised Statutes, pursuant to which Lender shall further evidence the appointment of USA as Lender's true and lawful attorney-in-fact to undertake the duties of USA hereunder. No one shall be required to look beyond such Declaration of Agency and Limited Power of Attorney for evidence of USA's authority hereunder. All Declarations of Agency and Limited Powers of Attorney may include the language: This document may be executed with counterpart signature pages, and the document with all counterpart signature pages shall constitute one and the same instrument.

12. Notices.    All notices, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been given (i) when personally delivered, or (ii) on receipt, when deposited with a recognized overnight courier service such as Federal Express or DHL, or (iii) three (3) business days after the date when deposited in the United States mail and sent postage prepaid by registered or certified mail, return receipt requested, addressed as follows:

v.1 Rev. 8/04

If to USA:          USA Commercial Mortgage Company
                    4484 S. Pecos Road
                    Las Vegas, Nevada 89121-5030
If to Lender:


Attention:

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

13.    Governing Law.  This Agreement shall be construed in accordance with the laws of the State of Nevada, without regard to the conflict of laws or rules thereof, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws,

14.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

15.    Attorney's Fees.  In the event any party hereto brings an action to enforce any of the provisions of this Agreement, the party against whom judgment is rendered in such action shall be liable to the other for reimbursement of its costs, expenses and attorneys' fees, including such costs, expenses and fees as may be incurred on appeal,

16.    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors and assigns.

17.    Headings.  Sections headings used in this Agreement are for convenience only and shall not affect the meaning or interpretation of this Agreement.

18.    Authority.  Each party represents and warrants to the other party that it is duly authorized to execute, deliver and perform this Agreement.

IN WITNESS WHEREOF, the parties hereto have signed, sealed, acknowledged and delivered this instrument the day and year first above written.

LENDER:

By:          REDACTED          REDACTED
Name:
Title:

USA COMMERCIAL MORTGAGE COMPANY

v.1 Rev. 8/04

6

By: _____
Joseph D. Milanowski, President.

# Exhibit B

# USA Commerical Mortgage Company ("USA")

as Loan Servicing Agent for

**Bay Pompano Beach**

5/10/2005 - 4/12/2006

THIS STATEMENT REFLECTS THE STATUS THROUGH THE BANKRUPTCY PETITION DATE.
CURRENT STATEMENTS WILL BE MAILED TO YOU SOON.

Vesting Name:

Address:         REDACTED         REDACTED

Client ID:

Performance Evaluation:    Non-Performing

| | | |
|---|---|---|
| 1. | Original Principal Investment | $50,243 |
| 2. | Principal Investment Assigned Out | 0 |
| 3. | Net Principal Investment | $50,243 |
| | | |
| 4. | Principal Payments Made by Borrower to USA | $26,190 |
| 5. | Principal Payments Remitted by USA to Lender | 13,238 |
| 6. | Principal Payments Unremitted by USA to Lender | $12,952 |
| | | |
| 7. | Interest Paid to USA by Borrower, net of service fee | $2,610 |
| 8. | Interest Remitted or Advanced by USA to Lender | 2,839 |
| 9. | Interest Due to (from) Lender | ($229) |
| | | |
| 10. | Unremitted Principal held in Collection Account | $0 * |
| 11. | Interest Due to (from) Lender | (229) |
| 12. | Net Amount Currently Due to (from) Lender | $12,723 |
| | | |
| 13. | Unremitted Principal not held in Collection Account | $12,952 |
| 14. | Interest Unpaid to USA by Borrower, net of service fee | 81 |

\* Undetermined at Filing

The interest amounts assume a simple interest calculation.

This statement is provided for information purposes only and is intended for the sole benefit of the named vested party. This statement is not intended to represent a loan payoff quote. USA reserves the right to update and supplement this statement.

Prepared by MFIM, LLC

## USA Commercial Mortgage Company ("USA")

Explanatory Notes to the Loan-by-Loan Lender Reconciliation Statements ("Statements")

*The numbered explanations below correspond to the line numbers on the Statements:*

1.      Line 1 is the total principal amount invested in the loan under each discrete "Vesting Name" (for example, "John Doe IRA" is a different Vesting Name than "John Doe, Trustee of the John Doe Family Trust").

2.      Line 2 is the amount of the principal investment shown on Line 1 that was later assigned out (i.e., sold) by this Lender to another Lender for which USA was the broker for the assignment(s).

