Parsons, Behle & Latimer
Nancy L. Allf, Bar No. 0128
Timothy P Thomas, Bar No. 5148
411 E. Bonneville Ave. #100
Las Vegas, NV 89101
(702) 599-6000
nallf@parsonsbehle.com

and

Robert C. LePome, Esq.
330 S. Third St. #1100B
Las Vegas, NV 89101
(702) 385-5509
Nevada Bar #1980
robert@robertlepome.com

Attorneys for Alexander et, al.

E-Filed on September 8, 2006

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| In re: | ) | BK-S-06-10725-LBR |
| | ) | Chapter 11 |
| USA COMMERCIAL MORTGAGE COMPANY | ) | |
| Debtor | ) | |
| In re: | ) | BK-S-06-10726-LBR |
| | ) | Chapter 11 |
| USA CAPITAL REALTY ADVISORS, LLC, | ) | |
| Debtor | ) | |
| In re: | ) | BK-S-06-10727-LBR |
| | ) | Chapter 11 |
| USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, | ) | |
| Debtor | ) | |
| In re: | ) | BK-S-06-10728-LBR |
| | ) | Chapter 11 |
| USA CAPITAL FIRST TRUST DEED FUND, LLC, | ) | |
| Debtor | ) | |
| In re: | ) | BK-S-06-10729-LBR |
| | ) | Chapter 11 |

USA SECURITIES, LLC,                           )
                            Debtor                 )

Affects:                                       )

■ All Debtors                                 )
□ USA Commercial Mortgage Co.                 )
□ USA Securities, LLC                         )
□ USA Capital Realty Advisors, LLC  )     DATE:        9-13-06
□ USA Capital Diversified Trust Deed )     TIME:        9:30 A.M.
□ USA First Trust Deed Fund, LLC        )

                                            )

## OPPOSITION TO DEBTOR'S EMERGENCY MOTION FOR ORDER EXTENDING THE DEBTORS' EXCLUSIVE PERIOD TO FILE A PLAN TO SEPTEMBER 15, 2006 (AFFECTS ALL DEBTORS)

COMES NOW Direct Lenders Alexander and others shown in the Second Amended Statement of Robert C. LePome, Esq. And Nancy Allf, Esq. Pursuant to Rule 2019 filed as Docket #1077 of the firm of Parsons, Behle, & Latimer and Robert C. LePome Esq. and object to the Emergency Motion for Order Extending the Debtors' Exclusive Period to File a Plan to September 15, 2006 (Affects All Debtors) filed on September 7, 2006 as Document No. 1252.  This Opposition is based upon the Points

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

2

and Authorities attached hereto.

 /s/ Robert C. LePome, Esq.
Robert C. LePome, Esq.
330 S. Third St. #1100B
Las Vegas, NV 89101
Nevada Bar #1980
(702) 385-5509

and

Parsons, Behle & Latimer
Nancy Allf, Esq., Bar #0128
Timothy P. Thomas, Bar #5148
411 E. Bonneville Ave. #100
Las Vegas, NV 89101

POINTS AND AUTHORITIES

Facts

1.    On April 13, 2006 (the "Petition Date") USA Commercial Mortgage Company ("USACM"), USA Capital Diversified Trust Deed Fund, LLC ("Diversified"), USA Securities, LLC ("Securities"), USA Capital Realty Advisors, LLC ("Realty") and USA Capital First Trust Deed Fund, LLC ("First") ("USACM" and collectively with Diversified, Securities, Realty and First, the "Debtors") filed voluntary petitions for relief under chapter 11 of the U.S. Bankruptcy Code ("Bankruptcy Code").

2. Debtors continue to operate their business as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code through Mesirow Interim Financial Management, LLC ("Mesirow").

3.    On May 10, 2006, the Office of the United States Trustee (the "U.S.

Trustee") appointed the following four committees in the Debtors' Cases: (a) The Official Unsecured Creditors Committee for USACM (the "Unsecured Committee"); (b) The Official Committee of Holders of Executory Contract Rights through USA Mortgage (the "Direct Lenders' Committee"); (c) The Official Committee of Equity Security Holders of USA First (the "USA First Committee"); and (d) The Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC (the "USA Capital Diversified Committee").

4. USACM is in the sub-prime, commercial mortgage business, servicing a loan portfolio9 on the Petition Date of approximately 115 commercial loans (the "Loan Portfolio") that are held by First, Diversified are sometimes collectively referred to as the "Funds") and various Direct Lenders (the Funds and Direct Lenders are collectively "Lenders").

5. Approximately 1,900 investors are invested in Diversified, approximately 1,300 investors are invested in First while approximately 3,600 individuals and entities are Direct Lenders.

