1          UNITED STATES BANKRUPTCY COURT

2             DISTRICT OF NEVADA

3             LAS VEGAS, NEVADA

4  In re:  USA COMMERCIAL MORTGAGE    )  JUNE 21, 2006
    COMPANY,                     )  E-Filed:  09/07/06

5                        )
        Debtor.            )  Case No.

6                        )  BK-S-06-10725-LBR
  _____)  Chapter 11

7

8         PARTIAL TRANSCRIPT OF PROCEEDINGS
                  OF

9      CROSS-EXAMINATION OF THOMAS J. ALLISON
                  ON

10            STATUS HEARING
           RE: MOTION FOR ORDER

11     UNDER 11, USC, SECTIONS 105(A), 345, AND 363
    APPROVING DEBTOR'S PROPOSED CASH MANAGEMENT PROCEDURES

12        AND INTERIM USE OF CASH IN ACCORDANCE
        WITH PROPOSED CASH BUDGET, NO. 8

13              AND
    MOTION DIRECTING PAYMENTS TO DIRECT LENDERS, NO. 336

14              AND
         ORDER SHORTENING TIME

15  RE: MOTION TO USE CASH COLLATERAL THROUGH JULY 29, 2006,
       PURSUANT TO SECOND REVISED BUDGET, NO. 407

16              AND
        MOTION TO RECONSIDER, NO. 609

17              AND
         ORDER SHORTENING TIME

18         RE: MOTION FOR AUTHORITY
     TO FORBEAR AND TO PROVIDE FURTHER FUNDING

19     FOR CERTAIN OUTSTANDING LOANS, NO. 592
              AND

20         ORDER SHORTENING TIME
    RE: MOTION FOR EMERGENCY INTERIM AND PERMANENT ORDERS

21  AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING,
              NO. 588

22              AND
         ORDER SHORTENING TIME

23      RE: MOTION FOR ORDER APPROVING AGREEMENT
       WITH INVESTMENT PARTNERS, NO. 575

24              AND

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

2

```
 1                    ORDER SHORTENING TIME
          RE: APPLICATION FOR ADMINISTRATIVE ORDER
 2      ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION
     AND REIMBURSEMENT OF EXPENSES OF PROFESSIONALS, NO. 570
 3                           AND
                    ORDER SHORTENING TIME
 4        RE: MOTION TO REMOVE FERTITTA ENTERPRISES, INC.,
           AS A MEMBER OF OFFICIAL COMMITTEE OF HOLDERS
 5             OF EXECUTORY CONTRACT RIGHTS, NO. 562
                             AND
 6                    ORDER SHORTENING TIME
               RE: APPLICATION TO EMPLOY
 7           ORRICK, HERRINGTON & SUTCLIFFE, LLP,
             AS COUNSEL TO THE OFFICIAL COMMITTEE
 8                  OF EQUITY SECURITY HOLDERS
     OF USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, NO. 619
 9                           AND
                    ORDER SHORTENING TIME
10      RE: APPLICATION TO EMPLOY BECKLEY SINGLETON, CHTD.,
               AS SPECIAL NEVADA BANKRUPTCY COUNSEL
11     TO THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
     OF USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, NO. 622
12                           AND
             JOINT MOTION FOR NUNC PRO TUNC ORDER
13     CLARIFYING REQUIREMENT TO PROVIDE ACCESS TO INFORMATION,
                           NO. 521
14                           AND
                    ORDER SHORTENING TIME
15        RE: APPLICATION TO EMPLOY FTI CONSULTING, INC.,
     AS FINANCIAL ADVISORS NUNC PRO TUNC AS OF JUNE 9, 2006,
16                         NO. 659
                             AND
17                    ORDER SHORTENING TIME
          RE: APPLICATION TO EMPLOY ALVAREZ & MARSAL, LLC,
18             AS FINANCIAL AND REAL ESTATE ADVISOR
              NUNC PRO TUNC TO JUNE 1, 2006, NO. 633
19                         VOLUME 1
               BEFORE THE HONORABLE LINDA B. RIEGLE
20                UNITED STATES BANKRUPTCY JUDGE

21                 Wednesday, June 21, 2006

22                       9:00 a.m.

23

24     Court Recorder:          Helen C. Smith

25     Proceedings recorded by electronic sound recording;
       transcript produced by transcription service.
```

3

```
 1    APPEARANCES:

 2    For Diversified Trust        MARC A. LEVINSON, ESQ.
      Deed Fund Committee:         Orrick, Herrington & Sutcliffe
 3                                 400 Capitol Mall
                                   Suite 300
 4                                 Sacramento, California 95814

 5                                 ANNE M. LORADITCH, ESQ.
                                   BRETT A. AXELROD, ESQ.
 6                                 Beckley Singleton, Chtd.
                                   530 Las Vegas Boulevard South
 7                                 Las Vegas, Nevada 89101

 8                                 JEFFERY D. HERMANN, ESQ.
                                   Orrick, Herrington & Sutcliffe
 9                                 777 South Figueroa Street
                                   Suite 3200
10                                 Los Angeles, California 90017

11    For the Official             CANDACE C. CARLYON, ESQ.
      Committee of Equity          Shea & Carlyon, Ltd.
12    Security Holders             233 South Fourth Street
      of USA Capital               Suite 200
13    First Trust Deed Fund,       Las Vegas, Nevada 89101
      LLC:
14
      For Boise-Gowan, LLC,        SUSAN WILLIAMS SCANN, ESQ.
15    and Franklin Stratford,      Deaner, Deaner, Scann, Malan
      Investment, LLC:               & Larsen
16                                 720 South Fourth Street
                                   Suite 300
17                                 Las Vegas, Nevada 89101

18    For the First Trust          EVE H. KARASIK, ESQ.
      Deed Committee:              Stutman, Treister & Glatt, P.C.
19                                 1901 Avenue of the Stars
                                   Twelfth Floor
20                                 Los Angeles, California 90067

21    For the Jones Vargas         JANET L. CHUBB, ESQ.
      Direct Lenders:              Jones Vargas
22                                 100 West Liberty
                                   Twelfth Floor
23                                 Reno, Nevada 89501

24

25
```

```
 1   APPEARANCES (Cont.):

 2   For the Unsecured          ROB CHARLES, JR., ESQ.
     Creditors Committee        Lewis and Roca, LLP
 3   of USA Commercial          3993 Howard Hughes Parkway
     Mortgage Company:          Suite 600
 4                              Las Vegas, Nevada 89109

 5   For the Canepa             LAUREL E. DAVIS, ESQ.
     Group:                     Lionel, Sawyer & Collins
 6                              300 South Fourth Street
                                Suite 1700
 7                              Las Vegas, Nevada 89101

 8   For the Official           GERALD M. GORDON, ESQ.
     Committee of Executory     GREGORY E. GARMAN, ESQ.
 9   Contract Holders of        Gordon & Silver, Ltd.
     USA Commercial             3960 Howard Hughes Parkway
10   Mortgage Company:          Ninth Floor
                                Las Vegas, Nevada 89109
11
     For Liberty Bank           WADE B. GOCHNOUR, ESQ.
12   (phonetic):                Haney, Woloson & Mullins
                                1117 South Rancho Drive
13                              Las Vegas, Nevada 89102

14   For CapitalSource          DAVID A. COLVIN, ESQ.
     Finance, LLC:              Marquis & Aurbach
15                              10001 Park Run Drive
                                Las Vegas, Nevada 89145
16
                                KENNETH J. OTTAVIANO, ESQ.
17                              Katten Muchin Rosenman, LLP
                                525 West Monroe Street
18                              Suite 1600
                                Chicago, Illinois 60661
19
     For the United States      AUGUST B. LANDIS, ESQ.
20   Trustee:                   Office of the United States Trustee
                                300 Las Vegas Boulevard South
21                              Suite 4300
                                Las Vegas, Nevada 89101
22
     For the Debtor:            ANNETTE W. JARVIS, ESQ.
23                              Ray, Quinney & Nebeker, P.C.
                                36 South State 1400
24                              Salt Lake City, Utah 84145

25
```

```
1    APPEARANCES (Cont.):

2    For the Debtors:          LENARD E. SCHWARTZER, ESQ.
                               Schwartzer & McPherson Law Firm
3                              2850 South Jones Boulevard
                               Suite 1
4                              Las Vegas, Nevada 89146

5    For Richard McKnight,     THOMAS J. GILLOON, ESQ.
     Esq.:                     Law Office of Richard McKnight, P.C.
6                              330 South Third Street
                               Suite 900
7                              Las Vegas, Nevada 89101

8    Also Present:            ROBERT A. RUSSELL
                              Manager
9                             Boise-Gowan, LLC
                              Franklin Stratford Investment, LLC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

6

