LEWIS
AND
ROCA
LLP
L A W Y E R S

E-filed on 9/15/06

1
2

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169
Facsimile (702) 949-8321
Telephone (702) 949-8320

3
4

40 North Central Avenue, Suite 1900
Phoenix, Arizona  85004-4429
Facsimile (602) 734-3824
Telephone (602) 262-5756

5

Susan M. Freeman AZ State Bar No. 004199
Email: sfreeman@lrlaw.com
Rob Charles NV State Bar No. 006593
Email: rcharles@lrlaw.com

6

Attorneys for Official Committee of Unsecured Creditors

7

## UNITED STATES BANKRUPTCY COURT

8

## DISTRICT OF NEVADA

| | |
|---|---|
| 9  **In re:** | Jointly Administered |
| 10 **USA Commercial Mortgage Company**<br>    **06-10725 – Lead Case** | Chapter 11 Cases |
| 11 | Judge Linda B. Riegle Presiding |
| **USA Capital Realty Advisors, LLC**<br>12    **06-10726** | **OFFICIAL UNSECURED CREDITORS'** |
| 13 **USA Capital Diversified Trust Deed Fund,**<br>**LLC** | **COMMITTEE'S OBJECTION TO**<br>**DEBTOR'S PROFESSIONALS' FEE**<br>**APPLICATIONS** |
| 14    **06-10727** | |
| 15 **USA Capital First Trust Deed Fund, LLC**<br>    **06-10728** | Date:  September 28, 2006<br>Time:  9:30 a.m.<br>**Affecting:** |
| 16 | ✕  All Cases |
| **USA Securities, LLC**<br>17    **06-10729** | **or Only:**<br>¨  USA Commercial Mortgage Company |
| 18              **Debtors.** | ¨   USA Capital Realty Advisors, LLC<br>¨   USA Capital Diversified Trust Deed Fund, |
| 19 | LLC<br>¨   USA Capital First Trust Deed Fund, LLC |
| 20 | ¨   USA Securities, LLC |

21      The Official Unsecured Creditors' Committee for USA Commercial Mortgage Company

22  ("Unsecured Committee") hereby objects to the following:

23  (1)     First Application Of Ray Quinney & Nebeker P.C. ("RQN") For Interim Compensation
            And Reimbursement Pursuant To 11 U.S.C. § 330 and 331 For The Period Of April 13,
24          2006 Through July 31, 2006;

25

26



(2)     First Application For Interim Allowance Of Attorney's Fees And Reimbursement Of Expenses Of Schwartzer & McPherson Law Firm From April 14, 2006 through July 31, 2006; and

(3)     First Interim Application For Compensation And Reimbursement Of Expenses For (I) Mesirow Financial Interim Management, LLC As Crisis Managers For The Debtors, And (II) Thomas J. Allison Of Mesirow Financial Interim Management, LLC As Chief Restructuring Officer For The Debtors And The Employment Of Certain Temporary Employees For The Period Of April 14, 2006 Through July 31, 2006

This Objection is supported by the following Memorandum of Points and Authorities.

2

LEWIS
AND
ROCA
LLP
L A W Y E R S

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ 4

MEMORANDUM OF POINTS AND AUTHORITIES ............................ 6

   I.   **Introduction** ........................................................................... 6

   II.  **Background** ............................................................................ 8

   III. **Standards Applicable To Reviewing Fee Applications Include a Prohibition of 'Lumping' Time Entries and a Requirement of Fairly Allocating Fees and Costs Among Multiple Estates** ........................................................ 9
       A.  **Debtors' Professional Fee Applications May Not Be Approved As Is** ............... 12
       B.  **The Unsecured Committee's Proposals for Allocation and Specific Reductions of Mesirow Fees and Costs** ................................ 13
       C.  **The Unsecured Committee's Proposals for Allocation and Specific Reductions of Ray Quinney & Nebeker Fees and Costs** ..................... 23
       D.  **The Unsecured Committee's Proposals for Allocation and Specific Reductions of Schwartzer & McPherson Fees and Costs** .................. 30

   IV. **Conclusion** ........................................................................... 34

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

1769132.2

LEWIS
AND
ROCA
LLP

L A W Y E R S

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Amdura Corp.*,
    139 B.R. 963 (Bankr. D. Colo. 1992) ................................................................. 10

*In re Animal Hosp. in Worldwide Plaza, P.C.*,
    2005 WL 3240583 (Bankr D. Mass. June 13, 2005). ...................................... 20, 21

*In re C & J Oil Co., Inc.*,
    81 B.R. 398 (Bankr. W.D. Va. 1987) ................................................................. 11

*In re Caribbean Constr. Services, Inc.*,
    283 B.R. 388 (Bankr. D.V.I. 2002) .................................................................... 12

*In re Frost*,
    214 B.R. 295 (Bankr. S.D.N.Y. 1997) ............................................................... 11

*In re Dutta*,
    175 B.R. 41 (B.A.P. 9th Cir. 1994) ................................................................... 11

*In re Ginji Corp.*,
    117 B.R. 983 (Bankr. D. Nev. 1990) ................................................................. 11

*In re H.E. Graf, Inc.*,
    125 B.R. 604 (Bankr. E.D. Cal. 1991) ............................................................... 20

*In re Hendersonville Bowling Center, Inc.*,
    65 B.R. 963 (Bankr. M.D. Tenn. 1986) ............................................................. 11

*In re Indian Motorcycle Apparel Accessories Co., Inc.*,
    174 B.R. 659 (Bankr. D. Mass. 1994) ............................................................... 10

*In re Kitchen Lady, Inc.*,
    144 B.R. 544 (Bankr. D. Fla. 1992) .................................................................. 21

*In re Poseidon Pools of America*,
    216 B.R. 98 (E.D.N.Y. 1997) ........................................................................... 11

*In re R. Kaufman Jewelers, Inc.*,
    171 B.R. 905 (Bankr. S.D. Fla. 1994) ............................................................... 21

*In re RJ Mfg. Inc.*,
    2004 WL 764669 (Bankr. N.D. Iowa Feb. 26, 2004) .......................................... 20

*In re Recycling Indus., Inc.*,
    243 B.R. 396 (Bankr. D. Colo.  2000) ............................................................... 11

*In re Schachter*,
    228 B.R. 359 (Bankr. E.D. Pa. 1999) ............................................................... 12

1769132.2

LEWIS
AND
ROCA
LLP
L A W Y E R S

1

## FEDERAL STATUTES

2

11 U.S.C. § 330(a)(1)(A) ........................................................................................................... 9

11 U.S.C. § 330(a)(4)(A) ........................................................................................................... 9

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1769132.2



## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    Introduction**

This objection concerns applications by Debtors' professionals to approve over $4.8 million of fees and expense reimbursements in these jointly-administered cases, of which over $4.5 million is sought from the estate of USA Commercial Mortgage ("USACM"). The Unsecured Creditors Committee of USACM ("Unsecured Committee") objects principally on account of the fee and cost allocation, which imposes an unfair burden on the USACM unsecured creditors.

We start with a given – these cases pose difficult challenges for Debtors' professionals. They have worked hard to provide five estates with the best results possible.  With that said, the professionals for all Debtor entities have sought to charge Debtors' estates with very large amounts of fees and costs.  The Unsecured Committee is unable to evaluate the fees and costs thoroughly because Debtors' professionals have lumped large amounts of their time entries. The Unsecured Committee has a few specific concerns as well, including the fact that the time detail shows Debtors determined the amount of default interest borrowers could be charged on their loans in May 2006, but did not send default notices to demand such interest until August 3 and 4, 2006, or even as late as September, rendering it more difficult for the USACM estate to collect default interest of approximately $3 million.  Indeed, Debtors' professionals have refused to demand default interest from borrowers before the default notice date, not withstanding the language of the notes.  While the Unsecured Committee supports payment of reasonable compensation to Debtors' professionals, that loss should be addressed in some fashion by the responsible professionals, at least until the default interest that should have been paid is collected. The Unsecured Committee's primary concern, however, is the unfair allocation of the vast majority of fees and costs to the USACM estate.

