**Exhibit 1**

Mr. Thomas J. Allison
USA Commercial Mortgage Company
USA Capital Realty Advisors, LLC,
USA Capital Diversified Trust Deed Fund, LLC
USA Capital First Trust Deed Fund, LLC
USA Securities, LLC 1

September 11, 2006

Dear Mr. Allison:

USA Commercial Mortgage Company ("Commercial Mortgage") and certain of its affiliates, including but not limited to USA Capital Diversified Trust Deed Fund, LLC ("Diversified Trust Deed Fund") and USA Capital First Trust Deed Fund, LLC ("First Trust Deed Fund"), are debtors in bankruptcy cases pending in the United States Bankruptcy Court for the District of Nevada (collectively, the "Debtors"), and are loan servicers for approximately 100 commercial loans (each, a "Serviced Loan"), to various borrowers (each a "Borrower," and collectively, the "Borrowers"). The Debtors, and certain direct investors (the "Lenders") also own interests in many of the Serviced Loans (each of the Serviced Loans and servicing arrangements individually listed on Exhibits A and B hereto is an "Asset" and, collectively, they all are "Assets").

SPCP Group, LLC, on behalf of certain of its affiliated investment funds ("Silver Point"), is willing to acquire substantially all of the Assets on the terms stated in this offer letter (the "Offer Letter"). Silver Point has consented to your request to structure its proposed acquisition of the Assets such that it can be consummated through a confirmed plan of reorganization to be proposed by the Debtors (the "Plan"), subject to the terms stated herein.

    1.    Acquisition of Assets. Based upon the information provided to us to date, and subject to the terms herein, Silver Point will acquire the Assets, effective as of July 31, 2006 (the "Cut-Off Date"), for cash consideration of $46,500,000 and other consideration set forth in this Offer Letter (the "Total Asset Purchase Price").

    (a).    Allocation of Purchase Price. We have considered your request to split the Total Asset Purchase Price into several components, with one possible allocation being noted in Sections "b" through "c" below (the Debtors' Agreed Allocation). This possible allocation of the Total Asset Purchase Price is provided at your request, without our expressing any opinion with regard to its accuracy, propriety or reasonableness:

    (b).    First Trust Deed Fund Assets. All Assets owned by First Trust Deed Fund, to the extent of First Trust Deed Fund's ownership interest in the Assets, as listed on Exhibit A hereto, for cash consideration of $46,500,000, as adjusted pursuant to paragraph 2 (the "First Trust Deed Fund Price").

    (c).    Commercial Mortgage Assets. All servicing agreements and related contracts (which will be purchased by an affiliate of Silver Point) for all of the Serviced Loans (each a "Service Agreement") owned by Commercial Mortgage, as listed in Exhibit B hereto, and rights thereunder after the Closing Date as more fully set forth in this Offer Letter, and all personal property necessary for enforcement of Service Agreements, including, without limitation, all servicing and investor records, databases, and servicing and reporting software (collectively, the

"Personal Property") in consideration of the sum of (i) 50% of the first $1,000,000 collected by Silver Point pursuant to ¶ 5(a) of the applicable Service Agreement, as provided in ¶ 4(b) of this Offer Letter, following reimbursement of all expenses incurred by Silver Point in connection with such enforcement efforts (with such amount to be reduced by the ratio of outstanding principal balance at closing of any Serviced Loans for which Service Agreements are excluded from this transfer by agreement among Silver Point and the Debtors, over the outstanding principal balance of Serviced Loans for which Service Agreements are actually transferred), (ii) 50% of the first $100,000 collected of default rate interest accrued on the First Trust Deed Fund Assets as of the Closing Date, plus (iii) the payments and obligations set forth in this Offer Letter ("Commercial Mortgage Price."). The Service Agreements shall be transferred to Silver Point in a manner mutually agreed upon among the Debtors and Silver Point.

The proposed Total Asset Purchase Price shall be valid only with regard to all Assets, as a whole, and is not separable to any extent. The foregoing allocations of the Total Asset Purchase Price may be adjusted at your, or our, discretion solely for Silver Point's purposes; provided that any adjustment will have no effect on the Total Purchase Price or on the Debtors' Agreed Allocations, unless otherwise agreed to by the Debtors and each of the Committees.

     2.     Adjustments to Purchase Price. The sum of the First Trust Deed Fund Price and the Commercial Mortgage Price equals the Total Asset Purchase Price listed above. The First Trust Deed Fund Price shall be further reduced by all payments of principal received by the Debtors after the Cut-Off Date to the extent any such principal payments are related to the First Trust Deed Fund Assets, in accordance with the following schedule:

     For an Asset listed on Exhibit C, 95% of any principal payments received by the Debtors after the Cut-Off Date.

     For an Asset Listed on Exhibit D, 85% of any principal payments received by the Debtors after the Cut-Off Date.

     For an Asset listed on Exhibit E, 80% of any principal payments received by the Debtors after the Cut-Off Date.

     For an Asset listed on Exhibit F, 65% of any principal payments received by the Debtors after the Cut-Off Date.

Silver Point shall have no interest in any payments collected after the Cut-Off Date and before the Closing Date that are proceeds of the First Trust Deed Assets for interest that has accrued prior to the Closing Date. Silver Point shall receive and retain all accrued interest collected after the Closing Date that are proceeds of the First Trust Deed Assets including without limitation First Trust Deed Fund's accrued default rate interest.

     3.     Fees Payable to Commercial Mortgage. After the Closing Date, Silver Point will collect and pay over to Commercial Mortgage (or its successor or assignee under the Plan), in accordance with the disbursement priorities stated in ¶ 4 below:

     (a)     all servicing fees and servicer advances accrued, but unpaid, as of the Closing Date ("Accrued Servicing Fees"),

     (b)     all late charges and default interest due, but unpaid, from Borrowers as of the Closing Date; provided, however, that Silver Point shall retain any and all proportionate default

interest in respect of and to the extent of Silver Point's interest in the First Trust Deed Fund Assets acquired by it ("Late Charges");

(c)    all exit fees, extension fees, deferred origination fees and other fees due to Commercial Mortgage pursuant to and as defined in the current documentation relating to each of the Serviced Loans whether accrued before or accruing after the Closing Date (the "Success Fees"); and

(d)    all proceeds of all Serviced Loans and Serviced Loan participations and related receivables owed to Commercial Mortgage, to the extent of Commercial Mortgage's interest therein, as set forth in Exhibit C hereto, pursuant to the terms of a Service Agreement in form substantially identical to the form of Service Agreement executed by Commercial Mortgage and Lenders before the bankruptcy filing;

4.    Distribution of Collected Money.  With respect to all servicing fees and other fees and sums due the loan servicer under any of the Service Agreements transferred to Silver Point on and after the Closing Date, such fees and sums shall be distributed in the following order, calculated on a loan by loan basis:

(a)    First, Silver Point shall be reimbursed for sums advanced under ¶ 4 of the applicable Service Agreement(s);

(b)    Second, Silver Point shall retain fees due under ¶ 5(a) of the applicable Service Agreement(s) for post-closing months;

(c)    Third, all other sums due under ¶ 5(b) of the applicable Service Agreement(s) shall be paid, to Silver Point if accrued on or after the Closing Date, or to Commercial Mortgage (or its successor or assignee under the Plan) if accrued prior to the Closing Date;

(d)    Fourth, all other sums due under ¶ 5(c) of the applicable Service Agreement(s) shall be paid, to Silver Point if accrued on or after the Closing Date, or to Commercial Mortgage (or its successor or assignee under the Plan) if accrued prior to the Closing Date, provided, however, that, subject to paragraph 1(c)(ii), all such sums payable in respect of First Trust Deed Fund Assets shall be paid to and retained by Silver Point; and

(e)    Fifth, all fees due under ¶ 5(a) of the applicable Service Agreement(s) for pre-closing months and all sums advanced or deemed advanced under ¶ 4 or any other provision of the applicable Service Agreement(s) before the Closing Date shall be paid to Commercial Mortgage (or its successor or assignee under the Plan).

Silver Point shall hold all sums collected and due to Commercial Mortgage in accordance with this paragraph in trust until paid.

5.    Compromises with Borrowers.  On and after the Closing Date, Silver Point shall have full authority to take any actions it deems appropriate as allowed under the applicable Service Agreement(s) and to enforce its rights in respect of the Assets, except as otherwise provided in this paragraph.  Silver Point may forgive the payment of Success Fees, in whole or in part:

(a)    notwithstanding any other provision herein, at its sole discretion for loans in which it owns a majority interest acquired as part of the First Trust Deed Fund Assets;

(b)      notwithstanding any other provision herein, at its sole discretion, after not less than ten (10) days' prior written notice to Commercial Mortgage (or its successor or assignee under the Plan), if, either after realization of the collateral securing a Serviced Loan, whether through foreclosure, deed in lieu, or otherwise, and exhaustion of such other remedies against the Borrower or any guarantor of the Serviced Loan that Silver Point in its reasonable discretion determines are viable and economically prudent, there remains an unsecured deficiency in respect of such Serviced Loan or, after realization of the collateral securing a Serviced Loan, whether through foreclosure, deed in lieu, or otherwise, Silver Point determines the Borrower (and any guarantor) lacks the reasonable ability to pay all or part of such Success Fees;

(c)      except pursuant to ¶¶ 5(a) and 5(b) of this Offer Letter, to which this clause expressly shall not apply, if it receives any amounts payable under ¶ 5(c) of the Service Agreement, with the prior written consent of Commercial Mortgage (or its successor or assign under the Plan), which consent shall not be unreasonably withheld (the failure to reply to a request by Silver Point for such consent within ten (10) days of the date of such request shall be deemed to be a consent); or

(d)      if Silver Point does not receive any amounts due under ¶ 5(c) of the Service Agreement, then, in its discretion, after not less than ten (10) days' prior written notice to Commercial Mortgage (or its successor or assignee under the Plan), Silver Point may forgive or reduce the payment of any Success Fees in the following circumstances:

(i).      where a Borrower (and any guarantor) is otherwise ready and able to fully pay off a Serviced Loan except for amounts due under ¶ 5(c) of the Service Agreement and Silver Point determines the Borrower (and any guarantor) lacks the reasonable ability to pay all or part of such Success Fees; or

(ii).      where a Borrower is otherwise ready and able only to pay off a Serviced Loan at a discount from its then principal balance, or at a discount of accrued and unpaid interest, and the Lenders have agreed to such compromise payment to satisfy the Borrowers' obligation, and Silver Point determines the Borrower (and any guarantor) lacks the reasonable ability to pay all or part of such Success Fees.

6.      Causes of Action Against Insiders.  As to Assets purchased from First Trust Deed Fund or Commercial Mortgage, other than the right to pursue personal guaranties of any of the Serviced Loans guaranteed by an insider of the Debtors, Silver Point is not through the transactions described in this Offer Letter acquiring any other claim or cause of action against an insider of any of the Debtors or against another Debtor.  Further, if Silver Point obtains a judgment in respect of any personal guaranty of any Serviced Loan by an insider of the Debtors, Silver Point will negotiate in good faith in an effort to reach an equitable agreement to do so in conjunction with any litigation by Commercial Mortgage (or its successor or assignee under a Plan) in a manner that will not impair Silver Point's ultimate economic realization in respect of its Assets purchased pursuant to the terms of this Offer Letter or otherwise or its obligations under the Service Agreements, but also will not impair any recovery or litigation efforts undertaken by any of the Debtors (or their successors or assigns under a Plan) in respect of other liability claims or causes of action that they are then prosecuting or may in the future prosecute against such insider.

