Bob L. Olson (Nevada Bar No. 3783)  Electronically Filed September 19, 2006
Anne M. Loraditch (Nevada Bar No. 8164)
BECKLEY SINGLETON, CHTD.
530 Las Vegas Boulevard South
Las Vegas, NV 89101
Telephone: (702) 385-3373
Facsimile: (702) 385-5024
Email:   bolson@beckleylaw.com; aloraditch@beckleylaw.com

Attorneys for the Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>                             Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>                             Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>                             Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725-LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>                             Debtor. | Date: October 19, 2006<br>Time: 9:30 a.m.<br>Place: Courtroom #1 |
| In re:<br>USA SECURITIES, LLC,<br>                             Debtor. | **DIVERSIFIED TRUST DEED FUND COMMITTEE'S OBJECTION TO PROOF OF CLAIM FILED BY PROSPECT HIGH INCOME FUND ET AL.** |
| Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA First Trust Deed Fund, LLC | (Affects indicated Debtors) |

{00316810;} - 1 -

The Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC (the "Diversified Fund Committee"), appointed in the chapter 11 case of USA Capital Diversified Trust Deed Fund, LLC ("Diversified"), by and through its counsel Beckley Singleton, Chtd.,[1] objects to the $20,000,000 Proof of Claim (the "Claim") filed by Prospect High Income Fund, ML CBO IV (Cayman), Ltd., Pamco Cayman, Ltd., Pam Capital Funding, L.P., Highland Crusader Fund, Ltd., PCMG Trading Partners XXIII, L.P. ("Highland Funds").

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

On June 7, 2006, the Highland Funds filed their Claim. A copy of the Claim is attached to the Declaration of Bob Olson as **Exhibit "1."**[2] The Claim was supported by the complaint Highland Funds filed on July 11, 2002 (the "Nevada Complaint") against Diversified.

Highland Funds allege that they hold $93,767,000 of bonds issued in connection with a $130,000,000 July 8, 1998, Indenture issued by Epic Resorts ("Epic") that was intended to be secured by a deed of trust against a leasehold on Indian land overseen by the Bureau of Indian Affairs ("BIA") near Palm Springs, California (the "Palm Springs Property"), and which is owned by Epic Resorts – Palm Springs Marquis Villas, LLC, ("Epic Palm Springs") a subsidiary of Epic. The Indenture Trustee failed to perfect its lien against the Palm Springs Property. Exhibit 1, Nevada Complaint, ¶¶ 10-11, 14-15, 21.

---

[1] Orrick, Herrington & Sutcliff, LLP, did not participate in the preparation of this Objection.

[2] All of the Exhibits described herein are attached to the Declaration of Bob Olson. All of the Exhibits are either published opinions or copies of papers filed in the Nevada Action, the Epic Bankruptcy and this case. This Court can and should take judicial notice of all of the Exhibits.

On June 26, 2000, Diversified loaned money to Epic that was secured by a deed of trust to the Palm Springs Property. Highland Funds alleges Diversified accepted this deed of trust with knowledge of Epic's contractual obligation to encumber the Palm Springs Property pursuant to the Indenture, as well as the Indenture's provisions that: (a) prohibited Epic from borrowing additional funds further encumbering its property; and (b) required Epic to perfect the Indenture Trustee's lien against the Palm Springs Property. Exhibit 1, Nevada Complaint, ¶¶ 13, 17 - 18, 20 – 22.

The Highland Funds allege they are entitled to a $14,000,000 judgment against Diversified for Tortious Interference, Conspiracy to Commit Tortious Interference and Aiding and Abetting a Tortious Interference. Exhibit 1, Nevada Complaint, ¶ 39 – 57.

Highland Funds, when asserting these Claims, ignore the fact that the Bank of New York ("BONY"), in its capacity as successor trustee under the Indenture, and while acting on behalf and for the benefit of the Highland Funds and the other bondholders, filed an adversary proceeding against Diversified and Epic Palm Springs in the Epic Bankruptcy (the "BONY Adversary Proceeding"), wherein it sought to impose an equitable lien against the Palm Springs Property and equitably subordinate Diversified's claim to that of the bondholders including the Highland Funds because of the same actions complained of in the Nevada Complaint. Diversified prevailed in the BONY Adversary Proceeding. *See In re Epic Capital Corporation*, 290 B.R. 514 (Bankr. D. Del. 2003)(hereinafter "*Epic I*") (**Exhibit "2"**); and *In re Epic Capital Corporation*, 307 B.R. 767 (D.Del. 2004)(hereinafter "*Epic II*") (**Exhibit "3"**).

BONY clearly acted on behalf of the Highland Funds in the Epic Bankruptcy and the BONY Adversary Proceeding. Thus, Highland Funds' Claim should be disallowed in its entirety because it is barred under the doctrines of res judicata, claim preclusion, collateral estoppel and

issue preclusion and Highland Funds are not entitled to any relief they request in the Nevada Complaint.

