Annette W. Jarvis, Utah Bar No. 1649
Steven C. Strong, Utah Bar No. 6340
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

E-FILED on September 22, 2006

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com

Attorneys for Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

In re:
USA COMMERCIAL MORTGAGE COMPANY,
                                               Debtor.

In re:
USA CAPITAL REALTY ADVISORS, LLC,
                                               Debtor.

In re:
USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,
                                               Debtor.

In re:
USA CAPITAL FIRST TRUST DEED FUND, LLC,
                                               Debtor.

In re:
USA SECURITIES, LLC,
                                               Debtor.

Affects:
☒ All Debtors
☐ USA Commercial Mortgage Company
☐ USA Securities, LLC
☐ USA Capital Realty Advisors, LLC
☐ USA Capital Diversified Trust Deed Fund, LLC
☐ USA Capital First Trust Deed Fund, LLC

Case No. BK-S-06-10725 LBR
Case No. BK-S-06-10726 LBR
Case No. BK-S-06-10727 LBR
Case No. BK-S-06-10728 LBR
Case No. BK-S-06-10729 LBR

Chapter 11

Jointly Administered Under
Case No. BK-S-06-10725 LBR

**MOTION FOR ORDER SCHEDULING AN AUCTION FOR THE SALE OF CERTAIN ASSETS, APPOINTING SPCP GROUP, LLC, AS LEAD BIDDER, AND APPROVING BID PROCEDURES AND PROTECTIONS**
**(AFFECTS ALL DEBTORS)**

Date: October 19, 2006
Time: 9:30 a.m.

### Preliminary Statement

Monetizing the Debtors' various assets to achieve maximum returns for creditors and investors in these cases involves unique challenges. Only a purchaser with diverse skills and experience can effectively manage the Debtors' servicing agreements, and only a purchaser with

- 1 -

1   substantial lending experience can quickly and efficiently analyze and value the Debtors' various
2   lending arrangements. SPCP Group, LLC (the "Purchaser") presents a unique combination of
3   these skill sets, combined with substantial wherewithal.

4       The Debtors have actively marketed their assets, and are pleased to present the Purchaser
5   as the presumptive acquiror of a significant portion of those assets, subject to the results of an
6   auction, to be held pursuant to the bidding procedures described in Exhibit A hereto (the "Bid
7   Procedures"). The Debtors believe that the Purchaser's commitment to provide the opening bid at
8   the auction, subject to entry of an Order, in form and substance satisfactory to the Purchaser,
9   approving this motion, represents the Debtors' best opportunity to realize a fair price for the assets
10  to be acquired by the Purchaser through a competitive auction process.

11      For the foregoing reasons, as further described below, the Debtors seek entry of the Order
12  approving the bid procedures described in Exhibit A hereto, and approving payment of the Break-
13  Up Fee and Expense Reimbursement in the event that those amounts should become payable to
14  the Purchaser pursuant to the terms of the bid procedures and the Purchaser's Offer Letter.

15  **Background Relevant to Approval of the Bid Procedures**

16      On September 12, 2006, USA Commercial Mortgage Company ("USACM"), USA Capital
17  Diversified Trust Deed Fund, LLC ("Diversified Fund"), USA Capital First Trust Deed Fund,
18  LLC ("FTD Fund"), USA Capital Realty Advisors, LLC ("Realty Advisors"), and USA Securities,
19  LLC ("USA Securities") (collectively, the "Debtors") accepted and countersigned an offer letter
20  dated September 11, 2006 (the "Offer Letter") from SPCP Group, LLC ("Purchaser") concerning
21  a proposed sale of substantially of the assets of the FTD Fund, primarily its interests in a portfolio
22  of loans, and certain assets of USACM, primarily those used to conduct its loan servicing business
23  (collectively, the "Property"), as identified in the Offer Letter (a copy of which is attached hereto
24  as Exhibit B). The Offer Letter embodies the proposal that will create the highest and best return
25  for the Debtors' estates, as well as their creditors and investors. It is the result of extensive
26  negotiations by and among the Purchaser, the Debtors, and the four official committees appointed
27  in the Debtors' bankruptcy cases, namely the Official Committee of Unsecured Creditors of USA
28  Commercial Mortgage Company ("UCC"), the Official Committee of Holders of Executory

Contract Rights Through USA Commercial Mortgage Company ("ECC"), the Official Committee of Equity Security Holders of USA Capital Diversified Trust Fund, LLC ("Diversified Committee"), and the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC ("FTD Committee") (collectively, the "Committees").

The Purchaser, the Debtors, and the Committees are now negotiating the terms of a definitive Asset Purchase Agreement (the "Agreement") consistent with the Offer Letter, and the Debtors intend to file the executed Agreement prior to the hearing on this motion. Subject to a competitive bidding process that will broadly expose the Property to any potential Higher and Better Offer (defined in the Bid Procedures) and approval by the Bankruptcy Court (the "Court") of the transfer of the Property pursuant to a confirmed chapter 11 plan of reorganization, the Debtors anticipate that the Agreement will make possible a consensual joint plan of reorganization that will effect a fair and comprehensive treatment of all stakeholders in these cases.

