1  Paul B. Lackey, Esq.
2  Texas Bar No. 00791061                    E-FILED ON: 10/4/06
   Michael P. Aigen, Esq.
3  Texas Bar No. 24012196
   LACKEY HERSHMAN, L.L.P.
4  3102 Oak Lawn Avenue, #777
   Dallas, Texas 75219
5  (214) 560-2201

6  and

7  CiCi Cunningham
8  Nevada Bar No.: 4960
   James A. Kohl, Esq.
9  Nevada Bar No.: 5692
   RAWLINGS, OLSON, CANNON
10 GORMLEY & DESRUISSEAUX
   9950 W. Cheyenne Ave.
11 Las Vegas, NV 89129
   (702) 384-4012
12
13 Attorneys for The Highland Funds

14              UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF NEVADA
15

| | |
|---|---|
| 16 In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR |
| 17 | Case No. BK-S-06-10727 LBR |
| 18 In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| 19 | |
| 20 In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED | Chapter 11 |
| 21 FUND,LLC,<br>Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725-LBR |
| 22 | Date:  October 19, 2006 |
| 23 In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | Time:  9:30 a.m.<br>Place:  Courtroom #1 |
| 24 | **THE HIGHLAND FUND'S** |
| 25 In re:<br>USA SECURITIES, LLC, | **OPPOSITION TO DIVERSIFIED**<br>**TRUST DEED FUND** |
| 26 Debtor. | **COMMITTEE'S OBJECTION TO**<br>**PROOF OF CLAIM** |
| 27 Affects: | |

27 Affects:
      □  All Debtors
28

                              1

1  ☐ USA Commercial Mortgage Company
2  ☐ USA Securities, LLC
   ☐ USA Capital Realty Advisors, LLC
3  ☐ USA Capital Diversified Trust Deed Fund, LLC
   ☐ USA First Trust Deed Fund, LLC
4

5        Prospect High Income Fund ("Prospect"), ML CBO IV (Cayman) Ltd. ("ML CBO IV),

6  Pamco Cayman, Ltd. ("Pamco"), Pam Capital Funding, L.P. ("Pam Funding"), Highland

7  Crusader Fund, Ltd. ("Crusader"), and PCMG Trading Partners XXIII, L.P. ("PCMG")

8  (collectively, the "Highland Funds"), by and through the undersigned attorney, hereby file their

9  Opposition to USA Capital Diversified Trust Deed Fund LLC's Committee's Objection to Proof

10 of Claim and respectfully allege as follows:
11

12                                            I.

13                          **PRELIMINARY STATEMENT**

14       USA Capital Diversified Trust Deed Fund LLC ("Diversified") Objects to the Highland

15 Funds' proof of claim ("Claim").  The Claim is based on the fact that Diversified interfered with

16 the Highland Fund's contractual rights with Epic Resorts.  To prosecute the Claim, the Highland

17 Funds filed suit against Diversified in the Eighth Judicial District Court, Clark County, Nevada

18 as Case No. A453232 ("State Court Case").[1]  Diversified's Objection is based on the doctrine of

19 claim preclusion.  Diversified's Objection should be denied because Diversified failed to tell the

20 Court that the same issue, claim preclusion based on the Delaware Bankruptcy Court decision,

21 was rejected <u>twice</u> in the State Court Case.  Diversified's Objection simply reargues the exact

22 same legal arguments it made in a summary judgment motion that was denied in the State Court

23

24 _____

25       [1] The State Court Case is styled *Prospect High Income Fund, a Maryland Corporation, ML CBO IV(Cayman)
   Ltd., a Cayman Island, LLC, Pamco Cayman, Ltd., a Cayman Island, LLC, Pam Capital Funding, L.P., a Cayman
26 Island, LLC, Highland Crusader, Fund, Ltd., a Bermuda Mutual Fund Company, and PCMG Trading Partners
   XXIII, L.P., vs. USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, a Nevada Limited Liability Company
27 and JOHN RODGERS BURK a California Law Corporation.*

28

                                            2

Case.   The Delaware Bankruptcy Court decision that Diversified relies on only decided the narrow issues of whether the Indenture Trustee had an equitable lien and whether Defendant Diversified's conduct was sufficiently egregious to warrant a finding of equitable subordination. The Delaware District Court, on appeal, only addressed the issue of equitable subordination. These narrow findings, which were decided under a different burden of proof, cannot be used as a basis for claim or issue preclusion in this proceeding.  Moreover, these exact arguments were previously made by Diversified to the Nevada State Court in a summary judgment motion – and that court rejected the arguments for the reasons discussed below.

I.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.    The Highland Funds Purchase Bonds Issued By Epic Resorts.

On July 8, 1998, Epic Resorts, a holding company that owns and operates multiple subsidiaries, which in turn operate timeshare vacation resorts, issued $130 million aggregate principal amount of Senior Secured Redeemable Notes due in 2005 pursuant to an indenture dated July 8, 1998, as supplemented (the "Indenture").  See Declaration of Davis Deadman ("Deadman Declaration) at ¶ 4. Subsequently, the Highland Funds purchased approximately $93.767 million of the Bonds.  Id.

### 2.    The Indenture Has Three Critical Provisions That Protected The Highland Funds.

As part of the bond offering, the Indenture contained three critical provisions.  First, Epic Resorts was prohibited from borrowing additional funds.   Specifically, Section 4.9 of the Indenture, Limitation on Indebtedness, states "the Company shall not, and shall not permit any of its Restricted Subsidiaries to, Incur any Indebtedness. . . ."  See Indenture at § 4.9. A full copy of the Indenture is attached to the Declaration of Bob L. Olson at Exhibit 4 and is incorporated by

3

reference.  Second, Epic Resorts would not encumber the Properties in favor of anyone else. Specifically, Section 4.12 of the Indenture, Limitation on Liens, states, "[Epic Resorts] will not and will not permit any Restricted Subsidiary to, directly or indirectly, create or permit to exist any Liens on any of its assets except for Permitted Liens." *Id.* at § 4.12.  Third, the bondholders would receive a lien in their favor on the Properties. *Id.* at § 11.01.

