# EXHIBIT A

## In The Matter Of:

*IN RE*
*EPIC CAPITAL CORPORATION*

---

*JOSEPH D. MILANOWSKI*
*April 11, 2002*

---

*ASSOCIATED REPORTERS OF NEVADA*
*CERTIFIED COURT REPORTERS*
*2300 W. SAHARA AVENUE*
*SUITE 770*
*LAS VEGAS, NV  USA  89102*
*(702) 382-8778    FAX: (702) 382-2050*

*Original File MILA0411.02, 87 Pages*
*Min-U-Script® File ID: 1214065973*

## Word Index included with this Min-U-Script®

Page 1

[1]          UNITED STATES BANKRUPTCY COURT
[2]              DISTRICT OF DELAWARE
[3]
[4]
[5] In re                        )
                                 ) Chapter 11
[6] EPIC CAPITAL CORPORATION,    )
    EPIC RESORTS, LLC,           ) Case No.
[7]                              ) 01-002458(MFW)
            Debtors.             )
[8]
[9]
[10]
[11]
[12]
[13]       DEPOSITION OF JOSEPH D. MILANOWSKI
[14]    Taken on Thursday, April 11, 2002
[15]          At 10:45 a.m.
[16]        4498 South Pecos Road
[17]          Las Vegas, Nevada
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25] Reported by: CYNTHIA K. DuRIVAGE, CSR No. 451

Page 2

[1] APPEARANCES:
[2] For the Bank of New York, as Indenture Trustee:
[3]          THOMAS A. HOWLEY, ESQ.
             Haynes And Boone
[4]          1000 Louisiana Street
             Suite 4300
[5]          Houston, Texas 77002-5012
             (713) 547-2412
[6]
[7] For the Official Committee of Unsecured Creditors:
[8]          W. HARDING DRANE, JR., ESQ.
             Potter, Anderson & Corroon
[9]          P.O. Box 951 - Hercules Plaza
             Wilmington, Delaware 19899
[10]         (302) 984-6000
[11]
     For the Trustee Anthony Schneliing:
[12]
             JOSEPH E. STRAUSS, ESQ.
[13]         Stroock & Stroock & Lavan
             180 Maiden Lane
[14]         New York, New York 10038-4982
             (212) 806-5526
[15]
[16] For USA Capital and the Witness:
[17]         JEFFREY A. DELLER, ESQ.
             Klett, Rooney, Lieber & Schorling
[18]         One Oxford Centre
             40th Floor
[19]         Pittsburgh, Pennsylvania 15219-6498
             (412) 392-1615
[20]
[21]
[22]
[23]
[24]
[25]

IN RE
EPIC CAPITAL CORPORATION

JOSEPH D. MILANOWSKI
April 11, 2002

---

Page 15

[1] Q: Do you ask for business models? Do
[2] you ask for projections? Do you sit down with them
[3] and talk to them?
[4] A: Typically, we'll have — typically,
[5] we'll have a proforma on project of construction
[6] budgets.
[7] You know, that's typical.
[8] Q: Do you normally do an on-site
[9] inspection?
[10] A: We always do an on-site inspection.
[11] Q: Always?
[12] A: (No audible response.)
[13] Q: How does the fund typically get
[14] access to capital in order to fund the proceeds of
[15] the loans? Is it exclusively investor money?
[16] A: It's investor money.
[17] Q: Since the fund's inception, has the
[18] fund had to have foreclosed on any collateral?
[19] A: The fund has not foreclosed on any
[20] property since its inception.
[21] Q: So it has had a pretty good track
[22] record?
[23] A: Yes, it has.
[24] Q: I saw a reference in the prospectus
[25] to the fact that the fund has created an entity to

Page 16

[1] acquire property in the instances where there has
[2] been a foreclosure or a workout? My impression was
[3] it was to get the loan out of — a nonperforming
[4] loan out of the fund?
[5] A: I think you misconstrued the
[6] prospectus.
[7] Q: So that is incorrect?
[8] A: Yeah. I think the prospectus — and
[9] I don't have it with me, so what I say is from
[10] memory. But I believe it says that the fund may
[11] sell property to a related entity and fund the sale
[12] of that property.
[13] But I'd have to refer to the
[14] prospectus as to what exactly it says. But I know
[15] it does not say it has created an entity. The fund
[16] does not have any other separate entities.
[17] Q: Is the fund currently involved in any
[18] significant litigation, other than —
[19] A: The fund has been named —
[20] MR. DELLER: I object on relevance.
[21] MR. HOWLEY: I am trying to get an
[22] overall picture of the fund, and to the extent it
[23] is involved in other litigation, it might be
[24] relevant to this, it might not be.
[25] I think I just need to have a general

Page 17

[1] picture of the fund and its business.
[2] MR. DELLER: With my objection noted,
[3] you can go ahead and answer that.
[4] THE WITNESS: Okay. The fund has
[5] been named in a lawsuit in March of 2001, along
[6] with — along with a number of other — USA
[7] Commercial Mortgage Company, Tom Hantges, myself,
[8] from a borrower.
[9]                    BY MR. HOWLEY:
[10] Q: And what are the allegations in the
[11] lawsuit?
[12] A: The allegations, which were recently
[13] displaced, included fraud, racketeering, you know,
[14] a number of, I believe found by the judge to be
[15] trumped-up allegations.
[16] Q: Where was that filed?
[17] A: Las Vegas.
[18] Q: You said it was dismissed. Is it on
[19] appeal?
[20] A: It was just — the ruling just came
[21] last — earlier this week, I think. Maybe it was
[22] last week.
[23] Q: Is it correct that the fund was
[24] contacted at some point in 2000 by Mr. Flatley?
[25] A: The fund through its manager, through

Page 18

[1] USA Capital, was contacted.
[2] Q: First of all, do you know who Tom
[3] Flatley is?
[4] A: Yes.
[5] Q: And who is he?
[6] A: He was the president of — is the
[7] president of Epic Resorts, primary owner of Epic
[8] Resorts as well.
[9] Q: Who did Mr. Flatley contact at
[10] USA Capital?
[11] A: Well, I met Tom Flatley, he had
[12] already — I don't know who directly brought in.
[13] He had already been introduced to my partner.
[14] I met Mr. Flatley originally here in Las Vegas in
[15] our offices. He was brought in by my partner, Tom
[16] Hantges.
[17] Q: And you don't know who introduced him
[18] to Mr. Hantges?
[19] A: No, I don't.
[20] Q: Do you know what Epic Resorts, LLC
[21] is?
[22] A: Epic Resorts, LLC is a time-share
[23] company.
[24] Q: Do you know what Epic Resorts Palm
[25] Springs Marquis Villas is?

---

Page 19

[1] A: That is the subsidiary that holds
[2] the — of Epic Resorts that holds the property
[3] Marquis Villas.
[4] Q: From here on, I would like to refer
[5] to that as Epic Palm Springs.
[6] A: Fine.
[7] Q: Do you recall when USA Capital was
[8] contacted by Mr. Flatley?
[9] A: Spring, summer of 2000. May, June,
[10] something like that.
[11] Q: Can you describe his initial
[12] communications with USA Capital?
[13] A: I can describe his initial
[14] communications as I know them from the time that I
[15] met him.
[16] Q: Yes.
[17] A: You know, like I said, he came into
[18] our office. I was introduced to him in our office
[19] by my partner. And he was asking a loan.
[20] Q: Do you know who a gentleman name
[21] Salvatore Reale is?
[22] A: Yes.
[23] Q: And who is that?
[24] A: He is a client of ours or has been a
[25] client of ours.

Page 20

[1] Q: In what way is he a client of
[2] USA Capital?
[3] A: He invested in some loans with us the
[4] past couple of years.
[5] Q: So is he affiliated with USA Capital?
[6] A: No.
[7] Q: Do you know if he is affiliated with
[8] Mr. Flatley?
[9] A: I don't believe he is.
[10] Q: Have you heard of a firm called
[11] Interstate Consultant?
[12] A: Never.
[13] Q: You haven't?
[14] A: No.
[15] Q: So you don't know what that entity
[16] does?
[17] A: I have no idea.
[18] Q: When Mr. Flatley, when he
[19] communicated to you, who did he say he was acting
[20] on behalf of?
[21] A: Epic Resorts.
[22] Q: Do you know who else was involved in
[23] the initial communications with Epic, or was there
[24] anybody else?
[25] A: The only people that I dealt with

Page 21

[1] from Epic during the transaction were Mr. Flatley,
[2] his attorney out of California, Rogers Burk, and
[3] that's the only ones that I recall.
[4] MR. HOWLEY: Can you mark that
[5] Exhibit 1, please.
[6] (Exhibit 1 was marked for
[7] identification.)
[8] BY MR. HOWLEY:
[9] Q: Take a look at that letter, please.
[10] It's a letter produced by USA Capital.
[11] A: It doesn't look like a letter
[12] produced by USA Capital. It looks like a letter
[13] produced by Epic Resorts.
[14] Q: It was produced in response to a
[15] document request by Bank of New York.
[16] A: Okay.
[17] Q: It's Bates stamped 04551 to 04553.
[18] It's a letter from Mr. Flatley to
[19] Sal, who I believe is Salvatore Reale.
[20] If you could take a look at that
[21] letter, I am going to ask you a couple questions
[22] about it.
[23] A: Okay.
[24] Q: Does this refresh your recollection
[25] as to who introduced Mr. Flatley to USA Capital?

