# EXHIBIT F

# JOHN ROGERS BURK
### A LAW CORPORATION

TELEPHONE
(916) 784-7030

2140 PROFESSIONAL DRIVE, SUITE 120
ROSEVILLE, CALIFORNIA 95661

FACSIMILE
(916) 784-7075

FILE NO.

August 7, 2000

E20-1-31

Tom Rondeau, Esq.
USA Commercial Mortgage Company, Inc.
4484 South Pecos Road
Las Vegas, NV 89121

Re:    Prospectus for U.S. Trust Company of New York Bond Indenture Dated July 8, 1998

Dear Tom:

Sometime ago you telephoned me with some concern about the language in the Offering Prospectus for the "Indenture" dated July 8, 1998 between Epic Resorts, LLC as an Issuer and United States Trust Company of New York as Trustee. You indicated the Prospectus you had showed that a Leasehold Deed of Trust for the entire amount of the issuance would be recorded against Palm Springs Marquis Villas. I explained to you that at some point in the negotiations it was determined that the Bureau of Indian Affairs would not allow a Leasehold Deed of Trust which exceeded the acquisition price of the property, and the Trustee did not have a Leasehold Deed of Trust in the amount of the PSMV acquisition price. The Trustee in that matter acknowledged the issuance was adequately secured, and did not pursue a security interest on the PSMV Leasehold.

Enclosed are copies of pages 7 and 51 of the Offering Prospectus for the Bond issuance. The language in this version makes it clear that there was no Leasehold Deed of Trust intended to be recorded against the PSMV property.

I thought this might be helpful to complete your file on this matter.

Sincerely yours,

JOHN ROGERS BURK,
A Law Corporation

By _____
John Rogers Burk

JRB:sw
Enclosures
cc(w/encls.): Epic Resorts – Palm Springs Marquis Villas, LLC

USA 04764

## The Offering

| | |
|---|---|
| Issuer . . . . . . . . . . . . . . . . . . | Epic Resorts, Inc. |
| Securities Offered . . . . . . . . . . . | $150 million principal amount of     % Senior Secured Notes Due 2005 (the "Notes"). |
| Maturity . . . . . . . . . . . . . . . . . | June    , 2005. |
| Interest Payment Dates . . . . . . . . . | June 15 and December 15 of each year, commencing on December 15, 1998. |
| Ranking . . . . . . . . . . . . . . . . . | The Notes will rank *pari passu* with all existing and future Senior Indebtedness of the Company and will rank senior in right of payment to all existing and future Subordinated Obligations of the Company. The Notes will be effectively subordinated in right of payment to any Secured Indebtedness of the Company, to the extent of the assets serving as security therefor. None of the assets of Epic (other than the Pledged Note (as defined)) will secure its obligations under the Notes. As of March 31, 1998, on a pro forma basis after giving effect to the Offering and the application of the net proceeds therefrom, the Company and the Subsidiary Guarantors would have had no Secured Indebtedness (other than in connection with the Notes), and no Senior Indebtedness other than the $150.0 million represented by the Notes. See "Description of Notes—Ranking." |
| Guarantees . . . . . . . . . . . . . . . | The Notes will be unconditionally guaranteed, jointly and severally, by the Subsidiary Guarantors. The Subsidiary Guarantees will be senior obligations of the Subsidiary Guarantors and will rank *pari passu* in right of payment with all other existing and future Senior Indebtedness of the respective Subsidiary Guarantors and senior in right of payment to all existing and future Subordinated Obligations of the respective Subsidiary Guarantors and may be released upon the occurrence of certain events. See "Description of Notes—Subsidiary Guarantees." |
| Security . . . . . . . . . . . . . . . . . | The Subsidiary Guarantees of Westpark Resort, Inc. and Scottsdale Links Resort, Inc. will initially be secured by a first mortgage or other similar instrument (subject to customary exceptions) (each, a "Mortgage") on the fee simple interest in the real property acquired by such subsidiary in connection with the Acquisitions (the "Pledged Real Property") and, upon the creation of Vacation Ownership Interests at such properties (which is expected to occur by October 1998), such Mortgages on the Pledged Real Property will automatically convert into Mortgages on the Pledged Vacation Ownership Interests of such subsidiaries. In addition, the Subsidiary Guarantee of Palm Springs Marquis Villas, Inc. will be secured by a first Mortgage on the Vacation Ownership Interests at its resort upon creation of such Vacation Ownership Interests (which is expected to occur by October 1998). Absent the occurrence and the continuance of an Event of Default, the Trustee will be required to release its lien on the Pledged Vacation Ownership Interests as they are sold and the Trustee will not have a lien on the proceeds of any such sale. As of March 31, 1998 on a pro forma basis, the Pledged Vacation Ownership Interests had Estimated Completed Inventory Life-of-Project Sales of approximately $338.5 million. At the closing of the Acquisitions, the Pledged Vacation Ownership Interests and the Pledged Real Property are estimated to have aggregate book values of $55.9 |

*mtge*

*no mtge*

7

USA 04765

Cash Proceeds of one or more Equity Offerings, at a redemption price equal to      % of the principal amount thereof, plus accrued and unpaid interest thereon, if any, to the date of redemption; *provided, however,* that at least 65% of the original aggregate principal amount of the Notes remains outstanding after each such redemption. In order to effect the foregoing redemption with the proceeds of any Equity Offering, the Company shall make such redemption not more than 90 days after the consummation of any such Equity Offering.

*Selection.* In the case of any partial redemption, selection of the Notes for redemption will be made by the Trustee on a *pro rata* basis, by lot or by such other method as the Trustee in its sole discretion shall deem to be fair and appropriate; *provided, however,* that if a partial redemption is made with proceeds of an Equity Offering, selection of the Notes or portion thereof for redemption shall be made by the Trustee only on a *pro rata* basis, unless such method is otherwise prohibited. Notes may be redeemed in part in multiples of $1,000 principal amount only. Notice of redemption will be sent, by first class mail, postage prepaid, at least 45 days (unless a shorter period is acceptable to the Trustee) prior to the date fixed for redemption to each holder whose Notes are to be redeemed at the last address for such holder then shown on the registry books. If any Note is to be redeemed in part only, the notice of redemption that relates to such Note shall state the portion of the principal amount thereof to be redeemed. A new Note in principal amount equal to the unredeemed portion thereof will be issued in the name of the holder thereof upon cancellation of the original Note. On and after any redemption date, interest will cease to accrue on the Notes or part thereof called for redemption as long as the Company has deposited with the Paying Agent funds in satisfaction of the redemption price pursuant to the Indenture.

Ranking

The Notes will be senior obligations of the Company and will rank *pari passu* in right of payment with all existing and future Senior Indebtedness of the Company and will rank senior in right of payment to any existing and future Subordinated Obligations of the Company. None of the assets of Epic (other than the Pledged Note) will secure its obligations under the Notes, and the Notes will be effectively subordinated in right of payment to Secured Indebtedness of the Company to the extent of the assets serving as security therefor. As of March 31, 1998, on a pro forma basis after giving effect to the Offering and the application of the net proceeds therefrom as discussed under "Use of Proceeds", the Company and the Subsidiary Guarantors would have had no Secured Indebtedness (other than in connection with the Notes) and no Senior Indebtedness other than the $150.0 million represented by the Notes.

Security

The Subsidiary Guarantees of West Park Resort, Inc. and Scottsdale Links Resort, Inc. will initially be secured by a first Mortgage or other similar instrument (subject to customary exceptions) on the Pledged Real Property and, upon the creation of Vacation Ownership Interests at such properties (which is expected to occur by October 1998), such Mortgages on the Pledged Real Property will automatically be converted into Mortgages on the Pledged Vacation Ownership Interests of such subsidiaries. In addition, the Subsidiary Guarantee of Palm Springs Marquis Villas, Inc. will be secured by a first Mortgage on the Vacation Ownership Interests once they are created (which is expected to occur by October 1998). Absent the occurrence and the continuance of an Event of Default, the Trustee will be required to release its lien on the Pledged Vacation Ownership Interests as they are sold and the Trustee will not have a lien on the proceeds of any such sale. As of March 31, 1998 on a pro forma basis, the Pledged Vacation Ownership Interests had Estimated Completed Vacation Ownership Life-of-Project Sales of approximately $338.5 million. The Pledged Vacation Ownership Interests and the Pledged Real Property are estimated to have aggregate book values of $55.9 million and $41.6 million, respectively, as of March 31, 1998. In addition, the Pledged Note evidencing the loan that the Company will make to Hilton Head, Inc. to finance construction of vacation ownership suites at the Planter's Quarters Resort will be pledged to the Trustee for the benefit of the holders of the Notes to secure the Company's obligations under the Notes. The Pledged Note will be secured by a first Mortgage on certain assets of Hilton Head, Inc. No assurances can be given that the property subject to the Mortgages could be sold for such amount in the event of a

51

USA 04766

# EXHIBIT G

# LOAN AGREEMENT

This Loan Agreement, dated as of June 26, 2000, is entered into by and among Epic Resorts - Palm Springs Marquis Villas, LLC, a Delaware limited liability company ("Borrower"), and USA Capital Diversified Trust Deed Fund, a Nevada limited liability company ("Lender").

## SECTION 1:  DEFINITIONS AND ACCOUNTING TERMS.

1.1     Defined Terms.     As used in this Agreement, the following terms shall have the meanings set forth respectively after each:

"Agreement" means this Loan Agreement.

"Assignment of Permits, Licenses, Franchises and Authorizations" means the Assignment of Permits, Licenses, Franchises and Authorizations executed by Borrower with respect to the operation of the Project (as defined below).

