FILED ELECTRONICALLY 7/19/06

Form B10 (Official Form 10) (04/04)

** *PLEASE NOTE INSTRUCTIONS ON REVERSE SIDE** *

| UNITED STATES BANKRUPTCY COURT-DISTRICT OF NEVADA | PROOF OF CLAIM - Chapter ☐ 13 ☒ 11 ☐ 7 ☐ Other |
|---|---|

| Name of Debtor  USA COMMERCIAL MORTGAGE CO. | Case Number  06-10725 |
|---|---|

NOTE: This form should NOT be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. Section 503..

Name of Creditor (The person or other entity to whom the debtor owes money or property)

Tom Gloy

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

Name & address where notices should be sent:
c/o Beesley Matteoni, Ltd.
Caryn S. Tijsseling, Esq.
5011 Meadowood Mall Way, Ste. 300
Reno, Nevada 89502
Telephone number: (775)827-8666

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope   sent to you by the court.

THIS SPACE FOR COURT USE ONLY

Last four digits of account or other number by which creditor identifies debtor:

Check here if this claim
☐ replaces   ☐ amends   a previously filed claim, dated _____

**1. BASIS FOR CLAIM**
☐ Goods sold
☐ Services performed
☒ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☐ Other _____

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (FILL OUT BELOW)
Last four digits of your Social Security # _____
Unpaid compensation for services performed from
_____   _____
     (date)   (date)

**2.** Date debt was incurred:  3/27/06     **3.** If court judgment, date obtained:

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim $**

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority

**Secured Claim.**
☒ Check this box if your claim is secured by collateral (including a right of setoff).

Brief description of collateral:
☒ Real Estate  ☐ Motor Vehicle  ☐ Other
Value of collateral: $  unknown

Amount of arrearage and other charges at time case filed included in secured claim, if any: $ _____

**Unsecured Priority Claim.**

☐ Check this box if you have an claim, all or part of which is entitled to priority.
Amount entitled to priority $ _____

Specify the priority of the claim:
☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B)
☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition, or cessation of the debtor's business, whichever is earlier- 11 U.S.C. § 507(a)(4)
☐ Contributions to an employee benefit plan.- 11 U.S.C. § 507(a)(5)
☐ Up to $2,225* of deposits toward purchase, lease or rental of property or services for personal, family or household use- 11 U.S.C. § 507(a)(7)
☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8)
☐ Other -Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every three years thereafter with respect to cases commenced on or after the date of adjustment.

**5.** Total amount of claim at time case filed:     $200,000.00
                (unsecured)   (secured)   (priority)   (Total)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☒ Check this box if claim includes interest, or other charges in addition to the principal amount of the claim. Attach an itemized statement of all interest or additional charges. + 12%

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting documents:** Attach copies of supporting documents, such as promissory notes purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and a copy of this proof of claim.

*(This space for court use only)*

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):
Date:
7/19/06  Caryn Tijsseling  Attorney for Tom Gloy

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571


**CAPITAL**

4484 S. Pecos Rd.
Las Vegas NV 89121

) For questions regarding your statement
please contact us at 1-888-921-8009
or 702-734-2400

Thomas Gloy
P. O. Box 4497
Incline Village, NV 89450

### Statement Information

| Page Count | 1 |
| Statement As Of | 02/28/2006 |
| Payment Method | Direct Deposit |

## Payment Summary

**Account: Thomas H. Gloy, a married man dealing with his sole and separate property**

| Total Investments | Total Principal | Total Interest Paid | Total Amount Paid |
|---|---|---|---|
| 2 | $ 0.00 | $ 2,100.00 | $ 2,100.00 |

## Transaction Detail

| Transaction Type | From Date | To Date | Beginning Balance | Ending Balance | Amount Paid |
|---|---|---|---|---|---|
| Investment: Cabernet | | | Original Investment: $ 100,000.00 | IR: 15.00% | YTD Interest: $ 3,750.01 |
| Interest Payment | 02/01/2006 | 02/28/2006 | $ 100,000.00 | $ 100,000.00 | $ 1,166.67 |
| Totals: | | | $ 100,000.00 | $ 100,000.00 | $ 1,166.67 |
| Investment: SVRB $4,500.00 | | | Original Investment: $ 100,000.00 | IR: 12.00% | YTD Interest: $ 2,999.99 |
| Interest Payment | 02/01/2006 | 02/28/2006 | $ 100,000.00 | $ 100,000.00 | $ 933.33 |
| Totals: | | | $ 100,000.00 | $ 100,000.00 | $ 933.33 |

## Full Account Summary

**Account: Thomas H. Gloy, a married man dealing with his sole and separate property**

| Total Originally Invested | Total Remaining Invested | Total YTD Interest |
|---|---|---|
| $ 200,000.00 | $ 200,000.00 | $ 6,750.00 |

**For a detailed breakdown of your statement or additional account information, please visit
http://www.tdinvestments.com**

# LOAN AGREEMENT



This Loan Agreement, dated as of February 17, 2005, is entered into by and between Cabernet Highlands, LLC, a Nevada limited liability company ("Borrower"), and those persons listed on **Exhibit "A"** attached hereto ("Lender").

## SECTION 1: DEFINITIONS AND ACCOUNTING TERMS.

1.1    Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth respectively after each:

"**Agreement**" means this Loan Agreement.

"**Assignment of Permits, Licenses, Franchises and Authorizations**" means the Assignment of Permits, Licenses, Franchises and Authorizations executed by Borrower.

"**Assignment of Rents**" means the Assignment of Rents contained in the Deed of Trust.

"**Business Day**" means any Monday, Tuesday, Wednesday, Thursday, or Friday on which banks in the State of Nevada are open for business.

"**Debt**" means any indebtedness of the Borrower other than indebtedness owed to trade creditors incurred in the ordinary course of business and payable in 180 days or less.

"**Deed of Trust**" means the Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing of even date herewith, executed by Borrower in favor of Lender with respect to the Property or portions thereof, either as originally executed or as it may from time to time be supplemented, modified or amended.

"**Default Rate**" shall have the meaning set forth in the Note.

"**Effective Date**" means the date the Deed of Trust is recorded in the Official Records of Washoe County, Nevada.

"**Environmental Indemnity**" means the Environmental and Accessibility Indemnity Agreement executed by Borrower and the Guarantor.

"**Financing Statement**" means financing statement of even date herewith executed by Borrower in favor of Lender with respect to the Personal Property.

"**Governmental Agency**" means any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, court, administrative tribunal or public utility.

1

"**Guarantor**" means, collectively, DDH Financial Corp., a Nevada corporation, USA Investment Partners, LLC, a Nevada limited liability company, Joseph D. Milanowski, and Kreg D. Rowe.

"**Guaranty**" means the Unconditional Guaranty executed by the Guarantor in favor of Lender, either as originally executed or as it may from time to time be supplemented, modified or amended.

"**Improvements**" means any and all improvements now existing or hereafter constructed on the Real Property.

"**Laws**" means, collectively, all federal, state and local laws, rules, regulations, ordinances and codes.

"**Lender**" means those persons listed on **Exhibit "A"** attached hereto, and any other persons or entities who may be added pursuant to an amendment to the Note.

"**Loan**" means the loan to be made by Lender to Borrower pursuant to Section 3 hereof.

"**Loan Documents**" means, collectively, this Agreement, the Note, the Security Documents, the Environmental Indemnity, the Guaranty and the Project Assignments, in each case either as originally executed or as the same may from time to time be supplemented, modified or amended, together with any other documents or instruments which may at any time be executed by Borrower in connection with the Loan.

"**Maturity Date**" means the date which is eighteen (18) months after the Deed of Trust is recorded.

"**Note**" means the promissory note of even date herewith, in the original principal amount of Five Hundred Thousand Dollars ($500,000), executed by Borrower in favor of Lender to evidence the Loan, either as originally executed or as it may from time to time be supplemented, modified or amended.

"**NRS**" means the Nevada Revised Statutes, as amended from time to time.

