Form B10 (Official Form 10) (04/04)    ** *PLEASE NOTE INSTRUCTIONS ON REVERSE SIDE* ** Filed Electronically 7/14/06

| UNITED STATES BANKRUPTCY COURT-DISTRICT OF NEVADA | PROOF OF CLAIM -Chapter |
|---|---|
| | ☐ 13 ☒ 11 ☐ 7 ☐ Other |

| Name of Debtor .USA COMMERCIAL MORTGAGE CO. | Case Number  06-10725 |
|---|---|

**NOTE: This form should NOT be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. Section 503..**

| Name of Creditor (The person or other entity to whom the debtor owes money or property)<br><br>Sergio Del Canizo, Tanamara Corporate Center, LLC | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name & address where notices should be sent:<br>c/o Beesley Matteoni, Ltd.<br>Caryn S. Tijsseling, Esq.<br>5011 Meadowood Mall Way, Ste. 300<br>Reno, Nevada 89502<br>Telephone number: (775)827-8666 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope   sent to you by the court. | THIS SPACE FOR COURT USE ONLY |

| Last four digits of account or other number by which creditor identifies debtor: | Check here if this claim<br>☐ replaces ☐ amends   a previously filed claim, dated _____ |
|---|---|

**1. BASIS FOR CLAIM**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☒ Other____ rent

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (FILL OUT BELOW)
  Last four digits of your Social Security #_____
  Unpaid compensation for services performed from
  _____To_____
  (date)          (date)

**2.  Date debt was incurred:  5/2006**     **3.  If court judgment, date obtained:**

**4.  Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed.  See reverse side for important explanations.

**Unsecured Nonpriority Claim $ $66,668.00**
☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority

**Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff)

Brief description of collateral:
☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Value of collateral:  $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any:  $_____

**Unsecured Priority Claim.**
☐ Check this box if you have an claim, all or part of which is entitled to priority.
  Amount entitled to priority $_____

Specify the priority of the claim:
- ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B)
- ☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition, or cessation of the debtor's business, whichever is earlier- 11 U.S.C. § 507(a)(4)
- ☐ Contributions to an employee benefit plan.- 11 U.S.C. § 507(a)(5)
- ☐ Up to $2,225* of deposits toward purchase, lease or rental of property or services for personal, family or household use- 11 U.S.C. § 507(a)(7)
- ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8)
- ☐ Other -Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every three years thereafter with respect to cases commenced on or after the date of adjustment.

**5.  Total amount of claim at time case filed:  $ 66,668.00***
(unsecured)     (secured)     (priority)     (Total)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest, or other charges in addition to the principal amount of the claim. Attach an itemized statement of all interest or additional charges. *Pursuant to 11 U.S.C. §365

**6.  Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.
**7.  Supporting documents:** *Attach copies of supporting documents,* such as promissory notes purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.  DO NOT SEND ORIGINAL DOCUMENTS.  If the documents are not available, explain.  If the documents are voluminous, attach a summary.
**8.  Date-Stamped copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and a copy of this proof of claim.

*(This space for court use only)*

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim
(attach copy of power of attorney, if any):
Date:
7/14/06  Caryn Tijsseling #6820  attorney for Tanamara Corporate Center and Sergio Del Canizo

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571

# TANAMERA CORPORATE CENTER

## MODIFIED GROSS OFFICE LEASE

This Office Lease (the "Lease"), dated as of the date set forth in Section 1 of the Summary of Basic Lease Information (the "Summary"), below, is made by and between Tanamera Corporate Center, LLC, a Nevada limited liability company ("Landlord"), and USA Commercial Mortgage, a Nevada Corporation ("Tenant").

### SUMMARY OF BASIC LEASE INFORMATION

| TERMS OF LEASE | | DESCRIPTION |
|---|---|---|
| 1. | Date: | March [January] 16, 2005 |
| 2. | Premises | |
| | 2.1 Premises: | Approximately 2,185 rentable (2,185 usable) square feet of space located in Building # 6 , located at 5488 Reno Corporate Drive Suite 100, Reno, Nevada 89521, as further illustrated in Exhibit A to the Lease. |
| | 2.2 Building: | Building Number: 6<br>Building Rentable Square Feet: 4,302<br>Building Area Acreage: 0.10 |
| | 2.3 Project: | The Building is part of an office project known as "Tanamera Corporate Center", as further set forth in Section 1.1.2 of this Lease. Project Acreage: 4.44 |
| | 2.4 Parking Allocation: | Parking allocation is 8 spaces, which parking is reciprocal throughout the Project. |
| 3. | Lease Term<br>(Article 2). | |
| | 3.1 Length of Term: | 60 months, together with any fractional month occurring at the beginning of the Lease Term. |
| | 3.2 Lease Commencement Date: | The earlier to occur of (i) the date upon which Tenant first commences to conduct business in the Premises, or (ii) the date upon which the Premises are ready for occupancy, which is anticipated to be October 1, 2005. The aforementioned anticipated occupancy date is only Landlord's best guess and is subject to full cooperation from Tenant and the City of Reno. |
| | 3.3 Lease Expiration Date: | The end of the month following sixty (60) months from the Lease Commencement Date (i.e.; if the Lease Commencement Date is October 1, 2005 the Lease Expiration Date would be September 30, 2010). |
| | 3.4 Option to Extend Lease: | Tenant will be granted one (1) option to extend this Lease for a period of sixty (60) months beyond the Lease Expiration Date. For this option to be valid Tenant must provide Landlord with a written notification of its desire to exercise this option at least 120 calendar days prior to the Lease Expiration Date. During the term of this Lease extension all terms, covenants and conditions outlined within this Lease shall remain in full force and effect with only the exception of the Base Rent as outlined in Section 4.4 of this Summary as as outlined in Section 4.4 below. |

4.      Base Rent
        (Article 3):

        4.1     Rent Commencement Date:              The Lease Commencement Date.

        4.2     Amount Due:

| Lease Year | Annual Base Rent | Monthly Installment of Base Rent | Monthly Rental Rate per Rentable Square Foot |
|---|---|---|---|
| Year 1 | $49,818.00 | $4,151.50 | $1.90 |
| Year 2 | $49,818.00 | $4,151.50 | $1.90 |
| Year 3 | $51,915.60 | $4,326.30 | $1.98 |
| Year 4 | $51,915.60 | $4,326.30 | $1.98 |
| Year 5 | $54,013.20 | $4,501.10 | $2.06 |

*Rental Rate includes a 4% escalation every two years

        4.3     Rent Payment Address:               5480 Reno Corporate Drive, Suite 100
                                                    Reno, Nevada 89521

        4.4     Amount Due During Lease Extension:   Should Tenant elect to extend the term of this Lease as set forth in Section
                                                    3.4 of this Summary the Base Monthly Rent beginning in the first month
                                                    of the Extension will be 2.0% above the Base Monthly Rent paid in the last
                                                    month of the initial Lease Term. Thereafter every two years of the Lease
                                                    Extension Term the Base Monthly Rent will increase by 4.0% above the
                                                    previous year.

        4.5     Tenant Utilities & Janitorial       Tenant shall pay for gas & electric for the premises plus janitorial.

5.      Base Year and Base Year Estimate
        (Article 4):

        5.1     Base Year:                          Calendar year 2006.

        5.2     Estimate of Direct Expenses
                included in Base Year:              $9,286.25 ($4.25 / SF/YR).

6.      Tenant's Share
        (Article 4):

        6.1     Building:                           51%

        6.2     Project:                            Approximately 5%.   The Building is 9% of the Project total square
                                                    footage as currently planned.

7.      Permitted Use
        (Article 5):                                General Office.

8.    Security Deposit
      (Article 2.1):                                    NA

9.    Tenant Signage:                                   Per the Tanamera Corporate Center Design Guidelines (To be created)

10.   Address of Tenant                                 9460 Double R Blvd, Suite 201
                                                        Reno, NV 89521
                                                        (Prior to Lease Commencement Date)

                                                        5488 Reno Corporate Drive, Suite 100
                                                        Reno, NV 89521
                                                        (After Lease Commencement Date)

11.   Address of Landlord                               9460 Double R Blvd., Suite 200
      (Section 29.18):                                  Reno, Nevada 89521

12.   Broker(s)
      (Section 29.24):                                  NA

13.   Tenant Improvement Allowance
      (Section 2 of **Exhibit B**):                     $76,475.00 ($35.00 / SF) The actual cost of the Tenant's build out in
                                                        excess of the Tenant Improvement Allowance will be due and payable to
                                                        Landlord upon the Lease Commencement Date. Notwithstanding the
                                                        foregoing, Tenant may elect to have Landlord amortize said excess build
                                                        out tenant improvement cost over the term of the Lease including a rate of
                                                        return to Landlord equal to 8.00% per annum and such amortized excess
                                                        tenant improvements shall be payable monthly to Landlord in addition to
                                                        the Tenant's Base Monthly Rent.

14.   Tenant Improvement Procedure:                     Within five days from final Lease Execution (if not before), Tenant shall
                                                        meet with Landlord's space planner and begin the space planning process
                                                        for the build out of Tenant's interior improvements. Within 30 calendar
                                                        days from Lease Execution, Tenant shall have finalized Tenant's interior
                                                        space plan and shall have met with Landlord's interior consultant to finalize
                                                        all interior finishes (i.e.; floor coverings, wall coverings, paint, cabinetry,
                                                        plumbing fixtures, counter tops, ceiling tiles, electrical needs, etc). Landlord
                                                        will then have 10 calendar days to meet with subcontractors and obtain a
                                                        preliminary cost estimate of Tenant's interior improvements. Note that
                                                        Landlord's preliminary cost estimate will be without the aid of final
                                                        working architectural, structural, HVAC, plumbing and electrical drawings
                                                        and will be only an estimate of the final bid costs. Tenant will thereafter
                                                        have five (5) working days to approve the preliminary budget and / or
                                                        modify its selections to better meet Tenant's budget requirements.
                                                        Following Tenant's approval of the preliminary cost budget, Landlord will
                                                        begin working drawings necessary to obtain a building permit for
                                                        construction and obtain final contractor bids for Tenant's interior
                                                        improvement construction.

15.   Type of Lease:                                    Modified Gross – Tenant pays utilities and janitorial
                                                        expenses for the premises above the Base Rent paid to Landlord.

16.   Guarantor(s)
      (**Exhibit G**):                                  NA

3

# ARTICLE 1
## PREMISES, BUILDING, PROJECT, AND COMMON AREAS

1.1    **Premises, Building, Project and Common Areas**.

      1.1.1    **The Premises**. Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the premises set forth in Section 2.1 of the Summary (the **"Premises"**). The outline of the Premises is set forth in **Exhibit A** attached hereto and the Premises shall have approximately the number of rentable square feet as set forth in Section 2.1 of the Summary. The parties hereto agree that the lease of the Premises is upon and subject to the terms, covenants and conditions herein set forth, and Tenant covenants as a material part of the consideration for this Lease to keep and perform each and all of such terms, covenants and conditions by it to be kept and performed and that this Lease is made upon the condition of such performance, subject to the rights and remedies of Tenant contained herein. The parties hereto hereby acknowledge that the purpose of **Exhibit A** is to show the approximate location of the **"Building,"** as that term is defined in Section 1.1.2, below, or to show the location of the Building within the Project (in the event the Premises are an entire building),only, and such Exhibit is not meant to constitute an agreement, representation or warranty as to the construction of the Premises, the precise area thereof or the specific location of the **"Common Areas,"** The term **"Project,"** as used in this Lease, shall mean (i) the Building and the Common Areas, or the elements thereof or of the accessways to the Premises or the **"Project,"** as that term is defined in Section 1.1.2, below. Except as specifically set forth in this Lease and in the Tenant Work Letter attached hereto as **Exhibit B** (the **"Tenant Work Letter"**). Tenant also acknowledges that neither Landlord nor any agent of Landlord has made any representation or warranty regarding the condition of the Premises, the Building or the Project or with respect to the suitability of any of the foregoing for the conduct of Tenant's business, except as specifically set forth in this Lease and the Tenant Work Letter. The taking of possession of the Premises by Tenant shall conclusively establish that the Premises and the Building were at such time in good and sanitary order, condition and repair, excepting any latent defects.

      1.1.2    **The Building and The Project**. The Premises are a part of the building set forth in Section 2.2 of the Summary (the **"Building"**) or in the event Tenant is leasing the entire building then the Premises are the Building. The Building is part of an office project commonly known as "Tanamera Corporate Center." The term **"Project,"** as used in this Lease, shall mean (i) the Building and the Common Areas, (ii) the land (which is improved with landscaping, parking facilities and other improvements) upon which the Building and the Common Areas are located, (iii) the other office buildings located adjacent to the Building and the land upon which such adjacent office buildings are located, and (iv) at Landlord's discretion, any additional real property, areas, land, buildings or other improvements added thereto outside of the Project.

      1.1.3    **Common Areas**. Tenant shall have the non-exclusive right to use in common with other tenants and owners in the Project, and subject to the CC&Rs and the rules and regulations referred to in Article 5 of this Lease, those portions of the Project which are provided, from time to time, for use in common by Landlord, Tenant and any other tenants of the Project (such areas, together with such other portions of the Project designated by Landlord, in its discretion, including certain areas designated for the exclusive use of certain tenants and owners, or to be shared by Landlord and certain tenants and owners, are collectively referred to herein as the **"Common Areas"**). The Common Areas (which are areas outside the Building) shall consist of the **"Project Common Areas"**. The term **"Project Common Areas,"** as used in this Lease, shall mean the portion of the Project designated as such by Landlord. The manner in which the Common Areas are maintained and operated shall be at the sole discretion of Landlord and the use thereof shall be subject to such rules, regulations and restrictions as Landlord may make from time to time. Landlord reserves the right to close temporarily, make alterations or additions to, or change the location of elements of the Project and the Common Areas, and to designate portions of the Common Area for exclusive use by any party designated by Landlord.

1.2    **Verification of Rentable Square Feet of Premises and Building**. For purposes of this Lease, "rentable square feet" and "usable square feet" of the Premises shall be deemed as set forth in Section 2.2 of the Summary and shall not be subject to re-measurement or modification.

# ARTICLE 2
## LEASE TERM

      The terms and provisions of this Lease shall be effective as of the date of this Lease. The term of this Lease (the **"Lease Term"**) shall be as set forth in Section 3.1 of the Summary, shall commence on the date set forth in Section 3.2 of the Summary (the **"Lease Commencement Date"**), and shall terminate on the date set forth in Section 3.3 of the Summary (the **"Lease Expiration Date"**) unless this Lease is sooner terminated as hereinafter provided. For purposes of this Lease, the term **"Lease Year"** shall mean each calendar year or fraction thereof occurring during the Lease Term. At any time during the Lease Term, Landlord may deliver to Tenant a notice in the form as set forth in **Exhibit C**, attached hereto, as a confirmation only of the information set forth therein, which Tenant shall execute and return to Landlord within five (5) days of receipt thereof.

4

## ARTICLE 3
## BASE RENT

Commencing on the date set forth in Section 4.1 of the Summary (the **"Rent Commencement Date"**), Tenant shall pay, without prior notice or demand, to Landlord or Landlord's agent at the address set forth in Section 4.3 of the Summary, or, at Landlord's option, at such other place as Landlord may from time to time designate in writing, by a check for currency which, at the time of payment, is legal tender for private or public debts in the United States of America, base rent (**"Base Rent"**) as set forth in Section 4 of the Summary, payable in equal monthly installments as set forth in Section 4 of the Summary in advance on or before the first day of each and every calendar month during the Lease Term, without any setoff or deduction whatsoever. The Base Rent for the first full month of the Lease Term which occurs after the expiration of any free rent period shall be paid at the time of Tenant's execution of this Lease. If any Rent payment date (including the Rent Commencement Date) falls on a day of the month other than the first day of such month or if any payment of Rent is for a period which is shorter than one month, the Rent for any fractional month shall accrue on a daily basis for the period from the date such payment is due to the end of such calendar month or to the end of the Lease Term at a rate per day which is equal to 1/365 of the applicable annual Rent. All other payments or adjustments required to be made under the terms of this Lease that require proration on a time basis shall be prorated on the same basis.

## ARTICLE 4
## ADDITIONAL RENT

4.1     **General Terms**. In addition to paying the Base Rent specified in Article 3 of this Lease, Tenant shall pay **"Tenant's Share"** of the annual **"Direct Expenses,"** as those terms are defined in Sections 4.2.6 and 4.2.2 of this Lease, respectively, which are in excess of the amount of Direct Expenses applicable to the "Base Year," as that term is defined in Section 4.2.1, below; provided, however, that in no event shall any decrease in Direct Expenses for any Expense Year below Direct Expenses for the Base Year entitle Tenant to any decrease in Base Rent or any credit against sums due under this Lease. Such payments by Tenant, together with any and all other amounts payable by Tenant to Landlord pursuant to the terms of this Lease, are agreed by Landlord and Tenant to be additional rent and are hereinafter collectively referred to as the **"Additional Rent,"** and the Base Rent and the Additional Rent are herein collectively referred to as **"Rent."** All amounts due under this Article 4 as Additional Rent shall be payable for the same periods and in the same manner as the Base Rent. Without limitation on other obligations of Tenant which survive the expiration of the Lease Term, the obligations of Tenant to pay the Additional Rent provided for in this Article 4 shall survive the expiration of the Lease Term.

