James D. Greene, Esq.
Nevada Bar No. 002647
Aubree L. Cherney, Esq.
Nevada Bar No. 009527
SCHRECK BRIGNONE
300 South Fourth Street
Suite 1200
Las Vegas, Nevada 89101
Telephone: (702) 382-2101
Facsimile: (702) 382-8135
Email: jgreene@schrecklaw.com
       acherney@schrecklaw.com
Attorneys for Capital Crossing Bank

E-filed on: October 12, 2006

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>USA COMMERCIAL MORTGAGE COMPANY,<br>                    Debtor. | Case No. BK-S-06-10725-LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re<br><br>USA CAPITAL REALTY ADVISORS, LLC,<br>                    Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re<br><br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>                    Debtor. | **OPPOSITION TO MOTION FOR ORDER SCHEDULING AN AUCTION FOR THE SALE OF CERTAIN ASSETS, APPOINTING SILVER POINT GROUP, LLC, AS LEAD BIDDER, AND APPROVING BID PROCEDURES AND PROTECTIONS**<br>**(AFFECTS ALL DEBTORS)** |
| In re<br><br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>                    Debtor. | |
| In re<br><br>USA SECURITIES, LLC,<br>                    Debtor. | DATE: October 19, 2006<br>TIME: 9:30 a.m. |
| Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA Capital First Trust Deed Fund, LLC | |

1

Capital Crossing Bank ("CCB"), by and through its counsel, James D. Greene, Esq. of Schreck Brignone, hereby files its Opposition to the Motion for Order Scheduling an Auction for the Sale of Certain Assets, Appointing SPCP Group, LLC, as Lead Bidder, and Approving Bid Procedures and Protections ("Bid Procedures Motion") filed by the Debtors in the above-captioned case. CCB is a creditor of the Debtors and is also a prospective bidder at the proposed auction for the sale of assets by the Debtors. This Opposition is made and based upon the attached points and authorities, the argument of counsel that may be presented and the hearing and all the pleadings and papers on file herein.

CCB objects to the Bid Procedures Motion because (1) it provides for a termination fee in favor of the proposed "stalking horse" bidder, SPCP Group, LLC ("Silver Point"), of $1,500,000, which is not warranted by the circumstances and, even if warranted, is excessive; (2) it provides for an initial overbid of $2 million, consisting of the $1.5 million breakup fee, plus an initial bid increment of $500,000 (instead of $100,000, the amount of subsequent bid increments), which is excessive and likely to chill bidding on the estates' assets; and (3) it requires a cash deposit of $2,325,000 from other potential bidders, but requires no cash deposit from Silver Point. The Court should deny the Bid Procedures Motion to the extent that it provides for an unnecessary and excessive breakup fee; to the extent that it requires an excessive initial overbid that creates an unbalanced playing field in favor of Silver Point; and to the extent that it requires a multi-million dollar deposit by other bidders, but requires no deposit by Silver Point. Allowing these elements to be included in the Bid Procedures will inhibit, rather than encourage, bidding and will prevent the Debtors from obtaining maximum value for the estates' assets.

A.  **FACTUAL BACKGROUND**

The Debtors filed petitions under Chapter 11 of the Bankruptcy Code on April 13, 2006. The Debtors collectively operated an enterprise in which parties were solicited to make loans secured by first trust deeds on real property. Post-petition, the management of the Debtors was replaced with Mesirow Financial, which has done an admirable job of attempting to organize and

2

reconstruct the Debtors' records, to the loans originated by the Debtors and to re-commence making payments to investors.

On or about September 12, 2006, the Debtors executed an Offer Letter dated September 11, 2006, ("Offer Letter") from Silver Point relating to a proposed sale of substantially all of the assets of the USA Capital First Trust Deed Fund ("FTD Fund"), consisting of its interest in a portfolio of loans, and servicing rights owned by USA Commercial Mortgage ("USACM"). The proposed purchase price in the Offer Letter for the FTD Fund assets is $46.5 million. The amount to be paid for the USACM servicing rights is derived from a formula based upon collections by the successful bidder, with a maximum of $550,000.

