# Exhibit "9"

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| EPIC CAPITAL CORPORATION, *et al.,* | § | Jointly Administered Under |
| | § | Case No. 01-2458-MFW |
| Debtors. | § | |
| | § | |
| ———————————————— | § | Adversary Proceeding No. 02-03021-MFW |
| THE BANK OF NEW YORK, AS | § | |
| SUCCESSOR INDENTURE TRUSTEE, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| EPIC RESORTS – PALM SPRINGS | § | |
| MARQUIS VILLAS, LLC, and | § | |
| | § | |
| USA CAPITAL DIVERSIFIED TRUST | § | |
| DEED FUND, LLC, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| ———————————————— | § | ———————————————— |
| THE BANK OF NEW YORK, AS | § | Civil Action No.  03-360 (JJF) |
| SUCCESSOR INDENTURE TRUSTEE, | § | |
| | § | |
| Appellant, | § | |
| | § | |
| v. | § | |
| | § | |
| EPIC RESORTS – PALM SPRINGS | § | |
| MARQUIS VILLAS, LLC, and | § | |
| | § | |
| USA CAPITAL DIVERSIFIED TRUST | § | |
| DEED FUND, LLC, | § | |
| | § | |
| Appellees. | § | |

BRIEF OF THE APPELLANT,
THE BANK OF NEW YORK AS SUCCESSOR INDENTURE TRUSTEE

David M. Fournier (ID# 2812)
Aaron A. Garber (ID# 3837)
PEPPER HAMILTON, LLP
1201 Market Street, Suite 1600
Wilmington, DE  19899
Phone:  (302) 777-6500
Fax:     (302) 656-8865

Tom A. Howley
Mark D. Sherrill
HAYNES AND BOONE, LLP
1000 Louisiana, Suite 4300
Houston, Texas 77002
Telephone:  (713) 547-2000
Fax:          (713) 547-2600

COUNSEL FOR THE BANK OF NEW YORK
AS SUCCESSOR INDENTURE TRUSTEE

Dated:  October 1, 2003.

2003
2003

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...........................................................iii

I. STATEMENT OF BASIS OF APPELLATE JURISDICTION......................... 1

II. SUMMARY OF THE ARGUMENT............................................... 1

III. APPLICABLE STANDARD OF APPELLATE REVIEW........................... 2

IV. STATEMENT OF THE CASE.................................................. 3

   A. Course of Proceedings................................................... 3

   B. Operative Facts......................................................... 3

V. ARGUMENT AND AUTHORITIES............................................. 10

   A. BNY SATISFIED THIS CIRCUIT'S TEST FOR THE
      APPLICABILITY OF EQUITABLE SUBORDINATION..................... 10

      1. The Bankruptcy Court's Determination that BNY Must
         Provide Evidence of "Egregious Conduct" to Warrant
         Equitable Subordination of USA Capital's Claim Under
         11 U.S.C. § 510(c) is Incorrect as a Matter of Law...................... 11

      2. The Facts of this Case Warrant Equitable Subordination................... 14

      3. The Bankruptcy Court's Conclusion that USA Capital
         Entered Into Its Loan Transaction in Good Faith Is
         Incorrect as a Matter of Law.......................................... 17

      4. The Bankruptcy Court's Finding of Fact That There
         Was No Evidence of Purposeful Conduct on the Part of
         USA Capital to Harm the Contractual Relationship
         Between the Debtors and Bondholders Is Clearly Erroneous................ 21

      5. The Bankruptcy Court's Conclusion that BNY Had Not
         Established that the Actions of USA Capital Constituted
         Tortious Interference with the Rights of BNY
         Is Incorrect as a Matter of Law........................................ 23

      6. The Bankruptcy Court's Conclusion that the Equities
         of the Case Do Not Favor BNY Is Incorrect as a Matter of Law............ 25

   B. CONCLUSION........................................................... 27

# TABLE OF AUTHORITIES

*Cases*                                                                      **Page Number**

*Becker v. Hamada,* 455 A.2d 355 (Del. 1982)................................................ 15

*Burden v. United States,* 917 F.2d 115 (3d Cir. 1990)................................ 11, 14

*Citicorp Venture Capital, Ltd. v. Committee of Creditors
Holding Unsecured Claims,* 160 F.3d 982 (3d Cir. 1998)................ 10 – 12, 17, 27

*EBS Litig. LLC v. Barclays Global Investors, N.A.,* 304 F.3d
302 (3d Cir. 2002)................................................................. 15, 18

*In re Cutty's-Gurnee,* 133 B.R. 934 (N.D. Ill. 1991)............................ 11 – 14

*In re Dean Witter P'ship Litig.,* 1998 WL 442456 (Del. Ch. Jul. 17, 1998)............ 16

*In re Fruehauf Trailer Corp.,* 250 B.R. 168 (D. Del. 2000)........................ 16, 22

*In re Holywell Corp.,* 913 F.2d 873 (11th Cir. 1990)............................... 12

*In re Model Imperial,* 250 B.R. 776 (Bankr. S.D. Fla. 2000)..................... 11 - 13

*In re Trim-Lean Meat Prods., Inc.,* 10 B.R. 333 (D. Del. 1981)................... 25-26

*In re USA Cafes, L.P. Litig.,* 1993 WL 18769 (Del. Ch. Jan. 21 1993)............. 16

*In re Vitreous Steel Prods.,* 911 F.2d 1233 (7th Cir. 1990)...................... 12

*In re Westgate-California Corp.,* 642 F.2d 1174 (9th Cir. 1981)................. 11

*Mellon Bank, N.A. v. Metro Comm., Inc.,* 945 F.2d 635 (3d Cir. 1991) ............. 2

*Montgomery Ward Holding Corp. v. Robert Shoebird,*
272 B.R. 836 (Bankr. D. Del. 2000)............................................. 14

*Pacific Gas & Elec. Co. v. Bear Stearns & Co.,* 791 P.2d
587 (Cal. 1990)................................................................. 24

*Seidel v. Lee,* 954 F.Supp. 810 (D. Del. 1996).................................. 16

*Telephone & Data Sys., Inc. v. EasTex Cellular, L.P.,*
1993 WL 344770 (Del Ch. 1993)................................................ 24

*Travelers Indem. Co. v. Lake,* 594 A.2d 38 (Del. 1991)......................... 24

### *Statutes*

11 U.S.C. 510(c)..................................................................................... 11

28 U.S.C. § 158(a).................................................................................. 1

## BRIEF OF THE APPELLANT

Appellant, The Bank of New York, as successor indenture trustee ("BNY"), submits this Brief in support of the appeal of the February 27, 2003 Opinion and Order (the "Order") of the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Order granted the motion of USA Capital Diversified Trust Deed Fund, LLC ("USA Capital") for summary judgment and denying BNY's cross-motion for summary judgment.

### I. STATEMENT OF BASIS OF APPELLATE JURISDICTION

The Order from which this appeal arises is a final order of the Bankruptcy Court and was entered in a core proceeding. It is appealable to this Court pursuant to 28 U.S.C. § 158(a).

### II. SUMMARY OF ARGUMENT

On appeal, BNY asserts that the claim of USA Capital in these bankruptcy cases should be equitably subordinated because USA Capital acted inequitably.[1] The Bankruptcy Court declined to subordinate USA Capital's claim. BNY asserts that there were a number of flaws in the Bankruptcy Court's analysis.

First, the Third Circuit has established a three-pronged test for the applicability of equitable subordination. BNY is able to demonstrate each of the three elements. The Bankruptcy Court, however, added a fourth element to the circuit's existing criteria.

---

[1] BNY filed a Statement of Issues and Designation of Items to be Included in Record on Appeal, in which it presented fourteen issues for appeal. BNY intends to prosecute the appeal of only those issues concerning the equitable subordination of USA Capital's claims, which issues are discussed herein. BNY does not intend to prosecute the appeal with regard to issues concerning its purported creation of an equitable lien.

BNY asserts that it was improper for the Bankruptcy Court to stray from the existing test established by the Third Circuit and that the three-pronged test should be employed.

Second, the record reflects that USA Capital recorded a lien against certain real property, notwithstanding its actual or inquiry knowledge of covenants in the Indenture prohibiting such actions.

BNY asserts that USA Capital ignored its actual or inquiry knowledge of the prohibition in the Indenture, and purposefully recorded the lien. USA Capital had actual or inquiry knowledge of the negative covenants in the Indenture, but nevertheless chose to close the loan transaction to the detriment of the Bondholders. BNY also disputes the Bankruptcy Court's finding that USA Capital acted in good faith in entering into its loan transaction with the Debtors.[2]

Finally, BNY can demonstrate that USA Capital tortiously interfered with its contractual relations with the Debtors. Such wrongful conduct of USA Capital is further support for the equitable subordination of USA Capital's claim.

### III. APPLICABLE STANDARD OF APPELLATE REVIEW

On appeal to this Court, the bankruptcy court's factual determinations are subject to a clearly erroneous standard, while its conclusions of law are subject to plenary review. *Mellon Bank, N.A. v. Metro Comm., Inc.*, 945 F.2d 635, 641 (3d Cir. 1991).

---

[2] This Brief shall refer to the following entities as the "Debtors": Epic Resorts; Epic Capital; Epic Palm Springs; Epic Resorts Management, LLC; Epic Resorts –Vacation Showplace, LLC; Epic Travel, LLC; Epic Marketing, LLC; Epic Resorts – Scottsdale Links, LLC; Daytona Beach Regency, Ltd.; Epic Resorts – Westpark Resort, LLC; and Epic Resorts – Hilton Head, LLC.

## IV. <u>STATEMENT OF THE CASE</u>

### A.    Course of Proceedings

1.    On April 23, 2002, BNY filed an Adversary Complaint (the "Complaint") against USA Capital and debtor, Epic Resorts - Palm Springs Marquis Villas, LLC ("Epic Palm Springs"). The Complaint sought (i) to determine the extent, validity and priority of competing liens, and (ii) to subordinate the claim of USA Capital on equitable grounds, pursuant to section 510(c) of the Bankruptcy Code.

2.    On May 30, 2002, USA Capital filed its Answer and Affirmative Defenses. Also on May 30, 2002, Anthony H.N. Schnelling, the chapter 11 trustee (the "Trustee"), filed his Answer.

3.    On July 10, 2002, USA Capital filed its Motion for Summary Judgment and Brief in Support. BNY filed its Cross-Motion for Summary Judgment on August 6, 2002.

4.    The Court issued the Order on February 27, 2003. The Order granted USA Capital's motion for summary judgment and denied BNY's cross-motion for summary judgment.

5.    BNY filed a timely Notice of Appeal on March 17, 2003. The deadline for filing this brief has been successively extended to October 1, 2003.

### B.    Operative Facts

6.    BNY is the successor indenture trustee under the Indenture dated July 8, 1998, as supplemented by the First Supplemental Indenture dated January 7, 1999 and the Second Supplemental Indenture dated February 3, 1999 (the "Indenture"). Indenture (Appellant's Statement of Issues and Designation of Items to be Included in Record on

Appeal by The Bank of New York, As Successor Indenture Trustee (the "Designation"),

1.)[3]  Under the Indenture, Epic Resorts, LLC ("Epic Resorts") and Epic Capital Corp.

("Epic Capital") issued $130 million aggregate principal amount of Senior Secured

Redeemable Notes due 2005 (the "Bonds").  *Id.*  United States Trust Company of New

York ("US Trust") was the indenture trustee until June, 2001, when BNY acquired US

Trust's corporate trust business.[4]  Designation, 1 and 2.

    7.    By the terms of the Indenture, payment of the Bonds is guaranteed by the

following Epic subsidiaries (collectively, the "Subsidiary Guarantors"):  (a) Epic Palm

Springs, (b) Epic Warrant Co., (c) Epic Travel, LLC, (d) London Bridge Resort, LLC,

(e) Epic Resorts –Westpark Resort, LLC, (f) Daytona Beach Regency, Ltd., (g) Epic

Resorts – Scottsdale Links Resort, LLC and (h) Epic Resorts – Hilton Head, LLC.

Indenture, Art. 10 (Designation, 1); Prospectus (Designation, 4).

    8.    On June 30, 1998, Epic Resorts, Epic Capital and Epic Warrant Co. entered

into a purchase agreement (the "Purchase Agreement") with the initial purchaser of the

Bonds, NatWest Capital Markets Limited ("NatWest").  Purchase Agreement

(Designation, 5).  Epic Resorts and NatWest negotiated the business terms of the

Indenture. *Id.*  Epic Resorts did not negotiate the business terms of the Indenture with US

Trust.  Declaration of John Guiliano (Designation, 6).  US Trust, as an indenture trustee,

does not become involved in negotiations preceding the closing of an indenture. *Id.*  US

Trust, therefore, did not reach any oral agreements with Epic Resorts regarding which

resorts would serve as collateral under the Indenture.

---

[3]  All Designation documents are identified in the attached Appendix.

[4]  This Brief shall refer to BNY and US Trust collectively as the "Indenture Trustee."

9.      At the closing of the Indenture (the "Closing"), the Indenture Trustee received fully executed mortgages on the resort properties of the following four Subsidiary Guarantors:  Epic Resorts – Westpark Resort, LLC; Epic Resorts – Scottsdale Links Resort, LLC; Daytona Beach Regency, Ltd.; and Epic Resorts – Hilton Head, LLC. Designation, 1, 3, 7-10.

10.      The Indenture further provided that Epic Resorts and Epic Capital would execute a leasehold deed of trust on the resort ("Palm Springs") owned by Epic Palm Springs.  Indenture, Art. 11 (Designation, 1).  Palm Springs sits on land held in trust by the United States for an Indian tribe and monitored by the Department of the Interior – Bureau of Indian Affairs ("BIA").  *Id.* (Designation, 1); Apr. Tr. 21 (Designation, 11). The provision in the Indenture requiring the leasehold deed of trust on Palm Springs could be fulfilled only upon the consent of the BIA.  *Id.*  Because Epic Palm Springs was the lessee of the property, the Debtors were the only parties authorized to request the consent of the BIA.  *Id.*  But for the issue of the BIA's consent, Epic Palm Springs would have executed the leasehold deed of trust at the Closing, and a form for that purpose was prepared at the Closing.  Designation, 12.

11.      A number of documents related to the Closing confirm the parties' original intent to grant a security interest in, *inter alia*, Palm Springs.  The closing index (the "Closing Index") prepared by White and Case, as counsel to NatWest, references a leasehold deed of trust in Palm Springs as one of the documents to be executed at closing, along with mortgages for the other four resorts.  Closing Index (Designation, 13).  The Purchase Agreement among Epic Resorts, Epic Capital, Epic Warrant Co. and NatWest provides:

[T]he obligations of Epic Resorts Palm Springs Marquis, Inc. [sic] … under its Subsidiary Guarantee will be secured by a leasehold mortgage on the real property leased by it; provided, however, that such leasehold mortgage is subject to approval by the Department of the Interior- Bureau of Indian Affairs.

Purchase Agreement, p. 3 (Designation, 5).

12.    The Offering Memorandum pursuant to which the Bonds were sold provides:

[T]he Subsidiary Guarantee of Epic Resorts –Palm Springs Marquis Villas, LLC will be secured by a leasehold mortgage on the leasehold acquired by it in connection with the Acquisitions, subject to the approval of such mortgage by the Department of Interior –Bureau of Indian Affairs.

Offering Memorandum, p. (i) (Designation, 14).

13.    Epic Resorts and Epic Capital represented in their prospectus (the "Prospectus") and other filings with the Securities and Exchange Commission (the "SEC") that a leasehold deed of trust relating to Epic Palm Springs had actually been executed. Prospectus, p. (iii) (Designation, 4). The Prospectus was prepared and filed with the SEC and distributed to the investing public approximately five months after the Closing. May Tr. 36-37 (Designation, 15). For example, the S-4 Registration Statement filed August 13, 1998 with the SEC provided as follows:

[T]he Subsidiary Guarantee of Epic Resorts – Palm Springs Marquis Villas, LLC is and will continue to be secured by a leasehold mortgage on the leasehold acquired by it in connection with the Acquisitions [of several resort properties by Epic Resorts].

