# Exhibit "10"

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) |
| | ) Jointly Administered Under |
| **EPIC CAPITAL CORPORATION,** *et al.,* | ) Case No. 01-2458-MFW |
| | ) |
| Debtors. | ) |
| | ) |
| **THE BANK OF NEW YORK, AS** | ) Adversary Proceeding |
| **SUCCESSOR INDENTURE TRUSTEE,** | ) No. 02-03021-MFW |
| | ) |
| Plaintiff/Appellant, | ) Civil Action No. 03-360 (JJF) |
| | ) |
| v. | ) |
| | ) |
| **EPIC RESORTS - PALM SPRINGS** | ) |
| **MARQUIS VILLAS, LLC,** | ) |
| | ) |
| and | ) |
| | ) |
| **USA CAPITAL DIVERSIFIED TRUST** | ) |
| **DEED FUND, LLC,** | ) |
| | ) |
| Defendants/Appellees/ | ) |
| Cross-Appellant. | ) |

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
2003 NOV 10 PM 2: 45

### BRIEF OF APPELLEE, USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

Jeffery A. Deller, Esquire
PA I.D. No. 78086
Klett Rooney Lieber & Schorling
A Professional Corporation
40th Floor, One Oxford Centre
Pittsburgh, PA 15219
Phone: (412) 392-2000
Facsimile: (412) 392-2128

Teresa K.D. Currier, Esquire
DE I.D. No. 3080
Klett Rooney Lieber & Schorling
A Professional Corporation
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
Phone: (302) 552-4200
Facsimile: (302) 552-4295

- AND -

NOV 1 4 2003

Rhonda L. Payne Thomas, Esquire
DE I.D. No. 4053
Mark R. Owens, Esquire
DE I.D. No. 4364
Klett Rooney Lieber & Schorling
A Professional Corporation
Two Logan Square, 12th Floor
Philadelphia, PA 19103
Phone: (215) 567-7500
Facsimile: (215) 567-2737

Dated: November 10, 2003

Counsel for Appellee/Cross-Appellant
USA Capital Diversified Trust Deed
Fund, LLC

KRLSPHI: :07909.3

**TABLE OF CONTENTS**

<u>Page</u>

I.    INTRODUCTION AND SUMMARY OF BRIEF OF APPELLEE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   APPLICABLE STANDARD OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  STATEMENT OF THE CASE AND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      1.    The Bondholders Erroneously Contend that the <u>Mobile Steel</u> Test is Applied
          Mechanically When Case Law Dictates That Equitable Subordination is Purely an
          Equitable Remedy That is Discretionary With the Trial Court.  . . . . . . . . . . . . 16

      2.    The Undisputed Record Reflects That the Bank of New York Failed to Meet its
          High Standard of Proof as USA Capital is a Non-Insider and its Transaction With
          the Debtor was in Good Faith and at Arms Length.  . . . . . . . . . . . . . . . . . . . . . 17

      3.    Even if USA Capital Engaged in Inequitable Conduct Sufficient for Equitable
          Subordination Purposes, the Bank of New York is not Entitled to Equitable
          Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      4.    The Bankruptcy Court Correctly Concluded That USA Capital Acted in Good Faith
          and Did Not Tortiously Interfere With the Indenture. . . . . . . . . . . . . . . . . . . . . 33

      5.    The Bankruptcy Court's Opinion and Order Must Be Affirmed as The Injuries, if
          any, to the Bank of New York were not Proximately Caused by USA Capital; nor
          has USA Capital Obtained an Unfair Advantage. . . . . . . . . . . . . . . . . . . . . . . . 37

V.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## TABLE OF AUTHORITIES

### CASES

**Page**

In re 604 Columbus Avenue Realty Trust,
968 F.2d 1332 (1st Cir. 1992) ............................................................ 18

In re After Six, Inc.,
177 B.R. 219 (Bankr. E.D.Pa. 1995) ................................................... 15, 23, 24

Albermarle Paper Co. v. Moody,
422 U.S. 405 (1975) ............................................................................ 3

Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc.,
25 B.R. 484 (Bankr. S.D.Ohio 1982) ................................................. 15

Aluminum Mills Corp. v. Citicorp North America, Inc. (In re Aluminum Mills
Corp.), 132 B.R. 869 (Bankr. N.D.Ill. 1991) ..................................... 17

Ansel Properties v. Nutri/System of Florida Associates (In re Nutri/System
of Florida Associates), 178 B.R. 645 (Bankr. E.D.Pa. 1995) ............ 17, 18

Antonios A. Alevizopoulos and Associates, Inc., v. Comcast International
Holdings, Inc., 100 F. Supp. 2d 178 (S.D.N.Y. 2000) ....................... 35

In re Atlanticrancher, Inc.,
279 B.R. 411 (Bankr. D.Mass. 2002) ................................................. 19

In re Autostyle Plastics, Inc.,
269 F.3d 726 (6th Cir. 2001) .............................................................. 16, 18

In re Baker & Getty Financial Services, Inc.,
974 F.2d 712 (6th Cir. 1992) .............................................................. 17, 24

Bechtel v. Robinson,
886 F.2d 644 (3d Cir. 1989) ............................................................... 2, 3

In re CTS Truss, Inc.,
868 F.2d 146 (5th Cir. 1989) .............................................................. 24

Callowhill v. Allen-Sherman-Hoff Co., Inc.,
832 F.2d 269 (3d Cir. 1987) ............................................................... 3

Capital Bank & Trust Co. v. 604 Columbus Avenue Realty Trust (In re 604
Columbus Avenue Realty Trust), 968 F.2d 1322 (1st Cir. 1992) ....... 19

Celotex Corporation v. Catrett,
417 U.S. 317 (1986) ............................................................................ 25

Central Cooperatives, Inc. v. Irwin (In re Colonial Poultry Farms),
177 B.R. 291 (Bankr. W.D. Mo. 1995) .............................................. 3

Cerberus Partners, L.P. v. gadsby & Hannah,
   728 A.2d 1057 (R.I. Super. Ct. 1999) ........................................................ 40

Citicorp Venture Capital Corp. v. Committee of Creditors Holding
   Unsecured Claims, 160 F.3d 982 (3d Cir. 1998) ........................ 15, 20, 30

Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured
   Claims, 323 F.3d 228 (3d Cir. 2003) ........................................................ 20

In re Computer Personalities Systems, Inc.,
   284 B.R. 415 (Bankr. E.D.Pa. 2002) ........................................................ 19

In re Continental Airlines,
   91 F.3d 553 (3d Cir. 1996)(en banc) ........................................................ 2

Cutty's-Gurnee,
   133 B.R. 934 (N.D. Ill. 1991) ........................................................ 21

E.E.O.C. v. Great Atlantic & Pacific Tea Co.,
   735 F.2d 69 (3d Cir. 1984) ........................................................ 3

In re Epic Capital Corp.,
   290 B.R. 514 (Bankr. D.Del. 2003) .................... 15, 16, 17, 20, 22, 24, 29, 33

In re Esta Later Charters, Inc.,
   875 F.2d 234 (9th Cir. 1989) ........................................................ 29

In re Fabricators, Inc.,
   926 F.2d 1458 (5th Cir. 1991) ........................................ 2, 15, 16, 18

Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman),
   126 B.R. 63 (9th Cir. BAP 1991) ........................................................ 19

In re Garfinckels, Inc.,
   203 B.R. 814 (Bankr. D.C. 1996) ........................................................ 2

General Signal Corp. v. MCI Telecommunications Corp.,
   66 F.3d 1500 (9th Cir. 1995) ........................................................ 34

Gertsch v. Johnson & Johnson Finance Corp.,
   237 B.R. 160 (B.A.P. 9th Cir. 1999) ........................................................ 26

Granite Partners, L.P. v. Bear, Stearns & Co., Inc.,
   17 F. Supp. 2d 275 (S.D.N.Y. 1998) ........................................................ 35

In re Herby's Foods, Inc.,
   2 F.3d 128 (5th Cir. 1993) ........................................................ 18

Herzog v. Leighton Holdings, Ltd. (In re Kids Creek Partners, L.P.),
   239 B.R. 497 (N.D. Ill. 1999) ........................................................ 18

Holiday Mart, Inc. v. Honolulu Professional Services, Inc.,
   715 F.2d 430 (9th Cir. 1983) ........................................................ 2, 3

IBM v. Comdisco, Inc.,
    C.A. No. 91-C-07-199, 1991 WL 269965 (Del. Super. Ct. Dec. 4, 1991) ............................ 34

In the Matter of Century Glove, Inc.,
    151 B.R. 327 (Bankr. D.Del. 1993) ................................................................ 17, 27

In the Matter of Mobile Steel Co.,
    563 F.2d 692 (5th Cir. 1977) ...................................................................... 15

In the Matter of Teltronics Service, Inc.,
    29 B.R. 139 (Bankr. E.D.N.Y. 1983) ............................................................ 17, 20

In the Matter of Whitehead,
    583 F.2d 1104 (9th Cir. 1978) ..................................................................... 3

In re Kansas City Journal Post Co.,
    144 F.2d 800-01 (8th Cir. 1944) .................................................................. 39

In re Kentucky Truck & Trailer Repair, Inc.,
    291 B.R. 84 (Bankr. W.D.Ky. 2002) ............................................................. 19

Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.,
    __F.3d __, 2003 WL 21731751 (3d Cir. July 28, 2003) ...................................... 22

La Grand Steel Products Co. v. Goldberg (In the Matter of Poole, McGonigle
    & Dick, Inc.), 796 F.2d 318 (9th Cir. 1985) ................................................... 3

In re M. Paolella & Sons, Inc.,
    161 B.R. 107 (E.D. Pa. 1993) aff'd 37 F.3d 1487 (3d Cir. 1994) ...................... 18, 24

In re Magnolia Gas. Co., LLC,
    255 B.R. 900 (Bankr. W.D. Okla. 2000) ..................................................... 3, 16

In re Medical Software Solutions,
    286 B.R. 431 (Bankr. D. Utah 2002) ........................................................... 19

In re Mid-American Waste Systems, Inc.,
    284 B.R. 53 (Bankr. D.Del. 2002) .............................................................. 19

Midatlantic National Bank v. Borg-Warner Acceptance Corp.,
    112 B.R. 607 (Bankr. D.Vt. 1990) .............................................................. 38

In re Model Imperial, Inc.,
    250 B.R. 776 (Bankr. S.D. Fla. 2000) .......................................................... 22

In re Mr. R's Prepared Foods, Inc.,
    251 B.R. 24 (Bankr. D.Conn. 2000) ............................................................ 38

Nordhoff Investments, Inc. v. Zenith Electronics Corp.,
    258 F.3d 180 (3d Cir. 2001) ...................................................................... 2

In re Nutri/System, Inc.,
 169 B.R. 854 (Bankr. E.D.Pa. 1994) ................................................................................. 20, 24

In re Octagon Roofing,
 157 B.R. 852 (Bankr. N.D.Ill. 1993) ................................................................................. 16

In re PWS Holding,
 228 F.3d 224 (3d Cir. 2000) ................................................................................. 2

In re Phase I Molecular Toxicology, Inc.,
 287 B.R. 571 (Bankr. D.N.M. 2002) ................................................................................. 2, 16

Rico v. Annulli,
 200 F.3d 189 (3d Cir. 1999) ................................................................................. 25

Sheets v. Dziabis,
 738 F. Supp. 307 (N.D. Ind. 1990) ................................................................................. 25

Speakers of Sport, Inc. v. Proserv, Inc.,
 178 F.3d 862 (7th Cir. 1999) ................................................................................. 34

Special Event Entm't v. Rockefeller Center, Inc.,
 458 F. Supp. 72 (S.D.N.Y. 1978) ................................................................................. 36

Taggart & Taggart Seed, Inc. v. First Tennessee Bank National Association,
 684 F. Supp. 230 (E.D. Ark. 1988) ................................................................................. 34

In re Tinsley & Groom,
 49 B.R. 85 (Bankr. W.D.Ky. 1984) ................................................................................. 15, 24

In re Trim-Lean Meat Products, Inc.,
 10 B.R. 333 (D.Del 1981) ................................................................................. 31

