Annette W. Jarvis, Utah Bar No. 1649
Steven C. Strong, Utah Bar No. 6340
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com

Attorneys for Debtors and Debtors-in-Possession

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR<br><br>Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR<br><br>Date: October 19, 2006<br>Time: 9:30 a.m.<br><br>**DECLARATION OF THOMAS J. ALLISON IN SUPPORT OF MOTION FOR ORDER SCHEDULING AN AUCTION FOR THE SALE OF CERTAIN ASSETS, APPOINTING SPCP GROUP, LLC, AS LEAD BIDDER, AND APPROVING BID PROCEDURES AND PROTECTIONS** |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>Debtor. | |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | |
| In re:<br>USA SECURITIES, LLC,<br>Debtor. | |
| Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA First Trust Deed Fund, LLC | |

I, Thomas J. Allison, hereby declare, verify and state as follows:

1. I am the Chief Restructuring Officer of USA Commercial Mortgage Company ("USACM"), USA Securities, LLC ("Securities"), USA Capital Realty Advisors, LLC ("Realty Advisors"), USA Capital Diversified Fund ("Diversified Fund") and USA Capital First Trust Deed Fund ("FTD Fund") (collectively, "Debtors") and I have personal knowledge of the statements contained herein.

2. I make this Declaration solely in my capacity as Chief Restructuring Officer of the Debtors and in support of the Debtors' Motion for Order Scheduling an Auction for the Sale of Certain Assets, Appointing SPCP Group, LLC, as Lead Bidder, and Approving Bid Procedures and Protections (the "Motion").

**Background**

3. On April 13, 2006 (the "Petition Date"), Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code commencing these jointly administered bankruptcy cases.

4. Prior to the Petition Date, USACM was in the business of underwriting, originating, brokering, funding and servicing commercial loans primarily secured by undeveloped land and residential and commercial developments, both on behalf of investors (sometimes referred to in this case as direct lenders) and for its own account. Diversified Fund and FTD Fund are direct lenders having interests in certain of the serviced loans. The primary business of Securities was to act as a registered broker/dealer to facilitate the sale of membership interests in the FTD Fund. Realty Advisors is the manager of the FTD Fund and the Diversified Fund.

5. On May 10, 2006, the U.S. Trustee's office filed notices of appointment indicating it had formed four official committees to serve in the Debtors' cases: (a) the Official Committee of

Unsecured Creditors of USACM; (b) the Official Committee of Holders of Executory Contract Rights of USACM; (c) the Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC; and (d) the Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC (collectively the "Committees"). Shortly thereafter, the Court approved applications by each of the Committees to employ legal counsel, and the applications of three of the four Committees to employ financial advisors.

6. Debtors, acting through me as their Chief Restructuring Officer, and Mesirow Interim Financial Management LLC ("MIFM"), which is providing interim management services for the Debtors, and in consultation with the financial advisors for the Committees, have actively marketed the assets of the Debtors for sale during the past several months.

7. Debtors have conducted an extensive marketing and sales process in an effort to provide a viable restructuring alternative for the Debtors, which resulted in the identification of fourteen potential purchasers of all or a part of Debtors' assets.

8. The fourteen potential purchasers executed confidentiality agreements and the Debtors responded to extensive due diligence requests from the fourteen potential bidders through the production of information, participation in presentations and discussions, as well as the facilitation of communications with borrowers and other parties-in-interest.

9. None of the fourteen potential purchasers was willing to go forward and expend the substantial resources necessary to agree to a definitive asset purchase agreement and become the "stalking horse" lead bidder without the benefit of significant bid protections, including a significant break-up fee as well as reimbursement of actual expenses.

**The Offer Letter and the Asset Purchase Agreement**

10. Eventually, the Debtors received six written proposals from the potential purchasers and after evaluating all of the proposals (which was done in consultation with the Committees),

Debtors concluded that the proposal submitted by SPCP Group, LLC was superior to the other written proposals. Accordingly, the Debtors, in cooperation with the Committees, entered into extensive negotiations with SPCP, Group, LLC to formulate an offer letter that would set forth a structure as to what assets would be sold, what assets would be retained, and how the sale would proceed that the Debtors and the Committees believed would maximize the value of the Debtors' estates.

11. On September 12, 2006, Debtors accepted and countersigned an offer letter dated September 11, 2006 (the "Offer Letter") from SPCP Group, LLC ("Purchaser") concerning a proposed sale of substantially all of the assets of FTD Fund, primarily its interests in a portfolio of loans, and certain assets of USACM, primarily those used to conduct its loan servicing business (collectively, the "Property"), as identified in the Offer Letter (a copy of which is attached to the Motion as Exhibit B).

