Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

and

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146-5308
Telephone:  (702) 228-7590
Facsimile:  (702) 892-0122
E-Mail:  bkfilings@s-mlaw.com

Attorneys for Debtors and Debtors-in-Possession

**E-FILED ON October 18, 2006**

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>                                                    Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>                                                    Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>                                                    Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>                                                    Debtor. | **NOTICE OF FILING OF**<br>**OPERATING AGREEMENT OF USA** |
| In re:<br>USA SECURITIES, LLC,<br>                                                    Debtor. | **CAPITAL FIRST TRUST DEED**<br>**FUND, LLC** |
| Affects:<br>  ☐  All Debtors<br>  ☐ USA Commercial Mortgage Company<br>  ☐ USA Capital Realty Advisors, LLC<br>  ☐ USA Capital Diversified Trust Deed Fund, LLC<br>  ☒ USA Capital First Trust Deed Fund, LLC<br>  ☐ USA Securities, LLC | **(AFFECTS USA CAPITAL FIRST**<br>**TRUST DEED FUND, LLC)** |

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    As requested by the Court, USA Capital First Trust Deed Fund, LLC ("FTD Fund") hereby

2    files a copy of its Second Amended and Restated Operating Agreement ("Operating Agreement"),

3    attached hereto as Exhibit A.

4    Respectfully submitted this 18th day of October, 2006.

5

6    _/s/   Jeanette E. McPherson_
     Lenard E. Schwartzer, Nevada Bar No. 0399

7    Jeanette E. McPherson, Nevada Bar No. 5423
     SCHWARTZER & MCPHERSON LAW FIRM

8    2850 South Jones Boulevard, Suite 1
     Las Vegas, Nevada  89146

9

10   and

11   Annette W. Jarvis, Utah Bar No. 1649
     RAY QUINNEY & NEBEKER P.C.

12   36 South State Street, Suite 1400
     P.O. Box 45385

13   Salt Lake City, Utah 84145-0385

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# Exhibit A

# SECOND AMENDED AND RESTATED

## OPERATING AGREEMENT

### OF

## USA CAPITAL FIRST TRUST DEED FUND, LLC

THIS SECOND AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") of USA Capital First Trust Deed Fund, LLC, a Nevada limited-liability company (the "Company") is made and entered into effective as of June 1, 2003, by and among USA Capital Realty Advisors, LLC, a Nevada limited-liability company, as the Company's manager (the "Manager") and as the Company's initial Member (the "Initial Member"), and such other persons as may be added as members pursuant to the terms hereof ("Members").

## ARTICLE I

## DEFINITIONS

Unless stated otherwise, the terms set forth in this Article I shall, for all purposes of this Agreement, have the meanings as defined herein:

1.1.    "Acquisition and Origination Expenses" shall mean expenses including, without limitation, legal fees and expenses, travel and communications expenses, costs of appraisals, accounting fees and expenses, title insurance funded by the Company, and miscellaneous expenses related to the origination, selection, and acquisition of mortgages, whether or not acquired.

1.2.    "Acquisition and Origination Fees" shall mean the total of all fees and commissions paid by any party in connection with making or investing in Company mortgage loans. Included in the computation of such fees or commissions shall be any selection fee, mortgage placement fee, nonrecurring management fee, and any origination fee, loan fee, or points paid by borrowers to the Manager, or any fee of a similar nature, however designated.

1.3.    "Act" shall mean the Securities Act of 1933, as amended.

1.4.    "Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant tax year, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amounts that such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)    Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(ii)(d)(4), (5), and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1.5.    "Administrator" shall mean the agency or official administering the securities law of the applicable state.

1.6.    "Affiliate(s)" shall mean, with respect to any Person, (a) any Person directly or indirectly controlling, controlled by, or under common control with such Person, (b) any Person owning or controlling ten percent (10%) or more of the outstanding voting securities of such Person, (c) any officer, director or general partner of such Person, or (d) any Person who is an officer, director, general partner, trustee or holder of ten percent (10%) or more of the voting securities of any Person described in clauses (a) through (c) of this sentence.  "Affiliates" of the Manager include, without limitation, USA Investment Partners, LLC, USA Commercial Mortgage Company (doing business as USA Capital), USA Commercial Real Estate Group, USA Securities, LLC and other entities or funds sponsored by USA Commercial Mortgage Company.

1.7.    "Agreement" shall mean this Second Amended and Restated Operating Agreement, as amended or otherwise modified.

1.8.    "Articles" shall mean the Articles of Organization for the Company, as originally filed with the Nevada Secretary of State and as amended from time to time.

1.9.    "Assets Under Management" shall mean all of the Company Property, including, without limitation, cash, notes, real estate owned, accounts receivable, and advances made to protect loan security, all at Gross Asset Values without reduction for Company Liabilities.

1.10.    "Book Adjustments" shall mean adjustments with respect to the Gross Asset Value of Company Property for depreciation, depletion, amortization, and gain or loss, as computed in accordance with Regulations Section 1.704-1(b)(2)(iv)(g).

1.11.    "Capital Account" shall mean, with respect to any Member, the Capital Account maintained for such Member in accordance with the following provisions:

(a)    To each Member's Capital Account there shall be credited such Member's Capital Contributions (as provided in Section 5.1 below), such Member's distributive share of Profits, and any items in the nature of income or gain (from unexpected adjustments, allocations, or distributions) that are specially allocated to a Member and the amount of any Company Liability that is assumed by such Member or that is secured by any Company Property distributed to such Member.

(b)    To each Member's Capital Account there shall be debited the amount of cash or the fair market value of Company Property distributed to such Member, such Member's distributive share of Losses, and any items in the nature of expenses or deductions that are specially allocated to such Member and the amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company.

In the event any portion of any Membership Interest, including, without limitation, any Economic Interest relating thereto, is transferred according to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the portion of the Membership Interest that is the subject of the transfer.

The provisions of this Section 1.11 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall

be interpreted and applied in a manner consistent with such regulations. In the event it is necessary to modify the manner in which the Capital Accounts are computed in order to comply with such regulations, the Manager shall make such modifications. The Manager shall adjust the amounts debited or credited to the Capital Accounts with respect to any property contributed to the Company or distributed to any Member and any liability that is secured by such contributed or distributed property or that is assumed by the Company in the event the Manager shall determine that such adjustments are necessary or appropriate pursuant to Regulations Section 1.704-1(b)(2)(iv). The Manager shall also make appropriate modifications if unanticipated events cause this Agreement not to comply with Regulations Section 1.704-1(b).

      1.12. "Capital Contributions" shall have the meaning set forth in Section 5.8 herein.

      1.13. "Class A Holding Period" shall mean the twelve (12) consecutive calendar months following the date the Manager accepts a Capital Contribution from a Member who agrees to commit the same for such period of time.

      1.14. "Class A Member" shall mean a Member that commits the Member's Capital Contribution to the Company for the Class A Holding Period, has been issued Class A Units, and is entitled to a Class A Preferred Return.

      1.15. "Class A Preferred Return" shall mean nine percent (9%) per annum, or such other percentage determined by the Manager from time to time, in its sole and absolute discretion, without reinvesting. The Class A Preferred Return shall be cumulative to the extent not distributed pursuant to Sections 6.3(a) and 6.3(b) herein, but shall not be subject to compounding.

      1.16. "Class B Holding Period" shall mean the twenty-four (24) consecutive calendar months following the date the Manager accepts a Capital Contribution from a Member who agrees to commit the same for such period of time.

      1.17. "Class B Member" shall mean a Member that commits the Member's Capital Contribution to the Company for the Class B Holding Period, has been issued Class B Units, and is entitled to a Class B Preferred Return.

      1.18. "Class B Preferred Return" shall mean ten percent (10%) per annum, or such other percentage determined by the Manager from time to time, in its sole and absolute discretion, without reinvesting. The Class B Preferred Return shall be cumulative to the extent not distributed pursuant to Sections 6.3(a) and 6.3(b) herein, but shall not be subject to compounding..

      1.19. "Class C Holding Period" shall mean the thirty-six (36) consecutive calendar months following the date the Manager accepts a Capital Contribution from a Member who agrees to commit the same for such period of time.

      1.20. "Class C Member" shall mean a Member that commits the Member's Capital Contribution to the Company for the Class C Holding Period, has been issued Class C Units, and is entitled to a Class C Preferred Return.

      1.21. "Class C Preferred Return" shall mean eleven percent (11%) per annum, or such other percentage determined by the Manager from time to time, in its sole and absolute discretion, without reinvesting. The Class C Preferred Return shall be cumulative to the extent not distributed pursuant to Sections 6.3(a) and 6.3(b) herein, but shall not be subject to compounding.

1.22. "Class D Member" shall mean any Member that has been issued Class D Units and is not entitled to a Class A Preferred Return, Class B Preferred Return, or Class C Preferred Return.

1.23. "Certificate of Dissolution" shall have the meaning set forth in Section 11.2(e) herein.

1.24. "Code" shall mean the Internal Revenue Code of 1986, as amended, and the corresponding portions of any subsequent federal revenue laws.

1.25. "Company" or "Fund" shall mean USA Capital First Trust Deed Fund, LLC.

1.26. "Company Counsel" shall have the meaning set forth in Section 14.13(a) herein.

1.27. "Company Liability" shall mean any enforceable debt or obligation for which the Company is liable or that is secured by any Company Property.

1.28. "Company Minimum Gain" shall mean an amount determined by first computing for each Company Nonrecourse Liability any gain the Company would realize if it disposed of Company Property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating the separately computed gains. The amount of Company Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, but only to the extent a Member is allocated a share of that minimum gain. For any taxable year, the net increase or decrease in Company Minimum Gain is determined by comparing the Company Minimum Gain on the last day of the immediately preceding taxable year with the Company Minimum Gain on the last day of the current taxable year. Notwithstanding any provision to the contrary contained herein, Company Minimum Gain and increases and decreases in Company Minimum Gain are intended to be computed in accordance with Code Section 704 and the Regulations issued thereunder, as the same may be issued and interpreted from time to time.

1.29. "Company Nonrecourse Liability" shall mean a Company Liability to the extent that no Member or Related Person bears the economic risk of loss (as defined in Regulations Section 1.752-2) with respect to that liability.

1.30. "Company Property" shall mean any property or other asset owned by the Company, whether real, personal, tangible, or intangible.

1.31. "Deceased Member" shall have the meaning set forth in Section 10.2(d)(i) herein.

1.32. "Distributable Amounts From Operations" shall mean (a) an amount of cash equal to the accrued income from operations and investment of Company Property, excluding Distributable Amounts From Sales or Refinancings, during any calendar quarter, year, or other period; plus (b) any and all funds released by the Manager from Reserves; less (c) the accrued operating expenses, depreciation, and amortization of the Company during such period (including, without limitation, fees due the Manager and/or the Manager's Affiliates, any adjustments for bad debt reserves or deductions or other Reserves that the Manager, in its sole discretion, may deem appropriate); provided, however, that Distributable Amounts From Operations shall not exceed the amount of cash on hand.

1.33. "Distributable Amounts From Sales or Refinancings" shall mean an amount of cash equal to the proceeds from all sales or other dispositions and all refinancings of Company Property, including proceeds from any line of credit that is secured by Company Property; provided, however, that any interest payment with respect to any note or other obligation received by the Company in connection with a sale or other disposition of Company Property shall be included in calculating Distributable Amounts

From Operations. Notwithstanding the preceding sentence, all principal with respect to any note or other obligation received by the Company in connection with a sale or other disposition of Company Property shall be included in the calculation of Distributable Amounts From Sales or Refinancings.

1.34.    "Distributions Notice" shall have the meaning set forth in Section 5.4.

1.35.    "Economic Interest" shall mean the right to receive distributions of cash or Company Property and allocations of income, gain, loss, deduction, credit, and similar items from the Company pursuant to this Agreement and the NRS, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company or any right to information concerning the business and affairs of the Company.

1.36.    "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

1.37.    "Effective Date" shall have the meaning set forth in Section 10.2(a).

1.38.    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

1.39.    "ERISA Plan Asset Regulations" shall have the meaning set forth in Section 5.3.

1.40.    "ERISA Plan Investors" shall have the meaning set forth in Section 10.2(d)(ii).

1.41.    "Fiscal Year" shall mean a calendar year ending December 31.

