Amy N. Tirre, Esq.                          **Electronically Filed on October 23, 2006**
Nevada Bar No. 6523
KUMMER KAEMPFER BONNER
RENSHAW & FERRARIO
5585 Kietzke Lane
Reno, Nevada 89511
Telephone:  (775) 852-3900
Facsimile:  (775) 852-3982
E-Mail:     atirre@kkbrf.com

-and-

James C. McCarroll, Esq.
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Telephone:  (212) 521-5400
Facsimile:  (212) 521-5450
E-Mail:     jmccarroll@reedsmith.com

Attorneys for SPCP Group, LLC

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>                                    Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>                                    Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>                                    Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND,<br>LLC,<br>                                    Debtor. | **DECLARATION OF DALE COONEY<br>IN SUPPORT OF DEBTORS'** |
| In re:<br>USA SECURITIES, LLC,<br>                                    Debtor. | **MOTION FOR ORDER SCHEDULING<br>AN AUCTION FOR THE SALE OF** |

| Affects: | CERTAIN ASSETS, APPOINTING |
|---|---|
| ☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA First Trust Deed Fund, LLC | SPCP GROUP, LLC, AS LEAD BIDDER, AND APPROVING BID PROCEDURES AND PROTECTIONS<br><br>**Hearing Date & Time:**<br><br>October 25, 2006, 9:30 A.M. |

I, DALE COONEY, declare as follows:

1.      I am over 21 years of age and competent to testify in this matter.  All of the statements made in this Declaration are true and accurate to my personal knowledge.

2.      I am an employee of Silver Point Capital, L.P., which is the Managing Member of SPCP Group, LLC ("Silver Point").

3.      I make this Declaration in support of Silver Point's bid to acquire certain loans and loan servicing agreements in the above-captioned Debtors'[1] bankruptcy cases pending before the United States Bankruptcy Court for the District of Nevada, Las Vegas Division.  If called as a witness, I could and would competently testify to the statements in this Declaration.


I.      **My Educational and Professional Background**

4.      I have an extensive educational and professional background in the finance, lending and troubled loan servicing fields, dating back to 1980.

5.      In 1980, I obtained a Bachelor of Science degree in accounting from the University of Illinois.  In 1981, I first attained the designation of Certified Public Accountant in

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Asset Purchase Agreement executed by Silver Point and the Debtors, and filed with this Court on October 19, 2006.

the State of Illinois.

6.      Commencing in 1980, I was employed by Arthur Andersen & Co ("AA") for approximately six years, specializing in the audit of financial service firms, primarily consisting of banks, savings and loans, commodities and brokerage firms and real estate companies

7.      In 1986, I left AA to join a small Chicago based real estate company hired by the Federal Savings & Loan Insurance Corporation ("FSLIC") to manage the workout and resolution of six failed Savings & Loans in New Orleans, Louisiana.   During this period, I personally managed and oversaw the management of over $500,000,000 in assets on behalf of the FSLIC.  I undertook these duties for a period of approximately two years.

8.      Commencing in or about 1988, I was engaged by the Federal Home Loan Bank of Atlanta to manage the resolution of over $325,000,000 in assets of a failed Federal Savings Bank located in Boca Raton, Florida.  Then, in or about 1989, I transitioned to providing regulatory consulting and loan workout advisory services to Federal Deposit Insurance Corporation ("FDIC") insured institutions located throughout the Northeast.

9.      I continued to specialize in troubled loan workouts and servicing when, in 1990 and 1991, I managed the resolution of five (5) failed Savings & Loans located in Dallas, Texas.  These Savings & Loans had aggregate assets exceeding $750,000,000.

10.      In or about 1992, I joined a Goldman Sachs affiliate, where I remained through mid-2000.  My initial responsibilities included running the Loan Recovery Department which had been retained by the FDIC to restructure and otherwise maximize the recovery associated with over $1.7 billion of non-performing loans from five failed banks located in the states of Connecticut and New York.  During this time, I managed and directed the activities of a

staff of over 45 people.

11.     Thereafter, from 1994 through 1996, I took the lead position in the resolution of a $500,000,000 non-performing loan portfolio acquired from Chase Manhattan Bank, followed immediately by taking the lead position in the workout and restructuring of a $775,000,000 non-performing loan portfolio acquired from the United States Department of Housing and Urban Development.

