**ELECTRONICALLY FILED**
October 23, 2006

1

2

3

4

5

6

7

8

9

STUTMAN, TREISTER & GLATT, P.C.
FRANK A. MEROLA
(CA State Bar No. 136934)
EVE H. KARASIK
(CA State Bar No. 155356)
ANDREW M. PARLEN
(CA State Bar No. 230429), Members of
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
Email:      fmerola@stutman.com
            ekarasik@stutman.com
            aparlen@stutman.com
Counsel for the Official Committee Of
Equity Security Holders Of USA Capital First Trust Deed Fund, LLC

SHEA & CARLYON, LTD.
JAMES PATRICK SHEA
(Nevada State Bar No. 000405)
CANDACE C. CARLYON
(Nevada State Bar No. 002666)
SHLOMO S. SHERMAN
(Nevada State Bar No. 009688)
228 South Fourth Street, First Floor
Las Vegas, Nevada 89101
Telephone: (702) 471-7432
Facsimile: (702) 471-7435
Email:      jshea@sheacarlyon.com
            ccarlyon@sheacarlyon.com
            ssherman@sheacarlyon.com

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

10

| | |
|---|---|
| In re: | BK-S-06-10725-LBR |
| USA COMMERCIAL MORTGAGE COMPANY, | Chapter 11 |
| Debtor. | |
| In re: | BK-S-06-10726-LBR |
| USA CAPITAL REALTY ADVISORS, LLC, | Chapter 11 |
| Debtor. | |
| In re: | BK-S-06-10727-LBR |
| USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, | Chapter 11 |
| Debtor. | |
| In re: | BK-S-06-10728-LBR |
| USA CAPITAL FIRST TRUST DEED FUND, LLC, | Chapter 11 |
| Debtor. | |
| In re: | BK-S-06-10729-LBR |
| USA SECURITIES, LLC, | Chapter 11 |
| Debtor. | |
| Affects | |
| ☒ All Debtors | Date:   October 25, 2006 |
| ☐ USA Commercial Mortgage Co. | Time: 9:30 a.m. |
| ☐ USA Securities, LLC | |
| ☐ USA Capital Realty Advisors, LLC | |
| ☐ USA Capital Diversified Trust Deed | |
| ☐ USA First Trust Deed Fund, LLC | |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### FTDF COMMITTEE STATEMENT IN SUPPORT OF MOTION FOR ORDER SCHEDULING AN AUCTION FOR THE SALE OF CERTAIN ASSETS, APPOINTING SPCP, LLC AS LEAD BIDDER, AND APPROVING BID PROCEDURES AND PROTECTIONS (AFFECTS ALL DEBTORS)

404240v2

1 | TO THE HONORABLE LINDA B. RIEGLE, UNITED STATES BANKRUPTCY JUDGE:

2       The Official Committee of Equity Security Holders of USA Capital First Trust

3 Deed Fund, LLC (the "FTD Fund Committee") appointed in the above-captioned bankruptcy

4 cases (the "Chapter 11 Cases"), files this statement (the "Statement") in support of the "Motion

5 for Order Scheduling an Auction for the Sale of Certain Assets, Appointing SPCP Group, LLC,

6 as Lead Bidder, and Approving Bid Procedures and Protections" (the "Bid Procedures Motion")[1],

7 filed by USA Commercial Mortgage Company ("USACM"), USA Capital Diversified Trust

8 Deed Fund, LLC ("DTD Fund"), USA Capital First Trust Deed Fund, LLC ("FTD Fund" and

9 together with the DTD Fund, the "Funds"), USA Capital Realty Advisors, LLC ("Realty

10 Advisors"), and USA Securities, LLC ("USA Securities" and collectively with USACM, DTD

11 Fund, FTD Fund, and Realty Advisors, the "Debtors"), and respectfully represents as follows:

## I.

## INTRODUCTION

      At the October 19, 2006 hearing, the Court expressed concerns regarding the sale
process and sequencing of sale and plan proceedings. As alluded to in open court, the issues
raised by the Court are largely the same issues which the parties have taken into account in their
significant and ongoing negotiations. While it is seldom that the Court is exposed to the process
by which the "sausages" are made, in this case it is important that the Court be aware of the
substantial input of the various constituencies. In particular, a discussion of the various assets
available for sale, the continued administrative burden of operating the cases, and the risks and
expenses of both the sale process and the confirmation process have been painstakingly
considered by the Debtors and the four official committees appointed in the Chapter 11 Cases
(the "Committees").

      Throughout the last several months, the Debtors and the Official Committees have
entered into significant discussions regarding the most effective "exit strategy" for this case. As
the Court is aware, this process presents unique challenges in that the Debtors are represented by

---

[1]   Terms not otherwise defined herein shall have the same meanings ascribed to them in the Bid
Procedures Motion.

1    joint management and counsel.    However, the presence of four Official Committees has

2    provided the opportunity to ensure that each of the constituencies is independently represented at

3    the settlement table.    Among the considerations taken into account during these discussions are

4    the following:

5            1.    USACM holds little in the way of saleable assets.    This Debtor's physical

6    assets consist mainly of used office equipment and computer systems.    While the Debtor is

7    attempting to gain value from a "sale" of its servicing rights, significant challenges are posed by

8    the fact that, once the contracts are transferred, lenders continue to have the right to replace the

9    servicer with a substitute servicer thereby severely discounting the value of such servicing rights;

10    and the cash flow stream from the loans is expected to continue to decline and potentially turn

11    negative in the short term as the performing loans, or "low hanging fruit", have largely been

12    collected by current management, resulting in the probability of increased collection costs and

13    lower collection rates on a go forward basis.

