Annette W. Jarvis, Utah Bar No. 1649
Steven C. Strong, Utah Bar No. 6340
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146-5308
Telephone:  (702) 228-7590
Facsimile:  (702) 892-0122
E-Mail:  bkfilings@s-mlaw.com

Attorneys for Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br><div align="right">Debtor.</div> | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br><div align="right">Debtor.</div> | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR<br><br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br><div align="right">Debtor.</div> | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br><div align="right">Debtor.</div> | Date:  October 30, 2006<br>Time:  10:30 a.m. |
| In re:<br>USA SECURITIES, LLC,<br><div align="right">Debtor.</div> | **DECLARATION OF THOMAS J. ALLISON IN OPPOSITION TO U.S. TRUSTEE'S MOTION TO CONVERT CASES** |
| Affects:<br>☒  All Debtors<br>☐  USA Commercial Mortgage Company<br>☐  USA Securities, LLC<br>☐  USA Capital Realty Advisors, LLC<br>☐  USA Capital Diversified Trust Deed Fund, LLC<br>☐  USA First Trust Deed Fund, LLC | |

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

I, Thomas J. Allison, hereby declare, verify and state as follows:

1.   I make this Declaration solely in my capacity as Chief Restructuring Officer of USA Commercial Mortgage Company ("USACM"), USA Capital Diversified Fund, LLC ("Diversified Fund"), USA Capital First Trust Deed Fund ("FTD Fund"), USA Capital Realty Advisors, LLC and USA Securities, LLC (collectively, "Debtors").

2.   The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on April 13, 2006 (the "Petition Date") and their cases are being jointly administered pursuant to an order of this Court.  The U.S. Trustee ("UST") appointed four official committees (the "Committees") in these cases.

3.   On October 24, 2006, on the eve of the continued hearing on the Debtors' motion for approval of bid procedures and protections relating to the Debtors' proposed sale of assets pursuant to an auction and in connection with a plan of reorganization, which motion was fully supported by each of the four Committees appointed by the UST, the UST filed a motion to convert the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code (the "Motion to Convert").

4.   For many reasons, including those stated below, I believe that conversion of the Debtors' cases to chapter 7 at this crucial stage would be a disastrous event for creditors, fund members, direct lenders, and other parties in interest in these cases.  Now that an asset purchase agreement ("APA") has been executed between the Debtors and SPCP Group, LLC ("Silver Point"), and the Court has approved the bid procedures and protections associated with subjecting Silver Point's bid to higher and better offers, and an auction has been set for December 7, 2006 to establish the successful bidder for substantially all of the assets of FTD Fund and the loan servicing business of USACM which is the cornerstone of the Debtors' proposed plan of reorganization, these cases are

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

on a fast track heading toward a confirmation hearing on a consensual plan of reorganization. Indeed, the Debtors and Committees are close to completing their negotiations for a comprehensive plan of reorganization that I believe will result in a much greater return to the creditors of the Debtors' estates and to the fund members of FTD Fund and Diversified Fund (collectively, the "Funds"), as well as to the direct lenders, than would a chapter 7 liquidation.

5.    If the Debtors' cases were to be converted to cases under chapter 7, I believe there would be an immediate and substantial decrease in the value of the estates of the three principal Debtors (USACM, FTD Fund, and Diversified Fund) for several reasons.  First, certain synergies now exist from being able to package assets of the Debtors together in a sale that are likely to be lost if a trustee or multiple trustees are appointed in these cases.  Indeed, if a trustee is appointed, it is more likely the Debtors' assets will be sold in a piecemeal fashion that will net less to the Debtors' estates than a packaged sale.  Second, once a conversion occurs, it is my opinion that potential purchasers will not be willing to pay as much for the Debtors' assets as they are now because there is a common perception that once a case is converted to a chapter 7, the debtor's assets will be available for sale at "fire sale" prices.  Third, administrative expenses will continue to be significant even if a new chapter 7 trustee (or multiple trustees) is appointed because the chapter 7 trustee will have to employ new counsel and new financial advisors, and they will face a lengthy and very steep learning curve to become familiar with the loans, the borrowers, the collateral, the significant claims that exist against the Debtors' prior management, and all of the relevant facts and circumstances necessary to maximize the value of the loan portfolios for the benefit of the Funds' creditors and members.  Fourth, the further delay occasioned by the appointment of a chapter 7 trustee (or trustees) and his/her need to get up to speed will in my opinion further decrease the value of the Debtors' loan portfolio because the development projects securing the loans must immediately move forward and are not capable of withstanding further delay.  Indeed,

