1  Annette W. Jarvis, Utah Bar No. 1649
   Steven C. Strong, Utah Bar No. 6340
2  RAY QUINNEY & NEBEKER P.C.
   36 South State Street, Suite 1400
3  P.O. Box 45385
   Salt Lake City, Utah 84145-0385
4  Telephone: (801) 532-1500
   Facsimile: (801) 532-7543
5  Email: ajarvis@rqn.com

6  Lenard E. Schwartzer, Nevada Bar No. 0399
   Jeanette E. McPherson, Nevada Bar No. 5423
7  SCHWARTZER & MCPHERSON LAW FIRM
   2850 South Jones Boulevard, Suite 1
8  Las Vegas, Nevada 89146-5308
   Telephone: (702) 228-7590
9  Facsimile: (702) 892-0122
   E-Mail: bkfilings@s-mlaw.com
10
   Attorneys for Debtors and Debtors-in-Possession
11

12            **UNITED STATES BANKRUPTCY COURT**

13                    **DISTRICT OF NEVADA**

   | | |
   |---|---|
   | In re: | Case No. BK-S-06-10725 LBR |
   | USA COMMERCIAL MORTGAGE COMPANY, | Case No. BK-S-06-10726 LBR |
   | Debtor. | Case No. BK-S-06-10727 LBR |
   | In re: | Case No. BK-S-06-10728 LBR |
   | USA CAPITAL REALTY ADVISORS, LLC, | Case No. BK-S-06-10729 LBR |
   | Debtor. | |
   | In re: | Chapter 11 |
   | USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, | |
   | Debtor. | Jointly Administered Under |
   | In re: | Case No. BK-S-06-10725 LBR |
   | USA CAPITAL FIRST TRUST DEED FUND, LLC, | |
   | Debtor. | Disclosure Statement Hearing |
   | In re: | Date: November 13, 2006 |
   | USA SECURITIES, LLC, | Time: 9:30 a.m. |
   | Debtor. | |
   | Affects: | Confirmation Hearing |
   | ☒ All Debtors | Date: December 15, 2006 |
   | ☐ USA Commercial Mortgage Company | Time: 9:30 a.m. |
   | ☐ USA Securities, LLC | **DISCLOSURE STATEMENT FOR** |
   | ☐ USA Capital Realty Advisors, LLC | **DEBTORS' SECOND AMENDED JOINT** |
   | ☐ USA Capital Diversified Trust Deed Fund, LLC | **PLAN OF REORGANIZATION** |
   | ☐ USA Capital First Trust Deed Fund, LLC | **DATED NOVEMBER 6, 2006** |
   | | **(AFFECTS ALL DEBTORS)** |

1

Revised Disclosure Statement

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1

## I.    INTRODUCTION

2      This Disclosure Statement provides information about the Debtors' Second Amended Joint

3   Plan of Reorganization Dated November 6, 2006 (the "Plan").  The "Debtors" are the five related

4   entities that filed petitions for relief under Chapter 11 of the United States Bankruptcy Code on

5   April 13, 2006 (the "Petition Date") in the U.S. Bankruptcy Court for the District of Nevada (the

6   "Court"), namely: USA Commercial Mortgage Company ("USACM"), USA Capital Realty

7   Advisors, LLC ("USA Realty"), USA Capital Diversified Trust Deed Fund, LLC ("DTDF"), USA

8   Capital First Trust Deed Fund, LLC ("FTDF" and together with DTDF , the "Funds"), and USA

9   Securities, LLC ("USA Securities").  The Debtors jointly prepared this Disclosure Statement to

10  help creditors (including direct lenders who may be creditors) as well as equity interest holders

11  who are entitled to vote (i.e., the members of the Funds) to evaluate the Plan and to encourage

12  them to vote to accept the Plan.

13      Current management of the Debtors was appointed as of the Petition Date and has

14  expended great efforts to carefully reconstruct the records of the Debtors to enable the Debtors to

15  present information contained in this Disclosure Statement that is as accurate as is reasonably

16  possible.  Nonetheless, because current management has no historical connection with the

17  Debtors, current management cannot verify that the information contained herein that is outside of

18  its personal knowledge is accurate or correct.

19      The Court's approval of this Disclosure Statement constitutes neither a certification that

20  the factual information contained in this Disclosure Statement is accurate, nor an endorsement of

21  the Plan.  Certain materials in this Disclosure Statement are taken from other readily available

22  documents or are digests of such documents.  Although efforts have been made to convey

23  accurately the contents of such documents, you are urged to examine the documents themselves

24  and to use the descriptions of documents contained in this Disclosure Statement only after having

25  conducted such an examination.

26      The purpose of this Disclosure Statement is to assist those who vote on the Plan to make an

27  informed decision whether to vote to accept or reject the Plan.  This Disclosure Statement is not

28  the Plan.  The Plan is summarized in this Disclosure Statement, but the summary is qualified by

Revised Disclosure Statement

the terms of the Plan itself.  If there are any inconsistencies between the Plan and the summary of the Plan contained in this Disclosure Statement, the Plan controls.  The Plan should be read in its entirety in conjunction with this Disclosure Statement.  No representations are made concerning the Debtors, their business operations, the value of their property, or the value of benefits offered to creditors or other parties in interest in connection with the Plan other than as set forth in this Disclosure Statement.  You should not rely on any representations or inducements made to obtain your acceptance or rejection of the Plan that are contrary to the information contained in this Disclosure Statement.

The Debtors believe that the Plan provides a comprehensive, workable solution to the many complex issues that resulted from the pre-petition irregularities that occurred in the Debtors' businesses – a solution that is in the best interests of the Debtors' creditors, members of the Funds (the "Fund Members"), direct lenders on the loans serviced by USACM (the "Direct Lenders"), and other parties in interest.  The Plan effectuates a sale of substantially all of the assets of FTDF and the loan servicing assets and business of USACM, puts in place a mechanism for maximizing the recovery on other assets and claims held by the Debtors, provides for the ongoing servicing and collection of the loans of the Direct Lenders by a reputable and experienced loan servicer, provides for the recovery of the "Prepaid Interest" (defined below) as property of the estate, and provides for an equitable distribution of the proceeds of the Debtors' assets to creditors and Fund Members.  The four official committees appointed by the United States Trustee in the Debtors' cases (the "Committees") also support the Plan and encourage you to vote in favor of the Plan.

A.    **Where to Find a Discussion of the Treatment of Your Claim Within This Disclosure Statement**

If you are a Direct Lender, treatment of your claims are discussed on pages ____ of this Disclosure Statement.  If you are a creditor of USACM, other than a Direct Lender, treatment of your claim can be found on pages ____ of this Disclosure Statement.

If you are a Fund Member having a membership interest in DTDF, treatment of your interest is discussed on pages ____ of this Disclosure Statement.  If you are a creditor of DTDF, treatment of your claim is discussed on pages ____ of this Disclosure Statement.

Revised Disclosure Statement

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

If you are a Fund Member having a membership interest in FTDF, treatment of your interest is discussed on pages _____ of this Disclosure Statement. If you are a creditor of FTDF, treatment of your claim is discussed on pages _____ of this Disclosure Statement.

If you are a creditor of USA Realty, treatment of your claim is discussed on pages _____ of this Disclosure Statement.

If you are a creditor of USA Securities, treatment of your claim is discussed on pages _____ of this Disclosure Statement.

**B.      Summary of the Treatment of Each Claim and Interest**

The following chart summarizes the classification and treatment of unclassified claims and classified claims and interests as to each of the Debtors:

| Claims Name | Description and Treatment | Estimated Distribution Percentages |
|---|---|---|
| | **USACM Claims and Equity Interests** | |
| | **Unclassified Claims** | |
| **Administrative Expense Claims** | Holders of Allowed Administrative Expense Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **Priority Tax Claims** | Holders of Allowed Priority Tax Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| | **Classified Claims** | |
| **A-1: Secured Tax Claims** | Holders of Allowed Secured Tax Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim. | 100% |
| **A-2: Other Secured Claims** | Holders of Allowed Other Secured Claims are to be treated pursuant to Option A or Option B below, at the discretion of USACM: **Option A:** Holders of Allowed Other Secured Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or **Option B:** USACM shall surrender the property securing the Allowed Other Secured Claim to the holder of such Claim by making the property reasonably available to such | 100% |

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

| Claims Name | Description and Treatment | Estimated Distribution Percentages |
|---|---|---|
| | holder on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; if the property securing an Allowed Other Secured Claim has been lost or destroyed, USACM shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B. | |
| A-3: Priority Unsecured Claims | Holders of Allowed Priority Unsecured Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| A-4: General Unsecured Claims | Holders of Allowed General Unsecured Claims, including the Unremitted Principal Claims, Allowed FTDF Unsecured Claims, the Allowed Direct Lender Unsecured Claim and the Allowed DTDF Unsecured Claim, shall receive a beneficial interest in the USACM Trust, and on account of their Allowed Claim may receive a Pro Rata Share of the assets of the USACM Trust after satisfaction of all Allowed unclassified Claims, Allowed Class A-1, A-2 and A-3 Claims, and all post-Effective Date fees, costs, and expenses of implementation of the USACM Plan and USACM Trust. Allowed Penalty Claims shall be subordinated in payment to the payment of the full amount of all Allowed General Unsecured Claims. | [   ] |
| A-5: Direct Lender Compromise Claims | The Direct Lenders will be released by USACM, FTDF, USA Realty and USA Securities from all Claims including but not limited to surcharge, recharacterization of Direct Lender Loans, and the collection of pre-petition accrued but unpaid fees due under Loan Servicing Agreements. In exchange (and as a compromise), Direct Lenders acknowledge and agree that the Prepaid Interest constitutes an asset of the USACM Estate or transfer their ownership rights, if any, in Prepaid Interest to the USACM estate, that USACM retains the maximum amount for servicing fees allowed and that $605,000 of the 2% Holdback can and will be used to reimburse USACM for the Allowed Professional fees and costs of the Direct Lender Committee. | N/A |
| A-6: Subordinated Claims | All Subordinated Claims shall receive no distribution under the Plan. | 0% |
| A-7: Equity | All Equity Interests in USACM, regardless of form, shall be cancelled and the holders of Equity Interests in USACM | 0% |

Revised Disclosure Statement

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

| Claims Name | Description and Treatment | Estimated Distribution Percentages |
|---|---|---|
| Interests | shall receive no distribution under the Plan. | |
| | **FTDF Claims and Interests** | |
| | **Unclassified Claims** | |
| Administrative Expense Claims | Holders of Allowed Administrative Expense Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| Priority Tax Claims | Holders of Allowed Priority Tax Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| | **Classified Claims** | |
| B-1: Secured Tax Claims | Holders of Allowed Secured Tax Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim. | 100% |
| B-2: Other Secured Claims | Holders of Allowed Other Secured Claims are to be treated pursuant to Option A or Option B below, at the discretion of FTDF:<br><br>**Option A:** Holders of Allowed Other Secured Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or<br><br>**Option B:** FTDF shall surrender the property securing the Allowed Other Secured Claim to the holder of such Claim by making the property reasonably available to such holder on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; if the property securing an Allowed Other Secured Claim has been lost or destroyed, FTDF shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B. | 100% |
| B-3: Priority Unsecured Claims | Holders of Allowed Priority Unsecured Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| B-4: General Unsecured Claims | Holders of Allowed General Unsecured Claims shall be paid in full on the Effective Date out of assets of the Estate, plus Postpetition Interest. | 100% |

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

| Claims Name | Description and Treatment | Estimated Distribution Percentages |
|---|---|---|
| **B-5: Equity Interests** | After the FTDF Payment has been made, holders of Allowed Equity Interests shall retain all distributions received after the Petition Date and receive the remaining Allocated Net Sale Proceeds after satisfaction of all Allowed unclassified Claims, Allowed Class B-1, B-2, B-3 and B-4 Claims, and post-Effective Date fees, costs, and expenses of implementation of the Plan for FTDF. Allowed Equity Interests shall receive a Pro Rata Share of the USACM Trust recoveries on account of the Allowed FTDF Unsecured Claim. | [    ] |
| **DTDF Claims and Interests** | | |
| **Unclassified Claims** | | |
| **Administrative Expense Claims** | Holders of Allowed Administrative Expense Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **Priority Tax Claims** | Holders of Allowed Priority Tax Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **Classified Claims** | | |
| **C-1: Secured Tax Claims** | Holders of Allowed Secured Tax Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim. | 100% |
| **C-2: Other Secured Claims** | Holders of Allowed Other Secured Claims are to be treated pursuant to Option A or Option B below, at the discretion of Post-Effective Date DTDF:<br>**Option A:** Holders of Allowed Other Secured Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or<br>**Option B:** Post-Effective Date DTDF shall surrender the property securing the Allowed Other Secured Claim to the holder of such Claim by making the property reasonably available to such holder on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; if the property securing an Allowed Other Secured Claim has been lost or destroyed, Post-Effective Date DTDF shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the | 100% |

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

| Claims Name | Description and Treatment | Estimated Distribution Percentages |
|---|---|---|
| | property securing the Allowed Other Secured Claim for purposes of this Option B. | |
| C-3: Priority Unsecured Claims | Holders of Allowed Priority Unsecured Claims paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| C-4: General Unsecured Claims | Holders of Allowed General Unsecured Claims shall be paid in full on the Effective Date out of the assets of the Estate, plus Postpetition Interest. | 100% |
| C-5: Equity Interests | Holders of Allowed Equity Interests shall retain their Equity Interests in DTDF and distributions received from the Petition Date, and after satisfaction of all Allowed unclassified Claims, Allowed Class C-1, C-2, C-3 and C-4 Claims, and all post-Effective Date fees, costs and expenses of implementation of Plan for DTDF, shall receive shall receive a Pro Rata Share of the assets of Post-Effective Date DTDF and the USACM Trust recoveries on account of the Allowed DTDF Unsecured Claim. | [    ] |
| **USA Realty Claims and Interests** | | |
| **Unclassified Claims** | | |
| Administrative Expense Claims | Holders of Allowed Administrative Expense Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| Priority Tax Claims | Holders of Allowed Priority Tax Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **Classified Claims** | | |
| D-1: Secured Tax Claims | Holders of Allowed Secured Tax Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim. | 100% |
| D-2: Other Secured Claims | Holders of Allowed Other Secured Claims are to be treated pursuant to Option A or Option B below, at the discretion of USA Realty: **Option A:** Allowed Other Secured Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or **Option B:** USA Realty shall surrender the property securing the Allowed Other Secured Claim to the holder of | 100% |

Revised Disclosure Statement

| Claims Name | Description and Treatment | Estimated Distribution Percentages |
|---|---|---|
| | such Claim by making the property reasonably available to such holder on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; if the property securing an Allowed Other Secured Claim has been lost or destroyed, USA Realty shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B. | |
| D-3: Priority Unsecured Claims | Holders of Allowed Priority Unsecured Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| D-4: General Unsecured Claims | Holders of Allowed General Unsecured Claims shall be paid a Pro Rata Share of assets of the Estate available after payment in full of Allowed unclassified Claims and Allowed Class D-1, D-2 and D-3 Claims. | 0% |
| D-5: Equity Interests | All Equity Interests in USA Realty, regardless of form, shall be cancelled and the holders of Equity Interests in USA Realty shall receive no distribution under the Plan. | 0% |
| **USA Securities Claims and Interests** | | |
| **Unclassified Claims** | | |
| Administrative Expense Claims | Holders of Allowed Administrative Expense Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| Priority Tax Claims | Holders of Allowed Priority Tax Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **Classified Claims** | | |
| E-1: Secured Tax Claims | Holders of Allowed Secured Tax Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim. | 100% |
| E-2: Other Secured Claims | Holders of Allowed Other Secured Claims are to be treated pursuant to Option A or Option B below, at the discretion of USA Securities: **Option A:** Allowed Other Secured Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or | 100% |

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

9

| Claims Name | Description and Treatment | Estimated Distribution Percentages |
|---|---|---|
| | **Option B:**  USA Securities shall surrender the property securing the Allowed Other USA Securities Claim to the holder of such Claim by making the property reasonably available to such holder on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; if the property securing an Allowed Other Secured Claim has been lost or destroyed, USA Securities shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B. | |
| **E-3: Priority Unsecured Claims** | Holders of Allowed Priority Unsecured Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **E-4: General Unsecured Claims** | Holders of Allowed General Unsecured Claims shall be paid a Pro Rata Share of assets of the Estate available after payment in full of Allowed unclassified Claims and Allowed Class E-1, E-2 and E-3 Claims. | [  ] |
| **E-5: Equity Interests** | All Equity Interests in USA Securities, regardless of form, shall be cancelled and the holders of Equity Interests in USA Securities shall receive no distribution under the Plan. | 0% |

## II.    VOTING

### A.    Deadline for Receipt of Ballots, and Admonition to Vote If Eligible

ALL BALLOTS MUST BE RECEIVED BY [December _____], 2006, OR THEY WILL

NOT BE COUNTED.  As delays in the delivery of mail can occur, the Debtors urge you to mail or

deliver your ballots well in advance of the voting deadline.

IT IS IMPORTANT THAT YOU VOTE.  VOTING ON THE PLAN WILL AFFECT

YOUR RIGHTS.  DETERMINING THE OUTCOME OF BALLOTING ON THE PLAN

REQUIRES A CALCULATION THAT CONSIDERS THE VOTES OF THOSE CREDITORS

AND EQUITY INTEREST HOLDERS (IF ENTITLED TO VOTE) WHO ACTUALLY VOTED

ON THE PLAN.  FURTHER, IF THE PLAN IS CONFIRMED, IT IS BINDING ON ALL

CREDITORS AND EQUITY INTEREST HOLDERS, WHETHER OR NOT YOU VOTED OR

Revised Disclosure Statement

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

WHETHER OR NOT YOU VOTED FOR OR AGAINST THE PLAN.  THUS, YOUR RIGHTS
MAY BE AFFECTED EVEN IF YOU DO NOT VOTE ON THE PLAN.  YOUR
OPPORTUNITY TO HAVE THE OUTCOME YOU DESIRE WILL LIKELY BE ENHANCED
IF YOU VOTE.  THE DEBTORS REQUEST, THEREFORE, THAT YOU VOTE IF YOU ARE
ENTITLED TO DO SO AND THAT YOU TAKE STEPS TO ENSURE THAT YOUR BALLOT
IS RECEIVED IN TIME TO BE COUNTED.

B.      Entities Entitled to Vote

Only creditors and equity interest holders whose claims or interests have been allowed for
purposes of voting and are "impaired" by the Plan are entitled to vote on the Plan.  For a claim to
be allowed for voting purposes, the claim must be listed in the Debtors' Schedules of Assets and
Liabilities ("Schedules"), or you must have filed a proof of claim describing the claim by the
"Voting Record Date" (defined below), or the claim must be a "Direct Lender Compromise
Claim" (defined below) in Class A-5 under the Plan.  A scheduled claim is allowed for voting
purposes if it is listed on the Schedules but is not listed as "disputed," "contingent" or
"unliquidated."  If a claim in the Schedules is listed as "disputed," "contingent" or "unliquidated,"
the holder of the claim will not be entitled to vote absent the timely filing of a proof of claim.

If a claim is not listed in the Schedules, or is listed as "disputed," "contingent" or
"unliquidated," the holder of the claim is not entitled to vote unless the holder files a proof of
claim on or before [the "Voting Record Date" set by the Court, which is November ____, 2006],
or unless the claim is a "Direct Lender Compromise Claim," which is a type of claim that all
Direct Lenders are deemed to hold in order to allow them to vote in Class A-5 under the Plan.
Moreover, no holder of a claim will be entitled to vote if any party in interest objects to that claim
before balloting on the Plan (or any amended Plan) occurs, unless the Court enters an order
allowing the claim for voting purposes notwithstanding the objection.

For an equity interest to be allowed, the equity interest holder's asserted interest must
appear on the lists of Fund Members in DTDF and FTDF maintained by the Debtors that were
deemed to be filed with the Court pursuant to the Stipulated Order entered September 15, 2006
(docket no. 1293) and from which an individual notice was mailed to each Fund Member

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

11

1    specifying the amount of the Fund Member's interest per the Debtors' records, or the holder of the

2    equity interest must have filed a proof of interest before [the Voting Record Date, which is

3    November _____, 2006]. In addition, no entity claiming to hold an equity interest may vote if any

4    party in interest has objected to the allowance of the asserted interest before balloting on the Plan

5    (or any amended Plan) occurs, unless the Court enters an order allowing the interest for voting

6    purposes notwithstanding the objection.

