GORDON & SILVER, LTD.  
GERALD M. GORDON, ESQ.  
Nevada Bar No. 229  
E-Mail: gmg@gordonsilver.com  
GREGORY E. GARMAN, ESQ.  
Nevada Bar No. 6654  
E-Mail: geg@gordonsilver.com  
3960 Howard Hughes Pkwy., 9th Floor  
Las Vegas, Nevada 89169  
Telephone (702) 796-5555  
Facsimile (702) 369-2666  

E-Filed November 22, 2006

Attorneys for the Official Committee  
of Holders of Executory Contract Rights through  
USA Commercial Mortgage Company

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case Nos.:<br>BK-S-06-10725-LBR<br>BK-S-06-10726-LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | BK-S-06-10727-LBR<br>BK-S-06-10728-LBR<br>BK-S-06-10729-LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>Debtor. | JOINTLY ADMINISTERED<br>Chapter 11 |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | |
| In re:<br>USA SECURITIES, LLC,<br>Debtor. | Date: OST Pending<br>Time: |
| Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA Capital First Trust Deed Fund, LLC<br>☐ USA Securities, LLC | |

### JOINT MOTION OF THE FOUR OFFICIAL COMMITTEES TO APPROVE SUPPLEMENTAL DISCLOSURE PURSUANT TO 11 U.S.C. § 1125

The Official Committee of Holders of Executory Contract Rights through USA Commercial Mortgage Company (the "Official Committee of Direct Lenders"), the Official

GORDON & SILVER, LTD.  
ATTORNEYS AT LAW  
NINTH FLOOR  
3960 HOWARD HUGHES PKWY  
LAS VEGAS, NEVADA 89169  
(702) 796-5555

100933-001/438695.doc

Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC (the "Official Committee of Equity Security Holders"), the Official Committee of Unsecured Creditors (the Official Committee of Unsecured Creditors"), and the Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC (the "Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund") (together the "Committees"), hereby jointly submit their Motion to Approve Supplemental Disclosure Pursuant to 11 U.S.C. § 1125 (the "Motion").

This Motion is made and based on the <u>Declaration of Gregory E. Garman, Esq. in Support of Joint Motion of the Four Official Committees to Approve Supplemental Disclosure Pursuant to 11 U.S.C. § 1125 For *In Camera* Review Only</u> (the "In Camera Garman Declaration"), the points and authorities which follow, any pleadings and papers contained in the Court's file, judicial notice of which is hereby requested, and any oral argument or evidence presented at the time of the hearing in this matter.

## POINTS AND AUTHORITIES

### I.

### INTRODUCTION

On November 16, 2006, this Court entered its Order approving the adequacy of Debtors' First Amended Disclosure Statement (the "Disclosure Statement") to accompany Debtors' Third Amended Joint Plan of Reorganization (the "Joint Plan"). Given the complexity of these proceedings and the far reaching issues to be resolved by the Joint Plan, the Debtors and Committees worked together closely in an effort to insure that the Disclosure Statement contained a fair and balanced analysis of the Joint Plan and detailed its impact on the various constituencies.

Since approval of the Disclosure Statement, the Committees have become aware of a lengthy document (the "Unauthorized Solicitation") criticizing the joint plan and asking that

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89169
(702) 796-5555

100933-001/438695.doc

2

parties in interest vote to reject the joint plan. The Committees believe the Unauthorized Solicitation contains incorrect and misleading assertions of fact as well as misstatements of applicable law. The Committees are further informed that the Unauthorized Solicitation has been widely distributed to Direct Lenders and Fund Investors. In order to protect the integrity of the solicitation process, the Committees respectfully request this Court approve, pursuant to 11 U.S.C. § 1125, a supplemental disclosure (the "Supplemental Disclosure") substantially in the form attached hereto as Exhibit "A" for posting on the Committees' and the Debtors' respective web sites or further distribution as they deem appropriate.

## II.

## STATEMENT OF FACTS

1. In open court on November 13, 2006, counsel for the Debtors and the Committees sought approval of a heavily negotiated Disclosure Statement to accompany Debtors' Third Amended Joint Plan of Reorganization.

