1

```
 1                UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF NEVADA
 2                     LAS VEGAS, NEVADA
     In re:  USA COMMERCIAL MORTGAGE   )  E-Filed:  11/27/06
 3   COMPANY,                          )
                                       )
 4           Debtor.                   )  Case No.
                                       )  BK-S-06-10725-LBR
 5   _____)  Chapter 11
                 PARTIAL TRANSCRIPT OF PROCEEDINGS
 6                              OF
                  JUDGE'S RULING ON DOCKET NO. 1661
 7                              ON
         OMNIBUS OBJECTION TO CLAIM OF IN THE AMOUNT, NO. 1244
 8                             AND
             OBJECTION TO CLAIM OF IN THE AMOUNT, NO. 1191
 9                             AND
     MOTION TO AUTHORIZE DEBTOR, USA COMMERCIAL MORTGAGE COMPANY,
10         AS LOAN SERVICER TO APPROVE LOAN MODIFICATION
                    FOR PALM HARBOR ONE LOAN,
11      TO PROVIDE THE PREVIOUSLY-AUTHORIZED SUBORDINATION
            OF THE MARLTON SQUARE 2ND LOAN IN CONNECTION
12       WITH THE PAYOFF OF THE MARLTON SQUARE 1ST LOAN,
              TO AUTHORIZE A SHORT-TERM FORBEARANCE
13             FOR THE MARLTON SQUARE 1ST LOAN,
     AND TO GENERALLY AUTHORIZE SHORT-TERM LOAN FORBEARANCES
14            AND FULL RELEASES AND RECONVEYANCES
              FOR LOANS PAID OFF IN FULL, NO. 1448
15                             AND
         MOTION FOR ORDER APPROVING CONTINUED USE OF CASH
16                  THROUGH JANUARY 31, 2007,
            PURSUANT TO FOURTH REVISED BUDGET, NO. 1452
17                             AND
         ORDER SHORTENING TIME RE: MOTION TO EXCLUDE DEBTORS
18            FROM HAVING TO FILE INTERCOMPANY CLAIMS
              AGAINST EACH OTHER BY THE BAR DATE,
19                   OR, ALTERNATIVELY,
         FOR THE APPROVAL OF THE IMMEDIATE APPOINTMENT
20                   OF SPECIAL COUNSEL
     TO FILE AND PURSUE THE INTERCOMPANY DEBTOR CLAIMS, NO. 1519
21                             AND
         MOTION TO CONVERT CASE TO CHAPTER 7, NO. 1661
22                       VOLUME 1
           BEFORE THE HONORABLE LINDA B. RIEGLE
23            UNITED STATES BANKRUPTCY JUDGE
                  Monday, October 30, 2006
24                       10:30 a.m.
     Court Recorder:        Cathy Shim
25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
```

2

```
1    APPEARANCES:

2    For the Debtor and        LENARD E. SCHWARTZER, ESQ.
     Debtor in Possession:     Schwartzer & McPherson Law Firm
3                              2850 South Jones Boulevard
                               Suite 1
4                              Las Vegas, Nevada 89146

5                              ANNETTE W. JARVIS, ESQ.
                               Ray, Quinney & Nebeker, P.C.
6                              36 South State Street
                               Suite 1400
7                              Salt Lake City, Utah 84145

8    For the First Trust       EVE H. KARASIK, ESQ.
     Deed Fund Committee:      Stutman, Treister & Glatt, P.C.
9                              1901 Avenue of the Stars
                               Twelfth Floor
10                             Los Angeles, California 90067

11                             CANDACE C. CARLYON, ESQ.
                               Shea & Carlyon, Ltd.
12                             233 South Fourth Street
                               Suite 200
13                             Las Vegas, Nevada 89101

14   For The Canepa Group:     LAUREL E. DAVIS, ESQ.
                               Lionel, Sawyer & Collins
15                             300 South Fourth Street
                               Suite 1700
16                             Las Vegas, Nevada 89101

17   For the Direct            GREGORY E. GARMAN, ESQ.
     Lenders Committee:        Gordon & Silver, Ltd.
18                             3960 Howard Hughes Parkway
                               Ninth Floor
19                             Las Vegas, Nevada 89109

20   For Diversified Trust     ANNE M. LORADITCH, ESQ.
     Deed Fund Committee:      Beckley Singleton, Chtd.
