**Entered on Docket**
**December 01, 2006**

_____
**Hon. Linda B. Riegle**
**United States Bankruptcy Judge**

STUTMAN, TREISTER & GLATT, P.C.
FRANK A. MEROLA
(CA State Bar No. 136934)
EVE H. KARASIK
(CA State Bar No. 155356)
CHRISTINE M. PAJAK,
(CA State Bar No. 217173), Members of
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
Email:    fmerola@stutman.com
          ekarasik@stutman.com
          aparlen@stutman.com
Counsel for the Official Committee Of
Equity Security Holders Of USA Capital First Trust Deed Fund, LLC

SHEA & CARLYON, LTD.
JAMES PATRICK SHEA
(Nevada State Bar No. 000405)
CANDACE C. CARLYON
(Nevada State Bar No. 002666)
SHLOMO S. SHERMAN
(Nevada State Bar No. 009688)
228 South Fourth Street, First Floor
Las Vegas, Nevada 89101
Telephone: (702) 471-7432
Facsimile: (702) 471-7435
Email:    jshea@sheacarlyon.com
          ccarlyon@sheacarlyon.com
          ssherman@sheacarlyon.com

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>　　　　　　　Debtor. | BK-S-06-10725-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>　　　　　　　Debtor. | BK-S-06-10726-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>　　　　　　　Debtor. | BK-S-06-10727-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>　　　　　　　Debtor. | BK-S-06-10728-LBR<br>Chapter 11 |
| In re:<br>USA SECURITIES, LLC,<br>　　　　　　　Debtor. | BK-S-06-10729-LBR<br>Chapter 11 |
| Affects<br>☒ All Debtors<br>☐ USA Commercial Mortgage Co.<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed<br>☐ USA First Trust Deed Fund, LLC | |

405716v1

**ORDER APPROVING JOINT MOTION OF THE FOUR OFFICIAL COMMITTEES TO APPROVE THE SUPPLEMENTAL DISCLOSURE PURSUANT TO 11 U.S.C. §1125 (AFFECTS ALL DEBTORS)**

On November 28, 2006, at 1:30 p.m., before the Honorable Linda Riegle, United States Bankruptcy Judge, a hearing ("Hearing") was held in connection with the "Joint Motion of The Four Official Committees To Approve The Supplemental Disclosure Pursuant To 11 U.S.C. §1125" (the "Joint Motion")[1], pursuant to which the four official committees appointed in these cases (the "Committees") requested Court approval of the publication and distribution of a Supplemental Disclosure by the Committees, which was attached as Exhibit "A" to the Joint Motion, in response to a letter that was circulated by Donna Cangelosi to numerous investors (the "Unauthorized Solicitation").

Upon review and consideration of the (a) the Joint Motion; (b) the Declaration of Gregory E. Garman filed in support of the Joint Motion; (c) the "Opposition to Joint Motion of the Four Official Committees to Approve Supplemental Disclosure Pursuant to 11 U.S.C. §1125" (the "Opposition") filed on behalf of Donna Cangelosi; and (d) the arguments of counsel made at the Hearing, the Court, hereby, finds that: (i) notice of the Joint Motion and the hearing thereon was adequate and proper under the circumstances and (ii) the relief sought in the Joint Motion is reasonable, necessary and in the best interests of the Debtors' respective estates.  Therefore,

**IT IS HEREBY ORDERED** that:

1.    The Joint Motion is hereby approved.

2.    The Supplemental Disclosure, a true and correct copy of which is attached hereto as Exhibit "1", is hereby approved.

3.    Each of the Committees and Debtors are hereby authorized to post the Supplemental Disclosure on their respective websites.

4.    By no later than 5:00 p.m. on Thursday, November 30, 2006, counsel for Ms. Cangelosi is hereby required to provide, to counsel for each of the Committees and the

---

[1]    Terms not otherwise defined herein shall have the same meanings ascribed to them in the Joint Motion.

Debtors, a list of all names and corresponding e-mail addresses of persons to whom the Unauthorized Solicitation was mailed (the "Recipients") and shall provide such list both in an electronic and printed format.

