Exhibit "1"

Compass Partners Purchase Agreement

_____

**ASSET PURCHASE AGREEMENT**

**dated**

**November 30, 2006**

**by and among**

**USA COMMERCIAL MORTGAGE COMPANY,**
**and**
**USA CAPITAL FIRST TRUST DEED FUND, LLC**
**("Sellers")**

**and**

**USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,**
**USA CAPITAL REALTY ADVISORS, LLC,**
**and**
**USA SECURITIES, LLC**
**("Acknowledging Parties")**

**and**

**COMPASS PARTNERS LLC**
**("Purchaser")**

_____

**ARTICLE I DEFINITIONS** ............................................................................................ 7
    **Section 1.1**   **Definitions** ..................................................................................... 7
    **Section 1.2**   **Other Definitional and Interpretive Matters.** .......................... 8
**ARTICLE II PURCHASE AND SALE OF LOANS AND SERVICING AGREEMENTS** .. 9
    **Section 2.1**   **Purchase and Sale of Loans** .......................................................... 9
    **Section 2.2**   **Purchase Price** .............................................................................. 10
    **Section 2.3**   **Adjustments to Purchase Price** ..................................................... 10
    **Section 2.4**   **Payment of Purchase Price** ........................................................... 11
    **Section 2.5**   **Deposit** ........................................................................................... 11
    **Section 2.6**   **Closing Escrow.** ............................................................................ 12
**ARTICLE III STATEMENTS OF USACM** .................................................................... 13
    **Section 3.1**   **Due Incorporation.** ....................................................................... 13
    **Section 3.2**   **Authority and Capacity** ................................................................. 13
    **Section 3.3**   **Litigation** ....................................................................................... 13
    **Section 3.4**   **Statements Regarding the Assets** ................................................. 13
**ARTICLE IIIA STATEMENTS OF FTDF** ..................................................................... 14
    **Section 3A.1**   **Due Incorporation** ...................................................................... 14
    **Section 3A.2**   **Authority and Capacity** ............................................................. 15
    **Section 3A.3**   **Litigation** ................................................................................... 15
    **Section 3A4**   **Statements Regarding the First Trust Deed Fund** .................... 15
    **Section 3A.5.**     **Statements Regarding Prepaid Interest** ............................ 15
**ARTICLE IV STATEMENTS OF PURCHASER** ........................................................... 15
    **Section 4.1**   **Due Organization and Good Standing** ........................................ 15
    **Section 4.2**   **Enforceability** ............................................................................... 16
    **Section 4.3**   **Authority and Capacity** ................................................................. 16
    **Section 4.4**   **No Conflict** .................................................................................... 16
**ARTICLE V BANKRUPTCY COURT APPROVAL** ..................................................... 16
    **Section 5.1**   **Bidding Procedures** ...................................................................... 16
    **Section 5.2**   **Sale Approval Order** ..................................................................... 16
    **Section 5.3**   **Plan of Reorganization** ................................................................. 17
**ARTICLE VI COVENANTS OF SELLERS** ................................................................... 17
    **Section 6.1**   **Delivery of Documents** ................................................................. 17
    **Section 6.2**   **No Modification** ............................................................................ 17
    **Section 6.3**   **Conduct of Business** ..................................................................... 18
    **Section 6.4**   **Other Bankruptcy Covenants** ...................................................... 18
    **Section 6.5**   **Taxes** .............................................................................................. 18
    **Section 6.6**   **Tax Reporting** .............................................................................. 18
    **Section 6.7**   **Reports/Notices** ........................................................................... 18
**ARTICLE VII COVENANTS OF PURCHASER** ........................................................... 19
    **Section 7.1**   **Causes of Action Against Insiders** ............................................... 19
    **Section 7.2**   **Causes of Action Against Debtors** ............................................... 19
    **Section 7.3**   **Servicing Agreements** ................................................................... 19
    **Section 7.4**   **Delivery of Assignment** ................................................................ 20
    **Section 7.5**   **Collections Payable to Sellers** ...................................................... 20
**ARTICLE VIII REMEDIES** ........................................................................................... 20
    **Section 8.1**   **Remedies for Breach by Purchaser** ............................................. 20

| | | |
|---|---|---|
| **Section 8.2** | **Remedies for Breach by Sellers** ..................................................... | 20 |
| **ARTICLE IX CONDITIONS TO CLOSING** ................................................... | | 21 |
| **Section 9.1** | **Conditions Precedent to Obligations of Purchaser** ...................... | 21 |
| **Section 9.2** | **Conditions Precedent to Obligations of Sellers** ........................... | 23 |
| **ARTICLE X TERMINATION** .......................................................................... | | 24 |
| **Section 10.1** | **Termination** ........................................................................ | 24 |
| **ARTICLE XI MISCELLANEOUS** .................................................................... | | 24 |
| **Section 11.1** | **Survival** .............................................................................. | 24 |
| **Section 11.2** | **Amendment** ....................................................................... | 24 |
| **Section 11.3** | **Counterparts** ..................................................................... | 24 |
| **Section 11.4** | **Entire Agreement** ............................................................. | 24 |
| **Section 11.5** | **Closing** ............................................................................... | 24 |
| **Section 11.6** | **Additional Collection Actions** ......................................... | 24 |
| **Section 11.7** | **Access to Documents** ....................................................... | 24 |
| **Section 11.8** | **Waivers** .............................................................................. | 25 |
| **Section 11.9** | **Notices** ............................................................................... | 25 |
| **Section 11.10** | **Acknowledging Parties** .................................................... | 26 |
| **Section 11.11** | **Governing Law/Venue** ...................................................... | 26 |
| **Section 11.12** | **Severability** ...................................................................... | 26 |
| **Section 11.13** | **Binding Effect; Third Party Beneficiaries; Successors and Assigns** ...... | 26 |
| **Section 11.14** | **Relationship of Parties** .................................................... | 27 |
| | | |
| **ARTICLE I DEFINITIONS** ............................................................................. | | 6 |
| **Section 1.1** | **Definitions** ........................................................................ | 6 |
| **Section 1.2** | **Other Definitional and Interpretive Matters.** ...................... | 8 |
| **ARTICLE II PURCHASE AND SALE OF LOANS AND SERVICING AGREEMENTS** .. | | 9 |
| **Section 2.1** | **Purchase and Sale of Loans** ............................................. | 9 |
| **Section 2.2** | **Purchase Price** ................................................................. | 10 |
| **Section 2.3** | **Adjustments to Purchase Price** ........................................ | 10 |
| **Section 2.4** | **Payment of Purchase Price** ............................................. | 11 |
| **Section 2.5** | **Deposit** .............................................................................. | 11 |
| **Section 2.6** | **Closing Escrow** ................................................................ | 12 |
| **ARTICLE III STATEMENTS OF USACM** ...................................................... | | 13 |
| **Section 3.1** | **Due Incorporation** ........................................................... | 13 |
| **Section 3.2** | **Authority and Capacity** .................................................... | 13 |
| **Section 3.3** | **Litigation** .......................................................................... | 13 |
| **Section 3.4** | **Statements Regarding the Assets** .................................... | 13 |
| **ARTICLE IV STATEMENTS OF PURCHASER** ............................................. | | 15 |
| **Section 4.1** | **Due Organization and Good Standing** ............................. | 15 |
| **Section 4.2** | **Enforceability** .................................................................. | 16 |
| **Section 4.3** | **Authority and Capacity** .................................................... | 16 |
| **Section 4.4** | **No Conflict** ....................................................................... | 16 |
| **ARTICLE V BANKRUPTCY COURT APPROVAL** ........................................ | | 16 |
| **Section 5.1** | **Bidding Procedures** .......................................................... | 16 |
| **Section 5.2** | **Sale Approval Order** ........................................................ | 16 |
| **Section 5.3** | **Plan of Reorganization** .................................................... | 17 |

**ARTICLE VI COVENANTS OF SELLERS** ........................................................... 17
    **Section 6.1**    **Delivery of Documents** .................................................. 17
    **Section 6.2**    **No Modification** ........................................................... 17
    **Section 6.3**    **Conduct of Business** ..................................................... 18
    **Section 6.4**    **Other Bankruptcy Covenants** ...................................... 18
    **Section 6.5**    **Taxes** ............................................................................ 18
    **Section 6.6**    **Tax Reporting** .............................................................. 18
    **Section 6.7**    **Reports/Notices** ........................................................... 18
**ARTICLE VII COVENANTS OF PURCHASER** ................................................... 19
    **Section 7.1**    **Causes of Action Against Insiders** .............................. 19
    **Section 7.2**    **Causes of Action Against Debtors** ............................... 19
    **Section 7.3**    **Servicing Agreements** .................................................. 19
    **Section 7.4**    **Delivery of Assignment** ............................................... 20
    **Section 7.5**    **Collections Payable to Sellers** ..................................... 20
**ARTICLE VIII REMEDIES** ................................................................................... 20
    **Section 8.1**    **Remedies for Breach by Purchaser** ............................. 20
    **Section 8.2**    **Remedies for Breach by Sellers** .................................. 20
**ARTICLE IX CONDITIONS TO CLOSING** ......................................................... 21
    **Section 9.1**    **Conditions Precedent to Obligations of Purchaser** .... 21
    **Section 9.2**    **Conditions Precedent to Obligations of Sellers** ......... 23
**ARTICLE X TERMINATION** ................................................................................ 24
    **Section 10.1**    **Termination** ................................................................. 24
**ARTICLE XI MISCELLANEOUS** ......................................................................... 24
    **Section 11.1**    **Survival** ....................................................................... 24
    **Section 11.2**    **Amendment** ................................................................. 24
    **Section 11.3**    **Counterparts** ............................................................... 24
    **Section 11.4**    **Entire Agreement** ....................................................... 24
    **Section 11.5**    **Closing** ........................................................................ 24
    **Section 11.6**    **Additional Collection Actions** .................................... 24
    **Section 11.7**    **Access to Documents** ................................................... 24
    **Section 11.8**    **Waivers** ....................................................................... 25
    **Section 11.9**    **Notices** ......................................................................... 25
    **Section 11.10**    **Acknowledging Parties** ............................................. 26
    **Section 11.11**    **Governing Law/Venue** ............................................. 26
    **Section 11.12**    **Severability** .............................................................. 26
    **Section 11.13**    **Binding Effect; Third Party Beneficiaries; Successors and Assigns** ...... 26
    **Section 11.14**    **Relationship of Parties** ............................................. 27


