1 | Dean T. Kirby, Jr.     Calif. Bar No. 090114
Leonard J. Ackerman Calif. Bar No. 171073

2 | KIRBY & McGUINN, A P.C.
600 B Street, Suite 1950

3 | San Diego, California 92101-4515
Telephone: (619) 685-4000  Facsimile:  (619) 685-4004

4 | dkirby@kirbymac.com
lackerman@kirbymac.com

5 |

6 | Michelle L. Abrams     Nev. Bar No. 5565
MICHELLE L. ABRAMS, LTD.
7201 West Lake Meade Blvd., Suite 210

7 | Las Vegas, NV 89128
Telephone: (702) 233-5040 Facsimile (702) 233-2209

8 | mabrams@mabramslaw.com

9 | Attorneys for Creditor
Debt Acquisition Company of America V

10 |

# UNITED STATES BANKRUPTCY COURT

## District of Nevada

| | |
|---|---|
| In re | ) Case No. BK-S-06-10725 LBR |
| | ) |
| USA COMMERCIAL MORTGAGE COMPANY | ) MEMORANDUM OF POINTS AND |
| | ) AUTHORITIES IN OPPOSITION TO |
| Debtor. | ) DEBTOR'S MOTION FOR APPROVAL |
| In re | ) OF PROCEDURES REGARDING |
| | ) ASSIGNMENTS OF LENDERS' DIRECT |
| USA CAPITAL REALTY ADVISORS, LLC | ) INTERESTS IN LOANS |
| | ) (AFFECTS USA COMMERCIAL |
| Debtor. | ) MORTGAGE) |
| In re | ) |
| | ) DATE: December 19, 2006 |
| USA CAPITAL DIVERSIFIED TRUST FUND, LLC | ) |
| | ) TIME:  10:00 a.m. |
| Debtor. | ) |
| In re | ) |
| | ) |
| USA CAPITAL FIRST TRUST DEED FUND, LLC | ) |
| | ) |
| Debtor. | ) |
| In re | ) |
| | ) |
| USA COMMERCIAL MORTGAGE COMPANY | ) |
| | ) |
| Debtor. | ) |
| Affects: | ) |
| ☐ All Debtors | ) |
| ☒ USA Commercial Mortgage Company | ) |
| ☐ USA Capital Realty Advisors, LLC | ) |
| ☒ USA Capital Diversified Trust Fund, LLC | ) |
| ☒ USA Capital First Trust Deed Fund, LLC | ) |
| ☐ USA Securities, LLC | ) |
| | ) |

I.    INTRODUCTION

As the Court knows, Debtor USA Commercial Mortgage Company was engaged in the business of originating and managing mortgage loans.  Money was received from investors known as Direct Lenders in exchange for fractionated beneficial interests in notes secured by recorded trust deeds.  The interest of the Direct Lenders appear of record in the various states and counties in which those trust deeds are recorded.  Although the Debtor in Possession has not yet assumed the Loan Servicing Agreements, it has continued to service the loans, distribute funds to Direct Lenders and retain servicing fees, under the authority of a limited "Order (A) Granting Debtors' Motion to Distribute Funds" entered August 24, 2006 (Docket No. 1184) (the "Distribution Order").[1]

Beginning in September, 2006, Debt Acquisition Company of America V (DACA) has acquired the interests of about 50 direct lenders in loans managed by the Debtor.  In connection with each purchase, the Direct Lender executed a written assignment which was recorded in the county in which the Direct Lender's interest in the deed of trust appeared of record.  Promptly after purchasing each such Direct Lender interest, DACA has notified the Debtor of the assignment in writing.

Until this Motion, the Debtor has not attempted to obtain an injunction or order restricting the right creditors to assign their claims (or, in the case of the Direct Lenders, to assign their fractional beneficial interests in loans under management by the Debtor in Possession).  Now, after DACA has purchased 50 Direct Lender claims, the Debtor in Possession has filed a motion which seeks to have the Court rewrite the provisions of the Loan Servicing Agreements, restrict the Direct Lenders' right to sell their trust deed interests, and retroactively penalize the assignees of Direct Lender interests.

