E-filed on December 8, 2006

1  Marc A. Levinson (California Bar No. 57613)        Bob L. Olson (Nevada Bar No. 3783)
2  Rachel Ragni (California Bar No. 214061)           Anne M. Loraditch (Nevada Bar No. 8164)
   ORRICK, HERRINGTON & SUTCLIFFE LLP                 BECKLEY SINGLETON, CHTD.
3  400 Capitol Mall, Suite 3000                       530 Las Vegas Boulevard South
   Sacramento, California 95814-4497                  Las Vegas, Nevada 89101
4  Telephone: (916) 447-9200                          Telephone: (702) 385-3373
   Facsimile: (916) 329-4900                          Facsimile: (702) 385-5024
5  Email:   malevinson@orrick.com;                    Email:   bolson@beckleylaw.com;
6           rragni@orrick.com                                  aloraditch@beckleylaw.com

7  *Attorneys for the Official Committee of Equity*
   *Security Holders of USA Capital Diversified Trust*
8  *Deed Fund, LLC*

9              **UNITED STATES BANKRUPTCY COURT**
                       **DISTRICT OF NEVADA**
10

11 | In re:                                          | Case No. BK-S-06-10725 LBR |
   | USA COMMERCIAL MORTGAGE COMPANY,                | Case No. BK-S-06-10726 LBR |
   |                              Debtor.            | Case No. BK-S-06-10727 LBR |
12 |                                                 | Case No. BK-S-06-10728 LBR |
13 | In re:                                          | Case No. BK-S-06-10729 LBR |
   | USA CAPITAL REALTY ADVISORS, LLC,               |                             |
   |                              Debtor.            |                             |
14 | In re:                                          | Chapter 11                  |
   | USA CAPITAL DIVERSIFIED TRUST DEED              |                             |
15 | FUND, LLC,                                      | Jointly Administered Under  |
   |                              Debtor.            | Case No. BK-S-06-10725-LBR  |
16 | In re:                                          |                             |
   | USA CAPITAL FIRST TRUST DEED FUND, LLC,         |                             |
17 |                              Debtor.            |                             |
18 | In re:                                          |                             |
   | USA SECURITIES, LLC,                            |                             |
19 |                              Debtor.            |                             |
20 | Affects:                                        | Date of Confirmation        |
   | ☒  All Debtors                                  | Hearing:   December 19, 2006 |
   | ☐  USA Commercial Mortgage Company              | Time:      10:00 a.m.       |
21 | ☐  USA Securities, LLC                          | Courtroom: 1                |
   | ☐  USA Capital Realty Advisors, LLC             |                             |
22 | ☐  USA Capital Diversified Trust Deed Fund, LLC |                             |
23 | ☐  USA First Trust Deed Fund, LLC               |                             |

24      **PLAN DOCUMENTS SUPPLEMENT AND NOTICE OF DISCLOSURES BY THE**
25          **OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF**
              **USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,**
26              **PURSUANT TO 11 U.S.C. §§ 1129(a)(4) AND (5)**

27

28

{00351925;}
OHS West:260140228.1

1     The Official Committee of Equity Holders of USA Capital Diversified Trust Deed Fund,

2     LLC ("Diversified Committee"), as appointed by the office of the United States Trustee on May

3     10, 2006, in the chapter 11 bankruptcy case of USA Capital Diversified Trust Deed Fund, LLC

4     ("DTDF"), hereby makes the following disclosures pursuant to sections 1129(a)(4) and (5) of the

5     United States Bankruptcy Code ("Bankruptcy Code") and pursuant to Article I.C. of the Debtors'

6     Third Amended Plan of Reorganization (the "Plan").

### Background

8     1.    The Plan contemplates that the reorganized DTDF (defined in the Plan and herein

9     as "Post-Effective Date DTDF") is to be governed and operated by a manager (defined in the

10     Plan and herein as the "DTDF Administrator") with input from a post-confirmation advisory

11     committee ("DTDF Post-Effective Date Committee"), all pursuant to the Plan and to Amended

12     and Restated Operating Agreement of USA Capital Diversified Trust Deed Fund, LLC (the

13     "DTDF Amended Operating Agreement").

### DTDF Administrator

15     2.    On November 29, 2006, the Diversified Committee selected Michael Tucker

16     ("Tucker") to serve as the DTDF Administrator.  Tucker is a Senior Managing Director of FTI

17     Consulting, Inc. ("FTI").  FTI has served as financial advisor to the Diversified Committee since

18     June 2006, and Tucker is and has from the outset been the FTI Senior Managing Director with

19     primary responsibility for such representation.  In such capacity, he has devoted hundreds of

20     hours to these chapter 11 cases, and has achieved a thorough understanding of the bankruptcy

21     cases generally and DTDF's portfolio of assets in particular.

22     3.    Tucker is a Certified Public Accountant and a Certified Fraud Examiner with over

23     21 years of experience, including having worked with companies in the real estate and financial

24     services industries.  For many years, Tucker has provided services to debtors and creditors in

25     reorganization and bankruptcy matters involving cash management, operational improvements,

26     business plans, debt restructuring, plans of reorganization, asset sales, valuation analysis and

27     other chapter 11 issues.

28

4.      As DTDF Administrator, Tucker will be compensated at his standard FTI hourly rate, which for 2006 is $450.00 per hour and which will increase as of January 2007 to an amount as yet undermined.  His reasonable costs also will be reimbursed by Post-Effective Date DTDF.

5.      Post-Effective Date DTDF will employ FTI for financial advisory and other services, possibly including accounting services.  Invoices from FTI will be reviewed by DTDF Post-Effective Date Committee, with advice by other professionals employed by Post-Effective Date DTDF.

### DTDF Post-Effective Date Committee

6.      The DTDF Amended Operating Agreement provides that the DTDF Post-Effective Date Committee shall be comprised of up to five members, and that it shall have the authority detailed in the DTDF Amended Operating Agreement.

7.      The Diversified Committee has selected the following individuals, each of whom holds equity interests in DTDF, and each of whom is a member of the Diversified Committee, to serve on the DTDF Post-Effective Date Committee:  Robert Hardy, Charles O. Nichols, Jerry T. McGimsey, and Robert Worthen, who will serve as Chair.  They are referred to collectively herein as the "Committee Members."  The members of the Diversified Committee gratefully acknowledged the volunteers' willingness to serve Post-Effective Date DTDF.

8.      The following provides additional details about each of the Committee Members:

(a)     **Robert Worthen** is a lifelong resident of Las Vegas, Nevada. After attending Brigham Young University, Mr. Worthen owned his own business for a number of years.  He later sold his business and now devotes his time to other interests.  Together, he and his wife are raising their four children.  Mr. Worthen has served as Chairman of the Diversified Fund Committee since its formation.

(b)     **Robert Hardy** has lived and worked in Nevada for over 50 years. Educated as an electrical engineer, he worked as a contractor for 20 years then developed real estate projects for another 20 years.  Now retired, he currently resides in Las Vegas.  Mr. Hardy has served on the Diversified Fund Committee since its formation.

1         (c)     **Jerry T. McGimsey** practiced law in Las Vegas for 29 years and

2 is now retired. He continues to reside in Las Vegas and is an avid golfer. Mr. McGimsey has served on the Diversified Fund Committee since its formation.

3         (d)     **Charles O. Nichols** is from Delaware, where he owned and

4 operated a number of businesses for almost 30 years. In 1995, he sold his interests there and retired to Las Vegas. Mr. Nichols has served on the

5 Diversified Fund Committee since its formation.

6

7     9.     Soon after the Effective Date, the DTDF Post-Effective Date Committee will

8 meet, and the Committee Members and Tucker shall establish a protocol for selecting one

9 additional member of the DTDF Post-Effective Date Committee.

10     10.     The members of the DTDF Post-Effective Date Committee will be compensated

11 for their service on the DTDF Post-Effective Date Committee as follows: Each will be paid

12 $500.00 for each meeting of the DTDF Post-Effective Date Committee he/she attends, whether

13 in person or telephonically, and each will have his/her reasonable expenses reimbursed by Post-

14 Effective Date DTDF. In addition, the members of the DTDF Post-Effective Date Committee

15 will receive customary indemnification, and Post-Effective Date DTDF will obtain a directors

16 and officers' policy for them.

17     11.     For his services as Chair, which will include frequent contact with holders of

18 interests in Post-Effective Date DTDF as well as leading the DTDF Post-Effective Date

19 Committee, Worthen will be paid an additional $1,000.00 per month, which amount shall be

20 reviewed and possibly changed by the DTDF Post-Effective Date Committee after the 90-day

21 anniversary of the Effective Date.

22           **Statement Pursuant to Bankruptcy Code Section 1129(a)(4)**

23     12.     Any payment by DTDF to any person described in Bankruptcy Code Section

24 1129(a)(4) shall be subject to the approval of the Bankruptcy Court.

25           **Statement Pursuant to Bankruptcy Code Section 1129(a)(5)**

26     13.     The Diversified Committee has made the foregoing decisions in the exercise of its

27 reasonable business judgment, and each member of the Diversified Committee believes that such

28

1  decisions are consistent with the interests of DTDF's creditors, if any, DTDF's equity holders,

2  and with public policy.

3       14.    No insider of DTDF has been chosen to be employed or retained by Post-

4  Effective Date DTDF.

5  **DTDF Amended Operating Agreement**

6       15.    A true and correct copy of the DTDF Amended Operating Agreement is attached

7  hereto as **Exhibit 1** and is incorporated for purposes herein by this reference.  The Diversified

8  Committee reserves the right to make non-material changes to the DTDF Amended Operating

9  Agreement prior to confirmation of the Plan.

10       DATED this 8th day of December 2006.

11                       BECKLEY SINGLETON, CHTD.

12                     By:

13                       Bob L. Olson (Nevada Bar No. 3783)

14                       Anne M. Loraditch (Nevada Bar No. 8164)

15                       530 Las Vegas Boulevard South

16                       Las Vegas, NV 89101

                            and

17                       Marc A. Levinson (California Bar No. 057613)

18                       Rachel Ragni (California Bar No. 214061)

19                       ORRICK, HERRINGTON & SUTCLIFFE LLP

                     400 Capitol Mall, Suite 3000

20                       Sacramento, CA  95814-4497

21                       *Attorneys for the Official Committee of Equity*

22                       *Security Holders of USA Capital Diversified Trust*

                     *Deed Fund, LLC*

23

24

25

26

27

28

**EXHIBIT 1**

**AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC**

THE LIMITED LIABILITY COMPANY MEMBERSHIP INTEREST UNITS REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("THE ACT"). SUCH UNITS MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON AT ANY TIME WITHOUT SUCH REGISTRATION UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQUIRED. THERE ARE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFER, AS SET FORTH IN THIS OPERATING AGREEMENT. IN ADDITION, IN NO EVENT MAY UNITS BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON WHO IS NOT A RESIDENT OF NEVADA FOR A PERIOD OF NINE MONTHS FROM THE DATE OF THE LAST SALE THEREOF BY THE FUND.

