Dean T. Kirby, Jr.     Calif. Bar No. 090114
Leonard J. Ackerman Calif. Bar No. 171073
KIRBY & McGUINN, A P.C.
600 B Street, Suite 1950
San Diego, California 92101-4515
Telephone: (619) 685-4000  Facsimile:  (619) 685-4004
dkirby@kirbymac.com
lackerman@kirbymac.com

Michelle L. Abrams     Nev. Bar No. 5565
MICHELLE L. ABRAMS, LTD.
7201 West Lake Meade Blvd., Suite 210
Las Vegas, NV 89128
Telephone: (702) 233-5040 Facsimile (702) 233-2209
mabrams@mabramslaw.com

Attorneys for Creditor
Debt Acquisition Company of America V

## UNITED STATES BANKRUPTCY COURT

### District of Nevada

| | |
|---|---|
| In re | Case No. BK-S-06-10725 LBR |
| USA COMMERCIAL MORTGAGE COMPANY | MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO CONFIRMATION OF DEBTOR'S PLAN |
| Debtor. | |
| In re | DATE: December 19, 2006 |
| USA CAPITAL REALTY ADVISORS, LLC | TIME:  10:00 a.m. |
| Debtor. | |
| In re | |
| USA CAPITAL DIVERSIFIED TRUST FUND, LLC | |
| Debtor. | |
| In re | |
| USA CAPITAL FIRST TRUST DEED FUND, LLC | |
| Debtor. | |
| In re | |
| USA COMMERCIAL MORTGAGE COMPANY | |
| Debtor. | |

Affects:
☐ All Debtors
☒ USA Commercial Mortgage Company
☐ USA Capital Realty Advisors, LLC
☒ USA Capital Diversified Trust Fund, LLC
☒ USA Capital First Trust Deed Fund, LLC
☐ USA Securities, LLC

## I.    INTRODUCTION

As the Court knows, Debtor USA Commercial Mortgage Company ("USACM") was engaged in the business of originating and managing mortgage loans.  Money was received from investors (referred to in the Plan as "Direct Lenders") in exchange for fractionated beneficial interests in notes payable by third parties and secured by recorded trust deeds (referred to in the Plan as the "Loans"). Interests in some of the Loans were held by an affiliate Debtor, USA Capital First Trust Deed Fund, LLC ("FTDF").  USACM entered into a pre-petition Loan Servicing Agreement with each Direct Lender.  USACM has continued to service the loans, distribute funds to Direct Lenders  and retain servicing fees, under the authority of a limited interim "Order (A) Granting Debtors' Motion to Distribute Funds" entered August 24, 2006 (Docket No. 1184) (the "Distribution Order"), as modified by the Order entered October 2, 2004 (Docket No. 1484).

Beginning in September, 2006, Debt Acquisition Company of America V ("DACA") has acquired the interests of about 50 Direct Lenders in loans managed by the Debtor.  In connection with each purchase, the Direct Lender executed a written assignment which DACA recorded in the county in which the Direct Lender's interest in the trust deed appeared of record.  DACA has notified the Debtor of each assignment in writing and recorded the assignment in the official records of the counties in which the respective trust deeds are recorded.

Pre-petition, USACM failed to remit to Direct Lenders some of the payments received from the borrower.  Those investors whose funds were misappropriated by USACM are referred to in the Plan as "Unremitted Principal Direct Lenders."  In addition to interests in Direct Loans, DACA has so far purchased from Direct Lenders 15 Unremitted Principal Claims totaling about $399,222.50.

Pursuant to this Court's Order entered November 8, 2006 (Docket No. 1761) the Debtors in Possession offered for sale at auction: (i)  the interest of FTDF in the Loans; and (ii) the rights of USACM under the Loan Servicing Agreements.  The auction was held on December 7, 2006, and Compass Partners LLC was the successful bidder.  The Court has not entered an order confirming the sale.  The Debtors contemplate that the sale will be confirmed as part of the Plan Confirmation Order.

/ / /

/ / /

The Disclosure Statement asserts that the Loan Servicing Agreements are not executory contracts.  The Debtors are forced to take this position because if the Loan Servicing Agreements are indeed executory contracts, the Plan violates the Bankruptcy Code.  The defects in the Plan's provisions in relation to the Loan Servicing Agreements has consequences for both kinds of claims and interests purchased by DACA: the Unremitted Principal Claims and the Direct Lender Loan interests themselves.

