1 | ALAN R. SMITH, ESQ.
Nevada Bar No. 1449
2 | KEVIN A. DARBY, ESQ.
Nevada Bar No. 7670
3 | Law Offices of Alan R. Smith
505 Ridge Street
4 | Reno, Nevada 89501
Telephone (775) 786-4579
5 | Facsimile (775) 786-3066
*Email: mail@asmithlaw.com*
6 |
*Attorney for* The Lenders Protection
7 | Group

> ELECTRONICALLY FILED - December 11, 2006

8 |            UNITED STATES BANKRUPTCY COURT

9 |                DISTRICT OF NEVADA

10 |                   —ooOoo—

11 |

| | |
|---|---|
| In Re:<br>USA COMMERCIAL MORTGAGE<br>COMPANY,<br>      Debtor.<br>_____/ | Case Nos.:<br>BK-S-06-10725-LBR<br>BK-S-06-10726-LBR<br>BK-S-06-10727-LBR<br>BK-S-06-10728-LBR<br>BK-S-06-10729-LBR |
| In Re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>      Debtor.<br>_____/ | JOINTLY ADMINISTERED<br>Chapter 11 |
| In Re:<br>USA CAPITAL DIVERSIFIED TRUST<br>DEED FUND, LLC,<br>      Debtor.<br>_____/ | Hearing Date:    December 19, 2006<br>Hearing Time:    10:00 a.m. |
| In re:<br>USA CAPITAL FIRST TRUST DEED<br>FUND, LLC,<br>      Debtor.<br>_____/ | **OBJECTION TO CONFIRMATION OF DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION AS IT APPLIES TO DEBTOR USA COMMERCIAL MORTGAGE COMPANY** |
| In re:<br>USA SECURITIES, LLC,<br>      Debtor.<br>_____/ | |
| Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA Capital First Trust Deed Fund, LLC<br>☐ USA Securities, LLC | |

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd

The Lenders Protection Group, as identified on the *Statement Of The Law Offices Of Alan R. Smith Pursuant To Bankruptcy Rule 2019* filed herein on December 6, 2006, and as supplemented thereafter ("LPG"), through its counsel, Alan R. Smith, Esq., hereby object to confirmation of Debtors' Third Amended Joint Chapter 11 Plan Of Reorganization (the "Plan"). This objection is based on the following points and authorities, the pleadings and papers on file in these cases, and any or all arguments that may be presented at the plan confirmation hearing.

## I.

## INTRODUCTION

The Plan of USA Commercial Mortgage Company ("USACM") presently before this Court is indisputably unconfirmable as a matter of law. As fully discussed and supported by controlling law, below, this Court cannot confirm the proposed Plan for the following insurmountable reasons:

1.     The Plan violates controlling Ninth Circuit case law by attempting to take lenders' property interests through plan confirmation, which is an improper and invalid circumvention of the requirements of Fed. R. Bankr. Proc., Rule 7001;

2.     The Plan is not feasible because USACM's improper attempt to recover property through a non-consensual "compromise" and plan confirmation will have no preclusive (i.e. res judicata) effect and, therefore, will leave USACM vulnerable to literally hundreds of lawsuits;

3.     The Plan improperly, yet ineffectively, attempts to foreclose lenders' setoff rights without due process;

4.     The Plan improperly classifies and treats creditors by failing to create separate secured creditor classes for creditors with setoff rights on account of both: (a) receiving allegedly improper prepaid interest; and (b) having their principal amount of certain investments stolen;

5.     The Plan attempts to assume and assign executory contracts (the Loan Servicing Agreements) without complying with the provisions of 11 U.S.C. § 365(b)(1), which establishes prerequisites to the assumption and assignment of executory contracts;

6.     The integrity of the voting process has been compromised by false and misleading communications from the Debtors to creditors, which wrongfully inform lenders they

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd          - 2 -

1    have no right to vote on the Plan;

2           7.     The proposed Plan attempts to recover service fees in excess of those allowed

3    under the Loan Servicing Agreements; and

4           8.     The Plan fails to pursue valuable assets, namely valuable claims for breach

5    of contract, conversion and breach of fiduciary duties.

6    **II.**

7    **OBJECTION ONLY AS TO PLAN OF USACM**

8        LPG only objects to confirmation of the Plan of USACM. LPG has no specific objections

9    to the confirmation of the Plan of other Debtors, unless this Court determines the Plans are

10    interdependent.

11    **III.**

12    **TIMING OF THE LPG'S EFFORTS**

13        The LPG is sensitive to this Court's concerns regarding the timing of its involvement in this

14    case. However, until recent drastic amendments to the Debtors' proposed Plan were revealed, the

15    LPG could not have possibly known that the plan ultimately presented for confirmation would so

16    blatantly violate lenders' due process rights. While hindsight is certainly 20/20, it is important for

17    this Court to understand the journey of the lenders in this bankruptcy case, and the flow of

18    information to them, in order to appreciate the timing of the LPG's involvement.

19        The instant cases are indisputably complicated, even for seasoned bankruptcy professionals.

20    Thus, there should be some level of sensitivity toward lenders, such as the LPG, who, after being

21    blind-sided by the news that their investments had been compromised and/or stolen, found

22    themselves entrenched in the unique and complicated world of bankruptcy. While LPG members

23    have observed the process from the outside, they were not privy to, nor involved in, the behind the

24    scenes negotiations of the plan as required by applicable confidentiality agreements. Thus, lenders

25    usually learned of action in the case when pleadings hit the docket in this matter.

26    ///

27    ///

28    ///

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd - 3 -

A.    **August 24, 2006 - Order On Debtors' Hold Funds Motion**

A review of relevant pleadings tracks the steady, yet subtle, deterioration of lenders' due process rights, particularly with regard to USACM's retention of certain segregated payments due to lenders. Specifically, on August 24, 2006 (Docket # 1184), this Court entered an Order, which first addressed the lenders' rights to those segregated funds. Pursuant to that Order, USACM was authorized to retain and segregate certain pre- and post-petition payments from borrowers on performing loans (the "Prepaid Interest"). The amount of the Prepaid Interest is intended to represent pre-petition payments allegedly made by USACM to lenders on non-performing loans. While the August 24th Order authorized USACM to retain and segregate the Prepaid Interest, it expressly preserved lenders' due process rights by requiring further order of the Court prior to USACM's disbursement or use of the Prepaid Interest. Thus, as of at least August 24, 2006, the LPG had every reason to believe they would be afforded due process and would be able to defend against USACM attempted taking of the Prepaid Interest.

