E-filed on December 11, 2006

Andrew M. Brumby, Esq.
Florida Bar No. 0650080
Lee D. Mackson, Esq.
Florida Bar No. 435929
Shutts & Bowen LLP
300 South Orange Avenue, Suite 1000
P.O. Box 4956
Orlando, Florida 32802-4956
Telephone: 407-423-3200; Facsimile: 407-425-8316
E-mail: abrumby@shutts-law.com

and

R. Vaughn Gourley, Esq.
Nevada Bar No. 0503
Stephens, Gourley & Bywater
3636 North Rancho Drive
Las Vegas, Nevada 89130
Telephone: 702-656-2355; Facsimile: 702-656-2776
E-mail: vgourley@1vcm.com
Attorneys for Standard Property Development, LLC

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>    Debtor.                                  / | Case No.: BK-S-06-10725 LBR<br>Case No.: BK-S-06-10726 LBR<br>Case No.: BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>    Debtor.                                  / | Case No.: BK-S-06-10728 LBR<br>Case No.: BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>    Debtor.                                  / | Chapter 11<br><br>Jointly Administered Under |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>    Debtor.                                  / | Case No.: BK-S-06-10725-LBR |
| In re:<br>USA SECURITIES, LLC,<br>    Debtor.                                  / | |

Affects:
    ☐ All Debtors
    ☒ USA Commercial Mortgage Co.
    ☐ USA Securities, LLC
    ☐ USA Capital Realty Advisors, LLC
    ☐ USA Capital Diversified Trust Deed
    ☐ USA First Trust Deed Fund, LLC
_____/

E-filed on December 11, 2006

**STANDARD PROPERTY COMPANY, LLC'S LIMITED OBJECTION
TO THE DEBTORS' THIRD AMENDED JOINT PLAN OF REORGANIZATION**

COMES NOW, Standard Property Development, LLC ("Standard") and pursuant to Section 1129 of title 11 of the United States Code (the "Bankruptcy Code"), F.R.B.P. 3020 and 9014 and this Court's Order Approving: (A) Debtors' Disclosure Statement; (B) Proposed Notice of Confirmation Hearing; (C) Proposed Solicitation and Notice Procedures; and (D) Proposed Form of Ballots dated November 16, 2006, Standard files this its Limited Objection to Confirmation of the Debtors' Third Amended Joint Plan of Reorganization (the "Plan"), as follows:

**A.    FACTUAL BACKGROUND AND PROCEDURAL POSTURE**

1. Standard is a Florida limited liability company formed for the purpose of acquiring certain real and personal property in Orange County, Florida (the "Property"), then utilized as a motel, but which was to be converted, post-acquisition, to a condominium. Standard has begun the process of converting the Property from its former utilization as a motel to that of condominium.

2. In order to finance both the acquisition of the Property, and its conversion/ construction to a condominium, Standard obtained a loan to finance such acquisition and construction through USA Commercial Mortgage Company ("USACM") as agent for a group of actual lenders comprised of a variety of individuals, entities and other interests (the "Direct Lenders"). In other words, the loan to Standard solicited and originated by USACM was actually funded by the Direct Lenders, a group consisting of in excess of 100 different people and entities. A small percentage of the loan was retained by a related entity, USA First Capital Trust Deed Fund, LLC (the "Fund").

3. The lending arrangement referenced in the preceding paragraph was evidenced in part by a document entitled Construction Loan Agreement dated as of February 27, 2006, and

2

entered into by and between Movant and the Direct Lenders (the "Construction Loan Agreement"). In addition, a Promissory Note Secured by Mortgage dated February 27, 2006, in the original stated principal amount of Seventeen Million Seven Hundred Fifty Thousand Dollars ($17,750,000.00) (the "Note") was duly executed by Standard in favor of the Direct Lenders. In order to provide collateral for the Note, among other documents, Standard executed in favor of the Direct Lenders that certain Mortgage, Security Agreement and Assignment of Rents dated February 27, 2006, granting and conveying to the Direct Lenders (collectively) a first priority mortgage lien upon and security interest in the Property.

