**EXHIBIT "B"**

## SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT (this "Agreement") is made effective as of July 6, 2005 by and among USA INVESTMENT PARTNERS, LLC ("Creditor"), HMA SALES, LLC ("Borrower") and LIBERTY BANK ("Lender").

### BACKGROUND

A. Borrower is or may become indebted to Creditor. Creditor is interested in the welfare of Borrower and will benefit if Lender extends or maintains credit to Borrower.

B. Borrower has requested that Lender extend and maintain credit to Borrower. Lender is willing to do so provided this Agreement is executed.

NOW, THEREFORE, the parties hereto, as an inducement for Lender to extend and maintain credit to Borrower, and with the understanding that Lender is relying upon the provisions of this Agreement and intending to be legally bound hereby, agree as follows:

1. **Definitions**. The following words and phrases as used in capitalized form in this Agreement, whether in singular or plural, shall have the meanings indicated:

    1.1 **"Loan Agreement"** shall mean that certain Receivables Loan Agreement between Borrower and Lender dated November 15, 2005, as it may be amended, modified, supplemented or restated from time to time.

    1.2 **"Scheduled Subordinated Debt"** shall mean the indebtedness described on Schedule 2.3 attached hereto, and all interest thereon and all fees, costs and expenses (including attorney's fees and legal expenses) related thereto.

    1.3 **"Senior Debt"** shall mean all liabilities and obligations of any nature, whether primary, secondary, absolute, contingent, sole, joint, several or joint and several, and all interest thereon and all fees, costs and expenses (including attorney's fees and legal expenses) related thereto, now or at any time or times hereafter existing, contracted or incurred, of or by Borrower to Lender, including without limitation, the Obligations as defined in the Loan Agreement, and all increases, decreases, extensions, amendments, replacements and renewals of any of such liabilities and obligations. Senior Debt shall explicitly include all interest accruing on any obligations of Borrower to Lender after commencement of any proceeding described in Section 3.2 below at the rate set forth in the applicable Senior Debt note, instrument or agreement, whether or not such interest is allowable in any such proceeding. Without limiting the foregoing, Lender shall have the option to make advances and provide financing in the future to Borrower or to a receiver, trustee or other fiduciary appointed by a court in any insolvency or court proceeding for Borrower or to Borrower as a debtor-in-possession. Creditor consents to the financing of Borrower or such fiduciary or debtor-in-possession after any such insolvency or court proceeding and agrees that such financing shall be included within the Senior Debt and the subordination and other restrictions and provisions of this Agreement shall be applicable thereto.

    1.4 **"Subordinated Debt"** shall mean all liabilities and obligations of any nature, whether primary, secondary, absolute, contingent, sole, joint, several or joint and

several, and all interest thereon and all fees, costs and expenses (including attorney's fees and legal expenses) related thereto, now or at any time or times hereafter existing, contracted or incurred, of Borrower to Creditor.

2. **Subordination**.

    2.1    Creditor subordinates all Subordinated Debt and all claims and demands arising therefrom to all the Senior Debt. Creditor agrees that all of the Senior Debt shall be paid in full (including without limitation all interest accruing on any Senior Debt after commencement of any proceeding described in **Section 3.2** below at the rate set forth in the applicable Senior Debt note, instrument or agreement, whether or not such interest is allowable in any such proceeding) before Creditor shall be paid anything (of any kind or character) on account of the principal of or interest on any Subordinated Debt or any other sums payable in connection therewith. Except for the Permitted Payments as hereinafter defined, until all of the Senior Debt is paid, performed and complied with in full and Lender has no further obligation to make any further loans or advances to Borrower, Borrower will not make, and Creditor will not demand or accept, either directly or indirectly, payment (of any kind or character) of all or any part of the Subordinated Debt without the prior written consent of Lender. The Senior Debt shall not be deemed to have been paid, performed or complied with in full unless the Lender has unconditionally and irrevocably received payment of the Senior Debt and Lender has no further obligation to make any further loans or advances to Borrower.

