Michael D. Warner (TX Bar No. 00792304)
David T. Cohen (TX Bar No. 75008424)
Alexandra P. Olenczuk (TX Bar No. 24033924)
**WARNER STEVENS, L.L.P.**
301 Commerce Street, #1700
Fort Worth, TX 76102
Tel:      (817) 810-5250
Fax:      (817) 810-5255
Email:  dcohen@warnerstevens.com
Email:  aolenczuk@warnerstevens.com

*and*

Michelle L. Abrams (NV Bar No. 5565)
**MICHELLE L. ABRAMS, LTD.**
7201 West Lake Mead Blvd., Ste. 210
Las Vegas, NV 89128
Tel:      (702) 233-5040
Fax:      (702) 233-2209
Email:  mabrams@mabramslaw.com

*Counsel for Sierra Liquidity Fund, L.L.C.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br>USA COMMERCIALMORTGAGE COMPANY,<br>　　　　　Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10725 LBR |
| In Re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>　　　　　Debtor. | Chapter 11 |
| In Re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>　　　　　Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In Re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>　　　　　Debtor. | OPPOSITION AND JOINDER<br>OF SIERRA LIQUIDITY FUND, L.L.C.<br>IN OPPOSITIONS TO MOTION FOR |
| In Re:<br>USA SECURIEITES, LLC,<br>　　　　　Debtor. | APPROVAL OF PROCEDURES<br>REGARDING ASSIGNMENTS OF DIRECT<br>LENDERS' INTERESTS IN LOANS,<br>AND FURTHER MEMORANDUM OF |
| Affects:<br>　□ All Debtors<br>　■ USA Commercial Mortgage Company<br>　□ USA Securities, LLC<br>　□ USA Capital Realty Advisors, LLC<br>　□ USA Capital Diversified Trust Deed Fund, LLC<br>　□ USA Capital First Trust Deed Fund, LLC | POINTS AND AUTHORITIES<br><br>Date:  January 3, 2007<br>Time: 10:00 a.m. |

Sierra Liquidity Fund, L.L.C. ("Sierra"), the assignee of various interests in loans serviced by debtor in possession, USA Commercial Mortgage Company ("USACM"), files this Opposition and Joinder (the "Joinder") in the Oppositions to USACM's Motion for Approval of Procedures Regarding Assignments of Direct Lenders' Interests in Loans [Dkt. no. 1805] (the "Motion") filed by the Official Committee of Direct Lenders (the "Committee"), Hall Financial Group, Ltd. and Hall Phoenix Inwood, Ltd. (collectively, "Hall"), and Debt Acquisition Company of America V ("DACA"; collectively with the Committee and Hall, the "Objectors"),[1] and further Memorandum of Points and Authorities in opposition to the Motion.  In support thereof, Sierra respectfully represents as follows:[2]

# I.
## SIERRA'S INTERESTS

Sierra has acquired the interests of certain Direct Lenders in loans serviced by USACM.  In connection with each purchase, the Direct Lender seller executed a written assignment of its interest in the loan which was recorded in the county in which the Direct Lender's interest in the deed of trust appeared of record.  Attached hereto as Exhibit "A" is a sample of such an assignment, consisting of an Agreement to Sell and Assign Beneficial Interest in Loan, entered into between Sierra and one of the

---

[1]  The Committee filed the *Official Committee of Direct Lenders' Opposition to Motion for Approval of Procedures Regarding Assignments of Direct Lenders' Interests in Loans* [Dkt. no. 1926] (the "Committee Opposition").  DACA filed a *Memorandum of Points and Authorities in Opposition to Debtor's motion for Approval of Procedures Regarding Assignments of Lenders' Direct Interests In Loans* [Dkt. no. 1957] ("DACA's Opposition").  Hall filed an Opposition to *Motion for Approval of Procedures Regarding Assignments of Direct Lenders' Interests in Loans* [Dkt. no. 1993] ("Hall's Opposition"; collectively with DACA's Opposition and the Committee's Opposition, the "Oppositions").

