1  Annette W. Jarvis, Utah Bar No. 1649
   Steven C. Strong, Utah Bar No. 6340
2  RAY QUINNEY & NEBEKER P.C.
   36 South State Street, Suite 1400
3  P.O. Box 45385
   Salt Lake City, Utah 84145-0385
4  Telephone: (801) 532-1500
   Facsimile: (801) 532-7543
5  Email: ajarvis@rqn.com

6  Lenard E. Schwartzer, Nevada Bar No. 0399
   Jeanette E. McPherson, Nevada Bar No. 5423
7  SCHWARTZER & MCPHERSON LAW FIRM
   2850 South Jones Boulevard, Suite 1
8  Las Vegas, Nevada 89146-5308
   Telephone: (702) 228-7590
9  Facsimile: (702) 892-0122
   E-Mail: bkfilings@s-mlaw.com
10
   Attorneys for Debtors and Debtors-in-Possession
11

12              UNITED STATES BANKRUPTCY COURT

13                   DISTRICT OF NEVADA

14 | In re:                                      | Case No. BK-S-06-10725 LBR
   | USA COMMERCIAL MORTGAGE COMPANY,            | Case No. BK-S-06-10726 LBR
   |                                    Debtor.  | Case No. BK-S-06-10727 LBR
15 | In re:                                      | Case No. BK-S-06-10728 LBR
16 | USA CAPITAL REALTY ADVISORS, LLC,           | Case No. BK-S-06-10729 LBR
   |                                    Debtor.  |
17 | In re:                                      | Chapter 11
18 | USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, |
   |                                    Debtor.  | Jointly Administered Under
19 | In re:                                      | Case No. BK-S-06-10725 LBR
   | USA CAPITAL FIRST TRUST DEED FUND, LLC,      |
20 |                                    Debtor.  | Date: December 19, 2006
21 | In re:                                      | Time: 10:00 a.m.
   | USA SECURITIES, LLC,                        |
22 |                                    Debtor.  |

23 | Affects:                                    | DECLARATION OF THOMAS J.
   | ☒ All Debtors                               | ALLISON IN SUPPORT OF THE
   | ☐ USA Commercial Mortgage Company           | CONFIRMATION OF THE DEBTORS'
24 | ☐ USA Securities, LLC                       | THIRD AMENDED JOINT PLAN OF
   | ☐ USA Capital Realty Advisors, LLC          | REORGANIZATION
25 | ☐ USA Capital Diversified Trust Deed Fund, LLC |
26 | ☐ USA Capital First Trust Deed Fund, LLC    | (AFFECTS ALL DEBTORS)

27

28                              1

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

I, Thomas J. Allison, hereby declare, verify and state as follows:

1.      I am the President and Chief Restructuring Officer of USA Commercial Mortgage Company ("USACM") and the Manager and Chief Restructuring Officer of each of the four other debtors in the above-captioned jointly administered chapter 11 cases ("Chapter 11 Cases"), namely USA Securities LLC ("USA Securities"), USA Capital Realty Advisors LLC ("USA Realty"), USA Capital Diversified Trust Deed Fund ("DTDF"), and USA Capital First Trust Deed Fund ("FTDF," and collectively with USACM, USA Securities, USA Realty, DTDF, and FTDF, the "Debtors").  I submit this Declaration in support of the confirmation of the Debtors' Third Amended Joint Plan of Reorganization, filed on November 15, 2006, including all Exhibits and documents incorporated therein (the "Plan").

2.      This Declaration is based upon my personal knowledge or, if so stated, upon information and belief.  Thus, all matters set forth in this Declaration are based on (a) my personal knowledge, (b) my review of relevant documents and records, (c) my view, based upon my experience and knowledge of the Debtors' businesses and financial condition, and/or (d) as to matters involving United States bankruptcy law or rules, my reliance on the advice of bankruptcy counsel to the Debtors.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

3.      Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the Plan.

4.      This Declaration supplements the information contained in the Debtors' Disclosure Statement, as well as all prior declarations I have made which are on file in the Chapter 11 Cases, and which are incorporated herein by this reference.

5.      I have over 25 years of experience serving as an advisor to troubled companies. Over the course of my career, I have evaluated and negotiated many major workouts, restructurings and reorganizations.

6.      I have served as the President and Chief Restructuring Officer to USACM and the Manager and Chief Restructuring Officer of the other Debtors throughout the Chapter 11 Cases,

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

and I have an intimate knowledge of the Debtors' businesses and financial condition.

7.    The Plan is the product of extensive negotiations among the Debtors and the four Committees appointed in the Chapter 11 Cases and, in my judgment, provides a comprehensive, workable solution to the many complex issues that resulted from the pre-petition irregularities that occurred in the Debtors' businesses, the details of which are set forth in my previous declarations that, under ¶ 4 above, have been incorporated herein.

### THE PLAN SHOULD BE CONFIRMED

### The Plan Complies With The Applicable Provisions Of 11 U.S.C. § 1129(a)

8.    *Section 1129(a)(1) of the Bankruptcy Code.*  In accordance with Section 1129(a)(1), the Plan complies with all of the applicable provisions of the Bankruptcy Code, including without limitation, Sections 1122 and 1123, discussed in ¶¶ a and b below.

a.    Section 1122 of the Bankruptcy Code.

i.    Consistent with Section 1122(a) of the Bankruptcy Code, each Class under the Plan differs in legal character or nature.  All Claims and Equity Interests placed within a Class are substantially similar to the other Claims or Equity Interests in that same Class because they are similar in legal character to the other Claims against or Equity Interests in Debtors.  Thus, the classification scheme embodied in the Plan is both reasonable and appropriate under Section 1122(a) of the Bankruptcy Code.

ii.    Unremitted Principal Claims, which are unsecured Claims against USACM, are properly classified in Class A-4 along with other General Unsecured Claims against USACM.

iii.    Section 1121(b), applying to the classification of administrative convenience claims, is not applicable to these Chapter 11 Cases because the Debtors' Plan does not provide for any such claims.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

b.      Section 1123 of the Bankruptcy Code.

i.      Section 1123(a)(1).  The Plan properly designates Classes of Claims and Equity Interests as required under Section 1123(a)(1) of the Bankruptcy Code, and provides for the treatment of Claims that should not be classified.  Article II Section C of the Plan designates Classes of Claims and Equity Interests for each of the Debtors, other than those specified in Sections 507(a)(2), (a)(3) and (a)(8) of the Bankruptcy Code.  "Unclassified Claims," *i.e.,* those in Sections 507(a)(2) and (a)(8), to the extent that they exist against the Debtors, are treated separately from the Article II Section  C classified Claims and Equity Interests, in Article II Section B of the Plan.  There are no Section 507(a)(3) Claims in these voluntary Chapter 11 Cases.  Thus, the Plan complies with Section 1123(a)(1).

ii.     Section 1123(a)(2).  The Plan complies with Section 1123(a)(2) of the Bankruptcy Code because it specifies unimpaired Classes of Claims and Equity Interests.  Article II Section C of the Plan lists each Class of Claims and Equity Interests and states the treatment of each Class under the Plan.  The following are Classes of Claims that are unimpaired under the Plan: Classes A-1 through A-3 (Claims against USACM), Classes B-1 through B-4 (Claims against FTDF), Classes C-1 through C-4 (Claims against DTDF), Classes D-1 through D-3 (Claims against USA Realty), and Classes E-1 through E-3 (Claims against USA Securities).  In the subsections of Article II Section C of the Plan discussing the treatment of each of these Classes of unimpaired Claims, the Plan expressly states that the Claims are not impaired and that the holders of Claims in such

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

4

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Classes are deemed to vote in favor of the Plan.[1]  The Plan contains no unimpaired Classes of Equity Interests in any of the Debtors.

  iii.  Section 1123(a)(3).  The Plan satisfies Section 1123(a)(3) because it specifies the treatment of impaired Classes of Claims or Equity Interests.  As noted above, Article II Section C of the Plan lists each Class of Claims and Equity Interests and states the treatment of each Class under the Plan.  The following Classes of Claims and Equity Interests are impaired under the Plan:  Classes A-4 through A-8 (Claims against and Equity Interests in USACM), Class B-5 (Equity Interests in FTDF), Class C-5 (Equity Interests in DTDF), Classes D-4 through D-5 (Claims against and Equity Interests in USA Realty), and Claims E-4 through E-5 (Claims against and Equity Interests in USA Securities).  In the subsection of Article II Section C of the Plan related to each of these Classes of impaired Claims, the Plan expressly states how these Claims or Equity Interests within each such Class will be treated.[2]

  iv.  Section 1123(a)(4).  Section 1123(a)(4) has been met because the Plan provides for the same treatment for each Claim or Equity

---

1 *See* Plan, Art. II Section C.1(a)-(c) (treatment of Classes A-1 through A-3, Claims against USACM); *id*. Section C.2(a)-(d) (treatment of Classes B-1 through B-4, Claims FTDF); *id*. Section C.3(a) - (d) (treatment of Classes C-1 through C-4, Claims against DTDF); *id*. Section C.4.(a)-(c) (treatment of Class D-1 through D-3, Claims against USA Realty); *id*. Section C.5(a)-(c) (treatment of Class E-1 through E-3, Claims against USA Securities); *see also id*. Section A (summarizing the treatment of unimpaired Classes of Claims against each Debtor); *id*. Art. III Section A (listing the above Classes of Claims as those that are deemed to accept the Plan.)

