1  Annette W. Jarvis, Utah Bar No. 1649
   RAY QUINNEY & NEBEKER P.C.
2  36 South State Street, Suite 1400
   P.O. Box 45385
3  Salt Lake City, Utah 84145-0385
   Telephone: (801) 532-1500
4  Facsimile: (801) 532-7543
   Email: ajarvis@rqn.com
5

6  Lenard E. Schwartzer, Nevada Bar No. 0399
   Jeanette E. McPherson, Nevada Bar No. 5423
7  SCHWARTZER & MCPHERSON LAW FIRM
   2850 South Jones Boulevard, Suite 1
8  Las Vegas, Nevada  89146-5308
   Telephone:  (702) 228-7590
9  Facsimile:  (702) 892-0122
   E-Mail:  bkfilings@s-mlaw.com
10 Attorneys for Debtors and Debtors-in-Possession

11

12              UNITED STATES BANKRUPTCY COURT
13                   DISTRICT OF NEVADA

14 | In re:                                  | Case No. BK-S-06-10725 LBR |
   | USA COMMERCIAL MORTGAGE COMPANY,        | Case No. BK-S-06-10726 LBR |
   |                              Debtor.     | Case No. BK-S-06-10727 LBR |
15 |------------------------------------------| Case No. BK-S-06-10728 LBR |
16 | In re:                                  | Case No. BK-S-06-10729 LBR |
   | USA CAPITAL REALTY ADVISORS, LLC,       |                            |
   |                              Debtor.     | Chapter 11                 |
17 |------------------------------------------|                            |
18 | In re:                                  | Jointly Administered Under |
   | USA CAPITAL DIVERSIFIED TRUST DEED      | Case No. BK-S-06-10725 LBR |
19 | FUND, LLC,                              |                            |
   |                              Debtor.     |                            |
20 |------------------------------------------| **REPLY BRIEF SUPPORTING** |
   | In re:                                  | **CONFIRMATION OF DEBTORS'** |
21 | USA CAPITAL FIRST TRUST DEED FUND,      | **THIRD AMENDED JOINT PLAN OF** |
   | LLC,                                    | **REORGANIZATION** |
22 |                              Debtor.     |                            |
   |------------------------------------------| **(Affects All Debtors)**  |
23 | In re:                                  |                            |
   | USA SECURITIES, LLC,                    |                            |
24 |                              Debtor.     | Date:  **December 19, 2006** |
   |------------------------------------------| Time:  **10:00 am**        |
25 | Affects:                                |                            |
   |   ☒ All Debtors                         |                            |
26 |   ☐ USA Commercial Mortgage Company     |                            |
   |   ☐ USA Capital Realty Advisors, LLC    |                            |
27 |   ☐ USA Capital Diversified Trust Deed Fund, LLC |                   |
   |   ☐ USA Capital First Trust Deed Fund, LLC |                         |
28 |   ☐ USA Securities, LLC                 |                            |

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................1

II.     SUMMARY OF OBJECTIONS.........................................................4

III.    OBJECTIONS TO THE PLAN'S TREATMENT OF PREPAID INTEREST.................5

        A.      Prepaid Interest Is Property Of The USACM Estate .........................6

                1.      Class A-5 Voted To Accept The Plan...............................6

                2.      Prepaid Interest Is Property Of The Estate ........................6

                3.      The Prepaid Interest Payments Were Paid From Untraceable, Commingled Funds Obtained From Various Sources And Therefore Constitute Property Of USACM's Estate .................7

                        (i)     Trust Fund Status Was Lost When The Collection Account Reached A Negative Balance........................8

                        (ii)    Untraceable Funds Are Property Of The Estate As A Matter of Law .........................9

                4.      USACM Is Entitled To Recoup The Prepaid Interest................12

        B.      Alleged Right of Unremitted Principal Creditors To Offset Against Prepaid Interest......................................................16

IV.     PLAN COMPROMISE ON PREPAID INTEREST IS BINDING ON DIRECT LENDERS.................20

        A.      Committees Are Authorized To Negotiate Class Treatment Under Plans ...........20

        B.      Compromises May Be Implemented Through A Reorganization Plan .................21

        C.      No Adversary Proceeding Is Necessary To Confirm The Plan .........................24

                1.      Fed. R. Bankr. P. 7001(7) Specifically Excludes Recoupment hrough A Plan From The Requirements Of An Adversary Proceeding.................................24

                2.      LPG's Authority Is Distinguishable.....................................25

                3.      A Debtor Need Not Commence A Declaratory Relief Action To Determine What Constitutes Property Of The Estate Under Section 541.................................25

        D.      The Compromise Class Does Not Violate Due Process Standards .....................26

V.      LOAN SERVICING FEES AND OTHER CHARGES TO DIRECT LENDERS .........27

VI.     TRANSFER OF THE LOAN SERVICING AGREEMENTS.................................29

        A.      The Transfer Of The LSAs From USACM To Compass Is Lawful And Does Not Prejudice The Direct Lenders ...............29

        B.      The LSAs Are Freely Transferable.................................29

        C.      Compass Is Qualified To Service The Loans And Can Perform Under The LSAs ........................30

        D.      The LSAs May Be Transferred From USACM To Compass Without Being Assumed And Assigned Because The LSAs Are Not Executory Contracts ........30

        E.      The Ninth Circuit Court Of Appeals Has Clearly Set Forth The Means By Which To Determine If A Contract Is Executory.....................32

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

ii

905152

F.    Because The Direct Lenders Had No Material Obligations Under The LSAs As Of The Petition Date, The LSAs Are Not Executory Contracts............33

    1.    The LSAs Dictate Rights of Both Parties To The Contract With Regard To The Loans, But Set Forth Independent Obligations Of Only USACM ............33

    2.    USACM's Right To Compensation For Servicing The Loan Does Not Render The LSAs Executory Contracts............33

    3.    The LSAs Are Not Executory Contracts On Account Of The Contingent Obligations Of The Direct Lenders In The LSAs, As Such Obligations Are Not Material And May Be Triggered Only At USACM's Option ............35

        (i)    Section 2(c)(iii) Of The LSA Does Not Render The LSA An Executory Contract ............35

        (ii)    Section 4 Of The LSA As Does Not Render The LSA Executory Contracts............39

        (iii)    Section 11 Of The LSA Does Not Render The LSA Executory Contracts............41

G.    The Plan Does Not Propose To Transfer The LSAs Free And Clear Of The Terms And Conditions Of The LSAs ............42

VII.    PLAN SOLICITATION ............43

    A.    No "Misinformation" Was Transmitted By The Debtors Or BMC ............43

    B.    Ms. Cangelosi And The "Lender Protection Group" Have Repeatedly Violated §1125 Even After This Court's Admonishment ............44

    1.    Misrepresentations Regarding Plan Contents ............45

    2.    Additional Mischaracterizations Regarding Confirmation Process And Distribution Priorities ............45

    3.    Ability Of Lender Protection Group Counsel To Represent The Diverse Interests Of Direct Lenders ............47

    4.    The Continued Improper Solicitations Constitute Grounds To Overrule The Objection Of The Lenders Protection Group ............47

VII.    DISPOSITION OF DOCUMENTS AND RECORDS ............49

IX.    CANCELLATION OF EQUITY INTERESTS OTHER THAN MEMBERSHIP INTERESTS IN DTDF AND FTDF ............50

X.    LITIGATION AGAINST DEBTORS' FORMER PRINCIPALS ............50

XI.    MISCELLANEOUS OBJECTIONS ............51

XII.    CONCLUSION ............54

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

iii

905152

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

## **TABLE OF AUTHORITIES**

**Cases**

*Aetna U.S. Healthcare, Inc. v. Madigan (In re Madigan)*, 270 B.R. 749 (B.A.P. 9th Cir. 2001) ...................................................................................................12, 13, 14

*Ashland Petroleum Co. v. Appel (In re B&L Oil Co.)*, 782 F.2d 155 (10th Cir. 1986) .................15

*Aviation Ventures, Inc. v. Joan Morris, Inc.,* 110 P.3d 59 (Nev. 2005) ........................................19

*Bronner v. Chenoweth-Massie (In re National Financial Realty Trust)*, 226 B.R. 586 (Bankr. W.D. Ky. 1998) ...........................................................................................36

*Capital and Serv., Inc. v. Rubino (In re Builders Capital and Serv., Inc.)*, 317 B.R. 603 (Bankr. W.D.N.Y. 2004) ...........................................................................................11

*Collingwood Grain, Inc. v. Coast Trading Co. (In re Coast Trading Co.)*, 744 F.2d 686 (9th Cir. 1984) ...........................................................................................32

*Commercial Union Ins. Co. v. Texscan Corp. (In re Texscan Corp.)*, 976 F.2d 1269 (9th Cir. 1992) ...........................................................................................31

*Connecticut General Life Ins. Co. v. Universal Ins. Co.,* 838 F.2d 612 (1st Cir. 1988).................7

*Cunningham v. Brown*, 265 U.S. 1 (1924)....................................................................9, 11

*Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214 (9th Cir. 1988) ......11

*Employees' Retirement System v. Osborne (In re THC Financial Corp.)*, 686 F.2d 799 (9th Cir. 1982)...........................................................................................31

*Enterprise Energy Corp. v. U.S. (In re Columbia Gas System, Inc.)*, 50 F.3d 233 (3d Cir. 1995) ...........................................................................................38

*Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.)*, 371 F.3d 397 (8th Cir. 2004)...........................................................................................8

*Focus Media Inc. v. National Broadcasting Co. Inc. (In re Focus Media Inc.)*, 378 F.3d 916 (9th Cir. 2004) ...........................................................................................13

*Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V.*, 209 F.3d 252 (3rd Cir. 2000).................19

905152

*Gill v. Easebe Enters. (In re Easebe Enters.)*, 900 F.2d 1417 (9th Cir. 1990) .............................36

*Goldberg v. New Jersey Lawyers' Fund for Client Protection*, 932 F.2d 273 (3d Cir. 1991) ........7

*Griffel v. Murphy (In re Wegner)*, 839 F.2d 533 (9th Cir. 1987) ................................................30

*Gulfstream Aerospace Technologies, Inc. v. Calascibetta (In re Strategic Technologies, Inc.)*, 2005 WL 1669615 (3rd Cir. 2005) .............................................................10, 11

*Hatoff v. Lemons & Associates, Inc. (In re Lemons & Associates, Inc.)*, 67 B.R. 198 (Bankr. D. Nev. 1986) .........................................................................................34, 39

*Herod v. Southwest Gas Co. (In re Gasmark Ltd.)*, 193 F.3d 371 (5th Cir. 1999) .......................13

*Holmes Environmental, Inc. v. Suntrust Banks, Inc. (In re Holmes Environmental, Inc.)*, 287 B.R. 363 (Bankr. E.D. Va. 2002) .......................................................................38

*In re Allegheny Intern, Inc.* 118 B.R. 282 (Bankr. W.D. Pa. 1990) ............................................21

*In re Bergt*, 241 B.R. 17 (Bankr. D. Alaska 1999) ....................................................................36

*In re Best Products, Co., Inc.,* 168 B.R. 35 (Bankr. S.D.N.Y. 1994) ....................................22, 23

*In re Century Glove, Inc.,* 914 Bankr. 952 *rev'd in part and aff'd in part*, 81 Bankr. 274 (D. Del. 1988) .........................................................................................................49

*In re Commercial Western Finance Corp.*, 761 F.2d. 1329 (9th Cir. 1985) ..............................25

*In re Golden Plan of California*, 829 F.2d 705 (9th Cir. 1986) ..............................................25

*In re Gulph Woods Corp.*, 83 B.R. 339 (Bankr. E.D. Pa. 1988) ................................................49

*In re Harold Adolphsen*, 38 B.R. 776 (Bankr. D. Minn. 1983) ..................................................39

*In re Helm*, 335 B.R. 528 (Bankr. S.D.N.Y. 2006) .......................................................32, 36, 41

*In re J.M. Fields, Inc.*, 22 B.R. 861 (Bankr. S.D.N.Y. 1982) ....................................................31

*In re Joint Eastern and Southern Dist. Asbestos Litigation*, 982 F.2d 721 (2d Cir. 1992) ............22

*In re Jorgensen*, 66 B.R. 104, 109 (B.A.P. 9th Cir. 1986) ....................................................27

*In re Precision Carwash Corp.*, 90 B.R. 34 (Bankr. E.D.N.Y. 1988) ..........................................31

*In re Regional Bldg. Systems*, 251 B.R. 274 (Bankr. D. Md. 2000) ...........................................27

*In re Swanson*, 312 B.R. 153 (Bankr. N.D. Ill. 2004) .............................................................27

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

v

*In re Teligent, Inc.*, 268 B.R. 723 (Bankr. S.D.N.Y. 2001) ............................................32

*In re Tevis*, 347 B.R. 679 (B.A.P. 9th Cir. 2006) ............................................27

*In re Texscan*, 976 F.2d ............................................32

*In re Transmax Technologies, Inc.* 349 B.R. 80 (Bankr. D. Nev. 2006) ........................48

*In re Walbran*, 2000 Bankr. LEXIS 1374 (Bankr. N.D. Ill. November 22, 2000) ...............38

*In re Waste Systems Int'l, Inc.*, 280 B.R. 824 (Bankr. D. Del. 2002) ............................31

*In re Wegner*, 839 F.2d 533 (9th Cir. 1988) ............................................32

*Jenson v. Continental Fin. Corp.*, 591 F.2d 477 (8th Cir. 1979) ............................................32

*Kosadnar v. Metropolitan Life Ins. Co. (In re Kosadnar)*, 157 F.3d 1011, 1015 (5th Cir.
    1998) ............................................14

*Long Term Disability Plan of Hoffman-La Roche, Inc. v. Hiler (In re Hiler)*, 99 B.R. 238
    (Bankr. D.N.J. 1989) ............................................13

*McCarty v. Mobil Exploration and Producing U.S., Inc. (In re United States Abatement
    Corp.)*, 79 F.3d 393 (5th Cir. 1996) ............................................12

*Mitchell v. Streets (In re Streets & Beard Farm P'ship)*, 882 F.2d 233 (2d Cir. 1989) ...............38

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ............................................26

*Newbery Corp. v. Fireman's Fund Ins. Co.,* 95 F.3d 1392 (9th Cir. 1996) ........................ passim

*Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718 (4th Cir. 1998) ........8, 9

*Oregon v. Harmon (In re Harmon)*, 188 B.R. 421 (B.A.P. 9th Cir. 1995) ............................13

*Pinkstaff v. Unites States (In re Pinkstaff)*, 974 F.2d 113 (9th Cir. 1992) ............................14, 15

*Sims v. United States Dept of Health and Human Serv. (In re TLC Hospitals, Inc.),* 224
    F.3d 1008 (9th Cir. 2000) ............................................12, 13, 14

*Tavenner v. United States (In re Vance)*, 298 B.R. 262 (Bankr. E.D. Va. 2003) ........................15

*Taylor Assoc. v. Diamant (In re Advent Mgt. Corp.)*, 178 B.R. 480 (B.A.P. 9th Cir. 1995)..........8

*United States v. Arkison (In re Cascade Rds.),* 34 F.3d 756 (9th Cir. 1994)............................17

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

*Unsecured Creditors' Committee v. Southmark Corp. (In re Helms)*, 139 F.3d 702 (9th Cir. 1998)...................................................................................................................31, 36

**Statutes**

11 U.S.C. § 541 ..........................................................................................................................6

11 U.S.C. § 547 ........................................................................................................................12

11 U.S.C. § 548 ........................................................................................................................12

11 U.S.C. § 550 ........................................................................................................................12

11 U.S.C. §1123 .......................................................................................................................21

11 U.S.C. §1125 .................................................................................................................44, 48

11 U.S.C. §1129 .................................................................................................................23, 48

Nev. Rev. Stat. §645B.250.................................................................................................1, 7, 12

**Other Authorities**

5 COLLIER ON BANKRUPTCY § 541 (15th ed. 2006) ...................................................................6

5 COLLIER ON BANKRUPTCY § 541.11[5] (15th ed. 2006) .........................................................9

5 COLLIER ON BANKRUPTCY § 553.10 (15th ed. 2006) ...........................................................12

5 COLLIER ON BANKRUPTCY § 553.11[5] (15th ed. 2006) .......................................................10

H.R. Rep 95-595, at 347 (1977).................................................................................................39

Kurt F. Gwynne, *Intercommittee Conflicts, Multiple Creditors' Committees, Offering Committee Membership and Other Alternatives for Insuring Adequate Representation Under Section 1102 of The Bankruptcy Code*, 14 ABI Law Review 109, at 110 (Spring, 2006).........................................................................................................................................21

S. Rep 95-989, at 58 (1978) .......................................................................................................39

William Stoddard, *Tracing Principles In Revise Article 9 § 9-315(B)(2); A Matter of Careless Drafting, or an Invitation to Creative Lawering*, 3 Nev. C.J. 135, 143 (2002)............8

Witkin, Summary of California Law, Contracts, § 852 at 938-39 (10th ed. 2005) ................37, 38

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1     USA Commercial Mortgage Company ("USACM"), USA Securities, LLC ("USA

2  Securities"), USA Capital Realty Advisors, LLC ("USA Realty"), USA Capital Diversified Trust

3  Deed Fund, LLC ("DTDF"), and USA Capital First Trust Deed Fund, LLC ("FTDF")

4  (collectively, the "Debtors"), respectfully submit this Reply Brief in support of confirmation of the

5  Debtors' Third Amended Joint Plan of Reorganization (the "Plan") and in reply to various

6  objections filed in opposition to the Plan.  The objections lack merit and should be overruled, and

7  the Plan should be confirmed.

