# EXHIBIT 1

# USA CAPITAL
# Time to Act

For the past few months, I've been biding my time and my tongue watching this Bankruptcy unfold. I have attended all but one of the hearings, have heard the judge and watched the professionals in action. Now just about all the cards are on the table and we can finally see the whole picture. And quite a picture it is!

The following is my opinion. Others equally informed share the same opinion. You will need to form your own opinion. You can educate yourselves by reading the plan – Docket # 1798 and 1799 – otherwise know as "The Disclosure Statement". Also reread Docket # 575 – the Security Agreement for M&H. Also, read Docket #1706, the Asset Purchase Agreement.

## IF YOU CARE ABOUT YOUR INVESTMENTS – PLEASE TAKE THE TIME TO READ THIS COMMUNICATION.

Let's take a look at what will happen, unless we stop the madness. Then let's look at what we can do about it. If you only have a couple of minutes to read this, then please go to the last part: ***Action Plan***

Within a few short days, you will be asked to vote on a reorganization plan (the Disclosure Statement) that accomplishes the following:

1. It takes our "prepaid interest" and increased Servicing Fees and makes them property of the estate.
2. It confirms both the sale of the First Trust Deed fund at a discounted value, and it transfers the Direct Lender's Loan Servicing Agreements (not the title to our loans) to the successful bidder via an auction to be held on December 7th. .
3. The Unsecured Claims will be paid out of the estate, but only after paying all the professional fees, paying other compromise claims, holdbacks, etc. If you had stolen principal or are in Amesbury/Hatters, you are unsecured.
4. It sets up two entities, the Post-Bankruptcy Diversified Fund and a new USACM Trust which will cooperate in pursuing the insiders and which in theory could benefit those damaged by USA Capital. The unpaid unsecured claims will be transferred to this USACM Trust.
5. The Diversified Fund does not have a plan at this point and reserves the right to litigate claims against the Direct Lenders if "certain compromises" can not be reached. They have not waived this claim in spite of the Direct Lenders unilaterally agreeing to disgorge $XXXXXX millions in so-called "prepaid interest." The Diversified Fund has threatened to characterize USACM's operation as Ponzi scheme, threatened recharacterization of our loans and threatened consolidation (pooling) Based on the facts this is an empty bucket and yet has been the tool used by the attorneys to cow the Direct Lenders Committee.

It should be noted that you are being asked to vote on the "Plan" even before full comment and opposition have been heard. The legal community is taking unprecedented short cuts to effect a confirmation before the end of the year. I have an interesting theory about why this is, and will discuss later.

1

Now let's take a much closer look at some of these points:

1. **Prepaid Interest and Servicing Fees**

The plan takes all your "prepaid interest" that you have or still must return through offset and recoupment and makes that money property of the Bankruptcy estate. Remember we sort of agreed that it was the moral thing to pay back the interest we were paid that the borrowers never paid in order to reimburse most of the money to those whose loans were paid back and their principal stolen? With this plan, that is not going to happen. The $25 Million of interest that they have recovered so far will actually go to pay the OBSCENE professional fees estimated to be $31 Million by February.

What happens to those with stolen principal? I thought they were going to get that money?? No, we're not. This was a scheme from the very beginning to fund the professional fees. The Professionals even got the judge to buy in. One of the reasons Judge Riegle would not let the Direct Lenders out of the Bankruptcy is that she asked how those with Stolen Principal would ever be repaid if you didn't recoup the interest from those investors that were "prepaid". Of course collecting it from the deadbeat borrowers would be one way. Freezing and liquidating the assets of Hantges and Milanowski would have been another. But the Collection efforts have been almost a complete failure and Hantges and Milanowski have not been forced to yield even a dime.

Was it Tom Allison that said that those with unremitted principal were the true creditors of the estate? He was dead wrong. The true creditors of this estate have been the professionals. We, the unsecured creditors are merely their instruments.

