ALAN R. SMITH, ESQ.
Nevada Bar No. 1449
KEVIN A. DARBY, ESQ.
Nevada Bar No. 7670
Law Offices of Alan R. Smith
505 Ridge Street
Reno, Nevada 89501
Telephone (775) 786-4579
Facsimile (775) 786-3066
Email: mail@asmithlaw.com

*ELECTRONICALLY FILED -12/18/06*

Attorney for Lenders Protection Group

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

—ooOoo—

| | |
|---|---|
| In Re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>    Debtor.<br>_____/<br>In Re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>    Debtor.<br>_____/<br>In Re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>    Debtor.<br>_____/<br>In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>    Debtor.<br>_____/<br>In re:<br>USA SECURITIES, LLC,<br>    Debtor.<br>_____/ | Case Nos.:<br>BK-S-06-10725-LBR<br>BK-S-06-10726-LBR<br>BK-S-06-10727-LBR<br>BK-S-06-10728-LBR<br>BK-S-06-10729-LBR<br><br>JOINTLY ADMINISTERED<br>Chapter 11<br><br>Hearing Date:  December 19, 2006<br>Hearing Time:  10:00 a.m.<br><br>**DECLARATION OF DONNA CANGELOSI IN SUPPORT OF THE LENDER PROTECTION GROUP'S OBJECTION TO CONFIRMATION OF DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION AS IT APPLIES TO DEBTOR USA COMMERCIAL MORTGAGE COMPANY** |

Affects:
☐ All Debtors
☒ USA Commercial Mortgage Company
☐ USA Capital Realty Advisors, LLC
☐ USA Capital Diversified Trust Deed Fund, LLC
☐ USA Capital First Trust Deed Fund, LLC
☐ USA Securities, LLC
_____/

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Dec Cangelosi 121206.wpd

I, DONNA CANGELOSI, being first duly sworn, do depose and say under the penalty of perjury:

1. I am a creditor in the USA Commercial Mortgage Company ("USACM") bankruptcy case (BK-S-06-10725-LBR) with claims classified as A-4 (General Unsecured Claims) and A-5 (Direct Lender Compromise Claims), and a member of the First Trust Deed Fund classified as B-5, in Debtors' Third Amended Joint Chapter 11 Plan of Reorganization filed herein on November 15, 2006.

2. I have knowledge of and am competent to testify to the matters stated herein, except to those matters stated upon information and belief, and as to those matters, I believe them to be true.

3. I have no formal training or education as an attorney or other legal related profession.

4. When USACM first entered into bankruptcy, I found little or no information available. What I did find, was widespread panic from the investors. This caused particular stress for me because I personally introduced many people to the USA Capital group, having been an investor since some time in 2000. Upon the filing of the bankruptcy case, I worked with others to organize a meeting of investors in Reno, which approximately 100 people attended. A primary concern of investors at that meeting was whether they needed to hire an attorney to represent our interests. At that meeting, certain attendees introduced the law firm of Stutman, Treister, & Glatt ("STG") as possibly being able to provide the attendees some guidance.

5. Thereafter, I had numerous communications with Jeffrey H. Davidson, Esq., and subsequently Eve Karasic, Esq., of STG. I estimate that I had 75 such communications with attorneys from STG, via both email and telephone. Mr Davidson was kind enough to take the time to educate me on committee composition and responsibilities. He also informed me that bankruptcy was a court of equity and that what was accomplished for one applied to all. I was also informed a committee would be created to represent investor interests, and in theory, they would represent the interests of all investors. At this time, I had no idea that certain principal investments had been stolen or that there was an issue with what has been labeled prepaid interest. Many investors at the initial meeting asked if they could provide a proxy to nominate me as a committee member so that we would have some representation. In addition, an internet chat room was born out of this meeting,

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Dec Cangelosi 121206.wpd    - 2 -

as well as the concept of developing an email list for us to stay in contact.

6. Based on the foregoing, and particularly my communications with attorneys from STG, I, and other lenders, decided not to hire an attorney until we could learn why USACM was in bankruptcy, why we were involved the scope of the situation and our treatment.

7. I attended the hearings held in this case on May 3, 2006. At that hearing, I understood Mr. Tom Allison to testify that these cases were truly about the investors. I further understood him to promise that investor collections would not be used by the Debtors for their operations or otherwise, except to pay the Debtors the servicing fees and other amounts to which they are entitled under applicable agreements.

8. Also during the May 3, 2006 hearing, I learned for the first time that 60% of the loans in the Debtors' portfolio were not performing, while lenders/investors were paid interest on those loans (the "Prepaid Interest"). I was also shocked to learn for the first time that certain loans had been paid off without lenders receiving the return of their principal (the "Diverted Principal"). I understood Mr. Allison to testify that the two sums (Prepaid Interest and Diverted Principal) appeared to be very close. I left comforted that the Debtor recognized that those with stolen principal investments were the true creditors of the estates.

