1  Annette W. Jarvis, Utah Bar No. 1649                    **E-FILED on December 19, 2006**
   RAY QUINNEY & NEBEKER P.C.
2  36 South State Street, Suite 1400
3  P.O. Box 45385
   Salt Lake City, Utah 84145-0385
4  Telephone: (801) 532-1500
   Facsimile: (801) 532-7543
5  Email: ajarvis@rqn.com

6  Lenard E. Schwartzer, Nevada Bar No. 0399
7  Jeanette E. McPherson, Nevada Bar No. 5423
   SCHWARTZER & MCPHERSON LAW FIRM
8  2850 South Jones Boulevard, Suite 1
   Las Vegas, Nevada  89146-5308
9  Telephone:  (702) 228-7590
   Facsimile:  (702) 892-0122
10 E-Mail:  bkfilings@s-mlaw.com

11 Attorneys for Debtors and Debtors-in-Possession

12

13                     **UNITED STATES BANKRUPTCY COURT**
                            **DISTRICT OF NEVADA**
14

| | |
|---|---|
| In re:<br><br>USA COMMERCIAL MORTGAGE COMPANY,<br>                                  Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br><br>USA CAPITAL REALTY ADVISORS, LLC,<br>                                  Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br><br>USA CAPITAL DIVERSIFIED TRUST DEED FUND,<br>LLC,<br>                                  Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br><br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>                                  Debtor. | |
| In re:<br><br>USA SECURITIES, LLC,<br>                                  Debtor. | **NOTICE OF FILING OF<br>TRANSCRIPT OF RULE 2004<br>EXAMINATION OF DEL BUNCH<br>TAKEN ON DECEMBER 19, 2006**<br><br>**(AFFECTS ALL DEBTORS)** |
| Affects:<br>    ☒  All Debtors<br>    ☐  USA Commercial Mortgage Company<br>    ☐  USA Securities, LLC<br>    ☐  USA Capital Realty Advisors, LLC<br>    ☐  USA Capital Diversified Trust Deed Fund, LLC<br>    ☐  USA Capital First Trust Deed Fund, LLC | |

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

USA Commercial Mortgage Company, USA Securities, LLC, USA Capital Realty Advisors, LLC, USA Capital Diversified Trust Deed Fund, LLC and USA Capital First Trust Deed Fund, LLC (collectively, the "Debtors"), by and through their counsel, hereby file the Transcript of the Rule 2004 Examination of Del Bunch taken on Tuesday, December 19, 2006, which is attached hereto as **Exhibit "1."**

Respectfully submitted this 19th day of December, 2006.

          _/s/   Lenard E. Schwartzer, Esq._

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146

and

Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# EXHIBIT "1"

1

```
 1              UNITED STATES BANKRUPTCY COURT

 2                   DISTRICT OF NEVADA

 3
     In re:                    ) Case Nos.
 4   USA COMMERCIAL MORTGAGE    ) BK-S-06-10725 LBR
     COMPANY,                   ) BK-S-06-10726 LBR
 5                             ) BK-S-06-10727 LBR
              Debtor.          ) BK-S-06-10728 LBR
 6   _____   ) BK-S-06-10729 LBR
                               )
 7   In re:                    ) Chapter 11
     USA CAPITAL REALTY ADVISORS,)
 8   LLC,                      )
                               )
 9            Debtor.          )
                               )
10   _____   )
     In re:                    )
11   USA CAPITAL DIVERSIFIED TRUST)
     DEED FUND, LLC,           )
12                             )
              Debtor.          )
13   _____   )
                               )
14   In re:                    )
     USA CAPITAL FIRST TRUST DEED)
15   FUND, LLC,                )
                               )
16            Debtor.          )
                               )
17   _____   )
     In re:                    )
18   USA SECURITIES, LLC,      )
                               )
19            Debtor.          )
     _____   )
20

21
          RULE 2004 EXAMINATION OF DEL M. BUNCH, JR.
22
          Taken on Tuesday, December 19, 2006
23                   At 2:11 p.m.
              At 1909 Red Robin Court
24                Las Vegas, Nevada

25   Reported by:  William C. LaBorde, CCR 673, RPR, CRR


          LAURIE WEBB & ASSOCIATES  (702) 386-9322
```

2

APPEARANCES:

For the Debtors:

    LENARD E. SCHWARTZER, ESQ.
    Schwartzer & McPherson Law Firm
    2850 South Jones Boulevard
    Suite 1
    Las Vegas, Nevada 89146-5308

For the Official Committee of Equity Holders of USA
Capital First Trust Deed Fund, LLC:

    SHLOMO S. SHERMAN, ESQ.
    Shea & Carlyon, Ltd.
    233 South Fourth Street
    Second Floor
    Las Vegas, Nevada 89101

For the Witness and Ernestine Bunch:

    RICHARD F. HOLLEY, ESQ.
    Santoro, Driggs, Walch, Kearney,
    Johnson & Thompson
    400 South Fourth Street
    Third Floor
    Las Vegas, Nevada 89101

* * * * * * * *

3

I N D E X

| WITNESS | PAGE |
|---|---|
| DEL M. BUNCH, JR. | |
| Examination by Mr. Schwartzer | 5 |

E X H I B I T S

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| A | June 9, 2004 Letter, Milanowski to Bunch | 5 |
| B | July 22, 2004 Letter, Milanowski to Bunch | 5 |
| C | March 27, 2001 Letter, Milanowski to Bunch | 5 |
| D | June 20, 2003 Letter, Hilson to Bunch | 5 |
| E | Checks to USA Commercial Mortgage | 5 |
| F | Copies of Checks and Bank Statements | 5 |
| G | Consolidated Balance Sheets | 5 |
| H | 1099 Forms | 5 |
| I | Motion For Order Temporarily Allowing the Claim of Del and Ernestine Bunch For Voting Purposes | 5 |
| J | 01/31/2006 Bank Statement | 24 |
| K | 02/28/2006 Bank Statement | 24 |
| L | 03/31/2006 Bank Statement | 24 |
| M | 2000 Bank Documents | 74 |

4

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| N | 2001 Bank Documents | 74 |
| O | 2002 Bank Statements | 74 |
| P | 2003 Bank Statements | 74 |
| Q | 2004 Bank Statements | 74 |
| R | 2005 Bank Statements | 74 |

5

1 P R O C E E D I N G S
2 (Exhibits A through I were
3 marked for identification.)
4 (Witness sworn.)
5 DEL M. BUNCH, JR.,
6 having been first duly sworn, was
7 examined and testified as follows:
8 EXAMINATION
9 BY MR. SCHWARTZER:
10 Q. State your name.
11 A. Del Bunch, B-u-n-c-h.
12 Q. And your address.
13 A. 1909 Red Robin Court.
14 MR. SCHWARTZER: And, Mr. Holley, I
15 assume you want the court reporter to send any
16 transcript of this for review?
17 Well actually it's a 2004 exam, so
18 there's no review, so we don't need to contact
19 anybody. Just prepare the transcript when we're
20 done.
21 THE REPORTER: Okay. Thank you.
22 BY MR. SCHWARTZER:
23 Q. Is there any physical or mental reason
24 why you cannot answer questions this afternoon?
25 A. Just a little medication for a cold, but

6

1 that's --
2 Q. Okay.
3 A. -- not affecting my mind yet.
4 Q. I understand that you are about 79 years
5 old, 73 --
6 A. Yes.
7 Q. -- years old?
8 A. 79, yeah.
9 Q. And so if you get tired and need a break
10 at any time, let me know.
11 A. Okay.
12 Q. You look fine to me, and I'm not
13 suggesting that you're not.
14 A. Yeah, fine.
15 Q. I just want to make sure you understand
16 that at any time you need a break, feel free to tell
17 me and we'll take a break.
18 A. Okay.
19 Q. I represent the debtors and debtors in
20 possession in the case of USA Commercial Mortgage
21 and its affiliates. As a practical matter, I
22 represent the new management, consisting of Mesirow
23 Financial Services, which is headed for this case by
24 Tom Allison, and I do not represent Joseph
25 Milanowski or Tom Hantges, who are the principals

7

1 and owners of this company.
2 A. Okay.
3 Q. So my client in part is a little bit in
4 the dark with regard to everything that occurred
5 prior to April 13th of this year. All we have is
6 records. We don't have any firsthand knowledge, and
7 so a lot of these questions may seem simple to you,
8 but it's because we weren't there and I'm expecting
9 since you were there you've got to have a better
10 memory of it than my client because my client wasn't
11 there.
12 So to begin with, how did -- when did you
13 first become aware of the company USA Commercial
14 Mortgage?
15 A. I'm looking at these because --
16 Q. "These" being your bank statements?
17 A. Uh-huh, uh-huh. Sometimes they're --
18 they had a name change at one point. I believe it
19 was in '03 or '4, but if we can just say Commercial
20 Mortgage, Commercial Capital maybe or --
21 Q. I think they used the name -- and let's
22 see if I'm correct. My understanding, that they
23 generally used the name USA Capital rather than USA
24 Commercial Mortgage. That was my impression.
25 A. Uh-huh.

8

1 Q. So could you tell me when you first
2 became aware of them.
3 A. Early 2000.
4 Q. Okay. And how did you become aware of
5 the company?
6 A. Advertising.
7 Q. And did you contact them or did they
8 contact you?
9 A. I believe I would have contacted them.
10 Q. Okay. Is there anybody in particular
11 that you recall first speaking to?
12 A. I believe it would have been Phill
13 Dickinson.
14 Q. Now, at the time you spoke to Phill
15 Dickinson, did he identify what position he had with
16 the company?
17 A. His business card said "Vice President,
18 Investments."
19 Q. Okay. Were you aware of what kind of
20 company USA Commercial was, USA Capital was?
21 A. They were a licensed real estate loan
22 broker.
23 Q. Okay. Had you -- prior to your
24 contacting them in 2000, had you had experience with
25 real estate loans?

9

1    **A.**   Lots of it.

2    **Q.**   And could you tell me your experience.

3  Generally over the years, what was -- what did you

4  do with commercial real estate loans?

5    **A.**   I have never been in anything except

6  residential.

7    **Q.**   So you didn't do commercial real estate

8  loans, but you did residential real estate loans?

9    **A.**   Correct.

10    **Q.**   And what kind of residential real estate

11  loans did you do?

12    **A.**   Primarily single-family home.

13    **Q.**   Okay.  Now are you talking about you made

14  loans on a completed single-family home or did you

15  do --

16    **A.**   No.

17    **Q.**   -- for real estate development?

18    **A.**   We worked with developers here in Las

19  Vegas, that we would make loans to them beginning

20  with acquiring the land, then going forward with the

21  infrastructure.  Then the next step would be

22  building homes and selling them in phases.

23    **Q.**   Okay.  Now when you say "we," who do you

24  mean? What's the "we" group?

25    **A.**   "We" is because I'm a strong believer

LAURIE WEBB & ASSOCIATES  (702) 386-9322

---

10

1  that there is no letter "I" in the word "team."  I

2  don't like the word "I."

3    **Q.**   Did you work for a company?

4    **A.**   Not in Las Vegas.

5    **Q.**   Did you -- now your experience in this

6  residential real estate loan, was it -- where was

7  it, in what location?

8    **A.**   California and Las Vegas.

9    **Q.**   Okay.  And how long have you lived in Las

10  Vegas?

11    **A.**   July 1st, '81.

12    **Q.**   And after that, how long have you made

13  residential real estate development loans in Las

14  Vegas, in Nevada?

15    **A.**   Since the early '90s.

16    **Q.**   Now, did you operate, did you have a

17  company name or did you have a licensed business or

18  something?

19    **A.**   I had a DBA, Loan Partners Capital.

20    **Q.**   Okay.  Now that appears on the bank

21  statements.  That appears to be Del Bunch DBA.

22    **A.**   DBA, uh-huh, right.

23    **Q.**   So is there anybody else that you made

24  investments for other than yourself?

25    **A.**   No.

LAURIE WEBB & ASSOCIATES  (702) 386-9322

---

11

1    **Q.**   What was the source of funds?  Where did

2  you get the money to start being into the

3  residential real estate loan development business?

4    **A.**   By working like hell.

5    **Q.**   Doing what?

6    **A.**   Prior to moving to Las Vegas, we had a

7  construction company located in Bellflower,

8  California, and through that company we built

9  single-family homes and apartment buildings.

10    **Q.**   So the source of the funds that you used

11  for the residential real estate loan business came

12  from the money you earned in the construction and

13  development business yourself?

14    **A.**   Yes.

15    **Q.**   Okay.  And the reason I'm asking again is

16  because you said "we" and I want to know if you got

17  a group of people together or things like that.

18    **A.**   "We" are my wife and I --

19    **Q.**   Okay.  That's what --

20    **A.**   -- and our dog.

21    **Q.**   Okay.  When you met with Mr. Dickinson, I

22  note that at least one paper I have shows you said

23  you met with him early in June of 2000.  Did you

24  meet with anyone else at that time?

25    **A.**   Besides Phill Dickinson?

LAURIE WEBB & ASSOCIATES  (702) 386-9322

---

12

1    **Q.**   Yes, from USA Commercial.

2    **A.**   Tom Hantges.

3    **Q.**   Okay.  And do you recall where you met

4  with him?

5    **A.**   No, but it was a dinner meeting.

6    **Q.**   Was there anybody else present?

7    **A.**   Don Walker.

8    **Q.**   Okay.  That would be your son-in-law?

9    **A.**   Son-in-law, uh-huh.

10    **Q.**   Anyone else?

11    **A.**   No, four people.

12    **Q.**   So your wife wasn't present?

13    **A.**   No.

14    **Q.**   What was discussed at that dinner?

15    **A.**   As I had mentioned previously, we had

16  been making loans to builders here in Las Vegas, so

17  we were actually in the same business as USA

18  Capital/Mortgage Company.  We were in the same

19  business, and I just felt like I wanted to just slow

20  down, so we have made loans to them.  We currently

21  also have loans with companies like Consolidated

22  Mortgage, OneCap, I believe Integrated.  Might be

23  another name or so around.

24    **Q.**   Okay.  Now, let me understand now.  The

25  loans that you made -- the arrangement you went into

LAURIE WEBB & ASSOCIATES  (702) 386-9322

13

1  with USA Capital or USA Commercial Mortgage --
2       A.    Uh-huh.
3       Q.    -- that was a loan to the company, not a
4  loan to a real estate developer; is that correct?
5       A.    That was a loan to Commercial Mortgage.
6       Q.    Okay.  Now with OneCap, did you make
7  loans to OneCap or did you make loans to real estate
8  developers through OneCap?
9       A.    We have beneficial interest in loans with
10  Consolidated, OneCap, Integrated, et cetera.
11       Q.    So there are specific loans where the
12  borrower makes the payments, you get your monthly
13  interest check; right?
14       A.    The borrower makes the payment to the
15  mortgage company.
16       Q.    Right.
17       A.    The mortgage company forwards a check for
18  our beneficial interest, yes.
19       Q.    Okay.  Now, with USA Commercial, there
20  isn't -- there was no borrower behind it, was there?
21       A.    There was originally, and it became
22  cumbersome and I checked, I thought, quite
23  thoroughly on USA Commercial Mortgage and was
24  comfortable after reviewing their financials, tax
25  returns, et cetera.  I became comfortable enough to

14

1  just have an unsecured loan.
2       Our original document called for a loan
3  up to 10 million, and it started with the first
4  check that we made was in June of 2000.  The last
5  check we issued would have been, I believe, March
6  of -- no, February '04.
7       Q.    Okay.
8       A.    I have prepared a schedule that you have.
9       Q.    Right.  And the promissory note that you
10  mentioned, is that the promissory note that was
11  attached to your proof of claim and is that a copy
12  of it?
13       A.    It would appear to be.
14       Q.    Okay.  And this is part of Exhibit I,
15  which is the motion for order temporarily allowing
16  the claim of Del and Ernestine Bunch for voting
17  purposes with the proof of claim attached as Exhibit
18  1 and the promissory note attached to it.
19       Was there ever a subsequent promissory
20  note written between you and USA Commercial Mortgage
21  after this June -- this note dated June 26, 2000?
22       A.    I don't believe so.
23       Q.    Is there --
24       A.    No.
25       Q.    -- any written amendment to this

15

1  promissory note that was ever executed between you
2  and USA Commercial Mortgage?
3       A.    No.  The verbiage in the note states that
4  we will make loans to them up to 10 million, and
5  after a four-year time frame, we hit the 10 million
6  number and we didn't make any additional loans to
7  them.
8       Q.    Okay.  Was there ever -- I note this note
9  says that it matures in one year from the date of
10  the note.  That would be June 26, 2001, right,
11  because the note says the maturity date is one year
12  from the date of the note?
13       MR. HOLLEY:  I think it says one year
14  after the last event.
15       A.    Last deposit.
16  BY MR. SCHWARTZER:
17       Q.    Oh, last deposit.  Oh, sorry.
18       A.    That's okay.
19       Q.    Okay.
20       A.    That's when in early '04 we hit the 10
21  mill. that I mentioned and then we -- they were not
22  interested in receiving any additional monies.
23       Q.    So they were not interested in receiving
24  any additional monies?
25       A.    Correct.

