E-filed December 26, 2006

1  Marc A. Levinson (California Bar No. 57613)
   Regina Ragni (California Bar No. 214061)
2  ORRICK, HERRINGTON & SUTCLIFFE LLP
   400 Capitol Mall, Suite 3000
3  Sacramento, CA  95814-4497
   Telephone:  (916) 447-9200
4  Facsimile:  (916) 329-4900
5  Email:    malevinson@orrick.com; rragni@orrick.com

6  Bob L. Olson (Nevada Bar No. 3783)
   Anne M. Loraditch (Nevada Bar No. 8164)
7  BECKLEY SINGLETON, CHTD.
   530 Las Vegas Boulevard South
8  Las Vegas, NV 89101
   Telephone:  (702) 385-3373
9  Facsimile:  (702) 385-5024
   Email:    bolson@beckleylaw.com; aloraditch@beckleylaw.com
10

11 *Attorneys for the Official Committee of Equity Security Holders of*
   *USA Capital Diversified Trust Deed Fund, LLC*
12
                    **UNITED STATES BANKRUPTCY COURT**
13
                         **DISTRICT OF NEVADA**
14

15 In re:                                    Case No. BK-S-06-10725 LBR
   USA COMMERCIAL MORTGAGE COMPANY,          Case No. BK-S-06-10726 LBR
16              Debtor.                        Case No. BK-S-06-10727 LBR
   In re:                                    Case No. BK-S-06-10728 LBR
17 USA CAPITAL REALTY ADVISORS, LLC,         Case No. BK-S-06-10729 LBR
                Debtor.
18 In re:                                    Chapter 11
   USA CAPITAL DIVERSIFIED TRUST DEED
19 FUND, LLC,                                Jointly Administered Under
                Debtor.                       Case No. BK-S-06-10725-LBR
20 In re:
   USA CAPITAL FIRST TRUST DEED FUND, LLC,   **Hearing Date:  January 3, 2007**
21              Debtor.                        **Hearing Time:  9:30 a.m.**
22 In re:
   USA SECURITIES, LLC,
23              Debtor.
   Affects:
24  ☒  All Debtors
    ☐  USA Commercial Mortgage Company
25  ☐  USA Securities, LLC
    ☐  USA Capital Realty Advisors, LLC
26  ☐  USA Capital Diversified Trust Deed Fund, LLC
    ☐  USA First Trust Deed Fund, LLC
27

28

{00356186;}
OHS West:260149020.2

Page 1 of 6

**OPPOSITION OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF USA CAPITAL DIVERSIFIED TRUST DEED F UND, LLC TO DEBTORS' APPLICATION PURSUANT TO FED.R.BANKR.P. 2014(A) AUTHORIZING THE EMPLOYMENT AND RETENTION OF BEADLE, MCBRIDE, EVANS & REEVES, LLP AS "ORDINARY COURSE ACCOUNTANTS"**

The Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC (the "Diversified Committee") appointed in the chapter 11 case of USA Capital Diversified Trust Deed Fund, LLC ("DTDF") submits its Opposition to Debtors' Application Pursuant to Fed.R.Bankr.P. 2014(A) Authorizing the Employment and Retention of Beadle, McBride, Evans & Reeves, LLP as "Ordinary Course Accountants" (the "Opposition" to the "Application"). The Opposition is supported by the Declaration of Michael Tucker (the "Tucker Declaration") previously filed in the above-captioned Chapter 11 Cases [Docket No. 994], a copy of which is attached hereto (without exhibits) for the Court's convenience, and which is incorporated for all purposes herein by this reference, the Declaration of Chas Harvick (the "Harvick Declaration"), and the Declaration of Anne M. Loraditch, Esq. (the "Loraditch Declaration"), both of which are filed concurrently herewith and also incorporated for all purposes herein by this reference. It also is supported by the papers and pleadings on file with the Court, and any arguments of counsel that the Court may entertain at the Court's next regularly scheduled omnibus presentment date noted above. In support of the Opposition, the Diversified Committee represents as follows:

**I.**

**INTRODUCTION**

1. On October 23, 2006, the Court entered its Order Granting Debtors' Motion for An Order Authorizing Retention of Professionals Utilized by Debtors in the Ordinary Course of Business (the "Employment Order") [Docket No. 1628]. The Employment Order provided that the Debtors in these Chapter 11 Cases may retain the services of Ordinary Course Professionals[1] without filing separate retention applications and without obtaining approval of the Court provided that Debtors, among other things, filed with the Court, and served upon the Interested Parties, a verified

---

[1] Unless otherwise defined, all capitalized terms shall have the meaning ascribed in the precedent papers and pleadings already on file with the Court in these cases.

BECKLEY
SINGLETON
ATTORNEYS AT LAW
530 LAS VEGAS BLVD SOUTH
LAS VEGAS, NEVADA 89101

{00356186;}
OHS West:260149020.2

1   statement within 20 days after the professional's post-petition engagement by the Debtors to which

2   any Interested Party could object within 20 days after the receipt of such verified statement.

3   Employment Order, ¶ 1.

4       2.   On December 6, 2006, Debtors filed the Affidavit of Garth McBride in Support of

5   Application Pursuant To Fed.R.Bankr.P. 2014(a) Authorizing The Employment And Retention Of

6   Beadle, McBride, Evans & Reeves, LLP As "Ordinary Course Accountants" (the "Verified

7   Statement"), and the Diversified Committee received a Notice of Electronic Filing of the Verified

8   Statement on that same date.

9   <center>**II.**</center>

10  <center>**OPPOSITION**</center>

11      3.   The Diversified Committee believes that Beadle, McBride, Evans & Reeves, LLP

12  ("Beadle") should not be permitted to represent DTDF or any of the Debtors in these Chapter 11

13  Cases because Beadle has acted, and the Diversified Committee suspects it continues to act, in direct

14  conflict with the Debtors' interests and that, as a result of Beadle's actions and omissions, DTDF and

15  other Debtors may have causes of action against Beadle.

16      4.   The Diversified Committee's financial advisors, FTI Consulting, Inc. ("FTI"), have

17  learned that Beadle prepared DTDF's U.S. returns of partnership income for 2002, 2003, 2004 and

18  2005 tax years, audited DTDF's financial statements for 2000, 2001 and 2002, and drafted an audit

19  of DTDF's 2003 financial statements.  Harvick Declaration, ¶ 5.[2]

20      5.   Beadle's complicity with the Debtors' insiders, Tom Hantges and Joseph Milanowski

21  (together, the "Insiders"), who own and/or control USA Investment Partners ("IP") and its numerous

22  affiliates, two of which are involuntary debtors in whose cases this Court recently has appointed gap

23  trustees, is inherent by its performance of accounting services during the very time frame when the

24  Insiders were converting DTDF monies to their own use, as outlined in the Tucker Declaration –

25  which has been of record and uncontested in this case since July 27, 2006.  See generally Tucker

26  Declaration.

27  ————————————————

28     [2] FTI has made repeated requests to the Debtors' professionals for Beadle's workpapers related to the DTDF audits but, to date, FTI has not received anything in response to its requests.  Harvick Declaration, ¶ 6.

