Filed
12-26-06
Electronically

| | |
|---|---|
| STUTMAN, TREISTER & GLATT, P.C. | SHEA & CARLYON, LTD. |
| FRANK A. MEROLA | JAMES PATRICK SHEA |
| (CA State Bar No. 136934) | (Nevada State Bar No. 000405) |
| EVE H. KARASIK | CANDACE C. CARLYON |
| (CA State Bar No. 155356) | (Nevada State Bar No. 002666 |
| CHRISTINE M. PAJAK | SHLOMO S. SHERMAN |
| (CA State Bar No. 217173) | (Nevada State Bar No. 009688) |
| 1901 Avenue of the Stars, 12th Floor | 233 South Fourth Street, Second Floor |
| Los Angeles, CA 90067 | Las Vegas, Nevada 89101 |
| Telephone: (310) 228-5600 | Telephone: (702) 471-7432 |
| E-mail:   fmerola@stutman.com | E-mail:   jshea@sheacarlyon.com |
|              ekarasik@stutman.com |              ccarlyon@sheacarlyon.com |
|              cpajak@stutman.com |              ssherman@sheacarlyon.com |

*Counsel for the Official Committee of Equity Security Holders of
USA Capital First Trust Deed Fund, LLC*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY<br>          Debtor | BK-S-06-10725-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>          Debtor | BK-S-06-10726-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>          Debtor | BK-S-06-10727-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>          Debtor. | BK-S-06-10728-LBR<br>Chapter 11 |
| In re:<br>USA SECURITIES, LLC,<br>          Debtor. | BK-S-06-10729-LBR<br>Chapter 11 |
| Affects<br>☐ All Debtors<br>☐ USA Commercial Mortgage Co.<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed<br>☒ USA Capital First Trust Deed Fund, LLC | Date: January 31, 2007<br>Time: 9:30 a.m. |

**OBJECTION OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF
USA CAPITAL FIRST TRUST DEED FUND, LLC TO PROOF OF CLAIM FILED BY
STANDARD PROPERTY DEVELOPMENT, LLC (CLAIM #120) (AFFECTS USA CAPITAL
FIRST TRUST DEED FUND, LLC)**

The Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC (the "FTDF Committee") appointed in the above-captioned bankruptcy cases (the "Chapter 11 Cases") hereby files this Objection to the Proof of Claim filed by Standard Property Development, LLC (the "Objection").

This Objection is made pursuant to Section 502 of the Bankruptcy Code and Rule 3007 of the Federal Rules of Bankruptcy Procedure, and is based on the pleadings, papers and records on file in the Chapter 11 Cases, the exhibits and points and authorities attached hereto, and any evidence and oral argument to be presented at the time of the hearing of Objection.

DATED this 26TH day of December, 2006.

SHEA & CARLYON, LTD.

JAMES PATRICK SHEA, ESQ.
CANDACE C. CARLYON, ESQ.
SHLOMO S. SHERMAN, ESQ.
233 South Fourth Street, Second Floor
Las Vegas, Nevada 89101

and

STUTMAN, TREISTER & GLATT, P.C.
FRANK A. MEROLA, ESQ.
EVE H. KARASIK, ESQ.
CHRISTINE M. PAJAK, ESQ.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067

*SHEA & CARLYON, LTD.*
*233 S. Fourth Street, Suite 200*
*Las Vegas, Nevada 89101*
*(702) 471-7432*

2

406128v2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## POINTS AND AUTHORITIES

### I.

### BACKGROUND

USA Commercial Mortgage Co. ("USACM") originated loans for borrowers and solicited the funding of such loans from numerous individuals and entities (collectively, the "Direct Lenders"), including USA Capital First Trust Deed Fund, LLC ("FTDF"). Upon information and belief, with few exceptions, USACM originated loans that provided for a mandatory initial funding amount with any additional funding to be made solely at the discretion of the Direct Lenders. Upon further information and belief, when USACM arranged an increase in the original loan amount, USACM solicited the existing Direct Lenders in the original loan for the additional funds. Absent the affirmative decision by the Direct Lenders to invest additional funds, the original loan amount would not be increased.

Standard Property Development, LLC ("Standard"), is a borrower under a loan originated by USACM (the "Standard Loan"). FTDF is one of 103 Direct Lenders that invested in the Standard Loan. The Direct Lenders on the Standard Loan respectively invested approximately an average of $80,000 in the Standard Loan. FTDF invested an initial $131,000 in the Standard Loan.

The Standard Loan was documented by the execution of a Promissory Note (the "Note"), a Construction Loan Agreement (the "Loan Agreement"), and a Mortgage and Security Agreement (the "Mortgage", and collectively, the "Loan Documents").

As set forth in the § 3.1 of the Loan Agreement, the Standard Loan was in the original principal amount of $8,240,000. Section 3.2 of the Loan Agreement provided that

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

3

406128v2

"through…January 31, 2007, Lender and USA shall have the exclusive right, <u>but not the</u> <u>obligation</u>, to increase the Loan Amount to an amount not to exceed …$17,750,000…" (emphasis added).

Standard has admitted that the promised funding of $8,240,000 was advanced on March 15, 2006. <u>See</u> <u>Addendum to Proof of Claim</u> ("Claim Addendum"), p. 2.

As contemplated by the Promissory Note and the Construction Loan Agreement, any increase to the loan amount was to be accomplished by adding additional Direct Lenders to fund the increase. In particular, Section 3.2 of the Construction Loan Agreement provided that any amounts added to the Loan Amount would be evidenced by appropriate amendments to the Promissory Note and the Mortgage memorializing the increase in the Loan Amount, and "the change in the identity of the persons and entities which comprise Lender and their respective undivided interests in the Loan." Thus, prior to April 13, 2006, certain Direct Lenders funded an increase to the Loan Amount of $1,400,000, evidenced by a recorded First Amendment to Mortgage reflecting both the increased Loan Amount as well as the addition of 13 new Direct Lenders to the Standard Loan. A copy of the First Amendment to Mortgage is attached hereto as **Exhibit "A".** With the exception of the single increase described above, upon information and belief, neither FTDF nor any of the other Direct Lenders consented to fund any increase in the Loan Amount.

Standard has admitted that its dealings were not with any individual Direct Lenders (including FTDF); but rather, that the Standard Loan was "solicited, originated, structured, and negotiated by…USA COMMERCIAL MORTGAGE COMPANY." <u>Claim Addendum</u>, p. 1.

*SHEA & CARLYON, LTD.*
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

4

406128v2

On November 10, 2006, Standard filed a proof of claim against the FTDF estate (the "Claim") for the alleged damages that it claims to have suffered as a result of the shortfall it experienced by not receiving the maximum loan amount of $17,750,000. Although the Claim itself does not disclose the amount sought by Standard, based upon the attached description, the Claim Addendum asserts that the Claim is secured to the extent of $671,000 (due an asserted right of setoff against an equal amount claimed by USACM), and is unsecured in an undetermined amount representing the unliquidated balance of Standard's damages.

