Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com

Attorneys for Debtors and Debtors-in-Possession

**E-FILED on January 2, 2007**

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: USA COMMERCIAL MORTGAGE COMPANY, Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re: USA CAPITAL REALTY ADVISORS, LLC, Debtor. | Chapter 11 |
| In re: USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, Debtor. | Jointly Administered Under Case No. BK-S-06-10725 LBR |
| In re: USA CAPITAL FIRST TRUST DEED FUND, LLC, Debtor. | **NOTICE OF FILING OF WEDNESDAY, DECEMBER 20, 2006 HEARING TRANSCRIPT** |
| In re: USA SECURITIES, LLC, Debtor. | **(AFFECTS ALL DEBTORS)** |
| Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA Capital First Trust Deed Fund, LLC | |

USA Commercial Mortgage Company, USA Securities, LLC, USA Capital Realty Advisors, LLC, USA Capital Diversified Trust Deed Fund, LLC and USA Capital First Trust Deed Fund, LLC (collectively, the "Debtors"), by and through their counsel, hereby file the Transcript of Proceedings of the Hearing In The Matter of USA Commercial, Taken on Wednesday, December 20, 2006 at 10:30 a.m., which is attached hereto as **Exhibit "1."**

Respectfully submitted this 2nd day of January, 2007.

*/s/ Lenard E. Schwartzer, Esq.*
Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146

and

Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# EXHIBIT "1"

* * * * *




TRANSCRIPT OF PROCEEDINGS OF THE BANKRUPTCY HEARING IN THE MATTER OF U.S.A. COMMERCIAL HELD BEFORE HONORABLE LINDA B. RIEGLE

Taken on Wednesday, December 20th, 2006

At 10:30 a.m.

At The Foley Building

300 South Third Street

Las Vegas, Nevada

REPORTED BY: RENE' R. HANNAH, CCR NO. 326

* * * * *

THE COURT: U.S.A. Commercial. Appearances, please?

MR. KIRBY: On the telephone is Dean Kirby of Kirby & McQuinn.

MS. JARVIS: Annette Jarvis and Steve Strong of Ray, Quinney & Nebeker on behalf of the debtors and debtors in possession.

MR. MEROLA: Frank Merola and Eve Karasik, members of Stutman, Treister & Glatt, Professional Corporation on behalf of the First Trust Deed Committee.

MS. CARLYON: Good morning, Your Honor. Candace Carlyon of Shea & Carlyon on behalf of the First Trust Deed Fund Committee.

MS. FREEMAN: Good morning. Susan Freeman and Rob Charles of Lewis and Roca on behalf of the Unsecured Creditors Committee.

MS. MCPHERSON: Good morning, Your Honor. Jeanette McPherson of Schwartzer & McPherson law firm on behalf of the debtors and debtors in possession.

MR. OLSON: Good morning, Your Honor. Bob Olson of Beckley Singleton, Nevada counsel for the Diversified Trustee Fund Committee.

MR. SMITH: Good morning, Your Honor. Alan

Smith for the Lenders Protection Group.

MR. HERMAN: Good morning, Your Honor. Jeff Herman of Orrick, Herrington & Sutcliffe for the Diversified Fund Committee.

MR. FIELD: Good morning, Your Honor. Eric Field on behalf of the Pension Benefit Guarantee Corporation.

MS. ALLF: Good morning, Your Honor. Nancy Allf of, I'm co-counsel with Robert Lepome, a group of direct lenders called the Alexander Group.

MR. SCHMAHL: Good morning, Your Honor. Michael Schmahl on behalf of Dr. Gary Kantor, Mrs. Kantor and Kantor Nephrology 401K plan.

MR. GORDON: Gerald Gordon and Greg Garman of Gordon & Silver on behalf of the Direct Lenders Committee.

MS. CHUBB: Good morning. Janet Chubb of Jones Vargas for the objecting Jones Vargas creditors.

MR. DAVIS: Good morning, Your Honor. George Davis of Wild, Gotchala & Manges on behalf of Compass Partners.

MR. LANDIS: Good morning, Judge. Augie Landis, assistant United States trustee.

THE COURT: As an aside, I signed that order for the trustee in that investment partners case.

MR. LANDIS: I'll make the appointment right after this hearing.

THE COURT: Let me go ahead and get the appearances on the telephone.

MR. KIRBY: Dean Kirby, Kirby & McQuinn for Debt Acquisition Company of America.

MR. COHEN: Good morning, Your Honor. This is David Cohen, Warner, Stevens for Sierra Liquidity Fund.

MR. LEVINSON: Good morning. Mark Levinson, of Orrick on behalf the Diversified Committee.

THE COURT: Okay. All right. We had some matters that were continued until 1:30, but they're resolved on the PBGC issue and then the question's also on the Bunch vote.

MR. SCHWARTZER: Lenard Schwartzer appearing for the debtor and the debtor in possession. Your Honor, with regard to the Bunch vote it has not been resolved and that is set for argument at 1:30. And I filed an opposition this morning and it should have been hand delivered to your chambers this morning with regard to the law with regard to that. I don't see Mr. Holley here, so I assume he's going to appear at 1:30.

THE COURT: And of course, that was set before we realized this would be set at 10:30, so

that's understandable.

MR. SCHWARTZER: That's right. And I think the outcome of that motion will have something to do with confirmation because if the Bunch claim is not allowed to vote, my understanding is class A-4 would be an accepting class in this case. But of course, I haven't been, wasn't here for the rest of the hearing yesterday, so I don't know if the Court is going to go forward without knowing that issue.

THE COURT: Okay.

MR. FIELD: Good morning, Your Honor. Eric Field on behalf of the PBGC Fund. I do not believe that our issue has been resolved, either.

THE COURT: So where are we on that, what's?

MR. FIELD: I think we're --

MS. JARVIS: I think Your Honor will stay the ruling on what language is, whether release is effective as we put it in a reply brief and try to accommodate whether the Court's going to require us to go further.

