1

```
 1              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEVADA
 2                  LAS VEGAS, NEVADA
    In re:  USA COMMERCIAL MORTGAGE    )  OCTOBER 19, 2006
 3  COMPANY,                          )  E-Filed:  11/30/06
                                       )
 4           Debtor.                   )  Case No.
                                       )  BK-S-06-10725-LBR
 5  _____)  Chapter 11
    USA COMMERCIAL MORTGAGE COMPANY,   )
 6                                     )
             Plaintiff,                )
 7                                     )
        vs.                            )  Adversary No.
 8                                     )  06-01146-LBR
    WELLS FARGO BANK, N.A., et al.,    )
 9                                     )
             Defendants.               )
10  _____)
    USA COMMERCIAL MORTGAGE COMPANY,   )
11                                     )
             Plaintiff,                )
12                                     )
        vs.                            )  Adversary No.
13                                     )  06-01167-LBR
    ROBERT J. KEHL, et al.,            )
14                                     )
             Defendants.               )
15  _____)
    USA COMMERCIAL MORTGAGE COMPANY,   )
16                                     )
             Plaintiff,                )
17                                     )
        vs.                            )  Adversary No.
18                                     )  06-01179-LBR
    STANDARD PROPERTY DEVELOPMENT,     )
19  LLC,                               )
             Defendant.                )
20  _____)

21           PARTIAL TRANSCRIPT OF PROCEEDINGS
                          OF
22      (06-01146) SCHEDULING CONFERENCE RE: COMPLAINT
     UNDER 11, USC, SECTIONS 105, 362, 542, 549, AND 550, NO. 38
23                         AND
        (06-01167) MOTION FOR SUMMARY JUDGMENT
24    AND FOR ORDER DIRECTING RELEASE OF FUNDS, NO. 97

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.
```

```
 1                    MOTION FOR SUMMARY JUDGMENT
          AND FOR ORDER DIRECTING RELEASE OF FUNDS, NO. 133
 2                             AND
                    MOTION FOR SUMMARY JUDGMENT
 3        AND FOR ORDER DIRECTING RELEASE OF FUNDS, NO. 148
                               AND
 4                    MOTION FOR SUMMARY JUDGMENT
          AND FOR ORDER DIRECTING RELEASE OF FUNDS, NO. 157
 5                             AND
                         STATUS HEARING
 6            RE: EMERGENCY MOTION FOR ORDER EXTENDING
         THE DEBTOR'S EXCLUSIVE PERIOD TO FILE A PLAN
 7               TO SEPTEMBER 15, 2006, NO. 1274
                               AND
 8            MOTION FOR RELIEF FROM STAY, NO. 1159
                               AND
 9             (06-10725) ORDER SHORTENING TIME
            RE: MOTION TO EXTEND EXCLUSIVITY PERIOD
10           TO CONFIRM PLANS OF REORGANIZATION
               TO DECEMBER 31, 2006, NO. 1357
11                             AND
      OBJECTION TO CLAIM 26 OF PROSPECT HIGH INCOME FUND, ET AL.,
12            IN THE AMOUNT OF 20,000,000, NO. 1345
                               AND
13                   ORDER SHORTENING TIME
          RE: MOTION FOR ORDER SCHEDULING AN AUCTION
14              FOR THE SALE OF CERTAIN ASSETS,
           APPOINTING SPCP GROUP, LLC, AS LEAD BIDDER,
15     AND APPROVING BID PROCEDURES AND PROTECTIONS, NO. 1381
                               AND
16        (06-01179) MOTION FOR PRELIMINARY INJUNCTION, NO. 20
                               AND
17                   ORDER SHORTENING TIME
          RE: MOTION FOR ORDER APPROVING RETENTION PLAN
18          OF DEBTOR'S REMAINING EMPLOYEES, NO. 1459
                               AND
19          (06-01167) MOTION FOR SUMMARY JUDGMENT
          AND FOR ORDER DIRECTING RELEASE OF FUNDS
20          WITH CERTIFICATE OF SERVICE, NO. 125
                               AND
21                   MOTION FOR SUMMARY JUDGMENT
          AND FOR ORDER DIRECTING RELEASE OF FUNDS
22          WITH CERTIFICATE OF SERVICE, NO. 128
                               AND
23                FIRST INTERIM APPLICATION
            OF THE OFFICIAL COMMITTEE OF HOLDERS
24             OF EXECUTORY CONTRACT RIGHTS
          THROUGH USA COMMERCIAL MORTGAGE COMPANY
25     FOR REIMBURSEMENT OF EXPENSES OF COMMITTEE MEMBERS, NO. 1370
```

1                               VOLUME 3
                    BEFORE THE HONORABLE LINDA B. RIEGLE
2                       UNITED STATES BANKRUPTCY JUDGE

3                        Thursday, October 19, 2006

4                              9:00 a.m.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Court Recorder:          Cathy Shim

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

```
 1  APPEARANCES:

 2  For USA Commercial        DAVID W. HUSTON, ESQ.
    Mortgage Company:         601 South Seventh Street
 3                            Second Floor
                              Las Vegas, Nevada 89101
 4
    For the Defendants,       JANET L. CHUBB, ESQ.
 5  Robert Kehl and           Jones Vargas
    Ruth Kehl:                100 West Liberty
 6                            Twelfth Floor
                              Reno, Nevada 89501
 7
    For the First Trust       FRANK A. MEROLA, ESQ.
 8  Deed Equity Committee:    Stutman, Treister & Glatt, P.C.
                              1901 Avenue of the Stars
 9                            Twelfth Floor
                              Los Angeles, California 90067
10
    For John R. Mallin and    JOHN J. LAXAGUE, ESQ.
11  Marie T. Mallin,          Cane Clark, LLP
    Trustees of Mallin        3273 East Warm Springs Road
12  Family Trust,             Las Vegas, Nevada 89120
    Custodian for
13  George J. Motto IRA,
    Peter A. Bolino,
14  Fabiola A. Bolino,
    Daniel Drubin,
15  Laura Drubin, and
    Beverly J. Stiles:
16
    For Wells Fargo Bank,     JEFFREY R. HALL, ESQ.
17  N.A.:                     Shea & Carlyon, Ltd.
                              233 South Fourth Street
18                            Suite 200
                              Las Vegas, Nevada 89101
19
    For the Defendant,        STEPHEN R. HARRIS, ESQ.
20  Rocklin/Redding,          Belding, Harris & Petroni, Ltd.
    LLC:                      417 West Plumb Lane
21                            Reno, Nevada 89509

22  For James Feeney:         AMBRISH S. SIDHU, ESQ.
                              Larsen & Stephens
23                            425 South Sixth Street
                              Las Vegas, Nevada 89101
24

25
```

```
 1    APPEARANCES (Cont.)

 2    For the First Trust       CANDACE C. CARLYON, ESQ.
      Deed Fund Committee:      Shea & Carlyon, Ltd.
 3                              233 South Fourth Street
                                Suite 200
 4                              Las Vegas, Nevada 89101

 5    For the Debtor and        LENARD E. SCHWARTZER, ESQ.
      Debtor in Possession:     Schwartzer & McPherson Law Firm
 6                              2850 South Jones Boulevard
                                Suite 1
 7                              Las Vegas, Nevada 89146

 8    For Highland Capital:     CICI CUNNINGHAM, ESQ.
                                Rawlings, Olson, Cannon, Gormley
 9                                 & Desruisseaux
                                9950 West Cheyenne Avenue
10                              Las Vegas, Nevada 89129

11                              PAUL LACKEY, ESQ.
                                ROSS MORTILLARO, ESQ.
12                              Lackey Hershman, LLP
                                3102 Oak Lawn Avenue
13                              Suite 777
                                Dallas, Texas 75219
14
      For Diversified Trust     BOB L. OLSON, ESQ.
15    Deed Fund Equity          Beckley Singleton, Chtd.
      Security Holders:         530 Las Vegas Boulevard South
16                              Las Vegas, Nevada 89101

17

18

19

20

21

22

23

24

25
```

1          (Court previously convened at 09:09:29 a.m.)

