1   Annette W. Jarvis, Utah Bar No. 1649                    **E-FILED on January 5, 2007**
    RAY QUINNEY & NEBEKER P.C.
2   36 South State Street, Suite 1400
    P.O. Box 45385
3   Salt Lake City, Utah 84145-0385
    Telephone: (801) 532-1500
4   Facsimile: (801) 532-7543
    Email: ajarvis@rqn.com
5
6   Lenard E. Schwartzer, Nevada Bar No. 0399
    Jeanette E. McPherson, Nevada Bar No. 5423
7   SCHWARTZER & MCPHERSON LAW FIRM
8   2850 South Jones Boulevard, Suite 1
    Las Vegas, Nevada  89146-5308
9   Telephone:  (702) 228-7590
    Facsimile:  (702) 892-0122
10  E-Mail:  bkfilings@s-mlaw.com
11
    Attorneys for Debtors and Debtors-in-Possession
12
13              **UNITED STATES BANKRUPTCY COURT**
                      **DISTRICT OF NEVADA**
14  | In re: | Case No. BK-S-06-10725 LBR |
15  | USA COMMERCIAL MORTGAGE COMPANY, | Case No. BK-S-06-10726 LBR |
    | Debtor. | Case No. BK-S-06-10727 LBR |
16  | In re: | Case No. BK-S-06-10728 LBR |
    | USA CAPITAL REALTY ADVISORS, LLC, | Case No. BK-S-06-10729 LBR |
17  | Debtor. | |
18  | In re: | Chapter 11 |
    | USA CAPITAL DIVERSIFIED TRUST DEED FUND, | |
19  | LLC, | Jointly Administered Under |
    | | Case No. BK-S-06-10725 LBR |
20  | Debtor. | |
21  | In re: | |
    | USA CAPITAL FIRST TRUST DEED FUND, LLC, | |
22  | Debtor. | **NOTICE OF FILING OF** |
    | In re: | **REPORTER'S TRANSCRIPT OF** |
23  | USA SECURITIES, LLC, | **PROCEEDINGS TAKEN ON** |
    | | **DECEMBER 19, 2006** |
    | Debtor. | |
24  | Affects: | **(AFFECTS ALL DEBTORS)** |
    |  ☒  All Debtors | |
25  |  ☐  USA Commercial Mortgage Company | |
    |  ☐  USA Securities, LLC | |
26  |  ☐  USA Capital Realty Advisors, LLC | |
    |  ☐  USA Capital Diversified Trust Deed Fund, LLC | |
27  |  ☐  USA Capital First Trust Deed Fund, LLC | |
28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

USA Commercial Mortgage Company, USA Securities, LLC, USA Capital Realty

Advisors, LLC, USA Capital Diversified Trust Deed Fund, LLC and USA Capital First Trust

Deed Fund, LLC (collectively, the "Debtors"), by and through their counsel, hereby file the

Reporter's Transcript of the Proceedings held on Tuesday, December 19, 2006, which is attached

hereto as **Exhibit "1."**

Respectfully submitted this 5th day of January, 2007.

_/s/    Lenard E. Schwartzer, Esq._

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146

and

Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# EXHIBIT "1"

REPORTER'S TRANSCRIPT OF PROCEEDINGS

HELD IN THE COURTROOM OF HONORABLE LINDA B. RIEGLE

Taken on Tuesday, December 19th, 2006

At 9:30 a.m.

The Foley Building

At 300 Las Vegas Boulevard South

Las Vegas, Nevada

REPORTED BY:  RENE' R. HANNAH, CCR NO. 326

Page 2

1          THE COURT:  Why don't I take appearances on

2 the 9:30 matter now and then at 10:00 we'll recommence

3 with the 10:00 appearances?

4          MR. SCHWARTZER:  Your Honor, Lenard

5 Schwartzer on behalf of the debtors and debtors in

6 possession.

7          MS. JARVIS:  Annette Jarvis on behalf of the

8 debtors and debtors in possession.

9          MR. HOLLEY:  Good morning, Your Honor.

10 Richard Holley on behalf of Dale and Ernestine Bunch.

11          MR. SCHWARTZER:  Your Honor, if we take the

12 Bunch matter first I can tell you what would be our

13 intention.  We had set the 2004 examination for

14 Mr. Bunch for 2:00 this afternoon at his home and we

15 will take that because we think additional information

16 can be developed that may affect this motion.  So we

17 would ask that this motion be continued to 1:00 or 1:30

18 tomorrow, depending on the Court's calendar.  I'm not

19 sure what time you have tomorrow to do that.  That

20 would give us enough time to take the examination and

21 have a transcript available for a hearing tomorrow

22 afternoon.

23          THE COURT:  And then the other issue may

24 be --

25          MR. SCHWARTZER:  It may not matter.

1          THE COURT:  Once you can address, even

2 assuming you have the issue, the question is depending

3 upon, of course, the one objection which says that

4 there really is something for equity, am I correct that

5 it's the class has a retaining thing, it doesn't make

6 any difference how they vote, anyway, is that?

7          MR. SCHWARTZER:  We would think that that

8 would be an appropriate ruling by this Court.

9          THE COURT:  I mean, it's a legal proposition.

10          MR. HOLLEY:  Very possible.

11          THE COURT:  It's a proposition.  If I

12 overrule the objection --

13          MR. SCHWARTZER:  It may become irrelevant.

14 It may become irrelevant.

15          THE COURT:  All right.  So this is the thing.

16 Tomorrow I have been able to free up my morning

17 calendar.  I have a few matters at 1:30 which is my

18 cases that I need to handle.  So why don't we say 2:00?

19          MR. SCHWARTZER:  And the only thing I have to

20 say is maybe this may seem, I have a trial in front of

21 Judge Markell at 3:00.  So 2:00 is about the latest I

22 can start, Your Honor, unless it becomes irrelevant, of

23 course.

24          THE COURT:  Okay.  Let's say 1:30.  It will

25 be a few minutes after that that we'll start.

Page 4

1           MR. SCHWARTZER:  That would be fine.  Thank

2 you.

3           MR. HOLLEY:  Thank you, Your Honor.

4           MR. SCHWARTZER:  The second thing on the 9:30

5 calendar, Your Honor, is the debtors motion to return

6 investor funds held in escrow.  And this is an

7 uncontested motion to, this was $250,000 that was

8 placed in an escrow account in California by the Barrys

9 and by the Bonzos for a loan to be made to Bundy Canyon

10 Development.  One of the entities was 70 percent

11 controlled by Mr. Milanowski and Mr. Hanges.

12           The funds were put there in March just before

13 the April filing.  For some reason the title company

14 recorded the deed, third deed of trust showing the

15 additional loan, but did not, when they found out there

16 was a bankruptcy filed they did not disburse the

17 250,000.  We have the affidavit from Mr. Allison.  It's

18 his opinion it's not good business judgment to fund the

19 loan.  He wouldn't advise doing that.  So what we're

20 asking for the Court is for authority to get an order

21 returning the $250,000 to the two investors and to

22 cancel that third deed of trust, third amendment to the

23 deed of trust because there's, the additional loan was

24 not made.

25           THE COURT:  And you have noticed the

Page 5

1 borrower?

2          UNKNOWN SPEAKER:  Yes.

3          THE COURT:  Somebody said yes.

4          MR. SCHWARTZER:  The borrower, yes.  The

5 borrower is Mr. Milanowski.  The borrowing entity is

6 Mr. Milanowski and Mr. Hanges, yes.

7          THE COURT:  Okay.  So that's granted.

8          MR. SCHWARTZER:  Thank you, Your Honor.

9          THE COURT:  Third thing is in the U.S.

10 Investors matter, appearances, U.S.A. Investors 6?

11          MR. SCHWARTZER:  Oh.

12          MR. HERMAN:  Good morning, Your honor.  Jeff

13 Herman, Orrick, Harrington & Sutcliffe, LLP for the

14 Diversified Fund.

15          MR. LANDIS:  Good morning, August Landis for

16 the assistant United States trustee.

17          THE COURT:  Mr. Walker?

18          MR. WALKER:  Yes, Your Honor.  Russell Walker

19 on behalf of the investment partners and Mr.

20 Milanowski.

21          THE COURT:  Okay.

22          MR. SCHWARTZER:  Your Honor, this will seem

23 like deja vu.  This is another motion for appointment

24 of an interim trustee in an involuntary case.  This

25 case involves what another property in Palm Springs

1 called the Hotel Zozo.  It is also property that it is

2 our understanding when it was purchased or wound up was

3 originally financed by a loan by Diversified and

4 foreclosed on and wound up in this other entity,

5 Investors 6.  We also have seen in that there have been

6 in this case, we've seen that there's been recorded

7 deeds of trust to a Mr. Sam Rialli, who is a creditor

8 of Mr. Milanowski and Mr. Hanges, but not a creditor of

9 Diversified; and therefore, we've already seen that

10 there's a problem created with the proceeds from this.

11 By having a trustee appointed, we'd like to have a sale

12 and have someone sell this property.  And we know there

13 are pending sales in this, the trustee would hold the

14 asset, would sell the property, hold the proceeds of

15 sale for the Court to determine who is entitled to it.

16 We believe it's necessary in this case, just like we

17 felt in the other case.  The facts are remarkably

18 similar, Your Honor.

19        THE COURT:  Okay.  Mr. Walker, I understand

20 you have not had time to file a written opposition so

21 I'll take an oral opposition, in-house.

22        MR. WALKER:  Well, Your Honor, again, with

23 respect to this particular property it's even a harder

24 case, I think for the estate to approve it as a claim

25 for this property.  We believe we're entitled to the

Page 7

1 same procedures, to the same rights to be able to

2 establish what this debt is.  We've been speaking with

3 the estate for, oh, more than three months with respect

4 to this property, working together.

5          THE COURT:  But you're not willing to

6 quitclaim it back?

7          MR. WALKER:  Well, again, I think the facts

8 are very different in this case and we're not willing

9 to quitclaim it, but we're willing to do what the Court

10 requested in the last hearing and that's provide liens

11 of record to support, make sure that the entire net

12 proceeds go to the Diversified Fund.

13          Now, in this case there is a loan only to the

14 Diversified Fund which is documented and they've given

15 us a payoff figure.  There's some serious questions

16 with regard to that, but this is a total surprise to

17 us.

18          THE COURT:  So, but.

19          MR. WALKER:  Their lien is of record in this

20 case.  It will be paid.

21          THE COURT:  Why did you then record a deed of

22 trust in favor of Mr. Rialli?

23          MR. WALKER:  Well, I think that came after

24 the fact.  That's after Diversified Fund's trust deed.

25 Again, I think that is cross-collateralized by this

Page 8

1 other property that I referenced in the last hearing,

2 but I think he's going to get paid from the sale of the

3 Royal Hotel and shouldn't have any claim with respect

4 to this property.

5          MR. MEROLA:  Object, Your Honor.  Counsel,

6 sorry, Frank Merola on behalf of the First Trust Deed

7 Committee.  Counsel has testified from the podium which

8 is especially problematic, given his clients have

9 refused to attend 2004 examinations and the one

10 representative of his client that has, has taken the

11 Fifth.  We can't have Counsel put into the record facts

12 his client is not willing to testify to under oath,

13 either.

14          MR. WALKER:  Your Honor, that's absolutely

15 out of line.  The fact of the matter is we haven't had

16 any opportunity to prepare written response or to have

17 any due process in this matter.  So I'm merely stating

18 for the Court what our position will be.  We haven't

19 had an opportunity to even present it.

20          THE COURT:  But why would a trustee be of any

21 harm to you?

22          MR. WALKER:  Well, like I say, I think

23 Diversified Funds, who has the lien of record, is going

24 to be protected through the foreclosure or through and

25 the sale of the property.

Page 9

1           THE COURT:  So why would it be something to

2 you now?

3           MR. WALKER:  Again, like I say, there should

4 be trust built up.  Since we have been involved in the

5 cases we haven't done anything but cooperate.

6           THE COURT:  But you didn't transfer the

7 property back.

8           MR. WALKER:  No, we haven't, but there is a

9 trustee of record that will come of the security.

10          THE COURT:  Your class didn't pay anything

11 when they took over the property, did they?

12          MR. WALKER:  Oh, yes.  They paid a lot of

13 money with respect to the Marquis Villas for instance.

14 They paid over $4 million out of their own pockets to

15 prepare the property for sale.  The Hotel Zozo is part

16 of the same project.  So substantial amounts of money

17 have been paid to preserve the value of the estate.

18 We're just asking for due process and the opportunity

19 to appear.

20          THE COURT:  When is the sale supposed to be

21 foreclosed?

22          MR. WALKER:  This one is not foreclosing yet.

23 There's a purchase contract in place.  There was an

24 attempt to try to work out some final issues, including

25 with the Bureau of Indian Affairs.  Because of those

Page 10

1 issues, it isn't scheduled to close.  So we're just

2 asking for the opportunity to present our case to the

3 Court.  We don't believe the trustee's --

4           THE COURT:  But the, your client is not going

5 to testify what each?

6           MR. WALKER:  We have other parties that can

7 testify.  I think the only witness so far was Mrs.

8 Loub, who didn't testify yesterday.

9           THE COURT:  But your client didn't appear for

10 the 2004.

11          MR. WALKER:  Again, Your Honor, that was on

12 short notice and was improper.  We objected to it.  My

13 understanding was, Your Honor, with respect to these

14 2004 examinations, the effort was really to get

15 information with respect to the sales, which they have

16 because we provided it to them.  We have been able to

17 make a full disclosure, ready to pay the immediate

18 proceeds we intend to do in this case, too.

19          THE COURT:  So what harm would be the

20 trustee?

21          MR. WALKER:  The difficulty is in the change

22 delay.

23          THE COURT:  Why would there be a change

24 delay?

25          MR. WALKER:  The trustee is going to have to

Page 11

1 approve the sale, any sale they feel is in the best

2 interest of the estate because potentially the cost as

3 Your Honor pointed out last time, the trustee's

4 commissions and so on could be astronomical with

5 respect to these properties.  So we're just asking for

6 an opportunity to be able to do what we agreed the

7 parties will do.

8            THE COURT:  Mr. Landis?

9            MR. SCHWARTZER:  Your Honor, I would like a

10 chance to respond to a couple of the arguments, but

11 I'll pass.

12            MR. LANDIS:  Just briefly, Your Honor, the

13 only issue here --

14            THE COURT:  Speak louder.

15            MR. LANDIS:  Sorry, the only issue here that

16 has been raised, the question is of due process.  The

17 Court has to figure out the pulse of this deal right

18 here.  What harm is the trustee?  The answer is there

19 isn't any.  From the due process standpoint the section

20 303 is the problem, the interim trustee in the Gap

21 area.  If the debtor wants to regain property, 303

22 provides the mechanism to do just that.  They post the

23 bond.  That's all it takes in order to get the property

24 back and complete the sale.  If the claim of the estate

25 exists then, of course, they have a mechanism to

Page 12

1 recover.  The statute is clear, I think, that the

2 circumstances here would warrant a trustee.  If the

3 Court is inclined, we'll proceed accordingly.

4           THE COURT:  Okay.

5           MR. SCHWARTZER:  Your Honor, we would want to

6 point out the deed of trust we understand is to the

7 direct lender who have Diversified.  Interest is not

8 deferred by the deed of trust and in fact, now is

9 subordinate to the, this Sam Rialli deed of trust that

10 was put on the property within the last 90 days.  We

11 think that is going to be subject to be set aside.  We

12 don't believe Mr. Rialli has any claim against it.  We

13 did, as the Court is aware, it will become expensed

14 with the trustee, but in the business judgment of the

15 debtor and Diversified committee which was, actually

16 wind up with the net proceeds of the sale after paying

17 off the actual deeds of trust, that it's worthwhile in

18 this case due to the lack of trust of the controlling

19 parties of this debtor to have a trustee.  And the

20 Court already told the U.S. trustee and the trustees,

21 whoever is appointed, be aware that this Court's

22 opinion is that it has the authority to determine

23 whether a reasonable commission, and we won't be

24 necessarily bound to the statutory amount, and just in

25 the consideration of that, parties who are going to pay

1 for the trustee, want the trustee.  And therefore, we

2 would ask the court to appoint one at this point in

3 time and the answer is sooner is better, because if

4 there is a sale pending it's better for the trustee to

5 get involved to make the necessary motions immediately

6 so there's less of a delay.

7            In any case, it would have to be that kind of

8 motion because no title company is going to give a

9 title policy for a sale, even if there was no trustee,

10 without a Court order approving it in this interim Gap

11 period.  So there's no delay and the cost is something

12 we're willing to bear.

13            THE COURT:  I was remiss in not having you

14 review those, the facts with me on this one.  This was

15 the, is this the Sheraton Hotel?  No, this is the Palm

16 Springs hotel.

17            MR. SCHWARTZER:  This is the, the Sheraton

18 Hotel disappeared.

19            THE COURT:  Okay.

20            MR. SCHWARTZER:  Altogether.

21            THE COURT:  Okay.  Was it, the other case is

22 the Sheraton?

23            MR. HERMAN:  If I can lay a background for

24 the Court.  In 2001 Diversified Fund made a loan

25 secured by the Salt Lake City Sheraton Hotel.  That

Page 14

1 hotel was foreclosed in 2002.  Diversified became the

2 owner of the hotel.  The hotel was sold in 2005, but

3 there was a deficiency and the deficiency is an amount

4 that is varied, depending on how you calculate it,

5 between six and a half million dollars and 13 million

6 dollars.  When the hotel was foreclosed in 2002, just

7 like in the Tree Moss Marquis Villas situation, instead

8 of putting the hotel up for sale or leaving it in the

9 Diversified Fund --

10        THE COURT:  Did Diversified take title at the

11 foreclosure sale?

12        MR. HERMAN:  They did take title at the

13 foreclosure sale by way of a credit bid, Your Honor.

14        THE COURT:  Right.  Of course.  That's what I

15 meant to say.

16        MR. HERMAN:  Of course.  And Mr. Milanowski

17 and Mr. Hanges instead had U.S.A. Investors, Roman

18 numeral VI come in and operate the hotel and act like

19 an owner.  They, U.S.A. Investors 6 entered into a

20 management agreement.  All the contracts for the hotel

21 were entered into as if U.S.A. Investors 6 was the

22 owner of the hotel.  I think they probably would have

23 transferred it to, from Diversified to U.S.A. Investors

24 6, if they paid a little bit more attention to detail

25 and actually did things the way they should have been

1 doing things.

2          Nonetheless, they recorded the deficiency on

3 the books as an obligation.  The deficiency when the

4 hotel was sold in 2005, October of 2005 has an

5 obligation of U.S.A. Investors 6.  In fact, during that

6 period between 2003, the foreclosure sale, and 2005

7 there was substantial monies taken out of Diversified

8 Fund and given to U.S.A. Investors 6 to cover

9 operational shortfalls, the working capital, et cetera.

10          So U.S.A. Investors 6 is our borrower, in

11 effect.  The Sheraton Hotel loan is the obligation.

12 There's no further collateral for the Sheraton Hotel

13 loan, separate and apart and independent from this.

14 U.S.A. Investors 6 purchased what used to be called the

15 Marquis Hotel in Palm Springs.  It's right next to the

16 Marquis Villas, the Tree Moss is now, they're adjoining

17 properties.  This was done largely, the entity, of

18 course, U.S.A. Investors 6 is owned by U.S.A.

19 Investment Partners, LLC, which in turn is owned by Mr.

20 Milanowski, Mr. Hanges and Mr. Hamilton.  So they

21 essentially owned the hotel, the Marquis Hotel which

22 later changed its name and is now known as Hotel Zozo.

23          But the hotel was, purchase was accomplished

24 by way of a 13 and a half million dollar direct lender

25 loan.  That 13 and a half million dollar direct lender

Page 16

1 loan is still on the property.  The property is in

2 escrow pursuant to a purchase agreement that was

3 entered into back in May, I believe it is.  This is

4 another one of these escrows that is kind of always two

5 weeks away from closing.  We really don't know what,

6 all the dynamics are to get to close.

7            The 13 and a half million dollar loan is in

8 default, massive default.  Mr. Allison has submitted a

9 payoff demand into escrow that exceeds 20 million

10 dollars.  Diversified at this point is merely an

11 unsecured contractor of U.S.A. Investor 6.  So we're

12 most anxious that the proceeds of that sale to the

13 equity, if you will, are maximized.  We were in

14 discussions with Mr. Milanowski.  He says all the right

15 things, Mr. Walker says all the right things, to work

16 hard to pay off the contractors.  We're going to make

17 sure the contractors get the money.  But in the

18 meantime during the discussions we saw a lien pop up in

19 the end of September in favor of Mr. Rialli, the

20 Salvatore J. Rialli Living Trust.  And that lien

21 purports to encumber all of the personal property at

22 the hotel.  If this were just a condominium, the

23 personal property would not be that important.  It's a

24 hotel, so that is in effect a blocking position.  And

25 Mr. Rialli has the ability now to say the escrow is not

1 going to close until I get my ten plus million dollars.

2          So from the Diversified's point of view this

3 is a better set of facts for the appointment of a

4 trustee, because in the Tree Moss Marquis Villas

5 situation we were just concerned that he might go out,

6 Mr. Milanowski might go out and pledge the property to

7 somebody else.  Here he's already done so.  And in

8 fact, we need some way of getting rid of that lien

9 because we are told, and Mr. Allison and the Mesirow

10 folks have tracked us down, that this Salvatore Rialli

11 obligation is merely an obligation of Mr. Milanowski

12 and Mr. Hanges personally.  The promissory note is to

13 them person personally.

14          So they've taken this obligation and they've

15 gone up and lien'd up another property.  And that's

16 really what the problem is here.  And the need for the

17 trustee is if it does close, then Mr. Rialli is going

18 to get ten million dollars and Diversified will get

19 nothing, because there's not enough money to pay

20 anything to Diversified.  And if that lien is honored

21 in the closing --

22          MR. SCHWARTZER:  Your Honor, the bulk of the

23 facts are in the declarations of Mr. Allison that was

24 filed with the motion.

25          THE COURT:  In that record is included a

1 recorded deed of trust of Rialli?

2            MR. SCHWARTZER:  Yes.

3            MR. HERMAN:  It's actually not a recorded

4 deed of trust.  It's BIA property.  We have to get BIA

5 approval.  It's a personal property lien, but because

6 it's a hotel the personal property is important and

7 it's blocked.  Thank you, Your Honor.

8            THE COURT:  All right.  I think there's been,

9 I understand it was on shortened time, but this is

10 certainly a circumstance, this is not merely that the

11 fox is in the hen house and the fox has started eating

12 hens.  So I'm going to appoint a trustee.  I find that

13 the corporate, during the Gap period there a trustee is

14 necessary to preserve the status quo, to investigate

15 sale and to insure that no more liens are put on the

16 property.

17            As I said, I will award a trustee.  It's not

18 concrete in my mind that a trustee has the absolute

19 right to a commission based upon what the sale price

20 is, but it's still by reason, reasonable.  I understand

21 the trustee may argue that, but I just want to make the

22 trustee aware of that issue.  But I still think in

23 light of the fact you're going to make a commission,

24 the point is we can't risk the property being further,

25 subject to further loss or by the deed of trust.  And I

Page 19

1 would order a speaking order and not a written order.

2 You may commence to appoint a trustee.

3          MR. LANDIS:  Very well, Your Honor.  We'll

4 probably prepare a written order as well.  We ask that

5 you waive the 921 requiring signatures of counsel.

6          THE COURT:  I will.

7          MR. LANDIS:  We'll immediately appoint a

8 trustee in accordance with the Court's order.  I thank

9 you, Your Honor.

10          THE COURT:  Do we need to take a short recess

11 so we can start the U.S.A.?  Do we need to organize?

12 Are we all set?

13          MR. MEROLA:  We're ready.

14          THE COURT:  So U.S.A. Commercial Mortgage

15 appearances.

16          MS. JARVIS:  Annette Jarvis on behalf of the

17 debtor and debtors in possession.

18          MS. CARLYON:  Good morning, Your Honor.

19 Candace Carlyon of Shea & Carlyon on behalf of the

20 First Trust Deed Fund Committee.  Don Secas, who took

21 the labor on of drafting the asset purchase agreement

22 from my firm is also present.

23          MR. MEROLA:  Good morning, Your Honor.  Frank

24 Merola, Eve Karasik and Kristine Pajak, members of

25 Stutman, Treitser & Glatt, Professional Corporation,

1 counsel for the First Trust Deed Committee.

2          MR. LEVINSON:  Good Morning.  Mark Levinson

3 of Orrick on behalf of the Diversified Committee.

4          MR. HERMAN:  Good morning.  Jeff Herman,

5 Orrick for Diversified Committee.

6          MS. CHUBB:  Good morning, Your Honor.  Janet

7 Chubb of Jones Vargas for the Jones Vargas objecting

8 creditors.  I can put them on the record if you like.

9 They're, all of our documents have been filed.

10          THE COURT:  Okay.

11          MS. FREEMAN:  Good morning, Your Honor.

12 Susan Freeman and Robb Charles of Lewis and Roca on

13 behalf of the Unsecured Creditors Committee.  Jeff

14 Berman of DSI, our proposed trustee for the U.S.A. CM

15 Liquidating Trust is also present.

16          MR. OLSON:  Good morning, Your Honor.  Bob

17 Olson of Beckley, Singleton, Nevada counsel for the

18 Diversified Trust Fund Committee.

19          MR. MEROLA:  Excuse me.  May I approach?

20          MR. GOURLEY:  Attorney Vaughn Gourley on

21 behalf of Standard Property Development, LLC.

22          THE WITNESS:  Good morning, Your Honor.  Alan

23 Smith representing the Lenders Protection Group.

24          MR. KIRBY:  Dean Kirby, Kirby & McQuinn for

25 Objecting Creditor Debt Acquisition Company of America

1 5.

2

3          MR. FIELD:  Good morning.  Eric Field on

4 behalf of the Pension Benefit Corporation.

5          MR. SCHMAHL:  Good morning, Your Honor.

6 Michael Schmahl on behalf of the Kantor Group, Dr. Gary

7 Kantor, Mrs. Lynn Kantor and the Kantor Nephrology 401K

8 Plan.

9          THE CLERK:  Excuse me.  Would you please

10 spell your last name for the record?

11          MR. SCHMAHL:  S-C-H-M-A-H-L.

12          MR. WALSH:  Good morning, Your Honor.  Greg

13 Walsh on behalf of my family trust.

14          MR. COHEN:  Good morning, Your Honor.  David

15 T. Cohen, Warner, Stevens appearing on behalf of Sierra

16 Liquidity Fund.

17          MR. GOCHNOUR:  Good morning, Your Honor.

18 Wade Gochnour on behalf of Liberty Bank.

19          MS. ALLF:  Good morning, Your Honor.  Nancy

20 Allf.  I'm co-counsel with Robert Lepome, a group of

21 direct lenders called the Alexander Group.

22          MR. DAVIS:  Good morning, Your Honor.  George

23 Davis of Wild, Gotchala & Manges on behalf of Compass

24 Partners.

25          MR. GORDON:  Good morning, Your Honor.

Page 22

1 Gerald Gordon and Greg Garman of Gordon & Silver on

2 behalf of Direct Lenders Committee.

3        MR. LEVINSON:  Good morning.  Mark Levinson.

4 Again.  I wanted to note that Michael Tucker, who's

5 been named by the Diversified Committee to be the

6 administrator of the post effective date entity is also

7 here.

8        MR. LANDIS:  August Landis, assistant United

9 States Trustee.

10       THE COURT:  Just procedurally to the extent

11 you're not speaking at the podium, I would allow those

12 at the table here commenting to remain seated because

13 it's better that we have --

14       UNIDENTIFIED SPEAKER:  Can you have the sound

15 system turned up, Your Honor?

16       THE COURT:  That gives a reverberated tone in

17 the recording.  I appreciate the problem.  I ask they

18 speak, make sure the microphone is in front of you

19 recording as opposed to amplification.  But again,

20 Counsel at the table, I'll let you remain seated while

21 you speak.  It's more important that we have good

22 recording rather than protocol.  So I'd allow that.

23        First, let me, I guess the first thing we

24 want to do is the motions in limine dealing with the

25 Liberty Bank issue.  Then after that if there's any

Page 23

1 modifications or clarification of the plan, then we'll

2 have any cross-examination of those who made

3 appropriate declarations.

4          MS. JARVIS:  Your Honor, if we could go

5 through it, when I walk through the affidavits there

6 actually is Mr. Allison's declaration, Mr. Black's

7 declarations are uncontroverted.  I don't think there

8 is any issues of fact.  The only issue of fact that was

9 raised was in the declaration of Victoria Loub in

10 support of the Investment Partners, Joe Milanowski and

11 Tom Hanges' motion.  We took the 2004 examination of

12 Victora Loub yesterday.  She did take the Fifth

13 Amendment, refused to answer any questions including

14 even to verify it was her signature on the declaration

15 or that she had made the statements in the declaration.

16          Last night, as a result of that we did file a

17 supplemental motion in limine asking for her

18 declaration to be stricken.  I think the law is clear

19 in the Ninth Circuit we did cite the United States

20 versus Ponzi case, that when someone gives testimony

21 they cannot then refuse to be cross-examined on that

22 testimony, and that an appropriate sanction for doing

23 that would be to strike that testimony.  So we could

24 ask at this point in time that that testimony be

25 stricken, Your Honor.

Page 24

1          THE COURT:  Okay.  So we'll hear argument on

2 that.  Any argument?

3          MR. WALKER:  Your Honor, Russell Walker on

4 behalf of the Investment Partners and Joseph

5 Milanowski.  I think with respect to Miss Loub's

6 testimony we don't oppose that motion to strike.  I

7 will state for the record, however, that I believe

8 there isn't really any factual issue between

9 Mr. Allison's declaration and Ms. Loub's declaration.

10 It's our intent to rely essentially on his testimony

11 today for those purposes.  Would you like me to address

12 the motion in limine, or?

13          THE COURT:  So we'll strike her testimony and

14 once I have on the motion in limine, have they

15 proceeded, have they filed an actual declaration?  I

16 thought they had.

17          MR. WALKER:  Who did that, Your Honor?

18          THE COURT:  Mr. Milanowski filed an

19 affidavit.

20          MR. WALKER:  No, Your Honor.

21          THE COURT:  Oh, he didn't?

22          MR. WALKER:  He did not.

23          THE COURT:  All right.  So let me have

24 arguments by Miss Jarvis first on the motion in limine.

25 Well, it's not really a motion in limine because now

1 this term, they can offer you are asking to strike the

2 opposition.

3        MS. JARVIS:  We originally filed a motion in

4 limine to strike their objection because we noticed up

5 the 2004 examinations of the Investment Partners and

6 Mr. Milanowski and he has specifically with respect to

7 Mr. Milanowksi, included in our 2004 examination that

8 we wanted to because we anticipated we file an

9 objection of confirmation.  That's one of the subject

10 matters that we wanted to cover, would be his

11 objections to the confirmation.  Those we have

12 submitted a declaration of the circumstances

13 surrounding not only the service of the 2004

14 examinations, but also the circumstances surrounding

15 having neither Investment Partner.  No, he did,

16 Mr. Milanwoski showing up for their 2004 examinations

17 last week and based on that, again, it's appropriate

18 under the rules that the sanction for that would be to

19 strike their pleading.  And that's what we have asked

20 because we have not had the opportunity to examine them

21 were respect to their objections to the plan.

22        Added to that now is the fact that we have

23 the one declaration that they did attach to their, to

24 attach to their objection being stricken because she

25 appeared and would not answer questions with respect to

1 that.  So that adds to it, I think is also the basis

2 for asking that their objection be stricken to the

3 plan.

4          THE COURT:  Okay.  All right.  Response?

5          MR. WALKER:  Your Honor, I have to disagree

6 with Counsel, respectfully.  With respect to the 2004

7 examinations they were done, if Your Honor looks at

8 those they were requesting testimony from USA Investor

9 6, which we just heard in the Hotel Zozo matter.  They

10 were requesting testimony of HMA Sales, which is the

11 owner of the Royal Hotel and they're requesting

12 testimony with respect to the Marquis Villas.  Those

13 issues, the reason the debtor requested those

14 examinations was not to determine our objection to the

15 plan, but merely to get to issues regarding the sales

16 of these properties.  In fact, the 2004 examination

17 ordered were issues, the first we received notice of

18 them on the 4th, not even giving us ten days' notice

19 within which to prepare.

20          The other problem that was created was that

21 the vast majority of the documents are still with

22 Commercial Mortgage Corporation.  We didn't have access

23 to any of those.

24          In negotiations with Mrs. Monson from Ray,

25 Quinney & Nebeker we had discussions saying we would

1 produce the records we did have within two weeks and

2 that we would defer the 2004 examinations until after

3 the confirmation hearing.  And then most likely those

4 would be continued until January of 2007.  That hardly

5 sounds to me, Your Honor, like they intended to have,

6 to take testimony with respect to the objection.  As I

7 stated, Your Honor, I think Mr. Allison's testimony is

8 going to be adequate for us to argue our objection to

9 the plan.  We also filed a motion for protective order

10 and motion to quash the subpoenas, and to strike those

11 objections.

12          THE COURT:  But you never set them on

13 hearing.

14          MR. WALKER:  No, we didn't because it

15 obviously happened right during the same week.

16          THE COURT:  Well, you did the foolish motions

17 that you submitted ex parte.  I don't know what

18 procedure you're using.  Some sort of an ex parte

19 protective order.  What was that?

20          MR. WALKER:  No.  Under the circumstances,

21 Your Honor, that's all we could do.  The fact of the

22 matter was Ms. Monson and I had an agreement that we

23 would postpone these until after this confirmation

24 hearing, that we would provide the documents which we

25 did yesterday, and that the testimony would be taken

Page 28

1 later on.  That doesn't suggest to me that it had

2 anything to do with the confirmation hearing.

3          THE COURT:  One of your arguments against

4 confirmation is equity shouldn't be wiped out.  Now, in

5 fact you have no testimony to countervail Mr. Allison,

6 how can you make that argument under 9011?

7          MR. WALKER:  Well, I think we can because the

8 first claims were filed showing the equity.  I think

9 it's more of a legal argument.  It's a matter of the

10 absolute priority rule.  If the estate and if the

11 Diversified Fund are able to realize on the $133

12 million worth of pledges that we've given the estate

13 and the Diversified Fund, it may well be there could be

14 equity at the end of the day.  All we're saying is just

15 preserve our right to that equity if and when that

16 occurs.

17          THE COURT:  No, you have to show as a factual

18 matter that.

19          MR. WALKER:  Well, once again, it's a matter

20 of records as to these claims.  Mr. Allison testified

21 and that will be a part of --

22          THE COURT:  It's of the assets, not the

23 claim.

24          MR. WALKER:  Exactly.  Mr. Allison testified

25 he didn't believe that 58 million dollars of assets had

1 value.

2          THE COURT:  Right.

3          MR. WALKER:  The liquidation analysis he's

4 given no value.

5          THE COURT:  Right.

6          MR. WALKER:  We can give a legal argument

7 that certainly has value to the estate.  If it comes in

8 then we should be entitled to equity.  That's all it

9 is, is essentially a legal argument.  And because of

10 that, Your Honor, we should have, the main thrust of

11 our objection is we want to see the direct lenders

12 receive the money that is rightfully theirs.

13          THE COURT:  But the direct lender has nothing

14 to do with your claim that your equity is preserved.

15          MR. WALKER:  No, that's our objection.

16          THE COURT:  You're argument is equity should

17 be preserved and your clients retain their equity

18 interest.

19          MR. WALKER:  That's one of our objections.

20          THE COURT:  That was one of your arguments,

21 right?

22          MR. WALKER:  That's correct.

23          THE COURT:  And you're unwilling to suggest

24 that that argument be foregone, when there is actually

25 no evidence to support it, right?

Page 30

1              MR. WALKER:  No.  Mr. Allison, I'll
2 cross-examine him and he can talk about what was done
3 with respect to the $58 million.
4              THE COURT:  So how under the ethical rules
5 can you so argue that there is equity when there's no
6 countervailing evidence?
7              MR. WALKER:  What I'm saying, there will be
8 evidence because the pledged value Mr. Allison can
9 testify with respect to the $58 million and with
10 respect to the --
11             THE COURT:  But you've been unwilling to even
12 transfer these properties over to these other
13 companies.
14             MR. WALKER:  Wait a minute, Your Honor,
15 that's not true.  With respect to these other two
16 properties we've been forthright.  Why do you think the
17 court has the evidence?
18             THE COURT:  I don't see any quitclaim deeds.
19             MR. WALKER:  No.  In essence, we had the
20 irrevocable escrow instructions, we had the --
21             THE COURT:  Wait a minute.  Wait a minute.
22 You told me yesterday there were no escrow
23 instructions.  You told me in Tree Moss there were no
24 escrow instructions.
25             MR. WALKER:  That's correct.  Wait a minute,

Page 31

1 Your Honor.  Let me make my statement.  We had

2 negotiated terms of escrow instructions.  We had

3 negotiated terms of assignment documents.  They were

4 never finalized because the buyer hasn't gotten to the

5 point, at least to my knowledge any of these projects

6 yet.  We did do a draft settlement statement on the

7 Royal Hotel.  We have been cooperating fully in

8 disclosing the information.

9          THE COURT:  I don't see any dollars.

10          MR. WALKER:  So don't start that, right.

11 Well, there's 14 and a half million dollars that could

12 come in in the next couple weeks on the sale of the

13 Marquis Villas.

14          THE COURT:  But you've already given a deed

15 of trust to someone else for over ten million, right?

16          MR. WALKER:  Like I said, it's

17 cross-collateralized.  We've been negotiating with

18 Mr. Rialli to get that resolved.  Again, a full

19 disclosure --

20          THE COURT:  Then why did you give him a deed

21 of trust?

22          MR. WALKER:  My understanding, he filed that

23 UCC1 essentially on his own.  And that may be

24 challengeable.  But like I stated, that was

25 cross-collateralized.  It was part of the Royal Hotel.

1 Fully within the debtor's ability to do that.  Like I

2 said, it was a loan to Investment Partners, not a loan

3 to Mr. Milanowski.  So based on that we believe we

4 ought to be able to certainly address our other

5 objections which go to the prepaid interest issue,

6 which goes to the unremitted principal issue.

7            THE COURT:  Tell me, how can you have a

8 standing to argue about prepaid interest?

9            MR. WALKER:  Because we will end up paying

10 the bill at the end of the day.  It isn't as I have

11 money to pay the creditors.

12            THE COURT:  Who's we?

13            MR. WALKER:  Investment Partners and

14 Mr. Milanowski.

15            THE COURT:  That's wonderful, but why?

16            MR. WALKER:  No, the fact of the matter is he

17 has given a pledge, Investment Partners has given a

18 pledge of $133 million which we hope to realize.  We

19 don't believe it's right to allow the estate to take

20 $39 million of prepaid interest and apply it to fees to

21 go to the unsecured creditors.

22            THE COURT:  How do you have any standing?

23            MR. WALKER:  Like I said, we are the ones who

24 are secondarily liable on that debt.

25            THE COURT:  If I saw cash on hand today I

1 might feel a little better.  Not pledges, real cash.

2            MR. WALKER:  That's what I said.

3            THE COURT:  If your client has the ability to

4 do it, do it.

5            MR. WALKER:  I know.  We have to close these

6 deals, but we have given them that agreement, but.

7            THE COURT:  It's been since April.

8            MR. WALKER:  That's correct.  And then --

9            THE COURT:  And they took the property before

10 the sale?

11            MR. WALKER:  $30 million in sales takes time,

12 Your Honor.  So on that basis, I think it's absolutely

13 patently unfair to deny us the opportunity to appear

14 and argue our case, argue our objection.

15            THE COURT:  Okay.

16            MR. WALKER:  And the motion in limine and the

17 fact it has been granted, there isn't that testimony.

18 We are left to rely on Mr. Allison.  But we believe we

19 should have the right to do that.

20            THE COURT:  All right.  Response?

21            MR. MEROLA:  Frank Merola on behalf of the --

22            THE COURT:  Make sure you speak into one of

23 the microphones.

24            MR. MEROLA:  Yes, Your Honor.  We're through

25 the looking glass here with Hanges and Milanowski.

1 There are two independent grounds to strike this in a

2 motion in limine.  First, the opposition has only

3 evidence the declaration of a person who would not

4 acknowledge he signed the declaration.  All the factual

5 contentions in that opposition are supported by the

6 Loub declaration.  Miss Loub under new and separate

7 counsel refused to acknowledge she even signed the

8 declaration.  So when we start going through the

9 headings in that opposition about the innovative idea

10 that the collection account is sacrosanct and never

11 violated is diametrically opposed to Mr. Allison's

12 testimony, and more importantly diametrically opposed

13 to common sense.

14          About 50 percent of these loans were in

15 default, but a hundred percent of the people were

16 getting current interest until the month they filed.

17 Something else was going through that collection

18 account.  Okay.  It makes no sense when you read the

19 declaration.  It doesn't square with common sense.

20          Secondly, Counsel does a noble effort, but

21 this is not the time to argue that.  They did not

22 understand the scope of what Mr. Hanges and

23 Mr. Milanowski were to testify.  On December 8th Your

24 Honor enter an order, enter as, document 1986 on the

25 docket.  This is your order, this is not a clerk's

Page 35

1 order for a 2004.  It indicates the examination would

2 include acts, conduct or property of the debtors or any

3 other matter which may affect the administration of the

4 debtor's estate and acts, conduct or property of the

5 debtor as it relates to the liabilities and financial

6 condition of the debtors, and the source of any money

7 or property acquired or any other matter relevant to

8 this case.  Assuming they can read, there should have

9 been no confusion as to what the scope of the 2004 was

10 over.

11         Your Honor, set a date and a time for

12 examination that they didn't even show up at.  Now

13 we're not here on OSC rate contempt, but we will be

14 soon.  We're not here on OSC rate contempt, but on the

15 same day Your Honor, as entered as docket number 1987.

16 Your Honor denied their motion for protective order.

17 They knew they were ordered to come in.  They sought

18 protection, they were denied the protection.  They

19 no-showed the examination.  They used a third person to

20 submit declaration and declaratory evidence, and then

21 they have her no-show, the 2000, she didn't no-show.

22 She appeared and then took the Fifth on every question

23 she was asked other than her name.  Enough is enough.

24         THE COURT:  All right.

25         MR. WALKER:  Your Honor, if I may respond

1 just briefly.

2          THE COURT:  Yes.  Ms. Jarvis can respond,

3 both at the same time.

4          MS. JARVIS:  Your Honor, the 2004 examination

5 that we requested on Exhibit A to the subpoena was

6 issued and this was filed with the Court or signed on

7 November 30th.  We served it on December 11th after the

8 Court granted our right to ask for a 2004 examination.

9 On Exhibit A, number 11 we specifically asked for all

10 documents relating to all matters affecting the

11 debtors' plan of reorganization, the plan, including

12 the solicitation process, any objections by Milanowski

13 or any of the Milanowski entities and all persons

14 contacted by Milanowski relating to the plan.

15          So there was specific notice given that part

16 of what we wanted to ask about in this 2004 examination

17 was objections and issues relating to the plan.

18          In addition, if you look at the declaration

19 that we filed with the motion in limine of Miss Monson,

20 in one of the exhibits sent Tuesday, December 12th she

21 specifically says, "Unfortunately, we don't have

22 agreement.  As a result, we plan to proceed with the

23 2004 examination as ordered by the Court."  In

24 addition, if the IP and Mr. Milanowski and Mr. Hanges

25 were able to file their objections to the plan, not

Page 37

1 having access to these documents, they obviously could

2 answer questions with respect to that objection without

3 having access to those documents.  So that is not a

4 fair response to that.  We timely noticed this up.  We

5 made it clear that the plan was what we were concerned

6 about.  We make it clear that we needed to have this

7 before the plan confirmation hearing and they did not

8 attend.  It is not true that the evidence that they

9 would present is the same as what Mr. Allison has put

10 forth in his declarations.  He testified the

11 declaration has been stricken of Ms. Loub.  He stated

12 that the trust account had never been commingled.  He

13 stated that there were no payments made out of it,

14 except for direct lenders.  And if you look at

15 Mr. Allison's declaration, he states that regular

16 payments were made to Dale Bunch, who was not a

17 directed lender, out of the collection account.

18 Regular payments were made to Sal Rialli out of the

19 collection account.  He gives other evidence of that,

20 and gives to the fact that these funds were commingled

21 as well.  So it's completely opposite to what intended

22 to be submitted.

23          It is not correct, Your Honor, under the

24 solicitation procedures, it specifically states and

25 this is under the order that Your Honor entered, that

Page 38

1 those that filed objections to the plan had to submit

2 evidence at the time they filed those objections.  With

3 Miss Loub's declaration being stricken, there was no

4 evidence presented.  They did not have the right to

5 cross-examine Mr. Allison when no evidence has been

6 presented to even put, show that there is some

7 uncontroverted fact at issue.  With respect to the

8 ability or the, of there being any value left or

9 equity, that was also specifically covered in

10 Mr. Allison's declaration.  That is an issue of fact

11 with respect to evaluation.  They have presented no

12 evidence in response to that, not timely and not now

13 and they should not be allowed to cross-examine

14 Mr. Allison.

15          In addition, Your Honor, in a motion in

16 limine we reference Federal Rule of Civil Procedure

17 37(b).  It is an appropriate remedy when we've made

18 proper discovery requests, when we clearly indicated

19 what we wanted to question them about.  It was

20 necessary to do that.  And they haven't filed the

21 objection.  They should have been prepared and willing

22 to answer questions.  It is an appropriate remedy under

23 rule 37(b) to strike their pleading, to strike their

24 objection and we ask that the Court do that, Your

25 Honor.

Page 39

1          THE COURT:  Okay.  Response?

2          MR. WALKER:  I guess, Your Honor, in summary

3 I'm wondering what they're afraid of.  Wondering why

4 they do not want us to present our objection and to

5 examine Mr. Allison.  Just with respect to Mr. Merola's

6 comments the protective order that Your Honor denied

7 was mistakenly, well, was referenced in our motion to

8 protective order with respect to the documents.  It had

9 nothing to do with the 2004 examinations of last week.

10 A protective order --

11          THE COURT:  But you never made a motion for

12 protective order and set it for hearing before, you

13 never even made a motion for protective order, right?

14          MR. WALKER:  Well, we did, Your Honor.

15          THE COURT:  You did that ex parte.

16          MR. WALKER:  No.  No, we filed a motion.  We

17 didn't schedule it for a hearing.  I guess I'm amazed

18 at how quickly some of these orders are entered, but

19 the fact of the matter is --

20          THE COURT:  You never submitted an order

21 shortening time.

22          MR. WALKER:  That's correct, Your Honor.

23          THE COURT:  Okay.  So if you don't submit an

24 order shortening time and a motion for order shortening

25 time, how do you expect it to be heard?

Page 40

1          MR. WALKER:  I understand.  Obviously, the

2 issue was not with respect to confirmation.  Now,

3 they've argued that it is today, but the fact of the

4 matter is they've had since April to try to examine Mr.

5 Milanowski.  The fact of the matter is, Your Honor, we

6 have been cooperating, we've been working --

7          THE COURT:  You've had since April to make

8 the payments, to make good on the property.

9          MR. WALKER:  On what property and what

10 payments are we talking about?

11          THE COURT:  How much money has come into the

12 estate from your clients?

13          MR. WALKER:  We committed to pay in excess of

14 $50 million.

15          THE COURT:  How much money has come in?

16          MR. WALKER:  $58 million pledge and we're

17 working on it every day.

18          THE COURT:  How much cash?

19          MR. WALKER:  None.

20          THE COURT:  None.  Thank you.

21          MR. WALKER:  The 14 and a half million is

22 ready to be paid and the proceeds from the Hotel Zozo

23 is probably in the offing as well and the Hotel Royal,

24 all of which probably in are in excess of $20 million.

25 So it takes time and that's our only explanation.  But

1 to prohibit us from arguing today is ridiculous.  When

2 we talk about the proper request, not one of the 2004

3 exams was given on ten business days' notice to the

4 parties.  Everyone was on order shortening time.  And

5 the fact of the matter was Mrs. Monson was willing to

6 put these back into January.  It had nothing to do with

7 confirmation, it only came up recently when they saw

8 our objection.  They said well, there must be some

9 basis for this and they wanted to exclude it.  I don't

10 believe Rule 37(b) --

11          THE COURT:  How can you possibly think as an

12 experienced litigator that if you file a declaration in

13 support of your objection, that they are not going to

14 examine you or want to examine you on that declaration

15 before confirmation?

16          MR. WALKER:  That was not the case.  We

17 expected they would examine her and she hired criminal

18 counsel and took the Fifth Amendment, which was a

19 surprise to me, but the fact of the matter is our

20 objection can go forward.

21          THE COURT:  She probably read the Nevada

22 versus Tomlinson case.

23          MR. WALKER:  Well, she had her counsel and I

24 think there was some miscommunication there, but the

25 fact of the matter is we believe we can move forward on

Page 42

1 the evidence Mr. Allison has presented.  With all due

2 respect to Counsel, I think that the fact of the matter

3 is the evidence is in Mr. Allison's declaration and his

4 testimony is an interesting issue.  I think the fact of

5 the matter is it will support our objection to the

6 plan.  And for that reason we should be allowed our due

7 process.  And that's an extreme remedy we can deal

8 with, the orders to show cause or other issues.  Given

9 more time, we can obviously have the information with

10 regard to the sales and have the parties appear and

11 testify.

12          So on that, Your Honor, we oppose the motion.

13          THE COURT:  Well, I'm going to grant the

14 motions in limine.  You can't expect, everybody knows

15 this case is, well, not on a fast track because as we

16 well know, we've even had an extension of the

17 exclusivity period.  It perhaps became a little more

18 compressed at the end, but it's compressed in

19 accordance with the rules.  And everybody knew this

20 because of the extraordinary expenses happening.

21          And the fact is we need to move on in this

22 case.  It's ridiculous and absurd to think that Mr.

23 Milanowski would think his deposition would not be

24 taken when he filed an opposition, which opposition

25 alleges the proposition that there is sufficient equity

Page 43

1 to go to him and that everybody, that there would be

2 equity left over after paying everybody in full, and

3 mind you they wouldn't be entitled to anything until it

4 was in full with interest.

5          So if we think about the huge interest rates

6 that were allowed, for example, to Diversified, it

7 would be unmanageable, unfortunately, I guess, but

8 unmanageable for anything else left for equity.  But if

9 you do think so you have got to show it by evidence.

10 You have to provide a declaration and the declaration

11 they provided is stricken because Miss Loub took the

12 Fifth.

13          Now, does that mean she was lying in her

14 declaration?  Does it mean she lied before?  She

15 certainly has the right, but you can't use the

16 deposition, or the pleadings.  So you can't just argue,

17 oh, well, I'm arguing the trustee's case because it

18 implies the factual allegations, because the fact of

19 whether or not you can confirm, whether or not you can

20 excise out equity, meaning the Hanges and Milanowski

21 group, is a factual question.

22          And you're not willing to rely on facts.  You

23 say they made these promises and therefore, I don't

24 know how you can even argue about making these

25 promises.  There's no evidence in the record of these

Page 44

1 promises.  And again, we can see these promises have

2 lead to zero dollars in cash as of now.  Nothing but

3 promises, promises, promises.  People will promise 24

4 percent interest.  People will promise their loans will

5 be paid.  People will promise a lot of things.

6          So I'm going to strike the opposition by the

7 Milanowski group.  The prepaid interest issue, I think

8 you have no standing on that.  In other cases there are

9 people who've argued the prepaid interest issue.  So

10 I'll strike the opposition for the Milanowski group.

11          Okay.  Now, where do we go next?

12          MS. JARVIS:  Your Honor, to finish going

13 through the affidavits that were filed, or the

14 declarations that were filed to the opposition to show

15 that there is, they're uncontroverted evidence and that

16 we don't need, there are no factual issues that are

17 controverted and therefore, we can go, we believe,

18 straight to legal arguments.

19          The only other declarations that were filed,

20 there was a declaration filed by Debt Acquisition Corp.

21 we just talked about, where they purchased certain

22 claims, starting in September which is about the time

23 the initial plan was filed.  It opposes the compromise.

24 It says it doesn't waive its defenses.  That's not

25 something that goes to whether this plan can be

Page 45

1 confirmed or cannot and therefore, it's not necessary

2 to consider.

3          The second is a late filed declaration filed

4 last night by Donna Congalesi.  This also should be

5 stricken because in accordance with the order on the

6 solicitation and procedures, it was required that any

7 evidence be submitted with opposition.  So this was

8 late filed; however, again, it goes to similar issues

9 just saying I oppose the compromises and I reserve my

10 rights, which does not go, does not need to be decided.

11 It's not a fact of issue that needs to be decided with

12 respect to this confirmation hearing.

13          There also was a declaration by Mr. Walsh.

14 Both Ms. Congalesi's and Mr. Walsh's declarations

15 attempt to provide parole evidence to refute the

16 unambiguous language in the loan servicing agreements

17 requiring them to pay servicing fees.  There is a

18 Supreme Court case of Nevada, the Ringel case that says

19 parole evidence does not, and of course, this is a

20 pretty standard rule, permit the admission of evidence

21 that would change the contract terms.  It indicates

22 this is also not central, not required as part of the

23 confirmation plan, does not refute the evidence that

24 establishes confirmation.  These are issues with

25 respect to servicing fee rights and whether those are

1 enforceable.

2           The plan provides that there is a procedure

3 to be followed to resolve any issues with respect to

4 the servicing fees as an alternative dispute

5 resolution, a procedure that was served on all lenders

6 as part of the lenders' supplement.  Those issues can

7 be dealt with pursuant to that procedure.  And

8 therefore, Your Honor, there are no facts that are

9 controverted that need to be dealt with in confirming

10 this plan.  And we would ask you just move directly

11 towards the legal arguments since those are the only

12 ones that are at issue.

13           THE COURT:  Any objection by those three

14 objectors to moving directly to arguments?

15           MS. CHUBB:  No, Your Honor.

16           THE COURT:  Okay.  All right.

17           MR. SMITH:  Alan Smith.  No, Your Honor.

18 Alan Smith on behalf of the lenders.

19           THE COURT:  All right.  Then why don't we

20 take a short recess so we can gather ourselves

21 together?  The way I think it should work is you go

22 forward, lay out again, the standards of the plan, lay

23 out what the plan does, any modifications, et cetera,

24 and I think just briefly address the arguments they're

25 going to raise by the objectors, then I'll have the

1 objectors make their arguments and then focus on your

2 reply on addressing their issues so that we know maybe,

3 you know, some things go away, maybe some things

4 change.  Is that an acceptable procedure?

5           MS. JARVIS:  Your Honor, I think we pretty

6 clearly addressed the objections in our reply brief.

7 We thought maybe it would be better as far as not

8 stretching this out necessarily to, because that kind

9 of is our case in chief we put in our confirmation

10 brief and in our reply brief, is just go ahead and let

11 the objectors --

12           THE COURT:  The objectors go first?

13           MS. JARVIS:  And we'll go ahead and we'll

14 respond so we don't ask for, score an opening

15 statement, but rather, a closing statement.

16           THE COURT:  Okay.  So that part makes sense.

17 Obviously, you want to save time on everybody's part,

18 whatever happens being the fewer hours we're here, the

19 less it costs everybody.  So how long would the

20 objectors, we'll start with the objectors first.  You

21 might want to talk among yourselves who goes first.  I

22 would ask the objectors to coordinate who does what

23 arguments so we're not reiterating, and then just let

24 the Court know when you're ready to start and then

25 we'll have your responses.

Page 48

1          MS. JARVIS:  There are a few objections.

2          THE COURT:  Are we waiving modifications

3 first?

4          MS. JARVIS:  There are a few objections that

5 have been resolved.

6          THE COURT:  Okay.

7          MS. JARVIS:  Maybe real quickly I could walk

8 the Court through those.  I believe the objections of

9 Standard Development, Benford and Copper Sage have been

10 resolved.  We've been talking about just clarifying

11 that they reserve their differences on foreclosure.  We

12 have circulated some language.  Compass, our purchaser,

13 has some issues with that.  So it's a matter of just

14 working out the language that we feel comfortable to go

15 in the plan.  I don't think there's any disagreement

16 that those borrowers are entitled to, that the plan

17 does not discharge their defense to foreclosure going

18 forward.

19          We also have resolved the opposition of

20 Liberty Bank.  They were concerned about clarifications

21 that the discharge, well, it's not a discharge, but the

22 injunction under the plan did not release third parties

23 and we will, we have agreed on some clarifying language

24 to make it clear that the release does not extend to

25 third parties, that those rights are preserved.  We

Page 49

1 will make it clear that the insiders as well are not

2 being released, whether they've served, meaning the

3 pre-petition insiders, are not being released.

4 Mr. Milanowksi has served as a director post petition,

5 but he would also not be included in this release.  So

6 that will be clarified as we enter this language.

7          The Pecos objection dealt with cure payments.

8 We did file a supplement yesterday on the contracts to

9 be assumed.  We had left open the possibility for a

10 variety of contracts to be assumed, because we didn't

11 know who the purchaser would be.  So once Compass

12 became the designated purchaser of, the winning bidder

13 of the auction they then have the option to decide

14 which contracts they wanted to assume.  They designated

15 those contracts as not being ones that they wanted to

16 assume, so they're being rejected.  And since the

17 objection went to the payment of cure payments, that's

18 not an issue anymore because the contracts are not

19 being assumed.

20          THE COURT:  Just an aside issue, on these

21 buildings I guess we're satisfied that no money from

22 U.S.A., the lender, the Diversified, went into those

23 buildings?  They're all separately owned, separately?

24          MS. JARVIS:  Yeah, they're separately owned.

25 And one of them I know is owned by another half, by

1 another party as well.  Certainly, at this point we

2 don't have any evidence that the money went in there.

3 But certainly if we discover that evidence we're going

4 to pursue it because.

5          THE COURT:  That's right.  The litigation is

6 preserved.

7          MS. JARVIS:  Right.  All the claims are

8 preserved.  We were very, very clear in both the

9 disclosure statement and the plan that all insider

10 litigation is preserved and will be prosecuted starting

11 now and post confirmation.

12          THE COURT:  Okay.  And PBGC, you may have

13 mentioned that.  You resolved that as well?

14          MS. JARVIS:  I think we're close on the

15 language.  Again, we're not intending to release any

16 third parties.  The release is limited to, you know,

17 the debtor and its post petition professionals.

18          THE COURT:  Let's take a short recess so you

19 can organize yourselves.  Thank you.

20          (Whereupon, a recess was taken.)

21          THE COURT:  Okay.  Who's going first?

22          MR. SMITH:   I've been elected to go first,

23 Your Honor.  Are you ready for me?

24          THE COURT:  Sure, go ahead.

25          MR. SMITH:  Alan Smith on behalf of the

Page 51

1  Lender Protection Group.  Your Honor, I'm not going to

2  reiterate on everything that's in the brief that I

3  filed.  I really just want to hit today on three main

4  points.  The first point I think alone is dispositive.

5  The plan as far as Commercial Mortgage, U.S.A.

6  Commercial Mortgage cannot be confirmed.  I say that

7  for several reasons.  First of all, each plan clearly

8  stands on its own.  These cases have not been

9  substantively consolidated, so we have to look at each

10 separate estate to determine whether the plan is

11 confirmable.

12         Looking at just the Commercial Mortgage plan,

13 from the balance summary that I have seen the class A-4

14 rejected the plan and class A-5 accepted the plan.  I

15 understand that the debtor and the plan proponents rely

16 on class A-5 as the impaired class of creditors

17 accepting the plan for purposes of cram down purposes.

18         And if you look, Your Honor at the, at really

19 what the A-5 class is, well, first of all, it's my

20 position that the A-5 class does not even have a claim.

21 And the reason why I say that is --

22         THE COURT:  Well, now, that wasn't one of the

23 issues raised in your opposition.

24         MR. SMITH:  Your Honor, I didn't have a

25 balance summary then.  I didn't know what the voting

1 members would do.

2          THE COURT:  Wait a minute.  Classification is

3 an issue that has to be raised before.

4          MR. SMITH:  I'm not arguing classification,

5 I'm just saying that this is not a class of creditors

6 that you can count for cram down.

7          THE COURT:  That's certainly something that

8 should have been in your initial opposition.  You

9 cannot raise it now.  Balance summary has nothing to do

10 with it.  Balance summary only has to do with whether

11 or not.

12          MR. SMITH:  Well, obviously it didn't become

13 an issue until the balance summary was filed.

14          THE COURT:  Wait a minute.  Of course, it

15 would.  If you think they had designated somebody as

16 impaired, they're not impaired, you have got to raise

17 it even before confirmation.

18          MR. SMITH:  Your Honor, that's not what I'm

19 saying.  I'm not arguing classification.

20 Classification is fine.

21          THE COURT:  You just told me A-5 wasn't

22 impaired.

23          MR. SMITH:  A-5 is not a class of creditors,

24 period.  That's what I'm saying.

25          THE COURT:  Okay.  You can't raise that now.

Page 53

1 You didn't raise it in your opposition.

2          MR. SMITH:  Here's why I think I can.  1129

3 A-10, you must make a finding today the debt has been

4 satisfied.  If you want to stop me and say, "Mr. Smith,

5 don't say any more about it," then stop me, but I think

6 that is an issue that must be addressed today.  You

7 must find A-10 satisfied, regardless of classification.

8 Sure, it's a separate class.  I'm saying it's not a

9 creditor class because under the plan --

10          THE COURT:  So what excuse do you have not to

11 raise that in your opposition?

12          MR. SMITH:  Not ripe.  It's not ripe until

13 today.

14          THE COURT:  You're saying they're not a

15 class.  That means they were never a class from the

16 beginning.

17          MR. SMITH:  That is not, no.

18          THE COURT:  You're saying they don't have a

19 claim; so therefore, they can't be a class.

20          MR. SMITH:  No, I'm not saying that.

21          THE COURT:  You just told me, you said they

22 don't have a claim.

23          MR. SMITH:  I'm saying they can't satisfy

24 A-10.

25          THE COURT:  You told me that, because you

Page 54

1 say, you do have them believe, so they're clearly

2 satisfied if they're an impaired class, right?

3          MR. SMITH:  Right.

4          THE COURT:  But you're trying to tell me

5 they're not impaired because they don't have a claim.

6          MR. SMITH:  No.

7          THE COURT:  What are you telling me?

8          MR. SMITH:  I'm telling you A-5 class has no

9 claims against the debtor, period.

10          THE COURT:  That's what I just said and you

11 said no, that's not what you're telling me.

12          MR. SMITH:  No, you said they're not

13 impaired.  I'm saying --

14          THE COURT:  You say they have no claim.  Why

15 was that not something that was obvious from the moment

16 that plan was filed?

17          MR. SMITH:  Well, Your Honor, I don't know

18 how the voting is going, you know, Your Honor, first of

19 all, look at the rate this is proceeding.  I mean, it

20 is pretty fast, okay?

21          THE COURT:  No, you came on late.

22          MR. SMITH:  Well, you admitted earlier before

23 I started that this case has moved at a pretty rapid

24 rate since the disclosure statement and plan was filed.

25          THE COURT:  We had two extensions of

1 exclusivity.

2          MR. SMITH:  Right.

3          THE COURT:  Which were opposed by the U.S.

4 Trustee's office.

5          MR. SMITH:  Right.

6          THE COURT:  It has proceeded in accordance

7 with the notice of rules.

8          MR. SMITH:  That's true, but since this plan,

9 you know.

10          THE COURT:  You had known this was filed.

11          MR. SMITH:  I understand.

12          THE COURT:  I can't get you to follow the

13 rules.  I'm just having the hardest time getting you to

14 follow the rules.

15          MR. SMITH:  Wait a minute.  I don't

16 appreciate that.

17          THE COURT:  Did you give me a courtesy copy

18 of your opposition?

19          MR. SMITH:  Yes.

20          THE COURT:  When?

21          MR. SMITH:  I called your office and

22 confirmed you had it.

23          THE COURT:  You didn't give it to us.

24          MR. SMITH:  Yes.

25          THE COURT:  Who delivered it to my office?

Page 56

1          MR. SMITH:  We asked a local representative

2 to deliver it.  It was a delivery service.  We called.

3 Are you saying you didn't receive it?

4          THE COURT:  Well, I downloaded it.

5          MR. SMITH:  Are you saying I didn't deliver a

6 courtesy copy?  Is that the problem?

7          THE COURT:  I thought you hadn't.  But if you

8 say you had, it's okay.  The next thing you had.

9          MR. SMITH:  I promise you, Your Honor, I

10 have, I'm really careful about that.  I have been

11 practicing for nearly 30 years.  I know how to practice

12 in bankruptcy court.  I know about courtesy copies.  I

13 called your office to ensure that you got it.

14          THE COURT:  All right.  I'll accept that.

15 And what about the declaration filed last night?

16          MR. SMITH:  Right.  The reason it was filed,

17 Your Honor, it has no facts pertinent to plan

18 confirmation.  But Miss Cangelosi, well, pertinent, but

19 not they're not material factual issues.  Ms. Cangelosi

20 was concerned about the comments you made that she's

21 been involved in this case from the beginning.  She

22 should know what's going on.  And she was offended by

23 that because she said, "I don't know what's going on.

24 These agreements, these deals are done behind closed

25 doors."  She never participated in them.

Page 57

1          THE COURT:  All right.

2          MR. SMITH:  She didn't know until --

3          THE COURT:  Go ahead.

4          MR. SMITH:  Okay.

5          THE COURT:  You did not raise the argument it

6 wasn't a class in your opposition and I'm not going to

7 let you proceed on that.  It's not fair.  This is an

8 issue which you --

9          MR. SMITH:  Okay.  That's fine.

10          THE COURT:  -- are using by the back door at

11 the last minute.

12          MR. SMITH:  That's fine, Your Honor.  It's an

13 issue before you that came about because I can't

14 possibly anticipate the balance summary.  If you don't

15 want me to talk about it, tell me to stop.

16          THE COURT:  It doesn't make any difference.

17 The point is if you claim that's not a class empowered

18 to vote, you must raise it at the appropriate time.

19          MR. SMITH:  That's not what I'm saying.

20          THE COURT:  Tell me again what you said.

21          MR. SMITH:  I'm saying, the acceptance of

22 that class does not satisfy 1129 A-10 and that's all

23 I'm saying.

24          THE COURT:  Why?

25          MR. SMITH:  Because they're not creditors.

Page 58

1 They're separately classified first.

2            THE COURT:  That's what I just said.  That

3 issue that they're not creditors is something you

4 should have raised before.  You can't --

5            MR. SMITH:  Why?  It's not ripe.  I can't

6 anticipate everything that might go on in this case.

7            THE COURT:  That has nothing to do with it.

8            MR. SMITH:  Your Honor, I don't know who's

9 going to vote for the plan and who isn't.  I don't know

10 if they're going to rely on class A-5 to cram down this

11 plan.  Maybe A-4 accepts.  Am I supposed to anticipate

12 that?

13            THE COURT:  Because you're telling me as a

14 legal matter, it has nothing to do with empowerment,

15 you're telling me as a legal matter they weren't

16 entitled to vote?

17            MR. SMITH:  No, I'm not saying that.

18            THE COURT:  You're saying they're not

19 creditors.  They don't have claims.

20            MR. SMITH:  Your Honor, this plan is very

21 clear.  It says every single claim, that class 5 has,

22 whether it's a claim for diverted principal, whether

23 it's a claim for tortious contract, or tortious

24 activity, whether it's a claim for breach of contract

25 is an A-4 claim.  That's what it says.  Every single

Page 59

1 right that an A-5 person has to collect money from the

2 debtor is A-4.  Every single thing.  There's not a

3 single claim that A-5 creditors have against this

4 debtor.  That's fine.  You separately classify it.  I

5 know why they did it.  And I don't know if we need to

6 get into it.

7           THE COURT:  So then you should have raised

8 the objection.

9           MR. SMITH:  Why?  I don't care about that.

10          THE COURT:  I guess you don't care about

11 raising issues in a timely fashion.  I'm not going to

12 sit here and argue.

13          MR. SMITH:  Your Honor, I'm not clairvoyant.

14          THE COURT:  It has nothing to do with it.

15 It's a legal issue which you chose.

16          MR. SMITH:  That's right.  And you have to

17 find today --

18          THE COURT:  I find you can't raise that

19 issue.

20          MR. SMITH:  Okay.  You stop me from raising

21 that issue.  By way of offer of proof, Your Honor.

22          THE COURT:  No.

23          MR. SMITH:  You're stopping me all together?

24          THE COURT:  Right, on this issue.  You can't

25 now tell me that it's not an appropriate class that can

Page 60

1 vote.  It's certainly appropriate to say if neither

2 class had voted to accept, it is appropriate to say you

3 don't have an impaired class voting, that is

4 appropriate, that it indeed, must be found and it

5 indeed can't be raised until after the ballot.  You're

6 not telling me that.  You're telling me there was only

7 one class of claim that was entitled to vote.  That's

8 what you're telling me.

9            MR. SMITH:  No, but if you want to stop me,

10 stop me.

11            THE COURT:  On that issue, yes.  You cannot

12 now argue that A-5 was a class that is not entitled to

13 vote.

14            MR. SMITH:  Just for the record, Your Honor,

15 I feel it's your job to find regardless of whether I

16 argue it or not, it's your job to find A-10 was

17 satisfied.

18            THE COURT:  I appreciate that.

19            MR. SMITH:  I think it's crystal clear it was

20 not.

21            MS. CARLYON:  Your Honor, I'm sorry, with

22 respect to Mr. Smith's purported offer of proof, is it

23 a fair statement that your denial of that request is

24 based upon your November 16th order which provided that

25 objections to confirmation must have evidentiary

Page 61

1 support and that the deadline for the submission of

2 that testimony or evidence was December 15th.

3          THE COURT:  Yes, and that the argument must

4 be raised in the objection.

5          MS. CARLYON:  Thank you, Your Honor.

6          MS. JARVIS:  And, Your Honor, I would also

7 point out this issue came up in the disclosure

8 statement hearing.  We spent thousands of dollars

9 soliciting all of these direct lenders.  And it is

10 prejudicial to us at this point for this to be raised.

11          THE COURT:  I agree.  This was an issue at

12 disclosure statement time.

13          MR. SMITH:  I highly doubt that the issue of

14 whether, and accept whether A-5 was an accepting class

15 for cram down purposes came up at the disclosure

16 statement hearing.  In fact, I think it's impossible.

17          THE COURT:  The issue of whether or not a

18 class is an appropriate class for voting raised at

19 disclosure is an appropriate issue at disclosure

20 statement time.

21          MR. SMITH:  But whether or not that class is

22 an appropriate class under A-10 to cram down a plan was

23 not raised.

24          THE COURT:  Well.

25          MR. SMITH:  I'm sorry, Your Honor.  I hate to

1 beat it, but I don't see how --

2             THE COURT:  You can, but I overruled your

3 objection.

4             MR. SMITH:  I don't see how it could ever

5 have been addressed before today.  As much as you want

6 to criticize me.

7             THE COURT:  Let's assume you put in a plan

8 that we are going to allow the votes of everybody who

9 has received, it's a silly example.  We're going to

10 allow you to vote, we're going to allow a vote of

11 everybody who was paid in full prior to confirmation.

12            MR. SMITH:  Right.

13            THE COURT:  Okay.

14            MR. SMITH:  Right.

15            THE COURT:  It's not a valid accepting class

16 because it's been paid in full, right?

17            MR. SMITH:  Absolutely.

18            THE COURT:  You claim that that issue cannot

19 be raised until confirmation.

20            MR. SMITH:  That's right.  You know why?

21            THE COURT:  Why?

22            MR. SMITH:  What if class A-4 accepts the

23 plan?

24            MR. MEROLA:  It doesn't matter.

25            MR. SMITH:  Exactly.  It wouldn't matter.

Page 63

1 That's why you don't know --

2            THE COURT:  No, no.

3            MR. SMITH:  -- until today.  So it's unfair.

4 I think it's prejudicial to me, my clients, to say I

5 should have thought of this possibly last week when the

6 brief was filed.

7            THE COURT:  Improper classification is raised

8 earlier.  That's what you're arguing.  You're saying

9 they're not entitled to vote.

10           MR. SMITH:  No.

11           THE COURT:  You're trying to lie in the weeds

12 and raise new issues of confirmation.

13           MR. SMITH:  No, Your Honor.  I'm only raising

14 the issue that was raised by the balance summary

15 because I did not know if A-4 accepted the plan.

16           THE COURT:  Then why did you allow, the

17 theory is the same.  If they're not appropriate class,

18 they can't vote.

19           MR. SMITH:  No.

20           THE COURT:  You allowed this estate to spend

21 hundreds of thousand of dollars for the vote to go out

22 and they're not an appropriate class.

23           MR. SMITH:  I am not, I'm not saying that.

24 Every time you say that, that is not my position.  Just

25 so I'm clear.  It's fine that that class exists.  It's

Page 64

1 fine it was sent out that way.  The effect of that, I

2 don't know.  You have to determine that today, is that

3 a class of contractors that allows you to cram down

4 this plan under A-10.  And I ask you this one question.

5 If it is, what are they owed?

6          MR. MEROLA:  Your Honor.

7          MR. SMITH:  I'm sorry.  Are we going to argue

8 back and forth, Your Honor, or do I get to present my

9 case?

10          THE COURT:  I've already overruled your

11 objection.

12          MR. MEROLA:  If you want to move on, that's

13 fine, Your Honor.  The only example I was going to

14 give, if his argument is the issue was not ripe until

15 he had a ballot tabulation, to know that it was raised

16 and that it invoked 1129 A-10, that's nonsense.  Take

17 the situation of classification of the single asset

18 real estate case where the deficiency claim is

19 separately classified.  The lender could not wait until

20 after the ballot tabulation comes out to first raise an

21 oral argument that that's an improper classification.

22          MR. SMITH:  I'm not raising that argument.

23          MR. MEROLA:  One, classification properly

24 raised --

25          MR. SMITH:  I'm not raising that --

1              THE COURT:  Please.

2              MR. SMITH:  Well, Mr. Merola interrupted me.

3              THE COURT:  Mr. Smith.  Go ahead.

4              MR. MEROLA:  Classification is properly

5 raised in the context of disclosure statement to the

6 extent it makes the plan unconfirmable.  Two,

7 bankruptcy rules provide the classification be raised

8 by motion separate from the confirmation.  This could

9 have been heard any time before if there was any

10 problem with these classes.  Instead, this was not

11 raised in the context of the disclosure statement, this

12 was not raised in literally dozens of oppositions, and

13 what he wants to do here is have an aha moment.  And

14 that's not how we're trying this case.  And we're

15 hearing for the first time, well, it was okay that that

16 class existed, but I didn't know you were going to rely

17 on it for 1129 A-10.  All of the classes have been

18 relied on for 1129 A-10.

19              There was no proper objections to

20 classification, either at the disclosure statement, not

21 by separate motion under the bankruptcy rules, nor

22 raised in the written objection.

23              THE COURT:  All right.

24              MR. SMITH:  Your Honor, Mr. Merola is on

25 completely the wrong track.  It's not a classification

Page 66

1 issue.  It only addresses whether or not you in your

2 discretion can find today that A-10 has been satisfied

3 for Commercial Mortgage.  And you cannot, because you

4 cannot, the Commercial Mortgage A-5 class does not have

5 a single claim, not a penny claim against the debtor.

6          THE COURT:  But that's a classification

7 issue.

8          MR. SMITH:  Yeah, they're classified

9 separately because there's a compromise.  It clearly

10 states that.  They tried to accomplish a compromise.

11 That's why there are classes.  It says right there.

12          THE COURT:  All right.  Let me rule on it.

13 The point is it is improperly raised at this time.

14 Under Rule 3013, for purposes of the plan acceptance,

15 the Court may on motion after a hearing directly

16 determine the classes of creditors.  It is a

17 distinction without a difference.  To claim now that is

18 not a classification issue, to argue that somebody

19 doesn't have a claim and is not entitled to vote

20 because they don't have a claim or because they're not

21 impaired is too late.  You didn't raise an objection at

22 confirmation.  It's, please let me finish so we can

23 move on.  I'm overruling your objection.

24          MR. SMITH:  Okay.

25          THE COURT:  For those legal reasons.  The

Page 67

1 point is we do have, I do have to determine whether or

2 not somebody is voted to accept is impaired.

3          MR. SMITH:  Right.

4          THE COURT:  We have according to plan and

5 that now is too late to object.  We have an impaired

6 class that is voted to accept.  You cannot now raise

7 the fact that wasn't a valid class.  You could have

8 raised it in your objection, you could have raised it

9 by motion.  You didn't do it.  You didn't do it

10 probably on purpose.  I'm overruling your objection on

11 that issue.

12          MR. SMITH:  That's unfair, Your Honor.  Why

13 would you make a comment like that, that did I it on

14 purpose?  That's silly.

15          THE COURT:  Because I guess you didn't want

16 them to --

17          MR. SMITH:  Does Your Honor think I'm trying

18 to play a game?  It's not a game, Your Honor.  I

19 represent 350 people that want to be protected.  I'm

20 not here playing some kind of joke.  And I know I'm

21 greatly outnumbered.  And there's huge momentum to get

22 this plan confirmed, but you still have to do what's

23 right, regardless of --

24          THE COURT:  I will, Mr. Smith, but I expect

25 you to play by the rules, too.

Page 68

1            MR. SMITH:  Okay.

2            THE COURT:  And just because you, I

3 appreciate this.  Everybody has suffered in this case.

4            MR. SMITH:  Right.

5            THE COURT:  But just because, you purport to

6 represent all these people and I do have a concern with

7 conflicts there which I want to address with you later.

8            MR. SMITH:  There's conflict with almost

9 every single person in this case.

10           THE COURT:  But the problem is different

11 because you're not a committee.

12           MR. SMITH:  That's true.

13           THE COURT:  You purport to represent people

14 with similar, and I'm concerned, but let me go on.

15 You've got to play by the rules.  You're not playing on

16 the rules on that issue.

17           MR. SMITH:  Okay.  I don't see it, but I'm

18 not going to, you obviously won't listen to me any

19 further, so I don't think I really.

20           THE COURT:  I'm not because it's not fair.

21 It's not fair for these people who have spent hundreds

22 of hours preparing for confirmation.

23           MR. SMITH:  Right.

24           THE COURT:  On a legal issue that requires

25 substantial research which you haven't even briefed or

1 anything.

2          MR. SMITH:  Your Honor, that's basic Chapter

3 11 confirmation law.  It's not anything highly

4 technical.  Every person in this room deals was that in

5 almost every case.  Almost every case is a cram down

6 case.

7          THE COURT:  I'm not, let's move on.

8          MR. SMITH:  All right.  Your Honor, on the

9 second issue I raised in my brief --

10          THE COURT:  Well, the first issue you raised

11 in your brief.  The first issue you didn't raise in

12 your brief.  Be absolutely clear about that.

13          MR. SMITH:  Your Honor, the first issue I

14 raised in the brief, and I'm not going to reiterate

15 every issue, is the prepaid interest issue.  And the

16 plan says that this is a compromise.  It says it's a

17 compromise and in return for the compromise, the direct

18 lenders are giving up, or the debtor is releasing

19 claims to, against the direct lender for fraudulent

20 conveyance, and perhaps other legal remedies.

21          The problem with the compromise is there's

22 never any compromise agreement.  We never signed

23 anything.  The compromise is intended to be effectuated

24 by the plan.  The compromise was negotiated by the

25 committee.  The people effected by the compromise --

Page 70

1           THE COURT:  Why, why do you have to have a

2 separate agreement as opposed to what's in the plan?

3 Let me address the one issue first.

4           MR. SMITH:  A compromise, I contend, is where

5 both sides have to agree; otherwise, you don't have a

6 compromise.  You can't have one side agree and not the

7 other.

8           THE COURT:  Okay.

9           MR. SMITH:  So the debtor is coming and

10 saying, "Here's the compromise."

11           THE COURT:  Uh-huh.

12           MR. SMITH:  I say where's the other side of

13 the agreement?  Did they sign anything, no.  Did they

14 sign a letter saying we want it, no.  There's no

15 agreement from the other side, the direct lender.  It's

16 not a compromise.  Now, Mr. Merola or whoever argues

17 may say, well, the compromise is in the plan, okay?

18 This is the compromise.  And when you vote yes for the

19 plan, then you're agreeing to the compromise and you're

20 agreeing to give up your prepaid interest.

21           What happens to the people that don't vote?

22 They never agreed to the compromise.  What happened to

23 the people?

24           THE COURT:  Well, why wouldn't they be deemed

25 to have voted much as a 363 sale, if you don't object,

1 you're deemed to consent.  And in a servicing agreement

2 on those who didn't vote.

3          MR. SMITH:  Because it's reversed, Your

4 Honor.  These are not people that are compromising

5 creditor claims against the estates.  If that were the

6 case, they would be bound by their class.  There's a

7 whole class of unsecured creditors who are treated in

8 the plan, you get 51 percent of the number, you get

9 66 percent of the amount, yes.  The whole class is

10 bound.  But now switch it and say now the estate wants

11 to recover money against all these people, all right?

12 And you say, okay, here's this class of people.  If

13 they accept a plan by requisite vote, the estate gets

14 to recover money from all these people?  It doesn't

15 work that way.  You didn't bind by an affirmative vote

16 in the class the estate's right to recovery money.

17 There's no law, there's no support for that in any way.

18          THE COURT:  Well, is not the point of the

19 plan, though, they don't recover them in the sense of

20 getting a judgment against them, it's netted against

21 future money.

22          MR. SMITH:  It's not netted.  It's taken.

23          THE COURT:  Let me back up a second.  Prepaid

24 interest.  You acknowledge that everybody that receives

25 what's euphemistically called prepaid interest, it

Page 72

1 wasn't interest, right?

2          MR. SMITH:  To the people who received it, it

3 was their normal payment.

4          THE COURT:  Wait a minute.

5          MR. SMITH:  They didn't know anything funny

6 was going on.

7          THE COURT:  I understand they knew, but the

8 point is they had no right to receive than money,

9 right?

10          MR. SMITH:  I don't know.

11          THE COURT:  How would they have had any

12 right, explain to me, the people that received this

13 money?  Their borrower was not paying, right?

14          MR. SMITH:  For a time, that's true.

15          THE COURT:  And we're only talking about

16 those people whose borrowers weren't paying, right?

17          MR. SMITH:  Right.  Right.

18          THE COURT:  So what right did they have to

19 receive money when their borrower was not paying?

20          MR. SMITH:  Well, Your Honor, I think it's, I

21 think you've switched it.

22          THE COURT:  Tell me what right did they have

23 to receive money?

24          MR. SMITH:  Because they actually received

25 the prepaid interest, had it in their possession.

Page 73

1          THE COURT:  What right did they have?

2          MR. SMITH:  No, no, no.  It's not what right

3 did they have to get it, they got it, okay?

4          THE COURT:  Okay.

5          MR. SMITH:  Whether it was a gift, whatever.

6 Even if it's a gift, you can't just give something to

7 somebody and say, whoops, I'm taking it back.

8          THE COURT:  How can a commercial company give

9 a gift?

10          MR. SMITH:  Your Honor, whatever they did

11 they made these payments.  And my position, look.  The

12 direct lenders have the money.  All right?  Okay.  You

13 say it's wrong, they shouldn't have gotten it.  So are

14 they just going to take it back?  You said all along in

15 this case, Your Honor, whenever the issue came up, you

16 said, we're going to hold the money.

17          THE COURT:  No.

18          MR. SMITH:  Subject to a future hearing to

19 decide, where we're going to, what rights the debtor

20 has to recover.  That theory never occurred.

21          THE COURT:  But under your theory, what you

22 claim to know as I understand it, under this plan is

23 what happens is if a person receives $12, just a number

24 as an example.

25          MR. SMITH:  That's not an example.  Okay.

1           THE COURT:  $20.  I don't care.  $200.  A

2 person receives $200, $200, and let's assume it's one

3 loan to make life simple and their borrower is not

4 paying.

5           MR. SMITH:  Right.

6           THE COURT:  Okay?  Let's assume their

7 borrower never pays another dime.

8           MR. SMITH:  Okay.

9           THE COURT:  And the property goes to

10 foreclosure and there's a first that's gotten ahead of

11 us and there's nothing left.

12           MR. SMITH:  I don't know why?

13           THE COURT:  Why isn't that possible when

14 we've seen that?  Some of these loans are done that

15 way.

16           MR. SMITH:  The majority of these loans are

17 not like that.

18           THE COURT:  Most unfortunately.  All right,

19 let's try this.  Let me go back.  They receive $200,

20 okay?

21           MR. SMITH:  Okay.

22           THE COURT:  Let's assume there's 20 borrowers

23 and let's assume there's a total of like $2,000.

24           MR. SMITH:  Right.

25           THE COURT:  So each person has some smaller

1 amount.

2          MR. SMITH:  Well, I don't.

3          THE COURT:  So why should that person be

4 allowed to get the money from the foreclosure and keep

5 the money they had before, and what happens to those

6 people whose money was used to pay the money they had

7 before?  Obviously, the money that they were paid

8 didn't come from heaven, it came from some other

9 borrower, maybe one of your borrowers.

10          MR. SMITH:  Or diverted principal.

11          THE COURT:  Diverted principal, that's right.

12 From what other borrower.  So why should the person who

13 got the money to which they were not entitled at all,

14 didn't come from the borrower, why should they be able

15 to keep that money without that being offset against

16 what they ultimately received?

17          MR. SMITH:  What they ultimately received.

18          THE COURT:  When the loan is finally paid

19 off.  When the loan pays off.

20          MR. SMITH:  First of all, I appreciate that.

21 Stop back and say let's just do what's fair here.  Make

22 it right for everybody.  And that as a general concept,

23 I think that's good.  The problem with it is

24 implementing it.

25          THE COURT:  Tell me the legal theory about

Page 76

1 why your person should be able to keep the money.

2          MR. SMITH:  The legal theory, it's not why

3 any people get to keep the money, it's why the estate

4 gets to get it back.  If I could just.

5          THE COURT:  Yeah.  Sorry, go ahead.  I

6 apologize.

7          MR. SMITH:  Okay.  They have the money.  You

8 order that it be set aside until this issue could be

9 resolved.  But it's their money.

10          THE COURT:  Wait, why do you say it's their,

11 oh, the current money.

12          MR. SMITH:  It's in their possession.

13 Everything they've been paid, whatever you call it, a

14 source, commingled funds, whatever, they were paid it

15 and they did have it.  So what you have said is, you

16 know what?  You shouldn't have gotten it, so we're just

17 going to take it back.

18          THE COURT:  No, we're going to net it back.

19          MR. SMITH:  Whatever.

20          THE COURT:  Under your theory when you say

21 they have to be sued.

22          MR. sMITH:  Of course they do.

23          THE COURT:  Your theory is each person has be

24 sued.

25          MR. SMITH:  Absolutely.

1             THE COURT:  Your theory, and the compromise

2 says we're not going to take it from you.  We're not

3 going to get a judgment against you if you get another

4 dime.

5             MR. SMITH:  Right.

6             THE COURT:  We're going to net against what

7 you get in the future.

8             MR. SMITH:  Oh, no.  That's not net.  When

9 you go out and take somebody's property, that's not

10 netting.

11            THE COURT:  Wait, wait.

12            MR. SMITH:  Netting is claims against each

13 other and you add up.

14            THE COURT:  Right.  They got $200 they

15 shouldn't have gotten.

16            MR. SMITH:  Right.

17            THE COURT:  Before you get 300 you hold back

18 200, that's netting.

19            MR. SMITH:  Right.

20            THE COURT:  Taking back is you sue them and

21 get a judgment.

22            MR. SMITH:  Right.

23            THE COURT:  To be satisfied against their

24 assets, right?

25            MR. SMITH:  Yeah, right.

1          THE COURT:  Under, now, what you're proposing

2 as I understand it, is that everybody should be sued

3 and therefore, well, that's what you're saying.  You're

4 saying you can't do it by compromise.

5          MR. SMITH:  No, no.  I'm saying that this is

6 a huge problem because, well, 7001 says you're going to

7 take property from another, you've got to sue.

8          THE COURT:  I understand.

9          MR. SMITH:  And it's been skipped.  You saw

10 it all along, Your Honor.  You said, you know what?

11 We're going to address the issue later as to how that

12 happened.

13          THE COURT:  I saw that, but the point is --

14          MR. SMITH:  And it hasn't happened.

15          THE COURT:  I understand that, but the point

16 is under your theory the compromise is not approved,

17 okay?

18          MR. SMITH:  Right.

19          THE COURT:  That means the estate --

20          MR. SMITH:  Well, I don't agree with that.

21 It's approved for the people that voted yes.

22          THE COURT:  Okay.  Do you agree the

23 compromise was approved for those who voted yes?

24          MR. SMITH:  I think that's probably Counsel's

25 opinion.

Page 79

1          THE COURT:  For those of you who objected

2 you're saying, "I don't agree"?

3          MR. SMITH:  Or didn't vote at all.

4          THE COURT:  Arguably so.

5          MR. SMITH:  Right.

6          THE COURT:  Let's just do your client for the

7 moment.  You might be right there, and I'm just

8 arguing.  What you're saying is, so I understand and I

9 guess so your clients understand, you're saying go out

10 and sue me now since there's no compromise.  That means

11 that not only can the estate argue, "We get the net,

12 but more importantly, we can get a judgment against you

13 for the amount that you received"?

14          MR. SMITH:  You know, I appreciate the

15 threats, and.

16          THE COURT:  Why isn't that the logical

17 extension?

18          MR. SMITH:  I'll tell you why, but the

19 problem with this is all these poor people, and they

20 are the poor people.

21          THE COURT:  I don't disagree at all.

22          MR. SMITH:  They've been cringing under

23 threats.  The plan has threats.

24          THE COURT:  But tell me why that isn't the

25 logical extension.

1          MR. SMITH:  Because, Your Honor, there's no

2 way in my opinion the estate can ever recover prepaid

3 interest if they sue, from these people.  And I'll tell

4 you why.  It's is not a fraudulent conveyance.  And

5 even though the plan says fraudulent conveyance,

6 interestingly enough, you'll note in the recent

7 pleadings filed by the debtor and the plan proponents,

8 it's not even mentioned.  There's no discussion of

9 fraudulent conveyance because it doesn't exist, because

10 when --

11          THE COURT:  Well, if there is a fraudulent

12 conveyance there would be a judgment against your

13 client for the amount.

14          NR. SMITH:  Right.

15          THE COURT:  Not just netted, there would be a

16 judgment against them, correct?

17          MR. SMITH:  Why, sure, there would be.

18          THE COURT:  Okay.

19          MR. SMITH:  Now, what has happened, instead

20 of saying fraudulent conveyance because it's

21 acknowledged in the brief, I think on page 25, but that

22 fact is clear.  You want a fraudulent conveyance you

23 have got to bring an adversary hearing.

24          THE COURT:  Okay.  Fine.  That's what I'm

25 saying, is the claim has already been modified to say

Page 81

1 fine.  Everybody that objects, or maybe voted no, the

2 estate is going to sue, retains the right to sue.

3          MR. SMITH:  Right.

4          THE COURT:  And if you sue on a fraudulent

5 conveyance theory, is it not true that if they win,

6 they get a judgment against your clients, not merely a

7 netting, not merely we're holding this money back?

8          MR. SMITH:  The only thing you're going to

9 get is the same prepaid interest that you already took.

10 I mean, what else?

11          THE COURT:  No, but the point, under netting

12 what happens is the money is offset against what will

13 be in the future.

14          MR. SMITH:  Right.

15          THE COURT:  If a judgment is against them.

16          MR. SMITH:  Right.

17          THE COURT:  A judgment is for X dollars.

18          MR. SMITH:  Right.

19          THE COURT:  Is to be satisfied under any

20 means in estate law.

21          MR. SMITH:  Sure.

22          THE COURT:  But in the compromise and I need

23 to clarify what the Diversified Fund is requesting,

24 because that may request a compromise.  Under the

25 compromise, the right to sue and get a judgment against

Page 82

1 them is foregone for a process of netting.

2          MR. SMITH:  Right.

3          THE COURT:  Now, let me see if that is indeed

4 correct.  I'm concerned about the Diversified

5 reservation of rights.

6          MS. FREEMAN:  Your Honor, first with respect

7 to the individual direct lenders.

8          THE COURT:  Um-hmm.

9          MS. FREEMAN:  The compromise provides there

10 will be a two-year period for netting out.  If in fact

11 we're unable to net enough money through the trust and

12 through the sales procedure, then there will be

13 individual proceedings, adversary proceedings against

14 the individual lenders if we need to.  There's the

15 option to do it.  It may not ever happen.  It may be

16 that there's enough money netted out and the remainder

17 will be so small it's not worth doing.  But to the

18 extent that there's going to be an action taken to

19 recover money that's in your possession right now, as

20 opposed to money that is coming in in the future

21 through netting, there will be individual adverse

22 proceedings.  They will have that protection before

23 money is taken from what is in their pockets today.

24          There's a two-year period of a tolling

25 agreement so that there's no action being taken against

Page 83

1 them now.  They'll just have netting, try to recover in

2 that method.  And only if it comes to the end of two

3 years and we need to go after someone with respect to

4 an adversary proceeding, there's the option to do it

5 under the compromise.

6           THE COURT:  Okay.

7           MR. SMITH:  That's what I understand, Your

8 Honor.  And my position is, sure.  You can say there's

9 netting.  There's another way of netting, too.  The

10 direct lenders that who receive these payments also

11 have funds diverted from them.  They also have netting

12 issues themselves.  And when you avoid having an

13 adversary proceeding you avoid addressing all those

14 issues.  You sort of ride rough-shod over the plan

15 confirmation.

16           THE COURT:  But why, I don't really know why,

17 why you insist on an adversary proceeding so your

18 clients will be sued?  I mean, I guess you'll represent

19 them all and be charged for it.  But why --

20           MR. SMITH:  Thanks again, Your Honor.

21           THE COURT:  I mean, I'm serious.  That's one

22 of the things we've been talking about.

23           MR. SMITH:  Do you have something against me

24 to make these kinds of comments?

25           THE COURT:  My point is whoever --

Page 84

1          MR. SMITH:  What have I done to deserve

2 those?  Here's my position.  I don't want anybody to

3 get sued.

4          THE COURT:  Well, then how do we avoid it?

5 You said in your objection they must do it by

6 adversary.

7          MR. SMITH:  I think my people who got prepaid

8 interest keep it, period.  And they can take their best

9 shot.

10          THE COURT:  No, you said it was to be done by

11 adversary.

12          MR. SMITH:  No.  If the estate wants to

13 recover anything, anything from anybody, they have to

14 do it by adversary.  There's no magic about that.

15          THE COURT:  Okay.  Now, let me ask the next

16 question.  You represent some people who had diverted

17 principal, correct?

18          MR. SMITH:  Correct.

19          THE COURT:  How did they, since their

20 principal was used to pay some of your other clients.

21          MR. SMITH:  Right.

22          THE COURT:  A, how is that not a conflict,

23 and B, how do the people whose money was diverted, get

24 that money back?

25          MR. SMITH:  Your Honor, as much as we try,

1 we're not God.  We can't make this those whole thing

2 fair for everybody.  And there's legal principles that

3 govern us.  And the people that have setup rights have

4 setup rights and the ones that don't, don't.  I can't

5 make it equal among all the people.

6           THE COURT:  But how can you represent

7 diverted funds of the people --

8           MR. SMITH:  Right.

9           THE COURT:  -- whose money went to pay,

10 presumably, maybe one of your other clients?

11           MR. SMITH:  That's, there's no way to get

12 that back.  It goes into the fund and it's commingled.

13 It's lost.  I don't know where it went.

14           THE COURT:  But the estate says, "We can get

15 it back through adversary.  They had no right to be

16 paid the $200."

17           MR. SMITH:  They can't get it back because

18 they can't trace money.

19           THE COURT:  There's no evidence of that.

20 There's no evidence the money can be traced.  None.

21           MR. SMITH:  Right.  That's what I'm saying,

22 so they can't say you got somebody's wrongful money.

23           THE COURT:  But the estate, there were people

24 who were paid money to which they weren't entitled.

25           MR. SMITH:  Right.

Page 86

1          THE COURT:  You're saying they have an

2 absolute right to keep it?

3          MR. SMITH:  Absolutely.

4          THE COURT:  Notwithstanding somebody else's

5 money was stolen to pay it?

6          MR. SMITH:  That's right.

7          THE COURT:  So in essence, even though your

8 client, one client A receives stolen goods from client

9 A, B receives stolen goods from A, B is stuck and A,

10 your other client, can't do anything about it?

11          MR. SMITH:  Well, I think anybody that has

12 prepaid interest is not liable.  I mean, the estate may

13 differ with me, but again, that's not before you today.

14 Your Honor, you keep interrupting me.  I don't know how

15 I can.

16          THE COURT:  How can you, how do you call it

17 prepaid interest?

18          MR. SMITH:  What?

19          THE COURT:  How do you call it, and I hate to

20 use that euphemism.

21          MR. SMITH:  Right.

22          THE COURT:  But how can you call it prepaid

23 interest?  Once again, let's assume he's got a loan and

24 this person never pays a dime of interest.

25          MR. SMITH:  Right.

Page 87

1          THE COURT:  How is prepaid interest, I mean,
2 by using this euphemism I think we've given the people
3 the idea that they had a right to it.

4          MR. SMITH:  Well, whatever.

5          THE COURT:  And they don't, do they?

6          MR. SMITH:  If you say they don't have a
7 right to it, are you going to go take it?  Can you do
8 that?  That's self help.  You need to have some way to
9 go get it.  You don't just go, here's the problems.

10          THE COURT:  So the estate has to sue them?

11          MR. SMITH:  The servicing agreement has cash
12 flowing through the servicing account.  It doesn't give
13 them the right to take the cash just because the
14 money's going through them.  So U.S.A. says, "Okay.  We
15 have got all the cash going through us and we think the
16 direct lenders owe us money.  Let's take it.  Let's go
17 to court."  And you say, "Well, you know what?  I don't
18 know yet.  So just hold it.  And then we'll decide
19 later."

20          THE COURT:  So you're saying --

21          MR. SMITH:  So here's the day of reckoning.
22 Right now.  You've held it until now.

23          THE COURT:  So you're saying it requires an
24 adversary and each of these people have to be sued.

25          MR. SMITH:  Oh, absolutely.

Page 88

1          THE COURT:  Okay.  So each of them have to be

2 sued, each of them have to retain counsel to do so?

3          MR. SMITH:  Well, I don't know about all

4 that.

5          THE COURT:  Well, why wouldn't they?

6          MR. SMITH:  Your Honor, it's not --

7          THE COURT:  Why wouldn't they?

8          MR. SMITH:  It's not highly technical.  It's

9 not a new issue.  If you are going to try to get money

10 from somebody out of the estate, then sue them.

11          THE COURT:  So you're saying each of your

12 clients need to be sued?

13          MR. SMITH:  I don't think it's fair to go

14 intimidate people and say if you don't agree, you are

15 going to get sued --

16          THE COURT:  I appreciate that.

17          MR. SMITH:  -- for fraudulent conveyance,

18 you're going to get sued for reclassification.

19          THE COURT:  Sure.

20          MR. SMITH:  You're going to get sued for

21 subordination.

22          THE COURT:  But what is the answer?  You're

23 the one that raised it in your pleading, is that they

24 must be sued.  And that's the only way to resolve the

25 issue, is through an adversary.  And I appreciate it.

Page 89

1 And you may be right, it's a legal matter.

2           MR. SMITH:  This is maybe going to come out

3 somewhere in writing.  I did not say my clients must be

4 sued.  I don't want them to be sued.  I'm just saying

5 you can't go take money without proper due process.

6 You can't.

7           THE COURT:  Okay.  But client A has their

8 money stolen from them, they want their money back.

9 How do they get it back?

10           MR. SMITH:  They bring an action.

11           THE COURT:  Against whom?

12           MR. SMITH:  Whoever has got it.  And then

13 whoever's got it has defends, as we do.

14           THE COURT:  Okay.  So they have to be sued.

15 So client A can sue client B.

16           MR. SMITH:  Only if the estate wants to take

17 the position that they're going to sue all the

18 investors, but if they think they need to sue all the

19 individual investors in order to make the pot bigger in

20 the bankruptcy, let them do it.

21           THE COURT:  But wait a minute.  You're acting

22 as if somehow there was enough money to go around.

23 There clearly wasn't, right?  In other words, the money

24 that was paid.

25           MR. SMITH:  I look at it like this.  Direct

Page 90

1 lenders are a little bit different than all the other

2 creditors in this case.  These are people whose names

3 are on trust deeds.  These are people that only U.S.A.

4 was supposed to only service their loans.  Wasn't

5 supposed to take anything.  All these people thought

6 that they were protected.

7              THE COURT:  Sure, and --

8              MR. SMITH:  Okay.  So Your Honor is saying

9 why should they be treated differently?  They bargained

10 for a completely different position.  They bargained

11 for a totally secured position as beneficiaries on a

12 note with a piece of property.

13              THE COURT:  But the problem was --

14              MR. SMITH:  And just because the estate needs

15 money to fund everybody does not mean these guys are

16 the targets.

17              THE COURT:  Wait a minute.  Wait a minute.

18 Your clients were paid when they weren't entitled to be

19 paid.  The deal was, wait a minute.  They only got paid

20 if the borrower paid.  The borrower did not pay and

21 they received money against Nevada law.  You are saying

22 there's, absolutely no consequences should fall to

23 someone who was paid outside of law or contract?

24              MR. SMITH:  No.  Number one, that's not

25 before you today.  There's no adversary proceeding.

1 It's not an issue before you.  You can't make that

2 decision today.  That's unfair of the direct lenders to

3 decide their rights.  That's number one.

4            THE COURT:  You're trying to tell me there's

5 no basis for this and the people have the absolute

6 right to the money?  I'm asking you what theory is

7 there for someone who had absolute no legal or

8 contractual rights to money?

9            MR. SMITH:  Okay.

10           THE COURT:  To refuse, to either allow the

11 money to be returned through netting and to demand that

12 they be paid, even though they received money they

13 weren't entitled to?

14           MR. SMITH:  First, let's say you come after

15 these people for fraudulent conveyance.  You said, "You

16 know what?  You got a gift.  You got a gift and you

17 didn't give anything back for it."  Here's a lender

18 thinking, "Oh, I just got my interest payment.  I got a

19 gift?  I didn't know that.  I thought I was just

20 getting a payment."  Well, guess what?  There is

21 consideration going back because I have a claim, just

22 like the United Energy case, Your Honor, which is the

23 Ninth Circuit decision I cited in the brief.  The

24 people that received the money have a claim against the

25 debtor for all different reasons, some of them diverted

Page 92

1 principal.  When they receive money from the debtor,

2 that claim against the debtor diminishes.  That's

3 consideration.  That's fraudulent conveyance.

4          Now, I don't think it's before you.  I don't

5 think I need to argue that right now, but if I had to

6 argue it --

7          THE COURT:  So your argument is it must

8 involve an adversary and I appreciate that, but the

9 people, which means the people must be sued.  I mean,

10 the alternative suggestion is don't sue anybody.  Hold

11 on.  You say don't sue anybody, and by the way, you

12 can't net.  Then what are the source of the funds of

13 the people that have diverted principal?

14          MR. SMITH:  The source of funds to get money

15 back to them?

16          THE COURT:  To pay the people with diverted

17 principal?

18          MR. SMITH:  Your Honor, whatever else is in

19 the estate.  There's a lot of money in there.

20          THE COURT:  What money?

21          MR. SMITH:  There's money from the Compass

22 sale, there's money from other sources, I don't know.

23          THE COURT:  So they're not entitled to get

24 back anything paid wrongfully to the people who got the

25 money?

Page 93

1          MR. SMITH:  That's right.

2          THE COURT:  Now, your diverted principal

3 people know this is your position?

4          MR. SMITH:  Your Honor is trying to put me on

5 the spot again.  I don't know why.

6          THE COURT:  Well, I think it's only fair.  I

7 mean, I've got a duty to enforce the conflict law.

8          MR. SMITH:  That's an issue unless you want

9 to consider my conflict of interest and try to

10 disqualify me.

11          THE COURT:  I'm just concerned.  You know,

12 we've got these allegedly 300, 400 people.  The reason

13 we've got committees is for the very problem of this.

14          MR. SMITH:  Every committee has a problem.

15          THE COURT:  And there's a fiduciary duty for

16 committees.

17          MR. SMITH:  Every committee has a conflict.

18 They represent a span of people, too, just like me.

19 And everything you say to me, every committee faces.

20 I'm no different.

21          THE COURT:  But they have a fiduciary duty.

22          MR. SMITH:  There's so many people here.

23          THE COURT:  I appreciate that, but I want to

24 be clear.  When these people have said, "I want you to

25 represent me."  And it's not you, it's anybody.  It's

Page 94

1 such a difficult case and it is the differing

2 interests.  We have, the bar rules are specific that

3 you can't represent creditors with different interests

4 unless they have validly consented.  And when you're

5 telling me that all these people say this, I guess I

6 want some assurance that they understand that you may

7 be robbing Peter to pay Paul.

8           MR. SMITH:  I guess, you know.

9           THE COURT:  That's all.  I'm concerned.

10           MR. SMITH:  I think what they know and they

11 understand as they read this is, "Gosh, if I don't

12 agree to this plan, there's not going to be a servicing

13 agent," as they've been told:  I'm going to be sued for

14 fraudulent conveyance," as they've been told.  "And

15 surcharge, and I'm going to face some horrendous

16 lawsuit in federal court."  I don't think that's right,

17 either.  That's really what has intimidated a lot of

18 people into voting yes.  Instead of saying, you know

19 what?  Here's the situation.  You have prepaid

20 interest, right?  You don't have to give it up.  You

21 can wait for a legal action.  Here's your risks in a

22 legal action.  You can take that position or you can

23 vote yes, in which case you voluntarily are giving up

24 your prepaid interest.

25           THE COURT:  Well, isn't that what the plan

Page 95

1 did?  Oh, no.  You're saying it was a compromise.  So

2 you are saying if the plan is amended that the estate

3 has the immediate right to sue those people who

4 objected and that satisfies your concerns?

5          MR. SMITH:  You keep saying it that way, so

6 it looks bad.  And I appreciate that.

7          THE COURT:  But isn't that your legal

8 position?

9          MR. SMITH:  Well, I think it would be stupid

10 for the estate to sue my people.  So no, I don't

11 believe that at all.

12          THE COURT:  Isn't it the legal position you

13 follow?

14          MR. SMITH:  My legal position is, just so I'm

15 clear, is you can't take money just because you want

16 it.  You can't take money because it's in your hand and

17 say I got this money from my servicing agent and I'm

18 going to keep it because I got it.  And you know, I

19 think they owe me, so I'm going to keep it in my

20 possession.

21          THE COURT:  Wait a minute.  There's no

22 legal --

23          MR. SMITH:  How is that different than what

24 these debtors did pre-petition that everybody is

25 complaining about?  They got money in their hands,

Page 96

1 yeah.  They have it.  Do they have the right to keep

2 it, use it for their purposes?  No, they can't do it.

3            THE COURT:  Because nobody was ever paid at

4 that time.

5            MR. SMITH:  What?

6            THE COURT:  Because your clients received,

7 fact.  Your clients received money to which they had no

8 contractual right to receive, right?

9            MR. SMITH:  Maybe.

10            THE COURT:  Why do you say maybe?

11            MR. SMITH:  Maybe it's diverted.  Look.  How

12 do we even know it's the debtors' money that paid the

13 prepaid interest?  You don't know where it came from.

14 You are saying the debtor gets this back?  You don't

15 know it starts from the debtor.  It could have started

16 from prepaid principal.  Maybe it's a trust account.

17            THE COURT:  No, it's my understanding, in

18 other words, the borrower, we know the borrower didn't

19 pay, right?

20            MR. SMITH:  Right.

21            THE COURT:  And if the borrower didn't pay,

22 okay, and your client received money on account of that

23 loan, right?

24            MR. SMITH:  Right.

25            THE COURT:  Ergo, your clients had to receive

Page 97

1 it from some source other than the borrower, right?

2          MR. SMITH:  Right.

3          THE COURT:  Okay.

4          MR. SMITH:  So who's going to sue them?

5 Commercial Mortgage?  Why do they get the right to sue

6 them?  Why isn't it Diversified?

7          THE COURT:  So it's Diversified, sure.

8          MR. SMITH:  Why isn't it the same people

9 whose money got stolen?

10          THE COURT:  So Diversified, but the point

11 is --

12          MR. SMITH:  Commercial Mortgage can't sue

13 them because they can't say it's their money.  They

14 don't know.  It's commingled.  So do they get to say if

15 it's commingled it's, everything, every penny in there

16 is ours?  I guess it's their position.  So there's a

17 hundred thousand dollars and $10 is commingled, so you

18 know what?  The whole hundred thousand dollars is our

19 money.

20          THE COURT:  So my loan, was Diver, my

21 borrower paid off, okay, Diversified.  This happened to

22 Diversified.  My borrower paid off, it paid me.  I

23 didn't get a dime of that.

24          MR. SMITH:  Right.

25          THE COURT:  You're saying I can't sue the

Page 98

1 people that received the money?

2          MR. SMITH:  Your Honor, I'm not saying you

3 can't sue anybody, but I don't know what your legal

4 remedy is.

5          THE COURT:  Well, how about recovery of the

6 money that was illegally paid out?

7          MR. SMITH:  Outside fraudulent conveyance

8 doesn't work.  Are you going to say recoupment?  Now

9 that is a big issue altogether.  That came up Saturday

10 morning at 2:00 a.m.  The first time any written --

11          THE COURT:  Sorry, you missed a lot of

12 hearings on that.

13          MR. SMITH:  No, I read that.  It hasn't come

14 up in connection with this confirmation process.  I

15 know it came up before, but it's never been argued,

16 it's not in the plan, not in any previous brief that

17 recoupment, not Fraudulent conveyance, recoupment is

18 the way that we really were entitled to get this money

19 from the direct lenders.  And that's now the position.

20 And the position for recoupment was --

21          THE COURT: I know you came in late, but that

22 has been argued like five list stay hearings.

23          MR. SMITH:  Did you decide it?

24          THE COURT:  Yes, I said as far as netting

25 there's a good chance of recoupment.

Page 99

1          MR. SMITH:  Your Honor, if you decided it

2  unequivocally, I'll stop right now.

3          THE COURT:  Well, I didn't.  If you look at

4  the transcripts I thought I said was the issue was

5  reserved, but it looks like recoupment is a valid

6  basing to allow netting at this stage.  And that there

7  is another lift stay because it may be that recoupment

8  is the answer.

9          MR. SMITH:  Well, when I saw you mentioned

10 that in that order, you said that you would table that

11 matter until it was properly before you.

12         THE COURT:  Sure.  Oh, I have not decided.

13 What I'm saying is the issue of recoupment has been

14 fully raised in those hearings.  I'm not saying you are

15 correct.  I'm not saying it is allowed, but it's

16 clearly been a legal issue that's been pending for at

17 least five months.

18         MR. SMITH:  That's fine, Your Honor.

19         MS. JARVIS:  Your Honor?

20         MR. SMITH:  Could I finish my argument before

21 being interrupted?  I don't mean you, I mean others.

22         THE COURT:  Yeah, sure.

23         MR. SMITH:  You can interrupt me, Your Honor.

24 I want to spend a moment on recoupment.  I know why

25 it's brought up at this last moment.  The reason it's

Page 100

1 brought up is because recoupment doesn't require an

2 adversary proceeding.  And it doesn't require an

3 adversary proceeding because it's not a process that

4 allows you to go get something.  That's not what

5 recoupment is.  Recoupment is a defense.  I didn't

6 brief this issue, you're right, because the first time

7 I saw it --

8          THE COURT:  I'll admit it was in your

9 opposition.

10          MR. SMITH:  Thanks.  I've looked, every Ninth

11 Circuit decision I have on it is contrary to what is

12 stated here.  Recoupment is a defense, Secal Investment

13 case, Ninth Circuit, 1998 it's not a claim or a debt,

14 In Re Madigan, Ninth Circuit, 2001, it cannot be used

15 defensively to seek recovery of property.

16          THE COURT:  Aren't they saying we're not

17 going to pay you this net payment, a defense of this

18 payment, because you owe us money?

19          MR. SMITH:  It's not their money to deal

20 with.  That's why I say, they're only servicing people.

21 It's not their money.  They collect it and send it on.

22 Just because it passes through them they can't say, oh,

23 we're going to hold on to this one and recoup.

24          THE COURT:  So let's assume we have a

25 straight mortgage company case.  And let's assume that

1 we don't have any fraud.  Let's assume that one month

2 I'm the servicer, Mrs. Jarvis is the borrower and

3 Mr. Merola also has a loan and I pay Mr. Merola instead

4 of you by mistake.  Innocent mistake.  The numbers are

5 reversed.  Let's assume he's also entitled to receive

6 money on a different loan.  Are you saying as a

7 servicer I can't then hold back that payment?  It's not

8 that he has to pay it back, it's just that I then hold

9 that payment.

10          MR. SMITH:  I think you owe Mr. Merola a call

11 if you are going to do anything that affects the

12 property rights.  I think you explain it to him, say

13 here's what's happening, he probably agrees.  He

14 doesn't agree, you can't take somebody's property, I

15 don't care what excuse you have.

16          THE COURT:  So I can't hold back the next

17 payment, even if he was wrongfully paid?

18          MR. SMITH:  No.  Of course not.  You have no

19 right to do that.  Like I was telling my associate it's

20 like a gardener that comes on your property who's

21 mowing your lawn.  And he says you owe him $500 for

22 something else and he sees, he's on your property

23 legally and he sees a nice piece of equipment there.

24 He goes, "That's worth about 500 bucks, I'm going to

25 take it.  I'm on your property, you owe me the money,

1 why can't I take it?"  Because you can't.  You have no

2 right to do that.  It's a self help and that's not what

3 recoupment is.  It's not a self help remedy.  Every

4 single Ninth Circuit decision says that.

5          Recoupment is a netting of a claim.

6 Recoupment is a defense.  Recoupment is not a way to

7 collect money and there's not a single case that says

8 recoupment is a way to collect money.  It's a defense.

9 And that's why it's not listed in 7001 as an adversary

10 proceeding, because it's never intended to be used

11 affirmatively.

12          THE COURT:  I need to go back to something

13 you said before, about you said the lenders are afraid

14 of the threat that if the plan's not confirmed, there

15 will be nobody to service it.

16          MR. SMITH:  Right.

17          THE COURT:  Why did you say that's not true?

18          MR. SMITH:  Well, I could turn that around

19 and say why it is true.  I mean, I don't know why, you

20 know, I raised that issue at the time of the sale to

21 first Silver Point and then Compass because I don't see

22 why it has to be connected to the plan.

23          THE COURT:  But they are.

24          MR. SMITH:  I don't see why you can't find a

25 servicer.  I understand the concept of why it was done

Page 103

1 here.  Sure, there might be no servicer under this

2 particular scenario, but to say, are you saying all

3 these talented people here can't find a servicer for

4 the loans?

5          THE COURT:  They've tried for eight months.

6          MR. SMITH:  Well, I've been advised of

7 several and I don't remember the names in Las Vegas

8 that are willing to take over as just servicer.

9          THE COURT:  Okay.  If this plan is not

10 confirmed there will not be a servicer unless there is

11 a separate sale under servicing rights, correct?  I

12 mean, correct?

13          MR. SMITH:  If this plan is not confirmed the

14 debtor will keep servicing this and there will be some

15 negotiation to try and fix the problem.

16          THE COURT:  Where does the debtor have the

17 money to service, because you said they can't net.

18          MR. SMITH:  Your Honor, are you saying

19 there's no money in the estate to handle the service

20 fees?

21          THE COURT:  You're saying they can't net and

22 you're also saying your clients only have to pay

23 service fees, you're also saying your clients only have

24 to pay one percent servicing fees?

25          MR. SMITH:  Your Honor, there's enough money

Page 104

1 in the estate to pay the servicing.  I think my clients

2 are still paying servicing fees.

3          THE COURT:  You have nothing to offer in the

4 way, you have no evidence.  So you're just speculating

5 that somebody else would provide the servicing.

6          MR. SMITH:  Well, just the same as you're

7 speculating no one else would.  There's no evidence

8 either way.

9          THE COURT:  Okay.  But you said there was a

10 threat, there would be nobody to service the loan.

11          MR. SMITH:  It's clearly a threat.

12          THE COURT:  But the plan is not confirmed

13 there will not be at this stage, right?

14          MR. SMITH:  There will not be?

15          THE COURT:  Somebody to service the loans.

16          MR. SMITH:  Theoretically, Compass to service

17 the loan.

18          THE COURT:  Right.  And you want the case

19 converted, so there wouldn't be anybody to service the

20 loans.

21          MR. SMITH:  I don't want the case converted.

22          THE COURT:  I thought that was one of your

23 positions.

24          MR. SMITH:  No, never.  Never taken that

25 position.

1          THE COURT:  Ms. Chubb wants the case

2 converted.

3          MR. SMITH:  I want, maybe I should back up

4 just so it's clear what I want.  I'm not sure to just

5 throw a monkey wrench in the works and say everything,

6 just go you know what?  Everybody start over.  I think

7 some things need to be changed.

8          THE COURT:  Have you tried to talk to

9 counsel?

10          MR. SMITH:  A little bit.  Who do I talk to?

11 Thee's so many people here.  I spoke to Mr. Garman and

12 I spoken to some of the others.  I don't think there's

13 any interest in negotiating with us because the plan

14 was imminent and was set before you and it's going

15 forward today.  And there's a lot of momentum and a lot

16 work and a lot behind this plan, and I don't think my

17 tiny little objection really received much

18 consideration at this point.

19          THE COURT:  I resent that.

20          MR. SMITH:  Not from you, I'm just saying

21 just, I appreciate that, but from the group as a whole

22 I don't think they looked at it and said, "Oh, this is

23 very intimidating.  We should talk to Mr. Smith and see

24 if we can do something that might satisfy his clients

25 and be a good compromise for the direct lenders."  No,

Page 106

1 it hasn't happened.

2          Your Honor, just to finish up recoupment.  In

3 the brief that was filed on Saturday by the debtors in

4 support of it they say the single transaction is the

5 servicing agreement.  Not true.  The servicing

6 agreement is only a servicing agreement.  The

7 transaction is the loan.  If you are going to

8 recoupment, it has to be within that loan.  You can't

9 cross the borders and say you've got something here and

10 I'm going to recoup it from some other loan over here.

11 Recoupment is a single transaction.  All the cases say

12 that.  It has to be within one transaction.

13          MR. MEROLA:  Your Honor.

14          THE COURT:  Please, Mr. Merola.

15          MR. SMITH:  Can I not be interrupted?

16          MR. MEROLA:  Well, Your Honor.

17          THE COURT:  Please, let him finish.

18          MR. SMITH:  And see, Your Honor, here what's

19 been done is across the border recoupment comes from

20 one, say a person has five loans.  And if there's

21 prepaid interest on one loan that has to be recovered,

22 it's taken from another loan.  It can't be done that

23 way.

24          THE COURT:  Well, they all got paid with one

25 check.

Page 107

1          MR. SMITH:  Maybe five different loans.

2          THE COURT:  Right.

3          MR. SMITH:  Setoff says it's person versus

4 person.  Direct lender, debtor, setoff.  Recoupment

5 says one transaction has to be within the one loan.  If

6 you are going to recoup, it has to stay there.  The

7 servicing agreement doesn't give you broad brush to say

8 I'm going to recoup whatever there is.  That's not

9 recoupment.  So, Your Honor, for all those reasons and

10 I know it's not before you, you're not deciding

11 recoupment today.  You can't because there's no

12 adversary proceeding, defenses haven't been raised.

13 This is just a plan confirmation.  What they've said is

14 this compromise is good because otherwise, we would

15 recoup.  I'm saying recoupment is completely

16 unavailable.  It just doesn't work.

17          THE COURT:  Okay.

18          MR. SMITH:  Your Honor, the last thing I

19 wanted to raise, last thing I wanted to raise was I had

20 some other issues.  I know you read the brief.  A lot

21 of people are here and I don't want to waste time on

22 it.  One issue is I really feel strongly that legal

23 action should have been brought against IP partners

24 Milanowski and Hanges properties, that they all have,

25 should have been tied up to protect the estate.  For

Page 108

1 reasons unknown to me that has not been done.  I don't

2 think it's right to say, "Okay.  We're done here.

3 Let's just turn to it over to the liquidation agent,

4 liquidation trustee and let him take his best shot."

5          The problem is I don't know what's happening

6 in this interim period to the various properties.  I

7 think it's something that should be done right now,

8 like tomorrow.  Lawsuits should be brought, lis pendens

9 should be filed, every property should be secured.

10          THE COURT:  Now, you know there's been two

11 involuntaries filed.

12          MR. SMITH:  Yeah.  But there's been no acton

13 and no lis pendens against the properties.  My primary

14 concern is the lis pendens so we know that there's not

15 payoffs that are going somewhere else, loans that are

16 going on or money taken out.  I assume that that's why

17 the 2004 examinations were scheduled at the last minute

18 before the confirmation hearing.  But I certainly think

19 that should have been a part of the plan.  If you ask

20 me what I want, it's not conversion, I want the plan to

21 be modified to do certain things.

22          THE COURT:  What would you modify the plan to

23 do?

24          MR. SMITH:  I would modify the plan to say

25 everybody that receives prepaid interest keeps it, or

1 if that doesn't work, everybody that receives prepaid

2 interest get a setoff against diverted principal,

3 because people that are direct lenders in this position

4 are not general unsecured creditors.  They are at a

5 different level.  They bargain at a different level,

6 they have different rights than unsecured creditors.

7            THE COURT:  But again, under your theory

8 anybody that has, diverted principal has absolutely no

9 right under your theory to recover the money that was

10 diverted to direct lenders.

11            MR. SMITH:  Well, you can't trace it.  You

12 don't know where it went.

13            THE COURT:  So you're not even going to give

14 them the opportunity?

15            MR. SMITH:  The people with diverted

16 principal that have prepaid interest, they keep the

17 prepaid interest which was going to net some of that to

18 the extent --

19            THE COURT:  Wait.  You said no netting.

20            MR. SMITH:  No, I said you can't collect the

21 prepaid interest.  So the people with diverted

22 principal that keep the prepaid interest are getting

23 some recovery.  To the extent they don't get all the

24 recovery, they have a claim for the remaining diverted

25 principal against the estate that, I've been told there

Page 110

1 are a lot of assets in there.  That's what's in the

2 pleadings that have been filed.  So they get whatever

3 they get there.

4          THE COURT:  All right.  Other opposition?

5 I'm sorry.

6          MR. SMITH:  I wasn't quite finished.

7          THE COURT:  I apologize.  I thought you were

8 done.

9          MR. SMITH:  I don't want to take up too much

10 of your time.  And I apologize, but it's partly your

11 fault, too, Your Honor, for asking for more questions.

12          THE COURT:  You're right.

13          MR. SMITH:  The last thing Your Honor, is I

14 wanted to mention the servicing agreement and whether

15 they're executory.  And you asked me what I want.  Just

16 so you know that I'm not being obstreperous, I want the

17 direct lenders to be able to say, "We don't like

18 Compass."  Maybe they do like Compass, but I want them

19 to be able to say, "We don't like Compass.  We don't

20 like what they're doing, we want to terminate the

21 servicing agreement."

22          THE COURT:  Well, you know they have the

23 rights.  They keep the rights.  So once it's

24 transferred, if they meet the requirements of the

25 51 percent.

1          MR. SMITH:  I appreciate that.

2          THE COURT:  They can terminate.

3          MR. SMITH:  You said that before.

4          THE COURT:  Is that not the case?  Everybody

5 agrees that's the case?

6          MR. SMITH:  Everybody agrees, but.

7          THE COURT:  Okay.  So what's the problem

8 then?

9          MR. SMITH:  Does everybody agree?

10         THE COURT:  There's a provision in the sale

11 agreement expressly provides the LSA's are not

12 modified.

13         MR. SMITH:  That's not my question, as

14 Mr. Merola knows, and the question is can 51 percent of

15 the people terminate Compass if they wanted to.

16         MS. CARLYON:  If there's an agreement that is

17 not in breach, the contract says no, that's why we keep

18 telling Mr. Smith the agreements are what they are.

19 We're not giving more rights or giving less rights than

20 under the contract.

21         MS. FREEMAN:  Your Honor, there was a dispute

22 early on and the court will recall from the copies of

23 the language up on the boards as to when you really do

24 have a right to terminate with 51 percent or if that's

25 only if the servicing agent has not taken action to try

1 to collect the money, and only then do you have a right

2 to terminate.  That legal issue was never finally

3 decided.  The contracts are what they are, to the

4 extent you have rights to terminate.  You still have

5 rights terminate.

6           MS. JARVIS:  Your Honor, he's not reached the

7 hundred free and clear of the scenario.

8           THE COURT:  Yeah, but that's been stated in

9 the brief, but that has nothing to do with the debtor

10 pre-petition defaults under the servicing development.

11 That's what it says in the brief.  And unless I'm

12 wrong, at least it's agreed that the direct lenders are

13 entitled to raise the debtors pre-petition default

14 under the grounds of terminating the servicing

15 agreements.  Am I accurate in that?

16           MR. DAVIS:  George Davis with Compass.  It's

17 our understanding we are purchasing these assets free

18 and clear of all liens, claims, encumbrances and

19 interests to the extent that, that's why we're paying

20 the purchase price we're paying and that's why the

21 estate has been able to benefit from the auction

22 process.  To the extent we post-closing default on any

23 obligations and those give rise to rights of the

24 counterparties to take action, absolutely.  They have

25 the full panoply of rights they have under applicable

Page 113

1 law and under the contract.  To the extent there are

2 preclosing defaults of parties other than us, we take

3 free and clear of those.

4          THE COURT:  I see.  Thank you for the

5 clarification.

6          MR. SMITH:  I don't see how that's possible.

7 You know, when I brought this up at the hearing before

8 the sale you said that they take subject to any

9 defaults that pre-existing their taking over.  I don't

10 she how you wipe the slate clean and say now you've got

11 these contracts and forgot about what defaults the --

12          THE COURT:  So you understand now, under your

13 position the sale agreement is not consummated.

14 There's no money received in the estate for either FDT

15 fund or servicing.

16          MR. SMITH:  And why is that?

17          THE COURT:  Because if they're taking free

18 and clear and they don't close because you say they're

19 not taking free, because I, you claim they have to be

20 assumed and assigned, there is no sale, there is no

21 sale.  You understand that.

22          MR. SMITH:  Well, no, because Your Honor, I

23 asked you this at prior --

24          THE COURT:  And I said it was an issue of

25 confirmation.

Page 114

1            MR. SMITH:  No, you said they'd be subject to

2 whatever defaults exist prior to the same and all

3 parties were present in the courtroom.

4            THE COURT:  I said the contracts are what the

5 contracts are.

6            MR. SMITH:  Right.  And you can't wipe clean

7 the pre-sale defaults, what legal theory allows you?

8            THE COURT:  So you understand, it's their

9 position then if that's the case, that they didn't

10 acquire the servicing rights because they're not free

11 and clear and there's no money coming into the

12 servicing rights to the FDT funds.  Just so you

13 understand that.

14            MR. SMITH:  Is it their position the direct

15 lenders are stuck with them interest as far as whether

16 or not they want it or not?

17            THE COURT:  Why else would you be selling?

18 Of course, if they default they have the right to

19 change it.

20            MR. SMITH:  So that is their position and

21 that's the problem we have.  You get stuck with

22 somebody you never bargained with, don't know anything

23 about to service their loan.

24            THE COURT:  You have 51 percent regardless of

25 what you do.

Page 115

1        MR. SMITH:  If I have 51 percent and there's

2 been a pre-petition default, can I terminate the

3 servicing agreement?

4        THE COURT:  It's the position.  Let me

5 understand what your position is.

6        MR. MEROLA:  I can give, Frank Merola on

7 behalf of the First Trust Deed Committee.  The buyer

8 certainly contends that it's free and clear.  There is

9 very carefully negotiated specific language in the ATA

10 that says it is free and clear.  Page 42 to 43, heading

11 G of the brief.  The free and clear language, however,

12 refutes the premise of objection as it does not include

13 any reference to the terms and conditions of the LSA.

14 Specifically section 5.2 of the Compass ATA provides in

15 relevant part, that an order approving the sale shall

16 include a provision, open quote, providing that the

17 sale of the assets to the purchaser shall be free and

18 clear of all liens, claims, interests, obligations and

19 encumbrances whatsoever under section 363 of bankruptcy

20 code and any other applicable sections of the

21 bankruptcy code.

22        What we have here is an agreement to

23 disagree.  Whatever that free and clear language means,

24 he's going to go to state court and contend one thing,

25 he's going to go to state court and contend another.

1 In fact, in their original asset purchase agreement,

2 Compass asked for a provision in the order that said

3 that pre-petition defaults could not be used to

4 terminate the agreements.  We struck that in the

5 version of the ATA and they accepted it.

6           THE COURT:  Okay.

7           MR. GORDON:  Gerald Gordon on behalf of the

8 of the Direct Lenders Committee.  Mr. Merola just

9 stated what we were going to talk about at recess, but

10 that is correct.  We understand and agreed that as

11 successor loan servicer they take no liability

12 whatsoever for any monetary claims or damages.  Clearly

13 that stays with the estate.  On the other hand, if

14 there was a pre-petition default on the part of U.S.A.

15 CM which could result in a termination, that issue

16 survives because the obligations are being transferred.

17 That is the issue of transfer.  As part of the

18 compromise the transfer issue that survives.  I'm not

19 saying they exist.  As Miss Freedman says, it is what

20 it is.  That issue can be taken up at a later day.  And

21 therefore, we're not making a determination whether

22 they have a right or whatever, that's simply, that

23 issue survives another day.

24           THE COURT:  Okay.

25           MR. SMITH:  Your Honor, I think that's what

1 you've said in the presence of both Silver Point and

2 Compass in the auction hearing.  In fact, when Mr.

3 Merola cited a brief for the debtors, he didn't read

4 the next sentence which says that the free and clear

5 sale, quote, "Does not include a transfer of free and

6 clear of the terms and conditions of the LSA's

7 themselves," which I think is clearly what we all

8 believed at the time.  So if there is a pre-petition

9 default and if 51 percent of the people elect to

10 terminate Compass, they can do so.

11         MR. DAVIS:  Your Honor, I think you can

12 understand from Compass' perspective why paying

13 $67 million and then taking the risk that the language

14 means whatever it means, and at court at some future

15 date will determine the quality of the assets that it

16 purchased is an unacceptable proposition.  The order

17 says free and clear of all liens, claims, encumbrances

18 and interest.  The language that was read clearly, we

19 are taking subject to the terms of the agreement that

20 we assume to the extent they give rise to rights

21 because of, you know, that arise post-closing.

22 Clearly, we take subject to that.  We're not seeking to

23 modify any of the agreements.  We are not going to take

24 them subject to existing default; otherwise, we're

25 purchasing nothing to the extent that the

Page 118

1 counterparties have the right to terminate those

2 agreements.  Or take the position that we don't have

3 the right to enforce them because of existing defaults

4 of the debtor.

5          THE COURT:  Okay.  It's obvious on this issue

6 this is something you need to discuss during the lunch

7 hour because, maybe I don't need to make a ruling on

8 it.

9          MR. MEROLA:  Your Honor, Compass set the

10 blood in the water and it's overreaching.  Section 7.3.

11 Of the purchase agreement says, "Nothing contained in

12 this agreement shall modify the obligations owed to the

13 lenders by the loan servicer or the right to lenders

14 under the loan servicing agreement."  And then the

15 other sentence says, this is from the asset purchase

16 agreement, "Nothing contained herein is intended to

17 waive any defense of the lender, or as the terms from

18 Commercial Mortgage assets, the sellers or the

19 successors under the servicing agreement."  He's

20 entitled to go into state court and contend the free

21 and clear language says what it says.  He's not

22 entitled to an advisory opinion of every possible

23 contingency that might affect the purchasing

24 agreements.  Those contracts are not amended.  They're

25 sold free and clear.

1            THE COURT:  I don't think I need to rule on

2 what the effect is because they're either executory or

3 they're not.  And whatever is transferred is what it

4 is.  So I don't think I need to rule as to what you may

5 recall.

6            MR. SMITH:  I think why --

7            THE COURT:  I understand why your cause came

8 in.

9            MR. SMITH:  I understand the 67 million is

10 very compelling.  Very compelling.  But I'm coming from

11 a totally different angle.  I'm coming from a bunch of

12 people who are not sure they want Compass as the

13 servicer.  They invested a lot of money, they

14 wrongfully picked U.S.A. Mortgage.  Now, yeah, they're

15 real cautious now.  They don't know what the agenda is.

16 Compass paid a lot of money for default interest and

17 they get a lot of money if the loans are in default.

18 On the other hand, these people simply want their loans

19 paid.  They're concerned that there may be different

20 points of view with Compass themselves.  They just want

21 their money back.  So they want the right to say,

22 "51 percent, we don't like you and we know that U.S.A.

23 is involved in pre-petition.  We want to terminate."

24 On the other hand, if Compass performs and they're

25 happy, they obviously need a loan servicer, they'll

Page 120

1 stay with them.

2          THE COURT:  All right.

3          MR. SMITH:  Could I have five more minutes,

4 Your Honor, then I'm done, then I don't have to come

5 back.  I have just one thing I wanted to raise as far

6 as the servicing agreements.  They are all executory.

7 Everybody knows it here.  They're clearly executory.

8 You have to run through a tortured legal argument to

9 come to the conclusion that they're not executory.

10          They're not like a promissory note where the

11 estate owes the debtor, the estate owes the direct

12 lenders money and there's nothing the direct lenders

13 can do.  There's not, that's the case.   There's things

14 on both sides to be done.  Clearly the direct lenders

15 have to a pay fee.  The fact that the servicer can

16 collect the fee from the loan income does not take it

17 out of the role of an executory contract.  Still the

18 fee is owed by the direct lender.

19          And as we just covered, the direct lender can

20 cancel.  That clearly makes it executory.  And

21 Mr. Kirby, who will stand up and address the court

22 later had two or three other reasons it is clearly an

23 executory contract.  And every time you mention it to

24 one of the attorneys they look down and shuffle their

25 feet and say, "Well, no, it's not executory."  Well,

1 they pretended like it's not executory so they don't

2 have to assume, cure, which means bring current all the

3 diverted principal, and assign to Compass and have

4 Compass provide adequate insurance of future

5 performance.  All those steps have been completely

6 skipped because we just arbitrarily say they're not

7 executory and they are.  That's wrong, Your Honor.

8         THE COURT:  Let me ask the practical question

9 which in a sense is unfair because it doesn't affect

10 your legal issue that you raised.  As a practical

11 matter under your theory, that's nothing left of this

12 case, right, because they can't sell the transferring

13 service, so they can't assume.

14         MR. SMITH:  Well, here's the problem I have.

15 You can't have it both ways.  And counsel for Compass

16 pointed out up here you can't say they're not

17 executory, so we're going to take them, transfer them

18 out.  And then after the transfer, oh, yeah, they are

19 executory, you can't cancel them, you can't do anything

20 with them.

21         THE COURT:  Just answer my question.  Under

22 your theory there's no way the servicing contract as a

23 practical matter, now put aside the legal issues, okay?

24         MR. SMITH:  Okay.

25         THE COURT:  As a practical matter there's no

1 way the servicing contracts could be sold, there'd be

2 no money coming in for anybody to be servicing, right?

3          MR. SMITH:  Your Honor, I can't tell from the

4 lies.  I mean, we can torture it and say something

5 else.

6          THE COURT:  As a practical matter, there's no

7 way the servicing contract can be sold and there's no

8 way that anybody as a group could get servicing done by

9 anybody unless 51 percent went out and found somebody,

10 right?

11          MR. SMITH:  No.  There's a lot of ways to do

12 it.  It was just done the wrong way.  It was done the

13 wrong way because it says they're not executory

14 contracts.

15          THE COURT:  Okay.  But the practice, and

16 you're right.  The practice is unfair.  As a practical

17 matter, you've been arguing practicalities to me.  As a

18 practical matter, what happened?

19          MR. SMITH:  I come to you with the same --

20          THE COURT:  As a practical matter, what

21 happened?

22          MR. SMITH:  As a practical matter, all of

23 these people don't want the servicer crammed down their

24 throats.  This is the practical matter.

25          THE COURT:  How did the 51 percent --

Page 123

1         MR. SMITH:  Whether they terminated or

2   whether you look at it as if it wasn't done properly,

3   it wasn't assumed, wasn't cured, wasn't assigned as

4   required by bankruptcy code, and everybody kind of

5   closes their eyes and says it's not an executory

6   contract and Compass stands up and says, "Oh, yes, it's

7   an executory contract.  You've got to pay."

8         THE COURT:  Let's assume, putting the legal

9   issue aside for a moment.  I want look at the practical

10  issue because you told me later that people are afraid

11  the servicing contract is being shoved down their own

12  throat, the converse being there is something else

13  there.

14        MR. SMITH:  Right.

15        THE COURT:  As a practical matter, if you are

16  correct that they're executory contracts, there's no

17  way they can be assumed.  But the point is there's not

18  enough money to pay back the diverted principal that

19  happened, and they can't be assigned, which means there

20  would be no nobody to service the loans, and that means

21  in order to get anybody's loan serviced, 51 percent of

22  the people would have to get together and find a new

23  servicer, right?

24        MR. SMITH:  Yes.

25        THE COURT:  Okay.

Page 124

1          MR. SMITH:  All I'm getting at through a

2  different angle is because the proper process was not

3  pursued, and everybody here knows it, that these

4  executive contracts were not assumed and assigned

5  according to the bankruptcy codes, that everyone who is

6  subject to Compass as servicing agent is going to have

7  the right --

8          THE COURT:  I would say everyone knows.

9  There's some good legal argument, so I don't think it's

10  fair to say everyone knows.

11          MR. SMITH:  Well, I read them all.  I think

12  they're tortured legal arguments, but I come to the

13  same result.  Everybody needs a servicer.  We all want

14  a servicer.  We just want to make sure, we've all gone

15  through one bad experience, we want to make sure that

16  Compass doesn't have a hidden agenda that is contrary

17  to our interests.  Compass paid a lot of money to do a

18  lot of things in this case.  On the one hand, maybe the

19  direct lenders don't care.  Maybe they care more about

20  having a really good servicing agent to make sure their

21  loans are collected, rather than the fact $67 million

22  are paid to the estate.  I mean, by and large, the

23  largest portion, three-quarters of this estate is

24  direct lenders.  They only want their money back.  They

25  don't care how much money, I'm sure they do, but they

Page 125

1 care more about getting their money back than they do

2 about how much money is raised to the estate to

3 distribute to unsecured creditors and everybody else.

4            THE COURT:  Now, we have an affidavit that

5 sets forth their ability to service loans.  And I have

6 nothing countervailing that.

7            MR. SMITH:  Well, your Honor, they haven't

8 done anything yet.  I'm just saying.

9            THE COURT:  How can they?

10            MR. SMITH:  They haven't started.

11            THE COURT:  Well, how can they?  The deal

12 isn't consummated yet.

13            MR. SMITH:  Yeah, exactly.

14            THE COURT:  Wait, a minute.  Wait a minute.

15 Wait a minute.  You're telling me that --

16            MR. SMITH:  I'm telling you these people,

17 maybe it's funny to a lot of people, but these people

18 do not know, and I hear all of the chuckling, there's a

19 lot of people out here that don't know Compass.  Are

20 you saying you rely on an affidavit to determine

21 conclusively whether or not they're a good servicing

22 agent or not?

23            THE COURT:  Well, have you done any

24 investigation?

25            MR. SMITH:  There's been some investigation

Page 126

1 on the Internet.  Some of my people have looked into

2 it.  Do they know?  No.

3           THE COURT:  I guess why I'm troubled about --

4           MR. SMITH:  Here's what I'm saying.  I'm not

5 saying I could say right now they're good or bad.

6           THE COURT:  Okay.

7           MR. SMITH:  Maybe they're excellent.  I just

8 want to have the right if we're not happy with them, we

9 have the right to get out.

10           THE COURT:  I guess what troubles me --

11           MR. SMITH:  I don't want to get stuck with

12 another person like U.S.A. --

13           THE COURT:  Sure.

14           MR. SMITH:  That has a hidden agenda.

15           THE COURT:  Exactly.

16           MR. SMITH:  And is using the money for some

17 ulterior motive to the expense of my people who don't

18 get paid on their loans.  That's all we want.  We want

19 to get paid on the loans.

20           THE COURT:  Exactly.

21           MR. SMITH:  And if it means give up default

22 interest so that we can get paid, we want default

23 interest given up.  I understand Compass paid a lot of

24 money for default interest.  Maybe they don't want to

25 give up default interest.

Page 127

1          THE COURT:  Wait, your client doesn't get the

2 default interest, anyway.

3          MR. SMITH:  Exactly.  My clients get paid.

4 Maybe, I'm not clear.  If Compass waits around and

5 collects default interest from my client's company.

6          THE COURT:  Default interest belongs to the

7 estate.  It doesn't belong to the direct lender.

8          MR. SMITH:  Let me give you an example.

9 Let's say the borrower, and I know this because the

10 borrower called me, wants to pay off his loan and

11 doesn't want to pay default interest.  The direct

12 lenders say, "Yeah.  Pay it off.  We want to get paid."

13          THE COURT:  But the--

14          MR. SMITH:  I'm sorry, one sec.  Direct

15 lenders say, "Pay it off.  We want our money."  Compass

16 says, "Hold on.  We want all the default interest

17 that's accrued, and every single penny of it.  If we

18 can't get it we want to foreclose."  We have a dilemma

19 here.  The direct lenders don't care about default

20 interest, they want their money.  Compass wants default

21 interest.  And all I'm saying is I don't want to be

22 stuck in a position, I don't want my clients to get

23 stuck in a position where the loan servicer cares

24 more --

25          THE COURT:  Sure.  Sure.

Page 128

1          MR. SMITH:  -- about collecting their default

2 interest than they do about collection the money for

3 the direct lenders.  We've been through this before,

4 Your Honor.

5          THE COURT:  Sure, but the default interest

6 doesn't belong to the direct lender under the

7 agreement.

8          MR. SMITH:  Absolutely.  It belongs to

9 Compass or the servicer, which is why they'd be

10 motivated to collect default interest.

11          THE COURT:  No, no, no, default interest

12 under the servicing agreement never belonged to the

13 direct lenders.

14          MR. SMITH:  I know that.

15          THE COURT:  Okay.  So again, for those

16 clients who had diverted principal who were relying on

17 this ton of money --

18          MR. SMITH:  Right.

19          THE COURT:  -- to pay their debt, you're

20 saying that your direct lenders should have the

21 absolute right to not even waive that issue and waive

22 their rights to direct?  Again, don't you have a

23 conflict here?

24          MR. SMITH:  Your Honor, you know, it's all a

25 conflict.

1          THE COURT:  And are you negotiating loans?

2          MR. SMITH:  Let's say I'm a direct lender and

3 I'm owed $500,000 on my loan, okay?  And I have an

4 unsecured claim in the estate and I'm going to get an

5 eight percent return on it.  My unsecured claim is

6 $100,000 and I'm going to get eight percent, $8,000.

7 You know what?  I don't care about the $8,000.  I want

8 the $500,000 loan paid.  And that's what every direct

9 lender is going to say.  They want their money.

10         THE COURT:  Sure.

11         MR. SMITH:  Do they care about an eight

12 percent claim, yes.  Do they care as much as collecting

13 on their loan, no.  No, they want their money.

14         THE COURT:  But I'm saying, what if one

15 client has just direct, diverted principal and doesn't

16 have a direct lender claim.  Aren't there some people

17 like that?

18         MR. SMITH:  Yeah.

19         THE COURT:  Okay.  So you're saying, "To heck

20 with those people, I don't care, even thought some of

21 them are my clients."

22         MR. SMITH:  Your Honor, people that have

23 diverted principal are also direct lenders.

24         THE COURT:  And you always ask them that?

25         MR. SMITH:  Every single one of them, you ask

Page 130

1 them, you say, "Do you care about your claim against

2 the, as an unsecured creditor?"

3          THE COURT:  No, I just asked you that

4 question and you said no.

5          MR. SMITH:  Oh.

6          THE COURT:  I said, "Aren't there some people

7 who only have diverted principal claims who were no

8 longer direct lenders?"

9          MR. SMITH:  No.

10          THE COURT:  Okay.  That was what I asked.

11          MR. SMITH:  No.  Thanks, Your Honor.  Thanks

12 for the chance to discuss it with you.

13          THE COURT:  All right.  Thank you.  Why don't

14 we take a recess for about 40 minutes and start at 1:00

15 with the next objector?

16          (Whereupon, a recess was taken.)

17          THE COURT:  Okay.  Next objector?

18          MS. JARVIS:  Your Honor, if I could just

19 quickly do a couple of other clean-up issues on the

20 record, the plan I think is intended to be clear, but

21 maybe not as clear as it could be with respect to

22 realty securities.  First Trust Deed Fund, the way it

23 is written is the debtors have the option to basically

24 turn over the finishing of the winding down of the

25 estates to the disbursing agent for the, or for the,

1 it's actually the first, the U.S.A. Commercial Mortgage

2 trust who then becomes the disbursement agent in

3 finishing the disbursements for those estates; however,

4 it's not to say it's the option the debtors, that's not

5 to say Mr. Allison won't be the responsible party for

6 winding down and completing the dissolution of these

7 estates.  So we'll just put a clarifying paragraph in

8 the order on that that's how it was intended to read,

9 but I think there was some concern it wasn't clear

10 enough.

11          That would also mean Mr. Allison would make

12 sure that with respect to any causes of action or

13 whatever needed to be or should be pursued in those

14 cases, that there would be that responsible party to

15 pursue those actions.

16          THE COURT:  Okay.

17          MS. JARVIS:  One other agreement we agreed to

18 we had, there was on the day of December 11th which was

19 the voting deadline, there was a complaint filed by the

20 Keels and some other parties with respect to asserting

21 new damage claims up to $19 million.  We've had

22 discussions with Miss Chubb who represents them and

23 reached an agreement rather than filing an objection to

24 those claims, that those claims would be voted on the

25 scheduled amounts which is $1.2 million, approximately.

Page 132

1 That at this point temporarily would make class A-4 an

2 accepting class, but there is still pending the motion

3 of Mr. Bunch which would be deciding that way.  And as

4 you know, we are going forward without that at this

5 point.

6            THE COURT:  Okay.  All right.  Next objector?

7            MR. KIRBY:  Good afternoon, Your Honor.  Dean

8 Kirby, Kirby & McQuinn for Debt Acquisition Company of

9 America.  I think I can be brief here.  Our opposition

10 raised two issues, basically.  One I think was

11 adequately dealt with by what transpired during Mr.

12 Smith's presentation, and that's the issue of the sale

13 free and clear of rights and defenses of counterparties

14 to the loan servicing agreement.

15            From what I thought I heard, Mr. Merola made

16 clear that the purchase agreement doesn't purport to do

17 that.  Neither does the plan, and I assume neither will

18 the confirmation order.  And that satisfies our client

19 on that point.

20            On the executory contract issue I want to

21 start by addressing the question the court had at the

22 conclusion of Mr. Smith's presentation, which is what's

23 the practical effect of finding that the loan servicing

24 agreements or executory contracts.  And we know what

25 the legal effect is.  And I don't think the debtor

Page 133

1 disputes this part, that if they're executory contracts

2 they can't be assigned unless they're assumed.

3         The plan in its present form therefore, can't

4 be confirmed because the plan expressly rejects all the

5 executory contracts other than the ones that are in the

6 schedule that the debtors file.  So what's the

7 practical effect of that?  There isn't enough money in

8 the Compass sale to pay all of the unremitted principal

9 claims, which would be the cure claims.  They're

10 executory in full.

11         So now what happens?  And I would suggest

12 that what happens is not that everyone abandons this

13 case and goes away and never thinks of it again, but

14 that some real negotiations take place between the

15 proponents of this plan and the parties who hold

16 unremitted principal claims.  Not to carve out or

17 provide special treatment for those who have objected,

18 but to find a number between treatment as generalized

19 secured creditors and one hundred percent prompt

20 payment.

21         THE COURT:  Now, did you buy any unremitted

22 principal claims?

23         MR. KIRBY:  Yes, Your Honor, we did.

24         THE COURT:  And you knew they were unremitted

25 principal when you bought it?

1          MR. KIRBY:  Yes, Your Honor.

2          THE COURT:  And I assume you bought it at a

3 big discount.

4          MR. KIRBY:  The discounts are stated in Mr.

5 Justice's declaration at from being 70 to 88 percent.

6 No, that's the amount of the purchase price in relation

7 to the amount of the claim, 70 to 88 percent.  Now, is

8 that fair, and is it fair to pay a greater proportion

9 of the proceeds of the Compass sale to holders of

10 unremitted principal claims?  I say yes because these

11 direct lenders did not bargain to be trade creditors of

12 this debtor.  They didn't extend unsecured credit to

13 this debtor, they were the beneficiaries of the trust

14 whose money was embezzled and stolen.

15          THE COURT:  Well, isn't your argument there

16 should have been a separate class, and isn't it too

17 late for that?

18          MR. KIRBY:  I'm not suggesting that at all.

19 I'm suggesting as the plan stands now, it's

20 unconfirmable and not for classification readings, but

21 because this is an executory contract.  But Your Honor

22 asked a practical question off the bat and it's not a

23 legal question.  And maybe I'm going further than the

24 Court wants me to go, but these unremitted principal

25 claim holders have a very colorable, very legitimate

1 claim to superior priority and legal status of their

2 claims to other claims.  And if --

3            THE COURT:  To whose claims?  Like for

4 example, direct lenders?

5            MR. KIRBY:  Like, for example, any unsecured

6 creditor, not an unremitted principal creditor,

7 including trade contractors, for example.

8            THE COURT:  Well, what if, for example,

9 Mr. Bunch actually did lend $10 million to the debtor?

10           MR. KIRBY:  Then he was a lender and extended

11 credit to the debtor.  He was not a, the beneficiary of

12 the trust whose funds were embezzled.  And my question

13 starting sort of backwards, really, from the legal part

14 says is it fair that people who are in that boat have

15 greater legal rights under the bankruptcy code and

16 ought to receive more favorable treatment under this

17 plan than the plan they're receiving?

18           THE COURT:  Well, where in the code does

19 that, couldn't have been a separate class, could it?

20 And if it is you're asking for subordination.

21           MR. KIRBY:  I understand, Your Honor.  I

22 don't think that when, well, first of all, this plan is

23 not confirmable and not for reasons of classification.

24 This plan isn't confirmable because these contracts are

25 executory and these unremitted principal claims, if

1 these contracts are to be assigned, are cure claims

2 that must be paid a hundred percent.  And I don't think

3 one needs to separately classify a creditor whose

4 contract is being assumed and who has a cure claim.

5 They're cure claims and it's an executory contract.

6            Is it fair they receive better treatment,

7 yes.  Is better treatment be negotiated?  Certainly.

8 Is there a legal basis for granting better treatment,

9 not a hundred percent if that's impractical, but is

10 there a real basis, most certainly.  So that is what I

11 see as the practical effect or arguing for the lender.

12            THE COURT:  People with principal claims

13 don't even have a contract anymore.

14            MR. KIRBY:  Sure, they do.

15            THE COURT:  Contract's been breached, the

16 money has been paid.  The contract only went so far as

17 servicing the agreement.  It's already been breached.

18 It's clearly not executory.  It's already been

19 breached, right?  Breached before the case was filed

20 for unremitted principal.  Clearly not an executory

21 contract anymore, even if it was.

22            MR. KIRBY:  An executory contract can be an

23 executory contract, notwithstanding the fact it's been

24 breached.

25            THE COURT:  But the point is there's no more

1 servicing to be done.  The contract was to service.

2 The loan has been paid in full.  There's nothing more

3 to service.

4           MR. KIRBY:  If there's nothing more to

5 service then, Your Honor, I agree with that.

6           THE COURT:  So all those people are

7 unremitted principal?

8           MR. KIRBY:  Are all in that boat?

9           THE COURT:  If, principal wasn't paid along

10 the way, principal's paid to pay off a loan.

11          MR. KIRBY:  I understand.

12          THE COURT:  So.

13          MR. KIRBY:  What Your Honor is saying --

14          THE COURT:  Anyone who has an unremitted

15 principal claim no longer has, even if it's an

16 executory contract, no longer has an executory

17 contract, because the contract is over.

18          MR. KIRBY:  Your Honor, that was not my

19 understanding, but if that's correct, then you're

20 correct.

21          MS. JARVIS:  Your Honor, if I could make sure

22 it's correct.  There were some payments where there

23 were partial payments made.

24          THE COURT:  Okay, but were, the majority were

25 full payments made.

Page 138

1          MR. KIRBY:  Now.

2          THE COURT:  So now your client maybe isn't

3 being, of course, now since they don't have an

4 executory contract, if your client was one of the

5 people that had diverted principal because it was paid

6 in full, it's no longer an executory contract.  And

7 your client now stands behind all those people that you

8 said should take before because they had an executory

9 contract.

10         MR. KIRBY:  Well, if my client is holding

11 assigned interest in loan servicing agreements where

12 there is no loan in existence anymore, then these

13 arguments do not apply to the claims.  I was unaware of

14 fact, that that is in fact the case.  I don't believe

15 it to be, but I can't stand here and represent to the

16 Court that is the case.

17         THE COURT:  No.  So now that you are going in

18 a different way do you still think executory contract

19 holders should be treated better?

20         MR. KIRBY:  That's what I'm here to argue.  I

21 want to reach the question, the legal question now, is

22 it an executory contract or not.  And we all agree that

23 to determine that issue you have to look at the

24 contract as a whole.  I don't think anybody disputes

25 that.  You can't legally separate particular aspects of

Page 139

1 the loan servicing agreement and analyze them as if

2 they were the whole contract.  And that's one of the

3 things that makes this case different from that Hadoff

4 case, which is the Nevada case, that those were

5 separate contracts.  The option agreement was a

6 separate agreement from the loan servicing agreement.

7           And it's clear that if you consider the loan

8 servicing agreement as a whole, that the loan servicer,

9 the debtor, the person who wants to assign these

10 agreements, had executory continuing obligations to

11 collect, to remit to their principals, to foreclose in

12 the event of a default, all those things.  So the issue

13 is not on the side of the loan servicer, the issue is

14 on the side of the direct lender.

15           One of the things that the direct lender is

16 obligated to do is to sell their interest in the loan

17 to the servicer for a set price upon demand by the

18 servicer.  And the basis for the debtors' argument is

19 that is a contingency, that's an option.  We know In Re

20 Helms, the Ninth Circuit case, options are not

21 executory contracts.  It's absolutely true that Helms

22 is binding and correct, but Helms isn't what we have

23 here.  If it's a simple option as it was in Helms and

24 all Helms was was an option, then the holder of the

25 option, the optionor, the person who granted the

1 option, doesn't have any obligation under the option

2 unless they exercise the option, and then they have the

3 obligation to pay.  But we already know that the person

4 who is, holds the option in this case has all kinds of

5 executory obligations under this agreement, considered

6 as a whole.  So the rationale of Helms doesn't apply.

7          Now, does anybody doubt that in the Helms

8 case if that option had been exercised, that this would

9 be then an executory contract?  I don't think Judge

10 Kazinski reading this opinion would have doubted that.

11 His reason was the question is, and I'm quoting, "At

12 the time of filing does each party have something it

13 must due to avoid materially breaching the contract?"

14 Typically, the answer is no.  The optionee commits no

15 breach by doing nothing.  The optionee is the person to

16 whom the option is granted, the debtor, right?  Well,

17 in this case the optionee the debtor, had lots of

18 duties.  So the reasoning of Helms doesn't apply.

19          Now, if that option had been exercised, at

20 that point there's an obligation on the one hand to pay

21 money and there's an obligation on the other hand to

22 deliver title.  And there's another name for that and

23 it's purchase agreement.  You pay money on the one

24 hand, deliver title on the other hand.

25          And if you read the debtor's reply to the

1 opposition we filed, you would think that a contract

2 that just had on the one hand the obligation to pay

3 money, and on the other hand the obligation to deliver

4 title wouldn't be executory, because they say that this

5 contract says that upon demand by the debtor the direct

6 lender has to pay foreclosure and legal fees.  Let's

7 say that's ministerial.  That's just an obligation to

8 pay money.  Well, that's one side of your typical

9 purchase agreement.  And the obligation to convey an

10 interest in real property in exchange for money, which

11 believe me would be a material breach in somebody's

12 mind if it wasn't done, necessitating an action for

13 specific performance and to quiet title, that as well

14 is a material executory obligation on the other side of

15 the coin.  And to say otherwise I think is to strain

16 what we commonly believe is an executory contract.

17          So for that reason, Your Honor, we maintain

18 that these agreements are executory, may not be

19 assigned unless assumed, and this plan in its present

20 form is not confirmable.

21          THE COURT:  Okay.  Thank you.  Other

22 objectors?

23          MR. FIELD:  Good afternoon, Your Honor.  Eric

24 Field on behalf of the Pension Benefit Guarantee

25 Corporation.  Our objection relates to the pension plan

1 of the U.S.A. Mortgage Company and relates to the issue

2 of the releases and injunction language in the plan.

3 Specifically ERISA prohibits limiting liability.

4          THE COURT:  I want to understand first, I

5 thought there were going to be some amendments you were

6 working on that, resolve that problem.  Have they not

7 and in what manner have they not?

8          MR. FIELD:  The language was proposed, but

9 the language that was proposed, it would allow us to

10 pursue our claims for any breaches of fiduciary duty

11 that occurred prior to September 30th, 2006, but it

12 would still enjoin any actions for any breaches that

13 may occur on or after September 30th, 2006.  So

14 essentially it states that date, this plan has no

15 person who has any fiduciary liability owed to the

16 plan.

17          THE COURT:  But the plan was terminated that

18 on date.

19          MR. FIELD:  The plan has not been terminated,

20 Your Honor.  The plan was frozen on that date.

21          THE COURT:  Okay.

22          MR. FIELD:  The plan was still active.

23          MS. JARVIS:  Your Honor, maybe I can frame it

24 more clearly.  The issue is the plan on September 30th

25 pursuant to this Court's order, the company itself

Page 143

1 became the trustee of the plan.  And we have no issue

2 with respect to allowing the PBGC to have a claim

3 against the debtor who is the trustee of this plan.

4 Where our disagreement lies is they would like

5 Mr. Allison, who is the CRO of the debtor to have

6 personal responsibility as the trustee for this trust.

7 And he is not the trustee, never has been the trustee,

8 and won't be the trustee.  And therefore, when he gets

9 the release, Mr. Allison is one the professionals as

10 the debtor under the plan to have an issue with that.

11 And our issue is he is not the trustee and we don't

12 think they have rights to reserve against him and the

13 release should stand in the plan.  That's where the

14 disagreement is.

15          THE COURT:  Okay.

16          MR. FIELD:  Our issue isn't specific to

17 Mr. Allison.  Our issue is anyone who may be acting as

18 fiduciary to the plan.  Although, we do have a unique

19 situation here in that it's uncommon for an entity to

20 be named fiduciary of a pension plan, but that's what

21 we have.  Our issue is anyone making discretionary

22 decisions on behalf of the pension plan, which may or

23 may not be Mr. Allison, would still owe a fiduciary

24 duty to the pension plan and its participants.  And

25 under ERISA anyone who has a fiduciary duty, a written

Page 144

1 instrument cannot limit a fiduciary's liability for

2 their breach.  Any written instrument that would try to

3 limit the fiduciary's liability would be void as

4 against public policy.

5          Actually, there's no, we have nothing

6 monitoring the assets of the pension plan right now.

7 We have a debtor who's the trustee, but we obviously

8 have people who are the decision makers for the trustee

9 who will make decisions or not make decisions related

10 to the pension plan.  We don't know what is being done

11 with these funds right now.  We don't know if they're

12 being invested, if they're sitting in cash.  We just

13 don't have any information on it.  This could be a

14 wasting trust right now.  Obviously, there is some

15 human who is responsible for making these discretionary

16 decisions.  And under ERISA you cannot limit their

17 liability.  It may not be Mr. Allison.  We just don't

18 know at this juncture who is responsible for these

19 decisions.  And we have an active pension plan that

20 essentially there is no one who could be held fiduciary

21 accountable for any breaches that may have occurred

22 since September 30th.

23          THE COURT:  Aren't the beneficiaries just all

24 the former insiders?

25          MR. FIELD:  Again, I'm not sure, yes.  The

Page 145

1 employees of U.S. Mortgage are the beneficiaries of the

2 plan, but for PBGC's purposes we are still obligated to

3 insure their pension.  Insiders are not, we're still

4 obligated to insure their pension.  In the event this

5 plan is terminated, which PBGC is right now

6 investigating whether we may or may not initiate

7 termination, the plan trustee has not initiated a

8 termination.

9          ERISA dictates when a pension plan gets

10 terminated, either a distress or standard or PBGC

11 initiated it.  Right now no steps have been taken to

12 terminate the plan.  So in the future if this plan

13 should be terminated we will have an obligation to

14 insure these claims.  And we would at that time take

15 over the assets, but between the time of September 30th

16 and the time that plan is terminated, we would have no

17 one to pursue any claims that we have.  Because once we

18 take over the plan, at that time we will step in as the

19 fiduciary.

20          THE COURT:  And why can't you take over the

21 plan now?

22          MR. FIELD:  We're investigating whether or

23 not we can.  They're asking non-debtor control group

24 entities who are involved, to investigate because they

25 may have the assets to maintain and continue the plan.

1 We just don't have the facts at this time.  But even if

2 we should terminate we still have this gap where

3 certainly there is no fiduciary.  Thank you, Your

4 Honor.

5          MS.  JARVIS:  Your Honor, this is such a

6 discreet issue.

7          THE COURT:  It is.

8          MS. JARVIS:  I could just, rather than

9 waiting until later, the statute clearly allows the

10 company to be the trustee.  The company is the trustee.

11 They have their claims against the company.  It's just

12 improper to try to expand that now to the CRO that is

13 running this company.  They have their fiduciary, which

14 is the company and they can make claims against the

15 company and that is allowed.  To expand that would just

16 be improper and punitive.  They can, we've asked the

17 PBGC to go ahead and take over the plan.  They can do

18 and that and that is their prerogative to do if they're

19 worried about the plan, they need to take control of

20 it, they can do that.  We cannot terminate because

21 there are affiliates.  The IP affiliates that make it

22 difficult for us to terminate because they aren't

23 necessarily insolvent.  And Your Honor is correct that

24 the beneficiaries of this plan are primarily the former

25 insiders.

Page 147

1          MR. FIELD:  It's a separate issue between

2 trustees and the fiduciaries.  Of course, it can be a

3 fiduciary and not necessarily the trustee of the plan.

4 You have discretion over plan assets, that could make

5 you the fiduciary, which is why just having it against

6 the debtor really doesn't cover --

7          THE COURT:  I can't believe, though, the PBGC

8 is going to demand that every restructuring officer in

9 all these cases be personally liable to the pension

10 plan.  You don't do that.

11          MR. FIELD:  Because normally we would never

12 have a debtor who's the trustee.  Normally we would

13 have a person, prior to September 30th we had named

14 trustees.  We had individuals and our claim would be

15 against the individuals.  But now we have an entity

16 who's the trustee.  That's why it's unique to PBGC

17 where an entity was appointed as trustee.  I agree,

18 nothing in ERISA seems to prohibit that, but it creates

19 the problem of who is the fiduciary of the plan.  Who's

20 making the discretionary decisions.  As far as we know,

21 since September 30th these assets could have been

22 dissipated and we would have no recourse --

23          THE COURT:  Well, couldn't you give it back

24 to the aforementioned since you can't touch it, anyway?

25 I mean, this is a non-sensical PBGC thing, I think.  I

Page 148

1 mean in all the problems PBGC has, and to hold up

2 confirmation on this.  So I guess it's a technical

3 issue.

4          MS. JARVIS:  And Your Honor, if you recall,

5 the reason why, in normal cases you wouldn't

6 necessarily replace the trustee.  The reason we did

7 replace the trustee in this case is because the

8 trustees were Joe Milanowski, Tom Hanges and Vicki

9 Loub.  And in order to make sure that there was a

10 preservation of this temporarily because we couldn't

11 terminate it and ask PBGC to terminate it, we put the

12 company, which is allowed, as the trustee.

13          THE COURT:  Can I order PBGC to terminate it?

14          MR. FIELD:  ERISA dictates, you can, if they

15 were seeking a distress termination and reorganization

16 you could approve their request, but the bankruptcy

17 court doesn't have the discretion to order PBGC to

18 terminate.

19          THE COURT:  This is a key issue, so I want

20 Counsel to comment.

21          MS. JARVIS:  What we're asking for, Your

22 Honor, is simply release the plan stay as is, which is,

23 you know, the meeting will clarify that the debtors,

24 they can make a claim against the debtors in this case,

25 Mr. Allison, the professionals of the debtor --

1           THE COURT:  His claim is that I can't do

2 that.

3           MS. JARVIS:  -- are released.

4           THE COURT:  His claim is I can't do that.

5 His claim is we have to, the restructuring offers can't

6 be released.

7           MR. FIELD:  That would be a little more broad

8 than what I'm saying.  What I'm saying is ERISA would

9 prohibit you from, as a matter of public policy --

10           THE COURT:  Well, have you given them the

11 language that you want?

12           MR. FIELD:  Yeah, I have the language right

13 here that I requested.

14           THE COURT:  Have you talked to them about

15 that's the language you want?

16           MR. FIELD:  Yes, we actually gave them this

17 language in our objection to --

18           THE COURT:  And do you disagree with that

19 language?

20           MS. JARVIS:  Yes, because we don't believe

21 it's proper that Mr. Allison not get a release under

22 the plan.  Releases under plans for professionals that

23 have, operated debtors have been in place since under

24 the act.  And it's proper that when they act,

25 particularly a CRO that comes in to try to reorganize

Page 150

1 the company and they have all kinds of difficulties,

2 gets a release under the plan.  They have been upheld

3 by courts and we believe it's proper that he gets this

4 release.

5          MR. FIELD:  If they're arguing that Mr.

6 Allison is not a fiduciary of the plan, of the pension

7 plan, then they have no issue with the language because

8 all the language is stating is that any breach of

9 fiduciary duty claim as it relates to pension plan are

10 not released.  If it's their position that the debtor

11 is the only fiduciary, then there is no issue with our

12 language.

13          MS. JARVIS:  But we need that understanding,

14 that it's also their understanding that it's not the

15 fiduciary.

16          THE COURT:  Will you concede the debtor is

17 the only fiduciary?

18          MR. FIELD:  No, Your Honor.  I don't know the

19 facts at the time to state that.

20          MR. MEROLA:  Your Honor, I'm trying to listen

21 real careful, so maybe, this is a very discreet issue.

22 And my suggestion would be let's --

23          THE COURT:  Defer that.

24          MR. MEROLA:  Give people a little guidance

25 and defer it.  But here's my understanding of the lay

1 of the land.  The plan is terminated, frozen and at the

2 same time the trustee is substituted.  So we have a

3 pre-activity and we have a freeze.  My limited

4 understanding of ERISA from being a bankruptcy lawyer

5 is that now that that plan has been frozen, nothing can

6 happen to that plan without your Court's order from

7 without PBGC's consent.

8          Mr., no one at the debtor, including Mr.

9 Allison, is exercising any discretionary function over

10 the assets of that plan at this point.  His technical

11 point, and I think it's very technical, is that unless

12 and until the termination occurs, I don't know what

13 happened in this frozen period.  So if Mr. Allison is

14 down in the safe stuffing his pockets with 20's, 29 USC

15 1110-A prohibits the release for that action.  So my

16 guess is there's room for a springing release upon

17 termination or something like that.  But let's give the

18 parties a chance.

19          THE COURT:  Okay.

20          MR. MEROLA:  This is a likely technical

21 point.  And I've run into 29 1110-A once before.  It's

22 a strange statute and I think it's just a point of

23 practice with PBGC these days.

24          THE COURT:  Okay.

25          MR. FIELD:  Just to clarify one statement and

Page 152

1 I'm finished, when a plan is frozen it doesn't

2 necessarily mean that anyone would need our approval to

3 do anything with it.  The plan is frozen just means

4 that no more fiduciary benefits were being accrued and

5 no more participants were coming in.  The plan is still

6 being administered and someone should still have

7 discretionary authority over the assets.

8          THE COURT:  Okay.  We'll trail this until

9 tomorrow then.

10          MR. FIELD:  Thank you, Your Honor.

11          MS. JARVIS:  Your Honor, also if they

12 terminate the plan before the effective date, it's not

13 going to be an issue because the effective date is when

14 the release goes into effect.

15          THE COURT:  Well, I think you can work this

16 out.  I just don't want to hear back and forth.  I

17 understand your position.  You're sent out here to do

18 this because we're the PBGC and we've got to do it.

19 But I'm trying to get some practical answers,

20 especially since we don't have real employees, for

21 example, who are impacted.  This is not where we're

22 trying to cut off, you know, a pilot's pension.  We're

23 talking about the insiders and it happened to be a

24 pension plan.  And unfortunately, I think because it is

25 a pension plan, the estate has no ability to take those

1 assets because it is a pension plan.  And to the extent

2 they do have an argument it has to be done by lawsuit.

3 It's a separate thing.  So let me have you talk, if you

4 could, classically and talk to your supervisors and you

5 can get a practical solution to this.

6          MR. FIELD:  Thank you, Your Honor.

7          THE COURT:  All right.  Thank you.

8          MR. WALSH:  Good afternoon, Your Honor.  Greg

9 Walsh on behalf of my family trust.  Having sat through

10 three hours of this today I'm thoroughly convinced I'm

11 a fish out of water.  Unfortunately, that means you'll

12 have to endure a little flopping up here, maybe three

13 or four minutes before I can suck any more air.

14          Let me start with this.  After having an

15 opportunity throughout many of the breaks this morning

16 to discuss matters with certain committee counsel, I

17 think we'll be able to work through my objection with

18 some clarifications and perhaps some stipulations.

19 First, I hadn't realized that the ADR process was

20 applicable to direct lender claims that were unrelated

21 to unsecured claims, because the definition set forth

22 in the plan only speaks to setting forth the process by

23 which objections to direct lender unsecured claims may

24 be resolved.  So I apologize for stopping there.  After

25 I read that I didn't go on.

1         But the first area I need a little built of

2 understanding is how the ADR process was negotiated.

3 As I look at the alternative dispute resolution

4 agreement, section one, subparagraph B-1, it sets forth

5 the definition of objecting parties.  I had filed an

6 adverse complaint in the proceeding and objection to

7 the plan.  I would ask for some understanding whether I

8 need to file something else in order to be considered

9 an objecting party under the plan.

10        THE COURT:  Query.  Understanding that the

11 ADR process is a part of this, are these not issues

12 that can be worked out through instruction or procedure

13 or do you think they're integral whether or not a plan

14 can be confirmed?

15        MR. WALSH:  I think they'll resolve by

16 objection.  I suppose that the procedure that I would

17 agree with would resolve my objection today.  I think I

18 do have substantive defenses to the plan being

19 confirmed and I'm willing as we work through the

20 issues, and there won't be very many.

21        THE COURT:  Okay.  Sorry.

22        MS. JARVIS:  And your Honor, we would agree

23 that is, the objection is filed would constitute

24 commencement of his rights under the ADR.  We certainly

25 have noticed that he has issues and we have no problem

Page 155

1 recognizing that as commencing that.

2         THE COURT:  Go ahead.  I just wanted to

3 clarify that one issue in my mind and where it was in

4 the process.

5         MR. WALSH:  Thank you, Your Honor.  Number

6 two on my short list here is does a direct lender have

7 to mediate a claim under the ADR process.  As I looked

8 at again, the agreement at section 2, subparagraph C on

9 page three it's suggested in the case of objections to

10 loan servicing, the schedule for litigation claims by

11 direct lenders, which would count me among them,

12 participation in the offer exchange procedure is

13 mandatory, but the mediation procedure is voluntary.

14 Then later in the agreement on page seven at section A,

15 subparagraphs two and three it appears that if we can't

16 come to terms in the offer exchange portion of the

17 agreement we must go to mediation of those claims.  For

18 instance, in paragraph 2, upon choosing to dispute the

19 objecting party's objection to the complaint the offer

20 and exchange procedure shall be terminated and the ADR

21 litigation shall be immediately subject to the

22 mediation procedure.  I don't really care which way

23 that goes, I just want to make sure because a default

24 in clause here, I don't run into it if I don't follow

25 through on the mediation procedure.

Page 156

1          MR. CHARLES:  Your Honor, Robb Charles.

2 Mr. Garman and I are the semi-authors of this.  And in

3 the objector has really pointed out kind of an

4 ambiguity.  The ADR procedures with respect to fee

5 disputes are essentially you must have a meet and

6 confer and you must mediate.  With respect to adversary

7 proceedings it seemed to us that some folks that had

8 adversaries might be uninterested in the mediation, so

9 mediation was optional in that sense.

10         But with respect to the fee disputes I

11 believe our view is that mediation of fee disputes is

12 required.  And really the point is to try to save

13 expenses as opposed to seeing how many times you can

14 come to court to resolve what may be relatively small

15 dollars.  If that clarifies.

16         THE COURT:  Does that A, clarify and B, meet

17 your objective?

18         MR. CHARLES:  With respect to the fee

19 dispute, we think that mediation by both parties is

20 required, and either could come to court first to seek

21 relief against the other until they had the mediation.

22         MR. GARMAN:  I understand the clarification.

23 I don't know.  A lot of times mediation is kind of

24 expensive, more expensive oftentimes than coming to

25 court.  As long as it's an efficient process, and I

1 haven't seen how that is going to play out.

2          MR. CHARLES:  Because we haven't had the

3 experience yet, but the notion from the Direct Lenders

4 Committee and from the Instant Creditors Committee was

5 to see if we could save on everyone's side, expense in

6 resolving disputes.  The genesis is a claims objection,

7 but with respect to these fee disputes as well,

8 literally, there should be relatively small fees

9 collected during the case that are in dispute.  And the

10 idea is to have a mediator help resolve it rather than

11 seeing a couple hours of your time.

12          THE COURT:  And here's something that I can

13 offer subject to the Ninth Circuit approval, assuming

14 the plan confirms and we get that stay.  I suspect

15 because of special circumstances with this case and our

16 district is still, our keys find the damage short.  I

17 suspect the Circuit would authorize us to use someone

18 such as Judge Glover to come down once a month and it

19 would be free, free to you.  In the alternative, Judges

20 Markell and Nakagawa, hear mediations on my behalf, and

21 we would put as many of those to them as possible.  The

22 problem is timing.  You just have two people who have

23 other cases to settle.  But I suspect and I can't, of

24 course, promise, but this is how a plan would work, I

25 think we could offer that.  And you may have been well

Page 158

1 thinking of that because you know, you have litigation

2 here, that we have some judges that don't mediate well.

3 They wear their mediator hat.  They have experience as

4 judges, but they wear their mediator hats.  So that

5 would certainly save expenses.

6          MR. CHARLES:  That would help.  There's

7 probably going to be a triage involved.  In other

8 words, objections to very large direct lender claims,

9 they're probably going to need judicial officers to

10 assist as mediators.  The expectation of the ADR

11 process is that we'll select mediators that will be

12 acceptable, but there will be a volume of this.  With

13 all due with respect, because these are important

14 issues, they are still small dollar issues.  They need

15 to be resolved fairly quickly and cheaply.

16          MR. GARMAN:  I'll move on to my third point

17 which I think is more substantive in nature.  The

18 release on pages 75 and 76 of the plan contemplate, I

19 think, a release of all claims and there's an

20 injunction in there as well.  I think this would

21 probably come into the no harm, no foul thing that

22 Charles and I discussed, but what I want to make sure

23 of is that my adversary complaint which deals with more

24 than just the loan servicing fee schedule and things of

25 that nature, it asks for declaratory relief as well,

Page 159

1 and adjunctive relief.  I want to make sure that to the

2 extent the release in the plan is construed, it's only

3 to pre-effective date claims that I might have.

4 Post-effective date, I want to be able to prosecute any

5 claim I might have relative to the service fees that

6 are being taken out by the purchaser, Compass.  In

7 other words, is there a res judicata effect to either

8 the alternative dispute resolution issue that we

9 discussed or any other issue that might be in the

10 adversary complaint.

11           I want to point out a couple of specific

12 concerns in the plan that I noticed.  One is again, I

13 mentioned the release which seems all encompassing.  If

14 we look at part three, section F on page 57 of the

15 plan, it speaks in terms of F as loan distributions and

16 loan servicing agreements.  And it says, "After the

17 effective date the direct lenders are obligated to

18 comply with the terms of the applicable loan servicing

19 agreements, including the payment of fees as set forth

20 in the loan servicing fee schedule included in the

21 direct lender supplement," then it says, "subject to

22 the resolution of any disputes regarding the same under

23 the alternative dispute resolution option."

24           It appears that that statement says the

25 direct lenders are going to comply with what the

Page 160

1 dispute resolution, option resolution might be in terms

2 of a new fee schedule for a particular direct lender,

3 but I can't find the corollary obligation of Compass to

4 do so.

5          THE COURT:  Okay.  I'll let you respond to

6 that, but because it is a discreet issue I think you're

7 right.  It's easier to just run this right now.

8          MR. CHARLES:  This language in the plan Mr.

9 Garman and I are not the direct authors of, but the

10 notion of the ADR and of the issues between Commercial

11 Mortgage and the direct lenders relates to essentially

12 pre-closing issues.

13          When you transfer the service, assuming the

14 plan is confirmed and you transfer servicing

15 agreements, they are unchanged.  So whatever they are,

16 they are.  And the point of this language is intended

17 to say that the ADR provisions govern dispute with

18 direct lenders, but as to pre-closing events.  I'm sure

19 Compass is standing behind me saying, "We'd really like

20 to whipsaw the lenders with the confirmation order and

21 bind them post confirmation on lots of things."  And

22 Mr. Merola will say the servicing agreements are what

23 they are.  This is not intended to change that

24 relationship.  This is intended to deal with servicing

25 fees that are taken out.  They may dispute that and if

1 they dispute that we need to resolve the dispute in an

2 official way.  But it's only pre-closing services.

3           MR. GARMAN:  I understand from one of the

4 committees that that's how it will be construed.  I

5 have a concern about the over-arching release in light

6 of ADR --

7           THE COURT:  Well, we know 1141 releases all

8 claims against the mediators, it's governed by the

9 plan.

10          MR. GARMAN:  Yes.  Well, no.  I'm not a

11 bankruptcy lawyer, but I can understand what you're

12 saying.

13          THE COURT:  Okay.

14          MR. GARMAN:  But what I'm concerned about is

15 what looks to be a res judicata effect as to a revised

16 fee schedule that comes under the alternative dispute

17 mechanism that only applies to me or a direct lender.

18 The language is the very specific to direct lenders.

19 What I'm looking for is an understanding from Compass

20 or the plan, if there's some language in the plan that

21 says, okay, post-effective date.  If they're taking out

22 three percent and I can prove it's one percent or two

23 percent or zero or whatever.

24          THE COURT:  Oh, so you're saying if the

25 agreement really was one percent you want to bind

1 Compass and say the agreement really was one percent.

2           MR. GARMAN:  Either the alternative dispute

3 resolution mechanism applies to both sides on a

4 prospective basis or neither side.  I can live with

5 either.  I'd rather not have to litigate twice.

6           THE COURT:  So you're saying this if, for

7 example, you say look.  My agreement was only one

8 percent.  And at mediation ADR, it says one percent.

9 You want it going forward that that's all that would be

10 paid to Compass.  Is that what you're saying?

11           MR. GARMAN:  I would prefer that.  If it does

12 go forward and it's just my obligations that are

13 governed in the service agreement by this provision,

14 but --

15           THE COURT:  I think I know what was intended,

16 but let me.

17           MS. JARVIS:  Your Honor, this was intended to

18 deal with the claims against the debtors.  So it's

19 intended to resolve those claims.  So it is only

20 pre-effective date claims.  So any issues they would

21 have, claims they would have against the debtor go into

22 this, but it doesn't resolve issues with respect to

23 Compass.  The contracts say they're transferred, not

24 modified.  They have certain provisions.  Those

25 provisions, you know, are contractual provisions that

1 have been agreed to by the parties, and move forward.

2          THE COURT:  But what if in the mediation,

3 question.  What if in the mediation we prove that my

4 agreement was indeed only one percent, because even

5 though it says up to three percent, mine was one

6 percent.  And that's what the mediation says.  The

7 mediation, it's not an order, but up to one percent.

8 Would it be Compass' position or are you saying Compass

9 still has the right to say you pay three percent

10 because it says up to three percent?

11          MS. JARVIS:  Because this is only mediation

12 between the debtor and the lender, with respect to

13 servicing fees or claims that would be owed back and

14 forth between the debtor and the lender.

15          THE COURT:  As opposed to the terms of the

16 contract, just what amounts they're owed?

17          MS. JARVIS:  Well, part of it would be a

18 determination of the terms because obviously, if

19 there's any dispute we said that whatever their

20 contracts say, they say.

21          THE COURT:  Uh-huh.

22          MS. JARVIS:  If you have a one percent

23 servicing fee, we're collecting a one percent servicing

24 fee.  If you have a three percent servicing fee, we're

25 collecting a three percent servicing fee.  And the

Page 164

1  notice given in the plan was if you sent out the loan

2  servicing schedules to each lender, then if you had an

3  objection you had to file it to the plan; otherwise,

4  it's determined to be what it says in the contract.

5           THE COURT:  But is the intent of that

6  determination only binding upon the debtor for the

7  pre-effective date claim?  And that, well, I guess the

8  next point is, I guess they could then argue the law of

9  the case as against Compass.

10          MR. CHARLES:  Your Honor, Robb Charles on

11  behalf of the committee.  That's certainly not the

12  intention of the creditors committee in negotiating

13  that provision.  Mr. Garman is saying the same thing on

14  behalf of the direct lenders.  It's not --

15          THE COURT:  Okay.  So what's your intent?

16          MR. CHARLES:  That you're only dealing with

17  the claims of direct lenders against Commercial

18  Mortgage essentially for servicing fees that are

19  collected during the case.

20          THE COURT:  Okay.

21          MR. CHARLES:  If there is a dispute, you've

22  taken too much, then that can be resolved.  But there's

23  no other dispute resolved, nothing that would bind

24  Compass or nothing that would benefit Compass.

25          THE COURT:  Okay.  So a determination that a

1 particular person, is it just as to an amount or is it

2 to the percentage?  In other words, I could see

3 disagreement saying you took Y dollars, I think I only

4 got Z dollars.

5          MR. CHARLES:  It could be any number of

6 things.  The objector really has some interesting

7 arguments about how his fees should be calculated and

8 whether his amounts were processed or whatever.  The

9 sole dispute that the plan resolves, and it creates an

10 ADR mechanism to try and do it expeditiously, is

11 pre-effective date services.

12          THE COURT:  Well, is the answer this?

13 Assuming we get over all of the problems, query if the

14 answer this.  That a person has the right to go to

15 mediation, in which case it's only binding, as you say.

16 But the person also has the right to commence an

17 adversary, in which case all rules of collateral,

18 estoppel, law of the case res judicata will apply.

19 Because I gather your ADR doesn't, does your ADR

20 preclude them from doing that?

21          MR. CHARLES:  No.  I would not expect to keep

22 post-effective date adversaries, but Compass wouldn't

23 be a party that.  What we're trying to do --

24          THE COURT:  But they're a successor, so by

25 the principal claim, would issue conclusion.

Page 166

1          MR. CHARLES:  If you go down there we're

2  going to be back in Mr. Merola's problem of Compass not

3  trying to take the LSA's as they are.  The goal was not

4  to be resolving these disputes in a way that would bind

5  purchasers.  And the purchaser would not have a reason

6  to come in to this proceeding to try and prospectively

7  limit its obligations.

8          MR. GARMAN:  Your Honor, Greg Garman for the

9  direct lenders.  This is entirely consistent with the

10 direct lender committee's efforts to make sure that

11 this process does not affect the contractual rights of

12 the direct lenders on a going forward basis with

13 Compass.  Like we've said, there is a transfer of these

14 rights.  As much as I like Compass and their Counsel,

15 the last thing we want to do is involve them in the

16 mediation process to determine claims of this

17 bankruptcy estate.

18          I think that it is entirely appropriate that

19 the contractual rights of the parties on a going

20 forward basis be what they are.  And if there's a

21 future disagreement about what the contractual rights

22 of those contracts are, I don't think that that's a

23 process that should necessarily involve control --

24          THE COURT:  So there's nothing in this ADR

25 that says that if, for example, the parties mediate and

Page 167

1 say we're only entitled to one percent, or three

2 percent eve.  Let's say three percent.  Let's go with

3 the converse.  There's nothing in this that says, and

4 Compass tries to charge three percent against you,

5 there's nothing that says that you can't challenge

6 Compass as to their charging three percent because you

7 say that wasn't the terms of the contract.  Is that yes

8 or no as A your understanding of what the terms are?

9        MR. CHARLES:  He's not sure and my answer is

10 yes.

11        THE COURT:  All right.  I asked the question

12 as a double negative.

13        MR. GARMAN:  That's why I lost you, Your

14 Honor.

15        THE COURT:  I apologize.  Let's try it again.

16 True or false.  Mr. Walsh says, "I'm only, you should

17 only have charged me one percent."  You go to mediation

18 and the mediator says, "No, three percent."  Is Mr.

19 Walsh then barred, and Compass then charges him three

20 percent after the effective date.

21        MS. JARVIS:  Yes.

22        THE COURT:  Is he barred from saying to

23 Compass, "No, the agreement was only one percent"?

24        MR. CHARLES:  Your Honor, take your question

25 and do it, because the mediation is just a private

Page 168

1 agreement which shouldn't be binding on the parties.

2            THE COURT:  Right.

3            MR. CHARLES:  Assume that there's a dispute

4 over Mr. Walsh's claim.  He says, "You've taken money."

5 We couldn't mediate it.  We couldn't resolve it.  You

6 decide the amount of his claim.  Our view is the

7 determination by the Court as to the amount of a

8 lender's claim for servicing fees does not bind the

9 purchaser, period.

10            THE COURT:  Does it bind Mr. Walsh?

11            MR. CHARLES:  Only with respect --

12            THE COURT:  It does.

13            MR. CHARLES:  Only with respect to his claim.

14            THE COURT:  To his claim?

15            MR. CHARLES:  Only as to his claim in the

16 estate.

17            THE COURT:  So it doesn't bind, in other

18 words, Mr. Davis can't say, "Sorry, you lost that with

19 the estate so you can't now say three percent is to me.

20 One percent is to me."

21            MR. CHARLES:  Your Honor, Robb Charles again.

22 That's our view.  Again, mediation was the agreement,

23 but if the Court's making a decision about allowance of

24 Mr. Walsh's claim, nothing in the plan protects Compass

25 and nothing in the plan disadvantaged Compass, it's

Page 169

1 just claims litigation.

2           THE COURT:  Okay.

3           MR. GARMAN:  Your Honor, I'm coming from all

4 directions here, but Greg Garman for the direct

5 lenders.  I think the best way to look at this issue is

6 does it affect post-closing.  And there is no effect by

7 way of the ADR on the relationship between direct

8 lenders and Compass post-closing.  It's simply a

9 pre-post issue.  If you look at it that way.

10          MR. DAVIS:  Your Honor, may I be heard for a

11 quick second?

12          THE COURT:  Uh-huh.

13          MR. DAVIS:  I believe that that's correct,

14 but although what I do believe we're getting out of

15 this in light of the settlement that's been reached

16 between the Direct Lenders Committee and the debtors,

17 is that there is an acknowledgement that the percentage

18 which is set forth in the agreement is the proper

19 charge and can be charged, and is not subject to

20 dispute.  The question I think is whether or not any

21 particular direct lender's contract provides the one

22 percent to three percent or something else.  But that

23 the Court as part of this confirmation hearing, as part

24 of the settlement and approving the settlement, we're

25 not going to be subjected to multiple challenges for

1 people saying, "Well, I got an offer circular that

2 provides for X," and the contract says Y and now we're

3 in 200, 500, a thousand disputes over what we can

4 properly charge.  But I agree that to the extent there

5 is disagreement as to whether a particular direct

6 lender's contract provided for one percent or three

7 percent, and that gets resolved as part of the

8 mediation process.  And since we're not parties to that

9 and we charge a percent that might be different than

10 what was agreed to as part of the mediation, that

11 wouldn't bind either party in connection with whatever

12 we were charging post closing.

13           THE COURT:  Okay.

14           MR. GARMAN:  A couple of comments, Your

15 Honor.  First of all, the acknowledgements that, is it

16 Mr. Davis?

17           THE COURT:  Yes.

18           MR. GARMAN:  Is referring to, I think it's on

19 page 34 of the plan.  Says, "The direct lenders agree

20 that with respect to the servicing fees paid prior to

21 effective date, U.S.A. CM will retain its contractual

22 servicing fees due under the loan servicing agreement

23 and with respect to loan servicing agreements, which

24 provide that U.S.A. CM may collect up to a maximum

25 amount for such servicing fees.  U.S.A. CM will remain

Page 171

1 a maximum amount of such servicing fee as provided

2 under the loan servicing agreement."

3          The acknowledgement does not go to

4 post-effective date transactions.  So I'm quite

5 concerned with the understanding, I guess, that Compass

6 has relative to post-effective date servicing fees.

7          Second, I wanted to point out again, it's

8 what I started with.  On the language itself in the

9 release, well, actually in the loan distributions and

10 loan servicing agreement section, which is on page 57

11 and 58 of the plan, does speak about after the

12 effective date.  And it does appear to bind direct

13 lenders to pay what's in the loan servicing agreements

14 subject to the resolution of any disputes regarding the

15 same under the ADR process, lines one through four.  I

16 mean, if that were, frankly, I can see the forest here,

17 I think, and I'm willing to stay as long as my rights

18 aren't compromised and after the effective date I'm not

19 bound by something that occurs in this case, relative

20 to my servicing fees, post-effective date servicing

21 fees.  I can live with that.  I can go back and

22 pre-effective date and litigate the claim.  And I know

23 it's probably not worth much and it's a waste of a lot

24 of time, but the important thing for me is having the

25 ability to know my rights aren't compromised by this.

1           And I'm hearing two different stories, to be

2 honest with you.  I'm hearing I have to acknowledge

3 that there's three percent if the contract says three

4 percent, the servicing agreement says three percent.

5           THE COURT:  Well, why wouldn't you?

6           MR. GARMAN:  Because that's not the agreement

7 I'm talking about.  I have five agreements.  I have a

8 servicing agreement that says you can charge up to

9 three percent and four subsequent, independent

10 agreements that say I get a net amount of interest on

11 the loan that I made with a particular borrower.

12          THE COURT:  But you have a written agreement,

13 though?

14          MR. GARMAN:  I have a written agreement that

15 predates those four subsequent agreements.  Those other

16 questions I want to litigate.  I'm pretty comfortable

17 and not particularly unsettled by the claim that the

18 parole evidence rule bars introduction of subsequent

19 oral agreement.  I'm not even sure whether it's

20 particularly oral agreement.  They sent me an offer.  I

21 accepted the offer.  It's all in writing.

22          So be that as it may, I'm prepared to

23 litigate that case when I have an opportunity.  I just

24 don't want to waive it.  I don't object to the plan,

25 when in effect, I'm getting two different stories about

1 what it is I'm leaving.

2          THE COURT:  So I think we need to clarify

3 probably on the record what is and isn't included in

4 the waiver.  And we probably have to go over some

5 language on the recess.

6          MR. CHARLES:  I think that's right, and work

7 it out with Compass.  I heard Compass saying

8 essentially, you objected, you're not bound, you are

9 still preserving your differences.  What they want to

10 avoid is 6,000.  I think it may be, let's see if we can

11 deal with it at a language level and move on.  This

12 objection has now been stated very clearly.  We've

13 engaged Compass.  We'll work out the wording, see if

14 that solves the problem.

15          THE COURT:  Okay.

16          MR. GARMAN:  Just one last one.  I don't want

17 to belabor this, but in all candor I heard Compass say

18 that if my service agreement itself says three percent,

19 that's what I'm stuck with.  That's what I heard.  I

20 might have been wrong about that, but if they were to

21 come up here and say, "Okay.  You have a right to

22 prosecute that claim post-effective date with Compass,"

23 fine.  I'll withdraw my objection.  But if they're

24 willing to say that I'll maintain my objection.

25          THE COURT:  Do you want to deal with that now

Page 174

1 or later, Mr. Davis, or do you want to have a chance to

2 talk about it?

3          MR. DAVIS:  Why don't we have an opportunity

4 to talk, and then we can resolve it.

5          THE COURT:  Okay.

6          MR. GARMAN:  Thank you for your patience.

7          THE COURT:  Okay.  The next objector?

8          MS. ALLF:  Thank you, Your honor.  Nancy Allf

9 on behalf of the Alexander Group of Direct Lenders.  We

10 joined into Mr. Walsh's limited objections.  And the

11 only point of clarification I would request today is

12 that our clients' rights under the ADR are triggered by

13 our joinder.  I just want to clarify that our rights

14 under ADR have been triggered by the filing of this

15 joinder.

16          THE COURT:  Well, isn't everybody going to

17 have the opportunity once the plan is confirmed, to

18 trigger those rights?

19          MR. MEROLA:  Yes.

20          THE COURT:  So whether they are or not, the

21 point is.

22          MS. JARVIS:  Yeah, and I guess if their

23 concerned, if they filed an objection to the plan, they

24 currently raised it, I have no problem acknowledging

25 that they triggered the ADR so they don't have to do it

1 again.

2          MS. ALLF:  I just acknowledged for Mr. Walsh

3 that we joined in.  And that's my only comment, Your

4 Honor.

5          THE COURT:  Okay.  Any others?

6          MR. COHEN:  Good afternoon, Your Honor.

7 David T. Cohen of Warner, Stevens appearing on behalf

8 of the Sierra Liquidity Group.  My client and I are

9 somewhat new to this case.  We filed our opposition

10 this past Friday, admittedly after the deadline, but

11 promptly after we found out about these proceedings.

12          THE COURT:  Well, you bought claims, you

13 chose to buy a claims all the way through this process.

14          MR. COHEN:  Yes.

15          THE COURT:  Okay.

16          MR. COHEN:  Those are the facts.  I admit

17 them and they're set forth in my pleading.  And I just

18 request that the Court consider the opposition along

19 with the others that have been filed.  We also filed an

20 opposition to the procedures motion, what's known as a

21 procedures motion in this case which was continued to,

22 I think January 3rd that we're very concerned about.

23 And those are my comments, Your Honor.

24          THE COURT:  Uh-huh.

25          MR. MEROLA:  Motion to strike was late filed,

Page 176

1 Your Honor.

2          MR. COHEN:  I think under these circumstances

3 the fact that my comments largely mirror the objections

4 that are already been filed and I acted properly and

5 not in a dilatory --

6          THE COURT:  But you chose to file your

7 claims --

8          MR. COHEN:  Yes.

9          THE COURT:  -- after all of this happened.

10 I'll strike it.

11          MR. MEROLA:  Thank you, Your Honor.

12          MS. CHUBB:  I want to set Your Honor's mind

13 at rest.  I have a limited representation today.  I

14 specifically do not represent the Fratitta Enterprise

15 Group or Mr. Bullard.  And my client, the Keel family

16 members and Mojave have unremitted principal claims.

17 The Andersons have all kinds of claims, but have

18 allowed me to make these arguments.  And Judy Fountain,

19 the other client, it, has gotten prepaid interest but

20 her loan is over-secured, and I think in the end it

21 will all wash out.  So I don't believe I have conflicts

22 here today.

23          I do support confirmation of the plan so long

24 as my objecting direct lenders' rights are preserved;

25 the right to defend any action, to turn over the money

1 that is being held subject to your netting orders.

2 Which I think I've been here pretty much all the time,

3 that question has really never been decided.  The

4 money's just sitting there.  Right now it still belongs

5 to the secured creditors.

6          We also would want the right to setoff for

7 any pre-petition mutual debts.

8          THE COURT:  Well, I guess I'm confused

9 because the plan doesn't say that.  So you say you're

10 supporting confirmation, but how can you say that when

11 the plan doesn't provide for that?

12          MS. CHUBB:  Well, I'm saying we would support

13 confirmation if we can have the protection preserved,

14 because I don't think the protection can be taken away.

15          THE COURT:  But you're saying so they have to

16 bring an adversary?

17          MS. CHUBB:  Well, you had asked Mr. smith

18 what he wanted.  And I'm at the outset here trying to

19 tell you what I think would make our objections go

20 away.

21          THE COURT:  So how do you do that?  You have

22 to file an adversary is what you're saying, right?

23          MS. CHUBB:  I did file an adversary.  I filed

24 an adversary for setoff.

25          THE COURT:  I'm sorry.  So it would have to

Page 178

1 be done, you're claiming, you want to engage in the

2 lawsuit process.

3           MS. CHUBB:  I'm saying, I'm not going to be

4 put in that corner where you tried to put Mr. Smith,

5 either.  I'm saying that, as he said, you can't just

6 take this money, you have to have a mechanism for

7 taking it.

8           THE COURT:  So it would have to be a lawsuit,

9 I guess.

10          MS. CHUBB:  Well, I already filed a lawsuit.

11          THE COURT:  Okay.  So it would have to be a

12 lawsuit and you said you filed one.

13          MS. CHUBB:  But I don't want the plan to

14 somehow purport to take away my rights under the

15 adversary for, you know, defending the recovery of

16 those monies.  We're entitled to setoff.  And the

17 debtors can't just take the money without some action.

18 And I didn't think of any action.  Also, the third

19 thing is we get to preserve our rights and we can

20 change the loans services if we want to.

21          That's just because I like to tell you at the

22 beginning when speaking.

23          THE COURT:  So you didn't sue on behalf of

24 all your clients, you sued just on behalf of the Keels,

25 didn't you?

Page 179

1          MS. CHUBB:  That's correct.

2          THE COURT:  But you didn't sue on behalf of

3 all your clients?

4          MS. CHUBB:  No, but I don't think there's any

5 deadline for that lawsuit, either.

6          THE COURT:  No, but you're still saying, you

7 know, either they're going to sue or you're going to

8 sue them.

9          MS. CHUBB:  I'm saying that you cannot

10 recover the post-petition payment made by a borrower

11 for my direct lender, without some legal action.

12          THE COURT:  Tell me what the alternative is.

13          MS. CHUBB:  What difference does that make?

14          THE COURT:  Tell me what the alternative is.

15          MS. CHUBB:  Yeah.  They could work it out

16 with me.  That would be good.

17          THE COURT:  Well, you won't do a compromise.

18 They tried to do a compromise and you won't.  Which is

19 under, that's fine.

20          MS. CHUBB:  I don't like that compromise.

21          THE COURT:  What are the options besides a

22 lawsuit?  Let's not just --

23          MS. CHUBB:  What difference does it make,

24 Your Honor?

25          THE COURT:  It makes a big difference.

Page 180

1         MS. CHUBB:  Why?

2         THE COURT:  Because you don't want to concede

3 there's a lawsuit involved.

4         MS. CHUBB:  Just for my objecting creditors?

5 There are a lot of people who want this plan, want the

6 compromise.  Let them compromise, just don't make us.

7         THE COURT:  Right.  That's fine.  So you're

8 saying sue my client and/or I'll sue you.  It's what I

9 want to serve.

10        MS. CHUBB:  No.  Do you want to have this

11 conversation?  You already had it with Mr. Smith.  I'm

12 not going to say that.  I'm saying that they cannot

13 recover the monies paid post-petition, just by this

14 netting process pursuant to the plan.

15        THE COURT:  Okay.  So what's the alternative?

16        MS. CHUBB:  I guess we litigate.  But

17 again --

18        THE COURT:  Okay.  Thank you.  There's

19 nothing wrong with lawsuits, but don't be afraid to

20 admit it.  If that's what you're asking, admit it.

21        MS. CHUBB:  Well, I filed a lawsuit.  Who

22 cares?

23        THE COURT:  Who cares, because there's legal

24 fees involved.  That's who cares.

25        MS. CHUBB:  I know you want this to be

Page 181

1 convenient and I know you would like to avoid the legal

2 fees, but there are just some basic rights that can't

3 be walked over.

4          THE COURT:  And that's fine, but don't say

5 there's some other answer besides a lawsuit when there

6 isn't.

7          MS. CHUBB:  Left only to the imagination of

8 lawyers, Your Honor.  Okay.  Let me just say, because

9 there are some questions you asked and I think I might

10 be able to help you with.

11          THE COURT:  Okay.

12          MS. CHUBB:  I think pretty clearly now the

13 39 million that's being held belongs to the direct

14 lenders, if for now.  And Your Honor, anybody can pay

15 anybody else's debt.  If you have a Netflix bill I can

16 pay your Netflix bill.  If I change my mind later, I

17 can't get my money back.

18          THE COURT:  But that requires my consent.

19          MS. CHUBB:  No, it doesn't.  I could pay your

20 Netflix bill I bet, without your consent or your phone

21 bill.

22          THE COURT:  No, no, no.  You're paying,

23 essentially.

24          MS. CHUBB:  So did U.S.A.

25          THE COURT:  The lender didn't, the borrower,

Page 182

1 it was the lender's money.  It was the person who had

2 diverted principal's money.  Did they consent?

3          MS. CHUBB:  Well, how about my clients, whose

4 unremitted principal was used to pay their prepaid

5 interest and now I can't setoff?  At the beginning of

6 the case the debtors say, oh we paid, before the filing

7 we paid you all of this prepaid interest.  You now owe

8 us money.  Under what cause of action, I don't know,

9 but they say you owe us that money.

10          THE COURT:  Because the prepaid interest

11 wasn't on that loan, right?

12          MS. CHUBB:  Sometimes it's, well, no.  It

13 wasn't.

14          THE COURT:  Okay.

15          MS. CHUBB:  But they're setting off against

16 other loss, which is equally troubling.  And I say,

17 "You owe me for unremitted principal, U.S.A.," and you

18 say I owe you for prepaid interest.  That is the

19 classic setoff and that's not being allowed under this

20 plan.  And 553 preserves that plan and I don't see how

21 you can take it away by a compromise that we didn't

22 agree to.

23          So, and you also asked, Your Honor, where is

24 the money going to come from to pay people?  Well, even

25 I wouldn't say that my direct lenders are entitled to

1 the more than the debt that they have not been paid.

2 That's all they get.  They don't get any extra money.

3          THE COURT:  Under your theory they would.

4          MS. CHUBB:  No, they wouldn't.

5          THE COURT:  Because look at, this is an

6 example.  They have gotten prepaid interest on this

7 loan, okay, you say they don't have to return for any

8 reason whatsoever.  Let us assume that Compass goes to

9 the bar and the bar says, "You know what?  I've been

10 meaning to pay you, but I didn't feel like paying and

11 now I'm going to pay you everything."  And your client

12 gets paid.  Why isn't that more than a hundred percent?

13          MS. CHUBB:  My client isn't going to get paid

14 more than my client is owed.

15          THE COURT:  How can they not.  They weren't

16 paid on the first, they weren't paid on that loan.

17 Their borrower didn't pay before.  You just told me you

18 weren't going to allow any offsets.

19          MS. CHUBB:  Right.

20          THE COURT:  Okay?  So under your theory they

21 don't have to pay that prepaid interest for any reason.

22          MS. CHUBB:  But if there's more than money

23 that is coming in, when the debtor advanced these

24 monies, it gave rise to a right to repayment.  The

25 borrower still owes the money.  So when that money

Page 184

1 comes in that money is going to be available to

2 everybody whose money was used to pay me.

3          THE COURT:  Wait, wait, wait.  How can they?

4 It's a direct loan.  Well, I guess the answer is the

5 borrower doesn't have to pay it.

6          MS. CHUBB:  The borrower does have to pay on

7 anything it hasn't paid on all of these loans.

8          THE COURT:  Okay.  So then if the --

9          MS. CHUBB:  In a perfect world if every loan

10 paid off, everybody would get paid in full.

11         THE COURT:  Sure.  If the borrower pays off a

12 hundred percent, you have already gotten your prepaid

13 interest.  You've already gotten money in advance that

14 you had no business getting.  You're saying, "No way

15 can you take that money back from me because I've got

16 it."  And you also claim that, "All of the money that

17 comes from this borrower is mine."

18         MS. CHUBB:  No, I'm saying I can only get

19 paid on a certain loan, like my client, can only get

20 paid on a certain loan what's owed.  And the rest of it

21 goes into this pot to pay people.

22         THE COURT:  So you can offset then.  The

23 debtor of the estate can net under that.

24         MS. CHUBB:  No, it's not netting, it's that

25 the money comes in to the estate and it goes to U.S.A.

1 after my client has been paid in full, taking into

2 account that they got prepaid interest.

3          THE COURT:  Well, that conflicts with what

4 you said before, but.

5          MS. CHUBB:  Well, I don't think so, but.  So

6 you know that we filed the adversary.  I don't see how

7 that can be wiped out by the plan, although I have

8 concerns that this compromise which we didn't agree to,

9 somehow might.  And all I'm saying is what I said last

10 summer, you know, you created this asset by letting

11 these monies be set aside.  It was never an asset of

12 the estate, it was a claim that the estate had against

13 other people.  And now the very asset that got created

14 by virtue of the let's-put-this-off-until-later

15 situation, is being used as one of the pawns in the

16 compromise.  It's just not property of the estate.  It

17 just isn't.

18          THE COURT:  So again, your unremitted

19 principal people are not allowed to have any of that 39

20 million under your theory?  It all goes to the direct

21 lenders?

22          MS. CHUBB:  No, that isn't what I said.  I

23 said we get to setoff to the extent we got prepaid

24 interest, we get to setoff for unremitted principal.

25          THE COURT:  So it's okay if you had two loans

1 out there, but if you had one loan, then you're just

2 stuck?

3          MS. CHUBB:  That's I guess so.  I don't have

4 one loan, but I guess some people, and some people in

5 this deal will get stuck.  And you can't make that

6 perfect through this plan or any plan that I can see,

7 but you can reserve the rights that my direct lenders

8 get under the code.  And I don't see how you can cram

9 down on them as part of this, quote, compromise, when

10 they haven't agreed to it.  Maybe the objecting parties

11 get to preserve their rights.  Maybe they have to, you

12 know, somebody has to come after them for the money.

13 Maybe they get to raise their defenses.

14          THE COURT:  And you acknowledge, though, that

15 if they're sued, that there could be a judgment entered

16 against them?  Not just netting, but a judgment entered

17 against them, if they lose?

18          MS. CHUBB:  Well, if they lose it depends on

19 what they lose on.  I mean, conceivably if there's

20 litigation, somebody is going to end up with a

21 judgment.

22          THE COURT:  Sure, but the point is you --

23          MS. CHUBB:  But everybody is going to raise

24 what's owed pre-petition.

25          THE COURT:  But you acknowledge if they lose

1 on the prepaid interest, they'll get a judgment against

2 them for the amount of the prepaid interest they've

3 gotten?

4           MS. CHUBB:  Except to the extent they have

5 defenses.

6           THE COURT:  If they lose on that issue.

7           MS. CHUBB:  Except to the extent they have

8 defenses, which we can raise.  That's all I'm trying to

9 do, is preserve the right to raise.

10          THE COURT:  Sure, but if you lose, there will

11 be judgment against them.

12          MS. CHUBB:  We're not going to lose.  It

13 can't be recoupment because that's not an assertive

14 cause of action.  It can't be a fraudulent conveyance

15 because the debtor got the value at the time it made

16 the advance because it can now collect against the

17 borrower.  So we're not going to lose.

18          THE COURT:  So you're guaranteeing your

19 clients are going to win the litigation?

20          MS. CHUBB:  Oh, sure I am, Your Honor.

21          THE COURT:  That's what you just said.  You

22 just said you're not going to lose.

23          MS. CHUBB:  Your Honor, I don't know why you

24 do that.  I guess because we're here all the time.  I'm

25 not going to argue with you.

Page 188

1          THE COURT:  You're not going to lose, you

2 said.  I just want you to acknowledge it can result in

3 a judgment against them.

4          MS. CHUBB:  I could lose.  That was a

5 facetious remark.  Of course, anybody can lose.  And

6 here lately, my odds aren't good.  So I just want to

7 preserve these rights.  I've made my objections.  Okay.

8          THE COURT:  Sure.  I appreciate that.  I just

9 want you to acknowledge because and you talk about the

10 compromise and there's nothing there.

11          MS. CHUBB:  I just don't want that

12 compromise.  My clients don't want that compromise.

13 And I don't see how it can be asserted against us even

14 if a lot of other people wanted it.  Thank you.

15          THE COURT:  Any other objectors?  All right.

16 Let's take a recess until about, you want to go to 3:15

17 to organize or is that too long?

18          MR. MEROLA:  No, we're ready to roll.

19          THE COURT:  Oh.  2:23.  Let's take about a

20 20-minute recess.

21          MR. MEROLA:  Thank you, Your Honor.

22          (Whereupon, a recess was taken.)

23          THE COURT:  Okay.  Ms. Jarvis?

24          MS. JARVIS:  Your Honor, I will go ahead and

25 respond first and then my very capable colleagues on

1 various committees will fill in in areas that I haven't

2 responded.  I do want to stay preliminarily, Your

3 Honor, as you can tell from the plan, this plan was

4 heavily negotiated with all of the constituencies.

5 This is a case where there are many different hurts

6 involved.  And the main concept of this plan in putting

7 it together is really to further the equitable

8 distribution to creditors in this case so that this

9 plan does provide, and we believe has a firm legal

10 basis for a situation where we can maximize assets and

11 equitably distribute it among all those that were hurt

12 in this case.

13          THE COURT:  I know I have a balance summary,

14 but rather than my digging through all this, do you

15 want to just generally refresh me as to the, and I know

16 have you the accepting classes, but I just want to get

17 a sense of the numbers, except arguably the unsecured.

18          MS. JARVIS:  Let me also mention to you, Your

19 Honor, that we have filed a replacement servicing, or

20 service the ballot.  When we originally filed it on, I

21 think if was Friday, unfortunately one of the lists of

22 the thousands of people served was left off and it was

23 replaced this morning.

24          THE COURT:  No, I know I have it, I was just

25 too lazy to look through this stack.  I know I looked

1 at it this morning, but.

2          MS. JARVIS:  In U.S.A. Commercial Mortgage,

3 Class A-4, general unsecured claims, votes counted,

4 876.  That's 61.09 percent that voted to accept.

5 That's 54.71 percent in amount that voted.  So 61

6 percent in number, 54 percent in amount.  Those voting

7 against it were 38.91 percent of number and

8 45.29 percent of amount.  And this is the one that I

9 said that at this point --

10          THE COURT:  The Dale Bunch?

11          MS. JARVIS:  Right.  At this point Dale

12 Bunch's, if you accepted the Keels, the resolution we

13 have on the Keels amount of voting, this class actually

14 becomes an accepting class pending the 3018 outcome of

15 Mr. Bunch.  The A-5 class, U.S.A. CM A-5 class, direct

16 lender compromise claims, the votes to accept, it was

17 68.88 percent of the number and 68.88 percent of the

18 amount.

19          THE COURT:  About how many people was it?

20          MS. JARVIS:  That was 1,224 votes in favor.

21 The votes against it were 31.12 percent in number and

22 in amount that was 553 votes.  The First Trust Deed

23 Fund equity interest, that's class B-5, there were 518

24 votes to accept.  That was 83.15 percent accepting and

25 86.22 percent in amount.  So 83 percent in number, 86

1 percent in amount.  Those voting to reject were 16.

2 percent in number and 13.78 percent in amount that

3 voted to reject.  So it was 105 votes to reject.

4          The Diversified Trust Deed Fund, class C-5,

5 which is also the equity interest, in that case 737

6 votes were in favor of the plan.  That was 83.47

7 percent in number and 86.39 percent in amount.  Those

8 voting to reject was 146 in number, that was 16.53 in

9 number and 13.61 percent in amount that voted against.

10         Then the U.S.A. Realty general unsecured

11 claims, that class is D-4.  There were seven votes

12 counted and all them voted in favor of the plan.  So a

13 hundred percent in number and a hundred percent in

14 amount.

15         In class E-4, that's the U.S.A. Securities

16 General Unsecured Claims, there were five votes cast.

17 That was a hundred percent in number and a hundred

18 percent in amount.

19         THE COURT:  Okay.  Thank you.

20         MS. JARVIS:  Your Honor, let me turn first to

21 the issue of the loan servicing agreements that we

22 believe are clear, they're not executory contracts and

23 therefore, can be transferred and sold free and clear

24 pursuant to 11.23 and 363.  There was an issue raised

25 that there had not been adequate notice that this would

1 be done.  And just to very briefly trace the history of

2 this, the first plan the debtors filed was on

3 September 15th and in that case that was right after

4 the initial term sheet was signed up with Silver Point.

5 And in that plan, the term sheet itself it did provide

6 that the LSA's would be sold to a buyer in a way that

7 wo not include administrative expense.  And

8 administrative expense was defined as secure amount.

9 So at that point in time it became clear the debtor

10 assumes that a contract, executory contract.  That was

11 then further clarified in the October 18th plan and

12 then May 3 again, very clear in the current plan that

13 we're seeking to have some.  So at least as early as

14 mid September it was clear that the debtor took the

15 position they, these were non-executory contracts.

16            The issue that comes up, Your Honor, that is

17 this an executory contract.  We keep hearing about

18 obligations on the need to be performed, but those

19 obligations are all on one side of the contract.  The

20 obligations that would trigger material breach are on

21 the U.S.A. Commercial Mortgage side of the contract.

22 And in order to be an executory contract under the code

23 you have to have those material obligations on both

24 sides.  And they're not material obligations on sides

25 of the lenders, which render these contracts

Page 193

1 non-executory.

2          As the Court knows in the Munsell case, you

3 know, this is the, I think the standard rule, that when

4 a party has substantially performed it's side of the

5 bargain such that the party's failure to perform

6 further would not constitute a material breach,

7 excusing performance by the other party, then the

8 contract is not executory.  And it has been conceded

9 that if the obligations of the one party is so far

10 performed, that the failure to complete any performance

11 would not cause a material breach, then it's not going

12 to be an executory contract.  In the end what's been

13 defined is what are the remaining obligations of the

14 direct lenders in this case.  They are clearly not

15 obligations that would be, constitute a material breach

16 and excuse performance by the other side, making these

17 non-executory contracts.

18          The three provisions that were raised, the

19 supposedly make this an executory contract on the side

20 of the lenders are the issue of the, in section 2-C

21 where it provides that at its sole discretion.

22          THE COURT:  Hang on one second.  Let me get

23 out my servicing contract.  Okay.  I happen to have one

24 which is between Finland and U.S.A. Commercial Mortgage

25 which was, this is, I don't know this is one of the

Page 194

1 ones that has since been filed or not, but this is one

2 of the ones I happen to have.  I assume they're all the

3 same or substantially similar, at least as far as this

4 goes.

5          MS. JARVIS:  Yeah, they are.

6          THE COURT:  Okay.

7          MS. JARVIS:  We did file one earlier.  It was

8 attached to Mr. Allison's declaration and we

9 incorporated all of his declarations into his current

10 declaration.  So it is in evidence in this hearing.

11          THE COURT:  I knew it was in the record

12 someplace, I just don't know where.

13          MS. JARVIS:  We can pull that for you.  If

14 you look at section 2-C, this is the first provision

15 which is the lenders claim make this executory.  In

16 that provision it says, quote, "At its sole discretion

17 at U.S.A. Commercial Mortgagee's sole discretion it can

18 pay off the lender by paying principal and accrued

19 interest and the lender shall concurrently execute and

20 deliver to U.S.A. an assignment and a deed of trust."

21 Does Your Honor have one?

22          THE COURT:  I do have one.

23          MS. JARVIS:  Great.

24          THE COURT:  This is the 804 version of the

25 loan servicing agreement.  Down at the bottom it has

1 got D.1 ref 804.

2          MS. JARVIS:  They're very similar.

3          THE COURT:  It says on that same provision I

4 just wanted to.

5          MS. JARVIS:  I think it's the same, Your

6 Honor.  The one we're looking at is the one that was

7 attached to Mr. Allison's declaration which was filed

8 on November 6th, 2006.

9          THE COURT:  Okay.  This provision, Your

10 Honor, is simply an option agreement.  It's solely

11 within the description of the debtor, U.S.A. Commercial

12 Mortgage exercised and therefore under the Helms case

13 and the National Financial Realty case that we decided.

14 It's an unexercised option agreement at the time of the

15 bankruptcy, which does not make it an executory

16 contract.  It's just an unexecuted unilateral contract

17 and therefore, the lenders are not capable of breaching

18 this agreement.  And the creation of any further

19 obligations lies solely within the discretion of the

20 optionee, which in this case is the debtor.  And under

21 the Helms case in this instance it does not make it an

22 executory contract because they don't have anything to

23 do with the lender to not have any performance, that

24 they would have to do that would trigger a breach of

25 this contract.

Page 196

1            Further, at the time this is within the

2 exercise, all they would have to do up to payment by

3 the debtor is to execute that assignment.  And there is

4 case law, Your Honor, that it says that back, it's in

5 the Lemmons case where it says that no substantial

6 performance remains on behalf of the investor.  So this

7 is a similar contract, and specifically it says an

8 obligation to convey title or to surrender a promissory

9 note upon satisfaction of the underlying debt is

10 sufficient to render an agreement executory.  So at

11 this point it would be an exercise of payment in full

12 of principal and interest and they would really have to

13 excuse at this time.  So that does not make it an

14 executory contract.

15            The second section they cite is section four

16 which provide that, quote, "On demand U.S.A. quote,

17 lender agrees to promptly pay in advance, sorry, to

18 reimburse U.S.A. Commercial Mortgage for certain out of

19 pocket expenses."  Now, even if a lender does not

20 comply with section four, it does not by the terms of

21 the contract itself excuse U.S.A. Commercial on its

22 performance.  In fact, in the very next sentence it

23 provides that if the lender does not advance or

24 reimburse these costs of demand, then, quote, U.S.A.

25 may at its discretion advance such fees, provided,

Page 197

1 however, that any fees advanced from U.S.A. should be

2 paid back from the proceeds of the foreclosure or any

3 other monies collected with respect to such loans

4 before any payments are made to the lenders.

5           So the lenders cannot breach this because the

6 provisions of the contract provide that the money in

7 possession of U.S.A. Commercial Mortgage, they've

8 already authorized them to then retain this money to be

9 paid so.  And further, they indicate any lenders does

10 not perform on this, it does not excuse U.S.A.

11 Commercial Mortgage from continuing to act under the

12 servicing agreement, it just provides U.S.A. Commercial

13 Mortgage a way to make sure it gets paid for its

14 continued performance.  So this is not a provision that

15 would excuse U.S.A. from further performance under the

16 contract.  And it's similar to the Texican case in the

17 Ninth Circuit.

18           The third provision they cite is section 11,

19 which provides that upon U.S.A.'s request the lender

20 will execute and deliver a declaration of agency and

21 limited power of authority.  Like in the Columbia Gas

22 case, this is really an administerial act because they

23 already authorized an authorized act, U.S.A. Commercial

24 Mortgage has, and already agreed to do this.  It is

25 merely that when asked, they need to sign it.

Page 198

1          So again, this does not make an executory

2  contract similar to the Columbia Gas case.  And as in

3  the Lemmons case, Your Honor, there was a decision that

4  these are, that these were not executory contracts

5  because like in this case, the performance has been

6  substantially made already by the lender.  They paid

7  their money and there's little or nothing left for them

8  to do except to wait for a payment.

9          THE COURT:  Weren't they looking, I know

10  there was executory contract involved, but in that case

11  were they looking not just to the Silver State

12  contracts, but in the agreement.

13          MS. JARVIS:  Right.  There was a double

14  agreement in that case, but it's a similar situation in

15  that this is a passive investment, they paid their

16  money, they performed and there was not anything that

17  they would have to, the lenders would have to perform

18  that would excuse towards the mortgage company from

19  further performance in this case and that makes the

20  contract non-executory.

21          These lenders are similar in their position

22  to the Scott and Campbell contract in the Quintex case

23  which was decided by the Ninth Circuit in 1991.  In

24  that case they said, looked at these contracts and they

25  said they have got, substantially completed their

Page 199

1 duties under the contracts.  In this case it would be

2 the advancement of money to fund the loan.  In that

3 case they said, quote, "There are no substantial

4 unperformed duties owed by them," but that the

5 contracts were not executory.

6          In that case these non-executory contracts

7 were sold under 363, the Ninth Circuit confirmed in the

8 Quintex case.  It was a sale free and clear under 363,

9 which was designed to maximize the value to the estate.

10 And the Ninth Circuit in that case confirmed that.

11          One of the issues I have that arises in the

12 situation you've heard from some of the objectors is

13 really the concern that they don't like the terms of

14 the contract that they signed.  They don't like the

15 fact that the debtors can sell these and transfer them

16 to a new servicer, but there is nothing in these

17 contracts that prohibits them from being transferred.

18 There's nothing that says the lender has the right to

19 choose who they transfer to.

20          Now, they do have rights, exercised certain

21 changing of servicers.  The 51 percent provision.  And

22 that really is their protection, Your Honor, because

23 once they're transferred they're concerned with whether

24 Compass pursues the action they need to pursue.  That

25 might be what triggers the 51 percent.  So these are

Page 200

1 the terms of the contract and they're bound by that.

2          There also has been some concern about the

3 default interest rate again.  That is one of the

4 provisions of the contract, that the lender sign the,

5 the contract belongs to Commercial Mortgage and the

6 servicer.  And that creates the situation it creates.

7 It doesn't change with respect to the now that we are

8 selling these to a new servicer.  They're new

9 provisions to the contract.  They're not changing.

10 They're not being modified and they're not ground for

11 not proving this transfer.

12          So we think it's clear these contracts are

13 not executory and they can be transferred under 363.

14          Let me next deal with the prepaid interest

15 issue.  Again, there has been some allegations that

16 it's not clear what happened to the prepaid interest.

17 We've not been given clear warning that the prepaid

18 interest would become the property of the estate.  So

19 let me take a few minutes to address this.  In the

20 original plan that was filed September 15, in section

21 6.4 it clearly says that any prepaid interest collected

22 from borrowers as well as prepaid interest that is

23 netted for lenders would become property of the estate

24 as confirmation.

25          So as part the confirmation process it was to

1 become property of the estate.  At this point nothing

2 prevented the lenders from doing discovery or whatever

3 they wanted to if they thought that this was improper

4 because this is clear in the notice as of September

5 15th, this is what was going to happen in this plan.

6 On the October 18th plan, again, section 6.4, notice

7 was given.  And while it was, the debtor's preserve the

8 right to bring in earlier response because at that time

9 the debtors were concerned that we might have to bring

10 an earlier dispositive hearing for liquidity purposes.

11 We ended up not having to do it, but in absence of

12 that, again, it's clear the confirmation seek a

13 determination again, and the confirmation of the plan

14 would determine that the prepaid interest was the

15 property of the estate.

16          If you look at the plan we have today, it's

17 very clear that the debtors are seeking a determination

18 that upon confirmation the prepaid interest and the

19 prepaid interest is identified both as interest that is

20 collected from borrowers that's already been paid to

21 lenders, and interest that is netted from lenders, that

22 that would be property of the estate.

23          If you turn to page 61 of the disclosure

24 statement it says, "Debtors contend and the plan

25 provides that the prepaid interest constitutes property

1 of the U.S.A. Commercial Mortgage bankruptcy estate

2 under section 541 of the bankruptcy code.  First by

3 making advanced payments to direct lenders without

4 receiving underlying payments from the borrowers, the

5 borrowers became indebted to U.S.A. Commercial Mortgage

6 for the amount that U.S.A. Commercial Mortgage

7 advanced.  The payment collected later from such

8 borrowers on account of such advanced funds constitutes

9 payment of that debt and is property of the estate

10 under section 541 A-1 and A-7 of the bankruptcy code.

11 Likewise, the payments collected from borrowers on

12 other loans and withheld from the applicable direct

13 lenders through the court approved netting process are

14 estate properties because they constitute a valid

15 recoupment and are setoff, and recovered from direct

16 lenders who received improper payment advances from

17 U.S.A. Commercial Mortgage's prior management.  That's

18 the prepaid interest collected and to be collected in

19 the future from the netting process is also property of

20 the estate under section 541 A-3 and A-7 of the

21 bankruptcy code.

22          And this is reiterated in the plan itself in

23 section 4-E, 1-D on the section entitled prepaid

24 interest.  So herein notice has been given that we have

25 asked for as part of confirmation, a determination of

Page 203

1 this property of the estate.  There is a second way

2 that prepaid interest is property of the estate and

3 that is through the compromise section of the claim.

4           So there's both a determination on its merits

5 that this is property of the estate.  And there is also

6 a backup, if I might say, of compromise.  And frankly,

7 Your Honor, when you look at the votes on the plan the

8 direct lenders have voted that the compromise, I will

9 not address that.  I will allow that to be direct

10 lenders' opportunity to address the issue, but we'll

11 turn then to why this is clearly the property of the

12 estate.  And this ties and I'm going to kind of go into

13 a circumstance, this ties into again this diverted

14 principal issue because the reason why the diverted

15 principal claims don't have special claim on this

16 money.  Also, part of why this money is included as

17 part of the property of the estate.  When money, and I

18 will explain this a little bit further, but when money

19 is paid out and cannot be traced to any source, then

20 when it's returned it's property of the estate.  And

21 that's the situation we have in this case, Your Honor.

22           In the Danning v. Bosak case it talks about a

23 547 issue but again, it's a situation you can't trace.

24 Lots of complainants, this is my money, you can't trace

25 it.  In this case we said it's property of the estate.

1 Recoupment is also appropriate here.  And Your Honor

2 may recall that when we brought our motion to first to

3 hold monies and then to hold funds and then to allow

4 for distributions, we saw the ability to net.  And when

5 we netted we stopped with the way these loans were

6 dealt, which means there were several loans in one

7 borrower or one lender's group that were paid with a

8 single check that were treated together.  It would be

9 in the same vesting, but there might be more than one

10 loan.  We did not extend it.  We did not go across and

11 pick up, try to pick up somebody with a different

12 vesting name and recoup across that.  We stuck only

13 with the grouping as it had been done before the case

14 was filed and we netted across those loans.  When the

15 Court allowed us that, the Court made a preliminary

16 ruling that recoupment was appropriate, that the court

17 found that recoupment was proper.  And what we are

18 asking for is in this confirmation of the plan the

19 determination that recoupment can be, is allowed in

20 this instance under the plan.

21          In this case, really it is a situation where

22 you're simply, it is a defense for the obligations that

23 otherwise would be owing these lenders.  We collect

24 this money, we need to remit this money him, but we

25 have the amounts they also owe us, so we are simply

Page 205

1  taking, it's very similar to an overpayment type

2  situation which is a classic situation of recoupment.

3  We're taking this and taking into account the

4  overpayment they already received netted them back and

5  then remitting them, the amount of the claim that we

6  owe them and what we owe them, taking out what we've

7  already overpaid them.  And in this case it is similar

8  to the Madigan case which is the Ninth Circuit case

9  because it's used solely for reduction of a claim in

10  paying out the lenders.

11           It also meets the logical relationship test.

12  I know we decided this before in the Newberry case.

13  I'm sure Mr. Charles will tell us more about this, but.

14           MR. CHARLES:  Thank you.

15           MS. JARVIS:  But it does say that recoupment

16  will be applied in the logical relationship test.  So

17  if there, it's a logical relationship between the two

18  debts that are being recouped or the reduction of the

19  claim, and it will apply.  Whether it would be

20  equitable for the debtor in this case, it's not just

21  the debtor.  It is the other side who would enjoy the

22  best benefits of the transactions without us meeting

23  the obligation in this case.  It would be inequitable

24  for the lenders to enjoy the benefits of this

25  transaction without allowing for the recoupment of this

Page 206

1 overpayment, Your Honor.

2           This is also similar to the Ashland case

3 which is a Tenth Circuit case we cited and this case

4 is, I think applicable in this case because in the

5 Tenth Circuit they affirm to recoup and the recoupment

6 was done.  Not, there was no adversary proceeding

7 required.  It was simply as they paid their debt.  In

8 this case it was debtor to, or a creditor to a debtor.

9 They simply recouped the amount that was allowed.

10          Now, this is the common way it's done.  Even

11 with respect to motions in limine, recoupment isn't

12 necessarily stayed, so there is no need as set forth in

13 this Ashland case to file any kind of adverse

14 proceeding because it's defensive.  Figuring out what

15 is the amount actually owed when you net out what is

16 owed back.  In the Ashland case it also talked about

17 the support to allow recoupment where it's a question

18 of unjust enrichment and the avoidance of a windfall,

19 that's what we have here, Your Honor, recoupment isn't

20 allowed.

21          Further, Your Honor, when not allowing

22 recoupment what you end up with is basically a

23 situation where the pre-petition debtors management,

24 you pay certain people improperly.  That would remain

25 in stone without a lot of expense in trying to recover

Page 207

1 that.  You know, they chose basically who got payments

2 that they didn't deserve.  And recoupment is a way of,

3 an allowed way that this can be brought back into the

4 estate or not brought back into the estate, or, but

5 termed to be property of the estate because it's held

6 back from amounts that are owed to the debtors to be

7 able to effectuate an equitable distribution among all

8 the creditors in this case.

9           Let me then turn to the diverted principal

10 claim because this kind of ties back into it.  And I

11 just want to review real quickly the evidence that we

12 have on this.  And again, Your Honor, it was very clear

13 from the original plan, September 15th plan it was our

14 position, and in fact as early as the April 14th

15 declaration of Mr. Allison there was evidence given of

16 not only diverted principal, but also commingling in

17 this account and the collection account pre-petition.

18 And this evidence is in more detail, has been given in

19 more detail in Mr. Allison's declaration and is

20 unrefuted that there is a commingling of this account.

21           In the original plan of September 15th it was

22 stated that if anybody thought they had any special

23 rights to these prepaid interest amounts, they would

24 have to trace.  And the law is very clear, Your Honor,

25 that the burden is on the party who's tracing.  And the

Page 208

1 Bullion Reserve of North America case which is the

2 Bosak case in the Ninth Circuit that says even if an

3 express trust was created, even if you had an express

4 trust Bosak would still have the duty under federal

5 bankruptcy law to trace such funds under question.

6 Such tracing requirement is necessary to further the

7 bankruptcy code policy the quality distribution among

8 similarly situated creditors.  Here in that case Bosak

9 cannot trace and therefore, the property in question is

10 property of the estate.  That's the same situation we

11 have here, Your Honor.  Let me just briefly walk

12 through it and kind of tie them together, why it's

13 clear these properties cannot be traced.

14          There was no express trust because the

15 collection account was never a trust account.  Was

16 never treated as a trust account, wasn't a trust

17 account.  In Mr. Allison's declaration he explains that

18 much of the money in the account did not come from the

19 borrowers.  A substantial part of the money constituted

20 uncollected servicing fees that belonged to Commercial

21 Mortgage.  Millions of dollars in the collection

22 account came from the Diversified Trust Deed funds.

23 Over five million dollars, and this is just an example

24 of monies that came in and out so it's clear this was

25 never, a trust account was never, always commingled.

1 In one example over $5 million came from T. J.

2 Marketing, which was not a borrower.

3         On the flip side, there were also substantial

4 funds that were transferred to parties that were not

5 borrowers.  In Mr. Allison's declaration he explains

6 that regular payments were made to Dale Bunch, who was

7 not a direct lender.  Regular payments were made to Sal

8 Rialli for the benefit of the principals of this

9 company, of U.S.A. Commercial Mortgage, again, who was

10 a not borrower.  Regular payments were made to Bob

11 Stupak, who was also not a direct lender, none of these

12 people were direct lenders.  And a payment was made for

13 the benefit of the Peterson family who were not direct

14 lenders.  They had converted ventures.  So in this

15 entire history this fund was commingled, was not

16 separated out or was not treated as an express trust,

17 nor is there any constructive trust that has been

18 approved.  The burden is on the creditor seeking to

19 oppose a constructive trust, and no one has presented

20 evidence and there is no evidence in front of this

21 Court that anyone has the ability to trace these funds.

22 And that makes these funds then, as I previously

23 stated, the property of the estate.  And it is the

24 party's burden who thinks they have a special claim to

25 these funds to prove that tracing.

Page 210

1          We also have evidence even though it's not

2  our burden to prove this, but in order to make sure

3  this is clear, in Mr. Allison's declaration he did

4  explain that tracing was impossible in this case.  He

5  cites inaccurate records.  He also cites there were

6  literally tens of thousands of transactions.  And in

7  fact in the exhibit Mr. Allison's declaration gives us

8  an example of one situation in which there was diverted

9  principal, showing that principle would come in and

10  literally thousands of checks would go out shortly

11  thereafter.  The practice of making --

12          THE COURT:  And on this chart we've got

13  payments to direct lenders.  These weren't from the

14  direct lenders in the, some were, but some weren't.

15          MS. JARVIS:  No, they were just direct

16  lenders.  Everyone was getting paid their interest.

17  And money would come in just go out to thousands,

18  commingled and go out to thousands of direct lenders.

19          THE COURT:  And this chart shows you, I guess

20  the point the money came in and after that date some

21  amount of money went out.

22          MS. JARVIS:  That's right.  It's just meant

23  to be demonstrative, Your Honor, to give a good example

24  of how this transaction worked and how not only was

25  commingled, but it went out to thousands of directors.

1           THE COURT:  And in this collections trust

2 account, everything was in there?

3           MS. JARVIS:  Yes.

4           THE COURT:  There was only one collections

5 trust account?

6           MS. JARVIS:  Yes, that's right.  As I just

7 explained to you, these different sources of money are

8 examples of what went into, there was different

9 payments made to direct lenders are examples of what

10 went out.  In addition the practice of making these

11 unearned prepaid interest payments began as early as

12 2001 and lasted over five years, which is also in

13 Mr. Allison's declaration.  The length of time in which

14 these prepaid interest payments were made, again

15 demonstrates the impossibility to trace in this

16 instance.  And the reason why this without tracing this

17 property is property of the estate.  Even if a

18 constructive trust existed, the trust ceased to exist

19 shortly just prior to its petition date.  And just

20 looking back at two ways of looking at that, if you

21 look at the checkbook back on the account on March 14,

22 2006 it was negative.  And Mr. Allison's declarations

23 go through a period of time when the book balance was

24 negative and there were more checks outstanding that

25 had to be paid.  So even if there was a claim that they

Page 212

1 could trace, at this point in time shortly before the

2 petition was filed, there was nothing left in the

3 account that we could trace.  The constructive trust

4 doctrine also does not apply when the total claims of

5 similarly situated creditors exceeds the amount in the

6 account.  There was 26 million in diverted principal as

7 explained in Mr. Allison's declaration, and yet the

8 bank balance, the actual balance not taking out the

9 checks that hadn't been written yet on March 16, 2006,

10 so very shortly before the bankruptcy was filed, was

11 only $2,704,817.  So again, when you look at this and

12 you have more claims that could make a claim to the

13 amounts and not enough money to go around, that would

14 constitute property of the estate.  Most of that law

15 was developed in Ponzi scheme situations where clearly

16 there was not enough to go around.  And in that case

17 it's down to the property of the estate to be equitably

18 distributed under the policies of bankruptcy law.

19         I would just make one last observation with

20 respect looking at the diverted principal and prepaid

21 interest.  The State assets have been used to collect

22 this money that is in the account now.  The money that

23 has been collected from borrowers that was previously

24 paid and the money that has been recouped or netted

25 from the direct lenders.  So if we just look at an

1 equitable situation we also have some money be

2 available for all creditors for the estate.  And that's

3 the determination that we're seeking at this time.

4            Let me just basically touch on one last

5 issue, and that is there have been claims that those

6 with the diverted principal, other claimants should be

7 able to offset.  And this is part of the compromise

8 that was reached.  The compromise reached between the

9 direct lenders and the uninsured creditors committees

10 of U.S.A. Commercial Mortgage, that there would not be

11 an offset.  And there's been some complaints about that

12 and I just want to go through and briefly explain one

13 of the sides of the compromise and why there is a

14 reasonable compromise to approve.  The Aviation

15 Ventures case that was cited actually in the Lender

16 Protection Group.

17            THE COURT:  Let me ask you a practical

18 question.  How many people have diverted principal, but

19 are also direct lenders besides the fund?

20            MS. JARVIS:  You mean how many are completely

21 paid off, how many have interest in other loans?

22            THE COURT:  Yeah.  In other words, most of

23 the diverted principal this is an issue that's been

24 raised.  It's a real issue in a sense that in order to

25 have a setoff you have to have the claim in a different

1 category, that being the diverted principal.

2          MS. JARVIS:  As you recall, well, because

3 most of the lenders in this case have loans and more

4 than one loan.  So it could make a substantial

5 difference because if they are paid totally out of one

6 loan.  So if they had diverted principal on one loan so

7 they no longer have anything owed on that loan, but

8 they have say three other loans that were still

9 collecting from to allow them to offset and it could

10 actually favor that lender over everybody else who's

11 been harmed in this estate.  And one of the things

12 that's been argued in the Lender Protection Group

13 brief, if you look at page 12 of their brief the

14 position they're taking is these lenders have claims

15 against U.S.A. Commercial Mortgage.  Principal

16 investments has been diverted or stolen, breach of

17 contract, breach of fiduciary duty, diversions of

18 others, that's under Nevada law they are permitted to

19 offset their claims to U.S.A. Commercial Mortgage

20 estate against U.S.A. Commercial Mortgage's claimed

21 prepaid interest.  So they're taking the position box

22 it's not just diverted principal.  Anybody in the

23 entire estate if they have any claims can offset the

24 prepaid interest.  And that is completely counter to an

25 equitable distribution situation.

Page 215

1          The law in this instance and again, that's

2 why this makes this compromise make sense, is that when

3 you look at that offset it's clear under Ninth Circuit

4 law that it is permissive and not mandatory.  So when

5 you have a 553 potential offset, the Court is the one

6 who decides whether it's within the discretion of the

7 bankruptcy court and it's not to be used for

8 inequitable purpose.  And in this case we think the

9 compromise that was reached, given the circumstances

10 that we're under, is not counter to the law because of

11 that discretion, and it is an appropriate compromise.

12 Thank you, Your Honor.

13          THE COURT:  Okay.  Frank?

14          MR. MEROLA:  Good afternoon, Your Honor.  On

15 behalf of the Direct Lender Committee, Frank Merola of

16 Stutman, Trietzer & Glatt.  First Trust Deed Committee.

17 I'm going to talk about direct lending, so.  Any good

18 plan of organization is a series of interrelated

19 compromises, and perhaps that's very true here.

20 Multiple estates have settled their claims with each

21 other that allow us a way, allow us to go forward and

22 get out of bankruptcy and at the same time the plan has

23 compromises of only certain rights with direct lenders.

24 And we've been talking about this most of the day at a

25 level that I'm concerned a lot of people in the

Page 216

1 audience don't understand.  And because we've had such

2 a campaign of misinformation on this issue, I want to

3 spend a few minutes.  Before I do, this issue is raised

4 primarily by the LendEr Protection committee.  I share

5 your concern that I don't know who they really

6 represent other than Ms. Bangle, because obviously

7 these positions, if you had a pure unremitted principal

8 person, the arguments you're advancing on behalf of the

9 pure direct lender fire upon each other.  And Your

10 Honor pointed out some of the problems there.  But

11 secondly, and even more basically, some of the people

12 listed on his statement of who he represents voted in

13 favor of the plan.  So to stand up and start nibbling

14 around at the edges of the plan doesn't make a lot of

15 sense.

16          Now, a lot of times when I can't figure out

17 something complicated I do them as Mrs. Karakis says,

18 because I don't have the attention span.  When I

19 thought about this direct lender issue I literally just

20 wrote it out.  Now, my example is that a single

21 borrower a direct lender up top has a hundred million

22 dollar obligation from a borrower whose at the bottom.

23 Assume that interest rate it is 12 percent.  So every

24 year the borrower should have sent the $12 to the

25 debtor and the debtor in turn should have sent the $12

1 back up to the direct lender.  That's the way it was

2 designed to work.  That's what Hanges and Milanowski

3 promised people.  But what happened pre-petition was

4 the borrower didn't pay.  In a lot of cases no money

5 went up to the estate, and notwithstanding the fact no

6 money went up to the estate, $12 went to the direct

7 lender.

8            Now, we've got some important

9 acknowledgements here today.  First of all, no one has

10 given you any evidence that disputes this money was

11 commingled in such a way that no one can trace where

12 it's from.  In fact, three times in his argument

13 Mr. Smith acknowledged commingling.  So this money

14 clearly wasn't this money here.  Your Honor is on and

15 understands this issue and the issue is they weren't

16 entitled to this money.  This $12 was not part of their

17 security interest.  This $12 was not part of their

18 security documents.  It's not the proceeds of their

19 collateral.  It purloined property of other people.  So

20 much so, Your honor, we have no one disputing that, the

21 fact that that transfer was illegal under Nevada state

22 law.  Now, notwithstanding the fact everyone

23 acknowledges it's illegal, and notwithstanding the fact

24 everyone acknowledges there's no contractual right to

25 payment, at least two people stood up here today and

1 said, well, I have the money and I have some defenses,

2 make them sue me.  Here is what we're settling, Your

3 Honor.  It's legally aligned on petition day.  Assume

4 that the borrower woke up and paid two years of

5 interest.  One for one he missed, and the current year.

6 $24 from the borrower went to the debtor.  I want to

7 make sure everyone understands this.  The current

8 portion of the current interest, the $12 went out to

9 the direct lenders.  That was already distributed.  All

10 we're fighting about is the $12 that was collected

11 post-petition that was erroneously paid pre-petition.

12 Now, the bad news in this case is if you take all those

13 $12 and add them up, it comes up to $39 million.  The

14 question is how do I get the $9 million back into the

15 estate that these people improperly got?  Now, I'm

16 going to talk about the compromise mostly from the

17 standpoint of procedure.  And the problem is whenever

18 you talk about procedure, when somebody has anything

19 that looks like a secured claim, you hear about adverse

20 proceedings.  Let's talk about what's not being

21 affected here.  The direct lenders claims under the

22 deed of trust, not affected.  The direct lenders claims

23 to future payments from the borrower, not affected.  I

24 direct lenders fractional interest in the deed of trust

25 that secures the property, not affected.  There's no

Page 219

1 avoidance of the lien, there's no modification of the

2 obligation.  The only thing that has happened is the

3 money they got that their borrower didn't pay is being

4 netted out of money that got paid later.  That's the

5 only right that's being affected.  That's the only

6 thing we're doing to the direct lenders.  Now, we've

7 seen things in chat rooms and on the Internet that

8 would make the hair I have remaining, fall out.  And

9 that's, we're taking all of the interest prospectively

10 that we're going to sue people and take the interest.

11 None of that is true.

12          Currently, approximately $16 million has been

13 collected and the goal is that as the borrower is paid

14 off or as the loan becomes mature and you have

15 collection actions, the full amount that was

16 erroneously paid over or something close to that will

17 come into the estate.  Now again, the mantra we keep

18 hearing is because these people had security interests,

19 an adversary proceeding is necessary.  That simply

20 isn't the case.  That's not what the law provides and

21 it's really an advance reading, if anything.

22          First of all, under 1123 of the bankruptcy

23 code we are entitled to classify and treat claims.  The

24 ability to designate treatment for a claim is the

25 ability to compromise it, by definition.  If a group of

1 people had hundred dollar claims, but vis-a-vis the

2 other creditors in an estate people didn't feel it was

3 appropriate they got paid in full, the plan provides

4 that people with $100 claims got $50 claims.  And if

5 that class is accepted by the requisite requirement

6 under 1126, would you call it a compromise or would you

7 call that a distribution?  The people in that class are

8 bound by that distribution.  And that's exactly what's

9 happening here.  In addition, under 1123 B3-A the plan

10 can always include compromise.  And all we're doing is

11 compromising this issue regarding the improperly paid

12 pre-petition interest against monies that come through

13 the estate.

14          Now, I think Miss Jarvis did an excellent

15 job.  A lot of the cases in this area are aha cases.

16 There are case where, again I apologize to people that

17 don't do bankruptcy.  They're the Chapter 13's where

18 people are trying to get discharged by declaration.

19 And that is that people are trying to sneak something

20 through in the plan.  That people haven't had an

21 opportunity to be heard and people say aha, I avoided

22 your security interest, or aha, I canceled a portion of

23 your lien.  Nothing like that is happening here.

24          A compromise on a ripe payment that occurred

25 pre-petition that they've known about since the

Page 221

1 beginning of the case is being compromised.  We heard

2 repeatedly we heard that two or three people say we

3 were promised things.  "We were promised A proceeding."

4 This is the proceeding.  We were crystal clear that the

5 proceeding could be in the context of a plan.  The plan

6 in the disclosure statements since they were filed are

7 crystalline on the issue that this confirmation is

8 being imposed.  But yet, we don't have any conflicting

9 evidence on the compromise, we don't have any efforts

10 to take discovery of the debtor to make sure are

11 contradicting any of these facts, we don't have any

12 contention that the payments, when made, were not

13 consistent with the contract and were in fact illegal.

14 What we do have is saying, well, we have undisclosed

15 defenses.  They can come and sue all four thousand of

16 us.  And that's clearly not what the code requires.

17         THE COURT:  Let me go back to my practical

18 questions again.  We now have a known universe of

19 people who claim who say go sue me and want to go

20 through the process, as opposed to in the beginning of

21 the case our concerns were, you know, you file a

22 lawsuit against some person, they don't know what to do

23 they don't have representation, they don't understand

24 it and you've got an absolute mess.

25         We now have a known universe of Ms. Chubb's

1 and Mr. Smith's clients who say sue us.  Come and get

2 us.  Query.  It's a practical matter.  Because we have

3 problems of I assume they appeal if your position

4 prevailed.  Why not modify the plan to say for those

5 people who accepted the plan or not voted, I think you

6 can clearly say they have consented to this process.

7 And as to those who have objected to the plan, then

8 either they start an adversary with the next day which

9 you anticipated, or you start the adversary and just

10 name them all as defendants.  That's a practical

11 question right now, putting aside your legal arguments.

12          MR. MEROLA:  No, I understand, Your Honor.

13 And the reason you can't do that or you shouldn't do

14 that is that we have a single corpus of assets that

15 there are multiple claims against.  The problem we have

16 with Ms. Chubb and Mr. Smith, is they take

17 diametrically opposed positions.  We are told in the

18 oppositions today that this pot of money, either A,

19 belongs only to direct lenders and you can't touch it

20 at all; B, belongs to the unremitted principal people

21 because they have some spiritual claims to these funds;

22 C, the insiders told us where they think it should go

23 that's different; and D, once we bring it back into the

24 estate we have the absolute priority rule we have to

25 represent.

Page 223

1          All four of these people want to keep this

2  money for themselves.  That's not an adversary

3  proceeding, that's a plan.  We have a dispute to a

4  single corpus of funds as to where it should go.  And

5  the only way to resolve that matter is to resolve it in

6  the context of a plan with all of those parties

7  represented.

8          So simply stated, I can't compromise, first

9  of all, that's not Mr. Smith's argument.  Mr. Smith's

10 argument is that I have to sue everyone who I don't

11 have a permanent consent from.  It's not just people

12 who were rejected.  So we're talking about thousands of

13 people.  Now, if I and Mr. Charles and the direct

14 lenders group sat down and figured out how to do this,

15 if we had to do it, what we would do is sue all these

16 people.  We would ask for a preliminary injunction

17 continuing the withholding so they wouldn't get paid

18 currently, and I would ask for a prejudgment attachment

19 on maybe their personal funds, but definitely on

20 anything they got out of this estate.  So we would be

21 in the position where we'd have no ability to

22 consummate the plan because we need the positive

23 consideration, and we'd have lawsuits to make sure that

24 none of those people got a penny.  Who does that serve?

25          The problem with Mr. Smith's position and the

Page 224

1 whole Lender Protection Group, is what are they

2 advocating?

3          Are they suggesting that we shouldn't have a

4 plan?  Again, what's so important is read the

5 conclusion of that objection.  It's the most

6 frustrating part with him and Miss Chubb.  They tell

7 you they don't oppose confirmation of the plan.  They

8 tell you they don't oppose consummation of the sale.

9 But what they want to do is they want to go in and pick

10 specific items of the compromise and tweak them in the

11 favor.  That's not the way interrelated compromises

12 work.

13          THE COURT:  I think they want to confirm the

14 plan as long as only their claims are paid.

15          MR. MEROLA:  Exactly.  And even in this

16 context they have thousands of people, they have the

17 two people objecting saying we don't want to get in the

18 way of the Compass sales.  Please consummate the

19 Compass sales, but we want to make sure you can't

20 offset against our prepaid principal, and you've got to

21 initiate litigation against us and we might have

22 defenses.  That's not the way bankruptcy is supposed to

23 work.  Again, we can go into that, but the idea that

24 there's a single corpus that we have to recover for the

25 benefit of multiple constituencies is what this is all

1 about.

2          In addition, under 7117 a plan can, you don't

3 need an adversary proceeding.  You can in a plan,

4 provide for other equitable remedies.  And the idea

5 that we're doing this through recoupment is an

6 equitable remedy that's expressly carved out of 7001

7 and 7007.

8          In addition, and I think I've covered this,

9 these are not Commercial Ventures.  This is not Golden

10 West.  We're not asking for an affirmative recovery.

11 We're not changing about the deed of trust.  We're not

12 avoiding the security interests.  Now, again, this

13 mantra that you can't do anything because we're

14 secured.  That is not true.  Under 1123 B-5 you can

15 modify all kinds of things related to security

16 creditors.  Under 1123 A-5 E and F, you can modify a

17 lien, you can cancel or modify an indenture.  Secured

18 creditors can have all types of contractual

19 non-property rights effected through a plan without an

20 adversary proceeding.

21          And if you go on to 1123 B, because we can

22 settle or adjust under B-3 and because we can provide

23 for treatment under B, the compromise can be

24 implemented that way.  So the new argument we have from

25 Mr. Smith today, and you asked me not to interrupt him,

Page 226

1 but he went into a lecture on recoupment and how it's

2 not valid as an affirmative claim. And that's

3 interesting because that's been an issue since Mr.

4 Lepome raised it in the context of the in term

5 distribution. But unfortunately for Mr. Smith again,

6 there's not a word about this theory in the objection.

7 This is a completely new argument that he's raised for

8 the first time. But even if he didn't, it isn't clear

9 that we're only doing recoupment.

10          There's an explanation as to what different

11 people at these tables, all think there's different

12 causes of action to get this money back. And some of

13 them are better for one group than they are for the

14 other. So we've been very careful not to lay out a

15 list of what these theories are, because then an army

16 of lawyers have to stand up and say, "Well, I like this

17 one and not that one."

18          Suffice it to say again, everyone

19 acknowledges the money was in violation of the contract

20 provision. And that it was illegal under Nevada state

21 law. Whether you call that a fraudulent conveyance,

22 whether you call it unjust enrichment, whether you call

23 that quantum merit, whether you call it equitable

24 recoupment, whatever you call that cause of action,

25 we're going to get that money back.

Page 227

1          And once they've acknowledge that it's

2  commingled, which they all did today, this idea that

3  it's not covered by an avoidance action kind of theory,

4  and I'm not labeling it one way or the other, it just

5  doesn't seem to make sense.  In addition, Mr. Smith

6  raised for the first time in his oral argument, that

7  you couldn't recoup or setoff any, you couldn't recoup,

8  anyway because of the single transaction test.  Your

9  Honor was right on it.  They got paid by a single

10  check.  They had a single loan servicing agreement, but

11  also, read page 61 and 62 of the disclosure statement

12  in the plan.  We didn't limit ourselves to recoupment.

13  Recoupment or setoff, it goes either way.

14          So where we are with regards to the Lender

15  Protection Group, on this issue is that the plan

16  implements a compromise with the direct lenders, solely

17  with regard to the erroneously paid pre-petition claims

18  through way of equitable recoupment of funds otherwise

19  coming through the estate.  None of their property

20  interests are effected.  None of their ability to

21  collect was effected.

22          One thing Your Honor pointed out, which I

23  think is just a great point.  When you look at this

24  chart, what would happen if the $24 went up here?  We

25  would be in the situation where the borrower would

Page 228

1 think this is all interest.  The borrower would have a

2 different amount of principal outstanding than the

3 direct lender, because the direct lender would be

4 taking the position that this $12 paid current interest

5 here.  So $12 was current interest for one period and

6 the additional $12 would be a reduction of principal.

7           So the only way they could book it would be

8 in such a way that the borrower would have different

9 amount of principal due, then the direct lender would

10 have to begin with.  And that's the windfall we're

11 trying to prevent.  In the case where so many people

12 had so much taken from them, can people really stand up

13 here and say that when a borrower didn't pay, they

14 should have an acceleration of payment of principal?

15 That's not what they've bargained for.  That turns

16 these agreements on their head.

17           Now, moving on, I'd like to address the view

18 of executory contracts.

19           THE COURT:  I have a question on the

20 compromise.  This is really more a good question for

21 Mr. Charles or Ms. Freeman who are going to take the

22 argument.  Do we not, I guess I am a little troubled by

23 the fact that notwithstanding the compromise, the

24 unsecured creditors committee is reserving the right to

25 sue away if we don't net enough.

1            MR. MEROLA:  I think I can clarify that in

2 their argument.

3            THE COURT:  Okay.

4            MR. MEROLA:  But no one is worse off because

5 of that.  And that's from our perspective, what we were

6 concerned about.  If the idea money doesn't come in in

7 the future such that there was never recoupment, you

8 have to have the ability to recover because everyone

9 should be on an equal footing when you start taking

10 this $12 fee that was illegally delivered.  Now at the

11 end of the day, it may happen, it may not happen, they

12 might collect eighty-five cents of the rest of the

13 money, they might be wildly successful with other

14 assets.

15            THE COURT:  But how is that a compromise?  It

16 would seem to me the unsecure creditor is not giving up

17 anything.  What are they giving if they say, "We get to

18 net and we get to sue you."  What are they giving up?

19 How are they compromised?

20            MR. MEROLA:  They're giving up other elements

21 regarding the allocation between the estates and the

22 direct lenders that I'll let them address.

23            THE COURT:  Okay.

24            MR. MEROLA:  But the idea of how we're

25 compromising recoupment on the prepaid interest is just

1 one element of this compromise.

2          THE COURT:  Okay.

3          MR. MEROLA:  Moving on to the issue of

4 whether the loan servicing agreements are executory

5 creditors not, I want to start with the countryman

6 test.  And the countryman test is that both sides have

7 to have obligations that are so material that the

8 failure to perform those obligations would result in an

9 excuse performance on the other side.  When we talk

10 about a material obligation the issue is does it go to

11 the very core of the contract.  So you have to look at

12 the whole scope of the contract.  Is it central.  And

13 what lawyers do because we're advocates is we find

14 executory contract cases with the exact same provision

15 and we say, aha, this one ha it so it's executory.

16 This one had it, it isn't.  You can't do that because

17 what is material in one contract may not be material

18 and at the core of the other.

19          These are loan servicing agreements.  The

20 core of these obligations are for loan servicing.  With

21 regard to the servicing, there is nothing the direct

22 lenders, have left to do.  Nothing.  There's nothing

23 left.  The idea that two or three people stood up and

24 here and said this is the most far-fetched, ridiculous

25 concept they've ever heard, the only case on point in

Page 231

1 the context of loan servicing agreements in this

2 circuit is the Lemmons case which expressly holds that

3 these kind of agreements are not executory.

4          This is not something we manufactured for the

5 purposes of this case.  This is consistent with the

6 doctrine that when you have the situation where you

7 have a direct lender who has obligations, it fails the

8 countryman test.

9          Now, three things have been mentioned, and I

10 think in argument, Mr. Kirby is down to one in his

11 argument is well, there's a right here that the agent

12 has to pay us off and we have to reconvey.  First of

13 all, why is that an obligation?  What lender has the

14 right to keep the note and deed of trust after he's

15 paid off in full?  That provision provides that if

16 they're paid, they have got to give the note and the

17 deed back.  It's a reconveyance provision.  It's in

18 every agreement with a deed of trust.  And in fact,

19 Your Honor knows, that the legislative history to 365

20 expressly provides that a deed of trust is not an

21 executory contract.  Every deed of trust has a

22 reconveyance provision upon satisfaction.  And why is

23 it not executory?  Because it doesn't go to the very

24 core of the deal and the failure to do it would not

25 constitute a material breach of excusing performance.

1 Everything else was done.  You can even get that

2 reconveyed as a matter of law.

3             The second one would be advance of cost

4 provision, that the borrowers have to advance cost.  As

5 Miss Jarvis explained, there's an express provision for

6 alternative performance in the agreement, such that the

7 failure to satisfy that does not result in a breach.

8 And then the delivery of authority documents.  Your

9 Honor, that's nothing more than a further assurance

10 provision in this agreement.  And clearly a further

11 assurance agreement does not go to the core of a loan

12 servicing agreement.  So consequently, the loan

13 servicing agreements are not executory.

14            Now, the last issue I'd like to raise is the

15 setoff issue, because this is the idea that maybe we

16 can setoff the cross loans or buy loans.  I want to

17 keep everyone focused.  First of all, setoff is a

18 permissive doctrine and as part of a permissive

19 doctrine, it's their burden to present evidence as to

20 why setoffs is appropriate in these circumstances.

21            You have no evidence in the record from

22 either of the objectors on the setoff issue.  Secondly,

23 once they talk about why it's permissive, they have to

24 show why it's applicable and they have to go down the

25 elements of setoff.  Again, there's no evidence

1 anywhere in the record as to which claims they're

2 seeking to set off, why they satisfy all the bells and

3 whistles.  You have general allegations that there are

4 all kinds of claims out there that might be entitled to

5 setoffs.  That's not what the doctrine provides.  And

6 then finally, and there's no case on there, but I

7 thought about this and thought about this and people

8 said, well, there's got to be a case out there.  And

9 the reason you don't allow setoff to a claim like this,

10 and I think there's an analogous situation.  By going

11 after this prepaid interest, what we're trying to do is

12 we're trying to put the pie back together.  Like any

13 avoidance action, we're trying to put the corpus back

14 together as it should have been and as it would have

15 been before the permissible transfers were made.

16          If you allow people to set off while you're

17 still trying to put the pie back together, you never

18 get the pie back together.  Again, I don't want to

19 prejudge that these are avoidance actions under 547 or

20 548.  But that's the reason you don't allow setoff

21 between 547 and 548 actions, because you never the get

22 the pie back together.  And then once you get the pie

23 back together and you're trying to adjust debtor and

24 creditor relationships such that people with claims now

25 have the ability to assert their claims, that's when

Page 234

1 setoff is appropriate, if ever.  It's not appropriate

2 at the juncture when you're trying to put the estate

3 back where it should have been, but for the illegal and

4 contractually impermissible transfers.  So where are

5 we?  After a whole day of arguing we're left with two

6 groups that don't want the plan confirmed, or do they?

7 Both of them tell you in the pleadings they don't want

8 to stop the plan confirmation.  Both of them tell you

9 in their pleadings they don't want to stop the Compass

10 sale.  But they want to nibble around the edges and try

11 to create the situation where maybe someone would blink

12 and change the elements of the deal.  There are too

13 many people in this deal to change one or two elements.

14 We now have a buyer, we have four committees, we have a

15 debtor, we have a direct lender.  We can't move a few

16 elements for the benefit of a few people that are

17 complaining about it.

18          I'm pleased to tell Your Honor that today, in

19 addition to the confirmation order, we would be asking

20 for an order that provided in addition the ten-day stay

21 would be waived and that the sale transaction be

22 consummated before the definition of the effective date

23 to facilitate a close of the transaction in the end of

24 the calendar year, if we can.  In the end of the

25 calendar year, we can consummate a sale transaction

Page 235

1  that gives us a new service, that brings $67 million of

2  cash into this estate.  It puts the litigation against

3  the insiders, where it belongs, in the litigation

4  trust.

5              That's where we are today, and I'm pleased

6  that we are.  The First Trust Deed Committee

7  respectfully requests confirmation of the plan over the

8  objectors.

9              THE COURT:  Okay.  We'll take a five-minute

10  recess then we'll hear from the unsecured creditors,

11  please.

12              (Whereupon, a recess was taken.)

13              MR. GARMAN:  Your Honor, Greg Garman on

14  behalf of the direct lenders.  We have a few minor

15  comments, mainly to address the Court's issue

16  concerning the compromise.  Your Honor, we put this

17  puzzle back together that was missing quite a few

18  pieces.  And in doing so, I think we have come up with

19  a very good solution for direct lenders.  And the

20  compromise does a great deal for direct lenders in

21  addition to resolving the prepaid interest issue.

22              First and foremost, the biggest issue that

23  faced direct lenders when we started this case, if you

24  recall, was whether or not our loans constituted

25  property of this bankruptcy estate.  You may recall

1 that there were various parties out there that didn't

2 even believe that we could be an official committee and

3 that we would be advocating the position that direct

4 lender interest does not constitute property of the

5 estate.  It has a clear benefit to direct lenders under

6 the compromise as proposed and that the estates and the

7 parties to the compromise are explicitly waiving their

8 right to argue that direct lender notes and deeds of

9 trust constitute an estate asset.  Thus, they're

10 leaving them in the direct lender's hands and the

11 direct lenders have the ability to enforce all rights

12 and remedies to their own property.

13        THE COURT:  And after we discovered the

14 tracing problems I guess that made, certainly made you

15 look more worried than probably you were in the

16 beginning of the case.

17        MR. GARMAN:  It did, Your Honor.

18        THE COURT:  Is that a fair thing to say?

19        MR. GARMAN:  Right.  The second issue that is

20 to the benefit of the direct lenders, is that

21 notwithstanding the fact that we have two parties up

22 here advocating the commencement of potentially

23 thousands of lawsuits, the constituents of the direct

24 lender committee have not taken the position that they

25 wanted ongoing litigation.  The direct lenders have

1 supported the M-5 class and they've supported an exit

2 strategy in this case that does not involve them being

3 a defendant in literally thousands of cases. And while

4 not all of the constituents in the M-5 category are

5 satisfied, specifically Ms. Chubb's clients and Mr.

6 Smith's, this is a direct benefit to lenders and one

7 they have chosen to accept and one that they absolutely

8 support. Continued litigation to resolve many of these

9 issues does not benefit the direct lender class as a

10 whole.

11          The third issue and the third benefit derived

12 direct lenders under the compromise is the issue of

13 surcharge. And the Court might recall, there was a

14 great deal of discussion early on in the case about

15 what fees could be surcharged to direct lenders.

16 Again, under the compromise the debtors and other

17 parties have agreed not to assert a surcharge against

18 the direct lenders for the costs associated with this

19 case. Now, the only caveat to that is the $605,000

20 payment, or $605,000 which is going to the estates to

21 reimburse them for the partial cost associated with the

22 direct lenders committee professional fees, those are

23 Gordon & Silver, they just had a financial advisor.

24 But that $605,000 is a bit misleading. It's not

25 $605,000 on top of what direct lenders would otherwise

1 pay under the loan service fees.  Included in that

2 amount, let me step back.  It's $605,000 in total.

3 That was determined as of the closing dates, or rather

4 the effective date of the plan based upon outstanding

5 loan principal balances as of the petition date.  So we

6 take what we've collected and what's in the collection

7 account at the end of the case and we prorate that over

8 what's there, what was outstanding principal at the

9 beginning of the case.  But it's not $605,000 on top of

10 all loan service fees to the extent that a direct

11 lender is a three percent direct lender under the terms

12 of their individual loan service fee.  That's included

13 in the number.  So it breaks down if you're a

14 1 percent, you have to take a few hundred on top of

15 your own service fee.  If to the extent you're a three

16 percenter, the $605,000 is included.  So it's some

17 number which is dramatically smaller than $605,000.

18 That means the direct lenders have not paid the cost of

19 Mesirow's fees, the cost of the debtors' fees, the

20 committees for the two funds, and they haven't even

21 paid the entire cost of the Direct Lender Committee for

22 what we've done in this case.

23          In addition to that, the direct lenders are

24 being forgiven for any pre-petition loan service fees

25 that it accrued, but were uncollected as of the

Page 239

1 effective date of the plan.  There is a great deal of

2 evidence put before you that on a pre-petition basis

3 even on performing loans, let alone non-performing

4 loans that accrued loan service fees, but even on

5 performing loans the debtor never took a loan service

6 fee.  Those are being waived.  That is a very large

7 number that the director lenders fear could be asserted

8 against them and another basis for litigation that is

9 being resolved by way of this compromise.  So in

10 exchange for the compromise that has been supported by

11 Class A-5 there's a portion of the $605,000 that's

12 being contributed by the direct lenders, and there's an

13 acknowledgement that the prepaid interest constitutes

14 an asset of this estate.  This was a decision made by

15 the Direct Lenders Committee at the consultation with

16 many of its constituencies, and in doing so, and I

17 don't want to advocate the position of the debtor, but

18 we played devil's advocate and we looked at the issue

19 of the prepaid interest and we looked at the issue of

20 recoupment and the argument that I advanced to my

21 client in the capacity of devil's advocate, was,

22 "Here's what the debtor is going to acknowledge.  We

23 have a substantial chance that we may lose this issue

24 should we need to try it."

25            There's been set out earlier today the key

1 issue that I think has been ignored to a certain extent

2 is what constitutes property of the estate.  The points

3 and authorities that the debtor set forth in their

4 confirmation brief, I think they make a fairly

5 compelling argument that the prepaid interest

6 constitutes property of the estate for two distinct

7 reasons.  The first is under the lowest intermediate

8 balance test, even to the extent that these were trust

9 funds, and again, the debtor hasn't acknowledged it and

10 it's just been assumed by way of the objectors, but

11 even just to the extent they were once deemed to be

12 trust fund dollars, that trust fund status has been

13 lost for both reasons, first being the lowest

14 intermediate balance test.  The Allison declaration

15 seems fairly clear on that point and there's no

16 evidence in the record to dispute it.

17          And the second is that there's a

18 long-standing policy, a long-standing bit of case law

19 in the Ninth Circuit, that untraceable funds are deemed

20 to be property of the estate.  The reason, and it says,

21 bankruptcy is a court of equity in which similarly

22 situated creditors are deemed to have pro rata share of

23 whatever constitutes the estate assets.  It is the only

24 equitable means in which similarly situated parties

25 with nearly identical claims can get equitable

1 treatment.  Anything contrary to creating a pool of

2 funds for distribution in this case could have the

3 potential impact of giving an unfair advantage to one

4 party over another.  I think that the Advent case set

5 forth in the Ninth Circuit is a case the side by the

6 debtor used the persuasive case that untraceable funds

7 constitute property of the estate.

8          Once this Court makes the determination that

9 this would be property of the estate under 541, then

10 the power to recoup exists for the debtor.  As set

11 forth in Rule 7001, sub seven, recoupment is an

12 equitable right specifically authorized by way of a

13 plan without an adversary proceeding.

14          So Your Honor, that concludes the comments of

15 the Direct Lender Committee, but I want to echo that

16 there was great benefit to the direct lenders by way of

17 the compromise.  And of all the things I've articulated

18 including the avoidance of thousands of litigation

19 cases that wouldn't benefit anyone in this estate.

20          THE COURT:  Okay, anyone else?

21          MS. FREEMAN:  Susan Freeman, Your Honor, for

22 the Unsecured Creditors Committee.  Let me just add to

23 what Mr. Garman said, a couple additional points that

24 we feel were given up to the direct lenders as part of

25 this settlement.  One is joining with the Diversified

1 Trust Fund Committee in the recharacterization

2 argument, that this really is an overall Ponzi scheme,

3 that the direct lenders ought to be treated like the

4 investors, they were all investing all this money and

5 trusting Mr. Hanges and Milanowski would take care of

6 them and pay them all the right way.  And all of the

7 parties should be treated as unsecured creditors and

8 the money should be shared equally among all of them.

9            You had a flavor for what kind of litigation

10 that would be.  You had the declaration for Michael

11 Tucker that sets forth the basis for those arguments.

12 Those arguments have not been pursued.  They are been

13 given up as part of the confirmation of this plan.  And

14 those are arguments that would have likewise benefitted

15 all of the unsecured creditors, not just those of

16 Diversified Trust Fund.

17            THE COURT:  Where are we in light of

18 Diversified?  If I confirm the plan, does that mean

19 Diversified is also barred from raising that issue?

20            MS. FREEMAN:  Diversified's Committee counsel

21 can speak to that.  I believe that if this plan is

22 confirmed then the money goes out the door and the

23 direct lenders get the rights and benefits that they

24 receive under this reorganization plan and you're not

25 able to kind of unscramble that egg again with that

1 kind of litigation over the long run.

2          The second thing Your honor, that is really

3 being given up is the right to go back and file

4 fraudulent conveyance claims right now against the

5 direct lenders.  With respect to the $12, the money

6 that they have received that was improperly received,

7 that wasn't their money, that they we're entitled to,

8 as Your Honor has gone into at length, we are agreed

9 that we will not pursue that $12, that we will not even

10 have the option to pursue that $12 for another two

11 years.  And that is meaningful; A we're agreeing that

12 we're not going to go take money from somebody, take

13 money that is already in somebody's possession, without

14 an adversary proceeding.  So they will get all of that

15 entitlement if and when there is a lawsuit to collect

16 money out of their pockets.

17          Number two, it means that by waiting this

18 period of time most of the money is likely to be

19 recovered through netting.  It's unlikely there will be

20 very much.  There may not be many lawsuits at all at

21 that point in time.  But C, what we're really giving up

22 here is a lot of prejudgment interest.  If we went out

23 and sued these people today, we really think that there

24 some very good causes of action and we've set them out.

25          THE COURT:  So you're giving up prejudgment

1 interest.

2          MS. FREEMAN:  Yeah.  If we got judgments

3 today against all of these people then we would be

4 earning interest on those judgment amounts.  We would

5 be earning interest from today on forward until the

6 point in time until we actually collected the money.

7 Whether it was through netting, because by then we'd

8 have a judgment and we could garnish the funds as they

9 come into our possession, then we could try to hold

10 onto them and try to prevent them from going out the

11 door and try and collect from those monies.  We have

12 those additional rights and we would be giving up

13 interest on those judgment amounts for a long period of

14 time and that could be a substantial amount of money.

15          So we have a lot of benefit we are giving to

16 direct lenders by virtue of this settlement.  We

17 believe they are fully protected by virtue of this

18 settlement, that they get all the rights they are

19 entitled to under the bankruptcy code, under the

20 bankruptcy rules.

21          I guess I would like to add one more part to

22 the setoff argument here.  Mr. Merola spoke very

23 persuasively about the need to get the pie back

24 together and make an equitable distribution to all of

25 the creditors.

1              In our brief we laid out to the Court that

2 there is good authority from the Ninth Circuit and from

3 other circuits with respect to the fact that you can't

4 offset against a fraudulent conveyance claim.  And it's

5 precisely for that reason.  Avoidance actions,

6 preferences, fraudulent conveyances are for the point

7 of bringing money into the estate to share with all the

8 creditors, and that's why just don't allow any kind of

9 setoff in those kinds of actions, because then the

10 individual creditor's getting the benefit.  That's the

11 policy that's line 502-D.  You have to pay your money

12 back so that it's shared among all creditors before you

13 can start getting distributions.  You can't just setoff

14 in those instances.  And in the Western Tie case that

15 we cited at the Ninth Circuit, dealt with the

16 circumstance where the bankruptcy court did allow the

17 offset and the Ninth Circuit reversed it and said no,

18 you just can't do that.  It's a matter of policy.  But

19 in the Western Tie case which is an old, old Supreme

20 Court case, a 1905 case, the court dealt with the fact

21 that you even had technical defenses to preferences.

22 You didn't have the right to pursue a preference suit.

23 But the court still refused to allow a setoff because

24 the money should be coming into the estate the money

25 should be equally distributed to all.

Page 246

1            And the court went on to say that the

2 bankruptcy court or at that point the bankruptcy

3 magistrate, has the power to take lawful steps to

4 protect the estate with respect to paying dividends to

5 a creditor if it doesn't pay the amount that is in fact

6 owed to the estate first.

7            These are fundamental bankruptcy policies.

8 They've gone back for a very long period of time.  You

9 need to bring the pie back together.  You need to

10 equitably share.  What we have is two groups of

11 creditors that are really saying, "No, I'd like to have

12 a plan.  I'd like to have a sale.  I just want to be

13 treated specially.  I want to get better rights than

14 anybody else."  And those that are asserting

15 entitlement to better rights really aren't entitled to

16 that.  Under fundamental bankruptcy policy you can't

17 say, "All right.  Well, the unremitted principal

18 unsecured creditors are entitled to better treatment

19 and really to subordinate effectively the other

20 unsecured creditors."  Our committee represents the

21 unsecured creditor body as a whole.  We don't pick and

22 chose and say, "You, unsecured creditor, are entitled

23 to better treatment than other unsecured creditors."

24 They're all entitled to treatment that is fair and just

25 and appropriate under the plan and that's exactly what

1 we're trying to do, to balance the interest of all, to

2 reach equitable settlements across the line, to try to

3 come up with the best solution.  And at this point in

4 time, Your Honor, we really believe that the best

5 solution for all of the constituents; the direct

6 lenders, certainly to the extent that the direct

7 lenders are unsecured creditors by virtue of holding

8 unremitted principal claims, and really all of the

9 unsecured creditors are best served by getting these

10 plans confirmed, by stopping the hemorrhaging of money

11 that is outgoing to professionals in this case and by

12 putting our trustee in charge to go ahead and pursue

13 lawsuits against Messrs. Hanges and Milanowski and try

14 and collect money and bring it in for the benefit of

15 all of those creditors.

16          We have an excellent trustee, Mr. Burman from

17 TSI.  Nationally recognized, very competent.  We'd like

18 to put him in charge and let him go out there and

19 collect money and be in the position to distribute it

20 to the estate and stop going on and on and on and just

21 running up more professional fees.  And we sure don't

22 want to spend more time and money with thousands of

23 lawsuits to pursue to further the interest under the

24 bankruptcy code, under Supreme Court cases, under the

25 Ninth Circuit court cases, under bankruptcy rules, you

Page 248

1 don't have to do.

2          THE COURT:  Even the lawsuits that's limited

3 to Mr. Smith's and Ms. Chubb's clients?  I meane.

4          MS. FREEMAN:  Right.  Don't think that's

5 necessary.  Certainly, if Your Honor tells us to do it,

6 we will do it.  But we really don't think that's

7 necessary.  I think that the case law and the rules and

8 the codes do not support that.  Do not require it.

9 It's something that could be done.  We don't think it

10 needs to be done.  That this kind of compromise in the

11 plan that it's binding on its class, they're

12 inappropriate.

13          THE COURT:  Okay.  Thank you.

14          MR. LEVINSON:  Good afternoon, Your Honor.

15 Marc Levinson for the Diversified Committee.  It's

16 almost ironic that I'm going last because my committee

17 and my constituency voted the highest in favor of the

18 plan.  We probably get the least out of this plan, but

19 what we do get, and why my committee unanimously and

20 strongly supported the plan, is we get out of

21 bankruptcy.  We have heard the complaints of our

22 committee members and our constituency about the high

23 cost of these cases and have taken that into

24 consideration in supporting the various compromises

25 that are embedded within the plan.  What the compromise

1 will allow us to do in addition to cutting costs, is to

2 control our own faith.  Diversified would go forward.

3 I, by the way joined in Ms. Freeman's analysis of

4 Mr. Burman.  He's terrific.  We have a terrific

5 administrator, Mr. Tucker, who knows more possibly

6 about the Diversified assets than anyone.  And we will

7 go forward and we will collect our assets for our

8 constituency.

9            This case has worked the way Chapter 11 cases

10 are supposed to work.  You have seen us in court.  I've

11 been i court probably ten times, maybe more.  My Nevada

12 counsel, Beckley, has been in court a number of times.

13 My partner has been in court a number of times.  Each

14 time we're here the various five constituencies, not to

15 mention the other folks, are fighting with one another.

16 That is the way Chapter 11 works.  We fight all the

17 time.  What you haven't seen is the hundred, 150

18 e-mails between us when we're fighting among one

19 another.  The conference calls when we're fighting with

20 one another.

21            Chapter 11 worked in this case and we finally

22 reached an agreement.  And here we are today the

23 constituents who have put in hours and 24/7 kinds of

24 commitments on this case saying we support it, we have

25 made our deals, cut our losses and move on with our

Page 250

1 lives.  All the compromises that have been embedded in

2 the plan, move to that end.  And that's why our

3 constituencies and the other constituencies have

4 supported it.  I know you're concerned about this

5 recharacterization and substantive consolidation.  And

6 let me address that.  You grilled me on that in the

7 disclosure hearing.  And I heard what you had to say.

8 I understood that if my committee did not raise an

9 objection to this, particularly in light of what the

10 plan said, that substantive consolidation goes away.

11 That argument goes away.  And in light of the

12 compromise between the mortgage company and direct

13 lenders that we couldn't do half-characterization, it

14 was all or nothing.  And that if we didn't raise it, we

15 waive it.  And we waive it.

16         So all this stress about the Diversified

17 committee is going to go out and sue each and every

18 direct lender aren't true.  We understand that when you

19 confirm this plan, that's it for recharacterization.

20 We understand that's it for substantive consolidation.

21 What we are getting out of this is we are a large

22 creditor of the mortgage company case.  How large

23 depends where we go from here in the future.  But we

24 are a large creditor of that estate and we well share

25 derivatively in that estate.  And we are getting

Page 251

1 benefits from our compromise with the First Trust Deed

2 Committee.  We're getting some money.  We're getting

3 their claim against the Vice Energy loan and we're

4 getting benefits from that as well.  So to our

5 constituency and to the professions who advise our

6 constituency this is the deal we're fulfilling and this

7 is the plan we're supporting.  So, of course, we urge

8 you to confirm it.

9            THE COURT:  Okay.

10            MS. JARVIS:  Your Honor, if I could just

11 address two things.  There were no objections with

12 respect to the sale and I just wanted to make sure that

13 we did point out that in the declaration of Mr. Allison

14 there was plenty of evidence to support the sale and we

15 did submit a declaration of Compass as well to support

16 the 363 M finding.  And Mr. Merola says if we want to

17 waive the ten-day period and close the sale we

18 certainly will work with Compass to deal with this as

19 quickly as possible.  We may actually see if we can

20 separate the closing of the sale from the effective

21 date because we're not going to be able to make this

22 effective before the end of the year but we certainly

23 will work towards getting it closed as quickly as

24 possible, and we'd like that option if it would work,

25 but we're not committing, to get that done.

Page 252

1          We also I wanted to make sure the court is

2 aware this was not specifically raised, we also did

3 submit evidence with respect to the 1990 standards for

4 the compromises that were included in the plan.  So I

5 just wanted to point out those two things as well.

6          THE COURT:  Okay.  Mr. Smith.

7          MR. SMITH:  I'm severely outnumbered here.  I

8 was wondering if you would consider allowing me to make

9 a short rebuttal.

10          THE COURT:  Sure.

11          MR. SMITH:  And just a few things, Your

12 Honor.  In light of all the comments that have been

13 made, and I'll be short.  First of all, as to the loan

14 service agreement being an executory contract, it's

15 been argued that it's not.  But aside from the payment

16 requirements, the direct lenders also have a right

17 under section three, "In the event of default for close

18 or other matters, if U.S.A. fails to act, then the

19 lenders can with 51 percent or more act on their own

20 behalf."  Section eight of the service agreement,

21 "Lender may with 30 days written notice to U.S.A.

22 terminate this agreement and the power of attorney

23 granted if one is granted in this agreement, if U.S.A.

24 failed to perform its obligations there."  This is not

25 like a promissory note, this is not an executory

Page 253

1 contract.  The borrower can't terminate a promissory

2 note.  Here, the other side can't terminate the

3 agreement.

4            THE COURT:  Let me ask this.  Why didn't you

5 raise this in your initial objection and pleading so

6 they could respond appropriately to it?

7            MR. SMITH:  It wasn't, there argument was in

8 their pleadings.  So I was listened to what they said

9 and I'm responding to what they said orally.  I didn't

10 see it in their pleadings.  If they could point it out,

11 fine.

12            THE COURT:  No, but when you objected to the

13 executory contract why didn't you say this is something

14 that made it executory?

15            MR. SMITH:  I think I did, Your Honor, that

16 the right to cancel the contract made it executory.

17 It's in my brief.  I didn't bring it up here.  You want

18 me to go get it?

19            THE COURT:  I don't recall seeing it.  That's

20 all right.  I didn't hear it in your argument, but

21 that's all right.  I know we just briefly touched the

22 issue.  I was just concerned about it.

23            MR. SMITH:  And I appreciate that.  Even the

24 name servicing agreement connotes executory contract,

25 there's stuff to be done.  Now, I just want to point

Page 254

1 out that if it's not executory, it's been argued that

2 it's not executory and that's because the direct

3 lenders, quote, have no material obligation.  Third

4 quote, nothing they have to do.  The direct lenders

5 cannot be in material breach.  Well, what does that

6 mean?  The necessary conclusion that follows is the

7 direct lenders can cancel freely.  They cannot be a

8 material breach, not executory, we cancel it and

9 Compass can't sue, can't sue the direct lenders.  Not

10 executory, they can't sue.  So I'm just saying you

11 can't have your cake and eat it, too.  You can't say

12 it's not executory so you can transfer it.

13          THE COURT:  Well, if you attempt to cancel

14 the point is it's not a material breach, it's just

15 ineffective.

16          MR. SMITH:  What do you mean, it's

17 ineffective?

18          THE COURT:  If you cancel --

19          MR. SMITH:  If you cancel anything, that's in

20 breach of the contract.  You cancel anything, it's in

21 breach of the contract, so.

22          THE COURT:  Well, you're saying cancellation

23 puts you in material breach and ergo, it's an executory

24 contract.  If you cancelled it's just, it's not

25 effective, right?  So what, they keep taking your

Page 255

1 servicing fee, it's not a material breach to excuse

2 their performance, it's just ineffective, right?

3         MR. SMITH:

4         THE COURT:  How can they keep taking the

5 servicing fee if it's canceled?  Just ineffective,

6 right?

7         MR. SMITH:  The cancellation is ineffective?

8         THE COURT:  Unless there's 51 percent, right?

9         MR. SMITH:  Well, if there's 51 percent and

10 you could cancel, all I'm saying, if there's 51 percent

11 and you cancel, obviously it's executory.  You cannot

12 have it both ways.  Like a promissory note, the

13 borrower can't cancel it.  A lease is different.

14 That's why it's a two-sided obligation.  There's things

15 on sides to be done there.

16         THE COURT:  The option agreement in Helms was

17 cancelable.

18         MR. SMITH:  It was cancelable?

19         THE COURT:  Yeah.

20         MR. SMITH:  It was cancelable by the

21 optionee?  No.

22         THE COURT:  I think it was.

23         MR. SMITH:  I don't think so.  That's the

24 difference here.  All right.

25         THE COURT:  Okay.  Any response to that?

Page 256

1 Sorry, I didn't mean to cut you off.  I apologize.

2          MR. SMITH:  Yes, Your Honor.  I just think

3 it's so obvious as an executory that I'm obviously

4 outnumbered.  The only other thing I want to point out

5 is the prepaid interest.  I didn't hear anything that

6 says how the compromise can bind those that don't vote

7 or that vote against the plan.  I don't see how it can.

8 Now, Mr. Merola used the clever words that we're

9 nibbling around the edges like we're trying to do

10 something improper or, you know, change the plan.  He

11 says you cannot have part of it and not the another.

12 You cannot have part of compromise and not the whole

13 thing.  Well, the bottom line, you're either in or out

14 of a compromise.  Those that want to be in because they

15 agree, are in.  And those that want to be out because

16 they didn't vote or voted against, are out.

17          So it's not like Mr. Merola says, that you're

18 partly in or partly out.  You're either in or out

19 because a compromise by definition requires that you're

20 in.

21          This is exactly like the Commercial Western

22 Finance case which was the Ninth Circuit case that I

23 cited that was very similar to this case.  In that was

24 a broker, kind of like here, the debtor brought in

25 money, lent it out to individuals, kind of like here.

Page 257

1 The difference being the debtor gave notes to the

2 investors and assigned the underlying notes and deed of

3 trust to secure the notes to the investors.  Chapter 11

4 the trustee said that those assignments are invalid,

5 and instead of suing you we're going to propose a plan

6 to say, "Well, you're going to get some of your money,

7 but not all of your money," and the plan was confirmed.

8 And it went up on appeal.  And the Ninth Circuit court

9 said, "No, you can't do it this way.  You have to bring

10 a lawsuit."  The debtors said, "Oh, my gosh, that's

11 horrible.  We'd have to file hundreds and hundreds of

12 lawsuits."  The Ninth Circuit said, "I'm sorry.  That's

13 the law."  Just because it's not expedient or not

14 comfortable, you don't like it,d that's the requirement

15 for due process.

16            Now, this argument was made this is similar

17 to an overpayment issue.  And I, in the case of an

18 overpayment, the person that received the overpayment

19 had some right, got that money.  The difference is

20 here, U.S.A. has no right to the ownership of the

21 money. They're an agent.  It passes through them.

22            THE COURT:  But what right did your clients

23 have to get that money?  It wasn't the borrower's

24 money.

25            MR. SMITH:  I think that gets it backwards.

Page 258

1 What right did they have to take it back?

2          THE WITNESS:  Because it had to have been

3 part of it was there.  It wasn't just from the

4 borrower.  It was from their loan servicing fees.  Some

5 of it was.

6          MR. SMITH:  Nobody knows.

7          THE COURT:  But you said yourself it can't be

8 traced.

9          MR. SMITH:  All we know is Commercial

10 Mortgage --

11          THE COURT:  But again, your position is even

12 though I have no legal right, whatever right to that

13 money, I'm keeping it.

14          MR. SMITH:  My position is that's reversed.

15 We don't have to prove to you why we can keep it.  They

16 have to prove to you why they can take it back.  That's

17 due process.  It was paid to --

18          THE COURT:  But you have no legal or

19 contractual right to that money.

20          MR. SMITH:  Well, Your Honor, I don't know

21 that that's true.  I think the debtor was obligated to

22 pay the direct lenders quite a bit.  I mean, they had

23 already stolen their money.  And quite a few other bad

24 things.

25          THE COURT:  Not the people that have

1 unremitted principal.  They didn't have unremitted

2 principal, they hadn't stolen their money.

3        MR. SMITH:  Who the other people?  No, maybe

4 they didn't steal their money, but they did a lot of

5 other things.  And to put that before you today as if

6 it were an adversary proceeding and we had tried the

7 case, we had witnesses and we had argued.

8        THE COURT:  So again you're Willing and you

9 want your clients to be sued in other words the

10 confirmation can't go forward unless your clients are

11 actually sued.

12        MR. SMITH:  I'm saying it's impossible for

13 them to take a servicing fee without due process.  I

14 don't want them to sue, I want them to leave us alone.

15 don't sue for it.

16        THE COURT: Okay.

17        MR. SMITH:  Leave it alone.  I think it's a

18 terrible cause of action and drop it.

19        THE COURT:  Okay.  It's mine and I'm keeping

20 it and I don't care who it belongs to.

21        MR. SMITH:  Your Honor, these are not people

22 that are sitting there with a windfall saying, "Oh boy,

23 we sure lucked out here.  We got a lot of extra money."

24 These people lost out here no matter how you look at

25 it.

1          THE COURT:  I know, but they didn't have a

2 right to the funds.  I understand a lot of people have

3 lost.  A lot of people have lost.  Why is it your

4 clients are so special?

5          MR. SMITH:  The debtor doesn't have any right

6 to the funds, why aren't you giving them to the debtor?

7          THE COURT:  You're saying your clients are

8 special.  Your clients shouldn't be treated like

9 everybody else because they're special in some regard.

10         MR. SMITH:  Absolutely.

11         THE COURT:  Why is that?

12         MR. SMITH:  Well, because they're a direct

13 lender, they have diverted principal, a lot of claims

14 against the debtors that the other creditors don't

15 have.  And they bargained for a position that's

16 slightly different.  They bargained for a position that

17 gave them absolute security on a loan.

18         THE COURT:  Wait a minute.  That's

19 impossible.  Every one of these direct lenders knew,

20 and it's unfortunate that, what if, for example, let's

21 assume there's no fraud.  What if the borrower, turns

22 out the project was just a dead project.  They have no

23 right to any monies, there's nothing to foreclose on,

24 right?

25         MR. SMITH:  No, that's not the issue here.

Page 261

1 Sure in that case.  Those aren't the issues.  I mean if

2 the project goes flat?

3            THE COURT:  Yeah.

4            MR. SMITH:  And doesn't pay at all, no.

5            THE COURT:  But they did get money in some of

6 those cases.

7            MR. SMITH:  Well, Commercial Mortgage

8 advanced money.  I don't know if it's their money.  You

9 hear today it's their money, but if it's commingled you

10 don't know whose money it is.  But if they advance

11 money, like Mr. Merola's char and I have my own chart,

12 they're going to recoup that when the borrower pays.  I

13 mean, they didn't just give it away.  They didn't say,

14 "Here's a gift.  Take it."  They fully expected to

15 recover that money when the borrower paid.  Why did

16 they advance it?

17            THE COURT:  How do you know that?

18            MR. SMITH:  Well, Your Honor, I.

19            THE COURT:  I mean if they gave them money

20 from diverted principal.

21            MR. SMITH:  Your Honor, I assume that

22 Commercial Mortgage isn't going to overpay my clients.

23            THE COURT:  How do you know if they didn't

24 already know that that loan wasn't already going to

25 pay, it's like a typical Ponzi, and in order for you to

Page 262

1 invest more money, we're going to pay you more interest

2 so you put a new loan in.

3          MR. SMITH:  I don't know, just you like don't

4 know the other way around.  But I do know that there's

5 a hope --

6          THE COURT:  But you can't tell me.

7          MR. SMITH:  -- that most of these loans, all

8 of these people here today are hoping all those loans

9 are going to pay.

10          THE COURT:  Of course, they do.

11          MR. SMITH:  So when they pay and if they pay

12 then the debtor is going to recoup the money they

13 advanced.  But they can't just take it.  That's my --

14          THE COURT:  All right.

15          MR. SMITH:  And stop the netting of a debt.

16 They said it's a netting, but U.S.A. says the direct

17 lenders owe them money because of the prepaid interest

18 issue.  What debt did they net?  They didn't net

19 anything.  They just went and took it back.  And all

20 I'm saying is that's not recoupment.  So if you look at

21 the prepaid interest, the compromise cannot affect the

22 people that didn't agree by very definition.

23          To get into the other issues if it's

24 recoupment, it doesn't work.  It's never been applied

25 in this fashion.  There's no authority to allow it to

1 be applied in this fashion, it's just tricky words that

2 makes it look like works.  It doesn't work.

3          THE COURT:  And how many people are covered

4 by your objection?

5          THE WITNESS:  How many people do I represent?

6          THE COURT:  Uh-huh, about?

7          MR. SMITH:  About 350.  I have updated about

8 350.  This is my chart, Your Honor.  I think

9 Mr. Merola's chart was a little inaccurate.  This is

10 the normal situation.  The borrower pays the debtor 12

11 bucks in interest.  12 paid to the direct lender fund.

12 Now we get into the prepaid interest issue.  The

13 borrower paid zero to the debtor servicer, the debtor

14 servicer pays $12 to the direct lender.  Probably.

15 What happens?  Now, the next scenario.  This is where

16 the difference is.  The borrow pays zero to the debtor

17 service.  Another borrower pays $24.  The debtor does

18 not pay the direct lender that money, puts it all in a

19 pot to pay creditors.

20          MR. MEROLA:  That's not accurate.

21          MR. SMITH:  Well, I think that's what's

22 happening here.

23          THE COURT:  No, that's not what it says.

24 That's not what the plan says.

25          MR. SMITH:  What?

Page 264

1            THE COURT:  The plan says it's netted against
2  that's owed to the person coming in.
3            MR. SMITH:  Well, that's not what's
4  happening.
5            THE COURT:  How can you possibly say that?
6            MR. SMITH:  It's netted against what person
7  that's coming in?
8            THE COURT:  How can you possibly say that?
9            MR. SMITH:  All the prepaid interest, well.
10           MR. MEROLA:  That's not correct.
11           THE COURT:  That's not what.
12           MR. SMITH:  Well, you know.  How can I
13  possibly say that?  Because all of the prepaid interest
14  is going into the pot.
15           THE COURT:  No.  Do you mean we've been here
16  for four hours and you don't understand the plan?
17           MS. CARLYON:  In that hypothetical there's
18  only $12 prepaid interest.  That's why ultimately when
19  the borrower paid, the direct lender gets all of their
20  money.
21           MR. SMITH:  I understand that if the borrower
22  pays, I understand that everybody is made whole at that
23  point.  I mean, if the debtor recoups his money and the
24  direct lender gets paid current, right?  If the
25  borrower pays them that money.

Page 265

1          THE COURT:  Well.  In other words, if your

2 client had two loans, borrower A and borrower B.

3 borrower A is on the left block and borrower B is

4 wherever.  And A pays nothing and B pays 24 your client

5 would otherwise be due 24, your client has already been

6 paid 12.

7          MR. SMITH:  Right.

8          THE COURT:  So your client gets 12.  And the

9 other 12 since he wasn't entitled to it, goes to the

10 prepaid interest?

11          MR. SMITH:  Well, I'm sorry, maybe my chart

12 wasn't drawn correctly, but my understanding is.

13          THE COURT:  Well, you have a factual

14 understanding, a big one.

15          MR. SMITH:  I don't think so.  I think it

16 spans all various different loans.  If there's been

17 whatever amount of dollars and prepaid interest there

18 is, it's not like Mr. Merola says, it's one loan.  It's

19 taken in any loan that that person has.  That's why

20 it's not security.

21          THE COURT:  That's true, but the point is he

22 only was overpaid 12.  So once that 24 comes in, he's

23 done.  It's over.  He was only overpaid 12.  He was

24 paid 12 he wasn't entitled to.  Once the 24 comes in he

25 has 24; 12 from the other borrower, 12 he got before

Page 266

1 and he's done.

2          MR. SMITH:  Yeah.  I guess what the real

3 problem is, if the borrower --

4          MS. FREEMAN:  Your Honor, if I might add, Mr.

5 Smith has now, has made in his presentation just now

6 the same admission as Ms. Chubb made before, which is

7 recoupment is appropriate and is allowed, just so long

8 as it's at the end after their clients get all of their

9 money, then there can be a recoupment.  But there

10 cannot be any recoupment along the way.

11          THE COURT:  Let me have her finish.

12          MS. FREEMAN:  They want preferential

13 treatment over others.  That's all.

14          MR. SMITH:  That's not really what I'm

15 saying.  I'm saying if it comes in from the borrower,

16 I'm saying that the debtor servicer doesn't have a

17 right to take it, period.

18          THE COURT:  He doesn't have a right to net

19 it.

20          MR. SMITH:  Unless the direct lender is paid

21 in full.

22          THE COURT:  What do you mean, paid in full?

23 Before the loan's paid?

24          MR. SMITH:  No if the direct lender, if the

25 borrower is bringing the loan current, and this money

1 has been advanced by the debtor, the debtor has the

2 right to recover that $12.

3          THE COURT:  But it's interest due in the

4 meantime.

5          MR. SMITH:  Right.

6          THE COURT:  So all that would be due from

7 that one borrower, he only had the right to the $12 at

8 that time.  He wouldn't have the right to the 24.  All

9 that was due was the 12.

10          MR. SMITH:  Well, Your Honor, you know what?

11 Really, the chart, maybe it doesn't show what I

12 intended to show.  The point is you can't take the

13 money by recoupment.

14          THE COURT:  Okay.

15          MR. SMITH:  Simply can't be done.  Well, I

16 want to say just one more thing.  On the setoff issue,

17 I think that the setoff issue is, it could only be in

18 the context of an adversary proceeding.  You can't sit

19 here and speculate today about what it might or might

20 not be.  I mean, that's what's happening here today.

21 There is no adversary proceeding.  The argument here is

22 is there a setoff or is there not a setoff.

23          I think that's improper and that's why due

24 process has not happened here.  You can't speculate on

25 what might happen because it is not before you.  You

Page 268

1 can't say, "You know what?  It's a good lawsuit," or,

2 "It's a bad lawsuit."  "So this is a good settlement,"

3 or, "This is a bad settlement," because you win the

4 lawsuit or you lose the lawsuit.  That bypasses the

5 whole issue that the lawsuit is not before you.  And

6 that's why those issues cannot be addressed now.

7           If you're going to get the pie back together,

8 fine.  That's a great goal.  You still have to follow

9 544, 547, 548.  You can't skip over that fact just

10 because it looks good or there's a lot of people saying

11 it needs to be done, or there's a lot of work to it may

12 incur a lot of fees.  Those rules have to be followed.

13 I know it looks good.  If you look at each individual

14 item, those rules are not followed.

15           And finally, with respect to the ten-day

16 stay, that's the first I've heard of that.  I don't

17 know that that's a proper request.  I don't know think

18 there's any proper basis for it.  There's no emergency

19 for it.  I know the sale to Compass is not scheduled to

20 close until, I think the agreement gives them until

21 probably, I think it's either the end of January or

22 February 17th.  But frankly, my clients are entitled to

23 customer whether they might appeal.  And if you shorten

24 the ten-day period, that will foreclose us out of that

25 possibility, and I don't think there's justifiable

1 reasons to do that.

2          THE COURT:  Any responses on the argument?  I
3 know we're going back and forth.

4          MR. MEROLA:  Do you need any, Your Honor, or
5 we're going to go back and forth.

6          MS. JARVIS:  No, I don't want to go back and
7 forth, I just wanted to make one thing very clear
8 because is think we responded to all of his arguments
9 about where recoupment is appropriate.  It's not,
10 there's just one thing I want to make clear.  You asked
11 Mr. Levinson does the Diversified equity holders, do
12 they understand whether they vote against the plan,
13 that recharacterization is gone.  When this plan is
14 confirmed, recharacterization is gone.  And I'm
15 answering the same question with respect to the direct
16 lenders.  It is clear in the plan that if this plan is
17 confirmed, when you vote for or against the plan, which
18 is why you had to object, because those objections
19 needed to be overruled by the court, prepaid interest
20 is property of the estate.

21          And as I've read to you earlier in the
22 disclosure statements it's very clear, and this is in,
23 out there, since this plan was first filed on
24 September 15th.  And the issues of commingling and the
25 issue of recoupment, we already have a preliminary

Page 270

1 ruling from the court.  We've already gone through this

2 issue.  There's no due process lost.  It's very clear

3 that this was done.  And you look again in pages 61 and

4 62 of the disclosure statement it says very clear that

5 the plan provides that the payments collected later, or

6 from the borrowers on account of advanced funds,

7 constitute payment of the debt and are property of the

8 estates.  That the prepaid interest also collected from

9 the netting process is also property of the estate.

10 And section 4-E, 1-D so provides.  So when this plan is

11 confirmed this is the proceeding, it has always been

12 noticed that this is the proceeding that this property

13 is the property of the estate to be properly

14 distributed to all the creditors of this estate.

15          THE COURT:  Okay.

16          MS. CARLYON:  Your Honor, I just wanted to

17 point out to the Court that pages 23 of the reply brief

18 deal with the exact issue that a plan may obtain a

19 compromise which binds the class.  We didn't belabor

20 every point that we made in our reply, but certainly

21 there are numerous authorities that have been submitted

22 to you on that point.

23          MS. MCPHERSON:  I just wanted to say that we

24 also object to the waiver of the ten days.  And we

25 still maintain that you can't through the plan make

Page 271

1 something the property of the estate that hasn't been

2 determined to be the property of the estate.

3          THE COURT:  Okay.

4          MR. DAVIS:  Good afternoon, Your Honor.  Just

5 a couple of things.  We took a break earlier today

6 after some lengthy discussion about what type of claims

7 and interest we would take free and clear of.  During

8 that break we had discussions with counsel for the

9 direct lender committee and I think we have reached

10 agreement on that.  I would like to just advise Your

11 Honor of how we think we've resolved that.

12          Basically, we would take free and clear of

13 all liens, claims, encumbrances, interests, including

14 any monetary or non-monetary defaults with one

15 exception, and I think this will address the issues

16 here which some parties have raised, which is the right

17 to the extent it existed, as of the petition date, of a

18 particular group of direct lenders to replace the

19 servicer in accordance with the loan servicing

20 agreement.

21          There is a provision in the loan servicing

22 agreement that was put into Your Honor in section eight

23 that requires 30 days written notice of notice of

24 termination.  We would agree to take, subject to the

25 only, to the extent they need an existence of the

Page 272

1 default, in order to exercise a right under that

2 section, to replace as under section three of the LSA,

3 we will agree to take subject to that, providing that

4 30 days written notice is given to us of any

5 termination under section eight of the LSA and we have

6 an opportunity to bring a motion before Your Honor.  To

7 the extent we do challenge their right to exercise that

8 remedy.  And it's only for rights that were in

9 existence and matured as of the petition date, which I

10 think is what's at issue.

11          The other piece of that is while we're going

12 to leave, take subject to a right under section three,

13 the existence we're taking to that right, in fact

14 subject to that right, we've agreed does not impair

15 Compass' ability to otherwise enforce the terms of the

16 servicing agreement, pending our being replaced as

17 servicer.

18          The other issues associated which is, and we

19 are all of the default interest and other fees that we

20 are paying to save money for that, obviously, to the

21 extent that we are replaced as servicer, properly, that

22 raises issue as to whether the subsequent servicer

23 could now waive our interest in all of those fees that

24 we've now purchased from the estate.  We have agreed

25 and the order will reflect, assuming it's acceptable to

Page 273

1 Your Honor what is the case in any event, but it will

2 just provide some clarity and comfort to us in going

3 forward, that any subsequent servicer would not have

4 the right to either compromise, subordinate or

5 otherwise impair any of the claims of Compass to

6 default rate interest or any of the other fees or

7 rights that we have purchased under the asset purchase

8 agreement.

9           So I think that resolves those issues, at

10 least as it relates to the Direct Lender Committee.

11           MR. GORDON:  That's correct, Your Honor.

12 Gerald Gordon.  It does preserve the loan servicing

13 agreement as is.  That was our concern with paragraph

14 three.  The agreement to come back to this Court or for

15 this Court to retain jurisdiction we think is in the

16 best interest of all parties, given the Court is

17 familiar with the loan servicing agreements.  All we're

18 doing is providing the same type of enforcement

19 provisions as the LSA implies and has.  You'd have to

20 read into it.

21           And we're just saying this Court instead of

22 some State court or some other disparate court, we feel

23 that this Court would give the most expeditious and

24 speedy resolution of those if any dispute arises.

25           MR. DAVIS:  Correct.  And your Honor, there

Page 274

1  was also some issue as to some parties who have timely

2  objected to the confirmation of the plan, taking issue

3  with, I guess the provision of the plan that says the

4  servicing fee in the agreement of the direct lender

5  committee and part of the compromise that's embedded in

6  the plan that the fees as chargeable under the service

7  agreement would be the fees and they'd be obligated to

8  that.  And there was some issue there.  I had said

9  earlier if you don't want to take it subject to having

10 thousand of lawsuits challenging what fees are

11 chargeable, the debtor has properly provided notice to

12 all the direct lenders, as I understand it, of the fees

13 that they believe are due and payable, and the

14 percentages that are due and payable.  We would agree

15 that with respect to those, and I should say this is

16 subject to we've asked for quantification of the

17 magnitude of this exception.  And subject to getting

18 comfortable with that, which I hope we'll be able to

19 do, we're waiting for that from Mesirow, we would agree

20 that with respect to those parties that timely objected

21 to the confirmation of the plan, that they would

22 preserve any right to argue that the fee is something

23 other than, again, those that raised this issue in

24 their objection to the confirmation of the plan, that

25 the fee is something other than as provided in that

Page 275

1 schedule.  And to the extent they want to preserve that

2 right and we preserve all of our rights, we will be

3 willing on that basis to proceed.  And as to everyone

4 else who did not timely object to that schedule, the

5 fee would be as provided in that agreement.

6          THE COURT:  Okay.

7          MR. MEROLA:  Your Honor, on behalf of one of

8 the seller, I would like to thank Compass for the

9 timely addressing these very complicated issues.

10 That's an enormous concession for a group like that to

11 make.

12          THE COURT:  And Mr. Walsh proper has, I

13 suppose, at least elucidates what your issues were, is

14 that correct?

15          MR. MEROLA:  It does, Your Honor.  I believe

16 Mr. Charles showed some language earlier that addresses

17 the issue.  There are two other specific areas in the

18 plan that I'll talk to Mr. Charles about that to deal

19 with that precise.

20          MS. JARVIS:  I just wanted to state, Your

21 Honor, when we did send out the servicing fee schedule,

22 that was the point.  We told each direct lender, we

23 sent each a statement what was accrued, percentage and

24 if they objected to it, if there was a problem they

25 needed to object.  And that was so we would know and

1 the borrower would know who had an issue with it.  So

2 this was consistent with that and the purpose of the

3 notice was given.

4          THE COURT:  Okay.  Let me tell you a

5 preliminary thought, and I don't want to make you all

6 have to come back tomorrow.  But we'll have to figure

7 out a procedure.  Let me say this.  I'm inclined to

8 conform a plan with one concern and I'll address that.

9 And I'm going to have to bring you back to more

10 carefully articulate all of my findings on the record.

11 I obviously prepared, I'm familiar with the case and

12 I've read the briefs and in my mind I haven't

13 verbalized it to the extent I need to for purposes of

14 oral findings.  So let me just give you the general

15 gist and maybe what we can do is tomorrow in the

16 afternoon those of you that want to leave can be in on

17 the phone so we don't keep everybody here.  That's one

18 thought.

19          This is a concern.  Let me tell you this.  I

20 think in general I'm satisfied that this is not an

21 executory contract.  Just in general, I don't, there

22 really isn't anything for the lender to do.  I

23 appreciate what Mr. Smith says, every everybody says

24 that, "Oh, gosh.  Of course it's an executory

25 contract," but that's sort of the same problem both he

Page 277

1 and I had in the Helms case.  I just presumed that

2 option contract, for example, was an executory

3 contract.  And I was relying on a Ninth Circuit case

4 that the Ninth Circuit overturned.  So, but the point

5 is it seemed to me an executory contract.  Well, you've

6 got something that needs to be done.  But that analysis

7 is too shallow.  And I think the Helms case did a very

8 good job in report that just because there's a contract

9 it's automatic an executory.  That's not it.  Never has

10 been the definition.  The countryman definition is the

11 true test of what is executory.  And when you go

12 through that analysis and go beyond the superficial

13 level you see there's nothing for the lenders to do.

14 They entered into a contract and there's nothing for

15 them to perform.  I'll articulate more fully each of

16 that analysis, but I wanted to get to that point.

17          What concerns me now about the compromise and

18 it's more as much gun shy as anything, is I tend to

19 believe that you can compromise the claims without

20 binging suits and settle, you certainly can do it,

21 vis-a-vis those people who have not objected, even if

22 he hadn't voted for the plan.  Because I think that

23 certainly encompasses it and notwithstanding, I think

24 it was Commercial Western that suggested that those

25 parties still had standing to object because there

1em

1 wasn't due process.  It's a different fact situation.

2 I'm a little nervous about those who objected, formally

3 objected to the plan.  Because the plan said to reserve

4 your rights you have got to object.  And I'm concerned

5 because the plan suggests that, I'm not determining

6 today whether there is or isn't proper for the estate

7 to reserve their rights in those issues.  I'm concerned

8 in the sense that, well, I think it makes perfect sense

9 and I think it probably is a compromise.  The

10 bankruptcy appellate panel and the Circuit seemed to

11 hold sacrosanct the formalistic service of a summons in

12 a complaint.  And to my mind, sometimes it's too

13 formalistic, because it's clear they've had an

14 opportunity to be heard in the due process concern.

15         I'm not ruling that you can't do it, I'm just

16 again, I'm throwing this out to you and I want you to

17 just think about it and decide what to do and I'll have

18 to decide one way or another whether to confirm or to

19 modify.  It seems to me you now have a limited universe

20 of those people who've objected.  It's a simple matter,

21 to you file a lawsuit tomorrow, you name those 300

22 people plus however many Ms. Chubb, you fight a lawsuit

23 and you've got it.

24         The rest of the parties have consented, I

25 think.  You can talk about it before you decide what

Page 279

1 you want to do.  You can try and convince me that I'm

2 absolutely, that you don't have to go that way.  Again,

3 I'm very nervous.

4            MR. MEROLA:  We reserve that right to try to

5 convince you otherwise, Your Honor, but something that

6 would be useful, is while Mr. Smith purports to

7 represent 300 people, just eyeballing it a number of

8 them voted in favor of the plan.  So if you're making

9 your list and checking it twice about who we're going

10 to serve summons again, Mr. Smith better be very

11 careful that everyone on that list will be expecting a

12 summons by the end of the week.

13            THE COURT:  So, on the one hand you're saying

14 just be those who objected.  But if they voted no it

15 would be to the contrary.  But I think to save the

16 objecting, because the plans said if you object, you've

17 got to object.  So if you get to the objecting they

18 voted yes.

19            MS. CARLYON:  Well, Your Honor this an issue

20 that we raised in footnote 19 of our reply, is that we

21 object to filing an objection on behalf of the Lenders

22 Protection Group, unquote.

23            THE COURT:  Oh, it's not group.  It's after

24 each individual client.

25            MS. CARLYON:  Well, that's what wasn't done.

Page 280

1 There was not an objection filed by any individual

2 client of Mr. Smith.  There was only an objection filed

3 on behalf of the enormous Lender Protection Group.  So

4 I would ask that to the extent that he has clients that

5 want to object and be sued, that he amend his objection

6 to set forth the names of those clients.

7          THE COURT:  So I guess the thing is I'll

8 hear, when I go through it tomorrow, I guess I'm more

9 concerned for you than for me.  I get remanded, so

10 what?  But your problem is if the Circuit on the back

11 says no, then you have a problem whether or not there's

12 a stay on appeal or not and you have a whole mootness

13 issue.  And who knows?  An appellate court might

14 attempt to do a stay on appeal.  I guess I shouldn't be

15 concerned.  You kids are all big kids.  But it did seem

16 to me, they're saying sue me.  So take them up on it.

17 And it resolves the issue once and for all.

18          As to those people who have objected, again

19 there are some people who have accepted the compromise.

20 Perfectly acceptable in the course of a plan, and maybe

21 even is to those that have objected.  But I guess, let

22 me also say that I'm not inclined to waive the ten day

23 on the closing because we've got objecting parties,

24 we've got the holidays coming up.  We've got a lot of

25 complicated issues.  But there's no real reason to me

Page 281

1 to shorten that time.  I can understand why Compass

2 wants to or maybe Compass' financial people, but that's

3 not a good enough reason.

4             MR. MEROLA:  Your Honor, we'd like to argue

5 that.

6             THE COURT:  And you can argue that, but you

7 have to make sure you file something in writing, again

8 assume again my tentative ruling is the plan should be

9 confirmed.  So what I want to know from you is would

10 you accept that modification or not.  And then I just

11 need to decide, well, if you're not going to modify can

12 I confirm, anyway, or not?  And I just need to make

13 that decision, you don't need to tell me tonight

14 because I'm not prepared to decide.  Quite frankly.  I

15 have to sit and cogitate those issues some more.  I've

16 read your cases and quite frankly, I was thinking

17 before that that was the answer.  And my problem may be

18 I'm looking at it from a practical standpoint as

19 opposed to a legal standpoint.  And I understand you're

20 asking for a legal conclusion, so.

21             UNKNOWN SPEAKER:  Your Honor?

22             THE COURT:  Uh-huh.

23             UNKNOWN SPEAKER:  By way of forwarning to

24 those who would be needing to give us, and I would join

25 in Candace's request that if that is a tentative or at

Page 282

1 least the direction active Oregon at least a direction

2 of your ruling that you do require Mr. Smith and Miss

3 Chubb to give us a list of the clients that would

4 prefer to be sued.  And they need to know that would

5 include the rest of the lender compromise; i.e. their

6 direct lender's share of all of the professional fees.

7          THE COURT:  Yes.  Oh, no, that's the point.

8          UNKNOWN SPEAKER:  And all of the

9 pre-assessment fees.

10          THE COURT:  If there's no compromise, there's

11 no compromise.

12          MR. MEROLA:  For those people.

13          UNKNOWN SPEAKER:  For those people.

14          THE COURT:  Right.  There's no compromise.

15 If they want to be sued, which is their right.  They

16 can say, fine.  I don't agree to any of it.

17          MR. MEROLA:  Right.  There's a suit for

18 everything.

19          THE COURT:  Sure.  If you say no compromise,

20 there's no compromise.

21          MS. CARLYON:  That's my motion, Your Honor.

22 I move to strike the objections who do not identify

23 specific parties unless that objection is amended to

24 name those parties.

25          THE COURT:  Well, the procedure, you could do

1 a procedure where you send a notice off to those people

2 and say, you've got five days to change your ballot or

3 withdraw your objection, or otherwise you'll be deemed

4 to be non-consenting, and therefore --

5            MS. CARLYON:  Well, we still need the names

6 and addresses of those people.

7            THE COURT:  Sure.  Well, he's done all of his

8 2016 statements.

9            MS. CARLYON:  If I might, the statement that

10 was filed does not set forth addresses and some of the

11 names do not conform to the names --

12            THE COURT:  Oh, okay.

13            MS. CARLYON:  -- that we see used on these by

14 the debtor.

15            THE COURT:  Oh, okay.

16            MS. CARLYON:  So if Mr. Smith is accepting

17 service, that's okay.  But if he's demanding that we

18 serve by mail those individual clients of his and

19 they're objecting parties, I think he should have to

20 file their addresses.

21            MR. SMITH:  I think, Your Honor, I need some

22 time to think about it, but perhaps I could inform the

23 constituents of my group that they could elect to

24 accept the compromise or they could elect to be sued.

25

Page 284

1          THE COURT:  Sure.

2          MR. SMITH:  And give them a reasonable time

3 to respond to that.

4          THE COURT:  Sure.  Assuming I go that

5 direction.

6          MR. SMITH:  I understand.

7          THE COURT:  I want to talk out the options

8 now so you understand.

9          MR. SMITH:  I do.  I have two other

10 questions, Your Honor.  Either you're going go make

11 tomorrow specific findings on 1129, including 1129

12 A-10.

13          THE COURT:  Yes.

14          MR. SMITH:  The last question is, is there

15 any possibility it could be in the morning or is that

16 out of the question.  Some of us were staying here and

17 I think a number of the people who are staying would

18 like to come back at a --

19          THE COURT:  I just don't want to, yeah, we

20 can do it at 10:30.  I just have to give myself enough

21 time.  I don't have the stamina that you guys do.  You

22 guys can work another five hours.  I don't have the

23 stamina to sit tonight and do another five hours' worth

24 of findings, so I'd rather do it in the morning.

25          MR. SMITH:  Your Honor, I appreciate that.

Page 285

1 If that's what you need, that's fine.  10:30 is okay.

2            THE COURT:  That's what I prefer.

3            MS. JARVIS:  Your Honor, in informing there

4 is some evidence in Mr. Allison's declaration and I

5 believe it is in part of this compromise that the

6 debtor waives 4.7 million in pre-petition servicing

7 fees.  Those, of course, would be collected against all

8 of the lenders if we go to trial.

9            THE COURT:  Uh-huh.

10           MS. JARVIS:  And I think we need to be kept

11 informed of that.

12           MS. CHUBB:  Excuse me.  Against the entire

13 4.7 against whoever you're suing, or a pro rata?

14           MS. JARVIS:  Pro rata amount, but that's the

15 whole amount.

16           THE COURT:  All right.  I'm sorry.

17           MR. SMITH:  Your Honor, people keep saying

18 people want to be sued, they want to be sued.  I want

19 tod be clear that they don't want to be sued, they just

20 don't want stuff taken from them without the right to

21 be heard.

22           THE COURT:  I understand.  There's either one

23 of two choices.  You either compromise or you be sued.

24 There is no other, there's no third alternative.

25           MR. SMITH:  There's a lot of other ways to do

Page 286

1 it, Your Honor.  Like in the Lemmons where there was a

2 test case to determine what their rights were, if the

3 committees want to go to the extent of serving all

4 these people in order to create a big fuss, they can do

5 so.

6           THE COURT:  How do I know that you would have

7 implemented, how do I know that you would say sorry, a

8 test case won't work?  You're telling me I'm not bound

9 by a test case.

10          MR. SMITH:  I'm not saying I would agree to

11 something like that.  It would save the estate.

12          THE COURT:  Too late.

13          MR. MEROLA:  Exactly.  Either they want to be

14 sued or not.

15          THE COURT:  Too late.

16          MR. MEROLA:  Either they want the compromise

17 or we'll sue you.

18          THE COURT:  Hold on.  So Mr. Smith it was

19 your turn.  You were speaking and you were interrupted.

20          MR. SMITH:  I just find that a little

21 offensive.  As an investor that has been involved in

22 the case, if this threat, and it doesn't need to be

23 that way.  Mr. Merola can make it that way, but these

24 are the people that were hurt.

25          MR. MEROLA:  It's not a threat.

Page 287

1          MR. SMITH:  I understand --

2          THE COURT:  Please.

3          MR. SMITH:  -- what you're saying, Your

4 Honor, but what I'm saying is there are ways to do it.

5 And I know Mr. Merola's maybe angry.  But there are

6 ways to do it where these people have already been

7 harmed already, do not need to be harmed extensively so

8 they can be before you in a proper way with due

9 process.  That's all I'm saying, and it seems to make

10 sense.

11          MR. MEROLA:  Mr. Smith spent three hours at

12 this hearing and countless hours at the other hearing

13 saying there was no set cases to bind them in the

14 compromise.  Your Honor is giving the option he's not

15 bound by the compromise.  I don't know if we can have a

16 complaint out by Friday, but we'll have one out by the

17 end of the year.  And we'll sue every one of the people

18 not bound by the compromise in each and every one of

19 the elements Mr. Garman outlined is being given in the

20 compromise.  We will reserve the right to prejudgment

21 interest, we will reserve the right to any damages, and

22 we will reserve the right to attorneys' fees under the

23 agreement.

24          MR. SMITH:  I appreciate all that, Your

25 Honor.

Page 288

1          THE COURT:  And the point is look.  There's

2  only two ways of resolving a case.  You sue and

3  everybody goes to court and it's decided by the court.

4          MR. SMITH:  That's right.

5          THE COURT:  Or you compromise.

6          MR. SMITH:  That's right.

7          THE COURT:  You have rejected the compromise,

8  which you have the right to do.  So the only other way

9  to resolve the issue is sue.  It may be that once the

10  lawsuit is started, arguably, I suppose, you could

11  reach a compromise.  But there's only two ways of doing

12  it.  There is no other way of doing it.  And to suggest

13  that is misleading to everybody in this courtroom.

14          MR. SMITH:  Well, it's been done before, but

15  if you don't want to do it that way, that's fine.  I

16  object to Mr. Merola, the threat of all this, and then

17  therefore, you have to do it because otherwise, you're

18  going to get sued for all these things.  These people

19  need to be informed what they can and can't do.

20          THE COURT:  But we have no choice.  You have

21  opposed the compromise.

22          MR. SMITH:  Right.

23          THE COURT:  If you are right as a legal

24  matter, that the only way for the compromise to be

25  effective is for the objecting parties to sue each and

Page 289

1 every one of them.

2            MR. SMITH:  Right.

3            THE COURT:  This plan cannot be confirmed.

4 Okay?

5            MR. SMITH:  Right.

6            THE COURT:  Ergo, if that's the case, why not

7 just bring the suit now?  You're the one who's saying

8 you can't confirm a plan with a compromise.  You're

9 saying you've got to bring a lawsuit.  You're the one

10 that's saying due process means file a summons of

11 service and complaint.

12            MR. SMITH:  Right.  I understand.

13            THE COURT:  There's nothing inherently wrong

14 with that.  You've just got to be aware that some

15 people request it.  I'm giving you exactly what you

16 asked for.

17            MR. SMITH:  You keep saying I requested it.

18 I didn't request that I be sued, I requested that their

19 money not be taken.

20            THE COURT:  So you're requesting your clients

21 keep the money forever?

22            MR. SMITH:  No, I'm saying you can't just

23 take it.  There's not legal basis.

24            THE COURT:  They're not.  They're going to

25 file a lawsuit and say they're entitled to it.

Page 290

1          MR. SMITH:  If Mr. Merola wants to sue all of

2  the individual investors, he certainly can do so.  He

3  may do it anyway, it says in the agreement.

4          THE COURT:  No, well, if the plan cannot be

5  confirmed because compromise can't be done and the

6  modification wasn't made and I said it has to be done,

7  right.  Every lender thinks he's being sued, because

8  it's the only way to resolve who owns the money.  How

9  else do you determine who owns a piece property?  How

10  do you determine that?  One way is you go fight with

11  tanks and trucks.  Another way is you file a lawsuit

12  and go to court, who has a right to A or B.  You were

13  saying I have the right to that money.  But the only

14  way to determine that if somebody else says that, is to

15  file a lawsuit.

16          MR. SMITH:  I agree with that.  That's what I

17  argued.

18          MS. JARVIS:  Your Honor, we would ask that

19  those names be provided to us by tomorrow morning.

20          THE COURT:  We'll see what the report is,

21  what happens.

22          MS. JARVIS:  We do intend on re-arguing with

23  respect to the plan can be confirmed.

24          THE COURT:  That's right.  In other words,

25  know who's not objecting.  You have to know who the

Page 291

1 non-objectors were.  It would make sense to give those

2 who objected the chance to decide if they wanted to

3 change their ballot.  We could keep the balloting open

4 or withdraw the objection.

5            MR. MEROLA:  Or Your Honor, we could confirm

6 the plan subject to an opt out compromise for those

7 people that timely objected.  That way it can be used

8 as a delaying tactic for the entry of confirmation

9 order and those people who wanted to be sued, put their

10 name on a piece of paper and they could sit.

11            THE COURT:  Sure that's an option.

12            MR. SMITH:  I have to make this objection.

13 nobody wants to me sued.

14            THE COURT:  But you can't --

15            MR. SMITH:  I understand that, Your Honor.

16            THE COURT:  How can you suggest that your

17 clients have the right to keep money for which they

18 weren't entitled and not have to account for a reason

19 why they should be able to keep that money?  Under your

20 theory they are never accountable to anybody because

21 they're not allowed to be sued to return the money.

22 You're saying they are not accountable period, end of

23 story, because they're your clients?

24            MR. SMITH: Your Honor, what I'm saying is

25 when the debtor advanced that money from a source

Page 292

1 unknown, it may not even be the debtor's money.  When

2 they advanced that money, it was going to be recouped

3 when the borrower repaid it.  I'm saying this is not a

4 free gift.  That's why it's not a fraudulent

5 conveyance.  That's why I'm saying there's no legal

6 theory to recover that money.

7        THE COURT:  But you preserve --

8        MR. SMITH:  It doesn't really matter.

9        THE COURT:  You play well win.

10        MR. SMITH:  -- because here we're arguing the

11 merits of the adversary proceeding.

12        THE COURT:  That's your right to argue, maybe

13 you're right that the plan requires an adversary but

14 you're telling me no, you would have no forum to argue

15 that.

16        MR. SMITH:  No, form to argue.

17        THE COURT:  No form, because you're telling

18 me they can't be sued.

19        MR. SMITH:  Well, no.  You keep saying they

20 want to be sued.  They want to be sued.  I'm saying I'm

21 not sure that's the case.  They want to keep the money.

22        THE COURT:  Sure.  They want to keep the

23 money and don't want to be accountable.

24        MR. SMITH:  Your Honor, they're all

25 accountable.  All of these people lost money.

1            THE COURT:  What I mean accountable is you

2 don't want to provide a forum where somebody else who

3 has an equally good argument to the right to the money

4 has the right to challenge the right to the money.

5 What sense of fairness is that?

6            MR. SMITH:  It doesn't really work that way,

7 I don't really need to go into it.  Your argument is

8 setoff.  And I might not oppose that.  If you're saying

9 all this money comes in and goes to the people who have

10 diverted principal so we can set it off, that is

11 probably a fair compromise.  That's not what's

12 happening.  It goes into a big pot and gets diluted by

13 people with general claims.

14            THE COURT:  I think you still misunderstand

15 this plan from what I'm hearing here.

16            MR. SMITH:  That's exactly what happened

17 here.  I don't misunderstand a thing.

18            MS. CHUBB:  Once they have diverted principal

19 they have priority over unsecured creditors, and the

20 answer is no.

21            MR. SMITH:  Because of what you said about

22 the set-up, going back to the people that lost the

23 money, I'm saying that's not exactly true.  It goes

24 into the pot and pays administrative fees.

25            THE COURT:  That's for people with diverted

Page 294

1 principal.  But for people, for your clients it's just

2 a matter of direct lender prepayments.  It's just gets

3 offsets for the money that is coming in next.  And if

4 no money ever comes in next.

5           MR. SMITH:  Yeah, that's the problem.

6           THE COURT:  If no money comes in next they

7 why should they have gotten the windfall?

8           MS. JARVIS:  Your Honor, the unrefuted

9 evidence is this money was all commingled and the Ninth

10 Circuit precedent is commingled money is the property

11 of the debtor.

12           THE COURT:  All right.  Let's reconvene at

13 10:30.

14           MR. SMITH:  Thank you, Your Honor.

15           MR. DAVIS:  One last thing because I left the

16 record kind of ambiguous.  The parties that were

17 contemplating accepting out of that provision I

18 mentioned, timely objected are Jo Anne Rudman and

19 Gregory and Shauna Walsh, for the record.

20           MS. JARVIS:  Can I raise one other

21 housekeeping matter since everyone is here?  I assume

22 we'll all be here tomorrow, but we had an informal

23 meeting among the committees and the debtors talking

24 about the fee applications are due in later.

25           THE COURT:  Do it later.

Page 295

1          MS. JARVIS:  Moving it back either to mid to

2 late January?

3          THE COURT:  Sure.

4          MS. JARVIS:  So we'll just file a stipulation

5 with the court, if that's okay.

6          THE COURT:  Sure.  And if any, I will allow

7 counsel to appear on the phone if you want to leave so

8 that your, I don't know, if it makes any difference.  I

9 would probably even allow counsel to argue on the phone

10 tomorrow.  It's always very difficult, but I'm trying

11 to keep the cost down.  I think everybody is hear,

12 anyway.  With Court Call we now have that ability we

13 did not have before.

14          MS. CHUBB:  I just wanted to note that my

15 group filed a joinder in the Glenman objection so we'd

16 be included in that opt out, being able to preserve

17 that.  Mr. Davis just stated --

18          THE COURT:  Right.  That's what your

19 contention is.  I don't know that that's the agreement.

20 That's what your contention is.

21          MS. CHUBB:  I'm just saying with respect to

22 the exceptions that he's giving that my group filed a

23 joinder in the Glenman objection, so we're part of that

24 group.

25          THE COURT:  Well, you filed an objection.

Page 296

1          MS. CHUBB:  Whatever we get, we get by virtue

2 of our joinder.  Whatever it is they're getting, we

3 just want to claim that.

4          THE COURT:  You can claim that, but you are

5 saying as an agreement.

6          MS. CHUBB:  I just want to reserve my right.

7          MR. MEROLA:  Your Honor, it's like cannibals

8 crossing the Alps.  Can we leave it tonight or do you

9 have another calendar in the morning?

10          THE COURT:  We're fine we can leave

11 everything here and lock it up.

12 (Whereupon, the proceeding was concluded at 5:19 p.m.)

13 ATTEST:  True and accurate transcript.

14 _____

15 RENE HANNAH,  CCR #326

16

17

18

19

20

21

22

23

24

25