J. Stephen Peek, Esq., NV. Bar No. 1758
Elissa F. Cadish, Esq., NV Bar No. 4273
Scott D. Fleming, Esq., NV Bar No. 5638
Matthew J. Kreutzer, Esq., NV Bar No. 8834
Hale Lane Peek Dennison and Howard
3930 Howard Hughes Parkway, Fourth Floor
Las Vegas, Nevada 89169
Telephone: (702) 222-2500
Facsimile: (702) 365-6940
Email: mkreutzer@halelane.com

*Attorneys for Rolland P. Weddell
And Spectrum Financial Group*

ELECTRONICALLY FILED
January 11, 2007

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| In re: | |
|---|---|
| USA COMMERCIAL MORTGAGE COMPANY  Debtor. | Bankruptcy No. BK-S-06-10725-LBR |
| In re: | Bankruptcy No. BK-S-06-10726-LBR |
| USA CAPITAL REALTY ADVISORS, LLC  Debtor. | Bankruptcy No. BK-S-06-10727-LBR |
| In re: | Bankruptcy No. BK-S-06-10728-LBR |
| USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC  Debtor. | Bankruptcy No. BK-S-06-10729-LBR |
| In re: | (Jointly Administered)  Chapter 11 |
| USA CAPITAL FIRST TRUST DEED FUND, LLC  Debtor. | **AMENDED DECLARATION OF WILLIAM F. SCHILZ IN SUPPORT OF SPECTRUM FINANCIAL GROUP, LLC'S PROOF OF CLAIM** |
| In re: | |
| USA SECURITIES, LLC  Debtor. | Hearing Date: January 17, 2007  Hearing Time: 9:30 a.m. |

///

::ODMA\PCDOCS\HLLASDOCS\228185\4            Page 1 of 9

J. Stephen Peek, Esq., NV. Bar No. 1758
Elissa F. Cadish, Esq., NV Bar No. 4273
Scott D. Fleming, Esq., NV Bar No. 5638
Matthew J. Kreutzer, Esq., NV Bar No. 8834
Hale Lane Peek Dennison and Howard
3930 Howard Hughes Parkway, Fourth Floor
Las Vegas, Nevada 89169
Telephone: (702) 222-2500
Facsimile: (702) 365-6940
Email: mkreutzer@halelane.com

*Attorneys for Rolland P. Weddell*
*And Spectrum Financial Group*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>USA COMMERCIAL MORTGAGE COMPANY<br>Debtor.<br>_____/ | Bankruptcy No. BK-S-06-10725-LBR<br><br>Bankruptcy No. BK-S-06-10726-LBR |
| In re:<br><br>USA CAPITAL REALTY ADVISORS, LLC<br>Debtor.<br>_____/ | Bankruptcy No. BK-S-06-10727-LBR<br><br>Bankruptcy No. BK-S-06-10728-LBR |
| In re:<br><br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC<br>Debtor.<br>_____/ | Bankruptcy No. BK-S-06-10729-LBR<br><br>(Jointly Administered)<br>Chapter 11 |
| In re:<br><br>USA CAPITAL FIRST TRUST DEED FUND, LLC<br>Debtor.<br>_____/ | **DECLARATION OF WILLIAM F. SCHILZ IN SUPPORT OF SPECTRUM FINANCIAL GROUP, LLC'S PROOF OF CLAIM** |
| In re:<br><br>USA SECURITIES, LLC<br>Debtor.<br>_____/ | |

I, WILLIAM F. SCHILZ, hereby declare under penalty of perjury as follows:

1. I am the managing member of Spectrum Financial Group, LLC, a Delaware limited liability company authorized to do business in the State of Nevada ("Spectrum"). I make this affidavit upon personal knowledge except as otherwise stated, and would be competent to testify to the matters stated herein.

