THE LIMITED LIABILITY COMPANY MEMBERSHIP INTEREST UNITS PURCHASED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). SUCH INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON AT ANY TIME IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT COVERING SUCH UNITS UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQUIRED. IN ADDITION, IN NO EVENT MAY UNITS BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON WHO IS NOT A RESIDENT OF NEVADA FOR A PERIOD OF NINE MONTHS FROM THE DATE OF THE LAST SALE THEREOF BY THE FUND.

## SUBSCRIPTION AGREEMENT AND POWER OF ATTORNEY

### USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,
a Nevada limited liability company

The undersigned hereby applies to become a Member of USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, a Nevada limited liability company (the "Company"), and subscribes to purchase the number of Units herein indicated in accordance with the terms and conditions of the Operating Agreement attached as Exhibit A to the Offering Circular dated March 1, 2000, as amended or supplemented from time to time (the "Offering Circular").

1. **REPRESENTATIONS AND WARRANTIES.** The undersigned represents and warrants as follows:

(a) I have received, read and fully understood the Offering Circular and in making this investment I am relying only on the information provided in the Offering Circular. I have not relied on any statements or representations inconsistent with those contained in the Offering Circular.

(b) I understand that the Units are being offered and sold without registration under the Securities Act of 1933, as amended, in reliance upon the exemption from such registration requirements for intrastate offerings. I acknowledge and understand that the availability of this exemption depends in part upon the accuracy of the representations and warranties contained herein, which I hereby make with the intent that they may be relied upon by the Manager.

765401/154660.2

EXHIBIT A

(c)     My principal residence is in the State of Nevada. Except as hereafter provided, if I am acting as the trustee of a trust or on behalf of any other business entity, both the principal office <u>and</u> the principal place of business of such trust or other entity are located in the State of Nevada. If I am acting as the trustee or custodian of a Keogh plan, Individual Retirement Account or other retirement plan and I am not a resident of Nevada, then all of the following requirements are satisfied: (i) all participants or beneficiaries of such retirement plan have their principal residence in Nevada; (ii) all investment decisions regarding such plan are made by such resident participants and/or beneficiaries; and (iii) I perform only ministerial functions with respect to the investment of plan assets, with no independent authority or discretion to make investment decisions.

(d)     I understand that Units may not be sold or otherwise disposed of without the prior written consent of the Manager, which consent may be granted or withheld in its sole discretion, and that any such transfer is also subject to other restrictions described in the Offering Circular and in the Operating Agreement. I have liquid assets sufficient to assure myself (i) that investment in these Units will not cause me undue financial difficulties and (ii) that I can provide for my current needs and possible personal contingencies or, if I am the trustee of a retirement trust, that the limited liquidity of the Units will not cause difficulty in meeting the trust's obligations to make distributions to plan participants in a timely manner.

(e)     I understand that an investment in the Units involves certain risks.

(f)     I am 18 years of age or older.

(g)     By virtue of my own investment acumen and experience or financial advice from my independent advisors (other than a person receiving commissions by reason of my purchase of Units), I am capable of evaluating the risks and merits of an investment in the Units.

(h)     I am purchasing the Units solely for my own account, and not with a view to or for a sale in connection with any distribution of the Units.

(i)     Either (i) I have a net worth (exclusive of home, furnishings and automobile) of at least $50,000 and an annual gross income of at least $50,000; or (ii) I have a net worth (exclusive of home, furnishings and automobile) of at least $100,000; or (iii) I am purchasing as a trustee or other fiduciary for an individual that meets the requirements of (i) or (ii) above or for an account or plan whose donor or plan participant meets the requirements of (i) or (ii) above.

2.     **POWER OF ATTORNEY.** I hereby irrevocably constitute and appoint the Manager as my true and lawful attorney-in-fact, with full power and authority for me, and in my name, place and stead, to execute, acknowledge, publish and file:

(a)     The Operating Agreement, the Articles of Organization of the Company and any amendments thereto or cancellations thereof required under the laws of the State of Nevada;

765401/154660.2

(b) Any other certificates, instruments and documents as may be required by, or may be appropriate under, the laws of any state or other jurisdiction in which the Company is doing or intends to do business; and

(c) Any documents which may be required to effect the continuation of the Company, the admission of an additional or substituted Member, or the dissolution and termination of the Company.

