E-filed on January 17, 2007

Marc A. Levinson (California Bar No. 57613)
Jeffery D. Hermann (California Bar No. 90445)
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, CA  95814-4497
Telephone:  (916) 447-9200
Facsimile:  (916) 329-4900
Email:    malevinson@orrick.com;
          rragni@orrick.com

Bob L. Olson (Nevada Bar No. 3783)
Anne M. Loraditch (Nevada Bar No. 8164)
BECKLEY SINGLETON, CHTD.
530 Las Vegas Boulevard South
Las Vegas, NV 89101
Telephone:  (702) 385-3373
Facsimile:  (702) 385-5024
Email:    bolson@beckleylaw.com;
          aloraditch@beckleylaw.com

*Attorneys for the Official Committee of Equity
Security Holders of USA Capital Diversified Trust
Deed Fund, LLC*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>                                   Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>                                   Debtor. | |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>                                   Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725-LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>                                   Debtor. | **DECLARATION OF MICHAEL A.<br>TUCKER IN SUPPORT OF<br>SUPPLEMENTAL BRIEF IN** |
| In re:<br>USA SECURITIES, LLC,<br>                                   Debtor. | **SUPPORT OF OBJECTION OF THE<br>OFFICIAL COMMITTEE OF<br>EQUITY SECURITY HOLDERS OF<br>USA CAPITAL DIVERSIFIED<br>TRUST DEED FUND, LLC, TO<br>CLAIMS NOS. 90, 93, 94, 95, 129, 130,<br>131, AND 136 FILED AGAINST USA<br>CAPITAL DIVERSIFIED TRUST<br>DEED FUND, LLC, BY MCGIMSEYS<br>AND JOHNNY CLARK** |
| Affects:<br>  ☐  All Debtors<br>  ☐  USA Commercial Mortgage Company<br>  ☐  USA Securities, LLC<br>  ☐  USA Capital Realty Advisors, LLC<br>  ☒  USA Capital Diversified Trust Deed Fund, LLC<br>  ☐  USA First Trust Deed Fund, LLC | Date:        January 31, 2007<br>Time:        9:30 a.m.<br>Courtroom:  1 |

1    I, Michael A. Tucker, hereby declare, verify and state as follows:

2    1.    I am a Senior Managing Director with FTI Consulting, Inc. ("FTI"), a financial

3    advisory services firm specializing in reorganization, litigation and related consulting services. I

4    joined FTI in 2002 upon FTI acquiring PricewaterhouseCoopers LLP's Business Recovery

5    Services group where I was a Partner and had been employed for 17 years.

6    2.    I make this Declaration in support of the supplemental brief filed concurrently

7    herewith by the Official Committee of Equity Holders of USA Capital Diversified Trust Deed

8    Fund, LLC (the "Diversified Committee") in support of its objections to the proofs of claim nos.

9    90, 93, 94, 95, 129, 130, 131, and 136 (the "Member Claims") filed against USA Capital

10   Diversified Trust Deed Fund, LLC ("Diversified Fund" or "Debtor") by Margaret B. McGimsey,

11   Sharon McGimsey, Bruce McGimsey, Johnny Clark, and Jerry McGimsey, who is a member of

12   the Diversified Committee (collectively, the "Members").

13   3.    FTI was retained by the Diversified Committee on June 9, 2006 to perform

14   financial advisory services for the Diversified Committee in the chapter 11 cases stated above

15   (the "Cases").

16   4.    Subsequent to FTI's retention, FTI has analyzed loans owed to Diversified Fund

17   and related party transactions; reviewed past and current financials of Diversified Fund and the

18   other debtors (together with Diversified Fund, the "Debtors") in these Cases, including the

19   Schedules of Assets and Liabilities, the Statement of Financial Affairs and Monthly Operating

20   Reports; performed various analyses and provided feedback regarding issues and numerous

21   motions filed in these Cases; and participated in meetings with the Diversified Committee's

22   counsel, the professionals for other official committees, the U.S. Trustee, borrowers on the

23   Debtors' loans and other parties in interest and professionals hired by the same.

24   5.    As a result, I have become familiar with the books and records of the Debtors, the

25   books and records of Diversified in particular, and I have reviewed Diversified's prospectus

26   dated June 2, 2003 (the "Prospectus"), including the form of subscription agreement attached

27   thereto. Based upon this information, I state the following facts as being true to the best of my

28   knowledge:

6.       As stated in Diversified's prospectus, Diversified Fund was a $200 million fund created in 2000 which sold membership units to investors.  Potential investors were required to purchase whole units through a minimum subscription of one unit, or $25,000, unless an investor already owned Diversified Fund membership units and had elected to reinvest periodic distributions of income, in which case fractional units could be purchased.  Prospectus, cover page.  A true and correct copy of the Prospectus is attached hereto as **Exhibit A**.  The current capitalization of Diversified Fund approximates $150 million.

7.       In order to purchase membership interests in Diversified Fund, investors were required to complete the subscription agreement ("Subscription Agreement"), a form of which was attached to the Prospectus.  Prospectus, p. 6.

8.       According to the Prospectus, Diversified Fund registered the sale of its membership units with the Nevada Securities Division, and strictly limited its offering to Nevada residents in order to avoid having to register its securities with the United States Securities and Exchange Commission, "pursuant to the intrastate exemption provided by Section 3(a)(11) of the Securities Act."  Prospectus, pp. 5, 38.

9.       The Members are among those investors, numbering over 1,300 as of April 13, 2006, who purchased membership units in Diversified Fund.

10.      The Member Claims are the only proofs of claim for damages on the basis of breach of contract and fraud filed, timely or otherwise, by holders of Diversified Fund interests against Diversified Fund.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 17th day of January 2007, at Phoenix, Arizona.


/s/ Michael A. Tucker

_____
Michael A. Tucker

# EXHIBIT A

## PROSPECTUS DATED JUNE 2, 2003

**PROSPECTUS**                                          <u>FOR NEVADA RESIDENTS ONLY</u>

# USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

CONTINUOUS OFFERING OF UP TO $200,000,000 IN MEMBERSHIP UNITS
3,139.02 UNITS REMAINING FOR PROCEEDS OF UP TO $78,475,500
MINIMUM INVESTMENT: $25,000, OR ONE UNIT

USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC makes or purchases entire or fractional interests in acquisition, development, construction, bridge or interim loans secured by first deeds of trust, among other things, on undeveloped land and residential and commercial developments located primarily in the United States. Our manager is USA Capital Realty Advisors, LLC. The loans will be arranged by USA Commercial Mortgage Company, which is a licensed mortgage broker under the laws of the State of Nevada and does business as USA Capital.

We have conducted a continuous offering of our membership units since May 2000 and have placed an aggregate of 4,860.98 units as of March 31, 2003. This Prospectus relates to the offer and sale of the remaining 3,139.02 units, including units to be issued under our distribution reinvestment plan. Prospective investors may only purchase whole units with a minimum subscription of one unit, or $25,000. Fractional units may be purchased only by investors who already own membership units and elect to reinvest their periodic distributions of income, subject to restrictions described in this Prospectus, or by investors who are permitted by our manager, in its sole discretion, to contribute pre-existing loans equal to the amount of such loans. Our manager may increase the maximum number of units offered at any time.

Since there is no public market for our membership units and since we do not expect a public market to develop, an investment in our membership units is illiquid. Further, our membership units are subject to restrictions to transfer imposed by federal and state securities laws and by our operating agreement. See "Risk Factors – Risks Related to an Investment in Our Membership Units" and "Summary of Operating Agreement." This offering also involves certain ERISA risks that should be considered by tax-exempt employee benefit plans. See "ERISA Considerations." All income we generate will be taxed to our members (other than tax-exempt entities) as ordinary income, regardless whether it is distributed in cash or reinvested. See "Federal Income Tax Consequences." In addition, we may elect to leverage our loan portfolio by obtaining a revolving credit facility from a third party lender. See "Leveraging the Portfolio."

|  | PRICE TO INVESTORS | COMMISSIONS[1] | NET PROCEEDS[2] |
|---|---|---|---|
| Minimum Investment Amount | $        25,000 | $        0 | $        25,000 |
| Units Outstanding as of March 31, 2003 | 121,524,500 | 0 | 121,524,500 |
| Maximum Offered by this Prospectus | 78,475,500 | 0 | 78,475,500 |
| Maximum Offering Amount | $    200,000,000 | $        0 | $    200,000,000 |

[1] Our membership units will be offered and sold by individuals who are licensed by the Nevada Securities Division as our issuer agents. Our manager shall pay a commission of not more than one percent (1%) of each unit sold. There is no firm commitment to purchase or sell any of our membership units.

[2] The net proceeds are calculated without including organizational and offering expenses, including, without limitation, legal and accounting expenses, reproduction costs, selling expenses and filing fees paid to the Nevada Securities Division. Our manager will pay all such expenses and will not seek reimbursement for such expenses.

**Investing in our membership units involves a high degree of risk. See "Risk Factors" beginning on page 36 to read about risks that each investor should carefully consider before acquiring our membership units. Investors must be prepared to bear the economic risk of their investment for an indefinite period of time and be able to withstand a total loss of their investment.**

**Substantial fees will be paid to our manager and its affiliates who are subject to certain conflicts of interest. See "Management – Compensation and Related Party Transactions" and "Management – Conflicts of Interest."**

**This Prospectus constitutes an offer only to bona fide residents of the State of Nevada who meet certain minimum investor suitability standards. See "Terms of the Offering – Investor Suitability Standards."**

---

**USA CAPITAL REALTY ADVISORS, LLC**

**THE DATE OF THIS PROSPECTUS IS JUNE 2, 2003.**

# TABLE OF CONTENTS

PAGE NO.

SUMMARY OF THE OFFERING .......................................................................................... 1
TERMS OF THE OFFERING .............................................................................................. 5
    Use of Proceeds.................................................................................................................. 5
    Investor Suitability Standards ........................................................................................... 6
    Subscription Agreements; Admission to as a Member ..................................................... 6
    Restrictions on Transfer .................................................................................................... 7
    Election to Receive Monthly Cash Distributions ............................................................. 8
PLAN OF DISTRIBUTION ................................................................................................. 8
BUSINESS ............................................................................................................................ 9
    Overview ............................................................................................................................ 9
    Mortgage Loans ................................................................................................................ 9
    Lending Standards and Policies ........................................................................................ 11
    Collateral for Loans .......................................................................................................... 15
    Loan Repayment ............................................................................................................... 16
    Enforcement of Security Interests..................................................................................... 17
    Competition....................................................................................................................... 18
    Regulations ....................................................................................................................... 18
    Environmental Issues ........................................................................................................ 19
    Properties .......................................................................................................................... 20
    Legal Proceedings............................................................................................................. 20
LEVERAGING THE PORTFOLIO ..................................................................................... 22
MANAGEMENT .................................................................................................................. 23
    Manager ............................................................................................................................ 23
    Fiduciary Responsibility of Our Manager ........................................................................ 24
    Affiliates of Our Manager ................................................................................................ 25
    Legal Proceedings Involving Affiliates of Our Manager .................................................. 26
    Compensation and Related Party Transactions ................................................................. 27
    Conflicts of Interest .......................................................................................................... 29
    Removal of USA Capital Realty Advisors, LLC as our Manager ..................................... 31
MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF
    OPERATIONS................................................................................................................... 33
    Accounting Policies .......................................................................................................... 33
    Results of Operations ........................................................................................................ 33
UNIT OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT ....................... 35
RISKS FACTORS................................................................................................................. 36
    Risks Related to an Investment in Our Membership Units ................................................ 36
    Risks Related to the Offering............................................................................................. 37
    Risks Related to USA Capital Diversified Trust Deed Fund ............................................. 38
    Risks Related to Our Industry ........................................................................................... 43
    Risks Particular to Development and Construction Loans ................................................. 45
    Tax-Related Risks ............................................................................................................. 47
DISTRIBUTION POLICY.................................................................................................... 48
SUMMARY OF OPERATING AGREEMENT..................................................................... 49
FEDERAL INCOME TAX CONSEQUENCES ................................................................... 54
ERISA CONSIDERATIONS ............................................................................................... 63
EXPERTS ............................................................................................................................. 63
EXHIBIT A – Audited Financial Statements of USA Capital Diversified Trust Deed Fund, LLC .............. A-1
EXHIBIT B – Operating Agreement.................................................................................... B-1
EXHIBIT C – Form of Distributions Notice........................................................................ C-1
EXHIBIT D – Form of Withdrawal Notice .......................................................................... D-1

## SUMMARY OF THE OFFERING

The following information is only a brief summary of the offering, and is qualified in its entirety by the information appearing elsewhere in this Prospectus. A thorough examination of the entire Prospectus, including the section entitled "Risk Factors," our financial statements, a copy of which is attached hereto as **Exhibit A**, and our operating agreement, a copy of which is attached hereto as **Exhibit B**, is recommended before investing in our membership units.

