## RISKS FACTORS

*Any investment in the membership units offered hereby involves a significant degree of risk and is suitable only for investors who have no need for liquidity in their investments. Each investor should consider carefully the following information about these risks, together with the other information contained in this Prospectus, before investing in our membership units. If any of the following risks actually occur, our business, results of operations and financial condition would likely suffer, and investors could lose part or all of their investment. It is impossible to accurately predict the results to investor as future conditions in the mortgage loan industry and the real estate development market, are unforeseeable. In addition, when considering this offering, each investor should consider the other factors discussed in this Prospectus under the captions "Management – Compensation and Related Party Transactions," "Management – Conflicts of Interest," "Leveraging the Portfolio" and "Federal Income Tax Consequences."*

### RISKS RELATED TO AN INVESTMENT IN OUR MEMBERSHIP UNITS

*There is no public market for our membership units and investors may not be able to dispose of their investment.*

There is no public market for our membership units. We have no present intent to register our membership units with any national securities exchange and do not expect a public market to develop for our membership units. Even if a potential buyer could be found, the transferability of our membership units is also restricted by the provisions of state and federal securities laws and our operating agreement. Accordingly, investors of our membership units may not be able to liquidate their investment promptly or at a reasonable price, if at all.

*Since investors are restricted from transferring their membership units and will have limited rights to redeem their membership units or withdraw from us, investors should expect to hold their membership units for an indefinite period of time.*

Any sale or transfer of our membership units also requires the prior written consent of our manager, which may be withheld in its sole discretion. Furthermore, members will have only limited rights to redeem their membership units or withdraw from us or to otherwise obtain the return of their then positive capital account balance. It is important to note that capital accounts are an accounting concept and that each member's capital account will likely differ from that member's percentage share of the fair market value of our net assets. As a result, all investors of our membership units must be capable of bearing the economic risks of this investment with the understanding that their interest in our membership units may not be liquidated by resale. Investors should expect to hold their respective membership units for an indefinite period of time.

*Although we have reached a capitalization of $100 million and are subject to our loan diversification restrictions, we will still be adversely affected if our limited number of borrowers experience financial difficulties or if the economic conditions deteriorate in regions where the properties securing the loans are located.*

Since we have sold our membership units in excess of $100 million as of March 31, 2003, our loan portfolio will be subject to, on a going forward basis, our loan diversification restrictions. Although we will be subject to such restrictions, we will remain at risk to events that impact our limited number of borrowers or the regions in which a majority of the properties that secure our loans are located. For example, as of March 31, 2003, we have mortgage loans in the aggregate principal amount of $72,813,149, or 72.8% of our loan portfolio, for which the underlying real property is located in either California, Nevada or Arizona. In addition, as of March 31, 2003, approximately 48% of our loans have been made to four borrowers. Accordingly, we will be adversely affected if one or more of our larger

–36–

borrowers experiences financial difficulties or if the economic conditions deteriorate in a particular region of the United States of America.

*Since our manager bases the distributions made to our members on our cash available for distribution and the cash to be generated from currently impaired or non-performing loans, our members will be relying on our manager's assessment that the impaired or non-performing loans have sufficient security to satisfy the amounts owed to us.*

In calculating the distributions to be made to our members, our manager considers the income to be generated by loans that may be either impaired or non-performing, only to the extent that such loans have sufficient security to satisfy the amounts owed to us. As a result, our members will receive distributions with respect to such loans and, in turn, incur the attendant tax burden during the year in which the distributions are made rather than in the year we receive the actual income anticipated. If our manager overestimates the value of the underling security with respect to such impaired or non-performing loan or if our manager is not able to recover all of the amounts owed to us, we will be required to offset loss on these loans against future income and, as a result, will have less cash to distribute to our members.

## RISKS RELATED TO THE OFFERING

*We are conducting this offering without the benefit of an underwriter and, as a result, may not be able to place all $78,475,500 of our membership units offered pursuant to this offering.*

Since we have not engaged an underwriter for this offering, there is no assurance that we will be successful in placing all $78,475,500 of our membership units offered pursuant to this offering. If we are not successful in raising the maximum offering amount, we will be limited in the number and amount of loans we can make and, as a result, will have a loan portfolio that may not be sufficiently diversified.

*Since we are conducting our offering without the assistance of an underwriter, investors will not be able to rely upon a third party to conduct due diligence with respect to the statements contained in this Prospectus.*

We are conducting our offering without the assistance of an underwriter. As a result, investors will not be able to rely upon a third party, such as an underwriter, with respect to the verification of the statements made in this Prospectus. Since a due diligence investigation assists in verifying the information provided in a prospectus, the fact that no independent third party will conduct such an investigation may increase the likelihood that this Prospectus will not disclose risks or other matters you might consider important in determining whether or not to purchase our membership units.

*Since we have not yet determined the proposed uses for the proceeds of this offering, we will have broad discretion in applying such proceeds.*

Although we will invest the proceeds from this offering in loans, we have not yet identified the actual loans that will be funded by the proceeds from this offering. Since our manager will have substantial discretion in investing these proceeds, investors of our membership units will be forced to rely upon the judgment of our manager and will have limited recourse in the event our investors do not agree with its investment decisions. Our manager will not engage any outside independent appraisals to confirm whether the projected use is reasonable.

*As a result of our reliance on the intrastate offering exemption provided by Section 3(a)(11) of the Securities Act and the generally narrow interpretation of the same, we may lose the benefit of this exemption from registration if one of our investors or a significant portion of our operations are deemed to be located outside of the State of Nevada.*

For our continuous offering of membership units, we have relied upon the intrastate offering exemption provided by Section 3(a)(11) of the Securities Act. The intrastate offering exemption requires an issuer to be organized and doing business within a particular state and to offer and sell its securities to residents of such state. Since this exemption from registration is generally interpreted narrowly and since the issuer bears the burden of proof in proving compliance with this exemption, we may lose the benefit of this exemption from registration if one of our investors or a significant portion of our operations are deemed to be located outside of the State of Nevada. If we are not able to sustain the burden of demonstration compliance with this exemption from registration, the offer and sale of our membership units would not have complied with the Securities Act. The principal remedy for violations of Section 5 of the Securities Act is to permit investors in an offering to rescind their subscription for our membership units, plus interest, less the amount of any income received by the investors. In the event it is determined that our reliance on the intrastate exemption is not permissible, we may be required to initiate a rescission offer to our investors or become subject to some other action initiated by our investors or by regulatory agencies. The occurrence of one or more of these events will adversely impact our operations and our ability to make distributions to our members.

## RISKS RELATED TO USA CAPITAL DIVERSIFIED TRUST DEED FUND

*Since we have a limited operating history, we cannot provide any assurances that we will have successful operations or sufficient cash to make distributions to our members.*

We were organized as a Nevada limited-liability company on February 3, 2000. Since we have a limited operating history, we cannot make any assurances that our operations will be successful or that we will meet our stated investment objectives. During the years ended December 31, 2002 and 2001, we generated revenues of $9,046,474 and $5,944,519, respectively, and net income of $7,795,508 and $5,709,794, respectively. However, during the years ended December 31, 2002 and 2001, we made cash distributions, net of reinvestments, of $7,999,195 and $3,388,680, respectively, to our members, where the former included $460,595 in distributions payable to members in the year ended December 31, 2001. If our operations do not generate sufficient income, our ability to make distributions to our members will be adversely impacted.

*Due to the number of impaired or non-performing loans as of December 31, 2002, the allocation of resources to enforce or preserve our interests may adversely affect our cash available for distribution to members.*

As of December 31, 2002, our loan portfolio contained seven loans of approximately $32.4 million that were either impaired or non-performing. These impaired or non-performing loans represented 33.5% of our total loan portfolio as of December 31, 2002. Although our management has not provided for an allowance for losses with respect to these loans and has determined that the underlying collateral is sufficient to recover the amounts due, there is no guarantee that the costs associated with enforcing our security interest with respect to a particular loan or foreclosing on the real property securing the loan will not have a material adverse effect on our results of operations or on our ability to make distributions to members. During the year ended December 31, 2002, we incurred professional fees of $637,652 as a result of our impaired or non-performing loans.

–38–

*Due to the number of members and our assets as of December 31, 2002, we will be required to register our membership units pursuant to the Securities Exchange Act of 1934 by filing a registration statement with the Securities and Exchange Commission.*

Section 12(g) of the Securities Exchange Act of 1934, or the Exchange Act, and the rules related thereto generally require companies that have assets greater than $10,000,000 and have more than 500 stockholders to register their equity securities pursuant to the Exchange Act. Although we have members rather than stockholders, we believe that the thresholds related to Section 12(g) of the Exchange Act are applicable to our operations and will require the preparation and filing of a registration statement with the Securities and Exchange Commission. We are currently preparing a registration statement to be filed with the Securities and Exchange Commission as soon as practicable. The registration of our membership units with the Securities and Exchange Commission and the attendant reporting requirements of the Exchange Act are costly and will impact our cash available for distribution.

*Since our manager is solely responsible for our management, investors should only invest in our membership units if they are willing to entrust our manager to make all decisions regarding our operations.*

Our manager will manage and control our affairs and will have general responsibility and ultimate authority over all matters affecting our operations. Investors will not have an opportunity to evaluate the specific projects that will be financed with the proceeds of this offering. Further, investors cannot elect to replace our manager or terminate our existence unless investors that hold 75% or more of our outstanding membership units so elect. Accordingly, prospective investors should not invest in our membership units unless they are willing to entrust all aspects of our management to our manager.

*Since we will rely on appraisals and other factors to determine the fair market value of the real property securing our loans, any error in the appraisal or any subsequent events that adversely affect the fair market value of the real property may render our loans under-secured.*

Although we will rely on appraisals and other factors to determine the fair market value of real property used to secure loans made by us, there is no assurance that such appraisals or other metrics will in any or all cases, be accurate. Moreover, since an appraisal fixes the value of real property at a given point in time, subsequent events could adversely affect the value of real property used to secure a loan. Such subsequent events may include nationwide, statewide or local economic factors, demographic or property trends, specific local events such as freeway construction or adverse weather conditions, or an overall decline in the real estate market. Neither the appraiser nor we will be able to predict with any certainty whether these events will occur after a loan is made. These subsequent events could adversely affect the value of the property securing the loans so that the aggregate outstanding balance of the loan made by us could exceed the value of the property.

*Since many of our loans provide for payments of interest only during the term and a balloon payment at the end of the term, we run the risk that a weak real estate market will prevent the borrowers from refinancing or selling their properties and, as a result, repaying our loans.*

We are in the business of lending money and, as such, takes the risk of defaults by borrowers and other risks faced by lenders. Most of our loans require payments of interest only during the loan term. As a result, the borrower will have to make a large "balloon" payment of principal that will be due at the end of the loan's term. Many borrowers are unable to repay such loans out of their own funds and are compelled to refinance or sell. Fluctuations in interest rates, the unavailability of mortgage funds or a weak real estate market could adversely affect the ability of borrowers to refinance their loans at maturity or sell their property and, in turn, repay their loans.

*Since our loans are not guaranteed by any government agency, we rely solely on the underlying real property or real property interests securing our loans for recourse.*

Since our loans will not be insured or guaranteed by a federally owned or guaranteed mortgage agency, our only recourse is to foreclose upon the mortgaged real property or bring an action against the guarantors, if any. Due to our reliance on the underlying real property, it is critical that we properly value the underlying real property and assess the risks of the loan.

*In the event that a borrower defaults and we are unable to recover from a principal or affiliate of a borrower that guaranteed the loan, we would be less likely to recover the full amount of a delinquent loan, which would affect our profitability.*

In connection with some, but not necessarily all, of our loans, we may obtain guaranties from the principals or affiliates of the borrower. Upon a borrower default, we may seek to recover repayment of some or all of the loan by enforcing the guaranties against the guarantors. Depending on local laws, a guarantor may have defenses that would impair our ability to enforce on or recover from the guarantor. Additionally, the net worth of a guarantor may decline between the date that the loan is funded and the guaranty is given and the date that we seek to enforce a guaranty. These factors may impair our ability to recover the full amount of a delinquent loan and force us to write down a loan.

*Because our manager may not be as familiar with borrowers, properties and the local market conditions with respect to loans secured by properties located outside Nevada, we may incur greater risk when loans are made to borrowers and when properties are located outside of Nevada.*

Our manager is based in Las Vegas, Nevada, whereas borrowers and the underlying real property security for our loans may reside or be located both inside and outside of the United States. Although we will obtain and analyze financial information about prospective borrowers, obtain an appraisal of the underlying real property and conduct other investigations as described in this Prospectus with respect to the underlying real property, our manager may not be as familiar with borrowers, property or the local market conditions in areas outside of Nevada. This potential unfamiliarity may result in loans that are under-secured or riskier and, in turn, may adversely affect our operating results.

