# ARTICLE IV
## THE MEMBERS - CAPITAL CONTRIBUTIONS

4.01    Capital Contributions of Members.  The Members shall contribute to the capital of the Company an amount equal to Twenty-Five Thousand Dollars ($25,000) for each Unit subscribed for by each such Member; provided, however, that the Initial Member shall contribute the sum of Fifty Thousand Dollars ($50,000) to the capital of the Company and its Capital Account shall be credited in such amount.  The total initial capitalization of the Company shall be a maximum of $100,000,000 and a minimum of $1,000,000; provided, however, the Manager reserves the right to issue additional Units (in excess of $100,000,000) from time to time in the future without approval of the Members.  The Company shall not begin doing business until the minimum capitalization of $1,000,000 is reached.  Subscription funds will be placed in an escrow account with an independent title company or a federally or state-insured bank until this minimum capitalization is reached.  Until the Company begins doing business, the capital contributions from Members will be invested in short-term certificates of deposit, money market funds or other liquid asset accounts.  The capital contributions of Members shall be made in cash, except that Members may, with the consent of the Manager, contribute entire or fractional interests in preexisting loans on the terms and conditions described in Section 4.08 below.  Notwithstanding any provision of this Agreement to the contrary, at any time after the minimum of $1,000,000 is received by the Company, the Initial Member may request that the Company redeem its initial Membership Interest for an amount equal to the positive balance in its Capital Account with respect to such initial Membership Interest, which redemption shall be consummated within thirty (30) days after the redemption request is received by the Company.

4.02    Admission to Company; Subscription Account.  To purchase Units an investor must deliver to the Company a Subscription Agreement in the form attached to this Agreement as Exhibit A, together with his or her cash contribution or the appropriate transfer documents, as required by the Manager, if the investor is contributing a preexisting loan.  Cash subscription funds received by the Manager shall be held by it in a non-interest bearing account until being transferred to the Company.  To facilitate the Company's record keeping, investors will only be admitted into the Company on the first and sixteenth day of each month.  Generally, subscription funds shall be considered for transfer to the Company on a first-in, first-out basis; however, the Manager reserves the right to admit non-ERISA plan investors before ERISA plan investors in order for the Company to remain exempt from the application of Title 29 of the Code of Federal Regulations Part 2510 relating to the definition of plan assets for purposes of ERISA (the "ERISA Plan Asset Regulations.").

4.03    Election to Compound Earnings or Receive Cash Distributions.  Upon subscription for Units, a subscribing Person must elect whether to receive monthly cash distributions from the Company or to allow his or her earnings to compound, which election is irrevocable by the subscribing Person until the first anniversary of admission.  Commencing on the first anniversary after a Member's admission to the Company and on each anniversary thereafter (provided that the Member has given the Manager at least 30 days prior written notice of its intentions), such Member may elect to either receive cash distributions (or if the Member previously had elected to receive cash distributions, such Member may elect not to receive cash distributions and to compound earnings provided that there is on file with the Nevada Securities Division an effective registration statement for the Units, and the Units are registered under the Securities Act of 1933, as amended (the []Securities Act[]), or are exempt from registration, and provided further that such Member shall have received the most current version of the Company's Offering Circular).  Notwithstanding the foregoing, the Manager at any time shall have the right to immediately commence making monthly distributions to one or more ERISA plan Members who previously had elected to compound earnings if necessary in order for the Company to remain exempt from the application of the ERISA Plan Asset Regulations.  Income allocable to Members who elect to compound their earnings will be

retained by the Company for purposes of making or investing in further mortgage loans or for other proper Company purposes, and the amount of such allocable income will be credited to their Capital Accounts.

4.04    No Participation in Management.  Except as expressly provided herein, the Members shall take no part in the conduct or control of the Company business and shall have no right or authority to act for or bind the Company.  Economic Interest Owners shall have no voting rights whatsoever.

4.05    Rights and Powers of Members.  Members shall have the right to vote upon the following matters, and no others, provided that a Minimum Percentage of Interests approve such matters:

(a)    dissolution and termination of the Company;

(b)    amendment to this Agreement, provided that the Manager has also approved such amendment and provided, further, that this Subsection (b) shall not apply to the matters set forth in Section 12.04 below, with respect to which matters the Manager alone may amend this Agreement without the vote of the Members;

(c)    merger or consolidation of the Company pursuant to Section 9.03 below; and

(d)    Removal of the Manager and election of a successor Manager, in the manner and subject to the conditions described in Sections 3.06 and 3.07 above.

4.06    Meetings.  The Company will hold annual meetings for all Members on a date established by the Manager.  The Manager shall provide each Member with at least 30 days prior written notice of each annual meeting, which shall be held at such date, time and location as shall be specified in the notice.  The Manager reserves the right to call special meetings of the Members on at least 30 days prior written notice, which notice shall state, in addition to the date, time and location of the meeting, the general purpose(s) of the special meeting.  A majority of the Membership Interests shall constitute a quorum at Company meetings.  Members may vote in person or by proxy with respect to those matters in which Members have, under this Agreement, approval rights.

4.07    Limited Liability of Members.  Units are non-assessable, and no Member shall be personally liable for any of the expenses, liabilities, or obligations of the Company or for any of the losses thereof beyond the amount of such Member's agreed upon Capital Contribution to the Company and such Member's share of any undistributed net income and gains of the Company; provided, that each Member shall remain liable to return to the Company any distributions that such Member is obligated to return pursuant to the Act; and provided further, that upon dissolution and termination of the Company each Member shall be liable to pay to the Company the amount of any deficit remaining in such Member's Capital Account, if and to the extent required under Subsection 9.02(e) below.

4.08    Contributions of Existing Loans.  At the discretion of the Manager, Members may be allowed to contribute to the Company in exchange for Units entire or fractional interests in preexisting loans that are secured by first deeds of trust and that otherwise satisfy the then-applicable investment guidelines of the Company.  Any such loans that are contributed to the Company shall not be in default at the time of contribution, shall satisfy the lending guidelines described in the Offering Circular and must have been originated by the Manager or its Affiliates (including, without limitation, USA Commercial Mortgage Company).  For purposes of crediting a contributing Member's Capital Account and for determining the number of Units that will be issued to such

contributing Member, the fair market value of any preexisting loan (or interest therein) contributed to the Company shall be deemed equal to the then-outstanding principal balance of the loan, together with any accrued but unpaid interest (the "Loan Balance") (or a proportionate share of the Loan Balance with respect to the contribution of a fractional loan interest).

4.09    Fractional Units.  A Member may purchase fractional Units only under the following circumstances:

(a)    When a Member has elected and is allowed to compound earnings as provided in Section 4.03, then such compounded earnings will be applied to purchase a fractional Unit whose value shall be determined by dividing the amount of compounded earnings by 25,000.  For example, if a Member has $1,000 of earnings in a month, that Member has elected to compound his or her earnings, and the conditions set forth in Section 4.03 above have been satisfied, then the Member will be deemed to have purchased in the following month 1/25th of a Unit ($1,000 divided by $25,000 per each Unit).

