Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

**E-Filed January 23, 2007**

and

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com

Attorneys for Appellees - Debtors and Debtors-in-Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>　　　　　Debtor. | ) ) ) ) | BK-S-06-10725-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>　　　　　Debtor. | ) ) ) | BK-S-06-10726-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>　　　　　Debtor. | ) ) ) | BK-S-06-10727-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>　　　　　Debtor. | ) ) ) | BK-S-06-10728-LBR<br>Chapter 11 |
| In re:<br>USA SECURITIES, LLC,<br>　　　　　Debtor. | ) ) ) | BK-S-06-10729-LBR<br>Chapter 11 |
| Affects:<br>☑ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA Capital First Trust Deed Fund, LLC<br>☐ USA Securities, LLC | ) ) ) ) ) ) ) ) ) | **OPPOSITION TO MOTION FOR STAY PENDING APPEAL**<br><br>Date:  January 24, 2007<br>Time:  3:30 p.m. |

407354v6

USA Commercial Mortgage Company ("USACM"), USA Securities, LLC ("USA Securities"), USA Capital Realty Advisors, LLC ("USA Realty"), USA Capital Diversified Trust Deed Fund, LLC ("DTDF"), and USA Capital First Trust Deed Fund, LLC ("FTDF"), debtors and debtors in possession in the above-captioned cases (the "Chapter 11 Cases") and the Appellees herein (collectively, the "Debtors"), hereby oppose (the "Opposition") the request of the Lenders Protection Group ("LPG")[1] and Charles B. Anderson Trust, Rita P. Anderson Trust, Baltes Company, Kehl Family Members (not defined by Appellants—*see* n.1), and Mohave Canyon, Inc. (the "Jones Vargas Direct Lenders" and together with the LPG, the "Appellants") for a stay of the Bankruptcy Court's *Order Confirming the "Debtors' Third Amended Joint Chapter 11 Plan of Reorganization"* (the "Plan," and "Confirmation Order")[2] pending appeal (the "Stay Motion").  In support of this Opposition, the Debtors submit the attached Memorandum of Points and Authorities, the Declaration of Thomas J. Allison filed concurrently herewith, and the entire record in the Chapter 11 Cases.

As discussed in detail in part I.A of the attached Memorandum of Points and Authorities, the Debtors-Appellees respectfully submit that the Stay Motion should be denied because the Appellants have failed to meet their burden for obtaining a stay pending their appeal of the Confirmation Order pursuant to Fed. R. Bankr. P. 8005 and the four-part test applied thereunder.

First, the Appellants have not established and cannot establish that they are likely to succeed on the merits because the Appellants objected to confirmation of the Plan but failed to present any evidence to the Bankruptcy Court in support of their objections.  Rather, the Debtors presented evidence in support of the confirmation of the Plan and to address the issues raised by the Appellants, this evidence was admitted by the Bankruptcy Court, and based on that evidence,

---

[1]  Neither the Notice of Appeal nor the Amended Notice of Appeal conforms to the Federal Rules of Bankruptcy Procedure because they fail to identify  the individuals that comprise the "Lenders Protection Group."  *See* Fed. R. Bankr. P. 8001(a) (2) (the notice of appeal "shall contain the names of all parties to the judgment, order or decree appealed from . . . ").  The "2019 Statement" that is referenced in the Notices is unclear, and as counsel for the "Lender Protection Group" admits, may need amendment.  This defect is potentially jurisdictional in nature.

[2]  Terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan.

1   the Bankruptcy Court entered the Confirmation Order.  The Appellants, having failed to present

2   any evidence below, are not aggrieved by the Confirmation Order, are barred from attacking it, and

3   certainly are incapable of making any showing that they are likely to succeed on the merits of this

4   appeal.

5          Appellants also have not established and cannot establish that they are likely to succeed on

6   the merits because (1) the USACM estate is entitled to recoup from Borrowers the illegal payments

7   made to the Direct Lenders prepetition, (2) no adversary proceeding is required for such

8   recoupment, and (3) the Direct Lender Compromise (as provided for under the Plan) is binding and

9   enforceable.

10          Second, the Appellants have not established that they will suffer irreparable injury—the

11   fact that their appeal may be rendered moot does not establish irreparable harm.

12          Third, in their Stay Motion, the Appellants have not even argued, much less demonstrated,

13   that no substantial harm will come to the Debtors-Appellees and other interested parties by the

14   imposition of a stay.  The Debtors, their estates, their creditors, and most significantly the over

15   4,000 investors will suffer substantial harm if the Stay Motion is granted.  The $67 million sale

16   will be thrown into jeopardy and the Effective Date of the Plan may never occur, leaving

17   thousands of investors not only with a markedly reduced recovery – if at all – but also without a

18   loan servicer to service their remaining approximately $750 million of investments in the loans[3]

19   currently being serviced by USACM.

20          Finally, the Appellants fail to demonstrate that a stay will not harm the public interest.

21          Accordingly, because the Appellants have not and cannot establish that they are entitled to

22   a stay pending their appeal of the Confirmation Order, the Stay Motion should be denied.  But, if

23   this Court is inclined to grant the Stay Motion, the Debtors maintain that any stay should be

24   conditioned on the Appellants posting a bond in an amount not less than $20 million from an

25   independent party.  This issue is discussed in more detail in part II.B of the attached Memorandum

26   of Points and Authorities.

27   _____

28   [3]    As of September 2006.

3

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.

3

## STATEMENT OF FACTS

4  **A.    General Background**

5          1.        USACM, a loan servicing company, facilitated individual investments in

6  fractional interests in loans to third party borrowers secured by first trust deed mortgages to more

7  than 3,600 individual investors (the "Direct Lenders").[4]  DTDF and FTDF, two investment funds,

8  with more than 1,300 and 950 members, respectively, and investments in 21 and 47 loans,

9  respectively, also loaned money, under the direction and control of USACM and its insiders, to

10  third party borrowers.  In total, as of the Petition Date USACM was servicing approximately 115

11  loans under this arrangement.

12          2.        Prior to the Petition Date, USACM regularly made monthly interest

13  payments to Direct Lenders regardless of whether the borrowers of the particular loans in which

14  the Direct Lenders had an interest were paying USACM.  These illegal payments included diverted

15  principal paid on loans from other borrowers to make these so-called "interest payments" (resulting

16  in claims for "Unremitted Principal"), deferred loan and related fees payable to USACM, money

17  transferred from DTDF, and funds received from other sources.[5]  All of these funds and others

18  were commingled in a single account of the Debtors in violation of Nevada law, rendering

19  impossible the tracing of these Prepaid Interest funds.  The Debtors' post-petition management has

20  determined that, as of the Petition Date, USACM made approximately $39.5 million in such

21  advance payments to Direct Lenders that did not come from their own Borrowers (defined in the

22  Plan as "Prepaid Interest").

23          3.        As USACM did not have sufficient funds to make monthly interest

24  

---

25  [4]  In the loans that USACM brokered, anywhere from 2 to 400 Direct Lenders could be investors

26  on a single loan.

27  [5]  Thus, Unremitted Principal creditors have a general unsecured claim against USACM, as the
   Bankruptcy Court found that they can neither trace the prepetition payment of "Prepaid

28  Interest" to their diverted principal nor assert any interest in the money that has been collected
   after the Petition Date.

1  payments to all Direct Lenders in April 2006, it did not make any payments to any of the Direct

2  Lenders, including the two Funds.

3          4.      Because of this fraudulent mismanagement, USACM, DTDF, and FTDF,

4  along with two other affiliated entities, including the putative manager of FTDF and DTDF, USA

5  Realty, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, on April 13,

6  2006 (the Petition Date").

