ELECTRONICALLY FILED
JANUARY __23__, 2007

Annette W. Jarvis, Esq.
Steven C. Strong, Esq.
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (802) 532-7543
Email: ajarvis@rqn.com
        sstrong@rqn.com

Lenard E. Schwartzer, Esq.
Jeanette E. Mcpherson, Esq.
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
Email: bkfilings@s-mlaw.com

Attorneys for Debtors

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>                    Debtor. | BK-S-06-10725-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>                    Debtor. | BK-S-06-10726-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>                    Debtor. | BK-S-06-10727-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>                    Debtor. | BK-S-06-10728-LBR<br>Chapter 11 |
| In re:<br>USA SECURITIES, LLC,<br>                    Debtor. | BK-S-06-10729-LBR<br>Chapter 11 |
| Affects<br>☒ All Debtors<br>☐ USA Commercial Mortgage Co.<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed<br>☐ USA First Trust Deed Fund, LLC | Date:  January 24, 2007<br>Time:  3:30 p.m. |

## DECLARATION OF THOMAS J. ALLISON

I, Thomas J. Allison, hereby declare, verify and state as follows:

1.    I am the President and Chief Restructuring Officer of USA Commercial Mortgage

407518v2

Company ("USACM") and the Manger and Chief Restructuring Officer of each of the four other

debtors in the above-captioned jointly administered chapter 11 Cases ("Chapter 11 Cases"),

namely USA Capital Diversified Fund, LLC ("DTDF"); USA Capital First Trust Deed Fund

("FTDF" and, together with DTDF, the "Funds"); USA Capital Realty Advisors, LLC and USA

Securities, LLC (collectively, the "Debtors"). I submit this declaration solely in my capacity as the

President or Manager and Chief Restructuring Officer of the Debtors and in support of the

Debtors' Opposition to Motion for Stay Pending Appeal.

2.    This Declaration is based on my personal knowledge or, if so stated, upon

information and belief. Thus, all matters set forth in this Declaration are based on (a) my personal

knowledge, (b) my review of relevant documents and records, (c) my view, based upon my

experience and knowledge of the Debtors' business and financial condition, and/or (d) as to

matters involving United States bankruptcy law or rules, my reliance on advice of bankruptcy

counsel to the Debtors. If I were called upon to testify, I could and would testify competently to

the facts set forth herein.

3.    Any capitalized term not expressly defined herein shall have the meaning ascribed

to that term in the Plan.

4.    This Declaration supplements all prior declarations made and which are on file in

the Chapter 11 Cases, including, without limitation, those Declarations which are attached to this

Declaration as Exhibit A (Declaration of Thomas J. Allison in Support of the Confirmation of the

Debtors' Third Amended Joint Plan of Reorganization, or, the "Confirmation Declaration"),

Exhibit B (Declaration of Thomas J. Allison in Support of Motion for Order Scheduling an

Auction for the Sale of Certain Assets, Appointing SPCF Group, LLC as Lead Bidder and

Approving Bid Procedures and Protections), Exhibit C (Supplemental Declaration of Thomas J.

Allison in Support of Motion for Order Scheduling an Auction of the Sale of Certain Asset,

2

407518v2

Appointing SPCF Group, LLC as Lead Bidder, and Approving Bid Procedures and Protections), and Exhibit D (Declaration of Thomas J. Allison in Support of Motion to Vacate Order Granting Temporary Stay, or, the "Stay Declaration"). The Declarations attached to this Declaration and which are on file in the Chapter 11 Cases are incorporated herein by this reference.

5.    I have over 25 years of experience serving as an advisor to troubled companies. Over the course of my career, I have evaluated and negotiated many major workouts, restructurings and reorganizations.

6.    I have served as the President and Chief Restructuring Officer of USACM and the Manager and Chief Restructuring Officer of the other Debtors throughout the Chapter 11 Cases, and I have extensive knowledge of the Debtors' businesses and financial condition.

7.    I was personally involved in and have extensive knowledge of the negotiations on the Plan and on the Asset Purchase Agreement executed with Compass Partners LLC ("Compass").

8.    As of the Petition Date, USACM was acting as a loan servicer for 115 separate loans (the "Serviced Loans") having a combined outstanding loan balance of approximately $962 million.

9.    There are approximately 3.600 investors (the "Direct Lenders") whose names appear as a "Lender" in the documents for one or more of the Serviced Loans. Among these Direct Lenders are the Funds. There are 3,200 investors in the Funds. Based on my meetings and interaction with these investors, it appears that many of these investors are elderly people who are dependent for their living expenses on the distributions from their investments. If distributions to these investors are interrupted by a stay, I believe it would work a hardship on such investors.

10.    Prior to April, 2006, USACM regularly made interest payments to Direct Lenders (including the Funds) each month regardless of whether the particular loans relating to each Direct

3

407518v2

Lender were performing or nonperforming.  Prior to the Petition Date, Direct Lenders, as a whole, received approximately $39.5 million in such interest payments that they were not entitled to receive at the time the payments were made (the "Prepaid Interest").  As more fully set forth in my Confirmation Declaration, the money to make these wrongful payments came from variety of commingled sources, including, among other sources, from principal payments made, but not remitted by USACM, on certain loans ("Diverted Principal").

11.     After my appointment as the Chief Restructuring Officer of the Debtors, I directed Mesirow Interim Financial Management LLC ("Mesirow") to reconstruct the books and records of the Debtors, which, as set forth in my prior Declarations, were incorrect and incomplete, and which appeared, in certain circumstances, to be intentionally inaccurate.

12.     As a result of the reconstruction of the books and records of the Debtors, on or around July 10, 2006, investor statements were sent to all Direct Lenders (including the Funds) setting forth the amount of Prepaid Interest paid to each Lender and the amount of Diverted Principal for each Lender.

13.     As a further result of the reconstruction of the books and records of the Debtors, pursuant to the Motion to Hold Funds and the Motion to Distribute filed, heard and granted by the Court, the Debtors held back and continue to hold back from all distributions made to Direct Lenders (including the Funds) after the Petition Date interest collected from Borrowers that had already been paid to the Lenders on the loans pre-petition, and netted amounts to recoup Prepaid Interest paid to the Lenders pre-petition from collections made post-petition on performing loans that would otherwise payable to Direct Lenders (including the Funds) (the "Prepaid Interest Collections").  Under the Asset Purchase Agreement, Compass is required to continue the Prepaid Interest Collections for the benefit of the USACM estate after the closing of any sale to Compass.

14.     The Disclosure Statement and Plan provided notice that the Prepaid Interest

4

407518v2

Collections would, as part of the confirmation of the Plan and the compromises with the Direct Lenders incorporated in the Plan, be determined to be property of the USACM estate for distribution to all creditors in that estate in accordance with the priorities set forth in the Bankruptcy Code and that if any Direct Lender objected to this treatment, they would have to file and prevail on an objection to the Plan.

15.    Appellants did not request any discovery as to the issues surrounding the Prepaid Interest Collections, the treatment of the Prepaid Interest Collections in the Plan, the compromise involving the Prepaid Interest Collections included in the Plan, or any alleged claim that any of the Appellants might make to any portion of the Prepaid Interest Collections.

16.    Appellants did not present any evidence as to the issues surrounding the Prepaid Interest Collections, the treatment of the Prepaid Interest Collections in the Plan, the compromise involving the Prepaid Interest Collections included in the Plan, nor did Appellants identify or present evidence on any claim that any of the Appellants might have to any portion of the Prepaid Interest Collections.  Consequently, when Appellants refer to "Segregated Funds," I am unsure as to exactly what funds this refers.

17.    Upon information and belief, I believe that Appellants include both Direct Lenders with Diverted Principal Claims and Direct Lenders who received Prepaid Interest but do not have Diverted Principal Claims.

18.    Compass has indicated to me and Debtors' counsel that if a stay is granted either staying the sale or staying the provisions of the Confirmation Order that provide Compass with the protections they bargained for as part of the sale, Compass would not close the sale.  Compass has further indicated that even if the sale and these provisions of the Confirmation Order were not stayed, they were unsure whether, in the face of the stay of any part of the Confirmation Order, that Compass would close.  Based on my extensive negotiations with Compass through the sale

5

407518v2

1  process, I believe there is a substantial likelihood that Compass would not close the sale if a stay of

2  any part of the Confirmation Order was granted.  Even if the stay was limited to the Prepaid

3  Interest Collections, because this would affect Compass, who is obligated to continue to collect

4  and pay over these Prepaid Interest Collections post-sale closing, and could involve Compass in

5  further disputes over this issue, I believe there is a risk that, even with this limited stay, Compass

6  would not close the sale.

7

8      19.    As set forth in my Stay Declaration, if the requested stay is granted, I believe the

9  $67 million sale will be thrown into jeopardy and, without the consummation of the sale, the

10  Effective Date of the Plan may never occur, significantly reducing recoveries to creditors of these

11  estates and leaving thousands of investors not only with a markedly reduced recovery – if at all –

12  but also without a loan servicer to service their remaining approximately $750 million of

13  investments in the loans currently being serviced by USACM.

14

15      20.    Without the proceeds from the sale, the Plan may no longer be feasible.  There

16  would be no "cash out" of the FTDF members, and USACM would not receive at least $8

17  million necessary to pay administrative and other expenses in order to make the Plan effective as

18  well as funds to commence litigation for creditor recoveries.  Further, since the compromise

19  between FTDF and DTDF in the plan provides for funding of litigation for DTDF through funds

20  loaned by FTDF from the proceeds of the sale, DTDF might not receive funds to pay

21  administrative and other expenses in order to make the Plan effective as well as funds to

22  commence litigation for creditor recoveries.  I believe, because of the intertwined compromises

23  by and among the Debtors' estates under the Plan, and the need for funding in these estates that

24  the closing of the sale provides, if the sale is jeopardized and/or the Prepaid Interest Collections

25  are not available to fund the Plan, the entire Plan would unwind and could result in a conversion

26  to Chapter 7.

27      21.    Without the closing of the sale and the consummation of the Plan (including the

28

6

407518v2

use of the Prepaid Interest Collections) within a short period of time, the Debtors do not have sufficient funds to continue operations (excluding professional fees) beyond 60 days.

22.    Furthermore, it was not contemplated that there would be a substantial period of time between the auction and the closing of the sale.  Delay in closing the sale also causes problems for the Debtors with the ongoing collection and servicing of loans.

23.    Currently, USACM's restructuring team has been responsible for servicing the loans of Direct Lenders, at a significant cost to the Debtors' estates.  If the Plan cannot be consummated, resulting in the failure to transfer USACM's loan servicing rights, it is highly unlikely that USACM will be able to continue to service the loans for any appreciable period of time.  The cost of the restructuring team is not sustainable, and no other entity has expressed any interest in taking over the servicing operations of the Debtor outside of the pending sale to Compass.

24.    I am not aware of any interested purchaser willing to purchase the FTDF or USACM assets if the sale to Compass does not close.  I would anticipate in that event that a sale process would have to be recommenced and, given the cost and timing of such process, might not be feasible.

25.    Finally, in the event of a stay, the Debtors' estates would continue to incur substantial administrative fees at the average rate of more than $1 million per month, which the estates cannot pay long term.  As set forth in my Stay Declaration, chapter 7 conversion would result in drastically reduced or nominal recoveries, if any, for creditors and investors.

26.    Moreover, even if the Purchaser were to waive the requirements of Section 9.1(k) of the APA, and even if the Sale closes in a timely fashion, a stay of the distribution of the Prepaid Interest Collections pursuant to the terms of the Plan threatens to unravel the entire Plan.  The Debtors' use of the Prepaid Interest Collections pursuant to the terms of the compromise with the Direct Lenders as set forth in the Plan is intertwined with all other compromises set forth in the plan.  Modification or elimination of even one of these interdependent compromises would

7

407518v2

1  threaten to unwind and eviscerate the foundation of the Plan.

2       DATED this 22nd day of January, 2007.

3

4

5

6

7                                          THOMAS J. ALLISON

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    8

407518v2

EXHIBIT A

Annette W. Jarvis, Utah Bar No. 1649
Steven C. Strong, Utah Bar No. 6340
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com

Attorneys for Debtors and Debtors-in-Possession

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>Debtor. | Chapter 11<br>Jointly Administered Under |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Date: December 19, 2006 |
| In re:<br>USA SECURITIES, LLC,<br>Debtor. | Time: 10:00 a.m. |
| Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA Capital First Trust Deed Fund, LLC | **DECLARATION OF THOMAS J. ALLISON IN SUPPORT OF THE CONFIRMATION OF THE DEBTORS' THIRD AMENDED JOINT PLAN OF REORGANIZATION**<br><br>**(AFFECTS ALL DEBTORS)** |

1

I, Thomas J. Allison, hereby declare, verify and state as follows:

1.      I am the President and Chief Restructuring Officer of USA Commercial Mortgage Company ("USACM") and the Manager and Chief Restructuring Officer of each of the four other debtors in the above-captioned jointly administered chapter 11 cases ("Chapter 11 Cases"), namely USA Securities LLC ("USA Securities"), USA Capital Realty Advisors LLC ("USA Realty"), USA Capital Diversified Trust Deed Fund ("DTDF"), and USA Capital First Trust Deed Fund ("FTDF," and collectively with USACM, USA Securities, USA Realty, DTDF, and FTDF, the "Debtors"). I submit this Declaration in support of the confirmation of the Debtors' Third Amended Joint Plan of Reorganization, filed on November 15, 2006, including all Exhibits and documents incorporated therein (the "Plan").

2.      This Declaration is based upon my personal knowledge or, if so stated, upon information and belief. Thus, all matters set forth in this Declaration are based on (a) my personal knowledge, (b) my review of relevant documents and records, (c) my view, based upon my experience and knowledge of the Debtors' businesses and financial condition, and/or (d) as to matters involving United States bankruptcy law or rules, my reliance on the advice of bankruptcy counsel to the Debtors. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

3.      Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the Plan.

4.      This Declaration supplements the information contained in the Debtors' Disclosure Statement, as well as all prior declarations I have made which are on file in the Chapter 11 Cases, and which are incorporated herein by this reference.

5.      I have over 25 years of experience serving as an advisor to troubled companies. Over the course of my career, I have evaluated and negotiated many major workouts, restructurings and reorganizations.

6.      I have served as the President and Chief Restructuring Officer to USACM and the Manager and Chief Restructuring Officer of the other Debtors throughout the Chapter 11 Cases,

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

2

1    and I have an intimate knowledge of the Debtors' businesses and financial condition.

2          7.      The Plan is the product of extensive negotiations among the Debtors and the four

3    Committees appointed in the Chapter 11 Cases and, in my judgment, provides a comprehensive,

4    workable solution to the many complex issues that resulted from the pre-petition irregularities that

5    occurred in the Debtors' businesses, the details of which are set forth in my previous declarations

6    that, under ¶ 4 above, have been incorporated herein.

7                        **THE PLAN SHOULD BE CONFIRMED**

8          **The Plan Complies With The Applicable Provisions Of 11 U.S.C. § 1129(a)**

9          8.      *Section 1129(a)(1) of the Bankruptcy Code*.  In accordance with Section

10   1129(a)(1), the Plan complies with all of the applicable provisions of the Bankruptcy Code,

11   including without limitation, Sections 1122 and 1123, discussed in ¶¶ a and b below.

12              a.      Section 1122 of the Bankruptcy Code.