3.      Line 3 is the difference between Line 1 and Line 2 and represents the Lender's net principal investment in this loan.

4.      Line 4 is the total amount of principal repayments attributable to the Lender in this loan that were made by the Borrower to USA as servicer on the loan.

5.      Line 5 is the amount of the principal repayments shown on Line 4 that was remitted by USA to the Lender.  Payments made to the Lender after the Borrower paid off the loan in full have been reclassified as principal payments and are included in this Line.  These payments may have been originally reported to the Lender as interest.

6.      Line 6 is the amount of the principal repayments shown on Line 4 that was not remitted by USA to the Lender.  (Line 6 is the difference between Line 4 and Line 5).

7.      Line 7 is the total amount of interest payments attributable to the Lender on this loan that were made by the Borrower to USA as servicer on the loan, net of USA's 1% servicing fee.  A 1% annual service fee on the Lenders outstanding principal has been calculated according to the terms of the servicing agreement for the months of uncollected interest.  That is, a service fee is being charged on all loans, regardless of pre-petition practice, for the months represented by the interest currently being collected.

8.      Line 8 is the total amount in interest payments that USA remitted or advanced to the Lender on account of this loan (whether or not the Borrower had made a corresponding interest payment to USA).  This should equal the amount of interest payments the Lender has received.

9.      Line 9 is the difference between Line 7 and Line 8.  If the number is positive, it represents interest that the Borrower paid to USA as servicer on account of Lender's interest in this loan that USA has not yet remitted to the Lender.  If the number is negative (in parentheses), it represents interest that USA paid to the Lender on this loan above and beyond what the Borrower had paid to USA as servicer.

10.     Line 10 is the amount of the unremitted principal shown in Line 6 that is being held in USA's collection account on behalf of the Lender. This figure has not been determined as of the Filing date, but will be shown on future statements. On this statement, all unremitted principal is on Line 13.

11.     Line 11 is the same as Line 9.

12.     Line 12 is net amount that USA believes is currently due to (or from) the Lender (the sum of Line 10 and Line 11). If the number is positive, it is the net amount USA believes it is holding on behalf of the Lender on this loan. If the number is negative (in parentheses), it represents the net overpayment USA made to the Lender on this loan.

13.     Line 13 is the amount of unremitted principal shown on Line 6 that is not held in USA's collection account. Line 13 (unremitted principal not held), when added with Line 10 (unremitted principal held), equals Line 6 (total unremitted principal repayments on this loan).

14.     Line 14 is the amount of unpaid interest that the Borrower owes to USA as servicer on this loan that is attributable to this Lender, net of USA's 1% service fee. This amount, if USA is able to collect it from the Borrower, would reduce the amount of overpaid interest (if any) due from the Lender shown on Line 9.

# Exhibit C

# USA Commerical Mortgage Company ("USA")

## USA Captial Diversified Trust Deed Fund
as of April 12, 2006

THIS STATEMENT REFLECTS THE STATUS AS OF THE BANKRUPTCY PETITION DATE.
CURRENT STATEMENTS WILL BE MAILED TO YOU SOON.

as Loan Servicing Agent for

Vesting Name:
Address:

REDACTED        REDACTED

Shareholder ID:

| Shares | Share Price | Share Value* | Book Value** |
|--------|-------------|--------------|--------------|
| 1,071,575.21 | $1.00 | $1,071,575.21 | $885,760.02 |

\*   Share value reflected on last statement.

\*\*The book value of the Fund is the net carrying value of the assets and liabilities on the books and records of the Fund as of April 12, 2006. The actual value and collectibility of the assets (notes and related receivables) has not been determined.