6. USACM used the monies raised by Lenders to fund loans to Borrowers that were arranged and serviced by USACM (the "Loans"). Direct Lenders were offered investments in Loans generally described by USACM in an offering document of a page or two in length. Direct Lenders would choose among different Loans being offered, would determine a dollar amount to invest, and would be included as a Lender within the promissory note signed by the Borrower (typically by reference to an exhibit to the

promissory note containing the identities of all the investors) and would be listed as

a beneficiary on the mortgage or deed of trust (again by way of an exhibit) that would

typically be recorded against the property.  The Funds likewise were included on the

list of promissory note lenders and mortgage or trust deed beneficiaries when money

from the Funds was used for various Loans.

7.    Direct Lenders and the Funds entered into servicing agreements with

USACM which were to govern all fo the Loans in which they participated.  Under the

typical servicing agreement, USACM was entitled to retain origination fees and points

charged tot eh Borrowers, late fees, extension fees, default interest and other fees and

expenses paid or reimbursed by the Borrower.  In addition, USACM was entitled to a

servicing fee consisting of a portion of the monthly interest to be paid by the Borrower

of between one and three percent per annum of the principal balance of the Loan, with

the difference between this servicing fee and the actual rate of interest paid by the

Borrowers, paid to the Direct Lenders and the Funds participating on that Loan.

8.  Mesirow has determined that USACM maintained a bank account generally

referred to as the Collection Trust Account (the "Collection Account") prior to the

Petition Date.  See Debtors' Motion for Order Approving Debtor's Proposed Case

Management Procedures and Interim Use of Cash in Accordance with Proposed Cash

Budget ("Cash Motion") [DE 407].  According to the Cash Motion, the Collection

Account served as the lone bank account to facilitate the collection of principal,

interest and fees on Loans due from the respective Borrowers.

9.  Commencing sometime in 2003, and possibly earlier, USACM began paying Direct Lenders interest payments each month despite not having collected interest payments from the Borrowers on their respective Loans.  USACM thereby "advanced" money to the Borrowers from money in the USACM Collection Account so that the Borrowers could pay their notes or a current basis.

10.  Approximately 48% of the loans were "performing" meaning that the borrowers paid their interest and principal and the interest and principal was remitted to the investors.  Approximately 48% of the Loans were non-performing meaning that either interest and/or principal was delinquent.  On five (5) occasions (the remaining 4%), the  loans were paid off which would make them "performing", however the principal was deposited into the Collection Account and some of these funds were used to make interest payments to the Direct Lenders.

11.  Fiesta Stoneridge is an extreme example of a Loan where the Borrower did not pay interest and the Direct Lenders received interest payments nonetheless.  Mesirow has determined that Fiesta Stoneridge was a $10 Million loan funded by 100 Direct Lenders on September 22, 2003 at an annual interest rate of 13% per year.  Fiesta Stoneridge actually owes $2,484,337.00 on its Note as of April 30, 2006, for almost two years of unpaid interest.  Despite that default, as of the Petition Date USACM had paid the 100 Direct Lenders $2,368,514.00 as interest on the Fiesta Stoneridge Loan.

12.  USACM effectively loaned its own money and the money of others to

Fiesta Stoneridge so that the interest payments could be made.

13.    Because the financial records of the Debtors did not accurately match the receipts of Loan payments and disbursements of cash to Direct Lenders, and because cash was commingled in the Collection Account, Mesirow has recreated the accounting records for each Loan in the Loan Portfolio based on existing accounting records and any other documentation that could be found.  Mesirow has represented that Borrower payments were not properly split between principal and interest on some Loans.  When a Borrower payment was treated as all principal, but in reality some of it should have been treated as interest, the principal balance per the accounting records was overstated.

14.    According to the USACM financial schedules filed with the Court, as of the Petition Date, the total amount of advances to Borrowers from USACM funds and the funds of others so that Borrowers would not be in Default was $41,702,978.00.  The source of the funds in the commingled bank accounts used by USACM for the advances has not been specifically identified.  In all cases it appears that funds received by Direct Lenders we used to fund loans or to fund the assignment or extension of a loan.  New funds were never directly used to pay on-going interest to prior investors.  In other words, there was no "Ponzi Scheme".

15.    According to the Mesirow's calculations, as of the Petition Date, approximately $24 million of principal payments received from Borrowers was no longer in the USACM "Collection Trust Account" and had not been remitted to Direct

Lenders ("Diverted Principal").

16.  The lack of payments from non-performing Loans serviced by USACM was not apparent to the Direct Lenders because the Direct Lenders kept receiving payments as if the Loans were performing.

17.  The total loans being serviced was about $960 Million so that the principal which was collected by USACM from paid-off loans that were not remitted totaled about 4% of the total portfolios.