```
1                          I  N  D  E  X

2   Witness                Direct    Cross    Red.    Rec.    Voir
                                                              Dire
3   THOMAS ALLISON
    (By Ms. Carlyon)                   8
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      E  X  H  I  B  I  T  S

 2    Number                  Description           Page

 3    Debtor's 1     Budget                          11

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

8

1          (Court previously convened at 09:20:20 p.m.)

2          (Partial transcript of Partial Testimony

3          of Thomas J. Allison at 03:57:54 p.m.)

4              THE COURT:  All right.  Cross.

5              MS. CARLYON:  Good afternoon, Mr. Allison.  My

6      name is Candace Carlyon.  I'm the attorney for the First

7      Trust Deed Committee.

8          Although we went a little bit astray on the interim,

9      I'm going to try to limit myself at least for the most part

10     to the interim request.

11                          CROSS-EXAMINATION

12     BY MS. CARLYON:

13     Q.   Now, the interim request is a maximum of $3,000,000,

14     right?

15     A.   That's correct.

16     Q.   How much do you anticipate drawing down other than

17     paying the lender's own fees, expenses, et cetera?

18     A.   Under the current forecast, we're not -- we're

19     forecasting to draw $125,000 down on the Boise-Gowan loan to

20     finish that -- that transaction.

21     Q.   Okay.  And to refresh my recollection, the Boise-Gowan

22     loan is a loan in which my funds are not participants,

23     right?

24     A.   I believe that's the case.

25     Q.   And the diversified funds are not participants, right?

1    A.    No.  That's totally held by direct investors.

2    Q.    Okay.  And are any of those direct investors

3    represented here today?

4    A.    I don't know if any of the direct investors that are in

5    the -- that are in that -- in that loan are --

6    Q.    Well, one of --

7    A.    -- here today.

8    Q.    At least, one of the direct investors opposed that

9    financing, right?

10   A.    Yes.

11   Q.    Okay.  And none of the direct investors filed anything

12   in support of that; is that right?

13   A.    Yes.

14   Q.    Okay.  Now, your projections demonstrate that you have

15   the ability in cash to fund that 125,000 if the debtor

16   needed to, right?

17   A.    My projections do, but Mr. Vice (phonetic) had --

18   Q.    Wait, wait, wait.  I have another question after that.

19   So the answer's yes?

20   A.    Yes.

21   Q.    Okay.  And as I understand it from talking to you

22   earlier today, your belief is that from a regulatory

23   standpoint USA CMC may not use its money even the

24   servicing-fee money to fund this loan.  It's prohibited from

25   doing so by state regulation; is that correct?

1    A.    That's what I've been told by Mr. Vice.

2    Q.    Okay.  And you're operating on that belief; is that

3    correct?

4    A.    That's correct.

5    Q.    But you are going to pledge USA's money to secure that

6    loan, right?

7    A.    Yes.

8    Q.    So we're taking that 125,000 that the debtor can't fund

9    directly, we're getting it from a third party, and we're

10    funding it and securing it by the money that we can't lend

11    directly; is that right?

12    A.    Yes.

13    Q.    Okay.  And that 125,000 is the only thing that you

14    contemplate needing to draw during the interim period; is

15    that correct?

16    A.    That's correct.  Unless --

17    Q.    Okay.

18    A.    Unless our collections dry up more dramatically than

19    what -- than what we --

20    Q.    Well, let's talk about that right now.  I have the

21    budget.

22            MS. CARLYON:  And did we admit that as an exhibit?

23            MS. JARVIS:  (Indiscernible).

24            MS. CARLYON:  All right.

25            THE COURT:  Oh.

1          MS. CARLYON:  Let's go ahead --

2          THE COURT:  Do you want to make the motion and

3  admit that?

4          MS. CARLYON:  I would move --

5          MS. JARVIS:  Sure.

6          MS. CARLYON:  As a matter of fact, I have --

7  BY MS. CARLYON:

8  Q.   It's been marked; is that correct?

9  A.   Yes.  Exhibit 1.

10          MS. CARLYON:  All right.

11          MS. JARVIS:  In fact --

12          MS. CARLYON:  I would move --

13          MS. JARVIS:  In fact, your Honor, we presented

14  three exhibits, and we would just ask that they -- the third

15  one is demonstrative only, but we would go ahead and ask --

16          MS. CARLYON:  I --

17          THE CLERK:  (Indiscernible).

18          MS. JARVIS:  -- that they be admitted.

19          MS. CARLYON:  Exhibit 2 and 3 I don't believe

20  bears on the interim loan, so maybe that's something we

21  could deal with on redirect if it becomes relevant, but I

22  would move at this time for Exhibit 1 to be admitted.

23          THE COURT:  All right.  That's admitted.

24      (Debtor's Exhibit No. 1 was admitted

25      into evidence.)

```
1            MS. CARLYON:  All right.

2    BY MS. CARLYON:

3    Q.   So you have that in front of you?

4    A.   Yes.

5            MS. CARLYON:  All right.  And the Court has that,

6    also?  All right.

7    BY MR. CARLYON:

8    Q.   So how much cash -- and this is the budget you filed

9    yesterday, right?

10   A.   Yes.

11   Q.   This is a good one right now --

12   A.   As far as --

13   Q.   -- as far as we know.

14   A.   -- we can see the line of sight --

15   Q.   Okay.

16   A.   -- on it, yes.

17   Q.   So for the current time period, we show cash on hand of

18   how much?

19   A.   About a million-three.

20   Q.   And that million-three is just money that's available

21   to pay costs of operation, right?

22   A.   That's correct.

23   Q.   Okay.  Now I want to talk about this period between now

24   and July 25th.  The debtor's operating expenses are shown on

25   this budget; is that right?
```

1    A.   Yes.

2    Q.   And that's under cash disbursements, operating

3    disbursements, in the second section down; is that correct?