A breakdown allocating the fees charged by Debtors' professionals among the bankruptcy estates is attached as Exhibits 1A, 2A and 3A.  In total, 93.2% of Mesirow's fees, 92.1% of

1769132.2

RQN's fees, and 92.2% of SM's fees have been allocated to the USACM estate.  *All* of the expenses Debtors' professionals incurred have been charged to the USACM estate.

Mesirow did not describe any method of fee allocation among the estates.  RQN allocated time relative to just one of the Committees to the estate for that Committee, and allocated the fees incurred in preparation of the Bankruptcy Schedules and Statement of Affairs, albeit on a somewhat arbitrary basis of 50% USACM, 20% FTDF, 25% DTDF and 5% each to USA Securities and USA Realty.  All the rest of the RQN time was charged entirely to the USACM estate.  SM attributed some time by Debtor, but says that it charged time spent on all Debtors solely to USACM and charged time spent on the three principal estates 50% to USACM, 25% to DTDF and 25% to FTDF.  The actual numbers are even more slanted against USACM.

The result is that time related in any way to USACM was charged in most instances 100% to the USACM estate and sometimes 50% or more to the USACM estate, including time spent on conference calls with professionals for all estates, time spent at court hearings, time spent evaluating the assets of all estates, and time spent on potential asset sales.  Nearly all of the motions and hearings in these cases relate to all Debtors, and the USACM estate has only a small fraction of the assets and asset values to be sold.  Yet it is being asked to shoulder the burden of the vast bulk of the combined Debtors' professional fees and all of their costs. Debtors' allocation must be more thoughtful and careful, because the current proposed allocation is unfair to the unsecured creditors of USACM.

Finally, at least as of this writing, Debtors' professionals have failed to allocate fees and costs to loans that could appropriately be charged to and collected from borrowers.  These fees and costs benefit the lenders to those borrowers, and should be separately tracked to enable a charge under ¶4 of the Loan Service Agreements, or a surcharge to the extent Debtors do not charge the borrowers and collect that money.  Otherwise, all borrower default-related fees and costs are borne by the unsecured creditors.

**II.    Background**

As the Court is well aware, USACM was the servicing company for loans that were extended by direct lenders, USA Capital Diversified Trust Deed Fund, LLC ("DTDF") and USA Capital First Trust Deed Fund, LLC ("FTDF").  USACM itself owns only a small portion, less than 0.29%, of the total loan portfolio.  Its assets principally consist of servicing fee income. Unquestionably, USACM has the responsibility to service the loans held by the two Funds and the Direct Lenders.  But that does not mean that the bulk of the bankruptcy legal work, or the bulk of the Mesirow accounting work that has supported Debtors' bankruptcy filings in this Court, or the bulk of the fees for asset sale efforts and investor and committee communications, all are chargeable to the USACM estate and its unsecured creditors.

Consistent lumping of time entries by Debtors' professionals has precluded the Unsecured Committee from determining with precision which time entries should be charged to which estate. Some time entries show services charged to USACM that on their face relate expressly to another estate, *e.g.*:

Mesirow:

- "Review of loan portfolios held by the First Deed Trust and Diversified Trust with potential purchaser."  Mesirow App, Ex. C1-A at 3.

- "Participate in call with potential purchaser and J. Nugent regarding sale of Diversified Trust loan interests . . . . [and] First Trust loan interests. . . . . Participate in call with prospective bidder for Debtors' loan interests and other assets and M. Kehl regarding Diversified Trust Deed Fund . . . . [and] First Trust Deed Fund." *Id.* at 4.

- "Prepare analysis of loan performance for First Trust, Diversified Trust and Direct Investor loan portfolios." *Id.*, Ex. C1-H at 43.

- "Prepare summary of percentage ownership by loan for USA Diversified Trust Deed Fund . . . . [and] USAIP." *Id.*, Ex. C1-M at 73.

- "Create Investor Report in Access for FTDF . . . . [and] DTDF." *Id.*, Ex. C1-M at 100.

RQN:

- "Telephone conference with SEC staff regarding document review."  RQN First Application, Ex. B-13, 5/1/06.

8

LEWIS
AND
ROCA
LLP
L A W Y E R S

- "Legal research on SEC compliance issues and conference with SC Strong regarding same" *Id.*, 5/3/06.

- "Conference with B. J. Kotter regarding SEC no-action letters and results of research with respect to filing requirements." *Id.*

- More than 11 time entries during the month of May alone were devoted to SEC issues, which only concerns FTDF, but were charged entirely to USACM.

The Unsecured Committee proposes that, at the least, percentage allocations among the estates can and should be ordered by category of services performed. Debtor USA Securities LLC ("USA Securities") is an inactive brokerage company, and Debtor USA Capital Realty Advisors, LLC ("USAC Realty") is nominally a manager of the two Fund Debtors but is in fact only a conduit for servicing fees passed through from the Funds to USACM. Debtors have only allocated time to those two estates that relate to the preparation of their bankruptcy schedules and monthly operating reports. The Unsecured Committee does not materially dispute that allocation. Debtors' failure to allocate a substantial portion of their fees and costs to the DTDF and FTDF estates is much more problematic.

### III. Standards Applicable To Reviewing Fee Applications Include a Prohibition of "Lumping" Time Entries and a Requirement of Fairly Allocating Fees and Costs Among Multiple Estates

Section 330 of the Bankruptcy Code provides that the Court may award to a professional reasonable compensation for actual, necessary services rendered as well as for reimbursement for actual, necessary expenses. 11 U.S.C. § 330(a)(1)(A). In determining the amount of reasonable compensation to be awarded, the Court is required to take into account the time actually spent on services performed – necessitating a breakdown to enable that analysis. And the Court is specifically precluded from allowing compensation for duplicative services or "services that were not reasonable likely to benefit *the debtor's estate*" or were not "necessary to the administration of *the case*." 11 U.S.C. § 330(a)(4)(a) (emphasis added).



In assessing applications for compensation and reimbursement of expenses filed under Section 330, the guidelines promulgated for the United States Trustees to review applications for compensation and reimbursement of expenses are helpful. These guidelines require, among other things, the following information in fee applications:

> Time entries should be kept contemporaneously with the services rendered in time periods of tenths of an hour. Services should be noted in detail and not combined or "lumped" together, with each service showing a separate time entry; however, tasks performed in a project which total a *de minimis* amount of time can be combined or lumped together if they do not exceed .5 hours on a daily aggregate.
>
> Whether application has prorated expenses where appropriate *between the estate and other cases* (e.g., travel expenses applicable to more than one case) and has adequately explained the basis for any such pro ration.
>
> Whether expenses incurred by the applicant to third parties are limited to the *actual amounts* billed to, or paid by, *the applicant of the estate*.

*United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses* (the "Guidelines"). Debtors' applications are rife with lumping of time entries and pro-ration of fees largely to USACM, and pro-ration of expenses entirely to USACM, without an adequate explanation for doing so.

Various cases have recognized the importance of adhering to these standards. In the *Amdura* case, for example, involving several debtors, the court required professionals to abide by a "Fee Order" that provided as follows:

> G. Fees and expenses of professionals retained by the Debtors shall be billed by such professionals, as applicable and practicable, to the extent possible, separately to the Estate benefiting from such service and shall be paid by such Estate ("Allocated Fees and Expenses"). To the extent fees and expenses are not capable of allocation by a professional to individual Estates, such fees and expenses shall be paid by all Estates on a proportionate basis as follows: The Debtors shall, on a monthly basis, calculate the total of Allocated Fees to be paid by each Estate and the percentage that Allocated Fees paid by each Estate bears to the total Allocated Fees incurred by professionals retained by the Debtors. Each Estate shall be responsible for the payment of the same percentage of fees and expenses that are incapable of allocation. By way of example, assume that, in a given month, a total of $100,000 in fees have been billed by Debtors' professionals, $48,000 to Coast to Coast Stores, Inc., $42,000 to AMDURA National Distribution Company, and $10,000 to AMDURA Corporation. In that month, Coast to Coast Stores, Inc. shall pay 48% of the fees incapable of allocation, AMDURA National 42%, and

10

1769132.2

LEWIS
AND
ROCA
LLP
L A W Y E R S

> AMDURA, 10%.  The percentages of unallocated fees that each Estate pays
> shall vary from month to month, with the monthly variation in the allocation of
> Allocated Fees to each Estate.