7.      Causes of Action Against Debtors.  Silver Point further agrees that it will not prosecute any action against any of the Debtors arising out of or relating to the acquired Assets and arising out of any event occurring before the Closing Date.  For the avoidance of doubt, the

foregoing agreement shall not apply to any asset acquired by Silver Point other than pursuant to this Offer Letter. Silver Point further agrees to be bound by any applicable provisions contained in a confirmed Plan, and by any applicable Orders entered by the Bankruptcy Court following the Closing Date.

8.     Lenders. Upon confirmation of the Plan, in compliance with the terms herein, and upon written request by any Lender for Silver Point to acquire the ownership interest that such Lender has in any of the Serviced Loans, Silver Point may, in its discretion, negotiate with such Lender, in an effort to reach a mutually agreeable purchase price to acquire the Lender's ownership interest in such Serviced Loans.

9.     Asset Transfer Through a Plan. Subject to the terms herein, and to documentation that is in all respects mutually acceptable to Silver Point and the Debtors with respect to the subject matter of this Offer Letter, Silver Point is willing to acquire the Assets through a Plan to be proposed by the Debtors, provided, however, that the Plan must satisfy all applicable Additional Conditions listed in paragraph 10 below.

10.     Additional Conditions. In addition to the foregoing, Silver Point's willingness to acquire the Assets is subject to the following conditions:

(a)     Transfer Agreement. Silver Point's willingness to acquire the Assets is subject to the parties entering into a transfer agreement ("Agreement") and ancillary and related documents with respect to the Assets, containing terms and provisions mutually acceptable to the parties. This Agreement shall be incorporated into a Plan, subject to the terms herein.

The Agreement shall contain reasonable and customary provisions for the transfer of assets in a bankruptcy case, and must be consistent with the terms of this Offer Letter and the nature of the Assets to be acquired by Silver Point. As of the Closing Date, there shall be no litigation or injunction preventing, hindering or delaying the consummation of the transactions contemplated herein, or impairing the Assets. Any liability for disgorgement claims arising prior to the closing of the transaction contemplated hereby will be retained by the Debtors.

(b)     Bankruptcy Court Process: Silver Point is willing to acquire the Assets through a Plan process, subject to the terms herein, provided that, within ten (10) days following acceptance of this Offer Letter, the Debtors shall file a motion seeking Bankruptcy Court approval of certain bidding procedures on terms that are reasonably acceptable to Silver Point (the "Bid Procedures Motion"), including, without limitation, the following: (a) scheduling an auction (the "Auction") for a sale and/or assignment or transfer of the Assets; (b) appointing Silver Point as the Stalking Horse Bidder; (c) approving certain bidding procedures, including, without limitation: (i) approving a break-up fee in an amount equal to $1,500,000 (the "Break-Up Fee"), which Break-Up Fee shall be payable only pursuant to the terms herein or in the event that any party other than Silver Point ultimately acquires the Assets for greater than the Total Asset Purchase Price plus the Minimum Incremental Overbid in the Auction process, and if payable, the Break-Up Fee shall be reduced by any expense reimbursement actually paid to Silver Point, which expense reimbursement shall be limited to a maximum amount of actual and reasonable expenses incurred by Silver Point up to $500,000 (the "Expense Reimbursement") (at the Debtors' option, by agreement of all of the Debtors, or pursuant to Order of the Bankruptcy Court, the obligation to pay the Break-Up Fee and/or the Expense Reimbursement may be apportioned among two or more of the Debtors), (ii) establishing an initial minimum incremental overbid (which is in excess of the Break-Up Fee) (the "Minimum Incremental Overbid") and the additional overbid amounts, both of which must be mutually acceptable to the Debtors and Silver Point, (iii) requiring that all

bids must be substantially similar to the form of the Agreement that is executed by and between the Debtors and Silver Point, provided that a bid may be submitted by two or more parties acting collectively to submit a bid for substantially all of the Assets, (iv) requiring that the cash consideration must, subject to the establishment of the minimum incremental overbid, be in excess of cash component of the Total Asset Purchase Price plus the minimum incremental overbid, (v) requiring a cash deposit of $2,325,000, and (vi) requiring that qualified overbids be submitted at least seven (7) days prior to the Auction. Debtors shall promptly schedule a hearing on the Bid Procedures Motion; provided, however, that no such hearing shall take place until (i) the Debtors and Silver Point have executed an Agreement and (ii) Silver Point has concluded its final due diligence as set forth in paragraph 10(c) below. The order granting the Bid Procedures Motion shall be referred to herein as the "Break-Up Fee Order."

As provided in paragraph 10(c) below, Silver Point will complete its final due diligence no later than the date of the initial hearing on the Bid Procedures Motion. As a condition precedent to Silver Point's continued obligation to perform pursuant to this Offer Letter, the Break-Up Fee Order must become a final, non-appealable Order of the Bankruptcy Court by no later than fifty-five (55) days following Debtors' acceptance of this Offer Letter. For the avoidance of doubt, notwithstanding any other provision herein, if the Break-Up Fee Order is not a final, non-appealable Order of the Bankruptcy Court by no later than fifty-five (55) days following Debtors' acceptance of this Offer Letter, then, unless waived by Silver Point in writing on or prior to the fifty-fifth day following the Debtors' acceptance of this Offer Letter, Silver Point shall be deemed to have rescinded this Offer Letter, and it will be of no further force or effect. In the event of a rescission of this Offer Letter by Silver Point pursuant to the terms of this paragraph, no Break-Up Fee, including no Expense Reimbursement, shall be paid to Silver Point and none will be provided for in the Break-Up Fee Order.

(i)    Plan: Subject to the terms herein, the Debtors shall transfer the Assets, including the Service Agreements, to the successful bidder at the Auction pursuant to a confirmed Plan. Within 30 days following the acceptance of the Offer Letter, the Debtors shall file a Plan and an accompanying Disclosure Statement, both in form and content mutually acceptable to the Debtors and Silver Point and consistent with the provisions of this Offer Letter, as such may be modified through further negotiations between the parties hereto. The Plan must seek Bankruptcy Code § 363(m) protection for the acquirer, must provide for acquirer to be released and held harmless with regard to all existing liabilities in respect of the Assets, and must provide all other reasonable and customary protections for the acquirer.

The Debtors shall promptly schedule a hearing to seek approval of the Disclosure Statement by the Bankruptcy Court under 11 U.S.C. §1125, which hearing shall be held approximately 70 days following the acceptance of this Offer Letter.    Upon approval of the Disclosure Statement by the Bankruptcy Court under 11 U.S.C. § 1125, the Debtors shall promptly solicit acceptances and proceed to confirmation of the Plan. The hearing on the confirmation of the Plan shall be scheduled for no earlier than 7 days following the Auction.

Unless waived by Silver Point in writing on or prior to 120 days following the Due Diligence Completion Date, Silver Point shall be released from any further obligation to perform pursuant to this Offer Letter or the Plan in the event that the Plan is not confirmed by a final, non-appealable Order of the Bankruptcy Court within 120 days from the Due Diligence Completion Date (the "Outside Approval Date"). In such event and as long as Silver Point is not in breach of the Agreement at the Outside Approval Date, Silver Point shall be entitled solely to the Expense Reimbursement for actual and reasonable expenses incurred by Silver Point in connection with this transaction.

For the avoidance of doubt, if the Outside Approval Date passes and Silver Point is paid an amount in respect of Expense Reimbursement, the Debtors will nonetheless be required to pay the full Break-Up Fee to Silver Point, reduced only by the amount paid to Silver Point in respect of Expense Reimbursement, if within 9 months following the Outside Approval Date any portion of the Assets is transferred to any party for a payment equal to or greater than the Total Asset Purchase Price. In the event that the Outside Approval Date passes and Silver Point has not waived compliance therewith, but it nonetheless thereafter acquires the Assets, then any Expense Reimbursement paid to Silver Point as a result of passage of the Outside Approval Date shall be repaid to the Debtors by Silver Point.

(c)    Due Diligence. Silver Point has already conducted substantial due diligence of the Debtors' books and records with respect to the Assets, however, it requires additional time to complete its final due diligence. Following acceptance by the Debtors of this Offer Letter, the Debtors shall provide Silver Point with reasonable access to the Debtors' books, records and personnel, Silver Point will use commercially reasonable efforts to complete its final due diligence review with respect to the Assets within 30 days of such acceptance, and it will in any event complete such final due diligence no later than the date of the initial hearing on the Bid Procedures Motion. On the date Silver Point completes its final due diligence, Silver Point shall notify the Debtors in writing by electronic mail (the "Due Diligence Completion Date"). All of Silver Point's obligations pursuant to this Offer Letter shall be subject to Silver Point's satisfaction with the results of such final due diligence. Final due diligence will include for each of the Assets, but will not be limited to: (i) confirmation of the performance and payment status of each Serviced Loan, and the performance and payment status of each Service Agreement, including non-Debtor contracting parties agreement; (ii) tax, title and UCC searches on all collateral; (iii) confirmation that the collateral appraised by Hilco Financial Services continues to be collateral with regard to each loan specified, in the same priority indicated in the Debtors' loan files, and that no liens have been released following the dates of applicable appraisals and title reports, except for loans paid in full before closing; and (iv) an environmental report with regard to each piece of real property that is in all respects satisfactory to Silver Point. The cost of such due diligence shall be borne by Silver Point. If at any time in the course of its final due diligence review, Silver Point determines that any Asset does not fully satisfy the foregoing criteria, then the Debtors and Silver Point will negotiate in good faith in an effort to agree on a reasonable reduction to the Total Asset Purchase Price. If the parties cannot reach agreement on any such adjustment to the Total Asset Purchase Price, then Silver Point may, at its option, either (a) proceed with the transaction at the then-existing Total Asset Purchase Price, or (b) rescind this Offer Letter, and be released from any further obligation to perform pursuant to this Offer Letter or the Plan.