## II.

## STATEMENT OF FACTS

### A. THE INDENTURE

Epic is a holding company that, through subsidiaries including Epic Palm Springs (collectively "Epic"), owned and operated vacation resorts. Epic Palm Springs owned the Palm Springs Property that was located on land administered by the BIA. *Epic 1,* at 517-18.

On July 8, 1998, Epic issued a $130,000,000 Indenture to which BONY was the trustee. *See* **Exhibit "4"**. Highland Funds held the majority of the bonds. The Indenture provided that Epic would grant BONY a deed of trust against the Palm Springs Property after obtaining BIA consent, which consent was to be obtained within sixty days after closing. BIA's consent was never obtained and the deed of trust to the Palm Springs Property was never delivered to BONY. *Id.* at 518.

### B. THE DIVERSIFIED LOAN TO EPIC

In June 2000, Epic Palm Springs approached Diversified to borrow additional funds. During the negotiations, Epic Palm Springs represented that the Palm Springs Property was unencumbered. Diversified verified this by examining the title to the Palm Springs Property and obtaining an opinion letter from counsel stating that the Palm Springs Property was unencumbered and that taking a security interest in the Palm Springs Property would not violate the Indenture. On June 22, 2000, BIA consented to the security interest being granted to Diversified and four days later Diversified loaned $11,500,000 to Epic Palm Springs secured by the Palm Springs Property. Diversified perfected its security interest on July 5, 2000. *Id.*

### C. THE EPIC BANKRUPTCY

Due to defaults under the Indenture, the Highland Funds filed an involuntary bankruptcy proceeding against Epic on July 19, 2001, and against Epic Palm Springs on November 9, 2001. *Id.* at 518-19.

Diversified sought relief from the stay because it was owed $13,804,833.66 on April 30, 2002, and the value of its collateral, the Palm Springs Property, was $14,019,525.00. *Id.* at 519. The hearing on Diversified's motion for relief from the stay was consolidated with the motion for summary judgment in the BONY Adversary Proceeding. *Id.* at 517.

### D. THE BONY ADVERSARY PROCEEDING IN THE EPIC BANKRUPTCY

On or about April 23, 2002, BONY filed a complaint (the "BONY Complaint") against Epic Palm Springs and Diversified. *See* **Exhibit "5."**[3] Haynes and Boone, LLP, was counsel for both BONY and Highland Funds. **Exhibit "6"** is a copy of the Statement Pursuant to Federal rule of Bankruptcy Procedure 2019 ("2019 Statement").

The BONY Complaint alleged that Diversified interfered with the indenture by taking a security interest in the Palm Springs Property. BONY sought to impose an equitable lien against the Palm Springs Property and equitably subordinate the claim of Diversified because of this interference. Exhibit 5, BONY Complaint, ¶¶ 8 – 20, 32 – 50; *see also* Bank of New York's Opposition to USA Capital's Motion for Summary Judgment and Memorandum in Support of the Bank of New York's Cross Motion for Summary Judgment ("BONY Opposition") at 25, a copy of which is attached, without exhibits, to the Olson Declaration as **Exhibit "7"**.

---

[3] The exhibits to the BONY Complaint are not attached. The Indenture described in the Bony Complaint is Exhibit 4.

The Epic Bankruptcy Court denied BONY all of the relief it requested. The Court held that BONY was not entitled to an equitable lien because, among other things, BONY was to be obtain the lien within sixty days of the closing of the Indenture and BONY went over two years without making reasonable efforts to record its interest. The Court also found that Diversified's knowledge of the terms of the Indenture required Diversified to only inquire whether the lien against the Palm Springs Property had been granted. The Court then described Diversified's diligence as follows:

> [Diversified] performed a diligent inquiry to determine whether any prior liens existed. It ordered an independent third party to perform a title examination of the property. In addition, [Diversified] required Epic Palm Springs to represent and warrant that the loan transaction with [Diversified] did "not and will not . . . result in a breach or constitute a default under, . . . or require any consent, under, any indenture . . ." *See* Loan Agreement at para 5.2(e). As an additional precaution, [Diversified] obtained an opinion letter from Epic's counsel, which stated that the lease was not encumbered by any security interest. Thus, we conclude that [Diversified] satisfied its duty to inquire whether there were any prior valid liens on the leasehold.

*Epic 1*, 290 B.R. at 523 (also quoting *Gretsch v. Johnson & Johnson Fin. Corp. (In re Gertsch)*, 237 B.R. 160, 170 (9th Cir. B.A.P. 1999) to support the proposition that "lenders do not have to hire detectives before relying on borrowers' . . . statements . . . Although a creditor is not entitled to rely upon an obviously false representation of the debtor, this does not require him or her to view each representation with incredulity requiring verification.").