In accordance with the terms of the Offer Letter and the subsequent Agreement to be filed, the Debtors request that the Court set a hearing (the "Bid Procedures Hearing") for October 19, 2006 (or no later than October 26, 2006 in any event) and enter an order (the "Bid Procedures Order") that same day granting the following relief:

1. Approving the Bid Procedures (attached hereto as Exhibit A) and thereby authorizing the Debtors, among other things, to (i) establish minimum qualifications for potential bidders to participate in the auction process, (ii) conduct an in-Court auction to obtain the highest and best offer for the Property, and (iii) determine, along with the UCC and the FTD Committee, the Successful Bid (as defined below).

2. Authorizing the Debtors to pay to the Purchaser: (i) a break-up fee in the amount of $1.5 million (the "Break-Up Fee"), payable under certain circumstances as more particularly detailed in the Offer Letter and summarized in the Points and Authorities below, which Break-Up Fee, if payable, shall be reduced by the amount of the Expense Reimbursement (defined below) actually paid to the Purchaser, and (ii) an expense reimbursement which shall be limited to a maximum amount of actual and reasonable expenses incurred by the Purchaser up to $500,000 (the "Expense Reimbursement"), payable under certain circumstances as more particularly detailed in the Offer Letter and summarized in the Points and Authorities below.

3. Scheduling an auction (the "Auction") in accordance with the Bid Procedures in order to identify the "Successful Bid" and the "Next Highest Bid" (as defined in the Bid Procedures) for the Property and approving the form of sale notice for the Auction (attached hereto as Exhibit C).

- 3 -

1    This Motion is based upon the following Points and Authorities, the pleadings, papers,
2  declarations and other records contained in the Court's file in these cases, judicial notice of which
3  is requested, and any argument or other evidence the Court entertains at the hearing on this
4  motion.

**POINTS AND AUTHORITIES**
**I.**
**JURISDICTION AND VENUE**

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N) and (O). The statutory basis for the relief sought herein is 11 U.S.C. §§ 105, 363, 365, 1107 and 1108.

2. Venue of this Chapter 11 case in this judicial district is proper pursuant to 28 U.S.C. §§ 1408.

3. On April 13, 2006 (the "Petition Date"), Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code commencing these jointly administered bankruptcy cases.

4. Debtors continue to operate and manage their businesses and assets as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5. Prior to the Petition Date, USACM was in the business of underwriting, originating, brokering, funding and servicing commercial loans primarily secured by undeveloped land and residential and commercial developments, both on behalf of investors (sometimes referred to in this case as direct lenders) and for its own account. Diversified Fund and FTD Fund are direct lenders having interests in certain of the serviced loans. The primary business of USA Securities was to act as a registered broker/dealer to facilitate the sale of membership interests in the FTD Fund. Realty Advisors is the manager of the FTD Fund and the Diversified Fund.

6. No request has been made for the appointment of a trustee or examiner in these cases.

7. On May 10, 2006, the U.S. Trustee's office filed notices of appointment indicating it had formed four official committees to serve in the Debtors' cases: (a) the UCC; (b) the ECC; (c) the Diversified Committee; and (d) the FTDF Committee. Shortly thereafter, the Court

- 4 -

1  approved applications by each of the Committees to employ legal counsel, and the applications of
2  three of the four Committees to employ financial advisors.

## II.

## THE PROPOSED SALE OF PROPERTY AND PROPOSED PROCEDURES

**Background**

8. USACM and FTD Fund intend to sell the Property in one transaction. The proposed sale also affects Diversified Fund and the direct lenders who are the constituents of the EEC in that the Purchaser will become the servicer of loans in which Diversified Fund and other Direct lenders own interests. Debtors, acting through their Chief Restructuring Officer, Thomas J. Allison of Mesirow Interim Financial Management LLC ("MIFM"), and the MIFM interim management team, and in consultation with the financial advisors for the Committees, have actively marketed the assets of the Debtors for sale during the past several months. Debtors have conducted an extensive sales process in an effort to provide a viable restructuring alternative for the Debtors. The Debtors identified well qualified bidders and executed confidentiality agreements with fourteen potential purchasers. As part of the process, the Debtors responded to extensive due diligence requests from the fourteen potential bidders through the production of information, participation in presentations and discussions as well as facilitation of communications with borrowers and other parties-in-interest. The Debtors initiated a process that allowed for evaluating and comparing preliminary bids. These efforts resulted in a vibrant solicitation process which resulted in the proposed sale alternative as one of the key features of a comprehensive plan of reorganization.