3.     **Diversified Conspires To Violate The Agreement.**

In the first quarter of 2000, Diversified met with Epic Resorts about a potential loan to Epic Resorts. *See* Deposition Transcript of Joseph Milanowski ("Milanowski Deposition"), dated April 11, 2002, excerpts of which are attached to the Declaration of Michael Aigen ("Aigen Declaration") as Exhibit A thereto, pp. 17:23-19:19; Deposition Transcript of Thomas Hantges ("Hantges Deposition"), dated April 11, 2002, excerpts of which are attached to the Aigen Declaration as Exhibit B thereto, pp. 8:10-11:25.  Milanowski and Hantges are principals of the Debtors and agents of Diversified.

During the course of its due diligence for the loan, Diversified requested and was provided with the Indenture.

Q: Why did you ask for a copy of the indenture in the prospectus?

A: Because we felt it was important Mr. Flatley told us there was a carve-out for the Palm Springs property and an ability for him to borrow some additional debt.

* * *

Q: If you could just take a look at [Exhibit 4].  I just want you to verify that this is a copy of the indenture that, number one, USA Capital produced and, number two, that that's a copy of the indenture provided to you by Mr. Flatley.

4

1

A: I believe it is.

2

3

Q: And that was provided to you in connection with the June 1 letter?

4

A: It was provided to us in connection with this loan.

5

Q: And it was provided to you prior to your approving the loan?

6

A: Yes it was.

7

*See* Milanowski Deposition, p. 28:8-16; p. 32:6-18.  Hantges testified that Diversified reviewed

8

the indenture prior to making the loan.

9

10

Q: Well, on this particular loan, do you recall any aspects of the due

11

diligence in which you were personally involved?

12

A: I recall that we reviewed the bond indenture to see if it was permissible

13

to make a loan.

14

* * *

15

16

Q: You mentioned the bond indenture and prospectus on here.  Do you

17

know why USA Capital asked for copies of those?

18

A: Yes, because we wanted to see what the bond indenture allowed, what

19

it didn't allow.  And the only way to do that is obviously to get a copy of it.

20

Q: Do you recall if you were provided a copy of it?  A: Yes, we were.  Q:

21

Were you provided those prior to approving the loan.

22

23

A: Yes, we were.

24

*See* Hantges Deposition, p. 28:9-11, 15-17; pp. 71:21 – 72:9.  Milanowaski testified that Debtors

25

and Diversified wanted copies of the indenture because they knew there was an issue with the

26

loan, the bondholders, and the covenants made by Epic to the bondholders.

27

Q: And in number 3 you asked for a copy of bond indenture and

28

5

prospectus of public bonds of Epic Resorts. Is that correct?

A: [by Milanowski] That's correct.

Q: Did you receive a copy of both of those documents?

A: Yes, we did.

Q: Why did you ask for a copy of those?

A: Because we knew – we knew that they were outstanding. We knew that that was part of the – that was why Epic had to file public reports and documents. And we wanted to make sure that we just understood the full financial condition of the borrower.

Q: Was it also to figure out whether the bondholders had a claim to Epic Palm Springs and its property.

A: It was to make sure that whatever loan we were providing was not violating any covenants.

*See* Transcript of Proceedings, dated April 30, 2002, in Case No. 01-2458 in the United States Bankruptcy Court for the District of Delaware, excerpts of which are attached hereto to the Aigen Declaration as Exhibit D thereto, pp. 34:18 – 35:12 (Milanowski Cross).

This testimony is confirmed by Thomas Rondeau, the in-house attorney for Debtors and agent of Diversified who testified that the indenture was specifically discussed with Flatley during the time Diversified was deciding whether to make the loan.

Q: Did Mr. Flatley ever raise the issue with you that the bondholders of that Epic Resorts, LLC have claims against Epic Palm Springs?...

A: No. Not to my knowledge....He just said that – that the indenture – I'm not sure what he means by that, but I assume it's some agreement with the

6

1    bondholders – that the indenture permitted the Palm Springs loan.

2

3           Q: Did he just bring that up out of the blue, or was that in response to--

4           A: No. I think that indenture discussion occurred way back when we were

5    making the loan. Yeah, I'm sure it did.

6           *See* Depoistion of Thomas Rondeau ("Rondeau Deposition") attached as Exhibit C to the

7    Aigen Declaration, pp. 90:10 – 91:2

8           As part of the loan agreement, required a lien on the Palm Springs property. Diversified's

9

10   position was that it did not loan money unless it had a security interest in real property.

11   Diversified reviewed the indenture and verified that it could make the loan.  In his deposition

12   Milanowski explained:

13           Q: Is this a typical USA Capital checklist, sir?

14           A: Yeah.  This was specifically – it's a – we have several checklists or one

15

16   primary one. This one took out extraneous requests, and it was more specified for

17   Epic.

18           Q: This checklist isn't dated, but I presume it was sent out before approval

19   of the loan; is that correct?

20           A: That's correct.

21           Q: Under the category "Borrower Information," NO. 3: "Copy of bond

22

23   indenture and prospectus for public bonds of Epic Resorts." Why did you ask for a

24   copy of the indenture in the prospectus?

25           A: Because we felt it was important.  Mr. Flatley told us there was a carve-

26   out for the Palm Springs property and an ability for him to borrow some

27   additional debt. Because we were looking for collateral.  We can only do real

28

1   estate loans; we don't do unsecured loans. So we wanted to verify that.