Page 22

[1] A: Like I said, Mr. Flatley, I first
[2] knew about him when he came into our office and I
[3] was introduced to him by Tom Hantges.
[4] Q: So this first line says:
[5] "Once again, I would like to
[6] thank you for taking the time
[7] to meet in Las Vegas to
[8] introduce me to Tom and Joe."
[9] A: Uh-huh.
[10] Q: So you didn't know that Salvatore
[11] Reale referred Mr. Flatley to USA Capital?
[12] A: You know, I knew that Sal had talked
[13] to Mr. Flatley. Okay? I didn't — I knew that he
[14] had talked to him. Okay? And he may have
[15] introduced him to Tom in Palm Springs.
[16] When I first met him, Tom Flatley,
[17] was in the office when Tom brought — Tom Hantges
[18] brought Tom Flatley into the office.
[19] Q: So this line is wrong where it
[20] says —
[21] MR. DELLER: Objection. That's
[22] argumentative.
[23] The witness has answered the
[24] question.
[25]

Page 27

[1]  A: My partner has been more involved
[2]  with that one.
[3]  Q: When you say your partner, is that
[4]  Mr. Hantges?
[5]  A: Tom Hantges.
[6]  Q: Is there something in the water over
[7]  in Palm Springs in that area, that street there?
[8]  Sorry.
[9]  A: Opportunities.
[10]  Q: Who primarily dealt with Mr. Flatley
[11] and Epic Palm Springs in the preapproval process?
[12]  A: That would have been my partner, Tom
[13] Hantges.
[14]  MR. HOWLEY: Mark that 2, please.
[15]  (Exhibit 2 was marked for
[16] identification.)
[17]                    BY MR. HOWLEY:
[18]  Q: Would you take a look at that,
[19] please. I have handed you what will be marked
[20] Exhibit No. 2.
[21]  Is this a typical USA Capital
[22] checklist, sir?
[23]  A: Yeah. This was specifically — it's
[24] a — we have several checklists or one primary
[25] one. This one took out extraneous requests, and it

Page 28

[1]  was more specified for Epic.
[2]  Q: This checklist isn't dated, but I
[3]  presume it was sent out before approval of the
[4]  loan; is that correct?
[5]  A: That's correct.
[6]  Q: Under the category "Borrower
[7]  Information," No. 3:
[8]  "Copy of bond indenture and
[9]  prospectus for public bonds of
[10] Epic Resorts."
[11] Why did you ask for a copy of the
[12] indenture in the prospectus?
[13]  A: Because we felt it was important.
[14] Mr. Flatley told us there was a carve-out for the
[15] Palm Springs property and an ability for him to
[16] borrow some additional debt. Because we were
[17] looking for collateral. We can only do real estate
[18] loans; we don't do unsecured loans.
[19]  So we wanted to verify that.
[20]  Q: And who talked to him about what
[21] collateral was available for a loan?
[22]  A: Tom Hantges.
[23]  Q: Were you privy to any of those
[24] discussions?
[25]  A: You know, what we were going to have

Page 29

[1]  as collateral for the loan was pretty much decided,
[2]  I believe, by the time I got involved.
[3]  Q: So it was Mr. Hantges that reached
[4]  that period of the negotiations?
[5]  A: The conversation probably would have
[6]  gone — I'm just speculating because this is
[7]  typically what happens, would be the borrower asks
[8]  for a loan, and we ask what collateral they have
[9]  because we're not unsecured lenders; we're real
[10] estate lenders.
[11]  Q: Do you know if you got answers to all
[12] these questions, all these checklist items?
[13]  A: I believe we did.
[14]  Q: If you could go to No. 5:
[15]  "Use of proceeds: What will
[16] loan proceeds be used for.""
[17] What was the answer given to you?
[18]  A: I can't recall at this time.
[19]  Q: You can't recall?
[20]  A: I'd have to review the tile. I don't
[21] know.
[22]  Q: But is it an item that you looked at
[23] in preparation for this deposition?
[24]  A: No.
[25]  Q: The second category of information

Page 30

[1]  says, "Project Information."
[2]  What project is that referring to?
[3]  A: The Palm Springs property.
[4]  Q: And when you say, "The Palm Springs
[5]  property," that's the Epic Palm Springs Resort?
[6]  A: Right.
[7]  MR. HOWLEY: Mark this No. 3,
[8]  please.
[9]  (Exhibit 3 was marked for
[10] identification.)
[11]                    BY MR. HOWLEY:
[12]  Q: This is a letter produced by
[13] USA Capital, authored by Mr. Flatley.
[14]  MR. DELLER: Do you have an extra
[15] copy for me?
[16]  MR. HOWLEY: I do.
[17]                    BY MR. HOWLEY:
[18]  Q: It was sent to you on June 1st.
[19] Do you recall receiving this letter?
[20]  A: I believe I, yes, received and read
[21] this.
[22]  Q: Was it in response to the checklist
[23] that you just —
[24]  A: Yes, it was.
[25]  Q: Now, if you turn back to the

**Min-U-Script®**

Page 31

[1] checklist, item 6 that you asked for was:
[2]     "Copies of contracts on
[3] purchases to be consummated
[4] with proceeds."
[5] I don't see that anywhere on this
[6] June 1 letter. Was that previously provided to
[7] you, or was it ever provided to you?
[8]     A: I don't recall at this time.
[9]     Q: If you could turn to page 2, the
[10] first full paragraph under No. 9, Mr. Flatley
[11] says:
[12]     "Joe, including the enclosed
[13] information and what I have
[14] sent previously, I believe this
[15] gives you everything you
[16] requested."
[17] Did you agree with that statement
[18] when you read this letter?
[19]     A: I don't remember right now.
[20]     Q: You don't remember?
[21]     MR. DELLER: Objection. Asked and
[22] answered.
[23]     MR. HOWLEY: One of the documents
[24] identified in Mr. Flatley's letter is the
[25] indenture.

Page 32

[1]     Please mark this as the next
[2] exhibit.
[3]     (Exhibit 4 was marked for
[4] identification.)
[5]                 BY MR. HOWLEY:
[6]     Q: If you could just take a look at
[7] that. I just want to verify that this is a copy of
[8] the indenture that, number one, USA Capital
[9] produced and, number two, that that's a copy of the
[10] indenture provided to you by Mr. Flatley.
[11]     A: I believe it is.
[12]     Q: And that was provided to you in
[13] connection with the June 1 letter?
[14]     A: It was provided to us in connection
[15] with this loan.
[16]     Q: And it was provided to you prior to
[17] your approving the loan?
[18]     A: Yes, it was.
[19]     Q: Along with the indenture, you
[20] requested the prospectus.
[21]     A: Uh-huh.
[22]     MR. HOWLEY: Could you mark that.
[23]     (Exhibit 5 was marked for
[24] identification.)
[25]     MR. DELLER: If we could let the

Page 33

[1] letter reflect that this is a 150-page document,
[2] the indenture.
[3]     MR. HOWLEY: Yes. It is what it is.
[4]                 BY MR. HOWLEY:
[5]     Q: If you could, sir, just take a look
[6] at that, and I would just like to verify that
[7] that's a copy of the prospectus provided to you,
[8] provided to USA Capital.
[9]     A: Yes, I believe this would have been.
[10] Yes.
[11]     Q: Was it provided to USA Capital prior
[12] to approval of the loan?
[13]     A: Yes, it was.
[14]     Q: Mr. Milanowski, did you conduct an
[15] on-site inspection of Epic Palm Springs?
[16]     A: Yes, I did.
[17]     Q: How many times did you visit the
[18] property?
[19]     A: I myself was down there once.
[20]     Q: Was that before USA Capital approved
[21] the loan?
[22]     A: Yes, it — it was before we funded
[23] the loan.
[24]     Q: You say before you funded the loan.
[25] Is that a distinction? Was it after you approved

Page 34

[1] it but before you funded it?
[2]     A: I don't quite remember.
[3] Sometimes — Tom was down there before.
[4]     Q: Tom Hantges?
[5]     A: Tom Hantges. I'm sorry.
[6]     Q: There are a lot of Toms involved in
[7] this.
[8]     A: Yeah. We've got four Toms in our
[9] office.
[10]     Q: I have been called Tom Flatley
[11] several times in this case.
[12]     A: You know, a lot of times, we may do
[13] an inspection, you know, just in conjunction with
[14] the final step to the approval, or it's just we may
[15] have approved it. conditioned on an inspection.
[16]     I know that Tom Hantges had been down
[17] to the property prior to my going to the property.
[18]     Q: So you visited the property as part
[19] of the due diligence?
[20]     A: That's correct. Either Tom Hantges
[21] or myself did.
[22]     Q: Did you go there to look at the
[23] construction or the development that was going to
[24] be undertaken by Epic?
[25]     A: I don't know what you're getting at.

---

Page 43

[1] A: Our written form of approval means we
[2] start — we start drafting loan documents.
[3] Q: So there is no formal letter that
[4] says, "The proposal dated March —"
[5] A: No.
[6] Q: — or, "May 29 is —"
[7] A: No, there's not.
[8] Q: Who was involved in the
[9] decision-making to approve the loan?
[10] A: Tom Hantges and myself.
[11] Q: So I assume it was a unanimous
[12] approval?
[13] A: Yes, it was.
[14] Q: And how was the amount of the loan
[15] determined?
[16] A: The amount of the loan was determined
[17] through negotiation, analysis, you know, just
[18] requests. A number of factors that entered into
[19] that.
[20] Q: Was it based upon an acquisition or a
[21] project that Mr. Flatley was undertaking?
[22] A: I don't know.
[23] Q: Do you recall the amount of the loan?
[24] A: The initial — the initial amount of
[25] the loan was $1-1/2 million.

---

Page 44

[1] MR. HOWLEY: Please mark that.
[2] (Exhibit 8 was marked for
[3] identification.)
[4] BY MR. HOWLEY:
[5] Q: Please take a look at that letter.
[6] If you could, tell me when you're
[7] ready.
[8] A: I'm ready.
[9] Q: Go to the last page where it says:
[10] "The foregoing instructions
[11] are accepted and agreed to on
[12] this 5 day of July, 2000."
[13] Does that reflect that the loan
[14] closed on July 5th, 2000?
[15] A: I don't know if it closed on the 5th
[16] or the next day, but that's when this letter was
[17] sent. I don't know when it recorded.
[18] Q: If you could go back to the first
[19] page.
[20] A: Yes.
[21] Q: The second full paragraph.
[22] Does the first sentence reflect the
[23] fact that the borrower received $4,775,000?
[24] A: No. That is the amount of the
[25] proceeds that were — that's the amount of —

---

Page 45

[1] that's the amount of proceeds that were advanced to
[2] the escrow.
[3] Q: What the borrower received was —
[4] it's saying in there an initial $5 million advance,
[5] less the deductions that are on page 2; "Loan Fees"
[6] in preparation. The balance was sent to the
[7] borrower.
[8] Q: Further down in the paragraph, it
[9] says:
[10] "The balance of 225,000 is
[11] being funded by USA Commercial
[12] Mortgage Company by investing a
[13] portion of its loan fee."
[14] A: Uh-huh.
[15] Q: What does that mean?
[16] A: What that means is USA Commercial
[17] Mortgage Company took a portion of its loan fee,
[18] and instead of taking out cash, it invested in the
[19] loan.
[20] Q: What loan fee did it charge in this
[21] transaction?
[22] A: Pardon me?
[23] Q: Do you know what loan fee it charged?
[24] A: Commercial Mortgage Company?
[25] Q: Yes.