"Assignment of Rents" means the Assignment of Rents contained in the Deed of Trust.

"BIA" means U.S. Department of Interior, Bureau of Indian Affairs.

"Business Day" means any Monday, Tuesday, Wednesday, Thursday, or Friday on which banks in the State of Nevada are open for business.

"Deed of Trust" means the Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing of even date herewith, encumbering the Property, as executed by the Borrower in favor of Lender, either as originally executed or as it may from time to time be supplemented, modified or amended.

"Default Rate" shall have the meaning set forth in the Note.

"Effective Date" means the date the Deed of Trust is recorded in the Official Records of Riverside County, California.

"Environmental Indemnity" means the Environmental and Accessibility Indemnity Agreement executed by Borrower and the Guarantor.

"Financing Statement" means financing statement of even date herewith executed by Borrower in favor of Lender with respect to the Personal Property.

"Governmental Agency" means any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, court, administrative tribunal or public utility.

1

"Guarantor" means, collectively, Thomas F. Flatley and Epic Resorts, LLC.

"Guaranty" means, collectively, the Limited Guaranty executed by Thomas F. Flatley, and the Guaranty executed by Epic Resorts, LLC, in favor of Lender, either as originally executed or as they may from time to time be supplemented, modified or amended.

"Improvements" means any and all improvements now existing or hereafter constructed on the Real Property.

"Laws" means, collectively, all federal, state and local laws, rules, regulations, ordinances and codes.

"Lender" means USA Capital Diversified Trust Deed Fund, LLC, a Nevada limited liability company, and any other persons or entities who may become a lender pursuant to an amendment to the Note.

"Loan" means the loan to be made by Lender to Borrower pursuant to Section 3 hereof.

"Loan Documents" means, collectively, this Agreement, the Note, the Security Documents, the Environmental Indemnity, the Guaranty and the Assignments, in each case either as originally executed or as the same may from time to time be supplemented, modified or amended, together with any other documents or instruments which may hereafter be executed by Borrower in connection with the Loan.

"Lots" means condominiums shown on the Condo Plan described in Exhibit B.

"Maturity Date" means the date which is twenty-four (24) months after the Deed of Trust is recorded.

"Note" means the promissory note of even date herewith, in the original principal amount of Eleven Million Five Hundred Thousand Dollars ($11,500,000), executed by Borrower in favor of Lender to evidence the Loan, either as originally executed or as it may from time to time be supplemented, modified or amended.

"Operation" means the operation of Borrower's business on the Property, including the operation, sales, leasing, running and maintenance of the Property and the Improvements.

"Permitted Exceptions" means the matters identified in Exhibit "A" attached hereto and made part hereof.

"Person" means any entity, whether and individual, trustee, corporation, partnership, trust, unincorporated organization or otherwise.

"Personal Property" means all present and future personal property of Borrower of every kind and nature, whether tangible or intangible, now or hereafter located at, upon or about the Property, or used or to be used in connection with or relating or arising with respect to the Property and/or the Project, including but not limited to the property described in the Deed of Trust.

"Project" means the all matters related to or involving the operation of the Palm Springs Marquis Villas Condominiums on the Property, or any portion thereof, as such exists at any time.

"Project Documents" means, collectively, all agreements, documents, instruments and materials of whatever kind or nature relating to the Project, including but not limited to: (a) any improvement plans and all other plans, specifications and drawings relating to the Project, (b) all approvals, consents, licenses and permits issued, or to be issued, by any Governmental Agency in connection with the Project, (c) the engineer's contract, architect's contract and any and all construction contracts, and all other agreements relating to the Project between Borrower and any contractor, subcontractor, independent project manager or supervisor, architect, engineer, laborer or supplier of materials, and (d) any take-out, refinancing or permanent loan commitment issued to Borrower with respect to the Property.

"Property" means, collectively, Borrower's leasehold interest in the Real Property, the Personal Property and any other buildings, structures, or improvements now or hereafter located on all or any portion of the Real Property.

"Real Property" means the real property and interests in real property described in Exhibit "B", consisting of Borrower's leasehold interest in the Palm Springs Marquis Villas property.

"Security Agreement" means the Security Agreement contained herein and in the Deed of Trust. If there is any conflict, the provisions in the Deed of Trust prevail.

"Security Documents" means the Deed of Trust, the Assignments, the Financing Statements and any other mortgage, deed of trust, assignment of leases, security agreement or assignment executed to secure the Note, either as originally executed or as they may from time to time be supplemented, modified or amended.

"Title Company" means First American Title Insurance Company.

"Title Policy" means the Lender's policy of title insurance and endorsements thereto required by this Agreement as a condition to the Disbursement of the Loan.

"USA" means USA Commercial Mortgage Company, Inc., Lender's representative hereunder.

3

"Use" means ownership, use, development, construction, maintenance, management, operation or occupancy.

1.2    Use of Defined Terms.    Any defined term used in the plural refers to all members of the relevant class, and any defined term used in the singular refers to any number of the members of the relevant class.  Any reference to the Loan Documents and other instruments, documents and agreements shall include such Loan Documents and other instruments, documents and agreements as originally executed or as the same may be supplemented, modified or amended.

1.3    Accounting Terms.    All accounting terms not specifically defined in this Agreement shall be construed in conformity with, and all financial data required to be submitted by this Agreement shall be prepared in conformity with, generally accepted accounting principles applied on a consistent basis.

1.4    Exhibits.    All exhibits to this Agreement, either as now existing or as the same may from time to time be supplemented, modified or amended, are incorporated herein by this reference.

SECTION 2:  RECITALS.

Borrower has applied to Lender for a Loan to obtain working capital.  Lender is willing to make the Loan to Borrower on the terms and conditions contained in this Agreement and the other Loan Documents.

SECTION 3:  THE LOAN.

3.1    Amount of the Loan.  Subject to the terms and conditions set forth in this Agreement, Lender agrees to make a loan (the "Loan") to Borrower in a principal amount of up to Eleven Million Five Hundred Thousand Dollars ($11,500,000) (the "Loan Amount"), the disbursement of which by Lender is subject to the terms and conditions of the Loan Documents.  The Loan Amount shall be disbursed in accordance with Lender's instructions to the Title Company, and according to the following schedule: (a) no later than June 30, 2000, $5,000,000; (b) on or about July 31, 2000, $5,000,000; and (c) as it accrues each month, the monthly interest due on all amounts disbursed, including the disbursements for interest due, up to a maximum of $1,500,000 (the "Interest Reserve").  From and after the Effective Date, the Loan Amounts actually disbursed (whether paid to, or on behalf of, Borrower, but excluding undisbursed amounts for Interest Reserve) shall bear interest at the rate set forth in the Note until fully repaid to Lender.  If Lender proposes to advance less than the amounts set forth herein on the appointed dates, or seeks to fund the Loan in additional advances or on a different schedule, then such changes shall be subject to Borrower's approval.

3.2    (Intentionally Omitted)

4

3.3    Interest Reserve.    Interest accruing on the Loan Amounts actually disbursed shall be paid from Interest Reserve as provided in Section 3.1, above.  Lender agrees to disburse a total of $1,500,000 in interest payments by paying the first $1,500,000 of interest that accrues on the Note, and Borrower shall only be responsible for interest payments thereafter.  Depletion of the Interest Reserve shall not release Borrower from any of Borrower's obligations under the Loan Documents, including but not limited to the obligation to pay interest accruing under the Note.  After depletion of the Interest Reserve, or, regardless of whether the entire Interest Reserve amount has been disbursed, so long as any Event of Default has occurred and is continuing, all interest payments under the Note shall be made by Borrower using its own funds; provided that Lender at its option and in its sole discretion may make disbursements from the Interest Reserve notwithstanding such Event of Default.

3.4    Prepayment.    Borrower agrees that all loan fees and any prepaid finance charges are fully earned as of the date they are paid and will not be subject to refund upon any early payment hereof (whether voluntarily or as a result of default). Borrower may prepay this Note in full or in part, but regardless of when this Note is prepaid, or if it is prepaid in part, or when it is fully paid, Borrower shall in addition pay interest equal to the difference between three months of interest (calculated on the full principal balance outstanding at the time the Loan is repaid), plus any accrued default or compound interest, less the total interest previously paid, if at the time of full repayment a lesser amount of interest (excluding default interest) is otherwise due.  In other words, Borrower agrees to pay three months of interest on the entire principal balance, calculated as set forth in the Note, plus any default interest or compound interest that may accrue, as the minimum interest due on this Loan.

3.5    Security.    The indebtedness evidenced by the Note, and all other indebtedness and obligations of Borrower under the Loan Documents, shall be secured by the Security Documents.  The Environmental Indemnity and the Guaranty and the respective obligations of Borrower and the Guarantor under each shall be unsecured.

3.6    Broker.    The loan evidenced by the Note was brokered by David Eogg, a licensed California real estate broker.

3.7    Payment Due Date.    Any language contained in any other Loan Document notwithstanding, interest on any payment not made on the due date (the first of the month with respect to interest payments; the Maturity Date with respect to principal) will, at the option of Lender, be calculated at the default rate from the time of an event of default as defined in Section 7.1 below.

3.8    Extension.    So long as the Loan is in good standing and no event of default has occurred and is continuing, USA shall recommend the extension of the Loan for a period of one year.  Borrower shall pay an extension fee equal to three percent (3%) of the outstanding Loan balance at the time of the extension, should one be given.

3.9    <u>Partial Release Provisions</u>.    Lender shall irrevocably instruct the Trustee under the Deed of Trust to release individual condominium units, and the Personal Property and Improvements appurtenant thereto, from the lien of the Deed of Trust, and execute and record a reconveyance thereof, upon the following terms and conditions:

(i) whole units only (not fractional time shares of a unit) may be released; and

(ii) Borrower shall pay to Lender $235,000. per unit, plus all costs and expenses of obtaining the partial release, for each unit released.