"**Operation**" means the operation of Borrower's business on the Property, including the operation, sales, leasing, running and maintenance of the Property and the Improvements.

"**Permitted Exceptions**" means the matters identified in **Exhibit "B"** attached hereto and made part hereof.

"**Person**" means any entity, whether an individual, trustee, corporation, partnership, trust, unincorporated organization or otherwise.

"**Personal Property**" means all present and future personal property (including the Project

2

Documents) of Borrower of every kind and nature, whether tangible or intangible, now or hereafter located at, upon or about the Property, or used or to be used in connection with or relating or arising with respect to the Property and/or the Project, including but not limited to the property described in the Deed of Trust.

"**Project**" means the project for the development of, and construction of improvements on, the Property, as such exists at any time.

"**Project Assignments**" means, collectively, the Assignment of Permits, Licenses, Franchises and Authorizations, and such other assignments, as Lender shall require.

"**Project Documents**" means, collectively, all agreements, documents, instruments and materials of whatever kind or nature relating to the Project, including but not limited to: (a) the improvement plans and all other plans, specifications and drawings relating to the Project, (b) all approvals, consents, licenses and permits issued, or to be issued, by any Governmental Agency in connection with the Project, (c) the engineer's contract, architect's contract and any and all construction contracts, and all other agreements relating to the Project between Borrower and any contractor, subcontractor, independent project manager or supervisor, architect, engineer, laborer or supplier of materials, and (d) any take-out, refinancing or permanent loan commitment issued to Borrower with respect to the Property.

"**Property**" means, collectively, the Real Property, the Personal Property and any other buildings, structures, or improvements now or hereafter located on all or any portion of the Real Property.

"**Real Property**" means the real property and interests in real property described in **Exhibit "C"**.

"**Security Agreement**" means the Security Agreement contained herein and in the Deed of Trust.

"**Security Documents**" means the Deed of Trust, the Assignments, the Financing Statements and any other mortgage, deed of trust, assignment of leases, security agreement or assignment executed to secure the Note, either as originally executed or as they may from time to time be supplemented, modified or amended.

"**Senior Encumbrances**" means (1) the deed of trust dated August 6, 2004, recorded on August 31, 2004 as Document No. 3091525 in the Official Records of Washoe County, Nevada, and (2) a Seller carryback deed of trust recorded concurrently with the Deed of Trust.

"**Title Company**" means Stewart Title of Northern Nevada.

"**Title Policy**" means the Lender's policy of title insurance and endorsements thereto required by this Agreement as a condition of the first Disbursement.

3

"USA" means USA Commercial Mortgage Company, a Nevada corporation, the mortgage company which arranged the Loan.

"Use" means ownership, use, development, construction, maintenance, management, operation or occupancy.

1.2    Use of Defined Terms. Any defined term used in the plural shall refer to all members of the relevant class, and any defined term used in the singular shall refer to any number of the members of the relevant class. Any reference to the Loan Documents and other instruments, documents and agreements shall include such Loan Documents and other instruments, documents and agreements as originally executed or as the same may be supplemented, modified or amended.

1.3    Accounting Terms. All accounting terms not specifically defined in this Agreement shall be construed in conformity with, and all financial data required to be submitted by this Agreement shall be prepared in conformity with, generally accepted accounting principles applied on a consistent basis.

1.4    Exhibits. All exhibits to this Agreement, either as now existing or as the same may from time to time be supplemented, modified or amended, are incorporated herein by this reference.

## SECTION 2: RECITALS.

Borrower has applied to Lender for a Loan to complete the acquisition of the Property, and to pay for entitlement work. Lender is willing to make the Loan to Borrower on the terms and conditions contained in this Agreement and the other Loan Documents.

## SECTION 3: THE LOAN.

3.1    Amount of the Loan. Subject to the terms and conditions set forth in this Agreement, Lender agrees to make a loan ("Loan") to Borrower in a principal amount of Five Hundred Thousand Dollars ($500,000) (the "Loan Amount"), the disbursement of which by Lender is subject to the terms and conditions of the Loan Documents. The Loan Amount shall be disbursed in three equal installments approximately at three month intervals in accordance with Lender's instructions to the Title Company. From and after the Effective Date, the Loan Amount advanced (whether paid to, or on behalf of Borrower) shall bear interest at the rate set forth in the Note until fully repaid to Lender.

3.2    Increase in Loan Amount. From the Effective Date through and including January 31, 2006, Lender and USA shall have the exclusive right, but not the obligation, to increase the Loan Amount to an amount not to exceed Two Million Six Hundred Thousand Dollars ($2,600,000). All amounts that Lender may advance after the Effective Date shall increase the Loan Amount and be used for the following purposes: (i) to pay for the cost of entitlement work, (ii) to pay the loan fees due with regard to such advance, and (iii) to fund the Interest Reserve (defined below). Upon each increase in the Loan Amount, Borrower shall execute amendments to the Note and the Deed of Trust which shall memorialize the increase in the Loan Amount, the change in the identity of the persons

4

and entities which comprise Lender and their respective undivided interests in the Loan. Upon the recordation of the amendment(s) to the Deed of Trust, the Title Company shall issue to Lender, at Borrower's expense, an endorsement or endorsements to the Title Policy which shall (i) insure the continued priority of the Deed of Trust, and that the additional advance is secured thereby, (ii) reflect the increase in the face amount of the policy corresponding to the increase in the Loan Amount, and (iii) set forth the change in the identity of the insured lenders and their respective undivided interests in the Loan. Upon any such additional advance, a portion thereof shall be deposited into the Interest Reserve (defined below) for the Loan. Nothing herein shall constitute a commitment by Lender or USA to fund to Borrower any more than the initial Loan Amount.

3.3    Prepayment.    Borrower agrees that all loan fees and any prepaid finance charges are fully earned as of the date they are paid and will not be subject to refund upon any early payment hereof (whether voluntarily or as a result of default). Subject to the foregoing, Borrower may prepay the Loan, in full or in part, at any time.

3.4    Security.    The indebtedness evidenced by the Note, and all other indebtedness and obligations of Borrower under the Loan Documents, shall be secured by the Security Documents. The Environmental Indemnity and the Guaranty and the respective obligations of any of Borrowers and the Guarantor under each shall be unsecured.

3.5    Yield Protection.    If, after the date of this Agreement, the adoption of any law or any governmental or quasi-governmental rule, regulation, policy, guideline or directive (whether or not having the force of law), or any change therein, or any change in the interpretation or administration thereof, or the compliance of the Lender therewith,

(a)    subjects the Lender to any tax, duty, charge or withholding on or from payments due from Borrower (excluding taxation of the overall net income of the Lender), or changes the basis of taxation of payments to the Lender in respect of its Loans or other amounts due it hereunder; or

(b)    imposes or increases or deems applicable any reserve, assessment, insurance charge, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, the Lender; or

(c)    imposes any other condition the result of which is to increase the cost to the Lender of making, funding or maintaining advances or reduces any amount receivable by the Lender in connection with advances, or requires the Lender to make any payment calculated by reference to the amount of advances held or interest received by it, by an amount deemed material by the Lender;

then, within fifteen (15) days of demand by the Lender, the Borrower shall pay the Lender that portion of such increased expense incurred (including, in the case of clause (c), any reduction in the rate of return on capital to an amount below that which it could have achieved but for such law, rule, regulation, policy, guideline or directive and after taking into account the Lender's policies as to capital adequacy) or reduction in an amount received which the Lender determines is attributable

5

to making, funding and maintaining the Loans.

3.6    Subordination.

(A) Lender hereby agrees that the Deed of Trust securing this Loan shall be subordinated to two deeds of trust securing acquisition loans. With respect to this provision, Lender acknowledges the following:

(i)    when and if additional advances are made hereunder, each advance must be subordinated to the Senior Encumbrances;

(ii)    the subordination of each advance merely preserves this Loan in the subordinate position to the Senior Encumbrances that it is in upon closing.