4.2     **Definitions of Key Terms Relating to Additional Rent**. As used in this Article 4, the following terms shall have the meanings hereinafter set forth:

4.2.1    **"Base Year"** shall mean the period set forth in Section 5 of the Summary.

4.2.2    **"Direct Expenses"** shall mean "Operating Expenses" and "Tax Expenses."

4.2.3    **"Expense Year"** shall mean each calendar year in which any portion of the Lease Term falls, through and including the calendar year in which the Lease Term expires, provided that Landlord, upon notice to Tenant, may change the Expense Year from time to time any other twelve (12) consecutive month period, and, in the event of any such change, Tenant's Share of Direct Expenses shall be equitably adjusted for any Expense Year involved in any such change.

4.2.4    **"Operating Expenses"** shall mean all expenses **(except janitorial and utility expense for the "Premises" which shall be the direct responsibility of Tenant)**, costs and amounts of every kind and nature which Landlord pays or accrues during any Expense Year because of or in connection with the ownership, management, maintenance, security, repair, replacement, restoration or operation of the Project, or any portion thereof. Without limiting the generality of the foregoing, Operating Expenses shall specifically include any and all of the following: (i) the cost of supplying any Project Common Area utilities to the Building (which are not paid for by Tenant), the cost of operating, repairing, maintaining, and renovating the utility, telephone, mechanical, sanitary, and storm drainage systems, and the cost of maintenance and service contracts in connection therewith; (ii) the cost of licenses, certificates, permits and inspections and the cost of contesting any governmental enactments which may affect Operating Expenses; (iii) the cost of all insurance carried by Landlord in connection with the Building; (iv) the cost of landscaping, re-lamping, and all supplies, tools, equipment and materials used in the operation, repair and maintenance of the Project, or any portion thereof, (v) costs incurred in connection with the parking areas servicing the Project; (vi) fees and other costs, including management fees (not to exceed 4% of Tenant's gross Rent), legal fees and the cost of all contractors in connection with the management, operation, maintenance and repair of the Building; (vii) payments under any equipment rental agreements; (viii) wages, salaries and other compensation and benefits, including taxes levied thereon, of all persons engaged in the operation, maintenance and security of the Project; (ix) costs under any instrument pertaining to the sharing of costs

5

by the Project; (x) operation, repair, maintenance and replacement of all systems and equipment and components thereof of the Premises; (xi) the cost of security and other services, maintenance and replacement of curbs and walkways, repair to roofs and re-roofing; (xii) amortization (including interest on the unamortized cost) of the cost of acquiring or the rental expense of personal property used in the maintenance, operation and repair of the Building, or any portion thereof, (xiii) costs, fees, charges or assessments imposed by, or resulting from any mandate imposed on Landlord by, any federal, state or local government for fire and police protection, trash removal, community services, or other services which do not constitute "Tax Expenses" as that term is defined in Section 4.2.5, below; and (xiv) payments under any easement, license, operating agreement, declaration, restrictive covenant, or instrument pertaining to the sharing of costs by the Building (none currently exists).

Tenant shall be responsible for payment of all utility and janitorial costs of operation of the "Premises" during the term of the lease.

   4.2.5 <u>Taxes</u>.

    4.2.5.1 **"Tax Expenses"** shall mean all federal, state, county, or local governmental or municipal taxes, fees, charges or other impositions of every kind and nature, whether general, special, ordinary or extraordinary, (including, without limitation, real estate taxes, general and special assessments, personal property taxes imposed upon the fixtures, machinery, equipment, apparatus, systems and equipment, appurtenances, furniture and other personal property used in connection with the Project, or any portion thereof), which shall be paid or accrued during any Expense Year (without regard to any different fiscal year used by such governmental or municipal authority) because of or in connection with the ownership, leasing and operation of the Project, or any portion thereof.

    4.2.5.2 Tenant's pro rata share of any costs and expenses (including, without limitation, reasonable attorneys' fees) incurred in attempting to protest, reduce or minimize Tax Expenses shall be included in Tax Expenses in the Expense Year such expenses are paid. Refunds of Tax Expenses shall be credited against Tax Expenses and refunded to Tenant regardless of when received, based on the Expense Year to which the refund is applicable, provided that in no event shall the amount to be refunded to Tenant for any such Expense Year exceed the total amount paid by Tenant as Additional Rent under this <u>Article 4</u> for such Expense Year.

   4.2.6 **"Tenant's Share"** shall mean the percentage set forth in Section 6 of the Summary.

   4.2.7 **"Tenant's Utilities and Janitorial"** shall mean the electricity and gas individually metered to the Premises to be paid for by Tenant above the Rent plus the cost for Janitorial services for the Premises to be contracted for and paid for by Tenant in addition to the Rent paid to Landlord.

  4.3 <u>Allocation of Direct Expenses</u>.

   4.3.1 <u>Method of Allocation</u>. The parties acknowledge that the Building is a part of a multi-building project and that the costs and expenses incurred in connection with the Project (i.e. the Direct Expenses) should be shared between the tenants and owners of all the buildings in the Project. Accordingly, as set forth in Section 4.2 above, Direct Expenses (which consists of Operating Expenses and Tax Expenses) are determined annually for the Project as a whole, and a portion of the Direct Expenses, which portion shall be determined by Landlord on an equitable basis, shall be allocated to the tenants of the Building (as opposed to the tenants of any other buildings in the Project) and such portion shall be the Direct Expenses for purposes of this Lease. Such portion of Direct Expenses allocated to the tenants of the Building shall include all Direct Expenses attributable solely to the Building and an equitable portion of the Direct Expenses attributable to the Project as a whole. The Building's pro-rata share of Project Operating Expenses shall be based on the number of square feet assigned to the Building Area (which is set forth in Section 2.2 of the Summary) divided by the total number of square feet in the Project and Tenant's Share of such Operating Expenses is set forth in Section 6.2 of the Summary. Tenant's Share of the of the Operating Expenses for the Building is set forth in Section 6.1 of the Summary and is based on the rentable square feet of the Premises divided by the total rentable square feet of the Building.

  4.4 <u>Calculation and Payment of Additional Rent</u>. If for any Expense Year ending or commencing within the Lease Term, Tenant's Share of Direct Expenses for such Expense Year exceeds Tenant's Share of Direct Expenses applicable to the Base Year, then Tenant shall pay to Landlord, in the manner set forth in Section 4.4.1, below, and as Additional Rent, an amount equal to the excess (the **"Excess"**).

6

4.4.1    <u>Statement of Actual Direct Expenses and Payment by Tenant</u>. Landlord shall provide to Tenant within 120 days following the end of each Expense Year, a statement (the "**Statement**") which shall state the Direct Expenses incurred or accrued for such preceding Expense Year, and which shall indicate the amount of the Excess (if any). Upon receipt of the Statement for each Expense Year commencing or ending during the Lease Term, if an Excess is present, Tenant shall pay, with its next installment of Base Rent due, the full amount of the Excess for such Expense Year, less the amounts, if any, paid during such Expense Year as "**Estimated Excess**," as that term is defined in Section 4.4.2, below. The failure of Landlord to timely furnish the Statement for any Expense Year shall not prejudice Landlord or Tenant from enforcing its rights under this Article 4. Even though the Lease Term has expired and Tenant has vacated the Premises, when the final determination is made of Tenant's Share of Direct Expenses for the Expense Year in which this Lease terminates, if an Excess is present, Tenant shall within thirty (30) days of such final determination pay to Landlord such amount. The provisions of this Section 4.4.1 shall survive the expiration or earlier termination of the Lease Term.

4.4.2    <u>Statement of Estimated Direct Expenses</u>. In addition, Landlord shall provide to Tenant within 120 days following the end of each Expense Year a yearly expense estimate statement (the "**Estimate Statement**") which shall set forth Landlord's reasonable estimate (the "**Estimate**") of what the total amount of Direct Expenses for the then-current Expense Year shall be and the estimated excess (the "**Estimated Excess**") as calculated by comparing the Direct Expenses for such Expense Year, which shall be based upon the Estimate, to the amount of Direct Expenses for the Base Year. The failure of Landlord to timely furnish the Estimate Statement for any Expense Year shall not preclude Landlord from enforcing its rights to collect any Estimated Excess under this Article 4, nor shall Landlord be prohibited from revising any Estimate Statement or Estimated Excess theretofore delivered to the extent necessary. Thereafter, Tenant shall pay, with its next installment of Base Rent due, a fraction of the Estimated Excess for the then-current Expense Year (reduced by any amounts paid pursuant to the next to last sentence of this Section 4.4.2). Such fraction shall have as its numerator the number of months which have elapsed in such current Expense Year, including the month of such payment, and twelve (12) as its denominator. Until a new Estimate Statement is furnished (which Landlord shall have the right to deliver to Tenant at any time), Tenant shall pay monthly, with the monthly Base Rent installments, an amount equal to one-twelfth (1/12) of the total Estimated Excess set forth in the previous Estimate Statement delivered by Landlord to Tenant.

4.4.3    <u>Tenant Audit</u>. If any dispute arises as to the amount of any Additional Rent due under the provisions of this Article 4, Landlord agrees and acknowledges that Tenant shall have the right, at Tenant's expense, to audit Landlord's books and records subject to the terms and conditions hereinafter set forth, and Tenant agrees and acknowledges that Tenant's right to audit such books and records shall be limited by the following terms and provisions: In order to exercise any right of audit as to any Expense Year, Tenant must notify Landlord in writing of Tenant's election to audit within forty-five (45) days after Tenant's receipt of the Statement described in Section 4.4.1, above. . Tenant shall not have any right of audit at any time that Tenant is in default of this Lease or in breach or non-compliance with any of the terms, covenants and obligations of Tenant set forth herein. Tenant hereby covenants and agrees to keep confidential all disputes and communications with Landlord concerning the Additional Rent due pursuant to Article 4 of this Lease. Tenant agrees that Tenant's auditors shall be Certified Public Accountants, and that Tenant shall not utilize any contingent fee auditor. So long as Tenant has complied with all of the foregoing conditions, Tenant shall have the right to audit Landlord's books and records, during the forty-five (45) day period following Landlord's receipt of Tenant's notice, during regular business hours and upon at least five (5) days' advance written notice. Tenant's audit shall be concluded within five (5) business days or less. Tenant's audit shall only pertain to the previous Expense Year. Tenant's right to audit is personal to Tenant and no subtenant or other entity shall have the right to audit. If Tenant's audit reveals that Tenant has underpaid the Excess, Tenant shall promptly tender to Landlord a sum equal to any such deficiency. If Tenant's audit demonstrates that Landlord has received more than the Excess, unless Landlord elects to arbitrate as set forth below, Landlord shall credit Tenant with a sum equal to the amount of any such overpayment against the next sums coming due under this Lease, and Landlord shall pay Tenant's cost for such audit. In the event of any dispute concerning the outcome of Tenant's audit, either party shall have the right to arbitrate such dispute in accordance with the Rules for Commercial Arbitration of the American Arbitration Association; provided, however, that Tenant shall have no right to compel arbitration unless Tenant has made and continues to make all of the monthly installments (whether disputed or not) due pursuant to Section 4.4.2, above. Tenant agrees and acknowledges that, in the event of any overstatement of the Excess, Tenant's sole remedy shall be to recoup all sums paid in error and Tenant shall not have any right to terminate this Lease or to be excused from the full and faithful performance of any or all of the other terms, covenants and obligations of Tenant contained herein. In all cases wherein Tenant has forfeited Tenant's rights of audit, as set forth above, by failing to timely notify Landlord of Tenant's election to audit or by breaching the confidentiality provisions set forth above or by failing to comply with all of Tenant's terms, covenants and obligations hereunder, Landlord's computation of the Excess shall be irrebuttably presumed to be accurate and correct. The foregoing arbitration clause is strictly limited to this Section 4.4.3, and the parties hereto do not intend to arbitrate any other matters arising under this Lease unless expressly so provided herein.

4.5    <u>Taxes and Other Charges for Which Tenant Is Directly Responsible</u>.

7

4.5.1    Tenant shall be liable for and shall pay ten (10) days before delinquency, taxes levied against Tenant's equipment, furniture, fixtures and any other personal property located in or about the Premises. If any such taxes on Tenant's equipment, furniture, fixtures and any other personal property are levied against Landlord or Landlord's property or if the assessed value of Landlord's property is increased by the inclusion therein of a value placed upon such equipment, furniture, fixtures or any other personal property and if Landlord pays the taxes based upon such increased assessment, which Landlord shall have the right to do regardless of the validity thereof but only under proper protest if requested by Tenant, Tenant shall upon demand repay to Landlord the taxes so levied against Landlord or the proportion of such taxes resulting from such increase in the assessment, as the case may be.

4.5.2    If the tenant improvements in the Premises, whether installed and/or paid for by Landlord or Tenant and whether or not affixed to the real property so as to become a part thereof, are assessed for real property tax purposes at a valuation higher than the valuation at which tenant improvements conforming to Landlord's "building standard" in other space in the Building are assessed, then the Tax Expenses levied against Landlord or the property by reason of such excess assessed valuation shall be deemed to be taxes levied against personal property of Tenant and shall be governed by the provisions of Section 4.5.1, above.

4.5.3    Notwithstanding any contrary provision herein, Tenant shall pay prior to delinquency any (i) rent tax or sales tax, service tax, transfer tax or value added tax, or any other applicable tax on the rent or services herein or otherwise respecting this Lease, (ii) taxes assessed upon or with respect to the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises or any portion of the Project, including the Project parking facility; or (iii) taxes assessed upon this transaction or any document to which Tenant is a party creating or transferring an interest or an estate in the Premises.

## ARTICLE 5
## USE OF PREMISES

5.1    **Permitted Use**. Tenant shall use the Premises solely for the Permitted Use set forth in Section 7 of the Summary and Tenant shall not use or permit the Premises or the Project to be used for any other purpose or purposes whatsoever without the prior written consent of Landlord, which may be withheld in Landlord's sole discretion.

5.2    **Prohibited Uses**. The uses prohibited under this Lease shall include, without limitation, use of the Premises or a portion thereof for any use prohibited under the CC&Rs (as hereinafter defined). Tenant further covenants and agrees that Tenant shall not use, or suffer or permit any person or persons to use, the Premises or any part thereof for any use or purpose contrary to the provisions of the Rules and Regulations set forth in **Exhibit D** attached hereto, or in violation of the laws of the United States of America, the State of Nevada, or the ordinances, regulations or requirements of the local municipal or county governing body or other lawful authorities having jurisdiction over the Project including, without limitation, any such laws, ordinances, regulations or requirements relating to hazardous materials or substances, as those terms are defined by applicable laws now or hereafter in effect. Tenant shall comply with all recorded covenants, conditions, and restrictions now or hereafter affecting the Project.

5.3    **CC&Rs**. Tenant shall comply with all recorded covenants, conditions, and restrictions currently affecting the Project. Additionally, Tenant acknowledges that the Project may be subject to any future covenants, conditions, and restrictions (the **"CC&Rs"**) which Landlord, in Landlord's discretion, deems reasonably necessary or desirable, and Tenant agrees that this Lease shall be subject and subordinate to such CC&Rs. Landlord shall have the right to require Tenant to execute and acknowledge, within fifteen (15) business days of a request by Landlord, a "Recognition of Covenants, Conditions, and Restriction," in a form substantially similar to that attached hereto as **Exhibit F**, agreeing to and acknowledging the CC&Rs.

8

## ARTICLE 6
### SERVICES AND UTILITIES

6.1     **Standard Tenant Services**. Landlord shall provide the following services on all days (unless otherwise stated below) during the Lease Term. Tenant shall pay for and control the use of services described in 6.1.1, 6.1.2, and 6.1.4, 6.2 and 6.3 as described below.

6.1.1     Landlord shall provide adequate electrical wiring and facilities for connection to Tenant's lighting fixtures and incidental use equipment, provided that (i) the connected electrical load of the incidental use equipment does not exceed an average of 3.0 watts per usable square foot of the Premises during the Building Hours on a monthly basis, and the electricity so furnished for incidental use equipment will be at a nominal one hundred twenty (120) volts and no electrical circuit for the supply of such incidental use equipment will require a current capacity exceeding twenty (20) amperes, and (ii) the connected electrical load of Tenant's lighting fixtures does not exceed an average of 9.80 watts per usable square foot of the Premises during the Building Hours on a monthly basis, and the electricity so furnished for Tenant's lighting will be at a nominal one hundred twenty (120) volts, which electrical usage shall be subject to applicable laws and regulations. Tenant will design Tenant's electrical system serving any equipment producing nonlinear electrical loads to accommodate such nonlinear electrical loads, including, but not limited to, oversizing neutral conductors, derating transformers and/or providing power-line filters. Engineering plans shall include a calculation of Tenant's fully connected electrical design load with and without demand factors and shall indicate the number of watts of unmetered and submetered loads. Tenant shall bear the cost of replacement of lamps, starters and ballasts for non-Building standard lighting fixtures within the Premises.