The Bid Procedures attached to the Bid Procedures Motion provide for Silver Point to receive a Breakup Fee of $1.5 million in the event that it is not the successful bidder at the proposed auction. Pursuant to the Bid Procedures, Silver Point is also entitled to an Expense Reimbursement of up to $500,000 in the event it is not the successful bidder, which is deducted from the Breakup Fee. The Bid Procedures also provide that the first incremental overbid must be $2 million, consisting of the amount needed to pay the Breakup Fee, plus a $500,000 initial overbid increment. Subsequent overbids need only be in the amount of $100,000. The Bid Procedures also include an extensive list of requirements to become a "Qualified Bidder", including the obligation to make a "good faith deposit" with the Debtors of $2,325,000. Neither the Bid Procedures nor the Offer Letter appears to require that Silver Point make a deposit of any kind.

On September 22, 2006, the Debtors filed the Bid Procedures Motion, which states that the Offer Letter embodies a proposal that will create the highest and best return for the Debtor's estates as well as the creditors and investors. The Offer Letter is, according to the Debtors, the result of extensive negotiations between and among Silver Point, the Debtors and the various committees appointed to represent different constituencies in the cases. The Debtors state that, during the marketing of the Debtors' assets over several months, they have received interest from 14 prospective bidders, all of whom executed confidentiality agreements and all of whom received comprehensive information about the assets. To quote the Debtors:

> The Debtors initiated a process that allowed for evaluating and comparing preliminary bids. These efforts resulted in a vibrant solicitation process which resulted in the proposed sale alternative as one of the key features of a comprehensive plan of reorganization.

The Bid Procedures Motion seeks approval of a bidding process that would establish qualifications for potential bidders to participate in an auction; to conduct an in-court auction to obtain the highest and best offer on the assets to be sold; and to determine which bidder at the auction will prevail. The Court should either deny the Bid Procedures Motion, grant it subject to modifications as described herein, or delay final consideration of the Bid Procedures Motion pending a determination of whether the proposed stalking horse bidder is willing to eliminate the Breakup Fee requirement and modify certain other provisions of the proposed initial bid in order to level the playing field and enhance, rather than inhibit, bidding by third parties.

**B.    LEGAL ARGUMENT**

**1.    The Proposed Breakup Fee is Unwarranted and, even if Warranted, Excessive.**

The purpose of bid procedure orders is to facilitate an open and fair public sale of the debtor's assets that is designed to maximize value for the debtor's estate. *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (citing *In Four B. Corp. v. Food Barn Stores, Inc*., 107 F.3d 558 (8th Cir. 1997)). "To accomplish that goal, bankruptcy courts are necessarily given discretion and latitude in conducting the sale." *Id*. The Ninth Circuit Court of Appeals has yet to address the standards applicable to determining whether a breakup fee or expense reimbursement is appropriate in the context of a sale made pursuant to Bankruptcy Code section 363. Three different standards currently exist for determining the approval of a termination fee or break-up fee:

> (1) **The Business Judgment Rule:** In *The Official Committee of Subordinated Bondholders v. Integrated Resources (In re Integrated Resources, Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992), the court relied on the business judgment rule to determine whether the proposed break-up fee at issue was appropriate.
>
> (2) **The Maximize Value Rule:** In *In re S.N.A. Nut Company*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995) (internal citations omitted), the court rejected the business judgment test and articulated an alternative standard, namely "whether the interest of all concerned

4

> parties are best served by such a fee." *Id*. The S.N.A. court also stated that "bankruptcy courts should carefully scrutinize breakup fees to be sure that, following the underlying policy guiding § 363, revenues will be maximized." *Id*. at 104.
>
> (3) **The O'Brien Standard - The Benefit to the Debtor's Estate:** In *Calpine Corp. v. O' Brien Environmental Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d. 527 (3d Cir. 1999), the Third Circuit Court of Appeals recognized that, even though bidding incentives are measured transactions, the determination of the appropriateness of such incentives in a bankruptcy case is governed by the administrative expense provisions of Section 503(b) of the Bankruptcy Code. Accordingly, to be approved, bidding incentive must provide benefit to a debtor's estate. *Id.* at 535.