S-4 Registration Statement (Designation, 16).

14.    The Prospectus made no suggestion that the holders of the Bonds (the "Bondholders") were not entitled to a leasehold deed of trust in Palm Springs. (Prospectus. Designation, 4.) Further, Epic Resorts attached an unexecuted copy of the form of leasehold deed of trust in favor of the Bondholders as an exhibit to its 10-K filing for fiscal year 1999. 10-K Annual Report (Designation, 17).

15.    Proceeds of the Bonds were the sole source of funds used to acquire four new resorts, including Palm Springs. Proceeds of the Bonds were further used to buy out the forty-four percent (44%) interest of several limited partners previously involved in Daytona Regency, Ltd. May Tr. 32 (Designation, 15).

16.    The Bondholders were further protected by two negative covenants in the Indenture. First, the Indenture prohibited the Debtors from incurring additional indebtedness:

> The Company shall not, and shall not permit any of its Restricted Subsidiaries to, Incur any Indebtedness [subject to certain exceptions not applicable to the facts of this case].

See Indenture, § 4.09 (Designation, 1).

17.    Second, the Indenture prohibited the Debtors from further encumbering any property or assets of Epic Resorts or the Subsidiary Guarantors, including Epic Palm Springs:

> The Company will not[,] and will not permit any Restricted Subsidiary to, directly or indirectly, create or permit to exist any Liens on any of its or their property or assets except for Permitted Liens [which, as defined in section 1.01, would not include any lien created by USA Capital].

See Indenture, § 4.12 (Designation, 1).

18.    In the first quarter of 2000, a meeting was arranged between Thomas Flatley, the principal of Epic Resorts, and Joseph Milanowski and Tom Hantges, the principals of USA Capital. May Tr. 13-14 (Designation, 15). Mr. Flatley represented that Epic Resorts needed a loan for some impending acquisitions. *Id.*

19.    USA Capital proposed to provide a loan to Epic Resorts, but the terms included a fifteen percent (15%) interest rate and an origination fee of five points, which constituted $575,000 on an $11.5 million loan. *Id.* (Designation, 15); Apr. Tr. 39.

(Designation, 11). Mr. Flatley agreed to the loan terms proposed by USA Capital, even though he considered them expensive. *Id.*

20.     Before approving the loan (the "USA Capital Loan"), USA Capital conducted some degree of due diligence concerning Epic Palm Springs and Epic Resorts. *See* USA Capital Document Request (Designation, 18). USA Capital requested, *inter alia,* a copy of the Indenture and Prospectus so that it could better evaluate the "financial condition of the borrower" and "to make sure that whatever loan [USA Capital] was providing was not violating any covenants." *Id.*; Apr. Tr. 35 (Designation, 11). Mr. Hantges stated that USA Capital requested and obtained the Indenture and the Prospectus "to see what the bond indenture allowed." Deposition of Tom Hantges, at pp. 71-72 (Designation, 19).

21.     As it admitted in its Answer, USA Capital received a copy of the Indenture and Prospectus prior to the closing of the USA Capital Loan. Answer (Designation, 20). *See also* Apr. Tr. 34-35 (Designation, 11); May Tr. 38 (Designation, 15.)

22.     Because USA Capital was concerned about inconsistencies between the Indenture and the representations of the Debtors, it requested a legal opinion. May Tr. 39 (Designation, 15). A letter dated August 7, 2000, from John Rogers Burk, an outside attorney for Epic Resorts, to Tom Rondeau, an attorney for USA Capital, describes USA Capital's concerns. Letter (Designation, 21). In that letter, Mr. Burk stated:

> Sometime ago you telephoned me with some concern about the language in the Offering Prospectus for the 'Indenture' dated July 8, 1998 between Epic Resorts, LLC as an Issuer and United States Trust Company of New York as Trustee... You indicated the Prospectus you had showed that a Leasehold Deed of Trust for the entire amount of the issuance would be recorded against Palm Springs Marquis Villas.

*Id.*

23.    Mr. Milanowski, testified at his deposition that USA Capital sought a legal opinion to confirm the statements of Mr. Flatley, "that he had the property available to be encumbered and that it was viable under the Indenture."    Deposition of Joseph Milanowski, p. 57 (Designation, 22).

24.    Notwithstanding USA Capital's concerns, it proceeded to close the USA Capital Loan on July 5, 2000, without having received the legal opinion letter that it requested. Designation, 23-31.

25.    USA Capital received the legal opinion on July 31, 2000.  In the letter, Mr. Burk stated:

> Based upon our review of the documents listed above ... we are of the opinion that (a) the Indebtedness incurred by Borrower pursuant to the Loan Documents is in compliance with the Indenture, [and] (b) the Guaranty by Epic does not violate the Indenture.

Designation, 35.

26.    Notwithstanding the content of Mr. Burk's letter, its arrival to USA Capital's offices on July 31, 2000 occurred after USA Capital had (i) closed on the loan to Epic Resorts, (ii) recorded its leasehold deed of trust against Epic Palm Springs, and (iii) had funded the first installment of $5 million (less applicable fees).  Designation, 23-31. USA Capital therefore could not have relied upon the legal opinion in making its decision to close the USA Capital Loan on July 5, 2000.

27.    Despite its concerns about encumbering Palm Springs, USA Capital did not contact the Indenture Trustee or any representatives of the bondholders to inquire about the Indenture or the Prospectus.

28.    Although the borrower was Epic Palm Springs, Mr. Flatley instructed USA Capital to wire the loan proceeds to a bank account in the name of the parent corporation,

Epic Resorts. Apr. Tr. 38 (Designation, 11). USA Capital was aware that the proceeds

of the USA Capital Loan would be used by Epic Resorts for "working capital purposes."

*Id.* USA Capital was also aware that Palm Springs was completely built-out and that the

proceeds of the secured loan would not be used for construction, improvements or

maintenance of Palm Springs, despite the pledge of Epic Palm Springs' assets as security

for the loan. *Id.*

29.    Section 4.12 of the Indenture prohibited such a loan for "general working

capital purposes." Indenture, §4.12 (Designation, 1).

30.    USA Capital does not provide unsecured loans, and therefore would not have

provided the loan to Epic Resorts on an unsecured basis. Milanowski Deposition, p. 28

(Designation, 22). Even if USA Capital had been willing to provide an unsecured loan, it

would have violated section 4.09 of the Indenture, which allowed the Epic parties to the

Indenture to incur additional indebtedness only if they could satisfy a minimum

consolidated coverage ratio test. Indenture, §4.09 (Designation, 1). The SEC filings for

1999 and 2000 demonstrate that Epic could not meet the minimum consolidated coverage

ratio test. Designation, 32-34.

## V. ARGUMENT AND AUTHORITIES

### A.    BNY SATISFIED THIS CIRCUIT'S TEST FOR THE APPLICABILITY OF EQUITABLE SUBORDINATION

The Third Circuit has established that the elements of equitable subordination are

as follows: (i) the claimant has engaged in some type of inequitable conduct, (ii) the

misconduct has resulted in injury to other creditors and conferred an unfair advantage on

the claimant, and (iii) equitable subordination of the claim is not inconsistent with the

provisions of the Bankruptcy Code. *Citicorp Venture Capital, Ltd. v. Committee of*

*Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-87 (3d Cir. 1998). *See also* 11 U.S.C. § 510(c). It is undisputed that USA Capital's conduct in this case has been to the harm of the Bondholders and to its own advantage. It is further undisputed that equitable subordination of USA Capital's claim would be consistent with the Bankruptcy Code. Accordingly, the issue should distill to whether BNY can satisfy the first criterion: whether USA Capital engaged in some type of inequitable conduct. [5] The Bankruptcy Court, however, added an additional criterion, egregious conduct.

> 1.  **The Bankruptcy Court's Determination that BNY Must Provide Evidence of "Egregious Conduct" to Warrant Equitable Subordination of USA Capital's Claim Under 11 U.S.C. § 510(c) is Incorrect as a Matter of Law**

The Third Circuit has held that "[t]he essential purpose of subordination 'is to undo or to offset any inequality in the claim position that will produce injustice or unfairness to other creditors in terms of the bankruptcy results.'" *Burden v. United States*, 917 F.2d 115, 117 (3d Cir. 1990) (quoting *In re Westgate-California Corp.*, 642 F.2d 1174, 1177 (9th Cir. 1981)). USA Capital's conduct in this case has created an inequality in the claims positions. Equitable subordination is an appropriate mechanism to offset that inequality and to correct the unfairness to creditors that will otherwise ensue.

The cases of *In re Model Imperial*, 250 B.R. 776 (Bankr. S.D. Fla. 2000) and *In re Cutty's-Gurnee*, 133 B.R. 934(N.D. Ill. 1991), are directly on point. Both cases address whether the attendant facts fit within the relevant equitable subordination standards. Both the Seventh and Eleventh Circuits employ the same standard as that

---

[5] BNY has never contended that inequitable conduct is not required for equitable subordination, as the Bankruptcy Court stated in the Order. (Order, 21.)

articulated by the Third Circuit in *Citicorp Venture Capital*. Neither *Model Imperial* nor

*Cutty's-Gurnee* adds an additional element of egregious conduct to the existing standard.

In *Model Imperial*, a lender loaned money to the debtor indirectly through a third

party as a conduit. It made the loan indirectly because of negative covenants in the

debtor's existing credit facility that prohibited the debtor from incurring more debt or

from allowing any further encumbrances to be created on its assets. The lender was

aware of the negative covenants in the debtor's credit facility at all relevant times.

Further, the lender acknowledged that "negative covenants are common features of loan

documents and that negative covenants serve a legitimate purpose by assisting lenders in

controlling their credit risk." *Model Imperial*, 250 B.R. at 781-84, 804. The *Model

Imperial* court recited identical equitable subordination standards to the three-part test

discussed by the Third Circuit in *Citicorp Venture Capital*. *Model Imperial*, 250 B.R. at

804 (quoting *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990)).

In *Cutty's-Gurnee*, an existing capital investor (the "Investor") provided a loan to

the debtor. Later, the debtor sought to obtain additional funding from a separate lender

(the "Lender") while trying to restructure its loan obligations to the Investor. As part of

the proposed restructuring with the Investor, the debtor agreed that it would grant a

mortgage to Investor, once it received financing from Lender. Lender was aware of the

agreement between the debtor and Investor to create a mortgage. Lender therefore

required the debtor to take certain actions that prevented Investor from receiving its

promised mortgage from the debtor. The court cited *In re Vitreous Steel Products*, 911

F.2d 1233, 1237 (7th Cir. 1990), to provide a standard for equitable subordination that is

identical to that provided by the Third Circuit in *Citicorp Venture Capital*. Applying that

three-pronged standard, the *Cutty's-Gurnee* court determined that Lender had acted to create a security interest in the debtor's property without regard to Lender's actual knowledge of Investor's intended security interest in the same property. The court concluded Lender's actions in obstructing Investor's property interest was misconduct sufficient to satisfy the equitable subordination standard. *Cutty's-Gurnee*, 133 B.R. at 958-59. Under facts analogous to those in the instant case, the *Cutty's-Gurnee* court did not add a fourth requirement of "egregious conduct."

Like *Cutty's-Gurnee*, many aspects of *Model Imperial* closely parallel the facts in this case. Here, USA Capital was aware of the negative covenants in the Indenture. As in *Model Imperial*, the negative covenants were included in the Indenture to control the credit risk involved in lending money to the Debtors. The *Model Imperial* court's analysis was simply that the facts of the case fit the three-pronged standard articulated by the controlling circuit, and therefore the claims warranted equitable subordination. The *Model Imperial* court did not add a fourth requirement of "egregious conduct."

The facts in this case are analogous to those of *Cutty's-Gurnee* and *Model Imperial*. In *Cutty's-Gurnee*, as in this case, the actions of a third-party lender to hinder the property interests of another lender were sufficient cause for the equitable subordination of its claims. In *Model Imperial* and in this case, the actions of a lender to circumvent covenants of existing loans provide the inequitable conduct necessary for equitable subordination. Both the *Cutty's-Gurnee* court and the *Model Imperial* court simply applied the standard for equitable subordination articulated by the controlling court of appeals. The Bankruptcy Court should have performed the same analysis and

applied the *Citicorp Venture Capital* standard without the additional requirement of egregious behavior.

In rejecting the approach used in *Cutty's-Gurnee*, the Bankruptcy Court quotes *Montgomery Ward Holding Corp. v. Robert Shoebird*, 272 B.R. 836 (Bankr. D. Del. 2000). Courts that recognize "no fault" equitable subordination, the Bankruptcy Court states, "must 'explore the particular facts and circumstances presented in each case before determining whether subordination of a claim is warranted.'" *Id.* (quoting *Burden*, 917 F.2d at 120). BNY agrees with the approach endorsed by *Montgomery Ward* and quoted by the Bankruptcy Court. A court certainly must make a case-by-case determination of whether the facts rise to the level of equitable subordination. In this case, the inequitable conduct of USA Capital does rise to the requisite level.

## 2.    The Facts of this Case Warrant Equitable Subordination

The inequitable conduct of USA Capital is manifest in the facts of this case. The Indenture contained negative covenants against the Debtors' incurring more debt (with certain exceptions not germane to this discussion) and against the encumbrance of several of the Debtors' properties, including Palm Springs. USA Capital obtained a copy of the Indenture "to make sure that whatever loan [USA Capital] was providing was not violating any covenants." Apr. Tr. 35 (Designation, 11). In addition, numerous SEC filings by Epic Resorts indicated that the subsidiary guaranty of Epic Palm Springs either was secured[6] or was to be secured by a leasehold mortgage on the Palm Springs property.

---

[6] As noted by the Bankruptcy Court, the Indenture and the Prospectus convey the intent of Epic Resorts and Epic Capital to use their "reasonable best efforts to obtain consent of the BIA." Other Public Documents, however, go further in describing the Indenture Trustee's interest in the Palm Springs property. For example the S-4 Registration Statement filed August 13, 1998 with the SEC provides that the subsidiary guaranty of Epic Palm Springs "is and will continue to be secured by a leasehold mortgage" on Palm Springs. S-4 Registration Statement (Designation, 17). Similar statements appear in the November 3,

USA Capital obtained *at least* one of those SEC filings, the Prospectus, "to see what the bond indenture allowed." Deposition of Tom Hantges, at pp. 71-72 (Designation, 19).

The record demonstrates that USA Capital had actual knowledge of the contents of the Prospectus and the Indenture, including the negative covenants. Even if USA Capital obtained none of the other Public Documents,[7] the Indenture and Prospectus alone placed USA Capital on inquiry notice. The Third Circuit has stated: "Inquiry notice requires only notice of 'facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery." *EBS Litig. LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302, 305 (3d Cir. 2002) (quoting *Becker v. Hamada, Inc..* 455 A.2d 355, 356 (Del. 1982)). In the Indenture and Prospectus, USA Capital discovered the intention of the parties to the Indenture to create a security interest in Palm Springs. The Indenture and Prospectus therefore contain "facts sufficient to put a person of ordinary intelligence and prudence on inquiry." *Id.* There is little question that the Indenture and Prospectus did put USA Capital on inquiry because after reviewing them, it requested the borrower representations and Mr. Burk's legal opinion. Therefore, under the definition set forth in *EBS Litigation*, USA Capital was on inquiry notice.

Moreover, USA Capital had access to – and should have reviewed – all of the other Public Documents. Had USA Capital performed a more diligent review that included all of the Public Documents, it surely would have furthered its concerns. As

---

1998 S-4-A Registration Statement Amendment, the November 12, 1998 Form 424 B-4, the March 31, 1999 Form 10-K Annual Report and the May 13, 1999 Form 10-K-A Amendment to the Annual Report.