Trone v. Smith (In re Westgate-California Corp.),
 642 F.2d 1174 (9th Cir. 1981) ................................................................................. 39

In re United States Abatement Corp.,
 39 F.3d 556 (5th Cir. 1994) ................................................................................. 24

In re Vermont Electric Generation & Transmission Cooperative, Inc.,
 240 B.R. 476 (Bankr. D.Vt. 1999) ................................................................................. 20

In re Vietri Homes, Inc.,
 58 B.R. 663 (Bankr. D.Del. 1986) ................................................................................. 18

Wilson v. Huffman (In the Matter of Missionary Baptist Foundation),
 818 F.2d 1144 (5th Cir. 1987) ................................................................................. 15

Wolff v. Rare Medium, Inc.,
 171 F. Supp. 2d 354 (S.D.N.Y. 2001) ................................................................................. 34

## STATUTES

11 U.S.C. § 510(c) ................................................................................ 2, 15, 17, 23, 35

Cal. Bus. & Prof. Code §§ 11013-11013.5 ................................................ 10, 11, 12, 13

Trust Indenture Act [at § 316, 15 U.S.C. §77ppp(b)] ...................................... 9

## MISCELLANEOUS

DeNatale & Abram, The Doctrine of Equitable Subordination As Applied to
Nonmanagement Creditors, 40 Bus. Law. 417, 424 (1985) .................................. 21

Robert L. Haig, Business and Commercial Litigation in Federal Courts, §
73.7 at 626 (1998) ................................................................................ 34

## I.   INTRODUCTION AND SUMMARY OF BRIEF OF APPELLEE

This appeal arises out of an action by the representative of various bondholder creditors (collectively, the "Bondholders") (the Bank of New York as successor indenture trustee ) to equitably subordinate the lien position of USA Capital Diversified Trust Deed Fund, LLC ("USA Capital"). USA Capital holds a first priority leasehold deed of trust in a timeshare resort owned by Epic Resorts - Palm Springs Marquis Villas, LLC (the "Debtor") in Palm Springs, California (the "Palm Springs Resort"). Before the Bankruptcy Court, the Bondholders contended that the Bondholders were supposed to have been granted a prior leasehold deed of trust in the Debtor's Palm Springs Resort, but that such leasehold deed of trust was never entered into by the parties due to an "oversight." See The Bank of New York's Opposition to USA Capital's Motion for Summary Judgment and Memorandum in Support of the Bank of New York's Cross Motion for Summary Judgment at 3. (Designation 34)  The Bondholders now complain that USA Capital holds a superior interest in the collateral because the Bondholders, over a period of several years, failed to take any action to create, enforce, preserve or protect their disputed interest all while the Debtor pledged its assets to a competing non-insider creditor who, as a part of an arms-length transaction, loaned the Debtor millions of dollars.  In essence, the Bondholders seek by this appeal to hold USA Capital as a de facto insurer of the Bondholders' malfeasance.  In the face of this undisputed record of oversights, inaction and acquiescence by the Bondholders, the Bank of New York now asks this Court to overlook the Bondholders' grossly dilatory conduct.  Based on the undisputed record before this Court, and for the reasons set forth more fully herein, this Court should not reward the Bondholders' by granting them the very rights that the Bondholders systematically waived, failed to assert, and failed to preserve for more than three years prior to the commencement of the Debtor's bankruptcy case.  Rather, the Court should affirm the Bankruptcy Court's opinion and order and conclude that the Bankruptcy Court did not abuse its

discretion when it determined that the Bondholders are not entitled to the remedy of equitable subordination under the facts and circumstances of this case.

## II.    APPLICABLE STANDARD OF REVIEW

The Bank of New York states in its brief [D.I. 11] (the "Bank of New York Brief") that the applicable standard of review in this case is that "the Bankruptcy court's factual determinations are subject to a clearly erroneous standard, while its conclusions of law are subject to plenary review." Bank of New York Brief at 2. The Bank of New York is mistaken. The applicable standard of review in this case is whether the Bankruptcy Court abused its discretion. Nordhoff Investments, Inc. v. Zenith Electronics Corp., 258 F.3d 180, 182 (3d Cir. 2001)(citing In re Continental Airlines, 91 F.3d 553, 560 (3d Cir. 1996)(en banc); see also In re PWS Holding, 228 F.3d 224, 235-36 (3d Cir. 2000)). Even though the Bankruptcy Court granted summary judgment in favor of USA Capital, the applicable standard of review does not change because the Bankruptcy Court reached its holding based upon the equities in this case. Bechtel v. Robinson, 886 F.2d 644, 647 (3d Cir. 1989)(on appeal of grant of summary judgment by the trial court, based in equity, Court of Appeals reviewed the trial court's equitable findings by applying an abuse of discretion standard).

Since the principles of equitable subordination are equitable in nature, the decision of whether or not to equitably subordinate a claim pursuant to Section 510 of the Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") rests with the sound discretion of the Bankruptcy Court. Holiday Mart, Inc. v. Honolulu Professional Services, Inc., 715 F.2d 430, 432 (9th Cir. 1983). Even if all of the common law pre-requisites for equitable subordination are present, the Bankruptcy Court is ***not required*** to equitably subordinate a claim based on the equities of the case. In re Fabricators, Inc., 926 F.2d 1458, 1464 n.9 (5th Cir. 1991); In re Garfinckels, Inc., 203 B.R. 814, 825 (Bankr. D.C. 1996); In re

Phase I Molecular Toxicology, Inc., 287 B.R. 571, 579 (Bankr. D.N.M. 2002); In re Magnolia

Gas. Co., LLC, 255 B.R. 900, 924 (Bankr. W.D. Okla. 2000); Central Cooperatives, Inc. v. Irwin

(In re Colonial Poultry Farms), 177 BR 291, 301 (Bankr. W.D. Mo. 1995).

      Because subordination under Section 510 of the Bankruptcy Code is an equitable

remedy, and the decision whether to impose it is extraordinary and within the trial court's sound

discretion, appellate court's review such determinations for abuse of discretion.  Bechtel v.

Robinson, 886 F.2d at 647 ("when a trial court makes an equitable assessment that assessment

reviewed for abuse of discretion"); Callowhill v. Allen-Sherman-Hoff Co., Inc., 832 F.2d 269,

271 n.4 (3d Cir. 1987); E.E.O.C. v. Great Atlantic & Pacific Tea Co., 735 F.2d 69, 81 (3d Cir.

1984); Holiday Mart, Inc. v. Honolulu Professional Services, Inc., 715 F.2D at 432 (9th Cir.

1983)(equitable determination of whether to subordinate a claim is addressed to the sound

discretion of the Bankruptcy Court, and the scope of review "is accordingly limited to a

determination of whether there was an abuse thereof"); La Grand Steel Products Co. v. Goldberg

(In the Matter of Poole, McGonigle & Dick, Inc.), 796 F.2d 318, 321 (9th Cir. 1985); In the

Matter of Whitehead, 583 F.2d 1104, 1107 (9th Cir. 1978);  Albermarle Paper Co. v. Moody, 422

U.S. 405, 424 (1975)(the standard of review when an equitable assessment of a lower court is

placed at issue is whether that court "located a 'just result' in light of the circumstances peculiar

to the case").

## III.  STATEMENT OF THE CASE AND FACTS

    1.    USA Capital is the Debtor's major secured creditor.  It is presently owed in

excess of $13.8 million, and such amount continues to climb as post-petition interest and costs of

collection accrue. (April Tr. at 23 - Designation 6; Exhibit USA-8 - Designation 8, Tab 10.)[1]

---

[1] Citations to the April 30, 2002 transcript are referred to herein as "April Tr. at ___," and citations to the
May 21, 2002 transcript are referred to herein as "May Tr. at ___."

2.     The Debtor owns and operates a 101 unit timeshare resort located in Palm Springs, California.  (April Tr. at 19, 91 - Designation 6.)    The land on which the Debtor operates its resort is Indian land administered by the United States Department of Interior, Bureau of Indian Affairs (the "BIA").  (April Tr. at 21 - Designation 6.)  The Debtor's interest in the resort arises out of a ground lease approved by the BIA known as Business Lease No. PSL-253 (the "Master Lease").  (April Tr. at 21 - Designation 6; Exhibit USA-127 - Designation 29, Tab 38.)

3.     The Debtor is a wholly owned subsidiary of Epic Resorts, LLC.  (April Tr. at 58 - Designation 6; Exhibit USA-13 at 6 - Designation 19, Tab 15; Exhibit Committee-5 - Designation 24, Tab 39.)  Epic Resorts, LLC is a holding company that, through its subsidiaries (collectively, "Epic"), owns and operates several vacation resorts in the continental United States, including resorts located in Las Vegas, Nevada; Scottsdale, Arizona; Palm Springs, California; Daytona Beach, Florida; Lake Havasu City, Arizona; and Hilton Head, South Carolina (the "Resorts").  (April Tr. at 53, 58-61 - Designation 6.)  Although the Epic family consists of a number of different companies, the Epic companies are an "integrated company" that has been "operated as one."  (May Tr. at 128-129, 174-175 - Designation 7.)

4.     Around July of 1998, Epic Resorts, LLC and Epic Capital Corporation issued $130 million in Senior Secured Redeemable Notes due 2005 (the "Bonds") pursuant to that certain trust indenture dated July 8, 1998 (as amended or modified from time to time, the "Indenture").  (April Tr. at 60-63 - Designation 6; Exhibit USA-13 - Designation 19, Tab 15; Exhibit USA-14 - Designation 19, Tab 16.)

5.     The current indenture trustee under the Indenture is the Bank of New York (including United States Trust Company of New York as its predecessor, the "Indenture Trustee"), and the holder of the majority of the Bonds is a group of bondholders that refer to

themselves as the Highland Funds.  (Lundberg Tr. at 5 - Designation 28, Tab 36; Exhibit USA-24 at 7 - Designation 25, Tab 24; Exhibit USA-27 at Tab D - Designation 25, Tab 26.)

6.     The Bank of New York asserts that certain of the subsidiaries of Epic Resorts, LLC have, pursuant to alleged upstream guaranties, guaranteed the Bond obligations of Epic Resorts, LLC and Epic Capital Corporation.

7.     Initially before the Bankruptcy Court, the Bank of New York contended that the Bond obligations are secured by various assets of Epic subsidiaries, including an alleged security interest in the assets of the Debtor.  Specifically, the Bank of New York contended that the Bondholders' alleged security interest in the Palm Springs Resort was senior to the interests of USA Capital.

8.     The Bank of New York pointed to Section 11.01(e) of the Indenture in support of the Bondholders' alleged security interest.  The Indenture and related documents were drafted by counsel to the Indenture Trustee.  (April Tr. at 62, 70 - Designation 6.)  Section 11.01(e) of the Indenture states:

> Each Issuer covenants and agrees that it will use its reasonable best efforts to obtain consent from the Department of Interior - Bureau of Indian Affairs (the "Bureau") to the imposition of a leasehold mortgage on the leasehold interest of Epic Resorts - Palm Springs Marquis Villas, LLC in the real property leased by it.  Promptly upon receipt of such consent, the Issuers shall grant, or cause to be granted, such leasehold mortgage . . . to the Trustee to secure the Obligations of Epic Resorts - Palm Springs Marquis Villas, LLC under its subsidiary guaranty; . . .

See Indenture at § 11.01(e) - Designation 19, Tab 16.

9.     Section 11.01(e) of the Indenture, however, proves to be misleading as the BIA **did not** approve the granting of a lien on the Palm Springs Resort for the benefit of the Bondholders. (April Tr. at 23, 24, 52, 68, 72 - Designation 6; Lundberg Tr. at 9-10, 36-38 - Designation 28, Tab 36.)  The Bondholders were well aware of the necessity of valid BIA

approval as the Prospectus drafted by the Indenture Trustee in connection with the Indenture unequivocally states:

> In addition, with respect to the proposed leasehold mortgage on the Palm Springs, Marquis Villas leasehold, no assurance can be given that the company will be able to obtain the approval of the Bureau of Indian Affairs to impose such a mortgage.  If such approval is not obtained, the subsidiary guarantee of Epic Resorts-Palm Springs Marquis Villas, LLC will not be secured by any mortgage on such leasehold.