12. The Offer Letter was executed after extensive and arms-length negotiations by and among the Purchaser, the Debtors, and the Committees. To the best of my knowledge, the Purchaser is a distinct and separate entity from the Debtors or any of its affiliates and does not have any ownership interest in the Debtors.

13. The Property to be sold, as described in the Offer Letter and exhibits thereto, includes the FTD Fund's ownership interest as a direct lender in 47 specifically identified loans, for a proposed purchase price of $46.5 million, subject to certain adjustments and conditions as stated in the Offer Letter (the "First Trust Deed Fund Assets," as defined in the Offer Letter), and USACM's servicing rights in 80 specifically identified loans, including rights to collect servicing fees and other fees as specified in the Offer Letter, for a proposed purchase price of one-half of the first $1 million in net servicing fees to be collected by the Purchaser, as well as certain upside sharing and

other consideration, as more specifically described in the Offer Letter (the "Commercial Mortgage Assets," as defined in the Offer Letter).

14. The Purchaser and the Debtors, in consultation with the Committees, have now negotiated the terms of a definitive Asset Purchase Agreement (the "Agreement") consistent with the Offer Letter, a copy of which will be filed with the Court prior to the October 19, 2006 hearing.

15. In this case, as a result of the negotiations with the Purchaser (and previous efforts by the Debtors to negotiate transactions for the Property with others), it is my business judgment that the purchase price offered to the Debtors under the Agreement, represents the highest and best offer that could be negotiated for the Property to this point.

16. However, to ensure that the estate maximizes its recovery, the Debtors negotiated with the Purchaser the right to expose the Offer Letter, the Agreement, and the sale and transfer of the Property to potential overbids in accordance with specific bid procedures (the "Bid Procedures"), a copy of which is attached to the Motion as Exhibit A.

17. The Bid Procedures form the basis of the proposed plan of reorganization that is currently on file and getting the Bid Procedures approved, including the Break-Up Fee discussed below, is essential to moving the Debtors' cases forward to a rapid conclusion.

**The Expense Reimbursement and Break-Up Fee**

18. The Offer Letter and the Agreement provide the Debtors with significant benefits that, in large part, stem from the Purchaser's commitment to pay a specific price for the Property and the Debtors right to expose the transactions contemplated in the Agreement to competitive bidding.

19. However, the exposure to competitive transactions jeopardizes Purchaser's bid under the Agreement and Purchaser has advised the Debtors that if forced to bear such risk without the protection of the Break-Up Fee, it would choose not to go forward with the Agreement and the

transactions therein contemplated. If this occurred, the Debtors would lose a fully negotiated and executed transaction with respect to the Property.

20. Consequently, in accordance with the Agreement, the Bid Procedures contain certain protections for the Purchaser as a "stalking horse" bidder and provides in certain circumstances that the Purchaser may receive reimbursement from the Debtors' estates for its reasonable expenses incurred in this proposed transaction up to a maximum of $500,000 (the "Expense Reimbursement"), and that in certain other circumstances the Purchaser may receive a payment of a Break-Up Fee in the amount $1.5 million (reduced by the amount of any Expense Reimbursement paid) from the Debtors' estates.

21. The Debtors and the Committees had extensive negotiations with the Purchaser about the reduction of the proposed Break-Up Fee to the current proposed amount of $1.5 million, which amount was substantially less than the other proposed purchasers indicated they were willing to accept.

**Why the Bid Procedures Should Be Approved**

22. It is my business judgment that the Bid Procedures are fair and reasonable and will increase the likelihood that Debtors will receive the greatest consideration possible for the Property. Specifically, it is my business judgment that in this case such procedures will facilitate a competitive and fair bidding process in several respects, including:

    a. The Debtors will provide notice on all entities known by the Debtors to have expressed an interest in a transaction involving the Property. Over the course of the past several months, the Debtors have discussed transactions involving the Property with a number of parties all of whom will be notified of the Auction and provided with a fair opportunity to come forward with qualifying bids and to participate in the Auction that will take place.

b. Pre-approval of the Bidding Procedures will ensure fair comparability between competing bids. The Bidding Procedures set forth in detail how bids must be submitted, what constitutes a Qualified Bid, how and when additional incremental bids will be received and considered, and other relevant "ground rules" surrounding the Auction. These "ground rules" will: (i) provide potential bidders with substantial information regarding the terms of the Purchase Agreement and the Auction against which they will be competing (if they so choose); (ii) create an orderly process within which the Debtors must review and consider any overbids; and (iii) facilitate the Debtors' comparison of any and all offers to determine which offer will yield the highest and best return to the estate.

c. Requiring that all bids be made in advance of the Auction will (i) provide an opportunity to review and clarify such bids, (ii) give bidders an opportunity to improve their current offers, and (iii) provide the non-debtor parties with sufficient time in which to evaluate the bids.

d. Requiring bidders to submit with their bid, deposits and bids that are at least on the same terms as those set forth in the Purchase Agreement will ensure that only serious, committed entities will participate in the bidding and lessen the chances that Debtors ultimately will be unable to close the sale of the Property because the Successful Bidder proves unable or unwilling to perform its duties.

e. Requiring that, after the initial bids, the bidding take place in pre-established increments in each instance, thereby further ensuring that Debtors' estates will materially benefit from the Auction and will not bear the expense of the Break-Up Fee.