1.42.    "Front-End Fees" shall mean the fees and expenses paid by any party for any service rendered to organize the Company or to acquire assets for the Company, including, without limitation, Organization and Offering Expenses, Acquisition and Origination Expenses, Acquisition and Origination Fees, interest on deferred fees and expenses, and any other similar fees, however designated by the Manager.

1.43.    "Gross Asset Value" shall mean, with respect to Company Property, the fair market value of Company Property at the time of its contribution to the Company as adjusted by Book Adjustments; with respect to Company Property that has been Revalued, the fair market value of such Company Property as adjusted by Book Adjustments. Gross Asset Value may be adjusted pursuant to Code Sections 734 and 754 whenever it is determined by the Manager, in its business judgment, that such adjustment is appropriate and advantageous; provided, however, that the expenses of making or revoking such election shall be allocated to all Members that benefit therefrom in proportion to the monetary benefits to such Members.

1.44.    "Holding Period" shall mean the Class A Holding Period for Class A Members, the Class B Holding Period for Class B Members, or the Class C Holding Period for Class C Members, as applicable.

1.45.    "Initial Member" shall have the meaning set forth in the introductory paragraph of this Agreement.

1.46.    "Manager" shall mean USA Capital Realty Advisors, LLC, a Nevada limited-liability company, or any other Person substituted in place thereof pursuant to this Agreement.

1.47.    "Manager Parties" shall have the meaning set forth in Section 3.6.

1.48. "Member Minimum Gain" shall mean an amount determined by first computing for each Member Nonrecourse Liability any gain the Company would realize if it disposed of Company Property subject to that liability for no consideration other than full satisfaction of the liability and then aggregating the separately computed gains. The amount of Member Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, but only to the extent a Member is allocated a share of that minimum gain. For any taxable year, the net increase or decrease in Member Minimum Gain is determined by comparing the Member Minimum Gain on the last day of the immediately preceding taxable year with the Member Minimum Gain on the last day of the current taxable year. Notwithstanding any provision to the contrary contained herein, Member Minimum Gain and increases and decreases in Member Minimum Gain are intended to be computed in accordance with Code Section 704 and the Regulations issued thereunder, as the same may be issued and interpreted from time to time.

1.49. "Member Nonrecourse Liability" shall mean any Company Liability to the extent that liability is nonrecourse under state law and on which a Member or Related Person bears the economic risk of loss under Regulations Section 1.752-2 because, for example, the Member of Related Person is the creditor or a guarantor.

1.50. "Member's Share of Company Minimum Gain" shall be computed at the end of any taxable year and shall equal the sum of nonrecourse deductions allocated to that Member (and to that Member's predecessors in interest) up to that time plus the distributions made to that Member (and to that Member's predecessors in interest) up to that time of proceeds of a nonrecourse liability allocable to an increase in Company Minimum Gain minus the sum of that Member's (and of that Member's predecessors in interest) aggregate share of the net decreases in Company Minimum Gain resulting from Revaluations of Company Property subject to one or more Company Nonrecourse Liabilities.

1.51. "Members" shall mean the Initial Member and the purchasers of Units admitted to the Company as Members, and "Member" shall mean any one Member.

1.52. "Membership Interest" shall mean a Member's entire interest in the Company and all rights, benefits, and privileges pertaining thereto.

1.53. "Minimum Percentage of Interests" shall mean one or more Percentage Interests of Members, or a specified group of Members that, when taken together, are greater than fifty percent (50%) of the aggregate of all Percentage Interests, or of all Percentage Interests held by such specified group of Members, on the last day of the prior calendar month.

1.54. "NRS" shall mean the Nevada Revised Statutes, as amended or otherwise modified.

1.55. "Offering" shall mean the offer and sale of Units of the Company made under the Prospectus.

1.56. "Organization and Offering Expenses" shall mean those expenses incurred in connection with and in preparing the Company for registration and subsequently offering and distributing Units to the public, including sales commissions paid in connection with distribution of Units of the Company and all advertising expenses.

1.57. "Partially Transferred Unit" shall have the meaning set forth in Section 8.4 herein.

1.58.    "Percentage Interest" shall mean the number of Units, excluding Redeemed Units, held by the Member divided by the number of Units, excluding Redeemed Units, held by all Members or the Members holding the applicable class(es) of Unit(s).

1.59.    "Person" shall mean both natural and legal persons, including any unincorporated association or entity, as the context may require.

1.60.    "Preferred Return" shall mean the aggregate of the Class A Preferred Return, the Class B Preferred Return, and the Class C Preferred Return.

1.61.    "Profits" and "Losses" shall mean, for each applicable period, the income, gain, loss, deductions, and credits, as the case may be, of the Company (including items not subject to federal income tax or deductible for federal income tax purposes), whether in the aggregate or separately stated, as appropriate, determined under federal income tax principles.

1.62.    "Program" shall mean the Company or any limited or general partnership, limited-liability company, limited-liability partnership, trust, joint venture, unincorporated association or other similar organization formed and operated for the primary purpose of investment in mortgage loans, as the context so requires.

1.63.    "Prospectus" shall mean the Company's prospectus as filed with the United States Securities and Exchange Commission pursuant to Rule 424, and any supplements, amendments, or restatements thereof.

1.64.    "Redeemed Unit" shall mean any Unit, or portion thereof that is attributable, as determined by the Manager in its sole discretion from the Company's books and records, to the portion of a Member's Capital Account actually or constructively set forth in such Member's Redemption Notice or the portion of an ERISA Plan Investor's Capital Account that the Manager elects to redeem pursuant to Section 10.2(d)(ii) herein.

1.65.    "Redemption Notice" shall have the meaning set forth in Section 10.2 herein.

1.66.    "Redemption Amount" shall be an amount equal to a Member's Capital Account (after adjustment for aggregate Writedowns changes to the Gross Asset Values of Company Property actually made during the calendar quarter) as of the last day of a calendar quarter multiplied by a fraction the numerator of which shall be the amount actually or constructively set forth in a Member's Redemption Notice or the amount of an ERISA Plan Investor's Capital Account that the Manager elects to redeem pursuant to Section 10.2(d)(ii) and the denominator of which shall be the aggregate of such Member's Capital Account with adjustments to Gross Asset Values actually made during the calendar quarter, but without adjustment for Writedowns.  Redemption Amounts shall be fixed from calendar quarter to calendar quarter, but with respect to Redemption Notices that have been accepted by the Company pursuant to Article X, there shall be no adjustments thereto for subsequent Writedowns or changes to the Gross Asset Values of Company Property.

1.67.    "Regulations" shall mean, except where the context indicates otherwise, the permanent, temporary, proposed, and temporary regulations of the Department of the Treasury under the Code as such regulations may be lawfully changed from time to time.

1.68.    "Reinvestment Unit" shall mean any Unit or fractional Unit that is issued pursuant to Section 5.4 and Section 5.10 herein.

1.69.    "Related Person" shall mean a person having a relationship to a Member that is described in Regulations Section 1.752-4(b).

1.70.    "Reserves" shall mean funds set aside or amounts allocated to reserves that shall be maintained in amounts deemed sufficient by the Manager for working capital and to pay taxes, insurance, debt service, or other costs or expenses incident to the ownership of Company Property or the operation of the Company's business, all as determined in the Manager's sole discretion.

1.71.    "Revaluation" shall mean an adjustment to the Gross Asset Value of any Company Property.

1.72.    "Roll-Up" shall mean a transaction involving the acquisition, merger, conversion, or consolidation, either directly or indirectly, of the Company and the issuance of securities of a Roll-Up Entity.  Such term does not include:

> (a)    a transaction involving securities of the Company that have been listed for at least 12 months on a national securities exchange or traded through the National Association of Securities Dealers Automated Quotation National Market System; or

> (b)    a transaction involving the conversion to corporate, trust, limited-liability company, or association form of only the Company if, as a consequence of the transaction, there will be no significant adverse change in any of the following:

>> (i)    Members' voting rights;

>> (ii)    the term of existence of the Company;

>> (iii)    Manager compensation; or

>> (iv)    the Company's investment objectives.

1.73.    "Roll-Up Entity" shall mean a partnership, real estate investment trust, corporation, trust, limited-liability company, or other entity that would be created or would survive after the successful completion of a proposed Roll-Up transaction.

1.74.    "Rules" shall have the meaning set forth in Section 14.13(a) herein.

1.75.    "Subscription Agreement" shall have the meaning set forth in Section 5.2 herein.

1.76.    "TMP" shall have the meaning set forth in Section 7.5 herein.

1.77.    "Units" shall mean the Membership Interests in the Company issued to Members upon their admission to the Company, pursuant to the Prospectus, or pursuant to any subsequent private or public offering of Membership Interests in the Company.  The Manager shall designate each Unit as a Class A Unit, a Class B Unit, a Class C Unit, or a Class D Unit in accordance with Section 5.2 herein. The term "Units" collectively represents the Class A Units, the Class B Units, the Class C Units and the Class D Units.

1.78.    "Unreturned Capital Contribution" means an amount equal to (a) the aggregate Capital Contributions of a Member as of a given date, less (b) the sum of all prior distributions to such Member pursuant to Section 6.4(b) herein.

1.79. "Writedown" shall mean an amount determined by the Manager in its reasonable business judgment for any Company Property by which the fair market value of Company Property at the time of such determination is less than the amount actually paid or allocated to the purchase of such Company Property. Writedown determinations may be made on the first day or the fifteenth day of each calendar month and shall be effective as of the day such writedown determination is made.

1.80. "Cause" shall mean: (a) the finding by a civil or criminal court of competent jurisdiction of a felony, or any other offense or wrongdoing involving embezzlement, fraud, misappropriation of funds, moral turpitude or dishonesty; or (b) the finding by a civil or criminal court of competent jurisdiction or by the United States Securities and Exchange Commission or state blue sky agency in an administrative proceeding that the Manager has willfully violated any federal or state securities law.

1.81. "NASAA Guidelines" shall mean the statements of policy applicable to the Company, as such statements of policy are adopted by the North American Securities Administrators Association.

## ARTICLE II

## ORGANIZATION OF THE COMPANY

2.1. Formation. The parties hereto hereby agree to form a limited-liability company, pursuant to the provisions of Chapter 86 of NRS, as the same may be amended from time to time.

2.2. Name. The name of the Company shall be "USA Capital First Trust Deed Fund, LLC."

2.3. Place of Business. The Company's principal place of business shall be located c/o USA Capital Realty Advisors, LLC, at 4484 South Pecos Road, Las Vegas, Nevada 89121, until changed by designation of the Manager, with written notice to all Members.

2.4. Purpose. The primary purpose of the Company shall be to make or purchase entire or fractional interests in acquisition, development, construction, bridge, or interim loans secured by first deeds of trust on undeveloped land, and residential and commercial developments located primarily in the United States, and to do any and all things relating or incidental thereto; provided, however, that the Company may hold up to 10% of its loan portfolio in such activities and transactions outside of the United States.

2.5. Term. The Company shall be deemed to have been formed and its term shall commence as of the filing of the Articles with the Nevada Secretary of State, and shall continue until terminated pursuant to the provisions of this Agreement or by operation of law.

2.6. Limited Power of Attorney. Each Member irrevocably constitutes and appoints the Manager, acting by and through any of its agents or executive officers, as such Member's true and lawful attorney-in-fact, with full power and authority for such Member, and in such Member's name, place, and stead, to execute, acknowledge, verify, deliver, record, publish, and file:

(a) This Agreement, the Articles, or any amendment or cancellation hereof or thereof required under the laws of the State of Nevada;

(b) Any certificate, instrument, or document, including, without limitation, fictitious business name statement, as may be required by, or may be appropriate under, the laws of any state or other jurisdiction in which the Company is doing or intends to do business; or

(c)    Any document that may be required to effect the continuation of the Company, the admission of an additional or substituted Member, the amendment of this Agreement, the dissolution or termination of the Company.

2.7.   <u>Nature of Limited Power of Attorney</u>.  The foregoing grant of authority is a special power of attorney coupled with an interest, is irrevocable, and shall survive the death of the undersigned or the delivery of an assignment of a Unit by the undersigned; provided, however, that where the assignee thereof has been approved for admission to the Company as a substituted Member under the terms of this Agreement, this power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Manager to execute, acknowledge, and file any instrument necessary to effect such substitution.