12.     From 1996 through mid-2000, my responsibilities included the underwriting, acquisition and workout of loans, and the establishment of servicing platforms in Brazil, Mexico, Japan, England and France, leading to a two-year expatriate deployment to Paris, France with respect to the resolution of a $1.5 billion joint venture acquisition between General Electric Capital Corporation and Goldman Sachs of a failed Paris-based bank.

13.     From mid-2000 through 2001, while with the Bank of New York, my responsibilities included the sourcing, underwriting, acquisition and management of nearly $250,000,000 of sub-performing and non-performing loans. I rejoined Goldman Sachs in 2002 where I was once again responsible for the underwriting, acquisition and workout of over 500,000,000 in non-performing loan portfolios. These responsibilities continued upon my joining Silver Point Capital, L.P. in early 2004, which has included the underwriting, acquisition and management of nearly $500,000,000 in non-performing and sub-performing loans, with an aggregate acquisition value exceeding $1.3 billion.

## II.     What is Silver Point?

14.     Silver Point is a private investment firm specializing in credit-related investments, with approximately $6 billion of capital under management.

15.     The firm is led by Edward Mulé and Robert O'Shea, two of the industry's

leading experts in credit-related investing. Mr. Mulé and Mr. O'Shea previously built and
managed significant and successful businesses in all of Silver Point's markets as partners and
managing directors of The Goldman Sachs Group, Inc. Founded in January 2002, Silver Point
builds upon their proven business approach, combining a firm-wide focus on credit analysis with
cross-disciplinary expertise in industry analysis, business valuation and capital markets to
intensively research and actively manage and resolve financial instruments and special situations
across the credit and related markets.

16.    We are highly experienced in managing distressed investments, including
actively and constructively participating in the restructuring and bankruptcy processes
independently through bank loan steering committees and ad hoc and official creditors
committees.

17.    We have built and staffed Silver Point to ensure that we maintain a high
capacity for difficult and time-consuming work.

## III.    Silver Point's Troubled Loan Management and Servicing Strategy

18.    Silver Point's middle market investment group is extremely well qualified
to manage and service portfolios of troubled loans.

19.    Silver Point's middle market troubled loan investment model is focused on
the acquisition, management and resolution of sub-performing and non-performing loan assets,
emphasizing current income potential, with near- to long-term capital appreciation.

20.    Silver Point's loan management strategies are developed on a loan-by-loan
basis, which in each instance compares and contrasts the available resolution alternatives,
including, but not limited to, short-term forbearance agreements, issuance of notices of default,

and foreclosure/guarantor litigation, at all times emphasizing an exit strategy that maximizes recovery on each loan, on a net present value basis.

21.    Working in conjunction with our third-party loan servicing provider, Laureate Capital, collections are monitored through mid-month and month-end delinquency reports, and trial balance reporting emphasizing delinquent credits.

**a.    Silver Point's Approach to Servicing Troubled But Performing Loans**

22.    Silver Point's third-party loan servicing provider, Laureate Capital, handles all administrative and financial aspects of managing performing, sub-performing, and non-performing loans within Silver Point's portfolio.

23.    Specifically, Laureate Capital issues billing notices, collects the payments from the Borrowers, remits collections directly to all lenders (or, where applicable, investors), and issues reports on payment status to Silver Point.  In addition, Laureate Capital also is responsible for tracking UCC expirations, real estate tax delinquencies, and insurance coverage for each improved collateral property.  Silver Point actively monitors collections through mid-month and month-end delinquency reports, as well as trial balance reporting emphasizing delinquent credits, produced by Laureate.  All cash payments are made to and disbursed by Laureate Capital, not Silver Point.

**b.    How Silver Point Typically Handles Past-Due or Defaulted Loans**

24.    Upon an account becoming fifteen (15) days past due, immediate contact is made with the borrower and/or guarantors, and outside legal counsel is engaged and directed to issue demand notices.

25.    If the default is not cured within the applicable notice period, acceleration notices are issued, and foreclosure and guarantor litigation is commenced.

26.     To the extent the collateral consists of income producing improved real estate, litigation efforts include the appointment of receivers to secure the collateral and seize the cash flow that would otherwise be diverted by the borrower and/or guarantors.

27.     Silver Point's role in this process, with regard to all loans for which it and Laureate have servicing responsibilities, includes, among other things, (i) maintaining frequent contact with the borrower and/or guarantors (ii) directing the activities of outside legal counsel, (iii) negotiating resolutions with the borrowers and/or guarantors, (iv) advancing funds for litigation and bankruptcy-related costs, as well as payment of delinquent taxes, insurance and other operating expenses on all foreclosed accounts, and (v) engaging real estate brokers to market, lease and sell the collateral property.