14            2.    Realty Advisors has virtually no assets.    While it purportedly acts as the

15    "manager" for the two funds, its failure to prevent, disclose or remedy USACM's prepetition

16    misconduct leaves that entity open to significant claims, including breach of fiduciary duties to

17    the two Funds.

18            3.    USA Securities has no saleable assets.    This entity was utilized as a

19    vehicle to sell interests in the funds.

20            4.    The DTD Fund has a large principal balance portfolio, but the apparent

21    lack of marketability of its assets is such that, while offers and expressions of interest for the

22    DTD Fund assets were received, the proposed price was so low that the DTD Fund Committee

23    determined that its constituency was better served by retaining both the portfolio and the various

24    causes of action, including significant claims against insiders and affiliates.

25            5.    Finally, the Debtors and the Committees (in various combinations) have

26    worked diligently to negotiate an exit strategy which manages the interlocking puzzle pieces of

27    these estates in a manner which creates the greatest synergy and value for all of the entities.

28    Among the give and take issues which comprise this process are a consideration of:

1        a.        The extent to which each estate will bear the administrative burden

2   of paying the Debtors' professionals.

3        b.        The extent to which each of the Funds and the Direct Lenders will

4   pay a servicing fee in excess of the 1% historically charged.

5        c.        The extent to which the Funds will be charged or refunded

6   management fees charged by Realty Advisors (and immediately passed through to USACM).

7        d.        The compromise of the USACM asserted rights to set off or recoup

8   prepetition overpayments, as well as the use of such recovered monies in the overall

9   reorganization.

10        e.        The extent to which the various entities will fund a litigation "war

11  chest" with which to pursue causes of action, as well as the allocation of recoveries from such

12  assets.

13        f.        The extent to which both the burden of the bid protections and any

14  increase in the bids will be allocated between USACM and the FTD Fund.

15        g.        The extent to which an acquirer has the ability to consider

16  additional Borrower funding, which would enhance the collectibility of existing loans, while

17  lowering claims against the estate.

18        h.        The apparent inability to reorganize these Debtors and the

19  increased likelihood of the Debtors various estates falling into administrative insolvency the

20  longer these proceedings continue without a prompt resolution.

21        Significant progress has been made on the settlement of these (and other issues),

22  and it is anticipated that the Debtors will be filing an amended plan which reflects settlements of

23  most, if not all, of these issues. Because resolution of these issues requires both a sale process

24  and the confirmation of a plan, Debtors and the Official Committees have been diligently

25  working to conclude both as quickly as possible. Like the chicken and the egg, neither can come

26  first without the other being involved. However, the representatives of the affected creditors and

27  investors have determined that it would be most expeditious to proceed on a dual track, with the

28  auction to precede the confirmation. While there is a recognized risk that the sale requires

404240v5                                    4

1  confirmation in order to close; the alternative of proceeding to confirmation without a purchaser

2  in place would create a greater risk -- both because of the difficulty of going forward with a plan

3  and disclosure statement without an identified buyer and terms (i.e. dividing the pie without

4  knowing whether there is one); and because the representatives appointed to weigh in on these

5  issues believe that it would be more costly and risky to go forward with confirmation first than to

6  go forward with sale first.

7          The FTD Fund Committee is hopeful that the discussion herein, as well as

8  supporting documents being filed by all affected groups, will assist the Court in appreciating the

9  attention that has been given to the intricacies of the integrated sale and confirmation process

10  necessary to extricate the creditors and investors from the dire situation in which they were

11  placed by prior management.  While any approach has both costs and risks, the representatives of

12  each of the creditor and investor groups, along with the Debtors, have spent substantial effort and

13  given tremendous thought as to the complex and intertwining issues presented.

14                                    **II.**

15                    **THE PROPOSED SALE OF ASSETS**

16          In order to put the Motion in proper context, the Court needs to understand which

17  assets are proposed to be sold and the price to be paid for such assets  by the proposed Stalking

18  Horse bidder

19      A.      Assets for Sale.

20          In the time since the Motion was filed, USACM and FTD Fund (together, the

21  "Sellers"), DTD Fund, USA Securities, and Realty Advisors (the "Acknowledging Parties"), and

22  SPCP Group, LLC ("Silver Point"), entered into that certain Asset Purchase Agreement, dated as

23  of October 19, 2006 (the "APA"), which was submitted to the Court on the very same day.

24  Pursuant to the APA, Silver Point will purchase the following assets:

25          •    FTD Fund's proportional interest in 44 different loans[2] (the "First Trust

26               Deed Fund Assets") for cash consideration of $46 million, subject to

27               certain adjustments (the "First Trust Deed Fund Price"); and

28  _____

[2]   The APA lists 46 loans, but two of the loans listed paid off subsequent to July 31, 2006.

1        • USACM's post-closing rights to service loans pursuant to the loan
2            servicing agreements for the USACM portfolio and related personal
3            property (the "Commercial Mortgage Assets" and together with First Trust
4            Deed Fund Assets, the "Property") for cash consideration based on the
5            future (i) collection of servicing fees, (ii) collection of default rate interest
6            and (iii) other payments and obligations set forth in the APA (the
7            "Commercial Mortgage Price").

8    **B.    First Trust Deed Fund Price.**

9            The APA provides for a purchase price for the First Trust Deed Fund Assets of

10   $46 million, subject to certain adjustments.[3]  Based on the current aggregate principal balance of

11   $63,539,756 for First Trust Deed Fund Assets, the base First Trust Deed Fund Price will yield a

12   72.4% return to the FTD Fund.