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

3

the Debtors have already been sued twice for failing to fully fund the construction budgets on two loans, and more litigation has been threatened.  Fifth, a chapter 7 trustee may be unwilling or, given the dire financial circumstances of the Debtors, unable to collect any of the remaining loans outstanding, or alternatively would likely have to accept substantial discounts in order to liquidate the remaining loans.  Indeed, the two Funds' assets consist almost entirely of loan receivables that will require substantial additional effort (and in some cases litigation) to collect.

6.   I also believe that conversion would cause an immediate and substantial loss in the value of the USACM estate due to a steep decrease in the value of USACM's loan servicing agreements and its ability to collect the fees, costs and other income that it is contractually entitled to receive under agreements with the borrowers and the direct lenders.  For example, in my opinion borrowers will be resistant to compromise and will try to delay making payments that are owed in order to see if the chapter 7 trustee (or trustees) runs out of money to collect the loans or gets to a point where due to cost considerations he/she has no alternative but to take a substantial discount on the loans.  Moreover, given that the Debtors' remaining employees continue to leave for other work, it is questionable whether a chapter 7 trustee will have the necessary resources to enable USACM to continue to service the loans which could become very problematic.  For instance, if USACM does not fulfil its post-petition obligations to collect loans, the direct lenders might assert claims against USACM that could dilute the potential distributions to other USACM creditors.  In addition, and perhaps most significantly, without the money in place to fund a liquidating trust to pursue litigation as set forth in the proposed plan of reorganization, it is questionable whether a chapter 7 trustee will have the necessary resources to collect significant assets from the non-debtor entity USA Investment Partners ("USAIP"), which owes a $58 million note to USACM secured by equity interests in a complicated web of entities related to USAIP.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

7.    I also believe that the Debtors' estates have increased in value since the Petition Date due to the post-petition operations of the Debtors as chapter 11 debtors-in-possession.  On the Petition Date, as I took over as Chief Restructuring Officer of USACM, and Manager of the FTD Fund and the Diversified Fund, I found that USACM had not been fulfilling its obligations as manager of the Funds, or as the loan servicing agent for the direct lenders.  I also discovered that the books and records of the companies were inaccurate, incomplete and misleading, and that no collection efforts had been undertaken with respect to delinquent borrowers.  I also found that loan servicing fees were not being collected and that payments from borrowers on performing loans were being diverted from the direct lenders on those loans to other direct lenders who had an interest in non-performing loans.  Under these circumstances, USACM had no value as an on-going entity, and that value has had to be re-created from post-petition efforts by the Debtors and others.  Furthermore, on the Petition Date, the FTD Fund was under investigation by the SEC, and the auditor could not complete the required audit of the books and records.  Moreover, the Diversified Fund consisted of 23 loans, 20 of which were non-performing.  While the underlying assets of the Funds had value, this value could not be made available to the Fund members absent substantial post-petition collection efforts.

8.    Although the administrative expenses of the Debtors' professionals and of the Committees are substantial and cannot be borne by these estates indefinitely, other additional value created for these estates during the initial six months of these cases, and continuing during the next few months until a plan of reorganization can be confirmed, far exceed the administrative expenses incurred.  For example, Creditors of USACM have benefited from USACM's aggressive post-petition collection efforts because under USACM's current management it has collected contractual fees and costs for its own estate from the borrowers in addition to principal and interest collected on behalf of the direct lenders.  Furthermore, USACM was able to obtain a promissory

5

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

note in the amount of $58 million from USAIP that is secured by equity interests that USAIP holds in other projects that the Debtors believe can bring significant additional value into these estates.  Additionally, the Debtors have successfully collected, post-petition, nineteen (19) loans at par plus accrued interest and other loans appear to be in a position to pay off soon including the Marquis, Halsey Canyon and Sheraton loans.  Moreover, the Debtors will have collected hundreds of millions owed on the outstanding loans by the end of the year.  Therefore, I do not believe that there has been any substantial or continuing loss to or diminution of the net assets of these estates since the Petition Date.  Rather, I believe that these and other activities, which were made possible only by the Debtors' incurring significant administrative expenses in their chapter 11 cases, have significantly increased the value of the Debtors' estates since the Petition Date.