7        In addition to the foregoing criteria for voting eligibility, only classes in which the claims

8    or interests of creditors and equity interest holders are "impaired" by the Plan (i.e., those whose

9    claims or interests are altered or who will not receive the full allowed amount of their claims in

10   cash pursuant to the original terms of their agreements) are entitled to vote to accept or reject the

11   Plan. Holders of claims that are not "impaired" are deemed to have accepted the Plan as a matter

12   of law. The Plan designates which classes are "impaired" under, and thus entitled to vote on, the

13   Plan.

14       If the claim or interest you hold has been classified in one of the impaired classes of claims

15   or interests created by the Plan (and that class is not deemed to have rejected the Plan), it is

16   important that you vote. The classes of claims impaired under the Plan and entitled to vote to

17   accept or reject the Plan are Classes A-4, A-5, D-4, and E-4. The classes of interests that are

18   impaired, but that are not deemed to have rejected the Plan, are Classes B-5 and C-5. In addition,

19   if you hold more than one claim or interest classified as "impaired" and entitled to vote under the

20   Plan, it is important that you vote with respect to each such claim or interest.

21       Allowance or disallowance of a claim or interest for voting purposes will not be

22   determinative of the allowable amount, if any, of such claim or interest for purposes of distribution

23   under the Plan.

24       **C.    Voting Instructions**

25           1.    The Voting Record Date

26       The Court has approved [November _____], 2006, as the record date for purposes of

27   determining which creditors and equity interest holders are entitled to vote on the Plan (the

28   "Voting Record Date").

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

12

Revised Disclosure Statement

1

2.    The Voting Deadline

2    **The Court has approved [December ____], 2006 at 4:00 p.m. prevailing Pacific Time**

3    **as the voting deadline (the "Voting Deadline").**  To be counted as votes to accept or reject the

4    Plan, all ballots must be properly executed, completed and delivered by (a) first class mail; (b)

5    overnight courier; or (c) personal delivery, **so that they are actually received**, in any case, by the

6    Debtors' solicitation agent, BMC Group, Inc. (the "Solicitation Agent"), at the appropriate address

7    below, no later than the Voting Deadline:

8        If by first class mail:

9        BMC Group
         Attn: USACM Solicitation Agent
10       P. O. Box 911
         El Segundo, CA 90245-0911
11       BMC Group

12

13       If by overnight courier or personal delivery:

14       BMC Group
         Attn: USACM Solicitation Agent
15       1330 East Franklin Avenue
         El Segundo, CA 90245
16

17   AS MAIL DELAYS MAY OCCUR, IT IS IMPORTANT THAT THE BALLOT OR BALLOTS

18   BE MAILED OR DELIVERED WELL IN ADVANCE OF THE DEADLINE SPECIFIED

19   ABOVE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE

20   COUNTED.

21       Each creditor or equity interest holder entitled to vote should receive a ballot for each

22   separately classified, impaired claim or interest held.  If you do not receive the required number of

23   ballots with your copy of the Court-approved Disclosure Statement, immediately notify the

24   Solicitation Agent for the Debtors by contacting BMC Group by telephone, toll-free at 888-909-

25   0100.

26   **D.    Results of Balloting Determined by Class**

27       Claimants and interest holders vote by class.  In general, a class of claimants accepts the

28   Plan if those creditors who vote to accept it hold at least two-thirds (2/3) in dollar amount and

Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    more than one-half (1/2) in number of the allowed claims in the class that actually vote on the

2    Plan.  In general, a class of equity interest holders accepts the Plan if it is accepted by those who

3    hold at least two-thirds (2/3) in amount of the allowed interests in the class that actually voted on

4    the Plan.  A class that is not "impaired" under the Plan is "conclusively presumed" to have

5    accepted the Plan under section 1126(f) of the Bankruptcy Code.  This means that each holder of a

6    claim or interest in a class that is not impaired is presumed to have accepted the Plan.  Conversely,

7    a class in which the holders of a claim or interest will not receive or retain any property under the

8    Plan on account of their claim or interest is deemed to have rejected the Plan under section

9    1126(g) of the Bankruptcy Code.

10            **E.        Confirmation Based Upon Acceptance of Plan by All Impaired Classes**

11            One of the statutory requirements that must be met for the Plan to be confirmed is that

12    under section 1129 of the Bankruptcy Code each of the impaired classes of claims or interests

13    must have accepted the Plan.  Alternatively, if all impaired classes do not accept the Plan, and

14    certain additional requirements are met including that at least one impaired class of claims as to

15    each of the Debtors accepts the Plan, then section 1129 of the Bankruptcy Code allows the

16    Debtors to seek to confirm the Plan over the negative vote of one or more classes of claims or

17    interests.  Further, because the Plan consists of a plan of reorganization for each of the five

18    separate Debtors, the Debtors reserve the right to request confirmation of the Plan for one or more

19    but less than all the Debtors under section 1129(b) of the Bankruptcy Code.

20            **F.        Confirmation Over the Objections of One or More Impaired Classes**

21

22            If an impaired class rejects the Plan but at least one other impaired class of each of the

23    Debtors has accepted it, the Plan may still be confirmed by the Court at the request of the Debtors.

24    To grant such a request, the Court must find, among other things, that the Plan does not

25    "discriminate unfairly" and that it is "fair and equitable" with respect to each impaired class that

26    rejected the Plan.

27            The phrases "discriminate unfairly" and "fair and equitable" are defined in section 1129(b)

28    of the Bankruptcy Code and by the case law interpreting that statute.  In other words, those

14

Revised Disclosure Statement

Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  phrases are "terms of art" and denote specific criteria for confirmation that the Plan must satisfy to

2  be confirmed by the Court if any impaired class rejects the Plan.

3  The Debtors believe the Plan satisfies the statutory criteria required by section 1129(b) of

4  the Code, and they intend to request confirmation of the Plan in the event it is rejected by any

5  impaired class.  Further, in accordance with section 1127 of the Bankruptcy Code, the Debtors

6  reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan exhibit or

7  schedule, including to amend or modify it to satisfy the requirements of section 1129(b) of the

8  Bankruptcy Code for one or more of the Debtors.

9  **III.    DEADLINE FOR FILING APPLICATIONS OR OTHER REQUESTS FOR
10         PAYMENT OF ADMINISTRATIVE EXPENSES**

11  The Plan establishes deadlines for the filing of applications or other requests for payment

12  of administrative expenses.  Generally, administrative expenses are certain types of claims that

13  arise only after the Petition Date and do not include claims that existed as of the Petition Date.  If

14  you have a claim for the payment of administrative expenses under sections 503(b) and 507(a)(2)

15  of the Bankruptcy Code, you must file with the Court an application or request for payment of

16  such administrative expense on or before the applicable bar date.  For professionals employed by

17  the Debtors or the Committees, this bar date is 45 days after the Plan become effective (the

18  "Effective Date").  For all other claims for administrative expenses, the bar date is 30 days after

19  the Effective Date.   If you do not timely file an application or request for payment of an

20  administrative expense claim before the applicable deadline, your administrative expense claim

21  will not receive any distribution under the Plan and will be forever barred.

22  Consequently, if you have a claim for payment of an administrative expense, review the

23  provisions of the Plan and this Disclosure Statement and timely file an application or request for

24  payment of such administrative expense to which you may be entitled with the Clerk of the Court

25  at the following address, or your claim will be forever barred:

26  U.S. Bankruptcy Court
    Foley Federal Building
27  300 Las Vegas Boulevard South
    Las Vegas, NV 89101
28

Revised Disclosure Statement

1    In addition, send a copy of the application or request to attorneys for the Debtors at the following

2    address:

3        Annette W. Jarvis
         Steven C. Strong
4        RAY QUINNEY & NEBEKER P.C.
         36 South State Street, Suite 1400
5        P.O. Box 45385
         Salt Lake City, Utah 84145-0385
6

7    **IV.    DEADLINE FOR FILING PROOFS OF CLAIM ARISING FROM REJECTION
         OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS**

8

9        **A.    Deadline for Filing Proofs of Claims**

10           As soon as practicable after the Court approves this Disclosure Statement but in no event

11   later than twenty (20) days prior to the commencement of the Confirmation Hearing (defined

12   below),, the Debtors will file a schedule with the Court setting forth all unexpired leases or

13   executory contracts, if any, that they intend to assume.  At this time, the Debtors do not anticipate

14   assuming any unexpired leases or executory contracts but reserve their right to do so.  The Plan

15   provides that all remaining unexpired leases or executory contracts not previously rejected that are

16   not listed on the schedule are rejected, as permitted by sections 365 and 1123 of the Bankruptcy

17   Code.  The Debtors do not consider the various loan servicing agreements USACM entered into

18   with Direct Lenders to service loans ("Loan Servicing Agreements") to be executory contracts.

19   Claims relating to USACM's services under the Loan Servicing Agreements are not deemed to be

20   executory contract related claims but are treated as Class A-4 claims, as described below.

21           If you have an unexpired lease or an unfulfilled executory contract with any of the Debtors

22   that has been or will be thus rejected, you have until thirty days after the date that the order

23   confirming the Plan ("Confirmation Order") is entered ("Confirmation Date") to file with the

24   Court a claim for damages arising from the rejection of the unexpired lease or executory contract.

25   If you do not timely file a claim within this time period, you will not receive any distribution on

26   your claim under the Plan, and your claim will be forever barred.  Any claim arising out of the

27   rejection of an unexpired lease or executory contract will be treated as a general unsecured claim.

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

1    If you have an unexpired lease or executory contract with one of the Debtors that has been

2  or will be rejected, review the provisions of the Plan and this Disclosure Statement and timely file

3  a proof of any claim to which you may be entitled or your claim will be forever barred.  File your

4  proof of claim with the Clerk of the Court at the following address:

5    U.S. Bankruptcy Court
     Foley Federal Building
6    300 Las Vegas Boulevard South
     Las Vegas, NV 89101
7

8  In addition, send a copy of the proof of claim to attorneys for the Debtors at the following address:

9    Annette W. Jarvis
     Steven C. Strong
10   RAY QUINNEY & NEBEKER P.C.
     36 South State Street, Suite 1400
11   P.O. Box 45385
     Salt Lake City, Utah 84145-0385
12

13   **B.    USACM's Unexpired Non-Residential Real Property Leases**

14    As of the Petition Date, USACM was the lessee under unexpired, non-residential real

15  property leases with the following lessors (collectively, the "Leases"):

16

| **Lessor** | **Premises** |
|---|---|
| 1)  Pecos Professional Park Limited Partnership ("Pecos Lease") | 4484 South Pecos Road, Las Vegas, Nevada  89121 |
| 2)  P&P Enterprises LLC ("P&P" Lease) | 940 Southwood Boulevard, Incline Village, Nevada known as Timber Ridge Plaza, Suite 103 |
| 3)  S&J Enterprise Investments, Inc. ("S&J" Lease") | 488 Reno Corporate Drive, Suite 100, Reno, Nevada 89511 |
| 4)  Haspinov, LLC ("Haspinov Lease") | 4480 South Pecos Road, Las Vegas, Nevada  89121 |

25  Other than USACM, none of the other Debtors were or are parties to any non-residential real

26  property leases.

27    USACM has rejected the P&P Lease, and the order approving the rejection of this lease

28  was entered on May 22, 2006.  USACM has also rejected the S&J Lease, and the order approving

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

17

1   the rejection of this lease was entered on August 1, 2006.  The P&P Lease and the S&J Lease were

2   rejected because USACM was no longer operating out of these leased premises.

3         USACM has entered into a stipulation and order to extend the time for it to assume or

4   reject the Pecos Lease and the Haspinov Lease until November 11, 2006.  USACM is working

5   towards obtaining another stipulation and order to further extend the time for it to assume or reject

6   the Pecos Lease and the Haspinov Lease.   USACM is currently operating out of the Pecos Lease

7   and Haspinov Lease premises, but has not yet determined whether to assume and assign, or to

8   reject those leases.

9   **V.      DATE AND TIME OF HEARING ON CONFIRMATION OF THE PLAN**

10         A copy of the Plan is attached as *Exhibit 1* to this Disclosure Statement.  The Court has

11   scheduled a hearing to consider confirmation of the Plan on December 15, 2006, at 9:30 a.m. PST

12   in the courtroom of the Honorable Linda Riegle ("Confirmation Hearing").   The Court has ordered

13   that objections, if any, to confirmation of the Plan must be filed on or before [December ____],

14   2006, and served on the attorneys for the Debtors at the following address:

15         Annette W. Jarvis
        Steven C. Strong
16         RAY QUINNEY & NEBEKER P.C.
        36 South State Street, Suite 1400
17         P.O. Box 45385
        Salt Lake City, Utah 84145-0385
18

19   If you object to the confirmation of the Plan you must file a timely objection to confirmation,

20   whether or not you vote to accept or reject the Plan.  You may vote to accept or reject the Plan (if

21   you are entitled to vote) whether or not you file an objection to confirmation of the Plan.  The date

22   of the Confirmation Hearing may be continued to such later time(s) as the Court may announce

23   during the Confirmation Hearing without further written notice.

24   **VI.     DESCRIPTION OF THE DEBTORS AND THEIR BUSINESSES**

25         **A.      USA Commercial Mortgage Company**

26         USACM, which sometimes did business under the trade name "USA Capital," is a Nevada

27   corporation with its sole remaining offices located in Las Vegas at the Pecos Road addresses given

28   above.  Public records of the Nevada Secretary of State indicate that USACM was organized as of

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

February 28, 1989.  Prior to the Petition Date, USACM was in the business of underwriting, originating, brokering, funding and servicing commercial loans primarily secured by residential and commercial developments, both on behalf of investors and for its own account.  USACM has been licensed as a mortgage broker by the State of Nevada since January 11, 1990, although its license was limited by the Mortgage Lending Division of the State of Nevada after the Petition Date to exclude raising investment funds from individual investors.

The primary shareholders of USACM are Thomas A. Hantges, Joseph D. Milanowski and Paul S. Hamilton (either in their own names or through trusts they control) who also managed USACM as officers and directors prior to the Petition Date.  As of the Petition Date, they relinquished management authority to Thomas J. Allison of Mesirow Financial Interim Management, LLC ("MFIM"), who became the President and Chief Restructuring Officer of USACM on that date.  Mr. Allison continues to serve in those capacities to the present.  Other management employees of USACM appointed after the Petition Date were Mark L. Olson, Vice President and Chief Operating Officer; Robert A. Hilson, Treasurer and Chief Financial Officer; and A. Faisal Siddiqui, Vice President and Chief Technology Officer.  Mr. Hilson's employment was terminated in September 2006.

As of the Petition Date, the loan portfolio that USACM was servicing consisted of approximately 115 loans having a combined outstanding balance of approximately $960 million. Since the Petition Date, USACM's new management has aggressively engaged in efforts to collect outstanding loan amounts.  As of September 30, 2006, the total outstanding balance of the serviced loans was approximately $791 million.  A loan summary spreadsheet created by MFIM providing information as of September 30, 2006, concerning each of the serviced loans is attached hereto as *Exhibit 2*.  Similar loan summaries created by MFIM as of earlier dates, including April 26, 2006, May 26, 2006, June 30, 2006, July 31, 2006, and August 31, 2006, are available for review on USACM's website at usacapitalcorp.com.

Prior to the Petition Date, USACM's business included soliciting individual investors to purchase fractional interest in loans, as well as originating and servicing the loans.  As of the Petition Date, there were approximately 3,600 investors whose names appear as a "Lender" in the

Revised Disclosure Statement

documents for one or more of the serviced loans.  In the Debtors' bankruptcy cases and in this

Disclosure Statement, the loan investors have been referred to as "Direct Lenders."  Many of the

Direct Lenders invested in more than one of the serviced loans, with the average being

approximately 3 to 4 loans for each Direct Lender.  Along with being the servicer, USACM is

itself a Direct Lender having an aggregate investment of approximately $2 million as of June 30,

2006, in the serviced loans.  Two of the other Debtors, DTDF and FTDF, are also Direct Lenders

having interests in certain of the serviced loans, as explained below.

**B.    USA Capital Diversified Trust Deed Fund, LLC**

DTDF is a Nevada limited liability company organized as of February 3, 2000.  A copy of

DTDF's Operating Agreement is on file with the Court at Docket # 1590.  It appears that the

purpose of DTDF was to allow USACM to offer investors (in Nevada only) the opportunity to

invest in loans that USACM originated by purchasing membership interests in a fund (i.e., DTDF)

that then invested in various loans, rather than (or in addition to) the investor investing directly in

the loans.  Because DTDF was not a fund registered with the U.S. Securities and Exchange

Commission ("SEC"), it could not solicit investors beyond the State of Nevada.  DTDF's stated

purpose was to make or purchase entire or fractional interests in acquisition, development,

construction, bridge or interim loans that were secured by first deeds of trust on, among other

things, undeveloped land and residential and commercial developments located primarily in the

United States.  There was a continuous offering of membership interests (known as "units") in

DTDF from May 2000 to July 2004.  In July 2004, DTDF stopped offering the sale of membership

units, and on September 27, 2005, the investors were notified that DTDF would be liquidating.

DTDF had approximately 1,350 members as of the Petition Date.  The aggregate outstanding

balance owed to DTDF on its loan investments as of July 31, 2006, was $117,742,343, consisting

of 21 loans (excluding the former Epic and Sheraton loans) in which DTDF invested as a Direct

Lender.  The loans were all originated by USACM.  As explained in further detail below, although

DTDF loans were supposed to be secured by first deeds of trust and have other protections for

DTDF investors, those protections were not generally provided by USACM.

Prior to the Petition Date, the sole manager of DTDF was nominally another of the

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

20

1    Debtors, USA Realty (described below), however, all management services were actually

2    provided by USACM and USACM received all of the management fees collected from DTDF.

3    Pursuant to an order of the Court entered shortly after the Petition Date, Mr. Allison is serving as

4    the chief restructuring officer of DTDF as well as the four other Debtors.

5          **C.**       **USA Capital First Trust Deed Fund, LLC**

6          FTDF is a Nevada limited liability company organized as of February 16, 2001.  A copy of

7    the FTDF Operating Agreement is on file with the Court at Docket # 1591.  It appears that the

8    purpose of FTDF was to allow USACM to offer investors throughout the United States (not just in

9    Nevada, as was the case with DTDF) the opportunity to invest in loans that USACM originated by

10   purchasing membership interests in a fund (FTDF) that invested in various loans, rather than (or in

11   addition to) the investor investing directly in the loans.  Prior to the Petition Date, FTDF filed

12   reports and disclosures with the SEC.  FTDF's stated purpose was to make or purchase entire or

13   fractional interests in acquisition, development, construction, bridge or interim loans that were

14   secured by first deeds of trust on, among other things, undeveloped land and residential and

15   commercial developments located primarily in the United States.  FTDF had approximately 950

16   members as of the Petition Date.  The aggregate outstanding balance owed to FTDF on its loan

17   investments as of July 31, 2006, was $62,653,825, consisting of 47 loans in which FTDF invested

18   as a Direct Lender.  The loans were all originated by USACM.

19         FTDF offered four classes of membership, Class A, B, C and D.  Class A members agreed

20   to commit their capital contributions for a period of twelve (12) months and were to receive the

21   "Class A Preferred Return" defined as "nine percent (9%) per annum, or such other percentage

22   determined by the manager from time to time, in its sole and absolute discretion, without

23   reinvesting."  See Second Amended and Restated Operating Agreement of FTDF, dated as of June

24   1, 2003, ("FTDF Operating Agreement") ¶¶ 1.13, 1.14, & 1.15.  Class B members agreed to

25   commit their capital contributions for a period of twenty-four (24) months and were to receive the

26   "Class B Preferred Return" defined as "ten percent (10%) per annum, or such other percentage

27   determined by the manager from time to time, in its sole and absolute discretion, without

28   reinvesting."  See FTDF Operating Agreement ¶¶ 1.16, 1.17, & 1.18.  Class C members agreed to

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

1  commit their capital contributions for a period of thirty-six (36) months and were to receive the

2  "Class C Preferred Return" defined as "eleven percent (11%) per annum, or such other percentage

3  determined by the manager from time to time, in its sole and absolute discretion, without

4  reinvesting."  See FTDF Operating Agreement ¶¶ 1.19, 1.20, & 1.21.  The Class D member of

5  FTDF is USA Securities (see below), and does not receive the returns described above for Class A

6  members, Class B members, or Class C members.