2. Since approval of the Disclosure Statement, Debtors have worked diligently to transmit the approved solicitation materials to approximately 7,300 unsecured creditors, Direct Lenders, Fund Investors and other parties of interest.

3. Even before the Court-approved solicitation materials have been received by the various constituencies, the Unauthorized Solicitation was transmitted to hundreds and potentially thousands of Direct Lenders and Fund Investors. See In Camera Garman Declaration ¶¶ 3-5. True and correct copies of the Unauthorized Solicitation were submitted to the Court for filing under seal on November 21, 2006, and attached to the In Camera Garman Declaration for in camera review.[1]

4. The Committees believe the Unauthorized Solicitation contains numerous incorrect misleading factual assertions as well as misstatements of applicable law.

5. The author of the Unauthorized Solicitation was present in Court on November 13,

---

[1] The Committees have submitted the Unauthorized Solicitation for in camera review pursuant to Local Rule 9018 as to prevent is further dissemination by being placed on the readily accessible court docket.

2006 at the time the Court took up the adequacy of Debtors' Disclosure Statement and did not make an oral or written objection.

6. In response to the factual inaccuracies and misstatements of law, Movants have jointly prepared the Supplement Disclosure attached hereto as Exhibit "A" for dissemination to unsecured creditors, Direct Lenders, Fund Investors and other parties of interest.

7. On November 16, 2006, this Court entered its Order approving: (A) Debtors' Disclosure Statement; (B) Proposed Notice of Confirmation Hearing; (C) Proposed Solicitation and Notice Procedures; and (D) Proposed Form of Ballot (Dkt. 1800).

## III.

## LEGAL ANALYSIS AND ARGUMENT

<u>The Supplemental Disclosure Is Necessary To Protect The Integrity Of The Solicitation Process</u>

Given the size and complexity of these cases, it is no surprise that certain individuals are frustrated and dissatisfied with the compromises contained in the Joint Plan. To this end, the Committees are sympathetic. At various point in these cases, each of the Committees has reached impasse with one another or the Debtors. Notwithstanding such differences, the Committees were able to reach agreement with one another and the Debtors to support the Joint Plan and recommend its approval their various constituencies.

The solicitation process codified in Chapter 11 contemplates that all parties-in-interest will be given the opportunity to participate in the plan process by casting their ballots or otherwise participating in the confirmation hearings. To this end, the Bankruptcy Code requires that this Court make specific findings that this disclosure statement contain "adequate information" such that creditors, Direct Lenders, Fund Investors and other parties-in-interest can make an "informed judgment about the plan.'"

A recent and carefully analyzed decision from the Bankruptcy Court, District of Nevada, sets forth the following requirements for transmission of a solicitation. <u>In re Trans Max Technologies, Inc.</u>, 349 B.R. 80, 87 (Bankr. D. Nev. 2006). Even where exclusivity has expired (which is not the case here), the proponent of the communication must obtain prior court

Gordon & Silver, Ltd.
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

100933-001/438695.doc

4

approval unless the communication satisfied the following three part test:

1) the information provided is truthful and absent of any false or misleading statements or legal or factual mischaracterizations;
2) the information is presented in good faith;
3) the soliciting party does not propose or suggest an alternative plan which has yet to gain court approval or otherwise failed to travel through the appropriate legal channels, as dictated by the Bankruptcy Code.

Here the integrity of the solicitation process has been jeopardized by the distribution of the Unauthorized Solicitation as it contains incorrect factual statements and misapplication of governing law.[2] Again, we are sympathetic that individual dissenters are dissatisfied with portions of the Joint Plan. To this end, they are free to vote no or otherwise object to confirmation. However, such individual dissenters are not permitted, without prior approval, to commence mass solicitation campaigns based upon incorrect or misleading statements of fact and misstatements of law. The failure to comply with the disclosure requirements set forth in section 1125 (particularly by someone who was present in Court and did not lodge an oral or written objection) may result in a tainted solicitation process that compromises the confirmation process. Thus, approval of the Supplemental Disclosure that summarizes and highlights portions of the existing <u>approved</u> Disclosure Statement will result in less confusion and protect meaningful participation as contemplated by section 1125.