21                             530 Las Vegas Boulevard South
                               Las Vegas, Nevada 89101
22
     For Drs. Alexander        ROBERT C. LePOME, ESQ.
23   and Others:               Law Offices of Robert C. LePome
                               330 South Third Street
24                             1100-B
                               Las Vegas, Nevada 89101

25
```

3

```
 1   APPEARANCES (Cont.)

 2   For The MacDonald Center   JEFFREY L. HARTMAN, ESQ.
     for Arts and              Hartman & Hartman
 3   Humanities:               510 West Plumb Lane
                               Suite B
 4                             Reno, Nevada 89509

 5   For the Official          ROB CHARLES, JR., ESQ.
     Unsecured Creditors       Lewis and Roca, LLP
 6   Committee:                3993 Howard Hughes Parkway
                               Suite 600
 7                             Las Vegas, Nevada 89109

 8   For the United States     AUGUST B. LANDIS, ESQ.
     Trustee:                  Office of the United States Trustee
 9                             300 Las Vegas Boulevard South
                               Suite 4300
10                             Las Vegas, Nevada 89101

11   Also Present:             DON MARKER (phonetic)
                               Committee Chair
12                             Unsecured Creditors Committee

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1          (Court previously convened at 10:44:43 a.m.)

2          (Partial transcript of Judge's ruling

3          on Motion to Convert at 11:44:24 a.m.)

4              THE COURT:  Okay.

5          (Colloquy not on the record.)

6              THE COURT:  I'm going to deny the motion.  To say

7     that this case is unusual is the epitome of understatement.

8     Now, while there are five separate debtors, each debtor is

9     intertwined with the other as it relates to the scheme that

10    was carried out, and that scheme was to raise money from

11    investors and lend it to others.  In some cases, those

12    others were insiders.

13        So even though we're talking about five separate

14    debtors, I'm going to for the most part refer collectively

15    to the motion, rather than going through the analysis as to

16    each debtor.

17        Now, it's important to correct the facts that the

18    U.S. Trustee laid out -- and I guess "correct" is the wrong

19    word, too -- to put the correct spin on the facts, rather

20    than the spin the U.S. Trustee puts on the facts and to

21    review the facts of this case.

22        To me, perhaps, the most important case -- and I'll get

23    back to why it's the most important case -- is that the

24    debtors are operating under a de facto trustee.

25        Prior management has no role.  Mr. Allison and Mesirow

1    are turnaround professionals retained in this case to

2    operate the debtors.

3        That was done by a motion, and the U.S. Trustee did not

4    object to the retention of a chief restructuring officer as

5    opposed to demanding a conversion or a Chapter 11 Trustee.

6        This is not a case in which there is no committee or

7    that the committees are inactive.  Rather, the

8    U.S. Trustee's Office appointed not one committee, but four.

9    Each of those committees is active and have taken an active

10   role in all matters.

11       Next is the unusual nature of the businesses, and I use

12   the term "businesses" lightly I guess.  It's interesting.  I

13   had a typo here.  I called it USCAM (phonetic), and that

14   probably is an appropriate acronym.

15       But Commercial Mortgage -- and I'm going to refer to

16   the servicing company as Commercial Mortgage.  I think

17   that's the easiest.

18       Commercial Mortgage is a servicing business.  It

19   serviced only the loans that were originated by it, so it

20   did not act as a servicer open to anyone who had loans, and

21   the two funds have never had any business, except owning

22   loans brokered by Commercial Mortgage.

23       Capital Realty was the manager of the two funds, and

24   now Mr. Allison is the manager, and the broker just brokered

25   some of the SEC funds.

6

1      So it's not your typical company that, for example,

2  manufactures things.  It's not a company that operates a

3  restaurant.  It's not a company even like a Countrywide that

4  services loans that it may originate or has loans sold to

5  it.

6      Even Commercial Mortgage has few creditors in the

7  traditional sense.  Rather, the bulk of its creditors will

8  be those who had lent money to borrowers, but did not

9  receive the repayment for those loans that were repaid.