      5.     The Committees and Debtors are hereby authorized, but not required, to send the Supplemental Disclosure to the Recipients or any other party in interest via electronic mail or U.S. Mail in their discretion.

      6.     With regard to whether the Unauthorized Solicitation is a violation of Bankruptcy Code section 1125 and whether sanctions should be imposed in connection therewith, the rights and legal positions of all parties are hereby reserved.

PREPARED AND SUBMITTED BY:

STUTMAN, TREISTER & GLATT, P.C.

_Cht M. Pajak_

Frank A. Merola, Esq.
Eve H. Karasik, Esq.
Christine M. Pajak, Esq.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067

and

SHEA & CARLYON, LTD.
Candace C. Carlyon, Esq.
Shlomo S. Sherman, Esq.
228 South Fourth Street, First Floor
Las Vegas, NV 89101

Counsel for the Official Committee of Equity
Security Holders of USA Capital First Trust
Deed Fund, LLC

Approved / Disapproved by

OFFICE OF THE U.S. TRUSTEE

By:

_____
Office of the U.S. Trustee

1  Debtors, a list of all names and corresponding e-mail addresses of persons to whom the

2  Unauthorized Solicitation was mailed (the "Recipients") and shall provide such list both in an

3  electronic and printed format.

4          5.      The Committees and Debtors are hereby authorized, but not required, to

5  send the Supplemental Disclosure to the Recipients or any other party in interest via electronic

6  mail or U.S. Mail in their discretion.

7          6.      With regard to whether the Unauthorized Solicitation is a violation of

8  Bankruptcy Code section 1125 and whether sanctions should be imposed in connection

9  therewith, the rights and legal positions of all parties are hereby reserved.

10

11

12  PREPARED AND SUBMITTED BY:        Approved / Disapproved by

13  STUTMAN, TREISTER & GLATT, P.C.    OFFICE OF THE U.S. TRUSTEE

14                                      By:

15  Frank A. Merola, Esq.              Office of the U.S. Trustee
    Eve H. Karasik, Esq.
16  Christine M. Pajak, Esq.
17  1901 Avenue of the Stars, 12th Floor
    Los Angeles, CA 90067
18
    and
19

20  SHEA & CARLYON, LTD.
    Candace C. Carlyon, Esq.
21  Shlomo S. Sherman, Esq.
    228 South Fourth Street, First Floor
22  Las Vegas, NV 89101

23  Counsel for the Official Committee of Equity
24  Security Holders of USA Capital First Trust
    Deed Fund, LLC
25

26

27

28

405716v1                              3

1

2    Approved/Disapproved by:                      Approved/Disapproved by:

3    LEWIS AND ROCA, LLP                           GORDON & SILVER, LTD.

4

5    By:    /s/ Rob Charles                         By:      /s/ Gerald M. Gordon
           SUSAN M. FREEMAN, ESQ.                        GERALD M. GORDON, ESQ.
6          ROB CHARLES, ESQ.                             GREGORY E. GARMAN, ESQ.
           Counsel for the Official Committee of         Counsel for the Official Committee of
7          Unsecured Creditors of USA Commercial         Holders of Executory Contract Rights of
8          Mortgage Company                              USA Commercial Mortgage Company

9    Approved/Disapproved by:                      Approved/Disapproved by:

10   ORRICK, HERRINGTON & SUTCLIFFE LLP            RAY QUINNEY & NEBEKER P.C. and
     and BECKLEY SINGLETON, CHTD.                   SCHWARTZER & MCPHERSON LAW
11                                                  FIRM

12

13   By:    /s/ Marc A. Levinson                    By:      /s/ Annette W. Jarvis
           MARC A. LEVINSON, ESQ.                          Annette W. Jarvis, Utah Bar No. 1649
14         LYNN TRINKA ERNCE, ESQ.                         36 South State Street, Suite 1400
           BRETT A. AXELROD, ESQ.                          P.O. Box 45385
15         ANNE M. LORADITCH, ESQ.                         Salt Lake City, Utah 84145-0385
16         Counsel for the Official Committee of          Attorneys for Debtors and Debtors-In-
           Equity Security Holders of USA Capital         Possession
17         Diversified Trust Deed Fund, LLC