**ARTICLE I DEFINITIONS** ..................................................................................... 7
    **Section 1.1**    **Definitions** ..................................................................... 7
    **Section 1.2**    **Other Definitional and Interpretive Matters.** ................. 8
**ARTICLE II PURCHASE AND SALE OF LOANS AND SERVICING AGREEMENTS** .. 9
    **Section 2.1**    **Purchase and Sale of Loans** ........................................... 9
    **Section 2.2**    **Purchase Price** ............................................................. 10
    **Section 2.3**    **Adjustments to Purchase Price** .................................... 10
    **Section 2.4**    **Payment of Purchase Price** .......................................... 11

**Section 2.5    Deposit** .................................................................................................. 11
**Section 2.6    Closing Escrow** ....................................................................................... 12
**ARTICLE III STATEMENTS OF USACM** ................................................................. 13
**Section 3.1    Due Incorporation** .................................................................................. 13
**Section 3.2    Authority and Capacity** .......................................................................... 13
**Section 3.3    Litigation** ................................................................................................. 13
**Section 3.4    Statements Regarding the Assets** .......................................................... 13
**ARTICLE IV STATEMENTS OF PURCHASER** ....................................................... 15
**Section 4.1    Due Organization and Good Standing** .................................................. 15
**Section 4.2    Enforceability** .......................................................................................... 16
**Section 4.3    Authority and Capacity** .......................................................................... 16
**Section 4.4    No Conflict** ............................................................................................. 16
**ARTICLE V BANKRUPTCY COURT APPROVAL** ................................................... 16
**Section 5.1    Bidding Procedures** ................................................................................ 16
**Section 5.2    Sale Approval Order** ............................................................................... 16
**Section 5.3    Plan of Reorganization** ........................................................................... 17
**ARTICLE VI COVENANTS OF SELLERS** ................................................................. 17
**Section 6.1    Delivery of Documents** ........................................................................... 17
**Section 6.2    No Modification** ...................................................................................... 17
**Section 6.3    Conduct of Business** ............................................................................... 18
**Section 6.4    Other Bankruptcy Covenants** ................................................................ 18
**Section 6.5    Taxes** ....................................................................................................... 18
**Section 6.6    Tax Reporting** ......................................................................................... 18
**Section 6.7    Reports/Notices** ...................................................................................... 18
**ARTICLE VII COVENANTS OF PURCHASER** ........................................................ 19
**Section 7.1    Causes of Action Against Insiders** ........................................................ 19
**Section 7.2    Causes of Action Against Debtors** ........................................................ 19
**Section 7.3    Servicing Agreements** ............................................................................. 19
**Section 7.4    Delivery of Assignment** .......................................................................... 20
**Section 7.5    Collections Payable to Sellers** ............................................................... 20
**ARTICLE VIII REMEDIES** ......................................................................................... 20
**Section 8.1    Remedies for Breach by Purchaser** ....................................................... 20
**Section 8.2    Remedies for Breach by Sellers** ............................................................ 20
**ARTICLE IX CONDITIONS TO CLOSING** ............................................................... 21
**Section 9.1    Conditions Precedent to Obligations of Purchaser** .............................. 21
**Section 9.2    Conditions Precedent to Obligations of Sellers** ................................... 23
**ARTICLE X TERMINATION** ...................................................................................... 24
**Section 10.1    Termination** ........................................................................................... 24
**ARTICLE XI MISCELLANEOUS** ............................................................................... 24
**Section 11.1    Survival** ................................................................................................. 24
**Section 11.2    Amendment** ........................................................................................... 24
**Section 11.3    Counterparts** ......................................................................................... 24
**Section 11.4    Entire Agreement** .................................................................................. 24
**Section 11.5    Closing** .................................................................................................. 24
**Section 11.6    Additional Collection Actions** ............................................................. 24
**Section 11.7    Access to Documents** ............................................................................ 24

**Section 11.8**     **Waivers** ................................................................................................ 25
**Section 11.9**     **Notices** .................................................................................................. 25
**Section 11.10**    **Acknowledging Parties** ........................................................................ 26
**Section 11.11**    **Governing Law/Venue** .......................................................................... 26
**Section 11.12**    **Severability** ........................................................................................... 26
**Section 11.13**    **Binding Effect; Third Party Beneficiaries; Successors and Assigns** ...... 26
**Section 11.14**    **Relationship of Parties** ......................................................................... 27

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") dated and effective as of this 30th day of November, 2006 is made by and between USA COMMERCIAL MORTGAGE COMPANY ("USACM") and USA CAPITAL FIRST TRUST DEED FUND, LLC ("FTDF" and collectively with USACM, the "Sellers") and USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, USA CAPITAL REALTY ADVISORS, LLC and USA SECURITIES, LLC (the "Acknowledging Parties") and COMPASS PARTNERS LLC and its affiliates and designees (collectively, the "Purchaser").

## W I T N E S S E T H:

WHEREAS, Sellers and certain non-seller affiliates and subsidiaries have filed voluntary petitions for reorganization pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), jointly administered as Case No. BK-S-06-10725 LBR (the "Bankruptcy Case"), and shall seek the entry of an order by the Bankruptcy Court authorizing and approving this Agreement and its consummation as provided in the Plan (as defined herein).

WHEREAS, FTDF desires to sell, and Purchaser desires to purchase, pursuant to the terms hereof, FTDF's interest in certain commercial loans as set forth herein and detailed on the schedules attached hereto.

WHEREAS, USACM desires to sell, and Purchaser desires to purchase, pursuant to the terms hereof, USACM's interest in certain servicing agreements and related contracts for all of the serviced loans as detailed on the schedules attached hereto.

NOW, THEREFORE, in consideration of the mutual covenants made herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I        DEFINITIONS

**Section 1.1        Definitions**.  As used in this Agreement, the following terms shall have the meanings specified below.

"**Accrued Servicing Fees**" means all servicing fees and servicer advances accrued, but unpaid, as of the Closing Date, except for (i) servicing fees accrued prior to the Petition Date, but which have not been collected by the Closing Date that will be forgiven if and when the Plan is confirmed, and (ii) Prepaid Interest.

"**Assets**" means, collectively, all First Trust Deed Fund Assets listed on Schedule 1 and the Commercial Mortgage Assets listed on Schedule 2, or included in the definitions thereof whether or not on such schedules, together with the Personal Property.

"**Auction**" means the auction scheduled by the Bankruptcy Court in connection with the Bid Procedures Motion.

"**Auction Date**" means December 7, 2006.

"**Bankruptcy Code**" means Title I of the Bankruptcy Reform Act of 1978, as amended, set forth in sections 101 et seq. of title 11 of the United States Code.

"**Bid Procedures Motion**" means a motion filed by the Debtors on or about September 22, 2006, seeking Bankruptcy Court approval of certain bidding procedures on terms that are acceptable to Purchaser.

"**Borrower**" means any obligor under a Loan.

"**Business Day**" means a day other than Saturday, Sunday or any day on which banks located in the State of Nevada are authorized or obligated to close.

"**Closing**" means the closing of the purchase and sale of the Assets on the Closing Date pursuant to the Sale Approval Order, and transfer of each of the Assets to Purchaser consistent with the terms hereof.

"**Closing Date**" means that date on which the Sale Approval Order becomes a Final Order, and each of the Assets actually is transferred to Purchaser consistent with the terms hereof, provided that in no event shall the Closing Date be later than the Outside Approval Date.

"**Commercial Mortgage**" means USA Commercial Mortgage Company.

"**Commercial Mortgage Assets**" means all Servicing Agreements and Personal Property for all of the Serviced Loans set forth in the Serviced Loan Schedule including without limitation Accrued Servicing Fees, Late Charges, Success Fees, other fees and sums due the loan servicer under any of the Servicing Agreements and, in addition, under any other Service Agreement to which Commercial Mortgage is party which is not on such schedule, and all proceeds of all Serviced Loans and Serviced Loan participations and receivables related solely to these purchased Serviced Loans and Serviced Loan participations owed to Commercial Mortgage, to the extent of Commercial Mortgage's interest therein, as set forth in the Serviced Loan Schedule. Commercial Mortgage Assets excludes any other assets not specifically identified herein, including, (i) USACM's rights (including indemnification, insurance rights and claims and avoidance actions), claims and recoveries against third parties arising out of, or relating to, events prior to the Closing Date with respect to Commercial Mortgage Assets or arising at any time with respect to assets which are not Commercial Mortgage Assets, (ii) Prepaid Interest, (iii) IP Receivable, (iv) all cash, accounts receivable, interests in promissory notes which are not Mortgage Notes, Serviced Loans or Loans, tax refunds and other similar assets and (v) tangible or intangible assets of USACM which are not Personal Property.