II.    STATEMENT OF THE CASE

According to declarations filed in connection with the Distribution Motion, management of the Debtor in Possession has prepared an accounting for each loan in which Direct Investors participated and has determined whether there were funds "due to" or "due from" each Direct Investor as to each loan as of the Petition Date.  An amount which was "due to" a Direct Lender would arise from payment(s) received by the Debtor as loan servicer pre-petition which were not remitted to the Direct

---

[1]    The Debtor's Motion to Distribute Funds and to Grant Ordinary Course Releases and Distribute Proceeds (Docket No. 847) is referred to in this brief as the "Distribution Motion."

1  Lender.  An amount which was "due from" a Direct Lender would arise from payment(s) which were

2  made by the Debtor to the Direct Lender in spite of the  fact that no payment had been received from

3  the Borrower.  These payments have been referred to in papers filed in this case as "Prepaid Interest."

4         A.      MUTUALITY, NETTING AND RECOUPMENT ISSUES

5       In the Distribution Motion, the Debtor in Possession made two assertions concerning the

6  recovery of so-called "Prepaid Interest" (i.e., sums "due from" a Direct Lender).  First, it was argued

7  that the Debtor in Possession ought to be able to recover "Prepaid Interest" by offsetting amounts which

8  were "due from" the Direct Lender on the petition date  against sums which the Debtor in Possession

9  collected on account of that same loan after the petition date.  The Distribution Motion recognizes

10  obliquely, but does not state directly, that this mode of recovery of Prepaid Interest is not an offset

11  which is authorized under 11 U.S.C. § 553(a), because the debts involved did not arise mutually pre-

12  petition.  While the "due from" debt existed *pre-petition*, the claimed opportunity to offset would only

13  arise, if and when the Debtor in Possession collects loan proceeds from the borrower *post-petition*.[2]

14       The Distribution Motion sought to get around the mutuality requirement by invoking a

15  recognized equitable exception: the doctrine of recoupment.  The Distribution Motion argued that the

16  Debtor in Possession could recover Prepaid Interest by offset against post-petition collections because

17  recoupment applies.  The Distribution Motion asserted that recoupment should apply not merely on a

18  loan by loan basis but to all loans serviced by the Debtor in Possession in which a particular Direct

19  Lender was involved.

20       The Debtor in Possession was authorized to engage in this broad netting (i.e., on a lender-by-

21  lender basis rather than on a loan-by-loan basis) under the Distribution Order.  However, the

22  Distribution Order recites that it is "preliminary in nature" and without prejudice to a challenge by any

23  party as to the right of the Debtor in Possession "to net all amounts that may be owed to or from a Direct

24  Lender."  (Distribution Order p.3 ln. 17 - p. 4 ln. 7.)  A further hearing on the Distribution Motion has

25  been scheduled for January 3, 2006, a date after the scheduled plan confirmation hearing.

26  / / /

27

28        [2]     The Distribution Motion assumes (but this Court never decided) that payments collected in trust by the Debtor in Possession as a loan servicer constitute a "debt" owing to the Direct Lender and subject to offset.  For a contrary view, See, *In re Bourne,* 262 B.R. 745 (Bankr. E.D. Tenn. 2002).

B.    ASSIGNABILITY OF THE DIRECT LENDER INTERESTS

As stated in the Distribution Motion, the fee called for under the various Loan Servicing Agreements was either 1% or 3%. DACA has acquired beneficial interests in loans which are serviced under both 1% and 3% agreements.

The Loan Servicing Agreements between the Debtor and Direct Lenders[3] states in Article 5:

> Should Lender desire to sell all or any part of its interest in the note and deed of trust, USA will assist Lender in finding potential buyers and completing the necessary documentation for the transaction. A fee of 5% of the remaining balance of Lender's undivided interest in the note amount will be deducted from the selling price and paid to USA on all such assignments for which USA locates the Assignee.