AMENDED AND RESTATED

OPERATING AGREEMENT

OF

USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

**THIS AMENDED AND RESTATED OPERATING AGREEMENT** (this "Agreement") is made and entered into effective as of December __, 2006, by and among Michael Tucker, an individual ("Manager"), and the persons listed on Schedule 1 hereto ("Members").

WHEREAS, the Company has heretofore been formed as a limited liability company pursuant to the provisions of Chapter 86 of NRS, as the same may be amended from time to time (the "Act"), and pursuant to the Articles of Organization, filed with the Nevada Secretary of State on February 3, 2000, and the Operating Agreement of USA Capital Diversified Trust Deed Fund, LLC (the "Original Agreement");

WHEREAS, on April 13, 2006, the Company, USA Commercial Mortgage Company, USA Securities, LLC, USA Capital Realty Advisors, LLC, and USA Capital First Trust Deed Fund, LLC (together, the "Debtors") commenced their bankruptcy cases by filing voluntary petitions under chapter 11 title 11 of the United States Code, as amended (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Nevada ("Bankruptcy Court");

WHEREAS, on November 15, 2006, the Debtors and certain of their Affiliates in the Debtors' jointly administered Chapter 11 Cases, proposed a joint chapter 11 Plan of Reorganization (the Third Amended Joint Chapter 11 Plan of Reorganization (together with any and all Bankruptcy Court-approved amendments thereto, all Exhibits thereto and all documents incorporated by reference therein, the "Plan")) pursuant to section 1121(a) of title 11 of the United States Code;

WHEREAS, on [DATE], the Bankruptcy Court's order confirming the Plan was entered on the docket of the Bankruptcy Court;

WHEREAS, on [DATE], the Plan became operative (the "Effective Date");

WHEREAS, the Plan calls for each Debtor to retain its own assets and liquidate them in an orderly way for distribution to their creditors and members;

WHEREAS, Article IV, section D.2 of the Plan provides that the reorganized DTDF (defined in the Plan as "Post-Effective Date DTDF") is to realize assets and to be governed and operated by a manager (defined in the Plan as the "DTDF Administrator") with input from a post-confirmation advisory committee (defined in the Plan as the "DTDF Post-Effective Date Committee"), all pursuant to the Plan and to the "DTDF Amended Operating Agreement;"

WHEREAS, in accordance with the Plan, the Company is liquidating all if its assets and shall dissolve as soon as practicable following such liquidation of substantially all of its assets, or earlier as provided herein;

WHEREAS, in accordance with the Plan, the Original Agreement has been amended and restated to read in its entirety, as set forth in this Agreement, which has been approved by the Bankruptcy Court without the need for further approval by the Members as required by the Original Agreement;

NOW, THEREFORE, in accordance with the Plan, the Original Agreement has been amended and restated to read as follows:

## ARTICLE I
## DEFINITIONS

The terms set forth in this Article I shall, for all purposes of this Agreement, have the meanings as defined herein. Capitalized terms used and not defined herein shall have the meanings assigned thereto in the Plan.

1.01.  "Affiliate(s)" shall mean, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting securities of such Person, (iii) any officer, director or general partner of such Person, or (iv) any Person who is an officer, director, general partner, trustee or holder of ten percent (10%) or more of the voting securities of any Person described in clauses (i) through (iii) of this sentence. "Affiliates" of the Manager include, without limitation, FTI Consulting, Inc.

1.02.  "Agreement" shall mean this Amended and Restated Operating Agreement, as the same may hereafter be amended from time to time.

1.03.  "Articles" shall mean the Articles of Organization for the Company originally filed with the Nevada Secretary of State and as amended from time to time.

1.04.    "Asset Purchase Agreement" means (A) the Revised First Amended And Restated Asset Purchase Agreement between USACM and FTDF, as sellers, DTDF, USA Securities and USA Realty, as acknowledging parties, and SPCP Group, LLC, as purchaser, Filed on November 7, 2006 [Docket No. 1750], and attached to the Plan as Exhibit A, as the same may be further amended pursuant to the terms of the Plan, or (B) any substantially similar agreement executed with a third party bidder, if a third party bidder is the purchaser of the Acquired Assets.

1.05.    "Capital Account" shall mean, with respect to any Member, the Capital Account maintained for such Member as set forth as of the Effective Date on Schedule 1 hereto, and as adjusted after the Effective Date in accordance with the following provisions:

(a)    To each Member's Capital Account there shall be credited such Member's capital contributions (as provided in Section 6.01), such Member's distributive share of Profits, and any items in the nature of income or gain (from unexpected adjustments, allocations or distributions) that are specially allocated to a Member and the amount of any Company liabilities that are assumed by such Member or that are secured by any Company property distributed to such Member.

(b)    To each Member's Capital Account there shall be debited the amount of cash or the fair market value of property distributed to the Member, such Member's distributive share of Losses, and any items in the nature of expenses or losses that are specially allocated to a Member and the amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company.

In the event any interest in the Company is transferred according to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

The provision of this Section 1.05 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  In the event it is necessary to modify the manner in which the Capital Accounts are computed in order to comply with such Treasury Regulations, the Manager shall make such modification.  The Manager shall adjust the amounts debited or credited to the Capital Accounts with respect to (1) any property contributed to the Company or distributed to any Member and (ii) any liabilities that are secured by such contributed or distributed property or that are assumed by the Company in the event the Manager shall determine that such adjustments are necessary or appropriate pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv).  The Manager shall also make appropriate modifications if unanticipated events cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

1.06.    "Cash Available for Distribution" shall mean an amount of cash equal to the excess of (i) accrued income from the sale or refinancing or other disposition of, Company assets, or any recoveries in connection with any litigation or claim, in each case during any calendar month over (ii) the accrued Operating Expenses, including any adjustments for bad debt reserves or deductions (including reasonable reserves), any expenses (including reasonable

reserves) associated with any obligations under Section 3.05 or Section 5.07 and reasonable cash reserves for operations, in each case as the Manager may deem appropriate.

1.07.    "Code" shall mean the Internal Revenue Code of 1986, as amended, and corresponding portions of any subsequent federal revenue laws.

1.08.    "Company" or "DTDF" shall mean USA Capital Diversified Trust Deed Fund, LLC.

1.09.    "DTDF Administrator" means the Manager of the Company, who has the powers and responsibilities set forth in Section 3.01 of this Agreement and in the Plan, or any successor manger appointed pursuant to Section 3.06 or 3.07 of this Agreement. The DTDF Administrator shall on the Effective Date be Michael Tucker, an individual residing at 2 N. Central Avenue, Suite 1200, Phoenix, Arizona 85004, who is as of the date hereof a Senior Managing Director of FTI Consulting, Inc.

1.10.    "DTDF Member Committee" means the oversight committee for the Company and the Members comprised of seven Members, which committee has the powers and responsibilities set forth in Article V of this Agreement. The initial members of the DTDF Member Committee shall be the following Members of the Company: Robert Worthen (chair), Robert Hardy, Charles O. Nichols, Jerry T. McGimsey, and an individual to be designated by the foregoing members of the DTDF Member Committee, who shall serve until their successors are appointed in accordance with this Agreement and the Act or their earlier resignation or termination.

1.11.    "DTDF Unremitted Principal Claim" means the General Unsecured Claim or other Claims of DTDF against USACM for Loan payments received by USACM but not paid to DTDF prior to the Petition Date.

1.12.    "DTDF Unsecured Claim" means the General Unsecured Claim of DTDF against USACM, excluding the DTDF Unremitted Principal Claim, allowed in the amount as may be agreed to by the USACM Committee and the DTDF Member Committee by the date of the commencement of the Confirmation Hearing, or if no agreement is reached by such date, the amount determined by the Court after an evidentiary hearing between such Committees; provided, however, that the USACM Committee and the DTDF Member Committee or, after the Effective Date, the Post-Effective Date Entities, may agree at any time as to the amount that represents the DTDF Unsecured Claim without further Court order by filing a notice of such agreement with the Court; and provided further, however, that prior to the Effective Date, the USACM Committee and the DTDF Member Committee shall consult with the FTDF Committee and the Direct Lender Committee regarding the issue.

1.13.    "Economic Interest" shall mean the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit and similar items from the Company pursuant to this Agreement and the Act (as defined in the Whereas clauses above), but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company, or any right to information concerning the business and affairs of the Company.

1.14.    "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

1.15.    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

1.16.    "Fiscal Year" shall mean a calendar year ending December 31.

1.17.    "General Unsecured Claim" means a claim against a Debtor arising on or before the Petition Date that is not an Administrative Expense Claim, Priority Tax Claim, Priority Unsecured Claim, Secured Claim, Secured Tax Claim or Subordinated Claim.

1.18.    "Litigation Claims" means any and all rights, causes of action, Claims, obligations, suits, debts, promises, agreements, judgments and demands of whatever kind or nature, whether know or unknown, suspected or unsuspected, whether at law or in equity, including, without limitation all Avoidance Actions, Non-Debtor Insider Litigation, and causes of action listed in the Schedules and the Statements of Financial Affairs Filed in each of the Debtor's Chapter 11 Cases, recoupment, set off and equitable subordination, whether or not brought as of the Effective Date, which are the property of or may be asserted by any of the Debtors and their respective Estates, or the Post-Effective Date Entities, and which have not been settled or otherwise resolved by Final Order as of the Effective Date.

1.19.    "10-90, Inc. Loan " means the 10-90, Inc. loan secured by the limited liability company interests of USAIP.