The Plan provides for the assignment of the Loan Servicing Agreements to Compass Partners without USACM first assuming them as executory contracts.  It is DACA's position that the Loan Servicing Agreements must be assumed in order to be assigned, as required by 11 U.S.C. § 365(f).  In order to assume the Loan Servicing Agreements, the Unremitted Principal Claims would have to be promptly paid in full. Instead, the Plan treats Unremitted Principal Claims as general unsecured claims.

If the Loan Servicing Agreements are executory contracts, they are rejected under the provisions of article V of the Plan.   Rejection of the Loan Servicing Agreements constitutes a breach of those agreements as provided by 11 U.S.C. § 365(g).  The Plan ignores the Debtors' many pre-petition breaches of the Loan Servicing Agreement, including the one arising by operation of law under section 365(g), and provides that the Loan Servicing Agreements are transferred "free and clear of all claims, liens, interests, obligations and encumbrances."  It is DACA's position that no contract, whether or not it is an executory contract, can be sold as an asset "free and clear" of the rights of the counterparty to that contract.  While the Plan is fatally ambiguous as to just what the "free and clear" language means, it is assumed that Compass Partners would take the position that DACA, as a successor in interest to the Direct Lenders, would have no defense to the exercise of any rights of Compass (such as the right to repurchase the Direct Lenders' interest under paragraph 2(c)(iii) of the Loan Servicing Agreement) notwithstanding the servicer's breach.

II.    PLAN PROVISIONS IN ISSUE

    A.    THE LOAN SERVICING AGREEMENTS ARE EXECUTORY
        CONTRACTS WHICH ARE REJECTED UNDER THE PLAN

On November 2. 2006 USACM filed an amendment (Docket No. 784) to its Schedules of Assets and Liabilities including an amended Schedule G (Executory Contracts).  Amended Schedule G contains what appears to be a complete list of the Loan Servicing Agreements between USACM and the Direct

Lenders.  Article V section A of the Plan provides that the Debtors would file a separate Schedule of Executory Contracts and Leases "that shall set forth the executory contracts and unexpired leases that are to be assumed and assigned effective on the Effective Date . . . ."  (Plan p. 60 ll. 22-27.)  That Schedule was filed on November 30 (Docket No. 1886).  None of the Loan Servicing Agreements are included in the list of executory contracts to be assumed.

In apparent contradiction to Amended Schedule G, the Debtors' First Amended Disclosure Statement at article IV section A ("Deadline for Filing Proofs of Claim") states in part "the Debtors do not consider the various loan servicing agreements USACM entered into with Direct Lenders to service loans ("Loan Servicing Agreements") to be executory contracts.  Claims relating to USACM's services under the Loan Servicing Agreements are not deemed to be executory contract related claims but are treated as Class A-4 claims . . . ."  (Disclosure Statement p. 21 ll. 10-14.)

Article V section B of the Plan states at p. 62:

> Effective upon the Effective Date, the Debtors hereby reject all executory contracts and unexpired leases that exist between the Debtors and any other Entities which have not previously been rejected, except the Debtors do not reject those executory contracts and unexpired leases (a) which are listed in the Schedule of Executory Contracts and Unexpired Leases referred to in section A above and assumed or assumed and assigned on the Effective Date, or (b) which are or have been specifically assumed, or assumed and assigned, by the Debtors with the approval of the Court by separate proceeding in the Chapter 11 Cases.

> All Allowed Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, shall be treated as General Unsecured Claims in Class A-4 (USACM), Class B-4 (FTDF), Class C-4 (DTDF), Class D-4 (USA Realty) and Class E-4 (USA Securities), respectively.

B.    UNREMITTED PRINCIPAL CLAIMS

The Plan defines "Unremitted Principal Claims" as "General Unsecured Claims against USACM for Loan payments received by USACM, but not paid over to applicable Lenders prior to the Petition Date." Plan p. 19 para. 130 ll. 22-25.)  The Plan defines Class A-4 as "all Allowed General Unsecured Claims against USACM, including . . . the Allowed Unremitted Principal Claims."  (Plan p. 33 ll. 15-21.)