B.    **September 15, 2006 - Debtors' Joint Plan Of Reorganization**

On September 15, 2006, the Debtors filed the Debtors' Joint Plan Of Reorganization (the "Original Plan") (Docket # 1310), which only confirmed the LPG's understanding that their due process rights were being preserved. Specifically, Section 6.4 of the Original Plan required the Debtors to initiate dispositive proceedings to determine their right to retain and use the Prepaid Interest. In addition, if the Debtors did not initiate such an action, the Original Plan expressly preserved the rights of lenders to initiate an adversary proceeding to determine their right to Prepaid Interest.[1] *See Original Plan*, § 6.4. Thus, as of at least September 15, 2006, the LPG still had every reason to believe they would be afforded due process and would be able to defend against USACM's attempted taking of the Prepaid Interest.

---

[1] As fully detailed in Section III, below, controlling law preserves the lenders rights to commence such an adversary proceeding irrespective of whether the Plan preserves that right. Specifically, confirmation of a plan has no preclusive effect on matters that must be raised through an adversary proceeding. *In re Enwally,* 368 F.3d 1165, 1173 (9th Cir. 2004). Thus, as currently drafted, the Plan potentially subjects the Debtors to hundreds of post-confirmation lawsuits by lenders.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd        - 4 -

**C.    October 18, 2006 - Debtors' First Amended Joint Plan Of Reorganization**

On October 18, 2006, the systematic deterioration of lenders' due process rights began to be revealed with the filing of Debtors' First Amended Joint Plan Of Reorganization ("First Amended Plan")(Docket # 1576). Rather than following the Original Plan's approach of <u>requiring</u> the Debtors to initiate separate proceedings to determine rights to Prepaid Interest, the First Amended Plan merely gave the Debtors the <u>option</u> to do so. *See First Amended Plan*, § 6.4(a). As an alternative, the First Amended Plan proposed to use plan confirmation as the dispositive proceeding to determine rights to the Prepaid Interest. *Id.* The First Amended Plan continued to preserve lenders rights to commence an adversary proceeding to recover Prepaid Interest and provided for reserve funds to pay any successful claims. *Id.,* at §§6.4(b) & (c). However, in the event neither the Debtor, nor a lender, commenced a proceeding to determine rights to the Prepaid Interest, the First Amended Plan declared the Prepaid Interest to be property of the estate. Again, as of October 18, 2006, the LPG still had every reason to believe they would, at a minimum, be afforded due process with the opportunity to defend against USACM's taking the Prepaid Interest.

**D.    November 6, 2006 - Debtors' Second Amended Joint Plan Of Reorganization**

On November 6, 2006, the Debtors finally revealed their true intent with respect to Prepaid Interest, through the filing of Debtors' Second Amended Joint Plan Of Reorganization ("Second Amended Plan")(Docket # 1741). The Second Amended Plan took a significant departure from the preservation of due process rights contained in prior plans. Under the Second Amended Plan, the Prepaid Interest is simply declared to be property of the Debtors, with no due process afforded to lenders. *See Second Amended Plan,* § IV.E.1.D. The Second Amended Plan neither required the Debtors to initiate a separate proceeding, nor did it preserve the right for lenders to initiate adversary proceedings to assert claims to Prepaid Interest.

The Second Amended Plan was not widely circulated. Instead, on November 15, 2006, the Debtor's Third Amended Joint Plan Of Reorganization (i.e. the "Plan," as defined above) was filed and distributed thereafter.

November 6, 2006, was the first possible time the LPG and other lenders could have learned there would be no separate proceeding to determine rights to the Prepaid Interest and that the Prepaid

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd       - 5 -

1  Interest would simply be taken by the Debtors through their Plan. In reality, LPG members did not

2  learn of the relevant Plan provisions until after November 15, 2006, when the Plan as circulated.

3  Upon learning how they would be treated by the Plan, members of LPG promptly scheduled a

4  meeting with the LPG's present counsel for November 15, 2006, and ultimately retained counsel

5  shortly thereafter. Given these facts and circumstances, the LPG's efforts are timely and reasonable.

6        Also, this Court has commented that LPG member Donna Cangelosi has been present at most

7  of the hearings in this case, has been involved in the reorganization and, therefore, her opposition

8  could have been raised earlier. While Ms. Cangelosi may have been present at hearings, she was not

9  privy to the confidential negotiations that led to the various plans. In fact, the first time she learned

10  about the terms of the reorganization was when the various plans were filed, as stated above. In all,

11  this case has moved very rapidly since filing the Second Amended Plan, with the Court even

12  shortening time for the confirmation hearing, thus leaving the lenders even less time to carefully

13  consider the Second Amended Plan.

14  **III.**

15  **LEGAL ARGUMENT**

16        11 U.S.C. § 1129(a) provides that the bankruptcy court shall confirm a plan only if the plan

17  complies with applicable provisions the Bankruptcy Code. As shown below, the Plan at bar cannot

18  be confirmed because it violates several provision of the Code, as well as lenders' fundamental right

19  to due process, as guaranteed by the Fifth Amendment of the Constitution.

20  **A.**    **The Plan Cannot Be Confirmed Because It Impermissibly Attempts To Recover Alleged**

21      **Property Of The Estate Without Commencing An Adversary Proceeding**

22      1.    **An Adversary Proceeding Is Required In Order To Take Prepaid Interest From**

23          **Lenders**

24        A plan is proposed in bad faith under 11 U.S.C. § 1129(c) when it attempts to accomplish

25  a result inconsistent with the Bankruptcy Code or applicable law. *In re Jorgensen,* 66 B.R. 104, 109

26  (B.A.P. 9th Cir. 1986) (A plan is proposed in bad faith under 11 U.S.C. § 1129 when it attempts to

27  accomplish a result inconsistent with the Bankruptcy Code or applicable law.). A plan proposed in

28  bad faith cannot be confirmed. 11 U.S.C. § 1129(a)(3).