4. That the intent of, and purpose of, the lending arrangement between Borrower and the Direct Lenders was to finance not just the acquisition of the Property, but its conversion and rehabilitation as well, cannot seriously be disputed. Standard would never have entered into the loan at all without assured funds needed for the completion of the project; a circumstance well known to the representatives of USACM. Moreover, the Direct Lenders themselves well knew that the loan was for the entire acquisition and construction amount, as reflected by the Exhibit A to the Affidavit of C. Nicholas Pereos (one of the Direct Lenders) filed in the Orange County Action (as defined below). According to Mr. Pereos, that solicitation letter is the only document he received regarding the loan, expressly states that the loan was for $17,750,000, and further states that "[o]ur loan will be used for the acquisition of the property and conversion of the existing hotel property to for sale condominiums." There is not one item in that document suggesting the loan was, would be, or even could be, capped at any lesser amount, or that the loan was for a more limited (i.e., acquisition only) purpose.

5. Notwithstanding the dating of the documents, a closing did not actually occur (i.e., no monies were disbursed, nor was the Property acquired by Standard) until March 15, 2006.

The sum of Eight Million Two Hundred Forty Thousand Dollars ($8,240,000.00) was initially advanced (the "Initial Amount"). In addition to closing costs, such amount funded the amount necessary for acquisition of the Property (approximately $6.9 Million), together with an origination fee based upon the entire amount (i.e., $17,750,000.00) to be borrowed under the Note ($887,500.00), and established an interest reserve (purportedly through August, 2006) in the amount of Three Hundred Seventy-five Thousand Dollars ($375,000.00).

6.    Notwithstanding the documents being dated February 27, 2006, and that no monies were disbursed to Standard until March 15, 2006, USACM claims interest is due from February 10, 2006, and that the interest reserve was effectively depleted by July 1, 2006.

7.    In accordance with the Control Account, Escrow Agreement and Security Agreement executed by Standard and Project Disbursement Group, Inc. ("PDG"), dated February 27, 2006 (the "Control Agreement"), the interest reserve was deposited with PDG and was to be disbursed to the Direct Lenders, in care of USACM, as billed by USACM monthly. In addition, PDG was to fund subsequent construction draws pursuant to the terms of, and in accordance with, the applicable provisions of the Construction Loan Agreement and the Control Agreement.

8.    In addition to the Initial Amount, on March 15, 2006, the Direct Lenders funded the initial monthly construction amount of $1.4 Million, in accordance with, and as reflected upon and as directed by, Exhibits "B" and "C" to the Construction Loan Agreement.

9.    In order to evidence the initial construction advance of $1.4 Million, on March 15, 2006 a First Amendment to Loan Documents was entered into by and between Standard and the Direct Lenders, as then identified on Exhibit A to the First Amendment to Loan Documents.

10.   Less than 30 days subsequent to the closing and disbursement of the Initial Amount, and the initial month's construction funding, on April 13, 2006, USACM, the Fund, and

certain affiliated entities (the "Debtors"), filed these voluntary Chapter 11 cases. It is highly unlikely that the Debtors did not know that the filing of bankruptcy was imminent at the time of execution of the applicable loan documents on February 27, 2006, and almost certainly by the time the initial loan proceeds were disbursed on March 15, 2006.

11. Subsequent to the acquisition of the Property, and the initial construction loan disbursement, Standard, acting in reliance upon what it believed to be the good faith of USACM, and its principals, the Direct Lenders, commenced the construction required to convert the Property from its then use to an alternative use as a condominium. That construction required a substantial demolition of the then buildings and improvements to the Property, with an intended subsequent renovation and remodeling of such improvements.

12. In good faith, Borrower commenced such demolition and construction, only to learn after substantial demolition of the applicable improvements had occurred that the Debtors had in fact filed bankruptcy, and that notwithstanding, among other things, (i) the terms of the Construction Loan Agreement, the Note, and the Mortgage; (ii) the acts and conduct of the authorized agents and representatives of USACM, itself the authorized agent and representative of the Direct Lenders; (iii) the representations to the managing member of the Borrower, George Venturella; (iv) the solicitation letter to the Direct Lenders; (v) the historical lending practices of USACM with respect to its originated loans generally; and (vi) the clear intent and purpose of the loan, that the Direct Lenders were not intending to fund future construction draws.

13. In or about June, 2006, Standard submitted a construction draw request to PDG in accordance with the terms of, and as contemplated by, the Construction Loan Agreement and the Control Agreement. Notwithstanding the requirement to fund such draw request on or within five

days of its submission, neither USACM, the Direct Lenders, nor PDG responded at all - verbally or otherwise – to such draw request, much less funded it.