    2.2    The right of Lender to enforce the subordination provisions and any other provisions hereof shall not in any way be prejudiced or impaired by any act or failure to act on the part of Lender, Borrower or Creditor, or by any noncompliance by Borrower or the Creditor with the terms, provisions and covenants of this Agreement.

    2.3    Notwithstanding the provisions of **Section 2.1** or elsewhere in this Agreement to the contrary, Borrower may make the payments to Creditor permitted under **Section 17.10** of the Loan Agreement with respect to the Scheduled Subordinated Debt ("**Permitted Payments**"), provided that (a) no Event of Default (as such term is defined in the Loan Agreement) has occurred; and (b) such payment would not result in any Event of Default or Incipient Default.

3. **In Furtherance of Subordination**.

    3.1    Creditor assigns to Lender Creditor's interest in all Subordinated Debt and all security and guaranties therefor as security for the payment of the Senior Debt. Lender will be under no duty to take any action with respect to the preservation of rights in any such collateral or guaranties or against any parties thereto or any other person, or to make any demand or give any notice, or to take any other action with respect thereto other than to exercise reasonable care in the physical custody thereof. All originals of notes, debentures or other instruments evidencing any Subordinated Debt shall be endorsed without recourse to the order of Lender and shall be delivered to Lender.

    3.2    Upon any distribution of any of the assets of Borrower, any guarantor of any of the Subordinated Debt or any collateral securing the Subordinated Debt,

upon or in connection with any dissolution, winding up, liquidation, arrangement or reorganization of Borrower, any guarantor of any of the Subordinated Debt or any other person or entity, or upon any assignment for the benefit of creditors or any other marshalling of the assets and/or liabilities of Borrower or any guarantor of any of the Subordinated Debt or otherwise, any payment, dividend or distribution of any kind (whether in cash, securities or other property) which would otherwise be payable or deliverable with respect to the Subordinated Debt, shall be paid or delivered directly to Lender for application (in the case of cash) to or as collateral (in the case of securities or other property) for the Senior Debt (including without limitation all interest accruing on any Senior Debt after commencement of any such proceeding at the rate set forth in the applicable Senior Debt note, instrument or agreement, whether or not such interest is allowable in any such proceeding).

3.3     If any proceeding described in <u>subsection 3.2</u> is commenced, Lender is irrevocably authorized (in its own name or in the name of Creditor or otherwise), but shall have no obligation, to demand, sue for, collect and receive all such payments, dividends and distributions referred to in <u>subsection 3.2</u>, give acquittances therefor, file claims, proofs of claim and take such other actions (including without limitation, voting the Subordinated Debt) as it may deem necessary or advisable. Lender is granted a power of attorney by Creditor with full power of substitution to execute and file such documentation and take any other action Lender may deem advisable to accomplish the foregoing, and to protect Lender's interest in the Subordinated Debt and its right of enforcement thereof. Such power being coupled with an interest is irrevocable.

3.4     In the event that (i) the total amount of all cash payments actually received by Lender related to the Subordinated Debt exceeds all of the Senior Debt (including without limitation all interest accruing on any Senior Debt after commencement of any such proceeding at the rate set forth in the applicable Senior Debt note, instrument or agreement, whether or not such interest is allowable in any such proceeding); (ii) Lender has no further agreement or understanding with Borrower pursuant to which Lender may extend credit to Borrower; and (iii) any such cash payment received by Lender may no longer be set aside as preferential under any federal or state bankruptcy law, then Lender shall reassign to Creditor, without recourse or representation, the remaining balance due under the Subordinated Debt and all collateral and guaranties securing the Subordinated Debt, or make such other disposition thereof as may be required by applicable law or court order.

3.5     In the event that the Senior Debt is refinanced with another lender for any reason, Creditor agrees at the request of Lender or of Borrower to execute and deliver a subordination agreement in favor of such new lender containing the same terms and conditions as this Agreement except for specific changes related to the identity of the new replacement lender and the terms of such replacement financing.