[2]  The Motion was filed and served on November 16, 2006.  According to the Notice of Hearing regarding the Motion, the deadline for filing responses to the Motion was December 1, 2006.  Sierra, however, did not become involved in the bankruptcy case until after it was assigned its first loan interest on November 18, 2006, and did not present the documentation regarding the assignment to USACM until December 4, 2006.  Therefore, Sierra never had an opportunity to be included among those served with notice of the Motion.  Sierra did not learn about the Motion and the hearing until December 4, 2006.  Thereafter, Sierra acted promptly to retain counsel to represent its interests and prepare and file this Joinder.  Since Sierra's opportunity to respond to the Motion was hampered by the timing of its acquisition of its interest, but Sierra acted diligently to prepare and file this Joinder, Sierra respectfully requests that the Court hear and consider the Joinder.

Direct Lenders on November 18, 2006, with party names and price information redacted. In its Motion, USACM refers to assignees such as Sierra as "Third-Party Investors" (Motion, para. 9).[3]

## II.
## THE MOTION, THE OPPOSITIONS, AND USACM'S REPLY

USACM proposes in its Motion to impose certain obligations and new contractual terms upon the Third-Party Investors.

USACM acknowledges in its Motion that its "standard Loan Servicing Agreement" permits the Direct Lenders to freely assign their interests to other parties (Motion, para. 6).

Through its Motion, USACM seeks to impose what it refers to as "rules and procedures" upon the Third-Party Investors (Motion, pp. 5-7). USACM has requested, *inter alia,* that the Court approve procedures including, *inter alia*:

1.1 USACM shall not be required to recognize any assignments of an interest in a Serviced Loan by a Direct Lender to a Third-Party Investor unless and until the Third Party Investor: (a) either: (i) purchases all of the Direct Lender's interests in all of the Serviced Loans held by that Direct Lender; or (ii) agrees that, in USACM's sole and absolute discretion, any or all of the 'due from' amounts on account of Prepaid Interest that are associated with any other loans held by the Direct Lender, as indicated on USACM's books and records, will be transferred along with the assignment of the particular loan interest in question to the Third-Party Investor, and will be deemed to effect a permanent offset against the balance owed to the Third-Party Investor on account of the assigned loan interest; and (b) agrees that the investment is subject to any and all holdbacks established by Court order in these cases that relate or may relate to the loan interests at issue.

1.2 The "Effective Date" of any assignment that meets the criteria set forth in Section 1.1 above shall be the first day of the month following the date on which the Third-Party Investor provides a copy of the assignment as recorded in the real property records relating to the loan in question to USACM and pays USACM the fee set forth below in Section 1.5.

1.3 Each Third-Party Investor shall be required to execute a standard USACM Loan Servicing Agreement containing a 3% loan servicing fee provision ("LSA").

---

[3]    Although USACM in its Motion distinguishes Direct Lenders from the Third-Party Investors, once the existing Direct Lenders have assigned their interests in loans to the Third-Party Investors, those Third-Party Investors become Direct Lenders. USACM apparently needs the different nomenclature, however, because several of its proposed procedures impose new obligations on the Direct Lenders it identifies as "Third-Party Investors."

1.4    USACM shall not be required to distribute to a Third-Party Investor any loan payments received by USACM (as servicer) during any period prior to the Effective Date (as defined above). USACM may distribute such payments to the Direct Lender as indicated on USACM's books and records prior to the Effective Date in accordance with the Holdbacks and Distributions Orders. Further, USACM shall not be required to distribute any payment to a Third-Party Investor until the executed LSA is provided to USACM.

1.5    USACM's fee for processing transfers where the Third-Party Investor has prepared and recorded the Assignment shall be $100 per loan. If USACM prepares the recording documents, an additional $250 per loan shall be assessed. Neither USACM nor any subsequent loan servicing provider shall be liable for any defect or error in the recording documents other than for gross negligence or intentional misconduct.

(Motion, paras. 1.1 - 1.5).