2 *See* Plan, Art. II Section C.1(d)-(h) (treatment of Classes A-4 through A-8,  Claims against and Equity Interests in USACM); *id*. Section C.2(e) (treatment of Class B-5, Equity Interests in FTDF); *id*. Section C.3(e) (treatment of Class C-5, Equity Interests in DTDF); *id*. Section C.4.(d)-(e) (treatment of Class D-4 through D-5, Claims against and Equity Interests in USA Realty); *id*. Section C.5(d)-(e) (treatment of Class E-4 through E-5, Claims against and Equity Interests in USA Securities); *see also id.* Section A (summarizing the treatment of impaired Classes of Claims against and Equity Interests in each Debtor); *id*. Art. III Section A (listing the above Classes of Claims and Equity Interests as those that are entitled to vote to accept or reject the Plan, or as those deemed to reject the Plan.)

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Interest of a particular Class, unless the holder of a particular Claim or Equity Interest has agreed less favorable treatment. Article II Section C of the Plan sets forth the treatment of Claims or Equity Interests classified in each Class under the Plan. The treatment of Claims and Equity Interests is also summarized in Article II Section A of the Plan. Those Sections of the Plan provide for the same treatment of each Claim and Equity Interest within a particular Class. While the holder of a Claim or Equity Interest may agree to less favorable treatment than other holders of Claims and Equity Interests within its Class, the Plan does not single out any Claim or Equity Interest for treatment different than other Claims or Equity Interests within its Class.

v.      Section 1123(a)(5) and (b).  The Plan provides adequate means for its implementation in a manner authorized under Section 1129(a)(5) and (b) and, therefore, satisfies Section 1123(a)(5). Article IV of the Plan, entitled "Implementation of the Plan," states the material terms related to its implementation. Section A of Article IV provides a summary of the means of implementation, and Section B through H, together with other Plan provisions referenced below, the Asset Purchase Agreement, the Schedule of Executory Contracts and Unexpired Leases, the Plan Documents Supplement and the Direct Lender Supplement, detail the means for implementing the Plan. Specifically, the Plan will be implemented in material part as authorized under Section 1123(a) and (b) by the following means:

1.    the transfer of certain Loan Servicing Agreements to the Asset Purchaser under an Asset Purchase Agreement in accordance with Section 1123(a)(5)(B);[3]

2.    the sale of the Acquired Assets pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code as authorized under Section 1123(a)(5)(D) of the Bankruptcy Code, and the disbursement of the Allocated Net Sale Proceeds in accordance with the Plan to holders of Claims against USACM and FTDF, and holders of Equity Interests in FTDF;[4]

3.    the effectuation of the "Intercompany Compromises," defined in Article IV Section of E of the Plan, and the releases set forth in Article VIII Section A of the Plan, as authorized under Section 1123(b)(3)(A) of the Bankruptcy Code;

4.    the transfer of certain assets of USACM to the USACM Trust, as authorized under Section 1123(a)(5)(B) of the Bankruptcy Code, the liquidation of those assets, and disbursement of Cash to beneficiaries of the USACM Trust pursuant to the Plan and the USACM Trust Agreement;[5]

5.    the retention by Post-Effective Date DTDF of assets of DTDF, as authorized under Section 1123(a)(5)(A) of the Bankruptcy Code, the liquidation of those assets by Post-Effective Date DTDF in accordance with the DTDF Amended Operating Agreement, and the disbursement of Cash in accordance with the Plan;[6]

6.    the retention and enforcement of certain Claims and causes of action and the liquidation of those Claims and causes of action and other assets of each of the Debtor's respective Estates, unless otherwise transferred to the USACM Trust or retained by Post-Effective Date DTDF, in accordance with Section 1123(b)(3)(B) and (b)(4) of the Bankruptcy Code,

---

3 Plan, Art. IV, Section A.1.

4 Plan, Art. IV, Sections A.2 & C.

5 Plan, Art. IV, Sections A.3 and D.1; *see id.* Art. VII; USACM Trust Agreement, filed as part of the Plan Documents Supplement [Docket No. 2002].

6 Plan, Art. IV, Sections A.5 & D.2; *see id.* Art. VII; DTDF Amended Operating Agreement, filed as part of the Plan Documents Supplement [Docket No. 2001].

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

and the distribution of Cash proceeds in accordance with the Plan;[7]

7.    the assumption and/or assumption and assignment of executory contracts and unexpired leases listed on the Schedule of Executory Contracts and Unexpired Leases and the rejection of other executory contracts and unexpired leases in accordance with and as authorized under Sections 365 and 1123(b)(2) of the Bankruptcy Code;[8]

8.    the retention by the Bankruptcy Court of jurisdiction in accordance with Article VIII Section D of the Plan;

9.    the imposition of the post-Effective Date injunction set forth in Article IV Section H of the Plan; and

10.    the eventual dissolution of each of the Debtors.[9]

vi.    <u>Section 1123(a)(6), (a)(7) and (a)(8).</u>  Subsections (a)(6), (a)(7) and (a)(8) of Section 1123 are not applicable in these Chapter 11 Cases.

9.    <u>*Section 1129(a)(2) of the Bankruptcy Code.*</u>  The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required under Section 1129(a)(2), including, without limitation, Sections 1125 and 1126 and all applicable Bankruptcy Rules.  Upon information and belief, the solicitation of votes on the Plan was (a) in compliance with all applicable laws, rules and regulations governing the adequacy of disclosure in connection with such solicitation, (b) in compliance with the "Solicitation Procedures" approved by the Court in the "Order Approving (A) Debtors' Disclosure Statement; (B) Proposed Notice of Confirmation Hearing; (C) Proposed Solicitation and Notice Procedures; and (D) Proposed Form of Ballots" ("Disclosure Statement Order"); and (c) commenced only after providing the Disclosure Statement, which was approved by the Court as part of the Disclosure Statement Order

---

7 Plan, Art. IV. Sections A.3, A.7, B & G; *id.* Art. VII &  Art. VIII Section L.

8 Plan, Art. V; *see* Schedule of Executory Contracts and Unexpired Leases, filed by the Debtors on November 29, 2006 [Docket No. 1886].