8  **I.    INTRODUCTION**

9     Although the Plan was served on over 7,300 creditors, equity interest holders, Direct

10 Lenders,[1] and other parties in interest, only nine (9) objections to confirmation of the Plan (and

11 four (4) joinders therein) were filed.  Notably, not a single member of DTDF or FTDF (the

12 "Funds"), on behalf of their equity interest in such Funds, nor any general unsecured creditor

13 (other than Direct Lenders) raised any objection to the Plan.  The primary objections were raised

14 by Direct Lenders and unsecured creditors holding Unremitted Principal Claims ("Unremitted

15 Principal Creditors").  In addition, objections were filed by Insiders, Borrowers, a claims trader,

16 and a few parties in interest having claims against Insiders seeking to clarify that the Plan does not

17 impair their claims against Insiders.

18    The objecting Direct Lenders and Unremitted Principal Creditors primarily complain that

19 the Plan impermissibly compromises their rights with respect to Prepaid Interest.  This Reply will

20 respond to each of their arguments in detail below but, first, it is important to frame the issue.

21    USACM, as a mortgage broker, facilitated loans made by groups of individual Direct

22 Lenders to third-party Borrowers.  Under Nevada state law, USACM was required to remit

23 payments it received from Borrowers to Direct Lenders after deducting contractually allowed fees.

24 To the extent a Borrower did not make a required payment on its Loan, USACM was prohibited

25 from making payments to Direct Lenders on behalf of the Borrower.  *See* NRS 645B.250.  For

26 example, if a Borrower paid $12 interest on a Loan, USACM was responsible for remitting such

27 ――――――――――

28 1 Capitalized terms not otherwise defined herein are defined in the Plan.

1

1    $12 to the applicable Direct Lender (less applicable fees).  If, however, a Borrower was obligated

2    to pay $12 interest on a Loan but failed to do so, USACM had no obligation to pay the Direct

3    Lender anything on account of such Loan (and was prohibited by Nevada law from doing so), and

4    the Direct Lender should not have received any payment on account of such Loan.

5         Unfortunately, pre-petition management for USACM did not follow these normal business

6    practices.  As all parties are aware, prior to the Petition Date, pre-petition management for

7    USACM made payments to Direct Lenders regardless of whether the Borrower made the payment

8    to USACM on the underlying Loan.  For example, even though a Borrower may have failed to

9    make a required $12 interest payment under a Loan, USACM, nevertheless, paid $12 in "interest"

10   to the applicable Direct Lender.  As described below, this was not just a one-time practice of pre-

11   petition management – USACM had a long history, stretching back several years, of making

12   unsubstantiated payments, otherwise known as "prepaid interest," to Direct Lenders.  *See*

13   Declaration of Thomas J. Allison filed in support of confirmation of the Plan ("Allison

14   Declaration") ¶¶ 61, 69.  Prior to the Petition Date, Direct Lenders, as a whole, received

15   approximately $39 million in "pre-paid interest" payments that they were not entitled to receive at

16   the time they were made.  *See* Allison Declaration ¶ 59.

17        As described in more detail below and in the Allison Declaration, a variety of sources were

18   used to make these pre-petition payments.  These sources included not only the diverted funds that

19   resulted in the Unremitted Principal Claims, but also included deferred loan and related fees

20   payable to USACM, funds received from Del Bunch, and money transferred from DTDF, among

21   others.  *See* Allison Declaration ¶¶ 83, 85.  Thus, it is impossible for any party in interest,

22   including Unremitted Principal Creditors, to trace the source of funds that USACM used to make

23   "prepaid interest" payments to Direct Lenders.  Such funds might have consisted of funds which

24   should have been remitted to other lenders or which belonged to USACM.

25        Tracing, however, is not a problem after the Petition Date.  USACM's post-petition

26   management knows exactly which monies have been collected on specific loans.  Further, the

27   post-petition management has been able to determine the aggregate amount that was overpaid pre-

28   petition, and has recovered approximately $ 16 million from Borrowers and recouped

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

2

1   approximately $16 million from Lenders of that amount since the Petition Date.

2          The Plan addresses the issue of what to do with the pot of money that was collected on

3   account of previously paid "pre-paid interest."  For example, suppose the Borrower that failed to

4   make a required $12 interest payment before bankruptcy now remits payment to USACM in the

5   amount of $12.  What should happen with the pot of money that USACM is holding that was

6   collected from Borrowers to replace the amounts that were previously and erroneously paid to

7   Direct Lenders prior to the Petition Date?

8          At least three different groups make competing claims against this pot of money.  First,

9   certain Direct Lenders assert that because they are still owed principal under their Loans, they are

10  entitled to keep not only the interest that was previously paid to them but any other payments

11  made by Borrowers on Loans in which the Direct Lenders hold an interest.  Second, Unremitted

12  Principal Creditors assert that because principal payments that they should have received were

13  included in the funds used to make these "pre-paid interest" payments, they are entitled to this pot

14  of money to satisfy their principal claims in priority over claims underlying the other source of

15  this prepaid interest.  Finally, other unsecured creditors, including those with administrative

16  claims, priority claims, and general unsecured claims against USACM assert that this money is

17  property of the USACM estate and should be distributed equally to all creditors in accordance

18  with the priority scheme established by the Bankruptcy Code.

19         As evidenced by these competing interests, disputes over this collected pot of money are

20  ripe for settlement and compromise.  While the merits will be argued in detail below, as a

21  preliminary matter it is clear that: (i) Direct Lenders should not get a windfall over other creditors

22  due to USACM's prior mismanagement; and (ii) Unremitted Principal Creditors have a general

23  unsecured claim as they can neither trace the pre-petition payment of "prepaid interest" to their

24  diverted principal nor assert any interest in the money that has been collected after the Petition

25  Date.  Moreover, because USACM is in possession of this pot of money under Bankruptcy Code

26  section 541(d), this matter can be resolved through confirmation of the Debtors' Plan and does not

27  require an adversary proceeding.  Thus, the proposed compromise by and between USACM and

28  Direct Lenders under the Plan can be approved by this Court.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

3

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Except for certain objections that raise issues with regard to specific, limited language in

2    the Plan (which the Debtors are attempting to resolve on a case-by-case basis), the remaining

3    objections are nothing more than attempts to thwart the Plan for selfish purposes.  For example,

4    the Debtors' Insiders and former owners and management, Mr. Milanowski and Mr. Hantges,

5    oppose the Plan in an effort to protect their own interests as they face both civil, and possibly

6    criminal, liability for their pre-petition business practices.  Not only do they claim that their equity

7    interests should not be cancelled, but they also make false, self-serving statements that they never

8    commingled money from Direct Lenders with other funds.  Their objections should be dismissed

9    out of hand.

10    The only other party in interest who raises issues with the Plan and, in particular, with the

11    Asset Sale Transaction, is a claims trader who presumably bought into this case under certain

12    assumptions.  It appears that this claim trader hedged its bets on the premise that the Loan

13    Servicing Agreements were executory contracts that would have to be assumed and assigned in

14    order to be transferred to a third-party purchaser.  As described in detail below, this premise was

15    misguided, and USACM can transfer the Loan Servicing Agreements free and clear of all claims

16    and interests as provided in the Asset Purchase Agreement with Compass Partners, LLC

17    ("Compass").

18    As set forth below, the Debtors and Committees respond to each argument raised in the

19    confirmation objections and request that the Court overrule each objection and confirm the Plan.[2]

20    **II.    SUMMARY OF OBJECTIONS**

21    The following objections to confirmation of the Plan were filed: (1) the Partial Opposition

22    filed by Joanne M. Grundman (docket no. 1947) and the Partial Opposition filed by Erna D.

23    Grundman and Joanne M. Grundman (docket no. 1948) (collectively, the "Grundman Objection");

24    (2) the Limited Objection filed by Gregory J. Walch and Shauna M. Walch as trustees of the

25    Gregory J. and Shauna M. Walch Family Trust (docket nos. 2003 and 2011) (the "Walch

26

27    _____

28    2 The four Committees will file separate joinders to this brief.  The Official Committee of Unsecured Creditors of
USACM is filing a separate brief on discrete issues with which DTDF does not join.

905152

Objection"); (3) the Limited Objection filed by Standard Property Development, LLC (docket nos. 2013 and 2045) (the "SPD Objection"); (4) the Objection filed by the Pension Benefit Guaranty Corporation (docket nos. 2017 and 2046) (the "PBGC Objection"); (5) the Limited Objection filed by Liberty Bank (docket nos. 2020 and 2047) (the "Liberty Bank Objection"); (6) the Opposition filed by Debt Acquisition Company of America V, LLC (docket nos. 2031 and 2050) (the "DACA Objection"); (7) the Objection filed by USA Investment Partners, LLC ("USAIP"), Joseph Milanowski, and Thomas Hantges (docket nos. 2035 and 2042) (the "Milanowski Objection"); (8) the Limited Objection filed by Pecos Professional Park Limited Partnership and Haspinov, LLC (docket nos. 2038 and 2052) (the "Pecos Objection"); and (9) the Objection filed by Donna Cangelosi and others referred to as the "Lender Protection Group" (docket no. 2042) (the "LPG Objection").  In addition, joinders in the SPD Objection were filed by Binford Medical Developers, LLC (docket no. 2028) and Copper Sage Commercial Center, LLC (docket no. 2029), a joinder in the LPG Objection was filed by Robert J. Kehl and others referred to as the "Objecting JV Creditors" (docket no. 2040), and a joinder in the Walch Objection was filed by Stanley Alexander and others (docket no. 2044).

The objections raise the following issues:  (a) the treatment of Prepaid Interest under the Plan (including alleged rights to offset Unremitted Principal Claims against Prepaid Interest); (b) the appropriateness of the loan servicing fees and other fees to be charged to Direct Lenders pursuant to the Plan; (c) the scope of the injunction and release provisions in the Plan; (d) the Debtors' ability to transfer Loan Servicing Agreements to Compass free and clear of all claims under the Plan; (e) the disposition under the Plan of documents and records within the Debtors' possession or control; (f) the cancellation of equity interests in Debtors other than DTDF and FTDF; (g) the "Notice of Non-Voting Status" that was mailed to creditors holding claims in unimpaired classes under the Plan; and (h) the pursuit of litigation against the Debtors' former principals and related parties under the Plan.  Each of these issues is addressed below.

## III.    OBJECTIONS TO THE PLAN'S TREATMENT OF PREPAID INTEREST

The Grundman Objection, the Milanowski Objection, and the LPG Objection each raised issues respecting the Plan's treatment of Prepaid Interest.  The issues raised are addressed herein.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

905152

**A.    Prepaid Interest Is Property Of The USACM Estate**

**1.    Class A-5 Voted To Accept The Plan.**

Class A-5, which is comprised of all of the Direct Lenders of USACM, voted by the requisite numbers to accept the Plan, thereby expressing both their acceptance of the Plan and, to the extent necessary, their acceptance of the compromise related to the Class A-5 claimants. Although Class A-5 voted to accept the Plan, thereby acknowledging that the Prepaid Interest, as defined in the Plan, constitutes property of USACM's Estate, the Debtors nonetheless believe it prudent to clarify why the Prepaid Interest constitutes property of USACM's Estate, regardless of the Class A-5 Vote.

**2.    Prepaid Interest Is Property Of The Estate.**

Section 541 of the Bankruptcy Code provides, in pertinent part, that:

> [t]he commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
> (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.
>
> (3) Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title
>
> (7) Any interest in property that the estate acquires after the commencement of the case.

11 U.S.C. § 541(a)(1), (a)(3), and (a)(7).

As evident from the statute, Congress clearly intended to define property of the estate in the broadest possible sense.[3] Under this expansive definition, and as demonstrated herein, the Prepaid Interest constitutes property of USACM's Estate.

---

3 *See* 5 COLLIER ON BANKRUPTCY § 541.01 ("Congress' intent to defined property of the estate in the broadest possible sense is evident from the language of the statute, which initially defines the scope of estate property to be all legal or equitable interest of the debtor in property as of the commencement of the case, wherever located and by whomever held. It would be hard to imagine language that would be more encompassing. Yet the remainder of section 541(a) attempts to do just that.")

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

905152

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

3.      **The Prepaid Interest Payments Were Paid From Untraceable, Commingled Funds Obtained From Various Sources And Therefore Constitute Property Of USACM's Estate.**

Prepetition, USACM's former management made regular monthly payments to certain Direct Lenders regardless of whether such Direct Lenders' respective loans were performing.  In the case of nonperforming loans, USACM would utilize funds in its collection account, which were commingled funds from a variety of untraceable sources, to advance payments to Direct Lenders whose loans were nonperforming.[4]  Notably, the collection account was comprised of funds received from various sources including, but not limited to, Unremitted Principal, deferred loan fees payable to USACM that were collected as part of the payments made by the various Borrowers, and monies transferred from DTDF.  *See* Allison Declaration ¶ 82-87.  However, because certain Direct Lenders' loans were nonperforming, the Direct Lenders receiving such payments had no legal or equitable right to the payments made by USACM.  In fact, Nevada law prohibited such payments by USACM.  *See* N.R.S. 645B.250 ("[A] mortgage broker or mortgage agent shall not advance payments to an investor on behalf of a person who has obtained a loan secured by a lien on real property and who has defaulted in his payments.").

When property in the possession of a debtor is alleged to be held in trust by the debtor for the benefit of a nondebtor, in order to establish a right to the property as a trust beneficiary, the nondebtor must: (1) demonstrate that the trust relationship and its legal source exist; and (2) *identify and trace the trust funds if they are commingled.  See Goldberg v. New Jersey Lawyers' Fund for Client Protection*, 932 F.2d 273, 280 (3d Cir. 1991) (emphasis added).  While the determination of whether a trust exists is usually a question of state law, the issue of identifying and tracing the alleged trust funds is exclusively a question of federal law.  *See Connecticut General Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 618 -619 (1st Cir. 1988).  Notably, "[t]he point of tracing is to follow the *particular* entrusted assets, *not* simply to identify *some* assets." *Id*. at 620 (emphasis added).  However, due to the fact that money has no extrinsic,

---

4 Payments on the nonperforming loans commenced as early as 2001.  *See* Allison Declaration ¶ 61.

905152

identifiable characteristics that permit it to be traced, once it is commingled, the Ninth Circuit

employs the "lowest intermediate balance rule" ("LIBR"), which provides as follows to trace

commingled funds: if the amount on deposit is reduced below the amount of the trust funds but not

depleted, the claimant is entitled to the lowest intermediate balance in the account, based on the

fiction that the trustee would withdraw non-trust funds first, retaining as much as possible of the

trust fund in the account.[5]  *See Connecticut General Life Ins. Co.*, 838 F.2d at 619; *Taylor Assoc.*

*v. Diamant (In re Advent Mgt. Corp.)*, 178 B.R. 480, 492 (B.A.P. 9th Cir. 1995).  Thus, when trust

funds are commingled, the claimant's proceeds held in trust only remain in the trust account to the

extent that the account balance remains at or above the amount of the claimant's trust funds; thus,

as the balance of the trust drops below the total amount of the claimant's trust funds, the

claimant's funds are likewise depleted.  *See* William Stoddard, *Tracing Principles In Revise*

*Article 9 § 9-315(B)(2); A Matter of Careless Drafting, or an Invitation to Creative Lawering*, 3

Nev. C.J. 135, 143 (2002).  "In no case is the trust permitted to be replenished by deposits made

subsequent to the lowest intermediate balance."  *Old Republic Nat'l Title Ins. Co. v. Tyler (In re*

*Dameron)*, 155 F.3d 718, 724 (4th Cir. 1998).

Assuming *arguendo* that some portion of the commingled funds in USACM's collection

account from which the Prepaid Interest payments were made was at one time deemed funds held

in trust, such funds subsequently lost their trust status for at least two reasons.