When four committees were formed and DIP financing was not approved, the number one interest of all the professionals was how do we cover our fees? Where do we get the money to get paid? USA Capital has no money. So the only way to fund their fees was to steal our money as legally as they could. And that is through Offset and Recoupment of prepaid interest as well as levying as many fees on the Direct Lenders as possible. After all, we're the ones with the money. In fact, when you listen to the US Bankruptcy Trustee stand in front of the judge and say "The Fees are not unreasonable, Your Honor, after all, it is only 3-4 % of a $960 Million estate" WRONG  This is not a $960 Million estate. This is maybe at best a $50 - $60 million estate, save for the worthless note (as it is executed today) that Milanowski signed.

So how do those with Stolen Principal get paid if the Professional Fees are greater than the Recaptured Interest? The answer, we don't.

On one hand, we pay back the prepaid interest on our non-performing loans dollar for dollar through semi legal extortion. Then we go to the very back of the line behind tax arrearages, unpaid FICA, statutory fines, Mesirow fees and all the attorneys. We will be hoping to catch a few crumbs of our money after the table has been cleared. The estimated return of unsecured money is 8%! So for every dollar they have taken from us in fees and prepaid interest we get back 8 cents.

2

I personally have $60,000 in stolen principal. I have another $100,000+ of unsecured money in Amesbury that Mesirow refuses to schedule on the F1. My portfolio wasn't in too bad a shape and I only owed $9000 in "Prepaid Interest". Obviously, I supported offset and recoupment as long as those of us with stolen principal received the recouped interest for our stolen money. Now, I feel safer trying to get my Prepaid Interest back than hoping for a few pennies of stolen principal..

Now let's talk Loan Servicing Fees

By now, most of us have received numerous statements. Remember the Servicing Fees were to commence on the BK filing date and would only be accessed to the money collected from that date on? When you look at your statements, many will see that servicing fees commence at prior random dates, and not necessarily April 13th. Now some committees are fighting to have us pay the maximum service fees from the inception of each of our loans.

Many people said I don't care about my interest, just get my principal back. Many said, I don't care about the 1% Loan Servicing – just get me whatever interest and principal back. Then the judge said let's hold back 3%. Then the Unsecured Lawyers said let's also surcharge the Direct Lenders with Collection and Appraisal Fees. So now, we are paying unprecedented fees for what? Lawyers that are doing nothing for us?

Have you noticed the collections have come to a virtual standstill? We now have a higher percentage of non-performing loans. Many that were performing have gone past maturity into non-performing. In September, Tom Allison forecasted he would collect 54 loans by year-end. Now that forecast is down to 10 by the end of January. What happened to all that effort to collect the other loans? Why are we paying fees if there is little effort to collect our loans? Why should we pay any additional collection fees if all that has been done is part of the loan servicer's job?

According to my statements, the fees are eating up much of the payments that would come back to me. As I stated above, my portfolio was in reasonably good shape, yet much of my interest payments have been eaten up with service fees for which there is no explanation.

How will the Professionals get paid if we don't give them our prepaid interest?
Well two efforts can be undertaken that will secure that money. Neither is a sure thing – but that's what they are offering us as our means of recovery of our stolen principal - long after they have collected their fat fees and fat year end bonuses.
1. Collect on the bad loans.
2. Go after Milanowski and Hantges.

   That is where the recovery should be made for our stolen principal, the health of the funds and the professional fees.

.

As this plan structure has taken form, collections of loans have slowed way down. Wonder why? Maybe because the professionals are guaranteed payment with our

3

money. If the professionals had to look at collecting their fees from the deadbeat borrower's payment of back interest, would they be willing to sell the loan servicing rights of our portfolio to a third party? Wouldn't they want to keep it closer and have more of a hand in it? Wouldn't that protect our investments more?

We are prohibited from suing USACM while it is in BK, but Hantges and Milanowski can be sued. Have they been? No. Why? Because the DIP managers have felt it was better to have them cooperating. Are they? NO. Have we seen any money from them? NO. Are M&H working to liquidate their assets? Yes - the Royal Hotel for one. Has the DIP done anything to capture all of the proceeds of that sale for us? NO. As a matter of fact the DIP allowed M & H to further encumber the hotel after the bankruptcy was filed so they could pay off other personal debts! Would all the professionals have tried to stop that sale if their fees were riding on a payday from the proceeds of that property? You bet.