9. Also at the May 3, 2006 hearing, I understood the Court to indicate the need to conduct a full audit and resolve numerous issues regarding setoff rights.

10. In whole, I left the hearing believing and understanding the lenders were going to be well represented and at this point there was no need to hire an attorney. We were hopeful that one committee would be formed, representing the interest of all investors.

11. On May 12, 2006, I attended the Debtors' §341 meeting of creditors. There, I understood Mr. Allison to state he was not pursuing the recovery of non-performing interest from the investors. I further understood his goal to be the recovery of money from the parties who rightfully owe it – the borrowers. Also, prior to the §341 meeting I was informed by U.S. Trustee, Augie Landis, that despite the fact I had the proxies of approximately $200,000,000 worth of lenders appointing me to the committee, I was not appointed to any committee because I had cross interests and the goal of the U.S. Trustee was to have committees composed solely of "pure" interests.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Dec Cangelosi 121206.wpd    - 3 -

12. I attended the hearings held in this case on May 18, 2006. At that hearing, it was my impression that the Court was very disturbed over having four (4) separate committees, particularly the expenses associated with this structure. I again left this hearing with the complete impressions that I was in good hands and my interests were being looked after by Mr. Allison and this Court. Thus, I saw no need to hire my own attorney.

13. I attended the hearings held in this case on June 5, 2006, where I understood each committee attorney was appearing in their official capacity for the first time. There, this Court again made it clear she was concerned over expenses and did not want duplication of effort. Thus, I again left the hearing believing my interests were being protected and I did not need to hire my own attorney.

14. I attended the hearings held in this case on June 15, 2006. I understood the attorneys for the Official Committee Of Executory Contract Holders Of USA Commercial Mortgage Company (the "Direct Lenders Committee"), which was appointed to look out for my interests as what has ultimately been classified as an A-5 claim holder (Direct Lender Compromise Claims), to explain they did not represent those direct lenders who have had their principal stolen and paid to others as interest on non performing loans. I understood the discussion to explain those with diverted principal had no representation. I further understood that this problem was appreciated by all involved and that those with stolen principal would be placed on a committee.

15. On June 16, 2006, I began communications with U.S. Trustee, Augie Landis. I understood Mr. Landis to explain those with stolen principal were represented by the Unsecured Creditor committee. I believed this was a conflict as anyone with stolen principal had cross interests and this would undermine his intent of only having pure interest committees. I believed those with stolen principal could not fully be represented by the present Unsecured Committee members due to their probable investments in other direct loans or the funds. Mr. Landis stated he was examining the Unsecured Creditors Committee as to whether additional committee members with stolen principal should be added.

16. I attended the hearings in this case on June 21, 2006. There, I learned additional committee members with Diverted Principal had not been added to the Unsecured Creditors

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Dec Cangelosi 121206.wpd    - 4 -

Committee. I met with Mr. Landis and again urged him of the conflict this could create.

17. At the June 21, 2006 hearing, I expressed my deep concern that the Direct Lenders Committee was not representing investors with Diverted Principal to Mr. Bill Bullard, committee chair. He told me he did not have diverted principal and did not care about those who did. In a heated exchange, Mr. Bullard challenged me to sue him if I wanted to collect my diverted principal.

18. While I was unhappy with the committee composition, I believed it would be nearly impossible to change the situation, even if I hired an attorney to pursue the issue. I understood this to be confirmed in conversations I had with STG attorneys.

19. Throughout the numerous hearings I attended, I always understood that any rights to setoff were being preserved. I also understood that any right I and others had to the recaptured Prepaid Interest were being preserved.

20. In late August, 2006, I reviewed this Court's August 24, 2006 Order (Docket # 1184), which I understood to protect me by requiring further Court order before USACM's could release Prepaid Interest it was recovering and segregating. My belief at that time was that the Debtors' plan of reorganization would return my representative contribution to the recaptured Prepaid Interest to compensate me for my representative claim to Diverted Principal.

21. In late September, 2006, I reviewed the Debtors' Joint Plan Of Reorganization (the "Original Plan") (Docket # 1310), which confirmed my understanding that there would be additional proceedings to determine the Debtors' right to retain and use the Prepaid Interest.

22. I was not involved in the formulation of, or negotiations behind, the Original Plan, or any amended plan filed thereafter. All versions of the plan were developed behind closed doors under strict confidentiality. In fact, the open line of communication I enjoyed with various committee members completely shut down as soon as plan formulation and negotiations began.

23. In November, 2006, I learned the Debtors had done a complete "180 degree turn" with regard to its position on the procedural requirements for their recovery of the Prepaid Interest. I learned the Debtors were proposing a plan that would simply take the Prepaid Interest, without any opportunity for me to defend against that taking or to assert claims I have to the Prepaid Interest, such as the setoff of my claims for Diverted Principal.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Dec Cangelosi 121206.wpd     - 5 -

24. I have learned that on November 6, 2006, the Debtors filed their Second Amended Joint Plan Of Reorganization ("Second Amended Plan")(Docket # 1741). I never received a copy of the Second Amended Plan from the Debtors.