16

1       Q.    Lucky you.
2       A.    Yes.
3       Q.    Okay.  This note provides -- the
4  promissory note provides for interest at the rate of
5  20 percent per annum as a basic interest rate; is
6  that correct?
7       A.    Yes.
8       Q.    Now, my understanding is that USA
9  Commercial Mortgage is mostly loaning out money at
10  12 percent interest to developers on properties.
11       A.    Not necessarily.  They also have made
12  loans up to 20 percent plus a loan broker's fee, so
13  obviously with our dollars they could earn more than
14  they're paying us or they should have just returned
15  our principal.
16       Q.    Do you know any particular loans that
17  they have where they got 20 percent interest?
18       A.    Not that I am personally aware of.
19       Q.    And --
20       A.    But I have --
21       Q.    -- who told you that they were making
22  loans at 20 percent interest?
23       A.    I don't recall.  You're going back six
24  years.
25       Q.    And do you recall seeing any

17

1  documentation of loans at 20 percent interest per
2  annum?
3      A.    No.
4      Q.    And, see, my problem is, is I can't
5  figure out what the heck they were doing because it
6  looks to me they were mostly making loans at 12
7  percent.  If they're borrowing money at 20 percent,
8  that means every day the loan's outstanding they're
9  losing money.
10     A.    It depends.  Now I made loans to
11 developers just as they were doing.
12     Q.    Right.
13     A.    And I was able to generate a little over
14 30 percent APR.
15     Q.    And that's because you counted the loan
16 fees and --
17     A.    You bet.
18     Q.    -- and extension fees and things like
19 that?
20     A.    Correct.
21     Q.    Okay.  And that is your understanding of
22 how they were going to be able to generate money if
23 they borrowed money at 20 percent?
24     A.    That is correct.
25     Q.    Okay.  Did you have discussions with them

18

1  about that?
2      A.    No.
3      Q.    At first I note the note originally says
4  "This Note is secured by one or more collateral
5  assignments of deeds of trust," and you mentioned
6  that originally there was some; is that correct?
7      A.    Originally there was going to be some,
8  yes.  There never was one because we had become --
9  because of the financial information and tax
10 returns, personal as well as business, I was of the
11 opinion that we did not need to go through getting a
12 beneficial interest in trust deeds, and you can
13 imagine what that would have built into as we got up
14 to our 10 mill. number.  We would be doing
15 reconveyances every month.
16     Q.    Okay.  When did the -- I notice in this
17 document, in the promissory note, it provides for
18 the default interest rate to be 24 percent interest.
19     A.    Uh-huh.
20     Q.    Do you know when did -- when, if ever,
21 did that default interest rate go into effect?
22     A.    The note mentions that the due date will
23 be one year from the last deposit that we make.  The
24 last deposit we made would have been in February
25 '04.  One year from that date would have been

19

1  February '05.
2      Q.    So after February '05, the interest rate
3  went to 24 percent?
4      A.    Yes.
5      Q.    Okay.
6      A.    And a late charge.
7      Q.    And did --
8      A.    I prefer to call it an extension fee,
9  but --
10     Q.    So in February of 2005, that would be one
11 year when 12 percent went into effect; right?
12     A.    You mean the 24?
13     Q.    Yeah, yeah.  I'm sorry.
14     A.    That's okay.
15     Q.    February 24, 2005, that's when the late
16 charge went into -- that's also when the late charge
17 would have gone into effect?
18     A.    Yes.
19     Q.    And since you had $10,000,000
20 outstanding, the late charge would have been 5
21 percent or $500,000?
22     A.    Correct.
23     Q.    Okay.  Was that late charge ever paid?
24     A.    No.
25     Q.    Was there any subsequent time when there

20

1  was an additional late charge due?
2      A.    It -- an additional late charge would
3  have been due one year from the February 4th or 5th
4  of '05.
5      Q.    Okay.  And was that late charge ever
6  paid?
7      A.    No.
8      Q.    I note as part of Exhibit I -- I guess
9  maybe I have it here too -- there's a schedule here.
10 It says "USA COMMERCIAL MORTGAGE, $10,500.00 [sic] @
11 24% for 1 year, Due 02/5/06," this schedule.  Did
12 you prepare that schedule?
13     A.    I didn't, but my son-in-law did.
14     Q.    Okay.  And this is a schedule that would
15 indicate this is based upon --
16     A.    The document speaks for itself.
17     Q.    Well, it may, but I just want to make
18 sure that I understand what the document's saying.
19     A.    Okay.
20     Q.    The document is saying that on February
21 1st, 2005 there was an addition to principal of
22 $500,000 and that was based upon the fact that there
23 was a late charge?
24     A.    Correct.
25     Q.    Okay.  And then when you have on February

21

1  6th, 2006 when it has another addition to principal
2  of $525,000, that's also a late charge?
3      A.   I don't agree with what you're saying.
4  If you want to let me look at the document, I'll --
5      Q.   If you want to tell me, I just want to
6  know where the --
7      A.   There's two late charges.
8      Q.   Right.
9      A.   One February '05, February '06.
10     Q.   Uh-huh.
11     A.   Period.
12     Q.   Right.
13     A.   Oh, if that's what it shows, then that's
14 accurate.
15     Q.   Then that's the late charge based upon
16 the late charge provision in the promissory note?
17     A.   Correct.
18     Q.   Because it looks to be 5 percent of the
19 principal amount.
20     A.   Yes.
21     Q.   Okay.  I just was trying to confirm that
22 you did not make an additional loan at these two
23 times.
24     A.   Oh, no.
25     Q.   That's all I'm trying to get at.  You

22

1  see?
2      A.   Right.
3      Q.   Because the charge says principal and it
4  doesn't say what it's for.  It does say 5 percent
5  late charge.  I just wanted to make sure it wasn't
6  an actual payment.
7      A.   Okay.
8      Q.   Also, this document has on it payments
9  received as one of the columns, and it has here in
10 this column over here, in the last column of payment
11 received, it has $196,000, but I don't see what date
12 that was received.
13          MR. HOLLEY:  Lenard, is this the last
14 entry you're looking at on that schedule in --
15          MR. SCHWARTZER:  It's the last entry in
16 the column entitled "PAYMENT RECEIVED."
17          MR. HOLLEY:  Okay.
18          MR. SCHWARTZER:  All the other payment
19 receiveds have a date next to it, but that
20 particular one does not.
21          THE WITNESS:  It does up above for some
22 reason.  Oops.
23 BY MR. SCHWARTZER:
24     Q.   So that would be --
25     A.   196 down here.

23

1      Q.   Right.  And that says due 2/5/06 and it
2  looks like it says in the column marked "FROM" date
3  it says 2/1/06 to 2/6/06 and then it has a payment
4  received, $196,000, but then there's another line
5  below that which has another what appears to be a
6  payment of 196, so I'm just trying to figure out did
7  you receive a payment --
8      A.   Lenard, in 2006 --
9      Q.   Yes.
10     A.   -- we received three payments.  We
11 received one in January, which would have been
12 interest for December.
13     Q.   Okay.
14     A.   We then received the -- it was a 275 --
15 217,000, I believe, amount received in February,
16 early February, and that would have been for
17 January's interest.  Then we received $196 --
18 196,000 in early March, which would have been
19 interest for February, the lesser amount because
20 there are less days in February than there are in
21 December or January.
22     Q.   Okay.
23     A.   It's a daily rate.
24     Q.   Okay.  Is there some documentation
25 showing when you received the payment in January

24

1  among your bank --
2      A.   Of this year?
3      Q.   Of this year, 2006.
4      A.   You bet.
5          MR. HOLLEY:  Let me get -- Mr. Bunch, I
6  can --
7          THE WITNESS:  Yeah, we have a copy of all
8  of this.
9          MR. SCHWARTZER:  Good.
10         MR. HOLLEY:  Here's some.  Lenard, these
11 are the '06 --
12         MR. SCHWARTZER:  Bank statements?
13         MR. HOLLEY:  -- statements.
14         MR. SCHWARTZER:  Okay.  Is this all three
15 months here?  Why don't we mark these as J, K and L.
16         MR. HOLLEY:  Do you want to do that or do
17 you want to just mark them as one?
18         MR. SCHWARTZER:  Well I want to ask about
19 each one.
20         MR. HOLLEY:  Okay.
21     (Exhibits J through L were
22      marked for identification.)
23 BY MR. SCHWARTZER:
24     Q.   Mr. Bunch, we've just marked the bank
25 statements your attorney gave me, and I just wanted

25

1  you to confirm that these are the bank statements
2  for your account, copies of the bank statement of
3  your account for the months of January, February and
4  March.
5      A.    Yes.
6      Q.    Okay.
7      A.    They are.
8      Q.    And it appears to me that the one that's
9  marked Exhibit J shows that you received the payment
10  from USA Commercial Mortgage and deposited it in
11  your account on January 10th, 2006 in the amount of
12  $217,000. Is that correct?
13      A.    That's what the document shows.
14      Q.    And do you have any recollection
15  different from that or is that -- this is accurate?
16      A.    That's -- it better be.
17      Q.    Okay. And then Exhibit K is the February
18  bank statement, and that shows you received a
19  payment from USA Capital in the amount of $217,000
20  on February 9th, 2006; is that correct?
21      A.    Correct.
22      Q.    And that would be the -- and you would
23  agree that's the date you received the payment from
24  USA Capital?
25      A.    Uh-huh.

LAURIE WEBB & ASSOCIATES  (702) 386-9322

26

1      Q.    By the way --
2      A.    Those are wires.
3      Q.    That's what I was going to ask you.
4  These aren't checks that you deposited. They're
5  wire transfers, so they have immediate credit upon
6  them hitting your bank account?
7      A.    Correct.
8      Q.    Okay. In looking at Exhibit L, it
9  indicates that there was a wire from USA Capital to
10  your bank account in the amount of $196,000 on March
11  13th, 2006; is that correct?
12      A.    That's what the document shows, yes.
13      Q.    And it's your recollection that that's
14  when the payment was received, or you have no
15  recollection?
16      A.    I have to go by -- I'm a strong believer
17  in documents.
18      Q.    So I should assume that that's when that
19  account -- that monies hit your account as well?
20      A.    Yes.
21      Q.    And did you receive any payments from USA
22  Capital after March 13th, 2006?
23      A.    No.
24      Q.    Have you received any payments from
25  Mr. Milanowski or Mr. Hantges since March 13th,

LAURIE WEBB & ASSOCIATES  (702) 386-9322

27

1  2006?
2      A.    No.
3      Q.    Have you made demand upon Mr. Hantges
4  or Mr. Milanowski for payment since March 13th,
5  2006?
6      A.    I gave you correspondence that showed
7  that when we were negotiating in early '04 that
8  because we were not coming up and being able to
9  agree, I had at that point made demand for payment
10  in full.
11      Q.    Okay. And when you say that, are you
12  referring to this letter, which has been marked as
13  Exhibit A, or is it another letter?
14      A.    No, it would be the next one dated July
15  something.
16      Q.    Okay.
17      A.    Latter part of July.
18      Q.    Okay. That would be the letter that's
19  marked Exhibit B?
20      A.    Yes, uh-huh.
21      Q.    Okay.
22      (Telephone interruption.)
23      MR. SCHWARTZER:  We'll take a break for
24  the phone.
25      (Discussion off the record.)

LAURIE WEBB & ASSOCIATES  (702) 386-9322

28

1  BY MR. SCHWARTZER:
2      Q.    So the July 22nd letter, which is Exhibit
3  B, has your note back, and this is a letter -- I
4  assume this is a copy of a letter that you sent back
5  to Mr. Milanowski?
6      A.    Milanowski, correct.
7      Q.    Okay.
8      A.    Yes.
9      Q.    Okay. What was the problem you had that
10  caused you in July of 2004 to decide that you didn't
11  want to leave the $10 million with USA Capital
12  anymore?
13      A.    Part of what we were talking about was we
14  did not want to receive our payoff without what we
15  would consider sufficient notice. I've had that
16  happen to me before, and that's a lot of money to
17  get at one time when you don't have a plan as to
18  where it's going to go.
19      Q.    So your basic problem with them is they
20  kept on saying, "We're going to start paying you
21  back," and you said, "I don't like that idea. I
22  want you to keep it out or give me a set schedule
23  for repayment"?
24      A.    Something that we could mutually agree
25  upon, yes.

LAURIE WEBB & ASSOCIATES  (702) 386-9322

29

1    Q.    Okay.  After you sent the letter that's
2  been marked as Exhibit B, which is your notice of --
3  which says "Please consider this reply as notice of
4  our intent to be repaid as per the terms of our ten
5  million dollar . . . note," did you have any further
6  communications with Mr. Milanowski or anyone else
7  from USA Capital about paying back the note?
8    A.    Well, first of all, with the late charge,
9  it would not have been due until February '05.
10    Q.    Right, I understand.  So February '05
11  comes by.  You haven't gotten a payment, have you?
12  You've got your monthly interest payments I take it?
13    A.    Correct.
14    Q.    And those monthly interest payments are
15  at 20 percent a month at that time or are they
16  already raised?
17    A.    No, they would have gone to the default
18  rate in February '05.
19    Q.    Okay.  So between July 2004 and February
20  '05, you would have continued to get your monthly
21  interest check at the 20 percent rate?
22    A.    I believe so.
23    Q.    Okay.  And February '05 comes, which
24  that's the due date of the note.  Did you ask them,
25  "Am I going to get paid?"  Did you have any

30

1  communication with them whether they were just going
2  to pay it off in February of '05 rather than pay the
3  late charge?
4    A.    Well after a certain number of days, as
5  per the note, the default late charge would have
6  automatically kicked in.  We would have somewhere in
7  that area or time frame agreed to extend it for one
8  more year.
9    Q.    Now as I understand the note, they had an
10  absolute right to extend it one more year.  Is that
11  correct?
12    A.    No.
13    Q.    No, they didn't?
14    A.    No.
15    Q.    So they had a right if they didn't pay it
16  on February 5th, 2005, they owe you a 5 percent late
17  charge?
18    A.    Correct.
19    Q.    And they owed you the whole $10 million?
20    A.    10 mill. 5.
21    Q.    Yeah, the 10 million plus the 5 percent
22  late charge.
23    A.    Uh-huh.
24    Q.    Did you have any communication at that
25  time with anyone with USA Capital about what they

31

1  were going to do?
2    A.    First of all, all of my -- I'm going to
3  say 99 percent of my communication with USA was
4  through Phill Dickinson.
5    Q.    Okay.
6    A.    He was their representative to us.  And
7  did I talk to him?  Yes.
8    Q.    I mean, in January of '05 did you say,
9  "By the way, am I going to get a check for $10
10  million, because, you know, I'd be really upset if
11  you paid it all off and I have noplace to put it"?
12  Did you have that kind of communication with him?
13          I don't want to put words in your mouth.
14  I'm just trying to figure out.
15    A.    No, no, I understand, but I'm trying to
16  think of the time frames of these things.
17          For whatever reason, we agreed to extend
18  the note for one year at the default rate.
19    Q.    Okay.  So that would have been from
20  February -- the extension would have been from
21  February 5th, 2005 to February 5th, 2006?  That
22  would be the one-year extension?
23    A.    I believe so.
24    Q.    Okay.  During that period of time, they
25  are paying -- it appears to me they were paying you

32

1  interest at the 24 percent interest rate.
2    A.    Correct.
3    Q.    And that was based upon then an
4  outstanding principal balance of $10,500,000?
5    A.    I believe so.
6    Q.    Okay.  Did you have any conversations
7  about what they were going to do in February of '06
8  with Mr. Dickinson or anybody else from USA Capital?
9    A.    Don't recall.
10    Q.    I mean, the reason I ask is because you
11  made it very clear in your letter back in June of
12  2004 one of the things you didn't want to happen is
13  somebody dumping a million dollars on your lap that
14  you'd have to reinvest.
15    A.    Uh-huh.
16    Q.    So it seems natural to me that you would
17  have asked, "Are you going to dump $10,500,000 on my
18  lap to reinvest?"  And you don't recall ever having
19  that conversation?
20    A.    With that late charge, I could have
21  accepted a $10,500,000 lump-sum payment.
22    Q.    Okay.  But I'm just asking.  You --
23    A.    I'm a numbers and interest --
24    Q.    Yeah.
25    A.    -- person.

33

1  Q.  I understand, but weren't you interested
2  in whether they were going to pay you back?
3  A.  They have never missed an interest
4  payment in six years.
5  Q.  I understand.
6  A.  You do get a comfort feeling.
7  Q.  I guess the next question is:  When did
8  you -- did you ever get nervous about their ability
9  to repay you?
10  A.  No.
11  Q.  Okay.  Did you ever have any discussions
12  with anyone at USA Capital, either Mr. Dickinson or
13  anyone else, concerning USA Capital's ability to
14  repay you?
15  A.  No.
16  Q.  Other than your original conversation
17  with Mr. Hantges and Mr. Dickinson back in, I guess,
18  2000, did you have any discussion with anyone about
19  how they were using your money?
20  A.  No.
21  Q.  Okay.
22  A.  Remember I get tax returns every year on
23  the business, on Tom Hantges and Joe Milanowski.
24  Q.  Okay.  So they provided you with
25  financial statements each year, and --

LAURIE WEBB & ASSOCIATES  (702) 386-9322

34

1  MR. HOLLEY:  Is it financial statements
2  or tax returns?
3  THE WITNESS:  Both.
4  MR. HOLLEY:  Okay.
5  MR. SCHWARTZER:  Okay.
6  BY MR. SCHWARTZER:
7  Q.  So let me show you what's -- let me find
8  it here.
9  Did you receive financial statements that
10  were audited by their accountant?
11  A.  Yes.
12  Q.  Okay.  And do you recall for what years
13  you received those financial statements?
14  A.  I have them from '98 because they gave me
15  '98, '99 when we first started working with them in
16  early 2000, and after that we received them every
17  year.
18  Q.  So do you recall the last year that you
19  received them?
20  A.  The last year would have been '05, and
21  that would have of course been after the petition
22  filed.
23  Q.  So did you ever receive a 2005 financial
24  statement?
25  A.  Yes, but not until after the bankruptcy

LAURIE WEBB & ASSOCIATES  (702) 386-9322

35

1  was filed March 13th, 2006.
2  Q.  That was the date of the --
3  A.  Filing of the petition.
4  MR. HOLLEY:  It was April, wasn't it?
5  THE WITNESS:  April 13th.
6  BY MR. SCHWARTZER:
7  Q.  It was April, April 13th.
8  A.  If I said anything different
9  than April --
10  MR. HOLLEY:  You said "March."
11  BY MR. SCHWARTZER:
12  Q.  You said "March."  Okay.  So it's
13  April --
14  A.  April 13th, '06.
15  Q.  And you received the 2005 financial
16  statement after that filing?
17  A.  Correct.
18  Q.  I guess when the bankruptcy petition was
19  filed, did you have any fear that you wouldn't get
20  repaid?
21  A.  No.
22  Q.  Why not?
23  A.  Because we were talking about getting our
24  loan collateralized with real property.
25  Q.  And with whom were you having that

LAURIE WEBB & ASSOCIATES  (702) 386-9322

36

1  conversation?
2  A.  Those would have been phone conversations
3  with Joe Milanowski.
4  Q.  And what real estate was he talking about
5  collateralizing your loan with?
6  A.  One of them -- and the only one that I
7  recall at that time -- was the Royal Hotel down at
8  99 Convention Center here in Las Vegas.
9  Q.  Okay.  Did anybody give you to understand
10  that that property was owned by USA Commercial
11  Mortgage?
12  A.  At that time I would have received a
13  copy of all recorded documents involving the Royal
14  Hotel.
15  Q.  So that would have meant you would have
16  known that was owned by another entity other than
17  USA --
18  A.  Whatever the document said.
19  Q.  Okay.  So did you ever hear of a company
20  called HMA Sales?
21  A.  HMS?
22  Q.  I thought it was HMA Sales, but it could
23  be HMS.
24  MR. SCHWARTZER:  Do you recall?
25  MR. SHERMAN:  I thought it was HMA too.