BECKLEY
SINGLETON
ATTORNEYS AT LAW
530 LAS VEGAS BLVD SOUTH
LAS VEGAS NEVADA 89101

{00356186;}
OHS West:260149020.2

6. In addition, the professionals employed by the Diversified Committee are informed and believe that Beadle prepared, and perhaps continues to prepare, tax filings for IP and for the Insiders personally. Loraditch Declaration, ¶ 5.

7. The Diversified Committee professionals have received and reviewed copies of the 2004 federal income tax return and corresponding schedule K-1s (dated September 2005) (the "Tax Return") that Beadle prepared for HMA Sales, LLC, a Nevada limited liability company managed by IP ("HMA"), which is in turn owned and/or controlled by the Insiders. Loraditch Declaration, ¶ 6. Information about HMA reprinted from the Nevada Secretary of State website, is attached to the Loraditch Declaration as Exhibit 1 and is incorporated herein by reference.[3]

8. Professionals for the Diversified Committee also have received and reviewed a memorandum **dated September 21, 2006** from Beadle to Joseph Milanowski (the "Beadle Memo") estimating the tax impact to HMA from the sale of the Royal Hotel property, the ownership and/or operation of which by HMA is believed to have been funded by DTDF. Loraditch Declaration, ¶ 7; see also Tucker Declaration.[4]

9. Thus, Beadle was representing the Insiders as recently as **three months ago**. The fact is that Beadle is simply too intertwined with the Insiders for the Diversified Committee, the Debtors, and this Court to tolerate.

10. Counsel for the Diversified Committee repeatedly has voiced concerns to counsel for DTDF over the engagement of Beadle as DTDF's ordinary course accountants. Loraditch Declaration, ¶ 8.

11. The Diversified Committee submits that the evidence – including the Tax Return and the Beadle Memo – demonstrates Beadle's continued involvement with the Insiders that cannot be seen as anything other than creating a direct conflict between Beadle and DTDF and the other Debtors in these Chapter 11 Cases. The Diversified Committee also notes that the perception of a

---

[3] A copy of the Tax Return has not been attached to the Loraditch Declaration due to the sensitive nature of such information. The Diversified Committee is prepared to produce such document to chambers should the Court wish to review it or if Beadle contests the facts stated in this paragraph 7.

[4] A copy of the Beadle Memo has not been attached to the Loraditch Declaration for the same reason as explained in footnote 3. The Diversified Committee is prepared to produce such document to chambers should the Court wish to review it or if Beadle contests the facts stated in this paragraph 8.




BECKLEY SINGLETON
ATTORNEYS AT LAW
530 LAS VEGAS BLVD SOUTH
LAS VEGAS, NEVADA 89101

{00356186;}
OHS West:260149020.2

1  conflict of interest is too great to outweigh the efficiencies in the employment of Beadle by the

2  Debtors.

3      12.    Accordingly, despite the Debtors' admirable effort to be cost-efficient, the Debtors'

4  post-petition employment and retention of Beadle as "Ordinary Course Accountants" should be

5  prohibited and the Application should be denied.

6      13.    At the very least, any order overruling this Opposition should expressly state that the

7  employment of Beadle by the estates in no way shall serve as a release of Beadle's bad acts, if any,

8  should any party in interest elect to later pursue Beadle.  Nor should such employment serve in any

9  way as an indemnification of Beadle for its prior conduct.

10     WHEREFORE, for all of the foregoing reasons, the Diversified Committee respectfully

11  requests that this Court enter an order denying the Application and prohibiting the Debtors'

12  employment and retention of Beadle, McBride, Evans & Reeves, LLP as "Ordinary Course

13  Accountants."  Should the Court overrule the Opposition, any order authorizing the employment of

14  Beadle should expressly provide that the postpetition employment of Beadle shall in no way serve to

15  release or indemnify Beadle for any of its prior acts, omissions or conduct.

16     DATED this 26th day of December 2006.

17                                 BECKLEY SINGLETON, CHTD.

18                          By: _____

19                                 BOB L. OLSON, ESQ.
                                   Nevada Bar No. 3783
20                                 ANNE M. LORADITCH, ESQ.
                                   Nevada Bar No. 8164
21                                 530 Las Vegas Boulevard South
                                   Las Vegas, NV 89101
22

23                                 *Attorneys for the Official Committee of Equity Security
                                   Holders of USA Capital Diversified Trust Deed Fund,
24                                 LLC*

25

26

27

28

BECKLEY
SINGLETON
ATTORNEYS AT LAW
530 LAS VEGAS BLVD SOUTH
LAS VEGAS, NEVADA 89101

{00356186;}
OHS West:260149020.2                                    Page 5 of 6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

**DECLARATION OF MICHAEL A. TUCKER**

BECKLEY
SINGLETON
ATTORNEYS AT LAW
530 LAS VEGAS BLVD SOUTH
LAS VEGAS, NEVADA 89101

{00356186;}
OHS West:260149020.2

Marc A. Levinson (California Bar No. 57613)
Jeffery D. Hermann (California Bar No. 90445)
Lynn Trinka Ernce (California Bar No. 179212)
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, CA  95814-4497
Telephone:  (916) 447-9200
Facsimile:  (916) 329-4900
Email:    malevinson@orrick.com; jhermann@orrick.com
lernce@orrick.com

Bob L. Olson (Nevada Bar No. 3783)
Anne M. Loraditch (Nevada Bar No. 8164)
BECKLEY SINGLETON, CHTD.
530 Las Vegas Boulevard South
Las Vegas, NV 89101
Telephone:  (702) 385-3373
Facsimile:  (702) 385-5024
Email:    bolson@beckleylaw.com; aloraditch@beckleylaw.com

Attorneys for the Official Committee of Equity Security Holders of
USA Capital Diversified Trust Deed Fund, LLC

E-filed on July 27, 2006

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL Mortgage COMPANY,<br>　　　　　　　　　　　　　　　Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>　　　　　　　　　　　　　　　Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>　　　　　　　　　　　　　　　Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725-LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>　　　　　　　　　　　　　　　Debtor. | **DECLARATION OF MICHAEL A.<br>TUCKER IN SUPPORT OF<br>DIVERSIFIED FUND<br>COMMITTEE'S LIMITED** |
| In re:<br>USA SECURITIES, LLC,<br>　　　　　　　　　　　　　　　Debtor. | **OPPOSITION TO MOTION TO<br>DISTRIBUTE FUNDS**<br><br>Date:　　August 4, 2006<br>Time:　　9:30 a.m.<br>Place:　　Courtroom #1 |