For the following reasons, Standard's claim lacks factual and legal basis, and should therefore be disallowed in its entirety.

## II.

## LEGAL ARGUMENT

A. **Standard has no Legal Basis for the Assertion of Claims Against FTDF or Any of the Direct Lenders**

1. The Loan Documents Unambiguously Limit the Amount of the Direct Lenders' Obligation to $8,240,000.

As discussed above, Section 3.2 of the Loan Agreement expressly provides that "through...January 31, 2007, Lender and USA shall have the exclusive right, *but not the obligation*, to increase the Loan Amount to an amount not to exceed ...$17,750,000..." Moreover, Section 3.1 of the Loan Agreement quite clearly states that Lender agrees to make a loan to Borrower...in a principal amount of *up to $8,240,000.*" Indeed, the Note itself references the disbursement schedule accompanying the Loan Agreement, which expressly

provides that "[a]ll advances after closing are subject to Section 3.2 of the Loan Agreement."[1] The Note also attaches a list of the Direct Lenders and the amount loaned by each, reflecting a total loan of *$8,240,000*.

Thus, the sole amount committed to Standard was the initial disbursement of $8,240,000 promised in Section 3.1 of the Loan Agreement. Standard admits that the $8,240,000 was in fact advanced on March 15, 2006.

Conveniently, in its Claim Addendum, Standard neglects to mention Section 3.2 of the Loan Agreement; instead, Standard merely references the execution of a promissory note in the "original stated principal amount" of $17,750,000 in an apparent attempt to establish, inferentially, an "obligation" by both USACM and the various Direct Lenders (including FTDF) to loan monies in excess of $8,240,000. Claim Addendum, p. 1. The Loan Documents in this case are clear, however, that the "Loan Amount" was $8,240,000, and that any disbursements in excess of that amount were to be made in the sole discretion of the Direct Lenders and USACM.

Pursuant to § 8.15(a) of the Loan Agreement, "[t]he laws of the State of Nevada, without regard to its choice of law provisions, shall govern the construction and enforcement of the Loan Documents."

According to Nevada law, where, as here, a contract is clear on its face, interpretation is a matter of law, and the court will enforce the contract as written. See, e.g., Chwialkowski v. Sachs, 834 P.2d 404, 406-07 (Nev. 1992) (summary judgment was appropriate, since an

---

[1] Although the Note references the disbursement instructions in "Exhibit B of the construction loan agreement," the disbursement schedule is actually Exhibit C to the Loan Agreement.

*SHEA & CARLYON, LTD.*
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

406128v2

unambiguous contract is construed from the language of the document); Ellison v. Calif. State Auto. Assn., 797 P.2d 975, 977 (Nev. 1990) ("It has long been the policy in Nevada that absent some countervailing reason, contracts will be construed from the written language and enforced as written"). Compare Stratosphere Litigation L.L.C. v. Grand Casinos, Inc., 298 F.3rd 1137, 1143-44 (9th Cir. 2002) ("Whether a contract is ambiguous is a question of law to be reviewed de novo.").

Standard asserts merely that:

> The intent and purpose of the lending arrangement between the Claimant and the Direct Lenders was to finance not only the acquisition of the property but its conversion and rehabilitation as well. The Claimant would never have entered into the loan at all without assured funds needed for the completion of the project – a circumstance well known to the representatives of the Debtors and Direct Lenders.

Claim Addendum, p. 2. As Standard should well be aware, however, the allegation that there was some extra-contractual understanding which contradicts the written terms of an agreement is simply not provable under Nevada law. "When parties reduce their contract to writing, all oral negotiations and agreements are merged in the writing, and the instrument must be treated as containing the whole contract...." Daly v. Del E. Webb Corp., 609 P.2d 319, 361-62, quoting Gage v. Phillips, 21 Nev. 150, 153 (1891). Courts are not free to modify or vary the terms of an unambiguous agreement. See, e.g., Kaldi v. Farmer's Ins. Exch., 21 P.3rd 16, 21 (Nev. 2001), citing State ex rel. List v. Courtesy Motors, 590 P.2d 163, 165 (1979). "The court is not at liberty, either to disregard words used by the parties, descriptive of the subject matter or of any material incident, or to insert words which the parties have not made use of." Reno Club, Inc. v. Young Inv. Co., 182 P.2d 1011, 1017 (Nev. 1947). In

1    Reno, as in the instant case, the court found that the provision at issue "appears to be in

2    ordinary and plain language. Its meaning seems clear." Id. at 1014.

3    Moreover, no different interpretation is mandated by the Promissory Note, which (1)

4    references the Loan Agreement; (2) provides that interest accrues only on the outstanding

5    

6    portion of the Note Amount; and (3) attaches a list of lenders and loan amounts, with a total of

7    $8,240,000. Any interpretation of the Loan Documents which would hold that any amounts in

8    excess of $8,240,000 were required to be loaned would contradict the express terms of the

9    Loan Agreement. The long-standing Nevada principles of construction of contracts are to the

10    

11    contrary – the court should construe provisions to be consistent with each other, and to give

12    meaning to each part. See, e.g., S.C. Fogus v. Ward and Harrison, 10 Nev. 269 (1875).

13    Extrinsic evidence is not admissible to contradict an express contract term. Kaldi, 21

14    P.3d at 21; Daly, 609 P.2d at 320. Nor is such evidence admissible under the guise of

15    "explaining" the meaning of a provision which is clear on its face. Kaldi, 21 P.2d at 21; Geo.

16    B. Smith Chemical v. Simon, 555 P.2d 216, 216 (Nev. 1976).

17    

18    In Kaldi, appellants argued that, although the contract provided Farmer's the right to

19    terminate the agency contract without cause, there was an unwritten term which required

20    cause for termination. The Nevada Supreme Court disagreed, affirming the dismissal of the

21    complaint, since Kaldi's efforts were to introduce parol or other extrinsic evidence, the effect

22    of which would be to contradict a clear term of the written agreement. The court

23    

24    distinguished this issue from a contract that is silent on a particular issue, or that incorporates

25    words that are capable of different meanings (citing as an example business days versus

26    calendar days). Further, the court noted that the contract in question "prohibits separate oral

27    

28    

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

8

406128v2

contracts and requires that all changes, alterations or modifications to the Agreement to be in writing and signed by all parties." Kaldi, 21 P.3d at 22. A similar provision prohibiting oral amendments, modifications, or waivers also appear in the Loan Agreement at § 8.10.