THE COURT: Okay. So tell me again, so, because there was argument back and forth. The PBGC contends that the release cannot release out Mr., cannot release out Mesirow? Tell me your position

again.

MR. FIELD: Our position is that the release cannot release any fiduciaries of the pension plan, be it Mesirow or any other possible fiduciary. And that any such release would be in violation of URISA, would make any written instrument void and the plan couldn't be confirmed under 1129-A-3.

THE COURT: Okay.

MS. JARVIS: And Your Honor, our position is that the fiduciary under the plan is the company. The company, we've carved that out so we clearly have a claim against them, but that that should not extend to the CRO that has come in to try to clean up this situation in bankruptcy. That this should not extend to, in this pretty unique circumstance of the CRO has come in and try to clean up this bankruptcy, took this pension plan, that the trustee was changed in order to take it away from the former insiders.

The company is the fiduciary, not Mr. Allison, not Mesirow. And we think it's appropriate in this case that they be in the release as set forth in the plan.

MR. FIELD: And our response to that would be the company is the trustee, but the fiduciary is the decision maker who has the discretion with the assets

of the pension plan, be that Mesirow or the individuals making the decisions.

MS. JARVIS: And as you know, Your Honor, we came in and got the Court to order that the pension plan be frozen. So the pension plan is frozen. Nothing is being done with the assets at this point in time.

MR. FIELD: But frozen means that benefits aren't being accrued. Frozen doesn't mean that the assets shouldn't be being invested.

THE COURT: Well, that's your interpretation.

MR. FIELD: That's correct.

THE COURT: What would be the position of each side if the release was to Mesirow, except as to anything in which he acted as opposed to failed to act? In other words, we know he hasn't, but let's assume, for example, he was willing to find, but by the same token, so that's one example as to opposed to where he literally did nothing because he wasn't supposed to, or should he? Does that satisfy your concerns?

MR. FIELD: No, Your Honor, because under URISA a breach could be acting or failing to act. And there is a fiduciary duty to act as a reasonably prudent trustee or fiduciary, and that would include investing. I mean there are DEO regulations that cover

the duty to invest.

THE COURT: Well, wasn't technically, I mean, well, he was the chief restructuring officer. The original principals were still in the case, why aren't they the fiduciaries? Why wasn't it them? Didn't they have the duty as opposed to Mr. Mesirow, Mr. Allison?

MR. FIELD: They were the fiduciaries up until September 30th. That's not our issue. Up until September 30th the insiders are the fiduciaries. Our issue is since September 30th, under this release language, in effect there is no fiduciary. There is no one who could be held accountable for any breach of the fiduciary duties. A company is an entity --

THE COURT: I can't believe you haven't worked this out. You know full well PBGC is going to appeal it just because they do those things. And they're government and it doesn't make any difference how much money they spend on things.

MS. JARVIS: And I see this as very, it's a unique situation. Very unique.

THE COURT: It is a unique situation. The point is there probably isn't even any money there. It's only been three months. And I understand why.

MS. JARVIS: And Your Honor, of course, the reason why this was done and why we sought this

approval from the Court is, especially the benefits were frozen for the benefit of this estate, so there would be no more accruals of any kind of benefit that the estate might be liable for, and also to make sure that the company as it currently is constituted became the plan trustee rather than former trustee.

THE COURT: Well, I suggest you work this out because otherwise, I'm going to have to take this under submission and demand a full briefing from everybody because it involves a URISA issue.

MS. JARVIS: Yeah.

THE COURT: And that means the confirmation will be delayed. So I suggest you show me the books right now and get it resolved. You may well be right, but I'm not in the position now, I thought sure this was going to be resolved before confirmation. You may need to just talk to somebody else at PBGC. You have been set out with marching orders, "This is our job, this is what we have to do." It's you're just not being very practical about things.

MR. FIELD: But I did speak with my higher-ups and our issue, we maintain this is a unique case and it's unique to the PBGC that a debtor was appointed trustee. But our issue is the bigger picture of having plans reorganization releasing pension plan

fiduciaries. We just can't allow that language to be into the plan with that objective.

THE COURT: But they're only releasing the, only chief restructuring officer.

MR. FIELD: Who may be the fiduciary.

THE COURT: But after confirmation he won't be.

MR. FIELD: But we still have the period from September 30th until the confirmation where there may have been a breach. And even after confirmation there's nothing in the plan that even says what's going to happen to the pension plan. So if it's not terminated, someone has to be the fiduciary. I mean, the reorganization ignores the pension plan altogether.

MS. JARVIS: Your Honor, that was not the issue raised. The debtor, entity of the debtor is an appropriate fiduciary to be appointed as the plan trustee. Mr. Allison was never appointed as the plan trustee. He's not a signatory on the plan. It is the company itself that is.

MR. FIELD: The fiduciary doesn't have to be on the plan to be a trustee.

THE COURT: Well, if he's not the fiduciary, then clearly, if he's not the fiduciary, then there's no problem not giving him a release because he's not

the fiduciary.

MS. JARVIS: And that's where we were yesterday, because we don't believe he is, but the PBGC is saying that.

THE COURT: I guess what I'm saying is why should I be the person to determine whether or not he is the fiduciary? If he isn't, if you're right, there is no liability.

MR. FIELD: There's no reason why they couldn't accept our proposed language and in the future argue he's not a fiduciary and that this language doesn't apply to him.

MS. JARVIS: We tried to work it out so we have a clear understanding whether he is or is not.

MR. FIELD: But we simply don't have the facts, we haven't done an audit of the plan.

THE COURT: Why would you not go to trial to do that to determine now who would be the fiduciary? I can't confirm a plan with this issue out there. I can tell you what to do and everything else, but.

MS. JARVIS: Okay, we'll work it out, Your Honor.

THE COURT: Okay. Anything else on the plan?