2          (Partial transcript at 12:41:38 p.m.)

3              THE CLERK:  Bankruptcy court is now in session.

4              THE COURT:  Be seated.  Okay.

5      Oh, I had forgotten to mention before -- and if you'd

6  pass this word along -- on the 30th, we won't start until

7  about 10:30.  I had to put a motion calendar on before that.

8  So as a practical matter, it will be about 10:30 before we

9  start.

10             MR. SCHWARTZER:  We'll put it on the Web site,

11  your Honor.

12             THE COURT:  Okay.  That would be great.  Thanks.

13  All right.

14      On the objection to claim.

15      (Colloquy not on the record.)

16             MS. CARLYON:  Your Honor, I just wanted -- this is

17  Candace Carlyon on behalf of the Investor Committee for the

18  First Trust Deed Fund.

19      I just wanted to make sure the Court is aware that our

20  objection to this same claim which was set for a hearing on

21  the 30th has been resolved.  That claim was withdrawn as to

22  First Trust Deed Fund.

23             THE COURT:  Okay.

24             MS. CARLYON:  I just wanted to give you the

25  heads-up.  The paperwork was filed some time ago, but I

7

1    wanted to make sure --

2              THE COURT:  Okay.

3              MS. CARLYON:  -- that you were aware.

4              THE COURT:  All right.

5              MS. CARLYON:  Thank you, your Honor.

6              THE COURT:  Thank you.

7              MS. CUNNINGHAM:  We probably need to make our

8    appearances since we --

9              THE COURT:  Yeah.

10             MS. CUNNINGHAM:  We didn't do it --

11             THE COURT:  All right.

12             MS. CUNNINGHAM:  -- this morning.

13             THE COURT:  Go ahead.

14         (Colloquy not on the record.)

15             MS. CUNNINGHAM:  CiCi Cunningham on behalf of

16   Highland Capital and also Paul Lackey and Ross Mortillaro

17   who are going to be arguing the motion.

18             MR. OLSON:  Good afternoon, your Honor.  Bob Olson

19   of Beckley Singleton on behalf of the Diversified Trust Deed

20   Fund Equity Security (indiscernible).

21             THE COURT:  Okay.

22             MR. OLSON:  Your Honor, the briefs on this are

23   fairly lengthy, and I thought I would ask you if you had any

24   specific questions you would like me to address before I

25   start with the argument.

8

1          THE COURT:  No.  I really don't.  They were

2     well-done on both parts.

3          MR. OLSON:  Okay.  Well, your Honor, if I could --

4          THE COURT:  If there's anything that you want to

5     highlight, that would be fine.  I'll have it just on both

6     sides I think, probably.

7          MR. OLSON:  Okay.  Thank you.

8          THE COURT:  You were surprised about the answer.

9     I saw that.  Okay.  Now what do I do.

10          MR. OLSON:  Well, I actually have several pages of

11     notes.  I thought I'd try to save everybody some time.

12          THE COURT:  Yeah.  And I appreciate that.  I --

13          MR. OLSON:  Your Honor, if I could summarize the

14     Highland Funds claim in one sentence, it's this.  They

15     allege that the debtors owe it or the Highland Funds

16     $20,000,000 because Diversified loaned 11-and-a-half-million

17     dollars to Epic Resorts.  We loaned somebody money.  And

18     because of that, we owe Highland Funds twice as much money.

19          The legal theory that all this is predicated upon is

20     that Diversified tortiously interfered with Epic Resorts'

21     $130,000,000 indenture.

22          The facts are pretty straightforward, and the whole

23     basis of this claim objection is is that this issue has been

24     tried by Highland Funds acting through their indenture

25     trustee in the Epic bankruptcy.  It was lost.  It was

1    appealed, and it was lost on appeal.

2        Your Honor, we submit that the claim should be

3    disallowed.  Highland Funds have had enough bites at the

4    apple in this case.

5        The facts -- and I believe they're pretty much

6    undisputed -- can be summarized as follows:  On July 8,

7    1998, Epic Resorts issued $130,000,000 of bonds.  Of those

8    $130,000,000 of bonds, the Highland Funds later purchased in

9    excess of 90,000,000 of those bonds.

10       I discovered looking through the appellee's brief on

11   appeal in the Epic bankruptcy that most of those bonds were

12   purchased by the Highland Funds after Diversified made the

13   loan that gives rise to this claim, not before.

14       The argument is is that although this indenture was

15   dated July 8, 1998, in June of 2000, approximately two years

16   later, Epic borrowed 11-and-a-half-million dollars from

17   Diversified.

18       And I think Epic is -- or excuse me.  Highland Funds

19   are maintaining that there were three provisions of the

20   indenture that Diversified knowingly interfered with when it

21   loaned the money to Epic.

22       The first is is that the Epic Marquis which was a

23   subsidiary of Epic Resorts was supposed to obtain Bureau of

24   Indian Affair approval to grant the indenture trustee a

25   leasehold deed of trust against property that I believe was

1    located on an Indian reservation.  Your Honor, that approval

2    was never obtained.

3        The indenture trustee did nothing between 1998 and 2000

4    to perfect any lien against that leasehold interest.  It was

5    just simply something that did not happen.

6        The second covenant in the indenture that the Highland

7    Funds claim Diversified tortiously interfered with was the

8    prohibition upon Epic incurring any additional debt.  In

9    other words, Epic covenanted not to borrow any additional

10   funds.  The third negative covenant was that Epic was

11   prohibited from further encumbering any of its assets.

12       Your Honor, approximately, a year after Diversified

13   loaned the 11-and-a-half-million dollars to Epic, the

14   Highland Funds engaged counsel and filed bankruptcy

15   petitions against Epic Resorts and then later against the

16   subsidiaries of Epic Resorts, including the Epic

17   Palm Springs entity.

18       On April 23rd, 2002, the Bank of New York who was the

19   successor trustee under the indenture filed a lawsuit

20   against Epic Palm Springs and against Diversified.  That

21   lawsuit contained two claims for relief.

22       The first claim for relief in the lawsuit was to

23   establish an equitable lien against the property that was

24   senior to that held by Diversified.  The second claim for

25   relief was to equitably subordinate the claim of Diversified

1    in the Epic bankruptcy.

2        Your Honor, there was a lot of discovery that was

3    conducted in that case and that Epic -- or excuse me -- that

4    Highland Funds had submitted in connection with their

5    opposition in this case.

6        They took the deposition of Mr. Milanowski and inquired

7    of him whether or not they knew of the indenture knowingly

8    violated, et cetera.  That deposition transcript was

9    produced by Highland Funds.

10        Similarly, they had deposed Mr. Hantges, made similar

11    inquiries of him.  They also deposed Thomas Rondall

12    (phonetic), the attorney for Diversified, and made similar

13    inquiries of him.

14        In the Epic bankruptcy court, the bankruptcy court

15    conducted a joint evidentiary hearing on the complaint that

16    sought equitable subordination and the imposition of an

17    equitable lien with Diversified's motion for relief from the

18    automatic stay.