///

2.  In January of 2000, Robert and Cheryl Porter, Rolland Weddell and Spectrum formed Principle Centered, Inc. ("PCI") to take over and develop ongoing projects other than the View that previously were owned and being developed by the Porters' company, American Communities.

3.  In order to continue to develop these projects, PCI needed to renegotiate the terms of American Communities' debts with Debtor USA Commercial Mortgage Company ("USA"), consisting of loans relating to the Harmony, Imagination (also called Somerset), and Inspiration (also called Green Valley Ranch) projects, the American Communities Working Capital Loan (which was subordinated loan secured by all of these projects), and the Housing Partners Loan (a purported loan by USA's affiliate, Housing Partners, LLC, to American Communities that was unsecured). Thus, a Debt Restructuring Agreement was entered on April 21, 2000 to accomplish this (the "Debt Restructuring Agreement"). *See* the Debt Restructuring Agreement, attached hereto as **Exhibit "1"**.

4.  The parties to the Debt Restructuring Agreement include, *inter alia*, American Communities, the Porters, PCI, Spectrum, Weddell, USA, and Housing Partners.

5.  Included in the loans addressed in the Debt Restructuring Agreement were three loans to American Communities originally brokered by USA that contained exit fee provisions (the "Mezzanine Loans") whereby, at the sole discretion of the lender(s), American Communities was to pay a specified amount as an exit fee to USA upon the sale of each lot on the project.

6.  Although USA brokered the Mezzanine Loans between American Communities and the various loan beneficiaries, USA was not nor has it ever been a party to any of these three loans or any of the loan documents related thereto.

7.  American Communities and the beneficiaries of the Mezzanine Loans contracted to preclude any other person or entity from having any rights of any nature under the respective loan agreements.

8.  On April 24, 2000, as a condition to execution of the Debt Restructuring Agreement, the beneficiaries of the Harmony Second, with USA acting as their attorney-in-fact and drafting all appropriate documents, assigned to Tom Gonzales ("Gonzales") 100% of their interest in the Deed of Trust, "the same being the entire interest in the Deed of Trust," together with all agreements executed

1 in connection with the loan secured by the Deed of Trust, including the Loan Agreement, the Promissory Note and the Guaranty.

9. On April 27, 2000, as a condition to execution of the Debt Restructuring Agreement, the beneficiaries of the Green Valley Ranch Second, with USA drafting all appropriate documents, assigned to USA, which assigned to Housing Partners, which assigned to Gonzales 100% of their interest in the Deed of Trust, "the same being the entire interest in the Deed of Trust," together with all agreements executed in connection with the loan secured by the Deed of Trust, including the Loan Agreement and the Promissory Note.

10. On April 27, 2000, as a condition to execution of the Debt Restructuring Agreement, the beneficiary of the Somerset Second, with USA acting as his attorney-in-fact and drafting all appropriate documents, assigned to Cindy Barden ("Barden") 100% of his interest in the Deed of Trust, "the same being the entire interest in the Deed of Trust," together with all agreements executed in connection with the loan secured by the Deed of Trust, including the Loan Agreement and the Promissory Note.

11. As the assignee of the beneficiaries of the Harmony Second and the Green Valley Ranch Second, Gonzales held the sole power and discretion to enforce the provisions of those Deeds of Trust, including payment of the exit fees to USA.

12. As the assignee of the beneficiary of the Somerset Second, Barden held the sole power and discretion to enforce the provisions of that Deed of Trust, including payment of the exit fees to USA.

13. Gonzales and Barden did not enforce the exit fee provisions contained in the Mezzanine Loans on any future lot sales.

14. On September 11, 2000, Gonzales amended the Deed of Trust for the Harmony Second to eliminate the exit fee provisions.

15. Both Gonzales and Barden expressed their willingness to amend the Deeds of Trust for the Green Valley Ranch Second and the Somerset Second to eliminate the exit fee provisions in those loans.