The power of attorney granted above is a special power of attorney coupled with an interest, is irrevocable, and shall survive my death or the delivery of an assignment of Units by me; provided, that where the assignee of Units has been approved by the Manager for admission to the Company as a substituted Member, such power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Manager to execute, acknowledge, file and record any instrument necessary to effect such substitution.

3. **ACCEPTANCE.** This Subscription Agreement and Power of Attorney (this "Agreement") will be accepted or rejected by the Manager within fifteen (15) days of its receipt by the Company. Upon acceptance, this subscription will become irrevocable, and will obligate the undersigned to purchase the number of Units indicated below, for the purchase price of $25,000 per Unit. The Manager will return a countersigned copy of this Agreement to accepted subscribers, which copy (together with my cancelled check) will be evidence of my purchase of Units.

4. **PAYMENT OF SUBSCRIPTION PRICE.** The full purchase price for Units is $25,000 per Unit, payable in cash concurrently with delivery of this Agreement. I understand that my subscription funds will not bear interest until I am admitted to the Company.

[ALTERNATIVE PARAGRAPH 4 - to be used if units are purchased through the contribution of an existing loan:

"The full purchase price for Units is $25,000 per Unit, payable by the undersigned's contribution to the Company of an existing real estate secured loan in exchange for Units. This loan contribution is subject to all of the terms and conditions of the Offering Circular and Operating Agreement. This loan contribution, and the undersigned's purchase of Units in exchange therefor, will be consummated when all documents and acts required by the Manager to transfer the loan to the Company have been signed, recorded and taken. These documents and acts include, without limitation, an endorsement of the original note that evidences the loan, a recorded assignment of the deed of trust that secures the loan and an endorsement to the lender's title insurance policy whereby the underlying title company recognizes the transfer of the note and deed of trust to the Company. The amount of Units sold in exchange for the loan contribution shall be equal to the outstanding principal balance of the loan, together with any accrued but unpaid interest."]

5. THE UNDERSIGNED AGREES TO INDEMNIFY, DEFEND (BY COUNSEL REASONABLY ACCEPTABLE TO THE INDEMNIFIED PARTY) AND HOLD THE COMPANY, ITS MANAGER, MEMBERS AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS, AND EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, AND DAMAGES (INCLUDING, WITHOUT LIMITATION, ALL ATTORNEYS' FEES WHICH SHALL BE PAID AS INCURRED) WHICH ANY OF THEM MAY INCUR, IN ANY MANNER OR TO ANY PERSON, BY REASON OF THE FALSITY, INCOMPLETENESS OR MISREPRESENTATION OF ANY INFORMATION FURNISHED BY THE UNDERSIGNED HEREIN OR IN ANY DOCUMENT SUBMITTED HEREWITH.

6. INVESTOR INFORMATION. (Please print or type)

Name and Address of Investor or Beneficial Owner:

Bruce McGimsey

7650 North Jones

Las Vegas, Nevada 89131
City                     Zip Code

702-656-8235    ( )
Telephone (Home)    Telephone (Office)

(1) My net worth (exclusive of home, furnishings and automobile) is at least $50,000 and my annual gross income in the prior year was at least $50,000:    **X** Yes ___ No

OR

(2) I have a net worth (exclusive of home, furnishings and automobile) of at least $100,000:    ___ Yes ___ No

OR

If I am purchasing as a trustee or other fiduciary, the individual donor, or plan participant meets the requirements of (1) or (2) above:    ___ Yes ___ No

765401/154660.2

Please complete the following, as applicable. (Investments by more than one of the following entities, even if related to each other or controlled by the same person, require completion of separate Subscription Agreement.)

Identifying Information        Monthly Income to Be:[1]

Individual:

Name **Bruce McGimsey**        Compounded    X X
Address **7650 N. Jones**      or Distributed  _____

**Las Vegas**, NV **89131**
Soc.Sec.No. **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**

Individual Retirement Account ("IRA"):

Trustee  _____       Compounded    _____
         _____       or Distributed _____
Address  _____
         _____
         _____, NV _____
Acct.No. _____       Tax I.D. No. _____

Pension or Profit Sharing Trust ("ERISA Plan"):

Trustee  _____       Compounded    _____
         _____       or Distributed _____
Address  _____
         _____
         _____, NV _____
Acct.No. _____       Tax I.D. No. _____

Corporation, Trust or Other:

Trustee  _____       Compounded    _____
         _____       or Distributed _____
Address  _____
         _____
         _____, NV _____
Acct.No. _____       Tax I.D. No. _____