| | |
|---|---|
| Fund Objectives | USA Capital Diversified Trust Deed Fund, LLC is a Nevada limited-liability company that makes or purchases entire or fractional interests in acquisition, development, construction, bridge or interim loans secured by first deeds of trust, among other things, on undeveloped land and residential and commercial developments located primarily in the United States. The membership units offered hereby represent membership interests in USA Capital Diversified Trust Deed Fund. |
| Manager | Our manager is USA Capital Realty Advisors, LLC, a Nevada limited-liability company, located at 4484 South Pecos Road, Las Vegas, Nevada 89121. |
| Prior Experience | USA Capital Realty Advisors, LLC was formed to serve as our manager. Our manager is wholly-owned by USA Investment Partners, LLC, a Nevada limited-liability company. USA Investment Partners, LLC is managed by USA Commercial Mortgage Company, a Nevada corporation, and is controlled by Thomas A. Hantges, Joseph D. Milanowski and Paul S. Hamilton. Thomas A. Hantges, Joseph D. Milanowski and Paul S. Hamilton, the officers and controlling stockholders of USA Commercial Mortgage Company, possess substantial prior experience in the mortgage industry. |
| The Offering; Capitalization | We have conducted a continuous offering of our membership units since May 2000. As of March 31, 2003, we have placed an aggregate of 4,860.98 membership units, net of redemptions, that represent net capital contributions of $121,524,500. As a result, pursuant to this Prospectus, we are offering up to 3,139.02 membership units, representing an aggregate offering amount of $78,475,500. |
| | Our manager may increase the maximum number of units offered at any time in its sole discretion. In this regard, our manager has increased this offering from $125,000,000, or 5,000 units, to $200,000,000, or 8,000 units, as of May 30, 2003. |
| Units Outstanding | As of March 31, 2003, there are 4,860.98 membership units, net of redemptions, issued and outstanding held by approximately 1,082 members. |
| Use of Proceeds | The proceeds from this offering shall be used to make or purchase entire or fractional interests in acquisition, development, construction, bridge or interim loans secured by first deeds of trust on undeveloped land and residential and commercial developments located primarily in the United States. A small portion of the proceeds may be set aside for cash reserves, in such amounts to be determined in the sole discretion of our manager, to meet our unexpected cash needs. |
| Term | We shall continue until terminated by our manager, in its sole discretion, or by vote of members holding 75% of our outstanding membership units. See "Summary of Operating Agreement – Winding Up." |
| Compensation to Our Manager and Its Affiliates | Our manager and its affiliates will receive substantial fees and other compensation related to our operations. See "Management – Compensation and Related Party Transactions." Our manager will be entitled to an asset management fee and an early withdrawal fee. In addition, USA Commercial Mortgage Company will be entitled to receive commissions for its mortgage broker services payable by the relevant borrower, and USA Commercial Real Estate Group will be entitled to real estate commissions on the resale of any property by us. |

| Mortgage Loan Portfolio | Loans made or purchased by us will be secured by whole or fractional interests in first deeds of trust on undeveloped land and residential and commercial developments located primarily in the United States.  In addition, these loans may be secured by second deeds of trust on other property and personal guaranties from the principals of the relevant borrower.  We will continue to make loans during the course of this offering.  See "Business – Lending Standards and Policies." |
|---|---|

At March 31, 2003, we had 37 mortgage loans outstanding in the aggregate principal amount of $110,593,377.  From our inception, we have made or purchased an aggregate of 60 mortgage loans in the aggregate principal amount of $189,372,236.  All of our outstanding mortgage loans have been made pursuant to certain pre-determined investment guidelines.  A summary of our mortgage loan portfolio, including the type, number, outstanding balance, interest rate, term, type of underlying real property or real property interest and geographic concentration of the underlying real property or real property interest of our mortgage loans, may be found in the section entitled, "Business – Mortgage Loans."

| Mortgage Broker | USA Commercial Mortgage Company, a Nevada corporation doing business as USA Capital, will serve as our mortgage broker. |
|---|---|

| Leveraging the Portfolio | We may elect to leverage our loan portfolio by obtaining a revolving credit facility from a third party lender.  This credit facility will be used primarily, but not exclusively, to fund new loan opportunities that arise prior to the maturity of then-existing mortgage loans.  This credit facility would be repaid primarily from loan payoffs as then-existing loans mature.  We would assign portions or all of our loan portfolio as security for this credit facility.  The total amount outstanding under this credit facility will not at any time exceed 25% of our total loan portfolio. |
|---|---|

Although we may be able to increase our yield through borrowings under this credit facility, we will be exposed to additional risks and possible adverse tax consequences as a result of borrowing under this proposed credit facility.  See "Leveraging the Portfolio," "Risk Factors" and "Federal Income Tax Consequences."

| Distribution Policy | We make distributions to members only from cash that is available for distribution.  Our operating agreement defines the term, "cash available for distribution," to mean the total cash revenues generated by our operations (including proceeds from the sale or refinancing of assets) during any calendar month, less all of our cash expenditures for debt service and accrued operating expenses, depreciation and amortization during such month, including a reasonable amount to be set aside for reserves to be determined by our manager.  Cash available for distribution will be determined by computing the net income during the calendar month on the accrual basis. |
|---|---|

During the years ended December 31, 2002 and 2001, we authorized distributions to members of $11,429,712 and $5,704,993, respectively, where of such distributions, $3,891,112 and $2,315,378, respectively, were reinvested by members.  With respect to the distributions authorized in the year ended December 31, 2001, $460,595 were paid in the year ended December 31, 2002.  The distributions to members for the years ended December 31, 2002 and 2001 represented annual returns of 11.96% per annum and 12.74% per annum, respectively.  See "Distribution Policy."

Members may elect to receive either periodic cash distributions of our income or apply such distributions towards the purchase of additional fractional membership units:  A member may purchase additional fractional membership units only if:

- The investor remains qualified to purchase membership units;

- There is an effective registration statement on file with the Nevada Securities Division with respect to our membership units; and

- Our membership units are registered under the Securities Act of 1933, as

amended, or the Securities Act, or exempt from such registration available.

Members may make their election to either receive or reinvest their distributions upon their initial subscription for our membership units. This election is irrevocable for one year and, afterwards, may be changed on an annual basis on written notice of at least 30 days to our manager. Notwithstanding the election made by a member, our manager, in its sole and absolute discretion, reserves the right to commence making cash distributions at any time to ERISA investors in order for us to remain exempt from the ERISA plan asset regulations. See "Distribution Policy," "ERISA Considerations" and "Summary of Operating Agreement."

**Risks Related to an Investment in Our Membership Units** .......  There is no public market for our membership units and we do not expect a public market to develop. In addition, there are substantial restrictions on transferability of our membership units under federal and state securities laws and under our operating agreement. Further, our members may not withdraw for one year and may, thereafter, withdraw subject to certain conditions and to the availability of funds. See "Risk Factors – Risks Related to an Investment in Our Membership Units."

**Risks Related to the Offering** ......................  Since we are proposing to conduct an offering of up to $78,475,500 of our membership units without the assistance of an underwriter, there is no assurance that we will successfully complete this offering. In addition, due to the absence of an underwriter, investors will not be able to rely upon an underwriter with respect to the verification of the statements made in this prospectus. Further, due to our reliance on the intrastate exemption from registration provided by Section 3(a)(11) of the Securities Act and the narrow interpretation of the same, we may lose the benefit of this exemption from registration if one of our investors or a significant portion of our operations are deemed to be located outside of the State of Nevada.

In terms of our access to proceeds, since we are not required to meet a minimum offering amount, all invested funds will become immediately available to us. In this regard, our manager will have substantial discretion in applying the proceeds from this offering. See "Risk Factors – Risks Related to the Offering"

**Risks Related to USA Capital Diversified Trust Deed Fund**...........  Our manager is solely responsible for our management and for the selection of loans made or purchased by us. In managing our operations, our manager will rely on its experience in the real estate market and appraisals to determine the fair market value of the underlying real property. As a result, investors should only invest in our membership units if they are willing to grant our manager such broad discretion. In addition, the compensation payable to our manager and its affiliates was not established with the benefit of arm's-length negotiations and may not be on terms favorable to us. Our manager is also subject to conflicts of interests and may engage in competitive activities. See "Risk Factors – Risks Related to USA Capital Diversified Trust Deed Fund."

Our loans are generally structured to require interest only payments during the term of the loan and a balloon payment of the principal at the end of the term. In addition, a substantial number of loans have been made in states located in the southwest United States, such as Nevada and California. The lack of geographic diversity may expose us to economic downturns in these regions. Further, our loans will not be insured or guaranteed by a federal owned or guaranteed mortgage company and, if guaranteed by a third party, may be subject to laws that limit our ability to recover from a third party guarantor. See "Risk Factors – Risks Related to USA Capital Diversified Trust Deed Fund."

| | |
|---|---|
| Risks Related to the Industry ................... | The mortgage lending industry is highly competitive as we will compete with other persons, entities, institutional lenders and others engaged in the mortgage lending business that have greater resources and greater experience than us. In addition, we must comply with all applicable state regulations governing the making of loans to borrowers in such states, such as usury laws and laws related to the advertising and marketing of loans. See "Risk Factors – Risks Related to the Industry." |
| | In addition to competitive forces and regulatory matters, the profitability of the loans we make or purchase are exposed to fluctuations in interest rates, contamination of the underlying real property by hazardous substances and damage caused by unanticipated events, such as acts of terrorism, war, earthquakes, floods, mudslides, acts of God or other similar events. See "Risk Factors – Risks Related to the Industry." |
| Risks Particular to Development and Construction Loans....... | We may invest a substantial portion of the proceeds from this offering in loans related to the development or construction of residential and commercial property. These loans possess additional risks compared to those loans secured by properties with completed improvements. For example, the development of residential property and the construction of offices or retail shops for a commercial property may be adversely affected by a depressed real estate market, higher interest rates, increased cost of materials, shortage of labor, the inability to obtain permits or entitlements necessary to complete the development or construction and other factors that traditionally affect construction. See "Risk Factors – Risks Particular to Development and Construction Loans." |
| Tax-Related Risks........... | We expect that we will be treated as a partnership for federal income tax purposes. Investors should consult their own tax advisors regarding the consequences that might be associated with their investment in our membership units. See "Federal Income Tax Consequences." |
| Reports to Members........ | We will provide to members annual audited financial statements and tax returns. |
| Investor Suitability.......... | Our membership units are offered exclusively to certain individuals, ERISA plans, individual retirement accounts, or IRAs, and other prospective investors who are bona fide Nevada residents and who meet certain minimum standards of income and/or net worth. Only investors who meet these investor suitability standards may be admitted as members. See "Terms of the Offering – Investor Suitability Standards." |
| Additional Information.... | During this offering, prospective investors and their professional advisors, if any, are invited to ask questions of our manager concerning the terms and conditions of this offering and to obtain any additional information that we possess or can acquire without unreasonable effort or expense as may be necessary to verify the accuracy of the information furnished in this Prospectus. Our contact information is as follows: |

USA Capital Diversified Trust Deed Fund, LLC
c/o USA Capital Realty Advisors, LLC
4484 South Pecos Road
Las Vegas, Nevada 89121
Telephone: (702) 734-2400

## TERMS OF THE OFFERING

We have conducted a continuous offering of our membership units since May 2000. As of March 31, 2003, we have placed, net of redemptions, an aggregate of 4,860.98 membership units, representing net capital contributions of $121,524,500. Due to an increase in the aggregate offering amount to $200,000,000, representing 8,000 membership units, we are offering the remaining 3,139.02 membership units, representing an offering amount of $78,475,500, pursuant to this offering. This offering includes membership units to be issued under our distribution reinvestment plan. This offering will close on the earlier to occur of one year from the date of this Prospectus or upon the sale of all of our membership units offered hereunder; provided, however, our manager may elect to extend this offering, in its sole and absolute discretion. In addition, our manager may increase the maximum number of membership units offered at any time.

Prospective investors may only purchase whole membership units with a minimum subscription of one unit, or $25,000. Fractional membership units may be purchased only by investors who already own membership units and elect to reinvest their periodic distributions of income, subject to restrictions described in this Prospectus, or by investors who are permitted by our manager, in its sole discretion, to contribute pre-existing loans equal to the amount of such loans.

We are conducting our continuous offering pursuant to the intrastate exemption provided by Section 3(a)(11) of the Securities Act and pursuant to the registration of this offering with the Nevada Securities Division. Accordingly, although we have not registered our offering with the Securities and Exchange Commission, we have registered our offering with the Nevada Securities Division. Due to our reliance on Section 3(a)(11) of the Securities Act, our offering is strictly limited to bona fide residents of Nevada. The Nevada Securities Division does not recommend or endorse the purchase of our membership units, nor has the Nevada Securities Division passed upon the accuracy of the information set forth herein. Further, this Prospectus does not constitute an offer to sell or a solicitation of any offer to buy with respect to any other person who is not a bona fide resident of Nevada or who fails to meet the specified investor suitability standards.

### USE OF PROCEEDS

The proceeds from the sale of our membership units will be used approximately as set forth below. The figures set forth below are only estimates, and actual use of proceeds will vary.

| PROPOSED USE | PRIOR OFFERINGS | % | MAXIMUM AMOUNT | % | TOTAL | % |
|---|---|---|---|---|---|---|
| Organizational and Offering Expenses..... | $ 0 | 0.0% | $ 0 | 0.0% | $ 0 | 0.0% |
| Mortgage Loans............ | 120,916,878 | 99.5% | 78,083,123 | 99.5% | 199,000,000 | 99.5% |
| Reserves and Working Capital ........ | 607,622 | 0.5% | 392,377 | 0.5% | 1,000,000 | 0.5% |
| TOTAL | $121,524,500 | 100.0% | $78,475,500 | 100.0% | $200,000,000 | 100.0% |

Since our manager has paid and will pay our organizational and offering expenses, we anticipate that a substantial portion of the proceeds from the sale of our membership units will be applied toward mortgage loans. Depending on the nature of each project, our loans may be used to fund the acquisition of property and pay development costs, costs to construct infrastructure improvements or costs to construct improvements. Typical development costs include costs to secure permits and entitlements and to resolve land use issues, architects' and engineers' fees and expenses, costs to secure utility services and

other costs needed to prepare the property for the construction of improvements. Costs to construct infrastructure improvements generally relate to grading, roads, sewers, sidewalks, lights and utility conduits. The costs to construct infrastructure or building improvements may include both "hard costs," such as the cost of materials, supplies and labor, and "soft costs," such as marketing and promotional costs, legal, accounting and other consultants' costs, cost of permits and construction management fees.