*In the event we invest in real estate located outside of the United States, we will be faced with the uncertainty of these foreign real estate markets and the uncertainty associated with enforcing obligations and foreclosing on real property.*

We may invest in real estate located outside the United States. Investing in real estate located in foreign countries creates risks associated with the uncertainty of foreign laws and markets including, without limitation, laws respecting foreign ownership, the enforceability of loan documents and foreclosure laws. Moreover, investments in foreign real estate are subject to currency conversion risks. In addition, income from investment in foreign real estate may be subject to tax by foreign jurisdictions, which would reduce the economic benefit of such investments. Our manager does not have any experience in investing in foreign real estate.

*Leasehold financing may harm our operations if a borrower, who is the owner of the right to develop or use the underlying real property under a long-term ground lease, defaults under the ground lease since the termination of the ground lease would render our security interest worthless and leave us as an unsecured creditor.*

Some of our loans may be secured by first deeds of trust that encumber leasehold interests in real estate that provide the borrower with the right to develop or use the underlying real property under a generally long-term ground lease. Leasehold loans can be riskier than loans secured by real property

because a default under a ground lease would generally give the owner of the real property the right to terminate the ground lease. If the ground lease is terminated, our security interest would disappear and we would be left as an unsecured creditor of the borrower. We will attempt to get the owner of the real property in a leasehold loan to agree to provide us with notices of default and the right to cure defaults under the ground lease so that we may prevent a termination of the ground lease.

*Since we may elect to leverage our portfolio by obtaining a credit line of up to 25% of the fair market value of our outstanding mortgage loans and secured by some or all of our mortgage loans, we may lose some or all of our assets if we are unable to repay this credit line.*

We may obtain a line of credit for the purposes of providing cash to our operations and acquiring, operating and developing for resale the real properties on which we have foreclosed. We may borrow up to 25% of the fair market value of our outstanding mortgage loans at any time. Should we be unable to repay the indebtedness and make the interest payments on the line of credit, the lender will likely declare us in default and require that we repay all amounts owing under the line of credit. Even if we are repaying the indebtedness in a timely manner, interest payments owing on the borrowed funds will reduce our income and the distributions investors receive.

Leveraging a loan entails certain risks to us that would not otherwise be present if we funded all of our loans from our own funds. For example, to the extent we make loans at fixed interest rates while we borrow funds under the credit facility at short-term variable interest rates, we would be subject to the risk that prevailing interest rates and its associated borrowing costs will rise above the levels earned by us on the fixed rate portion of our loan portfolio, causing losses to us. Also, we would be required to pledge some or all of our loans as security for the credit facility. If we should default under the credit facility, we would be at risk of losing some or all of our assets, such as our loans and the underlying real property security. Such a loss would cause investors to lose some or all of their invested capital.

*We may experience a material adverse effect if the construction management firm our manager proposes to use fails to properly perform its duties related to the administration of the loans and the payment of amounts due to subcontractors or material providers.*

In the context of construction loans, our manager will engage an independent construction management firm to oversee the disbursement of the loan to the borrower as construction progresses. The construction management firm will be required to process draw requests submitted by the borrower, review supporting documentation, such as invoices, conditional and unconditional lien waivers and architect's and contractor's certificates that evidence that the work for which the draw request applies has been completed in accordance with the plans and specifications and in a lien-free manner. The construction management firm will also make periodic site inspections to review the status of the construction. If the construction management firm fails to properly perform its duties, subcontractors or material providers may not be paid amounts due to them, which may result in the imposition of mechanics' liens on the property or loan amounts may be paid for construction work that does not conform to the appropriate plans and specifications.

*Since there were no arm's-length negotiations for the compensation payable to our manager and its affiliates, the compensation may not be on terms favorable to us or our members.*

Our manager and its affiliates will supervise the day-to-day management of our operations. In addition, our manager and its affiliates will receive substantial compensation from us and other parties in exchange for various services they have agreed to render to the management of our operations and with respect to the origination of our mortgage loans. This compensation has been established without the benefit of arm's-length negotiation and may not be on terms favorable to us or our members.

*There are several conflicts of interest involving our manager, such as the incentive to originate loans and the ability to engage in competitive activities, which may adversely impact our financial results.*

The transactions with our manager and its affiliates will result in various conflicts of interest since our manager and its affiliates are engaged in business activities involving real estate lending, and anticipate engaging in additional business activities in the future that may be competitive with us. In the future, our manager or its affiliates may also sponsor other funds formed to conduct business similar to that of ours. As a result, there will be a conflict of interest on the part of our manager as to the loans to be originated by these competing entities. If our manager elects to have more desirable loans originated by these competing entities rather than us, our financial results will be adversely affected.

In addition, borrowers will pay our manager loan brokerage commissions ranging from 2% to 5% per loan of the principal amount of each loan per annum. Since our manager possesses sole discretion as to which loans are appropriate for funding by us, our manager may have an incentive to originate loans in order to receive its commissions. These loans may be in an amount that is too large, may fail to provide our portfolio with sufficient diversification or may not provide us with the best return possible.

*As we will invest the proceeds of this offering in short-term certificates of deposit, money market funds or other liquid assets prior to using the funds to originate loans, we may receive a lower return from our proceeds and, as a result, may experience a decrease in profitability and in the amount of distributions to investors.*

There will be a delay between the time our membership units are sold and the time the proceeds from the sale of our membership units are invested in loans by us. During these periods, the proceeds of this offering will be invested in short-term certificates of deposit, money market funds or other liquid assets that may not yield a return as high as the anticipated return to be earned on our loans. The length of these delays may adversely affect the overall investment return to investors. Additionally, our manager will retain a contingency reserve fund to cover our unexpected cash needs. The contingency reserve fund may be invested in assets whose yield may not be as high as the yield that would result if such reserve funds were invested in loans. This lesser yield may adversely affect the investment return to our investors.

*Our manager may spend time on other activities, which could have a negative impact on our operations or result in diminished profitability.*

Our manager is not required to devote its full time to our affairs, but only such time as the management of our affairs reasonably requires. The failure of our manager to allocate sufficient time to manage our affairs may have a negative impact on our operations and, ultimately, our profitability.

*Our business, financial condition and results of operations could be adversely affected if we fail to retain the members of our manager's management team.*

Our manager will make all decisions with respect to our operations, including the determination as to what loans to make or purchase. We are dependent to a substantial degree on the members of our manager's management team for these continued services. Our success depends, in part, upon the continued performance of key officers, including Thomas A. Hantges, Joseph D. Milanowski and Paul S. Hamilton. The loss of any one of these persons could have a material adverse impact on our operations and our profitability.

*Our manager and members of our manager's management team will be indemnified and held harmless by us, to the fullest extent permitted under the Nevada Revised Statutes, against any action, suit or proceeding.*

The Nevada Revised Statutes and our operating agreement limit the personal liability of our manager and its management team for decisions made and actions taken by them on our behalf. Our operating agreement provides that our manager and its management team will be indemnified and held harmless by us, to the fullest extent permitted under the Nevada Revised Statutes, against any action, suit or proceeding.

## RISKS RELATED TO OUR INDUSTRY

*The mortgage lending business is highly competitive and we will compete for the availability of secured loans with many other persons, entities, institutional lenders and other engaged in the mortgage lending business that may have greater financial resources and experience.*

Due to the nature of our business, our profitability will depend to a large degree upon the future availability of secured loans. We will compete with other persons, entities, institutional lenders and others engaged in the mortgage lending business. Many of our competitors have greater resources and greater experience than us and may have other advantages over us in conducting their business and providing services to potential borrowers. There can be no assurance that we will find suitable investment opportunities in the future.

*The failure to comply with all applicable state regulations governing the making of loans to borrowers in a particular state, including regulations concerning a lender's advertising and marketing efforts, could impact our ability to fund or enforce our loans in that state, which would have an adverse impact on our profitability.*

States may have differing regulations and rules that govern the activities of lenders who make loans to borrowers within that state. These regulations and rules may affect, among other things, the nature of advertising and other marketing efforts that a lender can engage in to solicit borrowers and the manner in which loans are closed and serviced. We will undertake efforts to comply with all applicable regulations and rules in each state that govern our lending activities in that state. If we fail to comply with all such regulations and rules in any particular state, it could impact our ability to fund or enforce our loans in that state, and thus adversely impact our yield.

*If interest rates rise above the average interest rate being earned by our loan portfolio or if interest rates rise such that the real estate market becomes depressed, our operations will be adversely affected.*

Mortgage interest rates are subject to abrupt and substantial fluctuations. If prevailing interest rates rise above the average interest rate being earned by our loan portfolio, our operations will be adversely affected. Further, higher interest rates may have a chilling effect on the real estate market that, in turn, may result in poorer operating results.

*If the properties that secure our loans contain, or become contaminated with, toxic or hazardous substances, the value and the marketability of these properties will decrease, the ability of our borrowers to repay their loans will likely decrease and our profitability may be adversely affected.*

The properties that secure our loans may contain, or may become contaminated with, toxic or hazardous substances. While we will make reasonable investigations into whether the properties contain toxic or hazardous substances, these investigations will not guarantee that a property is free of toxic or

hazardous substances, nor can these investigations ensure that a property will not become contaminated with toxic or hazardous substances subsequent to the closing of the loan. In the event that a property securing one of our loans is found to be contaminated, it could adversely impair the value of the property and the ability of the borrower to repay the loan. If the borrower fails to remove or clean up contaminated property, it is possible that federal, state or local environmental agencies could perform the removal or cleanup, then impose liens upon, and subsequently foreclose on, the property to pay for the costs of such removal or cleanup. These factors can significantly decrease the value of the property as security for the loan. Furthermore, even if we do not foreclose on a contaminated property, the mere existence of hazardous substances on such real property security may depress the market value of such real property security such that the loan is no longer adequately secured.

In addition, this liability may, under certain circumstances, extend to a lender that has, pre-foreclosure, undertaken certain roles in managing the property or the activities of the borrower such that the lender could be characterized as an "owner" or "operator" under applicable environmental laws, or extend to a lender post-foreclosure. As a result, we may incur full recourse liability for the entire cost of any such removal and cleanup, as well as liability to tenants and other users of the affected property, or users of neighboring property. If we are required to incur such costs or satisfy such liabilities, this could have a material adverse effect on our profitability.

*In the event that a property securing one of our loans is subject to an act of terrorism, war, earthquake, flood, mudslide, act of God or similar events for which we either cannot obtain insurance or are not economically insurable, we may suffer a loss of principal and interest on a loan.*

Although our manager will arrange for comprehensive title, fire and casualty insurance on improved properties securing our loans and may arrange for earthquake insurance depending upon the relevant circumstances, there are certain types of losses that are either uninsurable or not economically insurable. These are losses resulting from acts of terrorism, war, earthquakes, floods, mudslides, acts of God or other similar events. In the event that the property, including any improvements on the property, securing one of our loans suffers losses resulting from one or more of these uninsured events, we will experience a significant decrease in the value of our security interest and, as a result, may suffer a loss of principal and interest on the loan.

*If one of our loans is found to be usurious, we may become subject to penalties and our profitability could be materially impacted.*

Most states have usury laws that establish maximum interest rates that lenders may charge on loans. Severe penalties, including loss of interest and treble damages, may be imposed upon lenders who violate these usury laws. Most, if not all, states with usury laws also have exemptions from these usury laws that allow lenders who qualify for the exemptions to make loans that exceed the maximum usury interest rate without being in violation of the usury laws. In many states, loans that are arranged by a party who is a licensed real estate broker in that state are exempt from usury restrictions. We will utilize licensed real estate brokers or otherwise avail itself of other exemptions that our manager believes will keep our loans from being usurious under applicable state laws. If one of our loans is found to be usurious, it could have a material adverse impact on our profitability.

*In the event that we acquire real property as a result of a foreclosure or otherwise, we will be exposed to risks that are traditionally related to the ownership of real property, such as construction risks, entitlement-related risks, absorption risks and environment-related risks.*

When we acquire any equity or leasehold interest in property by foreclosure or otherwise, we are exposed to the risks of liability incident to real property ownership or tenancy. Owners of real property may be subject to liability for injury to persons and property occurring on the real property or in

–44–

connection with the activity conducted thereon, and liability for non-compliance with governmental regulations. These risks may also include, but are not limited to, the construction risks in taking over and overseeing the completion of a project that has not been completed, the marketing and absorption risk of marketing and selling the homes or units to prospective purchasers or renters, potential liability to owners or renters for design or construction defects, the risks for environmental clean-up costs and related environmental liabilities, the economic risks of managing and operating a rental project. The impact of any of these or other factors described in this Prospectus can adversely impact the ability of our investors to recover the full amount of their initial investment.

### RISKS PARTICULAR TO DEVELOPMENT AND CONSTRUCTION LOANS

We may invest a substantial portion of our assets in loans made for the development or construction of residential and commercial property. The following are risks particular to construction loans that may be made or invested in by us, which could have a material adverse impact on our profitability.