(b)    When a Member has, with the prior written approval of the Manager, contributed entire or fractional interests in preexisting loans that are secured by first deeds of trust in exchange for Units as provided in Section 4.08, then such fractional Unit being purchased by such Member shall be equal to the Loan Balance (or a proportionate share of the Loan Balance with respect to the contribution of a fractional loan interest) divided by 25,000.  For example, if a Member has, with the prior written approval of the Manager, contributed a loan with a par value (i.e., principal plus accrued interest) of $710,000, then the Member will be deemed to have purchased 28.4 Units ($710,000 divided by $25,000 per Unit).

## ARTICLE V
## PROFITS AND LOSSES:  CASH DISTRIBUTIONS

5.01    Losses.  Losses shall be allocated among the Members as of the last day of each calendar month in accordance with their respective Percentage Interests; provided, however, that if any Membership Interest is purchased, transferred, increased or decreased prior to the end of such calendar month, then Losses for such month shall be allocated among all individuals and entities who were Members during such month (assuming a 30 day month) and based on a prorated portion of each Member's Percentage Interest (i.e., based on the number of days during such month that the individual or entity was a Member, assuming a 30 day month).

5.02    Profits.  Profits shall be allocated among the Members as of the last day of each calendar month during any Fiscal Year in the following order of priority:

(a)    First, to all of the Members in the same proportions as the Losses, if any, that were previously allocated to them pursuant to Section 5.01 above, until all such Losses have been recouped;

(b)    Thereafter, to the Members in accordance with their respective Percentage Interests; provided, however, that if any Membership Interest is purchased, transferred, increased or decreased prior to the end of such calendar month, then profits shall be allocated among all individuals and entities who were Members during such month (assuming a 30 day month) based on a prorated portion of each Member's Percentage Interest (i.e., based on the number of days during such month that the individual or entity was a Member, assuming a 30 day month).

5.03    Cash Available for Distribution.  Cash Available for Distribution shall be distributed only to those Members who elect in writing to receive such distributions during the term of the Company in accordance with Section 4.03.  Cash Available for Distribution distributable to those Members who elected to receive cash distributions as aforesaid shall be distributed to them in cash as soon as practicable after the end of each calendar month; and Cash Available for Distribution allocable to the remaining Members who have elected to compound, or reinvest, distributions (subject to the conditions imposed in Section 4.03 above) shall be retained by the Company and credited to their respective Capital Accounts as of the first day of the succeeding calendar month.  Total Cash Available for Distribution as of the close of business on the last day of each calendar month during any Fiscal Year shall be allocated among and promptly distributed or credited to the Members in accordance with their respective Percentage Interests; provided, however, that if any Percentage Interest increases or decreases prior to the end of such calendar month, then total Cash Available for Distribution shall be allocated among all individuals and entities who were Members during such month (assuming a 30 day month) and who elected to receive distributions, based on a prorated portion of each Member□s Percentage Interest (i.e., based on the number of days during such month that the individual or entity was a Member, assuming a 30 day month).

5.04    Cash Distributions Upon Dissolution.  Upon dissolution and termination of the Company, all Cash Available for Distribution shall thereafter be distributed to Members in accordance with the provisions of Article IX below.

5.05    Special Allocation Rules.

(a)    For purposes of this Agreement, a loss or allocation (or item thereof) is attributable to non-recourse debt which is secured by Company property to the extent of the excess of the outstanding principal balance of such debt (excluding any portion of such principal balance which would not be treated as an amount realized under Code Section 1001 and Paragraph (a) of Code Section 1.001-2 if such debt were foreclosed upon) over the adjusted basis of such property.  This excess is herein defined as □Minimum Gain□ (whether taxable as capital gain or as ordinary income) as more explicitly set forth in Treasury Regulation 1.704-1(b)(4)(iv)(c).  Notwithstanding any other provision of Article V, the allocation of loss or deduction (or item thereof) attributable to non-recourse debt which is secured by Company property will be allowed only to the extent that such allocation does not cause the sum of the deficit Capital Account balances of the Members receiving such allocations to exceed the minimum gain determined at the end of the Company taxable year to which the allocations relate.  The balance of such losses shall be allocated to the Manager.  Any Member with a deficit Capital Account balance resulting in whole or in part from allocations of loss or deduction (or item thereof) attributable to non-recourse debt which is secured by Company property shall, to the extent possible, be allocated income or gain (or item thereof) in an amount not less than the minimum gain at a time no later than the time at which the minimum gain is reduced below the sum of such deficit capital account balances.  This Section is intended and shall be interpreted to comply with the requirements of Treasury Regulation Section 1.704-1(b)(4)(iv)(e).

(b)    In the event any Member receives any adjustments, allocations or distributions, not covered by Section 5.05(a), so as to result in a deficit Capital Account, items of Company income and gain shall be specially allocated to such Members in an amount and manner sufficient to eliminate the deficit balances in their Capital Accounts created by such adjustments, allocations or distributions as quickly as possible.  This Section shall operate as a qualified income offset as utilized in Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

## ARTICLE VI
## ACCOUNTING AND REPORTS

6.01    Books and Records.  The Manager shall cause the Company to keep the following books and records, which shall be maintained at the Company's principal place of business and shall be available for inspection and copying by, and at the sole expense of, the Members, or their duly authorized representatives, during reasonable business hours and upon at least five (5) business days prior written notice to the Manager:

        (a)    A current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner;

        (b)    A current list of the full name and business or residence address of each Manager;

        (c)    A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

        (d)    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

        (e)    A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

        (f)    Copies of the financial statements of the Company, if any, for the six most recent Fiscal Years; and

        (g)    The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four Fiscal Years.

6.02    Financial Reports and Returns.  The Manager shall cause to be prepared and distributed to each Member the following:

        (a)    Within ninety (90) days after the end of each Fiscal Year of the Company, an annual report which shall contain a balance sheet of the Company as of the end of each Fiscal Year, an income statement and a report of the activities of the Company during such Fiscal Year, including a statement of changes in financial position for that Fiscal Year, which financial statements shall be audited by an independent certified public accounting firm in accordance with generally accepted auditing standards.

        (b)    Within ninety (90) days after the end of each Fiscal Year of the Company, such other information which the Members may need for preparation of their federal income tax returns.

6.03    Tax Matters Partner.  In the event the Company is subject to administrative or judicial proceedings for the assessment or collection of deficiencies for federal taxes or for the refund of overpayments of federal taxes arising out of a Member's distributive share of profits, the Manager shall act as the Tax Matters Partner ("TMP") and shall have all the powers and duties assigned to the TMP under Sections 6221 through 6232 of the

Code and the Treasury Regulations thereunder.  The Members agree to perform all acts necessary under Section 6231 of the Code and Treasury Regulations thereunder to designate the Manager as the TMP.

## ARTICLE VII
## TRANSFER OF COMPANY INTERESTS

7.01    Restrictions on Transfers.  Notwithstanding any provision to the contrary contained herein, the following restrictions shall apply to any and all proposed sales, assignments or transfers of Membership Interests and Economic Interests, and any proposed sale, assignment or transfer in violation of same shall be void ab initio:

(a)    No Member shall make any transfer or assignment of all or any part of its Membership Interest without the prior written consent of the Manager, which consent may be withheld in the sole discretion of the Manager.

(b)    No Member shall make any transfer or assignment of all or any part of its Economic Interest without the prior written consent of the Manager, which consent shall not be unreasonably withheld.