7          5.      These cases are complex, emotionally charged and have been often

8  contentious.  As of the Petition Date, the Debtors' pre-petition management was removed and

9  replaced by Thomas J. Allison of Mesirow Interim Financial Management ("Mesirow") as the

10 Chief Restructuring Officer for each of the Debtors, working with a team of Mesirow

11 professionals.  Mesirow quickly discovered that the books and records were nonexistent or in

12 shambles and had to be re-created, a daunting task that alone took nearly three months.  These

13 cases involve over 4,000 investors who, as of the Petition Date, directly or indirectly owned

14 investments of approximately $960 million in the 115 loans.  Many of these investors are elderly

15 people who invested their retirement monies and rely on the return on these investments to pay

16 their day to day living expenses.  Furthermore, four (4) official committees (the "Committees")

17 were appointed to represent the divergent interests in these Chapter 11 Cases: a committee to

18 represent the interests of the Direct Lenders, two committees to represent, respectively, each of the

19 Funds, and a committee to represent the interests of the general unsecured creditors of USACM,

20 which internally had the duty to represent not only trade creditors but also Lenders with claims for

21 unremitted principal.  All of the professionals of the Debtors' estates agree that the Chapter 11

22 Cases are among the toughest cases in which they have been involved.

23      **B.      The Sale And The Plan**

24          6.      Notwithstanding the challenges, the Debtors and Committees were able to

25 work together to formulate a resolution to these Chapter 11 Cases within eight months after they

26 had commenced.  These negotiations were extensive and sometimes contentious.  The parties

27 quickly realized that a traditional stand-alone reorganization would not work in this instance—no

28 third party was willing to finance and service a relatively short-term portfolio with numerous

1   delinquent loans, and, significantly, the Debtors could not and would not be able to continue to

2   fund their operations.  Accordingly, the Debtors commenced a process to implement a sale through

3   a chapter 11 plan.  In this regard, the Debtors and Committees negotiated a stalking horse bid in an

4   amount of approximately $47 million for the purchase of certain of the USACM servicing assets

5   and FTDF's fractionalized interests in over 47 loans.  Through a spirited auction held on December

6   7, 2006, $20 million more in value was generated through overbids.  In the end, Compass Partners,

7   LLC ("Compass") emerged as the successful bidder with a purchase price of approximately $67

8   million, which was documented in an asset purchase agreement, dated as of December 8, 2006,

9   between the Debtors and Compass (the "APA").  Under the terms of the APA, if the Confirmation

10  Order does not become a Final Order (as defined in the APA) **by February 16, 2007** (the "Outside

11  Approval Date"), Compass has the unilateral right to terminate the APA and receive a refund of its

12  deposit.

13          7.      Early in the process, the Debtors and Committees agreed that it was critical

14  that the sale be approved through a plan.  Concurrently with the marketing of the assets of

15  USACM and FTDF, the Debtors and Committees actively negotiated the terms of a plan,

16  beginning with a joint term sheet in early September 2006, that embodied crucial compromises by

17  and between the following parties: (1) FTDF and DTDF (which provides DTDF with $1 million

18  from FTDF's sale proceeds under the Plan to fund litigation necessary to generate recovery for its

19  members); (2) USACM and the Direct Lenders, that results in releases for the Direct Lenders so

20  they will not be sued by USACM for at least two years (and likely not at all) for the recovery of

21  illegal payments made prepetition and provides USACM with the recouped funds necessary to

22  generate recovery for USACM creditors; and (3) FTDF and USACM, which resolves all litigation

23  between these two Debtors.  These compromises are detailed and interdependent, and form the

24  fundamental foundation of the Plan.

25          8.      The Plan was fully supported by each of the Committees.  While the asset

26  sale to Compass provides the means necessary to implement the Plan, the Plan also depends on the

27  multiple, carefully crafted compromises among divergent constituencies, which paves the way for

28  the consummation of the Plan.  The Plan was approved by all classes of creditors and equity

1    interest holders entitled to vote on the Plan in December 2006, approximately eight months after

2    the commencement of these Chapter 11 cases.  On January 8, 2007, the Bankruptcy Court entered

3    the Confirmation Order confirming the Plan and approving the sale.

4       **C.**   **The Appellants' Request For A Stay**

5        9.   On January 17, 2007, the Appellants filed an appeal of the Confirmation

6    Order, which was automatically assigned under 28 U.S.C. § 158 to the United States Bankruptcy

7    Appellate Panel of the Ninth Circuit (the "BAP").  On the same day, the Appellants also filed their

8    Stay Motion with the BAP, without making any such motion before the Bankruptcy Court in the

9    first instance, as required by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 8005.

10       10.   Without affording any parties in interest a chance to respond to the Stay

11   Motion, the BAP issued an *ex parte* order temporarily staying the Confirmation Order through

12   February 20, 2007.

13       11.   On January 18, 2007, pursuant to 29 U.S.C. § 158(c)(1)(B), the Debtors

14   elected to have the appeal heard by the District Court, and filed an emergency motion therein to (i)

15   quash the temporary stay granted by the BAP, (ii) vacate the Stay Order, and (iii) require that the

16   request for a temporary stay be heard by the Bankruptcy Court.   This emergency motion was

17   heard by the District Court on January 22, 2007.  At the January 22, 2007 hearing, the District

18   Court granted the Debtors' motion, vacated the temporary stay and determined that the Stay

19   Motion must be determined on the merits by the Bankruptcy Court.

20       12.   The Appellants make a great show in the Stay Motion of celebrating the

21   claim that the requested stay applies only to "certain aspects" of the Confirmation Order.

22   However, if granted even in part, any stay seriously threatens not only to destroy tens of millions

23   of dollars in value created by the joint efforts of the Debtors and Committees, but also to force the

24   Debtors into a chapter 7 liquidation, which, as demonstrated in conjunction with the confirmation

25   of the Debtors' Plan, will provide a significantly diminished recovery to thousands of investors.

26   Contrary to the Appellants' assertions, if Compass does not waive the condition that the

27   Confirmation Order become a final order by February 16, 2007, a waiver that is highly unlikely if

28   a stay is in place, Compass is not obligated to close the sale, the Plan likely will crater, and nearly

4,000 investors will be irreparably harmed.  For the reasons set forth more fully below, the relief

requested by the Stay Motion should be denied.

## II.

## ARGUMENT

### A.    Appellants Have Failed To Meet Their Burden To Show That A Stay Pending Appeal Should Be Issued

13.    Courts ruling on stay motions under Bankruptcy Rule 8005 have identified

the following four elements as prerequisites to the issuance of a stay:

> a.    Applicant is likely to succeed on the merits of the appeal;
>
> b.    Applicant will suffer irreparable injury if the stay is denied;
>
> c.    No substantial harm will come to appellee or other interested parties; and
>
> d.    The stay will do no harm to the public interest.

*In re Wymer*, 5 B.R. 802, 806 (B.A.P. 9th Cir. 1980); *Universal Life Church, Inc. v. United States*,

191 B.R. 433, 444 (E.D. Cal. 1995); *Acton v. Fullmer (In re Fullmer)*, 323 B.R. 287, 292-93

(Bankr. D. Nev. 2005); *In re Liggett*, 118 B.R. 219, 221 (Bankr. S.D.N.Y. 1990).  "The party

seeking the stay bears the burden of proof to establish these factors by a preponderance of the

evidence." *In re Level Propane Gases, Inc.*, 304 B.R. 775, 777 (Bankr. N.D. Ohio 2004).

14.    "In applying these factors, the court [should be] mindful that a discretionary

stay pending appeal is viewed as an extraordinary remedy." *Acton v. Fullmer*, 323 B.R. at 293.

Moreover, because the test is conjunctive, <u>each</u> element must be satisfied and a strong showing as

to one or more of these four elements will not excuse a failure to establish the others.  *See, e.g., In

re Deep*, 288 B.R. 27, 30 (N.D.N.Y. 2003) ("[Movant's] failure to satisfy one prong of the standard

for granting a stay pending appeal dooms the motion.").

15.    In order to meet their burden of proof with regard to the need for the

issuance of a stay pending appeal, Appellants must demonstrate a "substantial case" or a "strong

case on appeal."  *Morgan v. Polaroid Corp. (In re Polaroid Corp.)*, No. 02-1353, 2004 U.S. Dist.

LEXIS 1917, at *4 (D. Del. 2004) (quoting *In re Pub. Serv. Co. of N.H.*, 116 B.R. 347, 348-49

(Bankr. D.N.H. 1990)).  Importantly, simply presenting a <u>prima facie</u> case will not satisfy this requirement.  *See In re Sung Hi Lim*, 7 B.R. 319, 321 (Bankr. D. Haw. 1980).

16.    As set forth below, Appellants fail to satisfy each element of the four-part test, and therefore the Stay Motion must be denied.

**1.    Appellants Have Failed To Demonstrate That They Are Likely To Succeed On Appeal**

17.    The Appellants' allege three reasons why they believe they are likely to prevail on appeal:

a.    That the Plan improperly recovers the Prepaid Interest (as defined below) as property of the estate without commencing an adversary proceeding – in fact, Bankruptcy Rule 7001(7) expressly authorizes such disputes to be resolved via a plan, and the Appellants received full due process in the Plan confirmation proceedings;

b.    That the Court improperly found the Debtors could use the defense of recoupment to recover illegally transferred Prepaid Interest – but Debtors recouped money in their own accounts against Direct Lenders' claims, which is a proper use of that equitable doctrine to avoid a windfall to Direct Lenders; and

c.    That the Plan improperly effectuates a global compromise without the consent of all parties giving up rights thereunder – yet the Code provides for disputes over claims to be settled by voting classes.