13                  i.      Consistent with Section 1122(a) of the Bankruptcy Code, each Class

14                          under the Plan differs in legal character or nature.  All Claims and

15                          Equity Interests placed within a Class are substantially similar to the

16                          other Claims or Equity Interests in that same Class because they are

17                          similar in legal character to the other Claims against or Equity

18                          Interests in Debtors.  Thus, the classification scheme embodied in

19                          the Plan is both reasonable and appropriate under Section 1122(a) of

20                          the Bankruptcy Code.

21                  ii.     Unremitted Principal Claims, which are unsecured Claims against

22                          USACM, are properly classified in Class A-4 along with other

23                          General Unsecured Claims against USACM.

24                  iii.    Section 1121(b), applying to the classification of administrative

25                          convenience claims, is not applicable to these Chapter 11 Cases

26                          because the Debtors' Plan does not provide for any such claims.

27

28                                                  3

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

b.    Section 1123 of the Bankruptcy Code.

    i.    Section 1123(a)(1).  The Plan properly designates Classes of Claims and Equity Interests as required under Section 1123(a)(1) of the Bankruptcy Code, and provides for the treatment of Claims that should not be classified.  Article II Section C of the Plan designates Classes of Claims and Equity Interests for each of the Debtors, other than those specified in Sections 507(a)(2), (a)(3) and (a)(8) of the Bankruptcy Code.  "Unclassified Claims," *i.e.,* those in Sections 507(a)(2) and (a)(8), to the extent that they exist against the Debtors, are treated separately from the Article II Section C classified Claims and Equity Interests, in Article II Section B of the Plan. There are no Section 507(a)(3) Claims in these voluntary Chapter 11 Cases.  Thus, the Plan complies with Section 1123(a)(1).

    ii.    Section 1123(a)(2).  The Plan complies with Section 1123(a)(2) of the Bankruptcy Code because it specifies unimpaired Classes of Claims and Equity Interests.  Article II Section C of the Plan lists each Class of Claims and Equity Interests and states the treatment of each Class under the Plan.  The following are Classes of Claims that are unimpaired under the Plan: Classes A-1 through A-3 (Claims against USACM), Classes B-1 through B-4 (Claims against FTDF), Classes C-1 through C-4 (Claims against DTDF), Classes D-1 through D-3 (Claims against USA Realty), and Classes E-1 through E-3 (Claims against USA Securities).  In the subsections of Article II Section C of the Plan discussing the treatment of each of these Classes of unimpaired Claims, the Plan expressly states that the Claims are not impaired and that the holders of Claims in such

4

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Classes are deemed to vote in favor of the Plan.[1]  The Plan contains

2    no unimpaired Classes of Equity Interests in any of the Debtors.

3       iii.    Section 1123(a)(3).  The Plan satisfies Section 1123(a)(3) because it

4    specifies the treatment of impaired Classes of Claims or Equity

5    Interests.  As noted above, Article II Section C of the Plan lists each

6    Class of Claims and Equity Interests and states the treatment of each

7    Class under the Plan.  The following Classes of Claims and Equity

8    Interests are impaired under the Plan:  Classes A-4 through A-8

9    (Claims against and Equity Interests in USACM), Class B-5 (Equity

10   Interests in FTDF), Class C-5 (Equity Interests in DTDF), Classes

11   D-4 through D-5 (Claims against and Equity Interests in USA

12   Realty), and Claims E-4 through E-5 (Claims against and Equity

13   Interests in USA Securities).  In the subsection of Article II Section

14   C of the Plan related to each of these Classes of impaired Claims,

15   the Plan expressly states how these Claims or Equity Interests within

16   each such Class will be treated.[2]

17      iv.    Section 1123(a)(4).  Section 1123(a)(4) has been met because the

18   Plan provides for the same treatment for each Claim or Equity

---

1 *See* Plan, Art. II Section C.1(a)-(c) (treatment of Classes A-1 through A-3, Claims against USACM); *id*. Section C.2(a)-(d) (treatment of Classes B-1 through B-4, Claims FTDF); *id*. Section C.3(a) - (d) (treatment of Classes C-1 through C-4, Claims against DTDF); *id*. Section C.4.(a)-(c) (treatment of Class D-1 through D-3, Claims against USA Realty); *id*. Section C.5(a)-(c) (treatment of Class E-1 through E-3, Claims against USA Securities); *see also id*. Section A (summarizing the treatment of unimpaired Classes of Claims against each Debtor); *id*. Art. III Section A (listing the above Classes of Claims as those that are deemed to accept the Plan.)

2 *See* Plan, Art. II Section C.1(d)-(h) (treatment of Classes A-4 through A-8,  Claims against and Equity Interests in USACM); *id*. Section C.2(e) (treatment of Class B-5, Equity Interests in FTDF); *id*. Section C.3(e) (treatment of Class C-5, Equity Interests in DTDF); *id*. Section C.4.(d)-(e) (treatment of Class D-4 through D-5, Claims against and Equity Interests in USA Realty); *id.* Section C.5(d)-(e) (treatment of Class E-4 through E-5, Claims against and Equity Interests in USA Securities); *see also*  *id.* Section A (summarizing the treatment of impaired Classes of Claims against and Equity Interests in each Debtor); *id.* Art. III Section A (listing the above Classes of Claims and Equity Interests as those that are entitled to vote to accept or reject the Plan, or as those deemed to reject the Plan.)

5

1    Interest of a particular Class, unless the holder of a particular Claim

2    or Equity Interest has agreed less favorable treatment.  Article II

3    Section C of the Plan sets forth the treatment of Claims or Equity

4    Interests classified in each Class under the Plan.  The treatment of

5    Claims and Equity Interests is also summarized in Article II Section

6    A of the Plan.  Those Sections of the Plan provide for the same

7    treatment of each Claim and Equity Interest within a particular

8    Class.  While the holder of a Claim or Equity Interest may agree to

9    less favorable treatment than other holders of Claims and Equity

10    Interests within its Class, the Plan does not single out any Claim or

11    Equity Interest for treatment different than other Claims or Equity

12    Interests within its Class.

13    v.    Section 1123(a)(5) and (b).  The Plan provides adequate means for

14    its implementation in a manner authorized under Section 1129(a)(5)

15    and (b) and, therefore, satisfies Section 1123(a)(5).  Article IV of the

16    Plan, entitled "Implementation of the Plan," states the material terms

17    related to its implementation.  Section A of Article IV provides a

18    summary of the means of implementation, and Section B through H,

19    together with other Plan provisions referenced below, the Asset

20    Purchase Agreement, the Schedule of Executory Contracts and

21    Unexpired Leases, the Plan Documents Supplement and the Direct

22    Lender Supplement, detail the means for implementing the Plan.

23    Specifically, the Plan will be implemented in material part as

24    authorized under Section 1123(a) and (b) by the following means:

25

26

27

28

6

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1.      the transfer of certain Loan Servicing Agreements to the Asset Purchaser under an Asset Purchase Agreement in accordance with Section 1123(a)(5)(B);[3]

2.      the sale of the Acquired Assets pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code as authorized under Section 1123(a)(5)(D) of the Bankruptcy Code, and the disbursement of the Allocated Net Sale Proceeds in accordance with the Plan to holders of Claims against USACM and FTDF, and holders of Equity Interests in FTDF;[4]

3.      the effectuation of the "Intercompany Compromises," defined in Article IV Section of E of the Plan, and the releases set forth in Article VIII Section A of the Plan, as authorized under Section 1123(b)(3)(A) of the Bankruptcy Code;

4.      the transfer of certain assets of USACM to the USACM Trust, as authorized under Section 1123(a)(5)(B) of the Bankruptcy Code, the liquidation of those assets, and disbursement of Cash to beneficiaries of the USACM Trust pursuant to the Plan and the USACM Trust Agreement;[5]

5.      the retention by Post-Effective Date DTDF of assets of DTDF, as authorized under Section 1123(a)(5)(A) of the Bankruptcy Code, the liquidation of those assets by Post-Effective Date DTDF in accordance with the DTDF Amended Operating Agreement, and the disbursement of Cash in accordance with the Plan;[6]

6.      the retention and enforcement of certain Claims and causes of action and the liquidation of those Claims and causes of action and other assets of each of the Debtor's respective Estates, unless otherwise transferred to the USACM Trust or retained by Post-Effective Date DTDF, in accordance with Section 1123(b)(3)(B) and (b)(4) of the Bankruptcy Code,

---

3 Plan, Art. IV. Section A.1.

4 Plan, Art. IV, Sections A.2 & C.

5 Plan, Art. IV. Sections A.3 and D.1; *see id.* Art. VII; USACM Trust Agreement, filed as part of the Plan Documents Supplement [Docket No. 2002].

6 Plan, Art. IV. Sections A.5 & D.2; *see id.* Art. VII; DTDF Amended Operating Agreement, filed as part of the Plan Documents Supplement [Docket No. 2001].

and the distribution of Cash proceeds in accordance with the Plan;[7]

7.    the assumption and/or assumption and assignment of executory contracts and unexpired leases listed on the Schedule of Executory Contracts and Unexpired Leases and the rejection of other executory contracts and unexpired leases in accordance with and as authorized under Sections 365 and 1123(b)(2) of the Bankruptcy Code;[8]

8.    the retention by the Bankruptcy Court of jurisdiction in accordance with Article VIII Section D of the Plan;

9.    the imposition of the post-Effective Date injunction set forth in Article IV Section H of the Plan; and

10.    the eventual dissolution of each of the Debtors.[9]

vi.    _Section 1123(a)(6), (a)(7) and (a)(8)._  Subsections (a)(6), (a)(7) and (a)(8) of Section 1123 are not applicable in these Chapter 11 Cases.

9.    _Section 1129(a)(2) of the Bankruptcy Code._  The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required under Section 1129(a)(2), including, without limitation, Sections 1125 and 1126 and all applicable Bankruptcy Rules.  Upon information and belief, the solicitation of votes on the Plan was (a) in compliance with all applicable laws, rules and regulations governing the adequacy of disclosure in connection with such solicitation, (b) in compliance with the "Solicitation Procedures" approved by the Court in the "Order Approving (A) Debtors' Disclosure Statement; (B) Proposed Notice of Confirmation Hearing; (C) Proposed Solicitation and Notice Procedures; and (D) Proposed Form of Ballots" ("Disclosure Statement Order"); and (c) commenced only after providing the Disclosure Statement, which was approved by the Court as part of the Disclosure Statement Order

---

7 Plan, Art. IV. Sections A.3, A.7, B & G; _id._ Art. VII &  Art. VIII Section L.

8 Plan, Art. V; _see_ Schedule of Executory Contracts and Unexpired Leases, filed by the Debtors on November 29, 2006 [Docket No. 1886].

9 Plan, Art. IV Sections A.3, A.5 –A.7; _id._ Art. VIII Section L.

8

Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  as containing adequate information within the meaning of Section 1125(a) of the Bankruptcy

2  Code.

3         10.    *Section 1129(a)(3) of the Bankruptcy Code.*  The Debtors have proposed the Plan in

4  good faith and not by any means forbidden by law in accordance with Section 1129(a)(3).

5            a.    Consistent with the objectives and overriding purpose of the Bankruptcy

6                Code, holders of Allowed Claims, and in the cases of FTDF and DTDF,

7                Allowed Equity Interests, will realize the highest possible and most certain

8                recoveries under the circumstances and in comparison to other alternatives,

9                including liquidation under Chapter 7 of the Bankruptcy Code.

10            b.    The process for the formulation of the Plan and the Plan itself provide

11                independent evidence of the Debtors' good faith.

12               i.    The Plan formulation process, which involved arm's-length,

13                    extensive and often hard-fought negotiations between the

14                    Committees and the Debtors, and between the Committees

15                    themselves, has resulted in compromises between the various

16                    Debtors' Estates and Direct Lenders.

17               ii.    Furthermore, as I discuss in more detail below, the sale of the

18                    Acquired Assets, including the lead bid and auction component, was

19                    an arm-length transaction that was extensively negotiated by the

20                    Debtors and the Committees, and it has produced the highest and

21                    best offer for the Acquired Assets.

22               iii.    The Plan is supported by all four Committees, thus evidencing their

23                    acknowledgment that the Plan is fundamentally fair and proposed in

24                    good faith.

25               iv.    The liquidation analysis attached as Exhibit 4 to the Disclosure

26                    Statement ("Liquidation Analysis"), including the supplements

27                    made thereto herein, demonstrate that holders of Allowed Claims

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

9

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

and, in the cases of FTDF and DTDF, holders of Equity Interests will receive substantially more under the Plan than they would in a hypothetical Chapter 7 liquidation.  The Plan maximizes the value of the Debtors' assets and proposes distributions on the Effective Date, or as soon as possible thereafter, depending on the circumstances.

11.    _Section 1129(a)(4) of the Bankruptcy Code_.  The Plan fully complies with Section 1129(a)(4) because it provides that any payment made or to be made for services or for costs and expenses incurred in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved, or are subject to approval, by the Court as reasonable.   Article II Section B.1 of the Plan and Article III of the Disclosure Statement set forth procedures for all Professionals or other Entities requesting compensation or reimbursement of expenses to seek Court approval for any final allowance of compensation or reimbursement of expenses.  Article VII Section A of the Plan sets forth procedures related to the objection of any such requests, and Article VIII Section D of the Plan provides for the Court's retention of jurisdiction to hear and determine any and all applications by Professionals or other Entities for compensation and reimbursement of expenses arising out of or related to the Debtors' Chapter 11 Cases.  Furthermore, to the extent that a break up fee is an expense "incurred in or in connection with a case, or in connection with the plan and incident to the case" within the meaning of Section 1129(a)(4), the break up fee payable to SPCP Group, LLC was approved by the Court in the Bid Procedures Order.

12.    _Section 1129(a)(5) of the Bankruptcy Code_.  The Plan complies with Section 1129(a)(5) because it adequately discloses affiliates of the Debtors participating in the joint Plan and, where applicable, successors to the Debtors under the Plan.

a.    The Debtors are all affiliates of one another, and this fact is apparent in the Plan.

b.    The Plan, as supplemented by the Plan Documents Supplement required under Article I Section C of the Plan, discloses those individuals who will

10

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

be retained by the Post-Effective Date Entities.

    i.      On December 8, 2006, the DTDF Committee filed a Plan Documents Supplement and Notice of Disclosures (the "DTDF Supplement") disclosing that Michael Tucker of FTI Consulting, Inc. (DTDF Committee's financial advisor) will serve as the DTDF Administrator. The identities of members of the DTDF Post-Effective Date Committee and the terms of compensation for Mr. Tucker and members of the Committee, if any, are also disclosed in the DTDF Supplement. To the best of my knowledge, the appointment of Mr. Tucker and the members to the DTDF Post-Effective Date Committee is consistent with the interests of the holders of Claims and Equity Interests in DTDF's case and with public policy.

    ii.     Also on December 8, 2006, the USACM Committee filed a Plan Documents Supplement and Disclosure (the "UCC Supplement") disclosing that Geoffrey L. Berman of Development Specialists, Inc. will serve as the USACM Trustee. The UCC Supplement also identities members of the USACM Trust Committee and terms related to the compensation of Mr. Berman and the members of the Committee, if any. To the best of my knowledge, the appointment of Mr. Berman and the members to the USACM Trust Committee is consistent with the interests of the holders of Claims in USACM's case and with public policy.

    iii.    Pursuant to Article VII Section E.1 of the Plan and the USACM Trust Agreement included in the UCC Supplement, Mr. Berman may serve as the Disbursing Agent for FTDF, USA Realty and USA Securities. Upon information and belief, his appointment in this

11

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    capacity will be pursuant to an agreement with each of those

2    respective Debtors.