Prepared by MFIM, LLC

# *"Exhibit C"*

Annette W. Jarvis, Utah Bar No. 1649
Steven C. Strong, Utah Bar No. 6340
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com

Attorneys for Debtors and Debtors-in-Possession

**E-FILED ON AUGUST 2, 2006**

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| | Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | Date: August 4, 2006<br>Time: 9:30 a.m. |
| In re:<br>USA SECURITIES, LLC,<br>Debtor. | **REPLY IN SUPPORT OF DEBTORS' MOTION TO DISTRIBUTE FUNDS AND TO GRANT ORDINARY-COURSE RELEASES AND DISTRIBUTE PROCEEDS** |
| Affects:<br>☐ All Debtors<br>☒ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☒ USA Capital Diversified Trust Deed Fund, LLC<br>☒ USA First Trust Deed Fund, LLC | **(AFFECTS USA COMMERCIAL MORTGAGE, USA CAPITAL DIVERSIFIED TRUST DEED FUND, AND USA CAPITAL FIRST TRUST DEED FUND)** |

1

RQNDOCS-#885589-v1-Reply_re_Motion_to_Distribute

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    USA Commercial Mortgage Company ("USA"), USA Capital Diversified Trust Deed

2  Fund, LLC ("Diversified Fund"), and USA Capital First Trust Deed Fund, LLC ("FTD Fund")

3  (collectively, the "Debtors") submit this Reply in support of the Debtors' Motion to Distribute

4  Funds and to Grant Ordinary-Course Releases and Distribute Proceeds (the "Motion") (DN 847).

5  A Declaration of Thomas J. Allison in support of the Motion is filed herewith (the "Allison

6  Declaration").

7    The following responses to Motion to Distribute were filed: (1) Partial Opposition filed by

8  Stanley Alexander and others (the "Alexander Objection") (DN 905); (2) Response and Request

9  for Clarification filed by Boise-Gowan LLC ("Boise-Gowan Response") (DN 936); (3) Limited

10  Objection of the Kantor Group ("Kantor Objection") (DN 985); (4) JV Direct Lenders' Partial

11  Opposition (DN 986) ("JV Objection"); (5) Diversified Fund Committee's Limited Opposition

12  (DN 987); (6) Opposition filed by Prospect High Income Fund and others (DN 991); (7) Response

13  filed by Unsecured Creditors' Committee of USACM (DN 995); (8) Direct Lender Kiven's

14  Opposition ("Kiven Objection") (DN 999); (9) Response of FTD Fund Committee (DN 1000);

15  (10) Mantas Group's Joinder in the Alexander partial opposition (DN 1001); (11) United States

16  Trustee's Limited Objection (DN 1005); (12) Official Committee of Direct Lenders' Limited

17  Opposition (DN 1042); and (13) Canepa Group Joinder in the limited opposition of the Direct

18  Lenders' Committee (DN 1044).

19                                    **SUMMARY**

20    The Motion seeks permission to distribute promptly approximately $68.2 million to Direct

21  Lenders.[1]  *See* Allison Declaration ¶¶ 10-18.  Debtors believe that if the Court approves the

22  distribution to Direct Lenders as proposed in the Motion, USACM will be able to mail out

23  payments to Direct Lenders within two weeks after an order approving the distributions is entered.

24  Nearly all, if not all, of the thirteen responses to the Motion support the Debtors' desire to

25  distribute a substantial portion of the funds held in the Collection Account to the Direct Lenders.

26

27    ───────────────

28    [1] Capitalized terms used but not defined herein are defined in the Motion to Distribute.

RQNDOCS-#885589-v1-Reply_re_Motion_to_Distribute

1    Some of the responses, such as those by the Diversified Committee and the Unsecured Creditors

2    Committee, support a substantial distribution at this time but suggest that additional amounts

3    based on unsupported percentages should be held back. Other responses, such as the Alexander

4    Objection, JV Objection, and Kiven Objection, support a substantial distribution but oppose any

5    netting or holdbacks by the Debtors. Debtors believe that amounts sought to be distributed

6    pursuant to the Motion are justified and appropriate, that the proposed netting and resulting

7    temporary holdbacks described in the Motion are justified and appropriate, and that arguments for

8    a lesser or greater distribution are unconvincing.

9                                **DEFERRAL OF CERTAIN ISSUES**

10           Several of the responding parties correctly note that Debtors have agreed to defer the

11   consideration of ongoing distributions until the hearing set for August 31, 2006. The Motion

12   sought authority to make an initial distribution to Direct Lenders based on the Direct Lender

13   Statements as of June 30, 2006, and also to make ongoing periodic distributions after the initial

14   distribution is made. At the request of certain of the Committees, Debtors agree that it is

15   appropriate to address only the proposed initial distribution at the August 4, 2006 hearing, and

16   request that the hearing on the issue of further periodic distributions be continued to August 31,

17   2006. This continuance will allow Debtors time to address certain issues respecting the ongoing

18   distributions that the Committees have raised in discussions with Debtors. The continuance will

19   not cause any delay in making future distributions, because Debtors will not have the system and

20   procedures in place for beginning ongoing periodic distributions before early September in any

21   event.