18. In no cases was money received by an investor and not immediately used to fund a loan or to pay off a departing investor who wished to assign his portion of the Note and Deed of Trust or who did not wish to extend a matured loan.

19.  In its Loan Summary as of June 30, 2006, filed July 26, 2006 [DE 976] USACM reported it has effectively advanced $39,531,228.00 to Borrowers to keep their loans current without informing the Lenders who received the interest payments that they were entitled to receive under their Notes.

20.  In the Motion to Distribute Funds and To Grant Ordinary-Course Releases And Distribute Proceeds, filed July 7, 2006 [DE 847] ("Distribution Motion"), Debtors proposed to withhold certain post-petition collections from Lenders with respect to funds paid to the Lenders from the proceeds of interest advances to their borrowers without prejudice to the rights of any party concerning the entitlement of Debtors, Lenders or anyone else to the funds withheld.

21.  Debtors' Distribution Motion was granted with modifications by the Court

after a hearing on August 4, 2006.

22.  The Transcript of the hearing of August 4, 2006 shows that the Court's preliminary finding was that "it appears at this stage that people had direct interest in loans that were actual beneficiaries on loans and deed of trust secured by deeds of trust which were governed by the servicing agreement".  See Partial Transcript of Proceedings of Judge's Ruling on Motion to Temporarily Hold Funds Pending a Determination of the Proper Recipients and Memorandum of Points of Authorities, No. 173 at page 7, lines 8-11 which is filed herein as Document No. 1239 and attached hereto as Exhibit "A" sometimes referred to hereafter as "transcript".  The Court further stated that "at this stage, it appears as if there is no basis for putting the money into an entire pot and sharing it.  Each person has their rights under loans and deeds of trust; hence, the money should be distributed."  See Transcript at page 7, line 25 through page 8 at line 3.

23.  The court then addressed the netting issue stating "I think it's appropriate at this stage to net without making a final legal determination.  Under the doctrine, I believe recoupment is applicable."  See Transcript at page 8 lines 4-7.

24.  The Court addressed the issue of whether the Direct Lenders Notes and Deed of Trust were property of the estate.  See Transcript at page 11, lines 2-5: "As to Mr. Landis' argument, to the extent that this is – I think this is appropriate to make these interim distributions because at this stage, it does not appear to be the property of the estate, and, therefore, no plan is required.

25.  The Court then addressed the proper procedure for determining whether netting is appropriate.  A lawsuit to determine the issue was not favored by the Court. The Court stated at page 10, line 1 of the Transcript that suing "is an incredibly-expensive, frustrating and unnecessary I think legal position."  Impliedly the issue may be decided by Motion - as was the entire procedure concerning the temporary netting while reserving all rights of the parties with regard to this issue for another day.

26.  On August 1, 2006 a Motion for Payment of Proceeds of Notes Secured by Deeds of Trust Without Reduction for Netting was filed by Nancy Allf and Robert C. LePome on behalf of Stanley Alexander and others as Document #1061.  The Certificate of Service was filed August 1, 2006 as Document No. 1063 but was incomplete due to the vacation schedules of the attorneys.  On August 2, 2006 an Errata to the Motion for Payment of Proceeds of Notes Secured by Deeds of Trust Without Reduction for Netting was executed and filed by Nancy Allf as Document No. 1080.  This was identical to Document No. 1061 except that the blanks were filled in showing the signature of Nancy Allf and the reference to the parties.

27.  The Notice of Hearing with Certificate of Service of the Motion for Payment of Proceeds of Notes Secured by Deeds of Trust Without Reduction for Netting was overlooked by Nancy Allf and when the Court called Mr. LePome's office his staff prepared the Notice on the same date which was August 24, 2006 as Document No. 1183.  The Debtor and other parties had filed their responses on August 18, 2006 and Movants filed their Reply on August 28, 2006.  The final determination of the Netting

issue was avoided on August 4, 2006 and to be decided on "another day".

28.  On August 31, 2006 the Debtor filed its Status and Agenda for August 31, 2006 Hearings, a copy of which is attached hereto as Exhibit "B".  The Netting issue was before the Court in the form of a Motion.  The court heard all issues on the Agenda and a Transcript has been ordered on an expedited basis so that an accurate Order with regard to all matters before the Court may be prepared.