4    A.   That's correct.

5    Q.   All right.  And for this period 06/25 through 07/23,

6    how much money is necessary to pay operating expenses?

7    A.   Between payroll and rents, we -- we -- we're -- we're

8    burning cash each week to do it.  During the period, we go

9    from a cash -- opening cash balance of about this week of a

10   million-three.  Through the August period, we go down to a

11   cash balance of $700,000.

12   Q.   Okay.  So this is my question.  I guess I'll go through

13   it with you a little more slowly.  I'm looking at 06/25

14   through 07/23.

15        Is it correct that those operating disbursements are

16   the only ones that need to be funded between now and the

17   July 25th hearing?

18   A.   As far as I can -- as I -- as far -- as best as I can

19   forecast --

20   Q.   Okay.

21   A.   -- yes.

22   Q.   And so far, your forecasts have been conservative.  You

23   beat your forecasts, right?

24   A.   Yes.

25   Q.   All right.  So 06/25 to 07/02, 877 plus 93, that's 180;

1   is that right?  You know what?  I have a calculator.

2   Looking at your figures in yesterday's budget for

3   disbursements for operating expenses, 06/25 of 87.7 million,

4   07/02 of 90.3 million, 07 I believe it's 09 of 87.7 million,

5   07/16 of 35,000,000, and 07/23 of 87.7 million, what's that

6   total?

7   A.   I'm sorry.  You were going so fast.  I couldn't -- my

8   -- my -- my keystroke ability is not that fast, Ms. Carlyon.

9   What -- what do you want me to add up?  The -- if we're

10  looking at --

11  Q.   I want you to look at the document and add up your

12  disbursements for operations from 06/25/06 through 07/23/04

13  (sic).

14  A.   Total operating disbursements each week?  Sure.

15  Q.   And as a heads-up, I got about $388,000.

16  A.   Without do -- with doing it fast, let's -- let's assume

17  it's in the same or it should be a little bit lower.  When

18  we go through disbursements each week, it -- it totals -- it

19  varies, but it -- it ranges between 67- and $80,000 a

20  week --

21       (Telephonic interruption over the line.)

22          THE WITNESS:  -- $87,000, between 60- and $87,000

23  a week in terms of --

24  BY MS. CARLYON:

25  Q.   So --

1    A.    -- operating expenses.

2    Q.    So, normally, it wouldn't be more that 320,000 for four

3    weeks.  That's what you're saying?

4    A.    Right.

5    Q.    Okay.  So you have a million-three now, you have these

6    operating disbursements between now and then that aren't

7    going to exceed 320, and you have money coming in between

8    now and then, right?

9    A.    We -- we -- again, we're forecasting money coming in.

10   Q.    Right.  You're forecasting collections of about

11   426,000, right?

12   A.    Yes.

13   Q.    Yes?

14   A.    That's correct.

15   Q.    Okay.  And between now and the final hearing, is there

16   anything else we have to spend money on?

17   A.    If there -- there may be unknown expenses that I can't

18   project at this point in time.

19   Q.    Okay.  So we've got 340 max going out, we've got

20   projected 426 coming in, and we've got a million-three cash

21   on hand.

22         What is it that you anticipate happening between now

23   and July 25th that creates a requirement of this interim

24   funding, other than the $125,000 loan?

25   A.    Outside of -- you have potentially having to take some

1    enforcement actions in negotiations we currently have

2    ongoing on -- on -- with a variety of different borrowers

3    which I haven't baked into these forecasts, you know,

4    because, again, I -- I -- I'm taking these forecasts to be

5    relatively conservative.  I can't forecast it.

6         So what I've done is take -- and it's not a -- this is

7    not a basis where I'm making widgets where I can say this is

8    what my production line is going to cost each week, and this

9    is what -- and this is what my net cost of goods are going

10   to be.

11        What I've been trying to forecast and create a cushion

12   for is the unknown, and one thing I've learned in this case

13   is that there is a lot of unknowns.

14             THE COURT:  Isn't that what Rumsfield (phonetic)

15   said?

16             MS. CARLYON:  I'm sorry?

17             THE COURT:  Isn't that what Rumsfield said?

18             THE WITNESS:  Gee.  Don't --

19             MS. CARLYON:  You --

20             THE WITNESS:  Please don't call me Rumsfield,

21   your Honor.

22   BY MS. CARLYON:

23   Q.   You're familiar with Federal Rules of Bankruptcy

24   Procedure 4001(c)(2) as to the requirements of an interim

25   financing; is that right?  You do this all the time.  You're

```
 1   aware of that, right?

 2   A.   I -- I do financings all the time.  I -- I don't look

 3   at the code all the time as I do them, Ms. Carlyon.

 4   Q.   Carlyon.  So in this --

 5   A.   Carlyon.

 6   Q.   In this case, you mailed a notice seven days ago that

 7   was just a notice, and that's what the bulk of the people

 8   got, right?

 9   A.   I did mail -- I'm sorry.  What notice are you -- that

10   I --

11   Q.   The --

12   A.   You're saying --

13   Q.   The notice of this hearing --

14   A.   Right.

15   Q.   -- went into the mail a week ago.  It was filed a week

16   ago.

17   A.   Right.  I didn't mail it.  I'm sorry.  You said I

18   mailed it.

19   Q.   No.

20   A.   I didn't.

21   Q.   I'm sorry.  You had BMC mail it.  I didn't mean to

22   suggest you were licking envelopes.  I know you're not.  And

23   the requirement -- so we're on less than 15-days' notice,

24   obviously, right?

25   A.   Yes.
```

1    Q.    All right.  So the requirement under 4001(c)(2) is that

2    the Court can grant the interim approval only to the extent

3    necessary to avoid immediate and irreparable harm to the

4    estate pending a final hearing.  Is there anything in your

5    budget that demonstrates that necessity between now and the

6    final hearing?

7    A.    In terms of the absolute numbers, no.  In terms --

8    Q.    Okay.

9    A.    -- of the -- in terms --

10    Q.    That --

11    A.    -- of the --

12    Q.    That's just my first question.  So the budget that you

13    submitted yesterday in support --

14            MR. SCHWARTZER:  Objection, your Honor.

15    MS. CARLYON:

16    Q.    -- support of the motion --

17            MR. SCHWARTZER:  I think he should be allowed to

18    answer the question; otherwise, we're going to spend --

19            THE COURT RECORDER:  Mr. --

20            MR. SCHWARTZER:  -- a lot of time --

21            THE COURT RECORDER:  Could you move closer --

22            MR. SCHWARTZER:  -- going on redirect --

23            THE COURT RECORDER:  -- to the microphone,

24    please --

25            MR. SCHWARTZER:  -- over every question.

```
 1              THE COURT RECORDER:  -- Mr. Schwartzer?

 2              THE COURT:  You need to be at a microphone.

 3              MR. SCHWARTZER:  Your Honor, it would be a lot

 4     easier if Ms. Carlyon would allow Mr. Allison to finish his

 5     answer.

 6         I know she could ask yes-or-no questions, but we have a

 7     limited amount of time and not allowing him to complete his

 8     answers is going to make redirect even longer.

 9              MS. CARLYON:  I appreciate that, but this is my

10     time, and I want an answer to the question I ask, not the

11     next question that's anticipated.

12              THE COURT:  And that's appropriate.  I know.

13     Sometimes, it's hard.  Sometimes, you save time, and,

14     sometimes, you don't, so --

15     BY MS. CARLYON:

16     Q.   So my first question is just the budget, the written

17     budget, that you submitted to the Court and everyone else

18     yesterday doesn't show the necessity to avoid immediate and

19     irreparable harm to the estate pending a final hearing,

20     right?

21     A.   Yes.

22     Q.   Okay.  In your professional judgment, something could

23     happen between now and then that would create that need; is

24     that correct?

25     A.   That's correct.
```

1  Q.   All right.  And your fear is that because this judge is

2  gone you wouldn't have the ability to come in and get

3  something heard; is that correct, too?