*In re Amdura Corp.*, 139 B.R. 963, 971 (Bankr. D. Colo. 1992).  Even with the Fee Order in place, professionals initially did not abide by its terms and were required to revise and re-file their fee applications.  *Id.*; *see also generally In re Indian Motorcycle Apparel Accessories Co., Inc.*, 174 B.R. 659, 663 (Bankr. D. Mass. 1994) (court would allow equal allocation of fees to two estates in the absence of contrary evidence, but if petitioning creditors or trustee disagreed with this approach they could seek reconsideration of the order); *In re C & J Oil Co., Inc.*, 81 B.R. 398, 400 (Bankr. W.D. Va. 1987) (fee applicant proposed allocating fee among three estates based upon the relative asset value of each entity); *cf. In re Frost*, 214 B.R. 295, 300 (Bankr. S.D.N.Y. 1997) ("Trustee has not shown a reason for departing from the general American rule governing the allocation of costs of litigation.  I see no reason to burden the estate for fees for services that do not benefit the estate."); *In re Hendersonville Bowling Center, Inc.*, 65 B.R. 963, 965-66 (Bankr. M.D. Tenn. 1986) (trustee's application for allowance of fees and administrative expenses would be denied in its entirety, among other reasons, because court was unable to determine whether trustee's allocation of expenses was accurate, reasonable or necessary absent audit of all estates in which he was trustee).

Lumping of time entries is likewise condemned in numerous reported opinions.  *See, e.g. In re Dutta*, 175 B.R. 41, 45, 46-47 (B.A.P. 9th Cir. 1994) (affirming bankruptcy court's decision to reduce fees for lumping); *In re Ginji Corp.*, 117 B.R. 983, 989 (Bankr. D. Nev. 1990) ("Bankruptcy Rule 2016 requires as much and the cases are legion which hold that "lumping" and mere short-hand descriptions will not suffice.") (J. Riegle).  In *In re Recycling Industries, Inc.* the court explained that lumping permits an applicant to claim compensation for rather minor tasks which, if reported individually, would not be compensable.  243 B.R. 396, 406 (Bankr. D. Colo. 2000).  Furthermore, it prevents the court from determining whether individual tasks were

1769132.2

LEWIS
AND
ROCA
LLP
L A W Y E R S

expeditiously performed within a reasonable period of time because it is impossible to separate into components the services which have been lumped together.  *Id.*

When time entries are lumped together, the court may reduce the compensation, require the professional to restructure it, or disallow the application outright.  *See Dutta*, 175 B.R. at 46-47 (reducing fees); *see also In re Poseidon Pools of America*, 216 B.R. 98, 100 (E.D.N.Y. 1997) ("Appellant asserts that the bankruptcy court should not have disallowed time entries for 'lumping' and duplication of services. The bankruptcy court had discretion to make such determinations.") (citations omitted); *In re Caribbean Constr. Services, Inc.*, 283 B.R. 388, 396 (Bankr. D.V.I. 2002) ("Where, as in this case, it is apparent that the applicant did provide valuable necessary services which unfortunately are lumped together with other services, we may apply an appropriate across-the-board reduction of the allowed compensation."); *In re Schachter*, 228 B.R. 359, 367 (Bankr. E.D. Pa. 1999) ("We also agree that time entries which are "lumped" and are not sufficiently specific in describing the services performed or which describe services which appear excessive for the particular task referenced merit disallowances.").

**A.    Debtors' Professional Fee Applications May Not Be Approved As Is.**

The fee applications filed by Debtors' professionals do not meet the standards required by the Bankruptcy Code, the U.S. Trustee guidelines, and case law.  The Unsecured Committee appreciates the work that has been performed, but its unsecured creditors cannot be required to bear the burden of the enormous fees that Debtors' professionals have asked this Court to thrust upon them.  The Unsecured Committee asks the Court to order several things:

1.    Either Debtors' professionals need to revise their fee applications in their entirety to de-lump the time entries, so that the Court, the U.S. Trustee and the four Committees can analyze them, or the Court should impose across-the-board fee reductions by way of a sanction.

2.    Debtors' professionals' fees and costs that do not specifically relate to a particular estate should be allocated on a reasonable basis among the estates of USACM, DTDF and FTDF.

1769132.2

LEWIS
AND
ROCA
LLP

L A W Y E R S

3. The fees and costs attributable to collection of loans, and to communicating with Direct Lenders and the Direct Lenders Committee should be separately tracked. (1) Those that are loan collection expenditures that still can be charged to the borrowers under applicable loan documents should be charged and collected from the borrowers. (2) Those that could have been charged to and collected from borrowers, but were never sought, should not be paid by USACM's unsecured creditors; that is a shared responsibility of Debtors' counsel and Mesirow. The services benefited the Lenders, and the fees and costs in this category should be segregated to enable a surcharge under a reorganization plan or otherwise.

4. Debtors' professionals' fees should be adjusted to take into account in some fashion the approximate $3 million they cost the USACM estate by not sending default notices to borrowers for two and a half months after doing the computations and drafting the notices.

### B. The Unsecured Committee's Proposals for Allocation and Specific Reductions of Mesirow Fees and Costs

The Unsecured Committee recommends the following allocation of Mesirow fees and costs, in addition to or in lieu of the allocations already implemented by Mesirow, as noted below.

### 1. Analyzing/Evaluating Restructuring Alternatives

Mesirow described its services in this category as "focused on the sale of all or significant portions of the Debtors' businesses and assets" (Mesirow App. at 12). The sale offers show the focus of these efforts and are a good measure of the basis for allocating fees of Debtors' professionals focused on the sale:

| Debtor | Asset Values per 1st Silver Point Offer | 1st Offer % | Asset Values per 2nd Silver Point Offer | 2nd Offer % |
|--------|------------------------------------------|-------------|------------------------------------------|-------------|
| USACM | $3,639,830 | 7.16% | $550,000 | 1.17% |
| DTDF | $2,593,399 | 5.10% | $0 | 0% |
| FTDF | $44,599,837 | 87.74% | $46,500,000 | 98.83% |

The Unsecured Committee proposes that a conservative allocation of fees in this category would be 10% USACM, 5% DTDF, and 85% FTDF.

### 2. Bankruptcy Motions/Filings

Mesirow has allocated all of its fees for assistance with bankruptcy motions and other filings to USACM, except for 1.1 hours billed to DTDF. The Unsecured Committee has reviewed the filings in these jointly administered bankruptcy cases. In fact 36% of them are filings that



specify on the caption they relate to "all" of Debtors or relate to USACM, DTDF and FTDF, 42%
show USACM alone, 10% show DTDF alone, and 12% show FTDF alone.  Most of Mesirow's
work on bankruptcy motions during this period likely related to the "hold motion" to authorize
distributions to Direct Lenders and the Funds after withholding certain money from the
distributions, which affected all three estates, substantially increasing the 36% nominal allocation
to "all."  The Unsecured Committee proposes that fees in this category should be allocated during
this fee period 50% to USACM, and 25% each to the DTDF and FTDF estates.

The Unsecured Committee also questions Debtors' decision (effectively, Mesirow's
decision as Debtors' management) to seek to disqualify Fertitta from serving as a member of the
Direct Lenders Committee.  Time spent in this category was wasted time, and distracted the
estates from effectively furthering the creditors' and investors' interests.  Debtors should have
known from the inception of this notion that it was not worth pursuing.  While the lumped time
entries preclude a completely accurate determination of the amount of fees incurred in this effort,
it appears to the Unsecured Committee that the Mesirow application shows at least 30 hours on
the Fertitta disqualification motion, and the Unsecured Committee requests that such fees be
disallowed before the allocation of the balance of the Mesirow fees in this category.