(d)    Conditions of Closing. In addition to the usual conditions of closing of transfer of the Assets, which will be expressed in the Agreement, the following are conditions of closing on the transaction, which shall be waivable by Silver Point, in its sole discretion:

(i)    A title company of Silver Point's choosing shall, at closing, solely at Silver Point's expense, be ready, willing and able to issue acceptable policies or reports for the collateral securing the Serviced Loans, at Silver Point's cost, confirming that all of the Serviced Loans listed on Exhibit A are subject to fully perfected and secured first liens in favor of the applicable Lenders;

(ii)    Debtors shall have deposited with a mutually acceptable escrow agent all documents required under the Agreement;

(iii)    The Serviced Loans that have not been paid in full before the Closing Date are in full force and effect and no condition exists nor has any event occurred that by notice, the passage of time, or otherwise, could gives rise to an impediment to the enforcement of the Serviced Loans;

(iv)    The Plan and confirmation order or sale/assignment approval order shall be consistent with the terms of this Offer Letter and the Agreement, and the Service Agreements shall not be materially modified, by Order or otherwise, except as expressly agreed by Silver Point, provided, however, that this does not affect the rights of the Lenders to consent to modify under a Plan any rights not conveyed to Silver Point pursuant to this Offer Letter, so long as any such modification will not adversely affect Silver Point in any way;

(v)    The Plan and confirmation order or sale/assignment approval order shall provide for the transfer of the Service Agreements in a manner which does not create related claims under section 503(b) of the Bankruptcy Code provided that the Debtors may waive this condition in their sole discretion, so long as it does not otherwise affect any provision herein;

(vi)    Debtors have not released or otherwise terminated their security interest in all or any portion of the Assets from the Cut-Off Date through the Closing Date except as to (a) Serviced Loans that have been paid in full before the closing, or (b) partial releases and related reconveyances made by the Debtors pursuant to Court orders entered prior to the date of this Offer Letter;

(vii)    A material adverse change condition as mutually agreed upon by the parties, provided that if the parties should fail to reach an agreement on the terms of a material adverse change clause by no later than 10 days from the date of acceptance of this Offer Letter, then Silver Point shall be deemed to have rescinded this Offer Letter and it will be of no further force or effect.

11.    Miscellaneous.

(a).    Closing.  For the avoidance of doubt, the transfers of Assets described throughout this Offer Letter shall be deemed to have closed solely upon an Order of the Bankruptcy Court transferring all Assets acquired by Silver Point pursuant hereto becoming a final, non-appealable Order, and each of the Assets actually being transferred to Silver Point consistent with the terms herein (the "Closing Date").

(b).    Additional Collection Actions.  Prior to the Closing Date, Commercial Mortgage may assign to Silver Point, on terms mutually acceptable to Commercial Mortgage and Silver Point, for purposes of collection, certain accounts receivable and notes receivable.

(c).    Access to Documents.  After the Closing Date, Silver Point will allow any of the Debtors or its successors or assignees under a confirmed Plan reasonable access to the Personal Property for all purposes, including original documents and files as needed.

(d).    Confidentiality.  The proposals evidenced by this Offer Letter, and the Offer Letter itself, along with any information that Silver Point delivers in connection therewith, is confidential and, except as expressly required by applicable law, the Debtors shall not and shall not permit their representatives to, directly or indirectly, disclose, reveal, divulge, publish or otherwise make known the existence any of the terms of this proposal to any person or entity without Silver Point's express written consent, provided, however, that Debtors may provide a

copy of this proposal to each of the official committees appointed in the Debtors' bankruptcy cases, and may discuss this proposal with each such committee, so long as such committee has executed a confidentiality agreement with Debtors that substantially conforms with the confidentiality provisions contained in this paragraph 10(e), and this proposal and all related information is transmitted to that committee subject to such confidentiality agreement; and provided, further, that upon their timely acceptance of this Offer Letter, the Debtors may make the Offer Letter and the terms hereof publicly available to the extent necessary to implement provisions herein.

(e).    Counterparts. This Offer Letter may be executed in two or more counterparts, each of which, when so executed and delivered, will be deemed to be an original, but all of which counterparts, taken together, will constitute one and the same instrument.

(f).    Amendments. This Offer Letter shall not be amended by either party without the express written consent of such other party.

(g).    Termination. Unless this Offer Letter is countersigned by the Debtors, and a copy of the countersigned Offer Letter is actually received by Silver Point on or before September 12, 2006 at 5:00 P.M. Eastern Daylight Time, this Offer Letter shall expire and be of no force or effect.

(h).    No Modification. Debtors agree that, from the first date listed below through the Closing Date in connection with transfer of the Assets to Silver Point, they shall not modify, alter, hypothecate, settle or compromise, all or any portion of the loan documents or obligations of any party thereunder in respect of any Asset, without the prior written consent of Silver Point.

(i).    Venue; Governing Law. This Offer Letter and the Agreement shall be governed by the laws of the State of New York, without regard to conflicts of law principles thereof (the "Governing Law Jurisdiction"). The United States Bankruptcy Court for the District of Nevada shall be the exclusive forum for the enforcement of the terms of this Offer Letter and the Agreement, in which case, the parties agree that, where applicable, such court will apply the laws of the Governing Law Jurisdiction, except where inconsistent with applicable bankruptcy law.

(j)    Successors and Assigns. References to any of the Debtors also is a reference to any successor or assign of such Debtor under the Plan or pursuant to an Order of the Bankruptcy Court.

12.    Service Agreements. Nothing contained in this Offer Letter, including but not limited to paragraphs 4, 5, and 6 herein, shall modify the obligations owed to the Lenders by the loan servicer or rights of the Lenders against the loan servicer (or the rights of the loan servicer against the Lenders) under the applicable Service Agreements and otherwise applicable law. Silver Point shall distribute any sums due to Lenders under any of the Service Agreements in accordance with the Service Agreements, as the same may be modified with the consent of the applicable Lenders, and with otherwise applicable law. Further, notwithstanding the foregoing, to the extent the Bankruptcy Court has entered an Order, including but not limited to an Order confirming a Plan, which interprets or enforces provisions of the Service Agreements or directs the distribution of payments under the Service Agreements or payments collected from Borrowers, Silver Point shall abide by the terms of such Order(s). If, as between the provisions of the Service Agreements and the Order(s) of the Bankruptcy Court, it is not clear to Silver Point how the sums collected shall be distributed, then Silver Point shall hold the sums payable to the Lender until Silver Point either receives joint direction from the Lender and Commercial

Mortgage (or its successor or assignee under the Plan) regarding disbursement of interest, or is directed by an order from a court of competent jurisdiction. Nothing contained in this Offer Letter is intended to waive any defenses of the Lenders or of Commercial Mortgage (or its successor or assignee) under the Service Agreements. For the avoidance of doubt, under no circumstance shall any pre-Closing Date liability assertable by any party attach to Silver Point, or to any Asset acquired by Silver Point pursuant to this Offer Letter, and the Order entered by the Bankruptcy Court transferring the Assets to Silver Point shall clearly so state.

[REMAINDER OF PAGE INTENTIONALLY BLANK – SIGNATURE PAGE FOLLOWS]

## SILVER POINT CAPITAL

Very Truly Yours,

*Sn*

SPCP Group, LLC,
a Delaware limited liability company

Date: September ___, 2006                    Accepted:

_____
Thomas J. Allison, on behalf of:
USA Commercial Mortgage Company
USA Capital Realty Advisors, LLC,
USA Capital Diversified Trust Deed Fund, LLC
USA Capital First Trust Deed Fund, LLC
USA Securities, LLC 1

SILVER POINT CAPITAL

Very Truly Yours,


SPCP Group, LLC,
a Delaware limited liability company


Date: September 12, 2006                    Accepted:


_____
Thomas J. Allison, on behalf of:
USA Commercial Mortgage Company
USA Capital Realty Advisors, LLC
USA Capital Diversified Trust Deed Fund, LLC
USA Capital First Trust Deed Fund, LLC
USA Securities, LLC

# EXHIBIT A

| Performance | Loan Name | Origination Date | 7/31/06 Loan Outstanding | CFT Ownership % | CFT Ownership Principal Balance | Purchase Price |
|---|---|---|---|---|---|---|
| Performing | Fiesta Development $6.6 (Fiesta Development, Inc.) | 11/14/05 | 6,600,000 | 100.00% | 6,600,000 | |
| Performing | University Estates, Inc. | 4/11/05 | 4,825,920 | 100.00% | 4,825,920 | |
| Non-Performing | Gramercy Court Condos (Gramercy Court, Ltd.) | 6/25/04 | 34,884,500 | 13.10% | 4,570,500 | |
| Non-Performing | Franklin – Stratford Investments, LLC | 3/30/05 | 5,225,000 | 80.67% | 4,215,000 | |
| Non-Performing | HFAH/Monaco, LLC | 12/19/03 | 4,000,000 | 100.00% | 4,000,000 | |
| Performing | Cloudbreak LV (Cloudbreak Las Vegas, LLC) | 12/17/03 | 3,800,000 | 99.31% | 3,773,675 | |
| Non-Performing | Eagle Meadows Development | 10/19/05 | 31,050,000 | 11.76% | 3,652,000 | |
| Non-Performing | Shamrock Tower, LP (619 Main. LP) | 8/5/04 | 10,500,000 | 31.43% | 3,300,000 | |
| Non-Performing | Margarita Annex | 7/26/04 | 12,000,000 | 24.42% | 2,930,000 | |
| Non-Performing | The Gardens Phase II (The Gardens, LLC) | 3/31/06 | 2,500,000 | 100.00% | 2,500,000 | |
| Performing | Columbia Managing Partners, LLC | 9/1/05 | 2,210,000 | 100.00% | 2,210,000 | |
| Non-Performing | Brookmere/Matteson $27,050,000 | 10/29/03 | 5,964,848 | 33.88% | 2,021,085 | |
| Non-Performing | Anchor B, LLC | 5/31/05 | 5,835,422 | 33.36% | 1,946,422 | |
| Non-Performing | Interstate Commerce Center Phase II (ISCC Phase II, LLC) | 8/11/04 | 1,856,849 | 86.34% | 1,603,204 | |
| Non-Performing | Palm Harbor One, LLC | 12/14/05 | 28,480,000 | 5.60% | 1,594,000 | |
| Non-Performing | Ocean Atlantic $9,425,000 (Ocean Atlantic Chicago, LLC) | 1/23/06 | 8,925,000 | 14.61% | 1,303,500 | |
| Non-Performing | Binford Medical Developers, LLC | 8/31/05 | 7,450,000 | 17.25% | 1,285,000 | |
| Performing | The Gardens, LLC Timeshare (The Gardens, LLC) | 3/24/04 | 3,902,274 | 31.03% | 1,211,050 | |
| Performing | Cottonwood Hills, LLC | 6/14/05 | 4,000,000 | 25.00% | 1,000,000 | |
| Performing | Mountain House Business Park (Pegasus-MH Ventures I, LLC) | 6/10/04 | 16,800,000 | 5.21% | 875,000 | |
| Non-Performing | Lake Helen Partners | 12/7/04 | 3,159,704 | 28.77% | 908,908 | |
| Non-Performing | ComVest Capital (Comvest Capital Satellite Arms, Inc) | 1/11/06 | 4,125,000 | 17.82% | 735,000 | |
| Non-Performing | 6425 Gess, LTD | 4/14/05 | 26,500,000 | 2.63% | 696,000 | |
| Non-Performing | Standard Property Development, LLC | 2/27/06 | 9,640,000 | 6.96% | 671,000 | |