BONY alleged that it was entitled to equitably subordinate Diversified's claim because of its tortious interference with the Indenture. The Epic Bankruptcy Court noted that Epic Palm Springs approached Diversified to borrow funds, *id.* at 518. The Epic Court then specifically found that Diversified had not tortiously interfered with the Indenture by stating:

> *Further, we cannot conclude that [Diversified] tortiously interfered with the agreement between BONY and [Epic].* The elements of tortious interference of a business relationship are as follows: "(1) the existence of a contractual, or prospective contractual relation between itself and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relationship, or to prevent the

> prospective relation from occurring; (3) the absence of a privilege or justification on the defendant; (4) the occasioning of actual legal damage as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the interference of the defendant. *LaBrum & Doak v. Brown (In re LaBrum & Doak, LLP)*, 225 B.R. 93 (Bankr. E.D. Pa. 1998).
>
> > *There is no evidence of a purposeful action on the part of [Diversified] to harm the relationship between [Epic], Capital and BONY.* Epic Palm Springs advised [Diversified] that no other creditor held a lien on the lease. Although [Diversified] had knowledge of the restrictive covenants, Epic Palm Springs represented and warranted that the entry into the secured loan transaction with [Diversified] did "not and will not . . . result in a breach or constitute a default under, . . . or require any consent under, and indenture. . . . See Loan Agreement at para 5.2(e). In addition, [Diversified's] report did not reveal any other liens on the lease. Prior to consummating the transaction, *[Diversified] confirmed with the BIA that no other lien existed on the property. [Diversified's] actions were not intended to harm any relationship between BONY and [Epic].* Furthermore, the relationship between [Epic], Capital and BONY were not altered: BONY did not have a lien on the leasehold prior to [Diversified's] loan to Epic Palm Springs and did not have one after the loan.

*Epic 1*, 290 B.R. at 524-25 (emphasis added). The District Court affirmed that finding by stating:

> The Bankruptcy Court thoroughly analyzed the facts of this case and found that despite [Diversified's] actual knowledge of the restrictive covenants in the Indenture, *[Diversified] did not intend to harm any relationship between the Debtors and the Bondholders*, . . . As the Bankruptcy Court pointed out, Epic Palm Springs represented and warranted to [Diversified] that the secured loan transaction would not result in a breach of the Indenture, [Diversified] obtained an opinion letter from Epic Palm Spring's counsel confirming this point, and [Diversified] confirmed that no other liens existed on the property. The information [Diversified] obtained is consistent with the Prospectus, which expressly states that if approval from the BIA is not obtained, "the subsidiary guaranty of Epic Resorts Palm Springs Marquis Villas, LLC will not be secured by any mortgage on such leasehold." (Exhibit USA-13 at 22, Designation 19, Tab 15). . . .

*Epic 2*, 307 B.R. at 772 – 73 (emphasis added).

The Epic Bankruptcy Court also rejected BONY's argument that the equities in the case warranted subordination by stating:

> The equities in this case do not warrant penalizing [Diversified] by subordinating its claim when it took all the steps necessary to perfect its interest. Moreover, the fact that the BONY did not obtain the necessary BIA approval should not be held against [Diversified]. [Diversified] entered into the transaction with Epic Palm Springs in good faith and after inquiring into the existence of any prior liens. It relied on Epic Palm Springs' representation that the loan would not create a breach under the Indenture. BONY on the other hand, slept on its rights and is, therefore, not entitled to equitable relief.

*Epic 1*, 290 B.R. at 525.

### E. THE STATE COURT LITIGATION

The gravaman of the Nevada Complaint is that Diversified tortiously interfered with the Indenture. The other causes of action -- Conspiracy to Commit Tortious Interference and Aiding and Abetting – derive from that cause of action.

All proceedings in connection with the Nevada Complaint have been stayed by these proceedings.

## III.

## STATEMENT OF AUTHORITIES

### A. THE CLAIM IS BARRED UNDER THE DOCTRINE OF CLAIM PRECLUSION

Federal law governs the collateral estoppel and *res judicata* effect of a case decided by a federal court. *Clark v. Columbia/HCA Info. Servs., Inc.*, 117 Nev. 468, 481, 25 P.3d 215, 224 (2001)(citing *Fireman's Fund Ins. Co. v. Intern. Market Place*, 773 F.2d 1068, 1069 (9th Cir. 1985)). Since the Epic Bankruptcy was in Delaware, part of the Third Circuit, that court's law governs the preclusive effect of a prior judgment. The law of the Third Circuit appears to be identical to that of Nevada, however.

The doctrine of res judicata, more commonly known as claim preclusion, "precludes parties or those in privity with them from relitigating a cause of action or an issue which has been finally determined by a court of competent jurisdiction." *University of Nevada v. Tarkanian*, 110 Nev. 581, 598, 879 P.2d 1180, 1191 (1994) (citing *Horvath v. Gladstone*, 97 Nev. 594, 597, 637 P.2d 531, 533 (1981); *Gilbert v. Warren*, 95 Nev. 296, 594 P.2d 696 (1979)). Stated differently, "*Res Judicata*, commonly referred to as claim preclusion, prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties regardless of whether they were asserted or determined in the prior proceeding." Russell, *Bankruptcy Evidence Manual*, § 1:1 (2006 ed.). Claim preclusion "is intended to prevent multiple litigation causing vexation and expense to the parties and waste judicial resources by precluding parties from relitigating issues they could have raised in a prior action concerning the same controversy." *Tarkanian*, 110 Nev.

at 598 (citation omitted). *See also Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992) ("Claim preclusion, formerly referred to as res judicata, gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in the earlier proceeding.").