9. The Property to be sold, as described in the Offer Letter and exhibits thereto, includes the FTD Fund's ownership interest as a direct lender in 47 specifically identified loans, for a proposed purchase price of $46.5 million, subject to certain adjustments and conditions as stated in the Offer Letter (the "First Trust Deed Fund Assets," as defined in the Offer Letter), and USACM's servicing rights in 80 specifically identified loans, including rights to collect servicing fees and other fees as specified in the Offer Letter, for a proposed purchase price of one-half of the first $1 million in servicing fees to be collected by the Purchaser, as well as certain upside sharing

and other consideration, as more specifically described in the Offer Letter (the "Commercial Mortgage Assets," as defined in the Offer Letter).[1]

10. This Motion seeks the Court's approval of a process that will permit a last and final exposure of the Property to interested parties, and the selection of the "Successful Bidder" by the Debtors, UCC, and FTD Committee at an in-court Auction to occur approximately 45 days after entry of the order approving this Motion (the "Bid Procedure Order"). The Debtors intend to seek Court approval of the sale of the Property through the plan confirmation process and anticipate that the entry of the confirmation order (the "Confirmation Order") approving the Debtors' Joint Plan of Reorganization filed September 15, 2006, shall approve the transfer of the Property (the "Plan").

11. The proposed sale of the Property to Purchaser shall be made on terms set forth in the Offer Letter and subsequent Agreement, or to an alternative purchaser for a higher price on substantially the same terms pursuant to the Bid Procedures, and shall be expressly subject to the Court's approval in connection with confirmation of the Plan.

**Expense Reimbursement and Breakup Fee**

12. In order to encourage the Purchaser to invest substantial time and effort, and to incur the significant expense, associated with due diligence and with the preparation of the Agreement and to take on the role of a "stalking horse" purchaser, for the benefit of the Debtors' estates, the Offer Letter provides that in certain circumstances the Purchaser may receive reimbursement from the Debtors' estates for its actual and reasonable expenses incurred by the Purchaser in pursuing this transaction up to a maximum of $500,000 (the "Expense Reimbursement"), and that in certain other circumstances the Purchaser may receive a payment of a Break-Up Fee in the amount $1.5 million, reduced by the amount of any Expense Reimbursement previously paid. The obligation to pay the Expense Reimbursement and/or Break-Up Fee will be allocated between the FTD Fund and USACM in a manner mutually agreed upon by the FTD Fund, the FTD Committee, USACM, and the UCC or, if no agreement is reached,

---

[1] Any summaries or descriptions in this motion of the Property and of any other provisions of the Offer Letter are

- 6 -

pursuant to further Bankruptcy Court order.

13. The Expense Reimbursement generally is payable in the event that the Plan is not confirmed within 120 days after Purchaser completes its due diligence (the "Outside Approval Date") and the Purchaser is not in breach of its obligations under the Offer Letter and subsequent Agreement. The relevant provisions of the Offer Letter relating to the Expense Reimbursement are incorporated herein by this reference. The Expense Reimbursement is payable on the terms set forth in Section 10(b)(i) of the Offer Letter, which include the following:

- Unless waived by Purchaser in writing on or prior to 120 days following the due diligence completion date, Purchaser shall be released from any further obligation to perform pursuant to the Offer Letter or the Plan in the event that the Plan is not confirmed by a final, non-appealable order of the Bankruptcy Court within 120 days from the due diligence completion date (the "Outside Approval Date"), and in such event, Purchaser, so long as it is not in breach of the Agreement, shall be entitled solely to the Expense Reimbursement for actual and reasonable expenses incurred by Purchaser.[2]

14. The Break-Up Fee is payable on the terms set forth in Section 10(b) of the Offer Letter, which are incorporated herein by this reference, including in the event that any party other than the Purchaser ultimately acquires the Property for greater than or equal to the Total Asset Purchase Price plus the Minimum Incremental Overbid in the Auction process, and if payable, the Break-Up Fee shall be reduced by any Expense Reimbursement actually paid to the Purchaser.

**Bid Procedures**

15. The specific bid procedures (the "Bid Procedures") that are proposed for approval by this Court based on the terms of the Offer Letter are set forth in Exhibit A. Some of the provisions set forth in the Bid Procedures are summarized below:

- The Bid Procedures establish the "Initial Minimum Incremental Overbid" amount, which is the amount by which the first bid at the Auction must exceed the "Total

---

intended solely for informational purposes and in no way alter the actual terms of the Offer Letter.

[2] The Offer Letter further provides in Section 10(b)(i) that in the event the Outside Approval Date passes and Purchaser is paid an amount for the Expense Reimbursement, the Debtors will nonetheless be required to pay the full Break-Up Fee to Purchaser (reduced by the amount of the Expense Reimbursement), if within 9 months following the Outside Approval Date any portion of the Property is transferred to any party for a payment equal to or greater than the Total Assets Purchase Price. Moreover, if the Outside Approval Date passes and Purchaser has not waived compliance therewith, but nonetheless thereafter acquires the Property, then any Expense Reimbursement paid to Purchaser as a result of passage of the Outside Approval Date shall be repaid to the Debtors by Purchaser.