2

3   *See* Milanowski Deposition at pp. 27:21 – 28:18.  After receiving the Indenture, Diversified

4   expressed concerns regarding the effect of the Indenture on this loan arrangement.

5           Q: I am asking you: Did issues come up between USA Capital and Epic

6       Resorts that motivated you to ask for a legal opinion; and if so, what were they?

7                                          * * *

8
        A:  We, Tom Hantges and myself, wanted to get a legal opinion based
9
10      upon what Tom Flatley told us, that he had the property available to be

11      encumbered and that it was viable under the indenture.

12   *See* Milanowski Deposition pp. 56:17-20; 57:4-8.  Similarly, the in-house attorney Rondeau was

13   concerned about the restrictions in the indenture and he raised red flags about the loan.  *See*

14   Rondeau Deposition, pp. 58-60.  Rondeau was so concerned about the indenture he called John

15
     Rogers Burk ("Burk").  Burk responded to Rondeau's concerns in a letter stating:
16

17          Sometime ago you telephoned me with some concern about the language
            in the Offering Prospectus for the Indenture dated July 8, 1998 between Epic
18          Resorts, LLC as an Issuer and United States Trust Company of New York as
            Trustee.
19

20   *See* Letter from Burke to Rondeau, dated August 7, 2000, attached to the Aigen Declaration as

21   Exhibit F.  Notwithstanding its knowledge of the terms of the indenture and Epic's contractual

22   obligations with the Highland Funds, Diversified decided to loan the money and encumber the

23   propert.  Hantges testified that Diversified was going to take a security interest in the epic

24   property:

25
            Q: So he told you that the Palm Springs property would be the collateral
26
27       for the loan; is that correct?

28

                                            8

1
    A: That's correct.

2
                        * * *

3

4
    Q: What was your purpose in making that site visit?

5
    A: Just it's standard operating procedure for us on loans just to see the

6
collateral, see if it's not sitting next to a nuclear reactor.  You know, just make

7
sure the property is in good form and it's the kind of property we want to loan on.

8
Physically just eyeball the collateral."

9

10
                        * * *

11
    A: But in this particular case, we were loaning on the property.  Let's put it

12
that way.

13
    Q: So the property was going to be the collateral for the loan?

14
    A: Correct.  The Marquis Palm Springs.

15

16
*See* Hantges Deposition at pp. 12:9-12; 31:25-32:5;14:13-21.  Rondeau agreed

17
with Milanowski and Hantges when he testified that Diversified would not make loans

18
unless it had a security interest in the property:

19
    Q: Does the fund ever invest in loans which are not secured by a deed trust

20
on real property?

21
    A: No.  No. It always takes a first deed of trust and either a fee title or a

22
long-term lease, long-term ground lease.;

23

24
                        * * *

25

26
    Q: Does the fund typically request a guarantee when they make a loan?

27
    A: Oh, yes. We always get guarantees.

28

9

1

Q: Always?

2

A: Always.

3

4
*See* Rondeau Deposition, pp. 40:12-16 ;36:20-37:1

5
**4.**    **Diversified Loans The Money Anyway And Attempts To Gain A Superior Lien On**
**The Property.**

6

7
At some point during the negotiations, Diversified discovered that The Highland Funds'

8
lien on the Palm Springs property had not been properly perfected.  With full knowledge of the

9
agreement between Epic Resorts and the bondholders (as evidenced by the testimony of Hantges,

10
Milanowski, and Rondeau), Diversified and Epic Resorts entered into a transaction whereby

11
Diversified would loan money to Epic Resorts and Diversified would be granted a priority lien

12
on the Palm Springs property.

13

14
Q: How much was the loan that USA Capital made in connection with this

15
matter?

16
A: $11.5 million.

17
Q: You never had any follow-up questions with Mr. Flatley or anyone else

18
at Epic –

19

20
A: It wasn't necessary.

21
Q: And why wasn't it necessary?

22
A: We had our collateral, and we made the loan.

23
*See* Milanowski Deposition, at pp. 80:14-16; 82:12-17.  The loan documents were executed on or

24
about June 26, 2000,[2] and the loan closed on or about July 5, 2000.

25

26
    [2]  *See* Loan Agreement, dated June 26, 2000, attached to the Aigen Declaration as Exhibit G; Promissory Note,
dates June 26, 2000, attached to the Aigen Declaration as Exhibit H; Leasehold Deed of Trust, Assignment of Rents,
27
Security Agreement and Fixture Filing, dated June 26, 2000, attached to the Aigen Declaration as Exhibit I.

28

10

Q: Go to the last page where it says: "The foregoing instructions are accepted and agreed to on this 5 day of July, 2000." Does that reflect that the loan closed on July 5th, 2000?

A: I don't know if it closed on the 5th or the next day, but that's when this letter was sent. I don't know when it recorded.

*See* Milanowski Deposition, p. 44:9-17

**5.    Diversified Knew It Was Interfering With The Highland Funds' Contractual Rights.**

At all relevant times, Diversified knew:

1. That Epic Resorts was contractually required to obtain a leasehold mortgage on the Palm Springs property for the Highland Funds;

2. That Epic Resorts was contractually prohibited from granting liens or agreeing to borrow additional money; and,

3. That Epic Resorts was contractually required to perfect a lien on the Properties for the benefit of the bondholders.

Notwithstanding that knowledge, Diversified loaned money to Epic Resorts and placed a lien on the Palm Springs property. Diversified entered into this scheme, despite full knowledge of Epic Resorts' contractual agreements with the bondholders; thus, Diversified tortiously interfered with the bondholders' agreements.