---

Page 46

[1] A: It charged the 5 points that is shown
[2] on the exhibit that you showed me. So whatever
[3] that is. $575,000.
[4] Q: Is that a typical loan fee?
[5] A: For a loan like this, yeah. Yes, it
[6] was.
[7] Q: Why do you say, "for a loan like
[8] this"? Is that based upon the risk involved?
[9] A: No. It's based upon us being private
[10] money lenders. We charge what we can.
[11] Q: Go for it.
[12] So has USA Commercial Mortgage
[13] Company been paid back their portion of its
[14] investment?
[15] A: USA Commercial Mortgage Company
[16] subsequently sold its position in the loan.
[17] Q: Do you recall who it sold it to?
[18] A: No. It could have been to an
[19] individual investor, or could it have been to the
[20] fund. I don't know.
[21] Q: If you could keep that letter handy.
[22] A: Sure.
[23] MR. HOWLEY: Mark that, please.
[24] (Exhibit 9 was marked for
[25] identification.)

---

**Min-U-Script®**

Page 79

[1] your answer?

[2] A: Yeah. I understood that.

[3] MR. DRANE: Let me just take a minute

[4] if I can.

[5] MR. DELLER: Sure.

[6] (There was a discussion off

[7] the record.)

[8] BY MR. DRANE:

[9] Q: I just have one other follow-up

[10] question.

[11] A: Sure.

[12] Q: I think I know the answer to this.

[13] Similar to the question I asked

[14] earlier about USA Capital and its entities, and

[15] this question may actually be incorporated in that,

[16] but I am going to ask this specific question.

[17] Does HMA Sales now or has it in the

[18] past or do you anticipate it will in the future

[19] have any financial dealings with Epic, LLC or any

[20] of its —

[21] A: No, it does not.

[22] Q: — related entities or Mr. Flatley or

[23] any of his entities?

[24] A: No, it does not. None of the related

[25] entities of USA Capital, USA Investment Partners,

Page 80

[1] HMA Sales do not have any relationship in the past

[2] or contemplated with Mr. Flatley.

[3] Q: Thank you.

[4] A: I'm just trying to get all of the

[5] other questions out of the way.

[6] MR. DRANE: I have no further

[7] questions.

[8] THE WITNESS: Thank you.

[9] MR. DRANE: Thank you.

[10] MR. DELLER: I just have a few.

[11]

[12] EXAMINATION

[13] BY MR. DELLER:

[14] Q: How much was the loan that

[15] USA Capital made in connection with this matter?

[16] A: $11.5 million.

[17] Q: Wasn't there an interest reserve that

[18] was set up?

[19] A: Yes. Approximately $1-1/2 million.

[20] Q: So there was a $10 million advance

[21] and a $1-1/2 million advance to the interest

[22] reserve?

[23] A: That's correct. The interest reserve

[24] was funded as it was due.

[25] Q: As you sit here today, do you know

Page 81

[1] the manner for which the Epic family actually used

[2] the you funds advanced by USA Capital?

[3] A: No, I do not.

[4] MR. DELLER: That's all I have.

[5] MR. HOWLEY: I have one follow-up

[6] question.

[7]

[8] FURTHER EXAMINATION

[9] BY MR. HOWLEY:

[10] Q: I believe you testified earlier, I

[11] asked you whether you knew what the proceeds were

[12] used for, and you said you didn't recall.

[13] Is that correct?

[14] A: I believe that's correct.

[15] Q: So which one is it? You don't

[16] remember or you don't know?

[17] MR. DELLER: I object. That's

[18] argumentative.

[19] BY MR. HOWLEY:

[20] Q: Is it you don't know, or you don't

[21] recall?

[22] MR. DELLER: I object again. If you

[23] can't recall, how do you know.

[24] MR. HOWLEY: I think it's two

[25] different answers.

Page 82

[1] BY MR. HOWLEY:

[2] Q: Just so I'm clear, which one is it?

[3] I am not trying to be argumentative.

[4] A: I don't know how they used the

[5] proceeds.

[6] The question you asked me, I believe,

[7] was how were they supposed to use the proceeds.

[8] I don't know how they actually did.

[9] Q: So you never followed up after the

[10] loan to see where the money went?

[11] A: No.

[12] Q: You never had any follow-up questions

[13] with Mr. Flatley or anyone else at Epic —

[14] A: It wasn't necessary.

[15] Q: And why wasn't it necessary?

[16] A: We had our collateral, and we made

[17] the loan.

[18] Q: Do you know whether any of the

[19] proceeds of the loan went to that collateral that

[20] you just referred to?

[21] A: I believe that some of the proceeds

[22] were supposed to go to that collateral.

[23] Q: They were supposed to, but do you

[24] know if they did?

[25] A: To the extent they made any

# EXHIBIT B

## In The Matter Of:

*IN RE*
*EPIC CAPITAL CORPORATION*

---

*THOMAS HANTGES*
*April 11, 2002*

---

*ASSOCIATED REPORTERS OF NEVADA*
*CERTIFIED COURT REPORTERS*
*2300 W. SAHARA AVENUE*
*SUITE 770*
*LAS VEGAS, NV  USA  89102*
*(702) 382-8778    FAX: (702) 382-2050*

Original File HANT0411.02, 84 Pages
Min-U-Script® File ID: 3015013740

**Word Index included with this Min-U-Script®**

IN RE
EPIC CAPITAL CORPORATION

THOMAS HANTGES
April 11, 2002

Page 1

[1]         UNITED STATES BANKRUPTCY COURT
[2]              DISTRICT OF DELAWARE
[3]
[4]
[5]  In re                                    )
                                              ) Chapter 11
[6]  EPIC CAPITAL CORPORATION,                )
     EPIC RESORTS, LLC,                       ) Case No.
[7]                                           ) 0002458(MFW)
             Debtors.                         )
[8]
[9]
[10]
[11]
[12]
[13]        DEPOSITION OF THOMAS HANTGES
[14]  Taken on Thursday, April 11, 2002
[15]       At 2:32 p.m.
[16]      4496 South Pecos Road
[17]      Las Vegas, Nevada
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25] Reported by: CYNTHIA K. DuRIVAGE, CSR No. 451

---

Page 2

[1] APPEARANCES:
[2] For the Bank of New York, as Indenture Trustee:
[3]        THOMAS A. HOWLEY, ESQ.
           Haynes And Boone
[4]        1000 Louisiana Street
           Suite 4300
[5]        Houston, Texas 77002-5012
           (713) 547-2412
[6]
[7] For the Official Committee of Unsecured Creditors:
[8]        W. HARDING DRANE, JR., ESQ.
           Potter, Anderson & Corroon
[9]        P.O. Box 951 - Hercules Plaza
           Wilmington, Delaware 19899
[10]       (302) 984-6000
[11]
      For the Trustee Anthony Schnelling:
[12]
           JOSEPH E. STRAUSS, ESQ.
[13]       Stroock & Stroock & Lavan
           180 Malden Lane
[14]       New York, New York 10038-4982
           (212) 806-5528
[15]
[16] For USA Capital and the Witness:
[17]       JEFFREY A. DELLER, ESQ.
           Klett, Rooney, Lieber & Schorling
[18]       One Oxford Centre
           40th Floor
[19]       Pittsburgh, Pennsylvania 15219-6498
           (412) 392-1615
[20]
[21]
[22]
[23]
[24]
[25]

IN RE
EPIC CAPITAL CORPORATION

THOMAS HANTGES
April 11, 2002

Page 7

[1] background.
[2] A: I have a BS in hotel administration.
[3] Q: From where?
[4] A: And an MBA.
[5] Q: And the hotel administration degree
[6] is from which institution?
[7] A: They're both from the University of
[8] Nevada Las Vegas.
[9] Q: Can you give me your job history
[10] since college.
[11] A: Between 1973 and 1980, I was employed
[12] in the hotel business. I was the hotel manager of
[13] the Stardust Hotel.
[14] Q: Here in Las Vegas?
[15] A: Yes. From 1980 to 1989, I was
[16] employed in the securities broker dealer industry.
[17] And from 1989 through present, I have
[18] been the owner — one of the owners of USA
[19] Commercial Mortgage Company and USA Capital.
[20] Q: You mentioned that you were a
[21] securities broker dealer.
[22] By whom were you employed during that
[23] period of time?
[24] A: Well, there was a couple.
[25] Before I owned my own firm, I was

Page 8

[1] employed by three separate firms, Rauscher Pierce
[2] Refsnes, Prudential Bache, and Smith Barney.
[3] In 1986, I founded USA Securities,
[4] which was our own broker dealer.
[5] Q: Does that company still exist?
[6] A: No.
[7] Q: When did that go out of business?
[8] A: I sold that to my partner. I sold my
[9] share in that probably around 1994.
[10] Q: Did there come a time when you met a
[11] gentleman named Thomas Flatley?
[12] A: Yes.
[13] Q: How did you come to meet Mr. Flatley?
[14] A: I was introduced to him by Salvatore
[15] Reale, who is a client of USA Capital who lives or
[16] who used to live in Palm Desert.
[17] Q: Approximately when was that that you
[18] were introduced?
[19] A: I would say, if you look at the
[20] origination of our loan, which I don't remember the
[21] date, I would say probably 30 to 60 days prior to
[22] that.
[23] Q: I am going to show you a document
[24] that was marked earlier today as Milanowski
[25] Exhibit 1, which is a letter dated March 28th,