SECTION 4:    <u>CONDITIONS TO DISBURSEMENT</u>.

The obligation of Lender to close the Loan, or the decision of Lender to make an additional advance is subject to the following conditions precedent:

(a)    Borrower shall, at its sole expense, deliver or cause to be delivered to Lender, in form and substance satisfactory to Lender:

(i)    the original Note;

(ii)    the original Deed of Trust;

(iii)    the original Financing Statement;

(iv)    the original Guaranty;

(v)    the original Environmental Indemnity;

(vi)    the original Assignment of Permits, Licenses, Franchises and Authorizations executed by Borrower;

(vii)    a certificate of consent of Borrower, authorizing the execution, delivery and performance of the Loan Documents to be executed by a specified authorized officer on behalf of Borrower;

(viii)    an ALTA form of extended coverage lender's policy of title insurance, or evidence of a commitment therefor, issued by an insurer satisfactory to Lender, together with such endorsements and binders thereto as may be required by Lender pursuant to Section 6.6 hereof, in a policy amount of not less than the face amount of the Note, insuring the Deed of Trust to be a valid first lien upon the Property, and showing the Property to be subject only to the Permitted Exceptions;

6

(ix)    an appraisal of the Real Property certified to Lender, performed by an appraiser acceptable to Lender;

(x)    certified copies of, or certificate evidencing, all insurance policies required to be delivered pursuant to this Agreement;

(xi)    copies of all permits and approvals by Governmental Agencies with respect to the Improvements (if available);

(xii)    current Financial Statements of Borrower and the Guarantors;

(xiii)    evidence, in form and substance acceptable to Lender, of the availability and sufficiency of all utilities to the Project;

(xiv)    copies of any proposed, or approved final Covenants, Conditions and Restrictions recorded or to be recorded on the Project;

(xv)    a Phase I Hazardous Waste Survey, prepared by an entity approved by Lender, in form and substance acceptable to, and approved by, Lender;

(xvi)    consent of the BIA to the Deed of Trust and Note;

(xvii)    such additional agreements, certificates, reports, approvals, instruments, documents, financing statements, consent and opinions as Lender may reasonably request; including, without limitation, a soils report for the Real Property (including, without limitation, all determinations required by Lender with respect to hazardous waste (as such term is defined in the Environmental Indemnities) and water located on the Real Property);

(b)    Lender shall have reviewed and approved the Permitted Exceptions;

(c)    Borrower has acquired leasehold title to the Real Property;

(d)    The Deed of Trust shall have been recorded in the Official Records of the County in which the Property is located as a first priority lien;

(e)    the Financing Statement shall have been filed for record with the California Secretary of State;

(f)    no event of default shall have occurred.

SECTION 5:   <u>REPRESENTATIONS AND WARRANTIES BY BORROWER.</u>

5.1.    Formation, Qualification and Powers of Borrower.    Borrower is a limited liability company duly formed and validly existing under the laws of the State of Delaware, is qualified to conduct business in California, and has all requisite power and authority to conduct its business, to own its property, and to execute, deliver and perform all of its obligations under the Loan Documents.

5.2    Authority and Compliance with Instruments and Government Regulations. The execution, delivery and performance by Borrower of all of its obligations under each Loan Document have been duly authorized by all necessary action and do not and will not:

(a)    require any consent or approval not heretofore obtained of any Person holding any security or interest or entitled to receive any security or interest in Borrower;

(b)    violate any provision of any organizational document or certificate of Borrower;

(c)    result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, right of others or other encumbrance of any nature, other than under the Loan Documents, upon or with respect to any property now owned or leased or hereafter acquired by Borrower;

(d)    violate any provision of any Law, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Borrower or the Property, which violation would have a material, adverse impact thereon;

(e)    result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under, any indenture or loan or credit agreement or any other agreement, lease or instrument to which Borrower is a party or by which Borrower or any property of Borrower, is bound or affected; and Borrower is not in default in any respect that is materially adverse to the interest of Lender or that would have any material adverse effect on the financial condition of Borrower or the conduct of its business under any Law, order, writ, judgment, injunction, decree, determination, award, indenture, agreement, lease or instrument described in Sections 5.2(d) and 5.2(e).

5.3    Execution of the Guaranty by the Guarantor. The execution and delivery of the Guaranty:

(a)    has been duly authorized by all necessary action;

(b).    does not require the consent, authorization or approval of any Governmental Agency or Person;

8

(c)    will not result in the creation of any lien or other claim of any nature upon or with respect to the property of the Guarantor, other than as may be set forth in the Guaranty; and

(d)    will not violate any provision of any Law having applicability to the Guarantor, in a manner which would have a material, adverse impact on the Guarantor; and, when executed and delivered, the Guaranty will constitute the legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms.

5.4    <u>No Governmental Approvals Required.</u>    Other than approval of and consent to the Note and Deed of Trust by the BIA, no authorization, consent, approval, order, license, exemption from, or filing, registration or qualification with, any Governmental Agency is or will be required to authorize, or is otherwise required in connection with:

(a)    the execution, delivery and performance by Borrower and the Guarantor of the Loan Documents executed by each of them; or

(b)    the creation of the liens, security interests or other charges or encumbrances described in the Security Documents; except that filing and/or recording may be required to perfect Lender's interest under the Security Documents.

5.5    <u>Binding Obligations.</u> The Loan Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Borrower and the Guarantor, as the case may be, enforceable against them in accordance with their respective terms.

5.6    <u>Financial Statements.</u> Borrower and the Guarantor have furnished to Lender a copy of recent financial statements relating to Borrower's and the Guarantor's financial condition and Borrower represents and warrants to Lender that such financial statements present fairly the financial position of Borrower and the Guarantor as at the date thereof.

5.7    <u>No Material Adverse Change.</u>    Borrower represents and warrants to Lender that there has been no material adverse change in the condition, financial or otherwise, of Borrower or the Guarantor since the date of the financial statements described in Section 5.6; since that date, neither Borrower nor the Guarantor has entered into any material transaction not disclosed in such financial statements; neither Borrower nor the Guarantor has any material liabilities or contingent liabilities not reflected or disclosed in such financial statements; and there are no material mortgages, deeds of trust, pledges, liens, security interests, claims, charges, right of others or encumbrances (including liens or retained security titles of conditional vendors) of any nature whatsoever on any property of Borrower or the Guarantor, and no material indebtedness not disclosed in financial statements.

9

5.8    Tax Liability. Borrower and the Guarantor have filed all tax returns (federal, state and local) required to be filed and have paid all taxes shown thereon to be due and all property taxes due, including interest and penalties, if any. Borrower and the Guarantor have established and are maintaining necessary reserves for tax liabilities, if any.

5.9    Compliance with Law.    Borrower and the Guarantor are in compliance in all material respects with all Laws and other requirements applicable to their businesses and have obtained all authorizations, consents, approvals, orders, licenses and exemptions from, and have accomplished all filings, registrations or qualifications with, any Governmental Agency that is necessary for the transaction of their business.

5.10    Compliance with Requirements.    Throughout the term of the Loan, Borrower shall comply with all applicable covenants, conditions and restrictions, Laws and other requirements, and all necessary approvals, consents, licenses and permits of any Governmental Agency have been regularly and finally received with respect thereto, including without limitation each of the following as applicable:

(a)    all zoning, land use and planning requirements;

(b)    subdivision and/or parcel map requirements, including without limitation Requirements of applicable Law regarding subdivisions, parcel maps and the division of land into lots or parcels;

(c)    environmental requirements and preparation and approval of any necessary environmental impact statements or reports;

(d)    all requirements regarding the provision of all necessary utilities to the Real Property including the irrevocable allocation to the Property of sufficient domestic and fire protection water service to the Property;

(e)    all requirements imposed by any public utility in connection with the supply of utilities to the Property; and

(f)    all requirements imposed in connection with any approval, consent, license or permit issued or required by any Governmental Agency in connection with the Project.

5.11    Litigation.    There are no actions, suits or proceedings pending or, to the best of Borrower's or Guarantor's knowledge, threatened against or affecting Borrower or the Guarantor or any property of Borrower or Guarantor before any court or Governmental Agency that would have a material adverse affect on the Property, or Borrower's or the Guarantor's ability to perform their respective obligations under the Loan Documents or Guaranty, respectively.

5.12   Title to Property.   .   Borrower has good and merchantable title to all of its property and assets as disclosed in the financial information provided Lender and at the time of the recordation of the Security Documents shall have good and merchantable title to the Property, and there shall be no mortgages, liens, pledges or other encumbrances or any character on the Property, other than the Security Documents and Permitted Exceptions, without prior consent of Lenders.

## SECTION 6:   AFFIRMATIVE AND NEGATIVE COVENANTS.

Until payment of the Note in full and performance of all obligations of Borrower under the Loan Documents, unless Lender otherwise consent in writing:

6.1   Compliance with Requirements.   Borrower shall comply with all conditions, covenants, restrictions, leases, easements, reservations, rights and rights-of-way and all applicable Laws and other requirements relating to the Property and the Project, and obtain all necessary approvals, consents, licenses and permits of any Governmental Agency, including without limitation those set forth in Section 5.10.