(B) Lender hereby further agrees that the Deed of Trust securing this Loan may be subordinated to a deed of trust (or deeds or trust) securing a construction loan (or loans) on a lot or lots encumbered by the Deed of Trust provided that the amount of the construction loan (or loans) does not exceed 80% of the value of the property subject to the construction loan (or loans). With respect to this provision, Lender acknowledges the following:

(i)    development loans may be necessary to complete the construction of lots or infrastructure (such as sidewalks, streets or utilities); construction loans may be necessary to complete the construction of homes on the lots; without either or both of which the lots are difficult to sell, and are not likely to produce as much cash flow;

(ii)    the term "value of the property" as used in this section means the appraised value of the property (based on actual sales of homes within the subdivision, whenever possible); and

(iii)    depending on the amount of the construction or development loan, and the value of the property without the construction as compared to with the construction, the subordination of this Loan to a construction or development loan could either increase, decrease, or leave unchanged the value of the property securing this Loan, which outcome would depend, among other things, on whether the construction was actually completed; and

(iv) a subordination of the Deed of Trust results in Lender's security interest in the Property becoming subject to and of lower priority than the lien of some other or later security instrument.

Lender further agrees that USA may, pursuant to a limited power of attorney given in connection with this Loan, sign for subordinations consistent with this section.

3.7    Partial Release Provisions. Lender shall release portions of the Real Property from the Deed of Trust upon payment to Lender of 92% of the net proceeds from the sale of the portion to be released, so long as the following additional conditions are met:

6

(a) the parcel being sold and the remaining portion of the Real Property are (or are comprised of) legal parcels under Nevada law;

(b) Borrower pays all costs and expenses associated with or relating to the release;

(c) upon release of the final portion of the Real Property, Borrower shall pay the Loan in full.

As used herein, the term "net proceeds" means the total consideration paid for the Real Property to be released, less customary closing costs and expenses; provided, however, that if the broker is affiliated with Borrower, then the total that may be deducted on account of a real estate commission shall be 2% of the gross sale price, or, if the affiliated broker is only receiving one half of the total commission to be paid, 1% on account of that half (with the other half paid to an unaffiliated broker paid in full), regardless of the actual commission paid.

Lender hereby agrees that money paid to obtain a partial release, or any other repayments from Borrower, may be reloaned to Borrower pursuant to Section 3.2 hereof until the total amount advanced equals $2,600,000.

## SECTION 4: CONDITIONS TO DISBURSEMENTS.

4.1    Initial Advance Conditions.  The obligation of Lender to initially close the Loan is subject to the following conditions precedent:

(a)    Borrower shall, at its sole expense, deliver or cause to be delivered to Lender, in form and substance satisfactory to Lender:

(i)    the original Note;

(ii)    the original Deed of Trust;

(iii)    the original Financing Statement;

(iv)    the original Guaranty;

(v)    the original Environmental Indemnity;

(vi)    the original Assignment of Permits, Licenses, Franchises and Authorizations executed by Borrower;

(vii)    a certificate of consent of Borrower, authorizing the execution, delivery and performance of the Loan Documents to be executed by a specified authorized officer on behalf of Borrower;

(viii)    an ALTA form of extended coverage of lender's policy of title insurance, or evidence of a commitment therefor, issued by an insurer satisfactory to

7

Lender, together with such endorsements and binders thereto as may be required by Lender pursuant to Section 6.6 hereof, in a policy amount of not less than the face amount of the Note, insuring the Deed of Trust to be a valid lien upon the Property, and showing the Property to be subject only to the Permitted Exceptions;

(ix)    an appraisal of the Real Property certified to Lender, performed by an appraiser acceptable to Lender;

(x)    certified copies of, or certificate evidencing, all insurance policies required to be delivered pursuant to this Agreement;

(xi)    copies of all permits and approvals by Governmental Agencies necessary to construct the Improvements (if available);

(xii)    current Financial Statements of Borrower and the Guarantor;

(xiii)    evidence, in form and substance acceptable to Lender, of the availability and sufficiency of all utilities to the Project;

(xiv)    copies of any proposed, or approved final Covenants, Conditions and Restrictions recorded or to be recorded on the Project;

(xv)    a Phase I Hazardous Waste Survey, prepared by an entity approved by Lender, in form and substance acceptable to, and approved by, Lender;

(xvi)    such additional agreements, certificates, reports, approvals, instruments, documents, financing statements, consents and opinions as Lender may reasonably request; including, without limitation, a soils report for the Real Property (including, without limitation, all determinations required by Lender with respect to hazardous waste [as such term is defined in the Environmental Indemnities] and water located on the Real Property).

(b)    Lender shall have reviewed and approved the Permitted Exceptions;

(c)    Borrower has acquired fee title to all of the Real Property;

(d)    The Deed of Trust shall have been recorded in the Official Records of the County in which the Property is located as a third priority lien;

(e)    The Financing Statement shall have been filed for record with the Nevada Secretary of State.

4.2    Future Advance Conditions.  The obligation of Lender to make any additional advances pursuant to Section 3.2 above is subject to following conditions:

(a)    The representations and warranties of Borrower contained in all of the Loan Documents shall be correct on and as of the date of the advance as though made on and as of that date and no Event of Default (or event which, with the giving of notice and/or the passage of time, would become an Event of Default) shall have occurred and be continuing;

(b)    Borrower shall, at its sole expense, deliver or cause to be delivered to Lender, in form and substance satisfactory to Lender:

(i)    from the title insurer who has issued the Title Policy, such endorsements, binders or modifications thereto as Lender may require; and

(ii)    such additional agreements, certificates, reports, approvals, instruments, documents, consents or opinions as Lender may reasonably request.

## SECTION 5: <u>REPRESENTATIONS AND WARRANTIES BY BORROWER.</u>

5.1    <u>Formation, Qualification and Powers of Borrower</u>.  Borrower is a limited liability company duly formed and validly existing under the laws of the State of Nevada and has all requisite power and authority to conduct its business, to own its properties, and to execute, deliver and perform all of its obligations under the Loan Documents.  The co-Manager DDH Financial Corp. is a Nevada corporation, and co-Manager USA Investment Partners, LLC is a Nevada limited liability company, both duly formed and validly existing under the laws of the State of Nevada and having all requisite power and authority to conduct their business, to own their properties, and to execute, deliver and perform all of their obligations.

5.2    <u>Authority and Compliance with Instruments and Government Regulations</u> .  The execution, delivery and performance by Borrower of all of its obligations under each Loan Document have been duly authorized by all necessary action and do not and will not:

(a)    require any consent or approval not heretofore obtained of any Person holding any security or interest or entitled to receive any security or interest in Borrower;

(b)    violate any provision of any organizational document or certificate of Borrower;

(c)    result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, right of others or other encumbrance of any nature, other than under the Loan Documents, upon or with respect to any property now owned or leased or hereafter acquired by Borrower;

(d)    violate any provision of any Law, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Borrower or the Property, which violation would have a material, adverse impact thereon;

(e)    result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under, any indenture or loan or credit agreement

9

or any other agreement, lease or instrument to which Borrower is a party or by which Borrower or any property of Borrower, is bound or affected; and Borrower is not in default in any respect that is materially adverse to the interest of Lender or that would have any material adverse effect on the financial condition of Borrower or the conduct of its business under any Law, order, writ, judgment, injunction, decree, determination, award, indenture, agreement, lease or instrument described in Sections 5.2(d) and 5.2(e).

     5.3    <u>Execution of the Guaranty by the Guarantor</u>.  The execution and delivery of the Guaranty:

    (a)    have been duly authorized by all necessary action;

    (b)    do not require the consent, authorization or approval of any Governmental Agency or Person;

    (c)    will not result in the creation of any lien or other claim of any nature upon or with respect to the property of the Guarantor, other than as may be set forth in the Guaranty; and

    (d)    will not violate any provision of any Law having applicability to the Guarantor, in a manner which would have a material, adverse impact on any Guarantor; and, when executed and delivered, the Guaranty will constitute the legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms.