6.1.2     Tenant shall provide janitorial services to the Premises, except weekends and the date of observation of the Holidays, in and about the Premises and window washing services in a manner consistent with other comparable buildings in the vicinity of the Building.

6.1.3     Tenant shall cooperate fully with Landlord at all times and abide by all regulations and requirements that Landlord may reasonably prescribe for the proper functioning and protection of the HVAC, electrical, mechanical and plumbing systems.

6.3     **Interruption of Use**. Tenant agrees that Landlord shall not be liable for damages, by abatement of Rent or otherwise, for failure to furnish or delay in furnishing any service (including telephone and telecommunication services), or for any diminution in the quality or quantity thereof, when such failure or delay or diminution is occasioned, in whole or in part, by breakage, repairs, replacements, or improvements, by any strike, lockout or other labor trouble, by inability to secure electricity, gas, water, or other fuel at the Building or Project after reasonable effort to do so, by any riot or other dangerous condition, emergency, accident or casualty whatsoever, by act or default of Tenant or other parties, or by any other cause; and such failures or delays or diminution shall never be deemed to constitute an eviction or disturbance of Tenant's use and possession of the Premises or relieve Tenant from paying Rent or performing any of its obligations under this Lease, provided that, except in the case of an interruption of use caused by the acts or omissions of Tenant, Tenant shall be entitled to a pro rata abatement of Rent during the period of any interruption of use that exceeds two (2) business days, until such interruption ceases. Furthermore, Landlord shall not be liable under any circumstances, unless caused by Landlord's acts or omissions, for a loss of, or injury to, property or for injury to, or interference with, Tenant's business, including, without limitation, loss of profits, however occurring, through or in connection with or incidental to a failure to furnish any of the services or utilities as set forth in this Article 6. Landlord may comply with voluntary controls or guidelines promulgated by any governmental entity relating to the use or conservation of energy, water, gas, light or electricity or the reduction of automobile or other emissions without creating any liability of Landlord to Tenant under this Lease, provided that the Premises are not thereby rendered untenantable.

## ARTICLE 7
### REPAIRS

Tenant shall, at Tenant's own expense, pursuant to the terms of this Lease, including without limitation Article 8 hereof, keep the Premises, including all improvements, fixtures and furnishings therein, and the floor or floors of the Building on which the Premises are located, in good order, repair and condition at all times during the Lease Term. In addition, Tenant shall, at Tenant's own expense, but under the supervision and subject to the prior approval of Landlord, and within any reasonable period of time specified by Landlord, pursuant to the terms of this Lease, including without limitation Article 8 hereof, promptly and adequately repair all damage to the Premises and replace or repair all damaged, broken, or worn fixtures and appurtenances, except for damage caused by ordinary wear and tear or beyond the reasonable control of Tenant; provided however, that, at Landlord's option, or if Tenant fails to make such repairs, Landlord may, but need not, make such repairs and replacements, and Tenant shall pay Landlord the reasonable cost thereof. Landlord may, but shall

9

not be required to, enter the Premises at all reasonable times to make such repairs, alterations, improvements or additions to the Premises or to the Project or to any equipment located in the Project as Landlord shall desire or deem necessary or as Landlord may be required to do by governmental or quasi-governmental authority or court order or decree.

## ARTICLE 8
## ADDITIONS AND ALTERATIONS

8.1    **Landlord's Consent to Alterations**. Tenant may not make any major improvements, alterations, additions or changes to the Premises or any mechanical, plumbing or HVAC facilities or systems pertaining to the Premises (collectively, the "Alterations") without first procuring the prior written consent of Landlord to such Alterations, which consent shall be requested by Tenant not less than thirty (30) days prior to the commencement thereof, and which consent shall not be unreasonably withheld by Landlord, provided it shall be deemed reasonable for Landlord to withhold its consent to any Alteration which adversely affects the structural portions or the systems or equipment of the Building or is visible from the exterior of the Building. The construction of the initial improvements to the Premises shall be governed by the terms of the Tenant Work Letter and not the terms of this Article 8.

8.2    **Manner of Construction**. Landlord may impose, as a condition of its consent to any and all Alterations or repairs of the Premises or about the Premises, such commercially reasonable requirements as Landlord in its sole discretion may deem desirable, including, but not limited to, the requirement that Tenant utilize for such purposes only contractors, subcontractors, materials, mechanics and materialmen selected by Tenant from a list provided and approved by Landlord, with such approval not to be unreasonably withheld, the requirement that upon Landlord's request, Tenant shall, at Tenant's expense, remove such Alterations upon the expiration or any early termination of the Lease Term, and the requirement that all Alterations conform in terms of quality and style to the building's standards established by Landlord. If such Alterations will involve the use of or disturb hazardous materials or substances existing in the Premises, Tenant shall comply with Landlord's rules and regulations concerning such hazardous materials or substances. Tenant shall construct such Alterations and perform such repairs in a good and workmanlike manner, in conformance with any and all applicable federal, state, county or municipal laws, rules and regulations and pursuant to a valid building permit, all in conformance with Landlord's construction rules and regulations. In the event Tenant performs any Alterations in the Premises which require or give rise to governmentally required changes to the "Base Building," as that term is defined below, then Landlord shall, at Tenant's expense, make such changes to the Base Building. The "Base Building" shall include the structural portions of the Building, and the public restrooms and the systems and equipment located in the internal core of the Building on the floor or floors on which the Premises are located. In performing the work of any such Alterations, Tenant shall have the work performed in such manner so as not to obstruct access to the Project or any portion thereof, by any other tenant of the Project, and so as not to obstruct the business of Landlord or other tenants in the Project. Tenant shall not use (and upon notice from Landlord shall cease using) contractors, services, workmen, labor, materials or equipment that, in Landlord's reasonable judgment, would disturb labor harmony with the workforce or trades engaged in performing other work, labor or services in or about the Building or the Common Areas.

8.3    **Payment for Improvements**. If payment is made directly to contractors, Tenant shall comply with Landlord's requirements for final lien releases and waivers in connection with Tenant's payment for work to contractors.

8.4    **Construction Insurance**. In addition to the requirements of Article 10 of this Lease, in the event that Tenant makes any Alterations in excess of $25,000, prior to the commencement of such Alterations, Tenant shall provide Landlord with evidence that Tenant carries **"Builder's All Risk"** insurance in an amount approved by Landlord covering the construction of such Alterations, and such other insurance as Landlord may require, it being understood and agreed that all of such Alterations shall be insured by Tenant pursuant to Article 10 of this Lease immediately upon completion thereof. In addition, Landlord may, in its discretion, require Tenant to obtain a lien and completion bond or some alternate form of security satisfactory to Landlord in an amount sufficient to ensure the lien-free completion of such Alterations and naming Landlord as a co-obligee.

8.5    **Landlord's Property**. All Alterations, improvements, fixtures, equipment and/or appurtenances which may be installed or placed in or about the Premises, from time to time, and fixed to the Building shall be at the sole cost of Tenant and shall be and become the property of Landlord, except that Tenant may remove any Alterations, improvements, fixtures and/or equipment which Tenant can substantiate to Landlord have not been paid for with any Tenant improvement allowance funds provided to Tenant by Landlord, provided Tenant repairs any damage to the Premises and Building caused by such removal and returns the affected portion of the Premises to a building standard tenant improved condition as determined by Landlord, normal wear and tear excepted. Furthermore, Landlord may, by written notice to Tenant prior to the end of the Lease Term, upon a showing of Landlord of good cause, or given following any earlier termination of this Lease, require Tenant, at Tenant's expense, to remove any Alterations or improvements in the Premises, and to repair any damage to the Premises and Building caused by such removal and returns the affected portion of the Premises to a building standard tenant improved condition as determined by Landlord. If Tenant fails to complete such removal and/or to repair any damage caused by the

10

removal of any Alterations or improvements in the Premises, and returns the affected portion of the Premises to a building standard tenant improved condition as determined by Landlord, then at Landlord's option, either (A) Tenant shall be deemed to be holding over in the Premises and Rent shall continue to accrue in accordance with the terms of Article 16, below, until such work shall be completed, or (B) Landlord may do so and may charge the cost thereof to Tenant. Tenant hereby protects, defends, indemnifies and holds Landlord harmless from any liability, cost, obligation, expense or claim of lien in any manner relating to the installation, placement, removal or financing of any such Alterations, improvements, fixtures and/or equipment in, on or about the Premises, which obligations of Tenant shall survive the expiration or earlier termination of this Lease.

## ARTICLE 9
## COVENANT AGAINST LIENS

Tenant shall keep the Project and Premises free from any liens or encumbrances arising out of the work performed, materials furnished or obligations incurred by or on behalf of Tenant, and shall protect, defend, indemnify and hold Landlord harmless from and against any claims, liabilities, judgments or costs (including, without limitation, reasonable attorneys' fees and costs) arising out of same or in connection therewith. Tenant shall give Landlord notice at least twenty (20) days prior to the commencement of any such work on the Premises (or such additional time as may be necessary under applicable laws) to afford Landlord the opportunity of posting and recording appropriate notices of non-responsibility. Tenant shall remove any such lien or encumbrance by bond or otherwise within five (5) days after notice by Landlord, or consent any such lien and encumbrance in good faith to completion beyond the date of Landlord's notice, provided Tenant secures a bond sufficient to cover the disputed amount in favor of Landlord, and if Tenant shall fail to do so, Landlord may pay the amount necessary to remove such lien or encumbrance, without being responsible for investigating the validity thereof. The amount so paid shall be deemed Additional Rent under this Lease payable upon demand, without limitation as to other remedies available to Landlord under this Lease. Nothing contained in this Lease shall authorize Tenant to do any act which shall subject Landlord's title to the Building or Premises to any liens or encumbrances whether claimed by operation of law or express or implied contract. Any claim to a lien or encumbrance upon the Building or Premises arising in connection with any such work or respecting the Premises not performed by or at the request of Landlord shall be null and void, or at Landlord's option shall attach only against Tenant's interest in the Premises and shall in all respects be subordinate to Landlord's title to the Project, Building and Premises.

## ARTICLE 10
## INSURANCE

10.1    **Indemnification and Waiver**. Tenant hereby assumes all risk of damage to property or injury to persons in, upon or about the Premises from any cause whatsoever and agrees that, in such case, Landlord, its partners, subpartners and their respective officers, agents, servants, employees, and independent contractors (collectively, **"Landlord Parties"**) shall not be liable for, and are hereby released from any responsibility for, any damage either to person or property or resulting from the loss of use thereof, which damage is sustained by Tenant or by other persons claiming through Tenant. Tenant shall indemnify, defend, protect, and hold harmless the Landlord Parties from any and all loss, cost, damage, expense and liability (including without limitation court costs and reasonable attorneys' fees) incurred in connection with or arising from any acts or omissions of Tenant in, on or about the Premises, any Tenant violation of any of the requirements, ordinances, statutes, regulations or other laws, including, without limitation, any environmental laws, any acts, omissions or negligence of Tenant or of any person claiming by, through or under Tenant, or of the contractors, agents, servants, employees, invitees, guests or licensees of Tenant or any breach by Tenant of the terms of this Lease, either prior to, during, or after the expiration of the Lease Term, provided that the terms of the foregoing indemnity shall not apply to the gross negligence or willful misconduct of Landlord. Should Landlord be named as a defendant in any suit brought against Tenant in connection with or arising out of Tenant's occupancy of the Premises, Tenant shall pay to Landlord its costs and expenses incurred in such suit, including without limitation, its actual professional fees such as appraisers', accountants' and attorneys' fees. Further, Tenant's agreement to indemnify Landlord pursuant to this Section 10.1 is not intended and shall not relieve any insurance carrier of its obligations under policies required to be carried by Tenant pursuant to the provisions of this Lease, to the extent such policies cover the matters subject to Tenant's indemnification obligations; nor shall they supersede any inconsistent agreement of the parties set forth in any other provision of this Lease. The provisions of this Section 10.1 shall survive the expiration or sooner termination of this Lease with respect to any claims or liability arising in connection with any event occurring prior to such expiration or termination. Landlord shall indemnify, defend, protect and hold harmless the Tenant, its partners, subpartners and their respective officers, agents, servants, employees, and independent contractors, from any and all loss, cost, damage, expense and liability ( including without limitation court costs and reasonable attorney's fees) incurred in connection with or arising from any acts or omissions of Landlord, in, on or about the Premises, any Landlord violation of any of the requirements, ordinances, statutes, regulations or other laws, including, without limitation, any environmental laws, any acts, omissions or gross negligence of Landlord or of the contractors, agents, servants, employees, invitees, guests or licensees of Landlord or any breach of Landlord of the terms of this Lease, either prior to, during, or after the expiration of the Lease Term, provided that the terms of the foregoing indemnity shall not apply to the gross negligence or willful misconduct of Tenant.

11

10.2     **Tenant's Compliance With Landlord's Fire and Casualty Insurance**. Tenant shall, at Tenant's expense, comply with all insurance company requirements pertaining to the use of the Premises. If Tenant's conduct or use of the Premises causes any increase in the premium for such insurance policies then Tenant shall reimburse Landlord for any such increase. Tenant, at Tenant's expense, shall comply with all rules, orders, regulations or requirements of the American Insurance Association (formerly the National Board of Fire Underwriters) and with any similar body.

10.3     **Tenant's Insurance**. Tenant shall maintain the following coverages in the following amounts.

10.3.1    Commercial General Liability Insurance covering the insured against claims of bodily injury, and property damage (including loss of use thereof) arising out of Tenant's operations, and contractual liabilities (covering the performance by Tenant of its indemnity agreements) including a Broad Form endorsement covering the insuring provisions of this Lease and the performance by Tenant of the indemnity agreements set forth in Section 10. 1 of this Lease, for limits of liability not less than:

        Bodily Injury and                   $2,000,000 each occurrence
        Property Damage Liability         $2,000,000 annual aggregate

10.3.2    Physical Damage Insurance covering (i) all office furniture, business and trade fixtures, office equipment, free-standing cabinet work, movable partitions, merchandise and all other items of Tenant's property on the Premises installed by, for, or at the expense of Tenant, (ii) the "Tenant Improvements," as that term is defined in Section 2.1 of the Tenant Work Letter, and any other improvements which exist in the Premises as of the Lease Commencement Date (excluding the Base Building) (the "**Original Improvements**"), and (iii) all other improvements, alterations and additions to the Premises. Such insurance shall be written on an "all risks" of physical loss or damage basis, for 90% of the full replacement cost value (subject to reasonable deductible amounts) new without deduction for depreciation of the covered items and in amounts that meet any co-insurance clauses of the policies of insurance and shall include coverage for damage or other loss caused by fire or other peril including, but not limited to, vandalism and malicious mischief, theft, water damage of any type, including sprinkler leakage, bursting or stoppage of pipes, and explosion, and providing business interruption coverage for a period of one year.

10.3.3    Worker's Compensation and Employer's Liability or other similar insurance pursuant to all applicable state and local statutes and regulations.

10.4     **Form of Policies**. The minimum limits of policies of insurance required of Tenant under this Lease shall in no event limit the liability of Tenant under this Lease. Such insurance shall (i) name Landlord, Landlord's lender, and any other party the Landlord so specifies, as an additional insured, including Landlord's managing agent, if any; (ii) specifically cover the liability assumed by Tenant under this Lease, including, but not limited to, Tenant's obligations under Section 10.1 of this Lease; (iii) be issued by an insurance company having a rating of not less than A-X in Best's Insurance Guide or which is otherwise acceptable to Landlord and licensed to do business in the State of Nevada; (iv) be primary insurance as to all claims thereunder and provide that any insurance carried by Landlord is excess and is noncontributing with any insurance requirement of Tenant; (v) be in form and content reasonably acceptable to Landlord; and (vi) provide that said insurance shall not be canceled or coverage changed unless thirty (30) days' prior written notice shall have been given to Landlord and any mortgagee of Landlord. Tenant shall deliver said policy or policies or certificates thereof to Landlord on or before the Lease Commencement Date and at least thirty (30) days before the expiration dates thereof. In the event Tenant shall fail to procure such insurance, or to deliver such policies or certificate, Landlord may, at its option, procure such policies for the account of Tenant, and the cost thereof shall be. paid to Landlord within five (5) days after delivery to Tenant of bills therefor.

10.5     **Subrogation**. Landlord and Tenant intend that their respective property loss risks shall be borne by reasonable insurance carriers to the extent above provided, and Landlord and Tenant hereby agree to look solely to, and seek recovery only from, their respective insurance carriers in the event of a property loss to the extent that such coverage is agreed to be provided hereunder. The parties each hereby waive all rights and claims against each other for such losses, and waive all rights of subrogation of their respective insurers, provided such waiver of subrogation shall not affect the right to the insured to recover thereunder. The parties agree that their respective insurance policies are now, or shall be, endorsed such that the waiver of subrogation shall not affect the right of the insured to recover thereunder, so long as no material additional premium is charged therefor.