In the bankruptcy context, breakup fees have been allowed in certain cases since approximately 1989. In the early years, such fees were evaluated based upon the "business judgment rule", which provided great latitude to the debtor's management in proposing sale opportunities and bidding procedures. More recently, however, courts have adopted the view that a proposed breakup fee must be carefully scrutinized to "insure that revenues are maximized and that the best interests of the debtor's estate, creditors and equity holders are furthered." *In re Tiara Motorcoach Corp*., 212 B.R. 133, 137 (Bankr. N.D. Ind. 1997); *see also In re Am. West Airlines, Inc.,* 166 B.R. 908, 911-12 (Bankr. D. Ariz. 1994) (adopting and approving the reasoning articulated in a law review article by a current member of the bench in this district, Judge Bruce Markell, Bruce A. Markell, *The Case Against Breakup Fees in Bankruptcy*, 66 Am. Bankr. L.J. 349 (1992)); *In re Hupp Indus., Inc*., 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992) (stating that breakup fees related to pre-plan confirmation of asset sales must be "highly scrutinized in view of the uncertainty of dividends, if any, to be received by claimants of the debtor's estate."); *In re Twenver, Inc*., 149 B.R. 954, 955-56 (Bankr. D. Colo. 1992) (stating that courts must carefully scrutinize breakup fees because "bidding incentives impose expenses on the debtor's estate and . . . affect the debtor, creditors and equity holders, alike.").

Courts have generally only approved breakup fees when there is a showing that the fee can, and will, achieve the result proposed by the debtor (i.e., encouragement of bidding and enhancement of the price ultimately received). In *In re American West Airlines, Inc*., for instance, the court rejected the payment under section 363(b) of a $4 to $8 million breakup fee to a bidder

5

1 for the debtor's assets as not "further[ing] the diverse interests of the debtor, creditors, and equity holders, alike." 166 B.R. at 912. The debtor had "trumpeted the need for a break-up fee as a necessary inducement for bidders and bidding generally," but the *America West* court disagreed. *Id*. Taking issue with the debtor's business judgment, the America West court "conclude[d] that payment of the contemplated break-up fee, in any amount, is not in the best interest of the estate, the creditors or the equity holders" chiefly because the debtor "ha[d] been thoroughly marketed and . . . the proposed break-up fee w[ould] not induce further bidding or bidding generally." *Id*. at 913; *see also Gey Assocs. Gen. P'Ship v. 310 Assocs., LP.*, No. 02 Civ. 0710(SHS), 2002 WL 31426344, at *2 (S.D.N.Y. Oct. 29, 2002) (where there were "two buyers drooling to make this purchase," a break-up fee was "both unnecessary (as there were already multiple bidders) and inappropriate (in that it hampered [the debtor's] ability to sell" the asset at issue)); *In re APP Plus, Inc.*, 223 B.R. 870, 875 (Bankr. E.D.N.Y. 1998) (declining to approve a "topping fee" because the court did not believe that it would "enhance the bidding or result in any substantial benefit to [the] estate"); *In re S.N.A. Nut Co.*, 186 B.R. 98, 106 (Bankr. N.D. Ill. 1995) (declining to award a break-up fee because the opening bid "may have lured in other bidders, but none of the offers received were reasonable").

Indeed, the *America West* court rejected the notion that a bankruptcy court should rely on the business judgment rule when analyzing a proposed breakup fee, but held instead that the court should carefully scrutinize the proposed breakup fee "to insure that the Debtors' estate is not unduly burdened and that the relative rights of the parties in interest are protected." *In re Am. West*, 166 B.R. at 912 (citing *In re Hupp Indus.*, 140 B.R. at 196). "The analysis conducted by the Court must therefore include a determination that *all* aspects of the transaction are in the best interests of all concerned." *Id*. (emphasis in original).