[7] This brief shall refer to the following documents as "Public Documents": (i) the Indenture, (ii) the Prospectus, (iii) Closing Index, (iv) the Offering Memorandum, (v) the Purchase Agreement, (vi) an S-4 Registration Statement filed August 13, 1998 with the SEC, (vii) an S-4-A Registration Statement Amendment filed November 3, 1998 with the SEC, (viii) a Form 424 B-4 filed November 12, 1998 with the SEC, (ix) a Form 10-K Annual Report filed March 31, 1999 with the SEC, and (x) a Form 10-K-A Amendment to the Annual Report filed May 13, 1999 with the SEC.

discussed above, the Debtors' filings with the SEC made even more direct statements with regard to the intended security interest than did the Indenture or the Prospectus. The August 13, 1998 S-4 Registration Statement and the March 31, 1999 Form 10-K Annual Report even include exhibits labeled "Form of Leasehold Deed of Trust, Assignment of Leases and Rents Securities Filing, granted July  , [sic] by Epic Resorts – Palm Springs Marquis Villas, LLC, by Barbara J. Goodman, Esq., as trustee for the benefit of United States Trust Company of New York, as trustee under the Indenture." Form S-4 (Designation, 16).  Such facts should have made USA Capital conduct an even more rigorous inquiry than it might have conducted based on the Indenture and Prospectus alone. This Court has previously found public filings to give rise to inquiry notice. *See In re Fruehauf Trailer Corp.*, 250 B.R. 168, 189 (D. Del. 2000) (citing *Seidel v. Lee*, 954 F.Supp. 810, 817 (D. Del. 1996); *In re Dean Witter P'ship Litig.*, 1998 WL 442456, \*9 (Del. Ch. 1998) (attached hereto as Exhibit A); *In re USACAFES, L.P. Litig.*, 1993 WL 18769, \*3-6 (Del. Ch. Jan. 21, 1993)) (attached hereto as Exhibit B).

In light of the many Public Documents setting forth the Indenture Trustee's interest in Palm Springs, USA Capital had either actual knowledge or inquiry knowledge of (i) the intention of the Debtors and the Indenture Trustee to create a security interest in Palm Springs; (ii) the negative covenants against the Debtors' incurring further debt; and (iii) the negative covenants against the Debtors' encumbering the Palm Springs property.

USA Capital's knowledge of the negative covenants and the intended security interest is demonstrated by its request for borrowers' representations and the legal opinion letter of Mr. Burk.  USA Capital requested the legal opinion letter because it learned from certain Public Documents that the USA Capital Loan would interfere with

the Bondholders' rights.    Notwithstanding the knowledge provided by the Public

Documents and the conflicting information given by the Debtors' representations, USA

Capital proceeded to close its loan to Epic Resorts and record its leasehold deed of trust

against Palm Springs *before* receiving the legal opinion letter from Mr. Burk.  The only

logical conclusion to be drawn from USA Capital's conduct is that it did not care about

the Indenture Trustee's interest in Palm Springs nor about the negative covenants in the

Indenture.

BNY asserts that the foregoing facts are sufficient to establish the three elements

of equitable subordination under *Citicorp Venture Capital*.  USA Capital engaged in

inequitable conduct that resulted in injury to the Bondholders.  Equitable subordination of

USA Capital's claims would not be inconsistent with the Bankruptcy Code.  Accordingly,

under the rule of the Third Circuit, equitable subordination is proper.  The Bankruptcy

Court's application of a test different from that established by *Citicorp Venture Capital*

was erroneous and led to an incorrect result.

3.    **The Bankruptcy Court's Conclusion that USA Capital Entered Into Its Loan Transaction in Good Faith Is Incorrect as a Matter of Law**

The Bankruptcy Court concluded that USA Capital entered into the USA Capital

Loan in good faith.  That conclusion of the Bankruptcy Court is dependent on the

Bankruptcy Court's findings that (a) USA Capital was not on inquiry notice, (b) USA

Capital satisfied its duty to inquire,[8] and (c) USA Capital's reliance on the Debtors'

---

[8] *See* Order, p. 15.  The Bankruptcy Court concluded that USA Capital was not on inquiry notice because it found that the Public Documents did not evidence any lien granted to BNY.  Somewhat incongruously, the Bankruptcy Court then suggested that USA Capital may have been on "notice to inquire whether the lien anticipated by the Indenture had, in fact, been granted." *Id.*  The Bankruptcy Court concluded that USA Capital had satisfied such a duty.

representations and an opinion letter dated after the closing is sufficient. Each of those findings is flawed.

    (a)    *USA Capital Was on Inquiry Notice*

First, USA Capital was on inquiry notice. As stated above, "Inquiry notice requires only notice of 'facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery.'" *EBS Litig.* 304 F.3d at 305. By virtue of reading *at least* the Indenture and the Prospectus, USA Capital had sufficient facts of the intended security interest in Palm Springs and the breach to the Indenture that the USA Capital Loan would cause. Those facts would have caused the ordinary person to inquire further. Under the standard articulated by the Third Circuit in *EBS Litigation*, it follows that USA Capital was on inquiry notice.

The Bankruptcy Court concluded that USA Capital was not on inquiry notice because it found that the Public Documents do not evidence that a lien had been granted to the Indenture Trustee. In determining the intention of the Public Documents, however, the Bankruptcy Court discussed the language of only the Indenture and the Prospectus. Several other Public Documents did evidence that a lien had been granted. For example, the S-4 Registration Statement filed August 13, 1998 with the SEC provided as follows:

> [T]he Subsidiary Guarantee of Epic Resorts – Palm Springs Marquis Villas, LLC is and will continue to be secured by a leasehold mortgage on the leasehold acquired by it in connection with the Acquisitions [of several resort properties by Epic Resorts].

S-4 Registration Statement (Designation, 16).

BNY asserts that a review of only the Indenture and the Prospectus was sufficient to place USA Capital on inquiry notice, because those two Public Documents included facts that would cause a reasonable person to inquire further. Even if the Indenture and

the Prospectus did not contain enough information to place USA Capital on inquiry notice, other Public Documents contained language that would even more clearly cause a reasonable person to inquire. Certainly, a reasonable person would be compelled to inquire further after reading that Palm Springs "is and will continue to be secured by a leasehold mortgage," as quoted in the S-4 Registration Statement.

(b)    *USA Capital Did Not Satisfy Its Duty to Inquire*

The Bankruptcy Court implied that although USA Capital was not on inquiry notice, it had some duty to inquire. *See* Order, p. 15. The Bankruptcy Court found that USA Capital satisfied that duty based on its lien search, its request for representations from the Debtors and its request for an opinion letter that it obtained after the closing. Such actions cannot satisfy a duty to inquire. Performing a lien search is a responsible action, but it should be considered a bare minimum.

A request for borrowers' representations cannot be persuasive in the inquiry of whether a lender has satisfied a duty to inquire. Because it has an interest in receiving the loan proceeds, the borrower will regularly provide self-serving representations. A lender that wishes to uncover the truth about a matter would surely look beyond the representations of the borrower, simply because an objective source of information is preferable to a subjective source. By the same principle, the law should not find that a lender that requests borrowers' representations has satisfied its duty to inquire. That lender has not sought information from a reliable source. Further, as a matter of policy, to allow a lender to satisfy its duty by requesting borrowers' representations simply encourages collusive behavior between borrower and lender. Accordingly, USA Capital's request for representations of the Debtors should not be considered a factor in

determining whether USA Capital satisfied its duty to inquire. Even USA Capital realized that the Debtors' representations were insufficient, because it requested the legal opinion letter to settle the inconsistencies between the Debtors' statements and the language of the Public Documents.

Finally, the legal opinion letter obtained from Mr. Burk should not satisfy the duty to inquire either. Although USA Capital may have had responsible intentions in seeking the opinion letter, the timing of its receipt renders it irrelevant to the issue of USA Capital's duty to inquire. If USA Capital had such a duty, then it could only satisfy its duty by receiving favorable information *before* it finalized the USA Capital Loan. On the contrary, USA Capital did not receive the legal opinion letter from Mr. Burk until after it had finalized the USA Capital Loan and recorded its security interest against Palm Springs. Accordingly, the legal opinion letter is immaterial to the question of whether USA Capital satisfied its duty to inquire.

(c) *USA Capital's Reliance on the Debtors' Representations and the Opinion Letter Was Insufficient*

USA Capital's request for representations from the Debtors should not constitute support for the proposition that it conducted a diligent inquiry. As discussed above, the Debtors were not a credible source of information, simply because it was in their self interest to provide information to allow the USA Capital Loan to close. Further, USA Capital had obtained from the Public Documents information concerning the negative covenants and the Indenture Trustee's intended security interest. The nature of that knowledge called for a more thorough inquiry. USA Capital never approached the Indenture Trustee or the Bondholders to inquire about the status of their lien on Palm Springs.

Likewise, the reliance on Mr. Burk's opinion letter, received July 31, 2000 after a July 5, 2000 closing, is not legally relevant. Because of the timing, USA Capital could not rely on the opinion letter in its determination of whether liens existed on Palm Springs or whether the USA Capital Loan would cause a breach of the Indenture. The Bankruptcy Court therefore should not have considered the opinion letter in its determination of whether USA Capital satisfied its duty to inquire.

Based on its faulty foundation, the Bankruptcy Court's conclusion that USA Capital entered in to the USA Capital Loan in good faith is likewise flawed. Rather, the record demonstrates the *bad faith* exhibited by USA Capital in making the USA Capital Loan and in recording a security interest against Palm Springs.

**4.    The Bankruptcy Court's Finding of Fact That There Was No Evidence of Purposeful Action on the Part of USA Capital to Harm the Contractual Relationship Between the Debtors and Bondholders Is Clearly Erroneous**

The Bankruptcy Court found no evidence of purposeful conduct by USA Capital to harm the relationship between the Debtors and the Bondholders. Order, 20. BNY asserts that the record demonstrates that USA Capital chose to close the USA Capital Loan, knowing its actions would harm the Bondholders. Such conduct plainly constitutes purposeful action to harm the contractual relationship between the Debtors and the Bondholders.

USA Capital obtained copies of the Indenture and the Prospectus, in performing its due diligence before closing the USA Capital Loan. From the Indenture and the Prospectus, USA Capital learned that the Debtors could not encumber assets, including Palm Springs. USA Capital also learned from the Indenture and the Prospectus that the Debtors could not enter into further indebtedness. The language of the negative

covenants in the Indenture was clear in prohibiting further encumbrances or indebtedness.[9]

Even if USA Capital was aware of none of the other Public Documents, its knowledge of the Indenture and the Prospectus gave it sufficient knowledge of the negative covenants in the Indenture. Moreover, USA Capital was on inquiry notice of the content of the remaining Public Documents. *Fruehauf Trailer*, 250 B.R. at 189. USA Capital is therefore charged with the knowledge that the Indenture Trustee had asserted a security interest in the Palm Springs leasehold interest.

By virtue of the Public Documents, USA Capital had knowledge of the following (collectively, the "Indenture Issues"): (a) the negative covenant in the Indenture against the Debtors' further encumbering Palm Springs; (b) the negative covenant in the Indenture against the Debtors' incurring further indebtedness; and (c) the intention of the Debtors and the Indenture Trustee to create a security interest in the Palm Springs leasehold interest. The knowledge of the Indenture Issues clearly caused USA Capital some concern because it led USA Capital to request the legal opinion letter from Mr. Burk.

Ultimately, however, USA Capital elected to close the USA Capital Loan without receiving the opinion letter. Such a choice represents USA Capital's decision to proceed with the potentially lucrative business endeavor without resolving its concerns arising out of its knowledge of the Indenture Issues. In making such a decision, USA Capital acted purposefully to harm the contractual relationship between the Debtors and the

---

[9] *See* p. 7, ¶¶ 16-17, *supra.*

Bondholders. The Indenture had been deliberately structured to contain the negative covenants as protections for the Bondholders.

In finding no evidence of purposeful action, the Bankruptcy Court emphasized that USA Capital relied on the Debtors' representations that the USA Capital Loan would not cause a breach of the Indenture. Such borrowers' representations, however, cannot overcome the unequivocal nature of the knowledge imparted on USA Capital by the Public Documents. Particularly in light of the self-serving nature of the Debtors' representations, a reasonable party would have made further inquiry to find answers to the Indenture Issues. Instead, USA Capital chose to proceed with closing the USA Capital Loan.

> **5.      The Bankruptcy Court's Conclusion that BNY Had Not Established that the Actions of USA Capital Constituted Tortious Interference With the Rights of BNY Is Incorrect as a Matter of Law**

BNY did not allege tortious interference with contractual relations in the Complaint and does not seek a judgment on such a cause of action. Nonetheless, BNY believes that it could satisfy the elements of tortious interference with contractual relations, and asserts that USA Capital's tortious interference with the Indenture is one aspect of the inequitable conduct required for equitable subordination of USA Capital's claims.

The elements of tortious interference with contractual relations are as follows: (i) the existence of a valid contract; (ii) knowledge of the contract on the part of the defendant; (iii) defendant's intentional acts designed to induce a breach or disruption;

(iv) actual breach or disruption of the contractual relationship; and (v) resulting damage. *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 589-90 (Cal. 1990).[10]

This discussion dovetails with the foregoing argument that there was purposeful action by USA Capital to harm the relationship between the Debtors and the Indenture Trustee. The requisite elements of tortious interference with contractual relations are present in this case. First, it is undisputed that the Indenture is a valid contract. Second, it is undisputed that USA Capital had knowledge of the Indenture at all relevant times. Third, as discussed above, USA Capital knew from its knowledge – both actual and imputed – of the Public Documents that entering into the USA Capital Loan would cause breaches of the Indenture. Fourth, by incurring more debt and by further encumbering assets, the Debtors actually breached the Indenture. Finally, because the Epic entities' insolvency will allow only a limited distribution to creditors, the Bondholders have been damaged as a direct result of USA Capital's interference. The existence of the additional debt, which would have been prevented had USA Capital heeded the negative covenants in the Indenture, will reduce the amount of recovery for the Bondholders.

Thus, BNY can establish each of the requisite elements of tortious interference of contractual relations. BNY believes that the tortious interference demonstrates USA Capital's inequitable conduct, as required for equitable subordination. BNY's claim for equitable subordination does not depend on its argument concerning tortious interference, however. Even if tortious interference of contractual relations does not apply to the

---

[10] "Delaware applies the substantive law of the state that has the most significant relationship to the controversy." *Telephone & Data Sys., Inc. v. EasTex Cellular L.P.*, 1993 WL 344770 (Del. Ch. 1993) (citing *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 41 (Del. 1991)). BNY believes that California law should apply because it is the site of the real property underlying the dispute. There does not, however, appear to be a significant distinction between California law asserted by BNY and the Pennsylvania law cited by the Bankruptcy Court.

instant facts, or if tortious interference with contractual relations is not tantamount to the required inequitable conduct, BNY believes that all of the facts and circumstances of this case independently rise to the level of inequitable conduct.

### 6.    The Bankruptcy Court's Conclusion that the Equities of the Case Do Not Favor BNY Is Incorrect as a Matter of Law

The Bankruptcy Court cites to *In re Trim-Lean Meat Products, Inc.*, 10 B.R. 333 (D. Del. 1981) in support for its finding that the equities disfavor BNY. *Trim-Lean*, however, actually supports BNY's position, and illustrates the reasons why the equities favor BNY.

In *Trim-Lean*, the debtor purchased and took possession of a truck tractor. The debtor executed a security agreement granting a security interest in the vehicle. The debtor, however, failed to apply for a certificate of title for the vehicle. Under applicable state law, a certificate of title was a prerequisite for perfection of the security interest. In determining whether an equitable lien should exist, the *Trim-Lean* court drew the following distinction:

> In many instances the problem will lie not in an obdurate buyer but rather with an uninformed or procrastinating one. Indeed, this was such a case. The Bankruptcy Judge found that Trim-Lean was not an uncooperative debtor, and, accordingly, there is every reason to believe that a demand by [the creditors] would have resulted in prompt perfection of the security interest.