(April Tr. at 50-51, 61-63 - Designation 6; Exhibit USA-13 at 22 - Designation 19, Tab 15.)

10.     Despite the BIA's refusal to approve a lien on the Master Lease in favor of the Bondholders, the Indenture Trustee closed the Indenture anyway and elected to waive its right to obtain a lien on the Palm Springs Resort.  (April Tr. at 61-73 - Designation 6, 76-80; Exhibit USA-18 - Designation 19, Tab 20.)  Consequently, no deed of trust whatsoever was granted in favor of the Indenture Trustee at closing of the Indenture.  (Id.; Lundberg Tr. at 9, 36-38 - Designation 28, Tab 36.)

11.     In fact, the reason that such a deed of trust was not executed and granted was because the Bondholders elected to forego their alleged lien on the Palm Springs Resort in exchange for a replacement lien on Epic's Daytona resort property, and the Bondholders voluntarily closed on the bond issue without a deed of trust over the Palm Springs Resort.  (Id.; May Tr. at 44-50 - Designation 7.)  Nonetheless, the Bondholders have described the failure to obtain the deed of trust a mere "oversight."  See, supra The Bank of New York's Opposition to USA Capital's Motion for Summary Judgment at 3.  (Designation 34)

12.     The foregoing recount of the bond transaction is consistent with materials Epic and its original Bondholders presented to Standard & Poor's rating service for the Bonds, as well as correspondence written by counsel to the Indenture Trustee as late as June of 1998.  These materials, drafted prior to closing of the Indenture, are totally devoid of any reference to the

Indenture Trustee being granted a lien on Epic's Daytona resort property. (May Tr. at 44-50 - Designation 7; Exhibits USA-28 through 30 - Designation 26, Tabs 27-29.) Instead, it is clear from the evidence that the parties agreed to replace the Palm Springs lien with the Daytona lien once it was apparent that the BIA had not approved an encumbrance of the Master Lease.

13.     The foregoing is also consistent with the closing and post-closing actions of the Indenture Trustee, who did not obtain an executed deed of trust and who did not complain of the Debtor's failure to grant a security interest in the Palm Springs Resort. (April Tr. at 62-73, 79-80 - Designation 6; May Tr. at 49-50 - Designation 7; Exhibit USA-18 - Designation 19, Tab 20.) In addition, an examination of the deeds of trust drafted in connection with the Indenture reveals that the very last deed of trust drafted by counsel to the Indenture Trustee was a deed of trust for the Daytona resort property. This is evident by the fact that the Daytona deed of trust contains a footer document number that is at least 3,289 document numbers higher than the other proposed deeds of trust. (Exhibit USA-15 through 19 - Designation 19-20, Tabs 17-21.) In addition, after the closing of the Indenture, title insurance policies were issued in favor of the Indenture Trustee on the four resort properties subject to the Indenture, but no insurance policies were issued on the Palm Springs Resort. (May Tr. at 60-62 - Designation 7; Exhibit USA-38 - Designation 27, Tab 35.) All of these facts support the fact that the Trustee waived its rights to security on the Palm Springs Resort, and instead obtained a lien on the Daytona resort property in its place.

14.     The conduct of the Indenture Trustee and the Bondholders since July of 1998 further demonstrates that the Bondholders agreed to forgo pursuit of their alleged lien position in the Palm Springs Resort. For example, Section 11.01(g) of the Indenture provides that "The Issuers and the Subsidiary Guarantors each agree that unless another time period is specified herein, each action required above by this Section 11.01 shall be completed as soon as practicable, but in no event later than 60 days after such action is required by the terms hereof or

requested to be taken by the Trustee." The undisputed facts, however, presented to the Bankruptcy Court revealed that at no time after closing did the Indenture Trustee complain to the Debtor or anyone else as a result of the Debtor's failure to execute the deed of trust on the Palm Springs Resort in favor of the Indenture Trustee. (April Tr. at 62-73 - Designation 6, 79-80; May Tr. at 50-62 - Designation 7; Lundberg Tr. at 4, 11-12, 17, 29-31 - Designation 28, Tab 36.) The silence of the Indenture Trustee is deafening in this regard, especially since the Indenture Trustee was, and has been, a sophisticated party represented by counsel and has so vigorously pursued its alleged legal rights and remedies in the Debtor's bankruptcy proceedings and in other venues. (May Tr. at 51-60 - Designation 7; Lundberg Tr. at 36-38 - Designation 28, Tab 36; Exhibit USA-27 at Tab D - Designation 25, Tab 26; Exhibit USA-32 - Designation 26, Tab 30; Exhibit USA-34 - Designation 26, Tab 32; Exhibit USA-36 - Designation 26, Tab 33.)

15.    The undisputed record before the Bankruptcy Court also further indicates that the Indenture Trustee not only did not complain about the fact that the Debtor did not grant it a deed of trust on the Palm Springs Resort at closing, but it even filed documents with the SEC after November of 1998 indicating that the Debtor was not in default under the Indenture. (May Tr. at 69-70 - Designation 7; Exhibit USA-21 at HCM 05921 - Designations 20-24, Tab 22.)[2] In addition, various Bondholders, including the Highland Funds, filed a lawsuit against the Indenture Trustee as a result of its negligent administration of the Indenture, but did not complain regarding the fact that the Indenture Trustee obtained no security interest in the Palm Springs Resort when it closed the Indenture. (May Tr. at 59-60 - Designation 7; Exhibit USA-37 - Designation 26, Tab 34.)

---

[2] The May 21 transcript contains a typographical error on Page 72, line 18 and references Exhibit 29, when it should be Exhibit 21.

16.    The statements and actions of the Bank of New York and the Highland Funds in the bankruptcy proceedings further corroborate the fact that the Bondholders waived or otherwise abandoned the inchoate lien they now pursue.  For example, the Highland Funds (whose counsel also serves as counsel to the Bank of New York in this proceeding) have acknowledged that no lien was granted at the closing of the Indenture and have averred in Court documents that "[the bondholders were] not granted a lien or security interest in Epic Resorts Palm Springs at the closing of the Indenture."  (Exhibit USA-27 at Tab D, p.10 n.1 - Designation 25, Tab 26.)  Even the Highland Funds' involuntary bankruptcy petition against the Debtor is devoid of any reference to an alleged security interest in the Palm Springs Resort.  (May Tr. at 56 - Designation 7; Exhibit USA-33 - Designation 26, Tab 31.)

17.    In addition, in response to the involuntary petitions filed by the Highland Funds, Epic filed a motion to dismiss contending that the filing of the involuntary petitions would impair the rights of Bondholders to exercise their rights with respect to the liens and security interests granted by Epic in connection with the bond issue.  (Exhibit USA-27 at Tab A (Motion to Dismiss and Reply Memorandum in Support of Motion to Dismiss) - Designation 25, Tab 26.) The Bondholders and the Bank of New York opposed Epic's motion to dismiss and in such proceedings unequivocally represented to the Bankruptcy Court that:

> MR. PARKINS: In the motion to dismiss filed by Epic, they point out that the Trust Indenture Act [at § 316, 15 U.S.C. § 77ppp(b)] has a proviso, one of them, except that such indenture may contain provisions limiting or denying the right of any such holder to institute any such suit, if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in surrender, impairment, waiver or loss of the lien of such indenture upon any property subject to such lien.
>
> In fact, this indenture contains such provision with respect to California real property there's a single action statute in, Your Honor.  You do a setoff and waive all your other rights.

And this indenture, in fact, has the language that is allowed to be in there pursuant to the Trust Indenture Act.

The answer with respect to that is easy. No. 1, there is no liens on real property held by any creditor, the petitioning creditors with respect to any real property in California, so there is no real property liens. . . . But, in any event, there is no California property which is subject of a lien.

This provision is in here consistent with the statute and is allowed by the statute. We did nothing which would violate this because there is no lien on any real property in California.

(Exhibit USA-27 at Tab A (Transcript of August 27, 2001 Hearing), pp. 19-21 - Designation 25, Tab 26.) The Bankruptcy Court ultimately sustained the objection and denied Epic's motion to dismiss. (Exhibit USA-27 at Tab A (Order) - Designation 25, Tab 26.)

18.     Almost two years after the closing of the Indenture, the Debtor approached USA Capital and sought to borrow additional funds for working capital purposes. (April Tr. at 15, 16, 73-75 - Designation 25; May Tr. at 38 - Designation 7.)

19.     On or about June 26, 2000, USA Capital and the Debtor executed various loan documents whereby USA Capital agreed to lend the Debtor $11.5 million. (April Tr. at 16-22 - Designation 6; Exhibits USA-1 through 7 - Designation 18, Tabs 3-9.)

20.     As security for the loan, the Debtor granted USA Capital a security interest in substantially all of its assets, including the Master Lease and the 66 condominium units in the Palm Springs Resort that had not yet been timeshared by the Debtor,[3] as well as a lien on

---

[3]California law requires that timeshare interests be conveyed to consumers free and clear of any encumbrances. See Cal. Bus. & Prof. Code §§ 11013-11013.5. As a result, USA Capital did not take a security interest in 35 units at the Palm Springs Resort that were already sold, either in whole or in part, to consumers as time shares. (Exhibit USA-6 - Designation 18, Tab 8.) In addition, the loan agreement between the Debtor and USA Capital required the Debtor to pay USA Capital $235,000 for each condominium unit that the Debtor desired to be released from USA Capital's lien. (Exhibit USA-1 at 6 - Designation 19, Tab 1.) As of the Petition Date, 3 condominium units subject to USA Capital's lien had been released resulting in a $705,000 reduction of the principal amount due USA Capital under the Loan Agreements. (Exhibit USA-8 - Designation 18, Tab 10.) As a consequence, 63 of the 101 units at the Palm Springs Resort remain a part of USA Capital's Collateral package as of today. (April Tr. at 91 - Designation 6.)

common areas, equipment, personalty, fixtures, and rents related thereto, and all products and proceeds of the same (the "Collateral"). (April Tr. at id. - Designation 6.)

21.    When the Debtor granted USA Capital a lien on the Collateral, the Debtor advised USA Capital that no other creditor held a lien on the Collateral. (April Tr. at 23, 76-78 - Designation 6; May Tr. at 67-69 - Designation 7; Exhibit USA-1 at 7, 8, 11 - Designation 18, Tab 3; Exhibit USA-6 at 4-5 - Designation 18, Tab 8; Exhibit USA-22 - Designation 24, Tab 23.)

22.    In addition, an ordinary title examination did not reveal any other liens on the Collateral. (April Tr. at 24 - Designation 6; Exhibit USA-22 - Designation 24, Tab 23.)

23.    USA Capital also requested, and obtained before funding was completed, an opinion letter from Epic's counsel that the USA Capital transaction would not violate the terms of the Indenture and that no other lien encumbered the Palm Springs Resort. (April Tr. at 24, 76-78 - Designation 6; Exhibit USA-22 - Designation 24, Tab 23.) In addition, prior to consummating the transaction, USA Capital confirmed with the BIA that no other lien existed on the property. (April Tr. at 24, 51-52 - Designation 6.)

24.    To memorialize the transaction, USA Capital and the Debtor executed various documents, including, without limitation, a Loan Agreement (the "Loan Agreement") dated as of June 26, 2000, a Promissory Note (the "Note") in the principal amount of $11.5 million, and a Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (the "Leasehold Deed of Trust"). (April Tr. at 16-22 - Designation 6; Exhibits USA-1 through 7 - Designation 18, Tabs 3-9.)

25.    Pursuant to ¶5.2(e) of the Loan Agreement, the Debtor represented and warranted that the entry into the secured loan transaction with USA Capital did "not and will not . . . result in a breach or constitute a default under, . . . or require any consent under, any indenture . . . ." See Loan Agreement at ¶5.2(e) - Designation 18, Tab 3.