23. It is also my business judgment that the amount of the Break-Up Fee and the Expense Reimbursement is reasonable in this case in view of the size and complexity of the transaction, the lost opportunity that Purchaser will incur if it does not become the Successful Bidder, the expenses that Purchaser will incur prior to the Auction, and the need for Debtors to attract a quality offer for and obtain a definitive agreement for the purchase of the Property with which to test the market.  At the very least, the Agreement sets a floor value for the Property that might not otherwise exist.

24. In this case, the Break-Up Fee is $1.5 million, and the Expense Reimbursement is not to exceed $500,000.  The Break-Up Fee represents approximately 3% of the cash consideration for the transaction (which does not include potentially substantial additional upside sharing and other consideration), and the maximum amount of the Expense Reimbursement is approximately 1% of the consideration for the transaction.  It is my business judgment that these percentages are reasonable in comparison with the purchase price.  Moreover, the amount payable under the Expense Reimbursement is to be deducted from the $1.5 million Break-Up Fee so that if the full $500,000 in Expense Reimbursement is incurred and paid, the net additional Break-Up Fee will be limited to $1 million, which is less than 2.2% of the cash price for the Property.

25. It is also my business judgment that if another bidder appears and pays substantially more than Purchaser's offer, it will have been the Purchaser's commitment to go through with its offer and its due diligence, efforts and financial capacity to purchase the Property that will have made the better offer possible and available to the Debtors' estates.

26. Furthermore, it is my business judgment that in light of the significant burdens borne by Purchaser, including the legal fees associated with the negotiation and drafting of the definitive Agreement, and the time and substantial expenses associated with conducting extremely complex due diligence, most of which will benefit the Debtors regardless of whether Purchaser or another

entity is the successful bidder, it is fair and reasonable for Purchaser to receive the Break-Up Fee if it does not ultimately acquire the Property.

27. It is also my business judgment that the approval of the Break-Up Fee is necessary to induce the Purchaser to continue to incur significant opportunity costs and internal-resource costs that are not recoverable under the Expense Reimbursement provision but that are nonetheless real costs that have been incurred and will be incurred until the proposed sale closes. The existence of the proposed deal with Purchaser ensures that the Debtor will have at least one substantial offer for the Property while at the same time permitting the Property to be exposed to potential overbids in order to ensure that the estates maximize their recovery on the Property.

28. Based on my conversations with the principals of the Purchasers, as well as the principals of the other potential purchasers, it is also my business judgment that the proposed Break-Up Fee was necessary to induce Purchaser to enter into the Agreement, and without such Break-Up Fee there either would have been no Agreement to purchase the Property by the Purchaser or any other party, or the amount of the purchase price for the Property would have been significantly lower.

**Objection filed by Capital Crossing Bank**

29. I am aware that on October 12, 2006, Capital Crossing Bank ("CCB") filed an Opposition to Motion for Order Scheduling an Auction for the Sale of Certain Assets, Appointing Silver Point Group, LLC, as Lead Bidder, and Approving Bid Procedures and Protections.

30. To date, CCB has not submitted to the Debtors a written or oral proposal to purchase any assets of the Debtors.

31. I am also aware that on October 11, 2006, notices of the transfer of two claims other than for security were filed with the Court which reflect that the scheduled claim of Taylor Samuels, Trustee of the Samuels 1999 Trust against one of the Debtors in the amount of $145.99 (the "Samuels Claim"), as well as the scheduled claim of Joseph Szabo against one of the Debtors in

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

the amount of $3,256.50 (the "Szabo Claim"), were transferred and assigned to Debt Acquisition Company of America V, LLC, which then subsequently assigned the Samuels Claim and the Szabo Claim to CCB.

32. The Samuels Claim is listed on the Amended Schedule F of the Schedules of Assets and Liabilities filed by USACM, and the Szabo Claim is listed on Schedule E of the Schedules of Assets and Liability filed by USACM.

33. I declare under penalty of perjury that the foregoing statements are true and correct according to my best knowledge, information and belief.

Executed this 18th day of October, 2006.

_____
Thomas J. Allison

896933