## ARTICLE III

## THE MANAGER

3.1.   <u>Management by the Manager, Generally</u>.  Subject to any provisions of the Articles and this Agreement relating to actions required to be approved by Members, if any, the business, property, and affairs of the Company shall be managed, and all powers of the Company shall be exercised, by or under the direction of the Manager.  In addition to the general management authority provided under this Section 3.1, and without limiting the generality of the foregoing, the Manager shall have all necessary powers to manage and carry out the purposes, business, and affairs of the Company, including, without limitation, the powers to exercise, authorize, and direct the officers of the Manager or the Company (if any) to exercise, on behalf of and in the name of the Company, all of the powers described in NRS 86.281, including, without limitation, the following powers and authority:

(a)    To expend Company funds in furtherance of the business of the Company and to acquire assets from any Person, including, without limitation, Affiliates of the Company or the Manager, upon such terms and conditions as the Manager deems advisable;

(b)    To offer additional Units for sale, to determine the terms of the offering of such Units, including, without limitation, the price thereof and commissions to be paid with respect thereto, and the manner of complying with the laws applicable thereto;

(c)    To employ, at the expense of the Company, such agents, employees, independent contractors, attorneys, and accountants, as the Manager deems reasonable and necessary, for any Company purpose;

(d)    To effect necessary insurance for the proper protection of the Company, Manager, or Members;

(e)    To prosecute, defend, pay, collect, compromise, arbitrate, or otherwise adjust any and all claims or demands for or against the Company;

(f)    To bind the Company in all transactions involving Company Property or the Company's affairs, including, without limitation, underwriting loans, preparing and executing all loan documents, funding loans, purchasing and selling notes, and extending or restructuring loans;

(g)     To enforce loan documents and to manage, lease, develop, or sell property to which the Company becomes the legal and equitable titleholder through foreclosure, deed in lieu of foreclosure, or otherwise;

(h)     To amend this Agreement with respect to the matters set forth in Sections 14.4(a) through (h) herein;

(i)     To determine the accounting method or methods to be used by the Company when an election with respect thereto is allowed, which methods may, if allowed by applicable law, be changed at any time upon thirty (30) days written notice to all Members;

(j)     To open accounts in the name of the Company in one or more banks, savings and loan associations, money market funds, or other financial institutions, and to deposit Company funds therein, subject to withdrawal upon the signature of the Manager or any Person authorized by the Manager;

(k)     To sell from time to time all or any portion of Company Property, or any undivided or beneficial interests therein, all upon such terms and conditions as the Manager shall deem appropriate in its sole business judgment;

(l)     To seek and obtain revolving or other credit facilities from third party lenders to allow the Company to leverage Company Property, including, without limitation, to negotiate and enter into loan agreements, security and pledge agreements, and other documents required by a third party lender as a condition to providing the Company with such a credit facility; and

(m)     To retain such advisors and professionals, execute all instruments and documents, and do all other things that are, in the sole business judgment of the Manager, necessary or appropriate to effectuate any of the foregoing.

3.2.    <u>Fiduciary Duty</u>.  The Manager shall also have a fiduciary responsibility for the safekeeping and use of all Company Property, whether or not the same is in the Company's possession or control, and the Manager shall not employ, or permit another to employ, any Company Property in any manner except for the exclusive benefit of the Company.  The Manager will not allow any Company Property to be commingled with the assets of the Manager or any other Person.

3.3.    <u>Limitation on Manager's Authority</u>.  The Manager has no authority to:

(a)     Appoint new Manager(s) without the prior affirmative vote or consent of a Minimum Percentage of Interests;

(b)     Voluntarily withdraw as a Manager without the prior affirmative vote or consent of a Minimum Percentage of Interests, unless such Manager's withdrawal would neither affect the tax status of the Company nor materially adversely affect any Member (subject to any delay in the effectiveness of the withdrawal as set forth under this Agreement);

(c)     Sell all or substantially all of the assets of the Company in one or a series of related transactions that is not in the ordinary course of business, without the prior affirmative vote or consent of a Minimum Percentage of Interests;

(d)     Amend this Agreement without the prior vote or consent of a Minimum Percentage of Interests, except as provided in Section 3.1(h) hereof and Section 14.4 herein;

      (e)     Dissolve or terminate the Company without the prior vote or consent of a Minimum Percentage of Interests;

      (f)     Make loans to the Manager or an Affiliate of the Manager, except as provided in this Agreement; and

      (g)     Pay a direct commission or fee to the Manager or any Affiliate of the Manager with regard to a Member's reinvestment or distribution of Distributable Amounts From Operations or Distributable Amounts From Sales or Refinancing, except as otherwise provided in this Agreement.

      3.4.   <u>Right to Purchase Receivables and Loans</u>.  As long as the requirements of Article IV are met and the Company adheres to the investment policies described in the Prospectus, the Manager, in its sole discretion, may at any time:

      (a)     Purchase from the Company the interest receivable or principal on delinquent mortgage loans held by the Company;

      (b)     Purchase from a senior lien holder the interest receivable or principal on mortgage loans senior to the mortgage loans held by the Company; or

      (c)     Use its own monies to cover any other costs associated with the mortgage loans held by the Company, such as property taxes, insurance, and legal expenses, which amounts shall be deemed to be a Capital Contribution by the Manager.

      3.5.   <u>Allocation of Time to Company Business</u>.  The Manager shall not be required to devote its full time efforts to the affairs of the Company, but shall devote whatever time, effort, and skill the Manager may deem reasonably necessary for the conduct of the Company's business. The Manager may engage in any other businesses, including, without limitation, businesses that are related to or competitive with the Company. Neither the Company nor any Member or any Affiliate thereof shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or the income or proceeds derived therefrom.

      3.6.   <u>Exculpation and Indemnification</u>.  Neither the Manager, nor its Affiliates, stockholders, officers, directors, managers, members, employees, or agents (the "Manager Parties"), shall have any liability whatsoever to the Company or to any Member for any loss suffered by the Company or any Member that arises out of any action or inaction of the Manager or any Manager Party, so long as the Manager or such Manager Party, in good faith, determined that such course of conduct was in the best interest of the Company and did not constitute intentional misconduct, fraud, or a knowing violation of the law. The Manager, the Manager Parties, and the employees and agents of the Company shall be entitled to be indemnified and held harmless by the Company, at the direct expense of the Company and not Members, against any loss, expense, claim, or liability (including, without limitation, reasonable attorneys' fees and costs, which shall be paid as incurred) resulting from the assertion of any claim or legal proceeding relating to the performance or nonperformance of any act concerning the activities of the Company, including, without limitation, claims or legal proceedings brought by a third party or by any Member, on its own behalf or as a Company derivative suit, so long as the party to be indemnified made a good faith determination that such course was in the best interests of the Company and did not constitute intentional misconduct, fraud, or a knowing violation of the law; provided, however, that any such indemnity shall be paid solely from the assets of the Company.  Nothing herein shall prohibit the Company from paying, in whole or in part, the premiums or other charges for any type of indemnity insurance in which the Manager, the Manager Parties, or other agents or employees of the Company are

indemnified or insured against liability or loss arising out of their actual or alleged negligence or gross negligence in the performance of their duties or out of any actual or alleged wrongful act against or by the Company including, without limitation, judgments, fines, settlements, and expenses incurred in the defense of actions, proceedings, and appeals therefrom. The Company shall pay the expenses of the Manager, the Manager Parties, and other agents and employees of the Company incurred in defending a civil or criminal action, suit, or proceeding as they are incurred, and in advance of the final disposition thereof, upon receipt of an undertaking by or on behalf of such Manager, Manager Party, or other agent or employee of the Company to repay the same if it is ultimately determined that such person is not entitled to be so indemnified.

Notwithstanding the foregoing, any right to indemnification hereunder shall be subject to the following:

(a)    The Manager or any Manager Party that is performing services on behalf of the Company or any Person acting as a broker-dealer on behalf of the Company shall not be indemnified for any losses, liabilities, or expenses arising from any alleged violation of federal or state securities laws unless the following additional conditions are met:

(i)    There has been a successful adjudication on the merits of each count involving alleged securities law violations as to the particular indemnitee; or

(ii)    Such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction as to the particular indemnitee; or

(iii)    A court of competent jurisdiction approves a settlement of the claims against a particular indemnitee and finds that indemnification of the settlement and related costs should be made; and

(iv)    In the case of subparagraph (iii) of this Section 3.6(a), the court of law considering the request for indemnification has been advised of the position of the Securities and Exchange Commission and, if applicable, the position of any state securities regulatory authority in which securities of the Company were offered or sold as to indemnification for violations of securities laws; provided, however, that the court need only be advised of and consider the positions of the securities regulatory authorities of those states:

A.    That are specifically set forth in this Agreement; and

B.    In which plaintiffs claim they were offered or sold Membership Interests.

(b)    The Company must not incur the cost of that portion of liability insurance that insures the Manager for any liability as to which the Manager is prohibited from being indemnified under this Section 3.6.

3.7.    <u>Removal of the Manager; Election of Successor Manager</u>. The Manager may be removed by the written consent of a Minimum Percentage of Interests for either Cause or without Cause only upon the following terms and conditions.

(a)    Termination for Cause.    In the event that the Manager is removed by the Members for Cause, the Manager shall forfeit the payment of the early termination fee to the Manager as provided for in Section 12.10 herein.

(b)    Notice.    Members may exercise such right by presenting to the Manager a written notice, which shall be executed by Members representing a Minimum Percentage of Interests, with their signatures acknowledged, to the effect that the Manager is removed effective as of the date the successor Manager, to be designated pursuant to Section 3.7(c) herein, assumes the duties and responsibilities of the office of the Manager; and

(c)    Successor Manager.    Concurrently with delivery of a notice pursuant to Section 3.7(b) above, or within ninety (90) days thereafter by written notice similarly given, a Minimum Percentage of Interests shall also designate a successor Manager.

(d)    Effectiveness.    The removal of the Manager and the substitution of a successor Manager, if any, shall be effective upon written acceptance of the duties and responsibilities of the office by the succeeding Manager.    Upon an effective substitution, this Agreement shall remain in full force and effect, except for the change in the Manager, and the business of the Company shall be continued by the successor Manager.

3.8.    Retirement by the Manager.    The Manager may, subject to Section 3.3(b), retire and withdraw from the Company upon not less than six (6) months written notice to all Members.    In the event that the Manager retires and withdraws, Members shall elect a successor Manager within ninety (90) days following the receipt notice of such retirement and withdrawal by a Minimum Percentage of Interests.

3.9.    Accrued Compensation.    If the Manager is removed as provided in Section 3.7 or should retire and withdraw as provided in Section 3.8, the Manager shall be entitled to all fees and other compensation earned by it through the effective date of its removal or retirement and withdrawal.

## ARTICLE IV

## INVESTMENT AND OPERATING POLICIES

4.1.    Commitment of Capital Contributions.    The Manager shall take all reasonable steps to commit at least eighty-six and one-half percent (86.5%) of the Capital Contributions to investments in mortgages (which is inclusive of an amount not to exceed three percent (3.0%) of the Capital Contributions that will be applied towards the Company's Reserves).    The Company may invest in or purchase investments in mortgages of such duration, on such real property, and with such additional security as the Manager, in its sole discretion, shall determine, subject to the investment policies set forth in Section 4.2.    These investments in mortgages may be senior to other mortgage loans on real property, all in the sole discretion of the Manager.

4.2.    Investment Policy.    In making investments in mortgages, the Manager shall follow the investment policies set forth in the Prospectus.

## ARTICLE V

### THE MEMBERS – CAPITAL CONTRIBUTIONS

5.1.    Initial Capital Contributions of Members.  Each Member shall initially contribute an amount equal to $10,000, and will be issued two (2) Units at a rate of $5,000 per Unit.  Each Member may subscribe for additional Units at a cost of $5,000 per Unit. The Company's total initial capitalization shall be a maximum of $120,000,000, or 24,000 Units, and a minimum of $1,500,000, or 300 Units; provided, however, that the Manager reserves the right (subject to complying with all applicable laws) to issue additional Units, which may increase the Company's capitalization up to an additional $380,000,000, or 76,000 Units, for a maximum capitalization of $500,000,000, or 100,000 Units, from time to time, without the approval of Members. The Company shall not begin doing business until it receives a minimum capitalization equal to $1,500,000.