28.     I believe that Silver Point's experience and capabilities in this area will be particularly valuable in servicing the Debtors' Assets, as a significant percentage of the loans for which Silver Point and Laureate will assume servicing responsibilities are in default.


**IV.    Silver Point's Commitment to Acquire the Assets**

29.     Silver Point first began to investigate the possibility of acquiring the Assets shortly after the Debtors' bankruptcy filing.  It commenced due diligence with regard to the potential value of the Assets in June 2006, and commenced negotiations with the Debtors and the Committees early in July.

30.     Following more than 90 days of intense, time-consuming and costly due diligence, as described in more detail below, we have executed a definitive Asset Purchase Agreement which, upon satisfaction of certain conditions stated therein, including approval of our Break-Up Fee, will obligate us to acquire the Assets.

31.     The Asset Purchase Agreement provides for a unified sale of most of FTDF's loan interests, and most of USACM's servicing rights. This is, in my view, the best way to realize value for both groups of assets – because those FTDF loan interests that are minority-owned would not be attractive to Silver Point or, in my opinion, most other potential purchasers, without the ability to control servicing of the underlying loans; and similarly, purchasing servicing rights without ownership interests in at least some of the underlying loans is generally inconsistent with our, and most of our competitors', investment strategy.

V.    **How Silver Point's Commitment Adds Value to the Estates and Encourages Bidding**

32.     The Total Asset Purchase Price to which we have agreed was carefully and vigorously negotiated. It provides the Debtors' estates, as well as their creditors and interest holders, with a floor from which higher bid amounts could build through the open auction proposed in the Bid Procedures and Buyer Protection Motion. It also assures all parties an acceptable minimum sale price for the Assets.

33.     Unlike other potential acquirers, we combine the financial wherewithal to be in a position to provide liquidity to investors who wish to exit their positions, with the ability to diligently service both performing and non-performing loans pursuant to the terms of the servicing agreements presently in place with regard to each loan.

34.     I believe that Silver Point has an excellent reputation in the financial community, and has a talented and diverse staff. I believe we have a vast reservoir of experience and expertise in workouts and restructurings, including a senior staff, as described above, that is comprised of former Goldman Sachs partners, the former chairman of Wachtel Lipton's bankruptcy department, and a wide array of experienced restructuring professionals. I believe

Case 06-10725-gwz    Doc 1635    Entered 10/23/06 16:24:20    Page 9 of 13

the middle market group will have full access to the accumulated knowledge of the firm in connection with management of the Assets.

35.    I believe that the thorough due diligence we have completed with regard to the Assets is consistent with our normal and widely known practice.  I also believe that, based upon our reputation and standing within the financial community, others within the financial community likely will be inclined to consider bidding on the Assets when they become aware that we have committed to a minimum price at which we will purchase them.

36.    In fact, counsel for the Debtors has informed me, and I believe, that following filing of our Offer Letter as an exhibit to the Bid Procedures and Buyer Protection Motion, new potential bidders have contacted the Debtors, and have begun due diligence with regard to the Assets.

37.    Counsel for the Debtors has further informed me, and I believe, that Silver Point's commitment to a specific purchase price for the Assets has encouraged other potential bidders to undertake due diligence with regard to the Assets, and may encourage competitive bidding at the auction.

## VI.    Why Silver Point Requires a Break-Up Fee

38.    The value that I believe Silver Point has added to the Debtors' estates by executing the Asset Purchase Agreement has been created through Silver Point incurring substantial opportunity costs and return on capital costs, in addition to hard costs.  We have incurred all of these costs in good faith reliance upon the Debtors' and each of the four Committees' assurances that they would make their best reasonable efforts to obtain Bankruptcy Court approval of the Break-Up Fee.  Absent such assurances, we would not have engaged in the

substantial due diligence we have undertaken, and we would not have submitted the bid that

forms the basis of the Asset Purchase Agreement.

39.    We have relied not only upon the assurances of appointed representatives

of all constituencies in these cases, but also upon the fact that <u>in no circumstance will the Break-</u>

<u>Up Fee be payable out of existing assets of the Debtors' estates</u>.  By its terms, the Break-Up Fee

will be payable only if the Assets are purchased by a third party for an amount that is at least

$2,000,000 greater than the proposed Total Asset Purchase Price; such that even after the Break-

Up Fee is paid, the Debtors' estates realize at least $500,000 <u>more</u> than they would through a

sale to Silver Point.[2]

40.    The Break-Up Fee was vigorously negotiated among Silver Point, the

Debtors, and each of the four Committees appointed by the U.S. Trustee in these cases.