13           The APA contemplates different price adjustments with respect to the First Trust

14   Deed Fund Price.  First, the APA has built-in price adjustments that enhance the recovery to the

15   FTD Fund to the extent that principal payments on FTD Fund loans are received after July 31,

16   2006 (the "Cut-Off Date") and the closing of the sale.  These adjustments provide for a partial

17   reduction in the purchase price (ranging from 65% to 95% of the principal collected) for each

18   dollar of principal collected prior to the close of the sale.  As the First Trust Deed Fund Price will

19   be reduced by less than the amount of the principal actually received by the FTD Fund, the net

20   effect of any principal pay downs on the First Trust Deed Fund Assets after the Cut Off Date will

21   be an increase on the overall return to the FTD Fund.[4]

22           Second, the APA has another price adjustment mechanism in the event the

23   _____

24   [3]  The First Trust Deed Fund Price specified in the Offer Letter was modified to address certain
25   issues regarding the First Trust Deed Fund Assets that came to light during Silver Point's
     due diligence process

26   [4]  For example, assume that, between the Cut-Off Date and the close of the sale, the FTD
27   Fund's proportionate share of the principal collected is a hypothetical $10 million , which
     falls within the 85% adjustment level contained in the APA, instead of reducing the purchase
28   price by the full $10 million of principal collected, the purchase price would be reduced by
     only $8,500,000 (i.e., 85% of $10 million).  The FTD Fund would retain the $10 million
     collected, thereby increasing the recovery percentage from 72.4% to 74.75%.

404240v5                              6

1    reported principal balance of the First Trust Deed Fund Assets as of the Cut Off Date proves to

2    be inaccurate.[5]  These adjustments will not be made on a dollar-for-dollar basis, but rather, will

3    be made according to the same "buckets" that are used to account for principal payments (i.e.,

4    ranging from 65% to 95%).  These downward adjustments in the First Trust Deed Fund Price

5    will be netted against any amounts by which the reported principal balance of the First Trust

6    Deed Fund Assets as of the Cut Off Date proves to be too low.[6]

7            Finally, all parties agree that there are certain title issues regarding one of the

8    FTD Fund loans that require further development and analysis.  To the extent that the Debtors

9    are able to resolve these issues by delivering an appropriate title policy endorsement, the First

10   Trust Deed Fund Price will be increased by $250,000.

11       **C.    Commercial Mortgage Price.**

12           The APA provides that in exchange for the Commercial Mortgage Assets,

13   USACM will receive interests in the collection of annual servicing fees as set forth in section

14   2.2(b) and 7.2(b) of the APA and default rate interest on the FTD Fund loans up to an

15   approximate amount of $550,000.  This sum is comprised of (a) 50% of the first $1,000,000

16   collected by Silver Point for annual servicing fees under the applicable loan servicing agreement

17   following reimbursement of all expenses incurred by Silver Point in connection with its

18   enforcement efforts and (b) 50% of the first $100,000 collected of default rate interest accrued on

19   the FTD Fund loans as of the date on which the order approving the Sale becomes a final order

20   (the "Closing Date").  In addition, while offers were made for the pre-closing servicing rights,

21   USACM elected to retain all pre-close accrued servicing fees and related fees.  Thus, after the

22   Closing Date, Silver Point will collect and pay over to USACM certain amounts, including (a) all

23   servicing fees accrued but unpaid as of the Closing Date and (b) all late charges and default

24

25   _____

26   [5]  All parties recognize that Debtors' new management has done all that it could in
     reconstructing the Debtors' records, but, in the end, Debtors' new management, like a chapter

27   7 trustee, cannot guarantee any of the records they have used in re-creating the Debtors'
     records.

28   [6]  Because the netting occurs on a "bucket by bucket" basis, the mechanic to implement this
     concept became admittedly complicated and lengthy.

1  interest due, but unpaid, from borrowers as of the Closing Date, with the exception of the

2  proportionate default interest in respect of the First Trust Deed Fund Assets.  In addition, Silver

3  Point will also perform certain services on behalf of USACM's estate to assist USACM in the

4  collection of its other assets, which it has elected to retain, including exit fees, extension fees,

5  and deferred origination fees, among others.

6                                                    III.

7  **THE FTDF COMMITTEE SUPPORTS THE AUCTION AND SALE PROCESS**

8              The FTDF Committee's decision to support the proposed sale to Silver Point

9  pursuant to the terms of the Offer Letter (and now pursuant to the APA) is based on extensive

10  analysis by the FTDF Committee and its professionals

11       A.    **The Proposed Sale Transaction Subject to the Auction Process is in**
              **the Best Interests of FTD Fund's Estate.**
12
              The FTDF Committee believes that proposed sale transaction, subject to the
13
14  auction process, is in the best interests of the FTD Fund estate and provides for the best

15  mechanism to maximize the recovery to the FTD Fund investors.  In order to gain comfort as to

16  the purchase price of the First Trust Deed Fund Assets, the FTD Fund Committee's professionals

17  spent considerable time and effort evaluating the ultimate recovery on the FTD Fund assets on a

18  standalone basis, the timing and cost of such recovery and the myriad of risks and uncertainties

19  inherent in achieving such recovery.  After evaluating the potential range of recovery values to

20  the FTD Fund relative to the risks, costs and uncertainties associated with such potential

21  recovery values, the FTD Fund Committee supported the purchase price agreed to by the Debtors

22  for the purchase of the First Trust Deed Fund Assets for several reasons.  First, the sale process

23  eliminates the timing and collection risk inherent in the continued workout of the FTD Fund

24  loans.  Second, the sale process removes the dilution of recoveries to investors from the

25  continued administrative burden associated with administering these Chapter 11 Cases and the

26  costs of collection and work out of the FTD Fund loan portfolio.  Third, the auction process and

27  purchase price adjustments for principal collections prior to the close of the sale is likely to

28  provide a higher recovery than that contained in the APA.  Accordingly, the FTD Fund

Committee believes that the proposed sales transaction, subject to the auction process, provides

404240v5                                              8

1    the best means to maximize the value to the FTD Fund investors.