9.    If this case is converted to a chapter 7 and a trustee (or multiple trustees) is appointed, all of the time, effort and substantial expense that has enabled the Debtor, in cooperation with the Committees, to negotiate the plan of reorganization as well as the APA with Silver Point will be wasted.[1]  More importantly, the significant benefits that creditors and other parties in interest will realize from a consensual plan of reorganization that resolves the complex global issues in these bankruptcy cases will be lost.  For instance, if there is no plan of reorganization, the inter-company claims will have to be litigated between the Debtors which will result in significant additional expense to the Debtors' estates.  Furthermore, the substantial benefits that the Diversified Fund, the FTD Fund, USACM and the direct lenders will realize as a result of the execution of the APA with Silver Point will also be lost.[2]

---

1 An outline of all of the efforts undertaken to analyze the Debtors' assets, market those assets, and reach an agreement with Silver Point that is acceptable to the Debtors and the Committees is set forth in my Declaration dated October 23, 2006, a copy of which is attached hereto as Exhibit A and incorporated herein.

2 A summary of the benefits that USACM, the Diversified Fund, the FTD Fund and the direct lenders will receive as a result of the APA are set forth in Exhibits 1, 2, 3 and 4 of Exhibit A hereto.

10.   For these reasons and more, I believe that the conversion requested by the U.S. Trustee is definitely not in the best interest of creditors, the estates, the direct lenders, or the fund members. In fact, I believe that the precipitous actions of the U.S. Trustee have put the collection efforts and the sale efforts in jeopardy, and is substantially diminishing the value of the Debtors' estates.

I declare under penalty of perjury that, to the best of my knowledge, information, and belief, the foregoing statements are true and correct.


Executed this 27th day of October, 2006.


_____

Thomas J. Allison

898166

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# Exhibit A
(to Declaration of Thomas J. Allison in Opposition
to U.S. Trustee's Motion to Convert Case)

Annette W. Jarvis, Utah Bar No. 1649
Steven C. Strong, Utah Bar No. 6340
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146-5308
Telephone:  (702) 228-7590
Facsimile:  (702) 892-0122
E-Mail:  bkfilings@s-mlaw.com

Attorneys for Debtors and Debtors-in-Possession

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | Date:  October 25, 2006<br>Time:  9:30 a.m. |
| In re:<br>USA SECURITIES, LLC,<br>Debtor. | **SUPPLEMENTAL DECLARATION OF THOMAS J. ALLISON IN SUPPORT OF MOTION FOR ORDER SCHEDULING AN AUCTION FOR THE SALE OF CERTAIN ASSETS, APPOINTING SPCP GROUP, LLC, AS LEAD BIDDER, AND APPROVING BID PROCEDURES AND PROTECTIONS** |
| Affects:<br>☒  All Debtors<br>☐  USA Commercial Mortgage Company<br>☐  USA Securities, LLC<br>☐  USA Capital Realty Advisors, LLC<br>☐  USA Capital Diversified Trust Deed Fund, LLC<br>☐  USA First Trust Deed Fund, LLC | |

I, Thomas J. Allison, hereby declare, verify and state as follows:

1. I make this Declaration solely in my capacity as Chief Restructuring Officer of USA Commercial Mortgage Company ("USACM"), USA Capital Diversified Fund, LLC ("Diversified Fund"), USA Capital First Trust Deed Fund ("FTD Fund"), USA Capital Realty Advisors, LLC and USA Securities, LLC (collectively, "Debtors") and in further support of the Debtors' Motion for Order Scheduling an Auction for the Sale of Certain Assets, Appointing SPCP Group, LLC ("Silver Point"), as Lead Bidder, and Approving Bid Procedures and Protections (the "Motion").

**The Solicitation Process**

2. As I stated in my prior Declaration dated October 18, 2006, the Debtors in coordination with the four official committees appointed in theses cases (the "Committees") have undertaken extensive efforts to explore various options for maximizing the assets of the Debtors' estates, including marketing for sale all or a portion of the Debtors' assets during the course of the last several months.

3. Under my direction, the Debtors, in cooperation from the Committees, pursued a dual track for potential restructuring of the Debtors either separately or individually.