7          Prior to the Petition Date, the manager of FTDF was USA Realty (described below), and

8  another of the Debtors, USACM, acted as the loan servicer.  USA Realty's management duties

9  included investing funds, hiring and paying professionals, preparing tax returns, and other duties.

10  Pursuant to an order of the Court entered shortly after the Petition Date, Mr. Allison is serving as

11  the chief restructuring officer of FTDF as well as the four other Debtors.

12      **D.      USA Securities, LLC**

13          USA Securities is a Nevada limited liability company organized as of March 3, 1999.  The

14  Company is a registered broker-dealer under SEC Rule 15c3-1(a)(2)(vi) and was a member of the

15  National Association of Securities Dealers (NASD).  It appears that the primary business of USA

16  Securities was to sell membership interests in FDTF.  USA Securities is dormant and has

17  conducted no business on or after the Petition Date.

18          Prior to the Petition Date, the sole members and co-managers of USA Securities were

19  Joseph Milanowski and Paul Hamilton.  On and after the Petition Date, and pursuant to resolutions

20  filed with USA Securities' bankruptcy petition, Thomas J. Allison of MFIM became the sole

21  manager of USA Securities.  Pursuant to an order of the Court, Mr. Allison is also serving as the

22  chief restructuring officer of USA Securities as well as the four other Debtors.

23      **E.      USA Capital Realty Advisors LLC**

24          USA Realty is a Nevada limited liability company organized as of January 18, 2001.  It is

25  the manager of FTDF and DTDF.  USA Realty is owned by USA Investment Partners LLC

26  ("USAIP"), and prior to the Petition Date USA Realty's sole managing member was Joseph

27  Milanowski.  (Based on records in possession of the Debtors, USAIP is owned by Thomas

28  Hantges, Joseph Milanowski, and Paul Hamilton, either directly or through trusts controlled by

Revised Disclosure Statement

1    these individuals.)

2        On and after the Petition Date, and pursuant to resolutions filed with USA Realty's

3    bankruptcy petition, Thomas J. Allison of MFIM became the sole manager of USA Realty.

4    Pursuant to an order of the Court, Mr. Allison is also serving as the chief restructuring officer of

5    USA Realty as well as the four other Debtors.

6        **F.    Other Related Entities**

7        Attached hereto as *Exhibit 3* is a chart showing relationships among the five Debtors, the

8    non-debtor entity USAIP, and certain related non-debtor entities.

9        **G.    Factors Precipitating Debtors' Bankruptcy Filings**

10        Prior to April 2006, it appears that USACM regularly made monthly interest payments to

11    Direct Lenders regardless of whether the borrowers of the particular loans in which the Direct

12    Lenders had an interest were paying USACM.  For example, during the first three months of 2006,

13    USACM collected on average approximately $5.3 million per month in interest payments on the

14    serviced loans from the borrowers but paid out on average approximately $9.7 million per month

15    to the Direct Lenders, using, among other sources, principal paid on loans from other borrowers to

16    make these interest payments.  MFIM has determined that as of the Petition Date, USACM made

17    approximately $39.5 million in such "prepaid" interest payments to Direct Lenders (defined in the

18    Plan as "Prepaid Interest").  USACM did not have sufficient funds to make monthly interest

19    payments to all Direct Lenders in April 2006, and therefore did not make any March 2006

20    payments (which were due in April) to any of the Direct Lenders.  USACM's inability to continue

21    making monthly payments to all Direct Lenders was a significant contributing factor to the

22    Debtors' decision to file for bankruptcy protection.

23        Another significant contributing factor was an investigation by the SEC.  Prior to the

24    Petition Date, USACM and FTDF received notice from the SEC that they were the subject of a

25    regulatory investigation.  FTDF and USACM believe that reorganization under Chapter 11 of the

26    Bankruptcy Code would result in a greater return to creditors of their estates, FTDF investors and

27    to Direct Lenders than would a potential receivership by the SEC.

28    / / /

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

**VII.    POST-PETITION DEVELOPMENTS**

    **A.    Investigating and Restating Debtors' Loan Records**

       On April 13, 2006, the Debtors filed for bankruptcy protection.  As explained, Thomas J. Allison of MFIM was appointed by the Board of Directors as the President, Chief Executive Officer, and Chief Restructuring Officer of USACM, and as the Manager and Chief Restructuring Officer of the other four Debtors (which are limited liability companies).  Mr. Allison's first action was to terminate the employment of Joseph Milanowski and Thomas Hantges as the principal officers and management of USACM.  Mr. Allison and MFIM next began an intensive review and investigation of the books and records of USACM and the four other related Debtors.  As explained, USACM was the loan servicer for the portfolios of the Direct Lenders, including FTDF and DTDF.  To date, the post-petition investigation of the Debtors, which is ongoing, indicates that USACM made monthly payments to the Direct Lenders, DTDF, and FTDF regardless of whether the borrower had paid the interest due.  Further, full principal repayments by at least four borrowers were collected by USACM but not disbursed to the appropriate Direct Lenders (referred to in the Plan as "Unremitted Principal").  Evidence of other irregularities includes a lack of any attempt to obtain collateral to secure at least four loans, loans without properly perfected security interests, loans secured by second liens, and other potential violations of the Nevada mortgage lending statutes.  In addition, many of the loans appear to have been extended to borrowers who were affiliated or otherwise related to USACM's pre-petition management, such that the borrower entities were partially owned by the owners and officers of USACM through one or more of their various entities (including USAIP).  Many of these loans were non-performing loans in that the underlying borrower had not paid the interest due.  Further investigation and analysis has continued.  To date, the history of fundings, assignments of fractional interests in an out of loans, interest paid and received, and principal payments has been reconstructed for 110 of the 115 loans in the USACM portfolio.  Five loans are still under investigation due to lack of records, foreclosure, litigation, or other special situations.  This reconstruction identified over 25 loans which were seriously delinquent (meaning they were over 6 months past due).  Collection efforts have focused on these 25 loans and other past due loans.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**B.      Significant Post-petition Motions and Other Court Filings**

Many significant motions and other papers have been filed with and ruled on by the Court in the Debtors' jointly administered bankruptcy cases.  As of November 3, 2006, the Court's docket in the jointly administered case (Bankruptcy Case No. 06-10725) contains 1,725 entries. The full docket and copies of all of the significant filings and orders in the Debtors' bankruptcy cases are publicly available free of charge through the Debtors' website, usacapitalcorp.com (click on "Filings").  Several of the most significant Court rulings to date are detailed below.

1.      Orders Approving Debtors' Use of Cash.  If the Debtors were not able to use the cash in the Debtors' bankruptcy estates, the Debtors would be unable to collect amounts owed from borrowers on outstanding loans and unable to continue other business operations essential in attempting to maximize the return to creditors, Direct Lenders, and Fund Members in these bankruptcy cases.  In response to periodic motions made by the Debtors requesting permission to continue using cash for the essential operations and administrative expenses of the Debtors, the Court entered orders on April 19 [docket no. 32], May 9, May 22 [docket no. 315], July 25 [docket no. 974], and September 14, 2006 [docket no. 1282], allowing Debtors to continue using cash in the bankruptcy estates pursuant to proposed cash budgets prepared by MFIM.  On October 5, 2006, Debtors filed a Motion for Order Approving Continued Use of Cash Through January 31, 2007 Pursuant to Fourth Revised Budget [docket no. 1451].  This Motion was approved by the Court at the October 30, 2006 hearing, although a written order has not yet been entered by the Court.

2.      Orders Approving Debtors' Employment of Professionals.  The Debtors filed applications requesting authority to retain Thomas J. Allison as chief restructuring officer, MFIM as restructuring and financial advisors [docket no. 6], Ray Quinney & Nebeker P.C. as general bankruptcy counsel [docket no. 23], and Schwartzer-McPherson Law Firm as local Nevada bankruptcy counsel [docket no. 21].  On April 19, 2006, the Court entered an order granting interim approval through July 27, 2006, for the Debtors to employ Mr. Allison and MFIM [docket no. 26].  On June 5, 2006, the Court entered an order granting interim approval through July 27, 2006, for the Debtors to employ the two law firms mentioned above as legal

Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

25

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1 counsel [docket nos. 474 and 475]. On August 11, 2006, the Court entered its order extending the

2 approval for the Debtors to continue employing the above-named professionals through October 2,

3 2006 [docket no. 1137]. On October 31, 2006, the Court entered a further order granting approval

4 for the continued retention of all these professionals through December 15, 2006 [docket no.

5 1708].

6          3.    Four Official Committees and Their Professionals. On May 10, 2006, the

7 U.S. Trustee's office filed notices indicating that four committees had been formed in the Debtors'

8 cases: (a) the Official Committee of Unsecured Creditors of USA Commercial Mortgage

9 Company [docket no. 201]; (b) the Official Committee of Holders of Executory Contract Rights

10 Through USA Commercial Mortgage Company [docket no. 202]; (c) the Official Committee of

11 Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC [docket no. 203]; and

12 (d) the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund,

13 LLC [docket no. 204]. Shortly thereafter, the Court approved applications by each of the

14 committees to employ legal counsel and the applications of three of the four committees to employ

15 financial advisors (the Executory Contract Rights Committee has not employed a financial

16 advisor). Each of the committees has established a website containing further information that is

17 available through a link on the usacapitalcorp.com website.

18          4.    Approval of Motion to Hold Funds. On May 8, 2006, USACM filed a

19 motion requesting permission to temporarily hold funds pending a determination of the proper

20 recipients and proper holdback amounts [docket no. 173]. USACM filed this motion, as directed

21 by the Court, to obtain permission from the Court to continue holding funds in USACM's loan

22 servicing collection account until USACM could complete its review and restatement of the

23 Debtors' loan servicing records. After considering all of the responses and oppositions to the

24 motion, the Court granted USACM's motion in an order entered July 6, 2006 [docket no. 836].

25 Although the Court approved USACM's request to continue to hold the funds temporarily, the

26 Court did not make any final rulings respecting the rights of any party to the funds that were being

27 held.

28          5.    Debtors' Bankruptcy Statements and Schedules. On June 15, 2006, each of

26

Revised Disclosure Statement

the Debtors filed its Statement of Financial Affairs ("Statements") and its Schedules, as required

by the Bankruptcy Code [docket nos. 673-682], and on June 23, 2006, certain amendments to the

Statements and Schedules were filed [docket no. 784].  Given the pre-petition loan servicing

irregularities and problems with the Debtors' accounting records, the preparation and filing of the

Statements and Schedules represented a major effort by the Debtors' new management and MFIM.

        6.     <u>Investor Statements Mailed to All Direct Lenders and Fund Members</u>.

Although not filed with the Court, investor statements as of the Petition Date were prepared and

mailed to all Direct Lenders and Fund Members on July 10, 2006, which was another major

milestone in the Debtors' cases.  After completing the accounting investigations and restatements

necessary to produce and file the Statements and Schedules, the Debtors were then able to prepare

and mail these investor statements to each Direct Lender indicating what their position was with

respect to each loan that they had an interest in as of the Petition Date.  Investor statements were

also prepared and mailed to the Fund Members indicating what their respective interests were in

DTDF and FTDF.  Shortly thereafter, the Debtors were able to update the loan accounting records

for each Direct Lender through June 30, 2006, and an updated investor statement was mailed to

each Direct Lender on July 27, 2006.  Additional investor statements were mailed out to Direct

Lenders on August 25, 2006, and October 20, 2006.

        7.     <u>$64 Million Distribution Approved by Court and Mailed to Investors</u>.  One

of the primary goals of Debtors' new, post-petition management was to distribute to investors, as

promptly as possible after the initial accounting work and reconstruction of the loan records was

completed, a significant portion of the funds USACM had collected and was holding.  The

Debtors accomplished this goal through their Motion to Distribute Funds [docket no. 847], which

elicited numerous responses and oppositions but which the Court approved at a hearing held on

August 4, 2006.  The Court's order granting the motion was entered on August 24, 2006 [docket

no. 1184], and the distributions, totaling approximately $64.3 million and representing approved

distributions on loan collections through June 2006 (after Court-approved holdbacks), were mailed

to Direct Lenders on August 25, 2006.  Shortly thereafter, FTDF distributed the approved portion

of the payments it received (after an appropriate reserve for claims) to its Fund Members.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

27

8.    <u>Order Granting Proposed Procedures for Distributions on a Monthly Basis</u>.
On August 29, 2006, Debtors filed their Modification to Motion to Distribute Funds and Proposed
Procedures for Ongoing Distributions [docket no. 1203] in which they sought to extend and
modify the relief requested in the Motion to Distribute Funds and to propose specific procedures
by which future interim distributions could be made to direct lenders and fund members on a
monthly basis.  On October 2, 2006, the Court entered a Modified Order Authorizing Interim
Distributions and Holdbacks [docket no. 1424] setting forth the procedures for future monthly
distributions less certain holdbacks.  Pursuant to this order, a second interim distribution of
approximately $61.3 million from the USACM collection account was mailed to Direct Lenders
on or about October 20, 2006, representing approved distributions on loan collections during July
and August 2006.  Shortly thereafter, FTDF distributed the approved portion of the payments it
received (after an appropriate reserve for claims) to its Fund Members.  A distribution on account
of loan collections received during September 2006 is expected to be made in November 2006.  A
distribution for October 2006 collections should be made in late November 2006.

9.    <u>Order Scheduling Auction and Establishing Bid Procedures</u>.  Over the
course of the last few months, a primary focus of the Debtors has been to negotiate the terms of
the Asset Purchase Agreement with SPCP Group, LLC ("Silver Point") to establish a lead bid for
the purchase of certain assets of FTDF and USACM which bid would then be subjected to an
auction process to determine if the assets could be sold for a higher and better offer.  Accordingly,
on September 22, 2006, after extensive discussions with counsel for the Committees and Silver
Point, Debtors filed a Motion for Order Scheduling an Auction for the Sale of Certain Assets,
Appointing SPCP Group, LLC, as Lead Bidder, and Approving Bid Procedures and Protections
(the "Bid Procedures Motion") [docket no. 1352].  On October 26, 2006, the Bid Procedures
Motion was approved by the Court subject to some minor modifications, and the order relating
thereto is expected to be entered on or prior to November 8, 2006.

10.    <u>Approval of Motion for Retention of Employees</u>.  On October 3, 2006, a
Motion for Order Approving Retention Plan of Debtors' Remaining Employees (the "Retention
Motion") [docket no. 1429] was filed.  Since the Petition Date, most of the Debtors' pre-petition

1   employees were terminated by Debtors' current management or left voluntarily for other work.

2   The Retention Motion was filed to request approval of certain incentives to encourage the

3   remaining eleven employees to stay until confirmation of the Plan.  The Debtors believed that the

4   cost of the incentives would be less expensive that if the Debtors had to replace those employees

5   with professional consultants or temporary employees.  The Court approved the Retention Motion

6   at the October 30, 2006 hearing, and entry of the written order is pending.

7           11.    Order Denying Motion to Convert Case to a Chapter 7.  On October 24,

8   2006 the United States Trustee ("UST") filed a Motion to Convert Case to Chapter 7 (the

9   "Conversion Motion") [docket no. 1661].   The UST argued that the requirements were met for the

10  case to be converted under 11 U.S.C. § 1112(b).  The Conversion Motion was strongly opposed by

11  the Debtors and all four of the Committees appointed by the UST who argued that conversion to a

12  liquidating Chapter 7 at this point would be disastrous and not in the best interest of creditors and

13  the estates.  At a hearing on October 30, 2006, the Court denied the Conversion Motion, and the

14  written order denying the motion was entered November 1, 2006 (docket no. 1711).

15          12.    Fixing of Claims Bar Date.  The Court set November 13, 2006, as the

16  deadline (the "Bar Date") for all creditors and equity security holders to file proofs of claim and

17  proofs of interest.  The Court recently extended the Bar Date, but only as to the filing of claims by

18  Direct Lenders, to January 13, 2007.

19  **VIII.   DESCRIPTION OF POST-PETITION OPERATIONS**

20          Thomas J. Allison and the MFIM staff investigated the allegations of improper accounting

21  for the loans USACM serviced ("Serviced Loans") to reconstruct the books and records of the

22  USACM loan portfolio in order to properly account for the payments and disbursements made

23  with respect to each loan in the portfolio.  The reconstruction effort focused on accounting for

24  each loan on a separate basis.  This effort necessarily included an analysis of the position of each

25  Direct Lender in each specific loan.  Under Mr. Allison's direction, USACM prepared a loan

26  summary as of the Petition Date containing various data respecting the 115 loans that constitute

27  the Serviced Loans.  To obtain the information necessary for the loan summary, as well as for the

28  Debtors' Schedules and Statements and the investor statements prepared as of the Petition Date, it

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

29

Revised Disclosure Statement

1   was first necessary to obtain, analyze and reconstruct the loan data.  This process began with

2   analyzing the existing USACM database containing data from 2004-2006.

3        MFIM determined, as of the Petition Date, that USACM's loan servicing database

4   contained substantial errors, including but not limited to the following:  (a) some borrower

5   payments were not entered into the system; (b) most interest payments from borrowers were not

6   posted in a timely manner; (c) payments were not applied according to the governing loan

7   documents, which required that that payments be applied first to outstanding interest and then

8   principal; (d) the amount of interest owed by borrowers was not calculated with the correct

9   number of days outstanding or correct amount of principal owing; (e) check numbers used were

10  not in sequence or were used multiple times; and (f) servicing fees were not charged, or were

11  calculated incorrectly using an interest rate "spread" rather than the loan service fee allowed

12  pursuant to the loan servicing agreements.  The research of USACM's books and records also

13  revealed that the historical data prior to 2004 was kept in Access or Excel electronic files that were

14  overwritten as they were updated, leaving no historical data or audit trail.  In addition, there was

15  no reliable system for tracking the numerous assignments in and out of various loans.  Thus, in

16  order to reconstruct the accounting for each loan, it was necessary to review and analyze the

17  source documentation of Direct Lenders' deposits of investment funds, fundings to the borrowers,

18  and assignments of Direct Lenders in or out of a loan.  Bank deposits, deposit or clear dates from

19  bank statements, and assignments were reviewed and documented.  A loan general ledger was

20  prepared for each of the Serviced Loans by using the source data and applying the correct interest

21  rate and days outstanding; applying payments first to outstanding interest then to principal;

22  correcting to use actual dates for the receipt of interest payments; calculating the amount of unpaid

23  interest owed to Direct Lenders as the promissory note interest rate less the loan servicing fee

24  allowed under the servicing agreements; tracking assignments in and out of various loans; and

25  recharacterizing payments made to Direct Lenders on a particular loan after the borrower had

26  repaid the loan as principal repayments, not interest payments (because interest was no longer due

27  from the borrower).

28       USACM, as directed by Mr. Allison, has also focused its efforts on collecting the loans in

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

30

1    its portfolio.  USACM determined that there were loans that had matured as well as loans with

2    uncollected interest.  A team consisting of USACM staff and MFIM staff has worked diligently to

3    collect the monies due to the Direct Lenders, including DTDF and FTDF.  As of October 30,

4    2006,  the team has collected approximately $185 million, consisting of $38 million in interest and

5    $146 million in principal.  In addition, MFIM estimates that 10 loans should be collected in the

6    next 90 days including at least 3 with substantial amounts of past due interest.