It should be noted that, even after the Committees filed a request for hearing on shortened time in response to the Unauthorized Solicitation, at least one additional unauthorized solicitation has been disseminated. Under these circumstances, the Court may consider an order requiring any further such communications to be brought before the Court for approval prior to dissemination. A similar issue was presented in <u>In re Gulph Woods Corp.</u>, 83 B.R. 339 (Bankr.

---

[2] Upon anecdotal information, Movants are optimistic that the Unauthorized Solicitation will have little impact upon the confirmation process. However, Movants and the Debtors reserve all available rights including those contained in 11 U.S.C. § 1126(e).

100933-001/438695.doc

5

E.D. Pa. 1988). In that case, the Chapter 11 debtor's principal sent a mailig to all of the other creditors, soliciting their rejection of a creditor's proposed plan. The Court recognized the delicate balance between the purposes of 1125(b) and the protections of the First Amendment. The Court held that: "If an interested party dispatched what is unmistakably a solicitation to accept or reject a plan, like here, to creditors during the voting period which contained falsehoods or mischaracterizations, then its dispatch would violate Section 1125(b), because it would tend to unfairly influence votes. Similarly, any mode of communication which would tend to misrepresent or distort the voting process should not be tolerated." Id. at 343. The Court enjoined the debtor's principal "from dispatching any further communications with creditors regarding the plan voting process, either orally or in writing, unless court approval is first obtained." Id. at 344.

## IV.
## CONCLUSION

WHEREFORE, based upon the foregoing, Movants respectfully request that this Court approve the supplemental disclosure as being consistent with the requirements of 11 U.S.C. § 1125, authorize Movants to publish or distribute the supplement disclosures to the extent necessary and for such other and further relief as this Court deems just and proper.

DATED this 22nd day of November, 2006.

GORDON & SILVER, LTD.

By: _____
GERALD M. GORDON, ESQ.
GREGORY M. GARMAN, ESQ.

STUTMAN, TREISTER & GLATT, P.C.

By: /s/ Christine M. Pajak
FRANK A. MEROLA, ESQ.
EVE H. KARASIK, ESQ.
CHRISTINE M. PAJAK, ESQ.

AND

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89169
(702) 796-5555

100933-001/438695.doc

6

SHEA & CARLYON, LTD.

CANDACE C. CARLYON, ESQ.


ORRICK, HERRINGTON & SUTCLIFFE, LLP


By: /s/ Marc A. Levinson
    MARC A. LEVINSON, ESQ.
    LYNN TRINKA ERNCE, ESQ.

AND

BECKLEY SINGLETON, CHTD.

BOB L. OLSON, ESQ.
ANNE LORADITCH, ESQ.


LEWIS AND ROCA LLP


By: /s/ Rob Charles
    SUSAN FREEMAN, ESQ.
    ROB CHARLES, ESQ.

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89169
(702) 796-5555

100933-001/438695.doc

7

# EXHIBIT A

Case 06-10725-gwz    Doc 1850    Entered 11/22/06 14:01:55    Page 8 of 20

As provided by the Bankruptcy Code, the Bankruptcy Court has approved the Disclosure Statement, finding that it adequately explained the Debtors' Plan which you have been asked to consider as a means to wind-up these bankruptcy cases. Recently, the Debtors and the four Committees became aware of various emails and other communications from certain Direct Lenders and investors criticizing both the Plan and the attorneys and other professionals who are involved in the bankruptcy cases, and recommending that you vote to reject the Plan. These communications have not been submitted to, let alone approved by, Judge Riegle, and they contain numerous incorrect and misleading statements of facts and assumptions of applicable law. Perhaps, even more importantly, they do not suggest a viable alternative to the Plan.

While each of the Committees shares many of the frustrations and complaints of the authors of these Unapproved Solicitations, they firmly believe that rejection of the Plan would be a huge step backward. They have taken to heart the one clear message shared by all throughout these proceedings, namely "get us out of bankruptcy as soon as possible."