10      Now, importantly, Commercial Mortgage brokered loans

11  with numerous investors from around the nation; hence, any

12  particular loan may have more than 100 and in some cases

13  hundreds of investors.

14      So, for example -- and I'm looking at the loan report

15  attached to the disclosure statement -- BarUSA had 221

16  lenders; Bay Pompano, 407; Brookmere/Matteson, 229.  Even

17  with loans with far fewer people, you have 50 investors.

18      Now, also, any particular investor may also be a lender

19  in several loans and/or may be a member of one of the funds,

20  and complicating matters further was that neither fund was

21  the only investor in a number of loans.

22      Now, also, let's talk about the kind of loans we're

23  talking about.  All of us here realize that, but I think

24  it's important to reiterate.

25      These are not loans made on my house or your house or

1    Joe Blow's house where you just file a notice of breach and

2    election to sell, and the money comes in.

3        These were for the most part development loans or

4    construction loans, and they're not in insignificant

5    amounts.

6        The smallest loan I see even then is Redwood Properties

7    at 269.   These are loans 12,000,000, 10,000,000, 30,000,000,

8    13,000,000, 16,000,000, 28,000,000.  They're from all over

9    the United States.

10       They would naturally involve sophisticated borrowers

11   and/or I suppose on the worst-case basis borrowers whose

12   intent was to get money and never pay it back.

13       Now, while everyone regularly received payments on the

14   loans that they had made and/or payments on account of their

15   membership interest, the truth as now discovered by

16   Mr. Allison is that the majority of the loans were

17   nonperforming.

18       That is the money that came in and was used to pay the

19   lenders on the nonperforming loans came from service fees or

20   the repayment of loans that was due to others.

21       As Mr. Allison has now discovered, prior management

22   took little or no action to collect loans and was very

23   sloppy and/or negligent and/or intentionally didn't get

24   appropriate documentation or collateralization on some

25   loans.  The music stopped with the investigation by the SEC

8

1    in the Nevada Mortgage Division.

2         Now, during the case, it's been apparent from the very

3    first day that the debtor could not and would not engage in

4    the business of brokering new loans.

5         Again, the business of the funds was merely owning

6    loans.  It was apparent from the first day that the funds

7    would not get new investors.

8         From the outset, it's been apparent that no new moneys

9    would come in, other than new moneys by meaning new loans,

10   new investors.

11        Rather, funds would come from the sale of the servicing

12   business, collection of the loans, and the sale of the

13   loans.

14        It is obvious that this case was one that bankruptcy

15   was a unique solution to a terrible problem, a way to

16   orderly liquidate the assets, pursue positive actions, see

17   that the direct lenders had a mechanism to collect on their

18   loans, and to pay the equity holders -- that is the fund

19   members -- and to the extent there is creditors the

20   creditors.

21        Now, Mr. Allison contrary to the implications of the

22   U.S. Trustee in the pleadings did obtain DIP,

23   debtor-in-possession financing.

24        But I believed that it was not -- and the U.S. Trustee

25   opposed the motion as well I believe -- that this was not in

9

1    the best interest of the estate due to potential problems

2    upon default, and I didn't approve the financing.

3        Perhaps, I should have.  I don't know what difference

4    it would have -- I mean, I'm not sure what the difference

5    would have been, the distinction, but that wasn't

6    Mr. Allison's -- he obtained the debtor-in-possession

7    financing.

8        But despite the lack of infusion of new funds from

9    financing, he has continued to service the loans, and, more

10    importantly -- and I'll talk about this more -- he has made

11    significant progress in collecting on the loans.

12        Now, the U.S. Trustee makes much of the fact that

13    Mr. Allison didn't get the debtor-in-possession financing,

14    and that was a continuing loss and shows that he couldn't do

15    it.  Why didn't he make the motion then?  Why wait until we

16    incurred $6,000,000 in fees?

17        Now, while the U.S. Trustee makes a lot of the fact

18    that a plan was not filed within the original exclusivity

19    period, the fact is that a plan has been filed, and, most

20    importantly, it's been done with the extensive cooperation

21    and negotiation of the committees.  Moreover, given the

22    extensive problems in this case, the time in which a plan

23    was filed was exceedingly short.