18   Approved/Disapproved by:

19   LAW OFFICES OF ALAN R. SMITH

20

21

22   By:_____
           ALAN R. SMITH, ESQ.
23         KEVIN A. DARBY, ESQ.
           Counsel for Donna Cangelosi
24

25

26

27

28

405716v1                                    4

1

2 | Approved/Disapproved by:

3 | LEWIS AND ROCA, LLP

4

5 | By:_____
   SUSAN M. FREEMAN, ESQ.

6 | ROB CHARLES, ESQ.
   Counsel for the Official Committee of

7 | Unsecured Creditors of USA Commercial
   Mortgage Company

8

9 | Approved/Disapproved by:

10 | ORRICK, HERRINGTON & SUTCLIFFE LLP.
    and BECKLEY SINGLETON, CHTD.

11

12

13 | By:_____
    MARC A. LEVINSON, ESQ.

14 | LYNN TRINKA ERNCE, ESQ.
    BRETT A. AXELROD, ESQ.

15 | ANNE M. LORADITCH, ESQ.
    Counsel for the Official Committee of

16 | Equity Security Holders of USA Capital
    Diversified Trust Deed Fund, LLC

17

18 | Approved/Disapproved by:

19 | LAW OFFICES OF ALAN R. SMITH

20

21

22 | By:_____
    ALAN R. SMITH, ESQ.

23 | KEVIN A. DARBY, ESQ.
    Counsel for Donna Cangelosi

24

25

26

27

28

Approved/Disapproved by:

GORDON & SILVER, LTD.


By:_____
    GERALD M. GORDON, ESQ.
    GREGORY E. GARMAN, ESQ.
    Counsel for the Official Committee of
    Holders of Executory Contract Rights of
    USA Commercial Mortgage Company

Approved/Disapproved by:

RAY QUINNEY & NEBEKER P.C. and
SCHWARTZER & MCPHERSON LAW
FIRM


By:_____
    Annette W. Jarvis, Utah Bar No. 1649
    36 South State Street, Suite 1400
    P.O. Box 45385
    Salt Lake City, Utah 84145-0385
    Attorneys for Debtors and Debtors-In-
    Possession

A05716v1                                           4

# EXHIBIT 1

As provided by the Bankruptcy Code, the Bankruptcy Court has approved the Disclosure Statement, finding that it adequately explained the Debtors' Plan which you have been asked to consider as a means to wind-up these bankruptcy cases. Recently, the Debtors and the four Committees became aware of various emails and other communications from certain Direct Lenders and investors criticizing both the Plan and the attorneys and other professionals who are involved in the bankruptcy cases, and recommending that you vote to reject the Plan. These communications have not been submitted to, let alone approved by, Judge Riegle, and they contain numerous incorrect and misleading statements of facts and assumptions of applicable law. Perhaps, even more importantly, they do not suggest a viable alternative to the Plan.

While each of the Committees shares many of the frustrations and complaints of the authors of these Unapproved Solicitations, they firmly believe that rejection of the Plan would be a huge step backward. They have taken to heart the one clear message shared by all throughout these proceedings, namely "get us out of bankruptcy as soon as possible."

The Committees as official representatives of Creditors, Direct Lenders and Investors, have been integrally and intimately involved in the bankruptcy process, and have negotiated the various compromises and processes set forth in the Plan because they believe that such agreements represent the best and most efficient means to maximize recoveries for Creditors, Direct Lenders and Investors, to end the bankruptcy proceedings as soon as possible, to transfer servicing of Loans without disruption to a reputable servicer, and to minimize and avoid the pain, uncertainty and cost of protracted

litigation involving Direct Lenders. In short, they believe that confirmation of the Plan is the best way "to get you out of bankruptcy as soon as possible."