"**Commercial Mortgage Price**" shall have the meaning ascribed to it in Section 2.2(b) hereof.

"**Committees**" means, collectively, all of the official committees of creditors or interest holders appointed to serve in the Bankruptcy Case.

"**Cut-off Date**" means July 31, 2006.

"**Debtors**" means the Sellers and the Acknowledging Parties that have filed for chapter 11 bankruptcy relief in the Bankruptcy Case.

"**Debtors' Agreed Allocation**" means the allocation of the Total Asset Purchase Price into components, as more fully described in Section 2.2 hereof, such being provided at Sellers' request, without Purchaser expressing any opinion with regard to its accuracy, propriety or reasonableness.

"**Deposit**" means the greater of $6,500,000 and 10% of Purchaser's purchase price for the Assets, which deposit shall be made pursuant to Section 2.5 hereof.

"**Final Order**" means an order or a judgment entered by a court of competent jurisdiction (x) that has not been reversed, stayed, modified or amended, (y) as to which no appeal or petition for review or motion for rehearing or reargument has been taken or has been made, and (z) as to which the time for filing a notice of appeal, a petition for review or a motion for reargument or rehearing has expired.

"**First Trust Deed Fund**" means USA Capital First Trust Deed Fund, LLC.

"**First Trust Deed Fund Assets**" means that portion of the Loans owned by First Trust Deed Fund that are set forth in the Loan Schedule, together with FTDF's interest in the Loan Documents, and proceeds of the Loans that would otherwise be payable to FTDF except as otherwise expressly stated herein.  First Trust Deed Fund Assets exclude any other assets not specifically identified herein as First Trust Deed Fund Assets, including, without limitation, (i) FTDF's rights (including indemnification, insurance rights and claims and avoidance actions), claims and recoveries against third parties arising out of, or relating to, events prior to the Closing Date with respect to any First Trust Deed Fund Asset (other than rights in connection with enforcement of any Mortgage or Servicing Agreement) or arising at any time with respect to assets which are not First Trust Deed Fund Assets, (ii) all books and records related to assets other than First Trust Deed Fund Assets, (iii) all cash, accounts receivable, tax refunds and other similar assets and (iv) tangible or intangible assets of FTDF.

"**First Trust Deed Fund Price**" shall have the meaning ascribed to it in Section 2.2(a) hereof.

"**FTDF Principal Balance**" shall mean the amount designated as "CFT Ownership Principal Balance" set forth on Schedule 1, which represents that amount of the principal balance of the Loan that First Trust Deed Fund owns.

"**FTDF Principal Balance Deficiency**" shall mean the amount that the FTDF Principal Balance as of the Cut-Off Date is less than the amount indicated in Schedule 1, as determined pursuant to section 9.1(c) on or before the Closing Date.

4

"**FTDF Principal Balance Surplus**" shall mean the amount that the FTDF Principal Balance as of the Cut-Off Date is more than the amount indicated in Schedule 1, as determined pursuant to section 9.1(c) on or before the Closing Date.

"**General Asset MAC**" shall have the meaning ascribed to it in Section 9.1(h).

"**General Service Agreement MAC**" shall have the meaning ascribed to it in Section 9.1(h).

"**Individual Asset MAC**" shall have the meaning ascribed to it in Section 9.1(i).

"**Insider**" shall have the meaning set forth in section 101(31) of the Bankruptcy Code, plus, to the extent not already covered by section 101(31), shall also include Joseph Milanowski, Thomas Hantges, Paul Hamilton, and USA Investment Partners, LLC (collectively the "USAIP Parties") and any "affiliate" of the Debtors or the USAIP Parties.  The term "affiliate" as referenced in section 101(31) and as used in this definition shall have the meaning set forth in section 101(2) of the Bankruptcy Code, plus, to the extent not already covered by section 101(2), shall also include any and all closely held private entities owned in whole or in part or controlled by the Debtors or any of the Debtors' Insiders.  Notwithstanding anything to the contrary herein, no borrower shall be deemed to be an Insider for purposes of Purchaser's enforcement of any of the Serviced Loans or the Loans.

"**IP Receivable**" mean that certain promissory note dated as of May 31, 2006, in the original principal amount of $58,374,918.81 made by USA Investment Partners, LLC in favor of USACM (as modified by the "Order Approving Agreement with Investment Partners" entered by the Court on July 24, 2006) and any other claims against USA Investment Partners, LLC or any of its affiliates or principals.

"**Late Charges**" means all late charges and default interest due, but unpaid, from Borrowers as of the Closing Date.

"**Lenders**" means those certain direct investors holding the unpaid principal balances and accrued interest balances, as confirmed pursuant to the terms hereof and the Plan, in the Loans.

"**Liabilities**" means claims, liabilities and obligations of every nature or kind, whether accrued, absolute, contingent or otherwise and whether asserted or unasserted, known or unknown and whether due or to become due.

"**Lien**" means any lien, claim, mortgage, security interest, pledge, charge, easement, servitude or other encumbrance of any kind, including any of the foregoing, arising under any conditional sales or other title retention agreement.

"**Litigation**" means a court action, an administrative or regulatory action or an arbitration proceeding involving USACM or FTDF, as applicable, excluding actions related to enforcement of the Loans and bankruptcy actions.

"**Loan**" means all of FTDF's interests in the commercial loans listed in the Loan Schedule.

"**Loan Documents**" means FTDF's or USACM's interests in all agreements and documents evidencing or securing the Loans including, but not limited to, the Mortgages and Mortgage Notes.

"**Loan Schedule**" means the schedule of Loans attached hereto as Schedule 1.

"**Mortgage**" means the mortgage, deed of trust, deed to secure debt or similar instrument creating a lien on the related Mortgaged Property as security for the Loans.

"**Mortgage Note**" means, with respect to the Loans, FTDF's interest in any promissory note or notes evidencing any Loan transferred by FTDF hereunder.

"**Mortgaged Property**" means, with respect to each Loan, the real property and personal property that is subject to the lien of the related Mortgage.

"**Net Adjustment 5**" the product of (i) the Net FTDF Principal Balance Surplus if any of Schedule 4 Loans and (ii) the quotient of (a) the Net FTDF Principal Balance Deficiency of Schedule 5 Loans and (b) the sum of each of the Net FTDF Principal Balance Deficiencies (if any) of the Schedule 5, 6 and 7 Loans.

"**Net Adjustment 6**" the product of (i) the Net FTDF Principal Balance Surplus if any of Schedule 4 Loans and (ii) the quotient of (a) the Net FTDF Principal Balance Deficiency of Schedule 6 Loans and (b) the sum of each of the Net FTDF Principal Balance Deficiencies (if any) of Schedule 5, 6 and 7 Loans plus the product of (i) the Net FTDF Principal Balance Surplus if any of Schedule 5 Loans and (ii) the quotient of the (c) Net FTDF Principal Balance Deficiency of Schedule 6 Loans and (d) the sum of each of the Net FTDF Principal Balance Deficiencies (if any) of Schedule 6 and 7 Loans.

"**Net Adjustment 7**" the product of (i) the Net FTDF Principal Balance Surplus if any of the Schedule 4 Loans and (ii) the quotient of (a) the Net FTDF Principal Balance Deficiency of the Schedule 7 Loans and (b) the sum of each of the Net FTDF Principal Balance Deficiencies (if any) of the Schedule 5, 6 and 7 Loans plus the product of (ii) the Net FTDF Principal Balance Surplus if any of Schedule 5 Loans and (iii) the quotient of (c) the Net FTDF Principal Balance Deficiency of the Schedule 7 Loans and (d) the sum of each of the Net FTDF Principal Balance Deficiencies (if any) of Schedule 6 and 7 Loans plus the Net FTDF Principal Balance Surplus if any of Schedule 6 Loans.

"**Net FTDF Principal Balance Deficiency**" means the aggregate difference between the FTDF Principal Balance Surplus of a set of Loans and the FTDF Principal Balance Deficiency of the same set of Loans if such difference is negative.

"**Net FTDF Principal Balance Surplus**" means the aggregate difference between the FTDF Principal Balance Surplus of a set of Loans and the FTDF Principal Balance Deficiency of the same set of Loans if such difference is positive.

"**Outside Approval Date**" February 16, 2007.

"**Person**" means an individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization or a federal, state, city, municipal or foreign government or an agency or political subdivision thereof.

"**Personal Property**" means all furniture and equipment owned by USACM (except for original computers and related hardware as may be necessary for USACM or its successor under the Plan to retain for evidentiary purposes in pursuing claims and causes of action retained and preserved in the Plan) to and those personal property assets of USACM necessary for enforcement of the Servicing Agreements, including, without limitation, all books and records of USACM related to the Loans, all servicing and investor records, databases, servicing and reporting software, and such reasonable assistance with operating and maximizing the efficiency of management of the foregoing as may be requested by the Purchaser, mutually agreed upon with the USACM before the Closing Date; provided, however, that only working copies of the relevant databases, and servicing and reporting software, will be delivered to Purchaser, with the originals being retained by USACM.

"**Petition Date**" means April 13, 2006.

"**Plan**" means the Debtors' Third Amended Joint Plan of Reorganization, which is deemed to be mutually acceptable to the Debtors and Purchaser, provided that it is, and remains through confirmation thereof, consistent in all respects with the provisions of this Agreement, as such may be modified through further negotiations between the parties hereto.