The above-quoted provision indicates that the parties intended that the interest of the Direct Lender in any loan would be freely assignable, and that only if the Debtor located an assignee would it be entitled to receive a 5% assignment fee. This would make sense, because 5% would substantially exceed any administrative costs incurred by the Debtor, and is more in the nature of a commission than an administrative fee.

Article 16 of the Loan Servicing Agreement also generally provides:

> 16. Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors and assigns.

Under this provision, the rights of either party under the Loan Servicing Agreement are freely assignable. The Debtor in Possession is in the process of taking advantage of the assignable nature of these agreements by conducting an auction under which it intends to sell its rights under the Loan Servicing Agreements to the highest bidder.

The free transferability of the loans purchased were an important part of the bargain with each Direct Lender. Many of these loans were sold to people whose investments were retirement savings, or who otherwise need liquidity in their investments. The Debtor promised under the Loan Servicing Agreement to assist the Direct Lenders in finding a new investor to buy their interest if they wished. Unfortunately, the Debtor in Possession is presumably not in a position to keep this promise now.

---

[3]    A copy of the standard form Loan Servicing Agreement is attached as Exhibit B to the Distribution Motion.

1    There is no reason for the Debtor in Possession, or this Court, to assume that it is in the interest

2 of the Direct Lenders to discourage parties like DACA from purchasing interests in these loans.  The

3 Direct Lenders who have chosen to sell their interests to DACA have recovered from 70% to 88% of

4 their investments to meet immediate cash needs by selling their interests to DACA, mitigating the risk

5 and damage which many of these investors may have incurred by being placed in inappropriate, illiquid

6 investments in the first place by the Debtor in its role as a mortgage loan broker.  The Official

7 Committee of Holders of Executory Contract Rights through USA Commercial Mortgage Company (the

8 "Direct Lenders Committee") has filed an opposition to the Motion which emphasizes the importance

9 of these transfer rights to the Direct Lenders.[4]

10    C.    DACA'S INVOLVMENT

11    DACA did not begin acquiring the interests of Direct Lenders in particular loans until

12 September, after the entry of the Distribution Order.  DACA has so far acquired only interests in

13 particular loans and has not acquired the entire portfolio of any Direct Lender.  In purchasing these

14 interests, DACA was aware of the Debtor's position that "due from" amounts could be collected from

15 any Direct Lender by recoupment against any payment due to that Direct Lender on any loan.  Under

16 the Distribution Order, a Direct Lender with a portfolio consisting of several loans, who wanted to

17 assign an interest in one loan, faced the problem that the purchaser of that particular loan might be

18 burdened with an offset of an amount which related to other loans not sold.

19    To solve this problem, DACA obtained the agreement of each Direct Lender seller to place a

20 portion of the purchase price for the loan with an independent escrow.  If Prepaid Interest were later

21 collected by offset against the loan purchased by DACA, then the escrow amount would revert to DACA

22 in the amount of the offset.  If the Prepaid interest were collected by offset against other loans not sold

23 to DACA, the escrow funds would be released in that amount to the Direct Lender.  It is for this reason

24 that DACA is unaffected by the position of the Debtor in Possession that loans should be netted on a

25 lender-by-lender basis and not a loan-by-loan basis.

26 / / /

27

28    [4]    The Direct Lender Committee's opposition (Docket No. 1926) briefs the issue of the
assignability of interests by the Direct Lender.  The authority cited in that brief further supports DACA's
position that the interests are freely assignable, and is not repeated in this Memorandum.

1    To summarize, the sale of Direct Lender interests in these loans meets a legitimate need of those

2  people who require liquidity in their investment and who could not, since the beginning of this case, call

3  upon the Debtor in Possession to perform the function of finding a new investors as it was required to

4  do under the Loan Servicing Agreement.  DACA has offered fair prices for these loans.  DACA has

5  carefully taken into account the relief requested in the Distribution Motion and has tailored its purchase

6  agreements to avoid conflict with the desire of the Debtor in Possession to use lender-by-lender netting.