1.20.    "Manager" shall mean the DTDF Administrator or any person or entity substituted in place thereof pursuant to this Agreement.

1.21.    "Members" shall mean the purchasers of Units admitted to the Company as Members as listed on Schedule 1 hereto, and "Member" shall mean anyone of the Members.  The Members are the holders of "Allowed Equity Interests" of DTDF under the Plan.

1.22.    "Membership Interest" shall mean a Member's entire interest in the Company and all rights, benefits and privileges pertaining thereto.

1.23.    "Minimum Percentage of Interests" shall mean one or more Percentage Interests of Members, or a specified group of Members, which taken together equal (i) with respect to an action by written consent of the Members, at least fifty and one-hundredth percent (50.01%) of the aggregate of all Percentage Interests and (ii) with respect to an action at a meeting of the Members, at least fifty and one-hundredth percent (50.01%) of the aggregate of all Percentage Interests represented by person or in proxy at such meeting of Members.

1.24.    "Non-Debtor Insider Litigation" means all Litigation Claims against Non-Debtor Insiders and recoveries therefrom.  Solely to the extent necessary to pursue this Non-Debtor Insider Litigation, this definition shall also include Litigation Claims by Debtors against Debtors who are Insiders, which Litigation Claims by Debtors against Debtors, notwithstanding anything to the contrary in this Plan and solely to the extent necessary to pursue Litigation Claims against Non-Debtor Insiders, shall survive the Confirmation of the Plan and the Effective Date and shall

5

not be extinguished; provided that to the extent there are inter-Debtor releases in this Plan, the prior sentence shall have no operative effect on such releases, which releases will bar any recoveries by applicable Debtors against Debtors as provided for therein.

1.25.    "NRS" means the Nevada Revised Statutes, as amended or otherwise modified.

1.26.    "Operating Expenses" means (i) the fees and expenses of the Manager, as set forth in Section 4.01, (ii) the fees and expenses of the DTDF Member Committee Members, as set forth in Section 5.08, and (iii) the fees and expenses of administering and disposing of all DTDF assets and pursing and defending all DTDF claims, as required by this Agreement and the Plan, including but not limited to, overhead costs of the Company, salaries of Company employees, accounting and legal fees and expenses and other advisor fees and expenses of the Company.

1.27.    "Penalty Claim" means a Claim against a Debtor for a fine, penalty, forfeiture, or for multiple, exemplary or punitive damages, arising before or after the Petition Date, to the extent that such fine, penalty, forfeiture or damages are not compensation for actual pecuniary loss suffered by the holder of such Claim or is asserted by a governmental unit.

1.28.    "Percentage Interest" shall mean the respective percentage interest of a Member determined as of the first and sixteenth days of each calendar month by dividing a Member's current Units by the total outstanding Units of all Members, which Percentage Interest is as set forth on Schedule 1 hereto as of the Effective Date.

1.29.    "Person" shall mean both natural and legal persons, including any unincorporated association or entity, as the context may require.

1.30.    "Profits" and "Losses" shall mean, for each Fiscal Year or other period, the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with accounting principles employed under the method of accounting at the close of each Fiscal Year on the Company's, information tax return filed for federal income tax purposes; *provided* that if the "book basis" and the "tax basis" of the Company's assets differ, the book basis shall be utilized to determine Profits and Losses, with such determination to be made by the DTDF Member Committee.

1.31.    "Units" shall mean the Membership Interests in the Company issued to Members upon their admission to the Company, pursuant to the Company's Offering Circular dated March 1, 2000 and any supplements, amendments or restatements thereof ("Offering Circular") or pursuant to any subsequent private or public offering of Membership Interests in the Company.

## ARTICLE II
## ORGANIZATION OF THE COMPANY

2.01.    Amendment And Restatement of Original Agreement.  The parties hereto hereby agree that the Original Agreement of the Company has been amended and restated as provided herein by order of the Bankruptcy Court, and is deemed amended pursuant to the provisions of the Act (as defined in the Whereas clauses above).

2.02.   Name.   The name of the Company shall be "USA Capital Diversified Trust Deed Fund, LLC."

2.03.   Place of Business.   The principal place of business of this Company shall be c/o USACM, 4484 South Pecos Road, Las Vegas, Nevada 89121, until changed by designation of the Manager, with notice to all Members.

2.04.   Purpose.   The primary purpose of this Company shall be to liquidate all assets of the Company, pursue all claims of the Company, and to pay the proceeds thereof to the Members after payment of reasonable Company Operating Expenses.   The activities of the Company are further described herein and in the Plan and the related Disclosure Statement, as filed with the Bankruptcy Court on November 15, 2006.

2.05.   Term.   The Company shall continue until terminated upon the earliest of (i) termination by the Manager upon liquidation of all DTDF assets and resolution of all DTDF claims, and distribution of the proceeds thereof to the Members, (ii) termination pursuant to the provisions of this Agreement, (iii) termination by operation of law or (iv) three years following the Effective Date; *provided, however,* that the three year term may be extended for five one year terms upon the approval of a majority of a quorum of the DTDF Member Committee Members.

2.06.   Power of Attorney: Each of the Members irrevocably constitutes and appoints the Manager, individually (or acting by and through any of its executive officers, if the manager is a corporation or other entity), as his true and lawful attorney-in-fact, with full power and authority for him, and in his name, place and stead, to execute, acknowledge, publish and file:

(a)   This Agreement, as amended and restated in accordance with the Plan, and in the form approved by the Bankruptcy Court;

(b)   Any amendment or cancellation of this Agreement after the Effective Date required under the laws of the State of Nevada; and

(c)   Any documents which may be required to effect the continuation of the Company, the amendment of this Agreement in accordance with its terms, or the dissolution and termination of the Company in accordance with this Agreement.

2.07.   Nature of Power of Attorney.   The foregoing grant of authority is a special power of attorney coupled with an interest, is irrevocable, and shall survive the death of the undersigned Members or the delivery of an assignment by the undersigned Members of a Membership Interest, *provided* that where the assignee thereof has been approved by the Manager for admission to the Company as a substituted Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Manager to execute, acknowledge and file any instrument necessary to effect such substitution.

## ARTICLE III
## THE MANAGER

3.01.   Management by the Manager.   Subject to any provisions of the Articles, the Act and this Agreement relating to actions required to be approved by the Members and the DTDF

Member Committee, the business, property and affairs of the Company shall be managed and all powers of the Company shall be exercised by or under the direction of the Manager. In addition to the general management authority provided under this Section and without in any way limiting the generality of the foregoing, the Manager shall have all necessary powers to manage and carry out the purposes, business and affairs of the Company, including, without limitation, the power to exercise and to authorize and direct the Company's or the Manager's officers (if any) to exercise, on behalf and in the name of the Company, all of the powers described in NRS 86.281, including, without limitation, the following powers and authority:

   (a) To retain and manage the assets of DTDF as described in the Plan following the Effective Date;

   (b) To cause the Company to comply, and ensure compliance by all Debtors, with the Plan;

   (c) To pursue the USACM Trust recoveries;

   (d) To liquidate all of the assets of DTDF in single transactions or a series of related transactions involving assets that have a face value of less than $1,000,000;

   (e) To liquidate all of the assets of DTDF following DTDF Member Committee approval in transactions involving assets that have a face value of $1,000,000 or more;

   (f) To pursue and defend all litigations, proceedings and other claims of DTDF, including but not limited to pursuing and defending all General Unsecured Claims, Litigation Claims, the DTDF Unsecured Claim and the DTDF Unremitted Principal Claim;

   (g) To settle all DTDF claims and proceedings, whether by suit, compromise, release or otherwise, involving less than $1,000,000 with respect to any single claim or proceeding or series of related claims or proceedings;

   (h) To settle all DTDF claims and proceedings, whether by suit, compromise, release or otherwise, involving $1,000,000 or more with respect to any single claim or proceeding or series of related claims or proceedings, following DTDF Member Committee approval;

   (i) To distribute the proceeds of all liquidated DTDF assets and the proceeds of all DTDF claims and proceedings, including all Cash Available for Distribution, to the Members in accordance with Article VII of this Agreement;

   (j) To employ, at the expense of the Company, such agents, employees, independent contractors, attorneys and accountants as the Manager deems reasonable and necessary in connection with the matters in (a) through (n) of this Section 3.01 or for any other valid Company purpose, after approval thereof by the DTDF Member Committee to the extent provided in Section 3.02(c) below;

(k)    To effect necessary insurance for the proper protection of the Company, the Manager, the DTDF Member Committee Members or Members, including director and officer insurance, after approval thereof by the DTDF Member Committee;

(l)    To, in accordance with the Asset Purchase Agreement and the Plan, utilize all databases, software, documents, records and office equipment currently owned by, or currently in the possession or control of, any of the Debtors, which, in the discretion of DTDF, are deemed to be necessary in connection with any of the foregoing;

(m)    To determine the accounting method or methods to be used by the Company, which methods may be changed at any time by written notice to all Members, after approval thereof by the DTDF Member Committee; and

(n)    To open accounts in the name of the Company in one or more banks, savings and loan associations or other financial institutions or money market funds, and to deposit Company funds therein, subject to withdrawal upon the signature of the Manager or any person authorized by the Manager.