/ / /

/ / /

C.    THE ASSET SALE TRANSACTION

Among the means of implementation set forth in Article IV of the Plan is the Asset Sale Transaction which, per the results of the auction, is proposed to take place between the Debtors as sellers and CASCM and FTDF as sellers and Compass Partners as purchaser.  The Plan provides:

> Except as expressly agreed to otherwise by the Debtors and the Asset Purchaser, the Acquired Assets *will be sold free and clear of all liens, Claims, encumbrances, rights of third parties and interests.* The Confirmation Order shall constitute an Order pursuant to section 363(b) and (f) of the Bankruptcy Code authorizing the sale of the Estates' interests in the Acquired Assets to the Asset Purchaser. The Confirmation Order shall provide that the Asset Purchaser is a good faith purchaser of assets within the meaning of section 363(m) of the Bankruptcy Code and has paid fair consideration and reasonable equivalent value of the Acquired Assets that are purchased. Except as set forth in the Asset Purchase Agreement and the Plan, the Asset Purchaser shall have no liability for Claims or Equity Interests against the Debtors (whether or not currently known) based on its purchase of Acquired Assets.

> After the Auction, the Asset Sale Transaction shall be approved in connection with Confirmation of the Plan. [italics added]

The Asset Purchase Agreement further provides at section 5.2 states that the Bankruptcy Court's Sale Approval Order (intended to be a part of the Plan Confirmation Order) shall "determine" that "the Purchaser is not a successor to Sellers or otherwise liable for any liabilities not expressly assumed and to the extent permitted by applicable law enjoining each and every holder of a claim for such liabilities from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against Purchaser or the Assets . . . ."

III.    THE LOAN SERVICING AGREEMENTS ARE EXECUTORY CONTRACTS

The Ninth Circuit has defined "executory contract" for purposes of Bankruptcy Code section 365 as one which contains  "obligations of both parties that are so far unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other." *In re Wegner,* 839 F.2d 533, 536 (9th Cir.1988).   A contract is executory "if material unperformed obligations remain for both parties." *In re Qintex Entertainment, Inc.,* 950 F.2d 1492, 1495 (9th Cir. 1991).

/ / /

/ / /

Clearly, USACM had substantial continuing obligations under the Loan Servicing Agreement. The Debtors are expected to contend that the Direct Lenders had no significant executory obligations other than to receive checks. To the contrary, the Loan Servicing Agreement imposes the following executory obligations on the Direct Lenders:

Section 2(c) provides that "until the total amount due under each note is paid in full:"

> (iii) In its sole discretion, USA may pay off any Lender at any time by paying the then outstanding balance of Lender's interest in the principal of the Loan, plus all accrued interest and any prepayment penalty or fee, if applicable. *Any Lender so paid off shall concurrently execute and deliver therewith to USA an assignment, in a form acceptable to USA. of all of such Lender's right. title, and interest in the Loan (including all documents evidencing the Loan) and in the deed of trust securing the Loan.* [italics added]."

This provision contains an executory obligation on the part of the Direct Lender to sell his or her interest in the Loan "at par" upon demand from the loan servicer. If the Direct Lender had refused to sell then the loan servicer would be unable to deliver clear record title to the trust deed or to the subject property after foreclosure. In the event of such a breach by the Direct Lender, the loan servicer would be required to commence and prosecute an action for specific performance of the purchase obligation created under the Loan Servicing Agreement and to quiet title.

Section 4 provides in relevant part:

> USA will assist the Lender in any necessary foreclosure proceedings to protect the Lender's interest in the note and deed of trust. *Upon demand by USA. Lender agrees to promptly pay, either in advance or to reimburse USA, for its pro rata portion of the out-of-pocket expenses incurred, including attorney's fees, trustee's fees and foreclosure costs.* [italics added].

The above-quoted section obligates the Direct Lender to advance payment of legal fees in the event of any foreclosure litigation. If the Direct Lenders failed to advance substantial legal fees, the loan servicer would be justified in taking the position that it was excused from its obligation to prosecute or defend foreclosure litigation on the Direct Lender's behalf. The Direct Lender's executory obligation to advance foreclosure and legal fees is clearly material.

/ / /

/ / /

1    Finally, section 11 provides in relevant part:

2

3        Upon USA's request. Lender hereby agrees to execute and deliver, in the
        presence of a notary public, a "Declaration of Agency and Limited Power
        of Attorney", in a form consistent with Chapter 645B of the Nevada

4        Revised Statutes, pursuant to which Lender shall further evidence the
        appointment of USA as Lender's true and lawful attorney-in-fact to

5        undertake the duties of USA hereunder.

6        The Loan Servicing Agreement creates a continuing executory relationship under which the

7    Direct Lender has substantial continuing obligations.  Failure to perform any of these obligations would

8    constitute a material breach of contract by the Direct Lender.  The Loan Servicing Agreement is clearly

9    an executory contract within the meaning of Bankruptcy Code section 365.