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd

- 6 -

1   Pursuant to Fed. R. Bank. Proc., Rule 7001, the initiation of an adversary proceeding is required to

2   determine an interest in property.   It is well settled within the Ninth Circuit that if an adversary

3   proceeding is required under Rule 7001, it is **a mandatory prerequisite and a plan of**

4   **reorganization cannot be used to circumvent Rule 7001**. *See, e.g. In re Commercial Western*

5   *Finance Corp.,* 761 F.2d 1329 (9th Cir. 1985). The use of an adversary proceeding under Rule 7001

6   is required because it affords due process to the parties involved, as guaranteed by the Fifth

7   Amendment. *In re Colortran, Inc.,* 218 B.R. 507, 510 (B.A.P. 9th Cir. 1997).

8       In *Commercial Western,* the Ninth Circuit addressed facts and plan provisions strikingly

9   similar to the case and Plan at bar. There, the Chapter 11 trustee attempted to avoid the debtor's

10  partial assignment of notes and deeds of trust under § 548 through a plan of reorganization.

11  Specifically, rather than initiating an adversary proceeding, the *Commercial Western* trustee sought

12  to avoid the assignee's interests through a so-called "compromise" contained in a Chapter 11 plan.

13  *Id.,* at 1331-32. Out of approximately 333 investors, 7 filed written objections to the plan, and 84

14  voted to accept it. *Id.* at 1332. The bankruptcy court confirmed the plan and the district court

15  affirmed.

16      On appeal to the Ninth Circuit, the court invalidated the trustee's attempt to avoid the

17  debtor's allegedly fraudulent transfers through plan confirmation and reversed the order confirming

18  the plan. *Commercial Western,* 761 F.2d at 1339. In doing so, the Ninth Circuit held that the

19  trustee's actions contravened Rule 7001, emphasizing that a trustee's initiation of an adversary

20  proceeding was a prerequisite to a legitimate exercise of its avoidance powers. *Id.* at 1337-38. The

21  *Commercial Western* court found it to be even more problematic that "in trying to avoid investors'

22  property interests by the court's approval of the plan, the trustee sought to place on the investors the

23  burden of challenging the trustee's ability to avoid their interests by requiring them to object to the

24  plan." *Commercial Western,* at 1337. The court found that such a scheme improperly circumvents

25  a trustee or debtor in possession's duty to prove they are entitled to relief. *Id.* Simply put, if a debtor

26  wants the benefit of avoiding allegedly improper payments, it must carry the burden of following the

27  mandated procedures of Rule 7001. *Id.* at 1338.

28      The principles articulated by the Ninth Circuit in *Commercial Western* are hardly novel. The

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd          - 7 -

1    Ninth Circuit addressed the same issue a year after *Commercial Western* in *Golden Plan of*

2    *California*, cited above.  There, the trustee attempted to recover allegedly fraudulent payments

3    through a noticed motion, not an adversary proceeding.  *Golden Plan of California*, 829 F.2d at 711.

4    The Ninth Circuit again invalidated such action as in violation of Rule 7001.  *Id.*  Relying on

5    *Commercial Western,* the court held the "trustee's failure to *initiate* adversary proceedings imposed

6    on investors the burden of challenging his actions and thus contravened Rule 7001." *Id.* at 712.

7          The Plan at bar seeks to accomplish exactly what was invalidated and prohibited in

8    *Commercial Western* and *Golden Plan of California*.    Specifically, through a so-called

9    "compromise", the Plan proposes to simply declare the Prepaid Interest to be property of USACM.

10   *See Plan,* § IV.E.1.D.  Such a scheme has been expressly invalidated by the Ninth Circuit as

11   improperly circumventing Rule 7001 and violating fundamental due process.  The Debtors cannot

12   take investors'/lenders' property, in this case the Prepaid Interest, without each lender's consent or

13   through an adversary proceeding under Rule 7001.  Without an adversary proceeding under Rule

14   7001, lenders will be deprived of the opportunity to assert their claims to the Prepaid Interest, their

15   defenses to USACM taking such property and will certainly be deprived full due process.

16         In fact, it is not even clear under what theory the Debtors' claim a right to the Prepaid

17   Interest. This is exactly why notions of due process require USACM to commence an adversary and

18   bear the burden of proving its case.  Unless lenders are required to follow procedure by asserting

19   their clams through a well pled complaint, it is nearly impossible for lenders to intelligibly assert

20   their defenses.

21         Additionally, the lenders who received allegedly improper Prepaid Interest are not creditors

22   of USACM as to the prepaid interest and, therefore, the Chapter 11 plan cannot alter their rights.

23   *See* 11 U.S.C. § 1123.  As presently proposed, the Plan cannot be confirmed.

24         2.    The Provisions Of NRS 645B.250 Are Not Relevant In This Bankruptcy Case

25         The LPG acknowledges that NRS 645B.250 provides in pertinent part:

26             ...a mortgage broker or mortgage agent shall not advance payments to an investor on
             behalf of a person who has obtained a loan secured by a lien on real property and
27             who has defaulted in his payments.

28   However, NRS.645B.250 places no liability on an investor who receives payments on a loan in

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd          - 8 -

1  default. NRS 645B.250 governs mortgage agents and prohibits them from making certain payments.

2  NRS 645B.250 is enforced by the Nevada Attorney General's Office, which has "primary

3  jurisdiction for the enforcement" of NRS Chapter 645B.    NRS 645B.800(1).    The primary

4  enforcement mechanism for Chapter 645B is criminal prosecution. *See* NRS 645B.950 ("a person...

5  who violates any provision of this chapter is guilty of a misdemeanor.")  While NRS 645B.810(1)

6  authorizes the attorney general to bring a civil action against a mortgage agent to recovery

7  administrative fines and the costs of investigation and prosecution, **there is no provision in Chapter**

8  **645B that provides for a private cause of action against lenders who receive payments on loans**

9  **in default.**

10        As NRS 645B.250 is primarily a criminal provision governing mortgage agents, which is

11  exclusively enforced by the Nevada Attorney General, it provides no recovery mechanism for the

12  Prepaid Interest against lenders.

13        3.    The Plan Cannot Effectuate A Global Settlement Unless All Parties Consent To The

14            Settlement

15        The Plan attempts to recover the Prepaid Interest through a non-consensual "compromise."

16  *See, Plan,* § IV.E.1.D.  Not only was such a mechanism expressly invalidated in *Commercial*

17  *Western* as in improper circumvention of Rule 7001, it also has absolutely no legal or binding effect

18  on the individual lenders.  The LPG understands the so-called "compromise" was negotiated by the

19  Committees in this case.  However, those Committees have no power or authority to bind their

20  constituents. *In re Donlevy's Inc.,* 111 B.R. 1, 5 (Bankr. D. Mass. 1990); 7 Alan N. Resnick, et al.