14. Because of the failure to fund the ongoing construction at the Property, and based upon the limited time to conclude construction based upon the reservations and hard contracts obtained by Standard in connection with the project, Standard has incurred substantial damages. Construction has been brought to a halt, and the multi-million dollars of deposits and reservations held by Standard for the sale of units are now at risk. Many have now been cancelled based upon the construction delays. Standard has learned its material costs have increased by at least $700,000.00, if not more, and the project is likely to be the subject of construction lien, and other, litigation. As referenced above, Standard has also now been informed that interest is claimed to be due for 17 days before a document was ever signed, 5 weeks before any funding occurred and that the interest reserve - - because of the above - - was effectively depleted by July, 2006.

15. In July 2006, Standard initiated an action against the Direct Lenders, other than any of the applicable Debtors, in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida (the "Orange County Action"), seeking damages for breach of the applicable agreements, and a breach of the implied covenant of good faith and fair dealing.

16. By letter dated August 4, 2006 from USACM, as the agent for the Direct Lenders, to Standard, the Direct Lenders declared a default under the terms of the Note and other Loan Documents. Such letter suggested that should the amount claimed to be due—an amount nowhere stated—not be paid as demanded, the Direct Lenders, acting through their agent, USACM, intended to institute legal action against Standard and/or its members.

17. Since the cessation of construction, various construction, and other, bills have gone unpaid. As a result, the Property is at risk of being subject to lien claims of the general

contractor and various subcontractors. In the event of litigation from the filing of such liens, such litigation will be required to take place in Orange County, Florida.

**B.    PROCEDURAL POSTURE**

18.    After Standard instituted the Orange County Action, and had filed a Motion for Relief from the Automatic Stay in the Debtors' bankruptcy cases seeking relief from the automatic stay to add USACM and the Fund as Defendants in the Orange County Action, on August 31, 2006, USACM instituted an adversary proceeding initially seeking an injunction prohibiting the Orange County Action from going forward (the "Adversary"). According to the original Complaint filed by USACM in the Adversary, and while acknowledging that neither it nor any other Debtor was a defendant in the Orange County Action, and that the automatic stay had not been violated, USACM alleged that the Orange County Action should be enjoined based upon an allegation that the Direct Lenders claimed that USACM needed to provide a defense for the Direct Lenders in the Orange County Action and that the Orange County Action would "necessarily determine facts" relating to USACM's relationship with the Standard and the Direct Lenders, and that USACM would be required to participate in discovery.

19.    On October 19, 2006, this Court conducted a hearing on both the Motion for Relief from the Automatic Stay (the "Stay Motion") and USACM's application for a preliminary injunction. By separate orders dated October 30, 2006, the Court both denied the Stay Motion, and enjoined the Standard from proceeding with the Orange County Action, or otherwise instituting litigation against the Direct Lenders.

20.    USACM, the Fund and the affiliated Debtors have now filed the Third Amended Joint Plan of Reorganization in their administratively consolidated bankruptcy cases (the "Plan"). The Plan proposes the sale of substantially all of the Fund's assets, and a sale of the servicing

rights to a substantial number of loans serviced by USACM, including Standard's. One of the underlying premises of the Plan is that the direct lender loans serviced by USACM are not property of the estate, and that monies received by the direct lenders pursuant to the terms of the applicable direct lender notes are likewise not property of the estate.

21. As is pertinent to Standard, the Plan proposes the following: (a) to sell the servicing rights to a group of the direct lender loans (but not the loans themselves), including Standard's, and to do so free and clear of liens, claims, encumbrances, rights of third parties and interests.[1] See Plan, Art. IV, C.

22. In addition, the Plan proposes to sell to the successful bidder at the auction the assets of the Fund, including the Fund's undivided approximate 6.5% interest in the Standard loan, and to do so "free and clear of liens, claims, encumbrances, rights of third parties and interests". See Plan, Art. IV, C.[2]

23. The above provisions are similar to various provisions of the Asset Purchase Agreement (as defined in the Plan) which provides for a sale free and clear of liens, claims and interests (Asset Purchase Agreement, Section 5.2), and suggests that no lien claim, interest, obligation or encumbrance attaches to any of the Fund assets following consummation of the sale. Asset Purchase Agreement, Section 7.5. Other provisions of the Plan provide for a finding that the purchaser under the Asset Purchase Agreement is a "good faith purchaser" within the meaning of Section 363(m), see Plan, Art. IV, C, and provides for a discharge and release of all claims against the Debtors and others, notwithstanding the provisions of Section 1141(d)(3), and

---

[1] Similar provisions may exist elsewhere in the Plan. By citing to these specific provisions, Standard does not intend to limit its objection solely to the cited provision; rather, the objection is to the concept generally.