4.     <u>Limitations on Creditor's Rights</u>. Without the prior written consent of Lender, Creditor agrees that it will not: (a) accelerate any of the Subordinated Debt or if such Subordinated Debt is due on demand, make demand for payment, (b) institute any court proceedings against Borrower or any guarantor of any of the Subordinated Debt to collect any Subordinated Debt, or (c) exercise any right or remedy against Borrower, Borrower's assets, any

-3-

guarantor of any of the Subordinated Debt or any of such guarantor's assets, or (d) amend or modify, alter the payment terms of the Subordinated Debt.

5. **Payments Held In Trust.** In the event that Creditor receives any dividend, distribution or payment referred to in **Section 3**, or receives any payment (of any kind or character) of any Subordinated Debt or security therefor in violation of this Agreement, Creditor will (a) not credit such payments against the Subordinated Debt, (b) notify Lender promptly thereof, and (c) receive the same in trust for Lender and will promptly pay and deliver the same to Lender in precisely the form received, except for any requisite endorsement or assignment, which Creditor will make without recourse, and authorizes Lender or any of its officers or employees to make in the event that Creditor does not make the same. Lender will apply any such moneys so received by it in reduction of the Senior Debt and will hold any property other than money so received by it as collateral security therefor. In the event Creditor shall obtain any lien, judgment or decree against Borrower, Creditor will immediately assign the same to Lender, or mark the same to Lender's use. If Creditor fails to make any endorsement or assignment required hereunder, Lender is hereby appointed attorney for Creditor with full power of substitution to make any such endorsement or assignment without recourse. Such power of attorney being coupled with an interest is irrevocable.

6. **Lender's Rights.** Without notice to Creditor and without affecting or releasing any obligation or agreement of Creditor under this Agreement or the subordination provided herein, Lender may at any time or times do any of the following with respect to any of the Senior Debt: (a) amend, modify, alter or waive any of the terms thereof or any of the documents executed in connection therewith, (b) renew or extend the time for payment of all or any part thereof, (c) increase or decrease the amount thereof, (d) accept collateral security or guaranties therefor and sell, exchange, fail to perfect, release or otherwise deal with all or any part of any such collateral or guaranties, (e) release any party primarily or secondarily obligated thereon, (f) grant indulgences and take or refrain from taking any action with regard to the collection or enforcement thereof, and (g) take any action which might otherwise constitute a defense to or a discharge of Borrower or any guarantor. Nothing contained in this Agreement shall impair any right of Lender with respect to any of the Senior Debt or any collateral security or guaranties therefor or the proceeds thereof.

7. **Representations.** Creditor represents and warrants to Lender that:

7.1 To Creditor's knowledge, there is no event of default or event which with the giving of notice, passage of time or both would constitute an event of default existing under any Subordinated Debt.

7.2 All Subordinated Debt will at all times be unsecured, except as disclosed in Schedule 2.3.

7.3 The execution, delivery and performance by Creditor of this Agreement, the consummation of the transactions contemplated herein and the fulfillment and compliance with the respective terms, conditions and provisions contained herein: (i) have been duly authorized by all necessary company action of Creditor, and (ii) will not conflict with or result in a breach of, or constitute a default under, any of the terms, conditions or provisions of

-4-

any applicable statute, law, rule, regulation or ordinance, or Creditor's Articles of Organization or Operating Agreement or any judgment, or order of any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign by which Creditor is bound or affected.

7.4 This Agreement has been duly executed and delivered by Creditor and constitutes the valid and binding obligation of Creditor, enforceable in accordance with its terms.

7.5 No consent, approval or authorization of or designation, declaration or filing with any governmental authority is required in connection with the execution, delivery or performance by Creditor of this Agreement.

8. Covenants.

8.1 Creditor agrees to assign, endorse without recourse and deliver immediately to Lender the original of any instrument or promissory note executed evidencing any Subordinated Debt.

8.2 Creditor and Borrower agree that Borrower will not give or permit to be given, and Creditor will not accept any security or guaranty for any Subordinated Debt without the prior written consent of Lender. Creditor agrees that upon receiving any such security or guaranty Creditor will immediately assign and deliver the same to Lender.