The Oppositions to the Motion filed by Hall, DACA and the Committee addressed several problems with the Motion, including, *inter alia*, that the Loan Servicing Agreements are executory contracts which have not yet been assumed and which must be assumed in their totality without modification if and when they are assumed (*See,* Hall Opposition, p. 4; Committee Opposition, p. 9); that USACM lacked any legal authority for the relief it seeks in the Motion (*See,* DACA Opposition, pp. 8-9; Committee Opposition, pp. 8-9); that the Direct Lenders have the right under Nevada law to assign their contract rights (*See,* Committee Opposition, pp. 9-10); that USACM may not unilaterally impose new contracts upon parties (*See,* Committee Opposition, pp. 10-11); and that the proposed terms, such as the 3% servicing fee and the delayed Effective Date, are contrary to the existing terms of the Loan Servicing Agreements and will harm the Direct Lenders and Third-Party Investors (*See,* Hall Opposition, pp. 6-9).

In its Reply Memorandum in Support of Motion for Approval of Procedures Regarding Assignments of Direct Lenders' Interests in Loans [Dkt. no. 2039] (the "Reply"), USACM denied that its proposed "procedures and rules" constituted a unilateral modification to existing contracts (Reply, p. 2. Indeed, USACM alleged that it "has no obligation to continue servicing a loan for a transferee with whom USACM has no contractual relationship" and that the proposed "procedures and rules" would establish such a contractual relationship with the Third-Party Investors. (Reply, p. 3). USACM dismissed the argument that the interests of the Direct Lenders in the Loan Servicing Agreements were

(or could be) assigned to the Third-Party Investors as "simply erroneous," notwithstanding paragraph 16 of its standard Loan Servicing Agreement (which provides that "This Agreement shall be binding upon and shall inure to the benefit of the parties respective successors and assigns"). (Reply, p. 2).

Without citing any legal authority whatsoever, USACM also stated that "the Loan Servicing Agreements are not executory contracts and that the transfer of the Loan Servicing Agreements to the successful bidder as part of the Plan is not an assumption and assignment." (Reply, p. 3). Indeed, the Debtor implied that the Debtor's mere statement in its Disclosure Statement that the Loan Servicing Agreements are not executory contracts was sufficient to conclusively determine that the Loan Servicing Agreements are not executory contracts. *See,* Reply, fn. 4.

In its Reply, USACM also offered to "compromise" with the Objectors by agreeing to "accept a new Loan Servicing Agreement with a one percent (1%) servicing fee if the Loan Servicing Agreement for the Direct Lender from which the loan interest was obtained contained a one percent (1%) loan servicing fee." (Reply, p. 3).

None of USACM's arguments in either its Motion or Reply are persuasive, and none demonstrate that USACM is entitled to the relief it seeks. As will be explained in further detail below,

    (1)    USACM's contention that the Loan Servicing Agreements are not executory is incorrect;

    (2)    USACM's proposed "procedures and rules" constitute an effort to add terms to the Loan Servicing Agreements – terms which include fees, rights and privileges to which USACM is not presently entitled under the current terms of the Loan Servicing Agreements;

    (3)    USACM may not unilaterally alter the terms of the Loan Servicing Agreements;

    (4)    USACM's proposed procedures could constitute improper interference with contractual relations and with the prospective economic advantage of the Direct Lenders and the Third-Party Investors;

    (5)    the Court lacks jurisdiction to compel the Third-Party Investors to enter into the proposed new contracts with USCAM; and

(6)      USACM's agreement to a 1% servicing fee if the original Loan Servicing Agreement provided for a 1% fee, while a step in the right direction, does not completely resolve the problems with USACM's proposed servicing fee.

**III.**
**AUTHORITIES AND ARGUMENT**

**A.      The Loan Servicing Agreements Are Executory Contracts Which Have Not Been Assumed, Can Not be Assumed or Assigned, and May Not Be Unilaterally Amended.**

USACM, in its Reply, cited no authority whatsoever for its conclusion that the Loan Servicing Agreements are not executory contracts.