9 Plan, Art. IV Sections A.3, A.5 –A.7; *id.* Art. VIII Section L.

1    as containing adequate information within the meaning of Section 1125(a) of the Bankruptcy

2    Code.

3         10.    *Section 1129(a)(3) of the Bankruptcy Code*.  The Debtors have proposed the Plan in

4    good faith and not by any means forbidden by law in accordance with Section 1129(a)(3).

        a.    Consistent with the objectives and overriding purpose of the Bankruptcy

              Code, holders of Allowed Claims, and in the cases of FTDF and DTDF,

              Allowed Equity Interests, will realize the highest possible and most certain

              recoveries under the circumstances and in comparison to other alternatives,

              including liquidation under Chapter 7 of the Bankruptcy Code.

        b.    The process for the formulation of the Plan and the Plan itself provide

              independent evidence of the Debtors' good faith.

              i.    The Plan formulation process, which involved arm's-length,

                    extensive and often hard-fought negotiations between the

                    Committees and the Debtors, and between the Committees

                    themselves, has resulted in compromises between the various

                    Debtors' Estates and Direct Lenders.

              ii.   Furthermore, as I discuss in more detail below, the sale of the

                    Acquired Assets, including the lead bid and auction component, was

                    an arm-length transaction that was extensively negotiated by the

                    Debtors and the Committees, and it has produced the highest and

                    best offer for the Acquired Assets.

              iii.  The Plan is supported by all four Committees, thus evidencing their

                    acknowledgment that the Plan is fundamentally fair and proposed in

                    good faith.

              iv.   The liquidation analysis attached as Exhibit 4 to the Disclosure

                    Statement ("Liquidation Analysis"), including the supplements

                    made thereto herein, demonstrate that holders of Allowed Claims

9

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

and, in the cases of FTDF and DTDF, holders of Equity Interests will receive substantially more under the Plan than they would in a hypothetical Chapter 7 liquidation.  The Plan maximizes the value of the Debtors' assets and proposes distributions on the Effective Date, or as soon as possible thereafter, depending on the circumstances.

11.    *Section 1129(a)(4) of the Bankruptcy Code*.  The Plan fully complies with Section 1129(a)(4) because it provides that any payment made or to be made for services or for costs and expenses incurred in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved, or are subject to approval, by the Court as reasonable.   Article II Section B.1 of the Plan and Article III of the Disclosure Statement set forth procedures for all Professionals or other Entities requesting compensation or reimbursement of expenses to seek Court approval for any final allowance of compensation or reimbursement of expenses.  Article VII Section A of the Plan sets forth procedures related to the objection of any such requests, and Article VIII Section D of the Plan provides for the Court's retention of jurisdiction to hear and determine any and all applications by Professionals or other Entities for compensation and reimbursement of expenses arising out of or related to the Debtors' Chapter 11 Cases.  Furthermore, to the extent that a break up fee is an expense "incurred in or in connection with a case, or in connection with the plan and incident to the case" within the meaning of Section 1129(a)(4), the break up fee payable to SPCP Group, LLC was approved by the Court in the Bid Procedures Order.

12.    *Section 1129(a)(5) of the Bankruptcy Code*.  The Plan complies with Section 1129(a)(5) because it adequately discloses affiliates of the Debtors participating in the joint Plan and, where applicable, successors to the Debtors under the Plan.

a.    The Debtors are all affiliates of one another, and this fact is apparent in the Plan.

b.    The Plan, as supplemented by the Plan Documents Supplement required under Article I Section C of the Plan, discloses those individuals who will

10

be retained by the Post-Effective Date Entities.

    i.    On December 8, 2006, the DTDF Committee filed a Plan Documents Supplement and Notice of Disclosures (the "DTDF Supplement") disclosing that Michael Tucker of FTI Consulting, Inc. (DTDF Committee's financial advisor) will serve as the DTDF Administrator.  The identities of members of the DTDF Post-Effective Date Committee and the terms of compensation for Mr. Tucker and members of the Committee, if any, are also disclosed in the DTDF Supplement.  To the best of my knowledge, the appointment of Mr. Tucker and the members to the DTDF Post-Effective Date Committee is consistent with the interests of the holders of Claims and Equity Interests in DTDF's case and with public policy.

    ii.    Also on December 8, 2006, the USACM Committee filed a Plan Documents Supplement and Disclosure (the "UCC Supplement") disclosing that Geoffrey L. Berman of Development Specialists, Inc. will serve as the USACM Trustee.  The UCC Supplement also identities members of the USACM Trust Committee and terms related to the compensation of Mr. Berman and the members of the Committee, if any.  To the best of my knowledge, the appointment of Mr. Berman and the members to the USACM Trust Committee is consistent with the interests of the holders of Claims in USACM's case and with public policy.

    iii.    Pursuant to Article VII Section E.1 of the Plan and the USACM Trust Agreement included in the UCC Supplement, Mr. Berman may serve as the Disbursing Agent for FTDF, USA Realty and USA Securities.  Upon information and belief, his appointment in this

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

11

1    capacity will be pursuant to an agreement with each of those

2    respective Debtors.

3        c.    To the best of my knowledge, none of the Persons disclosed in the DTDF

4    Supplement and the UCC Supplement is an insider of the Debtors, and,

5    therefore, Section 1125(a)(5)(B) does not apply in these Chapter 11 Cases.

6        13.    *Section 1129(a)(6) of the Bankruptcy Code.*  Section 1129(a)(6) is inapplicable in

7    these Chapter 11 Cases.  No regulatory commission has any jurisdiction over rate changes by the

8    Debtors.  Furthermore, the Plan does not provide for any rate changes by the Debtors.  Therefore,

9    the Plan satisfies the requirements of Section 1129(a)(6).

10        14.    *Section 1129(a)(7) of the Bankruptcy Code.*

11        a.    I directed the preparation of the Liquidation Analysis, attached as Exhibit 4

12    to Debtors' Disclosure Statement.  The Liquidation Analysis is still valid,

13    and it is incorporated herein by reference.

14        b.    The only adjustments to the estimated Liquidation Values that may be

15    appropriate at this time are those resulting from the Higher and Better Offer

16    that USACM and FTDF received from Compass Partners LLC ("Compass")

17    at the Auction on December 7, 2006 ("Compass Bid").

18        i.    The Compass Bid provides $8,000,000 for the "Commercial

19    Mortgage Assets," as that term is defined in the Asset Purchase

20    Agreement, which will be paid to the USACM Estate.

21        ii.    The "Additional Purchase Price" of $11,000,000 provided for in the

22    Compass Bid, which is not allocated to either the USACM or FTDF

23    Estate, after reduction of the Court-approved $1,500,000 breakup

24    fee that will be paid to the stalking horse bidder, SPCP Group, LLC,

25    is $9,500,000.  The allocation of this sum between USACM and

26    FTDF has not yet been determined.

27

28    12

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

iii. The Compass Bid provides an additional $48,000,000 for the "First Trust Deed Fund Assets," as that term is defined in the Asset Purchase Agreement, and that amount is paid solely to the FTDF Estate.

c. The Plan meets the requirements of Section 1129(a)(7), commonly referred to as the "best interest test" because each dissenting creditor or Equity Interest in an impaired Class will receive or retain value under the Plan that is not less than the amount such holder would receive if the Debtors were liquidated in Chapter 7.

d. Classes A-4, A-5, A-6, A-7, A-8, B-5, C-5, D-4, D-5, E-4, and E-5 are impaired under the Plan.

i. Of those impaired Classes, only Classes A-4, A-5, B-5, C-5, D-4, and E-4 will retain previously distributed assets and/or receive a distribution under the Plan. As shown in the Liquidation Analysis, as enhanced by additional distributions pursuant to the Compass Bid as referred to herein, this retention or distribution will yield to the holders of Claims and, in the case of Classes B-5 and C-5, holders of Equity Interests, significantly more than such holders would receive in a hypothetical Chapter 7 liquidation.

ii. Holders of Claims and/or Equity Interests classified in impaired Classes A-6 through A-8, D-5 and E-5 will receive no distribution under the Plan. Because, as demonstrated in the Liquidation Analysis, the holders of these Claims and/or Equity Interests would not receive any distribution if the USACM, USA Realty or the USA Securities' cases were liquidated under Chapter 7 of the Bankruptcy Code, each of these holders will achieve a recovery that is "not less than the amount" such holder would receive in a Chapter 7

13

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

liquidation.  Accordingly, the Plan satisfies Section 1129(a)(7) as to such holders of Claims and Equity Interests.

e.  Joseph Milanowski and Thomas Hantges ("Insider Equity Interests") filed an Objection to Confirmation of the Plan on December 11, 2006 [Docket No. 2051].  The Insider Equity Interests contend that the Plan is not fair and equitable (presumably under the Section 1129(a)(7) "best interests" test) because it provides that Equity Interests in USACM, USA Securities and USA Realty are canceled upon the Effective Date.  The Insider Equity Interests assert that "there is a possibility that all claim holders in at least USACM can be paid 100% of their claims" and that the Plan should acknowledge "the value that can be realized through the monetization of the $58 million dollar pledge, the $75 million dollar pledge and the potential value of other USACM assets."  Although the Insider Equity Interests mention two pledges, I am aware of only one pledge, a Security Agreement dated May 31, 2006 by and between IP and the Debtors.  It appears that the reference in the Insider Equity Interests' Objection to the $58 million dollar pledge refers to the repayment of the IP $58 Million Promissory Note.  I am not aware of any additional $75 million dollar pledge payable to USACM.

f.  On Page 5 of the Disclosure Statement, the Debtors have estimated the payoff to the Class A-4 General Unsecured Claims under the Plan will be 8-33%.  This payoff estimate was based on the Asset Purchase Agreement of SPCP Group, LLC, which was the only bid outstanding at the time.

g.  The overbid at the auction from the Compass Bid was $19,500,000 (the "Overbid").

h.  The Insider Equity Interests contend that IP $58 Million Promissory Note can be monetized (presumably for its full face value of $58,000,000).