### (i)    Trust Fund Status Was Lost When The Collection Account Reached A Negative Balance.

First, it is clear that when commingled funds, a portion of which constitute trust funds, are

depleted, the trust is deemed lost and the purported trust beneficiary becomes merely a general

creditor.  *See Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.)*, 371 F.3d 397,

402 (8th Cir. 2004) ("However, if the account is depleted after the trust fund has been deposited,

the trust fund is treated as lost."); *Connecticut General Life Ins. Co. v. Universal Ins. Co.*, 838

---

[5] As money lacks extrinsic, identifiable characteristics that render it traceable, once it is combined with other money, LIBR serves as a mechanism by which courts can trace money held in trust.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

905152

1  F.2d 612, 619 (1st Cir. 1988) ("Where, however, after the commingling, all the money is

2  withdrawn, the trust fund is treated as lost, even though later deposits were made into the

3  account."); *Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 724 (4th Cir.

4  1998) (citing *Cunningham v. Brown*, 265 U.S. 1 (1924) ); *see also* 5 COLLIER ON BANKRUPTCY

5  § 541.11[5] (15th ed. 2006) ("If the trust fund or property cannot be identified in its original or

6  substituted form, the purported beneficiary becomes merely a general creditor of the estate

7  [footnote omitted].  The result is the same where the trust property has been disposed of or

8  dissipated in such manner as to leave nothing in its place.").

9          On February 8, 2006, USACM's accounting records denote that the book value of

10  USACM's collection account had a <u>negative</u> balance of approximately $1,603,333.[6]  *See* Allison

11  Declaration ¶ 69.  Therefore, assuming certain funds held in USACM's collection account were

12  held in trust, on February 8, 2006, such trust ceased to exist due to the depletion of its funds.

13              **(ii)      Untraceable Funds Are Property Of The Estate As A Matter of
                           Law.**
14

15          Assuming *arguendo* that the requisite trust relationship could be established, it would

16  nonetheless be impossible to identify and trace the commingled funds utilized to make the Prepaid

17  Interest payments.  First, the collection account consisted of money, which has no extrinsic,

18  identifiable characteristics of its own, and once commingled, the means of tracing such funds is

19  through the utilization of the LIBR.  As aptly stated in *Connecticut General Life Ins. Co.*, where

20  the lowest intermediate balance is zero, the asserted trust recipient is "entitled to take nothing."

21  *Connecticut General Life Ins. Co.*, 838 F.2d at 619.  Even assuming that the lowest intermediate

22  balance in the collections account was greater than zero, the requisite tracing is nonetheless

23  impossible.  *See* Allison Declaration ¶ 68 (stating that regardless of attempts by USACM's

24  attorneys and financial consultants and advisors, it is impossible to specifically trace particular

26  6 Although USACM's bank records reveal that there was $19,946,265 in the collections account on February 8, 2006

27  as not all of the outstanding payments and/or debits had been received by their intended recipients, such sum does not

28  alter the analysis as the new sums being deposited certainly could not constitute the initial trust res being held in the

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

9

trust assets to subsequent distributions made by USACM, including Prepaid Interest payments). Although LIBR may readily be employed where the property of *one* trust beneficiary is commingled with the property of the trustor,[7] where, as is the case here, the monies in the collection account were obtained from a variety of sources and depleted significantly below the value of the purported funds held in trust, it is not possible to apply the LIBR to determine whose assets remain in the trust account. *See* Allison Declaration ¶¶ 82-87, 69; *see Gulfstream Aerospace Technologies, Inc. v. Calascibetta (In re Strategic Technologies, Inc.)*, 2005 WL 1669615 (3rd Cir. 2005) (Although the LIBR is helpful in identifying one party's assets commingled with the trustee, its value is significantly lessened when the assets are commingled with many other similarly situated individuals).  Additionally, it is impossible to trace which funds in the collection account were utilized to make the Prepaid Interest payments.  *See* Allison Declaration ¶ 68.  This is particularly evident when one appreciates that USACM commenced making Prepaid Interest payments as early as 2001.  *See* Allison Declaration ¶ 61.  Furthermore, the inability to trace funds emanates from the fact that funds in the collection account were used not only to make Prepaid Interest payments to Direct Lenders, but also to make interest payments on other loans, including loans to and for USACM and USACM's insiders.  *See* Allison Declaration ¶ 78-79. [8]

Where the purported trust funds cannot be traced, such funds are presumed to be property of USACM's Estate and the purported beneficiaries become general creditors of such estate.  *See Taylor Assoc. v. Diamant (In re Advent Mgt. Corp.),* 104 F.3d 293, 296 (9th Cir. 1997); 5 COLLIER ON BANKRUPTCY § 553.11[5] (15th ed. 2006) ("If the trust fund or property cannot be identified in its original or substituted form, the purported beneficiary becomes merely a general creditor of the

---

collections account.  Thus, the trust necessarily ceased to exist on February 8, 2006.

7 It is generally possible to apply the LIBR and thus trace the funds in this context because once the trust balance is depleted to less than the funds placed in trust, it is evident (applying the legal fiction that the trustor first utilized his own assets commingled in the trust account) that the remaining sums belong to the beneficiary of the trust.

8 Although certain Direct Lenders assume that USACM is able to trace the money USACM transferred to various recipients to particular Unremitted Principal, in light of the numerous sources of the funds and the numerous sources of the funds and the numerous recipients, such tracing is simply not possible.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

905152

estate.").  Addressing the situation where a purported trust beneficiary is seeking to establish itself as a trust recipient, the Ninth Circuit explained that "[i]f Taylor [the purported trust beneficiary] fails to trace the funds, we must presume that the funds constitute 'an interest of the debtor in property.'"  *Id.* (citing *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214, 1217 (9th Cir. 1988) for the proposition that "funds from commingled bank account controlled by debtor presumptively constitute property of debtor's estate")).[9]  Similarly, the Third Circuit has explained that where a purported trust beneficiary "could not sufficiently identify its funds in the commingled account, all of the Commerce Account Funds are presumed to be part of the bankruptcy estate."  *Gulfstream Aerospace Corp. v. Calascibetta (In re Strategic Technologies, Inc.)*, 2005 WL 1669615 (3rd Cir. 2005).[10]  Therefore, where, as here, it is impossible to trace the purported trust funds,[11] such funds are treated as property of USACM's Estate, with the purported beneficiaries retaining claims against such Estate.

The conclusion that the Prepaid Interest is property of the Estate is not only the legally correct determination, but it is also the only equitable result.  Bankruptcy courts, as courts of equity, and consistent with the mandates of the Bankruptcy Code, favor pro rata distribution of funds when such funds are claimed by creditors of like status.  *See Goldberg v. New Jersey Lawyers' Fund For Client Protection*, 932 F.2d 273, 280 (3rd Cir. 1991) (collecting cases); *In re Bullion Reserve of North America*, 836 F.2d at 1219 ("Equity requires that all these creditors share equally in whatever assets are available.").[12]  Consistently with the foregoing principles, the Plan

---

9 In *In re Bullion Reserve of North America*, the Ninth Circuit explained that "even if an express trust were created, Bozek [the purported trust beneficiary] would still have a duty under federal bankruptcy law to trace his funds to the bullion he received.  Such a tracing requirement is necessary to further the Bankruptcy Code's policy of equal distribution among similarly situated creditors.  Here, Bozek cannot trace the money he gave BRNA to the bullion he received.  Therefore, the bullion is property of the debtor under § 547."  836 F.2d at 1218.

10 *See also Cunningham v. Brown,* 265 U.S. 1, 10 (1924) (Where monies in a purported trust cannot be traced, "the defrauded lender becomes merely a creditor to the extent of his loss….").

11 *See* Allison Declaration ¶ 87.

12 *See also Capital and Serv., Inc. v. Rubino (In re Builders Capital and Serv., Inc.)*, 317 B.R. 603, 612 (Bankr. W.D.N.Y. 2004) ("Courts have favored *pro rata* distribution of assets where, as here, the funds of the defrauded victims were commingled and where victims similarly situated with respect to their relationship to the defrauders." Id. (citing S.E.C. v. Credit Bankcorp, Ltd., 290 F.3d 80, 88-89 (2d Cir. 2002)).

11

905152

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

creates a liquidation trust for the benefit of all those who were harmed by the Debtors' prepetition

conduct.

### 4.    USACM Is Entitled To Recoup The Prepaid Interest.

Direct Lenders receiving the Prepaid Interest payment had no legal or equitable right to the

payments made by USACM.  *See* N.R.S. 645B.250 ("[A] mortgage broker or mortgage agent shall

not advance payments to an investor on behalf of a person who has obtained a loan secured by a

lien on real property and who has defaulted in his payments."); RESTATEMENT (SECOND) OF TRUSTS

§ 254 (2006) ("If the trustee has made a payment out of trust property to one of several

beneficiaries to which the beneficiary was not entitled, such beneficiary is personally liable for the

amount of such overpayment, and his beneficial interest is subject to a charge for the repayment

thereof, unless he has so changed his position that it is inequitable to compel him to make

repayment.").[13]  As such, these payments were statutorily precluded and USACM possesses a

claim for the recovery of each payment made to a Direct Lender on a nonperforming loan.

The Bankruptcy Appellate Panel for the Ninth Circuit (the "BAP") has explained recoupment,

which is "an equitable doctrine that has long applied in the bankruptcy context,"[14] as follows:

> [e]quitable recoupment is a common law doctrine that is not
> expressly recognized in the Bankruptcy Code, but is preserved
> through judicial decisions. . . .
>
> Recoupment is the setting up of a demand arising from the same
> transaction as the plaintiff's claim or cause of action, strictly for the
> purpose of abatement or reduction of such claim. . . .
>
> In recoupment, the respective claims may arise either before or after
> the commencement of the bankruptcy case, but they must arise out
> of the same transaction.

*Aetna U.S. Healthcare, Inc. v. Madigan (In re Madigan)*, 270 B.R. 749, 753-54 (B.A.P. 9th Cir.

2001) (citations and quotations omitted).[15]

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

---

13 Furthermore, any such prepetition payments made on nonperforming loans are recoverable pursuant to Sections 547, 548, and 550 of the Bankruptcy Code.  *See* 11 U.S.C. §§ 547, 548, and 550.

14 5 COLLIER ON BANKRUPTCY § 553.10 (15th ed. 2006) (citing *Smith v. Mark Twain Nat'l Bank*, 805 F.2d 278, 291-292 (8th Cir. 1986)).

15 *See also Newberry Corp v. Fireman's Fund Ins. Co.*, 95 F.3d 1392 (9th Cir. 1996); *Sims v. United States Dept of*

1    The classic recoupment right occurs when a buyer overpays for goods and the court

2    authorizes such buyer to reduce the purchase price by the overpayment.  *See Herod v. Southwest*

3    *Gas Co. (In re Gasmark Ltd.)*, 193 F.3d 371, 374 (5th Cir. 1999).  Although overpayment is not a

4    requirement for the application of the equitable doctrine of recoupment, recoupment is often

5    applied to prevent a windfall in the overpayment context.  *See id.*  As aptly explained by the BAP,

6    recoupment "involves 'netting out debt,' [citation omitted] and is allowed 'because it would be

7    inequitable not to allow the defendant to recoup those payments against the debtor's[16] subsequent

8    claim [citation omitted]."  *In re Madigan*, 270 B.R. at 754 (quoting *Oregon v. Harmon (In re*

9    *Harmon)*, 188 B.R. 421, 425 (B.A.P. 9th Cir. 1995), *Newbery Corp.*, 95 F.3d at 1401, and citing

10   *Long Term Disability Plan of Hoffman-La Roche, Inc. v. Hiler (In re Hiler)*, 99 B.R. 238, 243

11   (Bankr. D.N.J. 1989)).

12        In the present matter, Direct Lenders have claimed that money collected or to be collected

13   by USACM must be paid over to them.  However, USACM has a right of repayment for each

14   Prepaid Interest payment made to a Direct Lender.  Pursuant to the equitable doctrine of

15   recoupment, USACM is entitled to reduce any future payments made by a Borrower by the

16   previous overpayments made to such Direct Lenders as long as both rights to payment arise out of

17   the same transaction or occurrence.  *See In re TLC Hospitals, Inc.*, 224 F.3d at 1011 ("The

18   limitation of recoupment…is that the claims or rights giving rise to recoupment must arise from

19   the *same transaction or occurrence* that gave rise to the liability sought to be enforced….").  *See*

20   *Newbery Corp*, 95 F.3d at 1402  (in determining whether obligations in question satisfy the "same

21   transaction or occurrence" requirement, the Ninth Circuit applies the "logical relationship test.").

22   The Direct Lenders made and brokered Loans through USACM pursuant to the terms of Loan

23   Servicing Agreements that applied to one or more Loans.  *See* Allison Declaration ¶ 84.  Thus,

24   USACM's relationship with each Direct Lender was generally governed by *one* Loan Servicing

25

26   *Health and Human Serv. (In re TLC Hospitals, Inc.),* 224 F.3d 1008 (9th Cir. 2000); *McCarty v. Mobil Exploration and Producing U.S., Inc. (In re United States Abatement Corp.),* 79 F.3d 393 (5th Cir. 1996).

27   16 Although in the bankruptcy context "recoupment is usually asserted by a creditor against a debtor, there is no
28   reason the principles should differ when the positions of the parties are reversed."  *Focus Media Inc. v. National*

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

905152

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Agreement and the claims asserted by and between them inherently arise from such agreement,

2    which is indicative of recoupment.  "When all claims arise out of one contract between the parties,

3    application of the recoupment doctrine is appropriate." *Kosadnar v. Metropolitan Life Ins. Co. (In*

4    *re Kosadnar)*, 157 F.3d 1011, 1015 (5th Cir. 1998); *see also In re Madigan*, 270 B.R. at 758

5    ("[C]ourts often find that the 'same transaction' requirement is satisfied when corresponding

6    liabilities arise under a single contract.").  Further, and consistently, the Direct Lenders received

7    their monthly interest payments from USACM with respect to all of the Loans in the Direct

8    Lender's portfolio, often through a single check, whether or not the underlying Loans were

9    performing or nonperforming.  *See* Allison Declaration ¶ 59.  Therefore, although a Direct Lender

10   may have an interest in several Loans, the payment of all of such Direct Lender's interest has

11   consistently been treated as part of a single transaction, generally governed by a single Loan

12   Servicing Agreement.  *See generally In re TLC Hospitals, Inc.*, 224 F.3d at 1008 (holding in the

13   Medicare context that the Department of Health and Human Services can deduct prepetition

14   overpayments made to the debtor from sums owed to the debtor for postpetition services via the

15   doctrine of recoupment, because the overpayments and underpayments from year to year are part

16   of the same transaction); *Newbery Corp.*, 95 F.3d at 1401 (holding that where a debtor was

17   contractually obligated to indemnify an entity for all losses incurred by such entity as a result of

18   the debtor's default on the entity's performance bonds and where that same entity had an

19   obligation to pay rent for the use of the debtor's equipment stemming directly from the debtor's

20   default on the bonds, the single transaction requirement is met and equity necessitates

21   recoupment).

22        The fact that the respective asserted rights satisfy the "single transaction or occurrence"

23   requirement is perhaps best illustrated by examining how the logical relationship test is applied in

24   the compulsory counterclaim context.  "The common-law claim for recoupment is analogous to a

25   'compulsory counterclaim interposed solely to defeat or diminish plaintiff's recovery.'" *In re*

26   *Madigan*, 270 B.R. at 755 (quoting Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,

27   _____

28   *Broadcasting Co. Inc. (In re Focus Media Inc.)*, 378 F.3d 916, 926 (9th Cir. 2004).

905152

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   *Federal Practice & Procedure* § 1409 (2nd ed. 1990)).  Within the Ninth Circuit, the logical

2   relationship test is employed to determine what constitutes a compulsory counterclaim.  *See*

3   *Pinkstaff v. Unites States (In re Pinkstaff)*, 974 F.2d 113, 115 (9th Cir. 1992).  "A logical

4   relationship exists when the counterclaim arises from the same aggregate set of operative facts as

5   the initial claim, in that the same operative facts serve as the basis of both claims or the aggregate

6   core of facts upon which the claim rests activates additional legal rights otherwise dormant in the

7   defendant."  *Id.*  (citations omitted).  In *Pinkstaff*, the Ninth Circuit held that where the IRS's

8   claim against the debtors arose from the debtors' failure to pay taxes owed and the debtors' claim

9   arose pursuant to a violation of the automatic stay through an attempt by the IRS to collect the

10  taxes owed by the debtor, the "basis of both cases revolve around the aggregate core of facts

11  regarding the debtor's unpaid taxes" and therefore, "the essential facts relating to the tax claim

12  itself are logically related to the IRS' collection activities."  *Id.*  Similarly, the Direct Lender's

13  claims, for remittance of funds collected by USACM, and USACM's claims for remittance of the

14  Prepaid Interest which arose from the Loan Servicing Agreement, clearly revolve around the same

15  aggregate core facts and are therefore logically related, thereby satisfying the "same transaction or

16  occurrence" requirement.