Yet our unsecured money is riding on collecting on the value of these properties in the LLC's on Exhibit A (page 22) of Docket 575 and none of the BK Professionals are doing anything to block the sale of this property for our benefit or secure any payments. No, we're just going to wait for Joe to bring in $20 Million next May. Independent people are seeking to act on our behalf and block or secure this sale. Thanks.

The point is the Professionals are working first and foremost for themselves and only have a mild interest in us – their clients. Our committees have been railroaded into compromise for the benefit of their lawyers. Bogus threats are being used to scare us and go along. Mesirow and the professionals have worked hard to stretch the law to their advantage to secure their fees. The Crooks are being protected with this scam.

## 2. Pending auction of the First Trust Deed Fund and Loan Servicing Rights to the highest bidder.

Who would be interested in buying this portfolio? Someone with deep pockets that can buy up our assets at a discount then go collect at or around par value.

Why have the loan collections slowed down so significantly? Why is Allison missing his loan collection forecast by 80%? He's a pro. He told me personally that he was going to collect a major portion of the portfolio before the auction and sale closure. Perhaps he's slowed down in order to sweeten the pot for the successful bidder. After all, the bigger the potential pot, the more attractive we look to the bidders. But how could purchasing the servicing rights to non-performing loans sweeten the pot?

Well – let's look at the whole architecture here.

In the very beginning, Hillco was employed to get appraisals. We were told the appraisals were necessary to understand the properties and negotiate with the lenders. Some appraisals were desktop, some were drive by, a few were detailed on site appraisals. The instructions to the appraiser were to appraise at liquidation value. So many of these appraisals came in below par for the face value of the notes.

4

When you see some of these appraisals, you say "Yikes" cut you losses and run. But remember, one man's junk is another man's gold. In comes a deep pocket firm to buy up the servicing rights to the portfolio. The first thing they do is solicit you to sell your loan to them at a deep discount. They use the appraisal as the ax over your head. Once they secure a significant interest in the loan, they get to work on it, using whatever means they can to make a profit. They may foreclose and do some workout. Maybe stronger collection tactics are employed. Maybe they sell the loan for a profit. The point is any successful bidder is looking at their ability to cash you out at a discount and then reap the benefits of the spread. They are not interested in the servicing fees. There's big profit to be made here for those with deep pockets. And the appraisals give them the ammunition to entice you to sell to them at a discount. Clever.

Be warned, you don't have to sell out, especially if you are in a first position.

If you are in a second position, monitor that underlying first. Make sure the first lien holder is not foreclosing and make sure that the new loan servicer is not buying out the first position in order to foreclose on the property from the first's position. I spoke with Dale Cooney of Silver Point Capital and asked him how they planned to treat the second position notes they acquired in the portfolio? His candid answer was that if they had to foreclose, he guessed they probably would do so from the second's position. Let's hope, we'll see.

I don't know how the LLC interests that M&H pledged as collateral for repayment of the 10-90 loan and the $58 Million note are going to be treated. I have not educated myself on this point to see if the new loan servicer has to forbear (not foreclose) on the underlying notes (the ones we hold). If the new loan servicer is allowed to foreclose on the M&H notes then we who are looking for recovery of our stolen principal from the equity of the M&H LLC interests are screwed again because that would wipe out their equity and our collateral interests with it.

The point is when the servicing rights to your loans are sold to a new loan servicer on December 7th, you will need to take a very active role in understanding your portfolio and protecting it. If you haven't gotten copies of your appraisal, do so. If you are in a second, try to start a dialogue with others in that same note. Having information can help you protect yourself.

Remember, you don't have to accept a discounted offer on your loan if you can hang in there. No one can force you to cash out.

As for those in the First Trust Deed Fund, your committee is absolutely convinced that given market conditions they would rather sell the portfolio at a steep discount than wait to service out the portfolio. What will you net out of it? Somewhere around 60%+ after all the compromises, and fees. There will also be some holdbacks too.