25. Thereafter, based on the sudden drastic change in the Debtors' position, I and many other investors collectively determined it would be necessary to consult an attorney regarding our rights and interests. In this regard, I arranged for a consultation with Mr. Alan R. Smith, Esq. on November 15, 2006, and I hired him shortly thereafter.

26. On November 15, 2006, the Debtors filed their Third Amended Joint Plan Of Reorganization (i.e. the "Plan"), which I obtained and reviewed on the Bankruptcy Management Corporation ("BMC") website on November 17, 2006. The Plan certainly confirmed what we had learned; that the Debtors were seeking to take the Prepaid Interest without having an opportunity to defend against that taking or to assert my claims to the Prepaid Interest funds.

27. Together with my copy of the Plan, I received ballots as both an A-4 (General Unsecured Claims) and A-5 (Direct Lender Compromise Claims) and B-5 claim holder. With my ballots, I received a *Notice of Non-Voting Status With Respect To Unimpaired Claims Deemed To Accept The Plan"* (the "Notice of Non-Voting Status"), a copy of which is attached hereto as Exhibit A. The Notice of Non-Voting Status informed me I had no right to vote on the Plan.

28. I believe, through my experience in this Bankruptcy Case, I have encountered a textbook example of a *"BAIT AND SWITCH."* I, and other lenders/creditors, were lulled into complacency believing our rights were being preserved and that our setoff rights would be recognized. We were further led to believe our interests were being protected by the committees and, thus, I, and others like me, did not hire an attorney to protect us. Then, suddenly, the Debtors sprung a Plan that directly contradicts all prior representations to lenders/creditors.

29. I believe there is a class of investors who have not been represented due to the committee composition and conflicts, being those lenders who have both: (a) received allegedly improper Prepaid Interest; and (b) have had the principal amount of certain investments stolen.

30. I do not consent to the so-called "compromise" with Direct Lenders proposed by the Plan. I believe all members of the LPG share this position.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Dec Cangelosi 121206.wpd    - 6 -

31. Prepetition, I entered into certain Loan Servicing Agreements with the Debtors. I believe some of those Agreements contain provision for servicing fees for up to 3% of the principal loan balance in some cases, while other, like mine, provide for a simple 1% servicing fee. However, my understanding from, and experience with, USACM was that they never would, and never actually did, enforce those provisions by collecting servicing fees directly to lenders. Rather, my understanding was that USACM would build the recovery of their servicing fees, if any, into the structure of the loan to be charged to the borrower. Since I became an investor in USACM in early 2000, USACM has never collected a service fee from me, or, I believe, the approximately 762 investors I communicate with, under the Loan Servicing Agreements.

32. I acknowledge this case has been a painful process for all involved and that many people want to get this case to be done and over. I, too, would like to see this matter come to a close as soon as possible, preferably through a confirmed plan of reorganization that complies with the Bankruptcy Code. I understand everyone is concerned with the continued accrual of legal fees if this goes on. However, I believe the loss that I and other lenders will suffer if the presently proposed Plan is confirmed will pale in comparison to the fees that will be generated.

33. Attached hereto as Exhibit B are true and correct copies of the loan statements, including my Investor History Report and an itemization of loan servicing fees, which I received from the Debtor.

34. From the beginning of this case, I, and numerous other investors, began communicating with each other regarding this Bankruptcy Case.

35. I understand that on November 6, 2006, the Debtors filed their Second Amended Plan Of Reorganization, which is substantially similar to the Plan presently before this Court. On approximately November 7, 2006, I obtained and reviewed a copy of the Second Amended Plan from the Bankruptcy Management Corporation ("BMC") website.

36. In understand that on November 15, 2006, the Debtors filed their Third Amended Plan Of Reorganization. On approximately November 17, 2006, I obtained and reviewed a copy of the Third Amended Plan from the Bankruptcy Management Corporation ("BMC") website. I am informed and believe that most, if not all, of the other direct lenders I have contact with, also

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Dec Cangelosi 121206.wpd    - 7 -

obtained and reviewed a copy of the Third Amended Plan on or about November 17, 2006.

37. After I read and reviewed the Third Amended Plan, I drafted and sent a letter to fellow direct lenders I had previous contact with. At the time I sent the letter, I believed, and I still believe, that all parties had received and reviewed the Third Amended Plan. In fact, my letter specifically informed recipients that the Plan and Disclosure Statement were available for review on the BMC website. My letter referred them to the specific docket numbers where the documents could be found and reviewed.

I hereby swear under penalty of perjury that the assertions of this Declaration are true.

DATED: December 18, 2006

/s/ *Donna Cangelosi*
DONNA CANGELOSI

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\Plan-DS\Dec Cangelosi 121206.wpd    - 8 -