LAURIE WEBB & ASSOCIATES  (702) 386-9322

37

BY MR. SCHWARTZER:

1  BY MR. SCHWARTZER:
2  Q.    I thought it was HMA Sales.
3  A.    Whatever it is.
4  Q.    Did you ever hear of that company?
5  A.    Not before I had those documents and
6  concerning the hotel.
7  Q.    Okay.  And when you saw the documents
8  concerning the Royal Hotel, they had the name HMA
9  Sales on it?
10  A.    Yes, I believe so.
11  Q.    And did you ask Mr. Milanowski or anyone
12  else how HMA Sales was going to give you a lien for
13  money that you were owed by USA Commercial Mortgage?
14  A.    You must recall I had their financial
15  statements for years.
16  Q.    Right.
17  A.    The entity owning the hotel was in their
18  financial statements.
19  Q.    Okay.  Did you hear -- when you looked --
20  do you have copies of Mr. Milanowski's and
21  Mr. Hantges's financial statements that you were
22  given?
23  A.    Yes.
24  Q.    Okay.  Would --
25  A.    And I supplied them to --

38

1  Q.    Did you give them to Mr. Allison or to --
2  A.    No, I didn't give them to Mr. Allison.
3  He already had them there.
4  Q.    Okay.
5  A.    I gave them to the law firm that Rob is
6  with, Lewis and Roca.
7  Q.    Lewis and Roca.  Okay.
8  A.    Right.  I gave them all of our records
9  from as far back, being 2000 forward.
10  Q.    Okay.
11  A.    Yes.
12  Q.    So I just wanted to make sure that we
13  already had those because it would be interesting to
14  see from my point of view if the financial
15  statements he gave you were the same as the
16  financial statements they gave other people.
17  A.    I wouldn't bet on that, but -- now, but
18  I'd be shocked if they were different.
19  Q.    Yeah, we'd both have questions about it.
20       I notice that the other things that are
21  attached to one of your declarations appears to be
22  things concerning the financial statements, and like
23  Exhibit C is a letter you sent to an auditor it
24  appears to be?
25  A.    Yes.  This was the second one that we

39

1  had.
2  Q.    And Exhibit D is another letter that --
3  A.    Was the first one.  June 20th, '03 it's
4  dated, and those amounts agree with their financial
5  statements.
6  Q.    All right.  And --
7  A.    At least the ones they provided me with.
8  Q.    And Exhibit E looks like a list of the
9  investments that you made, the monies that you
10  provided to USA Capital.
11  A.    Yes.  Yes.
12  Q.    Now who prepared that exhibit?
13  A.    Don Walker, my son-in-law.
14  Q.    Okay.  And from which document -- what
15  documentation did he base that on?
16  A.    Bank statements.
17  Q.    And that would be your bank statements
18  that you provided to him?
19  A.    Yes.
20  Q.    And to the best of your knowledge, this
21  is an accurate list of the monies that you sent to
22  USA Commercial Mortgage?
23  A.    To the best of my knowledge, it's 100
24  percent accurate.
25  Q.    Now when you made out -- I notice some of

40

1  those items say "WIRE" and some of them look like
2  it's check numbers.  Could you tell me when you were
3  writing out checks to what entity did you make the
4  checks payable?
5  A.    I gave you copies of the checks.
6  Q.    Okay.  That would be Exhibit F, what I
7  have marked here as Exhibit F?
8  A.    Yes, front and back.
9  Q.    Okay.  And Exhibit F would have copies of
10  all the checks that you wrote --
11  A.    That are on that list.
12  Q.    Okay.
13  A.    Yes.
14  Q.    So it looks like in each case the checks
15  were payable to USA Commercial Mortgage, but I
16  notice that some of them say "USA Commercial
17  Mortgage," but some of them also say "USA Commercial
18  Mortgage Investors Trust."
19  A.    I doubt it.  Let me see.
20  Q.    For example, here, this one, and that one
21  is -- what's the date on that check?
22  A.    December '03, December 8th, '03.
23  Q.    Is there some reason that check was
24  written to USA Commercial Mortgage Investors Trust?
25  A.    I could not tell you.

41

1    Q.    Do you have any recollection today of who
2    would have asked you to make the check out payable
3    to that?
4    A.    No, but that's the gal that issues our
5    checks, and why that one would be made out as it is,
6    the first time I recall ever seeing that.
7    Q.    Okay.  Let me ask this question since
8    there's --
9    A.    Sure.
10    Q.    -- another person who prepares your
11    checks.
12    A.    Yes.
13    Q.    Oh, see, I didn't know that.
14    A.    This person.  I'm sorry.
15    Q.    And who's that person?
16    A.    That person worked with us at the time.
17    She happens to be my niece also, and she paid all
18    checks that had to go out involving our DBA.
19    Q.    Okay.  And what is her name?
20    A.    Her name is Cyd Allred.
21    Q.    And how do you spell her last name?
22    A.    A-l-l-r-e-d.
23    Q.    And her first name, how do you spell
24    that?
25    A.    Cyd.

LAURIE WEBB & ASSOCIATES  (702) 386-9322

43

1    Q.    And it's on your account, and that check
2    is made payable to USA Capital.  Do you know why
3    that check was made out that way?
4    A.    No.  I just know it had no problem
5    clearing.
6    Q.    Well, my guess is your checks never have
7    any problem clearing.  Okay.
8        And here's another check made out by your
9    niece.  It looks like a check -- and it's hard for
10    me to read the date upside down --
11    A.    Well the date's up here, isn't it?
12    Q.    Yeah.
13    A.    Maybe that's when the bank got it.
14    Q.    So that's dated in July of 2003 and it's
15    for the amount of -- what is the amount?
16    A.    Where's my list?
17    Q.    50,000?  Is that for $50,000?
18    A.    Could be.
19    Q.    Okay.
20    A.    Could be.
21    Q.    And that's also signed by your niece,
22    Cyd?
23    A.    Yes.
24    Q.    And it's also made payable to USA
25    Commercial Mortgage Investors Trust.  Do you have

LAURIE WEBB & ASSOCIATES  (702) 386-9322

42

1    Q.    S-i-d or S-y-d, because it's unusual for
2    a woman?
3    A.    C-y-d.
4    Q.    C-y-d.  See, I got it completely wrong.
5    A.    S-i-d is a male I believe.
6    Q.    That's like Cyd Charisse.
7        And where does she reside?
8    A.    Las Vegas, Nevada.
9    Q.    Here.  Do you recall the address?
10    A.    No.
11    Q.    Do you recall the telephone number?
12    A.    Yes, 242-9487.
13    Q.    Okay.  And for what period of time did
14    she do your check preparation?
15    A.    If we look at the checks, I can answer
16    your question.
17    Q.    It's hard to say because some of them are
18    really illegible and some of them are clearly not --
19    A.    That's Don Walker.
20    Q.    That's Don Walker's signature?
21    A.    Right.
22    Q.    Now I notice that -- let's ask about this
23    check.  This is a check dated August 9th, 2003.
24    It's signed by Don Walker, who's your son-in-law.
25    A.    Uh-huh.

LAURIE WEBB & ASSOCIATES  (702) 386-9322

44

1    any reason at this time to recall why it was made
2    out to the Investors Trust rather than to USA
3    Commercial Mortgage?
4    A.    None at all.  That's -- today is the
5    first time I've ever noticed that.
6    Q.    Okay.  Now I can show you the next check.
7    This check is dated June 2003 and it's for an amount
8    of 1,105,000.  It also is signed by your niece, Cyd.
9    A.    Uh-huh.
10    Q.    And it also is made -- do you agree that
11    it's also made out to the USA Commercial Mortgage
12    Investors Trust?
13    A.    That's what the check says, yes.
14    Q.    And at this time do you have any
15    recollection why the checks were being made out to
16    the Investors Trust rather than --
17    A.    This meeting is the first time I have
18    ever seen a check made out like that.  I don't see
19    the checks.
20    Q.    Okay.
21    A.    Until we need them.
22    Q.    Now who would have communicated with Cyd
23    or Don Walker?  Because they've been writing, wrote
24    those checks, who would have been the person
25    communicating with them about how much to make the

LAURIE WEBB & ASSOCIATES  (702) 386-9322

45

1  check out for and to whom to make the check out to?

2     **A.**    They would have been communicating with

3  me.

4     **Q.**    Okay.

5     **A.**    And I with them.

6     **Q.**    Okay.  So now I notice -- so you would

7  have always told them the amount?

8     **A.**    Correct.

9     **Q.**    But it says here again -- and I'm looking

10  through these checks, and here's another one for

11  $45,000 and it's made out to USA Commercial Mortgage

12  Investors Trust and it's dated May 23rd, 2003.  At

13  least that's when it cleared the bank.

14     **A.**    Same answer.

15     **Q.**    So you have no recollection why it was

16  made out to that entity?

17     **A.**    No, but I sure will by the end of today.

18     **Q.**    Who will you ask to get the answer to

19  that question?

20     **A.**    Cyd.

21     **Q.**    Okay.  And with the one made out --

22     **A.**    All of them --

23     **Q.**    -- to Capital --

24     **A.**    -- made out to Investors Trust is what I

25  will be asking her about.

46

1     **Q.**    Because I'm looking through these and it

2  appears that almost all of these are made out to the

3  Investors Trust.  You could confirm it, too, by

4  looking through it.

5     **A.**    Those are factual check copies, so --

6     **Q.**    Yeah.

7     **A.**    -- however they're made payable is --

8     **Q.**    And it appears that each one that Cyd has

9  signed is made out to USA Commercial Mortgage Trust

10  and there's one by Mr. Walker that's made out to USA

11  Commercial and there's one by Mr. Walker that's made

12  out to USA Capital -- but all of the ones signed by

13  Cyd are made out to USA Commercial Mortgage

14  Investors Trust.  Do you want to look through this

15  and confirm --

16     **A.**    No.

17     **Q.**    -- that my analysis is correct?

18     **A.**    No.  I have a copy.

19     **Q.**    But Exhibit F is a true and correct copy

20  of your records?

21     **A.**    Yes.

22     **Q.**    Okay.

23     **A.**    My bank's records.

24     **Q.**    Your bank's records.

25     **A.**    Right.

47

1     **Q.**    And let me ask you what Exhibit G is.

2     **A.**    Exhibit G would be balance sheets of USA

3  Commercial Mortgage Company from '99 and 2000

4  through December 31st, 2005.

5     **Q.**    Okay.  And do you recall where you

6  received these from, who gave them to you?

7     **A.**    Those would have been received by us I

8  believe by mail.

9     **Q.**    Okay.  Now these documents were attached

10  to your declaration, and I notice they look like

11  financial statements in a format that is usually

12  used by accountants.  Do you recall whether you

13  received the cover sheet signed off by the

14  accountant as well?

15     **A.**    We would have.

16     **Q.**    So this is --

17     **A.**    I do believe.

18     **Q.**    So this is not a complete document, what

19  I have here?

20     **A.**    It's a one-page balance sheet.

21     **Q.**    Okay.  Well, I'm just saying it's a

22  balance sheet.  The first page is consolidated

23  balance sheets December 31st, 2000 and 1999, and

24  that has on it marked page 2.  And the next thing on

25  it is marked page 13, so obviously if this is --

48

1  this is not a complete document?

2     **A.**    No.

3     **Q.**    Somewhere around here you have a complete

4  document?

5     **A.**    You have as well.

6     **Q.**    I understand I do, but you had -- I'm

7  trying to find out if you were given the complete

8  document.

9     **A.**    I was given what we gave to the attorneys

10  involved in the bankruptcy.

11     **Q.**    That's Robert Charles, who represents the

12  Unsecured Creditors' Committee.  You gave him a set

13  of your documents?

14     **A.**    Yes.

15     **Q.**    Okay.  As we sit here today, do you

16  recall whether you received the complete financial

17  statement from the accountant with the accountant's

18  cover sheet saying, "This report meets the standards

19  of" --

20     **A.**    I believe I would have, yes.  Yes.

21     **Q.**    Okay.  And so it wouldn't have been just

22  page 2 and 13 followed by other pages.  It would

23  have been a complete financial statement?

24     **A.**    The purpose in those two page deals is

25  it's a balance sheet and then behind the balance

49

1  sheet they would have a narrative on covering
2  what -- explaining what different lines on the
3  financials were, et cetera.
4      Q.    So basically you wanted me to see or the
5  court to see the fact that the balance sheets of USA
6  Commercial Mortgage listed notes payable and they
7  had notes payable, including the first one on the
8  list being with interest payable at 20 percent
9  interest, which I assume is at that point in time
10  the amount of money that they owed to you, that USA
11  Commercial Mortgage owed to you?
12      A.    Those amounts on those dates will confirm
13  the list of checks that we provided by date.
14      Q.    Okay.  Was there any period of time where
15  Mr. Hantges, Mr. Dickinson, Mr. Milanowski or
16  someone else from USA Commercial gave you any
17  specifics on how the money you were loaning to the
18  company was being used?
19      A.    No.
20      Q.    Did they -- I note that you didn't loan
21  all the money all at one time; you loaned it over a
22  period of time.
23      A.    Didn't have it all at one time.
24      Q.    Did they ever call up and say, "Hey, Del,
25  I need $200,000 to put in this deal.  Could you loan

LAURIE WEBB & ASSOCIATES  (702) 386-9322

50

1  it to us?"
2      A.    Never.
3      Q.    How was it determined that you would loan
4  money to them?  Was it because you had the money?
5      A.    Because we would have received payoffs
6  from monies we had invested.
7      Q.    So the real driver in making this loan
8  was when you got money from some place else that you
9  had to invest, you sent it to USA Capital?
10      A.    Correct.
11      Q.    You didn't ever call them up and say, "Do
12  you need the money?"
13      A.    (Shaking head.)
14      Q.    And of course apparently they never said,
15  "No, we don't want it"?
16      A.    We already had an agreement up to 10
17  million.
18      Q.    I understand, but so the agreement was
19  you could force them to borrow up to 10 million?
20      A.    I don't know if you would want to say
21  force to because if they said, "We -- you know,
22  right now we'd rather do something different, like
23  not accept any more," we would have accommodated
24  them because there's other places that we could put
25  money.

LAURIE WEBB & ASSOCIATES  (702) 386-9322

51

1      Q.    But I'm just trying to say they never --
2  I'm just trying to make it clear they never called
3  you up and said, "We need money"?
4      A.    (Shaking head.)
5      Q.    Now when you had the extra money, was
6  there someone you called over there and said, "Oh,
7  by the way, I'm sending over a check for
8  $1 million"?
9      A.    Phill Dickinson would pick them up
10  physically from us.
11      Q.    I notice a couple were wire transfers.
12  Was there anything different on the days that you
13  did the wire transfers?
14      A.    Couldn't tell you.
15      Q.    Okay.  Now, when Cyd or Don wrote the
16  checks, okay, but Phill Dickinson picked them up,
17  did he pick them up from Cyd and Don or did he pick
18  them up from you?
19      A.    A good bit of the time we would leave it
20  at the guard shack in the front entrance, meaning
21  that Phill could then come by 1:00, 2:00, 4:00,
22  whenever, and pick it up, which means we didn't have
23  to be sitting here waiting for him to pick them up.
24      Q.    When you say "we" --
25      A.    "We," my wife and I.

LAURIE WEBB & ASSOCIATES  (702) 386-9322

52

1      Q.    Okay.  So that means at some point in
2  time after Cyd or Don wrote the check, the check was
3  in your possession and you brought it to the guard
4  gate?
5      A.    I didn't say that.
6      Q.    Okay.  Was the check in your possession?
7      A.    Not always.
8      Q.    Sometimes?
9      A.    Probably seldom.
10      Q.    But sometimes?
11      A.    Possible.
12      Q.    You just don't recall one way or the
13  other?
14      A.    I do not, no.
15      Q.    How would the check get from Cyd to the
16  guard gate?
17      A.    She would take it there.
18      Q.    So she would -- now where was her office
19  where she would do the writing of the checks?
20      A.    During this time frame, she was doing
21  that from -- I couldn't tell you with certainty.
22      Q.    She didn't do it out of your house?
23      A.    No.
24      Q.    She had her own house --
25      A.    Yes.