US_WEST:260063507.5                         - 1 -

Affects:
- ☐ All Debtors
- ☒ USA Commercial Mortgage Company
- ☐ USA Securities, LLC
- ☐ USA Capital Realty Advisors, LLC
- ☒ USA Capital Diversified Trust Deed Fund, LLC
- ☒ USA First Trust Deed Fund, LLC

(Affects indicated Debtors)

I, Michael A. Tucker, hereby declare, verify and state as follows:

1.    I am a Senior Managing Director with FTI Consulting, Inc. ("FTI"), a financial advisory services firm specializing in reorganization, litigation and related consulting services. I joined FTI in 2002 upon FTI acquiring PricewaterhouseCoopers LLP's Business Recovery Services group where I was a Partner and had been employed for 17 years.

2.    FTI was retained by the Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC ("Diversified Committee") on June 9, 2006 to perform financial advisory services for the Diversified Committee in the chapter 11 cases stated above.

3.    Subsequent to FTI's retention FTI has analyzed loans owed to USA Capital Diversified Trust Deed Fund, LLC ("Diversified Fund") and related party transactions; reviewed past and current financials of the Debtors including the Schedules of Assets and Liabilities, the Statement of Financial Affairs and Monthly Operating Reports; performed various analyses and provided feedback regarding issues and numerous motions filed in this case; and participated in meetings with the Debtors, the Diversified Committee and other official committees, the U.S. Trustee, borrowers on the USACM loans and other parties in interest and professionals hired by the same.

4.    The Diversified Committee is concurrently filing its Limited Opposition to the Debtors' Motion To Distribute Funds and To Grant Ordinary-Course Releases and Distribute Proceeds ("Distribution Motion"). I make this Declaration in support of such Limited Opposition to the Distribution Motion.

5.    On April 13, 2006 ("Petition Date") USA Commercial Mortgage Company ("USACM"), Diversified Fund, USA Capital First Trust Deed Fund LLC ("First Trust Fund"), USA Capital Realty Advisors, LLC ("USARA") and USA Securities, LLC filed for Chapter 11.

- 2 -

1   USACM is in the sub-prime, commercial mortgage business, servicing a loan portfolio of

2   approximately 115 commercial loans (the "Loan Portfolio") at the Petition Date that are primarily

3   owned by First Trust Fund, Diversified Fund (the First Trust Fund and Diversified Fund are

4   sometimes collectively be referred to as the "Funds") and various Direct Lenders.  USACM used

5   the monies raised by Diversified Fund, First Trust Fund, and from Direct Lenders to fund

6   USACM loans.  Approximately 1,900 investors are invested in Diversified Fund, approximately

7   1,300 investors are invested in First Trust Fund while approximately 3,600 individuals and

8   entities are Direct Lenders.

9         6.     Prior to the creation of the Diversified Fund and the First Trust Deed Fund, the

10   business model of USACM appeared to consist of the arranging of real property secured loans for

11   Direct Lenders.  Those Direct Lenders were offered investments in loans generally described by

12   USACM in an offering document of a page or two in length.  Direct Lenders would choose

13   between the different loans being offered, would determine a dollar amount to invest, and would

14   be included as a lender within the promissory note signed by the borrower (typically by reference

15   to an exhibit to the promissory note containing the identities of all the investors) and would be

16   listed as a beneficiary on the mortgage or deed of trust (again by way of an exhibit) that would

17   typically be recorded against the property.  The loans were typically for a term of one or two

18   years and were for a much higher rate of interest than the investors could obtain through more

19   traditional investments.

20         7.     The Direct Lenders would enter into a servicing agreement with USACM which

21   would govern all of the loans in which the Direct Lenders participated.  Under the typical

22   servicing agreement, USACM would be entitled to retain origination fees and points charged to

23   the borrowers, late fees, extension fees, default interest and other fees and expenses paid or

24   reimbursed by the borrower.  In addition, USACM would be entitled to a servicing fee consisting

25   of a portion of the monthly interest to be paid by the borrower of between one and three percent

26   per annum of the principal balance of the loan, with the difference between this servicing fee and

27   the actual rate of interest paid by the borrowers, paid to the Direct Lenders.

28

- 3 -

8.      While the direct involvement of the Direct Lenders in the initial documentation of the loans provided the appearance of safety and security for the Direct Lenders with respect to any competing claim to the proceeds of the loans made by USACM or its creditors, it was cumbersome in many respects for both the Direct Lenders and USACM.

9.      For USACM, this business model had high administrative costs and in some cases, meant months-long delays when individual signatures of Direct Lenders were needed.  It involved loan-by-loan reporting and money management.  When Direct Lenders sold out of loans and new Direct Lenders entered the loans, USACM's policy was to record amendments to the mortgages or deeds of trust.  USACM likely made similar arrangements for swapping out the exhibit to the promissory note identifying the Direct Lenders and changing the beneficiaries of title policies and the like.  The costs of attracting investor monies, including sales commissions and the costs of investor communications as to each loan was likely high.  Because of the need to fund monthly interest payments to the Direct Lenders, loan terms had to involve monthly payments from the borrowers.

10.     For Direct Lenders, the business model put the Direct Lenders in the position of making choices as to which loans to participate in, how much to invest among the different loans, what term to choose, etc.  The Direct Lenders also obtained no diversification of their exposure to the risk of default on their loans (although the Direct Lenders may have perceived only a negligible risk of default since USACM failed to share the news that loans were not performing), and the liquidity of their investments was dependent upon the timing of the repayment of the loans by the borrowers.

11.     The creation of the Diversified Fund in 2000 provided distinct operating advantages to USACM and was a more attractive investment vehicle to certain investors.

12.     The Diversified Fund was created as a $200 million fund and was offered to Nevada residents commencing in May, 2000.  I believe that the current capitalization of the Diversified Fund is approximately $150 million.

- 4 -

13.     Attached hereto as Exhibit "A" is a true and correct copy of the first 14 pages of a prospectus for the Diversified Fund dated as of June 2, 2003, which I obtained from the books and records of USACM (the "Prospectus").