2.    Even if the Loan Documents Were Not Clear, USACM Had No Authority to Promise Additional Funding on Behalf of the Lenders.

As set forth above, the Section 3.2 of the Loan Agreement provides that "Lender and USA shall have the exclusive right, but not the obligation to increase the loan amount." Thus, the Loan Agreement itself provides that any increase in funding would require the joint decision of USACM and the Direct Lenders. USACM is without authority to unilaterally commit the Direct Lenders to provide additional funds.

This limitation on USACM's authority is expressly articulated in the Loan Servicing Agreement (the "LSA") entered into between USACM and each Direct Lender (including FTDF) which authorizes USACM to act as servicing agent for such loan or loans on the particular Direct Lender's behalf. A true and correct copy of FTDF's LSA is attached hereto as **Exhibit "B"**. With respect to the scope of USACM's authority pursuant to the LSA, paragraph 2(e) of the LSA provides that "[n]otwithstanding the foregoing or any other provision contained herein, USA may not permit any modification to any Loan that would ... change the outstanding principal amount ... without Lender's prior consent." This language alone would render invalid any promises by USACM that would purport to increase or to otherwise change the outstanding principal amount without the FTDF's express approval.

Moreover, the regulations set forth in NAC 645B.260 expressly provides that "[a]ll decisions regarding the funding of investments in mortgages must be made by the investor."

1   There is no countermanding agreement or grant of authority of any nature that would permit

2   USACM to unilaterally obligate FTDF to increase its funding in any given project.

3   **B.  Even if the Court Determines Some Additional Funding Obligation Exists on
    Behalf of the Direct Lenders on the Standard Loan, Individual Direct Lenders'
    Obligations Should Be Limited to Their Respective Proportional Investments.**

6   Even if the Court determines that the Direct Lenders on the Standard Loan have some

7   additional funding obligation under the Loan Agreement or otherwise (which the FTDF

8   believes is highly unlikely for the reasons set forth in detail above), the individual Direct

9   Lenders' respective obligation for the additional funding should be limited to their

10  proportional respective investments.  As set forth above, USACM solicited funds from myriad

11  Direct Lenders and pooled their respective investments to fund the originated loans.  In most

12  of these loans, there are a multitude of Direct Lenders that invested respectively only a small

13  portion of the total original amount.  This is the case in the Standard Loan where there are 103

14  initial Direct Lenders with an average individual investment of $80,000.  It is wholly unfair,

15  as the Standard Claim purports, to require an individual Direct Lender to fund the entire

16  amount of the additional funding requested – in this case, in excess of $17 million – when the

17  Direct Lender signed on only for a relatively nominal investment.  Yet this is exactly what the

18  Standard Claim advocates with respect to FTDF.  At the time that Standard executed the

19  Promissory Note and the Construction Loan Agreement, FTDF was a Direct Lender with an

20  initial investment of $131,000 in the Standard Loan.  Thus, FTDF's proportional liability for

21  any purported breach of the Construction Loan Agreement would necessarily be limited to the

22  ratio of its original investment of $131,000 to the original loan amount of $8,240,000, or 1.5%

23  (for a total of $266,250, assuming an amount of damages equal to the maximum principal

406128v2

amount of $17,750,000). Yet the Standard Claim against FTDF alone purports to be a secured claim in the amount of $671,000, and an unquantified unsecured amount. Thus, while FTDF vigorously disputes any obligation for the increased loan amount funding alleged in the Standard Claim, in the unlikely event the Court concludes otherwise, the maximum exposure for the FTDF could be no more than 1.5% of the damages that Standard has allegedly sustained.

### C. No Portion of Standard's Claim is Secured, as Standard Does not Possess Any Right of Setoff

Standard apparently sees the $671,000 in principal loaned to it by FTDF as "security" for its Claim, seeking to withhold the payment of its obligation to FTDF as an offset against its claimed damages. Claim Addendum, p. 5. However, Standard contractually waived any right of offset in the Loan Documents. The Note clearly states, at ¶ 10 on p. 4: "Waivers. Borrower waives any right of offset it now has or may hereafter have against the Lender hereof and its successors and assigns...." The Mortgage clearly states, in § 24(e), that "[a]ll amounts due under this Mortgage, the Note, and the other Collateral Loan Documents shall be payable without setoff, counterclaim or any deduction whatsoever." This notion is repeated in § 26(e), among the Borrower's "Covenants, Representations, and Warranties," wherein the Borrower covenants that:

> None of the Collateral Loan Documents are subject to any right of rescission, setoff, abatement diminution, counterclaim or defense..., nor will the operation of any of the terms of such Collateral Loan Documents, or the exercise of any right thereunder, render any Collateral Loan Documents...subject to any right of rescission, setoff, abatement diminution, counterclaim or defense....

This provision waiving any right of setoff is enforceable. As several courts have

held, "[c]ontracting parties may preclude setoff between them by agreement. <u>See</u> <u>In re</u>

<u>Blanton</u>, 105 B.R. at 335 (citing 80 C.J.S. *Set-Off and Counterclaim* § 14 (1953))." <u>In re</u>

<u>Carlyle</u>, 242 B.R. 881, 892 (Bankr. E.D. Va. 1999).

> Parties to transactions may by agreement preclude setoff between them. *See* 80 *C.J.S. Set-Off And Counterclaim* § 14 (1953); 20 *Am.Jur.2d Counterclaim, Recoupment, and Setoff,* § 29 (1965); Annotation, *Contractual Waiver of Right of Setoff or Counterclaim,* 98 A.L.R. 602-07 (1935); <u>Armour & Co. v. Whitney & Kemmerer, Inc.,</u> 164 Va. 12, 178 S.E. 889, 98 A.L.R. 596 (1935); <u>Silbert v. Silbert,</u> 85 A.D.2d 661, 445 N.Y.S.2d 215 (1981). Courts will enforce contract provisions waiving setoff rights.

<u>In re Blanton</u>, 105 B.R. 321, 335 (Bankr. E.D. Va. 1989)

> We do, however, recognize the following principles. First, a creditor in bankruptcy proceedings may expressly waive a right of setoff – as, for example, by a written statement that the creditor will not assert that right. 5 *Collier, supra,* ¶ 553.07, at 553-78 & n. 2 (15th ed.2001) (citing <u>Blanton v. Prudential-Bach Securities, Inc.</u> *(In re Blanton),* 105 B.R. 321, 335 (Bankr. E.D. Va. 1989)); <u>see also</u> <u>In re Metro. Int'l, Inc.,</u> 616 F.2d 83, 86 (3d Cir. 1980) (holding that a creditor had expressly waived its right as a matter of law by oral statements on the record).

<u>In re Calore Exp. Co., Inc.,</u> 288 F.3d 22, 38 (1st Cir. 2002).