MR. MEROLA: Frank Merola of Stutman, Treitser & Glatt on behalf of First Trust Deed

Committee. Your Honor, the debtors met last night with its professionals and all the committees and their professionals and discussed at length the proposal Your Honor made at the end of the hearing, which essentially is for a consensual modification of the plan to carve out certain objecting parties from the compromise and allow us to commence litigation against those objecting parties.

After a great deal of discussion, we've concluded that doesn't work and I'd like to explain why. As Mr. Garman so wonderfully put it yesterday, the compromise from the standpoint of a direct lender has many interrelated components. Yesterday we spent most of the day focusing on the compromise as it related to prepaid interest. And when everyone was talking up here yesterday, they were talking about being sued for the prepaid interest. There's a couple of issues that relate prepaid issues and setoff that would relate investor by investor.

There are a number of other components of this compromise that are actually estate-wide. So, for example, you're not going to try to subsequently consolidate the direct lenders. You're not going to try to recharacterize all of those issues. You're not going to have a 506 C surcharge. We can't resolve

those issues globally if we allow some people to carve out, because the net result will be that those people that carve out will get the benefit of all of those global aspects of the compromise for nothing. And the problem is that we need the global aspects of the compromise to make the plan work as a whole.

What Mr. Garman's constituency negotiated for is the piece for the direct lenders, that no one is going to try to make their assets property of the estate. If we have to live by all of that, even if you carve out five or ten or fifteen people that we sue. And what we're concerned about is the prophecy in Mrs. Cangelosi's solicitation that said, "Vote no on the plan, you'll get all the benefits and we still will get to keep prepaid interest or we'll get a chance to litigate. We'll come to fruition."

So we're here today, the four committees and the debtors, to ask you to confirm the plan with the compromises as is. We had a great of discussion about Your Honor's concerns on appeal. We have evaluated those issues and we're requesting confirmation of the plan. Consistent with Your Honor's request at the end of yesterday's hearing, we're prepared to put on additional argument regarding the procedural issues and the compromise. Thank you.

THE COURT: Oh, I didn't know if you were standing for some other reason or you were going to make a point.

MS. CARLYON: I'm the person that would put on that argument.

THE COURT: Oh. I don't need that. I wanted to know first whether or not you were going to make a consensual modification. As I indicated yesterday, my concern, and I wasn't sure it was a mere legal concern or a practical concern, as I articulated my concern was in large measure a practical concern of how do you make this plan go without appeals and resolve that issue. But having, please stop rustling papers on the phone. Put your phone on mute. Is this Court Call that's doing this today?

THE CLERK: Yes, Court Call.

THE COURT: So subject to the PBGC problem, I'm prepared to confirm the plan. And let me address the large issues first, then I'm going to go through all the findings that relate to the findings necessary under a 1129. Let me first talk about the compromise and its binding effect on those who neither voted for the plan and/or objected.

First, and let me backtrack to say again the obvious. I think a part of the problem in this case as

far as people understanding what's happening and some of the misinformation that's been communicated is by the euphemism that we've used, prepaid interest. It isn't prepaid interest. That was a mere euphemism. I mean, you can define a term as anything you want and it's appropriate to define that term, the plan, as that. You know, you can define a cat as a dog as long as that's what the definition is.

And we've used this euphemism of prepaid interest throughout the case, I guess to kind of soften the blow of the fact that this money had no basis in law to the case. What happened was that this money was not paid by the borrower. A direct lender only had rights to receive monies paid by the borrower. Now, if this money wasn't due to go under from the servicer, there was no guarantees and there wasn't any separate obligation. Indeed, it's even unknown whether or not some of that, quote, interest, that was paid would ever be paid, for several reasons. One, what if we assume that the loan was a borrower who went into bankruptcy and let's assume it's under secured. There wouldn't be a right to prepaid interest, post-petition interest.

Some of these loans were null in bankruptcy at some point along the way. Alternatively, interest might never, ever be paid because, or due because the

borrower defaulted, never paid and the foreclosure happened, and the only money that resulted was enough to pay the principal and not interest.

So when we talk about prepaid interest it's a fallacy. It's nothing more than a windfall to the person who received it. And windfall is in a sense a bad word, because I don't mean to suggest that these people, and most people would seem, if not all, received the money in good faith. Whether or not they should have or could have done further investigation is beside the point. But the point is they had no contractual right to receive that money. They had no legal right to receive that money, meaning under Nevada law it is illegal for the servicer to pay a lender when the borrower hasn't paid.

Now, it's been argued that that's something that is a criminal penalty, but it seems to me if you receive something that the law says you may not receive, and by law I mean not by the contract or the statute, I mean criminal law, it means your defenses are much slimmer because it's against public policy for those payments to be made.

So with that in mind we're looking at, all right. People received money they weren't entitled to receive. How is that situation rectified? One way in

which it could have been rectified is for the debtor to file a lawsuit against everyone that received that money. Now, clearly I think they would have been entitled to a prejudgment writ of attachment because money was coming in their hands in the future. And more importantly, they would have received a judgment for that amount of money. If it was less than ten thousand, you're entitled to attorney's fee under Nevada law, or maybe it's 20,000 now. If it's less than a certain amount you're entitled to attorney fees under Nevada law. And the judgment would have been a personal liability. But rather than going to that the committees and the debtor got together and thought what, is there a better way of getting this money back, but also relieving those lenders from other debts that they may owe to the estate and/or rights they may lose? And the answer was a compromise. The compromise clearly meets the factors of A&C Properties, which is a Ninth Circuit case that deals with when a case should be compromised. There will be expensive litigation, you look at the complexity, look at the benefits.

Here the direct lender's benefit because they're not going to be sued under the theory that there are other loans, that their loans are not really their loans. And there's indeed an argument that

Diversified or others might make to say I'm sorry, you thought you had a direct loan. You thought it's not property of the estate. But there is an argument in light of the way then things were done the and monies were all commingled, it's not your property. It's the property of the estate and we all share.