19        In connection with that hearing, the Bank of New York

20    briefed the tortious-interference issues and alleged that

21    Diversified tortiously interfered with the indenture.

22        And because of that tortious interference, the

23    equitable lien should be imposed, and the claim of

24    Diversified should be equitably subordinated.

25        The bankruptcy court considered that, held at least two

1   days of evidentiary hearings, portions of the transcripts of

2   which the Highland Funds have submitted in opposition to the

3   claim objection, and found that there was no tortious

4   interference.

5        And the Epic bankruptcy court did that in a published

6   opinion, and I'd like to read briefly from that published

7   opinion, your Honor.

8        I'm referring to it looks like pages 524 and 525 of

9   what I've called Epic I in the papers, 290 Bankruptcy

10  Reporter.

11            THE COURT:  Okay.

12            MR. OLSON:  The Court states, "While USA

13  Capital" --

14            THE COURT:  524.

15            MR. OLSON:  Yes.

16            THE COURT:  Yes.

17            MR. OLSON:  The Westlaw printout --

18            THE COURT:  I see it.

19            MR. OLSON:  -- I have --

20            THE COURT:  I see it.

21            MR. OLSON:  -- is on page 11.

22            THE COURT:  Yes.  I see it.

23            MR. OLSON:  They state, "While USA Capital has

24  admitted that it read the indenture and the prospectus prior

25  to approving the loan to Epic Palm Springs, the Court does

1    not find this sufficient to rise to the level of egregious

2    conduct.  Further, we cannot conclude that USA Capital

3    tortiously interfered with the agreement between BNY and

4    Resorts."

5        If you go down to the next paragraph, your Honor, it

6    states, quote, "There is no evidence of purposeful action on

7    the part of USA Capital to harm the relationship between

8    Resorts, Capital, and BNY.  Epic Palm Springs advised USA

9    Capital that no other creditor held a lien on this lease.

10       Although USA Capital had knowledge of the restrictive

11   covenant, Epic Palm Springs represented and warranted that

12   the entry into the secured-loan transaction with USA Capital

13   did not and will not result in a breach or constitute a

14   default under or require any consent under any indenture,"

15   close quote.

16       The Court then went on to say, "In addition, USA

17   Capital's report did not reveal any other liens on this

18   lease.

19       Prior to consummating the transaction, USA Capital

20   confirmed with the BIA that no other liens existed on the

21   property.

22       USA Capital's actions were not intended to harm the

23   relationship between BNY and Resorts.  Furthermore, the

24   relationship between Resorts, Capital, and BNY was not

25   altered.

1          BNY did not have a lien on the leasehold prior to USA

2     Capital's loan to Epic Palm Springs and did not have one

3     after the loan."

4          Your Honor, BNY was dissatisfied with that decision and

5     appealed to the district court, and I think it is crystal

6     clear that the tortious-interference issue was litigated on

7     appeal by Bank of New York.

8          For instance, if you look at the appellate brief that

9     was filed by Bank of New York in the appeal -- I believe,

10    your Honor, I submitted that as Exhibit -- bear with me for

11    a moment -- Exhibit 9.

12         When you go to page 2 of that, the third full paragraph

13    states, quote, "Finally, BNY can demonstrate that USA

14    Capital tortiously interfered with its contractual relations

15    with the debtors.

16         Such wrongful conduct of USA Capital was further

17    support for the equitable subordination of USA Capital's

18    claim."

19         Your Honor, they went on to brief the issue.  The

20    district court in what I have called Epic II clearly pointed

21    out that tortious interference was being litigated and

22    considered on appeal.

23         For example, in Epic II which is 307 Bankruptcy

24    Reporter, your Honor -- I'm looking at page 770.  It's

25    page 4 on my Westlaw printout -- the Court stated, quote --

1    and the Court stated when describing BNY's or BNY's issues

2    on appeal that BNY alleged this.

3        Quote, "And that the bankruptcy court should have found

4    that USA Capital's conduct was purposeful and constituted

5    tortious interference with the contractual rights of BNY,"

6    close quote.

7        In the next paragraph -- and I'm reading from the

8    middle of it just at the very tail end of page 770,

9    your Honor -- the Court stated, quote, "USA Capital further

10    contends that the bankruptcy court correctly rejected BNY's

11    argument that USA Capital acted in bad faith and tortiously

12    interfered with the indenture," close quote, so it's clear

13    that issue was considered on appeal.

14        And on page 772 of that decision, the Court affirmed

15    the bankruptcy court by stating, quote, "The bankruptcy

16    court thoroughly analyzed the facts of this case and found

17    that despite USA Capital's actual knowledge of the

18    restrictive covenants in the indenture USA Capital did not

19    intend to harm any relationship between the debtors and the

20    bondholders and its conduct did not rise to the level

21    required to equitably subordinate the claim of a

22    noninsider," close quote, so I think it's crystal clear that

23    this was litigated in Delaware.

24        Now, I want to talk about the relationship between the

25    Highland Funds and BNY very briefly.  BNY was the successor

1    trustee under the indenture.

2        The Highland Funds owned in excess of $90,000,000 of

3    the $130,000,000 of bonds issued under that indenture, and I

4    think this is a very key point that the Highland Funds are

5    trying to de-emphasize.

6        Highland Funds and Bank of New York had the same

7    counsel in the Epic bankruptcy.  They filed a Rule 2019

8    statement saying they had the same counsel.

9        If you look at the papers that were filed in the Epic

10   bankruptcy, they admit to it at several different instances,

11   for example, in their opposition to the motion for summary

12   judgment.  It's clear they have the same counsel.  They had

13   input in what was going on in Delaware.

14       Your Honor, shortly after the BNY adversarial

15   proceeding was filed in Delaware, approximately three months

16   later, on July 11, 2002, the Highland Funds in their

17   capacity as bondholders and not through the indenture

18   trustee filed the complaint in Nevada.

19       And the complaint in Nevada was filed against

20   Diversified and the attorney that delivered an opinion

21   letter, and that complaint basically sought damages for

22   tortious interference because Diversified made the

23   11-and-a-half-million-dollar loan to Epic.

24       It arose from the same identical facts, the same

25   transaction.  I mean, there is no way to distinguish the

1    facts in the Nevada action from the facts in the Delaware

2    action.

3        They also sought relief against Diversified on two

4    derivative claims, the conspiracy and the

5    aiding-and-abetting claim.

6        Your Honor, during that case, the parties caused it to

7    be stayed pending the outcome of the Epic litigation in

8    Delaware.

9        After the Epic litigation was resolved, Diversified

10   filed a motion for summary judgment which was denied.

11   Diversified filed the motion for summary judgment on the

12   sole ground that the doctrine of issue preclusion or

13   collateral estoppel barred this action.

14       And I think this is really crucial because they did not

15   address or allege that the action was barred under the

16   doctrine of res judicata or claim preclusion, and those are

17   different legal concepts.  They have different

18   ramifications.

19       Before I get into the bulk of the argument, I wanted to

20   point out that the Nevada order denying the summary-judgment

21   motion was never reduced to a written order.  It's in the

22   form of a minute order.

23       The Nevada Supreme Court has held in cases that I've

24   cited in the reply indicating that minute orders are of no

25   force and effect.

1        And even if an order had been entered, your Honor, it

2    would be interlocutory.  It couldn't be appealed.  It is not

3    final, and it could be reconsidered at any time by whatever

4    judge is trying the case.

5        So I don't think that it really has any precedential

6    effect in this case.  It clearly is -- well, I think it's

7    irrelevant, but I wanted to address that.