///

16. The Debt Restructuring Agreement, to which USA is a party, defines the term "Lender" to include, *inter alia*, "any person or legal entity who holds a beneficial interest in any deed of trust securing any of the Loans [affected by this Agreement]."

17. In addressing the purchase of the Mezzanine Loans by Gonzales and Barden, the Debt Restructuring Agreement states that the purchasers "shall receive an assignment of beneficial interest in deed of trust *[sic]* and an assignment of the note and of all the loan documents evidencing the loan. The parties understand that the purchasers aforesaid do not wish to pay off the loans, but to acquire the current Lenders' right, title, and interest in and to them."

18. Thus, the parties to the Debt Restructuring Agreement, including USA, agreed that the intent was to transfer all beneficial interest in the deeds of trust securing the Mezzanine Loans, and all rights in connection therewith, to Gonzales and Barden.

19. Nevertheless, after entering the Debt Restructuring Agreement and related agreements, USA made demand on the escrow company closing sales of homes by Harmony to homebuyers to pay exit fees to USA out of the sale proceeds.

20. PCI informed USA that it no longer had any rights or interest with respect to the Mezzanine Loans and thus no right to make a claim for exit fees.

21. USA then initiated litigation in the Eighth Judicial District Court claiming its right to the exit fees, and naming the Porters, the escrow company, and the homebuyers as defendants.

22. Additionally, USA obtained an *ex parte* prejudgment writ of attachment against any escrow funds for sales of homes and recorded a *lis pendens* against the properties, including the homes already purchased by the innocent homeowners. After the defendants filed a motion to expunge the *lis pendens* and to discharge the writ of attachment, the court agreed and reversed these forms of relief that USA had obtained.

23. However, in the interim, USA had badly damaged PCI's reputation with the escrow companies and the homebuyers in the Harmony community, as word spread that they had been sued and their title impaired.

24. I am informed and believe that on August 16, 1999, American Communities, as the borrower, and Sterling USA, Inc., formerly known as Samoth USA, Inc. ("Sterling"), as the

beneficiary and lender, with USA as lender's agent for Sterling, entered into a Construction Loan Agreement, under which Sterling loaned American Communities $1,635,000.00 for development of the lots in its Somerset project (also known as Imagination).

25. In connection with the Construction Loan Agreement, American Communities executed a Promissory Note Secured by Deed of Trust dated August 16, 1999 (the "Sterling Promissory Note").

26. Pursuant to Paragraph 3 of the Sterling Promissory Note, the principal balance and all accrued and unpaid interest were due on the Maturity Date, defined as one year after the date on which the deed of trust securing the Note was recorded.

27. Based on review of the documents, I am aware that the Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated August 16, 1999, which secures the Sterling Promissory Note (the "Somerset First"), was recorded on August 19, 1999.

28. The Maturity Date for the Sterling Promissory Note was thus August 19, 2000.

29. Pursuant to the Debt Restructuring Agreement, USA, as lender's agent for Sterling, agreed as follows with respect to the Somerset First: "USA shall extend the loan when it comes due for one year (until on or about August 16, 2001), in accordance with the terms of the Loan Documents. If necessary, USA shall extend the loan for an additional period, up to April 1, 2002."

30. Sterling received substantial consideration in exchange for this agreement, in the form of an assumption fee of 1% of the construction loan principal, additional guarantors for the construction loan, and having the construction loan brought current. The additional guarantors were PCI, Weddell, and Spectrum.

31. On or about April 21, 2000, as contemplated and required by the Debt Restructuring Agreement, Imagination, a wholly owned subsidiary of PCI, assumed the Somerset First.

32. Beginning April 21, 2000, the monthly interest payments required by the construction loan documents were paid to USA, in accordance with the terms of the above-described agreements.

33. On or about September 19, 2000, Sterling recorded a Notice of Breach and Election to Sell (the "Notice of Default") in Book 20000919, as Instrument No. 01352 of the official records of the Recorder of Clark County, Nevada.