765401/154660.2

[1] The election whether to receive monthly cash distributions, or to allow earnings to compound, is irrevocable and no changes by the investor will be allowed for the first year after an investor's admission to the Company. Thereafter, an investor may, on an annual basis and subject to the terms and conditions contained in the Offering Circular and Operating Agreement, elect to switch how distributions are treated. The Manager, however, reserves the right to immediately commence making cash distributions to previously compounding investors to ensure that the Company remains exempt from the application of the Plan Asset Regulations. Investors have the right to withdraw from the Company, subject to certain limitations. (See discussion in Offering Circular under "ERISA Considerations," "Summary of Operating Agreement" and "Withdrawal from Company.")

Number of Units to be Purchased: __1__

Total Purchase Price ($25,000 per Unit): $ __25,000__

Make check payable to "USA Capital Diversified Trust Deed Fund, LLC" and return with this Subscription Agreement to c/o USA Commercial Mortgage Company, 4484 South Pecos Road, Las Vegas, Nevada 89121.

IN WITNESS WHEREOF, the undersigned hereby agrees to become a Member in USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, a Nevada limited liability company, upon the terms and conditions set forth in the Operating Agreement.

Dated: This __31__ day of __July__, 2002

__Bruce M. Himsey__ (signature)
(signature of Investor or
  Beneficial Owner)

_____
(signature of Investor or
  Beneficial Owner)

_____  _____
(signature of Trustee, if any)   (signature of Trustee, if any)

[IF IRA OR ERISA PLAN, THEN BOTH TRUSTEE AND BENEFICIAL OWNER(S) MUST SIGN.]

765401/154660.2

## ACCEPTANCE

The foregoing Subscription Agreement is hereby accepted by USA Capital Diversified Trust Deed Fund, LLC.

Dated: _____8.1_____, 2002
USA Capital Diversified Trust Deed Fund, LLC,
a Nevada limited liability company

By:     USA Capital Realty Advisors, LLC
        a Nevada limited liability company
        Its Manager

        By: _Victoria A. Heady_ (signature)

        Its: _____

connection with the issuance of any new instruments or certificates for any Units which are presented to the Manager for transfer during the nine-month period described in subparagraph (3) above.

Instruments or certificates shall bear the following legends:

THE MEMBERSHIP INTEREST UNITS PURCHASED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). SUCH INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON AT ANY TIME IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT COVERING SUCH UNITS UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS, OR AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE FUND TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQUIRED. IN ADDITION, IN NO EVENT MAY UNITS BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON WHO IS NOT A RESIDENT OF NEVADA FOR A PERIOD OF NINE MONTHS FROM THE DATE OF THE LAST SALE THEREOF BY THE FUND.

## LENDING STANDARDS AND POLICIES

### General Standards for Mortgage Loans

The Fund will engage in the business of making or purchasing entire or fractional interests in acquisition, development, construction and bridge, or interim, loans secured by first deeds of trust on undeveloped land and residential and commercial developments located in the United States. The Fund's loans will not be insured or guaranteed by any governmental agency or private mortgage insurance company. Fund loans will be selected for investment pursuant to a set of guidelines set forth below, which guidelines are designed to set standards for the quality of the real property security given for the loans. Certain of these guidelines can be changed by the Manager, as described below.

1. **Priority of Deeds of Trust**. All Fund loans will be secured only by first deeds of trust that encumber the property which the Fund loans are being used to acquire, develop, construct or otherwise finance. In some states, a mortgage is used to create a security interest in real property, rather than a deed of trust. For purposes of this Offering Circular, the term "deed of trust" means both a deed of trust and a mortgage.

2. **Geographic Area of Lending Activity**. The Fund will make loans secured by property located throughout the United States, although it is contemplated that many of the Fund's loans will be secured by property located in the western United States.

3. **Loan-to-Value Ratios**. The amount of a Fund loan will generally not exceed the following percentages, based on the appraised value of the security property as determined by an independent written appraisal at the time the loan is made.