In addition to mortgage loans, we may set aside a portion of the proceeds for cash reserves, in such amounts to be determined in the sole discretion of our manager, to meet our unexpected cash needs. The actual amount set aside for reserves may be at a higher or lower percentage than that set forth above.

INVESTOR SUITABILITY STANDARDS

Each investor who is admitted as a member must be a bona fide resident of the State of Nevada, meet certain eligibility standards described below and execute a Subscription Agreement, a copy of which has been provided with this Prospectus. By executing the Subscription Agreement, each prospective investor makes certain representations and warranties, upon which our manager will rely in accepting subscriptions. Each prospective investor must read the Subscription Agreement carefully.

In order to qualify as a bona fide resident of the State of Nevada, the prospective investor must have the investor's principal residence in Nevada, or if the investor is a trust, that the principal office of such trust is located in Nevada. In addition to this residency requirement, each prospective investor must meet certain investor suitability criteria. As a result of these criteria, each investor must either:

1.  Have a net worth (exclusive of home, furnishings and automobile) of at least $50,000 and an annual gross income of at least $50,000;

2.  Have a net worth (exclusive of home, furnishings and automobile) of at least $100,000; or

3.  If such investor is a fiduciary account, such as a qualified person or profit sharing plan or an IRA, have the requirements of either (1) or (2) above met by either the fiduciary account itself or by the donor or plan participant who directly or indirectly supplies the funds for investment.

SUBSCRIPTION AGREEMENTS; ADMISSION TO AS A MEMBER

In order to purchase our membership units, prospective investors are required to complete the Subscription Agreement and return the same to our manager. Additional copies of the Subscription Agreement may be obtained from USA Capital Realty Advisors, LLC, whose address is 4484 South Pecos Road, Las Vegas, Nevada 89121, and whose telephone number is (702) 734-2400.

By submitting the signed Subscription Agreement to our manager with payment for the purchase of our membership units, each prospective investor:

1.  Agrees to be bound by our operating agreement;

2.  Grants a special and limited power of attorney to our manager; and

3.  Represents and warrants that the investor meets the relevant suitability standards and is eligible to purchase our membership units.

Each Subscription Agreement is non-cancelable and irrevocable and any subscription funds are non-refundable for any reason, except with the prior written consent of our manager.

By executing the Subscription Agreement, a prospective investor unconditionally and irrevocably agrees to purchase the number of membership units shown thereon on a "when issued basis." Accordingly, upon executing the Subscription Agreement, an investor is not yet an owner of our membership units or a member. Membership units will be issued when the payment representing the purchase price for the prospective investor's subscription is received and the prospective investor is admitted as a member by our manager. All Subscription Agreements from prospective investors will be accepted or rejected by our manager within 15 days after receipt of such Subscription Agreements. During the period prior to a prospective investor's admission as a member, the prospective investor's subscription is irrevocable and the subscription funds received by our manager shall be held by our manager for the account of each such investor in a non-interest bearing subscription account.

In lieu of cash payment for our membership units, our manager may, in its sole discretion, permit a prospective investor to contribute entire or fractional interests in pre-existing loans that are secured by first deeds of trust in exchange for membership units. Any such loans that are contributed must not be in default at the time of contribution, shall satisfy the lending guidelines contained herein and must have been originated by our manager or its affiliates. The amount of membership units sold to a prospective investor in exchange for the contribution of pre-existing loans shall be equal to the then-outstanding principal loan balance, together with any accrued but unpaid interest, or a proportionate share of such loan balance with respect to the contribution of a fractional loan interest.

To facilitate our record keeping, prospective investors will only be admitted as members on the first and sixteenth day of each month. Our manager reserves the right to reject any subscription submitted for any reason. If accepted, a prospective investor will become a member without any further action by any person.

After having subscribed for at least one membership unit ($25,000), an investor may at any time, and from time to time, subscribe to purchase additional membership units so long as the offering is open. If an investor purchases any additional membership units on a day other than the first day of the month, each item of our income, gain, loss, deduction or credit for such month shall be prorated on a per diem basis.

Our manager reserves the right at any time, in its sole discretion, to cease soliciting for the sale of membership units and to cease admitting investors as members if it believes that suitable loan opportunities are not available.

## RESTRICTIONS ON TRANSFER

As a condition to this offering, restrictions have been placed upon the ability of investors to resell or otherwise dispose of any membership units purchased hereunder, including, without limitation, the following:

1.  No member may resell or otherwise transfer any membership units without the prior written consent of our manager, which consent may be withheld in its sole discretion. See "Summary of Operating Agreement – Limitations on Transferability."

2.  Our membership units may not be sold or transferred unless our membership units are registered under the Securities Act and any applicable state securities statutes, or an exemption from such registration is available.

3.  During the period that our membership units are being offered and sold in this offering and for a period of nine months from the date of the last sale of our membership units in

our continuous offering, no membership units may be sold or otherwise transferred to any person who is not a bona fide resident of the State of Nevada.

Notations regarding these limitations shall be made in our records with respect to all membership units offered hereby. The foregoing steps will also be taken in connection with the issuance of any new instruments for any membership units which are presented to our manager for transfer during the nine-month period described in subparagraph (3) above.

### ELECTION TO RECEIVE MONTHLY CASH DISTRIBUTIONS

Upon subscription for our membership units, an investor must elect whether to receive periodic cash distributions or have such cash distributions reinvested in exchange for additional membership units. Cash distributions may be reinvested as long as our membership units are registered with the Nevada Securities Division and either registered under the Securities Act or exempt from registration thereunder. This election, once made, is irrevocable for one year. An investor may not change the election prior to the first anniversary of the investor's admission as a member of USA Capital Diversified Trust Deed Fund, even if the investor's circumstances subsequently change.

Commencing on the first anniversary after an investor's admission as a member and on each anniversary thereafter, an investor may elect to reinvest cash distributions rather than receive cash distributions, and vice-versa, to the extent the investor has provided prior written notice of 30 days of such election to our manager, where a form of such notice is attached hereto as **Exhibit C**. Notwithstanding the foregoing, our manager reserves the right, at any time, to immediately commence making monthly cash distributions to ERISA plan investors who previously reinvested distributions in order to ensure that we remain exempt from the Plan Asset Regulations pursuant to the "significant participation" exemption. See "ERISA Considerations."

Income allocable to investors who elect to reinvest their distributions will be applied toward the purchase of fractional membership units in the amount of such income. The reinvested distributions will be retained by us for investing in further mortgage loans or other purposes. The income from reinvested distributions will be allocated among all investors; however, investors who reinvest will be credited with a larger proportionate share of such earnings than investors who receive monthly distributions since the number of membership units owned by investors who reinvest (and their capital accounts) will increase over time.

## PLAN OF DISTRIBUTION

Our membership units will be offered and sold by individuals who are licensed by the Nevada Securities Division as our issuer agents. These individuals will receive a commission payable by our manager, which commission shall not exceed one percent of each membership unit sold. There is no firm commitment to purchase any membership units, and there is no assurance that the maximum amount of this offering will be received.

# BUSINESS

## OVERVIEW

We are a Nevada limited-liability company that makes or purchases entire or fractional interests in acquisition, development, construction, bridge or interim loans. These loans are secured by first deeds of trust on undeveloped land and residential and commercial developments located in the United States and may also be secured by second deeds of trust on other property and personal guarantees from the principals of the relevant borrower. The loans will be arranged by USA Commercial Mortgage Company, which is a licensed mortgage broker under the laws of the State of Nevada and does business as USA Capital. See "Management – Affiliates of Our Manager."

We were formed through the filing of our articles of organization with the Nevada Secretary of State on February 3, 2000 and are governed by our operating agreement dated as of February 10, 2000, a copy of which is attached hereto as **Exhibit B**. See "Summary of Operating Agreement." In its sole discretion, our manager may elect to conduct our operations under a fictitious firm name.

## MORTGAGE LOANS

Since our organization and through March 31, 2003, we have made or purchased a total of 60 mortgage loans in the aggregate principal amount of $189,372,236. As of March 31, 2003, we had 37 mortgage loans outstanding in the aggregate principal amount of $110,593,377 as follows: nine acquisition loans in the aggregate principal amount of $13,161,928, one development loan in the aggregate principal amount of $21,829,501, eleven construction loans in the aggregate principal amount of $37,765,803, and sixteen bridge loans in the aggregate principal amount of $37,836,145. All of our outstanding mortgage loans have been made pursuant to certain pre-determined investment guidelines. See "Business – Lending Standards and Policies."

Loans that are classified as "acquisition" are loans where the funds were used to help a borrower acquire the collateral property; "development" loans are for the development of land on which residential or commercial properties are to be built (*i.e.*, sewer, water, roads, etc.); "construction" loans are for the vertical construction of residential or commercial properties (*i.e.*, concrete, framing, roofing, etc.); "bridge" loans are for the refinance of existing property of the borrower whether land, residential, or commercial buildings, whether or not the funds are used for acquisition. A portion of the funds may be used for renovation of the existing structures. Loans that include acquisition, development, and construction components are classified as "construction" loans.

It is important to note that the following information reflects our loan portfolio as of March 31, 2003 and should not be viewed as an indication of the characteristics of our future loans. As our manager has sole discretion for the initial selection, evaluation and negotiation of our mortgage loans and in making exceptions to our investment criteria, our mortgage loan portfolio may contain loans with different loan-to-value ratios, interest rates and terms.

The following is a table that provides summary information as to our loan portfolio at March 31, 2003. All percentages of our loan portfolio are approximate percentages and, due to rounding, may not add up to 100%.

| Type of Mortgage Loan | Number Out-standing | Aggregate Balance Out-standing | % of Loan Portfolio | Range of Interest Rates | Weighted Average of Interest Rates | Range of Remaining Term (Months) | Weighted Average of Remaining Term (Months) |
|---|---|---|---|---|---|---|---|
| Acquisition | 9 | $13,161,928 | 11.6% | 12.0%-14.0% | 12.7% | 2.9-11.8 | 7.4 |
| Bridge | 16 | $37,836,145 | 34.2% | 8.0-18.0% | 12.6% | 0.1-11.8 | 6.2 |
| Construction | 11 | $37,765,803 | 34.1% | 11.0%-14.0% | 12.7% | 0.0-14.6 | 5.9 |
| Development | 1 | $21,829,501 | 19.7% | 20.0% | 20.0% | 6.5 | 6.5 |
| **Total** | **37** | **$110,593,377** | **100.0%** | **8.0%-18.0%** | **14.1%** | **0.0-14.6** | **6.3** |

Our outstanding mortgage loans are secured by a wide range of real property or real property interests. As discussed herein, all of our loans are and will be secured by, among other things, first deeds of trust that encumber the underlying real property or real property interest. The following table provides a summary of the types of real property or real property interests that secure our mortgage loans at March 31, 2003.

| Type of Real Property or Real Property Interest | Number of Loans | Aggregate Balance Outstanding | % of Loan Portfolio |
|---|---|---|---|
| Residential Subdivisions | 11 | $27,093,321 | 24.5% |
| Commercial Property | 15 | $46,448,255 | 42.0% |
| Unimproved Land | 11 | $37,051,801 | 33.5% |
| **Total** | **37** | **$110,593,377** | **100.0%** |

As for the geographic concentration of the real property underlying our outstanding mortgage loans, we have mortgage loans secured by real property located in eleven states. The following table lists the geographic location of such real property and the related number, aggregate balance outstanding and portfolio percentage of our outstanding mortgage loans at March 31, 2003.

| State | Number of Loans | Aggregate Balance Outstanding | % of Loan Portfolio |
|---|---|---|---|
| California | 17 | $56,389,641 | 51.0% |
| Nevada | 7 | $8,882,603 | 8.0% |
| Arizona | 3 | $7,540,905 | 6.8% |
| Florida | 2 | $3,026,096 | 2.7% |
| Texas | 2 | $3,578,372 | 3.2% |
| New York | 1 | $10,073,587 | 9.1% |
| Utah | 1 | $9,985,000 | 9.0% |
| Massachusetts | 1 | $8,917,400 | 8.1% |
| Connecticut | 1 | $1,700,000 | 1.5% |
| New Mexico | 1 | $402,673 | 0.4% |
| Tennessee | 1 | $97,100 | 0.1% |
| **Total** | **37** | **$110,593,377** | **100.0%** |

As for the performance of our outstanding mortgage loans, there were no mortgage loans that were greater than 120 days past maturity at December 31, 2001. However, as of December 31, 2002, we had approximately $32.4 million of impaired or non-performing loans in our loan portfolio. Our manager has evaluated the collectability of these mortgage loans in light of the types and dollar amounts of loans in our loan portfolio, adverse situations that may effect the borrower's ability to repay, prevailing economic conditions and underlying collateral. As a result of such evaluation, our manager believes that the underlying values of assets securing the non-performing mortgage loans at December 31, 2002 are sufficient to realize the carrying value. Accordingly, we have not made an allowance for loan losses with respect to these mortgage loans.