*Increased interest rates, tighter credit, over development of residential homes and adverse economic conditions will most likely result in increased standing inventory for our borrowers who are homebuilders, which, in turn, would adversely affect the ability of these borrowers to repay our loans.*

Periods of high interest rates, tight credit, over development, adverse general economic conditions and a drop in home buyer confidence are among the factors that may make the sale of lots or homes in a project difficult and increase the standing inventory of homes. The slower sales and increased standing inventory reduces the amount of capital available to develop additional lots or build additional homes and, as a result, may result in lower home prices. In this event, the borrower will, most likely, be unable to complete the project on-time and may not be able to repay our loan in a timely manner.

*In the event that a borrower fails to obtain the requisite permits or entitlements for a property, the borrower risks increased costs associated with development and a diminished market value for the property, which, in turn, adversely affect the value of our collateral.*

Some projects that we will lend against may not, at the time the loan is made, have the requisite permits or entitlements necessary to complete the project. These permits and entitlements include zoning approvals, variances, architectural approvals, clearance on environmental impact concerns relating to traffic, open space, school or transit impact, endangered species, wetlands, noise and air quality and compliance with other local, state and federal governmental and quasi-governmental agencies that have jurisdiction over the project. These local, state and federal governmental and quasi-governmental agencies may include the Army Corps of Engineers, which has jurisdiction over areas that constitute wetlands, the Department of Fish and Game, which has jurisdiction to identify and protect endangered species, local planning commissions, which have jurisdiction over building permits, and community advisory committees, which may not have direct approval power but whose input is important in obtaining entitlements for a development.

There is a risk that certain entitlements may not be received, that certain entitlements previously received may be rescinded, that conditions set forth in interim permits may delay the issuance of final permits and that litigation may arise with respect to interim or final permits. In such a case, the borrower would have to bear the cost of holding land that is not fully entitled and, as a result, bear increased costs and the risk of diminished or a complete loss of market value. If this were to occur, the value of our collateral could be diminished. Until such time as the borrower has all final permits for the applicable project and all conditions thereto have been approved by all applicable governmental agencies, the borrower runs the risk of a complete loss of its investment in the applicable project.

*In the event a borrower is unable to timely complete its development project due to factors that traditionally affect construction, the borrower may not be able to satisfy its obligations to us in a timely manner, if at all.*

Any number of variables can adversely affect the ability of a developer to complete the construction of a project on time and within budget. These variables can include, without limitation, inclement weather that creates delays in construction; increases in the cost of materials or labor; shortages of materials or labor; difficulties in scheduling subcontractors or other labor and material providers; unforeseen soil conditions or other physical characteristics of the property; and the presence of hazardous materials that need to be remediated. If any one of these variables were to occur, our borrowers may not be able to complete their projects on time and, as a result, may not be able to satisfy their obligations to us in a timely manner.

Further, if the occurrence of one or more of these variables results in the failure of the borrower to complete a development or the bankruptcy of the borrower, we will be forced to either sell the project in bulk at a price that may not be sufficient to repay the relevant loan or identify and engage a substitute builder to complete the project. Under either scenario, the project will, most likely, be less profitable than expected and, as a result, result in lower returns to us, if any.

*The failure of local housing and development authorities to grant approvals related to building on unimproved land, or the imposition of a moratorium on building on unimproved land, would reduce the market value of the projects securing our loans.*

The housing and development industry is subject to extensive and complex regulations. These regulations affect homebuilding and development by specifying, among other things, the type and quality of building materials that must be used, permitted land uses and levels of density, the installation of services, such as water and waste disposal, the formation of area-wide assessment districts and the attendant costs thereof and the dedication of acreage for open space, parks, schools and other community purposes. Local authorities may refuse to grant approvals or change the forms of their approvals for building on unimproved land for a variety of reasons, including anti-growth ballot initiatives, environmental controls, such as the protection of endangered species or preservation of the natural terrain and coastlines, or water controls. In addition, a state or local authority could impose a building moratorium on property owned by a borrower. The foregoing events could have an adverse effect on a property securing one of our loans, including the inability to complete construction, delays in construction and loss of market value. These could have a material adverse impact on our profitability.

*In the event that the commercial real estate market is unable to absorb additional space, our borrowers may not receive the projected cash flow from the lease of new space and, as a result, may not have sufficient funds to repay their obligations to us.*

With respect to commercial projects such as office buildings or retail properties, adverse changes in general economic or local economic conditions, overbuilding or other factors can adversely affect a borrower's ability to lease its property. The ability of a market to absorb new commercial space is commonly referred to as the absorption rate. If the absorption rate is weak due to any of the factors described in this "Risk Factors" section or for other reasons, or if the rental rate declines below the rental rates that the borrower was anticipating when it commenced construction of its commercial project, a borrower may be unable to sell or refinance the commercial project or may have to refinance or sell the commercial project for less than it had anticipated. In such cases, the refinance or sales proceeds may not be sufficient to repay our loan to the borrower.

*If our borrowers are charged with unanticipated assessments relating to utilities or infrastructure, or if our borrowers are unable to obtain commitments from municipalities for utilities or infrastructure, our borrowers will achieve a reduced return on their developments and may not have sufficient funds to repay our loans.*

Both residential and commercial projects will need access to and the right to use utilities, particularly water, in order to be viable. In some areas, water is a scarce commodity and a project cannot be developed unless economical access to water can be provided. Although we will generally loan money for projects that have obtained "will serve" letters, *i.e.*, written commitments from the applicable utility provider that it will make utilities available to the project, this may not always be the case. Additionally, there is a risk that utility commitments previously received may be rescinded, that there may be difficulties in fulfilling conditions set forth in interim utility commitments and that litigation may arise with respect to such commitments. In such a case, the borrower would have to bear the cost of holding property that is not served by needed utilities and, as a result, bear increased costs and the risk of diminished or a complete loss of market value. If this were to occur, the value of our collateral could be diminished.

In addition, a project may be assessed to pay for the cost of water treatment plants or providing water service to a location where there are no water facilities available or to pay for the cost of other utility facilities. Additionally, municipalities are, with increasing frequency, imposing assessments on new developments to offset the impact of such developments on public infrastructure or services, such as schools, traffic, police or fire services, open space and other recreational facilities. These assessments will increase the property tax burden for the project, and may make the project less attractive to homebuyers or prospective tenants.

### TAX-RELATED RISKS

The discussion set forth in the section entitled "Federal Income Tax Consequences" is a summary of the expected material federal income tax consequences associated with the ownership and disposition of our membership units. We believe that such discussion fairly summarizes the relevant federal income tax consequences that are likely to be material to investors. Such discussion is intended to address only federal income tax consequences that are generally applicable to all investors who will become members. Before making a decision to invest in our membership units, each investor should assess the tax risks and its willingness and ability to comply with ongoing federal income tax filing and compliance requirements described under "Federal Income Tax Consequences."

For example, the investors will be allocated income but may not receive cash distributions in connection therewith with which to pay any associated income taxes. Additionally, our manager expects that our income will be unrelated business taxable income. Unrelated business taxable income, as opposed to certain other forms of income, is taxable to many tax-exempt institutional investors.

The specific tax consequences of the ownership and disposition of our membership units by investors will vary for each investor due to the unique circumstances surrounding each investor. Therefore, it is imperative that prospective investors review the discussion set forth in the section entitled "Federal Income Tax Consequences" and consult with their respective tax advisor to determine the interaction of their respective individual tax situation with the anticipated tax consequences of the ownership and disposition of our membership units. We have not requested and do not propose to request a ruling from the Internal Revenue Service or an opinion from tax counsel concerning any tax matters discussed herein.

## DISTRIBUTION POLICY

We make distributions to members only from cash that is available for distribution.  Our operating agreement defines the term, "cash available for distribution," to mean the total cash revenues generated by our operations (including proceeds from the sale or refinancing of assets) during any calendar month, less all of our cash expenditures for debt service and accrued operating expenses, depreciation and amortization during such month, including a reasonable amount to be set aside for reserves to be determined by our manager.  Cash available for distribution will be determined by computing the net income during the calendar month on the accrual basis.  In this regard, our manager bases its determination of the amount of distributions to be made to members on, in part, the projected returns from loans that are either impaired or non-performing, but have sufficient security to satisfy the amounts owed to us.  As a result of our manager's assessment of these loans, our members will be distributed cash based on, in part, projected income and will incur the tax burden with respect to such projected income in the year the income is deemed to have been earned.  If our manager is not able to recover the amounts owed from the relevant impaired or non-performing loan, we will be required to offset loss on these loans against future income and, as a result, will have less cash to distribute to our members.

Upon subscription for our membership units, members may elect to either receive monthly cash distributions or have their monthly cash distributions reinvested.  The ability to reinvest monthly cash distributions is strictly dependent upon the continued registration of this offering with the Nevada Securities Division and either the registration of our membership units under the Securities Act or the availability of an exemption from such registration.  Members who have elected to have their monthly cash distributions reinvested may not change their election until the first anniversary of their admission as members.  Upon the one-year anniversary and on an annual basis thereafter (as long as the member has provided our manager with prior written notice of 30 days), a member may elect to have the monthly cash distributions paid out in cash rather than reinvested.  The monthly cash distributions that are reinvested shall be used to make additional loans.  The earnings from these additional loans, if any, will be allocated among all of members; however, members who have elected to reinvest their monthly cash distributions will be allocated a greater share of any earnings due to the relatively larger of membership units held as a result of reinvestment.

In terms of the payment or reinvestment of our monthly cash distributions, we will distribute to members who have elected to receive cash payments of said distributions promptly after the end of the relevant calendar month, and we will reinvest said distributions as of the first day of the succeeding calendar month.  In addition, if an investor is admitted as a member, or a member purchases additional membership units, at any time other than the 1st and 16th day of a month, then the cash available for distribution to the member for such month shall be prorated on a per diem basis, assuming a 30 day month.

With respect to the limitations on distributions, members do not have the right to demand from us distributions in any form other than cash.  In addition, members may not receive distributions to the extent that such distributions would cause our liabilities (other than liabilities to members on account of their respective membership units) to exceed the fair value of our assets.

During the years ended December 31, 2002 and 2001, we authorized distributions to members of $11,429,712 and $5,704,993, respectively, where of such distributions, $3,891,112 and $2,315,378, respectively, were reinvested by members.  With respect to the distributions authorized in the year ended December 31, 2001, $460,595 were paid in the year ended December 31, 2002.  The distributions to members for the years ended December 31, 2002 and 2001 represented annual returns of 11.96% per annum and 12.74% per annum, respectively.

## SUMMARY OF OPERATING AGREEMENT

The following is a summary of our operating agreement dated as of February 10, 2000, and is qualified in its entirety by the terms of our operating agreement itself. Potential investors are urged to read the entire operating agreement, which is set forth as **Exhibit B** to this Prospectus.

### Rights and Liabilities of Members

The rights, duties and powers of our members are governed by our operating agreement and by the Nevada Revised Statutes. The discussion herein of such rights, duties and powers is qualified in its entirety by reference to our operating agreement and the Nevada Revised Statutes.

Investors who become members in USA Capital Diversified Trust Deed Fund in the manner set forth herein will not be responsible for our obligations and will be liable only to the extent of their agreed upon capital contributions. Members may be liable for any return of capital plus interest if necessary to discharge liabilities existing at the time of such return. Any cash distributed to our members may constitute, wholly or in part, return of capital.

Our members will have no control over our management except that, in some cases with the consent of our manager, members holding at least 75% of the outstanding membership units may approve or disapprove any of the following matters:

- Our dissolution and termination;

- Our merger or consolidation with one or more other entities;

- Amendment of our operating agreement (other than certain amendments for which no approval is required); and

- Removal of our manager and election of a successor manager.

In addition, upon the cessation of our manager for any reason (such as the withdrawal or resignation of our manager), members holding at least 75% of the outstanding membership units may elect a replacement manager to continue our business.

All questions as to the rights and obligations arising under our operating agreement are subject to arbitration, where such arbitration shall be governed by the rules of the American Arbitration Association. In the event of a dispute should arise under our operating agreement, a member may, within 60 days, make a demand for arbitration. The results of the arbitration are binding and the losing party is responsible for the costs of such arbitration.

### Capitalization

We currently have a maximum capitalization of $200,000,000, or 8,000 membership units. Although our operating agreement provides for our maximum initial capitalization to be $100,000,000, or 4,000 membership units, our operating agreement also reserves the right of our manager to issue additional membership units in excess of $100,000,000, *i.e.*, the maximum initial capitalization, from time to time without the approval of our members. Accordingly, through the written consent of our manager, our capitalization was increased to $200,000,000.

## Capital Contributions

Our membership units will be sold at a price per unit of $25,000, and no person may acquire less than one membership unit except under the following circumstances: (i) members who elect to reinvest monthly distributions of income from our operations shall be entitled to purchase fractional membership units with such reinvested distributions, and (ii) investors who are allowed, in our manager's sole discretion, to contribute pre-existing loans to us shall be entitled to purchase fractional membership units equal to the amount of such loans. Our manager has contributed the sum of $50,000 to us as our initial member.