(c)    No Member shall be entitled to sell, assign, transfer or convey his Membership Interest or Economic Interest to any person or entity other than a bona fide resident of the State of Nevada for a period of nine months after the termination of the offering of Units pursuant to which such Membership Interest (or the Membership Interest associated with such Economic Interest) was acquired.

(d)    Instruments evidencing a Membership Interest or Economic Interest shall bear and be subject to a legend condition in substantially the following form:

THE UNITS REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("THE ACT").  SUCH UNITS MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON AT ANY TIME WITHOUT REGISTRATION UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS, OR AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQUIRED.  THERE ARE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFER, AS SET FORTH IN THIS OPERATING AGREEMENT. IN ADDITION, IN NO EVENT MAY UNITS BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON WHO IS NOT A RESIDENT OF NEVADA FOR A PERIOD OF NINE MONTHS FROM THE DATE OF THE LAST SALE THEREOF BY THE FUND.

7.02    Transfer of Membership Interests and Substitution.  No assignee of the whole or any portion of a Membership Interest in the Company shall have the right to become a substituted Member in place of his assignor unless the following conditions are first met:

(a)    The assignor shall designate such intention in the instrument of assignment;

(b)    The written consent of the Manager to such substitution shall be obtained, which consent

may be withheld in the sole discretion of the Manager and which, in any event, shall not be given if the Manager determines that such sale or transfer may jeopardize the status of the original sale of said interest pursuant to the non-public and intrastate offering exemptions from registration under the Securities Act;

(c)    The instrument of assignment shall be in a form and substance satisfactory to the Manager;

(d)    The assignor and assignee named therein shall execute and acknowledge such other instruments as the Manager may deem necessary to effectuate such substitution, including but not limited to a power of attorney with provisions more fully described in this Agreement;

(e)    The assignee shall accept, adopt and approve in writing all of the terms and provisions of this Agreement as the same may have been amended;

(f)    Such assignee shall pay or, at the election of the Manager, obligate himself to pay all reasonable expenses (including reasonable attorneys' fees) connected with such substitution; and

(g)    The Company has received, if requested, a legal opinion in form and substance satisfactory to the Manager that such transfer will not violate the registration provisions of the 1933 Act, which opinion shall be furnished at the Member's expense.

Any assignment permitted under this Section 7.02 shall become effective as of the end of business on the last day of the month in which the conditions described in this Section 7.02 have been satisfied.

7.03    <u>Repurchase of Membership Rights Upon Transfer of Economic Interest</u>.    Upon and contemporaneously with any transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with the Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company, for a purchase price equal to $1.00 per Unit of Membership Interest, the Economic Interest of which has been transferred, all remaining rights and interests retained by the Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member. Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member is not unreasonable under the circumstances existing as of the date hereof.

For example, if a Member who holds twenty (20) Units of Membership Interest assigns the Economic Interests pertaining to five (5) Units in accordance with this Article VII, and if the transferee is not admitted as a substituted Member for any reason, such transferee shall hold the five (5) Units of Economic Interest so transferred as an Economic Interest owner and the transferring Member shall sell the balance of the rights associated with the Membership Interest transferred to the Company for an amount equal to five dollars ($5.00) (i.e., $1.00 per Unit of Membership Interest the Economic Interest of which has been transferred). The transferring Member shall retain fifteen (15) Units of Membership Interest.

# ARTICLE VIII
## WITHDRAWAL FROM COMPANY

8.01    <u>Withdrawal by Members</u>.  No Member shall have the right to withdraw from the Company or otherwise obtain the return of all or any portion of his Capital Account balance for a period of one (1) year after the date of the initial purchase of Units and admission to the Company of such Member or its predecessor in interest (the "Holding Period"), except for monthly distributions of Cash Available for Distribution, if any, to which such Member may be entitled pursuant to Section 5.03 above.  After the expiration of said Holding Period, a Member may withdraw, or partially withdraw, from the Company upon the following terms:

(a)    On the first anniversary of a Member's admission to the Company and on each anniversary thereafter, a Member may withdraw all or part of such Member's Capital Account from the Company by providing written notice of such Member's election to withdraw at least thirty (30) days but not sooner than sixty (60) days prior to each anniversary of such Member's admission to the Company.  Within sixty (60) days following such anniversary, the Manager will, to the extent of available Company cash flow, commence to return the Member's capital account.  Members seeking to withdraw their capital from the Company must do so by submitting to the Manager a Withdrawal Notice in the form attached hereto as Exhibit B.

(b)    Commencing with the end of the calendar month in which such Withdrawal Notice is given, any Cash Available for Distribution allocable to the Capital Account (or portion thereof) being withdrawn shall also be distributed in cash to the withdrawing Member in the manner provided in Section 5.03 above.

(c)    Notwithstanding any provision herein to the contrary, in certain situations, as discussed herein, the Company may give priority to the return of the Capital Accounts of certain Members and may return such Capital Accounts prior to the expiration of the Holding Period, as follows:

(i)    First, upon the death of the sole beneficiary of a corporate pension or profit-sharing plan, Individual Retirement Account or other employee benefit plan subject to ERISA or upon the death of a Member (the "Deceased Member"), the return of such Deceased Member's Capital Account shall have priority over the return of other withdrawing Members' and may be returned prior to the expiration of the Holding Period in the Manager's sole and absolute discretion.  If the administrator, executor or other personal representative of the estate of the Deceased Member gives the Manager a Withdrawal Notice, the Company shall, within 30 days thereafter, commence to return the entire Capital Account of the Deceased Member from Cash Available for Distribution.

(ii)    Second, the Manager, at its sole and absolute discretion, shall have the right, at any given time to immediately return all or a portion of the Capital Account of one or more ERISA plan investors (the "ERISA Plan Investors") in order to ensure that the Company remains exempt from the ERISA Plan Asset Regulations.  The return of such ERISA Plan Investors' Capital Accounts shall have priority over the return of all other withdrawing Members' Capital Accounts, including those of Deceased Members, and may be returned prior to the expiration of the Holding Period.

(d)    The withdrawal and return of a Member's Capital Account is subject to the following limitations:

(i)     The Company will not establish a reserve from which to fund withdrawals and, accordingly, the Company's capacity to return a Member's Capital Account is restricted to the availability of Company cash flow in any given calendar quarter. The Company is not required to liquidate any Company loans in order to fund withdrawals. For this purpose, cash flow is considered to be available only after all current Company expenses have been paid (including compensation to the Manager and its Affiliates) and adequate provision has been made for maintaining adequate reserves and for the payment of all monthly cash distributions on a pro rata basis which must be paid to Members who elected to receive such distributions upon subscription for Units.

(ii)     At the sole and absolute discretion of the Manager, the Company shall first apply available cash flow to return all or a portion of the Capital Accounts of ERISA Plan Investors.

(iii)     The Company shall then apply available cash flow to return the Capital Accounts of Deceased Members.

(iv)     If current cash flow in any given calendar quarter is inadequate to return a Member's Capital Account, the Company shall not be required to liquidate any mortgage loans prior to maturity for the purpose of liquidating the Capital Account of a withdrawing Member, but shall be required to pay whatever cash flow is available to withdrawing Members in order of withdrawal requests received. If Withdrawal Notices in excess of these limitations are received by the Manager, the priority of distributions among Members (but not Deceased Members and ERISA Plan Investors, who shall have first priority) shall be determined by the chronological order in which their respective Withdrawal Notices are received.