18.    As the authorities set forth below demonstrate, each of Appellants' contentions is faulty and is not supported by the uncontroverted confirmation evidence.  They therefore fail to sustain their burden of demonstrating a likelihood of success on appeal.

**a.    The Court Properly Found That USACM Can Recoup The Prepaid Interest**

**i.    The Prepaid Interest Is Comprised of Illegal Payments Previously Made To The Direct Lenders**

19.    As discussed above, the Debtors' Plan rests on the effectuation of several interdependent compromises, one of which was the "USCAM/Direct Lender" compromise (the "Compromise").  The effect of the Compromise is to prevent the inequitable situation that would

result if certain Direct Lenders were allowed to retain certain illegal prepetition payments of "Prepaid Interest," made at the expense of other creditors of the estate.[6]  The Compromise was accepted by Class 5-A, which is comprised of all of the Direct Lenders of USACM, a class which voted by the requisite numbers to accept the Plan.

20.    Pursuant to the terms of the Loan Servicing Agreements that governed the relationship between USACM and each Direct Lender, USACM was to collect payments on these loans from the Borrowers, and then pay the Direct Lenders after deducting contractually allowed fees.  To the extent a Borrower did not make a required payment on its loan, USACM was prohibited from making payments to Direct Lenders on behalf of the Borrower.  *See* N.R.S. 645B.250 ("[A] mortgage broker or mortgage agent shall not advance payments to an investor on behalf of a person who has obtained a loan secured by a lien on real property and who has defaulted in his payments.").

21.    Pre-petition management for USACM did not follow these normal business practices, but instead made illegal payments to certain Direct Lenders regardless of whether the Borrower made the payment to USACM on the underlying loan, referred to in the Plan as "Prepaid Interest."  Prior to the Petition Date, Direct Lenders, as a whole, received approximately $39.5 million in Prepaid Interest payments that they were not entitled to receive at the time they were made.

22.    A variety of sources were used to make these pre-petition payments, including not only Borrower repayments diverted from other loans, resulting in claims for Unremitted Principal, but also deferred loan and related fees payable to USACM, money transferred from DTDF without notice to DTDF investors, and funds received from other sources.  All of these funds and others were commingled in a single account of the Debtors in violation of

---

[6]    In rejecting Appellants' confirmation objections that their property had been taken from them without due process, the Bankruptcy Court explained that these payments to investors were not "prepayments," but were *illegal* under Nevada law.  December 20, 2006 transcript at pp. 15-16.  However, for purposes of consistency with the Plan, utilization of the term "Prepaid Interest" is retained herein to refer to these illegal prepetition payments received by Direct Lenders.

Nevada law, rendering impossible the tracing of these Prepaid Interest funds.[7]

23.    Pursuant to Bankruptcy Court orders, USACM has held back in a segregated account approximately $32 million of funds that have been paid by Borrowers during the course of the case that otherwise might be payable to Direct Lenders who received illegal Prepaid Interest prepetition.

### ii.    The USACM Estate Is Authorized To Recoup The Prepaid Interest From Repayments Of The Loans

24.    Upon the evidence presented and applicable law, the Bankruptcy Court concluded that Direct Lenders receiving the Prepaid Interest payments had no legal or equitable right to the payments made by USACM.  *See* N.R.S. 645B.250; RESTATEMENT (SECOND) OF TRUSTS § 254 (2006) ("If the trustee has made a payment out of trust property to one of several beneficiaries to which the beneficiary was not entitled, such beneficiary is personally liable for the amount of such overpayment, and his beneficial interest is subject to a charge for the repayment thereof, unless he has so changed his position that it is inequitable to compel him to make repayment.").  Thus, these payments were statutorily precluded and USACM has the right to recover each payment made to a Direct Lender on a nonperforming loan.

25.    Recoupment is an equitable doctrine that has long applied in the bankruptcy context:

> [e]quitable recoupment is a common law doctrine that is not expressly recognized in the Bankruptcy Code, but is preserved through judicial decisions. . . .
>
> Recoupment is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim. . . .
>
> In recoupment, the respective claims may arise either before or after the commencement of the bankruptcy case, but they must arise out of the same transaction.

*Aetna U.S. Healthcare, Inc. v. Madigan (In re Madigan)*, 270 B.R. 749, 753-54 (B.A.P. 9th Cir.

---

[7]    Thus, Unremitted Principal creditors have a general unsecured claim against USACM as they can neither trace the pre-petition payment of "Prepaid Interest" to their diverted principal nor assert any interest in the money that has been collected after the Petition Date.

1    2001) (citations and quotations omitted).**8**

2    26.    The classic recoupment right occurs when a buyer overpays for goods and

3    the court authorizes such buyer to reduce the purchase price by the overpayment.  *See Herod v.*

4    *Southwest Gas Co. (In re Gasmark Ltd.)*, 193 F.3d 371, 374-75 (5th Cir. 1999).  Recoupment

5    "involves 'netting out debt,' [citation omitted] and is allowed 'because it would be inequitable not

6    to allow the defendant to recoup those payments against the debtor's subsequent claim.'"  *In re*

7    *Madigan*, 270 B.R. at 754 (quoting *Oregon v. Harmon (In re Harmon)*, 188 B.R. 421, 425 (B.A.P.

8    9th Cir. 1995) and *Newbery Corp v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1401 (9th Cir. 1996);

9    *see Sims v. United States Dept. of Health and Human Serv. (In re TLC Hospitals, Inc.)*, 224 F.3d

10    1008, 1011 (9th Cir. 2000).  Although in the bankruptcy context "recoupment is usually asserted

11    by a creditor against a debtor, there is no reason the principles should differ when the positions of

12    the parties are reversed."  *Focus Media, Inc. v. National Broadcasting Co. (In re Focus Media*

13    *Inc.)*, 378 F.3d 916, 926 n.8 (9th Cir. 2004).

14    27.    The argument by those Direct Lenders who are appealing is that money

15    collected, or to be collected, from Borrowers by USACM must be paid over to them, leaving the

16    Debtors or their successors to sue the Direct Lenders to recover their illegal payments.  The Direct

17    Lenders Committee, the other Committees, the Debtors and the Court (as well as the super-

18    majority of Direct Lenders who voted for the Plan) recognize that USACM has a right of

19    repayment for each illegal Prepaid Interest payment made to a Direct Lender prior to the Petition

20    Date, and that pursuant to the equitable doctrine of recoupment, USACM is entitled to reduce

21    future payments to the Direct Lenders by the amount of prior illegal overpayments each received.

22    28.    Specifically, equity mandates that USACM may recoup the illegal

23    prepetition payments on nonperforming loans made to a Direct Lender from any subsequent

24    payments made by Borrowers, as any other result would grant a windfall by permitting the Direct

25    Lenders to keep payments to which they are not entitled, as well as to collect on future payments to

26

27    _____

28    **8**    *See also Newbery Corp v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1399 (9th Cir. 1996); *Sims v. United States Dept. of Health and Human Serv. (In re TLC Hospitals, Inc.)*, 224 F.3d 1008, 1011 (9th Cir. 2000); 5 COLLIER ON BANKRUPTCY § 553.10 (15th ed. 2006).

1    which they are actually entitled.  The equitable doctrine of recoupment exists for precisely this

2    situation – to permit the netting out of claims to ensure that no party in unjustly enriched.  *See e.g.,*

3    *Newbery Corp.*, 95 F.3d at 1401; *see also Ashland Petroleum Co. v. Appel (In re B&L Oil Co.)*,

4    782 F.2d 155, 157-58 (10th Cir. 1986); *Tavenner v. United States (In re Vance)*, 298 B.R. 262, 269

5    (Bankr. E.D. Va. 2003).  Simply stated, if recoupment is not permitted, certain Direct Lenders will

6    be unjustly enriched while other creditors (including other Direct Lenders) are left with a

7    disproportionately reduced share of recoveries.  Such a result is patently inequitable and must be

8    remedied.