3    c.    To the best of my knowledge, none of the Persons disclosed in the DTDF

4    Supplement and the UCC Supplement is an insider of the Debtors, and,

5    therefore, Section 1125(a)(5)(B) does not apply in these Chapter 11 Cases.

6    13.    *Section 1129(a)(6) of the Bankruptcy Code.*  Section 1129(a)(6) is inapplicable in

7    these Chapter 11 Cases.  No regulatory commission has any jurisdiction over rate changes by the

8    Debtors.  Furthermore, the Plan does not provide for any rate changes by the Debtors.  Therefore,

9    the Plan satisfies the requirements of Section 1129(a)(6).

10    14.    *Section 1129(a)(7) of the Bankruptcy Code.*

11    a.    I directed the preparation of the Liquidation Analysis, attached as Exhibit 4

12    to Debtors' Disclosure Statement.  The Liquidation Analysis is still valid,

13    and it is incorporated herein by reference.

14    b.    The only adjustments to the estimated Liquidation Values that may be

15    appropriate at this time are those resulting from the Higher and Better Offer

16    that USACM and FTDF received from Compass Partners LLC ("Compass")

17    at the Auction on December 7, 2006 ("Compass Bid").

18    i.    The Compass Bid provides $8,000,000 for the "Commercial

19    Mortgage Assets," as that term is defined in the Asset Purchase

20    Agreement, which will be paid to the USACM Estate.

21    ii.    The "Additional Purchase Price" of $11,000,000 provided for in the

22    Compass Bid, which is not allocated to either the USACM or FTDF

23    Estate, after reduction of the Court-approved $1,500,000 breakup

24    fee that will be paid to the stalking horse bidder, SPCP Group, LLC,

25    is $9,500,000.  The allocation of this sum between USACM and

26    FTDF has not yet been determined.

27

28    12

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

iii. The Compass Bid provides an additional $48,000,000 for the "First Trust Deed Fund Assets," as that term is defined in the Asset Purchase Agreement, and that amount is paid solely to the FTDF Estate.

c. The Plan meets the requirements of Section 1129(a)(7), commonly referred to as the "best interest test" because each dissenting creditor or Equity Interest in an impaired Class will receive or retain value under the Plan that is not less than the amount such holder would receive if the Debtors were liquidated in Chapter 7.

d. Classes A-4, A-5, A-6, A-7, A-8, B-5, C-5, D-4, D-5, E-4, and E-5 are impaired under the Plan.

i. Of those impaired Classes, only Classes A-4, A-5, B-5, C-5, D-4, and E-4 will retain previously distributed assets and/or receive a distribution under the Plan.  As shown in the Liquidation Analysis, as enhanced by additional distributions pursuant to the Compass Bid as referred to herein, this retention or distribution will yield to the holders of Claims and, in the case of Classes B-5 and C-5, holders of Equity Interests, significantly more than such holders would receive in a hypothetical Chapter 7 liquidation.

ii. Holders of Claims and/or Equity Interests classified in impaired Classes A-6 through A-8, D-5 and E-5 will receive no distribution under the Plan.  Because, as demonstrated in the Liquidation Analysis, the holders of these Claims and/or Equity Interests would not receive any distribution if the USACM, USA Realty or the USA Securities' cases were liquidated under Chapter 7 of the Bankruptcy Code, each of these holders will achieve a recovery that is "not less than the amount" such holder would receive in a Chapter 7

13

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    liquidation.  Accordingly, the Plan satisfies Section 1129(a)(7) as to

2    such holders of Claims and Equity Interests.

3    e.  Joseph Milanowski and Thomas Hantges ("Insider Equity Interests") filed an

4    Objection to Confirmation of the Plan on December 11, 2006 [Docket No. 2051].

5    The Insider Equity Interests contend that the Plan is not fair and equitable

6    (presumably under the Section 1129(a)(7) "best interests" test) because it provides

7    that Equity Interests in USACM, USA Securities and USA Realty are canceled

8    upon the Effective Date.  The Insider Equity Interests assert that "there is a

9    possibility that all claim holders in at least USACM can be paid 100% of their

10   claims" and that the Plan should acknowledge "the value that can be realized

11   through the monetization of the $58 million dollar pledge, the $75 million dollar

12   pledge and the potential value of other USACM assets."  Although the Insider

13   Equity Interests mention two pledges, I am aware of only one pledge, a Security

14   Agreement dated May 31, 2006 by and between IP and the Debtors.  It appears that

15   the reference in the Insider Equity Interests' Objection to the $58 million dollar

16   pledge refers to the repayment of the IP $58 Million Promissory Note.  I am not

17   aware of any additional $75 million dollar pledge payable to USACM.

18   f.  On Page 5 of the Disclosure Statement, the Debtors have estimated the payoff to

19   the Class A-4 General Unsecured Claims under the Plan will be 8-33%.  This

20   payoff estimate was based on the Asset Purchase Agreement of SPCP Group, LLC,

21   which was the only bid outstanding at the time.

22   g.  The overbid at the auction from the Compass Bid was $19,500,000 (the

23   "Overbid").

24   h.  The Insider Equity Interests contend that IP $58 Million Promissory Note can be

25   monetized (presumably for its full face value of $58,000,000).

14

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

i.  It would be misleading and not proper to value the IP $58 Million Promissory Note as being worth $58 million in immediate cash payable to USACM at this time (as argued by the Insider Equity Interests) or at any time in the near future.  IP does not have $58 million in cash at this time with which to pay the IP $58 Million Promissory Note.  The collateral for the IP $58 Million Promissory Note consists of pledged limited liability company interests owned by IP in eight limited liability companies, six of which are in the process of developing various real estate projects that are not completed at this time and which will require more equity contributions in order to complete and sell the projects and pay off the underlying mortgages on the projects and then return funds to the limited liability companies to be paid out as distributions on the limited liability company interests.  I am not aware of any market for or potential buyer of these pledged limited liability company interests, which are very illiquid.  There are many risks associated with any probability that USACM will realize the full $58 million or even a significant portion of the $58 million principal balance of the IP $58 Million Promissory Note.  In addition, DTDF may have claims against some of these pledged limited liability company interests with a potential priority over the claims of USACM to these pledged limited liability company interests.

ii. Notwithstanding the foregoing, and even assuming that the IP $58 Million Promissory Note can be immediately monetized and liquidated for its full face value of $58,000,000, and that USACM would receive the full $58,000,000 from such monetization and liquidation, there is still no possibility that the USACM Unsecured Claims will be paid 100%, and no possibility that there will be any distribution from the USACM Estate to the Insider Equity Interests.

15

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

i.  Even assuming solely for hypothetical purposes (in order to respond to the Objection of the Insider Equity Interests, and without any attempt to determine the allocation of the Overbid amount between USACM and FTDF) that the entirety of the Overbid of $19,500,000 were to be added to the payoff to the USACM Unsecured Claims, and even assuming solely for hypothetical purposes (in order to respond to the Objection of the Insider Equity Interests) that the full amount of $58,000,000 could be realized for USACM from the IP $58 Million Promissory Note and was to be added to the payoff to the USACM Unsecured Claims, there would still be a shortfall of approximately $35,000,000 and $385,000,000 in the payment of the USACM Unsecured Claims under the 33% high and the 8% low scenarios, respectively, with no distribution to the Insider Equity Interests.  As stated previously, there is no possibility that the USACM Unsecured Claims will be paid 100%, and no possibility that there will be any distribution from the USACM Estate to the Insider Equity Interests.

j.  The Liquidation Analysis states that the Estimated Liquidation Value of the Gross Proceeds from the liquidation of USACM's assets is $48,020,900.  The Liquidation Analysis also states that the net Estimated Amount Available to pay USACM Unsecured Claims is $29,869,200.  Finally, the Liquidation Analysis states that the Estimated Unsecured Claims against the USACM Estate will be $516,758,900, which means that there is an estimated shortfall under the Liquidation Analysis of $486,889,700 for the payment in full of the Estimated Unsecured Claims against the USACM Estate.  Under the Liquidation Analysis, there is no possibility that the USACM Unsecured Claims will be paid in full, and no possibility that there will be any distribution from the USACM Estate to the Insider Equity Interests.

16

k.  Even assuming solely for hypothetical purposes (in order to respond to the Objection of the Insider Equity Interests, and without any attempt to determine the allocation of the Overbid amount between USACM and FTDF) that the entirety of the Overbid of $19,500,000 were to be added to the net Estimated Amount Available to pay USACM Unsecured Claims in the Liquidation Analysis, and even assuming solely for hypothetical purposes (in order to respond to the Objection of the Insider Equity Interests) that the full amount of $58,000,000 could be realized for USACM from the IP $58 Million Promissory Note and was to be added to the net Estimated Amount Available to pay USACM Unsecured Claims in the Liquidation Analysis, there is still no possibility that the USACM Unsecured Claims will be paid in full, and no possibility that there will be any distribution from the USACM Estate to the Insider Equity Interests.

l.  It is fair and equitable to the Insider Equity Interests that their equity in USACM be canceled upon the Effective Date, and the Plan complies with the best interests test as to the Insider Equity Interests.

15.  *Section 1129(a)(8) of the Bankruptcy Code.*

a.  Subject to the exceptions contained in Section 1129(b) of the Bankruptcy Code, Section 1129(a)(8) requires that each Class of Claims and Equity Interests must either have accepted the Plan, or not be impaired under the Plan.

b.  Classes A-1 through A-3, B-1 through B-4, C-1 through C-4, D-1 through D-3 and E-1 through E-3 are unimpaired, and upon information and belief, based on the best information that I have obtained as of today, Classes A-5, B-5, C-5, D-4 and E-4, though impaired, have accepted the Plan.  Thus, Section 1129(a)(8) is satisfied with respect to each of those Classes.

c.  Classes A-6 through A-8, D-5 and E-5 are impaired and are not entitled to any distribution and, therefore, under Section 1126(g) of the Bankruptcy Court are deemed to reject the Plan.  Furthermore, upon information and

17

1    belief, based on the best information that I have as of today, impaired Class

2    A-4 has not voted to accept the Plan.  Thus, the Plan can be confirmed only

3    through the "cramdown" provisions of Section 1129(b) of the Bankruptcy

4    Code as to these Classes.  As I will address below, the Plan meets the

5    requirements of Section 1129(b) with respect to Classes A-4, A-6 through

6    A-8, D-5 and E-5 and, therefore, the failure to satisfy Section 1125(a)(8)

7    with respect to theses impaired rejecting Classes does not bar confirmation

8    of the Plan.

9        16.    *Section 1129(a)(9) of the Bankruptcy Code*.  Holders of Claims described in

10   Section 1129(a)(9) will be paid under the Plan in accordance with that Section.

11            a.    Pursuant to Article II Section B.1 of the Plan, unless otherwise agreed, each

12                 holder of a Claim under Section 507(a)(2) (Allowed Administrative

13                 Expense Claims, including Statutory Fees and Professional compensation)

14                 will receive Cash on the latter of the Effective Date or the date such

15                 Administrative Expense Claims becomes and Allowed Administrative

16                 Expense Claim.  The Debtors, whose petitions were voluntarily filed, do not

17                 have any Section 507(a)(2) Claims (gap claims in involuntary cases).  Thus,

18                 Section 1129(a)(9)(A) has been met.

19            b.    Priority Unsecured Claims (Claims entitled to priority under Section 507(a),

20                 other than Priority Tax Claims, Administrative Expense Claims, and

21                 Ordinary Course Administrative Expense Claims) are classified in Classes

22                 A-3 (USACM Priority Unsecured Claims), B-3 (FTDF Priority Unsecured

23                 Claims), C-3 (DTDF Priority Unsecured Claims), D-3 (USA Realty Priority

24                 Unsecured Claims) and E-3 (USA Securities Priority Unsecured Claims).

25                 Article II Section C sets forth the treatment of each of these Classes of

26                 Priority Unsecured Claims, stating that holders of Allowed Priority

27                 Unsecured Claims in each of these Classes shall be paid in full on the

28                                                              18

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Effective Date, unless such holder agrees otherwise.10

2    Section 1129(a)(9)(B), therefore, has been satisfied.

3    c.    Article II Section B.2 states that, unless otherwise agreed, holders of

4    Priority Tax Claims (Claims entitled to priority under Section 507(a)(8))11

5    against each of the Debtors will be paid in full in Cash from the relevant

6    Debtor's Estate, on the later of the Effective Date or the date such Priority

7    Tax Claim becomes and Allowed Priority Tax Claim, or, in either case as

8    applicable, as soon thereafter as practicable.  This treatment is more

9    favorable than allowed under Section 1129(a)(9)(C) and, therefore, that

10    provision has been met.

11    d.    Finally, the Plan complies with Section 1129(a)(9)(D).  Article II of the

12    Plan states that Allowed Secured Tax Claims against each of the Debtors, if

13    any, will be paid in full on or before the later of sixty days after the

14    Effective Date, or fifteen Business Days after the date the Secured Tax

15    Claims becomes an Allowed Claim.[12]

16    17.    *Section 1129(a)(10) of the Bankruptcy Code*.  This Section provides that at least

17    one impaired Class of Claims must accept the Plan, excluding acceptance by any insider.  Upon

18    information and belief, this Section 1129(a)(10) has been satisfied in each of the Debtors cases as

19    follows:

20    a.    In USACM's case, Classes A-4 through A-7 are Classes of Claims that are

21    impaired under the Plan.  Classes A-6 through A-7 will receive no

22    distribution under the Plan and, therefore, they are deemed to reject the

23    Plan.  Based on the information that I have at this time, of the voting

24

25    10 Plan, Art. II, Sections C.1(c), C.2(c), C.3(c); C.4(c), and C.5(c).

26    11 Plan, Art. I Section 114.

27    12 Plan, Art. II Sections C.1(a), C.2(a), C.3(a), C.4(a) & C.5(a); *see id*. Section A.

28                                            19

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    impaired Classes, Class A-5 has voted to accept the Plan and, therefore,

2    Section 1129(a)(10) has been met with regard to USACM.

3    b.    Section 1129(a)(10) does not apply to FTDF or DTDF because there are no

4    impaired class of Claims in their cases.  The only impaired Classes in FTDF

5    and DTDF' cases are Classes B-5 and C-5.  Those Classes, which

6    incidentally have, based on the information available to me at this time,

7    voted to accept the Plan, provide for the treatment of Equity Interests, not

8    Claims.

9    c.    Class D-4 is the only impaired Class of Claims in USA Realty's case, and it

10    appears that it has voted to accept the Plan.  Therefore, Section 1129(a)(10)

11    is met in USA Realty's case.

12    d.    Finally, in USA Securities' case, Class E-4 is the only impaired Class of

13    Claims, and it appears to have voted to accept the Plan.  Section

14    1129(a)(10) thus is met in  USA Securities' case.

15    18.    *Section 1129(a)(11) of the Bankruptcy Code*.  Section 1129(a)(11) has been met in

16    these Chapter 11 Cases because the Plan is feasible.  The Debtors have thoroughly analyzed their

17    ability to make the distributions required under the liquidating Plan, as set forth above, the Debtors

18    have provided adequate means for the implementation of the Plan, and they have established a

19    framework to facilitate a prompt distribution of Cash as required under the Plan.