22           The Motion also requests authority for the Funds to make distributions to their Fund

23   Members from available funds (if any) after appropriate reserves for claims and administrative

24   expenses are determined. As set forth in the Supplement to the Motion filed July 17, 2006 (as

25   modified by paragraph 11 of the Allison Declaration), the proposed distribution to Direct Lenders

26   would result in an initial distribution of approximately $2.4 million to the FTD Fund and no initial

27   distribution to the Diversified Fund. The FTD Fund Committee, with the consent of the FTD

28   Fund, recently filed objections to certain claims filed against the FTD Fund, and the claims

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

RQNDOCS-#885589-v1-Reply_re_Motion_to_Distribute

1   objections will be heard on August 31, 2006. FTD Fund believes that these objections must be

2   resolved before an appropriate claims and expense reserve for FTD Fund can be determined, and

3   therefore requests that the Court continue the hearing on the proposed distributions to the Funds to

4   August 31, 2006. Distributions to Fund Members of the FTD Fund can be made shortly thereafter

5   if the Court approves the distributions and an appropriate a reserve amount at the August 31, 2006.

6        Finally, in response to certain limited objections raised by the responding parties, including

7   the Kantor Objection and the limited objection of the Direct Lenders' Committee, Debtors hereby

8   reaffirm and clarify that they are not seeking by the Motion to obtain a conclusive and final

9   determination on legal issues addressed in the Motion respecting the proposed netting, including

10  the applicability of equitable recoupment and/or Section 502(d) of the Bankruptcy Code. Debtors

11  merely seek authority to distribute $68.2 million of the $93.5 million in the Collection Account as

12  an initial distribution, and reserve for another day a determination of the legal issues raised in

13  opposition to the proposed netting and holdbacks. Debtors will continue to hold the undistributed

14  funds in the Collection Account to be disbursed only in accordance with applicable orders of the

15  Court. The proposed netting and holdback of certain funds prior to releasing to Direct Lenders the

16  amounts to be distributed in the initial distribution as proposed in the Motion is based on the

17  Debtors' careful and laborious reconstruction of the pre-petition loan accounting system based on

18  source records of payments made or not made by borrowers to USACM as servicer and payments

19  made or not made by USACM to Direct Lenders. *See* Allison Declaration ¶¶ 3-19. Although the

20  Motion and the Allison Declaration establish a sound legal and factual basis for the lender-by-

21  lender netting proposed in the Motion, Debtors agree to defer to a later date any final

22  determination of the legal issues presented. Debtors seek no ruling at this time as to whether the

23  funds held back as a result of the proposed netting at this interim stage ultimately should be

24  distributed to Direct Lenders.

25                    **NO RESTITUTION OR SEIZURE OF FUNDS SOUGHT**

26        Contrary to the arguments raised in the Alexander Objection and Kiven Objection, the

27  netting and holdbacks proposed in connection with the Debtors' proposed initial distribution do

28  not constitute an attempt at "restitution" or to "seize" or "attach" property. Debtors have not and

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

4

RQNDOCS-#885589-v1-Reply_re_Motion_to_Distribute

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    are not arguing for the application of the doctrine of restitution as set forth in the Restatement of

2    Restitution published in 1936.  Nor do the two cases cited in the Alexander Objection, *Chase*

3    *Manhattan Bank v. Burden*, 489 A.2d 494 (D.C. App. 1985) and *Greenwald v. Chase Manhattan*

4    *Mortgage Corp.*, 241 F.3d 76 (1st Cir. 2001), have any application on the facts of this case.  The

5    two cases were not bankruptcy cases and do not address the equitable principles, statutory

6    provisions, and policy considerations at issue in bankruptcy.  In any event, the cases are not

7    binding on this Court.  Even if the doctrine of restitution were relevant in this case, the Ninth

8    Circuit has not adopted the reasoning of the two cases cited by the Alexander Objection respecting

9    the doctrine of restitution.