<u>No Further Extensions of the Time Within Which to</u>
<u>File a Plan Should be Granted to Debtor</u>

29.  On May 8, 2006 the Debtor filed its Motion to Temporarily Hold Funds Pending a Determination of the Proper Recipients, and Memorandum of Points and Authorities as Document No. 173.  The Motion and the Points and Authorities attached thereto contain paragraph B. which is attached hereto as Exhibit "C".  The title to paragraph B. accurately describes the subject matter as follows:

**"B.    USACM Has Contractual and Statutory Obligations Not to Release the Funds Until the Rightful Owner is Established."**

30.  Debtor essentially used the time from May 8, 2006 when their Motion to Temporarily Hold Funds (Document No. 173) was filed until July 7, 2006 when Debtors' Motion to Distribute Funds (Document No. 847) also called the "Distribution Motion" to reconstruct the accounts and to determine the "Rightful Owner" of the funds.

31.  The Plan of Reorganization was outlined by the Debtor on May 3, 2006 at Debtor's Meeting of Creditor's Hearing wherein Mr. Allison stated that he was looking

for an outside investor and that once all of the accounting was completed, he would

be in a position to propose a Plan.  The Debtor's Accounting was completed on or

before July 7, 2006 and Debtor represented to the Court that a Plan would be filed in

a week or two.  The time came and went.  Again Debtor represented to the Court on

August 4, 2006 hearing that a Plan would be filed before August 31, 2006 which was

the extended dated which was obtained by an unnoticed Order.  This Ex-Parte Order

was objected to by Movants herein and Movants further objected to any further

extensions after August 31, 2006.  See Objection to Stipulated Order Extending

Debtor's Exclusive Period to File a Plan to August 31, 2006 filed on August 24, 2006

as Document No. 1088 which states: "The Direct Lenders object to any further

extensions in this matter.  The Plan and Disclosure Statement should be filed

immediately so that this matter may move forward".  Again the time came and went

without a Plan being filed.

        32.  On August 31, 2006 the Court entered a "Stipulated Order Extending the

Debtors' Exclusive Period to File a Plan to September 15, 2006 as Document No.

1222.  The body of the Order cites 11 USC 1121(d)(1) which states that "Subject to

paragraph (2), or request of a party in interest made within the respective periods

specified in subsections (b) and (c) of this section and after notice and a hearing, the

court may for cause reduce or increase the 120 day period or the 180 day period

referred to in this section."

        33.  There had been no "Notice" of any proposed extension as required by

11USC 1121 (d) (1).  Therefore it would seem that the Stipulated Order of August 31, 2006 was improper when presented to the Court by Debtor's Counsel.

34.  On September 6, 2006 Debtor's Counsel submitted an Order Shortening Time to Hear Emergency Motion for Order Extending the Debtors Exclusive Period to File a Plan to September 15, 2006 and set such hearing for September 13, 2006.  The Court entered the Order Shortening Time on September 6, 2006 as Docket #1245.

35.  Movants had outlined a Plan in their Opposition to Motion to Hold Funds which was filed on May 18, 2006 as Document No. 281.  They would have assigned all Direct Lender Loans to a licensed collection agent.  New Powers of Attorney would be solicited and obtained.  A letter dated May 12, 2006 which had been mailed to all counsel who were identified as representing Direct Lenders was attached hereto as Exhibit "D" and is attached hereto as Exhibit "D" to Document #281.  The letter raised the issue of "Good Faith" which the Court must find in order to confirm a Plan and noted that the "Owners of Capital cannot meet this burden.  We all know the facts." The letter noted that it was "not likely that the Debtor will find a lending institution to lend over $100 Million when there are no assets to pledge nor is there goodwill."

36.  Movants and others similarly situated have over $900 Million of their own money at stake.  They have a right to either vote on a Plan or to propose their own Plan, or alternatively move to Dismiss or Convert to a Chapter 7.  It appears that if the case were to be dismissed the State of Nevada would complete the liquidation at  little or no cost to the Direct Lenders.  Filing a Plan immediately or allowing expiration of the

exclusivity period so that others may file a Plan will further the rights of the real parties in interest.

## Argument

To the extent that Bankruptcy Court are Courts of Law, the Plan should not have entered an Order extended the exclusivity period without a "Notice and Hearing"; as required by 11 USC 1121(d)(1).  The Motion now made is not made timely and should be denied.

To the extent that Bankruptcy Court are Courts of equity, the Court should not permit further elongation of the time period thereby allowing the assets of the Direct Lenders to be squandered on "management fees" and four sets of attorney fees for the committees and for their respective "experts".

## Conclusion

The Motion to Extend the Exclusive Period to File a Plan to September 15, 2006 should be denied.

 /s/ Robert C. LePome, Esq.
Robert C. LePome, Esq.
330 S. Third St. #1100B
Las Vegas, NV 89101
Nevada Bar #1980
(702) 385-5509

and

Parsons, Behle & Latimer
Nancy Allf, Esq., Bar #0128
Timothy P. Thomas, Bar #5148
411 E. Bonneville Ave. #100
Las Vegas, NV 89101