4  A.   That's also correct.

5  Q.   All right.  So if we had the availability of another

6  judge, that would go a long way towards not needing this

7  interim request; is that right?

8  A.   Well, I think we need the interim request for -- to --

9  to do the work necessary to complete the 17 projects we

10  talked about.

11      And I look at the interim financing to be built into an

12  integral part of the $41,000,000 that's needed to build out

13  the projects.

14  Q.   Okay.  I know you've wanted to talk about that, so

15  let's talk about that.  These 17 projects that you

16  contemplate funding, my group is the 100-percent owner of

17  only of them, right, the --

18  A.   That's --

19  Q.   The last one --

20  A.   -- correct.  You're 100 --

21  Q.   -- on your chart.

22  A.   You're 100-percent owner of one, but a participant in

23  -- in 11.

24  Q.   Right.  And of those 11, the bulk are a participation

25  interest of something around one to three percent, right?

1    A.    No.    It's actually -- they're averaged some of --

2    you're certified -- your trust deed fund is 17 point --

3    17 percent, 100 percent, 17 percent, 19 percent -- or excuse

4    me -- 80 percent, then a fractional interest, then

5    18 percent, then 5 percent, then a fractional interest, so

6    it cuts across the board, but you do have a substantial --

7    Q.    You --

8    A.    -- interest.

9    Q.    You skipped a lot of numbers that are less than the

10   number five, right?

11   A.    No.

12   Q.    You skipped --

13   A.    Actually, I walked --

14   Q.    -- over it.

15   A.    The First Trust Deed Fund on Binford (phonetic) has

16   17.2 percent of the project.

17   Q.    Are there any -- I'm sorry.  Are there any of these

18   loans on which my trust deed fund holds zero- to

19   five-percent interest?

20   A.    Yes.

21   Q.    How many of the 17?

22   A.    Out of the 17, I believe you're in 11 of them.

23   Q.    Okay.  With zero to five percent.

24   A.    No.  You're in 11 transactions, period.  The -- and if

25   we just -- if you go through, I'll -- you're --

1   Q.    You know what?

2   A.    You're --

3   Q.    I'll withdraw it because we can read, and we are short

4   of time.  You said that one of your integral parts of the

5   plan which is why you need to set up the loan now which is

6   why you need the interim request now so you can talk about

7   the things later is that you want to make new loans, right?

8   A.    Well, the -- the -- first of all, I think the most --

9   Q.    This is a yes-or-no question.

10  A.    I want to be able to make these loans first.  I want to

11  be able to -- to the extent that the last part of the -- the

12  last part of the DIP or the exit part of a DIP would be to

13  allow the debtor to continue.

14       If the debtor rehabilitates, puts new management in

15  place long term, to be able to have a warehouse facility, so

16  it can continue to -- to -- to generate revenue that could

17  -- could translate into value for the people that may not

18  get paid in this case.

19  Q.    Okay.  So you're contemplating making new loans, right?

20  A.    Yes.  At -- at some point --

21  Q.    And you're planning --

22  A.    -- in time.

23  Q.    Wait, wait.  And you're planning on living on the VIG

24  (phonetic) between what you can go out and borrow the money

25  for in the market secured by our assets or secured by the

1    new loan and what the borrower pays.  You're planning on

2    living on that three-percent differential, right?

3    A.    Yes.

4    Q.    Okay.  And from that three-percent differential, is it

5    accurate to say you would not be able to pay the

6    administrative expenses of this case?

7    A.    It would be -- if we -- if you're talking about the

8    origination of new loans, it's not living on three percent,

9    Ms. -- ma'am.

10        It's -- it's essentially looking at going back into the

11   origination business which would be the up-front fees on the

12   transactions, the -- and going through the -- the spread

13   income each month, but the -- the largest --

14   Q.    Is it --

15   A.    The largest driver in this case, the largest driver in

16   this company, was generating the up-front revenues.

17   Q.    Is that something that you plan on doing through a plan

18   of reorganization?

19   A.    Yes.

20   Q.    All right.  So creditors will have a say on whether

21   they want you to do that, right?

22   A.    Absolutely.

23   Q.    Okay.  And so far, my committee has come to you and

24   said we don't think you need to be originating new loans,

25   right?

1          MS. JARVIS:  Your Honor, that's hearsay --

2          THE WITNESS:  They -- they haven't come to me --

3          MS. JARVIS:  -- the current committee --

4          THE WITNESS:  -- and said that, yet.

5          THE COURT:  Well --

6          MS. JARVIS:  -- has come to him.

7          MS. CARLYON:  All right.

8    BY MS. CARLYON:

9    Q.   Well, at this time, the committees have not -- well,

10   you know what?  I'll strike that.  So the new loans are in

11   the future.  The construction funding of existing loans is

12   now, right?

13   A.   That's correct.

14   Q.   The one that we're 100 percent in is one where

15   construction hasn't even started, right?

16   A.   Correct.

17   Q.   Okay.  And you plan on filing a motion on 25-days'

18   notice to have these loans heard on August 4th.

19   A.   And --

20   Q.   When do you plan on asking the lenders whether they

21   want to be primed?

22   A.   The -- as we go through the structure, I think the

23   first thing we have to figure out is with each if we can --

24   how we -- the structure that would -- would be -- that could

25   be put together on it and what's the optimal way of putting

1    the transaction in place.

2    Q.    No.    Do --

3    A.    And it went (indiscernible), and it's -- the -- I --

4    I --

5    Q.    Do --

6    A.    Let me be very clear.

7    Q.    I don't --

8    A.    I said --

9    Q.    -- know if you're hearing --

10    A.    -- the optimal --

11    Q.    -- the question.

12    A.    -- structure whether or not there is a priming on that

13    loan to finish it out and what's in the best interest of

14    each of these loans if --

15    Q.    Right.    Well, the --

16    A.    -- if there's a loss.

17    Q.    Just to stop you.    The term sheet that you filed that

18    you want approval of or that you wanted approval of when you

19    filed this said those new loans, those 17 new loans, will be

20    priming loans, right?

21    A.    That's correct.

22    Q.    Do you plan on asking the lenders on the existing loans

23    if they want to be primed or if they'd rather take their

24    chances as is?

25    A.    Yes.

1    Q.    Okay.  When do you plan on asking them?

2    A.    During the month of July.

3    Q.    When in July?

4    A.    During the month of July.

5    Q.    How long before you start preparing that motion?

6    A.    I'm not going to be preparing the motion.  Ms. Jarvis

7    will.