### 3.    Bankruptcy Schedules and SOFA

Mesirow has allocated its time among the estates.  Given the size of the respective filings
for Schedules and Statement of Affairs in the different cases, Mesirow's allocation appears
sensible:

| Debtor | Mesirow's Fee Allocation | Number of Pages |
|---|---|---|
| USACM | 62.3% | 442 |
| DTDF | 9.3% | 146 |
| FTDF | 10.4% | 256 |
| USAC Realty Advisors | 7.2% | 28 |
| USA Securities | 10.9% | 29 |



The Committee recognizes that pages of text does not equate to difficulty of preparation or time entailed in preparation, although it is an indicator. The Committee does not object to this time and fee allocation.

### 4.    Case Administration

The tasks Mesirow describes as having been placed in this category relate to all three of the principal Debtors, but Mesirow has allocated its time 73.9% to USACM, 8.4% to DTDF, 7.7% to FTDF, 3.6% to USAC Realty Advisors and 6.4% to USA Securities. The Unsecured Committee assumes the time specified for the estates other than USACM relates to specific tasks, but the general time allocated to USACM alone should be should be allocated one-third each to the USACM, DTDF and FTDF estates. The Unsecured Committee recommends a change of percentages for USACM, DTDF and FTDF to 30% each, with the remaining 10% divided between Realty Advisors and Securities as Mesirow proposes.

### 5.    Cash Flow Analysis & Monitoring

Mesirow's application explains that the firm prepared, reviewed and analyzed weekly cash forecasts for "each of the Debtors." Mesirow has allocated its time, however, 100% to USACM. While DTDF did not get any of the cash actually received, FTDF received approximately 5% of the money under Debtors' first distribution motion. The Unsecured Committee proposes an allocation of fees in this category 95% to USACM and 5% to FTDF. The fees in this category directly benefit the Direct Lenders as well, and the USACM share should be included in the allocation of fees to Direct Lenders for potential future surcharge purposes.

### 6.    Committee Issues and Requests

Mesirow has allocated its time in this category by percentages that reflect apparent effort to charge fees to the Committee raising an issue or making a request: USACM 49.3% (of which a portion is attributed to the Unsecured Committee and a portion to the Direct Lenders Committee), DTDF 23.6% and FTDF 27.1%. The Unsecured Committee will not contest these allocations.

1769132.2



### 7.    Company Administration

Mesirow describes its time in this category as assistance and advice to Debtors' management with issues related to operating Debtors' ongoing business, in contrast to bankruptcy-focused services. Mesirow has charged all of its time in this category to USACM. The Unsecured Committee acknowledges that USAC Realty has charged a management fee of approximately $125,000 to DTDF and $81,400 to FTDF for management of the Funds that is passed through to USACM. Accordingly, the Unsecured Committee will not contest the allocation of all of the "company administration" fees to USACM.

### 8.    Court Hearings/Preparation

Mesirow has charged almost all of its time for attending court hearings and preparing for hearings to the USACM estate. Each of the hearings to date has dealt with motions and filings concerning all three Debtors. The unsecured creditors of USACM should not have to bear the cost of Mesirow's work on behalf of all three estates. The Unsecured Committee proposes that fees in this category should be allocated one-third each to the USACM, DTDF and FTDF estates.

### 9.    DIP Financing/Cash Collateral

Debtors sought DIP financing and use of the Funds' and Direct Lenders' cash collateral to benefit all three estates. Indeed, the principal benefit was for the Funds and the Direct Lenders, since the money was largely to complete borrower projects. The disputes over the DIP financing and cash collateral use, and thus most of Mesirow's time and services, concerned the assets Debtors proposed to pledge. As noted above, USACM has few assets, so its pledge was not at stake, yet Mesirow has allocated all of its time relating to litigating this issue to the USACM estate. The Unsecured Committee proposes that fees in this category should be allocated one-third each to the USACM, DTDF and FTDF estates. The fees in this category were incurred in an effort to specifically benefit the Direct Lenders as well, and should be included in the allocation of fees to Direct Lenders for potential future surcharge purposes.

1769132.2



### 10.     Disclosure Statement/Plan of Reorganization

Debtors' draft plan of reorganization, as shared with the Committees, is a joint plan, and there is a single disclosure statement for all of the estates.  Time spent preparing the plan and disclosure statement necessarily involved analysis and consideration of all three Debtors.  Yet Mesirow has charged all of its fees to USACM, to be borne by the USACM unsecured creditors. The Unsecured Committee proposes that fees in this category should be allocated one-third each to the USACM, DTDF and FTDF estates.

### 11.     Employment/Fee Applications

Debtors' employment application and its fee application were prepared and filed as a single document for all of the estates.  Time spent preparing these documents was time spent on behalf of all of the estates, yet 100% of the fees are being charged to USACM.  The Unsecured Committee proposes that fees in this category should be allocated one-third each to the USACM, DTDF and FTDF estates.

### 12.     Financial Analysis

Mesirow describes its time in this category as analysis and summarization of the status of loans serviced by USACM, calculation of fees due, analysis of historical financial transactions, and preparation of investor statements.  A review of the time entries shows this category as a hybrid of the "company administration" time and the "forensic loan accounting" time.  The Unsecured Committee proposes a hybrid allocation as well, of 5% to FTDF, 30% to DTDF and 65% to USACM.  The Unsecured Committee notes that while there are a few entries in this category concerning computation of default interest, most of the time entries for that work are in the "loan portfolio" category.  Mesirow professionals were simply not consistent on this categorization.

### 13.     Forensic Loan Accounting

Mesirow describes this category of time as the work it spent on reconstructing the proper accounting for each current loan, and investigating the transfer of funds between related party



entities.  Mesirow spent 4,156 hours, running up $1,528,168 of fees, in this category postpetition. That is after $250,000 in fees for prepetition work reportedly spent in substantial part on these tasks [Dkt. 6, Mesirow Employment Application]. The amount of fees is staggering.  The Unsecured Committee cannot help but question whether appropriately junior personnel were performing the work, and whether there was duplication and "wheel spinning," but is unable to determine any specific documentation of that, given the generic description of work.  The Unsecured Committee also realizes the work was complicated and extensive.

The FTDF loan documentation was apparently "cleaner" than the Direct Lenders' loan documentation, and the DTDF loan documentation appears to have been the worst of all.  The Unsecured Committee assumes that it and DTDF will receive all of Mesirow's underlying analysis and documentation and will be able to use them in prosecuting litigation against insiders to recover funds for USACM unsecured creditors and DTDF unsecured creditors and investors. The Unsecured Committee proposes that fees in this category be allocated 10% to FTDF and 45% to each of USACM and DTDF.

### 14.    Investor Issues and Requests

This category is described as time spent researching and replying to investor inquiries about their statements, accounts and loan portfolios.  Mesirow charged 93% of its time in this category to USACM, 4.5% to DTDF and 2.5% to FTDF.  Mesirow apparently did not track its time by specific investor, and the Unsecured Committee assumes it is referring here to Direct Lenders as well as Fund investors. The breakdown of potentially-inquiring persons and entities is:

| Debtor | Number of Lenders/Investors | Percentage |
|---|---|---|
| USACM (Direct Lenders) | 3,600 | 53% |
| DTDF | 1,900 | 28% |
| FTDF | 1,300 | 19% |

In the absence of evidence that vastly smaller numbers of Fund investors than Direct Lenders contacted Mesirow, the Unsecured Committee proposes that the Mesirow fees be allocated to the respective estates by percentage of lenders/investors.  Further, the fees in this

18

1769132.2



category directly benefit the Direct Lenders, and the fees allocated to USACM should be included in the allocation of fees to Direct Lenders for potential future surcharge purposes.