STRICTLY CONFIDENTIAL

# EXHIBIT A

| Performance | Loan Name | Origination Date | 7/31/06 Loan Outstanding | CFT Ownership % | CFT Ownership Principal Balance | Purchase Price |
|---|---|---|---|---|---|---|
| Performing | Roam Development Group L.P. | 3/23/05 | 25,601,735 | 2.37% | 605,688 | |
| Non-Performing | Harbor Georgetown, L.L.C. | 8/16/04 | 8,800,000 | 5.80% | 510,000 | |
| Non-Performing | Huntsville (West Hills Park Joint Venture) | 3/31/04 | 10,475,000 | 4.77% | 500,000 | |
| Non-Performing | Castaic Partners II, LLC | 7/11/05 | 5,600,000 | 7.59% | 425,000 | |
| Non-Performing | Amesbury/Hatters Point (Amesburyport Corporation) | 12/16/02 | 19,242,193 | 1.72% | 330,016 | |
| Non-Performing | Tapia Ranch (Castaic Partners, LLC) | 9/28/04 | 22,000,000 | 1.43% | 314,000 | |
| Repaid | Midvale Marketplace, LLC | 6/30/05 | - | 7.61% | - | |
| Performing | J. Jireh's Corporation | 9/2/05 | 8,825,000 | 3.00% | 265,000 | |
| Non-Performing | Wasco Investments LLC | 11/23/04 | 6,450,000 | 3.02% | 195,000 | |
| Non-Performing | Oak Shores II (John E. King and Carole D. King) | 6/6/05 | 12,150,000 | 0.03% | 3,925 | |
| Performing | Bay Pompano Beach, LLC | 6/20/05 | 14,680,390 | 1.20% | 176,623 | |
| Non-Performing | Del Valle - Livingston (Del Valle Capital Corporation, Inc) | 8/25/05 | 19,250,000 | 0.67% | 129,060 | |
| Non-Performing | Elizabeth May Real Estate, LLC | 2/24/06 | 10,050,000 | 1.19% | 120,000 | |
| Non-Performing | Marlton Square (MS Acquisition Company, LLC) | 8/11/05 | 30,000,000 | 0.39% | 118,000 | |
| Non-Performing | Clear Creek Plantation (Arapahoe Land Investments, L.P.) | 3/15/05 | 2,900,000 | 3.45% | 100,000 | |
| Non-Performing | Gateway Stone (Gateway Stone Associates, LLC) | 11/18/05 | 13,185,000 | 0.76% | 100,000 | |
| Non-Performing | 3685 San Fernando Road Partners, L.P. | 8/2/05 | 7,350,000 | 1.12% | 82,000 | |
| Non-Performing | Meadow Creek Partners, LLC | 2/23/06 | 8,250,000 | 0.87% | 72,000 | |
| Non-Performing | Rio Rancho Executive Plaza, LLC | 1/17/06 | 2,250,000 | 3.11% | 70,000 | |
| Non-Performing | Urban Housing Alliance - 435 Lofts (Urban Housing Alliance, LLC) | 7/13/05 | 8,150,000 | 0.37% | 30,000 | |
| Performing | The Gardens, LLC $2,425,000 (The Gardens, LLC) | 8/15/05 | 1,925,000 | 1.52% | 29,226 | |
| Non-Performing | Foxhill 216, LLC | 2/23/06 | 25,980,000 | 0.10% | 25,000 | |
| Non-Performing | Castaic Partners III, LLC | 9/22/05 | 4,675,000 | 0.53% | 25,000 | |
| | Total | | | | 62,652,742 | 46,500,000 |

STRICTLY CONFIDENTIAL

# EXHIBIT B

| Performance | Loan Name | Origination Date | 7/31/06 Loan Outstanding | Funds Interest % | Funds Interest $ | Fees Accrued | Fees Paid | Net Unpaid |
|---|---|---|---|---|---|---|---|---|
| Non-Performing | 3685 San Fernando Road Partners, L.P. | 8/2/05 | 7,350,000 | 1.12% | 82,000 | 85,056 | 72,806 | 12,250 |
| Performing | 5055 Collwood, LLC | 2/24/04 | 1,173,289 | 0.00% | - | 4,917 | 3,831 | 1,085 |
| Performing | 60th Street Venture, LLC | 12/22/05 | 3,700,000 | 0.00% | - | 19,395 | 16,316 | 3,079 |
| Non-Performing | 6425 Gess, LTD | 4/14/05 | 26,500,000 | 2.63% | 696,000 | 231,445 | - | 231,445 |
| Non-Performing | Amesbury/Hatters Point (Amesburyport Corporation) | 12/16/02 | 19,242,193 | 17.15% | 3,299,403 | 658,778 | 583,361 | 75,417 |
| Non-Performing | Anchor B, LLC | 5/31/05 | 5,835,422 | 33.36% | 1,946,422 | 63,544 | - | 63,544 |
| Non-Performing | BarUSA/$15,300,000 (Barusa, LLC) | 11/24/03 | 15,300,000 | 0.07% | 10,000 | 336,569 | 286,417 | 50,152 |
| Performing | Bay Pompano Beach, LLC | 6/20/05 | 14,680,390 | 1.67% | 245,438 | 158,882 | 146,317 | 12,565 |
| Non-Performing | Binford Medical Developers, LLC | 8/31/05 | 7,450,000 | 17.25% | 1,285,000 | 49,391 | 38,156 | 11,235 |
| Non-Performing | Brookmere/Matteson $27,050,000 | 10/29/03 | 5,964,848 | 33.88% | 2,021,085 | 19,987 | 8,540 | 11,447 |
| Performing | Bundy Canyon $1,050,000 (Bundy Canyon Land Development, LLC) | 1/6/06 | 1,050,000 | 0.00% | - | 5,391 | 5,391 | (0) |
| Non-Performing | Bundy Canyon $2,500,000 (Bundy Canyon Land Development, LLC) | 5/2/05 | 2,300,000 | 0.00% | - | 25,490 | 22,000 | 3,490 |
| Non-Performing | Bundy Canyon $5,000,000 (Bundy Canyon Land Development, LLC) | 9/28/05 | 4,250,000 | 0.71% | 30,000 | 31,700 | 22,238 | 9,463 |
| Performing | Bundy Canyon $5,725,000 (Bundy Canyon Land Development, LLC) | 1/14/05 | 5,725,000 | 0.00% | - | 71,963 | 71,963 | (0) |
| Non-Performing | Bundy Canyon $7,500,000 (Bundy Canyon Land Development, LLC) | 8/17/05 | 6,700,000 | 0.00% | - | 54,794 | 40,037 | 14,757 |
| Performing | Cabernet Highlands, LLC | 2/17/05 | 3,000,000 | 0.00% | - | 10,000 | 10,000 | 0 |
| Non-Performing | Castaic Partners II, LLC | 7/11/05 | 5,600,000 | 7.59% | 425,000 | 34,263 | 18,338 | 15,925 |
| Non-Performing | Castaic Partners III, LLC | 9/22/05 | 4,675,000 | 1.60% | 75,000 | 28,673 | 18,340 | 10,333 |
| Performing | Charlevoix Homes, LLC (Lindsay and Chandler Heights, LLC) | 4/3/06 | 3,400,000 | 0.00% | - | 8,217 | 8,217 | - |
| Non-Performing | Clear Creek Plantation (Arapahoe Land Investments, L.P.) | 3/15/05 | 2,900,000 | 3.45% | 100,000 | 9,740 | 2,417 | 7,324 |
| Performing | Cloudbreak LV (Cloudbreak Las Vegas, LLC) | 12/17/03 | 3,800,000 | 100.00% | 3,800,000 | 12,667 | 9,544 | 3,123 |
| Performing | Columbia Managing Partners, LLC | 9/1/05 | 2,210,000 | 100.00% | 2,210,000 | 7,035 | 7,035 | (0) |
| Non-Performing | ComVest Capital (Comvest Capital Satellite Arms, Inc) | 1/11/06 | 4,125,000 | 17.82% | 735,000 | 18,320 | 14,882 | 3,438 |
| Non-Performing | Copper Sage Commerce Center Phase II (Copper Sage Commerce Center, LLC) | 3/1/06 | 3,550,000 | 1.83% | 65,000 | 11,736 | 6,637 | 5,100 |
| Performing | Cornman Toltec 160, LLC | 6/24/05 | 6,375,000 | 0.08% | 5,000 | 20,871 | 20,871 | 0 |
| Performing | Cottonwood Hills, LLC | 6/14/05 | 4,000,000 | 25.00% | 1,000,000 | 40,004 | 40,004 | 0 |
| Non-Performing | Del Valle - Livingston (Del Valle Capital Corporation, Inc) | 8/25/05 | 19,250,000 | 0.67% | 129,000 | 110,286 | 94,247 | 16,040 |

STRICTLY CONFIDENTIAL

# EXHIBIT B

| Performance | Loan Name | Origination Date | 7/31/06 Loan Outstanding | Funds Interest % | Funds Interest $ | Fees Accrued | Fees Paid | Net Unpaid |
|---|---|---|---|---|---|---|---|---|
| Non-Performing | Eagle Meadows Development | 10/19/05 | 31,050,000 | 11.76% | 3,652,000 | 211,600 | 131,009 | 80,591 |
| Non-Performing | Elizabeth May Real Estate, LLC | 2/24/06 | 10,050,000 | 1.19% | 120,000 | 33,755 | 10,374 | 23,381 |
| Performing | Fiesta Development $6.6 (Fiesta Development, Inc.) | 11/14/05 | 6,600,000 | 100.00% | 6,600,000 | 22,000 | 16,500 | 5,500 |
| Performing | Fiesta Murrieta (Fiesta Development, Inc.) | 4/14/05 | 6,500,000 | 1.46% | 95,039 | 78,722 | 73,722 | 5,000 |
| Non-Performing | Fiesta Oak Valley (Oak Mesa Investors, LLC) | 6/15/04 | 20,500,000 | 0.05% | 9,500 | 333,015 | - | 333,015 |
| Non-Performing | Fiesta USA/Stoneridge (Capital Land Investors, LLC) | 9/22/03 | 10,000,000 | 0.00% | - | 212,526 | - | 212,526 |
| Non-Performing | Foxhill 216, LLC | 2/23/06 | 25,980,000 | 0.10% | 25,000 | 112,047 | 52,122 | 59,926 |
| Non-Performing | Franklin - Stratford Investments, LLC | 3/30/05 | 5,225,000 | 100.00% | 5,225,000 | 29,222 | 25,845 | 3,377 |
| Non-Performing | Gateway Stone (Gateway Stone Associates, LLC) | 11/18/05 | 13,185,000 | 0.76% | 100,000 | 61,677 | 28,423 | 33,254 |
| Performing | Goss Road (Savannah Homes, LLC) | 11/2/04 | 1,000,000 | 0.25% | 2,500 | 3,333 | 3,333 | (0) |
| Non-Performing | Gramercy Court Condos (Gramercy Court, Ltd.) | 6/25/04 | 34,884,500 | 13.10% | 4,570,500 | 151,312 | 42,293 | 109,018 |
| Non-Performing | Harbor Georgetown, L.L.C. | 8/16/04 | 8,800,000 | 5.80% | 510,000 | 155,600 | 112,602 | 42,998 |
| Non-Performing | Hasley Canyon (Los Valles Land & Golf, LLC.) | 3/3/04 | 11,700,000 | 0.00% | - | 259,392 | 161,699 | 97,694 |
| Performing | Hesperia II (Southern California Land Development, LLC) | 4/1/05 | 4,250,000 | 0.00% | - | 47,312 | 47,312 | (0) |
| Non-Performing | HFA- Clear Lake LLC | 1/6/05 | 16,050,000 | 0.88% | 141,000 | 230,499 | - | 230,499 |
| Non-Performing | HFA- Windham (HFAH Asylum, LLC) | 11/15/04 | 5,550,000 | 0.00% | - | 86,636 | - | 86,636 |
| Non-Performing | HFA-Clear Lake 2nd (HFAH Clear Lake, LLC) | 6/24/05 | 2,750,000 | 0.29% | 8,000 | 27,014 | - | 27,014 |
| Non-Performing | HFAH/Monaco, LLC | 12/19/03 | 4,000,000 | 100.00% | 4,000,000 | 100,322 | - | 100,322 |
| Non-Performing | Huntsville (West Hills Park Joint Venture) | 3/31/04 | 10,475,000 | 10.73% | 1,124,000 | 159,961 | 95,827 | 64,133 |
| Performing | I-40 Gateway West, LLC | 1/11/05 | 4,530,000 | 0.00% | - | 15,100 | 15,100 | 0 |
| Performing | I-40 Gateway West, LLC 2nd | 3/1/06 | 1,065,000 | 0.00% | - | 3,493 | 830 | 2,663 |
| Non-Performing | Interstate Commerce Center Phase II (ISCC Phase II, LLC) | 8/11/04 | 1,856,849 | 100.00% | 1,856,849 | 6,757 | - | 6,757 |
| Performing | La Hacienda Estate, LLC | 11/11/04 | 6,255,000 | 0.80% | 50,000 | 20,390 | 20,311 | 79 |
| Non-Performing | Lake Helen Partners | 12/7/04 | 3,159,704 | 35.76% | 1,129,948 | 34,564 | 22,687 | 11,878 |
| Non-Performing | Lerin Hills, LTD | 12/7/05 | 10,350,000 | 0.00% | - | 34,284 | 25,545 | 8,738 |
| Non-Performing | Margarita Annex | 7/26/04 | 12,000,000 | 24.42% | 2,930,000 | 228,338 | 197,759 | 30,579 |
| Non-Performing | Marlton Square (MS Acquisition Company, LLC) | 8/11/05 | 30,000,000 | 1.29% | 385,500 | 266,255 | 166,673 | 99,582 |