There are three essential elements for claim preclusion to apply: (1) the initial ruling must have been on the merits and have become final; (2) the party against whom the judgment is asserted must have been a party or in privity with a party to the prior litigation; and (3) the issue decided in the prior litigation must be identical to the issue presented in the current action. *Tarkanian*, 110 Nev. at 599 (citing *Horvath*, 97 Nev. at 597, 637 P.2d at 531). *See Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992) ("Claim preclusion requires: (1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action.").

Here, there is no question that Diversified satisfies the elements of claim preclusion. Accordingly, the Court should disallow the Claim in its entirety.

### 1. The Bankruptcy Order Was On The Merits And Final.

"Claim preclusion is triggered when a judgment is entered." *Tarkanian*, 110 Nev. at 599. "A valid and final judgment on a claim precludes a second action on that claim or any part of it." *Tarkanian*, 110 Nev. at 599 (citing *Gilbert v. Warren*, 95 Nev. 296, 594 P.2d 696 (1979)). Furthermore, a "bankruptcy court order fulfill[s] the first prong because for purposes of claim preclusion, judgments entered by consent are final judgments on the merits," *Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992) (citing *Interdynamics, Inc. v. Firma Wolf*, 653 F.2d 93, 96-97 (3d Cir.), *cert. denied*, 454 U.S. 1092 (1981)), and is considered to be a final order for purposes of collateral estoppel. *Robertson v. Isomedix, Inc. (In re Intl. Nutronics, Inc.)*, 28 F.3d 965 (9th Cir. 1994). Here, a final judgment was entered and affirmed on appeal. *See Epic 1* and *Epic 2*.

### 2. The Bondholders Were In Privity with the Indenture Trustee in the Bankruptcy Litigation.

The second element requires that the party against whom claim preclusion is sought in the subsequent litigation be the same, or in privity with, a party from the prior litigation. *See Tarkanian*, 110 Nev. at 599; *In re Genesis Health Ventures, Inc.*, 324 B.R. 510, 521 (D.Del. 2005); *Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992) (citations omitted).[4]

It cannot be disputed that bondholders are in privity with an indenture trustee. The unambiguous language in the Indenture provides for contractual privity – a substantive legal relationship - between the Highland Funds and BONY by stating:

> The Trustee may, in its sole discretion and without the consent of the Security Holders, on behalf of the Security Holders, take all actions it deems necessary or appropriate in order to (a) enforce any of the terms of the Collateral Documents and (b) collect and receive any and all amounts available in respect of the Obligations of the Subsidiary Guarantors hereunder. The Trustee shall have power to institute and maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any such acts that may be unlawful or in violation of the Collateral Documents or this Indenture, and such suits and proceedings as the Trustee may deem expedient to preserve or protect its interests and the interests of the Security Holders in the Collateral. . . .

Exhibit 4, *Indenture*, § 11.05.

---

[4] Judge Russell described the concept of privity as:

> A nonparty may be bound by a prior judgment if he or she was in "privity" with the parties to the prior action. The most obvious situation in which this will arise is where the nonparty was a nonparty in name only, and actively participated in the first litigation to such an extent that he or she was a party for all practical purposes. Restatement Second of Judgments, § 39. . . .
>
> Another situation in which a nonparty will be bound by a prior judgment is where it was represented in the first action. Thus, the trust beneficiaries are bound by judgments in actions involving the trustee, and class members are bound by judgments in class actions. Restatement Second of Judgments, §§ 41-42.
>
> Finally, a nonparty will be bound where there is some substantive legal relationship between a party and the nonparty, as where the nonparty succeeded to the interests of the party by purchase, inheritance, etc. *Browning v. Levy*, 283 F.3d 761 (6th Cir. 2002); Restatement Second of Judgments, §§ 43-61.

Russell, *Bankruptcy Evidence Manual*, § 2:14 (2006 ed.).

Perhaps the most persuasive evidence that the BONY was in privity with and acted as the virtual representative of the Highland Funds is the fact that they shared the same counsel in the Epic Bankruptcy. This dual representation was described by BONY as follows:

> *It is conceded that the same law firm represents individual Bondholders and BNY, as the Indenture Trustee.* Haynes and Boone, LLP filed a Statement Pursuant to Federal Rule of Bankruptcy Procedure 2019 disclosing this permissible *dual representation of aligned creditors* during the early stages of these jointly-administered cases.

Exhibit 7, BONY Opposition, at pg.28, n.11 (emphasis added); *See also* Exhibit 6.