- 7 -

Asset Purchase Price" (Purchaser's proposed purchase price specified in the Offer Letter), and establish the additional incremental overbid amount that applies to each successive bid;

- The Bid Procedures require that all bids must include an executed asset purchase agreement that is substantially identical to the Agreement;

- The Bid Procedures require that the cash consideration must equal or exceed the cash component of the Total Asset Purchase Price plus the Minimum Incremental Overbid;

- The Bid Procedures require a cash deposit of $2,325,000 as part of the qualifications to become a qualified bidder and participate in the Auction, and

- The Bid Procedures require that qualified overbids be submitted at least seven days prior to the Auction.

**Transferring the Assets Owned by Debtors**

16. Following confirmation of the Plan, and on the effective date thereof, the property that is the subject of the Successful Bid shall be sold by the relevant Debtors free and clear of all liens, claims, encumbrances and interests (other than as may be permitted pursuant to the terms of the Agreement) pursuant to Section 363(f) and 1146 of the Bankruptcy Code, as complemented by Bankruptcy Rule 6004. This transfer is referred to herein from time to time as the "363 Sale," which is to be confirmed and implemented in accordance with the Offer Letter and the Plan.

17. Debtors' ultimate commitment and obligation to transfer the Property as provided for in the Agreement, and the Purchaser's ultimate commitment and obligation to acquire and accept the Property, shall be dependent, among other things, upon the Court entering the Confirmation Order pursuant to Sections 1123, 1129 and 1141 of the Bankruptcy Code and the occurrence of the effective date of the Plan.

**Advertising and Noticing of the Auction**

18. Within three (3) business days following entry of the Bid Procedures Order and the setting of the Auction date, Debtors shall serve upon all persons the Debtors' believe may have an interest in submitting a qualified bid for the Property a <u>Notice of Sale of Property, Bid Procedures, and Invitation for Higher and Better Offers</u> ("Notice"), substantially in the form attached hereto as <u>Exhibit C</u>.

19. In order to give prospective bidders time to formulate and make bids, the Debtors request that the Court schedule a hearing to hold the Auction in Court on December 5, 2006, and request that the Court conduct the Auction in accordance with the Bid Procedures.

**Procedures Respecting Competing Offers for the Property**

20. Debtors believe it is in the best interests of their estates, their creditors and other parties in interest to have a final competitive bidding process to select the Successful Bidder for the Property. Therefore, Debtors, the UCC, and the FTD Commitee will select the Successful Bidder for the Property at the Auction generally as follows:

a) <u>Eligibility to Participate in the Sales Process</u>

Any potential bidder that seeks to participate in the sales process may do so only if that person is the Purchaser or has been approved by Debtors as a "Qualified Bidder" in advance of the commencement of the Auction.

b) <u>Eligibility to Make Competing Offers</u>

To qualify as a "Qualified Bidder," not less than one week prior to the commencement of the Auction such person must satisfy the Preliminary Qualifications (as defined in Exhibit A) and must submit the items required for a "Qualified Bid."

c) <u>Selection of the Successful Bid and the Next Highest Bid</u>

Upon the conclusion of the Auction, the Debtors, the UCC, and the FTD Committee shall determine which of the bids constitutes the highest and otherwise best bid for the property (the "Successful Bid"), with the Court available to resolve any disputes. The Successful Bidder shall execute and deliver to the Debtors its asset purchase agreement by no later than 5:00 p.m. the next day, which shall reflect the name of the successful bidder and the successful bid price submitted at the Auction.

21. After determining the "Successful Bid," the Debtors, the UCC and the FTD Committee shall determine which of the bids constitutes the next highest and otherwise best bid for the Property (the "Next Highest Bid"). If the bidder identified as the Next Highest Bidder agrees to maintain its status as the back-up bidder, then it must also agree that its Next Highest Bid will remain irrevocable and subject to acceptance by the Debtors, the UCC, and the FTD

Committee, and the Debtors will retain its Deposit, until the earlier of (a) the closing and effectiveness of the transactions contemplated by the Successful Bid, or (b) five (5) business days following the termination of the purchase agreement evidencing the Successful Bid if the Debtors do not accept the Next Highest Bid, provided, however, that if the Purchaser is the Next Highest Bidder, it may act as the Next Highest.[3]  If the Next Highest Bid is accepted, then by no later than 5:00 p.m. on the first business day following such acceptance, the Next Highest Bidder shall execute and deliver to the Debtors its asset purchase agreement, which shall reflect the name of the Next Highest Bidder and the Next Highest Bid price submitted at the Auction by the Next Highest Bidder and the Deposit shall be retained by the Debtors and applied against the purchase price of the Next Highest Bidder; provided however, that the Next Highest Bidder shall forfeit the Deposit if the Next Highest Bidder (a) modifies or withdraws the bid without the Debtors' consent before the consummation of the sale of the Property to such bidder or (b) breaches the terms of the agreement pursuant to which the bidder has agreed to purchase the Property.  If the bidder initially identified as the Next Highest Bidder does not agree to such terms, then the Debtors, the UCC, and the FTD Committee (and the Court, to the extent there is a dispute), may identify the next highest or otherwise best bid as the Next Highest Bid, and may continue to do so until such a bidder who has submitted a bid agrees to become the Next Highest Bidder.[4]