**6.    Epic Resorts Stops Paying Interest To The Bondholders.**

Pursuant to the Bonds and the Indenture, Epic Resorts was required to make semi-annual payments on June 15 and December 15 of each year.  On June 15, 2001, Epic Resorts did not make the required interest payment to the bondholders, including the Highland Funds, in the amount of $8,450,000.  Deadman Declaration, at ¶ 7.  The grace period for this interest payment

11

expired on July 15, 2001. *Id.* On July 17, 2001, the bond trustee, on behalf of the bondholders, declared that an event of default existed under the Indenture and accelerated the entire amount due and owing under the Indenture and the Bonds. *Id.* To date, the interest payment and the accelerated amount have not been paid in full. *Id.*

**7.    The Highland Funds' Interests Cannot Properly Be Enforced.**

The Highland Funds were hindered in their ability to recover the money they loaned to Epic Resorts because of Diversified's lien. *Id.* at 8. In direct interference with the proper execution of the Indenture's provisions, Diversified entered into a "deed-in-lieu of foreclosure" with respect to the Palm Springs property. *Id.* Among other things, Diversified obtained a complete assignment of all leasehold and personal property located at the Palm Springs resort to Diversified. *Id.* Additionally, sixty-three unsold timeshare units remained at the Palm Springs resort. *Id.* These sixty-three unsold units comprised almost half of the entire inventory of unsold units available at all of the resorts owned by Epic Resorts. *Id.* Diversified transferred ownership of the sixty-three unsold timeshare units and all other personal property located in the Palm Springs property to itself. *Id.*

**8.    The Highland Funds Are Damaged.**

As a result of the contractual provisions entered into by the Highland Funds and Epic Resorts, the Highland Funds had a right to expect that they would have a lien on the Palm Springs property or that Epic Resorts would not have incurred additional debt or further encumbered the Palm Springs property. *Id.* at ¶ 9. However, because of Diversified's illegal acts, the Highland Funds were not able to reap the benefits of the contract that they entered into with Epic Resorts.

Even if the Highland Funds never perfected a lien, because of the other provisions

1    limiting new indebtedness and liens on Epic Resorts, but for Defendants' conduct, the Highland
2
3    Funds would have received the value of this property in the bankruptcy. As a result of the illegal
4    acts of Diversified, the Highland Funds were not able to enforce this lien and, thus, have been
5    damaged by at least $20 million. Additionally, the Palm Springs property is and could generate
6    additional revenue. *Id.* at ¶ 10. Therefore, the Highland Funds are being damaged by not being
7    able to receive that revenue.
8
9    **9.    BNY Pursues Diversified In The Epic Bankruptcy.**

10        After Epic Resorts defaulted on the Indenture, it was forced into bankruptcy. In the
11   bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware,
12   Diversified filed a Motion for and Order (i) granting Relief from the Automatic Stay, (ii)
13   Directing the Trustee to Provide Diversified with Adequate Protection, and (iii) Directing the
14   Debtor to Abandon Diversified's Collateral.    The Indenture Trustee, Bank of New York
15
16   ("BNY"), objected to the Motion and filed an adversary proceeding on the grounds that it
17   possessed an equitable lien or mortgage on Diversified's collateral and that Diversified's lien
18   position should be subordinated to BNY's lien. *See Bank of New York v. Epic Resorts - Palm*
19   *Springs Marquis Villas, LLC (In re Epic Capital Corp.)*, 290 B.R. 514, 517 (Bankr. D. Del.
20   2003). In February 2003, the Bankruptcy Court issued its opinion, finding that there should be
21
22   no equitable lien and that Diversified's conduct did not warrant a finding of equitable
23   subordination. *Id.* at 519-27.The Bankruptcy Court determined that Diversified, as a non-insider,
24   had to engage in "egregious" conduct to warrant a finding of equitable subordination. *Id.* at 524.
25   The Bankruptcy Court found that BNY "failed to satisfy its burden of demonstrating egregious
26   conduct" and therefore denied BNY's claim for equitable subrogation. *Id.* The Bankruptcy
27   Court did not consider whether Epic Resorts breached other obligations in the Indenture.
28

13

On appeal, the District Court, only addressing the claim for equitable subordination, affirmed the Bankruptcy Court's finding that Diversified's conduct was not sufficiently egregious to warrant equitable subordination.[3]   There was no evaluation of whether Epic Resorts had breached other covenants in the Indenture or Diversified's role in Epic Resorts' failure to make payments under the Indenture (other than Diversified had a valid lien that should not be subordinated).

**10.    Diversified Pursues And Loses A Motion For Summary Judgment In Nevada State Court**

On July 11, 2002 the Highland Funds filed a complaint against Diversified and John Rogers Burk in Nevada State Court.   On March 10, 2005, Diversified filed a Motion for Summary Judgment, arguing that the Highland Funds' claims should be dismissed based on collateral estoppel.[4]   A hearing was held on April 5, 2005.   The Nevada State Court denied this motion.[5]

## II.

## SUMMARY OF ARGUMENTS

Diversified's objections based on preclusion are meritless and should be denied for, at least, four reasons:

First, the preclusion issues have already been decided in the Highland Funds' favor by the

---

[3]   *Bank of New York v. Epic Resorts - Palm Springs Marquis Villas, LLC*, 307 B.R. 767, 772-73 (D. Del. 2004) ("[T]he Court agrees with the Bankruptcy Court's conclusions that the equitable subordination of USA Capital's lien is not warranted in this case. . . . As the Bankruptcy Court recognized, equitable subordination is an extraordinary remedy which is applied sparingly. . . . The Bankruptcy court's decision is consistent with this principle and with the case law requiring a more egregious level of inequitable conduct to warrant the equitable subordination of a non-insider's claim.").