Page 9

[1] 2000, "Dear Sal," from Tom Flatley.
[2] I just ask you to take a look at
[3] that, and see if that refreshes your recollection
[4] on the timing.
[5] We noted this morning that although
[6] it's dated March 28th, the first fax line says,
[7] "May 28." So that may or may not be relevant in
[8] trying to date it.
[9] A: Fine. My recollection would be that
[10] I would rather rely on the loan documents. So if
[11] my loan document was dated, say, April, for that
[12] matter, I would feel comfortable telling you that I
[13] met him 30 to 60 days before that.
[14] Q: There was testimony this morning that
[15] the closing on the loan was in early July —
[16] A: July?
[17] Q: — of 2000.
[18] A: Then I would say that we probably met
[19] him — I mean, I'd have to really check my
[20] records. We probably met him somewhere around
[21] May.
[22] Q: Can you describe for me the
[23] circumstances under which you met him.
[24] A: Sal Reale said he knew of a
[25] time-share developer in Palm Springs that needed a

Page 10

[1] loan, would I speak to him.
[2] I said, "Yes. Have him send me some
[3] information or call me," whatever. And basically,
[4] that's how the meeting came about.
[5] Q: As a result of that conversation, did
[6] Mr. Flatley call you as a result of your —
[7] A: Oh, yes. Yes. Yes.
[8] Q: Did you have a conversation over the
[9] telephone with him?
[10] A: I think we spoke first on the phone.
[11] I mean — I mean, again, I don't think he just
[12] flew out.
[13] I think we spoke first on the phone
[14] and got some information from him, like we normally
[15] would do with most borrowers, and started on the
[16] property.
[17] Q: During that first conversation with
[18] him, do you recall generally what he told you? Not
[19] word-for-word but the substance of the information
[20] that he gave to you.
[21] A: I think, basically, you know, just
[22] reactions to most of the questions that we would
[23] have, which are standard lender-borrower questions.
[24] "What are you looking for? What loan amount? What
[25] is the exit strategy?" Questions like that.

---

Page 11

[1] "When do you need the loan by? and,
[2] you know, "What's the circumstances?" And just
[3] various things.
[4]    Q: Did he tell you at that time what he
[5] intended to use the proceeds of the loan for?
[6]    A: Basically — basically, I think he
[7] just said working capital.
[8]    Q: Did he tell you for what purpose he
[9] needed working capital?
[10]    A: I don't recall specifics.
[11]    Q: When you were introduced to
[12] Mr. Flatley, did he tell you what entity he was
[13] associated with?
[14]    A: Well, yeah. We got — we got into,
[15] you know, his corporate structure.
[16]    We understood that we were making a
[17] loan to Palm Springs Marquis. We understood that
[18] there was a corporate entity by the name of Epic
[19] that had other properties, and we understood the
[20] issues between one was here and, you know —
[21] because we asked about where we can put our
[22] collateral, that type of thing. You know, "What is
[23] this loan for?"
[24]    And he indicated it was for
[25] Palm Springs.

Page 12

[1]    So I understood at the end of the day
[2] that he was the president of not a public entity
[3] but an entity that filed public statements because
[4] of the bonds.
[5]    And he also had this other property
[6] in Palm Springs that was separate and aside from
[7] the financing that the bondholders had on the other
[8] property.
[9]    Q: So he told you that the Palm Springs
[10] property would be the collateral for the loan; is
[11] that correct?
[12]    A: That's correct.
[13]    Q: Did he tell you what he intended to
[14] do with the proceeds of the loan?
[15]    A: No. He just basically said, "working
[16] capital," and to refinance his existing —
[17] refinance his existing property, which was the
[18] Palm Springs Marquis.
[19]    Q: I am going to show you a document
[20] that has been marked earlier today as Milanowski
[21] Exhibit 2 and ask you if you are familiar with that
[22] document.
[23]    A: Yeah, I am.
[24]    Q: Do you recall if you provided
[25] Mr. Flatley with a copy of this checklist?

Page 13

[1]    A: My guess is Joe did because Joe puts
[2] these together.
[3]    MR. DELLER: I just want to instruct
[4] the witness: Don't guess. If you don't know, say
[5] that.
[6]    THE WITNESS: Okay. Then the answer
[7] is — let me correct my answer. I did not.
[8]       BY MR. DRANE:
[9]    Q: Did there come a time when you
[10] visited the Palm Springs property?
[11]    A: Yes.
[12]    Q: When, approximately, was that?
[13]    A: Prior to making the loan.
[14]    Q: Can you date it any closer than that?
[15]    A: Not really.
[16]    Q: Prior to making the loan, did you
[17] visit more than once?
[18]    A: To the best of my recollection, I
[19] visited it at least once, maybe twice, but once,
[20] I'm certain of.
[21]    Q: What do you recall about those
[22] visits?
[23]    A: It was a site inspection to basically
[24] see the collateral.
[25]    Met the Palm Springs management

Page 14

[1] team. Not Tom Flatley. He was not present.
[2]    Took a tour of the property and came
[3] home the same day.
[4]    Q: Who were the members of the
[5] management team you met there?
[6]    A: Keith — Keith-something. Keith —
[7] he ran the time-share resort for Flatley at the
[8] time. His name is Keith-something.
[9]    Q: Did you meet with anybody else?
[10]    A: I met some of the hotel staff. Met
[11] like the hotel manager who was a gentleman by the
[12] name of Tim-something. Tim and Keith.
[13]    Q: What was your purpose in making that
[14] site visit?
[15]    A: Just it's standard operating
[16] procedure for us on loans just to see the
[17] collateral, see if it's not sitting next to a
[18] nuclear reactor. You know, just make sure the
[19] property is in good form and it's the kind of
[20] property we want to loan on. Physically just
[21] eyeball the collateral.
[22]    Q: I gather that you were satisfied
[23] after your visit?
[24]    A: Yes.
[25]    Q: We discussed a little earlier your

---

**Min-U-Script®**

Page 27

[1]     In other words, I would categorize my
[2] role then as, you know, I think in school, they
[3] said management by exception.
[4]     When Joe finds things that need to be
[5] discussed, you know, because of our, you know,
[6] ten-year working relationship, he knows what we
[7] need to sit down and talk about.
[8]     And at that point, Joe and I would
[9] sit down, and Joe would tell me what I need to know
[10] so we can make, if you will, a joint decision an
[11] whether to proceed or ask for something else or
[12] decline.
[13]     Q: Let me put this more specifically in
[14] context to Epic, which is the subject of our
[15] specifically being here today.
[16]     I think you have already testified
[17] that you were involved in the origination of the
[18] loan; is that correct?
[19]     A: That's correct.
[20]     Q: Now, in the case of that particular
[21] loan, once it reached the due diligence stage, the
[22] gathering of material, the preparation of documents
[23] and so on, would it be fair to say that you were
[24] really not involved in that part of the process?
[25]     A: No. No. I was involved. I was just

Page 28

[1] involved in — I was involved in aspects that
[2] would come up that if there were something — for
[3] example, if there was something in the due
[4] diligence that Joe would want to discuss, we would
[5] discuss it.
[6]     I don't totally go away. I just
[7] react to whatever Joe believes is important issues
[8] to discuss.
[9]     Q: Well, on this particular loan, do you
[10] recall any aspects of the due diligence in which
[11] you personally were involved?
[12]     A: Well, site inspection for one.
[13]     Q: And we talked about that earlier?
[14]     A: Yes, we did.
[15]     I recall that we reviewed the bond
[16] indenture to see if it was permissible to make a
[17] loan.
[18]     I know that we required an opinion to
[19] that effect, which we had discussions with Flatley
[20] about his opinion. Of course, his opinion didn't
[21] mean anything to us, but we took an attorney's
[22] opinion on that.
[23]     We also looked at it. Tom Rondeau
[24] reviewed the document as well.
[25]     Joe and I would discuss our beliefs

Page 29

[1] as to the fact that we thought Epic was the kind of
[2] company we'd want to make, so we discussed the size
[3] of the entity, the fact that they had a line
[4] approved, the fact that they had five or six
[5] locations.
[6]     So really, we — you know, Joe and I
[7] would go around — would go around the horn, if
[8] you will, on all of the issues. I mean, I wouldn't
[9] be oblivious to any of it.
[10]     It's just that my interaction comes
[11] on the Joe level more so, and then, Joe typically
[12] is the guy that goes and does it, you see.
[13]     Q: I believe you testified something to
[14] the effect that you thought Epic was a company to
[15] which you wanted to loan money.
[16]     Is that what you just testified?
[17]     A: The Marquis.
[18]     Q: You said, in part, that was based on
[19] size.
[20]     What was it about the size that made
[21] the company attractive to you?
[22]     A: Well, it just — our belief was that
[23] Tom Flatley had a large operation even though we
[24] were only loaning on one of the projects. So we
[25] gave him credit in our evaluation as a seasoned

Page 30

[1] time-share developer. You know, his relationship
[2] meant to us that, you know, certainly smart
[3] guys — not that that means anything, but smart
[4] guys had also underwritten Tom Flatley and Epic, if
[5] you will.
[6]     It just gave us great comfort to know
[7] that he was not a small fish necessarily, but he
[8] was a guy who knew the time-share business well.
[9]     We look at the character of the
[10] developer, the tenure of the developer, the
[11] experience of the developer, and it just told us
[12] that Tom Flatley — and it goes to show you, a lot
[13] of times this don't mean anything — but that Tom
[14] Flatley was a guy who was in the time-share
[15] business, and that meant something to us.
[16]     Q: You mentioned the five to six
[17] locations.
[18]     How did that affect your
[19] determination?
[20]     A: Well, we knew they weren't our
[21] collateral because it was clear they couldn't be
[22] encumbered because we asked if we could put a
[23] second on just as additional collateral. We would
[24] try to take additional collateral any way we could
[25] get it, probably.