6.2   Sale or Other Encumbrances. Borrower specifically agrees that:

(a)   In order to induce Lender to make the Loan, Borrower agrees that if the Property or any part thereof or any interest therein, shall be sold, assigned, transferred, conveyed, pledged, mortgaged or encumbered with financing other than that secured hereby or otherwise alienated by Borrower whether voluntarily or involuntarily or by operation of law, except as shall be specifically herein permitted, such as under Section 3.9, or without the prior written consent of Lender, then Lender, at its option, may declare the Note, including the prepayment fee, if applicable, secured hereby and all other obligations hereunder to be forthwith due and payable.   Except as shall be otherwise specifically provided herein, (a) a change in the legal or equitable ownership of the Property whether or not of record, or (b) a change in the form of entity or ownership (including the hypothecation or encumbrance thereof) of the stock or any other ownership interest in Borrower shall be deemed a transfer of an interest in the Property; provided, however, that any transfer of the Property or any interest therein to an entity which controls, is controlled by or is under common control with Borrower shall not be considered a transfer hereunder.   In connection herewith, the financial stability and managerial and operational ability of Borrower is a substantial and material consideration to Lender in its agreement to make the loan to Borrower secured hereby. The transfer of an interest in the Property may materially alter and reduce Lender's security for the indebtedness secured hereby. Moreover, Lender has agreed to make its loan based upon the presumed value of the Property and the Rents and Profits (as such are defined in the Deed of Trust) thereof. Therefore, it will be a diminution of Lender's security if junior financing, except as shall be permitted by lender, or if other liens or encumbrances should attach to the Property.

(b)   Borrower may request Lender to approve a sale or transfer of the Property to a party who would become the legal and equitable owner of the Property and would

assume any and all obligations of Borrower under the Loan Documents (the "Purchaser"). Lender shall not be obligated to consider or approve any such sale, transfer or assumption or request for the same. However, upon such request, Lender may impose limiting conditions and requirements to its consent to an assumption.

(c)     In the event ownership of the Property, or any part thereof, becomes vested in a person or persons other than Borrower, the Lender may deal with such successor or successors in interest with reference to the Note or the Deed of Trust in the same manner as with Borrower, without in any way releasing, discharging or otherwise affecting the liability of Borrower under the Note, the Deed of Trust or the other Loan Documents. No sale of Borrower's interest in the Property, no forbearance on the part of Lender, no extension of the time for the payment of the Deed of Trust indebtedness or any change in the terms thereof consented to by Lender shall in any way whatsoever operate to release, discharge, modify, change or affect the original liability of the Borrower herein, either in whole or in part. Any deed conveying the Property, or any part thereof, shall provide that the grantee thereunder assume all of Borrower's obligations under the Note, the Deed of Trust and all other Loan Documents. In the event such deed shall not contain such assumption, Lender shall have all rights reserved to it hereunder in the event of a default or if Lender shall not elect to exercise such rights and remedies, the grantee under such deed shall nevertheless be deemed to have assumed such obligations by acquiring the Property or such portion thereof subject to the Deed of Trust. Nothing contained in this section shall be construed to waive the restrictions against the transfer of the Property contained in Section 6.2(a).

6.3     Removal of Personalty.     Borrower shall not:

(a)     install in or otherwise use in connection with the Project any materials, equipment or fixtures under any security agreements or similar agreements however denominated whereby the right is reserved or accrues to anyone to remove or repossess any such items or whereby any Person other than Lender reserves or acquires a lien upon such items, excepting equipment leases in the ordinary course of business; or

(b)     remove or permit the removal of any fixtures or personalty located on the Property or used in connection with the Project, except for tools and construction equipment intended for use in connection with the construction of other improvements, unless actually replaced by an article of equal suitability and value, owned by Borrower free and clear of any lien or security interest other than the Security Documents.

6.4     Payment of Taxes, Assessments and Charges.     Borrower shall pay, prior to delinquency, all taxes, assessments, charges and levies imposed by any Governmental Agency which are or may become a lien affecting the Property or any part thereof, including without limitation assessments on any appurtenant water stock; except that Borrower shall not be required to pay and discharge any tax, assessment, charge or levy that is being actively contested in good faith by appropriate proceedings, as long as Borrower has established and maintains reserves adequate to pay any liabilities contested pursuant to this Section in accordance with generally accepted accounting principles and,

12

by reason of nonpayment, none of the property covered by the Security Documents or the lien or security interest of Lender is in danger of being lost or forfeited.

6.5    <u>Insurance.</u>    The Borrower shall at all times maintain the following policies of insurance:

(a)    prior to completion of the Improvements, builder's "all risk" insurance ("completed value" form), including "course of construction" coverage, covering the Improvements and any Personal Property;

(b)    from and after completion of the Improvements, property "all risk" insurance covering the Improvements and any Personal Property;

(c)    commercial general liability insurance in favor of the Borrower (and naming the Lender as an additional insured) in an aggregate amount not less than $2,000,000.00 (or such greater amount as may be specified by the Lender from time to time) combined single limit; and

(d)    such other insurance as may be required by applicable Laws (including worker's compensation and employer's liability insurance) or as the Lender may reasonably require from time to time (including "all risk" insurance with respect to any other improvements now or in the future located on the Real Property and comprehensive form boiler and machinery insurance, if applicable, rental loss insurance and business interruption insurance).

The Borrower shall also cause any contractor and each subcontractor employed on the Property to maintain a policy of commercial general liability insurance and, upon request by the Lender, shall cause the Architect and any engineer engaged in connection with the Project to maintain a policy of professional liability insurance, in each case for such periods and in such amounts as the Lender may reasonably require from time to time.

Each policy of builder's-risk and all-risk insurance required by this Section 6.5 shall be in an amount not less than the full replacement cost of the property covered by such policy, shall contain a "waiver of coinsurance" provision, a "full replacement cost" endorsement, a "Mortgagee Loss Payable" clause, and a "Betterments" or "Building Ordinance" endorsement, and shall insure the Property against flood loss risk to the maximum available policy amount if the Real Property is located in a "Flood Hazard Area" (as determined by the Federal Emergency Management Agency). Each policy of commercial general liability insurance required by this Section shall cover personal injury, property liability, and contractual liability, including coverage for Borrower's indemnity obligations under the Loan Documents, and shall name Lender as an "additional insured". The commercial general liability insurance shall also cover completed operations, and such insurance shall be primary and non-contributing with any other insurance available to the Lender. All insurance policies shall be in form and substance and issued by insurers reasonably satisfactory to the Lender, and shall contain

such deductible and such endorsements as the Lender may reasonably require. Each policy shall require thirty (30) day written notice to Lender prior to any cancellation thereof. As a condition to funding the Loan, Borrower shall provide to Lender an ACORD 27 form certificate evidencing such policies. Upon request by the Lender from time to time, the Borrower shall deliver to the Lender originals or copies of all such insurance policies.

6.6    Title Insurance Endorsements.    Borrower shall deliver or cause to be delivered to Lender, in form and substance satisfactory to Lender, with respect to all of the Real Property, CLTA endorsement numbers 100, 100.29, 116 and 116.7 to the Title Policy and such other endorsement and binders as Lender may from time to time reasonably require.

6.7    Books and Records.    Borrower shall: (a) maintain full and complete books of account and other records reflecting the results of its operations (in conjunction with any other business as well as specifically with respect to the Project) in accordance with generally accepted accounting principles applied on a consistent basis; and (b) permit Lender and its agents, at any time and from time to time, upon twenty-four (24) hours telephonic notice to Borrower, to inspect and copy all of such books and records, including without limitation any books and records pertaining to the Project or the Project Documents.

6.8    Entry and Inspection. Lender and its agents shall, at all time, upon twenty-four (24) hours telephonic notice to Borrower, have the right of entry and free access to the Project and the right to inspect all work done, labor performed, and materials furnished in and about the Project. If, at any time, Lender determines, in its sole discretion, that regular inspections of the Project are required, the Borrower shall allow free access to such inspector. Such inspection shall be performed at Borrower's expense, with the actual cost thereof, reasonably incurred, to be paid by Borrower upon seventy-two (72) hours notice from Lender.

6.9    Physical Security of Project.    Borrower shall take appropriate measures to protect the physical security of the Project and the Property.

6.10    Reporting and Requirements. Borrower shall cause to be delivered to Lender, in form and detail satisfactory to Lender:

(a)    promptly upon Borrower's learning thereof, notice of:

(i)    any litigation materially affecting Borrower, and/or Guarantor Epic Resorts, LLC, and the Property or the Project;

(ii)    any dispute between Borrower and any Governmental Agency relating to the Property or the Project, the adverse determination of which would materially adversely affect the Property or the Project;

14

(iii)    any threat or commencement of proceedings in condemnation or eminent domain relating to the Property;

(iv)    any Event of Default or event which, with the giving of notice an/or the passage of time, could become and Event of Default; and

(v)    any change in the Manager of Borrower, as defined in Borrower's Operating Agreement.

(b)    as soon as available, and in any event within thirty (30) calendar days after the end of each quarter during the term of the Loan, a sales report for the Project for the quarter most recently ended (which sales report shall contain an itemized breakdown of the sales of Epic Vacation Club Memberships and the gross revenues with respect to the Project for such quarter), in reasonable detail and prepared in accordance with generally accepted accounting principles applied on a consistent basis, and certified as accurate by an officer of Borrower;

(c)    as soon as available, and in any event within forty-five (45) calendar days after the close of each fiscal quarter of Borrower and Guarantor Epic Resorts, LLC, quarterly financial statements applicable to Borrower and Guarantor Epic Resorts, LLC, all in reasonable detail and prepared in accordance with generally accepted accounting principles applied on a consistent basis;

(d)    as soon as available, and in any event within ninety (90) calendar days after the close of each fiscal year of Borrower, annual financial statements applicable to Borrower's parent, Epic Resorts, LLC, all in reasonable detail and prepared in accordance with generally accepted accounting principles applied on a consistent basis;

(e)    as soon as available, and in any event within ninety (90) calendar days after the close of each fiscal year of Guarantor, annual financial statements applicable to the Guarantor, all in reasonable detail and prepared in accordance with generally accepted accounting principles applied on a consistent basis;

(f)    promptly upon receipt thereof, any audited financial information applicable to Borrower or the Guarantor; and

(g)    such other information relating to Borrower, Guarantor Epic Resorts, LLC, the Property and/or the Project as Lender may reasonably request form time to time, including without limitation (i) tax returns, to be provided concurrently with the filing thereof with the relevant government authority or (ii) if Borrower or the Guarantor Epic Resorts, LLC receives an extension from the relevant governmental authority for filing a tax return, satisfactory evidence of such extension.