     5.4    <u>No Governmental Approvals Required</u>.  No authorization, consent, approval, order, license, exemption from, or filing, registration or qualification with, any Governmental Agency is or will be required to authorize, or is otherwise required in connection with:

    (a)    the execution, delivery and performance by Borrower and the Guarantor of the Loan Documents; or

    (b)    the creation of the liens, security interests or other charges or encumbrances described in the Security Documents; except that filing and/or recording may be required to perfect Lender's interest under the Security Documents.

     5.5    <u>Binding Obligations</u>.  The Loan Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Borrower and the Guarantor, as the case may be, enforceable against them in accordance with their respective terms.

     5.6    <u>Financial Statements</u>.  Borrower and the Guarantor have furnished to Lender a copy of recent financial statements relating to Borrower's and the Guarantor's financial condition and Borrower represents and warrants to Lender that such financial statements present fairly the financial position of Borrower and the Guarantor as at the date thereof.

     5.7    <u>No Material Adverse Change</u>. Borrower represents and warrants to Lender that there has been no material adverse change in the condition, financial or otherwise, of Borrower or the

Guarantor since the date of the financial statements described in Section 5.6; since that date, neither Borrower nor the Guarantor have entered into any material transaction not disclosed in such financial statements; neither Borrower nor the Guarantor have any material liabilities or contingent liabilities not reflected or disclosed in such financial statements; and there are no material mortgages, deeds of trust, pledges, liens, security interests, claims, charges, right of others or encumbrances (including liens or retained security titles of conditional vendors) of any nature whatsoever on any property of Borrower or the Guarantor, and no material indebtedness, not disclosed in such financial statements.

5.8    Tax Liability.  Borrower and the Guarantor have filed all tax returns (federal, state and local) required to be filed and have paid all taxes shown thereon to be due and all property taxes due, including interest and penalties, if any.  Borrower and the Guarantor have established and are maintaining necessary reserves for tax liabilities, if any.

5.9    Compliance with Law.  Borrower and Guarantor are in compliance in all material respects with all Laws and other requirements applicable to their business and have obtained all authorizations, consents, approvals, orders, licenses and exemptions from, and have accomplished all filings, registrations or qualifications with, any Governmental Agency that is necessary for the transaction of their business.

5.10    Compliance with Requirements.  Throughout the term of the Loan, Borrower shall comply with all applicable covenants, conditions and restrictions, Laws and other requirements, and all necessary approvals, consents, licenses and permits of any Governmental Agency have been regularly and finally received with respect thereto, including without limitation each of the following as applicable:

(a)    all zoning, land use and planning requirements;

(b)    subdivision and/or parcel map requirements, including without limitation Requirements of applicable Law regarding subdivisions, parcel maps and the division of land into lots or parcels;

(c)    environmental requirements and preparation and approval of any necessary environmental impact statements or reports;

(d)    all requirements regarding the provision of all necessary utilities to the Real Property including the irrevocable allocation to the Property of sufficient domestic and fire protection water service to the Property;

(e)    all requirements imposed by any public utility in connection with the supply of utilities to the Property; and

(f)    all requirements imposed in connection with any approval, consent, license or permit issued or required by any Governmental Agency in connection with the Project.

11

5.11    Litigation.  There are no actions, suits or proceedings pending or, to the best of Borrower's or any Guarantor's knowledge, threatened against or affecting Borrower or the Guarantor or any property of Borrower or the Guarantor before any court or Governmental Agency that would have a material adverse affect on the Property, or Borrower's or the Guarantor's ability to perform their respective obligations under the Loan Documents.

5.12    Title to Property.  Borrower has good and merchantable title to all of its property and assets as disclosed in the financial information provided Lender and at the time of the recordation of the Security Documents shall have good and merchantable title to the Property, and there shall be no mortgages, liens, pledges or other encumbrances of any character on the Property, other than the Security Documents and Permitted Exceptions, without prior consent of Lenders.

5.13    Subsidiaries: Divisions: Joint Ventures.  As of the date hereof, Borrower (a) has no other Subsidiaries; (b) has no divisions; and (c) is not engaged in any joint venture or partnership with any other Person.

5.14    ERISA.  The Borrower, Guarantor and each Subsidiary are in compliance in all Material respects with all applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  Neither a Reportable Event nor a Prohibited Transaction has occurred and is continuing with respect to any Plan; no notice of intent to terminate a Plan has been filed, nor has any Plan been terminated; no circumstances exist which constitute grounds entitling the PBGC to institute proceedings to terminate, or appoint a trustee to administer, a Plan, nor has the PBGC instituted any such proceedings; neither the Borrower nor any Commonly Controlled Entity has completely or partially withdrawn from a Multiemployer Plan; the Borrower and each Commonly Controlled Entity have met their minimum funding requirements under ERISA with respect to all of their Plans and the present value of all vested benefits under each Plan exceeds the fair market value of all Plan assets allocable to such benefits, as determined on the most recent valuation date of the Plan and in accordance with the provisions of ERISA; and neither the Borrower nor any Commonly Controlled Entity has incurred any liability to the PBGC under ERISA.

## SECTION 6: AFFIRMATIVE AND NEGATIVE COVENANTS.

Until payment of the Note in full and performance of all obligations of Borrower under the Loan Documents, unless Lender otherwise consents in writing:

6.1    Compliance with Requirements.  Borrower shall comply with all conditions, covenants, restrictions, leases, easements, reservations, rights and rights-of-way and all applicable Laws and other requirements relating to the Property and the Project, and obtain all necessary approvals, consents, licenses and permits of any Governmental Agency, including without limitation those set forth in Section 5.10.

6.2    Sale or Other Encumbrances.  Borrower specifically agrees that:

(a)    In order to induce Lender to make the Loan, Borrower agrees that if the Property or any part thereof or any interest therein, shall be sold, assigned, transferred, conveyed, pledged,

12

mortgaged or encumbered with financing other than that secured hereby or otherwise alienated by Borrower whether voluntarily or involuntarily or by operation of law, except as shall be specifically hereinafter permitted or without the prior written consent of Lender, then Lender, at its option, may declare the Note, including the prepayment fee, if applicable, secured hereby and all other obligations hereunder, to be forthwith due and payable. Except as shall be otherwise specifically provided herein, (a) a change in the legal or equitable ownership of the Property whether or not of record, or (b) a change in the form of entity or ownership (including the hypothecation or encumbrance thereof) of the stock or any other ownership interest in Borrower shall be deemed a transfer of an interest in the Property; provided, however, that any transfer of the Property or any interest therein to an entity which controls, is controlled by or is under common control with Borrower shall not be considered a transfer hereunder. In connection herewith, the financial stability and managerial and operational ability of Borrower is a substantial and material consideration to Lender in its agreement to make the loan to Borrower secured hereby. The transfer of an interest in the Property may materially alter and reduce Lender's security for the indebtedness secured hereby. Moreover, Lender has agreed to make its loan based upon the presumed value of the Property and the Rents and Profits (as such are defined in the Deed of Trust) thereof. Therefore, it will be a diminution of Lender's security if junior financing, except as shall be permitted by Lender, or if other liens or encumbrances should attach to the Property.

(b)    Borrower may request Lender to approve a sale or transfer of the Property to a party who would become the legal and equitable owner of the Property and would assume any and all obligations of Borrower under the Loan Documents (the "Purchaser"). Lender shall not be obligated to consider or approve any such sale, transfer or assumption or request for the same. However, upon such request, Lender may impose limiting conditions and requirements to its consent to an assumption.