## ARTICLE 11
## DAMAGE AND DESTRUCTION

11.1    **Repair of Damage to Premises by Landlord**. Tenant shall promptly notify Landlord of any damage to the Premises resulting from fire or any other casualty. If the Premises, the Building, or any Common Areas serving or providing access to the Premises shall be damaged by fire or other casualty, Landlord shall promptly and diligently, subject to reasonable delays for insurance adjustment or other matters beyond Landlord's reasonable control, and subject to all other terms of this Article 11, restore the Premises, the Building and such Common Areas. Such restoration shall be to substantially the same condition of the Premises, the Building and the Common Areas prior to the casualty, except for modifications required by zoning and building codes and other laws or by the holder of a mortgage on the Building or Project or any other modifications to the Common Areas deemed desirable by Landlord, provided that access to the Premises and any common restrooms serving the Premises shall not be materially impaired or otherwise prevent the operation of Tenant's business. Upon the occurrence of any damage to the Premises, upon written notice within thirty (30) days of any such casualty (the **"Landlord Repair Notice"**) to Tenant from Landlord, Tenant shall assign to Landlord (or to any party designated by Landlord) all insurance proceeds payable to Tenant under Tenant's insurance required under Section 10.3 of this Lease, and Landlord shall repair any injury or damage to the Tenant Improvements and the Original Improvements installed in the Premises and shall return such Tenant Improvements and Original Improvements to their original condition; provided that if the cost of such repair by Landlord exceeds the amount of insurance proceeds received by Landlord from Tenant's insurance carrier, as assigned by Tenant, the cost of such repairs shall be paid by Tenant out of any insurance proceeds received by Tenant from Tenant's insurance carrier to Landlord prior to Landlord's commencement of repair of the damage. In the event that Landlord does not deliver the Landlord Repair Notice within sixty (60) days following the date the casualty becomes known to Landlord, Tenant shall, at its sole cost and expense, repair any injury or damage to the Tenant Improvements and the Original Improvements installed in the Premises and shall return such Tenant Improvements and Original Improvements to their original condition. If Landlord fails to deliver a Landlord Repair Notice, prior to the commencement of construction, Tenant shall submit to Landlord, for Landlord's review and approval, all plans, specifications and working drawings relating thereto,. In the event that the Premises are rendered untenantable (hereinafter defined) by fire or any other casualty, and the damage is such that Landlord cannot reasonably be expected to substantially complete the repairs which are within Landlord's obligation within 60 days after the date of the fire other casualty, then Landlord may, at Landlord's sole option, elect to to relocate Tenant, within thirty (30) days after such fire or other casualty, to a comparable space in size, design and finish-out within the Complex. Landlord shall exercise this option by providing a relocation notice (the **"Relocation Notice"**) to Tenant within ten (10) business days after any such fire or other casualty. If Landlord does not elect to relocate Tenant under those circumstances, then Tenant shall have the right to terminate this Lease by delivering written notice to Landlord within thirty (30) days after any such fire or other casualty. If Tenant does not provide Landlord with notice of Tenant's termination election in this matter and within the time period specified in the preceding sentence, then Tenant shall be deemed to have irrevocably waived its right to terminate this Lease as a result of that certain fire or other casualty. For purposes of this paragraph, the term "Untenantable" shall mean that Tenant is unable to conduct its business in the Premises in a manner reasonable comparable to that conducted immediately before the applicable occurrence or that access to the Premises has been materially impeded as a result of such occurrence. Landlord shall not be liable for any inconvenience or annoyance to Tenant or its visitors, or injury to Tenant's business resulting in any way from such damage or the repair thereof; provided however, that if such fire or other casualty shall have damaged the Premises or Common Areas necessary to Tenant's occupancy, or renders the Premises "Untenantable" as defined below, Landlord shall allow Tenant a proportionate abatement of Rent during the time and to the extent the Premises are untenantable or unfit for occupancy for the purposes permitted under this Lease, and not occupied by Tenant as a result thereof; provided, further, however, that if the damage or destruction is due to the negligence or wilful misconduct of Tenant or any of its agents, employees, contractors, invitees or guests, Tenant shall be responsible for any reasonable, applicable insurance deductible (which shall be payable to Landlord upon demand) and there shall be no rent abatement.

11.2    **Landlord's Option to Repair**. Notwithstanding the terms of Section 11.1 of this Lease, Landlord may elect not to rebuild and/or restore the Premises, Building and/or Project, and instead terminate this Lease, by notifying Tenant in writing of such termination within thirty (30) days after the date of discovery of the damage, such notice to include a termination date giving Tenant sixty (60) days to vacate the Premises, but Landlord may so elect only if the Building or Project shall be damaged by fire or other casualty or cause, whether or not the Premises are affected, and one or more of the following conditions is present: (i) in Landlord's reasonable judgment, repairs cannot reasonably be completed within ninety (90) days after the date of discovery of the damage (when such repairs are made without the payment of overtime or other premiums); (ii) the holder of any mortgage on the Building or Project or ground lessor with respect to the Building or Project shall require that the insurance proceeds or any portion thereof be used to retire the mortgage debt, or shall terminate the ground lease, as the case may be; (iii) the damage is not fully covered by Landlord's insurance policies; (excluding any deductibles paid by Landlord); or (iv) the damage occurs during the last twelve (12) months of the Lease Term.

## ARTICLE 12
## NONWAIVER

13

No provision of this Lease shall be deemed waived by either party hereto unless expressly waived in a writing signed thereby. The waiver by either party hereto of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent breach of same or any other term, covenant or condition herein contained. The subsequent acceptance of Rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular Rent so accepted, regardless, of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent. No acceptance of a lesser amount than the Rent herein stipulated shall be deemed a waiver of Landlord's right to receive the full amount due, nor shall any endorsement or statement on any check or payment or any letter accompanying such check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the full amount due. No receipt of monies by Landlord from Tenant after the termination of this Lease shall in any way alter the length of the Lease Term or of Tenant's right of possession hereunder, or after the giving of any notice shall reinstate, continue or extend the Lease Term or affect any notice given Tenant prior to the receipt of such monies, it being agreed that after the service of notice or the commencement of a suit, or after final judgment for possession of the Premises, Landlord may receive and collect any Rent due, and the payment of said Rent shall not waive or affect said notice, suit or judgment.

## ARTICLE 13
## CONDEMNATION

If the whole or any part of the Premises, Building or Project shall be taken by power of eminent domain or condemned by any competent authority for any public or quasi-public use or purpose, or if any adjacent property or street shall be so taken or condemned, or reconfigured or vacated by such authority in such manner as to require the use, reconstruction or remodeling of any part of the Premises, Building or Project, or if Landlord shall grant a deed or other instrument in lieu of such taking by eminent domain or condemnation, Landlord shall have the option to terminate this Lease effective as of the date possession is required to be surrendered to the authority. If more than five percent (5%) of the rentable square feet of the Premises is taken, or if access to the Premises is substantially impaired, in each case for a period in excess of sixty (60) days, Tenant shall have the option to terminate this Lease effective as of the date possession is required to be surrendered to the authority. Tenant shall not because of such taking assert any claim against Landlord or the authority for any compensation because of such taking and Landlord shall be entitled to the entire award or payment in connection therewith, except that Tenant shall have the right to file any separate claim available to Tenant for any taking of Tenant's personal property and fixtures belonging to Tenant and removable by Tenant upon expiration of the Lease Term pursuant to the terms of this Lease, and for moving expenses, so long as such claims do not diminish the award available to Landlord, its ground lessor with respect to the Building or Project or its mortgagee, and such claim is payable separately to Tenant. All Rent shall be apportioned as of the date of such termination. If any part of the Premises shall be taken, and this Lease shall not be so terminated, the Rent shall be proportionately abated. Notwithstanding anything to the contrary contained in this Article 13, in the event of a temporary taking of all or any portion of the Premises for a period of sixty (60) days or less, then this Lease shall not terminate but the Base Rent and the Additional Rent shall be abated for the period of such taking in proportion to the ratio that the amount of rentable square feet of the Premises taken bears to the total rentable square feet of the Premises. Landlord shall be entitled to receive the entire award made in connection with any such temporary taking.

## ARTICLE 14
## ASSIGNMENT AND SUBLETTING

14.1    Transfers. Tenant shall not, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, assign, mortgage, pledge, hypothecate, encumber, or permit any lien to attach to, or otherwise transfer, this Lease or any interest hereunder, permit any assignment, or other transfer of this Lease or any interest hereunder by operation of law, sublet the Premises or any part thereof, or enter into any license or concession agreements or otherwise permit the occupancy or use of the Premises or any part thereof by any persons other than Tenant and its employees and contractors (all of the foregoing are hereinafter sometimes referred to collectively as "Transfers" and any person to whom any Transfer is made or sought to be made is hereinafter sometimes referred to as a "Transferee"). Any Transfer made without Landlord's prior written consent shall, at Landlord's option, be null, void and of no effect, and shall, at Landlord's option, constitute a default by Tenant under this Lease. Whether or not Landlord consents to any proposed Transfer, Tenant shall pay Landlord's review and processing fees, as well as any reasonable professional fees (including, without limitation, attorneys', accountants', architects', engineers' and consultants' fees) incurred by Landlord, within thirty (30) days after written request by Landlord, all of which shall not exceed $250.00.

14.2    INTENTIONALLY OMITTED.

14

14.3    **Effect of Transfer**. If Landlord consents to a Transfer, (i) the terms and conditions of this Lease shall in no way be deemed to have been waived or modified, (ii) such consent shall not be deemed consent to any further Transfer by either Tenant or a Transferee, (iii) Tenant shall deliver to Landlord, promptly after execution, an original executed copy of all documentation pertaining to the Transfer in form reasonably acceptable to Landlord, (iv) Tenant shall furnish upon Landlord's request a complete statement, certified by an independent certified public accountant, or Tenant's chief financial officer, setting forth in detail the computation of any Transfer Premium Tenant has derived and shall derive from such Transfer, and (v) unless Landlord consents otherwise in writing, no Transfer relating to this Lease or agreement entered into with respect thereto, whether with or without Landlord's consent, shall relieve Tenant or any guarantor of the Lease from any liability under this Lease, including, without limitation, in connection with the subject space.

14.4    **INTENTIONALLY OMITTED.**

14.5    **Occurrence of Default**. Any Transfer hereunder shall be subordinate and subject to the provisions of this Lease, and if this Lease shall be terminated during the term of any Transfer, Landlord shall have the right to: (i) treat such Transfer as cancelled and repossess the subject space by any lawful means, or (ii) require that such Transferee attorn to and recognize Landlord as its landlord under any such Transfer. If Tenant shall be in default under this Lease, Landlord is hereby irrevocably authorized, as Tenant's agent and attorney-in-fact, to direct any Transferee to make all payments under or in connection with the Transfer directly to Landlord (which Landlord shall apply towards Tenant's obligations under this Lease) until such default is cured. Such Transferee shall rely on any representation by Landlord that Tenant is in default hereunder, without any need for confirmation thereof by Tenant. Upon any assignment, the assignee shall assume in writing all obligations and covenants of Tenant thereafter to be performed or observed under this Lease. No collection or acceptance of rent by Landlord from any Transferee shall be deemed a waiver of any provision of this Article 14 or the approval of any Transferee or a release of Tenant from any obligation under this Lease, whether theretofore or thereafter accruing. In no event shall Landlord's enforcement of any provision of this Lease against any Transferee be deemed a waiver of Landlord's right to enforce any term of this Lease against Tenant or any other person. If Tenant's obligations hereunder have been guaranteed, Landlord's consent to any Transfer shall not be effective unless the guarantor also consents to such Transfer.

## ARTICLE 15
## SURRENDER OF PREMISES; OWNERSHIP AND REMOVAL OF TRADE FIXTURES

15.1    **Surrender of Premises**. No act or thing done by Landlord or any agent or employee of Landlord during the Lease Term shall be deemed to constitute an acceptance by Landlord of a surrender of the Premises unless such intent is specifically acknowledged in writing by Landlord. The delivery of keys to the Premises to Landlord or any agent or employee of Landlord shall not constitute a surrender of the Premises or effect a termination of this Lease, whether or not the keys are thereafter retained by Landlord, and notwithstanding such delivery Tenant shall be entitled to the return of such keys at any reasonable time upon-request until this Lease shall have been properly terminated. The voluntary or other surrender of this Lease by Tenant, whether accepted by Landlord or not, or a mutual termination hereof, shall not work a merger, and at the option of Landlord shall operate as an assignment to Landlord of all subleases or subtenancies affecting the Premises or terminate any or all such sublessees or subtenancies.

15.2    **Removal of Tenant Property by Tenant**. Upon the expiration of the Lease Term, or upon any earlier termination of this Lease, Tenant shall, subject to the provisions of this Article 15, quit and surrender possession of the Premises to Landlord in as good order and condition as when Tenant took possession and as thereafter improved by Landlord and/or Tenant, reasonable wear and tear and repairs which are specifically made the responsibility of Landlord hereunder excepted. Upon such expiration or termination, Tenant shall, without expense to Landlord, remove or cause to be removed from the Premises all debris and rubbish, and such items of furniture, equipment, business and trade fixtures, free-standing cabinet work, movable partitions and other articles of personal property owned by Tenant or installed or placed by Tenant at its expense in the Premises, and such similar articles of any other persons claiming under Tenant, as Landlord may, in its sole discretion, require to be removed, and Tenant shall repair at its own expense all damage to the Premises and Building resulting from such removal., reasonable wear and tear excepted.

## ARTICLE 16
## HOLDING OVER

If Tenant holds over after the expiration of the Lease Term or earlier termination thereof, with or without the express or implied consent of Landlord, such tenancy shall be from month-to-month only, and shall not constitute a renewal hereof or an extension for any further term, and in such case Rent shall be payable at a monthly rate equal to the product of 110% of the greater of (i) the Rent applicable

15

during the last rental period of the Lease Term under this Lease, and (ii) the then current market rent (as determined by Landlord). Such month-to-month tenancy shall be subject to every other applicable term, covenant and agreement contained herein. For purposes of this Article 16, a holding over shall include Tenant's remaining in the Premises after the expiration or earlier termination of the Lease Term, as required pursuant to the terms of Section 8.5, above, to remove any Alterations located within the Premises and replace the same with Building Standard Tenant Improvements. Nothing contained in this Article 16 shall be construed as consent by Landlord to any holding over by Tenant, and Landlord expressly reserves the right to require Tenant to surrender possession of the Premises to Landlord as provided in this Lease upon the expiration or other termination of this Lease. The provisions of this Article 16 shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at law. If Tenant fails to surrender the Premises upon the termination or expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, costs (including reasonable attorneys' fees) and liability resulting from such failure, including, without limiting the generality of the foregoing, any claims made by any succeeding tenant founded upon such failure to surrender and any lost profits to Landlord resulting therefrom.

## ARTICLE 17
## ESTOPPEL CERTIFICATES

Within ten (10) days following a request in writing by Landlord, Tenant shall execute, acknowledge and deliver to Landlord an estoppel certificate, which, as submitted by Landlord, shall be substantially in the form of **Exhibit E**, attached hereto (or such other form as may be required by any prospective mortgagee or purchaser of the Project, or any portion thereof), indicating therein any exceptions thereto that may exist at that time, and shall also contain any other information reasonably requested by Landlord or Landlord's mortgagee or prospective mortgagee. Any such certificate may be relied upon by any prospective mortgagee or purchaser of all or any portion of the Project. Tenant shall execute and deliver whatever other instruments may be reasonably required for such purposes. At any time during the Lease Term, Landlord may require Tenant to provide Landlord with a current financial statement and financial statements of the two (2) years prior to the current financial statement year. Such statements shall be prepared in accordance with generally accepted accounting principles and, if such is the normal practice of Tenant, shall be audited by an independent certified public accountant. Failure of Tenant to timely execute, acknowledge and deliver such estoppel certificate or other instruments shall constitute an acceptance of the Premises and an acknowledgment by Tenant that statements included in the estoppel certificate are true and correct, without exception. If Tenant fails to deliver the estoppel certificate within ten (10) days following a request by Landlord, Tenant by such failure irrevocably constitutes and appoints Landlord as its special attorney-in-fact to execute and deliver the certificate to any third party.

## ARTICLE 18
## SUBORDINATION

This Lease shall be subject and subordinate to all present and future ground or underlying leases of the Building or Project and to the lien of any mortgage, trust deed or other encumbrances now or hereafter in force against the Building or Project or any part thereof, if any, and to all renewals, extensions, modifications, consolidations and replacements thereof, and to all advances made or hereafter to be made upon the security of such mortgages or trust deeds, unless the holders of such mortgages, trust deeds or other encumbrances, or the lessors under such ground lease or underlying leases, require in writing that this Lease be superior thereto. Tenant covenants and agrees in the event any proceedings are brought for the foreclosure of any such mortgage or deed in lieu thereof (or if any ground lease is terminated), to attorn, without any deductions or set-offs whatsoever, to the lienholder or purchaser or any successors thereto upon any such foreclosure sale or deed in lieu thereof (or to the ground lessor), if so requested to do so by such purchaser or lienholder or ground lessor, and to recognize such purchaser or lienholder or ground lessor as the lessor under this Lease, provided such lienholder or purchaser or ground lessor shall agree to accept this Lease and not disturb Tenant's occupancy, so long as Tenant timely pays the rent and observes and performs the terms, covenants and conditions of this Lease to be observed and performed by Tenant. Landlord's interest herein may be assigned as security at any time to any lienholder. Tenant shall, within five (5) days of request by Landlord, execute such further instruments or assurances as Landlord may reasonably deem necessary to evidence or confirm the subordination or superiority of this Lease to any such mortgages, trust deeds, ground leases or underlying leases. Tenant waives the provisions of any current or future statute, rule or law which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect this Lease and the obligations of the Tenant hereunder in the event of any foreclosure proceeding or sale. If Tenant fails to deliver such instruments or assurances within five (5) days following a request by Landlord, Tenant by such failure irrevocably constitutes and appoints Landlord as its special attorney-in-fact to execute and deliver the instruments or assurances to any third party.