In the case at bar, the proposed Breakup Fee of up to $1.5 million (which includes the Expense Reimbursement component of up to $500,000) is not in the best interests of all concerned. Rather, in the event the proposed auction is successful and Silver Point is not the successful bidder, over $1 million in funds that should go to creditors will instead go to Silver Point even after it has been fully compensated for the costs of conducting due diligence and

6

negotiating the Offer Letter and the definitive purchase agreement. As Judge Markell noted, potential stalking horse bidders choose to examine and enter into transactions because they stand to make money. "As a consequence, the maximum breakup fee that a court should approve is one that offers to repay a bidder's direct costs of preparing and making its bid. Any additional fee will over-compensate the bidder for its risk in bidding; it pays the bidder for bidding when it would have bid without the fee." Markell, *supra*, at 369. Therefore, the Court should disallow in its entirety the Breakup Fee in the proposed in the Bid Procedures Motion.[1]

The Debtors pay lip service to the idea that most courts have taken a more stringent view of the propriety of breakup fees than the review called for by the business judgment rule. But the Debtors claim that the more stringent analysis is really a variation of the analysis under the business judgment rule. Bid Procedures Motion, p. 16. This view, however, ignores the fact that these courts have made clear that the court must apply a more stringent standard than the business judgment rule and have rejected the arguments made by the Debtors as to why the Breakup Fee should be allowed. First, the Debtors assert that the Silver Point bid is the result of arms-length negotiations. Bid Procedures Motion, p. 17. CCB has no reason to doubt the claims that the Offer Letter is the result of good faith, arms-length negotiations. And although this issue is a factor that all courts have included in the criteria for consideration of breakup fees, the good faith or arms-length nature of the negotiations is really nothing more than a threshold that must be crossed to have a breakup fee considered. Obviously, if the Breakup Fee is the result of collusion or self-dealing, the Court should reject it out of hand.[2]

The Debtors assert that the Breakup Fee is a reasonable percentage of the proposed purchase price and is "reasonable under the circumstances." Bid Procedures Motion, pp. 17-18.

---

[1] CCB does not object to Silver Point receiving a reasonable expense reimbursement. CCB, however, questions whether $500,000 is an appropriate cap for such expenses. CCB also notes that it is not clear from the Bid Procedures Motion whether the amount of the Expense Reimbursement to Silver Point must be approved by the Court and suggests that this issue be clarified.

[2] CCB further notes that the Bid Procedures Motion offers no evidence supporting why the Breakup Fee and the other bid protections in favor of Silver Point are necessary.

7

1   The Breakup Fee of $1.5 million represents 3.23% of the proposed purchase price for the FTD
2   assets. Although the Debtor suggests that this is a nominal sum, it is a large sum to the hundreds
3   or thousands of individual investors in FTD, especially when Silver Point is to be fully
4   compensated for the expenses of investigating and entering into the proposed transaction (and
5   thus bears no real risk). Moreover, the amount of the Breakup Fee must be considered in
6   conjunction with the initial incremental overbid of $500,000 (instead of $100,000 that applies to
7   the second and subsequent overbids). When both are considered, the percentage of these amounts
8   in relation to the purchase price rises to 4.3%, which represents a significant barrier to the entry of
9   other bidders. As Judge Markell has counseled and courts have agreed, payment of a breakup fee
10  will simply not be necessary to encourage a bidder so long as the initial bidder is entitled to
11  recover its expenses. Markell, *supra*, at 368-69; *In re O'Brien*, 181 F.3d at 535; *In re Am. West*,
12  166 B.R. at 912-13. Rewarding Silver Point with over $1 million, in addition to allowing it to
13  recover its expenses in pursuing the transaction is simply unwarranted regardless of the
14  "reasonableness" of the fee.