*Trim-Lean Meat Prods.*, 10 B.R. at 336.

Although the Bankruptcy Court did not make any finding on the matter, the Debtors in this case were not merely procrastinating. The record provides ample evidence of the Debtors' obdurate nature, but one example is Epic Palm Springs' false representations to USA Capital regarding the effect the USA Capital Loan would have on the Indenture. The *Trim-Lean* court indicated that it was less likely to grant equitable

relief because the debtor was merely "uninformed or procrastinating." *Id.* On the other hand, the equities in this case should favor BNY more heavily because of the obstructionist tactics of the Debtors.[11] Under the *Trim-Lean* facts, the court suggested that the creditor deserved no equitable relief because the debtor harbored no ill intentions. Here, BNY does deserve equitable relief because the Debtors acted deliberately to harm the Bondholders.

*Trim-Lean* touches upon another important distinction. The Bankruptcy Court states that BNY did not obtain the necessary consent from the BIA. Order, 22. Under the Indenture, however, certain of the Debtors were the only parties that were obligated to obtain BIA consent. Indenture, § 11.01(e) (Designation, 1). The failure or refusal of the Debtors to seek BIA approval, as required under the Indenture, should not be imputed to the Indenture Trustee, particularly in light of the uncooperative nature of the Debtors.

Finally, the equities of this case certainly should not favor USA Capital. USA Capital entered into a transaction that caused multiple breaches of the Indenture. It did so with actual knowledge of the intended security interest and the negative covenants in the Indenture. Even if, under some circumstances that strain credulity, USA Capital did not have actual knowledge of the intended security interest and the negative covenants, then it had inquiry knowledge of the same. Its actions in causing the breaches to the Indenture, and in purposefully harming the interest of the Bondholders, demonstrate a

---

[11] The Debtors' conduct in this case includes their incurring further indebtedness and encumbrances, contrary to the negative covenants in the Indenture and to the detriment of the Bondholders. In addition, however, the Debtors attempted to transfer valuable contracts and other assets out of the bankruptcy estates – including some such transactions to a newly created company headed by the Debtors' management. Because of such self-dealing and the conflicted nature of the Debtors' management, the Bankruptcy Court appointed a chapter 11 trustee for the Debtors' estates. *See, e.g.,* Order, 11 n.4 (commenting "[w]e also have not found Mr. Flatley's testimony in this case to be credible"); Hantges Deposition, at pp. 38-42 (Designation, 19) (describing proposed deed-in-lieu transaction through which Debtors sought to transfer property outside of bankruptcy estates).

lack of good faith in its dealings with Epic Palm Springs. USA Capital now enjoys an unfair advantage over the Bondholders as a result of its lack of good faith. The conclusion that the equities should not favor BNY is incorrect.

## B.    CONCLUSION

In light of the foregoing, it is clear that the Order is built on an unsteady foundation. The Bankruptcy Court's conclusion that the claims of USA Capital should not be equitably subordinated is not supported by law or the record. The Bankruptcy Court's erroneous conclusion with regard to equitable subordination is due, in part, to its incorrect conclusions and findings that (a) BNY must provide evidence of egregious conduct to establish the applicability of equitable subordination, (b) USA Capital entered into the USA Capital Loan in good faith, (c) there was no purposeful action on the part of USA Capital to harm the contractual relationship between the Debtors and the Indenture Trustee, and (d) BNY did not establish that USA Capital tortiously interfered with the Indenture.

On the contrary, BNY asserts that it need establish only the elements of equitable subordination set forth by the Third Circuit in *Citicorp Venture Capital*. The record reflects that BNY can establish each of those elements, in part because USA Capital entered into the USA Capital Loan in bad faith. USA Capital acted purposefully to harm the contractual relationship between the Debtors and the Indenture Trustee. In further support of the equitable subordination of USA Capital's claim, BNY can demonstrate that USA Capital's actions caused the tortious interference with the Indenture, which provides further support for the inequitable nature of USA Capital's actions. For the foregoing reasons, equitable subordination of the claim of USA Capital would be proper.

Accordingly, the Order should be reversed.

Dated:  October 1, 2003.

                                        Respectfully submitted,

                                        PEPPER, HAMILTON, LLP


                                        David M. Fournier (ID# 2812)
                                        Aaron Garber (ID# 3837)
                                        201 Market Street, Suite 1600
                                        Wilmington, DE  19899
                                        Phone:  (302) 777-6500
                                        Fax:  (302) 656-8865

                                             -and-

                                        HAYNES AND BOONE, LLP
                                        Tom A. Howley
                                        Texas State Bar No. 24010115
                                        Mark D. Sherrill
                                        Texas State Bar No. 24034678
                                        1000 Louisiana, Suite 4300
                                        Houston, Texas 77002
                                        Telephone: (713) 547-2000
                                        Facsimile:  (713) 547-2300

                                        COUNSEL FOR THE BANK OF
                                        NEW YORK AS SUCCESSOR
                                        INDENTURE TRUSTEE

# EXHIBIT A

Not Reported in A.2d
24 Del. J. Corp. L. 203
(Cite as: 1998 WL 442456 (Del.Ch.))

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.

In re DEAN WITTER PARTNERSHIP
LITIGATION

No. CIV. A. 14816.

July 17, 1998.

Pamela S. Tikellis, Esquire, and Robert J. Kriner, Jr.,
Esquire, of Chimicles, Jacobsen & Tikellis,
Wilmington, Delaware; of Counsel: Nicholas E.
Chimicles, Esquire, Denise Davis Schwartzman,
Esquire, Francis J. Farina, Esquire, and M. Katherine
Meermans, Esquire, of Chimicles, Jacobsen & Tikellis,
Haverford, Pennsylvania, Attorneys for Plaintiffs.

Kenneth J. Nachbar, Esquire, of Morris, Nichols,
Arsht & Tunnell, Wilmington, Delaware; of Counsel:
Martin London, Esquire, Richard A. Rosen, Esquire,
Robert N. Kravitz, Esquire, and Tracy Anbinder Baron
, Esquire, of Paul, Weiss, Rifkind, Wharton &
Garrison, New York, New York, Attorneys for
Defendants.

MEMORANDUM OPINION

CHANDLER, Chancellor.

*1 Investors, owners of interests in numerous real
estate limited partnerships, seek an accounting and
damages from general partners and financial advisors
for breaches of the fiduciary duties of care, loyalty and
candor. Information available to the investors long
before these lawsuits were instituted put the investors
on notice of the wrongs about which they now
complain. Therefore, all of the investors' claims are
barred by operation of the applicable statute of
limitations.

I. BACKGROUND

This action is a consolidation of several actions
brought by plaintiff investors against defendants Dean
Witter, Discover & Co. ("Dean Witter Discover"),
Dean Witter Reynolds, Inc. ("Dean Witter Reynolds"),
Dean Witter Realty, Inc. ("Dean Witter Realty")
(collectively "Dean Witter"), the managing and
associate general partners of seven Dean Witter real
estate limited partnerships, and Tempo-GP, Inc.

("Tempo-GP"), the general partner of Dean Witter/
Coldwell Banker Tax Exempt Mortgage Fund, L.P.
("Tax Exempt Mortgage Fund"). [FN1]

> FN1. An Order of Consolidation dated
> August 16, 1996, consolidated three actions
> filed in the Court of Chancery--*Segel v. Dean
> Witter, Discover & Co.*, C.A. No. 14816
> (filed Feb. 6, 1996); *Schectman v. Dean
> Witter, Discover & Co.*, C.A. No. 14829
> (filed Feb. 9, 1996); *Dosky v. Dean Witter,
> Discover & Co.*, C.A. No. 14838 (filed Feb.
> 15, 1996)--and added to the consolidated
> action plaintiffs from two other suits, one
> pending in the Southern District of New
> York--*Grigsby v. Dean Witter Reynolds, Inc.*,
> S.D .N.Y., No. 96 Civ. 4064(LAP) (originally
> filed Dec. 27, 1995)-- and one pending in the
> District of Maryland--*Young v. Dean Witter,
> Discover & Co.*, C.A. No. H-96-1139
> (D.Md.) (originally filed Feb. 6, 1996). *See*
> Order of Consolidation (Aug. 16, 1996)
> (Docket No. 9).

Plaintiffs are customers of Dean Witter Reynolds, who
between 1984 and 1989, purchased from Dean Witter
Reynolds units of the following limited partnerships:
Dean Witter Realty Income Partnership I, L.P.
("Income I"); Dean Witter Realty Income Partnership
II, L.P. ("Income II"); Dean Witter Realty Yield
Income Partnership III, L.P. ("Income III"); Dean
Witter Realty Income Partnership IV, L.P. ("Income
IV"); Dean Witter Realty Yield Plus, L.P. ("Yield
Plus"); Dean Witter Realty Yield Plus II, L.P. ("Yield
Plus II"); Dean Witter Realty Growth Properties, L.P.
("Growth Properties"); and Falcon Classic Cable
Income Properties, L.P. ("Falcon Classic Cable").
[FN2] With the exception of Falcon Classic Cable,
each of these Partnerships is a wholly-owned direct or
indirect subsidiary of Dean Witter and is organized in
the State of Delaware.

> FN2. These limited partnerships will be
> referred to collectively as the "Partnerships."
> The Partnerships bearing the Dean Witter
> name, *i.e.*, all of the defendant partnerships
> except Falcon Classic Cable, will also be
> referred to as the "Proprietary Partnerships."
> All of the Proprietary Partnerships are real
> estate limited partnerships.

Defendant Dean Witter Discover, a Delaware
corporation, is a publicly-held financial services
company providing credit and investment products.
Defendant Dean Witter Reynolds, a Delaware
corporation, is a broker-dealer and member of the New

York Stock Exchange and other major securities, futures and options exchanges in the United States. Dean Witter Reynolds operates the securities business of Dean Witter Discover and acted as the offeror and/or underwriter for the sale of the Partnerships to plaintiffs. Dean Witter Reynolds also organized the Proprietary Partnerships that it sold to plaintiffs and acted as the exclusive selling agent for Falcon Classic Cable, which it did not sponsor.

Defendant Dean Witter Realty, a Delaware corporation, is a wholly-owned subsidiary of Dean Witter Discover. Dean Witter Realty is responsible for the creation, marketing and oversight of the Proprietary Partnerships. It is also the parent of the Delaware corporate subsidiaries formed to serve as the managing general partners of the Proprietary Partnerships. These corporate subsidiaries are, in turn, the general partners of the Delaware limited partnerships or corporations formed to serve as the associate general partners of the Proprietary Partnerships. [FN3] Officers and employees of Dean Witter Realty served as officers and employees of these general partners. Dean Witter Realty was in charge of the day-to-day operations of each of the general partners of the Proprietary Partnerships.

> FN3. Managing and associate general partners will be referred to collectively as the "general partners."

**\*2** Defendants Dean Witter Realty Income Properties I Inc. and Dean Witter Realty Income Associates I, L.P. are the managing and associate general partners, respectively, of Income I. Defendants Dean Witter Realty Income Properties II Inc. and Dean Witter Realty Income Associates II, L.P. are the managing and associate general partners, respectively, of Income II. Defendants Dean Witter Realty Income Properties III Inc. and Dean Witter Realty Income Associates III, L.P. are the managing and associate general partners, respectively, of Income III. Defendants Dean Witter Realty Fourth Income Properties Inc. and Dean Witter Realty Income Associates IV, L.P. are the managing and associate general partners, respectively, of Income IV. Defendants Dean Witter Realty Yield Plus Inc. and Dean Witter Realty Yield Plus Associates, L.P. are the managing and associate general partners, respectively, of Yield Plus. Defendants Dean Witter Realty Yield Plus II Inc. and Dean Witter Realty Yield Plus Associates II, L.P. are the managing and associate general partners, respectively, of Yield Plus II. Defendants Dean Witter Realty Growth Properties Inc. and Dean Witter Realty Growth Associates, L.P. are

the managing and associate general partners, respectively, of Growth Properties.

In addition, plaintiffs named as defendants Dean Witter Realty Income Associates I Inc. and Dean Witter Realty Income Associates II Inc.--the general partners of the associate general partners of Income I and Income II, respectively. Each of these defendant general partners is a Dean Witter affiliate, or wholly-owned direct or indirect subsidiary, organized in Delaware.

Defendant Tempo-GP, a Delaware corporation, was originally owned jointly by a Dean Witter Discover subsidiary and Coldwell Banker Commercial Group, Inc. Today, Tempo-GP is a wholly-owned subsidiary of Dean Witter Discover. Tempo-GP is the general partner of the Tax Exempt Mortgage Fund and directed and controlled its activities. [FN4]

> FN4. In their Amended Complaint, none of the plaintiffs claims to have purchased units of the Tax Exempt Mortgage Fund. As such, plaintiffs do not have standing to assert any claims with respect to that fund or its general partner, Tempo-GP. *See Alabama By-Products Corp. v. Cede & Co.,* Del.Supr., 657 A.2d 254, 264 (1995).

Plaintiffs purport to bring this action on behalf of all persons and entities who purchased units of the Partnerships sold by or through Dean Witter Reynolds or other selling agents affiliated with Dean Witter from 1984 through the present. [FN5] Plaintiffs allege that defendants breached their fiduciary duties in connection with the Partnerships organized, sold and operated by defendants, in which plaintiffs invested. Among other things, plaintiffs allege that defendants breached the duties of loyalty, candor and care they owed to plaintiffs as their fiduciaries. Plaintiffs complain that they relied--to their detriment--upon the good faith of defendants in their roles as fiduciaries, as general partners, financial advisors and agents, and as officers and directors of the general partners. According to plaintiffs, defendants' breaches have caused plaintiffs to suffer the losses of substantial portions of their investments and have failed to realize the income, liquidity and security in their investments as promised them by defendants. [FN6]

> FN5. First Consolidated and Amended Class Action Complaint ¶ 37 (Docket No. 10) [hereinafter *Complaint* ]. All further references to "plaintiffs" shall include the named plaintiffs as well as the purported class

Not Reported in A.2d
(Cite as: 1998 WL 442456, *2 (Del.Ch.))

of plaintiffs.

FN6. Complaint ¶ 3.

**\*3** Plaintiffs assert that Dean Witter sold the Partnerships through uniform sales materials that promoted sale of the Partnerships at the expense of candor. Specifically, plaintiffs claim that defendants misrepresented or failed to disclose to them at the time of purchase the nature of the risks involved in investing in the Partnerships, that defendants misrepresented or failed to disclose the financial condition of the Partnerships in order to conceal losses, mismanagement, fraud and self-dealing, and that defendants misled plaintiffs into believing that Dean Witter was recommending and selecting investments that presented low risk and were suitable for retirement accounts. [FN7] Plaintiffs further allege that although Dean Witter represented to plaintiffs that it would maintain a relationship with the Partnerships and oversee their operation, [FN8] Dean Witter failed to supervise the Partnerships in the plaintiff investors' best interests.

FN7. Pls.' Memo. in Opp. to Defs.' Motion to Dismiss at 6 (Docket No. 32) [hereinafter *Pls.' Memo. in Opposition* ].

FN8. Complaint ¶ 25.

Plaintiffs insist that defendants were instead engaging in a systematic scheme designed to organize, sell and operate high risk, speculative limited partnerships in order to enrich themselves at the expense of plaintiff investors. According to plaintiffs, once defendants obtained investment capital from plaintiffs, defendants used the capital to purchase underperforming or failing investments owned by Dean Witter affiliates or to refinance underperforming loans owed to Dean Witter affiliates. Plaintiffs further allege that defendants channeled Partnership funds into faltering projects owned by earlier-formed Partnerships, to create the illusion of financial health for those Partnerships and to aid in marketing new ones. [FN9]

FN9. Pls.' Memo. in Opposition at 2.