26.     USA Capital perfected its security interest in the leasehold and other Collateral by recording its Leasehold Deed of Trust with the Official Records of Riverside County on July 5, 2000 at #2000-259242. (April Tr. at 20 - Designation 6; Exhibit USA-6 - Designation 18, Tab 8.) USA Capital also perfected its security interest in the Debtor's personal property by filing a UCC financing statement against substantially all of the personalty of the Debtor with the California Secretary of State on July 28, 2000. (April Tr. at 21-22 - Designation 6; Exhibit USA-7 - Designation18, Tab 9.) The United States Department of Interior, through the BIA, approved the security interest granted to USA Capital in connection with the closing of the loan on June 22, 2000. (April Tr. at 21 - Designation 6; Exhibit USA-6 at 23 - Designation 18, Tab 8.)

27.     As a part of the transaction, $1.5 million of the $11.5 million advance was used to fund a reserve to be used by the Debtor solely to make interest payments to USA Capital. (Id.) All of the advances required by the Loan Agreement were in fact made by USA Capital and that Epic had the full benefit of the same. (April Tr. at 16-19, 22-23, 74-75 - Designation 6; Exhibit USA-1 (Loan Agreement) - Designation 18, Tab 3; Exhibit USA-2 (Note) - Designation 18, Tab 4; Exhibit USA-8 (Loan Summary) - Designation 18, Tab 10.) For example, the funds advanced by USA Capital to Epic were used to fund payroll, pay utilities, maintain the resorts, conduct pest control, and cover sales and marketing expenses. (April Tr. at 74-75 - Designation 6.)

28.     After the Debtor entered into the loan transaction with USA Capital, the Debtor had numerous defaults under its Loan Agreement, Note, and Leasehold Deed of Trust (collectively, the "Loan Agreements"), (April Tr. at 24-30 - Designation 6; Exhibits USA-9 through 12 - Designations 18-19, Tabs 11-14), including failure to comply with the financial reporting and other covenants of the Loan Agreements, (Id.); failing to make requisite interest

payments on the Bonds to the Bondholders; and failing to make requisite interest payments under the Loan Agreements. (Id.; Exhibit USA-8 - Designation 18, Tab 10.)

29.    In addition, prior to Epic's failure to make the requisite interest payments on the Bonds, the Debtor failed to timely and promptly pay all lease obligations that accrued under the Master Lease. (May Tr. at 157-159, 176 - Designation 7.)

30.    By July of 2001, Epic's operational difficulties transcended its obligations to USA Capital. (April Tr. at 80-91 - Designation 6; Schnelling Tr. at 55, 86-88 - Designation 29, Tab 37; Exhibit USA-11 - Designation 19, Tab 13, Exhibit USA-24 - Designation 25, Tab 24, Exhibit USA-27 at Tab A - Designation 25, Tab 26.) As set forth above, Epic Resorts, LLC and Epic Capital Corporation defaulted on their obligations to make an $8.45 million interest payment to their Bondholders. (Id.) As a result, the Highland Funds filed involuntary bankruptcy petitions against Epic Resorts, LLC and Epic Capital Corporation, LLC (together, the "Initial Debtors") on July 19, 2001, (Exhibit USA-25 - Designation 25, Tab 25), and commenced involuntary bankruptcy proceedings against the Debtor and Epic Resorts Management, LLC on November 9, 2001. (Exhibit USA-33 - Designation 26, Tab 31.)

31.    On or about October 15, 2001, Epic Resorts, LLC and Epic Capital Corporation each consented to the entry of an Order for Relief under chapter 11 of the Bankruptcy Code. (April Tr. 80-91 - Designation 6; Exhibit USA-25 - Designation 25, Tab 25.) By Order dated February 14, 2002, the Court authorized the Office of the U.S. Trustee to appoint a chapter 11 trustee and by order dated March 8, 2002, Mr. Anthony Schnelling was appointed chapter 11 trustee.

32.    As a result of the precarious financial condition of the estates, USA Capital moved for relief from the automatic stay so that it could exercise its non-bankruptcy law rights with respect to the Collateral (Designation 1). Only after USA Capital moved for relief from the

automatic stay did the Indenture Trustee assert a lien on the assets of the Epic Palm Springs

estate and seek subordination of USA Capital's lien position (Designation 4). In fact, the Bank

of New York and the Bondholders objected to USA Capital's Relief From Stay Motion on these

grounds (Designation 2). On April 23, 2002, the Indenture Trustee also filed the adversary

proceeding to determine the extent, priority and validity of its alleged lien and to seek equitable

subordination of USA Capital's claims. (Designations 4 and 13.)

33.     On May 30, 2002, USA Capital filed its Answer and Affirmative Defenses.
(Designation 14.)

34.     After undertaking discovery, and presenting testimony to the Bankruptcy Court

in connection with the relief from stay proceedings, USA Capital filed its Motion for Summary

Judgment on July 10, 2002. (Designation 15.) On August 6, 2002, the Indenture Trustee filed its

Cross-Motion for Summary Judgment. (Designation 31.)

35.     On February 27, 2003, the Bankruptcy Court granted USA Capital's Motion for

Summary Judgment and denied the Indenture Trustee's Cross-Motion for Summary Judgment.

(Designation 37).[4] This appeal followed.

## IV.    ARGUMENT AND AUTHORITIES

As a general matter, the Bankruptcy Court did not abuse its discretion when it rejected

the Bondholders' argument that USA Capital's perfected security interest should be subordinated

to the Bondholders' claim pursuant to Section 510(c) of the Bankruptcy Code. The law is clear

in that the power conferred upon Bankruptcy Courts to equitably subordinate a claim is used

infrequently and sparingly, as case law mandates that equitable subordination is "an unusual

---

[4]On June 26, 2003, the Bankruptcy Court entered an Order (A) Granting USA Capital Relief from the
Automatic Stay; and (B) Authorizing the Trustee to Cause EPIC Resorts - Palm Springs Marquis Villas et al. to
Turnover USA Capital's Collateral to USA Capital [Case No. 01-2458 D.I. No. 950] (the "Stay Order"). USA
Capital reserves all of its rights and defenses with respect to the Stay Order and nothing herein is a waiver of the
same.

remedy which should be applied in limited circumstances." In re Fabricators, Inc., 926 F.2d

1458, 1464 (5th Cir. 1991). See also, In re Tinsley & Groom, 49 B.R. 85, 90 (Bankr. W.D.Ky.

1984) ("Equitable subordination is a harsh remedy that is not to be lightly invoked."); Allied

Technology, Inc. v. R.B. Brunemann & Sons, Inc., 25 B.R. 484, 499 (Bankr. S.D.Ohio 1982)

("Subordination is essentially a discretionary exercise of the court's equitable powers, and

should only be used sparingly to rectify obvious inequities."); In re After Six, Inc., 177 B.R. 219,

232 (Bankr. E.D.Pa. 1995) ("equitable subordination is an extraordinary measure which is not

lightly invoked"). The "mere cry of inequity" is clearly insufficient to support an equitable

subordination claim. Wilson v. Huffman (In the Matter of Missionary Baptist Foundation), 818

F.2d 1144, 1146 (5th Cir. 1987).

Section 510(c) of the Bankruptcy Code provides that after notice and hearing,

the court may:

> . . . under principles of equitable subordination, subordinate for
> purposes of distribution all or part of an allowed claim to all or
> part of another allowed claim . . .

See 11 U.S.C. § 510(c). The legal standard for establishing equitable subordination was set forth

in In the Matter of Mobile Steel Co., 563 F.2d 692, 699-700 (5th Cir. 1977). Most courts have

uniformly followed and applied the Mobile Steel test, and generally require the following three

conditions to be shown to justify equitable subordination: (i) the claimant must have engaged in

some type of inequitable conduct; (ii) the misconduct must have resulted in injury to the creditors

of the bankrupt and conferred an unfair advantage on the claimant; and (iii) equitable

subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

Mobile Steel, 563 F.2d at 699-700; Citicorp Venture Capital Corp. v. Committee of Creditors

Holding Unsecured Claims, 160 F.3d 982, 986 (3d Cir. 1998). The Bankruptcy Court recognized

and applied these three elements while analyzing the Bondholders' claims. See In re Epic

Capital Corp., 290 B.R. 514 , 523-525 (Bankr. D.Del. 2003).    In fact, the Bankruptcy Court

appropriately exercised its discretion by dismissing the equitable subordination claims when it

concluded based on undisputed evidence that:

> Equitable subordination is an extraordinary measure which is
> not lightly invoked. The equities in this case do not warrant
> penalizing USA Capital by subordinating its claim when it took
> all the steps necessary to perfect its interest. Moreover, the fact
> that the BONY did not obtain the necessary BIA approval
> should not be held against USA Capital. USA Capital entered
> into the transaction with Epic Palm Springs in good faith after
> inquiring into the existence of any prior liens. It relied on Epic
> Palm Springs' representation that the loan would not create a
> breach under the Indenture. BONY on the other hand, slept on
> its rights and is, therefore, not entitled to equitable relief.

In re Epic Capital Corporation, 290 B.R. at 525 (citations and quotations omitted)

> 1.    **The Bondholders Erroneously Contend that the Mobile Steel Test is
> Applied Mechanically When Case Law Dictates That Equitable
> Subordination is Purely an Equitable Remedy That is Discretionary
> With the Trial Court.**

In its brief, the Bank of New York suggests that the Mobile Steel test for equitable

subordination, as adopted by the Third Circuit in Citicorp Venture Capital, is a "rule" that is

applied mechanically without regard for the particular facts and circumstances of a case and

without regard of the discretionary power conferred upon the Bankruptcy Court.

Notwithstanding the rigid suggestions of the Bank of New York, it is well established that

"[e]ven upon a showing of all three [Mobile Steel] factors, equitable subordination is not

*required*, but merely *permitted*." In re Phase-I Molecular Toxicology, Inc., 287 B.R. 571, 579

(Bankr. D.N.M. 2002) (emphasis original) (citing In re Autostyle Plastics, Inc., 269 F.3d 726,

744 (6th Cir. 2001); In re Magnolia Gas Co., L.L.C., 255 B.R. 900, 924 (Bankr. W.D.Okla.

2000); In re Fabricators, Inc., 926 F.2d 1458, 1464-65 (5th Cir. 1991); see also, In re Octagon

Roofing, 157 B.R. 852, 857 (Bankr. N.D.Ill. 1993). As such, the Bankruptcy Court was free to exercise its discretion and did so appropriately as set forth below.

> 2. **The Undisputed Record Reflects That the Bank of New York Failed to Meet its High Standard of Proof as USA Capital is a Non-Insider and its Transaction With the Debtor was in Good Faith and at Arms Length.**

In its opinion, the Bankruptcy Court recognized that the legal standard in applying the Mobile Steel test varies depending on whether the creditor is an insider or non-insider. See In re Epic Capital Corp., 290 B.R. at 524 (citing Ansel Properties v. Nutri/System of Florida Associates (In re Nutri/System of Florida Associates), 178 B.R. 645, 657 (Bankr. E.D.Pa. 1995)). In this case, it is undisputed that USA Capital is a non-insider of the Debtor.[5] With respect to non-insiders, the law provides that there "is no duty of 'kindness'" and that "a non-fiduciary may act strategically to protect itself to the detriment of others." Aluminum Mills Corp. v. Citicorp North America, Inc. (In re Aluminum Mills Corp.), 132 B.R. 869, 896 (Bankr. N.D.Ill. 1991). The primary distinctions between insider/non-insider status is that subordinating claims of insiders versus those of non-insiders:

> . . . lie in the severity of the misconduct required to be shown, and the degree to which the court will scrutinize the claimant's actions toward the debtor or its creditors. Where the claimant is a non-insider, egregious conduct must be proven with particularity. It is insufficient for the objectant in such cases to merely establish sharp dealing; rather, he must prove that the claimant is guilty of gross misconduct tantamount to "fraud, overreaching or spoliation to the detriment of others." Where the claimant is an insider, his dealings with the debtor will be subjected to more exacting scrutiny.

See In re Baker & Getty Financial Services, Inc., 974 F.2d 712, 718 (6th Cir. 1992) (quoting In the Matter of Teltronics Serv., Inc., 29 B.R. 139, 169 (Bankr. E.D.N.Y. 1983)); In the Matter of

---

[5] With respect to corporate debtors, the Bankruptcy Code defines an "insider" as including: (i) a director of the debtor, (ii) an officer of the debtor, (iii) a person in control of the debtor, (iv) a partnership in which the debtor is a general partner, (v) a general partner of the debtor, or (vi) a relative of a general partner, director, officer or person in control of the debtor. See 11 U.S.C. § 101(31).