5.2.    Classification of Units.

(a)    Classification of Units; Designation of Units.  The Company shall be authorized to issue four classes of Units, Class A Units, Class B Units, Class C Units and Class D Units. The Company shall appropriately designate each Unit based on the Holding Period(s):  (i) selected by the Member in the Company's subscription agreement (the "Subscription Agreement") executed and delivered by the Member and as approved by the Manager upon its acceptance of the relevant Subscription Agreement; or (ii) selected by the Member no more than ninety (90) days and no less than sixty-one (61) days prior to the expiration of the Member's relevant Holding Period, only to the extent accepted by the Manager. The failure of a Member to change the relevant Holding Period for such Member's applicable Units pursuant to (ii) above or the election by the Manager to reject the request for a change in the designation of the Member's Units pursuant to (ii) above shall result in the applicable Units of Member continuing to have the same Holding Period(s) and classification(s).  If, however, a selection pursuant to (ii) above is accepted, in whole or in part, by the Manager, the selected Holding Period(s) shall apply to the applicable Units and such Units shall be reclassified accordingly.

(b)    No Limitation on Ownership or Conversion of Units.  Subject to the terms and provisions of this Agreement, and to the extent approved by the Manager, there is no prohibition on whether a Member can own more than one class of Units or convert, at applicable times, Units from one class to another.

5.3.    Admission to Company; Subscription Account.  To purchase Units, a Person must deliver to the Company an executed Subscription Agreement, together with a cash contribution in immediately available funds, U.S. currency.  Generally, subscriptions of qualified investors shall be accepted by the Company on a first-come first-serve basis; provided, however, the Manager reserves the right to admit non-ERISA Plan Investors before ERISA Plan Investors in order for the Company to remain exempt from the application of Title 29 of the Code of Federal Regulations Part 2510 relating to the definition of plan assets for purposes of ERISA (the "ERISA Plan Asset Regulations").

5.4.    Election to Reinvest or Receive Cash Distributions.  Upon subscription for Units, a subscribing Person must elect whether to receive its pro rata share of Distributable Amounts From Operations from the Company on a monthly basis or to allow such Person to reinvest his, her, or its share thereof.   Such election will become effective upon the Company's acceptance of such Person's subscription, and in the event of an election to reinvest, the written consent of the Manager approving such election. Thereafter, by giving the Manager a notice, substantially in the form attached hereto as Exhibit A, at least five (5) days prior to the effective date of the desired election change (a "Distributions

Notice"), a Member may elect to either receive its pro rata share of Distributable Amounts From Operations or (if the Member previously had elected to receive such distributions) not to receive its pro rata share of Distributable Amounts From Operations on a monthly basis and to reinvest the same; provided, however, that (a) in the event of an election to reinvest, the Manager shall have given its written consent thereto, (b) such Member shall continue to meet the investor suitability requirements set forth in the Prospectus and the Subscription Agreement, and (c) such additional Units must be registered under the Act, or be exempt from such registration; and provided further, that such Member shall have received the most current version of the Prospectus.  It shall be the responsibility of each Member to promptly notify the Company if such Member no longer meets such suitability requirements.  Notwithstanding the foregoing, the Manager shall, at all times, have the right to immediately commence making monthly distributions of Distributable Amounts From Operations to any ERISA Plan Investor, on a last-in first-out basis, that previously elected to reinvest such distributions if such action is, in the Manager's sole business judgment, reasonably necessary for the Company to remain exempt from the application of the ERISA Plan Asset Regulations.  Distributable Amounts From Operations allocable to Members who elect to reinvest will be retained by the Company for purposes of making or investing in additional mortgage loans or for other proper Company purposes, and Reinvestment Units shall be issued to such Members accordingly.

5.5.    No Participation in Management.  Except as expressly provided herein, Members shall take no part in the conduct or control of the Company's business and shall have no right or authority to act for or bind the Company.  Economic Interest Owners shall have no voting rights whatsoever.

5.6.    Rights and Powers of Members.  Members shall only have the right to vote upon the matters set forth herein; provided, however, that a Minimum Percentage of Interests is required to approve such matters:

(a)    Dissolution and termination of the Company;

(b)    Amendment of this Agreement; provided, however, that this Subsection (b) shall not apply to any amendment by the Manager made pursuant to Section 14.4 below, with respect to which matters the Manager alone may act to amend this Agreement without the vote of any Member;

(c)    Sale of all or substantially all of the Company Property or merger or consolidation of the Company pursuant to Section 11.3 below; and

(d)    Removal of the Manager and election of a successor Manager pursuant to the terms and conditions set forth in Section 3.7 and Section 3.8 hereof.

5.7.    Meetings.  The Manager, or Members holding a Percentage Interest greater than ten percent (10%) may call a meeting of the Company.  If Members representing the requisite Percentage Interest present to the Manager a statement requesting a meeting, or the Manager calls a meeting, the Manager shall provide each Member with at least thirty (30) days advance written notice of each meeting to be held, which notice shall include the date, time, location, and the general purpose(s) thereof.  A majority of the Membership Interests, excluding Redeemed Units, shall constitute a quorum at Company meetings.  Members may vote in person or by proxy with respect to those matters in which Members have, under this Agreement, approval rights; provided, however, that a Minimum Percentage Interest of all the Membership Interests, excluding Redeemed Units, shall be required for any Member action at such meeting.

5.8.    Limited Liability of Members.    Units are non-assessable, and no Member shall be personally liable for any of the expenses, liabilities, or obligations of the Company or for any of the losses thereof beyond the amount of such Member's agreed upon capital contributions ("Capital Contributions") to the Company and such Member's share of any undistributed net Profit of the Company; provided, however, that each Member shall remain liable to return to the Company any distribution that such Member is obligated to return pursuant to the NRS.    Upon the dissolution and termination of the Company, no Member or Manager shall be liable to pay to the Company or any other Member the amount of any deficit remaining in such Member's Capital Account.

5.9.    Access to Books and Records.    During the Company's normal business hours and with prior written notice of at least five (5) business days, Members and their designated representatives shall have access to all books and records of the Company.    An alphabetical list of the names and addresses of all Members, together with the number of Units held by each Member, shall be maintained as a part of the books and records of the Company.    The Company shall make the list available upon the written request of any Member or such Member's representative for such stated purpose, including, without limitation, matters relating to the Members' voting rights under federal proxy law, if any.    A copy of the Member list shall be deposited in the mail, addressed to such requesting Member, within ten (10) business days following the Company's receipt of such Member's request.    The Company may charge a reasonable fee for a copy of such list.    The Member list shall be updated no less frequently than once each calendar quarter so to reflect changes in the information contained therein.

If the Manager neglects or refuses to exhibit, produce, or mail a copy of the Member list as requested, the Manager shall be liable to the requesting Member for the costs, including attorneys' fees, incurred by that Member for compelling the production of the list and for the actual damages, if any, suffered by that Member due to such refusal or neglect.    However, the Company need not exhibit, produce, or mail a copy of the Member list if one of the purposes or reasons for the request therefore is (a) for selling the same or copies thereof, or (b) another commercial purpose that is not consistent with such Member's interest in the Company as a Member.    The Manager may require the Member requesting the list to represent to the Company and the other Member's that the list is not requested for any of the above-described improper purposes.    The remedies provided hereunder to Members requesting copies of the list are in addition to, and shall not in any way limit, other remedies available to Members under federal or Nevada law.

5.10    Reinvestment Units.    A Member may purchase fractional Units only with such Member's pro rata share of Distributable Amounts From Operations if such Member has made a proper election to reinvest and has received the written consent of the Manager, which may be withheld in the Manager's sole discretion, as provided in Section 5.4 above to do so; provided, however, that such fractional Units shall be of the same class as the Units to which such Member's applicable share of Distributable Amounts From Operations is derived.    Such amounts shall be applied, on the first day of the calendar month succeeding the calendar month to which such distributions are attributable, to purchase fractional Unit(s) with a value to be determined by dividing the amount of such Member's pro rata share of such distribution by $5,000.    For example, if a Member is otherwise entitled to receive a $2,500 distribution attributable to its Class A Units and a $3,000 distribution attributable to its Class C Units on the first day of January 2003 with respect to Distributable Amounts From Operations for December 2002 and such Member has an election to reinvest in effect, then such Member, if the Manager so consents, will be deemed to have purchased one-half (1/2) of a Class A Unit ($2,500 divided by $5,000) and three-fifths (3/5) of a Class C Unit ($3,000 divided by $5,000) as of January 1, 2003.    Solely for purposes of this Section 5.10 and Section 5.4, Distributable Amounts From Operations shall include all amounts of a Member's Preferred Return made from Distributable Amounts From Sales or Refinancings.

## ARTICLE VI

### PROFITS AND LOSSES: CASH DISTRIBUTIONS

6.1.    Losses. After giving effect to the allocations set for in Section 6.6 herein, Losses shall be allocated to and among all Members in the following order of priority; provided, however, that Losses shall not be allocated to a Member pursuant to this Section 6.1 to the extent such allocation would cause such Member to have an Adjusted Capital Account Deficit following such allocation:

(a)    First to all the Members in the same proportions as their aggregate unrecouped Profits, if any, that have been previously allocated to them pursuant to Section 6.2(c) below, until all such Profits have been fully recouped;

(b)    Second, to all the Members in accordance with their respective Capital Account balances.

6.2.    Profits. After giving effect to the allocations set for in Section 6.6 herein, Profits shall be allocated to and among all Members in the following order of priority:

(a)    First, to each Member in an amount equal to the distributions of Preferred Return received by each Member pursuant to Sections 6.3 and 6.4 herein;

(b)    Second, to all of Members in the same proportions as their aggregate unrecouped Losses, if any, that have been previously allocated to them pursuant to Section 6.1(b) above, until all such Losses have been fully recouped; and

(c)    Third, forty percent (40%) to and among all the Members, excluding the Class D Members, in accordance with their then respective Capital Account balances and sixty percent (60%) to and among the Class D Members in accordance with their then respective Capital Account balances.

6.3.    Distributable Amounts From Operations. The aggregate Distributable Amounts From Operations shall be distributed to and among all Members as follows:

(a)    First, to pay Preferred Returns as follows:

(i)    To each Class A Member, Class B Member, and Class C Member, in an amount equal to the Class A Preferred Returns that would be payable to such Member if all such Member's Units were originally designated as Class A Units upon acceptance of such Member's Subscription Agreement or renewal pursuant to Section 5.2 herein, but only to the extent that (A) such Member's cumulative Class A Preferred Returns from the inception of the Company to the end of the current period exceeds (B) the sum of all prior distributions to such Member pursuant to this Section 6.3(a)(i) and Section 6.4(a)(i) herein; and then

(ii)    Next, to each Class B Member and Class C Member, but only with respect to their respective Class B Units and Class C Units, in an amount equal to (A) the Class B Preferred Returns that would be payable to such Member if all such Member's Class B Units and Class C Units were originally designated as Class B Units upon acceptance of such Member's Subscription Agreement or renewal pursuant to Section 5.2 herein less (B) the Class A Preferred Returns that would be payable to such Member if all

such Member's Class B Units and Class C Units were Class A Units, but only to the extent that (Y) such Member's cumulative Class B Preferred Returns from the inception of the Company to the end of the current period exceeds (Z) the sum of all prior distributions to such Member, with respect to such Member's Class B Units and Class C Units, pursuant to Section 6.3(a)(i), this Section 6.3(a)(ii), Section 6.4(a)(i), and Section 6.4(a)(ii); and then

(iii)    Next, to each Class C Member, but only with respect to such Member's Class C Units, in an amount equal to (A) the Class C Preferred Returns payable to such Member with respect to such Member's Class C Units less (B) the Class B Preferred Returns that would be payable to such Member if all such Member's Class C Units were Class B Units, but only to the extent that (Y) such Member's cumulative Class C Preferred Returns from the inception of the Company to the end of the current period exceeds (Z) the sum of all prior distributions to such Member, with respect to such Member's Class C Units, pursuant to Section 6.3(a)(i), Section 6.3(a)(ii), this Section 6.3(a)(iii), Section 6.4(a)(i), Section 6.4(a)(ii), and Section 6.4(a)(iii); and then

(b)    Second, forty percent (40%) to and among all the Members, excluding the Class D Members, in accordance with their then respective Capital Account balances and sixty percent (60%) to and among all the Class D Members in accordance with their then respective Capital Account balances.

(x)    A Member's share of Distributable Amounts From Operations shall be distributed to such Member only if such Member does not have an effective election to reinvest the same under Section 5.4. With respect to Members who have an effective election to reinvest under Section 5.4, the Company shall retain their distributable amounts and apply the same to purchase Reinvestment Units in accordance with Sections 5.4 and 5.10 above; provided, however, that such amounts shall be deemed to have been distributed to such Members and immediately thereafter contributed to the Company.