41.    The Break-Up Fee proposed in the Bid Procedures and Buyer Protection

Motion is significantly lower than the break-up fee that was initially requested by Silver Point.

Moreover, counsel for the Debtors has informed me that our initially requested break-up fee was

lower than the break-up fee demanded by any other party that has expressed an interest in the

Assets, and the Break-Up Fee proposed in the Bid Procedures and Buyer Protection Motion is

<u>materially</u> lower than the break-up fee to which any other potential bidder had indicated it would

agree.

42.    Silver Point commenced substantial due diligence with regard to the

Assets in early July, 2006.  In the nearly four months since then, my business unit within Silver

---

2  The only other circumstance in which the Break-Up Fee would be payable to Silver Point,
pursuant to the terms of the Asset Purchase Agreement, is if the Debtors are required to close the
sale to Silver Point, they fail to do so by the Outside Approval Date, and they thereafter, within
nine months, sell the Assets to a third party for an amount equal to or greater than the Total Asset
Purchase Price.  In this circumstance, the Debtors still would not pay the Break-Up Fee out of
their existing assets.

Point has been materially limited in its ability to underwrite additional potential acquisitions due to the extraordinary time commitment associated with this transaction.

43.     Since July, as a direct result of pursuing the USA Capital opportunity, Silver Point has identified but declined to pursue acquisition of four loan portfolios, with a total face value of approximately $128,000,000.

44.     To date, I personally have spent nearly 900 hours on our due diligence efforts with regard to the Assets, and on negotiation of our Offer Letter, the definitive Asset Purchase Agreement, and the many documents related thereto.  Additionally, other members of our internal staff (including our legal, administrative and compliance personnel) have spent hundreds of hours on our due diligence and negotiation efforts.  Included in the foregoing are more than 250 person-hours spent by myself and my colleagues at the Debtors' facilities in Las Vegas, and in traveling between those facilities and Silver Point's offices in Greenwich, Connecticut and Dallas, Texas.

45.     While I am unable to precisely quantify the opportunity cost resulting from our full-time commitment to acquisition of the Assets, I believe it greatly exceeds the Break-Up Fee we are requesting.

46.     In addition to our lost opportunity costs, Silver Point also has suffered, and will continue to suffer, from its ongoing commitment of $46,000,000 of its capital – foregoing any returns from the deployment of that portion of its capital to alternate investments.  Pursuant to the Asset Purchase Agreement, Silver Point's commitment to acquire the Assets will remain outstanding for up to 120 days from October 19, 2006.  Moreover, Silver Point has been required to budget for this acquisition since September 11, 2006 and from at least that date through the proposed auction date of December 7, 2006 – approximately 90 days, and, when taken through

the latest potential closing date, an aggregate commitment of approximately 150 days.[3]

47.    Consistent with its duty to maximize returns for its investors, Silver Point believes that in order for it to justify making the commitments provided for in the Asset Purchase Agreement it requires the protection of the Break-Up Fee.  Moreover, Silver Point believes it is reasonable for it to receive the protection of the Break-Up Fee because, as described in detail above: (i) it has suffered substantial costs, in the form of opportunity costs, return on capital costs, and hard costs; (ii) its committed bid has conferred benefit on the Debtors' estates by creating a floor from which higher bid amounts could build through the open auction proposed in the Bid Procedures and Buyer Protection Motion, while assuring all parties an acceptable minimum sale price for the Assets; and (iii) <u>in no circumstance will the Break-Up Fee be payable out of existing assets of the Debtors' estates</u> – it will only be payable from proceeds of a bid that results in the Debtors' estates realizing at least $500,000 <u>more</u>, after payment of the Break-Up Fee, than they would through a sale to Silver Point.[4]

---

[3]  In addition to our lost opportunity and return on capital costs, Silver Point has incurred extensive hard costs associated with this transaction.  For example, Silver Point has incurred significant attorneys' fees, taxes, and title reporting fees, which I believe total more than $300,000 to date – all with no guarantee of reimbursement.

[4]  *See* n. 2, supra.

I declare under penalty of perjury that the foregoing is true and correct. I executed this Declaration on October 23, 2006 in Dallas, Texas.

Dale S. Cooney

Dale Cooney