2           **1.**       **The sale process eliminates the timing and collection risk**
                     **inherent in the continued workout of the FTD Fund loans.**

3

4           As of August 31, 2006, approximately half of FTD Fund's loan portfolio is

5    classified as being non-performing. The FTD Fund's options with respect to these non-

6    performing loans are very limited and will likely require advancing significant funds to pursue

7    collection efforts. The FTD Fund (along with Direct Lenders with shared interests in the FTD

8    Fund properties) may be required to proportionately fund the costs related to the foreclosure and

9    bankruptcy process, as well as the costs of the maintenance of the properties (including payment

10   of current and, in certain cases, potentially past due property taxes) it holds an interest in prior to

11   their disposition. As stated previously, the "low hanging fruit" has been picked in this case.

12   Despite the Debtors' best efforts, the Debtors' estates are approaching administrative insolvency

13   as the professional fees continue to mount and the performing loan cash flow stream continues to

14   decline. As the number of non-performing loans exceeds the number of performing loans, the

15   servicer will need to suspend distributions in order to build a war chest to begin collection

16   activities on the increasing number of delinquent borrowers. Thus, we are rapidly approaching a

17   point where the FTD Fund would have the choice of leaving the servicer with inadequate

18   liquidity to complete its articulated objectives or advance funds to the servicer in excess of its

19   pro rata allocation of such obligations.

20          Moreover, the collection efforts and related litigation would be complicated by

21   the fact that the FTD Fund owns only partial interests in the vast majority of the First Trust Deed

22   Fund Assets. Thus, the FTD Fund could not on its own negotiate settlements or compromises of

23   non-performing loans. Before any loan servicer can accept a reduced principal payment as a

24   payoff on a loan, it must first have consent from 100% of the Direct Lenders on such loan, which

25   in the case of certain of the FTD Fund loans involves hundreds of Direct Lenders. All of the

26   foregoing, significantly constrains the ability of the FTD Fund to workout these loans.

27          Further, a myriad of economic factors outside of the Debtors', or any other

28   servicer's, control may impair the ultimate recovery on the FTD Fund loans including, but not

limited to: (i) the lack of projected demand for projects financed by the FTD Fund loans, (ii) the

404240v5                    9

1     inability to refinance projects at par due to cash flow constraints in a market with increasing

2     interest rates, and (iii) a downturn in real estate values or tightening of credit standards from

3     potential lending sources.

         **2.    The sale process eliminates the dilution of recoveries due to the continued administrative burden associated with the collection and work out of the FTD Fund loan portfolio.**

6       The sale of the First Trust Deed Fund Assets eliminates the FTD Fund's

7     continuing obligation to fund burdensome administrative and collection costs. The FTD Fund

8     servicing agreement provide for a servicing fee of "up to 3%". Until July 2006, USACM elected

9     only to charge the FTD Fund a 1% servicing fee. Due to the USACM Committee's demand,

10    USACM is now holding back an additional 2% servicing fee from the FTD Fund. Furthermore,

11    many of the FTD Fund loans (since more than 50% are non-performing) will require significant

12    collection costs and foreclosure costs that will be deducted from the ultimate recovery on the

13    underlying loans. Additionally, if the FTD Fund or a trust entity were to remain in existence

14    after confirmation of a plan of reorganization, distributions to the FTD Fund members would be

15    depleted by the costs of the transition from bankruptcy as well as the future administrative costs

16    (including necessary professional fees) of operating the FTD Fund post-effective date. All of

17    these costs would be paid from the FTD Fund loan portfolio, thereby reducing the ultimate

18    recovery available for to FTD Fund members.

         **3.    The auction process and the adjustments for principal collections prior to the close of the sale provide for a potentially higher recovery than contained in the Silver Point LOI.**

22       While Silver Point was chosen by the Debtors as the "stalking horse" for the

23    auction process at a base price that was acceptable to the FTD Fund Committee, key to the FTD

24    Fund Committee's decision to support the sale transaction was the likelihood of overbids to be

25    obtained through an auction process. Accordingly, the Debtors continue to discuss with, and

26    market the sale of the Debtors' assets to, other parties, and there have been numerous expressions

27    of interest received to date with two parties "pre-qualified" as set forth in the Bid Procedures

28    Motion. The APA creates a "floor" for a process by which the FTD Fund can explore what these

     assets will bring when exposed to the market. In fact, the mere fact that Silver Point has entered

404240v5

1   into the APA is likely to attract more interest from other bidders in the proposed transaction by

2   establishing the credibility of the value of the Property.  Further, the FTD Fund Committee

3   negotiated a favorable purchase price adjustment for the FTD Fund to the extent that principal

4   payments are received prior to the Closing Date.  With the sale of the First Trust Deed Fund

5   Assets conditioned upon the completion of an auction process to facilitate the submission of

6   higher bids for the First Trust Deed Fund Assets and a purchase price adjustment mechanism in

7   the FTD Fund's favor in the event that loans paid off prior to the closing of the sale, the FTD

8   Fund Committee believes that the highest market price for the First Trust Deed Fund Assets

9   would be realized in such an auction and sale process.