4. Under my direction, as part of this process, the Debtors, in cooperation with the Committees, evaluated and explored a self-liquidation plan for each of the Debtors. This process included an evaluation of potential asset recoveries, costs of self-liquidation, and collection risks.

5. At the same time, under my direction, the Debtors began pursuing potential sales of all or a portion of the Debtors' assets. As part of this process, the Debtors contacted and pursued leads for potential bidders both for the loan assets of the FTD Fund and the Diversified Fund and for the servicing assets of USACM, both jointly and individually.

6.   As a result of those marketing efforts, the Debtors were able to identify fourteen potential purchasers who were interested in doing due diligence and purchasing all or a portion of the Debtors' assets.

7.   Of these potential bidders, the Debtors received only one bid solely for the servicing assets of USACM.  The bid did not involve any cash consideration for the assets and proposed to compensate USACM's estate for the servicing assets solely through the sharing of additional servicing fees to be charged to the direct lenders post-closing.

8.   Further, after speaking with representatives of the potential purchasers, I believe the main reason for the lack of bids for USACM's servicing business by strategic buyers in the business was because there were a large percentage of non-performing and partially funded loans in the Debtors' loan servicing portfolio.   Consequently, any party purchasing the servicing business would need to commit a substantial amount of time and effort and up-front capital to pursue the collection and foreclosure of these non-performing loans, which expenses would only be reimbursed by the direct lenders at a later time.  Furthermore, many of the loans in the portfolio had not been funded in the full amount of the construction budget, and therefore, not only was there a risk that the principal and interest on these loans would not be paid in full, but the borrowers on these loans were starting to threaten and file litigation, and mechanics liens were also being filed on the property, requiring further up-front costs from any potential servicer.

9.   Accordingly, as the marketing of the Debtors assets continued, it became clear to me that if money of any significance was going to be realized from the sale of the Debtors' assets, that money was going to come from a financial purchaser who was willing to acquire all or a substantial portion of the loan portfolio owned by the FTD Fund and/or Diversified Fund and who also had servicing capability or a servicing partner that could take over the loan servicing business.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

10. In addition, there are unique problems with the Diversified Fund loan portfolio which made a fair valuation of the portfolio by a third party difficult such that the bids that were received which allocated some value to the Diversified Fund portfolio were, in the opinion of the Debtor and the committee for the Diversified Fund, insufficient to make the sale of Diversified Fund assets superior to the self-liquidation of those assets.

11.   The loan portfolio owned by the FTD Fund, however, consists of loans which are, by and large, performing loans secured by deeds of trust in a first lien position, which were of substantial interest to potential purchasers.  However, the FTD Fund also had small fractional interests in numerous loans on projects that had unfunded construction budget amounts, thus requiring a financial buyer who could commit capital to extend additional funding where economically warranted to preserve the value and collectibility of the existing loans.  Further, as the FTD Fund held small fractional interests in these loans, it was clear to me that packaging the servicing business, with its contractual responsibility to actively manage these loans, with the purchase of these small fractional loan interests enhanced the value of both.

12. The Debtors received five (5) bids for the loan portfolio of the FTD Fund and the servicing business, including the bid from Silver Point.  Silver Point's bid was the highest received for the FTD Fund assets and the only bid that was high enough for the FTD Fund and the committee for the FTD Fund to agree to accept the bid.

13. The Silver Point bid originally included a bid for the loan portfolio of the Diversified Fund.  However, this bid was not high enough for the Diversified Fund and the committee for the Diversified Fund to accept over the self-liquidation option.  Nevertheless, because the Diversified Fund loan portfolio had some fractional interests in traditional loans held by direct lenders that needed servicing, the Diversified Fund and the committee for the Diversified Fund negotiated with

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

4

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Silver Point to exclude the Diversified Fund loan assets from the sale, except for the sale of the servicing rights with respect to the fractional interests held in traditional loans with direct lenders.

14. The Debtors also asked all bidders, including Silver Point, to allocate their bids among the assets being purchased and while this was not such a significant issue to Silver Point this became a subject of intense negotiation among the Committees.  At the same time the negotiations on the bid were proceeding with Silver Point, the Debtors and the Committees were also negotiating among themselves to resolve intercompany issues and allocate assets generally among the various estates in a term sheet ("the Plan Term Sheet") that was being negotiated with respect to a plan of reorganization (the "Plan").  Thus, the bid made by Silver Point and accepted by the Debtors does not reflect all of the value attributable to each estate as a result of the Silver Point bid, which also includes these intercompany compromises that are being facilitated as a result of the Silver Point bid and are being negotiated in the Plan Term Sheet.