7

8    *[remainder of page intentionally left blank]*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

The total USACM has collected from borrowers after the Petition Date through September 30, 2006, on the serviced loans is $184,528.383.89, which includes the amounts collected on the following loans that were repaid substantially or in full:

| Loan | Date | Principal | Interest |
|---|---|---|---|
| 5252 Orange LLC | 6/9/2006 | $ 3,800,000.00 | $ 62,965.56 |
| Ashby Financial Company LLC | 9/1/2006 | $ 7,200,000.00 | $ 2,010,137.25 |
| Boise Gowan 93 LLC | 8/29/2006 | $ 2,425,000.00 | $ 48,984.97 |
| Copper Sage Commerce Center LLC | 6/22/2006 | $ 179,105.65 | $ 14,508.78 |
| Del Valle Isleton | 5/23/2006 | $ 6,420,000.00 | $ 123,604.23 |
| Fiesta Beaumont | 7/21/2006 | $ 2,400,000.00 | $ 17,499.93 |
| Glendale Tower Partners, LP | 8/31/2006 | $ 6,500,000.00 | $ 288,580.07 |
| Golden State Investments LP | 6/5/2006 | $ 2,850,000.00 | $ 173,041.84 |
| HFA- North Yonkers | 5/26/2006 | $ 24,000,000.00 | $ 4,168,402.75 |
| HFA-Riviera | 5/26/2006 | $ 5,000,000.00 | $ 767,361.09 |
| HFA- Riviera 2nd | 5/26/2006 | $ 8,000,000.00 | $ 2,698,080.00 |
| J. Jireh Corporation | 8/31/2006 | $ 8,825,000.00 | $ 198,037.00 |
| LCG Gilroy LLC | 6/30/2006 | $ 4,950,000.00 | $ 444,747,79 |
| Midvale Marketplace  LLC | 7/14/2006 | $ 4,075,000.00 | $ 366,232.33 |
| Opaque Land Development LLC | 4/28/2006 | $ 4,827,970.00 | $ 856,614.77 |
| Preserve at Galleria, LLC | 9/27/2006 | $ 3,591,750.00 | $ 88,938.12 |
| Roam Development Group | 8/2/2006 | $ 25,042,250.00 | $ 7.637.26 |
| Urban Housing Alliance LLC | 8/21/2006 | $ 8,150,000.00 | $ 261,473.25 |
| **Total** | | **$128,236,075.65** | **$ 12,594,747.09** |

IX.    **SUMMARY OF THE PLAN**

This part of the Disclosure Statement summarizes the provisions of the Plan.  The Plan, after it has been confirmed, will constitute a contract between the Debtors and their creditors, equity interest holders, and Direct Lenders.  If confirmed, the Plan will be binding on all parties in interest in the case including all creditors, equity interest holders, and Direct Lenders, whether or not they voted for the Plan.  This summary is a broad outline of the Plan and is qualified in its entirety by reference to the Plan.  It is therefore advisable, as mentioned above, that you review the Plan carefully for the full details of the treatment of creditors and equity interest holders and seek the assistance of your own counsel and other professionals as you may deem appropriate to ensure you adequately understand the Plan and its consequences.

A.    **General Plan Summary**

The Plan contemplates the liquidation of each Debtor's estate and the distribution of the liquidation proceeds to each such Debtor's creditors and equity interest holders, as applicable.  The Plan will be implemented, in part, through a proposed asset sale transaction, in which substantially all of the assets of FTDF (primarily its interests in a portfolio of loans) and certain assets of USACM (primarily those used to conduct its loan servicing business) will be transferred to a third party purchaser.  The Plan will also be implemented through the settlement of several disputes among the various parties in interest in these cases.

Specifically, the Plan will be implemented through the following transactions:

- the sale of substantially all of the assets of FTDF and certain assets of USACM, and disbursement of related proceeds and certain other cash of the estates in accordance with the Plan;

- the transfer of most Loan Servicing Agreements to the purchaser of the FTDF and USACM sale assets, which will be or be affiliated with a qualified third-party servicing agent;

- the transfer of the remaining USACM assets, principally including (a) recovered Prepaid Interest; (b) the $58 million secured note payable by IP; (c) USACM's interests in certain notes; (d) USACM's right to collect origination, extension, or other success fees

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

and default interest premiums; and (e) lawsuits to be brought against Hantges, Milanowski, USAIP and other non-Debtor insiders, aiders and abetters of wrongdoing that led to the bankruptcy case, to a USACM Trust in which all unsecured creditors will share as beneficiaries;

- the retention by DTDF after the effective date of the Plan of its assets, principally including (a) its 10-90 secured note payable by IP; (b) lawsuits against the same wrongdoers; (c) its interest in the $58 million secured note payable by IP; and (d) its claims against USACM;

- the transfer of certain assets of FTDF to DTDF as part of its settlement of all claims and disputes between FTDF and DTDF, which will be used to pay DTDF's administrative expense and creditor claims, and begin funding its litigation;

- the liquidation of the DTDF assets and USACM Trust assets, including through coordinated litigation against the wrongdoers;

- distribution of the net proceeds of the DTDF assets to holders of allowed equity interests in DTDF (and any remaining creditor claims), and distribution of the net proceeds of USACM Trust assets to the USACM unsecured creditors as Trust beneficiaries, in accordance with the Plan, followed by the dissolution of those entities;

- the distribution of FTDF's share of the proceeds from the sale of its assets to equity interest holders in FTDF after satisfaction of all allowed claims against FTDF, followed by the dissolution of FTDF; and

- the liquidation of any assets of the USA Realty estate and the USA Securities estate, distribution of cash to holders of allowed claims against USA Realty and USA Securities, respectively, in accordance with the Plan, and the dissolution of USA Realty and USA Securities.

**B.    Classification and Treatment of Claims and Interests**

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

1    While this Disclosure Statement provides a brief description of the types of potential

2    Claims to receive treatment under the Plan, NOTHING IN THIS DISCLOSURE STATEMENT

3    OR IN THE PLAN IS INTENDED TO, NOR DOES IT, CONSTITUTE AN ADMISSION THAT

4    ANY CLAIM OR EQUITY INTEREST IS OR SHOULD BE ALLOWED.  THE DEBTORS

5    RESERVE ALL RIGHTS TO OBJECT TO ANY AND ALL CLAIMS OF ANY CREDITOR OR

6    EQUITY INTEREST HOLDER UNDER THE PLAN.

7                                    **i.    Unclassified Claims.**

8    The Plan addresses certain unclassified claims for which treatment is mandated under the

9    Bankruptcy Code.  These include administrative expense claims under sections 503(b) and

10   507(a)(1), and priority tax claims under section 507(a)(8) of the Bankruptcy Code.  These

11   unclassified claims are not considered impaired and they do not vote on the Plan because they are

12   automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such,

13   the Debtors have <u>not</u> placed the following claims in a class.  The respective treatments for these

14   claims are provided below.

15                            **a.    Administrative Expenses for Each Debtor**

16                                    **1.    General**

17   Administrative expenses are claims for costs or expenses of administering the Debtors'

18   Chapter 11 Cases which are allowed under Bankruptcy Code section 503(b), and referred to in

19   Bankruptcy Code section 507(a)(1).  These claims include, without limitation, (i) any actual and

20   necessary postpetition expenses of preserving the estates, (ii) any actual and necessary postpetition

21   expenses of operating the businesses of the debtors, (iii) all compensation or reimbursement of

22   expenses to the extent allowed by the Court under Bankruptcy Code sections 330, 331, or 503, and

23   (iv) any fees or charges assessed against the estates under 1930 of title 28 of the United States

24   Code.

25   Each holder of an allowed administrative expense in a particular estate will be paid in full

26   in cash out of such estate.  Payment will be made on the later of, or as soon as practicable

27   thereafter: (a) the Effective Date, or (b) the date the expense becomes an allowed administrative

28   expense except to the extent that the holder of an allowed administrative expense agrees to a

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

1   different treatment.  The Direct Lender Committee professional fees and costs are an

2   administrative expense of USACM, a portion of which shall be reimbursed pursuant to the

3   compromise set forth in the Plan.

4                    **2.        Bar Date For Administrative Claims**

5                         **(i).        General Provisions**

6            Except as provided below for professionals or entities requesting compensation providing

7   services on behalf of the Debtors' estates, , requests for payment of Administrative Expenses must

8   be filed no later than thirty (30) days after the Effective Date.

9            The Plan establishes a bar date by which all final fee applications, to the extent not

10  previously filed, for the compensation of professionals for services rendered and for

11  reimbursement of expenses incurred on or before the Effective Date pursuant to Bankruptcy Code

12  sections 327, 328, 503(b), 1103, and/or 1106 and all other requests for payment of administrative

13  expenses incurred before the Effective Date under Bankruptcy Code sections 507(a)(1) or 507(b)

14  must be filed with the Court or be forever barred.

15           The holders of administrative expenses (including without limitation, professionals

16  requesting compensation or reimbursement of expenses and any governmental units asserting

17  claims for federal, state or local taxes) who are required to file a request for payment of such

18  claims but that do not do so by the applicable bar date will be forever barred from asserting their

19  claims for administrative expenses against the Debtors, the estates, the USACM Trust, DTDF any

20  other person or entity, or any of their respective property.

21                       **(ii).        Professionals**

22           All professionals or other entities requesting compensation or reimbursement of expenses

23  under sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered

24  before the Effective Date (including any compensation requested by any professional or any other

25  entity for making a substantial contribution in the Chapter 11 Cases) will need to file and serve on

26  the Debtors, the USACM Trust, and DTDF an application for final allowance of compensation

27  and reimbursement of expenses.  This application must be filed no later than forty-five (45) days

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

after the Effective Date.  Any objection to such applications must be timely filed and served in accordance with Nevada District Court Local Rule 9014.

### (iii).    Ordinary Course Liabilities

The holders of claims for administrative expenses based on liabilities incurred in the ordinary course of the Debtors' businesses prior to the Effective Date (other than professionals or other entities described in subparagraph (2), above, and governmental units that hold claims for taxes or claims and/or penalties related to such taxes) are not required to file any request for payment of these claims.  Each administrative expense shall be assumed and paid by the obligated estate under the terms and conditions of the particular transaction giving rise to that administrative expense, without any further action by the holder of such administrative expense.

### 3.    Priority Tax Claims

A priority tax claim is that portion of any general unsecured claim for unpaid taxes which is entitled to priority under section 507(a)(7) of the Bankruptcy Code.  Each holder of an allowed priority tax claim in a particular estate will be paid in full, in cash from such estate.  This payment will be made on the later of, or as soon as practicable thereafter, the: (a) Effective Date, or (b) the date such priority tax claim becomes an allowed priority tax claim, except to the extent that the holder of an allowed priority tax claim agrees to a different treatment.

### ii.    Classified Claims and Equity Interests.

The following describes the Plan's classification of claims against and equity interests in the Debtors and the treatment that holders of allowed claims and allowed equity interests will receive under the Plan.  The Plan provides that holders of such allowed claims can agree to accept less favorable treatment by settlement or otherwise.

If the Plan is confirmed by the Court, each holder of a claim in a particular class will receive the same treatment as the other holders in the same class of claims or equity interests whether or not such holder voted to accept the Plan.  Moreover, upon confirmation, the Plan will be binding on all creditors and interest holders of the Debtors and the Direct Lenders, regardless of whether such creditors, interest holders or Direct Lenders voted to accept the Plan.  Such treatment

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  will be in full satisfaction, release and discharge of such holder's respective claims against and

2  equity interests in the Debtors, except as otherwise provided in the Plan.

3  **a.    USACM – (Classes A-1 through A-7)**

4  **1.    Class A-1: Secured Tax Claims**

5  Class A-1 consists of all allowed secured tax claims against USACM. A secured tax claim

6  in Class A-1 is a claim of a governmental unit against USACM to the extent of the value of any

7  interest in property of USACM's estate securing such claim.

8  These claims will be paid in full. Payment on these claims will be made on or before the

9  later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date

10  the claim becomes an allowed claim. This class is unimpaired so the holders of claims in this

11  class are presumed to vote in favor of the Plan.

12  **2.    Class A-2: Other Secured Claims**

13  Class A-2 consists of all other allowed secured claims against USACM. These are claims

14  against USACM to the extent of the value of any interest in property of USACM's estate securing

15  such claim, other than a secured tax claim.

16  The holders these claims will either have their claim paid in full or USACM will surrender

17  the property securing the claim in full satisfaction of the claim. USACM has the discretion to

18  choose either option. If USACM elects to pay the claim in full, payment will be made on or

19  before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after

20  the date the claim becomes an allowed claim. If USACM elects to surrender the property, it shall

21  do so by making the property reasonably available to the holder before the later of (i) sixty (60)

22  days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an

23  allowed claim. In the event that the property securing the claim has been lost or destroyed,

24  USACM will provide notice to the holder of this fact. The delivery of this notice will constitute a

25  "surrender" of the property. This class is unimpaired so the holders of claims in this class are

26  presumed to vote in favor of the Plan.

27

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

### 3.    Class A-3: Priority Unsecured Claims

Class A-3 consists of all allowed claims against USACM entitled to priority in right of payment under Bankruptcy Code section 507(a) except priority tax claims and claims for administrative expenses.  These claims are primarily for employee wages, vacation pay, severance pay, contributions to benefit plans and other similar amounts.

These claims will be paid in full on the Effective Date unless USACM and the creditor agree to different treatment.  This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

### 4.    Class A-4: General Unsecured Claims

Class A-4 consists of all allowed general unsecured claims against USACM.  This class includes allowed unsecured claims, including claims of trade creditors, claims for loan payments received by USACM but not paid over to applicable lenders prior to the Petition Date ("Unremitted Principal Claims"), all unsecured claims (whether under contract, tort, or other legal theory) of Direct Lenders against USACM, and the unsecured claims of FTDF and DTDF against USACM.

The holders of these claims will receive a pro-rata share of the assets that are recovered by the USACM Trust (see section below).  This class is impaired and the holders of claims in this class will have the opportunity to vote to accept or reject the Plan.  The Debtors and Committees expect that objections will be filed to unsecured claims against USACM asserting losses on account of a deficit between the amount of a Direct Lender's or fund investor's loan or investment, and the amount received from the Debtors pre-petition and postpetition.  The Debtors and Committees anticipate that only holders of unsecured claims that prove breach of the Loan Servicing Agreements or prove damages proximately caused by some act or failure to act by USACM in violation of a contractual or statutory duty or fraud will be allowed.

### 5.    Class A-5: Direct Lender Compromise Claims

Class A-5 consists of all Direct Lenders of USACM.  In exchange (and as a compromise) for a release by USACM, FTDF, USA Realty, and USA Securities for all claims and causes of actions against the Direct Lenders, including claims relating to surcharge, recharacterization of

39

1  Direct Lender loans, fraudulent conveyance, and the collection of prepetition accrued but unpaid

2  servicing, success and other fees and default interest due under the Loan Servicing Agreements,

3  the Direct Lenders acknowledge that the Prepaid Interest constitutes an asset of the USACM

4  estate, or will otherwise transfer their ownership rights, if any, in Prepaid Interest to the USACM

5  estate.  As part of the overall settlement, and release of claims for surcharge, and for allocation of

6  a portion of the Debtors' professional fees and costs along with professional fees and costs of

7  counsel for the Direct Lenders Committee, the Direct Lenders further agree that up to $605,000 of

8  the 2% Holdback (as defined in the Plan) will be used to reimburse USACM for the allowed

9  professional fees and costs of the Direct Lender Committee.  That amount will be allocated among

10  the Holdbacks from Direct Lenders pro rata based on the principal amount of their loans on the

11  Petition Date.  USACM will retain the maximum amount for its contractual servicing fee due

12  under the respective Loan Servicing Agreements (whether 1% or more), and the balance of the 2%

13  Holdback will be refunded to the applicable Direct Lender.  Those Direct Lenders with loan

14  servicing fees of in excess of 1% will not be charged for both a portion of the $605,000 and the

15  maximum contractual loan servicing fee.  Instead, their share of the $605,000 will be recovered

16  from the loan servicing fees paid to USACM.  It is anticipated that as of the Effective Date of the

17  Plan, most of the Prepaid Interest has been recovered and retained by the USACM estate through

18  netting of holdbacks during the bankruptcy case.  It is further anticipated that the remainder should

19  be recovered either (a) after transfer of servicing rights under the sale to Silver Point or approved

20  overbidder through netting of additional holdbacks or (b) through setoff against Claims before

21  allowance.  The statute of limitations for recovery of the Prepaid Interest will be tolled for two

22  years, to enable recovery by holdbacks and netting, but in the unlikely event that Prepaid Interest

23  has not been recovered after two years, thereafter such Direct Lenders may be sued for any

24  unrecovered Prepaid Interest. This class is impaired and the holders of these claims will have the

25  opportunity to vote to accept or reject the Plan.

26         Please note that if you are a Direct Lender and you object to the proposed compromises set

27  forth above, you must file and pursue an objection to confirmation of the Plan to preserve your

28  objection.  Voting to reject the Plan will not be sufficient to preserve your objection.

40

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**6.    Class A-6: Subordinated Claims**

Class A-6 consists of all subordinated claims against USACM.  Claims in Class A-6 are claims against USACM asserted by a non-debtor insider.  A holder of a Class A-6 claim will receive no distribution under the Plan.  This class is impaired and since no payment will be made on these claims the holders of these claims are deemed to have rejected the Plan.

**7.    Class A-7: Equity Interests**

Class A-7 consists of all equity interests in USACM.  These equity interests, in every form, will be cancelled and no payment will be made on their account.  This class is impaired and since no payment will be made on these interests the holders of these interests are deemed to have rejected the Plan.

**b.    FTDF – (Classes B-1 through B-5)**

**1.    Class B-1: Secured Tax Claims**

Class B-1 consists of all allowed secured tax claims against FTDF.  A secured tax claim in Class B-1 is a claim of a governmental unit against FTDF to the extent of the value of any interest in property of FTDF's estate securing such claim.

These claims will be paid in full.  Payment on these claims will be made on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim.  This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

**2.    Class B-2: Other Secured Claims**

Class B-2 consists of all other allowed secured claims against FTDF.  Claims in Class B-2 are claims against FTDF to the extent of the value of any interest in property of FTDF's estate securing such claim, other than a secured tax claim.

The holders of these claims will either have their claim paid in full or FTDF will surrender the property securing the claim in full satisfaction of the claim.  FTDF has the discretion to choose either option.  If FTDF elects to pay the claim in full, payment will be made on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim.  If FTDF elects to surrender the property, it shall do so by

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

41

making the property reasonably available to the holder before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim.  In the event that the property securing the claim has been lost or destroyed, FTDF will provide notice to the holder of this fact.  The delivery of this notice will constitute a "surrender" of the property.  This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

### 3.    Class B-3: Priority Unsecured Claims

Class B-3 consists of all allowed claims against FTDF entitled to priority in right of payment under Bankruptcy Code section 507(a) except priority tax claims and claims for administrative expenses.  Generally, these claims include employee wages, vacation pay, severance pay, contributions to benefit plans and other similar amounts.

These claims will be paid in full on the Effective Date unless FTDF and the creditor agree to different treatment.  This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

### 4.    Class B-4: General Unsecured Claims

Class B-4 consists of all allowed general unsecured claims against FTDF.  This class includes unsecured claims, including claims of trade creditors or professionals who rendered services to FTDF prior to the Petition Date.  These claims will be paid in full on the Effective Date.  The holders of these claims will also receive statutory post-petition interest on their claim. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

### 5.    Class B-5: Equity Interests

Class B-5 consists of all allowed equity interests in FTDF.  The holders of these equity interests will retain their pro-rata share of all distributions that were received after the Petition Date.  They will also receive their pro rate share of the net sale proceeds from the sale of the FTDF assets to Silver Point, after the satisfaction of all classified and unclassified claims of FTDF, as well as their pro rata share of and beneficial interest in all assets recovered by the

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

1   USACM Trust (subject to the compromise with DTDF as set forth below).  This class is impaired

2   and the holders of claims in this class will have the opportunity to vote to accept or reject the Plan.

3                  **c.        DTDF – (Classes C-1 through C-5)**

4                  **1.        Class C-1: Secured Tax Claims**

5          Class C-1 consists of all allowed secured tax claims against DTDF.  A secured tax claim in

6   Class C-1 is a claim of a governmental unit against DTDF to the extent of the value of any interest

7   in property of DTDF's estate securing such claim.

8          These claims will be paid in full.  Payment on these claims will be made on or before the

9   later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date

10  the claim becomes an allowed claim.  This class is unimpaired so the holders of claims in this

11  class are presumed to vote in favor of the Plan.

12                 **2.        Class C-2: Other Secured Claims**

13         Class C-2 consists of all other allowed secured claims against DTDF.  Claims in Class A-2

14  are claims against USACM to the extent of the value of any interest in property of USACM's

15  estate securing such claim, other than a Secured Tax Claim.

16         The holders of these claims will either have their claim paid in full or DTDF will surrender

17  the property securing the claim in full satisfaction of the claim.  DTDF has the discretion to

18  choose either option.  If DTDF elects to pay the claim in full, payment will be made on or before

19  the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the

20  date the claim becomes an allowed claim.  If DTDF elects to surrender the property, it shall do so

21  by making the property reasonably available to the holder before the later of (i) sixty (60) days

22  after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an

23  allowed claim.  In the event that the property securing the claim has been lost or destroyed, DTDF

24  will provide notice to the holder of this fact.  The delivery of this notice will constitute a

25  "surrender" of the property.  This class is unimpaired so the holders of claims in this class are

26  presumed to vote in favor of the Plan.