The Committees as official representatives of Creditors, Direct Lenders and Investors, have been integrally and intimately involved in the bankruptcy process, and have negotiated the various compromises and processes set forth in the Plan because they believe that such agreements represent the best and most efficient means to maximize recoveries for Creditors, Direct Lenders and Investors, to end the bankruptcy proceedings as soon as possible, to transfer servicing of Loans without disruption to a reputable servicer, and to minimize and avoid the pain, uncertainty and cost of protracted

litigation involving Direct Lenders. In short, they believe that confirmation of the Plan is the best way "to get you out of bankruptcy as soon as possible."

**The Plan is a compromise. It not only represents a fair outcome under the circumstances, but also avoids the worst possible outcome that various parties, including the authors of the Unapproved Solicitations, could suffer under a chapter 7 liquidation.**

While the Bankruptcy Court has ruled that the Disclosure Statement contains adequate information, and while the Committees believe that the Disclosure Statement provides answers to the unsubstantiated, misleading and incorrect statements in the Unapproved Solicitations, the Committees also believe that you will be assisted in making your decision regarding the Plan by considering the following short response to the points raised in the Unapproved Solicitations.

1. **Prepaid Interest**: The Unapproved Solicitations assert that Direct Lenders have the right to retain Prepaid Interest received prior to the date of the filing of the bankruptcy. As all Direct Lenders are aware, the issues regarding whether the Prepaid Interest should be retained by USA Commercial Mortgage Company ("USACM") or the Direct Lenders has been the subject of much scrutiny and debate in these bankruptcy cases. USACM paid over $39 million to Lenders, including the Funds and Direct Lenders, which funds were not previously paid by the various Borrowers prior to the bankruptcy filing. This is real cash. Because the source of funds that were used to make these pre-petition payments to Lenders came from commingled funds of USACM, it is not possible to trace those funds to individual Direct Lenders and such funds became property of the USACM estate and are available to be distributed to all USACM

405580v5

creditors, including Direct Lenders with unsecured claims. The Debtors shortly will be filing a legal brief supported by authenticated evidence that substantiates this legal position.

Absent a compromise on the Prepaid Interest, USACM would be forced to bring lawsuits against individual Direct Lenders to recover the Prepaid Interest at great cost to both USACM and the Direct Lenders. If not repaid, USACM would assert a claim to recover the payments under, for example, state and federal fraudulent conveyance law. In order to avoid hundreds or perhaps thousands of lawsuits, the Plan proposes that where either borrowers have paid the interest which USACM prepaid (about $14 million), or where USACM has netted the Prepaid Interest from Lenders (about $18 million), the USACM estate keeps the funds, does not pursue litigation, and the Direct Lenders collect the sums they were always due from Borrowers. For the approximately $7 million remaining in uncollected Prepaid Interest, the Plan continues the same netting process as Judge Riegle has already authorized, and the statute of limitations is tolled for 2 years to allow these sums to be collected without the need for litigation. The DTDF Committee, however, has not agreed to any such compromise with USACM, and, as a result, USACM may assert fraudulent transfer and other claims against DTDF and DTDF may raise any defenses in response, including those raising recoupment and offset claims. If not compromised, such competing claims likely will be resolved by Judge Riegle in one lawsuit between the USACM Trust and Post-Effective Date DTDF.

2. **Bankruptcy Code Mandates Distribution In A Specified Order**: The Unapproved Solicitations argue that professional fees and expenses should

not be paid before the Direct Lenders and Fund members receive recoveries on their investments. The Bankruptcy Code, however, mandates a different result. To encourage professionals and other businesses to provide services to companies in bankruptcy, all costs incurred during the bankruptcy, including professional fees as well as such items as payroll, utilities, and other expenses that keep a debtor alive during the bankruptcy process, are "administrative expenses," which must be paid before any other claims or interests. Without this protection, few entities would be willing to provide goods or services to a bankrupt debtor's estate.

After administrative expenses are paid in full, the Bankruptcy Code then provides that priority claims (primarily claims for employee wages, vacation pay, severance pay and contributions to benefit plans and other similar amounts) must be paid before general unsecured claims. Therefore, Direct Lenders with unremitted principal claims (as well as holders of all other unsecured claims) can only be paid after administrative expenses and priority claims have been paid in full.