24        Now, the U.S. Trustee says it takes the position that

25    all liquidating plans aren't permitted, but I don't think

1    that follows.

2         It seems to me that any liquidating plan under their

3    interpretation could never be allowed because there's not

4    new money coming in.  It's a liquidation of the old assets.

5         I mean, I guess there could be a rare case where you

6    have a business that operates for a very short period of

7    time making widgets.  It makes widgets for a short while,

8    and then it stops business and sells the business.

9         But I believe the U.S. Trustee's real position is

10   liquidating plans are not allowed.  And if that's the case,

11   again, why, and it's a mystery to me.

12        And if it believes that it has to make the motion and

13   if it believes it must be granted, why wait now until

14   professionals have in good faith incurred fees doing the

15   work, doing the negotiations, Mr. Mesirow taking all the

16   time to put the loans together, working extensively, and the

17   various constituencies?  Why has it waited this long to make

18   the motion?

19        I can't believe it was intended to chill the bidding.

20   I don't want to put that implication on the U.S. Trustee's

21   Office.

22        But, clearly, that would have been the result and may

23   still because this notice went out to 4,000 people

24   notwithstanding the order on the bidding which has yet to go

25   out, and he did not ask to shorten the time to hear the

1    motion.

2          And to suggest that the motion is filed the day without

3    consultation with anyone, the day before the sale motion set

4    for seven days before the bidding end, to suggest that that

5    was just done because, oh, we thought we had to and to

6    suggest that that's the way it gets decided is beyond

7    comprehension to me.

8          Now, let's apply the facts to the statute here.

9    Question of standing, now, I do find it understanding that

10   the U.S. Trustee was deleted from Section 1112 as to who may

11   bring the motion.

12         But I do agree with Mr. Landis that since 307 gives the

13   trustee general standing and 28, USC, Section 586

14   contemplates the U.S. Trustee is to file the motion I find I

15   do have standing.

16         Now, the more complicated issue is how in the world

17   does one read Section (b)(1) of 1112.  Does it mean -- and

18   I'm going to have to read this for the record, so bear with

19   me.  For those of you that have the code, you can read

20   along, obviously.

21         It says, "Except as provided in paragraph 2 of this

22   subsection, Subsection C of this section, and

23   Section 1104(a)(3), on request of a party in interest and

24   after notice of the hearing absent unusual circumstances

25   specifically identified by the Court that established that

1   the request of conversion or dismissal is not in the best

2   interest of creditors in the estate, the Court shall convert

3   a case to a case under this chapter to a case under

4   Chapter 7 or dismiss a case in this chapter whichever is in

5   the best interest of creditors in the estate if the movant

6   establishes cause."

7       Now, if you look at that paragraph alone, it would

8   appear to say that if they establish cause the Court still

9   has the ability to examine what the unusual circumstances

10  are of a case.

11      Paragraph 2 then provides, "The relief provided in

12  paragraph 1 shall not be granted absent unusual

13  circumstances specifically identified by the Court that

14  established that such relief is not in the best interest of

15  creditors in the estate if the debtor or another party in

16  interest objects and establishes that, A, there's a

17  reasonable likelihood that a plan will be confirmed" -- and

18  I'm shortening -- "and, B, the grounds for granting such

19  relief include any act or omission of the debtor, other than

20  under paragraph 4(a)."

21      And 4(a) is substantial or continuing loss or

22  diminution of the estate in the absence of a reasonable

23  likelihood of rehabilitation.

24      The trustee argues that if they establish 4(a) I

25  do not have any discretion to look at the unusual

circumstances.

I think that that reads too much and reads out paragraph B(1).  If that was the case, then paragraph B(1) has absolutely no purpose in this statute and the except as provided is meaningless.

I think that if that was the interpretation that it would read as follows:  B(1) would just start on request of a party in interest, and then 2 deals with the 4(a).