**The Plan is a compromise. It not only represents a fair outcome under the circumstances, but also avoids the worst possible outcome that various parties, including the authors of the Unapproved Solicitations, could suffer under a chapter 7 liquidation.**

While the Bankruptcy Court has ruled that the Disclosure Statement contains adequate information, and while the Committees believe that the Disclosure Statement provides answers to the unsubstantiated, misleading and incorrect statements in the Unapproved Solicitations, the Committees also believe that you will be assisted in making your decision regarding the Plan by considering the following short response to the points raised in the Unapproved Solicitations.

      1.    **<u>Prepaid Interest</u>:**    The Unapproved Solicitations assert that Direct Lenders have the right to retain Prepaid Interest received prior to the date of the filing of the bankruptcy. As all Direct Lenders are aware, the issues regarding whether the Prepaid Interest should be retained by USA Commercial Mortgage Company ("USACM") or the Direct Lenders has been the subject of much scrutiny and debate in these bankruptcy cases. USACM paid over $39 million to Lenders, including the Funds and Direct Lenders, which funds were not previously paid by the various Borrowers prior to the bankruptcy filing. This is real cash. Because the source of funds that were used to make these pre-petition payments to Lenders came from commingled funds of USACM, it is not possible to trace those funds to individual Direct Lenders and such funds became property of the USACM estate and are available to be distributed to all USACM

creditors, including Direct Lenders with unsecured claims. The Debtors shortly will be filing a legal brief supported by authenticated evidence that substantiates this legal position.

Absent a compromise on the Prepaid Interest, USACM would be forced to bring lawsuits against individual Direct Lenders to recover the Prepaid Interest at great cost to both USACM and the Direct Lenders. If not repaid, USACM would assert a claim to recover the payments under, for example, state and federal fraudulent conveyance law. In order to avoid hundreds or perhaps thousands of lawsuits, the Plan proposes that where either borrowers have paid the interest which USACM prepaid (about $14 million), or where USACM has netted the Prepaid Interest from Lenders (about $18 million), the USACM estate keeps the funds, does not pursue litigation, and the Direct Lenders collect the sums they were always due from Borrowers. For the approximately $7 million remaining in uncollected Prepaid Interest, the Plan continues the same netting process as Judge Riegle has already authorized, and the statute of limitations is tolled for 2 years to allow these sums to be collected without the need for litigation. The DTDF Committee, however, has not agreed to any such compromise with USACM, and, as a result, USACM may assert fraudulent transfer and other claims against DTDF and DTDF may raise any defenses in response, including those raising recoupment and offset claims. If not compromised, such competing claims likely will be resolved by Judge Riegle in one lawsuit between the USACM Trust and Post-Effective Date DTDF.

> 2.    **Bankruptcy Code Mandates Distribution In A Specified**

**Order**: The Unapproved Solicitations argue that professional fees and expenses should

not be paid before the Direct Lenders and Fund members receive recoveries on their investments. The Bankruptcy Code, however, mandates a different result. To encourage professionals and other businesses to provide services to companies in bankruptcy, all costs incurred during the bankruptcy, including professional fees as well as such items as payroll, utilities, and other expenses that keep a debtor alive during the bankruptcy process, are "administrative expenses," which must be paid before any other claims or interests. Without this protection, few entities would be willing to provide goods or services to a bankrupt debtor's estate.

After administrative expenses are paid in full, the Bankruptcy Code then provides that priority claims (primarily claims for employee wages, vacation pay, severance pay and contributions to benefit plans and other similar amounts) must be paid before general unsecured claims. Therefore, Direct Lenders with unremitted principal claims (as well as holders of all other unsecured claims) can only be paid after administrative expenses and priority claims have been paid in full.

Further, if the Plan is not confirmed, and the cases are converted to Chapter 7 liquidations, the costs of the Chapter 7 cases, including all of the fees of the appointed Chapter 7 Trustees and their professionals would be paid first; then all of the costs of the chapter 11 bankruptcy cases (including professional fees) would be paid; then statutory priority claims; then unsecured claims; then equity interests (such as FTDF and DTDF investors). In short, failure to approve the Plan would result in significant additional expenses which would be paid ahead of unsecured creditors and investors.