"**Prepaid Interest**" means (a) all causes of action to recover principal or interest payments USACM paid in advance to the applicable Lender(s) (other than First Trust Deed Fund) before the Petition Date; (b) all principal and interest payments USACM or Purchaser has collected or will collect postpetition (including, without limitation, collections made by Purchaser after the Closing Date) from Borrowers for such advanced principal and interest payments; and (c) all payments USACM or Purchaser has collected or will collect postpetition (including, without limitation, collections made by Purchaser after the Closing Date) on any Loan that would otherwise be payable to a Lender (other than First Trust Deed Fund) that received an advanced principal or interest payment from USACM prior to the Petition Date, but only to the extent of such advanced principal or interest payments.

"**Sale Approval Order**" means an order entered by the Bankruptcy Court approving the sale of the Assets pursuant to Section 363 of the Bankruptcy Code, which is presently contemplated to be the Order confirming the Plan.

"**Schedule 4 Loans**" means those Loans listed on Schedule 4.

"**Schedule 5 Loans**" means those Loans listed on Schedule 5.

"**Schedule 6 Loans**" means those Loans listed on Schedule 6.

"**Schedule 7 Loans**" means those Loans listed on Schedule 7.

"**Schedule Value 4**" means for a Loan listed on Schedule 4, 95%.

"**Schedule Value 5**" means for a Loan listed on Schedule 5, 85%.

"**Schedule Value 6**" means for a Loan listed on schedule 6, 80%.

"**Schedule Value 7**" means for a Loan listed on Schedule 7, 65%.

"**Servicing Agreement**" means those servicing agreements for all of the Serviced Loans, including, without limitation, the Loans.

"**Serviced Loan**" means any loan that is the subject of a Servicing Agreement.

"**Serviced Loan Schedule**" means the schedule of Serviced Loans that are the subject of Servicing Agreements attached hereto as Schedule 2 and including the Loans.

"**Success Fee**" means all exit fees, extension fees, deferred origination fees and other fees due to Commercial Mortgage pursuant to and as defined in the current documentation and agreements relating to each of the Serviced Loans whether accrued before or accruing after the Closing Date.

"**Total Asset Purchase Price**" means the sum of the First Trust Deed Fund Price and the Commercial Mortgage Price, subject to any applicable adjustments pursuant to Sections 2.3 and 9.1(i) hereto, and as the same may be finally determined as a result of the Auction.

**Section 1.2      Other Definitional and Interpretive Matters**.

(a)      Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

**Calculation of Time Period**.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

**Dollars**.  Any reference in this Agreement to $ shall mean U.S. dollars.

**Exhibits/Schedules**.  The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.  The Exhibits and/or Schedules shall not be amended following the Auction Date, except pursuant to the terms hereof.

**Gender and Number**.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

8

**Headings**.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections, and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

**Herein**.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

**Including**.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity, question of intent, or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

**Knowledge**.  With respect to references to the knowledge, including the qualification of any statement in this Agreement by the word known (as used in any statement in Article III or Article IIIA) or the phrase "to the knowledge of the Sellers" "to Sellers' knowledge," or by any other variant thereof, the Sellers shall be deemed to have knowledge of a matter if the Chief Restructuring Officer, Mr. Thomas Allison, in his capacity as President and Chief Restructuring Officer, or Mesirow Financial Interim Management, LLC., solely in its capacity as the restructuring consultant, has actual knowledge of the matter or was in possession of documentation indicative of any such matter.   Notwithstanding anything contrary in this Agreement, neither the Thomas Allison, in his capacity as President and Chief Restructuring Officer of the Debtors, Thomas Allison, in his personal capacity, nor Mesirow Financial, Mesirow Financial Interim Management, LLC, Mesirow Financial Consulting, LLC or their respective affiliates, officers, directors, members, shareholders, employees, representatives or agents shall have any liability, personal or otherwise, relating to or arising from this Agreement, including, without limitation, any obligations of the Debtors under the Agreement, any statements in the Agreement or the statements in Articles III and IIIA of the Agreement.  Any and all such liabilities relating to or arising from the Agreement shall be liabilities of the Debtors' bankruptcy estates and shall be solely the responsibility of the Debtors' bankruptcy estates.

## ARTICLE II    PURCHASE AND SALE OF LOANS AND SERVICING AGREEMENTS

**Section 2.1    Purchase and Sale of Loans**.  Pursuant to this Agreement, Sellers hereby agree to sell, assign, transfer, convey and deliver to Purchaser, and Purchaser hereby agrees to purchase from Sellers, all of Sellers' right, title and interest in and to the Assets.

**Section 2.2     Purchase Price**.  The Total Asset Purchase Price for the sale or transfer of the Assets shall be allocated according to the Debtors' Agreed Allocation as follows:

(a)     First Trust Deed Fund Assets.  The First Trust Deed Fund Assets for the cash consideration of $48,000,000.00, as adjusted pursuant to Section 2.3 (the "First Trust Deed Fund Price"); plus

(b)     Commercial Mortgage Assets.  The Commercial Mortgage Assets, for the consideration of $8,000,000.00, as adjusted pursuant to Section 2.3(i) (the "Commercial Mortgage Price").  The Servicing Agreements shall be transferred to Purchaser (or its affiliate) in a manner mutually agreed upon between USACM and the Purchaser.

(c)     Additional Purchase Price.     An additional purchase price of $1,500,000.00.

The Total Asset Purchase Price shall be valid only with regard to all Assets, as a whole, and is not separable to any extent.  The foregoing allocations of the Total Asset Purchase Price may be adjusted at Sellers', or Purchaser's, discretion solely for Purchaser's purposes, provided that any adjustment will have no effect on the Total Asset Purchase Price or on the Debtors' Agreed Allocation, unless otherwise agreed to by the Debtors and each of the Committees.

**Section 2.3     Adjustments to Purchase Price**.

(a)     The First Trust Deed Fund Price shall be further reduced by all payments of principal received by FTDF or any of the Sellers after the Cut-Off Date to the extent any such principal payments are related to the First Trust Deed Fund Assets in accordance with the following schedule:

(i)     For a Loan listed on Schedule 4, 95% of any principal payments received by FTDF or any of the Sellers as to First Trust Deed Fund Assets after the Cut-Off Date;

(ii)     For a Loan listed on Schedule 5, 85% of any principal payments received by FTDF or any of the Sellers as to First Trust Deed Fund Assets after the Cut-Off Date;

(iii)     For a Loan listed on Schedule 6, 80% of any principal payments received by  FTDF or any of the Sellers as to First Trust Deed Fund Assets after the Cut-Off Date; and

(iv)     For a Loan listed on Schedule 7, 65% of any principal payments received by FTDF or any of the Sellers as to First Trust Deed Fund Assets after the Cut-Off Date.

(b)     At the Closing Date, if the aggregate FTDF Principal Balance Deficiency for Schedule 4 Loans is greater than the aggregate FTDF Principal Balance Surplus for Schedule

4 Loans, then the First Trust Deed Fund Price shall be further reduced in an amount equal to the amount of such positive difference multiplied by the Schedule Value 4.

       (c)    If there is a Net FTDF Principal Balance Deficiency of the Schedule 5 Loans, and if the sum of the Net FTDF Principal Deficiency of Schedule 5 Loans and Net Adjustment 5 is negative then the Purchase Price shall be reduced by such amount times Schedule Value 5.

       (d)    If there is a Net FTDF Principal Balance Deficiency of the Schedule 6 Loans, and if the sum of the Net FTDF Principal Deficiency of Schedule 6 Loans and Net Adjustment 6 is negative then the Purchase Price shall be reduced by such amount times Schedule Value 6.

       (e)    If there is a Net FTDF Principal Balance Deficiency of the Schedule 7 Loans, and if the sum of the Net FTDF Principal Deficiency of Schedule 7 Loans and Net Adjustment 7 is negative then the Purchase Price shall be reduced by such amount times Schedule Value 7.

       (f)    For the avoidance of doubt, the methodology of the calculations set forth in items in (d) - (e) is set forth in Schedule 2.3(f).

       (g)    The First Trust Deed Fund Price shall not be adjusted on account of, and Purchaser shall have no interest, in any payments collected before the Closing Date that are proceeds of the First Trust Deed Assets for interest that has accrued prior to the Closing Date. Purchaser shall receive and retain all accrued interest that has accrued prior to the Closing Date but is collected after the Closing Date that are proceeds of the First Trust Deed Assets including, without limitation, First Trust Deed Fund's accrued default rate interest.

       (h)    On or before the Closing Date, if Sellers deliver to Purchaser an endorsement from the existing title company for the Loan referred to as Gramercy Court Ltd. certifying that amounts advanced or to be advanced thereunder are prior and superior in interest to any and all other non-tax lienholders or claimants, including, but not limited to, Mountain West Mortgage LLC's Deed of Trust and Assignment of Leases and Rents recorded on March 11, 2004, then the First Trust Deed Fund Price shall be increased in the amount of $250,000.00 ("Additional Price Adjustment").

       (i)    The Commercial Mortgage Price shall be reduced dollar for dollar by the amount of any payoff or reduction of the Commercial Mortgage Assets from the Auction Date through the Closing Date.

       **Section 2.4    Payment of Purchase Price**.  Subject to the terms and provisions hereof, payment of the Total Asset Purchase Price is subject to the adjustments and/or credits set forth in this Agreement and shall be paid by Purchaser to Sellers on the Closing Date, by wire transfer, in immediately available funds.