7  DACA has engaged in no misconduct or overreaching.  There is no reason for the Debtor in Possession

8  to penalize the Direct Lenders, or DACA, by seeking retroactive relief which seems to have as its aim

9  a restraint on alienation of the loans.

10  III.    DACA'S POSITION ON THE RELIEF REQUESTED IN THE INSTANT MOTION

11    The Motion requests that the Court approve five "rules and procedures" relating to the

12  assignment of Direct Lender interests.  These "rules and procedures" refer to DACA and other

13  purchasers as "Third Party Investors" and are quoted below in italics:

14    A.    THE "PERMANENT OFFSET" ELECTION

15    *USACM shall not be required to recognize any assignments of an
interest in a Serviced Loan by a Direct Lender to a Third-Party Investor
16    unless and until the Third Party Investor: (a) either (i) purchases all of
the Direct Lender's interests in all of the Serviced Loans held by that
17    Direct Lender; or (ii) agrees that, in USACM's sole and absolute
discretion, any or all of the "due from" amounts on account of Prepaid
18    Interest that are associated with any other loans held by the Direct
Lender, as indicated on USACM's books and records, will be transferred
19    along with the assignment of the particular loan interest in question to
the Third-Party Investor, and will be deemed to effect a permanent offset
20    against the balance owed to the Third-Party Investor on account of the
assigned loan interest; and (b) agrees that the investment is subject to
21    any and all holdbacks established by Court order in these cases that
relate or may relate to the loan interest at issue.*

22

23    As explained above, because of the escrow arrangement negotiated between DACA and the

24  Direct Lenders, the economic interests of DACA will not be injured if the Debtor in Possession is

25  allowed by the Court to recover Prepaid Interest on a "lender by lender" basis.  DACA interprets the

26  Motion as requesting that the Debtor in Possession be allowed to make an election at the time that it is

27  notified of the transfer, that all of the "due from" amounts on account of Prepaid Interest" will be offset

28  only against future payments on the transferred loan.  If so: (i) this election should only apply to offsets

---

1  which have not already been made by the Debtor in Possession against other loans, since these offsets

2  and balances were relied upon by the parties in connection with the assignment; (ii) DACA should be

3  notified of the election within a reasonable time.

4          B.      THE "EFFECTIVE DATE"

5

6          *1.2      The "Effective Date" of any assignment that meets the criteria set
          forth in Section 1.1 above shall be the first day of the month following the
          date on which the Third-Party Investor provides a copy of the assignment*

7          *as recorded in the real property records relating to the loan in question
          to USACM and pays USACM the fee set forth below in Section 1.5.*

8

9          DACA has no objection to establishment of a "record date" for purposes of the assignment, in

10  order to insure that the Debtor in Possession is not exposed to liability for inadvertently making a

11  distribution after receiving notification of a transfer.  However, DACA believes that the proposal of the

12  Debtor in Possession, to make the Effective Date be the first day of the month following receipt of

13  notification, and applying the Effective Date to funds received at any time during that preceding month,

14  will create too long a period of uncertainty as to who payments are going to and in what amount.

15  Presently, DACA is able to offer and make payment to Direct Lender for its interest within five days

16  of executing an assignment.  Under the proposal made by the Debtor in Possession, that date would

17  could be extended to in excess of 30 days.  DACA believes that a more reasonable solution would make

18  the assignment effective five business days after receipt by the Debtor in Possession.  An order

19  establishing the Effective Date should also make clear that all funds which were not distributed to the

20  Direct Lender before the Effective Date should be distributed to the transferee on or after the Effective

21  Date.

22          DACA also believes that the receipt of a copy of an executed assignment should be sufficient

23  for a loan servicer, particularly since the assignment must be acknowledged before a notary to be in

24  recordable form.  There is no purpose served by requiring a conformed copy of the assignment bearing

25  a recorder's stamp.  There may be significant delays in obtaining such conformed copies from the

26  various counties, and these delays could straddle the first of a month.