3.02.    <u>Actions by Manager with Approval of DTDF Member Committee</u>: Subject to any provisions of the Articles, the Act and this Agreement relating to actions required to be approved by the Members, the following actions shall be proposed by the Manager and require the approval of a majority of a quorum of the DTDF Member Committee Members:

(a)    To liquidate all of the assets of DTDF in transactions or a series of related transactions involving $1,000,000 or more;

(b)    To settle any DTDF claims and proceedings, whether by suit, compromise, release or otherwise, involving $1,000,000 or more with respect to any single claim or proceeding or series of related claims or proceedings;

(c)    To initially retain agents, employees (excluding employees replacing existing Company employees), independent contractors, attorneys, accountants and other advisors and professionals, at the expense of the Company;

(d)    With respect to Holders of Allowed Other Secured Claims, to select between payment of such claims pursuant to Option A or Option B below:

**Option A:**  pay the Holders of Allowed Other Secured Claims in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or

**Option B:** surrender the property securing the Allowed Other Secured Claim to the holder of such Claim by making the property reasonably available to such holder on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; *provided, however*, that if the property securing an Allowed Other Secured Claim has been lost or destroyed, the Company shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim

(e)    To File a motion seeking an Order setting a Cash reserve in an amount different than as provided in a proof of Claim or Equity Interest, or in the Schedules, in each case as required and permitted by the Plan;

(f)    To enter into a settlement agreement with respect to any recoveries or compromises with respect to the USACM Trust;

(g)    To settle and compromise any objection to a Disputed Claim or Disputed Equity Interest under the Plan, if appropriate, and asserting any and all Claims, rights of action, causes of action, counterclaims and defenses held by the Company;

(h)    To setoff or recoup against any Claim or Equity Interest and the distributions to made pursuant to the Plan in respect of such Claim or Equity Interest, any counterclaims, setoffs, or recoupment of any nature whatsoever that the Company may have against the holder of the Claim or Equity Interest, all in accordance with the Plan;

(i)    To dissolve Company in accordance with Sections 2.05 and 11.01 hereof;

(j)    To purchase necessary insurance, including director and officer insurance, for the proper protection of the Company, the Manager, the DTDF Member Committee Members and the Members;

(k)    To amend this Agreement, provided that this Subsection (k) shall not apply to the matters set forth in Section 13.04 below, with respect to which matters the Manager alone may amend this Agreement without the vote of the Members;

(l)    To approve any merger, consolidation or other similar transactions of the Company pursuant to Section 11.03 below;

(m)    To bind the Company in any transactions involving the Company's property or business affairs, including preparing and executing all loan documents, purchasing and selling notes and extending or restructuring loans, in each involving in excess of $1,000,000 individually or in a series of related transactions; and

(n)    To determine the accounting method or methods to be used by the Company, which methods may be changed at any time by written notice to all Members.

3.03.    <u>Fiduciary Duty</u>.  In addition to the duties under the Act, the Manager shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Company, and the Manager shall not employ such funds or assets in any manner except for the exclusive benefit of the Company.

3.04.    <u>Allocation of Time to Company Business</u>.  The Manager shall not be required to devote full time to the affairs of the Company but shall devote whatever time, effort and skill the Manager may deem to be reasonably necessary for the conduct of the Company's business. The Manager may engage in any other businesses, *provided, however*; that the Manager may not engage in businesses related to or competitive with the Company.

3.05.   Exculpation and Indemnification.   Neither the Manager, nor his employer, nor such employer's shareholders, officers, directors, employees or agents ("Manager Parties"), shall have any liability whatsoever to the Company or to any Member for any loss suffered by the Company or any Member which arises out of any action or inaction of the Manager or any Manager Parties, so long as the Manager or such other Person, in good faith, determined that such course of conduct was in the best interests of the Company and did not constitute intentional misconduct, fraud, or knowing violation of the law.   The Manager, the Manager Parties, and the employees and agents of the Company shall be entitled to be indemnified and held harmless by the Company, at the expense of the Company, against any loss, expense, claim or liability (including reasonable attorneys' fees, which shall be paid as incurred) resulting from the assertion of any claim, or legal proceeding relating to the performance or nonperformance of any act concerning the activities of the Company, including claims or legal proceedings brought by a third party or by Members, on their own behalf or as a Company derivative suit, so long as the party to be indemnified determined in good faith that such course was in the best interests of the Company and did not constitute intentional misconduct, fraud, or knowing violation of the law; *provided*, that any such indemnity shall be paid solely from the assets of the Company. Nothing herein shall prohibit the Company from paying in whole or in part the premiums or other charge for any type of indemnity insurance in which the Manager, Manager Parties or other agents or employees of the Company are indemnified or insured against liability or loss arising out of their actual or asserted misfeasance or nonfeasance in the performance of their duties or out of any actual or asserted wrongful act against, or by, the Company including, but not limited to, judgments, fines, settlements and expenses incurred in the defense of actions, proceedings and appeals therefrom.   The Company shall pay the expenses of the Manager, Manager Parties and other agents and employees of the Company incurred in defending a civil or criminal action, suit or proceeding as they are incurred and in advance of the final disposition of the action, suit or proceeding, upon receipt of an undertaking, as required in NRS 86.441 or any successor statute.

3.06.   Removal of the Manager; Election of Successor Manager.   The Manager may be removed upon the following terms and conditions:

    (a)    Members.

        (i)    The Manager may be removed by the written consent of a Minimum Percentage of Interests. Members may exercise such right by presenting to the Manager a written notice, which shall be executed by Members representing a Minimum Percentage of Interests, to the effect that the Manager is removed effective on the date set forth in such notice.

        (ii)    Concurrently with delivery of such notice or within ninety (90) days thereafter by written notice similarly given, a Minimum Percentage of Interests may also designate a successor Manager.

    (b)    DTDF Member Committee Members.

        (i)    The Manager may be removed by the DTDF Member Committee Members.   The DTDF Member Committee Members may exercise such right by

presenting to the Manager a written notice to the effect that the Manager is removed effective on the date set forth in such notice.

        (ii)    Concurrently with delivery of such notice or within ninety (90) days thereafter by written notice similarly given, the DTDF Member Committee Members may also designate a successor Manager

        (c)    Substitution of a new Manager, if any, shall be effective upon written acceptance of the duties and responsibilities of a Manager by the new Manager. Upon effective substitution of a new Manager, this Agreement shall remain in full force and effect except for the change in the Manager and the business of the Company shall be continued by the new Manager.

3.07.   <u>Retirement by Manager</u>. The Manager may withdraw ("retire") from the Company upon not less than four (4) months written notice of same to the Members. In the event that the Manager retires, the DTDF Member Committee Members shall designate a successor manager.

3.08.   <u>Accrued Compensation</u>. If the Manager should be removed as provided in Section 3.06 or should retire as provided in Section 3.07, it shall be entitled to all fees and other compensation earned by it through the effective date of removal or retirement.

**ARTICLE IV**
**TRANSACTIONS BETWEEN THE COMPANY,**
**<u>THE MANAGER AND AFFILIATES</u>**

4.01.   <u>Loan Servicing and Asset Management Fee</u>. The Manager shall act as servicing agent with respect to all Company loans and shall manage all of the Company's assets, including all claims and proceedings under the Plan or otherwise. In consideration for such collection and management efforts, the Manager shall be entitled to receive a fee in the amount of $450 per hour, which rate is expected to be increased for calendar year 2007, with any such increase subject to the approval of the DTDF Member Committee. On or after the 15th day of each calendar month, the Manager shall submit to the DTDF Member Committee an itemized list of its fees and disbursements for the prior calendar month. If the DTDF Member Committee does not dispute any such fees an disbursements within seven days of receipt of an itemized list thereof, such fees and disbursements shall be payable on or before the last day of the calendar month following the month in which the fees and expenses were incurred. If the DTDF Member Committee does not agree with such fees and disbursements, within seven days of receipt of an itemized list thereof, it shall deliver to the Manager a written notice of such disagreement and the reasons therefor. The Manager and the DTDF Member Committee shall work together to resolve such disputes within 10 days thereafter, and the Manager shall be paid the agreed upon fees and disbursements immediately after such resolution.

4.02.   <u>Operating Expenses</u>.

        (a)    On or after the 15th day of each calendar month, the Manager shall submit to the DTDF Member Committee all bills for legal, accounting and other third-party service provider fees and expenses, and a detailed statement of other Operating Expenses, including, but not limited to, employee salaries and overhead, in each case for the prior calendar month, as well

as a summary of all Operating Expenses with a comparison to a summary thereof for each of the last three calendar months.

(i) <u>Third-Party Service Provider Expenses</u>.  If the DTDF Member Committee does not agree with any third-party service provider Operating Expenses it shall give the Manager written notice of any disagreement within ten days after receipt of the bills therefor, and the Manager shall send a notice of dispute of any such third-party fees or expenses to the applicable provider.  The Manager shall attempt to resolve any such dispute and pay such agreed upon third-party fees or expenses as soon as practicable thereafter.  If the DTDF Member Committee does not dispute any such third-party fees or expenses, the Manager shall cause the Company to pay such third-party fees or expenses on or before the last day of the calendar month following the month in which the fees and expenses were incurred.

(ii) <u>Internal Operating Expenses</u>.  If the DTDF Member Committee does not agree with any internal Operating Expenses for the prior calendar month, it shall give the Manager written notice of any disagreement and the reasons therefor, and the Manager and the DTDF Member Committee shall work together to resolve such disagreements within 10 days after such notice.  Any such resolution shall be implemented on a prospective basis

(b) All Operating Expenses that are not third-party service provider expenses shall be paid as incurred.  Notwithstanding the foregoing in the event any such expense is individually in excess of $2,500, the Manager shall have the Chair counter-sign the check for payment of such expense.

4.03. <u>Sale of Real Estate to the Manager or its Affiliates</u>.  In the event the Company becomes the owner of any real property by foreclosure on a Company loan, the Company may not sell such property to the Manager or an Affiliate of the Manager, unless the DTDF Member Committee approves the sale.

4.04. <u>Sale of Loans to Manager or Affiliates</u>.  The Company may not sell existing loans to the Manager or its Affiliates, unless the DTDF Member Committee approves the sale.  Notwithstanding the foregoing, the Manager shall be under no obligation to purchase any loans from the Company or to guarantee any payments under any Company loan.

4.05. <u>Change in Manager</u>.  If the Manager as of the date of this Agreement ceases to be the Manager or is replaced as the Manager, then the affiliated parties specifically identified in Section 1.01 may change.  Such affiliated parties may be replaced by, among other parties, Affiliates of the new Manager.

## ARTICLE V
## DTDF MEMBER COMMITTEE

5.01. <u>DTDF Member Committee</u>.  In accordance with the Plan, the Company and the Members shall establish and maintain a committee of Members, to be called the DTDF Member Committee, and to be comprised of five Members (the "<u>DTDF Member Committee Members</u>").

The initial members of the DTDF Member Committee are as listed in the definition of "DTDF Member Committee," and have been approved in connection with the confirmation of the Plan.

5.02.    Substitute Members.  Any DTDF Member Committee Member may resign, or be removed by the remaining DTDF Member Committee Members.  Upon the resignation or removal of a DTDF Member Committee Member, a successor to such Person, who is a Member, shall be appointed by the remaining DTDF Member Committee Members; *provided, however*, that if more than three (3) DTDF Member Committee Member resign or are removed within any three month period, the resigning or removed members' successors shall be elected by the Minimum Percentage of Interests.