10   IV.    AS EXECUTORY CONTRACTS, THE LOAN SERVICING AGREEMENTS
           MAY NOT BE ASSIGNED UNLESS THEY ARE FIRST ASSUMED

11
         Section 365(f) of the Bankruptcy Code provides in subdivision (2):
12
             (2) The trustee may assign an executory contract or unexpired lease of
13           the debtor only if—

14           (A) the trustee assumes such contract or lease in accordance with the
             provisions of this section; and

15
             (B) adequate assurance of future performance by the assignee of such
16           contract or lease is provided, whether or not there has been a default in
             such contract or lease.

17

18       The clear language of this section states that if a contract is executory it may not be assigned by

19   Debtor in Possession unless it is first assumed.  This is consistent with Ninth Circuit authority to the

20   effect that "Unless and until rights under an executory contract are timely and affirmatively assumed

21   by the trustee, they do not become property of the debtor's estate. *In re Lovitt,* 757 F.2d 1035, 1041 (9th

22   Cir.), cert. denied sub nom. *Cheadle v. Appleatchee Riders Ass'n,* 474 U.S. 849, 106 S.Ct. 145, 88

23   L.Ed.2d 120 (1985)."  *In re Tleel,* 876 F.2d 769, 770 (9th Cir. 1989).

24       "If an executory contract is assumed, it acquires the status of an asset of the estate, and the

25   non-debtor's contractual rights become an administrative liability with priority over other claims.  If the

26   executory contract is rejected, however, the contract does not vest in the estate, and the non-debtor has

27   only a claim, like that of any other creditor, to a distributive share of the estate's assets."  *In re Statewide

28   Oilfield Const., Inc.,* 134 B.R. 399, 402 (Bankr. E. D. Cal. 1991).

1    The Debtors' Plan seeks to sell USACM's rights under the Loan Servicing Agreements without

2    curing the breaches under these agreements –notably, without restoring to the Direct Lenders the funds

3    embezzled pre-petition by USACM, i.e., without paying in full the Unremitted Principal Claims.

V.    IF THE LOAN SERVICING AGREEMENTS WERE ASSUMED, THE UNREMITTED PRINCIPAL CLAIMS WOULD BE REQUIRED TO BE PAID PROMPTLY, IN FULL

Bankruptcy Code section 365(b) provides:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
>> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>>
>> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>>
>> (C) provides adequate assurance of future performance under such contract or lease.

"[W]hen a contract is assumed under section 365, all unpaid amounts due under the agreement must be paid." *In re Network Access Solutions, Corp.,* 330 B.R. 67, 76 (Bankr. D. Del. 2005). "Section 365(b)(1) essentially 'allows a debtor to continue in a beneficial contract provided, however, that the other party is made whole at the time of the debtor's assumption of said contract.'" *In re Liljeberg Enterprises, Inc.,* 304 F.3d 410, 438 (5th Cir. 2002). The obligation of the Debtor in Possession to cure defaults at the time of assumption of the executory contracts cannot be avoided or discharged by confirmation of a chapter 11 plan. *In re National Gypsum Co.,* 208 F.3d 498, 506-07 (5th Cir. 2000).

In this case, the Plan seeks to reap millions of dollars for the bankruptcy estate of USACM by selling the Loan Servicing Agreements, but does not propose to make the counterparties to those agreements whole. The requirement that the counterparty to an executory contract be compensated for any actual pecuniary loss resulting from the breach of that contract mandates in this case that the Direct Lenders receive full repayment of the funds embezzled by the Debtor – i.e., full payment of the Unremitted Principal Claims.

/ / /

VI.    IF THE LOAN SERVICING AGREEMENTS ARE REJECTED, THEY
       ARE DEEMED TO HAVE BEEN BREACHED BY USACM

The Plan as it is presently drafted does not provide for assumption of the Loan Servicing Agreements as executory contracts, nor have the Debtors asked the Court to determine, after proper notice and hearing, that the Loan Servicing Agreements are not executory contracts.  If they are, they fall within the general language of Article V section B, of the Plan, under which all executory contracts not expressly assumed are rejected.  Bankruptcy Code section 365(g) provides in relevant part:

> (g) Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—

> (1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition;

Under this provision, rejection will constitute one of many uncured material breaches of the Loan Servicing Agreements by the Debtor.  Compass Partners will take the assignment of these Loan Servicing Agreements subject to all of the rights of the Direct Lenders as counterparties which may arise from these breaches.