21  *1103 Collier on Bankruptcy 15th Edition p. 1103.05* (2006). The Committees cannot settle on behalf

22  of their constituents, nor can their constituents be bound to give up any property under the Plan

23  unless each individually agrees. Specifically, Prepaid Interest cannot be taken without the agreement

24  of each lender whose rights are affected.   To the extent the Plan proposes to force settlement on

25  parties without their consent, it is not proposed in good faith and cannot be confirmed. Furthermore,

26  confirmation of the Plan cannot force the non-consenting lenders to give up their Prepaid Interest.

27  A plan can bind a class of creditors with regard to treatment of their claims if the requisite vote is

28  obtained, but it cannot deprive non-consenting parties of their property rights merely because the

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd          - 9 -

1    Plan is confirmed.

2  **B.**  **The Plan Is Not Feasible Because USACM's Attempt To Recover Prepaid Interest**

3       **Without An Adversary Proceeding Will Have No Preclusive Effect On A Lender's Right**

4       **To Sue To Recover Prepaid Interest**

5          Under § 1129(a)(11), in order to confirm the Plan, the Court must find that it is feasible and

6  confirmation is not likely to be followed by liquidation or further financial reorganization of the

7  debtors.  The presently proposed Plan is not feasible because it leaves the Debtors, in particular

8  USACM, vulnerable to literally thousands of lawsuits seeking to recover the Prepaid Interest.  The

9  Ninth Circuit has acknowledged that "[i]f an issue must be raised through an adversary proceeding

10  it is not part of the confirmation process and, unless it is actually litigated, confirmation will have no

11  preclusive effect."  *In re Enwally,* 368 F.3d 1165, 1173 (9th Cir. 2004).  In other words, although

12  confirmed plans are *res judicata* to issues therein, the confirmed plan has no preclusive effect on

13  issues that must be brought by adversary proceeding.  *Id; See also In re Ransom,* 336 B.R. 790

14  (B.A.P. 9th Cir. 2005).

15          As shown above, the Debtors right to Prepaid Interest must be determined through an

16  adversary proceeding.  While the Plan purports to fix the parties' rights to Prepaid Interest, such a

17  determination will have no preclusive effect on those parties.  In other words, upon confirmation, the

18  rights to Prepaid Interest will not be fully and finally litigated.  Thus, lenders will be able to

19  commence independent actions against USACM for the recovery of Prepaid Interest outside of the

20  bankruptcy forum.  Such a result, while likely unintended, certainly renders the plan not feasible and,

21  therefore, not confirmable.

22  **C.**  **Assuming Arguendo That Debtors Have A Valid Claim To The Prepaid Interest,**

23       **Confirmation Of The Plan Will Impermissibly Foreclose Creditors' Setoff Rights**

24       **Without Due Process**

25          Lenders with both Prepaid interest and diverted principal investments have setoff rights that

26  are improperly being foreclosed by the Plan without due process.   As shown below, the Debtors

27  cannot use their Plan to foreclose lenders' setoff rights.

28  ///

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd        - 10 -

1    1.    Numerous Lenders Have Enforceable Setoff Rights

2    Simply stated, setoff "is grounded on the absurdity of making A pay B when B owes A."

3    *Studley v. Boylston National Bank,* 229 U.S. 523, 528 (1913). A creditor's ability to setoff a debt

4    owed to a debtor against a claim the creditor has against the debtor is governed by 11 U.S.C. § 553.

5    Section 553(a) provides:

6    > Except as otherwise provided in this section and in section 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such
7    > creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the
8    > commencement of the case...

9    Section 553 does not create a right to setoff, but merely preserves a creditor's setoff rights under

10    applicable non-bankruptcy law. *In re Luz International, Ltd.,* 219 B.R. 837, 844 (B.A.P. 9th Cir.

11    1998).

12    Setoffs in bankruptcy have been "generally favored," and a presumption in favor of their

13    enforcement exists. *In re De Laurentiis Entertainment Group, Inc.,* 963 F.2d 1269, 1277 (9th Cir.

14    1992). To enforce a right to setoff, a creditor must establish that:

15            (1)    it has a right to setoff under non-bankruptcy law; and

16            (2)    this right should be preserved in bankruptcy under § 553.

17    2.    Lenders Have Setoff Rights Under Nevada Law

18    As explained by the Supreme Court of Nevada, setoff is an equitable remedy that should be

19    granted when justice so requires to prevent inequity. *Aviation Ventures, Inc. v. Joan Morris, Inc.,* 110

20    P.3d 59, 63 (Nev. 2005). Setoff is a form of counterclaim which a defendant may urge by way of

21    defense or to obtain a judgment for whatever balance is due. *Id.* Setoff is a doctrine used to

22    extinguish the mutual indebtedness of parties who each owe a debt to one another. *Id.* In fact, the

23    claims that give rise to a setoff need not arise out of the same transaction; they may be entirely

24    unrelated. *Id.*

25    The Supreme Court of Nevada has held that valid setoff rights exist where each party has a

26    valid and enforceable debt against the other party. *Aviation Ventures,* at 64. While setoff is certainly

27    allowed in a case where both parties are solvent, it is "especially necessary in cases where one party

28    is insolvent to protect the interests of the solvent party." *Id.*

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd        - 11 -

1    Here, assuming USACM has valid claims to the Prepaid Interest, many lenders will have

2    enforceable setoff rights under Nevada law. Those lenders have claims against USACM for principal

3    investments that have been diverted or stolen, breach of contract, breach of fiduciary duty, conversion

4    and others. Thus, under Nevada law, they are permitted to offset their claims in USACM's estate

5    against USACM's claim to Prepaid Interest.

6         3.    Lenders' Setoff Rights Should Be Preserved Under § 553

7    In determining whether the right to setoff should be preserved in bankruptcy under § 553, the

8    party asserting setoff must demonstrate the following:

9              (1)    the debtor owes the creditor a prepetition debt;

10             (2)    the creditor owes the debtor a prepetition debt; and

11             (3)    the debts are mutual.

12    *Luz,* 219 B.R. at 843.

13    It is assumed solely for the sake of this argument that USACM has a valid prepetition claim

14    to the Prepaid Interest. It appears to be undisputed by the Debtors that certain lenders have valid pre-

15    petition claims for diverted/stolen principal investments. Thus, the first two elements are satisfied.