[2] See footnote 1, supra.

purports to enjoin any Entity (as defined in the Plan) from taking certain action with respect to on account of any debt, Claim, liability, Equity Interest or Right. See Plan Art. IV, H.[3]

### C. ARGUMENT AND CITATION OF AUTHORITIES

1. The parameters of what is precisely being sought under the Plan pursuant to the above referenced provisions (and any other similar provision in the Plan and/or the Asset Purchase Agreement) is not entirely clear.[4] Therefore, in an abundance of caution, Standard is filing this limited objection. To the extent the intent of the Plan is, or to the extent the Plan could otherwise be interpreted, to effect or obtain a discharge, release, enjoin or otherwise preclude the assertion of claims, defenses, setoffs or recoupments to any attempt to enforce the Note or the Mortgage by or on behalf of the Direct Lenders, or that any such provision could be interpreted as a release, discharge, bar, injunction or other prohibition to the assertion of any right of setoff, recoupment or defense to any attempt to enforce the Note or Mortgage (collectively with the other Direct Lenders or individually) as to the Fund's interest in the Standard loan, Standard objects thereto.

(a) Sale of Servicing Rights

2. One of the fundamental premises of the Plan is that the direct lender loans are not property of the estate. Indeed, the direct lender loans themselves are not even purported to be sold (other than whatever fractional interest therein the Fund might have). To the contrary, the only item proposed to be sold under the Asset Purchase Agreement (leaving aside the Fund assets) are the servicing rights held by USACM. Because the only asset being sold are the servicing rights, and the loans themselves are not being sold, the sale contemplated by the Asset

---

[3] See footnote 1, supra.
[4] See footnote 1, supra.

Purchase Agreement and the Plan cannot be effective to transfer any interest in the direct lender loans to the successful purchaser, much less to do so "free and clear of any and all liens, claims, encumbrances, rights of third parties and interests". The Plan itself would appear to preclude any later assertion by or on behalf of the Direct Lenders (or anyone else attempting to enforce the terms of the Note, Mortgage or other Loan Documents) that any counterclaim, claim, offset, recoupment, defense or other matter relating to or in any way pertaining to the circumstances surrounding the loan transaction with Standard is in any way barred or prohibited.

3. In addition to the foregoing, Standard would note that any attempt in the Plan to release a non-debtor, such as the Direct Lenders, from whatever, if any, liability any such individual or entity may have with respect to the circumstances surrounding the loans being sold would run afoul of Ninth Circuit law prohibiting a release or discharge of non-debtors under Chapter 11 plans. *See, e.g., Trulis v. Barton, 107 F.3d 685, 691 (9th Cir. 1995); Underhill v. Royal, 769 F 2d, 1426, 1432 (9th Cir., 1985). See also Star Phoenix Mining Company v. West One Bank, 147 F.3d 1145, 1147 (9th Cir. 1998).* Similarly, an attempt to interpret the Plan to create a post-confirmation an injunction to the assertion of claims against non-debtors, such as the Direct Lenders, would likewise contravene well established Ninth Circuit law. *See, e.g., In re Lowenschuss, 67 F.3d 1394 (9th Cir. 1995), cert. denied, 517 U.S. 1243 (1996); American Hardwoods, Inc. v. Deutsch Credit Corp., 885 F.2d 621 (9th Cir. 1989).*

4. Even if the above were not the case, the assertion of claims by way of setoff, recoupment,[5] and the assertion of defenses generally would not be barred by confirmation of the

---

[5] Recoupment has been defined to be the setting up of a demand arising out of the same transaction from which a plaintiff's claim or cause of action arises, strictly for purpose of abatement or reduction of such claim. The defensive use of recoupment is not an independent basis for the debt, and therefore there is no claim against estate property. *See generally, Newberry Corp. v. Fireman's Fund Ins. Co., 95 F.3d 1392, 1399-1400 (9th Cir. 1996); In re Madigan, 270 BR 749, 754 (9th Cir. BAP 2001).* Even those courts that hold that setoff under Section 553 may be prohibited post confirmation of a Chapter 11 plan of reorganization, also hold that recoupment is not so precluded.
(cont.)

E-filed on December 11, 2006

Plan, sale of the assets, and/or the discharge provisions of the Plan. See, e.g., *In re De Laurentis Entertainment Group, Inc.*, 963 F 2d 1269 (9th Cir.), cert. denied, 506 U.S. 918 (1992).