8.3 Creditor will give Lender immediate written notice of any event of default or any event of which Creditor has knowledge, which might, upon the passage of time or the giving of notice or both, constitute a default under the Subordinated Debt.

8.4 Creditor will permit Lender to inspect and copy all books, records, instruments and documents evidencing or pertaining to the Subordinated Debt. Borrower consents to such inspection.

8.5 In the event that Creditor at any time has any indebtedness or other obligations owing to Borrower for any reason, including without limitation any accounts receivable owing to Borrower, Creditor will not offset the indebtedness or other obligations owing to Borrower against any of the Subordinated Debt.

9. **Limitation on Consent to Payment or Granting of Security**. In the event that Lender consents in writing to the making of a payment on account of the Subordinated Debt or to the granting of collateral security or any guaranties for the Subordinated Debt, which payment or grant would otherwise be prohibited pursuant to **Sections 2 or 8**, such consent shall be deemed to be a consent to the payment or grant specifically referred to in such written consent and shall not be construed as a waiver of **Sections 2 or 8** generally as to all future payments or grants. A consent by Lender to any request shall not be deemed to be a consent to future similar requests.

-5-

10. **Subordination Legend.** Creditor and Borrower shall cause each instrument that at any time evidences all or any portion of the Subordinated Debt to be conspicuously marked as follows:

> "This instrument is subject to the terms of a Subordination Agreement in favor of Liberty Bank, which Subordination Agreement is incorporated herein by reference. Notwithstanding any contrary statement contained in the within instrument, no payment on account of the principal or interest thereof shall become due or be paid except in accordance with the terms of such Subordination Agreement."

11. **No Assignment.** Creditor agrees that Creditor will not assign or deliver to any person or entity other than Lender, any Subordinated Debt or any evidence thereof or security or guaranty therefor without the prior written consent of Lender. In the event Creditor does so without such consent, Creditor will immediately become liable to Lender in the amount so assigned. If Creditor makes any such assignment with such consent, Creditor will obtain the assignee's agreement to be bound by this Agreement.

12. **Termination.** This Agreement will continue in full force and effect as long as any Senior Debt remains outstanding, and thereafter, so long as Lender has any agreement or understanding with Borrower pursuant to which Lender may extend credit to Borrower. To the extent any payment or payments of any Senior Debt or any Subordinated Debt received by Lender are subsequently invalidated, declared to be fraudulent or preferential, set aside or are required to be repaid to a trustee, receiver or other person or entity under any bankruptcy act, state or federal law, common law or equitable cause, then this Agreement will be revived and continue in full force and effect. This Agreement may not be terminated except by an instrument in writing signed by the Lender.

13. **Waivers.**

13.1 Creditor hereby waives, to the extent permitted by applicable law, any right to notice from Lender prior to disposition of any assets of Borrower or any guarantor or any collateral securing any of the Senior Debt. To the extent Creditor is not permitted by applicable law to waive notice, Creditor agrees that ten (10) days notice prior to any such disposition shall be reasonable. Creditor agrees not to interfere with any disposition of assets of Borrower or any Guarantor or any collateral securing any of the Senior Debt by or at the direction of Lender and waives, to the extent permitted by applicable law, the right to challenge any such disposition as not commercially reasonable. Creditor agrees that the sale or other disposition of any collateral securing the Senior Debt by Lender or by Borrower at the request of Lender after an Event of Default has occurred with respect to the Senior Debt shall operate to extinguish and terminate any security interest Creditor may have in such collateral.

13.2 Creditor waives any right to require the Lender to marshall any assets of Borrower or any guarantor or to otherwise proceed in any fashion against Borrower, any guarantor or any other person.

13.3   Except as otherwise provided in the Loan Agreement, Creditor waives notice of any default by Borrower under the Senior Debt and all other notices of any kind, and waives protest of all notes and other instruments evidencing any of the Senior Debt.

13.4   Creditor waives any right to subrogation, reimbursement or indemnity in connection with any of the Senior Debt until the Senior Debt shall have been repaid.