According to the Ninth Circuit, "[a]n executory contract is one 'on which performance remains due to some extent on both sides.' [citation omitted]  More precisely, a contract is executory if 'the obligations of both parties are so unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other.'"  *Unsecured Creditors' Committee of Robert L. Helms Construction & Development Co. v. Southmark Corporation (In re Robert L. Helms Construction & Development Co.)*, 139 F.3d 702, 705 (9th Cir. 1998).  *See also, Hall v. Perry (In re Cochise College Park, Inc.)*, 703 F.2d 1339, 1348 (9th Cir. 1983) (citing the same standard).  Notably, the *Cochise College Park* case concerned land purchase contracts, and the Ninth Circuit that case specifically found that

> some if not all of the land sale contracts encompassed both obligations of the purchaser to make various payments at times certain and obligations of Cochise to deliver the deed to the lot to the purchaser, to release the mortgage, if any, on that lot upon completion of payments on the promissory note, and to construct various improvements.   Under these circumstances, the failure of Cochise to develop the land as promised *or to convey a warranty deed to the purchaser could each constitute a material breach* excusing performance by the land purchaser of his remaining obligations. [footnote omitted]  Likewise, the failure of any given land purchaser to make payments on his promissory note could constitute a material breach excusing Cochise from completing its performances under the land sale contract. [footnote omitted]  Thus, in all likelihood, some if not all of the land sale contracts here were executory.

703 F.2d at 1348-49 (emphasis added).

The terms of USACM's standard Loan Servicing Agreement demonstrate sufficient obligations on the parts of both USACM and the Direct Lenders for those Agreements to be considered executory contracts under the standards discussed in *Cochise College Park*.   Obviously, the Loan Servicing Agreements require USACM to perform various tasks in servicing the loans.   The Loan Servicing Agreements also require the Direct Lenders to *inter alia,* (i) immediately execute and deliver to USACM an assignment of all of the Direct Lenders' right title and interests in any loans and deeds of trust securing loans upon any payoff by USACM (Loan Servicing Agreement, para. 2(c)(iii)); (ii) grant or deny consent to any request by USACM to modify the loan interest rate, forgive the payment of any principal or interest, change the outstanding principal amount or extend the loan maturity date (Loan Servicing Agreement, para. 2(e)); and (iii) to pay any attorneys' fees or other foreclosure costs incurred by USACM (Loan Servicing Agreement, para. 4).   Since the Ninth Circuit stated in *Cochise College Park* that the failure to convey title upon payment would constitute a material breach and constituted sufficient circumstances to render certain contracts in that case executory, the obligation of the Direct Lenders to assign their right, title and interest to USACM and the other obligations imposed upon the Direct Lenders in the Loan Servicing Agreements render the Loan Servicing Agreements executory contracts.  *Accord, In re Commonwealth Mortgage Company, Inc.*, 149 B.R. 4, 6-7 (Bankr. D. Mass, 1992) (Loan servicing agreements assumed to be executory contracts).

The Loan Servicing Agreements have not yet been assumed by USACM.   11 U.S.C. Section 365(a) "requires the assumption of an executory contract to be effectuated through an express order of the court."  *In re Gamma Fishing Company, Inc.*, 70 B.R. 949, 951 (Bankr. S.D.Cal. 1987).  Further, "[a]n executory contract assumed in bankruptcy is accompanied by all its provisions and conditions.  It may not be assumed in part and rejected in part."  *Id.*, at 952.  In other words, in assuming a contract, a debtor may not alter the terms of the contract unless the other party to the contract has agreed to the alterations.   Such is not the case here.   USACM has not requested authority to assume the Loan Servicing Agreements, and neither the Direct Lenders nor the Third-Party Investors have agreed to the changes in the terms of the Loan Servicing Agreements proposed by USACM in the Motion.

Further, the Debtor is unable to assume the Loan Servicing Agreements absent the agreement of the Direct Lenders and the Third-Party Investors due to the provisions of 11 U.S.C. Section

365(b)(1).  Section 365(b)(1) states that a debtor may not assume an executory contract unless the debtor has cured all defaults or provided adequate assurance of prompt cure.  USACM, in its own Motion, admits that it has defaulted upon the Loan Servicing Agreements.  In particular, USACM states that (i) due to its irregular pre-petition record keeping it was necessary to seek Orders permitting USACM to net and hold back amounts that may be owed by a Direct Lender against amounts that USACM has collected on behalf of the Direct Lender on a different loan within that Direct Lender's portfolio (Motion, para. 5); and (ii) the current management of USACM is still unable to straighten out what monies are due to or due from any given Direct Lender with respect to any given loan within that Direct Lender's portfolio (Motion, para. 10).