14

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

i.   It would be misleading and not proper to value the IP $58 Million
     Promissory Note as being worth $58 million in immediate cash payable
     to USACM at this time (as argued by the Insider Equity Interests) or at
     any time in the near future.  IP does not have $58 million in cash at this
     time with which to pay the IP $58 Million Promissory Note.  The
     collateral for the IP $58 Million Promissory Note consists of pledged
     limited liability company interests owned by IP in eight limited liability
     companies, six of which are in the process of developing various real
     estate projects that are not completed at this time and which will require
     more equity contributions in order to complete and sell the projects and
     pay off the underlying mortgages on the projects and then return funds
     to the limited liability companies to be paid out as distributions on the
     limited liability company interests.  I am not aware of any market for or
     potential buyer of these pledged limited liability company interests,
     which are very illiquid.  There are many risks associated with any
     probability that USACM will realize the full $58 million or even a
     significant portion of the $58 million principal balance of the IP $58
     Million Promissory Note.  In addition, DTDF may have claims against
     some of these pledged limited liability company interests with a
     potential priority over the claims of USACM to these pledged limited
     liability company interests.

ii.  Notwithstanding the foregoing, and even assuming that the IP $58
     Million Promissory Note can be immediately monetized and liquidated
     for its full face value of $58,000,000, and that USACM would receive
     the full $58,000,000 from such monetization and liquidation, there is
     still no possibility that the USACM Unsecured Claims will be paid
     100%, and no possibility that there will be any distribution from the
     USACM Estate to the Insider Equity Interests.

15

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

i.  Even assuming solely for hypothetical purposes (in order to respond to the Objection of the Insider Equity Interests, and without any attempt to determine the allocation of the Overbid amount between USACM and FTDF) that the entirety of the Overbid of $19,500,000 were to be added to the payoff to the USACM Unsecured Claims, and even assuming solely for hypothetical purposes (in order to respond to the Objection of the Insider Equity Interests) that the full amount of $58,000,000 could be realized for USACM from the IP $58 Million Promissory Note and was to be added to the payoff to the USACM Unsecured Claims, there would still be a shortfall of approximately $35,000,000 and $385,000,000 in the payment of the USACM Unsecured Claims under the 33% high and the 8% low scenarios, respectively, with no distribution to the Insider Equity Interests.  As stated previously, there is no possibility that the USACM Unsecured Claims will be paid 100%, and no possibility that there will be any distribution from the USACM Estate to the Insider Equity Interests.

j.  The Liquidation Analysis states that the Estimated Liquidation Value of the Gross Proceeds from the liquidation of USACM's assets is $48,020,900.  The Liquidation Analysis also states that the net Estimated Amount Available to pay USACM Unsecured Claims is $29,869,200.  Finally, the Liquidation Analysis states that the Estimated Unsecured Claims against the USACM Estate will be $516,758,900, which means that there is an estimated shortfall under the Liquidation Analysis of $486,889,700 for the payment in full of the Estimated Unsecured Claims against the USACM Estate.  Under the Liquidation Analysis, there is no possibility that the USACM Unsecured Claims will be paid in full, and no possibility that there will be any distribution from the USACM Estate to the Insider Equity Interests.

16

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

k.    Even assuming solely for hypothetical purposes (in order to respond to the Objection of the Insider Equity Interests, and without any attempt to determine the allocation of the Overbid amount between USACM and FTDF) that the entirety of the Overbid of $19,500,000 were to be added to the net Estimated Amount Available to pay USACM Unsecured Claims in the Liquidation Analysis, and even assuming solely for hypothetical purposes (in order to respond to the Objection of the Insider Equity Interests) that the full amount of $58,000,000 could be realized for USACM from the IP $58 Million Promissory Note and was to be added to the net Estimated Amount Available to pay USACM Unsecured Claims in the Liquidation Analysis, there is still no possibility that the USACM Unsecured Claims will be paid in full, and no possibility that there will be any distribution from the USACM Estate to the Insider Equity Interests.

l.    It is fair and equitable to the Insider Equity Interests that their equity in USACM be canceled upon the Effective Date, and the Plan complies with the best interests test as to the Insider Equity Interests.

15.    *Section 1129(a)(8) of the Bankruptcy Code.*

a.    Subject to the exceptions contained in Section 1129(b) of the Bankruptcy Code, Section 1129(a)(8) requires that each Class of Claims and Equity Interests must either have accepted the Plan, or not be impaired under the Plan.

b.    Classes A-1 through A-3, B-1 through B-4, C-1 through C-4, D-1 through D-3 and E-1 through E-3 are unimpaired, and upon information and belief, based on the best information that I have obtained as of today, Classes A-5, B-5, C-5, D-4 and E-4, though impaired, have accepted the Plan. Thus, Section 1129(a)(8) is satisfied with respect to each of those Classes.

c.    Classes A-6 through A-8, D-5 and E-5 are impaired and are not entitled to any distribution and, therefore, under Section 1126(g) of the Bankruptcy Court are deemed to reject the Plan. Furthermore, upon information and

17

1    belief, based on the best information that I have as of today, impaired Class

2    A-4 has not voted to accept the Plan.  Thus, the Plan can be confirmed only

3    through the "cramdown" provisions of Section 1129(b) of the Bankruptcy

4    Code as to these Classes.  As I will address below, the Plan meets the

5    requirements of Section 1129(b) with respect to Classes A-4, A-6 through

6    A-8, D-5 and E-5 and, therefore, the failure to satisfy Section 1125(a)(8)

7    with respect to theses impaired rejecting Classes does not bar confirmation

8    of the Plan.

9        16.    _Section 1129(a)(9) of the Bankruptcy Code_.  Holders of Claims described in

10   Section 1129(a)(9) will be paid under the Plan in accordance with that Section.

11           a.    Pursuant to Article II Section B.1 of the Plan, unless otherwise agreed, each

12                 holder of a Claim under Section 507(a)(2) (Allowed Administrative

13                 Expense Claims, including Statutory Fees and Professional compensation)

14                 will receive Cash on the latter of the Effective Date or the date such

15                 Administrative Expense Claims becomes and Allowed Administrative

16                 Expense Claim.  The Debtors, whose petitions were voluntarily filed, do not

17                 have any Section 507(a)(2) Claims (gap claims in involuntary cases).  Thus,

18                 Section 1129(a)(9)(A) has been met.

19           b.    Priority Unsecured Claims (Claims entitled to priority under Section 507(a),

20                 other than Priority Tax Claims, Administrative Expense Claims, and

21                 Ordinary Course Administrative Expense Claims) are classified in Classes

22                 A-3 (USACM Priority Unsecured Claims), B-3 (FTDF Priority Unsecured

23                 Claims), C-3 (DTDF Priority Unsecured Claims), D-3 (USA Realty Priority

24                 Unsecured Claims) and E-3 (USA Securities Priority Unsecured Claims).

25                 Article II Section C sets forth the treatment of each of these Classes of

26                 Priority Unsecured Claims, stating that holders of Allowed Priority

27                 Unsecured Claims in each of these Classes shall be paid in full on the

28

18

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  Effective Date, unless such holder agrees otherwise.10

2  Section 1129(a)(9)(B), therefore, has been satisfied.

3  c.  Article II Section B.2 states that, unless otherwise agreed, holders of

4  Priority Tax Claims (Claims entitled to priority under Section 507(a)(8))11

5  against each of the Debtors will be paid in full in Cash from the relevant

6  Debtor's Estate, on the later of the Effective Date or the date such Priority

7  Tax Claim becomes and Allowed Priority Tax Claim, or, in either case as

8  applicable, as soon thereafter as practicable.  This treatment is more

9  favorable than allowed under Section 1129(a)(9)(C) and, therefore, that

10  provision has been met.