17       Moreover, equity mandates that USACM may recoup the prepetition payments on

18  nonperforming loans made to a Direct Lender from any subsequent payments made by the

19  Borrower as any other result would grant the Direct Lender a windfall by permitting him or her to

20  keep payments to which they are not entitled, as well as to collect on future payments to which

21  they are actually entitled.  The equitable doctrine of recoupment exists for precisely this situation –

22  to permit the netting out of claims to ensure that no party in unjustly enriched.  *See e.g., Ashland*

23  *Petroleum Co. v. Appel (In re B&L Oil Co.)*, 782 F.2d 155, (10th Cir. 1986); *Tavenner v. United*

24  *States (In re Vance)*, 298 B.R. 262, 269 (Bankr. E.D. Va. 2003) ("As part of its equitable

25  foundation, an important function of the [recoupment] doctrine is to prevent unjust enrichment.

26  [citation omitted]  The court must consider whether any party would receive a windfall."):

27  *Newbery Corp.*, 95 F.3d at 1401 (noting that recoupments should be allowed where one party had

28  made certain payments to another party and it would be inequitable not to allow the payor to

recoup those payments against the payees' subsequent claim against the payor).  Simply stated, if recoupment is not permitted, certain Direct Lenders will be unjustly enriched while other creditors (including Direct Lenders) are left without a proportionate share of recoveries.  Such a result is patently inequitable and must be remedied through recoupment.

**B.**     **Alleged Right of Unremitted Principal Creditors To Offset Against Prepaid Interest**

Some of the Objections assert that the Plan unfairly compromises a Direct Lender's right to setoff.  These objectors assert that their Unremitted Principal Claims should be allowed to setoff any right USACM has to recover "pre-paid interest" from them, and this alleged "right" cannot be compromised under the Plan.  However, what the Objections fail to recognize is that in all compromises, there are two sides of the story.  Thus, while the objecting parties have advocated why they should be entitled to assert their right of setoff, there is an equally, if not more, compelling, rationale as to why the Court, after the time-consuming and expensive litigation that inevitably would follow denial of confirmation, would deny the application of setoff in these cases.

While the following briefly presents the arguments that USACM would raise in such litigation, they are expressly presented in support of the USACM – Direct Lenders settlement.  As noted in the separate brief filed today by the USACM Committee, the Court is not asked to make rulings of law or fact with respect to setoff against Prepaid Interest.  Nor is any ruling on the merits of the disputes discussed herein requied in light of the settlement embodied in the Plan.

Turning to the arguments raised by the Objections, it should be noted at the outset that setoff is an equitable remedy that is within the Court's discretion to decide whether it should be applied.  As the Court of Appeals for the Ninth Circuit has explained:

> Section 553, however, "is permissive, not mandatory. 'Its application, when properly invoked before a court, rests in the discretion of that court, which exercises such discretion under the general principles of equality.'" *Norton, 717 F.2d at 772 (quoting 4 Collier on Bankruptcy Par. 553.02 at 553-11 (15th ed. 1983)). Accord, e.g., Buckenmaier, 127 Bankr. at 237* ("While setoffs are generally favored they are not automatically permitted."); *Pieri v. Lysenko (In re Pieri), 86 Bankr. 208, 210 (Bankr. 9th Cir. 1988)*

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

16

905152

("Under the Code, the allowance of setoff is not automatic but is instead permissible at the discretion of the bankruptcy court, applying the general principles of equity. Setoff should not be allowed when it would be inequitable or contrary to public policy to do so.") (citations omitted); *Bacigalupi v. Parkway Plaza Investors (In re Bacigalupi, Inc.), 60 Bankr. 442, 445 (Bankr. 9th Cir. 1986)* ("The allowance or disallowance of a setoff is a decision which ultimately rests in the sound discretion of the bankruptcy court."); *see also FDIC v. Bank of America, 701 F.2d 831, 836-37 (9th Cir.)* ("Setoff will not be permitted when it would be inequitable or contrary to public policy to do so."), *cert. denied, 464 U.S. 935, 78 L. Ed. 2d 310, 104 S. Ct. 343 (1983); Riggs v. Government Employees Fin. Corp., 623 F.2d 68, 73 (9th Cir. 1980)* ("Despite the seemingly mandatory language of [the setoff provision under the former Bankruptcy Act], it is well settled that allowance of a setoff lies within the sound discretion of the trial court.").

*United States v. Arkison (In re Cascade Rds.)*, 34 F.3d 756, 763 (9th Cir. 1994). *See also Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1399 (9th Cir. 1996). Accordingly, setoff is just the type of matter that is ripe for settlement.

The primary objective of USACM's new management in these Chapter 11 Cases has been to put the pieces of the puzzle back together. This has involved re-creating the USACM's books and records as well as trying to collect all "pre-paid interest" that was previously advanced to Direct Lenders. Through these efforts, USACM has pieced together recoveries of this "pre-paid interest" together into one big pot. Regardless of how one characterizes the recovery of these monies by USACM, the overall goal is the same – to maximize the size of the pot for a pro rata distribution to those parties who have competing claims to these funds.[17] This is the maxim behind all bankruptcy policies.

More specifically, USACM believes that its recovery of the "pre-paid interest" is analogous to avoidance actions under the Bankruptcy Code. Under the avoiding powers of a debtor's estate, a debtor has the power to recover monies on behalf of the debtor's estate, which is then typically distributed to a debtor's creditors on a pro rata basis in accordance with the priority scheme under the Bankruptcy Code. *See* 11 U.S.C. §§ 550-548. On its face, this does not seem

---

17 As set forth in the Introduction, at least three distinct groups have made competing claims to this money – Direct

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

905152

fair.  As all first-time preference defendants question, "The debtor owes me money but I have to pay money back to the debtor?"  Bankruptcy policy, however, is clear – one creditor should not get preferred treatment over another.

Another USACM argument is USACM's right to recoup the "pre-paid interest" has precedence over any rights of setoff the Direct Lenders may have.  Although recoupment and setoff are related doctrines, they arise in distinct situations and instill distinct rights upon the parties.  This is particularly true in bankruptcy cases, in which recoupment rights generally are unaffected, but setoff rights are affected by, among other things, pre- and postpetition distinctions and the provisions of Bankruptcy Code sections 362 and 553.[18]

Setoff is, in essence, the offsetting of mutual, competing *claims* between two parties.  Party A's claim against Party B is offset by Party B's competing claim against Party A.  It does not matter whether the claims are of the same nature, or whether they arise under the same contract or transaction.  Indeed, the competing claims can have no relationship whatsoever, except that they are between the same two parties.

According to this theory, however, recoupment does not involve the assertion of competing claims, but rather a *defense* against payment of a particular claim.  *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1400 (9th Cir. 1996) (holding that "when the creditor's claim arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation") (quotations omitted).  Although, as with setoff, the defense is based upon a competing right to payment, the right must arise under the same contract or transaction.  Unlike with setoff, in which Party A offsets its competing (and potentially unrelated) claims against Party B, with recoupment Part A simply defends against any requirement to pay Party B.  It is for this reason that courts unanimously

---

Lenders, Unremitted Principal Creditors, and USACM's administrative and unsecured creditors.

18 In *addition* to the obvious, better treatment that recoupment rights have in bankruptcy, section 9404(a) of the Uniform Commercial Code makes an assignee of receivables subject to *all* rights of recoupment (*see* section 9404(a)(1)), but only those rights of setoff that arose before the account debtor receives notice of the right (*see* section 9404(a)(2)).

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

905152

1    concur that recoupment rights are not "claims" for purposes of bankruptcy – recoupment is a

2    defense to a claim.  *See Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V.*, 209 F.3d 252, 261

3    (3rd Cir. 2000) (holding that "a right of recoupment is a defense and not a claim").

4         In this case, USACM would argue that it has a right to recoup the interest payments it has

5    received and will receive from the Borrowers against the "pre-paid interest" that it paid to the

6    Direct Lenders.  This right is not merely a competing claim against the Direct Lenders, but also a

7    ***defense*** to any right they have to payment of the interest.  The assertion of this defense negates

8    any claim that the Direct Lenders have to the interest payments.

9         As noted, the premise of setoff is that two parties have competing, mutual claims against

10   each other.  To the extent that one party has an independent defense to the claim, however, setoff

11   cannot exist.  Here, USACM would claim that it has an independent defense – its right to recoup –

12   which negates any right the Direct Lenders' have to setoff vis-à-vis the interest payments, to the

13   extent of the recoupment.

14        Finally, as another alternative, USACM submits that doubt exists as to whether the

15   Unremitted Principal Creditors can establish a right of setoff due to the lack mutuality in the debts.

16   State law setoff doctrine invariably requires mutuality of debts.  That is, debts must be owing

17   between the same parties, in the same right or capacity.  *See Aviation Ventures, Inc. v. Joan*

18   *Morris, Inc.,* 110 P.3d 59, 63 (Nev. 2005) ("Setoff is a doctrine used to extinguish the mutual

19   indebtedness of parties who each owe a debt to one another.")  Here, there is an open question as

20   to whether there is mutuality.

21        On the one hand, Direct Lenders are asserting claims against USACM for a variety of

22   causes of action, including the failure to remit certain principal payments to them.  The creditor-

23   debtor relationship here is that between the Direct Lender and USACM.

24        On the other hand, USACM asserts a right to collect the amounts it previously paid out as

25   "pre-paid interest".  Under a different theory for the recovery of pre-paid interest, USACM can

26   arguably assert this right by stepping into the shoes of the Direct Lenders.  For example, Direct

27   Lenders had no right to receive any monies directly from USACM.  Under Nevada law, USACM

28   was to act as a mere conduit to pass money from Borrowers to Direct Lenders.  When USACM

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

19

905152

made "pre-paid interest" payments to Direct Lenders, it did so on behalf of the Borrowers.  Thus, USACM essentially subrogated to the rights of Direct Lenders to receive this money from the Borrowers.  In other words, USACM "bought" the Direct Lender's claims for this interest payment, and Borrowers now owe this money to Direct Lenders.  Therefore, the claim for "pre-paid interest" is not one between USACM and Direct Lenders but rather is between USACM and Borrowers.  Because there is no mutuality in the debts, there can be no setoff of the claims as between USACM and Direct Lenders.

In sum, there are competing rationales as to whether or not Direct Lenders should be able to enforce rights of setoff against USACM for collected "pre-paid interest".  As is apparent, the dispute on setoff is very complicated.  While both sides have a probability of success of resolving each of the disputes discussed above in their favor, such success is far from assured.  To resolve this dispute by litigation would result in significant administrative expense, and consequent delay, in litigating each of these disputes to finality.  Accordingly, the compromise on the Direct Lenders' right of setoff satisfies the A&C Properties test and USACM requests that the Court approve this compromise between USACM and Direct Lenders.

## IV.   PLAN COMPROMISE ON PREPAID INTEREST IS BINDING ON DIRECT LENDERS

The LPG Objection[19] objects to the terms of the Direct Lenders compromise, asserting that the Committees cannot bind their constituents, the Direct Lenders must individually compromise claims, and due process standards are not met.[20]  The Lender Protection Group's arguments are without merit and should not preclude confirmation of the Plan.

### A.   Committees Are Authorized To Negotiate Class Treatment Under Plans

---

19 In this regard, objection must be made to the filing of a pleading by the "Lenders' Protection Group" without identifying the particular claimants upon whose behalf the pleading was filed.  Issues relating to confirmation, including standing to object as to particular aspects of a plan, are creditor specific.  Without identifying a particular creditor raising particular objections, it is impossible for the responding parties to fully determine whether the objections are appropriately raised.

20 Such an objection was also circulated by "Edward L. Burgess – Self Represented Owner / Direct Loans by First Savings Bank Custodian for Edward Burgess IRS," but apparently that document was not timely filed.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

905152

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    The ability of a committee to negotiate the proposed settlement of a class treatment can not

2  seriously be questioned.  "In enacting the Bankruptcy Code of 1978, Congress intended that

3  creditors' committees would 'provide supervision of the debtor in possession and of the trustee'

4  and 'protect their constituents' interests.'  Congress also intended that creditors' committees

5  would serve as the 'primary negotiating bodies' for the formulation of a plan of reorganization."

6  Kurt F. Gwynne, *Intercommittee Conflicts, Multiple Creditors' Committees, Offering Committee*

7  *Membership and Other Alternatives for Insuring Adequate Representation Under Section 1102 of*

8  *The Bankruptcy Code*, 14 ABI Law Review 109, at 110 (Spring, 2006) (citing H.R. Rep. No. 95-

9  595, at 401 (1977)).

10    When a creditors' committee and debtor agree regarding the proposed treatment of a class

11  under a plan of reorganization,[21] the committee does not, as pointed out by the Lenders Protection

12  Group, "bind" the individual members of the class.  However, the fundamental structure of the

13  Bankruptcy Code provides for a vote by class, which <u>is</u> binding on individual members.  Thus, the

14  argument that the settlement is inappropriate because each and every member of the class does not

15  agree simply misses the mark in the context of a chapter 11 case.  As provided by 11 U.S.C.

16  § 1126(c), a class of claims accepts a plan where creditors holding at least two-thirds in amount

17  and more than one-half in number of the allowed claims have accepted such plan.  As

18  demonstrated by the ballot tabulation report which will be filed with the Court no later than

19  December 18, 2006, Class A-5, which is exclusively comprised of claims of Direct Lenders, has

20  voted to accept the Plan.

21    **B.    <u>Compromises May Be Implemented Through A Reorganization Plan</u>**

22    The implementation of a compromise through a plan of reorganization is perfectly

23  appropriate.  *See, e.g., In re Allegheny Intern, Inc.* 118 B.R. 282, 309 (Bankr. W.D. Pa. 1990).  "A

24  plan may provide for compromise of litigation."  There, the court recognized that a proposed

25  settlement, effectuated through a plan of reorganization, was appropriate.  In so doing, the court

26

27  21  It should be noted that the contents of a plan can certainly include the compromise of claims, and provisions for

28  the distribution of sale proceeds as well as litigation claims.  *See, e.g.*, 11 U.S.C. §§1123(b)(3)(a); 1123 (b)(4); and

905152

1  noted that: "It is very significant that [affected classes of shareholders] have voted in favor of the

2  plan, **thereby signifying their approval of the settlement**…" *Id.* (emphasis added).[22]

3      The ability of a plan to incorporate a settlement as to a class, which that class accepts by

4  affirmative vote, is further illustrated by the case of *In re Joint Eastern and Southern Dist.*

5  *Asbestos Litigation*, 982 F.2d 721, 735-36 (2d Cir. 1992). There, the court distinguished between

6  protections afforded a settlement class under a plan of reorganization versus settlement of class

7  action litigation.

8           Insolvency exerts powerful pressures upon contending creditors to
           compromise their position so that a fair distribution of assets is
9           achieved--through a reorganization that contemplates continuation
           of the Debtor where feasible, and otherwise through liquidation. To
10          lessen the risk that these pressures will lead to unfair compromises,
           bankruptcy law provides numerous safeguards not contained in class
11          action procedures. For example, for a plan of reorganization to be
           approved, the plan must be put to a vote of all members of impaired
12          classes of creditors…, the vote is taken only after a solicitation
           based on a detailed description of the plan…, the plan can be
13          "crammed down" over the objection of a dissenting class of
           creditors only if strict fairness standards are met…, and the plan
14          may not be imposed against the wishes of an impaired class that
           would fare better under liquidation….
15

16

17  *Id*. at 735-36.

18      The argument that such a settlement is procedurally inadequate is also flawed. A similar

19  argument was raised in *In re Best Products, Co., Inc.,* 168 B.R. 35 (Bankr. S.D.N.Y. 1994).

20  There, Judge Brozman dealt with an objection which asserted that certain settlements contained in

21  the proposed plan of reorganization could not be approved, absent completion of adversary

22  proceedings with regard to issues resolved by the Plan. The court began with a general statement

23  of policy favoring settlement through a plan of reorganization:

24           Courts, as a general rule, favor compromise as compromises are 'a
           normal part of the process of reorganization'. [citations omitted]  In
25

26  1123(b)(6).

27  22 Although one of the shareholder classes did not achieve acceptance under §1126, the court nonetheless approved
   the plan, including the settlement, stating: "It is clear to the court that this settlement is of great benefit to the estate,
28  the creditors, and equity holders." *Allegheny*, 118 B.R. at 309.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

22

905152

1
2
3
4

> this spirit, §1123(b)(3)(A) of the Bankruptcy Code specifically permits a plan to provide for the settlement of any claim belonging to the debtor or the estate.  But whether the claim is compromised as part of the plan or pursuant to a separate motion, the standards for approval of the compromise are the same.

5    *Id*. at 50.  Judge Brozman then noted:

6
7
8
9

> Remember that [debtor] put this compromise into the plan rather than simply bringing it on for a hearing.  Thus, where the court usually has to infer creditor assent from lack of creditor opposition, here the creditor body voted on the plan, one of the cornerstones of which was the compromise of the …action.  Creditor support was overwhelming.