### 3. The Diversified Fund:
This fund still remains a mess. Your hopes are riding on things like collecting on the 1090 loan, the $58 Million note and additional compromises and money from the other entities. At this point, there is no firm estimate of any return percentage post-bankruptcy, but the liquidation within the bankruptcy estimates 15%. This entity will not be sold in

5

the auction. Without having a clear plan, it is uncertain how this entity will service and collect its loans. Significantly, none of the collected "prepaid interest" has been used to offset your losses in this debacle and none is anticipated.

### 4 and 5. Remaining Unsecured Creditors and Claims and the Liquidation and Litigation Trust

If you had stolen principal you are an unsecured creditor. If you are in Amsebury Hatters, you are mostly unsecured and must prove that you are owed the money as a result of continuous partial releases of our collateral while the loan was non performing. Is this a strong breech of the LSA? And this practice continued post petition. This means, after the professionals get 100% of their money, you may see some pennies.

Where do we have any hope of recovery? By collecting on the notes from M&H and suing them. How good are the notes from M&H? Not very good. We were only granted interest in their LLC's. We do not have liens on the actual real properties assets. When I asked Allison why this was, he said he had control over most of those properties through the servicing rights of the loans that you and I hold. However, we are selling those rights to the highest barracuda. What happens to our visibility into the activities of those properties? What happens if the Servicer buys out a large percentage of our holdings and decides to foreclose, leaving the underlying LLC with no value? Where are we then? We need to get the answer to this because ultimately the value is in the real estate, not the LLC interests, which are nothing but paper and promises subject to ever more lawyering.

The point is that the Las Vegas Boys stopped cooperating with us when Allison accepted a security interest on a balance sheet versus a piece of land. A lien on the real property should have been secured for our benefit. And there should have been no intervening liens allowed. If the Royal Hotel or any other real asset sells there should be no question that the proceeds are paid to the estate on our behalf. That is very much in question as of this date. A Section 2004 enquiry should have been requested the moment this bankruptcy was filed. It would have required a complete disclosure of assets, under oath by the perpetrators. But that was not done by anyone, including the Committees. They should have sought the immediate recovery of fraudulent transfers totaling over $21 Million that USAIP took from USACM in the months that preceded filing for bankruptcy. Instead the managers and professionals have agreed among themselves to call it a loan. We will see what the tax code has to say about that. Do you suppose they reported it as income?

None of this was done – why? Because the professional fees were secured when they developed a scheme to use our prepaid interest for their compensation?

So after an estimated $31 Million in fees, we will be asked to cough up money to do what should have been done on our behalf, secure the underlying properties and sue the crooks. This will be the only way we will see any money and it will take years. The line forms to the right, as of this morning there were 10 others on court dockets in front of us and our place is very uncertain because it's a race to judgment We haven't even gotten to the gates yet, let alone out of the starting blocks.

### Why is the Plan Confirmation being rushed before year end?

The pat answer from the professionals is to try to shut down the legal fees. It is more likely to give us little time to digest the plan, seek legal opinions and object to it. Some of the things they are doing in this plan are not permissible in the BK code. However, if the plan is confirmed, they are permitted to do things that are outside the BK Code. It become a negotiated fait accompli

The Professional fees continue to accumulate after the plan confirmation just at about the same rate. This is disclosed in their financial forecast – so what is the rush?

What does year-end mean to a bunch of Professionals? BONUS TIME. If they can get the plan confirmed, they get a guaranteed payment of their fees. And what does that mean? Bonuses – big fat bonuses paid in January. If they cannot secure their compensation through the plan, they may have to wait until next year. Allison himself told me this was the biggest BK case this year. Big Fees mean BIG BONUSES. And boy, do we have big fees.

Wouldn't you rather have the lawyers participate in our risk? Wouldn't you rather they not be given a guaranteed payment with our "prepaid interest" and have to look to collecting their fees from the deadbeat borrowers and M&H? Wouldn't you rather they be watching over our portfolio to assure that no monkey business is performed by the new loan servicer that would upset their fees? Wouldn't you rather them on our side as we pursue any and all remedies against Milanoski and Hantges? Don't you believe that they would have tried to stop the sale of the Royal Hotel along with Craig Orick's Great White Investment ( a true white knight) if they needed M&H assets to get paid?