LAURIE WEBB & ASSOCIATES  (702) 386-9322

53

1    Q.    -- or apartment or her own residence?
2    A.    Yes.
3    Q.    Did she have an office to work out of?
4    A.    In her home.
5    Q.    In her home, so wherever she did it,
6  wherever her home was, that's where she worked out
7  of?
8    A.    Yes.
9    Q.    So what you're telling me is if she wrote
10  the check in her office, signed it, she could have
11  just delivered it over to the guard gate without you
12  ever seeing it?
13    A.    Yes.
14    Q.    And without you ever touching it even?
15    A.    Yes.
16    Q.    Is the same true with the checks prepared
17  by Don Walker?
18    A.    Yes.
19    Q.    How would have he gotten the checks to
20  write them?
21    A.    Would have had to be from Cyd.
22    Q.    Okay.
23    A.    Sometimes when Cyd goes on vacation she
24  leaves extra checks with Don, and that's when he
25  would typically have signed one.

LAURIE WEBB & ASSOCIATES  (702) 386-9322

54

1    Q.    Okay.
2    A.    But there was never a check written that
3  I didn't say, "It's for 'X' number of dollars."
4    Q.    Okay.  So I understand.
5         Part of Exhibit I is a schedule that says
6  "Interest & additional charges for USACM bankruptcy,
7  All charges pre-petition."  Okay?
8         Do you know who prepared that schedule?
9    A.    Don Walker.
10    Q.    And I'm not sure why it says that the --
11  it says "DATE INCURRED" on several items and at
12  least one of the items --
13    A.    I have a copy here.
14    Q.    Okay.  Says the date incurred is -- the
15  last item is date incurred "April 06 interest unpaid
16  (to petition date)."  I assume that means he
17  calculated the interest only through April 13th,
18  2006, the date of the petition?
19    A.    April 13th, yeah.  That's what the
20  Bankruptcy Code says.
21    Q.    Okay.
22    A.    It's my understanding that after that
23  petition date we get a lesser amount of interest
24  than we have been collecting from Commercial
25  Mortgage, which of course we will be going after

LAURIE WEBB & ASSOCIATES  (702) 386-9322

55

1  them for the difference.
2    Q.    Okay.  If the Chapter 11 plan is not
3  confirmed, what is your belief what will happen in
4  this Chapter 11 case?
5         MR. HOLLEY:  I'm going to interpose --
6    A.    Do you want my guess?
7         MR. HOLLEY:  Just a minute.  I'll just
8  interpose an objection at this point to the extent
9  it asks for a legal conclusion on the part of the
10  witness.
11  BY MR. SCHWARTZER:
12    Q.    And the answer is?
13    A.    The answer is what he said.
14    Q.    No, he didn't tell you not to answer.  He
15  just said --
16    A.    Well he told you what --
17    Q.    -- you would be making some legal
18  conclusions, but I'm trying to find out where you
19  think this case should go if the plan is not
20  confirmed because you are a major creditor --
21    A.    Uh-huh.
22    Q.    -- and it is important to -- you know, we
23  try to get a consensual plan and we're trying to
24  figure out how we can get this plan to be a
25  consensual plan, and like I said, you're a large

LAURIE WEBB & ASSOCIATES  (702) 386-9322

56

1  creditor.
2    A.    The unsecured creditors of USA Commercial
3  Mortgage are scheduled to take a bath reduction in
4  their amounts due by upwards of $50 million.  The
5  plan says 8 to 33 percent, and I got to tell you I
6  just feel that that's not right for the unsecured
7  creditors, who, in my opinion, would be receiving a
8  lesser amount percentage-wise than either of the two
9  funds or the individual direct lenders, just that
10  simple.
11    Q.    Okay.  So that's your -- that's the
12  problem you have, but do you have any alternative
13  ideas of how to increase the amount of money
14  available to pay unsecured creditors that have
15  not -- that are not provided for in the plan?
16         MR. HOLLEY:  Same objection.
17         MR. SCHWARTZER:  And I'll recognize it's
18  a continuing objection.
19         MR. HOLLEY:  Thank you.
20    A.    Sorry.
21  BY MR. SCHWARTZER:
22    Q.    I'm trying to find out is there some
23  other way of getting more money into the bankruptcy
24  estate than is described into the plan?
25    A.    I believe so.  We have not been able to

LAURIE WEBB & ASSOCIATES  (702) 386-9322

57

1  get financial information out of Tom Allison,
2  et cetera, from day one as to how much cash has been
3  collected for things like late charges, default
4  interest, exit fees, et cetera.  I can't tell you as
5  we sit here because he has been unwilling to provide
6  that information.
7      Q.    Okay.
8      A.    It's my belief that the amounts of monies
9  that would be available after administrative fees,
10  a.k.a. Mesirow, you, et cetera, that there would be
11  considerably more than 8 to 33 percent available for
12  the unsecured creditors of Commercial Mortgage.
13      Q.    If what happened?  I mean, we want to be
14  out of the -- Mesirow wants to be out of this.  As
15  much as I enjoy doing this, my job is to work myself
16  out of a job, like every Chapter 11 attorney.
17          If we don't have a plan confirmed, we're
18  still stuck in the business.  How would we -- how do
19  we get from where we are now to out of the business?
20  Somebody has to run the business.  Who would -- is
21  there someone you would prefer to be running the
22  business?
23      A.    I have no idea, but I do know that
24  there's more than one qualified mortgage collection
25  business here in Las Vegas --

58

1      Q.    Yeah.
2      A.    -- that could handle it to answer your
3  question.
4      Q.    Well, do you have a problem with the
5  people from Compass handling the collection?
6      A.    None at all.
7      Q.    Okay.
8      A.    No.  And I might explain why, because
9  they're not collecting any notes and deeds of trusts
10  for the unsecured creditors.
11      Q.    Actually they're not.  You're right.
12  They're just going to be collecting it for the
13  direct lenders and to the extent that either First
14  Trust Deed Fund or Diversified Trust Deed Fund has a
15  fractional interest of some loans it will be
16  collecting for those entities as well.
17      A.    That's my understanding.
18      Q.    Okay.  Do you have any -- have you had
19  any conversations or have you made any since the
20  filing of the bankruptcy with Mr. Hantges or
21  Mr. Milanowski?
22      A.    I have not talked with Tom Hantges.  I
23  have talked with Joe Milanowski --
24      Q.    And --
25      A.    -- by phone.

59

1      Q.    And do you recall when that was?
2      A.    It was after April 13th, '06.
3      Q.    That's about a nine-month period.  Is it
4  near the beginning of that nine-month period or has
5  it been in the last couple of weeks?
6      A.    I don't know that I could identify dates,
7  but I can tell you the subject matter.
8      Q.    That would help, yes.
9      A.    The subject matter is, "What are we going
10  to do about getting our loan collateralized?"  And
11  like I said earlier, the first situation that was
12  being discussed was the Royal Hotel.
13      Q.    Right.  Has he discussed any other
14  properties that he would give you as collateral?
15      A.    Verbally on the phone, there was some
16  property that they were involved in in the Temecula,
17  California, area and the general Sacramento area of
18  California.
19      Q.    Now, the Temecula, California, property,
20  did he refer to that as the Bundy Canyon property by
21  any chance?
22      A.    Just identified it by the name of the
23  property.
24      Q.    Okay.
25      A.    Yeah.

60

1      Q.    Has Mr. Milanowski in fact provided you
2  with any additional collateral for your debt?
3      A.    No.
4      Q.    Has he offered any collateral of his
5  personal assets to you?
6      A.    No.
7      Q.    Has he made any suggestion to you about
8  how you should vote with regard to this plan of
9  reorganization?
10      A.    No.  Tom Allison did, but Joe Milanowski
11  did not.
12      Q.    Other than your conversation with Tom
13  Allison and your own attorney, has anyone discussed
14  whether or not you should accept or reject the
15  proposed plan?
16      A.    No.
17      Q.    Have you checked on any Web sites or
18  Internet sites for that information?
19      A.    I am computer challenged, but I do have
20  children that have computers.
21      Q.    Okay.
22      A.    And if I need something, I call them and
23  somehow or other it magically appears on my fax
24  machine.
25      Q.    Has anybody -- has any of your children

61

1  provided you with any of that information over your
2  fax machine concerning whether or not to vote for or
3  against the plan?
4      A.      The decision to not vote for the plan was
5  strictly my own.  My son-in-law, Don Walker, had a
6  different view.  He thought we should vote to accept
7  it.
8      Q.      Okay.
9      MR. SCHWARTZER:  Mr. Sherman, if you have
10  any questions, I guess this is as good a time as
11  any, and if you want to take a break before we
12  start, I --
13      THE WITNESS:  Anybody want a Pepsi or
14  something?
15      MR. SCHWARTZER:  I'd love a Pepsi.
16      (Recess taken from 3:28 p.m.
17      to 3:34 p.m.)
18  BY MR. SCHWARTZER:
19      Q.      I just handed you Exhibit H, which looks
20  like 1099 forms.  Are those copies of the 1099 forms
21  that you received from USA Commercial Mortgage?
22      A.      Yes.
23      Q.      And I do have just a few more questions.
24      With regard to the payments from USA
25  Commercial Mortgage, do you know were the payments

63

1  account?
2      A.      I don't believe they ever would have been
3  made to me if that's what you're saying.
4      Q.      No, I'm saying they made out checks
5  payable to you.  Who would they have made the checks
6  payable to?  Would they have made it payable to some
7  other entity or name?
8      A.      No, there's only one.
9      MR. HOLLEY:  Perhaps --
10      A.      That's me DBA.
11      MR. HOLLEY:  Perhaps we can try to get a
12  little bit of a time frame here.
13      MR. SCHWARTZER:  Okay.
14      MR. HOLLEY:  It's a little confusing to
15  me.
16      MR. SCHWARTZER:  Okay.
17      A.      The first three or four interest payments
18  were handled through -- and I'm trying to find the
19  checks here -- were handled via deposit slips.
20  BY MR. SCHWARTZER:
21      Q.      And --
22      A.      After that we then said, "You know, this
23  is crazy.  You know, they mail them to us.  We have
24  to make out a deposit slip.  We have to take it to
25  the" -- so we got off of that.

62

1  always wired to your account or did you receive
2  checks?
3      A.      No, not in the beginning.  In the
4  beginning, they were -- there were deposit slips.
5      Q.      Do you by any chance -- did you by any
6  chance make copies of their checks to you?
7      A.      I don't believe so.
8      Q.      Okay.
9      A.      No.
10      Q.      At this time do you have any recollection
11  whether those checks were from USA Commercial
12  Mortgage Investors Trust?
13      A.      I have no idea.
14      Q.      Okay.  So you just have no recollection
15  one way or the other?
16      A.      Uh-uh.
17      THE REPORTER:  Your answer?  You said
18  "uh-uh."  Your answer?
19  BY MR. SCHWARTZER:
20      Q.      Oh, yes.  "Uh-uh" could be interpreted a
21  lot of different ways.
22      A.      What was the question then?
23      Q.      Do you have any recollection whether any
24  of the checks that were made payable to you were
25  from the USA Commercial Mortgage Investors Trust

64

1      Q.      Okay.  Do you recall of those first few
2  checks to whom they were made payable?
3      A.      I have no idea, but I bet it was Loan
4  Partners Capital I would guess.
5      Q.      Now I notice that the --
6      A.      If they weren't --
7      Q.      -- the promissory note doesn't -- the
8  promissory note, which is attached as an exhibit to
9  Exhibit I --
10      A.      Uh-huh.
11      Q.      -- that promissory note says it's payable
12  to Del and Ernestine Bunch, so why would they have
13  made the check out to any other name?
14      A.      Because a DBA is Del Bunch doing business
15  as.
16      Q.      Okay.  And do you recall whether you ever
17  requested them to do that?
18      A.      No.
19      Q.      So actually as we sit here today, you
20  have no recollection how they made out those checks?
21      A.      No.
22      Q.      Okay.  Number two --
23      A.      As long as they cleared, that's all I --
24      Q.      The next part of that is I also want
25  to -- the other part of the question is:  As we sit

65

1  here today, you have no recollection whether those
2  checks were coming from an account entitled "USA
3  Commercial Mortgage" or "USA Commercial Mortgage
4  Investors Trust"?
5  **A.** No.
6  **Q.** Okay.
7  **A.** Nope. Because after the first three or
8  four, like I say, after that they were all wires,
9  and fortunately our bank -- and I didn't notice this
10  until all this nonsense came about, but they put
11  right on the statement "USA COMMERCIAL."
12  **Q.** It says "USA COMMERCIAL ACH 349," so that
13  gives an account number. Would you --
14  **A.** Unfortunately it gives my social security
15  number.
16  **Q.** Well we're not going to be showing it to
17  a lot of people.
18  **A.** Yeah, well I --
19  **Q.** And I also notice that the more recent
20  ones, like this one which is marked as Exhibit L,
21  doesn't say "USA Commercial Mortgage," but it says
22  "USA Capital."
23  **A.** That's what it says.
24  **Q.** So I assume that means some of them say
25  "USA Commercial" and some of them say "USA Capital."

LAURIE WEBB & ASSOCIATES (702) 386-9322

66

1  **A.** All I can tell you is this one says "USA
2  Capital."
3  **Q.** And which one were you looking at before
4  said "USA COMMERCIAL"?
5  **A.** This would have been January 31st, '03.
6  THE WITNESS: Can we go off the record
7  for a second?
8  MR. HOLLEY: Do you want to talk?
9  THE WITNESS: No. Tell him off the
10  record.
11  MR. HOLLEY: Oh, sure.
12  MR. SCHWARTZER: Okay. Let's go off the
13  record, Mr. Bunch.
14  (Recess taken from 3:39 p.m.
15  to 3:46 p.m.)
16  MR. SCHWARTZER: Let's go back on the
17  record.
18  BY MR. SCHWARTZER:
19  **Q.** I want to ask you. You just handed me a
20  document consisting of pages 5 through 8, and it
21  looks -- so that means it's part of another
22  document. Is this part of a financial statement
23  that you were given?
24  **A.** Correct.
25  **Q.** Okay.

LAURIE WEBB & ASSOCIATES (702) 386-9322

67

1  **A.** Where are the checks I gave you that you
2  already have with those narratives in it?
3  MR. HOLLEY: Do you --
4  **A.** Was it F?
5  MR. HOLLEY: Exhibit F are copies of the
6  checks, yes.
7  BY MR. SCHWARTZER:
8  **Q.** Yeah, Exhibit --
9  **A.** Okay. Look -- yeah, right. Look at
10  1992.
11  **Q.** Well, you mean 2002?
12  **A.** I'm sorry.
13  **Q.** Okay. I have checks here dated all over
14  the place, including some in 2002.
15  **A.** But did you not also receive these
16  narratives?
17  **Q.** Now, I'm sure that my client has copies
18  of these financial statements.
19  **A.** I am too.
20  **Q.** Okay. So this is --
21  **A.** But what I'm --
22  **Q.** So basically what you're telling me, the
23  information about the investments in Investment
24  Partners that you have --
25  **A.** Uh-huh.

LAURIE WEBB & ASSOCIATES (702) 386-9322

68

1  **Q.** -- is based upon the financial statements
2  that were provided by USA Commercial Mortgage to
3  you?
4  **A.** Right.
5  **Q.** And you don't have any other independent
6  knowledge of it?
7  **A.** No. When I get a statement from like
8  Deloitte & Touche, I have not much reason to doubt
9  the information.
10  **Q.** I'll remain silent on my opinion of that.
11  **A.** Yeah, right.
12  **Q.** On the other hand, you didn't have any --
13  other than the information you got from the
14  financial statements, you did not have any other
15  direct conversations with them about how they were
16  putting money in USA Investment Partners?
17  **A.** Nope. No.
18  **Q.** And they never told you, "You know, Del,
19  you know, the great news is we're able to take your
20  money and put it into these real estate developments
21  in California and make a ton of money"?
22  **A.** That's what these things said.
23  **Q.** That's what those things said, but did
24  either Mr. Dickinson or Mr. Hantges or
25  Mr. Milanowski ever say that they were using your

LAURIE WEBB & ASSOCIATES (702) 386-9322

69

1  money to do that?
2      A.    They did not specify as to what they were
3  doing with the loans we made to them.
4      Q.    Okay.
5      A.    Uh-uh.
6      Q.    Okay.  That's what I needed to know.  I
7  have no further questions at this time.
8      A.    But one of these explains when they took
9  the great majority of assets and transferred them
10 into Investment Partners, and that was done in a
11 certain year, and I -- I was hoping this is -- that
12 this would tell us.
13     Q.    But the important thing from my point of
14 view is finding out if you had any conversations
15 with them that they talked to you about this rather
16 than you --
17     A.    Not past these.
18     Q.    So your only information about Investment
19 Partners and the assets put in Investment Partners
20 comes from the financial statements that you were
21 given?
22     A.    Right.
23          MR. SCHWARTZER:  Okay.  I have no further
24 questions, and I appreciate your being here.
25          Mr. Holley, if you want to ask any

70

1  questions --
2          MR. HOLLEY:  I think that do you want to
3  give them those bank statements so that --
4          THE WITNESS:  I ran them a copy.
5          MR. SCHWARTZER:  Okay.  What we'll do is
6  attach as the next exhibit in order --
7          THE WITNESS:  I assume since you asked
8  the question it's okay.
9          MR. SCHWARTZER:  -- a set, which would be
10 Exhibit M, which would be a set of your financial --
11         THE WITNESS:  Bank statements.
12         MR. SCHWARTZER:  -- your bank statements,
13 and this is the bank statements that would show all
14 the payments that were received by you?
15         THE WITNESS:  Correct.
16         MR. SCHWARTZER:  Okay.
17         THE WITNESS:  Never missed one.
18         MR. SCHWARTZER:  Okay.  And that would be
19 the bank statements --
20         THE WITNESS:  From BankWest.
21         MR. SCHWARTZER:  -- from BankWest.
22         MR. HOLLEY:  What I would suggest,
23 Lenard, for keeping track of this --
24         MR. SCHWARTZER:  Yes.
25         MR. HOLLEY:  -- is --

71

1          MR. SCHWARTZER:  Label them in order?
2          MR. HOLLEY:  -- label them in years as
3  subsequent exhibits.  For example --
4          MR. SCHWARTZER:  Okay.  I'll do that.  So
5  the exhibit for the year -- I just want to make sure
6  I can read these.  The first one is for the year
7  2000?
8          MR. HOLLEY:  Yes.
9          THE WITNESS:  That would be --
10         MR. SCHWARTZER:  It will be Exhibit M.
11 The one for the year -- and then the next one has
12 December 30th, 2000 through --
13         MR. HOLLEY:  Now let's see.  The --
14         MR. SCHWARTZER:  -- January 31st --
15         THE WITNESS:  Yeah.  That's a dumb
16 statement.
17         MR. HOLLEY:  What you will see with --
18         THE WITNESS:  It's for the month of
19 January.
20         MR. SCHWARTZER:  For the month of
21 January.
22         THE WITNESS:  Right.
23         MR. SCHWARTZER:  And we'll label that
24 as --
25         MR. HOLLEY:  Well if I -- this next one

72

1  in sequence will be Exhibit N, but what you will see
2  is for 2001 --
3          MR. SCHWARTZER:  Yes.
4          MR. HOLLEY:  -- there's the month of
5  January.
6          MR. SCHWARTZER:  Uh-huh.
7          MR. HOLLEY:  Then it skips over to the
8  month of August, so this was only -- this is only a
9  partial.
10         MR. SCHWARTZER:  Okay.  So these are the
11 bank ---
12         THE WITNESS:  No, wait a minute.  We
13 should have every month.
14         MR. SCHWARTZER:  These are the bank
15 statements only for the months in which you received
16 a payment from USA Commercial Mortgage?
17         THE WITNESS:  Yes.
18         MR. SCHWARTZER:  Okay.
19         MR. HOLLEY:  But --
20         THE WITNESS:  Well --
21         MR. HOLLEY:  -- I can't say that's true.
22         THE WITNESS:  But it was every month from
23 July of 2000 through March of 2005.
24         MR. HOLLEY:  I think the intent --
25         THE WITNESS:  And if you count the

73

1  months, there should be an identical number of

2  statements here.