14.     According to the Prospectus:  (i) USACM had sold $121,524,500 worth of units in the Fund prior to that date;  (ii)  investors were not offered a fixed rate of return but rather a "flow-through" of the profits generated by the Diversified Fund through the Diversified Fund acting as a Direct Lender in loans generated by USACM;  (iii) Diversified Fund would invest only in loans secured by first deeds of trust upon real property;  (iv) loan-to-value ratios for the loans in which Diversified Fund would become a Direct Lender would not exceed 75% and may be as low as 60%; and (v) loan diversification restrictions would be imposed upon the loans invested in by the Diversified Fund such that no loan would exceed $20 million, no loan would exceed 15% of all loans outstanding at any time, and no more than 25% of the loans outstanding at any time would be made to a single borrower or an affiliate of such borrower.

15.     The advantages of the Fund business model to USACM were obvious:  (i) the coordination in the timing between loan originations and fund-raising was less of an issue since monies in the Diversified Fund were available to immediately fund a loan or to fill a gap in the funding of other loans involving many individual Direct Lenders;  (ii) loan closings could occur with just one signature (typically of Mr. Milanowski) and without having to involve funding from dozens of investors;  (iii) decisions as to loan administration and workouts/foreclosures of troubled loans could be made solely by USACM without input or the necessity of obtaining approval from dozens of individual Direct Lenders;  (iv) Diversified Fund was free of the requirement that each loan generate monthly interest to be distributed to Direct Lenders and USACM could now make loans with deferred repayment terms;  (v) greater access to greater amounts of investor monies;  and (vi) perhaps most significantly, greater "flexibility" in the handling of the affairs and monies of the Diversified Fund as a result of the above and the generally lower level of scrutiny associated with this business model.

16.     The advantages to the investors in Diversified Fund were also obvious:  (i) as the name implies, their investments were diversified over a portfolio of loans such that the impact of

- 5 -

1  a loan default would be much less within the Diversified Fund than if the investor were to become

2  a Direct Lender in a defaulted loan; (ii) for those investors that did not relish searching out the

3  best loans being offered for direct investment, the investor was freed from the responsibility of

4  choosing loans or dollar amounts to be allocated among several loans; (iii) investors could invest

5  any amount over $25,000 at any time, regardless of whether acceptable loans were being offered

6  for direct investment at the time; (iv) greater liquidity in that Diversified Fund investors could

7  redeem some or all of their investment without regard to the timing of the repayment of a single

8  loan as in the case of the Direct Lender business model.

9        17.      According to the Debtors Motion for Order Approving Debtors' Proposed Cash

10  Management Procedures and Interim Use of Cash in Accordance with Proposed Cash Budget

11  ("Cash Motion") Docket # 407, the Funds and Direct Lenders own fractional shares of various

12  loans in the Loan Portfolio, with substantial overlap among the members of the Funds and the

13  Direct Lenders.  In other words, a substantial number of the 3,600 Direct Lenders are the same

14  individuals who also invested indirectly in the Loan Portfolio by purchasing membership interest

15  in one or both of the Funds.

16        18.      The accounting of the Funds' interests in loans is treated as if each of the Funds is

17  an individual lender.  In other words, the Funds are two large Direct Lenders in addition to the

18  individual Direct Lenders.

19        19.      Based on the Loan Summary provided by the Debtors as of April 27, 2006, the

20  total amount of the Loan Portfolio is approximately $962.1 million, of which Diversified Fund is

21  owed $107.9 million, First Trust Fund is owed $66.1 million, Direct Lenders are owed $784.2

22  million, USACM is owed $3.1 million and the owner of $.8 million is yet to be determined.

23        20.      According to the Cash Motion, USACM maintained a bank account generally

24  referred to as the Collection Trust Account (the "Collection Account") prior to the filing date.

25  The Collection Account served as the lone bank account to facilitate the collection of principal,

26  interest and fees on loans due from the respective borrowers. Consequently, since cash is a

27  fungible commodity and because borrower receipts were commingled, all borrower payments lost

28  their characterization on a loan by loan basis upon deposit into the Collection Account. This lack

1    of a loan by loan characterization is a critically important issue when considering disbursements

2    from the Collection Account.

3        21.    Regarding disbursements from the Collection Account, the Cash Motion states that

4    "funds from this bank account were used to make monthly interest payments to Investors as well

5    as to fund the ongoing operations and overhead of the Debtors' joint business enterprise."

6    Therefore, it is impossible to state with any degree of certainty that a particular borrower payment

7    (i.e. principal, interest or fees) was actually used for a specific payment to Direct Lenders or a

8    specific payment for operational expenses.

9        22.    The Distribution Motion is based upon what I consider to be an attempt to track

10    the flow of funds in the Collection Account on a loan by loan basis. Such an analysis requires that

11    an assumption be made with regard to the timing of borrower receipts and investor payments in

12    order to perform the "matching" of a particular receipt to the payments made or not made to

13    Direct Lenders on that specific loan. For example, if a borrower payment on a particular loan was

14    received in a month, the Debtors have assumed that any subsequent payments to Direct Lenders

15    came from those proceeds. However, in reality the original cash receipt may have been used the

16    following day to fund USACM overhead or even payments to Direct Lenders involved in other

17    loans. And the subsequent payments to Direct Lenders may have been covered by subsequent

18    borrower receipts from other loans. It is simply not possible to determine with any degree of

19    certainty which particular loans have funds that are not accounted for. At best, it is an exercise

20    based on the period of time one chooses to analyze.

21        23.    The Debtor's calculations of borrower payments still in the collection account

22    (approximately $9 million) versus those payments deemed not to be in the collection account

23    (approximately $24 million) as of the Petition Date is entirely dependent upon various

24    assumptions.  First, the Debtor assumes that all money in the Collection Account belongs to

25    Direct Lenders instead of any of the cash belonging to USACM as a result of operations, loans,

26    servicing fees, loan origination fees or other sources of USACM cash collections.  Due to the

27    fungible nature of cash, as noted above, it is impossible to determine whether or not that

28    assumption is valid.  The $9 million in the Collection Account at the Petition Date has not been

- 7 -

1  recognized as a potential asset of the Debtor with the Debtor proposing to distribute these

2  prepetition collections in full.

3      24.    The Debtors have made assumptions related to choosing which borrower's

4  principal payments are deemed to be "in" or "not in" the Collection Account.  For instance, two

5  borrowers, Roam Development and Del Valle Isleton each made principal payments to the

6  Collection Account on February 28, 2006, yet only Del Valle Isleton's payments are deemed by

7  the Debtors to be in the Collection Account on that day.  Thus, one group of Direct Lenders is to

8  be paid in full under the Distribution Motion (subject to offset) while the other exactly situated

9  group of Direct Lenders receives nothing and is treated as an unsecured creditor.