Thus, irrespective of the Court's determination as to the merits of Standard's Claim,

Standard has no right or "security interest" in the principal amount owed to FTDF under the

loan documents.

## III.

## <u>CONCLUSION</u>

For the reasons stated above, the FTDF Committee respectfully requests that the Court

1    disallow Standard Property Development LLC's claim in its entirety.

2    DATED this 20th day of December, 2006.

3                                           SHEA & CARLYON, LTD.

4

5

6                                           JAMES PATRICK SHEA
                                            CANDACE C. CARLYON
7                                           SHLOMO S. SHERMAN
                                            233 South Fourth Street, Second Floor
8                                           Las Vegas, Nevada 89101

9
                                            and
10

11                                          STUTMAN, TREISTER & GLATT, P.C.
                                            FRANK A. MEROLA
12                                          EVE H. KARASIK
                                            CHRISTINE M. PAJAK
13                                          1901 Avenue of the Stars, 12th Floor
                                            Los Angeles, CA 90067
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                          13

*SHEA & CARLYON, LTD.*
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

406128v2

# EXHIBIT "A"

Prepared By and Return To:
Brian M. Jones, Esquire
Shutts & Bowen LLP
300 S. Orange Avenue, Suite 1000
Orlando, Florida 32801



## FIRST AMENDMENT TO MORTGAGE

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Mortgagor hereby agrees to the execution, delivery, and recording of this Amendment to that certain Mortgage (the "Mortgage") dated February 27, 2006, executed in favor of those persons listed on Exhibit "A" as Mortgagees. The Mortgage was recorded on March 14, 2006 as Document No. 20060173321 in Book 8533, Page 0782 in the Official Records of Orange County, State of Florida.

Said Mortgage is hereby amended to add a new **Exhibit "A"** (in the form attached hereto) thereto to reflect the present Mortgagees.

Said Mortgage affects the real property described on **Exhibit "B"** hereto.

Dated this _____20_____ day of March, 2006.

**MORTGAGOR:**       **Standard Property Development, LLC**

By: _____
George Venturella, Manager

**BENEFICIARY:**      **USA Commercial Mortgage Company, Attorney-in-Fact**

By: _____
Joseph D. Milanowski, President

Documentary stamp taxes in the amount of $62,125.00 and intangible tax in the amount of $35,500.00 were paid on the Mortgage recorded in OR Book 8533, Page 782, Public Records of Orange County, Florida, and no additional consideration has been paid and no further documentary stamp taxes or intangible taxes are due.

1

STATE OF NEVADA )
                       ) ss
COUNTY OF CLARK )

      This document was executed and acknowledged before me on this _____20_____ day of March, 2006 by Joseph D. Milanowski, as President of USA Commercial Mortgage Company.

AMANDA STEVENS
NOTARY PUBLIC
STATE OF NEVADA
Date Appointment Exp: 01-16-2010
Certificate No: 02-72937-1

_Amanda Stee_
Notary Public
(My commission expires: _1-16-06_ )

(additional notary follows)

AMANDA STEVENS
NOTARY PUBLIC
STATE OF NEVADA
Date Appointment Exp: 01-16-2010
Certificate No: 02-72937-1

STATE OF _____ )
                             ) ss.
COUNTY OF _____ )

      On _____, 2006, before me, _____, a Notary Public in and for said State, personally appeared **George Venturella,** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

                                         (Seal)

_____
      Signature

2

**MORTGAGOR:**

**Standard Property Development, LLC**

By: _____

Steve Parmee, Director

STATE OF FLORIDA )
)
COUNTY OF ORANGE )

     The foregoing instrument was acknowledged before me this 22nd day of March, 2006 by Steve Parmee.   He is (✓) personally known to me or ( ) has/have produced _____ as identification.

(NOTARY SEAL)

ALEXANDRA LION
Comm# DD0384932
Expires 1/9/2009
Bonded thru (800)432-4254
Florida Notary Assn., Inc

_Alexandra Lion_

Notary Public, State of Florida
Print Name:  ALEXANDRA LION
Commission No.: DD 0384932
My Commission Expires: 1/9/2009

ORLDOCS 10385141 1

## EXHIBIT "A"

### LENDER

| | NAMES | AMOUNT |
|---|---|---|
| 1 | Premiere Holdings Inc. Defined Benefit Pension Plan & Trust | $50,000 |
| 2 | Anne E. Abrams Trustee of the Abrams Living Trust dtd 10/23/96 | $50,000 |
| 3 | Sidney R. Adams and Lisa Adams Investment Account | $60,000 |
| 4 | August J. Amaral Inc. a Nevada corporation | $100,000 |
| 5 | Charles B. Anderson Trustee of the Charles B. Anderson Trust | $100,000 |
| 6 | First Savings Bank Custodian for Edwin E. Arnold IRA | $50,000 |
| 7 | Louise M. Barker  a widower | $50,000 |
| 8 | Harriet Bender Trustee of The Bender Family Trust By-Pass Trust dated 7/30/92 | $100,000 |
| 9 | Robert B. Bender & Paula S. Bender husband & wife as joint tenants with right of survivorship | $250,000 |
| 10 | Land Exchange Accommodators | $300,000 |
| 11 | Peter A. Bolino & Fabiola A. Bolino Trustees of the Bolino Family Revocable Trust dated 3/6/95 | $60,000 |
| 12 | James R. Bonfiglio & Donna M. Bonfiglio General Partners of the Broadwalk Investments Limited Partnership | $100,000 |
| 13 | Jerome Bresson Trustee of the Jerome Bresson Revocable Trust dated 12/1/89 | $100,000 |
| 14 | Michael T. Bridges Trustee of the Bridges Family Trust | $100,000 |
| 15 | William L. Brogan & Dyxeen L. Brogan husband and wife as joint tenants with right of survivorship | $50,000 |
| 16 | Charles R. Brooks and Wendy S. Brooks husband and wife as joint tenants with right of survivorship | $50,000 |
| 17 | Howard D. Brooks & Doreen C. Brooks Trustees of the Brooks Living Trust dated 6/30/97 | $50,000 |
| 18 | Richard L. Cadieux & Clara M. Cadieux husband & wife as joint tenants with right of survivorship | $100,000 |
| 19 | Peter W. Capone & Deidre D. Capone husband & wife as joint tenants with right of survivorship | $50,000 |
| 20 | James B. Cardwell & Reba Jo Cardwell Trustees of the Cardwell Family Trust | $495,000 |
| 21 | James B. Cardwell Trustee of the Cardwell Charitable Trust | $339,000 |
| 22 | Reba Jo Cardwell a married woman dealing with her sole and separate property | $100,000 |
| 23 | Tracy Cavin Trustee Of The Tracy Cavin Family Trust UTD 11/10/03 | $60,000 |
| 24 | Bernard Cohen and Elaine Cohen Trustees of the Bernard Cohen Trust dated 3/24/88 | $50,000 |