Now, concededly, I think everybody realized that maybe isn't the strongest argument, but it is a legal argument with factual support. Alternatively, one could argue the subject of consolidation because these entities diverted monies back and forth and monies were commingled. If that was the case, then that might mean assets would be shared. Other arguments are that the contracts clearly provided that servicing fees were to be paid over a period of time and apparently they weren't. So that is being given up. So it is a fair compromise.

Now, can this compromise be effected on those who do not accept and/or object? And this is the part that was troubling me. But in reviewing the cases, reviewing the points and authorities and thinking about it further I believe that you can, notwithstanding the fact that they have objected. And we get there several ways. First of all, since the code tells us that we can effectuate a compromise through a plan under 1123

B-3, that's got to mean something. I mean, it if just means a compromise between one person who has a claim and the estate, then you can just do that through a motion.

I think the compromise envisions much like a class action settlement. In other words, class actions are often used as a way of doing it since class action litigation has been modified. We know we can do class action settlements much like that. We also know that you can modify the rights of secured creditors. Now, it's a little different in this case because they're secured as to the lender as to opposed to the estate, but we know that rights can be modified. Also, we know that through the plan process creditors can, in other words, it's the class of steps. They can receive, for example, 25 cents on the dollar instead of 90 cents on the dollar. And that's done through a class process. This is really the same thing. This is really saying how is my claim adjusted? What do I get in the future? How do I adjust what I owe and they owe me? So I think it's appropriate.

I do think that A-5 is a class that can vote and it's properly voted. Now, it would seem to me that that argument that A-5 is not a proper class to vote has been waived because it was not properly objected

to, nor appropriately raised. But even if, I believe that A-5 is a class that is entitled to vote is because it has claims, it has rights to equitable relief in the true sense of the word. So it has claims.

Now, just so I don't forget to mention, I think I have it in my notes, that would eliminate the issue concerning the Bunch vote, but if the Bunch vote is, if the claim is, if the claim is not temporarily allowed for voting purposes that means class A-4 would have consented as well. I think it's also appropriate because the settlement does not, adversely affects the right to settle.

Let me add one other thing vis-a-vis the rights to the compromise. The compromise and why an adversary is not required. Not only is a compromise a compromise, but it's recoupment. It's strictly recoupment, which doesn't require an adversary proceeding.

Similarly, for example, in the servicing agreement the lender agrees that if U.S.A. pays expenses or advances sums to protect the lenders' interest in the note and deed of trust, U.S.A. may advance the fee and any fees advanced shall be paid back from the proceeds of the foreclosure. Now, I recognize that that goes to foreclosure, but I see no

reason why the same principal isn't true when you received a payment for which you weren't entitled under the note. So it's not, an adversary is not required for recoupment.

What about setoffs? First of all, we know that setoff is an accountable right and it's discretionary. And in this case I don't believe that setoff would be appropriate. Now, it's a little unclear who would have these setoff rights, and part of the problem is we had people representing numerous lenders, and I'm really unclear if they really do have diverted principal as well as direct lender retention claims, but let's assume they do. Setoff would be inappropriate because it would create unfair treatment. If we compare someone who had principal that was diverted, but did not receive any prepaid interest, either because their borrower was paying on the other loans or they only had the one loan, and that person would just get their percentage of what the pot was going to be. But if a person had diverted principal and the direct lender claim for which they received, they would receive more than if they had the setoff. They would be allowed to keep under their theory, the interest to which they were not entitled and get the, diverted, their share of the diverted principal. So

they would be getting more than the person who only had the one loan.

Also, as we knew under 502 D, a claim is disallowed and no payments made until such time as any payments due under the trustee's powers are repaid. So that to me is analogous in disapproving a setoff. I also agree and I would incorporate the arguments concerning mutuality that have been set forth in page 19 of the reply brief.

Now, let me go through more mundane, oh, I'm sorry. The executory contract. I also find that these are not executory contracts. As I stated yesterday and I think Mr. Smith was saying, that everybody shuffles their feet and you say it's not executory, it is an executory, it's not an executory contract. Well, I think the problem is as we all have initial thought that, depending how much we've really thought about this and I've got to admit that every time I read about the countryman's definition my eyes sort of glaze over, the first reaction is every contract has to be an executory contract if it's a contract. That analysis is totally superficial and legally wrong. I think the Helms case proved that point. It was an option contract. Wouldn't one think that an option contract where A and B were involved would be an executory

contract? And the answer is no because the point is the option was given, there's no other performance due on the other side other than just say yes.

And the point is in order to be an executory contract, and let me adopt the arguments on page 31 of the reply brief. An executory contract is one, quote, "on which performance remains due to some extent on both sides." As the quote went on it said in Helms, "More precisely, a contract is executory if the obligations of both parties are so far unperformed that the mere (sic) of either party's complete performance would cause a material breach and thus excuse the performance on the other." Here this is nothing, while it's true the debtor owed duties to the direct lenders, the direct lenders had no obligations to perform. The contract was signed and to suggest that, well, if the lender wanted to buy me out I have to give title, that's been overruled. I mean, that concept has been, I think overruled by Helms, that that is not the kind of breach that's a material breach. And indeed, in the Lemmons case the mere requirements you give a deed is not something that constitutes, it's not the kind of thing that is within the definition of executory contract.

Similarly, the other alleged obligations just

don't rise to that level. The obligation to, well, I think they talked about the payback money, but that wasn't to pay back, it was just withheld. And the giving of documents to close title, it's just a ministerial duty and in any case, they've already given those rights to the powers of attorney. So it is not an executory contract and can therefore be transferred without process of assumption and assignment.

Now, let me go through the more mundane findings, and quite frankly, what I intend to do is incorporate as my findings the evidence submitted by Mr. Allison. So let me summarize, but let me indicate that I do incorporate his statements made in page two through 37 of his affidavit, make those findings. Obviously, I'm going to try and go through these, obviously where he says someplace. It's my belief since if I had no countervailing evidence I would make a finding that that is the fact.