8        The key issue that I think was raised in state court

9    and that has been raised in Highland Funds' opposition is

10   basically this.

11       That claim preclusion -- or excuse me.  Issue

12   preclusion or collateral estoppel didn't apply because the

13   Delaware Court applied a different standard of proof or

14   burden of proof, and that is the egregious-conduct standard.

15       Your Honor, I have found the concept of an

16   egregious-conduct standard as a burden of proof kind of

17   confusing.

18       I had always thought burdens of proof were things like

19   clear-and-convincing evidence, by a preponderance of the

20   evidence, beyond a reasonable doubt.

21       I had never heard of an egregious-conduct burden of

22   proof.  I can see how a party would have the burden of

23   proving that, but I don't think there is such a burden of

24   proof.

25       Your Honor, every case that I was able to locate

1   addressing the burden of proof in tortious-interference

2   claims, have allegations of fraud, have held that the burden

3   of proof is by the preponderance of the evidence, and I have

4   cited -- I don't know -- 20, 30, 40 cases to that effect,

5   and I'm sure there were a lot more.

6       I think the burden of proof is by a preponderance of

7   the evidence, and I think that burden of proof is what the

8   U.S. Supreme Court would apply per the Groven versus Garno

9   (phonetic) decision.

10      Your Honor, with respect to res judicata or claim

11  preclusion, again, I don't think that was litigated in state

12  court.

13      It doesn't appear to me to be briefed in the opposition

14  that the Highland Funds filed.  I think they focussed on

15  collateral estoppel or issue preclusion.

16      But the elements for res judicata to apply are pretty

17  simple.  First is there has to be a final ruling on the

18  merits.  Second, the ruling has to be against a party to

19  that proceeding or somebody that's in privity with that

20  party.  Third, there has to be a subsequent suit based upon

21  the same action.

22      Now, the commentary in the case law interpreting the

23  third element of taking it a step further, basically,

24  res judicata bars a party from litigating a claim that was

25  or could have been litigated in the prior action.

1          Now, I think this is crucial because in the prior

2     action they called their claims equitable subordination, and

3     they cite an equitable lien, but it was all predicated upon

4     allegations of tortious interference.  They could have.

5     They should have raised that claim in that action.

6          But if you apply these three elements of res judicata

7     to the facts in this case, I think it's clear the claims

8     should be disallowed.

9          First, there is no doubt that there was a final

10    decision in Delaware, no doubt whatsoever.  Second, we

11    maintain that an indenture trustee is in privity with the

12    bondholders it represents when it sues to collect funds owed

13    under an indenture.

14          The first basis for supporting that allegation,

15    your Honor, is what I have called contractual privity.  I

16    don't know if there's an actual legal concept called that,

17    but I think the indenture contractually places the Highland

18    Funds in privity with Bank of New York.

19          And if you look at the reply that I filed, your Honor,

20    on page 11 -- or excuse me -- page 13, you will see the

21    language from Section 1105 of the indenture that gave Bank

22    of New York this right to pursue actions on behalf of the

23    bondholders.

24               THE COURT:  Um-h'm.

25               MR. OLSON:  Okay.

1          THE COURT:  Go ahead.

2          MR. OLSON:  And what I'll do is just read into the

3     record the language that I've highlighted.  "The trustee may

4     on behalf of the security holders take all actions it deems

5     necessary or appropriate in order to, A, enforce any of the

6     terms of the collateral documents and, B, collect and

7     receive any and all amounts available in respect of the

8     obligations of the subsidiary guarantors hereunder.

9          The trustee shall have power to institute and maintain

10    such suits and proceedings as the trustee may deem expedient

11    to preserve or protect its interests and the interests of

12    the security holders of the collateral."

13         Your Honor, that provision empowered Bank of New York

14    to go out and take acts on behalf of and for the benefit of

15    the Highland Funds.  I don't think you could have a clearer

16    example of privity.

17         Interestingly, in the City of Seattle case that's cited

18    in the papers, if you look at that case, and you look at the

19    language that was involved in I think it was actually

20    Section 1104 and 1105 of the indenture in that case, the

21    Court held that that vested the indenture trustee in that

22    case with authority to enter into a settlement that was

23    binding on all the bondholders and commented that if it

24    weren't binding on the bondholders or the actions of the

25    trustee weren't binding on the bondholders it would lead to

1    an incongruous result.

2         Second, your Honor, I've spent a lot of time

3    researching the available case law that addresses the issue

4    of whether an indenture trustee is in privity with

5    bondholders.

6         And what I found and cited in the materials are two

7    cases from the Ninth Circuit Court of Appeals that answer

8    that question affirmatively, the City of Seattle case and

9    the Stratosphere case.

10        I cite a number of U.S. Supreme Court cases, some in

11   the main body of the argument, some in footnotes.  One of

12   those cases, your Honor, you will note was from 1876 that

13   held that the trustee in a railroad indenture acted on

14   behalf of and bound the bondholders on that indenture.

15   That's been the law of this country for at least 130 years.

16        I will note that in the opposition I did not see a

17   single case saying that an indenture trustee cannot bind the

18   bondholders when it sues on their behalf.  I have not seen a

19   single case that says there's no privity, and there is

20   nothing in their papers to that effect.

21        Additionally, your Honor, all the treatises such as

22   Fletcher Cyclopedias on corporations, they say the same

23   thing.  Bondholders are bound by the acts of the indenture

24   trustee.

25        And, finally, your Honor, there is admissions in the

1    papers filed before this Court and in Delaware that there

2    was privity.  They admit certain facts that I think

3    establish privity.

4        For example -- and I'm looking at page 3 in my reply

5    that cites various -- excuse me -- page 4 of my reply that

6    cites various portions of the opposition that Highland Funds

7    filed in this case.

8        They state, quote, "The bond trustee on behalf of the

9    bondholders declared that an event of default existed under

10   the indenture and accelerated the entire amount due and

11   owing under the indenture and the bonds."

12       When they go on to describe the litigation in Delaware,

13   they state, "The Highland Funds concede that the district

14   court affirmed the bankruptcy court's finding that the

15   indenture trustee and, therefore, the Highland Funds do not

16   have a property interest in the property, and that the

17   conduct of Diversified was not sufficiently sufficient to

18   warrant equitable subordination."

19       There are similar allegations in the other papers that

20   I have cited where Bank of New York said it was acting on

21   behalf of the bondholders.

22       Your Honor, the third element for the application of

23   res judicata is is that the complaint and the claims arise

24   from the same set of facts.  There is no dispute about that.

25       The BNY adversary complaint and the Nevada complaint

1    were both predicated upon the same allegations of tortious

2    interference by Diversified.

3        For those reasons, I think the claim should be

4    disallowed in its entirety under the principle of

5    collateral -- or excuse me -- res judicata.

6        Your Honor, collateral estoppel I think also bars the

7    claim.  The elements for that is that you have to have the

8    identical issue decided in a prior action.  There has to be

9    a final judgment on the merits.

10        The party that the estoppel is being asserted against

11    has to be a party to the case in the prior action or in

12    privity with them, and there has to have been a full and

13    fair opportunity to litigate it.  Your Honor, I think all

14    four of those elements are present in this case.

15        Tortious interference was painstakingly detailed by the

16    Court in Epic I.  They considered tortious interference.  If

17    you compare the elements the Epic I Court examined with the

18    elements in Nevada, you will find that they're the same.

19        Second, there is no doubt it was a final judgment on

20    the merits.  Third, the Highland Funds were in privity with

21    Bank of New York.  They even had the same counsel,

22    your Honor.