///

34. The Notice of Default asserted that Imagination was in default under the Somerset First as a result of failure to pay the full principal amount of the construction loan on the asserted maturity date of August 20, 2000.

35. Sterling also notified others with whom American Communities, PCI, and Imagination, as well as the Guarantors, do business, that American Communities and Imagination were in default under the construction loan, which statement was false.

36. Sterling instructed Nevada Construction Services to suspend all disbursements of the construction loan and remit to it all funds then held by Nevada Construction Services in its control disbursement account, thus holding up payments to subcontractors who worked on the construction project being funded with the construction loan.

37. A lender with whom PCI was discussing potential financing of several PCI projects learned of the Notice of Default, which had not been disclosed by PCI because they were unaware of any default (because there was no such default). Thereafter, this lender provided only one limited loan and was not interested in providing any further financing to PCI.

38. Imagination notified USA and Sterling of the impropriety of their actions in light of their express agreement in the Debt Restructuring Agreement to extend the Maturity Date for the Somerset First until at least August 16, 2001 and, thus, that the amounts claimed to be in default were not yet due.

39. Instead, USA and Sterling informed American Communities that it would extend the construction loan only if certain additional fees and costs not contemplated by the Debt Restructuring Agreement were paid, pursuant to USA's "normal terms and conditions," and also that Imagination pay the foreclosure costs and penalties incurred by Sterling in its wrongful and inappropriate institution of foreclosure proceedings.

40. Additionally, Hantges informed me that USA was aware of its obligation to extend the construction loan but would continue to refuse to do so unless Spectrum, Weddell and Gonzales helped USA regarding the View Loans, which were in default. However, PCI and Imagination had no obligation regarding the View loans, and had no ownership interest in American Black Mountain, the borrower under those loans and owner of the View project.

41.     Although USA signed the Debt Restructuring Agreement on behalf of Sterling, USA never informed Sterling about the existence of the Debt Restructuring Agreement or that Sterling had any obligation to extend the construction loan, thus leading to the recording of the notice of default by Sterling.

42.     Because of the improper refusal of USA and Sterling to extend the construction loan as promised, American Communities, Imagination, the Porters, PCI, Weddell and Spectrum were forced to file suit against USA and Sterling in the District Court, Clark County, Nevada.

43.     As a result of the litigation initiated by the plaintiffs against USA and Sterling, USA purchased the loan from Sterling and paid Sterling a substantial amount of default interest and related foreclosure fees because Sterling incorrectly insisted that the loan was in default.

44.     Upon purchase of the loan, becoming the beneficiary of the Somerset First, USA rescinded the Notice of Default filed by Sterling but then claimed that PCI was responsible for the improper default fees charged by Sterling which occurred due to USA's failure to inform Sterling about its obligation to extend the construction loan. USA asserts, without support, that PCI was obligated to inform USA that it needed the extension, although the Debt Restructuring Agreement contains no such requirement, and indicates that USA bore an obligation to extend the loan.

45.     As a result of the actions of USA and Sterling with respect to the improper recording of a NOD and pursuit of foreclosure, as well as initiation of the litigation over the exit fees and recording a writ of attachment and *lis pendens* with respect thereto, USA interfered with the business and reputation of Spectrum, Weddell, and PCI and its subsidiaries.

46.     I am informed and believe that on November 30, 1999, USA brokered a loan between American Communities, as the borrower, and the Green Valley Ranch Beneficiaries as the beneficiaries and/or lenders, for the acquisition and development of the Inspiration project, with the loan known as the Green Valley Ranch First.

47.     As part of the Debt Restructuring Agreement, USA agreed to advance additional development funds for the Inspiration project by expanding or replacing the Green Valley Ranch First. In addition, Inspiration assumed the Green Valley Ranch First.

///

48.   USA failed to honor its obligation under the Debt Restructuring Agreement to advance the additional development funds for Inspiration, even though PCI requested that they do so.