13

**EXHIBIT B**

| Type of Property/Loan | Maximum Loan to Value Ratio (subject to increase by the Manager) |
|---|---|
| Residential Subdivisions (loans to land developers and residential builders) | 75% |
| Commercial Property (including but not limited to multi-unit residential property, office buildings, industrial and warehouse facilities, retail stores, shopping centers, motels, self-storage facilities, and senior housing) | 75% |
| Unimproved Land | 60% |

These loan-to-value ratios may be increased if, in the sole discretion of the Manager, a given loan is supported by credit adequate to justify a higher loan-to-value ratio or if mortgage insurance is obtained; however, the Manager does not anticipate obtaining or requiring the borrowers to maintain mortgage insurance. In addition, the maximum loan to value ratio for unimproved land may be increased, in the Manager's discretion, to 75% if the unimproved land is already entitled (e.g., a final subdivision map has been recorded on the land), a tentative map has been approved for the unimproved land, or the Manager believes that the borrower is likely to secure key entitlements. Appraisals and loan-to-value ratios may be determined on an as-completed basis for construction loans (i.e., the value of property as determined by the appraiser assuming that all of the improvements for which the loan is being sought are completed). Finally, the foregoing loan-to-value ratio will not apply to purchase-money financing offered by the Fund to sell any real estate owned (acquired through foreclosure) or to refinance an existing loan that is in default at the time of maturity. In such cases, the Manager shall be free to accept any reasonable financing terms that it deems to be in the best interests of the Fund, in its sole discretion.

The Fund will receive an appraisal for each property on which it will make a mortgage loan. Generally, appraisers retained by the Fund shall be certified by the American Institute of Real Estate Appraisers (M.A.I. or S.R.A.), although appraisals from appraisers holding other credentials (e.g., who meet the minimum qualifications prescribed by local laws or are of the type generally used by commercial lenders in the state the property is situated) may be used with respect to some Fund loans. The Manager will review each appraisal report

4. **Terms of Loans.** Fund loans will have a term of between one (1) and three (3) years, although the Fund may make loans that have a shorter maturity if the Manager believes in its sole discretion that the loans represent a sound investment opportunity. Most loans will require payments of interest only during the loan term, and the borrower will have to make a substantial "balloon payment" at the end of the term. Many borrowers do not have funds sufficient to make this balloon payment and, consequently, must refinance or sell the underlying property. (See "Risks and Other Important Factors -- Loan Defaults and Foreclosures".)

5. **Escrow Conditions**. Fund loans will be funded through an escrow account handled by either a qualified title insurance or escrow company or other qualified company performing similar functions. The escrow agent will be instructed not to disburse any of the Fund's funds out of the escrow for purposes of funding the loan until:

14

(a)    Satisfactory title insurance coverage has been obtained for all loans, with the title insurance policy naming the Fund as the insured and providing title insurance in an amount equal to the principal amount of the loan. Title insurance insures only the validity and priority of the Fund's deed of trust, and does not insure the Fund against loss by reason of other causes, such as diminution in the value of the property, over-appraisals, borrower's defaults, etc.

(b)    Satisfactory fire and casualty insurance has been obtained for all loans, which insurance shall name the Fund as loss payee in an amount equal to the principal amount of the Fund's loan. Fire insurance will not be required where a loan is secured by unimproved land. (See "Risk Factors -- Uninsured Losses.")

6.    **Absence of Mortgage Insurance**. The Manager does not intend to arrange for mortgage insurance, which would afford some protection against loss if the Fund foreclosed on a loan and there were insufficient equity in the property to repay all sums owed.

7.    **Fund as Payee**. All loan documents (notes, deeds of trust, etc.) and insurance policies will name the Fund as payee and beneficiary. Loans will not be written in the name of the Manager or any other nominee, although loans that the Fund purchases or are contributed by investors in exchange for Units (as described below) will originally be written in the name of the original lender or investor. Such loans will be assigned to the Fund when they are purchased or contributed.

8.    **No Loans to Manager**. No loans will be made by the Fund to the Manager or to any of its affiliates, except for any financing extended as part of a sale of real estate owned as a result of foreclosure. (See "Conflicts of Interest -- Sale of Real Estate Owned to Affiliates".)

9.    **Purchase of Loans from Manager or Affiliates**. Preexisting loans, or fractional interests therein, that are secured by first deeds of trust may be purchased from the Manager, Affiliates or other third parties; provided that any such loan is not in default and otherwise satisfies the foregoing lending guidelines. The purchase price to the Fund for any such loan will be equal to the then-outstanding principal balance of the loan, together with any accrued but unpaid interest (the "Loan Balance") (or a proportionate share of the Loan Balance with respect to the purchase of a fractional loan interest).