Of the seven impaired or non-performing loans in our loan portfolio at December 31, 2003, we have started foreclosure proceedings with respect to one loan in the approximate amount of $10 million and will be required to obtain relief from the bankruptcy proceedings of a debtor involving a loan in the approximate amount of $11 million. The remaining five loans have been classified as non-performing and total approximately $11.4 million. With respect to previously impaired loans, during the year ended December 31, 2001, the developer for one of the properties for which we had made a mortgage loan effectively abandoned the project due to issues that are unrelated to the viability of the project. In this regard, M.P.D.D. Ranch, LLC, an entity managed by one of our affiliates, assumed the role of developer for the purposes of completing the project. During the year ended December 31, 2002, the project was completed and our loan was paid in full.

LENDING STANDARDS AND POLICIES

### General Standards for Mortgage Loans

We make or purchase entire or fractional interests in acquisition, development, construction, bridge or interim loans secured by first deeds of trust on undeveloped land and residential and commercial developments located in the United States. These loans may also be secured by second deeds of trust on other property and personal guarantees from the principals of the relevant borrower. Since our loans will not be insured or guaranteed by any governmental agency or private mortgage insurance company, our manager selects our loans pursuant to certain investment guidelines relating to the real property that secures the loans. The following investment guidelines are subject to change in the sole discretion of our manager.

1.    **Priority of Deeds of Trust**. All of our loans are and will be secured by first deeds of trust that encumber the relevant real property or real property interest and may also be secured by second deeds of trust on other property. In some states, a mortgage is used to create a security interest in real property, rather than a deed of trust. For purposes of this Prospectus, the terms "deed of trust" and "mortgage" mean both a deed of trust and a mortgage.

A mortgage has two parties: a borrower called the "mortgagor" and a lender called the "mortgagee." The mortgagor gives the mortgagee a lien on the property as security for the loan or, in some states, the mortgagor conveys legal title of the property to the mortgagee until the loan is repaid but retains equitable title and the right of possession to the property so long as the loan is not in default. In contrast, a deed of trust has three parties: a borrower-grantor called the "trustor," a third party grantee called the "trustee," and a lender-creditor called the "beneficiary." The trustor grants the property, irrevocably until the debt is paid, "in trust, with power of sale" to the trustee to secure payment of the obligation. The trustee's authority is governed by law, the express provisions of the deed of trust and the directions of the beneficiary.

2.    **Geographic Area of Lending Activity**. We will make loans secured by real property located primarily in the United States. However, in the sole discretion of our manager, we may invest up to 10% of our loan portfolio in loans secured by real property located outside of the United States.

3.    **Loan-to-Value Ratios.**  Our loans will generally not exceed certain loan-to-value percentages, based on the value of the underlying property as determined by an independent written appraisal at the time the loan is made or by our manager based on other factors.

We will generally receive an appraisal for each property on which we will make a mortgage loan; provided, however, our manager may, in its sole discretion, elect to forego the use of an appraisal and base the valuation of such property on other factors.  Generally, appraisers retained by us will be certified by the American Institute of Real Estate Appraisers.  We may use appraisals from individuals who hold other credentials, such as those who meet the minimum qualifications prescribed by local laws or who commercial lenders in the state in which the property is situated generally use.  Our manager will review each appraisal report.  Any real property appraisal supporting a loan will be maintained in our manager's records for at least five years, and will be made available for inspection and duplication at the request of any investor.

| TYPE OF PROPERTY/LOAN | MAXIMUM LOAN TO VALUE RATIO |
|---|---|
| Residential Subdivisions (loans to land developers and residential builders) | 75% |
| Commercial Property (including but not limited to multi-unit residential property, office buildings, industrial and warehouse facilities, retail stores, shopping centers, motels, self-storage facilities, and senior housing) | 75% |
| Unimproved Land | 60% |

These loan-to-value ratios may be increased if, in the sole discretion of our manager, a particular loan is supported by credit adequate to justify a higher loan-to-value ratio or if mortgage insurance is obtained.  It is important to note that our manager does not anticipate obtaining or requiring the borrowers to maintain mortgage insurance.  In addition, the maximum loan-to-value ratio for unimproved land may be increased, in our manager's discretion, to 75% if the unimproved land is already entitled, a tentative map has been approved for the unimproved land or our manager believes that the borrower is likely to secure key entitlements.

Appraisals and loan-to-value ratios may be determined for construction loans upon the assumption that all of the improvements for which the loan is being sought are completed.  Finally, our maximum loan-to-value ratios will not apply to purchase-money financing offered by us to sell any real estate owned, which is acquired through foreclosure, or to refinance an existing loan that is in default at the time of maturity.  In such cases, our manager will be free to accept any reasonable financing terms that it deems to be in our best interests, in its sole discretion.

4.    **Terms of Loans.**  Although loans will generally have a term of between one and three years, we may make loans with a shorter maturity if our manager believes, in its sole discretion, that the loans represent a sound investment opportunity.  Most loans will require payments of interest only during the loan term, and the borrower will have to make a substantial "balloon payment" at the end of the term.  Many borrowers do not have funds sufficient to make this balloon payment and, consequently, must refinance or sell the underlying property.  See "Risks Factors – Risks Related to USA Capital Diversified Trust Deed Fund."

5.    **Escrow Conditions.**  Loans will be funded through an escrow account handled by either a qualified title insurance or escrow company or other qualified company performing similar functions.

–12–

The escrow agent will be instructed not to disburse any of our funds out of the escrow for purposes of funding the loan until:

- Satisfactory title insurance coverage has been obtained for all loans, with the title insurance policy naming us as the insured and providing title insurance in an amount equal to the principal amount of the loan. Title insurance insures only the validity and priority of our deed of trust, and does not insure us against loss by reason of other causes, such as diminution in the value of the property, over-appraisals, borrower's defaults, etc.

- Satisfactory fire and casualty insurance has been obtained for all loans, which insurance shall name us as loss payee in an amount equal to the principal amount of our loan. Fire insurance will not be required where a loan is secured by unimproved land.

6.   **Absence of Mortgage Insurance.**  Our manager does not intend to arrange for mortgage insurance, which would afford some protection against loss if we foreclosed on a loan and there were insufficient equity in the property to repay all sums owed.

7.   **Fund as Payee.**  All loan documents (notes, deeds of trust, etc.) and insurance policies will name us as payee and beneficiary. Loans will not be written in the name of our manager or any other nominee, although loans that we purchase or loans that are contributed by investors in exchange for our membership units will originally be written in the name of the original lender or investor. Such loans will be assigned to us when they are purchased or contributed.

8.   **No Loans to Manager.**  No loans will be made by us to our manager or to any of its affiliates, except for any financing extended as part of a sale of real estate owned as a result of foreclosure. See "Management – Conflicts of Interest" and "Compensation and Related Party Transactions."

9.   **Purchase of Loans from Manager or Affiliates.**  Pre-existing loans, or fractional interests of such loans, that are secured by first deeds of trust may be purchased from our manager, its affiliates or other third parties; provided, however, that any such loan is not in default and otherwise satisfies our lending guidelines. The purchase price to us for any such loan will be equal to the then-outstanding principal balance of the loan, together with any accrued but unpaid interest, or a proportionate share of the loan balance with respect to the purchase of a fractional loan interest.

10.  **Loan Diversification.**  Since we have reached a minimum capitalization of $100 million, we will apply the following loan diversification restrictions on a going forward basis:

- No loan (or interest in a loan) will exceed $20 million;

- No one loan, or interest in a loan, will exceed 15% of all of our loans outstanding at the time of the loan; and

- No more than 25% of our loans outstanding at any time will be made to a single borrower, together with any affiliates of such borrower.

As of March 31, 2003, our loan portfolio consisted of 37 mortgage loans in the aggregate amount of $110,593,377. With the exception of one loan in the principal amount of $21,829,501, there are no mortgage loans in our loan portfolio that exceed 15% of the aggregate principal amount of our loan portfolio or that are made to a single borrower representing 25% of the aggregate principal amount of our loan portfolio.

**12.** **Loan Participations.** We may purchase fractional interests in loans (sometimes referred to as loan participations), so long as the loan otherwise meets our lending criteria. With respect to new loans, we may fund such loans by ourselves or we may participate in the funding of such loans with:

- Another mortgage fund or investment vehicle that we or our affiliates have formed or manage; or

- Other investors that are clients of USA Commercial Mortgage Company or their affiliates.

If we participate in funding a new loan with clients of USA Commercial Mortgage Company or their affiliates, then we and such parties shall have fractional interests in such loan equal to the relative amounts that they have funded.

**13.** **Reserve Fund.** Our manager may, in its sole discretion, establish a contingency reserve fund for the purpose of covering our unexpected cash needs. The amount of this reserve fund, if any, would be established by our manager. This reserve fund may be held in cash, bank accounts, certificates of deposit, money market accounts, short-term bankers acceptances, publicly traded bond funds or other liquid assets. The yield from investments of reserve funds may not be as high as the yield that would result if such reserve funds were invested in loans. While portions of the reserve fund may be used by our manager to fund investor redemptions, the principal purpose of the reserve fund will be for other unexpected cash flow needs, not for such redemptions, and our manager shall not be required to exhaust reserve funds to meet requested redemptions.

**14.** **Leasehold Financing.** We may also make loans that are secured by first deeds of trust that encumber leasehold interests in undeveloped land and residential and commercial developments located in the United States. In leasehold loans, the borrower does not own the land but rather has the right to occupy and develop the land under a long-term ground lease with the owner of the land. The security for the loan would be the borrower's leasehold interest in the land (*i.e.*, the right to occupy and use the land under the terms of the ground lease), rather than a fee interest in the land. Loans secured by leasehold interests pose additional risks than loans secured by fee interests in land. See "Risk Factors – Risks Related to USA Capital Diversified Trust Deed Fund."

**Credit Evaluations; Guarantors**

Our manager may consider the income level and general creditworthiness of a borrower to determine a borrower's ability to repay our loan according to its terms. It is important to note that such considerations are subordinate to a determination that the appraised value of the property, which may be on an "as constructed" basis with respect to a construction loan, is sufficient to satisfy the loan-to-value ratios described above or such other loan-to-value ratios as our manager deems appropriate for any particular loan. Therefore, we may make loans to borrowers who are in default under their other obligations for the purposes of debt consolidation or who do not have sources of income that would be sufficient to qualify for loans from other lenders such as banks or savings and loan associations. In addition, some, but not all, of our loans will also be guaranteed by persons or entities other than the borrower. Our manager will exercise its business judgment in deciding which of our loans will also be guaranteed.

**Sale of Loans**

We will invest in mortgage loans for investment and do not expect to engage in real estate operations in the ordinary course of business (except as may be required if we foreclose on a property on which we have invested in a mortgage loan and take over ownership and management of the property). We do not presently intend to invest in mortgage loans primarily for the purpose of reselling such loans in

–14–

the ordinary course of business; however, we may occasionally sell mortgage loans (or fractional interests therein) when our manager determines that it appears to be advantageous for us to do so, based upon then current interest rates, the length of time that the loan has been held by us, and our overall investment objectives.

### Loan Servicing

Our manager will oversee the servicing of our loans. In servicing our loans, our manager will make or manage, potentially through third parties, construction loan disbursements, collection of loan payments, loan enforcement and other loan administrative services. Currently, our manager has designated USA Commercial Mortgage Company to service our loans. Our manager, or its agents, will be entitled to contract with third party service providers to assist it in loan servicing (e.g., engaging a construction loan administrator to handle construction loan disbursements) provided that such third party service providers charge competitive fees for their services. Our manager will be compensated for such loan servicing activities. See "Compensation and Related Party Transactions."

### Remedies Upon Default

If one of our loans goes into default, the range of responses that our manager may take with respect to the default will vary depending on the nature of the default and the circumstances existing at the time of the default. These responses can include, without limitation, granting additional cure periods to the borrower, requiring the borrower to contribute additional funds to the project, refraining from funding future phases of construction, replacing the borrower with an independent construction manager to supervise the completion of the project, seeking a receiver to oversee the completion of the project, foreclosing non-judicially under the mortgage or deed of trust or taking such other loan enforcement actions as are typically undertaken by commercial lenders in the state that governs the enforcement action, negotiating and accepting a deed in lieu of foreclosure, and/or commencing legal action against the borrowers or against any guarantors of the loan if our manager determines that such actions are prudent under the circumstances. Our manager also may forgive debt or modify the economic terms of the loan (e.g., altering the rate of interest, extending the maturity date or altering the payment obligations) if it believes such actions are advisable under the circumstances.

### COLLATERAL FOR LOANS

The following shall describe the types of real property and real property interests that secure the repayment of our loans.

*Raw and Unimproved Land.* Our acquisition and development loans are the only loans that are secured by raw and unimproved land. The funds from acquisition loans will be used to acquire raw and unimproved land. In contrast, the funds from development loans will be used to install utilities, sewers, water pipes and streets. To the extent that our borrowers are unable to complete these infrastructure-related improvements according to schedule, borrowers may not be able to refinance or sell their property for the projected value of the land. As a result, our borrowers may not be able to repay their loans, and we may have to foreclose on land whose infrastructure is partially completed or whose value has been diminished.