At the discretion of our manager, our members may be allowed to contribute entire or fractional interests in pre-existing loans that are secured by first deeds of trust in exchange for our membership units. Any such loans that are contributed shall not be in default at the time of contribution, shall satisfy the foregoing lending guidelines and must have been originated by our manager or its affiliates. The amount of units sold to a member in exchange for such a contribution shall be equal to the then-outstanding principal balance of the loan, together with any accrued but unpaid interest (or a proportionate share of such loan balance with respect to the contribution of a fractional loan interest).

## Rights, Powers and Duties of Manager

Subject to the right of the members to vote on specified matters, our manager will have complete charge to manage and carry out our purposes, business and affairs. Our manager is not required to devote full time to our affairs but only such time as is required for the conduct of our business. Our manager acting alone has the power and authority to act for and bind us

Our manager is granted the special power of attorney of each member for the purpose of executing, acknowledging, publishing and filing certain documents on behalf of each member. These documents include our operating agreement, our articles of organization, any certificates, instruments and documents as may be required in connection with our business and any documents as may be required to effect our continuation, the admission of an additional or substitute member or our dissolution or termination. The special power of attorney is coupled with an interest, is irrevocable and shall survive the death of each member.

Our operating agreement provides that our manager and its agents shall not have any liability to us or any of our members for any loss suffered by us of our members that arises out of any action or inaction of our manager or its agents so long as our manager or its agents, in good faith, determined that such course of conduct was in our best interests and did not constitute intentional misconduct, fraud or knowing violation of the law. In addition, we may elect to advance expenses to our manager or its agents in defending a civil or criminal action, suit or proceeding as incurred and in advance of the final disposition of the action.

## Profits and Losses

Our profits and losses accrued during any calendar month will be allocated to our members as of the last day of such calendar month. Profits and losses allocable to our members will be allocated among them in accordance with their respective outstanding capital account balances as of the first day of such month. We will only admit investors as members on the 1st and 16th day of each month. If an investor is admitted as a member, or if a member purchases additional membership units, on the 16th day of the month, then the profits and losses allocable to the member for such month shall be prorated on a per diem basis, assuming a 30 day month.

Upon transfer of membership units (if permitted under our operating agreement and applicable law), profit and loss will be allocated to the transferee beginning with the next succeeding calendar month.

### Meetings of Members

We will hold annual meetings for all members on a date established by our manager. Our manager reserves the right to call special meetings of the members with prior written notice of at least 30 days, which notice shall state, in addition to the date, time and location of the meeting, the general purpose(s) of the special meeting. A majority of the outstanding membership units shall constitute a quorum at such meetings. Our members may vote in person or by proxy with respect to those matters in which members have, under our operating agreement, approval rights.

### Accounting and Reports

Our manager will cause to be prepared and furnished to members an annual report of our operation, which will be audited by an independent accounting firm. Within 90 days of the close of the year covered by the report, a copy or condensed version will be furnished to our members. Our members shall be furnished such detailed information as is reasonably necessary to enable them to complete their own tax returns within 90 days after the end of the year. During business hours and with five days' prior notice, any member or the member's legal representative may inspect our financial statements and other books and records as they relate to our internal affairs.

### Amendment of our Operating Agreement

Our operating agreement may be amended by our manager alone with respect to certain matters described in our operating agreement, or upon the vote of members holding at least 75% of the outstanding membership units with respect to all other matters.

### Withdrawal from USA Capital Diversified Trust Deed Fund

A member has no right to withdraw or to obtain the return of all or any portion of sums paid for the purchase of our membership units (or reinvested earnings with respect thereto) for at least 12 months after the date such membership units are purchased. After 12 months from a member's admission and on each anniversary thereafter, members may withdraw all or part of their capital accounts by providing written notice of such member's election to withdraw at least 30 days but not sooner than 60 days prior to each anniversary of such member's admission, where a form of such notice is attached hereto as **Exhibit D**. Notwithstanding the foregoing, if a proposed withdrawal would cause a member's capital account to fall below $25,000, then the member must withdraw the entire amount of the capital account. Additionally, if a member has purchased membership units over time, then such member shall not be entitled to withdraw any portion of the relevant capital account that relates to membership units which have not been held by such member for at least one year. Our manager will, to the extent of available cash flow, then commence to return the member's capital account.

The amount that a withdrawing member will receive is based on the withdrawing member's capital account. A capital account is a sum calculated for tax and accounting purposes, and may be greater than or less than the fair market value of such member's membership units. The fair market value of a member's membership units will generally be irrelevant in determining amounts to be paid upon withdrawal, except to the extent that the current fair market value of our loan portfolio is realized by sales of existing loans (which sales are not required to be made).

We will not establish a reserve from which to fund withdrawals and, accordingly, our capacity to return a member's capital account is restricted to the availability of cash flow. For this purpose, cash flow is considered to be available only after all current expenses have been paid (including compensation to our manager and affiliates), adequate reserves have been established for anticipated expenses, and adequate provision has been made for the payment of all monthly cash distributions on a pro rata basis which must be paid to our members who elected to receive, rather than reinvest, such distributions.

Our manager anticipates funding member withdrawals from the following sources: interest and principal payments from fund loans; funds contributed by new investors; and, in our manager's sole discretion, draws on our revolving credit facility. If our current cash flow is inadequate to return a member's capital account, we are not required to liquidate any loans prior to maturity for the purpose of liquidating the capital account of a withdrawing member, and is merely required to continue paying whatever cash flow is available to withdrawing members.

Members who seek to withdraw shall be allowed to do so, subject to available cash flow, on a "first come, first serve" basis (*i.e.*, we will fund member withdrawals in the order in which member withdrawal notices are received by our manager); provided, however, that certain members may have priority upon the death of such members or if such members are ERISA plan investors, as described more fully in our operating agreement. Subject to the foregoing, a member whose withdrawal notice was received first shall be entitled to a return of that member's entire capital account before we shall return any of the capital account of a member whose withdrawal notice was received on a later date. Notwithstanding the foregoing, if we dissolve, from and after such date, all members shall have equal priority as to the return of their capital accounts regardless of when they submitted withdrawal notices.

Upon our dissolution and termination, a five-year winding-up period is provided for liquidating our loan portfolio and distributing cash to members. Due to high prevailing interest rates or other factors, we could suffer reduced earnings (or losses) if a substantial portion of our loan portfolio remains and must be liquidated quickly at the end of such winding-up period. Members who complete a withdrawal prior to any such liquidation will not be exposed to this risk. Conversely, if prevailing interest rates have declined at a time when the loan portfolio must be liquidated, unanticipated profits could be realized by those members who remain in the fund until its termination.

**Limitations on Transferability**

Our operating agreement places substantial limitations upon transferability of membership interests. Any transferee (including a donee) must be a person or entity which would have been qualified to purchase a membership unit in this offering. No membership units may be transferred if, in the judgment of our manager, a transfer would jeopardize our tax status as a partnership or cause our termination for federal income tax purposes.

A transferee may not become a substituted member without the consent of our manager. A transferee who does not become a substituted member will own an economic interest which entitles him or her only to the share of income or return of capital to which the transferor would be entitled. Economic interest owners will have no voting rights whatsoever or any right to inspect records or receive information from us.

**Term**

We were organized on February 3, 2000. Our term will end on the earlier of the date chosen by our manager, in its sole discretion, pursuant to the terms of our operating agreement or by operation of law.

## Winding Up

Upon the occurrence of an event of dissolution under our operating agreement, our manager shall wind up our affairs as follows:

- Cease making or purchasing any new loans;

- Liquidate our assets as promptly as is consistent with obtaining the fair current value thereof, either by sale to third parties or by collecting loan payments under the terms of the loan;

- Apply and distribute to members, in proportion to the positive balances in their respective capital accounts, all sums of cash received during the winding up process; provided, however, all of our debts have been paid or otherwise adequately provided for; and

- Upon the completion of the liquidation and the distribution of liquidation proceeds, cause to be filed Articles of Dissolution with the Nevada Secretary of State and furnish a statement to our members of the receipts and disbursements made during the winding up process.

In the event we dissolve at a time when there are outstanding unfulfilled withdrawal requests, such withdrawal requests will be of no further force or effect and all members will thereafter be entitled to receive their pro rata portion of all liquidating distributions from us in accordance with their respective outstanding capital account balances.

## Merger with Other Business Entities

Our manager, upon the prior written consent of members representing at least 75% of our outstanding membership units, will have the right to merge us with one or more other business entities (of which our manager may be a sponsor or co-sponsor).

## FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of the anticipated federal income tax aspects of an investment in our membership units. Because this is a summary, it does not contain all the information that may be important to all investors. This summary is based on the Internal Revenue Code in existence on the date of this Prospectus, existing laws, judicial decisions and administrative regulations, rulings and practice, any of which are subject to change, and these changes could be retroactive.

We may be subject to state and local taxes in states and localities in which the Internal Revenue Service or state authorities deem us to be doing business, and except for the reference to specific states, this discussion does not cover state or local tax consequences investors may incur in connection with their investment.

The Internal Revenue Service may challenge some of the deductions we intend to claim or positions we intend to take for tax purposes. The Internal Revenue Service has increased its audit efforts with respect to limited partnerships and limited-liability companies, and an audit of our information return may result in, among other things, an increase in our gross income, the disallowance of certain deductions or credits we have claimed or in an audit of the income tax returns of investors.

Any audit adjustments made by the Internal Revenue Service could adversely affect investors even if none of these adjustments are ultimately sustained, since the investors will, directly or indirectly, bear the expense of contesting the adjustments.

We urge all investors to consult and rely upon their own tax advisors with respect to their own tax situation, potential changes in applicable laws and regulations and the federal and state consequences arising from an investment in our membership units. The cost of the consultation could, depending on the amount charged to investors, decrease any return anticipated on investment. Nothing in this Prospectus is or should be construed as legal or tax advice to any specific investor, as individual circumstances may vary. This federal income tax consequences section of this Prospectus only provides the current state of tax laws. All investors should be aware that the Internal Revenue Service may not agree with all tax positions taken by us and that legislative, administrative or court decisions may reduce or eliminate an investor's anticipated tax benefits.

### Fund Tax Status

We intend to be treated for federal income tax purposes as a partnership and not as an association taxable as a corporation. Under treasury regulations issued in December 1996, a domestic limited-liability company with more than one member will be classified as a partnership for federal income tax purposes unless it makes an election to be classified as an association taxable as a corporation. We are a domestic limited-liability company and have more than one member. Our manager will not cause us to make an election to be classified as an association taxable as a corporation. Based on the foregoing, we intend to be treated as a partnership for federal income tax purposes and not as an association taxable as a corporation.

Assuming that we will be classified as a partnership for federal income tax purposes, in the discussion that follows, as the context requires:

- The use of the term partnership will be construed to refer also to a limited-liability company classified as a partnership for federal income tax purposes;

- The use of the term partner will be construed to refer also to a member of a limited-liability company; and

–54–

- The use of the terms partnership interest or interest in the partnership or similar terms will be construed to refer also to the interest of a member in a limited-liability company.

## Publicly Traded Partnership Rules

In 1987, Congress added Section 7704 to the Internal Revenue Code, which taxes certain publicly traded partnerships as corporations. If we were taxed as a corporation for federal income tax purposes, we would be a separate taxable entity. In such a case, we, rather than our investors, would be taxed on the income and gains, and would be entitled to claim the losses and deductions, resulting from its operations. A distribution from us to an investor would be taxable to the investor in the same manner as a distribution from a corporation to a stockholder. The effect of the foregoing would substantially reduce the after-tax economic return on an investment in our membership units.

A partnership will be deemed a publicly traded partnership if its interests are traded on an established securities market, or its interests are readily tradable on a secondary market or the substantial equivalent thereof.

Our manager believes that our membership units will not be traded on an established securities market and will not be readily tradable on a secondary market (or the substantial equivalent thereof) within the meaning of the treasury regulations. Accordingly, we believe that we will not be classified as a publicly traded partnership under Section 7704 of the Internal Revenue Code. If, however, we are classified as a publicly traded partnership, we will be taxed as a corporation, and our income and losses would be subject to different passive loss rules under Section 469 of the Internal Revenue Code, all as discussed below.

## Alternative Minimum Tax

Depending on each investor's own tax situation, an investment in our membership units could create or increase an investor's liability under the alternative minimum tax provisions applicable to corporations or individuals, as the case may be. We urge each investor to consult the investor's own tax advisor in this regard.

## Determination of Basis in Our Membership Units

Investors will not be taxed on distributions received from us unless the distributions exceed the investors adjusted basis in their respective membership units. The adjusted basis of investors in their respective membership units is the amount each investor originally paid for the membership units increased by:

- The investor's proportionate share of partnership indebtedness with respect to which no investor is personally liable;

- The investor's proportionate share of our taxable income; and

- Any additional capital contributions made by the investor;

and decreased by:

- The investor's proportionate share of our losses;

- The amount of cash, and fair value of noncash, distributions to the investor; and

–55–

- Any decreases in the investor's share of any of partnership nonrecourse liabilities.

Any increase in nonrecourse liabilities is treated as a cash contribution and a decrease in nonrecourse liabilities is treated as a cash distribution, even though an investor does not actually contribute or receive cash. Distributions in excess of an investor's basis generally will be treated as gain from the sale or exchange of an investor's membership units.