(v)     If a Member has purchased Units over time, then such Member shall not be entitled to withdraw any portion of its Capital Account that relates to Units which have not been held by such Member for at least one year. For example, if a Member purchased two Units at the start of Year 1 and then two more Units at the start of Year 2, then such Member shall be entitled to withdraw $50,000 of capital in Year 2 (which relates to such Member's purchase of its initial two Units), but cannot withdraw the balance of its capital (which relates to such Member's purchase of the second two Units) until Year 3. The restriction described in this Subsection 8.01(d)(v) shall not apply to the purchase of Units that are made from reinvesting distributions.

(vi)     If a proposed withdrawal would cause a Member's Capital Account to fall below $25,000, then the Member must withdraw its entire capital account from the Company.

(e)     Notwithstanding the foregoing, during the liquidation period the Capital Account of a withdrawing Member shall remain subject to adjustment as described in Section 1.04 above. Any reduction in said Capital Account by reason of an allocation of Losses, if any, shall reduce all subsequent liquidation payments proportionately. In no event shall any Member receive cash distributions upon withdrawal from the Company if the effect of such distribution would be to create a deficit in such Member's Capital Account.

(f)     If the Company dissolves pursuant to Section 9.01 below at a time when any Members who have previously given Withdrawal Notices have not yet received the return of their respective full Capital Accounts, then in such event the winding up provisions of Section 9.02 below shall apply and the distribution provisions of Subsection 9.02(c) shall be controlling, such that liquidation payments shall thereafter be made

proportionately to all Members pursuant to Subsection 9.02(c) and no further payments shall be made pursuant to this Article VIII.

## ARTICLE IX
## DISSOLUTION OF THE COMPANY;
## MERGER OF THE COMPANY

9.01    Events Causing Dissolution.    The Company shall dissolve upon occurrence of the earlier of the following events:

(a)    The election of the Manager, in its sole discretion, to dissolve the Company; or

(b)    The affirmative vote of a Minimum Percentage of Interests; or

(c)    The failure of a Minimum Percentage of Interests to elect a new Manager within (i) 90 days after the removal of the existing Manager as provided in Section 3.06(b), or (ii) six months after the retirement of the existing Manager as provided in Section 3.07.

9.02    Winding Up.    Upon the occurrence of an event of dissolution, the Company shall not immediately be terminated, but shall continue until its affairs have been wound up.  Upon dissolution of the Company, unless the business of the Company is continued as provided above, the Manager will wind up the Company's affairs as follows:

(a)    No new loans shall be made or purchased.

(b)    Except as may be agreed upon by the Manager and a Minimum Percentage of Interests in connection with a merger or consolidation described in Section 9.03, the Manager shall liquidate the assets of the Company as promptly as is consistent with recovering the fair market value thereof, either by sale to third parties (including the Manager or Affiliates) or by servicing the Company's outstanding loans in accordance with their terms; provided, however, the Manager shall liquidate all Company assets for the best price reasonably obtainable in order to completely wind up the Company's affairs within five (5) years after the date of dissolution.

(c)    Except as may be agreed upon by the Manager and a Minimum Percentage of Interests in connection with a merger or consolidation described in Section 9.03, all sums of cash held by the Company as of the date of dissolution (including liquid assets which shall be converted to cash), together with all sums of cash received by the Company during the winding up process from any source whatsoever, shall be applied and promptly distributed to the Members in proportion to the positive balances in their respective outstanding Capital Accounts, but only after all the Company's debts have been paid or otherwise adequately provided for.

(d)    Upon the completion of the liquidation of the Company and distribution of liquidation proceeds, the Manager shall cause to be filed a Certificate of Dissolution as required by the Act and shall furnish to each of the Members a statement setting forth the receipts and disbursements of the Company during such liquidation, the amount of proceeds from such liquidation distributed and the amount of proceeds paid or distributed to Members.

9.03    Merger or Consolidation of the Company.    The Company may be merged or consolidated with one

or more other entities, which may be Affiliates of the Company, provided that the principal terms of any such merger or consolidation are first approved by the Manager and by the affirmative vote of a Minimum Percentage of Interests. In any such merger or consolidation, the Company may be either a disappearing or surviving entity.

# ARTICLE X
## TRANSACTIONS BETWEEN THE COMPANY,
## THE MANAGER AND AFFILIATES

10.01   Loan Brokerage Commission.   USA Commercial Mortgage Company, an Affiliate of the Company, will receive a brokerage or origination fee for loans made by the Company in an amount determined on a case-by-case basis, provided that the loan brokerage or origination fees are anticipated to average between two percent (2%) and four percent (4%) per annum of the principal amount of each loan, but may be lower depending on market conditions. Loan brokerage commissions may be paid to USA Commercial Mortgage Company when the loan is funded or may be paid over the life of the loan. Loan brokerage commissions are underwritten in, and thus will be paid from, Company loans.

10.02   Loan Servicing and Asset Management Fee.   The Manager may act as servicing agent with respect to all Company loans and may manage all of the Company's assets. In consideration for such collection and management efforts, the Manager shall be entitled to receive a monthly loan servicing and asset management fee equal to one-twelfth (1/12th) of one percent (0.16666%) of the Net Assets Under Management as of the last day of each calendar month, payable on or before the fifteenth (15th) day of the following calendar month.

10.03   Sale of Real Estate to the Manager or its Affiliates.   In the event the Company becomes the owner of any real property by foreclosure on a Company loan, the Company may sell such property to the Manager or an Affiliate of the Manager provided the net purchase price must be not less than any of the following: (i) the amount of any third-party offer received, if any; (ii) the independently appraised value of such property at the time of sale; and (iii) the total amount of the Company's ⎡investment⎤ in the property. The Company's investment includes, without limitation, the following: the unpaid principal amount of the Company's loan, unpaid interest accrued to the date of foreclosure, expenditures made to protect the Company's interest in the property such as payments for insurance and taxes, costs of foreclosure (including attorneys' fees actually incurred to prosecute the foreclosure or to obtain relief from stays in bankruptcy), and any advances made by the Manager, if any, on behalf of the Company for any of the foregoing.

A portion of the purchase price may be paid by the Affiliate of the Manager executing a promissory note in favor of the Company, secured by a deed of trust on the property being sold. The note may be in the amount of the entire purchase price of the property paid by the Affiliate or some portion thereof, and the note will otherwise contain terms and conditions comparable to those that would be contained in notes executed by third parties.

(c) If the Company acquires property through foreclosure, USA Commercial Real Estate Group or some other Affiliate of the Manager may, in some circumstances, serve as the listing broker in the sale of such property. USA Commercial Real Estate Group or such Affiliate would earn a competitive brokerage commission.

10.04   Legal Fees.   Documentation of some of the Company's loans will be prepared by the general counsel for USA Commercial Mortgage Company, which is the sole shareholder of the Manager. These legal

fees will be paid by the borrower under such loans.

10.05 <u>Sale of Loans to Manager or Affiliates</u>. The Company may sell existing loans to the Manager or its Affiliates, but only so long as the Company receives net sales proceeds from such sale in an amount equal to the total unpaid balance of principal, accrued interest and other charges owing under such loan. Notwithstanding the foregoing, the Manager shall be under no obligation to purchase any loans from the Company or to guarantee any payments under any Company loan.