9        29.    The Appellants argue that recoupment may not be used offensively to

10   recover property – only defensively to offset a claim.  However, in this case, USACM is not

11   seeking affirmatively to recover assets from the possession of the Appellants, and is thus not

12   seeking to utilize recoupment as an "offensive" claim.  Instead, USACM is exercising recoupment

13   from funds <u>held in its own account</u>, as received from Borrowers under the terms of the prepetition

14   contracts, which the Appellants claim should be paid over to them by USACM.  Thus, USACM is

15   properly exercising its right to recoup illegal Prepaid Interest as a defense to the Appellants' claims

16   that the funds from postpetition payments by Borrowers held in USACM's account should be paid

17   over to them while they also retain the illegal Prepaid Interest.

18       30.    In fact, the Loan Servicing Agreements expressly authorize USACM to

19   recoup sums advanced for the benefit of the Direct Lenders, above and beyond its servicing fee

20   from repayments made on the Loans.  *See* Loan Servicing Agreement ¶ 4 (any fees advanced by

21   the Debtor in protecting the Direct Lenders' rights under the loans "shall be paid back from . . .

22   monies collected with respect to such Loan, before any payments are made to Lender").  Thus, by

23   entering into the Loan Servicing Agreements, the Direct Lenders have already acknowledged the

24   propriety of USACM's right to recoup in certain instances.

25       31.    This result is not only legally correct, but it is also the only equitable one.

26   Bankruptcy courts, as courts of equity, and consistent with the mandates of the Bankruptcy Code,

27   favor pro rata distribution of funds when such funds are claimed by creditors of like status.  *See*

28   *Goldberg v. New Jersey Lawyers' Fund For Client Protection*, 932 F.2d 273, 280 (3rd Cir. 1991)

13

1    (collecting cases); *In re Bullion Reserve of North America*, 836 F.2d 1214, 1219 (9ᵗʰ Cir. 1988)

2    ("Equity requires that all these creditors share equally in whatever assets are available.").[9]

3        **b. An Adversary Proceeding Is Not Required For The Court To Approve USACM's Exercise Of Recoupment Rights**

4        **Pursuant To The Plan**

5        32. Appellants argue that the Plan improperly recovers Prepaid Interest as

6    property of the estate without commencing an adversary proceeding.  However, the Bankruptcy

7    Court rightfully concluded that no adversary proceeding is necessary in this instance.  In fact, Rule

8    7001(7) specifically *excludes* from the requirement of an adversary proceeding equitable remedies

9    such as recoupment when they are provided for in a chapter 11 plan.[10]  "[A] Chapter 11, 12 or 13

10   plan may provide for equitable relief . . . even if an adversary proceeding would be required to

11   secure such relief outside of the plan confirmation process.  Fed R. Bankr. P. 7001(7) and (8)."  *In*

12   *re Fuller*, 255 B.R. 300, 305 (Bankr. W.D. Mich. 2000).

13       **i. Recoupment Is Not An Avoiding Power Action That Requires An Adversary Proceeding**

14

15       33. In support of its position, the Appellants rely upon only two cases for the

16   basic proposition that debtors generally must commence adversary proceedings to exercise their

17   avoiding power rights.  However, these cases are not relevant here, as recoupment is not an

18   avoiding power.  Unlike the exercise of recoupment rights contemplated by the Debtors' Plan, the

19   plan in *In re Commercial Western Finance Corp.*, 761 F.2d 1329 (9th Cir. 1985) sought to avoid

20   security interests granted by the debtor on a pre-petition basis.  Similarly, in *Bear v. Coben (In re*

21   *Golden Plan of California)*, 829 F.2d 705 (9th Cir. 1986), the trustee sought to invalidate investors

22   notes and deeds of trust without commencing an adversary proceeding.  Such actions clearly fall

23   within the scope of Bankruptcy Rule 7001(2) as they are "proceeding[s] to determine the validity,

24

25   ⁹ *See also Gaffney. v. Rubino (In re Builders Capital & Serv., Inc.)*, 317 B.R. 603, 612 (Bankr.

26   W.D.N.Y. 2004) ("Courts have favored *pro rata* distribution of assets where, as here, the funds of the defrauded victims were commingled and where victims similarly situated with respect to their relationship to the defrauders."  (citations omitted)).

27   ¹⁰ *See* Fed. R. Bankr. P. 7001(7) (providing that adversary proceedings include "a proceeding to

28   obtain an injunction or other equitable relief, <u>except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief</u>." (emphasis added)).

1    priority, or extent of a lien or other interest in property…" and are fundamentally distinguishable

2    from the exercise of equitable recoupment.

3         34.    By contrast, in these Chapter 11 Cases, there is no attempt to modify the

4    Notes or Deeds of Trust, or otherwise impact the interests of the Appellants.  Appellants' collateral

5    interests remain the same and the documents governing their security interests with the Borrower

6    are not modified in any way.  In fact, at the conclusion of these Chapter 11 Cases, the Appellants

7    will have the same security interests in the same Notes, from the same Borrowers, with the same

8    amount of principal and interest due, reduced only by payments of interest or principal paid by

9    Borrowers.

10        35.    Accordingly, this matter could be and was resolved through confirmation of

11   the Plan and did not require an adversary proceeding.  Therefore, USACM's right to exercise

12   recoupment under the Plan was properly approved by the Bankruptcy Court.

13                    **ii.    The Settlement Embodied In The Plan Of The**
                             **Rights Direct Lenders Have To Offset Various**
14                           **Claims They May Have Against USACM Against**
                             **Prepaid Interest Payments Is Binding Upon**
15                           **Appellants**

16        36.    Appellants also argue that the Plan improperly compromises their right to

17   offset Unremitted Principal Claims against USACM's right to recover illegal Prepaid Interest from

18   them.  The Appellants cite to the case of *Carolco Television Inc. v. National Broadcasting Co. (In*

19   *re DeLaurentiis Entertainment Group Inc.),* 963 F.2d 1269 (9th Cir. 1992), in support of their

20   position.  However, *DeLaurentiis* is in no way inconsistent with the terms of the Compromise, as

21   approved in connection with the Plan.  *DeLaurentiis* merely "addressed the issue of whether a right

22   of setoff 'not listed in the plan' was extinguished as a result of the plan's confirmation based

23   [generally by operation of the discharge] under Sections 1141(c) and (d). . . .That analysis does not

24   control . . . [where] claims, including setoff, were specifically addressed and disallowed in the []

25   Plan and the Confirmation Order."  *In re Twins, Inc.*, 318 B.R. 90, 95-96 (Bankr. D.S.C. 2004)

26   (emphasis added).  *See also Daewoo Int'l (Am.) Corp. Creditor Trust v. SSTS Am. Corp.,* No. 02

27   Civ. 9629 (NRB), 2003 U.S. Dist. LEXIS 9802, at *13 (S.D.N.Y. June 11, 2003) (distinguishing

28   *DeLaurentiis*: "[*DeLaurentiis* did] not involve a confirmation order which specifically prohibits

1    the assertion of a setoff or recoupment claim against the debtor or the creditor trust.  Indeed, where

2    there is a specific provision in the confirmation order prohibiting setoff claims, courts have

3    indicated that the right to setoff may not survive the confirmation plan.").

4        37.    Thus, while the following briefly presents arguments that USACM would

5    raise over this issue if litigation were necessary, no ruling on the merits of the setoff disputes is

6    required in light of the settlement embodied in the Plan, which, as discussed below, was properly

7    approved by the requisite majority of Direct Lenders.**11**

8        38.    In arguing that their potential setoff rights should not be compromised by

9    the Plan, effectively the Appellants want priority rights over all other unsecured creditors.

10   USACM submits, however, that doubt exists as to whether even the Unremitted Principal creditors

11   can establish a right of setoff due to the  mutuality requirement.  *See Aviation Ventures, Inc. v.*

12   *Joan Morris, Inc.,* 110 P.3d 59, 63 (Nev. 2005) ("Setoff is a doctrine used to extinguish the mutual

13   indebtedness of parties who each owe a debt to one another.").  Here there is an open question as

14   to whether there is mutuality.  On the one hand, various Direct Lenders are asserting unsecured

15   claims against USACM for a variety of causes of action, including the failure to remit certain

16   principal payments to them.  The creditor-debtor relationship here is that between the Direct

17   Lender and USACM.  On the other hand, USACM can arguably assert a right to collect the

18   amounts it previously paid out as Prepaid Interest.  USACM asserts this right by stepping into the

19   shoes of the Direct Lenders.  In other words, by paying the Prepaid Interest to the Direct Lenders,

20   USACM is subrogated to the Direct Lender's claims for this interest payment, and Borrowers now

21   owe this money to USACM.  Therefore, the claim for Prepaid Interest is not one between USACM

22   and Direct Lenders but rather is between USACM and Borrowers.  Because there is no mutuality

23   in the debts, there can be no setoff of the claims as between USACM and Direct Lenders.