20    a.    The only fixed distributions that the Debtors must make under the Plan on

21    the Effective Date are payments on account of Allowed Administrative

22    Expense Claims, Allowed Priority Tax Claims, Allowed Secured Tax

23    Claims (Classes A-1, B-1, C-1, D-1 and E-1), Allowed Other Secured

24    Claims (Classes A-2, B-2, C-2, D-2 and E-2), Allowed Priority Unsecured

25    Claims (Classes A-3, B-3, C-3, D-3 and E-3), and, in the cases of FTDF and

26

27

28                                                    20

DTDF, Allowed General Unsecured Claims (Classes B-4 and C-4).[13]  The Debtors anticipate that they will have sufficient Cash on the Effective Date, or on another date agreed to by the holder of an Allowed Claim, to pay these Classes of Claims, to the extent that Claims exist against a Debtor within a Class, or to make the reserves required under the Plan.

b.    Furthermore, the Plan, including all of the documents incorporated therein, has adequate provisions for the creation and management of the USACM Trust, the retention of assets by and the management of Post-Effective Date DTDF, and for making distributions to holders of Allowed Claims or Equity Interests classified in Classes A-4 (Allowed General Unsecured Claims against USACM), B-5 (Equity Interests in FTDF), C-5 (Equity Interests in DTDF), D-4 (Allowed General Unsecured Claims against USA Realty) and E-4 (Allowed General Unsecured Claims against USA Securities), which are the only other Classes that will receive a distribution under the Plan.[14]

19.    *Section 1129(a)(12) of the Bankruptcy Code.*  The Plan complies with Section 1129(a)(12) because all fees payable under section 1930 of title 28 have been paid or the Plan provides for the payment of all such fees on the effective date of the Plan.  The Plan complies with this requirement.  Article II Section B.1(b) states that all Statutory Fees, which are fees under section 1930 of title 28,15 shall be paid in Cash in full on or before the Effective Date.

20.    *Section 1129(a)(13) of the Bankruptcy Code.*  Section 1129(a)(13), requiring compliance with Section 1114 of the Bankruptcy Code, has no application in the Chapter 11 Cases and, therefore, the Plan complies with this Section.

---

13 *See* Plan, Art. II, Sections A & B.

14 *Id.*

15 Plan, Art. I. Section 125.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

21

21.     *Section 1129(a)(14) of the Bankruptcy Code.*  Section 1129(a)(14) requires that domestic support obligations be paid.  This provision has no application to these business Debtors who have no such obligations.

22.     *Section 1129(a)(15) of the Bankruptcy Code.*  Section 1129(a)(15) expressly states that it applies to "case[s] in which the debtor is and individual."[16]  This Section has no application to these business Debtors who are not "individuals."

23.     *Section 1129(a)(16) of the Bankruptcy Code.*  Section 1129(a)(16) states that "[a]ll transfers of property of the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust."[17]  This provision does not apply in these Chapter 11 Cases because the Debtors are a moneyed business or commercial corporation.

## The Plan Complies With The Applicable Provisions of 11 U.S.C. § 1129(b)

24.     To the best of my knowledge and as discussed above, Section 1129(a)(8) of the Bankruptcy Code has not been met in USACM case as to Classes A-4, A-6, A-7 and A-8, in USA Realty's case as to Class D-5, and in USA Securities' case as to Class E-5.  Thus, to be confirmed, the Plan must satisfy the requirements of Section 1129(b) that it not "discriminate unfairly," and that it be "fair and equitable" as to these Classes.  Both of these requirements have been met in these cases and, therefore, notwithstanding the Debtors' inability to satisfy Section 1129(a)(8), the Plan may be confirmed as to the rejecting impaired Classes.

> a.     The Plan does not "discriminate unfairly."  The Plan does not "discriminate unfairly" with respect to impaired Classes A-4, A-6, A-7, A-8, D-5 and E-5, because to the extent that there is different treatment, there is a reasonable basis for the different classification and treatment of the respective Claims and Equity Interests included in each such Class.

---

16 11 U.S.C. § 1129(a)(15).

17 11 U.S.C. § 1129(a)(16).

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

22

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

b.    The Plan is "fair and equitable" as to Unsecured Claims--Classes A-4, A-6 and A-7. Class A-4 consists of Allowed General Unsecured Claims against USACM, Class A-6 consists of Allowed Penalty Claims against USACM,[18] and Class A-7 is comprised of Subordinated Claims against USACM.[19] These Classes, all of which have not accepted the Plan, provide for the treatment of Claims against USACM that would be unsecured against USACM and, therefore, whether the Plan is fair and equitable as to these Classes is evaluated under Section 1129(b)(2)(B)(ii).

i.    The Plan is "fair and equitable" as to Classes A-4 and A-6 because holders of junior Claims or Equity Interests will not receive or retain under the Plan on account of such junior Claim or Equity Interest any property.

ii.    The only Classes of Claims and Equity Interests that are junior to Class A-4 Claims are Claims in Classes A-6 through A-8. Holders of Class A-6 Claims will not receive or retain any property unless holders of Allowed Class A-4 Claims are paid in full, plus interest. Holders of Class A-7 Claims will not receive or retain under the Plan on account of their Claim any property unless holders of Class A-4 and Class A-6 Claims are paid in full, plus interest.[20] Furthermore, holders of Equity Interests in USACM, classified in Class A-8, will receive no distribution and retain no property under the Plan.[21]

---

18 Plan, Art. II, Section C.1(f).

19 Plan, Art. II, Section C.1(g).

20 Plan, Art. II. Section C.1(g).

21 Plan, Art. II Section C.1(h).

23

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

iii.     The only Classes of Claims and Equity Interests that are junior to Class A-6 Claims are Claims in Classes A-7 through A-8. Holders of Class A-7 Claims will not receive or retain under the Plan on account of their Claim any property unless holders of Class A-6 Claims are paid in full, plus interest.[22] Furthermore, holders of Equity Interests in USACM, classified in Class A-8, will receive no distribution and retain no property under the Plan.[23]

iv.     The Plan is "fair and equitable" as to Class A-7 because holders of junior Claims or Equity Interests will not receive or retain under the Plan on account of such junior Claim or Equity Interest any property. The only Class that is junior to Class A-7 Claims is Class A-8, which is comprised as Equity Interests in USACM. Holders of Equity Interests in USACM will receive no distribution or retain any property under the Plan.

b.     The Plan is "fair and equitable" as to Equity Interest Classes--Classes A-8, D-5 and E-5. Whether the Plan is "fair and equitable" within the meaning of Section 1129(b)(2)(C)(ii) as to Class A-8, which is comprised of Equity Interests in USACM, Class D-5, which is comprised of Equity Interests in USA Realty, and Class E-5, which is comprised of Equity Interests in USA Securities because no holder of any interest that is junior to the Equity Interests treated in these Classes will receive or retain any property under the Plan.[24]

---

22 Plan, Art. II. Section C.1(g).

23 Plan, Art. II Section C.1(h).

24 *See* Art II. Sections C.1, C.4 & C.5.

24

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

## SPECIFIC FACTS ADDRESSING THE SALE

25.    A material component in implementing the Plan is the transfer of the USACM Assets and the FTDF Assets to Compass (the "Sale") pursuant to the Asset Purchase Agreement dated December 8, 2006 ("Compass APA").   My statements herein explain why the Sale is in accordance with Section 363 of the Bankruptcy Code.

26.    The Debtors, in coordination with the Committees, have undertaken extensive efforts to explore various options for maximizing the assets of the Debtors' estates.  These efforts are outlined in detail in the following Declarations, both of which have been incorporated herein by reference:  "Declaration of Thomas J. Allison in Support of Motion for Order Scheduling an Auction for the Sale of Certain Assets, Appointing SPCF Group, LLC as Lead Bidder, and Approving Bid Procedures and Protections" filed on October 18, 2006 ("Auction Declaration"); and "Supplemental Declaration of Thomas J. Allison in Support of Motion for Order Scheduling an Auction for the Sale of Certain Assets, Appointing SPCF Group, LLC as Lead Bidder, and Approving Bid Procedures and Protections" filed October 23, 2006 ("Supplemental Auction Declaration").

27.    Furthermore, as discussed in detail in the Supplemental Auction Declaration, the Debtors, acting through me, as their Chief Restructuring Officer, and  Mesirow Interim Financial Management LLC ("Mesirow"), which is providing interim management services for the Debtors, and in consultation with the Committee's financial advisors, actively marketed the Debtors' assets for sale during the past several months.

28.    As a result of those marketing efforts, the Debtors were able to identify fourteen potential purchasers who were interested in doing due diligence and purchasing all or a portion of the Debtors' assets.

29.    After assisting potential purchaser with their respective due diligence, the Debtors, then, received initial offers from potential bidders, the content of which are described in more detail in the Supplemental Auction Declaration.

30.    As I describe in my Supplemental Auction Declaration, the Debtors concluded that

packaging the servicing business of USACM along with the purchase of FTDF's fractional

interests in loans enhanced the value of both. Furthermore, and as I explain in detail in my

Supplemental Auction Declaration, the Debtors made a calculated decision not to sell the assets of

the other Debtors' Estates.

31.     For reasons explained in more detail in the Auction Declaration and the

Supplemental Auction Declaration, the Debtors selected SPCP Group, LLC ("Silver Point") as the

stalking horse bidder, and the Debtors, acting through me, the Committees and Silver Point

proceeded to negotiate an asset purchase agreement (the "Stalking Horse APA") related to the sale

of certain assets of USACM and FTDF.

32.     On November 8, 2006, the Court entered the Bid Procedures Order, designating

Silver Point as the lead bidder, and scheduling an auction for November 7, 2006 to allow

competing bidders to make Higher and Better Offers for the assets ("Auction").

33.     Upon information and belief, a copy of the Bid Procedure Order was served on 61

different Entities whom the Debtors believed had an interest in purchasing the assets of USACM

and FTDF.

34.     On November 30, 2006, the deadline for the submission of "Qualified Bids," as

that term is defined in the Bid Procedures Order, the Debtors and the Committees received two

potential bidders: the first from Compass, and the second from Desert Capital REIT, Inc. ("Desert

Capital").

35.     Unlike the Stalking Horse APA which did not include pre-closing rights associated

with loan servicing, the Compass Bid contemplated the purchase of all assets associated with

USACM's servicing rights, including accrued servicing fees, late charges, success fees and other

fees and sums due to USACM for $8 million.  In addition, the Compass Bid also increased the

purchase price of the FTDF assets being sold from $46 million to $48 million and included

separate consideration of $1.5 million to account for payment of the Break-Up Fee to Silver Point.

Upon receiving the Compass Bid, the Debtors, acting at my direction, informed Silver Point and

Desert Capital of this new structure so that they could evaluate the Compass bid and determine

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

26

1    whether they would be willing to restructure their bids.

2        36.    On December 5, 2006, the Debtors designated the Compass Bid to be a Qualified

3    Bid.

4        37.    After review of the Compass Bid, the Debtors, the Committees, and the other

5    bidders agreed that the structure of the Compass Bid, with its inclusion of additional USACM

6    Assets, would be adopted by all bidders and would form the basis of all bids at the Auction.

7    Competitive bidding at the Auction, therefore, began with the Compass Bid of $57.5 million.

8        38.    After approximately 15 rounds of bidding, the Auction concluded after Compass

9    submitted a bid of $67 million.

10        39.    I determined on behalf of the Debtors, with the unanimous concurrence of the

11    Committees, that Compass had submitted the Successful Bid, and this decision was approved and

12    "so ordered" by the Court.

13        40.    Following the Auction, Compass followed all procedures required under the Bid

14    Procedures Order.

15        41.    In my opinion, the USACM and FTDF Estates benefited greatly from the Auction.

16    Prior to the Auction, these Estates had assurances of receiving a total of only slightly more than

17    $46.5 million on the closing of the Stalking Horse APA.  The successful Compass Bid, however,

18    totaled $67 million.  Accordingly, the Auction added almost $19 million in net value.  In addition,

19    Compass also agreed to make certain favorable concessions to the terms of the Stalking Horse

20    APA, thereby increasing the USACM and FTDF Estates.

21        42.    Following the Auction, the Debtors and Compass entered into the Compass APA.

22        43.    The proposed Sale is not a sale of all of the assets of USACM or FTDF.

23            a.    Notably, the USACM Assets specifically exclude, among other things, the

24                following assets: (i) pre-petition accrued servicing fees, which are being

25                compromised under the Plan and any Prepaid Interest (as defined in the

26                Compass APA), (ii) USACM's litigation rights against third parties arising

27                out of, or related to, events prior to the closing date, (iii) the IP $58 Million

28                                                27

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Promissory Note and any other claims against IP or any of its affiliates or principals, (iv) all cash, accounts receivable, notes receivable, interests in promissory notes which are not related to the USACM loan portfolio, tax refunds and other similar assets, and (v) loans made to Placer Vineyards and Marquis Hotel.

    b.    In the case of FTDF, the FTDF Assets are defined to exclude cash and cash equivalents and Litigation Claims unrelated to the collection or enforceability of the loans that constitute the FTDF Assets.

44.    In my business judgment, the Sale is in the best interests of the Debtors' Estates.

45.    Together with the Committees, I have determined on behalf of the Debtors that selling the USACM Assets and FTDF Assets to Compass is the best option that will maximize the value of these Assets for the Debtors and their respective Estates.

46.    There exists a sound business justification for the Sale.

    a.    With respect to the sale of the FTDF Assets, the Sale maximizes the value of the FTDF Estate for the benefit of holders of Claims against and Equity Interests in FTDF.  After reviewing and balancing all alternatives, I have decided on behalf of FTDF that a sale of the FTDF Assets is in the best interests of holders of Allowed Claims against and Equity Interests in FTDF, and the FTDF Committee has concurred.

    b.    With respect to the sale of the USACM Assets, the Sale maximizes the value of the USACM Estate for the benefit of holders of Allowed Claims against USACM.  After reviewing and balancing all alternatives, I have decided on behalf of USACM that a sale of the servicing assets is in the best interests of creditors, and the Unsecured Creditors Committee has concurred.

47.    Notice of the Sale was adequate and reasonable.

    a.    As noted above, prior to the Auction, a notice of the Auction, including

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   copies of the Bid Procedures Order and the Stalking Horse APA, was

2   served on 61 Entities who the Debtors had identified as being potential

3   purchasers of the USACM Assets and FTDF Assets.

4       b.    Upon information and belief, pursuant to applicable Federal and Local

5   Bankruptcy Rules and Disclosure Statement Order and other applicable law,

6   copies of the Plan and the Disclosure Statement and related pleadings,

7   which included a copy of the Stalking Horse APA, were served 29 days

8   before the Confirmation Hearing on: (i) the Office of the United States

9   Trustee, (ii) the Committee and its counsel, (iii) the Debtors' creditors, (iv)

10   holders of equity interests in FTDF, (v) holders of equity interests in DTDF,

11   and (vi) those parties listed on the Debtors' Limited Mailing Matrix on file

12   with the Court.  As the Sale of the USACM Assets and FTDF Assets is an

13   integral part of the Debtors' Plan, it is described in detail in the Disclosure

14   Statement.

15       48.    In my business judgment, the purchase price for the Sale of the USACM Assets and

16   the FTDF Assets is fair and reasonable because, as outlined above, the Sale was negotiated in

17   good faith, and was the product of a highly-competitive bidding and Auction process that resulted

18   in the highest and best offer for such Assets.

19       49.    The Sale, as memorialized in the Compass APA, is made in good faith.