10        Debtors are not seizing or attaching property.  The property at issue is already in

11    USACM's possession, and the automatic stay applies equally to enjoin attempts to obtain property

12    *from* the estate as it does in enjoining attempts to obtain property *of* the estate.  11 U.S.C. §

13    362(a)(3).  The automatic stay of Section 362(a)(3) "requires that no entity grab non-estate

14    property *from* the estate without the court supervision that comes from a stay relief proceeding."  3

15    Collier on Bankruptcy ¶ 362.03[5] at 362-20 (15th rev. ed. 2002).  Thus, Debtors are entitled to

16    retain possession of the property held by their estates, whether or not such property constitutes

17    property of the estate, unless and until the Court grants relief from stay after an appropriate motion

18    or unless and until Debtors move for authority to distribute funds, as they have done in the

19    Motion, and the Court grants such motion.

20        The case relied upon in the Kiven Objection, *Groupo Mexicano de Desarrollo S.A. v.*

21    *Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), does not apply on the unique facts and

22    circumstances of this case.  In *Groupo Mexicano,* the Court held, in relation to the issues relevant

23    to the Kiven Objection, that a district court lacked power to issue a pre-judgment preliminary

24    injunction preventing the defendant from transferring assets in which no lien or equitable interest

25    was claimed.  In that case, the plaintiff alleged that the defendant was favoring Mexican creditors

26    and that if a pre-judgment preliminary injunction was not issued, there would be no assets

27    available to satisfy the judgment.  Importantly, the plaintiff sought to attach assets of the defendant

28    which were completely unrelated to the claim being asserted.  Indeed, the Supreme Court, in

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   distinguishing *United States v. First Nat. City Bank*, 379 U.S. 378 (1965), a case relied upon by

2   the respondents in *Groupo Mexicano*, observed that one of the factors in that case where the

3   Supreme Court upheld the grant of a prejudgment injunction prohibiting the transfer of assets, was

4   "the creditor (the Government) asserted an equitable lien on the property, ... which presents a

5   different case from that of the unsecured general creditor." *First National City Bank*, 379 U.S. at

6   326 (the *First National* Court relied heavily on the existence of a statute authorizing tax

7   injunctions and public policy (i.e., collection of taxes)). Furthermore, although there was no

8   extensive discussion of the impact of the bankruptcy law on such situations, the Court recognized

9   that the "law of fraudulent conveyances and bankruptcy was developed to prevent [the dissipation

10  of assets and favoring of creditors]." *Id.* at 322. Accordingly, Groupo Mexicano has limited

11  precendential value in this case. Here, Debtors may assert at least an equitable interest or lien

12  upon the funds held back and the ability to withhold the funds at this point is certainly related to

13  the final relief to be sought in the case. Finally, unlike the pre-judgment injunction in *Groupo*

14  *Mexicano* that prohibited the transfer of *any* of the defendant's assets, USACM is only temporarily

15  holding back a portion of the funds in the Collection Account to the extent the Direct Lenders and

16  Debtors both assert an interest. .

17                  **NO OBJECTIONS RAISED TO ORDINARY-COURSE PARTIAL RELEASES**

18          None of the responses to the Motion objected to Debtors' request in the Motion for

19  authority to grant ordinary-course partial releases on the limited conditions set forth in the Motion.

20  Thus, this particular relief requested in the Motion should be granted promptly to facilitate

21  USACM's ongoing loan servicing responsibilities. Debtors agree that, as suggested in the Boise-

22  Gowan Response, the order granting such relief should make it clear that no releases granted pre-

23  petition in connection with pre-petition closings are affected.

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

6

1    WHEREFORE, Debtors respectfully request that the Court grant the relief requested in the

2    Motion, as modified in this Reply.

3        Respectfully submitted this 2nd day of August, 2006.

4
5                                    /s/ Jeanette E. McPherson
                                     Lenard E. Schwartzer, Nevada Bar No. 0399
6                                    Jeanette E. McPherson, Nevada Bar No. 5423
                                     SCHWARTZER & MCPHERSON LAW FIRM
7                                    2850 South Jones Boulevard, Suite 1
                                     Las Vegas, Nevada 89146
8
9                                    and

10                                   Annette W. Jarvis, Utah Bar No. 1649
                                     Steven C. Strong, Utah Bar No. 6340
11                                   RAY QUINNEY & NEBEKER P.C.
                                     36 South State Street, Suite 1400
12                                   P.O. Box 45385
                                     Salt Lake City, Utah 84145-0385
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

RQNDOCS-#885589-v1-Reply_re_Motion_to_Distribute