8    Q.    How long before you instruct your counsel to start

9    preparing the motion are you going to make the requests of

10   the lenders?  How long are they going to have to answer you,

11   and then how much time are you going to talk to them before

12   you have your attorney start preparing a motion to prime

13   them?

14   A.    I think if we go through -- the first part of this is

15   to go through with -- and the dialogue started yesterday --

16   with the -- with the financial advisors for the two funds.

17        And it -- it's going to take some time to go through

18   each.  I think the process is -- you're -- you're racing to

19   judgment on the process.

20        The process is going to be getting people educated as

21   to why each of these transactions make sense, why we're

22   protecting the value, why they -- why the -- why it makes

23   sense for the value of the estate.

24        And if we don't do the end -- and, frankly, to put the

25   analytic in place, that could this -- will this deal

1  monetize and monetize at par, and what's the downside in

2  each of these transactions.

3       And, frankly, what I -- what I'll have to begin

4  noticing these investors are there's a potential loss of

5  principal and interest if this deal is not done.

6  Q.   And I --

7  A.   What we --

8  Q.   I'm sorry.

9  A.   -- have to be able --

10 Q.   Just --

11 A.   What I have to be able --

12 Q.   My only question is when.  When do you plan on --

13 A.   During --

14 Q.   -- notifying them of that?

15 A.   During --

16 Q.   When?

17 A.   -- the month of July.

18 Q.   Okay.  Do you plan on doing it at least two weeks

19 before Ms. Jarvis starts working on this motion?

20 A.    I can't say that -- the exact time line.  I know that

21 it will work -- will -- it will be -- it will be -- the work

22 on it will be dependant upon how fast we move with each of

23 the groups.  I can't give you the exact time line to the

24 day.

25 Q.   Okay.  With regard to the Boise-Gowan -- am I saying it

1   right -- the loan that you want to make the $125,000 right

2   now --

3   A.   That's correct.

4   Q.   -- is there some connection between that loan and the

5   insiders?

6   A.   No.  They -- you actually --

7   Q.   Okay.  So Mr. Hantges and Mr. Milanowski have nothing

8   to do with that loan.  They're not equity participants.

9   A.   They --

10  Q.   They're not guarantors.

11  A.   They --

12  Q.   They're not co-borrowers.

13  A.   They were equity participants.  I believe my

14  understanding is that they either have been bought out or

15  are being bought out of the --

16  Q.   Okay.

17  A.   -- Boise-Gowan loan.

18       (Telephonic interruption over the line.)

19  BY MS. CARLYON:

20  Q.   The documents in your file, do they indicate --

21  A.   Yes.  They indicated that --

22           THE COURT:  Excuse me.  Somebody's on the line,

23  please.  Mute your phones.

24           THE CLERK:  Someone's dialing.

25           THE WITNESS:  The --

```
 1          (Telephonic interruption over the line.)

 2              THE WITNESS:  The Boise-Gowan loan to be -- to be

 3   specific, the investment partners, Mr. Hantges and

 4   Milanowski, negotiated with Mr. Russell an equity stake in

 5   that transaction without -- without consideration.  I -- Mr.

 6   Russell is -- was -- is subsequently --

 7          (Telephonic interruption over the line

 8          continuing through the below questioning.)

 9   BY MS. CARLYON:

10   Q.   I --

11   A.   -- is negotiating --

12   Q.   I don't --

13   A.   -- out of that.

14   Q.   I'm not asking you hearsay statements that Mr. Russell

15   made to you.  I'm just asking you in your files does it

16   indicate that insiders are equity holders in that project?

17   A.   Yes.

18   Q.   Okay.  Now, with regard to that loan, that $125,000.

19   And if I heard you correctly, you say you need to loan that

20   money to pay potential mechanic's liens and past-due

21   property taxes; is that right?

22   A.   No.

23   Q.   Okay.

24   A.   That's in -- the Boise-Gowan loan is the completion of

25   engineering in development on the property as well as the
```

1  payment of property taxes.

2  Q.   Okay.  So the payment of property taxes is behind us

3  now, right, or is above us now.

4  A.   (No audible response.)

5       (Telephonic interruption over the line

6       continuing through the below questioning.)

7       (Colloquy not on the record.)

8           MS. CARLYON:  Sorry.

9  BY MS. CARLYON:

10 Q.   There's no need to pay property taxes between now and

11 July, right?

12 A.   I'm not sure if I can make that -- make that assumption

13 with you right now.

14 Q.   Okay.  When you say completion of engineering, what do

15 you mean?

16 A.   Complete -- there's an engineering site that's needed

17 to -- to get to the next round of fund -- to get this

18 transaction to the next round of funding.

19 Q.   So the 125,000 isn't to complete the project and be

20 done with it?  It's just to do preliminary engineering work?

21 A.   No.  I didn't say that.  I said it's to complete the

22 engineering work necessary, and I think that what that will

23 do --

24 Q.   I'm sorry.  Is engineering work somebody physically

25 building a building or is it somebody writing stuff down?  I

1   mean, are you talking about --

2   A.   I think it --

3   Q.   -- an engineer like a person --

4   A.   Not a --

5   Q.   -- that comes out and --

6   A.   Not a trained engineer, not -- it's an engineering to

7   -- an engineering-design work to finish the project off.

8   See, what I -- what this project is -- is --

9   Q.   So --

10  A.   -- positioned to go into is --

11  Q.   So the project --

12  A.   -- the next round --

13  Q.   -- is under construction now.

14  A.   Yes.

15  Q.   But the design work hasn't been done?

16  A.   It -- I'm not an -- I'm not a construction engineer,

17  but it's engineering work that's needed to complete the

18  project to get it to the next step.

19  Q.   And the next step will be another request for funding?

20  A.   No.  The next step will be financing it through --

21  financing it through a third party.

22  Q.   And when you say that there are these commitments to

23  fund on these 17 loans, including Boise-Gowan, all of the

24  documents that I have seen say very specifically there is no

25  commitment to fund these additional amounts.  Do you have

1   loan documents on Boise-Gowan that says something different?

2   A.   The Boise-Gowan shows draws to get to 2.5 million

3   dollars.

4   Q.   I'm sorry.  The loan agreement, does it say that

5   additional funding is discretionary?

6   A.   It says it's discretionary up --

7   Q.   Okay.  And is that --

8   A.   -- up to the draws.

9   Q.   Is that true on all of these loans?

10  A.   It all -- it says they're all discretionary.

11  Q.   Okay.

12  A.   But each of the --

13  Q.   No.  That's --

14  A.   Each --

15  Q.   That's my only question --

16  A.   Okay.

17  Q.   -- because you're saying commitment, but your loan

18  documents say discretionary.

19  A.   Yes.

20  Q.   Okay.  Now, with regard to the fees that will be

21  incurred to get this $125,000, can you run through how much

22  money we're talking about.

23  A.   $75,000 in the commitment fee.

24  Q.   Okay.

25  A.   Legal fees are -- legal and due-diligence fees I

1    believe are up to $200,000.

2    Q.    Is there a cap or is that estimate?

3    A.    What I believe it's -- the estimate is an up-to subject

4    to Court approval.