### 15.    Leases, Executory Contracts and Agreements

Mesirow describes its time in this category as identification of Debtors' leases and executory contracts, analyses of cure amounts and rejection damages, and preparation of supporting documentation for Debtors' rejection of contracts and leases.  However, significant portions of the time entries concern analysis of borrowers' collateral.  The amount of money charged by Mesirow to this category illustrates the problem – the few executory contracts and leases at issue in the rejection and extension motions cannot justify 387.4 hours of work and $83,762 fees.  The time concerning borrowers' collateral should be moved to the "financial analysis" category before the true executory contract and lease time is charged to the USACM estate to be borne by the USACM unsecured creditors.  The remaining contracts at issue in this category should be the contracts and leases at issue in the rejection motion and extension of decision-time motion.  Those were USACM leases and contracts, and the Unsecured Committee does not object to Mesirow's allocation of all time in this category – *after the financial analysis time is moved* – to USACM.  The Unsecured Committee estimates the amount of fees that should be moved is at least 75%, or $63,000, and has reallocated that amount in its charts attached as Exhibit 2.

### 16.    Liquidation Analysis

Mesirow says this time was spent preparing liquidation assessments of the assets for each of Debtors.  As noted in category 1 above concerning asset sale time, USACM holds the fewest assets, yet Mesirow proposes to charge it with 87.7% of the time its professionals spent on their liquidation analysis, with 6.4% to DTDF and 5.9% to FTDF.  The Unsecured Committee proposes to allocate the fees by respective asset amounts shown on the bankruptcy Schedules:

1769132.2

LEWIS
AND
ROCA
LLP
L A W Y E R S

| Debtor | Scheduled Assets | Percentage of Assets |
|---|---|---|
| USACM | $122,468,825 | 39% |
| DTDF | $124,507,855 | 40% |
| FTDF | $67,012,890 | 21% |
| USA Realty Advisors | $1,272,125 | (less than 1%) |
| USA Securities | | 0% |

### 17.    Loan Portfolio

Mesirow describes time in this category as assisting USACM with loan servicing, including calculation of default interest and preparation of demand letters for borrowers, settlement discussions with borrowers, and examination of loan documents. This is akin to the "company administration" category for which the two Funds are charged management fees. USACM does not dispute that most of the time in this category should be allocated to USACM. These are fees that should be included in the collection costs charged to borrowers, however, and the Unsecured Committee strongly contends that Debtors should have sought payment from the borrowers for such fees. At the least, the fees in this category directly benefit the Direct Lenders, and should be included in the allocation of fees to Direct Lenders for potential future surcharge purposes.

The time entries in this category show, further, that Mesirow collected data to determine default interest entitlement on May 11 and assisted in preparation of default interest letters on May 9 and reviewed demand letters after completing those calculations on May 24. But Debtors did not send default notices to borrowers *until August 3 and 4*, after repeated urging by the Unsecured Committee, and on September 13, Ms. Jarvis stated additional letters were only recently sent out! The default rate of interest is 5-6% higher than the non-default rate. The principal amount of the loans for which default letters were finally sent is in excess of $300 million, so the default interest entitlement may be $1.5 million per month. Debtors say that their delay in sending the notices was due to the need to reconstruct the loan ledgers, yet they knew which loans were in default (non-performing) from the first loan status report. Debtors have

1769132.2

LEWIS
AND
ROCA
LLP
L A W Y E R S

1   refused to demand default interest from borrowers for time before their default notices were sent.

2   Debtors' professionals may have cost the USACM estate at least $3 million, unless this position is

3   changed and the sums collected.

4   　　　　Courts have reduced professional fee and expense awards due to unjustified delay that

5   harmed the estate and its creditors. In *In re RJ Mfg. Inc.*, for example, the court found that certain

6   delays in the case were attributable to the debtor and its attorney, which increased attorney fees

7   beyond that which was reasonable. 2004 WL 764669, *3 (Bankr. N.D. Iowa Feb. 26, 2004). The

8   court reduced the debtor's attorney's compensation accordingly. *See id.* In *In re H.E. Graf, Inc.*,

9   a chapter 7 trustee lost 20 months' of 4% interest on received funds and incurred unnecessary

10  bond premiums. The court reduced the trustee's fees and expenses and then offset those amounts

11  by the lost interest, so the trustee received nothing. 125 B.R. 604, 607 (Bankr. E.D. Cal. 1991);

12  *see also In re Animal Hosp. in Worldwide Plaza, P.C.*, 2005 WL 3240583 (Bankr. D. Mass. June

13  13, 2005) (trustee's compensation reduced for "long delay" in closing case); *In re Kitchen Lady,*

14  *Inc.*, 144 B.R. 544, 549 (Bankr. D. Fla. 1992) (trustee's compensation reduced for failure to

15  efficiently administer the estate); *In re R. Kaufman Jewelers, Inc.*, 171 B.R. 905 (Bankr. S.D. Fla.

16  1994) ($42,000 in requested fees reduced to award of $ 4,970 where trustee administered the

17  estate of the debtor without due care and attention).

18  　　　　　　　**18.    Management of the Estates by CEO/CRO**

19  　　　　This category of fees covers Tom Allison's time managing all of Debtors' estates. The

20  time is not described except generically, so the Unsecured Committee has no way to determine

21  how much time was spent on which estate. It is certain, however, that Mr. Allison was the

22  manager for all of Debtors' estates, and his time should not be allocated solely to USACM and

23  borne by USACM's unsecured creditors. The Unsecured Committee proposes that fees in this

24  category should be allocated one-third each to the USACM, DTDF and FTDF estates.

25  　　　　Further, to the extent Mr. Allison spent time collecting loans in default, his time should

26  have been charged to and collected from borrowers.

1769132.2

LEWIS
AND
ROCA
LLP
L A W Y E R S

### 19. Meetings/Teleconferences

Mesirow has listed 59.7 hours of conference calls and meetings with Debtors, Debtors' counsel, and "other significant parties in interest." Yet Mesirow proposes to allocate its time 89.4% to USACM, 4.4% to DTDF, and 6.2% to FTDF. It is apparent that the unfair "default" category to charge any time that concerned multiple Debtors or issues concerning all Debtors was charged to the USACM estate. The Unsecured Committee proposes that fees in this category should be allocated one-third each to the USACM, DTDF and FTDF estates.

### 20. Monthly Operating Reports

Mesirow has allocated its time in this category by percentages that reflect apparent effort to charge fees to the separate estates: USACM 30.4%, DTDF 20.4%, FTDF 19%, USA Realty 13% and USA Securities 17.2%. The Unsecured Committee will not contest these allocations.

### 21. Strategic Management

Mesirow describes this category of time as "right-sizing" the business to operate efficiently, analyzing Debtors' relationship with companies owned by the USACM insiders and negotiating and executing a security agreement with USA Investment Partners. The benefits of time in this category extend to the two Funds, but appear to principally benefit USACM. The Unsecured Committee will not contest the allocation of this time to the USACM estate.

### 22. Valuation Analysis/Appraisal

Mesirow describes this time as assessing the value of assets belonging to the estates and serving as collateral for the loans serviced by USACM. Since Mesirow separately charged for preparing a liquidation analysis of the estates' assets, and for sale analysis, this time must be principally or entirely related to engaging Hilco, working with that company and reviewing its appraisals. The appraisals of collateral for the Direct Lenders and DTDF and FTDF benefit them. Mesirow has allocated 99.3% of its hours in this category to USACM and 0.7% to FTDF. The Unsecured Committee proposes that a more fair allocation would be made by comparing the approximate principal balance of loans in the portfolio for which collateral appraisals were made:

1769132.2

LEWIS
AND
ROCA
LLP
L A W Y E R S

| Debtor | Principal Loan Balances | Percentage |
|--------|------------------------|------------|
| USACM | $700,000,000 | 78% |
| DTDF | $130,000,000 | 14% |
| FTDF | $70,000,000 | 8% |

Since Debtors apparently have not charged collection costs on defaulted loans from the borrowers on those loans, despite the Unsecured Committee's complaints, either Debtors' professionals should bear that expense on loans in default, or the Funds should bear their share and the balance should be segregated for a potential surcharged to the Direct Lenders.