STRICTLY CONFIDENTIAL

# EXHIBIT B

| Performance | Loan Name | Origination Date | 7/31/06 Loan Outstanding | Funds Interest % | Funds Interest $ | Fees Accrued | Fees Paid | Net Unpaid |
|---|---|---|---|---|---|---|---|---|
| Non-Performing | Marlton Square 2nd (MS Acquisition Company, LLC) | 8/11/05 | 6,000,000 | 0.00% | - | 36,140 | 15,690 | 20,450 |
| Non-Performing | Marquis Hotel (USA Investors VI, LLC) | 3/29/05 | 13,500,000 | 0.71% | 96,000 | 231,741 | - | 231,741 |
| Non-Performing | Meadow Creek Partners, LLC | 2/23/06 | 8,250,000 | 0.87% | 72,000 | 22,482 | 15,607 | 6,875 |
| Performing | Mountain House Business Park (Pegasus-MH Ventures I, LLC) | 6/10/04 | 16,800,000 | 5.67% | 953,000 | 217,108 | 217,108 | (0) |
| Non-Performing | Oak Shores II (John E. King and Carole D. King) | 6/6/05 | 12,150,000 | 0.10% | 11,877 | 123,746 | 113,705 | 10,042 |
| Non-Performing | Ocean Atlantic $9,425,000 (Ocean Atlantic Chicago, LLC) | 1/23/06 | 8,925,000 | 14.61% | 1,303,500 | 9,000 | 6,750 | 2,250 |
| Performing | Ocean Atlantic (Ocean Atlantic/PFG-Westbury, LLC) | 11/1/05 | 2,700,000 | 0.00% | - | 33,531 | 11,184 | 22,347 |
| Non-Performing | Palm Harbor One, LLC | 12/14/05 | 28,480,000 | 5.60% | 1,594,000 | 162,395 | 98,045 | 64,349 |
| Non-Performing | Placer Vineyards (Placer County Land Speculators, LLC) | 12/10/04 | 31,500,000 | 0.00% | - | 207,549 | 81 | 207,468 |
| Non-Performing | Placer Vineyards 2nd (Placer County Land Speculators, LLC) | 12/10/04 | 6,500,000 | 0.00% | - | 38,903 | - | 38,903 |
| Performing | Preserve at Galleria, LLC | 10/6/05 | 3,711,750 | 0.11% | 3,988 | 14,643 | 14,643 | (0) |
| Performing | Redwood Properties, LLC | 11/15/05 | 269,641 | 100.00% | 269,641 | 1,844 | - | 1,844 |
| Non-Performing | Rio Rancho Executive Plaza, LLC | 1/17/06 | 2,250,000 | 3.11% | 70,000 | 8,602 | 4,880 | 3,722 |
| Non-Performing | Shamrock Tower, LP (619 Main. LP) | 8/5/04 | 10,500,000 | 31.43% | 3,300,000 | 161,095 | - | 161,095 |
| Non-Performing | Slade Development, Inc. | 12/5/05 | 3,525,000 | 1.42% | 50,000 | 16,204 | 11,823 | 4,381 |
| Performing | Southern California Land 2nd (Southern California Land Development, LLC) | 8/3/05 | 2,800,000 | 1.25% | 35,000 | 23,565 | 23,565 | (0) |
| Non-Performing | Standard Property Development, LLC | 2/27/06 | 9,640,000 | 6.96% | 671,000 | 35,175 | 27,141 | 8,033 |
| Performing | SVRB $4,500,000 (SVRB Investments, LLC) | 4/27/05 | 1,424,082 | 0.00% | - | 25,772 | 24,925 | 847 |
| Performing | SVRB 2nd $2,325,000 (SVRB Investments, LLC) | 4/27/05 | 2,325,000 | 0.00% | - | 25,448 | 23,511 | 1,938 |
| Non-Performing | Tapia Ranch (Castiac Partners, LLC) | 9/28/04 | 22,000,000 | 1.43% | 314,000 | 233,291 | 130,582 | 102,709 |
| Non-Performing | Ten-Ninety, Ltd./$4,150,000 | 12/30/02 | 4,150,000 | 20.48% | 850,000 | - | - | - |
| Non-Performing | The Gardens Phase II (The Gardens, LLC) | 3/31/06 | 2,500,000 | 100.00% | 2,500,000 | 5,964 | - | 5,964 |
| Performing | The Gardens, LLC $2,425,000 (The Gardens, LLC) | 8/15/05 | 1,925,000 | 5.53% | 106,371 | 21,613 | 21,572 | 42 |
| Performing | The Gardens, LLC Timeshare (The Gardens, LLC) | 3/24/04 | 3,902,274 | 36.47% | 1,422,984 | 34,553 | 30,571 | 3,982 |
| Performing | University Estates. Inc. | 4/11/05 | 4,825,920 | 100.00% | 4,825,920 | 15,939 | 15,939 | 0 |
| Non- | Wasco Investments LLC | 11/23/04 | 6,450,000 | 3.02% | 195,000 | 74,552 | 25,587 | 48,965 |
| | Total | | 704,875,862 | | 69,338,465 | 6,835,095 | 3,650,780 | 3,184,315 |

STRICTLY CONFIDENTIAL

# EXHIBIT C

| Performance | Loan Name | 7/31/06 Loan Outstanding | Funds Interest % | Funds Interest $ |
|---|---|---|---|---|
| Performing | Cloudbreak LV (Cloudbreak Las Vegas, LLC) | 3,800,000 | 99.31% | 3,773,675 |
| Performing | Cottonwood Hills, LLC | 4,000,000 | 25.00% | 1,000,000 |
| Performing | The Gardens, LLC $2,425,000 (The Gardens, LLC) | 1,925,000 | 1.52% | 29,226 |
| Non-Performing | Brookmere/Matteson $27,050,000 | 5,964,848 | 33.88% | 2,021,085 |
| Non-Performing | Wasco Investments LLC | 6,450,000 | 3.02% | 195,000 |
| Non-Performing | Franklin - Stratford Investments, LLC | 5,225,000 | 80.67% | 4,215,000 |
| Non-Performing | Interstate Commerce Center Phase II (ISCC Phase II, LLC) | 1,856,849 | 86.34% | 1,603,204 |
| Non-Performing | Meadow Creek Partners, LLC | 8,250,000 | 0.87% | 72,000 |
| Performing | Bay Pompano Beach, LLC | 14,680,390 | 1.20% | 176,623 |
| Non-Performing | Clear Creek Plantation (Arapahoe Land Investments, L.P.) | 2,900,000 | 3.45% | 100,000 |
| | **Total** | 55,052,087 | | 13,185,812 |

STRICTLY CONFIDENTIAL

# EXHIBIT D

| Performance | Loan Name | 7/31/06 Loan Outstanding | Funds Interest % | $ |
|---|---|---|---|---|
| Non-Performing | Oak Shores II  (John E. King and Carole D. King) | 12,150,000 | 0.03% | 3,925 |
| Performing | J. Jireh's Corporation | 8,825,000 | 3.00% | 265,000 |
| Non-Performing | Margarita Annex | 12,000,000 | 24.42% | 2,930,000 |
| Non-Performing | Binford Medical Developers, LLC | 7,450,000 | 17.25% | 1,285,000 |
| Non-Performing | Shamrock Tower, LP (619 Main. LP) | 10,500,000 | 31.43% | 3,300,000 |
| Non-Performing | Marlton Square (MS Acquisition Company, LLC) | 30,000,000 | 0.39% | 118,000 |
| Non-Performing | Del Valle - Livingston (Del Valle Capital Corporation, Inc) | 19,250,000 | 0.67% | 129,000 |
| | **Total** | 100,175,000 | | 8,030,925 |

STRICTLY CONFIDENTIAL

# EXHIBIT E

| Performance | Loan Name | 7/31/06 Loan Outstanding | Funds Interest % | Funds Interest $ |
|---|---|---|---|---|
| Non-Performing | Gramercy Court Condos (Gramercy Court, Ltd.) | 34,884,500 | 13.10% | 4,570,500 |
| Performing | Fiesta Development $6.6 (Fiesta Development, Inc.) | 6,600,000 | 100.00% | 6,600,000 |
| Non-Performing | HFAH/Monaco, LLC | 4,000,000 | 100.00% | 4,000,000 |
| Non-Performing | Gateway Stone (Gateway Stone Associates, LLC) | 13,185,000 | 0.76% | 100,000 |
| Non-Performing | Rio Rancho Executive Plaza, LLC | 2,250,000 | 3.11% | 70,000 |
| Performing | The Gardens, LLC Timeshare  (The Gardens, LLC) | 3,902,274 | 31.03% | 1,211,050 |
| Non-Performing | Standard Property Development, LLC | 9,640,000 | 6.96% | 671,000 |
| Non-Performing | ComVest Capital  (Comvest Capital Satellite Arms, Inc) | 4,125,000 | 17.82% | 735,000 |
| Performing | Roam Development Group L.P. | 25,801,735 | 2.37% | 605,688 |
| Performing | Columbia Managing Partners, LLC | 2,210,000 | 100.00% | 2,210,000 |
| Non-Performing | Elizabeth May Real Estate, LLC | 10,050,000 | 1.19% | 120,000 |
|  | Total | 116,448,509 |  | 20,893,239 |