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992), involved a 1983 default on $2.25 billion of bonds used to finance construction of two nuclear power plants that were never completed and the Multidistrict Litigation that arose from the default. Chemical Bank was the trustee for the bondholders. *Id.* at 1274. The case was settled in 1988 and the settlement required approximately $687 million to be paid into a settlement fund. *Id.* at 1275. Chemical Bank then negotiated a single proposed plan of allocation to govern the division of those settlement proceeds. *Id.* The district court approved the settlement in 1990. *Id.* at 1276. A number of bondholders that objected to the settlement appealed to the Ninth Circuit. *Id.*

The Ninth Circuit affirmed the lower court's holding that Chemical Bank had the power under the Bond Resolution "to represent all Bondholders as their trustee and attorney-in-fact in prosecuting the claims it alleged on their behalf." *Id.* at 1280. The Ninth Circuit held that section 11.5 of the Bond Resolution, which is similar to Section 11.5 of the Indenture, *see above*, p. 11, empowered the trustee with authority to settle or compromise the bondholders' claims. The Ninth Circuit also noted that a different reading of the Bond Resolution would allow a single dissenting bondholder to deny the trustee the ability to settle or compromise claims for the bondholders, "an interpretation which we find to be incongruous." *Id.* at 1281.

{00316810;}
US_WEST:260056390.6
- 11 -

In *Stratosphere Litigation, LLC v. Grand Casinos, Inc.*, 298 F.3d 1137 (9th Cir. 2002), the Stratosphere was a Chapter 11 debtor in bankruptcy. *Id.* at 1141. Prior to its bankruptcy filing, the Stratosphere had made a public offering of $203 million in junk bonds "to finance the construction and development of the Stratosphere Tower, Casino & Hotel." *Id.* at 1141. As part of the junk bond offering, the Stratosphere entered into a Standby Equity Commitment (the "Commitment") with Grand Casinos, Inc. ("Grand Casinos"), which purported to obligate Grand Casinos to fund an escrow account whenever the Stratosphere's cash flow fell below a certain dollar figure. *Id.* at n.1. The escrow funds were to be distributed to Stratosphere upon Stratosphere's raising of additional equity. *Id.*

During the bankruptcy proceedings, an Official Committee of Noteholders (*i.e.*, holders of the junk bond notes) (the "Noteholder Committee") was formed and the indenture trustee on the junk bond offering was appointed thereto. *Id.* at n.2. The Noteholder Committee "moved to assume the Commitment on behalf of [the] Stratosphere pursuant to § 365 of the Bankruptcy Code." *Id.* The Bankruptcy Court, however, held that the Commitment would <u>not</u> be assumed and further held "that [Grand Casino's] obligation to fund an escrow account was conditioned on [Stratosphere's] performance of its obligation to raise equity, which it did not do" because it was in bankruptcy. *Id.* at 1142. The Noteholder Committee—of which the indenture trustee was a member—failed to appeal the Bankruptcy Court's decision. *Id.*

Subsequently, a *successor* indenture trustee brought an action in the district court alleging that Grand Casinos had breached the Standby Equity Commitment by failing to fund the escrow. *Id.* at 1141. The parties then filed cross-motions for summary judgment. *Id.* "The district court held that [the successor indenture trustee's] claim . . . was barred by res judicata" and thus granted partial summary judgment in favor on Grand Casinos. *Id.*

On appeal, the successor indenture trustee challenged both the Bankruptcy Court's jurisdiction and its prior "determination that [Grand Casino's] obligation to fund an escrow account was discharged" because of Stratosphere's failure to raise additional equity. *Id.* at 1142. The Ninth Circuit held, however, that such challenge was barred by res judicata. The court stated, "Because [the successor indenture trustee] and the Official Committee both represent the Noteholders, the Official Committee's failure to appeal the bankruptcy court's judgment is imputed to [the successor indenture trustee] for res judicata purposes." *Id.* (citing *In re Schimmels*, 127 F.3d 875, 881 (9th Cir. 1997)).

It has long been the Supreme Court's view that indenture trustees and bondholders are in privity with one another. *See, e.g., Kersh Lake Drainage Dist. Of Jefferson, Lincoln and Desha Counties v. Johnson*, 309 U.S. 485 (1940). In *Kersh Lake* the Supreme Court recognized that:

> It has been long held that bondholders are not necessary parties to and are bound by the decree - even if adverse to their interests - in litigation wherein an indenture trustee under a bond issue is a party and exercises in good faith and without neglect his contractual authority to represent and assert the lien securing the issue.

*Id.* at 491 (citing *Elwell v. Fosdick*, 134 U.S. 500 (1890); *Richter v. Jerome*, 123 U.S. 233 (1887)).[5] Thus, based upon this line of authority, the Supreme Court in *Kersh Lake* held that certain note certificate holders' claims were barred by the doctrine of *res judicata*—even though they were not parties to the previous suit, and even where they had no notice of the previous suit—because their representative (a statutorily-appointed commissioner) had acted on their behalf in a previous action. *Id.* at 488-92.