**Refund of Deposits**

22. The Bid Procedures provide that within five (5) business days after the conclusion of the Auction, the deposits submitted by all of the bidders shall be returned, except for (a) the deposit of the Successful Bidder, in which case the deposit will be applied to the purchase price for the Property; (b) the deposit of the Next Highest Bidder, if any, subject to the specific provisions of the Bid Procedures; and any bidder that forfeits its deposit under the provisions of

---

[3] As noted in the Bid Procedures, in the event the Next Highest Bidder is the Purchaser, nothing in the Bid Procedures is intended to nor does it extend the Outside Approval Date as that term is defined in the Offer Letter.

[4] To the extent there is any dispute about what is the "Successful Bid" or the "Next Highest Bid," the Bankruptcy Court shall make that determination.

- 10 -

1  the Bid Procedures.  Nonetheless, in the event the Debtors terminate the proposed sale the deposits
2  submitted by all of the bidders shall be returned.

### III.

### LEGAL AUTHORITIES AND ARGUMENT

A.  **INTRODUCTION**

Debtors, in carrying out their duties, have determined that any offer for the Property must be tested through a public solicitation process.  Because MIFM has been marketed the Debtors' assets to prospective financial and strategic buyers for several months and has engaged in discussions with at least fourteen (14) parties, Debtors are aware that one or more potential qualified purchasers may be taking a "wait and see" approach to acquiring the Property.  Debtors needed to expose the Property for a last and final time to prospective purchasers to test whether the other interests in the market are higher and better.

Debtors have agreed to a $1.5 million Break-Up Fee which, if payable, shall be reduced by any Expense Reimbursement (not exceeding $500,000) actually paid to the Purchaser.  Debtors have also agreed to an Expense Reimbursement not to exceed $500,000 in the event the Plan is not confirmed by a final non-appealable order of the Bankruptcy Court within 120 days of Purchaser's completion of its due diligence.  The amount of the Break-Up Fee and the Expense Reimbursement is reasonable in view of the size and complexity of the transaction, the lost opportunity that Purchaser will likely incur if it does not become the Successful Bid, the expenses that Purchaser will incur prior to the Auction, and the need for Debtors to attract a quality offer for and obtain a definitive agreement for the purchase of the Property with which to test the market.

B.  **THIS COURT HAS AUTHORITY TO APPROVE THE BID PROCEDURES**

The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) ("a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).  Applying Bankruptcy Code Section 363, bankruptcy courts frequently have considered and approved auction and bidding procedures in advance of a proposed sale of

- 11 -

property of the estate. See, e.g., Doehring v. Crown Corp. (In re Crown Corp.), 679 F.2d 774, 775 (9th Cir. 1982) (noting that the district court had required specified minimum overbid amounts, deposits, and the form of purchase agreement to be used by bidders); In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (noting that the bankruptcy court had entered an order requiring that overbids be made in specified minimum increments with deposits); In re Table Talk, Inc., 53 B.R. 937, 943 (Bankr. D. Mass. 1985) (noting that Bankruptcy Code section 363 requires notice and a hearing prior to the establishment of bidding procedures for the sale of property of the estate).

To that end, courts have uniformly recognized that establishing bidding procedures in advance of the sale hearing itself often facilitates a debtor's efforts to increase the value ultimately realized by the estate through: (i) creating a well-defined and orderly forum in which potential bidders are provided a fair opportunity to submit competing offers; (ii) ensuring fair comparability among competing bids; and (iii) encouraging the originally proposed purchaser to proceed with its proposed transaction by granting certain protections against the risk that party would otherwise bear in its entirely by having its offer exposed to overbids. See generally In re Finanical News Network, Inc., 126 B.R. 152, 156 (S.D.N.Y. 1991); appeal dismissed, 931 F.2d 217 (2d Cir. 1991).