[4]   *See* Diversified Motion for Summary Judgment, attached to the Aigen Declaration as Exhibit K.

[5]   *See* Nevada State Court Minutes Order, attached to the Aigen Declaration as Exhibit L.

14

1    Nevada State Court;
2
3        Second, Diversified incorrectly argues the Bankruptcy Court decision had a preclusive
4    effect in this suit when it was decided under a different standard;
5        Third, the issues in this suit were not fully and fairly litigated, and
6        Fourth, Diversified fails to sufficiently establish that the Highland Funds are in privity
7    with BNY.  Because Diversified fails to show that preclusion applies on dispositive issues,
8    Diversified fails to establish that its Objection is valid.
9
10       Additionally, Diversified's argument that the elements of tortious interference are not
11   satisfied is fatally flawed.   As discussed below, the evidence clearly demonstrates that
12   Diversified committed intentional acts designed to interrupt the Highland Fund's contractual
13   relations, those contractual relations were disrupted, and the Highland Funds were damaged.
14
                                           **III.**
15
                     **ARGUMENTS AND AUTHORITIES**
16
        **A.      The Nevada State Court Has Already Decided Twice That The Delaware
17                Courts' Rulings Do Not Collectively Estop The Highland Funds' Claims.**
18
        Diversified objects to the Highland Funds' claim under the doctrines of claim and issue
19
     preclusion.  However, Diversified conspicuously ignores the fact in its Objection that it filed a
20
     Motion for Summary Judgment in Nevada State Court, arguing the same grounds that it presents
21
     in its Objection.  That motion, which is basically identical to its Objection, sought to have the
22
     Nevada State Court grant summary judgment against the Highland Funds on the grounds that
23
     collateral estoppel prevented the Highland Funds from re-litigating issues that were raised and
24
     decided by the Delaware Courts.[6]  The court denied the motion and held that collateral estoppel
25

26       ---
         [6]  Additionally, John Rogers Burk, another defendant in Nevada State Court, also filed a motion for summary
27       judgment arguing that collateral estoppel applied to the Highland Funds' claims.

28

                                            15

did not apply to the Highland Funds' claims against Diversified.[7]  For the same reasons, which are discussed below, Diversified's objections should be overruled once again.

### B.    Claim Preclusion and Issue Preclusion Does Not Apply To Issues That Would Support Diversified's Objections.

Diversified objects to the Highland Fund's claims based on claims preclusion and issue preclusion.  The essence of both of these legal doctrines is that the Highland Funds were in privity with BNY and the issues denied by the Delaware Courts were identical to the issues raised in the instant case. *See* Diversified's Objection at 10-17.  As discussed below, however, and as current Nevada Supreme Court Justice Parraguirre and Judge Herndon both recognized, this is not the case.

### 1.    The dispositive issues in this case were not previously decided.

Diversified bears the burden of showing with "clarity and certainty" what was determined by the prior judgment. *Hydranautics v. Filmtec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000). Diversified claims that the identical issue is whether Diversified tortiously interfered with the Indenture between BNY and Epic. *See* Defendant Diversified's Objection at 9.  This is untrue. The issue in the Delaware Bankruptcy Court and on appeal before the District Court was the existence of the lien and whether Diversified tortiously interfered under an egregious standard with that contract.  The issue before this Court and the Nevada State Court is whether the Highland Funds have a contractual right that was interfered with by Diversified and whether that interference caused the Highland Funds' damages.  In fact, the Highland Funds' allege in this case that it was Defendants' interference that prevented the Highland Funds from having a

---

[7]    Similarly, when he was sitting as a trial judge, the Honorable Justice Ron Parraguirre denied Mr. Burk's motion and held that collateral estoppel did not apply.  A true and correct copy of the Order is attached to the Aigen Declaration as Exhibit M.

property interest.

The Highland Funds concede that the District Court affirmed the Bankruptcy Court's finding that the Indenture Trustee, and therefore the Highland Funds, do not have a property interest in the property and that the conduct of Diversified was not sufficiently egregious to warrant equitable subordination. However, neither the Bankruptcy Court nor the District Court considered the effect of Diversified's conduct on the failure of Epic Resorts to abide by the other covenants in the Indenture, including the prohibitions on Epic Resorts' ability to grant liens or to borrow additional money. Therefore, the lack of a property interest – addressed in the Delaware Bankruptcy Court - has no bearing on Diversified's interference, in this case, with the Indenture.

Moreover, the issues decided by the Bankruptcy Court and District Court were decided under a different standard-evaluating <u>egregious</u> conduct - thus making collateral estoppel improper.[8]   Intentional conduct, the standard for a finding of liability in this case,[9] is a lower standard than egregious conduct, which is often required by courts for the award of exemplary damages.[10]    For example, someone could commit a tort, like tortious interference, but his

---

[8]  *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1322 (9th Cir. 1992) ("Under New York law, the burden of proof for common law fraud requires clear and convincing evidence, a more stringent standard than the preponderance of the evidence standard applicable to fraud claims brought under section 10(b) and Rule 10b-5. Because collateral estoppel does not preclude claims that have a different burden of proof than previously decided claims, a failure to prevail on a fraud claim under New York law would not preclude a fraud claim under federal law.") (citations omitted); *Peterson v. Clark Leasing Corp.*, 451 F.2d 1291, 1292 (9th Cir. 1974) ("The doctrine of collateral estoppel prevents parties from re-litigating issues that have been resolved in an earlier action between the same parties or their privies. The doctrine applies only to issues that are identical in both actions. Issues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits be the same.") (citing MOORE'S FEDERAL PRACTICE).