**Page 31**

[1] But it wasn't full of what our loan
[2] was, and he said it was very clear that the
[3] documents did not allow it, and our loan was to the
[4] Marquis in any case. So we did not.
[5] But we did look at what other
[6] collateral he had, who was encumbered on it, and it
[7] was clear that the bondholders, you know, were.
[8] Q: Now, did you have any discussions
[9] with Mr. Flatley before the time of the loan as to
[10] what the proceeds of the loan were to be used for?
[11] A: You know, basically, again, I go back
[12] to the fact that it was a refi. It was existing
[13] property. And he was going to use it, he told us,
[14] for working capital.
[15] Q: Can you explain that a little more,
[16] what you mean by a refi of the existing property
[17] and what you mean by using it for working capital.
[18] A: Well, anytime you go in — it's just
[19] a term, really. I'm not sure it's the best
[20] descriptive word.
[21] But refi tells me we're going in and
[22] we're refinancing. In this particular case, there
[23] was no debt, so that might confuse you a little
[24] bit. Typically, if there's debt on the property,
[25] you're refinancing the debt. But in this

**Page 32**

[1] particular case, we were loaning on the property.
[2] Let's put it that way.
[3] Q: So the property was going to be the
[4] collateral for the loan?
[5] A: Correct. The Marquis Palm Springs.
[6] Q: But you did not actually know where
[7] the proceeds of the loan were going to be used.
[8] Is that fair at all?
[9] A: That's pretty fair. I think that's
[10] pretty much what I knew, that he was going to use
[11] it for working capital, and that's what I knew.
[12] Q: In other words, the working capital
[13] was not necessarily going to be used at
[14] Palm Springs; it might be used elsewhere in the
[15] Epic family.
[16] Is that your understanding?
[17] MR. DELLER: I'm going to object.
[18] BY MR. DRANE:
[19] Q: Let me ask you —
[20] A: Sure. Ask me.
[21] Q: Did you know where the proceeds of
[22] the loan were going to be used as working capital?
[23] A: No.
[24] Q: I would like to sort of fast-forward
[25] in time now to the period after the loan had been

**Page 33**

[1] made.
[2] Did there come a time when you became
[3] aware that Epic was having any difficulty in
[4] repaying the loan?
[5] A: I think the only time that we knew
[6] that Epic was having difficulty repaying the loan
[7] was once he didn't make his interest payments
[8] because, up until that point, there was no —
[9] there was no obligation for him to do anything
[10] other than provide us with financials and updated
[11] financial summaries.
[12] So until the first loan payment
[13] wasn't made, the answer is: No.
[14] Q: Do you recall approximately when the
[15] first payment failed to be made by Epic?
[16] A: My guess, it's right in there, but it
[17] was probably the 13th month. I think we set up a
[18] one-year interest reserve.
[19] So my recollection is going to be —
[20] if you give me that document back, that term
[21] sheet — it's going to tell you how long we put an
[22] interest reserve in there for, and it would be the
[23] first month because the first time an interest
[24] payment was due, it was not made.
[25] Q: Hantges Exhibit 5, is that the one

**Page 34**

[1] you're referring to?
[2] A: No. No. The term sheet you gave me.
[3] MR. DELLER: Exhibit 7.
[4] BY MR. DRANE:
[5] Q: I give you Milanowski —
[6] MR. DELLER: I have a copy here.
[7] BY MR. DRANE:
[8] Q: — Milanowski Exhibit 7.
[9] A: "A portion of the total loan
[10] amount shall be funded for an
[11] interest reserve of 12 months."
[12] So the 13th month would be the month
[13] because he never made an interest payment.
[14] MR. DRANE: Have that marked as
[15] Hantges 6.
[16] (Exhibit 6 was marked for
[17] identification.)
[18] THE WITNESS: Okay.
[19] BY MR. DRANE:
[20] Q: This Hantges 6 is a letter dated
[21] June 7, 2001, addressed to you from Mr. Flatley.
[22] Do you recall receiving this letter
[23] on or about June 7th of 2001?
[24] A: Yeah.
[25] Q: Prior to the date of this letter, do

Page 47

[1] some empty rooms. It was a site inspection, you
[2] know, just to see that things were okay.
[3]     I couldn't come back and say to
[4] anyone that the property has, you know, materially
[5] depreciated, and it didn't. But I did say that I
[6] was concerned that the employees problems didn't
[7] feel that, you know, they might be long-timers, and
[8] they probably were only, you know, half-ass there,
[9] and who was really watching the property. Just a
[10] lender observation.
[11]     Q: So it was your conclusion that some
[12] of the employees were concerned about their future
[13] because of the financial difficulties that
[14] happened.
[15]     Is that fair?
[16]     A: That's only fair to say that I
[17] intimated that. I was not told that.
[18]     I would just say that, in abstract,
[19] that would be my feeling that most employees would
[20] feel about a situation when they knew the boss was
[21] in bankruptcy and, you know, that kind of thing.
[22]     Q: Did you get the impression — strike
[23] that.
[24]     You mentioned that there was some
[25] disrepair, and you mentioned in particular garbage

Page 48

[1] and landscaping.
[2]     Was it the kind of thing that could
[3] have been put right in fairly short order?
[4]     A: Well, yes and no. That would really
[5] be put in right repair, obviously, unless you let
[6] the landscaping burn out. That would be a
[7] different story.
[8]     Q: That hadn't happened?
[9]     A: No, I didn't see signs of it yet.
[10] I didn't see signs of it yet, but that looked like
[11] it was potentially occurring.
[12]     What I was more concerned about is
[13] one of the maintenance men there, and I don't know
[14] his name, told me that he felt there was a
[15] significant amount of maintenance issues.
[16]     MR. HOWLEY: I'm just going to object
[17] to the extent that this is hearsay.
[18]     Go ahead.
[19]     THE WITNESS: That the maintenance
[20] man that I ran across told me that there was a
[21] significant amount of maintenance that was not
[22] being tended to because they had no budget.
[23]     BY MR. DRANE:
[24]     Q: Did he give you any specifics on
[25] that?

Page 49

[1]     A: I didn't get into specifics, no. The
[2] answer is no.
[3]     Q: Did he indicate to you how long it
[4] might take to make up for any maintenance
[5] shortcomings that he saw?
[6]     A: No.
[7]     Q: Did you come to any conclusion that
[8] it would take a long time or a short time or
[9] anything along those lines?
[10]     A: No, I did not.
[11]     Q: You didn't have a view one way or the
[12] other?
[13]     A: No. That's correct.
[14]     Q: Okay. Let's go to the site visit.
[15] that you made in the last 30 days that I think you
[16] indicated you went alone or not with anybody else
[17] from USA Capital.
[18]     Did you meet with anybody else at the
[19] site —
[20]     A: No.
[21]     Q: — on that occasion?
[22]     A: No, I didn't.
[23]     Q: So this would have been —
[24]     A: Approximately 30 days ago.
[25]     Q: About mid-March?

Page 50

[1]     A: Within the last 30 days. I'd say
[2] three weeks ago, probably. Three to four weeks
[3] ago.
[4]     Q: What was the purpose of that site
[5] visit?
[6]     A: Just basically — you know,
[7] actually, that site visit was in conjunction with
[8] the fact that I had other business in Palm Springs
[9] that was unrelated. And I just took the
[10] opportunity just to kind of walk through the
[11] facility. You know, I'd say it was a five-minute
[12] walk.
[13]     Q: Did your observations differ from the
[14] observations you made four or five months ago?
[15]     A: No.
[16]     Q: Did you come to any new conclusions
[17] as far as what was needed or not need?
[18]     A: No new conclusions
[19]     (There was a discussion off
[20] the record.)
[21]     BY MR. DRANE:
[22]     Q: During the period since, let's say,
[23] last July, do you recall any time where USA Capital
[24] investigated the possibility of operating the
[25] Palm Springs Marquis Villas operation?

Page 71

[1] Q: If you could look under "Borrower
[2] Information," category 6.
[3] "USA Capital requested copies
[4] of contracts on purchases to be
[5] consummated with proceeds."
[6] A: Okay.
[7] Q: Do you know if you received any
[8] information with respect to item 6?
[9] A: I don't recall receiving any, no.
[10] Q: Do you know why USA Capital asked for
[11] such information?
[12] A: Well, that would have been a better
[13] question for Joe because he put this together, but,
[14] you know, obviously, something prompted Joe to
[15] write that.
[16] And so, to my recollection, no. But
[17] obviously, Joe put that down, either because he
[18] heard something during a conversation, or he might
[19] have intimated that maybe something was going to
[20] occur. I don't know.
[21] Q: You mentioned the bond indenture and
[22] prospectus on here.
[23] Do you know why USA Capital asked for
[24] copies of those?
[25] A: Yes, because we wanted to see what

Page 72

[1] the bond indenture allowed, what it didn't allow.
[2] And the only way to do that is obviously to get a
[3] copy of it.
[4] Q: Do you recall if you were provided a
[5] copy of it?
[6] A: Yes, we were.
[7] Q: Were you provided those prior to
[8] approving the loan?
[9] A: Yes, we were.
[10] Q: Did you ever have any discussions
[11] with Mr. Flatley about the indenture and the
[12] prospectus?
[13] A: Yes. Yeah, we did have conversations
[14] with them, and I think what it revolved around was
[15] basically what was allowed and what was not
[16] allowed. And I think it was clear that he told us
[17] that the Marquis was not a part of the collateral
[18] that was covered for the bondholders, and it was
[19] free and clear. And that the bond indenture,
[20] obviously, was going to show us what the
[21] collateral — what collateral was encumbered. And
[22] certainly whatever other information was relevant.
[23] We reviewed the bond indenture
[24] primarily for those issues.
[25] Q: Did you read the indenture?

Page 73

[1] A: No. Tom Rondeau read it, I know, and
[2] our outside counsel did. I don't know whether Joe
[3] did or didn't.
[4] Q: Did anyone at USA Capital ever pick
[5] up the phone and call the indenture trustee or
[6] anybody else on behalf of the bondholders and ask
[7] about the indenture prospectus?
[8] A: I don't know.
[9] Q: So you didn't?
[10] A: I did not.
[11] Q: Did you as CEO of USA Capital
[12] instruct anybody to call an individual trustee or
[13] individual bondholder and ask questions about the
[14] indenture?
[15] A: That would have been something that
[16] if would it have been handled, it would have been
[17] handled by Joe or Tom.
[18] Q: Did Mr. Flatley ever tell you that he
[19] used bondholder proceeds to purchase the Epic
[20] Palm Springs Resort?
[21] A: No.
[22] Q: Did you ever ask him, since this
[23] resort was free and clear, according to
[24] Mr. Flatley, how he financed the purchase?
[25] A: No, I didn't.