6.11    <u>Surveys.</u>    Borrower agrees to furnish Lender all of the following:

(a)    perimeter surveys of the Property (a copy of a Subdivision Map of the Property, if one exists, shall satisfy this requirement); and

(b)    upon request by Lender, if not included in the perimeter survey, a survey made and certified by a licensed engineer or surveyor showing the locations of the Improvements located on the Property and showing that the Improvements are located entirely within the Property lines and do not encroach upon any easement, or breach or violate any Law or any covenant, condition or restriction of record, or any building or zoning ordinance.

6.12    Management of Property and Project. Borrower shall not enter into any agreement providing for the management, leasing or operation of the Property or the Project without the prior written consent of the Lender.

6.13    Defense of Vested Right, Modification of Vested Rights.    Borrower shall at all times, at its own cost and expense take, pursue and assert all such actions and defenses as are necessary to perfect, maintain and protect its vested development rights with respect to the Property. Should Borrower fail to do so, Lender may do so either in its own name or the name of the Borrower; and all unrecovered fees, costs and expenses incurred by Lender in connection therewith shall be payable by Borrower to Lender on demand, shall bear interest at the Default Rate specified in the Note, and shall be secured by the Deed of Trust. Borrower shall not modify, amend, cancel, terminate or otherwise alter any development rights or entitlements with respect to the Property, without Lender's prior written consent, which consent shall not be unreasonably withheld.

6.14    Financial Covenants. Borrower's parent, Epic Resorts, LLC, must, until all amounts due under the Note and Deed of Trust have been fully repaid, (a) maintain a consolidated net worth of $13,000,000, and (b) maintain an unrestricted cash balance, in the form of cash, and notes and mortgages receivable in good standing and available for pledge to Lender, of at least $2,500,000.

## SECTION 7:  EVENTS OF DEFAULT AND REMEDIES UPON DEFAULT.

7.1    Events of Default.    The occurrence of any one or more of the following, whatever the reason therefor, shall constitute an Event of Default hereunder:

(a)    Borrower shall fail to pay within five days after written notice from Lender any installment of principal or interest on the Note or any other amount owing under this Agreement or the other Loan Documents; or

(b)    Borrower or Guarantor shall fail to perform or observe any term, covenant or agreement contained in any of the Loan Documents on its part to be performed or observed, other than the failure to make a payment covered by Section 7.1(a), and such failure shall continue uncured as of thirty (30) calendar days after written notice of such failure is given by Lender to Borrower; provided, however, that if Borrower has commenced to cure the default within said 30-day period and is diligently pursuing such

16

cure, but the default is of such a nature that it cannot be cured within 30 days, then the cure period shall be extended for the number of days necessary to complete the cure, but in no event shall the total cure period be longer than 90 days (the cure period set forth in this Section 7.1(b) shall not apply to any other Events of Default); or

(c)     any representation or warranty in any of the Loan Documents or in any certificate, agreement, instrument or other document made or delivered pursuant to or in connection with any of the Loan Documents proves to have been incorrect in any material respect when made; or

(d)     Borrower (which term shall include any entity comprising Borrower) is dissolved or liquidated, or otherwise ceases to exist, or all or substantially all of the assets of Borrower or Guarantor are sold or otherwise transferred without Lender's written consent; or

(e)     Borrower or Guarantor is the subject of an order for relief by the bankruptcy court, or is unable or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors; or

(f)     Borrower or Guarantor applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer ("Receiver"); or a Receiver is appointed without the application or consent of Borrower or Guarantor, as the case may be, and the appointment continues undischarged or unstayed for sixty (60) calendar days; or Borrower or Guarantor institutes or consents to any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, custodianship, conservatorship, liquidation, rehabilitation or similar proceedings relating to it or to all or any part of its property under the laws of any jurisdiction; or any similar proceeding is instituted without the consent of Borrower or Guarantor, as the case may be, and continues undismissed or unstayed for sixty (60) calendar days; or any judgment, writ, attachment, execution or similar process is issued or levied against all or any part of the Property of Borrower or Guarantor, and is not released, vacated or fully bonded within sixty (60) calendar days after such issue or levy; or

(g)     there shall occur a material adverse change in the financial condition of Borrower or Guarantor Epic Resorts, LLC from their respective financial conditions as of the date of the Note, as determined by Lender in its reasonable discretion, and Lender reasonably believes that such adverse change shall jeopardize (i) Lender's ability to collect the amounts due under the Note, as they become due, or (ii) Lender's ability to foreclose on the Mortgaged Property; or

(h)     any Loan Document, at any time after its execution and delivery and for any reason other than the agreement of Lender or the satisfaction in full or all indebtedness and obligations of Borrower under the Loan Documents, ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction; or Borrower or any trustee, officer, director, shareholder or partner of any entity comprising

17

Borrower or Guarantor claims that any Loan Document is ineffective or unenforceable, in whole or in part, or denies any or further liability or obligation under any Loan Document unless all indebtedness and obligations of Borrower thereunder have been fully paid and performed; or

(i)     all or a substantial portion of the Property is condemned, seized or appropriated by any Governmental Agency; or

(j)     Borrower is dissolved or liquidated, or otherwise ceases to exist, or all or substantially all of the assets of Borrower or Guarantor are sold or otherwise transferred without Lender's written consent; or

(k)     any lien or security interest created by any Security Document, at any time after the execution and delivery of that Security Document and for any reason other than the agreement of Lender or the satisfaction in full of all indebtedness and obligations of Borrower under the Loan Documents, ceases or fails to constitute a valid, perfected and subsisting lien of the priority required by this Agreement or security interest in and to the Property purported to be covered thereby; subject only to the Permitted Exceptions; or

(l)     any default occurs in any loan document or other agreement by and between Borrower and Lender or by Borrower in favor of Lender with reference to the Loan or otherwise, or any default occurs in any loan document regarding any loan or other obligation secured by the Property or any portion thereof.

7.2     Remedies Upon Default.     Upon the occurrence of any Event of Default, Lender may, at its option, to any or all of the following:

(a)     declare the principal of all amounts owing under the Note, this Agreement and the other Loan Documents and other obligations secured by the Security Documents, together with interest thereon, and any other obligations of Borrower to Lender to be forthwith due and payable, regardless of any other specified maturity or due date, without notice of default; presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind or character, and without the necessity of prior recourse to any security; or

(b)     take possession of the Property and, at Lender's option, let contracts for, or otherwise proceed with finishing the Improvements and paying the cost thereof; and if Lender advances its own funds for such purposes, such funds shall be considered advanced under the Note and shall be secured by the Security Documents, notwithstanding that such advances may cause the total amount advanced under the Note to exceed the face amount of the Note or the amount committed to be advanced pursuant to this Agreement, and Borrower shall immediately upon demand reimburse Lender therefor, together with interest thereon as if such advances were advances under the Note, from the date of such advance until the date of reimbursement (nothing contained in this Section 7.2(b) or elsewhere in this Loan Agreement shall be construed to make Lender a

18

"mortgagee in possession" unless and until Lender actually takes possession of the Property either in person or through an agent or receiver);

(c)   terminate any right of Borrower to receive any additional advance;

(d)   terminate all rights of Borrower and obligations of Lender under the Loan Documents;

(e)   exercise its right and power to sell, or otherwise dispose of, the Personal Property, or any part thereof, and for that purpose may take immediate and exclusive possession of the Personal Property, or any part thereof, and with or without judicial process to the extent permitted by law, enter upon any premises on which the Personal Property or any part thereof may be situated and remove the same therefrom without being deemed guilty of trespass and without liability for damages thereby occasioned, or at Lender's option Borrower shall assemble the Personal Property and make it available to the Lender at the place and the time designated in the demand; and

(f)   exercise any and all of its rights under the Loan Documents, including but not limited to the right to take possession of and foreclose on any security, and exercise any other rights with respect to any security, whether under the Security Documents or any other agreement or as provided by Law, all in such order and in such manner as Lender in its sole discretion may determine.

7.3.   Cumulative Remedies; No Waiver.   All remedies of Lender provided for herein are cumulative and shall be in addition to any and all other rights and remedies provided in the other Loan Documents or provided by Law from time to time.   The exercise of any right or remedy by Lender hereunder shall not in any way constitute a cure or waiver of any default hereunder or under any of the other Loan Documents, nor invalidate any notice of default or any act done pursuant to any such notice, nor prejudice Lender in the exercise of any rights hereunder or under the Loan Documents.   No waiver by Lender of any default by Borrower hereunder shall be implied from any omission by Lender to take action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default expressly made the subject of the waiver.   Any such express waiver shall be operative only for the time and to the extent therein stated.   Any waiver of any covenant, term or condition contained herein shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition.   The consent or approval by Lender to or of any act by Borrower requiring further consent or approval shall not be deemed to waive or render unnecessary consent or approval to or of any subsequent act.