(c)    In the event ownership of the Property, or any part thereof, becomes vested in a person or persons other than Borrower, the Lender may deal with such successor or successors in interest with reference to the Note or the Deed of Trust in the same manner as with Borrower, without in any way releasing, discharging or otherwise affecting the liability of Borrower under the Note, the Deed of Trust or the other Loan Documents. No sale of Lender's interest in the Property, no forbearance on the part of Lender, no extension of the time for the payment of the Deed of Trust indebtedness or any change in the terms thereof consented to by Lender shall in any way whatsoever operate to release, discharge, modify, change or affect the original liability of the Borrower herein, either in whole or in part. Any deed conveying the Property, or any part thereof, shall provide that the grantee thereunder assume all of Borrower's obligations under the Note, the Deed of Trust and all other Loan Documents. In the event such deed shall not contain such assumption, Lender shall have all rights reserved to it hereunder in the event of a default or if Lender shall not elect to exercise such rights and remedies, the grantee under such deed shall nevertheless be deemed to have assumed such obligations by acquiring the Property or such portion thereof subject to the Deed of Trust. Nothing contained in this section shall be construed to waive the restrictions against the transfer of the Property contained in Section 6.2(a).

6.3    Removal of Personalty.  Borrower shall not:

13

(a)     install in or otherwise use in connection with the Project any materials, equipment or fixtures under any security agreements or similar agreements however denominated whereby the right is reserved or accrues to anyone to remove or repossess any such items or whereby any Person other than Lender reserves or acquires a lien upon such items; or

(b)     remove or permit the removal of any fixtures or personalty located on the Property or used in connection with the Project, except for tools and construction equipment intended for use in connection with the construction of other improvements, unless actually replaced by an article of equal suitability and value, owned by Borrower free and clear of any lien or security interest other than the Security Documents.

6.4     Payment of Taxes, Assessments and Charges.   Borrower shall pay, prior to delinquency, all taxes, assessments, charges and levies imposed by any Governmental Agency which are or may become a lien affecting the Property or any part thereof, including without limitation assessments on any appurtenant water stock; except that Borrower shall not be required to pay and discharge any tax, assessment, charge or levy that is being actively contested in good faith by appropriate proceedings, as long as Borrower has established and maintains reserves adequate to pay any liabilities contested pursuant to this Section in accordance with generally accepted accounting principles and, by reason of nonpayment, none of the property covered by the Security Documents or the lien or security interest of Lender is in danger of being lost or forfeited.

6.5     Insurance.   The Borrower shall at all times maintain the following policies of insurance:

(a)     prior to completion of the Improvements, if any, builder's "all risk" insurance ("completed value" form), including "course of construction" coverage, covering the Improvements and any Personal Property;

(b)     from and after completion of the Improvements, property "all risk" insurance covering the Improvements and any Personal Property;

(c)     commercial general liability insurance in favor of the Borrower (and naming the Lender as an additional insured) in an aggregate amount not less than $2,000,000 (or such greater amount as may be specified by the Lender from time to time) combined single limit; and

(d)     such other insurance as may be required by applicable Laws (including worker's compensation and employer's liability insurance) or as the Lender may reasonably require from time to time (including "all risk" insurance with respect to any other improvements now or in the future located on the Real Property and comprehensive form boiler and machinery insurance, if applicable, rental loss insurance and business interruption insurance).

The Borrower shall also cause any contractor and each subcontractor employed on the Property to maintain a policy of commercial general liability insurance and, upon request by the Lender, shall cause the Architect and any engineer engaged in connection with the Project to maintain a policy of professional liability insurance, in each case for such periods and in such

14

6.10    <u>Reporting and Requirements</u>. Borrower shall cause to be delivered to Lender, in form and detail satisfactory to Lender:

    (a)    promptly upon Borrower's learning thereof, notice of:

        (i)    any litigation affecting or relating to Borrower, and/or the Guarantor, and the Property or the Project;

        (ii)    any dispute between Borrower and any Governmental Agency relating to the Property or the Project, the adverse determination of which would adversely affect the Property or the Project;

        (iii)    any threat or commencement of proceedings in condemnation or eminent domain relating to the Property;

        (iv)    any Event of Default or event which, with the giving of notice and/or the passage of time, could become and Event of Default; and

        (v)    any change in the Manager of Borrower, as defined in Borrower's Operating Agreement.

    (b)    as soon as available, and in any event within thirty (30) calendar days after the end of each month during the term of the Loan, if applicable, a status report for the Project for the month most recently ended (which status report shall contain an itemized breakdown of the progress of construction, sales of Lots, the gross revenues and all costs and expenses with respect to the Project for such month), in reasonable detail and prepared in accordance with generally accepted accounting principles applied on a consistent basis, and certified as accurate by an officer of Borrower;

    (c)    as soon as available, and in any event within forty-five (45) calendar days after the close of each fiscal quarter of Borrower and each of the Guarantor, quarterly financial statements applicable to Borrower and each of the Guarantor, all in reasonable detail and prepared in accordance with generally accepted accounting principles applied on a consistent basis;

    (d)    as soon as available, and in any event within ninety (90) calendar days after the close of each fiscal year of Borrower, annual financial statements applicable to Borrower, all in reasonable detail and prepared in accordance with generally accepted accounting principles applied on a consistent basis;

    (e)    as soon as available, and in any event within ninety (90) calendar days after the close of each fiscal year of the Guarantor, annual financial statements applicable to the Guarantor, all in reasonable detail and prepared in accordance with generally accepted accounting principles applied on a consistent basis;

    (f)    promptly upon receipt thereof, any audited financial information applicable to

Borrower or the Guarantor; and

(g)     such other information relating to Borrower, Guarantor, the Property and/or the Project as Lender may reasonably request from time to time, including without limitation (i) tax returns, to be provided concurrently with the filing thereof with the relevant government authority or (ii) if Borrower or Guarantor receive an extension from the relevant governmental authority for filing a tax return, satisfactory evidence of such extension.

6.11    Surveys.  Borrower agrees to furnish Lender all of the following:

(a)     a perimeter survey of the Property (a copy of the Subdivision Map of the Property shall satisfy this requirement); and

(b)     upon request by Lender, immediately upon completion of the foundations of any of the Improvements, a survey made and certified by a licensed engineer or surveyor showing the locations of the Improvements located on the Property and showing that the Improvements are located entirely within the Property lines and do not encroach upon any easement, or breach or violate any Law or any covenant, condition or restriction of record, or any building or zoning ordinance.

6.12    Management of Property and Project.  Borrower shall not enter into any agreement providing for the management, leasing or operation of the Property or the Project without the prior written consent of the Lender.

6.13    Defense of Vested Right, Modification of Vested Rights.  Borrower shall at all times, at its own cost and expense take, pursue and assert all such actions and defenses as are necessary to perfect, maintain and protect its vested development rights with respect to the Property.  Should Borrower fail to do so, Lender may do so either in its own name or the name of the Borrower, and all unrecovered fees, costs and expenses incurred by Lender in connection therewith shall be payable by Borrower to Lender on demand, shall bear interest at the Default Rate specified in the Note, and shall be secured by the Deed of Trust.  Borrower shall not modify, amend, cancel, terminate or otherwise alter any development rights or entitlements with respect to the Property, without Lender's prior written consent, which consent shall not be unreasonably withheld.

6.14    No Gifting.  Until this Loan has been fully repaid, Borrower agrees not to transfer more than a total of five percent (5%) of its assets unless receiving full consideration therefore without the written permission of Lender.

6.15    ERISA Reports.  As soon as possible, and in any event within thirty (30) days after the Borrower knows or has reason to know that any circumstances exist that constitute grounds entitling the PBGC to institute proceedings to terminate a Plan subject to ERISA with respect to the Borrower or any Commonly Controlled Entity, and promptly but in any event within two (2) Business Days of receipt by the Borrower or any Commonly Controlled Entity of notice that the PBGC intends to terminate a Plan or appoint a trustee to administer the same, and promptly but in any event within five (5) Business Days of the receipt of notice concerning the imposition of

withdrawal liability with respect to the Borrower or any Commonly Controlled Entity, the Borrower will deliver to the Lender a certificate of the chief financial officer of the Borrower setting forth all relevant details and the action which the Borrower proposes to take with respect thereto.