## ARTICLE 19
## DEFAULTS; REMEDIES

19.1    **Events of Default.** The occurrence of any of the following shall constitute a default of this Lease by Tenant:

16

19.1.1    Any failure by Tenant to pay any Rent or any other charge required to be paid under this Lease, or any part thereof, when due, and the failure continues for ten (10) days or more after Tenant receives written notice from Landlord there of; or

19.1.2    Except where a specific time period is otherwise set forth for Tenant's performance in this Lease, in which event the failure to perform by Tenant within such time period shall be a default by Tenant under this Section 19.1.2, any failure by Tenant to observe or perform any other provision, covenant or condition of this Lease to be observed or performed by Tenant where such failure continues for ten (10) days after written notice thereof from Landlord to Tenant; provided that if the nature of such default is such that the same cannot reasonably be cured within a ten (10) day period, Tenant shall not be deemed to be in default if it diligently commences such cure within such period and thereafter diligently proceeds to rectify and cure such default, but in no event exceeding a period of time in excess of thirty (30) days after written notice thereof from Landlord to Tenant; or

19.1.3    To the extent permitted by law, a general assignment by Tenant or any guarantor of this Lease for the benefit of creditors, or the taking of any corporate action in furtherance of bankruptcy or dissolution whether or not there exists any proceeding under an insolvency or bankruptcy law, or the filing by or against Tenant or any guarantor of any proceeding under an insolvency or bankruptcy law, unless in the case of a proceeding filed against Tenant or any guarantor the same is dismissed within sixty (60) days, or the appointment of a trustee or receiver to take possession of all or substantially all of the assets of Tenant or any guarantor, unless possession is restored to Tenant or such guarantor within thirty (30) days, or any execution or other judicially authorized seizure of all or substantially all of Tenant's assets located upon the Premises or of Tenant's interest in this Lease, unless such seizure is discharged within thirty (30) days; or

19.1.4    Abandonment or vacation of all or a substantial portion of the Premises by Tenant; or

19.1.5    The failure by Tenant to observe or perform according to the provisions of Articles 5, 14, 17 or 18 of this Lease where such failure continues for more than ten (10) business days after notice from Landlord; or

19.1.6    Tenant's failure to occupy the Premises within ten (10) business days after the Lease Commencement Date. The notice periods provided herein are in lieu of, and not in addition to, any notice periods provided by law.

19.2    **Remedies Upon Default**. Upon the occurrence of any event of default by Tenant, Landlord shall have, in addition to any other remedies available to Landlord at law or in equity (all of which remedies shall be distinct, separate and cumulative), the option to pursue any one or more of the following remedies, each and all of which shall be cumulative and nonexclusive, without any notice or demand whatsoever.

19.2.1    Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, without being liable for prosecution or any claim or damages therefor; and Landlord may recover from Tenant the following:

(i)    The worth at the time of any unpaid rent which has been earned at the time of such termination; plus

(ii)    The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(iii)    The worth at the time of award of the amount by which the unpaid rent for the balance of the Lease Term after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(iv)    Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, specifically including but not limited to, any free rent or other concessions provided to Tenant, brokerage commissions and advertising expenses incurred, expenses of remodeling the Premises or any portion thereof for a new tenant, whether for the same or a different use, and any special concessions (including free rent) made to obtain a new tenant; and

(v)    At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

17

The term **"rent"** as used in this Section 19.2 shall be deemed to be and to mean all sums of every nature required to be paid by Tenant pursuant to the terms of this Lease, whether to Landlord or to others. As used in Paragraphs 19.2.1 (i) and (ii), above, the "worth at the time of award" shall be computed by allowing interest at the rate set forth in Article 25 of this Lease, but in no case greater than the maximum amount of such interest permitted by law. As used in Paragraph 19.2.1(iii) above, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

     19.2.2    If Landlord does not elect to terminate this Lease on account of any default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all rent as it becomes due. In such case, Landlord shall make reasonable attempts to relet the Premises, in which case Tenant shall pay any unpaid and accrued Rent, less all amounts received by Landlord as a result of such reletting.

     19.2.3    Landlord shall at all times have the rights and remedies (which shall be cumulative with each other and cumulative and in addition to those rights and remedies available under Sections 19.2.1 and 19.2.2, above, or any law or other provision of this Lease), without prior demand or notice except as required by applicable law, to seek any declaratory, injunctive or other equitable relief, and specifically enforce this Lease, or restrain or enjoin a violation or breach of any provision hereof.

     19.3    **Subleases of Tenant**. Whether or not Landlord elects to terminate this Lease on account of any default by Tenant, as set forth in this Article 19, Landlord shall have the right to terminate any and all subleases, licenses, concessions or other consensual arrangements for possession entered into by Tenant and affecting the Premises or may, in Landlord's sole discretion, succeed to Tenant's interest in such subleases, licenses, concessions or arrangements. In the event of Landlord's election to succeed to Tenant's interest in any such subleases, licenses, concessions or arrangements, Tenant shall, as of the date of notice by Landlord of such election, have no further right to or interest in the rent or other consideration receivable thereunder.

     19.4    **Form of Payment After Default**. Following the occurrence of an event of default by Tenant, Landlord shall have the right to require that any or all subsequent amounts paid by Tenant to Landlord hereunder, whether to cure the default in question or otherwise, be paid in the form of cash, money order, cashier's or certified check drawn on an institution acceptable to Landlord, or by other means approved by Landlord, notwithstanding any prior practice of accepting payments in any different form.

     19.5            **Efforts to Relet**. No re-entry or repossession, repairs, maintenance, changes, alterations and additions, reletting, appointment of a receiver to protect Landlord's interests hereunder, or any other action or omission by Landlord shall be construed as an election by Landlord to terminate this Lease or Tenant's right to possession, or to accept a surrender of the Premises, nor shall same operate to release Tenant in whole or in part from any of Tenant's obligations hereunder, unless express written notice of such intention is sent by Landlord to Tenant. Tenant hereby irrevocably waives any right other-wise available under any law to redeem or reinstate this Lease.

**ARTICLE 20**
**COVENANT OF QUIET ENJOYMENT**

     Landlord covenants that Tenant, on paying the Rent, charges for services and other payments herein reserved and on keeping, observing and performing all the other terms, covenants, conditions, provisions and agreements herein contained on the part of Tenant to be kept, observed and performed, shall, during the Lease Term, peaceably and quietly have, hold and enjoy the Premises subject to the terms, covenants, conditions, provisions and agreements hereof without interference by any persons lawfully claiming by or through Landlord. The foregoing covenant is in lieu of any other covenant express or implied.

**ARTICLE 21**
**SECURITY DEPOSIT**

     Concurrent with Tenant's execution of this Lease, Tenant shall deposit with Landlord a security deposit (the **"Security Deposit"**) in the amount set forth in Section 8 of the Summary, as security for the faithful performance by Tenant of all of its obligations under this Lease. If Tenant defaults with respect to any provisions of this Lease, including, but not limited to, the provisions relating to the payment of Rent, the removal of property and the repair of resultant damage, Landlord may, without notice to Tenant, but shall not be required to apply all or any part of the Security Deposit for the payment of any Rent or any other sum in default and Tenant shall, upon demand therefor, restore the Security Deposit to its original amount. Any unapplied portion of the Security Deposit shall be returned to Tenant, or, at

18

Landlord's option, to the last assignee of Tenant's interest hereunder, within thirty (30) days following the expiration of the Lease Term. Tenant shall not be entitled to any interest on the Security Deposit.

## ARTICLE 22
## SUBSTITUTION OF OTHER PREMISES

Landlord shall have the right to move Tenant to other space in the Project equal to the Premises, in design, finish-out, space and view, and all terms hereof shall apply to the new space with equal force. In such event, Landlord shall give Tenant prior notice, shall provide Tenant, at Landlord's sole cost and expense, with tenant improvements at least equal in quality to those in the Premises and shall move Tenant's effects to the new space and pay all transfer cabling, phone an computer costs at Landlord's sole cost and expense at such time and in such manner as to inconvenience Tenant as little as reasonably practicable, as well as pay for the cost of Tenant letterhead and stationery changes equal to a sixty (60) day supply. Simultaneously with such relocation of the Premises, the parties shall immediately execute an amendment to this Lease stating the relocation of the Premises.

## ARTICLE 23
## SIGNS

23.1    Subject to Landlord's prior written approval, in its sole discretion, and provided all signs are in keeping with the quality, design and style of the Building and Project, Tenant, if the Premises comprise an entire floor of the Building, at its sole cost and expense, may install identification signage anywhere in the Premises.

23.2    **INTENTIONALL OMMITTED.**

23.3    **Prohibited Signage and Other Items.** Any signs, notices, logos, pictures, names or advertisements which are installed and that have not been separately approved by Landlord may be removed without notice by Landlord at the sole expense of Tenant. Tenant may not install any signs on the exterior or roof of the Project or the Common Areas. Any signs, window coverings, or blinds (even if the same are located behind the Landlord-approved window coverings for the Building), or other items visible from the exterior of the Premises or Building, shall be subject to the prior approval of Landlord, in its sole discretion.

## ARTICLE 24
## COMPLIANCE WITH LAW

Tenant shall not do anything or suffer anything to be done in or about the Premises or the Project which will in any way conflict with any law, statute, ordinance or other governmental rule, regulation or requirement now in force or which may hereafter be enacted or promulgated. At its sole cost and expense, Tenant shall promptly comply with all such governmental measures. Should any standard or regulation now or hereafter be imposed on Landlord or Tenant by a state, federal or local governmental body charged with the establishment, regulation and enforcement of occupational, health or safety standards for employers, employee's, landlords or tenants, then Tenant agrees, at its sole cost and expense, to comply promptly with such standards or regulations. Tenant shall be responsible, at its sole cost and expense, to make all alterations to the Premises as are required to comply with the governmental rules, regulations, requirements or standards described in this Article 24. The judgment of any court of competent jurisdiction or the admission of Tenant in any judicial action, regardless of whether Landlord is a party thereto, that Tenant has violated any of said governmental measures, shall be conclusive of that fact as between Landlord and Tenant.

## ARTICLE 25
## LATE CHARGES

If any installment of Rent or any other sum due from Tenant shall not be received by Landlord or Landlord's designee within ten (10) business days after said amount is due, then Tenant shall pay to Landlord a late charge equal to five percent (5%) of the overdue amount plus any attorneys' fees incurred by Landlord by reason of Tenant's failure to pay Rent and/or other charges when due hereunder. The late charge shall be deemed Additional Rent and the right to require it shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner. In addition to the late charge described above, any Rent or other amounts owing hereunder which are not paid within fifteen (15) days after the date they are due shall bear interest from the date when due until paid at a rate per annum equal to the annual **"Bank Prime Loan"** rate cited in the Federal Reserve Statistical Release Publication G.13(415), published on the first Tuesday of each calendar month (or such other comparable index as Landlord and Tenant shall reasonably agree upon if such rate ceases to be published) plus four (4) percentage points.

19

## ARTICLE 26
## LANDLORD'S RIGHT TO CURE DEFAULT; PAYMENTS BY TENANT

26.1    **Landlord's Cure**. All covenants and agreements to be kept or performed by Tenant under this Lease shall be performed by Tenant at Tenant's sole cost and expense and without any reduction of Rent, except to the extent, if any, otherwise expressly provided herein. If Tenant shall fail to perform any obligation under this Lease, and such failure shall continue in excess of the time allowed under Section 19.1.2, above, unless a specific time period is otherwise stated in this Lease, Landlord may, but shall not be obligated to, make any such payment or perform any such act on Tenant's part without waiving its rights based upon any default of Tenant and without releasing Tenant from any obligations hereunder.

26.2    **Tenant's Reimbursement**. Except as may be specifically provided to the contrary in this Lease, Tenant shall pay to Landlord, upon delivery by Landlord to Tenant of statements therefor: (i) sums equal to expenditures reasonably made and obligations incurred by Landlord in connection with the remedying by Landlord of Tenant's defaults pursuant to the provisions of Section 26.1; (ii) sums equal to all losses, costs, liabilities, damages and expenses referred to in Article 10 of this Lease; and (iii) sums equal to all expenditures made and obligations incurred by Landlord in collecting or attempting to collect the Rent beyond the due date and any applicable notice and cure periods or in enforcing or attempting to enforce any rights of Landlord under this Lease or pursuant to law, including, without limitation, all legal fees and other amounts so expended. Tenant's obligations under this Section 26.2 shall survive the expiration or sooner termination of the Lease Term.

## ARTICLE 27
## ENTRY BY LANDLORD

Landlord reserves the right at all reasonable times and upon reasonable notice to Tenant of not less than twenty-four (24) hours (except in the case of an emergency) to enter the Premises to (i) inspect them; (ii) show the Premises to prospective purchasers, mortgagees or tenants, or to current or prospective mortgagees, ground or underlying lessors or insurers; (iii) alter, improve or repair the Premises or the Building, or for structural alterations, repairs or improvements to the Building or the Building's systems and equipment. Notwithstanding anything to the contrary contained in this Article 27, Landlord may enter the Premises at any time to (A) perform services required of Landlord, including janitorial service; (B) take possession due to any breach of this Lease in the manner provided herein; and (C) perform any covenants of Tenant which Tenant fails to perform. Landlord may make any such entries without the abatement of Rent and may take such reasonable steps as required to accomplish the stated purposes. Tenant hereby waives any claims for damages or for any injuries or inconvenience to or interference with Tenant's business, lost profits, any loss of occupancy or quiet enjoyment of the Premises, and any other loss occasioned thereby, unless such entry is associated with the Premises being Untenantable for any reason, then in such case, Tenant shall be entitled to an equitable abatement of rent for any period of time beyond three (3) business days that the Premises are Untentable. For each of the above purposes, Landlord shall at all times have a key with which to unlock all the doors in the Premises, excluding Tenant's vaults, safes and special security areas designated in advance by Tenant. In an emergency, Landlord shall have the right to use any means that Landlord may deem proper to open the doors in and to the Premises. Any entry into the Premises by Landlord in the manner hereinbefore described shall not be deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or an actual or constructive eviction of Tenant from any portion of the Premises. No provision of this Lease shall be construed as obligating Landlord to perform any repairs' alterations or decorations except as otherwise expressly agreed to be performed by Landlord herein.

## ARTICLE 28
## TENANT PARKING

28.1    **Tenant Parking**. Landlord shall maintain, or caused to be maintained, an automobile parking area within the Project for the benefit and use of the visitors and patrons and employees of Tenant, and other tenants and occupants of the Project, subject to all conditions and restrictions set forth in the CC&Rs, Rules and Regulations and other instruments pertaining to the Project parking facility. Tenant shall be allotted the number of parking spaces (**Parking Allocation**) in the Project parking facility as set forth in Section 2.4 of the Summary.

28.2    **Other Terms**. Landlord specifically reserves the right to change the size, configuration, design, layout and all other aspects of the Project parking facility at any time and Tenant acknowledges and agrees that Landlord may, without incurring any liability to Tenant and without any abatement of Rent under this Lease, from time to time, close-off or restrict access to the Project parking facility for purposes of permitting or facilitating any such construction, alteration or improvements, provided that Landlord provides reasonable alternative parking for Tenant and its invitees. Landlord may delegate its responsibilities hereunder to a parking operator in which case such parking operator shall have all the rights of control attributed hereby to the Landlord. The parking spaces provided to Tenant pursuant to

20

this Article 28 are provided to Tenant solely for use by Tenant's own personnel and such spaces may not be transferred, assigned, subleased or otherwise alienated by Tenant without Landlord's prior approval.

28.3    **Parking Procedures**. The number of parking spaces initially allotted to Tenant will not be separately identified; however, Landlord reserves the right in its sole and absolute discretion to separately identify by signs or other markings the area to which Tenant's parking spaces relate. Landlord shall have no obligation to monitor the use of such parking facility, nor shall Landlord be responsible for any loss or damage to any vehicle or other property or for any injury to any person. Tenant's parking spaces shall be used only for parking of automobiles no larger than full size passenger automobiles, sport utility vehicles or pick-up trucks. Tenant shall comply with all rules and regulations which may be adopted by Landlord from time to time with respect to parking and/or the parking facilities servicing the Project. Tenant shall not have the exclusive right to use any specific parking space. If Landlord grants to any other tenant the exclusive right to use any particular parking space(s), Tenant shall not use such spaces. All trucks (other than pick-up trucks) and delivery vehicles shall be (i) parked at the loading dock of the Building, (ii) loaded and unloaded in a manner which does not interfere with the businesses of other occupants of the Project, and (iii) permitted to remain on the Project only so long as is reasonably necessary to complete loading and unloading. In the event Landlord elects in its sole and absolute discretion or is required by any law to limit or control parking, Tenant agrees to participate in such validation or assessment program under such reasonable rules and regulations as are from time to time established by Landlord.