15  The Debtors assert that the Breakup Fee will not hamper bidding and that it "correlates
16  with a maximization of value to the Debtor's estates." Bid Procedures Motion, p. 19. This
17  argument is, as the *O'Brien* court noted, "a logical fallacy." 181 F.3d at 537. Requiring an initial
18  overbid of $2 million, rather than $600,000,[3] obviously creates a barrier to other bidders entering
19  into the bidding. Moreover, this argument has little impact in cases where there appears to be
20  substantial interest in the assets and vigorous bidding is likely. In such a situation, the fact that
21  the stalking horse bidder was the first to "sign on the dotted line" is of minimal import. *See Gey*
22  *Assocs. Gen. P'ship*, 2002 WL 31426344 at *2; *In re APP Plus, Inc.*, 223 B.R. at 870.
23  Additionally, these arguments were specifically rejected by, among others, the *O'Brien* court (the
24  only circuit court to address the breakup fee issue) and the court in *America West*. *See In re*
25  *O'Brien*, 181 F.3d at 537; *In re Am. West*, 166 B.R. at 913.

---

[3]   The $600,000 figure assumes a full expense reimbursement of $500,000 and an initial bid increment of $100,000.

8

The unreasonableness of the Breakup Fee in relation to the value being provided is further illustrated when the dual nature of the proposed sale is considered. The proposed sale is really two sales of assets by two different sellers. The FTD assets are being sold for $46.5 million. The USACM assets (the servicing rights) are being sold for a sum based upon a formula that is to provide for at least $550,000. Although the FTD investors may have determined that the Breakup Fee is reasonable in relation to the purchase price of their assets, it is inconceivable that the USACM creditors could draw a similar conclusion about the Breakup Fee in relation to their assets. Indeed, the Breakup Fee for exceeds the maximum amount of any purchase price they can anticipate receiving. The Breakup Fee is thus clearly out of all proportion to the consideration being paid in relation to the servicing agreements.

This Court should follow the lead of those courts and the counsel of Judge Markell by rejecting the proposed breakup fee of $1.5 million. The Court should instead allow only a reasonable expense reimbursement to Silver Point in the event it is not the successful bidder.

**2. The Initial Overbid Increment is Unwarranted and Should be Reduced to $100,000**

As discussed above, the Bid Procedures provide that the initial bid increment must be $2 million, reflecting the $1.5 million breakup fee and an initial increment of $500,000. Subsequent overbids are to be made in increments of $100,000. The Bid Procedures Motion does not even attempt to justify (and does not discuss) this illogical and unwarranted barrier to entry for other bidders. Even assuming that the relatively lax standard of the business judgment rule is used regarding the Bid Procedures as a whole, and regardless of what the Court determines regarding the Breakup Fee, there is no rational justification for this patent barrier to entry in bidding. If the second and subsequent increments are to be $100,000, the Court should require that the same figure be used for the initial overbid. The initial overbid should therefore be no more than whatever amount the Court determines is a reasonable expense reimbursement, plus a $100,000 bid increment.

9

**3. The Court Should Require that Silver Point Post a Deposit in the Same Amount that Other Qualified Bidders are Required to Post.**

The Bid Procedures require that to become a "Qualified Bidder" a prospective bidder must, among other things, post a deposit of $2,350,000 with the Debtors' representatives. Neither the Bid Procedures nor the Offer Letter, however, require Silver Point to post a deposit of any kind. This represents yet another barrier to entry onto a playing field that is clearly tilted significantly in favor of Silver Point. The point of the process contemplated by the Bid Procedures Motion is to create a reasonably level playing filed that will maximize the value of the estates' assets. Silver Point should therefore be required to post a deposit equivalent to the deposit required of other bidders.

**C.    CONCLUSION**

For the reasons set for the above, CCB moves the Court to either deny the Bid Procedures Motion or to grant it only if (1) the Breakup Fee is eliminated or reduced, (2) the initial bid increment is reduced to $100,000, and (3) Silver Point is required to post a deposit with the Debtors equivalent to the deposit that other qualified bidders are required to post.

Respectfully submitted this 12th day of October, 2006.

SCHRECK BRIGNONE


By   /s/ James D. Greene
James D. Greene
300 South Fourth Street, #1200
Las Vegas, Nevada 89101
Attorneys for Capital Crossing Bank