Defendants filed a motion to dismiss on December 10, 1996. [FN10] The motion cites several grounds for dismissal, including: (1) that the claims are time-barred; (2) that plaintiffs' allegations fail to state a claim; and (3) that plaintiffs have improperly brought this action as a direct, rather than derivative, action. The parties briefed the motion, presented oral

argument to the Court, and conducted a supplemental round of briefing specifically addressing the statute of limitations issue. As explained below, I agree with defendants that the applicable statute of limitations bars plaintiffs' claims. [FN11] Thus, plaintiffs' claims must be dismissed for failure to file within the statutory period.

FN10. Defs.' Memo. in Support of Motion to Dismiss (Docket No. 21) [hereinafter *Defs.' Motion to Dismiss* ].

FN11. Because I have determined that defendants' claim of time-bar is dispositive, I need not address the other grounds offered by defendants in their motion to dismiss.

## II. LEGAL STANDARD

There is clear legal precedent in Delaware for granting a motion to dismiss on the ground that a plaintiff's claims are barred by operation of the statute of limitations. [FN12] This is so even in equity. Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances. [FN13] Moreover, it is "well settled that where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised by [a] motion to dismiss." [FN14]

FN12. *Boeing Co. v. Shrontz*, Del. Ch., C.A. No. 11273, Berger, V . C. (Apr. 20, 1992) (dismissing breach of fiduciary duty claims on grounds of time-bar); *Halpern v. Barran*, Del. Ch., 313 A.2d 139 (1973) (same).

FN13. *Kahn v. Seaboard Corp.*, Del. Ch., 625 A.2d 269, 271 (1993). *See also United States Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc.*, Del.Supr., 677 A.2d 497 (1996) ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period.").

FN14. *Seaboard*, 625 A.2d at 277 (dismissing, with permission to replead, complaint in equity on statute of limitations grounds).

**\*4** In evaluating a motion to dismiss, I am required to assume the truthfulness of all well-pleaded (*i.e.*, nonconclusory) allegations of the complaint for purposes of the motion. [FN15] I am also required to draw from the complaint all inferences or conclusions

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d

(Cite as: 1998 WL 442456, *4 (Del.Ch.))

of fact that may reasonably be drawn from the specific facts alleged therein. [FN16] Conclusions asserted in the complaint, however, will only be accepted as true if there are specific allegations of fact to support them. [FN17] In the end, I may only dismiss the Amended Complaint if it is clear that plaintiffs will not be entitled to relief under any set of facts that could be proven based on the allegations of the complaint. [FN18]

FN15. *Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., C.A. No. 88, 1996, at 11-12, Veasey, C.J. (Sept. 17, 1997) (en banc); *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 & n. 6 (1988).

FN16. *Id.*

FN17. *In re Santa Fe Pac. Shareholders Litig.,* Del.Supr., 669 A.2d 59, 65-66 (1995); *Grobow,* 539 A.2d at 187 & n. 6.

FN18. Ct. Ch. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1105 (1985); *Litman v. Prudential-Bache Properties, Inc.,* Del. Ch., C.A. No. 12137, at 4-5, Chandler, V.C. (Jan. 14, 1994), *aff'd,* Del.Supr., 642 A.2d 837 (1994). Plaintiffs cite *Snyder v. Butcher & Co.,* Del.Super., C.A. No. 91C-04- 289, Goldstein, J. (Sept. 15, 1992), for the proposition that it is improper for a court to grant a motion to dismiss on statute of limitations grounds whenever the complaint alleges fraudulent concealment as part of its claims. Plaintiffs, however, misread *Snyder. Snyder* stated that granting a motion to dismiss on statute of limitations grounds would be inappropriate where a plaintiff has "*successfully pled* fraudulent concealment." *Id .* at 9 (emphasis added). Where a plaintiff has successfully alleged a claim of fraudulent concealment "the affirmative statute of limitations defense turns on a question of fact," rendering a summary disposal inappropriate. *Id. Snyder* does nothing, however, to alter the general rule that when it is clear from the face of the complaint that the statute of limitations bars a plaintiff's claims, despite an allegation of fraudulent concealment, dismissal is still appropriate. *See Boeing Co. v. Shrontz,* op. at 4-5 (dismissing breach of fiduciary duty claims on statute of limitations grounds, despite allegation of fraudulent self-dealing). *See also Shockley v. Dyer,* Del.Supr., 456 A.2d 798, 799 (1983) (affirming grant of summary judgment, despite plaintiff's allegation of fraudulent concealment, where

viewing the facts in a light most favorable to plaintiffs, "it becomes clear that by an exercise of due diligence plaintiff could have discovered her rights.").

## III. ANALYSIS

### A. Statute of Limitations

It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty. [FN19] With the exception of the Falcon Classic Cable claim, which was a brand new claim as of the filing of the Amended Complaint on October 7, 1996, plaintiffs filed their pre-consolidation complaints on February 6, 9 & 15, 1996, alleging breaches of fiduciary duty by Dean Witter and the general partners of the Partnerships. [FN20] Applying the three-year statute of limitations, any claim that accrued prior to February 6, 1993 (or prior to October 7, 1993, with respect to the Falcon Classic Cable claim) is barred by operation of the statute. If, however, plaintiffs' cause of action accrued on or after February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic claim), then the claims are timely and can proceed.

FN19. 10 *Del. C.* § 8106; *Dofflemyer v. W.F. Hall Printing Co.,* D. Del., 558 F.Supp. 372, 379 (1983) (applying Delaware law).

FN20. Under the Order of Consolidation, all documents previously filed and served in the cases consolidated by the Order were deemed filed, served and part of the record in the consolidated action. Only the three Court of Chancery cases were consolidated by that Order. The earliest of these cases—*Segel*—was filed February 6, 1996. Thus, February 6, 1996, is the earliest operative date for statute of limitations purposes. *See* Order of Consolidation ¶¶ 1, 9.

### B. Time of Accrual

The general law in Delaware is that the statute of limitations begins to run, *i.e.,* the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action. [FN21] Plaintiffs here complain of two different types of injuries. First, they allege that Dean Witter violated its fiduciary duties in the marketing and sale of the Partnerships. Second, plaintiffs allege that defendants [FN22] committed post-offering breaches of their fiduciary duties in connection with the management and oversight of the Partnerships.

Not Reported in A.2d
(Cite as: 1998 WL 442456, *4 (Del.Ch.))

Page 5

FN21. *David B. Lilly Co. v. Fisher*, D. Del.,
18 F.3d 1112, 1117 (1994); *Isaacson, Stolper
& Co. v. Artisan's Sav. Bank*, Del.Supr., 330
A.2d 130, 132 (1974).

FN22. Plaintiffs do not allege post-offering
mismanagement with respect to Falcon
Classic Cable. Complaint ¶¶ 266-68.

Plaintiffs allege that defendants breached their
fiduciary duties in recommending and selling to
plaintiffs Partnerships that would never (and could
never) achieve their promised objectives. Accepting
this allegation as true, plaintiffs' injuries occurred *when
they purchased* their Partnership interests as a result of
defendants' alleged misrepresentations. [FN23] Thus,
plaintiffs' cause of action accrued when they invested
in the allegedly fraudulent Partnerships. The
Partnerships at issue were marketed and sold to the
plaintiffs in the mid-to-late 1980s. The last of these
sales was completed by the end of 1989. [FN24] Thus,
with respect to the marketing and sale of the
Partnerships, plaintiffs' cause of action accrued no later
than year-end 1989. Absent tolling of the statute of
limitations, these claims became stale at the end of
1992--years before plaintiffs filed their Amended
Complaint.

FN23. *Seidel v. Lee*, D. Del., C.A. No.
93-494-JJF, at 16, Farnen, C.J. (Dec. 30,
1996) (applying Delaware law) (fiduciary
duty claim accrues when breach
accomplished). *See also In re Merrill Lynch
Ltd. Partnerships Litig.*, S.D.N.Y., No. 95
Civ. 10657(MBM), at 11-20 (Aug. 26, 1997)
(applying federal RICO law, which has same
standard for statute of limitations accrual).

FN24. Complaint ¶¶ 9-23.

*5 With respect to the allegations of post-offering
breaches arising out of the management and oversight
of the Partnerships, plaintiffs allege that defendants
operated the Partnerships to benefit themselves at the
expense of the investors. Among other things, plaintiffs
complain that Partnership real estate investments were
chosen solely for the purpose of benefiting other Dean
Witter affiliates and that the Partnerships paid
excessive commissions and fees. For each Partnership,
these alleged violations of fiduciary duty began-- and
plaintiffs consequently began to suffer injury--shortly
after each Partnership was formed. The Amended
Complaint is replete with allegations of injudicious
mortgage loans and unwarranted management
commissions throughout the mid-to-late 1980s. [FN25]

Thus, as with the marketing and sales claims, plaintiffs'
cause of action regarding the alleged post-offering
breaches accrued no later than year-end 1989. [FN26]
Plaintiffs filed their complaint on February 6, 1996--
well past the expiration of the three-year limitations
period. *Absent tolling*, therefore, all of plaintiffs' claims
fall outside the statutory period and would be time-
barred.

FN25. *See, e.g.,* Complaint ¶¶ 91-121 (Yield
Plus), ¶¶ 129-35 (Yield Plus II), ¶¶ 136-46
(Yield Plus & Yield Plus II), ¶¶ 156-79
(Growth Properties), ¶¶ 193-98 (Income I), ¶¶
209-16 (Income II), ¶¶ 233-39 (Income II, III
& IV).

FN26. *Dofflemyer*, 558 F.Supp. at 379
(fiduciary duty claim accrues at time of
breach).

*C. Tolling*

Plaintiffs allege that their claims are timely because
the statute of limitations was tolled until January 26,
1996, when an article in the *Wall Street Journal*
[FN27]--reporting that the Securities and Exchange
Commission ("SEC") was negotiating with Dean
Witter Reynolds and two other brokerage firms
concerning their limited partnership sales practices
during the 1980s and that a settlement fund might be
established--first put them on notice of their potential
claims. [FN28] Plaintiffs assert three separate theories
to support a tolling of the statute of limitations in this
case: (1) inherently unknowable injuries; (2) fraudulent
concealment; and (3) equitable tolling. Each of these
doctrines permits tolling of the limitations period
where the facts underlying a claim were so hidden that
a reasonable plaintiff could not timely discover them.
[FN29]

FN27. This article will be referred to as the "
*Wall Street Journal* article" or the "article."

FN28. Pls.' Memo. in Opposition at 9.

FN29. *See, e.g., Playtex, Inc. v. Columbia
Casualty*, Del.Super., C.A. No. 88C-MR-233,
at 7, Del Pesco, J. (Sept. 20, 1993)
("Ignorance of the facts supporting a cause of
action will not toll the statute, absent some
special consideration such as 'inherently
unknowable' injuries or fraudulent
concealment.").

Under the doctrine of inherently unknowable injuries,

Not Reported in A.2d
(Cite as: 1998 WL 442456, *5 (Del.Ch.))

the running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical impossibility. [FN30] For the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury. [FN31] Often, plaintiffs can establish "blameless ignorance" by showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception. [FN32] This doctrine tolls the limitations period until a plaintiff had "reason to know" that a wrong has been committed. [FN33]

> FN30. *Ruger v. Funk,* Del.Super., C.A. No. 93C-04-210, at 5-6, Lee, J. (Jan. 22, 1996).

> FN31. *Seidel,* op. at 17.

> FN32. *See, e.g., Isaacson,* 330 A.2d at 133-34 (applying "discovery rule" in light of relationship of "confidence and reliance by plaintiff on the expertise of defendant").

> FN33. *Pack & Process, Inc. v. Celotex Corp.,* Del.Super., 503 A.2d 646, 650 (1985).

The statute of limitations will also be tolled if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth. [FN34] Unlike the doctrine of inherently unknowable injuries, fraudulent concealment requires an affirmative act of concealment by a defendant--an "actual artifice" that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry. [FN35] "Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute [of limitations]." [FN36] Where there has been fraudulent concealment from a plaintiff, the statute is suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence. [FN37]

> FN34. *Litman,* op. at 8.

> FN35. *Halpern,* 313 A.2d at 143.

> FN36. *Id.*

> FN37. *Id.*

\*6 Under the theory of equitable tolling, the statute of

limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary. [FN38] Underlying this doctrine is the idea that "even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that ... constitute self-interested acts injurious to the [Partnership]." [FN39] This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong. [FN40]

> FN38. *Yaw v. Talley,* Del. Ch., C.A. No. 12882, at 10, Jacobs, V.C. (March 7, 1994) (Fiduciaries who benefit personally from their wrongdoing, especially as a result of fraudulent self-dealing, will not be afforded the protection of the statute of limitations.).

> FN39. *Seaboard,* 625 A.2d at 275-76 (Given the fiduciary duties that the law imposes on corporate directors, stockholders are entitled to rely on the good faith of the directors when they act with respect to the corporation's property or processes.).

> FN40. *In re Maxxam, Inc./Federated Dev. Shareholders Litig.,* Del. Ch., 659 A.2d 760, 769 (Feb. 13, 1995).

As the party asserting that tolling applies, plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled. [FN41] Significantly, if the limitations period is tolled under any of these theories, it is tolled *only until* the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury. [FN42] Thus, the limitations period begins to run when the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e.,* on inquiry notice. [FN43] Accordingly, for plaintiffs to establish that this action was filed in a timely manner, under any one of these theories, they must convince the Court that they were *not* on inquiry notice of their claims before February 6, 1993 (or before October 7, 1993, with respect to the Falcon Classic Cable claim). [FN44]

> FN41. *United States Cellular,* 677 A.2d at 504; *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 35, Allen, C. (Nov. 21, 1995).

> FN42. *In re ML-Lee Acquisition Fund II, L.P. Litig.,* D. Del., 848 F.Supp. 527, 554 (1994)

Not Reported in A.2d
(Cite as: 1998 WL 442456, *6 (Del.Ch.))

(inherently unknowable injuries); *United States Cellular*, 677 A.2d at 503 (equitable tolling); *Litman*, op. at 8 (fraudulent concealment).

FN43. *See Seidel*, op. at 16-17 (inherently unknowable injuries: statute tolled until such time as persons of ordinary intelligence and prudence would have facts sufficient to place them on inquiry notice of an injury); *Seaboard*, 625 A.2d at 275 (equitable tolling: statute of limitations does not run against plaintiff until he knows or has reason to know facts alleged to give rise to wrong); *Halpern*, 313 A.2d at 143 (fraudulent concealment: running of statute suspended only until plaintiff's rights are discovered or would have been discovered by exercise of reasonable diligence). *See also Nardo v. Guido DeAscanis & Sons, Inc.*, Del.Super., 254 A.2d 254, 256 (1969) (standard for length of tolling is the same for fraudulent concealment, equitable tolling and inherently unknowable torts).

FN44. Where the tolling of the statute of limitations turns on controverted issues of fact, a pre-discovery dismissal of the claim would be inappropriate. *See, e.g., In re Asbestos Litig.*, Del.Supr., 673 A.2d 159, 163 (1996) (only when the record is uncontroverted that plaintiff "discovered" his injury more than [three] years prior to filing his suit is summary judgment appropriate). However, when it is clear from the face of the complaint (and the documents incorporated by reference in it) that plaintiffs' tolling theories fail even to raise a legitimate doubt about the time the claims accrued, dismissal is appropriate if the claims were filed after the applicable limitations period expired. Plaintiffs cite *In re Maxxam* for the proposition that "a defendant should not be permitted to use the statute of limitations as a shield where the defendant possesses information critical to the existence of an actionable claim of wrongdoing and prevents the plaintiff from discovering that information in a timely fashion." *In re Maxxam, Inc./ Federated Dev. Shareholders Litig.*, Del. Ch., C.A. Nos. 12111 & 12353, at 13, Jacobs, V.C. (June 21, 1995). The danger is in dismissing an action prematurely when plaintiffs do not yet have access to the information they need to state their claims fully. Here, it is clear to the Court that all of the necessary information was not only publicly available, but already in plaintiffs' hands at least as far back as 1990—an entirely different situation than the one presented to

the *In re Maxxam* Court.