Century Glove, Inc., 151 B.R. 327, 335 (Bankr. D.Del. 1993) (egregious conduct "tantamount to fraud, overreaching or spoliation" required); see also In re Vietri Homes, Inc., 58 B.R. 663, 665 (Bankr. D.Del. 1986) (same); In re 604 Columbus Avenue Realty Trust, 968 F.2d 1332 (1st Cir. 1992); In re M. Paolella & Sons, Inc., 161 B.R. 107, 117-119 (E.D. Pa. 1993) aff'd 37 F.3d 1487 (3d Cir. 1994)("gross or egregious" misconduct "tantamount to fraud, overreaching or spoliation" must be proved with particularity); Nutri/System, 178 B.R. at 657 (requiring that the movant prove with particularity "egregious conduct such as fraud, spoliation or overreaching").

The Bankruptcy Court in this case is not alone in holding that a different standard is applied under the first prong of the Mobile Steel test to insiders than is applied to non-insiders of the Debtor.  Many courts have held that a debtor's transactions with insiders are held to more exacting scrutiny than those transactions it may undertake with non-insiders.  As a consequence, the threshold for "inequitable conduct" giving rise to the equitable subordination remedy is much higher for cases involving non-insiders as opposed to insiders.  In re Autostyle Plastics, Inc., 269 F.3d at 744 ("When viewing equitable subordination claims, courts impose a higher standard of conduct upon insiders. . . . Therefore, 'if the claimant is an insider, less egregious conduct may support equitable subordination'")(quoting In re Herby's Foods, Inc., 2 F.3d 128, 131 (5th Cir. 1993); cf. In re Fabricators, 926 F.2d at 1496 ("If claimant is not an insider, then evidence of more egregious conduct such as fraud, spoilation or overreaching is necessary.")); Herzog v. Leighton Holdings, Ltd. (In re Kids Creek Partners, L.P.), 239 B.R. 497,504 (N.D. Ill. 1999)(In this case, the court answered the question regarding whether the Mobile Steel test applies with "equal force to non-insiders as it does to insiders" in the negative.  For example, in Kids Creek, the Court agreed that non-insiders are held to a higher standard and that before subordination can be ordered the non-insiders' conduct must be more egregious than conduct of an insider. Additionally, the court held that the "egregiousness test used by the bankruptcy court in this case

does not conflict with the <u>Mobile Steel</u> test, but rather applies it with specificity."); <u>In re Medical</u>

<u>Software Solutions</u>, 286 B.R. 431, 447 n.10 (Bankr. D. Utah 2002); <u>In re Computer Personalities</u>

<u>Systems, Inc.</u>, 284 B.R. 415, 427-28 (Bankr. E.D.Pa. 2002)("'The quality of conduct that will be

deemed 'inequitable' under § 510(c) depends on the nature of the relationship between the debtor

and the party whose claim is subject to attack on equitable subordination grounds[.]' . . . Where

the claimant is an insider or fiduciary of the debtor, the trustee must present evidence of unfair

conduct. . . . However, where the claimant is not an insider or fiduciary of the debtor, 'egregious

conduct must be proven with particularity.'")(citations omitted)(collecting cases); <u>In re</u>

<u>Mid-American Waste Systems, Inc.</u>, 284 B.R. 53, 69-70 (Bankr. D.Del. 2002)("The *most*

*important factor* in determining if a claimant has engaged in inequitable conduct for the purposes

of equitable subordination is whether the claimant was an insider or outsider in relation to the

debtor at the time of the act. . . .  For non-insider claimants, egregious conduct *must* be

established to justify equitable subordination.")(citing <u>Friedman v. Sheila Plotsky Brokers, Inc.</u>

<u>(In re Friedman)</u>, 126 B.R. 63, 71 (9th Cir. BAP 1991)(emphasis added)(citations omitted); <u>In re</u>

<u>Atlanticrancher, Inc.</u>, 279 B.R. 411 439-40 (Bankr. D.Mass. 2002)("'[M]ost cases involving

'equitable subordination' also involve corporate insiders or fiduciaries who have obtained unfair

advantages over other creditors through, for example, fraud.  Where a bankruptcy court has

subordinated the debt of a creditor who was not an insider, it has done so on the ground that

conduct was egregious and severely unfair in relation to other creditors.'")(quoting <u>Capital Bank</u>

<u>& Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust)</u>, 968

F.2d 1332, 1360 (1st Cir. 1992)); <u>In re Kentucky Truck & Trailer Repair, Inc.</u>, 291 B.R. 84,

94-95 (Bankr. W.D.Ky. 2002)("Case law development in this area indicates that where the

conduct complained of involves a non-insider to the debtor, the 'egregious conduct must be

proven with particularity' and the creditor must be found guilty of 'gross misconduct tantamount

to fraud, overreaching or spoilation to the detriment of others.'"); In re Vermont Electric Generation & Transmission Cooperative, Inc., 240 B.R. 476, 484 (Bankr. D.Vt. 1999)("'Where the claimant is a non-insider, egregious conduct must be proven with particularity'")(quoting Anaconda-Ericsson v. Hessen (In re Teltronics), 29 B.R. 139, 169 (Bankr. E.D.N.Y. 1983)); In re Nutri/System, Inc., 169 B.R. 854, 865-66 (Bankr. E.D.Pa. 1994)("It is well established that the party invoking subordination must show, with particularity, egregious conduct on the part of the respondent to effect subordination unless the respondent is an insider, in which case the burden on the moving party is less demanding.").  Based upon the foregoing plethora of case law, the Bankruptcy Court did not abuse its discretion by requiring the Bank of New York to "prove with particularity 'egregious conduct such as fraud, spoilation or overreaching'" to establish if USA Capital, a non-insider, engaged in inequitable conduct.  In re Epic Capital Corporation, 290 B.R. at 524.

Even though the Court of Appeals for the Third Circuit has not ruled on whether egregious conduct is the appropriate standard under the Mobile Steel test for actions by a non-insider, the Third Circuit recently upheld a bankruptcy court decision subordinating an insider's claim by finding "facts to establish the *egregious conduct* warranting subordination." Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims, 323 F.3d 228, 235 (3d Cir. 2003)(emphasis added).  Based upon this language, the conclusion is clear that if some level of egregious conduct was required for an insider's claim to be subordinated, at least some level (most likely a higher level) of egregious conduct is required for a non-insider's claim to be subordinated.

In its brief, the Bank of New York ignores the insider/non-insider dichotomy set forth above and merely relies upon precepts set forth in, among other cases, Citicorp Venture Capital Corp. v. Committee of Creditors Holding Unsecured Claims, 160 F.3d 982 (3d Cir. 1998) and In

re Cutty's-Gurnee, 133 B.R. 934 (N.D. Ill. 1991) to improperly suggest that "egregious conduct" is not germane to the equitable subordination analysis. However, each of these cases cited by the Bank of New York are clearly distinguishable as they are cases where the claimant subject to the equitable subordination action is an insider owing fiduciary and other duties to the debtor's shareholders and creditors. See generally DeNATALE & ABRAM, The Doctrine of Equitable Subordination As Applied to Nonmanagement Creditors, 40 Bus. Law. 417, 424 (1985)(noting that "the relationship of the creditor to the debtor is an essential factor" in determining the appropriate standard of misconduct necessary to give rise to equitable subordination). In this case now before the Court, USA Capital had no such fiduciary duty to the debtor's shareholders and other creditors. Consequently, "egregious conduct" sufficient to "shock the conscience of the court" is required to equitably subordinate the liens and claims of non-insider creditors of the Debtor.

The Bank of New York's reliance on Cutty's-Gurnee is misplaced. The Bank of New York argues that the facts of Cutty's-Gurnee are analogous to the case at bar. Specifically, the Bank of New York argues that because the Cutty's-Gurnee Court did not examine whether the lender (the "Lender") subject to equitable subordination in that case engaged in egregious conduct the Bankruptcy Court wrongfully examined whether USA Capital engaged in egregious conduct in its equitable subordination analysis. This is a comparison of apples and oranges. As previously noted, the Bank of New York completely ignores the fact that the Lender in Cutty's-Gurnee was an insider. USA Capital is not an insider. The facts of Cutty's- Gurnee are clearly distinguishable to the case at bar. Additionally, in Cutty's-Gurnee the investor harmed by the actions of the Lender had an equitable mortgage on certain real property collateral. The Bondholders neither have an equitable lien nor an equitable mortgage because the BIA did not

approve any security interest in favor of the Bondholders on the Palm Springs Resort.[6]  In re Epic Capital Corp., 290 B.R. at 520-523.  Therefore, there was no lien or mortgage, equitable or otherwise, for USA Capital to be on notice of.[7]  Third, according to the Cutty's-Gurnee Court, the Lender in that case wrongfully and "intentionally induced" the debtor to breach the debtor's prior written agreement with the investor holding the equitable mortgage.  As set forth more fully below in this Brief, USA Capital did not induce the Debtor to usurp any security interest held by the Bondholders as it was the Debtor approached USA Capital for a loan and not *vice versa*.  Moreover, the Bondholders did not have a security interest in the Palm Springs Resort and as a result were not harmed by any of the actions of USA Capital.  Accordingly, the Cutty's-Gurnee case is clearly distinguishable to the case at bar and the Bank of New York's reliance upon the Cutty's-Gurnee case is misplaced.

The Bank of New York also relies upon In re Model Imperial, Inc., 250 B.R. 776 (Bankr. S.D. Fla. 2000), which is also misplaced.  The Bank of New York attempts to compare the bank (the "Bank") subject to subordination in Model Imperial to USA Capital.  There is no comparison between the Bank in Model Imperial and USA Capital.  In Model Imperial, the Bank actively conspired with the debtor to fraudulently structure a straw-loan transaction which was intended to circumvent of the rights of a bank group and proceeded in a course of conduct that

---

[6]The Bondholders even acknowledged in hearings before the Bankruptcy Court that the Bondholders were not granted any liens on any of the Debtor's assets in California and in the involuntary petition commencing the underlying bankruptcy case failed to disclose any of the inchoate interests the Bondholders now seek to enforce through these proceedings.  The Bondholders are now judicially estopped from contending that they otherwise have some sort of lien interest in the Palm Springs resort.  Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., __F.3d __, 2003 WL 21731751 (3d Cir. July 28, 2003).

[7]The Bank of New York points to various SEC filings as support for some claim that a lien was intended to be granted to the Bondholders in the Palm Springs Resort.  No evidence is in the record reflecting that the SEC filings were filed in the chain of title; nor is there any evidence in the record that the SEC filings referenced by the Bank of New York were reviewed or provided to USA Capital in connection with the loan other than one (1) financial statement of Epic Resorts, LLC.  Moreover, each of the SEC filings referenced by the Bank of New York are subject to statements in the bond offering Prospectus which unequivocally states that no lien will be granted to the Bondholders on the Palm Springs Resort in the absence of BIA approval.

ignored fraudulent transfers by the debtor. The undisputed record in the case before this Court, however, demonstrates that USA Capital did not act in concert with the Debtor to prejudice the Bondholders' rights. Rather, the record reflects that USA Capital, through normal and reasonable business actions, loaned money to the Debtor without ulterior motives to harm the Bondholders.

Accordingly, as the Bankruptcy Court correctly held, to subordinate USA Capital's claims in this case it was necessary for the Bondholders to prove that USA Capital was guilty of "gross misconduct tantamount to fraud, overreaching or spoliation . . . ." However, the only basis asserted by the Bondholders in support of subordinating USA Capital's claim is the mere fact that USA Capital possessed a copy of the Indenture and Prospectus when USA Capital closed on its $11.5 million loan facility with the Debtor. See Complaint to Determine Validity, Extent, and Priority of Liens, and for Equitable Subordination Pursuant to 11 U.S.C. § 510(c) at ¶¶ 46 through 50 ([Adv. Proc. 02-03021, D.I. 1] - Designation 13.) The Bankruptcy Court correctly recognized that this allegation, even if true, cannot form the basis of an equitable subordination claim against USA Capital.