(y)    Notwithstanding anything contained in this Section 6.3 or in Section 6.4, this Section 6.3(a) and Section 6.4(a) shall be applied so pay the Preferred Returns of all classes of Units for the applicable period before paying any Preferred Return for any class of Units for a subsequent period.

(z)    For example, a Class A Unit, Class B Unit, and Class C Unit are each entitled to a Preferred Return of $90, $100, and $110, respectively for June 2002. Where the Company has $280 with which to make Preferred Return distributions for June 2002, the Preferred Return distributions for June 2002 must be paid as follows: the Class A Unit is to receive $90, the Class B Units is to receive $95, and the Class C Unit is to receive $95. For the July 2002, a Class A Unit, Class B Unit, and Class C Unit are each entitled to a Preferred Return of $90, $100, and $110, respectively. Where the Company has $300 with which to make Preferred Return distributions, the Preferred distributions for July 2002 must be paid as follows: the Class B Unit and Class C Unit must receive the remainder of the Preferred Return accrued to them for June 2002 before any Preferred Return for July 2002 can be paid to any Member of any class of Units. Thus, the Class B Unit will receive $5, which is attributable to its unpaid June 2002 Preferred Return, and the Class C Unit will receive $15, which is attributable to its unpaid June 2002 Preferred Return. The remaining $280 ($300 less the remaining June 2002 Preferred Return paid to the Class B Unit and the Class C Unit) must be paid as follows: The Class A Unit is to receive $90, the Class B Units is to receive $95, and the Class C Unit is to receive $95.

6.4.    <u>Distributable Amounts From Sales or Refinancings</u>.  Distributable Amounts From Sales or Refinancings shall be retained by the Company and used for any Company purpose.  If the Company makes distributions of Distributable Amounts From Sales or Refinancings to Members, such distributions shall, after satisfying redemption obligations pursuant to Article X, be made as follows:

(a)    First, to pay Preferred Returns as follows:

(i)    To each Class A Member, Class B Member, and Class C Member, in an amount equal to the Class A Preferred Returns that would be payable to such Member if all such Member's Units were originally designated as Class A Units upon acceptance of such Member's Subscription Agreement or renewal pursuant to Section 5.2 herein, but only to the extent that (A) such Member's cumulative Class A Preferred Returns from the inception of the Company to the end of the current period exceeds (B) the sum of all prior distributions to such Member pursuant to Section 6.3(a)(i) herein and this Section 6.4(a)(i); and then

(ii)    Next, to each Class B Member and Class C Member, but only with respect to their respective Class B Units and Class C Units, in an amount equal to (A) the Class B Preferred Returns that would be payable to such Member if all such Member's Class B Units and Class C Units were originally designated as Class B Units upon acceptance of such Member's Subscription Agreement or renewal pursuant to Section 5.2 herein less (B) the Class A Preferred Returns that would be payable to such Member if all such Member's Class B Units and Class C Units were Class A Units, but only to the extent that (Y) such Member's cumulative Class B Preferred Returns from the inception of the Company to the end of the current period exceeds (Z) the sum of all prior distributions to such Member, with respect to such Member's Class B Units and Class C Units, pursuant to Section 6.3(a)(i), Section 6.3(a)(ii), Section 6.4(a)(i), and this Section 6.4(a)(ii); and then

(iii)    Next, to each Class C Member, but only with respect to such Member's Class C Units, in an amount equal to (A) the Class C Preferred Returns payable to such Member with respect to such Member's Class C Units less (B) the Class B Preferred Returns that would be payable to such Member if all such Member's Class C Units were Class B Units, but only to the extent that (Y) such Member's cumulative Class C Preferred Returns from the inception of the Company to the end of the current period exceeds (Z) the sum of all prior distributions to such Member, with respect to such Member's Class C Units, pursuant to Section 6.3(a)(i), Section 6.3(a)(ii), Section 6.3(a)(iii), Section 6.4(a)(i), Section 6.4(a)(ii), and this Section 6.4(a)(iii); and then

(b)    Second, forty percent (40%) to and among all the Members, excluding the Class D Members, in accordance with their then respective Capital Account balances and sixty percent (60%) to and among all Class D Members in accordance with their then respective Capital Account balances.

Notwithstanding anything contained in this Section 6.4 or in Section 6.3, Section 6.3(a) and this Section 6.4(a) shall be applied so pay the Preferred Returns of all classes of Units for a given Fiscal Year before paying any Preferred Return for any class of Units for a subsequent Fiscal Year.  Refer to the last paragraph of Section 6.3 for an example of the applicable of the preceding sentence.

6.5.    Distributions Upon Dissolution.  Upon dissolution and termination of the Company, all Distributable Amounts from Operations and Distributable Amounts From Sales or Refinancings shall be distributed to Members in accordance with the provisions of Article XI herein.

6.6.    Special Allocation Rules.

(a)    Company Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain for a taxable year, each Member shall be allocated items of income and gain for that taxable year equal to that Member's share of the net decrease in Company Minimum Gain. A Member's share of the net decrease in Company Minimum Gain determined in accordance with Regulations Section 1.704-2(g).  This Section 6.6(a) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    Member Minimum Gain Chargeback.  If during a taxable year there is a net decrease in Member Minimum Gain, any Member with a share of that Member Minimum Gain ("partner minimum gain," as determined under Regulations Section 1.704-2(i)) as of the beginning of that taxable year shall be allocated items of income and gain for that taxable year (and if necessary, for succeeding taxable years) equal to that Member's share of the net decrease in the Member Minimum Gain.  A Member's share of the net decrease in Member Minimum Gain is determined in a manner consistent with the provisions of Regulations Section 1.704-2(i). This Section 6.6(b) is intended to comply with the minimum gain chargeback requirements in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)    Qualified Income Offset.  In the event any Member, in such capacity, unexpectedly receives any adjustments, allocations, or distributions described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4) (regarding depletion deductions), 1.704-1(b)(2)(ii)(d)(5) (regarding certain mandatory allocations under Regulations regarding family partnerships, the so-called varying interest rules or certain in-kind distributions), or 1.704-1(b)(2)(ii)(d)(6) (regarding certain distributions, to the extent they exceed certain expected offsetting increases in a Member's Capital Account), items of Company income and gain shall be specially allocated to such Members in an amount and a manner sufficient to eliminate, as quickly as possible, the Adjusted Capital Account Deficit of the Member created by such adjustments, allocations, or distributions. Any special allocations of items of income or gain pursuant to this subsection shall be taken into account in computing subsequent allocations of Profits pursuant to this Article VI so that the net amount of any items so allocated and the Profits, Losses, or other items so allocated to each Member pursuant to this Article VI shall, to the extent possible, be equal to the net amount that would have been allocated to each such Member pursuant to this Article VI as if such unexpected adjustments, allocations, or distributions had not occurred.

(d)    Section 704(c) Allocations.  In accordance with Code Section 704(c) and the applicable Regulations issued thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among all Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value. In the event the Gross Asset Value of any Company Property is adjusted pursuant to this Agreement, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take into account any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.  Any elections or other decisions relating to such allocations shall be made by the Manager in any manner that reasonably reflect the purpose of this Agreement.

Allocations made pursuant to this subsection (d) are solely for purposes of federal, state, and local taxes and shall not affect or in any way be taken into account in computing any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

(e)     Allocation of Code Section 1245 Recapture.  Gain recognized under Code Section 1245(a)(1), or any successor federal revenue law, shall be allocated to the Members who received the tax benefits of the depreciation or amortization deductions attributable thereto.

(f)     Compliance with Regulations; Other Allocations.  This Section 6.6 is intended to comply with certain requirements of the Regulations.  The Manager shall make such other special allocations as are required in order to comply with any mandatory provision of the Regulations or to reflect a Member's Economic Interest in the Company determined with reference to such Member's right to receive distributions from the Company and such Member's obligation to pay its expenses and liabilities.

6.7.     Interests that Vary During the Year.  The Manager shall make pro rata allocations of loss, income, and expense deductions to an additional Member, a substitute Member, or an Economic Interest Owner for that portion of the Company's tax year in which an additional Member, substitute Member, or Economic Interest Owner held an Economic Interest in accordance with the provisions of Section 706(d) of the Code and the Regulations.

## ARTICLE VII

## ACCOUNTING AND REPORTS

7.1.     Books and Records.  The Manager shall cause the Company to keep the following books and records, which shall be maintained at the Company's principal place of business and shall be available for inspection and copying by the requesting Member, or such Member's duly authorized representative(s), at such Member's sole cost and expense during reasonable business hours and upon at least five (5) business days prior written notice to the Manager:

(a)     A current list of the full name and last known business or residence address of each Member and known Economic Interest Owner, together with the Capital Contributions, Capital Account, and Percentage Interest of each Member and known Economic Interest Owner;

(b)     A current list of the full name and business or residence address of each current or past Manager;

(c)     A copy of the Articles and any and all amendments thereto, together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

(d)     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

(e)     A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

     (f)    Copies of the financial statements of the Company, if any, for the current and past six (6) Fiscal Years; and

     (g)    The Company's books and records as they relate to the internal affairs of the Company for at least the current and past six (6) Fiscal Years.

7.2.    <u>Annual Financial Reports and Returns</u>.  The Manager shall, at the Company's expense, cause to be prepared and distributed to each Member, at least annually, audited financial statements prepared in accordance with generally accepted accounting principals accompanied by a report thereon containing an opinion of an independent certified public accountant.  The financial statements shall include:

     (a)    An audited balance sheet, statement of income or loss, statement of Members' equity, and a statement of cash flow;

     (b)    A statement as to any transactions with the Manager or its Affiliates, and of fees, commissions, compensation, and other benefits paid or accrued to the Manager or its Affiliates from the Company for the Fiscal Year completed, showing the amount paid or accrued to each recipient and the respective services performed therefor; and

     (c)    A report identifying distributions of (i) Distributable Amounts From Operations during such year, (ii) funds held as Reserves in prior years that have been released from Reserves and have been added to Distributable Amounts From Operations, (iii) Distributable Amounts From Sales or Refinancings during such year, (iv) lease payments on net leases with builders and sellers, and (v) Reserves established from Capital Contributions.

Copies of the foregoing financial statements and reports shall be distributed to each Member within ninety (90) days after the close of each Fiscal Year, or as soon as practicable thereafter. Additionally, within ninety (90) days after the end of each Fiscal Year, or as soon as practicable thereafter, the Manager shall cause the Company to distribute such other information that Members may need for the preparation of their respective federal income tax returns.

7.3.    <u>Quarterly Reports</u>.  If the Company is registered under Section 12(g) of the Securities Exchange Act of 1934, as amended, the Manager shall cause to be prepared, at Company expense, a quarterly report for each of the first three (3) quarters in each Fiscal Year that contains unaudited financial statements (consisting of a balance sheet, a statement of income or loss, and a statement of cash flow) and a statement of other pertinent information regarding the Company and its activities during the period covered by such report.  Copies of the statement and other pertinent information shall be distributed to each Member within sixty (60) days after the close of each applicable quarter.

7.4.    <u>Suitability Requirements</u>.  The Manager, at Company expense, shall maintain for a period of at least six (6) years a record of the documentation set forth in the Prospectus.

7.5.    <u>Tax Matters Partner</u>.  In the event the Company is subject to administrative or judicial proceedings for the assessment or collection of deficiencies for federal taxes or for the refund of overpayments of federal taxes arising out of a Member's distributive share of Profits, the Manager shall act as the Tax Matters Partner (the "TMP") and shall have all the powers and duties assigned to the TMP under Code Sections 6221 through 6232 and the Regulations thereunder.  Each Member agrees to perform all acts necessary under Code Section 6231 and the Regulations thereunder to designate the Manager as the TMP.