**B.    The Proposed Auction and Sale Benefits All of the Debtors'
        Constituents.**

As described in more detail above, the Debtors propose to auction the First Trust

Deed Fund Assets and the post-Closing servicing rights of USACM.  Nevertheless, the proposed

sale and auction process provides substantial benefits to each of the Debtors and all of their

constituents other than the DTD Fund who, due to the uncertainties associated with the majority

of the loans in its fund, has elected to pursue the collection of its loans separately from the other

Debtors.

Regardless of whose assets are being sold, all of the constituencies in these cases,

including the Direct Lenders, will benefit greatly from the proposed auction and sale process.

First, all Direct Lenders will be assured that their loan servicing agreements will be transferred to

a qualified loan servicer who has a vested interest in collecting the loans and is not requiring an

upfront advance of collection costs.  A prerequisite for a potential bidder ("Potential Bidder") to

participate in the auction process includes the submission of not only written evidence of its

financial ability to close the sale, but also written evidence of evidence of its qualifications to act

as a loan servicer and its ability to perform the obligations under the Loan Servicing Agreements.

No sale transaction will be approved unless the proposed loan servicer is qualified to service the

USACM loan portfolio.  Moreover, direct lenders will now have the benefit of having a loan

servicer who has a vested interest in more than a third of the loans as the loan servicer is

404240v5                                    11

1  expected to own the FTD Fund's portfolio of partial interests in loans.  Finally, by consummating

2  the sale through a plan on the proposed timetable, the Debtors' estates will relieve themselves of

3  the enormous administrative burden of these cases.  Once these assets are sold and the loan

4  servicing rights are transferred to a third party, the Debtors' estates will cease to incur the costs

5  of the Debtors' professionals, which have been, to date, accruing at more than $1 million per

6  month. There is no question that the sale transaction benefits all constituencies by bringing these

7  cases to as rapid a close a possible.

8       **c.**    **The Structure of the Stalking Horse Bid Will Ensure that the Debtors**
                 **Maximize the Value of Their Collective Assets.**

9

10       As described further below, the First Trust Deed Fund Assets and Commercial

11  Mortgage Assets are being sold together as one package. Silver Point's stalking horse bid is

12  representative of, and favorable to, the other bids that the Debtors received in that Silver Point

13  expressed an interest in purchasing the loan servicing rights, along with all fractional interests in

14  loans that were available (which turned out to be only the FTD Fund loan portfolio for the

15  reasons described above).  The market place has recognized that a synergy exists in purchasing

16  these assets together as potential bidders have expressed a belief that the whole is greater than

17  the sum of the parts due to the considerable collection costs that are required to monetize all of

18  the remaining loans.  Indeed, Silver Point, and nearly all of the other identified bidders have

19  expressed a desire to purchase MORE of the Debtors' excluded assets. Due to the numerous

20  fractional interests in each loan and the likelihood that most, if not all, of the collection costs will

21  need to be advanced by the servicer, the only bids received that provided material value to both

22  the FTD Fund and the USACM estate were those offers that conditioned their offers on acquiring

23  both the servicing rights and the FTD Fund loans so that the upfront cash needs of the purchaser

24  for collection remedies could be initially subsidized by the collections on the FTD Fund loans.

25       While the FTD Fund Committee understands that the Debtors have received some

26  inquiries from loan servicers to "purchase" just the rights of loan servicing, both before and after

27  receiving the initial bid of Silver Point, the FTD Fund believes that none have offered to

28  purchase the servicing rights on the same or better terms than those offered by Silver Point.  In

fact, none of the offers for servicing rights presented to the FTD Fund Committee exceeded the

404240v5                       12

1  book amount of accrued but unpaid servicing fees. As a result of marketing the Debtors' assets

2  prior to the selection of the Silver Point, it is the understanding of the FTD Fund Committee that

3  the Debtors believed it was in the interests of the Debtors' estates to sell these assets jointly. The

4  Debtors, however, have left open in the bid procedures the possibility of a joint bid by a loan

5  servicer, who would acquire just the loan servicing rights, and another party, who would acquire

6  the FTD Fund loan portfolio. Nevertheless, the Debtors believe that marketing the assets

7  together will provide the greatest return to both the USACM and FTD Fund estates, and proposes

8  to auction these assets together in response to the considerations raised in the marketplace.

9                                                  IV.

10  **THE BID PROCEDURES, INCLUDING THE BREAK-UP FEE, WILL ENCOURAGE**
                                          **BIDDING**

11

12                At the hearing on October 19, 2006, the Court expressed several concerns about

13  the bid procedures negotiated by the parties. These concerns include why the Debtors are

14  proposing to sell the First Trust Deed Fund Assets and USACM's loan servicing rights in one

15  package and the necessity and amount of the Break-Up Fee. The FTD Fund Committee believes

16  that the Bid Procedures will function to maximize value for all of the estates.