15. With respect to the USACM assets, while its bid was consistent with other bids received for the servicing business, Silver Point's bid indicated that Silver Point was not willing to pay much in cash for these assets.  Therefore, USACM and the Unsecured Creditors Committee (the "UCC") negotiated for a sharing arrangement to be included in the price for the loan servicing business that includes not only 50% of the first $1 million of servicing fees accruing after the date of closing (the "Closing Date") of the asset purchase agreement with Silver Point (the "Asset Purchase Agreement), and $50,000 of accrued default rate interest as of the Closing Date collected on the FTD Fund assets, but also all servicing fees accrued as of the Closing Date but collected thereafter, all late charges and default interest due but unpaid as of the Closing Date (except with respect to the default interest relating to the FTD Fund loans), and all exit fees, extension fees, deferred origination fees, and other fees due to USACM whether accruing before or after the Closing Date, all pre-paid interest collected to be paid as the Court may order under the plan, and

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

all amounts relating to the small fractional interests in loans held by USACM, the servicing rights

to which would be transferred to the bidder.   As part of this purchase price, the Debtors and the

UCC also negotiated a waterfall provision relating to distributions from monies collected on loans

after the Closing Date, an agreement not to prosecute actions against the Debtors arising out of the

assets acquired relating to events occurring before the Closing Date, and cooperation with respect

to the pursuit of insider claims so as to help maximize the recovery for both Silver Point and the

USACM estate.

16.  Of paramount importance in particular to USACM and the Diversified Fund estates, the

Debtors and the Committees also negotiated to exclude from the assets to be sold all causes of

action of all of the Debtors, including specifically all causes of action against non-debtor insiders,

except for certain guarantees on existing loans.  This exclusion will result in the retention by the

estates of receivables owed by USA Investment Partners and the obligation on the 10-90, Inc.

loan which is also an obligation of USA Investment Partners.  This litigation will be dealt with in

the Plan Term Sheet and the Plan.  These excluded assets were important concessions made by

Silver Point that also made this bid superior to other bids submitted to the Debtors, as the non-

Debtor insider litigation is an important source of recovery for creditors and members of these

estates.

17.  The Silver Point bid accepted by the Debtors also reflects the concern and input from the

official committee of holders of excecutory contract rights (the "ECC"), which negotiated for

language respecting the lenders' rights under the servicing agreements to be transferred.  Both

USACM and the ECC likewise investigated and satisfied themselves that Silver Point had the

expertise and experience to service the loans effectively.

**Negotiating the Offer Letter With Silver Point**

18. After extensively analyzing the various proposals that had been made by the potential purchasers, it became clear to me and the Committees that the proposed purchase price being made Silver Point was high enough, and the expressions of flexibility were clear enough (as opposed to other bidders who purchase offers were for far less money, and had much less flexibility in how their proposals were structured) that significant negotiating efforts to establish a floor for the purchase of a portion of the Debtors' assets should begin in earnest with Silver Point.

19. As a result, there were approximately three weeks of very intense negotiations among Debtors, the Committees and Silver Point regarding the proposed Offer Letter before I signed it. These negotiations centered around not only what assets would be sold and for what price, but, as I previously explained, also centered around what assets the Debtors and the relevant Committees believed would have more value if those assets were excluded from the sale and instead were self liquidated.

20. Silver Point was willing to pay the highest price offered for both the FTD Fund loans and the USACM servicing business to establish an acceptable floor for these Debtors' assets proposed to be sold.

21. The Debtors had also identified certain problems with being able to sell the assets that the Debtors felt could be best solved in the Plan and needed the ability to fold all of the intercompany issues into the Plan on which all parties in interest could vote.  Silver Point's willingness to buy through the Plan rather than a sale under 11 U.S.C. § 363 of the Bankruptcy Code was also a factor that made this the highest and best stalking horse bid to the Debtors and the Committees.