27

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

**3.**        **Class C-3: Priority Unsecured Claims**

Class C-3 consists of all allowed claims against DTDF entitled to priority in right of payment under Bankruptcy Code section 507(a) except priority tax claims and claims for administrative expenses. Generally, these claims include employee wages, vacation pay, severance pay, contributions to benefit plans and other similar amounts.

These claims will be paid in full on the Effective Date unless DTDF and the creditor agree to different treatment. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

**4.**        **Class C-4: General Unsecured Claims**

Class C-4 consists of all allowed general unsecured claims against DTDF. This class includes unsecured claims, including claims of trade creditors or professionals who rendered services to DTDF prior to the Petition Date. These claims will be paid in full on the Effective Date. The holders of these claims will also receive statutory interest on their claim. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

**5.**        **Class C-5: Equity Interests**

Class C-5 consists of all allowed equity interests in DTDF. The holders of these interests will retain their interest in DTDF and all distributions, if any, that were received after the Petition Date. They will also receive their pro rata share in the assets recovered by DTDF and the assets recovered by the USACM Trust. They will also share in the monies received from FTDF pursuant to the compromise with FTDF discussed below. This class is impaired and the holders of claims in this class will have the opportunity to vote to accept or reject the Plan.

**d.**        **USA Realty – (Classes D-1 through D-5)**

**1.**        **Class D-1: Secured Tax Claims**

Class D-1 consists of all allowed secured tax claims against USA Realty. A secured tax claim in Class D-1 is a claim of a governmental unit against USA Realty to the extent of the value of any interest in property of USA Realty's estate securing such claim.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

1    These claims will be paid in full.  Payment on these claims will be made on or before the

2    later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date

3    the claim becomes an allowed claim.  This class is unimpaired so the holders of claims in this

4    class are presumed to vote in favor of the Plan.

5    **2.    Class D-2: Other Secured Claims**

6    Class D-2 consists of all other allowed secured claims against USA Realty.  Claims in

7    Class D-2 are claims against USA Realty to the extent of the value of any interest in property of

8    USA Realty's estate securing such claim, other than a secured tax claim.

9    The holders of these claims will either have their claim paid in full or USA Realty will

10    surrender the property securing the claim in full satisfaction of the claim.  USA Realty has the

11    discretion to choose either option.  If USA Realty elects to pay the claim in full, payment will be

12    made on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15)

13    business days after the date the claim becomes an allowed claim.  If USA Realty elects to

14    surrender the property, it shall do so by making the property reasonably available to the holder

15    before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after

16    the date the claim becomes an allowed claim.  In the event that the property securing the claim has

17    been lost or destroyed, USA Realty will provide notice to the holder of this fact.  The delivery of

18    this notice will constitute a "surrender" of the property.  This class is unimpaired so the holders of

19    claims in this class are presumed to vote in favor of the Plan.

20    **3.    Class D-3: Priority Unsecured Claims**

21    Class D-3 consists of all allowed claims against USA Realty entitled to priority in right of

22    payment under Bankruptcy Code section 507(a) except priority tax claims and claims for

23    administrative expenses.  Generally, these claims include employee wages, vacation pay,

24    severance pay, contributions to benefit plans and other similar amounts.

25    These claims will be paid in full on the Effective Date unless USA Realty and the creditor

26    agree to different treatment.  This class is unimpaired so the holders of claims in this class are

27    presumed to vote in favor of the Plan.

28    **4.    Class D-4: General Unsecured Claims**

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

45

Revised Disclosure Statement

Class D-4 consists of all allowed general unsecured claims against USA Realty. This class includes unsecured claims, including claims of trade creditors or professionals who rendered services to USA Realty prior to the Petition Date.

The holders of these claims will receive a pro rata share of the remaining USA Realty assets after the payment in full of all USA Realty unclassified claims and the claims in Classes D-1 to D-3, unless the creditor and USA Realty agree to different treatment. This class is impaired and the holders of claims in this class will have the opportunity to vote to accept or reject the Plan.

### 5.      Class D-5: Equity Interests

Class D-5 consists of all equity interests in USA Realty. These equity interests, in every form, will be cancelled and no payment will be made on their account. This class is impaired and since no payment will be made on these interests the holders of these interests are deemed to have rejected the Plan.

### e.      USA Securities – (Classes E-1 through E-5)

### 1.      Class E-1: Secured Tax Claims

Class E-1 consists of all allowed secured tax claims against USA Securities. A secured tax claim in Class E-1 is a claim of a governmental unit against USA Securities to the extent of the value of any interest in property of USA Securities' estate securing such claim.

These claims will be paid in full. Payment on these claims will be made on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

### 2.      Class E-2: Other Secured Claims

Class E-2 consists of all other allowed secured claims against USA Securities. Claims in Class E-2 are claims against USA Securities to the extent of the value of any interest in property of USA Securities' estate securing such claim, other than a secured tax claim.

The holders of these claims will either have their claim paid in full or USA Securities will surrender the property securing the claim in full satisfaction of the claim. USA Securities has the discretion to choose either option. If USA Securities elects to pay the claim in full, payment will

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

46

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   be made on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15)

2   business days after the date the claim becomes an allowed claim.  If USA Securities elects to

3   surrender the property, it shall do so by making the property reasonably available to the holder

4   before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after

5   the date the claim becomes an allowed claim.  In the event that the property securing the claim has

6   been lost or destroyed, USA Securities will provide notice to the holder of this fact.  The delivery

7   of this notice will constitute a "surrender" of the property.  This class is unimpaired so the holders

8   of claims in this class are presumed to vote in favor of the Plan.

9                    **3.       Class E-3: Priority Unsecured Claims**

10          Class E-3 consists of all allowed claims against USA Securities entitled to priority in right

11  of payment under Bankruptcy Code section 507(a) except priority tax claims and claims for

12  administrative expenses.  Generally, these claims include employee wages, vacation pay,

13  severance pay, contributions to benefit plans and other similar amounts.

14          These claims will be paid in full on the Effective Date unless USA Realty and the creditor

15  agree to different treatment.  This class is unimpaired so the holders of claims in this class are

16  presumed to vote in favor of the Plan.

17                   **4.       Class E-4: General Unsecured Claims**

18          Class E-4 consists of all allowed general unsecured claims against USA Securities.  This

19  class includes unsecured claims, including claims of trade creditors or professionals who rendered

20  services to USA Securities prior to the Petition Date.

21          The holders of these claims will receive a pro rata share of the remaining USA Securities

22  assets after the payment in full of all USA Securities unclassified claims and the claims in Classes

23  E-1 to E-3, unless the creditor and USA Securities agree to different treatment.  This class is

24  impaired and the holders of claims in this class will have the opportunity to vote to accept or reject

25  the Plan.

26                   **5.       Class E-5: Equity Interests**

27          Class D-5 consists of all equity interests in USA Securities.  These equity interests, in

28  every form, will be cancelled and no payment will be made on their account.  This class is

                                              47

1  impaired and since no payment will be made on these interests the holders of these interests are

2  deemed to have rejected the Plan.

3      **C.    No Substantive Consolidation**

4      On the Effective Date, all of the assets of each Debtor shall be sold, transferred, distributed

5  or retained by the Debtors' estate or the USACM Trust with all proceeds of sold, transferred, or

6  liquidated assets of each Debtor being retained by the Debtors' estates or the USACM Trust.  All

7  claims against and equity interests in the Debtors and their respective estates shall be retained by

8  the holders of allowed claims and allowed equity interests against and in the respective estates,

9  except as otherwise provided for under the Plan.  The allowance, voting, treatment and

10  distributions on account of allowed claims and allowed equity interests shall be as set forth in the

11  Plan on an individual estate basis.  Notwithstanding any inference to the contrary in this section,

12  the equity interests in USACM, USA Securities and USA Realty shall be retained only until the

13  Effective Date, at which date, these equity interests shall be cancelled on an individual estate basis

14  under the Plan.

15      **D.    Sale of USACM Assets and FTDF Assets**

16      On the Effective Date, USACM will sell its loan servicing assets and FTDF will sell

17  substantially all of its assets, free and clear of liens and interests through an auction process.

18  Although another bidder may submit a higher bid, currently the highest bid for the assets to be

19  sold of USACM and FTDF is that of a company called SPCP Group, LLC (aka "Silver Point").1

20  Silver Point is a U.S.-based investment fund that is unaffiliated with any of the Debtors.  The

21  Debtors and the Committees have negotiated an agreement that will dictate the terms of sale to

22

23

24

25  1    The Debtors are aware that certain sensitive personally identifiable information is being transferred to Silver Point
26  in connection with the sale.  The Debtors have taken and will continue to take reasonable efforts to protect such
    personally identifiable.  The appointment of a "consumer privacy ombudsman," as contemplated under the October
    2005 amendments to the Bankruptcy Code, is not required, however, because as of the Petition Date, the Debtors did
27  not have any formal policy regarding the privacy of personally identifiable information about individuals.  11 U.S.C.
    §363(b)(1)
28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

48

Silver Point (the "Asset Purchase Agreement"), and that will be used as a model for potentially higher and better offers. Silver Point's loan servicing capabilities are described below.

Pursuant to the Asset Purchase Agreement, USACM and FTDF are selling the following assets:

- FTDF's proportional interest in 44 different loans[2] (the "FTDF Assets") for cash consideration of $46 million, subject to certain adjustments (the "FTDF Price"); and

- USACM's post-closing rights to service loans pursuant to the Loan Servicing Agreements for the USACM portfolio and related personal property (the "USACM Assets") for cash consideration based on the future (i) collection of servicing fees, (ii) collection of default rate interest and (iii) other payments and obligations set forth in the Asset Purchase Agreement (the "USACM Price").

### 1.    FTDF Price

The Asset Purchase Agreement provides for a purchase price for the FTDF Assets of $46 million, subject to certain adjustments. Based on the current aggregate principal balance of $63,539,756 for the FTDF Assets, the base FTDF Price will yield a 72.4% return to the FTDF. Of course, actual distributions to the FTDF Fund Members will be reduced by allowed administrative expenses, allowed claims, and settlements.

The Asset Purchase Agreement contemplates different price adjustments with respect to the FTDF Price. First, the Asset Purchase Agreement has built-in price adjustments that enhance the recovery to the FTDF to the extent that principal payments on FTDF loans are received after July 31, 2006, (the "Cut-Off Date") and the closing of the Asset Purchase Agreement. These adjustments provide for a partial reduction in the purchase price (ranging from 65% to 95% of the principal collected) for each dollar of principal collected prior to the close of the sale. As the FTDF Price will be reduced by less than the amount of the principal actually received by FTDF,

---

2    The APA lists 46 loans, but two of the loans listed paid off subsequent to July 31, 2006.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

1    the net effect of any principal pay downs on the FTDF Assets after the Cut Off Date will be an

2    increase on the overall return to FTDF.[3]

3          Second, the Asset Purchase Agreement has another price adjustment mechanism in the

4    event the reported principal balance of the FTDF Assets as of the Cut Off Date proves to be

5    inaccurate.[4]  These adjustments will not be made on a dollar-for-dollar basis, but rather, will be

6    made according to the same "buckets" that are used to account for principal payments (i.e.,

7    ranging from 65% to 95%).  These downward adjustments in the FTDF Price will be netted

8    against any amounts by which the reported principal balance of the FTDF Assets as of the Cut Off

9    Date proves to be too low.[5]

10          Finally, all parties agree that there are certain title issues regarding one of the FTDF loans

11   that require further development and analysis.  To the extent that the Debtors are able to resolve

12   these issues by delivering an appropriate title policy endorsement, the FTDF Price will be

13   increased by $250,000.

14          **2.      USACM Price.**

15          In consideration of the USACM Price, Silver Point will pay USACM approximately

16   $550,000 over time for USACM's servicing business and related assets, including the right to

17   service the loans in the USACM portfolio as described in more detail below.  Silver Point will pay

18   USACM out of the proceeds that Silver Point will receive from servicing these loans.

19   Specifically, USACM will pay $500,000 out of the first $1,000,000 it collects in interest

20   payments, net of their collecting and servicing fees.  Silver Point will also pay $50,000 out of the

21   first $100,000 it collects on default rate interest payments on FTDF assets.

22   ───────────────────

23   3    For example, assume that, between the Cut-Off Date and the close of the sale, the FTDF's proportionate share of
        the principal collected is a hypothetical $10 million , which falls within the 85% adjustment level contained in the
24      APA, instead of reducing the purchase price by the full $10 million of principal collected, the purchase price
        would be reduced by only $8,500,000 (i.e., 85% of $10 million).  The FTDF would retain the $10 million
25      collected, thereby increasing the recovery percentage from 72.4% to 74.75%.

26   4    All parties recognize that Debtors' new management has done all that it could in reconstructing the Debtors'
        records, but, in the end, Debtors' new management, like a chapter 7 trustee, cannot guarantee any of the records
27      they have used in re-creating the Debtors' records.

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

1    Importantly, USACM elected to retain all pre-close accrued servicing fees and related fees.

2    Thus, after the closing of the Asset Purchase Agreement ("Closing"), Silver Point will collect and

3    pay over to USACM certain amounts, including (a) all servicing fees accrued but unpaid as of the

4    Closing and (b) all late charges and default interest due, but unpaid, from borrowers as of the

5    Closing, with the exception of the proportionate default interest in respect of the FTDF Assets.  In

6    addition, Silver Point will also perform certain services on behalf of USACM's estate to assist

7    USACM in the collection of its other assets, which it has elected to retain, including exit fees,

8    extension fees, and deferred origination fees, among others.

9    **3.    Auction.**

10    The sale of the USACM Assets and FTDF Assets to Silver Point is subject to an auction

11    process.  The auction process allows other qualified bidders to make higher and better offers for

12    the USACM Assets and FTDF Assets.  Thus, the price paid for the USACM Assets and FTDF

13    Assets may increase even more to the extent that overbidders participate in the auction process and

14    decide to pay more for these assets.  It is anticipated that the auction for these assets will take

15    place on December 7, 2006.

16    **4.    Transfer of the Loan Servicing Agreements**

17    As stated above, included among the USACM Assets are the Loan Servicing Agreements.

18    Pursuant to sections 363 and 1123(a)(5) of the Bankruptcy Code, these Loan Servicing

19    Agreements are not modified, and will be transferred to Silver Point (or the successful

20    overbidder), at the Court-supervised auction, free and clear of liens, claims, and interests including

21    any alleged claims under § 503(b) of the Bankruptcy Code.  The Debtors and Committees believe

22    that the transfer of these Loan Servicing Agreements to the asset purchaser is not an assumption

23    and assignment of the agreements because they are not executory contracts and thus no

24    assumption or assignment is required to transfer them as assets of the USACM estate.

25    **a.    Summary of Silver Point's Loan Servicing Capability**

26

27

28    5    Because the netting occurs on a "bucket by bucket" basis, the mechanic to implement this concept became
      admittedly complicated and lengthy.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

1    Silver Point is a private investment firm specializing in credit-related investments, with

2    approximately $6 billion of capital under management.  Silver Point's middle market investment

3    group is well-qualified to manage and service portfolios of troubled loans.  Silver Point's middle

4    market troubled loan investment model is focused on the acquisition, management and resolution

5    of sub-performing and non-performing loan assets, emphasizing current income potential, with

6    near- to long-term capital appreciation.  Silver Point, working in conjunction with its third-party

7    loan servicing provider, Laureate Capital, LLC ("Laureate"), monitors collections through mid-

8    month and month-end delinquency reports, and trail balance reporting emphasizing delinquent

9    credits.

10    Laureate has been working as a loan services for Silver Point since May 2004.  Laureate

11    has serviced approximately 150 loans for Silver Point, totaling approximately $300 million of

12    outstanding debt.  Laureate has been servicing loans since 1994.  Today, Laureate services

13    approximately 2,170 loans, totaling approximately $9 billion dollars of outstanding debt, for

14    approximately 60 lenders.  Standard & Poors recently gave Laureate a very favorable rating and

15    stated that Laureate is effectively positioned "as a highly capable commercial primary loan

16    servicer" in its service evaluation dated July 20, 2006.  In addition, Laureate is audited annually by

17    the audit department of its parent BB&T Corp., a financial holding company with almost $100

18    billion in assets.  The audit staff has documented Laureate's compliance with the minimum

19    servicing standards identified by the Mortgage Bankers' Association Uniform Single Attestation

20    Program for Mortgage Bankers.

21    Laureate handles all administrative and financial aspects of managing performing, sub-

22    performing and non-performing loans within Silver Point's portfolio.  Specifically, Laureate issues

23    billing notices, collects the payments from Borrowers, remits collections directly to lenders (or,

24    where applicable, investors), and issues reports on payments to Silver Point.  In addition, Laureate

25    also is responsible for tracing UCC expirations, real estate tax delinquencies, and insurance

26    coverage for each improved collateral property.  As mentioned above, Silver Point actively

27    monitors collections through mid-month and month-end delinquency reports, as well as trial-

28    balance reporting emphasizing delinquent credits, produced by Laureate.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

1    The Debtors and Committees expect that any successful bidder, if other than Silver Point,

2    will have similar loan servicing capabilities, and overbidders will provide evidence of their

3    capabilities and experience in conjunction with sale procedures.

4        **5.    The Sale of the FTDF Assets is in the Best Interests of the**

5            **FTDF Estate**

6

7    FTDF believes that the proposed sale of the FTDF Assets and USACM Assets, subject to

8    an auction process, is in the best interests of the FTDF estate and provides for the best

9    mechanism to maximize the recovery to the FTDF investors.  In order to gain comfort as to the

10   purchase price of the FTDF Assets, the professionals of FTDF and the FTDF Committee spent

11   considerable time and effort evaluating the ultimate recovery on the FTDF assets on a standalone

12   basis, the timing and cost of such recovery and the myriad of risks and uncertainties inherent in

13   achieving such recovery.  After evaluating the potential range of recovery values to FTDF

14   relative to the risks, costs and uncertainties associated with such potential recovery values, FTDF

15   supported the FTDF Price agreed to by the Debtors for several reasons.  First, the sale process

16   eliminates the timing and collection risk inherent in the continued workout of the FTDF loans.

17   Second, the sale process removes the dilution of recoveries to investors from the continued

18   administrative burden associated with administering these Chapter 11 Cases and the costs of

19   collection and work out of the FTDF loan portfolio.  Third, the auction process and purchase

20   price adjustments for principal collections prior to the close of the sale is likely to provide a

21   higher recovery than that contained in the Asset Purchase Agreement. Accordingly, FTDF

22   believes that the proposed Asset Sale Transaction, subject to the auction process, provides the

23   best means to maximize the value to the FTDF investors.

24       **6.    The Sale of the USACM Assets is in the Best Interests of the USACM**

25            **Estate and Direct Lenders**

26   USACM is transferring its servicing rights in 80 specifically identified loans, including

27   rights to collect servicing fees and other fees, as well as limited personal property related to loan

28

Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

53

Revised Disclosure Statement

1   servicing.  The proposed purchase price is $500,000 out of the first $1,000,000 it collects in

2   servicing fees, after reimbursement of Silver Point's expenses.  Silver Point will also pay $50,000

3   out of the first $100,000 it collects on default rate interest payments on FTDF Assets.

4   Importantly, USACM elected to retain all pre-close accrued servicing fees and related fees.

5   Thus, after the closing of the Asset Purchase Agreement ("Closing"), Silver Point will collect

6   and pay over to USACM certain amounts, including (a) all servicing fees accrued but unpaid as

7   of the Closing and (b) all late charges and default interest due, but unpaid, from borrowers as of

8   the Closing, with the exception of the proportionate default interest in respect of the FTDF

9   Assets.  In addition, Silver Point will also perform certain services on behalf of USACM's estate

10  to assist USACM in the collection of its other assets, which it has elected to retain, including exit

11  fees, extension fees, and deferred origination fees, and including collecting and remitting Prepaid

12  Interest to the USACM Trust, among others.

13          This transaction creates a mechanism for collection and servicing of Loans by an

14  experienced, well-capitalized loan servicer.  The new servicer will allow Direct Lenders a means

15  for collection of their Loans.  The new servicer will collect post-Closing servicing fees in

16  consideration of those efforts.