Further, if the Plan is not confirmed, and the cases are converted to Chapter 7 liquidations, the costs of the Chapter 7 cases, including all of the fees of the appointed Chapter 7 Trustees and their professionals would be paid first; then all of the costs of the chapter 11 bankruptcy cases (including professional fees) would be paid; then statutory priority claims; then unsecured claims; then equity interests (such as FTDF and DTDF investors). In short, failure to approve the Plan would result in significant additional expenses which would be paid ahead of unsecured creditors and investors.

3. **USACM Unsecured Claims Must Be Treated Alike:** The Unapproved Solicitations suggest that in the event the Prepaid Interest is recovered and

405580v5

determined to be property of the estate of USACM, such funds should be used solely to satisfy the unremitted principal claims of Direct Lenders. Generally, the Bankruptcy Code does not allow for this and provides that all unsecured creditors must receive the similar treatment. Direct Lenders with unremitted principal claims are only one type of a general unsecured claim in the USACM general unsecured creditor class. Other claims in this class include the DTDF unremitted principal claim of approximately $19 million, the FTDF unremitted principal claim of approximately $370,000, and other claims of Direct Lenders, FTDF and DTDF against USACM that have not yet been allowed. All creditors holding these unsecured claims have the right to share pro-rata in the USACM recoveries, including the Prepaid Interest.

4. **Servicing Fees:** The Unapproved Solicitations imply that the 2% holdback the Court ordered will all be retained by USACM. This is not the case. Under the compromise in the Plan, $605,000 of the 2% holdback will be used to reimburse USACM in part for the fees and expenses incurred by the Direct Lender Committee and their professionals. After this reimbursement, USACM is only permitted to retain from the 2% holdback the actual servicing fees permitted to be collected under the individual Direct Lender loan servicing agreement. For example, if a Direct Lender has a 3% loan servicing agreement, then the full amount of the 2% holdback for such Direct Lender will be retained by USACM. But, if a Direct Lender has a 1% loan servicing agreement, then USACM will release the additional 2% in distributions being held back less the particular Direct Lender's pro rata share of the $605,000 reimbursement. USACM has asserted that, if the Plan is not confirmed, it may seek to collect more of the 2% holdback as a surcharge from Direct Lenders with 1% loan servicing agreements.

405580v5

A second reason for the compromise is that before the bankruptcy filing, USACM collected funds and paid them to Direct Lenders without collecting a servicing fee. One estimate of uncollected servicing fees exceeds $9 million. After the bankruptcy filing, USACM has collected some, but not all, of the servicing fees accrued under the loan servicing agreements. Under the Plan, claims for accrued prepetition servicing fees unpaid on the closing of the sale will be waived. If the Plan is not confirmed, it is very likely that USACM (including any appointed chapter 7 trustee) will seek to collect these fees.

5. **Collateral for 10-90 Loan and $58 Million Note:** The Unapproved Solicitation suggests that the new servicer to be selected through the auction process will have recourse to the collateral for both the DTDF 10-90 Loan and the $58 Million Note. This is incorrect. The new servicer is neither purchasing the DTDF 10-90 Loan (which, with accrued interest now exceeds $80 million) nor the $58 Million Note, and will have no recourse to the collateral securing these assets.

6. **Recovery Estimates:** The Unapproved Solicitation states that under the Plan, unsecured creditors of USACM will receive only an 8% recovery, DTDF members will receive only a 15% recovery, and FTDF members will receive only a 60% recovery. Contrary to these unsupported estimates, the Debtors, in the Disclosure Statement, forecasted a range of recoveries for each of these constituency groups as follows:

- Unsecured creditors of the USACM estate, including creditors holding unremitted principal claims are anticipated to receive recoveries that range from a low of 8% to a high of 33%.

- DTDF members are anticipated to receive recoveries of a low of 25% to a high of 46%. The lengthy footnote on page 9 of the Disclosure Statement explains that actual results could be much greater or lower than such estimate.

- FTDF members are anticipated to receive recoveries ranging from 67% to 70%.