So I think reading these together putting meaning to both clauses the more accurate reading, the better reading, is to suggest that even if they establish cause under 4(a) that it's a substantial or continuing loss and the absence of a reasonable likelihood of rehabilitation I can still look at the unusual circumstances, but let's put that aside for the moment.  Let's assume that their interpretation is correct.

The trustee has argued that rehabilitation requires that the debtor is going to continue on in business.  I believe that is too narrow a reading of the word "rehabilitation" because as I indicated that would rule out liquidating plans, and we know from the code that liquidating plans are permitted under 1123(b).

The code specifically permits debtors to liquidate by selling or transferring all assets, sell or adjust claim or interest, and to retain and enforce any claim or interest.

1      And, clearly, any company which is not doing new

2  business is technically losing money if one counts the fees

3  that are paid to professionals.

4      But here I think there's an important use of the word

5  "rehabilitation", and, unfortunately, every case is not the

6  manufacturer who has come upon hard times.

7      Unfortunately, some cases are cases in which businesses

8  have been operated to defraud individuals, either the

9  investors, or in the kind of case like this, direct lenders

10  or shareholders or creditors.

11      We've seen everything from Enron to whatever.  And in

12  that case, a company which is operating illegally is now

13  turned around to operating legally.

14      Now, while there cannot be any new loans, the point is

15  one point that was illegal under Nevada law is that it is

16  illegal under Nevada law to make payments to individuals on

17  loans that are in default, and, clearly, that was going on.

18      That has stopped, and that's what created the situation

19  that people were left to believe that their loans were

20  performing.

21      What we had before -- and this gets also to the idea of

22  loss of assets, and I think Mr. Charles was right.  These

23  two ideas are kind of integrally related.

24      What we had before is we had a smoke-and-mirror

25  business.  We had paper assets.  Liquidating trusts are

1    recognized, and they're valuable and useful tools in the

2    arsenal of creditors.

3        Moreover, turnaround professionals are widely and

4    commonly used to administer these complicated cases.  They

5    have the experience.  They have the resources.

6        One of the more successful cases in this district was

7    the AgriBioTech case where growers which originally thought

8    they would receive 20 cents on the dollar received 70 cents

9    on the dollar.

10       It was a case which was hopelessly insolvent.  The

11   insiders had merged something like 50 companies in a very

12   short time.

13       By use of the liquidating plan, assets were liquidated.

14   The business did not continue.  Complicated claims were

15   resolved through the plan's negotiation process, and causes

16   of action were preserved to pursue for the benefit of

17   creditors.

18       I have absolutely no doubt that if that case had been

19   administered by a trustee or converted as opposed to being

20   run by a professional turnaround manager and the qualified

21   professionals he retained that growers and other creditors

22   would have received far less.

23       Let's face it.  Trustees don't have the abilities to

24   manage these complicated cases absent hiring the exact

25   person such as Mr. Mesirow that we have now.

1        Moreover, now, the U.S. Trustee says he has to do it,

2    and I recognize that's what the statute says, but there are

3    other cases in this district filed post-October 17th of '05.

4        For example, 21st Century Technologies, there is a loss

5    in the last statement of $1,616,967.  The only asset is a

6    lawsuit, and there's not been a pip made about appointing a

7    trustee or converting that case.  In fact, there's a

8    liquidating plan on file right now.

9        Now, let's look at the continuing loss or diminution.

10   We've got two parts of that test if we assume that applies.

11   The test is that grounds for relief there's a substantial or

12   continuing loss to or diminution of the estate and absence

13   of a reasonable likelihood of rehabilitation.

14       What does a loss mean in a case like this?  Yeah.  I

15   don't think you can look at the professional fees because in

16   every case you've got professional fees.

17       And, again, was the U.S. Trustee setting everybody up

18   by appointing four committees, letting them incur $6,000,000

19   in fees, and then being quiet until the end?  Because as we

20   know, Chapter 7 fees are paid before Chapter 11 fees.

21       Here servicing fees are sufficient to pay the

22   operations of collecting the loans.  The funds are not

23   losing money.  They've got the same number of loans, and,

24   indeed, more money has been collected and monetized because

25   of Mr. Allison's efforts.