3.    **USACM Unsecured Claims Must Be Treated Alike:** The Unapproved Solicitations suggest that in the event the Prepaid Interest is recovered and

determined to be property of the estate of USACM, such funds should be used solely to satisfy the unremitted principal claims of Direct Lenders. Generally, the Bankruptcy Code does not allow for this and provides that all unsecured creditors must receive the similar treatment. Direct Lenders with unremitted principal claims are only one type of a general unsecured claim in the USACM general unsecured creditor class. Other claims in this class include the DTDF unremitted principal claim of approximately $19 million, the FTDF unremitted principal claim of approximately $370,000, and other claims of Direct Lenders, FTDF and DTDF against USACM that have not yet been allowed. All creditors holding these unsecured claims have the right to share pro-rata in the USACM recoveries, including the Prepaid Interest.

          4.     **Servicing Fees:** The Unapproved Solicitations imply that the 2% holdback the Court ordered will all be retained by USACM. This is not the case. Under the compromise in the Plan, $605,000 of the 2% holdback will be used to reimburse USACM in part for the fees and expenses incurred by the Direct Lender Committee and their professionals. After this reimbursement, USACM is only permitted to retain from the 2% holdback the actual servicing fees permitted to be collected under the individual Direct Lender loan servicing agreement. For example, if a Direct Lender has a 3% loan servicing agreement, then the full amount of the 2% holdback for such Direct Lender will be retained by USACM. But, if a Direct Lender has a 1% loan servicing agreement, then USACM will release the additional 2% in distributions being held back less the particular Direct Lender's pro rata share of the $605,000 reimbursement. USACM has asserted that, if the Plan is not confirmed, it may seek to collect more of the 2% holdback as a surcharge from Direct Lenders with 1% loan servicing agreements.

A second reason for the compromise is that before the bankruptcy filing, USACM collected funds and paid them to Direct Lenders without collecting a servicing fee. One estimate of uncollected servicing fees exceeds $9 million. After the bankruptcy filing, USACM has collected some, but not all, of the servicing fees accrued under the loan servicing agreements. Under the Plan, claims for accrued prepetition servicing fees unpaid on the closing of the sale will be waived. If the Plan is not confirmed, it is very likely that USACM (including any appointed chapter 7 trustee) will seek to collect these fees.

5.    **Collateral for 10-90 Loan and $58 Million Note:** The Unapproved Solicitation suggests that the new servicer to be selected through the auction process will have recourse to the collateral for both the DTDF 10-90 Loan and the $58 Million Note. This is incorrect. The new servicer is neither purchasing the DTDF 10-90 Loan (which, with accrued interest now exceeds $80 million) nor the $58 Million Note, and will have no recourse to the collateral securing these assets.

6.    **Recovery Estimates:** The Unapproved Solicitation states that under the Plan, unsecured creditors of USACM will receive only an 8% recovery, DTDF members will receive only a 15% recovery, and FTDF members will receive only a 60% recovery. Contrary to these unsupported estimates, the Debtors, in the Disclosure Statement, forecasted a range of recoveries for each of these constituency groups as follows:

- Unsecured creditors of the USACM estate, including creditors holding unremitted principal claims are anticipated to receive recoveries that range from a low of 8% to a high of 33%.

- DTDF members are anticipated to receive recoveries of a low of 25% to a high of 46%. The lengthy footnote on page 9 of the Disclosure Statement explains that actual results could be much greater or lower than such estimate.

- FTDF members are anticipated to receive recoveries ranging from 67% to 70%.