       **Section 2.5    Deposit**.  Purchaser shall submit to the Sellers (i) $2,325,000 of the Deposit to the Sellers on or prior to November 30, 2006 pursuant to the Bid Procedures Motion, (ii) $4,175,000 of the Deposit on or prior to 5:00 p.m. (Nevada time) on

December 6, 2006 and (iii) 10% of any additional amount, if any, over $65,000,000 Purchaser bids at the Auction for the Assets within 24 hours after the conclusion of the Auction if Purchaser is selected as the winning bidder at the Auction.  The Deposit shall be held by Sellers in a segregated interest bearing escrow account from the date of its submission to the Sellers with all interest payable to the Purchaser, provided, however, if Purchaser is not the successful bidder at the Auction, the Sellers shall immediately return the Deposit to the Purchaser.

**Section 2.6**    **Closing Escrow**.

(a)    Sellers shall have deposited with a mutually acceptable escrow agent all documents and Personal Property required under this Agreement, including, without limitation, the following:

(i)    any Personal Property in their possession, including, without limitation, copies of all loan servicing and/or investor reporting software and databases, including written documentation, programming code and business rules associated with each Loan and/or Lender;

(ii)    all original Mortgage Notes, together with an allonge to such Mortgage Notes, endorsed to Purchaser or, if such originals are not available, appropriate affidavit(s) of loss with respect thereto;

(iii)    the original recorded Mortgages with recording information endorsed thereon (or a copy certified by the appropriate public recording office);

(iv)    original assignments to Purchaser of all right, title and interest of Seller in and to the Mortgages, Mortgage Notes, and all other Assets;

(v)    all other original Loan Documents and if such originals are not available, at the request of Purchaser, appropriate affidavit(s) of lost original Loan Documents;

(vi)    original assignments of the UCC financing statements from Sellers to Purchaser;

(vii)    all appraisals, surveys, title reports, title insurance policies, commitments to issue title insurance policies, documents, correspondence, credit records, payment histories, insurance policies or certificates in Sellers' possession that pertains to the Assets;

(viii)    all original Servicing Agreements and original powers of attorney executed by the Lenders in Sellers' possession; and

(ix)    on or before the date notices are to be transmitted pursuant to Section 9.1(c) hereof, a schedule of servicing fees due on each Serviced Loan, together with a detailed explanation regarding how such fees are calculated.

(b)    Prior to the Auction Date, Sellers shall have deposited with a mutually acceptable escrow agent all Mortgages, Mortgage Notes (including alloneges to such Mortgage Notes, endorsed to Purchaser) Loan Documents and Personal Property to be transferred under this Agreement.  To the extent original Loan Documents are unavailable, Sellers shall execute appropriate affidavit(s) of lost original Loan Documents.

(c)    On the Closing Date, the Sellers shall deliver to the Purchaser all borrower escrow deposits and amounts similarly held in escrow or trust for borrowers related to the loans covered by the Servicing Agreements, together with an accounting thereof.

## ARTICLE III    STATEMENTS OF USACM

USACM, severally and not jointly, hereby makes the following closing condition statements to the Purchaser as follows:

**Section 3.1    Due Incorporation**.  USACM is duly organized, and validly existing under the laws of its state of formation.  USACM has a provisional, limited license to conduct all activities performed with respect to the servicing of the Serviced Loans.

**Section 3.2    Authority and Capacity**.  Subject to obtaining Bankruptcy Court approval pursuant to the Sale Approval Order and/or confirmed Plan, USACM has all requisite corporate power, authority and capacity to enter into this Agreement and to perform the obligations hereunder.  Without limiting the generality of the foregoing, subject to obtaining the Sale Approval Order, the execution and delivery of this Agreement, and any related agreements or instruments, and the consummation of the transactions contemplated hereby and thereby, each has been duly and validly authorized by all necessary  action, and this Agreement and any related agreements or instruments each constitute a valid and legally binding agreement of USACM enforceable in accordance with its or their terms.

**Section 3.3    Litigation**.  Except for adversary proceedings and other matters pending in the Bankruptcy Court and as set forth on Schedule 3.3, to the knowledge of USACM, there is no Litigation pending or threatened, nor is there any order, injunction or decree outstanding against or relating to USACM, which could have a material adverse effect upon any of the Assets or materially impair the ability of USACM to perform their obligations hereunder, nor does USACM know of any material basis for any such litigation, proceeding, claim or demand or governmental investigation.  To USACM's knowledge, USACM is not in default in any material respect with regard to any order of any court, governmental authority or arbitration board or tribunal to which USACM is a party or is subject, and USACM is not in violation of any laws, ordinances, governmental rules or regulations to which it is subject, which such default or violation might materially and adversely affect any of the Loans.

**Section 3.4    Statements Regarding the Assets**.  With respect to the Commercial Mortgage Assets, USACM hereby makes the following closing condition statements to the Purchaser as follows:

(a)    Subject to Bankruptcy Court approval pursuant to the Sale Approval Order and/or confirmed Plan, USACM has the legal right and authority to sell, convey and transfer the Commercial Mortgage Assets to the Purchaser.

13

(b)     The outstanding principal balance with regard to each of the Loans, as set forth in Schedule 1 attached hereto, is each borrower's outstanding balance as of the Cut-Off Date.

(c)     The assignment of the Mortgages to Purchaser has been or will be on or before the Closing Date duly authorized, executed and delivered by USACM.

(d)     Sellers have taken no action that would render the Mortgage Notes or Mortgages or any of the other Loan Documents invalid or unenforceable.  All Mortgage Notes and Mortgages and the other Loan Documents are legal, valid and binding obligations of the maker thereof.

(e)     Except as provided in Sections 6.2 and 9.1(g) hereof with respect to the Loan Documents, USACM has not since the Cut-Off Date, modified the Mortgages or Mortgage Notes in any respect, or satisfied, canceled or subordinated any Mortgage or Mortgage Note in whole or in part or released all or any portion of any Mortgaged Property from the lien of any Mortgage, or executed any instrument of release, cancellation or satisfaction affecting the Mortgages or Mortgage Notes.

(f)     Except as set forth on Schedule 3.4(f), there is no litigation, proceeding or governmental investigation or any judicial order, injunction or decree pending, or to USACM's knowledge, threatened with respect to the Loans, which could have a material adverse effect upon the Loans.

(g)     No written notice has been received by USACM to the effect that (A) the maintenance, operation, occupancy or use of any Mortgaged Property violates any zoning or building code or regulation, any restrictive covenant, or any other federal, state or municipal law, ordinance or regulation applicable to any Mortgaged Property, or (B) any material licenses, permits, inspections, authorizations, certifications or approvals required by any governmental authority having jurisdiction over the operation of any Mortgaged Property has not been performed or issued and paid for, or is not in full force and effect.

(h)     There is no pending or known threatened condemnation or similar proceeding affecting any Mortgaged Property or any part thereof, and all Mortgaged Property complies with all zoning, environmental and hazardous substance laws.

(i)     The First Trust Deed Fund Assets are term loans and have been fully advanced by FTDF and the other lenders parties thereto and there are no further obligations of FTDF or any other lender to fund or make any advances under the Loans.  Notwithstanding the foregoing, the loans listed on Schedule 3.4(g) that are part of the First Trust Deed Fund Assets have the option, but not the obligation, to fund certain unfunded construction budget requirements as set forth in that Schedule.

**ARTICLE IIIA**
**STATEMENTS OF FTDF**

FTDF, severally and not jointly, hereby makes the following closing condition statements to the Purchaser as follows:

14

**Section 3A.1. Due Incorporation**.  FTDF is and shall continue to be, duly organized and validly existing under the laws of the State of Nevada.

**Section 3A.2. Authority and Capacity**.  Subject to obtaining the Sale Approval Order, FTDF has all requisite corporate power, authority and capacity to enter into this Agreement and to perform the obligations hereunder.  Without limiting the generality of the foregoing, subject to obtaining the Sale Approval Order, the execution and delivery of this Agreement, and any related agreements or instruments, and the consummation of the transactions contemplated hereby and thereby, has been duly and validly authorized and this Agreement constitutes a valid and legally binding agreement of FTDF enforceable in accordance with its terms.

**Section 3A.3. Litigation**.  Except for adversary proceedings and other matters pending in the Bankruptcy Court and as set forth on Schedule 3.A3, to the knowledge of FTDF, there is no Litigation pending or threatened, nor is there any order, injunction or decree outstanding against or relating to FTDF, which could have a material adverse effect upon any of the Assets or materially impair the ability of FTDF to perform their obligations hereunder.  To FTDF's knowledge (i) FTDF is not in default in any material respect with regard to any order of any court, governmental authority or arbitration board or tribunal to which FTDF is a party or is subject, and (ii) FTDF is not in violation of any laws, ordinances, governmental rules or regulations to which it is subject, either of which such default or violation might materially and adversely affect any of the Loans.

**Section 3A.4. Statements Regarding the First Trust Deed Fund Assets**.  With respect to the First Trust Deed Fund Assets, FTDF hereby states to Purchaser as of the Closing Date, subject to obtaining Bankruptcy Court approval pursuant to the Sale Approval Order and/or confirmed Plan, as follows:

(a)      FTDF has the legal right and authority to sell, convey and transfer the First Trust Deed Fund Assets to the Purchaser.

(b)      The assignment by FTDF of the related Mortgages to Purchaser has been or will be on or before the Closing Date duly authorized, executed and delivered by FTDF.

**Section 3A.5. Statements Regarding Prepaid Interest**.  The Prepaid Interest due from First Trust Deed Fund has previously been netted by USACM and, upon the transfer of such amount to USACM pursuant to the Plan, no Prepaid Interest will remain due from First Trust Deed Fund.