27          Finally, DACA has not provided  conformed recorded copies of assignments as to past

28  transactions, in part because it was not notified that this would be a requirement.  The order approving

In re USA Commercial Mortgage Company, et al.                          Bankruptcy Case No. BK-S-06-10729 LBR
Memorandum in Opposition to Motion for Approval of Procedures re Assignments etc.           Page No. 6

1  these procedures should specify that this particular rule is not retroactive in its application in cases

2  where the Debtor in Possession has already received a  non-conformed copy of the assignment.

3          C.      THE NEW LOAN SERVICING AGREEMENT

4                  *1.3     Each Third-Party Investor shall be required to execute a standard
                   USACM Loan Servicing Agreement containing a 3 % loan servicing fee
5                  provision ("LSA").*

6          This proposed "rule and procedure" is overreaching and an unauthorized restraint on alienation

7  of the Direct Lender's interest in the loan and Loan Servicing Agreement.  As explained above, the Loan

8  Servicing Agreement provides that it inures to the benefit of the parties' successors and assigns.  There

9  is no legal basis to require that the servicing fee provided for under the Agreement should triple as the

10 result of an assignment.

11         D.      LIMITATIONS ON DISTRIBUTIONS

12                 *1.4     USACM shall not be required to distribute to a Third-Party
                   Investor any loan payments received by USACM (as servicer) during any
13                 period prior to the Effective Date (as defined above). USACM may
                   distribute such payments to the Direct Lender as indicated on USACM's
14                 books and records prior to the Effective Date in accordance with the
                   Holdbacks and Distributions Orders. Further, USACM shall not be
15                 required to distribute any payment to a Third-Party Investor until the
                   executed LSA is provided to USACM.*

16

17         As explained above, DACA has no objection to an Effective Date procedure, but believes that

18 a notice period of five business days should be sufficient.  DACA should not be required to provide

19 conformed copies of assignments bearing a recorder's stamp.  Finally, application of the "Effective

20 Date" procedure should not be retroactive where the Debtor in Possession has already been sufficiently

21 notified of an assignment.  However, there is no legal basis for requiring DACA to sign a new Loan

22 Servicing Agreement.

23         E.      PROCESSING FEES

24                 *1.5     USACM's fee for processing transfers where the Third Party
                   Investor has prepared and recorded the Assignment shall be $100 per
25                 loan. If USACM prepares the recording documents, an additional $250
                   per loan will be assessed. Neither USACM nor any subsequent loan
26                 servicing provider shall be liable for any defect or error in the recording
                   documents other than for gross negligence or intentional misconduct.*

27

28

1    There is no legal basis for the Court to rewrite the Loan Servicing Agreements to provide for fees

2 in addition to those agreed to by the Debtor and the Direct Lender.  Article 5 of the Loan Servicing

3 Agreement, quoted above, states in part that "a fee of 5% of the remaining balance of Lender's undivided

4 interest in the note amount will be deducted from the selling price and paid to USA *on all such*

5 *assignments for which USA locates the Assignee.* [*italics* added]."  The parties specifically addressed

6 the issue of fees in the case of an assignment of the Direct Lender's beneficial interest in the loan, and

7 they provided for a fee only in the case in which the Debtor located the assignee at the request of the

8 Direct Lender.

9 IV.    THIS COURT HAS NO POWER TO CHANGE THE TERMS
       OF THE LOAN SERVICING AGREEMENTS

10

11    The Motion is expressly based on the Bankruptcy Court's general equitable powers granted 11

12 U.S.C. § 105(a).  While section 105 grants broad power to a court to implement the Bankruptcy Code,

13 it is not a blank check to enter any order which a bankruptcy court determines to be "fair"or of benefit

14 to a debtor.  Although the bankruptcy court "'is a court of equity, it is not free to adjust the legally valid

15 claim of an innocent party who asserts the claim in good faith merely because the court perceives that

16 the result is inequitable.' DeNatale & Abram, The Doctrine of Equitable Subordination as Applied to

17 Nonmanagement Creditors, 40 Bus. Law. 417, 428 (1985)."  *U.S. v Noland,* 517 U.S. 535, 538, 116

18 S.Ct. 1524, 134 L.Ed.2d 748 (1996).  "Bankruptcy courts are not authorized in the name of equity to

19 make wholesale substitution of underlying law controlling the validity of creditors' entitlements, but are

20 limited to what the Bankruptcy Code itself provides."  *Raleigh v. Illinois Dept. of Revenue,* 530 U.S.