5.03.    No Participation in Management; Proxy of Members.  Except as provided in this Agreement and the Plan, DTDF Member Committee Members shall take no part in the conduct or control of the Company's business and shall have no right or authority to act for or bind the Company.  It is hereby acknowledged and agreed that the DTDF Member Committee is a practicable expedient through which matters which would otherwise be subject to approval of Members may instead be presented for approval to a committee of such Members, and that as such, and by virtue of this Article 5, the Members hereby tender to the DTDF Member Committee their proxy to act on such matters as are subject to DTDF Member Committee approval under this Agreement.

5.04.    Rights and Powers of the DTDF Member Committee Members.  DTDF Member Committee Members shall vote to approve or not approve the matters set forth in Section 3.02 hereof.  The failure of the DTDF Member Committee Members to approve any of the actions listed in Section 3.02 hereof shall be deemed binding and conclusive for purposes of this Agreement.

5.05.    Meetings.

(a)    The Company will hold quarterly meetings of the DTDF Member Committee on a date and at a time established by the Manager and agreed upon by the DTDF Member Committee Members.   The meetings may be in person or telephonic.   One DTDF Member Committee Member, designated by the remaining DTDF Member Committee Members, shall serve as the chair-person (the "Chair") of DTDF Member Committee meetings.   Robert Worthen shall be the initial Chair.

(b)    The Manager, the Chair (by notice to the Manager who shall immediately thereafter send a notice of a special meeting), or any three DTDF Member Committee Members (by notice to the Manager who shall immediately thereafter send a notice of a special meeting) may call special meetings of the DTDF Member Committee.  The Manager shall provide each DTDF Member Committee Member with at least two (2) days' prior electronic mail notice (in accordance with Section 13.02 of this Agreement) of each special meeting, which shall be held at such date and time as shall be specified in the notice.  The prior electronic notice shall state, in addition to the date, time and location of the meeting, the general purpose(s) of the special meeting.

(c)    A majority of the DTDF Member Committee Members shall constitute a quorum at DTDF Member Committee meetings.  A quorum shall be required to be present in person or by phone for a DTDF Member Committee meeting.  The approval of a majority of a quorum of DTDF Member Committee Members shall constitute a DTDF Member Committee action.  DTDF Member Committee Members may vote on a proposed matter or action (as described in this Section), or may act by their unanimous written consent, with respect to those matters in which DTDF Member Committee Member have, under this Agreement, approval rights.

5.06.    Limited Liability of DTDF Member Committee Members.  No DTDF Member Committee Member shall be personally liable for any of the expenses, liabilities, or obligations of the Company or for any of the losses thereof beyond the amount of such Member's agreed upon Capital Contribution to the Company and such Member's share of any undistributed net income and gains of the Company, *provided*, that each Member shall remain liable to return to the Company any distributions that such Member is obligated to return pursuant to the Act or this Agreement.

5.07.    Exculpation and Indemnification.    None of the DTDF Member Committee Members shall have any liability whatsoever to the Company or to any Member for any loss suffered by the Company or any Member which arises out of any action or inaction of a DTDF Member Committee Member, so long as the DTDF Member Committee Member, in good faith, determined that such course of conduct was in the best interests of the Company  All actions and inactions of a DTDF Member Committee Member shall be presumed to have resulted from such DTDF Member Committee Member's good faith determination that such course of conduct was in the best interests of the Company, absent intentional misconduct, fraud, or knowing violation of the law.  The DTDF Member Committee Members shall be entitled to be indemnified and held harmless by the Company, at the expense of the Company, against any loss, expense, claim or liability (including reasonable attorneys' fees, which shall be paid as incurred) resulting from the assertion of any claim, or legal proceeding relating to the performance or nonperformance of any act concerning the activities of the Company, including claims or legal proceedings brought by a third party or by Members, on their own behalf or as a Company derivative suit, so long as the party to be indemnified determined in good faith that such course was in the best interests of the Company and did not constitute intentional misconduct, fraud, or knowing violation of the law; provided, that any such indemnity shall be paid solely .from the assets of the Company.  Nothing herein shall prohibit the Company from paying in whole or in part the premiums or other charge for any type of indemnity insurance in which the DTDF Member Committee Members are indemnified or insured against liability or loss arising out of their actual or asserted misfeasance or nonfeasance in the performance of their duties or out of any actual or asserted wrongful act against, or by, the Company including, but not limited to, judgments, fines, settlements and expenses incurred in the defense of actions, proceedings and appeals therefrom.  The Company shall pay the expenses of the DTDF Member Committee Members incurred in defending a civil or criminal action, suit or proceeding as they are incurred and in advance of the final disposition of the action, suit or proceeding, upon receipt of an undertaking, as required in NRS 86.441 or any successor statute.

5.08.    Compensation and Expenses of DTDF Member Committee Members.    Each DTDF Member Committee Member shall receive a fee in the amount of $500 for each board

meeting he or she attends. In addition, the Chair of the DTDF Member Committee shall receive the sum of $1,000 per month as compensation for the performance of additional duties, which will include, but not be limited to, frequent contact with Members. Each DTDF Member Committee Member shall be reimbursed for all reasonable expenses incurred by such Person in connection with the performance of such Person's duties under this Agreement, promptly following submission to the Manager of receipts for such expenses.

5.09. <u>Duty to Act in Good Faith Only</u>. The sole duty of the DTDF Member Committee Members shall be to act in good faith. The DTDF Member Committee Members shall not owe the Company nor the other Members any fiduciary or other obligations beyond the duty to act in good faith.

**ARTICLE VI**
**MEMBERS - CAPITAL CONTRIBUTIONS**

6.01. <u>Capital Contributions of Members</u>. The Members have contributed to the Company the amount of capital set forth on <u>Schedule 1</u> hereto. Such capital contributions by the Members have been credited to the Members' Capital Accounts.

6.02. <u>Admission to Company; Subscription Account</u>. To purchase Units, each investor listed on Schedule 1 hereto executed and delivered to the Company a Subscription Agreement in the form attached to hereto as Exhibit A, together with his or her cash contribution. Generally, subscription funds shall be considered for transfer to the Company on a first-in, first-out basis; *provided, however*, the Manager reserves the right to admit non-ERISA plan investors before ERISA plan investors in order for the Company to remain exempt from the application of Title 29 of the Code of Federal Regulations Part 2510 relating to the definition of plan assets for purposes of ERISA (the "<u>ERISA Plan Asset Regulations</u>").

6.03. <u>Election to Compound Earnings or Receive Cash Distributions</u>. Each Member hereby elects to receive quarterly cash distributions from the Company notwithstanding any election to the contrary made by a Member prior to the Effective Date.

6.04. <u>No Participation in Management</u>. Except as expressly provided herein or in the Plan, the Members shall take no part in the conduct or management of the Company business and shall have no right or authority to act for or bind the Company.

6.05. <u>Rights and Powers of Members</u>. Members shall have the right to vote upon the following matters, and no others, provided that a Minimum Percentage of Interests must approve the following matters:

(a)  dissolution and termination of the Company other than in accordance with the provisions of Sections 2.05 and 11.01 hereof;

(b)  amendment to this Agreement, provided that this Subsection (b) shall not apply to the matters set forth in Section 13.04 below, with respect to which matters the Manager alone may amend this Agreement without the vote of the Members;

(c)  merger or consolidation of the Company pursuant to Section 11.03 below;

(d)     election of successor DTDF Member Committee Members under certain circumstances in accordance with Section 5.03; and

(e)     removal of the Manager and election of a successor Manager, in the manner and subject to the conditions described in Section 3.06(a).

6.06.    <u>Meetings</u>.  The Company will hold annual meetings for all Members on a date established by the Manager to the extent required under the Act.  The Manager and the DTDF Member Committee shall provide each Member with at least 30 days' prior written notice of any such annual meeting, which shall be held at such date and time as shall be specified in the notice. The Manager reserves the right to call special meetings of the Members on at least-30 days' prior written notice, which notice shall state, in addition to the date, time and location of the meeting, the general purpose(s) of the special meeting.  Members may vote in person or by proxy with respect to those matters in which Members have, under this Agreement, approval rights.  In addition, the Members may act by written consent without a meeting on such matters.

6.07.    <u>Limited Liability of Members</u>.  Units are non-assessable, and no Member shall be personally liable for any of the expenses, liabilities, or obligations of the Company or for any of the losses thereof beyond the amount of such Member's agreed upon Capital Contribution to the Company and such Member's share of any undistributed net income and gains of the Company, *provided*, that (1) each Member shall remain liable to return to the Company any distributions that such Member is obligated to return pursuant to the Act and (2) if liquid Company assets are insufficient to fulfill any indemnity obligation of the Company pursuant to Section 3.05 or Section 5.07 hereof, the Manager may recall distributions previously made to the Members at any time prior to the third anniversary of the date of such distributions solely for the purpose of fulfilling such indemnity obligations.  Each Member's portion of such obligation shall be equal to such Member's pro rata share of any such indemnification amount based upon the applicable Member's share of the aggregate of all such distributions made to Members.

6.08.    <u>Fractional Units</u>.  All fractional Units held by Members shall be aggregated until each Member holds as most, one fractional Unit.

## ARTICLE VII
## PROFITS AND LOSSES; CASH DISTRIBUTIONS

7.01.    <u>Losses</u>.  Losses shall be allocated among the Members as of the last day of each calendar quarter in accordance with their respective Percentage Interests; *provided, however*, that if any Membership Interest is purchased, transferred, increased or decreased prior to the end of such calendar quarter, then Losses for such quarter shall be allocated among all individuals and entities who were Members during such quarter (and based on a prorated portion of each Member's Percentage Interest (i.e., based on the number of days during such quarter that the individual or entity was a Member).

7.02.    <u>Profits</u>.  Profits shall be allocated among the Members as of the last day of each calendar quarter in accordance with their respective Percentage Interests; *provided, however*, that if any Membership Interest is purchased, transferred, increased or decreased prior to the end of such calendar quarter, then Profits for such quarter shall be allocated among all individuals and

entities who were Members during such quarter and based on a prorated portion of each Member's Percentage Interest (i.e., based on the number of days during such quarter that the individual or entity was a Member).