VII.   THE LOAN SERVICING AGREEMENTS CANNOT BE SOLD FREE AND CLEAR
       OF THE RIGHTS OF DIRECT LENDERS AS COUNTERPARTIES

"Before an executory contract may be assigned, trustee first must assume the contract, and adequate assurance of future performance of the contract must be provided.  Bankr.Code, 11 U.S.C.A. § 365(f)(2)(A, B)."  *Cinicola v. Scharffenberger,* 248 F.3d 110, 120 (3d Cir. 2001).  It is the process of assumption of an executory contract which provides the opportunity for the Bankruptcy Court to adjudicate what defaults exist under the contract and what is necessary to cure them.  It is also black letter law that an executory contract may only be assumed in whole, not in part, and cannot be rewritten by the Bankruptcy Court to make it more advantageous to the Debtor or an assignee.  See generally, *In re Plitt Amusement Co. of Washington, Inc.,* 233 B.R. 837 (Bankr. C.D.Cal. 1999).

/ / /

In essence, the Plan proposes a novel end run around the requirement that an executory contract be assumed before it is assigned.  But even if this Court were to conclude that the USACM is legally entitled to sell the Loan Servicing Agreements without assuming them, there is no authority for the proposition that such an assignment can be "free and clear" of the rights of the counterparties to the contract, depriving them of what their legal status under the assigned contract would otherwise be.  This is not a case in which some third party claims an interest in the Loan Servicing Agreements,  or holds a lien or encumbrance on them.  As to those parties, a sale free and clear of an executory contract would presumably be authorized (after assumption), with the rights of that third party to attach to the sale proceeds.  What the Debtor proposes to do is to alter the rights of the counterparties themselves, in essence re-writing the contract.

The Plan attempts to circumvent this obvious problem by providing that the Direct Lenders are "compromising" their claims with the Debtor.  Far from requiring that the Direct Lenders affirmatively agree to such a compromise, the Plan provides that even a vote against the Plan does not prevent a Direct Lender from being bound by the "compromise."  The Plan states at p. 51:

> If the Plan is confirmed, all Direct Lenders will be bound to the compromise provisions set forth herein, regardless of whether they vote to accept or reject the Plan, or Class A- 5 votes to accept or reject the Plan; all such objections must be made by objecting to Plan confirmation.

DACA contends that the Direct Lenders cannot be bound by a purported compromise agreement where the Debtors have erected a practical barrier which effectively precludes most Direct Lenders from opting out of the compromise.  DACA maintains that none of the Direct Lenders are bound by the "compromise" and that DACA will not be bound by the compromise should it acquire additional Direct Lender claims and interests in the future.

VIII.    BREACH OF THE LOAN SERVICING AGREEMENTS EXCUSES
         PERFORMANCE BY THE DIRECT LENDERS AS COUNTERPARTIES

 "A material breach by one party to a contract may excuse further performance by another party to the contract. See *Young Elec. Sign Co. v. Fohrman,* 86 Nev. 185, 466 P.2d 846, 847 (1970).  '[T]he party who commits the first breach of a contract cannot maintain an action against the other for a subsequent failure to perform.' *Bradley v. Nev.-Cal.-Or. Ry.,* 42 Nev. 411, 178 P. 906, 908-09 (1919)."

1    *Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby,* LLP, 440 F.Supp.2d 1184, (D. Nev. 2006).  It

2    is DACA's position that if the Loan Servicing Agreements are assigned to Compass Partners all

3    defenses of the Direct Lenders based on any breach by the Debtors (including but not limited to the

4    breach occurring by operation of law upon rejection), including the defense of excuse of performance,

5    are preserved.

6    IX.    <u>CONCLUSION</u>

7         The Loan Servicing Agreements are clearly executory contracts.  They impose upon Direct

8    Lenders a continuing obligation to sell their Loan interests to the servicer upon demand, and to front the

9    costs of foreclosure litigation.  As executory contracts, they cannot be assigned (i.e., sold), without first

10   being assumed.  Assumption in this case requires among other things that all Unremitted Principal

11   Claims be paid in full.

12        Regardless of whether the Loan Servicing Agreements may be sold without being assumed, there

13   is no legal basis for assigning them "free and clear" of the contract rights of the Direct Lenders as

14   counterparties.  Under Nevada Law, the Debtors' breach of these contracts excuses the Direct Lenders

15   from further performance, including performance of the contractual obligation to sell their interests to

16   the Loan Servicers upon demand.

18   DATE: December 11, 2006                    KIRBY & McGUINN, A P.C.

20                                            By:_/s/_____
                                             Dean T. Kirby, Jr. Attorneys for
21                                           Debt Acquisition Company of America V