16    With regard to the mutual debt requirement, the Ninth Circuit has set forth a three-prong test

17    for determining the mutuality of debts. These factors are:

18             (1)    the debts must be in the same right;

19             (2)    the debts must be between the same individuals; and

20             (3)    those individuals must stand in the same capacity.

21    *In re Visiting Home Servs., Inc.,* 643 F.2d 1356, 1360 (9th Cir. 1981).

22    In order for debts to "be in the same right" they must both be prepetition debts. *Luz,* 219 B.R.

23    at 845. Here, USACM's alleged right to Prepaid Interest, and lenders claims for diverted/stolen

24    principal, arose pre-petition. Therefore, the debts are in the same right.

25    The second prong is likewise satisfied as all relevant debts are between the same parties (i.e.

26    USACM and each individual lender). USACM and the individual lender also each acted in the same

27    capacity in connection with each debt.

28    As all required elements to setoff are satisfied here, lenders setoff rights should certainly be

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd    - 12 -

1    preserved in bankruptcy.  Foreclosing those rights, as presently proposed by the Plan, will cause

2    significant harm to lenders with set of rights.  This is exactly why an adversary proceeding must be

3    used to recover Prepaid Interest – so lenders fan raise setoff and other defenses.

4         The LPG anticipates that Plan proponents will argue setoff is inapplicable because the Prepaid

5    Interest amounts to a fraudulent conveyance.  The LPB does not believe there is any such hard and

6    fast rule applicable to this case, which would support such a theory.  *See In re United Energy Corp.,*

7    944 F.2d 589 (9th Cir. 1991).  *United Energy* involved a Ponzi scheme.  The debtor corporation had

8    made payments to certain investors, who believed that the payments represented returns on

9    investments in solar energy equipment.  *United Energy,* at 590-91.  In reality, the payments were

10   disbursed in order to make the business venture appear to be a success and attract new investors.  *Id.*

11   After the debtor filed its bankruptcy petition, the trustee sought to avoid the payments has having been

12   made for less than reasonably equivalent value (i.e. as fraudulent transfers).  *Id.* at 591.  The Ninth

13   Circuit held that the investors had acquired claims for rescission and restitution when they made their

14   initial investments.  *Id.*  Thus, the court held the payments that the investor received were made for

15   reasonably equivalent  value because they partially satisfied the restitution claims; therefore, the

16   claims were not avoidable.  *Id.* at 593.  In other words, the payments were not fraudulent transfers.

17   *Id.* at 597.

18        Also on appeal to the Ninth Circuit, the *United Energy* trustee argued that by allowing

19   investors to retain the payments the Court would be sanctioning an impermissible offset of a

20   fraudulent conveyance.  *United Energy,* at 597.  The Ninth Circuit found this assertion to be

21   "misleading as it places the proverbial cart before the horse by assuming the conclusion." *Id.*  As the

22   court concluded the payments to investors were not fraudulent transfers, there was necessarily no

23   permissible offset.  *Id.*

24        In the present case, as in *United Energy,* the transfers of Prepaid Interest cannot be fraudulent

25   transfers because lenders may argue the payments satisfied the repayment of their diverted principal,

26   restitution for misuse of investor funds in creating loans, and other claims.  If this issue was properly

27   brought before the Court through an adversary proceeding, these issues could be fully adjudicated

28   through presentation of the evidence and full briefing of the legal issues.  At present, any discussion

1 on such issues is in large part speculative guesswork, which undermines fundamental notions of due

2 process.

3       4.    <u>USACM Cannot Foreclose Lenders' Setoff Rights Through Their Plan</u>

4      The Ninth Circuit has found that § 553 must take precedence over § 1141.[2] *DeLaurentiis,* 963

5 F.2d at 1276.  In doing so, the court explained that a contrary conclusion essentially would nullify §

6 553. *Id.*  at 1277.  If § 1141 were to take precedence over § 553, setoffs would be allowed under

7 Chapter 11 only where they were expressly allowed in a plan of reorganization. *Id.*

8      Acknowledging the inequities of foreclosing setoff rights through a plan, the Ninth Circuit

9 explained absent a setoff, a creditor with setoff rights is in the worst of both worlds: it must pay its

10 debt to the debtor in full, but is only entitled to receive a tiny fraction of the money the debtor owes

11 it. *DeLaurentiis,* at 1277.  It was to avoid this unfairness to creditors that setoffs were allowed in

12 bankruptcy in the first place. *Id.*

13      The Plan at bar proposes to effectuate the exact form of inequitable treatment criticized by the

14 *DeLaurentiis* Court.  Under the Plan, USACM attempts to take 100% of its alleged claim against

15 lenders in the form of Prepaid Interest, while requiring the lenders to then "go to the back of the line"

16 and receive between 8% and 35% of their claim against USACM.. *See First Amended Disclosure*

17 *Statement,* p. 5.  The Plan also attempts to foreclose lenders setoff rights to servicing fees holdbacks

18 and future servicing fees. *Plan,* IV.E.1.(f)&(g).

19      For illustrative example, the Court should consider a hypothetical lender that received

20 allegedly improper pre-petition prepaid interest payments totaling $100,000, but had $200,000 in a

21 principal investment diverted/stolen.  That lender should be able to offset the USACM claim of

22 $100,000 against his claim against USACM's estate of $200,000.  As a result, that lender would

23 receive the return of his representative contribution to Prepaid Interest (i.e. $100,000) and be left with

24 a $100,000 claim against the estate, which, in the worst case scenario, is projected to be paid at

25

26

27   [2]    While § 553 preserves setoff rights, § 1141 makes the provisions of a confirmed plan binding on all creditors.

28

1   approximately $0.08 on the dollar. Thus, the creditor would receive his $100,000 back from Prepaid

2   Interest, in addition to approximately $8,000 on his general unsecured claim ($100,000 x .08 =

3   $8,000), for a total of $108,000.

4        As currently drafted, the Plan simply takes the $100,000 contributed to the Prepaid Interest

5   fund, while the lender is left receiving approximately $0.08 on the dollar for his $200,000 claim. In

6   other words, the Plan proposes to pay this hypothetical investor only $16,000 total for his claim

7   ($200,000 x .08 = $16,000).