5. For the foregoing reasons, therefore, the sale of the servicing rights to the direct lender loans cannot discharge, release, enjoin or adversely impact the assertion of any counterclaim, setoff, recoupment or defense against the Direct Lenders in connection with litigation relating to the enforcement of the Note, Mortgage and other Loan Documents by or on behalf of the Direct Lenders and/or the loan transaction relating thereto generally, and Standard objects to confirmation of the Plan to the extent any provision thereof, including, without limitation, any of those referenced above, intend such a result, or could be so interpreted.

(b) The Sale of the Funds Assets.

1. The analysis with respect to the sale of the Funds' assets, including its interest in the Standard loan, is slightly different. Because the Fund itself is a debtor, Standard concedes that the assertion of any affirmative claim against the Fund arising out of the loan transaction evidenced in part by the Note, Mortgage and other Loan Documents would need to be asserted by way of claim in the Fund's bankruptcy case.

However, the sale of the Fund assets, including its undivided interest in the Standard loan, do not preclude the assertion by Standard of any recoupment or other defense it might have to the attempted enforcement of Note, Mortgage or other Loan Documents by or on behalf of the Direct Lenders (including the assignee of the Funds' interest). The only basis by which such could be said to occur would be either through sale of the Funds' interest "free and clear of liens, claims,

---

See, e.g., *In re Powell*, 284 BR 573, 576-77 (Bankr. D. Md. 2002; *In re Trans World Airlines, Inc.*, 275 BR. 712, 718-19 (Bankr. Del. 2002); see also *Folger Adam Security, Inc. v. Dematteis/MacGregor JV*, 209 F.3d 252, 258-62 (3rd Cir. 2000); *In re De Laurentis Entertainment Group, Inc.*, 963 F 2d 1269 (9th Cir.), cert denied, 506 U.S. 918 (1992). Standard's defenses would appear to be in the nature of recoupment, rather than set off, but resolution of that issue is not necessary to resolve Standard's objections to the Plan.

encumbrances, rights of third parties and interests" or through the release, discharge and injunction provisions otherwise set out in the Plan.

Virtually all courts agree that the term "interest" for purposes of Section 363 does not include recoupment and other defenses, as such are not a "debt," and therefore not a "claim" against estate property as contemplated by Section 363. *See, e.g.*, *Folger Adam Security, Inc. v. Dematteis/MacGregor, JV*, 209 F 3d 252, 258-62 (3rd Cir. 2000); *In re Madigan*, 270 BR 749, 754 (9th Cir. BAP 2001); *In re Powell*, 284 BR 573, 576-77 (Bankr. Md. 2002); *In re Trans World Airlines, Inc.*, 275 BR. 712, 718-19 (Bankr. Del. 2002). As a result, neither a Section 363 sale "free and clear of liens, claims, encumbrances and interests" or a plan incorporating such a sale, may eliminate defenses, including recoupment.

With respect to setoff, the *De Laurentis Entertainment Group, Inc.* case makes clear that defensive setoff is permissible even after confirmation of a Chapter 11 plan, and even against an assignee of the original holder. Therefore, the terms of the Plan cannot release, discharge or enjoin the assertion of any such setoff claim (defensively). If a Plan itself cannot do so, then a purported sale under a plan (which seems to have occurred in *De Laurentis*) cannot accomplish the result either.

Therefore, Standard objects to the Plan to the extent it purports to, or may later be interpreted to, attempt to release, discharge, prohibit, enjoin or otherwise preclude the assertion of any setoff, recoupment, or any other defense by Standard to the attempted enforcement of the Note, Mortgage and other Loan Documents pertaining to the Standard transaction by or on behalf of the successor to the Funds' undivided interest in the Standard loan.

E-filed on December 11, 2006

WHEREFORE, Standard requests the Court sustain its objection, deny confirmation of the Plan until such time as an appropriate modifications to the Plan has been included to address Standard's limited objection, and for such other and further relief the Court deems just and proper.

SHUTTS & BOWEN LLP
300 South Orange Avenue, Suite 1000
Orlando, FL 32801
(407) 423-2300
(407) 425-8316 Facsimile
abrumby@shutts-law.com (E-mail)


By: /s/ Andrew M. Brumby
    Andrew M. Brumby
    Florida Bar No.: 0650080

and

STEPHENS, GOURLEY & BYWATER
3636 North Rancho Drive
Las Vegas, Nevada 89130
Telephone: 702-656-2355
Facsimile: 702-656-2776
E-mail: vgourley@1vcm.com


By: /s/ R. Vaughn Gourley, Esq.
    R. Vaughn Gourley, Esq.
    Nevada Bar No. 0503

ORLDOCS 10734238 1