13.5   Lender is irrevocably authorized to demand and receive specific performance of this Agreement by Creditor, even if Borrower has breached its agreements hereunder, at any time upon the breach by Creditor of its agreements hereunder. Creditor irrevocably waives any defense based on the adequacy of a remedy at law which might be asserted as a bar to such remedy of specific performance.

13.6   Creditor agrees that Lender may apply to the Senior Debt all proceeds received from the sale or disposition of any other assets of Borrower or any guarantor in such order as Lender may determine in its sole discretion.

14.   **Releases**. Lender may release any one or more parties hereto, or the successors or assigns thereof, from any or all obligations hereunder, and such release, or any release by operation of law, shall not release any other party hereto from, nor in any way affect, any of the obligations of any other party under this Agreement, or affect the subordination of any of the Subordinated Debt to the Senior Debt.

15.   **Notices**. All notices, requests and other communications made or given in connection with this Agreement shall be in writing and, unless receipt is stated herein to be required, shall be deemed to have been validly given when delivered personally against receipt or by private carrier, or three (3) business days after when delivered, registered or certified mail, return receipt requested, in all cases with charges prepaid, addressed as follows, or delivered to the individual or division or department to whose attention notices to a party are to be addressed, until some other address (or individual or division or department for attention) shall have been designated by notice given by a party to the other:

> To Creditor:   USA Investment Partners, LLC
> 4484 South Pecos Road
> Las Vegas, NV 89121
> Attention: Thomas Rondeau, Esquire
>
> To Borrower:   HMA Sales, LLC
> 101 Convention Center Drive
> Las Vegas, NV 89109
> Attention: Joseph Milanowski
>
> To Lender:   Liberty Bank
> 315 Main Street
> Middletown, CT 06457
> Attention: Jason M. Gordon, Vice President

-7-

16. **Submission to Jurisdiction**. Borrower and Creditor hereby consent to the non-exclusive jurisdiction of any state or federal court located within the State of Connecticut, and irrevocably agree that, subject to the Lender's election, all actions or proceedings relating to this Agreement or the transactions contemplated hereunder shall be litigated in such courts, and Borrower and Creditor waive any objection which they may have based on improper venue or forum non conveniens to the conduct of any proceeding in any such court and waive personal service of any and all process upon them, and consent that all such service of process be made by mail or messenger directed to them at the address set forth in Section 15. Nothing contained in this section shall affect the right of Lender to serve legal process in any other manner permitted by law or affect the right of Lender to bring any action or proceeding against Borrower or Creditor or their property in the courts of any other jurisdiction.

17. **Delay or Omission Not Waiver**. Neither the failure nor any delay on the part of Lender to exercise any right, remedy, power or privilege hereunder shall operate as a waiver thereof or impair any such right, remedy, power or privilege. No single, partial or full exercise of any rights, remedies, powers and privileges by Lender shall preclude further or other exercise thereof. No course of dealing between Lender and Borrower or Creditor shall operate as or be deemed to constitute a waiver of Lender's rights hereunder or affect the duties or obligations of Borrower or Creditor.

18. **Miscellaneous**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns. If any party hereto is a partnership, all provisions of this Agreement applicable to such party shall be binding upon and include not only the partnership but each and all of the partners thereof individually. This Agreement may not be modified except in writing executed by the party against whom enforcement of such modification is sought. The rights granted to Lender hereby shall be in addition to any other rights of Lender under any other subordination agreement, if any, now or hereafter outstanding. All rights and remedies of Lender shall be cumulative. The provisions of this Agreement shall operate only in favor of and only for the benefit of Lender, its successors and assigns, and not in favor of or for the benefit of Borrower, Creditor or any other person or entity. Wherever the Lender's consent is required or permitted, such consent shall be at the sole and absolute discretion of Lender.

19. **Counterparts; Facsimile Signatures**. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart. Any signature on this Agreement delivered by facsimile transmission shall be deemed to be an original signature to this Agreement.