Among other obligations imposed upon USACM, USACM's standard Loan Servicing Agreement requires USACM to (i) "[k]eep appropriate accounting records on each note and the sums collected thereon, which records will reflect the amounts collected as to principal, interest and late charges, and, if applicable, insurance, taxes and other specified amounts.  Those records will be available for review by the Lender during regular business hours at USA's corporate office" (Loan Servicing Agreement, para. 2(b)); and (ii) "[p]roceed diligently to collect all payments due under the terms of the note and promptly pay the proper parties, *when and if due*, principal, interest, late charges, insurance and other specified funds" (Loan Servicing Agreement, para 2(c)(i)).  As USACM admitted in its Motion, it failed to keep appropriate or accurate records.  As a result, it felt compelled to obtain an order from this Court allowing it to refrain from making distributions to certain Direct Lenders that the Direct Lenders would otherwise be entitled to.  Thus, USACM is in default under the Loan Servicing Agreements, and may not assume or assign those Agreements until or unless the defaults are cured.  *See,* 11 U.S.C. Section 365(b)(1).  *See also,* 11 U.S.C. Section 365(f)(2) ("The trustee may assign an executory contract or unexpired lease of the debtor only if – (A) the trustee assumes such contract or lease in accordance with the provisions of this section").

**B.** **Through its Proposed Procedures, USACM is Attempting to Add New Terms to the Loan Servicing Agreement.**

Notwithstanding USACM's assertion in its Reply that its proposed procedures would not alter the existing Loan Servicing Agreements, the procedures proposed in the Motion would, in fact, change existing terms of the Loan Servicing Agreements and add new terms which would grant USACM rights, fees and privileges to which it is not entitled.

For example, Paragraph 5 of the Loan Servicing Agreement contains the only terms under which USACM is entitled to fees under the Loan Servicing Agreement. *See,* Committee Opposition, Exhibit 1, para. 5. Paragraph 5 of the Loan Servicing Agreement provides, *inter alia*, that

> Should Lender desire to sell all or any part of its interest in the note and deed of trust, **USA will assist Lender in** finding potential buyers and **completing the necessary documentation for the transaction.** A fee of 5% of the remaining balance of Lender's undivided interest in the note amount will be deducted from the selling price and paid to USA on all such assignments for which USA locates the Assignee. (emphasis added).

The requirement in paragraph 5 for USACM to assist in completing the necessary documentation for the transaction is not dependent upon USACM first finding the proposed buyer. Rather, the requirement for USACM to assist in the documentation is absolute whether or not USACM has found the buyer. Further, USACM is entitled to a fee for completing the documentation only if it has found the buyer for the Lender. If USACM does not provide the buyer, it is not entitled to a fee or other compensation under the terms of paragraph 5 of the Loan Servicing Agreement.

USACM's proposed procedures nos. 1.5 and 2.5 directly contradict paragraph 5 of the Loan Servicing Agreement in that they provide for USACM to receive a fee for processing transfers, notwithstanding that it is legally obligated to assist in the completing the necessary documentation for the transfer without any compensation if USACM has not found the buyer. Thus, USACM's assertion that its proposed procedures would not alter the existing term of the Loan Servicing Agreements is simply incorrect. The proposed procedures clearly would replace existing terms of the Loan Servicing Agreements with new terms.

**C.    USACM May Not Unilaterally Alter the Terms of the Loan Servicing Agreements.**

As explained above, notwithstanding USACM's allegation in its Reply that it is not attempting to unilaterally modify the Loan Servicing Agreements, proposed procedures clearly constitute an attempt to unilaterally alter the terms of and introduce new terms to the Loan Servicing Agreements.