11  d.  Finally, the Plan complies with Section 1129(a)(9)(D).  Article II of the

12  Plan states that Allowed Secured Tax Claims against each of the Debtors, if

13  any, will be paid in full on or before the later of sixty days after the

14  Effective Date, or fifteen Business Days after the date the Secured Tax

15  Claims becomes an Allowed Claim.[12]

16  17.  *Section 1129(a)(10) of the Bankruptcy Code*.  This Section provides that at least

17  one impaired Class of Claims must accept the Plan, excluding acceptance by any insider.  Upon

18  information and belief, this Section 1129(a)(10) has been satisfied in each of the Debtors cases as

19  follows:

20  a.  In USACM's case, Classes A-4 through A-7 are Classes of Claims that are

21  impaired under the Plan.  Classes A-6 through A-7 will receive no

22  distribution under the Plan and, therefore, they are deemed to reject the

23  Plan.  Based on the information that I have at this time, of the voting

---

25  10 Plan, Art. II, Sections C.1(c), C.2(c), C.3(c); C.4(c), and C.5(c).

26  11 Plan, Art. I Section 114.

27  12 Plan, Art. II Sections C.1(a), C.2(a), C.3(a), C.4(a) & C.5(a); *see id*. Section A.

28

1                        impaired Classes, Class A-5 has voted to accept the Plan and, therefore,

2                        Section 1129(a)(10) has been met with regard to USACM.

3           b.        Section 1129(a)(10) does not apply to FTDF or DTDF because there are no

4                        impaired class of Claims in their cases.  The only impaired Classes in FTDF

5                        and DTDF' cases are Classes B-5 and C-5.  Those Classes, which

6                        incidentally have, based on the information available to me at this time,

7                        voted to accept the Plan, provide for the treatment of Equity Interests, not

8                        Claims.

9           c.        Class D-4 is the only impaired Class of Claims in USA Realty's case, and it

10                        appears that it has voted to accept the Plan.  Therefore, Section 1129(a)(10)

11                        is met in USA Realty's case.

12           d.        Finally, in USA Securities' case, Class E-4 is the only impaired Class of

13                        Claims, and it appears to have voted to accept the Plan.  Section

14                        1129(a)(10) thus is met in  USA Securities' case.

15       18.      *Section 1129(a)(11) of the Bankruptcy Code*.  Section 1129(a)(11) has been met in

16 these Chapter 11 Cases because the Plan is feasible.  The Debtors have thoroughly analyzed their

17 ability to make the distributions required under the liquidating Plan, as set forth above, the Debtors

18 have provided adequate means for the implementation of the Plan, and they have established a

19 framework to facilitate a prompt distribution of Cash as required under the Plan.

20           a.        The only fixed distributions that the Debtors must make under the Plan on

21                        the Effective Date are payments on account of Allowed Administrative

22                        Expense Claims, Allowed Priority Tax Claims, Allowed Secured Tax

23                        Claims (Classes A-1, B-1, C-1, D-1 and E-1), Allowed Other Secured

24                        Claims (Classes A-2, B-2, C-2, D-2 and E-2), Allowed Priority Unsecured

25                        Claims (Classes A-3, B-3, C-3, D-3 and E-3), and, in the cases of FTDF and

26

27

28                                20

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

DTDF, Allowed General Unsecured Claims (Classes B-4 and C-4).[13]  The Debtors anticipate that they will have sufficient Cash on the Effective Date, or on another date agreed to by the holder of an Allowed Claim, to pay these Classes of Claims, to the extent that Claims exist against a Debtor within a Class, or to make the reserves required under the Plan.

b.    Furthermore, the Plan, including all of the documents incorporated therein, has adequate provisions for the creation and management of the USACM Trust, the retention of assets by and the management of Post-Effective Date DTDF, and for making distributions to holders of Allowed Claims or Equity Interests classified in Classes A-4 (Allowed General Unsecured Claims against USACM), B-5 (Equity Interests in FTDF), C-5 (Equity Interests in DTDF), D-4 (Allowed General Unsecured Claims against USA Realty) and E-4 (Allowed General Unsecured Claims against USA Securities), which are the only other Classes that will receive a distribution under the Plan.[14]

19.    *Section 1129(a)(12) of the Bankruptcy Code.*  The Plan complies with Section 1129(a)(12) because all fees payable under section 1930 of title 28 have been paid or the Plan provides for the payment of all such fees on the effective date of the Plan.  The Plan complies with this requirement.  Article II Section B.1(b) states that all Statutory Fees, which are fees under section 1930 of title 28,[15] shall be paid in Cash in full on or before the Effective Date.

20.    *Section 1129(a)(13) of the Bankruptcy Code.*  Section 1129(a)(13), requiring compliance with Section 1114 of the Bankruptcy Code, has no application in the Chapter 11 Cases and, therefore, the Plan complies with this Section.

---

13 *See* Plan, Art. II, Sections A & B.

14 *Id.*

15 Plan, Art. I. Section 125.

21

21.    *Section 1129(a)(14) of the Bankruptcy Code.*  Section 1129(a)(14) requires that domestic support obligations be paid.  This provision has no application to these business Debtors who have no such obligations.

22.    *Section 1129(a)(15) of the Bankruptcy Code.*  Section 1129(a)(15) expressly states that it applies to "case[s] in which the debtor is and individual."[16]  This Section has no application to these business Debtors who are not "individuals."

23.    *Section 1129(a)(16) of the Bankruptcy Code.*  Section 1129(a)(16) states that "[a]ll transfers of property of the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust."[17]  This provision does not apply in these Chapter 11 Cases because the Debtors are a moneyed business or commercial corporation.

## The Plan Complies With The Applicable Provisions of 11 U.S.C. § 1129(b)

24.    To the best of my knowledge and as discussed above, Section 1129(a)(8) of the Bankruptcy Code has not been met in USACM case as to Classes A-4, A-6, A-7 and A-8, in USA Realty's case as to Class D-5, and in USA Securities' case as to Class E-5.  Thus, to be confirmed, the Plan must satisfy the requirements of Section 1129(b) that it not "discriminate unfairly," and that it be "fair and equitable" as to these Classes.  Both of these requirements have been met in these cases and, therefore, notwithstanding the Debtors' inability to satisfy Section 1129(a)(8), the Plan may be confirmed as to the rejecting impaired Classes.

> a.    The Plan does not "discriminate unfairly."  The Plan does not "discriminate unfairly" with respect to impaired Classes A-4, A-6, A-7, A-8, D-5 and E-5, because to the extent that there is different treatment, there is a reasonable basis for the different classification and treatment of the respective Claims and Equity Interests included in each such Class.

---

16 11 U.S.C. § 1129(a)(15).

17 11 U.S.C. § 1129(a)(16).

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

b.      The Plan is "fair and equitable" as to Unsecured Claims--Classes A-4, A-6

and A-7.  Class A-4 consists of Allowed General Unsecured Claims against

USACM, Class A-6 consists of Allowed Penalty Claims against USACM,[18]

and Class A-7 is comprised of Subordinated Claims against USACM.[19]

These Classes, all of which have not accepted the Plan, provide for the

treatment of Claims against USACM that would be unsecured against

USACM and, therefore, whether the Plan is fair and equitable as to these

Classes is evaluated under Section 1129(b)(2)(B)(ii).

i.      The Plan is "fair and equitable" as to Classes A-4 and A-6 because

holders of junior Claims or Equity Interests will not receive or retain

under the Plan on account of such junior Claim or Equity Interest

any property.

ii.      The only Classes of Claims and Equity Interests that are junior to

Class A-4 Claims are Claims in Classes A-6 through A-8.  Holders

of Class A-6 Claims will not receive or retain any property unless

holders of Allowed Class A-4 Claims are paid in full, plus interest.