10   *Id*. at 61.

11       The Direct Lender Committee and the USACM Committee (along with the Debtors)

12   negotiated a proposed settlement of claims among USACM and Direct Lenders.  This settlement

13   was clearly set forth in the Plan and Disclosure Statement, which were sent to all Direct Lenders.

14   Every Direct Lender received a class A-5 ballot.  All Direct Lenders had the opportunity to vote

15   for or against the settlement.  The Direct Lender compromise class (A-5) voted to resolve their

16   similar claims related to the Prepaid Interest and other disputed issues as set forth unequivocally in

17   the Plan and Disclosure Statement, to accept the settlement, and to accept the Plan.

18       Even though it is fundamental that when the requisite vote is achieved, the non-consenting

19   class members (such as the Lender Protection Group) are bound by such vote, the objecting

20   individual claimants are not without protections.  The protections provided to individual members

21   of an impaired accepting class include that the holders "will receive or retain under the plan on

22   account of such claim or interest property of a value, as of the Effective Date of the Plan, that is

23   not less than such holder would so receive or retain if the Debtor were liquidated under chapter [7]

24   of this title on such date."  11 U.S.C. §1129(a)(7)(A)(ii).  As to the dissenting Direct Lender

25   claims, this test is met.  The Plan provides for a Liquidating Trust to pursue and distribute all

26   assets *pro rata*.  Direct Lenders asserting <u>claims</u> will inherently receive their *pro rata* share of

27   such liquidation.

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

23

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

C.    **No Adversary Proceeding Is Necessary To Confirm The Plan**

      1.    **Fed. R. Bankr. P. 7001(7) Specifically Excludes Recoupment Through A Plan From The Requirements Of An Adversary Proceeding.**

Certain Direct Lenders have objected to confirmation based upon the mistaken assumption that commencement of a declaratory relief action "is a mandatory prerequisite" to confirmation of Debtors' Plan.  More specifically, they have argued the Plan has improperly attempted to "circumvent Rule 7001".  *See* LPG Objection, p. 6, l.3-4.  Lender Protection Group's argument is entirely inconsistent with the plain language of Rule 7001(7).  To the contrary, Rule 7001(7) specifically *excludes* from the requirement of an adversary proceeding equitable remedies such as recoupment when they are provided for in a chapter 11 plan.  Rule 7001 provides:

> An adversary proceeding is governed by the rules of this Part VII. The following are adversary proceedings:
>
> (1) a proceeding to recover money or property, other than a proceeding to compel the debtor to deliver property to the trustee, or a proceeding under § 554(b) or § 725 of the Code, Rule 2017, or Rule 6002;
>
> (2) a proceeding to determine the validity, priority, or extent of a lien or other interest in property, other than a proceeding under Rule 4003(d);
>
> (3) a proceeding to obtain approval under § 363(h) for the sale of both the interest of the estate and of a co-owner in property;
>
> (4) a proceeding to object to or revoke a discharge;
>
> (5) a proceeding to revoke an order of confirmation of a chapter 11, chapter 12, or chapter 13 plan;
>
> (6) a proceeding to determine the dischargeability of a debt;
>
> (7) a proceeding to obtain an injunction *__or other equitable relief, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief__*;
>
> (8) a proceeding to subordinate any allowed claim or interest, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for subordination;
>
> (9) a proceeding to obtain a declaratory judgment relating to any of the foregoing; or

905152

1    (10) a proceeding to determine a claim or cause of action removed under 28
2    U.S.C. § 1452.

3    Fed. R. Bankr. P. 7001 (emphasis added).

4    **2.    Lender Protection Group's Authority Is Distinguishable.**

5    In support of its position, the LPG Objection relies upon only two cases that collectively

6    stand for the proposition that as a vehicle for the exercise of avoidance powers debtors must

7    generally commence adversary proceedings.  With this proposition Debtors do not disagree.

8    However, unlike the exercise of recoupment and setoff rights contemplated by the Debtors Plan,

9    the plan in *In re Commercial Western Finance Corp.*, 761 F.2d. 1329 (9th Cir. 1985) sought to

10    avoid security interests granted by the debtor on a pre-petition basis.  Similarly, in *In re Golden*

11    *Plan of California*, 829 F.2d 705 (9th Cir. 1986), the trustee sought to disallow investors notes and

12    deeds of trust without commencing an adversary proceeding.  Such actions clearly fall within the

13    scope of Rule 7001 as they are "proceeding[s] to determine the validity, priority, or extent of a lien

14    or other interest in property…" and are fundamentally distinguishable from the exercise of

15    equitable recoupment. *See* Fed. R. Bankr. P. 7001(2).

16    **3.    A Debtor Need Not Commence A Declaratory Relief Action To**
       **Determine What Constitutes Property Of The Estate Under Section**
17       **541.**

18    In this case, there is no attempt to modify the Deed of Trust or otherwise impact the

19    interests of the Direct Lenders.  The Direct Lenders' collateral interests remain the same and the

20    documents governing their security interests with the Borrower are unimpacted.  In fact, at the

21    conclusion of these bankruptcy cases, the Direct Lenders will have the same security interests in

22    the same Note, from the same Borrower, with the same amount of principal and interest due,

23    reduced only by payments of interest or principal that they actually received.

24    As set forth in detail in Debtors' Confirmation Brief, Prepaid Interest recovered under the

25    doctrine of recoupment constitutes property of Debtor's estate as a matter of law.  Unlike

26    traditional litigation recovery actions, the Debtor is not seeking to affirmatively recover assets

27    from the ***possession*** of Direct Lenders.  Instead, the Debtor is exercising recoupment from funds

28    held in the Debtor's own account or that will otherwise be paid directly from borrowers.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

25

905152

1    A basic requirement of the chapter 11 process is that a Debtor must identify, at the outset

2    of a case, all assets which are included within the "estate". Here, USACM did so on June 16,

3    2006, by filing its Schedule of Assets and Liabilities (Docket 682). Included within the schedule

4    of assets is a detailed description of the Prepaid Interest. Notwithstanding the fact that Prepaid

5    Interest falls within the definition of property of the estate contained in §541 and was scheduled,

6    the LPG Objection demands that the Debtor affirmatively commence a declaratory relief action to

7    reaffirm the scope of the estate. In support of their position they provide no authority as none

8    exists. The logical extension of the Lender Protection Group position is absurd; a Debtor must

9    always commence a declaratory relief action to determine the scope of § 541. As set forth in the

10    Confirmation Brief, Prepaid Interest constitutes an asset of the Debtor's estate as a matter of law.

11    In the context of a contested plan process, this Court has the ability and duty to determine the

12    scope of Debtor's assets including the Prepaid Interest.

13    Moreover, the true goal of the Lender Protection Group appears not to be sure that any

14    alleged rights of Direct Lenders are protected but rather to cause a conversion of the Debtors'

15    cases to chapter 7. On the one hand, the Lender Protection Group argues that in order to

16    determine the Direct Lenders' rights regarding Prepaid Interest that individual adversary

17    proceedings must be commenced. The Lender Protection Group then argues that the Plan is not

18    feasible because individual Direct Lenders retain the right to file adversary proceedings regardless

19    of the Plan and this chaos will render the Plan not feasible. Essentially, the Lender Protection

20    Group advocates that no plan should ever be confirmed in these cases; thus, the only option then is

21    conversion of these cases to a chapter 7. The Lender Protection Group's selfish motives should

22    not be permitted to destroy the value been maximized for the creditors and interest holders of these

23    Estates under the Plan.

24    **D.        The Compromise Class Does Not Violate Due Process Standards**

25    Due process requires "notice and an opportunity to be heard." *Mullane v. Central Hanover*

26    *Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Objecting parties are being given that opportunity.

27    Indeed, the fact that objecting parties have filed objecting pleadings and had the opportunity to

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

905152

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

present admissible evidence via declaration,[23] demonstrates that there is no due process violation, especially as here where the objecting party has the opportunity to be present at the hearing, argue their position, and present evidence in support thereof. *See In re Tevis*, 347 B.R. 679, 696 (B.A.P. 9th Cir. 2006); compare *In re Swanson*, 312 B.R. 153, 159 (Bankr. N.D. Ill. 2004) (holding that confirmation can be an appropriate vehicle for such matters as claim valuation and determining what a secured creditor will receive); *In re Regional Bldg. Systems*, 251 B.R. 274, 291-92 (Bankr. D. Md. 2000) (rejecting argument that due process was violated where lien was extinguished through chapter 11 plan, rather than through adversary proceedings, so long as plan was not deceptive). Here, Direct Lenders have been afforded notice and an opportunity to be heard, squarely satisfying the due process requirements. As noted in the case cited by the Lender Protection Group, *In re Jorgensen*, 66 B.R. 104, 109 (B.A.P. 9th Cir. 1986), "Creditors were noticed of the confirmation hearing and had an opportunity to appear."

## V.    LOAN SERVICING FEES AND OTHER CHARGES TO DIRECT LENDERS

The Grundman Objection and LPG Objection also object to the provisions of the Plan that would allow the loan servicer to charge the maximum (for the vast majority of Direct Lenders, either 1% or 3% annually) loan servicing fee under the applicable Loan Servicing Agreements. The Grundman Objection also objects to USACM charging Direct Lenders for appraisals and loan collection costs. The Walch Objection requests only that the Court establish a procedure for allowing Direct Lenders to challenge the proposed loan servicing fees.

The objections to the contractual servicing fees and other fees and costs allowed under the Loan Servicing Agreement are not well-founded. The Direct Lenders each signed a Loan Servicing Agreement applicable to their loan investments through USACM, and the provision in each Loan Servicing Agreement addressing the contractually agreed and permissible loan servicing fees is not ambiguous. Paragraph 5 of the standard Loan Servicing Agreement provides, in relevant part:

---

23 Any purported "exhibits" which were filed without satisfying authentication and other admissibility requirements should not be considered in connection with confirmation. *See, e.g.,* Local Rule 9014(c).

905152

> Lender authorizes USA to retain monthly, as compensation for services performed hereunder, (a) one-twelfth (1/12th) of its annual servicing fee, which shall not exceed three percent (3%) [or 1%, as the case may be] per annum of the maximum principal amount of each of the Loans, (b) any late charges collected from the Borrower pursuant to the terms of the Note, and (c) default interest collected from the Borrower pursuant to the terms of the Note."

That Paragraph 5 also contains a sentence indicating that "USA derives the bulk of its revenues from charging loan fees" to the Borrower does not change the fact that the Direct Lenders agreed to a loan servicing fee of up to 3% (or 1%), and it is certainly equitable, as well as contractually allowed, to charge the maximum servicing fee rate after the Petition Date when USACM has not originated any new loans and thus has not received substantial revenues from loan fees charged to Borrowers, yet has the ongoing obligation to service the Direct Lenders' loans.

USACM's post-petition management has carefully reviewed thousands and thousands of Loan Servicing Agreements, recorded the maximum loan servicing fee that is allowed under each, and prepared and mailed an individual statement to each Direct Lender specifying the maximum contractual loan servicing fees (which are to be charged pursuant to the Plan) applicable to each Direct Lender. As described below, there is a mechanism in place under the Plan for resolving any disputes a Direct Lender may have concerning the proper amount of the loan servicing fee. The objections to the Plan relating to loan servicing fees and other fees allowable under the Loan Servicing Agreements should be overruled.

The Walch Objection should also be overruled because the Plan already establishes alternative dispute resolution procedures. *See* Plan Article I, Section E. Pursuant to the Alternative Dispute Resolution Agreement (the "ADR Agreement"), which was filed with the Court as part of the Direct Lender Supplement on November 29, 2006 (docket no. 1887), Direct Lenders are able to dispute the amount of the loan servicing fee claimed by USACM set forth on the Loan Servicing Fee Schedule. The ADR Agreement, the terms of which will be approved and implemented upon entry of the Confirmation Order, clearly applies to any dispute or "objection to the Loan Servicing Fee Schedule…." The Walch Objection simply disputes the amount of the loan servicing fee established under the Plan and is thus directly subject to the ADR Agreement

905152

1   and procedures. Because these procedures provide the relief the Walch Objection requests, the

2   Walch Objection should be overruled.

3   **VI.    TRANSFER OF THE LOAN SERVICING AGREEMENTS**

4       **A.    The Transfer Of The LSAs From USACM To Compass Is Lawful And Does Not Prejudice The Direct Lenders**

5

6       The Compass APA contemplates the transfer of the LSAs from USACM to Compass.

7   Several Plan objections, namely the LPG Objection, the DACA Objection, and the Grundman

8   Objection,[24] dispute the legality of such transfer of the LSAs. As set forth below, however, the

9   proposed transfer of the LSAs is lawful in that the LSAs are freely transferable, the LSAs are not

10  executory contracts, and the transfer will benefit the Direct Lenders by providing them with an

11  experienced loan servicer committed to fulfilling its obligations under the LSAs. When the lack

12  of restrictions on transferability of the LSAs is considered along with Compass' qualifications to

13  service the USACM loan portfolio and the fact that the LSAs are not executory contracts, the

14  proposed transfer of the LSAs from USACM to Compass should be approved.

15      **B.    The LSAs Are Freely Transferable**

16      USACM may transfer the LSAs to Compass because the LSAs are freely transferable.

17  While the LSAs contain restrictions on the ability of Direct Lenders to change loan servicers, the

18  LSAs do not restrict the right of the loan servicer to transfer its servicing rights. In fact, the

19  language of the LSAs contemplates that the servicer may transfer the LSAs, providing in

20  paragraph 16: "This Agreement shall be binding upon and shall inure to the benefit of the parties'

21  respective successors and assigns." If the servicer was prohibited from transferring the LSAs, this

22  language would be rendered meaningless.

23

24

25

_____

26  24 The Grundman Objection requests that the Court to hold that the LSAs are executory contracts, but does not

27  provide any legal basis for this request. Accordingly, this Reply does not specifically address the Grundman Objection, but, rather, generally directs all arguments contained herein regarding the non-executory nature of the

28  LSAs in response to the Grundman Objection.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

29

C.    **Compass Is Qualified To Service The Loans And Can Perform Under The LSAs**

As set forth in the "Declaration of David Blatt," Compass is qualified to service the loans and perform under the LSAs.  Additionally, the Debtors and the Committees are confident that Compass is qualified to service the USACM's loan portfolio and will perform all obligations of the loan servicer under the LSAs.  Indeed, Compass could not have even participated in the Auction if Compass had not demonstrated to the Debtors and the Committees that it has the capability to properly service USACM's loan portfolio and will perform its obligations under the LSAs.  Pursuant to the Bid Procedures Order, in order to be deemed a Qualified Bidder, Compass was required to provide "[a] written statement of [its] intentions with respect to servicing the loans identified in the [Stalking Horse APA], and satisfactory evidence of the [its] qualifications to act as loan servicer, and its ability to perform the obligations under the Loan Servicing Agreements." Bid Procedures Order, ¶ 2(iii).  In advance of the Auction, Compass provided such written statement to the Debtors, who, along with the Committees, were satisfied by Compass' representations in support thereof.  Furthermore, no party in interest objects to Compass' qualifications on these grounds or any other grounds at the Auction.

Moreover, in the "Declaration of David Blatt" filed in support of confirmation of the Plan, detailed information is provided about Compass' loan servicing capabilities and Compass' intention to perform all obligations of the loan servicer under the LSAs.  Accordingly, upon transfer of the LSAs to Compass, the USACM loan portfolio will be serviced by a financially stable entity that has demonstrated the ability to service the USACM loan portfolio and has provided adequate assurance that it will perform its obligations under the LSAs.

D.    **The LSAs May Be Transferred From USACM To Compass Without Being Assumed And Assigned Because The LSAs Are Not Executory Contracts**

Bankruptcy Code section 365 governs the disposition of executory contracts to which a debtor is a party.  The determination of whether a contract is executory within the meaning of the Bankruptcy Code is a question of federal law. *Griffel v. Murphy (In re Wegner)*, 839 F.2d 533, 536 (9th Cir. 1987).  If a debtor chooses to assume an executory contract, the debtor generally

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

30

905152

1    must cure, or provide adequate assurance that it will promptly cure, all defaults under the contract,

2    thereby elevating the non-debtor party's claim for breach of contract to an administrative priority

3    claim.  11 U.S.C. § 365(b)(1)(A).  In contrast, claims arising from a prepetition non-executory

4    contract are merely general unsecured claims.  *In re Waste Systems Int'l, Inc.*, 280 B.R. 824, 827

5    (Bankr. D. Del. 2002).

6        While "executory contract" is not defined in the Bankruptcy Code, the Ninth Circuit Court of

7    Appeals has adopted the "Countryman" definition of executory contract, providing as follows:

8              An executory contract is one "on which performance remains due to
               some extent on both sides."  More precisely, a contract is executory
9              if "the obligations of both parties are so [far] unperformed that the
               failure of either party to complete performance would constitute a
10             material breach and thus excuse the performance of the other."