The plan does not adequately secure the assets of M&H for our benefit. It is nebulous at best. It provides little clarity as to how the proceeds will be paid into the USACM estate. The Bankruptcy Plan has attempted, but failed to compromise the claims between the DTDF, and the Direct Lenders. It leaves us to fight each other while attempting to chase down Hantges and Milanowsi. In essence the money that can be extracted from the DLs will run out soon, and the professionals will be leaving the sinking ship, leaving the mess to us. This is not worth the $30 Million price tag.

### *BOTTOM LINE: THE PLAN IS NOT ACCEPTABLE*

## ACTION PLAN

For many months, many have been asking me if they should hire a lawyer. My answer has always been that I felt they should do what they feel they need to do, but for me, I needed to see more cards before taking action. The cards are on the table now, and for me and I believe you, the time to hire a lawyer is now.

Up until this point, we have seen little if any effectual results of the lawyers who have represented independent interests. Please don't misunderstand me to say they are not good: all their issues have just been deferred or dismissed stating that they are untimely.

7

Well now the plan is available and the issues must be dealt with immediately, or we will become further victims.

In seeking legal assistance, we had the following criteria:

1. We needed to be convinced that any action we would take would only improve our position and the outcome for many, versus waste time and money.
2. The lawyer had to be aggressive
3. We needed a Bankruptcy expert with a good track record.
4. We needed someone well versed in authoring and analyzing Disclosure Statements
5. We needed someone with a strong real estate background.
6. We wanted someone who knew the judge and how she makes decisions.
7. We wanted someone who would quote us a fee, versus try to collect a percentage of a portfolio or a large amount of money from lots of investors for a windfall.
8. We wanted someone who would tell us up front, on their own nickel, where the issues were with the proposed plan (Disclosure Statement) and what actions we could pursue to protect ourselves.

After a long search, I think we found him.

The lawyer our group has selected has 25 years in the Bankruptcy business with 27 years of practice under his belt. He is highly respected in the BK circles, knows Judge Riegle and has a strong background in Real Estate transactions. His firm has authored hundreds of Disclosure Statements (Plans). He came highly recommended from a BK Trustee specializing in Real Estate along with a Judge's recommendations. He has proposed a fee structure that is very economical if many participate (about $1,000 or way less per investor depending on the number of participants) with no backend recovery or success fees. He also has had first hand experience in dealing with H&M. And most importantly, he and his staff have taken the time to review the case and give us our platform to move forward. The following are six points whereby we need legal action now.

The following are the attorney's initial comments:

1. <u>Prepaid Interest</u>. From our review of the proposed plan, we strongly believe the plan proponent's attempt to establish the Prepaid Interest as an asset of the bankruptcy estate cannot be accomplished through a plan of reorganization. Rather, fundamental principles of due process require that the issue of the estate's entitlement to the Prepaid Interest be determined through a bankruptcy adversary proceeding. As you may already know, an adversary proceeding is in essence litigation within a bankruptcy case. Accordingly, it would be our position that the current plan cannot be confirmed.
    a. Although the plan's attempt to irreversibly establish the estate's interest in the Prepaid Interest is patently unallowable under the bankruptcy code, the failure raise this issue, through an objection to the disclosure statement and plan, may result in a confirmation of the plan and those provisions. In other words, even though what they are trying to do is impermissible, it may still be approved and become controlling if you do not object.
    b. Also, as we explained to you in detail yesterday, we believe that surcharge or recharacterization are not viable threats against the Direct Lenders.
2. <u>Servicing Fees</u>. We also believe there are significant objections to be raised with regard to the proposed payment of the servicing fees. First the 2% is just a cap on servicing fees, not a guarantee. Secondly, certain servicing agreements provide for lower or no servicing fees.

8

Finally, there are significant questions of whether servicing fees are actually earned when the servicing agent has stolen or misused the assets.