3       MR. HOLLEY:  Yes.  I think the intent

4  with respect to 2001 is that every month be

5  provided, but the -- what you have there skips some

6  months.

7       MR. SCHWARTZER:  Okay.

8       THE WITNESS:  Should not.

9       MR. HOLLEY:  So I know it should not, but

10 what we will do is we will supplement what will be

11 Exhibit N --

12      THE WITNESS:  All right.

13      MR. HOLLEY:  -- with the months that

14 happen to be missing in the attachment that we

15 presently have.

16      THE WITNESS:  Right.

17      MR. SCHWARTZER:  Okay.  And Exhibit N is

18 for the year 2001.  The Exhibit O will be for the

19 year 2002.  The Exhibit P will be for the bank

20 statements from BankWest for the year 2003.

21      Exhibit Q will be the BankWest statements

22 for the year 2004.  Exhibit R will be the BankWest

23 bank statements for the year 2005.

24      THE WITNESS:  There's only three --

25      MR. SCHWARTZER:  Okay.

LAURIE WEBB & ASSOCIATES  (702) 386-9322

---

74

1       THE WITNESS:  Sorry.  Go ahead.

2       MR. SCHWARTZER:  And --

3       THE WITNESS:  You should have three for

4  '06.

5       MR. HOLLEY:  And then '06 has already

6  been marked previously as Exhibits J, K and L.

7       MR. SCHWARTZER:  Okay.  That's correct.

8       So that being said, are we completed or

9  do you have any questions, Richard?

10      MR. HOLLEY:  I do not have any questions.

11      MR. SCHWARTZER:  Okay.  We're done except

12 for you marking these up and then immediately

13 running home, doing this so we could have a

14 transcript sometime tonight.

15           (Exhibits O through R were

16           marked for identification.)

17           (Examination recessed at

18           3:53 p.m.)

19

20

21

22

23

24

25

LAURIE WEBB & ASSOCIATES  (702) 386-9322

---

75

1            CERTIFICATE OF WITNESS

2  PAGE  LINE  CHANGE        REASON

3  _____

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15            *  *  *  *  *

16      I, DEL M. BUNCH, JR., witness herein, do

   hereby certify and declare under penalty of perjury

17 with the within and foregoing transcription to be my Rule

   2004 Examination in said action; that I have read,

18 corrected and do hereby affix my signature to said

   Rule 2004 Examination.

19

20      _____

   DEL M. BUNCH, JR.

21 Witness

22

23      Subscribed and sworn to before me this _____

   day of _____ 200__.

24

25      _____

   NOTARY PUBLIC

LAURIE WEBB & ASSOCIATES  (702) 386-9322

---

76

1            REPORTER'S CERTIFICATE

2

3  STATE OF NEVADA     )

                      ) ss

   COUNTY OF CLARK     )

4

5       I, William C. LaBorde, a duly commissioned

   Notary Public, Clark County, State of Nevada, do

6  hereby certify:

7       That I reported the taking of the Rule 2004

   Examination of the witness, DEL M. BUNCH, JR., at

8  the time and place aforesaid:

9       That prior to being examined, the witness was

   by me duly sworn to testify to the truth, the whole

10 truth, and nothing but the truth:

11      That I thereafter transcribed my shorthand

   notes into typewriting and that the typewritten

12 transcript of said Rule 2004 Examination is a

   complete, true and accurate record of testimony

13 provided by the witness at said time to the best of

   my ability.

14

15      I further certify (1) that I am not a

   relative, employee or independent contractor of

16 counsel of any of the parties: nor a relative,

   employee or independent contractor of the parties

17 involved in said action: nor a person financially

   interested in the action: nor do I have any other

18 relationship with any of the parties or with counsel

   of any of the parties involved in the action that

19 may reasonably cause my impartiality to be

   questioned; and (2) that transcript review was not

20 requested.

21      IN WITNESS WHEREOF, I have hereunto set my

   hand in the County of Clark, State of Nevada, this

22 19th day of December 2006.

23      _____

24      William C. LaBorde, CCR 673, RPR, CRR

25

LAURIE WEBB & ASSOCIATES  (702) 386-9322

## $

**$10** [3] - 28:11; 30:19; 31:9
**$10,000,000** [1] - 19:19
**$10,500,000** [3] - 32:4, 17, 21
**$10,500.00** [1] - 20:10
**$196** [1] - 23:17
**$196,000** [3] - 22:11; 23:4; 26:10
**$200,000** [1] - 49:25
**$217,000** [2] - 25:12, 19
**$45,000** [1] - 45:11
**$50** [1] - 56:4
**$50,000** [1] - 43:17
**$500,000** [2] - 19:21; 20:22
**$525,000** [1] - 21:2

## '

**'03** [5] - 7:19; 39:3; 40:22; 66:5
**'04** [4] - 14:6; 15:20; 18:25; 27:7
**'05** [12] - 19:1; 20:4; 21:9; 29:9, 18, 20, 23; 30:2; 31:8; 34:20
**'06** [7] - 21:9; 24:11; 32:7; 35:14; 59:2; 74:4
**'81** [1] - 10:11
**'90s** [1] - 10:15
**'98** [2] - 34:14
**'99** [2] - 34:15; 47:3
**'X'** [1] - 54:3

## 0

**01/31/2006** [1] - 3:22
**02/28/2006** [1] - 3:23
**02/5/06** [1] - 20:11
**03/31/2006** [1] - 3:24
**06** [1] - 54:15

## 1

**1** [5] - 2:5; 14:18; 20:11; 51:8; 76:14
**1,105,000** [1] - 44:8
**10** [19] - 14:3; 15:4, 20; 18:14; 30:20; 50:16, 19
**100** [1] - 39:23
**1099** [3] - 3:18; 61:20
**10th** [1] - 25:11
**11** [4] - 1:7; 55:2, 4;

57:16
**12** [3] - 16:10; 17:6; 19:11
**13** [2] - 47:25; 48:22
**13th** [12] - 7:5; 26:11, 22, 25; 27:4; 35:1, 5, 7, 14; 54:17, 19; 59:2
**19** [1] - 1:22
**1909** [2] - 1:23; 5:13
**196** [2] - 22:25; 23:6
**196,000** [1] - 23:18
**1992** [1] - 67:10
**1999** [1] - 47:23
**19th** [1] - 76:21
**1:00** [1] - 51:21
**1st** [2] - 10:11; 20:21

## 2

**2** [3] - 47:24; 48:22; 76:19
**2/1/06** [1] - 23:3
**2/5/06** [1] - 23:1
**2/6/06** [1] - 23:1
**20** [11] - 3:13; 16:5, 12, 17, 22; 17:1, 7, 23; 29:15, 21; 49:8
**2000** [14] - 3:25; 8:3, 24; 11:23; 14:4, 21; 33:18; 34:16; 38:9; 47:3, 23; 71:7, 12; 72:23
**2001** [6] - 3:12; 4:2; 15:10; 72:2; 73:4, 18
**2002** [4] - 4:3; 67:11, 14; 73:19
**2003** [7] - 3:13; 4:4; 42:23; 43:14; 44:7; 45:12; 73:20
**2004** [13] - 1:21; 3:9; 4:5; 5:17; 28:10; 29:19; 32:12; 73:22; 75:17; 76:7, 12
**2005** [11] - 4:6; 19:10, 15; 20:21; 30:16; 31:21; 34:23; 35:15; 47:4; 72:23; 73:23
**2006** [14] - 1:22; 21:1; 23:8; 24:3; 25:11, 20; 26:11, 22; 27:1, 5; 31:21; 35:1; 54:18; 76:21
**200___** [1] - 75:23
**20th** [1] - 39:3
**217,000** [1] - 23:15
**22** [1] - 3:10
**22nd** [1] - 28:2
**233** [1] - 2:9
**23rd** [1] - 45:12

**24** [8] - 3:22-24; 18:18; 19:3, 12, 15; 32:1
**24%** [1] - 20:11
**242-9487** [1] - 42:12
**26** [2] - 14:21; 15:10
**27** [1] - 3:12
**275** [1] - 23:14
**2850** [1] - 2:4
**2:00** [1] - 51:21
**2:11** [1] - 1:23

## 3

**30** [1] - 17:14
**30th** [1] - 71:12
**31st** [4] - 47:4, 23; 66:5; 71:14
**33** [2] - 56:5; 57:11
**349** [1] - 65:12
**3:28** [1] - 61:16
**3:34** [1] - 61:17
**3:39** [1] - 66:14
**3:46** [1] - 66:15
**3:53** [1] - 74:18

## 4

**4** [1] - 7:19
**400** [1] - 2:14
**4:00** [1] - 51:21
**4th** [1] - 20:3

## 5

**5** [17] - 3:4, 9-10, 12-13, 15-19; 19:20; 21:18; 22:4; 30:16, 20-21; 66:20
**50,000** [1] - 43:17
**5th** [2] - 20:3; 30:16; 31:21

## 6

**673** [2] - 1:25; 76:23
**6th** [1] - 21:1

## 7

**73** [1] - 6:5
**74** [6] - 3:25; 4:2
**79** [2] - 6:4, 8

## 8

**8** [3] - 56:5; 57:11; 66:20
**89101** [2] - 2:10, 15
**89146-5308** [1] - 2:5
**8th** [1] - 40:22

## 9

**9** [1] - 3:9
**99** [2] - 31:3; 36:8
**9th** [2] - 25:20; 42:23

## A

**A-l-l-r-e-d** [1] - 41:22
**a.k.a** [1] - 57:10
**ability** [3] - 33:8, 13; 76:13
**able** [5] - 17:13, 22; 27:8; 56:25; 68:19
**absolute** [1] - 30:10
**accept** [3] - 50:23; 60:14; 61:6
**accepted** [1] - 32:21
**accommodated** [1] - 50:23
**account** [12] - 25:2, 11; 26:6, 10, 19; 43:1; 62:1; 63:1; 65:2, 13
**accountant** [3] - 34:10; 47:14; 48:17
**accountant's** [1] - 48:17
**accountants** [1] - 47:12
**accurate** [5] - 21:14; 25:15; 39:21, 24; 76:12
**ACH** [1] - 65:12
**acquiring** [1] - 9:20
**action** [4] - 75:17; 76:16
**actual** [1] - 22:6
**addition** [2] - 20:21; 21:1
**additional** [8] - 15:6, 22, 24; 20:1; 21:22; 54:6; 60:2
**address** [2] - 5:12; 42:9
**administrative** [1] - 57:9
**Advertising** [1] - 8:6
**ADVISORS** [1] - 1:7
**affecting** [1] - 6:3
**affiliates** [1] - 6:21
**affix** [1] - 75:18
**aforesaid** [1] - 76:8
**afternoon** [1] - 5:24
**agree** [6] - 21:3; 25:23; 27:9; 28:24; 39:4; 44:10
**agreed** [2] - 30:7; 31:17
**agreement** [2] - 50:16, 18

**ahead** [1] - 74:1
**Allison** [6] - 6:24; 38:1; 57:1; 60:10, 13
**Allowing** [1] - 3:20
**allowing** [1] - 14:15
**Allred** [1] - 41:20
**almost** [1] - 46:2
**alternative** [1] - 56:12
**amendment** [1] - 14:25
**amount** [14] - 21:19; 23:15, 19; 25:11, 19; 26:10; 43:15; 44:7; 45:7; 49:10; 54:23; 56:8, 13
**amounts** [4] - 39:4; 49:12; 56:4; 57:8
**analysis** [1] - 46:17
**annum** [2] - 16:5; 17:2
**answer** [10] - 5:24; 42:15; 45:14, 18; 55:12-14; 58:2; 62:17
**apartment** [2] - 11:9; 53:1
**appear** [1] - 14:13
**APPEARANCES** [1] - 2:1
**appreciate** [1] - 69:24
**APR** [1] - 17:14
**April** [7] - 7:5; 35:4, 7, 9, 13-14; 54:15, 17, 19; 59:2
**area** [3] - 30:7; 59:17
**arrangement** [1] - 12:25
**assets** [3] - 60:5; 69:9, 19
**assignments** [1] - 18:5
**assume** [7] - 5:15; 26:18; 28:4; 49:9; 54:16; 65:24; 70:7
**attach** [1] - 70:6
**attached** [6] - 14:11, 17-18; 38:21; 47:9; 64:8
**attachment** [1] - 73:14
**attorney** [3] - 24:25; 57:16; 60:13
**attorneys** [1] - 48:9
**audited** [1] - 34:10
**auditor** [1] - 38:23
**August** [2] - 42:23; 72:8
**automatically** [1] - 30:6

**available** [3] - 56:14; 57:9, 11
**aware** [5] - 7:13; 8:2, 4, 19; 16:18

## B

**B-u-n-c-h** [1] - 5:11
**balance** [8] - 32:4; 47:2, 20, 22-23; 48:25; 49:5
**Balance** [1] - 3:17
**bank** [21] - 7:16; 10:20; 24:1, 24; 25:1, 18; 26:6, 10; 39:17; 43:13; 45:13; 65:9; 70:3, 12-13, 19; 72:11, 14; 73:19, 23
**Bank** [13] - 3:16, 22-25; 4:2-6; 24:12; 39:16; 70:11
**bank's** [2] - 46:23
**bankruptcy** [6] - 34:25; 35:18; 48:10; 54:6; 56:23; 58:20
**Bankruptcy** [1] - 54:20
**BANKRUPTCY** [1] - 1:1
**BankWest** [5] - 70:20; 73:20
**base** [1] - 39:15
**based** [5] - 20:15, 22; 21:15; 32:3; 68:1
**basic** [2] - 16:5; 28:19
**bath** [1] - 56:3
**became** [2] - 8:2; 13:21, 25
**become** [3] - 7:13; 8:4; 18:8
**begin** [1] - 7:12
**beginning** [4] - 9:19; 59:4; 62:3
**behind** [2] - 13:20; 48:25
**belief** [2] - 55:3; 57:8
**believer** [1] - 9:25; 26:16
**Bellflower** [1] - 11:7
**below** [1] - 23:5
**beneficial** [3] - 13:9, 18; 18:12
**best** [3] - 39:20, 23; 76:13
**bet** [4] - 17:17; 24:4; 38:17; 64:3
**better** [2] - 7:9; 25:16
**between** [3] - 14:20; 15:1; 29:19

**bit** [3] - 7:3; 51:19; 63:12
**BK-S-06-10725** [1] - 1:4
**BK-S-06-10726** [1] - 1:4
**BK-S-06-10727** [1] - 1:5
**BK-S-06-10728** [1] - 1:5
**BK-S-06-10729** [1] - 1:6
**borrow** [1] - 50:19
**borrowed** [1] - 17:23
**borrower** [3] - 13:12, 14, 20
**borrowing** [1] - 17:7
**Boulevard** [1] - 2:4
**break** [2] - 6:9, 16-17; 27:23; 61:11
**broker** [1] - 8:22
**broker's** [1] - 16:12
**brought** [1] - 52:3
**builders** [1] - 12:16
**building** [1] - 9:22
**buildings** [1] - 11:9
**built** [2] - 11:8; 18:13
**BUNCH** [6] - 1:21; 3:3; 5:5; 75:16, 20; 76:7
**Bunch** [14] - 2:12; 3:9, 11-12, 14, 20; 5:11; 10:21; 14:16; 24:5, 24; 64:12, 14; 66:13
**Bundy** [1] - 59:20
**business** [15] - 8:17; 10:17; 11:3, 11, 13; 12:17, 19; 18:10; 33:23; 57:18-20, 22, 25; 64:14
**BY** [17] - 5:9, 22; 15:16; 22:23; 24:23; 28:1; 34:6; 35:6, 11; 37:1; 55:11; 56:21; 61:18; 62:19; 63:20; 66:18; 67:7

## C

**C-y-d** [2] - 42:3
**calculated** [1] - 54:17
**California** [6] - 10:8; 11:8; 59:17-19; 68:21
**cannot** [1] - 5:24
**Canyon** [1] - 59:20
**Capital** [24] - 2:7; 7:20, 23; 8:20; 10:19; 13:1; 25:19, 24; 26:9,