10      25.    Similar questions arise in connection with the Debtors' calculation for these two

11  borrowers for other payments such as Del Valle's payment on February 23, 2006, being deemed

12  in the Collection Account while Roam Development's other February 2006 payments (on

13  2/27/06, 2/24/06, 2/15/06 and 2/13/06) being deemed not in the Collection Account.  See these

14  borrowers' prepetition payment histories below where the Debtors made determinations as to

15  whether payments are deemed "in" or "not in" the Collection Account.  Based on the past records

16  of USACM, one cannot determine with any degree of certainty if it was Del Valley or Roam

17  Development's funds that are not in the Collection Account.

| Date | Borrower Principal Payments | Del Valle | | Roam Development | |
|---|---|---|---|---|---|
| | | Deemed to be "IN" Collection Account | Deemed to be "NOT in" Collection Account | Deemed to be "IN" Collection Account | Deemed to be "NOT in" Collection Account |
| 2/13/06 | 121,037 | | | | 422,571 |
| 2/15/06 | 73,374 | | | | 73,374 |
| 2/23/06 | 280,000 | 280,000 | | | |
| 2/24/06 | 74,736 | | | | 74,736 |
| 2/27/06 | 73,116 | | | | 73,116 |
| 2/28/06 | 20,000 | 20,000 | | | |
| 2/28/06 | 20,000 | 20,000 | | | |
| 2/28/06 | 90,966 | | | | 90,966 |
| 3/1/06 | 20,000 | 20,000 | | | |
| 3/8/06 | 127,861 | | | 127,861 | |
| 3/15/06 | 20,000 | 20,000 | | | |
| 3/16/06 | 83,311 | | | 83,311 | |
| 3/24/06 | 20,000 | 20,000 | | | |

- 8 -

26.     Commencing sometime in 2003, and possibly earlier, USACM began paying Direct Lenders interest payments each month, whether or not the interest payments had been collected from the borrowers on the loans in the Loan Portfolio.  In other words, USACM was "advancing" money to Direct Lenders.  Furthermore, according to the Cash Motion, when borrowers paid down principal or paid off loans within the Loan Portfolio, the principal payments received by USACM as loan servicer were not returned to the Direct Lenders as principal payments but, were held and used in some cases to fund interest payments to Direct Lenders holding interests in non-performing loans.

27.     Fiesta Stoneridge is but one example of a loan where the borrower did not pay interest and the Direct Lenders received interest payments nonetheless.  Fiesta Stoneridge was a $10 million loan funded by 100 Direct Lenders on September, 22, 2003 at an annual interest rate of 13% per year.  Fiesta Stoneridge actually owes $2,484,337 to the Direct Lenders as of April 30, 2006, which is almost two years of unpaid interest.  At the same time, the 100 Direct Lenders had $2,368,514 of interest prepaid to them by USACM as of the Petition Date even though USACM has not received the interest payment from Fiesta Stoneridge.

28.     As of the Petition Date many of the Direct Lenders owe money to USACM (pre-payments of interest) or are owed money by USACM (principal not remitted), or both.  Furthermore, because the financial records of the Debtors did not accurately match the receipts of loan payments and disbursements of cash to Direct Lenders, and because cash was commingled in the Collection Account, the Debtors' financial advisors had to recreate the accounting records for each loan in the Loan Portfolio based on existing accounting records and any other documentation that could be found.  The Debtors' financial advisors have represented that this is an ongoing process (as of July 25, 2006).  For example, it is our understanding from discussions with the Debtors that borrower payments have not been properly split between principal and interest.  If a borrower payment has been treated as all principal, when in reality some of it should have been treated as interest, it would result in the principal balance per the accounting records to be overstated.

- 9 -

29. According to the USACM financial schedules filed with the Court, as of the Petition Date, the total amount of advances to Direct Lenders was $41,702,978. The source of the funds used by USACM for the advances has not specifically been identified. However, according to the Debtors' presumptive and preliminary calculations, as of the Petition Date, approximately $24 million of principal payments received from borrowers was not in the USACM "Collection Trust Account" and had not been remitted to Direct Lenders ("Diverted Principal"). Although the source of the advances has not been specifically identified it appears the Diverted Principal was used to fund Ponzi payments to Direct Lenders.

30. The lack of payments from non-performing loans serviced by USACM was not visible to the Direct Lenders because the Direct Lenders kept receiving payments as if the loans were performing.

31. Commencing in January of 2003, USACM began using the Diversified Fund as a source of funds for the Collection Account and potentially even earlier in connection with other transactions such as the Sheraton loan as discussed later.

32. On January 8, 2003, USACM received $11,425,000 from Diversified Fund funds that was recorded as an advance on the 10-90 Inc. loan, a loan made by Diversified Fund discussed later in this Declaration. USACM's specific use of the funds has not yet been determined. However, the funds went straight to the USACM Collection Account, the account used for payments to Direct Lenders.

33. The Diversified Fund was further used as a piggy bank, between February and December of 2004 when USACM received 20 payments from 17 different borrowers that totaled $18,914,005 that should have been remitted to Diversified Fund. Per the Debtors' financial advisors, the checks were actually cut by USACM at one point, but there were never distributed and were ultimately cancelled. As of the Petition Date, USACM still has not remitted the $18,914,005 to Diversified Fund. USACM's specific use of the funds has not yet been determined; but again the cash would have been in the Collection Account.

- 10 -

34.  According to the Hold Funds report provided by the Debtors as of the Petition Date there is approximately $24 million of Diverted Principal which does not include the $18.9 million owed to Diversified.  The detail of the $24 million is as follows:

| | Borrower | Direct Lenders | Amount Diverted | Number of Payments | Time Period |
|---|---|---|---|---|---|
| 1. | Beau Rivage Homes | 157 | 22,208 | 1 | 9/15/2005 |
| 2. | Bay Pompano Beach | 407 | 7,398,013 | 20 | 12/7/2005 - 1/23/2006 |
| 3. | Cabernet | 65 | 900,000 | 1 | 1/13/2006 |
| 4. | Universal Hawaii | 127 | 5,040,827 | 1 | 1/13/2006 |
| 5. | Beastar | 84 | 3,073,694 | 1 | 1/24/2006 |
| 6. | Copper Sage Commerce Center | 28 | 417,750 | 2 | 1/30/2006 and 3/17/2006 |
| 7. | Roam Development | 291 | 422,571 | 5 | 2/13/2006 - 2/28/2006 |
| 8. | Lake Helen Partners | 35 | 7,646 | 1 | 2/17/2006 |
| 9. | Freeway 101 | 57 | 3,750,000 | 1 | 2/21/2006 |
| 10. | Oak Shores II | 176 | 3,000,000 | 1 | 2/27/2006 |
| | | 1427 | 24,032,709 | 34 | |

35.  Of the 10 loans comprising the $24 million of Diverted Principal, four of the loans have been paid in full as of the Petition Date with no remaining outstanding balance due. These four loans (funded by a total of approximately 296 lenders) account for $12.3 million of the Diverted Principal.  Below is a summary of background information on each of the four fully paid loans:

- The **Beastar loan** originated in May 2005 with a maximum loan amount of $7.325 million. There were two December 2005 principal payments totaling $4.2 million and a final payment in full of $3.125 million in January 2006. Of the final payment, $3.074 million was deemed diverted.