| | | |
|---|---|---|
| 25 | Gareth A. R. Craner Trustee of The Gareth A. R. Craner Trust Dtd 6/01/02 | $50,000 |
| 26 | Richard N. Dahlke a married man dealing with his sole & separate property | $50,000 |
| 27 | Monica J. Della an unmarried woman | $50,000 |
| 28 | First Savings Bank Custodian For George A. Di Gioia IRA | $85,000 |
| 29 | Patrick J. Doyle and Jill M. Doyle Trustees of the Doyle Family Trust dated 9/23/1999 | $50,000 |
| 30 | Charles B. Dunn IV Trustee of the Charles B. Dunn IV Trust dated 8/12/05 | $50,000 |
| 31 | William Dupin & Penny Dupin husband & wife as joint tenants with right of survivorship | $50,000 |
| 32 | Ellis L. Elgart and Sivia V. Elgart Trustees of the Ellis L. Elgart Revocable Living Trust dated 7/8/02 | $50,000 |
| 33 | Sagrario T. Evers Trustee of the Sagrario T. Evers Living Trust dated 5/1/01 | $50,000 |
| 34 | Joseph A. Farrah & Emily T. Farrah Trustees of the Farrah Family Trust dated 9/18/03 | $50,000 |
| 35 | Dionisio A. Fernandes MD and Fiola Fernandes husband and wife Joint Tenants with Right of Survivorship | $50,000 |
| 36 | Seymour Frank a married man dealing with his sole and separate property | $50,000 |
| 37 | Anthony Fruscione and Lyda Fruscione Trustees of The Fruscione Family Trust dated11/21/2005. | $50,000 |
| 38 | Theodore J. Fuller and Joan L. Fuller Trustee of the Fuller Family Trust dated 5/29/97 | $50,000 |
| 39 | Ronald G. Gardner Trustee of the Ronald G. Gardner Trust | $200,000 |
| 40 | First Savings Bank custodian for Richard W. Gilmour IRA | $50,000 |
| 41 | Theodora Gottwald an unmarried woman | $50,000 |
| 42 | William Harrison Goulding and Elizabeth R. Goulding husband & wife as joint tenants with right of survivorship | $50,000 |
| 43 | David W. Grace & Denise Grace Trustees of the David W. Grace & Denise Grace Family Trust dated 10/18/96 | $50,000 |
| 44 | Jeff Hacker an unmarried man | $50,000 |
| 45 | James W. Hale Sr. an unmarried man | $50,000 |
| 46 | Joanne A. Halvorson a married woman dealing with her sole & separate property | $50,000 |
| 47 | Christian K. Hartmann & Katharina Hartmann Trustees of the Hartmann 1997 Trust U/A dated 1/29/97 | $90,000 |
| 48 | Raymond G. Hawkins an unmarried man | $200,000 |
| 49 | Diane H. Higgins a married woman dealing with her sole and separate property | $100,000 |
| 50 | Robert Hitchins an unmarried man | $50,000 |

| | | |
|---|---|---|
| 51 | John A. Hoglund & Patricia O. Hoglund husband & wife as joint tenants with right of survivorship | $50,000 |
| 52 | John M. Hoover & Suzanne J. Hoover Trustees of the Hoover Family 1985 Trust dated 4/3/85 | $125,000 |
| 53 | Richard Houlihan a single man | $50,000 |
| 54 | Milton P Kaplan MD TTEE FBO the Milton P Kaplan Profit Sharing Plan Dtd 10/1/77 | $50,000 |
| 55 | G. Robert Knoles and Christina G. Knoles husband and wife as joint tenants with the rights of survivorship | $50,000 |
| 56 | Patrice A. Labossiere a single woman dealing with her sole and separate property | $50,000 |
| 57 | Renee Leff-Kaplan a married woman dealing with her sole and separate property | $50,000 |
| 58 | F. Ted Lemons | $50,000 |
| 59 | James E. Lofton & Denise G. Lofton husband & wife as joint tenants with right of survivorship | $50,000 |
| 60 | Mary Council Mayfield Trustee of the Hazel R. Council Trust dated 9/23/05 | $50,000 |
| 61 | Rudy Leroy McTee & Sharon Kaye McTee Trustees of the R & S McTee 1995 Trust dated 4/20/95 | $50,000 |
| 62 | Joseph E. Mele a married man dealing with his sole and separate property | $100,000 |
| 63 | Don D. Meyer an unmarried man & Dennis E. Hein an unmarried man as joint tenants with right of survivorship | $50,000 |
| 64 | Michaelian Holdings LLC a Nevada limited liability company | $100,000 |
| 65 | Mahendra C. Mody a single man | $75,000 |
| 66 | Monighetti Inc. a Nevada corporation | $50,000 |
| 67 | Wesley L. Monroe & Jeannie M. Monroe as joint tenants with right of survivorship | $200,000 |
| 68 | Daniel D. Newman Trustee of the Daniel D. Newman Trust dated 11/1/92 | $50,000 |
| 69 | Roger Noorthoek an unmarried man | $50,000 |
| 70 | Robert L. Ogren Trustee for the benefit of the Robert L. Ogren Trust dated 6/30/92 | $100,000 |
| 71 | Philip A. Palmintere & Nanci S. Palmintere Trustees of the Palmintere Revocable Trust dated 6/19/98 | $50,000 |
| 72 | Mojave Canyon Inc. a Nevada Corporation; J.B. Partain President | $125,000 |
| 73 | First Savings Bank Custodian For C. Nicholas Pereos IRA | $50,000 |
| 74 | Beaux Pontak and Denise Pontak husband and wife as Joint Tenants With Right of Survivorship | $50,000 |
| 75 | Stephanie K. Resley an unmarried woman | $50,000 |
| 76 | Larry L. Rieger & Patsy R. Rieger Trustees of the Larry L. Rieger & Patsy R. Rieger Revocable Trust dated 8/14/91 | $50,000 |