In summary, I find that the plan complies with all the applicable provisions of the bankruptcy code. Section 1129 A-1 is complied with. 1122 has been complied with for the basis set forth and the factual findings that he has set forth. I previously spoke about A-5 and I do find that A-5 is a proper classification and a proper vote. I find 1123 has been

complied with for the reasons set forth in these affidavits and so find. I find that 1129, A-2 has been complied with for the reasons set forth in his, and make the finding set forth his affidavit. I find the solicitation of votes was in compliance. I find 1129 A-3 has been complied with for the reasons set forth. In paragraph D-2 I find that the sales of the assets was an arm's length transaction. I find that 1129 A-4 has been complied with and adopt as my finding the evidence set forth by Mr. Allison. I find that 1129 A-5 has been complied and adopted as my findings the evidence set forth by him and to the extent that his affidavit was one to the best of his knowledge, since there's no contrary affidavit I make the findings that he has suggested, including the appointment of Mr. Tucker and Mr. Berman. And each of those is in the best interests, is appropriate. I find that 1129 A-6 has been met because it's inapplicable. I find that the liquidation analysis demonstrates that each, that that has been met and adopt the evidentiary statements that he has set forth as findings. On page 14 I find that the objection by the insider equity interest has been stricken. But in any event, I find that there is no evidence to support the contingent that U.S.A. CM creditors would be paid hundred percent such that there

would be no possibility of any distribution to the insider equity interest such that the requirements of 1129 A-8 were met and that the plan is fair and equitable to the insider equity interest, and that their interest be cancelled upon the effective date.

Again, I find 1129 A-8 has been met and adopt and the findings set forth by Mr. Allison's evidentiary affidavit. I find 1129 A-9 has been met and adopt the evidence that, as my findings as Mr. Allison has set forth. I find 1129 A-10 has been met and adopt his findings, and I find that A-5 has voted to accept the plan. I voted that the classes set forth in the ballot summary have voted in accordance with that ballot summary.

A-4 is the only class that we don't know at this stage, but as I indicated, that is not required for a finding since A-4 is receiving as much as they would in liquidation and the plan can be crammed down, even if their ballot is meant to reject because it's fair and equitable to them. And there would be A-7 as well as a fair and equitable requirement, not only because no junior class is receiving or retaining anything, but as well is fair and equitable in the larger context of equity.

I find that 1129 A-11 has been met and adopt

the findings of Mr. Allison. I find 1129 A-12 has been met and adopt the findings in his affidavit. I find 1129 A-13 has been met and adopt his findings, I mean, adopt his evidence as findings. A-14 is not applicable. A-15 is not applicable. A-16 is not applicable. And I misspoke before. I find that the claim complies with applicable provisions in 1129 B, which is a cram down, and adopt those findings including the findings that I previously made in connection with my other statements.

With respect to the sale, I adopt the evidence support of Mr. Allison and find that the debtor has undertaken efforts to explore the options. I find that the bid procedures order was served. I find that all of the procedures have been followed. I find there has been benefit to the estate. I find that it's in the best interests of the debtors' estates, there is sound business justification for the sale, that notice of sale was reasonable, the purchase price is fair and reasonable, the sale is made in good faith. I specifically make the findings that Compass is not an insider, does not have any pre-petition or post-petition affiliations with any debtors, major creditors, holders of equity interest or any of the former or current officers or directors. I find that

the sale is not the result of product collusion or any attempt to take unfair advantage and I find that Compass' asset purchase agreement represents the culmination of substantial good faith arm's length negotiations among the debtors, the committees and Compass, and I find that Compass has provided evidence demonstrating the good faith in accordance with the bid procedures order and that Compass has the ability to service the accounts in accordance with the asset purchase agreement.

I adopt the findings of the inner company compromises and find that they are fair and reasonable as I indicated before, and I adopt as findings of facts concerning the objections to confirmation, and in particular the facts which I've indicated previously, that the funds did not come from a particular bar, it was made to direct lenders. And I'm summarizing. His facts laid them out more carefully. And that the money is impossible to trace and that the funds, there was a negative book balance and that the payment of those funds to direct lenders came from various sources other than the particular borrowers to which they were made, made on account of.

So subject only to resolving the pension benefit guarantee issue, I will confirm the plan.

MS. JARVIS: We resolved it, Your Honor.

THE COURT: Okay.

MS. JARVIS: We'll go ahead and go with the language. Let me just read it that we've agreed to. That we will add into the confirmation order. Notwithstanding any provision of the liquidating plan, nothing shall release any claim or claims that PBGC or any pension plan currently or formerly sponsored by the debtors against any person arising under 29 USC, sections 1104 to 1109 with respect to the pension plan.

THE COURT: And that's acceptable to PBGC?

MS. JARVIS: Yes, Your Honor.

THE COURT: Okay. Thank you. Let me just add in conclusion, I know how hard, I can't say I know, I can understand how difficult people's feelings must be in this case and the trauma they have gone through and will go through, and I appreciate that. And I appreciate the fact that Mr. Smith has, you know, represented his clients in the best manner possible. But there is no easy answer, but I think this solution is appropriate under the bankruptcy code, appropriate on all of the facts and circumstances, and does the best job possible to make the best of a terrible situation.

Hopefully, Compass will be able to, as in the

servicing capacity, be able to start collecting on some of these loans that were past due. Perhaps the estate will be able to recover assets that were misappropriated along the way. And I appreciate everybody's efforts, and although it may have been harder on some people, and Mr. Smith, I apologize to you, but, you know, it's part of the process. It's nothing personal. I know you were trying to do your best job representing your clients, and you did a good job of that. The fact I disagree doesn't take away from that.

MR. MEROLA: Your Honor, we all want to get to maximizing value for the constituencies in this estate. And consistent with that, we would like to go back to the ten-day stay issue not on the confirmation, but solely as it relates to the sale transaction.

THE COURT: Oh.