23        And, fourth, it was fully litigated.  There was

24    discovery.  There was a trial.  There was a briefed appeal,

25    and there was at least a published decision by the district

1    court, so I think that it had to have -- there is no way it

2    can be found not to have been fully and fairly litigated.

3         With that in mind, your Honor, we would request that

4    the claim be disallowed in its entirety and, hopefully, put

5    the equity security holders to the Diversified Fund in a

6    position to where they can start receiving distributions.

7              THE COURT:  Okay.

8              MR. OLSON:  Thank you.

9              MS. CARLYON:  I'm sorry to interrupt --

10             THE COURT:  What --

11             MS. CARLYON:  -- your Honor.  I didn't want to

12   detract from Mr. Olson's excellent argument.  But having

13   entered my appearance, I wanted to get permission to be

14   excused.

15             THE COURT:  Oh, sure.  Thank you.

16             MS. CARLYON:  Thank you, your Honor.

17             THE COURT:  Also, if there's anybody left on the

18   phone, we probably don't need to leave them on the phone.  I

19   don't want to cut anybody off, but I don't want to incur the

20   cost of having the phone line open, either.  What do you

21   think?  Go ahead?  It doesn't take --

22             MR. SCHWARTZER:  This is --

23             THE COURT:  -- that much more?

24             MR. SCHWARTZER:  -- in the claims litigation in

25   the main case, your Honor.  I guess --

1          THE COURT:  It's in --

2          MR. SCHWARTZER:  -- they would have it --

3          THE COURT:  -- the fund, so, all right, we'll

4     leave it open.  I mean, it's in the one main case.

5          MR. SCHWARTZER:  On behalf of the debtor of USA

6     Capital Diversified Fund, we filed a very simple joinder,

7     your Honor, and I'm not going to repeat Mr. Olson's

8     argument.

9          I think he went over almost everything I would have

10    said, other than I would want to point out despite whatever

11    happened in state court on the motions for summary judgment

12    those are not final judgments.  They're not binding in any

13    way on this Court and not to have no opinion about what the

14    judges did there.

15         But it does appear to me that in addition to

16    res judicata collateral estoppel does apply with regard to

17    this because there does seem to be the identical underlying

18    facts were presented to the Delaware Court.

19         The Court specifically found there was no tortious

20    interference.  It's clearly a final judgment on the merits.

21    The privity issue was the same.

22         The bondholders -- an indenture trustee as a

23    representative of a bondholder is usually held just on that

24    facts alone to be privity.

25         And the last thing is the opportunity to litigate, and

1   here you have the Highland Funds as a group being the

2   majority bondholders being represented by the indenture

3   trustee having the same counsel in the case.  They had the

4   opportunity.

5        It's, you know, there was -- remember, this case in

6   Delaware arose on a motion to lift stay filed by

7   Diversified.

8        Therefore, Highland Funds would have the opportunity on

9   its own behalf to litigate and oppose that motion to lift

10  stay if it chose to do so.

11       The fact that they chose to do it through the Bank of

12  New York as the indenture trustee doesn't mean they did not

13  have the full and fair opportunity to litigate the issue,

14  and we would think on that additional basis, your Honor, the

15  claim should be dismissed.

16            THE COURT:  Okay.  Mr. Krieger, we're not going to

17  start the Chapter 13s 'til 2:30.

18       The trustee knows that, too, right?  Oh, we don't know.

19            THE CLERK:  Yes, they do.

20            THE COURT:  Yeah.

21            MR. SCHWARTZER:  Yeah.  You do have two calendars

22  I think.

23            THE COURT:  Oh, I know.  I've got three calendars.

24            MR. SCHWARTZER:  I know because I have -- I have

25  one (indiscernible) two other (indiscernible) in my car.

1          THE COURT:  So, I mean, you're welcome to stay.

2     But, you know, if you've got better things to do, we aren't

3     going to start there 'til 2:30, so --

4          MR. KRIEGER:  Okay.  (Indiscernible) stay

5     (indiscernible).

6          THE COURT:  All right.  Opposition.

7          MR. LACKEY:  Good afternoon, your Honor.  My

8     name's Paul Lackey from the law firm of Lackey Hershman, and

9     I represent -- people have kind of been calling it the

10     Highland Funds.  I want to take a step back, so you

11     understand exactly who it is I represent.

12          But it's Prospect High Income Fund, it's ML CBO, it's

13     PamCo Funding, Pam Capital, Highlander Crusader, and PCMG

14     Trading, and what are these funds?

15          Well, these are investment funds, and they're large

16     investment funds, and what they do is they take money from

17     people that are investing it and invest that money for them.

18          For example, some of their largest investors include

19     the teachers union, the California Teachers Union Retirement

20     Funds, and they invest people's retirement funds in various

21     ways, so they can make money.

22          And in this case, they were these various -- I'll call

23     them Highland Funds now -- were bondholders in a company

24     called Epic Resorts.

25          And I'll try not to be too repetitive because I think

1  many of the basic facts are not in dispute, but they were

2  bondholders in a company called Epic Resorts which was a

3  timeshare company that was in bankruptcy in Delaware.

4  Of course, when Epic Resorts issued the bonds, there

5  was a bond indenture, and that bond indenture had three

6  requirements set out, previously, by counsel.

7  They agreed not to further encumber this Palm Springs

8  property, the Epic Marquis, they agreed not to incur

9  additional debt, and Epic Resorts agreed to use their best

10  efforts to get a lien on this property for the benefit of

11  the bondholders.

12  In early 2000, USA Capital or Diversified -- I've been

13  calling it USA Capital for a couple of years in the

14  litigation in state court, but I'll try to refer to them as

15  Diversified -- and Epic entered into discussions whereby

16  Diversified was to loan money to Epic.  As part of that loan

17  agreement, Diversified wanted a lien on this Palm Springs

18  property, the Palm Springs Marquis.

19  Diversified asked for and received, actually received,

20  a copy of the indenture.  Now, after they reviewed the

21  indenture, they were rightly uncomfortable with the terms of

22  the loan.

23  And they went back to Epic and said, hey, it looks like

24  your indenture doesn't allow this kind of a loan.  What's

25  the problem?  Epic says, well, we'll get you an opinion

letter.

They didn't timely receive an opinion letter. However, because of the amount of money involved and the generous terms of the loan, Diversified went ahead and funded the first half of the loan without even receiving an opinion letter that it didn't violate the indenture.

Now, thereafter, (indiscernible) on the bankruptcy opinion, Diversified did receive an opinion letter from an attorney, Defendant Burke (phonetic), and funded the remainder of the loan.

Subsequently, Epic Resorts failed to make a bond payment to my bondholders when it was due which resulted in Epic being placed in an involuntary bankruptcy in Delaware, later converted into a voluntary bankruptcy.

During the bankruptcy for the first time, the bondholders discovered that they didn't have a perfected security interest on the Palm Springs property, and that, in fact, Diversified claimed to have such an interest.

Now, in the bankruptcy proceeding, Bank of New York as indenture trustee brought an adversary proceeding that sought only two things.

The first was that an equitable lien on the property. Now, everyone agrees that's not really in play in today's argument.

The second is to have Diversified's debt equitably

1    subordinated to the bondholders.  That was the nature of the

2    proceeding.

3        The bankruptcy court in the opinion that you've been

4    discussing and looking at denied that request.  In its

5    opinion regarding equitable subordination, the bankruptcy

6    court noted that it used the standard of egregious conduct

7    because equitable subordination was a, quote, "extraordinary

8    remedy."  And on that basis, the Court denied the motion for

9    equitable subordination.  Now, that was appealed.