49.   These multiple breaches of the Debt Restructuring Agreement by USA so soon after entering that agreement and at a time when PCI was working on turning around the construction projects to be profitable caused substantial damage to PCI and ultimately kept it from being successful. We were unable to obtain financing at rates that would reasonably allow PCI to be profitable and have adequate cash flow to continue to develop its projects.

50.   Ultimately, PCI and its subsidiaries were forced to seek bankruptcy protection in the spring of 2001, which bankruptcy was later converted to a Chapter 7 liquidation. In the context of the bankruptcy proceedings, Spectrum purchased the claims of PCI and its subsidiaries against USA for damages resulting from USA's actions. Attached hereto as **Exhibit "2"** is the Order from the Bankruptcy Court authorizing Spectrum to purchase the claims of PCI and its subsidiaries.

51.   PCI and its subsidiaries lost everything, rather than being the successful profitable venture it would have been were it not for USA's improper and bad faith actions in the months following the Debt Restructuring Agreement. Attached hereto as **Exhibit "3"** are pro formas prepared by PCI based on having entered the Debt Restructuring Agreement and anticipating moving forward smoothly thereunder, demonstrating the profits that would have been made from the PCI subsidiary ventures if it was not for USA's breaches.

52.   In addition, PCI, Spectrum, and Weddell agreed to guarantee the Harmony First, Green Valley Ranch First, and Somerset First, as well as the American Communities Working Capital Loan in connection with the Debt Restructuring Agreement, and they have been sued based on these loan guarantees.

53.   PCI, Spectrum, and Weddell would not have agreed to these guarantees had they known that USA would later fail to comply with numerous obligations undertaken in connection with the Debt Restructuring Agreement, and thus they should not be bound by the guarantees.

54.   Based on the entering of the Debt Restructuring Agreement, which was necessary for PCI to be viable and profitable, Weddell and Spectrum loaned monies to PCI, Destination II, Enchantment II, Harmony II, Imagination and Inspiration, jointly and severally, from April 2000

Hale Lane Peck Dennison and Howard
3930 Howard Hughes Parkway, Fourth Floor
Las Vegas, Nevada 89169

1  through December 2000, in the collective amount of $9,500,000.00. The loans from Spectrum and
2  Weddell were used by PCI and each of its subsidiaries to pay interest on construction loans, provide
3  working capital for PCI and its five (5) subsidiaries and to pay subcontractors, suppliers and material
4  men for work done on some or all of the projects owned by PCI's five (5) subsidiaries, including but
5  not limited to the Harmony project, the Imagination (Somerset) project and the Inspiration (Green
6  Valley Ranch) project. Attached hereto as **Exhibit "4"** is a copy of the note from PCI to Spectrum for
7  the money Spectrum loaned. Attached hereto as **Exhibit "5"** is a copy of a ledger for each of the
8  advances comprising the total loan amount.

9      55. Spectrum's Proof of Claim seeks damages for USA's bad faith and fraudulent actions
10  and its breaches of contract, including its loans to PCI and its subsidiaries of $6,785,175.87. The Proof
11  of Claim also seeks punitive treble damages of $20,355,527.61. Last, the Proof of Claim includes an
12  amount for accumulated interest and the PCI companies' lost profits of $22,440,296.52 for a total
13  claim of $49,581,000.

14      DATED this 10th day of January, 2007.

I do hereby swear under penalty of perjury that
the foregoing assertions contained in this
Declaration are true and correct. I am aware that
if any statements made by me herein are willfully
false, I am subject to punishment.

*/s/ William F. Schilz*

WILLIAM F. SCHILZ

C:\Documents and Settings\Bill Schilz\Local Settings\Temporary Internet Files\OLK165\HLLASDOCS-#228185-v2-Affidavit_of_William_F__Schilz_in_Support_of_Spectrum's_Proof_of_Claim.DOC

Page 9 of 9