10.    **Contributions of Loans**. At the sole discretion of the Manager, Members may be allowed to contribute entire or fractional interests in preexisting loans that are secured by first deeds of trust in exchange for Units. Any such loans that are contributed to the Fund shall not be in default at the time of contribution, shall satisfy the foregoing lending guidelines and must have been originated by the Manager or its Affiliates. The amount of Units sold to a Member in exchange for such a contribution shall be equal to the Loan Balance (or a proportionate share of the Loan Balance with respect to the contribution of a fractional loan interest).

11.    **Loan Diversification**. Until such time as $100,000,000 in Units have been sold, no Fund loan (or Fund interest in a loan) will exceed $20,000,000. Once $100,000,000 in Units have been sold, (i) no Fund loan (or Fund interest in a loan) will exceed fifteen percent (15%) of total Fund loans outstanding at the time of the loan, and (ii) no more than twenty-five (25%) of the Fund's loans outstanding at any time shall be made to a single borrower, together with any affiliates of such borrower.

15

## LEGISLATIVE HISTORY
### P.L. 95-598

know that detection of nonpayment is more difficult for the taxing authority than it is for a supplier or lender, and that an unpaid supplier quickly stops shipping goods, though an unpaid taxing authority is usually unable to take collection action for months.

#### E. OTHER PRIORITIES

Current law contains three other priorities that are not carried over in H.R. 8200. The first is a little-used provision granting a priority to expenses of creditors in connection with the prosecution of criminal offenses against the debtor, or in connection with the revocation of confirmation of a repayment plan.[127] The second is a priority for claims of landlords to the extent they are given priority under applicable State law.[128]

The more major priority set aside is the Federal, State, and local governments' nontax priority, and the Federal priority established in the Revised Statutes.[129] The chorus calling for repeal of that priority in bankruptcy cases has grown in recent years.[130] One organization even suggested that the government's nontax claims be subordinated to general unsecured claims, because most of the governments' claims resulted from various social programs that the

---

[120] See H.R. REP. No. 687, 89th Cong., 1st Sess. 6 (1965).
[121] Bankruptcy Act § 64a(4), 11 U.S.C. 104(a)(4) (1970).
[122] H.R. 8200 § 101 (proposed 11 U.S.C. 507(6)).
[123] Security First National Bank v. United States, 153 F.2d 563 (9th Cir. 1946); In re Fonda, J. & G. R. R., 126 F.2d 604, 606 (2d Cir. 1942).
[124] H.R. 8200 § 101 (proposed 11 U.S.C. 503(a)(1)).
[125] Otte v. United States, 419 U.S. 42 (1974).
[126] H.R. 8200 § 101 (proposed 11 U.S.C. 346(f)).
[127] Bankruptcy Act § 64a(3), 11 U.S.C. 104(a)(3) (1970).
[128] Id. § 64a(5), 11 U.S.C. 104(a)(5) (1970).
[129] Id. See Revised Statutes § 3466, 31 U.S.C. 191 (1970).
[130] Plumb, supra note 113; COMMISSION REPORT, pt. I, at 216-19; Hearings, pt. 3, at 1590-91, 1626, 1696.

[page 194]

Congress had agreed to fund, and that therefore the government should not compete with other creditors who had extended credit for business, not social welfare, reasons.[131] H.R. 8200 does not go so far, but simply places the government's nontax claims on a parity with other unsecured claims,[132] unless, of course, the government's claim is secured. The time has past when the sovereign can do no wrong and is entitled to the first fruits of every insolvent estate.[133]

#### F. SUBORDINATION OF SECURITY PURCHASE RESCISSION CLAIMS

A difficult policy question to be resolved in a business bankruptcy concerns the relative status of a security holder who seeks to rescind his purchase of securities or to sue for damages based on such a purchase: Should he be treated as a general unsecured creditor based on his tort claim for rescission, or should his claim be subordinated? The issue of subordination must be resolved one way or the other; in any particular case there is no middle ground for compromise, though there may be a middle statutory ground. The argument for mandatory subordination is best described by Professors Slain and Kripke.[134] The arguments against subordination were presented by the Securities and Exchange Commission.[135]

A brief review of the case law in this area is appropriate. For many years, a security holder was precluded from asserting his rescission