*Commercial Properties and Development Projects.* Many of our loans are secured by either commercial properties or properties on which commercial projects are being built. These properties have, or will have, improvements, such as office buildings, retail stores, industrial buildings, warehouses, hotels and resorts. The value of these properties and the ability of our borrowers to lease their properties is dependent upon the availability of other similar commercial properties, the ability of the market to absorb new commercial space and general economic or local economic conditions. To the extent that our

3.     <u>Loan-to-Value Ratios</u>.  Our loans will generally not exceed certain loan-to-value percentages, based on the value of the underlying property as determined by an independent written appraisal at the time the loan is made or by our manager based on other factors.

We will generally receive an appraisal for each property on which we will make a mortgage loan; provided, however, our manager may, in its sole discretion, elect to forego the use of an appraisal and base the valuation of such property on other factors.  Generally, appraisers retained by us will be certified by the American Institute of Real Estate Appraisers.  We may use appraisals from individuals who hold other credentials, such as those who meet the minimum qualifications prescribed by local laws or who commercial lenders in the state in which the property is situated generally use.  Our manager will review each appraisal report.  Any real property appraisal supporting a loan will be maintained in our manager's records for at least five years, and will be made available for inspection and duplication at the request of any investor.

| TYPE OF PROPERTY/LOAN | MAXIMUM LOAN TO VALUE RATIO |
|---|---|
| Residential Subdivisions (loans to land developers and residential builders) | 75% |
| Commercial Property (including but not limited to multi-unit residential property, office buildings, industrial and warehouse facilities, retail stores, shopping centers, motels, self-storage facilities, and senior housing) | 75% |
| Unimproved Land | 60% |

These loan-to-value ratios may be increased if, in the sole discretion of our manager, a particular loan is supported by credit adequate to justify a higher loan-to-value ratio or if mortgage insurance is obtained.  It is important to note that our manager does not anticipate obtaining or requiring the borrowers to maintain mortgage insurance.  In addition, the maximum loan-to-value ratio for unimproved land may be increased, in our manager's discretion, to 75% if the unimproved land is already entitled, a tentative map has been approved for the unimproved land or our manager believes that the borrower is likely to secure key entitlements.

Appraisals and loan-to-value ratios may be determined for construction loans upon the assumption that all of the improvements for which the loan is being sought are completed.  Finally, our maximum loan-to-value ratios will not apply to purchase-money financing offered by us to sell any real estate owned, which is acquired through foreclosure, or to refinance an existing loan that is in default at the time of maturity.  In such cases, our manager will be free to accept any reasonable financing terms that it deems to be in our best interests, in its sole discretion.

4.     <u>Terms of Loans</u>.  Although loans will generally have a term of between one and three years, we may make loans with a shorter maturity if our manager believes, in its sole discretion, that the loans represent a sound investment opportunity.  Most loans will require payments of interest only during the loan term, and the borrower will have to make a substantial "balloon payment" at the end of the term.  Many borrowers do not have funds sufficient to make this balloon payment and, consequently, must refinance or sell the underlying property.  See "Risks Factors – Risks Related to USA Capital Diversified Trust Deed Fund."

5.     <u>Escrow Conditions</u>.  Loans will be funded through an escrow account handled by either a qualified title insurance or escrow company or other qualified company performing similar functions.

borrowers are not able to maintain lease rates at or above projected levels, these borrowers may not generate sufficient cash flow from operations to satisfy their obligation to us.

*Residential Properties and Developments.* In addition to commercial properties, many of our loans are secured by properties on which our borrowers are developing residential projects. Generally, as the residential project is developed and homes are sold, we receive payments against the loan. In making loans secured by such properties, the risk that these borrowers will not repay their loans increases if they cannot complete the residential development, either on time or within budget. Relevant factors include, without limitation, inclement weather that creates delays in construction; increases in the cost of materials or labor; shortages of materials or labor; difficulties in scheduling subcontractors or other labor and material providers; unforeseen soil conditions or other physical characteristics of the property; and the presence of hazardous materials that need to be remediated. If any one of these variables were to occur, these borrowers may not be able to complete their projects on time and, as a result, may not be able to satisfy their obligations to us in a timely manner.

*Unentitled Properties.* We may make loans secured by real property that, at the time the loan is made, does not have the requisite permits or entitlements necessary to complete the proposed development on the real property. These permits and entitlements include zoning approvals, variances, architectural approvals, clearance on environmental impact concerns relating to traffic, open space, school or transit impact, endangered species, wetlands, noise and air quality and compliance with other local, state and federal governmental and quasi-governmental agencies that have jurisdiction over the project. These local, state and federal governmental and quasi-governmental agencies may include the Army Corps of Engineers, which has jurisdiction over areas that constitute wetlands, the Department of Fish and Game, which has jurisdiction to identify and protect endangered species, local planning commissions, which have jurisdiction over building permits, and community advisory committees, which may not have direct approval power but whose input is important in obtaining entitlements for a development.

There is a risk that certain permits or entitlements may not be received, that certain permits or entitlements previously received may be rescinded, that conditions set forth in interim permits may delay the issuance of final permits and that litigation may arise with respect to interim or final permits. In such a case, the borrower would have to bear the cost of holding land that is not fully entitled and, as a result, bear increased costs and the risk of diminished or a complete loss of market value. If this were to occur, the value of our collateral could be diminished. Until such time as the borrower has all final permits for the applicable project and all conditions thereto have been approved by all applicable governmental agencies, the borrower runs the risk of a complete loss of its investment in the applicable project.

*Leasehold Interests.* A small number of our loans may be secured by first deeds of trust that encumber leasehold interests in real estate. These leasehold interests provide the holder with the right to develop or use the underlying real property under a generally long-term ground lease. Loans secured by a leasehold interest can be riskier than loans secured by real property because a default under a ground lease would generally give the owner of the real property the right to terminate the ground lease. If the ground lease is terminated, our security interest would disappear and we would be left as an unsecured creditor of the borrower. In this situation, we attempt to get the owner of the real property in a loan secured by a leasehold interest to agree to provide us with notices of default and the right to cure of defaults under the ground lease so that we may prevent a termination of the ground lease.

LOAN REPAYMENT

Depending on the nature of a loan and the purposes for which the borrower is seeking the loan, a loan may be repaid from the sale, lease or refinance of the real property that secures such loan or from other sources. Land development loans, such as loans used to finance the cost of entitling and subdividing land, are generally repaid from the sale of the entitled, subdivided land to other developers or homebuilders.

Construction loans to residential homebuilders are typically repaid from the sale of the completed homes. In contrast, construction loans to commercial developers are typically repaid either from a sale or refinancing of the project. Bridge loans can be repaid from the sale or refinancing of the property or from other sources of funds that the borrower has access to.

ENFORCEMENT OF SECURITY INTERESTS

The manner in which we will enforce our rights under a mortgage or deed of trust will depend on the laws of the state in which the property is situated. Depending on local laws, we may be able to enforce our mortgage or deed of trust by judicial foreclosure or by non-judicial foreclosure through the exercise of a power of sale. Local laws will also dictate, among other things, the amount of time and costs associated with a judicial or non-judicial foreclosure sale, whether or not we would be entitled to recover from the borrowers a judgment for the resulting shortfall if the proceeds from the sale of the property are not sufficient to pay the debt, or a deficiency judgment, either concurrently with or following a judicial or non-judicial sale, whether there are limits as to the amount of this deficiency judgment and whether the borrower would have a right to redeem the property following a judicial or non-judicial sale.

**Foreclosure**

A judicial foreclosure is a public sale of the property conducted under an order of the court of the state in which the property is located, with the sales proceeds being applied to satisfy the underlying debt. A judicial foreclosure is subject to most of the delays and expenses of other lawsuits and can take up to several years to complete, depending on how busy the local courts are. In contrast, a non-judicial foreclosure is a private sale of the property conducted directly by the mortgagee, in the case of a mortgage, or the trustee, in the case of a deed of trust, following the giving of appropriate notice and the expiration of appropriate cure periods. It is generally cheaper and quicker to conduct a non-judicial foreclosure than to conduct a judicial foreclosure.

In some states, a lender is allowed to foreclose non-judicially and then seek to recover the deficiency from the borrower. In other states, a lender is not entitled to recover a deficiency judgment if the lender forecloses non-judicially; the lender must instead foreclose judicially if it seeks to recover a deficiency judgment. Some states also limit the amount of deficiency that can be recovered from a borrower following a judicial foreclosure sale to the difference between the amount of the debt owing to the lender and the higher of (i) the successful sales price bid at the foreclosure sale, or (ii) the fair market value of the property at the time of foreclosure (a so-called "fair value limitation"). Moreover, some states provide that a borrower and/or junior lienholder have a right to redeem the property for a period of time following a judicial foreclosure sale by paying to the successful bidder an amount equal to the successful sales price bid at the foreclosure sale and the costs of the foreclosure sale. This right of redemption can depress the amount bid at a judicial foreclosure sale because the successful bidder would have to take the property subject to the borrower's and/or the junior lienholder's right of redemption. Real property that is sold through a non-judicial foreclosure sale is, in many states, not subject to a right of redemption.

In summary, whether or not a lender would pursue a judicial or a non-judicial foreclosure, and the extent and nature of other remedies available to a lender against a borrower in connection with a real property secured loan, will depend on the laws of the state in which the real property is located. If a borrower were to default under one of our loans, our manager, as the loan servicer, would evaluate the applicable laws, and consider the enforcement practices typically undertaken by commercial lenders in the state in which the property is located before commencing enforcement actions.

### Actions Against Guarantors

In some instances, a loan may not only be secured by real property security but also guaranteed by a third party guarantor. As a result, if a deficiency remains on a loan, we will attempt to enforce the guaranty against the guarantors. Investors should be aware that, depending on local laws, a guarantor may have defenses that would impair our ability to enforce its guaranty. For example, in some states, if a loan obligation is modified without the guarantor's consent, the guarantor may be exonerated from part or all of its obligations under the guaranty. Other states may require that a lender first exhaust all of its remedies against the borrower and real property security and only then can seek any resulting deficiency from the guarantor. A guarantor may, under some local laws, be able to waive some of these defenses in advance provided that the waivers are sufficiently explicit.

### Other Loan Enforcement Issues

Other matters, such as litigation instituted by a defaulting borrower or the operation of the federal bankruptcy laws, may have the effect of delaying enforcement of the lien of a defaulted loan and may in certain circumstances reduce the amount realizable from sale of a foreclosed property.

## COMPETITION

The mortgage lending business is highly competitive. We will compete with other persons, entities, institutional lenders and others engaged in the mortgage lending business. Our primary competitors are conventional lenders, such as commercial banks, thrifts, conduit lenders, insurance companies, mortgage brokers, pension funds and other financial institutions, and non-conventional lenders, much like us who offer secured loans on an expedited basis for slightly higher fees and rates than those charged by conventional lenders. Many of our competitors have greater resources and greater experience than us and may have other advantages over us in conducting their business and providing services to potential borrowers. There can be no assurance that we will find suitable investment opportunities in the future.

## REGULATIONS

We are subject to federal, state and local laws and regulations applicable to businesses generally, as well as to such laws and regulations directly applicable to the mortgage lending industry. Generally, our management and investment practices are not supervised or regulated by any federal or state authority, except that certain aspects of our operations and/or the operations of our affiliates are subject to supervision or regulation by the Financial Institutions Division of the Department of Business and Industry for the State of Nevada, or the Nevada Financial Institutions Division, and the Securities Division of the Nevada Secretary of State, or the Nevada Securities Division. In addition, we may be subject to the state and local regulation and licensing as a result of our lending activities in certain states.

With respect to the Nevada Securities Division, we have registered our continuous intrastate offering on an annual basis since May 2000. The registration of our offering involves the submission of our Prospectus and additional materials for review by the Nevada Securities Division. Notwithstanding the registration of this offering with the Nevada Securities Division, such registration does not constitute a recommendation or endorsement from the Nevada Securities Division with respect to the purchase of our membership units. With respect to the Nevada Financial Institutions Division, we became licensed as a mortgage broker on February 5, 2002. As a result, we conduct our mortgage lending operations under privileged license issued by the Nevada Financial Institutions Division. In this regard, the Nevada Financial Institutions Division has broad discretionary authority over our activities, including the authority to conduct periodic regulatory audits of all aspects of its operations.

Since our core business is regulated, the laws, rules and regulations applicable to us are subject to regular modification and change. We cannot assure investors that federal, state or local laws, rules or regulations will not be amended or adopted in the future that could make compliance much more difficult or expensive.

ENVIRONMENTAL ISSUES

Under current federal and state law, the owner and operator of real property contaminated with toxic or hazardous substances is, in most situations, liable for all costs associated with any remedial action necessary to bring the property into compliance with applicable environmental laws and regulations. This liability may arise regardless of who caused the contamination or when it was caused. Under certain circumstances, a mortgage lender who has acquired title through foreclosure may be exempt from such liability.

The properties that secure our loans may contain, or may become contaminated with, toxic or hazardous substances. While our manager will make reasonable investigations into whether the properties contain toxic or hazardous substances prior to making or purchasing a loan that is secured by such real property, these investigations will not guarantee that the real property is free of toxic or hazardous substances, nor can they ensure that the real property does not become contaminated with toxic or hazardous substances subsequent to the closing of the loan. This liability may, under certain circumstances, extend to a lender that has, pre-foreclosure, undertaken certain roles in managing the property or the activities of the borrower such that the lender could be characterized as an "owner" or "operator" under applicable environmental laws, or extend to a lender post-foreclosure.