**Taxation of Income**

Under the laws pertaining to federal income taxation of limited-liability companies that are treated as partnerships, no federal income tax will be paid by us as an entity. Each individual investor will report on the investor's own federal income tax return the investor's distributive share of our income, gains, losses, deductions and credits, whether or not any actual distribution is made to such investor during a taxable year. Each individual investor may deduct the investor's distributive share of our losses, if any, to the extent of the tax basis in the investor's membership units at the end of the fiscal year in which the losses occurred. The characterization of an item of profit or loss will usually be the same for the investor as it is for us. Since individual investors will be required to include our income in their personal income without regard to whether there are distributions of our income, such investors will become liable for federal and state income taxes on our income even though they have received no cash distributions from us with which to pay such taxes owed.

**Computation of Gain or Loss on Sale or Redemption of Our Membership Units**

If an investor sells the investor's membership units, including a sale of membership units to us in a redemption transaction, the investor will recognize gain or loss on the sale measured by the difference between the amount realized and the adjusted basis in the investor's membership units.

**Character of Gain or Loss**

Gain on the sale of membership units that have been held over 12 months should be taxable as long-term capital gain, except for that portion of the gain allocable to substantially appreciated inventory items and unrealized receivables, as those terms are defined in Section 751 of the Internal Revenue Code, which would be treated as ordinary income. We may have unrealized receivables arising from the ordinary income component of market discount bonds. In addition, if we hold property as a result of foreclosure, which is unsold at the time an investor sells the investor's membership units, or holds an investment in a mortgage loan that is classified as an equity interest, the amount of ordinary income that would result if we were to sell the property is expected to be an unrealized receivable.

**Distributions**

To the extent cash distributions do not exceed the tax basis in the investor's membership units, they will constitute a return of capital, and each investor will be required to reduce the tax basis of the investor's membership units by the amount of such distributions and to use such adjusted basis in computing gain or loss, if any, realized upon the sale or the disposition of our membership units. Such distributions will not be taxable to investors as ordinary income or capital gain until there is no remaining tax basis, and thereafter, may be taxable as gain from the sale or exchange of our membership units. Investors will be taxed each year on their share of our income, even if they elect to have their share of our distributions reinvested through the purchase of additional membership units. Investors who elect to reinvest will have to pay taxes on their share of our income even though they did not receive any cash from us.

Distributions by us to investors may take the form of either actual cash distributions, or deemed distributions. A deemed distribution is treated as a cash distribution and can result from an investor's

–56–

decision to participate in our distribution reinvestment plan. If an investor elects to participate in our distribution reinvestment plan, under the terms of our operating agreement, the investor will be deemed to have received a distribution that is related to our income and to have recontributed the same amount to us.

**Limitations on Deductions of Losses**

The ability of investors to deduct their share of our losses or deductions during any particular year is subject to the basis limitation, the at-risk limitation, the passive loss limitation and the limitation on the deduction of investment interest.

1.    Basis Limitation

Investors will not be able to deduct from their respective taxable income any amount attributable to their share of our losses or deductions that are in excess of the tax basis of the investors' membership units at the end of our taxable year in which the losses or deductions occur. Any loss or deduction that is disallowed by reason of the basis limitation may be carried forward and deducted in later tax years to the extent that the investors' tax basis in their membership units is increased in such later years (subject to the application of the other limitations discussed below).

2.    At-Risk Limitation

Investors, other than corporations that are neither S-corporations nor certain closely-held corporations, may not deduct from their taxable income any amount attributable to their share of our losses or deductions that are in excess of the amount for which investors are considered to be at-risk with respect to such activities at the end of our tax year in which the loss or deduction occurred. In general, investors will initially be "at risk" to the extent of the basis in such investors' membership units (unless they borrowed amounts on a nonrecourse basis to acquire such membership units). This initial at-risk amount generally will be increased by the investor's share of our income and gains and decreased by the investor's share of our losses and deductions and the amount of distributions made to such investor.

Any loss or deduction that may not be deducted by reason of the at-risk limitation generally may be carried forward and deducted in later taxable years to the extent that such investor's at-risk amount is increased in such later years (subject to application of the other limitations). Generally, the at-risk limitation is to be applied on an activity-by-activity basis.

If the amount for which an investor is considered to be at-risk with respect to our activities is reduced below zero (e.g., by distributions), the investor will be required to recognize ordinary income to the extent that such investor's at-risk amount is reduced below zero. The amount of ordinary income so recognized, however, cannot exceed the excess of the amount of our losses and deductions previously claimed by an investor over any amounts of ordinary income previously recognized pursuant to the at-risk limitation rules.

3.    Passive Loss Limitation

The Tax Reform Act of 1986 strictly limited the use by an investor, other than an investor that is not an S-corporation, a certain closely-held corporation, or a personal service corporation, of losses from a passive investment in a business, such as an investment as an investor in the fund, to offset income from other sources. Under this limitation, losses from a passive activity can generally be used only to offset income from other passive activities, but cannot be used to offset "portfolio income," which is defined generally as interest, dividends, royalties and gain derived from the disposition of property other than an interest in a passive activity held for investment (i.e., interest received by us on temporary investments of working capital), or active business income, including, without limitation, earned income. A passive

activity is defined as any activity that involves the conduct of a trade or business in which the taxpayer does not materially participate or any rental activity. Passive activity losses that cannot currently be used to offset passive activity income can be carried forward indefinitely to offset passive activity income in future years, and may be deducted in full when a taxpayer disposes of its entire interest in such activity.

Assuming we are engaged in a trade or business, our income or losses allocable to investors, other than interest income and other portfolio income, should be passive activity income or loss that would be aggregated with the other passive activity income and losses (other than income and losses from publicly traded partnerships) of each investor in determining the effect of the passive loss limitation on such investor. As a result, the ability of an investor to utilize our losses, if any, on a current basis will generally depend upon whether such investor has other passive activity income, taking into account all other passive activity income and losses (other than income and losses from publicly traded partnerships), after application of the "at-risk" rules, which are discussed above. Assuming an investor's participation in the fund is considered to be a passive activity, the ability of such investor to offset our income, if any, on a current basis will generally depend upon whether such investor has passive activity losses from other sources (other than publicly traded partnerships).

If we are classified as a "publicly traded partnership" (and not taxed as a corporation), each investor's share of our income could not be offset by losses of the investor from any other source. Any of our losses would be held in suspense at the investor level and could be used only to offset future income from us or upon a complete disposition of an investor's interest in us.

4.    Non-business Interest Limitation

Generally, the "investment interest" of a taxpayer (other than a corporation) may be deducted only to the extent of the taxpayer's "net investment income." Any investment interest that is not deductible solely by reason of this limitation may be carried forward to later tax years and treated as investment interest in such later tax years. In general, investment interest is any interest paid or accrued on debt incurred or continued to purchase or carry property held for investment, and net investment income includes gross income and gains from property held for investment and is reduced by expenses that are directly connected with the production of such income and gains.

To the extent that interest is attributable to a passive activity, which may include interest incurred or deemed to have been incurred by an investor to acquire or carry its interests and an investor's share of interest incurred by a partnership in connection with its operations, it is treated as a passive activity deduction and is subject to limitation under the passive loss limitation discussed above and not under the investment interest limitation. In addition, the effect of the investment interest limitation on a particular investor will depend on such investor's specific tax situation. Accordingly, each investor should consult with the investor's own tax advisor.

**Depreciation**

From time to time we may acquire equity or leasehold interests in real property by foreclosure. The cost of the improvements on any of these owned real properties may be recovered through depreciation deductions over a period of 39 years.

**Investment Interest**

Section 163(d) of the Internal Revenue Code, applicable to non-corporate taxpayers and S-corporation stockholders, limits the deductibility of interest incurred on loans used to acquire or carry property held for investment. Property held for investment includes all investments held for the production of taxable income or gain, but does not include trade or business property or interest incurred to construct

trade or business property.  Investment interest is deductible by non-corporate taxpayers and S-corporation stockholders only to the extent it does not exceed net investment income for the taxable year.

Net investment income is the excess of investment income over the sum of investment expenses. Interest expense we incur and interest expense incurred by investors to acquire their membership units will not be treated as investment interest to the extent attributable to a passive activity conducted by us. However, that portion of interest expense allocable to portfolio investments is subject to the investment interest limitations.

Interest attributable to debt an investor incurs in order to purchase or carry our membership units may constitute investment interest subject to these deductibility limitations.  Each investor should consider the effect of investment interest limitations on using debt financing for the investor's purchase of our membership units.

**Property Held Primarily for Sale; Potential Dealer Status**

We were organized to invest in loans primarily secured by deeds of trust on real property.  However, if we were, at any time, deemed for federal tax purposes to be holding one or more of our loans primarily for sale to customers in the ordinary course of business, any gain or loss realized upon the disposition of such loans would be taxable as ordinary gain or loss rather than as capital gain or loss.  The federal income tax rates for ordinary income are higher than those for capital gains.  In addition, income from sales of loans to customers in the ordinary course of business would also constitute unrelated business taxable income to any investors that are tax-exempt entities.  Under existing law, whether or not real property is held primarily for sale to customers in the ordinary course of business must be determined from all the relevant facts and circumstances.  We intend to make and hold all of our loans for investment purposes only, and to dispose of our loans, by sale or otherwise, at the discretion of our manager and as consistent with our investment objectives.  It is possible that, in so doing, we will be treated as a "dealer" in mortgage loans, and that profits realized from such sales will be considered unrelated business taxable income to otherwise tax-exempt investors in us.

**Unrelated Business Taxable Income**

Our membership units may be offered and sold to certain tax-exempt entities (such as qualified pension or profit sharing plans) that otherwise meet the investor suitability standards described elsewhere in this Prospectus.  Such tax exempt entities generally do not pay federal income taxes on their income unless they are engaged in a business that generates "unrelated business taxable income," as that term is defined by Section 513 of the Internal Revenue Code.  Under the Internal Revenue Code, tax-exempt purchasers of membership units will be deemed to be engaged in an unrelated trade or business by reason of interest income earned by us.  Interest income, which will constitute the primary source of our income, does not constitute an item of unrelated business taxable income, except to the extent it is derived from "debt-financed property."  We will utilize borrowed funds in order to make loans.  Therefore, some portion of the interest earned on our loans will constitute unrelated business taxable income and investors that are otherwise exempt from federal and state income taxes will realize some taxable income by reason of interest income earned by us.

Rents from real property and gains from the sale or exchange of property are also excluded from unrelated business taxable income, unless the property is held primarily for sale to customers or is acquired or leased in certain manners described in Section 514(c)(9) of the Internal Revenue Code. Therefore, unrelated business taxable income may also be generated if we operate or sell at a profit any property that has been acquired through foreclosure on a loan made by us, but only if such property is deemed to be held primarily for sale to customers or is acquired from or leased to a person who is related to a tax-exempt investor in us.

The trustee of any trust that purchases our membership units should consult with the trustee's tax advisors regarding the requirements for exemption from federal income taxation and the consequences of failing to meet such requirements, in addition to carefully considering the trustee's fiduciary responsibilities with respect to such matters as investment diversification and the prudence of particular investments.

### Partnership Tax Returns, Tax Information and Audits

Our manager will prepare our income tax returns.  In connection with the preparation of our income tax returns, our manager will prepare and distribute to the investors, not later than ninety days after the close of each fiscal year, all information necessary in the preparation of the investors' federal income tax returns, including our Schedule K (Form 1065), and each investor's respective Schedule K-1.  Such information will not be supplied to assignees that are not substitute investors.

Investors are required to report their distributive share of the items set forth on their own Schedule K-1 on their respective individual tax returns consistent with our treatment of the items on its returns.  An investors may report an item inconsistently if the investor files a statement with the Internal Revenue Service identifying the inconsistency.  Otherwise, the Internal Revenue Service may summarily assess additional taxes necessary to make an investor's treatment of the item consistent with our treatment of the item without a notice of deficiency or an opportunity to protest the additional tax in the United States Tax Court being afforded to the investor.  Penalties for intentional disregard of the consistency requirements may also be assessed.

The Internal Revenue Service may audit our tax returns.  Tax audits and adjustments are made at our level in one unified proceeding, the results of which are binding on all investors.  Investors may, however, protest the additional tax paying the full amount thereof and suing for a refund in either the U.S. Claims Court or a U.S. District Court.

### USA Capital Realty Advisors, LLC is Tax Matters Partner

A limited-liability company that is classified as partnership for tax purposes must designate a tax matters partner to represent it in dealing with the Internal Revenue Service.  USA Capital Realty Advisors, LLC will serve as the tax matters partner to act on our behalf and on behalf of the investors with respect to partnership items, to deal with the Internal Revenue Service and to initiate any appropriate administrative or judicial actions to contest any proposed adjustments at the partnership level.

If an investor own less than 1% of our outstanding membership units, the investor will not receive notice from the Internal Revenue Service of these administrative proceedings unless the investor forms a group with other investors, having an aggregate interest of 5% or more, and request the notice.