10.06 <u>Purchase of Loans from Manager or Affiliates</u>. The Company may purchase existing loans from the Manager or its Affiliates, provided that the following conditions are met:

      (a)     At the time of purchase the borrower shall not be default under the loan; and

      (b)     No brokerage commissions or other compensation by way of premiums or discounts shall be paid to the Manager or its Affiliates by any person by reason of such purchase (except loan origination fees).

10.07 <u>Loan Participations with Affiliates</u>. Some of the Company's loans may be funded or purchased in participation with other entities or funds that have been sponsored by USA Commercial Mortgage Company or other Affiliates of the Manager or with other investors who are clients of USA Commercial Mortgage Company or other Affiliates of the Manager.

10.08 <u>Change in Manager</u>. If USA Capital Realty Advisors ceases to be the Manager or is replaced as the Manager, then the affiliated parties specifically identified in this Article X may change. Such affiliated parties may be replaced by, among other parties, Affiliates of the new Manager.

**ARTICLE XI**
**ARBITRATION**

11.01 <u>Arbitration</u>. As among the parties hereto, all questions as to rights and obligations arising under the terms of this Agreement are subject to arbitration, and such arbitration shall be governed by the rules of the American Arbitration Association.

11.02 <u>Demand for Arbitration</u>. If a dispute should arise under this Agreement, any Member may within sixty (60) days make a demand for arbitration by filing a demand in writing with the other.

11.03 <u>Appointment of Arbitrators</u>. The parties may agree upon one arbitrator, but in the event that they cannot agree, there shall be three, one named in writing by each of the parties within five (5) days after demand for arbitration is given and a third chosen by the two appointed. Should either party refuse or neglect to join in the appointment of the arbitrator(s) or to furnish the arbitrator(s) with any papers or information demanded, the arbitrator(s) are empowered by both parties to proceed ex parte.

11.04 <u>Hearing</u>. Arbitration shall take place in Las Vegas, Nevada, and the hearing before the arbitrator(s) of the matter to be arbitrated shall be at the time and place within said city as is selected by the arbitrator(s). The arbitrator(s) shall select such time and place promptly after his (or their) appointment and shall give written notice thereof to each party at least sixty (60) days prior to the date so fixed. At the hearing any relevant evidence

may be presented by either party, and the formal rules of evidence applicable to judicial proceedings shall not govern. Evidence may be admitted or excluded in the sole discretion of the arbitrator(s). Said arbitrator(s) shall hear and determine the matter and shall execute and acknowledge their award in writing and cause a copy thereof to be delivered to each of the parties.

11.05  Arbitration Award. If there is only one arbitrator, his decision shall be binding and conclusive on the parties, and if there are three arbitrators, the decision of any two shall be binding and conclusive. The submission of a dispute to the arbitrator(s) and the rendering of his (or their) decision shall be a condition precedent to any right of legal action on the dispute. A judgment confirming the award of the arbitrator(s) may be rendered by any Court having jurisdiction; or such Court may vacate, modify, or correct the award in accordance with the prevailing sections of Nevada law.

11.06  New Arbitrators. If three arbitrators are selected under the foregoing procedure but two of the three fail to reach an agreement in the determination of the matter in question, the matter shall be decided by three new arbitrators who shall be appointed and shall proceed in the same manner, and the process shall be repeated until a decision is finally reached by two of the three arbitrators selected.

11.07  Costs of Arbitration. The costs of such arbitration shall be borne by the losing party or in such proportions as the arbitrator(s) shall determine.

## ARTICLE XII
## MISCELLANEOUS

12.01  Covenant to Sign Documents. Without limiting the power of attorney granted by Sections 2.06 and 2.07 above, each Member covenants, for himself and his successors and assigns, to execute, with acknowledgment or verification, if required, any and all certificates, documents and other writings which may be necessary or expedient in the creation of the Company and the achievement of its purposes, including, without limitation, all such filings, records or publications necessary or appropriate in the judgment of the Manager to comply with the applicable laws of any jurisdiction in which the Company shall conduct its business.

12.02  Notices. Except as otherwise expressly provided for in this Agreement, all notices which any Member may desire or may be required to give any other Member shall be in writing and shall be deemed duly given when delivered personally or when deposited in the United States mail, first-class postage prepaid, addressed to the Member's address as shown in the books of the Company pursuant to written notification to the Manager. Notices to the Manager or to the Company shall be delivered to the Company's principal place of business, as set forth in Section 2.03 above or as hereafter charged as provided herein.

12.03  Right to Engage in Competing Business. Nothing contained herein shall preclude any Member from purchasing or lending money upon the security of any other property or rights therein, or in any manner investing in, participating in, developing or managing any other venture of any kind, without notice to the other Members, without participation by the other Members, and without liability to them or any of them. Each Member waives any right he may have against the Manager for capitalizing on information received as a consequence of the Manager's management of the affairs of this Company.

12.04  Amendment. This Agreement is subject to amendment by the affirmative vote of a Minimum Percentage of Interests with the written concurrence of the Manager. Notwithstanding anything to the contrary

contained in this Agreement, the Manager shall have the right to amend this Agreement, without the vote or consent of any of the Members, when:

     (a)     There is a change in the name of the Company or the amount of the contribution of any Member;

     (b)     A person is substituted as a Member;

     (c)     An additional Member is admitted;

     (d)     A person is admitted as a successor or additional Manager in accordance with the terms of this Agreement;

     (e)     There is a change in the character of the business of the Company;

     (f)     There is a false or erroneous statement in this Agreement; or

     (g)     A change in this Agreement is required in order that it shall accurately represent the agreement among the Members.

12.05 <u>Governing Law</u>. This Agreement shall be governed by and shall be interpreted and enforced in accordance with the substantive laws of the State of Nevada.

12.06 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties and supersedes any and all prior agreements and representations, either oral or in writing, between the parties hereto with respect to the subject matter contained herein.

12.07 <u>Waiver</u>. No waiver by any party hereto of any breach of, or default under, this Agreement by any other party shall be construed or deemed a waiver of any other breach of or default under this Agreement, and shall not preclude any party from exercising or asserting any rights under this Agreement with respect to any other breach or default.

12.08 <u>Severability</u>. If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

12.09 <u>Captions</u>. Section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference an in no way define, limit, extend or describe the scope of this Agreement.

12.10 <u>Number and Gender</u>. Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and the word "person" shall include a natural person, firm, partnership, corporation, trust, association of other form of legal entity. Any consent or action required or permitted to be given or made by a Manager may be given or made by any Manager.

12.11 <u>Counterparts</u>. This Agreement may be executed in counterparts, any or all of which may be signed

by the Manager on behalf of the Members as their attorney-in-fact.