24       39.    Furthermore, USACM would argue that setoff is an equitable remedy that is

25   within the Court's discretion to decide whether it should be applied.  *See, e.g.*, *United States v.*

26   *Arkison (In re Cascade Rds.),* 34 F.3d 756, 763 (9th Cir. 1994); *Newbery Corp.,* 95 F.3d at 1399.

27

28

**11**   Actually, more than 68.8% of the Direct Lenders voting in Class A-5 accepted the Plan.

40. The primary objective of USACM's new management in these Chapter 11 Cases has been to put the pieces of the puzzle back together. This has involved re-creating the USACM's books and records as well as trying to collect all "Prepaid Interest" that was previously advanced to Direct Lenders. Through these efforts, USACM has pieced together recoveries of this "Prepaid Interest" together into one big pot. Regardless of how one characterizes the recovery of these monies by USACM, the overall goal is the same – to maximize the size of the pot for a pro rata distribution to those parties who have competing claims to these funds. This is the maxim behind all bankruptcy policies.

41. More specifically, USACM believes that its recovery of the "Prepaid Interest" is analogous to avoidance actions under the Bankruptcy Code. Under the avoiding powers of a debtor's estate, a debtor has the power to recover monies on behalf of the debtor's estate, which is then typically distributed to a debtor's creditors on a pro rata basis in accordance with the priority scheme under the Bankruptcy Code. Bankruptcy policy is clear – one creditor should not get preferred treatment over another.

42. Another argument that could be raised by USACM if the matter were to proceed to litigation instead of being settled pursuant to the Plan is that USACM's right to recoup the Prepaid Interest for pro rata distribution to its creditors has precedence over any rights of setoff the Direct Lenders may have. Although recoupment and setoff are related doctrines, they arise in distinct situations and instill distinct rights upon the parties. This is particularly true in bankruptcy cases, in which recoupment rights generally are unaffected, but setoff rights are affected by, among other things, pre- and postpetition distinctions and the provisions of Bankruptcy Code sections 362 and 553.

43. As noted, the premise of setoff is that two parties have competing, mutual claims against each other. To the extent that one party has an independent defense to the claim, however, setoff cannot exist. Here, USACM would claim that it has an independent defense – its right to recoup – which would negate any right the Direct Lenders' have to setoff vis-à-vis the interest payments, to the extent of the recoupment.

44. As is apparent, the dispute on setoff is very complicated. To resolve this

17

1    dispute by litigation would result in significant administrative expense, and consequent delay, in

2    litigating each of these disputes to finality.  Accordingly, the Compromise with Direct Lenders was

3    properly approved pursuant to the Plan confirmation.

###             c.    Appellants Are Incorrect In Asserting That A Plan
                      Cannot Provide For Settlement Of Disputed Claims

5    45.    Appellants assert in their Stay Motion that a plan cannot provide for a

6    compromised treatment of claims without 100% approval of the class.  The Bankruptcy Court's

7    rejection of this assertion is correct as a matter of law.

###             i.    The Bankruptcy Code Authorizes Settlement In
                      Plans

10    46.    As an initial matter, 11 U.S.C. §1123(a)(3) requires that the plan "specify

11    the treatment of any class of claims or interest that is impaired under the plan."[12]  Section

12    1123(b)(3) permits the plan to provide for the settlement or adjustment of any claim or interest

13    belonging to the debtor or to the estate; while subsection (b)(6) permits the plan to include any

14    other appropriate provision not inconsistent with the applicable provisions of title 11.

15    47.    The ability of a plan to include a settlement of disputed claims is long

16    recognized, and no contrary authority has been cited by Appellants, here or below.  For example,

17    in *In re Allegheny Int'l, Inc.,* 118 B.R. 282, 307 (Bankr. W.D. Pa. 1990), the plan proposed, "inter

18    alia, to settle the adversary action by the Creditors' Committee and Equity Committee against the

19    secured bank lenders."  The equity committee objected to the settlement  *Id.*  The claims settled

20    included avoidance actions against the banks, and the banks' claims for recovery against the

21    debtor.  The court found:  "It is clear that this settlement is an integral part of the debtor's plan of

22    reorganization.  Consummation of the settlement is conditioned upon confirmation of the plan, and

23    similarly, confirmation of the plan is conditioned upon consummation of the settlement."  *Id.* at

24    309.  The settlement in that case was supported by the debtor, the creditors' committee, and a class

---

26    [12]  As Judge Riegle pointed out during the confirmation hearing, no creditor, including Appellants,
27    objected to the classifications set forth in the Plan, which include two classifications of claims
      held by Direct Lenders--the claims based upon a right to receive performance under the loan
      servicing agreements were classified in class  A-5, and the claims of Direct Lenders whose
28    principal had been diverted prepetition and/or who have asserted other causes of action against
      USACM were classified as general unsecured creditors under class A-4.

of creditors.  The court approved the plan, including the settlement, finding that "[e]ven when an impaired class of claims or interests does not accept the plan, the court may approve the settlement and the plan if the court determines that the plan is fair and equitable to those impaired classes." *Id*.  While so holding, the court recognized that, while "[t]his court has discretion to approve a settlement as part of a reorganization plan"; "there are limits to a court's discretion in approving a settlement.  This court is guided by the case law which teaches that a compromise should be approved if it is fair and equitable."  *Id.  Compare In re Best Products Co., Inc*., 168 B.R. 35, 60 (Bankr. S.D.N.Y. 1994) ("Remember that [the debtor] put this compromise into the plan rather than simply bringing it on for a hearing.  Thus, whereas the court usually has to infer creditor assent from lack of creditor opposition, here the creditor body voted on the plan, one of the cornerstones of which was the compromise of the LBOP and Bank Preference Actions.").

### ii.    The Uncontroverted Evidence Supported The Settlements In The Plan

48.    In these Chapter 11 Cases, the plan proponents submitted the uncontroverted Declaration of Thomas Allison in Support of the Confirmation of the Debtors' Third Amended Joint Plan of Reorganization,[13] (the "Allison Declaration", which is Docket No. 2147 below, a copy of which is filed herewith) which demonstrated that the settlement was fair, reasonable, negotiated at arm's length, and in the best interests of the Debtors and the Direct Lenders.  As in *Allegheny*, the settlement was supported by the Debtors and, unlike *Allegheny*, also enjoyed the support of *all* Committees, as well as being approved by *all* classes entitled to vote.

49.    In these Chapter 11 Cases, as in *Allegheny*, the evidence demonstrated that the claims which would be litigated absent confirmation presented substantial risk to the parties requesting that the settlement not be approved.  *Allegheny*, 118 B.R. at 313.  The evidence in these Chapter 11 Cass demonstrated massive fraud, similar in effect to that which occurred in the

---

[13]    Pursuant to LR 9017, the Court required initial direct testimony to be submitted by Declarations, to be filed by December 11, 2006.   Counsel for Appellants filed no timely declarations and declined to cross-examine Mr. Allison.

*Lemons*[14] case.  Prepetition, USACM misappropriated investor funds, including payments which should have been segregated and paid to Direct Lenders.  At the same time, USACM paid purported monthly "interest" payments to all investors, including Direct Lenders, regardless of whether the notes in which the particular Direct Lenders had invested were performing.[15]  The prepetition conduct of the Debtors also included massive intermingling of funds, including funds borrowed from third parties by USACM; funds paid by lenders which should have been segregated for payment to Direct Lenders; funds representing management and other fees purportedly earned by both USACM and USA Realty; and funds representing fees to which USACM was contractually entitled to be paid by Borrowers.  Similarly, the bank account which was required to contain only segregated loan payments due to Direct Lenders was used for a variety of payments, including repayments of loans made to USACM.  Indeed, such misconduct and intermingling of funds was cited by the DTDF Committee in asserting that all investors should be treated as general unsecured creditors, and that all assets, including post-petition loan repayments, be treated as property of the estate.  The Direct Lenders Committee contested this assertion that these not be treated as property of the estate.   The compromise approved as a part of the Plan included a compromise of this litigation; permitting Direct Lenders whose monies were not diverted to retain their interest in the notes and deeds of trust as not being property of the estate, as well as the non-diverted proceeds attributable to such investments, less only the amounts illegally paid (on an investor by investor basis) as prepetition "interest" where the Borrower had not made the actual interest payment, which would have triggered such a distribution.  The Bankruptcy Court approved the settlement based upon consideration of the evidence presented by the Debtors.  Appellants failed to make any contrary evidentiary showing; nor did they request any discovery as to the issues surrounding this settlement or the plan.