20       a.    To the best of my knowledge, Compass is not an insider of any of the

21   Debtors.

22       b.    To the best of my knowledge, Compass does not have any prepetition or

23   postpetition affiliations with any of the: (a) Debtors or their retained

24   professionals; (b) major creditors of the Debtors or such parties retained

25   professionals; (c) holders of any Equity Interests in USACM or such

26   parties' retained professionals; (d) any Equity Interests in FTDF or such

27   parties' retained professions; (d) any of the Debtors' former or current

28       29

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

officers or directors or other insiders; (e) any affiliates of the Debtors.

    c.    To the best of my knowledge, the Sale was not a result of fraud or collusion nor any attempt by Compass or any other Entity to take an unfair advantage of USACM or FTDF.

    d.    As described above, the Compass APA represents the culmination of substantial, good faith, arm's length negotiations among the Debtors, the Committees, and Compass.

    e.    Compass has provided evidence demonstrating its good faith in accordance with the Bid Procedures Order.

50.    Upon information and belief, the Sale is entitled to protection under Section 363(m) of the Bankruptcy Code.

## THE INTERCOMPANY COMPROMISES

51.    The Debtors and the Direct Lenders have agreed to resolve certain disputes, which are the "Intercompany Compromises," set forth in Article IV Section E of the Plan.

52.    The Intercompany Compromises were negotiated principally by the Committees, but the Debtors participated in the negotiations.

53.    The Intercompany Compromises represent the culmination of substantial, good faith, arm's length negotiations.

54.    As part of the USACM/Direct Lender compromise set forth in Article IV Section E of the Plan, accrued but uncollected servicing fees as of the Petition Date as determined by the Debtors' current management under my direction totaled approximately $4,700,000.

55.    I have evaluated the Intercompany Compromises and, in my business judgment, the Compromises are fair and reasonable given the facts and circumstances of the respective Debtors' cases, and are in the best interest of the Debtors' Estates.  In reaching these conclusions, I considered:

    a.    the probability of success of any litigation that had been commenced or would have been commenced related to the disputes;

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

b.    the difficulties of collection;

c.    the complexity, expense, inconvenience, and attendant delay if all of the matters being compromised were litigated; and

d.    the interests of creditors and, when applicable, Equity Interests.

## SPECIFIC FACTS ADDRESSING OBJECTIONS TO CONFIRMATION

56.    As of the Petition Date, USACM was acting as the loan servicer for 115 separate loans (the "Serviced Loans") having a combined outstanding loan balance of approximately $962,000,000.

57.    As of the Petition Date, approximately 62 of the Serviced Loans were delinquent in the payment of interest or otherwise could be considered nonperforming (the "Nonperforming Loans"). The Nonperforming Loans represent 54% in number, and 72% in outstanding loan balance, of the Serviced Loans.

58.    There are approximately 3,600 investors (the "Direct Lenders") whose names appear as a "Lender" in the documents for one or more of the Serviced Loans. Among these Direct Lenders are FTDF and DTDF (collectively, the "Funds"). There are 3,200 investors in the Funds.

59.    Prior to April 2006, USACM regularly made interest payments to Direct Lenders (including the Funds) each month regardless of whether the particular loans relating to each Direct Lender were performing or nonperforming. Prior to the Petition Date, Direct Lenders, as a whole, received approximately $39 million in Prepaid Interest payments that they were not entitled to receive at the time the payments were made. These payments were made with respect to all of the loans in a Direct Lender's portfolio, often through a single check.

60.    There was no distinction in the treatment of the 3,600 investors who hold fractional interests in specific loans (the "Direct Lenders") and the 3,200 investors who own membership interests in the Funds (the "Fund Members").

61.    The practice of making interest payments without any regard to whether the relevant loans were performing began as early as 2001. The problem grew especially severe in the

31

1    months preceding the Petition Date.

2    62.    By way of illustration, during the first three months of 2006, USACM collected an

3    average of approximately $5.3 million per month in interest payments on the Serviced Loans, but

4    it paid out on average approximately $9.7 per month to the Direct Lenders in interest payments.

5    This resulted in an average deficit of $4.4 million per month during the first three months of 2006.

6    63.    USACM apparently covered some, but not all, of this deficit was by using principal

7    payments that were received by USACM on some of the Serviced Loans.  However, while

8    USACM's records show that principal payments were indeed received, it is impossible to

9    determine how the money related to any particular payment was spent, and it is therefore

10    impossible to trace the misdirected principal payments.

11    64.    For example, during the last two weeks of October 2005, USACM collected

12    $1,229,696 in principal on a loan known as "Bay Pompano."  Some of this money ($806,149) was

13    properly directed to the relevant investors.  However, the remaining money was used for other

14    purposes, and it is impossible to determine where the money went because, among other things, on

15    November 7, 2005, USACM made 3,141 disbursements totaling over $16 million.

16    65.    By way of further example, during the last two weeks of November 2005, USACM

17    received principal payments in the amount of $2,789,934 on the Bay Pompano loan.  This time

18    none of the money was properly directed to the relevant investors.  However, once again, it is

19    impossible to trace the funds because on December 7, 2005, USACM made 3,277 disbursements

20    totaling over $11 million.

21    66.    The pattern described in the preceding two paragraphs was repeated on numerous

22    instances with respect to the Bay Pompano loan through March 2006.  A chart outlining the

23    history of the Bay Pompano loan is attached hereto as Exhibit A.

24    67.    In addition, the pattern described with respect to the Bay Pompano loan was

25    followed with respect to all or nearly all of the principal payments that were received by USACM

26    on other loans prior to the Petition Date.

27    68.    Despite the significant efforts of my accountants, lawyers, and financial

28                                                                                32

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    consultants, it is impossible to specifically trace particular funds to subsequent distributions made

2    by USACM, including Prepaid Interest payments to Direct Lenders.

3        69.    In addition to the facts set forth above, the amounts present at various times in the

4    USACM Collection Account make it impossible to trace funds in that account.  For example, it

5    appears that approximately $26 million in principal payments were diverted in the three months

6    between December 2005 and February 2006.  However, even though at least $26 million had

7    come into the account in the preceding three months from principal payments alone, the book

8    balance of the account became negative during February 2006.  For example, although the bank

9    balance on February 8, 2006, was $19,946,265, there were millions of dollars worth of outstanding

10   disbursements that had not yet cleared the account.  Included in these disbursements were Prepaid

11   Interest payments that were made to Direct Lenders on February 8, 2006.  Given the

12   disbursements that had been made, the true—or book—balance of the account on February 8,

13   2006, was ($1,603,333), a negative balance.

14       70.    By way of further illustration, the book balance of the account on February 9, 2006

15   was ($1,418,660).  The book balance of the account on February 10, 2006, was ($1,377,757).  The

16   book balance on February 13, 2006, was ($731,503).

17       71.    The book balance of the account was also negative in March 2006.  On March 10,

18   2006, the book balance was ($131,522).  The book balance on March 14, 2006, was ($4,479).

19       72.    The negative book balance in the collection account was created in large part by

20   making Prepaid Interest payments to Direct Lenders to which those investors were not entitled.

21   The deficit was then covered, in part by using money that belonged to USACM for servicing fees

22   and money that USACM had received in principal payments on certain loans.

23       73.    Furthermore, even ignoring the large amount of disbursements that had not cleared

24   the bank, the bank balance of the collection account on March 16, 2006, was just $2,704,817.  As

25   stated above, the amount of diverted principal was nearly ten times this number.  Because Direct

26   Lenders were similarly situated, it is impossible to conclude that certain of the Direct Lenders can

27   trace their particular funds to the money in the account, while other identically situated investors

28                                                              33

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    cannot.

2        74.    In addition to all of the foregoing difficulties, accurate tracing is not possible

3    because as of the Petition Date, USACM's loan servicing database contained substantial errors,

4    including but not limited to the following:  (a) some borrower payments were not entered into the

5    system; (b) most interest payments from borrowers were not posted in a timely manner; (c)

6    payments were not applied according to the terms of the governing loan documents, which require,

7    among other things, that payments be applied first to outstanding interest and then to principal; (d)

8    the amount of interest owed by borrowers was not calculated correctly; (e) check numbers were

9    not used in sequence or were used multiple times; (f) servicing fees were not charged or were

10    calculated incorrectly.

11        75.    Furthermore, money belonging to USACM as well as other entities was historically

12    commingled in the USACM account.

13        76.    Although the collection account has been referred to as a "trust account," it did not

14    function as such.  Mesirow's analysis of the collection account, performed under my direction,

15    establishes that deposits into the account were not limited to money received from Borrowers, and

16    disbursements from the account were not limited to disbursements to Direct Lenders.

17        77.    By way of example, on March 10, 2006, $196,000 was disbursed to Del Bunch,

18    who was not a Direct Lender.  Similar disbursements were made to Mr. Bunch on a regular basis.

19        78.    On January 8, 2006, a payment of $181,221 was made from the collection account

20    to Sal Reale.  Sal Reale was not a Direct Lender and not even a creditor of USACM.  Rather, Sal

21    Reale was a creditor of Joseph Milanowski personally.  Similar payments were made to Sal Reale

22    from the collection account on a regular basis.

23        79.    On January 9, 2006, a payment of $1,292 was made from the collection account to

24    Bob Stupak for a short-term loan.  Mr. Stupak was a creditor of USACM and not a Direct Lender.

25    Similar payments were made to Mr. Stupak on a regular basis.

26        80.    Also on January 9, 2006, a payment of $18,083 was made from the collection

27    account for "Convertible Debentures."  This payment was made to the Petersen family, who were

28                                                                34

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   unsecured creditors of USACM and not Direct Lenders.

2       81.    The foregoing paragraphs provide examples only.  Our detailed analysis of bank

3   records indicates that there was a regular pattern of making disbursements from the collection

4   account to parties other than Direct Lenders.

5       82.    As established above, many of the disbursements from the collection account were

6   made to persons or entities who were not Direct Lenders.  In addition, much of the money in the

7   collection account did not come from payments on loans or did not otherwise belong to Direct

8   Lenders.

9       83.    For example, much of the money in the collection account belonged to USACM

10  because USACM had earned the funds as servicing fees.  Our detailed analysis of bank records

11  reveals that no servicing fees were ever transferred out of the collection account to USACM's

12  operating account or otherwise disbursed from the collection account to USACM.

13      84.    The servicing fees discussed in the preceding paragraph were earned by USACM

14  pursuant to the terms of Loan Servicing Agreements that applied to one or more loans.  Thus,

15  USACM's relationship with each Direct Lender was generally governed by a single Loan

16  Servicing Agreement.

17      85.    In addition, to the foregoing example of money in the collection account that did

18  not belong to Direct Lenders, our analysis reveals that millions of dollars in the collection account

19  came from DTDF.

20      86.    By way of further example, on October 12, 2005, a deposit was made into the

21  collection account in the amount of $5,866,879.  This money came from TJA Marketing, which

22  was not a borrower on any of the Serviced Loans.  Interestingly, this deposit and other funds were

23  needed because the October payment of Prepaid Interest to Direct Lenders created a negative book

24  balance in the collection account.

25      87.    Thus, as demonstrated by the foregoing paragraphs, the payments that were made

26  to Direct Lenders came from a variety of untraceable sources.

27      88.    As of the Petition Date, the incidence of delinquencies in the Serviced Loans was

28                                        35

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    high and likely to increase.  Without the expenditure of estate resources, it was unlikely that

2    borrowers would meet their ongoing obligations.  In addition, the costs to any one Loan Investor

3    of collecting payments from borrowers on Nonperforming Loans was, in my view, prohibitive.  In

4    addition, borrowers were not likely to cooperate with fractionalized collection efforts in any event.

5         89.    Accordingly, for the benefit of the estate, I have initiated measures for collecting

6    unpaid interest on Nonperforming Loans.  Estate assets have been used, and professionals have

7    been engaged, in order to collect substantial funds for the benefit of all of the creditors of the

8    estate.

9         90.    Mesirow's analysis and investigation into the finances of USACM conducted under

10   my direction indicates that USACM had been insolvent for more than one year prior to the

11   Petition Date, at the very least.  This insolvency is due in large part to a series of transactions

12   which left USACM with a substantial obligation to the Collection Account, a receivable from IP

13   with substantial collectibility risk, and an inability for USACM to meet its debts as they come due.

14   Based on Mesirow's review and investigation of the books and records of USACM, USACM

15   reported an obligation to the Collection Account at least as far back as 2003. By January 2005,

16   USACM's obligation to the Collection Account was approximately $28 million.  At that same

17   time, USACM reported capital and retained earnings of $15.6 million. During the same period,

18   USACM's books and records report approximately $62 million in total assets, including a

19   receivable from IP of approximately $42 million.

20        91.    Mesirow's review and investigation into the transactions that gave rise to the $42

21   million receivable conducted under my direction indicate that that no evidence exists of any note

22   or loan agreement documenting the obligation of IP to repay this amount to USACM, that no

23   evidence exists of a security agreement or pledge of any assets of IP towards the $42 million

24   receivable and that the IP ventures funded by the Collection Account  provided no cash flow to

25   repay the inter-company payable to USACM.  Based on this review and analysis, the receivable

26   shown on the books and records of USACM from IP is subject to substantial collectibility risk and

27

28                          36

1   should be ascribed only nominal value.

2       92.     Adjusting the purported $15.5 million in capital and retained earnings in January

3   2005 on USACM books and records to reflect the valuation adjustment of the receivable due from

4   IP to a nominal value would result in USACM reporting a negative equity. To illustrate, at a $0

5   value, USACM would report a negative equity of $26.4 million. Even at a 15% valuation or $6.3

6   million, USACM would still report a negative equity of $20.1 million.  In addition, the $28

7   million obligation to the Collection Trust Account, which consisted primarily of diverted borrower

8   principal payments from DTDF and should never have occurred in the first place, represents an

9   immediate obligation that is due and owing back to the Collection Account at the very least.  Since

10  USACM had less than $0.5 million cash on hand as of January 31, 2005, USACM clearly was

11  incapable of meeting this repayment and possessed little other liquidity to satisfy this obligation

12  and as such was unable to meet their debts as they come due.

13      93.     Based on this analysis, I conclude that USACM was insolvent from both a balance

14  sheet test and an ability to meet debts as they come due as least as far back as January 2005 in

15  large part due to the transactions described above.  Furthermore, a similar analysis reveals that

16  USACM remained insolvent through the Petition Date both from a balance sheet test and an

17  ability to meet debts as they come due.

18      I declare, under penalty of perjury, that, to the best of my knowledge, information and

19  belief, that the foregoing is true and correct.