5    Q.    Because the current -- the reason I ask -- I'm not

6    trying to trick you -- the form of order that was passed

7    around by your counsel this morning said that not even

8    Judge Riegle let alone us can review the reasonableness of

9    these fees, and it specifically did not cap these fees.  Is

10   it going --

11   A.    I didn't say they --

12   Q.    -- to be in the order --

13   A.    -- were capped.

14   Q.    -- a cap on the fees?

15        MS. JARVIS:  Your Honor, I think that was a

16   mischaracterization.  If she's speaking about a document,

17   she should pull out the document.

18        MS. CARLYON:  Great.  I'll do that if we need to.

19        MS. JARVIS:  (Indiscernible).

20   BY MS. CARLYON:

21   Q.    Is there a cap on these fees?

22   A.    No.

23   Q.    Okay.  Does Judge Riegle have to approve the fees

24   before they're paid?

25   A.    I believe she does.  I'm not --

1    Q.    Okay.

2    A.    I --

3    Q.    So that will be in the order that no fees will be paid

4    without Judge Riegle approving them; is that right?

5    A.    Yes.

6    Q.    Okay.  And are the fees that you're obligated to pay if

7    they're reasonable the fees relative to the $3,000,000

8    commitment or are the fees relative to the $15,000,000?

9    A.    $3,000,000 commitment.

10   Q.    Okay.  So only the fees that relate to the 3,000,000

11   can be awarded, and Judge Riegle has to award them; is that

12   right?

13   A.    I believe so.  I -- I'd check with our -- with the

14   lawyers going back and forth, but I believe that's the case.

15   Q.    Okay.  And is there a cap of 200?

16   A.    There -- as I said a couple times, there's no cap.

17   What I understand the number to be is up to $200,000.

18   Q.    When you say up to, you think that that's what's

19   estimated.

20   A.    That's what's been estimated.  That --

21   Q.    Okay.

22   A.    That's what I've been told.  It's up to $200,000.

23   Q.    Okay.  Up to implies a cap.  Have you been told that

24   there is a cap?

25   A.    No.  I've -- we've --

1   Q.   Okay.

2   A.   I've said that three times.

3   Q.   Well, yeah, I know, but then you keep going and using

4   the phrase "up to", so I'm just trying to understand what

5   you mean by that, so there's 75.  There's estimated of up to

6   200 --

7   A.   That's correct.

8   Q.   -- with no cap, and what else?

9   A.   There is a loan-servicing fee of $10,000 and I believe

10  an unused commitment fee of $3,000.

11  Q.   Okay.  So we've got 275, 285, 288.  We're paying 288.

12  We're paying somewhere between 90 and 288 in order to borrow

13  $125,000, right?

14  A.   Plus, to give us the -- the -- the ability to borrow up

15  to $3,000,000 and to have some reserves in case something

16  untoward happens to this estate.

17  Q.   Right.  But you have a million-three now.  You project

18  that you're going to bring in more than you spend between

19  now and there, so you've already got a cushion of over a

20  million-three, right?

21  A.   Well, I've got a million-three cash on hand today, and

22  I'm hoping that I'd be able to collect some money along the

23  path, and I will be spending money for payroll.

24  Q.   Right.  And when you say it's a hope and an expense,

25  I'm just talking about the budget you've given to us because

1  that's all I have.

2  A.    Sure.

3  Q.    And under the budget that you gave to us yesterday, you

4  project bringing in $488,000 in this interim period, right?

5  A.    That's correct.

6  Q.    You told us you don't expect to spend more than 340,

7  right?

8  A.    That's correct.

9  Q.    So you expect to bring in 140,000 more than you spend

10 in the interim period, right?

11 A.    That's --

12 Q.    Right?

13 A.    -- correct.

14 Q.    Plus, you have cash on hand of a million-three, right?

15 A.    Yes.

16 Q.    Okay.  Now, the foreclosure costs, you estimate

17 out-of-pocket costs of $200,000 on each of four loans; is

18 that right?

19 A.    Yes.

20 Q.    Okay.  And does that cover -- is that just the

21 trustee-sale guarantee and the notice of breach?

22 A.    It's the legal fee going to out-of-court and going to

23 out-of-state and doing enforcement actions on these

24 transactions.

25 Q.    Okay.  But to initiate foreclosure, you need to have

1    the title company file the notice of breach.  How much will

2    that cost?

3    A.    I haven't worked through the budget on each of the

4    various costs, and I -- I believe the costs vary per state.

5    Q.    I'm sorry.  You have worked through the budget to the

6    extent that you have estimated the total cost per each of

7    the four foreclosures is 200,000 each, right?

8    A.    That's correct.

9    Q.    In the detail supporting that, what's put into that

10   assumption for the cost of starting the foreclosure?

11   A.    It's -- it's going through the steps necessary to

12   notify the debtor to foreclose, to take the steps necessary

13   to take the property, and to --

14   Q.    What's the dollar amount needed to pay the title

15   company to file the notice of breach?

16   A.    I don't have that on each --

17   Q.    Do you have --

18   A.    -- by each --

19   Q.    Do you have some idea?

20   A.    Not at the moment.

21   Q.    Is it fair to say that that's something that you

22   probably have funds to do if you need to do it between now

23   and the final hearing?

24   A.    Yes.

25   Q.    Okay.  And the professional fees, all of the attorneys

1    working for you are appointed by this Court, right?

2    A.    That's correct.

3    Q.    They're counsel in a bankruptcy case, right?

4    A.    The -- the -- the attorneys that are -- are working for

5    me now are, but I would be --

6    Q.    Right.

7    A.    I would be retaining -- I would be seeking the approval

8    to hire ordinary-course attorneys to -- to do enforcement

9    actions on --

10   Q.    Okay.

11   A.    -- in each of the states that I would be going in.

12   Q.    Right.  But if you file that motion, you have to file

13   that motion and set it for a hearing, so that's not going to

14   predate this interim period expiring, right?

15         So all of the attorneys working now in your office took

16   this job knowing that the bankruptcy code generally provides

17   that no fee applications even an interim application is

18   filed for 120 days, right?

19   A.    Yes.

20   Q.    Okay.  And that 120 days plus 30 days for a hearing is

21   not going to expire in this interim period, right?

22   A.    No.  Not for the -- the attorneys that were retained

23   by --

24   Q.    Okay.

25   A.    -- retained under -- under the code.

1   Q.   Okay.  So what's going to collateralize this loan?

2   A.   The loans and a combination of loans that are in the

3   First Trust Deed Fund and the Diversified Trust Deed Fund

4   which -- which tie together to be 100, essentially

5   100-percent owned.

6   Q.   I'm sorry.  You're going to give deeds of trust on the

7   real property?

8   A.   There will be liens taken out on it.

9   Q.   Okay.  There will be liens taken on the real property?

10  A.   No.

11  Q.   Okay.

12  A.   They'll be taking --

13  Q.   Every asset of the First Trust Deed Fund and the

14  Diversified Fund will be pledged to secure this loan, right?

15  A.   Yes.

16  Q.   Is that pretty much what's going to secure the loan?

17  A.   Yes.  And the -- and the assets --

18  Q.   Okay.

19  A.   -- and whatever -- and the assets of Commercial

20  Mortgage as well.

21  Q.   And as far as Commercial Mortgage, the asset that it

22  has right now is the cash that it's able to spend, right,

23  the --

24  A.   Yes.

25  Q.   The money in the operating account.

1    A.    That's correct.

2    Q.    But if you have money in the operating account, you

3    won't need to borrow the money, so that collateral we assume

4    is going to be gone when we need funding, right?