### 23. Cost Reimbursement

Mesirow has charged 100% of the costs that its professionals have incurred performing services for all of Debtors to the USACM estate. That is absolutely wrong and unjustifiable. The Unsecured Committee proposes that Mesirow's costs be allocated in accordance with the percentage allocations for the total of its fees, as re-allocated by the Unsecured Committee, *i.e.* 51.7% to the USACM estate, 31.6% to DTDF, 15.6% to FTDF, 0.5% to USAC Realty and 0.6% to USA Securities. See Exhibit 1B for the Unsecured Committee's reallocation calculations.

### C. The Unsecured Committee's Proposals for Allocation and Specific Reductions of Ray Quinney & Nebeker Fees and Costs

The Unsecured Committee recommends the following allocation of RQN fees and costs, in addition to or in lieu of the allocations RQN already implemented, as noted below.

### 1. Case Administration

RQN described its services in this category as dealing with motions, noticing, the Section 341 meeting and other administrative duties. The principal motions were the Hold motion and Distribution motion, but RQN also included time in this category for its DIP financing motion and overall evaluation of Debtors' loan portfolio. The issues in the motions and of course the Section 341 meeting concerned all Debtors, but RQN allocated all of its fees to USACM. RQN set up separate categories for preparation of the bankruptcy Schedules and Statement of Affairs for the other Debtors, as noted below, but its overall "case administration" time is not simply RQN's time on the USACM Schedules. The result is that USACM is charged with 97.8% of the case

1769132.2



administration fees, while DTDF and FTDF bear 0.9% each and USA Realty and USA Securities bear 0.2% each.  The allocation is extremely unfair to USACM's unsecured creditors. The Unsecured Committee proposes that fees in this category should be allocated one-third each to the USACM, DTDF and FTDF estates.

### 2.    Asset Analysis and Recovery

RQN's services in this category concerned investigation of various loan transactions and analysis of the entire loan portfolio in which Direct Lenders and both Funds have an interest, benefiting USACM, FTDF and DTDF equally.  RQN also placed its time with respect to obtaining security for the $58 million receivable from insider Investment Partners to USACM in this category.  That time is USACM-focused.  RQN allocated 100% of its time to USACM, despite the work being performed for all Debtors.  Overall, the Unsecured Committee recommends that the RQN time in this category be allocated 50% to USACM and 25% each to DTDF and FTDF during this application period.

### 3.    Asset Disposition

RQN's services in this category concerned efforts to sell the assets of USACM, DTDF and FTDF, but RQN allocated all of the fees to USACM.  As explained in section III.B.1 above with respect to Mesirow's comparable fees, given the respective assets considered in the sale, the Unsecured Committee proposes that a conservative allocation of fees in this category would be 10% USACM, 5% DTDF, and 85% FTDF.

### 4.    Business Operations

Unlike Mesirow, RQN was not operating USACM's loan servicing business.  As explained in the RQN fee application, the law firm's time in this category concerned collection and partial release issues on various loans, and discussions with borrowers and their counsel. Inconsistently, RQN also included time in this category for documentation of the Investment Partners note and the motion to distribute funds, and investigation and evaluation of the loan portfolio for all three of the principal Debtors.  It does not appear that anyone undertook the task

LEWIS
AND
ROCA
LLP
L A W Y E R S

of re-categorizing time to make it uniform.  The services in this category appear to affect all three of the principal estates relatively equally, but RQN chose to allocate all of the fees to USACM.  The Unsecured Committee proposes that fees in this category should be allocated one-third each to the USACM, DTDF and FTDF estates.

Further, the Unsecured Committee strongly contends that RQN's fees incurred in collection of loans should have been and should now be included in the collection costs charged to borrowers, and that Debtors should have sought payment from the borrowers for such fees.  At the least, the collection fees in this category directly benefit the Direct Lenders, and should be included in the allocation of fees to Direct Lenders for charges under ¶ 4 of the LSAs or potential future surcharge purposes.

### 5.    Claims Administration and Objections

RQN included in this category an analysis of investor fund issues, claims trading (with no distinction among estates), and distributions to Direct Lenders.  While USACM is obviously not an "investor fund" and claims trading occurred with respect to all three estates, RQN billed all of its fees to USACM.  The Unsecured Committee proposes that fees in this category should be allocated one-third each to the USACM, DTDF and FTDF estates.

### 6.    Employee Benefits / Pensions

RQN's services with respect to employee benefits and pensions relates to the USACM estate, and the Unsecured Committee does not contest charging USACM with all of the fees in this category.

### 7.    Fee / Employment Applications

RQN is counsel for all of Debtors, and time incurred with respect to its employment application should be billed to all three of the principal estates, but billed all of its time in this category to USACM.  Indeed, much of the time concerned responding to DTDF's and the U.S. Trustee's objections to the firm's employment for the multiple estates.  RQN included time in this category with respect to the Hilco employment application, authorizing Hilco to appraise

LEWIS
AND
ROCA
LLP
L A W Y E R S

collateral for loans in which USACM held less than a 0.3% interest, and a motion to approve employment of ordinary course professionals for all the estates.

Since Debtors have not charged RQN's fees relating to obtaining Hilco appraisals as collection costs from the borrowers on those loans, despite the Unsecured Committee's complaints, either Debtors' professionals should bear that expense, or the Funds should bear their share and the balance should be segregated for a potential surcharged to the Direct Lenders.  The Unsecured Committee proposes that fees in this category should be allocated one-third each to the USACM, DTDF and FTDF estates, pending a later surcharge determination.

### 8.        Fee / Employment Objections

RQN time in this category concerned objections to employment of counsel in all three principal estates, but RQN charged all of its time to USACM.  The Unsecured Committee proposes that fees in this category should be allocated one-third each to the USACM, DTDF and FTDF estates.

### 9.        Executory Contracts

RQN's services with respect to executory contracts during this fee application period appear to have concerned only USACM leases and contracts.  The Unsecured Committee does not object to allocating 100% of such fees to the USACM estate.

### 10.        Financing

RQN spent time in this category on Debtors' DIP financing (to obtain money to complete borrower projects for the benefit of the Funds as well as Direct Lenders), and disputes concerning the propriety of collateralizing a DIP loan with non-USACM assets.  These fees should not be charged 100% to USACM.  As with the comparable Mesirow fees, the Unsecured Committee proposes that fees in this category should be allocated one-third each to the USACM, DTDF and FTDF estates.  The fees in this category were incurred in an effort to specifically benefit the Direct Lenders as well, and should be included in an allocation of fees to Direct Lenders for potential future surcharge purposes.

1769132.2



### 11.    Litigation

The litigation to which RQN devoted its time principally concerned the Hold Motion and the objections to it and counter-motions for stay relief.  RQN included time in this category for the interpleader action concerning investor account funds and the motion to approve the Investment Partners security agreement, but also the DIP financing motion, and committee-constituent information protocol motion.  USACM should not bear 100% of such fees, as RQN has proposed.  Further, as noted with respect to the Mesirow fees above, the RQN time spent on the motion to disqualify Fertitta from the Direct Lenders Committee was a waste of time that RQN should have realized from the start.  The Unsecured Committee proposes that fees in this category should be allocated one-third each to the USACM, DTDF and FTDF estates, after deduction for the fees and time spent on the Fertitta disqualification motion (which the Unsecured Committee is unable to quantify from the lumped time entries).

### 12.    Plan and Disclosure Statement

RQN included in this category not only time spent on a draft plan and disclosure statement it is negotiating with all four Committees, but also time spent on a potential sale of assets that would be central to that plan (somewhat overlapping the asset disposition time).  The sale time primarily benefits FTDF, while RQN billed 100% of its time to USACM.  The Unsecured Committee is being conservative when it proposes that fees in this category should be allocated one-third each to the USACM, DTDF and FTDF estates.

### 13.    Tax Issues

The RQN time in this category indirectly benefits all estates, but principally relates to the USACM estate.  The Unsecured Committee does not object to charging all the fees in this category during this application period to the USACM estate.