STRICTLY CONFIDENTIAL

# EXHIBIT F

| Performance | Loan Name | 7/31/06 Loan Outstanding | Funds Interest % | Funds Interest $ |
|---|---|---|---|---|
| Non-Performing | Anchor B, LLC | 5,835,422 | 33.36% | 1,946,422 |
| Non-Performing | 3685 San Fernando Road Partners, L.P. | 7,350,000 | 1.12% | 82,000 |
| Non-Performing | 6425 Gess, LTD | 26,500,000 | 2.63% | 696,000 |
| Non-Performing | Ocean Atlantic $9,425,000 (Ocean Atlantic Chicago, LLC) | 8,925,000 | 14.61% | 1,303,500 |
| Non-Performing | Urban Housing Alliance - 435 Lofts  (Urban Housing Alliance, LLC) | 8,150,000 | 0.37% | 30,000 |
| Performing | Mountain House Business Park (Pegasus-MH Ventures I, LLC) | 16,800,000 | 5.21% | 875,000 |
| Performing | University Estates,  Inc. | 4,825,920 | 100.00% | 4,825,920 |
| Non-Performing | Palm Harbor One, LLC | 28,480,000 | 5.60% | 1,594,000 |
| Non-Performing | The Gardens Phase II  (The Gardens, LLC) | 2,500,000 | 100.00% | 2,500,000 |
| Non-Performing | Lake Helen Partners | 3,159,704 | 28.77% | 908,908 |
| Non-Performing | Castaic Partners II, LLC | 5,600,000 | 7.59% | 425,000 |
| Non-Performing | Castaic Partners III, LLC | 4,675,000 | 0.53% | 25,000 |
| Non-Performing | Huntsville (West Hills Park Joint Venture) | 10,475,000 | 4.77% | 500,000 |
| Non-Performing | Harbor Georgetown, L.L.C. | 8,800,000 | 5.80% | 510,000 |
| Non-Performing | Amesbury/Hatters Point (Amesburyport Corporation) | 19,242,193 | 1.72% | 330,016 |
| Non-Performing | Tapia Ranch (Castaic Partners, LLC) | 22,000,000 | 1.43% | 314,000 |
| Non-Performing | Foxhill 216, LLC | 25,980,000 | 0.10% | 25,000 |
| Non-Performing | Eagle Meadows Development | 31,050,000 | 11.76% | 3,652,000 |
|  | **Total** | **240,348,239** |  | **20,542,766** |

STRICTLY CONFIDENTIAL

SILVER POINT CAPITAL

Mr. Thomas J. Allison
USA Commercial Mortgage Company
USA Capital Realty Advisors, LLC,
USA Capital Diversified Trust Deed Fund, LLC
USA Capital First Trust Deed Fund, LLC
USA Securities, LLC 1

September 11, 2006

Dear Mr. Allison:

USA Commercial Mortgage Company ("Commercial Mortgage") and certain of its affiliates, including but not limited to USA Capital Diversified Trust Deed Fund, LLC ("Diversified Trust Deed Fund") and USA Capital First Trust Deed Fund, LLC ("First Trust Deed Fund"), are debtors in bankruptcy cases pending in the United States Bankruptcy Court for the District of Nevada (collectively, the "Debtors"), and are loan servicers for approximately 100 commercial loans (each, a "Serviced Loan"), to various borrowers (each a "Borrower," and collectively, the "Borrowers"). The Debtors, and certain direct investors (the "Lenders") also own interests in many of the Serviced Loans (each of the Serviced Loans and servicing arrangements individually listed on Exhibits A and B hereto is an "Asset" and, collectively, they all are "Assets").

SPCP Group, LLC, on behalf of certain of its affiliated investment funds ("Silver Point"), is willing to acquire substantially all of the Assets on the terms stated in this offer letter (the "Offer Letter"). Silver Point has consented to your request to structure its proposed acquisition of the Assets such that it can be consummated through a confirmed plan of reorganization to be proposed by the Debtors (the "Plan"), subject to the terms stated herein.

      1.     Acquisition of Assets. Based upon the information provided to us to date, and subject to the terms herein, Silver Point will acquire the Assets, effective as of July 31, 2006 (the "Cut-Off Date"), for cash consideration of $46,500,000 and other consideration set forth in this Offer Letter (the "Total Asset Purchase Price").

      (a).    Allocation of Purchase Price. We have considered your request to split the Total Asset Purchase Price into several components, with one possible allocation being noted in Sections "b" through "c" below (the Debtors' Agreed Allocation). This possible allocation of the Total Asset Purchase Price is provided at your request, without our expressing any opinion with regard to its accuracy, propriety or reasonableness:

      (b).    First Trust Deed Fund Assets. All Assets owned by First Trust Deed Fund, to the extent of First Trust Deed Fund's ownership interest in the Assets, as listed on Exhibit A hereto, for cash consideration of $46,500,000, as adjusted pursuant to paragraph 2 (the "First Trust Deed Fund Price").

      (c).    Commercial Mortgage Assets. All servicing agreements and related contracts (which will be purchased by an affiliate of Silver Point) for all of the Serviced Loans (each a "Service Agreement") owned by Commercial Mortgage, as listed in Exhibit B hereto, and rights thereunder after the Closing Date as more fully set forth in this Offer Letter, and all personal property necessary for enforcement of Service Agreements, including, without limitation, all servicing and investor records, databases, and servicing and reporting software and equipment

SILVER POINT CAPITAL

(collectively, the "Personal Property") in consideration of the sum of (i) 50% of the first $1,000,000 collected by Silver Point pursuant to ¶ 5(a) of the applicable Service Agreement, as provided in ¶ 4(b) of this Offer Letter, following reimbursement of all expenses incurred by Silver Point in connection with such enforcement efforts (with such amount to be reduced by the ratio of outstanding principal balance at closing of any Serviced Loans for which Service Agreements are excluded from this transfer by agreement among Silver Point and the Debtors, over the outstanding principal balance of Serviced Loans for which Service Agreements are actually transferred), (ii) 50% of the first $100,000 collected of default rate interest accrued on the First Trust Deed Fund Assets as of the Closing Date, plus (iii) the payments and obligations set forth in this Offer Letter ("Commercial Mortgage Price."). The Service Agreements shall be transferred to Silver Point in a manner mutually agreed upon among the Debtors and Silver Point.

The proposed Total Asset Purchase Price shall be valid only with regard to all Assets, as a whole, and is not separable to any extent. The foregoing allocations of the Total Asset Purchase Price may be adjusted at your, or our, discretion solely for Silver Point's purposes; provided that any adjustment will have no effect on the Total Purchase Price or on the Debtors' Agreed Allocations, unless otherwise agreed to by the Debtors and each of the Committees.

2.    Adjustments to Purchase Price. The sum of the First Trust Deed Fund Price and the Commercial Mortgage Price equals the Total Asset Purchase Price listed above. The First Trust Deed Fund Price shall be further reduced by all payments of principal received by the Debtors after the Cut-Off Date to the extent any such principal payments are related to the First Trust Deed Fund Assets, in accordance with the following schedule:

For an Asset listed on Exhibit C, 95% of any principal payments received by the Debtors after the Cut-Off Date.

For an Asset Listed on Exhibit D, 85% of any principal payments received by the Debtors after the Cut-Off Date.

For an Asset listed on Exhibit E, 80% of any principal payments received by the Debtors after the Cut-Off Date.

For an Asset listed on Exhibit F, 65% of any principal payments received by the Debtors after the Cut-Off Date.

Silver Point shall have no interest in any payments collected after the Cut-Off Date and before the Closing Date that are proceeds of the First Trust Deed Assets for interest that has accrued prior to the Closing Date. Silver Point shall receive and retain all accrued interest collected after the Closing Date that are proceeds of the First Trust Deed Assets including without limitation First Trust Deed Fund's accrued default rate interest.

3.    Fees Payable to Commercial Mortgage. After the Closing Date, Silver Point will collect and pay over to Commercial Mortgage (or its successor or assignee under the Plan), in accordance with the disbursement priorities stated in ¶ 4 below:

(a)    all servicing fees and servicer advances accrued, but unpaid, as of the Closing Date ("Accrued Servicing Fees"),

(b)    all late charges and default interest due, but unpaid, from Borrowers as of the Closing Date; provided, however, that Silver Point shall retain any and all proportionate default

SILVER POINT CAPITAL

interest in respect of and to the extent of Silver Point's interest in the First Trust Deed Fund Assets acquired by it ("Late Charges");

(c)     all exit fees, extension fees, deferred origination fees and other fees due to Commercial Mortgage pursuant to and as defined in the current documentation relating to each of the Serviced Loans whether accrued before or accruing after the Closing Date (the "Success Fees"); and

(d)     all proceeds of all Serviced Loans and Serviced Loan participations and related receivables owed to Commercial Mortgage, to the extent of Commercial Mortgage's interest therein, as set forth in Exhibit C hereto, pursuant to the terms of a Service Agreement in form substantially identical to the form of Service Agreement executed by Commercial Mortgage and Lenders before the bankruptcy filing;

4.     Distribution of Collected Money.  With respect to all servicing fees and other fees and sums due the loan servicer under any of the Service Agreements transferred to Silver Point on and after the Closing Date, such fees and sums shall be distributed in the following order, calculated on a loan by loan basis:

(a)     First, Silver Point shall be reimbursed for sums advanced under ¶ 4 of the applicable Service Agreement(s);

(b)     Second, Silver Point shall retain fees due under ¶ 5(a) of the applicable Service Agreement(s) for post-closing months;

(c)     Third, all other sums due under ¶ 5(b) of the applicable Service Agreement(s) shall be paid, to Silver Point if accrued on or after the Closing Date, or to Commercial Mortgage (or its successor or assignee under the Plan) if accrued prior to the Closing Date;

(d)     Fourth, all other sums due under ¶ 5(c) of the applicable Service Agreement(s) shall be paid, to Silver Point if accrued on or after the Closing Date, or to Commercial Mortgage (or its successor or assignee under the Plan) if accrued prior to the Closing Date, provided, however, that, subject to paragraph 1(c)(ii), all such sums payable in respect of First Trust Deed Fund Assets shall be paid to and retained by Silver Point; and

(e)     Fifth, all fees due under ¶ 5(a) of the applicable Service Agreement(s) for pre-closing months and all sums advanced or deemed advanced under ¶ 4 or any other provision of the applicable Service Agreement(s) before the Closing Date shall be paid to Commercial Mortgage (or its successor or assignee under the Plan).

Silver Point shall hold all sums collected and due to Commercial Mortgage in accordance with this paragraph in trust until paid.