The Supreme Court has stated that holding that bondholders not to be bound by the acts of the trustee would create a very dangerous doctrine in equity practice. The Supreme Court stated:

---

[5] *See also Kerrison v. Stewart*, 93 U.S. 155, 160 (1876); *Corcoran v. Chesapeake and Ohio Canal Co.*, 94 U.S. 741, 745 (1876); *Shaw v. Railroad Co.* 100 U.S. 605, 611 (1879)(stating ""the trustee of a railroad mortgage represents the bondholders in all legal proceedings carried on by him affecting his trust, to which they are not actual parties, and whatever binds him, if he acts in good faith, binds them").

> But why is he not bound? It was his duty as trustee to represent and protect the holders of these bonds: and for that reason he was made a party, and he faithfully discharged that duty. It would be a new and very dangerous doctrine in equity practice to hold that the *cestui que trust* is not bound by the decree against his trustee in the very matter of the trust for which he was appointed.

*Corcoran v. Chesapeake and Ohio Canal Co.*, 94 U.S. 741, 745 (1876).[6]

The Highland Funds were unquestionably represented by, and in privity with, BONY in the Epic Bankruptcy. The Indenture created contractual privity between BONY and the Highland Funds and they even shared the same counsel in the Epic Bankruptcy. BONY made several arguments for and on behalf of the Highland Funds. At page 3 of the BONY Opposition, BONY argued extensively that the bondholders "should have had a properly perfected, first priority leasehold deed of trust in Epic Palm Springs' interest in the Palm Springs resort . . . ." Similarly, BONY alleged on page 25 of the BONY Opposition on behalf of the bondholders that Diversified's claim should be subordinated to that of the Highland Funds because of Diversified's alleged tortious interference with the Indenture. Thus, it cannot be disputed that the Highland Funds were nonparties "in name only" and undoubtedly participated in that litigation. Russell, *Bankruptcy Evidence Manual*, § 2:4 (2006 ed.).

---

[6] The law regarding corporate mortgages and the rights, remedies and liabilities of bondholders and trustees under corporate mortgages is analogous as well. A leading treatise provides:

> [A]s a general rule, <u>the acts of the trustee relating to the security</u>, at least if within the scope of the powers of the trustee, <u>are binding on the bondholders</u>, and judgments in actions to which the trustee is a party in his or her representative capacity are ordinarily binding on the bondholders although none of them were joined as parties to the action.

FLETCHER CYC CORP, *Mortgages and Security Interests*, § 3152 (2005) (footnotes omitted) (emphasis added).

> The trustee is the representative and agent of the bondholders in many matters, including all litigation connected with the trust, not only in the courts below, but also on appeal, and <u>a judgment in an action affecting the subject matter of the trust, to which the trustee is a party and by which he or she is bound, binds the bondholders, though they may not be parties nor participate in the proceedings.</u>

*Id.* at § 3152 (footnotes omitted) (emphasis added).

### 3. The Issues Decided By The Epic Bankruptcy Court Are Identical To The Issues Raised In The Instant Case.

The third element of claim preclusion requires that "the issue decided in the prior litigation be identical to the issue presented in the current action." *Tarkanian*, 110 Nev. at 599. "Whether two lawsuits are based on the identical cause of action 'turn[s] on the essential similarity of the underlying events giving rise to the various legal claims.'" *Board of Trustees of Trucking Employees Welfare Fund, Inc. v. Centra*, 983 F.2d 494, 504 (3d Cir. 1992) (quoting *United States v. Athlone Industries*, 746 F.2d 977, 983-84 (3d Cir. 1984)). This is a conceptual analysis that should not be applied mechanically. *See Centra*, 983 F.2d at 504. Indeed, courts "should focus on the central purposes" of claim preclusion, which is "to require a plaintiff to present all claims arising out of the same occurrence in a single suit." *Id.*

The modern view of claim preclusion is expansive, "embrac[ing] all grounds of recovery that were asserted in a suit, *as well as those that could have been asserted, and thus has a broader reach than collateral estoppel.*" *Tarkanian*, 110 Nev. at 600 (citation omitted)(emphasis added); *see also CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 191 (3d Cir. 1999) (claim preclusion "bars a party from litigating a claim that it could have raised or did raise in a prior proceeding in which it raised another claim based on the same cause of action") (citations omitted). Moreover, "[t]he Restatement [of Judgments] observes that a claim extinguished by res judicata 'includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.'" *Gregory v. Chehi*, 843 F.2d 111, 117 (3d Cir. 1998) (quoting Restatement (Second) of Judgments § 24(1) (1982)). To determine "what constitutes a 'transaction,' pragmatic consideration of whether the facts are related in time, space, origin or motivation is appropriate." *Id.* In particular, "where one act causes a number of harms to, or invades a number of different interests of the same person, there is still but one transaction; a judgment based on the act usually prevents the person from maintaining another action for any of the harms not sued for in the first action." Restatement (Second) of Judgments § 24(1).

The Third Circuit in *Gregory* elaborated further:

> Multiple claims do not arise solely because a number of different legal theories deriving from a specific incident are used to assert liability. The transaction remains unitary "although the several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief."