Furthermore, courts have made it clear that the debtor's business judgment is entitled to great deference with respect to the procedures to be used in selling assets from the estate. See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that overbid procedures that have been negotiated by a debtor in possession are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

In this case, as a result of negotiations with Purchaser (and previous efforts by the Debtors to negotiate transactions for the Property with others), the Debtors assert that the purchase price offered to Debtors under the Agreement, represents the highest and best offer that could be negotiated for the Property to this point. However, to ensure that the estate maximizes its

recovery, the Debtors negotiated with Purchaser the right to expose the Offer Letter and subsequent Agreement and the sale and transfer of the Property to potential overbids in accordance with the Bidding Procedures. Approving the Bid Procedures, including scheduling the date of the Auction, and establishing deadlines related to the bidding process, will certainly increase the likelihood that Debtors will receive the greatest consideration possible for the Property. Specifically, such procedures will facilitate a competitive and fair bidding process in several respects, including:

    1) The Debtors have committed to providing notice on (i) all entities known by the Debtors to have expressed an interest in a transaction involving the Property, (ii) all parties Debtors believe may have an interest in purchasing the Assets, and (iii) all parties who have filed a special notice request in these cases. Over the course of the past several months, the Debtors have discussed transactions involving the Property with a number of parties all of whom will be notified of the Auction and provided with a fair opportunity to come forward with qualifying bids and to participate in the Auction that will take place.

    2) Pre-approval of the Bidding Procedures will ensure fair comparability between competing bids. The Bidding Procedures set forth in detail how bids must be submitted, what constitutes a Qualified Bid, how and when additional incremental bids will be received and considered, and other relevant "ground rules" surrounding the Auction. These "ground rules" are important to all interested parties because they will: (i) provide potential bidders with substantial information regarding the terms of the Purchase Agreement against which they will be competing (if they so choose) at the Auction; (ii) create an orderly process within which overbids must be reviewed and considered; and (iii) facilitate the comparison of any and all offers to determine which offer will yield the highest and best return to the Debtors' estates. See e.g. In re Financial News Network, Inc., 126 B.R. at 156 (recognizing that one purpose of court-imposed sales procedures is "to ensure fair comparability between competing bids or to protect other bidders who have limited their bids to the announced terms."

3) Requiring that all bids be made in advance of the Auction will (i) provide an opportunity to review and clarify such bids, (ii) give bidders an opportunity to improve their current offers, and (iii) provide the non-debtor parties with sufficient time in which to evaluate the bids.

4) Requiring bidders to submit with their bid, deposits and bids that are at least on the same terms as those set forth in the Purchase Agreement will ensure that only serious, committed entities will participate in the bidding and lessening the chances that Debtors ultimately will be unable to close the sale of the Property because the Successful Bidder proves unable or unwilling to perform its duties; and

5) Requiring that, after the initial bids, the bidding take place in pre-established increments in each instance, thereby further ensuring that Debtors' estates will materially benefit from the Auction and will not bear the expense of the Break-Up Fee.

In summary, the Bid Procedures serve the interests of the estate in several ways. The procedures themselves are fair, reasonable and productive as they will permit Debtors to conduct an orderly sale and obtain the best possible price on the best possible terms for the Property. The procedures require that potential bidders demonstrate their capacity to complete the transaction and be ready to complete the transaction immediately upon the effectiveness of any confirmed Plan. It would be a serious loss to the Debtors and their estates if they surrendered the opportunity to sell the assets to Purchaser in favor of a competing bidder only to discover the bidder incapable of consummating the transaction.

Moreover, the procedures are a necessary component of the sale of the Property to Purchaser. The Bid Procedures will help Debtors obtain the highest and best possible price for the Property. The procedures will not hamper or chill any potential purchaser from making an overbid. Accordingly, the proposed Bid Procedures are appropriate under the circumstances and are within the Debtors' sound business judgment.

**C.    The Court Should Approve the Break-Up Fee.**

As indicated above, the Bid Procedures provide the Debtors with significant benefits that, in large part, stem from the Purchaser's commitment to pay a specific price for the Property and

- 14 -

the Debtors' right to expose the transactions contemplated in the Agreement to competitive bidding. However, it is that very exposure to competitive transactions which jeopardizes Purchaser's bid under the Agreement. Indeed, Purchaser has advised the Debtors that if forced to bear such risk without the protection of the Break-Up Fee, it would choose not to go forward with the Agreement and the transactions therein contemplated. If this occurred, the Debtors would lose a fully negotiated transaction with respect to the Property. Consequently, in accordance with the Agreement, the Bid Procedures contain certain protections for Purchaser as a "stalking horse" bidder. Among other things, the Agreement provides that the Purchaser shall be entitled to receive from the Debtors the Break-Up Fee if a competing bidder is determined to be the Successful Bidder at the Auction and such Successful Bid is approved by the Bankruptcy Court.

The case law is somewhat unclear regarding the appropriate standard that courts should apply when considering whether to approve break-up fee arrangements. For a time, In re Integrated Resources, Inc., 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), aff'd 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 40 (2d Cir. 1993) (on jurisdictional grounds), was the undisputed leading case in this area, standing for the proposition that the debtor's agreement to enter into a break-up or termination fee arrangement was reviewable under the "business judgment" standard generally applicable to transactions proposed under Bankruptcy Code section 363(b). See also In re Crowthers McCall Pattern, Inc., 114 B.R. 877 (Bankr. S.D.N.Y. 1990); In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24 (Bankr. S.D.N.Y. 1989).