[9]  Tortious interference, aiding and abetting, and conspiracy all require intentional conduct. *See* Diversified's Objection at 18-20.

[10]  *See, e.g., Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1167, 1192 (3rd Cir. 1993) (finding that tortious interference requires intentional conduct but punitive damages are only awarded upon a finding of egregious conduct); *see also Fineman v. Armstrong World Indus.*, 774 F. Supp. 225, 244 n.16 (D.N.J. 1991), *aff'd in part, rev'd in part* 980 F.2d 171 (3rd Cir. 1992) ("The malice standard that applies to tortious interference with a

behavior would not rise to the level requiring punitive damages to be awarded. Therefore, collateral estoppel also does not apply because the standard used by the Bankruptcy and District Courts is a more stringent standard than required here.[11]

As the Nevada State Court recognized twice already, neither the District Court's nor the Bankruptcy Court's decisions can serve as collateral estoppel because dispositive issues were not previously decided and because the issues that were decided were evaluated under another standard.[12]

**2.    There has been no "full and fair" litigation of Diversified's conduct.**

Diversified concedes that for collateral estoppel to apply, the issue must be fully and fairly litigated. *See* Diversified's Objection at 17. However, as discussed previously, the issues that would need to be "fully and fairly litigated" have not been decided. Specifically, there has been no assessment of whether Diversified's actions constituted tortious interference with Epic Resorts' contract with the Highland Funds under the appropriate state law standard. Therefore,

_____

prospective contract is less stringent than that required for punitive damages despite the fact that the word "malice" is used for both. Punitive damages may be awarded in New Jersey only where the conduct of the defendant is particularly egregious.").

[11]    *Clark*, 966 F.2d at 1322 ("Under New York law, the burden of proof for common law fraud requires clear and convincing evidence, a more stringent standard than the preponderance of the evidence standard applicable to fraud claims brought under section 10(b) and Rule 10b-5. Because collateral estoppel does not preclude claims that have a different burden of proof than previously decided claims, a failure to prevail on a fraud claim under New York law would not preclude a fraud claim under federal law.") (citations omitted); *Peterson*, 451 F.2d at 1292 ("The doctrine of collateral estoppel prevents parties from re-litigating issues that have been resolved in an earlier action between the same parties or their privies. The doctrine applies only to issues that are identical in both actions. Issues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits be the same.") (citing MOORE'S FEDERAL PRACTICE).

[12]    *Cf. Brennan v. EMDE Medical Research, Inc.*, 652 F. Supp. 255, 266 (D. Nev. 1986) ("By holding that the Highland Funds were not entitled to inspect the books, the state judge did not thus necessarily decide that there had also been no fraud in the amendment of the Articles and the issuance of new stock.") (citing *Landex, Inc. v. State ex rel. List*, 94 Nev. 469, 582 P.2d 786, 790 (Nev. 1978) (issue preclusion proper only where issues actually and necessarily decided in prior proceeding)).

1  again, collateral estoppel cannot apply to this Court's consideration of the Highland Funds'
2
3  claims against Diversified.

4      **3.    Diversified has not established privity.**

5      Diversified contends that BNY and the Highland Funds are in privity for purposes of *res*

6  *judicata* and collateral estoppel. Specifically, Diversified claims that the Indenture creates this

7  privity and that privity is somehow created by the mere fact that BNY and the Highland Funds

8
9  had the same counsel. The Indenture, however, does not say anything about privity, and the fact

10  that the parties had the same counsel is irrelevant to issue and claim preclusion.

11      In support of its contention that privity exists, Diversified cites to three cases, *Kersh*

12  *Lake, City of Seattle, and Stratosphere Litigation.*[13]  However, Trust Fund Deed merely

13  summarizes those cases without offering any explanation of how or why those decisions apply to

14  this case. Rather than guess what Trust Fund Deed's argument for application of these cases may

15
16  be, Highland Funds points out that these cases are factually distinguishable from this case. *Kersh*

17  *Lake*, in addition to offering no discussion of privity, involves a case where certificate holders

18  were barred by statute from being made parties in certain proceedings. As a result, the certificate

19  holders were bound by the actions of their statutorily-imposed representatives. *See Kersh*, 309

20  U.S. at 644-45.  *City of Seattle*, while somewhat similar factually to this case, turns on the

21  specific language of the contract at issue in that case and whether certain groups interests were
22
23  adequately represented.[14]  As such, the holding in *City of Seattle* is case-specific and has no

24

25      [13] *Kersh Lake Drainage Dist. v. Johnson*, 309 U.S. 485 (1940); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1991); *Stratosphere Litigation, L.L.C. v. Grand Casinos, Inc.*, 298 F.3d 1137 (9th Cir. 2002).

26      [14] *See City of Seattle*, 955 F.2d at 1279 ("The critical inquiry to determine whether the district court had both
27  jurisdiction and authority to approve the anti-suit settlement must be whether Chemical bank was authorized under
the Bond Resolution to settle claims on behalf of all Bondholders and whether it acted as an authorized and adequate

28

19

1
2    application to the Indenture in this case.  Finally, *Stratosphere* involves application of *res*
3    *judicata* in the context of confirming a plan of reorganization, and is therefore also
4    distinguishable from this case. *See Stratosphere Litigation*, 298 F.3d at 1143)

5           To prove that *res judicata* or collateral estoppel apply, Diversified must demonstrate that
6    the Highland Funds are in privity with the Trustee.  Nevada courts define a "privy" in the
7    collateral estoppel context as "one, who after rendition of the judgment, has acquired an interest
8
9    in the subject matter affected by the judgment through or under one of the parties, as by
10   inheritance, succession, or purchase."[15]  Diversified has thus failed to establish that the Highland
11   Funds and BNY are in privity for collateral estoppel purposes.