Page 74

[1] Q: Just so I am clear, you used the term
[2] "refi" a lot, and the way I understand the term
[3] "refi" is when you refinance existing debt.
[4] You were saying earlier that that's
[5] not the way you use the term?
[6] A: We use it more broadly, but I
[7] understand — I understand the definition that you
[8] just said, and I agree with it. I mean, that's a
[9] more literal interpretation of what the word "refi"
[10] means.
[11] But sometimes Joe and I categorize
[12] any loan we make as a refi.
[13] Q: So just so I'm clear, you didn't take
[14] out any preexisting creditor of Epic Palm Springs,
[15] did you?
[16] A: No. The property was free and clear
[17] at the time of our loan.
[18] Q: Did Mr. Flatley ever tell you that he
[19] had significant working capital expenditures coming
[20] up as part of the driving force for the need for
[21] this loan?
[22] A: No.
[23] Q: I asked you earlier if you read the
[24] indenture, and I believe you said, "No."
[25] Did you read the prospectus for the

# EXHIBIT C

## In The Matter Of:

*IN RE EPIC CAPITAL CORPORATION,*
*EPIC RESORTS, LLC, DEBTORS.*

---

*THOMAS RONDEAU*
*December 6, 2001*

---

*ASSOCIATED REPORTERS OF NEVADA*
*CERTIFIED COURT REPORTERS*
*2300 W. SAHARA AVENUE*
*SUITE 770*
*LAS VEGAS, NV  USA  89102*
*(702) 382-8778    FAX: (702) 382-2050*

Original File ROND1206.01, 170 Pages
Min-U-Script® File ID: 2893022199

**Word Index included with this Min-U-Script®**

IN RE EPIC CAPITAL CORPORATION,
EPIC RESORTS, LLC, DEBTORS.

THOMAS RONDEAU
December 6, 2001

Page 1

[1]     UNITED STATES BANKRUPTCY COURT
[2]          DISTRICT OF DELAWARE
[3]
[4]
[5] In re                                    )
                                             ) Case No.
[6] EPIC CAPITAL CORPORATION,                ) 01-002458(MFW)
    EPIC RESORTS, LLC,                       )
[7]                                          )
           Debtors.                          )
[8]
[9]
[10]
[11]
[12]
[13]
[14]      DEPOSITION OF THOMAS RONDEAU
[15]   Taken on Thursday, December 6, 2001
[16]           At 9:04 a.m.
[17]      4496 South Pecos Road
[18]        Las Vegas, Nevada
[19]
[20]
[21]
[22]
[23]
[24]
[25] REPORTED BY: Cynthia K. DuRivage, CSR No. 451

Page 2

[1] APPEARANCES:
[2] For Prospect Street High Income Fund, Pam Capital
    Funding, L.P., ML CBO TV (Cayman), Ltd., and PAMCO
[3] Cayman, Ltd.:
[4]      THOMAS A. HOWLEY, ESQ.
         Haynes and Boone
[5]      1000 Louisiana Street
         Suite 4300
[6]      Houston, Texas 77002
         (713) 547-2000
[7]
[8] For USA Capital and the witness:
[9]      BARNEY ALES, ESQ.
         Goold, Patterson, DeVore, Ales & Roadhouse
[10]     4496 South Pecos Road
         Suite 200
[11]     Las Vegas, Nevada 89121
         (702) 436-2600
[12]
[13] For Official Committee of Unsecured Creditors:
[14]     W. HARDING DRANE, JR., ESQ.
         Potter, Anderson & Corroon
[15]     Hercules Plaza
         P.O. Box 951
[16]     Wilmington, Pennsylvania 19899
         (302) 984-6000
[17]
     For Epic Resorts, LLC and Epic Capital Corporation:
[18]
         MARK FRANK, ESQ.
[19]     (Present by Telephone)
         1700 Grant Building
[20]     Pittsburgh, Pennsylvania 15219
         (412) 261-0310
[21]
[22]
[23]
[24]
[25]

THOMAS RONDEAU
December 6, 2001

IN RE EPIC CAPITAL CORPORATION,
EPIC RESORTS, LLC, DEBTORS.

Page 33

[1] appraisals or —

[2] A: No.

[3] Q: — depending on where the property

[4] is?

[5] A: It depends. I'm opposed to having a

[6] single appraiser do all the work. The

[7] relationship, it just isn't good, in my opinion, to

[8] do it that way.

[9] You want to get good appraisals, but

[10] you want different people to work on different —

[11] I've been here a long time doing real estate.

[12] I kind of know who I want to do certain projects.

[13] Some people are better at some things than others.

[14] So that issue of getting the right appraiser for

[15] the right job is also the issue.

[16] You know, I just don't trust that

[17] kind of an arrangement because I just have —

[18] maybe I'm paranoid, but it's my opinion, if you do

[19] all the business with one appraiser, pretty soon,

[20] you can't rely on what you're getting because they

[21] want to please you to keep the business.

[22] That's just my view. But no, we

[23] don't use the same appraisers all the time.

[24] Q: Is there a committee that needs to

[25] approve the loan before the fund will invest it?

Page 34

[1] A: Well, there's not a formal committee,

[2] but Tom and Joe and I will make the decision.

[3] I mean, Tom and Joe have 90 percent of it. I only

[4] raise red flags. That's what lawyers do. I raise

[5] red flags. I tell them my concerns, and they go

[6] ahead and make a final decision. They make the

[7] final decision. Tom and Joe are the two people

[8] that make the final decision on each loan.

[9] Q: So when it gets to you to be papered,

[10] you have the discretion to go back to them and

[11] raise your red flags, or is that before it gets to

[12] you?

[13] A: Oh, I have the duty to do that, and I

[14] do it. I do it at any time that I'm aware of

[15] something, yes, I do it.

[16] Q: Other than requesting a checklist of

[17] documents, is there any other, generally speaking,

[18] credit evaluations that are done on these

[19] borrowers?

[20] A: That, again, varies on what they get

[21] in the first instance.

[22] But yes, they have obtained credit

[23] reports. They've hired companies to do background

[24] investigations if they feel it's appropriate.

[25] The level of scrutiny depends on the

Page 35

[1] condition of the borrower, the experience level,

[2] the location and type of project. All these

[3] factors, I know, go into the equation.

[4] Some loans are very easy to make

[5] because the borrower has had a long record with us,

[6] they've had — taken many loans, paid them back

[7] timely. They're great.

[8] Then there are other borrowers who

[9] come in and, you know, are interested, but it's

[10] another matter before you make a determination.

[11] Q: So are these typically borrowers that

[12] can obtain conventional financing with the bank?

[13] A: Well, actually, that's one.

[14] I think there's basically two or

[15] three classes of borrowers that I'm thinking

[16] about.

[17] One is people who are on the margins

[18] with the bank and can't get them from the bank due

[19] to typically the federal regulations. Lending

[20] limits sometimes with the banks. There's a number

[21] of reasons.

[22] One reason is that they need the

[23] money fast. That's a big factor in our business.

[24] They need the money. They don't want to sit around

[25] for three, four months playing with the bank.

Page 36

[1] They know that we will evaluate, turn

[2] around and actually loan the money in a very short

[3] time. We've done it as quickly as two weeks. And

[4] we typically do it in less than a month. I mean,

[5] that's kind of the nature of the business is to

[6] produce.

[7] And then, another reason that they

[8] come to us is some borrowers are quite big, like

[9] comes to mind, Triple Five comes to mind is one,

[10] and they kind of have a lot of money out with the

[11] banks. Not that the banks won't lend to them, but

[12] they're already at their limit many times with a

[13] particular bank.

[14] And then, we'll take on projects, you

[15] know, the banks won't. I mean, that's the nature

[16] of the business. That's what we're here for.

[17] Q: Does the fund ever invest in

[18] unsecured loans?

[19] A: No.

[20] Q: Does the fund ever invest in loans

[21] which are not secured by a deed trust on real

[22] property?

[23] A: No.

[24] No. It always takes a first deed of

[25] trust and either a fee title or a long-term lease,

Min-U-Script®

ASSOCIATED REPORTERS

IN RE EPIC CAPITAL CORPORATION,
EPIC RESORTS, LLC, DEBTORS.

THOMAS RONDEAU
December 6, 2001

Page 37

[1] long-term ground lease.
[2]  Q: How does the fund typically provide
[3] the proceeds of the loan? Is it from borrowings,
[4] or is it from investor proceeds?
[5]  A: Investor proceeds, yeah.
[6] As loans pay off, then the money
[7] comes back into the fund, and it's complicated,
[8] obviously, but people have a right to be paid off
[9] within a year, or they can, you know, reinvest
[10] their money or just leave it.
[11]  So when their year comes up, we ask
[12] them what they want to do. We can pay it off.
[13] I believe the majority reinvest. Most people are
[14] happy with that kind of return in this market.
[15] They think that 13 is very good. I'm not, believe
[16] it or not, plugged into these markets, so I don't
[17] know what is good or bad. But I think most people
[18] like it. They think it's a good, steady return,
[19] reliable.
[20]  So the vast majority of funds — all
[21] of it comes from what is raised by investors. As
[22] it matures, more and more is what I call reinvested
[23] money. In the beginning, it was all new money, and
[24] now, a lot of it is reinvested money.
[25]  Q: Does the fund have a revolving credit

Page 38

[1] facility?
[2]  A: No.
[3]  Q: So it doesn't have any financing of
[4] its own?
[5]  A: Not — not at the present time, no.
[6] I think they're looking into that, but they don't
[7] have it at the present time.
[8]  No. We rely on raising money the way
[9] we always have from our mortgage agents' contacts,
[10] people in the community who are interested in these
[11] kinds of loans.
[12]  Q: Do investors have any say into the
[13] fund's investments?
[14]  A: None.
[15]  Q: You touched on this briefly earlier,
[16] but does the fund ever invest in preexisting loans,
[17] either at par or a discount?
[18]  A: I'm not sure I follow that.
[19] Preexisting loans that we have?
[20]  Q: Do you buy pieces of existing loans
[21] out on the market?
[22]  A: No. No, I don't think — I won't
[23] say never, but if we did — I don't believe they
[24] have ever done that at this point in time. And
[25] that's something we generally don't do at all.