SECTION 8:   MISCELLANEOUS.

8.1   Performance by Lender.   In the event that Borrower shall default in or fail to perform any of its obligations under the Loan documents, Lender shall have the right, but not the duty, without limitation upon any of Lender's rights pursuant thereto, to perform the same, and Borrower agrees to pay to Lender, within seventy-two (72) hours

19

after demand therefor, all costs and expenses incurred by Lender in connection therewith, including without limitation actual attorneys' fees reasonably incurred, together with interest thereon from the date of expenditure at the Default Rate.

8.2    Actions.    Provided Borrower has not promptly so acted, Lender shall have the right to commence, appear in, and defend any action or proceeding purporting to affect the rights or duties of the parties hereunder or the payment of any funds, and in connection therewith Lender may pay necessary expenses, employ counsel, and pay reasonable attorneys' fees. Borrower agrees to pay to Lender within seventy-two (72) hours after demand therefor, all costs and expenses incurred by Lender in connection therewith, including without limitation actual attorneys' fees reasonably incurred, together with interest thereon from the date of expenditure at the Default Rate.

8.3    Advances Obligatory. Anything herein to the contrary notwithstanding, it is specifically understood and agreed that any advances made by Lender pursuant to this Agreement, including, but not limited to, all funds advanced by Lender, shall be deemed advanced by Lender under an obligation to do so, regardless of the person or entity to whom such advance is made. Advances made in the reasonable exercise of Lender's judgment that such are necessary to complete the Improvements or to protect its security are to be deemed obligatory advances hereunder and are to be secured by the Note and Deed of Trust, and such security shall relate back to the original recording of the Deed of Trust.

8.4    Nonliability of Lender.    Borrower acknowledges and agrees that:

(a)    any inspections of the Property or the construction of the Improvements made by or through Lender are for purposes of administration of the Loan only and Borrower is not entitled to rely upon the same with respect to the quality, adequacy or suitability or materials or workmanship, conformity to the plans therefor, state of completion or otherwise; Borrower shall make its own inspections of such construction to determine that the quality of the Improvements and all other requirements of such construction are being performed in a manner satisfactory to Borrower and in conformity with the Improvement Plans and all applicable Laws; and Borrower shall immediately notify Lender, in writing, should the same not be in conformity with the plans therefor and all applicable laws;

(b)    by accepting or approving anything required to be observed, performed, fulfilled or given to Lender pursuant to the Loan Documents, including any certificate, statement of profit and loss or other financial statement, survey, appraisal, lease or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance or approval thereof shall not constitute a warranty or representation to anyone with respect thereto by Lender;

(c)    Lender neither undertakes nor assumes any responsibility or duty to Borrower to select, review, inspect, supervise, pass judgment upon or inform Borrower of

any matter in connection with the Project, including without limitation matters relating to the quality, adequacy or suitability of: (i) any plans or specifications, (ii) architects, contractors, subcontractors and materialmen employed or utilized in connection with the construction of the Improvements, or the workmanship of or the materials used by any of them, or (iii) the progress or course of any construction and its conformity or nonconformity with the plans therefor; and Borrower shall rely entirely upon its own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or information supplied to Borrower by Lender in connection with such matters is for the protection of Lender only and neither Borrower nor any third party is entitled to rely thereon;

(d)    Lender owes no duty or care to protect Borrower against negligent, faulty, inadequate or defective building or construction;

(e)    the relationship of Borrower and Lender under the Loan Documents is, and shall at all times remain, solely that of borrower and lender, and Lender neither undertakes nor assumes any responsibility or duty to Borrower or to any other Person with respect to the Property or Loan, except as expressly provided in the Loan Documents; and notwithstanding any other provision of the Loan Documents: (i) Lender is not, and shall not be construed as, a partner, joint venturer, alter-ego, manager, controlling person or an insider or other business associate or participant of any kind of Borrower, and Lender does not intend to ever assume such status; (ii) Lender's activities in connection with the Loan Documents shall not be "outside the scope of the activities of a lender of money" under Nevada law, as amended or recodified from time to time, and Lender does not intend to ever assume any responsibility to any Person for the quality, suitability, safety or condition of the Property or Improvements; and (iii) Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Borrower; and

(f)    Lender shall not be directly or indirectly liable or responsible for any loss, claim, cause of action, liability, indebtedness, damage or injury of any kind or character to any Person or property arising from any construction on, or occupancy or use of, any of the Property, whether caused by, or arising form: (i) any defect in any building, structure, soil condition, grading, fill, landscaping, or other improvements thereon or in any on-site or off-site improvement or other facility therein or thereon; (ii) any act or omission of Borrower or any of Borrower's agents, employees, independent contractors, licensees or invitees; (iii) any accident in or on any of the Property or any fire, flood or other casualty or hazard thereon; (iv) the failure of Borrower, any of Borrower's licensees, employees, invitees, agents, independent contractors or other representatives to maintain any of the Property in a safe condition; and (v) any nuisance made or suffered on any part of the Property.

8.5    No Third Parties Benefited.    This agreement is made for the purpose of defining and setting forth certain obligations, rights and duties of borrower and Lender in connection with the Loan. It shall be deemed a supplement to the Note and the Security Documents, and shall not be construed as a modification of the Note or the Security

Documents, except as provided herein. It is made for the sole protection of Borrower and Lender, and Lender's successors and assigns. No other Person shall have any rights of any nature hereunder of by reason hereof.

8.6    Indemnity.    Borrower indemnifies. Lender against, and holds Lender harmless from, any and all losses, damages (whether general, punitive or otherwise), liabilities, claims, cause of action (whether legal, equitable or administrative), judgments, court costs and legal or other expenses, including attorneys' fees, which Lender may suffer or incur as a direct or indirect consequence of: (a) Lender's performance of this Agreement or any of the Loan Documents, including, without limitation, Lender's exercise or failure to exercise any rights, remedies or powers in connection with this Agreement or any of the Loan Documents but excluding charges and assessments by Governmental Agencies imposed upon the Lender in the normal course of the Lender's business such as taxes and regulatory fees; (b) Borrower's failure to perform any of Borrower's obligations as and when required by this Agreement or any of the other Loan Documents, including, without limitation, any failure, at any time, of any representation or warranty of Borrower to be true and correct and any failure by Borrower to satisfy any condition; (c) any claim or cause of action of any kind by any Person to the effect that Lender is in any way responsible or liable for any act or omission by Borrower, whether on account of any theory or derivative liability or otherwise, including but not limited to any claim or cause of action for fraud, misrepresentation, tort or willful misconduct; (d) any act or omission by Borrower, any contractor, subcontractor or material supplier, engineer, architect, or any other Person with respect to any of the Property or Improvements; or (e) any claim or cause of action of any kind by any Person which would have the effect of denying Lender the full benefit or protection of any provision of this Agreement or the Loan Documents but excluding charges and assessments by Governmental Agencies imposed upon Lender in the normal course of Lender's business such as taxes and regulatory fees. Lender's rights of indemnity shall not be directly or indirectly limited, prejudiced, impaired or eliminated in any way by any finding or allegation that Lender's conduct is active, passive or subject to any other classification or that Lender is directly or indirectly responsible under any theory of any kind, character or nature for any act or omission by Borrower or any other Person. Notwithstanding the foregoing, Borrower shall not be obligated to indemnify Lender with respect to any intentional tort or act of negligence which Lender is personally determined by the judgment or a court of competent jurisdiction (sustained on appeal, if any) to have committed. Borrower shall pay any indebtedness arising under this indemnity to Lender immediately within seventy-two (72) hours after demand therefor by Lender together with interest thereon from the date such indebtedness arises until paid at the Default Rate. Borrower's duty to defend and indemnify Lender shall survive the release and cancellation of the Note and the release and reconveyance or partial release and reconveyance of the Deed of Trust. Lender agrees to similarly indemnify Borrower for any gross negligence, wilfull misconduct, or misrepresentation made with respect to the Loan.

8.7    Commissions.    Borrower hereby indemnifies Lender from the claim of any Person for a commission or fee in connection with the Loan, except for a claim made by

a Person retained by Lender or USA. The Loan Fee payable to USA shall be paid from the Loan proceeds at the close of escrow.

8.8    Lenders' Representative. The persons and entities which comprise Lender hereby collectively appoint USA Commercial Mortgage Company ("USA") to administer the Loan on their behalf, to make all necessary demands on Borrower and to execute and deliver all approvals and notices to be given by Lender hereunder.

8.9    Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, except that, except as provided herein, Borrower may not assign its rights or interest or delegate any of its duties under this Agreement or any of the other Loan Documents without prior written consent of Lender.

8.10    Amendments; Consents.    No amendment, modification, supplement, termination or waiver of any provision of this Agreement or any of the other Loan Documents, and no consent to any departure by Borrower therefrom, may in any event be effective unless in writing signed by Lender, and then only in the specific instance and for the specific purpose given.

8.11    Costs, Expenses and Taxes. Borrower shall pay to Lender, within seventy-two (72) hours after written demand therefor:

(a)    the actual attorneys' fees and out-of-pocket expenses incurred by Lender in connection with the negotiation, preparation, execution, delivery and administration of this Agreement and any other Loan Documents and any matter related thereto, which shall not exceed, in the aggregate, $12,000 for which Borrower is liable;

(b)    the actual costs and expenses of Lender in connection with any modification of any Loan Document or in connection with the enforcement of this Agreement and any other Loan Document and any matter related thereto, including the actual fees and out-of-pocket expenses, reasonably incurred, of any legal counsel, independent public accountants and other outside experts retained by Lender; and

(c)    all costs, expenses, fees, premiums and other charges relating or arising with respect to the Loan Documents or any transactions contemplated thereby or the compliance with any of the terms and conditions thereof, including, without limitation, appraisal fees, inspection fees, cost review fees, recording fees, filing fees, release or reconveyance fees, title insurance premiums, and the cost of realty tax service for the term of the Loan.