6.16   <u>Debt</u>. Create, incur, assume, or suffer to exist, or permit any Subsidiary to create, incur, assume, or suffer to exist, any Debt, except:

(a)   Debt of the Borrower under this Agreement or the Note;

(b)   Debt described in Exhibit "D", but no voluntary prepayments, renewals, extensions, or refinancings thereof;

(c)   Debt of the Borrower subordinated on terms satisfactory to the Lender to the Borrower's Liabilities;

(d)   Accounts payable to trade creditors for goods or services which are not aged more than forty-five (45) days from the billing date and current operating liabilities (other than for borrowed money) which are not more than thirty (30) days past due, in each case incurred in the ordinary course of business, as presently conducted, and paid within the specified time, unless contested in good faith and by appropriate proceedings; Debt of the Borrower or any Subsidiary secured by purchase-money Liens permitted by Lender.

6.17   <u>Guaranties. Etc.</u> Assume, guaranty, endorse, or otherwise be or become directly or contingently responsible or liable, or permit Borrower, Guarantor or any Subsidiary to assume, guaranty, endorse, or otherwise be or become directly or contingently responsible or liable (including, but not limited to, an agreement to purchase any obligation, stock, assets, goods, or services, or to supply or advance any funds, assets, goods, or services, or an agreement to maintain or cause such Person to maintain a minimum working capital or net worth, or otherwise to assure the creditors of any Person against loss) for obligations of any Person, except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

## SECTION 7: <u>EVENTS OF DEFAULT AND REMEDIES UPON DEFAULT.</u>

7.1   <u>Events of Default</u>. The occurrence of any one or more of the following, whatever the reason therefor, shall constitute an Event of Default hereunder:

(a)   Borrower shall fail to pay when due any installment of principal or interest on the Note or any other amount owing under this Agreement or the other Loan Documents; or

(b)   Borrower or Guarantor shall fail to perform or observe any term, covenant or agreement contained in any of the Loan Documents on its part to be performed or observed, other than the failure to make a payment covered by Section 7.1(a), and such failure shall continue uncured as of ten (10) calendar days after the occurrence of such failure; provided, however, that if Borrower has commenced to cure the default within said 10-day period and is diligently pursuing

18

such cure, but the default is of such a nature that it cannot be cured within 10 days, then the cure period shall be extended for the number of days necessary to complete the cure, but in no event shall the total cure period be longer than 30 days (the cure period set forth in this Section 7.1(b) shall not apply to any other Events of Default); or

(c)    any representation or warranty in any of the Loan Documents or in any certificate, agreement, instrument or other document made or delivered pursuant to or in connection with any of the Loan Documents proves to have been incorrect in any material respect when made; or

(d)    Borrower (which term shall include any entity comprising Borrower) is dissolved or liquidated, or otherwise ceases to exist, or all or substantially all of the assets of Borrower or any Guarantor are sold or otherwise transferred without Lender's written consent; or

(e)    Borrower or any Guarantor is the subject of an order for relief by the bankruptcy court, or is unable or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors; or Borrower or any Guarantor applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer (the "Receiver"); or a Receiver is appointed without the application or consent of Borrower or any Guarantor, as the case may be, and the appointment continues undischarged or unstayed for sixty (60) calendar days; or Borrower or any Guarantor institutes or consents to any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, custodianship, conservatorship, liquidation, rehabilitation or similar proceedings relating to it or to all or any part of its property under the laws of any jurisdiction; or any similar proceeding is instituted without the consent of Borrower or any Guarantor, as the case may be, and continues undismissed or unstayed for sixty (60) calendar days; or any judgment, writ, attachment, execution or similar process is issued or levied against all or any part of the Property of Borrower or any Guarantor, and is not released, vacated or fully bonded within sixty (60) calendar days after such issue or levy; or

(f)    there shall occur a material adverse change in the financial condition of Borrower or any Guarantor from their respective financial conditions as of the date of the Note, as determined by Lender in its reasonable discretion, and Lender reasonably believes that such adverse change shall jeopardize (i) Lender's ability to collect the amounts due under the Note, as they become due, or (ii) Lender's ability to foreclose on the Mortgaged Property; or

(g)    any Loan Document, at any time after its execution and delivery and for any reason other than the agreement of Lender or the satisfaction in full of all indebtedness and obligations of Borrower under the Loan Documents, ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction; or Borrower or any trustee, officer, director, shareholder or partner of any entity comprising Borrower or any Guarantor claims that any Loan Document is ineffective or unenforceable, in whole or in part, or denies any or further liability or obligation under any Loan Document unless all indebtedness and obligations of Borrower thereunder have been fully paid and performed; or

(h)    all or a substantial portion of the Property is condemned, seized or appropriated by any Governmental Agency; or

(i)      Borrower is dissolved or liquidated, or otherwise ceases to exist, or all or substantially all of the assets of Borrower or Guarantor are sold or otherwise transferred without Lender's written consent; or

(j)      any lien or security interest created by any Security Document, at any time after the execution and delivery of that Security Document and for any reason other than the agreement of Lender or the satisfaction in full of all indebtedness and obligations of Borrower under the Loan Documents, ceases or fails to constitute a valid, perfected and subsisting lien of the priority required by this Agreement or security interest in and to the Property purported to be covered thereby, subject only to the Permitted Exceptions; or

(k)      any default occurs in any loan document or other agreement by and between Borrower and Lender or by Borrower in favor of Lender with reference to the Loan or otherwise, or any default occurs in any loan document regarding any loan or other obligation secured by the Property or any portion thereof.

7.2      Remedies Upon Default. Upon the occurrence of any Event of Default, Lender may, at its option, do any or all of the following:

(a)      declare the principal of all amounts owing under the Note, this Agreement and the other Loan Documents and other obligations secured by the Security Documents, together with interest thereon, and any other obligations of Borrower to Lender, to be forthwith due and payable, regardless of any other specified maturity or due date, without notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind or character, and without the necessity of prior recourse to any security;

(b)      take possession of the Property and, at Lender's option, let contracts for, or otherwise proceed with finishing the Improvements and paying the cost thereof; and if Lender advances its own funds for such purposes, such funds shall be considered advanced under the Note and shall be secured by the Security Documents, notwithstanding that such advances may cause the total amount advanced under the Note to exceed the face amount of the Note or the amount committed to be advanced pursuant to this Agreement, and Borrower shall immediately upon demand reimburse Lender therefor, together with interest thereon as if such advances were advances under the Note, from the date of such advance until the date of reimbursement (nothing contained in this Section 7.2(b) or elsewhere in this Loan Agreement shall be construed to make Lender a "mortgagee in possession" unless and until Lender actually takes possession of the Property either in person or through an agent or receiver);

(c)      terminate any right of Borrower to receive any additional advance;

(d)      terminate all rights of Borrower and obligations of Lender under the Loan Documents;

(e)      exercise its right and power to sell, or otherwise dispose of, the Personal Property, or any part thereof, and for that purpose may take immediate and exclusive possession of the

20

Personal Property, or any part thereof, and with or without judicial process to the extent permitted by law, enter upon any premises on which the Personal Property or any part thereof may be situated and remove the same therefrom without being deemed guilty of trespass and without liability for damages thereby occasioned, or at Lender's option Borrower shall assemble the Personal Property and make it available to the Lender at the place and the time designated in the demand; and

(f)      exercise any and all of its rights under the Loan Documents, including but not limited to the right to take possession of and foreclose on any security, and exercise any other rights with respect to any security, whether under the Security Documents or any other agreement or as provided by Law, all in such order and in such manner as Lender in its sole discretion may determine.

7.3      Cumulative Remedies; No Waiver.  All remedies of Lender provided for herein are cumulative and shall be in addition to any and all other rights and remedies provided in the other Loan Documents or provided by Law from time to time.  The exercise of any right or remedy by Lender hereunder shall not in any way constitute a cure or waiver of any default hereunder or under any of the other Loan Documents, nor invalidate any notice of default or any act done pursuant to any such notice, nor prejudice Lender in the exercise of any rights hereunder or under the Loan Documents.  No waiver by Lender of any default by Borrower hereunder shall be implied from any omission by Lender to take action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default expressly made the subject of the waiver.  Any such express waiver shall be operative only for the time and to the extent therein stated.  Any waiver of any covenant, term or condition contained herein shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition.  The consent or approval by Lender to or of any act by Borrower requiring further consent or approval shall not be deemed to waive or render unnecessary consent or approval to or of any subsequent act.