## ARTICLE 29
## MISCELLANEOUS PROVISIONS

29.1    **Terms; Captions**. The words "Landlord" and "Tenant" as used herein shall include the plural as well as the singular. The necessary grammatical changes required to make the provisions hereof apply either to corporations or partnerships or individuals, men or women, as the case may require, shall in all cases be assumed as though in each case fully expressed. The captions of Articles and Sections are for convenience only and shall not be deemed to limit, construe, affect or alter the meaning of such Articles and Sections.

29.2    **Binding Effect**. Subject to all other provisions of this Lease, each of the covenants, conditions and provisions of this Lease shall extend to and shall, as the case may require, bind or inure to the benefit not only of Landlord and of Tenant, but also of their respective heirs, personal representatives, successors or assigns, provided this clause shall not permit any assignment by Tenant contrary to the provisions of Article 14 of this Lease.

29.3    **No Air Rights**. No rights to any view or to light or air over any property, whether belonging to Landlord or any other person, are granted to Tenant by this Lease. If at any time any windows of the Premises are temporarily darkened or the light or view therefrom is obstructed by reason of any repairs, improvements, maintenance or cleaning in or about the Project, the same shall be without liability to Landlord and without any reduction or diminution of Tenant's obligations under this Lease.

29.4    **Modification of Lease**. Should any current or prospective mortgagee or ground lessor for the Building or Project require a modification of this Lease, which modification will not cause an increased cost or expense to Tenant or in any other way materially and adversely change the rights and obligations of Tenant hereunder, then and in such event, Tenant agrees that this Lease may be so modified and agrees to execute whatever documents are reasonably required therefore and to deliver the same to Landlord within ten (10) days following a request therefor. At the request of Landlord or any mortgagee or ground lessor, Tenant agrees to execute a short form of Lease and deliver the same to Landlord within ten (10) days following the request therefore.

29.5    **Transfer of Landlord's Interest**. Tenant acknowledges that Landlord has the right to transfer all or any portion of its interest in the Project or Building and in this Lease, and Tenant agrees that in the event of any such transfer, Landlord shall automatically be released from all liability under this Lease, provided that any transferee agrees in writing to be bound by the terms and conditions of this Agreement, and Tenant agrees to look solely to such transferee for the performance of Landlord's obligations hereunder after the date of transfer and such transferee shall be deemed to have fully assumed and be liable for all obligations of this Lease to be performed by Landlord, including the return of any Security Deposit, and Tenant shall attorn to such transferee. Tenant further acknowledges that Landlord may assign its interest in this Lease to a mortgage lender as additional security and agrees that such an assignment shall not release Landlord from its obligations hereunder and that Tenant shall continue to look to Landlord for the performance of its obligations hereunder.

21

29.6    **Prohibition Against Recording**. Except as provided in Section 29.4 of this Lease, neither this Lease, nor any memorandum, affidavit or other writing with respect thereto, shall be recorded by Tenant or by anyone acting through, under or on behalf of Tenant.

29.7    **Landlord's Title**. Landlord's title is and always shall be paramount to the title of Tenant. Nothing herein contained shall empower Tenant to do any act which can, shall or may encumber the title of Landlord.

29.8    **Relationship of Parties**. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venturer or any association between Landlord and Tenant.

29.9    **Application of Payments**. Landlord shall have the right to apply payments received from Tenant pursuant to this Lease, regardless of Tenant's designation of such payments, to satisfy any obligations of Tenant hereunder, in such order and amounts as Landlord, in its sole discretion, may elect.

29.10    **Time of Essence**. Time is of the essence with respect to the performance of every provision of this Lease in which time of performance is a factor.

29.11    **Partial Invalidity**. If any term, provision or condition contained in this Lease shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, provision or condition to persons or circumstances other than those with respect to which it is invalid or unenforceable, shall not be affected thereby, and each and every other term, provision and condition of this Lease shall be valid and enforceable to the fullest extent possible permitted by law.

29.12    **No Warranty**. In executing and delivering this Lease, Tenant has not relied on any representations, including, but not limited to, any representation as to the amount of any item comprising Additional Rent or the amount of the Additional Rent in the aggregate or that Landlord is furnishing the same services to other tenants, at all, on the same level or on the same basis, or any warranty or any statement of Landlord which is not set forth herein or in one or more of the exhibits attached hereto.

29.13    **Landlord Exculpation**. The liability of Landlord or the Landlord Parties to Tenant for any default by Landlord under this Lease or arising in connection herewith or with Landlord's operation, management, leasing, repair, renovation, alteration or any other matter relating to the Project or the Premises shall be limited solely and exclusively to an amount which is equal to the lesser of (a) the interest of Landlord in the Building or (b) the equity interest Landlord would have in the Building if the Building were encumbered by third-party debt in an amount equal to ninety percent (90%) of the value of the Building (as such value is determined by a certified appraisal commissioned and paid for by Landlord), provided that in no event shall such liability extend to any sales or insurance proceeds received by Landlord or the Landlord Parties in connection with the Project, Building or Premises. Neither Landlord, nor any of the Landlord Parties shall have any personal liability therefor, and Tenant hereby expressly waives and releases such personal liability on behalf of itself and all persons claiming by, through or under Tenant. The limitations of liability contained in this Section 29.13 shall inure to the benefit of Landlord's and the Landlord Parties' present and future partners, beneficiaries, officers, directors, trustees, shareholders, agents and employees, and their respective partners, heirs, successors and assigns. Under no circumstances shall any present or future partner of Landlord (if Landlord is a partnership), or trustee or beneficiary (if Landlord or any partner of Landlord is a trust), have any liability for the performance of Landlord's obligations under this Lease. Notwithstanding any contrary provision herein, neither Landlord nor the Landlord Parties shall be liable under any circumstances for injury or damage to, or interference with, Tenant's business, including but not limited to, loss of profits, loss of rents or other revenues, loss of business opportunity, loss of goodwill or loss of use, in each case, however occurring.

29.14    **Entire Agreement**. It is understood and acknowledged that there are no oral agreements between the parties hereto affecting this Lease and this Lease constitutes the parties' entire agreement with respect to the leasing of the Premises and supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements and understandings, if any, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease. None of the terms, covenants, conditions or provisions of this Lease can be modified, deleted or added to except in writing signed by the parties hereto.

29.15    **Right to Lease**. Landlord reserves the absolute right to effect such other tenancies in the Project as Landlord in the exercise of its sole business judgment shall determine to best promote the interests of the Building or Project. Tenant does not rely on the fact, nor does Landlord represent, that any specific tenant or type or number of tenants shall, during the Lease Term, occupy any space in the Building or Project.

22

29.16    **Force Majeure**. Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain services, labor, or materials or reasonable substitutes therefor, governmental actions, civil commotions, fire or other casualty, and other causes beyond the reasonable control of the party obligated to perform, except with respect to the obligations imposed with regard to Rent and other charges to be paid by Tenant pursuant to this Lease and except as to Tenant's obligations under Articles 5 and 24 of this Lease (collectively, a **"Force Majeure"**), notwithstanding anything to the contrary contained in this Lease, shall excuse the performance of such party for a period equal to any such prevention, delay or stoppage and, therefore, if this Lease specifies a time period for performance of an obligation of either party, that time period shall be extended by the period of any delay in such party's performance caused by a Force Majeure.

29.17    **Waiver of Redemption by Tenant**. Tenant hereby waives, for Tenant and for all those claiming under Tenant, any and all rights now or hereafter existing to redeem by order or judgment of any court or by any legal process or writ, Tenant's right of occupancy of the Premises after any termination of this Lease.

29.18    **Notices**. All notices, demands, statements, designations, approvals or other communications (collectively, **"Notices"**) given or required to be given by either party to the other hereunder or by law shall be in writing, shall be (A) sent by United States certified or registered mail, postage prepaid, return receipt requested (**"Mail"**), (B) transmitted by telecopy, if such telecopy is promptly followed by a Notice sent by Mail, (C) delivered by a nationally recognized overnight courier, or (D) delivered personally. Any Notice shall be sent, transmitted, or delivered, as the case may be, to Tenant at the appropriate address set forth in Section 10 of the Summary, or to such other place as Tenant may from time to time designate in a Notice to Landlord, or to Landlord at the addresses set forth below, or to such other places as Landlord may from time to time designate in a Notice to Tenant. Any Notice will be deemed given (i) three (3) days after the date it is posted if sent by Mail, (ii) the date the telecopy is transmitted, (iii) the date the overnight courier delivery is made, or (iv) the date personal delivery is made or attempted to be made. If Tenant is notified of the identity and address of Landlord's mortgagee or ground or underlying lessor, Tenant shall give to such mortgagee or ground or underlying lessor written notice of any default by Landlord under the terms of this Lease by registered or certified mail, and such mortgagee or ground or underlying lessor shall be given a reasonable opportunity to cure such default prior to Tenant's exercising any remedy available to Tenant. As of the date of this Lease, any Notices to Landlord must be sent, transmitted, or delivered, as the case may be, to the following addresses:

> Tanamera Corporate Center, LLC
> 9460 Double R Boulevard, Suite 200
> Reno, NV 89521
> Attention: Kreg D. Rowe
>
> and
>
> Double Diamond Management
> 5480 Reno Corporate Drive, Suite 100
> Reno, NV 89521
> Attention: Rick Gardner

29.19    **Joint and Several**. If there is more than one Tenant, the obligations imposed upon Tenant under this Lease shall be joint and several.

29.20    **Authority**. If Tenant is a corporation, trust or partnership, each individual executing this Lease on behalf of Tenant hereby represents and warrants that Tenant is a duly formed and existing entity qualified to do business in Nevada and that Tenant has full right and authority to execute and deliver this Lease and that each person signing on behalf of Tenant is authorized to do so. In such event, Tenant shall, within ten (10) days after execution of this Lease, deliver to Landlord satisfactory evidence of such authority and, if a corporation, upon demand by Landlord, also deliver to Landlord satisfactory evidence of (i) good standing in Tenant's state of incorporation and (ii) qualification to do business in Nevada.

29.21    **Attorneys' Fees**. In the event that either Landlord or Tenant should bring suit for the possession of the Premises, for the recovery of any sum due under this Lease, or because of the breach of any provision of this Lease or for any other relief against the other, then all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party therein shall be paid by the other party, which obligation on the part of the other party shall be deemed to have accrued on the date of the commencement of such action and shall be enforceable whether or not the action is prosecuted to judgment.

29.22    **Governing Law; WAIVER OF TRIAL BY JURY**. This Lease shall be construed and enforced in accordance with the laws of the State of Nevada. IN ANY ACTION OR PROCEEDING ARISING HEREFROM, LANDLORD AND TENANT HEREBY CONSENT TO (I) THE JURISDICTION OF ANY COMPETENT COURT WITHIN THE STATE OF NEVADA, (II) SERVICE OF PROCESS BY ANY MEANS AUTHORIZED BY NEVADA LAW, AND (III) IN THE INTEREST OF SAVING TIME AND EXPENSE, TRIAL WITHOUT A JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR THEIR SUCCESSORS IN RESPECT OF ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. IN THE EVENT LANDLORD COMMENCES ANY SUMMARY PROCEEDINGS OR ACTION FOR NONPAYMENT OF BASE RENT OR ADDITIONAL RENT, TENANT SHALL NOT INTERPOSE ANY COUNTERCLAIM OF ANY NATURE OR DESCRIPTION (UNLESS SUCH COUNTERCLAIM SHALL BE MANDATORY) IN ANY SUCH PROCEEDING OR ACTION, BUT SHALL BE RELEGATED TO AN INDEPENDENT ACTION AT LAW.

29.23    **Submission of Lease**. Submission of this instrument for examination or signature by Tenant does not constitute a reservation of, option for or option to lease, and it is not effective as a lease or otherwise until execution and delivery by both Landlord and Tenant.

29.24    **Brokers**. Landlord and Tenant hereby warrant to each other that they have had no dealings with any real estate broker or agent in connection with the negotiation of this Lease, excepting only the real estate brokers or agents specified in Section 12 of the Summary (the **"Brokers"**), and that they know of no other real estate broker or agent who is entitled to a commission in connection with this Lease. Each party agrees to indemnify and defend the other party against and hold the other party harmless from any and all claims, demands, losses, liabilities, lawsuits, judgments, costs and expenses (including without limitation reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing on account of any dealings with any real estate broker or agent, other than the Brokers, occurring by, through, or under the indemnifying party.

29.25    **Independent Covenants**. This Lease shall be construed as though the covenants herein between Landlord and Tenant are independent and not dependent and Tenant hereby expressly waives the benefit of any statute to the contrary and agrees that if Landlord fails to perform its obligations set forth herein, Tenant shall not be entitled to make any repairs or perform any acts hereunder at Landlord's expense or to any setoff of the Rent or other amounts owing hereunder against Landlord.

29.26    **Project or Building Name and Signage**. Landlord shall have the right at any time to change the name of the Project or Building and to install, affix and maintain any and all signs on the exterior and on the interior of the Project or Building as Landlord may, in Landlord's sole discretion, desire. Tenant shall not use the name of the Project or Building or use pictures or illustrations of the Project or Building in advertising or other publicity or for any purpose other than as the address of the business to be conducted by Tenant in the Premises, without the prior written consent of Landlord.

29.27    **Counterparts**. This Lease may be executed in counterparts with the same effect as if both parties hereto had executed the same document. Both counterparts shall be construed together and shall constitute a single lease.

29.28    **Confidentiality**. Tenant acknowledges that the content of this Lease and any related documents are confidential information. Tenant shall keep such confidential information strictly confidential and shall not disclose such confidential information to any person or entity other than Tenant's financial, legal, and space planning consultants.

29.29    **Transportation Management**. Tenant shall fully comply with all present or future programs intended to manage parking, transportation or traffic in and around the Building, and in connection therewith, Tenant shall take responsible action for the transportation planning and management of all employees located at the Premises by working directly with Landlord, any governmental transportation management organization or any other transportation-related committees or entities.

29.30    **Building Renovations**. It is specifically understood and agreed that Landlord has made no representation or warranty to Tenant and has no obligation and has made no promises to alter, remodel, improve, renovate, repair or decorate the Premises, Building, or any part thereof and that no representations respecting the condition of the Premises or the Building have been made by Landlord to Tenant except as specifically set forth herein or in the Tenant Work Letter. However, Tenant hereby acknowledges that Landlord is currently renovating or may during the Lease Term renovate, improve, alter, or modify (collectively, the **"Renovations"**) the Project, the Building and/or the Premises including without limitation the parking structure, common areas, systems and equipment, roof, and structural portions of the same, which Renovations may include, without limitation, (i) installing sprinklers in the Building common areas and tenant spaces,

(ii) modifying the common areas and tenant spaces to comply with applicable laws and regulations, including regulations relating to the physically disabled, seismic conditions,, and building safety and security, and (iii) installing new floor covering, lighting, and wall coverings in the Building common areas, and in connection with any Renovations, Landlord may, among other things, erect scaffolding or other necessary structures in the Building, limit or eliminate access to portions of the Project, including portions of the common areas, or perform work in the Building, which work may create noise, dust or leave debris in the Building. Tenant hereby agrees that such Renovations and Landlord's actions in connection with such Renovations shall in no way constitute a constructive eviction of Tenant nor entitle Tenant to any abatement of Rent. Landlord shall have no responsibility or for any reason be liable to Tenant for any direct or indirect injury to or interference with Tenant's business arising from the Renovations, nor shall Tenant be entitled to any compensation or damages from Landlord for loss of the use of the whole or any part of the Premises or of Tenant's personal property or improvements resulting from the Renovations or Landlord's actions in connection with such Renovations, or for any inconvenience or annoyance occasioned by such Renovations or Landlord's actions; provided that, in the event any Renovations cause the Premises to be Untenantable for three (3) days or more, Tenant shall be entitled to an equitable abatement of Rent until the Premises are restored to their state of existence prior to becoming Untenantable.

29.31    **No Violation**. Tenant hereby warrants and represents that neither its execution of nor performance under this Lease shall cause Tenant to be in violation of any agreement, instrument, contract, law, rule or regulation by which Tenant is bound, and Tenant shall protect, defend, indemnify and hold Landlord harmless against any claims, demands, losses, damages, liabilities, costs and expenses, including, without limitation, reasonable attorneys' fees and costs, arising from Tenant's breach of this warranty and representation.

29.32    **INTENTIONALLY OMMITTED**

29.33    **Development of the Project**.

29.33.1    **Subdivision**. Landlord reserves the right to further subdivide all or a portion of the Project. Tenant agrees to execute and deliver, upon demand by Landlord and in the form requested by Landlord, any additional documents needed to conform this Lease to the circumstances resulting from such subdivision.