**D. Were Plaintiffs on Inquiry Notice?**

Defendants contend it is clear that, based on the allegations of the Amended Complaint, plaintiffs cannot under any circumstances show that the statute of limitations was tolled for the length of time necessary to render their action timely. First, defendants note that the very facts pleaded in the Amended Complaint demonstrate that plaintiffs were on inquiry notice of defendants' alleged wrongful conduct long before February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic Cable claim). Second, defendants point out that other Partnership investors filed lawsuits against Dean Witter Reynolds alleging breach of fiduciary duty in connection with the same Proprietary Partnerships *before* the *Wall Street Journal* article was published. [FN45] That fact, defendants argue, shows conclusively that the existence of the claims was not beyond the grasp of the reasonably diligent investor. Finally, defendants make the practical argument that the *Wall Street Journal* article, touted by plaintiffs as their clarion call, could not possibly have provided the "essential missing information" that plaintiffs assert. The article simply did not disclose any information about Dean Witter's sales practices, nor did it identify any limited partnerships by name.

> FN45. *See, e.g., Grigsby v. Dean Witter Reynolds Inc.*, Cal.Super. Ct., C.A. No. 695777 (filed Dec. 27, 1995) (asserting claims with respect to the Proprietary Partnerships); *McCoy v. Dean Witter Reynolds, Inc.*, E.D. Tenn., C.A. No. 94-5779 (regarding demand for arbitration filed Dec. 28, 1989, asserting claims with respect to Income I & II); *Eno v. Dean Witter Reynolds, Inc.*, N.Y. Sup.Ct., Index No. 127300/95 (regarding demand for arbitration filed May 25, 1994, asserting claims with respect to Income II).

Defendants emphasize that the allegations of wrongful conduct asserted in the Amended Complaint are based on events that all occurred in the mid-to-late 1980s. Moreover, every fact cited by plaintiffs in the Amended Complaint comes from disclosures in documents that were either provided to plaintiffs contemporaneously with the wrongful conduct now being alleged or publicly available Securities Exchange Commission ("SEC") filings made by the Partnerships. [FN46] As a matter of law, defendants assert, disclosures in any of those documents--the sole source of plaintiffs' allegations--were sufficient to place

Not Reported in A.2d
(Cite as: 1998 WL 442456, *6 (Del.Ch.))

Page 8

plaintiffs on inquiry notice of their claims long before
February 6, 1993.

> FN46. According to defendants, investors in
> each Partnership received from Dean Witter a
> prospectus (and all applicable supplements),
> annual and quarterly reports, and periodic
> "property profiles" describing properties in
> which the Partnership had invested. Each
> Partnership also filed with the SEC (and
> made available to investors on request)
> reports on Form 10-K, reports on Form 10-Q,
> and reports on Form 8-K. Defs.' Motion to
> Dismiss at 7-8.
>
> The Court may properly consider the contents
> of the *Wall Street Journal* article, Partnership
> prospectuses, property profiles, customer
> account statements, quarterly and annual
> reports and SEC filings in considering this
> motion to dismiss, because by expressly
> referring to and so heavily relying on these
> documents in the Amended Complaint,
> plaintiffs have incorporated them by reference
> into the Amended Complaint. *Glaser v.
> Norris*, Del. Ch., C.A. No. 9583, at 9 n. 1,
> Chandler, V.C. (Jan. 6, 1992).

*7 Although the information they now use to support
their allegations was publicly available at the time of
the alleged wrongs, plaintiffs claim that they were
prevented from discovering defendants' wrongful
conduct prior to January 26, 1996, as a result of
defendants' misrepresentations regarding the health of
their Partnership investments. Until reading the *Wall
Street Journal* article, plaintiffs assert that they relied--
and were entitled to rely--on defendants' assurances
that the Partnerships' properties were performing better
than comparable properties, that the Partnerships'
losses were only temporary, and that these losses were
not caused by any wrongful conduct on the part of
defendants. In fact, the Partnerships' losses were
accompanied by an overall real estate market decline.
It was the publication of the article, plaintiffs contend,
that first alerted them to their potential claims, *i.e.*, to
the idea that their investment losses were the result of
defendants' wrongful conduct rather than a general
downturn in the real estate market. And it was not until,
*after reading the article*, plaintiffs hired a consulting
expert, who sifted through "more than 300 publicly-
filed documents," that plaintiffs were able to
reconstruct the Partnerships and actually discover
defendants' wrongful conduct. [FN47] Accordingly,
plaintiffs argue they were not on inquiry notice until
January 26, 1996 and, therefore, that is the date the
statute of limitations began to run.

> FN47. Pls.' Memo. in Opposition at 3.

As noted above, the limitations period is tolled until
such time that persons of ordinary intelligence and
prudence would have facts sufficient to put them on
inquiry which, *if pursued*, would lead to the discovery
of the injury. [FN48] Inquiry notice does *not* require
*actual* discovery of the reason for the injury. Nor does
it require plaintiffs' awareness of all of the aspects of
the alleged wrongful conduct. Rather, the statute of
limitations begins to run when plaintiffs should have
discovered the general fraudulent scheme. [FN49]
Thus, the critical inquiry for purposes of this motion to
dismiss is: were plaintiffs *entitled to rely* on
defendants' representations for as long as they did, *i.e.*,
up until publication of the January 26, 1996, *Wall
Street Journal* article, or were they on inquiry notice
before that date? [FN50]

> FN48. *In re ML-Lee Acquisition Fund II, L.P.
> Litig.*, 848 F.Supp. at 554 (defendants'
> misrepresentations were unknowable until
> publication of the Annual Report disclosing
> particular investment and its lack of success).

> FN49. *McCoy v. Goldberg*, S.D.N.Y., 748
> F.Supp. 146, 158 (1990) (statutory period
> does not await plaintiffs' leisurely discovery
> of the full details of the alleged scheme)
> (internal citations omitted). Although
> plaintiffs suggest that their claims were
> "unknowable" because it required an expert to
> uncover defendants' alleged wrongdoing, that
> argument is without merit. It may in fact have
> taken an expert to unravel the entire scheme
> alleged by plaintiffs. But having all of the
> facts necessary to articulate the wrong is *not*
> required. Rather, "[o]nce a plaintiff is in
> possession of facts sufficient to make him
> suspicious, or that ought to make him
> suspicious, he is deemed to be on inquiry
> notice." *Harner v. Prudential Secs. Inc.*, E.D.
> Mich., 785 F.Supp. 626, 633 (1992) (citations
> omitted), *aff'd*, 6th Cir., 35 F.3d 565 (1994).

> FN50. Defendants assert that when plaintiffs
> read the article, they responded by doing what
> they could have done several years earlier--
> they read the public documents and hired an
> expert to review them. Defs.' Motion to
> Dismiss at 15-16.

The Partnerships sustained steady losses from the
outset. Plaintiffs allege that defendants purposely put
them off the trail of inquiry by notifying them of these
losses, while at the same time reassuring plaintiffs that
the Partnerships were returning profits. [FN51] For

example, plaintiffs "received regular distributions, falsely reassuring [them] regarding the financial condition of their investments." [FN52] In reliance on the fiduciary duties owed by defendants, plaintiffs assert that they "had no reason to go behind Defendants' campaign of misinformation" to discover the true source of the Partnership losses. [FN53]

> FN51. *See, e.g., Income III,* 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 6-C (Docket No. 25) ("1990 was a difficult and disappointing year for real estate investments in general.... Fortunately, due to the high quality of its properties and size of its portfolio, the Partnership has been able to avoid the worst of the[ ] problems.... The cash distribution paid during the 1990 fiscal year was ... an annualized return of 6.25%.").

> FN52. Pls.' Memo. in Opposition at 51.

> FN53. *Id.* at 48.

*8 Plaintiffs specifically complain that the annual reports concealed the fact that these consistent cash distributions were actually a return of partners' capital rather than a "return on investment." [FN54] Pointing to the 1990 Annual Report for the Yield Plus II Partnership as an example, plaintiffs assert that they could not have known that Partnership capital was being impaired, in light of the statement that the "distribution ... was an annualized return on investment of 7.5%." [FN55] But in the same annual report, three pages away on page four, is a chart showing clearly that the partners' capital had declined from the previous year. Moreover, from a chart on page six, it is apparent from even the most cursory glance that the amount of the cash distributions for the year 1990 far exceeded the Partnership's net income for the same year. These charts are not, as plaintiffs suggest, hard to understand, nor are they buried at the back of a thick report. The typical annual report for the Partnerships is no more than fifteen pages in length. While the distributions were maintained at a fairly high level, looking beyond the language on the first page of these annual reports, the fact that the distributions are consistently greater than the Partnership income *should have alerted* plaintiffs to the fact that something was amiss.

> FN54. *See, e.g.,* Pls.' Memo. in Opposition at 7, 23-24, 26-28, 51.

> FN55. Yield Plus II, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro

(Dec. 10, 1996), Ex. 2-D (Docket No. 23).

Plaintiffs seek refuge in the proposition that where the statute of limitations inquiry involves claims of self-dealing by a fiduciary, "[t]he emphasis is upon the protection of the beneficiary of the fiduciary duty, so long as she is reasonably attentive to her interests, albeit trusting." [FN56] Accordingly, plaintiffs assert, the fiduciary relationship between plaintiffs and defendants in this case entitled plaintiffs to rely upon the presumed good faith and loyalty of defendants. Plaintiffs correctly point out that beneficiaries are entitled to trust their fiduciaries . [FN57] As a result, reasonable reliance on the competence and good faith of those who have assumed a legal responsibility toward a plaintiff can be sufficient to toll the running of the statute of limitations. [FN58] But, the trusting plaintiff still must be *reasonably attentive* to his interests. *"[B]eneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC filings."* [FN59] Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available. [FN60]

> FN56. *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 37, Allen, C. (Nov. 21, 1995).

> FN57. *See, e.g., Borden v. Sinskey,* 3d Cir., 530 F.2d 478, 489, n. 10 (1976) ("Shareholders have no duty to search a corporation's records for evidence of misconduct on the part of corporate officers and directors. Rather, they are entitled to assume that those standing in a fiduciary relationship to them will be faithful to their charge.").

> FN58. *Seaboard,* 625 A.2d at 275.

> FN59. *Seidel,* op. at 18 (emphasis added).

> FN60. *Id.* (rejecting plaintiff's inherently unknowable tolling argument because "the public documents, which form the basis of many of Plaintiff's claims, could have provided Plaintiff with adequate notice of an alleged misconduct by Defendants."). In the instant case, the public documents provide the basis for *all* of plaintiffs' claims. *See also In re USACafes, L.P. Litig.,* Del. Ch., C.A. No. 11146, 18 Del. J. Corp. L. 1204, 1213 (1993) ("[I]nterest holders need not delve aggressively into the internal affairs of a ...

Not Reported in A.2d

(Cite as: 1998 WL 442456, *8 (Del.Ch.))

limited partnership in order to assure that a non-public, self-dealing transaction is not foreclosed from attack by limitations, but when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights.").

It is not too much to ask investors to read beyond the first page of an annual report, to read past the rosy forecasts and actually look at the cold, hard figures provided to them. Had plaintiffs bothered, for example, to read past the first page of the 1989 Annual Report for Income II--a document that was delivered to investors by mid-1990 at the latest--they would have been alarmed. [FN61] Although large distributions were being made, with a quick glance it is clear that the amount of these distributions far exceeded the "net income" figure. [FN62] In fact, the figures show the amount of the "partners' capital" steadily declining from 1986 to 1989. [FN63] Yet, the first page of this annual report states so optimistically: "The cash distribution paid for the 1989 fiscal year [constituted] an annualized return of 7%." This blatant contradiction should have been a "red flag" to any investor--and should have prompted an inquiry by plaintiffs into the health of their investments. [FN64]

FN61. Income II, 1989 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (July 11, 1997), Ex. C (Docket No. 52).

FN62. For the fiscal year 1989, the Income II Partnership shows a net income figure of $7,043,996 and cash distributions of $13,768,450. *Id.* at 7.

FN63. *Id.*

FN64. *In re Prudential Sec. Inc. L.P. Litig.*, S.D.N.Y., 930 F.Supp. 68, 76 (1996) ("Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of that fraud will be imputed to him.").

**\*9** The presence of this inherently contradictory information in each Partnership's annual report starting in the late 1980s for the earlier Partnerships and its appearance in all of the Partnerships by 1990 compels the conclusion that plaintiffs were not reasonably attentive to their investment interests. [FN65] Plaintiffs

were not entitled to sit idly by, blindly relying on defendants' assurances, when the documents and disclosures plaintiffs received regularly were so suggestive of mismanagement. [FN66] Whether accompanied by optimistic projections or not, these discrepancies alone were sufficient notice of wrongdoing to prompt inquiry into the Partnerships. Upon receipt for each Partnership of the first annual report revealing cash distributions in excess of net income, plaintiffs were on inquiry notice of their claims. [FN67]

FN65. *See, e.g.*, Income I, 1989 Annual Report, Ex. A; Income II, 1989 Annual Report, Ex. C; Income III, 1989 Annual Report, Ex. L; Income IV, 1989 Annual Report, Ex. M; Growth Properties, 1989 Annual Report, Ex. D (attachments to the Affidavit of Ronald J. DiPietro (July 11, 1997) (Docket No. 52)); Yield Plus, 1989 Annual Report, Ex. 1-D; Yield Plus II, 1990 Annual Report, Ex. 2-D (attachments to Affidavit of Ronald J. DiPietro (Dec. 10, 1996) (Docket No. 23)); Falcon Classic Cable, 1990 Annual Report, Ex. B (attachment to Affidavit of Mary Lou Frick (Dec. 10, 1996) (Docket No. 26)).

FN66. *See, e.g., Playtex, Inc. v. Columbia Casualty*, Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("inherently unknowable" theory of tolling did not apply where a "wealth of information regarding [the cause of action] was generally available" when the fraud occurred); *Halpern*, 313 A.2d at 143 (statute is tolled only for the "period of fraudulent concealment").

FN67. *See Ruger v. Funk*, op. at 6 ("Actual discovery surely commences the running of the statute; so will any change in circumstances that renders the injury no longer inherently unknowable, or the ignorance of the party-plaintiff no longer blameless."). The Amended Complaint also alleges that such "deceptive" cash distributions were used to promote the sale of later Partnerships, and the purchasers of the later Partnerships would have no reason to review the financial information/materials for the earlier Partnerships. Assuming this is true, it still should have been obvious to the investors soon after receiving their annual reports that the cash distributions *they* were receiving were inflated and not reflective of actual earnings. Perhaps for one year, this would not raise too much concern, but certainly after the second or third straight year of cash distributions that far exceeded

Not Reported in A.2d
(Cite as: 1998 WL 442456, *9 (Del.Ch.))

Partnership income, accompanied by a commensurate decline in partners' capital, plaintiffs should have been aware that the cash distributions they were receiving were not the result of investment gains--and that they were most likely duped into purchasing the Partnerships in the first place. The inherent contradiction between the distributions--described in these annual reports as "annualized returns"--and the declining partners' capital and net income lower than that the distributions should have caused plaintiffs to question whether the touted cash distributions of the earlier partnerships were truly indicative of profits. That is inquiry notice. *Queen Anne Pier Condominium Council v. Raley,* Del.Super., C.A. No. 85C-JA10, at 8, Lee, J. (Jan. 26, 1988) (inquiry notice means the existence of facts sufficient to put person of ordinary intelligence and prudence on inquiry which, *if pursued,* would lead to the discovery).