In In re After Six, Inc., the unsecured creditors committee attempted to subordinate an unsecured claim filed by a creditor bank. 177 B.R. at 222-231. In reaching its conclusion that the more stringent standard applied because the committee made no allegation that the bank was an insider, the In re After Six, Inc. court noted that:

> It is also established that, in a practical sense, the courts have actually confined equitable subordination of claims to three general categories of cases: those in which a fiduciary of the debtor misuses his position to the disadvantage of other creditors; those in which a third party, in effect, controls the debtor to the disadvantage of others; and those in which a third-party defrauds creditors.

177 B.R. at 232 (citing In re CTS Truss, Inc., 868 F.2d 146, 148-49 (5th Cir. 1989); In re United States Abatement Corp., 39 F.3d 556, 561 (5th Cir. 1994); In re Paolella & Sons, Inc., 161 B.R. 107, 117-18 (Bankr. E.D.Pa. 1993); In re Nutri/System, 169 B.R. 854, 865-66 (Bankr. E.D.Pa. 1984)). The Bankruptcy Court in the instant case correctly determined that "[t]here was no evidence of fraud, illegality, breach of fiduciary duties, undercapitalization, or use of Epic Palm Springs as a mere instrumentality or alter ego." In re Epic Capital Corp., 290 B.R. at 524. As such, the Bank of New York's equitable subordination fails and the Bankruptcy Court's opinion and order must be affirmed.

The worst that can be construed from USA Capital's loan with the Debtor is that USA Capital's loan was not conservatively made by USA Capital given the uncertainty now asserted by the Bank of New York over the terms and conditions of the Indenture. USA Capital's loan to the Debtor, however, does not give rise to a cause of action under Section 510 of the Bankruptcy Code under these facts. Indeed, courts have routinely held that "lax, imprudent, and ill advised" loans of a pre-petition lender do not rise to the level of gross or egregious misconduct necessary for equitable subordination purposes. See In re Baker & Getty Financial Services, Inc., 974 F.2d at 718. As one Court held:

> Giving the greatest weight to the most damaging testimony against defendant's lending practices establishes only a lending policy which was liberal in approving renewal applications, accepting face value debtors' projections, relying heavily on the character and ability of the debtors, and financing the debtors' overzealous goals. Such policy, while perhaps not sound or prudent practice, falls short of imposing culpability for the results which the debtors' actions eventually occasioned.

In re Tinsley and Groom, 49 B.R. 85, 91 (Bankr. W.D.Ky. 1984).

USA Capital's secured transaction plainly was not even "lax or imprudent" under any stretch of the imagination. When the Debtor granted USA Capital a lien on the Collateral, the

Debtor advised USA Capital that no other creditor held a lien on the Palm Springs Resort.
Pursuant to ¶5.2(e) of the Loan Agreement, the Debtor represented and warranted that the entry
into the secured loan transaction with USA Capital did "not and will not . . . result in a breach or
constitute a default under , . . . or require any consent under, any indenture . . ." In addition, an
ordinary title examination did not reveal any other liens on the Collateral. USA Capital also
obtained an opinion letter from Epic's counsel that the USA Capital transaction did not violate
the terms of the Indenture and that no other lien encumbered the Palm Springs Resort. In
addition, prior to consummating the transaction, USA Capital confirmed with the BIA that no
other lien existed on the property and that the Indenture was not implicated, which was further
corroborated by the fact that no deed of trust was executed in favor of the Indenture Trustee and
by the fact that the Prospectus unequivocally stated that if BIA approval was not obtained by the
Indenture Trustee, "the subsidiary guaranty of Epic Resorts-Palm Springs Marquis Villas, LLC
will not be secured by any mortgage on such leasehold." (Exhibit USA-13 at 22 - Designation
19, Tab 15.)

Additionally, the Bank of New York's hollow and conclusory allegations, that the Debtor
allegedly breached the negative covenant in the Indenture with respect to indebtedness (the
"Indebtedness Covenant") by virtue of the Loan Agreement with USA Capital, do not defeat the
grant of summary judgment in favor of USA Capital for several reasons. See Indenture at § 4.09
- Designation 19, Tab 16; Celotex Corporation v. Catrett, 417 U.S. 317, 324-25 (1986)("One of
the principal purposes of the summary judgment rule is to isolate and dispose of factually
unsupported claims or defenses, and we think it should be interpreted in a way that allows it to
accomplish this purpose."); Rico v. Annulli, 200 F.3d 189, 198-99 (3d Cir. 1999)(noting that
conclusory allegations are not enough); Sheets v. Dziabis, 738 F. Supp. 307, 309 (N.D. Ind.
1990)(conclusory allegations contained in affidavits are not enough). First, as set forth in the

record, the Bank of New York merely alleges in a conclusory fashion that the Indebtedness Covenant was breached by the Debtor as a result of the USA Capital loan facility. The only support that the Bank of New York provides for this hollow allegation are conclusory allegations which cite generally to hundreds of pages of SEC filings filed by the Debtor in 1999 and 2000. See The Bank of New York's Opposition to USA Capital's Motion for Summary Judgment and Memorandum in Support of the Bank of New York's Cross Motion for Summary Judgment at 15. (Designation 34) The Bank of New York, however, fails to identify how the Indebtedness Covenant is calculated or which portions of data in the hundreds and hundreds of pages of SEC documents are germane to the undisclosed calculation of the covenant as cited by the Bank of New York. Without more, no Court and no party to this litigation can conclude whether the covenant cited by the Bank of New York was breached in the first instance.

Ignoring the fact that the Bank of New York has not demonstrated that a breach of the Indebtedness Covenant was caused by USA Capital's loan, the Bank of New York's appeal must nonetheless fail. The fact remains that USA Capital was simply not the cause of any such breach claimed by the Bank of New York as, as set forth more fully below, it was the Debtor who solicited USA Capital to make the loan and USA Capital did not induce the Debtor to breach the Indenture. Notwithstanding this undisputed state of the record, the Bank of New York implicitly suggests that before lenders make loans to borrowers, lenders should hire forensic accountants and perform a forensic audit. Lenders, however, do "not have to hire detectives before relying on borrowers' . . . statements." Gertsch v. Johnson & Johnson Fin. Corp., 237 B.R. 160, 170 (B.A.P. 9th Cir. 1999). Pursuant to ¶5.2(e) of the Loan Agreement, the Debtor represented and warranted that the entry into the secured loan transaction with USA Capital did "not and will not . . . result in a breach or constitute a default under , . . . or require any consent under, any indenture . . ." (Designation 18, Tab 3.) In addition, an ordinary title examination did not reveal any other liens

on the Collateral.  USA Capital also obtained an opinion letter from Epic's counsel that the USA

Capital transaction did not violate the terms of the Indenture and that no other lien encumbered

the Palm Springs Resort.  (Designation 24, Tab 23.)  While it is true that the Bank of New York

complains that the opinion letter delivered to USA Capital was delivered in mid-funding by USA

Capital, the Bank of New York's complaint in this regard is a red herring as the undisputed

record in this case is that USA Capital nonetheless requested such an opinion letter in connection

with the loan transaction, was advised that the opinion would be delivered, and in-fact received it

before USA Capital's final funding installment was made.   Under these circumstances, the

Bankruptcy Court did not abuse its discretion and its conclusion that USA Capital's lien and

claims should not be subordinated is a correct one.[8]

        3.       **Even if USA Capital Engaged in Inequitable Conduct Sufficient for Equitable Subordination Purposes, the Bank of New York is not Entitled to Equitable Relief.**

Even if USA Capital's possession of the Indenture and Prospectus could be deemed

"inequitable conduct" for purposes of equitable subordination pursuant to Section 510(c) of the

Bankruptcy Code, the Bank of New York has not demonstrated that the Bankruptcy Court abused

its discretion in denying the Bank of New York's request for equitable relief.  As an initial

matter, the doctrine of equitable subordination requires that the Bank of New York must show a

causal link between the complained of conduct and the alleged harm suffered by the Indenture

Trustee.  In the Matter of Century Glove, Inc., 151 B.R. at 327.  The facts of this case are that

the actions of USA Capital did not proximately cause the alleged harm to the Bondholders.  The

Indenture Trustee can only blame itself (and its predecessor) and not USA Capital, for the failure

of the Indenture Trustee to obtain a properly executed, approved and recorded deed of trust in

---

[8]USA Capital's loan transaction to the Debtor was fully disclosed as a part of public filings made by the Debtor with the SEC.  As with the other rights systematically waived and ignored by the Bondholders, the record in this case reflects no action(s) of any sort by the Bondholders, whether through the Indenture Trustee or otherwise, to enforce any Indebtedness Covenant of the Debtor.

connection with the bond issue.  At all times material hereto the Indenture Trustee has been a large sophisticated financial institution with extensive resources and has been represented by lawyers from some of the most highly regarded law firms in the country.  The Indenture Trustee surely could have refused to close the bond issue if the deed of trust on the Palm Springs Resort was intended to be security.  Indeed, USA Capital would not have closed its transaction with the Debtor without it.

However, the facts are that the Indenture Trustee closed the bond issue without obtaining an executed deed of trust within the sixty days required under the Indenture,[9] and at this late hour complains of this result even though it was of no doing by USA Capital.  The undisputed testimony in this case is that no deed of trust was given to the Indenture Trustee because BIA approval was never granted for the alleged deed of trust, and as a result the Indenture Trustee obtained a lien on Epic's Daytona resort property instead.  The Indenture Trustee apparently disagrees with this evidence, and has made mere hollow statements in response.  The fact remains that the Indenture Trustee did nothing since closing the Indenture to enforce the Indenture Trustee's new found interpretation of its agreements with the Debtor.  Since 1998, did the Indenture Trustee send a simple demand letter to the Debtor demanding that the Debtor execute the alleged deed of trust?  No it did not.  Since 1998 did the Indenture Trustee send a simple request to the Debtor demanding that the Debtor make another attempt to seek BIA approval of the alleged security?  No it did not.  Did the Indenture Trustee file a *lis pendens* in the chain of title to protect its alleged security?  No it did not.  Did the Indenture Trustee commence a legal action against the Debtor to enforce those provisions of the Indenture it now cites as authority for its alleged inchoate lien?  No it did not.  Did the Indenture Trustee commence any

---

[9]Pursuant to Section 11.01(g) of the Indenture (Designation 19, Tab 16), "The Issuers and the Subsidiary Guarantors each agree that unless another time period is specified herein, each action required above by this Section 11.01 shall be completed as soon as practicable, but in no event later than 60 days after such action is required by the terms hereof or requested to be taken by the Trustee."

legal action against the Debtor to enforce the Indebtedness Covenant? No it did not. What did the Indenture Trustee do to enforce its alleged security interest and other interests since closing the Indenture in 1998? The answer is simple - it did nothing.

Under these circumstances, the harm (if any) caused to the Indenture Trustee was caused by the Indenture Trustee itself, and not by USA Capital.[10] Moreover, under the facts of this case the Indenture Trustee assumed the risk that it would suffer the consequences of being an unsecured creditor as to the Palm Springs Resort since (i) it did not secure an executed deed of trust at the closing of the bond issue and (ii) the Prospectus issued in connection with the bond issue clearly provided that if the Indenture Trustee did not obtain a deed of trust that was met with BIA approval, "the subsidiary guarantee of Epic Resorts-Palm Springs Marquis Villas, LLC will not be secured by any mortgage on such leasehold." (Exhibit USA-13 at 22 - Designation 19, Tab 15.) Therefore, the Indenture Trustee, not USA Capital, inflicted the alleged harm upon itself and the Bondholders. Accordingly, the Bank of New York is not entitled to equitable relief. In re Epic Capital Corp., 290 B.R. at 525 ("BONY on the other hand, slept on its rights and is, therefore, not entitled to equitable relief."); In re Esta Later Charters, Inc., 875 F.2d 234, 239 n.11 (9th Cir. 1989)("*vigilantibus non dormientibus aequitas subvenit,*" that is "equity aids the vigilant, not those who slumber on their rights.").