## ARTICLE VIII

### TRANSFER OF COMPANY INTERESTS

8.1.    Restrictions on Transfers.    Notwithstanding any provision to the contrary contained in this Agreement, the restrictions set forth herein shall apply to any and all sales, assignments, or transfers of Units or Economic Interests, as the case may be, and any such sale, assignment, or transfer in violation of this Agreement shall be void ab initio:

(a)    No Member shall make any transfer or assignment of all or any part of its Units without the prior written consent of the Manager, which consent may be withheld in the sole discretion of the Manager;

(b)    No Economic Interest Owner shall make any transfer or assignment of all or any part of its Economic Interests without the prior written consent of the Manager, which consent shall not be unreasonably withheld; provided, however, that such consent shall not entitle any transferee to become a substituted Member;

(c)    No Member or Economic Interest Owner shall be entitled to sell, assign, transfer, or convey any part of its Units or Economic Interests, as the case may be, if in the opinion of the Manager or the Company's then counsel, such sale, assignment, transfer, or conveyance would cause a termination of the Company under Code Section 708; and

(d)    No Member or Economic Interest Owner shall be entitled to sell, assign, transfer, or convey any part of its Units or Economic Interests, as the case may be, if in the opinion of the Manager or the Company's then counsel, such sale, assignment, transfer, or conveyance would cause the Company to be classified as a "publicly traded partnership" within the meaning of Code Section 7704 and the Regulations thereunder, and therefore, the Manager shall not: (i) permit the transfer of any Unit or Economic Interest on an "established securities market" or a "secondary market (or the substantial equivalent thereof)" within the meaning of Code Section 7704 and the Regulations thereunder; (ii) permit the transfer of any Unit or Economic Interest that would cause the aggregate of the transfers in the Company's capital or profits to exceed two percent (2%) of the aggregate interests in the Company's capital and profits; or (iii) permit the redemption, resignation, or withdrawal of any Unit or Economic Interest, except in compliance with the provisions of this Agreement.

8.2.    Transfer of Units and Substitution.    No assignee of all or any portion of a Unit or an Economic Interest shall have the right to become a substituted Member in place of an assignor unless the following conditions are satisfied; provided, however, that allocations of Profit, Loss, and any and all distributions to be paid pursuant to Sections 6.3 or 6.4 shall accrue and be payable to the transferor for the month in which such conditions are satisfied:

(a)    The assignor shall designate such intention in the instrument of assignment;

(b)    The written consent of the Manager to such substitution shall be obtained, which consent may be withheld in the sole discretion of the Manager;

(c)    The instrument of assignment shall be in a form and substance satisfactory to the Manager;

(d)     The assignor and assignee named therein shall execute and acknowledge such other instruments as the Manager may deem necessary to effectuate such substitution, including, without limitation, a power of attorney consistent with provisions more fully described in this Agreement;

(e)     The assignee shall accept, adopt, and approve all of the terms and provisions of this Agreement in writing;

(f)     The assignee shall pay or, at the election of the Manager, obligate himself to pay all reasonable expenses (including reasonable attorneys' fees and costs) connected with such substitution; and

(g)     The Company shall have received, if requested, a legal opinion, that is in form and substance satisfactory to the Manager's counsel that such transfer will not violate the registration provisions of the Act or cause the Company to be classified as "publicly traded partnership" within the meaning of Code Section 7704 and the Regulations thereunder, which opinion shall be furnished at the assignor's expense.

Any assignment permitted under this Section 8.2 shall become effective as of the end of business on the last day of the month in which the conditions described in this Section 8.2 are satisfied.

8.3.    <u>Notice to California Residents</u>

**IT IS UNLAWFUL TO CONSUMMATE A SALE OR TRANSFER OF THIS SECURITY, OR ANY INTEREST THEREIN OR TO RECEIVE ANY CONSIDERATION THEREFOR, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, EXCEPT AS PERMITTED IN THE COMMISSIONER'S RULES.**

8.4.    <u>Repurchase of Membership Rights Upon Transfer of Economic Interest</u>.  Upon and contemporaneously with any transfer, assignment, conveyance, or sale (whether arising out of an attempted charge upon a Member's Unit(s) by judicial process, a foreclosure by a creditor of such Member, or otherwise) of such Member's Economic Interest(s) that does not at the same time transfer the balance of the rights associated with the Unit(s) to which such Economic Interest(s) relate (i.e., the rights of the Member to vote or otherwise participate in the management of the business, property, and affairs of the Company) (the "Partially Transferred Unit(s)"), the Company shall purchase from the Member, and the Member shall sell to Company, for a purchase price equal to one dollar ($1.00) per Partially Transferred Unit, all remaining rights thereto and interests therein that are retained by the Member.  Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member or as set forth in this Agreement.  Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests is not unreasonable under the circumstances existing as of the date hereof.

For example, if a Member who holds two (2) Units assigns the Economic Interests pertaining to one (1) Unit in accordance with this Article VIII and if the transferee is not, for any reason, admitted as a substituted Member, then such transferee shall hold the Economic Interest of the one (1) Unit so transferred as an Economic Interest Owner and the transferring Member shall sell the balance of the rights associated with the Partially Transferred Unit to the Company for an amount equal to one dollar ($1.00) (i.e., $1.00 per Partially Transferred Unit).  The transferring Member shall retain the remaining one (1) whole Unit.

## ARTICLE IX

### ROLL-UPS

9.1.    <u>Roll-Up Transactions</u>.  In connection with a proposed Roll-Up, an appraisal of all Company Property shall be obtained from a competent, independent expert.  If the appraisal will be included in a prospectus used to offer the securities of a Roll-Up Entity, the appraisal shall be filed with the Securities and Exchange Commission and the states as an exhibit to the registration statement for such offering.  Accordingly, an issuer using the appraisal shall be subject to liability for violation of Section 11 of the Act, and any comparable provision under state law for any material misrepresentation or material omissions in the appraisal.  Company Property shall be appraised on a consistent basis.  The appraisal shall be based on an evaluation of all relevant information, and shall indicate the value of Company Property as of the date immediately prior to the announcement of the proposed Roll-Up.  The appraisal shall assume an orderly liquidation of Company Property over a twelve (12) month period.  The terms of the engagement of the independent expert shall clearly state that the engagement is for the benefit of the Company and Members.  A summary of the independent appraisal, indicating all material assumptions underlying the appraisal, shall be included in a report to Members in connection with a proposed Roll-Up.

In connection with a proposed Roll-Up, the Person sponsoring the Roll-Up shall offer to Members who vote "no" on the proposal the choice of:

(a)    Accepting the securities of the Roll-Up Entity offered in the proposed Roll-Up;

or

(b)    One of the following:

(i)    remaining as Members in the Company and preserving their interests therein on the same terms and conditions as existed previously; or

(ii)    receiving cash in an amount equal to each Member's pro-rata share of the appraised value of the net Company Property.

9.2.    <u>Prohibitions on Roll-Up Transactions</u>.  The Company shall not participate in any of the following Roll-Up transactions:

(a)    That would result in Members having democracy rights in the Roll-Up Entity that are less than those provided for under this Agreement.  If the Roll-Up Entity is a corporation, the voting rights of Members shall correspond to the voting rights provided for in this Agreement to the greatest extent possible.

(b)    That includes provisions that would operate to materially impede or frustrate the accumulation of shares by any purchaser of the securities of the Roll-Up Entity (except to the minimum extent necessary to preserve the tax status of the Roll-Up Entity).  The Company shall not participate in any proposed Roll-Up that would limit the ability of a Member to exercise the voting rights of its securities of the Roll-Up Entity on the basis of the number of Units held by that Member.

(c)    In which Members' rights of access to the records of the Roll-Up Entity will be less than those provided for under this Agreement.

(d)    In which any of the costs of the transaction would be borne by the Company if the Roll-Up is not approved by Members.

## ARTICLE X

## RESIGNATION, WITHDRAWAL, AND REDEMPTION

10.1.    <u>Resignation, Withdrawal, and Redemption by Members</u>.  Except as set forth in this Article X, no Member shall have the right to resign or withdraw from the Company or shall have the right to have any portion of its Capital Account redeemed.

10.2.    <u>Limited Right of Redemption</u>.  No Member shall have the right to have any portion of its Capital Account redeemed unless such Member delivers written notice (a "Redemption Notice") to the Manager at least sixty–one (61) days prior to the date such Member desires to have such Units redeemed and such Member obtains the written consent of the Manager, which consent may be withheld in the Manager's sole discretion.  Any such redemption shall be at the Redemption Amount and subject to the following terms and conditions:

(a)    A Member must provide a Redemption Notice, substantially in the form attached hereto as <u>Exhibit B</u>, to the Manager.  On the expiration of the later of (i) the sixty-one (61) day period following the Manager's receipt of the Redemption Notice, or (ii) the last day of the calendar month during which such sixty-one (61) day period expires (the "Effective Date"), the Manager shall, to the extent Distributable Amounts From Sales or Refinancings that are available after paying Preferred Returns and the Capital Contributions of Members admitted after the applicable Effective Date then available, and on a first-come first-serve basis among all Members, commence to redeem such Member's Capital Account, at the Redemption Amount, to the extent set forth in such Member's Redemption Notice.

(b)    From the date the Redemption Notice is received by the Manager until the close of the Effective Date, any Distributable Amounts From Operations and Preferred Returns that are allocable to a redeeming Member shall be distributed to such redeeming Member, as the case may be, in the manner set forth in Section 6.3 and 6.4 herein; provided, however, that such redeeming Member shall not be entitled to any Distributable Amounts From Operations or Preferred Return that, after the Effective Date, would have been attributable to the portion of its Capital Account set forth in such Redemption Notice.

(c)    Upon written acceptance of such Redemption Notice by the Manager, the redeeming Member shall be deemed to have given a Distribution Notice electing to receive its pro rata share of Distributable Amounts From Operations and Preferred Returns that are attributable to the portion of its Capital Account set forth in such Redemption Notice.

(d)    Notwithstanding any provision in this Section 10.2 to the contrary, the Company may give priority to the Redemption Notices of certain Members as follows:

(i)    First, upon the death of the sole beneficiary of a corporate pension or profit-sharing plan, individual retirement account, or other employee benefit plan subject to ERISA or upon the death of an individual Member (each a "Deceased Member"), a Redemption Notice of such Deceased Member shall have priority over a Redemption Notice of all other Members.  If the administrator, executor, or other personal representative of the estate of a Deceased Member gives a Redemption Notice, the

Company shall, as soon as practicable following the Effective Date, commence to redeem the entire Capital Account of such Deceased Member, from Distributable Amounts From Sales or Refinancings available after paying Preferred Returns and the Capital Contributions of Members admitted after the applicable Effective Date, subject to the availability thereof, on a first-come first-serve basis.

(ii)     Second, the Manager, in its sole discretion, shall have the right, at any time, to immediately redeem all or a portion of the Capital Account of one or more ERISA plan investors (the "ERISA Plan Investors"), on an last-in first-out basis, to ensure that the Company remains exempt from the ERISA Plan Asset Regulations. The redemption of such ERISA Plan Investors pursuant to this Section 10.2(d)(ii) shall have priority over the redemptions of all other Members, including, without limitation, Deceased Members.

(e)     The redemption of all or any portion of a Member's Capital Account shall be subject to the following limitations:

(i)     The Company shall not establish a reserve from which to fund redemptions, and the Company's capacity to pay the Redemption Amount to any Member shall be restricted to the availability of Distributable Amounts From Sales or Refinancings available after paying Preferred Returns and the Capital Contributions of Members admitted after the applicable Effective Date.  The Company shall not be required to liquidate any Company Property in order to pay all or any portion of any Redemption Amount.

(ii)     At the sole discretion of the Manager, the Company may first apply available Distributable Amounts From Sales or Refinancings available after paying Preferred Returns and the Capital Contributions of Members admitted after the applicable Effective Date to pay all or any portion of the Redemption Amount applicable to the redemption of any portion of an ERISA Plan Investor's Capital Account, on a last-in first-out basis.

(iii)     The Company may then apply available Distributable Amounts From Sales or Refinancings available after paying Preferred Returns and the Capital Contributions of Members admitted after the applicable Effective Date to pay the Redemption Amount applicable to the redemption of a portion of a Deceased Member's Capital Account, on a first-come first-serve basis.

(iv)     If Distributable Amounts From Sales or Refinancings available after paying Preferred Returns and the Capital Contributions of Members admitted after the applicable Effective Date are, at that time, inadequate to satisfy all or any portion of any Member's Redemption Amount, the Company shall not be required to liquidate any mortgage loans prior to maturity for the purpose of paying such Redemption Amount, but may pay whatever of such amounts are then available to satisfy any Redemption Amounts owed to such Deceased Members and ERISA Plan Investors in the order set forth above and, in the case of all other Members, in the order such Member's Redemption Notice was received by the Company.

(v)     If a Redemption Notice that is accepted would cause the aggregate value of such Member's remaining Capital Account to fall below $10,000, then the Manager shall redeem, and such Member shall be deemed to have requested the redemption of, all

of such Member's Capital Account, notwithstanding anything to the contrary contained in such Member's Redemption Notice.