17        A.    **The Bid Procedures Provide for Uniformity and Transparency in the**
              **Bidding Process and Ensure that No Single Debtor Will Be Favored Over**
18            **Other Debtors.**

19                The Debtors and the Official Committees worked diligently with Silver Point to

20  craft straightforward, transparent procedures that will encourage competitive bidding at the

21  Auction by entities qualified to service loans and with the financial capability to close an

22  acquisition transaction. In order for Potential Bidders to perform due diligence and examine the

23  Assets, Potential Bidders must show, among things, that they are both financially qualified to

24  consummate the transaction and qualified to service loans. Once Potential Bidders have satisfied

25  the Preliminary Qualifications, they are given more than a sufficient amount of time to submit

26  Qualified Bids. Thus, the Bid Procedures serve to filter out Potential Bidders who are unsuitable

27  to act as loan servicers or who are not otherwise financially capable of closing the sale, while at

28  the same time welcoming those Potential Bidders who are qualified to service loans and do have

the financial wherewithal to close the transaction to participate in the sale process.

1    The Bid Procedures contemplate a sale of the First Trust Deed Fund Assets along
2    with USACM's servicing rights because the Debtors and the Committees have determined that
3    the value is maximized through a combined sale.  As discussed above, there have been no
4    expressions of interest for the servicing rights alone in excess of the Silver Point offer and when
5    marketed alone, the First Trust Deed Fund Assets may lose a substantial portion t of their value.
6    Given these facts, the Bid Procedures provide for a joint sale that ensures that neither the FTD
7    Fund nor USACM will be favored over one another by Potential Bidders.  Potential Bidders
8    cannot collude with one Debtor or Official Committee to the detriment of the other Debtor
9    because there is a single purchase price for the Property and the purchase allocation is left to the
10   estates and not the Potential Bidders.  If the sale of such assets was not linked, Potential Bidders
11   could attempt to pit the FTD Fund against USACM to create a situation in which the price of
12   either or both of the First Trust Deed Fund Assets and USACM's servicing rights are driven
13   down.  Both estates benefit from the sale of their assets in a combined package.

14    The parties realize that they must address how to allocate the overbids for the
15   Property, but they view this issue as simply another issue to be dealt with in the context of a
16   global settlement under the Plan.  The FTD Fund Committee firmly believes that many of the yet
17   to be resolved issues in the Chapter 11 Cases, from professional fee allocation to payment of
18   servicing and management fees to allocation of an overbid at the Auction are interrelated and are
19   best addressed at once with all relevant parties participating in the resolution process. If the FTD
20   Fund (or any of the estates) are forced to resolve these economic issues in a piecemeal fashion,
21   they will not maximize value for their constituencies.  The parties have made substantial effort
22   and significant progress working towards a global resolution of these cases to be incorporated
23   into a plan of reorganization and the FTD Fund Committee is optimistic that a global settlement
24   is near.

25   **B.    The Break-Up Fee, Which Is Supported by the Debtors and the Official**
26   **Committees, Is Necessary and Is in the Best Interests of the Debtors' Estates**
     **and Their Constituencies.**
27

28    As set forth in detail in the Bid Procedures Motion and the Debtors' reply (the
"Bid Procedures Reply") to the opposition of Capital Crossing Bank to the Bid Procedures

404240v5                                          14

1  Motion, the Break-Up Fee is necessary and appropriate in the Chapter 11 Cases. All of the

2  Official Committees strongly support the Break-Up Fee. Additionally, the FTD Fund

3  Committee, like the Debtors, believes that had the parties not agreed to the Break-Up Fee, Silver

4  Point (nor any of the other potential bidders) would not have executed the Agreement and there

5  would not be a stalking horse bidder for the Property.

6          The Break-Up Fee is primarily payable upon closing of the sale of the Property to

7  a Successful Bidder and that the Break-Up Fee is to be paid by the Successful Bidder, not the

8  Debtors' estates. As such, the Debtors' estates will not pay the Break-Up Fee from estate assets.[7]

9  Indeed, because the Bid Procedures couple the Break-Up Fee with a specific initial overbid

10  increment that pays the Break-Up Fee and Expense Reimbursement in full, the estates are further

11  ahead on a net/net basis even after paying the Break Up Fee.

12          Moreover, to the best of the FTD Fund Committee's knowledge, no bidder who

13  approached the Debtors offered to become the stalking horse bidder without a break-up fee.

14  Indeed, not only was Silver Point's proposed break-up fee less than that of other bidders, but the

15  Debtors and the FTD Fund Committee were successful in negotiating Silver Point's break-up fee

16  down significantly to its current proposed level.

17          The FTD Fund Committee believes that the Break Up Fee creates value for these

18  estates. First, an Auction with a committed Stalking Horse is the only way the FTD Fund

19  Committee will go forward with a sale—a floor on the sale price allows the FTD Fund

20  Committee, as fiduciaries, to embrace the sale process and eliminates the uncertainty associated

21  with selling the assets relative to continuing to workout the loans on a standalone basis. Without

22  a Break Up Fee, no buyer was willing to complete its due diligence and give a binding offer that

23  provided that floor and then be subject to overbid. In fact, based on the increased activity and

24  interest in the purchase of the various assets, it appears that the terms of the Silver Point purchase

25  offer have increased the interest in the assets rather than create an impediment towards obtaining

26

27  [7]  The only other instance in which the Break-Up Fee would be payable is if the parties are

28       unable to close the transaction by the Outside Approval Date, which date is 120 days from
         October 19, 2006, and within nine months of such date the Property is sold to a third party
         for a price equal to or greater than the APA purchase price.

404240v5                                    15

1   higher and better offers.