22. In my opinion and in the opinions of the Committees with whom I have consulted, all of these foregoing factors make Silver Point the ideal lead bidder for the assets of the FTD Fund and USACM that are to be purchased.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

23. Notwithstanding the foregoing, Silver Point (along with all of the other potential purchasers) made it very clear from the beginning of the negotiations, that given (a) its lost opportunity costs in pursuing other deals; (b) the extreme complexity associated with this transaction given all of the various parties in interest and the problems with the loan portfolio; and (c) the extensive allocation of internal resources that would be required in order to close this transaction, including conducting the required due diligence and negotiating the purchase of the Debtors' assets, it would not be willing to participate in a long and contentious process culminating in the confirmation the Plan, unless it received a break-up fee as the lead bidder which had plowed hard and difficult ground for other bidders.

24. As a result, the break-up fee became a major point of contention between Silver Point, the Debtors and the Committees and was very heavily negotiated. The end results of these negotiations were a substantially reduced break-up fee in amount and a very limited triggering of the break-up fee obligation.

**The Break-Up Fee Only Comes Into Play in Certain Limited Circumstances**

25. Under the terms of the break-up fee as eventually negotiated among Silver Point, the Debtors and the Committees, the break up fee is payable only if a higher bid is accepted and closed by the Debtors[1]. If the bid procedures are approved, including the initial incremental bid amount, and if a competing bidder prevails at the auction then, as negotiated by the Debtors and the Committees, the break-up fee will be payable solely out of an overbid amount.

26. Only the expense reimbursement, not the break-up fee, is payable if the Debtors are unable to close the transaction, if the transaction cannot be closed by the Outside Approval Date, or if

---

1 There is one other scenario in which the break-up fee may be payable to Silver Point under the Asset Purchase Agreement. If the Debtors fail to sell the assets to any purchaser at the auction, but later sell any portion of the assets within nine months following the Outside Approval Date to another party for a payment equal to or greater than the

certain breaches by the Debtors occur (except as noted in the footnote accompanying paragraph 25 above).

**What Specific Assets Are Included in the Sale, and What Can Each Constituency Expect to Receive From the Sale**

27. Attached as Exhibits 1, 2, 3, and 4 are charts prepared under my direction outlining the major benefits for USACM, the Diversified Fund, the FTD Fund and the direct lenders from the proposed sale.

28. When reviewing the provisions of the Offer Letter and Asset Purchase Agreement, it is important to distinguish between the loan assets proposed to be sold by FTD Fund and the servicing assets to be sold by USACM.  As defined in the Asset Purchase Agreement, the "First Trust Deed Fund Assets" to be sold includes "Loans," which are by definition limited to loans in which FTD Fund has an interest and for which "Mortgaged Property" exists as security for the FTD Fund loans.  On the other hand, the "Commercial Mortgage Assets" to be sold by USACM primarily are the loan servicing agreements and related rights in connection with the "Serviced Loans," a defined term which, as opposed to the term "Loans," includes most of the loans that are currently being serviced by USACM (with some exclusions).   The Asset Purchase Agreement sets forth "Statements" relating to the assets being sold by USACM, some of which relate to the "Serviced Loans" and some of which relate only to the "Loans" (the FTD Fund loans) (see Article III of the Asset Purchase Agreement) that are distinct from the "Statements" relating to the assets being sold by the FTD Fund (see Article IIIA of the Asset Purchase Agreement).   This was done in recognition of the fact that the FTD Fund portfolio consists of generally good, performing loans, as opposed to some of the problematic loans contained in the general serviced loan portfolio.   The material adverse condition clauses found in Section 9.1 (h) and (i) were also

---

Total Asset Purchase Price, and only if Silver Point is not in breach of the Asset Purchase Agreement, then the break-

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

9

negotiated with this distinction in mind.  The most problematic loans are held by the Diversified

Fund, and these have been excluded from the sale.

**Silver Point's Stalking Horse Bid Has Increased Interest in the Debtors' Assets and Has Attracted Other Bidders**

29. Since the Offer Letter was published and included in the Plan filed with the Court, sale

efforts in bringing in competing bidders have continued under my direction.  As Silver Point is a

credible buyer well known in the industry, it is my impression from the new expressions of

interest that we have obtained since the Offer Letter became public, that there is increased interest

in the Debtors' assets, including the addition of new interested buyers.