17          The sale of the servicing assets was linked to the sale of the FTDF Assets for two

18  reasons.  First, given that the servicing portfolio is comprised of a substantial number of non-

19  performing loans it became apparent that substitute loan servicers were not willing to service the

20  portfolio without modification of the existing loan service agreements or Lenders paying (out of

21  pocket) collection costs including foreclosure and attorney fees and costs.  Linking the sale of

22  servicing rights to the sale of the FTDF.  Assets expanded the market for available loan servicers

23  to include parties (like Silver Point) who are willing to perform loan servicing as a condition of

24  purchasing the FTDF  Assets at a discount to its face value.  Second, buyers wanted a known,

25  substantial amount of loans to be included in the servicing portfolio.  Without that critical mass,

26  a servicer would not know what Loans might be available for servicing after the Closing.  This

27  synergy caused the FTDF Committee to agree to an allocation of the potential Overbid that

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

1    recognizes the value contributed for the servicing assets that is not reflected in the present

2    allocation of the purchase price.

3        The practical alternative to the sale from the perspective of the USACM creditors was to

4    create a servicing entity, which would require staff, facilities, and capitalization.  One issue for

5    creditors is whether such a new servicing entity would be profitable.  An even more difficult

6    issue is how the funds to operate such an entity would be obtained.

7        Balancing the alternatives, USACM's current management decided that a sale of the

8    servicing assets was in the best interests of creditors, and the Unsecured Committee concurred.

9

10

11

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

12

13

14        **E.        Intercompany Compromises.**

15            **1.        Settlement Between USACM and Direct Lenders**

16        As discussed below, USACM, FTDF, USA Securities, USA Realty and the Direct

17    Lenders Committee have reached a resolution of certain disputes between them.  In order to

18    avoid the time and costs involved in litigation of the disputes, as well as to provide more

19    certainty to the Direct Lenders, the Direct Lenders Committee believes that it is in the best

20    interest of the Direct Lenders to approve the compromise as incorporated in the Plan.  Please

21    note that if you are a Direct Lender and you object to the proposed compromise in the Plan

22    regarding Prepaid Interest, as discussed below, you must file and pursue an objection to

23    confirmation of the Plan to preserve your objection.  Voting to reject the Plan will not be

24    sufficient to preserve your objection.

25            **a.        Prepaid Interest**

26        Prior to the Petition Date, USACM's former management regularly made monthly

27    interest payments to certain Direct Lenders regardless of whether those Direct Lenders respective

28

Revised Disclosure Statement

loans were performing.  In the case of nonperforming loans (where borrowers failed to make timely interest payments), USACM used other funds in its collection account to make interest payments to certain of the Direct Lenders ("Prepaid Interest").  The Debtors believe that the accumulated funds in its collection account came from multiple sources, including, but not limited to, the diversion of principal payments from borrowers ("Unremitted Principal"); deferred loan fees payable to USACM that were collected as part of the payments made by borrowers on certain loans; and transfers from DTDF that were otherwise payable to certain Direct Lenders.  Therefore, since approximately January 2003, there were a variety of funds commingled in the collection account that were used to make Prepaid Interest payments to certain Direct Lenders on nonperforming loans being serviced by USACM, as well as to pay interest on direct loans to USACM or to insiders.

Since the Petition Date, USACM through MFIM has continued to service loans and collect interest and principal payments from borrowers.  Some previously non-performing loans have become performing.  As a result, USACM is now receiving interest payments despite having already transferred funds to Direct Lenders in the form of Prepaid Interest.  The Direct Lenders that previously received the Prepaid Interest are not entitled to receive their loan interest twice, which would result if interest payments on now-performing loans were passed on to those Direct Lenders.  As of September 30, 2006, USACM has collected approximately $14 million in recovered Prepaid Interest.  As additional interest payments are collected, the amount of recovered Prepaid Interest held by USACM should continue to rise.

As part of its post-petition operations, USACM has continued to collect interest and principal payments on performing loans held by certain Direct Lenders.  Unrelated to such performing loans, individual Direct Lenders, prior to bankruptcy, received Prepaid Interest on account of non-performing loans.  Pursuant to Court orders, USACM has retained funds on account of Prepaid Interest from the otherwise performing loans (this process has sometimes been referred to as "Netting").  As of September 30, 2006, USACM has collected approximately

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

1    $14 million in recovered Prepaid Interest, as additional payments are collected from borrowers,

2    that amount may continue to rise.

3         Debtors contend that the recovered Prepaid Interest constitutes property of USACM's

4    bankruptcy estate under Section 541(a) of the Bankruptcy Code.  First, by making Prepaid

5    Interest payments to Direct Lenders without receiving the underlying payments from borrower,

6    the borrower became indebted to USACM for the amount it advanced.  The excess funds

7    constitute payment of that debt, and thus, are property of the estate under sections 541(a)(1) and

8    (a)(7) of the Bankruptcy Code.  Likewise, the withheld funds (from the Court-approved netting

9    process) are estate property because they constitute a valid recoupment and/or setoff and

10   recovery from investors who received improper payments of Prepaid Interest from USACM's

11   prior management.  As such, the withheld funds are property of the estate under sections

12   541(a)(3) and (a)(7) of the Bankruptcy Code.

13        The Debtors further believe that individual Direct Lenders cannot trace their Unremitted

14   Principal to the excess funds or withheld funds, as required under applicable bankruptcy and

15   non-bankruptcy law.  First, the Unremitted Principal funds in the collection account were used,

16   not only to make Prepaid Interest payments to other Direct Lenders but also to make interest

17   payments on other loans, including for USACM or USACM insiders.  Second, the Unremitted

18   Principal was commingled in the collection account with other funds of USACM and DTDF.

19   Because money is fungible, Debtors believe it is impossible for individual Direct Lenders to

20   trace their Unremitted Principal to any particular payment of Prepaid Interest, as such,  Direct

21   Lenders are unable to impose a trust upon recovered Prepaid Interest and such funds constitute

22   USACM estate property.

23        The Unsecured Creditors Committee has also asserted that Prepaid Interest transfers from

24   accounts in the name of USACM and in which it held an interest to Direct Lenders that were not

25   entitled to such funds (since not obtained from their respective borrowers on their Loans), may

26   be recovered from Direct Lender transferees as fraudulent conveyances, and has requested

27   authorization to pursue such litigation.

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

57

On the other hand, certain Direct Lenders have argued that recovered Prepaid Interest is not property of the USACM bankruptcy estate. Rather, certain Direct Lenders have taken the position (among other theories) that recovered Prepaid Interest should be held in a constructive or other equitable trust for the Direct Lenders whose payments were diverted as Unremitted Principal.

### b.    Surcharge

USACM has alleged that it is entitled to surcharge the Direct Lenders for payment of a portion of its professional fees, including fees of its financial advisor, MFIM, as well as its counsel, Ray, Quinney & Nebeker and Schwartzer & McPherson, for services specifically related to the Direct Lenders. Additionally, USACM has alleged that it is entitled to surcharge the Direct Lenders for payment of the fees and costs of counsel for the Direct Lenders Committee, Gordon & Silver, Ltd. under Bankruptcy Code provisions and case law holding that committee professionals should be paid from amounts distributed to their constituents. This surcharge is alleged to be in addition to any servicing fees or collection costs charged under the Loan Servicing Agreement. Throughout USACM's bankruptcy case, the Direct Lenders Committee has vigorously asserted that the Direct Lenders' loans do not constitute property of USACM's bankruptcy estate. As such, the Direct Lenders Committee has taken the position that USACM has no authority to seek reimbursement of or surcharge the Direct Lenders' loans for any of its professionals' fees and costs that are not otherwise authorized under the Loan Servicing Agreements.

### c.    Recharacterization and Substantive Consolidation

Certain parties have threatened litigation seeking recharacterization of the Direct Lenders' Claims as equity investments in USACM, or to substantively consolidate them with the USACM, DTDF or FTDF estates and/or seeking substantive consolidation of the Debtors' estates.

### d.    Accrued and Unpaid Loan Servicing Fees

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

58

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   USACM asserts that it is entitled to collect loan servicing fees that were accrued and
2   unpaid as of the Petition Date from Direct Lenders.

3               e.        **Compromise and Settlement**

4       As a settlement and compromise of these and other disputes, the Plan provides that Direct
5   Lenders will be released by USACM, FTDF, USA Realty and USA Securities from all Claims
6   including but not limited to surcharge, recharacterization of Direct Lender Loans, and the
7   collection of pre-petition accrued but unpaid fees due under Loan Servicing Agreements.  In
8   exchange for this release, Direct Lenders will acknowledge and agree that recovered Prepaid
9   Interest constitutes an asset of the USACM Estate or, to the extent necessary, will transfer their
10  ownership rights, if any, in recovered Prepaid Interest to the USACM estate.  The netting of
11  Prepaid Interest from loan collections will be continued by any subsequent loan servicer.  Any
12  Direct Lender who does not consent to being bound by this acknowledgement and agreement
13  must object to confirmation of the Plan and present sufficient evidence to trace any of its
14  Unremitted Principal to assets of the USACM estate.

15      All of the Debtors and their respective Estates agree under the settlement not to surcharge
16  the Direct Lenders for the administrative fees and costs of their professionals.  USACM further
17  agrees to limit the amount of reimbursement it seeks for payment of the counsel for the Direct
18  Lenders Committee solely from the 2% Holdback to a maximum amount of $605,000.  All fees
19  and costs of counsel for the Direct Lenders Committee incurred above the $605,000 amount shall
20  be paid by the estate of USACM and not the Direct Lenders.  The $605,000 shall be allocated
21  among the Holdbacks from Direct Lenders on a pro-rata basis based upon the unpaid principal
22  balance of their loans as of the Petition Date.

23      The compromise further provides that USACM retains the maximum amount of servicing
24  fees provided for in Loan Service Agreements. Lenders with "up to" x% in annual loan servicing
25  fees will be charged that x% amount, but the reimbursement of the Allowed Professional fees
26  and costs of the Direct Lender Committee comes out of those fees.  Lenders with 1% or less
27  annual servicing fees will share in the reimbursement of the Allowed Professional fees and costs

59

1   of the Direct Lender Committee and the balance of their 2% Holdback will be returned. In

2   addition, USACM agrees that the Direct Lenders are not responsible for loan servicing fees

3   accrued and unpaid as of the Petition Date.

**2.      Settlement Between FTDF and USACM.**

4

5           As described below, FTDF and USACM have reached a global settlement on the numerous

6   disputes between them.  While each of these compromises is described separately, no one

7   compromise can be consummated without the other.  In order to avoid the time and costs of

8   protracted litigation on one or more of these disputes, FTDF and USACM believe that it is in the

9   best interests of their respective estates for the Plan, which contemplates the settlements described

10  below, to be approved.

**a.      Fees and Expenses Incurred by USACM as FTDF's Loan**
**Servicer**

11

12

13

14          USACM currently acts as FTDF's loan servicer under the terms of the FTDF Loan

15  Servicing Agreement, executed by and between USACM and FTDF.  In exchange for USACM

16  servicing FTDF's loan portfolio, FTDF has the following obligations: (i) payment of a servicing

17  fee up to 3% per annum of the maximum principal amount of each of FTDF's Loans and (ii)

18  reimbursement for FTDF's proportionate share of USACM's out-of-pocket expenses incurred in

19  connection with foreclosure proceedings, including attorney's fees, trustee's fees and foreclosure

20  costs (collectively, the "Sevicer Advances").  Under the terms of the loans serviced by USACM, it

21  is standard practice for the borrower to be responsible for all costs of foreclosure and for USACM

22  to seek reimbursement of Servicer Advances from such borrowers, which could then be remitted

23  to FTDF and other direct lenders.

24          Prior to the Petition Date, USACM, however, never collected more than a 1% servicing fee

25  from FTDF.  From the Petition Date through June 2006, USACM continued to collect a 1%

26  servicing fee from FTDF.  Thereafter, pursuant to the Modified Order Authorizing Interim

27  Distributions and Holdbacks [docket no. 1424], USACM has collected a 3% servicing fee from

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

60

FTDF.  FTDF and USACM dispute the amount of the servicing fee that should be collected from FTDF.

In connection with the Servicer Advances, while USACM did not seek the reimbursement from FTDF of any such advances it incurred prior to the Petition Date, it has since sought reimbursement from FTDF for certain Servicer Advances incurred after the Petition Date.  Most recently, FTDF has been charged with its proportionate share of real estate appraisals related to the FTDF loan portfolio.  In addition, USACM has put FTDF on notice that it intends to seek reimbursement of other Servicer Advances associated with foreclosure proceedings, including the fees and expenses incurred by certain professionals USACM has hired to handle such foreclosures. As described below, FTDF questions whether it should be responsible for reimbursing Servicer Advances when it is already paying its share of the Debtors' professional fees and expenses in accordance with the FTDF Debtors' Professionals' Fee/Cost Allocation (see below).

As part of the parties' overall settlement, FTDF and USACM have reached an agreement on the amount of FTDF's servicing fee and FTDF's obligation to reimburse Servicer Advances.  In connection with the servicing fee, FTDF shall be charged a 1% servicing fee for the period of the Petition Date through June 30, 2006.  Thereafter, commencing on July 1, 2006 and ending on the earlier of January 31, 2007, or the Effective Date, FTDF shall be charged a 2.5% loan servicing fee.  Finally, to the extent any prepetition servicing fees remain outstanding, such fees shall be waived in full by USACM.

Second, with respect to Servicer Advances, FTDF shall pay its proportionate share of all Servicer Advances incurred by USACM prior to the close of the Asset Sale Transaction; provided, however, that, if FTDF pays its Debtors' Professionals' Fee/Cost Allocation (described below), FTDF shall not then be responsible for reimbursing Servicer Advances incurred by the Debtors' professionals, except solely for Servicer Advances for those professionals who actually perform foreclosure work, excluding USACM's bankruptcy professionals.  Furthermore, should USACM receive payment from any source for Servicer Advances that have been previously paid by FTDF, then USACM shall reimburse FTDF for such Servicer Advances paid by FTDF.  Both USACM

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

1    and FTDF believe that the compromise on FTDF's payment of the servicing fee and Servicer

2    Advances far outweigh the risks and costs of litigating these disputes.

3                    b.        **Management Fee**

4          USACM also acts as FTDF's de facto manager.  As described above, USA Realty is the

5    manager of FTDF under the terms of the FTDF Operating Agreement.  USA Realty, however, has

6    no employees of its own and simply passes the benefits and burdens under the FTDF Operating

7    Agreement through to USACM.  Pursuant to the FTDF Operating Agreement, USA Realty is

8    entitled to collect the FTDF Management Fee equal to 1.5% per annum of FTDF's assets under

9    management.  In practice, this management fee is paid to USA Realty and then directly transferred

10   to USACM.  Since the Petition Date, FTDF has incurred approximately $78,000 per month for the

11   FTDF Management Fee.  As FTDF realizes little benefit from the FTDF Management Fee and is

12   already being allocated its share of the Debtors' professional fees and expenses, FTDF believes

13   that it should not be responsible for paying the FTDF Management Fee.

14         In consideration of the fees and expenses already charged to the FTDF estate, the parties

15   have agreed that the FTDF Management Fee shall be waived in full for both prepetition and

16   postpetition periods, through the earlier of January 31, 2007, or the Effective Date.  Any

17   management fees paid by FTDF to USACM since the Petition Date shall be applied to reduce the

18   obligations of FTDF to USACM under the Plan, and any remaining management fees shall be

19   repaid by USACM to FTDF.  Management fees from July 2006 until the Effective Date shall be

20   deposited n the USA Realty account and transferred to FTDF on the Effective Date.

21                    c.        **Debtors' Professional Fees and Expenses**

22

23         FTDF, as one of the Debtors, shares responsibility for the administrative costs of these

24   Chapter 11 Cases.  Since the Petition Date, the Debtors' professionals have allocated their fees and

25   expenses among the five Debtors' estates.  In September 2006, the Unsecured Creditors'

26   Committee objected to the allocation of the Debtors' professional fees and expenses through July

27   31, 2006, arguing that FTDF and DTDF should bear more of the burden.  To resolve this dispute,

28   the parties have agreed that FTDF shall be responsible for a flat amount on a monthly basis for its

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

62

Revised Disclosure Statement

1   share of these fees and expenses. FTDF's Debtors' Professionals' Fee/Cost Allocation shall be

2   $125,000 per month commencing on the Petition Date and ending on the earlier of January 31,

3   2007, or the Effective Date.

4

5

6                          **d.**        **Claims Asserted By and Between USACM and FTDF**

7        Like other Direct Lenders, FTDF was also a victim of USACM's pre-petition management

8   practices. First, USACM failed to remit $347,775 from principal collected on FTDF's loans to

9   FTDF, resulting in a FTDF Unremitted Principal Claim in the amount of $347,775. Second,

10   USACM paid to FTDF certain amounts that it had never collected from FTDF loan borrowers. In

11   fact, prior to the Petition Date, FTDF had received $2,557,307 in "pre-paid interest" (the "FTDF

12   Prepaid Interest"). USACM has subsequently netted this pre-paid interest against amounts

13   collected post-petition in connection with the FTDF loan portfolio. The FTDF Prepaid Interest is

14   now being held in the USACM Collection Account. Third, FTDF asserts a general unsecured

15   claim against USACM for its failure to fulfill its fiduciary duties, among others, under its Loan

16   Servicing Agreement and FTDF Operating Agreement, which is referred to as the FTDF

17   Unsecured Claim.

18        As part of the global settlement between USACM and FTDF to avoid the costs and risks

19   associated with litigating these issues, the parties have agreed to recognize each of the above

20   claims, which will receive the following treatment under the Plan. The FTDF Unremitted

21   Principal Claim will be allowed as a USACM Unsecured Claim in the amount of $347,775, which

22   FTDF will transfer to DTDF as part of its compromise with DTDF (see below). With respect to

23   the FTDF Prepaid Interest being held in the USACM Collection Account, USACM, on the

24   Effective Date of the Plan, shall be permitted to retain the FTDF Prepaid Interest as an

25   unencumbered asset of its estate. Finally, the amount of FTDF's general unsecured claim against

26   USACM (the "FTDF Unsecured Claim") shall be allowed in either (i) the amount as agreed to by

27   FTDF and USACM on or before the Confirmation Hearing, or (ii) if no agreement is reached by

28   such date, the amount determined by the Court after an evidentiary hearing.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**e.      Allocation of the Overbid,  Break-Up Fee, and Expense**

**Reimbursement**

In order to maximize the value of their respective estates, USACM and FTDF agreed to jointly sell their assets, subject to an auction process, as described above.  It is expected that the Court will soon enter an order approving certain protections for Silver Point, who agreed to become the lead bidder, and establishing certain guidelines for the suction.  The anticipated Court order will provide that, under specified circumstances, the Silver Point will be entitled to the break-up fee of $1,500,000 (less the amount of any expense reimbursement already paid) and an expense reimbursement of up to $500,000.

The parties have agreed that only the estates of USACM and FTDF shall be liable for the break-up fee or expense reimbursement.  Furthermore, USACM and FTDF have agreed that their estates shall share in any overbid in the same proportion or in the same manner as they share in the liability for the Break-Up Fee or the Expense Reimbursement.  The allocation shall be 85% to FTDF and 15% to USACM for any overbid consideration, and any incurred break-up fee or expense reimbursement obligation (as those terms are used in the Asset Purchase Agreement) shall be allocated in the same percentages, except as otherwise provided in the Stipulation memorializing the agreement between USACM and FTDF on the overbid allocation filed by the USACM Committee and the FTDF Committee with the Court, under seal, and served on the Debtors as confidential information, no later than ten (10) days prior to the Auction.

**f.      January 31, 2007 as the Termination Date of the FTDF/USACM**

**Compromise**

USACM and FTDF both recognize that their overall compromise is very time sensitive and have agreed on an outside date by which their settlement agreement must be implemented.  By entering into this settlement, the parties are not foregoing any of their respect rights in connection

64

Revised Disclosure Statement

with the compromises reached on FTDF's payment of servicing fees, Servicer Advances, the FTDF Management Fee, or the FTDF's Debtors' Professionals Fee/Cost Allocation should the Effective Date of the Plan not occur by January 31, 2007.  In that event, the parties' settlement regarding FTDF's payment of servicing fees, Servicer Advances, the FTDF Management Fee, and the FTDF's Debtors' Professionals Fee/Cost Allocation shall no longer be enforceable as of February 1, 2007, and USACM and FTDF shall have reserved all of their rights with respect thereto for all periods after January 31, 2007, including the right of USACM seek a Court order to compel FTDF's payments of such fees for all time periods after January 31, 2007.