7. **Professional Fees:** The Unapproved Solicitations suggest that the rapid pace of the Chapter 11 Cases is driven by the desire of estate professionals to obtain year-end bonuses. This is simply wrong. Professional final fee applications are not due to be filed until February 2007 with a hearing to approve such fees and costs not likely until early March 2007. Further, the professionals for the DTDF Committee and as well as the Debtors' professionals (with respect to work performed on behalf of DTDF) have received no payments to date, and are unlikely to receive payment prior to year-end. Moreover, the USACM professionals for the Debtors have only been paid approximately 50% of their fees for work performed through July, 2006, and have not yet received any payment for work performed for August, September, or October. While significant fees and costs have been approved for professionals in these Chapter 11 Cases, on an interim basis, only a portion has actually been paid. Finally, all of the professional fees and costs are subject to final review and approval as part of the final fee application process. Nevertheless, these very same professionals have taken the highly unusual step of permitting interim payments to investors prior to confirmation of a plan of reorganization.

8. **Direct Lender Claims Against Debtor Entities:** The Unapproved Solicitations suggest that Direct Lenders have claims against USA Realty, USA Securities, FTDF and DTDF for the alleged transfer of Direct Lender funds to these entities, and that Direct Lenders should not be required to release the other entities. There are factual bases for these compromises under the Plan. All Prepaid Interest transferred to FTDF has been offset against FTDF collections during the Chapter 11 Cases with such funds being transferred to USACM as part of the compromise. In addition, USA Realty and USA Securities do not have any significant assets available to pay claims.

9. **Recharacterization**: The Unapproved Solicitations assert that recharacterization is not a real threat to Direct Lenders and the compromises in the Plan do not provide for a full resolution. The Direct Lenders Committee believes that a claim of recharacterization against Direct Lenders will most likely not prevail. However, without the compromise there is no assurance that such actions will not be brought against Direct Lenders. Thus, in order to avoid even the possibility of this litigation against Direct Lenders, FTDF, USA Realty and USA Securities each provide the Direct Lenders with a release from any action to recharacterize the loans as property of the Debtors' estates. The Direct Lenders claims against DTDF and DTDF Claims against the Direct Lenders are not settled under the Plan, and all rights are preserved.

10. **$58 Million Note Collection:** The Unapproved Solicitations suggest that the Plan does not provide an adequate mechanism to collect or to secure this the $58 Million Note, the balance of which, with interest, now exceeds $60 million. This statement is incorrect. The $58 Million Note was secured pursuant to an agreement

405580v5

previously approved by the Bankruptcy Court. Further, the Plan provides that both DTDF and USACM will retain their allocated share (which share is yet to be determined) in the $58 Million Note. It is anticipated that the Post-Effective Date DTDF and the USACM Trust will jointly pursue recovery of the $58 Million Note as provided in the Plan and Disclosure Statement and discussed further below. Both the Post-Effective Date DTDF and the USACM Trust have every incentive to collect the $58 Million Note in full, no matter how the proceeds are divided between them.

11. **Direct Lender Settlement Standing:** The Unapproved Solicitations state that the Direct Lender settlement in the Plan was approved only by the Direct Lenders Committee and not by the individual Direct Lenders. This is true. The settlement was negotiated long and hard and in good faith by the Direct Lenders Committee, and the Direct Lenders Committee believes the settlement is in the best interests of the Direct Lenders. As contemplated by the Bankruptcy Code, Direct Lenders have the opportunity to vote in favor or against such settlement in class A-5 of the Plan.

12. **The Sale to Silver Point or an Overbidder:** The Unapproved Solicitations assert that there are no valid grounds for FTDF to sell its loans at the discounted price. FTDF, as well as the FTDF Committee, believe that the proposed sale of the FTDF assets, subject to an auction process, is in the best interests of the FTDF estate and provides for the best recovery to the FTDF investors. The professionals of FTDF and the FTDF Committee spent considerable time and effort evaluating the ultimate recovery on the FTDF assets on a standalone basis, the timing and cost of such recovery and the myriad of risks and uncertainties inherent in achieving such recovery.