1          Now, the U.S. Trustee sort of like Ms. Chubb has a

2     tendency to do is trying to stir the crowd by talking about

3     the fees affecting creditors.  It doesn't affect the direct

4     lenders.

5          Those fees come out of the servicing fees, and the only

6     persons who could complain is Mr. Charles' constituency as

7     the unsecured creditors.

8          So there are not fewer assets by use of the servicing

9     fees to pay the direct lenders or the fund members because

10    the funds get their loans.

11         Now, as I have said, I believe B(1) applied, so that I

12    look even if you assume cause.  Even, again, if I say, okay,

13    there is a cause, that even if they have established cause,

14    I think under B(1) I can look at unusual circumstances to

15    determine that it's not appropriate to convert or dismiss.

16         Now, in addition to the facts that I have laid out, the

17    unusual circumstances include the devastating effect of

18    conversion.

19         And just as a doctor is to do no harm, presumably, the

20    U.S. Trustee should govern his actions in the same manner.

21    To convert this case would be devastating.

22         First, one can assume the U.S. Trustee would appoint

23    five trustees.  The U.S. Trustee has already argued there's

24    conflicts.

25         And to now suggest the case can be substantively

1    consolidated and so we only have one trustee I find is an

2    absolute hypocrisy.

3        We have issues of interparty claims which may come up

4    and require the appointment of different counsel in these

5    cases.

6        But we also have the claims process by which the

7    parties are working this out through negotiations and the

8    plan process.

9        That plan process has the advantage.  One big advantage

10   is the plan process would have a mechanism by which causes

11   of action that may belong to an individual direct lender

12   could be assigned to the estate and pursued for the benefit

13   of everyone.

14       One of the prime things that happened in the

15   AgriBioTech was that the causes of actions that the growers

16   had against lenders and others was assigned to the estate in

17   a manner which stood challenges of standing.

18       A Chapter 7 Trustee can't do that, and there's no

19   mechanism by which a Chapter 7 Trustee I don't think get

20   assigned the causes of action.

21       What would that mean?  That means each direct lender

22   would be left to go fend, to go sue, himself against the

23   insiders in the case.

24       This is not a case in which -- and it's probably akin

25   to the standing cases that suggest that the trustee cannot

1    pursue actions that belong to shareholders, but the plan

2    mechanism provides a mechanism for this.

3         Now, it's true the committees would cease to exist, but

4    the expenses of five separate trustees and the cost of those

5    professionals would far outweigh the remaining work of the

6    committees.

7         Because there are five trustees, they each sue each

8    other.  More importantly, each of the direct lenders would

9    be probably sued as well, and they would probably sue.

10        Finally, each trustee would be presumably because of

11   certain other amendments to BAPCPA which is what I like to

12   call it be entitled to a commission of three percent

13   regardless of the work accomplished.  The U.S. Trustee never

14   mentions that in his motion.

15        It is possible, too, that the trustees could argue that

16   three percent would be on top of the servicing fees to

17   direct lenders because commissions are paid on moneys

18   distributed to parties in interest.

19        I think a trustee could make a straight face that the

20   trustee would be entitled to not only servicing fees, but

21   three percent of what is paid over to direct lenders.

22        Also, the trustee is entitled to his percentage even if

23   all the funds go to other professionals.  That's again

24   something the U.S. Trustee has failed to point out.

25        And, indeed, what troubles me in a lot of the cases in

1    this district is that while we say that there are a lot of

2    asset cases most of the assets go to the professionals and

3    not so much to the unsecured creditors.

4        I'm not suggesting that there's anything wrong with

5    that because in a lot of cases you've got to pursue an

6    action to see if there's something there, but the reality is

7    the fees -- a lot of those cases, Saxton, for example, is

8    administratively insolvent.

9        Now, importantly, it's doubtful that a buyer could be

10    found.  It's easy for the U.S. Trustee to say, oh, the

11    Chapter 7 Trustee could find a buyer.

12        You've got a sophisticated issue here.  You don't have

13    even something I guess, arguably, simple like the sale of a

14    factory.  You've got a portfolio and a servicing business.