7.    **Professional Fees:** The Unapproved Solicitations suggest that the rapid pace of the Chapter 11 Cases is driven by the desire of estate professionals to obtain year-end bonuses. This is simply wrong. Professional final fee applications are not due to be filed until February 2007 with a hearing to approve such fees and costs not likely until early March 2007. Further, the professionals for the DTDF Committee and as well as the Debtors' professionals (with respect to work performed on behalf of DTDF) have received no payments to date, and are unlikely to receive payment prior to year-end. Moreover, the USACM professionals for the Debtors have only been paid approximately 50% of their fees for work performed through July, 2006, and have not yet received any payment for work performed for August, September, or October. While significant fees and costs have been approved for professionals in these Chapter 11 Cases, on an interim basis, only a portion has actually been paid. Finally, all of the professional fees and costs are subject to final review and approval as part of the final fee application process. Nevertheless, these very same professionals have taken the highly unusual step of permitting interim payments to investors prior to confirmation of a plan of reorganization.

8.    **Direct Lender Claims Against Debtor Entities:**  The
Unapproved Solicitations suggest that Direct Lenders have claims against USA Realty,
USA Securities, FTDF and DTDF for the alleged transfer of Direct Lender funds to these
entities, and that Direct Lenders should not be required to release the other entities.
There are factual bases for these compromises under the Plan. All Prepaid Interest
transferred to FTDF has been offset against FTDF collections during the Chapter 11
Cases with such funds being transferred to USACM as part of the compromise. In
addition, USA Realty and USA Securities do not have any significant assets available to
pay claims.

9.    **Recharacterization**:  The Unapproved Solicitations assert that
recharacterization is not a real threat to Direct Lenders and the compromises in the Plan
do not provide for a full resolution. The Direct Lenders Committee believes that a claim
of recharacterization against Direct Lenders will most likely not prevail. However,
without the compromise there is no assurance that such actions will not be brought
against Direct Lenders. Thus, in order to avoid even the possibility of this litigation
against Direct Lenders, FTDF, USA Realty and USA Securities each provide the Direct
Lenders with a release from any action to recharacterize the loans as property of the
Debtors' estates. The Direct Lenders claims against DTDF and DTDF Claims against the
Direct Lenders are not settled under the Plan, and all rights are preserved.

10.    **$58 Million Note Collection:**  The Unapproved Solicitations
suggest that the Plan does not provide an adequate mechanism to collect or to secure this
the $58 Million Note, the balance of which, with interest, now exceeds $60 million. This
statement is incorrect. The $58 Million Note was secured pursuant to an agreement

previously approved by the Bankruptcy Court. Further, the Plan provides that both
DTDF and USACM will retain their allocated share (which share is yet to be determined)
in the $58 Million Note. It is anticipated that the Post-Effective Date DTDF and the
USACM Trust will jointly pursue recovery of the $58 Million Note as provided in the
Plan and Disclosure Statement and discussed further below. Both the Post-Effective Date
DTDF and the USACM Trust have every incentive to collect the $58 Million Note in full,
no matter how the proceeds are divided between them.

        11.     **Direct Lender Settlement Standing:**  The Unapproved
Solicitations state that the Direct Lender settlement in the Plan was approved only by the
Direct Lenders Committee and not by the individual Direct Lenders. This is true. The
settlement was negotiated long and hard and in good faith by the Direct Lenders
Committee, and the Direct Lenders Committee believes the settlement is in the best
interests of the Direct Lenders. As contemplated by the Bankruptcy Code, Direct
Lenders have the opportunity to vote in favor or against such settlement in class A-5 of
the Plan.

        12.     **The Sale to Silver Point or an Overbidder:**  The Unapproved
Solicitations assert that there are no valid grounds for FTDF to sell its loans at the
discounted price. FTDF, as well as the FTDF Committee, believe that the proposed sale
of the FTDF assets, subject to an auction process, is in the best interests of the FTDF
estate and provides for the best recovery to the FTDF investors. The professionals of
FTDF and the FTDF Committee spent considerable time and effort evaluating the
ultimate recovery on the FTDF assets on a standalone basis, the timing and cost of such
recovery and the myriad of risks and uncertainties inherent in achieving such recovery.