## ARTICLE IV      STATEMENTS OF PURCHASER

Purchaser hereby makes the following closing condition statements to the Sellers as follows:

**Section 4.1      Due Organization and Good Standing**.  Purchaser is and shall continue to be duly organized, validly existing and in good standing under the laws of its state of formation.

15

**Section 4.2    Enforceability**.    This Agreement and any related agreements or instruments each constitutes a valid and legally binding agreement of Purchaser enforceable in accordance with its terms.

**Section 4.3    Authority and Capacity**.    Purchaser has all requisite limited liability company power, authority and capacity to enter into this Agreement and to perform the obligations hereunder.    Without limiting the generality of the foregoing, the execution and delivery of this Agreement, and any related agreements or instruments, and the consummation of the transactions contemplated hereby and thereby, has been duly and validly authorized.  This Agreement has been duly and validly executed and delivered by Purchaser.

**Section 4.4    No Conflict**.   Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby, nor compliance with its terms and conditions, shall: (a) violate, conflict with, result in the breach of, or constitute a default under, be prohibited by, or require any additional approval under any of the terms, conditions or provisions of Purchaser's Certificate of Formation or Operating Agreement, or of any mortgage, indenture, deed of trust, loan or credit agreement or instrument to which Purchaser is now a party or by which it is bound, or of any order, judgment or decree of any court or governmental authority applicable to Purchaser, or (b) result in the creation or imposition of any lien, charge or encumbrance of any material nature upon any of the properties or assets of Purchaser.

## ARTICLE V      BANKRUPTCY COURT APPROVAL

**Section 5.1    Bidding Procedures**.   The Bid Procedures Motion has been filed with the Bankruptcy Court and is acceptable to Purchaser.

**Section 5.2    Sale Approval Order**.   The Sale Approval Order shall be reasonably acceptable in form and substance to Purchaser and shall include provisions, among others (i) providing that Purchaser shall not incur any liability as a successor to the Sellers unless such liability is expressly assumed, (ii) approving the sale of the Assets to Purchaser on the terms and conditions set forth in this Agreement, or such higher and better terms and conditions offered at the Auction, and authorizing Sellers to proceed with this transaction, (iii) stating that any objections timely filed with respect to the sale of the Assets, which have not been withdrawn, are overruled or the interests of such objections have been otherwise satisfied or adequately provided for by the Bankruptcy Court, (iv) finding that the Total Asset Purchase Price represents fair value for the Assets, (v) finding that the sale is in the best interests of the Debtors' estates and creditors, (vi) finding that Purchaser is a good faith purchaser of the Assets under Section 363(m) of the Bankruptcy Code and that the provisions of Section 363(m) of the Bankruptcy Code have not been violated, (vii) providing that the sale of the Assets to Purchaser shall be free and clear of all liens, claims, interests, obligations and encumbrances whatsoever under Section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code, (viii) providing that the Bankruptcy Court shall retain jurisdiction for the purpose of enforcing the provisions of the Sale Approval Order including, without limitation, compelling delivery of the Assets to Purchaser and protecting Purchaser against any liens, claims, interests, obligations and encumbrances against Sellers or the Assets, (ix) finding that there are no brokers involved in consummating the sale and no brokers' commissions are due, (x) authorizing and directing

16

Sellers to execute, deliver, perform under, consummate and implement this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing, and (xi) determining that Purchaser is not a successor to Sellers or otherwise liable for any liabilities not expressly assumed and to the extent permitted by applicable law permanently enjoining each and every holder of any claim for such liabilities from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against Purchaser or the Assets related thereto, and (xiii) finding that, pursuant to Section 1146(c) of the Bankruptcy Code, the within transaction is "in contemplation of a plan or plans of reorganization to be confirmed in the Bankruptcy Cases," and as such shall be free and clear of any and all transfer tax, stamp tax, or similar taxes; provided, however, that Purchaser's obligations hereunder shall not be conditioned on the findings set forth in this clause (xiii).  Sellers shall use commercially reasonable efforts to obtain entry of the Sale Approval Order in the form described hereto.  Purchaser's obligations to consummate the transactions contemplated herein shall be conditioned upon the Bankruptcy Court's entry of the Sale Approval Order in form and substance satisfactory to Purchaser.  To the extent that there is any inconsistency between this paragraph and the Sale Approval Order, the Sale Approval Order shall govern.

        **Section 5.3        Plan of Reorganization**.  Subject to the terms hereof, the Sellers shall transfer the Assets to the successful bidder at the Auction pursuant to a confirmed Plan that is in all material respects consistent with the terms of this Agreement.  The Debtors have previously scheduled a hearing to seek approval of the Disclosure Statement by the Bankruptcy Court under Section 1125 of the Bankruptcy Code, which hearing was held on November 13, 2006.  Upon approval of the Disclosure Statement by the Bankruptcy Court under Section 1125 of the Bankruptcy Code, the Debtors shall promptly solicit acceptances and proceed to confirmation of the Plan.  The hearing on the confirmation of the Plan shall be scheduled for no earlier than seven (7) days following the Auction.

## ARTICLE VI        COVENANTS OF SELLERS

        **Section 6.1        Delivery of Documents**.  At any time and from time to time at and after the Closing, upon request of Purchaser, the Sellers shall do, execute, and acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, such further acts, deeds, assignments, transfers, conveyances, powers of attorney, confirmations and assurances as Purchaser may reasonably request to more effectively convey, assign and transfer to and vest in the Purchaser full legal right, title and interest in and actual possession of the Assets and to generally carry out the purposes and intent of this Agreement.  The Sellers shall also furnish Purchaser and Acknowledging Parties with such information and documents in its possession or under their control, or which the Sellers can execute or cause to be executed, as will enable Purchaser to prosecute any and all petitions, applications, claims and demands relating to or constituting a part of the Assets.  USACM shall also provide Purchaser with all reasonable assistance that Purchaser may request in operating, and maximizing the operating efficiency of, all items of Personal Property prior to the Closing Date.

        **Section 6.2        No Modification**.  Except in the ordinary course of business or pursuant to Court order, since September 12, 2006, Sellers have not materially modified, altered, hypothecated, settled or compromised, all or any portion of the First Trust

17

Deed Fund Assets or Servicing Agreements or obligations of any party thereunder in respect of any First Trust Deed Fund Assets or Servicing Agreements, and will not do so at any time from December 7 2006 through the Closing Date without the prior consent of the Purchaser.

Section 6.3    **Conduct of Business**.  Following the execution hereof and prior to the Closing Date, USACM shall use its commercially reasonable efforts to preserve the Assets, and, subsequent to December 7, 2006, shall consult with Purchaser prior to implementing any material decisions affecting any of the Assets, and Sellers shall conduct their business in the ordinary course consistent with past practice.

Section 6.4    **Other Bankruptcy Covenants**.  Sellers shall promptly make all filings, take all actions, and use commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the sale of the Assets consistent with the terms herein.  In the event that an appeal is taken, or a stay pending appeal is requested, from any order relating to the Plan or to the Assets, generally, Sellers shall promptly notify Purchaser of such appeal or stay request and, upon Purchaser's request, shall provide to Purchaser within two (2) Business Days after Sellers' receipt thereof, a copy of the related notice of appeal or order of stay.  Sellers shall also provide Purchaser with written notice of any motion, application, brief or other pleading filed in connection with any appeal relating to the transactions contemplated hereunder.

Section 6.5    **Taxes**.  Sellers shall pay all income taxes with respect to the Assets that accrued prior to the Closing Date and Purchaser shall have no liability for income taxes accruing prior to the Closing Date.  Purchaser hereby acknowledges and agrees that Purchaser shall be responsible for any transfer taxes, if any, in connection with the purchase and sale of the Assets and Sellers are not responsible for and shall not be required to pay any real property taxes outstanding with respect to the Assets.

Section 6.6    **Tax Reporting**.  Sellers shall prepare and timely transmit all required Forms 1098 and 1099 for calendar year 2006 in respect of the Assets.

Section 6.7    **Reports/Notices**.  USACM timely shall have:

(a)    provided to Purchaser each week after the Auction and prior to Closing weekly collections statements showing principal and interest stated individually with respect to each Loan;

(b)    provided to Purchaser two Business Days prior to the Auction statements showing principal and interest stated individually with respect to each Loan as of a recent date; and,

(c)    informed Purchaser, in each case within two Business Days prior to the Auction and thereafter within two Business Days of occurrence, of any:

(i)    payoff offer received with regard to any Loan, or any discussions relating to payoff of any Loan;

(ii)    negotiations engaged in by the Sellers with regard to any resolution of any Loan other than by payoff;

(iii)    communications with Sellers' attorneys regarding any pending litigation; and

(iv)    discussions with any Borrower regarding re-financing or potential re-financing of any Loan.

## ARTICLE VII    COVENANTS OF PURCHASER

**Section 7.1    Causes of Action Against Insiders**.   As to the Assets purchased, other than the right to pursue personal guaranties of any of the Serviced Loans guaranteed by an Insider of the Debtors, Purchaser is not through the transactions described herein acquiring any other claim or cause of action against an Insider of any of the Debtors or against another Debtor.   Further, if Purchaser obtains a judgment in respect of any personal guaranty of any Serviced Loan by an Insider of the Debtors, Purchaser will negotiate in good faith in an effort to reach an equitable agreement to do so in conjunction with any litigation by Sellers (or their successor or assignee under a Plan) in a manner that will not impair Purchaser's ultimate economic realization in respect of its Assets purchased pursuant to the terms hereof or otherwise its obligations under the Servicing Agreements, but also will not impair any recovery or litigation efforts undertaken by any of the Debtors (or their successors or assigns under a Plan) in respect of other liability claims or causes of action that they are then prosecuting or may in the future prosecute against such Insider.