21 15, 24-25, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000).  See generally, Ahart, "The Limited Scope of Implied

22 Powers of a Bankruptcy Judge: A Statutory Court of Bankruptcy, Not a Court of Equity," 79 Am. Bankr.

23 L.J. 1 (2005).

24    The power of the Court to alter the entitlements of the Direct Lenders is further limited due to

25 the fact that the Direct Lenders' interest in these loans, and the payments received by the Debtors in its

26 capacity as loan servicer, are not property of the bankruptcy estate. The fact that loans merely serviced

27 by the Debtor are not property of the estate is expressly recognized by 11 U.S.C. § 541(d), which

28

1   provides:

2           Property in which the debtor holds, as of the commencement of the case,
        only legal title and not an equitable interest, such as a mortgage secured
3           by real property, or an interest in such a mortgage, sold by the debtor but
        as to which the debtor retains legal title to service or supervise the
4           servicing of such mortgage or interest, becomes property of the estate
        under subsection (a)(1) or (2) of this section only to the extent of the
5           debtor's legal title to such property, but not to the extent of any equitable
        interest in such property that the debtor does not hold.

6

7   See, *In re LiTenda Mortg. Corp.,* 246 B.R. 185 (Bankr. D. N.J. 1999) aff'd, 276 F.3d 578 (3d Cir.2001)

8   (holding that mortgage loans which chapter 7 debtor sold pre-petition were not property of the estate

9   even though debtor retained servicing rights).

10  V.    CONCLUSION

11          DACA recognizes the interest of the bankruptcy estate in adopting rules and procedures as to

12  the transfer of Direct Lender interests which will avoid conflict and ambiguity.  An example of such a

13  rule is the "Effective Date" procedure, modified in some respects as explained above.

14          However, requiring DACA as assignee to enter into substitute loan servicing agreements with

15  provisions for higher servicing fees and new administrative fees goes beyond practical needs and

16  amounts to nothing more than a "wish list" request by the Debtor in Possession.  Granting this relief

17  would restrict the alienability of these interests at the expense of the Direct Lenders.

18          DACA requests that the Court's order on the Motion provide:

19  1   That if an "Effective Date" for assignments is imposed: (i) the Effective Date is five business

20      days after notification of the assignment; (ii) that all distributions not made to the Direct Lender

21      prior to the assignment date must be made to the assignee; (iii) that transferees may produce

22      executed copies of the assignment without the need for a recorder stamp; and (iv) that the

23      assignments as to which the Debtor was notified previously are effective, i.e., the Effective Date

24      shall not be applied retroactively.

25  2   That the Debtor may elect to offset all amounts "due from" the Direct Lender against future

26      payments collected against a transferred loan, by giving written notice of the election to the

27      transferee within 30 days after the Effective Date.

28

---

In re USA Commercial Mortgage Company, et al.                    Bankruptcy Case No. BK-S-06-10729 LBR
Memorandum in Opposition to Motion for Approval of Procedures re Assignments etc.          Page No. 9

3      That, consistent with the Court's order on the Distribution Motion, the right of the Debtor in

Possession to recoup against future payments on any loan has not yet been determined by the

Court and that the parties' claims rights and defenses as to the recoupment issue are preserved.

4      That the Motion is denied in all other respects.

/ / /


DATE: December 5, 2006                               KIRBY & McGUINN, A P.C.


                                                    By: /s/ Dean T. Kirby, Jr
                                                    Dean T. Kirby, Jr. Attorneys for
                                                    Debt Acquisition Company of America V