7.03.   <u>Cash Available for Distribution</u>.   Cash Available for Distribution shall be distributed to all Members as soon as practicable after the end of each calendar quarter; *provided* that in the event Cash Available for Distribution exceeds $10 million at any time, it shall be distributed to Members within ten days of the Company's receipt of the funds creating such amount of Cash Available for Distribution.   All distributions shall be allocated among the Members as of the end of the most recent quarter in accordance with their respective Percentage Interests; *provided, however*, that if any Percentage Interest increased or decreased prior to the end of such calendar quarter, then total Cash Available for Distribution shall be allocated among all individuals and entities who were Members during such quarter, based on a prorated portion of each Member's Percentage Interest (i.e., based on the number of days during such quarter that the individual or entity was a Member); and *provided, further*, that that any taxable distributions may be made as required under Section 7.04(b) of Section 7.04(c) of the Code.

7.04.   <u>Allocation of Taxable Items</u>.   All taxable income and loss of the Company shall be allocated among the Members in a manner consistent with the allocation of Profit and Loss except as otherwise required by Section 704(b), Section 704(c) or other provisions of the Code.

(a)   For purposes of this Agreement, a loss or allocation (or item thereof) is attributable to non-recourse debt which is secured by Company property to the extent of the excess of the outstanding principal balance of such debt (excluding any portion of such principal balance which would not be treated as an amount realized under Code Section 1001 and Paragraph (a) of Code Section 1.001-2 if such debt were foreclosed upon) over the adjusted basis of such property.   This excess is herein defined as "Minimum Gain" (whether taxable as capital gain-or as ordinary income) as more explicitly set forth in Treasury Regulation 1.704-1(b)(4)(iv)(c).   Notwithstanding any other provision of Article V, the allocation of loss or deduction (or item thereof) attributable to non-recourse debt which is secured by Company property will be allowed only to the extent that such allocation does not cause the sum of the deficit Capital Account balances of the Members receiving such allocations to exceed the minimum gain determined at the end of the Company taxable year to which the allocations relate.   The balance of such losses shall be allocated to the Manager.   Any Member with a deficit Capital Account balance resulting in whole or in part from allocations of loss or deduction (or item thereof) attributable to non-recourse debt which is secured by Company property shall, to the extent possible, be allocated income or gain (or item thereof) in an amount not less than the minimum gain at a time no later than the time at which the minimum gain is reduced below the sum of such deficit capital account balances.   This Section is intended and shall be interpreted to comply with the requirements of Treasury Regulation Section 1.704-1(b)(4)(iv)(e).

(b)   In the event any Member receives any adjustments, allocations or distributions, not covered by Section 7.05(a), so as to result in a deficit Capital Account, items of Company income and gain shall be specially allocated to such Members in an amount and manner sufficient to eliminate the deficit balances in their Capital Accounts created by such adjustments, allocations or distributions as quickly as possible.   This Section shall operate as a qualified income offset as utilized in Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

# ARTICLE VIII
## ACCOUNTING AND REPORTS

8.01.  <u>Books and Records</u>.  The Manager shall cause the Company to keep the following books and records, which shall be maintained at the Company's principal place of business and shall be available for inspection and copying by, and at the sole expense of the Members, or their duly authorized representatives, during reasonable business hours and upon at least two (2) business days' prior written electronic mail notice (in accordance with Section 13.02 of this Agreement) to the Manager:

(a)  A current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner,

(b)  A current list of the full name and business or residence address of the Manager.

(c)  A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

(d)  Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(e)  A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

(f)  Copies of the financial statements of the Company, if any, for the six most recent Fiscal Years; and

(g)  The Company's books and records as they relate to the internal affairs of the Company for at least the current and past six Fiscal Years.

8.02.  <u>Financial Reports and Returns</u>.  The Manager shall cause to be prepared and distributed to each Member the following:

(a)  Within ninety (90) days after the end of each Fiscal Year of the Company, an annual report which shall contain a balance sheet of the Company as of the end of each Fiscal Year, an income statement and a report of the activities of the Company during such Fiscal Year, including a statement of changes in financial position for that Fiscal Year.

(b)  Within ninety (90) days after the end of each Fiscal Year of the Company, such other information which the Members may need for preparation of their federal and state income tax returns.

(c)    Within forty-five (45) days after the end of each calendar quarter, a quarterly report which shall contain (1) a balance sheet of the Company as of the end of such quarter, (2) an income statement of the Company as of the end of such quarter, (3) a report of any actions taken in connection with the Company's rights and obligations under the Plan and (4) a report of the activities of the Company during such quarter, including a statement of changes in the Company's financial position for that quarter, a description of any Company assets sold and a description of the status any Company claims or proceedings initiated, continued or settled.

If a Member has an email address, such financial reports and returns may be sent to such Member's email address (in accordance with Section 13.02 of this Agreement).

8.03.    Tax Matters Partner.    In the event the Company is subject to administrative or judicial proceedings for the assessment or collection of deficiencies for federal taxes or for the refund of overpayments of federal taxes arising out of a Member's distributive share of profits, the Manager shall act as the Tax Matters Partner ("TMP") and shall have all the powers and duties assigned to the TMP under Sections 6221 through 6232 of the Code and the Treasury Regulations thereunder.    The Members agree to perform all acts necessary under Section 6231 of the Code and Treasury Regulations thereunder to designate the Manager as the TMP.

**ARTICLE IX**
**TRANSFER OF COMPANY INTERESTS**

9.01.    Restrictions on Transfers.    Notwithstanding any provision to the contrary contained herein, the following restrictions shall apply to any and all proposed sales, assignments or transfers of Membership Interests and Economic Interests, and any proposed sale, assignment or transfer in violation of same shall be void ab initio:

(a)    No Member shall make any transfer or assignment of all or any part of its Membership Interest without the prior written consent of the Manager, which consent shall not be unreasonably withheld.

(b)    No Member shall make any transfer or assignment of all or any part of its Economic Interest without the prior written consent of the Manager, which consent shall not be unreasonably withheld.

(c)    No Member shall be entitled to sell, assign, transfer or convey his Membership Interest or Economic Interest to any person or entity other than a bona fide resident of the State of Nevada for a period of nine months after the termination of the offering of Units pursuant to which such Membership Interest (or the Membership Interest associated with such Economic Interest) was acquired.

(d)    Instruments evidencing a Membership Interest or Economic Interest shall bear and be subject to a legend condition in substantially the following form:

THE UNITS REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("THE ACT"). SUCH UNITS MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED,

PLEDGED OR HYPOTHECATED TO ANY PERSON AT ANY TIME WITHOUT REGISTRATION UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS, OR AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQUIRED. THERE ARE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFER, AS SET FORTH IN THIS OPERATING AGREEMENT. IN ADDITION, IN NO EVENT MAY UNITS BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON WHO IS NOT A RESIDENT (OF NEVADA FOR A PERIOD OF NINE MONTHS FROM THE DATE OF THE LAST SALE THEREOF BY THE FUND.

9.02.  <u>Transfer of Membership Interests and Substitution</u>.  No assignee of the whole or any portion of a Membership Interest in the Company shall have the right to become a substituted Member in place of his assignor unless the following conditions are first met:

(a)    The assignor shall complete and execute an agreement in form and substance satisfactory to the Manager,  and the assignee shall complete and execute an agreement an agreement in form and substance satisfactory to the Manager;

(b)    The assignor shall designate the assignor's intention to become a substituted Member in the instrument of assignment;

(c)    The written consent of the Manager to such substitution shall be obtained, which consent may be withheld in the reasonable discretion of the Manager and which, in any event, shall not be given if the Manager determines that such sale or transfer may jeopardize the status of the original sale of said interest pursuant to the non-public and intrastate offering exemptions from registration under the Securities Act or may cause an issue under ERISA or cause or materially increase the risk that the Company will be a publicly traded partnership taxable as a corporation under the Code;

(d)    The assignor and assignee named therein shall execute and acknowledge such other instruments as the Manager may deem necessary to effectuate such substitution, including but not limited to a power of attorney with provisions more fully described in this Agreement;

(e)    The assignee shall accept, adopt and approve in writing all of the terms and provisions of this Agreement as the same may have been amended;

(f)    Such assignee shall pay or, at the election of the Manager, obligate himself to pay all reasonable expenses (including reasonable attorneys' fees) connected with such substitution; and

(g)    The Company has received, if requested, a legal opinion in form and substance satisfactory to the Manager that such transfer will not cause a violation of the registration provisions of the 1933 Act, ERISA or the Code, which opinion shall be furnished at the Member's expense.

Any assignment permitted under this Section 9.02 shall become effective as of the end of business on the last day of the month in which the conditions described in this Section 9.02 have been satisfied.

9.03.   <u>Repurchase of Membership Rights Upon Transfer of Economic Interest</u>.  Upon and contemporaneously with any transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Members Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Members Economic Interest which does not at the same time transfer the balance of the rights associated with the Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company); the Company shall purchase from the Member, and the Member shall sell to Company, for a purchase price equal to $1.00 per Unit of Membership Interest, the Economic Interest of which has been transferred, all remaining rights and interests retained by the Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest.  Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member.  Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member is not unreasonable under the circumstances existing as of the date hereof.

For example, if a Member who holds twenty (20) Units of Membership Interest assigns the Economic Interests pertaining to five (5) Units in accordance with this Article VII, and if the transferee is not admitted as a substituted Member for any reason, such transferee shall hold the five (5) Units of Economic Interest so transferred as an Economic Interest owner and the transferring Member shall sell the balance of the rights associated with the Membership Interest transferred to the Company for an amount equal to five dollars ($5.00) (i.e., $1.00 per Unit of Membership Interest the Economic Interest of which has been transferred).  The transferring Member shall retain fifteen (15) Units of Membership Interest

## ARTICLE X
## WITHDRAWAL FROM COMPANY

No Member shall have the right to withdraw from the Company or otherwise obtain the return of all or any portion of his Capital Account balance, except for quarterly distributions of Cash Available for Distribution, if any, to which such Member may be entitled pursuant to Section 7.03 above.