8        The difference between receiving $108,000 and $16,000 is certainly significant. Valid setoff

9   rights which would entitle a lender to drastically improve his position should not be foreclosed,

10  particularly without a full and fair opportunity for lenders to litigate their set off rights. Indeed, this

11  Court's August 24, 2006 Order contemplated "any final determination with respect to any

12  distributions and any offsets related thereto, including any factual findings and legal ruling, shall be

13  made upon appropriate notice and in such additional proceedings as to be determined by the Court."

14  *See, August 24, 2006 Order,* ¶ 5. There has been no such additional proceeding, nor has this Court

15  determined what additional proceedings may be necessary. The only "additional proceeding" is the

16  Plan, which, as stated above, cannot by itself accomplish a taking of property. As held by the Ninth

17  Circuit in *DeLaurentiis,* the lenders' right to setoff trumps the binding effect of the Plan. For these

18  reasons, the Plan, and in particular its foreclosure of lenders' setoff rights, cannot be confirmed.

19  **D.**   **The Plan Must Establish Separate Classes For Creditors Who Have Both Diverted**

20       **Principal And Who Have Received Allegedly Improper Prepaid Interest In Order To**

21       **Properly Preserve Their Setoff Rights, Which Are Secured Claims Under 11 U.S.C. §**

22       **506(a)**

23       Proper classification of claims under 11 U.S.C. § 1122 is crucial to confirmation of a chapter

24  11 plan. Section 1129(a)(1) provides that the court may confirm a plan only if the plan complies with

25  the applicable provisions of chapter 11. Under §1122(a), claim or interest may be included in a

26  particular class only if it is "substantially similar" to other claims and interests of such class. In

27  determining whether claims are substantially similar, only the nature of the claim or interest is

28  relevant, not the identity of the holder of the claim or interest. *See, e.g., In re Coram Healthcare,*

1  *Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004).

2      Here, the claims of lenders with both Prepaid Interest and claims for diverted/stolen principal

3  are not similar to any other claim and must be in their own class.  Specifically, these are the lenders

4  with setoff rights, discussed above.  The unique nature of the lenders' setoff rights demands that they

5  be treated differently than those without setoff rights.  Indeed, **setoff rights are treated as secured**

6  **claims under the Bankruptcy Code**.  *See* 11 U.S.C. §506(a).  Specifically, §506(a) provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, **or that is subject to setoff under section 553 of this title,** is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim.  Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

12  (*Emphasis added.*).  The legislative history shows appreciation for the similarity of liens and setoffs,

13  which led to the merging of the two as secured claims under the Bankruptcy Code:

> [T]he analogy between a deposit or debt that may be offset and a security interest is not complete.  Nevertheless, it is adequate to justify giving an offsetting creditor the same protection as the bill gives secured creditors generally.

16  H.R. No. 595, 95th Cong., 2d Sess. 184 (1978), *reprinted in* 1978 U.S.C.C.A.N. 6146.

17      Moreover, lenders who have been stayed from exercising a valid setoff right are entitled to

18  "adequate protection" to protect against diminution in the value of their interest in Prepaid Interest.

19  *In re Mason*, 79 B.R. 786, 788 (Bankr. N.D. Ill. 1987).  As explained in the legislative history:

> The premise behind the adequate protection treatment of mutual debts and credits is that an amount that may be offset is tantamount to a security interest for the benefit of the creditor. The adequate protection provision follows the adequate protection given to other secured creditors.

23  H.R. Rep. No. 595, 95th Cong., 1st Sess. 185 (1978), *reprinted in* App. Pt. 4(d)(i).  In the absence of

24  adequate protection, the creditor is entitled to relief from the automatic stay to exercise the creditor's

25  setoff right. 11 U.S.C. § 362(d).  In this regard, members of LPG have filed a motion seeking relief

26  from the stay.

27      With regard to the Plan, it cannot be confirmed without establishing separate classes of

28  secured creditors holding setoff rights and treating those secured creditors in accordance with the

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd         - 16 -

1  Bankruptcy Code.

2  **E.**    **The Plan Improperly Attempts To Assume And Assign The Loan Servicing Agreements**

3        **Without Curing Their Defaults And Providing Adequate Assurances Of Future**

4        **Performance**

5        The Plan proposes to transfer USACM's Loan Servicing Agreements through a so-called asset

6  sale. *See Plan,* Art. IV.C. However, because the Loan Servicing Agreements are executory contracts,

7  USACM must comply with 11 U.S.C. § 365, which governs the assumption of executory contracts,

8  prior to assigning the Loan Servicing Agreements.

9        A contract is executory under § 365 when performance is due to some extent on both sides;

10  in executory contracts, obligations of parties are so far unperformed that failure of either party to

11  complete performance would constitute material breach and thus excuse performance of the other.

12  *In re Texscan Corp.* 976 F.2d 1269 (9th Cir. 1992).  Here, the Loan Servicing Agreement were

13  certainly executory, as USACM still had the obligation to service loans, and lenders arguably had the

14  remaining obligation of paying fees to USACM.  In fact, even the Committee formed to protect

15  parties with rights under Loan Servicing Agreements has been appropriately named the OFFICIAL

16  COMMITTEE OF **EXECUTORY CONTRACT** HOLDERS OF USA COMMERCIAL

17  MORTGAGE COMPANY.

18        Pursuant to 11 U.S.C. § 365(b)(1), an executory contract that is in default cannot be assumed

19  and assigned, unless, at the time of assumption, the Debtor:

20                (A)    cures, or provides adequate assurances that it will promptly cure such

21                        default;

22                (B)    compensates, or provides adequate assurances that it will promptly

23                        compensate, a party other than the debtor to such contract for any

24                        actual pecuniary loss to such party resulting from such default; and

25                (C)    provides adequate assurance of future performance under the contract.

26        The executory Loan Servicing Agreements were in default on the petition date in this case,

27  because, among other things, USACM was not taking required action to collect on defaulting loans,

28  had diverted principal payments on various loans, and had misinterpreted the status of the loans..

1       The Plan fails to acknowledge the executory nature of the Loan Servicing Agreements.  In

2 addition, the Loan Servicing Agreements are not listed on the Schedule of Executory Contracts, filed

3 herein on November 29, 2006 (Docket # 1886).   Instead, it appears the Plan proposes to merely

4 assign the Loan Servicing Agreements, without first assuming them and satisfying all prerequisites

5 to assumption under § 365(b)(1).  *See Plan,* Art. IV.C.  USACM has not cured the defaults under the

6 Loan Servicing Agreements and has not even attempted to supply lenders adequate assurance of

7 future performance.   Thus, absent the consent of lenders or satisfaction of § 365(b), the proposed

8 transfer of the Loan Servicing Agreements is wholly improper under the Bankruptcy Code.