20. **Governing Law**. This Agreement shall be governed by and construed according to the laws of the State of Connecticut, without regard to any rules or principles regarding conflict of laws or any rule or canon of construction which interprets agreements against the draftsman.

21. **Severability**. If any provision herein shall for any reason be held invalid or unenforceable, no other provision shall be affected thereby, and this Agreement shall be construed as if the invalid or unenforceable provision had never been a part of it.

-8-

22. <u>Entire Agreement</u>. This instrument embodies the entire agreement of the parties hereto with respect to the subject matter hereof, and there are no courses of dealing, usages of trade, or other representations, promises, terms or conditions referring to such subject matter, and no inducements or representations leading to the execution hereof other than as mentioned herein.

23. <u>Waiver of Right to Trial by Jury</u>. BORROWER, CREDITOR AND LENDER WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR ANY OTHER DOCUMENT OR INSTRUMENT ATTACHED HERETO, REFERRED TO HEREIN OR DELIVERED IN CONNECTION HEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE BORROWER, CREDITOR OR LENDER WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DOCUMENT OR INSTRUMENT ATTACHED HERETO, REFERRED TO HEREIN OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE. BORROWER, CREDITOR AND LENDER AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF BORROWER, CREDITOR AND LENDER TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. BORROWER AND CREDITOR ACKNOWLEDGE THAT THEY HAVE HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL REGARDING THIS SECTION, THAT THEY FULLY UNDERSTAND ITS TERMS, CONTENT AND EFFECT, AND THAT THEY VOLUNTARILY AND KNOWINGLY AGREE TO THE TERMS OF THIS SECTION.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, intending to be legally bound hereby, effective as of the day and year first above written.

CREDITOR:

USA INVESTMENT PARTNERS, LLC

By: _____
Joseph D. Milanowski, Manager

BORROWER:

HMA SALES, LLC

By: USA Investment Partners, LLC, its manager

By: _____
Joseph D. Milanowski, its manager

LENDER:

LIBERTY BANK

By: _____
Jason M. Gordon, Vice President

STATE OF NEVADA                          :
                                         :   SS.
COUNTY OF _Clark_                        :

On this, the _8_ day of _June_____, 2005, before me, a notary public, personally appeared Joseph D. Milanowski, who acknowledged himself to be the manager of USA Investment Partners, LLC, the manager of HMA Sales, LLC, and that he as such officer, being authorized to do so, executed the foregoing instrument on behalf of the company for the purposes therein contained by signing his name on behalf of the company as such officer.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_Amanda K_____
Notary Public
My Commission Expires:  1·16·06

```
AMANDA STEVENS
Notary Public, State of Nevada
Appointment No. 02729371
My Appt. Expires Jan. 16, 2006
```

DOCS_PH 1598780v6

-11-

STATE OF NEVADA           :
                          :  SS.
COUNTY OF Clark           :

On this, the 8 day of June, 2005, before me, a notary public, personally appeared Joseph D. Milanowski, who acknowledged himself to be the manager of USA Investment Partners, LLC, and that he/she as such officer, being authorized to do so, executed the foregoing instrument on behalf of the company for the purposes therein contained by signing his name on behalf of the company as such officer.

**IN WITNESS WHEREOF**, I hereunto set my hand and official seal.

*Amanda S.*
Notary Public
My Commission Expires: 1-16-06

AMANDA STEVENS
Notary Public, State of Nevada
Appointment No. 02729371
My Appt. Expires Jan. 16, 2006

-12-

DOCS_PH 1598780v6

## SCHEDULE 2.3

### Schedule of Subordinated Debt

As of May 31, 2005, HMA Sales, LLC had $28,332,573.98 due to USA Investment Partners, LLC under the provisions of the operating agreement of HMA Sales, LLC concerning Additional Capital Contributions. Such amounts accrue a preferred return of 15% per annum, are secured by the assets of the Company, and are repaid from "Available Funds" as defined in Section 5.07 of the operating agreement.

This amount includes $3,795,000 that has been funded under the above arrangement subsequent to the date of the Loan Agreement — November 15, 2004.