USACM contends in its Reply that its proposed procedures are simply a means by which to establish contractual relationships with Third-Party Investors with whom it alleges it is not currently in contractual privity.  In fact, however, contractual relationships already exist between USACM and the Third-Party Investors by virtue of the assignments between the Direct Lenders and the Third-Party Investors.

While Sierra cannot speak for any other Third-Party Investor, the assignment agreements that it has entered into with Direct Lenders provide for the assignment of not only the Direct Lenders' interests in a particular loan, but also in the rights to collect that loan, and in "all rights . . . that Seller may have against . . . the servicer and originator of the Loan, USA Commercial Mortgage Company ('Servicer')."  *See*, Exhibit "A," para. 1(iii).  In other words, the Direct Lenders with whom Sierra has contracted have been assigning all their rights related to USACM, including rights respecting the Loan Servicing Agreements, to Sierra.

That Direct Lenders might sell only a portion of their loan holdings was clearly contemplated in the Loan Servicing Agreements.  *See,* Committee Opposition, Exhibit 1, para. 5 ("Should Lender desire to sell <u>all or any part of its interest</u> . . . .") (emphasis added).  Further, the Loan Servicing Agreements clearly contemplate that those Agreements may be assigned.  *See,* Loan Servicing Agreement, para. 16 ("This Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors and assigns").  Given the express terms of the Loan Servicing Agreements, USCAM may not dismiss the possibility that the Third-Party Investors are parties to the existing Loan Servicing Agreements as "simply erroneous" with no further discussion.[4]  Indeed,

---

[4]  USACM's implication that the Direct Lenders cannot assign their interests in the Loan Servicing Agreements to the Third-Party Investors is ironic, considering the fact that USACM proposes in its Chapter 11 plan to assign its interests in the Loan Servicing Agreements to the purchaser of its assets.  USACM offers no explanation why it may assign its interests in the Loan Servicing Agreements, but the Direct Lenders may not assign theirs.  It stands to reason that if USACM may assign its interests in the Loan Servicing Agreements, so may the Direct

Nevada law concerning assignments establishes that the assignments from the Direct Lenders to the Third-Party Investors actually do create contractual relationships between USACM and the Third party Investors.

Nevada law freely permits the assignment of contractual rights. *See, Commercial Credit Corporation v. Matthews*, 77 Nev. 377, 391 (Nev. 1961) ("We recognize the rule that after a contract is made, rights created by it are assignable . . . ."). Further, once an assignment of contractual rights has been made, the other party to the contract is obligated to fulfill its duties to the assignee. *See, Wood v. Chicago Title Agency of Las Vegas*, 109 Nev. 70, 72 (Nev. 1993) ("After notice of [an] assignment has been given to the obligor . . . . [t]he obligor must pay the assignee.") (first alteration in original). In other words, under Nevada law, upon the Direct Lenders' assignment of rights in the Loan Servicing agreements to the Third-Party Investors, the Third-Party Investors became parties to those Agreements to whom USACM owes servicing duties.

Since USACM already has contractual relationships with the Third-Party Investors by virtue of the assignments from the Direct Lenders to the Third-Party Investors, USACM's assertion in its Reply that it is merely attempting to establish contractual relationships where none currently exist is erroneous. Rather, as explained above, the procedures sought in the Motion are an attempt to alter the existing contractual rights and obligations which exist between USACM and the Third-Party Investors. Since no section of the Bankruptcy Code permits a debtor to unilaterally alter the terms of an executory contract to which it is a party and USACM's own standard Loan Servicing Agreement provides that its terms "cannot be modified except by a written amendment signed by both parties" (Loan Servicing Agreement, para. 10), USACM may not unilaterally change the terms of the Loan Servicing Agreement.

---

Lenders. Indeed, if USACM may assign its interests in the Loan Servicing Agreements, USACM may be estopped from arguing that the Direct Lenders may not similarly assign their interests.