Holders of Class A-7 Claims will not receive or retain under the

Plan on account of their Claim any property unless holders of Class

A-4 and Class A-6 Claims are paid in full, plus interest.[20]

Furthermore, holders of Equity Interests in USACM, classified in

Class A-8, will receive no distribution and retain no property under

the Plan.[21]

---

18 Plan, Art. II, Section C.1(f).

19 Plan, Art. II, Section C.1(g).

20 Plan, Art. II. Section C.1(g).

21 Plan, Art. II Section C.1(h).

23

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

iii.   The only Classes of Claims and Equity Interests that are junior to Class A-6 Claims are Claims in Classes A-7 through A-8.  Holders of Class A-7 Claims will not receive or retain under the Plan on account of their Claim any property unless holders of Class A-6 Claims are paid in full, plus interest.[22]  Furthermore, holders of Equity Interests in USACM, classified in Class A-8, will receive no distribution and retain no property under the Plan.[23]

iv.   The Plan is "fair and equitable" as to Class A-7 because holders of junior Claims or Equity Interests will not receive or retain under the Plan on account of such junior Claim or Equity Interest any property.  The only Class that is junior to Class A-7 Claims is Class A-8, which is comprised as Equity Interests in USACM.  Holders of Equity Interests in USACM will receive no distribution or retain any property under the Plan.

b.   <u>The Plan is "fair and equitable" as to Equity Interest Classes--Classes A-8, D-5 and E-5</u>.  Whether the Plan is "fair and equitable" within the meaning of  Section 1129(b)(2)(C)(ii) as to Class A-8, which is comprised of Equity Interests in USACM, Class D-5, which is comprised of Equity Interests in USA Realty, and Class E-5, which is comprised of Equity Interests in USA Securities because no holder of any interest that is junior to the Equity Interests treated in these Classes will receive or retain any property under the Plan.[24]

---

22 Plan, Art. II. Section C.1(g).

23 Plan, Art. II Section C.1(h).

24 *See* Art II. Sections C.1, C.4 & C.5.

24

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

## SPECIFIC FACTS ADDRESSING THE SALE

25.    A material component in implementing the Plan is the transfer of the USACM Assets and the FTDF Assets to Compass (the "Sale") pursuant to the Asset Purchase Agreement dated December 8, 2006 ("Compass APA").   My statements herein explain why the Sale is in accordance with Section 363 of the Bankruptcy Code.

26.    The Debtors, in coordination with the Committees, have undertaken extensive efforts to explore various options for maximizing the assets of the Debtors' estates.  These efforts are outlined in detail in the following Declarations, both of which have been incorporated herein by reference:  "Declaration of Thomas J. Allison in Support of Motion for Order Scheduling an Auction for the Sale of Certain Assets, Appointing SPCF Group, LLC as Lead Bidder, and Approving Bid Procedures and Protections" filed on October 18, 2006 ("Auction Declaration"); and "Supplemental Declaration of Thomas J. Allison in Support of Motion for Order Scheduling an Auction for the Sale of Certain Assets, Appointing SPCF Group, LLC as Lead Bidder, and Approving Bid Procedures and Protections" filed October 23, 2006 ("Supplemental Auction Declaration").

27.    Furthermore, as discussed in detail in the Supplemental Auction Declaration, the Debtors, acting through me, as their Chief Restructuring Officer, and  Mesirow Interim Financial Management LLC ("Mesirow"), which is providing interim management services for the Debtors, and in consultation with the Committee's financial advisors, actively marketed the Debtors' assets for sale during the past several months.

28.    As a result of those marketing efforts, the Debtors were able to identify fourteen potential purchasers who were interested in doing due diligence and purchasing all or a portion of the Debtors' assets.

29.    After assisting potential purchaser with their respective due diligence, the Debtors, then, received initial offers from potential bidders, the content of which are described in more detail in the Supplemental Auction Declaration.

30.    As I describe in my Supplemental Auction Declaration, the Debtors concluded that

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  packaging the servicing business of USACM along with the purchase of FTDF's fractional

2  interests in loans enhanced the value of both. Furthermore, and as I explain in detail in my

3  Supplemental Auction Declaration, the Debtors made a calculated decision not to sell the assets of

4  the other Debtors' Estates.

5        31.    For reasons explained in more detail in the Auction Declaration and the

6  Supplemental Auction Declaration, the Debtors selected SPCP Group, LLC ("Silver Point") as the

7  stalking horse bidder, and the Debtors, acting through me, the Committees and Silver Point

8  proceeded to negotiate an asset purchase agreement (the "Stalking Horse APA") related to the sale

9  of certain assets of USACM and FTDF.

10        32.    On November 8, 2006, the Court entered the Bid Procedures Order, designating

11  Silver Point as the lead bidder, and scheduling an auction for November 7, 2006 to allow

12  competing bidders to make Higher and Better Offers for the assets ("Auction").

13        33.    Upon information and belief, a copy of the Bid Procedure Order was served on 61

14  different Entities whom the Debtors believed had an interest in purchasing the assets of USACM

15  and FTDF.

16        34.    On November 30, 2006, the deadline for the submission of "Qualified Bids," as

17  that term is defined in the Bid Procedures Order, the Debtors and the Committees received two

18  potential bidders: the first from Compass, and the second from Desert Capital REIT, Inc. ("Desert

19  Capital").

20        35.    Unlike the Stalking Horse APA which did not include pre-closing rights associated

21  with loan servicing, the Compass Bid contemplated the purchase of all assets associated with

22  USACM's servicing rights, including accrued servicing fees, late charges, success fees and other

23  fees and sums due to USACM for $8 million.  In addition, the Compass Bid also increased the

24  purchase price of the FTDF assets being sold from $46 million to $48 million and included

25  separate consideration of $1.5 million to account for payment of the Break-Up Fee to Silver Point.

26  Upon receiving the Compass Bid, the Debtors, acting at my direction, informed Silver Point and

27  Desert Capital of this new structure so that they could evaluate the Compass bid and determine

28                                          26

1    whether they would be willing to restructure their bids.

2        36.    On December 5, 2006, the Debtors designated the Compass Bid to be a Qualified

3    Bid.

4        37.    After review of the Compass Bid, the Debtors, the Committees, and the other

5    bidders agreed that the structure of the Compass Bid, with its inclusion of additional USACM

6    Assets, would be adopted by all bidders and would form the basis of all bids at the Auction.

7    Competitive bidding at the Auction, therefore, began with the Compass Bid of $57.5 million.

8        38.    After approximately 15 rounds of bidding, the Auction concluded after Compass

9    submitted a bid of $67 million.

10        39.    I determined on behalf of the Debtors, with the unanimous concurrence of the

11    Committees, that Compass had submitted the Successful Bid, and this decision was approved and

12    "so ordered" by the Court.

13        40.    Following the Auction, Compass followed all procedures required under the Bid

14    Procedures Order.

15        41.    In my opinion, the USACM and FTDF Estates benefited greatly from the Auction.

16    Prior to the Auction, these Estates had assurances of receiving a total of only slightly more than

17    $46.5 million on the closing of the Stalking Horse APA.  The successful Compass Bid, however,

18    totaled $67 million.  Accordingly, the Auction added almost $19 million in net value.  In addition,

19    Compass also agreed to make certain favorable concessions to the terms of the Stalking Horse

20    APA, thereby increasing the USACM and FTDF Estates.

21        42.    Following the Auction, the Debtors and Compass entered into the Compass APA.

22        43.    The proposed Sale is not a sale of all of the assets of USACM or FTDF.

23            a.    Notably, the USACM Assets specifically exclude, among other things, the

24                following assets: (i) pre-petition accrued servicing fees, which are being

25                compromised under the Plan and any Prepaid Interest (as defined in the

26                Compass APA), (ii) USACM's litigation rights against third parties arising

27                out of, or related to, events prior to the closing date, (iii) the IP $58 Million

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   Promissory Note and any other claims against IP or any of its affiliates or

2   principals, (iv) all cash, accounts receivable, notes receivable, interests in

3   promissory notes which are not related to the USACM loan portfolio, tax

4   refunds and other similar assets, and (v) loans made to Placer Vineyards and

5   Marquis Hotel.

6   b.   In the case of FTDF, the FTDF Assets are defined to exclude cash and cash

7   equivalents and Litigation Claims unrelated to the collection or

8   enforceability of the loans that constitute the FTDF Assets.

9   44.   In my business judgment, the Sale is in the best interests of the Debtors' Estates.