11   *Unsecured Creditors' Committee v. Southmark Corp. (In re Helms)*, 139 F.3d 702, 705 (9th Cir.

12   1998) (internal citations omitted).  *Accord Commercial Union Ins. Co. v. Texscan Corp. (In re*

13   *Texscan Corp.)*, 976 F.2d 1269, 1271-72 (9th Cir. 1992); *Employees' Retirement System v.*

14   *Osborne (In re THC Financial Corp.)*, 686 F.2d 799, 804 (9th Cir. 1982).

15       One bankruptcy court has aptly explained the rationale of the Countryman definition in the

16   context of a situation in which the non-debtor party to a contract has fully performed its

17   obligations while the debtor party has yet to fully perform its obligations:

18             It would run contrary to the fundamental policies underlying the
               Bankruptcy Act to extend the statutory option, conferred upon the
19             trustee and the debtor in possession, to reject or assume executory
               contracts to situations where the debtor has already received the
20             contractual benefits and where the sole effect of assuming the
               contract would be to prefer one general creditor over others whose
21             contracts have not been assumed.  Assumption of such a contract
               would convert the breach of contract claim of the nonbankruptcy
22             party into an expense of administration without providing any
               further benefit to the estate.
23

24   *In re J.M. Fields, Inc.*, 22 B.R. 861, 864 (Bankr. S.D.N.Y. 1982) (internal citations omitted).

25   *Accord In re Precision Carwash Corp.*, 90 B.R. 34, 38-39 (Bankr. E.D.N.Y. 1988).  In other

26   words, where, as of the petition date, a debtor has remaining obligations under a contract, but the

27   non-debtor party has performed its obligations under such contract, assumption of the contract

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

31

905152

1   would harm the estate and prejudice other creditors in that the non-debtor party's claim would be

2   converted into an administrative expense even though the non-debtor party had not provided any

3   benefit to the debtor's estate. *Jenson v. Continental Fin. Corp.*, 591 F.2d 477, 481 n.5 (8th Cir.

4   1979).

5   **E.    The Ninth Circuit Court Of Appeals Has Clearly Set Forth The Means By**
        **Which To Determine If A Contract Is Executory**

6

7           The Ninth Circuit Court of Appeals has provided step-by-step instructions as to how a

8   bankruptcy court should determine if a contract is an executory contract. A court "must first

9   evaluate the obligations of both parties [as of the petition date] and determine whether they are

10  material obligations." *In re Texscan*, 976 F.2d at 1272 (citing *In re Wegner*, 839 F.2d at 536).

11  Next, a court must "determine whether, on the date the petition was filed, either party's failure to

12  perform its remaining obligations would give rise to a material breach and excuse performance."

13  *Id.* (citing *Collingwood Grain, Inc. v. Coast Trading Co. (In re Coast Trading Co.)*, 744 F.2d 686,

14  692 (9th Cir. 1984); *In re Wegner*, 839 at 536)). If the court finds that "either party has

15  'substantially performed' its side of the bargain, such that the party's failure to perform further

16  would not excuse performance by the other party, then the contract is not executory."[25] *Id.* (citing

17  *Marcus & Millichap, Inc. v. Munple, Ltd. (In re Munple)*, 868 F.2d 1129, 1130 (9th Cir. 1989).

18          As a practical matter, in conducting this analysis, courts often look to whether a contract is

19  executory as to one party (i.e. whether an obligation of a party is so far underperformed that the

20  party's failure to complete performance would constitute a material breach) and then to the other

21  party. If the contract is executory as of the petition date to both parties, then the contract is

22  "executory" under the Bankruptcy Code and is subject to the section 365 of the Bankruptcy Code.

23  *See e.g.*, *Id.* at 1272-73; *In re Wegner*, 839 F.2d at 536; *In re Helm*, 335 B.R. 528, 538 (Bankr.

24  S.D.N.Y. 2006); *In re Teligent, Inc.*, 268 B.R. 723, 731 (Bankr. S.D.N.Y. 2001).

25  **F.    Because The Direct Lenders Had No Material Obligations Under The LSAs As**

26

27  25 The materiality of a remaining obligation and whether the failure to perform a remaining obligation is a material
    breach of the contract that excuses performance of the non-breaching party is an issue of state law. *Id.* (citing *In re*

28  *Wegner*, 839 F.2d at 536).

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**Of The Petition Date, The LSAs Are Not Executory Contracts**

1. **The LSAs Dictate Rights Of Both Parties To The Contract With Regard To The Loans, But Set Forth Independent Obligations Of Only USACM.**

The LSAs are agreements between USACM, on one hand, and a particular Direct Lender, on the other hand, that govern the loan servicing arrangement between such parties. While the LSAs set forth numerous obligations of USACM in connection with arranging and servicing the loans, the LSAs provide for only two contingent, non-material obligations on the part of the Direct Lenders that only can be triggered at the option of USACM and a another contingent, non-material obligation that has already been performed by the Direct Lenders. As noted, the Debtors do not dispute that as of the Petition Date, USACM had unperformed material obligations under the LSAs relating to servicing the Loans. With respect to the Direct Lenders, however, the LSAs do not contain any unperformed material obligations.

2. **USACM's Right To Compensation For Servicing The Loans Does Not Render The LSAs Executory Contracts.**

Under the LSAs, USACM has the right to compensation for servicing the Loans. Specifically, in consideration for USACM's services under the LSA's, USACM is authorized to retain from loan collections: (a) an annual servicing fee paid monthly, (b) any late charges collected, and (c) any default interest collected. Additionally, if a Direct Lender wants to sell its interest in a deed of trust, USACM may assist the Direct Lender in the sale in exchange for a fee, which fee is deducted from the selling price. It is important to note that Direct Lenders never have possession of any of funds by which USACM is compensated nor any independent obligation to compensate USACM for its services. Both the servicing fee and the sales fee are retained by USACM from monies paid to USACM for the benefit of the Direct Lenders. Similarly, USACM collects and keeps any default interest or late charges.

The LPG Objection half-heartedly argues that the LSAs are executory because the "lenders _arguably_ had the remaining obligation of paying fees to USACM". LPG Objection. p. 17, l. 13-14 (emphasis added). The lackluster nature of the LPG's argument and the absence of this argument

905152

from the DACA Objection is no surprise given that, short of changing loan servicers and/or terminating the LSA, a Direct Lender has no ability to prevent USACM from collecting the servicing fee, the sales fee, default interest, or late charges.  In other words, Direct Lenders cannot breach the LSA by refusing to pay USACM.  Thus, even though as of the Petition Date, USACM still stood to be compensated for servicing loans under the LSAs, the compensation terms of the LSAs do not render the LSA's executory as to Direct Lenders:  USACM receives its compensation as a right under the LSAs, not as the fruit of the Direct Lenders fulfilling any obligation under the LSAs.

A Bankruptcy Court in this district has made a similar ruling in an analogous case.  In *Hatoff v. Lemons & Associates, Inc. (In re Lemons & Associates, Inc.)*, 67 B.R. 198 (Bankr. D. Nev. 1986), the court ruled that agreements between a loan servicer and investors were not executory contracts.  As in the Chapter 11 Cases, Lemons was a mortgage broker through which investors could purchase interests in notes secured by deeds of trust.  In connection with investing in notes through Lemons, investors were required to enter into several agreements with Lemons, including a "Limited Collection Agent Authority" giving Lemons the right to act as attorney-in-fact for the investor in all matters relating to collection and foreclosure of the investor's note and a "Note and Trust Deed Repurchase Option Agreement" giving Lemons the option to repurchase an investor's interest in a note and deed of trust.  In seeking to qualify for secured status under 11 U.S.C. § 365(j) on the grounds that an assignment of a trust deed is a sale of an interest in real property, the investors argued that their agreements with Lemons were executory contracts.  The court, however, held that the investor agreements were not executory because "no substantial performance remains on the part of the typical investor. He has paid his money to Lemons and there is little or nothing left for him to do except await repayment." *Id.* at 216.  In other words, the bankruptcy court held that the investors were simply passive investors and that there was nothing the investors could do to materially breach their agreements with Lemons.

Here, as in *Lemons*, the Direct Lenders are simply passive investors who can do nothing to materially breach the LSAs and have no affirmative duties under the LSAs.  The essence of the LSAs is that USACM will arrange and service loans for the Direct Lenders in exchange for a fee.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

34

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   The Direct Lenders have no control over this fee, and, thus, have no power to prevent USACM

2   from being compensated while the LSAs are in effect.  As such, the compensation provisions of

3   the LSAs do not render them executory contracts.

4   **3.    The LSAs Are Not Executory Contracts On Account Of The Contingent Obligations Of The Direct Lenders In The LSAs, As Such Obligations Are Not Material And May Be Triggered Only At USACM's Option.**

5

6

7       In taking the position that the LSAs are executory contracts, DACA primarily argues that

8   the LSAs are executory contracts because they contain three provisions that purportedly impose

9   "substantial continuing obligations" on Direct Lenders and the failure by a Direct Lender to

10  perform any those obligations would constitute a material breach of the LSA by such Direct

11  Lender.  Notably, in making this argument, DACA cites to case law for purposes of defining the

12  term "executory contract," but DACA fails to cite to any case law in support of its contention that

13  these three provisions render the LSAs executory and for good reason:  as set forth below, case

14  law in the Ninth Circuit dictates that these three provisions do not render a contract executory.  In

15  a similar vein, DACA neglects to acknowledge the context of these provisions with respect to how

16  and, indeed if, such provisions could be invoked by the loan servicer and again for good reason, as

17  a Direct Lender's failure to comply with any of the provisions would not constitute a material

18  breach that would excuse performance by USACM.

19      **(i)    Section 2(c)(iii) Of The LSA Does Not Render The LSA An Executory Contract.**

20

21      Section 2(c) of the LSA governs the ability of USACM to purchase, in the words of

22  DACA, a Direct Lender's "interest in the Loan 'at par' upon demand"  DACA Objection, p. 5, l. 12.

23  Specifically, Section 2(c)(iii) of the LSAs provides that until the total amount due under each note

24  is paid in full:

25          <u>In its sole discretion</u>, USA may pay off any Lender at any time by paying the then outstanding balance of Lender's interest in the principal of the Loan, plus all accrued interest and any prepayment penalty or fee, if applicable.   Any Lender so paid off shall concurrently execute and deliver therewith to USA an assignment, in a form acceptable to USA, of all of such Lender's right, title, and

26

27

28

35

interest in the Loan (including all documents evidencing the Loan)
and in the deed of trust securing the Loan.

(emphasis added).  In other words, USACM has the option to purchase a Direct Lender's interest in a loan at par and, upon USACM exercising such option, the Lender must perform the ministerial act of delivering title of its interest in such loan to USACM.

Under *Unsecured Creditors Committee v. Southmark Corp. (In re Helms)*, 139 F.3d 702 (9th Cir. 1998) (*en banc*), the LSAs are not executory contracts on account of this provision.  In *Helms*, the Ninth Circuit Court of Appeals, sitting *en banc*, overruled *Gill v. Easebe Enters. (In re Easebe Enters.)*, 900 F.2d 1417, 1419 (9th Cir. 1990), in which it had held that option contracts are executory contracts.  According to the *Helms* court, "[a] better approach… is to ask whether the option requires further performance from each party at the time the petition is filed.  Typically the answer is no, and the option is therefore not executory."  *Helms*, 139 F.3d at 705.  The *Helms* court explained its rationale as follows:  "The optionee need not exercise the option – if he does nothing, the option lapses without breach.  The contingency which triggers potential obligations – exercising the option – is completely within the optionee's control."  *Id.* at 705-06.  Accordingly, the Ninth Circuit held that "we look to outstanding obligations at the time the petition for relief is filed and ask whether both sides must still perform.  Performance due only if the optionee chooses at his discretion to exercise the option doesn't count <u>unless he has chosen to exercise it</u>" as of the Petition Date.  *Id.* (emphasis added).  In other words, "[t]he question thus becomes:  At the time of filing, does each party have something it must do to avoid materially breaching the contract?  Typically the answer is no; the optionee commits no breach by doing nothing."  *Id.*  *See also In re Bergt*, 241 B.R. 17, 20 (Bankr. D. Alaska 1999) (holding that a right of first refusal is not an executory contract where there was no sale pending on the petition date); *Bronner v. Chenoweth-Massie (In re National Financial Realty Trust)*, 226 B.R. 586, 589 (Bankr. W.D. Ky. 1998) (recognizing that "[t]he contingent nature of the obligations arising from an option agreement make them quite distinguishable from the typical contract" and electing to follow *Helms*).

As DACA states in the DACA Objection, Section 2(c)(iii) of the LSAs allows USACM to purchase a Direct Lender's interest in a loan at par on demand.  As such, the provision is an option

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

905152

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  in which USACM is the optionee holding the right to call, in its sole discretion, the Direct

2  Lender's interest in a loan for face value.  Upon, but not until, USACM exercises that option,

3  Section 2(c)(iii) imposes no obligation on the Direct Lender.  Because, as of the Petition Date,

4  USACM had not exercised this option with respect to any of the LSAs as of the Petition Date, no

5  Direct Lender had to do anything to avoid breaching its obligation at such time.  Thus, Section

6  2(c)(iii) falls squarely with the class of agreements that *Helms* holds not to be executory contracts.

7       Moreover, Section 2(c)(iii) cannot be grounds for finding the LSAs to be executory

8  contracts because a Direct Lender's failure to perform in accordance with Section 2(c)(iii) would

9  not be a material breach that would excuse USACM's performance under the LSA at issue.  Courts

10  in Nevada have not provided standards by which to determine (a) if a particular failure to perform

11  under a contract is a material breach or (b) under what circumstances a breach of contract excuses

12  performance of the non-breaching party.  In California, however, "[t]he test is whether the breach

13  is <u>material</u>, and a <u>total or complete</u> breach is of course material and a ground for termination by

14  the injured party.  Whether a <u>partial</u> breach is material depends on the importance or seriousness

15  thereof and the probability of the injured party getting substantial performance."  1 Witkin,

16  Summary of California Law, Contracts, § 852 at 938-39 (10th ed. 2005) (emphases in original).

17  Additionally, a leading treatise has commented that:

> something more than a mere default is ordinarily necessary to
> excuse the other party's performance in the typical situation…  [I]f
> the prior breach of such a contract was slight or minor, as opposed
> to material or substantial, the nonbreaching party is not relieved of
> his or her duty of performance, although he or she may recover
> damages for the breach…  [A] breach of contract which is only
> "partial," as opposed to "total," will not relieve the other party from
> his or her obligation to perform.

23  14 Williston on Contracts, §43:5 (4th ed. 2006).  The Williston treatise offers the following

24  summary of courts' methods of determining whether a breach is material:

> [I]t has been said that a "material breach" is a failure to do
> something that is so fundamental to a contract that the failure to
> perform that obligation defeats the essential purpose of the contract
> or makes it impossible for the other party to perform under the
> contract.  In other words, for a breach of contract to be material, it
> must "go to the root" or "essence" of the agreement between the

37

905152

parties, or be "one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract."  A breach is "material" if a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions, the breach substantially defeats the contract's purpose, or the breach is such that upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence of the contract.  Other courts have defined a breach of contract as "material" if the promisee receives something substantially less or different from that for which he or she bargained…. [W]here a breach causes no damages or prejudice to the other party, it may be deemed not to be "material."

*Id.*, §63:3 (internal citations omitted).