3. <u>Allowed Direct Lender Unsecured Claims.</u> The plan proponents attempt to limit the recovery the allowed Direct Lender unsecured claims to the estate of USA Commercial Mortgage. However, because such claims arise from diverted principal to other Debtors, we do not think it is proper (let alone fair and equitable) to limit the Direct Lender's claims to USA Commercial Mortgage.
4. <u>IP Note.</u> The plan does not sufficiently provide a mechanism to collect on this note or to adequately secure the note. We believe the plan is defective for failing to address these issues.
5. <u>Pursuit of Claims against Milinowski and Hantges.</u> The plan fails to address or provide for the pursuit of claims against the individuals that looted these Debtors. We believe these claims must be pursued. We will strongly object to any plan that does not provide for a recovery mechanism against those individuals.
6. <u>Standing/Authority For Settlement.</u> The plan purports to effectuate a "settlement" between the Debtor and the Direct Lenders. However, it appears this settlement was negotiated and agreed to by the Direct Lenders Committee, but not the individual Direct Lenders. The Committee does not have the standing/authority to bind the individual Direct Lenders to such a settlement.

***If you have taken the time to educate yourself and agree that you don't like the plan or how you are being treated, then you need to object by joining our legal action. From the beginning, I have said that there is strength in numbers, and now is the time to use our alliance.***

In addition to the above legal action, we are currently evaluating if we will participate with Great White Investment's independent action to secure M&H assets outside the Bankruptcy Court. Part of the legal war chest we collect may go to fund this very positive action, such as what just happened on the Royal Hotel. It's now time to arm and protect ourselves.

- If you feel that you don't want your prepaid interest becoming property of the estate and used to pay professional fees, come join our action.
- If you are an unsecured creditor with Stolen Principal or are in Amesbury Hatters and you want further action securing the Investment Partners Notes that will help us recover some our money, then join our action.
- If you object to all the Servicing and other fees that have been taken from us, join us.
- If you want the professionals on our side trying to collect from the deadbeat borrowers and H&M, rather than having a guaranteed paycheck, then join us.
- If you want to freeze Milaowski's and Hantges' assets, then join us.
- If you want to see M&H in jail, then join us.
- If you are tired of being railroaded into a compromise on bogus threats, then join us.

Our goal would be to get 500 people to join us in this action. The more we get, the less the fees. Even more would be outstanding. Money collected will be kept in a trust account. Any action we will take will, in essence, becomes like a class action. But wouldn't it be powerful if our attorneys could tell the judge I represent 500 or more investors who object?

We have until December 11th to make a very bold statement to the court. Motions must be filed by this date. Many of the normal plan confirmation steps have been truncated. Plan confirmation is currently scheduled for December 18th. We must act now. Let's let

9

the attorneys feel what it is like to be turned upside down and have their money shaken from their pockets. It's time the professionals feel our pain of not receiving income they were counting on. Sound familiar?

If you are interested in joining this action, please contact Robert Ulm at lenderobjections@yahoo.com and he will forward you all the details on how you can join up. Please do so quickly as we need to move rapidly. His email address is also in the body of your email. Remember there is strength in numbers and we must show the judge through our representation that we object.

And one more thing, **Vote No** on the Plan Disclosure Statement if you agree with what you have read.

10

# EXHIBIT 2

**From:** Donna Cangelosi [mailto:dcangelosi@gmail.com]
**Sent:** Wed 12/6/2006 10:36 PM
**To:** Donna Cangelosi
**Subject:** USA Capital Lender Protection Group - vote yes or no for the Plan.

Hello all:

As the plan voting comes down to the final stretch, many are still confused as to which way to go. This plan is very complex and confusing. The following is our opinion derived from our intimate involvement

The Direct Lender committee cry is vote yes and let's get on with our lives. Yes, we take a haircut with loan servicing fees. Yes, we give over unprecedented servicing fees. Yes we give back our prepaid interest and any rights we may have to it. We need a servicer. These are the A5 votes.

The First Trust Deed Fund committee says let's get on with it. We will sell the portfolio for a discount, yes, but then we are done. Some of that money will go to to the Diversified Fund to settle any lawsuits they may have against us. Some money goes to pay fees Then we will get our share. Depending on the auction price, it will be $.65 -$.70 per dollar.