22; 28:11; 29:7; 30:25; 32:8; 33:12; 39:10; 43:2; 45:23; 46:12; 50:9; 64:4; 65:22, 25; 66:2
**CAPITAL** [3] - 1:7, 11, 14
**Capital's** [1] - 33:13
**Capital/Mortgage** [1] - 12:18
**card** [1] - 8:17
**Carlyon** [1] - 2:9
**Case** [1] - 1:3
**case** [5] - 6:20, 23; 40:14; 55:4, 19
**cash** [1] - 57:2
**caused** [1] - 28:10
**CCR** [2] - 1:25; 76:23
**Center** [1] - 36:8
**certain** [2] - 30:4; 69:11
**certainty** [1] - 52:21
**CERTIFICATE** [2] - 75:1; 76:1
**certify** [3] - 75:16; 76:6, 14
**cetera** [6] - 13:10, 25; 49:3; 57:2, 4, 10
**challenged** [1] - 60:19
**chance** [3] - 59:21; 62:5
**change** [1] - 7:18
**CHANGE** [1] - 75:2
**Chapter** [4] - 1:7; 55:2, 4; 57:16
**charge** [20] - 19:6, 16, 20, 23; 20:1, 5, 23; 21:2, 15-16; 22:3, 5; 29:8; 30:3, 5, 17, 22; 32:20
**charges** [4] - 21:7; 54:6; 57:3
**Charisse** [1] - 42:6
**Charles** [1] - 48:11
**check** [32] - 13:13, 17; 14:4; 29:21; 31:9; 40:2, 21, 23; 41:2; 42:14, 23; 43:1, 3, 8-9; 44:6, 13, 18; 45:1; 46:5; 51:7; 52:2, 6, 15; 53:10; 54:2; 64:13
**checked** [2] - 13:22; 60:17
**checks** [34] - 26:4; 40:3-5, 10, 14; 41:5, 11, 18; 42:15; 43:6; 44:15, 19, 24; 45:10; 49:13; 51:16; 52:19;

53:16, 19, 24; 62:2, 6, 11, 24; 63:4, 19; 64:2, 20; 65:2; 67:1, 6, 13
**Checks** [2] - 3:15
**children** [2] - 60:20, 25
**claim** [3] - 14:11, 16
**Claim** [1] - 3:20
**CLARK** [1] - 76:3
**Clark** [2] - 76:5, 21
**clear** [2] - 32:11; 51:2
**cleared** [2] - 45:13; 64:23
**clearing** [2] - 43:5, 7
**clearly** [1] - 42:18
**client** [4] - 7:3, 10; 67:17
**Code** [1] - 54:20
**cold** [1] - 5:25
**collateral** [4] - 18:4; 59:14; 60:2, 4
**collateralized** [2] - 35:24; 59:10
**collateralizing** [1] - 36:5
**collected** [1] - 57:3
**collecting** [4] - 54:24; 58:9, 12, 16
**collection** [2] - 57:24; 58:5
**column** [4] - 22:10, 16; 23:2
**columns** [1] - 22:9
**comfort** [1] - 33:6
**comfortable** [2] - 13:24
**coming** [2] - 27:8; 65:2
**Commercial** [47] - 3:15; 6:20; 7:13, 19-20, 24; 8:20; 12:1; 13:1, 5, 19, 23; 14:20; 15:2; 16:9; 25:10; 36:10; 37:13; 39:22; 40:15-17, 24; 43:25; 44:3, 11; 45:11; 46:9, 11, 13; 47:3; 49:6, 11, 16; 54:24; 56:2; 57:12; 61:21, 25; 62:11, 25; 65:3, 21, 25; 68:2; 72:16
**COMMERCIAL** [5] - 1:4; 20:10; 65:11; 66:4
**commercial** [2] - 9:4, 7
**commissioned** [1] - 76:5
**Committee** [2] - 2:7;

48:12
**communicated** [1] - 44:22
**communicating** [2] - 44:25; 45:2
**communication** [4] - 30:1, 24; 31:3, 12
**communications** [1] - 29:6
**companies** [1] - 12:21
**company** [15] - 7:1, 13; 8:5, 16, 20; 10:3, 17; 11:7; 13:3, 15, 17; 36:19; 37:4; 49:18
**COMPANY** [1] - 1:4
**Company** [2] - 12:18; 47:3
**Compass** [1] - 58:5
**complete** [7] - 47:18; 48:1, 3, 7, 16, 23; 76:12
**completed** [2] - 9:14; 74:8
**completely** [1] - 42:4
**computer** [1] - 60:19
**computers** [1] - 60:20
**concerning** [5] - 33:13; 37:6, 8; 38:22; 61:2
**conclusion** [1] - 55:9
**conclusions** [5] - 21:21; 25:1; 46:3, 15; 49:12
**confirm** [5] - 21:21; 25:1; 46:3, 15; 49:12
**confirmed** [3] - 55:3, 20; 57:17
**confusing** [1] - 63:14
**consensual** [2] - 55:23, 25
**consider** [2] - 28:15; 29:3
**considerably** [1] - 57:11
**consisting** [2] - 6:22; 66:20
**Consolidated** [3] - 3:17; 12:21; 13:10
**consolidated** [1] - 47:22
**construction** [2] - 11:7, 12
**contact** [3] - 5:18; 8:7
**contacted** [1] - 8:9
**contacting** [1] - 8:24
**continued** [1] - 29:20
**continuing** [1] - 56:18

**contractor** [2] - 76:15
**Convention** [1] - 36:8
**conversation** [4] - 32:19; 33:16; 36:1; 60:12
**conversations** [5] - 32:6; 36:2; 58:19; 68:15; 69:14
**copies** [9] - 25:2; 37:20; 40:5, 9; 46:5; 61:20; 62:6; 67:5, 17
**Copies** [1] - 3:16
**copy** [8] - 14:11; 24:7; 28:4; 36:13; 46:18; 54:13; 70:4
**correct** [13] - 7:22; 13:4; 16:6; 17:24; 18:6; 25:12, 20; 26:11; 28:6; 30:11; 46:17, 19; 74:7
**Correct** [16] - 9:9; 15:25; 17:20; 19:22; 20:24; 21:17; 25:21; 26:7; 29:13; 30:18; 32:2; 35:17; 45:8; 50:10; 66:24; 70:15
**corrected** [1] - 75:18
**correspondence** [1] - 27:6
**counsel** [2] - 76:15, 17
**count** [1] - 72:25
**counted** [1] - 17:15
**COUNTY** [1] - 76:3
**County** [2] - 76:5, 21
**couple** [2] - 51:11; 59:5
**course** [3] - 34:21; 50:14; 54:25
**court** [2] - 5:15; 49:5
**COURT** [1] - 1:1
**Court** [2] - 1:23; 5:13
**cover** [2] - 47:13; 48:18
**covering** [1] - 49:1
**crazy** [1] - 63:23
**credit** [1] - 26:5
**creditor** [2] - 55:20; 56:1
**creditors** [5] - 56:2, 7, 14; 57:12; 58:10
**Creditors'** [1] - 48:12
**CRR** [2] - 1:25; 76:23
**cumbersome** [1] - 13:22
**Cyd** [15] - 41:20, 25; 42:6; 43:22; 44:8, 22; 45:20; 46:8, 13;

51:15, 17; 52:2, 15; 53:21, 23

## D

**daily** [1] - 23:23
**dark** [1] - 7:4
**DATE** [1] - 54:11
**date** [18] - 15:9, 11-12; 18:22, 25; 22:11, 19; 23:2; 25:23; 29:24; 35:2; 40:21; 43:10; 49:13; 54:14, 18, 23
**date's** [1] - 43:11
**date)** [1] - 54:16
**dated** [8] - 14:21; 27:14; 39:4; 42:23; 43:14; 44:7; 45:12; 67:13
**dates** [2] - 49:12; 59:6
**days** [3] - 23:20; 30:4; 51:12
**DBA** [6] - 10:19, 21-22; 41:18; 63:10; 64:14
**deal** [1] - 49:25
**deals** [1] - 48:24
**debt** [1] - 60:2
**Debtor** [5] - 1:5, 9, 12, 16, 19
**debtors** [2] - 6:19
**Debtors** [2] - 2:2
**December** [9] - 1:22; 23:12, 21; 40:22; 47:4, 23; 71:12; 76:21
**decide** [1] - 28:10
**decision** [1] - 61:4
**declaration** [1] - 47:10
**declarations** [1] - 38:21
**declare** [1] - 75:16
**Deed** [3] - 2:7; 58:14
**DEED** [2] - 1:11, 14
**deeds** [3] - 18:5, 12; 58:9
**default** [6] - 18:18, 21; 29:17; 30:5; 31:18; 57:3
**DEL** [6] - 1:21; 3:3; 5:5; 75:16, 20; 76:7
**Del** [8] - 3:20; 5:11; 10:21; 14:16; 49:24; 64:12, 14; 68:18
**delivered** [1] - 53:11
**Deloitte** [1] - 68:8
**demand** [2] - 27:3, 9
**deposit** [7] - 15:15,

17; 18:23; 62:4; 63:19, 24
**deposited** [2] - 25:10; 26:4
**described** [1] - 56:24
**DESCRIPTION** [2] - 3:8; 4:1
**determined** [1] - 50:3
**developer** [1] - 13:4
**developers** [4] - 9:18; 13:8; 16:10; 17:11
**development** [4] - 9:17; 10:13; 11:3, 13
**developments** [1] - 68:20
**Dickinson** [12] - 8:13, 15; 11:21, 25; 31:4; 32:8; 33:12, 17; 49:15; 51:9, 16; 68:24
**difference** [1] - 55:1
**different** [8] - 25:15; 35:8; 38:18; 49:2; 50:22; 51:12; 61:6; 62:21
**dinner** [2] - 12:5, 14
**direct** [3] - 56:9; 58:13; 68:15
**discussed** [4] - 12:14; 59:12; 60:13
**discussion** [1] - 33:18
**Discussion** [1] - 27:25
**discussions** [2] - 17:25; 33:11
**DISTRICT** [1] - 1:2
**Diversified** [1] - 58:14
**DIVERSIFIED** [1] - 1:11
**document** [16] - 14:2; 18:17; 20:16, 20; 21:4; 22:8; 25:13; 26:12; 36:18; 39:14; 47:18; 48:1, 4, 8; 66:20, 22
**document's** [1] - 20:18
**documentation** [3] - 17:1; 23:24; 39:15
**Documents** [2] - 3:25; 4:2
**documents** [6] - 26:17; 36:13; 37:5, 7; 47:9; 48:13
**dog** [1] - 11:20
**dollar** [1] - 29:5
**dollars** [3] - 16:13;

32:13; 54:3
**Don** [13] - 12:7; 39:13; 42:19, 24; 44:23; 51:15, 17; 52:2; 53:17, 24; 54:9; 61:5
**done** [3] - 5:20; 69:10; 74:11
**doubt** [2] - 40:19; 68:8
**down** [4] - 12:20; 22:25; 36:7; 43:10
**Driggs** [1] - 2:13
**driver** [1] - 50:7
**due** [7] - 18:22; 20:1, 3; 23:1; 29:9, 24; 56:4
**Due** [1] - 20:11
**duly** [3] - 5:6; 76:5, 9
**dumb** [1] - 71:15
**dump** [1] - 32:17
**dumping** [1] - 32:13
**During** [2] - 31:24; 52:20

## E

**Early** [1] - 8:3
**early** [7] - 10:15; 11:23; 15:20; 23:16, 18; 27:7; 34:16
**earn** [1] - 16:13
**earned** [1] - 11:12
**effect** [3] - 18:21; 19:11, 17
**either** [4] - 33:12; 56:8; 58:13; 68:24
**employee** [2] - 76:15
**end** [1] - 45:17
**enjoy** [1] - 57:15
**entities** [1] - 58:16
**entitled** [2] - 22:16; 65:2
**entity** [5] - 36:16; 37:17; 40:3; 45:16; 63:7
**entrance** [1] - 51:20
**entry** [2] - 22:14
**Equity** [1] - 2:7
**Ernestine** [4] - 2:12; 3:20; 14:16; 64:12
**ESQ** [3] - 2:3, 8, 13
**estate** [16] - 8:21, 25; 9:4, 7-8, 10, 17; 10:6, 13; 11:3, 11; 13:4, 7; 36:4; 56:24; 68:20
**et** [6] - 13:10, 25; 49:3; 57:2, 4, 10
**event** [1] - 15:14
**exam** [1] - 5:17
**Examination** [6] -

3:4; 74:17; 75:17; 76:7, 12
**EXAMINATION** [2] - 1:21; 5:8
**examined** [2] - 5:7; 76:9
**example** [2] - 40:20; 71:3
**except** [2] - 9:5; 74:11
**executed** [1] - 15:1
**exhibit** [4] - 39:12; 64:8; 70:6; 71:5
**Exhibit** [34] - 14:14, 17; 20:8; 25:9, 17; 26:8; 27:13, 19; 28:2; 29:2; 38:23; 39:2, 8; 40:6, 9; 46:19; 47:1; 54:5; 61:19; 64:9; 65:20; 67:5, 8; 70:10; 71:10; 72:1; 73:11, 17-19, 21
**exhibits** [1] - 71:3
**Exhibits** [4] - 5:2; 24:21; 74:6, 15
**exit** [1] - 57:4
**expecting** [1] - 7:8
**experience** [3] - 8:24; 9:2; 10:5
**explain** [1] - 58:8
**explaining** [1] - 49:2
**explains** [1] - 69:8
**extend** [3] - 30:7, 10; 31:17
**extension** [4] - 17:18; 19:8; 31:20, 22
**extent** [2] - 55:8; 58:13
**extra** [2] - 51:5; 53:24

## F

**fact** [3] - 20:22; 49:5; 60:1
**factual** [1] - 46:5
**family** [3] - 9:12, 14; 11:9
**far** [1] - 38:9
**fax** [2] - 60:23; 61:2
**fear** [1] - 35:19
**February** [29] - 14:6; 18:24; 19:1, 10, 15; 20:3, 20, 25; 21:9; 23:15, 19-20; 25:3, 17, 20; 29:9, 18-19, 23; 30:2, 16; 31:20; 32:7
**fee** [2] - 16:12; 19:8
**fees** [4] - 17:16, 18;

57:4, 9
**felt** [1] - 12:19
**few** [2] - 61:23; 64:1
**figure** [4] - 17:5; 23:6; 31:14; 55:24
**filed** [3] - 34:22; 35:1, 19
**Filing** [1] - 35:3
**filing** [2] - 35:16; 58:20
**Financial** [1] - 6:23
**financial** [24] - 18:9; 33:25; 34:1, 9, 13, 23; 35:15; 37:14, 18, 21; 38:14, 16, 22; 39:4; 47:11; 48:16, 23; 57:1; 66:22; 67:18; 68:1, 14; 69:20; 70:10
**financially** [1] - 76:16
**financials** [2] - 13:24; 49:3
**fine** [2] - 6:12, 14
**firm** [1] - 38:5
**Firm** [1] - 2:4
**first** [20] - 5:6; 7:13; 8:1, 11; 14:3; 18:3; 29:8; 34:15; 39:3; 41:6, 23; 44:5, 17; 47:22; 49:7; 59:11; 63:17; 64:1; 65:7; 71:6
**First** [3] - 2:7; 31:2; 58:13
**FIRST** [1] - 1:14
**firsthand** [1] - 7:6
**Floor** [2] - 2:10, 15
**followed** [1] - 48:22
**follows** [1] - 5:7
**force** [2] - 50:19, 21
**foregoing** [1] - 75:17
**format** [1] - 47:11
**forms** [2] - 61:20
**Forms** [1] - 3:18
**fortunately** [1] - 65:9
**forward** [2] - 9:20; 38:9
**forwards** [1] - 13:17
**four** [4] - 12:11; 15:5; 63:17; 65:8
**four-year** [1] - 15:5
**Fourth** [2] - 2:9, 14
**fractional** [1] - 58:15
**frame** [4] - 15:5; 30:7; 52:20; 63:12
**frames** [1] - 31:16
**free** [1] - 6:16
**FROM** [1] - 23:2
**front** [2] - 40:8; 51:20
**full** [1] - 27:10

**FUND** [2] - 1:11, 15
**Fund** [3] - 2:7; 58:14
**funds** [3] - 11:1, 10; 56:9

## G

**gal** [1] - 41:4
**gate** [3] - 52:4, 16; 53:11
**general** [1] - 59:17
**generally** [1] - 7:23
**Generally** [1] - 9:3
**generate** [2] - 17:13, 22
**given** [5] - 37:22; 48:7, 9; 66:23; 69:21
**great** [2] - 68:19; 69:9
**group** [2] - 9:24; 11:17
**guard** [4] - 51:20; 52:3, 16; 53:11
**guess** [6] - 20:8; 33:7, 17; 35:18; 43:6; 55:6; 61:10; 64:4

## H

**hand** [2] - 68:12; 76:21
**handed** [2] - 61:19; 66:19
**handle** [1] - 58:2
**handled** [2] - 63:18
**handling** [1] - 58:5
**Hantges** [10] - 6:25; 12:2; 26:25; 27:3; 33:17, 23; 49:15; 58:20, 22; 68:24
**Hantges's** [1] - 37:21
**hard** [2] - 42:17; 43:9
**head** [2] - 50:13; 51:4
**headed** [1] - 6:23
**hear** [3] - 36:19; 37:4, 19
**heck** [1] - 17:5
**hell** [1] - 11:4
**help** [1] - 59:8
**hereby** [3] - 75:16, 18; 76:6
**herein** [1] - 75:16
**hereunto** [1] - 76:20
**Hilson** [1] - 3:13
**hit** [3] - 15:5, 20; 26:19
**hitting** [1] - 26:6
**HMA** [6] - 36:20, 22, 25; 37:2, 8, 12