- The **Copper Sage** loan originated in June 2004 with a maximum loan amount of $4 million. During the period of December 2005 through March 2006, 5 principal payments were made totaling $3.82 million. A final payment in full for $179,106 was received post petition on June 22, 2006. Of the final two prepetition payments (all of the January 2006 payment and a small portion of the March 2006 payment), $417,750 was deemed diverted.

- The **Freeway 101** loan originated in August 2004 with a maximum loan amount of $4.5 million. One principal payment for $750,000 was received in February 2005. A final payment in full for $3.75 million was received in February 2006 of which the entire amount was deemed diverted.

- 11 -

- The **Universal Hawaii** loan originated in August 2004 with a maximum loan amount of $8.75 million. Two payments were made near the end of May 2005 totaling $3.584 million and a final payment in full for $5.166 million in January 2006. Of the final payment, $5.041 million was deemed diverted.

36. The remaining 6 loans (funded by a total of 1,131 lenders) represent borrowers with balances still outstanding (partial pays) and account for the remaining $11.7 million in Diverted Principal.  Below is a brief summary of the 6 partially paid loans:

- **Bay Pompano Beach** - $14.7 million principal outstanding. Diverted Principal of $7.4 million.
- **Beau Rivage Homes** - $66,199 principal outstanding. Diverted Principal of $22,208.
- **Cabernet** - $3.0 million principal outstanding. Diverted principal of $900,000.
- **Lake Helen Partners** - $3.16 million principal outstanding. Diverted Principal of $7,646.
- **Oak Shores II** - $12.15 million principal outstanding. Diverted Principal of $3.0 million.
- **Roam Development** - $26.566 million principal outstanding. Diverted Principal of $422,571.

37. Based on preparation of the "Timeline of Diverted Payments" (Attached hereto as Exhibit "A"), it appears that there was a consistent pattern of diversion all the way back to 2003. It also clearly demonstrates that the timing of the bankruptcy filing was simply an arbitrary matter. In other words, whenever the Debtors' management decided to stop diverting principal payments, a bankruptcy filing would have been necessary. By way of example, had the filing date occurred on February 1, 2006 instead of April 12, 2006, the Freeway 101 payment of $3.75 million that was received on February 21, 2006 and diverted would have presumably been captured by the debtor-in-possession estate and preserved for future disposition. However, because the filing arbitrarily occurred on April 12th, these funds are not available. The Freeway 101 Lenders are therefore disadvantaged purely due to the unlucky timing of the filing.

38. The diversion of principal was obviously intentionally hidden from the Direct Lenders since, even though a loan would pay off in full, the Direct Lenders would still receive

- 12 -

1  monthly interest payments as if the loan were still outstanding and the borrower was continuing
2  to make monthly payments.

3       39.    For example, in the Universal Hawaii loan (principal amount of $5,066,413) where
4  USACM put 127 Direct Lenders into a single loan, USACM received payment in full on January
5  13, 2006. Rather than notifying the 127 Direct Lenders of the payment in full in January 2006,
6  USACM took the money and continued to pay the 127 investors monthly interest checks in
7  February 2006 and March 2006. The receipt of those monthly interest checks conveyed to those
8  127 Direct Lenders that their loan remained outstanding and continued to generate monthly
9  interest.

10      40.    Based on the notion that USACM was advancing payment to Direct Lenders at the
11  Petition Date without notifying Direct Lenders of non-performing loans and the unknown use of a
12  substantial amount of funds from January 2003, the operations of USACM are extremely suspect
13  and likely constitute a form of a Ponzi scheme, as previously discussed.

14      41.    Despite the promises and representations contained in the Diversified Fund
15  Prospectus, USACM did not adhere to the requirements of the Prospectus. A prime example of
16  these underwriting violations is described in the following five loans.

17      42.    **10-90 Inc. Loan** - At the Petition Date Diversified Fund owned 100% of the 10-
18  90, Inc. loan which is a non-performing loan with a current investment of $55,113,781 and an
19  interest receivable of $21,063,341 totaling $76,177,122. The 10-90. Inc. loan is the largest loan
20  in the entire USACM portfolio.

21      43.    The borrower for the 10-90, Inc. loan was 10-90, Inc. ("10-90"). However, it
22  appears 10-90 was used as a pass through to USA Investment Partners LLC ("IP") since 10-90
23  borrowed funds from Diversified Fund then 10-90 lent the funds to IP. Furthermore, the 10-90/IP
24  loan was formally transferred from 10-90 to IP on January 1, 2005.

25      44.    The 10-90, Inc./IP loan was a revolving loan that originated in April of 2002 and
26  was last drawn on in February 2005. Between April 2002 and February 2005 it appears the loan
27  proceeds were used as a substantial source of funds for IP. The primary members of IP are Tom
28  Hantges and Joe Milanowski. Through IP, Tom Hantges and Joe Milanowski were using a

US_WEST:260063507.5

1    substantial portion of Diversified's funds (the 10-90, Inc. loan) as a source of funds for projects

2    and other deals of IP and IP related entities.

3        45.    The 10-90, Inc./IP loan is currently a non-performing loan that is secured by the

4    assignment of IP's membership interest in Ashby USA, LLC, Capital Land Investors, LLC and

5    Random Developments, LLC.  The 10-90, Inc./IP loan is not secured by first deeds of trust that

6    encumber the relevant real property or real property interest or by second deeds of trust or other

7    real property.

8        46.    This virtually unsecured loan to the principals of USACM accounts for

9    approximately 50% of the total assets in the Diversified Fund portfolio.  This loan by itself

10    violates all three of the diversification requirements (no loan to exceed $20 million, no loan to

11    exceed 15% of loan portfolio, and loans to a single borrower including affiliates will not exceed

12    25% of the portfolio), violates the first priority deed of trust collateral requirement, violates the

13    loan-to-value requirement (loan must not exceed 75% of the value of the real property collateral),

14    and violates the no loans to USACM or any of its affiliates requirement.

15        47.    **Epic loan** - The second largest loan in the Diversified Fund is not a loan, rather it

16    is what is left after a 2002 foreclosure on the real property collateral.  According to the Loan

17    Summary as of April 27, 2006 the Epic loan has a listed principal amount of $18,915,000.

18    Diversified Fund purchased the property at the foreclosure sale, but USACM vested management

19    and control of the property (a Palm Springs condominium resort property) in an affiliate of

20    USACM by the name of Tree Moss, LLC.  In February, 2006, USACM caused Diversified Fund

21    to quitclaim the subject property to Tree Moss, LLC for what appears to be no consideration.