| | | |
|---|---|---|
| 77 | Seymour H. Rosenberg Trustee of the Seymour H. Rosenberg Revocable Trust dated 11/20/03 | $50,000 |
| 78 | First Savings Bank Custodian For Robert A. Schell IRA | $50,000 |
| 79 | Karl O. Schelling a married man dealing with his sole & separate property | $50,000 |
| 80 | Walter E. Seebach Trustee of the Walter E. Seebach Living Trust dated 11/1/85 | $75,000 |
| 81 | First Savings Bank Custodian For James W. Shaw IRA | $60,000 |
| 82 | Michael Shubic | $25,000 |
| 83 | Tommie W. Sisk a divorced man | $50,000 |
| 84 | Donald J. Smith & Shirley M. Smith Trustees of the Donald J. Smith & Shirley M. Smith Trust | $100,000 |
| 85 | Terrance H. Smith a single man | $100,000 |
| 86 | First Trust Co. of Onaga Custodian For Robert Speckert IRA | $100,000 |
| 87 | Jennifer Chong Stalder Trustee of the Chong Chu Stalder Trust dated 4/19/90 | $50,000 |
| 88 | Nicholas A. Steinmetz & Cynthia M. Steinmetz Trustees of the 2001 Steinmetz Family Trust | $50,000 |
| 89 | Gordon N. Stimpson & Marjorie I. Stimpson Co-Trustees of The Stimpson Family Trust Dated 5/9/00 | $50,000 |
| 90 | Bertha M. Strauss an unmarried woman | $70,000 |
| 91 | Leonard L. Teachenor & Therese M. Teachenor Trustees of the Leonard and Therese Teachenor Trust dated 2/12/01 | $50,000 |
| 92 | Cal Terrill & Judy Terrill Trustees of the Terrill Family Revocable Living Trust dated 3/11/02 | $50,000 |
| 93 | Jack S. Tiano Trustee for An Accountancy Corporation Profit Sharing Plan & Trust dated 02/28/1997 | $50,000 |
| 94 | William E. Trappman and Carol B. Trappman husband and wife as joint tenants with the rights of survivorship | $50,000 |
| 95 | Carol A.Tripp a married woman dealing with her sole and separate property | $50,000 |
| 96 | T-2 Enterprises LLC. Manager  Warren W. Tripp | $75,000 |
| 97 | T-3 Enterprises LLC. Manager Warren W. Tripp | $50,000 |
| 98 | Tripp Enterprises Inc. a Nevada corporation | $100,000 |
| 99 | Warren W. Tripp Trustee of the Tripp Enterprises Inc. Restated Profit Sharing Plan | $50,000 |
| 100 | Warren W. Tripp a married man dealing with his sole & separate property | $100,000 |
| 101 | Gary E. Tucker & Linda L. Tucker husband & wife as joint tenants with right of survivorship | $50,000 |
| 102 | George Turner an unmarried man | $120,000 |
| 103 | Robert H. Turner & Nancy A. Turner Trustees of the 1994 Turner Family Trust dated 9/23/94 | $100,000 |

| 104 | USA Capital First Trust Deed Fund | $671,000 |
| 105 | Malden Ventures Ltd. Defined Benefit Pension Plan | $50,000 |
| 106 | Marsha G. Vieira an unmarried woman | $250,000 |
| 107 | Tobias Von Euw Trustee of the Tobias Von Euw Revocable Trust dated 11/23/04 | $80,000 |
| 108 | Robert R. Wade Trustee of the Robert R. Wade Revocable Trust dated 5/22/01 | $70,000 |
| 109 | Scott E. Wagner an unmarried man | $80,000 |
| 110 | David C. Wahl and Margaret A. Wahl husband and wife as joint tenants with the right of survivorship | $50,000 |
| 111 | Darren E. Watson A single man transfer on death to Linda L. Watson | $50,000 |
| 112 | Kurt Weber & Patricia Weber Husband and wife as joint tenants with right of survivorship | $50,000 |
| 113 | Bruce H. Womble & R. Joanne Womble Trustees of the Womble Living Trust dtd 2/3/98 | $100,000 |
| 114 | Robert R. Wright & Betty M. Wright Trustees of the Wright Trust | $50,000 |
| 115 | Zawacki a California LLC | $50,000 |
| | TOTAL | $9,640,000 |

EXHIBIT "B"

LEGAL DESCRIPTION

A portion of Lot 2, VISTA CENTRE REPLAT, according to the Plat thereof recorded in Plat Book 18, Pages 117 through 121, Public Records of Orange County, Florida, described as follows:

Begin at the Southwest corner of said Lot 2 and run North 89°50'45" East along the South line of said Lot 2 for a distance of 354.96 feet; thence run North 00°09'15" West for a distance of 220.30 feet; thence run South 89°59'52" East for a distance of 135.00 feet; thence run North 00°00'08" East for a distance of 370.00 feet to the Southerly Right-of-Way line of Palm Parkway; thence run North 89°59'52" West along said Southerly Right-of-Way line for a distance of 237.82 feet to the point of curvature of a curve concave Northerly having a radius of 1403.40 feet and a central angle of 10°00'00"; thence run Westerly along the arc of said curve and said Southerly Right-of-Way line for a distance of 244.94 feet; thence run North 79°59'52" West along said Right-of-Way line for a distance of 33.82 feet; thence leaving said Right-of-Way line run South 00°09'49" West along the Westerly line of said Lot 2 for a distance of 241.49 feet; thence run South 89°50'11" East along said Westerly line for a distance of 28.31 feet; thence run South 00°24'42" West along said Westerly line for a distance of 200.67 feet; thence run South 00°14'27" West along said Westerly line for a distance of 176.23 feet to the Point of Beginning.

Standard Property Development



# SHUTTS & BOWEN LLP

ATTORNEYS AND COUNSELLORS AT LAW

Direct Dial: (407) 835-6759

E-MAIL ADDRESS:
alion@shutts-law.com

April 28, 2006

**VIA FEDERAL EXPRESS**

Maggie Stone
Legal Department
USA Commercial Mortgage Company
4484 South Pecos Road
Las Vegas, NV  89121

Re:    **Standard Property Development, LLC Loan from USA Capital**

Dear Maggie:

Enclosed with this correspondence is the *original recorded* First Amendment to Mortgage for Mortgagor, Standard Property Development, LLC and Beneficiary, USA Capital Mortgage Company.

If you have any questions regarding the foregoing please do not hesitate to contact me.

Sincerely,

Alexandra Lion
Assistant to Brian M. Jones, Esq.

Enclosure

ORLDOCS 10384060 1
300 SOUTH ORANGE AVENUE SUITE 1000 • P.O. BOX 4956 • ORLANDO FLORIDA 32802-4956 • TELEPHONE (407) 423-3200 • FACSIMILE (407) 425-8316 • www.shutts-law.com

MIAMI      FORT LAUDERDALE      WEST PALM BEACH      ORLANDO      TALLAHASSEE      AMSTERDAM      LONDON

# EXHIBIT "B"

# LOAN SERVICING AGREEMENT

This Loan Servicing Agreement ("Agreement") is made as of the _____ day of_____,
2003, between USA Commercial Mortgage Company ("USA") and_____ USA Capital First Trust Deed
Fund_____("Lender").