MR. MEROLA: Which we have no objections to. So we would like a limited waiver to give the debtor the optionality, I'm not saying it's going to close in ten days, but to give the debtor the optionality that the stay will not apply as it applies to the provisions of the order related to the sale.

THE COURT: Sale. Okay.

MS. JARVIS: Your Honor, also one

clarification. I think Your Honor made all the currents and findings, but my understanding is from the findings that you made, that you will give a 363 M finding with respect to the sale.

THE COURT: I didn't say the word, but yes.

MS. JARVIS: You didn't specifically say that and that's why I was just asking and clarifying. I assumed that you intended that.

THE COURT: Yes. I didn't make magic words, but you're right.

MS. CARLYON: Your Honor, can I ask for a clarification on two of the findings?

THE COURT: Sure. Let me have Mr. Smith's comment. You have a comment on the ten days?

MR. SMITH: Sure. Couple of things, Your Honor, yeah. The ten days, I'm concerned whether that creates some kind of a strategic advantage. I haven't really thought about it, but I just don't want, I'm not sure I want to appeal it or not, but I don't want to be prejudiced in having that ten days to appeal if I want to. I don't know any rigid circumstances that require it to be shortened.

THE COURT: Well, the sale. The thing is --

MR. SMITH: Well, it's interrelated, but if you do the sale, I'm not sure it might prejudice some

sort of appeal right that I might have. Frankly, as I sit there and heard it I haven't really thought it through. The second thing I want to ask you is when we address the ability of direct lenders terminating the service agreement, and then Counsel for Compass stood up and I couldn't quite hear it and I canvassed other people, so I wanted to ask you if I could. Where are we on that? I'm just not sure.

THE COURT: Do you want to repeat for the record what you said yesterday?

MR. SMITH: Thank you, Your Honor.

THE COURT: So we have it all in one spot?

MR. DAVIS: Sure, Your Honor. I'll do my best. I don't have all of the notes in front of me, but what we are intending to do and what we're willing to accept is to the extent that there is a direct lender that had a right that was matured as of the petition date to replace the servicer based upon the failure of U.S.A. to perform as the servicer, not because of diverted principal or anything like that, that we are willing to take, subject to those limited rights, but in all other respects we take free and clear, liens, claims, encumbrances, setoff rights, improvement rights, monetary and non-monetary defaults, et cetera. And we had certain provisions to deal with,

or certainly agreements to deal with a dispute concerning whether there was a right or wasn't a right to replace the servicer. There's a 30-day provision in section eight of the agreement, we agreed that Compass would be provided 30-days' written notice as provided in the agreement. We'd have the opportunity to the extent we wanted to challenge to bring up before Your Honor, depending on Your Honor's ruling on that, the effectiveness of any attempted replacement of Compass as servicer would be effectively stayed, pending your ruling. And further, that notwithstanding that we're taking subject to this limited right, in all other, and in all respects Compass has the right and ability, Compass has the right and ability to enforce the agreement as though it took free and clear of all monetary, non-monetary defaults.

THE COURT: Okay. Thank you.

MR. SMITH: Still, Your Honor, just so that my silence is not a waiver, I don't, I disagree with that. I think they take subject to whatever defaults existed of whatever nature and can't be limited in any way. But my question was, is are you, is this Court retaining jurisdiction over those issues if somebody wants to terminate the service agreement?

THE COURT: If it's in the plan, I will. If

it's not in the plan, I won't.

MR. GORDON: Let me, paragraph three provides for termination in the event that U.S.A. did not force the, let's call it foreclosure rights or enforcement of rights, question rights. That survives. Obviously, the LSA survives. The LSA does not provide for any provision, any remedy or any procedure in the event there's a dispute. So what we agreed to with Compass was, obviously paragraph three we recognize. And obviously, to facilitate if a dispute arises because the LSA does not provide for, that this would be the Court by which the parties would come for a quick, hopefully speedy, and expeditious and cheap resolution if a dispute arises.

So we're completely consistent with the LSA. We have expended in touch by providing this remedy or this form, for that matter.

MR. SMITH: And is that form, are you saying it's in the plan or is it elsewhere?

THE COURT: I think it would be modified and put in the plan.

MR. GORDON: It will be in the confirmation orders and in the findings.

MR. SMITH: And would that also include the rights in paragraph eight of the servicing agreement as

well that survives or what part?

THE COURT: All the agreement survives.

MR. GORDON: The entire agreement survives.

MR. SMITH: Okay.

MR. GORDON: But what Compass wanted to know was several things. One is that they were taking free and clear in essence what we call the other monetary and non-monetary rights. That's fair. They want to know that if the purchase assets default, interest, et cetera, that if the document is transferred to a third party that their rights are preserved, they can't be prejudiced. And they also want to know that other defaults by, such as which could rise to monetary damages such as recoupment or breach of contracts damages, they're not liable for. That's fair also.

MR. SMITH: I understand. Thank you.

MR. KIRBY: Your Honor, Dean Kirby on the telephone.

THE COURT: Uh-huh.

MR. KIRBY: I just wanted to note for the record that as you know, our client has opposed the sale. We don't believe that these contracts can be sold free and clear of any of the rights of the counterparties and we're not agreeing to the settlement or agreement that's been worked out with the

committees.

THE COURT: That's fine, but that objection has been overruled. And I need to say that. I'm overruling all the objections to the plan that haven't been dealt with PBGC has just modified.

MR. KIRBY: I understand, Your Honor. I just didn't want my silence to be interpreted as consent to that.

THE COURT: Okay. Thank you.

MS. JARVIS: Your Honor, to clarify the last decision, the retention provisions in the plan are very broad and when we add into the confirmation order this issue with respect to this Court retain jurisdiction over disputes with respect to the termination of the loan servicing agreements, it is merely clarifying what is already a very broad interpretation of the jurisdiction provision of the plan.

THE COURT: Mr. Merola, Mr. Herman?