10       And on appeal, the appeal brief said you used the wrong

11   standard.  The bankruptcy court didn't need to find

12   egregious conduct to get to equitable subordination.

13       If she had found mere tortious interference or one of

14   these other torts regardless of whether it was egregious,

15   that should be enough to get equitable subordination.

16       And the district court makes it crystal clear that

17   that's not the case.  That the case in equitable

18   subordination is that you have to have egregious conduct.

19       And as a matter of fact, the very sentence read to you

20   by Mr. Olson from the district court opinion makes it clear

21   that the bankruptcy court found its -- its being

22   Diversified's -- conduct did not rise to the level required

23   to equitably subordinate the claim of an noninsider.  And in

24   the paragraph before that, the district court makes it clear

25   that that standard is egregious conduct.

1      And so if you weren't clear from the bankruptcy court

2    opinion -- although I think it's relatively clear that she

3    says you have to have exceptional remedy, egregious conduct,

4    and then it reached the level of egregious conduct -- the

5    district court opinion says everything below was correct

6    with regard to egregious conduct, and you have a

7    correctly-applied heightened standard of review to BNY's

8    claim.

9      That standard, your Honor, is not the standard for

10   determining tortious interference under Nevada or any other

11   state.  It is simply the standard for determining equitable

12   subordination.

13     Defendant Diversified now seeks for about the third

14   time to avoid liability here by using this opinion to avoid

15   the liability to the bondholders of Epic.  And, of course,

16   they argue claim preclusion and issue preclusion, primarily.

17     Now, Diversified has lost this exact same argument in

18   front of --

19          THE COURT:  So what?

20          MR. LACKEY:  -- two judges.  Well, I'm not

21   saying --

22          THE COURT:  So what?

23          MR. LACKEY:  -- it has a preclusive effect, but I

24   suspect --

25          THE COURT:  Don't --

1          MR. LACKEY:  -- had they won the argument --

2          THE COURT:  -- argue it, then.  Don't make a big

3    deal out of something --

4          MR. LACKEY:  I thought it was something --

5          THE COURT:  -- that has no --

6          MR. LACKEY:  -- that you would like to know.

7          THE COURT:  -- legal authority.

8          MR. LACKEY:  That --

9          THE COURT:  You try to make a big deal --

10         MR. LACKEY:  I --

11         THE COURT:  -- out of the fact --

12         MR. LACKEY:  I don't think it's a --

13         THE COURT:  -- they didn't tell you this.  They

14   didn't tell you that.  There is no legal effect to that,

15   right?

16         MR. LACKEY:  There is no legal effect on this

17   proceeding today.

18         THE COURT:  All right.  Then move on.

19         MR. LACKEY:  But I think it's an important

20   factual --

21         THE COURT:  Why?

22         MR. LACKEY:  -- piece of the factual background --

23         THE COURT:  Why?

24         MR. LACKEY:  -- that they've lost this argument.

25   If I were a judge, your Honor, it's something I would want

1    to know whether or not it's -- it's not a binding argument.

2              THE COURT:  Well, then don't make it --

3              MR. LACKEY:  But I think it's important.

4              THE COURT:  -- if it hasn't got any legal effect.

5              MR. LACKEY:  Okay, your Honor.

6              THE COURT:  I mean, you purport to argue that in

7    your pleading.  You just don't put it as a fact.  You

8    purport to have it and then just leave it --

9              MR. LACKEY:  Well --

10             THE COURT:  -- making me have to go and think,

11   well, are you trying to argue something.

12             MR. LACKEY:  No.  We would have told you if we

13   were arguing that it was meant to be binding.  It's part of

14   the factual background of how this case gets to you and how

15   far along the case has come and been in state court.

16        I'm going to address their individual arguments now,

17   your Honor, but I also think it's important to note that we

18   filed a motion to lift stay on October 18th, a couple of

19   days ago or maybe yesterday at this point, to allow us to

20   finish this litigation in the state court.

21             THE COURT:  This is from your summary of

22   arguments.  "First, the preclusion issues have already been

23   decided in Highland Funds' favor in the Nevada State Court."

24             MR. LACKEY:  Correct, your Honor.

25             THE COURT:  You've got that in your argument

1    authority --

2            MR. LACKEY:  Right.

3            THE COURT:  -- not your factual authority.

4            MR. LACKEY:  Okay.  Then, perhaps, that it's

5    misplaced, but I think that it's an important point.

6            THE COURT:  You were trying to mislead me.

7            MR. LACKEY:  Not at all, your Honor.  We were

8    trying to show you exactly what had happened before.  No

9    one's argued, well, it's not -- there's not an argument or a

10   case citation that it somehow has a preclusive

11   claim-estoppel or issue-estoppel effect.

12        The burden on claim preclusion or issue preclusion is,

13   of course, on Mr. Olson and his clients, on Diversified, to

14   prove with clarity and certainty -- and that's the

15   Hydranautics opinion in the Ninth Circuit, 2000, cited in

16   our brief -- that these issues create claim or issue

17   preclusion, and the dispositive issues were simply not cited

18   or not previously decided.

19        The Delaware bankruptcy complaint in the portions cited

20   are about equitable subordination, an extraordinary remedy

21   that requires egregious conduct.

22        The district court then held that it was precisely that

23   egregious conduct which warrants equitable subordination and

24   which was not found.  That issue has no bearing on these

25   issues today.

1        The issues here are whether certain provisions of the

2    indenture providing additional encumbrance of debt and

3    provision of liens were violated and whether USA Capital,

4    Diversified, intentionally assisted or participated in the

5    violation of those provisions, not whether there was

6    egregious conduct, and then whether their violation of the

7    indenture resulted in damage to the Highland Funds.

8        Furthermore, your Honor, not only were the dispositive

9    issues not decided under anything like the same standard you

10   would in a state law claim, there's no res judicata effect

11   because the tortious-interference claims between my clients,

12   the bondholders, and Diversified were noncore claims that

13   were state law claims between one nondebtor and another.

14       There is not a case cited about the preclusive effect

15   of an equitable-subordination decision because it has no

16   such effect in this kind of scenario where you have separate

17   state law claims between the one-time nondebtor,

18   Diversified, and my clients, the nondebtor, the bondholder.

19       This was an equitable-subordination proceeding that

20   doesn't have that kind of res judicata effect, and none of

21   the cases they cite have anything to do with that kind of

22   proceeding.

23       The cases they cite, the Stratosphere case and the

24   other privity case, are about releases given by a bankruptcy

25   case, the Seattle case, releases given by a bankruptcy

1    court.

2        They have nothing to do with a proposed res judicata

3    effect of an equitable-subordination proceeding.  Since the

4    equitable-subordination proceeding requires such a high

5    standard, egregious conduct, to get to an extraordinary

6    remedy, it simply doesn't have and there are no cases that

7    indicate that it has res judicata effect.

8        As a matter of fact, the Third Circuit 1999 core

9    state's case that they cite says that claim preclusion in a

10   bankruptcy procedure will only apply if the claim is at

11   least related to the bankruptcy case.

12       "A party to a bankruptcy won't be precluded from later

13   bringing a claim that could not conceivably have any effect

14   on the bankruptcy estate."

15       Furthermore, the Fifth Circuit in Howell Hydrocarbons,

16   897 F .2d 183, found that a bankruptcy court's confirmation

17   plan wouldn't preclude a later RICO claim because the

18   bankruptcy court would not have jurisdiction over the claim,

19   the same as here.