EXHIBIT C

# BANKRUPTCY REFORM ACT OF 1978
P.L. 95-598

claim on a parity with general creditors. For example, *In re Racine Auto Tire Company*[136] denied such claims on the basis of estoppel en pais. That case involved the issuance of preferred stock in violation of state Blue Sky laws. Three years after the issuance, the corporation was adjudicated bankrupt, and the stockholders attempted to file a claim for recovery of the consideration paid. The court noted that the four elements necessary for estoppel en pais were present. The stockholders knowingly assumed a position as equity security holders which is at variance with the position of a general creditor. The stockholders repeatedly ratified that position by accepting dividends and asserting to the world to be stockholders. The stockholders profited from their position to the extent of dividends paid. Finally, the stockholders did not attempt to change their position until more than two years had elapsed. Although the court concluded that the stockholders were estopped from asserting any claim, the interests of the general creditors would have been protected to the same extent by mandatory subordination.

The law with respect to the rights of rescinding security holders was dramatically changed in 1937 by the decision of the Supreme Court in *Oppenheimer v. Harriman National Bank and Trust Co.*[137] That case, based on facts that occurred before passage of the Securities Acts, permits a rescinding security holder to share *pari passu* in the bank-

---

[131] *Hearings*, pt. 3, at 1696.
[132] *See* H.R. 8200 § 321(a) (amendment to Revised Statutes § 3466, 31 U.S.C. 191 (1970)).
[133] COMMISSION REPORT, pt. I, at 216-19.
[134] Slain & Kripke, *The Interface Between Securities Regulation and Bankruptcy: Allocating the Risk of Illegal Securities Issuance Between Security Holders and the Issuer's Creditors*, 48 N.Y.U. L. REV. 261 (1973).
[135] *Hearings*, pt. 4, at 2184-86.
[136] 290 F. 939 (7th Cir. 1923).
[137] 301 U.S. 206 [57 S.Ct. 719, 81 L.Ed. 1042.] (1937).

[page 195]

rupt estate with general creditors. The Supreme Court has not withdrawn from this position since 1937 but has specifically left the question open in Chapter X case, *Protective Committee v. Anderson.*[138]

There is also authority under present law that if a security holder can trace the consideration paid into proceeds of the estate then he can, in straight bankruptcy, either reclaim the consideration or assert a security interest in the proceeds as a secured creditor.[139] That case involved an unincorporated individual oil and gas operator who sold working interests to investors, many of whom asserted rescission claims when the operator filed a petition in bankruptcy. It is possible that the case is analogous to a corporation selling investment contracts.[140]

Whether the rescinding security holder should be subordinated to, share *pari passu* with, or have priority over, unsecured creditors requires consideration of the elements of restitutionary relief. Generally, American law disfavors the general creditor whenever he competes with persons who have transferred property to a debtor in a voidable transaction. Professors Slain and Kripke argue that the general rule is premised on the assumption that the general creditor did not, in making his decision to extend credit, rely on the debtor's ownership of property transferred by the rescinding transferor. They point out that in the instant case, the unsecured creditor does rely on an apparent cushion of equity securities in making the decision to extend credit.

## LEGISLATIVE HISTORY
P.L. 95–598

They conclude that allocation of assets in a bankruptcy case is a zero-sum situation, and that rules of allocation in bankruptcy should be predicated on allocation of risk. The two risks to be considered are the risk of insolvency of the debtor and the risk of an unlawful issuance of securities. While both security holders and general creditors assume the risk of insolvency, Slain and Kripke conclude that the risk of illegality in securities issuance should be borne by those investing in securities and not by general creditors. Placing rescinding share holders on a parity with general creditors shifts the risk of an illegal stock offering to general creditors. The general creditors have not had the potential benefit of the proceeds of the enterprise deriving from ownership of the securities and it is inequitable to permit shareholders that have had this potential benefit to shift the loss to general creditors. This conclusion is consistent with the equitable doctrine of laches which they characterize as "an anti-straddle rule". Laches will apply to cut off rescission rights if the security holders have failed to assert a known claim and such failure has caused detrimental reliance to an adverse party. In many cases, security holders of a bankrupt debtor will be aware of their rescission rights prior to bankruptcy.

The Securities and Exchange Commission supports the position that rescission claims of security holders should not be subordinated on a mandatory basis. The SEC argues that investors who are refrauded never bargained for the securities they received and therefore never consciously took the risk that the enterprise would become insolvent because of the illusion of investing in an enterprise of a different

---

[138] 390 U.S. 414, 453 (1968).
[139] In re Rhine, 241 F. Supp. (D.Colo. 1965).
[140] Cf. Securities and Exchange Commission v. C. M. Joiner Leasing Corp., 320 U.S. 344 [64 S.Ct. 120, 88 L.Ed. 88.] (1943).