If any property that secures one of our loans is found to be contaminated, it could impair the value of the property. For example, the value of the property would be impaired due to the decreased desirability of the property, slower absorption of the property into the market, declining sales prices, lower rental rates or decreased occupancy rates. In addition, the ability of the borrower to repay the loan would be affected in the event that the borrower would have to pay for the cost to remove or clean up the contamination or in the event that the borrower would be liable to purchasers or tenants of the property or owners or occupants of adjoining property for property damage, bodily injury, lost profits or other consequential damages. If the borrower fails to remove or clean up contaminated property, it is possible that federal, state and local environmental agencies could perform the removal or cleanup, then impose liens upon, and subsequently foreclose on, the property to pay for the costs of such removal or cleanup. Furthermore, even if we do not foreclose on a contaminated property, the mere existence of hazardous substances on such real property security may depress the market value of such real property security such that the loan is no longer adequately secured.

We generally will not participate in the on-site management of any facility on property that secures one of our loans in order to minimize the potential of liability for cleanup of any environmental contamination under applicable federal, state or local laws. However, where we have taken title to contaminated property due to foreclosure or otherwise, our manager may determine that it is in our best interests to cause the property to be cleaned up. As a result, we may incur full recourse liability for the entire cost of any such removal and cleanup and liability to tenants and other users of the affected property, or users of neighboring property, including liability for consequential damages. It is possible that these obligations, collectively, may exceed the value of the property.

We would also be exposed to risk of lost revenues during any cleanup, and to the risk of lower lease rates or decreased occupancy if the existence of such substances or sources on the property becomes known. If we fail to remove the substances or sources and clean up the property, it is possible that federal, state or local environmental agencies could perform such removal and cleanup, and impose and subsequently foreclose liens on the property for the cost thereof. We may find it difficult or impossible to sell the property prior to or following any such cleanup. We could be liable to the purchaser thereof if our manager knew or had reason to

know that such substances or sources existed. In such case, we could also be subject to the costs described above.

## PROPERTIES

We maintain our offices at the offices of our manager at 4484 South Pecos Road, Las Vegas, Nevada 89121. Although we do not intend to own or lease any real property, we have been forced to initiate foreclosure proceedings against borrowers with respect to the real property underlying their obligations to us. In this regard, as of December 31, 2002, we have foreclosed on two loans and, as a result, hold two properties for sale. The properties are located in Nevada, where one property involves a commercial development and the other property involves a residential development.

## LEGAL PROCEEDINGS

During the ordinary course of business, we have been and will be involved in legal proceedings with respect to the enforcement of our security interests. In addition to these matters, we are currently involved in two following proceedings.

On March 29, 2001, a group of plaintiffs involved in certain loans made by us filed a complaint in the United States District Court, District of Nevada, against USA Capital Diversified Trust Deed Fund, USA Commercial Mortgage Company, Thomas A. Hantges, Joseph D. Milanowski and certain other affiliated parties and investors. In their complaint, the plaintiffs alleged that several loans arranged by USA Commercial Mortgage Company and the sale of some securities by an affiliate of USA Commercial Mortgage Company constituted violations of the state and federal Racketeer Influenced and Corrupt Organization Acts, and state and federal securities law. In addition, the plaintiffs alleged intentional and negligent misrepresentation, breach of contract and the implied covenant of good faith and fair dealing, intentional interference with contractual relations, defamation and other torts. The plaintiffs are seeking unspecified compensatory, punitive and treble damages, in addition to costs and certain equitable relief, including equitable subordination. In addition to the complaint filed in United States District Court, District of Nevada, the plaintiffs initiated a related adversary proceeding in United States Bankruptcy Court for the District of Nevada and two related actions in Nevada state court. All of the actions have been subsequently consolidated in the United States District Court, District of Nevada. In addition, pursuant to a stipulation and order of dismissal filed on September 21, 2001, the claims based on state and federal securities fraud were dismissed with prejudice.

As a result of the Court's ruling on of the plaintiffs' claims related to the federal Racketeer Influenced and Corrupt Organization Act, the plaintiffs filed on April 26, 2002 their second amended complaint that generally contained the same allegations as in the original complaint. In response, the defendants filed several motions to dismiss certain of the claims. On March 31, 2003, although the Court denied substantially all of the defendants' motions to dismiss, the Court again ordered the plaintiffs to file another amended complaint. The parties are currently arguing motions and proceeding with discovery. USA Capital Diversified Trust Deed Fund, USA Commercial Mortgage Company, as well as Messrs. Hantges and Milanowski, will continue to vigorously defend this matter.

On July 11, 2002, a group of plaintiffs filed a complaint in District Court, Clark County, Nevada against USA Capital Diversified Trust Deed Fund and John Rodgers Burk, P.C. with respect to certain redeemable notes issued by Epic Resorts, LLC and an indenture related to the same. John Rodgers Burk, P.C. and Epic Resorts, LLC are not affiliated with us. In their complaint, the plaintiffs alleged that, among other things, the defendants tortiously interfered with and conspired to tortiously interfere with the contractual agreements between the plaintiffs and Epic Resorts, LLC. The plaintiffs have alleged damages in excess of $14 million and are seeking unspecified general, special and punitive damages, pre-judgment and post-judgment interest and reasonable attorneys' fees and costs. The defendants have filed an answer

in this matter denying the material allegations of the complaint.  The plaintiffs, through the trustee under the indenture, filed similar claims against us in an adversary proceeding pending in United States Bankruptcy Court for the District of Delaware, where Epic Resorts, LLC and its subsidiaries, including Epic Resorts-Palm Springs Marquis Villas, LLC, are subject to Chapter 11 bankruptcy proceedings.  In the bankruptcy adversary proceedings, the indenture trustee sought to impose an equitable lien in favor of the bond holders on the leasehold interest and other assets of Epic Resorts-Palm Springs Marquis Villas, LLC and the equitable subordination of the first deed of trust held by us on such assets due to, among other things, alleged, on our part, tortious interference and alleged inequitable conduct.  We opposed the adversary proceeding filed by the indenture trustee and, in June of 2002, moved for summary judgment. On February 27, 2003, the United States Bankruptcy Court granted our summary judgment motion and affirmed our first deed of trust.  The indenture trustee has appealed the ruling made by the United States Bankruptcy Court.  We will vigorously defend the appeal and ourselves against all allegations made by the plaintiffs in described above.

## LEVERAGING THE PORTFOLIO

We may elect to leverage our loan portfolio by obtaining a revolving credit facility from a third party lender. This credit facility would be used primarily, but not exclusively, to fund new loan opportunities that arise prior to the maturity of then-existing loans. This credit facility may also be used for other purposes. Our manager is not required to draw on the credit facility in order to fund monthly distributions or member withdrawals, although it may do so in its sole discretion. As of the date of this Prospectus, we have not entered into a binding loan agreement with any third party lender and there is no assurance that we will ever obtain a revolving credit facility or that such a credit facility, if obtained, would be in place during our entire term.

Leveraging our loan portfolio would enable us to keep our funds invested in loans, rather than invested in short-term certificates of deposit, money-market funds or other liquid assets which may not yield a return as high as the anticipated return to be earned on mortgage loans. For example, if an existing loan matures, it may be several months or more before we could reinvest the loan proceeds in a new loan. During that period, the loan proceeds would be invested in one of the short-term investments described above. By using the credit facility, we can lessen the time funds are invested in such short-term investments by making new loans as loan opportunities arise, rather than wait for existing loans to pay off, or new investor funds to accrue, in order to make such new loans. By leveraging our loan portfolio, we can also increase our yield. This increased yield will result if the interest earned by us on our leveraged loans exceeds the interest that must be paid by us on the funds borrowed from a third party lender. This "spread" between the interest earned on a leveraged loan and the interest paid on the borrowed funds used to make the loan will accrue to us.

This credit facility is intended to be repaid primarily from loan payoffs as then-existing loans mature. The credit of facility may also be repaid from new investor funds or distributions that investors have elected to have reinvested. Investors who have elected to reinvest their distributions will be credited with the purchase of additional membership units on the effective date of reinvestment, even if the distributions are used to repay the credit facility.

We would assign portions or all of our loan portfolio as security for this credit facility. The total amount outstanding under this credit facility will not at any time exceed 25% of our total loan portfolio. Borrowing under this credit facility can have possible adverse tax consequences. See "Federal Income Tax Consequences – Unrelated Business Taxable Income."

The leveraging of our loan portfolio entails certain risks that would not otherwise be present if we funded all of our loans from our own funds. For example, to the extent we make loans at fixed interest rates while we borrow funds under the credit facility at short-term variable interest rates, we will be subject to the risk that prevailing interest rates (and our associated borrowing costs) will rise above the levels earned by us on the fixed rate portion of our loan portfolio. This would create losses for us. Since we will be required to pledge some or all of our loans as security for the credit facility, a default under the credit facility would risk the loss of some or all of our assets (*i.e.*, our loans and the underlying real property security). Such a loss would cause our investors to lose some or all of their invested capital.

Examples of a default under the credit facility may include our failure to make timely payments on the credit facility, our failure to observe any of the covenants contained in the credit agreement, our default under any other loan agreement to which we are a party, the bankruptcy or insolvency of our manager, and other events specified in the credit agreement. Thus, we are at risk of losing some or all of our loan portfolio on the occurrence of many events that do not directly relate to our ability to service our loans and some of which are not within our control.

# MANAGEMENT

Our manager will manage and direct our affairs. All of our loans will be underwritten, arranged and serviced by our manager or its affiliate. Our manager is wholly-owned by USA Investment Partners, LLC, a Nevada limited-liability company. USA Investment Partners, LLC is managed by USA Capital Commercial Mortgage Company, a Nevada corporation. In turn, USA Capital Commercial Mortgage Company is controlled by Thomas A. Hantges, Joseph D. Milanowski and Paul S. Hamilton.

## MANAGER

Our manager manages and controls our affairs and has responsibility and final authority in almost all matters affecting our operations. More specifically, our manager has complete authority and responsibility for the following:

- Evaluating and choosing the mortgage loans in which we will invest;

- Originating and servicing our mortgage loan investments;

- Managing our mortgage loan investments; and

- Managing all of our operations.

### Evaluation and Acquisition

Our manager will consider prospective loans for investment. In that regard, our manager will evaluate the credit of prospective borrowers, analyze the potential return on such mortgage loan transactions, review property appraisals and determine which types of transactions appear to be most favorable to us.

### Originating and Servicing of Mortgage Loans

Our manager or an affiliate will obtain, process, make and invest in, broker and sell, manage and service our mortgage loans. Currently, our manager, through USA Commercial Mortgage Company, acts as our loan servicing agent. The mortgage loan services will include:

- Reviewing loans;

- Recommending changes in loans;

- Employing and supervising employees who handle the loans;

- Preparing and reviewing projected performance;

- Reviewing reserves and working capital; and

- Collecting and maintaining all loans.

### Management of Loan Portfolio

After we acquire mortgage loans, our manager will also manage our mortgage loan portfolio. Our manager is responsible for:

–23–

- Creating and implementing investment policies in furtherance of those contained in this Prospectus;

- Preparing and reviewing budgets, economic surveys, cash flow and taxable income or loss projections and working capital requirements;

- Preparing and reviewing reports for securities filings, distribution to investors or otherwise;

- Communicating with investors;

- Supervising and reviewing our bookkeeping, accounting and audits;

- Supervising and reviewing the preparation of our state and federal tax returns; and

- Supervising professionals, including attorneys, accountants and appraisers.

Investors have no right to participate in the management or control of our business or affairs other than to exercise the limited voting rights provided for investors in our operating agreement. Our manager has primary responsibility for the initial selection, evaluation and negotiation of our mortgage loans. Our manager will provide all executive, supervisory and administrative services for our operations, including servicing the mortgage loans we hold. Our books and records are maintained by our manager, subject to audit by independent certified public accountants.

## FIDUCIARY RESPONSIBILITY OF OUR MANAGER

Under Nevada law, the fiduciary duties of a manager to a limited-liability company and its members are similar to those of a general partner to a partnership and its partners. Accordingly, a manager is accountable to a limited-liability company as a fiduciary, which means that a manager is required to exercise good faith and integrity with respect to company affairs. This fiduciary duty is in addition to those other duties and obligations of, and limitations on, our manager that are set forth in our operating agreement. Pursuant to the terms of our operating agreement, during business hours and with prior written notice of five days, any investor or the investor's legal representative may inspect our financial statements and other books and records as they relate to our internal affairs.

Our operating agreement provides that our manager will have no liability to us for losses resulting from errors in judgment or other acts or omissions, unless our manager is guilty of intentional misconduct, fraud or knowing violation of the law. Our operating agreement also provides that we will indemnify our manager and its agents against liability and related expenses (including reasonable attorneys' fees and costs) resulting from any claim or legal proceeding relating the performance or non-performance of any act related to our operations, so long as our manager and its agents acted in good faith and in our best interests and did not engage in intentional misconduct, fraud or knowing violation of the law. Therefore, investors may have a more limited right of action than they would have absent these provisions in our operating agreement. A successful indemnification of our manager or any litigation that may arise in connection with our manager's indemnification could deplete our assets as allowed under Nevada law. Investors who believe that a breach of our manager's fiduciary duty has occurred should consult with their own counsel.