Adjustments, if any, resulting from any audit may require an investor to file an amended tax return, and may result in an audit of the investor's own tax return.  Any audit of an investor's tax return could result in adjustments of items unrelated to our operations as well as income and losses from our operations.

### Original Issue Discount Rules

The original issue discount rules under the Internal Revenue Code pertain to mortgage loans and obligations issued by us.  The effect will be that we will realize as interest income the amount that economically accrues under a mortgage loan during the course of the year, using compound interest concepts, even where a lesser amount is actually paid or accrued under its terms.  Identical concepts will be used for determining our interest deduction on its obligations, if any.

**Market Discount**

We may purchase mortgage investments for an amount substantially less than the remaining principal balance of the mortgage investments. Each monthly payment which we receive from a mortgagor will consist of interest at the stated rate for the investment in a mortgage loan and a principal payment. If we purchase an investment in a mortgage loan at a discount, for federal income tax purposes the principal portion of each monthly payment will constitute the return of a portion of our investment in the investment in a mortgage loan and the payment of a portion of the market discount for the investment in a mortgage loan.

We will recognize the amount of each monthly payment attributable to market discount as ordinary income, but the amount of each monthly payment representing the return of our investment will not constitute taxable income to us. The Internal Revenue Code also treats accrued market discount as ordinary income on the sale of an investment in a mortgage loan.

**Possible Legislative Tax Changes**

In recent years there have been a number of proposals made in Congress by legislators, government agencies and by the executive branch of the federal government for changes in the federal income tax laws. In addition, the Internal Revenue Service has proposed changes in regulations and procedures, and numerous private interest groups have lobbied for regulatory and legislative changes in federal income taxation. It is impossible to predict the likelihood of adoption of any proposal, the likely effect of any proposals upon the income tax treatment presently associated with investment in mortgage loans or membership units or the effective date, which could be retroactive, of any legislation that may derive from any past or future proposal.

We strongly urge each investor to consider ongoing developments in this uncertain area and to consult the investor's own tax advisors in assessing the risks of investment in our membership units.

**State and Local Taxes**

We currently contemplate investing in or purchasing loans primarily in the United States, but we may invest up to 10% of our loan portfolio in loans secured by real property located outside of the United States. Nevada does not have an income tax law, and we believe that no taxes will be imposed by the State of Nevada or any of its localities on our assets or income or on any investor's share of any income derived from our activities in Nevada.

Other states and localities may impose a tax on our assets or income or on each investor based on the investor's share of any income derived from our activities in those states and localities.

If an investor is an entity that is exempt from federal income taxation, it is likely that the investor is also exempt from state and local taxation.

The state in which an investor resides may impose taxes on the investor's share of any income derived from the investor's interest in our membership units. Each investor should consult with the investor's own tax advisors concerning the applicability and impact of any state and local tax laws in the investor's state of residence.

**Allocations Between Transferor and Transferee**

Our operating agreement provides that we will allocate our income, gains, losses and deductions between transferors and transferees of our membership units in a manner that complies with Section 706(d) of the Internal Revenue Code and the regulations promulgated thereunder.

**Portfolio Income**

Our primary source of income will be interest, which is ordinarily considered "portfolio income" under the Internal Revenue Code. Similarly, temporary regulations issued by the Internal Revenue Service in 1988 (Temp. Reg. §1.469-2T(f)(4)(ii)) confirmed that net interest income from an equity-financed lending activity such as the fund will be treated as portfolio income, not as passive income, to investors. Therefore, investors will not be entitled to treat their proportionate share of our income as "passive income," against which passive losses (such as deductions from unrelated real estate investments) may be offset.

**Distributions to Foreign Investors**

Generally, Sections 1441 through 1446 of the Internal Revenue Code will require us to withhold 30% of any distribution of income that is effectively connected with the conduct of a trade or business in the United States and income derived from sources within the United States that is not effectively connected with the conduct of a trade or business within the United States. Such withholding percentage may be reduced by an existing tax treaty. Foreign individuals and entities should consult their own tax advisors for additional information on this matter.

## ERISA CONSIDERATIONS

The Employee Retirement Income Security Act of 1974, or ERISA, contains strict fiduciary responsibility rules governing the actions of "fiduciaries" of employee benefit plans. It is anticipated that some members will be corporate pension or profit-sharing plans and Individual Retirement Accounts, or other employee benefit plans that are subject to ERISA. In any such case, the person making the investment decision concerning the purchase of Units will be a "fiduciary" of such plan and will be required to conform to ERISA's fiduciary responsibility rules. Persons making investment decisions for employee benefit plans (*i.e.*, "fiduciaries") must discharge their duties with the care, skill and prudence which a prudent man familiar with such matters would exercise in like circumstances. In evaluating whether the purchase of Units is a "prudent" investment under this rule, fiduciaries should consider all of the risk factors set forth in this Prospectus. Fiduciaries should also carefully consider the possibility and consequences of unrelated business taxable income as well as the percentage of plan assets which will be invested in the fund insofar as the diversification requirements of ERISA are concerned. An investment in the fund and our membership units is relatively illiquid, and fiduciaries must not rely on an ability to convert an investment in our membership units into cash in order to meet liabilities to plan participants who may be entitled to distributions.

Due to the complex nature of ERISA, all investors are urged to consult their own tax advisor or pension consultant to determine the application of ERISA to their prospective investment.

### Plan Asset Regulations

In order to avoid application of the U.S. Department of Labor's plan asset regulations, we will limit subscriptions for our membership units from ERISA plan investors such that, immediately after each sale of such membership units, ERISA plan investors will hold less than twenty-five percent (25%) of our total outstanding membership units.

### Annual Valuation

Fiduciaries of plans subject to ERISA are required to determine annually the fair market value of the assets of such plans as of the close of any such plan's fiscal year. Although our manager will provide annually upon the written request of a member an estimate of the value of our v membership units based upon, among other things, outstanding mortgage investments, it may not be possible to value our membership units adequately from year to year, because there will be no market for them.

## EXPERTS

Beadle, McBride, Evans & Reeves LLP have audited our financial statements as of December 31, 2002. These financial statements are included in this Prospectus. We rely on Beadle, McBride, Evans & Reeves LLP as experts in auditing and on the Beadle, McBride, Evans & Reeves LLP report for our financial statements included herein.

**EXHIBIT A – Audited Financial Statements of USA Capital Diversified Trust Deed Fund, LLC**

## INDEX TO FINANCIAL STATEMENTS

Report of Independent Accountant...................................................................................... A-3

Balance Sheet ................................................................................................................ A-4

Statement of Operations ................................................................................................ A-5

Statement of Changes in Members' Equity..................................................................... A-6

Statements of Cash Flows .............................................................................................. A-7

Notes to Financial Statements........................................................................................ A-8

## REPORT OF INDEPENDENT ACCOUNTANT

To Management
USA Capital Diversified Trust Deed Fund, LLC
Las Vegas, Nevada

We have audited the accompanying balance sheets of USA Capital Diversified Trust Deed Fund, LLC as of December 31, 2002 and 2001, and the related statements of operations, changes in members' equity and cash flows for the years ended December 31, 2002 and 2001 and the period from inception (February 3, 2000) to December 31, 2000. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of USA Capital Diversified Trust Deed Fund, LLC as of December 31, 2002 and 2001, and the results of its operations, changes in its members equity and cash flows for the years ended December 31, 2002 and 2001 and the period from inception (February 3, 2000) to December 31, 2000 in conformity with accounting principles generally accepted in the United States of America.

Las Vegas, Nevada
May 28, 2003

A-3

## USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

### Balance Sheets as of December 31, 2002 and 2001

|  | 2002 | 2001 |
|---|---|---|
| **ASSETS** | | |
| Cash | $ 11,998,420 | $ 6,774,486 |
| Investments in mortgage loans, net of allowance for loan losses of $0 and $0, respectively | 96,807,129 | 62,970,501 |
| Interest and other receivables | 1,638,212 | 1,343,814 |
| Prepaid expenses and other current assets | — | 28,549 |
| Due from affiliate | — | 700,000 |
| Real estate held for sale | 1,679,929 | — |
| Total assets | $ 112,123,690 | $ 71,817,350 |
| **LIABILITIES AND MEMBERS' EQUITY** | | |
| Accounts payable and accrued expenses | $ 102,786 | $ 140,869 |
| Due to managing member | 228,939 | — |
| Distributions payable | — | 460,595 |
| Commitments and contingencies | — | — |
| Members' equity | 111,791,965 | 71,215,886 |
|  | $ 112,123,690 | $ 71,817,350 |

**See Notes to Financial Statements.**

A-4

**USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC**

**STATEMENTS OF OPERATIONS**
**For the years ended December 31, 2002 and 2001 and the period from inception (February 3, 2000)**
**to December 31, 2000**

| | 2002 | 2001 | Inception to December 31, 2000 |
|---|---|---|---|
| **Revenues:** | | | |
| Interest earned from investments in mortgage loans | $ 8,702,179 | $ 5,853,045 | $ 813,028 |
| Other income | 344,295 | 91,474 | — |
| Total revenues | $ 9,046,474 | $ 5,944,519 | $ 813,028 |
| | | | |
| **Expenses:** | | | |
| Professional fees | $ 637,652 | $ — | $ — |
| Management fees to managing member | 488,498 | 148,567 | — |
| Other | 124,816 | 86,158 | — |
| | 1,250,966 | 234,725 | — |
| | | | |
| Net income | $ 7,795,508 | $ 5,709,794 | $ 813,028 |

**See Notes to Financial Statements.**

A-5

**USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC**

**STATEMENTS OF CHANGES IN MEMBERS' EQUITY**
For the years ended December 31, 2002 and 2001 and the period from inception (February 3, 2000)
to December 31, 2000

| | 2002 | 2001 | Inception to December 31, 2000 |
|---|---|---|---|
| Balance, January 1 | $ 71,215,886 | $ 22,755,335 | $ — |
| Issuance of membership units | 50,613,385 | 49,720,322 | 22,450,000 |
| Reinvestment of distributions | 3,891,112 | 2,315,378 | 305,335 |
| Redemptions | (10,294,214) | (3,579,950) | — |
| Net income | 7,795,508 | 5,709,794 | 813,028 |
| Distributions | (11,429,712) | (5,704,993) | (813,028) |
| Balance, December 31 | $ 111,791,965 | $ 71,215,886 | $ 22,755,335 |

**See Notes to Financial Statements.**

A-6

## USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

### STATEMENTS OF CASH FLOWS
For the years ended December 31, 2002 and 2001 and the period from inception (February 3, 2000)
to December 31, 2000

| | 2002 | 2001 | Inception to December 31, 2000 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Interest received | $ 8,752,076 | $ 4,845,569 | $ 568,164 |
| Cash paid to vendors | (1,031,561) | (122,405) | — |
| Net cash provided by operating activities | 7,720,515 | 4,723,164 | 568,164 |
| | | | |
| **Cash flows from investing activities:** | | | |
| Mortgage loans made by the fund | (78,655,709) | (57,615,301) | (22,628,341) |
| Mortgage loans repaid to the fund | 43,139,152 | 17,273,141 | — |
| Repayment from (advance to) affiliates | 700,000 | (661,322) | (38,678) |
| Net cash (used in) investing activities | (34,816,557) | (41,003,482) | (22,667,019) |
| | | | |
| **Cash flows from financing activities:** | | | |
| Proceeds from issuance of membership units | 50,613,385 | 49,345,322 | 22,825,000 |
| Members' redemptions | (10,294,214) | (3,579,950) | — |
| Member distributions, net of reinvestments | (7,999,195) | (3,097,480) | (339,233) |
| Net cash provided by financing activities | 32,319,976 | 42,667,892 | 22,485,767 |
| | | | |
| Increase in cash | 5,223,934 | 6,387,574 | 386,912 |
| Cash, beginning of year | 6,774,486 | 386,912 | — |
| Cash, end of year | $ 11,998,420 | $ 6,774,486 | $ 386,912 |

The following is a reconciliation of net income to net cash provided by operations:

| | | | |
|---|---|---|---|
| Net income | $ 7,795,508 | $ 5,709,794 | $ 813,023 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| (Increase) in interest receivable | (294,398) | (1,098,950) | (244,864) |
| (Increase) decrease in prepaid expenses and other current assets | 28,549 | (28,549) | — |
| Increase in due to managing member | 228,939 | | |
| Increase (decrease) in accounts payable and accrued expenses | (38,083) | 140,869 | — |
| Net cash provided by operating activities | $ 7,720,515 | $ 4,723,164 | $ 568,154 |

Supplemental disclosures of cash flow information:

| | | | |
|---|---|---|---|
| Non-cash investing and financing activities | | | |
| Real estate held for sale acquired through foreclosure | $ 1,679,929 | $ — | $ |

**See Notes to Financial Statements.**

A-7

### USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

### NOTES TO FINANCIAL STATEMENTS

**Note 1.  Nature of Business and Summary of Significant Accounting Policies**

The summary of significant accounting policies is presented to assist in the understanding of the financial statements.  The financial statements and notes are representations of management.  These accounting policies conform to accounting principles generally accepted in the United States of America and have been consistently applied in the preparation of the financial statements.