12.12  Legal Representation.

(a)    Counsel to the Company may also be counsel to the Manager or any Affiliate of the Manager.  The Manager may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to any applicable rules of professional conduct or similar rules ("Rules").  The law firm engaged as legal counsel to the Company in connection with the formation of the Company and the offer and sale of Units ("Company Counsel") is not involved in the underwriting, documentation or routine servicing of loans made or acquired by the Company.  Each Member acknowledges that Company Counsel does not and will not represent any Member, and that in the absence of a clear and explicit written agreement Company Counsel shall owe no duties directly to any Member. Notwithstanding any adversity that may develop, in the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and the Manager (or its Affiliate), on the other hand, then each Member agrees that Company Counsel may represent either the Company or such Manager (or its Affiliate), or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

(b)    Each Member further acknowledges that Company Counsel has represented only the interests of the Manager and not the other Members in connection with the formation of the Company and the preparation and negotiation of this Agreement, and each Member acknowledges that it has been afforded the opportunity to consult with independent counsel with regard thereto.

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands the day and year first above written.

**MANAGER:**            USA CAPITAL REALTY ADVISORS,
                        a Nevada corporation

                        By: _____

                        Its: _____
                              President

**INITIAL MEMBER:**      USA CAPITAL REALTY ADVISORS,
                        a Nevada corporation

                        By: _____

                        Its: _____
                              President

# FIRST AMENDMENT
## TO
## OPERATING AGREEMENT
### OF
### USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

THE UNDERSIGNED, being the sole manager (the "Manager") of USA Capital Diversified Trust Deed Fund, LLC, a Nevada limited-liability company (the "Company"), does hereby make and enter into this First Amendment to Operating Agreement (this "First Amendment") as of the date set forth on the signature page hereto (the "Effective Date") for the purposes of amending the Company's operating agreement dated February 10, 2000 (the "Operating Agreement").

**1.    AMENDMENT**

In accordance with the powers granted to the Manager in Section 12.04(f) and Section 12.04(g) of the Operating Agreement, Section 4.07 of the Operating Agreement, which currently reads as follows:

> 4.07    Limited Liability of Members. Units are non-assessable, and no Member shall be personally liable for any of the expenses, liabilities, or obligations of the Company or for any of the losses thereof beyond the amount of such Member's agreed upon Capital Contribution to the Company and such Member's share of any undistributed net income and gains of the Company' provided, that each Member shall remain liable to return to the Company any distributions that such Member is obligated to return pursuant to the Act; and provided further, that upon dissolution and termination of the Company each Member shall be liable to pay to the Company the amount of any deficit remaining in such Member's Capital Account, if and to the extent required under Subsection 9.02(e) below.

shall be amended and replaced in its entirety with the following:

> 4.07    Limited Liability of Members. Units are non-assessable, and no Member shall be personally liable for any of the expenses, liabilities, or obligations of the Company or for any of the losses thereof beyond the amount of such Member's agreed upon Capital Contribution to the Company and such Member's share of any undistributed net income and gains of the Company' provided, that each Member shall remain liable to return to the Company any distributions that such Member is obligated to return pursuant to the Act.

**2.    GENERAL PROVISIONS**

**2.1    Interpretation.** In the event that there is a conflict between any of the provisions of this First Amendment and any of the provisions of the Operating Agreement, the provisions of this First Amendment shall control.

**2.2    Remaining Terms and Conditions.** Except as expressly amended or modified by this First Amendment, all of the terms and conditions of the Operating Agreement shall remain unchanged and in full force and effect.

**2.3    Governing Law; Venue.** This First Amendment shall be governed by and shall be interpreted and enforced in accordance with the substantive laws of the State of Nevada.

**2.4    Neutral Interpretation.** This First Amendment shall be construed in accordance with its intent and without regard to any presumption or any other rule requiring construction against the party causing the same to be drafted.

IN WITNESS WHEREOF, the undersigned has executed this First Amendment as of the 2nd day of June 2002.

**USA CAPITAL REALTY ADVISORS, LLC**

By:   **USA INVESTMENT PARTNERS, LLC,**
its sole manager

By:   **USA COMMERCIAL MORTGAGE COMPANY,**
its sole manager

By: _____

Its: _____ President _____

**EXHIBIT C – Form of Distributions Notice**

USA Capital Realty Advisors, LLC
4484 South Pecos Road
Las Vegas, Nevada 89121


Ladies and Gentlemen:

      I am an investor in USA Capital Diversified Trust Deed Fund, LLC (the "Fund"). By checking in the space below, I am exercising my election to switch how my future distributions from the Fund are treated.

☐      My distributions from the Fund are currently paid to me on a monthly basis. I hereby elect to have all future distributions from the Fund reinvested through the purchase of additional Unit(s), rather than distributed to me on a monthly basis. I understand that my ability to have future Fund distributions reinvested is subject to and only valid so long as (i) an effective registration statement is on file with the Securities Division of the Nevada Secretary of State, and (ii) the Units I would be purchasing are registered under the Securities Act of 1933, as amended, or an exemption from such registration being available. I further acknowledge that I have received and reviewed the most current Prospectus for the Fund.

☐      My distributions from the Fund are currently reinvested through the purchase of additional Unit(s)). I hereby elect to have all future distributions from the Fund paid to me on a monthly basis. All future distributions from the Fund should be mailed to me at the address given below.

      This election is subject to all of the terms and conditions set forth in the Prospectus and the Operating Agreement for the Fund.


_____

[Name of investor]


_____    _____

[Signature of investor]         [Date]


_____


_____

[Current address of investor]

**EXHIBIT D – Form of Withdrawal Notice**

USA Capital Realty Advisors, LLC
4484 South Pecos Road
Las Vegas, Nevada 89121

Ladies/Gentlemen:

I am an investor in USA Capital Diversified Trust Deed Fund, LLC (the "Fund"). I hereby elect to withdraw the following amount of my investment in the Fund:

$_____

[specify dollar amount that you seek to withdraw; if your proposed withdrawal would cause your capital account to fall below $25,000, then you must withdraw your entire interest in the Fund]

I understand that this withdrawal election is subject to all of the terms and conditions contained in the Prospectus and Operating Agreement for the Fund. I understand that the Fund does not maintain reserves to fund investor withdrawals and that my request for withdrawal will be subject to available Fund cash flow, as described in the Operating Agreement. Additionally, I acknowledge that under the Prospectus and Operating Agreement, certain types of investors seeking withdrawal from the Fund may have priority over my withdrawal request.

All withdrawal payments should be mailed to me at the address given below.


_____
[Name of investor]


_____            _____
[Signature of investor]                   [Date]


_____


_____
[Current address of investor]

D–2

Form of Subscription Agreement

THE MEMBERSHIP UNITS TO BE PURCHASED THROUGH THIS SUBSCRIPTION AGREEMENT MAY ONLY BE PURCHASED BY BONA FIDE RESIDENTS OF THE STATE OF NEVADA AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF SUCH MEMBERSHIP UNITS MAY BE MADE: (A) EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT; OR (B) UNLESS THE FUND HAS BEEN FURNISHED WITH A SATISFACTORY OPINION OF COUNSEL FOR THE HOLDER THAT SUCH TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION IS EXEMPT FROM THE PROVISIONS OF SECTION 5 OF THE ACT AND THE RULES AND REGULATIONS IN EFFECT THEREUNDER. IN ADDITION, FOR A PERIOD OF NINE (9) MONTHS FROM THE DATE OF THE LAST SALE OF MEMBERSHIP UNITS BY THE FUND, IN NO EVENT MAY SUCH MEMBERSHIP UNITS BE OFFERED FOR SALE, TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF TO ANY PERSON WHO IS NOT A BONA FIDE RESIDENTS OF THE STATE OF NEVADA.