---

[14]  *See, e.g., In re Lemons & Assoc.,* 67 B.R. 198 (Bankr. D. Nev. 1986).  While *Lemons* involved the overselling of interests in notes secured by deeds of trust, the USACM case involves commingling and misappropriation of funds.  Here, there were investors who purchased interests in specific notes and deeds of trust, as well as investors who purchased an interest in the two Funds, which, in turn, purchased interests in notes purportedly secured by deeds of trust.

[15]  This is reminiscent of the "guaranteed rate of return" in *Lemons*, *see* 67 B.R. at 201.

50.     While the Plan is clearly the appropriate vehicle for proposing the treatment of creditor claims, even though the claims may be impaired by such treatment, each individual creditor retains the protections set forth in 11 U.S.C. §1129(a)(7), which requires that the dissenting creditor receive property of a value, as of the effective date of the plan, that is not less than the amount such holder would receive under a chapter 7 liquidation.  Where, as in these Chapter 11 Cases, the Debtors meet their initial burden of proof with regard to the liquidation value test, the burden shifts to the dissenting creditors to submit evidence that the test has not been met.[16]  In fact, the Appellants presented absolutely no evidence to support their objections.

51.     Accordingly, the Bankruptcy Court found that the Debtors satisfied § 1129(a)(7) by providing each creditor with the individual protection mandated by the Bankruptcy Code.  11 U.S.C. § 1129(a)(7).

52.     The Bankruptcy Court, having considered the evidence, and finding and concluding that the treatment afforded all classes was appropriate and in accordance with §1129, confirmed the Plan, including the Compromise.  It is clear that the confirmation order appropriately bound dissenting creditors to the treatment proposed in the Plan.  *See, e.g.*, 11 U.S.C. §1141, "Effect of Confirmation."  As set forth in subsection (a), "…the provisions of a confirmed plan bind the debtor…and any creditor…whether or not…impaired under the plan and whether or not such creditor…has accepted the plan."

### iii.     The Appellants Received Due Process

53.     Appellants argue that "due process" concerns preclude the use of the

---

[16]     *See, e.g., In re PWS Holding Corp.,* 228 F.3d 224, 250 (3rd Cir. 2000) (As the objecting creditor failed to challenge the Debtors' liquidation analysis and did not introduce evidence to demonstrate that the recapitalization claims have significant value, the Third Circuit held that the District Court did not commit clear error in holding that the Debtors met their burden under §1129(a)(7).); *In re Kellogg Square Psp,* 160 B.R. 343, 358 (Bankr. D. Minn. 1993) (in considering §1129(a)(7) analysis, if the debtor meets its initial burden by producing evidence that its proffered interest rate is defensible, the burden shifts to the objecting creditor); *In re Spiegel, Inc.,* 2005 W.L. 1278094, at *7 (Bankr. S.D.N.Y. 2005) (plan satisfies §1129(a)(7) where liquidation analysis contained in the disclosure statement and other evidence proffered or adduced at confirmation hearing are persuasive and credible, and not challenged or controverted by other evidence); *In re Magnatrax Corp.*, 2003 W.L. 22807541, 7 (Bankr. D. Del. 2003) (the plan satisfies §1129(a)(7) where, inter alia,  the evidence proffered at the confirmation hearing, including the affidavit submitted by the proponent, has not been controverted by other persuasive evidence or has not been challenged).

1    Compromise to effect the treatment of Direct Lenders under the Plan.  To the contrary, the

2    confirmation process itself satisfies due process concerns.  Due process requires notice and an

3    opportunity to be heard.  *Mullane v. Central Hanover Bank  Trust Co.,* 339 U.S. 306, 314 (1950).

4    Each Direct Lender was permitted to vote on the Plan and to object to the Plan.   Objecting parties

5    were given full due process protections in the context of the confirmation hearing.  Due process is

6    afforded where the objecting party has the opportunity to be present at the hearing, argue his

7    position, and present evidence in support thereof.[17]  In fact, the very case cited by Appellants in

8    their confirmation objection, *In re Jorgansen*, 66 B.R. 104 (B.A.P. 9th Cir. 1986), establishes that

9    confirmation satisfies the fundamental elements of due process, noting that "Creditors were

10   noticed of the confirmation hearing and had an opportunity to appear." *Id.* at 109.

11          54.     In these Chapter 11 Cases, the Appellants had a full and fair opportunity to

12   appear, to submit evidence, to brief the issues, and to argue the merits of the Plan, including the

13   Compromise.   Indeed, the Bankruptcy Court found that noticing requirements had been met and

14   held a two-day hearing on confirmation.  Counsel for the Appellants appeared at the confirmation

15   hearing, presented arguments, but significantly failed to present any evidence to support their

16   objections to confirmation.  Accordingly, the Appellants were afforded due process, the

17   Compromise is valid, and the Confirmation Order should not be stayed to afford the Appellants a

18   second chance to assert arguments that are wholly without any evidentiary support to the

19   determinant of the Debtors, their creditors and thousands of investors.  Simply, by failing to

20   present evidence or otherwise protect their rights below, the Appellants will not succeed on the

21   merits and, therefore, a stay pending appeal is not appropriate.

22          55.     Thus, in summary, the Appellants have failed to meet their burden of

23   demonstrating a likelihood of success on the merits on any of the issues of law raised in the Stay

24   Motion, and on that ground alone the Stay Motion must be denied.

25

26   [17]   *See In re Tevis*, 347 B.R. 679, 696 (B.A.P. 9th Cir. 2006); *compare In re Swanson*, 312 B.R.
     153, 159 (Bankr. N.D. Ill. 2004)(holding that confirmation can be an appropriate vehicle for
27   such matters as claim valuation and determining what a secured creditor will receive); *In re
     Regional Bldg. Systems*, 251 B.R. 274, 291-92 (Bankr. D. Md. 2000)(rejecting argument that
28   due process was violated where lien was extinguished through chapter 11 plan, rather than
     through adversary proceedings, so long as plan was not deceptive).

22

2.    **Appellants Will Not Suffer An Irreparable Injury Absent A Stay Pending Appeal**

56.    Courts have universally held that in order for a movant to prevail on a request for a stay pending appeal, the movant must demonstrate both that it will be harmed if the stay is not issued and that such harm will be irreparable (*i.e.*, not capable of compensation).  *See, e.g., In re Kmart Corp.*, No. 02 C 9257, 2002 U.S. Dist. LEXIS 24851, at *3 (N.D. Ill. Dec. 30, 2002).

57.    Recognizing that an analysis of irreparable harm in this instance will come down to an argument that they might suffer economic damages in the event they succeed on appeal, the Appellants attempt to argue that "[w]here adequate compensatory relief will not be available after the appeal is resolved, financial injury is sufficient to constitute irreparable harm," Stay Motion at 18:3-6.  However, neither of the cases cited by the Appellants actually stands for such a proposition.  In both cases, the movant's request for a stay pending appeal was denied because it found that the movant had merely suffered economic injuries.  *See Sampson v. Murray*, 415 U.S. 61, 90 (1974); *Foreign Autobody Specialists, Inc. v. Superior Court of California*, 739 F.2d 466, 471 (9th Cir. 1984).  In so holding, neither case examined whether financial relief would be available after resolution of the appeal, nor was the issue even raised.  The Appellants' characterization of the holdings in these cases is blatantly incorrect.  To the contrary, caselaw holds that economic loss will *not* sustain a stay.[18]

58.    The Appellants argue that they will be harmed because the so-called "Segregated Funds" (a term only loosely and ambiguously defined in the Stay Motion) will likely be disbursed absent a stay.  However, to the extent the disbursement of the "Segregated Funds" pending appeal may moot the Appellants' appeal, that basis alone is legally insufficient to establish

---

[18]    *See Kmart Corp.*, 2002 U.S. Dist. LEXIS 24851, at *5 ("[E]conomic loss will generally not sustain a stay."); *FFG-NJ Vehicle Funding Corp. v. Holtmeyer (In re Holtmeyer)*, 229 B.R. 579, 583 (E.D.N.Y. 1999) (stay denied where movant failed to demonstrate that his alleged injury, if any, would not be capably of being fully remedied by money damages); *Sandra Cotton, Inc. v. Bank of N.Y.*, 64 B.R. 262, 263 (W.D.N.Y. 1986) (debtor not granted stay where it "failed to prove that it would be irreparably harmed because it could not be adequately compensated by legal damages for the loss of the property in question).