20

21

22      _____
         Thomas J. Allison

23  905174

24

25

26

27

28                                37

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

EXHIBIT B

1  Annette W. Jarvis, Utah Bar No. 1649
2  Steven C. Strong, Utah Bar No. 6340
   RAY QUINNEY & NEBEKER P.C.
3  36 South State Street, Suite 1400
   P.O. Box 45385
4  Salt Lake City, Utah 84145-0385
   Telephone: (801) 532-1500
5  Facsimile: (801) 532-7543
   Email: ajarvis@rqn.com
6
7  Lenard E. Schwartzer, Nevada Bar No. 0399
   Jeanette E. McPherson, Nevada Bar No. 5423
8  SCHWARTZER & MCPHERSON LAW FIRM
   2850 South Jones Boulevard, Suite 1
9  Las Vegas, Nevada  89146-5308
   Telephone:  (702) 228-7590
10 Facsimile:  (702) 892-0122
   E-Mail:  bkfilings@s-mlaw.com
11
12 Attorneys for Debtors and Debtors-in-Possession

13                   **UNITED STATES BANKRUPTCY COURT**
14                        **DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>                                      Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>                                      Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR<br><br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>                                      Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>                                      Debtor. | Date:  October 19, 2006<br>Time:  9:30 a.m. |
| In re:<br>USA SECURITIES, LLC,<br>                                      Debtor. | **DECLARATION OF THOMAS J. ALLISON IN SUPPORT OF MOTION FOR ORDER SCHEDULING AN AUCTION FOR THE SALE OF CERTAIN ASSETS, APPOINTING SPCP GROUP, LLC, AS LEAD BIDDER, AND APPROVING BID PROCEDURES AND PROTECTIONS** |
| Affects:<br>☒  All Debtors<br>☐  USA Commercial Mortgage Company<br>☐  USA Securities, LLC<br>☐  USA Capital Realty Advisors, LLC<br>☐  USA Capital Diversified Trust Deed Fund, LLC<br>☐  USA First Trust Deed Fund, LLC | |

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

I, Thomas J. Allison, hereby declare, verify and state as follows:

1.   I am the Chief Restructuring Officer of USA Commercial Mortgage Company ("USACM"), USA Securities, LLC ("Securities"), USA Capital Realty Advisors, LLC ("Realty Advisors"), USA Capital Diversified Fund ("Diversified Fund") and USA Capital First Trust Deed Fund ("FTD Fund") (collectively, "Debtors") and I have personal knowledge of the statements contained herein.

2.   I make this Declaration solely in my capacity as Chief Restructuring Officer of the Debtors and in support of the Debtors' Motion for Order Scheduling an Auction for the Sale of Certain Assets, Appointing SPCP Group, LLC, as Lead Bidder, and Approving Bid Procedures and Protections (the "Motion").

## Background

3.   On April 13, 2006 (the "Petition Date"), Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code commencing these jointly administered bankruptcy cases.

4.   Prior to the Petition Date, USACM was in the business of underwriting, originating, brokering, funding and servicing commercial loans primarily secured by undeveloped land and residential and commercial developments, both on behalf of investors (sometimes referred to in this case as direct lenders) and for its own account.  Diversified Fund and FTD Fund are direct lenders having interests in certain of the serviced loans.  The primary business of Securities was to act as a registered broker/dealer to facilitate the sale of membership interests in the FTD Fund.  Realty Advisors is the manager of the FTD Fund and the Diversified Fund.

5.   On May 10, 2006, the U.S. Trustee's office filed notices of appointment indicating it had formed four official committees to serve in the Debtors' cases:  (a) the Official Committee of

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Unsecured Creditors of USACM; (b) the Official Committee of Holders of Executory Contract Rights of USACM; (c) the Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC; and (d) the Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC (collectively the "Committees").  Shortly thereafter, the Court approved applications by each of the Committees to employ legal counsel, and the applications of three of the four Committees to employ financial advisors.

6.   Debtors, acting through me as their Chief Restructuring Officer, and Mesirow Interim Financial Management LLC ("MIFM"), which is providing interim management services for the Debtors, and in consultation with the financial advisors for the Committees, have actively marketed the assets of the Debtors for sale during the past several months.

7.   Debtors have conducted an extensive marketing and sales process in an effort to provide a viable restructuring alternative for the Debtors, which resulted in the identification of fourteen potential purchasers of all or a part of Debtors' assets.

8.   The fourteen potential purchasers executed confidentiality agreements and the Debtors responded to extensive due diligence requests from the fourteen potential bidders through the production of information, participation in presentations and discussions, as well as the facilitation of communications with borrowers and other parties-in-interest.

9.   None of the fourteen potential purchasers was willing to go forward and expend the substantial resources necessary to agree to a definitive asset purchase agreement and become the "stalking horse" lead bidder without the benefit of significant bid protections, including a significant break-up fee as well as reimbursement of actual expenses.

**The Offer Letter and the Asset Purchase Agreement**

10. Eventually, the Debtors received six written proposals from the potential purchasers and after evaluating all of the proposals (which was done in consultation with the Committees),

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Debtors concluded that the proposal submitted by SPCP Group, LLC was superior to the other written proposals.   Accordingly, the Debtors, in cooperation with the Committees, entered into extensive negotiations with SPCP, Group, LLC to formulate an offer letter that would set forth a structure as to what assets would be sold, what assets would be retained, and how the sale would proceed that the Debtors and the Committees believed would maximize the value of the Debtors' estates.

11. On September 12, 2006, Debtors accepted and countersigned an offer letter dated September 11, 2006 (the "Offer Letter") from SPCP Group, LLC ("Purchaser") concerning a proposed sale of substantially all of the assets of FTD Fund, primarily its interests in a portfolio of loans, and certain assets of USACM, primarily those used to conduct its loan servicing business (collectively, the "Property"), as identified in the Offer Letter (a copy of which is attached to the Motion as Exhibit B).

12. The Offer Letter was executed after extensive and arms-length negotiations by and among the Purchaser, the Debtors, and the Committees.  To the best of my knowledge, the Purchaser is a distinct and separate entity from the Debtors or any of its affiliates and does not have any ownership interest in the Debtors.

13. The Property to be sold, as described in the Offer Letter and exhibits thereto, includes the FTD Fund's ownership interest as a direct lender in 47 specifically identified loans, for a proposed purchase price of $46.5 million, subject to certain adjustments and conditions as stated in the Offer Letter (the "First Trust Deed Fund Assets," as defined in the Offer Letter), and USACM's servicing rights in 80 specifically identified loans, including rights to collect servicing fees and other fees as specified in the Offer Letter, for a proposed purchase price of one-half of the first $1 million in net servicing fees to be collected by the Purchaser, as well as certain upside sharing and

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

other consideration, as more specifically described in the Offer Letter (the "Commercial Mortgage Assets," as defined in the Offer Letter).

14. The Purchaser and the Debtors, in consultation with the Committees, have now negotiated the terms of a definitive Asset Purchase Agreement (the "Agreement") consistent with the Offer Letter, a copy of which will be filed with the Court prior to the October 19, 2006 hearing.

15. In this case, as a result of the negotiations with the Purchaser (and previous efforts by the Debtors to negotiate transactions for the Property with others), it is my business judgment that the purchase price offered to the Debtors under the Agreement, represents the highest and best offer that could be negotiated for the Property to this point.

16. However, to ensure that the estate maximizes its recovery, the Debtors negotiated with the Purchaser the right to expose the Offer Letter, the Agreement, and the sale and transfer of the Property to potential overbids in accordance with specific bid procedures (the "Bid Procedures"), a copy of which is attached to the Motion as Exhibit A.

17. The Bid Procedures form the basis of the proposed plan of reorganization that is currently on file and getting the Bid Procedures approved, including the Break-Up Fee discussed below, is essential to moving the Debtors' cases forward to a rapid conclusion.

**The Expense Reimbursement and Break-Up Fee**

18. The Offer Letter and the Agreement provide the Debtors with significant benefits that, in large part, stem from the Purchaser's commitment to pay a specific price for the Property and the Debtors right to expose the transactions contemplated in the Agreement to competitive bidding.

19. However, the exposure to competitive transactions jeopardizes Purchaser's bid under the Agreement and Purchaser has advised the Debtors that if forced to bear such risk without the protection of the Break-Up Fee, it would choose not to go forward with the Agreement and the

transactions therein contemplated.  If this occurred, the Debtors would lose a fully negotiated and executed transaction with respect to the Property.

20. Consequently, in accordance with the Agreement, the Bid Procedures contain certain protections for the Purchaser as a "stalking horse" bidder and provides in certain circumstances that the Purchaser may receive reimbursement from the Debtors' estates for its reasonable expenses incurred in this proposed transaction up to a maximum of $500,000 (the "Expense Reimbursement"), and that in certain other circumstances the Purchaser may receive a payment of a Break-Up Fee in the amount $1.5 million (reduced by the amount of any Expense Reimbursement paid) from the Debtors' estates.

21. The Debtors and the Committees had extensive negotiations with the Purchaser about the reduction of the proposed Break-Up Fee to the current proposed amount of $1.5 million, which amount was substantially less than the other proposed purchasers indicated they were willing to accept.

**Why the Bid Procedures Should Be Approved**

22. It is my business judgment that the Bid Procedures are fair and reasonable and will increase the likelihood that Debtors will receive the greatest consideration possible for the Property.  Specifically, it is my business judgment that in this case such procedures will facilitate a competitive and fair bidding process in several respects, including:

      a.  The Debtors will provide notice on all entities known by the Debtors to have expressed an interest in a transaction involving the Property.  Over the course of the past several months, the Debtors have discussed transactions involving the Property with a number of parties all of whom will be notified of the Auction and provided with a fair opportunity to come forward with qualifying bids and to participate in the Auction that will take place.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

b.  Pre-approval of the Bidding Procedures will ensure fair comparability between competing bids.  The Bidding Procedures set forth in detail how bids must be submitted, what constitutes a Qualified Bid, how and when additional incremental bids will be received and considered, and other relevant "ground rules" surrounding the Auction.  These "ground rules" will:  (i) provide potential bidders with substantial information regarding the terms of the Purchase Agreement and the Auction against which they will be competing (if they so choose); (ii) create an orderly process within which the Debtors must review and consider any overbids; and (iii) facilitate the Debtors' comparison of any and all offers to determine which offer will yield the highest and best return to the estate.

c.  Requiring that all bids be made in advance of the Auction will (i) provide an opportunity to review and clarify such bids, (ii) give bidders an opportunity to improve their current offers, and (iii) provide the non-debtor parties with sufficient time in which to evaluate the bids.

d.  Requiring bidders to submit with their bid, deposits and bids that are at least on the same terms as those set forth in the Purchase Agreement will ensure that only serious, committed entities will participate in the bidding and lessen the chances that Debtors ultimately will be unable to close the sale of the Property because the Successful Bidder proves unable or unwilling to perform its duties.

e.  Requiring that, after the initial bids, the bidding take place in pre-established increments in each instance, thereby further ensuring that Debtors' estates will materially benefit from the Auction and will not bear the expense of the Break-Up Fee.

23. It is also my business judgment that the amount of the Break-Up Fee and the Expense Reimbursement is reasonable in this case in view of the size and complexity of the transaction, the lost opportunity that Purchaser will incur if it does not become the Successful Bidder, the expenses that Purchaser will incur prior to the Auction, and the need for Debtors to attract a quality offer for and obtain a definitive agreement for the purchase of the Property with which to test the market.  At the very least, the Agreement sets a floor value for the Property that might not otherwise exist.

24. In this case, the Break-Up Fee is $1.5 million, and the Expense Reimbursement is not to exceed $500,000.  The Break-Up Fee represents approximately 3% of the cash consideration for the transaction (which does not include potentially substantial additional upside sharing and other consideration), and the maximum amount of the Expense Reimbursement is approximately 1% of the consideration for the transaction.  It is my business judgment that these percentages are reasonable in comparison with the purchase price.  Moreover, the amount payable under the Expense Reimbursement is to be deducted from the $1.5 million Break-Up Fee so that if the full $500,000 in Expense Reimbursement is incurred and paid, the net additional Break-Up Fee will be limited to $1 million, which is less than 2.2% of the cash price for the Property.

25. It is also my business judgment that if another bidder appears and pays substantially more than Purchaser's offer, it will have been the Purchaser's commitment to go through with its offer and its due diligence, efforts and financial capacity to purchase the Property that will have made the better offer possible and available to the Debtors' estates.

26. Furthermore, it is my business judgment that in light of the significant burdens borne by Purchaser, including the legal fees associated with the negotiation and drafting of the definitive Agreement, and the time and substantial expenses associated with conducting extremely complex due diligence, most of which will benefit the Debtors regardless of whether Purchaser or another

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

entity is the successful bidder, it is fair and reasonable for Purchaser to receive the Break-Up Fee if it does not ultimately acquire the Property.

27. It is also my business judgment that the approval of the Break-Up Fee is necessary to induce the Purchaser to continue to incur significant opportunity costs and internal-resource costs that are not recoverable under the Expense Reimbursement provision but that are nonetheless real costs that have been incurred and will be incurred until the proposed sale closes. The existence of the proposed deal with Purchaser ensures that the Debtor will have at least one substantial offer for the Property while at the same time permitting the Property to be exposed to potential overbids in order to ensure that the estates maximize their recovery on the Property.

28. Based on my conversations with the principals of the Purchasers, as well as the principals of the other potential purchasers, it is also my business judgment that the proposed Break-Up Fee was necessary to induce Purchaser to enter into the Agreement, and without such Break-Up Fee there either would have been no Agreement to purchase the Property by the Purchaser or any other party, or the amount of the purchase price for the Property would have been significantly lower.

**Objection filed by Capital Crossing Bank**

29. I am aware that on October 12, 2006, Capital Crossing Bank ("CCB") filed an Opposition to Motion for Order Scheduling an Auction for the Sale of Certain Assets, Appointing Silver Point Group, LLC, as Lead Bidder, and Approving Bid Procedures and Protections.

30. To date, CCB has not submitted to the Debtors a written or oral proposal to purchase any assets of the Debtors.

31. I am also aware that on October 11, 2006, notices of the transfer of two claims other than for security were filed with the Court which reflect that the scheduled claim of Taylor Samuels, Trustee of the Samuels 1999 Trust against one of the Debtors in the amount of $145.99 (the "Samuels Claim"), as well as the scheduled claim of Joseph Szabo against one of the Debtors in

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

the amount of $3,256.50 (the "Szabo Claim"), were transferred and assigned to Debt Acquisition Company of America V, LLC, which then subsequently assigned the Samuels Claim and the Szabo Claim to CCB.

32. The Samuels Claim is listed on the Amended Schedule F of the Schedules of Assets and Liabilities filed by USACM, and the Szabo Claim is listed on Schedule E of the Schedules of Assets and Liability filed by USACM.

33. I declare under penalty of perjury that the foregoing statements are true and correct according to my best knowledge, information and belief.

Executed this 18th day of October, 2006.


_____
Thomas J. Allison

896933

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

EXHIBIT C

1  Annette W. Jarvis, Utah Bar No. 1649
2  Steven C. Strong, Utah Bar No. 6340
   RAY QUINNEY & NEBEKER P.C.
3  36 South State Street, Suite 1400
   P.O. Box 45385
4  Salt Lake City, Utah 84145-0385
   Telephone: (801) 532-1500
5  Facsimile: (801) 532-7543
   Email: ajarvis@rqn.com
6
7  Lenard E. Schwartzer, Nevada Bar No. 0399
   Jeanette E. McPherson, Nevada Bar No. 5423
8  SCHWARTZER & MCPHERSON LAW FIRM
   2850 South Jones Boulevard, Suite 1
9  Las Vegas, Nevada  89146-5308
   Telephone:  (702) 228-7590
10 Facsimile:  (702) 892-0122
   E-Mail:  bkfilings@s-mlaw.com
11
12 Attorneys for Debtors and Debtors-in-Possession

13            UNITED STATES BANKRUPTCY COURT
14                  DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>　　　　　　　　　　　　　　　　　Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>　　　　　　　　　　　　　　　　　Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND,<br>LLC,<br>　　　　　　　　　　　　　　　　　Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>　　　　　　　　　　　　　　　　　Debtor. | Date:  October 25, 2006<br>Time:  9:30 a.m. |
| In re:<br>USA SECURITIES, LLC,<br>　　　　　　　　　　　　　　　　　Debtor. | SUPPLEMENTAL DECLARATION<br>OF THOMAS J. ALLISON IN<br>SUPPORT OF MOTION FOR ORDER |
| Affects:<br>　☒  All Debtors<br>　☐  USA Commercial Mortgage Company<br>　☐  USA Securities, LLC<br>　☐  USA Capital Realty Advisors, LLC<br>　☐  USA Capital Diversified Trust Deed Fund, LLC<br>　☐  USA First Trust Deed Fund, LLC | SCHEDULING AN AUCTION FOR<br>THE SALE OF CERTAIN ASSETS,<br>APPOINTING SPCP GROUP, LLC,<br>AS LEAD BIDDER, AND<br>APPROVING BID PROCEDURES<br>AND PROTECTIONS |

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1

I, Thomas J. Allison, hereby declare, verify and state as follows:

1.  I make this Declaration solely in my capacity as Chief Restructuring Officer of USA Commercial Mortgage Company ("USACM"), USA Capital Diversified Fund, LLC ("Diversified Fund"), USA Capital First Trust Deed Fund ("FTD Fund"), USA Capital Realty Advisors, LLC and USA Securities, LLC (collectively, "Debtors") and in further support of the Debtors' Motion for Order Scheduling an Auction for the Sale of Certain Assets, Appointing SPCP Group, LLC ("Silver Point"), as Lead Bidder, and Approving Bid Procedures and Protections (the "Motion").