5    A.    If I spend it -- if we spend that money.  I'm trying to

6    hoard as much money as I can to make sure that this company

7    can survive and collect --

8    Q.    Well, you're not --

9    A.    -- the loans.

10   Q.    You're not planning on borrowing money if you have the

11   money to spend, right?

12   A.    No.

13   Q.    Okay.  So the things that you're going to do with this

14   money, is it fair to say that they're all things that

15   USA CMC is doing in its role as servicing agent?

16   A.    Yes.

17   Q.    Okay.  And USA CMC receives some money from doing that,

18   right?

19   A.    It's received as loan-servicing fees each month.

20   Q.    Right.  And my funds are obligated to pay

21   loan-servicing fees which are in most cases three percent,

22   right?

23   A.    They vary by -- by loan.

24   Q.    Okay.  For the First Trust Deed, aren't they mostly

25   three percent?

1    A.    Yes.

2    Q.    Okay.  And your position is that my fund also has to

3    pay a management fee to USA -- is it Real Estate Advisors

4    (sic)?  Is there a management fee that you say we have to

5    pay as well?

6    A.    Yes.

7    Q.    Okay.  And who does that go to?

8    A.    That -- that ends up in USA Commercial Mortgage to fund

9    the business.

10   Q.    It ends up in USA Commercial Mortgage, but who do you

11   claim it's owed to under a contract?

12   A.    Realty Advisors.

13   Q.    USA Realty Advisors, and then it's your -- and that's,

14   what, another how many percent, another one percent,

15   one-and-a-half percent?

16        (Telephonic interruption over the line

17        continuing through the below questioning.)

18             THE WITNESS:  That's -- that's -- that's -- if we

19   go through the fees, it -- it's the same fee you're talking

20   about.

21   BY MS. CARLYON:

22   Q.    So it's another three percent?

23   A.    No.  It's the same three percent.  You're adding fee on

24   fee, and it's not exact.

25   Q.    Okay.  So you're not asking for a management fee above

1    and beyond the loan-servicing fees on loan-by-loan basis?

2    A.    We're -- we have a loan-management fee at Diversified

3    Trust Deed Fund.

4    Q.    I'm talking about the First Trust Deed Fund.  Does

5    Realty Advisors claim that they're entitled to a management

6    fee on top of the loan-servicing fee that USA CMC --

7    A.    Yes.

8    Q.    -- is entitled to, and how much is that?

9    A.    It's about one -- it's about three -- I think it's

10   three percent.

11   Q.    Okay.  And that's what we pay USA CMC to do all the

12   things that you're going to do with the money that you're

13   going to borrow, right?

14   A.    Yes.

15   Q.    All right.  And so you're going to take that money, and

16   you're going to go borrow more money, and you're to secure

17   it with our assets, right?

18   A.    Yes.

19   Q.    Is it accurate to say that if the final loan is

20   approved you intend to use that money to pay professional

21   fees?

22   A.    Amongst other -- well, amongst other things --

23   Q.    Okay.

24   A.    -- that it would be used for professional fees for this

25   estate.

1    Q.    That's one of the real reasons that you need a

2    permanent loan to pay your fees, right?

3    A.    We need a permanent loan for a variety of things

4    which --

5    Q.    And that's one of them, right?

6    A.    It's one of the -- one of the uses, yes.

7    Q.    And we've requested several times that debtor's

8    professionals tell us how they are tracking --

9              UNIDENTIFIED SPEAKER:  (Indiscernible) attorney

10   has their phone on.

11   BY MS. CARLYON:

12   Q.    -- and allocating their fees, so that the things that

13   you are doing because USA CMC is supposed to do them for our

14   servicing fee are allocated to USA CMC.  Are you doing that

15   because I haven't heard how you're doing that.

16   A.    Our people are keeping time on a variety of different

17   -- I -- if we're looking at specific loans and working on

18   specific loans, we're charging our time to those specific

19   loans we're working on.

20        If we're working on committee matters, we're charging

21   it across the board to all fees because that's a committee

22   matter.

23   Q.    Okay.

24   A.    So it --

25   Q.    And then --

```
 1   A.    It --

 2   Q.    -- everything --

 3   A.    That's --

 4   Q.    -- else --

 5   A.    It --

 6   Q.    -- is USA CMC?

 7   A.    It -- it -- it -- so there's various -- there's --

 8   there's amounts of time that are being charged specifically

 9   to loans.  There's amounts of times being charged across the

10   board to all loans in the portfolio, all 115.

11   Q.    Okay.  And are you going to detail for the committees

12   in the next week or so exactly how you're doing that?

13   A.    I think we can walk through that with your -- with your

14   people, yes.

15   Q.    Great.  And with regard to the moneys that you are

16   utilizing, how are we going to avoid the problem of having

17   this loan pay the expenses of USA CMC and having the

18   collateral for this loan and, therefore, the repayment of

19   this loan come from our funds?

20   A.    Could you repeat your question?

21   Q.    Right.  How are you going to ensure that when you

22   borrow money for USA CMC purposes it doesn't end up getting

23   paid for by my funds?

24   A.    What we were looking at doing as we're borrowing money,

25   you know, we're looking at putting that money specifically
```

1    in the transactions.

2        The line-of-sight money that we're looking to borrow at

3    this point in time is the 17 loans that are out there that

4    we're -- we're talking about and funding those transactions

5    in order to protect the value in each of those

6    transactions --

7    Q.    Okay.

8    A.    -- in which --

9    Q.    Is it --

10   A.    -- some of those are -- are your loans.

11   Q.    And is it fair to say that if the lenders on any of

12   those transactions say, no, I don't want to make those

13   additional loans you're not going to make that request?

14   A.    That's correct.

15   Q.    Okay.  So on the -- is it Boise-Gowan?  I apologize.

16   A.    Yes.

17   Q.    I'm so tired.  So if the lenders on that loan say, no,

18   I don't want you to make that loan, you'll withdraw the

19   request.

20   A.    Well, I -- if I go through the lenders and go through

21   the -- the borrower and see what the damage is, I think what

22   we should talk about with the lenders would be to not just

23   say a yes or a no.

24   Q.    I think so --

25   A.    I think what the borrower --

1    Q.   -- too.

2    A.   I think what the borrower would need to know -- what

3    the -- there needs to be an understanding between the

4    borrower and what the downside is if the loan isn't made and

5    having that discussion.  Right.  That discussion has not

6    occurred, yet.

7    Q.   Now, that discussion still hasn't occurred on the day

8    the motion is being heard?

9    A.   Between the -- between the borrowers and between the --

10   the borrowers --

11   Q.   The --

12   A.   -- of the --

13   Q.   The direct lenders on this loan.

14   A.   No.  I have not had direct contact with them.

15   Q.   Okay.  Ms. Davis represents one of them, right?

16   A.   Yes.

17   Q.   She's been at every hearing with you, right?

18   A.   Yes.

19   Q.   Okay.  And with regard to the statement that the fees

20   are chargeable on a loan-by-loan basis, that's because each

21   loan-servicing agreement provides that the expenses of

22   collection including legal fees and appraisal fees and

23   foreclosure fees are paid by those lenders, right?