### 14.    Travel Time

When RQN professionals traveled to Las Vegas for meetings and hearings and to assist all three principal Debtors, they charged all of their time to USACM.  The Unsecured Committee

LEWIS
AND
ROCA
LLP

L A W Y E R S

proposes instead that fees in this category should be allocated one-third each to the USACM, DTDF and FTDF estates.

### 15.    Regulatory Work

RQN's services in this category principally concerned compliance with SEC regulations, communications and meetings with SEC regulators, and response to a SEC subpoena that principally affected FTDF. RQN nonetheless billed all of its time to the USACM estate. RQN professionals' time in this category also concerned such compliance and communications with Nevada State regulations and regulatory personnel, which affected DTDF and the Direct Lenders. Because of the amount of time spent on SEC matters, the fees in this category should be charged 50% to FTDF and 25% each to USACM and DTDF.

### 16.    FTDF Committee Relations

RQN appears to have allocated its time for multiple-committee calls and presentations (and time spent on the committee information protocol that it inconsistently did not bill in the litigation category) equally among the four Committees, while billing additional meetings and correspondence with a single Committee just to that Committee. The Unsecured Committee does not object to this allocation.

### 17.    DTDF Committee Relations

As with the FTDF Committee relations category of time, the Unsecured Committee does not object to this allocation.

### 18.    Unsecured Committee Relations

As with the FTDF Committee relations category of time, the Unsecured Committee does not object to this allocation.

### 19.    Executory Contracts (Direct Lender) Committee Relations

As with the FTDF Committee relations category of time, the Unsecured Committee does not object to this allocation.

1769132.2



LEWIS
AND
ROCA
LLP
L A W Y E R S

### 20.    USAC Realty Advisors

RQN allocated 5% of its time incurred in preparation of the bankruptcy Schedules and Statement of Affairs as an estimate of the time spent for this Debtor on that task. The Unsecured Committee would have preferred a more accurate method of time-keeping, but does not object to this allocation.

### 21.    USA Securities

RQN allocated 5% of its time incurred in preparation of the bankruptcy Schedules and Statement of Affairs as an estimate of the time spent for this Debtor on that task. Again, the Unsecured Committee would have preferred a more accurate method of time-keeping, but does not object to this allocation.

### 22.    FTDF – Case Administration

RQN allocated 20% of its time incurred in preparation of the bankruptcy Schedules and Statement of Affairs, apparently as an estimate of the time spent for this Debtor on that task. The Unsecured Committee would have preferred a more accurate method of time-keeping, but does not object to this allocation. It would have been preferable for RQN to similarly separate the time it spent on the USACM Schedules preparation time, while allocating the joint case administration time to all three Debtors.

### 23.    DTDF – Case Administration

RQN allocated 25% of its time incurred in preparation of the bankruptcy Schedules and Statement of Affairs as an estimate of the time spent for this Debtor on that task. The Unsecured Committee would have preferred a more accurate method of time-keeping, but does not object to this allocation. Again, it would have been preferable for RQN to similarly separate the time it spent on the USACM Schedules preparation time, while allocating the joint case administration time to all three Debtors.

### 24.    Costs

Allocation of 100% of RQN's costs to the USACM estate, to be paid from the pockets of its unsecured creditors, is absolutely unacceptable and unjustifiable. The Unsecured Committee

1769132.2



1  proposes that the costs for RQN, like the costs for Mesirow, be allocated in accordance with the

2  percentage allocations for the total of RQN's fees, as re-allocated by the Unsecured Committee,

3  *i.e.* 40.1% to the USACM estate, 29% to DTDF, and 30.9% to FTDF.  The computation of the

4  Unsecured Committee's reallocation of RQN fees and costs is attached as Exhibit 2B.

5          **D.      The Unsecured Committee's Proposals for Allocation and Specific**
                     **Reductions of Schwartzer & McPherson Fees and Costs**

6          The SM fee application is very difficult to respond to, in light of the way SM chose to

7  present its time entries.  The time detail attached to the application text is not segregated by ABA

8  task code.  Thus, the Unsecured Committee must assume that SM accurately captured the time

9  entries in its summaries of the services performed by task code in the application text.  Since time

10 entries are lumped and some run on for as much as a full page, the Unsecured Committee simply

11 cannot tell if the summarized allocation is correct.  One time entry on June 19, 2006, for example,

12 includes time relating to a 2014 statement, Bundy Canyon loan payment, settlement with

13 Investment Partners, removal of Fertitta from the Direct Lenders Committee, DIP financing, and

14 Ms. Jarvis' workload, among other topics (the fee application pages are not numbered).

15         Assuming that SM has accurately task-coded the sub-parts of its lumped time entries, and

16 accurately broken them out in the text of its fee application, the Unsecured Committee still objects

17 to SM's method of allocation among Debtors' estates.  Separately allocating for time relating only

18 to a single Debtor is fine.  But SM has allocated time "on matters that pertain to all Debtors"

19 solely to USACM (SM Application at 8).  And SM says it has allocated time spent on USACM,

20 DTDF and FTDF (including the Interpleader Adversary time) 50% to USACM and 25% each to

21 the two Funds, without any reasoned evaluation of the particular time spent.  The fee summaries

22 in the text of SM's fee application show the percentages allocated to USACM are even more

23 skewed.

24         The Unsecured Committee recommends the following changes to SM's allocation of fees

25 and costs.  As with the Mesirow and RQN fees, the Unsecured Committee advocates that time

26

1769132.2



spent on objecting to Fertitta as a member of the Direct Lenders Committee should be deducted before the rest of the allocation.

### 1.    Case Administration

SM describes its time in this category as relating to filing documents in Bankruptcy Court, participating in meetings and telephone conferences and attending the Section 341 meeting, reviewing case dockets and maintaining agendas for omnibus hearings, and keeping documents organized.  These tasks relate to all of Debtors, and SM's method of allocation among them is unclear.  Debtors USAC Realty and USA Securities had a *de minimis* role in the Section 341 meeting and initial filings, and virtually no role thereafter.  The Unsecured Committee recommends that SM's time in this category should be charged one-third to each of USACM, DTDF and FTDF estates.

### 2.    Asset Analysis and Research

SM describes its time in this category as relating to analysis of assets and liabilities on financial statements for Debtors, and various documents regarding investors in various projects, loan summaries and loan documents.  All three of the principal Debtors had financial statements, and loan documents and the two Funds had investors.  SM appears to have  charged its time 94.3% to USACM and 2.9% each to DTDF and FTDF.  The Unsecured Committee recommends that SM's time in this category should instead be charged one-third to each of USACM, DTDF and FTDF estates.

### 3.    Business Operations

SM says that time in this category relates to review and filing of monthly operating reports and obtaining Court approval for use of cash to continue business operations.  SM appears to have charged its time 93.6% to USACM and 3.2% each to DTDF and FTDF.  The Unsecured Committee recommends that SM's time in this category should instead be charged one-third to each of USACM, DTDF and FTDF estates.

1769132.2



### 4.    Fee / Employment Applications

SM's time in this category concerned the employment applications for all of Debtors' professionals, and the fee applications for them.  Both types of applications concern USACM, DTDF and FTDF (with de minimis reference to USAC Realty and USA Securities).  SM appears to have  charged its time 81.2% to USACM, 5.1% to DTDF and 13.7% to FTDF.  The Unsecured Committee recommends that SM's time in this category should instead be charged one-third to each of USACM, DTDF and FTDF estates.

### 5.    Meetings / Communications with Investors / Committees

SM's time in this category concerned correspondence and meetings with investors and creditors of the three principal Debtors and their counsel, and with the Committees.  SM includes no evidence that it communicated twice as frequently with USACM constituents and counsel than with those for the two Funds.  SM appears to have  charged its time 80.7% to USACM, 8.7% to DTDF, and 10.6% FTDF.  The Unsecured Committee recommends that SM's time in this category should instead be charged one-third to each of USACM, DTDF and FTDF estates.

### 6.    Claims Administration and Objections

SM says it reviewed claims and objections to claims and correspondence with the claims agent.  The only objections to claims filed thus far were by the FTDF Committee.  Yet SM has allocated all of its time to USACM.  Conservatively, and giving FTDF the benefit of the doubt, the Unsecured Committee recommends that SM's time in this category should instead be charged one-third to each of USACM, DTDF and FTDF estates.