5.     Compromises with Borrowers.  On and after the Closing Date, Silver Point shall have full authority to take any actions it deems appropriate as allowed under the applicable Service Agreement(s) and to enforce its rights in respect of the Assets, except as otherwise provided in this paragraph.  Silver Point may forgive the payment of Success Fees, in whole or in part:

(a)     notwithstanding any other provision herein, at its sole discretion for loans in which it owns a majority interest acquired as part of the First Trust Deed Fund Assets;

SILVER POINT CAPITAL

(b)     notwithstanding any other provision herein, at its sole discretion, after not less than ten (10) days' prior written notice to Commercial Mortgage (or its successor or assignee under the Plan), if, either after realization of the collateral securing a Serviced Loan, whether through foreclosure, deed in lieu, or otherwise, and exhaustion of such other remedies against the Borrower or any guarantor of the Serviced Loan that Silver Point in its reasonable discretion determines are viable and economically prudent, there remains an unsecured deficiency in respect of such Serviced Loan or, after realization of the collateral securing a Serviced Loan, whether through foreclosure, deed in lieu, or otherwise, Silver Point determines the Borrower (and any guarantor) lacks the reasonable ability to pay all or part of such Success Fees;

(c)     except pursuant to ¶¶ 5(a) and 5(b) of this Offer Letter, to which this clause expressly shall not apply, if it receives any amounts payable under ¶ 5(c) of the Service Agreement, with the prior written consent of Commercial Mortgage (or its successor or assign under the Plan), which consent shall not be unreasonably withheld (the failure to reply to a request by Silver Point for such consent within ten (10) days of the date of such request shall be deemed to be a consent); or

(d)     if Silver Point does not receive any amounts due under ¶ 5(c) of the Service Agreement, then, in its discretion, after not less than ten (10) days' prior written notice to Commercial Mortgage (or its successor or assignee under the Plan), Silver Point may forgive or reduce the payment of any Success Fees in the following circumstances:

(i).     where a Borrower (and any guarantor) is otherwise ready and able to fully pay off a Serviced Loan except for amounts due under ¶ 5(c) of the Service Agreement and Silver Point determines the Borrower (and any guarantor) lacks the reasonable ability to pay all or part of such Success Fees; or

(ii).     where a Borrower is otherwise ready and able only to pay off a Serviced Loan at a discount from its then principal balance, or at a discount of accrued and unpaid interest, and the Lenders have agreed to such compromise payment to satisfy the Borrowers' obligation, and Silver Point determines the Borrower (and any guarantor) lacks the reasonable ability to pay all or part of such Success Fees.

6.     Causes of Action Against Insiders.  As to Assets purchased from First Trust Deed Fund or Commercial Mortgage, other than the right to pursue personal guaranties of any of the Serviced Loans guaranteed by an insider of the Debtors, Silver Point is not through the transactions described in this Offer Letter acquiring any other claim or cause of action against an insider of any of the Debtors or against another Debtor.  Further, if Silver Point obtains a judgment in respect of any personal guaranty of any Serviced Loan by an insider of the Debtors, Silver Point will negotiate in good faith in an effort to reach an equitable agreement to do so in conjunction with any litigation by Commercial Mortgage (or its successor or assignee under a Plan) in a manner that will not impair Silver Point's ultimate economic realization in respect of its Assets purchased pursuant to the terms of this Offer Letter or otherwise or its obligations under the Service Agreements, but also will not impair any recovery or litigation efforts undertaken by any of the Debtors (or their successors or assigns under a Plan) in respect of other liability claims or causes of action that they are then prosecuting or may in the future prosecute against such insider.

7.     Causes of Action Against Debtors.  Silver Point further agrees that it will not prosecute any action against any of the Debtors arising out of or relating to the acquired Assets and arising out of any event occurring before the Closing Date.  For the avoidance of doubt, the

SILVER POINT CAPITAL

foregoing agreement shall not apply to any asset acquired by Silver Point other than pursuant to this Offer Letter. Silver Point further agrees to be bound by any applicable provisions contained in a confirmed Plan, and by any applicable Orders entered by the Bankruptcy Court following the Closing Date.

8.    Lenders.  Upon confirmation of the Plan, in compliance with the terms herein, and upon written request by any Lender for Silver Point to acquire the ownership interest that such Lender has in any of the Serviced Loans, Silver Point may, in its discretion, negotiate with such Lender, in an effort to reach a mutually agreeable purchase price to acquire the Lender's ownership interest in such Serviced Loans.

9.    Asset Transfer Through a Plan.    Subject to the terms herein, and to documentation that is in all respects mutually acceptable to Silver Point and the Debtors with respect to the subject matter of this Offer Letter, Silver Point is willing to acquire the Assets through a Plan to be proposed by the Debtors, provided, however, that the Plan must satisfy all applicable Additional Conditions listed in paragraph 10 below.

10.    Additional Conditions.  In addition to the foregoing, Silver Point's willingness to acquire the Assets is subject to the following conditions:

(a)    Transfer Agreement.  Silver Point's willingness to acquire the Assets is subject to the parties entering into a transfer agreement ("Agreement") and ancillary and related documents with respect to the Assets, containing terms and provisions mutually acceptable to the parties. This Agreement shall be incorporated into a Plan, subject to the terms herein.

The Agreement shall contain reasonable and customary provisions for the transfer of assets in a bankruptcy case, and must be consistent with the terms of this Offer Letter and the nature of the Assets to be acquired by Silver Point. As of the Closing Date, there shall be no litigation or injunction preventing, hindering or delaying the consummation of the transactions contemplated herein, or impairing the Assets. Any liability for disgorgement claims arising prior to the closing of the transaction contemplated hereby will be retained by the Debtors.

(b)    Bankruptcy Court Process:  Silver Point is willing to acquire the Assets through a Plan process, subject to the terms herein, provided that, within ten (10) days following acceptance of this Offer Letter, the Debtors shall file a motion seeking Bankruptcy Court approval of certain bidding procedures on terms that are reasonably acceptable to Silver Point (the "Bid Procedures Motion"), including, without limitation, the following: (a) scheduling an auction (the "Auction") for a sale and/or assignment or transfer of the Assets; (b) appointing Silver Point as the Stalking Horse Bidder; (c) approving certain bidding procedures, including, without limitation: (i) approving a break-up fee in an amount equal to $1,500,000 (the "Break-Up Fee"), which Break-Up Fee shall be payable only pursuant to the terms herein or in the event that any party other than Silver Point ultimately acquires the Assets for greater than the Total Asset Purchase Price plus the Minimum Incremental Overbid in the Auction process, and if payable, the Break-Up Fee shall be reduced by any expense reimbursement actually paid to Silver Point, which expense reimbursement shall be limited to a maximum amount of actual and reasonable expenses incurred by Silver Point up to $500,000 (the "Expense Reimbursement") (at the Debtors' option, by agreement of all of the Debtors, or pursuant to Order of the Bankruptcy Court, the obligation to pay the Break-Up Fee and/or the Expense Reimbursement may be apportioned among two or more of the Debtors), (ii) establishing an initial minimum incremental overbid (which is in excess of the Break-Up Fee) (the "Minimum Incremental Overbid") and the additional overbid amounts, both of which must be mutually acceptable to the Debtors and Silver Point, (iii) requiring that all

SILVER POINT CAPITAL

bids must be substantially similar to the form of the Agreement that is executed by and between the Debtors and Silver Point, provided that a bid may be submitted by two or more parties acting collectively to submit a bid for substantially all of the Assets, (iv) requiring that the cash consideration must, subject to the establishment of the minimum incremental overbid, be in excess of cash component of the Total Asset Purchase Price plus the minimum incremental overbid, (v) requiring a cash deposit of $2,325,000, and (vi) requiring that qualified overbids be submitted at least seven (7) days prior to the Auction. Debtors shall promptly schedule a hearing on the Bid Procedures Motion; provided, however, that no such hearing shall take place until (i) the Debtors and Silver Point have executed an Agreement and (ii) Silver Point has concluded its final due diligence as set forth in paragraph 10(c) below. The order granting the Bid Procedures Motion shall be referred to herein as the "Break-Up Fee Order."

As provided in paragraph 10(c) below, Silver Point will complete its final due diligence no later than the date of the initial hearing on the Bid Procedures Motion. As a condition precedent to Silver Point's continued obligation to perform pursuant to this Offer Letter, the Break-Up Fee Order must become a final, non-appealable Order of the Bankruptcy Court by no later than fifty-five (55) days following Debtors' acceptance of this Offer Letter. For the avoidance of doubt, notwithstanding any other provision herein, if the Break-Up Fee Order is not a final, non-appealable Order of the Bankruptcy Court by no later than fifty-five (55) days following Debtors' acceptance of this Offer Letter, then, unless waived by Silver Point in writing on or prior to the fifty-fifth day following the Debtors' acceptance of this Offer Letter, Silver Point shall be deemed to have rescinded this Offer Letter, and it will be of no further force or effect. In the event of a rescission of this Offer Letter by Silver Point pursuant to the terms of this paragraph, no Break-Up Fee, including no Expense Reimbursement, shall be paid to Silver Point and none will be provided for in the Break-Up Fee Order.

(i)     Plan: Subject to the terms herein, the Debtors shall transfer the Assets, including the Service Agreements, to the successful bidder at the Auction pursuant to a confirmed Plan. Within 30 days following the acceptance of the Offer Letter, the Debtors shall file a Plan and an accompanying Disclosure Statement, both in form and content mutually acceptable to the Debtors and Silver Point and consistent with the provisions of this Offer Letter, as such may be modified through further negotiations between the parties hereto. The Plan must seek Bankruptcy Code § 363(m) protection for the acquirer, must provide for acquirer to be released and held harmless with regard to all existing liabilities in respect of the Assets, and must provide all other reasonable and customary protections for the acquirer.

The Debtors shall promptly schedule a hearing to seek approval of the Disclosure Statement by the Bankruptcy Court under 11 U.S.C. §1125, which hearing shall be held approximately 70 days following the acceptance of this Offer Letter.    Upon approval of the Disclosure Statement by the Bankruptcy Court under 11 U.S.C. § 1125, the Debtors shall promptly solicit acceptances and proceed to confirmation of the Plan. The hearing on the confirmation of the Plan shall be scheduled for no earlier than 7 days following the Auction.

Unless waived by Silver Point in writing on or prior to 120 days following the Due Diligence Completion Date, Silver Point shall be released from any further obligation to perform pursuant to this Offer Letter or the Plan in the event that the Plan is not confirmed by a final, non-appealable Order of the Bankruptcy Court within 120 days from the Due Diligence Completion Date (the "Outside Approval Date"). In such event and as long as Silver Point is not in breach of the Agreement at the Outside Approval Date, Silver Point shall be entitled solely to the Expense Reimbursement for actual and reasonable expenses incurred by Silver Point in connection with this transaction.

SILVER POINT CAPITAL

For the avoidance of doubt, if the Outside Approval Date passes and Silver Point is paid an amount in respect of Expense Reimbursement, the Debtors will nonetheless be required to pay the full Break-Up Fee to Silver Point, reduced only by the amount paid to Silver Point in respect of Expense Reimbursement, if within 9 months following the Outside Approval Date any portion of the Assets is transferred to any party for a payment equal to or greater than the Total Asset Purchase Price.  In the event that the Outside Approval Date passes and Silver Point has not waived compliance therewith, but it nonetheless thereafter acquires the Assets, then any Expense Reimbursement paid to Silver Point as a result of passage of the Outside Approval Date shall be repaid to the Debtors by Silver Point.