*Gregory*, 843 F.2d at 117 (quoting Restatement (Second) of Judgments § 24(1)). The Court also stated that where both state and federal law is involved, "the Restatement advocates claim preclusion, provided that the first court to adjudicate the matter has jurisdiction to entertain the omitted claim." *Gregory*, 843 F.2d at 117 (citing *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 482 n. 22 (1982). Finally, the Court explained, "claim preclusion may not be evaded simply by adding allegations of conspiracy to the very same activity challenged in the first action." *Gregory*, 843 F.2d at 118 (citing *Riverside Memorial Mausoleum*, 581 F.2d at 67; *Kauffman v. Moss*, 420 F.2d 1270 (3d Cir.), *cert. denied*, 400 U.S. 846 (1970)).

In the instant case, the initial judgment was a final bankruptcy court order. BONY filed an adversary proceeding against Diversified, a discrete lawsuit, in which the claims of BONY and the Highland Funds against Diversified were actually litigated. Highland Funds was in privity with BONY. The claims in the BONY Adversary Proceeding and the clams asserted in the Nevada Complaint arise from identical underlying events – whether Diversified tortiously interfered with the Indenture by entering into the loan transaction with and accepting collateral from Epic Palm Springs. Thus, the doctrines of claim preclusion and *res judicata* require that this Court disallow the Highland Funds' Claim in its entirety.

**B.  THE CLAIM IS BARRED UNDER THE DOCTRINE OF ISSUE PRECLUSION.**

"The doctrine of collateral estoppel operates to preclude the parties or their privies from relitigating issues previously litigated and actually determined in the prior proceeding." *Marine Midland Bank v. Monroe*, 104 Nev. 307, 308, 756 P.2d 1193, 1194 (1998). The Third Circuit[7]

---

[7] The Nevada Supreme Court's test to determine whether summary judgment may be granted on the basis of collateral estoppel is almost identical to the test of the Third Circuit. In Nevada a party must show: (1) the issue decided in the prior litigation must be identical to the issue presented in the current action; (2) the initial ruling must have been on the merits and have become final; and (3) the party against whom the judgment is asserted must have

uses the following four-part test to determine whether summary judgment may be granted on the basis of issue preclusion:

> (1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question.

*Board of Trustees of Trucking Employees of N.J. Welfare Fund, Inc. v. Centra*, 893 F.2d 495, 504 (3rd Cir. 1992). The doctrine of collateral estoppel or issue preclusion "may be implicated when one or more of the parties to an earlier suit are involved in subsequent litigation on a different claim." *Tarkanian*, 110 Nev. at 598-99, 879 P.2d at 1191. An issue is considered identical in two cases if there is "a substantial overlap between the evidence or argument to be advanced in the two proceedings." Restatement Second of Judgments, § 27 (cited with approval in *Amtrak v. Pa. Pub. Util. Comm'n*, 288 F.3d 519, 525 (3rd Cir. 2002). Issue preclusion may apply to different causes of action if the same fact issue is presented. *See LaForge*, 116 Nev. at 420, 997 P.2d at 134.

Here, it cannot be reasonably disputed that all four of those elements are present. First, the issues presented by the Nevada Complaint arise from identical underlying events and are identical to the issues litigated in the BONY Adversary Proceeding. Both cases are predicated upon allegations that Diversified tortiously interfered with the Indenture by loaning funds to and accepting collateral from Epic Palm Springs. The Epic Bankruptcy Court unambiguously held that Diversified did not tortiously interfere with the Indenture and the District Court for the District of Delaware affirmed that holding. *See Epic 1* and *Epic 2*. Second, the decision of the Epic Bankruptcy Court, which was affirmed on appeal, is clearly a final judgment on the merits. Third, the Highland Funds and BONY were, without a question, in privity with one another. *See above* at section III.A.2 (pages 10-15). Fourth, there is not any question that the Highland Funds, acting through BONY, had a full opportunity to litigate these questions. Not only did Highland

---

been a party in privity with a party to the prior litigation. *LaForge v. State Univ. and Community College Sys. Of Nev.*, 116 Nev. 415, 419, 997 P.2d 130, 133 (2000).

Funds and BONY share the same counsel in the Epic Bankruptcy, the case was fully litigated and adjudicated at a hearing on a motion for summary judgment and appealed. *See Epic 1* and *Epic 2*.

### C. THE CLAIM IS BARRED BECAUSE HIGHLAND FUNDS CANNOT PROVE THE ELEMENTS OF ITS TORTIOUS INTERFERENCE CLAIM AND THE OTHER CLAIMS ARE PURELY DERIVATIVE.