More recently, however, a number of courts have rejected the use of the business judgment standard, holding instead that break-up or termination fees must be "carefully scrutinized in . . . assets sales to ensure that the debtor's estate is not unduly burdened and that the relative rights of parties in interest are protected." In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992); In re Tiara Motorcoach Corp., 212 B.R. 133 (Bankr. N.D. Ind. 1997); In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995); In re America West Airlines, Inc., 166 B.R. 198 (Bankr. D. Ariz. 1994) (court must determine whether the transaction will further "diverse interests of debtor, creditors and equity holders alike").

At first glance, Hupp and its progeny appear to conflict with Integrated Resources. Indeed, the cases following Hupp purport to expressly reject the holding in Integrated Resources. Upon further examination, however, it becomes apparent that those cases merely expand upon, rather than reject, the approach taken by the court in Integrated Resources. The court in Integrated Resources expressly stated that "when a sale of the debtor's assets outside the ordinary course of business is proposed . . . bankruptcy courts will carefully scrutinize the use of break-up fees. This is because bidding incentives impose expenses on the debtor's estate, and do not merely affect shareholders . . . but affect the debtor, creditors and equityholders alike." 135 B.R. at 750-51. In affirming the bankruptcy court's decision in that case, the District Court elaborated on the scrutiny to which break-up fees are to be subjected, finding the following three questions of particular relevance:

    i.    is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation;

    ii.    does the fee hamper, rather than encourage, bidding; and

    iii.    is the amount of the fee unreasonable relative to the proposed purchase price?

In re Integrated Resources, Inc., 147 B.R. at 657.

The court in Hupp did not create a different standard as much as it simply expanded on the foregoing list of relevant inquiries, reasoning that courts considering break-up fees should carefully consider the following factors:

    i.    whether the fee requested correlates with a maximization of value to the debtor's estate;

    ii.    whether the underlying negotiated agreement is an arms-length transaction between the debtor's estate and the negotiating acquirer;

    iii.    whether the principal secured creditors and the official creditors committee are supportive of the concession;

    iv.    whether the subject break-up fee constitutes a fair and reasonable percentage of the propose purchase price;

  v. whether the dollar amount of the break-up fee is so substantial that it provides a "chilling effect" on other potential bidder;

  vi. the existence of available safeguards beneficial to the debtor's estate; and

  vii. whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee.

In re Hupp Indus., Inc., 140 B.R. at 194.

  Clearly, substantial overlap exists in the areas of inquiry identified by the respective courts in Integrated Resources and Hupp. In fact, the cases can be fairly synthesized into a bottom-line standard requiring courts to review all relevant facts and circumstances surrounding the proposed break-up fee arrangement to determine whether that arrangement is in the best interest of the estate based upon the factors identified above. In the present case, that standard has been met for the reasons that follow.

  **1.** **The Break-Up Fee Is the Product of Arm's Length, Good Faith Negotiations.**

  As stated in In re 995 5th Avenue Associates, 96 B.R. 24 (Bankr. S.D.N.Y. 1989), a bankruptcy court should generally uphold a break-up fee which was not tainted by self-dealing and was the product of arms-length negotiations. The proposed Break-Up Fee was the result of arms-length negotiations between representatives of the Debtors, the Committees, and the Purchaser. The Purchaser is a distinct and separate entity from the Debtors or any of its affiliates, does not have any ownership interest in the Debtors and has no connection to or affiliation with the Debtors or their business other than making the offer to purchase the Property as described herein. Thus, the relationship between the parties in the instant case is not tainted by any self-dealing or manipulation.

  **2.** **The Break-Up Fee Constitutes a Reasonable Percentage of the Purchase Price.**

  A termination, topping or break-up fee which constitutes a fair and reasonable percentage of the proposed purchase price and which is reasonably related to the risk, effort and expenses of the prospective purchaser generally is permissible. See, e.g., In re 995 Fifth Avenue Assoc., 96 B.R. at 28; In re Twenver, Inc., 149 B.R. 954, 956-57 (Bankr. D. Colo. 1992).

In this case, the Break-Up Fee is $1.5 million, and the Expense Reimbursement is not to exceed $500,000. Furthermore, as explained above, the Break-Up Fee is reduced by any actual payment of the Expense Reimbursement by the Debtors to the Purchaser – thus, the Debtors' maximum exposure for the Break-Up Fee and Expense Reimbursement, in the aggregate, is $1.5 million, not $ 2 million. The Break-Up Fee represents approximately 3% of the cash consideration for the transaction (which does not include potentially substantial additional upside sharing and other consideration) and further, the 3% figure is before reduction in respect of Expense Reimbursement, which the parties expect will result in a net Break-Up Fee of significantly less than 3%. The maximum amount of the Expense Reimbursement is approximately 1% of the consideration for the transaction. These percentages are reasonable in comparison with the purchase price. See, e.g., In re Tiara Motorcoach, Corp., 212 B.R. 133, 138 (Bankr.N.D.Ind. 1997) (rejecting a 10% breakup fee as unreasonable and exceeding the 1% to 2% range of fees found to be reasonable).

### 3. The Amount of the Break-Up Fee Is Fair and Reasonable Under the Circumstances.

The compensation to be provided to Purchaser in the form of its Break-Up Fee is fair and reasonable. If another bidder appears and pays substantially more than Purchaser's offer, the Debtors will have the initial offer from Purchaser to thank for this benefit. It would only be Purchaser's commitment to go through with its offer and its due diligence, efforts and financial capacity to purchase the Property that would have made a better offer possible and available to the Debtors' estates.

As previously stated, Purchaser has incurred, and will continue to incur, substantial expenses and significant risks in seeking to purchase the Property. Such expenses include legal fees associated with the negotiation and drafting of the definitive Agreement, time and substantial due diligence expenses. In light of the significant burdens borne by Purchaser, most of which will benefit the Debtors whether Purchaser or another entity is the successful bidder, it is fair and reasonable for Purchaser to receive the Break-Up Fee if it does not ultimately acquire the Property.

### 4. The Break-Up Fee Will Not Hamper Bidding.

A break-up fee is enforceable if it encourages bidding, and will not be accepted if it discourages bidding. Integrated Resources, 147 B.R. at 659; see, e.g., 995 Fifth Ave., 96 B.R. at 28. A termination or break-up fee encourages bidding to the extent that it (a) attracts or retains a potentially successful bid; (b) establishes a bid standard or minimum for other bidders to follow; or (c) attract additional bidders. Integrated Resources, 147 B.R. at 662.

This factor goes hand-in-hand with the previous factor, in that a break-up fee that otherwise is found to be "fair and reasonable" presumably will not be found to create a chilling effect on other potential bidders. Indeed, the proposed Break-Up Fee in this case is not designed to chill the bidding process. Rather, the Debtors believe that the Break-Up Fee was justified to induce Purchaser to enter into the Agreement and to adequately compensate Purchaser for its efforts and the risks it is taking. The Debtors further believe that there would be no Agreement, or any other offer, without the Break-Up Fee. Thus, the existence of the proposed deal with Purchaser ensures that the Debtor will have at least one substantial offer for the Property while at the same time permitting the Property to be exposed to potential overbids in order to ensure that the estates maximize their recovery on the Property.

### 5. The Break-Up Fee Correlates with a Maximization of Value to the Debtors' Estates.

The Bid Procedures, including the Break-Up Fee, have been designed to create a forum that increases the likelihood that the Debtors will realize higher and better offers by establishing and providing notice of fair and orderly procedures for the submission of overbids. At the same time, the Bid Procedures, and more particularly, the Break-Up Fee, provide Purchaser with sufficient incentive and motivation to move forward with the Purchase Agreement. Without the Break-Up Fee, the Debtors believe Purchaser would not have become a party to the Purchase Agreement. At the very least, the Purchase Agreement sets a floor value for the Property that might not otherwise exist.

**D.    THE COURT SHOULD SET A HEARING TO APPROVE THE BID PROCEDURES AND SCHEDULING THE AUCTION AND APPROVING THE FORM OF SALE NOTICE FOR THE AUCTION.**

- 19 -

1     Debtors request that this Court set a hearing to approve the Bid Procedures on October 19, 2006 which is a regularly scheduled omnibus hearing in this case. At that hearing, the Debtors would further request that the Court set the date, time and location for the Auction to sell the Property, which the Debtors suggest should be December 5, 2006. During the period of time between the approval of the Bid Procedures and the Auction Debtors will be able to provide notice to other potential Qualified Bidders that Debtors, the Committees or other parties in interest have identified during the marketing period. In turn, those parties will be able to perform due diligence if they meet the Preliminary Qualifications that are set forth in the Bid Procedures to determine if they wish to submit and offer and participate in the Auction process.

    In furtherance of scheduling the date and time of the Auction, the Court should approve the form of the Notice so that there will be no issues raised at the Auction as to whether notice was adequate and whether due process considerations have been satisfied.

### **CONCLUSION**

    Based on the foregoing, Debtors respectfully move the Court for entry of an order: (i) approving the Bid Procedures attached hereto; (ii) approving the payment of the Break-Up Fee and Expense Reimbursement pursuant to the terms of the Offer Letter and subsequent Agreement, as outlined herein; and (iii) scheduling the Auction as requested herein.

DATED: September 22, 2006

    */s/  JEANETTE E. MCPHERSON*
Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Esq., Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas NV  89146

and

Annette W. Jarvis, Utah Bar No. 1649
Steven C. Strong, Utah Bar No. 6340
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385

Attorneys for Debtors and Debtors-in-Possession

893127