12

13   **C.     There is Sufficient Evidence To Support The Highland Fund's Tortious
           Interference Claims.**

14          Diversified also claims that the Highland Funds cannot prove the elements of tortious
15   interference.  Specifically, it claims that the Highland Funds cannot establish that Trust Fund
16
     Deed committed intentional acts intended or desired to disrupt a contractual relationship, that
17
18   there was an actual disruption, and that there were damages. *See* Trust Fund Deed's Objection at
19   18. This contention is untrue.

20          USA Capital's interference with the Indenture is manifest upon review of the sworn
21   testimony of its principals, who admit that they had knowledge of the Indenture prior to entering
22

23

24   ──────────────────────
     representative of the Heerey Group's interests.  If both of these requirements are met, Chemical bank was in privity
25   with the members of the Heerey Group...").

26        [15]  *In re Shuman*, 68 B.R. 290, 292 (D. Nev. 1986) (finding that a trustee cannot use a state court finding to
     serve as collateral estoppel in a subsequent adversary proceed because the trustee is not in privity with either creditor
27   bank or the debtor).

28

                                        20

into the transaction. Such admissions were made in sworn depositions,[16] as well as under oath in other legal proceedings.[17]

Clearly, these intentional acts disrupted the contractual relationship between the Highland Funds and Epic Resorts, as these acts specifically prevented the Highland Funds from receiving the benefit of the bonds. Deadman Declaration at ¶¶ 8-10. As such, the Highland Funds were

---

[16] *See* Deposition Transcript of Joseph Milanowski ("Milanowski Deposition"), dated April 11, 2002, excerpts of which are attached as Exhibit A hereto, p. 28:8-16 ("Q: Why did you ask for a copy of the indenture in the prospectus? A: Because we felt it was important Mr. Flatley told us there was a carve-out for the Palm Springs property and an ability for him to borrow some additional debt."); p. 32:6-18 ("Q: If you could just take a look at [Exhibit 4]. I just want you to verify that this is a copy of the indenture that, number one, USA Capital produced and, number two, that that's a copy of the indenture provided to you by Mr. Flatley. A: I believe it is. Q: And that was provided to you in connection with the June 1 letter? A: It was provided to us in connection with this loan. Q: And it was provided to you prior to your approving the loan? A: Yes it was."); *see also* Deposition Transcript of Thomas Hantges ("Hantges Deposition"), dated April 11, 2002, excerpts of which are attached as Exhibit B hereto, p. 28:9-11, 15-17 ("Q: Well, on this particular loan, do you recall any aspects of the due diligence in which you were personally involved? A: I recall that we reviewed the bond indenture to see if it was permissible to make a loan."); pp. 71:21 – 72:9 ("Q: You mentioned the bond indenture and prospectus on here. Do you know why USA Capital asked for copies of those? A: Yes, because we wanted to see what the bond indenture allowed, what it didn't allow. And the only way to do that is obviously to get a copy of it. Q: Do you recall if you were provided a copy of it? A: Yes, we were. Q: Were you provided those prior to approving the loan. A: Yes, we were."); *see also* Deposition Transcript of Thomas Rondeau ("Rondeau Deposition"), dated December 6, 2001, excerpts of which are attached as Exhibit C hereto, pp. 90:10 – 91:2 ("Q: Did Mr. Flatley ever raise the issue with you that the bondholders of that Epic Resorts, LLC have claims against Epic Palm Springs?…A: No. Not to my knowledge….He just said that – that the indenture – I'm not sure what he means by that, but I assume it's some agreement with the bondholders – that the indenture permitted the Palm Springs loan. Q: Did he just bring that up out of the blue, or was that in response to -- A: No. I think that indenture discussion occurred way back when we were making the loan. Yeah, I'm sure it did.").

[17] *See* Transcript of Proceedings, dated April 30, 2002, in Case No. 01-2458 in the United States Bankruptcy Court for the District of Delaware, excerpts of which are attached as Exhibit D, pp. 34:18 – 35:12 ([Milanowski Cross] – Q: And in number 3 you asked for a copy of bond indenture and prospectus of public bonds of Epic Resorts. Is that correct? A: [by Milanowski] That's correct. Q: Did you receive a copy of both of those documents? A: Yes, we did. Q: Why did you ask for a copy of those? A: Because we knew – we knew that they were outstanding. We knew that that was part of the – that was why Epic had to file public reports and documents. And we wanted to make sure that we just understood the full financial condition of the borrower. Q: Was it also to figure out whether the bondholders had a claim to Epic Palm Springs and its property. A: It was to make sure that whatever loan we were providing was not violating any covenants. "); *see also* Transcript of Proceedings, dated May 21, 2002, in Case No. 01-2458 in the United States Bankruptcy Court for the District of Delaware, excerpts of which are attached as Exhibit E, p. 38:8 – 19 ([Flatley Cross] – Q: And you testified on direct that the existence of the Indenture was disclosed to USA Capital; is that correct? A: [by Thomas Flatley] Correct. Q: And USA Capital requested copies of the Indenture and the Prospectus as part of their due diligence; correct? A: Correct. Q: And USA Capital, in fact, received copies of those documents as part of their due diligence; correct? A: Yes.").

clearly damaged.[18]   Thus, there is sufficient evidence to support the Highland Fund's tortious interference claims.[19]

### D. The Delaware Courts' Rulings Have No Effect On The Highland Funds' Conspiracy And Aiding and Abetting Claims.

#### a. Conspiracy

To recover on a claim for conspiracy, the Highland Funds have to establish "a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts." *Hilton Hotels Corp. v. Butch Lewis Prods.*, 109 Nev. 1043, 1048, 862 P.2d 1207, 1210 (Nev. 1993).   Diversified argues that this claim fails as a matter of law because there is no evidence of tortious interference. Diversified's Objection at 20. This argument is, at best, irrelevant. Even Diversified must concede the Courts found that "Epic Resorts and Epic Capital defaulted on their *obligation* to make an \$8.45 million interest payment to their Bondholders." *Bank of New York*, 307 B.R. 767, 770 (emphasis added)  At a minimum, there was a contractual obligation to make

---

[18]   Moreover, USA capital's alleged reliance on the opinion letter drafted by John Rogers Burk is disingenuous in light of the fact that the relevant loan documents were executed prior to receiving the Opinion Letter – in fact, USA Capital did not receive the requested Legal Opinion until July 31, 2000, after it had already (i) executed the loan documents; (ii) closed on the loan, (iii) recorded its leasehold deed of trust against Epic Palm Springs, and (iv) funded the first installment of \$5 million, less fees. *See* Loan Agreement, dated June 26, 2000, attached to the Aigen Declaration as Exhibit G; Promissory Note, dated June 26, 2000, attached to the Aigen Declaration as Exhibit h; *see also* Transcript of Proceedings, dated May 21, 2002, in Case No. 01-2458 in the United States Bankruptcy Court for the District of Delaware, excerpts of which are attached to the Aigen Declaration as Exhibit E, pp. 41 – 43 (Thomas Flatley testifying that the Opinion Letter was dated July 31, 2006, that the USA Capital Loan Transaction closed on July 5' 2000, and that the Loan Agreement and Leasehold Deed of Trust were dated June 26, 2000).

[19]   In conclusory fashion, absent any evidence or analysis, Diversified claims, in a footnote, that it was "justified and/or privileged" in making the loan that interfered with the Indenture and any liens belonging to Highland Funds. No such justification exists, however, where the interfering party's actions are improper. *See National Right to Life Political Action Committee v. Friends of Bryan*, 741 F. Supp. 807, 814 (D. Nev. 1990); RESTATEMENT (SECOND) OF TORTS § 767.   Here, the deposition testimony of USA Capital's principles regarding their actions, level of knowledge, and motives all demonstrate that its interference was improper and not justified or privileged.

1
2    payments to the Highland Funds, which Diversified fails to acknowledge. There was no
3    evaluation of all the duties owed under the Indenture. Indeed, there was no evaluation of whether
4    Epic Resorts breached its duties not to incur additional debt or further encumber the property.
5    The Highland Funds contend and have the burden to prove that Diversified promoted Epic
6    Resorts' failure to abide by these obligations. Diversified's argument that they did not tortiously
7    interfere is irrelevant to this issue, especially considering the "egregious" standard used by the
8    Delaware courts.
9

10                                b.      Aiding and Abetting

11          To prove a claim for aiding and abetting, the Highland Funds must show that Diversified
12    substantially assisted or encouraged Epic's conduct in breaching the Indenture. *Dow Chem. Co.
13    v. Mahlum,* 114 Nev. 1468, 1490, 970 P.2d 98, 112 (Nev. 1998) Specifically, (1) Epic must have
14    committed an act (such as failing to perform under the Indenture) that injured the Highland
15    Funds; (2) that Diversified was aware of its role in promoting the failure to perform at the time
16    he provided assistance; and (3) that Diversified knowingly and substantially assisted Epic in its
17    failure to perform. *Id.*
18

19          Diversified also objects to the Highland Fund's claims because there was no tortious
20    interference. *See* Diversified's Objection at 19. This, however is untrue. Again, the Delaware
21    courts found that Diversified did not engage in behavior sufficiently egregious to warrant
22    equitable subordination. *See Bank of New York,* 307 B.R. at 772. There was no finding that
23    Epic Resorts did not breach its other obligations under the Indenture and there was no finding
24    that Diversified did not knowingly substantially assist or encourage Epic Resorts.
25
26          All of these issues are integral to this Court's determination of the Highland Funds'
27    claims for aiding and abetting. Because none of these issues were decided, the Highland Funds'
28

claims cannot be precluded as a matter of law.

## IV.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, the Highland Funds respectfully request that the Court reject Diversified's Objection to Proof of Claim Filed by the Highland Funds in its entirety and grant whatever further and other relief the Court deems necessary and just.

DATED this $\underline{4}$ day of October, 2006.

Rawlings, Olson, Cannon, Gormley & Desruisseaux

By: _____
CiCi CUNNINGHAM 4960
JAMES A. KOHL 5692
Rawlings, Olson, Cannon, Gormley &
Desruisseaux
9950 W Cheyenne Ave
Las Vegas, Nevada 89129
(702) 384-4012

PAUL B. LACKEY
Texas Bar No. 00791061
MICHAEL P. AIGEN
Texas Bar No. 24012196
LACKEY HERSHMAN, L.L.P.
3102 Oak Lawn Avenue, #777
Dallas, Texas 75219
(214) 560-2201 - Phone
(214) 560-2203 – Fax

24

1

2

## CERTIFICATE OF SERVICE

3

4    I hereby certify that on the 4th day of October, 2006, I transmitted a true and correct

5    copy of the foregoing Opposition to Diversified Trusts Objection to Proof of Claim by placing it

6    in a facsimile machine and transmitting it to the number set forth below.

7

8        Bob L. Olson (Nevada Bar No. 3783)
         Anne M. Loraditch (Nevada Bar No. 8164)

9        Beckley Singleton, Chtd.
         530 Las Vegas Boulevard South

10       Las Vegas, Nevada  89101

11       (702) 385-5024 - Facsimile

12

13       Attorneys for
         Diversified Diversified Committee

14

15

16

17       Tina Goddard

18

19

20

21

22

23

24

25

26

27

28