Page 39

[1]  We have sometimes — sometimes some
[2] companies participate with us in a loan. Once
[3] again, people know that if they are with us, they
[4] can make a nice return. So there's a few people
[5] who occasionally will participate with us in loans
[6] as a participating investor.
[7]  The distinction between that and the
[8] ordinary investor is if someone puts in $20,000
[9] into the loan, they're listed as a beneficiary on
[10] the deed of trust, there are multiple beneficiaries
[11] on deeds of trust, and they're secured, which is
[12] required by the law. And that's what they get.
[13] And then they sign a loan service agreement with us and
[14] they give us a power of attorney to administer the
[15] loan so we can do what needs to be done.
[16]  Someone who throws up $5 million on a
[17] $20 million loan will get a written participation
[18] agreement. So we go a little further. When
[19] someone puts up 5 million, they want more
[20] information, we give them reports on this and
[21] that.
[22]  Typically, a mom and pop operation do
[23] not want any. I mean, they get — they just don't
[24] want a lot of data from us. They want their money,
[25] and at the end of the term, they want their

Page 40

[1] payback. That's what they want, and that's what
[2] they've been getting for years, for the most part.
[3]  So institutional investors, for the
[4] most part, they want more for obvious reasons.
[5] That's the only distinction. Other than that,
[6] they're listed, they're secured, just like anybody
[7] else. They just get a little bit more.
[8]  So those are the two sources of funds
[9] and our own money. We have some loans we own a
[10] hundred percent, a number of loans we participate
[11] in.
[12]  Q: Does the fund typically request a
[13] guarantee when they make a loan?
[14]  A: Oh, yes. We always get guarantees.
[15]  Q: Always?
[16]  A: Always.
[17]  Q: So there is not a loan in the fund's
[18] portfolio today that doesn't have a guarantee?
[19]  A: There is not a loan that USA Capital
[20] has made today without a loan.
[21]  Q: Is it typical to have more than one
[22] guarantee?
[23]  A: Yeah. More than one person on a
[24] guarantee and sometimes more than one guarantee.
[25] Whether I do multiple guarantees or put two or

**Page 57**

[1] (Exhibits 3, 4, 5 and 6 were
[2] marked for identification.)
[3]          BY MR. HOWLEY:
[4]    Q: If you could just briefly, before we
[5] get to the exhibits in front of you, just summarize
[6] the approval process that USA Capital and the fund
[7] went through with respect to the loan to Epic
[8] Palm Springs.
[9]    A: There would have been review of the
[10] appraisal, the guarantees — the financial
[11] statements, I'm sorry. The physical inspection of
[12] the property. And then, their own assessment as to
[13] the — you know, the strength and the business
[14] record of the borrower. And that would have led
[15] them to decide to make this loan.
[16]    Q: Is it typical for Joe or Tom to do an
[17] onsite inspection?
[18]    A: Yes. I believe we always try to have
[19] somebody, either Joe or Tom or Richard Kropp,
[20] review the land or the property that we're taking.
[21]    Q: Do you recall if they met with
[22] Mr. Flatley face-to-face?
[23]    A: I wasn't there, so I don't know. But
[24] my recollection is, yes, they told me that they had
[25] a meeting with Tom Flatley at the Palm Springs

**Page 58**

[1] property prior to closing the loan, yes.
[2]    Q: Do you recall if they ever met at
[3] Epic's headquarters at King of Prussia,
[4] Pennsylvania?
[5]    A: To my knowledge, they never went back
[6] East.
[7]    Q: You mentioned earlier that you raise
[8] red flags kind of at the end of the process.
[9]    Do you recall if you raised any red
[10] flags here?
[11]    A: Yes. I recall —
[12]    MR. ALES: Wait a minute. I'm going
[13] to object as to any questions as to the
[14] communication going between Tom in his capacity as
[15] lawyer in scrutinizing and opining as to the loan
[16] documents or any of the legal documents for that
[17] matter.
[18]    MR. HOWLEY: I am not trying to delve
[19] into the attorney-client privilege.
[20]    What I am trying to do is, to the
[21] extent he testified earlier that he is a third head
[22] on this committee, in his business judgment.
[23]          BY MR. HOWLEY:
[24]    Q: Did you raise any red flags that
[25] wouldn't be legal issues or rendering legal advice

**Page 59**

[1] to Joe or Tom?
[2]    MR. ALES: Wait. I think he
[3] testified that is his duty to raise red flags as a
[4] lawyer.
[5]    THE WITNESS: I will state that I
[6] raised red flags.
[7]    MR. ALES: I think we can establish
[8] that, but as to what they are and their
[9] communications, I will object to that.
[10]          BY MR. HOWLEY:
[11]    Q: Were any of the red flags you raised
[12] nonlegal issues?
[13]    A: I don't think that's — the answer
[14] to that will be yes. I will say that. But that's
[15] not the test of whether there is a confidentiality
[16] privilege to what I said or not. That's a legal
[17] issue, not a factual issue. Lawyers kind are
[18] consulted, they give all kinds of advice apart from
[19] legal advice.
[20]    Yes, I think the term "legal issue"
[21] is somewhat vague, and I would say that everything
[22] that I discussed with them has legal
[23] ramifications. In other words, it's affected by
[24] statutory or case law and the facts of the case.
[25]    My job is to say: Given this

**Page 60**

[1] statute, given that case, given these facts
[2] generate certain issues.
[3]    So yes, definitely, I have to say, it
[4] definitely was legal. Definitely.
[5]    Q: So you did raise red flags?
[6]    A: Yes. And I will add that that's not
[7] atypical.
[8]    Q: Can you turn to the first document in
[9] that pile there. It's called a loan agreement.
[10]    A: Yeah. It's marked as Exhibit 2,
[11] yes.
[12]    Q: Can you look over Exhibit 2, please,
[13] and let me know if that is a true and correct copy
[14] of the loan agreement between Epic Palm Springs and
[15] the fund.
[16]    A: Yes, it appears to be a copy of the
[17] executed loan agreement.
[18]    Q: Was that loan agreement prepared
[19] under your supervision?
[20]    A: Yes.
[21]    Q: Did you produce that document to my
[22] clients?
[23]    A: Yes.
[24]    Q: If you could, please turn to page 5.
[25] First, let me ask you: How much was

THOMAS RONDEAU
December 6, 2001

IN RE EPIC CAPITAL CORPORATION,
EPIC RESORTS, LLC, DEBTORS.

Page 89

[1] Q: Before the filing of the involuntary,
[2] which was in November, prior to that, did
[3] Mr. Flatley ever say he couldn't reach a settlement
[4] because Epic Resorts, LLC was subject to a
[5] bankruptcy?
[6] A: He did not.
[7] In fact, the advice was to the
[8] contrary. I believe we talked to Pat Semegen or
[9] Semegen, S-e-m-e-g-e-n, I believe.
[10] Q: And they advised you that the
[11] bankruptcy had no effect on their ability to reach
[12] a settlement?
[13] A: That is correct. Yes.
[14] Q: Do you know why things moved so
[15] quickly from this payment restructure that's
[16] outlined in these letters to just a flat-out
[17] assignment?
[18] A: He couldn't make those payments is
[19] why.
[20] By the time of his proposal on June
[21] 25th or, actually, Mr. Milanowski's proposal on
[22] June 25th required the — we expected the interest
[23] to continue to be paid monthly, and then, the
[24] release price was changed to $215,000. The release
[25] price would take care of the principal, and the

Page 90

[1] interest payments had to be maintained.
[2] They could not maintain interest
[3] payments. So without the interest maintained,
[4] there was nothing.
[5] Q: But as of right now, they haven't
[6] been declared in a payment default, have they?
[7] A: I don't know. I thought we had, but
[8] in any event, they acknowledged it, and they have
[9] worked out a settlement agreement with them.
[10] Q: Did Mr. Flatley ever raise the issue
[11] with you that the bondholders of that Epic Resorts,
[12] LLC have claims against Epic Palm Springs?
[13] A: No. Not that. No.
[14] Q: He never mentioned it?
[15] A: No. Not to my knowledge. I mean,
[16] I've talked to him once or twice. But no, he's
[17] never raised that.
[18] He just said that — that the
[19] indenture — I'm not sure what he means by that,
[20] but I assume it's some agreement with the
[21] bondholders — that the indenture permitted the
[22] Palm Springs loan.
[23] Q: Did he just bring that up out of the
[24] blue, or was that in response to —
[25] A: No. I think that indenture

Page 91

[1] discussion occurred way back when we were making
[2] the loan. Yeah, I'm sure it did.
[3] Q: Did he provide you with a copy of
[4] the —
[5] A: There may be. Again, I'm going to
[6] search these underwriting documents a little more
[7] diligently, and I'll put someone on it and see what
[8] we can get for you. Okay?
[9] Q: So was he in constant contact with
[10] you between June 15 and July 15 about the pending
[11] default under the indenture?
[12] MR. ALES: Objection to the form of
[13] the question. Lacks foundation, vague and
[14] ambiguous.
[15] THE WITNESS: Well, he was in no
[16] contact with me during that period of time, and
[17] that's where his contacts over the defaults on the
[18] indentures, there was — I know there was some
[19] contact, and the reason I know it is that Tom
[20] Hantges discussed with me.
[21] I can't be certain as to the time
[22] frame, however, but it was the summer, but exactly
[23] when, I don't know.
[24] BY MR. HOWLEY:
[25] Q: Did the filing of the involuntary

Page 92

[1] petition against Epic Palm Springs change the
[2] structure of the proposed settlement?
[3] A: To the extent that we recognized that
[4] we'd have to go into court and get approval,
[5] bankruptcy court and get approval on it.
[6] Otherwise, in our view, it would not be worth
[7] having.
[8] Q: So up to that point, the filing of
[9] the involuntary petition, you agreed with
[10] Mr. Semegen's opinion that you did need bankruptcy
[11] court approval?
[12] A: Oh, yeah, I agreed with that. They
[13] were a party to the proceeding.
[14] MR. FRANK: Did you say "did" or
[15] "didn't"?
[16] THE WITNESS: I did. Epic Resorts,
[17] our borrower, was not in bankruptcy.
[18] BY MR. HOWLEY:
[19] Q: You made reference to the fact that
[20] you have reached an agreement.
[21] I am going to hand you what is called
[22] a settlement agreement and general release.
[23] A: Yes.
[24] MR. HOWLEY: You need to mark that.
[25]

Min-U-Script®

ASSOCIATED REPORTERS

# EXHIBIT D

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


In Re:                         )
                               )
EPIC CAPITAL CORPORATION,      ) Case No. 01-2458 (MFW)
et al.,                        )
                               )
        Debtors.               )


United States Bankruptcy Court
824 Market Street - Sixth Floor
Courtroom No. 1
Wilmington, Delaware

April 30, 2002
2:18 p.m.

TRANSCRIPT OF PROCEEDINGS

BEFORE:    THE HONORABLE MARY F. WALRATH, JUDGE.

WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware   19801
(302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

1    number 5, "Use of Proceeds.  What will loan proceeds

2    be used for?"  Did you get an answer to that question?

3        A.    Yeah.  The proceeds were to be used just for

4    general working capital.

5        Q.    When you say general working capital, is that

6    of Epic Resorts-Palm Springs, Marquis Villas?

7        A.    That would be as we knew it, of Epic Resorts.

8        Q.    Epic Resorts, LLC.  Is that correct?

9        A.    That's correct.

10       Q.    Number 6, you asked for copies of contracts on

11   purchases to be consummated with proceeds.

12       A.    Correct.

13       Q.    Were you provided copies of those acquisition

14   contracts?

15       A.    Not that I know of.  As I said, there was some

16   talk about those, but it sort of got dropped as we

17   went through the process.

18       Q.    And in number 3 you asked for a copy of bond

19   indenture and prospectus of public bonds of Epic

20   Resorts.  Is that correct?

21       A.    That's correct.

22       Q.    Did you receive a copy of both of those

23   documents?

24       A.    Yes, we did.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1        Q.    Why did you ask for a copy of those?

2        A.    Because we knew -- we knew that they were

3    outstanding.  We knew that that was part of the --

4    that was why Epic had to file public reports and

5    documents.  And we wanted to make sure that we just

6    understood the full financial condition of the

7    borrower.

8        Q.    Was it also to figure out whether the

9    bondholders had a claim to Epic Palm Springs and its

10   property?

11       A.    It was to make sure that whatever loan we were

12   providing was not violating any covenants.

13       Q.    You testified earlier that USA Capital

14   concluded that in its review of the documents provided

15   to it that the bondholders did not have a claim to the

16   property at Epic Palm Springs.  Is that correct?

17       A.    That's correct.

18       Q.    Please turn to Exhibit No. 2-B in the Bank of

19   New York exhibit notebook.

20              THE COURT:  What number again?

21              MR. HOWLEY:  Exhibit 2.

22              THE COURT:  B-2?

23              MR. HOWLEY:  Exhibit No. 2 in the Bank of

24   New York exhibit --



# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

COPY

| | |
|---|---|
| In re: | : Chapter 11 |
| EPIC CAPITAL CORPORATION, et al., | : Case No. 01-02458 (MFW) |
| Debtors. | : Jointly Administered |

844 King Street
Wilmington, Delaware
Courtroom 2A

Tuesday, May 21, 2002
9:40 a.m.

BEFORE:    THE HONORABLE MARY F. WALRATH
United States Bankruptcy Court Judge

APPEARANCES:

> W. HARDING DRANE, JR., ESQ.
> WILLIAM A. HAZELTINE, ESQ.
> POTTER, ANDERSON & CORROON LLP
>   for Creditors Committee of Epic Capital
>   Corp. and Epic Resorts LLC

> JEFFREY A. DELLER, ESQ.
> JAMES HELTON JOSEPH, ESQ.
> KLETT, ROONEY, LIEBER & SCHORLING
>   for USA Capital

> THOMAS A. HOWLEY, ESQ.
> HAYNES and BOONE LLP
>   for Bank of New York

2

APPEARANCES, cont'd:

    PAUL DOUGHERTY, ESQ.
    McCARTER and ENGLISH
      and
    CRAIG MARTIN, ESQ.
      for Cort Business Services Corp.


    JULIE COMPTON, ESQ.
    Office of the United States Trustee


    WILLIAM D. SULLIVAN, ESQ.
    ELZUFON, AUSTIN, REARDON, TARLOV
      & MONDELL, P.A.
      for GranTree Corp.


    ROBERT BOVARNICH, ESQ.
    MONTGOMERY McCRACKEN
      for Five Star


    KEVIN GROSS, ESQ.
    ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A.
      and
    KENNETH PASQUALE, ESQ.
    STROOCK & STROOCK & LAVAN LLP
      for the Trustee


- - -

Case 06-10725-gwz    Doc 1446-1    Entered 10/04/06 17:34:06    Page 33 of 38

1        Q.    Now, Mr. Flatley, I'm going to ask you

2   some questions about the transaction with USA Capital;

3   okay?

4        A.    Yes.

5        Q.    You first contacted USA Capital sometime

6   in the first half of 2000; correct?

7        A.    Correct.

8        Q.    And you testified on Direct that the

9   existence of the Indenture was disclosed to USA

10  Capital; is that correct?

11       A.    Correct.

12       Q.    And USA Capital requested copies of the

13  Indenture and the Prospectus as part of their due

14  diligence; correct?

15       A.    Yes.

16       Q.    And USA Capital, in fact, received

17  copies of those documents as part of their due

18  diligence; correct?

19       A.    Yes.

20       Q.    And as part of their due diligence did

21  USA Capital raise issues with you with respect to the

22  Indenture and the Prospectus?

23       A.    When you say raise issues, what do you

24  mean?

Case 06-10725-gwz   Doc 1446-1   Entered 10/04/06 17:34:06   Page 34 of 38

1          Q.     Did they express any concerns to you

2     that language in the Indenture raised issues with them

3     with respect to whether the bondholders have claims to

4     the property at Epic - Palm Springs?

5          A.     I don't believe so.   No.

6          Q.     Please turn to Bank of New York Exhibit

7     No. 10, please.

8          A.     Okay.

9          Q.     This is a letter from John Rogers Burke

10    who you have previously identified as an attorney for

11    Epic - Palm Springs; correct?

12         A.     Yes.

13         Q.     And the letter is to Mr. Tom Rondeau who

14    is the general counsel of USA Capital; correct?

15         A.     Yes.

16         Q.     And this letter reflects that USA

17    Capital was concerned about some of the language in

18    the Prospectus; correct?

19         A.     I don't know how to answer that.   I

20    mean, the letter was written to Rondeau and it says

21    what it says.   I don't know what you mean by the

22    concerns.

23         Q.     What's the date of this letter?

24         A.     August 7th.

Case 06-10725-gwz    Doc 1446-1    Entered 10/04/06 17:34:06    Page 35 of 38

1          Q.     And also in this letter Mr. Burke makes

2    an attempt to explain why a Deed of Trust was not

3    executed on Epic - Palm Springs; correct?

4          A.     Yes.   He mentions about the Bureau of

5    Indian Affairs, the leasehold Deed of Trust in the

6    letter.  Yes.

7          Q.     But he doesn't make any mention at all

8    about the swapping of collateral agreement that you

9    have testified here today, does he?

10         A.     No.   That happened in 1998.

11         Q.     Well, this letter is dated August of

12   2000.

13         A.     Right.   That's two years after the swap

14   occurred.

15         Q.     So he doesn't make any mention of it in

16   this letter as an explanation as to why a Deed of

17   Trust was not executed with respect to Epic - Palm

18   Springs, does he?

19         A.     This just refers to the Bureau of Indian

20   Affairs situation.

21         Q.     So it doesn't mention it, does it?

22         A.     About the Daytona?

23         Q.     Yes.

24         A.     No.

Case 06-10725-gwz    Doc 1446-1    Entered 10/04/06 17:34:06    Page 36 of 38

```
 1              Q.     Now you also testified on Direct about

 2    the fact that a legal opinion was delivered to USA

 3    Capital.  Do you recall that?

 4              A.     Yes, I do.

 5              Q.     Please turn to Exhibit U22, please.

 6              A.     I have it.

 7              Q.     And this is the document that you

 8    previously identified as the legal opinion; correct?

 9              A:     Yes.

10              Q.     Now, first of all, Mr. Burke was not

11    counsel to Epic Resorts with respect to the

12    negotiation and closing of the Indenture, was he?

13              A.     No, he was not.

14              Q.     And Jones, Day was your counsel with

15    respect to that; correct?

16              A.     Correct.

17              Q.     And up to this point Mr. Burke had

18    simply assisted Epic - Palm Springs with some

19    timeshare filings; correct?

20              A.     That's correct.

21              Q.     And what is the date of this document

22    for the record, Mr. Flatley?

23              A.     July 31st, 2000.

24              Q.     And the letter also says it's effective
```

1   as of July 31, 2000; correct?

2          A.     Where does it say that?

3          Q.     The first sentence of the letter:  "This

4   is to inform you that the Epic Resorts - Palm Springs

5   Marquis Villas LLC legal opinion dated July 31, 2000

6   by the undersigned is hereby effective."

7          A.     Yes.

8          Q.     And isn't it true, Mr. Flatley, that the

9   loan transaction with USA Capital closed on July 5th,

10  2000?

11         A.     I believe that's correct.  Yes.

12         Q.     And please turn to Exhibit U6.

13         A.     That's the Leasehold Deed of Trust?

14         Q.     Yes, sir.

15         A.     Yes.

16         Q.     You previously identified this document;

17  correct?

18         A.     Correct.

19         Q.     And the date of this document is

20  June 26, 2000; correct?

21         A.     Yes.

22         Q.     In the upper righthand corner it states

23  that this document was filed in the County records on

24  July 5th, 2000; correct?

Case 06-10725-gwz    Doc 1446-1    Entered 10/04/06 17:34:06    Page 38 of 38

1          A.     Correct.

2          Q.     Turn to Exhibit U1, please.

3          A.     I have it.

4          Q.     And you've previously identified this as

5     the Loan Agreement; correct?

6          A.     Yes.

7          Q.     And this document is dated June 26,

8     2000; correct?

9          A.     Correct.

10          Q.     Please turn to Exhibit U2.  This is the

11     document that you previously identified as the

12     promissory note secured by Deed of Trust; correct?

13          A.     Correct.

14          Q.     And this document is dated June 26, 2000

15     as well; correct?

16          A.     Yes.

17               MR. HOWLEY:  I have no further

18     questions, Your Honor.

19               THE COURT:  Anybody else wish to Cross?

20               MR. PASQUALE:  No questions, Your Honor.

21               THE COURT:  Redirect?

22                    REDIRECT EXAMINATION

23               MR. DELLER:  Judge, I have another set

24     of binders.  May I approach?