All sums paid or expended by Lender under the terms of this Agreement and the other Loan Documents shall be considered to be a part of the Loan. Except as otherwise specifically stated herein, all such sums shall be secured by the Security Documents, shall bear interest from the date of expenditure as if such sums were advances under the

23

Note, and shall be immediately due and payable by Borrower within seventy-two (72) hours after demand therefor.

8.12    Survival of Representations and Warranties. All representations and warranties of Borrower and Guarantor contained herein or in any other Loan Document shall survive the making of the Loan and execution and delivery of the Note, and are material and have been or will be relied upon by Lender, notwithstanding any investigation made by Lender or on behalf of Lender. For the purpose of the foregoing, all statements contained in any certificate, agreement, financial statement, or other writing delivered by or on behalf of Borrower or Guarantor pursuant hereto or to any other Loan Document or in connection with the transactions contemplated hereby or thereby shall be deemed to be representations and warranties of Borrower or Guarantor contained herein or in the other Loan Documents, as the case may be.

8.13    Notices.    . All notices to be given pursuant to this Agreement shall be sufficient if given by personal services, by guaranteed overnight delivery services, by telex, telecopy or telegram or by being mailed postage prepaid, certified or registered mail, return receipt requested, to the described addresses of the parties hereto as set forth below; or to such other address as a party may request in writing. Any time period provided in the giving of any notice hereunder shall commence upon the date of personal service, the date after delivery to the guaranteed overnight delivery service, the date of sending the telex, telecopy or telegram or two (2) days after mailing certified or registered mail.

BORROWER'S ADDRESS:            Mr. Thomas F. Flatley, President
                               Epic Resorts – Palm Springs Marquis Villas, LLC
                               1150 First Avenue, Suite 900
                               King of Prussia, Pennsylvania 19406

LENDER'S ADDRESS:              c/o USA Commercial Mortgage Company
                               4484 South Pecos Road
                               Las Vegas, Nevada 89121
                               Attn: Joe Milanowski

8.14    Further Assurances.    Borrower shall, at its sole expense and without expense to Lender, do such further acts and execute and deliver such further documents as Lender from time to time may reasonably require for the purpose of assuring and confirming unto Lender the rights hereby created or intended now or hereafter so to be, or for carrying out the intention or facilitating the performance of the terms of any Loan Document, or for assuring the validity of any security interest or lien under any Security Document.

8.15    Governing Law.    The Loan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of Nevada, unless specifically otherwise provided.

24

8.16    <u>Severability of Provisions.</u>    Any provision in any Loan Document that is held to be inoperative, unenforceable or invalid shall be inoperative, unenforceable or invalid without affecting the remaining provisions, and to this end the provisions of all Loan Documents are declared to be severable.

8.17    <u>Assignment or Sale of Participation by Lender; Advertising.</u>    Lender may, at any time, sell, transfer, assign or grant participation in the Loan and in the Loan Documents and Lender may forward to its Partners or to such participant and prospective participant all documents and information relating to the Loan and to Borrower, whether furnished by Borrower or otherwise, as Lender determines necessary or desirable.

8.18    <u>Headings.</u>    Section headings in this Agreement are included for convenience of reference only and are not part of this Agreement for any other purpose.

8.19    <u>Time of the Essence.</u>    Time is of the essence.

8.20    <u>Confidentiality</u>    Lender agrees that it will not disclose the fact or any of the terms of the Loan or any financial information or other information received in connection with the Loan about Borrower, Borrower's parent or Guarantor, without the prior specific written consent of Borrower and Guarantor, except in the normal process of publicizing the Loan opportunity to raise money, and except as required by Nevada law, or by order of a court of competent jurisdiction.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

BORROWER: Epic Resorts – Palm Springs Marquis Villas, LLC, a Delaware limited liability company.

By: _____
Thomas F. Flatley, President

LENDER: USA Capital Diversified Trust Deed Fund, LLC

By: USA Capital Realty Advisors, a Nevada corporation, its Manager

By: _____
Joseph D. Milanowski, President

125

# EXHIBIT "A"

## PERMITTED EXCEPTIONS

Exceptions 1 and 2 (with all taxes paid current), and 3 through 13, inclusive, as shown on that Preliminary Title Report dated as of June 2, 2000 issued by First American Title Insurance Company, Order No. 2168333, Craig B. Goodwin, Title Officer.

26

## EXHIBIT "B"

### DESCRIPTION OF REAL PROPERTY

The property affected is Borrower's Leasehold Interest, as more fully described in the Deed of Trust, in and to the following property:

### PARCEL 1

Condominium Units 101, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 117, 119, 120, 121, 122, 123, 124, 125, 126, 127, 201, 208, 209, 210, 211, 212, 213, 214, 224, 225, 226, 227, 228, 229, 230, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 321, 322, 323, 324, 325, 326, 327, 328, 329, 330, 331, and 332, as set forth on that certain plan entitled "condominium Plan for Tract 16544" ("Condo Plan") consisting of five (5) sheets recorded on December 17, 1984 as Instrument Number 275194, and Re-recorded on March 20, 1985, as Instrument Number 57082, Riverside County Records, located on Lot 1 of "Tract No. 16544" shown on the map filed July 24, 1984 in Book 143 of Tract maps, Pages 39-40, Riverside County Records, California.

### PARCEL 2

An undivided 66/101st interest in Lot 1 of "Tract No. 16544" shown on the map filed July 24, 1984 in Book 143 of Tract Maps, Pages 39-40, Riverside County Records, California, together with all Improvements thereon, excluding the Units.

### PARCEL 3

An exclusive easement appurtenant to each Unit for the use and occupancy of those portions of the Limited Common Area designated in the Declaration of Covenants, Conditions and Restrictions for Palm Springs Marquis Villas Condominiums (Second Amended & Restated), adopted April 2, 1999 and recorded April 28, 1999 as Document No. 99-179647 ("Declaration"), and shown on the Condo plan.

### PARCEL 4

A Non-exclusive easement for use and enjoyment of the Common Area as provided under the Declaration and shown on the Condo Plan.

27

# EXHIBIT H

# PROMISSORY NOTE
## SECURED BY DEED OF TRUST

$11,500,000.00

Las Vegas, Nevada
June 26, 2000

This Promissory Note ("Note"), dated as of June 26, 2000, is made and delivered by Epic Resorts - Palm Springs Marquis Villas, LLC, a Delaware limited liability company ("Borrower"), in favor of USA Capital Diversified Trust Deed Fund, LLC, a Nevada limited liability company ("Lender").

FOR VALUE RECEIVED, Borrower promises to pay to Lender, or order, the principal sum of Eleven Million Five Hundred Thousand Dollars ($11,500,000.00) (the "Note Amount"), together with interest as provided herein. Disbursement of the loan will be governed by that certain Loan Agreement dated on or about the date of this Note between Lender and Borrower (the "Loan Agreement").

1. __Interest Rate.__ Interest shall accrue on the outstanding portion of the Note Amount, from the date the Deed of Trust is recorded _and_ Lender has deposited the Note Amount with Title Company to be disbursed to Borrower or Lender has disbursed portions of the Note Amount to pay interest on behalf of Borrower, until the date the Note Amount is paid in full, at the rate of fifteen percent (15%) per annum. Interest shall be calculated on the basis of a 360-day year and actual days elapsed. Accrued but unpaid interest shall be compounded monthly.

2. __Payments.__ Interest accrued on the Note Amount as of the last day of each month shall be due and payable on the first day of the next following month. The principal is due in a single payment on the Maturity Date (as defined in section 3, below). All payments shall be made in lawful money of the United States of America and in immediately available funds at Lender's office, the address for which is specified below, or at such other place as the Lender hereof may from time to time direct by written notice to Borrower.

3. __Maturity Date.__ If not sooner paid, the outstanding principal balance under this Note, all accrued and unpaid interest, and all other indebtedness of Borrower owing under any and all of the Loan Documents shall be due and payable in full on or before the date which is two years after the Deed of Trust is recorded (the "Maturity Date").

4. __Application of Payments.__ All payments on this Note shall, at the option of the Lender hereof, be applied first to the payment of accrued interest then payable.

5. __Prepayment.__ Borrower agrees that all loan fees and any prepaid finance charges are fully earned as of the date they are paid and will not be subject to refund upon early payment (whether voluntary or as a result of default). Borrower may prepay this Note in full or in part, but regardless of when this Note is prepaid, or if it is prepaid in part, or when it is fully paid, Borrower shall in addition pay interest equal to the difference between three months of interest, plus any accrued default or compound interest, less the total interest previously paid, if at the

time of full repayment a lesser amount of interest (excluding default interest) is otherwise due. In other words, Borrower agrees to pay three months of interest on the outstanding balance, calculated as set forth in the Note, plus any default interest or compound interest that may accrue, as the minimum interest due on this Loan.

6.    Collateral.  This Note is secured by a Leasehold Deed of Trust of even date encumbering real property located in Riverside County, California. (the "Deed of Trust").

7.    Defaults; Acceleration.  The occurrence of any Event of Default (as hereinafter defined) shall be a default hereunder.  Upon the occurrence of an Event of Default, Lender may declare the entire principal balance of the Note then outstanding (if not otherwise then due and payable) and all other obligations of Borrower hereunder to be due and payable immediately, and immediately exercise all remedies available to Lender under the Deed of Trust and other Loan Documents.  Subject to the applicable provisions of law, upon any such declaration, the principal of the Note and accrued and unpaid interest, and all other amounts to be paid under this Note shall become and be immediately due and payable, anything in this Note to the contrary notwithstanding.

The occurrence of any one or more of the following, whatever the reason therefor, shall constitute an "Event of Default" hereunder:

(a)    Borrower shall fail to pay within five days after receipt of written notice from Lender that such amount or payment is past due, which written notice shall be sent five days or more following the due date of any payment or amount any amount due pursuant to the Note; or

(b)    Borrower or any guarantor ("Guarantor") of the Note shall fail to perform or observe any term, covenant or agreement contained in the Note, the Deed of Trust or any guaranty executed and delivered concurrently herewith on its part to be performed or observed, other than the failure to make a payment covered by subsection (a), and such failure shall continue uncured as of the earlier of thirty (30) calendar days after the occurrence of such failure or ten (10) calendar days after written notice of such failure is given by Lender to Borrower (the cure period set forth in this subsection (b) shall not apply to any other Event of Default); or

(c)    any representation or warranty contained in any document made or delivered pursuant to or in connection with any of the Loan Documents proves incorrect or to have been incorrect in any material respect when made; or

(d)    Borrower (which term shall include any entity comprising Borrower) is dissolved or liquidated, or otherwise ceases to exist, or all or substantially all of the assets of Borrower or any Guarantor are sold or otherwise transferred without Lender's written consent; or

(e)    Borrower or any Guarantor is the subject of an order for relief by the bankruptcy court, or is unable or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors; or Borrower or any Guarantor applies for or

consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer ("Receiver"); or any Receiver is appointed without the application or consent of Borrower or any Guarantor, as the case may be, and the appointment continues undischarged or unstayed for thirty (30) calendar days; or Borrower or any Guarantor institutes or consents to any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, custodianship, conservatorship, liquidation, rehabilitation or similar proceedings relating to it or to all or any part of its property under the laws of any jurisdiction; or any similar proceeding is instituted without the consent of Borrower or any Guarantor, as the case may be, and continues undismissed or unstayed for thirty (30) calendar days; or any judgment, writ, attachment, execution or similar process is issued or levied against all or any part of the Property or Borrower or any Guarantor, and is not released, vacated or fully bonded within thirty (30) calendar days after such issue or levy; or

(f)    there shall occur a material adverse change in the financial condition of Borrower or any Guarantor from their respective financial conditions as of the date of this Note, as determined by Lender in its reasonable discretion; or

(g)    any Loan Document (meaning any document executed by Borrower or any Guarantor in connection with this Loan), at any time after its execution and delivery and for any reason other than the agreement of Lender or the satisfaction in full of all indebtedness and obligations of Borrower under the Loan Documents, ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction; or Borrower or any trustee, officer, director, shareholder or partner of any entity comprising Borrower or any Guarantor claims that any Loan Document is ineffective or unenforceable, in whole or in part, or denies any or further liability or obligation under any Loan Document, unless all indebtedness and obligations of Borrower thereunder have been fully paid and performed; or

(h)    an Event of Default shall occur under any other loan made by Lender to Borrower.

8.    Late Charge.    Borrower acknowledges that if any interest payment is not made when due or if the entire amount due under this Note is not paid by the Maturity Date, the Lender hereof will incur extra administrative expenses (i.e., in addition to expenses incident to receipt of timely payment) and the loss of the use of funds in connection with the delinquency in payment. Because the actual damages suffered by the Lender hereof by reason of such extra administrative expenses and loss of use of funds would be impracticable or extremely difficult to ascertain, Borrower agrees that five percent (5%) of the amount so delinquent shall be the amount of damages to which such Lender is entitled, upon such breach, in compensation therefor. Therefore, Borrower shall, in the event any payment required under this Note is not paid within five (5) days after written notice from Lender has been received notifying Borrower of a missed payment, pay to the Lender hereof as such Lender's sole monetary recovery to cover such extra administrative expenses and loss of use of funds, liquidated damages in the amount of five percent (5%) of the amount of such delinquent payment. The provisions of this paragraph are intended to govern only the determination of damages in the event of a breach in the performance of the obligation of Borrower to make timely payments hereunder. Nothing in this

Note shall be construed as an express or implied agreement by the Lender hereof to forbear in the collection of any delinquent payment or in exercising any of its rights and remedies under the Loan Documents, or be construed as in any way giving Borrower the right, express or implied, to fail to make timely payments hereunder, whether upon payment of such damages or otherwise. The right of the Lender hereof to receive payment of such liquidated and actual damages, and receipt thereof, are without prejudice to the right of such Lender to collect such delinquent payments and any other amounts provided to be paid hereunder or under any security for this Note or to declare a default hereunder or under any security for this Note.

9.    Default Rate.  From and after the Maturity Date or the date which is five (5) days after receipt of written notice from Lender of the occurrence of any Event of Default, through and including the date such default is cured, at the option of the Lender hereof, all amounts owing under the Note and all sums owing under all of the Loan Documents shall bear interest at a default rate equal to twenty-four percent (24%) per annum ("Default Rate"). Such interest shall be paid on the first day of each month thereafter, or on demand if sooner demanded.

10.    Waivers.  Borrower waives any right of offset it now has or may hereafter have against the Lender hereof and its successors and assigns. Borrower waives presentment, demand, protest, notice of protest, notice of nonpayment or dishonor and all other notices in connection with the delivery, acceptance, performance, default or enforcement of this Note. Borrower expressly agrees that any extension or delay in the time for payment or enforcement of this Note, to renewal of this Note and to any substitution or release of the Property, all without any way affecting the liability of Borrower hereunder. Any delay on Lender's part in exercising any right hereunder or under any of the Loan Documents shall not operate as a waiver. Lender's acceptance of partial or delinquent payments or the failure of Lender to exercise any rights shall not waive any obligation of Borrower or any right of Lender, or modify this Note, or waive any other similar default.

11.    Costs of Collection.  Borrower agrees to pay all costs of collection when incurred and all costs incurred by the Lender hereof in exercising or preserving any rights or remedies in connection with the enforcement and administration of this Note or following a default by Borrower, including but not limited to actual attorneys' fees. If any suit or action is instituted to enforce this Note, Borrower promises to pay, in addition to the costs and disbursements otherwise allowed by law, such sum as the court may adjudge reasonable attorneys' fees in such suit or action.

12.    Usury.  Borrower hereby represents that this loan is for commercial use and not for personal, family or household purposes. It is the specific intent of the Borrower and Lender that this Note bear a lawful rate of interest, and if any court of competent jurisdiction should determine that the rate herein provided for, together with any other amounts due under the Note or any other Loan Document, exceeds that which is statutorily permitted for the type of transaction evidenced hereby, the interest rate shall be reduced to the highest rate permitted by applicable law, with any excess interest theretofore collected being applied against principal or, if such principal has been fully repaid, returned to Borrower upon written demand.

13. <u>Notices</u>. All notices to be given pursuant to this Note shall be sufficient if given by personal services, by guaranteed overnight delivery services, by telex, telecopy or telegram or by being mailed postage prepaid, certified or registered mail, return receipt requested, to the described addresses of the parties hereto as set forth below, or to such other address as a party may request in writing. Any time period provided in the giving of any notice hereunder shall commence upon the date of personal service, the date after delivery to the guaranteed overnight delivery service, the date of sending the telex, telecopy or telegram or two (2) days after mailing certified or registered mail.

BORROWER'S ADDRESS:        Mr. Thomas F. Flatley, President
                           Epic Resorts - Palm Springs Marquis Villas, LLC
                           1150 First Avenue, Suite 900
                           King of Prussia, Pennsylvania 19406

LENDER'S ADDRESS:          c/o USA Commercial Mortgage Company
                           4484 South Pecos Road
                           Las Vegas, Nevada 89121
                           Attn. Joseph D. Milanowski

14. <u>Assignment By Lender</u>. Lender may assign its rights hereunder or obtain participants in this Note at any time, and any such assignee, successor or participant shall have all rights of the Lender hereunder.

15. <u>Multiple Parties</u>. A default on the part of any one entity comprising Borrower or any Guarantor of this Note shall be deemed a default on the part of Borrower hereunder. The obligations of Borrower are joint and several.

16. <u>Construction</u>. This Note shall be governed by and construed in accordance with the laws of the State of Nevada. This Note and all security documents and guaranties executed in connection with this Note have been reviewed and negotiated by Borrower, Lender and Guarantors at arms' length with the benefit of or opportunity to seek the assistance of legal counsel and shall not be construed against either party. The titles and captions in this Note are inserted for convenience only and in no way define, limit, extend, or modify the scope of intent of this Note.

17. <u>Partial Invalidity</u>. If any section or provision of this Note is declared invalid or unenforceable by any court of competent jurisdiction, said determination shall not affect the validity or enforceability of the remaining terms hereof. No such determination in one jurisdiction shall affect any provision of this Note to the extent it is otherwise enforceable under the laws of any other applicable jurisdiction.

18. <u>Venue</u>. The venue of any action brought in connection with this Note shall be laid in Clark County, Nevada.

5

19.        Time of Essence. Time is of the essence with respect to every term of this Note.

20.        Entire Agreement. This Note and the documents described herein constitute the entire understanding of Borrower and Lender with respect to the matters discussed herein, and supersede all prior and contemporaneous discussions, agreements, and representations, whether oral or written. This Note may only be modified in a writing signed by Lender, or its loan servicing agent, and Borrower.

BORROWER: Epic Resorts - Palm Springs Marquis Villas, LLC

By: _____
     Thomas F. Flatley, President