# SECTION 8:  MISCELLANEOUS.

8.1      Performance by Lender.  In the event that Borrower shall default in or fail to perform any of its obligations under the Loan documents, Lender shall have the right, but not the duty, without limitation upon any of Lender's rights pursuant thereto, to perform the same, and Borrower agrees to pay to Lender, within seventy-two (72) hours after demand therefor, all costs and expenses incurred by Lender in connection therewith, including without limitation actual attorneys' fees reasonably incurred, together with interest thereon from the date of expenditure at the Default Rate.

8.2      Actions.  Provided Borrower has not promptly so acted, Lender shall have the right to commence, appear in, and defend any action or proceeding purporting to affect the rights or duties of the parties hereunder or the payment of any funds, and in connection therewith Lender may pay necessary expenses, employ counsel, and pay reasonable attorneys' fees.  Borrower agrees to pay to Lender within seventy-two (72) hours after demand therefor, all costs and expenses incurred by Lender in connection therewith, including without limitation actual attorneys' fees reasonably incurred, together with interest thereon from the date of expenditure at the Default Rate.

8.3      Advances Obligatory.  Anything herein to the contrary notwithstanding, it is

21

specifically understood and agreed that any advances made by Lender pursuant to this Agreement, including but not limited to all funds advanced by Lender, shall be deemed advanced by Lender under an obligation to do so, regardless of the person or entity to whom such advance is made. Advances made in the reasonable exercise of Lender's judgment that such are necessary to complete the Improvements or to protect its security are to be deemed obligatory advances hereunder and are to be secured by the Note and Deed of Trust, and such security shall relate back to the original recording of the Deed of Trust.

8.4    <u>Nonliability of Lender</u>.  Borrower acknowledges and agrees that:

(a)    any inspections of the Property or the construction of the Improvements made by or through Lender are for purposes of administration of the Loan only and Borrower is not entitled to rely upon the same with respect to the quality, adequacy or suitability of materials or workmanship, conformity to the plans therefor, state of completion or otherwise; Borrower shall make its own inspections of such construction to determine that the quality of the Improvements and all other requirements of such construction are being performed in a manner satisfactory to Borrower and in conformity with the Improvement Plans and all applicable Laws; and Borrower shall immediately notify Lender, in writing, should the same not be in conformity with the plans therefor and all applicable laws;

(b)    by accepting or approving anything required to be observed, performed, fulfilled or given to Lender pursuant to the Loan Documents, including any certificate, statement of profit and loss or other financial statement, survey, appraisal, lease or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance or approval thereof shall not constitute a warranty or representation to anyone with respect thereto by Lender;

(c)    Lender neither undertakes nor assumes any responsibility or duty to Borrower to select, review, inspect, supervise, pass judgment upon or inform Borrower of any matter in connection with the Project, including without limitation matters relating to the quality, adequacy or suitability of: (i) any plans or specifications, (ii) architects, contractors, subcontractors and materialmen employed or utilized in connection with the construction of the Improvements, or the workmanship of or the materials used by any of them, or (iii) the progress or course of any construction and its conformity or nonconformity with the plans therefor; and Borrower shall rely entirely upon its own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or information supplied to Borrower by Lender in connection with such matters is for the protection of Lender only and neither Borrower nor any third party is entitled to rely thereon;

(d)    Lender owes no duty of care to protect Borrower against negligent, faulty, inadequate or defective building or construction;

(e)    the relationship of Borrower and Lender under the Loan Documents is, and shall at all times remain, solely that of borrower and lender, and Lender neither undertakes nor assumes any responsibility or duty to Borrower or to any other Person with respect to the Property or Loan,

except as expressly provided in the Loan Documents; and notwithstanding any other provision of the Loan Documents: (i) Lender is not, and shall not be construed as, a partner, joint venturer, alter-ego, manager, controlling person or an insider or other business associate or participant of any kind of Borrower, and Lender does not intend to ever assume such status; (ii) Lender's activities in connection with the Loan Documents shall not be "outside the scope of the activities of a lender of money" under Nevada law, as amended or recodified from time to time, and Lender does not intend to ever assume any responsibility to any Person for the quality, suitability, safety or condition of the Property or Improvements; and (iii) Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Borrower; and

(f)    Lender shall not be directly or indirectly liable or responsible for any loss, claim, cause of action, liability, indebtedness, damage or injury of any kind or character to any Person or property arising from any construction on, or occupancy or use of, any of the Property, whether caused by, or arising from: (i) any defect in any building, structure, soil condition, grading, fill, landscaping, or other improvements thereon or in any on-site or off-site improvement or other facility therein or thereon; (ii) any act or omission of Borrower or any of Borrower's agents, employees, independent contractors, licensees or invitees; (iii) any accident in or on any of the Property or any fire, flood or other casualty or hazard thereon; (iv) the failure of Borrower, any of Borrower's licensees, employees, invitees, agents, independent contractors or other representatives to maintain any of the Property in a safe condition; and (v) any nuisance made or suffered on any part of the Property.

8.5    <u>No Third Parties Benefitted</u>.  This agreement is made for the purpose of defining and setting forth certain obligations, rights and duties of Borrower, Lender and USA in connection with the Loan.  It shall be deemed a supplement to the Note and the Security Documents, and shall not be construed as a modification of the Note or the Security Documents, except as provided herein. It is made for the sole protection of Borrower, Lender, and USA and their successors and assigns. No other Person shall have any rights of any nature hereunder or by reason hereof.

8.6    <u>Indemnity</u>.  Borrower indemnifies Lender against, and holds Lender harmless from, any and all losses, damages (whether general, punitive or otherwise), liabilities, claims, cause of action (whether legal, equitable or administrative), judgments, court costs and legal or other expenses, including attorneys' fees, which Lender may suffer or incur as a direct or indirect consequence of: (a) Lender's performance of this Agreement or any of the Loan Documents, including, without limitation, Lender's exercise or failure to exercise any rights, remedies or powers in connection with this Agreement or any of the Loan Documents but excluding charges and assessments by Governmental Agencies imposed upon the Lender in the normal course of the Lender's business such as taxes and regulatory fees; (b) Borrower's failure to perform any of Borrower's obligations as and when required by this Agreement or any of the other Loan Documents, including without limitation any failure, at any time, of any representation or warranty of Borrower to be true and correct and any failure by Borrower to satisfy any condition; (c) any claim or cause of action of any kind by any Person to the effect that Lender is in any way responsible or liable for any act or omission by Borrower, whether on account of any theory or derivative liability or otherwise, including but not limited to any claim or cause of action for fraud, misrepresentation, tort or willful misconduct; (d) any act or omission by Borrower, any contractor,

23

subcontractor or material supplier, engineer, architect, or any other Person with respect to any of the Property or Improvements; or (e) any claim or cause of action of any kind by any Person which would have the effect of denying Lender the full benefit or protection of any provision of this Agreement or the Loan Documents but excluding charges and assessments by Governmental Agencies imposed upon Lender in the normal course of Lender's business such as taxes and regulatory fees. Lender's rights of indemnity shall not be directly or indirectly limited, prejudiced, impaired or eliminated in any way by any finding or allegation that Lender's conduct is active, passive or subject to any other classification or that Lender is directly or indirectly responsible under any theory of any kind, character or nature for any act or omission by Borrower or any other Person. Notwithstanding the foregoing, Borrower shall not be obligated to indemnify Lender with respect to any intentional tort or act of negligence which Lender is personally determined by the judgment or a court of competent jurisdiction (sustained on appeal, if any) to have committed. Borrower shall pay any indebtedness arising under this indemnity to Lender immediately within seventy-two (72) hours after demand therefor by Lender together with interest thereon from the date such indebtedness arises until paid at the Default Rate. Borrower's duty to defend and indemnify Lender shall survive the release and cancellation of the Note and the release and reconveyance or partial release and reconveyance of the Deed of Trust.

8.7    Commissions. Borrower hereby indemnifies Lender from the claim of any Person for a commission or fee in connection with the Loan.

8.8    Lenders' Representative. The persons and entities which comprise Lender hereby collectively appoint USA Commercial Mortgage Company ("USA") to administer the Loan on their behalf, to make all necessary demands on Borrower and to execute and deliver all approvals and notices to be given by Lender hereunder.

8.9    Binding Effect: Assignment. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, except that, as provided herein, Borrower may not assign its rights or interest or delegate any of its duties under this Agreement or any of the other Loan Documents without prior written consent of Lender.

8.10    Amendments: Consents. No amendment, modification, supplement, termination or waiver of any provision of this Agreement or any of the other Loan Documents, and no consent to any departure by Borrower therefrom, may in any event be effective unless in writing signed by Lender, and then only in the specific instance and for the specific purpose given.

8.11    Costs, Expenses and Taxes. Borrower shall pay to Lender, within seventy-two (72) hours after demand therefor:

(a)    the actual attorneys' fees and out-of-pocket expenses incurred by Lender in connection with the negotiation, preparation, execution, delivery and administration of this Agreement and any other Loan Documents and any matter related thereto;

(b)    the actual costs and expenses of Lender in connection with any modification of any Loan Document or in connection with the enforcement of this Agreement and any other Loan

24

Document and any matter related thereto, including the actual fees and out-of-pocket expenses, reasonably incurred, of any legal counsel, independent public accountants and other outside experts retained by Lender; and

(c)    all costs, expenses, fees, premiums and other charges relating or arising with respect to the Loan Documents or any transactions contemplated thereby or the compliance with any of the terms and conditions thereof, including without limitation the Disbursement Agent's fee, appraisal fees, inspection fees, cost review fees, recording fees, filing fees, release or reconveyance fees, title insurance premiums, and the cost of realty tax service for the term of the Loan.

All sums paid or expended by Lender under the terms of this Agreement and the other Loan Documents shall be considered to be a part of the Loan. Except as otherwise specifically stated herein, all such sums shall be secured by the Security Documents, shall bear interest from the date of expenditure as if such sums were advances under the Note, and shall be immediately due and payable by Borrower within seventy-two (72) hours after demand therefor.

8.12    <u>Survival of Representations and Warranties</u>. All representations and warranties of Borrower and Guarantor contained herein or in any other Loan Document shall survive the making of the Loan and execution and delivery of the Note, and are material and have been or will be relied upon by Lender, notwithstanding any investigation made by Lender or on behalf of Lender. For the purpose of the foregoing, all statements contained in any certificate, agreement, financial statement, or other writing delivered by or on behalf of Borrower or Guarantor pursuant hereto or to any other Loan Document or in connection with the transactions contemplated hereby or thereby shall be deemed to be representations and warranties of Borrower or Guarantor contained herein or in the other Loan Documents, as the case may be.

8.13    <u>Notices</u>. All notices to be given pursuant to this Agreement shall be sufficient if given by personal services, by guaranteed overnight delivery service, by telex, telecopy or telegram or by being mailed postage prepaid, certified or registered mail, return receipt requested, to the described addresses of the parties hereto as set forth below, or to such other address as a party may request in writing. Any time period provided in the giving of any notice hereunder shall commence upon the date of personal service, the day after delivery to the guaranteed overnight delivery service, the date of sending the telex, telecopy or telegram or two (2) days after mailing certified or registered mail.

**BORROWER'S ADDRESS:**    Cabernet Highlands, LLC
9460 Double R Boulevard, Suite 200
Reno, Nevada 89521
Attn. Kreg D. Rowe

**LENDER'S ADDRESS:**    USA Commercial Mortgage Company
4484 South Pecos Road
Las Vegas, Nevada 89121
Attn: Joe Milanowski

8.14    Further Assurances.  Borrower shall, at its sole expense and without expense to Lender, do such further acts and execute and deliver such further documents as Lender from time to time may require for the purpose of assuring and confirming unto Lender the rights hereby created or intended now or hereafter so to be, or for carrying out the intention or facilitating the performance of the terms of any Loan Document, or for assuring the validity of any security interest or lien under any Security Document.

8.15    Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)    The laws of the State of Nevada, without regard to its choice of law provisions, shall govern enforcement of the Loan Documents.

(b)    BORROWER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (i) SUBMITS TO PERSONAL JURISDICTION IN THE STATE OF NEVADA OVER ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THE NOTE, THIS INSTRUMENT OR ANY OTHER OF THE LOAN DOCUMENTS, (ii) AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN CLARK COUNTY, NEVADA, (iii) SUBMITS TO THE JURISDICTION OF SUCH COURTS, AND, (iv) TO THE FULLEST EXTENT PERMITTED BY LAW, AGREES THAT IT WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY FORUM OTHER THAN CLARK COUNTY, NEVADA (BUT NOTHING HEREIN SHALL AFFECT THE RIGHT OF LENDER TO BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM). BORROWER FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO THE BORROWER AT THE ADDRESS FOR NOTICES DESCRIBED IN SECTION 8.13 HEREOF, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

(c)    BORROWER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THE INDEBTEDNESS SECURED HEREBY OR ANY CONDUCT, ACT OR OMISSION OF LENDER, TRUSTEE OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER, TRUSTEE OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

8.16    Severability of Provisions.  Any provision in any Loan Document that is held to be inoperative, unenforceable or invalid shall be inoperative, unenforceable or invalid without affecting the remaining provisions, and to this end the provisions of all Loan Documents are declared to be severable.

8.17    Assignment or Sale of Participation by Lender; Advertising.  Lender may, at any time, sell, transfer, assign or grant participation in the Loan and in the Loan Documents and Lender may forward to its Partners or to such participant and prospective participant all documents and information relating to the Loan and to Borrower, whether furnished by Borrower or otherwise, as Lender determines necessary or desirable.  Lender and USA may also reasonably divulge and advertise the making of the Loan and the amount thereof.

8.18    Headings.  Section headings in this Agreement are included for convenience of reference only and are not part of this Agreement for any other purpose.

8.19    Time of the Essence.  Time is of the essence with respect to all duties and obligations of Borrower under any Loan Document.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**BORROWER:**      **Cabernet Highlands, LLC**

By: DDH Financial Corp., Co- Manager         By: USA Investment Partners, LLC, Co Manager

By: _____         By: _____
　　　Kreg D. Rowe, President         　　　Joseph D. Milanowski, Manager

**LENDER:**

_____         _____

27

8.16    Severability of Provisions.  Any provision in any Loan Document that is held to be inoperative, unenforceable or invalid shall be inoperative, unenforceable or invalid without affecting the remaining provisions, and to this end the provisions of all Loan Documents are declared to be severable.

8.17    Assignment or Sale of Participation by Lender; Advertising.  Lender may, at any time, sell, transfer, assign or grant participation in the Loan and in the Loan Documents and Lender may forward to its Partners or to such participant and prospective participant all documents and information relating to the Loan and to Borrower, whether furnished by Borrower or otherwise, as Lender determines necessary or desirable.  Lender and USA may also reasonably divulge and advertise the making of the Loan and the amount thereof.

8.18    Headings.  Section headings in this Agreement are included for convenience of reference only and are not part of this Agreement for any other purpose.

8.19    Time of the Essence.  Time is of the essence with respect to all duties and obligations of Borrower under any Loan Document.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**BORROWER:**      **Cabernet Highlands, LLC**

By: DDH Financial Corp., Co- Manager       By: USA Investment Partners, LLC, Co-Manager

By: _____              By: _____
Kreg D. Rowe, President                        Joseph D. Milanowski, Manager

**LENDER:**

_____                  _____