29.33.2    **The Other Improvements**. If portions of the Project or property adjacent to the Project (collectively, the "Other Improvements") are owned by an entity other than Landlord, Landlord, at its option, may enter into an agreement with the owner or owners of any or all of the Other Improvements to provide (i) for reciprocal rights of access and/or use of the Project and the Other Improvements, (ii) for the common management, operation, maintenance, improvement and/or repair of all or any portion of the Project and the Other Improvements, (iii) for the allocation of a portion of the Direct Expenses to the Other Improvements and the operating expenses and taxes for the Other Improvements to the Project, and (iv) for the use or improvement of the Other Improvements and/or the Project in connection with the improvement, construction, and/or excavation of the Other Improvements and/or the Project. Nothing contained herein shall be deemed or construed to limit or otherwise affect Landlord's right to convey all or any portion of the Project or any other of Landlord's rights described in this Lease.

29.33.3    **Construction of Project and Other Improvements**. Tenant acknowledges that portions of the Project and/or the Other Improvements may be under construction following Tenant's occupancy of the Premises, and that such construction may result in levels of noise, dust, obstruction of access, etc. which are in excess of that present in a fully constructed project. Tenant hereby waives any and all rent offsets or claims of constructive eviction which may arise in connection with such construction.

29.34    **Office and Communications Services**.

29.34.1    **The Provider**. Landlord has advised Tenant that certain office and communications services may be offered to tenants of the Building by a concessionaire under contract to Landlord ("Provider"). Tenant shall be permitted to contract with Provider for the provision of any or all of such services on such terms and conditions as Tenant and Provider may agree.

29.34.2    **Other Terms**. Tenant acknowledges and agrees that: (i) Landlord has made no warranty or representation to Tenant with respect to the availability of any such services, or the quality, reliability or suitability thereof, (ii) the Provider is not acting as the agent or representative of Landlord in the provision of such services, and Landlord shall have no liability or responsibility for any failure or inadequacy of any such services, or any equipment or facilities used in the furnishing thereof, or any act or omission of Provider, or its agents, employees, representatives, officers or contractors; (iii) Landlord shall have no responsibility or liability for the installation, alteration, repair, maintenance, furnishing, operation, adjustment or removal of any such services, equipment or facilities; and (iv) any contract or

25

other agreement between Tenant and Provider shall be independent of this Lease, the obligations of Tenant hereunder, and the rights of Landlord hereunder, and, without limiting the foregoing, no default or failure of Provider with respect to any such services, equipment or facilities, or under any contract or agreement relating thereto, shall have any effect on this Lease or give to Tenant any offset or defense to the full and timely performance of its obligations hereunder, or entitle Tenant to any abatement of rent or additional rent or any other payment required to be made by Tenant hereunder, or constitute any accrual or constructive eviction of Tenant, or otherwise give rise to any other claim of any nature against Landlord.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be execute the day and date first above written.

"Landlord":                                                    "Tenant":
Tanamera Corporate Center, LLC                    USA Commercial Mortgage, Inc.
a Nevada limited liability company                   a Nevada Corporation
By: DOH Financial Group As Manager

By: _____              By: _____

Its: President _____              Its: _____

Date: 3 16·05 _____              Date: _____


                                                              By: _____

                                                              Its: _____

                                                              Date: _____

26

**EXHIBIT A**
**TANAMERA CORPORATE CENTER**
**SITE PLAN/BUILDING LAYOUT**





**EXHIBIT B**

**TANAMERA CORPORATE CENTER**

**TENANT WORK LETTER**

**[TO BE PROVIDED FOLLOWING FINAL SPACE PLAN & INTERIOR BUDGET]**

**EXHIBIT C**

**TANAMERA CORPORATE CENTER**

**NOTICE OF LEASE TERM DATES**

To:     USA Commercial Mortgage

Re:     Office Lease dated March 16, 2005 between Tanamera Corporate Center, LLC ("Landlord"), and USA Commercial Mortgage, Inc. ("Tenant") concerning the office building located at 5488 Reno Corporate Drive Suite 100, Reno, Nevada 89511 (Bldg # 6 in the Tanamera Corporate Center)

In accordance with the Office Lease (the "Lease"), we wish to advise you and/or confirm as follows:

1.      The Lease Term shall commence on November 14, 2005 for a term of 60 months ending on November 13, 2010.

2.      Rent shall commence to accrue on November 14, 2005 in the amount of $4,762.92.

3.      If the Lease Commencement Date is other than the first day of the month, the first billing will contain a pro rata adjustment. Each billing thereafter, with the exception of the final billing, shall be for the full amount of the monthly installment as provided for in the Lease.

4.      Your rent checks should be made payable to (**TBD**).

5.      The exact number of rentable / usable square feet within the Premises is 2,149 / 2,149 square feet, respectively.

6.      Tenant's Share as adjusted based upon the exact number of usable square feet within the Premises is 51%.

**AGREED AND ACCEPTED:**

"Landlord":
Tanamera Corporate Center, LLC
a Nevada limited liability company
By: DDH Financial Corp as Manager

By: _____

Its: President
Date: ___11/18/05___

"Tenant":
USA Commercial Mortgage, Inc.
a Nevada Corporation

By: _____

Its: President
Date: ___11-17-05___

## EXHIBIT D

## TANAMERA CORPORATE CENTER

## RULES AND REGULATIONS

Tenant shall faithfully observe and comply with the following Rules and Regulations. Landlord shall not be responsible to Tenant for the nonperformance of any of said Rules and Regulations by or otherwise with respect to the acts or omissions of any other tenants or occupants of the Project. In the event of any conflict between the Rules and Regulations and the other provisions of this Lease, the latter shall control.

1.    Tenant shall not alter any lock or install any new or additional locks or bolts on any doors or windows of the Premises without obtaining Landlord's prior written consent ' Tenant shall bear the cost of any lock changes or repairs required by Tenant. Two keys will be furnished by Landlord for the Premises, and any additional keys required by Tenant must be obtained from Landlord at a reasonable cost to be established by Landlord. Upon the termination of this Lease, Tenant shall restore to Landlord all keys of stores, offices, and toilet rooms, either furnished to, or otherwise procured by, Tenant and in the event of the loss of keys so furnished, Tenant shall pay to Landlord the cost of replacing same or of changing the lock or locks opened by such lost key if Landlord shall deem it necessary to make such changes.

2.    All doors opening to public corridors shall be kept closed at all times except for normal ingress and egress to the Premises.

3.    Tenant, its employees and agents must be sure that the doors to the Building are securely closed and locked when leaving the Premises. In case of invasion, mob, riot, public excitement, or other commotion, Landlord reserves the right to prevent access to the Building or the Project during the continuance thereof by any means it deems appropriate for the safety and protection of life and property.

4.    Landlord shall have the right to prescribe the weight, size and position of all safes and other heavy property brought into the Building and also the times and manner of moving the same in and out of the Building. Safes and other heavy objects shall, if considered necessary by Landlord, stand on supports of such thickness as is necessary to property distribute the weight. Landlord will not be responsible for loss of or damage to any such safe or property in any case. Any damage to any part of the Building, its contents, occupants or visitors by moving or maintaining any such safe or other property shall be the sole responsibility and expense of Tenant

5.    The requirements of Tenant will be attended to only upon application at the management office for the Project or at such office location designated by Landlord. Employees of Landlord shall not perform any work or do anything outside their regular duties unless under special instructions from Landlord.

6.    No sign, advertisement, notice or handbill shall be exhibited, distributed, painted or affixed by Tenant on any part of the Premises or the Building without the prior written consent of the Landlord. Tenant shall not disturb, solicit, peddle, or canvass any occupant of the Project and shall cooperate with Landlord and its agents of Landlord to prevent same.

7.    The toilet rooms, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed, and no foreign substance of any kind whatsoever shall be thrown therein. The expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the tenant who, or whose servants, employees, agents, visitors or licensees shall have caused same.

8.    Tenant shall not overload the floor of the Premises, nor, mark, drive nails or screws, or drill into the partitions, woodwork or drywall or in any way deface the Premises or any part thereof without Landlord's prior written consent.

9.    Except for vending machines intended for the sole use of Tenant's employees, no machines other than fractional horsepower office machines shall be installed, maintained or operated upon consent of Landlord.

10.    Tenant shall not use or keep in or on the Premises, the Building, or the Project any kerosene, gas corrosive material, material capable of emitting toxic fumes, or other flammable or combustible fluid chemicals. Tenant shall provide material safety data sheets for any Hazardous Material used or kept on the Premises.

11.    Tenant shall not without the prior written consent of Landlord use any method of heating or air conditioning that supplied by Landlord.

12.    Tenant shall not use, keep or permit or allow the Premises to be occupied or used be used or kept, any foul or noxious gas or substance in or on the reason of noise, odors, or vibrations, or interfere w manner offensive or objectionable to Landlord or other occupants of the instrument, radio, phonograph, or in any other way. Tenant shall not throw anything out of doors, windows or skylights or

13.    Tenant shall not bring into or keep within the e Premises any animals, birds, aquarium, or, except in areas designated by Landlord, bicycles or other vehicles.

14.    The Premises shall not be used for the se of merchandise, for lodging or for any improper, objectionable or immoral Notwithstanding the foregoing, Un laboratory-approved equipment and microwave ovens may be used in the Premises and brewing co te and similar beverages for emplo applicable to la t s codes, ordinances, reg

15.    The Premises shall n used for use provided for in the Summary. Tenant ll not occupy or p andise except a incidental to the use of the Premises portion of the to be occupied as an office for a messenger-type operation or dispatch office, public stenographer or typist, o liquor, narcotics, or tobacco in any form, or as a medical office, or as a barber or manicure shop, or as employ cale of express prior written consent of Landlord. Tenant shall not engage or pay any employees on the Premises except the such tenant on the Premises nor advertise for laborers giving an address at the Premises.

16.    Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of Lord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of these Rules and Regulations.

17.    Tenant, its employees and agents shall not loiter in or on the entrances, corridors, sidewalks, lobbies, courts, halls, stairways, elevators, vestibules or any Common Areas for the purpose of smoking tobacco products or for any other purpose, nor in any way obstruct such areas, and shall use them only as a means of ingress and egress for the Premises.

18.    Tenant shall not waste electricity, water or air conditioning and agrees to cooperate fully with Landlord to ensure the most effective operation of the Building's heating and air conditioning system. Tenant shall participate in recycling programs undertaken y Landlord.

19.    Tenant shall store all its trash and garbage within the interior of the Premises. No material shall be placed in the trash xes or receptacles if such material is of such nature that it may not be disposed of in the ordinary and customary manner of removing and isposing of trash and garbage in Reno, Nevada without violation of any law or ordinance governing such disposal. If the Premises is or comes infested with vermin as a result of the use or any misuse or neglect of the Premises by Tenant, its agents, servants, employees, tractors, visitors or licensees, Tenant shall forthwith, at Tenant's expense, cause the Premises to be exterminated from time to time to the sfaction of Landlord and shall employ such licensed exterminators as shall be approved in writing in advance by Landlord.

20.    Tenant shall comply with all safety, fire protection and evacuation procedures and regulations established by Landlord or governmental agency.

31

21.     Any persons employed by Tenant to do janitorial work shall be subject to the prior written approval of Landlord, and while in the Building and outside of the Premises, shall be subject to and under the control and direction of the Building manager (but not as an agent or servant of such manager or of Landlord), and Tenant shall be responsible for all acts of such persons.

22.     No awnings or other projection shall be attached to the outside walls of the Building without the prior written consent of Landlord, and no curtains, blinds, shades or screens shall be attached to or hung in, or used in connection with, any window or door of the Premises other than Landlord standard blinds. All electrical ceiling fixtures hung in the Premises or spaces along the perimeter of the Building must be fluorescent and/or of a quality, type, design and a warm white bulb color approved in advance in writing by Landlord. Neither the interior nor exterior of any windows shall be coated or otherwise sunscreened without the prior written consent of Landlord. Tenant shall be responsible for any damage to the window film on the exterior windows of the Premises and shall promptly repair any such damage at Tenant's sole cost and expense. Tenant shall keep its window coverings closed during any period of the day when the sun is shining directly on the windows of the Premises.

23.     The sashes, sash doors, skylights, windows, and doors that reflect or admit light and air into the halls, passageways or other public places in the Building shall not be covered or obstructed by Tenant, nor shall any bottles, parcels or other articles be placed on the windowsills.

24.     Tenant must comply with requests by the Landlord concerning the informing of their employees of items of importance to the Landlord.

25.     Tenant must comply with all applicable **"NO-SMOKING"** or similar ordinances. If Tenant is required under the ordinance to adopt a written smoking policy, a copy of said policy shall be on file in the office of the Building.

26.     Tenant hereby acknowledges that Landlord shall have no obligation to provide guard service or other security measures for the benefit of the Premises, the Building or the Project. Tenant hereby assumes all responsibility for the protection of Tenant and its agents, employees, contractors, invitees and guests, and the property thereof, from acts of third parties, including keeping doors locked and other means of entry to the Premises closed, whether or not Landlord, at its option, elects to provide security protection for the Project or any portion thereof. Tenant further assumes the risk that any safety and security devices, services and programs which Landlord elects, in its sole discretion, to provide may not be effective, or may malfunction or be circumvented by an unauthorized third party, and Tenant shall, in addition to its other insurance obligations under this Lease, obtain its own insurance coverage to the extent Tenant desires protection against losses related to such occurrences. Tenant shall cooperate in any reasonable safety or security program developed by Landlord or required by law.

27.     All office equipment of any electrical or mechanical nature shall be placed by Tenant in the Premises in settings approved by Landlord, to absorb or prevent any vibration, noise and annoyance.

28.     Tenant shall not use in any space or in the public halls of the Building, any hand trucks except those equipped with rubber tires and rubber side guards.

29.     No auction, liquidation, fire sale, going-out-of-business or bankruptcy sale shall be conducted in the Premises without the prior written consent of Landlord.

30.     No tenant shall use or permit the use of any portion of the Premises for living quarters, sleeping apartments or lodging rooms.

31.     Tenant shall install and maintain, at Tenant's sole cost and expense, an adequate, visibly marked and properly operational fire extinguisher next to any duplicating or photocopying machines or similar heat producing equipment, which may or may not contain combustible material, in the Premises.

Landlord reserves the right at any time to change or rescind any one or more of these Rules and Regulations, or to make such other and further reasonable Rules and Regulations as in Landlord's judgment may from time to time be necessary for the management, safety, care and cleanliness of the Premises, Building, the Common Areas and the Project, and for the preservation of good order therein, as well as for the convenience of other occupants and tenants therein. Landlord may waive any one or more of these Rules and Regulations for the

benefit of any particular tenants, but no such waiver by Landlord shall be construed as a waiver of such Rules and Regulations in favor of any other tenant, nor prevent Landlord from thereafter enforcing any such Rules or Regulations against any or all tenants of the Project. Tenant shall be deemed to have read these Rules and Regulations and to have agreed to abide by them as a condition of its occupancy of the Premises.

**EXHIBIT E**

**TANAMERA CORPORATE CENTER**

**FORM OF TENANT'S ESTOPPEL CERTIFICATE**

The undersigned as Tenant under that certain Office Lease (the "Lease") made and entered into as of March 16, 2005 by and between Tanamera Corporate Center, LLC as Landlord, and the undersigned as Tenant, for Premises located at 5488 Reno Corporate Drive Suite 100, Reno, Nevada 89511, certifies as follows:

1.      Attached hereto as Exhibit A is a true and correct copy of the Lease and all amendments and modifications thereto. The documents contained in Exhibit A represent the entire agreement between the parties as to the Premises.

2.      The undersigned currently occupies the Premises described in the Lease, the Lease Term commenced on November 14, 2005, and the Lease Term expires on November 13, 2010, and the undersigned has no option to terminate or cancel the Lease or to purchase all or any part of the Premises, the Building and/or the Project.

3.      Base Rent became payable on November 14, 2005.

4.      The Lease is in full force and effect and has not been modified, supplemented or amended in any way except as provided in Exhibit A.

5.      Tenant has not transferred, assigned, or sublet any portion of the Premises nor entered into any license or concession agreements with respect thereto except as follows:

6.      Tenant shall not modify the documents contained in Exhibit A without the prior written consent of Landlord's mortgagee.

7.      All monthly installments of Base Rent, all Additional Rent and all monthly installments of estimated Additional Rent have been paid when due through _____. The current monthly installment of Base Rent is $4,762.92.

8.      All conditions of the Lease to be performed by Landlord necessary to the enforceability of the Lease have been satisfied and Landlord is not in default thereunder. In addition, the undersigned has not delivered any notice to Landlord regarding a default by Landlord thereunder.

9.      No rental has been paid more than thirty (30) days in advance and no security has been deposited with Landlord except as provided in the Lease.

10.      As of the date hereof, there are no existing defenses or offsets, or, to the undersigned's knowledge, claims or any basis for a claim, that the undersigned has against Landlord.

11.      If Tenant is a corporation or partnership, each individual executing this Estoppel Certificate on behalf of Tenant hereby represents and warrants that Tenant is a duly formed and existing entity qualified to do business in Nevada and that Tenant has full right and authority to execute and deliver this Estoppel Certificate and that each person signing on behalf of Tenant is authorized to do so.

12.      There are no actions pending against the undersigned under the bankruptcy or similar laws of the United States or any state.

13.      Other than in compliance with all applicable laws and incidental to the ordinary course of the use of the Premises, the undersigned has not used or stored any hazardous substances in the Premises.

14.      To the undersigned's knowledge, all tenant improvement work to be performed by Landlord under the Lease has been completed in accordance with the Lease and has been accepted by the undersigned and all reimbursements and allowances due to the undersigned under the Lease in connection with any tenant improvement work have been paid in full.

The undersigned acknowledges that this Estoppel Certificate may be delivered to Landlord or to a prospective mortgagee or prospective purchaser, and acknowledges that said prospective mortgagee or prospective purchaser will be relying upon the statements contained herein in making the loan or acquiring the property of which the Premises are a part and that receipt by it of this certificate is a condition of making such loan or acquiring such property.

Executed at _____ on the 17 day of November, 2005

"Tenant":        USA Commercial Mortgage,
                 a Nevada Corporation

                 By: _____

                 Its President

EXHIBIT F

RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:

_____
_____
_____
_____
_____

## RECOGNITION OF COVENANTS, CONDITIONS, AND RESTRICTIONS

This Recognition of Covenants, Conditions, and Restrictions (this "Agreement") is entered into as of the 16th day of ~~January~~ March, 2005, by and between Tanamera Corporate Center, LLC (Landlord"), and USA Commercial Mortgage, Inc. ("Tenant"), with reference to the following facts:

A.        Landlord and Tenant entered into that certain Office Lease Agreement dated ~~January~~ March 16, 2005 (the "Lease"). Pursuant to the Lease, Landlord leased to Tenant and Tenant leased from Landlord space (the **"Premises"**) located in an office building on certain real property described in **Exhibit "A"** attached hereto and incorporated herein by this reference (the **"Property"**).

B.        The Premises are located in an office building located on real property which is part of an area owned by Landlord containing approximately 4.44 acres of real property located in the City of Reno, Nevada (the **"Project"**), as more particularly described in **Exhibit "B"** attached hereto and incorporated herein by this reference.

C.        Landlord, as declarant, will record, a Declaration of Covenants, Conditions, and Restrictions (the **"Declaration"**), dated _____, in connection with the Project.

D.        Tenant is agreeing to recognize and be bound by the terms of the Declaration, and the parties hereto desire to set forth their agreements concerning the same.

NOW, THEREFORE, in consideration of (a) the foregoing recitals and the mutual agreements hereinafter set forth, and (b) for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows,

1.        Tenant's Recognition of Declaration. Notwithstanding that the Lease has been executed prior to the recordation of the Declaration, Tenant agrees to recognize and by bound by all of the terms and conditions of the Declaration.

2.        Miscellaneous.

2.1        This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, estates, personal representatives, successors, and assigns.

2.2        This Agreement is made in, and shall be governed, enforced and construed under the laws of, the State of Nevada.

2.3        This Agreement constitutes the entire understanding and agreements of the parties with respect to the subject matter hereof, and shall supersede and replace all prior understandings and agreements, whether verbal or in writing. The parties confirm and acknowledge that there are no other promises, covenants, understandings, agreements, representations, or warranties with respect to the subject matter of this Agreement except as expressly set forth herein.

2.4        This Agreement is not to be modified, terminated, or amended in any respect, except pursuant to any instrument in writing duly executed by both of the parties hereto.

36

2.5    In the event that either party hereto shall bring any legal action or other proceeding with respect to the breach, interpretation, or enforcement of this Agreement, or with respect to any dispute relating to any transaction covered by this Agreement, the losing party in such action or proceeding shall reimburse the prevailing party therein for all reasonable costs of litigation, including reasonable attorneys' fees, in such amount as may be determined by the court or other tribunal having jurisdiction, including matters on appeal.

2.6    All captions and heading herein are for convenience and ease of reference only, and shall not be used or referred to in any way in connection with the interpretation or enforcement of this Agreement.

2.7    If any provision of this Agreement, as applied to any party or to any circumstance, shall be adjudged by a court of competent jurisdictions to be void or unenforceable for any reason, the same shall not affect any other provision of this Agreement, the application of such provision under circumstances different form those adjudged by the court, or the validity or enforceability of this Agreement as a whole.

2.8    Time is of the essence of this Agreement.

2.9    The Parties agree to execute any further documents, and take any further actions, as may be reasonable and appropriate in order to carry out the purpose and intent of this Agreement.

2.10    As used herein, the masculine, feminine or neuter gender, and the singular and plural numbers, shall each be deemed to include the others whenever and whatever the context so indicates.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

"Landlord":
Tanamera Corporate Center, LLC
a Nevada limited liability company
By: _DDH Financ Corp, Manage_
Its: _President_
Date: _3/16/05_

"Tenant":
USA Commercial Mortgage, Inc.
a Nevada Corporation
By: _____
Its: _____
Date: _____

By: _____
Its: _____
Date: _____

37

**ADDENDUM 4 TO LEASE AGREEMENT Dated March 16, 2005**

**By and Between**

**Tanamera Corporate Center, LLC "Landlord"**

**And**

**USA Commercial Mortgage "Tenant"**

The parties above have executed a Lease Agreement (the "Agreement") on March 16, 2005 covering the Premises described therein (the "Premises").

It is the express intention of the parties that the lease shall be revised as follows:

1.  Effective November _14_, 2005, Landlord has sold the Building to a new owner. Landlord hereby assigns its rights, title and interest in the Lease Agreement to:

    S&J Enterprise Investments, Inc.
    Po Box 461
    Napa, CA 94559
    Attn: Sergio Del Canizo
    707-254-9378

    Please mail your monthly rental checks to this address, until you receive further notice from the Landlord.

All other conditions and provisions set forth under the Lease Agreement and any associated amendments will remain in full force and effect.

"LANDLORD":

S&J Enterprise Investments Inc.

By: _____
Its: _____
By: _____
Its: _____
Date : _12-1-05_

TENANT":

USA Commercial Mortgage,
a Nevada Corporation

By: _____
Its: President
Date: _11-17-05_

AGREED:
Tanamera Corporate Center, LLC
A Nevada limited liability company
By: DDH Financial Corp, as Manager

By: _____
Kreg D. Rowe

Its: President
Dated: _11-18-05_

# Change Order Log

**TANAMERA COMMERCIAL**
DEVELOPMENT, LLC
9460 Double R Blvd., Ste. #200, Reno, NV 89521
Fx (775) 850-4251 / Ph (775) 850-4200

| | |
|---|---|
| Company: | USA Capital |
| Owner: | |
| Job : | USA Capital |
| Job #: | 060-06-00100 |
| Project : | Tanamera Corporate Center |
| Project Manager: | Jenny McGrath |

S=Submitted, A=Approved, R=Rejected

| Date | C/O Number | Description | $ Amt | Schedule Change | S | A | R |
|---|---|---|---|---|---|---|---|
| 4/7/05 | N/A | Original Signed Final Budget | $117,737.86 | N/A | | A | |
| 9/7/05 | 1 | Revised breakroom cabinets for larger refridgerator | $1,750.00 | 0 | | A | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| | |
|---|---|
| Change Orders to date Total: | 1,750.00 |
| Minus Rejected Change Orders: | 0.00 |
| Grand Total for Change Orders: | 1,750.00 |
| | |
| Construction Schedule Adjusted by: | 0   Days |
| Misc. Fees | |
| | |
| Adjusted Contract Subtotal: | 119,487.86 |
| Adjusted GC 0% Fee: | 0.00 |
| Adjusted Contract Grand Total: | 119,487.86 |
| TI Allowance: | (85,960.00) |
| Amount Owed by Tenant Sub Total: | 33,527.86 |
| Less Tenant Paid Deposits: | 0.00 |
| Amount Owed by Tenant Grand Total: | 33,527.86 |

AS REVISED PER ADDENDUM.

EXAMPLE OF TI OVERAGE AMORTIZED OVER THE TERM OF THE LEASE

Calculations:

| | | |
|---|---|---|
| Tenant Improvement Total | $ | 119,487.86 |
| Tenant Improvement Allowance | $ | (85,960.00) |
| Total Overage Amt Due | $ | 33,527.86 |
| Amortized over 60 months @ 8% | $ | 40,789.44 |
| Monthly payment of amortized amount | $ | 679.82 |

**ADDENDUM 4 TO LEASE AGREEMENT Dated March 16, 2005**

**By and Between**

**Tanamera Corporate Center, LLC "Landlord"**

**And**

**USA Commercial Mortgage "Tenant"**

The parties above have executed a Lease Agreement (the "Agreement") on March 16, 2005 covering the Premises described therein (the "Premises").

It is the express intention of the parties that the lease shall be revised as follows:

1.  Effective November  17 , 2005, Landlord has sold the Building to a new owner.  Landlord hereby assigns its rights, title and interest in the Lease Agreement to:

    S&J Enterprise Investments, Inc.
    Po Box 461
    Napa, CA 94559
    Attn: Sergio Del Canizo
    707-254-9378

    Please mail your monthly rental checks to this address, until you receive further notice from the Landlord.

All other conditions and provisions set forth under the Lease Agreement and any associated amendments will remain in full force and effect.

"LANDLORD":                                    TENANT":

S&J Enterprise Investments Inc.                USA Commercial Mortgage,
                                               a Nevada Corporation

By:_____                     By:_____

Its:_____                    Its: President

By:_____

Its:_____

Date :_____                   Date:___11-17- 05___


AGREED:
Tanamera Corporate Center, LLC
A Nevada limited liability company
By: DDH Financial Corp, as Manager

By:_____
        Kreg D. Rowe

Its: President
Dated:___11-18-05___

## ADDENDUM 3 TO LEASE AGREEMENT Dated March 16, 2005

### By and Between

### Tanamera Corporate Center, LLC "Landlord"

### and

### USA Commercial Mortgage "Tenant"

The parties above have executed a Lease Agreement (the "Agreement") on March 16, 2005 covering the Premises described therein (the "Premises").

It is the express intention of the parties that the lease shall be revised as follows:

### Summary of Basic Lease Information

| | | |
|---|---|---|
| 2.1 | Premises: | 5488 Reno Corporate Drive, Suite 100, Reno, Nevada 89511. |
| 3.2 | Lease Commencement Date: | November 14, 2005. |
| 3.3 | Lease Expiration Date: | November 13, 2010. |
| 4.1 | Rent Commencement Date: | November 14, 2005. |

4.2     Amounts Due:

| Lease Year | Total Annual Rent | Monthly Installment of Base Rent | Monthly Installment of Amortized Tenant Improvements | Total Monthly Rental Rate per Rentable Square Foot |
|---|---|---|---|---|
| Year 1 | $57,155.04 | $4,083.10 | $679.82 | $2.22 |
| Year 2 | $57,155.04 | $4,083.10 | $679.82 | $2.22 |
| Year 3 | $59,218.08 | $4,255.02 | $679.82 | $2.30 |
| Year 4 | $59,218.08 | $4,255.02 | $679.82 | $2.30 |
| Year 5 | $61,281.12 | $4,426.94 | $679.82 | $2.38 |

All other conditions and provisions set forth under the Lease Agreement and any associated amendments will remain in full force and effect.

"LANDLORD":

Tanamera Corporate Center, LLC
A Nevada limited liability company
By: DDH Financial Corp, as Manager

By:

Its: President

Date : 11/18/05

TENANT":

USA Commercial Mortgage,
a Nevada Corporation

By:

Its: President

Date: 11-17-05

## ADDENDUM TO LEASE AGREEMENT Dated March 16, 2005

### By and Between

### Tanamera Corporate Center, LLC "Landlord"

### and

### USA Commercial Mortgage "Tenant"

The parties above have executed a Lease Agreement (the "Agreement") on March 16, 2005 covering the Premises described therein (the "Premises").

It is the express intention of the parties that the lease shall be revised as follows:

1. Section 13 of the Summary of Basic Lease Information, shall be changed to $87,400.00 ($40.00/SF) for the Tenant Improvement Allowance.

All other conditions and provisions set forth under the Lease Agreement will remain in full force and effect

"LANDLORD":

Tanamera Corporate Center, LLC
a Nevada limited liability company
By: DDH Financial Corp, as Manager

By: _____

Its: President

Date : 4/6/05

TENANT":

USA Commercial Mortgage,
a Nevada Corporation,

By: _____

Its: _____

Date: _____

TANAMERA CORPORATE CENTER

MODIFIED GROSS OFFICE LEASE

    This Office Lease (the "Lease"), dated as of the date set forth in Section 1 of the Summary of Basic Lease Information (the "Summary"), below, is made by and between Tanamera Corporate Center, LLC, a Nevada limited liability company ("Landlord"), and USA Commercial Mortgage, a Nevada Corporation ("Tenant").

### SUMMARY OF BASIC LEASE INFORMATION

| | TERMS OF LEASE | DESCRIPTION |
|---|---|---|
| 1. | Date: | ~~January~~ *March* _16_, 2005 |
| 2. | Premises | |
| | 2.1   Premises: | Approximately 2,185 rentable (2,185 usable) square feet of space located in Building # 6 , located at 5488 Reno Corporate Drive Suite 100, Reno, Nevada 89521, as further illustrated in **Exhibit A** to the Lease. |
| | 2.2   Building: | Building Number: 6<br>Building Rentable Square Feet: 4,302<br>Building Area Acreage: 0.10 |
| | 2.3   Project: | The Building is part of an office project known as "Tanamera Corporate Center", as further set forth in <u>Section 1.1.2</u> of this Lease.<br>Project Acreage: 4.44 |
| | 2.4   Parking Allocation: | Parking allocation is 8 spaces, which parking is reciprocal throughout the Project. |
| 3. | Lease Term<br>(Article 2). | |
| | 3.1   Length of Term: | 60 months, together with any fractional month occurring at the beginning of the Lease Term. |
| | 3.2   Lease Commencement Date: | The earlier to occur of (i) the date upon which Tenant first commences to conduct business in the Premises, or (ii) the date upon which the Premises are ready for occupancy, which is anticipated to be October 1, 2005. The aforementioned anticipated occupancy date is only Landlord's best guest and is subject to full cooperation from Tenant and the City of Reno. |
| | 3.3   Lease Expiration Date: | The end of the month following sixty (60) months from the Lease Commencement Date (i.e.; if the Lease Commencement Date is October 1, 2005 the Lease Expiration Date would be September 30, 2010). |
| | 3.4   Option to Extend Lease: | Tenant will be granted one (1) option to extend this Lease for a period of sixty (60) months beyond the Lease Expiration Date. For this option to be valid Tenant must provide Landlord with a written notification of its desire to exercise this option at least 120 calendar days prior to the Lease Expiration Date. During the term of this Lease extension all terms, covenants and conditions outlined within this Lease shall remain in full force and effect with only the exception of the Base Rent as outlined in Section 4.4 of this Summary as as outlined in Section 4.4 below. |

4.      Base Rent
        (Article 3):

        4.1     Rent Commencement Date:                    The Lease Commencement Date.

        4.2     Amount Due:

| Lease Year | Annual Base Rent | Monthly Installment of Base Rent | Monthly Rental Rate per Rentable Square Foot |
|---|---|---|---|
| Year 1 | $49,818.00 | $4,151.50 | $1.90 |
| Year 2 | $49,818.00 | $4,151.50 | $1.90 |
| Year 3 | $51,915.60 | $4,326.30 | $1.98 |
| Year 4 | $51,915.60 | $4,326.30 | $1.98 |
| Year 5 | $54,013.20 | $4,501.10 | $2.06 |

*Rental Rate includes a 4% escalation every two years

        4.3     Rent Payment Address:           5480 Reno Corporate Drive, Suite 100
                                                Reno, Nevada 89521

        4.4     Amount Due During Lease Extension:      Should Tenant elect to extend the term of this Lease as set forth in Section
                                                3.4 of this Summary the Base Monthly Rent beginning in the first month
                                                of the Extension will be 2.0% above the Base Monthly Rent paid in the las
                                                month of the initial Lease Term. Thereafter every two years of the Lease
                                                Extension Term the Base Monthly Rent will increase by 4.0% above the
                                                previous year.

        4.5     Tenant Utilities & Janitorial           Tenant shall pay for gas & electric for the premises plus janitorial.


5.      Base Year and Base Year Estimate
        (Article 4):

        5.1     Base Year:                      Calendar year 2006.

        5.2     Estimate of Direct Expenses
                included in Base Year:          $9,286.25 ($4.25 / SF/YR).

6.      Tenant's Share
        (Article 4):

        6.1     Building:                       51%

        6.2     Project:                        Approximately 5%.   The Building is 9% of the Project total square
                                                footage as currently planned.

7.      Permitted Use
        (Article 5):                            General Office.

## PROOF OF CLAIM STATEMENT

Claimant reserves the right to amend this claim to properly reflect priority or other classification, credits and charges after the date set forth or after the date hereof, including interest, attorney's fees, costs and related charges assessable against the Debtor or its property, particularly but not limited to those contemplated by section 506(b) of the Bankruptcy Code. Until the determinations thereof are made, and the precise date of payment of this claim is determined, the amount and priority thereof is undeterminable, and must accordingly be determined by an appropriate Order of the court to be entered at an appropriate time.