### IV. CONCLUSION

On the basis of this record, I conclude that the information in the annual reports alone should have provided plaintiffs with adequate notice of any alleged misconduct by defendants. [FN68] Based on the facts alleged in the Amended Complaint, drawing all inferences in favor of plaintiffs, I conclude that plaintiffs were clearly on inquiry notice of their claims long before February 6, 1993 (or before October 7, 1993, with regard to the Falcon Classic Cable claim). [FN69] The limitations period for this cause of action is three years. Plaintiffs' February 1996 filing (the earliest of plaintiffs' filings) comes *more* than three years after they were placed on inquiry notice. For these reasons, I grant defendants' motion to dismiss on the ground that the plaintiffs' claims are time-barred by operation of the statute of limitations. [FN70]

FN68. Although I conclude that the glaring inconsistencies contained in the annual reports were sufficient, in and of themselves, to place plaintiffs on inquiry notice of their

potential causes of action, those discrepancies were not the only indications plaintiffs had of their potential claims. I need not address them in substance (as I find the material in the annual reports dispositive on the issue), but I am inclined to agree with defendants' other assertions of plaintiffs' inquiry notice: (1) that plaintiffs were on notice no later than 1992, when defendants changed the format of their monthly account statements to reflect the true, rather than par, value of the Partnerships. *See In re Prudential Sec. Inc. L.P. Litig.,* 930 F.Supp. at 76-77; (2) that some investors in the Partnerships did manage to file lawsuits against the very same limited partnerships *before* January 26, 1996, suggests the alleged wrongful conduct was detectable by the average investor; and (3) that the *Wall Street Journal* article neither disclosed any concrete information about sales practices or the investments in question, nor mentioned by name the limited partnership defendants in this case, thus raising a serious doubt as to how the article alone could have prompted such an inquiry.

FN69. *Cf. Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995) (motion to dismiss denied because issue of plaintiffs' inquiry notice was in dispute).

FN70. Plaintiffs' request, in the alternative, to amend their Amended Complaint is hereby denied. No amendment would cure the fatal flaw in plaintiffs' current Amended Complaint--that it was filed too late. *Glaser v. Norris,* Del. Ch., C.A. No. 9538, at 30-31, Chandler, V.C. (Jan. 6, 1992) ("A court should deny leave to amend a complaint when the amendment would be futile due to the insufficiency of the proposed amendment.")

IT IS SO ORDERED.

1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

EXHIBIT B

Not Reported in A.2d                                              Page 12
(Cite as: 1993 WL 18769 (Del.Ch.), 18 Del. J. Corp. L. 1204)

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

In re USACAFES, L.P. LITIGATION.

Civ. A. No. 11146.

Submitted: Oct. 13, 1992.
Decided: Jan. 21, 1993.

**1205 Joseph A. Rosenthal, Rosenthal, Monhait,
Gross & Goddess, P.A., Wilmington, Scott W. Fisher,
and Jerald M. Stein, Garwin, Bronzaft, Gerstein &
Fisher, New York City, and Robert M. Roseman,
Spector & Roseman, P.C. Philadelphia, for plaintifffs.

John H. Small, and Bruce E. Jameson, Prickett, Jones,
Elliott, Kristol & Schnee, Wilmington, Michael L.
Knapek, and Michael C. French, Jackson & Walker,
Dallas, TX, for defendants Cafes One, L.P., Cafes
General Partner, Inc., Sam Wyly, Charles J. Wyly, C.
Jeffrey Rogers, B.B. Tuley, J.D. Francis, and F. Jay
Taylor.

Daniel A. Dreisbach, Richards, Layton & Finger,
Wilmington, David L. Kornblau, Paul, Weiss, Rifkind,
Wharton & Garrison, New York City, for defendant
Metsa, Inc.

MEMORANDUM OPINION

ALLEN, Chancellor.

*1 Pending is plaintiffs' motion pursuant to Chancery
Court Rule 15, for leave to file a Second Amended
Consolidated and Supplemental Complaint.

**1206 Since 1989, plaintiffs have been pursuing
class action claims related to the sale that year of
substantially all of the assets of USACafes, L.P. to
Metsa Acquisition Corp., ("Metsa"). _See In Re
USACafes, L.P. Litigation,_ Del.Ch., 600 A.2d 43
(1991). The class action is on behalf of all of the
public holders of limited partnership interests in
USACafes, L.P. (now Cafes One, L.P.). The principal
defendants are the general partner, USACafes General
Partner, Inc., its directors (including its controlling
shareholders Sam and Charles Wyly), and Metsa.

Plaintiffs now seek to amend their complaint to seek
damages in a derivative capacity, on behalf of Cafes
One, L.P., against the directors of the general partner,

for allegedly improper payments made to the
defendants in the years prior to the sale of assets to
Metsa. (¶¶ 41-49) Central defendants in the proposed
amended pleading, as in the original pleading, are Sam
and Charles Wyly, brothers who own all of the voting
stock of the general partner, as well as approximately
40% of the limited partnership units, and who serve as
chairman and president (Sam) and director and officer
(Charles) of the general partner.

The new allegations are that in the years 1986 to 1989
the directors of the general partner awarded themselves
"excessive directors' fees, salaries, travel expenses,
automobile expenses, business allowances, and options
grants" that "were unrelated to any services rendered to
USACafes." (¶ 94) These fees were paid by the
partnership under the Partnership Agreement.

Specifically, plaintiffs allege that in 1988, Sam Wyly
attended only one directors' meeting personally and
three by telephone and provided no other substantial
services to USACafes, while receiving $124,278 in
wages and salaries, and $483,000 in "non-employee
compensation" from USACafes. (¶ 43) Plaintiffs
allege that as compensation for attending these four
directors' meetings in 1988, Charles Wyly received
$114,305 in wages and salary and $183,000 in "non-
employee compensation." For the year 1989, Sam
Wyly received payments totaling $684,711 [FN1] and
Charles Wyly received $353,865 **1207 for services
of substantially the same character. [FN2] (¶ 44) This
is alleged to be waste or, at least, unfair self-dealing,
since the Wylys are alleged to dominate and control the
board of directors of the general partner.

> FN1. Sam Wyly allegedly received the
> following payments in 1989:

> FN2. Charles Wyly is alleged to have
> received the following payments in 1989:

In addition, the proposed complaint seeks to add
claims that the partnership paid one Don Thomson,
who is alleged to be a friend of the Wylys, over
$300,000 in fees and expenses in 1988, and loaned him
several hundred thousand dollars from 1987 to 1989.
These payments are said to constitute waste.

It is also alleged that defendants awarded themselves
options to purchase limited partnership units, including
100,000 options to Sam Wyly and Charles Wyly each
in 1986 and 200,000 to Sam and 100,000 to Charles in
1988, without compensation to the firm. (¶ 47)

Not Reported in A.2d                                                                                       Page 13
(Cite as: 1993 WL 18769, *2 (Del.Ch.), 18 Del. J. Corp. L. 1204, **1207)

*2 It is further asserted that in an effort to conceal these activities, defendants converted USACafes from a corporation to a limited partnership in 1986, thus avoiding certain disclosure obligations created by the federal securities laws and regulations. (¶ 48) Compliance with these avoided disclosure obligations, in plaintiffs' view, would have resulted in the exposure of defendants' activities to the scrutiny of plaintiffs and the general public, and alerted plaintiffs to bring suit to protect the asserted rights of the limited partnership before the expiration of the statute of limitations.

Finally, plaintiffs seek to add to their complaint, additional detail regarding the Metsa transactions. These new factual allegations are that the business prospects for the Company were quite good at the time of the sale and that, in connection with the sale, the Wyly's diverted $438,000 in fees to Glass and Wyly, a financial advisory firm owned by Evan Wyly, Sam Wyly's son. (¶ 69)

Plaintiffs also claim that the newly alleged acts of corporate waste injured the class of unit holders in the Metsa sale because they had the effect of depressing the market value of USACafes, L.P. and thus decreasing the amount realizable by the unit holders in its sale. The claim that the entity was over-reached by the general partners is, however, plainly a derivative and not a class claim. It is one thing to claim that the unit holders might have individually **1208 received more on a liquidation sale if the company would have been better shopped or if some part of the consideration the buyer was willing to pay had not been improperly diverted. It is rather different to say that more could have been realized if the business had years earlier been run in some other way. The latter claim is plainly derivative and relates to earlier acts and earlier (potential) liabilities. This is a material fact in a motion raising limitations issues.

I.

Defendants oppose plaintiffs' motion to amend, arguing that the proposed additional claims would be stricken on a motion to dismiss and therefore should not be added to the complaint. *See Itek Corp. v. Chicago Aerial Indus., Inc.*, Del.Supr., 257 A.2d 232, 233 (1969). Defendants maintain that the proposed derivative claims, contained in Count III of the proposed complaint, cannot survive a motion to dismiss because: (1) the applicable statute of limitations has run; (2) in any event, plaintiff has failed to meet the demand requirement by making demand upon the general partner to pursue these claims

or adequately alleging that demand is excused; (3) plaintiffs' and their law firm will have fatal conflicting interests if they attempt to represent both the class and derivative claimants simultaneously; and (4) the proposed complaint fails to allege fraud with particularity.

II.

I turn to the limitation issue which I regard as dispositive. Defendants claim that, to the extent that plaintiffs' proposed amended complaint seeks to recover damages for alleged wrongdoing which occurred prior to July 1, 1989, the claims are barred by application of the three year statute of limitations contained in 10 *Del.C.* § 8106 (1991). [FN3]

FN3. Plaintiff filed the proposed Second Amended Complaint on July 1, 1992.

*3 The application of the statute of limitations by the Court of Chancery, in an action charging a corporate director with actionable self-dealing has been the subject of a recent opinion. *See Kahn v. Seaboard Corp.*, Del.Ch., No. 11485, Allen, C. (Jan. 14, 1993). In that case, in harmonizing *Bokat v. Getty Oil Co.*, Del.Supr., 262 A.2d 246 (1970) and *Bovay v. H.M. Byllesby & Co.*, Del.Supr., 38 A.2d 808 (1944), I expressed the opinion that where actionable self-dealing is alleged in a derivative suit against a corporate fiduciary, **1209 the statute of limitations applies, but may be tolled until such time as a reasonably diligent and attentive stockholder knew or had reason to know the facts alleged to constitute the wrong. Furthermore, it was there held that where, as here, plaintiff's pleading shows on its face that if the applicable statute were applied, the claim asserted would be time-barred, then it is plaintiff's burden to plead facts which could support a conclusion that, in the circumstances, the running of the statute was tolled. *See Kahn v. Seaboard Corp., supra* at 16. Finally, if this is done as a pleading matter, but defendant is able to show by undisputed facts outside of the pleadings that the statute was not tolled during the three year period prior to filing of the complaint, then defendant may be awarded a summary judgment. *See Bokat v. Getty Oil Co., supra.*

Here the principal question with respect to the impact, if any, of the statute of limitations upon the present assertion of this claim is the question when did class members have reasonable notice of the facts now alleged to constitute the claims that plaintiff wishes to assert derivatively. The parties have submitted certain

Not Reported in A.2d

(Cite as: 1993 WL 18769, *3 (Del.Ch.), 18 Del. J. Corp. L. 1204, **1209)

public filings which I treat as establishing, not the truth of any statements therein, but the fact that the statements therein were made on and after the filing of such documents.

A. Disclosures Concerning Salaries Received by Directors

A review of the 10-K forms and other public documents filed by USACafes with the S.E.C. shows that prior to fiscal year 1988, the company disclosed the individual salaries paid by the partnership to each of the general partner's directors or principal officers each year. For example, the 1986 prospectus issued by USACafes discloses that in fiscal year 1986 the defendants were paid the following cash compensation: Sam Wyly-$456,000; Charles Wyly-$228,000; C. Jeffrey Rogers-$337,865; Charles B. Brewer-$170,500; Ronald W. Parker- $165,500; Mr. J.D. Francis and Mr. F. Jay Taylor-$30,000 director's fee to each. (DX A at 75)

USACafes 10-K for the fiscal year ending December 31, 1987 shows the following cash compensation: Sam Wyly-$580,144; Charles Wyly-$288,143; C. Jeffrey Rogers-$287,938 salary, $682,948 bonus; Charles B. Brewer-$131,292 salary, $261,906 bonus; Ronald W. Parker-$142,308 salary, $270,085 bonus; Mr. J.D. Francis and Mr. F. Jay Taylor-$30,000 director's fee to each. (DX B at 45) [FN4]

FN4. All references to defense exhibits refer to documents attached to defendants' submission of October 21, 1992.

*4 **1210 In fiscal year 1988, under the heading "Executive Compensation", the company reported only the aggregate amount of direct and indirect expenses, incurred by the General Partner on behalf of the partnership, and reimbursed by the partnership. In 1988, these expenses totalled $5,830,000. (DX C at 48) Plaintiffs now assert Sam Wyly received some $610,000 (see p. 2 above) that year. While his share of the $5.8 million expense was not reported, note how comparable that amount was to what had been reported for the previous year ($580,000) as payments to him. For fiscal year 1989, the Company reported the direct and indirect expenses incurred by the general partner and paid by the partnership in the same fashion, stating that they totalled approximately $7,200,000. (DX D at 59) Now plaintiffs wish to allege that Sam Wyly received $684,711 (see n. 1 above) which was not separately disclosed.

B. Disclosures Concerning Loans To C. Jeffrey Rogers

Plaintiffs allege that improper loans were extended to Mr. C. Jeffrey Rogers from 1986 until 1989. (¶ 46) A review of the S.E.C. filings shows that the existence and amount, but not the exact purpose, of these loans was disclosed by the Company. The prospectus issued in 1986 stated that "since October 1983, Mr. Rogers has obtained a series of loans from the Company ... with the largest principal amount ... outstanding ... being $977,455." (DX A at 79) The Company's 10-K for the fiscal year ending December 31, 1987 discloses that Mr. Rogers at that point had two loans of $1,062,176 and $864,911 respectively. (DX B at 48) The 10-K for the fiscal year ending December 31, 1988 disclosed that Mr. Rogers owed the Company $1,131,000 on that date. (DX C at 43) Finally, the 1989 10-K shows that as of October 1989, Mr. Rogers owed $813,000 to the Company and that this debt was forgiven "in conjunction with the sale" to Metsa. (DX D at 25)

The 1986 prospectus and December 31, 1987 10-K form do not describe how Rogers applied the funds he obtained through the loans from the Company, except to note that they included amounts owed under his stock purchase agreement with the Company. (DX A at 79) The 1988 and 1989 10-K forms state that the loans included amounts under stock and unit purchase agreements "and for personal use." (DX C at 40; DX D at 49)

C. Disclosure of Payments to Don Thomson

Don Thomson, a former director of USACafes and later a consultant to the company, is alleged in the proposed amended **1211 complaint to have received improper cash payments from the Company and to have improperly arranged for the Company to pay hundreds of thousands of dollars in life insurance premiums on his behalf. (¶ 45) The 1986 prospectus stated that in February 1984 Mr. Thomson entered into a seven year contract to provide financial advisory services to the Company in exchange for the Company paying him a fee of $90,000 annually. The document states that the Company was also paying the premiums on an insurance policy on his life. [FN5] The prospectus discloses that the annual premium on this policy was $124,236 for fiscal year 1986. (DX A at 78) The same document also reveals that Mr. Thomson was indebted to the company in the amount of $106,390. (DX A at 79) Mr. Thomson's indebtedness to the Company is disclosed on the 1987, 1988, and

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                Page 15
(Cite as: 1993 WL 18769, *4 (Del.Ch.), 18 Del. J. Corp. L. 1204, **1211)

1989 10-K forms. (DX B at 39; DX C at 43; DX D at
54.) In 1989 Mr. Thomson's indebtedness totalled
$317,000 and was forgiven as part of the Metsa sale.
That forgiveness is challenged in the existing class
action. (DX D at 54)

> FN5. The document also states that
> USACafes was the beneficiary under the
> policy to the extent of premiums previously
> paid, with the remainder being paid to Mr.
> Thomson's immediate family.

D. Disclosures of Grants of Stock and Unit Options

*5 The plaintiffs allege in ¶ 47 of the Complaint that
"Sam Wyly dispensed huge quantities of options to
acquire USACafes securities to himself, his brother,
and certain favored executives whenever he deemed it
appropriate." Putting to one side the defects of such a
pleading from the point of view of vagueness, it must
be noted that the following was disclosed in 1986:
"[o]n September 22, 1986 the Company granted
200,000 and 100,000 non-qualified stock options to
Sam Wyly and Charles J. Wyly, Jr. respectively, at an
exercise price of $6.25 per share, the last reported sales
price of the common stock on such date." (DX A at
75) The 1986 prospectus also states that C. Jeffrey
Rogers received options to buy 257,000 shares while
Charles Brewer and Ronald Parker received options to
buy 70,000 and all directors and officers received
options to buy 452,000 shares. The 1987 form 10-K
states that

> [d]uring 1987, Mr. Rogers was granted 100,000
> options to purchase units ... at a price ... which
> represented fair market value ... No other executive
> officers of the General Partner were granted unit
> options during 1987.

(DX B at 47) The 1988 form 10-K states that "[o]n
January 18, 1988, **1212 200,000 and 100,000
options were granted to Mr. Sam Wyly and Mr.
Charles Wyly, respectively, at $8.00 per unit which
approximated fair market value." (DX C at 49) The
1988 10-K also states that on January 17, 1988 Mr.
Rogers received options to purchase 120,000 units
while Mr. Parker and Mr. Brewer received options on
35,000 and 20,000 units respectively. Mr. Parker also
received, according to the 1988 form 10-K, additional
options to purchase 17,500 units on November 18,
1988. (DX C at 49) The 1989 form 10-K states that
on May 10, 1989 an option to purchase 25,000 units at
$9.125 was issued to "an executive officer of the
general partner" and later redeemed for the difference
between the exercise price and $10.25, totalling
$28,125. (DX D at 61)

* * *

Generally Delaware courts have, in the absence of
actual steps to conceal a wrong by a corporate director,
applied the statute of limitations to stockholders in
derivative actions against corporate directors seeking
the award of money. *See Bokat v. Getty Oil Co.,*
Del.Supr., 262 A.2d 246 (1970); *Halpern v. Barran,*
Del.Ch., 313 A.2d 139 (1973); *Boeing Co. v. Shrontz,*
Del.Ch., No. 11273, Berger, V.C. (Apr. 20, 1992). In
*Bovay v. H.M. Byllesby & Co., supra* the Court
declined to do so where the essence of the claim was
fraudulent self-dealing that personally enriched a
corporate fiduciary. My understanding of this law
when read together is set forth in *Kahn v. Seaboard
Corp., supra.*

Here I conclude that the statute of limitations does
apply to bar litigation now of these claims that, if they
are assumed to be valid, arose prior to July 1, 1989.
[FN6]

> FN6. I note that these new matters do not
> arise out of the subject matter of the
> complaint--the asset sale to Metsa or the
> disclosure of voting rights in the 1986
> Prospectus and thus would not "relate back"
> under Ch.C. Rule 15.

I find no basis in the pleaded or undisputed facts
concerning public disclosures to rebut the application
of the statute. The notion that the 1986 conversion to
the partnership form had the purpose or effect of
"covering up" the alleged wrongs now brought
forward--the grant of options and the payment of
salaries chiefly--seems palpably to be a lawyers'
invention for litigation use. But I here do not now
pass on matters of plausibility; plaintiffs' counsel are
permitted to advance factual contentions that others
take to be implausible **1213 if they have good
ground to believe them to be true. *See* Ch.C. Rule 11
(1991). But plaintiffs have pleaded no fact that would
support the idea that this reorganization was done for
the purpose of concealing future wrongs. More
pertinently they have not shown that the conversion
resulted in a situation in which a reasonably alert
interest holder would not have been placed on notice of
conduct of the kind here complained of, during the
period when the statute was running but had not run
out.

*6 The facts set forth above, derived from publicly
filed documents, disclose to reasonably alert interest
holders the existence of a practice of paying

compensation to the Wylys and the level of those payments and the Wylys involvement in the Company; disclosed the loans to Mr. Rogers; disclosed payments to Mr. Thomson and the insurance arrangements; and disclosed the grants of options at market price.

Shareholders or interest holders need not delve aggressively into the internal affairs of a corporation or a limited partnership in order to assure that a non-public, self-dealing transaction is not foreclosed from

attack by limitations, but when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights. *See Bokat, supra; Kahn v. Seaboard Corp., supra.* That in my judgment is the case here.

The motion to file the proposed amended complaint will be denied. The parties are directed to confer and attempt to agree on those parts of the proposed amendment that may be permitted by agreement.

```
Salary:              $141,421
Director's Fee:      $339,000
Business Allowance:  $144,000
Auto, Travel & Ins.   $60,490
                     --------
Total                $684,711


Salary:              $141,421
Director's fee       $111,000
Business Allowance    $72,000
Auto, Travel & Ins.   $29,324
                     --------
Total                $353,865
```

1993 WL 18769 (Del.Ch.), 18 Del. J. Corp. L. 1204

END OF DOCUMENT

## CERTIFICATE OF SERVICE

I, Aaron A. Garber, hereby certify that on October 1, 2003, I caused service of the Brief Of The Appellant, The Bank Of New York As Successor Indenture Trustee by causing a copy thereof to be served via United States mail, first class, postage pre-paid upon those parties listed below.

Jeffrey A. Deller, Esq.
Klett, Rooney, Lieber & Schorling
One Oxford Center, 40th Floor
Pittsburgh, PA 15219
Tel: 412-392-2000
Fax: 412-392-2128

Teresa K.D. Currier, Esq.
Klett, Rooney, Lieber & Schorling
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
Tel: 302-552-4220
Fax: 302-552-4295

Robin E. Keller, Esq.
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982
Tel: 212-806-5400
Fax: 212-806-6006

Kevin Gross, Esq.
Rosenthal, Monhait, Gross
& Goddess, P.A.
1401 Mellon Bank Center
Wilmington, DE 19801
Tel: 302-656-4433
Fax: 302-658-7567

William Hazeltine, Esq.
Potter, Anderson & Corroon
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801
Tel: 302-984-6000
Fax: 302-658-1192

Julie L. Compton, Esq.
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2313
Lockbox 35
Wilmington, DE 19801
Tel: 302-573-6491
Fax: 302-573-6497

Aaron A. Garber (DE No. 3837)

WL: #126887 v1 (2PWN01!.DOC)

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **EPIC CAPITAL CORPORATION, *et al.*,** | § | **Jointly Administered Under** |
| | § | **Case No. 01-2458-MFW** |
| Debtors. | § | |
| | § | |
| ──────────────────────── | § | ──────────────────────── |
| | § | |
| THE BANK OF NEW YORK, AS | § | **Adversary Proceeding No. 02-03021-MFW** |
| SUCCESSOR INDENTURE TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| EPIC RESORTS – PALM SPRINGS | § | |
| MARQUIS VILLAS, LLC, and | § | |
| | § | |
| USA CAPITAL DIVERSIFIED TRUST | § | |
| DEED FUND, LLC, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| ──────────────────────── | § | ──────────────────────── |
| | § | |
| THE BANK OF NEW YORK, AS | § | **Civil Action No.  03-360 (JJF)** |
| SUCCESSOR INDENTURE TRUSTEE, | § | |
| | § | |
| Appellant, | § | |
| | § | |
| v. | § | |
| | § | |
| EPIC RESORTS – PALM SPRINGS | § | |
| MARQUIS VILLAS, LLC, and | § | |
| | § | |
| USA CAPITAL DIVERSIFIED TRUST | § | |
| DEED FUND, LLC, | § | |
| | § | |
| Appellees. | § | |

## APPENDIX FOR BRIEF OF THE APPELLANT,
## THE BANK OF NEW YORK AS SUCCESSOR INDENTURE TRUSTEE

David M. Fournier (ID# 2812)          Tom A. Howley
Aaron A. Garber (ID# 3837)           Mark D. Sherrill
PEPPER HAMILTON, LLP                HAYNES AND BOONE, LLP
1201 Market Street, Suite 1600        1000 Louisiana, Suite 4300
Wilmington, DE  19899               Houston, Texas 77002
Phone:   (302) 777-6500              Telephone:  (713) 547-2000
Fax:      (302) 656-8865             Fax:         (713) 547-2600


Dated:  October 1, 2003.            COUNSEL FOR THE BANK OF NEW YORK
                                    AS SUCCESSOR INDENTURE TRUSTEE

## APPENDIX TO APPELLANT'S OPENING BRIEF

**The following documents have been designated as part of the record on appeal, in the *Appellant's Statement of Issues and Designation of Items to be Included in Record on Appeal By The Bank of New York, As Successor Indenture Trustee*, and are attached thereto. Exhibit numbers referenced in this Brief refer to the numbers set forth below:**

1.      Indenture by and among Epic Resorts, LLC and Epic Capital Corp., as Issuers, and United Trust Company of New York, as Trustee, dated February 3, 1999, contained in USA Capital Appendix, Volume #2, Exhibit #16.[1]

2.      Transcript of Deposition of Loretta Lundberg, contained in USA Capital Appendix, Volume #5, Exhibit # 36.

3.      USA Capital Appendix, Volume #6, Exhibit #36.

4.      Prospectus, contained in USA Capital Appendix, Volume #2, Exhibit # 15.

5.      Purchase Agreement by and among Epic Resorts, LLC, Epic Capital Corp. and Epic Warrant Co., as sellers, and NatWest Capital Markets Limited, as purchaser, dated June 30, 1998, contained in BNY Appendix, Exhibit #3.

6.      Declaration of John Guiliano, contained in BNY Appendix, Exhibit #1.

7.      Deed of Trust, dated July 8, 1998, by and between Epic Resorts –Westpark Resort, LLC and United States Trust Company of New York, contained in USA Capital Appendix, Volume #2, Exhibit #17.

8.      Deed of Trust, dated July 8, 1998, by and between Epic Resorts – Scottsdale Links Resort, LLC and United States Trust Company of New York, contained in USA Capital Appendix, Volume #2, Exhibit #18.

9.      Mortgage, dated July 8, 1998, by and between Epic Resorts – Hilton Head, LLC and United States Trust Company of New York, contained in USA Capital Appendix, Volume #2, Exhibit #19.

---

[1] Appendices of USA Capital and BNY refer to the appendices filed in the Bankruptcy Court, relating to the cross-motions for summary judgment, and appearing at docket numbers 12-24 and 31, in adversary proceeding no. 02-3021. Such appendices were included in the Designation.

10.      Mortgage, dated July 8, 1998, by and between Daytona Beach Regency, Ltd. and United States Trust Company of New York, contained in USA Capital Appendix, Volume #2, Exhibit #21.

11.      Transcript of Bankruptcy Court Hearing held April 30, 2002.

12.      Form of Leasehold Deed of Trust, dated July __, 1998 [sic], by and between Epic Resorts – Palm Springs Marquis Villas, LLC and United States Trust Company of New York, LLC, contained in USA Capital Appendix, Volume #2, Exhibit #20.

13.      Closing Index, contained in BNY Appendix, Exhibit #2.

14.      Offering Memorandum, contained in BNY Appendix, Exhibit #4.

15.      Transcript of Bankruptcy Court Hearing Held May 21, 2002.

16.      S-4 Registration Statement, filed with the SEC August 13, 1998, by Epic Resorts, contained in Complaint, Exhibit D.

17.      10-K Annual Statement, filed with the SEC March 31, 1999, by Epic Resorts, contained in Complaint, Exhibit G.

18.      USA Capital request for documents, contained in BNY Appendix, Exhibit #6.

19.      Deposition of Tom Hantges, contained in BNY Appendix, Exhibit #7.

20.      Answer and Affirmative Defenses of USA Capital Diversified Trust Deed Fund, LLC to the Complaint to Determine Validity, Extent and Priority of Liens and For Equitable Subordination Pursuant to 11 U.S.C. § 510(c) Filed by The Bank of New York.

21.      Letter dated August 7, 2000, from John Rogers Burk to Tom Rondeau, contained in BNY Appendix, Exhibit #8.

22.      Deposition of Joseph Milanowski, contained in BNY Appendix, Exhibit #12.

23.      Loan Agreement, dated June 26, 2000, by and between Epic Resorts – Palm Springs Marquis Villas, LLC and USA Capital Diversified Trust Deed Fund, contained in USA Capital Appendix, Volume #2, Exhibit #3.

24.      Promissory Note Secured by Deed of Trust, dated June 26, 2000, by and between Epic Resorts – Palm Springs Marquis Villas, LLC and USA Capital Diversified Trust Deed Fund, contained in USA Capital Appendix, Volume #2, Exhibit #4.

25.      Letter dated June 26, 2000, from Thomas F. Flatley to Joseph Milanowski, contained in USA Capital Appendix, Volume #2, Exhibit #5.

26.    Guaranty, by and between Epic Resorts, LLC and USA Capital Diversified Trust Deed Fund, contained in USA Capital Appendix, Volume #2, Exhibit #6.

27.    Limited Guaranty, by and between Thomas F. Flatley and USA Capital Diversified Trust Deed Fund, contained in USA Capital Appendix, Volume #2, Exhibit #7.

28.    Recorded Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing, filed July 5, 2000, by and between Epic Resorts – Palm Springs Marquis Villas, LLC and USA Capital Diversified Trust Deed Fund, contained in USA Capital Appendix, Volume #2, Exhibit #8.

29.    UCC-1 Filing Statement, filed July 28, 2000, by and between Epic Resorts – Palm Springs Marquis Villas, LLC and USA Capital Diversified Trust Deed Fund, contained in USA Capital Appendix, Volume #2, Exhibit #9.

30.    Letter dated June 29, 2000, from Thomas Rondeau to Dorothy Sweet, contained in BNY Appendix, Exhibit #9.

31.    Letter dated July 31, 2000, from Thomas Rondeau to Dorothy Sweet, contained in BNY Appendix, Exhibit #10.

32.    Form 10-Q Quarterly Statement, filed by Epic Resorts, LLC, with the SEC for quarterly period ended June 30, 1999, contained in BNY Appendix, Exhibit #13.

33.    Form 10-K Annual Report, filed by Epic Resorts, LLC, with the SEC for year ended December 31, 1999, contained in BNY Appendix, Exhibit #14.

34.    Form 10-Q-A, Amended Quarterly Statement, filed by Epic Resorts, LLC, with the SEC, for quarterly period ended June 30, 1999, contained in BNY Appendix, Exhibit #15.

35.    Letter dated July 31, 2000, from John Rogers Burk to Tom Rondeau, contained in BNY Appendix, # 7.

## CERTIFICATE OF SERVICE

I, Aaron A. Garber, hereby certify that on October 1, 2003, I caused service of the Appendix For The Brief Of The Appellant, The Bank Of New York As Successor Indenture Trustee by causing a copy thereof to be served via United States mail, first class, postage pre-paid upon those parties listed below.

Jeffrey A. Deller, Esq.
Klett, Rooney, Lieber & Schorling
One Oxford Center, 40th Floor
Pittsburgh, PA 15219
Tel: 412-392-2000
Fax: 412-392-2128

Teresa K.D. Currier, Esq.
Klett, Rooney, Lieber & Schorling
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
Tel: 302-552-4220
Fax: 302-552-4295

Robin E. Keller, Esq.
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982
Tel: 212-806-5400
Fax: 212-806-6006

Kevin Gross, Esq.
Rosenthal, Monhait, Gross
& Goddess, P.A.
1401 Mellon Bank Center
Wilmington, DE 19801
Tel: 302-656-4433
Fax: 302-658-7567

William Hazeltine, Esq.
Potter, Anderson & Corroon
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801
Tel: 302-984-6000
Fax: 302-658-1192

Julie L. Compton, Esq.
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2313
Lockbox 35
Wilmington, DE 19801
Tel: 302-573-6491
Fax: 302-573-6497

Aaron A. Garber (DE No. 3837)

WL: #126887 v1 (2PWN01!.DOC)