In balancing the equities of this case, the Court should also consider the actions of the Highland Funds, as well as those of the Indenture Trustee. The Highland Funds are the primary bondholder creditors of the Debtor who hold in excess of $93,767,000.00, or in excess of

---

[10]To the extent that the Indenture Trustee now claims that Mr. Flatley some how improperly failed to execute the deed of trust or improperly failed to obtain BIA approval of the alleged lien of the Indenture Trustee, such conduct complained of by the Indenture Trustee is that of Mr. Flatley and not USA Capital. In any event the Indenture Trustee took no action since July of 1998 to mitigate the impact any such alleged improper conduct.

seventy-two percent (72%), of the Bonds.[11]  (See Complaint of Highland Funds against USA Capital at Clark County, Nevada District Court Case No. A453232 - Designation 34, Tab 41.) The Highland Funds purchased most of these bonds at a discount after June of 2000.  (See Exhibit USA-33 - Designation 26, Tab 31.)  At the time when the Highland Funds purchased most of these bonds, the following facts were of public record:

- One, the Prospectus disclosed that absent BIA approval the Subsidiary Guarantee of Epic Resorts - Palm Springs Marquis Villas, LLC is not secured by any leasehold mortgage in favor of the Indenture Trustee (See Exhibit USA-13 at p. 22 - Designation 19, Tab 15; See BNY Exhibit 4 (Offering Memorandum) at p. 21 - Designation 32.)

- Two, nothing in the public record evidenced BIA approval of a leasehold deed of trust in favor of the Indenture Trustee.  (See April Tr. at 24 - Designation 6.)

- Three, no executed leasehold deed of trust on the Palm Springs resort in favor of the Indenture Trustee appeared in any SEC filing. (See BNY Exhibit-14 - Designation 32.)

- Four, no deed of trust in favor of the Indenture Trustee had been recorded in the Riverside County, California Recorder's office.  (See April Tr. at 24 - Designation 6.)

- Five, a deed of trust in favor of USA Capital had been recorded in the Riverside County, California Recorder's office.  (See Exhibit USA-6 - Designation 18, Tab 8.)

- Six, the BIA had approved the leasehold deed of trust in favor of USA Capital.  (See id. at p. 23)

- Seven, the Debtors' borrowings from USA Capital were disclosed in SEC documents. (See April Tr. at 79 - Designation 6; Exhibit USA-23 at Bates No. CMM00798 - Designation 24.)

---

[11] USA Capital believes, and therefore avers, the Highland Funds or affiliates of the Highland Funds may have acquired additional bonds at a discount since either the closing of USA Capital's loan facility and/or the filing of the Debtor's bankruptcy case.  In addition, USA Capital avers that the Bank of New York bears the burden of quantifying any "harm" to the Bondholders and that it has not put forth any evidence in the record adequately reflecting the amount and quantity of pre-USA Capital loan Bondholders who are currently Bondholders of the Debtor.  Without Bank of New York putting such evidence into the record, the Bank of New York can hardly be deemed to have met its burden pursuant to Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims, 160 F.3d 982 (3d Cir. 1998) and the Bankruptcy Court's decision and order dismissing the Bank of New York's complaint was correct.

Notwithstanding this public information, the Highland Funds proceeded on a systematic course of purchasing a substantial portion of the Debtors' Bonds. Through their agent in this case, the Bank of New York, the Highland Funds seek (through the doctrine of equitable subordination) to ask this Court to hand them collateral to which they are not entitled despite the fact that they acquired their notes at a discount in the face of a public record that unequivocally demonstrated that (i) the notes purchased by the Bondholders were not secured by the Palm Springs Resort and (ii) Epic - Palm Springs had entered into the loan transaction with USA Capital and granted a leasehold deed of trust in favor of USA Capital. Under these circumstances most, if not all, of the Bondholders are not the appropriate candidates for the remedy of equitable subordination.

The Bank of New York cites In re Trim-Lean Meat Products, Inc., 10 B.R. 333 (D.Del 1981) as support for its argument that the equities favor the Bank of New York in this case. The Bank of New York's reliance on Trim-Lean is misplaced because the Trim-Lean supports USA Capital's argument, which the Bankruptcy Court agreed, that the equities disfavor the Bank of New York. As an initial matter, the Bank of New York's contention that "obstructionist tactics" of the Debtor's former executive, Thomas Flatley,[12] harmed the Bondholders indeed supports USA Capital's contention that USA Capital was not the legal cause of any injury alleged by the Bank of New York. Secondly, the Bondholders newfound claim of "obstructionist tactics" as it relates to the closing of the Indenture is a new legal theory espoused by the Bondholders in this appeal. The undisputed record before the Bankruptcy Court states that the Bondholders previously contended that their failure to obtain a leasehold deed of trust was merely due to an "oversight." See The Bank of New York's Opposition to USA Capital's Motion for Summary

---

[12]The "obstructionist tactics" cited by the Bank of New York are irrelevant to these proceedings. For example, the Bank of New York alleges that Mr. Flatley attempted to transfers assets out of the bankruptcy estates and engaged in self-dealing. Each of the activities cited by the Bank of New York occurred years after the bond issue closed and years after the USA Capital loan facility closed.

Judgment and memorandum in Support at 3 (Designation 34)   Either way, the Bondholders'
claims fail from both a legal cause perspective and a laches/contributory negligence perspective.

In Trim-Lean, Judge Stapleton refused to recognize an equitable lien in instances where
the claimant has not "done everything reasonable under the circumstances to perfect its lien." Id.
at 335. In Trim-Lean, the borrower breached its security agreement by failing to "do everything
necessary or expedient to perfect and preserve any security interest" of the lender. Id. at 336.
The agreement at issue also provided the lender with numerous remedies in the event of default,
including repossession of its collateral and foreclosure. As such, the lender was "in a position to
make demand upon [the borrower] with a reasonable expectation of securing prompt
compliance." Id. However, the facts of Trim-Lean were such that after the borrower closed on
its deal with the lender, the lender never formally demanded that the borrower promptly record
the lender's security interest. Id. As a result, Judge Stapleton concluded that the lender was not
entitled to assert an equitable lien. Id. The Court also concluded that the borrower's prima facie
failure to abide by the executory promise in the applicable security agreements did not render the
borrower "uncooperative" or "obdurate." Specifically, the Court observed:

> [The lender] also argues on appeal that the trustee is not
> entitled to the truck tractor because [the borrower] obtained the
> vehicle through fraud. : It contends that an inference of
> fraudulent intent on [the borrower's] part can be drawn from its
> unjustified and illegal failure to take any steps to comply with
> ¶C by registering the truck tractor. This allegation is based on
> the representations contained in ¶C of the security agreement
> which was quoted [above].
>     This argument is simple *non sequitur*. [Borrower's]
> failure to perform its obligation to perfect under the security
> agreement does not imply that it had deceived [the lender] into
> contracting with it. Standing by itself, a mere failure to perform
> [a contractual obligation] is consistent with an honest intent as
> well as with a dishonest one. [Lender] has suggested no
> additional circumstance that would permit me to infer fraudulent
> intent in this case.

> In summary, I have concluded that the application of the equitable lien doctrine would be inappropriate in this case, and that [the borrower] has not been shown to have acquired the contested tractor by fraud.

Id.

Application of this case to the case at bar leads to the inescapable conclusion that the equities do not favor the Bank of New York. Like the lender in Trim Lean, as set forth above, the Indenture Trustee took absolutely no steps since 1998 to protect or enforce its alleged interest.[13]   Under these circumstances, the Bankruptcy Court's opinion and order was well founded and the equitable subordination claims of the Bondholders do not pass any muster.

> 4.    **The Bankruptcy Court Correctly Concluded That USA Capital Acted in Good Faith and Did Not Tortiously Interfere With the Indenture.**

Finally, the Bankruptcy Court rejected the Bank of New York's suggestion that USA Capital acted in bad faith and tortiously interfered with the Indenture. This finding of the Bankruptcy Court should be affirmed as the Bankruptcy Court correctly determined that "[t]here is no evidence of purposeful action on the part of USA Capital to harm the relationship between Resorts, Capital and BONY." In re Epic Capital Corporation, 290 B.R. at 525. The undisputed facts are that Epic Palm Springs represented and warranted that the entry into the secured loan transaction with USA Capital did "not and will not ... result in a breach or constitute a default under, . . . or require any consent under, any indenture." (Order at 21) (citing Loan Agreement at ¶ 5.2(e)) (Designations 12 and 37.) As recognized by the Bankruptcy Court, USA Capital confirmed with the BIA that no other lien existed on the property, prior to consummating the transaction. Id. Significantly, it was also noted that the relationship between Epic Resorts, USA

---

[13]The failure of the Indenture Trustee and the Bondholders, since July of 1998, to enforce the alleged provisions of the Indenture and compel the Debtor to execute the purported deed of trust or otherwise further pursue BIA approval corroborate Mr. Flatley's testimony that no lien was granted to the Indenture Trustee for the benefit of the Bondholders at the closing of the Indenture.

Capital and the Bank of New York was not altered because the Bank of New York did not have a

lien on the leasehold prior to USA Capital's loan to Epic Palm Springs and did not have one after

the loan.

Moreover, the Bondholders' reliance on the negative covenants in the Indenture to state a

claim is a red-herring as the Bondholders are merely attempting to bootstrap a legal claim

(tortious interference of contract) into an equitable claim for equitable subordination. To state a

cause of action for intentional interference with contractual relations, a plaintiff must show,

among other things, that the defendant intentionally "induced" the contracting party to breach its

contract.  See Wolff v. Rare Medium, Inc., 171 F.Supp.2d 354, 359-60 (S.D.N.Y. 2001);[14]

Speakers of Sport, Inc. v. Proserv, Inc., 178 F.3d 862 (7th Cir. 1999); Taggart & Taggart Seed,

Inc. v. First Tennessee Bank Nat'l Ass'n, 684 F.Supp 230 (E.D. Ark. 1988); General Signal

Corp. v. MCI Telecomms. Corp., 66 F.3d 1500 (9th Cir. 1995); IBM v. Comdisco, Inc., C.A. No.

91-C-07-199, 1991 WL 269965 at *8 (Del. Super. Ct. Dec. 4, 1991). Mere inducement by itself,

however, is not enough as common law imposes an additional requirement that the inducement

be procured through "wrongful means", which includes "physical violence, fraud,

misrepresentation, civil suits and criminal prosecutions, and some degree of economic pressure .

. . ." Wolff, 171 F.Supp.2d at 359-60 (S.D.N.Y. 2001). "Wrongful means", however "does not

include persuasion alone although it is knowingly directed at interference with the contract." Id.

---

[14] The Bank of New York's claims with respect to the negative covenants contained in the Indenture relate
to USA Capital's conduct in relation to the Bondholders contract rights. Because the Indenture is a contract that was
entered into in New York, and has a New York choice of law provision, see Indenture at § 12.10 (Designation 19,
Tab 16), New York law governs any tortious interference claim asserted by the Bank of New York. See, e.g.,
Speakers of Sport, Inc. v. Proserv, Inc., 178 F.3d 862, 864 (7th Cir. 1999); Taggart & Taggart Seed, Inc. v. First
Tennessee Bank Nat'l Ass'n, 684 F.Supp 230, 233 (E.D. Ark. 1988).  See also General Signal Corp. v. MCI
Telecomms. Corp., 66 F.3d 1500, 1506 (9th Cir. 1995) (California law broadly construes contractual choice-of-law
provisions to include all causes of action arising from or related to their contract); see also ROBERT L. HAIG,
Business and Commercial Litigation in Federal Courts, § 73.7 at 626 (1998) (stating in regard to tortious interference
claims, "[m]ost courts give deference to contractual choice of law provisions"); see also IBM v. Comdisco, Inc.,
C.A. No. 91-C-07-199, 1991 WL 269965 at *8 (Del. Super. Ct. Dec. 4, 1991)(Delaware courts generally give effect
to contractual choice of law provisions).

at 360.   In addition, the plaintiff must also prove that the defendant's actions were the "but for"

proximate cause of the alleged breach of contract.   That is, that there would not have been a

breach "but for" the activities of the defendant.   See Antonios A. Alevizopoulos and Assocs.,

Inc., v. Comcast Int'l Holdings, Inc., 100 F.Supp.2d 178, 186 (S.D.N.Y. 2000).

Under applicable law, USA Capital can hardly be deemed to have "tortiously interfered"

with the Indenture as USA Capital simply did not induce the Debtors to breach any contract.   The

undeniable fact of this case is that it was the Debtor who approached USA Capital with respect

to the transaction at issue, and not *vice versa*.   (See Complaint to Determine Validity, Extent and

Priority of Liens and for Equitable Subordination Pursuant to 11 U.S.C. § 510(c) at ¶16 -

Designation 4; April Tr. at 76; Designation 6.)   As indicated by the correspondence cited by the

Bank of New York, Epic Resorts actively solicited the loan and consistently requested "a quick

turn around" of the transaction. (See BNY Exhibit-5 - Designation 32.)   In addition, it did not

matter from Epic Resorts' perspective as to whether the loan came from USA Capital or some

other lender as Mr. Flatley testified at his deposition in this matter:

> Q.    What would have been the consequences had USA Capital not made the
>        loan . . .?
>
> MR. BOVARNICK: Objection to the form. You can answer.
>
> WITNESS: I don't think anything would have happened.
>
> Q.    Nothing would have happened?
>
> A.    I'm not being a wise guy. . . .[B]ut we would have probably just gone to
>        another lender.

(See Supplemental Appendix Tab 44 - Designation 34.)

Under these circumstances, USA Capital can hardly be deemed to have tortiously

interfered with a contract between the Indenture Trustee and the Debtor if the Debtor had already

been pre-disposed to breach it.  Granite Partners, L.P. v. Bear, Stearns & Co., Inc., 17 F.Supp.2d

275, 293-94 (S.D.N.Y. 1998) (dismissing tortious interference claim where allegations indicated that third party was predisposed toward breaching its agreement with plaintiff and would have done independently of each of the defendant's actions or participation); Special Event Entm't v. Rockefeller Ctr., Inc., 458 F.Supp. 72, 78 (S.D.N.Y. 1978)(dismissing claim of tortious interference with contract where the breaching parties "were not disposed toward honoring their alleged commitment even before [they] entered the negotiations").[15]

No facts are present which reflect that the loan transaction by and between the Debtor and USA Capital was procured "wrongfully" or through "improper means." No allegations, let alone evidence, was produced by the Bondholders which suggest that the USA Capital loan transaction with the Debtor was the result of "physical violence, fraud, misrepresentation, civil suits and criminal prosecutions." Nor can USA Capital be hardly accused of exerting any "economic pressure" or "economic inducement" of any sort over Epic, as the Bank of New York avers in its papers that the terms and conditions of the USA Capital loan were "expensive" and "harsh." (See BNY Brief at p. 11 - Designation 32; BNY Exhibit #5 - Designation 32.) Simply stated, the suggestion of the Bank of New York that some sort of "tortious interference" took place is unsubstantiated.

---

[15]Moreover, in connection with the USA Capital loan the Debtor also represented and warranted that the entry into the secured loan transaction with USA Capital did "not and will not . . . result in a breach or constitute a default under , . . . or require any consent under, any indenture . . . ." (See Exhibit USA-1 (Loan Agreement) at ¶5.2(e) - Designation 18, Tab 3). Further, USA Capital also took the added precaution of obtaining an opinion letter from Epic's counsel that concluded that the USA Capital transaction would not violate the terms of the Indenture and that no other liens encumbered the Collateral pursuant to it. The Bank of New York complains that the written opinion of counsel was delivered to USA Capital on or about July 31, 2000, which was before the funding by USA Capital was complete but after the execution of the loan. While the formal written document was delivered to USA Capital after the execution of the loan documents, and before the final funding was complete, the fact of the matter remains that USA Capital required the legal opinion as a part of the loan. (See April Tr. at 77 - Designation 6).

5. **The Bankruptcy Court's Opinion and Order Must Be Affirmed as The Injuries, if any, to the Bank of New York were not Proximately Caused by USA Capital; nor has USA Capital Obtained an Unfair Advantage.**

The undisputed facts set forth above also support the Bankruptcy Court's conclusion that USA Capital is not the proximate cause of any of the injuries now complained by the Bank of New York. In addition to the fact that USA Capital never "wrongfully induced" Epic-Palm Springs to enter into the loan transaction at issue, USA Capital also had absolutely nothing to do with the Indenture Trustee's failure to enforce the Indenture, the Indenture Trustee's failure to obtain a deed of trust on the Palm Springs Resort or its failure to obtain BIA approval of an alleged deed of trust. USA Capital also had nothing to do with the Indenture Trustee's extensive hibernation. Rather, at the Debtor's request, USA Capital made a good faith loan to the Debtor in the amount of $11.5 million. The testimony adduced in this matter provides that all of the advances required by the Loan Agreement were in fact made by USA Capital and Epic had the full benefit and use of the same in its operations.[16] Under these circumstances, USA Capital's conduct does not rise to the level of wrongful or inequitable conduct necessary for a finding of tortious interference or equitable subordination.

Assuming that the Bank of New York has proved with particularity that USA Capital's act of providing a secured loan to the Debtor is tantamount to "gross misconduct tantamount to fraud, overreaching or spoliation," such alleged inequitable conduct is insufficient in and of itself for the Bank of New York to prevail on its equitable subordination claim. Rather, the Bank of New York must also meet the second prong of the Mobile Steel test, which is "a conjunctive test,

---

[16] The Bondholders complain of the fact that the loan proceeds were used for "working capital" purposes for the Epic family. The Bondholders can hardly complain in this regard because, as set forth in the Bondholders' papers, the Bondholders' allegedly held security interests in the other members of the Epic family. Surely making working capital loans to the Epic family served to preserve the Bondholders alleged collateral. In fact, it is requested that the Court take judicial notice of the fact that the Epic family was recently sold in the Bankruptcy Court, with the Bondholders' liens attaching to a lion's share of the proceeds. (See Order Approving Sale [Case No. 01-2458-MFW D.I. 117]).

benefitted from USA Capital's loan as the infusion of such proceeds undoubtedly increased the going concern value of the Epic family, which incidentally has been described by all parties hereto as an "integrated company" that has been "operated as one." (May Tr. at 128-129, 174-175 - Designation 7.)

Without USA Capital's loan, the Epic family would have had to procure funds from another lending source. No evidence has been presented which suggests that an alternative lending source would have loaned the Debtor $11.5 million on an unsecured basis. Indeed, without such funds the Indenture Trustee would have been forced to make actual cash advances to the Debtor (thereby increasing the Indenture Trustee's unpaid claim by a like amount) or find that the Debtor did not have sufficient working capital to maintain its going concern value. Either way, the Indenture Trustee's belated attempt to set aside USA Capital's lien position is nothing but a disguised effort to unjustly enrich itself at the expense of USA Capital.

Having made actual advances of new money in this case, it is beyond pale that USA Capital's retention of its lien and claim status is neither unfair nor inequitable under the circumstances. Taking USA Capital's collateral away after it actually advanced $11.5 million to the Debtor would reward the Indenture Trustee with an undeserved windfall for its lackadaisical administration of the Indenture. Subordination of USA Capital's lien position under these circumstances would be manifestly unfair to USA Capital, especially since the purpose of equitable subordination is remedial, and not penal. Indeed, Courts have recognized that "[t]he time honored maxim that equity will not enforce a penalty adds another limitation to the subordination power" of the Bankruptcy Courts. Trone v. Smith (In re Westgate-California Corp.), 642 F.2d 1174, 1178 (9th Cir. 1981) (quoting In re Kansas City Journal Post Co., 144 F.2d 800-01 (8th Cir. 1944)). Additional equitable doctrines apply as well to foreclose relief to the Bondholders, including (a) equity follows the law, and (b) equitable relief is not appropriate

where the plaintiff has adequate remedies at law.  To the extent the Bondholders claim Mr.

Flatley and others have caused the Bondholders to forego any interest in the Palm Springs

Resort, the Bondholders can assert such legal claims elsewhere. Cf. Cerberus Partners, L.P. v.

gadsby & Hannah, 728 A.2d 1057, 1067 (R.I. Super. Ct. 1999)(cause of action recognized by

assignee of security interest against law firm who failed to record and perfect security interest).

In fact, the Bondholders are currently involved in litigation with the various indenture trustee's

regarding their negligent administration of the Indenture. See (Designation 34, Tab 41)

Consequently, because the Bank of New York's equitable subordination claim is nothing but a

disguised effort to obtain a wind-fall and impose a penalty against USA Capital, and because the

Bondholder's have legal remedies against various other parties who caused the alleged "harm" of

the Bondholders, the Bank of New York's contentions are without merit both factually and

legally.  Under these circumstances, the Bankruptcy Court did not commit an abuse of discretion

and the Bankruptcy Court's opinion and order must be affirmed.

## V.    CONCLUSION

The foregoing demonstrates that the Court should affirm the Bankruptcy Court's opinion

and order and conclude that the Bankruptcy Court did not abuse its discretion when it determined

that the Bondholders are not entitled to the remedy of equitable subordination under the facts and

circumstances of this case.

Dated: November 10, 2003            **KLETT ROONEY LIEBER & SCHORLING,**
                                    **A PROFESSIONAL CORPORATION**

                                    By:  _____
                                         Mark R. Owens (No. 4364)
                                         Two Logan Square, 12th Floor
                                         Philadelphia, PA 19103
                                         (215) 567-7500

                                         Counsel  for  Appellee/Cross-Appellant  USA
                                         Capital Diversified Trust Deed Fund, LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) ) ) | Jointly Administered Under Case No. 01-2458-MFW |
| EPIC CAPITAL CORPORATION, *et al.,* | ) ) | |
| Debtors. | ) ) | |
| ———————————— | ) ) | |
| THE BANK OF NEW YORK, AS INDENTURE TRUSTEE, | ) ) ) | Adv. Proc. No. 02-3021-MFW |
| Plaintiff/Appellant, | ) ) | Civil Action No. 03-360 (JJF) |
| v. | ) ) | |
| EPIC RESORTS - PALM SPRINGS MARQUIS VILLAS, LLC, | ) ) ) | |
| and | ) ) | |
| USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, | ) ) ) | |
| Defendants/Appellees/ Cross-Appellant. | ) ) ) | |
| ———————————— | | |

AFFIDAVIT OF RAELENA Y. TAYLOR

STATE OF DELAWARE:
              SS:
NEW CASTLE COUNTY:

    I, Raelena Y. Taylor, certify that I am, and at all times during the service of process, have been, an employee of Klett Rooney Lieber and Schorling, P.C., not less than 18 years of age and not a party to the matter concerning which service of process was made November 10, 2003. I certify further that two (2) copies of the attached:

KRLSPHI:207288.2

## BRIEF OF APPELLEE, USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

was made on the following parties on the attached list by First Class Mail and Hand Delivery (to City of Wilmington, Delaware addresses only).

Raelena Y. Taylor

SWORN AND SUBSCRIBED before me this 10th day of November 2003.

NOTARY

NOTARIAL SEAL
MELISSA N. BISACCIA
Notary Public - State of Delaware
Date of Appointment: February 12, 2001
My Commission Expires: February 12, 2004

KRLSPHL:#07288.2

2

## SERVICE LIST

Kevin Gross, Esquire
Rosenthal, Monhait, Gross
& Goddess
Mellon Bank Center - Ste. 1401
Wilmington, DE  19899-1070

Julie L. Compton, Esquire
Office of the U.S. Trustee
844 King Street
Suite 2313
Wilmington, DE  19801

William Hazeltine, Esq.
Potter, Anderson & Corroon
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801

Robin E. Keller, Esq.
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Tom A. Howley, Esquire
Mark D. Sherrill, Esquire
Haynes & Boone
1000 Louisiana Street - Ste. 4300
Houston, TX  77002

Aaron Garber,
David M. Fournier, Esquire
Pepper Hamilton, LLP
1201 Market Street - Ste. 1600
P.O. Box 1709
Wilmington, DE  19899-1709.

Teresa K.D. Currier, Esquire
Klett Rooney Lieber & Schorling
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801

3