(vi)    The Company shall pay interest on the Redemption Amount at the then effective Class A Preferred Return rate, which interest shall be cumulative but not subject to compounding.

(f)    If the Company dissolves pursuant to Section 11.1 herein at a time when any Member that has previously given a Redemption Notice that has been accepted by the Manager and that has not yet been satisfied in full, then in such event the winding up provisions of Section 11.2 herein shall apply and the distribution provisions of Section 11.2(c) shall be controlling.

10.3.    Early Redemption Fee.  Notwithstanding any other provision of this Agreement and except with respect to redemptions pursuant to Section 10.2(d), to the extent that a Member fails to provide Redemption Notice that properly requests a redemption as of the expiration of the applicable Holding Period, then, that such Member shall, upon the Manager's acceptance of such Redemption Notice, be assessed an early redemption fee equal to five percent (5%) of the initial Capital Contribution attributable to the requested redemption, with seventy-five percent (75%) of such fee being paid to the Manager and twenty-five percent (25%) being paid to the Company.

10.4.    Manager Discretion.  Within the sole discretion of the Manager, reasonably exercised, the Manager may modify or amend the provisions of Section 10.2, except as to Deceased Members and ERISA Plan Investors, to ensure the company shall not be classified as a "publicly traded partnership" within the meaning of Code Section 7704 and the Regulations thereunder.

10.5.    Resignation, Withdrawal, and Redemption by Manager.  Notwithstanding any provision to the contrary contained herein, a Manager that is also a Member may not resign or withdraw from the Company or have or cause any portion of its Capital Account to be redeemed while serving as a Manager.

## ARTICLE XI

## DISSOLUTION OF THE COMPANY;

## MERGER OF THE COMPANY

11.1.    Events Causing Dissolution.  The Company shall dissolve upon the occurrence of any of the following events:

(a)    The election of the Manager, in its sole discretion, to dissolve the Company;

(b)    The affirmative vote of a Minimum Percentage of Interests; or

(c)    The failure of a Minimum Percentage of Interests to elect a new Manager within ninety (90) days after the removal of the existing Manager as provided in Section 3.7, or notice of retirement of the existing Manager as provided in Section 3.8.

11.2.    Winding Up.  Upon the occurrence of an event of dissolution, the Company shall not immediately be terminated, but shall continue until its affairs have been wound up.  Upon dissolution of the Company, the Manager shall wind up the Company's affairs as follows:

(a)     The Company shall not make or purchase any new loans or conduct any new business;

(b)     Except as may be agreed upon by the Manager and a Minimum Percentage of Interests in connection with a merger or consolidation described in Section 11.3, the Manager shall liquidate Company Property as promptly as is consistent with recovering the fair market value thereof, either by sale to third parties (including, without limitation, the Manager or Affiliates of the Manager) or by servicing the Company's outstanding loans in accordance with their terms; provided, however, that the Manager shall liquidate all Company Property for the best price reasonably obtainable in order to completely wind up the Company's affairs within two (2) years after an event of dissolution occurs;

(c)     All Profits and Losses resulting from the activities set forth in Section 11.2(b) above shall be allocated to and among the Members as set forth in Sections 6.1 and 6.2 above;

(d)     Except as may be agreed upon by the Manager and a Minimum Percentage of Interests in connection with a merger or consolidation described in Section 11.3, all sums of cash held by the Company as of the date or event dissolution occurs (including, without limitation, liquid assets that shall be converted to cash), together with all sums of cash received by the Company during the winding up process from any source whatsoever, and any remaining Company Property shall be applied and promptly distributed to all Members in proportion to their then respective positive Capital Account balances, but only after all Company Liabilities have been paid or otherwise adequately provided for and all outstanding Redemption Amounts have been paid; and

(e)     Upon the completion of the liquidation of the Company and distribution of liquidation proceeds, the Manager shall cause to be filed a Certificate of Dissolution as required by the NRS ("Certificate of Dissolution") and shall furnish to each Member a statement setting forth the receipts and disbursements of the Company during such liquidation, the amount of proceeds from such liquidation distributed, and the amount of proceeds paid or distributed to Members.

11.3.    Merger or Consolidation of the Company.  Subject to Article IX, the Company may be merged or consolidated with one or more other entities, which may be Affiliates of the Company; provided, however, that the principal terms of any such merger or consolidation are first approved by the Manager and by the affirmative vote of a Minimum Percentage of Interests.  In any such merger or consolidation, the Company may be either a disappearing or surviving entity.

## ARTICLE XII

### TRANSACTIONS BETWEEN THE COMPANY,

### THE MANAGER AND AFFILIATES

12.1.    Loan Brokerage Commission.  USA Commercial Mortgage Company, an Affiliate or its successors or assigns, will receive a brokerage or origination fee for loans made by the Company in an amount not to exceed five percent (5%) of the principal amount of each loan per annum.  Such fee may be lower depending on market conditions.  Loan brokerage commissions will be paid to USA Commercial Mortgage Company either at the time the loan is funded or over the life of the loan.

12.2.    <u>Asset Management Fee and Loan Servicing</u>.  The Manager may act as servicing agent with respect to all Company loans and may manage all of the Company's Property.  In consideration for such collection and management efforts, the Manager shall be entitled to receive a loan servicing and asset management fee equal to one and one-half percent (1.50%) per annum of the Assets Under Management, which shall be paid monthly at a rate of one-eighth of one percent (0.125%) of Assets Under Management as of the last day of each calendar month and be payable on or before the fifteenth (15th) day of the following calendar month.

12.3.    <u>Sale of Real Estate to the Manager or its Affiliates</u>.  In the event the Company becomes the owner of any real property by foreclosure on a Company loan, the Company may sell such property to the Manager or an Affiliate of the Manager; provided, however, that the purchase price must be not less than:  (a) the amount of the highest third-party offer received, if any; (b) the independently appraised value of such property at the time of sale; or (c) the total amount of the Company's "investment" in the property.  The Company's "investment" shall include, without limitation, the unpaid principal amount of the Company's loan, unpaid interest accrued through the date of foreclosure, expenditures made to protect the Company's interest in the property (such as payments for insurance and taxes), costs of foreclosure (including attorneys' fees actually incurred to prosecute the foreclosure or to obtain relief from the automatic stay in bankruptcy), and any advances made by the Manager on behalf of the Company for any of the foregoing.

A portion of the purchase price may be paid by an Affiliate of the Manager executing a promissory note in favor of the Company, secured by a deed of trust on the property being sold.  The note may be in the amount of the entire purchase price of the property to be paid by the Affiliate or any portion thereof, and the note shall contain terms and conditions comparable to those that would be contained in notes executed by third parties.

If the Company acquires property through foreclosure, USA Commercial Real Estate Group or an Affiliate of the Manager may serve as the listing broker in the sale of such property. USA Commercial Real Estate Group or such Affiliate would earn a reasonable brokerage commission, not to exceed six percent (6.0%), or the applicable percentage set forth in the NASAA Guidelines.

12.4.    <u>Legal Fees</u>.  Documentation of some of the Company's loans may be prepared by the general counsel for USA Commercial Mortgage Company, which is the sole stockholder of USA Investment Partners, LLC, which is the manager of the Manager.  These legal fees will be paid by the borrower under such loans.

12.5.    <u>Placement Agent Fees</u>.  USA Securities, LLC, an affiliate of the Manager, and its representatives, will receive a commission up to three percent (3.0%) for each Unit sold pursuant to the Offering.  These commissions will be paid by the Manager with non-Company funds.

12.6.    <u>Sale of Loans to Manager or Affiliates</u>.  The Company may sell existing loans to the Manager or its Affiliates, only if the Company receives net sales proceeds from such sale in an amount equal to the total unpaid balance of principal, accrued interest, and other charges owing under such loan. Notwithstanding the foregoing, the Manager shall be under no obligation to purchase any loans from the Company or to guarantee any payments under any Company loan.

12.7.    <u>Miscellaneous Fees</u>.  The Manager may receive miscellaneous fees from borrowers and/or the Company.  Such fees include, without limitation, reconveyance fees, demand fees, messenger service fees, and reimbursement for accounting fees.

12.8.    <u>Purchase of Loans from Manager or Affiliates</u>.  The Company may purchase existing loans from the Manager or its Affiliates; provided, however, that the following conditions are met:

        (a)       At the time of purchase the borrower shall not be default under the loan; and

        (b)       No brokerage commissions or other compensation by way of premiums or discounts shall be paid to the Manager or its Affiliates by any person by reason of such purchase (except loan origination fees).

12.9.    <u>Loan Participations with Affiliates</u>.  Some of the Company's loans may be funded or purchased in participation with other entities or funds that have been sponsored by USA Commercial Mortgage Company, other Affiliates of the Manager, or with other investors who are clients of USA Commercial Mortgage Company or other Affiliates of the Manager.

12.10.   <u>Change in Manager; Early Termination Fee</u>.  If USA Capital Realty Advisors, LLC ceases to be the Manager or is replaced as the Manager without Cause, then the affiliated parties specifically identified in this Article XII may change.  Such affiliated parties may be replaced by Affiliates of the new Manager for purposes of this Agreement.  To the extent that the Manager is removed other than for Cause pursuant to Section 3.7 herein, the Manager shall be entitled to receive an early termination fee equal to one and one-half percent (1.5%) of the Assets Under Management as of the close of business on the last day of the calendar month in which the Manager's removal is effective.  Such fee shall be paid in a single lump-sum payment on or before the fifteenth (15) day of the calendar month following the calendar month in which the Manager's removal is effective.

**ARTICLE XIII**

**<u>ARBITRATION</u>**

13.1.    <u>Arbitration</u>.  As among the parties hereto, all questions as to rights and obligations arising under the terms of this Agreement may be resolved through arbitration, and such arbitration shall be governed by the rules of the American Arbitration Association.

13.2.    <u>Demand for Arbitration</u>.  If a dispute should arise under this Agreement, any Member may, within sixty (60) days from the date such dispute arises, make a demand for arbitration by filing a demand in writing with the other.

13.3.    <u>Appointment of Arbitrators</u>.  The parties may agree upon one arbitrator, but in the event that they cannot agree, there shall be three arbitrators.  Each party to the arbitration shall have the right to appoint one arbitrator by sending written notice to the other party within five (5) days after demand for arbitration is given.  The third arbitrator shall be chosen by the two arbitrators appointed by the parties to the arbitration.  Should either party refuse or neglect to join in the appointment of the arbitrator(s) or to furnish the arbitrator(s) with any papers or information demanded, the arbitrator(s) may, in their sole discretion, proceed ex-parte.

13.4.    <u>Hearing</u>.  Arbitration shall take place in Las Vegas, Nevada, and the hearing before the arbitrator(s) of the matter to be arbitrated shall be at the time and place within said city as is selected by the arbitrator(s).  The arbitrator(s) shall select such time and place promptly after his (or their) appointment and shall give written notice thereof to each party at least sixty (60) days prior to the date so selected.  At the hearing, any relevant evidence may be presented by either party, and the formal rules of evidence applicable to judicial proceedings shall not govern. Evidence may be admitted or excluded in

the sole discretion of the arbitrator(s). Said arbitrator(s) shall hear and determine the matter and shall execute and acknowledge their award in writing and cause a copy thereof to be delivered to each of the parties.

13.5. _Arbitration Award_. If there is only one arbitrator, the arbitrator's decision shall be binding and conclusive on the parties to the arbitration, and if there are three arbitrators, the decision of any two shall be binding and conclusive. The submission of a dispute to the arbitrator(s) and the rendering of a decision shall be a condition precedent to any right of legal action on the dispute. A judgment confirming the award of the arbitrator(s) may be rendered by any court having jurisdiction; or such court may vacate, modify, or correct the award in accordance with the prevailing sections of Nevada law.

13.6. _New Arbitrators_. If three arbitrators are selected under the foregoing procedure but two of the three fail to reach an agreement in the determination of the matter in question, the matter shall be decided by three new arbitrators who shall be appointed and shall proceed in the same manner, and the process shall be repeated until a decision is finally reached by two of the three arbitrators selected.

13.7. _Costs of Arbitration_. The costs of such arbitration shall be borne by the losing party or in such proportions as the arbitrator(s) shall determine.

## ARTICLE XIV

## MISCELLANEOUS

14.1. _Covenant to Sign Documents_. Without limiting the power of attorney granted by Sections 2.6 and 2.7 above, each Member covenants, for such Member and such Member's successors and assigns, to execute, with acknowledgment or verification, if required, any and all certificates, documents, and other writings that may be necessary or expedient in the creation of the Company and the achievement of its purposes, including, without limitation, all such filings, records, or publications necessary or appropriate in the judgment of the Manager to comply with the applicable laws of any jurisdiction in which the Company shall conduct its business.

14.2. _Notices_. Except as otherwise expressly provided for in this Agreement, all notices that any Member may desire or may be required to give the Company or any other Member shall be in writing and shall be deemed actually received when delivered personally or four (4) days following deposit in the United States mail, first-class postage prepaid, addressed to the Member's address as shown in the books of the Company pursuant to written notification to the Manager. Notices to the Manager or to the Company shall be delivered to the Company's principal place of business, as set forth in Section 2.3 above or as hereafter changed as provided herein.

14.3. _Right to Engage in Competing Business_. Nothing contained herein shall preclude any Member from purchasing or lending money upon the security of any other property or rights therein, or in any manner investing in, participating in, developing, or managing any other venture of any kind. No other Member shall have the right of participation therein and each Member waives any right he may have against the Manager and any other Member for using information received as a consequence of participation in the Company or the management of the Company.

14.4. _Amendment_. This Agreement is subject to amendment by the affirmative vote of a Minimum Percentage of Interests and the written consent of the Manager. Notwithstanding anything to

the contrary contained in this Agreement, the Manager shall have the right to amend this Agreement without the vote or consent of a Minimum Percentage of Interests or any Members, when:

    (a)    There is a change in the name of the Company;

    (b)    There is a change in the amount of the contribution of any Member;

    (c)    A Person is substituted as a Member;

    (d)    An additional Member is admitted;

    (e)    A Person is admitted as a successor or additional Manager in accordance with the terms of this Agreement;

    (f)    There is a change in the character of the business of the Company;

    (g)    There is a false or erroneous statement in this Agreement; or

    (h)    A change in this Agreement is required in order to accurately represent the understanding among all Members.

14.5.    <u>Governing Law; Venue</u>. This Agreement shall be governed by and shall be interpreted and enforced in accordance with the procedural and substantive laws of the State of Nevada. Subject to the arbitration provisions of Article XIII above, each Member and each holder of an Economic Interest: (a) agrees that any legal suit, action or proceeding arising out of or relating to this Agreement shall be instituted exclusively in Nevada State Court, County of Clark, or in the United States District Court for the District of Nevada; (b) waives any objection to the venue of any such suit, action or proceeding and the right to assert that such forum is not a convenient forum; and (c) irrevocably consents to the jurisdiction of the Nevada State Court, County of Clark, and the United States District Court for the District of Nevada in any such suit, action or proceeding.

14.6.    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties and supersedes any and all prior agreements and representations, either oral or in writing, between the parties hereto with respect to the subject matter contained herein.

14.7.    <u>Representations, Warranties, and Covenants of Members</u>. Each Member hereby acknowledges that the Company is relying on the representations, warranties, and covenants set forth in such Member's Subscription Agreement with respect to such Member's suitability in issuing Units to such Member. Each Member represents and warrants to, and covenants and agrees with the Company that: (a) such Member is not making a market in the Units; (b) such Member will not transfer any Unit on an "established securities market" or a "secondary market (or substantial equivalent thereof)" within the meaning of Code Section 7704 and the Regulations thereunder; and (c) such Member will not transfer any Unit through "matching services" within the meaning of Code Section 7704 that is not approved in advance by the Manager. Each Member shall indemnify and hold harmless the Company against all damages, losses, or expenses incurred by the Company with respect to a breach of any representation, warranty, or covenant of such Member or, in the case such Member's continued suitability, such Member fails to notify the Company as to such Member's lack of continued suitability, and shall defend the Company in any action or proceeding with respect to such breach.

14.8.    <u>Waiver</u>. No waiver by any party hereto of any breach of, or default under, this Agreement by any other party shall be construed or deemed a waiver of any other breach of or default

under this Agreement, and shall not preclude any party from exercising or asserting any rights under this Agreement with respect to any other breach or default.

14.9.    Severability. If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

14.10.   Captions. Section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference only, and in no way define, limit, extend, or describe the scope of this Agreement.

14.11.   Number and Gender. Whenever the singular number is used in this Agreement, and when required by the context, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders and vice versa. In the event there is more than one Manager, any consent or action required or permitted to be given or made by a Manager may be given or made by any Manager.

14.12.   Counterparts. This Agreement may be executed in counterparts, any or all of which may be signed by the Manager on behalf of all Members as their attorney-in-fact.

14.13.   Legal Representation.

(a)     Counsel to the Company may also be counsel to the Manager or any Affiliate of the Manager. The Manager may execute on behalf of the Company and all Members any consent to the representation of the Company that counsel may request pursuant to any applicable rules of professional conduct or similar rules ("Rules"). The law firm engaged as legal counsel to the Company in connection with the formation of the Company and the offer and sale of Units ("Company Counsel") is not involved in the underwriting, documentation or routine servicing of loans made or acquired by the Company. Each Member acknowledges that Company Counsel does not and will not represent any Member, and that, in the absence of a clear and explicit written agreement, Company Counsel shall owe no duties directly to any Member. Notwithstanding any adversity that may develop, in the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and the Manager or its Affiliate, on the other hand, then each Member agrees that Company Counsel may represent either the Company or such Manager or its Affiliate, or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

(b)     Each Member further acknowledges that Company Counsel has represented only the interests of the Manager and not the other Members in connection with the formation of the Company and the preparation and negotiation of this Agreement, and each Member acknowledges that it has been afforded the opportunity to consult with independent counsel with regard thereto.

14.14.   Waiver of Action for Partition. Each Member irrevocably waives during the term of the Company any right that he may have to maintain any action for partition with respect to Company Property.

14.15.  Execution of Additional Instruments.  Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney, and other instruments necessary to comply with any laws, rules, or regulations.

14.16.  Rights and Remedies Cumulative.  The rights and remedies provided by this Agreement are cumulative, and the use of any one right or remedy by any party shall not preclude or waive the right or use of any or all other remedies.  Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance, or otherwise.

14.17.  Heirs, Successors, and Assigns.  Each and all of the covenants, terms, provisions, and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors, and assigns.

14.18.  Creditors.  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company.

14.19.  Attorneys' Fees.  In the event any party hereto institutes an action or other proceeding to enforce any rights arising under this Agreement, other than an arbitration proceeding pursuant to Article XIII above, the party prevailing in such action or other proceeding shall be paid all reasonable costs and attorneys' fees by the other party, such fees to be set by the court and not by a jury, and to be included in any judgment entered in such proceeding.

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands the day and year first above written.

**MANAGER:**     USA CAPITAL REALTY ADVISORS, LLC

By:    USA Investment Partners, LLC

     By:   USA Commercial Mortgage Company

     By:   /s/ Joseph D. Milanowski, President
          Joseph D. Milanowski, President

**MEMBERS:**     USA CAPITAL REALTY ADVISORS, LLC,
            as attorney-in-fact for the persons listed on
            Schedule A attached hereto

By:    USA Investment Partners, LLC

     By:   USA Commercial Mortgage Company

     By:   /s/ Joseph D. Milanowski, President
          Joseph D. Milanowski, President

## SCHEDULE A

### LIST OF MEMBERS/UNIT OWNERSHIP
### (AS OF MARCH 29, 2001)

| MEMBER | NUMBER AND CLASS OF UNITS | CAPITAL CONTRIBUTION |
|---|---|---|
| USA Capital Realty Advisors, LLC<br>4484 South Pecos Road<br>Las Vegas, Nevada 89121 | 10 Class D Units | $ 50,000 |

## EXHIBIT A

### FORM OF DISTRIBUTIONS NOTICE

USA Capital Realty Advisors, LLC
4484 South Pecos Road
Las Vegas, Nevada 89121

Ladies/Gentlemen:

I am an investor in USA Capital First Trust Deed Fund, LLC (the "Fund"). By checking in the space below, I am exercising my election to change how my future Fund distributions are treated.

☐    My Fund distributions are currently paid to me on a monthly basis to the extent available. I hereby elect to have all future Fund distributions, if any, reinvested in the Fund through the purchase of additional unit(s), rather than distributed to me on a monthly basis. I acknowledge that I have received and reviewed the most current prospectus for the Fund and that the Manager must consent to my election in writing before the same will become effective.

☐    My Fund distributions are currently reinvested in the Fund through the purchase of additional unit(s). I hereby elect to have all future Fund distributions paid to me on a monthly basis. All future Fund distributions should be mailed to me at the address given below.

This election is subject to all of the terms and conditions set forth in the Fund's prospectus and the Fund's operating agreement, as amended.

_____
[Name of investor]

_____
[Signature of investor]

_____
[Date]

_____

_____
[Current address of investor]

## EXHIBIT B

### FORM OF REDEMPTION NOTICE

USA Capital Realty Advisors, LLC
4484 South Pecos Road
Las Vegas, Nevada 89121

Ladies/Gentlemen:

  I am an investor in USA Capital First Trust Deed Fund (the "Fund").  I hereby elect to have the following amount of my investment in the Fund redeemed:

$_____    [Specify dollars amount that you seek to have redeemed; if your proposed redemption would cause your investment in the Fund to fall below $10,000, then your whole investment will be redeemed.]

  Class _____   [Specify the class of membership units that you seek to have redeemed.]

  _____ Months   [Specify the holding period applicable to your class of membership units.]

  I understand that this redemption election is subject to all of the terms and conditions contained in the prospectus and the operating agreement for the Fund.  I understand that the Fund does not maintain reserves to fund redemptions and that my request for redemption will be subject to available Distributable Amounts from Sales or Refinancings (as defined in the Fund's operating agreement) and the Capital Contributions (as defined in the Fund's operating agreement) of Investors that are admitted to the Fund after the date this redemption notice becomes effective.  I acknowledge that under the prospectus and the operating agreement, the redemption elections of certain types of investors may have priority over my redemption request.  Finally, I understand that the Fund is under no obligation to accept this request and, if this redemption election is made during the term of the holding period applicable to my class of membership units, the Fund, in its sole and absolute discretion, may accept this request and will charge an early redemption fee equal to 5% of my initial investment, with 75% of such fee being paid to USA Capital Realty Advisors, LLC, as manager of the Fund, and 25% being paid to the Fund.  All redemption payments shall be mailed to the address given below.

_____   _____
[Name of investor]            [Date]

                _____

_____   _____
[Signature of investor]          [Current address of investor]

## EXHIBIT C

## FORM OF REQUEST FOR CHANGE OF CLASSIFICATION

USA Capital Realty Advisors, LLC
4484 South Pecos Road
Las Vegas, Nevada 89121

Ladies/Gentlemen:

I am an investor in USA Capital First Trust Deed Fund, LLC (the "Fund"). Through this notice, I am requesting a change in the class of my membership units in the Fund and, as a result, a change in the holding period and the preferred return applicable to my membership units in the Fund. In this regard, I am requesting that the following membership units in the Fund,

_____ membership units (insert number), all designated as Class _____ Units (insert class)

be converted into the following class(es) in the following amount(s):

|  | Class A Units | Class B Units | Class C Units |
|---|---|---|---|
| Number: | _____ Units | _____ Units | _____ Units |

This request for change in classification is subject to all of the terms and conditions set forth in the Fund's prospectus and the Fund's operating agreement, as amended, including, without limitation, the prior written approval of the change in classification by USA Capital Realty Advisors, LLC, the Fund's manager, which may be withheld in its sole discretion.

_____          _____
[Name of investor]                                    [Date]

                                                      _____
_____          _____
[Signature of investor]                             [Current address of investor]

## ACKNOWLEDGEMENT

On behalf of the Fund, USA Capital Realty Advisors, LLC, the Fund's manager, hereby:

☐    Rejects the above request for change in classification such that the membership units referenced above shall remain in the same class, have the same holding period or bear the same preferred return.

☐    Approves the request for change in classification as follows:

|  | Class A Units | Class B Units | Class C Units |
|---|---|---|---|
| Number: | _____ Units | _____ Units | _____ Units |

The undersigned hereby executes this Acknowledgement as of _____, 20____.

USA CAPITAL REALTY ADVISORS, LLC,
    as manager of USA Capital First Trust Deed Fund, LLC

By: _____

Its: _____

11581_24.DOC                          C-1