2                                          V.

3   **AN AUCTION PROCESS FOLLOWED BY PLAN CONFIRMATION IS IN THE BEST
    INTERESTS OF THE DEBTORS' ESTATES**

4

5       A.      **Proposed Timing to Exit These Chapter 11 Cases.**

6               The FTD Fund Committee believes that the proposed sale is the best means by

7   which to reach a global resolution to the Chapter 11 Cases and, thereby, achieve finality for FTD

8   Fund members while at once stemming the mounting professional fees necessary to administer

9   the Chapter 11 Cases. Accordingly, the Debtors have worked with the Committees and Silver

10  Point to craft a timeline, incorporated into the Offer Letter and APA, for implementing the sale

11  and plan confirmation process that will expeditiously conclude the Chapter 11 Cases while

12  maximizing the value of the Debtors' estates. The key remaining dates of the proposed timeline

13  are as follows:

14      •   **November 6, 2006**: Deadline for order approving the Bid Procedures Motion
            to become a final, non-appealable order (must occur no later than 55 days
15          after execution of the Offer Letter). If this condition is not met, pursuant to
            the APA, Silver Point shall be deemed to have rescinded the Offer Letter.

16
        •   **November 13, 2006**: Hearing on approval of the Disclosure Statement.
17

18      •   **November 30, 2006**: Deadline to submit Qualified Bids (one week prior to
            the Auction). This assumes that the Auction is held on December 7, 2006.
19

20      •   **December 7, 2006**: The proposed date of the Auction.

21      •   **December 15, 2006**: The proposed hearing date on Plan confirmation.

22      •   **December 26, 2006**: Earliest date by which an order confirming the Plan may
            become a final, non-appealable order and, in turn, closing of the sale may
23          occur (assumes that a confirmation order is entered on December 15, 2006).

24      •   **February 5, 2006**: Deadline for entry of order confirming the Plan without
            violating the Outside Approval Date (see below).
25

26      •   **February 16, 2006**: The Outside Approval Date.[8] If the Plan is not

27  _____

    [8]  The Outside Approval Date is 120 days from the Due Diligence Completion date, which is
28  October 19, 2006. Because 120 days from October 19, 2006 is Saturday, February 17, 2007,
    this timeline adopts Friday, February 16, 2007 as the Outside Approval Date out of an
    abundance of caution.

1    confirmed by a final, non-appealable order of the Bankruptcy Court as of this
2    date, Silver Point shall be released from any further obligation to perform
     pursuant to the Offer Letter or the Plan. So long as Silver Point is not in
3    breach of the Asset Purchase Agreement on this date, Silver Point is entitled
     to the Expense Reimbursement (subject to Bankruptcy Court approval of the
4    Bid Procedures).

5              If implemented, this aggressive timeline will result in the Debtors' emerging from

6    chapter 11 around the New Year. At such time, creditors, Direct Lenders, and Fund members

7    will be free of the constraints and burdens of being mired in bankruptcy and will be able to move

8    forward in accordance with the Plan. FTD Fund members will receive a substantial amount of

9    their initial investments in the FTD Fund, while Direct Lenders will be ensured that their loans

10   will continue to be serviced by a qualified entity and DTD Fund members may focus their efforts

11   of their ongoing collection efforts without any distractions from the administration of these

12   chapter 11 cases. USACM creditors will receive consideration from the sale transaction, as well

13   as other assets they are retaining that will be liquidated over time without bearing the enormous

14   cost of compensating a reorganization professional to operate the USACM servicing operations.

15   Indeed, all creditors, Direct Lenders, and Fund members will no longer have to bear the burden

16   paying professionals fees the numerous law firms and financial advisors that are necessary so

17   long as the estates remain in chapter 11.

18             In addition, the Debtors and Committees believe that the nature of the assets

19   mandates that the auction, which will lock-up the successful bidder in a relatively short

20   timeframe, be held prior to the plan confirmation process. As emphasized above, this case

21   centers on a portfolio of 93 loans. These are relatively short-term loans that have a term of 1 to 5

22   years, with many of the loans maturing in the coming months. Moreover, over one- half of these

23   loans are non-performing. As non-performing loans are more expensive to service since they

24   require initial outlays of capital to fund collection efforts and foreclosure costs, it is critical that

25   the loan service agreements are transferred at a time when the Debtors transfer the rights to

26   service both performing and non-performing loans. Further, delay may deplete the numbers of

27   potential servicing entities interested in the sale transaction as such entities may not want to be

28   obligated to provide a significant capital outlay with only a delayed return expected, if any. In

404240v5                                    17

1    addition, it is also critical that the FTD Fund sell its loan portfolio quickly as the attempts by the

2    DTD Fund and USACM to sell their interests demonstrate that not much of a market exists for

3    either non-performing loans or a small portfolio of fractional interests in loans.  As delay will

4    only hinder efforts to maximize value for these assets, it is crucial that USACM and FTD Fund

5    land a stalking horse buyer as soon as possible.

6              Furthermore, the sale is expressly linked to confirmation of a plan of

7    reorganization, which will ensure that the sale takes place inside the context of a plan that offers

8    a global resolution to these cases.  As outlined below, alternative strategies are simply not

9    feasible or offer inferior solutions.

10    **B.    A 363(b) Sale Outside of a Plan of Reorganization Fails to Offer a
           Global Solution to these Cases.**

11

12              While conducting a sale under section 363(b) of the Bankruptcy Code (a "363(b)

13    Sale") is often preferable to selling assets under a plan, such is not the case here, where the

14    Debtors and the Committees are attempting to employ an asset sale as part of a global resolution

15    through a Plan, in accordance with the policies of the Bankruptcy Code.

16              While the parties considered effecting the sale of the Property through a 363(b)

17    Sale, the parties concluded that the Court and other parties-in-interest would view such a sale as

18    an effort to disenfranchise constituencies from the plan process.  Only a plan gives the Direct

19    Lenders (who contend they are not creditors) and the members of the FTD Fund and the DTD

20    Fund (equity) a meaningful understanding of what they will get at the end of the day, how they

21    will get it and, more importantly, established procedures for  letting their desires be known –

22    either through voting on the Plan or objecting to confirmation. Furthermore, conducting a sale of

23    the First Trust Deed Fund Assets pursuant to section 363(b) of the Bankruptcy Code rather than

24    through the plan confirmation process would undermine the goal of the Debtors and the Official

25    Committees to resolve as many issues as possible at once so as to curb the increasing costs of the

26    Chapter 11 Cases and maximize the value of all five Debtor estates.  Carrying out a 363 Sale to

27    be followed perhaps months later by plan confirmation would needlessly prolong the Chapter 11

28    Cases and, as such, would cost additional millions of dollars in professional fees while

continuing to leave creditors, Direct Lenders, and fund members mired in uncertainty.

1  Moreover, carving out the sale of the First Trust Deed Fund Assets from the plan process would

2  simply create another hurdle to achieving plan confirmation: if the First Trust Deed Fund Assets

3  are liquidated through a 363(b) Sale, the FTD Fund estate will hold the proceeds of the sale but

4  will have no mechanism by which to distribute such proceeds until a plan is confirmed.  Further,

5  the liquidation of the First Trust Deed Fund Assets without a negotiated plan would cause

6  litigation among the estates as each estate reaches for a share of the liquidated First Trust Deed

7  Fund Assets on account of asserted intercompany claims – these estate disputes only are resolved

8  completely through a global resolution under a plan.  A 363 Sale in a vacuum results only in the

9  partial resolution of the issues of a sole estate, while the four other Debtors must continue to

10  determine their chapter 11 exit strategies.

11          In stark contrast, selling the First Trust Deed Fund Assets through the plan will

12  ensure that the Bankruptcy Code's plan protections are not eviscerated with respect to the FTD

13  Fund, while simultaneously allowing the Debtors to expeditiously bring closure to the Chapter

14  11 Cases in a manner that maximizes the value of all of the Debtors' estates.

15     **c.    Requiring that the Plan Confirmation Process Precede the Auction
16             Will Hinder The Marketing of the Debtors' Assets and Chill Bidding.**

17          At the October 19th hearing, the Court expressed concern for proceeding with the

18  auction prior to the plan confirmation process due to the perceived risk that the FTD Fund

19  investors may not elect to vote in favor of the sale transaction, which would then trigger the

20  expense reimbursement obligation to Silver Point.  As explained above, it is essential that the

21  Debtors lock-up the successful bidder as quickly as possible.  As fewer performing loans remain

22  available for sale, there will be less interest from potential overbidders, which will reduce any

23  value to be generated through the auction process.  Moreover, the FTD Fund Committee has

24  little confidence that the Debtors would be able to secure a stalking horse that is willing to wait

25  the necessary time for the Debtors to obtain approval of a disclosure statement, solicit

26  acceptances on a plan, and obtain plan confirmation.  Under the Debtors' already very aggressive

27  timeline, the earliest that a plan could be confirmed, pursuant to a final order, is the end of

28  December 2006.  However, under this scenario the auction takes place in early December, giving

the stalking horse (as well as potential overbidders) some sense of certainty before the close of

404240v5                                    19

1   this year. If forced to have the plan confirmation process precede the auction, it is most likely

2   that the earliest a sale could close is some time in February 2007 (or later) – a seven month wait

3   to acquire the purchased assets is extensive even in the bankruptcy setting. The FTD Fund

4   Committee believes that given the nature of the estates' assets, it is simply unrealistic that any

5   potential bidder would commit to being a stalking horse bidder (which is entitled to no guarantee

6   that it will ultimately acquire the assets) for such a long period of time without any further

7   assurances from the Debtors or the Court. It is one thing to lock up $46 million in credit with the

8   certainty that it will be used for its intended purpose, but it is another thing to lock up $46

9   million for only the chance to buy the Debtors' assets. Delaying the auction until after the Plan

10  confirmation is likely to result in no sale transaction – not due to the lack of votes by the FTD

11  Fund members, but rather because there will no longer be a purchaser for the First Trust Deed

12  Fund Assets. For these reasons, the FTD Fund Committee fully supports the process of

13  conducting the auction prior to the plan confirmation process.

14                                      **CONCLUSION**

15          For the reasons set forth herein, as well as in the Bid Procedures Motion and the

16  Bid Procedures Reply, the FTD Fund Committee respectfully requests that the Court grant the

17  relief requested in the Bid Procedures Motion.

18

19

20  FRANK A. MEROLA (CA State Bar No. 136934),
    EVE H. KARASIK (CA State Bar No. 155356), and

21  ANDREW M. PARLEN (CA State Bar No. 230429), Members of
    STUTMAN, TREISTER & GLATT, P.C.

22  1901 Avenue of the Stars, 12th Floor
    Los Angeles, CA 90067

23  Telephone: (310) 228-5600

24  and
    CANDACE C. CARLYON

25  Shea & Carlyon, Ltd.
    228 S. Fourth Street, First Floor

26  Las Vegas, NV 89101
    Telephone: (702) 471-7432

27  COUNSEL FOR THE
    OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

28  OF USA CAPITAL FIRST TRUST DEED FUND, LLC

404240v2                                    20