**Proceeding With the Silver Point Asset Purchase Agreement is in the Best Interests of the Debtors' Estates Given the Growing Cash Needs and the Problems of a Complete Self-Liquidation of the Debtors' Assets**

30. As explained above, under my direction, the Debtors have explored the self-liquidation

option both for the FTD Fund loans and for USACM's servicing business.  In my opinion, this

sale option is better for all of the estates for several reasons.  First, I believe the administrative

costs in running this estate occasioned by any substantial delay in consummating the sale

agreement or that would occur if Silver Point did not stay in the transaction because of a failure to

have the break-up fee approved, would greatly exceed the $1 million portion of the break-up fee

that is over and above the expense reimbursement.  Second, as the better loans are collected, the

FTD Fund estate and USACM's estate will be left with a loan portfolio increasingly dominated by

non-performing loans.  As such, few or no performing loans will remain to generate the cash

necessary to address the many problems that exist in the non-performing portfolio and to provide

funding for the pursuit of retained litigation in each estate.  Third, this sale is critical to getting the

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

up fee, less any amounts paid to Silver Point as an expense reimbursement, would become payable to Silver Point.

Plan confirmed for all of the estates as it provides funding and a structure for the settlement of intercompany issues involving all of the Debtors' constituencies.

31. Given these factors, I believe that compelling circumstances exist for the break-up fee to be approved and that the approval of the break-up fee will benefit all of the Debtors' constituencies in each of these pending bankruptcy cases.

**It is in the Best Interest of the Debtors Estates to Hold the Auction prior to Confirming a Plan of Reorganization**

32. In my opinion, it is also in the best interest of the Debtors' estates to hold the auction prior confirming the Plan for the following reasons. First, because both the ultimate price to be obtained at the auction, as well as the identity and experience of the prevailing bidder as a loan servicer will be very important to creditors and other parties in interest, I felt it was important that they be provided with as much information as possible before the Plan is confirmed that they will need to decide whether to support the Plan, and it may satisfy what might otherwise be objections to the Plan. Second, as set forth above, the sale includes only a portion of the Debtors' total assets. The treatment of the excluded assets and the intercompany claims are set forth in the Plan. As such, where the Debtors and the Committees are trying to reach a global resolution of all of the issues in these cases, I felt the best approach would be to permit creditors and other parties in interest to vote on the proposed resolution of the Debtors' cases as a whole, rather than proceeding piecemeal by confirming a plan of reorganization and then proceeding with an asset sale under 11 U.S.C. § 363(b). Third, conducting a sale of the assets under 11 U.S.C. § 363(b) may also have the effect of disenfranchising creditors and other parties in interest. While in theory these parties could have individually objected to the proposed sale under § 363, the likelihood is that the vast majority of these parties would not have weighed in on the proposed sale. However, effecting the proposed sale of a portion of the Debtors' assets through the Plan assures that all creditors and

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

other parties in interest will weigh in on the proposed sale of the assets, as well as the proposed global resolution of the Debtors' cases.  Fourth, completing a sale under § 363 to be followed by the confirmation of the Plan will simply, in my opinion, take too much time and be too costly given the amount of professional fees that continue to accrue in these cases.  Fifth, locking-up the stalking horse bidder now is critical because as the performing loans continue to pay off, fewer and fewer performing loans will remain available to sell, thereby resulting in less and less interest from potential overbidders, and correspondingly, less value that will come into the Debtors' estates.  Sixth, based on my discussions with representatives of the potential purchasers who have inquired about purchasing the Debtors' assets, I believe it is unlikely that any stalking horse bidder is going to wait the necessary time that it would take for the Debtors to first obtain the approval of a disclosure statement, solicit acceptances to the Plan, and obtain confirmation of the Plan, prior to proceeding with the sale.

Executed this 23ʳᵈ day of October, 2006.

Thomas J. Allison

897609 04

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**EXHIBIT 1**

**BENEFITS TO FTDF FROM SALE UNDER APA**

- Cash price of $46,500.  As a result of the completion of due diligence, this has been reduced to $46 million subject to further adjustments for collected principal payments made to FTDF and principal balance adjustments (see Sections 2.2(a) and 2.3 of the APA).  The adjustments found in Section 2.3(a) were negotiated to allow FTDF additional benefits from loans collected after July 31, 2006, but prior to the Closing Date of the transaction.  The adjustments found in the remainder of Section 2.3 were negotiated as adjustments for issues identified by Silver Point's due diligence as a final and full settlement of those identified issues, which includes the assignment of certain claims back to FTDF in exchange for certain of the price adjustments.
- Retention of causes of action by FTDF.
- Retention of accrued interest, including default interest, collected prior to the Closing Date.
- Complete monetization of loan portfolio.
- No due diligence out.
- Reduces administrative costs by facilitating a complete and prompt resolution of the case.

## EXHIBIT 2

## BENEFITS TO COMMERCIAL MORTGAGE FROM SALE UNDER APA

- Relieves Commercial Mortgage from servicing an increasing number of difficult non-performing loans, including the need to front costs for collecting on these loans from an ever shrinking amount of current collections of fees from performing loans.
- Provides for an experienced servicer to appropriately service the loans going forward to minimize claims that could be made against Commercial Mortgage.
- Provides for a well funded servicer that can offer funding, where economically warranted in its sole discretion, to deal with unfunded borrower requirements to preserve the value of current loans, to allow for potential settlement of pending litigation, and to minimize potential litigation from these projects.
- Cash consideration of the first $1 million collected on annual servicing fees after reimbursement of Purchaser's collection expenses. (See Section 2.2(b) of the APA.)
- Sharing of 50% of the first $100,000 of accrued, but uncollected default rate interest as of the closing date which is collected after the Closing Date on the FTDF loans. As the retention of this remaining amount of default interest was important to Silver Point, this issue was carried over into the intercompany claims discussions among the Debtors and the Committees. (See Section 2.2(b) of the APA.)
- Retention of all causes of action, including causes of action against insiders. Agreement to coordinate efforts with Commercial Mortgage with respect to pursuing personal guarantees against insiders. (See Section 7.3 of the APA.)
- Agreement not to prosecute any actions against any of Debtors arising out of or relating to acquired Assets and arising out of events occurring before the Closing Date, thus reducing claims in the Commercial Mortgage estate.   (See Section 7.4 of the APA.)
- Retention of rights to pre-paid interest whether collected before or after the Closing Date, subject to the Court's order with respect to the disposition of this collected pre-paid interest.  (See Section 7.5 of the APA.)
- Retention of servicing fees accrued as of the Closing Date that may be collected after the Closing Date, of all late charges accrued but unpaid as of the Closing Date (except as relates to the FTDF loans purchased), of all exit fee, of all extension fees, of all deferred origination fees, and of all other fees, whether accrued before or after the Closing Date, and of all distributions on loan interests owned by Commercial Mortgage. (See Section 7.1 of the APA.)  Agreement has also been reached on the order of payment of fees collected.  (See Section 7.2 of the APA.)
- Collection burden for collecting fees to be remitted to Commercial Mortgage estate taken on by purchaser.
- $58 million receivable owed by IP is retained by the estate.
- Access for all Debtors to records transferred and retention of original electronic databases for use in retained litigation.
- Agreement to transfer the LSAs under a plan (the preferred transfer mechanism of the Debtors) in a manner that does not create administrative expense claims against the estate.  (See Section 9.1(f).)
- Reduces administrative costs by facilitating a complete and prompt resolution of the case.

- **EXHIBIT 3**

**BENEFITS TO DIVERSIFIED FROM SALE UNDER APA**

- Fractional ownership in certain loans transferred to Silver Point for servicing, with proceeds of such loans to be remitted to Diversified.
- Loans excluded from serviced portfolio or from acquired loans to allow for these loans to be collected by the Diversified Trust under the plan, including without limitation, the 10-90 loan to IP.
- Retention of all causes of action, including causes of action against insiders.
- Provides the basis for negotiations on a Plan to resolve intercompany claims held by Diversified.
- Reduces administrative costs by facilitating a complete and prompt resolution of the case.

**EXHIBIT 4**

**BENEFITS TO DIRECT LENDERS FROM SALE UNDER APA**

- Transfer of Servicing Contracts to an experienced and well funded servicer.
- Ability of Silver Point to address unfunded borrower requirements, in Silver Point's sole discretion, to preserve existing loans and avoid unnecessary litigation affecting Direct Lenders.
- Ability of Silver Point to advance funding for aggressive collection efforts benefiting direct lenders.
- Agreement of Silver Point to abide by the servicing agreements.  (See Section 7.5 of the APA.)
- Direct Lenders rights to terminate servicer under the LSAs are not affected.
- Reduces administrative costs by facilitating a complete and prompt resolution of the case.