### 3.    Settlement Between FTDF and DTDF

As described below, FTDF and DTDF, through their respective committees, have reached a settlement regarding DTDF's threatened litigation to seek the re-characterization of all loans serviced by USACM, including the FTDF loan portfolio, as property of the Debtors' estates and the substantive consolidation of the Debtors' estates.[6]

Under the re-characterization argument, DTDF seeks to pool all loans together into one collective pot, from which all direct lenders, including the FTDF, would share, pro rata, based on the amount of their respective original investment.  In this scenario, FTDF, rather than looking solely to the FTDF loan portfolio for recovery, would be just one of many direct lenders asserting a claim against the common pool of loans.  Thus, while FTDF would be able to seek recovery from a larger asset pool, the number of claims against that asset pool would also be significantly greater.  On the other hand, if only the Debtors' estates were substantively consolidated together, all assets and liabilities would become part of the same estate, resulting in all of the Debtors' constituencies (excluding Direct Lenders) seeking recovery from a much smaller, single pot of

_____

6    DTDF first asserted its claims for re-characterization and substantive consolidation in opposing USACM's Motion for Interim Distributions.  In approving the Motion for Interim Distributions, the Court did so without

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

1   assets.  As the Bankruptcy Code dictates that general unsecured claims must be paid before equity

2   interests, substantive consolidation would delay and potentially reduce recovery to holders of

3   FTDF Equity Interests.

4           In analyzing the ramifications of re-characterization with respect to FTDF's anticipated

5   recovery, the FTDF Committee believes that re-characterization, in and of itself, would only have

6   a minor negative impact on the expected recovery for holders of FTDF equity interests.  While the

7   effect of substantive consolidation of only the Debtors' estates on the FTDF recovery is much

8   more meaningful, the Court is not likely to grant this relief.  Litigation, however, is not without its

9   own costs.  Litigation is very expensive and would increase the administrative burden of these

10  Chapter 11 Cases.  Moreover, any litigation with respect to claims for re-characterization or

11  substantive consolidation would necessarily delay recovery to holders of FTDF equity interests.

12  Distributions could not be made to any of the Debtors' constituencies, let alone holders of FTDF

13  equity interests, until the litigation had been resolved.  After taking into account the cost and delay

14  of DTDF litigating its claims for re-characterization and substantive consolidation, FTDF, with the

15  support of the FTDF Committee, believes it is in the best interests of the FTDF estate to settle this

16  threatened litigation.  The terms of this settlement are described below.  Like the FTDF/USACM

17  compromise, the parties negotiated this settlement as a whole, and no one compromise can be

18  consummated without the other.

19          a.      **FTDF Payment to DTDF and Terms of Repayment.**

20

21          On the Effective Date, FTDF shall pay to DTDF $500,000.  In addition, FTDF shall also

22  pay an additional sum of up to $500,000 from 50% of any overbid increment actually paid and

23  allocated to FTDF, after taking into consideration any break-up fee (including any expense

24  reimbursement) paid by FTDF (together with the $500,000 payment, the "FTDF Payment").  In

25  other words, the minimum amount of the FTDF Payment is $500,000, which can only be

26  increased to the extent that FTDF actually receives additional consideration from the sale of the

27  _____

28      prejudice to the rights of any party in interest.  As a result, DTDF has reserved all of its rights with respect to

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

FTDF Assets.  FTDF will evenly split this potential "upside" with DTDF until DTDF receives an additional $500,000.

DTDF shall have no obligation to repay the FTDF Payment until holders of DTDF equity interests have received the same recovery as holders of FTDF Equity Interests, which is defined as the FTDF Base Recovery Percentage in the Plan.  Upon achieving the FTDF Base Recovery Percentage (not as adjusted below), DTDF shall repay $500,000 of the FTDF Payment.  The repayment of the remaining amount of the FTDF Payment shall be based on the adjusted FTDF Base Recovery Percentage, which shall be calculated as follows: on each anniversary of the Effective Date, a further calculation shall be performed by increasing the dollar amount of the recovery that DTDF must obtain in order for DTDF to achieve the adjusted FTDF Base Recovery Percentage by adding $5 million per year to such amount (the "Adjusted FTDF Base Recovery Percentage").  Upon achieving the Adjusted FTDF Base Recovery Percentage, DTDF shall repay the balance of the FTDF Payment.

### b.    Transfer of FTDF Assets and Claims to DTDF

As further consideration of the parties' settlement, FTDF will transfer to DTDF its interest in the Bysynergy Loan, the FTDF Unremitted Principal Claim, and the proceeds of certain non-assignable actions, which include FTDF's right to pursue certain tort actions against USA Realty, USA Securities and USACM (the "FTDF Transferred Assets").  DTDF, not FTDF, shall bear the costs of pursuing the recovery on the FTDF Transferred Assets.

### c.    FTDF General Unsecured Claim Subordination

Finally, FTDF will transfer its pro-rata share of recoveries from its interests as a beneficiary in the USACM Trust to DTDF until the allowed DTDF equity interests receive a recovery of 85% on their investment in DTDF from all sources of recovery allocated to the DTDF

---

asserting claims for re-characterization and substantive consolidation.

Revised Disclosure Statement

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

and DTDF Post-Effective Date Estate (the "DTDF 85% Recovery").  After the DTDF 85%

Recovery is reached, FTDF will retain its pro-rata share of recoveries from its interests as a

beneficiary in the USACM Trust.

**4.    No Compromise of the Disputes Between USACM and DTDF**.

Despite substantial efforts among the USACM Committee and the DTDF Committee,

these two Committees have been unable to reach agreement on a resolution of the disputes

between USACM and DTDF.  These disputes primarily consist of the following:

a.    The allowed amount of the DTDF general unsecured claim against

USACM.

b.    The allocation of the USAIP $58 Million Promissory Note as

between USACM and DTDF.

c.    The assignment of priority (i.e., first priority liens or second priority

liens) of the collateral pledged by USAIP for both the DTDF 10-90, Inc. Loan and the IP Security

Agreement.  (The IP Security Agreement is dated May 31, 2006 and was made by USAIP in favor

of USACM, DTDF, FTDF, USA Securities and USA Realty as modified by the Order Approving

the Agreement with Investment Partners entered by the Bankruptcy Court on July 24, 2006.)

d.    USACM's right to recovery from DTDF of $4,641,402 in Prepaid

Interest, given DTDF's claims against USACM, including for Diverted (or Unremitted) Principal,

and the possibility of offsetting such claims.

e.    DTDF's payment of the approximately $124,000 per month

management fee to USA Realty, which management fee is then paid over by USA Realty to

USACM.

Revised Disclosure Statement

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    f.    The refund of the 2% Holdback to DTDF and the payment by DTDF

2    of a one percent (1%) servicing fee to USACM for both the prepetition and postpetition periods.

3

4    g.    The amount and payment of DTDF's share of the professional fees

5    and costs incurred by the Debtors' professionals in the USACM Estate commencing on the

6    Petition Date. The USACM Committee and the DTDF Committee will continue to work to settle

7    these disputes.  If these Committees are unable to resolve these disputes in whole or in part, the

8    USACM Trust and the Post Effective Date DTDF will litigate these disputes after the Effective

9    Date.

10    **F.    Post-Effective Date Entities**

11    **1**.    **FTDF, USA Realty, and USA Securities After the Effective Date**

12    On and after the Effective Date, FTDF, USA Realty and USA Securities will have the

13    authority to effect all transactions and take all actions required by the Plan.  In particular, FTDF

14    and the FTDF Committee shall each have authority to prosecute (a) claim objections in the FTDF

15    Estate, and (b) the non-assignable FTDF litigation claims on behalf of FTDF subject to the

16    compromise with DTDF discussed above.  After the actions set forth in this paragraph are

17    completed, FTDF, USA Realty, and USA Securities shall be dissolved in accordance with the

18    Confirmation Order and applicable state law.

19

20    **2.    The USACM Trust**

21    The USACM Trust will be created pursuant to a trust agreement, the form of which will be

22    submitted to the Court at least ten (10) days prior to the commencement of the Confirmation

23    Hearing.  The USACM Trust will hold title to all assets of USACM not collected or not disposed

24    of prior to the Effective Date including such things as accounts, notes or receivables of USACM

25    (including USACM estate's share of the USAIP $58 million Promissory Note), all litigation

26    claims including claims against non-debtor insiders belonging to or assertable by the USACM

27    Estate, and all servicing and related fees to be retained by USACM as set forth in the Asset

28    Purchase Agreement.  The purpose of the USACM Trust is to realize assets that can be liquidated

69

1    with net proceeds disbursed to its beneficiaries.  The beneficiaries will include all unsecured

2    claims against USACM that have been allowed, including allowed unremitted principal claims,

3    and the unsecured claims of DTDF, FTDF and the Direct Lenders.

4                **3.    The Post-Effective Date DTDF**

5           The post-Effective Date DTDF will be created by an amendment to the current DTDF

6    operating agreement.  This agreement will be amended to, among other things, reflect the

7    appointment of an officer to manage the affairs of DTDF after the Effective Date, to provide for

8    any oversight and replacement of such officer, and to reflect the fact that the charge of such officer

9    will be to liquidate the assets of DTDF for the benefit of the equity holders of DTDF.  The form of

10    such amendment will be submitted to the Court at least ten (10) days prior to the commencement

11    of the Confirmation Hearing.  The post-Effective Date DTDF will hold title to all assets of DTDF

12    not collected or not disposed of prior to the Effective Date including such things as the DTDF

13    loans, certain assets transferred by FTDF to DTDF, all litigation claims including non-debtor and

14    professional litigation held by or assertable by DTDF, and the DTDF estate's share of the USAIP

15    $58 million Promissory Note.  The purpose of DTDF after the Effective Date is to realize assets

16    that can be liquidated with net proceeds disbursed to its beneficiaries, which include all of the

17    equity interests in DTDF that have been allowed.

18                **4.    The Litigation Against Non-Debtor Insiders**

19

20           The USACM, FTDF and DTDF bankruptcy estates have rights, claims and causes of

21    action among their assets, defined in the Plan as "Litigation Claims."  The FTDF estate transfers

22    its non-assignable litigation claims to the DTDF estate under a settlement between them, and these

23    FTDF causes of action and DTDF causes of action are transferred by the plan to DTDF after the

24    Effective Date.  A subcategory of litigation claims is the non-debtor insider and litigation, which

25    generally consists of all of the claims that exist against the insiders of the Debtors, including but

26    not limited to those that can be asserted against Joseph D. Milanowski, Thomas A. Hantges, Paul

27    S. Hamilton, USAIP, and all persons and entities related to or affiliated with those persons and

28    entities who may have improperly received direct or indirect transfers of property of the Debtors,

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

70

1   or aided and abetted such wrongdoing.  The claims against these individuals and entities are

2   extensive, and may include, but are not necessarily limited to, the following causes of action:  (1)

3   breach of contract, (2) breach of fiduciary duty, (3) usurpation or theft of business opportunities,

4   (4) conversion; (5) negligence, (6) mismanagement, (7) an accounting, (8) fraud, (9) fraudulent

5   inducement, (10) negligence misrepresentation, (11) fraudulent conveyance, (12) equitable

6   contribution, (13) equitable indemnity, and (14) securities violations.  The Unsecured Committee

7   and DTDF Committee expect that the USACM Trust and DTDF will agree on terms of a joint

8   prosecution agreement to pursue these causes of action.  The Plan provides for such a joint effort,

9   and that the net recoveries will be shared among the USACM Trust beneficiaries and DTDF

10  investors, without further court approval.

11          **5.      Post-Effective Date Administrators and Advisory Committees.**

12          The USACM Trust and DTDF will each be separately managed by an estate administrator

13  and chief executive officer, respectively, and by an advisory committee, unless otherwise agreed

14  to by the DTDF Committee and the unsecured creditors of USACM.  The estate administrator for

15  the USACM Trust will be also be its trustee, a person proposed by the Committee for the

16  unsecured creditors of USACM (the "USACM Trustee").  The chief executive officer for DTDF

17  will be a person proposed by the DTDF Committee (the "DTDF Administrator").  The retention of

18  both of the estate administrators must be approved by the Court at the Confirmation Hearing.

19          The advisory committees for the USACM Trust will be will be comprised of five persons,

20  who will be named in the Plan Supplement and available for review at least ten (10) days before

21  the deadline for Plan objections.  The Committees for DTDF and the Direct Lenders will each

22  appoint one of the five, and the Committee for the unsecured creditors of USACM will appoint the

23  other three.  In the event of a vacancy, the resigning member will appoint a replacement.  The

24  advisory committee for DTDF will be named in a supplement to the Plan well.

25          In their capacity as estate administrators, the USACM Trustee and DTDF Administrator

26  will assume responsibility for administrative expense and claims objections, Plan distributions,

27  and other aspects of implementing the Plan for their respective bankruptcy estates.  The USACM

28  Trustee may assume such responsibility for those duties for the USA Realty and USA Securities

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

71

1    estates as well.  They will also be responsible for liquidating the assets transferred to the USACM

2    Trust and DTDF, which includes pursuing litigation claims, paying the costs of such litigation and

3    administration of the USACM Trust and DTDF, respectively, and distributing net proceeds in

4    accordance with the Plan.  The USACM Trustee and DTDF Administrator may engage lawyers,

5    accountants and other professionals, who may be professionals for existing Committees.  The

6    estate administrators and advisory committees will continue in their capacities until the assets of

7    the USACM Trust and Post-Effective Date DTDF, respectively, have been liquidated and all

8    distributions have been made in accordance with the Plan.

9         **G.    USACM's Pension Plan**

10         USACM established and maintains a pension plan for certain of its employees known as

11    the USA Commercial Mortgage Company Defined Benefit Pension Plan (the "Pension Plan").

12    The Pension Plan is covered by Title IV of the Employee Retirement Income Security Act of

13    1974, as amended, ("ERISA"), (29 U.S.C. § 1301 et seq.).  On October 20, 2006, the Court

14    entered an order freezing the Pension Plan and approving the appointment of USACM as the

15    successor trustee for the Pension Plan.

16         The Pension Benefit Guaranty Corporation ("PBGC"), a United States Government

17    corporation, guarantees the payment of certain pension benefits upon termination of a pension plan

18    covered by Title IV of ERISA.  The PBGC asserts that USACM and all members of its controlled

19    group are obligated to contribute to the Pension Plan the amount necessary to satisfy ERISA's

20    minimum funding standards under ERISA section 302 and Internal Revenue Code section 412,

21    and that the Pension Plan may be terminated only if the statutory requirements of either ERISA

22    section 4041, 29 U.S.C. section 1341, or ERISA section 4042, 29 U.S.C. section 1342, are met.

23    The PBGC further asserts that if the Pension Plan terminates, USACM and all members of its

24    controlled group will be jointly and severally liable for the unpaid minimum funding

25    contributions, premiums, and unfunded benefit liabilities of the Pension Plan.

26         The PBGC has informed Debtors that it intends to file in the bankruptcy proceedings

27    estimated claims for unfunded benefit liabilities, contingent on plan termination, and claims for

28    unpaid minimum funding contributions and premiums under the Pension Plan.  The PBGC also

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

72

asserts that it is entitled to administrative priority for certain amounts of its claims under 11 U.S.C. sections 507(a)(2), 507(a)(5) and 507(a)(8).  The Debtors currently do not know what amounts the PBGC will claim as an administrative priority, but the Debtors contend the right of the PBGC to an administrative priority claim is limited under applicable bankruptcy law.  Further, the Debtors are evaluating whether the PBGC has any claims against the estates, and do not know whether the PBGC has valid claims.

The PBGC alleges that unless the Pension Plan has been terminated prior to the effective date of the plan of reorganization, Debtors' liability to the Plan under ERISA, or their liability to the PBGC with respect to the Plan, will not be affected in any way by this reorganization proceeding, confirmation of the Plan of Reorganization, or discharge in bankruptcy.  USACM does not necessarily agree with the PBGC's assertion.

**H.    Binding Nature of the Plan and Injunction Included in Plan**

As provided in section 1141(a) of the Bankruptcy Code, upon entry of the Confirmation Order, the Plan shall bind the Debtors, all entities that are to acquire any property either directly or indirectly under the Plan, and all holders of claims and interests, including the Direct Lenders, whether or not their claims and/or interests are impaired under the Plan and whether or not they have accepted the Plan.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 cases under section 105 or 362 of the Bankruptcy Code or that are otherwise existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date of the Plan.

While under section 1141(d) of the Bankruptcy Code one or more of the Debtors may not qualify for a discharge, all parties (including all holders of claims and/or interests) bound by the Plan pursuant to section 1141(a) of the Bankruptcy Code will be permanently enjoined, on and after the Effective Date of the Plan, from:

(i)    commencing or continuing in any manner any action or other proceeding of any kind;

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1          (ii)     enforcing, attaching, collecting, or recovering by any manner or means of any

2 judgment, award, decree, or order;

3          (iii)     creating, perfecting, or enforcing any encumbrance of any kind;

4          (iv)     asserting any right of setoff, subrogation, or recoupment of any kind against the

5 Debtors, their estates, the USACM Trust and DTDF or their assets or their estate representatives,

6 with respect to or on account of any such claim or interest; and

7          (v)     taking any action that would interfere with the consummation of the Plan.

8 **X.     ALTERNATIVES TO THE PLAN AND LIQUIDATION ANALYSIS**

9

10        **A.     Alternatives to the Plan**

11       The Debtors have carefully considered all reasonable alternatives to the organized

12 liquidation that was selected and is set forth in the Plan.  During the first several months of these

13 cases, the Debtors diligently sought to obtain post-petition financing that might have allowed

14 USACM to reorganize and remain in business as a loan originator and loan servicer.  However,

15 after the Debtors' unsuccessful attempts to obtain Court approval for two different term sheets for

16 post-petition financing from two reputable lenders, the Debtors were unable to obtain further

17 reasonable proposals from potential lenders for such financing.  The Debtors then diligently

18 marketed the significant assets available for sale to various potential acquirers, and the result of

19 those intensive efforts is the Asset Purchase Agreement with Silver Point, and the final auction

20 process that will bring forth the highest and best offer to acquire the assets of USACM and FTDF

21 identified for sale pursuant to the Plan.  Further, extensive negotiations with the different

22 Committees resulted in the proposed structure for the organized liquidation of remaining assets

23 and the potential recovery of other assets that is also carried out through the Plan.

24       The Debtors believe that if the Plan is not confirmed, a reasonably likely alternative is that

25 the cases will be converted to liquidation cases under Chapter 7 of the Bankruptcy Code.  As

26 discussed below, the Debtors believe that the Chapter 7 alternative is not in the best interest of any

27 of the creditors, equity interest holders, or other parties in interest in these cases.

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1

2          **B.      Liquidation Analysis and Best Interest of Creditors Test**

3          Pursuant to section 1129(a)(7) of the Bankruptcy Code, for the Plan to be confirmed it

4   must provide that creditors and holders of equity interests will receive at least as much under the

5   Plan as they would receive in a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code

6   (the "Best Interest Test").  The Best Interest Test with respect to each impaired class requires that

7   each holder of a claim or equity interest of such class either (a) accepts the plan or (b) receives or

8   retains under the Plan property of a value, as of the Effective Date, that is not less than the value

9   such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the

10  Bankruptcy Code.  The Court will determine whether the value received under the Plan by the

11  holders of claims in each class of creditors or equity interests equals or exceeds the value that

12  would be allocated to such holders in liquidation under Chapter 7 of the Bankruptcy Code.  The

13  Debtors believe that the Plan meets the Best Interest Test and provides value that is significantly

14  greater than that which would be recovered by each such holder in a proceeding under Chapter 7

15  of the Bankruptcy Code.

16         The chart attached hereto as *Exhibit 4* provides a preliminary liquidation analysis

17  ("Liquidation Analysis") for each of the five Debtors and, based on certain assumptions discussed

18  below, supports the conclusion that a hypothetical liquidation under Chapter 7 of the Bankruptcy

19  Code would return less value to each holder of a claim or equity interest in each class under the

20  Plan than would the proposed distributions to be made under the Plan.  Further analysis, including

21  calculation of recovery values under the Plan versus the Chapter 7 liquidation alternative, will be

22  provided after all proofs of claim filed by the November 13, 2006, bar date are reviewed.

23         **C.      General Assumptions for the Liquidation Analysis**

24         The following general assumptions were made in preparing the Liquidation Analysis for

25  each of the five Debtors.

26         1.      The Liquidation Analysis was prepared in accordance with section

27  1129(a)(7)(A)(ii) of the Bankruptcy Code to determine whether the Plan is in the interests of the

28  Debtors' estates and creditors.

Revised Disclosure Statement

2.      The Liquidation Analysis is based upon a number of estimates and assumptions that, although considered reasonable by the Debtors, are subject to economic, business, governmental regulation and contingencies beyond the control of the Debtors.  Accordingly, no assurances can be made.  The Liquidation Analysis is subject to change.  Nothing contained herein shall be used as an admission against the Debtors or any other person.

3.      The Liquidation Analysis utilizes the Debtors' unaudited financial statements as of July 31, 2006, and other figures estimated by the Debtors as a basis for determining liquidation values.

4.      The Liquidation Analysis assumes a conversion to Chapter 7 on November 15, 2006.

5.      The Liquidation Analysis does not quantify potential legal causes of action, which may include, without limitation, proceeds of avoidance actions as well as claims of the Debtors against third parties.

**D.      Notes to the Liquidation Analysis**

The following notes apply to the Liquidation Analysis for each of the five Debtors that is attached hereto as *Exhibit 4*.  The notes below relate to specific asset categories identified in the Liquidation Analysis and correspond to the "Note Reference" column in that analysis.

A.  Cash and Cash Equivalents: Estimated recovery of Cash and Cash Equivalents on hand is assumed to be 100%.  The Liquidation Analysis assumes that the Debtors will be entitled to any applicable servicing and interest revenue earned until 11/15/06.

B.  Investments in Loans: Estimated recoveries for Investments in Loans are based upon a loan by loan recovery analysis and current management estimates.  These recoveries are allocated in accordance with the loan documents.

C.  Principal in Collection Account:  Estimated recovery of Principal in Collection Account is assumed to be 100%.

D.  Accounts Receivable: Estimated recoveries for Accounts Receivable are based upon current management estimates.

E.  Prepaid Interest: The Liquidation Analysis assumes that the Court will allow USACM to retain Prepaid Interest (both the uncollected amounts and the funds in collection account).

Revised Disclosure Statement

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

F.  Notes Receivable: Estimated recoveries for Notes Receivable are based upon current management estimates.

G.  Prepaid Expenses: The Liquidation Analysis assumes no recovery for Prepaid Expenses.

H.  Property, Plant & Equipment: Estimated recoveries for Property, Plant & Equipment are based on appraisals and current management estimates.

I.   Other Assets:  Estimated recoveries for Other Assets are based upon current management estimates.

J.   Administrative Claims:  Estimated based on management's current estimates of operating costs, Chapter 7 trustee and professional fees, and Chapter 11 professional fees.

K.  Secured Claims: Based on scheduled claims (none scheduled)

L.   Priority Claims: Based on 105% of scheduled claims

M.  Unsecured Claims: Based on scheduled claims plus estimated deficiency claims

N.  Equity Interests: Based on total equity as reported on the July 31, 2006 balance sheet, net of restructuring charges and reserves

## XI.    PLAN FEASIBILITY

The Bankruptcy Code requires that in order to confirm the Plan, the Court must find that confirmation of the Plan is not likely to be followed by a further liquidation or need for further financial reorganization of the Debtors (the "Feasibility Test").  For the Plan to meet the Feasibility Test, the Court must find that the Debtors will possess the resources and working capital necessary to meet their obligations under the Plan.

The Debtors believe that the structure set forth in the Plan, as discussed above, provides a feasible framework for the recovery of certain claims and assets held by the Debtors and an orderly, phased liquidation of the Debtors and their assets, and that confirmation of the Plan is not likely to be followed by any further liquidation or reorganization of the Debtors.

## XII.    POTENTIAL MATERIAL FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

Revised Disclosure Statement

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    PROVIDED BELOW IS A SUMMARY DESCRIPTION OF CERTAIN UNITED

2   STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTORS

3   AND TO CERTAIN HOLDERS OF ALLOWED CLAIMS OR INTERESTS.  THIS

4   DESCRIPTION IS FOR INFORMATIONAL PURPOSES ONLY AND, DUE TO A LACK OF

5   DEFINITIVE JUDICIAL OR ADMINISTRATIVE AUTHORITY OR INTERPRETATION,

6   SUBSTANTIAL UNCERTAINTIES EXIST WITH RESPECT TO VARIOUS TAX

7   CONSEQUENCES OF THE PLAN AS DISCUSSED HEREIN.  ONLY CERTAIN

8   CONSEQUENCES OF THE PLAN FOR THE DEBTORS AND FOR HOLDERS OF

9   ALLOWED CLAIMS OR INTERESTS ARE DESCRIBED BELOW.  NO OPINION OF

10  COUNSEL HAS BEEN SOUGHT OR OBTAINED WITH RESPECT TO ANY TAX

11  CONSEQUENCES OF THE PLAN.  NO RULINGS OR DETERMINATIONS OF THE IRS OR

12  ANY OTHER TAX AUTHORITIES HAVE BEEN SOUGHT OR OBTAINED WITH RESPECT

13  TO THE TAX CONSEQUENCES OF THE PLAN, AND THE DISCUSSION BELOW IS NOT

14  BINDING UPON THE IRS OR SUCH OTHER AUTHORITIES.  THE DEBTORS ARE

15  MAKING NO REPRESENTATIONS REGARDING THE PARTICULAR TAX

16  CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS

17  TO ANY CLAIM OR EQUITY INTEREST HOLDER, AND NO PERSON IS RENDERING

18  ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.  NO ASSURANCE

19  CAN BE GIVEN THAT THE IRS WOULD NOT ASSERT, OR THAT A COURT WOULD

20  NOT SUSTAIN, A POSITION DIFFERENT FROM ANY DISCUSSED HEREIN.

21    THE DISCUSSION OF UNITED STATES FEDERAL INCOME TAX

22  CONSEQUENCES BELOW IS BASED ON THE INTERNAL REVENUE CODE, TREASURY

23  REGULATIONS, JUDICIAL AUTHORITIES, PUBLISHED POSITIONS OF THE IRS AND

24  OTHER APPLICABLE AUTHORITIES, ALL AS IN EFFECT ON THE DATE OF THIS

25  DISCLOSURE STATEMENT, AND ALL OF WHICH ARE SUBJECT TO CHANGE OR

26  DIFFERING INTERPRETATIONS (POSSIBLY WITH RETROACTIVE EFFECT).

27    THE FOLLOWING DISCUSSION DOES NOT ADDRESS FOREIGN, STATE OR

28  LOCAL TAX CONSEQUENCES OF THE PLAN, NOR DOES IT PURPORT TO ADDRESS

Revised Disclosure Statement

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO

2    SPECIAL CLASSES OF TAXPAYERS SUBJECT TO SPECIAL TAX RULES (E.G., BANKS

3    AND CERTAIN OTHER FINANCIAL INSTITUTIONS, INSURANCE COMPANIES, TAX-

4    EXEMPT ORGANIZATIONS, PERSONS WHOSE FUNCTIONAL CURRENCY IS NOT THE

5    UNITED STATES DOLLAR, DEALERS IN SECURITIES OR FOREIGN CURRENCY,

6    PERSONS WHO RECEIVED THEIR ALLOWED CLAIMS OR INTERESTS PURSUANT TO

7    THE EXERCISE OF AN EMPLOYEE STOCK OPTION OR OTHERWISE AS

8    COMPENSATION AND PERSONS HOLDING ALLOWED CLAIMS OR INTERESTS AS A

9    HEDGE AGAINST, OR THAT ARE HEDGED AGAINST, CURRENCY RISK OR THAT ARE

10    PART OF A STRADDLE, CONSTRUCTIVE SALE OR CONVERSION TRANSACTION).

11    FURTHERMORE, THE FOLLOWING DISCUSSION DOES NOT ADDRESS UNITED

12    STATES FEDERAL TAXES OTHER THAN INCOME TAXES.

13      EACH CLAIM OR INTEREST HOLDER IS STRONGLY URGED TO CONSULT HIS,

14    HER, OR ITS OWN TAX ADVISOR REGARDING THE UNITED STATES FEDERAL,

15    STATE, LOCAL AND ANY FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS

16    DESCRIBED HEREIN AND IN THE PLAN.

17      **A.**      **General Tax Administration and Reporting**

18      The USACM Trust shall be treated as a grantor trust, for federal income tax purposes,

19 within the meaning of sections 671 through 677 of the Internal Revenue Code. Pursuant to and in

20 accordance with the Plan, the USACM Trustee shall be responsible for all tax matters of the

21 USACM Trust, including, but not limited to, the filing of all tax returns and other filings with

22 governmental authorities on behalf of the USACM Trust for time periods ending on or before the

23 last day of the last tax reporting year of the USACM Trust, including the filing of tax returns for

24 the applicable USACM Trust as a grantor trust pursuant to section 1.671-4(a) of the United States

25 Income Tax Regulations, the filing of determination requests under section 505 of the Bankruptcy

26 Code (if deemed necessary), and responding to any tax audits of the USACM Trust. The USACM

27 Administrator shall provide such information to the beneficiaries of the USACM Trust as will

28 enable them to properly file their separate tax returns and shall withhold and pay over any amounts

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

required by tax law.  The USACM Administrator is authorized to act as agent for the USACM Trust in withholding or paying over any amounts required by law (including tax law) to be withheld or paid by the USACM Trust in connection with the transfer and assignment of the assets of the estate to the USACM Trust pursuant to the Plan.

No liquidating trust will be created for any other Debtors' estate.  Each other Debtor is a limited liability company which is treated as a partnership for federal tax purposes.  Of the four limited liability companies which are Debtors, only DTDF will undergo a transfer of its assets to a DTDF Administrator.  The DTDF Administrator will have similar duties with respect to the filing of tax returns and governmental reports and the provisions of tax information to creditors and to members of the Debtor as are described above with respect to the USACM Trustee of the USACM Trust.

### 1. Allocation of Reportable Tax Items.

Except as otherwise set forth in the Plan or a USACM Trust Agreement, and as more fully set forth in B through D below, items of income, deduction, credit, or loss of the USACM Trust shall be allocated for federal income tax purposes among the beneficiaries of the applicable USACM Trust pro rata on the basis of their beneficial interests; provided, however, that to the extent any item of income cannot be allocated in the taxable year in which it arises, the USACM Trust shall pay the federal, state and local taxes attributable to such income (net of related deductions) and the amount of such taxes shall be treated as having been received by, and paid on behalf of the Beneficiaries when such allocations are made.  Similarly such tax items determined with respect to DTDF will be reported by the estate administrator to governmental authorities and to the creditors and members of DTDF.   The estate administrator shall be entitled to deduct any federal or state withholding taxes from any payments made with respect to allowed claims or interests, as appropriate, and shall otherwise comply with section 346 of the Bankruptcy Code.

### 2. Valuations.

The USACM Trustee shall provide for consistent valuations of assets transferred to the USACM Trust as of the Effective Date and as of the date of any other taxable event and shall use such valuations for all federal tax purposes.

### B. Consequences to the Debtors

#### 1. Sale of Acquired Assets

Revised Disclosure Statement

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    If the anticipated sales of the assets of USACM and FTDF to Silver Point, or a higher and

2  better bidder approved by the Court, close as contemplated by the Plan, the sales will result in

3  realization of a gain to the Debtor that sells such assets in an amount equal to the excess of the

4  proceeds received over the basis of the acquired asset in the hands of the Debtor.  The sales will

5  result in a loss to the Debtor that sells such assets in an amount equal to the shortfall between such

6  basis and the proceeds received.  Gains and losses realized by the respective Debtors will be

7  passed through to their shareholders or members on Schedules K-1 and the latter will pay any

8  resulting tax as further explained in paragraph B.2. below.

9    **2.    Partial Satisfaction of Indebtedness**

10    USACM's transfer of its property to the USACM Trust will be treated as a deemed two-

11  step transfer to the shareholders of the Debtor, followed by deemed transfers to the beneficiaries of

12  those trusts.  This will be in satisfaction of the Debtor's obligations to the creditor beneficiaries in

13  amounts up to the fair market value of the transferred property on the Effective Date as determined

14  and reported by the USACM Trustee of the USACM Trust.  USACM will recognize gain or loss

15  on this transfer in an amount up to the difference between that fair market value and the Debtor's

16  basis in the transferred property.

17    Any gain or loss realized by USACM (which is an S corporation Debtor) from those

18  transfers will pass through to the shareholders on Schedule K-1.  A shareholder who recognizes

19  taxable income or gain from those transfers or from any other source will pay any resulting tax.

20    USA Realty, USA Securities, FTDF and DTDF are limited liability companies classified

21  directly or indirectly as partnerships.  A partnership is not taxed on its income but passes it

22  through on Forms K-1 to its partners.  Losses are similarly passed through to the partners.

23    S corporations and partnership entities do not have unused losses or carry-forwards, but the

24  shareholders and partners may be unable to use losses from the corporation or partnerships for any

25  of several reasons, such as lack of basis, not being "at risk" on the investment in the corporation or

26  partnership, etc.

27    **3.    Cancellation of Indebtedness Income**

28

81

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   Confirmation of the Plan can be expected to give rise to cancellation of indebtedness

2   income ("COD").  Under the Plan, each Debtor will generally realize COD in an amount equal to

3   the excess of the adjusted issue price of any of its indebtedness exchanged or canceled (including

4   any accrued but unpaid interest) over the fair market value of any property transferred to the

5   USACM Trust or DTDF or to the creditors of any of the Debtors on the Effective Date, as

6   determined and reported by the USACM Trustee, DTDF Administrator, or FTDF, USA Realty or

7   USA Securities, respectively.  Because the COD will arise in the course of a proceeding pursuant

8   to Chapter 11 or 7, respectively, of the Bankruptcy Code, USACM may not be required to include

9   such COD in distributable income on K-1 to shareholders.  Instead, certain shareholders may be

10  required to reduce certain of their beneficial tax attributes by the amount of COD excluded from

11  taxable income by reason of the bankruptcy.  Such attribute reduction would first be applied to

12  reduce the shareholders' net operating losses, next to reduce certain other tax attributes (such as

13  capital loss carryforwards and the tax basis of certain property), and finally to reduce some

14  subsidiary attributes, if applicable.  If the amount of COD excluded from taxable income by

15  reason of the bankruptcy exceeds available tax attributes, the excess would permanently escape

16  taxation.

17          However, tax treatment of COD for members of limited liability companies treated as

18  partnerships is different from the treatment of S corporation shareholders.  COD realized from

19  discharge of partnership debt is partnership income allocated to the partners on Form K-1 pursuant

20  to Internal Revenue Code section 702(a).  Each partner's basis in its membership interest is

21  increased by the COD income allocation and the partner is deemed to have received cash in an

22  equivalent amount.  Only members who are themselves bankrupt will be entitled to exclude COD

23  income under Internal Revenue Code section 108.

24          **4.        Effects of Filing by Partnerships**

25          When a limited liability company classified as a partnership files for bankruptcy, no new

26  taxable entity is automatically created for federal income tax purposes, and the partnership is not

27  terminated under Internal Revenue Code section 708.  Therefore, each partnership is considered as

28  continuing until it is terminated.  Under section 708(b) (in the absence of special circumstances

Revised Disclosure Statement

such as a merger or division), a partnership will terminate if no part of any business, financial

operation or venture of the partnership continues to be carried on by any of its partners in a

partnership.  Until the partnership completely ceases all business activities and has no assets, it

should be treated as continuing.  The transfer of all assets of a partnership to an estate

administrator for liquidation should not by itself terminate the partnership, because the partnership

will still have financial operations and will be deemed to have assets after the transfer.  Thus, the

filing of a bankruptcy case alone does not result in recognition of income, gain or loss by the

partnership, depreciation recapture or deemed disposition of the partnership's assets (so gain on

any installment obligations held by the partnership is not thereby accelerated), but the later

transfer of all assets of a partnership to creditors will trigger all of the foregoing consequences.

Each Debtor that is a limited liability company will be deemed terminated upon the earlier of the

transfer of all of its assets to creditors, or its dissolution and termination under Nevada state law.

### C.    Tax Consequences to Creditors

For United States federal income tax purposes, USACM's transfer of its property to the

USACM Trust will be treated as a deemed transfer to beneficiaries of a trust who are creditors in

satisfaction of the Debtor's obligations to those creditors, followed by deemed transfers by the

creditors to the USACM Trust.  The deemed transfers to the several respective classes of creditors

will be treated as taxable recognition events to those creditors, resulting in reportable gains or

losses equal to the fair market value of the creditors' interests in the transferred property on the

Effective Date, as determined and reported by the trustee, reduced by the creditors' bases in their

receivables from the Debtors.

The deemed transfers from the several respective classes of creditors to the USACM Trust

will be treated as creating a grantor trust, with the several respective classes of creditors treated as

grantors.  As grantors of such grantor trust, the several respective classes of creditors will report

their pro-rata shares of all items of taxable income, gains and losses of the creditors' trust on their

federal income tax returns, and pay any resulting tax liability.

The transfer of assets directly from the other Debtors, or from DTDF, to creditors will

similarly be taxable recognition events to those creditors, resulting in gains or losses equal to the

Revised Disclosure Statement

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

fair market values of the assets received reduced by the creditors' bases in their receivables from the Debtors.  All of the several respective classes of creditors should consult their own tax advisors for information that might be relevant to their particular situations and circumstances and the particular tax consequences to them.

**D.        Tax Consequences to USACM Stockholders and Members of the Debtors**

For United States Federal income tax purposes, USACM's transfer of its property to the USACM Trust will be treated as a deemed transfer to USACM shareholders, followed by a deemed transfer by its shareholders to the USACM Trust.  The deemed transfer to the shareholders of USACM will be treated as exchanges in redemption of their shares of stock of USACM.  Any excess of the value of assets, except for assets classified as inventory, received through the deemed distribution over a shareholder's basis in those shares will generally be taxable long or short term capital gain.  The transfer of assets, except for assets classified as inventory, by the Debtors directly to creditors of the other Debtors, which are classified as partnerships, will be treated as distributions of capital which will be tax free until a member has recovered its basis in its membership interest.  In addition, each member of a limited liability company will be deemed to have COD to the extent of that partner's allocable share of the debt discharged in bankruptcy.  See the discussion of COD income in B-3 above.  Any excess of the value received through the deemed distribution over a member's basis in its membership interest will generally be taxable as long or short term capital gain.  Assets classified as inventory generally generate ordinary income when distributed to shareholders or members.  Shareholders and members should consult their own tax advisors for further information.

 [*Remainder of this page intentionally left blank.*]

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement

## XIII.   CONCLUSION

The Debtors and the four Committees believe that the Plan offers a fair and comprehensive solution to the numerous complex and difficult issues presented in these bankruptcy cases, fairly addresses the rights of all creditors, equity holders, and other parties in interest, and provides a significant recovery for creditors and Fund Members that is greater than other reasonably likely alternatives.  The Debtors and the four Committees therefore urge that you vote to accept the Plan. Dated this 7th day of November, 2006.


THE DEBTORS:

USA Commercial Mortgage Company
USA Securities, LLC
USA Capital Realty Advisors, LLC
USA Capital Diversified Trust Deed Fund, LLC
USA First Trust Deed Fund, LLC



By: _____
            Thomas J. Allison
            Chief Restructuring Officer


                                                    Respectfully submitted,


                                                    /s/ Lenard E. Schwartzer_____
                                                    Lenard E. Schwartzer, Nevada Bar No. 0399
                                                    Jeanette E. McPherson, Nevada Bar No. 5423
                                                    SCHWARTZER & MCPHERSON LAW FIRM
                                                    2850 South Jones Boulevard, Suite 1
                                                    Las Vegas, Nevada  89146

                                                    and

                                                    Annette W. Jarvis, Utah Bar No. 1649
                                                    Steven C. Strong, Utah Bar No. 6340
                                                    RAY QUINNEY & NEBEKER P.C.
                                                    36 South State Street, Suite 1400
                                                    P.O. Box 45385
                                                    Salt Lake City, Utah 84145-0385

899884v3

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Revised Disclosure Statement