405580v5

They further believe that the foregoing considerations support the proposed price for the FTDF assets for several reasons. First, the sale process eliminates the timing and collection risk inherent in the continued workout of the FTDF loans. Second, the FTDF investors will stop bearing the cost of collection and work-out of the FTDF loan portfolio. Third, the auction process encourages a sale of the loan portfolio to provide a higher recovery than the price already offered by Silver Point. Accordingly, FTDF, and the FTDF Committee, believe that the proposed sale, subject to the auction process, provides the best means to maximize the value to the FTDF investors.

13. **Litigation Against Hantges, Milanowski and USAIP:** The Unapproved Solicitations assert that the Plan provides no clear path for litigation against the insiders of the Debtors, including Hantges, Milanowski and USAIP. The USACM Trust and the Post-Effective Date DTDF will own all of the claims and causes of action for the benefit of their creditors and investors, respectively. Under the Plan, the USACM Trustee and the DTDF Administrator will have the funding created from the liquidation of assets, including collection of Prepaid Interest, to fund the litigation.

The Plan does not bar Direct Lenders from hiring counsel and filing suit if they believe that they have individual claims against Hantges, Milanowski, USAIP or other insiders. However, Direct Lenders have no greater or lesser right to payment than other unsecured creditors of Hantges, Milanowski and USAIP, so if they bring suit, and recover judgment, they will, at best, share pro rata with other creditors. The Plan provides a vehicle for all with claims against USACM, including the Direct Lenders, to share in the proceeds, while also spreading the expense. In contrast, a Chapter 7 Trustee

will have to find a way of funding the administration of the case, including the cost of pursuing the necessary litigation against Hantges, Milanowski, USAIP and others.

14.     **Alternatives to the Plan:**  The Unapproved Solicitations fail to list any viable alternatives to the proposed Plan, asserting that Silver Point will wait around until the Plan can be modified and confirmed.

This approach ignores both reality and the Bankruptcy Code. For instance, if the Plan is not confirmed, it is highly unlikely that USACM will continue to service the loans for any appreciable period of time. As such, who will service the loans, particularly the non-performing loans? Will a new servicer agree to the existing loan servicing fees or require higher fees? To date, Mesirow has performed the servicing function, but cannot cost-effectively fulfill that role for the long-term. Further, Mesirow and lawyers in these cases have effectively financed the servicing operation as they have been paid only a fraction of their fees and costs incurred to date. The chaos which would be created by USACM simply terminating its servicing has been a major concern of the Direct Lenders Committee from the beginning of these cases. Given these serious challenges and many other issues, and finding no other acceptable alternatives, the Direct Lenders Committee and the three other Committees negotiated and support the Plan.

If the Plan is not confirmed, the Court will have two choices – either grant more time for preparation, filing and prosecution of a different plan, which would involve months of delay and significantly increased professional fees and costs, or convert the cases to a Chapter 7 liquidation, which would require a Chapter 7 trustee to collect assets, determine claims, and see to distributions. As explained above, the expenses of administration in a Chapter 7 case have priority over the Chapter 11 administrative

405580v5

expenses, which have priority over unsecured claims or the rights of Fund investors. In other words, general unsecured claims, including claims for unremitted principal, would be paid only after more administrative expenses, including expenses for potentially duplicative work (as the Chapter 7 trustee will need to verify the work previously done by Mesirow), have been paid in full.

15. **Modifications to the Plan:** The Unapproved Solicitations suggest that the intention of the authors is not to derail confirmation of the current Plan, but rather to simply seek certain modifications to the Plan. As explained in the Disclosure Statement, the Plan contemplates several integrated compromises, which must be considered as a whole. Piecemeal modifications to the Plan are not a viable option and would present a much larger undertaking that would involve further negotiations between the Debtors' various parties in interest. Moreover, to the extent that significant modifications are made to the Plan, a further solicitation of the Debtors' creditors and equity interest holders would be needed to vote on a revised plan. This would simply add to the cost and delay of these bankruptcy cases and would prevent the Debtors from "getting out of bankruptcy as soon as possible."

405580v5