15        The current sale proposal depends upon a plan, and the

16    plan-confirmation process is invaluable to achieve top

17    dollar because it gives a buyer confidence that it can't

18    obtain through a liquidation by a Chapter 7 Trustee fire

19    sale or not.

20        It's doubtful that the trustee would continue to

21    service the loans.  As noted at the prior hearing, the

22    servicing business is only valuable as an adjunct to the

23    sale of the fund assets, so you'd lose the additional

24    servicing fees.

25        And how would you collect the servicing fees and the

1    exit fees that are due on these loans that if they're ever

2    finally paid?

3        So it's likely a trustee would reject all the contracts

4    and leave the direct lenders on their own.  The result of

5    this is that borrowers would have no one to receive payment

6    on performing loans.  If I have a performing loan, who am I

7    going to pay?

8        And while the lenders may seek another servicer, that

9    requires action by 51 percent of each loan, and some

10   servicers may be out there, but it requires a collective

11   effort.  It's a difficult situation.

12       It also would give borrowers who needed a nudge to pay

13   a reason not to pay.  They could sit back and wait until

14   somebody files an action either to foreclose, either

15   judicially or otherwise.

16       Again, how can that be accomplished with all the

17   numerosity of borrowers and the different kinds of

18   borrowers?

19       We contrast that to the collection efforts that have

20   been done by Mr. Allison and the negotiations that he has

21   made with borrowers.

22       Let's even assume that we have a trustee that comes in

23   and is familiar with this kind of thing.  He would have to

24   start afresh.

25       Do you think the borrower he's talking to would come

1    back with the last offer he gave Mr. Allison?  Of course

2    not.  The borrower would come back with his bottom-line

3    first offer because all bets are off.

4         Now, while the Court -- and what's interesting, too,

5    about this case and makes this case more difficult is that

6    while the Court is given an out under 1104(a)(3) to

7    converting or dismissing by appointing a trustee -- and

8    that's going to cover most of the cases -- here we have a

9    de facto trustee.

10        We really have what Mr. Landis says he wants unless he

11   wants somebody I guess that's directly under his authority.

12   This just doesn't fit within what 1112 says or was meant to

13   say.

14        It's clear that congress was concerned about debtors

15   who go in and stay in Chapter 11 with nothing but hopes and

16   dreams and schemes who merely want to delay their creditors

17   while they collect their salaries and pay off trust-fund

18   taxes, but that's not this case.

19        This case is going to depend upon the ability to get a

20   plan that covers all the issues.  This is a case which needs

21   a comprehensive plan and not scattered actions to deal with

22   all its problems.

23        As I have said, it's not a case which was intended

24   to or falls within the parameters of amended 1112.  All

25   right.

1    Let's take about a 15-minute recess, and then we'll

2    finish up with the other matters.

3    MS. CARLYON:  On this matter, your Honor, given

4    the delicate situation that we're in vis-a-vis a sale, it

5    would be our request that the order denying the motion be a

6    simple order entered immediately, and that the U.S. Trustee

7    cause that to be served on the people that received the

8    original notice.

9    THE COURT:  Yes.  I'll make my oral findings and

10    conclusions on the record, and that's not to say that I may

11    ultimately publish this as a memorandum, but it certainly

12    won't change any of the result.

13    And so I make my oral findings and conclusions on the

14    record, and I guess if anybody -- certainly, you could use

15    the transcript if anybody wants the opinion to be published.

16    All right.

17    Well, let's take about a 15-minute recess.  And, of

18    course, (indiscernible) the U.S. Trustee does it or BNC, so

19    you'll have to notice the order to everyone.

20    MS. CARLYON:  Thank you, your Honor.

21    THE CLERK:  All rise.

22    (Recess at 12:13:43 p.m.)

23    (Thereupon, the portion requested to be transcribed

24    was concluded.)

25

24

1        I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5

6    /s/ Lisa L. Cline                           11/27/06

7    _____           _____
     Lisa L. Cline, Transcriptionist              Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CLINE TRANSCRIPTION SERVICES   (702) 644-1123