They further believe that the foregoing considerations support the proposed price for the

FTDF assets for several reasons. First, the sale process eliminates the timing and

collection risk inherent in the continued workout of the FTDF loans. Second, the FTDF

investors will stop bearing the cost of collection and work-out of the FTDF loan

portfolio. Third, the auction process encourages a sale of the loan portfolio to provide a

higher recovery than the price already offered by Silver Point. Accordingly, FTDF, and

the FTDF Committee, believe that the proposed sale, subject to the auction process,

provides the best means to maximize the value to the FTDF investors.

13.    **Litigation Against Hantges, Milanowski and USAIP:** The

Unapproved Solicitations assert that the Plan provides no clear path for litigation against

the insiders of the Debtors, including Hantges, Milanowski and USAIP. The USACM

Trust and the Post-Effective Date DTDF will own all of the claims and causes of action

for the benefit of their creditors and investors, respectively. Under the Plan, the USACM

Trustee and the DTDF Administrator will have the funding created from the liquidation

of assets, including collection of Prepaid Interest, to fund the litigation.

The Plan does not bar Direct Lenders from hiring counsel and filing suit if

they believe that they have individual claims against Hantges, Milanowski, USAIP or

other insiders. However, Direct Lenders have no greater or lesser right to payment than

other unsecured creditors of Hantges, Milanowski and USAIP, so if they bring suit, and

recover judgment, they will, at best, share pro rata with other creditors. The Plan

provides a vehicle for all with claims against USACM, including the Direct Lenders, to

share in the proceeds, while also spreading the expense. In contrast, a Chapter 7 Trustee

will have to find a way of funding the administration of the case, including the cost of pursuing the necessary litigation against Hantges, Milanowski, USAIP and others.

14.    **Alternatives to the Plan:** The Unapproved Solicitations fail to list any viable alternatives to the proposed Plan, asserting that Silver Point will wait around until the Plan can be modified and confirmed.

This approach ignores both reality and the Bankruptcy Code. For instance, if the Plan is not confirmed, it is highly unlikely that USACM will continue to service the loans for any appreciable period of time. As such, who will service the loans, particularly the non-performing loans? Will a new servicer agree to the existing loan servicing fees or require higher fees? To date, Mesirow has performed the servicing function, but cannot cost-effectively fulfill that role for the long-term. Further, Mesirow and lawyers in these cases have effectively financed the servicing operation as they have been paid only a fraction of their fees and costs incurred to date. The chaos which would be created by USACM simply terminating its servicing has been a major concern of the Direct Lenders Committee from the beginning of these cases. Given these serious challenges and many other issues, and finding no other acceptable alternatives, the Direct Lenders Committee and the three other Committees negotiated and support the Plan.

If the Plan is not confirmed, the Court will have two choices – either grant more time for preparation, filing and prosecution of a different plan, which would involve months of delay and significantly increased professional fees and costs, or convert the cases to a Chapter 7 liquidation, which would require a Chapter 7 trustee to collect assets, determine claims, and see to distributions. As explained above, the expenses of administration in a Chapter 7 case have priority over the Chapter 11 administrative

expenses, which have priority over unsecured claims or the rights of Fund investors. In other words, general unsecured claims, including claims for unremitted principal, would be paid only after more administrative expenses, including expenses for potentially duplicative work (as the Chapter 7 trustee will need to verify the work previously done by Mesirow), have been paid in full.

15. **Modifications to the Plan:** The Unapproved Solicitations suggest that the intention of the authors is not to derail confirmation of the current Plan, but rather to simply seek certain modifications to the Plan. As explained in the Disclosure Statement, the Plan contemplates several integrated compromises, which must be considered as a whole. Piecemeal modifications to the Plan are not a viable option and would present a much larger undertaking that would involve further negotiations between the Debtors' various parties in interest. Moreover, to the extent that significant modifications are made to the Plan, a further solicitation of the Debtors' creditors and equity interest holders would be needed to vote on a revised plan. This would simply add to the cost and delay of these bankruptcy cases and would prevent the Debtors from "getting out of bankruptcy as soon as possible."

405580v5