**Section 7.2    Causes of Action Against Debtors**.   Purchaser agrees that it will not prosecute any action against any of the Debtors arising out of or relating to the acquired Assets and arising out of any event occurring before the Closing Date.   For the avoidance of doubt, the foregoing agreement shall not apply to any asset acquired by Purchaser other than pursuant to this Agreement.   Purchaser further agrees to be bound by any applicable provisions contained in a confirmed Plan, and by any applicable orders entered by the Bankruptcy Court following the Closing Date.

**Section 7.3    Servicing Agreements**.   Nothing contained in this Agreement shall modify the obligations owed to the Lenders by the loan servicer or rights of the Lenders against the loan servicer (or the rights of the loan servicer against the Lenders) under the applicable Servicing Agreements and otherwise applicable law.   Purchaser shall distribute any sums due to Lenders under any of the Servicing Agreements in accordance with the Servicing Agreements, as the same may be modified with consent of the applicable Lenders, and with otherwise applicable law.   Further, notwithstanding the foregoing, to the extent the Bankruptcy Court has entered an order, including, but not limited to, an order confirming a Plan, which interprets or enforces provisions of the Servicing Agreements or directs the distribution of payments under the Servicing Agreements or payments collected from Borrowers, Purchaser shall abide by the terms of such order(s).   If, as between the provisions of the Servicing Agreements and the order(s) of the Bankruptcy Court, it is not clear to Purchaser how the sums collected shall be distributed, then Purchaser shall hold the sums payable to the Lender until Purchaser either receives direction from the Lender and, as to items not constituting Commercial

Mortgage Assets, the Sellers (or their successor or assignee under the Plan) regarding disbursement of interest, or is directed by an order from a court of competent jurisdiction. Nothing contained herein is intended to waive any defenses of the Lenders or, as to items not constituting Commercial Mortgage Assets, the Sellers (or their successors or assignees) under the Servicing Agreements.  For the avoidance of doubt, under no circumstance shall any pre-Closing Date liability assertable by any party attach to Purchaser, or to any Asset acquired by Purchaser, pursuant to this Agreement, and the order entered by the Bankruptcy Court transferring the Assets to Purchaser shall clearly so state.  Furthermore, for the avoidance of doubt, notwithstanding any other provision herein, or any order which may in the future be entered by the Bankruptcy Court, all servicing fees due pursuant to the terms stated in the Servicing Agreements, and all interest due on the First Trust Deed Fund Assets, shall continue to be due and payable, and Purchaser shall collect such servicing fees and interest for its sole benefit on and after the Closing Date.

Section 7.4    **Delivery of Assignment**.  In the event that, upon Closing there is no Additional Price Adjustment, then upon Closing, Purchaser shall assign to FTDF, on terms and conditions reasonably acceptable to FTDF, all of its right, title and interest in and to the claims under the title policy described in Section 2.3 in connection with the occurrence of the Additional Price Adjustment.

Section 7.5    **Collections Payable to Sellers**.  After the Closing Date, all Prepaid Interest collected by Purchaser shall be paid over to Sellers (or their successor or assignee under the Plan) in accordance with the provisions of the Plan.

## ARTICLE VIII   REMEDIES

Section 8.1    **Remedies for Breach by Purchaser**.  In the event that Purchaser breaches any material statement or covenant required of Purchaser hereunder, and such breach prevents the Sellers from concluding the Closing and in fact the Sellers do not conclude the Closing; or if Purchaser is required to conclude the Closing pursuant to the terms hereof and fails to conclude the Closing for any reason other than failure of a condition precedent as set forth in Section 9.1, then Sellers shall be entitled to terminate this Agreement and, as their sole remedy, to make a claim against the Deposit for the amount of any actual damages suffered by Sellers.

Section 8.2    **Remedies for Breach by Sellers**.  In the event that after the Auction, Sellers breach any material statement or covenant required of Sellers hereunder other than a breach of Sections 9.1(h), 9.1(i) or 9.1(k), for which Purchaser's remedy is set forth therein (and which, with respect to Sections 9.1(h) and 9.1(i), shall apply if the Court does not enter an order confirming USACM's records of disbursements and payments of principal as to any of the Loans), and other than a breach of Section 3.4(b), for which Purchaser's remedy is the price adjustment set forth in Section 2.3, then Purchaser shall be entitled, in its sole discretion, and as its sole remedy, (a) to proceed to Closing, (b) to sue Sellers for specific performance, provided, however, that if a breach hereunder prevents or prohibits Sellers from concluding the Closing, then such breach shall be deemed to be a General Asset MAC, or (c) by giving written notice to the Sellers on or before the Closing Date, to rescind or terminate this Agreement and be released from any further obligation to perform pursuant to this Agreement or the Plan.  If

Purchaser elects to rescind or terminate this Agreement pursuant to the terms hereof, Purchaser shall be entitled, as its sole remedy, to a refund of its Deposit.

## ARTICLE IX      CONDITIONS TO CLOSING

**Section 9.1      Conditions Precedent to Obligations of Purchaser**.  The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)      Between the Auction Date and the Closing Date, Purchaser shall not have discovered any taxes, liens, or encumbrances in respect of the Assets that may have a higher priority than Sellers in the Assets other than those identified by Purchaser in connection herewith;

(b)      Sellers shall have performed and complied in all material respects with all obligations and conditions required in this Agreement to be performed or complied with them prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Sellers, dated the Closing Date, to the forgoing effect;

(c)      The Debtors shall solicit votes on the Plan, which contemplates the sale of the Assets to the Purchaser in accordance with this Agreement and shall set forth the validity and amount of the servicing fees payable under the Servicing Agreements that are a part thereof, from all counter-parties to the Servicing Agreements.  The Sale Approval Order, which shall approve the sale of the Assets pursuant to Section 363(m) of the Bankruptcy Code and is presently contemplated to be the order confirming the Plan, shall be binding on all such counter-parties.  Furthermore, to ensure that there are no post-Closing Date disputes with regard to the unpaid balance, and any other amounts due in connection with each of the Loans, the Sellers shall transmit to each Borrower under each of the Loans a notice, in form acceptable in all respects to the Purchaser, confirming each such amount due in connection with each of the Loans, and the Court shall enter orders with respect thereto.

(d)      The loans included in the First Trust Deed Funds Assets that have not been paid in full before the Closing Date are in full force and effect and no condition exists nor has any event occurred that by notice, the passage of time, or otherwise, could give rise to an impediment to the enforcement of such loans;

(e)      The Plan and order confirming the Plan or the Sale Approval Order or similar order shall be consistent with the terms found in Article V hereof, and the  Servicing Agreements shall not be materially modified, by order or otherwise, except as expressly agreed to by Purchaser, provided, however, that this does not affect the rights of the Lenders to consent to modify under a Plan any rights not conveyed to Purchaser pursuant to the terms hereof, so long as any such modification shall not adversely affect Purchaser in any way;

(f)      The Plan and order confirming the Plan and/or Sale Approval Order shall provide for the transfer of the Servicing Agreements in a manner which does not create related

claims under Section 503(b) of the Bankruptcy Code, provided that the Sellers may waive this condition in their sole discretion, so long as it does not otherwise affect any provision herein;

(g)    Sellers have not released or otherwise terminated their security interest in all or any portion of the Assets from the Cut-Off Date through the Closing Date except as to (i) Serviced Loans that have been paid in full before the Closing Date, or (ii) partial releases and related reconveyances made by the Sellers pursuant to Court orders entered prior to the date of this Agreement.

(h)    Between the Auction Date and the Closing Date, or at any time with respect to statements set forth in Articles III and IIIA (with the exception of Section 3.4(b)), there will be no adverse change that, through no fault of Purchaser, impairs the value of the First Trust Deed Fund Assets by an amount greater than $1,250,000 (a "General Asset MAC"); provided however, that, the calculation of any impairment in such value shall exclude any payments of principal received by the Debtors after the Cut-Off Date to the extent such principal payments are related to the First Trust Deed Fund Assets. Additionally, no adverse change will have occurred that, through no fault of Purchaser, impairs Purchaser's ability to enforce rights under the Servicing Agreements with regard to (i) 2% or more of the unpaid principal balance of the First Trust Deed Fund Assets outstanding as of the Closing Date, or (ii) 10% or more of the unpaid principal balance as of October 19, 2006 of Assets that are not First Trust Deed Fund Assets (a "General Service Agreement MAC"). If a General Asset MAC or a General Service Agreement MAC occurs, then Purchaser may, in its sole discretion, by giving written notice to the Debtors on or before the Closing Date, rescind or terminate this Agreement and be released from any further obligation to perform pursuant to this Agreement or the Plan.

(i)    Additionally, between the Auction Date and the Closing Date, or at any time with respect to the statements set forth in Articles III and IIIA (with the exception of Section 3.4(b)), there will be no adverse change that, through no fault of Purchaser, impairs the value of any one or more First Trust Deed Fund Assets by an amount that is material but does not exceed $1,250,000, provided however, that, the calculation of any impairment in such value shall exclude any payments of principal received by the Debtors after the Cut-Off Date to the extent such principal payments are related to the First Trust Deed Fund Assets (an "Individual Asset MAC"). If an Individual Asset MAC occurs, then Purchaser may, in its sole discretion, proceed to close the transaction, excluding or including the Asset or Assets with regard to which an Individual Asset MAC has occurred, at the previously agreed Total Asset Purchase Price minus the lesser of (a) 0.75% of the cash otherwise payable as part of the Total Asset Purchase Price or (b) the actual value of the Individual Asset MAC; provided however, that the Total Asset Purchase Price shall only be adjusted once pursuant to this provision; and

(j)    Purchaser shall have actually obtained an interim license to operate in the State of Nevada or an exemption, satisfactory to Purchaser in all reasonable respects by no later than the Closing Date, from any and all applicable Nevada laws or regulations that would require any licensing of Purchaser and affiliate of Purchaser identified by Purchaser by the State of Nevada in connection with or as a result of consummation of this transaction. Sellers shall provide reasonable cooperation and support to Purchaser in connection with its effort to obtain such interim license or exemption. The condition to the timing of the obtaining of this interim license or regulatory exemption may be extended by the Sellers at their sole discretion.

(k)      The Plan has been confirmed by a Final Order of the Bankruptcy Court by the Outside Approval Date.

(l)      There is no Litigation pending or threatened, nor any order, injunction or decree outstanding against or relating to the Sellers, which materially impairs the value of the Assets or the ability of the Sellers to perform their obligations hereunder.

(m)      No notice has been issued by any governmental authority or any party entitled to enforce a restrictive covenant affecting any Mortgaged Property to the effect that (A) the maintenance, operation, occupancy or use of any Mortgaged Property violates any zoning or building code or regulation, any restrictive covenant, or any other federal, state or municipal law, ordinance or regulation applicable to any Mortgaged Property, or (B) any material licenses, permits, inspections, authorizations, certifications or approvals required by any governmental authority having jurisdiction over the operation of any Mortgaged Property has not been performed or issued and paid for, or is not in full force and effect.

(n)      Purchaser shall, at Purchaser's expense, if any, receive an endorsement of the existing title policy from the existing title company for each Loan and, if not, such failure to receive any endorsement or all endorsements, individually or collectively, does not materially impair the value of the Assets or the ability of the Sellers to perform their obligations hereunder. Sellers shall use their best commercially reasonable efforts to cause each endorsement to be received by Purchaser hereunder.

(o)      No pending or threatened condemnation or similar proceeding exists affecting any Mortgaged Property or any part thereof, and all Mortgaged Property complies with all zoning, environmental and hazardous substance laws.

**Section 9.2      Conditions Precedent to Obligations of Sellers**.   The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable law):

(a)      Bankruptcy Court approval by Final Order of the Bankruptcy Court;

(b)      The statements of Purchaser set forth in Article IV of this Agreement shall be true and correct in all material respects, at and as of the Closing Date; and

(c)      Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the forgoing effect.

(d)      By no later than the Closing Date, Purchaser shall have obtained the interim license or exemption described in Section 9.1(j) hereof.

## ARTICLE X        TERMINATION

**Section 10.1        Termination**.  Notwithstanding anything to the contrary contained herein, this Agreement may be terminated at any time before the Closing (a) by mutual consent of the Sellers and the Purchaser, (b) by the Seller, upon a breach by Purchaser of Section 9.2 in accordance with Section 8.1 hereof, or (c) by the Purchaser upon a breach by Seller of Section 9.1 in accordance with Section 8.2 hereof.  In the event of termination pursuant to this Section, the Agreement shall become null and void and have no effect, with no liability on the part of the Sellers, or Purchasers with respect to this Agreement, except for liability for breach of this Agreement as set forth herein.

## ARTICLE XI        MISCELLANEOUS

**Section 11.1        Survival**.  Sellers' statements, covenants and agreements contained in this Agreement shall not survive the Closing Date, other than covenants and agreements which by their terms survive the Closing Date.

**Section 11.2        Amendment**.  This Agreement shall not be amended without the express written consent of the parties hereto.

**Section 11.3        Counterparts**.  This Agreement may be executed in two or more counterparts, each of which, when so executed and delivered, will be deemed to be an original, but all of which counterparts, taken together, will constitute one and the same instrument.

**Section 11.4        Entire Agreement**.  This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements, arrangements and understandings relating to the subject matter hereof, including the Offer Letter.  There are no written or oral agreements, understandings, statements between the parties other than those set forth herein.

**Section 11.5        Closing**.  For the avoidance of doubt, the transfers of Assets described herein shall be deemed to have closed solely upon the Sale Approval Order becoming a Final Order, and each of the Assets actually being transferred to Purchaser being so transferred consistent with the terms hereof.  Upon Closing, Purchaser, to the extent it acquires the Assets, shall be deemed released from any confidentiality obligations to which it had previously agreed, or pursuant to which is was otherwise bound.

**Section 11.6        Additional Collection Actions**.  After the Auction Date, Sellers shall assign to Purchaser, for purposes of collection, all accounts receivable and notes receivable, except for the IP Receivable.

**Section 11.7        Access to Documents**.  Prior to the Closing Date, Debtors shall provide Purchaser with reasonable access to Debtors' books, records and personnel.  After the Closing Date, Purchaser shall allow any of the Sellers (or their successors or assignees under a confirmed Plan) reasonable access to the Personal Property, including original documents and files, for all purposes as needed.

**Section 11.8    Waivers**.  The rights of each of the parties hereunder shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing.  Any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other such right.  Any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right.  No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of any such right.

**Section 11.9    Notices**.  All notices and other communications hereunder shall be in writing (including a writing delivered by facsimile transmission) and shall be deemed to have been duly given: (a) when delivered, if sent by registered or certified mail (return receipt requested); (b) when delivered, if delivered personally or by telecopy, or (c) on the first following business day, if sent by United States Express Mail or overnight courier, in each case to the parties at the following addresses (or at such other addresses as shall be specified by like notice);

If to Sellers and Acknowledging Parties:

> USA Commercial Mortgage Company
> 4484 Pecos Avenue
> Las Vegas, Nevada 89121
> Facsimile: (702) 456-2057
> Attn:  Mr. Thomas J. Allison

> and

> Ray Quinney & Nebeker P.C.
> 36 South State Street, Suite 1400
> Salt Lake City, Utah  84111
> Facsimile: (801) 532-7543
> Attn:  Annette W. Jarvis, Esq.

and, with respect to notices of default under Article VII, notice shall also be given to

> Stutman, Treister & Glatt, P.C.
> 1901 Ave. of the Stars, 12th Floor
> Los Angeles, CA 90067
> Facsimile: (310) 228-5788
> Attn:   Frank A. Merola, Esq.

> and

> Lewis & Roca, LLP
> 3993 Howard Hughes Pkwy., Suite 600
> Las Vegas, Nevada 89169
> Facsimile: (702) 949-8321
> Attn: Robert Charles, Esq.

25

If to Purchaser:

> Compass Partners LLC
> 333 Seventh Avenue, 3rd Floor
> New York, NY  10001
> Facsimile: (212) 253-4003
> Attn:  David Blatt
>
> and
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, NY  10153
> Facsimile:  (212) 310-8007
> Attn:  George A. Davis, Esq.
>       Ted S. Waksman, Esq.

**Section 11.10    Acknowledging Parties**.  Sellers and Purchaser agree that the Acknowledging Parties are entitled to information produced or shared pursuant to this Agreement and to participate fully in the process of obtaining Bankruptcy Court approval for this Agreement and Sale Approval Order and/or Plan.  Notwithstanding anything herein to the contrary, the Acknowledging Parties agree to Article 5 hereof and this Section 11.10.

**Section 11.11    Governing Law/Venue**.  This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Nevada, without regard to conflicts of law principles thereof.  The United States Bankruptcy Court for the District of Nevada shall be the exclusive forum for the enforcement of the terms of this Agreement.

**Section 11.12    Severability**.  In the case any provision in this Agreement shall be found by a court of competent jurisdiction to be invalid, illegal or unenforceable, such provision shall be construed and enforced as if it had been more narrowly drawn so as not to be invalid, illegal or unenforceable, and the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

**Section 11.13    Binding Effect; Third Party Beneficiaries; Successors and Assigns**.  This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective legal representatives, successors and assigns.  Except as expressly set forth herein, nothing expressed or referred to in this Agreement is intended or shall be construed to give any person or entity other than the parties to this Agreement, or their respective legal representatives, successors and assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.  A reference to any of the Debtors, including the Sellers, is also a reference to any successor or assign of such Debtors under the Plan or pursuant to an order of the Bankruptcy Court.  Purchaser may assign its rights under this Agreement to any of its subsidiaries or affiliates, and may assign the Assets to any of its subsidiaries or affiliates.

**Section 11.14    Relationship of Parties**.   The relationship between the parties is an arms-length, non-affiliated relationship, and Sellers are not, and shall not represent to third parties, that they are acting as agents for or on behalf of Purchaser.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, each of the undersigned parties to this Agreement has caused this Agreement to be duly executed in its corporate name by one of its duly authorized officers, all as of the date first above written.

**"SELLERS"**

USA COMMERCIAL MORTGAGE COMPANY

By: _____
Name: _____
Title: _____

USA CAPITAL FIRST TRUST DEED FUND, LLC

By: _____
Name: _____
Title: _____

**"PURCHASER"**

COMPASS PARTNERS LLC

By: _____
Name: David Blatt
Title: Manager

**"ACKNOWLEDGING PARTIES"**

USA CAPITAL DIVERSIFIED TRUST DEED FUND


By: _____
Name: _____
Title: _____


LLC, USA CAPITAL REALTY ADVISORS, LLC


By: _____
Name: _____
Title: _____


USA SECURITIES, LLC


By: _____
Name: _____
Title: _____