## ARTICLE XI
## DISSOLUTION OF THE COMPANY;
## MERGER OF THE COMPANY

11.01.   <u>Events Causing Dissolution</u>.  The Company shall dissolve upon occurrence of the earliest of the following events (each an "<u>Event of Dissolution</u>"):

    (a)    As provided in Section 2.05 hereof;

    (b)    The affirmative vote of a Minimum Percentage of Interests;

(c)      The entry of an order by the Bankruptcy Court subsequent to the approval of the Plan; or

(d)      The failure of a Minimum Percentage of Interests to elect a new Manager within (i) 90 days after the removal of the existing Manager as provided in Section 3.06(b), or (ii) six months after the retirement of the existing Manager as provided in Section 3.07.

11.02.  Winding Up.  Upon the occurrence of an Event of Dissolution, the Company shall not immediately be terminated, but shall continue until its affairs have been wound up.  Upon the occurrence of an Event of Dissolution, the Manager, or if there is not a Manager the DTDF Member Committee, will wind up the Company's affairs as follows:

(a)      Except as may be agreed upon by the Manager and a Minimum Percentage of Interests in connection with a merger or consolidation described in Section 11.03, the Manager shall liquidate the assets of the Company as promptly as is consistent with recovering the fair market value thereof either by sale to third parties (including the Manager or Affiliates as provided in this Agreement) or by servicing the Company's outstanding loans in accordance with their terms; *provided, however*, the Manager shall liquidate all Company assets for the best price reasonably obtainable in order to completely wind up the Company's affairs within one (1) year after the date of dissolution; *provided, however*, that such one year period may be extended for three one year periods upon the approval of a majority of a quorum of the DTDF Member Committee Members.

(b)      Except as may be agreed upon by the Manager and a Minimum Percentage of Interests in connection with a merger or consolidation described in Section 11.03, all sums of cash held by the Company immediately prior to filing the Certificate of Dissolution as required under Section 11.02(c) below (including liquid assets which shall be converted to cash), together with all sums of cash received by the Company during the winding up process from any source whatsoever, shall be applied and promptly distributed to the Members in accordance with Article VII, but only after all the Company's debts have been paid or otherwise adequately provided for, and any reserves that may be required in connection with Section 3.05 or 5.07 have been adequately provided for, as determined by the Manager.

(c)      Upon the completion of the liquidation of the Company and distribution of liquidation proceeds, the Manager shall cause to be filed a Certificate of Dissolution as required by the Act and shall furnish to each of the Members a statement setting forth the receipts and disbursements of the Company during such liquidation, the amount of proceeds from such liquidation distributed and the amount of proceeds paid or distributed to Members.

11.03.  Merger or Consolidation of the Company.  The Company may be merged or consolidated with one or more other entities (whether by statutory merger, sale of all or substantially all assets in a single transactions or series of related transactions or otherwise), provided that the principal terms of any such merger, consolidation or other transaction are first approved by the Manager and by the affirmative vote of a Minimum Percentage of Interests.  In any such merger, consolidation or other transaction, the Company may be either a disappearing or surviving entity.

# ARTICLE XII
# ARBITRATION

12.01.  <u>Arbitration</u>.  As among the parties hereto, all questions as to (a) interpretation of the Plan shall be determined by the Bankruptcy Court and (b) the rights and obligations arising under the terms of this Agreement shall be subject to arbitration, and such arbitration shall be governed by the rules of the American Arbitration Association.

12.02.  <u>Demand for Arbitration</u>.  If a dispute should arise under this Agreement, any Member may within sixty (60) days make a demand for arbitration by fling a demand in writing with the other.

12.03.  <u>Appointment of Arbitrators</u>.  The parties may agree upon one arbitrator, but in the event that they cannot agree, there shall be the one named in writing by each of the parties within five (5) days after demand for arbitration is given and a third chosen by the two appointed. Should either party refuse or neglect to join in the appointment of the arbitrator(s) or to furnish the arbitrator(s) with any papers or information demanded, the arbitrator(s) are empowered by both parties to proceed ex parte.

12.04.  <u>Hearing</u>.  Arbitration shall take place in Las Vegas, Nevada, and the hearing before the arbitrator(s) of the matter to be arbitrated shall be at the time and place within said city as is selected by the arbitrator(s): The arbitrator(s) shall select such time and place promptly after his (or their) appointment and shall give written notice thereof to each party at least sixty (60) days prior to the date so fixed At the hearing any relevant evidence maybe presented by either party, and the formal rules of evidence applicable to judicial proceedings shall not govern.  Evidence may be admitted or excluded in the sole discretion of the arbitrator(s).  Said arbitrator(s) shall hear and determine the matter and shall execute and acknowledge their award in writing and cause a copy thereof to be delivered to each of the parties.

12.05.  <u>Arbitration Award</u>.  If there is only one arbitrator, his decision shall be binding and conclusive on the parties, and if there are three arbitrators, the decision of any two shall be binding and' conclusive.  The submission of a dispute to the arbitrator(s) and the rendering of his (or their) decision shall be a condition precedent to any right of legal action on the dispute.  A judgment confirming the award of the arbitrator(s) may be rendered by any Court having jurisdiction; or such Court may vacate, modify, or correct the award in accordance with the prevailing sections of Nevada law.

12.06.  <u>New Arbitrators</u>.  If three arbitrators are selected under the foregoing procedure but two of the three fail to reach an agreement in the determination of the matter in question, the matter shall be decided by three new arbitrators who shall be appointed and shall proceed in the same manner, and the process shall be repeated until a decision is finally reached by two of the three arbitrators selected.

12.07.  <u>Costs of Arbitration</u>.  The costs of such arbitration shall be borne by the losing party or in such proportions as the arbitrator(s) shall determine.

# ARTICLE XIII
# MISCELLANEOUS

13.01.  <u>Covenant to Sign Documents</u>.  Without limiting the power of attorney granted by Sections 2.06 and 2.07 above, each Member covenants, for himself and his successors and assigns, to execute, with acknowledgment or verification, if required, any and all certificates, documents and other writings which may be necessary or expedient in the creation of the Company and the achievement of its purposes, including, without limitation, all such filings, records or publications necessary or appropriate in the judgment of the Manager to comply with the applicable laws of any jurisdiction in which the Company shall conduct its business.

13.02.  <u>Notices</u>.  Except as otherwise expressly provided for in this Agreement, all notices which any Member may desire or may be required to give any other Member shall be in writing and shall be deemed duly given when delivered personally or when deposited in the United States mail, first-class postage prepaid, addressed to the Member's address as shown in the books of the Company pursuant to written notification to the Manager.  If a Member has an email address on record in the books of the Company, notices sent to such address shall be deemed duly given when sent to such email address provided a copy of any such email notice is retained in the Company's records.  Notices to the Manager or to the Company shall be delivered to the Company's principal place of business, as set forth in Section 2.03 above or as hereafter changed as provided herein.

13.03.  <u>Right to Engage in Competing Business</u>.  Nothing contained herein shall preclude any Member from purchasing or lending money upon the security of any other property or rights therein, or in any manner investing in, participating in, developing or managing any other venture of any kind, without notice to the other Members, without participation by the other Members, and without liability to them or any of them.  Each Member waives any right he may have against the Manager for capitalizing on information received as a consequence of the Manager's management of the affairs of this Company.

13.04.  <u>Amendment</u>.  This Agreement is subject to amendment by the affirmative vote of a Minimum Percentage of Interests with the written concurrence of the Manager. Notwithstanding anything to the contrary contained in this Agreement, the Manager shall have the right to amend this Agreement, without the vote or consent of any of the Members, when:

        (a)     There is a change in the amount of the contribution of any Member;

        (b)     A person is substituted as a Member;

        (c)     A person is admitted as a successor or additional Manager in accordance with the terms of this Agreement;

        (d)     There is a false or erroneous statement in this Agreement;

        (e)     A change in this Agreement is required in order that this Agreement shall accurately represent the agreement embodied in the Plan; or

(f)    The Bankruptcy Court shall have approved an amendment of this Agreement at the request of the Manager or the DTDF Member Committee.

13.05.  Governing Law.  This Agreement shall be governed by and shall be interpreted and enforced in accordance with the substantive laws of the State of Nevada.

13.06.  Entire Agreement.  This Agreement and the Plan constitute the entire agreement between the parties and supersedes any and all prior agreements and representations, either oral or in writing, between the parties hereto with respect to the subject matter contained herein and therein.

13.07.  Waiver.  No waiver by any party hereto of any breath of, or default under, this Agreement by any other party shall be construed or deemed a waiver of any other breach of or default under this Agreement, and shall not preclude any party from exercising or asserting any rights under this Agreement with respect to any other breach or default.

13.08.  Severability.  If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions of this Agreement shall remain in fill force and effect and shall in no way be affected, impaired or invalidated.

13.09.  Captions.  Section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference an in no way define, limit, extend or describe the scope of this Agreement.

13.10.  Number and Gender.  Whenever the singular number is used in this Agreement and when required by the context,  the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and the word "person" shall include a natural person, firm, partnership, corporation, trust, association of 'ether form of legal entity.  Any consent or action required or permitted to be given or made by a Manager may be given or made by any Manager.

13.11.  Terms of the Plan Govern Interpretation.  In the event of a conflict between any of the terms of this Agreement and the Plan, the terms of the Plan shall govern.

13.12.  Counterparts.  This Agreement may be executed in counterparts, any or all of which may be signed by the Manager on behalf of the Members as their attorney-in-fact.

13.13.  Legal Representation.  Counsel to the Company may also be counsel to the Manager or any Affiliate of the Manager.  The Manager may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to any applicable rules of professional conduct or similar rules ("Rules").  Each Member acknowledges that Company counsel does not and will not represent any Member with respect to the matters herein and in the Plan, and that in the absence of a clear and explicit written agreement Company counsel shall owe no duties directly to any Member. Notwithstanding any adversity that may develop, in the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and the Manager (or its Affiliate), on the other hand, then each Member agrees that

Company counsel may represent either the Company or such Manager (or its Affiliate), or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands the day and year first above written.

**MANAGER:**                                MICHAEL TUCKER

 

 

Its: _____

**MEMBERS:**                                Attorney-In-Fact for the Members

By: _____
Michael Tucker as Attorney-In-Fact
for the persons listed on Schedule A
attached hereto.

## SCHEDULE A

## MEMBERS

**[Note: this completed schedule is in the books and records of the Manager]**

| Name and Address | Date of Admission | Capital Contribution | Units Held* | Percentage Interest* | Capital Account Balance* |
|---|---|---|---|---|---|
| | | | | | |

* As of the Effective Date.

## EXHIBIT A

### FORM OF SUBSCRIPTION AGREEMENT

### AND POWER OF ATTORNEY

THE LIMITED LIABILITY COMPANY MEMBERSHIP INTEREST UNITS PURCHASED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (the "ACT"). SUCH INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON AT ANY TIME IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT COVERING SUCH UNITS UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQUIRED. IN ADDITION, IN NO EVENT MAY UNITS BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON WHO IS NOT A RESIDENT OF NEVADA FOR A PERIOD OF NINE MONTHS FROM THE DATE OF THE LAST SALE THEREOF BY THE FUND.

### SUBSCRIPTION AGREEMENT AND POWER OF ATTORNEY

### USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,
### a Nevada limited liability company

The undersigned hereby applies to become a Member of USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, a Nevada limited liability company (the "Company"), and subscribes to purchase the number of Units herein indicated in accordance with the terms and conditions of the Operating Agreement attached as Exhibit A to the Offering Circular dated _____, 2000, as amended or supplemented from time to time (the "Offering Circular").

**1.    REPRESENTATIONS AND WARRANTIES.**    The undersigned represents and warrants as follows:

**(a)**    I have received, read and fully understood the Offering Circular and in making this investment I am relying only-on the information provided in the Offering Circular. I have not relied on any statements or representations inconsistent with those contained in the Offering Circular.

**(b)**    I understand that the Units are being offered and sold without registration under the Securities Act of 1933, as amended, in reliance upon the exemption from such registration requirements for intrastate offerings. I acknowledge and understand that the availability of this exemption depends in part upon the accuracy of the representations and warranties contained herein, which I hereby make with the intent that they may be relied upon by the Manager.

**(c)**    My principal residence is in the State of Nevada. Except as hereafter provided, if I am acting as the trustee of a trust or on behalf of any other business entity, both the principal office and the principal place of business of such trust or other entity are located in the State of Nevada. I am acting as the trustee or custodian of a Keogh plan, Individual Retirement Account or other retirement plan and I am not a resident of Nevada, then all of the following requirements are satisfied: (i) all participants or beneficiaries of such retirement plan have their principal residence in Nevada; (iii) all investment decisions regarding such plan are made by such resident participants and/or beneficiaries; and (vii) I perform only ministerial functions with respect to the investment of plan assets, with no independent authority or discretion to make investment decisions.

**(d)**    I understand that Units may not be sold or otherwise disposed of without the prior written consent of the Manager, which consent may be granted or withheld in its sole discretion, and that any such transfer is also subject to other restrictions described in the Offering Circular and in the Operating Agreement I have liquid assets sufficient to assure myself (1) that investment in these Units will not cause me undue financial difficulties and (ii) that I can provide for my current needs and possible personal contingencies or, if I am the trustee of a retirement trust, that the limited liquidity of the Units will not cause difficulty in meeting the trust's obligations to make distributions to plan participants in a timely manner.

**(e)**    I understand that an investment in the Units involves certain risks.

**(f)**    I am 18 years of age or older.

**(g)**    By virtue of my own investment acumen and experience or financial advice from my independent advisors (other than a person receiving commissions by reason of my purchase of Units), I am capable of evaluating the risks and merits of an investment in the Units.

**(h)**    I am purchasing the Units solely for my own account, and not with a view to or for a sale in connection with any distribution of the Units.

**2.    POWER OF ATTORNEY**.  I hereby irrevocably constitute and appoint the Manager as my true and lawful attorney-in-fact, with full power and authority for me, and in my name, place and stead, to execute, acknowledge, publish and file:

**(a)**    The Operating Agreement, the Articles of Organization of the Company and any amendments thereto or cancellations thereof required under the laws of the State of Nevada;

**(b)**    Any other certificates, instruments and documents as may be required by, or may be appropriate under, the laws of any state or other jurisdiction in which the Company is doing or intends to do business; and

**(c)**    Any documents which may be required to effect the continuation of the Company, the admission of an additional or substituted Member, or the dissolution and termination of the Company.

The power of attorney granted above is a special power of attorney coupled with an interest, is irrevocable, and shall survive my death or the delivery of an assignment of Units by me; provided, that where the assignee of Units has been approved by the Manager for admission to the Company as a substituted Member, such power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Manager to execute, acknowledge, file and record any instrument necessary to effect such substitution.

**3.    ACCEPTANCE.**  This Subscription Agreement and Power of Attorney (this "Agreement") will be accepted or rejected by the Manager within fifteen (15) days of its receipt by the Company.  Upon acceptance, this subscription will become irrevocable, and will obligate the under-signed to purchase the number of Units indicated below, for the purchase price of $25,000 per Unit.  The Manager will return a countersigned copy of this Agreement to accepted subscribers, which copy (together with my cancelled check) will be evidence of my purchase of Units.

**4.    PAYMENT OF SUBSCRIPTION PRICE.**  The full purchase price for Units is $25,000 per Unit, payable in cash concurrently with delivery of this Agreement.  I understand that my subscription funds will not bear interest until I am admitted to the Company.

[ALTERNATIVE PARAGRAPH 4 - to be used if units are purchased through the contribution of an existing loan:.

"The full purchase price for Units is $25,000 per Unit, payable by the undersigned's contribution to the Company of an existing real estate secured loan in exchange for Units.  This loan contribution is subject to all of the terms and conditions of the Offering Circular and Operating Agreement.  This loan contribution, and the undersigned's purchase of Units in exchange therefor, will be consummated when all documents and acts required by the Manager to transfer the loan to the Company have been signed, recorded and taken.  These documents and acts include, without limitation, an endorsement of the original note that evidences the loan, a recorded assignment of the deed of trust that secures the loan and an endorsement to the lender's title insurance policy whereby the underlying title company recognizes the transfer of the note and deed of trust to the Company.  The amount of Units sold in exchange for the loan contribution :shall be equal to the outstanding principal balance of the loan, together with any accrued but unpaid interest"]

**5.    THE UNDERSIGNED AGREES TO INDEMNIFY, DEFEND (BY COUNSEL REASONABLY ACCEPTABLE TO THE INDEMNIFIED PARTY) AND HOLD THE COMPANY, ITS  MANAGER, MEMBERS AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS, AND EACH OF THEIR RESPECTIVE**

SUCCESSORS AND ASSIGNS, HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, AND DAMAGES (INCLUDING, WITHOUT LIMITATION, ALL ATTORNEYS' FEES WHICH SHALL BE PAID AS INCURRED) WHICH ANY OF THEM MAY INCUR, IN ANY MANNER OR TO ANY PERSON, BY REASON OF THE FALSITY, INCOMPLETENESS OR MISREPRESENTATION OF ANY INFORMATION FURNISHED BY THE UNDERSIGNED HEREIN OR IN ANY DOCUMENT SUBMITTED HEREWITH.

**6.    INVESTOR INFORMATION.**  (Please print or type)

Name and Address of Investor or Beneficial Owner.

_____
_____
_____
_____
_____
_____
_____, Nevada 9_____
City                              Zip Code

(____)_____    (____)_____
Telephone (Home)      Telephone (Office)

Please complete the following, as applicable.  (Investments by more than one of the following' entities, even if related to each other or controlled by the same person, require completion of separate Subscription Agreement.)

<u>Identifying Information</u>                    <u>Monthly Income to Be: [l]</u>

Individual:

    Name: _____          Compounded _____
                                                      or Distributed _____

    Address _____
                    _____, NV 9_____
    Soc.Sec.No. _____

Individual Retirement Account ("IRA"):

    Trustee _____          Compounded _____
                                                      or Distributed _____
    Address:_____
                    _____, NV 9_____

Acct. No_____          Tax I.D. No. 94-_____

Pension Profit Sharing Trust ("ERISA Plan"):

Trustee _____          Compounded _____
_____          or Distributed _____
Address:_____
_____
_____, NV 9____
Acct. No_____          Tax I.D. No. 94-_____

Corporation, Trust or Other:

| | | |
|---|---|---|
| Trustee | _____ | Compounded _____ |
| | _____ | or Distributed _____ |
| Address: | _____ | |
| | _____ | |
| | _____, NV 9____ | |
| Acct. No_____ | | Tax I.D. No. 94-_____ |

[1]   The election whether to receive monthly cash distributions, or to allow earnings to compound, is irrevocable and no changes by the investor will be allowed for the-first year after an investor's admission to the Company.  Thereafter, an investor may, on an annual basis and subject to the terms and conditions contained in the Offering Circular and Operating Agreement, elect to switch how distributions are treated.  The Manager, however, reserves the right to immediately commence making cash distributions to previously compounding investors to ensure that the Company remains exempt from the application of the Plan Asset Regulations.  Investors have the right to withdraw from the Company, subject to certain limitations. (See discussion in Offering Circular under "ERISA Considerations," "Summary of Operating Agreement" and "Withdrawal from Company.")

Number of Units to be Purchased:                _____

Total Purchase Price ($25,000 per Unit):        $_____

Make check payable to "USA Capital Diversified Trust Deed Fund, LLC" and return with this Subscription Agreement to do USA Commercial Mortgage Company, 4484 South Pecos Road, Las Vegas, Nevada 89121.

IN WITNESS WHEREOF, the undersigned hereby agrees to become a Member in USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, a Nevada limited liability company, upon the terms and conditions set forth in the Operating Agreement

Dated: _____, 20__

_____          _____
(signature of Investor or                     (signature of Investor or
  Beneficial Owner)                              Beneficial Owner)

_____          _____
(signature of Trustee, if any)                 (signature of Trustee, if any)

[IF IRA OR ERISA PLAN, THEN BOTH TRUSTEE AND BENEFICIAL OWNER(S) MUST SIGN.]

_____

## ACCEPTANCE

The foregoing Subscription Agreement is hereby accepted by USA Capital Diversified Trust Deed Fund, LLC.

Dated: _____, 20__

USA Capital Diversified Trust Deed Fund, LLC,
a Nevada limited liability company

By:     USA Capital Realty Advisors,
        a Nevada corporation
        Its Manager

    By:     _____

    Its:    _____