9       Moreover, even if USACM is allowed to assign the executory Loan Servicing Agreements

10 without first curing defaults, the assignee of the Agreements must take the Loan Servicing

11 Agreements subject to existing rights and defaults.  The Plan is not clear that the purchaser is subject

12 to existing defaults.  *See Plan,* IV.C (p. 47, ll. 10-19).

13       The LPG certainly acknowledges that someone must service the loans and appreciates the

14 interest of the Compass Group.  However, the LPG must preserve their right to have some say so in

15 who services their loans and must preserve any existing claims for default it has under the Loan

16 Servicing Agreements.

17       The Plan, which attempts to assume and assign the executory Loan Servicing Agreements,

18 without curing defaults, is not proposed in good faith and cannot be confirmed.

19 **F.**    **The Plan Attempts To Recover Service Fees In Excess Of Those Allowed By The Loan**

20      **Servicing Agreements**

21       Pursuant to this Court's August 24, 2006 Order, discussed in Section II, above, the Debtors

22 are holding a total of 3% of certain pre and post-petition payments from borrowers on performing

23 loans as servicing fees under the Loan Servicing Agreements (the "Servicing Fees Holdback").  The

24 Segregated Servicing Holdback represent: (a) 1% servicing fees under the Loan Servicing Agreement;

25 and (b) an additional 2% of principal on all loans that were paid off post petition, such that the

26 servicing fees on such loans is 3%.  August 24, 2006, Order, ¶ 2(a)&(b).  The August 24th Order

27 further preserved all parties rights and legal interests to such funds, pending further Court order. Id.,

28 at ¶ 3. The Order further contemplated "any final determination with respect to any distributions and

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd          - 18 -

1  any offsets related thereto, including any factual findings and legal ruling, shall be made upon

2  appropriate notice and in such additional proceedings as to be determined by the Court." Id., at ¶ 5.

3  The Plan proposes to take a maximum of $605,000 of the Servicing Fees Holdback and use it to pay

4  administrative claims.  Plan, IV.E.1.e.  In addition, USACM is to retain as servicing fees the

5  maximum amount allowed under the Servicing Agreements.

6        The proposed retention of servicing fees is contrary to the Loan Servicing Agreements. While

7  USACM is authorized to retain a service fee not to exceed 3% per annum of the maximum principal

8  amount of each loan  under ¶ 5 of the Loan Servicing Agreements, the intent and understanding of

9  the parties has always been that no servicing fees would be charged to lenders.  The relevant provision

10 of the Loan Servicing Agreement is ambiguous in its use of the phrase "one twelfth (1/12th) of its

11 annual servicing fees, which shall not to exceed 3%."  There is no explanation of "annual servicing

12 fees."  Thus, this Court may go beyond the four corners of the Loan Servicing Agreement to interpret

13 the meaning of "one twelfth (1/12th) of its annual servicing fees, which shall not to exceed 3%."

14 *Ringle v. Bruton,* 86 P.3d 1032, 1037 (Nev. 2004) (Parol evidence is admissible to clarify ambiguous

15 terms in a written agreement.).

16        From the beginning, lenders were informed by USACM that "[t]here are never any fees

17 charged to our investors."  See February 11, 2004, Letter To Ronnie McLemore, attached hereto as

18 Exhibit B.  The course of dealing between USACM and its lenders confirmed as much, as lenders

19 were never charged servicing fees by USACM.  Thus, it is clear from admissible parol evidence that

20 the parties never intended for lenders to be charged 1%, 2% or 3% servicing fees, or other collection

21 fees.

22        The Plan's proposed recovery of the Servicing Fees Holdback is contrary to the Loan

23 Servicing Agreements.  For the same reasons lenders are entitled to full due process as to the

24 USACM's recovery of Prepaid Interest, as discussed above, they are equally entitled to due process

25 to allow them to assert any claims they have to the Servicing Fees Holdback and their defenses to

26 Debtors' recovery of those funds.

27 ///

28 ///

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd          - 19 -

G.      **The Integrity of The Voting Process Has Been Compromised By Misinformation**
        **Disseminated To Creditors, Which Inaccurately Informes Qualified Voters That They**
        **Have No Right To Vote**

11 U.S.C. § 1126(a) states the general rule that the holder of an allowed claim or interest may vote such claim or interest to accept or reject a plan of reorganization in a chapter 11 case. In this case, the integrity of voting process has been compromised by inaccurate and deceptive information that has been sent to creditors, which includes flat out inaccurate notices to creditors informing them they have no right to vote on the Plan.

Enclosed with Cangelosi's ballot, she also received a *"Notice of Non-Voting Status With Respect To Unimpaired Claims Deemed To Accept The Plan"* (the "Notice of Non-Voting Status"), a copy of which is attached hereto as Exhibit A. The Notice of Non-Voting Status provides:

> PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS
> NOTICE BECAUSE UNDER THE TERMS OF ARTICLE II, SECTION C
> OF THE PLAN, YOU ARE A HOLDER OF A CLAIM IN A CLASS
> PRESUMED TO HAVE ACCEPTED THE PLAN AND THEREFORE IN
> ACCORDANCE WITH SECTION 1126(f) OF THE UNITED STATES
> BANKRUPTCY CODE YOU ARE NOT ENTITLED TO VOTE ON HE
> PLAN.

The Notice of Non-Voting Rights sent to Cangelosi (and likely other creditors) is inaccurate and deceptive, as Cangelosi certainly has voting rights under the express provisions of the Plan. In fact, the very section cited by the Notice expressly confirms her right to vote. Specifically, Cangelosi is a holder of both Class A-4 and Class A-5. Pursuant to Article II, Section C(1)(d)(e), holders of Class A-4 and Class A-5 are both impaired and, therefore, both entitled to vote on the Plan. *See Plan*, p. 33, ll. 19-21; p. 34, ll.11-13. Thus, the Notice of Non-Voting Status, in so far as it was sent to Cangelosi and other Class A-4 and Class A-5 creditors, directly contradicts the rights of Class A-4 and Class A-5 under the Plan.

Cangelosi has no way of knowing how many other creditors were misinformed that they had no right to vote on the Plan. However, she respectfully submits that the fact even one creditor was

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd       - 20 -

1  misinformed regarding her voting rights compromises the integrity of the entire process.  The Plan

2  cannot be confirmed until proper assurances are made that all parties with voting rights understand

3  they have a right to vote.

4  **H.**      **The Plan Must Require Pursuit Of Valuable Litigation Claims, Rather Than Merely**

5           **Leaving The Liquidating Trustee The Discretion To Pursue Those Claims**

6            The Plan fails to provide for the recovery of valuable claims of the Debtors, namely claims

7  for conversion and breach of fiduciary duty against the Debtors' former principals.  As debtors-in-

8  possession, the Debtors are bound by a duty of loyalty that includes an obligation to maximize the

9  value of the estate.  See, e.g., 7 Alan N. Resnick, et al. *1107 Collier on Bankruptcy* 15th Edition p.

10  1107.02 (2006).  Courts have held that managers of breach their duty of loyalty by failing to maximize

11  the value of the estate.  *Home Ins* debtors-in-possession . *Co. Of Ill. V. Adco Oil Co.*, 154 F.3d 739,

12  743 (7th Cir. 1998).

13            In the instant matter, the Debtors have proposed a plan that contains no express requirement,

14  or mechanism, for the pursuit of claims against the Debtors' former principals.  Moreover, neither the

15  Plan, nor the Debtors, have taken any action to secure the property of those potentially liable former

16  principals through the recording of lis pendens or the pursuit of prejudgment attachment.  Instead, the

17  Plan leaves those claims for the liquidating trustee, who enjoys considerable discretion whether to

18  even pursue those claims.

19            As currently drafted, the Plan amounts to a breach of the Debtors' fiduciary duties, in

20  particular their duty of loyalty.  Unless the Plan provides for an express mechanism to maximize the

21  value of the estates through pursuit of these valuable claims, it cannot be confirmed.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd          - 21 -

**IV.**

**CONCLUSION**

For the reasons discussed above, the LPG respectfully submits that the Plan presently at bar cannot be confirmed as a matter of law.

DATED this 11th day of December, 2006.

LAW OFFICES OF ALAN R. SMITH

/s/ Alan R. Smith

By_____
ALAN R. SMITH, ESQ.
Attorney for The Lenders Protection Group

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Obj Plan 121106-kad.wpd          - 22 -

# EXHIBIT "A"

## NOTICE OF NON-VOTING STATUS WITH RESPECT TO
## UNIMPAIRED CLAIMS DEEMED TO ACCEPT THE PLAN

**PLEASE TAKE NOTICE** that on November 15, 2006, the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court") approved the above captioned Debtors' Disclosure Statement for Debtors' Third Amended Joint Chapter 11 Plan of Reorganization, dated November 15, 2006 (the "Disclosure Statement") for their Third Amended Joint Chapter 11 Plan of Reorganization (the "Plan") for use by the Debtors in soliciting acceptances or rejections of the Plan from holders of a class of claims or interests that is impaired under the Plan and who are (or may be) entitled to receive distributions under the Plan.

**PLEASE TAKE FURTHER NOTICE** THAT YOU ARE RECEIVING THIS NOTICE BECAUSE UNDER THE TERMS OF ARTICLE II, SECTION C OF THE PLAN, YOU ARE A HOLDER OF A CLAIM IN A CLASS PRESUMED TO HAVE ACCEPTED THE PLAN AND THEREFORE IN ACCORDANCE WITH SECTION 1126(f) OF THE UNITED STATES BANKRUPTCY CODE YOU ARE NOT ENTITLED TO VOTE ON THE PLAN.

**PLEASE TAKE FURTHER NOTICE THAT THE DISCLOSURE STATEMENT, THE PLAN, THE DISCLOSURE STATEMENT ORDER, AND ANY OTHER SOLICITATION PACKAGE MATERIALS ARE AVAILABLE FOR VIEWING BY ACCESSING THE DEBTORS' WEBSITE AT WWW.BMCGROUP.COM/USACMC OR BY CONTACTING THE DEBTORS' SOLICITATION AGENT IN WRITING AT USACMC, C/O BMC GROUP, INC., 1330 E. FRANKLIN AVENUE, EL SEGUNDO, CA 90245, OR VIA EMAIL AT USACMC@BMCGROUP.COM, OR CALLING 888-909-0100.**

**PLEASE TAKE FURTHER NOTICE THAT IF YOU HAVE ANY QUESTIONS ABOUT THE STATUS OF YOUR CLAIM(S), YOU SHOULD CONTACT THE DEBTORS' SOLICITATION AGENT AT THE ADDRESS OR TELEPHONE NUMBER LISTED ABOVE.**

EXHIBIT " A "

# EXHIBIT "B"



Wednesday, February 11, 2004

Ronnie McLemore
307 Wind Ridge
Palestine, TX 75801

Dear Mr. McLemore:

We would like to take this opportunity to introduce our Company and our Trust Deed investment program to you. USA Capital is a private lending firm. We make secured real estate loans to developers and builders throughout the Southwest. Private investors participate in these loans for twelve months while earning interest paid monthly. At the end of the loan term the investor receives their principal investment back. One of our first ventures into the Las Vegas market was to fund twenty million dollars for the phase I construction of the RIO Hotel in 1989. We are a company that originates, underwrites, funds and services short term real estate loans for our clients. The objective of our product is to bring secured, high income, short term returns to our investors. USA Capital has been placing our client's money into trust deed investments since 1989. Not one dollar has ever been lost by a USA investor. We have our own in-house real estate counsel. All USA loans are individually documented and serviced. All of our investors are placed directly on the deed of trust. Our investors are currently enjoying rates between 11% and 13% with interest paid monthly. There are never any fees charged to our investors.

In the last 12 months USA has funded $285 million in trust deed loans on behalf of our clients. The average interest rate earned was 12%. Interest is always paid monthly directly to the investor or deposited to the account of your choice. This program is suitable for individuals, pensions, IRAs, and some institutions use this program to enhance their short term cash management yields.

Typically our investors receive a one page Trust Deed Investment sheet each time a loan is available. Enclosed are loan summary sheets of investments we currently have available for participation. If you have an interest in participating in any particular loan, all you need to do is call us. Our minimum participation is $50,000. Thank you.

Sincerely,

Paul Hamilton
Managing Director
USA Capital

Phill Dickinson
Vice President-Investments
USA Capital

EXHIBIT " _B_ "