**D.** **The Proposed Procedures Could Constitute Interference with Contractual Relations and/or Interference With Prospective Economic Advantage.**

The procedures proposed by USCAM require that the Third-Party Investors enter into new contracts agreeing to use USCAM as servicer, and would prohibit the Third-Party Investors from receiving any payments on its loans until such contracts were executed, irrespective of whether the transferring Direct Lender was subject to a "holdback" on account of pre-paid interest or not. *See,* Motion, paras. 1.3 and 1.4. If a transferring Direct Lender is not currently subject to a holdback because of pre-paid interest, Sierra is entitled to "all rights and claims to accrued interest, cash distributions, voting rights and other benefits of any nature whatsoever distributable or allocable to Seller's fractionalized ownership interest in the Loan . . . ." Exhibit A, para. 1. It seems reasonable to assume that the assignment contracts of other Third-Party Investors likely include similar terms and such Third-Party Investors would have similar entitlements. Therefore in the event that the transferring Direct Lender is not currently subject to a holdback because of pre-paid interest, USACM's proposal to withhold distributions to the Third-Party Investors until such time as they execute a new agreement with USCAM would constitute an improper interference with contractual relations and/or an improper interference with prospective economic advantage.

The tort of wrongful interference with prospective economic advantage consists of "(1) a prospective contractual relationship between the plaintiff and a third party; (2) the defendant's knowledge of this prospective relationship; (3) the intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and, (5) actual harm to the plaintiff as a result of the defendant's conduct." *Las Vegas-Tonopah-Reno Stage Line, Inc. v. Gray Line Tours of Southern Nevada*, 106 Nev. 283, 287 (Nev. 1990). The closely related tort of wrongful interference with contractual relations consists of "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage with the property rights of the Third-Party Investors." *J.J. Industries, LLC v. Bennett*, 119 Nev. 269, 273 (Nev. 2003). "Interference" for purposes of the tort of interference with prospective economic advantage is considered "intentional if the actor desires to bring it about or if he knows that the interference is

certain or substantially certain to occur as a result of his action." *Las Vegas-Tonopah-Reno Stage Line,* 106 Nev. at 288. "Interference" for purposes of the tort of interference with contractual relations is considered intentional if the actor has "knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract." *J.J. Industries*, 119 Nev. at 273. Thus, if USCAM is aware of the fact that Direct Lenders and Third-Party Investors have entered into or intend to enter into contracts assigning the interests in the loans and loan distributions (which USCAM has admitted in its Motion it is) interference with the transfer of the loan interests and/or interference with the normal distribution of loan payments when the transferring Direct Lender is not subject to a holdback would constitute interference with contractual relations and/or with prospective economic advantage.

**E.    The Court Lacks Jurisdiction to Compel the Third-Party Investors to Enter Into the Proposed New Contracts With the Debtor.**

Nothing in the Bankruptcy Code permits a debtor to force any party, whether the debtor is in contractual privity with the other party or not, to enter into a new contract with the debtor, outside of the parameters of a Chapter 11 plan. Debtors and third parties may *agree* to enter into contracts, but third parties generally cannot be *compelled* to enter into unwanted contracts. The only exception to this general rule is that a Chapter 11 plan constitutes a contract and may be "crammed down" upon an unaccepting class of creditors.

USCAM, however, has not made its proposals regarding the obligations of the Third-Party Investors in the context of its Chapter 11 plan. Rather, USCAM has sought approval of its proposed procedures by way of the Motion.

Essentially, USCAM is seeking a mandatory injunction from the Court, ordering Third-Party Investors to enter into new contracts with the Debtor. Such injunctive relief may only be obtained via adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001(7). *In re Martin*, 268 B.R. 168 (Bankr. E.D.Ark. 2001) ("Since, the debtor may not obtain an injunction by motion, the motion must be denied"). Further, USCAM has failed to present evidence demonstrating the several elements warranting an injunction, such as irreparable harm, success on the merits, or the balance of

hardships.  *See, ITT Corporation v. Hilton Hotels Corporation*, 978 F.Supp. 1342, 1345 (D. Nev. 1997) (a party requesting preliminary injunctive relief "must show: (1) probable success on the merits and irreparable injury; or (2) sufficiently serious questions going to the merits to make the case a fair ground for litigation and a balance of hardships tipping decidedly in favor of the party requesting relief . . . . 'The standards for issuing a permanent injunction are substantially similar to those applied to requests for preliminary injunctive relief; however in order to obtain a permanent injunction plaintiffs must actually succeed on the merits of their claims.'").  USCAM, therefore, is prohibited from obtaining the relief it has sought in the Motion.

Further, USCAM has failed to explain how the Court would have jurisdiction to impose the proposed procedures upon the Third-Party Investors in the absence of having such Third-Party Investors brought before the Court in the context of an adversary proceeding.  Federal Rule of Civil Procedure 65(d), as made applicable herein by Federal Rule of Bankruptcy Procedure 7065, provides in pertinent part that "[e]very order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in its terms . . . ; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert of participation with them who receive actual notice of the order by personal service or otherwise."  In other words, due to Rules 7001(7) and 65(d) the Court may not impose a mandatory injunction upon any entity which who has not been named as a defendant in an adversary proceeding and accorded the full rights of a defendant in an adversary proceeding.

**F.    USACM's Offer to Permit Some Servicing Fees to Remain at 1% Does Not Solve All the Problems With the Motion's Proposal Regarding Servicing Fees.**

Although USACM offered in its Reply to permit the servicing fees on the loans where the current servicing fees are 1% to remain at 1% in the proposed new contracts with the Third-Party Investors, USACM's offer does not solve all of the problems with the proposed new contracts or the proposed servicing fees.  As discussed above, USACM has no right to impose new contracts upon the Third-Party Investors.  Further, the Reply does not address the fee percentage which would be imposed if the current fee is not 1%.  Based upon the Reply, Sierra can only presume that USACM intends for

the new servicing fee percentage to be 3% for all contracts where the current fee is other than 1%.

USACM's proposals set forth in the Motion could impair Sierra's economic interests in the loans. More specifically, an increase of the servicing fee to 3% would increase the risk Sierra assumed in purchasing the Direct Lender interests given the contractual rights that are in effect under the current Loan Servicing Agreements. USACM's agreement to keep the current 1% servicing fees at 1% will not be sufficient to prevent injury to Sierra if Sierra has purchased loans where the servicing fee is not 1%. Further, an increase of the servicing fee to 3% could cause injury to the Direct Lenders by reducing liquidity and potential value available to them through a sale of their loan interests. Therefore, USACM's offer to permit some servicing fees to remain at 1% is not enough to render the 3% servicing fee proposal, or any of the other proposals set forth in the Motion, allowable.

## IV.
## CONCLUSION

Since (i) the proposed procedures would alter the terms of unassumed executory contracts; (ii) USACM is not entitled to impose modified contractual terms upon Third-Party Investors; (iii) USACM lacks authority to compel the Third-Party Investors to enter into new contracts with USACM; (iv) the Motion was not the correct vehicle by which to obtain a mandatory injunction compelling parties to enter into new contracts; and (v) the proposed procedures would impair the Third-Party Investors' contractual rights and economic advantages, the Motion should be denied.

WHEREFORE, Sierra respectfully requests that the Motion be denied.

Dated: December 15, 2006

Michael D. Warner (TX Bar No. 00792304)
David T. Cohen (TX Bar No. 75008424)
Alexandra P. Olenczuk (TX Bar No. 24033924)
**WARNER STEVENS, L.L.P.**
301 Commerce Street, #1700
Fort Worth, TX 76102
Tel:     (817) 810-5250
Fax:     (817) 810-5255
Email:  dcohen@warnerstevens.com
Email:  aolenczuk@warnerstevens.com

[SIGNATURES CONTINUED NEXT PAGE]

*and*

**MICHELLE L. ABRAMS, LTD.**

By: _____/s/ Michelle L. Abrams_____
Michelle L. Abrams (NV Bar No. 5565)
7201 West Lake Mead Blvd., Ste. 210
Las Vegas, NV 89128
Tel:     (702) 233-5040
Fax:     (702) 233-2209
Email:  mabrams@mabramslaw.com

*Counsel for Sierra Liquidity Fund, L.L.C.*