10   45.   Together with the Committees, I have determined on behalf of the Debtors that

11   selling the USACM Assets and FTDF Assets to Compass is the best option that will maximize the

12   value of these Assets for the Debtors and their respective Estates.

13   46.   There exists a sound business justification for the Sale.

14   a.   With respect to the sale of the FTDF Assets, the Sale maximizes the value

15   of the FTDF Estate for the benefit of holders of Claims against and Equity

16   Interests in FTDF.  After reviewing and balancing all alternatives, I have

17   decided on behalf of FTDF that a sale of the FTDF Assets is in the best

18   interests of  holders of Allowed Claims against and Equity Interests in

19   FTDF, and the FTDF Committee has concurred.

20   b.   With respect to the sale of the USACM Assets, the Sale maximizes the

21   value of the USACM Estate for the benefit of holders of Allowed Claims

22   against USACM.  After reviewing and balancing all alternatives, I have

23   decided on behalf of USACM that a sale of the servicing assets is in the best

24   interests of  creditors, and the Unsecured Creditors Committee has

25   concurred.

26   47.   Notice of the Sale was adequate and reasonable.

27   a.   As noted above, prior to the Auction, a notice of the Auction, including

28   28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    copies of the Bid Procedures Order and the Stalking Horse APA, was

2    served on 61 Entities who the Debtors had identified as being potential

3    purchasers of the USACM Assets and FTDF Assets.

4    b.    Upon information and belief, pursuant to applicable Federal and Local

5    Bankruptcy Rules and Disclosure Statement Order and other applicable law,

6    copies of the Plan and the Disclosure Statement and related pleadings,

7    which included a copy of the Stalking Horse APA, were served 29 days

8    before the Confirmation Hearing on: (i) the Office of the United States

9    Trustee, (ii) the Committee and its counsel, (iii) the Debtors' creditors, (iv)

10   holders of equity interests in FTDF, (v) holders of equity interests in DTDF,

11   and (vi) those parties listed on the Debtors' Limited Mailing Matrix on file

12   with the Court.  As the Sale of the USACM Assets and FTDF Assets is an

13   integral part of the Debtors' Plan, it is described in detail in the Disclosure

14   Statement.

15   48.    In my business judgment, the purchase price for the Sale of the USACM Assets and

16   the FTDF Assets is fair and reasonable because, as outlined above, the Sale was negotiated in

17   good faith, and was the product of a highly-competitive bidding and Auction process that resulted

18   in the highest and best offer for such Assets.

19   49.    The Sale, as memorialized in the Compass APA, is made in good faith.

20   a.    To the best of my knowledge, Compass is not an insider of any of the

21   Debtors.

22   b.    To the best of my knowledge, Compass does not have any prepetition or

23   postpetition affiliations with any of the: (a) Debtors or their retained

24   professionals; (b) major creditors of the Debtors or such parties retained

25   professionals; (c) holders of any Equity Interests in USACM or such

26   parties' retained professionals; (d) any Equity Interests in FTDF or such

27   parties' retained professions; (d) any of the Debtors' former or current

28                                                                    29

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    officers or directors or other insiders; (e) any affiliates of the Debtors.

2    c.    To the best of my knowledge, the Sale was not a result of fraud or collusion

3    nor any attempt by Compass or any other Entity to take an unfair advantage

4    of USACM or FTDF.

5    d.    As described above, the Compass APA represents the culmination of

6    substantial, good faith, arm's length negotiations among the Debtors, the

7    Committees, and Compass.

8    e.    Compass has provided evidence demonstrating its good faith in accordance

9    with the Bid Procedures Order.

10    50.    Upon information and belief, the Sale is entitled to protection under Section 363(m)

11    of the Bankruptcy Code.

**THE INTERCOMPANY COMPROMISES**

13    51.    The Debtors and the Direct Lenders have agreed to resolve certain disputes, which

14    are the "Intercompany Compromises," set forth in Article IV Section E of the Plan.

15    52.    The Intercompany Compromises were negotiated principally by the Committees,

16    but the Debtors participated in the negotiations.

17    53.    The Intercompany Compromises represent the culmination of substantial, good

18    faith, arm's length negotiations.

19    54.    As part of the USACM/Direct Lender compromise set forth in Article IV Section E

20    of the Plan, accrued but uncollected servicing fees as of the Petition Date as determined by the

21    Debtors' current management under my direction totaled approximately $4,700,000.

22    55.    I have evaluated the Intercompany Compromises and, in my business judgment, the

23    Compromises are fair and reasonable given the facts and circumstances of the respective Debtors'

24    cases, and are in the best interest of the Debtors' Estates.  In reaching these conclusions, I

25    considered:

26    a.    the probability of success of any litigation that had been commenced or

27    would have been commenced related to the disputes;

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

b.     the difficulties of collection;

c.     the complexity, expense, inconvenience, and attendant delay if all of the matters being compromised were litigated; and

d.     the interests of creditors and, when applicable, Equity Interests.

## SPECIFIC FACTS ADDRESSING OBJECTIONS TO CONFIRMATION

56.     As of the Petition Date, USACM was acting as the loan servicer for 115 separate loans (the "Serviced Loans") having a combined outstanding loan balance of approximately $962,000,000.

57.     As of the Petition Date, approximately 62 of the Serviced Loans were delinquent in the payment of interest or otherwise could be considered nonperforming (the "Nonperforming Loans"). The Nonperforming Loans represent 54% in number, and 72% in outstanding loan balance, of the Serviced Loans.

58.     There are approximately 3,600 investors (the "Direct Lenders") whose names appear as a "Lender" in the documents for one or more of the Serviced Loans. Among these Direct Lenders are FTDF and DTDF (collectively, the "Funds"). There are 3,200 investors in the Funds.

59.     Prior to April 2006, USACM regularly made interest payments to Direct Lenders (including the Funds) each month regardless of whether the particular loans relating to each Direct Lender were performing or nonperforming. Prior to the Petition Date, Direct Lenders, as a whole, received approximately $39 million in Prepaid Interest payments that they were not entitled to receive at the time the payments were made. These payments were made with respect to all of the loans in a Direct Lender's portfolio, often through a single check.

60.     There was no distinction in the treatment of the 3,600 investors who hold fractional interests in specific loans (the "Direct Lenders") and the 3,200 investors who own membership interests in the Funds (the "Fund Members").

61.     The practice of making interest payments without any regard to whether the relevant loans were performing began as early as 2001. The problem grew especially severe in the

31

months preceding the Petition Date.

62.     By way of illustration, during the first three months of 2006, USACM collected an average of approximately $5.3 million per month in interest payments on the Serviced Loans, but it paid out on average approximately $9.7 per month to the Direct Lenders in interest payments. This resulted in an average deficit of $4.4 million per month during the first three months of 2006.

63.     USACM apparently covered some, but not all, of this deficit was by using principal payments that were received by USACM on some of the Serviced Loans.  However, while USACM's records show that principal payments were indeed received, it is impossible to determine how the money related to any particular payment was spent, and it is therefore impossible to trace the misdirected principal payments.

64.     For example, during the last two weeks of October 2005, USACM collected $1,229,696 in principal on a loan known as "Bay Pompano."  Some of this money ($806,149) was properly directed to the relevant investors.  However, the remaining money was used for other purposes, and it is impossible to determine where the money went because, among other things, on November 7, 2005, USACM made 3,141 disbursements totaling over $16 million.

65.     By way of further example, during the last two weeks of November 2005, USACM received principal payments in the amount of $2,789,934 on the Bay Pompano loan.  This time none of the money was properly directed to the relevant investors.  However, once again, it is impossible to trace the funds because on December 7, 2005, USACM made 3,277 disbursements totaling over $11 million.

66.     The pattern described in the preceding two paragraphs was repeated on numerous instances with respect to the Bay Pompano loan through March 2006.  A chart outlining the history of the Bay Pompano loan is attached hereto as Exhibit A.

67.     In addition, the pattern described with respect to the Bay Pompano loan was followed with respect to all or nearly all of the principal payments that were received by USACM on other loans prior to the Petition Date.

68.     Despite the significant efforts of my accountants, lawyers, and financial

32

consultants, it is impossible to specifically trace particular funds to subsequent distributions made by USACM, including Prepaid Interest payments to Direct Lenders.

69.    In addition to the facts set forth above, the amounts present at various times in the USACM Collection Account make it impossible to trace funds in that account. For example, it appears that approximately $26 million in principal payments were diverted in the three months between December 2005 and February 2006. However, even though at least $26 million had come into the account in the preceding three months from principal payments alone, the book balance of the account became negative during February 2006. For example, although the bank balance on February 8, 2006, was $19,946,265, there were millions of dollars worth of outstanding disbursements that had not yet cleared the account. Included in these disbursements were Prepaid Interest payments that were made to Direct Lenders on February 8, 2006. Given the disbursements that had been made, the true—or book—balance of the account on February 8, 2006, was ($1,603,333), a negative balance.

70.    By way of further illustration, the book balance of the account on February 9, 2006 was ($1,418,660). The book balance of the account on February 10, 2006, was ($1,377,757). The book balance on February 13, 2006, was ($731,503).

71.    The book balance of the account was also negative in March 2006. On March 10, 2006, the book balance was ($131,522). The book balance on March 14, 2006, was ($4,479).

72.    The negative book balance in the collection account was created in large part by making Prepaid Interest payments to Direct Lenders to which those investors were not entitled. The deficit was then covered, in part by using money that belonged to USACM for servicing fees and money that USACM had received in principal payments on certain loans.

73.    Furthermore, even ignoring the large amount of disbursements that had not cleared the bank, the bank balance of the collection account on March 16, 2006, was just $2,704,817. As stated above, the amount of diverted principal was nearly ten times this number. Because Direct Lenders were similarly situated, it is impossible to conclude that certain of the Direct Lenders can trace their particular funds to the money in the account, while other identically situated investors

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

33

cannot.

74.    In addition to all of the foregoing difficulties, accurate tracing is not possible because as of the Petition Date, USACM's loan servicing database contained substantial errors, including but not limited to the following:  (a) some borrower payments were not entered into the system; (b) most interest payments from borrowers were not posted in a timely manner; (c) payments were not applied according to the terms of the governing loan documents, which require, among other things, that payments be applied first to outstanding interest and then to principal; (d) the amount of interest owed by borrowers was not calculated correctly; (e) check numbers were not used in sequence or were used multiple times; (f) servicing fees were not charged or were calculated incorrectly.

75.    Furthermore, money belonging to USACM as well as other entities was historically commingled in the USACM account.

76.    Although the collection account has been referred to as a "trust account," it did not function as such.  Mesirow's analysis of the collection account, performed under my direction, establishes that deposits into the account were not limited to money received from Borrowers, and disbursements from the account were not limited to disbursements to Direct Lenders.

77.    By way of example, on March 10, 2006, $196,000 was disbursed to Del Bunch, who was not a Direct Lender.  Similar disbursements were made to Mr. Bunch on a regular basis.

78.    On January 8, 2006, a payment of $181,221 was made from the collection account to Sal Reale.  Sal Reale was not a Direct Lender and not even a creditor of USACM.  Rather, Sal Reale was a creditor of Joseph Milanowski personally.  Similar payments were made to Sal Reale from the collection account on a regular basis.

79.    On January 9, 2006, a payment of $1,292 was made from the collection account to Bob Stupak for a short-term loan.  Mr. Stupak was a creditor of USACM and not a Direct Lender. Similar payments were made to Mr. Stupak on a regular basis.

80.    Also on January 9, 2006, a payment of $18,083 was made from the collection account for "Convertible Debentures."  This payment was made to the Petersen family, who were

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    unsecured creditors of USACM and not Direct Lenders.

2        81.    The foregoing paragraphs provide examples only.  Our detailed analysis of bank

3    records indicates that there was a regular pattern of making disbursements from the collection

4    account to parties other than Direct Lenders.

5        82.    As established above, many of the disbursements from the collection account were

6    made to persons or entities who were not Direct Lenders.  In addition, much of the money in the

7    collection account did not come from payments on loans or did not otherwise belong to Direct

8    Lenders.

9        83.    For example, much of the money in the collection account belonged to USACM

10   because USACM had earned the funds as servicing fees.  Our detailed analysis of bank records

11   reveals that no servicing fees were ever transferred out of the collection account to USACM's

12   operating account or otherwise disbursed from the collection account to USACM.

13       84.    The servicing fees discussed in the preceding paragraph were earned by USACM

14   pursuant to the terms of Loan Servicing Agreements that applied to one or more loans.  Thus,

15   USACM's relationship with each Direct Lender was generally governed by a single Loan

16   Servicing Agreement.

17       85.    In addition, to the foregoing example of money in the collection account that did

18   not belong to Direct Lenders, our analysis reveals that millions of dollars in the collection account

19   came from DTDF.

20       86.    By way of further example, on October 12, 2005, a deposit was made into the

21   collection account in the amount of $5,866,879.  This money came from TJA Marketing, which

22   was not a borrower on any of the Serviced Loans.  Interestingly, this deposit and other funds were

23   needed because the October payment of Prepaid Interest to Direct Lenders created a negative book

24   balance in the collection account.

25       87.    Thus, as demonstrated by the foregoing paragraphs, the payments that were made

26   to Direct Lenders came from a variety of untraceable sources.

27       88.    As of the Petition Date, the incidence of delinquencies in the Serviced Loans was

28                                                          35

high and likely to increase. Without the expenditure of estate resources, it was unlikely that borrowers would meet their ongoing obligations. In addition, the costs to any one Loan Investor of collecting payments from borrowers on Nonperforming Loans was, in my view, prohibitive. In addition, borrowers were not likely to cooperate with fractionalized collection efforts in any event.

89.      Accordingly, for the benefit of the estate, I have initiated measures for collecting unpaid interest on Nonperforming Loans. Estate assets have been used, and professionals have been engaged, in order to collect substantial funds for the benefit of all of the creditors of the estate.

90.      Mesirow's analysis and investigation into the finances of USACM conducted under my direction indicates that USACM had been insolvent for more than one year prior to the Petition Date, at the very least. This insolvency is due in large part to a series of transactions which left USACM with a substantial obligation to the Collection Account, a receivable from IP with substantial collectibility risk, and an inability for USACM to meet its debts as they come due. Based on Mesirow's review and investigation of the books and records of USACM, USACM reported an obligation to the Collection Account at least as far back as 2003. By January 2005, USACM's obligation to the Collection Account was approximately $28 million. At that same time, USACM reported capital and retained earnings of $15.6 million. During the same period, USACM's books and records report approximately $62 million in total assets, including a receivable from IP of approximately $42 million.

91.      Mesirow's review and investigation into the transactions that gave rise to the $42 million receivable conducted under my direction indicate that that no evidence exists of any note or loan agreement documenting the obligation of IP to repay this amount to USACM, that no evidence exists of a security agreement or pledge of any assets of IP towards the $42 million receivable and that the IP ventures funded by the Collection Account provided no cash flow to repay the inter-company payable to USACM. Based on this review and analysis, the receivable shown on the books and records of USACM from IP is subject to substantial collectibility risk and

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

should be ascribed only nominal value.

92.    Adjusting the purported $15.5 million in capital and retained earnings in January 2005 on USACM books and records to reflect the valuation adjustment of the receivable due from IP to a nominal value would result in USACM reporting a negative equity. To illustrate, at a $0 value, USACM would report a negative equity of $26.4 million. Even at a 15% valuation or $6.3 million, USACM would still report a negative equity of $20.1 million.  In addition, the $28 million obligation to the Collection Trust Account, which consisted primarily of diverted borrower principal payments from DTDF and should never have occurred in the first place, represents an immediate obligation that is due and owing back to the Collection Account at the very least.  Since USACM had less than $0.5 million cash on hand as of January 31, 2005, USACM clearly was incapable of meeting this repayment and possessed little other liquidity to satisfy this obligation and as such was unable to meet their debts as they come due.

93.    Based on this analysis, I conclude that USACM was insolvent from both a balance sheet test and an ability to meet debts as they come due as least as far back as January 2005 in large part due to the transactions described above.  Furthermore, a similar analysis reveals that USACM remained insolvent through the Petition Date both from a balance sheet test and an ability to meet debts as they come due.

I declare, under penalty of perjury, that, to the best of my knowledge, information and belief, that the foregoing is true and correct.

_____

Thomas J. Allison

905174

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122