Furthermore, numerous courts have held that when the remaining obligations of one party to a contract are simply ministerial, the contract at issue is not executory. *See, e.g.*, *Enterprise Energy Corp. v. U.S. (In re Columbia Gas System, Inc.)*, 50 F.3d 233, 242-43 (3d Cir. 1995) (holding that settlement agreements were not executory where the only remaining obligation of one class of parties to the agreement was to execute a supplemental contract that would take the terms of a global settlement agreed to by the class and apply it to each class member because such obligation was a "functionally ministerial dut[y]"); *Mitchell v. Streets (In re Streets & Beard Farm P'ship)*, 882 F.2d 233,235 (2d Cir. 1989) (holding that "the delivery of legal title is a mere formality and does not represent the kind of significant legal obligation that would render the contract executory");  *Holmes Environmental, Inc. v. Suntrust Banks, Inc. (In re Holmes Environmental, Inc.)*, 287 B.R. 363, 390 (Bankr. E.D. Va. 2002) (escrow agreement was not an executory contract where only remaining obligation of one party was to submit invoices to procure payment, as breach of this requirement would not "go to the root of the contract" nor "defeat an essential purpose" of the contract); *In re Walbran*, 2000 Bankr. LEXIS 1374 (Bankr. N.D. Ill. November 22, 2000) (where the only obligation of one party to a contract was to collect weekly payments and to sign "whatever documents," contract was not executory);

One relevant example in which this principle has been applied is in the context of determining whether a promissory note or a contract for deed is an executory contract.  In fact, the legislative history of 11 U.S.C. § 365 provides that "a note is not usually an executory contract if

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

38

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   the only performance that remains due is repayment.  Performance on one side of the contract

2   would have been completed and the contract is no longer executory."  H.R. Rep 95-595, at 347

3   (1977); S. Rep 95-989, at 58 (1978).  *See also*, *e.g. In re Harold Adolphsen*, 38 B.R. 776, 778

4   (Bankr. D. Minn. 1983) (holding that a contract for deed is not an executory contract and stating

5   that the "[t]he fact that [the vendor] hold legal title and must at some point convey it to the debtors

6   does not render the contract executory any more than the duty of the holder of promissory note to

7   return the note when the debt is satisfied makes it executory."  Indeed, the *Lemons* court, in ruling

8   that the agreements at issue were not executory, analogized the investors' obligations under such

9   agreements to the obligations of a note holder with respect to a promissory note, stating: "An

10  obligation to convey title or to surrender a promissory note upon satisfaction of the underlying

11  debt is insufficient to render an agreement executory."  *Lemons*, 67 B.R. at 216

12          The obligation that Section 2(c)(iii) imposes on Direct Lenders is minimal and, in light of

13  the relevant legal authority detailed above, cannot serve as grounds to characterize the LSAs as

14  executory contracts.  In practice, all a Direct Lender has to do on account of Section 2(c)(iii) is (1)

15  to sign a document prepared by USACM acknowledging that USACM has exercised a right,

16  namely purchasing the Direct Lender's interest in a loan, that the Direct Lender has already

17  conferred upon USACM by virtue of entering into the LSA, and (2) to turnover documents to

18  USACM's possession that the Direct Lender has already committed to turning over under the

19  circumstances by virtue of entering into the LSA.  Section 2(c)(iii) provides Direct Lenders with

20  no room for discretion and requires Direct Lenders to perform only a ministerial task.  While it

21  may lead to a suit for specific performance, as stated by DACA, a Direct Lender's failure to

22  comply with this provision certainly would not be grounds for USACM to cease performing under

23  the LSA, particularly where a Direct Lender owned interests in other loans that were serviced by

24  USACM pursuant to that same LSA.

25          **(ii)      <u>Section 4 Of The LSA Does Not Render The LSA Executory
26              Contracts.</u>**

27          Pursuant to Section 4 of the LSAs, Direct Lenders are obligated to pay for certain expenses

28  incurred by USACM in servicing loans, but only at USACM's option:  "Upon demand by USA,

39

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   Lender agrees to promptly pay, either in advance or to reimburse USA, for its pro rata portion of

2   the out-of pocket expenses incurred, including attorney's fees, trustee fees and foreclosure costs."

3   Immediately thereafter, however, the LSA contains a built-in remedy:

> In the event that Lender fails to pay such sums to USA upon demand or request thereof, or if USA elects to advance such sums, USA may, it its discretion, advance such fees, including trustee's fees, attorney's fees, and costs of foreclosure; provided, however, that any fees advanced by USA shall be paid back from proceeds of the foreclosure (whether by reinstatement or sale), or from any other monies collected with respect to such Loan, before any payments are made to Lender.

9   Notably, the DACA Objection is silent as to this built-in remedy, with the result being that Section

10  4 is quoted completely out of context in the DACA Objection.  Indeed, Direct Lenders have no

11  obligations under Section 4 of the LSAs because USACM can simply advance fees that a

12  particular Direct Lender opts not to pay and then recoup such fees through foreclosure or any

13  monies collected with respect to the loan at issue.  Moreover, far from excusing USACM's

14  performance in the event that a Direct Lender does not comply with Section 4, this section

15  explicitly provides that USACM's recourse in such a situation is simply to withhold funds.  As

16  such, Section 4 can be analogized to the LSA's compensation provision:  in both cases, there is

17  nothing a Direct Lender can do to materially breach the LSA, as USACM has rights it may

18  exercise regardless of any position the Direct Lender may take.  Ultimately, Section 4 of the

19  LSAs, by its own terms, dictates the conclusion that a Direct Lender's failure to reimburse

20  USACM for expenses set forth therein is not a material breach that excuses USACM's

21  performance under the LSA.

22          Furthermore, as with Section 2(c)(iii), Direct Lenders have no obligations under Section 4

23  unless and until USACM opts to exercise a particular right that the LSAs confer upon USACM.

24  As of the Petition Date, USACM had not made any such demands that remained unfulfilled by

25  Direct Lenders, and, therefore, no Direct Lender had any obligation to USACM as of the Petition

26  Date on account of Section 4 of the LSAs.

27

28

905152

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

(iii)    **Section 11 of the LSA Does Not Render the LSA Executory Contracts.**

Section 11 of the LSA is entitled "Limited Power of Attorney" and, when read in its entirety, makes clear that the excerpt relied upon by DACA in arguing that the LSAs are executory is not grounds for such a finding.  Prior to the sentence excerpted by DACA, Section 11 provides that the Direct Lender party to the LSA "agrees that USA shall have full power and authority, and Lender hereby appoints USA as its true and lawful attorney-in-fact" with respect to the LSA and the Direct Lender's interest in any note, deed of trust, guaranty, security agreement or other document pertaining to a loan serviced pursuant to the LSA.  This agreement is followed by the sentence upon with DACA relies:

> Upon USA's request, Lender hereby agrees to execute and deliver, in the presence of a notary public, a "Declaration of Agency and Limited Power of Attorney", in a form consistent with Chapter 645B of the Nevada Revised Statutes, pursuant to which Lender shall further evidence the appointment of USA as Lender's true and lawful attorney-in fact to undertake the duties of USA hereunder.

(emphasis added).

Again, as with Sections 2(c)(iii) and 4, a Direct Lender's obligation arises only after USACM elects to exercise its rights under the LSAs.  Unless and until USACM chooses to request that a Direct Lender execute and deliver a "Declaration of Agency and Limited Power of Attorney," such Direct Lender has no obligation to do so.  As of the Petition Date, no such requests were outstanding, and, therefore, under *Helms*, Section 11 is not grounds for holding that the LSAs are executory contracts.  Furthermore, for the reasons set forth above, signing a document that the Direct Lenders have already agreed to sign upon demand is simply a ministerial task and, as such, the failure to perform when requested would not be a material breach of the LSA that would excuse USACM's performance thereunder.

Additionally, a simple understanding of Section 11 and how it relates to Chapter 645B of the NRS and, in turn, USACM's loan servicing functions reveals the impact of, at this point, a Direct Lender's failure to comply with Section 11.  Section 645B.330 of the NRS sets forth limitations on the use of powers of attorney by mortgage brokers and mortgage agents.  In relevant

41

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  part, Section 645B.330 provides that "[a] mortgage broker or mortgage agent shall not engage in

2  any act or transaction on behalf of a private investor pursuant to a power of attorney unless: (a)

3  The power of attorney is executed for the sole purpose of providing services for not more than one

4  specific loan in which the private investor owns a beneficial interest."  In other words, if a lender

5  and a mortgage broker want the mortgage broker to act on behalf of the lender pursuant to a power

6  of attorney, the parties must enter into a separate power of attorney for each loan on account of

7  which a mortgage broker or mortgage agent provides services. With respect to USACM, therefore,

8  Section 645B.330 of the NRS requires that notwithstanding the power of attorney provision in the

9  LSAs, USACM and a particular Direct Lender must enter into a distinct power of attorney

10  agreement for each loan serviced by USACM on account of that Direct Lender.  Because of this

11  requirement, each Direct Lender has executed a "Declaration of Agency and Limited Power of

12  Attorney" for each loan serviced by USACM on account of that Direct Lender.  Since a

13  "Declaration of Agency and Limited Power of Attorney" has been executed by each Direct Lender

14  with respect to all loans in which each Direct Lender has invested through USACM, the Direct

15  Lenders have performed this obligation and have no remaining obligation under this provision.

16       Moreover, since the Petition Date, USACM has not originated any new loans or contracted

17  with any new Direct Lenders, nor will USACM do so in the future.  Correspondingly, no Direct

18  Lender has been asked to execute a "Declaration of Agency and Limited Power of Attorney" since

19  the Petition Date nor will be asked in the future to execute such a document pursuant to the LSAs.

20  Thus, it is impossible for a Direct Lender to breach an LSA by failing to comply Section 11 of the

21  LSAs and, therefore, Section 11 does not provide grounds for holding that the LSAs are executory

22  contracts.

23       **G.**       **The Plan Does Not Propose To Transfer The LSAs Free And Clear Of The Terms And Conditions Of The LSAs**

24

25  The DACA Objection and the LPG Objection both object to the Plan on the grounds that the

26  Plan proposes to transfer the LSAs free and clear of rights of Direct Lenders.  The "free and clear"

27  language of the Compass APA, however, refutes the premise of this objection, as it does not

28  include any reference to the terms and conditions of the LSAs.  Specifically, Section 5.2 of the

905152

1   Compass APA provides, in relevant part, that the order approving the Sale shall include a

2   provision "(vii) providing that the sale of the Assets to Purchaser shall be free and clear of all

3   liens, claims, interests, obligations and encumbrances whatsoever under Section 363 of the

4   Bankruptcy Code and any other applicable sections of the Bankruptcy Code."  Upon transfer of

5   the LSAs to Compass, this provision, which was also included in the original Silver Point APA

6   filed with this Court in mid-October 2006, provides the scope of the "free and clear" sale, and does

7   not include a transfer free and clear of the terms and conditions of the LSAs themselves.

8   Accordingly, the "free and clear" transfer of the LSAs is not objectionable.

9   **VII.    PLAN SOLICITATION**

10          The LPG Objection argues that:  "the integrity of the voting process has been

11  compromised by misinformation disseminated to creditors, which inaccurately informes (sic)

12  qualified voters that they have no right to vote."  While there is no question that the integrity of

13  the voting process was compromised by the numerous misleading and unauthorized solicitations

14  sent by the so called "Lenders Protection Group," such is not the case with regard to the "plain

15  vanilla" Notice Of Non-Voting Status With Respect To Unimpaired Claims Deemed To Accept

16  The Plan" which was distributed by BMC to creditors holding claims in classes which were

17  unimpaired.[26]

18          **A.    No "Misinformation" Was Transmitted By The Debtors Or BMC**

19          As a starting point, it should be noted that there is not a declaration or other authenticating

20  evidence indicating the receipt, or circumstances of receipt, of the document simply marked

21  Exhibit "A" to the LPG Objection.[27]  For this reason alone, the exhibit should be stricken and the

22  argument disregarded.  *See, e.g.*, Local Rule 9014(c), requiring submission of admissible evidence

23  and this Court's Order Approving (A) Debtors' Disclosure Statement; (B) Proposed Notice of

24  Confirmation Hearing; (C) Proposed Solicitation; and (D) Proposed Form of Ballots (Affects All

25

26

27  26 See Declaration Stephanie Kjontvedt, to be filed prior to the Confirmation hearing.

28  27 The LPG objection asserts that Exhibit A was received by Donna Cangelosi.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

43

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   Debtors) entered on November 16, 2006 which clearly directed that "Objections to Confirmation

2   and the Confirmation Brief must have evidentiary support."

3        However, an examination of Exhibit A leads to the inescapable conclusion that no

4   misinformation was transmitted.  The notice simply provides that "under the terms of Article II,

5   Section C of the Plan, you are a holder of a claim in a class presumed to have accepted the Plan

6   and therefore in accordance with section 1126(f) of the United States Bankruptcy Code you are

7   not entitled to vote on the Plan."  Article II, Section C of the Plan sets forth which claims are

8   impaired and unimpaired.  Included in the unimpaired claims are secured claims as to USACM.

9   Because unimpaired claims are deemed to accept the Plan, there is no need for the holders of such

10  creditors to vote on the Plan.

11       Ms. Cangelosi filed two proofs of claim, which appear on the claims register in this case as

12  claims nos. 1716 and 1717.[28]  Although Ms. Cangelosi did not complete section 5 on either proof

13  of claim form, the asserted amount and classification of each claim is hand written in the upper

14  right hand corner.  Claim 1716 says:  "Schedule Amounts/Classified $719,000.00 Secured."

15  Similarly, claim 1717 says:  "Amount/Classified $110,000 Secured."  As clearly reflected in the

16  Plan, secured claims against USA Commercial Mortgage Company (the name of the Debtor

17  identified by Ms. Cangelosi in both of her alleged proofs of claim) are in fact unimpaired and are

18  not entitled to vote on the Plan.  Accordingly, the mailing of the "Notice of Nonvoting Status" was

19  appropriate under the solicitation procedures approved for confirmation of the Plan.

20   **B.    Ms. Cangelosi And The "Lender Protection Group" Have Repeatedly Violated
21          §1125 Even After This Court's Admonishment**

22       The true improper solicitation which has occurred in this case was that of Ms. Cangelosi

23  and her "Lender Protection Group."  One improper solicitation was identified in the Declaration of

24  Gregory E. Garman, Esq. in Support of the Joint Motion of the Four Official Committees to

25  Approve Supplemental Disclosure Pursuant to 11 U.S.C. §1125, filed under seal on November 22,

26

27  ――――――――――――――――――

28  28 Pursuant to Fed. R. Evid. 201, it is requested that the Court take judicial notice of its own records with regard to
    these documents.

1   2006 (the "First Improper Solicitation").[29]  The First Improper Solicitation, sent out before the

2   Debtors had even transmitted the Disclosure Statement contained misleading and inaccurate (to

3   put it charitably) statements, and culminated with the direction "**Vote No** on the Plan Disclosure

4   Statement if you agree with what you have read."  *Id.* at 10.  (emphasis in original).

5        After admitting to sending the unauthorized solicitation,[30] and being chastised by this

6   Court for doing so, the Debtors have discovered at least one more improper solicitations by email

7   from Ms. Cangelosi, a true and correct copy of which is attached hereto as Exhibit "2."  These

8   latter improper solicitations contain further misleading and inaccurate statements as the following:

9        **1.    Misrepresentations Regarding Plan Contents.**

10        Among the misleading statements contained in the December 6th unauthorized solicitation

11   are the following:  "The Diversified Fund Committee has no plan."  *Id.* at 1.  "And you will now

12   stand behind the bankruptcy Professionals, the liquidation trustee and the very expensive and

13   elongated mediation process for proofs of claim (I am told this is the most expensive part of the

14   bankruptcy process, I thought $31 million was expensive!)."

15        **2.    Additional Mischaracterizations Regarding Confirmation Process And
                 Distribution Priorities.**

16        The missive included a section entitled "**Reasons to intelligently vote for YES to the**

17   **Plan confirmation**", among them:  "You are an attorney or professional involved in the

18   bankruptcy.  You get paid, in full, plain and simple."  This is clearly misleading, as professionals

19   must be paid in full in order to confirm a plan of reorganization, and are not placed in voting

20   classes.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

---

29 During the solicitation period, the Committees requested, and the Court approved, filing the improper solicitation under seal, so as not to further improperly affect balloting.  As the balloting period has expired, a copy of that unauthorized solicitation is attached hereto as Exhibit 1.

30 *See, e.g.,* Opposition to Joint Motion of the Four Official Committees to Approve Supplemental Disclosure Pursuant to 11 U.S.C. §1125, docket no. 1864 in this case, at page 2.

905152

Among the contents of the section entitled "**Reasons to intelligently vote NO to the plan confirmation**:"

1.  You have diverted principal…this plan acknowledges that your money was stolen, then says you're ok with it, you do not expect any meaningful recovery, and it is ok that the attorneys get your money rather that your (sic) being repaid…"

2.  You receive "prepaid interest" and are now having to pay it back. And pay it back.  And pay it back….The law is, if you were due an interest payment, and it was paid to you, and you received it in good faith, then it is yours….You were lied to yet again….Vote no on the Plan to let the judge know that money is yours to keep….This includes you in the Diversified Fund.

3.  You are unhappy with the ever increasing fees, fees of every type, from every angle.  Everyone knows this scam….

    (a)  now you are further outraged that additional fees are being assessed in addition to the servicing fee that should not have been assessed.
    …

    (c)  You realize that these new categories of fees will never end.

    (d)  Vote no on the plan if you believe the fees being charged to the Direct Lenders are simply wrong.

4.  You believe that Hantges and Milanowski should be held responsible for stealing your money….

5.  The Diversified Fund is going to sue all the direct lenders.  This is sort of like the sun rising in the east.  You do not have to believe it for it to be true.  It is the only logical explanation for their actions….

6.  Vote No on this plan if you are morally outraged by the process.  As a direct lender you are not part of this bankruptcy.  You have been hijacked by the process….There is nothing that can (sic) legally do to take money from you, other than to just do it knowing that you will not fight for it.  VoteNo on the plan simply because it is the "right" thing to do.

This section of the improper solicitation followed a trite analysis of why a Direct Lender might want to vote "YES" on the Plan, which when reviewed, was clearly intended to demonstrate that only "NO" votes should be cast.

905152

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

3.    **Ability Of Lender Protection Group Counsel To Represent The Diverse Interests Of Direct Lenders.**

The Debtors would remind this Court that the  unauthorized solicitations also make highly inappropriate statements regarding the retention of counsel (the very same counsel who filed the objection to confirmation).  It is hard to imagine how counsel for the "Lender Protection Group" can fulfill his fiduciary duty to various clients, who apparently include, but are not limited to, Direct Lenders with pre-petition sold out loans and even clients who are not Direct Lenders.  *See* Statement of the Law Offices of Alan R. Smith Pursuant to Bankruptcy Rule 2019 filed on December 6, 2006 (docket no. 1967).  The Court has raised this question, but no response has been forthcoming.  Counsel is described as "Someone who knew the judge and how she makes decisions."  *Id.* at 8.  The representation was made that "He…knows Judge Riegle" and "came highly recommended from a BK Trustee specializing in Real Estate along with a Judge's recommendations."  *Id.*  The solicitation represents that "His firm has authored hundreds of Disclosures Statements (Plans)."  *Id.*  The First Improper Solicitation urges:

> If you want the Professionals on our side trying to collect from the deadbeat borrowers and H and M, rather than having a guaranteed paycheck, then join us.  If you want to see M and H in jail, then join us.  If you are tired of being railroaded into a compromise on bogus threats, then join us.

It is abundantly clear that Direct Lenders come in all flavors.  For example, Direct Lenders with Unremitted Principal want the Prepaid Interest returned only to their group while Direct Lenders with no Unremitted Principal assert an unfettered right to such Prepaid Interest.  Unless Mr. Smith represents one or the other flavor of Direct Lenders, the ability of one attorney to represent all flavors is highly suspect in these cases.

4.    **The Continued Improper Solicitations Constitute Grounds To Overrule The Objection Of The Lenders Protection Group.**

These improper solicitations contain numerous inaccuracies and are patently misleading.  Instead of requesting changes to the official Disclosure Statement, Ms. Cangelosi has opted to attempt to influence the voting through unauthorized solicitations suggesting untoward behavior

47

905152

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

by the court appointed professionals; suggesting that her selected counsel "knows the judge;" suggesting that professionals need not be paid at confirmation as required by 11 U.S.C. §1129(a)(9)(A) and 507(a)(2) (and, also inaccurately, representing that professionals are guaranteed to receive 100% of the fees requested, even though she is fully aware that the approval process includes the right of all creditors to review and object to professional fees in this case and ignoring the fact that she has not objected to any professional fees to date); even suggesting that a no vote on the plan will result in successful criminal prosecution of former management; and, utilizing a highly improper "scare tactic" by telling Direct Lenders that each of them will be sued if the plan is confirmed.

These solicitations clearly violate 11 U.S.C. §1125.  An unapproved solicitation may be transmitted only where the communication satisfies a three part test, including that:  "The information provided is truthful and absent of any false or misleading statements or legal or factual mischaracterizations…."  *In re Transmax Technologies, Inc.* 349 B.R. 80, 87 (Bankr. D. Nev. 2006).[31]  Where §1125(b) is violated the sanctions included in FED. R. BANKR. P. Rule 2019(b) are appropriate.  That subsection provides, in relevant part, that:

> On motion of any party in interest or on its own initiative the court may (1) determine whether there has been a failure to comply with the provisions of subdivision (a) of this rule or with any other applicable law regulating the activities and personnel of any entity, committee, or indenture trustee or any other impropriety in connection with any solicitation and, if it so determines, the court may refuse to permit that entity, committee or indenture trustee to be

---

[31] While Direct Lenders voted to support the Plan despite the unauthorized solicitation, following the First Improper Solicitation, the vote of claimants asserted unsecured claims against the USACM was initially non-accepting.  An initial analysis indicates that approximately $2 million in "no" ballots were cast by those to whom the unauthorized solicitations were directed and there is no doubt that there are more in this category.  It is impossible, however, to calculate the exact amount of the "no" ballots cast by those who received Ms. Cangelosi's email as despite the Court's Order, Ms. Cangelosi only provided a portion of the actual names of the Direct Lenders on her email list.  (The Debtors and the Committees did post the Court approved corrected solicitations on their respective websites and emailed such solicitation to those on Ms. Cangelosi's email list.)

905152

1  heard further or to intervene in the case; (2) examine any
2  representation provision of a …authorization, and any claim or
   interest acquired by an entity or committee in contemplation or in
3  the course of a case under the Code and grant appropriate relief; and
4  (3) hold invalid any authority, acceptance, rejection, or objection
   given, procured, or received by an entity or committee who has not
5  complied with this rule of with § 1125(b) of the Code.

6       In this case, the so called "Lenders Protection Group", through its organizer, Donna

7  Cangelosi, has clearly violated § 1125(b) of the Bankruptcy Code.  Under the extreme

8  circumstances of this case, it is clearly appropriate to overrule the objection in its entirety.  In

9  addition, the Court may consider additional remedies, including invalidating votes, and the entry

10 of monetary sanctions.  *See, e.g., In re Century Glove, Inc.,* 914 Bankr. 952, 958, *rev'd in part and*

11 *aff'd in part*, 81 Bankr. 274 (D. Del. 1988); *In re Gulph Woods Corp.*, 83 B.R. 339, 343 (Bankr.

12 E.D. Pa. 1988).  This conduct should not be permitted and the LPG Objection should be overruled.

13 **VIII.    DISPOSITION OF DOCUMENTS AND RECORDS**

14      Pursuant to Article IV, Section D(1) and (2) of the Plan, the Debtors are proposing to grant

15 access to the USACM Trust and Post-Effective Date DTDF to "all databases, software,

16 documents, records and office equipment currently owned by, or currently in the possession or

17 control of, any of the Debtors," which in the discretion of the USACM Trust or Post-Effective

18 Date DTDF, respectively, "are deemed to be necessary" (the "Corporate Records").  The

19 Milanowski Objection argues that not all of the Corporate Records currently in the Debtors'

20 possession are property of the estate and, as such, cannot be conveyed under the Plan.

21      To the extent that the ownership of the Corporate Records is in dispute, the Debtors

22 contend that the issue should be decided by the Court, but not at the Confirmation Hearing.

23 USAIP and Joseph Milanowski have filed a motion seeking a protective order ("Protective Order

24 Motion") that the Debtors believe will resolve the access and ownership issues surrounding the

25 Corporate Records.  A hearing on the Protective Order Motion is set for January 3, 2007, giving

26 the Court, in all likelihood, the opportunity to resolve these issues prior to the entry of an order

27 confirming the Plan.  To the extent that USAIP and Joseph Milanowski prevail on the Protective

28 Order Motion, those documents will not be in the Debtors' possession and will not be a part of the

49

905152

1   Corporate Records to which the USACM Trust and Post-Effective Date DTDF will have access as

2   of the Effective Date of the Plan.  Thus, disposition of the Corporate Records is not a

3   Confirmation issue.

4   **IX.    CANCELLATION OF EQUITY INTERESTS OTHER THAN MEMBERSHIP
         INTERESTS IN DTDF AND FTDF**

5

6        The Milanowski Objection suggests that the Plan is not fair and equitable to the extent it

7   provides for the cancellation of the equity interests in USACM, USA Realty, and USA Securities.

8   Equity interests in these entities are substantially owned or controlled by Milanowski and Hangtes.

9   They suggest that "there is a possibility that all claim holders in at least USACM can be paid

10  100% of their claims" and, therefore, that their equity interests should not be cancelled under the

11  Plan.  Unfortunately, due to the numerous and substantial pre-petition problems that occurred

12  under the watch of Milanowski and Hantges, the statement that creditors of the USACM estate

13  might receive 100% payment on their claims is false.  According to the Allison Declaration, even

14  assuming that there would be substantial additional payments into the USACM estate from USAIP

15  or related entities in the near future, a highly speculative proposition at best, there is no possibility

16  that the unsecured creditors of USACM will be paid 100% on their claims, and therefore there will

17  be no distribution from the USACM estate to the equity interest holders of USACM.  *See* Allison

18  Declaration ¶ 14; Disclosure Statement (estimation of range of recovery from 8% to 33%).  Thus,

19  it is fair and equitable to cancel all such interests upon the Effective Date of the Plan.  To suggest

20  that the Plan be modified to permit equity to retain their interests would be patently unfair to the

21  senior classes who have voted on the Plan with the expectation that such interests would not be

22  retained.  In any event, this is a fact question and the objectors have offered no evidence in support

23  of their argument that USACM is solvent.

24  **X.    LITIGATION AGAINST DEBTORS' FORMER PRINCIPALS**

25        The LPG Objection also alleges that the Plan "fails to provide for the recovery of valuable

26  claims for conversion and breach of fiduciary duty against the Debtors' former principals."  To the

27  contrary, one of the main purposes of the USACM Trust and the Post-Effective Date DTDF, as set

28  forth in the Plan Supplements filed by the UCC and the DTDF Committee on December 8, 2006

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

50

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   pursuant to the Plan, is to pursue litigation against the Debtors' former principals and their

2   affiliates.  This litigation, defined as "Non-Debtor Insider Litigation" in Art. I, Section A(100) of

3   the Plan, is potentially the most valuable asset of the USACM Trust and the Post-Effective Date

4   DTDF estate and will be pursued vigorously on behalf of their constituencies.  The Plan clearly

5   provides that such litigation is retained for the benefit of the Post-Effective Date Entities, *see* Plan

6   p. 58, "Preservation of Rights of Action and Defenses," and the Disclosure Statement provides

7   additional details of the potential types of claims to be brought in that litigation as well as the

8   potential defendants, *see* Disclosure Statement at p. 75-76, "The Litigation Against Non-Debtor

9   Insiders."

## XI.    MISCELLANEOUS OBJECTIONS

11          There are several miscellaneous objections to confirmation of the Plan. The PBGC

12  Objection, the SPD Objection, and Liberty Bank Objection primarily seek clarification that the

13  injunction and release provisions of the Plan do not release claims they may have against non-

14  debtor third parties.  The Debtors do not believe that either the injunction or the release provisions

15  result in releases against non-debtor third parties.

16          The release provision provides:

17          Except as otherwise expressly provided in the Plan, on and after the
            Effective Date, none of the Debtors, the Debtors in Possession, the
18          Committees, the members of the Committees, nor any of their
            employees, officers, directors, agents, or representatives, nor any
19          Professionals employed by any of them, shall have or incur any
            liability to any Entity for any authorized act taken or authorized
20          omission made in good faith in connection with or related to the
            Chapter 11 Cases or the Estates, including objections to or
21          estimations of Claims, disposition of assets, or formulating,
            determining not to solicit acceptances or rejections to, or confirming
22          the Plan, or any contract, instrument, release, or other agreement or
            document created in connection with the Plan.
23

24          Consistent with section 1125(e) of the Bankruptcy Code, the Entities
            that have solicited acceptances or rejections of the Plan and/or that
25          have participated in the offer, issuance, sale, or purchase of
            securities offered or sold under the Plan, in good faith and in
26          compliance with the applicable provisions of the Bankruptcy Code,
            are not liable, on account of such solicitation or participation, for
27          violation of any applicable law, rule, or regulation governing the

28

51

905152

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

The injunction language provides:

This Plan provides for an injunction of certain actions against the Debtors. Holders of Claims against and Equity Interest in the Debtors may not pursue (1) property of the Estates other than through the Claims and Equity Interests allowance process; or (2) the Debtors or their agents.

Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order shall not discharge Claims against or Equity Interests in the Debtors. However, no holder of a Claim or Equity Interest may receive any payment from or seek recourse against any assets that are distributed or to be distributed under the Plan, except for those assets required to be distributed to such holder as expressly provided for in the Plan. As of the Effective Date, all Entities are precluded from asserting against any assets that are distributed or to be distributed under the Plan any Claims, rights, causes of action, liabilities or interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, other than as expressly provided in the Plan or Confirmation Order, regardless of the filing, lack of filing, allowance or disallowance of such a Claim or Equity Interest and regardless of whether such an Entity has voted to accept the Plan.

Except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date all Entities that have held, currently hold or may hold a debt, Claim, other liability or Equity Interest against or in the Debtors that would be discharged upon confirmation of the Plan on the Effective Date but for the provisions of section 1141(d)(3) of the Bankruptcy Code shall be permanently enjoined from taking any of the following actions on account of such debt, Claim, liability, Equity Interest or right: (A) commencing or continuing in any manner any action or other proceeding on account of such debt, Claim, liability, Equity Interest or right against assets or proceeds thereof that are to be distributed under the Plan, other than to enforce any right to a distribution with respect to such assets or the proceeds thereof as provided under the Plan; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against any assets to be distributed to creditors under the Plan, other than as permitted under subparagraph (A) above; and (C) creating, perfecting or enforcing any lien or encumbrance against any assets to be distributed under the Plan, other than as permitted by the Plan, provided that nothing contained herein shall limit the rights of any distributee under the

905152

Plan from taking any actions in respect of property distributed or to be distributed to it under the Plan.

There is no mention of non-debtor entities or their representatives (except for the Committees) in either the release or the injunction provisions.  Nor is there any mention of releasing any former insiders of the Debtors in either of these provisions.  In fact, as set forth herein, all causes of action, claims, and rights are specifically and broadly preserved against the insiders.  Further, the injunction is properly limited as required for a liquidating Chapter 11 Plan.  The objections to the release and injunction provisions are clearly much ado about nothing.

However, in the interest of consensually resolving these objections the Debtors are negotiating clarifying language with these parties to include in a proposed confirmation order that will satisfy their objections.  To the extent these objections are not withdrawn prior to the commencement of the confirmation hearing, the Debtors propose the following clarifying language and will ask the Court to rule that the objections are overruled based on this proposed language:

- **PBGC Objection**

  Nothing in this Confirmation Order or the Plan shall release any claim or claims of the Pension Benefit Guaranty Corporation ("PBGC") or any pension plan currently or formerly sponsored by the Debtors against any non-debtor third parties, including without limitation the trustees of the USA Commercial Mortgage Company Defined Benefit Pension Plan prior to September 30, 2006.

- **SPD Objection (joined by Binford Medical Developers, LLC and Copper Sage Commercial Center, LLC);**

  Nothing in this Confirmation Order or the Plan shall release or enjoin any defense that Standard Property Development, LLC, Binford Medical Developers, LLC, or Copper Sage Commercial Center, LLC may assert against collection or foreclosure of the Loan made to the applicable Borrower.

- **Liberty Bank Objection**

  Nothing in this Confirmation Order or the Plan, including without limitation the injunction provided in Section IV.H. of the Plan: (i) shall alter, affect or supersede the Bankruptcy Court's Order

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

905152

1    Approving Agreement With Investment Partners entered on July 24,
2    2006 (Docket No. 946); or (ii) shall enjoin, prejudice, limit, preclude
     or otherwise impair the rights and remedies that Liberty Bank has or
3    may have against any non-debtor third parties, including without
     limitation HMA Sales, LLC ("HMA") and USA Investment
4    Partners, LLC ("USAIP"), under the Receivables Loan Agreement
     between Liberty Bank and HMA dated as of November 15, 2004, as
5    amended, and the loan documents securing and/or relating thereto,
     including without limitation the Guaranty Agreement executed by
6    USAIP and the Subordination Agreement among USAIP, HMA and
7    Liberty Bank, each dated as of November 15, 2004.

8         The Pecos Objection seeks clarification that the cure payments that are scheduled to be

9    paid to the Pecos entities (which are the landlords of the two adjacent buildings in which the

10   Debtors conduct business) will not be subordinated under the Plan.  The Plan does not attempt to

11   do so, and again, clarifying language may be provided in the Confirmation Order.  Additionally, if

12   the Haspinov, LLC and Pecos Professional Park Limited Partnership leases for real property are

13   assumed, the cure payments will not be subordinated under the provisions of the Debtors' Plan.

14   **XII.    CONCLUSION**

15        For the reasons set forth above, the Debtors and Committees respectfully request that all

16   Plan objections be overruled and that the Plan be confirmed, and for such other and further relief

17   as this Court may deem appropriate under the circumstances.

18        Respectfully submitted this 15th day of December, 2006.

19
20                              _/s/ Jeanette E. McPherson_____
                                Annette W. Jarvis, Utah Bar No. 1649
21                              RAY QUINNEY & NEBEKER P.C.
                                36 South State Street, Suite 1400
22                              P.O. Box 45385
                                Salt Lake City, Utah 84145-0385
23                              and
                                Lenard E. Schwartzer, Nevada Bar No. 0399
24                              Jeanette E. McPherson, Nevada Bar No. 5423
                                SCHWARTZER & MCPHERSON LAW FIRM
25                              2850 South Jones Boulevard, Suite 1
                                Las Vegas, Nevada  89146
26
27
28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

905152