The Diversified Fund committee has no plan. They will go to mediation next week, after the plan vote to see if they can seek a compromise with the Unsecured Creditors committee of USACM. No other committees are involved.

If you are an unsecured creditor - you probably are miserable. You thought the prepaid interest was going to be used to return your diverted principal. That money, along with the servicing fees are now property of the USACM estate. And you will now stand behind the Bankruptcy professionals, the Liquidation Trustee and the very expensive and elongated mediation process for proof of claims ( I am told this is the most expensive part of the Bankruptcy process, I thought $31 Million was expensive!) You may see a few pennies of your money. Maybe. These are the A4 votes.

The problem is with the way the committees were constituted. The US Trustee did not consider the cross interests of the average investor. If you had Direct loans and are in the DTDF, you may end up suing yourself. If you had principal stolen, you are struggling with - who represented me in this plan? On one hand, I pay back the interest that I was "prepaid" and on the other hand, I get no money for my stolen principal, at least not now, maybe not for years and then only pennies. And if you are a pure Direct Lender, you are wondering why should you pay that "prepaid" interest back. You were given it to defraud you. And what about those servicing fees?

So how do I vote? Well the following is our opinion as to how you should vote.

### *Reasons to intelligently vote for YES to the Plan confirmation:*

1. The number one reason: You need the money, any money, sooner rather than later. Although subject to debate because of all the different parties involved, it is logical to believe people will see money sooner if the plan is confirmed. Why? Because if the plan is confirmed, the rights and obligations of the parties are defined by the plan, regardless of what is right and wrong, and regardless of what is legal or not legal.

2. You want to put this behind you and will forevermore just put the money in an old coffee can, like grandma used to do. Face it, this has been very ugly. We all had our money stolen to some degree, and it has made us question everyone involved, most importantly, ourselves. Forget right and wrong, it is better to just put this behind us and move on with our lives. We will be happier if we can move on, and that is worth whatever compromise has been suggested.

3. You are a direct lender with mainly performing loans. Wow, that's a bit like winning the lottery, but, people win the lottery. The plan is confirmed, your LSA is transferred to a new loan servicer...a better loan servicer, and you continue to proceed with your good fortune. The exorbitant fees irritate you, but on balance, you feel it is a minor irritation, and, of course, you do not believe the threat of litigation from Diversified Fund and the others (like the Borrowers) is anything to worry about.

4. You are in Diversified Fund and believe that your recovery from the law suits you lodge against the Direct Lenders will be greater than giving up your prepaid interest and diverted principal. You are in the First Trust Deed Fund and the discount you will recieve is acceptable.

5. You are an attorney or professional involved in the bankruptcy. You get paid, in full, plain and simple.

### *Reasons to intelligently vote NO to the plan confirmation:*

1. You have diverted principal. What this really means is that your money was stolen. This plan acknowledges that your money was stolen, then says you're okay with it,

you do not expect any meaningful recovery, and it is okay that the attorneys get your money rather than your being repaid (this is the prepaid interest issue, where those who received "prepaid interest" were obliged to pay it back (or have it "netted") so that the attorneys can be paid. This scam by the attorneys takes your money, which went to pay other lenders on nonperforming loans, and gives it to the attorneys rather than the other direct lenders. What about using your money to pay you back? What about offsetting diverted principal with your prepaid interest? Well, no, that's just not how it works. Really? Vote no on the plan to let the judge know that this patently ridiculous result is not okay.

2. You received "prepaid interest" and are now having to pay it back. And pay it back. And pay it back. You believe that the law is on your side. The law is, if you were due an interest payment, and it was paid to you, and you received it in good faith, then it is yours. If the party that paid the interest to you seeks recourse, that recourse is legally against the Borrower, and not you. You felt morally compelled to give this "prepaid interest" back to those direct lenders with diverted principal, even though you were legally entitled to keep the money. That's what you were told. You were lied to yet again. The money that you repaid is not going to those with diverted principal, but rather is going to the lawyers and professionals. Vote no on the plan to let the judge know that money is yours to keep. If you are required to pay back interest on a direct lender loan, it should go to people who had their money stolen on a direct lender loan. Not the lawyers. So vote no to say you don't agree that the money goes to the professionals. This includes you in the Diversified Fund.

3. You are unhappy with the ever increasing fees, fees of every type, from every angle. Everyone knows this scam. We invested our money to receive a fixed rate of return. A common rate was 12%. No one cared how USA was collecting their fee because you were supposed to receive a fixed rate of return. 12%. 12% net. Meaning that 12% is 12%. Not 12% less any loan servicing fees. 12%. Yes, you signed a document giving USA the right to collect a fee (1% to 3%). However, the intent and the "course of dealing" with USA…over a dozen years…clearly demonstrates that you were entitled to the 12% that you were promised. Not 12% less fees. 12%. USA's documentation states that also.

   a. Now you are further outraged that additional fees are being assessed in addition to the servicing fee that should not have been assessed. You realize that the Debtor and the attorneys are having strategy sessions to determine how to classify an expense as a legitimate "Collection" fee according to the loan servicing agreement. And, you realize you are paying the attorney's fees for figuring out how to classify the fees that you are being charged as legitimate.

    b.    You simply do not believe that a loan servicer that has done the kind of job that USA has done deserves a loan servicing fee.

    c.    You realize that these new categories of fees will never end.

    d.    Vote No on the plan if you believe the fees being charged to the direct lenders are simply wrong.

4. You believe that Hantges and Milanowski should be held responsible for stealing your money. No one has done anything to hold these guys responsible. Vote No on the plan if you believe these guys should pay the price for stealing this money. Don't let them walk away with some flimsy promissory notes.

5. The Diversified Fund is going to sue all of the direct lenders. This is sort of like the sun rising in the east. You do not have to believe it for it to be true. It is the only logical explanation for their actions. This plan does not prevent that action, and does not address the Borrowers ability to sue the direct lenders, as in the Standard case. Vote No on the plan if you would prefer to have a plan that provides an end to this mess, and not just a new beginning.    THIS PLAN DOES NOT PROVIDE CLOSURE.

6. Vote No on this plan if you are morally outraged by the process. As a direct lender, you are not part of this bankruptcy. You have been hijacked by the process. Your loans are not part of the estate. There is nothing that can legally do to take money from you, other than to just do it knowing that you will not fight for it. Vote No on the plan simply because it is the "right" thing to do.

As Ben Franklin said "tis hard for an empty bag to stand upright".

The Lenders Protection Group is attempting to make this plan better for many who would vote no. We are fighting to get your prepaid interest back, we are fighting to get you a higher return for your diverted principal. We are fighting to reduce the servicing fees. We are fighting to assure that the new loan servicer cannot rob you of your fees. We are fighting to protect you from law suits.

**Furthermore, if you are a Direct Lender and vote yes on the A5 ballot, you may be giving up your rights to prepaid interest and loan servicing fee reductions should we succeed in our action. If you vote yes, you may be agreeing to these fees by you vote.**

Many have asked for the Lender Protection Group agreement. If you have not returned it, you will not be listed as an objector to the plan. In order to tell the judge you object to this plan, you should join our group, file your own motion and appear in court or hire your own attorney. We think our approach is the most economical.

The fight is quick and short. We need your support to win. Without your support, we have less power. It's time to finally do something. Don't wait for someone else to do it for you. If you have not yet joined, contact
*Lenderobjections@yahoo.com* . We need your agreements and fees returned by Wednesday, December 13th to be part of the plan objection. Please don't delay. Your delay creates a lot of work for us.

**And one more little note. Over the past few weeks we have spent literally hundreds of hours responding to your questions. We no longer have that luxury. Please join the chat room if you have not.** In Google.com go to chat rooms and register for usacapinvestors group .
 This will be the best place for your questions. We are very busy working on your behalf. And for those who have joined the LPG, we will be keeping you updated *privately* of our progress and actions.

 **Be well**

 **Donna**