**HMS** [2] - 36:21, 23
**Holders** [1] - 2:7
**Holley** [2] - 5:14; 69:25
**HOLLEY** [42] - 2:13; 15:13; 22:13, 17; 24:5, 10, 13, 16, 20; 34:1, 4; 35:4, 10; 55:5, 7; 56:16, 19; 63:9, 11, 14; 66:8, 11; 67:3, 5; 70:2, 22, 25; 71:2, 8, 13, 17, 25; 72:4, 7, 19, 21, 24; 73:3, 9, 13; 74:5, 10
**home** [6] - 9:12, 14; 53:4-6; 74:13
**homes** [2] - 9:22; 11:9
**hoping** [1] - 69:11
**Hotel** [4] - 36:7, 14; 37:8; 59:12
**hotel** [2] - 37:6, 17
**house** [2] - 52:22, 24

## I

**idea** [4] - 28:21; 57:23; 62:13; 64:3
**ideas** [1] - 56:13
**identical** [1] - 73:1
**identification** [3] - 5:3; 24:22; 74:16
**identified** [1] - 59:22
**identify** [2] - 8:15; 59:6
**illegible** [1] - 42:18
**imagine** [1] - 18:13
**immediate** [1] - 26:5
**immediately** [1] - 74:12
**impartiality** [1] - 76:18
**important** [2] - 55:22; 69:13
**impression** [1] - 7:24
**IN** [1] - 76:20
**including** [2] - 49:7; 67:14
**increase** [1] - 56:13
**INCURRED** [1] - 54:11
**incurred** [2] - 54:14
**independent** [3] - 68:5; 76:15
**indicate** [1] - 20:15
**indicates** [1] - 26:9
**individual** [1] - 56:9
**information** [9] - 18:9; 57:1, 6; 60:18; 61:1; 67:23; 68:9, 13;

69:18
**infrastructure** [1] - 9:21
**Integrated** [2] - 12:22; 13:10
**intent** [1] - 29:4; 72:24; 73:3
**Interest** [1] - 54:6
**interest** [32] - 13:9, 13, 18; 16:4, 10, 17, 22; 17:1; 18:12, 18, 21; 19:2; 23:12, 17, 19; 29:12, 14, 21; 32:1, 23; 33:3; 49:8; 54:15, 17, 23; 57:4; 58:15; 63:17
**interested** [4] - 15:22; 33:1; 76:17
**interesting** [1] - 38:13
**Internet** [1] - 60:18
**interpose** [2] - 55:5, 8
**interpreted** [1] - 62:20
**interruption** [1] - 27:22
**invest** [1] - 50:9
**invested** [1] - 50:6
**Investment** [5] - 67:23; 68:16; 69:10, 18
**Investments** [1] - 8:18
**investments** [3] - 10:24; 39:9; 67:23
**Investors** [13] - 40:18, 24; 43:25; 44:2, 12, 16; 45:12, 24; 46:3, 14; 62:12, 25; 65:4
**involved** [4] - 48:10; 59:16; 76:16, 18
**involving** [2] - 36:13; 41:18
**issued** [1] - 14:5
**issues** [1] - 41:4
**item** [1] - 54:15
**items** [2] - 40:1; 54:11
**itself** [1] - 20:16

## J

**January** [11] - 23:11, 21, 25; 25:3, 11; 31:8; 66:5; 71:14, 19, 21; 72:5
**January's** [1] - 23:17
**job** [2] - 57:15

69:18
**Joe** [4] - 33:23; 36:3; 58:23; 60:10
**Johnson** [1] - 2:14
**Jones** [1] - 2:4
**Joseph** [1] - 6:24
**JR** [6] - 1:21; 3:3; 5:5; 75:16, 20; 76:7
**July** [9] - 3:10; 10:11; 27:14, 17; 28:2, 10; 29:19; 43:14; 72:23
**June** [10] - 3:9, 13; 11:23; 14:4, 21; 15:10; 32:11; 39:3; 44:7

## K

**Kearney** [1] - 2:13
**keep** [1] - 28:22
**keeping** [1] - 70:23
**kept** [1] - 28:20
**kicked** [1] - 30:6
**kind** [3] - 8:19; 9:10; 31:12
**knowledge** [4] - 7:6; 39:20, 23; 68:6
**known** [1] - 36:16

## L

**Label** [1] - 71:1
**label** [2] - 71:2, 23
**LaBorde** [3] - 1:25; 76:5, 23
**land** [1] - 9:20
**lap** [2] - 32:13, 18
**large** [1] - 55:25
**Las** [14] - 1:24; 2:5, 10, 15; 9:18; 10:4, 8-9, 13; 11:6; 12:16; 36:8; 42:8; 57:25
**last** [13] - 14:4; 15:14, 17; 18:23; 22:10, 13, 15; 34:18, 20; 41:21; 54:15; 59:5
**Last** [1] - 15:15
**late** [19] - 19:6, 15-16, 20, 23; 20:1, 5, 23; 21:2, 7, 15-16; 22:5; 29:8; 30:3, 5, 16, 22; 32:20; 57:3
**Latter** [1] - 27:17
**law** [7] - 12:8; 20:13; 38:5; 39:13; 42:24; 61:5
**Law** [1] - 2:4
**LBR** [5] - 1:4
**least** [4] - 11:22; 39:7; 45:13; 54:12
**leave** [2] - 28:11; 51:19

leaves [1] - 53:24
legal [2] - 55:9, 17
Lenard [4] - 22:13;
23:8; 24:10; 70:23
LENARD [1] - 2:3
lenders [2] - 56:9;
58:13
less [1] - 23:20
lesser [3] - 23:19;
54:23; 56:8
Letter [4] - 3:9, 12
letter [11] - 10:1;
27:12, 18; 28:2-4;
29:1; 32:11; 38:23;
39:2
Lewis [2] - 38:6
licensed [2] - 8:21;
10:17
lien [1] - 37:12
LINE [1] - 75:2
line [1] - 23:4
lines [1] - 49:2
list [6] - 39:8, 21;
40:11; 43:16; 49:8, 13
listed [1] - 49:6
lived [1] - 10:9
LLC [5] - 1:8, 11, 15,
18; 2:7
Loan [2] - 10:19;
64:3
loan [19] - 8:21; 10:6;
11:3, 11; 13:3-5; 14:1;
16:12; 17:15; 21:22;
35:24; 36:5; 49:20,
25; 50:3, 7; 59:10
loan's [1] - 17:8
loaned [1] - 49:21
loaning [2] - 16:9;
49:17
loans [26] - 8:25; 9:4,
8, 11, 14, 19; 10:13;
12:16, 20-21, 25;
13:7, 9, 11; 15:4, 6;
16:12, 16, 22; 17:1, 6,
10; 58:15; 69:3
located [1] - 11:7
location [1] - 10:7
look [6] - 6:12; 21:4;
40:1; 42:15; 46:14;
47:10
Look [2] - 67:9
looked [1] - 37:19
looking [7] - 7:15;
22:14; 26:8; 45:9;
46:1, 4; 66:3
looks [8] - 17:6;
21:18; 23:2; 39:8;
40:14; 43:9; 61:19;
66:21
losing [1] - 17:9

love [1] - 61:15
Ltd [1] - 2:9
Lucky [1] - 16:1
lump [1] - 32:21
lump-sum [1] - 32:21

## M

machine [2] - 60:24;
61:2
magically [1] - 60:23
mail [2] - 47:8; 63:23
major [1] - 55:20
majority [1] - 69:9
male [1] - 42:5
management [1] -
6:22
March [12] - 3:12;
14:5; 23:18; 25:4;
26:10, 22, 25; 27:4;
35:1, 10, 12; 72:23
mark [2] - 24:15, 17
marked [14] - 5:3;
23:2; 24:22, 24; 25:9;
27:12, 19; 29:2; 40:7;
47:24; 65:20; 74:6, 16
MARKED [2] - 3:8;
4:1
marking [1] - 74:12
matter [3] - 6:21;
59:7, 9
matures [1] - 15:9
maturity [1] - 15:11
McPherson [1] - 2:4
mean [6] - 9:24;
19:12; 31:8; 32:10;
57:13; 67:11
meaning [1] - 51:20
means [6] - 17:8;
51:22; 52:1; 54:16;
65:24; 66:21
meant [1] - 36:15
medication [1] - 5:25
meet [1] - 11:24
meeting [2] - 12:5;
44:17
meets [1] - 48:18
memory [1] - 7:10
mental [1] - 5:23
mentioned [4] -
12:15; 14:10; 15:21;
18:5
mentions [1] - 18:22
Mesirow [3] - 6:22;
57:10, 14
met [3] - 11:21, 23;
12:3
might [1] - 58:8
Might [1] - 12:22
Milanowski [18] -

3:9, 12; 6:25; 26:25;
27:4; 28:5; 29:6;
33:23; 36:3; 37:11;
49:15; 58:21, 23;
60:1, 10; 68:25
Milanowski's [1] -
37:20
mill [3] - 15:21;
18:14; 30:20
million [13] - 14:3;
15:4; 28:11; 29:5;
30:19, 21; 31:10;
32:13; 50:17, 19;
51:8; 56:4
mind [1] - 6:3
minute [1] - 55:7;
72:12
missed [2] - 33:3;
70:17
missing [1] - 73:14
money [26] - 11:2,
12; 16:9; 17:7, 9,
22-23; 28:16; 33:19;
37:13; 49:10, 17;
50:4, 8, 12, 25; 51:3,
5; 56:13, 23; 68:16,
20-21; 69:1
monies [7] - 15:22,
24; 26:19; 39:9, 21;
50:6; 57:8
month [11] - 18:15;
29:15; 59:3; 71:18,
20; 72:4, 8, 13, 22;
73:4
monthly [4] - 13:12;
29:12, 14, 20
months [6] - 24:15;
25:3; 72:15; 73:1, 6,
13
MORTGAGE [2] -
1:4; 20:10
mortgage [3] -
13:15, 17; 57:24
Mortgage [41] - 3:15;
6:20; 7:14, 20, 24;
12:22; 13:1, 5, 23;
14:20; 15:2; 16:9;
25:10; 36:11; 37:13;
39:22; 40:15, 17-18,
24; 43:25; 44:3, 11;
45:11; 46:9, 13; 47:3;
49:6, 11; 54:25; 56:3;
57:12; 61:21, 25;
62:12, 25; 65:3, 21;
68:2; 72:16
mostly [1] - 16:9;
17:6
Motion [1] - 3:19
motion [1] - 14:15
mouth [1] - 31:13

moving [1] - 11:6
MR [101] - 5:9, 14,
22; 15:13, 16; 22:13,
15, 17-18, 23; 24:5,
9-10, 12-14, 16, 18,
20, 23; 27:23; 28:1;
34:1, 4-6; 35:4, 6,
10-11; 36:24; 37:1;
55:5, 7, 11; 56:16, 19,
21; 61:9, 15, 18;
62:19; 63:9, 11,
13-14, 16, 20; 66:8,
11-12, 16, 18; 67:3, 5,
7; 69:23; 70:2, 5, 9,
12, 16, 18, 21-22,
24-25; 71:1, 4, 8, 10,
13-14, 17, 20, 23, 25;
72:3, 6-7, 10, 14,
18-19, 21, 24; 73:3, 7,
9, 13, 17, 25; 74:2, 5,
7, 10
must [1] - 37:14
mutually [1] - 28:24

## N

name [14] - 5:10;
7:18, 21, 23; 10:17;
12:23; 37:8; 41:19-21,
23; 59:22; 63:7; 64:13
narrative [1] - 49:1
narratives [2] - 67:2,
16
natural [1] - 32:16
near [1] - 59:4
necessarily [1] -
16:11
need [9] - 5:18; 6:9,
16; 18:11; 44:21;
49:25; 50:12; 51:3;
60:22
needed [1] - 69:6
negotiating [1] -
27:7
nervous [1] - 33:8
NEVADA [1] - 1:2;
76:2
Nevada [8] - 1:24;
2:5, 10, 15; 10:14;
42:8; 76:5, 21
Never [2] - 50:2;
70:17
never [9] - 9:5; 18:8;
33:3; 43:6; 50:14;
51:1; 54:2; 68:18
new [1] - 6:22
news [1] - 68:19
next [10] - 9:21;
22:19; 27:14; 33:7;
44:6; 47:24; 64:24;

70:6; 71:11, 25
niece [4] - 41:17;
43:9, 21; 44:8
nine [1] - 59:3
nine-month [1] -
59:3
None [2] - 44:4; 58:6
nonsense [1] - 65:10
noplace [1] - 31:11
Nos [1] - 1:3
NOTARY [1] - 75:25
Notary [1] - 76:5
Note [1] - 18:4
note [32] - 11:22;
14:9, 18, 20-21; 15:1,
3, 8, 10-12; 16:3;
18:3, 17, 22; 20:8;
21:16; 28:3; 29:5, 7,
24; 30:5, 9; 31:18;
49:20; 64:7, 11
notes [4] - 49:6;
58:9; 76:11
nothing [1] - 76:10
notice [14] - 18:16;
28:15; 29:2; 38:20;
39:25; 40:16; 42:22;
45:6; 47:10; 51:11;
64:5; 65:9, 19
noticed [1] - 44:5
number [6] - 15:6;
18:14; 30:4; 42:11;
54:3; 65:13, 15; 73:1
NUMBER [2] - 3:8;
4:1
Number [1] - 64:22
numbers [2] - 32:23;
40:2

## O

objection [3] - 55:8;
56:16, 18
obviously [2] -
16:13; 47:25
occurred [1] - 7:4
OF [5] - 1:2, 21; 75:1;
76:2
offered [1] - 60:4
office [3] - 52:18;
53:3, 10
Official [1] - 2:7
old [2] - 6:5, 7
One [3] - 18:25; 21:9;
36:6
one [55] - 7:18;
11:22; 15:9, 11, 13;
18:4, 8, 23; 19:10;
20:3; 22:9, 20; 23:11;
24:17, 19; 25:8;
27:14; 28:17; 30:7,

10; 31:18, 22; 32:12; 36:6; 38:21, 25; 39:3; 40:20; 41:5; 45:10, 21; 46:8, 10-11; 47:20; 49:7, 21, 23; 52:12; 53:25; 54:12; 57:2, 24; 62:15; 63:8; 65:20; 66:1, 3; 69:8; 70:17; 71:6, 11, 25

**one-page** [1] - 47:20
**one-year** [1] - 31:22
**OneCap** [5] - 12:22; 13:6-8, 10
**ones** [3] - 39:7; 46:12; 65:20
**Oops** [1] - 22:22
**operate** [1] - 10:16
**opinion** [3] - 18:11; 56:7; 68:10
**order** [3] - 14:15; 70:6; 71:1
**Order** [1] - 3:19
**original** [2] - 14:2; 33:16
**Originally** [1] - 18:7
**originally** [3] - 13:21; 18:3, 6
**outstanding** [3] - 17:8; 19:20; 32:4
**owe** [1] - 30:16
**owed** [4] - 30:19; 37:13; 49:10
**own** [4] - 52:24; 53:1; 60:13; 61:5
**owned** [2] - 36:10, 16
**owners** [1] - 7:1
**owning** [1] - 37:17

**P**

**p.m** [6] - 1:23; 61:16; 66:14; 74:18
**PAGE** [2] - 3:2; 75:2
**page** [6] - 47:20, 22, 24-25; 48:22, 24
**pages** [2] - 48:22; 66:20
**paid** [5] - 19:23; 20:6; 29:25; 31:11; 41:17
**paper** [1] - 11:22
**part** [9] - 7:3; 14:14; 20:8; 27:17; 55:9; 64:24; 66:21
**Part** [2] - 28:13; 54:5
**partial** [1] - 72:9
**particular** [3] - 8:10; 16:16; 22:20
**parties** [4] - 76:15

**Partners** [7] - 10:19; 64:4; 67:24; 68:16; 69:10, 19
**past** [1] - 69:17
**pay** [5] - 30:2, 15; 33:2; 56:14
**payable** [15] - 40:4, 15; 41:2; 43:2, 24; 46:7; 49:6-8; 62:24; 63:5; 64:2, 11
**paying** [5] - 16:14; 28:20; 29:7; 31:25
**PAYMENT** [1] - 22:16
**payment** [18] - 13:14; 22:6, 10, 18; 23:3, 6-7, 25; 25:9, 19, 23; 26:14; 27:4, 9; 29:11; 32:21; 33:4; 72:16
**payments** [11] - 13:12; 22:8; 23:10; 26:21, 24; 29:12, 14; 61:24; 63:17; 70:14
**payoff** [1] - 28:14
**payoffs** [1] - 50:5
**penalty** [1] - 75:16
**people** [5] - 11:17; 12:11; 38:16; 58:5; 65:17
**Pepsi** [2] - 61:13, 15
**per** [4] - 16:5; 17:1; 29:4; 30:5
**percent** [26] - 16:5, 10, 12, 17, 22; 17:1, 7, 14, 23; 18:18; 19:3, 11, 21; 21:18; 22:4; 29:15, 21; 30:16, 21; 31:3; 32:1; 39:24; 49:8; 56:5; 57:11
**percentage** [1] - 56:8
**percentage-wise** [1] - 56:8
**Perhaps** [2] - 63:9, 11
**period** [6] - 31:24; 42:13; 49:14, 22; 59:3
**Period** [1] - 21:11
**perjury** [1] - 75:16
**person** [7] - 32:25; 41:10, 14-16; 44:24; 76:16
**personal** [2] - 18:10; 60:5
**personally** [1] - 16:18
**petition** [7] - 34:21; 35:3, 18; 54:7, 16, 18, 23
**phases** [1] - 9:22
**Phill** [7] - 8:12, 14;

11:25; 31:4; 51:9, 16, 21
**phone** [4] - 27:24; 36:2; 58:25; 59:15
**physical** [1] - 5:23
**physically** [1] - 51:10
**pick** [5] - 51:9, 17, 22
**picked** [1] - 51:16
**place** [3] - 50:8; 67:14; 76:8
**places** [1] - 50:24
**plan** [14] - 28:17; 55:2, 19, 23-25; 56:5, 15, 24; 57:17; 60:8, 15; 61:3
**plus** [2] - 16:12; 30:21
**point** [7] - 7:18; 27:9; 38:14; 49:9; 52:1; 55:8; 69:13
**position** [1] - 8:15
**possession** [3] - 6:20; 52:3, 6
**Possible** [1] - 52:11
**practical** [1] - 6:21
**pre** [1] - 54:7
**pre-petition** [1] - 54:7
**prefer** [2] - 19:8; 57:21
**preparation** [1] - 42:14
**prepare** [2] - 5:19; 20:12
**prepared** [4] - 14:8; 39:12; 53:16; 54:8
**prepares** [1] - 41:10
**present** [2] - 12:6, 12
**presently** [1] - 73:15
**President** [1] - 8:17
**previously** [2] - 12:15; 74:6
**Primarily** [1] - 9:12
**principal** [6] - 16:15; 20:21; 21:1, 19; 22:3; 32:4
**principals** [1] - 6:25
**problem** [7] - 17:4; 28:9, 19; 43:4, 7; 56:12; 58:4
**promissory** [11] - 14:9, 18-19; 15:1; 16:4; 18:17; 21:16; 64:7, 11
**proof** [2] - 14:11, 17
**properties** [2] - 16:10; 59:14
**property** [6] - 35:24; 36:10; 59:16, 19-20, 23

**proposed** [1] - 60:15
**provide** [1] - 57:5
**provided** [11] - 33:24; 39:7, 10, 18; 49:13; 56:15; 60:1; 61:1; 68:2; 73:5; 76:13
**provides** [3] - 16:3; 18:17
**provision** [1] - 21:16
**PUBLIC** [1] - 75:25
**Public** [1] - 76:5
**purpose** [1] - 48:24
**purposes** [1] - 14:17
**Purposes** [1] - 3:21
**put** [7] - 31:11, 13; 49:25; 50:24; 65:10; 68:20; 69:19
**putting** [1] - 68:16

**Q**

**qualified** [1] - 57:24
**questioned** [1] - 76:19
**questions** [10] - 5:24; 7:7; 38:19; 61:10, 23; 69:7, 24; 70:1; 74:9
**quite** [1] - 13:22

**R**

**raised** [1] - 29:16
**ran** [1] - 70:4
**rate** [10] - 16:4; 18:18, 21; 19:2; 23:23; 29:18, 21; 31:18; 32:1
**rather** [6] - 7:23; 30:2; 44:2, 16; 50:22; 69:15
**re** [5] - 1:3, 7, 10, 14, 17
**read** [3] - 43:10; 71:6; 75:17
**real** [17] - 8:21, 25; 9:4, 7-8, 10, 17; 10:6, 13; 11:3, 11; 13:4, 7; 35:24; 36:4; 50:7; 68:20
**really** [2] - 31:10; 42:18
**REALTY** [1] - 1:7
**REASON** [1] - 75:2
**reason** [8] - 5:23; 11:15; 22:22; 31:17; 32:10; 40:23; 44:1; 68:8
**reasonably** [1] - 76:18

**receive** [7] - 23:7; 26:21; 28:14; 34:9, 23; 62:1; 67:15
**received** [28] - 22:9, 11-12; 23:4, 10-11, 14-15, 17, 25; 25:9, 18, 23; 26:14, 24; 34:13, 16, 19; 35:15; 36:12; 47:6, 13; 48:16; 50:5; 61:21; 70:14; 72:15
**RECEIVED** [1] - 22:16
**receivals** [1] - 22:19
**receiving** [3] - 15:22; 56:7
**recent** [1] - 65:19
**Recess** [2] - 61:16; 66:14
**recessed** [1] - 74:17
**recognize** [1] - 56:17
**recollection** [11] - 25:14; 26:13, 15; 41:1; 44:15; 45:15; 62:10, 14, 23; 64:20; 65:1
**reconveyances** [1] - 18:15
**record** [6] - 27:25; 66:6, 10, 13, 17; 76:12
**recorded** [1] - 36:13
**records** [5] - 7:6; 38:8; 46:20, 23
**Red** [1] - 1:23; 5:13
**reduction** [1] - 56:3
**refer** [1] - 59:20
**referring** [1] - 27:12
**regard** [3] - 7:4; 60:8; 61:24
**reinvest** [1] - 32:14, 18
**reject** [1] - 60:14
**relationship** [1] - 76:17
**relative** [2] - 76:15
**remain** [1] - 68:10
**Remember** [1] - 33:22
**reorganization** [1] - 60:9
**repaid** [2] - 29:4; 35:20
**repay** [2] - 33:9, 14
**repayment** [1] - 28:23
**reply** [1] - 29:3
**report** [1] - 48:18
**Reported** [1] - 1:25
**reported** [1] - 76:7

**reporter** [1] - 5:15
**REPORTER** [2] -
5:21; 62:17
**REPORTER'S** [1] -
76:1
**represent** [3] - 6:19,
22, 24
**representative** [1] -
31:6
**represents** [1] -
48:11
**requested** [2] -
64:17; 76:19
**reside** [1] - 42:7
**residence** [1] - 53:1
**residential** [7] - 9:6,
8, 10; 10:6, 13; 11:3,
11
**respect** [1] - 73:4
**returned** [1] - 16:14
**returns** [4] - 13:25;
18:10; 33:22; 34:2
**review** [3] - 5:16, 18;
76:19
**reviewing** [1] - 13:24
**Richard** [1] - 74:9
**RICHARD** [1] - 2:13
**Rob** [1] - 38:5
**Robert** [1] - 48:11
**Robin** [2] - 1:23; 5:13
**Roca** [2] - 38:6
**Royal** [4] - 36:7, 13;
37:8; 59:12
**RPR** [2] - 1:25; 76:23
**Rule** [4] - 75:17;
76:7, 12
**RULE** [1] - 1:21
**run** [1] - 57:20
**running** [2] - 57:21;
74:13

**S**

**Sacramento** [1] -
59:17
**Sales** [5] - 36:20, 22;
37:2, 9, 12
**Santoro** [1] - 2:13
**saw** [1] - 37:7
**schedule** [9] - 14:8;
20:9, 11-12, 14;
22:14; 28:22; 54:5, 8
**scheduled** [1] - 56:3
**Schwartzer** [2] - 2:4;
3:4
**SCHWARTZER** [60] -
2:3; 5:9, 14, 22;
15:16; 22:15, 18, 23;
24:9, 12, 14, 18, 23;
27:23; 28:1; 34:5;

35:6, 11; 36:24; 37:1;
55:11; 56:17, 21;
61:9, 15, 18; 62:19;
63:13, 16, 20; 66:12,
16, 18; 67:7; 69:23;
70:5, 9, 12, 16, 18,
21, 24; 71:1, 4, 10,
14, 20, 23; 72:3, 6,
10, 14, 18; 73:7, 17,
25; 74:2, 7, 11
**second** [2] - 38:25;
66:7
**Second** [1] - 2:10
**secured** [1] - 18:4
**SECURITIES** [1] -
1:18
**security** [1] - 65:14
**See** [1] - 42:4
**see** [13] - 7:22; 17:4;
22:1, 11; 38:14;
40:19; 41:13; 44:18;
49:4; 71:13, 17; 72:1
**seeing** [3] - 16:25;
41:6; 53:12
**seem** [1] - 7:7
**seldom** [1] - 52:9
**selling** [1] - 9:22
**send** [1] - 5:15
**sending** [1] - 51:7
**sent** [5] - 28:4; 29:1;
38:23; 39:21; 50:9
**sequence** [1] - 72:1
**Services** [1] - 6:23
**set** [5] - 28:22; 48:12;
70:9; 76:20
**several** [1] - 54:11
**shack** [1] - 51:20
**Shaking** [2] - 50:13;
51:4
**Shea** [1] - 2:9
**sheet** [6] - 47:13, 20,
22; 48:18, 25; 49:1
**Sheets** [1] - 3:17
**sheets** [3] - 47:2, 23;
49:5
**Sherman** [1] - 61:9
**SHERMAN** [2] - 2:8;
36:25
**SHLOMO** [1] - 2:8
**shocked** [1] - 38:18
**shorthand** [1] -
76:11
**show** [3] - 34:7; 44:6;
70:13
**showed** [1] - 27:6
**showing** [2] - 23:25;
65:16
**shows** [6] - 11:22;
21:13; 25:9, 13, 18;
26:12

**sic** [1] - 20:10
**SID** [2] - 42:1, 5
**signature** [1] - 42:20;
75:18
**signed** [8] - 42:24;
43:21; 44:8; 46:9, 12;
47:13; 53:10, 25
**silent** [1] - 68:10
**simple** [2] - 7:7;
56:10
**single** [3] - 9:12, 14;
11:9
**single-family** [3] -
9:12, 14; 11:9
**sit** [4] - 48:15; 57:5;
64:19, 25
**sites** [1] - 60:17
**sitting** [1] - 51:23
**situation** [1] - 59:11
**six** [2] - 16:23; 33:4
**skips** [2] - 72:7; 73:5
**slip** [1] - 63:24
**slips** [2] - 62:4; 63:19
**slow** [1] - 12:19
**social** [1] - 65:14
**someone** [3] - 49:16;
51:6; 57:21
**sometime** [1] - 74:14
**Sometimes** [3] -
7:17; 52:8; 53:23
**sometimes** [1] -
52:10
**somewhere** [1] -
30:6
**Somewhere** [1] -
48:3
**son** [5] - 12:8; 20:13;
39:13; 42:24; 61:5
**Son** [1] - 12:9
**son-in-law** [5] - 12:8;
20:13; 39:13; 42:24;
61:5
**Son-in-law** [1] - 12:9
**sorry** [4] - 15:17;
19:13; 41:14; 67:12
**Sorry** [2] - 56:20;
74:1
**source** [2] - 11:1, 10
**South** [3] - 2:4, 9, 14
**speaking** [1] - 8:11
**speaks** [1] - 20:16
**specific** [1] - 13:11
**specifics** [1] - 49:17
**specify** [1] - 69:2
**spell** [2] - 41:21, 23
**ss** [1] - 76:3
**standards** [1] - 48:18
**start** [3] - 11:2;
28:20; 61:12

**started** [2] - 14:3;
34:15
**State** [3] - 5:10; 76:5,
21
**STATE** [1] - 76:2
**statement** [10] -
25:2, 18; 34:24;
35:16; 48:17, 23;
65:11; 66:22; 68:7;
71:16
**Statement** [3] - 3:22
**statements** [34] -
7:16; 10:21; 24:12,
25; 25:1; 33:25; 34:1,
9, 13; 37:15, 18, 21;
38:15, 22; 39:5,
16-17; 47:11; 67:18;
68:1, 14; 69:20; 70:3,
11-13, 19; 72:15;
73:2, 20-21, 23
**Statements** [5] -
3:16; 4:3
**states** [1] - 15:3
**STATES** [1] - 1:1
**step** [1] - 9:21
**still** [1] - 57:18
**Street** [2] - 2:9, 14
**strictly** [1] - 61:5
**strong** [2] - 9:25;
26:16
**stuck** [1] - 57:18
**subject** [2] - 59:7, 9
**Subscribed** [1] -
75:22
**subsequent** [3] -
14:19; 19:25; 71:3
**sufficient** [1] - 28:15
**suggest** [1] - 70:22
**suggesting** [1] - 6:13
**suggestion** [1] - 60:7
**Suite** [1] - 2:5
**sum** [1] - 32:21
**supplement** [1] -
73:10
**supplied** [1] - 37:25
**sworn** [4] - 5:4, 6;
75:22; 76:9
**SYD** [1] - 42:1

**T**

**tax** [4] - 13:24; 18:9;
33:22; 34:2
**team** [1] - 10:1
**Telephone** [1] -
27:22
**telephone** [1] - 42:11
**Temecula** [1] -
59:16, 19
**temporarily** [1] -

14:15
**Temporarily** [1] -
3:19
**ten** [1] - 29:4
**terms** [1] - 29:4
**testified** [1] - 5:7
**testify** [1] - 76:9
**testimony** [1] - 76:12
**THE** [30] - 5:21;
22:21; 24:7; 34:3;
35:5; 61:13; 62:17;
66:6, 9; 70:4, 7, 11,
15, 17, 20; 71:9, 15,
18, 22; 72:12, 17, 20,
22, 25; 73:8, 12, 16,
24; 74:1, 3
**thereafter** [1] - 76:11
**they've** [1] - 44:23
**Third** [1] - 2:15
**Thompson** [1] - 2:14
**thoroughly** [1] -
1:23
**three** [6] - 23:10;
24:14; 63:17; 65:7;
73:24; 74:3
**tired** [1] - 6:9
**today** [6] - 41:1;
44:4; 45:17; 48:15;
64:19; 65:1
**together** [1] - 11:17
**Tom** [8] - 6:24; 12:2;
33:23; 57:1; 58:22;
60:10, 12
**ton** [1] - 68:21
**tonight** [1] - 74:14
**took** [1] - 69:8
**Touche** [1] - 68:8
**touching** [1] - 53:14
**track** [1] - 70:23
**transcribed** [1] -
76:11
**transcript** [5] - 5:16,
19; 74:14; 76:12, 19
**transcription** [1] -
75:17
**transferred** [1] - 69:9
**transfers** [3] - 26:5;
51:11, 13
**true** [4] - 46:19;
53:16; 72:21; 76:12
**TRUST** [2] - 1:11, 14
**Trust** [17] - 2:7;
40:18, 24; 43:25;
44:2, 12, 16; 45:12,
24; 46:3, 9, 14; 58:14;
62:12, 25; 65:4
**trust** [2] - 18:5, 12
**trusts** [1] - 58:9
**truth** [3] - 76:9
**try** [2] - 55:23; 63:11

**trying** [12] - 21:21, 25; 23:6; 31:14; 48:7; 51:1; 55:18, 23; 56:22; 63:18
**Tuesday** [1] - 1:22
**two** [5] - 21:7, 22; 48:24; 56:8; 64:22
**typewriting** [1] - 76:11
**typewritten** [1] - 76:11
**typically** [1] - 53:25

## U

**under** [1] - 75:16
**Unfortunately** [1] - 65:14
**UNITED** [1] - 1:1
**unpaid** [1] - 54:15
**Unsecured** [1] - 48:12
**unsecured** [6] - 14:1; 56:2, 6, 14; 57:12; 58:10
**unusual** [1] - 42:1
**unwilling** [1] - 57:5
**up** [19] - 14:3; 15:4; 16:12; 18:13; 22:21; 27:8; 43:11; 49:24; 50:11, 16, 19; 51:3, 9, 16-18, 22-23; 74:12
**upset** [1] - 31:10
**upside** [1] - 43:10
**upwards** [1] - 56:4
**USA** [76] - 1:4, 7, 11, 14, 18; 2:7; 3:15; 6:20; 7:13, 23; 8:20; 12:1, 17; 13:1, 19, 23; 14:20; 15:2; 16:8; 20:10; 25:10, 19, 24; 26:9, 21; 28:11; 29:7; 30:25; 31:3; 32:8; 33:12; 36:10, 17; 37:13; 39:10, 22; 40:15-17, 24; 43:2, 24; 44:2, 11; 45:11; 46:9, 12-13; 47:2; 49:5, 10, 16; 50:9; 56:2; 61:21, 24; 62:11, 25; 65:2, 11-12, 21-22, 25; 66:1, 4; 68:2, 16; 72:16
**USACM** [1] - 54:6

## V

**vacation** [1] - 53:23
**Vegas** [14] - 1:24; 2:5, 10, 15; 9:19;

10:4, 8, 10, 14; 11:6; 12:16; 36:8; 42:8; 57:25
**Verbally** [1] - 59:15
**verbiage** [1] - 15:3
**via** [1] - 63:19
**Vice** [1] - 8:17
**view** [3] - 38:14; 61:6; 69:14
**vote** [4] - 60:8; 61:2, 4, 6
**Voting** [1] - 3:20
**voting** [1] - 14:16

## W

**wait** [1] - 72:12
**waiting** [1] - 51:23
**Walch** [1] - 2:13
**Walker** [10] - 12:7; 39:13; 42:19, 24; 44:23; 46:10; 53:17; 54:9; 61:5
**Walker's** [1] - 42:20
**wants** [1] - 57:14
**ways** [1] - 62:21
**Web** [1] - 60:17
**weeks** [1] - 59:5
**WHEREOF** [1] - 76:20
**whole** [2] - 30:19; 76:9
**wife** [3] - 11:18; 12:12; 51:25
**William** [3] - 1:25; 76:5, 23
**WIRE** [1] - 40:1
**wire** [4] - 26:5, 9; 51:11, 13
**wired** [1] - 62:1
**wires** [2] - 26:2; 65:8
**wise** [1] - 56:8
**Witness** [3] - 2:12; 5:4; 75:21
**witness** [5] - 55:10; 75:16; 76:7, 9, 13
**WITNESS** [31] - 3:2; 22:21; 24:7; 34:3; 35:5; 61:13; 66:6, 9; 70:4, 7, 11, 15, 17, 20; 71:9, 15, 18, 22; 72:12, 17, 20, 22, 25; 73:8, 12, 16, 24; 74:1, 3; 75:1; 76:20
**woman** [1] - 42:2
**word** [2] - 10:1
**words** [1] - 31:13
**write** [1] - 53:20
**writing** [3] - 40:3; 44:23; 52:19

**written** [4] - 14:20, 25; 40:24; 54:2
**wrote** [5] - 40:10; 44:23; 51:15; 52:2; 53:9

## Y

**year** [30] - 7:5; 15:5, 9, 11, 13; 18:23, 25; 19:11; 20:3, 11; 24:2; 30:8, 10; 31:18, 22; 33:22, 25; 34:17, 20; 69:11; 71:5, 11; 73:18-20, 22
**years** [8] - 6:4, 7; 9:3; 16:24; 33:4; 34:12; 37:15; 71:2
**yourself** [2] - 10:24; 11:13