22        48.    **Sheraton Hotel loan** - The third largest loan in the Diversified Fund is not a loan

23    either.  According to the Loan Summary as of as of April 27, 2006 the Sheraton Hotel loan has a

24    listed principal amount of $6,845,000.

25        49.    This loan was originally funded in 1999 by Direct Lenders other than Diversified

26    Fund.  For reasons presently unknown, the decision was made by USACM in 2001 to transfer the

27    loan to the Diversified Fund.  This process took almost six months due to the requirement that

28    each individual Direct Lender execute documentation transferring their interest in the loan.

- 14 -

1    Interestingly, the loan went into default shortly thereafter. In 2002, Diversified Fund took

2    enforcement action, eventually foreclosing upon the Salt Lake City airport hotel that

3    collateralized the loan, and purchased the property at the foreclosure sale.

4        50.    However, USACM vested management and control of the property in another

5    USACM affiliate, USA Investors VI, LLC. USA Investors VI, LLC operated the property for

6    several years and sold it to a third party in 2005. Although it appears that the net sales proceeds

7    were placed into the Diversified Fund operating account, and the "loan balance" was reduced by

8    the amount of the net sales proceeds, it is unclear what happened to the monies placed into the

9    Diversified Fund account and a large "principal balance" remained on the books. At this point,

10    there is no loan and the former collateral for the loan has been sold.

11        51.    **Colt loans** - The fourth largest loan in the Diversified Fund is actually a series of

12    non-performing loans relating to the redevelopment of the historic Colt arms factory in Hartford,

13    Connecticut. At the Petition Date Diversified Fund owned 100% of the following three Colt

14    loans:

15        a.    Colt CREC Building loan with a current investment of $3,718,777 and an interest

16            receivable of $923,496 totaling $4,642,273 due to Diversified Fund;

17        b.    Colt DIV added #1 loan with a current investment of $1,500,000 and an interest

18            receivable of $470,625 totaling $1,970,625 due to Diversified Fund;

19        c.    100% of the Colt DIV added #2 loan with a current investment of $3,100,000 and

20            an interest receivable of $670,375 totaling $3,770,375 due to Diversified Fund.

21        52.    Furthermore, at the Petition Date Diversified Fund owned 42.8% of the Colt

22    Gateway loan with a current investment of $2,393,657 (Diversified Fund's percent ownership)

23    offset by an advancement of interest from USACM of $328,220 resulting in $2,065,437 due to

24    Diversified Fund.

25        53.    The borrower on the Colt loans in each case is Colt Gateway, LLC, an entity in

26    which USACM affiliate Investment Partners is a member.

27

28

US_WEST:260063507.5

54.    Unfortunately, the three Colt loans that are 100% owned by Diversified Fund are undocumented and unsecured.  Loan documents apparently prepared in 2003 have never been executed by the borrower and the loan documents apparently do not contemplate a deed of trust.

55.    **Fiesta Development McNaughton loan** – Another example of violating the lending criteria noted in the Prospectus.  At the Petition Date Diversified Fund owned 100% of the Fiesta Development McNaughton loan with a current investment of $6,000,000 and an interest receivable of $976,444 totaling $6,976,444 due to Diversified Fund.  The Fiesta Development McNaughton loan is a "bullet loan" (no interest is due until maturity, at which point all principal and interest is due and payable) that is the fifth largest loan in Diversified Fund's portfolio.  The loan is not secured by first deeds of trust that encumber the relevant real property or real property interest or by second deeds of trust or other real property.

56.    The borrower is Fiesta Development and the guarantor is Richard Ashby. Investment Partners and possibly other USACM affiliates have ownership interests in Ashby and Fiesta-related entities and development projects.

57.    The mismanagement of the loan origination activities of Diversified Fund by USA Mortgage regarding the above described 100% owned loans, is summarized as follows:

| Loan | Principal | Performing ? | Portfolio Diversification? | Insider Loan? | Secure ? | LTV<75%? |
|---|---|---|---|---|---|---|
| 10-90, Inc. | $55mm | No | Fail | Fail | Fail | Fail |
| Epic Resorts | $18.9mm | No | Fail | Fail | Fail | Fail |
| Sheraton Hotel | $6.8mm | No | Fail | Fail | Fail | Fail |
| Colt DIV #1 (no loan documentation) | $1.5mm | No | OK | Fail | Fail | Fail |
| Colt DIV #2 (no loan documentation) | $3.1mm | No | OK | Fail | Fail | Fail |
| CREC – Colt (no loan documentation) | $3.7mm | No | OK | Fail | Fail | Fail |
| Fiesta McNaughton | $6mm | Yes | OK | Fail | Fail | Fail |
|  | $95mm |  |  |  |  |  |

58.    The investor statement distributed to investors in the Diversified Fund by USA Mortgage on December 31, 2005, a true and correct copy of which is attached hereto as Exhibit "C", is directly at odds with the foregoing chart.  For example, the 10-90, Inc. loan is described as "[s]ecured by 3 master planned communities in Southern California totaling approximately 6,500 lots" and the Fiesta McNaughton loan is described as "[s]ecured by approximately 800 acres for development of a master planned community located in Coachella, California.

59.    USACM and USACM-related entities are involved in various real estate development activities.  Furthermore, it appears some of the loans in the Loan Portfolio pertain to these real estate development activities.  These development activities were conducted in a series of affiliated companies typically owned by Messrs. Milanowski and Hantges, the owners of USACM, or their affiliates.  The identified related entities and relationships are discussed below.

60.    **Investment Partners** - Investment Partners seemed to have an involvement in many of the loans in the Loan Portfolio.  As discussed above, Investment Partners is the direct borrower in the 10-90, Inc. loan, the single largest loan in the Loan Portfolio by far.  Investment Partners was also an equity participant in many of the borrowers (or entities that had ownership interests in the borrowers) that obtained loans from USACM.  Based on our limited research it appears Investment Partners (excluding the HFA loans) is involved in approximately 24 loans that have an approximate outstanding loan balance of $210 million as of June 30, 2006.  Given there are 115 loans with a total balance outstanding of approximately $850 million as of June 30, 2006, Investment Partners is involved in 21% of the total number of loans, and 25% of the total outstanding amount of the loans.

61.    **USA Investors VI** - This is an entity that is owned substantially by Investment Partners.  As discussed above, the Sheraton Hotel property was given to USA Investors VI after foreclosure of the Diversified Fund loan and purchase at the foreclosure sale by Diversified Fund. I am investigating other involvement of this entity in the real estate activities of USACM.

62.    **HMA Sales, LLC** - This is an entity that is nominally 50% owned by Investment Partners although, by virtue of certain arrangements with Allen Abolafia, the holder of a 45%

1   member interest, Investment Partners may have a much greater stake in profits.  HMA Sales, LLC

2   is the owner of the Royal Hotel which reportedly is in the process of being sold.

3        63.    **Tree Moss Partners, LLC** - Tree Moss appears to be wholly owned by HMA

4   Sales, LLC.  Tree Moss is the entity that was given the Epic Resorts property after the foreclosure

5   in 2002 by Diversified Fund and which obtained title to that property for no apparent

6   consideration in February of 2006.  The extent of the other real estate activities of Tree Moss is

7   presently unknown.

8        64.    **David Fogg** - Mr. Fogg and Mr. Hantges were both officers and shareholders of a

9   real estate development company by the name of Inco Homes which filed bankruptcy in

10  Riverside, California in 1999.  Mr. Fogg is also the principal of 10-90, Inc., the original borrower

11  in the 10-90, Inc. loan transaction.  For reasons unknown at the present time, Mr. Fogg's company

12  apparently borrowed money from Diversified Fund and immediately transferred that money to

13  Investment Partners or to entities designated by Investment Partners.  Mr. Fogg is also involved

14  in other Investment Partners transactions.

15       65.    **Richard Ashby/Fiesta Development** - Mr. Ashby is a Southern California real

16  estate developer and a principal in Fiesta Development.  He and Fiesta Development are involved

17  in at least eight outstanding loans in the USACM portfolio, involving $63 million in principal

18  amount.  Three of these loans have been designated as performing by the Debtors and five as non-

19  performing.  Mr. Ashby personally guaranteed six of the eight loans.

20       66.    Investment Partners has equity interests in at least three of the development

21  projects of Fiesta and Ashby, the Stoneridge Project, the Oak Valley Project and the Roripaugh

22  Ranch project.  Based on the funding of the 10-90 loan, some monies received by Investment

23  Partners in the $55 million 10-90, Inc. loan were used to finance the equity participation in these

24  and other development projects.

25       67.    **Homes For America** - Homes For America ("HFA") is a real estate developer that

26  operates throughout the United States.  Affiliates of HFA are borrowers in the USACM portfolio

27  in at least six loans.  Investment Partners owns equity interests in the project being developed by

28  HFA, the Colt Gateway Project in Hartford, Connecticut.

<center>- 18 -</center>

68.     Based on our review of the loan files, the loan files fail to provide even the minimum amount of information necessary to understand basic facts about the loan.  For instance, the loan file for the 10-90, Inc. loan contained only the loan documents originated at the inception of the loan, plus the documents by which the parties agreed in 2003, that there was no need for the involvement of 10-90, Inc. and that 10-90, Inc. would assign its interest as lender to Diversified Fund so that Diversified Fund would thereafter be the direct lender to Investment Partners.  For instance the loan file for the 10-90 Inc. loan contains only 17 basic loan transaction documents.  This for a $55 million loan, largest by far in the Debtors' Loan Portfolio.

69.     As discussed above, USACM transferred loans among Direct Lenders and the Funds, and transferred loans among the Funds.  USACM transferred real estate owned among its affiliates for no apparent consideration (as in the case of the foreclosed Epic Resorts property being transferred to Tree Moss, LLC)  The quantity and velocity of monies transferred from one USACM affiliate to another (as in the case of the $58 million book entry indicating that USACM transferred such amounts to IP, the $11.4 million transfer from Diversified Fund to the USACM Collection Account in January, 2003, the $55 million transferred from Diversified Fund to IP under the guise of the 10-90, Inc. loan) and the poor state of the books and records of USACM (discussed above), makes it very difficult and exorbitantly expensive to sort out the true nature of the affairs among the USACM affiliates.

70.     These estates could be overwhelmed by the administration costs associated with litigation of disputes among Debtors and Direct Lenders and the need to recreate the USACM books and records in connection with such litigation.

71.     All of this will detract from the main goal of collecting the loans and distributing the monies to creditors as efficiently and as quickly as possible.

72.     According to the Debtor's bankruptcy schedules, at the Petition Date Diversified Fund had Accounts Receivable from USACM in the amount of $18,914,005.  At the Petition Date according to Diversified Fund's Loan Summary provided by the Debtor, Diversified Fund owes USACM $4,574,199 for the advancement of payments that were not paid by the borrowers.  The net result of offsetting the $18,914,005 due to Diversified Fund from USACM with the

- 19 -

1   $4,574,199 due to USACM from Diversified Fund would be an outstanding amount due to

2   Diversified Fund from USACM of $14,339,806 ($18,914,005 - $4,574,199).

3          73.    The $18,914,005 owed to Diversified Fund from USACM is a result of borrower

4   payments received by USACM that were not remitted to Diversified Fund.  The payments that

5   were not remitted to Diversified Fund were received by USACM between February and

6   December of 2004.  Furthermore, the $18,914,005 is comprised of 20 payments received from 17

7   different borrowers.

8          74.    As mentioned above, the $4,574,199 owed to USACM is a result of payments by

9   USACM from monies not paid by the borrowers.  Of the amounts advanced, $936,897 was for

10  advancements of principal payments and $3,637,302 was for the advancement of interest

11  payments.  Moreover, the amount advanced to Diversified Fund pertains to 21 loans and is the net

12  of the total amount advanced ($4,698,529) against the total amount of Diversified Fund funds in

13  the "Collection Account" as of the Petition Date ($124,330) for the 21 loans.

14         75.    Currently the calculation of the aggregate dollar amount of the proposed

15  distribution does not take into account the offset of prepetition receivables with prepetition

16  payables between the USACM and the Direct Lenders.

17         76.    In my opinion, the prepetition amounts owed and due between the Direct Lenders

18  and USACM should be offset prior to a calculation of distributions.

19         77.    Based on the above facts, in my opininion there should be an appropriate holdback

20  of the funds proposed to be distributed by the Debtor and the distribution should be an interim

21  distribution rather than a permanent schedule for future distributions.  With the goal of caution

22  and fiscal conservation, I believe an appropriate amount of hold back would be accomplished if

23  the distribution were limited to 90% of the amounts proposed by the Debtors on account of

24  interest payments of 25% of the amounts of principal repayments.

25         78.    If called as a witness, I could and would testify hereto.

26

27

28

US_WEST:260063507.5

1    79.    I declare under penalty of perjury under the laws of the United States of America

2    that the foregoing is true and correct to the best of my knowledge and belief.

3    Executed this 27th day of July, 2006, at Phoenix, Arizona.

4

5    _Michael A. Tucker_

6    Michael A. Tucker

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

US_WEST:260063507.5