## RECITALS

A.    USA is a mortgage broker and loan servicer in Clark County, Nevada.

B.    Lender lends, or wishes to lend, money to various borrowers (the term "Borrower" includes single and
married persons, corporations, trusts, partnerships and all other legal entities) from time to time, which loans
are arranged by USA and are secured by interests in real and/or personal property.

C.    Lender wishes to retain the services of USA in connection with making and servicing a loan or loans
(Loan" or "Loans" as the context requires), including all Loans heretofore or hereafter placed by Lender
through USA, all upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are
hereby acknowledged, the parties agree as follows:

1.    <u>Services in Connection with Arranging the Loans</u>. USA will perform the following services in
connection with arranging each Loan:

(a)    Obtain a promissory note or notes secured by the trust deed referred to in Section 1(b)
below, executed by Borrower in a form customarily used by USA and approved by USA's counsel.

(b)    Obtain a deed of trust, assignment of rents and security agreement executed by
Borrower in form customarily used by USA and approved by USA's counsel, and cause the same to be
properly recorded.

(c)    Obtain one or more personal or corporate guaranties, if applicable and as determined by
USA to be necessary, executed by such guarantors, as USA shall deem appropriate, in form customarily used
by USA.

(d)    If USA deems it appropriate or necessary, obtain, at Borrower's expense, an appraisal
of the property to be encumbered, prepared and executed by an appraiser reasonably satisfactory to USA.

(e)    Obtain from a reputable title insurance company, at Borrower's expense, a fully-paid
ALTA lender's policy of title insurance, showing Lender as an insured, in an amount at least equal to the
initial principal amount of the note and showing as exceptions only those items approved by USA and its
counsel.

(f)    Cause the Borrower to obtain, where applicable, casualty insurance policies in amounts
at least equal to the principal amount of the note or the full insurable value of the improvements on the

encumbered real property, whichever is less, containing a mortgage or loss payee clause naming Lender, or USA (as agent for Lender), as an additional insured or loss payee.

(g)    Obtain from the Borrower and each guarantor such recent financial statements and information as USA shall deem appropriate.

(h)    Obtain, with respect to any and all encumbrances of record to which Lender's deed of trust will be subject, documentation verifying the principal balance thereof within a reasonable time prior to the making of the Loan and specifying any then existing defaults thereunder.

(i)    Obtain such other documents in connection with the Loan, as USA may deem appropriate in order to protect the Lender's interest.

(j)    All documents which USA obtains from borrower in connection with arranging or servicing any Loan, so long as such Loan is outstanding, shall be kept on file in USA's corporate office and be available to Lender upon request.  Notwithstanding the foregoing, USA shall have no obligation or responsibility to obtain any original documents in connection with any Loan serviced by USA, but not arranged or originated by USA.

(k)    Prepare and deliver to escrow closing instructions to effectuate the Loan closing in accordance with the Loan Agreement and the Fee Agreement.

2.    <u>Services of USA in Connection with Servicing the Loans</u>.   Subject to and in accordance with the terms and conditions set forth in this Agreement, and all applicable laws, Lender instructs and authorizes USA to, and USA will perform the following services in connection with servicing each of the Loans:

(a)    Verify, where applicable, that the property encumbered by Lender's deed of trust is insured (at the Borrower's expense) by a sufficient casualty insurance policy and that Borrower has sufficient liability insurance coverage.  USA will hold for the Lender's account such policies and renewals thereof.

(b)    Keep appropriate accounting records on each note and the sums collected thereon, which records will reflect the amounts collected as to principal, interest and late charges, and, if applicable, insurance, taxes and other specified amounts.  Those records will be available for review by the Lender during regular business hours at USA's corporate office.

(c)    Until the total amount due under each note is paid in full:

(i)    Proceed diligently to collect all payments due under the terms of the note and promptly pay the proper parties, when and if due, principal, interest, late charges, insurance and other specified funds.

(ii)    In the event the Borrower fails to make any payment to USA as required by the terms of the note, USA will take steps to collect the payment including but not limited to delivering default notices, commencing and pursuing foreclosure procedures, and obtaining representation for Lender in litigation and bankruptcy proceedings as deemed necessary or appropriate by USA in its business judgment to

fully protect the interests of the Lender, and of all Lenders in the loan.

   (iii) In its sole discretion, USA may pay off any Lender at any time by paying the then outstanding balance of Lender's interest in the principal of the Loan, plus all accrued interest and any prepayment penalty or fee, if applicable. Any Lender so paid off shall concurrently execute and deliver therewith to USA an assignment, in a form acceptable to USA, of all of such Lender's right, title, and interest in the Loan (including all documents evidencing the Loan) and in the deed of trust securing the Loan.

   (iv) In its sole discretion, USA may waive late payment charges, assumption fees, charges for returned checks due to insufficient funds, or other fees which may be collected in the ordinary course of servicing the Loans.

  (d) Provide the Lender with regular statements regarding loan collections, but in no event less frequently than quarterly.

  (e) Without limiting the generality of anything contained herein, Lender hereby authorizes and empowers USA, on Lender's behalf, to: (1) execute and deliver demands for payoff and beneficiary's / lender's statements of condition and the like; (2) execute and deliver any and all instruments if satisfaction or cancellation, or of partial or full release, discharge, or reconveyance, or authorizations in connection therewith, with respect to any Loans paid in full and with respect to the related real or personal property securing such Loans; (3) execute and deliver any and all other documents with respect to any Loans that are customary and consistent with loan servicing practices pertaining to such loans; (4) consent to modifications of the Loans if the effect of any such modification will not materially or adversely affect the security provided by the real or personal property in connection therewith; (5) institute foreclosure proceedings (judicial or non-judicial), obtain a deed-in-lieu thereof, engage in settlement discussions, and enter into forbearance and other settlement-related agreements (which agreements may contain provisions that release or waive claims against a Borrower or Guarantor); and (6) take title in the name of Lender (in proportion to its interest in the Loan) to any real property upon a foreclosure or delivery of a deed-in-lieu thereof. Notwithstanding the foregoing or any other provision contained herein, USA may not permit any modification to any Loan that would change the interest rate, forgive the payment of any principal or interest (expressly excluding late charges or the difference between default and non-default interest), change the outstanding principal amount, or extend the maturity date, without Lender's prior consent; provided, however, if Lender fails to grant or deny its consent within three (3) business days after notice from USA, Lender shall be deemed to have conclusively given its consent.

  3. <u>Rights of Lender if USA Fails to Act</u>. Pursuant to NAC 645B.073, in the event of default, foreclosure, or other matters that require action, if for any reason USA fails to act on Lender's behalf as authorized herein, then Lender may, with approval of fifty-one percent (51%) or more of all of the holders of the beneficial interest of record in the Loan, act on behalf of all such holders of beneficial interest of record. These actions may include, but are not limited to:

   (a) the designation of the mortgage broker, servicing agent or other person to act on behalf of the holders of the beneficial interests in the loan; and

   (b) the sale, encumbrance or lease of real property owned by the holders resulting

from a foreclosure or the receipt of a deed in lieu of a foreclosure.

4.    <u>Legal Proceedings</u>.    USA will assist the Lender in any necessary foreclosure proceedings to protect the Lender's interest in the note and deed of trust. Where necessary, in USA's business judgment, USA may retain attorneys on Lender's behalf. Any legal proceeding instituted by USA pursuant to this Agreement may be pursued in USA's name only or as agent for Lender. Upon demand by USA, Lender agrees to promptly pay, either in advance or to reimburse USA, for its pro rata portion of the out-of-pocket expenses incurred, including attorney's fees, trustee's fees and foreclosure costs. In the event that Lender fails to pay such sums to USA upon demand or request thereof, or if USA elects to advance such sums, USA may, in its discretion, advance such fees, including trustee's fees, attorney's fees, and costs of foreclosure; provided, however, that any fees advanced by USA shall be paid back from the proceeds of the foreclosure (whether by reinstatement or sale), or from any other monies collected with respect to such Loan, before any payments are made to Lender. In the event of any litigation concerning the Loan, Lender hereby appoints USA as its agent to accept service of any summons and complaint, naming Lender as a party.

5.    <u>Compensation to USA for Loan Servicing</u>.    Lender authorizes USA to retain monthly, as compensation for services performed hereunder, (a) one-twelfth (1/12th) of its annual servicing fee, which shall not exceed three percent (3%) per annum of the maximum principal amount of each of the Loans, (b) any late charges collected from the Borrower pursuant to the terms of the Note, and (c) and default interest collected from the Borrower pursuant to the terms of the Note. Notwithstanding the foregoing, it is agreed and acknowledged that USA derives the bulk of its revenues from charging loan fees ("points") to the Borrower. Certain Borrowers, however, may prefer to pay a higher rate of interest in exchange for a reduction in loan fees payable in advance to USA, the higher interest rate comprising a deferred loan fee. USA will notify Lender when such a case arises, and advise Lender of what portion of the interest is payable to USA as a deferred loan fee.

Should Lender desire to sell all or any part of its interest in the note and deed of trust, USA will assist Lender in finding potential buyers and completing the necessary documentation for the transaction. A fee of 5% of the remaining balance of Lender's undivided interest in the note amount will be deducted from the selling price and paid to USA on all such assignments for which USA locates the Assignee.

In the event an extension of a Loan is negotiated, USA shall be entitled to charge a fee therefor from the Borrower pursuant any separate fee agreement between USA and the Borrower.

6.    <u>USA's Right to Delegate</u>.    Notwithstanding anything contained herein, USA may in its sole discretion delegate specific loan arranging and servicing obligations to credit bureaus, real estate tax service companies, real estate brokers or agents, appraisers, attorneys, trustees, or others, provided that USA shall remain responsible for all action taken or not taken by such companies, agents, representatives, and others throughout the term of this Agreement.

7.    <u>No Legal Advice</u>.    Lender acknowledges that USA will not act as Lender's attorney or provide legal advice to Lender, and that Lender is encouraged to seek independent counsel in connection with any questions Lender may have concerning this agreement, any Loan, USA's form loan documents, or any other matter.

8.    <u>Termination</u>.    Lender may, by 30 days written notice to USA, terminate this agreement, and the

power of attorney granted, if one is granted, under Section 11 of this Agreement, if USA fails to perform its obligations hereunder.

9.    Lender's Registration.  Lender(s) name as listed in the first paragraph of this Agreement is the exact form for registration of Lender's interest and for reference to Lender in the Loan Documents.

10.    Integration Clause.  This Agreement contains the entire agreement between the parties hereto and cannot be modified except by a written amendment signed by both parties.  The invalidity of any portion of this agreement shall in no way affect the balance thereof.  This Agreement shall remain in effect until Lender's interest in all notes and deeds of trust with respect to Loans arranged and/or serviced by USA is completely liquidated (unless sooner terminated in accordance with the terms hereof).

11.    Limited Power of Attorney.  With respect to each loan, Lender hereby agrees that USA shall have full power and authority, and Lender hereby appoints USA as its true and lawful attorney-in-fact to (a) hold the original note(s), and (b) to do all things and take all actions on behalf of Lender which are necessary or convenient to effectuate this Agreement and its intent and to protect Lender's interest under any note, deed of trust, guaranty, security agreement or other document pertaining to any Loan.  Upon USA's request, Lender hereby agrees to execute and deliver, in the presence of a notary public, a "Declaration of Agency and Limited Power of Attorney", in a form consistent with Chapter 645B of the Nevada Revised Statutes, pursuant to which Lender shall further evidence the appointment of USA as Lender's true and lawful attorney-in-fact to undertake the duties of USA hereunder.  No one shall be required to look beyond such Declaration of Agency and Limited Power of Attorney for evidence of USA's authority hereunder.  All Declarations of Agency and Limited Powers of Attorney may include the language: This document may be executed with counterpart signature pages, and the document with all counterpart signature pages shall constitute one and the same instrument.

12. Notices.  All notices, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been given (i) when personally delivered, or (ii) on receipt, when deposited with a recognized overnight courier service such as Federal Express or DHL, or (iii) three (3) business days after the date when deposited in the United States mail and sent postage prepaid by registered or certified mail, return receipt requested, addressed as follows:

If to USA:          USA Commercial Mortgage Company
                    4484 S. Pecos Road
                    Las Vegas, Nevada 89121-5030
                    Attention:

If to Lender:



                    Attention:

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

13.    Governing Law.  This Agreement shall be construed in accordance with the laws of the State of

Nevada, without regard to the conflict of laws or rules thereof, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

14.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

15.    Attorney's Fees. In the event any party hereto brings an action to enforce any of the provisions of this Agreement, the party against whom judgment is rendered in such action shall be liable to the other for reimbursement of its costs, expenses and attorneys' fees, including such costs, expenses and fees as may be incurred on appeal.

16.    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors and assigns.

17.    Headings.  Sections headings used in this Agreement are for convenience only and shall not affect the meaning or interpretation of this Agreement.

18.    Authority.  Each party represents and warrants to the other party that it is duly authorized to execute, deliver and perform this Agreement.

IN WITNESS WHEREOF, the parties hereto have signed, sealed, acknowledged and delivered this instrument the day and year first above written.

LENDER: USA Capital First Trust Deed Fund

By: _____
Name: Joseph D. Milanowski
Title: Manager

By: _____
Name: _____
Title: _____

USA COMMERCIAL MORTGAGE COMPANY:

By: _____
Joseph D. Milanowski, President