MR. MEROLA: I'm going to try again. Your Honor, I'll make an offer of proof that in selecting the highest and best offer, each of the committees and the debtor considered the certainty of close. The ultimate certainty of close is to close the transaction. For whatever internal accounting reasons related to the calendar year, which I can't speak to,

Compass is highly motivated to close this transaction now. Secondly, the purchase and sale agreement with Compass provides that the purchase price for the U.S.A. Commercial Mortgage assets is reduced dollar for dollar for each dollar collected from the auction date to the close. The longer it is to the close, the lower the purchase price is under that.

THE COURT: Yeah, but you would be able to keep what you collected.

MR. MEROLA: I understand, Your Honor, but the purchase price does change.

THE COURT: Now --

MR. MEROLA: I do not think it is highly likely that this transaction will close within the ten days. I have been requested by multiple parties to see if we can get the flexibility to close the transaction within the ten days, if possible.

THE COURT: The thing I want to know is if there is an appeal to the confirmation order, how would that affect, I mean, would they close notwithstanding the fact that the confirmation order wouldn't have been entered yet? And Mr. Smith has a fair point. He doesn't want to be prejudiced in his rights. I mean, you know, if it really is going to affect it, then we really need to know that.

MR. MEROLA: Well, absent the stay, Your Honor, we will do everything we can to consummate all the transactions provided for under the plan, including the purchase and sale. I would argue, Your Honor, that the possibility of an appeal of the confirmation order is yet another reason to give Compass the flexibility to close, because I don't want to be in the situation where they're using the fact that the confirmation order is not final, which is required under the purchase agreement, to start negotiating purchase price or continue the closing.

THE COURT: So they're willing to close even though the confirmation order is not final? Are they waiving that requirement? That's really the answer.

MR. MEROLA: If that's the case. That may be the case.

MS. CHUBB: It may be, but I was going to suggest that the ten days not be waived, but shortened so they can close on the 29th if they want to if we don't have a stay.

THE COURT: Well, you know what? Today is the 20th. Ten days from now is the 31st.

MS. CHUBB: That's on a weekend, though. So they probably couldn't close. So I'm suggesting if we haven't gotten a stay by the 28th, they can close on

the 29th.

MR. DAVIS: Your Honor, you asked whether or not we would be willing to waive the formality of the confirmation order. The answer is yes, since Your Honor has already granted us protection under the 373 M.

THE COURT: Oh, okay.

MR. SMITH: Your Honor, my concern is the practical issue. My concern is a practical mootness issue. I know things take place in furtherance of the plan, that may tend to prejudice me. I'm not saying I'm going to take appeal, but if things go forward pursuant with the plan, I'm sure I'd to be faced with an argument, "Look, Mr. Smith. You can't unwind what's already been done." The Compass sale has already been closed. It can't be unwound. It's part of the overall.

THE COURT: Except you never objected to any part of the sale aspect.

MR. SMITH: Well, I objected to the plan. So I don't want to be prejudiced in that objection by saying, "Look. The plan has already been implemented so there's nothing you can do." That's the sole reason why I'm objecting to shortening that period. And I appreciate everybody would like to close earlier, but

Compass bargained to close by the end of January. So it's not like it's a big surprise to them. And I'm concerned about the attempt to move it up and gain some sort of advantage to effect any appeal that might be filed.

THE COURT: Okay.

MS. CHUBB: Your Honor, we'll check with our clients to make a decision that we're not appealing, then we'll be happy to tell them if they want to close before the 29th.

MR. MEROLA: I think Ms. Chubb's suggestion is an excellent way to split the baby. My only request if the stay is not obtained by the 26th, that would give us two business days in that week, because the Friday before is going to be difficult to close on.

MR. SMITH: I don't really look forward to spending my Christmas day working on a motion for a stay. If you order it I'll do it, but the 26th is the day after Christmas. That essentially gives us two days. That's not going to work, Your Honor.

MR. MEROLA: It gives them all of next week, Your Honor.

MR. SMITH: There's no exigent circumstance that causes this to happen, other than they would really like to do it.

THE COURT: Well, since it's only the sale I'll shorten the time to the 27th at noon. That's really splitting the baby.

MS. CHUBB: Your Honor, it's supposed to be ten days.

THE COURT: You're the one that suggested the shortening time.

MS. CHUBB: I did, and I suggested shortening it to the 29th, not to the 27th.

THE COURT: You said 28th.

MS. CHUBB: I said if we didn't have a stay by the 28th they would be able to close on the 29th.

MR. MEROLA: Close of business on the 27th and we're closing. That game's over.

MS. CHUBB: That's what you say.

THE COURT: This is just on the sale aspect. They're waiving a formality requirement. It seems to me the benefit of the estate.

MR. SMITH: It is, Your Honor, but I can just tell you the first thing I'm going to face on an appeal if I bring one is there's nothing to do now. The sale is closed.

THE COURT: But you didn't argue anything about the sale. You argued about how the money is paid out.

MR. SMITH: I don't think I needed to do that. I get ten days until you shorten it.

THE COURT: I understand.

MR. SMITH: And in this ten days if you allow something to happen that is going to make my appeal practically moot, then I'm really prevented from appealing. Your Honor, that's really what is being attempted.

THE COURT: I don't think to remove this doctrine would affect that because there are certainly ways, what is effected is the way your clients are paid, not the sale.

MS. CHUBB: How about this? They wouldn't raise the mootness issue?

THE COURT: Is there an objection to raising the mootness issue?

MR. MEROLA: We're not going to waive the mootness issue.

MS. FREEMAN: Susan Freeman. No, we're not going to waive anything.

THE COURT: Well, then I think if you're not willing to waive that, then I guess I can't.

MR. MEROLA: Fine, Your Honor.

THE COURT: Okay. Sorry, Mr. Herman?

MR. HERMAN: Your Honor, hopefully by way of

just a housekeeping point of view, but the Diversified Fund is a direct lender. The Diversified Fund did not sign up for the compromise embodied in the plan. And we still have outstanding issues with Mr. Charles and Miss Freeman. We continue to try and work out those issues.

THE COURT: Well, you're bound to the plan like everybody else is. Okay.

MR. HERMAN: That's exactly right, Your Honor, but we are not a party to the compromise. So I would just like some clarification that the Court's rationale was really in support of approving the compromise and not things that are binding on other parties in the case who --

THE COURT: But you're in that class. You're bound like everybody else. You're in that class. I know you said you wouldn't agree to it unless you objected. That's why I asked the question yesterday.

MR. HERMAN: By the terms of the plan, Your Honor.

THE COURT: Yes. You're bound by the terms of the plan.

MR. HERMAN: Diversified Fund is not a member of the A-5 class.

THE COURT: But to the extent of those claims

you are.

MR. HERMAN: That's not the way the plan is drafted, Your Honor. This is not a controversial issue.

THE COURT: It is.

MR. HERMAN: We've already, well, amongst the professionals it's not.

THE COURT: Well, it is. If you want to be treated differently, you're no different than Mr. Smith's client.

MS. JARVIS: I think, Your Honor, in fact maybe, I think I understand what he's saying. With respect to the substantive consolidation, that issue is gone. I think specifically he's dealing with the Court's determination with respect to the compromise, which the compromise may have included a compromise on offsets. There are some separate issues. Diversified did not vote in the A-5 class because it's a separate debtor estate. And I think with respect to those findings in the U.S.A. Commercial Mortgage estates he's simply asking since they didn't vote in that plan, we're not on that side, that they retain that.

THE COURT: Right, to the extent that they had a claim as a direct lender, I think they are. You can find it out later if you want, but.

MR. MEROLA: Well, that's all we're asking, Your Honor. That's as to the plan.

MR. HERMAN: We have additional facts to present to the Court. There are additional arguments, there are differences to the foreclosure --

THE COURT: But the point is to the extent you're a direct lender and fit within A-5, whether you loan or not, you're bound by the plan like everybody else.

MR. HERMAN: Of course, but I think that we can demonstrate to the Court that that wasn't the intent of the plan. That's all I'm asking, is the Court's rationale for approving the compromise is not binding upon a party who is not a part of the compromise.

THE COURT: It is. That was Mr. Smith's problem. Mr. Smith said, "I'm not a part of this compromise. I didn't agree to it." It is.

MR. HERMAN: Let me rephrase, Your Honor. A party who is not under the plan purported to be bound by the compromise. I'm not trying to change anything, I'm not trying to change anything in the plan, I'm not trying to change anything in the form of orders.

THE COURT: It seems to me if you are someone whose claim fits within A-5, you are bound just like

every class member. Maybe you are going to litigate it later, but that's my view.

MR. HERMAN: We understand that's your view.

THE COURT: But you're here and you didn't file an objection to the plan.

MR. HERMAN: And we're willing to live by the terms of the plan, it's just that --

THE COURT: So don't ask me for clarification of what you think the plan does to you.

MS. JARVIS: Your Honor, if I could just help, the direct lender and the way it is confined in plan specifically excludes USCA, ACM and the fund. So Diversified is a fund he's excluded from the definition of direct lender. So I think --

THE COURT: The plan says whatever it is.

MR. HERMAN: That's exactly right, Your Honor. That's all we're asking for. Thank you.

MS. CARLYON: Sorry, Your Honor. I just had two brief sections I would ask that the Court might clarify the findings. With regard to the finding that Compass has no relationship to any of the parties in essence, there were certain disclosures that were made to this Court and filed with regard to connections, and I would ask the finding be that otherwise, other than as disclosed, there are no such connections.

THE COURT: I'm relying on Mr., I mean, I wondered about that. Mr. Allison's affidavit does not contain that exception. His affidavit says they do not have any pre-petition or post-petition affiliation as an absolute member. As an absolute.

MS. CARLYON: And they do not. I don't think they have any affiliation whatsoever. I think there were certain connections that were disclosed to this Court that don't rise to that level.

THE COURT: He also says they do not exhibit affiliations with any of them. It says affiliations.

MS. CARLYON: And I think that's absolutely true.

THE COURT: Okay.

MS. CARLYON: And then with regard to the analysis under 1129 A-7, you adopted the actual submission by Mr. Allison with regard to the liquidation class. Would it be appropriate for the Court also to find that no countervailing evidence has been presented by any objecting creditor that they would not receive as much through confirmation as in a liquidation?

THE COURT: That's fine. I said the only evidence I had was.

MS. CARLYON: Right.

THE COURT: I guess I assumed from, if you want to add the next statement that there was no countervailing evidence, that's fine, too.

MS. CARLYON: Thank you, Your Honor.

MR. MEROLA: Your Honor, would it be appropriate to make findings that the direct lenders' interest under the notes and deed of trust have not been amended or modified pursuant to the plan?

THE COURT: Yes. Yes, I think that's what the plan says, but that's another day.

MR. MEROLA: Thank you, Your Honor.

THE COURT: Okay. Thank you. Just when do you anticipate uploading the findings and the orders so my staff knows?

MR. MEROLA: Everyone is very anxious to have the order entered, but given the numbers of parties that have to review it, we're going to work throughout the afternoon. We have working drafts proposed. We'll have the augmented, we're going to incorporate, I think, your oral findings rather than trying to recreate them, but the parties have already been working on drafts of both documents.

THE COURT: Okay.

MS. JARVIS: I think we're substantially there between the committees and the debtors. Now it's

a matter of distributing it to all the other parties to common on before submitting it to the court.

MS. CARLYON: Does it make sense to shorten the time to sign off on the order or file objections?

THE COURT: Well, let's give everybody 24 hours to review the findings.

MS. CARLYON: Thank you, Your Honor.

MR. MEROLA: Thank you, very much for your patience, Your Honor.

(Whereupon, the morning's proceedings were concluded at 12:10 p.m.)

ATTEST: True and accurate transcript.

René R. Hannah by M. White

RENE R. HANNAH, CCR #326