20       Our nondebtor claim at the time against a nondebtor for

21   state law violations is simply not one that the bankruptcy

22   court could have or would have entertained as part of its

23   equitable-subordination claim, and that leads directly to

24   the third point which is that the issues were decided under

25   a markedly-different standard.

1          It is absolutely true that the Delaware Court did state

2     in one of the paragraphs that they could not conclude that

3     USA Capital "tortiously interfered with the agreement

4     between BNY and Resorts."

5          That was after in the previous paragraph the Court

6     indicated it was considering this tortious interference

7     under an egregious standard.  That's the bankruptcy court

8     opinion at pages 18 and 19.

9          When one looks to the district court opinion, it

10    becomes even more clear because there the appellants argued

11    the bankruptcy court used the wrong standard.

12         There is no egregious standard for equitable

13    subordination, and the bankruptcy court says that's not

14    true.  The bankruptcy court -- or I'm sorry.  The district

15    court says that's not true.

16         The district court stated that USA Capital's, quote,

17    "conduct does not rise to the level required to equitably

18    subordinate the claim of a noninsider," close quote.  And in

19    the previous paragraph, they indicate that that is egregious

20    conduct.

21         And, of course, what you can't get around is that when

22    different standards are used collateral estoppel or

23    res judicata simply don't apply, and those are the

24    Ninth Circuit cases cited in our brief.

25         Thus, there has been no full and fair litigation of

1    Trust Deed Funds' conduct.  Whether it's tortious

2    interference or whether it's aiding and abetting the estate,

3    the only issue decided by the bankruptcy court was does it

4    reach a level that it's egregious that gets you equitable

5    subordination.

6         Furthermore, your Honor, I think it's at a minimum

7    there are some fact issues regarding privity.  This is a

8    different case than Seattle or than Stratosphere where you

9    have an undisputed relationship between the indenture

10   trustee and the bondholders.

11        Here, by 2002, the bondholders had sued the indenture

12   trustee, had sued BNY, for its failures with regard to

13   various things relating to the bonds, and that's a

14   substantially-different case than any of the privity cases

15   they cite.

16        I don't think the privity argument is important,

17   ultimately, here because I don't think you have res judicata

18   for equitable subordination or for an egregious claim.

19        But at a minimum, it seems like you would have to

20   schedule an evidentiary hearing to determine the status of

21   BNY's relationship to the bondholders given that it had

22   already been sued for breaches of the indenture itself.

23        Of course, your Honor, there is sufficient evidence of

24   tortious interference.  There's the sworn testimony of the

25   four USA Capital principals that establishes -- cited in our

1    brief -- that they had knowledge of the indenture, that they

2    had an actual copy of the indenture, and that they had

3    reviewed the indenture and were concerned about the

4    indenture provisions prior to closing on the Epic loan.

5        Furthermore, your Honor, the Delaware Bankruptcy Court

6    would have no effect on conspiracy or aiding-and-abetting

7    claims.

8        These claims are not derivative of the

9    tortious-interference claims.  They contain separate

10   elements, and they say that, in essence, Diversified

11   assisted the estate in defrauding us, the bondholders.

12       And you know they defrauded the bondholders because

13   they didn't make the bond payment, and those claims are

14   separate and apart from the tortious interference relating

15   to the lien which was examined in the bankruptcy court.

16            THE COURT:  Okay.  Thank you.  All right.

17       Reply.

18            MR. OLSON:  Bob Olson on behalf of the Diversified

19   Committee.  There are just a couple of points I'd like to

20   respond to.

21       First, the allegations that a bankruptcy court somehow

22   doesn't have jurisdiction, I think those are unfounded.  The

23   United States Supreme Court has said that when you file a

24   proof of claim you submit to the bankruptcy court's

25   jurisdiction.

1          That's the Langenkamp versus Culp decision in 1990 and

2     the Granfinanciera decision, 1989.  It's clear the

3     bankruptcy court has jurisdiction on this.

4          Your Honor, with respect to the egregious-conduct

5     standard, I think there is confusion as to it being an

6     additional element to be shown versus the burden of proof.

7          If you look at the opposition that was filed -- and

8     please allow me to grab that -- I think the opposition makes

9     this point clear.

10          Page 17 of the opposition, footnote 10, your Honor,

11     cites a Third Circuit case, Lightning Lube versus Witco

12     Corporation, for the proposition that, quote, "Finding that

13     tortious interference requires intentional conduct, but

14     punitive damages are awarded only on a finding of egregious

15     conduct."  In other words, you can have a tortious

16     interference that is egregious and one that is not.

17          If you find there is a tortious interference, they can

18     look at the egregious-conduct standard to see if punitive

19     damages are warranted.

20          It's basically the same thing with equitable

21     subordination.  I would submit that it's an additional

22     element.  It's not a different standard of proof.

23          Now, where this becomes I think crucial, your Honor, is

24     is the bankruptcy court in Delaware examined the tortious

25     interference, and they found there was no interference.

1    There was no intent to interfere.

2        There was no alteration of BNY's contractual rights

3    with Epic because Diversified made the loan.  They didn't

4    have to get to whether the interference was egregious

5    because they found there was no interference, and I think

6    the waters have been kind of muddied on that point.

7        Your Honor, I think that it's clear this case has been

8    litigated.  Mr. Lackey has pointed out all the deposition

9    testimony supporting their claim of tortious interference.

10        That testimony was obtained in the Epic bankruptcy in

11    connection with the Bank of New York's lawsuit against

12    Diversified.  That's where all that discovery came from.  It

13    didn't come from the Nevada action.

14        For those reasons, your Honor, I would submit that this

15    Court should simply disallow the claim in its entirety.

16        Thank you.

17            THE COURT:  Okay.

18            MR. LACKEY:  Your Honor, may I point you to one

19    paragraph, a district court opinion, briefly --

20            THE COURT:  All right.

21            MR. LACKEY:  -- because it addresses that

22    proof-of-claim argument.  I believe it's on page 5.  The way

23    it paginates from Westlaw, the document in front of you,

24    it's the second full paragraph --

25            THE COURT:  What page?

1          MR. LACKEY:  -- under the discussion, page 5.  It

2    says page 5 --

3          THE COURT:  Um-h'm.

4          MR LACKEY:  -- at the top right-hand corner.

5          THE COURT:  Um-h'm.

6          MR. LACKEY:  Under discussion, the second full

7    paragraph that begins by its appeal --

8          THE COURT:  Um-h'm.

9          MR. LACKEY:  -- about midway down right before the

10   citation, the district court says, "The party seeking to

11   apply equitable subordination bears a higher burden of proof

12   in which he or she must show that the respondent engaged in

13   egregious conduct such as fraud, spoliation, or

14   overreaching."

15      The district court specifically says that for what

16   they're affirming which is equitable subordination there is

17   a higher burden of proof.  Those are the words of the

18   district court.

19      That it is a separate burden of proof than any other

20   kind of burden of proof that you would have in proving

21   tortious interference or any other kind of tort claim.

22          MR. OLSON:  May I respond briefly, your Honor?

23          THE COURT:  Okay.

24          MR. OLSON:  The district court does use

25   burden-of-proof language, but there is no such thing as a

1    burden of proof of egregious conduct.

2        I think they have the burden of proving egregious

3    conduct which is different than the underlying tortious

4    interference, but they didn't even get that far.

5            THE COURT:  Okay.

6            MR. OLSON:  Thank you.

7            THE COURT:  Mr. Schwartzer, did you want to say

8    something?

9            MR. SCHWARTZER:  I just want to make sure the

10   Court saw what I think is the obvious point.  In looking at

11   page 524 of the Epic I decision, the Court specifically goes

12   through the elements of tortious interference which are

13   exactly the ones everybody agrees that it doesn't require

14   egregious conduct and says, "We cannot conclude that

15   Diversified tortiously interfered with the agreement between

16   BNY and Epic," and then it says, "The elements of tortious

17   interference are."

18       I mean, the bankruptcy court in Delaware clearly

19   applied the standard that everybody agrees should be applied

20   for tortious interference without a higher requirement of

21   egregiousness.

22       And maybe that wasn't required to be done on the 510,

23   you know, subordination action, but they did do it.  It's a

24   finding of fact and a conclusion of law.

25       And, therefore, it's clearly gone ahead on claim

1   preclusion, even if it's not going to work on res judicata.

2   And if there was no tortious interference, there's no claim

3   by the Highland Funds, end of story.

4           THE COURT:  Okay.  Well, I'm going to sustain the

5   objection to claim.  As we know, the federal law of claim

6   preclusion applies.

7       And just to reiterate here, issue preclusion forecloses

8   relitigation of factual or legal issues that have been

9   actually and necessarily decided in earlier litigation, and

10  the elements are a fair and full opportunity to litigate,

11  issue actually litigated, final judgment, and privity.

12      Well, despite the arguments, the point is that tortious

13  interference is a subset which would entitle one to

14  equitable subordination.

15      So in determining whether or not there was equitable

16  subordination that was necessary, the Court looked at, well,

17  what are you arguing was the conduct that creates equitable

18  subordination.  What was the egregious conduct you're

19  arguing?

20      Highland and BNY says, wait a minute, it's tortious

21  interference.  Let us tell you all about tortious

22  interference.

23      And the bankruptcy court in Delaware disagreed and said

24  as Mr. Schwartzer indicated at page 290 B.R. 524 right at

25  headnote 13, "Further, we cannot conclude that USA Capital

1    tortiously interfered with the agreement between BNY and

2    Resorts.  The elements of tortious interference of a

3    business relationship are as follows," and it went on to

4    list the elements.

5        There is no evidence of purposeful action to harm.

6    Epic advised USA Capital that no other creditor held a lien.

7    Although USA had knowledge of the restrictive covenants,

8    Epic Palm represented and warranted the entry will not

9    result in a breach.

10        In addition, USA Capital's report did not reveal any

11    other liens.  Prior to consummating, they confirmed no other

12    lien.  USA Capital's actions were not intended to harm any

13    relationship.

14        Furthermore, the relationship was not altered.  BNY did

15    not have a lien on the leasehold prior, and it did not have

16    one afterwards.

17        So in order to determine as I've indicated whether or

18    not equitable subordination's appropriate, the Court looked

19    at tortious interference as invited to by Highland.  That

20    actual issue has been litigated.

21        But even if you go and say, well, what was the actual

22    issue because we have the state court issues, I think we

23    also have claim preclusion because that bars an action which

24    involves the same cause of action.

25        When you look at cause of action, you look at -- it's a

1    transactional approach, whether the two suits arise out of

2    the same transactional nucleus of facts, and a contract is

3    considered to be a transaction for claim-preclusion

4    purposes.

5        Again, here in order -- it's the same set of facts.

6    And here in the state court -- and I'm a little concerned

7    about things that are being told to me that don't match the

8    pleadings.

9        Counsel told me that, well, we've got some other claims

10    of action that aren't just tortious interference.  Well, the

11    second claim of action is conspiracy to commit tortious

12    interference.

13        You can't have a conspiracy to commit something that's

14    already been litigated.  Tortious interference was the

15    gravamen of the complaint.

16        Then you also tell me that aiding and abetting was

17    separate.  Burke -- oh, I'm sorry.  That says Burke.  "Burke

18    knowingly and substantially assisted USA Capital in

19    substantially interfering.

20        USA Capital knowingly encouraged Epic to breach the

21    duties and obligations (indiscernible) the plaintiffs."  It

22    doesn't even use the words "aiding" and "abetting" as

23    against USA Capital.

24        So I find that issue preclusion and/or claim

25    preclusion -- oh, let me talk about privity.  I just am

1    amazed that you argue that you're not in privity with the

2    trust indenture.

3        That would just turn trust-indenture law upside down,

4    how in the world you could say that a person who holds a

5    bond isn't bound by the trust indenture.

6        What's amazing to me is, Highland, I assume that you

7    have all these claims.  I can't envision that you would

8    suggest that any one of the people that invest in your fund

9    are free to go out and sue on something after you've already

10   litigated the issue.

11       Or, for example, you've won a claim on behalf of your

12   investors against someone.  Let's say Diversified under your

13   theory, and let's assume I guess Diversified, and you lose,

14   and somebody brings it that they couldn't argue

15   res judicata.

16       I mean, I'm just amazed that you could make such an

17   argument, and I'm just amazed that there wasn't an 9011

18   pleading brought on that particular ground, so I'll sustain

19   the objection.

20           MR. OLSON:  Your Honor, a couple of housekeeping

21   matters.

22           THE COURT:  Um-h'm.

23           MR. OLSON:  I believe this with claim was filed in

24   all five estates, not just the Diversified estate.  I did

25   indicate that it affected all debtors.

```
 1              THE COURT:  Oh, I wondered why --

 2              MR. OLSON:  When I prepare --

 3              THE COURT:  -- that was in there.

 4              MR. OLSON:  When I prepare the order, do you want

 5   me to just indicate that it's disallowed against all five or

 6   just Diversified?  I mean --

 7         (Colloquy not on the record.)

 8              THE COURT:  This motion was only brought in

 9   Diversified.  I would hope they would withdraw their claim

10   if they have no basis for any other funds.

11              MR. OLSON:  Yeah.

12              MR. SCHWARTZER:  I'll write them --

13              MR. OLSON:  Well, I do believe we --

14              MR. SCHWARTZER:  I'll write them a letter --

15              MS. CUNNINGHAM:  We'd be happy to --

16              MR. SCHWARTZER:  -- your Honor.

17              MS. CUNNINGHAM:  We've already withdrawn our claim

18   in First Trust Deed Fund, your Honor, and we'll be happy to

19   withdraw our claims in the others.

20              THE COURT:  Okay.

21              MR. OLSON:  Okay.  And your findings and facts --

22              THE COURT:  Conclusions on the record, on the

23   record.

24              MS. CUNNINGHAM:  I mean --

25              MR. OLSON:  Thank you.
```

1    MS. CUNNINGHAM:  -- pending, of course, that my

2  clients decide not to appeal.  I mean, I just want to

3  preserve the record.  I'm not trying to be difficult.

4    THE COURT:  All right.  I understand that, but, I

5  mean, you know, be careful.  If you don't have a claim

6  against these other funds, then now is the time to withdraw

7  it before somebody does bring a 9011 action.

8    MS. CUNNINGHAM:  Okay.

9    MR. OLSON:  And just to be clear, the pleadings

10  did indicate that it affected all debtors.

11    THE COURT:  Right.

12    MR. OLSON:  I had checked that box off.

13    THE COURT:  Oh, you did.  Okay.  All right.  So

14  I'll sustain your objection in all five cases, then.

15    MR. OLSON:  Thank you.

16    THE COURT:  Okay.  Thank you.

17    THE CLERK:  All rise.

18    (Court concluded at 01:35:19 p.m.)

19

20

21

22

23

24

25

1     I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5

6    /s/ Lisa L. Cline                         11/30/06

7    Lisa L. Cline, Transcriptionist           Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25