[page 196]

nature. The SEC is of the opinion that a security holder who has been defrauded should be treated the same as any other tort victim of the debtor. Mandatory subordination would result in different treatment to security holders whose fraud claims were reduced to judgment before bankruptcy, and those security holders whose claim had not reached that point.

Unfortunately, the SEC's desire to leave the issue to the courts on a case-by-case basis is not as clear cut as it may seem. Professor Kripke has made clear that leaving the issue to the courts to resolve on a case-by-case basis in effect means that rescission claims will not be subordinated because the doctrine of equitable subordination is inapplicable as between two innocent third parties. His statement is supported by the opinion of the Second Circuit in *In Re Credit Industrial Corp.*, in which the court noted: [141]

> Equitable subordination, which is founded upon estoppel, is the doctrine invoked by courts to deny equal treatment to creditors based on some inequitable or unconscionable conduct in which they have engaged, or a special position which they occupy vis-a-vis the bankrupt that justifies subordination of their claims....

The bill generally adopts the Slain/Kripke position, but does so in a manner that is administratively more workable. The bill subordinates in priority of distribution rescission claims to all claims that are senior

## BANKRUPTCY REFORM ACT OF 1978
P.L. 95-598

to the claim or interest on which the rescission claims are based.[141] Thus, a rescission claim resulting from the purchase of a subordinated debenture would share in the proceeds of the estate before equity security holders but after general unsecured creditors. The bill also provides for some case-by-case adjustment. The court is given general authority to subordinate claims on equitable grounds.[143] If those that would take before subordinated rescission claim holders had been involved in some activity that led to the fraudulent issue of the securities on which the rescission claims were based, the court would be able to subordinate those with dirty hands below the rescission claim holders, thus restoring the rescission claim holders to nearly a creditor position.

### VIII. PARTNERS AND PARTNERSHIPS

Treatment of partners and partnerships under title 11 can be divided between tax and non-tax issues. The tax aspects of partnerships and partners in cases under title 11 is discussed separately in connection with the special tax provisions in sections 346, 728, 1146, and 1331. The non-tax issues merit discussion in their own right.

Title 11 does not define "partner" or "partnership"; the definitions are left to nonbankruptcy law as construed by the bankruptcy court. Section 101(29) of title 11 does make clear that a partnership is a person which means that a governmental unit, estate, or trust is not a partnership. Any partner that is otherwise considered a person or

---

[141] 366 F.2d 402 (2d Cir. 1966).
[142] H.R. 8200 § 101 (proposed 11 U.S.C. 510(a)(2)).
[143] Id. (proposed 11 U.S.C. 510(b)).

[page 197]

governmental unit will not be disqualified from such status by virtue of being a partner. A "partner" includes a general or limited partner unless otherwise specified, and a "partnership" includes a general or limited partnership from its inception until it is dissolved and its affairs are fully settled. However, a partnership association, the liability of which is limited to subscribed capital, is treated solely as a corporation under 11 U.S.C. 101(8)(A)(ii) while a limited partnership, and implicitly a general partnership, are not corporations by virtue of 11 U.S.C. 101(8)(B). Also, a partnership by estoppel would continue to be excluded from being a debtor under title 11. *In re Kenney*, 97 F. 554, 559, (S.D.N.Y. 1899), aff'd, 105 F. 897, 899 (2d Cir. 1900), aff'd on another issue sub. nom. *Clarke v. Larramore*, 188 U.S. 486 (1903).[1]

Whether a partner may be a debtor under 11 U.S.C. 109 depends upon the kind of entity it is. For example, if the partner is an estate or trust, it may not proceed under title 11, but it may do so if it is an individual, partnership, corporation, or governmental unit that is otherwise eligible to be a debtor.

Whether a partnership may be a debtor under title 11 is a different issue. Section 109 of title 11 indicates that an eligible partnership may be a debtor only under chapters 7 or 11 of title 11. In order to be eligible, 11 U.S.C. 109(a) requires the partnership to have a sufficient nexus with the United States; a partnership lacking that nexus would not be eligible merely because a partner in such partnership would be eligible for relief under title 11. Also, under 11 U.S.C. 109(b) and