Insofar as the indemnification of our manager for liabilities arising under the Securities Act may be permitted pursuant to the above-described provisions of our operating agreement, we have been informed that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

## AFFILIATES OF OUR MANAGER

The affiliates of our manager include USA Commercial Mortgage Company, USA Investment Partners, LLC, USA Commercial Real Estate Group, Thomas A. Hantges, Joseph D. Milanowski and Paul S. Hamilton. The business address of our manager and its affiliates is 4484 South Pecos Road, Las Vegas, Nevada 89121. The following chart shows the ownership structure of the various persons and entities that are affiliated with our manager:



**USA Commercial Mortgage Company**, doing business as USA Capital, is a Nevada corporation that underwrites, originates, funds and services loans secured by undeveloped land and residential and commercial developments, both on behalf of investors and for its own account. Since 1990, it has originated approximately $910 million in loans, secured by property located throughout the western United States. USA Capital has been licensed as a mortgage broker in the State of Nevada since January 11, 1990, and is controlled by Thomas A. Hantges, Joseph D. Milanowski and Paul S. Hamilton through their management control and ownership control over USA Commercial Mortgage Company. The remaining 8.6% of USA Commercial Mortgage Company is owned by Red Granite, LLC, a company owned by the spouse of Thomas A. Hantges as her sole and separate property. Mr. Hantges disclaims any beneficial ownership or control over the shares of common stock held by Red Granite, LLC.

**USA Investment Partners, LLC** is a Nevada limited-liability company and is the manager of our manager. In turn, USA Investment Partners, LLC is managed by USA Commercial Mortgage Company. USA Investment Partners, LLC is beneficially owned by Thomas A. Hantges, Joseph D. Milanowski and Paul S. Hamilton.

**USA Commercial Real Estate Group** is a Nevada corporation that was formed in 1987 and is licensed as a Nevada real estate broker. USA Commercial Real Estate Group is owned by Thomas A. Hantges and Joseph D. Milanowski.

**Thomas A. Hantges** Since 1997, Mr. Hantges has been Chairman and Chief Executive Officer of USA Commercial Mortgage Company. Mr. Hantges is a Chartered Financial Analyst. He has lived in Las Vegas since 1967, obtaining both his BA and MBA from the University of Nevada Las Vegas. He is the founder of USA Commercial Mortgage Company, a licensed mortgage company that specializes in the placement of trust deed investments on behalf of its investors. Mr. Hantges has more than 20 years of experience in the financial and securities industries. Since 1990, Mr. Hantges has also developed single-family lots, single-family and multi-family residences and commercial subdivisions in southern and northern Nevada.

**Joseph D. Milanowski** Since 1998, Mr. Milanowski has been President and Chief Operating Officer of USA Commercial Mortgage Company. Mr. Milanowski is a Chartered Financial Analyst. He has lived in Las Vegas since 1988 and has been associated with USA Commercial Mortgage Company since 1993. He is primarily responsible for much of the underwriting and servicing for USA Commercial Mortgage Company. During his tenure with USA Commercial Mortgage Company and its affiliates, some of his primary responsibilities have included securities research for the gaming industry, real estate investment analysis and investment banking services for various investors. Mr. Milanowski obtained his BA in Economics from the University of Michigan and his MBA in finance from the University of Arizona.

**Thomas Rondeau, Esq.** Mr. Rondeau has served as general counsel for USA Commercial Mortgage Company since September 1998. Previously, Mr. Rondeau served as the litigation director of a law firm concentrating in real estate matters, particularly the acquisition, development, and financing of major commercial projects throughout Clark County, Nevada. Mr. Rondeau has also served as an arbitrator in commercial cases and as an instructor at real estate seminars. Mr. Rondeau received a BA from the University of California at Berkeley in 1970, an MA from California State University in Sonoma in 1976, and a JD from the University of Arizona in 1983. In addition to his legal experience, Mr. Rondeau has taught English at the University of Arizona, and worked as a cost accountant.

**Paul S. Hamilton** Since 1999, Mr. Hamilton has been Senior Investment Advisor of USA Commercial Mortgage Company. Mr. Hamilton attended the University of Nevada Las Vegas, concentrating in both Business and Political Science. Mr. Hamilton has been associated with USA Commercial Mortgage Company since 1995. During his tenure with USA Commercial Mortgage Company, Mr. Hamilton has engaged in the acquisition, sale, lease and analysis of commercial real estate projects. In addition, he is involved in account management and the underwriting of both short-term and permanent loans.

LEGAL PROCEEDINGS INVOLVING AFFILIATES OF OUR MANAGER

In addition to the legal proceedings involving us, certain affiliates of our manager have been involved or are currently involved in legal proceedings.

In March 1998, Mr. Hantges was named as a defendant in a civil action brought by the Securities and Exchange Commission in the United States District Court for the Southern District of New York. In

its opinion, the court concluded that the Commission made a proper showing that the defendants, including Mr. Hantges, had violated the registration requirements of the Securities Act and that the freeze on the assets of the defendants relating to the proceeds from the sale of shares in question should continue. However, the court determined that Mr. Hantges was not likely to engage in future violations of the Securities Act. Accordingly, the preliminary injunction entered by the court against some of the defendants in the action, was not entered against Mr. Hantges. There has been no further action involving Mr. Hantges with respect to this matter.

In May 2000, USA Capital Realty Advisors, a Nevada corporation, and USA Commercial Mortgage Company, an affiliated company, entered into a Consent Agreement with the Nevada Securities Division, in connection with the sale of undivided interests in a promissory note issued by two unaffiliated limited liability companies. The staff of the Nevada Securities Division believed the sales of the interests in the promissory note violated the registration requirements of the Nevada Uniform Securities Act, or the Nevada Act. Under the terms of the Consent Agreement, USA Capital Realty Advisors and USA Commercial Mortgage Company agreed to comply in the future with all provisions of the Nevada Act and the rules promulgated thereunder, to submit quarterly reports to the Nevada Securities Division advising as to the status of the repayment of the principal and interest under the promissory note in question, and to pay a fine of $25,000. The promissory note was subsequently paid in full. No further action has been taken on this matter.

## COMPENSATION AND RELATED PARTY TRANSACTIONS

The following discussion summarizes the forms of compensation to be received by our manager and its affiliates. All of the amounts described below will be received regardless of our success or profitability. None of the following compensation was determined by arm's-length negotiations. Our manager retains the right to terminate all or any portion of its business relationship with us at any time, in which event we would seek to retain one or more other firms to perform the various services to be rendered by our manager as described below.

| FORM OF COMPENSATION | RECIPIENT | ESTIMATED AMOUNT OR METHOD OF COMPENSATION |
|---|---|---|
| Loan brokerage commissions | USA Commercial Mortgage Company | Borrowers will pay loan brokerage fees ranging from an effective rate of 2%-5% per annum of the principal amount of each loan. Loan brokerage fees are paid by borrowers out of loan proceeds, either directly to USA Commercial Mortgage Company, or indirectly to us and then to USA Commercial Mortgage Company. USA Commercial Mortgage Company has agreed to not charge us for any of its services in exchange for the right to charge the relevant borrower. |
| Asset management and loan servicing fee | USA Capital Realty Advisors, LLC | We are obligated to pay up to 1.0% per annum of our assets under management, payable monthly to our manager at a rate of 1/12th of 1% of our assets under management. |
| Reimbursement of legal fees | USA Commercial Mortgage Company | The documentation of some of our loans will be prepared by the general counsel for USA Commercial Mortgage Company. Those legal fees will be paid by the borrower under such loans. |

| FORM OF COMPENSATION | RECIPIENT | ESTIMATED AMOUNT OR METHOD OF COMPENSATION |
|---|---|---|
| Real estate commissions | USA Commercial Real Estate Group | If we acquire property through foreclosure, USA Commercial Real Estate Group may, in some circumstances, serve as the listing broker in the sale of such property. USA Commercial Real Estate Group would earn a competitive brokerage commission. |
| | | During the years ended December 31, 2002 and 2001, USA Commercial Real Estate Group has not earned any real estate commissions from us. |
| Early withdrawal fee | USA Capital Realty Advisors, LLC | Our manager, in its sole and absolute discretion, may allow an investor to withdraw from USA Capital Diversified Trust Deed Fund during the first 12 months after the date the relevant membership units are purchased on the condition that the investor pay an early withdrawal fee equal to 5% of such original investment amount, with 75% of such early withdrawal fee being paid to our manager and 25% being paid to us. |
| Miscellaneous Fees | USA Capital Realty Advisors, LLC | Borrowers may be required to pay miscellaneous fees to our manager such as reconveyance fees, demand fees, copy fees and messenger service fees. |

With respect to the loan brokerage fees payable to USA Commercial Mortgage Company, the effective rate is calculated by modifying the actual loan brokerage fee in light of the term of the loan. For example, if the actual loan brokerage fee is 6% and the term of the loan is 18 months, the effective loan brokerage fee would equal 4% per annum. Loan brokerage fees are generally paid to USA Commercial Mortgage Company when the loan is funded, but may be paid over the term of the loan. In addition, in the event of an extension or renewal of a mortgage loan, the borrower will be required to pay an additional loan brokerage fee to USA Commercial Mortgage Company.

As used in the table above, assets under management mean our total capital, including cash, reserve funds, notes, real estate owned, accounts receivable, advances made to protect loan security and any of our other assets, valued at fair market value. The asset management and loan-servicing fee will be paid on or before the 15th day of each calendar month with respect to assets under management as of the last day of the immediately preceding month. There are no caps or ceilings on the total amount of the above fees, compensation, income, distributions or other payments that may be made to our manager or its affiliates. We will pay these fees and expenses monthly in arrears; provided, however, our manager may elect, at any time, to defer without interest thereon the payment of any amounts owed by us. During the years ended December 31, 2002, 2001 and 2000, our manager agreed to waive a portion of its fees and receive $488,498, $148,567 and $0, respectively. More specifically, in the year ended December 31, 2002, our manager agreed to have its asset management and loan-servicing fee calculated by taking only 0.5% per annum of our assets under management, rather than 1.0% per annum. As of December 31, 2002, we have paid all fees to our manager with the exception of $229,000 of the fees earned by our manager during the year ended December 31, 2002, of which amount our manager subsequently agreed to waive additional fees of $75,790 and received the balance of $153,210.

In addition to the compensation payable to our manager and its affiliates, we have entered into other transactions and arrangements with our manager and its affiliates. During the year ended December 31, 2001, we advanced $700,000 to HMA Sales, LLC, an affiliate of our manager. Although the advance

was repaid in January 2002, the advance was not in conformance with our lending standards and policies. We have adopted additional procedures to ensure compliance with the prohibition against loans to our manager and its affiliates, unless such loan is made as part of a sale of real estate owned as a result of foreclosure.

During the year ended December 31, 2002, USA Commercial Mortgage Company, designated by our manager to service our mortgage loan investments, had collected approximately $7,000,000 of interest and principal on our mortgage loans that was not immediately remitted to us. This amount represented funds accumulated by USA Commercial Mortgage Company that are held on our behalf and generally remitted to us on a periodic basis. USA Commercial Mortgage Company has agreed to pay us interest on such funds at a rate of 20% per annum from the receipt of the funds and until the funds are remitted to us. Although USA Commercial Mortgage Company has remitted the collected funds to us, we earned interest income of approximately $254,400 from USA Commercial Mortgage Company on these unsecured advances.

With respect to our organizational and operational expenses, our manager has paid for such expenses during the years ended December 31, 2002, 2001 and 2000 in the amounts of $51,494, $95,000 and $68,000, respectively. Our manager has not requested reimbursement of such expenses and has effectively donated the payment of such expenses to us.

## CONFLICTS OF INTEREST

The relationships with our manager and its affiliates will result in various conflicts of interest. Our manager and its affiliates are engaged in business activities involving real estate lending, and anticipate engaging in additional business activities in the future that may be competitive with us. Our manager and its affiliates will exercise their fiduciary duties to us and our members in a manner they believe will preserve and protect the rights of our members. Additionally, our operating agreement contains provisions that limit our ability to enter into transactions with our manager and its affiliates.

Pursuant to our operating agreement, we may sell existing loans to our manager or its affiliates only if we receive net sales proceeds from such sale in an amount equal to the total unpaid principal balance, accrued interest and other charges owing under such loan. Our manager is under no obligation to purchase any loans from us or to guarantee any payments under any of our loans. However, we may purchase existing loans from our manager or its affiliates so long as, at the time of purchase, the borrower is not in default under the loan and no brokerage commissions or other compensation, such as premiums or discounts, are paid to our manager or its affiliates based upon such purchase, other than loan origination fees.

The paragraphs below describe material conflicts of interest that may arise in the course of the management and operation of our business by our manager. The list of potential conflicts of interest reflects our knowledge of the existing or potential conflicts of interest as of the date of this Prospectus. We cannot assure investors that other conflicts of interest will not arise in the future.

### Loan Brokerage Commissions

The compensation to our manager and its affiliates was not determined by arm's length negotiations. It is anticipated that the loan brokerage commissions charged to borrowers by our manager for most loans will range between 2%-5% per loan of the principal amount of each loan per annum. Loan brokerage commissions may be paid to USA Commercial Mortgage Company when the loan is funded or may be paid over the term of the loan. Loan brokerage commissions are paid by borrowers out of loan proceeds, either directly to USA Commercial Mortgage Company, or indirectly to us and then to USA Commercial Mortgage Company. Any increase in such charges will have a direct, adverse effect upon

the interest rates that borrowers will be willing to pay us, thus reducing the overall rate of return to our members. Conversely, if our manager reduces the loan brokerage commissions charged by it, a higher rate of return might be obtained for us and our members.

This conflict of interest will exist in connection with every loan transaction, and investors must rely upon the fiduciary duties of our manager to protect their interests. We will generally charge borrowers interest at the rate generally prevailing in the geographical areas where the security property is located for loans to comparable borrowers of similar size, duration and security.

### Other Funds or Businesses

The compensation structure applicable to our manager or its affiliates in connection with loans that are originated by it or its affiliates may be different and, depending on the circumstances at a given point in time, may be more lucrative to our manager than the compensation structure applicable to our manager in connection with us. As a result, where there may exist a financial incentive for our manager to cause loans to be originated for private investors, we must rely on the fiduciary duties of our manager to protect our interests under such circumstances. In the future, our manager or its affiliates may also sponsor other funds formed to conduct business similar to ours. If these other funds have funds to invest at the same time, there will then exist conflicts of interest on the part of our manager as to whether our manager offers a particular loan opportunity to us or to these other funds. Our manager will decide which loans are appropriate for funding by us or by such other funds after consideration of all relevant factors, including the size of the loan, portfolio diversification, and amount of uninvested funds. These other funds, or other investors that are clients of USA Commercial Mortgage Company or its affiliates, may also participate with us in making new loans.

Our manager, its affiliates or other funds sponsored or managed by USA Commercial Mortgage Company or its affiliates, may engage for their own account, or for the account of others, in other business ventures, similar to our operations or otherwise, and neither we nor any member shall be entitled to any interest therein.

We will not have independent management and we will rely on our manager for the management of our operations. Our manager will devote only so much time to our business as is reasonably required. Our manager will have conflicts of interest in allocating management time, services and functions between its other business interests and any future partnerships which it may organize as well as other business ventures in which it may be involved. Our manager believes it has sufficient staff available to be fully capable of discharging its responsibilities to all such entities.

### Lack of Independent Legal Representation

We have not been represented by independent legal counsel to date. Our reliance on the same counsel used by our manager in the preparation of this Prospectus and our organization may result in the lack of independent review.

### Purchase of Loans From Our Manager or Other Affiliated Entities

We may purchase loans from our manager or other entities that are affiliated with our manager as long as the loans are not in default and otherwise satisfy our lending guidelines. The purchase of such loans may not be made pursuant to arm's-length negotiations, and our manager would have a conflict of interest in negotiating the terms of purchase for such loans.

**Sale of Defaulted Loans or Real Estate Owned to Affiliates**

In the event one of our loans goes into default or we become the owner of any real property by reason of foreclosure on one of our loans, our manager's first priority will be to arrange the sale of the loan or property for a price that will permit us to recover the full amount of our invested capital plus accrued but unpaid interest and other charges, or as much as can be reasonably obtained in light of current market conditions. In order to facilitate such a sale, our manager may arrange a sale to persons or entities controlled by or affiliated with our manager, such as to another entity formed by our manager or its affiliates or to other investors who are clients of our manager, USA Commercial Mortgage Company or their affiliates, for the express purpose of acquiring defaulted loans or foreclosure properties from lenders such as us. Our manager will be subject to conflicts of interest in arranging such sales since it will represent both parties to the transaction. For example, we and the potential buyer will have conflicting interests in determining the purchase price and other terms and conditions of sale. Our manager's decision will not be subject to review by any outside parties.

Our manager has undertaken to resolve these conflicts by setting a purchase price for each defaulted loan or property that is not less than either the independently appraised value of such loan or property, if any, at the time of sale, the amount of the highest third party offer actually received, if any, or the total amount of our investment in the property. Our investment is deemed to include without limitation the following:

- The unpaid principal amount of the loan upon which we foreclosed;

- All unpaid interest accrued to the date of foreclosure;

- Expenditures made to protect our interest in the property such as payments for insurance and taxes;

- All costs of foreclosure (including attorneys fees actually incurred to prosecute the foreclosure or to obtain relief from stays in bankruptcy); and

- Any advances made by or on our behalf for any of the foregoing.

A portion of the purchase price may be paid by the affiliate executing a promissory note in favor of us, secured by a deed of trust on the property being sold. The total loan-to-value ratio for the property may equal the entire purchase price of the property paid by the affiliate, and the note will otherwise contain terms and conditions comparable to those that would be contained in notes executed by third parties.

If we acquire real property through foreclosure, USA Commercial Real Estate Group may, in some circumstances, serve as the listing broker in the sale of such real property. In such case, USA Commercial Real Estate Group will earn a competitive brokerage commission.

REMOVAL OF USA CAPITAL REALTY ADVISORS, LLC AS OUR MANAGER

USA Capital Realty Advisors, LLC will cease to be our manager upon its removal, withdrawal or dissolution, or if it is found to be bankrupt. Members holding at least 75% of our outstanding membership units can remove USA Capital Realty Advisors, LLC as our manager upon written notice by such investors to the effect that our manager is removed effective on the date set forth in such notice. Concurrently with delivery of such notice or within 90 days thereafter by written notice similarly given, members holding at least 75% of our outstanding membership units may designate a successor manager.

Substitution of a new manager will be effective upon written acceptance of the duties and responsibilities of a manager, as set forth in our operating agreement, by the new manager. Upon effective substitution of a new manager, our operating agreement will remain in full force and effect, except that the new manager will have changed, and our operations will be continued by the new manager.

Our manager may withdraw at any time upon not less than six months written notice of the same to our investors and with the consent of members holding at least 75% of our outstanding membership units. In the event that our manager retires, the members holding at least 75% of our outstanding membership units must designate a successor manager. If members holding at least 75% of our outstanding membership units fail to designate and admit a successor manager within the time specified, we will dissolve. Our manager may assign its membership units, but our manager may not be changed except as set forth above.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

We were organized on February 3, 2000 and have conducted limited business operations. As of March 31, 2003, we had 4,860.98 membership units issued and outstanding held by approximately 1,082 members. The 4,860.98 membership units issued and outstanding represent the issuance of 5,239 membership units, the issuance of 281.16 membership units through reinvestment of distributions and the redemption of 659.18 membership units. The proceeds from the sale of these membership units have been used to invest in mortgage loans secured by real property located primarily in the United States.

We do not anticipate hiring any employees, acquiring any fixed assets such as office equipment or furniture or incurring material office expenses during the next 12 months because we will be utilizing our manager's personnel and office equipment. We will not pay our manager any overhead or other compensation for providing us with its personnel and equipment.

### ACCOUNTING POLICIES

The preparation of financial statements in conformity with generally accepted accounting principles requires our management to make estimates and assumptions that affect reported amounts of assets and liabilities and the disclosure of contingent liabilities. Due to the inherent uncertainty of such estimates, our actual results may differ and our estimates and assumptions may require revision in future periods.

With respect to our key accounting policies, we have adopted policies with respect to revenue recognition, the impairment of mortgage loans, the allowance for loan losses, the fair value of financial instruments, the lack of distinction between comprehensive income and net income and income taxes. For a detailed discussion of our accounting policies, see Note 1, "Summary of Accounting Policies," to our financial statements, a copy of which is attached hereto as **Exhibit A**.

### RESULTS OF OPERATIONS

#### Years Ended December 31, 2002 and 2001

During the year ended December 31, 2002, we generated revenues of $9,046,474, compared to $5,944,519 of revenues during the year ended December 31, 2001. During the year ended December 31, 2002, our revenues consisted of $8,702,179 in interest and $344,295 in other income. During the year ended December 31, 2001, our revenues consisted of $5,853,045 in interest and $91,474 in other income. The increase in revenues resulted primarily from the increased number of mortgage loans made by us and the corresponding increase in interest earned from such loans. In addition, we earned additional interest as a result of interest paid by USA Commercial Mortgage Company with respect to funds held on our behalf, but not immediately remitted to us.

During the year ended December 31, 2002, we incurred general and administrative expenses of $1,250,966, compared to $234,725 during the year ended December 31, 2001. During the year ended December 31, 2002, our general and administrative expenses consisted of $637,652 in professional fees, $488,498 in management fees and $124,816 in other expenses. During the year ended December 31, 2001, our general and administrative expenses consisted of $148,567 in management fees and $86,158 in other expenses. The $1,016,241 increase in general and administrative expenses was due primarily to the $340,131 increase in management fees that reflect the increased size of our loan portfolio and the additional costs related to the enforcement of our security interests.

Accordingly, during the year ended December 31, 2002, we generated a net income of $7,795,508, compared to net income of $5,709,794 generated by us during the year ended December 31, 2001. Although our net income increased by $2,085,714, the $3,101,955 increase in revenues was offset by, in part, increased management fees due to our larger loan portfolio and additional professional fees incurred with respect to our impaired or non-performing loans.

**Year Ended December 31, 2001 and Period from Inception to December 31, 2000**

During the year ended December 31, 2001, we generated revenues of $5,944,519 compared to $813,028 of revenues during the period from inception to December 31, 2000. During the year ended December 31, 2001, our revenues consisted of $5,853,045 in interest and $91,474 in other income. During the period from inception to December 31, 2000, our revenues consisted of $813,028 in interest. The increase in revenue resulted primarily from the increased number of mortgage loans made by us and the corresponding increase in interest earned from such loans.

During the year ended December 31, 2001, general and administrative expenses of $234,725, compared to none during the period from inception to December 31, 2000. During the year ended December 31, 2001, our general and administrative expenses consisted of $148,567 in management fees and $86,158 in other expenses. The increase in general and administrative expenses was due primarily to our expanding operations related to the continuing sale of membership units and the additional loans made by us.

Accordingly, during the year ended December 31, 2001, we generated a net income of $5,709,794, compared to net income of $813,028 generated by us during the period from inception to December 31, 2000.

**Liquidity and Capital Resources**

Since our inception, our principal capital resources were the payment of expenses by our manager and the capital contributions of members pursuant to our prior and current offerings of our membership units. During the years ended December 31, 2002, 2001 and 2000, our manager has paid for the expenses related to our organization and operation in the amounts of $51,494, $95,000 and $68,000, respectively. With respect to the capital contributions received, as of March 31, 2003, we have issued 5,239 membership units, redeemed 659.18 membership units and issued 281.16 membership units through the reinvestment of distributions by members. Accordingly, we have issued a net of 4,860.98 membership units, representing capital contributions of $121,524,500. We also generate cash from the repayment of our loans and may generate additional cash from the sale of our loans or from a credit line secured by our loans.

At December 31, 2002, we held $11,998,420 in cash and maintained working capital of $11,666,695, compared to $6,774,486 in cash and working capital of $6,901,571 at December 31, 2001. The increase cash and working capital reflects the additional placement of membership units and the resulting cash on hand as a result of such placements. In addition, our members' equity increased from $71,215,886 at December 31, 2001 to $111,791,965 at December 31, 2002. The increase in members' equity resulting primarily from the additional placement of membership units pursuant to our offering.

During the year ended December 31, 2002, our operating activities provided net cash of $7,720,515, compared to $4,723,164 during the year ended December 31, 2001. The $2,997,351 increase in net cash provided by operating activities resulted primarily from the increased interest received due to the larger loan portfolio in the year ended December 31, 2002 versus the year ended December 31, 2001. In the year ended December 31, 2002, the $8,752,076 of interest received was offset by $1,031,561 paid to vendors. In 2001, the $4,845,569 of interest received was offset by $122,405 paid to vendors.

During the year ended December 31, 2002, our investing activities used net cash of $34,816,557, compared to $41,003,482 during the year ended December 31, 2001. The $6,186,925 decrease in net cash used in investing activities was due to the $21,040,408 increase in loans made, offset by the $25,866,011 increase in loans repaid and the $1,361,322 increase in repayments from affiliates. During the year ended December 31, 2002, the net cash used in investing activities consisted of $78,655,709 in loans made by us, $43,139,152 in loans repaid and $700,000 in advances repaid from affiliates. During the year ended December 31, 2001, the net cash used in investing activities consisted of $57,615,301 in loans made by us, $17,273,141 in loans repaid and $661,322 in advances to affiliates.

During the year ended December 31, 2002, our financing activities provided net cash of $32,319,976, compared to $42,667,892 during the year ended December 31, 2001. The $10,347,916 decrease in net cash provided by financing activities was due to the $55,035 increase in proceeds from the issuance of our membership units, offset by the $6,714,264 increase in member redemptions and the $4,901,715 increase in member distributions, net of reinvestments. During the year ended December 31, 2002, the net cash provided by financing activities consisted of $50,613,385 in proceeds from the issuance of our membership units, $10,274,214 in member redemptions and $7,999,195 in member distributions, net of reinvestments. During the year ended December 31, 2001, the net cash provided by financing activities consisted of $49,345,322 in proceeds from the issuance of our membership units, $3,579,950 in member redemptions and $3,097,460 in member distributions, net of reinvestments.

## UNIT OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth specified information as of March 31, 2003 with respect to the beneficial ownership of our membership units held by our manager and its affiliates. As of March 31, 2003, there are no members that beneficially own 10% or more of our outstanding membership units. Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and includes voting and investment power with respect to our membership units. The address for USA Capital Realty Advisors, LLC, our manager, is: 4484 South Pecos Road, Las Vegas, Nevada 89121.

| NAME OF BENEFICIAL OWNER | NUMBER OF UNITS OWNED | PERCENTAGE OF UNITS | |
|---|---|---|---|
| | | PRIOR TO THE OFFERING | AFTER THE OFFERING (ASSUMING FULL SUBSCRIPTION) |
| USA Capital Realty Advisors, LLC | 2 units | 0.040% | 0.025% |

We have not issued nor authorized any options, warrants or other securities that are either convertible or exercisable into our membership units. Accordingly, there are no options, warrants or other securities to purchase our membership units.