*Nature of Business*

USA Capital Diversified Trust Deed Fund, LLC (the Fund) is primarily engaged in the business of mortgage lending.  The Fund invests in loans secured by real estate through trust deeds or mortgages.  The Fund was organized February 3, 2000 as a limited liability company under the laws of the State of Nevada.  The Fund does not operate as an "investment company" within the meaning of the Investment Company Act of 1940.

*Estimates*

The preparation of financial statements in accordance with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent liabilities as of the date of the financial statements and the reported amounts of revenues and expenses during the period.  Actual results could differ from those estimates.

*Summary of accounting policies*

*Revenue recognition*

Interest income on loans is accrued by the effective interest method.  Interest revenue is suspended when a loan is impaired or non-performing.  A loan is considered non-performing when the payment of principal or interest is 120 days past due.  The Fund does not hold loans for resale, or prepare loan documents.  Additionally, the Fund does not service any loans.  Accordingly, there are no revenues from loan fees, collection fees, or similar charges.  **(See Note 3)**

*Investments in mortgage loans*

Investments in mortgage loans are collateralized by deeds of trust or mortgages.  Substantially all loans are fixed rate loans with maturities of one year or less, interest rates ranging from 8% to 20%.  Generally, all of the Fund's loans require interest only payments with any remaining principal payment due at maturity.  The Fund has both the intent and ability to hold the loans to maturity and, therefore, are classified and accounted for as "held for investment" and are carried at cost.  As stated above, the Fund suspends the recognition of interest income when a loan is deemed impaired or non-performing.  A loan is deemed impaired when, based on current information and events, it is probable that the Fund will be unable to collect all amounts due according to the contractual terms of the loan.

USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

NOTES TO FINANCIAL STATEMENTS

**Note 1.  Nature of Business and Summary of Significant Accounting Policies - *continued***

*Allowances for loan losses*

When deemed necessary, the Fund will set an allowance for possible credit losses on mortgage loans.
Additions to the reserve are based on an assessment of certain factors including, but not limited to,
estimated future losses on the loans and general economic conditions.  Actual losses on loans are recorded
as a charge-off or reduction of the loan loss reserve.  Subsequent recoveries of loan amounts previously
charged off are recorded as an increase to the loan loss reserve.

*Real estate held for sale*

Real estate held for sale includes real estate acquired through foreclosure and is carried at the lower of the
cost of the recorded mortgage loan or the property's estimated fair value, less estimated costs to sell.

*Fair value of financial instruments*

The carrying amounts of cash, interest receivable, prepaid expenses and other current assets, due from
affiliate, accounts payable and accrued expenses and amounts due managing member approximate fair
value due to their short maturities.  The carrying value of investments in mortgage loans, net of the
allowance for loan losses, approximates fair value, which is estimated based upon the projected cash
flows discounted at the estimated current rates at which similar loans with similar collateral would be
made.

*Comprehensive income*

There is no difference between comprehensive income and net income for the periods ended
December 31, 2002 and 2001 and for the period from inception (February 3, 2000) to December 31, 2000.

*Cash and credit risk*

Financial instruments, which potentially subject the Fund to credit risk, include cash in bank deposit
accounts and loans collateralized by trust deeds.

The Fund maintains its cash in bank deposit accounts, which at times may exceed the federally insured
limits.  The Fund has not experienced any losses from such accounts and believes it is not exposed to any
significant credit risk.

**Note 2.  Investment in mortgage loans and concentration of credit risk**

By design, the Fund limits its investments to certain types of real estate based loans.  Accordingly, there
is a concentration of mortgage loans for the acquisition and/or development of commercial and residential
property and bridge loans.  Bridge loans are designed as short-term financing which are expected to be
replaced by construction or permanent financing.  Investments in mortgage loans were to twenty-seven
different borrowers.  Five borrowers accounted for approximately fifty percent of the total portfolio.

## USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

### NOTES TO FINANCIAL STATEMENTS

**Note 2. Investment in mortgage loans and concentration of credit risk - *continued***

Investments in mortgage loans at December 31, 2002 consists of:

| Loan Type | Number of Loans | Balance | Average interest rate | Portfolio percentage |
|---|---|---|---|---|
| Construction | 9 | $25,174,078 | 13.06% | 26.00% |
| Land | 12 | 22,052,656 | 14.27% | 22.78% |
| Time share | 2 | 21,801,761 | 14.25% | 22.52% |
| Bridge | 8 | 21,521,634 | 12.31% | 22.23% |
| Acquisition and development | 3 | 6,257,000 | 14.33% | 6.47% |
| | 34 | $96,807,129 | | 100.00% |

Loans are split approximately equally between commercial and residential developments.

At December 31, 2002 the Fund had started foreclosure proceedings on one loan in the approximate amount of $10,000,000 and another borrower with a loan totaling approximately $11,000,000 had filed bankruptcy proceedings in an effort to delay foreclosure. In the opinion of management, the underlying collateral is sufficient to recover amounts due. Five other loans totaling approximately $11,400,000 were classified as non-performing and interest income had been suspended for financial reporting purposes. The Fund's management has concluded that no allowance for loan losses was necessary with respect to these loans.

The following is a schedule by geographic location of mortgage loans at December 31, 2002:

| | Number | Balance | Percentage |
|---|---|---|---|
| California | 16 | $45,432,263 | 46.94% |
| New York | 1 | 11,006,762 | 11.37% |
| Utah | 1 | 9,960,000 | 10.29% |
| Nevada | 7 | 8,958,043 | 9.25% |
| Arizona | 3 | 8,018,908 | 8.28% |
| Texas | 2 | 4,970,140 | 5.13% |
| Massachusetts | 1 | 4,801,000 | 4.96% |
| Florida | 2 | 3,271,379 | 3.38% |
| New Mexico | 1 | 388,634 | 0.40% |
| | | $96,807,129 | 100.00% |

The following is a schedule by maturities of mortgage loans at December 31, 2002:

| | |
|---|---|
| 2003 | $92,006,129 |
| 2004 | 4,801,000 |
| 2005 | — |
| | $96,807,129 |

**USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC**

**NOTES TO FINANCIAL STATEMENTS**

**Note 3.  Related party transactions**

Various related parties are involved with the marketing, brokering and collection of the Fund's loans.

USA Commercial Mortgage Company (Mortgage), a company related by common management, markets and brokers the Fund's loans.  Commissions are paid by the borrowers for the services provided by Mortgage.  Mortgage has agreed not to charge the Fund for any of its services in exchange for the rights to the fees charged to the borrower.

USA Capital Realty Advisors (Realty), the managing member and an owner of two of the Fund's membership units, services the loans, collects the interest and remits the proceeds to the Fund.  The Fund has agreed to pay Realty an annual fee of 1% of the assets under management.  For the year ended December 31, 2002, Realty agreed to perform these services for a fee not to exceed 1/2 of 1%.  Fees incurred for 2002 for Realty's services totaled approximately $488,500 of which approximately $229,000 were unpaid at December 31, 2002.  Any additional amounts due under the terms of the agreement for the year ended December 31, 2002 were waived.  For the year  ended December 31, 2001, fees to Realty approximately $148,500 with the balance of fees for the year waived.  All fees were waived for the period from inception to December 31, 2000.

USA Commercial Real Estate Group (Real Estate), a company related by common management, may serve as the listing broker in the event real property is acquired through foreclosure.  Real Estate would be paid a commission competitive with commissions charged by non related parties.  The affiliate has not provided any services for the period from inception to December 31, 2002.

During the year ended December 31, 2001, the developer of one of the properties that the Fund had loaned to effectively abandoned the project due to issues not relating to the viability of the specific project for which the loan was granted.  M.P.D.D. Ranch, LLC, an entity managed by an affiliate of the Fund, has assumed the position of developer to complete the project.  During the year ended December 31, 2002, the project was completed and the loan paid in full.

During the year ended December 31, 2001, the Fund advanced $700,000 to HMA Sales LLC, an affiliate of the Fund's manager.  The advance was repaid in January, 2002.

USA Commercial Mortgage Company, an affiliate of the Fund manager, has been designated by the Fund manager to service its mortgage loan investments.  During the year ended December 31, 2002, USA Commercial Mortgage collected interest and principal payments on the Fund's mortgage loans that were not immediately remitted to the Fund.  These amounts represented unsecured advances that Mortgage repaid in full to the Fund with interest at an annual rate of 20%.  During the year ended December 31, 2002, interest on these advances amounted to approximately $254,400 and is reflected in other income on the statement of operations.

The original managing member, USA Capital Realty Advisors (an S corporation) was dissolved effective January 18, 2001.  USA Capital Realty Advisors, LLC was substituted as manager.

**Note 4.  Real estate held for sale**

During the year, the Fund foreclosed on two loans totaling approximately $1,700,000 and took title to the properties.  One of these properties was sold subsequent to year end in an amount sufficient to recover all principal and interest, suspended interest and other costs associated with the enforcement of the collateral.  Subsequent to December 31, 2002, the Fund entered into a contract for the sale of the other property.  The

**USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC**

**NOTES TO FINANCIAL STATEMENTS**

contract provides for sufficient cash to enable the Fund to recover all principal, interest, suspended interest and related costs.

**Note 5. Distributions to members and income taxes**

Under the laws pertaining to federal income taxation of limited liability companies that are treated as partnerships, no federal income tax is paid by the Fund as an entity. Each individual member reports on his federal income tax return his distributive share of the Fund's income, gains, losses, deductions and credits, whether or not any distributions are made during the year.

The Fund distributes profits to its members based on the calculation of income for income tax purposes as long as the managing member considers the amounts ultimately recoverable.

For income tax purposes, certain interest income is not suspended for loans that are deemed non-performing for financial statement purposes. Additionally, certain expenses may be capitalized as part of the basis in real estate held for sale and or as additional amounts due the Fund which is different than accounting principals generally accepted in the United States. Since the fund is taxed as a partnership, there are no deferred tax assets or liabilities as a result of these differences.

**Note 6. Contingencies**

The Fund, together with Mortgage (See Note 3) and other related parties were named by certain borrowers as defendants in litigation related to certain loans. Management believes the suit is without merit and has been advised by Mortgage that USA Commercial Mortgage will pay all costs relating to the defense of this action. It is not possible to determine the ultimate financial impact, if any, of these actions.

**Note 7. Commitments**

At December 31, 2002 the Fund had commitments to advance additional amounts on existing loans amounting to approximately $60,210,000.

**Note 8. Reclassifications**

The 2001 and 2000 financial statements reflect certain reclassifications, which had no effect on net income, to conform to the presentation in the current year.

**EXHIBIT B – Operating Agreement**

<u>EXHIBIT B</u>

**THE LIMITED LIABILITY COMPANY MEMBERSHIP INTEREST UNITS REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("THE ACT"). SUCH UNITS MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON AT ANY TIME WITHOUT SUCH REGISTRATION UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQUIRED. THERE ARE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFER, AS SET FORTH IN THIS OPERATING AGREEMENT. IN ADDITION, IN NO EVENT MAY UNITS BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON WHO IS NOT A RESIDENT OF NEVADA FOR A PERIOD OF NINE MONTHS FROM THE DATE OF THE LAST SALE THEREOF BY THE FUND.**

### OPERATING AGREEMENT

### OF

### USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

**THIS OPERATING AGREEMENT** (this "Agreement") is made and entered into effective as of February 10, 2000, by and among USA Capital Realty Advisors, a Nevada corporation ("Manager"), USA Capital Realty Advisors, a Nevada corporation, as the initial Member, (the "Initial Member"), and such other persons as may be added as members pursuant to the terms hereof ("Members").

### ARTICLE I
### DEFINITIONS

Unless stated otherwise, the terms set forth in this Article I shall, for all purposes of this Agreement, have the meanings as defined herein:

1.01    "<u>Affiliate(s)</u>" shall mean, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting securities of such Person, (iii) any officer, director or general partner of such Person, or (iv) any Person who is an officer, director, general partner, trustee or holder of ten percent (10%) or more of the voting securities of any Person described in clauses (i) through (iii) of this sentence. "Affiliates" of the Manager include, without limitation, USA Commercial Mortgage Company (doing business as USA Capital), USA Commercial Real Estate Group, and other entities or funds sponsored by USA Commercial Mortgage Company.

1.02    "<u>Agreement</u>" shall mean this Operating Agreement, as the same may hereafter be amended from time to time.

1.03    "<u>Articles</u>" shall mean the Articles of Organization for the Company originally filed with the

Nevada Secretary of State and as amended from time to time.

1.04   "Capital Account" shall mean, with respect to any Member, the Capital Account maintained for such Member in accordance with the following provisions:

(a)   To each Member's Capital Account there shall be credited such Member's capital contributions (as provided in Section 4.01), such Member's distributive share of Profits, and any items in the nature of income or gain (from unexpected adjustments, allocations or distributions) that are specially allocated to a Member and the amount of any Company liabilities that are assumed by such Member or that are secured by any Company property distributed to such Member.

(b)   To each Member's Capital Account there shall be debited the amount of cash or the fair market value of property distributed to the Member, such Member's distributive share of Losses, and any items in the nature of expenses or losses that are specially allocated to a Member and the amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company.

In the event any interest in the Company is transferred according to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

The provisions of this Section 1.04 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such regulations. In the event it is necessary to modify the manner in which the Capital Accounts are computed in order to comply with such regulations, the Manager shall make such modifications. The Manager shall adjust the amounts debited or credited to the Capital Accounts with respect to (i) any property contributed to the Company or distributed to any Member and (ii) any liabilities that are secured by such contributed or distributed property or that are assumed by the Company in the event the Manager shall determine that such adjustments are necessary or appropriate pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv). The Manager shall also make appropriate modifications if unanticipated events cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

1.05   "Cash Available for Distribution" shall mean an amount of cash equal to the excess of accrued income from operations and investment of, or the sale or refinancing or other disposition of, Company assets during any calendar month over the accrued operating expenses, depreciation and amortization of the Company during such month, including any adjustments for bad debt reserves or deductions (including reasonable reserves) as the Manager may deem appropriate.

1.06   "Code" shall mean the Internal Revenue Code of 1986, as amended, and corresponding portions of any subsequent federal revenue laws.

1.07   "Company" shall mean USA Capital Diversified Trust Deed Fund, LLC.

1.08   Intentionally Deleted.

1.09   "Economic Interest" shall mean the right to receive distributions of the Company's assets and

allocations of income, gain, loss, deduction, credit and similar items from the Company pursuant to this Agreement and the Act (as defined in Section 2.01), but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company, or any right to information concerning the business and affairs of the Company.

1.10    "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

1.11    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

1.12    "Fiscal Year" shall mean a calendar year ending December 31.

1.13    Intentionally Deleted.

1.14    "Members" shall mean the Initial Member and the purchasers of Units admitted to the Company as Members, and "Member" shall mean any one of the Members.

1.15    "Membership Interest" shall mean a Member's entire interest in the Company and all rights, benefits and privileges pertaining thereto.

1.16    "Minimum Percentage of Interests" shall mean one or more Percentage Interests of Members, or a specified group of Members, which taken together equal at least seventy-five percent (75%) of the aggregate of all Percentage Interests, or of all Percentage Interests held by such specified group of Members, on the first and sixteenth days of the current calendar month.

1.17    "Manager" shall mean USA Capital Realty Advisors, a Nevada corporation, or any person or entity substituted in place thereof pursuant to this Agreement.

1.18    "Net Assets Under Management" means the total Company's capital, including cash, notes (at book value), real estate owned (at book value), accounts receivable, advances made to protect loan security, and any other Company assets valued at fair market value, less Company liabilities.

1.19    "NRS" means the Nevada Revised Statutes, as amended or otherwise modified.

1.20    "Percentage Interest" shall mean the respective percentage interest of a Member determined as of the first and sixteenth days of each calendar month by dividing a Member's current Capital Account by the total outstanding Capital Accounts of all Members.

1.21    "Person" shall mean both natural and legal persons, including any unincorporated association or entity, as the context may require.

1.22    "Profits" and "Losses" shall mean, for each Fiscal Year or other period, the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with accounting principles employed under the method of accounting at the close of each Fiscal Year on the Company's information tax return filed for federal income tax purposes.

1.23    "Units" shall mean the Membership Interests in the Company issued to Members upon their

admission to the Company, pursuant to the Company's Offering Circular dated March 1, 2000 and any supplements, amendments or restatements thereof ("Offering Circular") or pursuant to any subsequent private or public offering of Membership Interests in the Company.

## ARTICLE II
## ORGANIZATION OF THE COMPANY

2.01    <u>Formation</u>.  The parties hereto hereby agree to form a limited liability company, pursuant to the provisions of Chapter 86 of NRS, as the same may be amended from time to time (the "Act").

2.02    <u>Name</u>.  The name of the Company shall be "USA Capital Diversified Trust Deed Fund, LLC."

2.03    <u>Place of Business</u>.  The principal place of business of this Company shall be located c/o USA Capital Realty Advisors, 4484 South Pecos Road, Las Vegas, Nevada 89121, until changed by designation of the Manager, with notice to all Members.

2.04    <u>Purpose</u>.  The primary purpose of this Company shall be to make or purchase entire or fractional interests in acquisition, development, construction and bridge, or interim, loans secured by first deeds of trust on undeveloped land and residential and commercial developments located in the United States, and to do any and all things relating or incidental thereto.  The Company intends to leverage its loan portfolio by obtaining a revolving credit facility from a third party lender.  This credit facility will be used primarily, but not exclusively, to fund new loan opportunities that arise prior to the maturity of then-existing Company loans.  This credit facility would be repaid primarily from loan payoffs as then-existing Company loans mature.  The Company will assign portions or all of the Company's loan portfolio as security for this credit facility.  The total amount outstanding under this credit facility will not at any time exceed 25% of the Company's total loan portfolio.  The Company will only obtain a credit facility if the terms and conditions of the credit facility are acceptable in the Manager□s sole discretion.  The activities of the Company are described in greater detail in the Offering Circular.

2.05    <u>Term</u>.  The Company shall be deemed to be formed and its term shall commence as of the day the Articles are filed with the Nevada Secretary of State, and shall continue until terminated (i) by the Manager, in its sole discretion, (ii) pursuant to the provisions of this Agreement, or (iii) by operation of law.

2.06    <u>Power of Attorney</u>.  Each of the Members irrevocably constitutes and appoints the Manager, acting by and through any of its executive officers, as his true and lawful attorney-in-fact, with full power and authority for him, and in his name, place and stead, to execute, acknowledge, publish and file:

(a)    This Agreement, the Articles, and any amendments or cancellation thereof required under the laws of the State of Nevada;

(b)    Any certificates, instruments and documents, including, without limitation, fictitious business name statements, as may be required by, or may be appropriate under, the laws of any state or other jurisdiction in which the Company is doing or intends to be business; and

(c)    Any documents which may be required to effect the continuation of the Company, the admission of an additional or substituted Member, the amendment of this Agreement, or the dissolution and termination of the Company.

765401/153254.4                               B-5.

2.07    <u>Nature of Power of Attorney</u>.  The foregoing grant of authority is a special power of attorney coupled with an interest, is irrevocable, and shall survive the death of the undersigned or the delivery of an assignment by the undersigned of a Membership Interest, provided that where the assignee thereof has been approved by the Manager for admission to the Company as a substituted Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Manager to execute, acknowledge and file any instrument necessary to effect such substitution.

**ARTICLE III**
**THE MANAGER**

3.01    <u>Management by the Manager, Generally</u>.  Subject to any provisions of the Articles and this Agreement relating to actions required to be approved by the Members, if any, the business, property and affairs of the Company shall be managed and all powers of the Company shall be exercised by or under the direction of the Manager.  In addition to the general management authority provided under this Section and without in any way limiting the generality of the foregoing, the Manager shall have all necessary powers to manage and carry out the purposes, business and affairs of the Company, including, without limitation, the power to exercise and to authorize and direct the Company's or the Manager's officers (if any) to exercise, on behalf and in the name of the Company, all of the powers described in NRS 86.281, including, without limitation, the following powers and authority:

(a)    To expend Company funds in furtherance of the business of the Company and to acquire and deal with assets upon such terms as it deems advisable, from Affiliates and other persons;

(b)    To offer additional Units for sale from time to time to determine the terms of the offering of Units, including the price thereof and the amount of discounts allowable or commissions to be paid and the manner of complying with applicable law;

(c)    To employ, at the expense of the Company, such agents, employees, independent contractors, attorneys and accountants as the Manager deems reasonable and necessary for any Company purpose;

(d)    To effect necessary insurance for the proper protection of the Company, the Manager or Members;

(e)    To prosecute, defend, pay, collect, compromise, arbitrate, or otherwise adjust any and all claims or demands of or against the Company;

(f)    To bind the Company in all transactions involving the Company's property or business affairs, including underwriting loans, preparing and executing all loan documents, funding loans, purchasing and selling notes and extending or restructuring loans;

(g)    To enforce loan documents and to manage, lease, develop and sell property that the Company takes title to through foreclosure, deed in lieu of foreclosure or otherwise;

(h)    To amend this Agreement with respect to the matters described in Subsections 12.04(a)

through (g) below;

(i)     To determine the accounting method or methods to be used by the Company, which methods may be changed at any time by written notice to all Members;

(j)     To open accounts in the name of the Company in one or more banks, savings and loan associations or other financial institutions or money market funds, and to deposit Company funds therein, subject to withdrawal upon the signature of the Manager or any person authorized by the Manager;

(k)     To sell from time to time all or any portion of the Company's assets, or any undivided or beneficial interests therein, all upon such terms and conditions as the Manager shall deem appropriate in its sole business judgment; and

(l)     To seek and obtain revolving or other credit facilities from third party lenders to allow the Company to leverage the Company's loan portfolio, including, without limitation, to negotiate and enter into loan agreements, security and pledge agreements, and other documents required by a third party lender as a condition to providing the Company with such a credit facility;

(m)     To retain such advisors and professionals, execute all instruments and documents and do all other things necessary or appropriate in the judgment of the Manager to effectuate any of the foregoing.

3.02    <u>Fiduciary Duty</u>.  The Manager shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Company, and the Manager shall not employ such funds or assets in any manner except for the exclusive benefit of the Company.

3.03    <u>Allocation of Time to Company Business</u>.  The Manager shall not be required to devote full time to the affairs of the Company but shall devote whatever time, effort and skill the Manager may deem to be reasonably necessary for the conduct of the Company's business.  The Manager may engage in any other businesses including businesses related to or competitive with the Company.

3.04    <u>Exculpation and Indemnification</u>.  Neither the Manager, nor its shareholders, officers, directors, employees or agents ("Manager Parties"), shall have any liability whatsoever to the Company or to any Member for any loss suffered by the Company or any Member which arises out of any action or inaction of the Manager or any Manager Parties, so long as the Manager or such other Person, in good faith, determined that such course of conduct was in the best interests of the Company and did not constitute intentional misconduct, fraud, or knowing violation of the law.  The Manager, the Manager Parties, and the employees and agents of the Company shall be entitled to be indemnified and held harmless by the Company, at the expense of the Company, against any loss, expense, claim or liability (including reasonable attorneys' fees, which shall be paid as incurred) resulting from the assertion of any claim or legal proceeding relating to the performance or nonperformance of any act concerning the activities of the Company, including claims or legal proceedings brought by a third party or by Members, on their own behalf or as a Company derivative suit, so long as the party to be indemnified determined in good faith that such course was in the best interests of the Company and did not constitute intentional misconduct, fraud, or knowing violation of the law; provided, that any such indemnity shall be paid solely from the assets of the Company.  Nothing herein shall prohibit the Company from paying in whole or in part the premiums or other charge for any type of indemnity insurance in which the Manager, Manager Parties or other agents or employees of the Company are indemnified or insured against liability or loss arising out of their actual

or asserted misfeasance or nonfeasance in the performance of their duties or out of any actual or asserted wrongful act against, or by, the Company including, but not limited to, judgments, fines, settlements and expenses incurred in the defense of actions, proceedings and appeals therefrom. The Company shall pay the expenses of the Manager, Manager Parties and other agents and employees of the Company incurred in defending a civil or criminal action, suit or proceeding as they are incurred and in advance of the final disposition of the action, suit or proceeding, upon receipt of an undertaking, as required in NRS 86.441 or any successor statute.

3.05    Capital Contribution of the Manager.  The Manager shall contribute the sum of Fifty Thousand Dollars ($50,000) to the capital of the Company as the initial Member, and its Capital Account shall be credited in such amount.

3.06    Removal of the Manager; Election of Successor Manager.  The Manager may be removed upon the following terms and conditions:

(a)    The Manager may be removed by the written consent of a Minimum Percentage of Interests.  Members may exercise such right by presenting to the Manager a written notice, which shall be executed by Members representing a Minimum Percentage of Interests, with their signatures acknowledged, to the effect that the Manager is removed effective on the date set forth in such notice.

(b)    Concurrently with delivery of such notice or within ninety (90) days thereafter by written notice similarly given, a Minimum Percentage of Interests may also designate a successor Manager.

(c)    Substitution of a new Manager, if any, shall be effective upon written acceptance of the duties and responsibilities of a Manager by the new Manager.  Upon effective substitution of a new Manager, this Agreement shall remain in full force and effect except for the change in the Manager and the business of the Company shall be continued by the new Manager.

3.07    Retirement by Manager.  The Manager may withdraw ([]retire[]) from the Company upon not less than six (6) months written notice of same to the Members.  In the event that the Manager retires, the Members shall elect a successor manager by a Minimum Percentage of Interests.

3.08    Accrued Compensation.  If the Manager should be removed as provided in Section 3.06 or should retire as provided in Section 3.07, it shall be entitled to all fees and other compensation earned by it through the effective date of removal or retirement.