## SUBSCRIPTION AGREEMENT

THIS SUBSCRIPTION AGREEMENT (this "Agreement") is made and entered into as of the date set forth on the signature page hereto, by and between USA Capital Diversified Trust Deed Fund, LLC, a Nevada limited-liability company (the "Fund"), and the prospective purchaser listed on the signature page hereto (the "Purchaser").

## WHEREAS

WHEREAS, the Fund has distributed with this Agreement a copy of its Prospectus dated June 9, 2003 (the "Prospectus") through which the Fund is conducting an offering of certain of its membership units (the "Units") in reliance upon the exemption from registration provided by Section 3(a)(11) of the Securities Act of 1933, as amended (the "Securities Act"), and the rules and regulations promulgated thereunder (the "Offering");

WHEREAS, the Fund wishes to sell to the Purchaser, and the Purchaser wishes to purchase from the Fund, on the terms and in the manner set forth in this Agreement and in the Prospectus, the number and amount of the Units as indicated on the signature page attached hereto;

NOW, THEREFORE, for and in consideration of the premises and mutual covenants, agreements, understandings, undertakings, representations, warranties and promises, and subject to the conditions hereinafter set forth, and intending to be legally bound thereby, the parties do hereby covenant and agree that the recitals set forth above are true and accurate and are hereby incorporated in and made a part of this Agreement, and further covenant and agree as follows:

1.    PURCHASE AND SALE OF THE UNITS

    1.1    **Purchase Price.** Subject to the terms and conditions of this Agreement, the Purchaser hereby agrees to purchase from the Fund, and the Fund hereby agrees to sell to the Purchaser, the Units in the number and amount indicated on the signature pages attached hereto (the "Investment Amount").

**1.2    Acknowledgment from the Fund.**  Upon execution of this Agreement, receipt of the Investment Amount and acceptance of this Agreement by the Fund, the Fund will deliver to the Purchaser an acknowledgment of its receipt of the Investment Amount and the resulting number of Units.

**2.    USE OF PROCEEDS**

The Investment Amount shall be used as described in the Prospectus.  Upon execution and delivery of this Agreement, the Investment Amount shall not, under any circumstances, be refunded to the Purchaser.

**3.    REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**

The Purchaser hereby represents and warrants to the Fund as follows:

**3.1    Nevada Resident Status.**  The Purchaser is a bona fide resident of the State of Nevada. The Purchaser understands the Fund is relying on the Purchaser with respect to the accuracy of this representation and understands the significance of the Purchaser's representation to the Fund that the Purchaser is a Nevada resident.  If the Purchaser is an entity, the principal office and the principal place of business of the Purchaser are located in the State of Nevada.  If the undersigned is acting as the trustee or custodian of a Keogh plan, Individual Retirement Account or other retirement plan and is not a resident of the State of Nevada, the undersigned represents and warrants that:  (1) all participants or beneficiaries of such retirement plan have are bona fide residents of the State of Nevada; (2) all investment decisions regarding such retirement plan are made by such participants or beneficiaries; and (3) the undersigned performs only ministerial functions with respect to the investment of the assets of the retirement plan with no independent authority or discretion to make investment decisions.

**3.2    Independent Investigation.**  The Purchaser represents and warrants that the Purchaser has received and has reviewed in its entirety the Prospectus and the appendices attached thereto.  In addition, the Purchaser represents and warrants that the Purchaser has had a reasonable opportunity to ask questions of and receive answers from the Fund concerning the Fund and the Offering, and all such questions, if any, have been answered to the full satisfaction of the Purchaser.  In making this investment decision to purchase the Units, the Purchaser is not relying on any oral or written representations or assurances from the Fund or its agents other than as set forth in this Agreement.

**3.3    Authorization.**  This Agreement constitutes valid and legally binding obligations of the Purchaser, enforceable in accordance the terms herein.  The Purchaser has full power and authority to enter into this Agreement.  To the extent that the Purchaser is a trust, the undersigned trustee of the Purchaser is the duly authorized trustee and the Purchaser has all necessary powers and authority to acquire the Units under the laws of the state of its domicile and under the terms of the trust agreement, as amended, under which it was created.  To the extent that the Purchaser is a corporation, limited-liability company or partnership, the undersigned officer, manager or general partner of the Purchaser is the duly authorized officer, manager or general partner and the Purchaser has all necessary powers and authority to acquire the Units under the laws of the state of its organization, the terms of the appropriate agreement, as amended, under which it was created, and the terms of the appropriate agreement, as amended, under which it is governed.

**3.4    Purchase for Own Account.**  The Units will be acquired for investment purposes only for such Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and he has no present intention of selling, granting any participation in, or otherwise distributing the same.  By executing this Agreement, the Purchaser further represents and warrants that the Purchaser does not have any contract, undertaking, agreement, or arrangement with any

person to sell, transfer, or grant participations to such person or to any third person, with respect to any of the Units.

**3.5     Restricted Securities.** The Purchaser understands that the Units are characterized as "restricted securities" under the federal securities laws inasmuch as the Units are being acquired from the Fund in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Securities Act only in certain limited circumstances. In this regard, the Purchaser represents that the Purchaser is familiar with Securities and Exchange Commission Rule 144 ("Rule 144"), as presently in effect, and understand the resale limitations imposed thereby and by the Act. Without in any way limiting the representations set forth above, the Purchaser: (1) agrees not to make any disposition of all or any portion of the Units unless there is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or (2) shall have notified the Fund of the proposed disposition and shall have furnished the Fund with a statement of the circumstances surrounding the proposed disposition, and, if reasonably requested by the Fund, the Purchaser shall have furnished the Fund with an opinion of counsel, reasonably satisfactory to the Fund, that such disposition will not require registration of such Units under the Act. It is agreed that the Fund will request opinions of counsel for transactions made pursuant to Rule 144 only if such request is reasonable.

**3.6     Risk of Loss.** The Purchaser represents and warrants that the Purchaser: (1) can bear the economic risk of loss of the Purchaser's entire investment in the Fund and the Units without any material adverse effect on the Purchaser's economic stability; and (2) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the investment to be made by the Purchaser pursuant to this Agreement and the Prospectus. The Purchaser understands that an investment in the Fund involves substantial risks and has reviewed the "RISK FACTORS" section of the Prospectus.

**3.7     Independent Legal Advice.** The Purchaser represents and warrants that the Purchaser has had the opportunity to review this Agreement and the transactions contemplated by this Agreement with his own legal counsel. The Purchaser is relying solely on such counsel, if any, and not on any statements or representations of the Fund of any of its agents for legal advice with respect to this investment or the transactions contemplated by this Agreement.

**3.8     Consent to Terms of the Operating Agreement.** The Purchaser represents and warrants that the Purchaser understands that execution of this Agreement by the Purchaser constitutes consent to the terms of the Operating Agreement of the Fund, as amended (the "Operating Agreement"). In this regard, the Purchaser has carefully reviewed the rights, obligations and privileges of the Units as described in the Prospectus and the Operating Agreement and agrees to each and every term thereof.

**4.     LIMITED POWER OF ATTORNEY**

**4.1     Scope.** The Purchaser hereby irrevocably constitutes and appoints the Fund's manager or its designee(s) as the Purchaser's true and lawful attorney-in-fact, with full power and authority for the Purchaser, and in the Purchaser's name, place and stead, to execute, acknowledge, verify, deliver, record, publish and file on the Purchaser's behalf the following:

**4.1.1**     The Operating Agreement and the articles of organization of the Fund and any amendments thereto or cancellations thereof required under the laws of the State of Nevada;

**4.1.2**     Any other certificates, instruments and documents as may be required by, or may be appropriate under, the laws of any state or other jurisdiction in which the Fund is doing or intends to do business; and

4.1.3    Any documents that may be required to effect the continuation of the Fund, the admission of an additional or substituted member, or the dissolution and termination of the Fund.

**4.2    Term; Exercise; Survival.** This limited power of attorney is a special power of attorney and is coupled with an interest in favor of the Manager and as such:

4.2.1    Shall be irrevocable and continue in full force and effect notwithstanding the subsequent death or incapacity of any party granting this limited power of attorney, regardless of whether the Fund or the Fund's manager shall have had notice thereof;

4.2.2    May be exercised for a member by a facsimile signature of the Fund's manager or, after listing more than one member, including the undersigned, by a single signature of the Fund's manager acting as attorney in fact for all of them; and

4.2.3    Shall survive the delivery of an assignment by the Purchaser of the whole or any portion of the Purchaser's Units in the Fund, except that where the assignee thereof has been approved by the Fund's manager for admission to the Fund and a substituted member, this limited power of attorney given by the assignor shall survive the delivery of such assignment for the sole purpose of enabling the Fund's manager to execute, acknowledge, and file any instrument necessary to effect such substitution.

**5.    INDEMNIFICATION BY THE PURCHASER**

The Purchaser agrees that the Purchaser shall indemnify and hold harmless the Fund and its members, managers, officers, directors, employees, agents and professional advisors from and against any and all loss, damage, liability, or expense, including costs and reasonable attorneys' fees, that the foregoing, or any of them, may incur by reason of, or in connection with, any misrepresentation, inaccurate statement or material omission made by the Purchaser herein, any breach of any of the Purchaser's warranties, or any failure on the Purchaser's part to fulfill any of the Purchaser's covenants, agreements or obligations set forth herein.

**6.    GENERAL PROVISIONS**

**6.1    Attorneys' Fees.** If any legal action or any arbitration or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it may be entitled.

**6.2    Survival of Warranties.** The warranties, representations and covenants of the Purchaser contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of the Purchaser or the Fund.

**6.3    Successors and Assigns.** Nothing in this Agreement, express or implied, is intended to confer upon any party other than the signatories hereto any rights, remedies, obligations, or liabilities under or by reason of this Agreement. The Purchaser may not assign any of the Purchaser's rights or interests in and under this Agreement without the prior written consent of the Fund, and any attempted assignment without such consent shall be null and void and without any force or effect whatsoever.

**6.4    Governing Law; Venue.** This Agreement shall be governed by and construed under the law of the State of Nevada, disregarding any principles of conflicts of law that would otherwise provide

for the application of the substantive law of another jurisdiction. The Fund and the Purchaser: (1) agree that any legal suit, action or proceeding arising out of or relating to this Agreement shall be instituted exclusively in Nevada State Court, County of Clark, or in the United States District Court for the District of Nevada; (2) waive any objection to the venue of any such suit, action or proceeding and the right to assert that such forum is not a convenient forum; and (3) irrevocably consent to the jurisdiction of the Nevada State Court, County of Clark, and the United States District Court for the District of Nevada in any such suit, action or proceeding. Each of the foregoing persons further agrees to accept and acknowledge service of any and all process which may be served in any such suit, action or proceeding in the Nevada State Court, County of Clark, or in the United States District Court for the District of Nevada and agrees that service of process upon it mailed by certified mail to its address shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding.

     **6.5**     **Counterparts.** This Agreement may be executed at different times and in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

     **6.6**     **Titles and Subtitles.** The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

     **6.7**     **Notices.** Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing, shall be sent by facsimile to the party to be notified and shall be deemed effectively given upon personal delivery to the party to be notified, or four days after deposit with the United States Post Office, by registered or certified mail, postage prepaid and addressed to the party to be notified. Any notice to the Purchaser shall be sent to his facsimile number and address set forth on the signature page hereto, or at such other facsimile number or address as a party may designate by ten (10) days' advance written notice to the other party. Any notice to the Fund shall be sent to Joseph D. Milanowski, USA Capital Diversified Trust Deed Fund, LLC, 4484 South Pecos Road, Las Vegas, Nevada 89121, facsimile number (702) 734-0163.

     **6.8**     **Entire Agreement; Amendments and Waivers.** This Agreement constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Fund and the Purchaser.

     **6.9**     **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms. In addition, if any such provision, or any part thereof, is held to be unenforceable, the parties agree that the court, regulatory agency or other governmental body making such determination shall have the power to delete or add specific words or phrases, so that such provision shall then be enforceable to the fullest extent permitted by law.

     **6.10**     **Neutral Interpretation.** This Agreement shall be construed in accordance with its intent and without regard to any presumption or any other rule requiring construction against the party causing the same to be drafted.

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date first set forth above.

| NUMBER OF UNITS | PRICE PER UNIT | | AMOUNT |
|---|---|---|---|
| _____ Units      x | $25,000 | = | $ _____ |

**(The "Minimum Subscription" is one (1) Unit or $25,000)**

**INDIVIDUAL:**

_____
(Signature of Subscriber)

Date: _____

By: _____
       (Print Name of Subscriber)

Address: _____

SSN: _____

_____ Nevada _____
      (City)                              (Zip Code)

_____
(Signature of Joint Investor / Additional Signatory) (if applicable)

Date: _____

By: _____
       (Print Name of Joint Investor / Additional Signatory)

SSN: _____

**ENTITY:**

_____
(Signature of Authorized Signatory)

Date: _____

By: _____
       (Print Name of Authorized Signatory)

Address: _____

Its: _____
       (Print Title of Authorized Signatory)

_____ Nevada _____
      (City)                              (Zip Code)

EIN: _____

**RETIREMENT PLAN:**

_____
(Signature of Individual Plan Participant)

Date: _____

By: _____
       (Print Name of Individual Plan Participant)

Address: _____

SSN: _____

_____ Nevada _____
      (City)                              (Zip Code)

_____
(Signature of Custodian or Trustee)

Date: _____

By: _____
       (Print Name of Custodian or Trustee)

Its: _____
       (Print Title of Custodian or Trustee)

## ACCEPTANCE OF SUBSCRIPTION AGREEMENT

On _____, 20___, USA Capital Diversified Trust Deed Fund, LLC, a Nevada limited-liability company (the "Fund"), hereby accepts the offer of the above purchaser to purchase the Membership Units of the Fund (the "Units") in the dollar amount and number of the Units as stated on the previous signature page.

**USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC**

By:   **USA CAPITAL REALTY ADVISORS, LLC,**
         its sole manager

    By:   **USA INVESTMENT PARTNERS, LLC,**
                  its sole manager

        By:   **USA COMMERCIAL MORTGAGE COMPANY,**
                           its sole manager

           By:   _____
                                    _____
                                    _____