23

that the Appellants will suffer irreparable injury.[19]

59.    Furthermore, as addressed above, there has been no violation of the Appellants' due process rights, and any allegation to the contrary is nothing more than empty rhetoric.  Accordingly, Appellants have simply made no showing of irreparable harm.

**3.    Appellants Have Failed To Show That The Requested Stay Will Not Result In A Substantial Harm To The Debtors Or Any Other Parties In Interest**

60.    A stay pending appeal should be denied where the movant cannot establish that no substantial harm will come to the other interested parties.  "[C]ourts have found that the loss of the ability to reorganize is essentially irreparable injury."  *Acton v. Fullmer*, 323 B.R. at 304.  *See also, Arvay v. Hyman (In re Bob Hamilton Real Estate, Inc.)*, 164 B.R. 703, 705 (Bankr. M.D. Fla. 1994) (denying stay where it would create substantial hardship to creditors by preventing trustee from making distributions); *In re St. Mary Hosp.*, 157 B.R. 235, 238 (Bankr. E.D. Pa. 1993) (denying stay of distribution order where creditors could be harmed by further delay of payment); *Sung Hi Lim*, 7 B.R. at 322 (finding that lender will sustain damages from being precluded from proceeding with its right to foreclose).  In the Stay Motion, the Appellants have not even addressed this factor directly.

61.    In this instance, if the Appellants' request is granted, the Debtors and their creditors will suffer substantial harm.  Although the Appellants frame their request for relief as seeking only a stay of distribution of the "Segregated Funds" (as ambiguously defined in the Stay Motion), the appeal and request for stay itself jeopardizes the sale that is the very cornerstone of the Plan, and thereby threatens to completely derail the Debtors' reorganization.  The sale – worth more than $67 million and the Debtors' only viable exit strategy from chapter 11 – hangs in the

---

[19]  *See, e.g., Acton v. Fullmer*, 323 B.R. at 304 (noting majority of cases hold that "the risk that an appeal may become moot does not itself constitute irreparable injury."); *In re 203 N. LaSalle St. Partnership*, 190 B.R. 595, 598 (N.D. Ill. 1995) ("It is well settled that an appeal being rendered moot does not itself constitute irreparable harm."); *In re Dakota Rail, Inc.*, 111 B.R. at 821 ("[T]he mooting of his appeal is not sufficient, by itself, to establish that [the movant] will be injured by denying the stay."); *In re Kent*, 145 B.R. 843, 844 (Bankr. E.D. Va. 1991) (same); *In re The Charter Co.*, 72 B.R. 70, 72 (Bankr. M.D. Fla. 1987) (same); *In re Great Barrington Fair & Amusement, Inc.*, 53 B.R. 237, 240 (Bankr. D. Mass. 1985) (same).

balance.  Unless the Confirmation Order becomes a Final Order[20] by the Outside Approval Date,

the sale could be permanently jeopardized and the Debtors' Plan rendered infeasible to the

detriment to over 4,000 individuals.  Furthermore, the use of the "Segregated Funds," as well as

the sale proceeds, underlies the myriad interdependent compromises that form the foundation of

the Plan.  Thus, any stay of the Confirmation Order, no matter how limited it is intended to be by

the Appellants, can result in the inability of the Debtors to consummate the Plan.

62.    The primary means for implementing the Plan is the sale.  The sale not only

brings in substantial funds to the Debtors' estates, but also facilitates the key compromises among

the Debtors' various interest groups.  Compass' commitment to complete the sale, however, is not

open-ended.  Under the terms of the parties' agreement, Compass has the right to walk away from

the deal if the Confirmation Order does not become a Final Order by the Outside Approval Date.

This would have disastrous consequences for all involved in these Chapter 11 Cases:

- Without the proceeds from the sale, the Plan is no longer feasible.  There would be no "cash out" of the FTDF members, and USACM would not receive at least $8 million necessary to pay administrative and other expenses in order to confirm the Plan as well as funds to commence litigation for creditor recoveries.  Further, the numerous intertwined compromises by and among the Debtors' estates under the Plan, which are dependent on a source of funding from the sale and the "Segregated Funds," would unwind, resulting in more litigation, delay and expense.  As a result, distributions to USACM's unsecured creditors, FTDF creditors, FTDF equity holders, DTDF creditors, and DTDF equity holders, would be significantly delayed and substantially reduced.

- Furthermore, Direct Lenders would also be negatively impacted at a substantial cost.  Currently, USACM's restructuring team has been responsible for servicing the loans of Direct Lenders, at a significant cost to the Debtors' estates.  If the Plan cannot be consummated, resulting in the failure to orderly transfer USACM's loan servicing rights, it is highly unlikely that USACM will be able to continue to service the loans for any appreciable period of time.  The cost of the restructuring team is not

_____

20  Under the APA, "Final Order" is defined to mean "an order or a judgment entered by a court of competent jurisdiction (x) that has not been reversed, stayed, modified or amended, (y) as to which no appeal or petition for review or motion for rehearing or reargument has been taken or has been made, and (z) as to which the time for filing a notice of appeal, a petition for review or a motion for reargument or rehearing has expired."  While this "Final Order" requirement can be waived if an appeal is pending in order to close the sale transaction, a stay will likely preclude any closing.

sustainable, and no other entity has expressed any interest in taking over the servicing operations of the Debtor. As such, who will service the loans, particularly the non-performing loans? Will a new servicer agree to the existing loan servicing fees or require new servicing agreements and higher fees?

- Finally, the Debtors' estates would continue to incur substantial administrative fees at the average rate of more than $1 million per month, which the estates cannot pay long term. A chapter 7 conversion would result in drastically reduced or nominal recoveries, if any, for creditors and investors.

63. Any delay in the closing of the sale or the Effective Date of the Plan will continue to exacerbate an injury that is entirely preventable.[21] There is no question that granting the Stay Motion will at best delay the sale, but will more likely cause the sale and Plan not to be consummated. As noted above, Compass has no obligation to close the sale unless the Confirmation Order becomes a final order by the Outside Approval Date. The deadline for the sale to close, and for the Effective Date to occur in order to preserve the intercompany settlements, is February 16, 2007. While Appellants argue that the stay would only affect the distribution of the "Segregated Funds," the effect of such a stay has much broader ramifications. Under the terms of the APA, Plan and Confirmation Order, Compass is expressly authorized and required to continue to recoup funds on behalf of the USACM estate. As the linchpin of the stay goes to the heart of whether USACM can properly assert its recoupment rights, Compass is unlikely to go forward with the sale – and its obligation to continue recoupment process – without the benefit of a final order that approves of these actions.

64. Moreover, the hardship occasioned by further delay in payment of the estates' creditors is an injury sufficient to deny a stay pending appeal. *See In re Permian*

---

[21] *See, e.g.*, *Section 20 Land Group, Ltd. v. Collier County (In re Section 20 Land Group, Ltd.)*, 252 B.R. 819, 821 (Bankr. M.D. Fla. 2000) ("Any delay in the reorganization process and the completion of a sale of the Debtors or their assets will doom these [c]hapter 11 cases."). In such circumstances, courts have often refused to issue a stay pending appeal. *See, e.g., In re Babcock & Wilcox*, No. 00-1154, 2000 U.S. Dist. LEXIS 6448, at *17-18 (E.D. La. 2000) (denying stay of post-petition financing order where debtor and its creditors would be harmed thereby); *In re Kar Dev. Assocs., L.P.*, 180 B.R. 624, 627 (Bankr. D. Kan. 1994) (motion for stay of use of cash collateral pending appeal denied, because stay would be harmful to debtor and its creditors).

1   *Producers Drilling, Inc.*, 263 B.R. 510, 523 (W.D. Tex. 2000) (holding that delay in payment to

2   creditors is an injury that may be considered for this prong);  *Sung Hi Lim*, 7 B.R. at 321 (same);

3   *Bob Hamilton Real Estate*, 164 B.R. at 705 (denying stay where it would create substantial

4   hardship to creditors by preventing trustee from making distributions); *St. Mary Hosp.*, 157 B.R. at

5   238 (denying stay of distribution order where creditors could be harmed by further delay of

6   payment).  Even assuming that any stay granted would prohibit only the distribution of a clearly

7   and narrowly defined subset of funds (in contrast to Appellants' ambiguous and potentially far-

8   reaching definition of "Segregated Funds"), this will necessarily result in a delay to USACM's

9   creditors and undermine the Compromise affecting Class A-5 of the Plan.  For example, the

10  intertwined compromises in the Plan were based on the presumption that the USACM estate

11  (including Direct Lenders with allowed claims) would have the benefit of all of the Prepaid

12  Interest (including whatever portion falls with Appellants' definition of "Segregated Funds").  If

13  this premise is thrown into doubt, the entirety of the Plan is also jeopardized.  Moreover, without

14  the "Segregated Funds," the assets of the USACM estate would be greatly diminished, thereby

15  making it unlikely that the USACM estate would be able to make a distribution to USACM's

16  unsecured creditors until it either receives Court approval to use the "Segregated Funds" or

17  receives recoveries from its pursuit of certain causes of action.

18          **4.**      **Appellants Cannot Meet Their Burden Of Proving That**

19                       **Granting The Stay Will Not Harm The Public Interest**

20          65.       Appellants fail to consider the fact that staying the Confirmation Order is

21  likely to result in harm to the Debtor's parties in interest.  "To the extent that the public interest has

22  been considered in the bankruptcy context, courts have identified the achievement of

23  reorganization as a public interest worthy of protection."  *Acton v. Fullmer*, 323 B.R. at 305; *see*

24  *Babcock & Wilcox*, 2000 U.S. Dist. LEXIS 6448, at *19 (public interest not served by granting of

25  stay that would have a materially adverse effect on debtor's restructuring efforts); *In re Gathering*

26  *Restaurant, Inc.,* 79 B.R. 992, 999 (Bankr. N.D. Ind. 1986) ("In the context of a bankruptcy case . .

27  . the public interest . . . means the promoting of a successful reorganization which should be one of

28  the paramount concerns of a bankruptcy case").

        66.       There is simply no public interest or policy which favors a further delay in

1    consummation of the sale and the Debtors' Plan, which would result from the grant of even a

2    partial stay of the Confirmation Order.  *Cf. In re Leibinger-Roberts, Inc.*, 92 B.R. 570, 574 (Bankr.

3    E.D.N.Y. 1988) ("[A] stay would be adverse to the public interest because it would serve only to

4    delay the implementation of a possibly successful plan."); *In re East Redley Corp.*, 20 B.R. 612,

5    615 (Bankr. E.D. Pa. 1982) (court refused to stay order confirming plan of reorganization where

6    "allow[ing] this matter to drag on and force the creditors to wait several years while the case runs

7    its appellate course would be a travesty.").  A stay would also undermine the Bankruptcy Code

8    policy of facilitating the disposition of assets for value.  *Cf. In re Richmond Metal Finishers, Inc.*,

9    36 B.R. 270, 273 (Bankr. E.D. Va. 1984), *rev'd on other grounds*, 38 B.R. 341 (E.D. Va. 1984),

10   *rev'd*, 756 F.2d 1043 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1987) ("If there is a public

11   interest in this matter, it is seeing that the purposes and policies of the Bankruptcy Code are not

12   frustrated. . . .").   Finally, it is worth noting in conjunction with the public interest, that the

13   Debtors' businesses are highly regulated by both the State of Nevada and the Securities and

14   Exchange Commission.  Both entities have shown a keen interest in the Chapter 11 Cases.

15   **B.**     **Any Stay Pending Appeal Should Be Conditioned On Appellants
16           Posting A Minimum $20 Million Bond From An Independent Third
             Party**

17            67.    The posting of a bond is crucial in this Appeal and it should be required by

18   any court that may be inclined to grant the Stay Motion.  In the event any stay is granted, the

19   Debtors state the following in support of requesting that the Appellants be required to post a bond.

20            68.    Courts have recognized that "[t]he requirement of an appeal bond is an

21   'appropriate order' under Rule 8005; its purpose is to protect the prevailing party against any loss

22   caused by the unsuccessful attempt to reverse the bankruptcy court's decision on appeal.  *Equitable*

23   *Life Assurance Soc'y v. James River Assocs. (In re James River Assocs.),* 148 B.R. 790, 797-98

24   (E.D. Va. 1992) (internal citations omitted); *see also In re United Merchants & Mfrs., Inc.,* 138

25   B.R. 426, 430 (D. Del. 1992) (stating that "[t]he purpose of Rule 8005 is to protect the adverse

26   party from potential losses resulting from the stay."); *In re Theater Holding Corp.,* 22 B.R. 884,

27   885 (Bankr. S.D.N.Y. 1982) (stating that the purpose of the filing of a bond "is to indemnify the

28   party prevailing in the original action against loss caused by an unsuccessful attempt to reverse the

1    holding of the bankruptcy court.").

2           69.    Consistent with this purpose, courts requiring a bond do so in an amount

3    sufficient to protect the appellee from damages resulting from the stay.  *See, e.g., Lyon v. In re*

4    *Anderson Pipeline Co. (In re Anderson Res. Co.),* 78 B.R. 603, 604 (D. Colo. 1987) ("The issue on

5    the bond amount is . . . the amount of the anticipated damage to the debtors."); *In re Pub. Serv. Co.*

6    *of N. H.,* 116 B.R. at 350 (in denying stay pending appeal of confirmation order, court noted that

7    any bond "would have to cover massive amounts of accruing interest and other delay costs

8    accruing monthly").

9           69.    The Appellants make mere conclusory assertions that a stay prohibiting the

10   Debtors from spending the so-called "Segregated Funds" protects all parties.  These assertions,

11   devoid of citations to the record, demonstrate the need for the Bankruptcy Court to find the facts as

12   the trial court.  Quite to the contrary of the Appellants' assertions, the cornerstones of the Plan (the

13   sale and the effectuation of various compromises between and among the Debtors and other parties

14   in interest), and all distributions to be made under the Plan, are jeopardized by the stay.  Thus,

15   given that the purpose of a bond under Rule 8005 is to protect the appellee from damages caused

16   by the stay, the Appellants should be required to post a large bond.

17          71.    Section 9.1(k) of the Asset Purchase Agreement provides that one of the

18   conditions precedent to the obligations of the Purchaser thereunder is that the Plan has been

19   confirmed by a Final Order of the Bankruptcy Court by the Outside Approval Date.  The

20   Appellants' appeal of the Confirmation Order and any stay granted in connection therewith

21   threatens to completely derail the Plan by allowing Compass the opportunity to walk away from

22   the Asset Purchase Agreement, particularly if this Court does not set an expedited briefing

23   schedule on the matter.  Of particular concern is the fact that Compass has indicated to the Debtors

24   that it is uncertain whether it will waive the "Final Order" condition if the stay requested by

25   Appellants is in place.  *See* Declaration of Annette Jarvis ¶ 2.  Compass is clearly not willing to

26   waive this condition and close the sale at this time.  With no sale, there will be no Plan, no

27   distribution to thousands of investors, and the uninterrupted service of the Direct Lenders' loans

28   would be thrown into jeopardy.

70.     Moreover, even if the Purchaser were to waive the requirements of Section 9.1(k) of the Asset Purchase Agreement, and even if the Sale closes in a timely fashion, a stay of the distribution of the Prepaid Interest pursuant to the terms of the Plan threatens to unravel the entire Plan.  The Debtors' use of the Prepaid Interest pursuant to the terms of the compromise with the Direct Lenders as set forth in the Plan is intertwined with all other compromises set forth in the plan.  Modification or elimination of even one of these interdependent compromises would unwind and threaten to eviscerate the foundation of the Plan.

73.     Therefore, given that the stated purpose of a bond under Bankruptcy Rule 8005 is to protect appellees from damages resulting from a stay, and considering the likely potential for catastrophic damage if the APA is not consummated, the Debtors believe that the Appellants should be required to submit a bond in the amount of at least $20 million.

**III.**

**CONCLUSION**

Therefore, for all of the reasons stated herein, the Debtors respectfully submit that the Appellants' Stay Motion should be denied.  If, however, the Court is inclined to grant the Appellants a stay pending appeal, the stay should be conditioned on the Appellants posting a bond in an amount not less than $20 million.

Respectfully submitted this 22 day of January, 2007.

RAY QUINNEY & NEBEKER P.C.
   and
SCHWARTZER & MCPHERSON LAW FIRM


By _/s/Lenard E. Schwartzer_____
        Lenard E.hwartzer, Esq.

Attorneys for Appellees - Debtors and Debtors-in-Possession