**The Solicitation Process**

2.  As I stated in my prior Declaration dated October 18, 2006, the Debtors in coordination with the four official committees appointed in theses cases (the "Committees") have undertaken extensive efforts to explore various options for maximizing the assets of the Debtors' estates, including marketing for sale all or a portion of the Debtors' assets during the course of the last several months.

3.  Under my direction, the Debtors, in cooperation from the Committees, pursued a dual track for potential restructuring of the Debtors either separately or individually.

4.  Under my direction, as part of this process, the Debtors, in cooperation with the Committees, evaluated and explored a self-liquidation plan for each of the Debtors.  This process included an evaluation of potential asset recoveries, costs of self-liquidation, and collection risks.

5.  At the same time, under my direction, the Debtors began pursuing potential sales of all or a portion of the Debtors' assets.  As part of this process, the Debtors contacted and pursued leads for potential bidders both for the loan assets of the FTD Fund and the Diversified Fund and for the servicing assets of USACM, both jointly and individually.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

6.   As a result of those marketing efforts, the Debtors were able to identify fourteen potential purchasers who were interested in doing due diligence and purchasing all or a portion of the Debtors' assets.

7.   Of these potential bidders, the Debtors received only one bid solely for the servicing assets of USACM.  The bid did not involve any cash consideration for the assets and proposed to compensate USACM's estate for the servicing assets solely through the sharing of additional servicing fees to be charged to the direct lenders post-closing.

8.   Further, after speaking with representatives of the potential purchasers, I believe the main reason for the lack of bids for USACM's servicing business by strategic buyers in the business was because there were a large percentage of non-performing and partially funded loans in the Debtors' loan servicing portfolio.   Consequently, any party purchasing the servicing business would need to commit a substantial amount of time and effort and up-front capital to pursue the collection and foreclosure of these non-performing loans, which expenses would only be reimbursed by the direct lenders at a later time.  Furthermore, many of the loans in the portfolio had not been funded in the full amount of the construction budget, and therefore, not only was there a risk that the principal and interest on these loans would not be paid in full, but the borrowers on these loans were starting to threaten and file litigation, and mechanics liens were also being filed on the property, requiring further up-front costs from any potential servicer.

9.   Accordingly, as the marketing of the Debtors assets continued, it became clear to me that if money of any significance was going to be realized from the sale of the Debtors' assets, that money was going to come from a financial purchaser who was willing to acquire all or a substantial portion of the loan portfolio owned by the FTD Fund and/or Diversified Fund and who also had servicing capability or a servicing partner that could take over the loan servicing business.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

3

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

10. In addition, there are unique problems with the Diversified Fund loan portfolio which made a fair valuation of the portfolio by a third party difficult such that the bids that were received which allocated some value to the Diversified Fund portfolio were, in the opinion of the Debtor and the committee for the Diversified Fund, insufficient to make the sale of Diversified Fund assets superior to the self-liquidation of those assets.

11.  The loan portfolio owned by the FTD Fund, however, consists of loans which are, by and large, performing loans secured by deeds of trust in a first lien position, which were of substantial interest to potential purchasers.  However, the FTD Fund also had small fractional interests in numerous loans on projects that had unfunded construction budget amounts, thus requiring a financial buyer who could commit capital to extend additional funding where economically warranted to preserve the value and collectibility of the existing loans.  Further, as the FTD Fund held small fractional interests in these loans, it was clear to me that packaging the servicing business, with its contractual responsibility to actively manage these loans, with the purchase of these small fractional loan interests enhanced the value of both.

12. The Debtors received five (5) bids for the loan portfolio of the FTD Fund and the servicing business, including the bid from Silver Point.  Silver Point's bid was the highest received for the FTD Fund assets and the only bid that was high enough for the FTD Fund and the committee for the FTD Fund to agree to accept the bid.

13. The Silver Point bid originally included a bid for the loan portfolio of the Diversified Fund.  However, this bid was not high enough for the Diversified Fund and the committee for the Diversified Fund to accept over the self-liquidation option.  Nevertheless, because the Diversified Fund loan portfolio had some fractional interests in traditional loans held by direct lenders that needed servicing, the Diversified Fund and the committee for the Diversified Fund negotiated with

4

Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Silver Point to exclude the Diversified Fund loan assets from the sale, except for the sale of the servicing rights with respect to the fractional interests held in traditional loans with direct lenders.

14. The Debtors also asked all bidders, including Silver Point, to allocate their bids among the assets being purchased and while this was not such a significant issue to Silver Point this became a subject of intense negotiation among the Committees.  At the same time the negotiations on the bid were proceeding with Silver Point, the Debtors and the Committees were also negotiating among themselves to resolve intercompany issues and allocate assets generally among the various estates in a term sheet ("the Plan Term Sheet") that was being negotiated with respect to a plan of reorganization (the "Plan").  Thus, the bid made by Silver Point and accepted by the Debtors does not reflect all of the value attributable to each estate as a result of the Silver Point bid, which also includes these intercompany compromises that are being facilitated as a result of the Silver Point bid and are being negotiated in the Plan Term Sheet.

15. With respect to the USACM assets, while its bid was consistent with other bids received for the servicing business, Silver Point's bid indicated that Silver Point was not willing to pay much in cash for these assets.  Therefore, USACM and the Unsecured Creditors Committee (the "UCC") negotiated for a sharing arrangement to be included in the price for the loan servicing business that includes not only 50% of the first $1 million of servicing fees accruing after the date of closing (the "Closing Date") of the asset purchase agreement with Silver Point (the "Asset Purchase Agreement), and $50,000 of accrued default rate interest as of the Closing Date collected on the FTD Fund assets, but also all servicing fees accrued as of the Closing Date but collected thereafter, all late charges and default interest due but unpaid as of the Closing Date (except with respect to the default interest relating to the FTD Fund loans), and all exit fees, extension fees, deferred origination fees, and other fees due to USACM whether accruing before or after the Closing Date, all pre-paid interest collected to be paid as the Court may order under the plan, and

all amounts relating to the small fractional interests in loans held by USACM, the servicing rights

to which would be transferred to the bidder.    As part of this purchase price, the Debtors and the

UCC also negotiated a waterfall provision relating to distributions from monies collected on loans

after the Closing Date, an agreement not to prosecute actions against the Debtors arising out of the

assets acquired relating to events occurring before the Closing Date, and cooperation with respect

to the pursuit of insider claims so as to help maximize the recovery for both Silver Point and the

USACM estate.

16.  Of paramount importance in particular to USACM and the Diversified Fund estates, the

Debtors and the Committees also negotiated to exclude from the assets to be sold all causes of

action of all of the Debtors, including specifically all causes of action against non-debtor insiders,

except for certain guarantees on existing loans.  This exclusion will result in the retention by the

estates of receivables owed by USA Investment Partners and the obligation on the 10-90, Inc.

loan which is also an obligation of USA Investment Partners.  This litigation will be dealt with in

the Plan Term Sheet and the Plan.  These excluded assets were important concessions made by

Silver Point that also made this bid superior to other bids submitted to the Debtors, as the non-

Debtor insider litigation is an important source of recovery for creditors and members of these

estates.

17.  The Silver Point bid accepted by the Debtors also reflects the concern and input from the

official committee of holders of excecutory contract rights (the "ECC"), which negotiated for

language respecting the lenders' rights under the servicing agreements to be transferred.  Both

USACM and the ECC likewise investigated and satisfied themselves that Silver Point had the

expertise and experience to service the loans effectively.

**Negotiating the Offer Letter With Silver Point**

18. After extensively analyzing the various proposals that had been made by the potential purchasers, it became clear to me and the Committees that the proposed purchase price being made Silver Point was high enough, and the expressions of flexibility were clear enough (as opposed to other bidders who purchase offers were for far less money, and had much less flexibility in how their proposals were structured) that significant negotiating efforts to establish a floor for the purchase of a portion of the Debtors' assets should begin in earnest with Silver Point.

19. As a result, there were approximately three weeks of very intense negotiations among Debtors, the Committees and Silver Point regarding the proposed Offer Letter before I signed it. These negotiations centered around not only what assets would be sold and for what price, but, as I previously explained, also centered around what assets the Debtors and the relevant Committees believed would have more value if those assets were excluded from the sale and instead were self liquidated.

20. Silver Point was willing to pay the highest price offered for both the FTD Fund loans and the USACM servicing business to establish an acceptable floor for these Debtors' assets proposed to be sold.

21. The Debtors had also identified certain problems with being able to sell the assets that the Debtors felt could be best solved in the Plan and needed the ability to fold all of the intercompany issues into the Plan on which all parties in interest could vote.  Silver Point's willingness to buy through the Plan rather than a sale under 11 U.S.C. § 363 of the Bankruptcy Code was also a factor that made this the highest and best stalking horse bid to the Debtors and the Committees.

22. In my opinion and in the opinions of the Committees with whom I have consulted, all of these foregoing factors make Silver Point the ideal lead bidder for the assets of the FTD Fund and USACM that are to be purchased.

Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

7

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

23. Notwithstanding the foregoing, Silver Point (along with all of the other potential purchasers) made it very clear from the beginning of the negotiations, that given (a) its lost opportunity costs in pursuing other deals; (b) the extreme complexity associated with this transaction given all of the various parties in interest and the problems with the loan portfolio; and (c) the extensive allocation of internal resources that would be required in order to close this transaction, including conducting the required due diligence and negotiating the purchase of the Debtors' assets, it would not be willing to participate in a long and contentious process culminating in the confirmation the Plan, unless it received a break-up fee as the lead bidder which had plowed hard and difficult ground for other bidders.

24. As a result, the break-up fee became a major point of contention between Silver Point, the Debtors and the Committees and was very heavily negotiated. The end results of these negotiations were a substantially reduced break-up fee in amount and a very limited triggering of the break-up fee obligation.

**The Break-Up Fee Only Comes Into Play in Certain Limited Circumstances**

25. Under the terms of the break-up fee as eventually negotiated among Silver Point, the Debtors and the Committees, the break up fee is payable only if a higher bid is accepted and closed by the Debtors[1]. If the bid procedures are approved, including the initial incremental bid amount, and if a competing bidder prevails at the auction then, as negotiated by the Debtors and the Committees, the break-up fee will be payable solely out of an overbid amount.

26. Only the expense reimbursement, not the break-up fee, is payable if the Debtors are unable to close the transaction, if the transaction cannot be closed by the Outside Approval Date, or if

---

1 There is one other scenario in which the break-up fee may be payable to Silver Point under the Asset Purchase Agreement. If the Debtors fail to sell the assets to any purchaser at the auction, but later sell any portion of the assets within nine months following the Outside Approval Date to another party for a payment equal to or greater than the

1    certain breaches by the Debtors occur (except as noted in the footnote accompanying paragraph 25

2    above).

3    **What Specific Assets Are Included in the Sale, and What Can Each Constituency Expect to**
**Receive From the Sale**

4

5    27. Attached as Exhibits 1, 2, 3, and 4 are charts prepared under my direction outlining the

6    major benefits for USACM, the Diversified Fund, the FTD Fund and the direct lenders from the

7    proposed sale.

8    28. When reviewing the provisions of the Offer Letter and Asset Purchase Agreement, it is

9    important to distinguish between the loan assets proposed to be sold by FTD Fund and the

10   servicing assets to be sold by USACM.  As defined in the Asset Purchase Agreement, the "First

11   Trust Deed Fund Assets" to be sold includes "Loans," which are by definition limited to loans in

12   which FTD Fund has an interest and for which "Mortgaged Property" exists as security for the

13   FTD Fund loans.  On the other hand, the "Commercial Mortgage Assets" to be sold by USACM

14   primarily are the loan servicing agreements and related rights in connection with the "Serviced

15   Loans," a defined term which, as opposed to the term "Loans," includes most of the loans that are

16   currently being serviced by USACM (with some exclusions).   The Asset Purchase Agreement sets

17   forth "Statements" relating to the assets being sold by USACM, some of which relate to the

18   "Serviced Loans" and some of which relate only to the "Loans" (the FTD Fund loans) (see Article

19   III of the Asset Purchase Agreement) that are distinct from the "Statements" relating to the assets

20   being sold by the FTD Fund (see Article IIIA of the Asset Purchase Agreement).   This was done

21   in recognition of the fact that the FTD Fund portfolio consists of generally good, performing

22   loans, as opposed to some of the problematic loans contained in the general serviced loan

23   portfolio.  The material adverse condition clauses found in Section 9.1 (h) and (i) were also

24

25

26

27   _____

28   SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122   Total Asset Purchase Price, and only if Silver Point is not in breach of the Asset Purchase Agreement, then the break-

9

negotiated with this distinction in mind.  The most problematic loans are held by the Diversified

Fund, and these have been excluded from the sale.

**Silver Point's Stalking Horse Bid Has Increased Interest in the Debtors' Assets and Has Attracted Other Bidders**

29. Since the Offer Letter was published and included in the Plan filed with the Court, sale

efforts in bringing in competing bidders have continued under my direction.  As Silver Point is a

credible buyer well known in the industry, it is my impression from the new expressions of

interest that we have obtained since the Offer Letter became public, that there is increased interest

in the Debtors' assets, including the addition of new interested buyers.

**Proceeding With the Silver Point Asset Purchase Agreement is in the Best Interests of the Debtors' Estates Given the Growing Cash Needs and the Problems of a Complete Self-Liquidation of the Debtors' Assets**

30. As explained above, under my direction, the Debtors have explored the self-liquidation

option both for the FTD Fund loans and for USACM's servicing business.  In my opinion, this

sale option is better for all of the estates for several reasons.  First, I believe the administrative

costs in running this estate occasioned by any substantial delay in consummating the sale

agreement or that would occur if Silver Point did not stay in the transaction because of a failure to

have the break-up fee approved, would greatly exceed the $1 million portion of the break-up fee

that is over and above the expense reimbursement.  Second, as the better loans are collected, the

FTD Fund estate and USACM's estate will be left with a loan portfolio increasingly dominated by

non-performing loans.  As such, few or no performing loans will remain to generate the cash

necessary to address the many problems that exist in the non-performing portfolio and to provide

funding for the pursuit of retained litigation in each estate.  Third, this sale is critical to getting the

up fee, less any amounts paid to Silver Point as an expense reimbursement, would become payable to Silver Point.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Plan confirmed for all of the estates as it provides funding and a structure for the settlement of

intercompany issues involving all of the Debtors' constituencies.

31. Given these factors, I believe that compelling circumstances exist for the break-up fee to

be approved and that the approval of the break-up fee will benefit all of the Debtors'

constituencies in each of these pending bankruptcy cases.

**It is in the Best Interest of the Debtors Estates to Hold the Auction prior to Confirming a
Plan of Reorganization**

32. In my opinion, it is also in the best interest of the Debtors' estates to hold the auction prior

confirming the Plan for the following reasons.  First, because both the ultimate price to be

obtained at the auction, as well as the identity and experience of the prevailing bidder as a loan

servicer will be very important to creditors and other parties in interest, I felt it was important that

they be provided with as much information as possible before the Plan is confirmed that they will

need to decide whether to support the Plan, and it may satisfy what might otherwise be objections

to the Plan.  Second, as set forth above, the sale includes only a portion of the Debtors' total

assets.  The treatment of the excluded assets and the intercompany claims are set forth in the Plan.

As such, where the Debtors and the Committees are trying to reach a global resolution of all of the

issues in these cases, I felt the best approach would be to permit creditors and other parties in

interest to vote on the proposed resolution of the Debtors' cases as a whole, rather than proceeding

piecemeal by confirming a plan of reorganization and then proceeding with an asset sale under 11

U.S.C. § 363(b).  Third, conducting a sale of the assets under 11 U.S.C. § 363(b) may also have

the effect of disenfranchising creditors and other parties in interest.  While in theory these parties

could have individually objected to the proposed sale under § 363, the likelihood is that the vast

majority of these parties would not have weighed in on the proposed sale.  However, effecting the

proposed sale of a portion of the Debtors' assets through the Plan assures that all creditors and

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

11

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  other parties in interest will weigh in on the proposed sale of the assets, as well as the proposed

2  global resolution of the Debtors' cases.  Fourth, completing a sale under § 363 to be followed by

3  the confirmation of the Plan will simply, in my opinion, take too much time and be too costly

4  given the amount of professional fees that continue to accrue in these cases.  Fifth, locking-up the

5  stalking horse bidder now is critical because as the performing loans continue to pay off, fewer

6  and fewer performing loans will remain available to sell, thereby resulting in less and less interest

7  from potential overbidders, and correspondingly, less value that will come into the Debtors'

8

9  estates.  Sixth, based on my discussions with representatives of the potential purchasers who have

10  inquired about purchasing the Debtors' assets, I believe it is unlikely that any stalking horse bidder

11  is going to wait the necessary time that it would take for the Debtors to first obtain the approval of

12  a disclosure statement, solicit acceptances to the Plan, and obtain confirmation of the Plan, prior to

13  proceeding with the sale.

14

15  Executed this 23rd day of October, 2006.

16

17  Thomas J. Allison

18

19

20

21  897609 04

22

23

24

25

26

27

28

**EXHIBIT 1**

**BENEFITS TO FTDF FROM SALE UNDER APA**

- Cash price of $46,500.  As a result of the completion of due diligence, this has been reduced to $46 million subject to further adjustments for collected principal payments made to FTDF and principal balance adjustments (see Sections 2.2(a) and 2.3 of the APA).  The adjustments found in Section 2.3(a) were negotiated to allow FTDF additional benefits from loans collected after July 31, 2006, but prior to the Closing Date of the transaction.  The adjustments found in the remainder of Section 2.3 were negotiated as adjustments for issues identified by Silver Point's due diligence as a final and full settlement of those identified issues, which includes the assignment of certain claims back to FTDF in exchange for certain of the price adjustments.
- Retention of causes of action by FTDF.
- Retention of accrued interest, including default interest, collected prior to the Closing Date.
- Complete monetization of loan portfolio.
- No due diligence out.
- Reduces administrative costs by facilitating a complete and prompt resolution of the case.

# EXHIBIT 2

## BENEFITS TO COMMERCIAL MORTGAGE FROM SALE UNDER APA

- Relieves Commercial Mortgage from servicing an increasing number of difficult non-performing loans, including the need to front costs for collecting on these loans from an ever shrinking amount of current collections of fees from performing loans.
- Provides for an experienced servicer to appropriately service the loans going forward to minimize claims that could be made against Commercial Mortgage.
- Provides for a well funded servicer that can offer funding, where economically warranted in its sole discretion, to deal with unfunded borrower requirements to preserve the value of current loans, to allow for potential settlement of pending litigation, and to minimize potential litigation from these projects.
- Cash consideration of the first $1 million collected on annual servicing fees after reimbursement of Purchaser's collection expenses. (See Section 2.2(b) of the APA.)
- Sharing of 50% of the first $100,000 of accrued, but uncollected default rate interest as of the closing date which is collected after the Closing Date on the FTDF loans. As the retention of this remaining amount of default interest was important to Silver Point, this issue was carried over into the intercompany claims discussions among the Debtors and the Committees. (See Section 2.2(b) of the APA.)
- Retention of all causes of action, including causes of action against insiders. Agreement to coordinate efforts with Commercial Mortgage with respect to pursuing personal guarantees against insiders. (See Section 7.3 of the APA.)
- Agreement not to prosecute any actions against any of Debtors arising out of or relating to acquired Assets and arising out of events occurring before the Closing Date, thus reducing claims in the Commercial Mortgage estate. (See Section 7.4 of the APA.)
- Retention of rights to pre-paid interest whether collected before or after the Closing Date, subject to the Court's order with respect to the disposition of this collected pre-paid interest. (See Section 7.5 of the APA.)
- Retention of servicing fees accrued as of the Closing Date that may be collected after the Closing Date, of all late charges accrued but unpaid as of the Closing Date (except as relates to the FTDF loans purchased), of all exit fee, of all extension fees, of all deferred origination fees, and of all other fees, whether accrued before or after the Closing Date, and of all distributions on loan interests owned by Commercial Mortgage. (See Section 7.1 of the APA.) Agreement has also been reached on the order of payment of fees collected. (See Section 7.2 of the APA.)
- Collection burden for collecting fees to be remitted to Commercial Mortgage estate taken on by purchaser.
- $58 million receivable owed by IP is retained by the estate.
- Access for all Debtors to records transferred and retention of original electronic databases for use in retained litigation.
- Agreement to transfer the LSAs under a plan (the preferred transfer mechanism of the Debtors) in a manner that does not create administrative expense claims against the estate. (See Section 9.1(f).)
- Reduces administrative costs by facilitating a complete and prompt resolution of the case.

- **EXHIBIT 3**

**BENEFITS TO DIVERSIFIED FROM SALE UNDER APA**

- Fractional ownership in certain loans transferred to Silver Point for servicing, with proceeds of such loans to be remitted to Diversified.
- Loans excluded from serviced portfolio or from acquired loans to allow for these loans to be collected by the Diversified Trust under the plan, including without limitation, the 10-90 loan to IP.
- Retention of all causes of action, including causes of action against insiders.
- Provides the basis for negotiations on a Plan to resolve intercompany claims held by Diversified.
- Reduces administrative costs by facilitating a complete and prompt resolution of the case.

**EXHIBIT 4**

**BENEFITS TO DIRECT LENDERS FROM SALE UNDER APA**

- Transfer of Servicing Contracts to an experienced and well funded servicer.
- Ability of Silver Point to address unfunded borrower requirements, in Silver Point's sole discretion, to preserve existing loans and avoid unnecessary litigation affecting Direct Lenders.
- Ability of Silver Point to advance funding for aggressive collection efforts benefiting direct lenders.
- Agreement of Silver Point to abide by the servicing agreements. (See Section 7.5 of the APA.)
- Direct Lenders rights to terminate servicer under the LSAs are not affected.
- Reduces administrative costs by facilitating a complete and prompt resolution of the case.

EXHIBIT D

Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com

Attorneys for Debtors and Debtors-in-Possession

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA – LAS VEGAS**

| | |
|---|---|
| THE LENDERS PROTECTION GROUP; CHARLES B. ANDERSON TRUST; RITA P. ANDERSON TRUST; BALTES CO.; KEHL FAMILY MEMBERS; MOJAVE CANYON, INC.,<br><br>               Appellants,<br><br>v.<br><br>USA COMMERCIAL MORTGAGE CO., et al.,<br><br>               Appellees. | Dist. Ct. Case No. _____<br><br><br>**DECLARATION OF THOMAS J. ALLISON IN SUPPORT OF MOTION TO VACATE ORDER GRANTING TEMPORARY STAY** |
| In re:<br><br>USA COMMERCIAL MORTGAGE CO.; USA CAPITAL REALTY ADVISORS, LLC; USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC; USA CAPITAL FIRST TRUST DEED FUND, LLC, and USA SECURITIES, LLC,<br><br>               Debtors. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR<br><br>Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |

1

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

I, Thomas J. Allison, hereby declare, verify and state as follows:

1.  I make this Declaration solely in my capacity as Chief Restructuring Officer of USA Commercial Mortgage Company ("USACM"), USA Capital Diversified Fund, LLC ("Diversified Fund"), USA Capital First Trust Deed Fund ("FTD Fund"), USA Capital Realty Advisors, LLC and USA Securities, LLC ("Security") (collectively, the "Debtors").

2.  The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on April 13, 2006 (the "Petition Date") and their cases are being jointly administered pursuant to an order of this Court.  The U.S. Trustee ("UST") appointed four official committees (the "Committees") in these cases.

3.  On January 8, 2007, the Bankruptcy Court entered an order confirming the Debtors' Plan of Reorganization (the "Plan").  On  January 17, 2007, an amended joint notice of appeal was filed by a group of interested parties referred to as the "Lender Protection Group" and by other interested parties represented by the law firm Jones Vargas (the "JV Group" and, collectively with the Lender Protection Group, the "Appellants").  By an ex parte motion filed January 17, 2007, the Appellants obtained a temporary stay pending appeal from the Bankruptcy Appellate Panel by order entered after the ex parte motion was filed (the "Stay Order").  The Stay Order provides, "The request for a temporary stay contained in the motion is hereby ORDERED GRANTED to maintain the status quo while further briefing takes place."

4.  If the Stay Order was intended to prohibit the Debtors from distributing funds to Direct Lenders from the USACM Collection Account, then normal monthly distributions that are made from funds held for the benefit of Direct Lenders in the Collection Account cannot be made. Further, and more importantly, the Stay Order calls into question the Debtors' ability to complete the $67 million sale transaction with Compass Partners under the Plan.

2

5. For many reasons, including those stated below, I believe that the Stay Order will result in irreparable harm to the Debtors' estates if allowed to continue for any length of time as the pending sale to Compass Partner could be jeopardized and the Debtors' estates have limited funds to continue operations. The Debtors and Committees have spent many months negotiating a comprehensive Plan. The alternative to the Plan is Chapter 7 liquidation. I believe the filed and confirmed Plan will result in a much greater return to the creditors of the Debtors' estates and to the fund members of FTD Fund and Diversified Fund (collectively, the "Funds"), as well as to the direct lenders, than would a chapter 7 liquidation.

6. If the Debtors' cases were to be converted to cases under Chapter 7, I believe there would be an immediate and substantial decrease in the value of the estates of the three principal Debtors (USACM, FTD Fund, and Diversified Fund). The two Funds' assets consist almost entirely of loan receivables that will require substantial additional effort (and in some cases litigation) to collect. A new chapter 7 trustee (or multiple trustees) would face a very steep learning curve in becoming familiar with the loans, the borrowers, the collateral, the significant claims that exist against the Debtors' prior management, and all of the relevant facts and circumstances necessary to maximize the value of the loan portfolios for the benefit of the Funds' creditors and members. A chapter 7 trustee may be unwilling or unable to collect any of the remaining loans outstanding, or likely would have to accept substantial discounts in order to liquidate the remaining loans. Further, the immediate and substantial loss in the value of the USACM estate would be a result of a steep decrease in the value of USACM's loan servicing agreements and in its ability to collect the fees, costs and other income that it is contractually entitled to under agreements with the borrowers and the direct lenders, and, more significantly, in the reduced likelihood of collecting significant assets from the non-debtor entity USA Investment Partners ("USAIP"), which owes a $58 million note secured by equity interests in a complicated web of entities related to USAIP.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

7.   In addition, there are other reasons that I believe the Stay Order would result in irreparable harm to the Debtor's estates.  First, certain synergies now exist from being able to package assets of the Debtors together in a sale that are likely to be lost if the Debtors' cases were converted to cases under Chapter 7 and a trustee or multiple trustees are appointed in these cases.  Indeed, if a trustee is appointed, it is more likely the Debtors' assets will be sold in a piecemeal fashion that will net less to the Debtors' estates than a packaged sale.  Second, once a conversion occurs, it is my opinion that potential purchasers will not be willing to pay as much for the Debtors' assets as they are now because there is a common perception that once a case is converted to Chapter 7, the Debtors' assets will be available for sale at "fire sale" prices.  Third, administrative expenses will continue to be significant even if a new chapter 7 trustee (or multiple trustees) is appointed because the chapter 7 trustee will have to employ new counsel and new financial advisors, and they will face a lengthy and very steep learning curve to become familiar with the loans, the borrowers, the collateral, the significant claims that exist against the Debtors' prior management, and all of the relevant facts and circumstances necessary to maximize the value of the loan portfolios for the benefit of the Funds' creditors and members.  Fourth, the further delay occasioned by the appointment of a chapter 7 trustee (or trustees) and his/her need to get up to speed will in my opinion further decrease the value of the Debtors' loan portfolio because the development projects securing the loans must immediately move forward and are not capable of withstanding further delay.  Indeed, the Debtors have already been sued twice for failing to fully fund the construction budgets on two loans, and more litigation has been threatened.  Fifth, a chapter 7 trustee may be unwilling or, given the difficult financial circumstances of the Debtors, unable to collect any of the remaining loans outstanding, or alternatively would likely have to

4

1  accept substantial discounts in order to liquidate the remaining loans.  Indeed, the two Funds'

2  assets consist almost entirely of loan receivables that will require substantial additional effort (and

3  in some cases litigation) to collect.

4      8.  If the Stay Order is maintained or a new stay pending appeal imposed, it is my opinion that

5  a bond is appropriate to mitigate potential damages that the Debtors' estates could suffer from the

6  collapse of the pending close of the Compass sale transaction.  Based on a limited analysis, I

7  believe that the bond should be set at a minimum of $20 million, which incorporates the $8

8  million portion of the Compass purchase price attributable to the assets of USACM, the $2 million

9  incremental price for the FTD Fund assets and the $11 million overbid for the USACM and FTD

10  Funds assets that in my opinion represent value that would be substantially at risk if a stay is

11  maintained or granted.  Moreover, I have not analyzed or included in the $20 million figure

12  amounts for other potential damages, including the inability to sell or collect the FTD Fund assets

13  if not sold to Compass under the Plan, ongoing administrative and operating expenses of the

14  Debtors, and other damages that could be incurred.

15      9.  I believe that the facts set forth above and the arguments set forth in the Emergency

16  Motion to Vacate Order Granting Temporary Stay demonstrate an urgent need to have the

17  Emergency Motion considered by this Court on an expedited basis.

18   I declare under penalty of perjury that, to the best of my knowledge, information, and belief, the

19  foregoing statements are true and correct.

20      Executed this 18th day of January, 2007.

21

22

23

24  _____

25  Thomas J. Allison

26  909804