24   A.   Yes.

25   Q.   But you haven't brought forward a motion to have those

```
1   people pay those amounts that you need so badly, right?

2   A.    Not yet.

3   Q.    Okay.  When do you plan on filing that motion?

4   A.    Soon.  Well, we're -- we'll be working through that.

5   Q.    The reason I'm concerned, Mr. Allison, is because it

6   appears to me that you need to borrow $125,000 for 30 days,

7   that the cost of doing that is estimated to be well over

8   $300,000, that the benefit of that is Boise-Gowan which my

9   funds have no interest in, that the collateral that pledges

10  that loan is my client's assets, and that the only lender

11  that's been heard on that matter has said I don't want you

12  to fund it, so I'm a little bit concerned in light of all of

13  that as to why --

14              MS. JARVIS:  Your Honor, this --

15  BY MS. CARLYON:

16  Q.    -- this funding --

17              MS. JARVIS:  I object.

18  BY MS. CARLYON:

19  Q.    -- is necessary --

20              MS. JARVIS:  This question is argumentative.

21  BY MS. CARLYON:

22  Q.    -- and why --

23              THE COURT:  Well, I think --

24  BY MS. CARLYON:

25  Q.    -- the fees --
```

```
 1              THE COURT:  -- she's getting to the summary of

 2   that.

 3   BY MS. CARLYON:

 4   Q.    -- and why the fees are reasonable.

 5         Can you just explain very briefly in light of all those

 6   factors why the fees are reasonable for $125,000 interim

 7   loan which is all you've told me you really need.

 8   A.    The characterization that you're making that this is

 9   just a $125,000 loan on a short-term basis misses the point.

10   It misses the point --

11   Q.    Okay.

12   A.    -- greatly.

13   Q.    Let me ask you --

14   A.    Let me finish --

15   Q.    -- a hypothetical.

16   A.    -- if I can.  It misses the point because what we're

17   looking at is the -- trying to put together a funding source

18   to fund out the remaining -- the -- the loans that need

19   funds to protect their value.

20   Q.    Okay.

21   A.    And the work that needs to be done in the interim

22   period with CapitalSources, our lender, is -- and in working

23   through all the steps that you talked about and notice in

24   talking to our investors is tied into -- is tied into the

25   work process that we're going to have to go into during the
```

1   month of July to get a motion on file, so that we can get

2   these things funded.  The --

3   Q.   So, hypothetically --

4   A.   The -- so it ties in --

5   Q.   I'm sorry.

6   A.   So it's -- it's not just looking at the loan from a

7   perspective of saying this a short-term loan on cash.  To

8   the extent that we're looking at this and projecting out the

9   estate, this estate is -- you know, we're projecting our

10  cash balance to be -- to be decreased if we -- if we look

11  through our numbers by the end of this period of time.

12       And what we're looking to do is trying to protect this

13  estate, so that it has enough liquidity to look at August

14  and beyond, so that we can take -- get the best solution

15  possible for all the investors.

16  Q.   So that's why we're back to the big picture and why we

17  heard a lot of evidence today.  Is it fair to say that if

18  we're not going to make the big loan it doesn't make sense

19  to make the interim loan?

20  A.   That's correct.  If we're not going to protect the --

21  protect these loans, it --

22  Q.   Okay.  And is it also fair to say that if you approve

23  the interim loan today you are front-ending the expense of

24  the big loan at least insofar as the obligation to pay those

25  expenses?

1   A.   Yes.

2        (Colloquy not on the record.)

3           MS. CARLYON:   Okay.

4        (Telephonic interruption over the line

5        continuing through the below questioning.)

6   BY MS. CARLYON:

7   Q.   Now, with regard to the word "priming", your attorney

8   asked you whether this loan was going to prime anyone, and

9   you said no; is that correct?

10  A.   The loan itself is going to be -- we're going to be

11  securing as opposed to going in and priming the individual

12  investors.

13  Q.   But you're going to be priming every administrative

14  creditor in this estate, right?

15  A.   Yes.

16  Q.   You're going to prime the landlord, right?  Right?

17  A.   Yes.

18  Q.   You're going to prime the utilities, right?

19  A.   Yes.

20  Q.   You're going to prime my fees, right?

21          MS. JARVIS:  Your Honor, we'd object

22  (indiscernible).  This is a mischaracterization of priming.

23  Priming to use the bankruptcy code means priming a secured

24  lien, and that's how the question was asked, originally, and

25  now this question is kind of blurring that definition.

1          MS. CARLYON:  And I apologize.  The whole loan has

2     been kind of a blur to me, but let me clarify.

3     BY MS. CARLYON:

4     Q.   You are requesting today a loan secured by all of the

5     assets of all of the estates; is that correct?

6     A.   Yes.

7     Q.   And that loan has a security interest which would have

8     to be repaid before and prior to expenses of administration,

9     right?

10    A.   Yes.

11    Q.   And nothing in the notice that you sent out a week ago

12    tells anyone that; is that correct?

13    A.   I'm sure that -- yeah.  Well, I look at what was sent

14    out in the notice is that this is a DIP -- DIP loan.

15    Q.   Okay.  Let's go ahead and look at the notice.  I've

16    marked it as Creditor's A.  Do you have that in front of

17    you, sir?

18    A.   No.  I'm sorry.  I don't.

19          THE CLERK:  Here.

20    BY MS. CARLYON:

21    Q.   And do you have it now?

22    A.   Yes.

23    Q.   Page 2, No. 2 is the motion for emergency interim and

24    permanent orders authorizing the debtor to obtain

25    postpetition financing.  Okay.  Does that tell people that

1   this is going to have a superpriority administrative-claim

2   effect?

3   A.   It says, "That the debtor can maintain its operations

4   and to make such loans as necessary to protect the value of

5   the loan portfolio until a final hearing of July 25th,

6   2006."

7   Q.   So no?

8   A.   No.

9   Q.   Okay.  And did you serve this motion on postpetition

10  administrative creditors who are not prepetition creditors?

11  A.   I didn't do the service on this, ma'am?

12  Q.   Okay.  Did you give BMC the addresses of the

13  postpetition administrative creditors who are not

14  prepetition creditors to make sure they got notice of this

15  hearing?

16  A.   I didn't give -- no.  I didn't give the individuals

17  notice.  I -- I relied on my attorneys to do so.

18  Q.   Now, part of this loan term sheet calls for a lockbox.

19  Can you explain that.

20       MS. JARVIS:  Your Honor, I think I clarified that

21  that's no longer in the term sheet.

22       MS. CARLYON:  I'm sorry.

23  BY MS. CARLYON:

24  Q.   Mr. Allison, is that correct?  There's no lockbox?

25  A.   That's correct.

1          MS. JARVIS:  On the interim period.

2    BY MS. CARLYON:

3    Q.    And the order will so provide?

4    A.    Yes.

5          MS. CARLYON:  All right.  And I have no further

6    questions.

7          Thank you.

8          (Thereupon, the portion requested to be transcribed

9          was concluded at 04:38:26 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5

6    /s/ Lisa L. Cline               09/07/06

7    Lisa L. Cline, Transcriptionist      Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25