### 7.    Employee Benefits / Pensions

SM describes time in this category as relating to the motion to pay employee prepetition wages.  USACM was the employer for these employees, and the Unsecured Committee agrees that all of the time and fees in this category should be charged to the USACM estate.

1769132.2



### 8.    Executory Contracts / Leases

SM says this time relates to the review of executory contracts and leases and the rejection of personal property leases. The Unsecured Committee believes that all of the leases involved were USACM leases, and agrees that all of the time and fees in this category should be charged to the USACM estate.

### 9.    Financing

SM describes this time as research, correspondence, and attendance at hearings to secure DIP financing. The Unsecured Committee believes that the DIP financing issues were heard along with a multitude of other issues at omnibus hearings, and in any event, the DIP financing was intended to benefit all Debtors and the disputes over collateralization of DIP financing concerned all Debtors. SM has charged all the time in this category to USACM. The Unsecured Committee recommends that SM's time in this category should instead be charged one-third to each of USACM, DTDF and FTDF estates.

### 10.    Litigation / Adversary Proceedings

The litigation described by SM in this category concerns all Debtors, with the exception that the Wells Fargo adversary may reasonably be allocated to USACM alone. SM has separated out the fees it allocates in this category to USACM and DTDF, and separately lists three adversary matters, which presumably it allocates in accordance with the statement at the beginning of its fee application text. The Unsecured Committee recommends that SM's time spent on the Wells Fargo adversary be allocated to USACM, and that the rest of the time be allocated one-third each to USACM, DTDF and FTDF.

### 11.    Tax Issues

SM reports that it corresponded with various tax agencies regarding the "Debtors' [plural]" bankruptcy case, but SM charged all of its time to USACM. The amount at issue is de minimis, and the Unsecured Committee will assume that the correspondence related only to USACM.

1769132.2



### 12.    Regulatory Matters

SM says that it communicated with the SEC, which only regulates FTDF, but it charged its time solely to USACM. The Unsecured Committee recommends that the time be charged instead to the FTDF estate.

### 13.    Unsecured Creditor Committee Relations

SM billed time in this category for communications solely with counsel for the Unsecured Committee. The Committee agrees that this time should be charged solely to the USACM estate.

### 14.    Executory Contract Right Committee Relations

SM billed time in this category for communications solely with counsel for the Direct Lenders Committee. The Committee agrees that this time should be charged solely to the USACM estate.

### 15.    Costs

The Unsecured Committee makes the same point with respect to SM's costs as it did with the costs charged by Mesirow and RQN. They should be allocated reasonably among the estates, not charged entirely to USACM and borne by its unsecured creditors. The Unsecured Committee proposes that the costs for RQN, like the costs for Mesirow, be allocated in accordance with the percentage allocations for the total of RQN's fees, as re-allocated by the Unsecured Committee, *i.e.* 35.4% to the USACM estate, 32.1% to DTDF, and 32.5% to FTDF. The Unsecured Committee's computations for its recommended reallocation of SM fees and costs is set forth on Exhibit 3B.

## IV.    Conclusion

Debtors' professionals and the other Committees may disagree with some of the allocation percentages proposed by the Unsecured Committee, but overall the Unsecured Committee's approach is much more fair and reasonable than the approach taken by Debtors' professionals in their first fee applications. USACM, as a fiduciary, and its counsel (who also represent the related Debtors), must treat the unsecured creditors of the USACM estate fairly in both their substantive

1769132.2



business decisions and in how they keep track of and allocate their time and expenses. That includes fairly allocating administrative expenses among multiple estates.

The bottom line result is that instead of the overwhelmingly unfair burden imposed on the USACM unsecured creditors by Debtors' professionals in their first fee applications, the Unsecured Committee is proposing a reasonable and fair basis for allocating the professional fees incurred on behalf of all of Debtors' estates. The supporting calculations for the Unsecured Committee's proposals are set forth in attached Exhibits 1B, 2B and 3B. The result is:

### Mesirow Fee Application

| Debtor | USACM | DTDF | FTDF | USAC Realty | Securities |
|---|---|---|---|---|---|
| Fee Amount | $3,124,300 | $104,400 | $98,900 | $14,400 | $22,400 |
| Fee % | 92.9% | 3.1% | 2.9% | 0.4% | 0.7% |
| Cost Amount | $213,810 | $0 | $0 | $0 | $0 |
| Cost % | 100% | 0% | 0% | 0% | 0% |

### Unsecured Committee's Reallocation of Mesirow Fee Application

| Debtor | USACM | DTDF | FTDF | USAC Realty | Securities |
|---|---|---|---|---|---|
| Fee Amount | $1,738,600 | $1,063,500 | $525,600 | $15,200 | $21,600 |
| Fee % | 51.7% | 31.6% | 15.6% | 0.5% | 0.6% |
| Cost Amount | $110,490 | $67,580 | $33,400 | $970 | $1,370 |
| Cost % | 51.7% | 31.6% | 15.6% | 0.5% | 0.6% |

### Ray Quinney & Nebeker Fee Application

| Debtor | USACM | DTDF | FTDF | USAC Realty | Securities |
|---|---|---|---|---|---|
| Fee Amount | $863,120 | $38,600 | $32,300 | $530 | $530 |
| Fee % | 92.1% | 4.12% | 3.67% | .06% | .06% |
| Cost Amount | $64,950 | $0 | $0 | $0 | $0 |
| Cost % | 100% | 0% | 0% | 0% | 0% |

1769132.2

LEWIS
AND
ROCA
LLP

L A W Y E R S

**Unsecured Committee's Reallocation of Ray Quinney & Nebeker Fee Application**

| Debtor | USACM | DTDF | FTDF | USAC Realty | Securities |
|--------|-------|------|------|-------------|------------|
| **Fee Amount** | $375,830 | $271,770 | $289,600 | $0 | $0 |
| **Fee %** | 40.1% | 29% | 30.9% | 0% | 0% |
| **Cost Amount** | $26,050 | $18,830 | $20,070 | $0 | $0 |
| **Cost %** | 40.1% | 29% | $30.9% | 0% | 0% |

**Schwartzer & McPherson Fee Application**

| Debtor | USACM | DTDF | FTDF | USAC Realty | Securities |
|--------|-------|------|------|-------------|------------|
| **Fee Amount** | $244,430 | $8,310 | $11,300 | $300 | $680 |
| **Fee %** | 92.2% | 3.1% | 4.3% | 0.1% | 0.3% |
| **Cost Amount** | $5,470 | $0 | $0 | $0 | $0 |
| **Cost %** | 100% | 0% | 0% | 0% | 0% |

**Unsecured Committee's Reallocation of Schwartzer & McPherson Fee Application**

| Debtor | USACM | DTDF | FTDF | USAC Realty | Securities |
|--------|-------|------|------|-------------|------------|
| **Fee Amount** | $93,780 | $85,190 | $86,040 | $0 | $0 |
| **Fee %** | 35.4% | 32.1% | 32.5% | 0% | 0% |
| **Cost Amount** | $1,930 | $1,760 | $1,770 | $0 | $0 |
| **Cost %** | 35.4% | 32.1% | 32.5% | 0% | 0% |

The Unsecured Committee further requests that in awarding professional fees, the Court take into account the $3 million (at least) that Debtors' professionals have apparently cost the USACM creditors by their choice not to send default notices to borrowers for over two months after preparing the computations to enable such notices to be sent, and then taking the position that default interest is not due until the default notice is given, despite the language of the notes.

1769132.2

LEWIS
AND
ROCA
LLP
L A W Y E R S

RESPECTFULLY SUBMITTED September 15, 2006.

**LEWIS AND ROCA LLP**


By   /s/ RC (#006593)
              Susan M. Freeman
              Rob Charles
*Attorneys for Official Committee of Unsecured*
*Creditors of USA Commercial Mortgage Company*

1769132.2