(c)    Due Diligence.  Silver Point has already conducted substantial due diligence of the Debtors' books and records with respect to the Assets, however, it requires additional time to complete its final due diligence.  Following acceptance by the Debtors of this Offer Letter, the Debtors shall provide Silver Point with reasonable access to the Debtors' books, records and personnel, Silver Point will use commercially reasonable efforts to complete its final due diligence review with respect to the Assets within 30 days of such acceptance, and it will in any event complete such final due diligence no later than the date of the initial hearing on the Bid Procedures Motion.  On the date Silver Point completes its final due diligence, Silver Point shall notify the Debtors in writing by electronic mail (the "Due Diligence Completion Date").  All of Silver Point's obligations pursuant to this Offer Letter shall be subject to Silver Point's satisfaction with the results of such final due diligence.  Final due diligence will include for each of the Assets, but will not be limited to: (i) confirmation of the performance and payment status of each Serviced Loan, and the performance and payment status of each Service Agreement, including non-Debtor contracting parties agreement; (ii) tax, title and UCC searches on all collateral; (iii) confirmation that the collateral appraised by Hilco Financial Services continues to be collateral with regard to each loan specified, in the same priority indicated in the Debtors' loan files, and that no liens have been released following the dates of applicable appraisals and title reports, except for loans paid in full before closing; and (iv) an environmental report with regard to each piece of real property that is in all respects satisfactory to Silver Point.  The cost of such due diligence shall be borne by Silver Point.  If at any time in the course of its final due diligence review, Silver Point determines that any Asset does not fully satisfy the foregoing criteria, then the Debtors and Silver Point will negotiate in good faith in an effort to agree on a reasonable reduction to the Total Asset Purchase Price.  If the parties cannot reach agreement on any such adjustment to the Total Asset Purchase Price, then Silver Point may, at its option, either (a) proceed with the transaction at the then-existing Total Asset Purchase Price, or (b) rescind this Offer Letter, and be released from any further obligation to perform pursuant to this Offer Letter or the Plan.

(d)    Conditions of Closing.  In addition to the usual conditions of closing of transfer of the Assets, which will be expressed in the Agreement, the following are conditions of closing on the transaction, which shall be waivable by Silver Point, in its sole discretion:

(i)    A title company of Silver Point's choosing shall, at closing, solely at Silver Point's expense, be ready, willing and able to issue acceptable policies or reports for the collateral securing the Serviced Loans, at Silver Point's cost, confirming that all of the Serviced Loans listed on Exhibit A are subject to fully perfected and secured first liens in favor of the applicable Lenders;

(ii)    Debtors shall have deposited with a mutually acceptable escrow agent all documents required under the Agreement;

SILVER POINT CAPITAL

(iii)    The Serviced Loans that have not been paid in full before the Closing Date are in full force and effect and no condition exists nor has any event occurred that by notice, the passage of time, or otherwise, could gives rise to an impediment to the enforcement of the Serviced Loans;

(iv)    The Plan and confirmation order or sale/assignment approval order shall be consistent with the terms of this Offer Letter and the Agreement, and the Service Agreements shall not be materially modified, by Order or otherwise, except as expressly agreed by Silver Point, provided, however, that this does not affect the rights of the Lenders to consent to modify under a Plan any rights not conveyed to Silver Point pursuant to this Offer Letter, so long as any such modification will not adversely affect Silver Point in any way;

(v)    The Plan and confirmation order or sale/assignment approval order shall provide for the transfer of the Service Agreements in a manner which does not create related claims under section 503(b) of the Bankruptcy Code provided that the Debtors may waive this condition in their sole discretion, so long as it does not otherwise affect any provision herein;

(vi)    Debtors have not released or otherwise terminated their security interest in all or any portion of the Assets from the Cut-Off Date through the Closing Date except as to (a) Serviced Loans that have been paid in full before the closing, or (b) partial releases and related reconveyances made by the Debtors pursuant to Court orders entered prior to the date of this Offer Letter;

(vii)    A material adverse change condition as mutually agreed upon by the parties, provided that if the parties should fail to reach an agreement on the terms of a material adverse change clause by no later than 10 days from the date of acceptance of this Offer Letter, then Silver Point shall be deemed to have rescinded this Offer Letter and it will be of no further force or effect.

11.    Miscellaneous.

(a).    Closing. For the avoidance of doubt, the transfers of Assets described throughout this Offer Letter shall be deemed to have closed solely upon an Order of the Bankruptcy Court transferring all Assets acquired by Silver Point pursuant hereto becoming a final, non-appealable Order, and each of the Assets actually being transferred to Silver Point consistent with the terms herein (the "Closing Date").

(b).    Additional Collection Actions. Prior to the Closing Date, Commercial Mortgage may assign to Silver Point, on terms mutually acceptable to Commercial Mortgage and Silver Point, for purposes of collection, certain accounts receivable and notes receivable.

(c).    Access to Documents. After the Closing Date, Silver Point will allow any of the Debtors or its successors or assignees under a confirmed Plan reasonable access to the Personal Property for all purposes, including original documents and files as needed.

(d).    Confidentiality. The proposals evidenced by this Offer Letter, and the Offer Letter itself, along with any information that Silver Point delivers in connection therewith, is confidential and, except as expressly required by applicable law, the Debtors shall not and shall not permit their representatives to, directly or indirectly, disclose, reveal, divulge, publish or otherwise make known the existence or any of the terms of this proposal to any person or entity without Silver Point's express written consent, provided, however, that Debtors may provide a

copy of this proposal to each of the official committees appointed in the Debtors' bankruptcy cases, and may discuss this proposal with each such committee, so long as such committee has executed a confidentiality agreement with Debtors that substantially conforms with the confidentiality provisions contained in this paragraph 10(e), and this proposal and all related information is transmitted to that committee subject to such confidentiality agreement; and provided, further, that upon their timely acceptance of this Offer Letter, the Debtors may make the Offer Letter and the terms hereof publicly available to the extent necessary to implement provisions herein.

(e).   **Counterparts.** This Offer Letter may be executed in two or more counterparts, each of which, when so executed and delivered, will be deemed to be an original, but all of which counterparts, taken together, will constitute one and the same instrument.

(f).   **Amendments.** This Offer Letter shall not be amended by either party without the express written consent of such other party.

(g).   **Termination.** Unless this Offer Letter is countersigned by the Debtors, and a copy of the countersigned Offer Letter is actually received by Silver Point on or before September 12, 2006 at 5:00 P.M. Eastern Daylight Time, this Offer Letter shall expire and be of no force or effect.

(h).   **No Modification.** Debtors agree that, from the first date listed below through the Closing Date in connection with transfer of the Assets to Silver Point, they shall not modify, alter, hypothecate, settle or compromise, all or any portion of the loan documents or obligations of any party thereunder in respect of any Asset, without the prior written consent of Silver Point.

(i).   **Venue; Governing Law.** This Offer Letter and the Agreement shall be governed by the laws of the State of New York, without regard to conflicts of law principles thereof (the "Governing Law Jurisdiction"). The United States Bankruptcy Court for the District of Nevada shall be the exclusive forum for the enforcement of the terms of this Offer Letter and the Agreement, in which case, the parties agree that, where applicable, such court will apply the laws of the Governing Law Jurisdiction, except where inconsistent with applicable bankruptcy law.

(j)   **Successors and Assigns.** References to any of the Debtors also is a reference to any successor or assign of such Debtor under the Plan or pursuant to an Order of the Bankruptcy Court.

12.   **Service Agreements.** Nothing contained in this Offer Letter, including but not limited to paragraphs 4, 5, and 6 herein, shall modify the obligations owed to the Lenders by the loan servicer or rights of the Lenders against the loan servicer (or the rights of the loan servicer against the Lenders) under the applicable Service Agreements and otherwise applicable law. Silver Point shall distribute any sums due to Lenders under any of the Service Agreements in accordance with the Service Agreements, as the same may be modified with the consent of the applicable Lenders, and with otherwise applicable law. Further, notwithstanding the foregoing, to the extent the Bankruptcy Court has entered an Order, including but not limited to an Order confirming a Plan, which interprets or enforces provisions of the Service Agreements or directs the distribution of payments under the Service Agreements or payments collected from Borrowers, Silver Point shall abide by the terms of such Order(s). If, as between the provisions of the Service Agreements and the Order(s) of the Bankruptcy Court, it is not clear to Silver Point how the sums collected shall be distributed, then Silver Point shall hold the sums payable to the Lender until Silver Point either receives joint direction from the Lender and Commercial

SILVER POINT CAPITAL

Mortgage (or its successor or assignee under the Plan) regarding disbursement of interest, or is directed by an order from a court of competent jurisdiction.  Nothing contained in this Offer Letter is intended to waive any defenses of the Lenders or of Commercial Mortgage (or its successor or assignee) under the Service Agreements.  For the avoidance of doubt, under no circumstance shall any pre-Closing Date liability assertable by any party attach to Silver Point, or to any Asset acquired by Silver Point pursuant to this Offer Letter, and the Order entered by the Bankruptcy Court transferring the Assets to Silver Point shall clearly so state.

[REMAINDER OF PAGE INTENTIONALLY BLANK – SIGNATURE PAGE FOLLOWS]

SILVER POINT CAPITAL

Very Truly Yours.

SPCP Group, LLC,
a Delaware limited liability company

Date: September ___, 2006

By:
Name:
Title:

Accepted:

Date: September ___, 2006

By:
Name:

Title:

Exhibit B1

SHAVER POINT CAPITAL

| Performance Evaluation | Loan Name | No of Investors | Origination Date | Loan Ownership Percentage | | | | Loan Amount |
|---|---|---|---|---|---|---|---|---|
| | | | | DTF | FHD | CM | Total Held by Investors | |
| Non-Performing | Anchusbury Hatters Point | 393 | 12/16/02 | 15.18% | 1.72% | 0.38% | 82.31% | 19,242,193 |
| Non-Performing | Huntsville | 146 | 3/31/04 | 5.96% | 4.77% | | 89.27% | 10,475,000 |
| Non-Performing | Lake Helen Partners | 45 | 12/7/04 | 7.26% | 27.56% | 0.90% | 64.28% | 3,159,704 |
| Performing | The Gardens, LLC-TimeShare | 51 | 3/24/04 | 5.43% | 31.03% | | 63.53% | 4,133,619 |
| Performing | HFA - Clear Lake | 267 | 1/6/05 | 0.88% | | | 98.81% | 16,050,000 |
| Performing | Bay Pompano Beach | 407 | 6/20/05 | 0.47% | 1.20% | | 98.33% | 14,748,415 |
| Performing | Mountain House Business Park | 202 | 6/10/04 | 0.30% | 5.24% | 0.13% | 94.33% | 16,800,000 |
| Non-Performing | Cloudbreak LV | 2 | 12/17/03 | 0.49% | 99.51% | | | 3,800,000 |
| Performing | Oak Shores II (John & Carole King) | 176 | 6/6/05 | 0.07% | 1.49% | | 98.44% | 12,150,000 |
| Non-Performing | Ten Ninety-Ltd-$4,150,000 | 48 | 12/30/02 | 20.48% | | | 79.52% | 4,150,000 |
| Performing | Interstate-Commerce Center-Phase II | 2 | 8/11/04 | 13.72% | 86.28% | | | 4,856,849 |
| Non-Performing | Ashby Financial-$7,200,000 | 73 | 5/3/04 | 2.08% | | | 97.92% | 7,200,000 |

SILVER POINT CAPITAL

TWO GREENWICH PLAZA, 1ST FLOOR, GREENWICH, CT 06830 • PHONE: (203) 542-4000 • Fax: (203) 542-4164