In Nevada, tortious interference is comprised of two varieties: (1) interference with contractual relations; and (2) interference with prospective economic advantage. *See Hilton Hotels Corp. v. Butch Lewis Productions, Inc.*, 109 Nev. 1043, 862 P.2d 1207 (1993); *Consolidated Generator-Nevada, Inc. v. Cummins Engine Co., Inc.*, 114 Nev. 1304, 971 P.2d 1215 (1998). Highland Fund's tortious interference claim fails to specify which variety of the claim it is pursuing. Regardless, under either, the claim fails. To establish a claim for interference with contractual relations, a claimant must prove: 1) there exists a valid contract between the claimant and a third-party; 2) that the defendant knew about the contract; 3) that the defendant committed intentional acts intended or designed to disrupt the contractual relationship; 4) that there was an actual disruption of the contract; and 5) that the claimant sustained damages. *See Hotels Corp. v. Butch Lewis Productions, Inc.*, 109 Nev. 1043, 862 P.2d 1207 (1993). The elements of a claim for interference with prospective economic advantage are essentially the same, except the relationship between the plaintiff and a third-party is prospective. *See Custom Teleconnect, Inc. v. Int'l Tele-Services, Inc.*, 254 F. Supp. 2d 1173, 1180 (D. Nev. 2003) (citing *Leavitt v. Leisure Sports, Inc.*, 103 Nev. 81, 734 P.2d 1221, 1225 (1987)).[8]

Here, for the reasons stated throughout, the Highland Funds cannot establish (at least) the third

---

[8] Significantly, the *Epic I* court used a combination of the two tests in concluding that the tests were not met (*i.e.*, the court employed a test which evaluated both existing and prospective contractual relationships). *See Epic 1*, 290 B.R. at 524-25 (quoting *LaBrum & Doak v. Brown (In re LaBrum & Loak, LLP)*, 225 B.R. 93 (Bankr. E.D. Pa. 1998)).

through fifth elements. First, there is simply no evidence whatsoever that Diversified committed intentional acts designed specifically for the purpose of interrupting some contractual relationship between Epic and the Highland Funds. *See id.* at 524-45. ("There is no evidence of a purposeful action on the part of [Diversified] to harm the relationship between [Epic], Capital and BONY."). "[Diversified's] actions were not intended to harm any relationship between BONY and [Epic]." Second, the contractual relationship was not disrupted. As noted by the *Epic I* court, "the relationship between [Epic], Capital and BONY <u>was not altered</u> . . . ." *Id.* at 525 (emphasis added). Third, there was no damage. "BONY did not have a lien on the leasehold prior to [Diversified's] loan to Epic [] and did not have one after the loan." *Id.* Thus, Highland Funds' tortious interference claims fails.[9]

Moreover, because Highland Funds' tortious interference claim fails, so do its claims for "conspiracy to commit tortious interference" and "aiding and abetting" because each of these claims are based upon the false presumption that Diversified committed acts of tortious interference. It is well established that a conspiracy itself – the agreement to commit a wrongful act – does not create a civil cause of action; rather, it is the wrongful *acts*, and the resulting

---

[9] Even assuming, *arguendo*, that the elements of the tortious interference claim could be established (which they cannot), Diversified was justified and/or privileged to make the secured loan. "Generally speaking, acts taken by a party acting to promote its own economic interests are privileged." 45 Am.Jur.2d *Interference* § 28 (footnote omitted). Furthermore, "[i]t is not necessary that the interferer's interest outweigh that of the party whose rights are interfered with, it being sufficient if the impetus of the interferer's conduct lies in a proper business interests [*sic*] rather than in wrongful motives." *Id.* (footnote omitted). With respect to prospective business advantage, the Nevada Supreme Court has recognized that "[p]erhaps the most significant privilege or justification for interference with a prospective business advantage is free competition." *Crockett v. Sahara Realty Corp.*, 95 Nev. 197, 199, 591 P.2d 1135, 1136 (1979) (quotations omitted). Here, it is not clear which version of interference the Highland Fund alleges. To the extent it alleges interference with prospective economic advantage, Diversified's actions were absolutely privileged. *See id.* (holding that a competitor is privileged to divert business by fair and reasonable means). *See also Custom Teleconnect, Inc. v. Int'l Tele-Services, Inc.*, 254 F. Supp. 2d 1173, 1182 (D. Nev. 2003).

*damage*, which give rise to the cause of action for civil conspiracy. *See Eikelberger v. Tolotti*, 96 Nev. 525, 611 P.2d 1086, 1089 n.1 (1980) ("The gist of a civil conspiracy is not the unlawful agreement but the damage resulting from that agreement or its execution. The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff."). In other words, conspiracy is not a separate and independent tort. *See id.*

Here, the underlying tort alleged to have been committed is interference. However, as noted, the Epic Bankruptcy Court has already held that Diversified committed no intentional acts designed to disrupt the contractual relationship at issue. *See Epic I* at 524-25. The court also found that there was no actual disruption of the contract and also no damages. *See id.* at 525. Thus, both the conspiracy and aiding and abetting claims must fail, as they are purely derivative of the interference claim.

Dated this 19th day of September 2006.

BECKLEY SINGLETON, CHTD.

By: _____
Bob L. Olson (Nevada Bar No. 3783)
Anne M. Loraditch (Nevada Bar No. 8164)
530 Las Vegas Boulevard South
Las Vegas, Nevada 89101

*Attorneys for the Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC*