1

1       UNITED STATES BANKRUPTCY COURT

2             DISTRICT OF NEVADA

3              LAS VEGAS, NEVADA

4  In re:  USA COMMERCIAL MORTGAGE    )  E-Filed:  01/29/07
   COMPANY,                           )
5                                     )
            Debtor.                   )  Case No.
6                                     )  BK-S-06-10725-LBR
   _____ )  Chapter 11
7

8

9            TRANSCRIPT OF PROCEEDINGS
                      OF
10   AUCTION RE: SALE OF PROPERTY, BID PROCEDURES,
     AND INVITATION FOR HIGHER AND BETTER OFFERS
11                  VOLUME 1
     BEFORE THE HONORABLE LINDA B. RIEGLE
12        UNITED STATES BANKRUPTCY JUDGE

13         Thursday, December 7, 2006

14               9:30 a.m.

15

16

17

18

19

20

21

22

23

24  Court Recorder:        Helen C. Smith

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

2

```
1    APPEARANCES:

2    For the Debtor:              STEVEN T. WATERMAN, ESQ.
                                  STEVEN C. STRONG, ESQ.
3                                 Ray, Quinney & Nebeker, P.C.
                                  36 South State Street
4                                 Suite 1400
                                  Salt Lake City, Utah 84145
5
     For the First Trust         FRANK A. MEROLA, ESQ.
6    Deed Investor Committee:     EVE H. KARASIK, ESQ.
                                  Stutman, Treister & Glatt, P.C.
7                                 1901 Avenue of the Stars
                                  Twelfth Floor
8                                 Los Angeles, California 90067

9    For the First Trust         CANDACE C. CARLYON, ESQ.
     Deed Fund Committee:         Shea & Carlyon, Ltd.
10                                233 South Fourth Street
                                  Suite 200
11                                Las Vegas, Nevada 89101

12   For Diversified Trust       ANNE M. LORADITCH, ESQ.
     Deed Fund Committee:         Beckley Singleton, Chtd.
13                                530 Las Vegas Boulevard South
                                  Las Vegas, Nevada 89101
14
                                  MARC A. LEVINSON, ESQ.
15                                Orrick, Herrington & Sutcliffe, LLP
                                  400 Capitol Mall
16                                Suite 300
                                  Sacramento, California 95814
17
     For the Official           ROB CHARLES, JR., ESQ.
18   Unsecured Creditors         Lewis and Roca, LLP
     Committee:                   3993 Howard Hughes Parkway
19                                Suite 600
                                  Las Vegas, Nevada 89109
20
     For the Direct             GERALD M. GORDON, ESQ.
21   Lenders Committee:           GREGORY E. GARMAN, ESQ.
                                  Gordon & Silver, Ltd.
22                                3960 Howard Hughes Parkway
                                  Ninth Floor
23                                Las Vegas, Nevada 89109

24   For Compass Partners,      GEORGE A. DAVIS, ESQ.
     LLC:                         Weil, Gotshal & Manges, LLP
25                                767 Fifth Avenue
                                  New York, New York 10153
```

3

```
 1   APPEARANCES (Cont.):

 2   For Compass Partners,      DAVID S. BLATT, ESQ.
     LLC:                       Williams & Connolly, LLP
 3                              725 Twelfth Street N.W.
                                Washington, D.C. 20005
 4
     For Desert Capital         REGINA M. McCONNELL, ESQ.
 5   REIT, Inc., and            Kravitz, Schnitzer, Sloane,
     Consolidated Mortgage        Johnson & Eberhardy, Chtd.
 6   Company:                   1389 Galleria Drive
                                Suite 200
 7                              Henderson, Nevada 89014

 8                              THOMAS A. CONNOP, ESQ.
                                Locke, Liddell & Sapp, LLP
 9                              2200 Ross Avenue
                                Suite 2200
10                              Dallas, Texas 75201

11   For Donna Cangelosi        ALAN R. SMITH, ESQ.
     and Lender Protection      505 Ridge Street
12   Group:                     Reno, Nevada 89501

13
     For Silver Point           JAMES C. McCARROLL, ESQ.
14   Capital, L.P.:             CONSTANTINE KARIDES, ESQ.
                                Reed Smith, LLP
15                              599 Lexington Avenue
                                Twenty-ninth Floor
16                              New York, New York 10022

17                              ROBERT E. McPEAK, ESQ.
                                Kummer, Kaempfer, Bonner, Renshaw
18                                & Ferrario
                                3800 Howard Hughes Parkway
19                              Seventh Floor
                                Las Vegas, Nevada 89109
20
     For the Debtor and         LENARD E. SCHWARTZER, ESQ.
21   Debtor in Possession:      JEANETTE E. McPHERSON, ESQ.
                                Schwartzer & McPherson Law Firm
22                              2850 South Jones Boulevard
                                Suite 1
23                              Las Vegas, Nevada 89146

24

25
```

4

```
1    APPEARANCES (Cont.):

2    For the United States    AUGUST B. LANDIS, ESQ.
     Trustee:                Office of the United States Trustee
3                            300 Las Vegas Boulevard South
                             Suite 4300
4                            Las Vegas, Nevada 89101

5    For Individual Direct    SPENCER M. JUDD, ESQ.
     Lenders:                 Albright, Stoddard, Warnick
6                              & Albright
                              801 South Rancho Drive
7                             Suite D-4
                              Las Vegas, Nevada 89106
8
     Also Present:           THOMAS J. ALLISON
9                            President and CRO
                             BILL FASEL
10                           USA Commercial Mortgage Company
                             Mesirow Financial Interim
11                             Management, LLC

12                           DON WALKER
                             Committee Chair
13                           Unsecured Creditors Committee

14                           SALMAN KHAN
                             Silver Point Capital, L.P.
15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (Court convened 09:42:13 a.m.)

 2              THE COURT:  Okay.  USA Commercial.

 3      Appearances, please.

 4      (Colloquy not on the record.)

 5              MR. WATERMAN:  Your Honor, Steven T. Waterman of

 6      Ray, Quinney & Nebeker appearing on behalf of the debtors.

 7      Ms. Jarvis expresses her unhappiness in not being able to be

 8      here today.

 9              MR. MEROLA:  Good morning, your Honor.

10      Frank Merola and Eve Karasik, members of Stutman, Treister &

11      Glatt, Professional Corporation, on behalf of the First

12      Trust Deed Investor Committee.

13              MS. CARLYON:  Good morning.  Candace Carlyon of

14      the law firm of Shea & Carlyon on behalf of the First Trust

15      Deed Fund Committee.

16              MS. LORADITCH:  Good morning, your Honor.

17      Anne Loraditch of Beckley Singleton, Chartered, Nevada

18      counsel for the Diversified Trust Deed Fund Committee.

19              MR. LEVINSON:  Good morning.  Marc Levinson of

20      Orrick also on behalf of the Diversified Committee.

21              MR. CHARLES:  Good morning.  Rob Charles from

22      Lewis and Roca.  We represent the Official Unsecured

23      Creditors of Committee of USA Commercial Mortgage Company,

24      and Don Walker (phonetic), our committee chair, is here

25      today.
```

```
 1          MR. GORDON:  Good morning, your Honor.

 2   Gerald Gordon and Greg Garman of Gordon & Silver on behalf

 3   of the Direct Lenders Committee.

 4          MR. DAVIS:  Good morning, your Honor.

 5   George Davis of Weil, Gotshal & Manges on behalf of Compass

 6   Partners, one of the debtors.

 7          MS. McCONNELL:  Good morning, your Honor.

 8   Regina McConnell and Thomas Connop on behalf of Desert

 9   Capital REIT Inc., and Consolidated Mortgage Company.

10          MR. SMITH:  Good morning, your Honor.  Alan Smith

11   representing Donna Cangelosi and the Lender Protection

12   Group.

13          MR. McCARROLL:  Good morning, your Honor.

14   James McCarroll of Reed Smith, LLP, on behalf of

15   Silver Point, the stalking-horse bidder.

16          MR. KARIDES:  Good morning.  Constantine Karides

17   also from Reed Smith on behalf of the stalking-horse bidder,

18   Silver Point Capital.

19          MR. SCHWARTZER:  Lenard Schwartzer, local counsel

20   for the Debtors and Debtors in Possession.

21          MR. McPEAK:  Good morning, your Honor.

22   Robert McPeak, Kummer, Kaempfer, Bonner, Renshaw & Ferrario,

23   local counsel for Silver Point.

24          MR. LANDIS:  Good morning, Judge.  Augie Landis,

25   Assistant United States Trustee.
```

1          THE COURT:  I just realized nobody invited you to

2    yesterday's party, did they?

3          MR. LANDIS:  It's okay, your Honor.  I was at

4    another party down the hall.

5          THE COURT:  Oh, okay.  All right.  Just to bring

6    other people up to speed, there were some issues regarding

7    the holding of the auction yesterday.

8       We resolved those by deciding that the actual auction

9    itself would be at 1:30, rather than 9:30, and, this

10   morning, we would deal with any matters that needed to be

11   dealt with concerning the actual auction going forward.

12      I'm surprised to see so many people here because I

13   thought that with that it would just be preliminary issues.

14   Hopefully, there weren't that many, and then we'd see you

15   all again at 1:30, so somebody needs to I guess bring me up

16   to speed on where we are and or if you, indeed, want to

17   proceed now at 9:30.

18         MR. WATERMAN:  Well, your Honor, if I might

19   suggest an order that we could resolve some of the pending

20   issues?  We need to resolve the issue of the Silver Point or

21   SPCD motion for a continuance, then, perhaps, we could --

22         THE COURT:  Well, I don't have a motion for a

23   continuance.

24         MR. WATERMAN:  The motion that they filed

25   yesterday.

8

1          THE COURT:  Well, I ruled on that.

2          MR. WATERMAN:  All right.  Then we could address

3    the issue of Compass Partners becoming or having been

4    certified as a qualified bidder.  We could then address the

5    Desert Capital request with respect to their failure to

6    qualify as a qualified bidder.

7          THE COURT:  What request by Desert Capital?

8          MR. WATERMAN:  It was filed last night,

9    your Honor.

10          THE COURT:  Well, they didn't bother to serve me

11    with a courtesy copy.

12          MR. WATERMAN:  And then if there are any other

13    preliminary matters we could address those at that time.

14          THE COURT:  I think it's kind of important that

15    somebody alert me that that's an issue, but I guess Desert

16    Capital didn't think that was important enough.

17          MS. CARLYON:  And, your Honor, and then there was

18    the objection filed --

19          THE COURT RECORDER:  I'm sorry, Ms. Carlyon.

20          MS. CARLYON:  -- by Mr. Smith.

21          THE COURT RECORDER:  Can you speak into --

22          MS. CARLYON:  I'm sorry.

23          THE COURT RECORDER:  -- the microphone, please?

24       Thank you.

25          MS. CARLYON:  Then the only other thing I know of

1    that's preliminary was the objection by Mr. Smith.

2           MR. WATERMAN:  That's correct.  The Cangelosi

3    objection.  We could deal with that as well.

4           THE COURT:  Okay.  All right.  So dealing with

5    Compass Partners, I have nothing in writing.  What is the

6    issue about there being at this stage a qualified bidder?

7       And I recognize that you were -- this is how I said I

8    perceived the auction to proceed.  We had the two bidders.

9    They would proceed.  My only job was to preside, in essence.

10      The committees would then decide which was the highest

11   bid.  If there were disputes, then those would be brought to

12   me.  I am not aware of any dispute that anybody has filed

13   concerning whether or not Compass is a qualified bidder.

14          MR. MEROLA:  Your Honor, if I might?  Frank Merola

15   on behalf of the First Trust Deed Committee.  The only

16   purpose of pointing out the Compass is there's a change in

17   the form of the agreement.

18      We asked for some what we thought were important

19   concessions from Compass and negotiations throughout the

20   night.  They have acquiesced to our request.

21      Most significantly, there's an increased deposit, and

22   there's a change in the remedy provision to make that

23   deposit liquidated damages in the event they fail to satisfy

24   any conditions.

25      We had conditions in the Silver Point deal that had to

1   be satisfied before the auction happened, for example, the

2   regulatory approvals.

3       Because this is an auction, they didn't have that

4   opportunity to go and get those ahead of time, so failure to

5   satisfy any of those conditions if they couldn't close would

6   result in the deposit being delivered.  There's no dispute

7   as far as Compass being a qualified bidder, and all of the

8   committees I believe agree with that.

9       May I offer a suggestion for today?  Let's deal with

10  Mr. Smith's objection to the extent that has to be dealt

11  with, then let's take a brief recess, so your Honor can look

12  at the Desert pleadings.

13      All of the committees as far as I know consented to the

14  OST.  We want to resolve this issue before we start the

15  auction.

16              THE COURT:  Okay.

17              MR. MEROLA:  Okay?

18              THE COURT:  All right.  So, Mr. Smith, then let's

19  hear your objections.

20              MR. SMITH:  Good morning, your Honor.  What I

21  would prefer to do, I'll present it now, and I'm not sure

22  that whether or not there's agreement and whether or not

23  there's any objection remaining.

24      What I'd really like to do is I was unable to talk to

25  Mr. Schwartzer.  I have to talk to some other counsel.  You

1  wanted me to speak with him yesterday.

2      I was in court in the afternoon.  When I was done, he

3  was in court, so we missed each other, so I was going to use

4  the break to speak with him briefly.

5      THE COURT:  All right.

6      MR. SMITH:  It may save the Court time.

7      THE COURT:  I think that would because, again --

8      MR. SMITH:  Okay.

9      THE COURT:  -- as I had indicated on the record

10  yesterday, just as a heads-up, when I read your objections I

11  saw many of those as things we have either dealt with at the

12  priors hearing which ordered the auction, authorized the

13  auction, and (indiscernible) issues which may well be fair

14  game for confirmation.

15      MR. SMITH:  Right.

16      THE COURT:  A part of the problem was that you

17  weren't a part of this whole process, and there is a certain

18  learning curve.

19      MR. SMITH:  Right.

20      THE COURT:  So I think it would be helpful for you

21  to talk to everyone.  And as I had indicated yesterday, you

22  know, today is the auction, so I --

23      MR. SMITH:  Well, what I tried to do is limit,

24  your Honor, certain things I felt should be brought up prior

25  to the auction because the bidders should know what at least

1   some of the direct lenders' position is.  That's why I

2   raised it at that time.

3            THE COURT:  Okay.

4            MR. SMITH:  And I thought it would be

5   inappropriate to then raise them at the plan and

6   confirmation hearing when the auction had already taken

7   place.

8            THE COURT:  Okay.  All right.  Well, I --

9            MR. SMITH:  So I'll --

10           THE COURT:  You --

11           MR. SMITH:  I'll stand up first after we come back

12   if you'd like.

13           THE COURT:  Sure.  That's fine.

14           MR. SMITH:  Okay.

15           THE COURT:  All right.  So when we come back, the

16   only issue is going to be as I understand it the emergency

17   motion of Capital.

18       Did you even file a motion for order shortening time,

19   Capital?

20           MS. McCONNELL:  Yes, your Honor, we did.

21           THE COURT RECORDER:  I'm sorry, Counsel.

22           MS. McCONNELL:  We filed it --

23           THE COURT RECORDER:  You need to come to the

24   microphone, so we can record your response, please.

25       (Colloquy not on the record.)

```
1              THE COURT RECORDER:  Thank you.

2              MS. McCONNELL:  Yes, your Honor.  We did file that

3    yesterday evening as well.  We filed them both together at

4    approximately 6:15 p.m. I believe.

5              THE COURT:  Well, let me ask a silly question.

6    How did you expect I was going to be made aware of this?  If

7    you --

8              MS. McCONNELL:  Well --

9              THE COURT:  -- don't give us courtesy copies, you

10   don't let the clerk know.

11             MS. McCONNELL:  We were going to come in today,

12   and we had spoken with the -- I had spoken with

13   Jeannette McPherson yesterday evening as well, and she had

14   informed me that all the counsels had agreed to --

15             THE COURT:  Okay.

16             MS. McCONNELL:  -- have it heard today as well.

17             THE COURT:  Okay.  All right.  Well, I'll look at

18   it, and we'll take a recess, and it's a very short motion.

19   There's nothing really on here.

20             MS. McCONNELL:  Yeah.  It's basically just the

21   facts of what's happened over the last week.

22             THE COURT:  Okay.  Is there any -- did anyone get

23   a chance to -- committees get any chance to take a position

24   or file an opposition or --

25          (Colloquy not on the record.)
```

1          THE COURT:  Nobody else has filed anything --

2          MR. SCHWARTZER:  Your --

3          THE COURT:  -- right?

4          MR. SCHWARTZER:  Your Honor, we haven't filed

5     anything in response.  We're prepared to argue it.

6          THE COURT:  Okay.

7          MR. SCHWARTZER:  So --

8          MR. MEROLA:  Your Honor, Ms. Karasik --

9          MR. SCHWARTZER:  Well --

10          MR. MEROLA:  -- points out that there were

11    declarations related to that motion.  We have copies --

12          THE COURT:  Okay.

13          MR. MEROLA:  -- if you don't.

14          THE COURT:  I can print them from on-line now that

15    I know --

16          MS. McCONNELL:  Yeah.  And I have an extra.

17          THE COURT:  -- that they're there.

18          MS. McCONNELL:  I have an extra copy of

19    everything, too.

20          THE COURT:  That would be much more helpful than

21    making us download it.  I don't have any staff today, so did

22    you attempt to even deliver courtesy copies to the Court?

23          MS. McCONNELL:  No.  I'm sorry, your Honor.  We

24    didn't.  We just had it filed.

25          THE COURT RECORDER:  I'm sorry.  Again, you need

1    to speak at the microphone.

2        Thank you.

3            MS. McCONNELL:  (Indiscernible).

4            THE COURT:  All right.

5        (Colloquy not on the record.)

6            THE COURT:  We'll take a recess.

7            MS. McCONNELL:  Okay.  And that's a copy of

8    everything we filed yesterday.

9            THE COURT:  Okay.  All right.  Thank you.

10            THE CLERK:  All rise.

11        (Recess at 09:52:16 a.m.)

12        (Court reconvened at 10:08:22 a.m.)

13            THE CLERK:  Bankruptcy court is now in session.

14        (Colloquy not on the record.)

15            THE COURT:  Be seated.  All right.

16        Go ahead.  Oh.

17            MR. MEROLA:  Your Honor, as a housekeeping matter.

18    I in my earlier remarks characterized provisions of the

19    executed APAs regarding the modifications.

20        That characterization is the view of the committee, and

21    the bidders may disagree with the interpretation of how that

22    language works.  The parties have agreed to the language.

23        We hope we're going to have a closing, so we're not

24    arguing about what triggers the liquidated damages, but I've

25    been asked and I think it's appropriate to indicate that my

1  comments are not accepted by some of the buyers, and they

2  have different views of how those provisions operate.

3          THE COURT:  Okay.  All right.  So on the

4  Consolidated motion, the Desert Capital motion.

5          MR. MEROLA:  Your Honor, if I could, again?  Now

6  that you've read the papers, I think you know what the issue

7  is, and let me just on behalf of my committee tell you where

8  we are.

9          THE COURT:  Well, yeah.  And since you're more

10  familiar, tell me exactly how Mr. Hamilton fits into this --

11          MR. MEROLA:  Well --

12          THE COURT:  -- from your perspective and then as

13  from the --

14      (Colloquy not on the record.)

15          MR. MEROLA:  Sometimes, especially, in a case with

16  a lot of consumer involvement, perception is reality, and

17  the concern at least of our committee is that without having

18  this vetted in open court we did not want to qualify as a

19  bidder an entity that had a relationship whether current or

20  past or future with someone that was a former insider of the

21  debtor and is likely to be a defendant in some of this

22  litigation.

23      Our understanding is -- and, again, your Honor, I'm

24  characterizing the disclosures that have been made.  I don't

25  have any personal knowledge.

1          THE COURT:  Tell me exactly.  Let's go backwards.

2     Tell me for the record, and, again, you know, I'm aware of

3     who the insiders were.

4          But since I'm the person that only sees these things

5     when they come to me to adjudicate the estate, you're far

6     more familiar with who did what, what you think whom did

7     what along the way, so tell me exactly who Mr. Hamilton was

8     and, importantly, for the record in each of the entities.

9               MR. MEROLA:  Well, that might be more detail than

10    I have.  Generally, he held an -- there's a page in the

11    disclosure statement that has an org chart which is a

12    historical document they found while they were at the

13    debtor.  I don't know if they have firsthand knowledge of

14    these relationships.

15         What page was that in the disclosure statement?

16              MR. GORDON:  291.

17              MR. MEROLA:  Thank you.

18         It's page 291 of the disclosure statement, and can I

19    put that up here?

20         (Colloquy not on the record.)

21              THE COURT:  Yeah.  That would be helpful.

22         (Colloquy not on the record.)

23              THE COURT:  They supposedly finally got this

24    fixed, so that it goes the other way.

25         (Colloquy not on the record.)

1          MR. SCHWARTZER:  But it's upside down, right?

2      (Colloquy not on the record.)

3          THE COURT:  There.  That works.

4          MR. MEROLA:  Okay.  And, your Honor, will see --

5          THE COURT:  Oh, yes.  Okay.  And that refreshes my

6  -- my visual recollection --

7          MR. MEROLA:  Right.  And it --

8          THE COURT:  -- understands, yes.

9          MR. MEROLA:  -- helps me, too.

10          THE COURT:  Right.

11          MR. MEROLA:  Mr. Hamilton in addition to being an

12  officer, I believe he was the chief financial officer of the

13  debtor at one time?

14          UNIDENTIFIED SPEAKER:  At one point.

15          MR. MEROLA:  At one point, he was the chief

16  financial officer of the main debtor.  He also had equity

17  interests in some of the higher-level companies.

18      So you'll see that he had an indirect -- he was a

19  co-manager of USA Securities, he had an indirect equity

20  interest of five percent in USA Capital Realty Advisors, and

21  he had a five-percent interest in USA Commercial Mortgage.

22      Now, unlike some of the other principals, he wasn't

23  there when the music stopped.  He had already resigned.  The

24  issue is to the extent there were mismal or nonfeasance

25  regarding the debtor when those events occurred and did they

1    happen on his watch as chief financial officer.

2              THE COURT:  And he held the title of chief

3    financial officer.

4              MR. MEROLA:  That is my understanding at one time.

5    Now, we are told on the other side of the equation that he

6    is or was the chief investment officer of Desert.  He is not

7    a principal.  He doesn't have an equity interest.

8         But what occurred to me is what would be the headline

9    of the business page of the Review Journal if the committees

10   went and qualified an entity with Mr. Hamilton.

11        (Colloquy not on the record.)

12             MR. MEROLA:  I'm sorry.  What?

13        (Colloquy not on the record.)

14             MR. ALLISON:  Your Honor, to clear the record,

15   Mr. Hamilton --

16             THE COURT:  You need to move --

17             THE COURT RECORDER:  (Indiscernible) --

18             THE COURT:  -- your microphone.

19             THE COURT RECORDER:  -- please.

20             THE COURT:  Oh, sorry.

21             MR. ALLISON:  I'm sorry.

22             THE COURT:  For the record --

23             MR. ALLISON:  Sorry, your Honor.

24             THE COURT:  You know, for our record, you need to

25   identify yourself, and then we need you at the microphone.

```
1              MR. ALLISON:  Sorry, your Honor.  I apologize.

2              THE COURT:  That's fine.

3              MR. ALLISON:  I just want to make sure that the

4    record was clear with respect to Mr. Hamilton.

5              THE COURT:  Wait.

6              MR. ALLISON:  I am --

7              THE COURT:  Hang on.

8              MR. ALLISON:  -- Tom Allison.

9              THE COURT:  You still need to state your name for

10   the record.

11             MR. ALLISON:  Tom Allison.

12             THE COURT:  We all know who you are, but the

13   person who is sitting --

14             MR. ALLISON:  Thank you, your Honor.

15             THE COURT:  -- in Nampa, Idaho --

16             MR. ALLISON:  Does not.

17             THE COURT:  -- doesn't know who you are.

18             MR. ALLISON:  Thank you, your Honor.  I apologize.

19   Your Honor, Tom Allison, president and CRO of USA Commercial

20   Mortgage.

21        Your Honor, Mr. Hamilton was a director of USA

22   Commercial Mortgage.  He was a broker.  He did not have the

23   title of CFO, but was a director and an insider and an

24   investor in the various entities that Mr. Merola is

25   outlining.
```

1     THE COURT:  And he brokered as a -- whether he did

2 it right or wrong, he was the broker that brokered a number

3 of the loans that are now in question?

4     MR. ALLISON:  Yes, your Honor.  And he resigned

5 from the company between -- I don't have the exact date,

6 but, obviously, before I got there, and I believe it was

7 about 12 months before I got there, your Honor.

8     So he was no longer a director of the company and was

9 no longer an employee, and it was 8 to 12 months.  He left 8

10 to 12 months prior to the bankruptcy being filed.

11     THE COURT:  But is it fair to say -- question.

12 Loans that were brokered at the time he was there, those

13 loans are still extant, are they not?

14     MR. ALLISON:  Yes.  Yes.  Some of them are,

15 your Honor.  I --

16     THE COURT:  Okay.

17     MR. ALLISON:  I don't have the register of which

18 loans he was involved with, personally, but the majority of

19 the loans that were in existence 12 months ago if they

20 haven't been collected are in existence today, your Honor.

21     THE COURT:  And if they're still in existence,

22 some of them are nonperforming?

23     MR. ALLISON:  Yes, your Honor.

24     THE COURT:  And so one could question whether

25 rightfully or wrongfully that the loan was not brokered

1    appropriate.

2        We all know that bad loans are made because

3    circumstances change, and we all know that bad loans are

4    made because people don't do their job right.

5        I guess the point is the argument could be made for

6    anyone who was a broker at that company at that time either

7    direction.  Is that a fair statement?

8            MR. ALLISON:  It could be either, either way,

9    your Honor.  The point is that a lot of the loans that are

10   in existence were there when he was a broker, but he was a

11   broker and a director.

12           THE COURT:  Okay.

13           MR. ALLISON:  I --

14           THE COURT:  Director of --

15           MR. ALLISON:  I'm sorry, Frank.

16           THE COURT:  -- all --

17           MR. ALLISON:  I just wanted to clarify that.

18           MR. MEROLA:  That's fine.

19           THE COURT:  -- of US --

20           MR. ALLISON:  Thank you very much.

21           THE COURT:  He was a director of all --

22           MR. MEROLA:  Well, keep in mind there's LLCs in

23   there.

24           THE COURT:  Right.

25           MR. MEROLA:  So the only one that's a corporation

1    is USA Commercial --

2              THE COURT:  Okay.

3              MR. MEROLA:  -- Mortgage.

4              THE COURT:  So was he the man they -- so he was a

5    director of USA Commercial Mortgage.

6              MR. MEROLA:  And in the LLCs at least as USA

7    Securities, he was the co-manager and held -- he was the

8    co-manager.

9         And with USA Capital Realty, he is an equity partner in

10   USA Investment Partners, LLC, which indirectly held all of

11   the equity of USA Capital Realty Advisors which, in turn,

12   held the funds.  He was --

13             THE COURT:  Okay.

14             MR. MEROLA:  He was the manager of the funds.

15             THE COURT:  And the IP loan is the loan that was

16   just recently collateralized, correct?

17             MR. MEROLA:  Yes.

18             THE COURT:  And he's just part of the same entity.

19             MR. MEROLA:  Yes.  Investment Partners, yes.

20   Well, let me.  The way I've been thinking about this, I

21   think we have to assume if we're going to qualify him that

22   he is going to be a defendant.  And using that assumption,

23   where do we get?

24        We know as a matter of law a sale, a direct sale, to an

25   insider isn't prohibited in the Ninth Circuit.  We have

1    Wildhorse (phonetic) and those cases, so we're past that.

2         There are two issues that we have to grapple with, and

3    we've been grappling with them, collectively, and we're

4    sorry we're going to let you grapple with it.

5         The first issue is one of perception among the

6    investors.  It is always distasteful when a former insider

7    that created part of the problem now wants to buy the assets

8    at a discount.

9         It always creates a perception problem among the

10    creditors, and here where we have a wide-braced consumer

11    market to some people this is going to be a (indiscernible)

12    that he is bidding on a discounted amount to buy these

13    assets back.

14         The converse is -- and, you know, I'm usually a

15    debtor's lawyer.  The converse is his money is green, and

16    the best thing we can do for these investors is we can get

17    as much as possible for these assets.

18         Having another party to the auction is always

19    beneficial, and that's where we are with the perception

20    issue.

21         The second issue before the bidders stampede me is the

22    bidders might have a problem with this because, obviously,

23    this is a person that would have information regarding these

24    loans that would not be available to the other bidders.

25    Now, is that good or bad in this situation?

1       If the information he has makes him think there are

2   real hidden gems here, he's going to bid up the price.  If

3   the information he has tells him that there's a place he's

4   got to pull back, he isn't.  We don't know.

5       Now, what have we done?  One, there were other issues

6   in addition to the Hamilton issue mostly -- and, again, I

7   don't want to minimize the effort Desert has gone through in

8   the last week, but they showed up very late to this party.

9       The package they submitted indicated they showed up

10  very late to this party.  They haven't had as much time to

11  do due diligence.

12      They don't have as advanced a financing commitment as

13  Compass, and they don't have the type of capital like Silver

14  Point and can just write a check.

15      So what we did was we put modifications into the

16  purchase agreement with a very big liquidated-damages

17  provision.

18      Now, I don't want to be in a situation where I approve

19  a buyer who doesn't close.  A liquidated-damages clause

20  doesn't make someone get financing.

21      But if someone's willing to put $6,000,000 at stake to

22  play, that indicates to me they're very serious, and they're

23  going to work very hard to close.

24      So with that disclosure -- and that's all I know,

25  unfortunately -- we're kind of stymied, but I can tell you

1    that no one wanted to stand up here -- oh, and this

2    provision.

3         The other thing that Desert's done is Mr. Hamilton has

4    resigned, and there's a separation agreement, and there's

5    been a moralization of his resignation, and Desert is

6    assuring us he won't have anything to do with this.

7         Now, again, as a guy who structures things with

8    debtors, I can tell you what does that mean.  Is he still

9    going to be a consultant and not getting paid?  Is he going

10   to come back afterwards?  I don't know.

11        Now, with that disclosure, the one thing I can tell you

12   is the reason I'm up here is no one wanted to stand in front

13   of this group and tell you they were going to qualify an

14   entity with Paul Hamilton as the bidder.

15        If your Honor feels that it would beneficial and

16   appropriate to maximize the value of these assets to qualify

17   him with his indirect relationship, for the record, he's not

18   getting a release.  He's probably going to be a defendant.

19   We're probably going to have litigation with him.

20        But to be very honest, when I, Frank Merola, not

21   speaking on behalf of the committee look at these three

22   bids, Desert is the best servicing operation.  That's what

23   they do as opposed to having to get an independent

24   contractor to service or a third-party servicer.

25        They want to play.  They have real money.  They have

1    responsible counsel.  This issue now is out in the public,

2    and we leave it to your Honor.

3                THE COURT:  Okay.

4                MR. GORDON:  Your Honor, from the Direct Lenders

5    Committee standpoint, we would seek to qualify Consolidated

6    with the following provisions:

7        Obviously, we relied upon the letter and the

8    termination of Mr. Hamilton.  We share all the same concerns

9    as all committees have this both perception and

10   uncomfortableness with regard to Mr. Hamilton being

11   involved.

12       They have assured us.  They have provided a draft

13   letter that he will be terminated, severed, and not come

14   back.

15       Number two is our primary objections are twofold from

16   the direct lenders' standpoint, one, obviously, to find a

17   qualified servicer to take over these contracts, these

18   servicing agreements, and, number two, to maximum the value

19   to the liquidating trust for those direct lenders who have

20   claims in this proceeding who have been harmed.  A vigorous

21   bidding process achieves that.

22       With regard to the contract, we have discussed this

23   with the debtor.  I believe the debtor has discussed it with

24   Consolidated.  They can fill the Court in, but we need to

25   have at least some conformity and agreements.

1        There's a couple of provisions that we have raised with

2   regard to the Consolidated offer or proposal, the APA, and

3   which are unacceptable to us.  We have discussed that.  We

4   believe those are gone, but I'll leave that to the debtor to

5   discuss and/or Consolidated.

6        Basically, if they agree, in general, to the Compass

7   APA, that would solve our issues and, of course, come up

8   with a forfeitable deposit.  I'm sorry.  Gerald Gordon on

9   behalf of the Direct Lenders.

10          MR. CHARLES:  Rob Charles on behalf of the

11   Unsecured Creditors.  We support the qualification of this

12   bidder.

13        One our frustrations in the process has been that,

14   really, it was being driven by financial bidders who are

15   interested in the First Trust Deed assets and other economic

16   assets, really, as financial bidders and saw the servicing

17   rights as either less valuable or we were told at times not

18   valuable.  We were even told the servicing rights are a

19   negative which drives down our value.

20        By having a servicer at the auction, you demonstrate

21   that that's not true.  And with luck, the auction will

22   demonstrate the real value of the Commercial Mortgage assets

23   that have been put into play in the Compass offer and that

24   would be then in play with this offer as well.

25          THE COURT:  Okay.  Let me ask.  I need to go

1  through the qualification section first, so that I

2  understand where we've even met that, so Mr. Allison or

3  someone who's familiar with the qualification process.

4      Counsel.

5          MR. WATERMAN:  Your Honor, the debtor's concern

6  was twofold.

7          THE COURT:  Let me go through.  Let me go through

8  first.  Let me go through, and I'm just going to go right

9  through the bid procedures, page 2.  Okay.

10     Did this bidder satisfy -- and I'm only suggesting

11  Mr. Allison or someone because I needed the management type

12  who's gone through this process because I'm going to ask you

13  if they've met each of these other qualifications before we

14  deal with this side issue.

15         MR. MEROLA:  The answer is going to be,

16  your Honor, not strictly.

17         THE COURT:  Okay.  So let's go through each of

18  these, so we can do it.

19         MR. MEROLA:  Yes, your Honor.

20         THE COURT:  Okay.  So were they a "potential"

21  bidder as that term is defined?

22         MR. FASEL:  Yes.

23         MR. MEROLA:  Yes.

24         MR. ALLISON:  Yes.

25         THE COURT:  Yes.  Okay.  Now, did it submit to the

1    debtors a qualified bid, and we'll go through each of those

2    elements later.  Did they submit a bid no later than

3    4:00 o'clock on November 30th --

4             MR. MEROLA:  The --

5             THE COURT:  -- or were --

6             MR. MEROLA:  The submission was timely.

7             THE COURT:  It was timely.  Okay.  Now, did they

8    set forth the identity of the potential bidder with the full

9    disclosure as required by subparagraph I?

10             MR. MEROLA:  They in a letter made reference to a

11    securities filing that in the securities filing the

12    involvement of Mr. Hamilton was apparent --

13             THE COURT:  Okay.

14             MR. MEROLA:  -- yes.

15             THE COURT:  But, I mean, they did what they're

16    supposed to in subparagraph I.

17             MR. MEROLA:  Not strictly, your Honor.

18             THE COURT:  Okay.  Now, did they do an executable

19    letter acknowledging receipt of copy of the bid procedures

20    and agree to accept them and be bound by it?

21             MR. FASEL:  Bill Fasel for the debtor, Mesirow,

22    yes.  Yes.

23             THE COURT:  Okay.  Did they do an executed asset

24    purchase agreement?

25             MR. FASEL:  Yes.

31

1           MR. MEROLA:  Yes.

2           THE COURT:  Okay.  And did it contain terms and

3   conditions substantially similar or better to those in the

4   purchase agreement?

5           MR. MEROLA:  It was nearly identical.

6           THE COURT:  Okay.  Did they provide for a closing

7   on a date required by the purchase agreement and didn't

8   contain any financing conditions?

9           MR. MEROLA:  Yes.

10           THE COURT:  So they did that.  Okay.  Did they

11   disclose the purchase price which was at least equal to the

12   stocking-horse bidder --

13       (Colloquy not on the record.)

14           THE COURT:  -- on a basis no less favorable?

15           MR. FASEL:  Yes.

16           THE COURT:  Okay.  And was the cash consideration

17   equal to the cash component?

18           MR. MEROLA:  Yes.

19           MR. FASEL:  Yes.

20           THE COURT:  Okay.  And what about a deposit equal

21   to at least 2.325?

22           MR. FASEL:  In this regard, your Honor, we had

23   consulted with the committees, and the committees suggested

24   that given the fact that from a financing point of view

25   their financing qualifications were not as, you know, secure

1   and were looking for ways to get more comfortable.

2       The idea of increasing the deposit to a

3   six-and-a-half-million-dollar nonrefundable deposit as

4   Mr. Merola outlined, previously, for the other bidder was

5   the same request we made of them.  They, in turn, agreed to

6   step up into that --

7              THE COURT:  And have --

8              MR. FASEL:  -- deposit amount.

9              THE COURT:  -- they --

10             MR. FASEL:  They did --

11             THE COURT:  -- deposited that amount?

12             MR. FASEL:  They deposited that amount as of

13   yesterday.

14             THE COURT:  Okay.  Now --

15             MR. FASEL:  Yes.

16             THE COURT:  -- the main thing to me is 6 which

17   relates together.  6 is satisfactory evidence of the

18   financial ability to close including current financial

19   statements and/or such other financial disclosures are

20   requested and the ability to consummate on the date in terms

21   no less favorable.

22       Now, I know you said you had some questions.  How

23   severe are those questions?  In other words -- and I guess

24   also the source of the funds.  Are they just going to get

25   money from other investors --

1          MR. FASEL:  Yeah.  I --

2          THE COURT:  -- like these people or are they --

3       (Colloquy not on the record.)

4          THE COURT:  They get the money from financial

5   investors?

6          MR. FASEL:  Yeah.  They're looking --

7          THE COURT:  And --

8          MR. FASEL:  Your Honor, that area is probably the

9   area where we have the most debate and most conversation

10  amongst the committees and the debtor.

11      Currently, as it stands right now, they have their own

12  financial business that can generate cash flow from the

13  nature of their business.

14      But, right now, as it relates to secure financing

15  sources, they're only at the term-sheet stage with several

16  financing sources and so very preliminary.

17      Yes.  They did as Mr. Merola has pointed out entered

18  the picture a little bit late and weren't able to get to the

19  position where Compass is in a secured-commitment fashion.

20          MR. MEROLA:  They are talking to third-party --

21          THE COURT RECORDER:  I'm sorry, Counsel.

22          MR. MEROLA:  -- institutional-financing type.

23          THE COURT RECORDER:  Could you move --

24          MR. MEROLA:  I'm sorry.

25          THE COURT RECORDER:  -- a little closer --

1          MR. MEROLA:  Frank --

2          THE COURT RECORDER:  -- to the microphone?

3          MR. MEROLA:  Frank Merola.  They're talking to --

4          THE COURT:  It's the microphone now we need.

5          MR. MEROLA:  They're talking to third-party

6    institutional-financing sources.

7          THE COURT:  Okay.

8          MR. ALLISON:  Your Honor, just to amplify

9    Mr. Merola's point -- this is Tom Allison speaking --

10   they're talking to one of the lenders that provided us a

11   commitment for DIP financing over the course of the summer,

12   and firm did extensive due diligence over the course of the

13   summer, your Honor --

14         THE COURT:  Okay.

15         MR. ALLISON:  -- just to make sure you have the

16   facts.

17         THE COURT:  So with that, there is satisfactory

18   evidence at least to be a qualified bidder.  Let's forget

19   whether or not he's Mr. Hamilton.  Forget whether or not

20   it's Mr. Hantges.  Let's assume that for moment.  Forget all

21   of that.  Just look at the other criteria.

22      Would they meet the criteria of at least at this stage

23   of ability to consummate the sale on the date in terms and

24   conditions?  Are you content with that --

25         MR. ALLISON:  Yes, your Honor.

1          THE COURT:  -- to be a qualified bidder, and have

2     they filed a statement confirming the bid's irrevocable?

3          MR. ALLISON:  Yes, your Honor.

4          MR. FASEL:  Yes.

5          THE COURT:  Okay.  Now, the next question I have

6     is -- and this is really a question for counsel going back

7     to counsel.

8       As I understand the bid procedures and the order, even

9     if they become the successful -- if their dollar amount is

10    higher today than anybody else's dollar amount, it is still

11    in the discretion of the debtor with the consultation of the

12    committees to weigh all these things and decide who is the

13    highest, best bidder --

14         MR. MEROLA:  Highest and best.  That's --

15         THE COURT:  -- highest and best, subject to an

16    ultimate if there's no agreement determination by me.  And,

17    of course, then we have the confirmation process.

18         MR. MEROLA:  Correct, your Honor.

19         MR. FASEL:  Correct.

20         THE COURT:  Okay.  Now, okay.

21         MR. MEROLA:  I mean, for example and for the

22    record, if we had an equal monetary bid --

23         THE COURT RECORDER:  I'm sorry, Counsel.  I --

24         MR. MEROLA:  I'm Frank Merola.  I'm sorry.

25         THE COURT:  You could --

1          MR. MEROLA:  The --

2          THE COURT:  That microphone moves if you need to

3   move it to you.

4          MR. MEROLA:  If we had an equal monetary bid that

5   did not have the type of financing contingent -- this has no

6   contingency.

7      They're obligated to close, but we know they don't have

8   the financing.  If we had a comparable monetary bid that did

9   have the financing, we would view that as higher and better.

10          THE COURT:  Okay.  All right.  So let me hear from

11   Capital.

12          THE CLERK:  Bill, could you state your last

13   name --

14      (Colloquy not on the record.)

15          THE CLERK:  -- for me?

16          MR. FASEL:  Yes.  Bill Fasel.

17          THE CLERK:  How do you spell that?

18          MR. FASEL:  F-a-s-e-l.

19          THE CLERK:  Thank you.

20          MS. McCONNELL:  Your Honor, Regina McConnell on

21   behalf of Desert Capital and with me is Tom Connop.  He is

22   out-of-state counsel, and we filed his verified petition.

23          THE COURT:  All right.

24          MS. McCONNELL:  Can we have permission for him --

25          THE COURT:  That's fine.

1          MS. McCONNELL:  -- to argue?  Okay.

2          THE COURT:  Sure.

3       Thank you.

4          MR. CONNOP:  Good morning, your Honor.  Thank you

5    for allowing me to argue here today.

6          THE COURT:  I need your appearance for the record,

7    please.

8          MR. CONNOP:  Thomas Connop, law firm of Locke,

9    Liddell & Sapp, Dallas, Texas.  Your Honor, simply to make a

10   couple observations, I think the sticking point here has to

11   do with Mr. Hamilton.

12      Mr. Hamilton I want to assure the Court has no equity

13   interest in Desert Capital REIT or in Consolidated Mortgage,

14   LLC.

15      We appreciate the observations of the Trust Deed

16   Committee as well as Mr. Cogan (sic).  I'm not familiar with

17   all the names, so forgive me.

18          THE COURT:  Merola?

19          MR. CONNOP:  Mr. Merola.  We are a qualified

20   bidder.

21          THE COURT:  Why don't you move the microphone a

22   little closer to you there.

23      Thank you.

24          MR. CONNOP:  Thank you.  Sorry.

25          THE COURT:  That's all right.

1          MR. CONNOP:  We understand that the principle

2    parties have recognized that we have met the qualifications

3    to be a qualified bidder.

4        I want to assure the Court that we are interested in

5    adding value to this process.  That Consolidated Mortgage,

6    the entity that will be handling the servicing of the Trust

7    Deed assets, the Commercial Mortgage assets, is very

8    experienced, 30 years in this community.

9        It has existing relationships, has or had existing

10   relationships, with a sizable number of the existing

11   constituents of that committee.

12         THE COURT:  Could you tell me for my own purposes

13   who are the insiders of Consolidated Mortgage now?

14         MR. CONNOP:  Mr. Todd Perriot (phonetic).  I --

15         THE COURT:  I just need names.  I'm sorry.

16         MR. CONNOP:  Mr. Todd Perriot.  Actually,

17   Consolidated Mortgage is a subsidiary of Desert Capital

18   REIT.  It's a publicly-traded real-estate investment trust.

19         THE COURT:  Oh, it's publically traded.

20         MR. CONNOP:  Right.

21         THE COURT:  And it no longer has any relationships

22   with Vista Group, Mr. Trenber (phonetic), with any of those

23   people, correct?

24         UNIDENTIFIED SPEAKER:  No.

25         MR. CONNOP:  No.

1          THE COURT:  No.  Okay.

2          MR. CONNOP:  I'm sorry.  In sum, your Honor -- and

3    I don't want to belabor this process -- Mr. Hamilton has no

4    equity interest.

5      He has agreed to disassociate himself and has committed

6    to disassociate himself with Consolidated Mortgage or Desert

7    Capital --

8          THE COURT:  Well --

9          MR. CONNOP:  -- REIT.

10          THE COURT:  Well, how do I know that he won't be

11   rehired next week?

12          MR. CONNOP:  We will commit to that, your Honor.

13   Mr. Perriot will state that under oath if necessary.  He

14   will not rejoin this company if we are the successful

15   bidder.

16          THE COURT:  In any fashion.

17          MR. CONNOP:  In any fashion.

18          THE COURT:  Consultant.

19          MR. CONNOP:  He will not be an employee.  And if

20   you desire, your Honor, we will severe that relationship as

21   any kind of consultant.  It is important to us to see if we

22   can assist this estate in maximizing its value.  We believe

23   strongly that we --

24          THE COURT:  So you agree --

25          MR. CONNOP:  -- can do that.

1         THE COURT:  -- that all relationships will be

2    severed?

3         MR. CONNOP:  There will be no relationship between

4    Consolidated Mortgage or Desert Capital REIT with

5    Mr. Hamilton.

6         THE COURT:  And you won't share any information in

7    the future.

8         MR. CONNOP:  Your Honor, if that's what the Court

9    wants, we won't share any information.

10        THE COURT:  Okay.  All right.  Other comments by

11   the committees, et cetera.

12        MR. MEROLA:  Your Honor, just in terms of a

13   mechanic -- Frank Merola on behalf of First Trust Deed -- I

14   see where you're getting with the Hamilton relationship.

15        Perhaps, it would be appropriate given that we have

16   this two-stage process, auction and confirmation, that as of

17   the time of confirmation to the extent they want a

18   good-faith finding we will have to get declarations from

19   them if they are the successful buyer that the relationship

20   has been severed, that they have a termination agreement,

21   and make them make those representations at the time of the

22   confirmation.

23        THE COURT:  That's right because the point is, you

24   know, under 363 it must be a good-faith finding, and they're

25   rather specific.

1        And I see counsel for Capital nodding his head, so I

2   know he's aware it.  The Ninth Circuit -- I know there's

3   some controversy about what the last opinion was.

4        But in order to confirm a plan, I must make those

5   findings, and those findings include that there is no

6   insider, no collusion, et cetera, so I will expect -- and

7   then we discussed it at the prior hearing documentations

8   that included that.  All right.

9        Any other comments?

10   (Colloquy not on the record.)

11        MR. GORDON:  Your Honor --

12   (Colloquy not on the record.)

13        MR. GORDON:  -- I would just go one step beyond

14   where Mr. Merola is that the 363 is a subject to

15   confirmation.

16        But that if in the event the Court finds that because

17   of Mr. Hamilton that there's a limited 363 or that it can't

18   give it that that's not a condition to the deal closing from

19   Desert Capital's standpoint.  In other words --

20        THE COURT:  But how do I do that if --

21        MR. GORDON:  The 363 protects postconfirmation

22   from reversal.  I'm just saying that I don't want to go down

23   the road, choose them, and then end up at confirmation, and

24   then a problem arises with Mr. Hamilton.  They're going to

25   close the deal or the money's forfeited.

```
1          THE COURT:  Well, but the point is I assume their
2   deal requires them to get a 363 finding.  I don't want them
3   to be in a position where they bid knowing they can't get a
4   363 finding.  That's Mr. Merola's and my point.
5          MR. GORDON:  I appreciate that.  What I'm saying
6   is is that they --
7          THE COURT:  -- if they're willing --
8          MR. GORDON:  They have to understand --
9          THE COURT:  -- to waive that.
10         MR. GORDON:  They're going to have to waive that
11  requirement at this time because if they don't, then they
12  have an out.  If there's a problem later on, we've chosen a
13  buyer, we've gone down this road, and we cannot confirm or
14  close the transaction.  All I'm saying is they have to
15  assume the risk.
16         MR. MEROLA:  If they bid, and they say they need a
17  363 finding, and they can't get the 363 finding, we will
18  make the liquidated-damages provision crystalline that their
19  gamble cost them $6,000,0000.
20         MR. GORDON:  That's my point.
21         THE COURT:  Okay.
22         MR. GORDON:  I agree.
23         THE COURT:  Well, again, so the important part to
24  me here is how this process worked, and the process worked,
25  first, we had preliminary bidders, and then we had qualified
```

1    bidders.

2         Qualified bidders to me are, in essence, bidders who

3    qualify with the financial elements.  That's not to say that

4    if you had a problem that you -- for example, let us assume

5    that Mr. Hamilton was an equity owner, and that he had an

6    interest in this company.

7         It seems to me that company could not bid because he's

8    not an insider -- he is an insider which would be

9    disqualified from bidding either under the code or because

10    of the potential conflicts.

11         So the representation is he is no longer employed by

12    and will not be a part of Capital REIT, and, more

13    importantly, the next level of protection is this gives you

14    the opportunity to do -- let's assume they are the highest

15    in dollar number.

16         Well, even if we get through this sale, you're going to

17    look at all the bids together, but let's assume arguendo

18    their dollar number was way above everybody else's.  Assume

19    that arguendo.

20         You still have the opportunity to look at the

21    connections and convince yourself that this is the right

22    thing to do in a case of dispute, then we have to decide

23    where we are, and we also have a procedure for the next

24    backup bidder.

25              MR. MEROLA:  Right, your Honor.

```
 1              THE COURT:  So it's not like we're in a situation
 2     when they bid, okay, fine, you get the 6,000,000, but then
 3     we've lost everything else because there's nobody else
 4     around.
 5              MR. MEROLA:  Exactly, your Honor.  And assume that
 6     Mr. Hamilton wasn't here.  Because of the financing
 7     contingency, you would always look at that and know you're
 8     going to have more time and effort to get them to a close.
 9         And so their bid is going to have to be such that it
10     compensates the estate for that additional time and
11     uncertainty.
12              THE COURT:  Well, it has to close by a certain
13     date under the contract.
14              MR. MEROLA:  Understood, your Honor.
15              THE COURT:  Yeah.
16              MR. MEROLA:  But, you know, you've done closings,
17     and we're all going to be sweating blood three nights before
18     this closes.  And if we absolutely -- it's still running
19     around trying to get financing by the end of the year.
20              THE COURT:  Okay.  All right.
21         So yes.
22              MR. DAVIS:  Good morning, your Honor.
23     George Davis for Compass Partners.  I recognize --
24              THE COURT:  If you want, you can -- there you go.
25              MR. DAVIS:  There we go.  Thank you very much.
```

1    Your Honor, I recognize as a bidder we have limited standing

2    on this issue.  I would like to just point out a couple of

3    things to you.

4         First, when we went through the process of being

5    qualified, we were told that there was a firm deadline by

6    which the debtor needed to make a decision which was two

7    days prior to the auction.  We were asked to make

8    significant concessions in order for the debtor to deem us

9    qualified by 5:00 p.m. on Tuesday.

10        As far as I'm aware, this bidder, Desert, was not

11   qualified then, wasn't put through the same pressure that we

12   were to make concessions in order to be here today.  As a

13   matter of fundamental fairness, that doesn't seem right to

14   me.

15        Second, your Honor, the statement that other bidders

16   will be on the hook and be in second place isn't true at

17   least as it regards us.  The bidding procedures say --

18            THE COURT:  On page (indiscernible) of the --

19        (Colloquy not on the record.)

20            MR. DAVIS:  The bidding procedures -- let me point

21   your Honor to the right page.  Here it is.  On page 6,

22   paragraph 7, it's the second paragraph.  It says, "If the

23   bidder identified as the next highest bidder" --

24            THE COURT:  Ah.

25            MR. DAVIS:  -- "agrees to maintain its status as

1   the backup bidder to the successful bidder, then it must

2   also agree."  We have not agreed to do that, okay, for the

3   record, your Honor.

4        And then, finally, I believe there was a representation

5   that as of today Desert or the principal, Mr. Hamilton, is

6   not an equity interest holder.

7        Since this is a publically-traded REIT, and, obviously,

8   anyone can buy stock, I would suggest that there be a

9   representation that to the extent he participate and

10  your Honor allows it notwithstanding my comments that he

11  agree that he won't purchase stock.

12            THE COURT:  Thank you.

13       Mr. Reed (sic) -- or yes.

14       (Colloquy not on the record.)

15            THE COURT:  We have more (indiscernible), and so

16  forth.

17            MR. MEROLA:  Oh, I'm sorry.

18            MR. McCARROLL:  No problem.

19       Your Honor, James McCarroll of Reed Smith on behalf

20  Silver Point, the stalking-horse bidder.  Mr. Davis has

21  captured most of the points I would make in my argument.

22       The provision with regard to the next highest bidder

23  obviously is not an indentured servitude provision.  It is

24  voluntary.

25       We will not be the next highest bidder.  If we are not

1    the successful bidder, we will take our breakup fee and go

2    home.  That is our worst-case scenario.

3        We want to acquire these assets.  We want to acquire

4    these assets through a full and fair bidding process.

5    Your Honor, this is not fair.  This entity was not a

6    qualified bidder.

7            THE COURT:  And why do you say that?

8            MR. McCARROLL:  This entity was not a qualified

9    bidder as of the deadline.  The debtors declared the

10    qualified bidders on Tuesday.  The qualified bidders were

11    Silver Point which was prequalified and Compass.

12        Now, we had extensive discussion yesterday with regard

13    to Compass and with regard to various issues, but this

14    entity came up at no point.

15        This entity filed a motion at 6:15 last night to compel

16    qualification seeking the Court's approval of its

17    qualification.

18        This entity had not even been brought to our attention,

19    other than as an entity that had submitted a bid, but was

20    not qualified.

21            THE COURT:  Oh, so you were not -- they didn't

22    even tell -- I'm looking at page 3.

23            MR. McCARROLL:  Yes, your Honor.

24            THE COURT:  "The initial determination of whether

25    a potential bidder is a qualified bidder is within the

1    discretion of the debtors."

2            MR. McCARROLL:  Um-h'm.

3            THE COURT:  "Although the debtors agree to consult

4    with the committees in making each determination, it shall

5    be committed to the potential bidder."  Oh, it says

6    potential bidder.

7            MR. McCARROLL:  That --

8            THE COURT:  And this was kind of the disputes we

9    had yesterday --

10           MR. McCARROLL:  That is correct --

11           THE COURT:  -- which was the person --

12           MR. McCARROLL:  -- your Honor.

13           THE COURT:  -- as opposed to you.

14           MR. McCARROLL:  That is correct, your Honor.  The

15   Court may recall that we had some extensive discussion,

16   though, about turnover of the competing APA to us.  That

17   was, indeed, turned over to us on --

18           THE COURT:  So where --

19           MR. McCARROLL:  -- on --

20           THE COURT:  -- under the --

21           MR. McCARROLL:  -- on --

22           THE COURT:  Again, going back, a potential bidder

23   is defined not as you anyplace.

24           MR. McCARROLL:  That's correct, your Honor.

25           THE COURT:  In fact, you defined yourself as --

```
1          (Colloquy not on the record.)

2               THE COURT:  -- stalking-horse bidder.

3               MR. McCARROLL:  That is correct, your Honor.

4               THE COURT:  So how in the world can you say that

5     that paragraph requires the information be given to you?

6               MR. McCARROLL:  Well, your Honor, in order to

7     permit a fair and competitive auction process, we believe we

8     do need to be working off of the --

9               THE COURT:  Well, it's a good idea.

10              MR. McCARROLL:  -- playing off of the same --

11              THE COURT:  But under the contract --

12              MR. McCARROLL:  -- song sheet, really.

13              THE COURT:  -- where is it in the contract?

14              MR. McCARROLL:  Well, your Honor, it does not

15    appear in --

16              THE COURT:  Okay.

17              MR. McCARROLL:  -- so many words in the contract.

18              THE COURT:  Okay.

19              MR. McCARROLL:  I do believe, though, that for

20    this to be a full and fair competitive auction process, you

21    know, we're entitled to our breakup fee if we're bested.  We

22    don't want that, but that's what will happen if we're not

23    able to bid competitively.

24              THE COURT:  Okay.  So why do you say they're not a

25    qualified bidder as a matter under the definition of the
```

1    term "qualified bidder"?

2           MR. McCARROLL:  Under the definition of the term

3    "qualified bidders", your Honor, this party was not declared

4    a qualified bidder two business days before the auction.

5    The debtors, in fact, specifically stated that there was one

6    other qualified bidder, Compass.

7           THE COURT:  But, again, the only paragraph you're

8    relying on is that particular paragraph for that as a

9    qualification.

10          MR. McCARROLL:  That's correct, your Honor.

11          THE COURT:  Okay.

12          MR. McCARROLL:  Additionally, your Honor, this

13   entity has apparently -- I've never seen it's APA.  I've

14   never heard anything about it until this minute until

15   appearing in court today.

16      But this entity apparently has waived the conditions to

17   closing with regard to financing, but it does not have

18   committed financing.  I believe everyone's been clear on

19   that point.

20      If I'm incorrect, I'm sure someone will correct me, but

21   this entity does not have committed financing.  It has

22   represented at the Court's request today for the first time

23   to my knowledge that the former USA Commercial insider will

24   not participate in the future in this entity.

25      Mr. Davis points out that there is a publically-traded

1   entity involved here, and anyone can buy stock, so we would

2   need rather extensive representations.  I mean, I suppose

3   everyone would need to rely upon those.

4        But I believe that if this entity were the successful

5   bidder -- I won't speak for Compass, but I believe Mr. Davis

6   has represented that they won't be the next highest bidder.

7   We will not be the next highest bidder.

8             THE COURT:  Well, I know everybody says that now.

9   You may not be, but I know everybody's in a game of chicken.

10  I understand that.  I understand exactly what's going on.

11            MR. McCARROLL:  Well, I --

12            THE COURT:  And I --

13            MR. McCARROLL:  I can only think --

14            THE COURT:  -- appreciate that, you know, you have

15  no commitment.  You may well, and that's good to let people

16  know, but --

17            MR. McCARROLL:  Your Honor, I can only convey to

18  the Court what's been represented to me by my clients which

19  is that they will not be the next highest bidder, so the

20  Court can accept that for --

21            THE COURT:  Okay.

22            MR. McCARROLL:  -- what it's worth or not, but --

23            THE COURT:  Well, as well, the committee knows in

24  determining which is the highest bid.

25            MR. McCARROLL:  Of course.  Of course.  But,

1    your Honor, this entity appears to be entering the process

2    with some degree of abandon.  I understand that it's only

3    been here for a week.

4         As the Court is well-aware, these are very complicated

5    assets on which Silver Point has spent countless hundreds of

6    hours doing its evaluation.

7         This entity appears to have access to

8    six-and-a-half-million dollars of easy money that it's

9    willing to gamble with, but we have no assurance that this

10   entity will close.

11        Your Honor has noted -- and I will not claim to appear

12   here today to speak for the best interest of the debtor's

13   estates, their creditors, and interest holders.

14        But it does occur to me that this can't be creating an

15   auction process where Silver Point may not be able to bid

16   competitively cannot be in the --

17              THE COURT:  Well, how --

18              MR. McCARROLL:  -- best interest --

19              THE COURT:  I still don't understand, again, your

20   comment that you had to know who the other bidders was.  We

21   discussed that yesterday, and there's no legal basis for

22   that, nor is there any factual basis.

23        As I said by analogy yesterday, you know, when the U.S.

24   is sending out open bidding for the latest B-52 --

25              MR. McCARROLL:  Um-h'm.

1          THE COURT:  -- Lockheed can't call up and say we

2    demand to know what Boeing has bid.  I mean, it just doesn't

3    work that way.

4          MR. McCARROLL:  I agree with the Court's thoughts

5    on that subject; however, I do believe that the contract in

6    a federal request for a proposal would be rather clearly

7    specified what's being bidded upon and what's for sale.

8    That's not what's --

9          THE COURT:  They haven't --

10         MR. McCARROLL:  -- happening --

11         THE COURT:  But they --

12         MR. McCARROLL:  -- here.

13         THE COURT:  They haven't changed that.  They're

14   bidding on what you're bidding on.

15         MR. McCARROLL:  Well --

16         THE COURT:  You ran the show.

17         MR. McCARROLL:  Well, no, your Honor.  I don't

18   believe that's the case.  They are not bidding upon what

19   we're bidding upon.  They're bidding upon --

20       (Colloquy not on the record.)

21         MR. McCARROLL:  -- what Compass is bidding upon --

22         MR. MEROLA:  That --

23         MR. McCARROLL:  -- which is --

24         MR. MEROLA:  That's not true, your Honor.

25         MR. McCARROLL:  They have --

54

1          MR. MEROLA:  They have your format.

2          MR. McCARROLL:  -- submitted a bid --

3          MR. MEROLA:  It's a purchase agreement.

4          THE COURT RECORDER:  I'm sorry, Counsel.

5          MR. McCARROLL:  -- in our format.

6          THE COURT RECORDER:  I need you to speak --

7          MR. MEROLA:  I'm sorry.

8          THE COURT RECORDER:  -- into a microphone.

9          MR. MEROLA:  Frank Merola.  They have submitted an

10   asset purchase agreement in your form.

11         MR. McCARROLL:  Very well.  Your Honor, this is

12   part of the problem I would submit.  I'm hearing about all

13   of this the first time today.  I'm hearing about all of this

14   right now.

15         THE COURT:  Well, as we said yesterday -- and I

16   appreciate Silver Point's good faith in being here, and I

17   appreciate their participation, and, hopefully, you know,

18   we'll get a good bid from Silver Point or Compass.

19      My only point is as I said yesterday you guys drafted

20   the contract in the beginning.  You are the ones that drove

21   that contract.

22      So to the extent these are concerns that you had, as I

23   said yesterday, I've already ruled the only deal was it

24   would be as good as or better.  As it turns out --

25         MR. McCARROLL:  That is correct, your Honor.

1      THE COURT:  -- their offer is exactly the same as

2  yours, except maybe there's some terms on the deposit.

3      Now, the question is are they a qualified bidder, and

4  that is a fair question in the sense that as we have said

5  before.

6      The person that used to bid on every casino in town,

7  when she came off the street with all her possessions in her

8  hand, and she bid on every casino in town --

9      MR. McCARROLL:  Yeah.

10      THE COURT:  -- we understood she didn't have the

11  financial ability, but we assume we've gone through that, so

12  that's a fair question, but I've gotten assurances from

13  Mesirow that they have met the requirements under the terms

14  of your contract --

15      MR. McCARROLL:  Yes, your Honor.  I --

16      THE COURT:  -- to be --

17      MR. McCARROLL:  I --

18      THE COURT:  -- a qualified bidder.

19      MR. McCARROLL:  I now understand that it is under

20  the terms of our contract, and that gives me a new problem

21  that I thought we had resolved this morning.

22      I had the impression as of this morning that we were to

23  proceed on the Compass contract.  That we were to proceed to

24  bid upon the Compass assets, and I have clients back at an

25  office across town right now working to modify our bid.

1        THE COURT:  But that's fine.  I mean, your

2   contract said -- I mean, again, we went through this

3   yesterday.

4        Your contract said the deal must be as good as or

5   better, so you bid, and you bid on those two contracts, and

6   you can bid on the Compass, and you could say we're bidding

7   on these assets at that price.  You can do it either way you

8   want, right?  Is that a fair statement?

9        MR. McCARROLL:  Well, your Honor, I don't know

10  what I'm bidding on.  I don't know if it's the debtor's and

11  the committees' position that the assets Compass is bidding

12  upon are for sale or not.

13       THE COURT:  Of course, they are.  Nobody suggested

14  they're not.

15       MR. McCARROLL:  Well, your Honor, when we first

16  went through the negotiation process with the parties, it

17  wasn't at all clear to us that those assets were for sale,

18  but --

19       THE COURT:  But you know they are now, right, ever

20  since --

21       MR. McCARROLL:  Well --

22       THE COURT:  -- yesterday.

23       MR. McCARROLL:  Well, I don't, your Honor, I guess

24  as of this morning if the debtors are accepting an offer as

25  a qualified bid that will sell those assets and then that

1    will not sell those assets --

2              THE COURT:  Well, it --

3              MR. McCARROLL:  -- as of today.

4              THE COURT:  But --

5              MR. McCARROLL:  I'm not --

6              THE COURT:  But --

7              MR. McCARROLL:  -- sure --

8              THE COURT:  But what's --

9              MR. McCARROLL:  -- what's for sale.

10             THE COURT:  -- the problem?  Under your

11   procedure --

12             MR. McCARROLL:  Yes, your Honor.

13             THE COURT:  Look, you drafted the procedure.

14             MR. McCARROLL:  Well --

15             THE COURT:  Your procedure could have said -- and

16   there's nothing wrong with the way you drafted it, but just

17   follow me through.

18             MR. McCARROLL:  Sure.

19             THE COURT:  Your contract and your bid-procedure

20   motion could have said we are only bidding on these assets,

21   and that's it, and this is the contract and no change, so we

22   have an absolute apples to apples.

23             MR. McCARROLL:  Yeah.

24             THE COURT:  It didn't work that way.  You drafted

25   the contract and the bid procedures such that parties could

1   do a contract which was a little bit different and allow the

2   committees to then weigh considering all the facts and

3   circumstances what's a better deal.

4           MR. McCARROLL:  The --

5           THE COURT:  You knew that.  You drafted it.

6           MR. McCARROLL:  Your Honor, respectfully, I don't

7   believe that's an accurate characterization at all.  We

8   participated in drafting all of these documents with four

9   committees and the debtors.  They were heavily negotiated.

10  None of these documents are in any way authored by us.

11          THE COURT:  Okay.  But the point is it was driven

12  by you.  When you --

13          MR. McCARROLL:  Well --

14          THE COURT:  -- said no to something -- for

15  example, there are few things in that contract I didn't like

16  -- they stayed in there because you refused to alter your

17  position on them.  I said, fine, you know, it's up to the

18  debtors.  That's fine.

19          MR. McCARROLL:  Um-h'm.

20          THE COURT:  But you knew from the beginning that

21  the contracts -- you might be bidding on a

22  slightly-different variation of the theme in the assets.

23  You knew that.

24          MR. McCARROLL:  That's correct, your Honor.  We --

25          THE COURT:  Okay.

```
1              MR. McCARROLL:  We didn't choose that, but we --

2              THE COURT:  But you --

3              MR. McCARROLL:  We --

4              THE COURT:  -- knew it.

5              MR. McCARROLL:  We knew it.  That --

6              THE COURT:  Okay.

7              MR. McCARROLL:  That's correct, your Honor.  We --

8              THE COURT:  All right.

9              MR. McCARROLL:  We didn't choose it, but we knew

10     it.  Your Honor, I really have one fundamental problem at

11     this point and separately --

12             THE COURT:  Well, what do want --

13             MR. McCARROLL:  -- one concern.

14             THE COURT:  -- me to do?

15             MR. McCARROLL:  I would like a clear affirmation

16     by the debtors and the committees as to what we are to bid

17     upon at 1:30 this afternoon.

18         (Colloquy not on the record.)

19             THE COURT:  Okay.

20             MR. McCARROLL:  And, additionally, your Honor, I

21     do continue to see real issues as Compass has stated and I

22     believe as the debtors and the committees have noted that

23     this bidder just doesn't have financing.  This bidder --

24             THE COURT:  And that's --

25             MR. McCARROLL:  -- has no --
```

```
 1              THE COURT:  -- a valid concern --

 2              MR. McCARROLL:  -- commitment.

 3              THE COURT:  -- as to whether or not it meets

 4    paragraph 6.  I understand that.

 5              MR. McCARROLL:  Yes, your Honor.

 6              THE COURT:  Thank you.

 7              MR. McCARROLL:  Thank you, your Honor.

 8              MR. MEROLA:  Frank Merola on behalf of the First

 9    Trust Deed Committee, your Honor.  The reason other bidders

10    are given very limited standing with regard to who's a

11    qualified bidder and how the procedures work is because they

12    have one objective, and that is to chase away as many

13    competing bidders as possible and pay as little for the

14    asset as possible.

15        While I understand counsel, and I respect what they

16    have to say, this procedure has worked the way it was

17    designed.  These are never pretty, but this is the way this

18    was designed, and let me go through it.

19        There was an initial determination that they were not a

20    qualified bidder.  The procedures at the bottom of page 3

21    over to page 4 says, "The initial determination of whether a

22    potential bidder is a qualified bidder is within the

23    discretion of the debtors, although the debtors agree to

24    consult with the committees in making a determination and

25    shall be communicated to a potential bidder no later than
```

1    two business days prior to the auction."  It was

2    communicated to Desert that they were not qualified.

3         The next sentence says, "Any dispute as to whether a

4    potential bidder is a qualified bidder including if any one

5    of the committees disagrees with the debtor's determination

6    shall be resolved by the bankruptcy court."

7         They filed a motion.  We're here to resolve it.

8    Because we didn't make them a qualified bidder, there was

9    nothing to give the other debtors.

10        Now, let's go to -- so the procedures worked, and

11   that's how it was supposed to be done.  Let's go to the

12   problems that Mr. McCarroll raised.

13        Most of Mr. McCarroll's problem are

14   second-round-of-auction problems that if we have

15   nonconforming contracts, and we're trying to square them.

16        What I said is factually accurate.  With their bid,

17   they submitted a marked-up Silver Point contract.  And

18   because it's going to be important later in the day, let's

19   talk about what happened.

20        One of the bidders -- I keep getting the names wrong

21   because they both start with C.  One of the bidders,

22   Compass, changed the definition of the servicing assets in

23   their contract.  It is unfair for Silver Point to suggest

24   those assets were not for sale.

25        They did extensive due diligence on those assets.  They

1    made a proposal on those assets which I believe Mr. Charles

2    characterized as laughable.

3        And so Mr. Charles took the assets off the table

4    because they were unwilling to pay for them.  Now, a buyer

5    is willing to pay for them.

6        Everyone is cognizant of the nonmatching-contract

7    problem.  Compass has assured us that they will bid under

8    either form of the contract.

9        If everyone is going to go to the Consolidated form of

10    contract with their definition of assets, they'll bid --

11            MS. CARLYON:  Compass.

12            MR. MEROLA:  -- on that form.

13            UNIDENTIFIED SPEAKER:  Compass.

14    (Colloquy not on the record.)

15            MR. MEROLA:  I'm sorry.  They will bid on that

16    form.  I wish we'd give -- I'm going to call them Desert.

17    That will be easier, so there's no problem.

18        But if there is a problem, it happens all the time in

19    these auctions.  That's why we wanted a court-supervised

20    auction.

21            THE COURT:  So let me ask, and, well, we might as

22    well address it now.  So at the auction, let's assume

23    Compass is first.  Compass would say I bid Y dollars under

24    my contract --

25            MR. MEROLA:  Correct.

1      THE COURT:  -- for example.  Desert says I bid

2   Z dollars under my contract which is the Silver Point

3   contract.  Silver Point can say I bid A dollars under its

4   contract or the Compass contract.  Is that a fair

5   assessment?

6      MR. MEROLA:  That might happen, but we believe

7   that by 1:30 we will have a conforming format --

8      THE COURT:  Okay.

9      MR. MEROLA:  -- of contract.

10      THE COURT:  But there is nothing in the bid

11   procedures that would preclude them --

12      MR. MEROLA:  Because the bid procedures say that

13   they're going to buy at least --

14      THE COURT:  Right.

15      MR. MEROLA:  -- the assets covered by the Silver

16   Point --

17      THE COURT:  And I recognize --

18      MR. MEROLA:  -- contract.

19      THE COURT:  -- that if I was sitting here I

20   couldn't say which was which.  But since the process goes

21   back with the committees, you can then weigh the higher

22   dollars with the various contracts.

23      MR. MEROLA:  And we all --

24      THE COURT:  Correct?

25      MR. MEROLA:  And we all have --

1          THE COURT:  Okay.

2          MR. MEROLA:  -- our financial advisors here.

3          THE COURT:  So there's nobody here we'll preclude,

4     so that we understand, and we're getting ahead of ourselves.

5     Assume you can't agree on one contract, does the bidders

6     agree they could each bid on their own contracts whether or

7     not --

8          MR. MEROLA:  There's nothing in these procedures

9     that I can make them bid on any form --

10         THE COURT:  Okay.

11         MR. MEROLA:  -- of contract.

12         THE COURT:  Okay.  Mr. Davis, you had a comment.

13         MR. DAVIS:  Your Honor, what I would suggest --

14    and I think each bidder should be able to bid on their

15    contract, and, ultimately, the debtor in consultation with

16    the committees will make a determination.

17         The one thing that's very important at the outset of

18    the auction I believe is that the debtor must articulate the

19    value that it ascribes to the assets which one bidder is not

20    purchasing, but another bidder is.

21         Only then will you know at the auction whether if

22    someone is bidding on the old Silver Point structure, and

23    we're bidding including additional assets at a higher dollar

24    value whether or not the old structure plus the value that

25    has been ascribed to the assets that are not being purchased

1  under that structure is higher, you know, than the other

2  bidder.

3      (Colloquy not on the record.)

4          MR. DAVIS:  At the very least, we need to know

5  that on a dollar basis that when it becomes someone's turn

6  to bid that the debtor and, hopefully, with the consensus of

7  the committees believes that the last bid that was bid is a

8  better bid or is at least --

9          THE COURT:  Sure.

10          MR. DAVIS:  -- the highest bid.

11          THE COURT:  I appreciate it from the strategy

12  standpoint.  But, again, just so that I'm clear and to

13  repeat Mr. McConnell's (sic) point, everybody agrees that he

14  could bid on your contract or his contract, and we're not

15  forcing him to determine which contract has to be bid on.

16          MR. MEROLA:  Correct.

17          MR. DAVIS:  Correct.  I don't see --

18          THE COURT:  Okay.

19          MR. DAVIS:  -- a reason to do that, but I do think

20  it is important, so that we know what we're bidding and who

21  is higher.

22          THE COURT:  Sure.

23          MR. DAVIS:  And, ultimately, we'll go back I

24  suppose to a determination of who is better.  But at least

25  for purposes of the auction in determining who is higher,

1    there must be an articulation, hopefully, by the debtor,

2    hopefully supported by each of the committees as to the

3    value of those assets that are not being purchased under any

4    particular contract.

5           THE COURT:  Okay.  And I'm saying okay meaning I

6    hear you.

7        (Colloquy not on the record.)

8           MR. WATERMAN:  Thank you for that clarification,

9    your Honor, because we are not going to make a determination

10   and tell the bidders how we value individual components of

11   the assets being purchased.

12       We, at this point, the debtors, have determined and I

13   believe with the consent of all four committees that the

14   Compass bid as submitted satisfies the requirement of the

15   minimum incremental overbid.

16       And I think everyone -- that is the debtors and the

17   four committees -- are all on the same page that in terms of

18   a format the Compass bid is a better format with which to

19   work because we are dealing with a set dollar amount, not a

20   dollar amount plus a stream of payments.

21       (Colloquy not on the record.)

22           MR. WATERMAN:  I think your Honor is correct when

23   you say that paragraph 6 when we talk about the

24   determination of the successful bidder grants to the debtors

25   and the committees the ability to determine not only highest

1    but best bid and can take into account qualitative concerns

2    at that point in time or any differences between what assets

3    may have been included or excluded in the bids, but I don't

4    think that we're going to state our valuation in-between

5    each incremental bid.

6         Also, as to the Paul Hamilton or insider issue, it is

7    not an issue of disqualification.  It's an issue of

8    disclosure.

9         And the disclosure of an insider contact for all the

10   reasons that have already been stated may result in that bid

11   not being the best bid or may result in problems of

12   confirming the bid or obtaining necessary findings, but I

13   think in terms of becoming a qualifying bidder it's merely a

14   disclosure issue.

15             THE COURT:  Okay.  Now, I need to go back.  It's

16   my fault.  I've sort of let you all under random access, and

17   we've kind of been going back and forth through the issues.

18        So let's go back to the qualified-bid issue, rule on

19   that, then we'll hear Mr. Smith's objections, then we should

20   take a recess, and you focus on how we go about the bidding

21   issues, and then we'll finish up from there.  All right.

22        So let me understand again from Mr. Allison.  You

23   believe that the Capital Group has provided under

24   paragraph 6 satisfactory evidence of their financial ability

25   to close and the ability to consummate the sale.

1          MR. ALLISON:  That would paragraph 3, sub 6.

2          THE COURT:  Excuse me.  Paragraph sub 6, yes.

3          MR. ALLISON:  Your Honor, they have put the

4   deposit up.  They have told me the financing source they're

5   looking at.  They're in discussions with them.  They have a

6   term sheet from them.  They do not have a commitment letter

7   from them.

8          THE COURT:  If they don't have a commitment

9   letter, how -- if this was some other bidder, would you have

10  said that they were qualified?

11         In other words, but for the Hamilton thing, you would

12  have found they're qualified or would that have been

13  something that caused you to pause?

14         Forget the deposit issue because, again, I'm troubled

15  by deposits because, you know, okay, it's $6,000,000, but

16  then you risk everything else.

17         Do you feel comfortable that with this kind of company

18  they can raise that capital?  You know, it's one thing to

19  say, you know, you go out and find some letter that says

20  I'll give you the money.  But if you don't have the backup,

21  do you feel comfortable that this company has that ability?

22         MR. ALLISON:  This company should have the ability

23  to close this transaction in terms of raising the money, and

24  they are talking to reputable lenders.  They're talking --

25         THE COURT:  Okay.

1          MR. ALLISON:  -- to National Lending Sources, but

2     they don't have it.  One of the things that for fairness,

3     your Honor, and disclosure, in talking with Compass, they

4     had a term sheet earlier or late last week, and I pushed

5     them very hard to move to a firm commitment letter from

6     their lender.

7          And just so you have the ability of the dialogue that

8     we have had with Compass, they had a term sheet, and I

9     pushed them very hard to get to --

10          THE COURT:  So why shouldn't --

11          MR. ALLISON:  -- a commitment letter.

12          THE COURT:  -- Desert then have to have a firm

13     commitment letter as well?

14          MR. ALLISON:  Well, your Honor, that's what I'm

15     trying to share with you is that we had the Paul Hamilton

16     issue out there to begin with.  And in consultation with the

17     committees this morning, they felt it was important that we

18     bring this up to you.

19          So I don't know where they're at today in terms of

20     whether they're talking to their lender, and maybe, perhaps,

21     they can have the commitment letter before the auction this

22     afternoon.

23          THE COURT:  Okay.  All right.  Let me hear from

24     counsel on the financial ability.

25          Mr. Connop, is that it?  Yes.  I'm sorry.

1              MR. CONNOP:  Connop, your Honor.

2              THE COURT:  Um-h'm.

3              MR. CONNOP:  Thank you very much.

4         (Colloquy not on the record.)

5              MR. CONNOP:  The issue of financing I think is

6    collateral to this issue.  Mr. --

7              THE COURT:  Well, to me, it's not --

8              MR. CONNOP:  Well, let me --

9              THE COURT:  -- because to me --

10             MR. CONNOP:  Let me explain.

11             THE COURT: -- the issue is --

12             MR. CONNOP:  Mr. Perriot will testify that Desert

13   Capital REIT can liquidate $175,000,000 in current assets to

14   close this deal.

15             THE COURT:  Okay.

16             MR. CONNOP:  I hope that the assets will not sell

17   for that much; however, nonetheless, we can close the deal.

18             THE COURT:  Okay.

19             MR. CONNOP:  Thank you.

20             THE COURT:  That's the issue.  Thank you.  All

21   right.

22        Well, with that, I find them to be a qualified bidder.

23   That is based upon them meeting the requirements of the

24   (indiscernible) and, also, on the further representations --

25   and let me summarize -- that Mr. Hamilton is not currently

1    an employee, officer, director, consultant, that he has no

2    relationship with this company and will have no relationship

3    with the company, and that he agrees to sign an agreement by

4    which he will not acquire any shares of the company if it's

5    the successful bidder.

6        Now, obviously, if it's not the successful bidder, then

7    it doesn't make a difference, and I recognize the concern.

8    I think it's valid the concern is here.

9        But as Mr. Merola points out, if someone is otherwise

10   qualified, and there is no ownership interest, it was he was

11   merely an employee, and they otherwise meet good faith, and

12   they can close, that is cold hard cash.

13       This is not a situation where -- and there's the

14   servicing issues.  But, again, if there's any concern with

15   the servicing, et cetera, that can be dealt with in

16   determining is that the highest and best offer.

17       This will also give you the opportunity to investigate

18   that, but it appears as if there aren't sufficient

19   relationships that would disqualify or even provide an

20   impediment to acquiring the assets.  All right.

21       Now, Mr. Smith.

22           MR. MEROLA:  Well, before we do that,

23   your Honor --

24           THE COURT:  Um-h'm.

25           MR. MEROLA:  -- could we dismiss the new qualified

1    bidder, so they can go --

2              THE COURT:  Yes.

3              MR. MEROLA:  -- finish their APA with some subteam

4    of who we have here?

5              THE COURT:  Sure.

6              MR. MEROLA:  Just give us --

7              THE COURT:  So all --

8              THE COURT:  -- one minute.

9              THE COURT:  Anyone who wishes to be excused, so, I

10   mean, we'll see you back here.  Oh, we have the other issue

11   on the bidding.  Did you want to take a recess on Mr. Davis'

12   issue?

13             MR. MEROLA:  No, your Honor.

14             THE COURT:  Okay.  You're all set on -- I mean,

15   I'm not --

16             MR. MEROLA:  Well --

17             THE COURT:  I don't --

18             MR. MEROLA:  -- we're --

19             THE COURT:  About saying about the values?

20             MR. MEROLA:  We don't need to do that now.

21             THE COURT:  Okay.

22             MR. MEROLA:  We're going to, hopefully, by 1:30.

23   I don't want to deal with hypotheticals.

24             THE COURT:  Okay.

25             MR. MEROLA:  By 1:30, we're probably going to have

1    all conforming contracts, and it's not going to come up.  We

2    are not going to make anyone bid in a vacuum.

3        We are not going to pick someone for nonmonetary

4    reasons without telling them how much we value those and

5    giving them an opportunity to overbid.  Our incentive is to

6    get as much as possible --

7            THE COURT:  Exactly.

8            MR. MEROLA:  -- here.

9            THE COURT:  And you will know what that

10   bottom-line number now is because the bottom-line number has

11   changed because of what assets have been collected,

12   et cetera, so everybody will know that, correct?

13           MR. MEROLA:  Yes, your Honor.

14           THE COURT:  Okay.  All right.  Thank you.

15       So why don't we just take two minutes, so anyone who

16   wishes to that doesn't need to stay for this short argument

17   on Mr. Smith's can leave, and then we'll come back.

18       (Colloquy not on the record.)

19           THE CLERK:  All rise.

20       (Recess at 11:06:02 a.m.)

21       (Court reconvened at 11:23:12 a.m.)

22           THE CLERK:  Bankruptcy court is now in session.

23       (Colloquy not on the record.)

24           THE COURT:  Be seated.  Okay.

25       On Mr. Smith's opposition.

1          MR. SMITH:  Thanks, your Honor.  I just wanted to

2     inform you I did file a 2019 statement, but it's not

3     complete.

4          I don't have all the information, but it lists 111

5     members, and I believe that all of them or nearly all are

6     people that are direct lenders.

7          And other than the issue of how much money may be

8     brought in from this auction to the estate, I think that the

9     issue of what these direct lenders are left with as far as

10    who services their loans is something worth considering.

11         I'm really down to three issues.  The first issue is

12    kind of underscored by Mr. Merola's comments about one of

13    the potential bidders is a better servicer than the other.

14         Frankly, I and I know that the constituents of my group

15    really don't know much about who is a good servicer or who

16    is not, and, apparently, some will be direct servicers or

17    others may contract out.

18         These are all, your Honor, as you know tricky loans,

19    not all of them, but many of them are.  They're loans that

20    are in default.  They're loans that may require additional

21    funding.  They're loans that require an analysis that if

22    additional funding is provided they may be very valuable.

23    We're not sure what's going to be done.

24         So the first issue of the three that I have is are

25    these direct lenders stuck forever with whoever is the

1    successful bidder as their loan servicer.

2          And you asked me yesterday to talk to counsel, and here

3    is the range of responses that I have.  Some say 51 percent

4    of the people in a loan can cancel and get their own

5    servicer.

6          Some say you can only cancel if the servicing agreement

7    is in default.  And if it's in default, some say it is in

8    default because USA is in default under certain terms of it,

9    and some say, no, USA is not in default.

10          THE COURT:  Okay.  Now, the first question is have

11    you read the servicing agreements?

12          MR. SMITH:  About 20 times.

13          THE COURT:  Okay.

14          MR. SMITH:  And, your Honor, what the language in

15    the servicing -- and the language in the servicing agreement

16    as far as termination says in paragraph 8, "Lender may by

17    30-days' written notice to USA terminate this agreement and

18    a power of attorney granted if one is granted under

19    Section 11 of this agreement if USA fails to perform its

20    obligations hereunder."

21          My position is this.  I don't think USA has performed

22    its obligations hereunder.  I think that direct lenders can

23    cancel if they want.  I think 51 percent of them can go get

24    their own servicer if they want.

25          I have been told, well, that's going to require

1   litigation.  That's going to require litigation.  Mr. Smith,

2   you're going to have to go.

3       You know, the new purchaser, the successful bidder, is

4   going to want to litigate that issue with you as to whether

5   there is a default or not.

6       And I can assure you the last thing at least the people

7   in my group want is more litigation, so I really wanted that

8   issue clarified by you, your Honor.

9       I don't know if there is disagreement.  I spoke for

10  counsel for Silver Point.  He was not able to provide me an

11  answer offhand.  He is looking into it.  Maybe by 1:30,

12  he'll have an answer, but my people want me to report are we

13  stuck or are we not.

14          THE COURT:  Okay.

15          MR. SMITH:  That's number one.

16          THE COURT:  I think I know the answer, but I'll

17  let counsel speak to that, so --

18          MR. SMITH:  Okay.  And the second issue,

19  your Honor, that I wanted to address is that under the --

20  I've done my best to catch up.  Under the --

21          THE COURT:  I know.  It's --

22          MR. SMITH:  -- loan-servicing --

23          THE COURT:  It's difficult.  And as I said to you,

24  I didn't mean to be condescending in any manner.  The point

25  is it is difficult.

1          It's a long process.  You've been in cases where, you

2     know, you've been in it from the beginning, and somebody

3     comes in in the middle.

4               MR. SMITH:  Yeah.

5               THE COURT:  And at first, you're impatient, and

6     you have forgotten that there's just a lot of knowledge that

7     you learned just being involved.

8               MR. SMITH:  Right.

9               THE COURT:  And I appreciate that fact.

10              MR. SMITH:  Right.  And what I've tried to do is

11    limit my objection.  Obviously, we need a servicer.  We need

12    to go forward.  We need money into the estate.  I don't want

13    to stop it.  I just want to make sure my people --

14              THE COURT:  Sure.

15              MR. SMITH:  -- are protected.

16         The second issue, your Honor, is that the servicing

17    rates have been published.  I mean, it wasn't any great

18    surprise to anybody -- at least, it wasn't to me -- that the

19    servicing rates are the maximum allowed under the servicing

20    agreement.  Even though USA never charged those, now it's

21    the maximum.

22         But the servicing agreement also says that USA will

23    collect some of its servicing fees from the borrower.  For

24    example, there may be loans where USA is collecting

25    13 percent from the borrower and paying the direct lenders

1    12 percent, and that one-percent spread is the servicing

2    fee.

3        So the next question I have is I didn't see that, and

4    maybe I missed it in what's been published.  But people who

5    are in those types of loans where USA was keeping that

6    spread as a servicing fee, do the direct lenders get the

7    benefit of that spread still?

8            THE COURT:  Well, where would they have had the

9    right to it under their agreements?

10           MR. SMITH:  It says in the agreement on

11   paragraph 5 --

12           THE COURT:  No, no.  In the agreement with the --

13       (Colloquy not on the record.)

14           THE COURT:  The lenders' agreement with USA

15   Commercial.  Where were the --

16           MR. SMITH:  Right.

17           THE COURT:  Or is that what you were pointing me

18   to?

19           MR. SMITH:  That's what I mean, the servicing

20   agreement.  It says in paragraph 5 that that's the case, and

21   that it had been the practice in some loans, not all of

22   them, prior to the sale.

23       (Colloquy not on the record.)

24           MR. SMITH:  And as I understand it, the sale is

25   not in any way modifying the --

```
 1                THE COURT:  Right.

 2                MR. SMITH:  -- loan-servicing --

 3                THE COURT:  So if the agreement --

 4                MR. SMITH:  -- agreement.

 5                THE COURT:  Didn't the agreement previously

 6    provide that any spread went to USA Commercial?  Isn't that

 7    what it said?

 8                MR. SMITH:  Yeah.

 9                THE COURT:  Okay.

10                MR. SMITH:  It said --

11                THE COURT:  So I'm --

12                MR. SMITH:  And it said --

13                THE COURT:  -- confused why --

14                MR. SMITH:  -- that the spread --

15                THE COURT:  -- there's any ambiguity.

16                MR. SMITH:  It said the spread is going to pay the

17    servicing fee.  So instead of the, see --

18                THE COURT:  I don't think it said that.

19                MR. SMITH:  Yeah.  That's exact.  I mean, that's

20    what I read.  Maybe I'm wrong, your Honor, but what they did

21    is they would lend money out at 13 percent -- and I'm not

22    saying -- this is an example -- and then they'd pay the

23    direct lenders 12 percent, and then that one-percent spread

24    is really being collected from the borrower.

25                THE COURT:  Okay.
```

1          MR. SMITH:  And what they told the direct lenders

2     is, look, instead of getting a 12-percent loan for you and

3     having you pay 1 percent we actually got a 13-percent loan.

4          THE COURT:  But not one of the servicing

5     agreements say that, though, right?

6          MR. SMITH:  No.  This is what it says, and you can

7     correct me if I'm wrong.  "It is agreed and acknowledged

8     that USA derives the bulk of its revenues" -- and I'm

9     reading from paragraph 5 -- "receives the bulk of its

10    revenues from charging the loan-fees points to the borrower.

11         Certain borrowers, however, may prefer to pay a higher

12    rate of interest in exchange for a reduction in loan fees

13    payable in advance to USA, the higher interest rate

14    comprising a deferred-loan fee.

15         USA will notify lender when such a case arises and

16    advise the lender what portion of the interest is payable to

17    USA as a deferred-loan fee," so the practice was --

18         THE COURT:  Well, but where is the obligation to

19    turn it over to the lender?  It doesn't say that.  It just

20    says it will tell them.

21         MR. SMITH:  Well, it says --

22         THE COURT:  Well, the point is --

23         MR. SMITH:  It --

24         THE COURT:  -- the agreement is what the agreement

25    is.

1          MR. SMITH:  I just want to know, prospectively.

2    If that's been the case, prospectively, is that going to be

3    honored?  That's my only question.  If the loan fees are

4    being --

5          THE COURT:  But the agreement is what it is.  The

6    agreement is what it is.

7          MR. SMITH:  Okay.  Well --

8          THE COURT:  I mean, the written agreement --

9          MR. SMITH:  -- I --

10          THE COURT:  -- is what it is.

11          MR. SMITH:  All I'm saying is the published

12    schedule doesn't comply or doesn't comport with that

13    provision where the fee was paid by that interest

14    differential by the borrower.

15          THE COURT:  But that agreement doesn't say that

16    money's paid to the lender.  It just says it will notify

17    them, right?

18          MR. SMITH:  That's not the way I read it.

19          THE COURT:  Well, that's what --

20          MR. SMITH:  And --

21          THE COURT:  -- you --

22          MR. SMITH:  -- that's not --

23          THE COURT:  -- just read to me.

24          MR. SMITH:  Okay.  Well --

25          THE COURT:  That's the language you read to me.

1           MR. SMITH:  Okay.

2       (Colloquy not on the record.)

3           MR. SMITH:  You know, your Honor, that's the way

4   it was done, and that was told to them.

5           THE COURT:  Oh, okay.

6           MR. SMITH:  And that's the way my people

7   interpreted that agreement --

8           THE COURT:  Okay.

9           MR. SMITH:  -- or some of the people that I have,

10  so, I mean, I just want to know --

11          THE COURT:  So just be very careful in this whole

12  regard because you've got the parol-evidence rule in Nevada.

13  I mean, you know, you've got the written-contract rule,

14  so --

15      (Colloquy not on the record.)

16          MR. SMITH:  Right.  I understand that.  I'm just

17  reading this again to see maybe --

18      (Colloquy not on the record.)

19          MR. SMITH:  Maybe you're right.  Maybe I missed

20  it.

21      (Colloquy not on the record.)

22          MR. SMITH:  Well, that's the way I read it.

23          THE COURT:  Okay.

24          MR. SMITH:  And that was done.  That is what was

25  done in the past, so I just wanted --

1          THE COURT:  Okay.

2          MR. SMITH:  -- that clarified.  You know, the

3    final thing, your Honor, is that -- and I raise this now, a

4    position, and I don't know if there's anything that can be

5    done about it.

6          But, certainly, a portion of the assets in these

7    estates that really hasn't been addressed, yet, is are

8    assets owned by Investment Partners, and --

9          THE COURT:  Now, what does that have to do with

10   this sale?

11         MR. SMITH:  That's what I'm going to explain.

12   Investment Partners is obligor on some of the loans that

13   will be turned over to the servicing agent under this sale.

14         MR. MEROLA:  No.

15         MR. SMITH:  If I'm wrong, I'm wrong.  I'll stop

16   right here.  I hear Mr. Merola say no, but that's what I

17   understood.

18         I understood that Investment Partners is obligor on

19   some of the loans that are now going to be serviced by the

20   successful bidder.

21         And my concern is that if there's no control over what

22   the servicer can do can they foreclose on those loans

23   without any oversight by anybody from I guess it would be

24   the liquidation trust or the surviving entities after this

25   bankruptcy case.

1       (Colloquy not on the record.)

2           MR. SMITH:  It seems to me there should be some

3   protection to assure that the assets of Investment Partners

4   are not lost through the foreclosure.

5           THE COURT:  Okay.  All right.  Response.

6           MR. MEROLA:  Very briefly, your Honor.  Mr. Smith

7   raises a number of points that I think are reflective of the

8   frustration a lot of the investors feel in this matter.

9       I think the day after this thing filed bankruptcy

10  people were going through their files to see what agreements

11  they had with this entity, and they started reading them.

12  And in many cases, they started reading them for the first

13  time.

14      These agreements are what they are.  I don't think

15  anyone in this room as an investor would have signed these

16  agreements now --

17      (Colloquy not on the record.)

18          MR. MEROLA:  -- if they knew then what they know

19  now, but this is not a place to get declaratory relief as to

20  all of the provisions of these agreements in the hands of a

21  successor.

22      All we're doing here is transferring some of these

23  assets.  We shouldn't be in the business of interpreting

24  every provision prospectively on these.  There's just not a

25  declaratory-relief action.

1          Or the other way you could read pleading is they're

2     trying to negotiate with the buyers to modify these

3     provisions.

4          The mantra we had in this sales process that has been

5     drilled through our head by Mr. Gordon and Mr. Garman is

6     don't touch the agreements.  We can't touch the agreements.

7          There are things that are good, and there are things

8     that are bad for the direct lenders in these agreements.

9     They can't pick and choose.  We have elected not to touch

10    the agreements.  That's where they are.

11         The last point on Investment Partners, Investment

12    Partners is not a direct obligor on any of the loans being

13    transferred.  Investment Partners may be an indirect owner

14    of the LLC or the partnership that got the loan.  Okay.

15         That being said, it's nonsensical to suggest that there

16    should be some -- if you're a direct lender in one of those

17    loans that Investment Partners is an indirect equity owner,

18    you want to collect the loan, and you have a secured claim

19    on the land.  You should be able to foreclose on that land.

20         What they're suggesting is some kind of marshaling with

21    the totality of the litigation that people are going to go

22    after.  That's not the deal the direct lenders in those

23    loans made.

24         And in my case, one of the direct lenders is my fund.

25    And for my fund to go out and recover on a lien it has on

1    property just to get the note, they're going to have to do

2    that.

3        There's nothing nefarious about trying to enforce these

4    obligations and get paid, even if it means that's to the

5    detriment of Investment Partners.

6        None of these issues are necessary -- there's no issue

7    before you for declaratory relief.  I don't think you could

8    even resolve these issues, even if there was an action for

9    declaratory relief, but they're certainly nothing to do

10   before the auction at 1:30.

11            THE COURT:  All right.

12            MR. GORDON:  Your Honor, the issue with the

13   loan-servicing agreements, it's not an auction issue.  It's

14   a confirmation issue, if any.

15        As Mr. Merola said, the mantra of the Direct Lenders

16   Committee was from the very beginning of this case and

17   became more strident as we went was we do not mess around

18   with the loan-servicing agreements.

19        We understand that there are issues involving

20   interpretation or issues that direct lenders have been told.

21   There are issues that they have with regard to the

22   statements they have received from the debtor in possession,

23   but those are interpretation.  Those are administrative.

24   They need to work those out.

25        The very essence of the transactions before the Court

1    is the loan-servicing agreements are taken as is.  They're

2    being transferred.

3         They're not being mucked around with.  Provisions are

4    not being changed.  If they start to change, we have other

5    problems.

6         I will tell the Court that as in all of our discussions

7    with prospective servicing agents they demanded changes to

8    take these such as, well, we may want the performing loans,

9    but we don't want the nonperforming loans or we want

10   up-front fees to cover foreclosure costs or we want to raise

11   the percentages of service fees.

12        As the Court read paragraph 5, I read it the same way.

13   I've read it from the beginning of the case.  I understand.

14   Direct lenders two days ago when we met with hundreds of

15   direct lenders in Reno and Las Vegas expressed that they

16   were told that that additional-interest spread was going to

17   cover their costs, nothing in the documents.

18        We appreciate that.  There was a lot of statements

19   made, but the documents speak for themselves.  This is not

20   the time or place to deal with interpretation, et cetera.

21   We want them transferred in their entirety subject to their

22   terms.  That's the deal.

23             THE COURT:  Okay.  Any reply, Mr. Smith?

24        (Colloquy not on the record.)

25             MR. SMITH:  No, your Honor.  Other than, you know,

1   as I said, I mean, I guess the third point is probably

2   solved if there's -- I mean, I understood differently.  But

3   if there's no Investment Partners' loans directly involved

4   in the servicing, that takes of that, and I --

5             THE COURT:  Well, I guess I have a concern, too.

6   You better make sure that in all these clients you represent

7   that you don't have a conflicting interest there, and have

8   you discussed that conflicting interest?

9             MR. SMITH:  The best I can.

10            THE COURT:  I mean, you know, on one hand, you're

11  saying --

12            MR. SMITH:  You know --

13            THE COURT:  -- don't collect again.  But if

14  somebody's got a direct loan with --

15            MR. SMITH:  With?  With who?

16            THE COURT:  With Investment Partners.  I mean,

17  that the Investment Partner -- this is not something being

18  transferred to the servicer, but to suggest that loans

19  shouldn't --

20            MR. SMITH:  I --

21            THE COURT:  -- be --

22            MR. SMITH:  You know, I --

23            THE COURT:  -- collected?

24            MR. SMITH:  I just wasn't aware of that,

25  your Honor, and I'll certainly go investigate that.  I --

1            THE COURT:  Okay.

2            MR. SMITH:  I don't believe that.

3            THE COURT:  Okay.

4            MR. SMITH:  But, I mean, I still feel that -- I

5    mean, you said you had an idea on what you were going to --

6    how you felt about my first point.  I think that's the

7    most --

8            THE COURT:  Well --

9            MR. SMITH:  -- critical point.

10           THE COURT:  -- but the point is the contract says

11   what it is, and it's --

12           MR. SMITH:  Well --

13           THE COURT:  -- being transferred, another

14   contract.  The contract says what it says about -- and I

15   think the plan suggests -- does not the plan say that after

16   -- I mean, there is no stay after confirmation, and they're

17   free to do whatever their remedies are under the contract.

18           MR. SMITH:  And that by the sale they take it

19   subject to whatever defaults that USA had in their

20   preexistent --

21           THE COURT:  The contract --

22           MR. SMITH:  -- sale.

23           THE COURT:  -- is what it is.  There is no stay

24   postconfirmation.  It's the new entity.  I mean, there's no

25   stay to prevent the enforcement of the servicing agreement.

1   There's a certain discharge, you know.

2            MR. SMITH:  Right.

3            THE COURT:  So that's what the plan says.

4            MR. SMITH:  All right.  I understand.

5            THE COURT:  Okay.  So the sale goes forward.  To

6   the extent that any of those were objections, they're

7   overruled.  All right.

8        We'll see you back at 1:30.  Do you want to just say --

9   do you want to -- rather than say 1:30, do you want to say

10  2:30 or --

11           MR. MEROLA:  No.

12       (Colloquy not on the record.)

13           THE COURT:  -- is it easier --

14           MR. MEROLA:  No.

15           THE COURT:  -- to bring everybody back --

16           MR. MEROLA:  No.

17           MS. CARLYON:  No.

18           UNIDENTIFIED SPEAKER:  1:30.

19       (Colloquy not on the record.)

20           THE COURT:  -- and corral you in one place?

21       (Colloquy not on the record.)

22           THE COURT:  Eileen, you said they can use that

23  courtroom?

24           THE CLERK:  Yes.  Courtroom I and III.

25           THE COURT:  Okay.  You can use Courtroom I and III

1    to caucus --

2              MS. CARLYON:  Thank you, your Honor.

3              THE COURT:  -- if you want caucus, even during the

4    lunch hour, but let Eileen know if that's what you want to

5    do if you want to come earlier.

6         (Colloquy not on the record.)

7              MR. MEROLA:  Thank you, your Honor.

8              MS. CARLYON:  Thank you --

9              THE COURT:  All right.

10             MS. CARLYON:  -- very much.

11             THE COURT:  Thank you.

12             THE CLERK:  All rise.

13        (Recess at 11:39:29 a.m.)

14        (Court reconvened 01:36:24 p.m.)

15             THE CLERK:  Bankruptcy court is now in session.

16        (Colloquy not on the record.)

17             THE COURT:  Be seated.

18        (Colloquy not on the record.)

19             THE COURT:  All right.  USA Commercial.

20        Appearances.

21        What I'll do is I'm going to ask for the appearances of

22   counsel first, and then when we proceed to the auction I'll

23   ask separately for the appearance of the bidders, so that we

24   have those separate.

25             MR. WATERMAN:  Steven T. Waterman of Ray, Quinney

1    & Nebeker appearing on behalf of the debtors.

2              MS. McPHERSON:  Good afternoon, your Honor.

3    Jeanette McPherson of Schwartzer & McPherson Law Firm on

4    behalf of the debtors and debtors in possession.

5              MR. MEROLA:  Good afternoon, your Honor.

6    Frank Merola and Eve Karasik, members of Stutman, Treister &

7    Glatt, Professional Corporation, on behalf of the First

8    Trust Deed Committee.

9              MS. CARLYON:  Good afternoon, your Honor.

10   Candace Carlyon of Shea & Carlyon on behalf of the First

11   Trust Deed Fund Investors Committee.

12             MR. McCARROLL:  Good afternoon, your Honor.

13   James McCarroll of Reed Smith on behalf of Silver Point.

14             MR. CHARLES:  Hi.  Rob Charles from Lewis and

15   Roca.  We represent the Official Committee of Unsecured

16   Creditors of USA Commercial Mortgage Company, and

17   Don Walker, our committee chair, is present.

18             MR. CONNOP:  Good afternoon, your Honor.

19   Tom Connop, Locke, Liddell & Sapp, Dallas, Texas, on behalf

20   of Desert Capital REIT and Consolidated Mortgage, LLC, also

21   Regina McConnell.

22        (Colloquy not on the record.)

23             MR. GORDON:  Good afternoon, your Honor.

24   Gerald Gordon and Greg Garman of Gordon & Silver on behalf

25   the Direct Lenders Committee.

1          (Colloquy not on the record.)

2               MR. DAVIS:  Good afternoon, your Honor.

3    George Davis of Weil, Gotshal & Manges on behalf Compass

4    Partners.

5               MR. LEVINSON:  Good afternoon.  Marc Levinson of

6    Orrick for the Diversified Committee.

7               MR. LANDIS:  Good afternoon, Judge.  Augie Landis,

8    Assistant United States trustee.

9          (Colloquy not on the record.)

10              THE COURT:  You know, Mr. Charles and Mr. Garman

11   have a good idea.  Why don't I ask counsel for the

12   committees.  If you want to move over there, that gives the

13   bidders some room at the table.  I see that everybody's

14   scrunched up over there and kind out, so --

15         (Colloquy not on the record.)

16              THE COURT:  Any of the other bidders want to move

17   up closer here?

18         (Colloquy not on the record.)

19              THE COURT:  Okay.  So before we start, then, is

20   there any issues on the conduct of the auction that we need

21   to deal with as we have one conduct or we don't?  Where are

22   we?

23              MR. WATERMAN:  Your Honor, I think there is one

24   issue.  The bid procedures anticipate that the first event

25   at the auction would be a draw of lots to determine the

```
 1   order of bidding with Silver Point being the first bidder.

 2   At this point, the minimum incremental overbid has been

 3   already received from Compass.

 4       Rather than drawing lots, we would suggest that Compass

 5   be designated as the second bidder and Desert Capital as the

 6   third bidder who has not at this point submitted a

 7   qualifying bid, although they are a qualified bidder under

 8   the decision this morning.

 9           THE COURT:  Well, but I based that decision based

10   upon you telling me they were a qualified bidder.  I'm

11   confused about what you're telling me now.

12           MR. WATERMAN:  No.  I'm just trying to resolve the

13   issue, instead of drawing lots --

14           THE COURT:  Okay.

15           MR. WATERMAN:  -- just determining the order.

16           THE COURT:  Well, does --

17           MS. CARLYON:  Your Honor, to clarify, the bidding

18   procedures called for a qualifying bidder just to match.

19           THE COURT:  Right.

20           MS. CARLYON:  What he is saying is they just

21   matched, whereas Compass actually gave an incremental

22   overbid that would be their first-round auction bid.

23           THE COURT:  Oh, I see.  I see.  Okay.

24           MS. CARLYON:  Candace Carlyon.

25           THE COURT:  I --
```

1          MS. CARLYON:  Excuse me.

2          THE COURT:  Does Compass or Capital care if you

3    draw lots or what order you go or do you want to -- this is

4    not hard.  We can just draw a lot, rather than debating it.

5    Rather than spending $2,000 debating it, we can --

6          (Colloquy not on the record.)

7          MR. DAVIS:  Your Honor, no.  It seems to me that

8    there is agreement on the debtor from the perspective of the

9    debtors and the committees that our bid is the highest.  I

10   think that should start the auction.

11         THE COURT:  Okay.

12         MR. DAVIS:  And then beyond that we don't care who

13   bids after us.

14         THE COURT:  Okay.  All right.  And are we bidding

15   on -- is it agreed that we're bidding on one contract or are

16   the bidders free to say their bid is based upon their

17   contract or which contract?

18         MR. MEROLA:  Frank Merola on behalf of the First

19   Trust Deed Committee.  During the break, all of the parties

20   moved to the format of the Compass contract, so we're

21   bidding on the same form of contract.

22         It is our understanding -- and I understand there's

23   some dispute, so I want to resolve it now.  It is our

24   understanding that the increments of bidding will be as

25   provided in Section 4, Roman et V of the bid procedures,

1    page 4 and 5 which indicates, "Subsequent overbid

2    increments, overbid increment, A, shall be not less than

3    $100,000 and, B, shall be made to increase the "total" asset

4    purchase price as that term is defined in the purchase

5    agreement."

6         And then the footnote says, "To clarify, during the

7    auction, bidders shall make increased bids with respect to

8    the total asset purchase price and shall not allocate any

9    overbid increment, including the minimum incremental overbid

10   between the First Trust Deed property and the Commercial

11   Mortgage property.

12        The allocation of such overbid increment including the

13   minimum incremental overbid shall be made in accordance with

14   the terms of the plan or subsequent orders of the Court."

15        So all we are looking for from overbidders -- we can

16   put it up here.  We'll show you what the stalking-horse bid

17   was, then we'll show you what the Compass bid was, and we're

18   looking for $150,000 more than that when we go to Desert or

19   they pass.

20             THE COURT:  Okay.  So everybody agrees with that.

21   Everybody --

22        (Colloquy not on the record.)

23             UNIDENTIFIED SPEAKER:  100.

24             UNIDENTIFIED SPEAKER:  100.

25             UNIDENTIFIED SPEAKER:  100.

```
1              MR. MEROLA:  Oh, I'm sorry.

2              THE COURT:  100, you mean.

3              MR. MEROLA:  100.

4         (Colloquy not on the record.)

5              THE COURT:  Okay.  All right.  So we'll --

6         (Colloquy not on the record.)

7              THE COURT:  Oh, Mr. Charles had a comment.  Sorry.

8              MR. CHARLES:  I'm the first of a line.  Can I

9    translate for you what he just said?

10        (Colloquy not on the record.)

11             MR. CHARLES:  I don't want to break this.

12        (Colloquy not on the record.)

13             MR. CHARLES:  Yeah.  Rob Charles.  I'm not allowed

14   to touch equipment in courtrooms in Arizona, in general.

15        (Colloquy not on the record.)

16             MR. CHARLES:  Ooh, what happens at the end of the

17   countdown?

18             THE COURT:  Did we turn it off?  Oh, okay.

19        (Colloquy not on the record.)

20             THE COURT:  Because of the what?

21             THE CLERK:  The bulbs (indiscernible).

22             THE COURT:  Okay.

23             MR. CHARLES:  And my daughter would want you to

24   turn it off to save energy.

25             THE COURT:  Okay.
```

1        MR. CHARLES:  What Mr. Merola just said was in the

2    overbidding from this point forward please ignore the

3    allocation of value between the First Trust Deed Fund the

4    portion of the Commercial -- the Commercial Mortgage assets

5    that Silver Point originally bid on and the new Commercial

6    Mortgage assets that are on the table.

7        And he said the reason to that was because the bid

8    procedures in talking about additional bids for the First

9    Trust Deed Fund and the rights to a little bit of profit on

10   the servicing and to the First Trust Deed default interest

11   were required to be unitary.  And since they were required

12   to be unitary there, you should be unitary, even in this

13   context.

14       But we are dealing with a different bid than this bid

15   procedure was drafted for.  What we have now is a bid for

16   depending upon your values, perhaps, seven-and-a-half-

17   million dollars for Commercial Mortgage's rights to collect

18   success fees, default interest, and some interests in loans.

19   This is the first bid for these assets.  We're not

20   overbidding on these assets.

21       The reason why Mr. Merola said that is because if you

22   apply an 85/15 agreed split of overbids for the assets that

23   were in the Silver Point proposal, then I think Mr. Merola

24   would say I'll thankfully take 85 percent of the purchase

25   price for the additional Commercial Mortgage assets, and you

1    the Commercial Mortgage creditors which include Diversified

2    as a creditor today and the direct lenders as creditors can

3    have 15 percent.

4         And the problem with that is since this is not the sale

5    that the bid procedure -- that at least these pieces of the

6    assets are not the sale of the bid procedure contemplated.

7    It's also not the sale that our constituency can support.

8              THE COURT:  I need you to jump ahead and tell me

9    what your bottom line is, so that I --

10             MR. CHARLES:  Let the overbidders bid based upon

11   the contract.  In other words, the contract as I understand

12   it says that Compass has bid 2,000,000 more for the First

13   Trust Deed Fund portfolio.

14        And they have bid 8,000,000 for a pot that included the

15   part that Silver Point had originally bid on, profits on

16   servicing and First Trust Deed default interest, as well as

17   the additional assets that we have agreed can be sold if

18   it's a fair price.

19        And so what our proposal would be is to let them

20   overbid by a bucket if you will, and then what the Court

21   will have to consider the debtors will actually have to

22   consider in consultation with the committees what is the

23   best offer, but then we'll find out what the value of these

24   assets is.

25        And the reason why this is so important -- and I really

1    can't emphasize how much heat the unsecured creditors are

2    putting on me about this issue -- we did not know when we

3    started this process if there was a bidder for the profits

4    in servicing and for these future fees, the default-interest

5    extension fees and success fees.

6        We found out in our negotiations with Silver Point they

7    would make a fair offer for the things that were held back,

8    and so we said, fine, we'll sell --

9            THE COURT:  But is --

10           MR. CHARLES:  -- other things.

11           THE COURT:  -- there a problem if the total is

12   100,000 as opposed to --

13           MR. CHARLES:  What Mr. Merola said -- what he

14   meant to say I think is start with 48 for First Trust Deed

15   Fund, 8 for the Commercial Mortgage assets.  Those two

16   together are 56.

17       And then overbidders will bid in $100,000 increments

18   over 56,000,000.  We'll figure out how the additional

19   consideration, the 8,000,000 --

20           THE COURT:  Right.

21           MR. CHARLES:  -- and the additional hundreds are

22   split later.

23           MR. MEROLA:  No.

24           MR. CHARLES:  So --

25           MR. MEROLA:  (Indiscernible).

1          MR. CHARLES:  I understood that to be his

2     proposal, and I apologize if I have mischaracterized it.

3     Let me shut up and have him explain to you what he's asking

4     for.

5          THE COURT:  Okay.

6          MR. MEROLA:  I hope this is minimal.  I hope it's

7     a tempest in a teapot.  This is the purchase agreement.

8     There's a red line, one, but I'm just putting it up there

9     for illustrative purposes.

10        The First Trust Deed assets are 48.  The Commercial

11    Mortgage assets under this are 8.  I'm not asking to take

12    the 8.  I'm not asking for 85 percent of the 8,000,000.  He

13    can put that in his pocket.

14        What I'm talking about is I don't want a situation

15    where the bidders are trying to whipsaw the constituencies

16    by loading up value to one of those sets of purchase prices

17    and not the other, so all we're talking about is the

18    incremental bids above this fifty-seven-five.

19          THE COURT:  So, well --

20        (Colloquy not on the record.)

21          THE COURT:  Let me ask this.  Does anybody care

22    if, oh, we don't even bother with a certain minimum

23    incremental bid?  I mean, okay, you know, arguably, we could

24    spend hours doing a dollar, a dollar, a dollar, but nobody's

25    going to do that.

1              MR. MEROLA:  No.  I mean, all I'm worried about,

2    your Honor --

3              THE COURT:  And we're not bidding out the

4    allocation today.  Allocation's not an issue.

5              MR. MEROLA:  That's all --

6              THE COURT:  The only amount --

7              MR. MEROLA:  -- I want.

8              THE COURT:  -- is what's the next bid.

9              MR. MEROLA:  All I want to do is vis-a-vis the

10   bidders.  They are giving you a fixed number that is

11   allocated by the bid procedures which are clear on this

12   point.  I'm not trying to take the $8,000,000 allocation on

13   the unsecured assets.  We're not doing that.

14      But the issue is assuming this is the proper allocation

15   between these assets the increments of the overbids will be

16   split as agreed to by the parties, but I don't want the

17   bidders to have the luxury of, for example, saying,

18   Mr. Charles, I'm going to leave Merola's number at the same

19   place, and I'm going to increase only your number.  I want

20   you to be higher.  I want you to vote for me for a higher

21   and better.  I don't want that to happen.  I want the

22   bidders to bid on a total dollar, so we don't split the

23   constituency.

24      And, your Honor, again, there's many things in this bid

25   procedure that are not clear.  This is completely clear.

1   That there's only supposed to be bids on the overbid.

2        If Mr. Charles is suggesting that this is improvident

3   in light of what's happened now, that's a subject to a

4   motion to reconsider that isn't --

5             THE COURT:  Well --

6             MR. MEROLA:  -- before you today.

7             THE COURT:  -- let's do this because we're getting

8   -- you know, I don't want to make any bidders nervous, and

9   we spend more time and eat up the extra money that you may

10  or may not get just sitting here arguing about it.

11       I mean, I propose this, one of two things.  Either we

12  get rid of a set number of incremental bid now that we've

13  met it or we just let them bid, and they can bid however

14  they want for each pocket.

15       But the point is just as you said in the beginning

16  their determination of how it's allocated is not binding on

17  the Court.

18       They may need it for their own purposes or it may be

19  useful to ascertain how much they think it goes for each

20  pot.  It may be worth something in a later valuation

21  hearing.

22            MR. MEROLA:  That is inconsistent with these

23  procedures, your Honor.  These procedures --

24            THE COURT:  Do you --

25            MR. MEROLA:  These procedures provide to bid only

1    in single increments.  It's the subsequent overbid

2    language --

3            THE COURT:  Right.

4            MR. MEROLA:  -- only to adjust the total asset

5    purchase price, and the order expressly provides that we're

6    not to take overbids that allocate the value between the two

7    pools of assets.  We discussed and contemplated this issue,

8    and we addressed and resolved it.

9        (Colloquy not on the record.)

10            THE COURT:  Okay.  Mr. Davis, anything?

11            MR. CHARLES:  Your Honor, may --

12        (Colloquy not on the record.)

13            THE COURT:  Let's let the bidders have a --

14            MR. CHARLES:  Let me get my papers out of the way,

15    your Honor.

16            MR. DAVIS:  Thank you, your Honor.  I agree with

17    Mr. Merola.  I believe this will become a circus if people

18    start allocating value, and what I'd like to suggest -- and

19    I have never used one of these, but let me try.

20        (Colloquy not on the record.)

21            MR. DAVIS:  If I can get this --

22            THE COURT:  It's like low-tech PowerPoint.

23        (Colloquy not on the record.)

24            MR. DAVIS:  There we go.  Okay.  In our initial

25    bid, we allocated value as between the two groups of assets,

1    but there is a clause C which you haven't seen which

2    provides an additional purchase price, and that's above the

3    other bid.

4              THE COURT:  Okay.

5              MR. DAVIS:  I would suggest that we all bid based

6    upon increases to C, and then it gets allocated however

7    your Honor finds appropriate --

8              THE COURT:  Okay.

9              MR. DAVIS:  -- after the conclusion of the

10   auction.

11             THE COURT:  Anybody have any objection to that?

12   Any of the bidders care --

13             MR. CONNOP:  That's fine --

14             THE COURT:  -- one way or the other?

15             MR. CONNOP:  -- from our perspective.

16             MR. McCARROLL:  Your Honor, James McCarroll of

17   Reed Smith.  We also agree with Mr. Merola.  That makes

18   sense to us.  We are bidding on the pool of assets.  However

19   the parties allocate our bids is up to them.

20             THE COURT:  Okay.  Is that your understanding,

21   too, Mr. Connop?

22             MR. CONNOP:  Tom Connop on behalf of Desert

23   Capital.  Yes, your Honor.

24             THE COURT:  Okay.

25             MR. CONNOP:  That's fine.

1          THE COURT:  Fine.  All right.  So with that, may I

2     have the appearances of those people who will be --

3          MR. CHARLES:  So you're --

4          THE COURT:  Oh, sorry.  Mr. Charles.

5          MR. CHARLES:  -- agreeing with them, and I

6     understand that, but I just need to make it clear that our

7     view is -- and I believe that the Diversified Committee and

8     the Direct Lenders Committee agree with the notion of

9     separate overbids, but I understand that the bidders want

10    to go ahead --

11         THE COURT:  But the point is --

12         MR. CHARLES:  -- differently.

13         THE COURT:  -- it will be bid, and then --

14         MR. CHARLES:  Understood.

15         THE COURT:  -- that's not binding on me.  That's

16    not binding the committees.  We're just trying to get to a

17    sale of some assets.

18         MR. CHARLES:  And as long as we're clear that the

19    first 8,000,000 is not going to be grabbed, that helps

20    reduce some of the uncertainty that's associated with this

21    issue.

22         THE COURT:  And --

23         MR. CHARLES:  And Mr. Merola's already confirmed

24    that.

25         THE COURT:  Okay.

```
 1              MR. CHARLES:  And this is Rob Charles again.
 2    Sorry.
 3              THE COURT:  Okay.  All right.  So with that, let
 4    me have the appearances of those people who will be making
 5    the bids on behalf of the various bidders.
 6         Was there anything else before I start that?
 7              MR. MEROLA:  No.
 8              THE COURT:  No.  Okay.
 9              MR. CONNOP:  Good afternoon, your Honor.
10    Tom Connop on behalf of Desert Capital REIT.
11         (Colloquy not on the record.)
12              MR. KHAN:  Good afternoon, your Honor.
13    Salman Khan on behalf of Silver Point Capital.
14              THE COURT:  Okay.  You need to speak in the
15    microphone, and you need to spell your name.
16              THE CLERK:  And could you spell your --
17              MR. KHAN:  It's --
18              THE CLERK:  -- for us?
19              MR. KHAN:  -- S-a-l-m-a-n K-h-a-n.
20              THE COURT:  Okay.  And on behalf of the other
21    bidder.
22              MR. DAVIS:  George Davis of Weil, Gotshal & Manges
23    on behalf of Compass Partners.
24              THE COURT:  Okay.  All right.  So how we intend to
25    proceed and allow them -- I just want to go over it in case
```

1   I'm wrong in any regard -- is the stalking-horse bid has

2   been made.

3       Oh, what is that number now?

4           MR. MEROLA:  Fifty-seven-five, your Honor.

5           THE COURT:  Is --

6           MR. WATERMAN:  No.

7           MR. MEROLA:  I'm sorry.  The stalking-horse bid

8   was --

9       (Colloquy not on the record.)

10          UNIDENTIFIED SPEAKER:  Forty-six-and-five.

11          MR. MEROLA:  -- forty-six-five.

12          THE COURT:  Well, I need to know that number

13  reduced by all your mathematical permutations.

14      (Colloquy not on the record.)

15          MR. WATERMAN:  Your Honor, the stalking-horse bid

16  of Silver Point was $46,550,000 plus a stream of payments.

17          THE COURT:  I understand that, but you have a

18  formula in here for reducing the bid based upon --

19          MR. MEROLA:  Per the payouts.

20          THE COURT:  -- where we stand today.

21          MR. MEROLA:  Yes, your Honor.

22          THE COURT:  That's the number I'm trying to find.

23          MR. MEROLA:  46,000,000.

24          THE COURT:  Okay.  46,000,000.

25      Thank you.

1          MR. MEROLA:  Okay.  46,000,000 was Silver Point.

2    Compass is at a total of fifty-seven-five.  The bid is to

3    Desert.  They have 20 minutes.

4          THE COURT:  Okay.  Thank you.  So what will happen

5    next is Desert -- Compass' bid has been made -- I'm sorry.

6    Mr. Davis.

7          MR. DAVIS:  I'm sorry, your Honor.  I would just

8    like one point of clarification.  We have not seen any of

9    the amended APAs by any of the other bidders.

10       What I'd like is a representation from those who have

11   seen it that there are no material differences between

12   these, our purchase agreement which I understand is,

13   essentially, the model that the others are bidding off of

14   and those that they have negotiated, because I think that

15   might -- yeah.  I think it's important to know that we're

16   working --

17         THE COURT:  Exactly.

18         MR. DAVIS:  -- from the same agreement.

19         THE COURT:  And that was what I understood in the

20   beginning.

21       (Colloquy not on the record.)

22         THE COURT:  But let's have that representation by

23   each of the bidders I had Mr. Merola --

24         MR. MEROLA:  Right.  And the good --

25         THE COURT:  -- make of that.

1          MR. MEROLA:  The bad news is that to do this we

2     broke into teams, so none of us have seen all of them.

3          THE COURT:  Okay.

4          MR. MEROLA:  So --

5          THE COURT:  But from Silver Point's standpoint and

6     from Capital's standpoint is that you are understanding your

7     agreement is substantially similar to the Compass/Point

8     agreement.

9          MR. MEROLA:  And we worked with Silver Point.  So

10    the form of their agreement, they have some definitions and

11    schedules, but it doesn't change the substance.

12         THE COURT:  Go ahead and make that representation

13    if you would.

14    (Colloquy not on the record.)

15         MR. McCARROLL:  Thank you, your Honor.

16    James McCarroll on behalf of Silver Point.  It is our

17    understanding that our asset purchase agreement is

18    substantially similar to Compass'.

19    As Mr. Merola noted, we did make some definitional

20    changes that we have run by Mr. Merola's committee and the

21    debtors, and we believe all parties are in agreement that

22    they certainly in no way harm any parties in interest.

23         THE COURT:  Okay.

24         MR. MEROLA:  And while we have counsel up here, I

25    would like the agreement of the bidders that we can share

1    the draft agreements across the bidding parties.

2        We're not going to disseminate them widely, but people

3    should be able to see them and know what they're bidding

4    against.

5            MR. McCARROLL:  Silver Point agrees.

6            THE COURT:  Okay.

7        (Colloquy not on the record.)

8            THE COURT:  And, Capital, I need a representation

9    from Capital that their agreement --

10       (Colloquy not on the record.)

11           THE COURT:  They're agreeing to the Compass Point

12   agreement in a substantially-similar form.

13           MR. CONNOP:  Yes, your Honor.  We were working

14   with the debtor from the basis of the Compass agreement.

15       (Colloquy not on the record.)

16           MR. CONNOP:  I understand that they are

17   substantially similar.  There were some clarifications made

18   which -- and I think the debtor indicated that, and the

19   debtor can correct me if I'm incorrect.

20       They did not want to include a 363(m) finding as a

21   condition to the order.  We will bid on that assumption.  We

22   will also bid on the assumption that in Section 8.2 of the

23   Compass agreement --

24       (Colloquy not on the record.)

25           THE COURT:  Well, but --

```
1              MR. CONNOP:  Should I --

2              THE COURT:  But the 363(m) --

3              MR. CONNOP:  -- get into that?

4              THE COURT:  -- only applies to Capital.  Is that

5    fair to say?  You're acknowledging that everybody else can

6    ask for that 363(m).

7              MR. CONNOP:  We understand that that's included

8    for the other --

9              THE COURT:  Okay.

10             MR. CONNOP:  -- two bidders.  That is not to

11   say --

12             THE COURT:  Thank you.

13             MR. CONNOP:  -- we won't try to --

14             THE COURT:  Exactly.

15             MR. CONNOP:  -- urge that.

16             THE COURT:  I understand that.

17        (Colloquy not on the record.)

18             MR. CONNOP:  There was a clarification to

19   Section 9.1H to add in the event of a general

20   service-agreement MAC (phonetic) or what they've called a

21   Big MAC (phonetic) that on two days if -- in the event of

22   that, two days after the notification, the bidder's deposit

23   would be returned.

24        (Colloquy not on the record.)

25             MR. CONNOP:  Also, Section 9.1K is deleted from
```

1  Section 8.2 which would then provide that, in essence, if a

2  final order is not entered by the outside approval date that

3  the bidder's deposit will be returned.

4          THE COURT:  Okay.  But, everybody, the dates all

5  stayed the same in all these contracts --

6          MR. MEROLA:  The closing dates --

7          THE COURT:  -- et cetera, correct?

8          MR. MEROLA:  -- stay the same.

9          MR. WATERMAN:  Yes.

10          THE COURT:  Okay.

11          MR. MEROLA:  The definition of assets is the same.

12          THE COURT:  Okay.  Any other comments, Mr. Davis?

13          MR. DAVIS:  Your Honor, I really don't want to

14  delay the auction at all, but what I would suggest is that

15  someone who has access to a computer blackline both of the

16  agreements as they have been agreed to against our agreement

17  and as quickly as possible disseminate them here, so that we

18  can confirm that there are no material changes before the

19  conclusion of the auction.

20          THE COURT:  Is that all right, acceptable to

21  everyone?  Can you --

22          MR. MEROLA:  The question is --

23          THE COURT:  -- do that?

24          MR. MEROLA:  -- how we're going to do it.

25      (Colloquy not on the record.)

```
 1              THE COURT:  There a wireless here.  I'll let you
 2    use our printer.  We've got wireless in the courtroom.
 3    E-mail it to my deputy.
 4         (Colloquy not on the record.)
 5              THE COURT:  And we could print it here.
 6              MR. MEROLA:  Excuse me.
 7         (Colloquy not on the record.)
 8              MR. MEROLA:  Can --
 9              THE COURT:  That --
10              MR. MEROLA:  Can I --
11              THE COURT:  -- will work.
12              MR. MEROLA:  Can I use your phone connection?
13              THE COURT:  Sure.
14         (Colloquy not on the record.)
15              MR. MEROLA:  Ms. Pajak, are you there?
16         (Colloquy not on the record.)
17              MR. MEROLA:  Oh, okay.
18              THE CLERK:  Oh, it's listen only.
19              MR. MEROLA:  Okay.
20         (Colloquy not on the record.)
21              THE COURT:  So why don't you -- do you want to
22    take ten minutes before we -- we won't count this as the bid
23    time.  Do you want to take ten minutes just to straighten
24    these little issues out?
25         (Colloquy not on the record.)
```

1          THE COURT:  I see everybody's a little bit nervous

2    about these things.  I'd rather have everybody, you know, be

3    allayed as to your concerns.

4         (Colloquy not on the record.)

5          THE COURT:  We'll take ten minutes.  This does not

6    count as the bid.  We will recommence the technical auction

7    when we come back.

8         (Colloquy not on the record.)

9          THE COURT:  And, well, I will, in essence, declare

10   the first auction as not having started.  We'll start the

11   auction when we come back just so it's clear.

12        (Colloquy not on the record.)

13         THE COURT:  And feel free to use our --

14        (Colloquy not on the record.)

15         THE COURT:  Anything we can do?  I saw Vicky

16   (phonetic) lurking here someplace, so --

17          THE CLERK:  No.  I'll call (indiscernible).

18          THE COURT:  There she is in the back.  Okay.  So

19   our IT people are here.  Feel free to use --

20          MR. MEROLA:  Thank you --

21          THE COURT:  -- out computers --

22          MR. MEROLA:  -- your Honor.

23          THE COURT:  -- et cetera.

24        (Colloquy not on the record.)

25          THE CLERK:  All rise.

1          (Recess at 01:59:40 p.m.)

2          (Court reconvened at 03:01:47 p.m.)

3              THE CLERK:  Bankruptcy court is now in session.

4          (Colloquy not on the record.)

5              THE COURT:  Be seated.  Okay.  All right.  Let's

6     have the appearances of the bidder's agents again, so that

7     we can have the auction all in one portion in our various

8     transcripts.

9              MR. CONNOP:  Good afternoon, your Honor.

10    Thomas Connop, Locke, Liddell & Sapp, LLP, representing

11    Desert Capital REIT.

12             MR. McCARROLL:  Good afternoon, your Honor.

13    James McCarroll of Reed Smith, LLP, on behalf of

14    Silver Point Capital, the stalking-horse bidder.

15             MR. DAVIS:  Good afternoon, your Honor.

16    George Davis of Weil, Gotshal & Manges on behalf of Compass

17    Partners.

18             THE COURT:  Okay.  So I understand, is this a true

19    or false statement?  That the document which was entitled

20    redline agreement dated -- purchase agreement dated as of

21    December blank that I have been handed is the agreement that

22    all the bidders are working from and the bids are to be

23    measured from?

24             UNIDENTIFIED SPEAKER:  No.

25             THE COURT:  Is that a true statement or not?

1              MR. MEROLA:  No.

2              THE COURT:  No.

3              UNIDENTIFIED SPEAKER:  No.

4              THE COURT:  Okay.

5              MR. MEROLA:  That is a redline of the difference

6    between the Compass and the Silver Point bids.

7              THE COURT:  All right.

8              MR. MEROLA:  We could not do a redline of the

9    Consolidated because we literally interlineated it in the

10   hour.

11       We're doing the agreement now.  We'll have a redline

12   available, but we've made the interlineated agreement

13   available to all the parties.

14             THE COURT:  Okay.  So that we know what

15   everybody's bidding from, each entity's bidding from their

16   own contract.

17             MR. MEROLA:  Yes.

18             THE COURT:  But the contracts are substantially

19   similar.

20             MR. MEROLA:  Substantially similar.

21             THE COURT:  All right.

22             MR. MEROLA:  Okay.  The bid is to Consolidated

23   Desert.

24             THE COURT:  Okay.  So, again, just so we can have

25   one transcript -- I'm sorry.

1      Mr. Davis had a comment first.

2           MR. DAVIS:  Just a quick clarification,

3  your Honor.  In reviewing the blackline of the Silver Point

4  agreement, there are certain changes that I view as being

5  clarifying changes that we would intend to make with respect

6  to our final APA once should we be the winning bidder, and

7  we execute an APA.  I view them all as clarifying.

8      And I assume to the extent that they're definitional

9  and otherwise clarifying, and they're acceptable in

10  Silver Point's APA it would likewise be acceptable in ours.

11           THE COURT:  Okay.

12      (Colloquy not on the record.)

13           MR. GORDON:  Your Honor, Gerald Gordon of Gordon &

14  Silver.  One last small modification to the Silver Point

15  that we agreed to with Silver Point.

16      There is a parenthetical under Commercial Mortgage

17  assets definition.  That parenthetical is going to be

18  deleted.

19           THE COURT:  Okay.  Now, just so that I'm clear on

20  the Compass --

21      (Colloquy not on the record.)

22           THE COURT:  -- there's a provision concerning the

23  exemption by November 27th from regulatory provisions.  Is

24  that a provision that's -- oh.  Yeah.  November 27th has

25  passed.  Has that either happened or are you willing to

```
1    waive that on Compass'?

2         (Colloquy not on the record.)

3            THE COURT:  I'm sorry.  Let me give you the page

4    number, article number.  Article 9.1K, it says, "Purchaser

5    shall actually obtain an exemption satisfactory no later

6    than November 27th."

7         (Colloquy not on the record.)

8            MR. DAVIS:  Excuse me, your Honor.  One second.

9         (Colloquy not on the record.)

10           MR. KARIDES:  Your Honor, I think you're looking

11   at our redline version.  That applied to us.

12           THE COURT RECORDER:  Your appearance, please,

13   Counsel.

14           MR. KARIDES:  Constantine Karides, Reed Smith --

15           THE COURT:  Okay.  I --

16           MR. KARIDES:  -- for Silver Point.

17           THE COURT:  All right.  All right.  Now, I'm

18   confused.  Is this redline agreement I have here the Compass

19   agreement redline to make Silver Point's now?

20           UNIDENTIFIED SPEAKER:  The other way.

21           MR. WATERMAN:  Other way.

22           THE COURT:  The other --

23           MR. KARIDES:  The other --

24           THE COURT:  -- way.

25           MR. KARIDES:  -- way around, yes.
```

1              THE COURT:  Okay.

2              MR. KARIDES:  That reflects --

3              THE COURT:  Well --

4              MR. KARIDES:  -- Silver Point's present form of an

5    APA that we would proceed on that is otherwise substantially

6    similar to the two competing bid versions.

7         (Colloquy not on the record.)

8              THE COURT:  Okay.  Well, then all right.  Have you

9    received your exemption?

10        (Colloquy not on the record.)

11             MR. KARIDES:  Yeah.  We're fine with that.

12             THE COURT:  Okay.

13        (Colloquy not on the record.)

14             THE COURT:  So I guess, conversely, have Compass

15   received the interim license or an exemption by

16   November 27th?

17             MR. MEROLA:  No.

18             MR. WATERMAN:  I don't think that's a condition of

19   the agreement, but (indiscernible).

20             MR. DAVIS:  Your Honor, that's a condition to

21   closing in our agreement.

22             MR. MEROLA:  Right.  It's at 9.2D in the Compass

23   agreement.

24        (Colloquy not on the record.)

25             MR. MEROLA:  And it reads, "By no later than the

1    closing date" --

2        (Buzzing sound in the recording.)

3        MR. MEROLA:  -- "purchaser shall have obtained the

4    interim license or exemption" --

5        THE COURT:  All right.  It's our stupid system.

6    Oh, it's your phone maybe?

7        MR. DAVIS:  Oh, sorry.  I thought this was off.

8    Sorry, your Honor.

9        THE COURT:  Okay.  Sometimes, the lectern does

10   that too sometimes.

11       MR. DAVIS:  Okay.  No.  This was on by accident.

12   Sorry.

13       THE COURT:  Okay.  All right.  So that we're clear

14   on everything, the document I have, purchase agreement --

15       MR. DAVIS:  Now mine's off, so that can't be me.

16   I don't know if anyone else's maybe?

17       THE COURT:  This purchase agreement, the redline,

18   is Silver Point's.  Okay.  The Desert one is the smaller

19   version that just says Desert on it, and the Compass one is

20   the one that we received yesterday?  Is that a fair

21   statement?

22       MR. DAVIS:  Correct, your Honor.

23       THE COURT:  Okay.  All right.

24       (Colloquy not on the record.)

25       THE COURT:  Before we start, let's have all these

1    clarifications.  You got ten minutes, everybody, to give me

2    all your last dribs and drabs on this before we start the

3    auction.

4              MR. WATERMAN:  Well, during the noon hour or just

5    before the start of the 1:30 session, the Compass agreement

6    as modified and signed was filed with the court.

7              THE COURT:  Okay.  So I don't physically have a

8    copy, but it's on file.

9              MR. DAVIS:  That's correct, your Honor.

10             THE COURT:  Okay.

11             MR. DAVIS:  When you said last night, we had

12   finished it last night.  That's the one I thought you were

13   referring to, but, yes --

14             THE COURT:  I received --

15             MR. DAVIS:  -- I think it was filed --

16             THE COURT:  -- one --

17             MR. DAVIS:  -- this morning.

18             THE COURT:  I received one yesterday, so there was

19   one --

20             MR. DAVIS:  Oh.

21             THE COURT:  -- since that time.

22             MR. DAVIS:  This one's since that time.

23             THE COURT:  Okay.

24        (Colloquy not on the record.)

25             MR. WATERMAN:  The one yesterday is the same,

1    except it is unsigned.

2            THE COURT:  Okay.

3            MR. CHARLES:  We needed to clarify one thing for

4    all the bidders.  There are two loans called Marquis and

5    Placer Vineyards that have accrued default interest and

6    servicing fees.

7        Essentially, what the bidders are bidding on for those

8    is those servicing fees and default interest that may accrue

9    after the closing of the sale.

10       So the dollars that accrue up through the closing of

11   the sale on Marquis and Placer Vineyards stay in the

12   Commercial Mortgage pot.  They may be collected later by the

13   buyer, but the right to those dollars stays in Commercial

14   Mortgage.

15       Accrued after the closing is the buyer's money, and I

16   think everyone wanted me to clarify that for the benefit of

17   all the bidders.

18           THE COURT:  Okay.

19       (Colloquy not on the record.)

20           MR. MEROLA:  Your Honor, while we're doing

21   housekeeping, on the docket, you'll notice filed in the last

22   24 hours at least by my firm and I think some of the other

23   professionals as the identity of buyers was made clear and

24   some of them have financing parties the professionals

25   employed on behalf of the State have filed additional

1  disclosures regarding unrelated representations in my case

2  of one of the financing parties that they're talking to.

3  But because we're asking for a good-faith finding, we're

4  trying to be very diligent on that.

5          THE COURT:  Okay.

6          MR. WATERMAN:  One other clarification to what

7  Mr. Charles just said, your Honor.  There is one Marquis

8  loan, and there are two Placer loans, so it's a total of

9  three loans, but two different --

10          THE COURT:  Okay.

11          MR. WATERMAN:  -- borrowers.

12          THE COURT:  Well, we're going to have the cleanest

13  house in the country.  Is there anything else before we

14  start this auction?

15      (Colloquy not on the record.)

16          THE COURT:  All right.  One more time, we're going

17  to start the auction.  We had the stalking-horse bidder at

18  46,000,000.  We have Compass at 57.5.  it's now up to

19  Capital --

20          MR. MEROLA:  Desert Capital.

21          THE COURT:  -- Desert Capital, to make a bid now

22  or in the next 20 minutes.

23      Do you have a bid?

24          MR. CONNOP:  Tom Connop for Desert Capital,

25  $58,000,000.

1          THE COURT:  Okay.  All right.  Silver Point is

2     next.

3          Thank you.

4          Do you wish to recess or do you wish to make a bid now?

5     You'll have 20 minutes.  The question is if you are prepared

6     to go forward we can keep moving.  If you'd like to the

7     time, we can take the time.

8          MR. KHAN:  We need a couple of minutes.

9          THE COURT:  All right.  Fine.  Do you want to --

10    you know, if at all -- it's a silly question, Eileen.  Where

11    does that exit door lead?  Does that lead to the

12    attorney-conference area?

13         (Colloquy not on the record.)

14         THE CLERK:  (Indiscernible).

15         THE COURT:  Okay.  If you would like to -- and if

16    any of the bidders would like to during your 20-minute time

17    just briefly step out there, you certainly may.  Now,

18    whether or not you can get back in, I have no idea.

19         THE CLERK:  No, Judge.  They keep it locked.

20         THE COURT:  So you'd have to, what, knock three

21    times or something --

22         (Colloquy not on the record.)

23         THE COURT:  -- or come in the front?

24         THE CLERK:  (Indiscernible).

25         (Colloquy not on the record.)

1          THE COURT:  Okay.  I just work here.  I don't

2    know.

3        (Colloquy not on the record.)

4          THE CLERK:  I received an E-mail from a

5    Bobby Chandry (phonetic).

6          MR. CONNOP:  Yes.

7          THE COURT:  Is there someone here that --

8          MR. CONNOP:  Yeah.

9          THE CLERK:  Should I go ahead and download this?

10         MR. CONNOP:  Yeah.  It's our APA --

11         THE CLERK:  I'm sorry?

12         UNIDENTIFIED SPEAKER:  Desert Capital's.

13       (Colloquy not on the record.)

14         MR. MEROLA:  It's their --

15         MR. CONNOP:  -- the final draft.

16         MR. MEROLA:  -- purchase agreement.

17       (Colloquy not on the record.)

18         MR. WATERMAN:  That's the Desert Capital --

19         THE CLERK:  Should I go ahead --

20         MR. WATERMAN:  -- asset purchase --

21         THE CLERK:  -- and print it out?

22         MR. WATERMAN:  -- agreement.

23         MR. MEROLA:  If you could, please.

24         MR. WATERMAN:  Is it --

25         MS. McCONNELL:  Yeah.

1            MR. WATERMAN:  -- redlined?

2            MS. McCONNELL:  No.  No.  It's clean.

3       (Colloquy not on the record.)

4            MR. WATERMAN:  I think only the redline, not the

5    clean.

6            THE CLERK:  Okay.

7       (Colloquy not on the record.)

8            MR. McCARROLL:  Your Honor, James McCarroll on

9    behalf of Silver Point.  I'll just note upon making this bid

10   I'll direct the Court's attention to Provision 4, Sub 5 of

11   the bid procedures that makes it clear that each bid by

12   Silver Point, each increased bid by Silver Point, will be

13   supplemented with the 1.5-million-dollar breakup-fee amount,

14   so on that basis, and that is the last sentence of

15   Section 4, Sub 5 of the bid procedures.

16           THE COURT:  Wait.

17      (Colloquy not on the record.)

18           MR. McCARROLL:  It reads --

19           THE COURT:  All right.  Why don't you make your

20   bid, and then I --

21           MR. McCARROLL:  Certainly, your Honor.  And just

22   to be clear, it reads, "For the avoidance of debt,

23   including, without limitation, in comparison to other

24   qualified bidders' increased bids, any increased bids

25   submitted by the stalking-horse bidder shall be calculated

1    as the amount actually bid by the stalking-horse bidder plus

2    the amount of the breakup fee."

3        THE COURT:  Okay.

4        MR. McCARROLL:  On that basis, Silver Point bids

5    56.6 million which is supplemented with the

6    1.5-million-dollar breakup-fee amount for a total amount of

7    58.1 million.

8        THE COURT:  Does anybody disagree with that

9    interpretation before we go to the next bid?

10        MR. WATERMAN:  The debtors agree with --

11        THE COURT:  All right.

12        MR. WATERMAN:  -- that interpretation.

13        THE COURT:  Thank you.  All right.

14      Does Compass wish to bid or do you wish to take time?

15        MR. DAVIS:  We'll bid, your Honor.  George Davis

16    on behalf of Compass Partners.  We bid 58.2 million.

17        THE COURT:  Okay.  Thank you.

18      Does Desert wish to bid or do you want to take time to

19    -- Desert Capital -- to consider your next bid?

20        MR. CONNOP:  Your Honor, Desert Capital bids

21    59,000,000.

22        THE COURT:  Okay.  Does Silver Point wish to bid

23    now or do you wish to take a short break?

24        MR. KHAN:  We'll bid.  On the same basis as --

25        THE COURT RECORDER:  I'm sorry.  You need to speak

1    into a microphone, please.

2              THE COURT:  Just --

3              MR. KHAN:  Oh.

4              THE COURT:  You can use that microphone.  You just

5    need to speak up, and I'll allow you just to be seated.

6    That's fine.

7              MR. KHAN:  On the same basis as our first bid,

8    we'll bid a total of 59.1 million.

9          (Colloquy not on the record.)

10             THE COURT:  Okay.  Does Compass wish to bid?

11             MR. DAVIS:  Yes, your Honor.  Compass bids 59

12   point -- oh, there we go -- 2 million.

13             THE COURT:  Does Desert Capital wish to bid?

14             MR. CONNOP:  Desert Capital bids 59.3 million.

15             THE COURT:  Um-h'm.  Does Silver Point wish to

16   bid?

17             MR. KHAN:  Yes, your Honor.  59.4 million.

18             THE COURT:  Does Capital wish to bid --

19             MR. DAVIS:  Yes, your Honor.

20             THE COURT:  -- Compass?  Excuse me.

21             MR. DAVIS:  Compass, 59 --

22             THE COURT:  I'm doing what Mr. Merola did.

23             MR. DAVIS:  Oh, that's okay.  59.5 million,

24   your Honor.

25             THE COURT:  Does Desert Capital wish to bid?

1            MR. CONNOP:  Your Honor, Desert Capital will bid

2    59.6.

3            MR. McCARROLL:  I'm sorry.  What was your bid?

4            MR. CONNOP:  59.6.

5            THE COURT:  Does Silver Point wish to bid?

6            MR. KHAN:  Yes, your Honor.  59.7.

7            THE COURT:  Does Compass wish to bid?

8            MR. DAVIS:  Yes, your Honor.  59.8 million.

9            THE COURT:  Does Desert REIT, Desert, wish to bid,

10   Desert Capital?  Sorry.

11           MR. CONNOP:  Yes, your Honor.  Desert Capital will

12   bid 60,000,000.

13           THE COURT:  Does Silver Point wish to bid?

14           MR. KHAN:  Yes, your Honor.  60.1.

15           THE COURT:  Does Compass wish to bid?

16           MR. DAVIS:  Yes, your Honor.  60.2.

17           THE COURT:  Does Desert Capital wish to bid?

18           MR. CONNOP:  Your Honor, Desert Capital -- pardon

19   me.  Desert Capital builds (sic) -- bids 60.3 million.

20           THE COURT:  Does Silver Point wish to bid?

21           MR. KHAN:  Yes, your Honor.  Silver Point's bid is

22   60.4 million.

23           THE COURT:  Does Compass wish to bid?

24           MR. DAVIS:  Yes, your Honor.  Compass bids

25   60.5 million.

```
 1              THE COURT:  Hopefully, we're going too fast for
 2   you Mr. Merola.
 3              MR. MEROLA:  Well --
 4              THE COURT:  No?
 5              MR. MEROLA:  -- when I write --
 6              THE COURT:  We're fine?
 7              MR. MEROLA:  -- no one can read it, anyway, so --
 8              THE COURT:  Okay.  So you've got it?  60.5 is what
 9   I'm up to.  Okay.  All right.  And that was by --
10              THE CLERK:  Compass.
11              MR. DAVIS:  Compass.
12              THE COURT:  Compass.
13         Does Desert Capital wish to bid?
14         (Colloquy not on the record.)
15              MR. CONNOP:  Yes, your Honor.  Desert Capital bids
16   60.6.
17              THE COURT:  Does Silver Point wish to bid?
18              MR. KHAN:  Yes, your Honor.  Silver Point bids
19   60.7.
20              THE COURT:  Does Compass wish to bid?
21              MR. DAVIS:  Yes, your Honor.  Compass bids
22   60.8 million.
23              THE COURT:  And I have no objection if the parties
24   that are bidding be seated because it's more important we
25   have a good record with the microphones at your mouth, so
```

1   that's not a problem at all.

2               MR. DAVIS:  Okay.

3               THE COURT:  Desert Capital, does it wish to bid?

4               MR. CONNOP:  Yes, your Honor.  Desert Capital bids

5   60.9 million.

6               THE COURT:  And Silver Point?

7               MR. KHAN:  Yes, your Honor.  61.0.

8               THE COURT:  And Compass?

9               MR. DAVIS:  61.1, your Honor.

10              THE COURT:  And Desert Capital?

11              MR. CONNOP:  Your Honor, Desert Capital bids 61.2.

12              THE COURT:  And Silver Point?

13              MR. KHAN:  Yes, your Honor.  61.3.

14              THE COURT:  And Compass?

15              MR. DAVIS:  Your Honor, 61.4.

16              THE COURT:  And Desert Capital?

17              MR. CONNOP:  61.5, your Honor.

18              THE COURT:  And Silver Point?

19              MR. KHAN:  61.6, your Honor.

20              THE COURT:  And Compass?

21              MR. DAVIS:  61.7.

22              THE COURT:  And Desert Capital?

23              MR. CONNOP:  61.8, your Honor.

24              THE COURT:  Silver Point?

25              MR. KHAN:  61.9, your Honor.

```
 1                THE COURT:  Compass?

 2                MR. DAVIS:  62,000,000, your Honor.

 3                THE COURT:  And Desert?

 4                MR. CONNOP:  62.1, your Honor.

 5                THE COURT:  Silver Point?

 6                MR. KHAN:  Your Honor, we would request a

 7    20-minute recess.

 8                THE COURT:  Okay.  You've got it, so we'll recess

 9    -- I mean, we'll start --

10        (Colloquy not on the record.)

11                THE COURT:  -- no later than --

12        (Colloquy not on the record.)

13                THE COURT:  Let's see.  That's about 3:15.

14        (Colloquy not on the record.)

15                THE COURT:  What time is it?  So we'll say --

16    3:15 -- about 25 of.  By according to that clock at 25 of.

17                MR. KHAN:  Okay.

18        (Colloquy not on the record.)

19                MR. WATERMAN:  Or --

20                THE COURT:  Who knows if that's the real time --

21                MR. WATERMAN:  Or --

22                THE COURT:  -- or not.

23                MR. WATERMAN:  Or sooner if they're ready.

24                THE COURT:  I'm sorry?

25                MR. WATERMAN:  Or sooner if they're ready.
```

```
 1            THE COURT:  Or sooner if you're ready, yes.

 2    Please let us know if you're ready.

 3            MS. CARLYON:  Thank you, your Honor.

 4         (Colloquy not on the record.)

 5            THE CLERK:  All rise.

 6         (Recess at 03:18:55 p.m.)

 7         (Court reconvened at 03:29:54 p.m.)

 8            THE CLERK:  All rise.

 9         (Colloquy not on the record.)

10            THE CLERK:  Bankruptcy court is now in session.

11         (Colloquy not on the record.)

12            THE COURT:  Be seated.  Okay.

13        Silver Point.

14            MR. KHAN:  Your Honor, Silver Point bids 63.1

15    million.

16            THE COURT:  Thank you.

17         (Colloquy not on the record.)

18            THE COURT:  Compass.

19         (Colloquy not on the record.)

20            THE COURT:  Oh, we lost our Compass.

21            UNIDENTIFIED SPEAKER:  It looks like --

22            MR. BLATT:  I'll --

23            UNIDENTIFIED SPEAKER:  It's okay.  We can --

24            THE COURT:  Yeah.  We can go --

25         (Colloquy not on the record.)
```

```
 1                THE COURT:  Oh, if you want to go ahead, that's
 2     fine.
 3                MR. BLATT:  That's fine.
 4                THE COURT:  If you want to go --
 5                UNIDENTIFIED SPEAKER:  We would --
 6                MR. BLATT:  Compass will bid 65.
 7                THE COURT:  H'mm, everybody must have flights to
 8     catch.
 9                UNIDENTIFIED SPEAKER:  Touche.
10         (Colloquy not on the record.)
11                THE COURT:  Better hurry today because the rodeo's
12     in town, and it's hard to get out of town today, so --
13                MR. MEROLA:  Yeah.  Right.
14                THE COURT:  Capital REIT?
15                MR. CONNOP:  Your Honor, we'd like five minutes.
16                THE COURT:  I couldn't hear you.
17                MR. CONNOP:  I'm sorry.
18                MR. MEROLA:  Five minutes.
19                MR. CONNOP:  We'd like five minutes.
20                THE COURT:  Fine.  All right.
21         (Colloquy not on the record.)
22                THE COURT:  Is it easier if I go off the bench?
23     It probably is.  It gives everybody a chance.  Do you need
24     the time?
25                MR. CONNOP:  We'll try --
```

1           MR. MEROLA:  I think we're (indiscernible).

2           MR. CONNOP:  We'll try to be brief.

3      (Colloquy not on the record.)

4           MS. CARLYON:  As a matter of fact, I think it

5  would be very helpful if we had permission to use the cells

6  and the BlackBerrys when court is not in session --

7           THE COURT:  Oh, sure.

8           MS. CARLYON:  -- in this room.

9      Thank you, your Honor.

10          THE COURT:  Yeah.  That's fine.  Well, we only

11  care as long as they're off when we're in session.  Okay.

12  So we'll take a recess.  It's probably easier.

13     (Colloquy not on the record.)

14          THE CLERK:  All rise.

15          THE COURT:  Just let us know when you're ready.

16     (Colloquy not on the record.)

17          THE COURT:  And the time on that is 3:30.  10 of.

18  No.  About 15 of.

19     (Colloquy not on the record.)

20          THE COURT:  Sorry.  About 10 of.

21     (Recess at 03:31:22 p.m.)

22     (Court reconvenes at 03:44:07 p.m.)

23          THE CLERK:  Bankruptcy court is now in session.

24     (Colloquy not on the record.)

25          THE COURT:  Be seated.  All right.

1        I believe we left at Desert Capital; is that correct?

2              MR. CONNOP:  Yes, your Honor.  Desert Capital bids

3    65.5 million.

4              THE COURT:  Silver Point?

5              MR. KHAN:  Your Honor, we ask for a short recess.

6              MR. MEROLA:  Your Honor --

7              THE COURT:  Okay.

8              MR. MEROLA:  Your Honor, before we begin that

9    recess on the clock, at this point, the committees and the

10   debtor will be requesting that Desert and Compass increase

11   their deposits.

12       The original negotiation for the deposit was for a

13   ten-percent.  And at these levels, we have exceeded the

14   amount of the deposit.

15       Also, in the off period, we'll be discussing with each

16   of the parties certain nonmonetary issues we want changed in

17   the form of agreements to assure certainty at closing.

18              THE COURT:  All right.

19              MR. MEROLA:  Thank you.

20              THE COURT:  I mean, I hear what you're saying --

21              MR. MEROLA:  I --

22              THE COURT:  -- when I say all right.

23       (Colloquy not on the record.)

24              MR. MEROLA:  I can't --

25              THE COURT:  Okay?

1          MR. MEROLA:  I can't make them agree.  I can only

2     ask.

3          THE COURT:  Okay.  All right.  So did you want to

4     take that recess before the clock starts running --

5          MR. MEROLA:  We won't start --

6          THE COURT:  -- on their bid?

7          MR. MEROLA:  -- the 20 minutes on Silver Point

8     until we -- we're going to go to the attorney lounge and

9     talk to all three groups at once.

10          THE COURT:  Okay.  Fine.

11      (Colloquy not on the record.)

12          THE COURT:  Okay.  Thank you.

13          THE CLERK:  All rise.

14      (Colloquy not on the record.)

15          THE COURT:  You know, I have some ministerial

16     matters I need to discuss just on some hearings coming up.

17     If the parties who aren't involved in that could stay, and

18     we could at least resolve some --

19          MR. MEROLA:  I think --

20          THE COURT:  -- of those issues.

21          MR. MEROLA:  -- we'll go to the courtroom, and

22     then we'll tell someone on your staff when the

23     20 minutes starts.

24          THE COURT:  Okay.  That's fine.

25          MR. MEROLA:  Okay?

1          THE COURT:  But in the meantime, I can take care

2     of the housekeeping matters with the people who are

3     involved.  It's just on timing on objection --

4          MR. MEROLA:  Thank you.

5          THE COURT:  -- to claim and things like that.

6       (Colloquy not on the record.)

7          THE COURT:  So I guess somebody from the debtor's

8     side.  Ms. McPherson can -- I just have a question,

9     Mr. Gordon, just one representative, whoever's not needed

10    over there, just a couple of housekeeping questions I've

11    got, not on the bids.

12      (Colloquy not on the record.)

13         THE COURT:  Everybody can -- well, I'll just wait

14    here 'til we start that.  So at least, we can accomplish

15    that, so we're not keeping everybody later.

16         MS. CARLYON:  Second string or (indiscernible),

17    your Honor?

18         THE COURT:  The second shift.

19      (Colloquy not on the record.)

20         THE COURT:  The questions I have is on that motion

21    to seal the direct lenders, and then I also have Ms. Scann's

22    order shortening time.  At least, we can talk about the way

23    we're going to proceed on the 15th --

24         UNIDENTIFIED SPEAKER:  Okay.

25         THE COURT:  -- that's all --

```
1              UNIDENTIFIED SPEAKER:  Okay.

2              THE COURT:  -- just some housekeeping things.

3         (Colloquy not on the record.)

4              THE COURT:  So if everybody else that's not going

5    to be in this, I'm going to conduct some hearings while

6    you're doing that and not related to the auction, just some

7    housekeeping matters.

8         (Colloquy not on the record.)

9              THE COURT:  What I might suggest is if we divide

10   the auction transcript.  Would that work?  Does that work,

11   Helen, that you can start --

12             THE COURT RECORDER:  Sure.

13             THE COURT:  -- a different transcript, so that

14   they've got all the auction at once?

15             THE COURT RECORDER:  I can do that, your Honor.

16             THE COURT:  And, of course, the certified reporter

17   can do what she wants.

18        (Colloquy not on the record.)

19        (Thereupon, the housekeeping transcript commenced

20        at 03:46:45 p.m.)

21             THE COURT:  Okay.  There's the housekeeping

22   questions I had, and the rest of you could go, whomever.

23   I --

24             MR. STRONG:  Yes, your Honor.

25             THE COURT:  There was --
```

1           MR. STRONG:  Steven Strong from Ray, Quinney.

2           THE COURT:  Oh, good.  Thank you.

3      Somebody had submitted a motion to seal the motion

4  concerning the amounts of direct lenders.  I certainly agree

5  that the amount that any direct lender has is something that

6  should be sealed because it lists the amount of their

7  investment, and that's a privacy issue.  The question is why

8  are we even filing it in the first place.  That's the only

9  question I had.

10          MR. STRONG:  The reason for filing it was so

11 your Honor would have that information in case you wanted to

12 refer to it.

13     The direct lenders have each received or will receive

14 very shortly a separate sheet that shows their loans and the

15 loan-servicing percentage relating to their loans.

16     And I think it's a monthly accrual of the

17 loan-servicing fee.  And so rather than mailing them the

18 entire list, we filed, initially, a summary.

19          THE COURT:  Okay.  So --

20          MR. STRONG:  And then the full list is filed under

21 seal whereas each direct lender will receive only one page.

22          THE COURT:  Okay.  So there may be a need for it

23 is what you're saying.

24          MR. STRONG:  In case your Honor would like to

25 refer to it and if it becomes relevant at some point, and we

1    have also I believe produced the full list --

2              MR. GARMAN:  Yeah.

3              MR. STRONG:  -- to the committees.

4              THE COURT:  Okay.

5              MR. GARMAN:  Your Honor, this came up because when

6    we drafted the plan -- Greg Garman on behalf of the Direct

7    Lenders Committee.

8         When we drafted the plan, it was contemplated that the

9    direct lenders' supplement would contain a single schedule

10   that would be mailed to all direct lenders which would

11   identify the loan-service fee that was being charged against

12   them, so that they could object to it.  To be consistent

13   with the terms of the plan, that schedule still needs to

14   exist.

15             THE COURT:  Okay.

16             MR. GARMAN:  However, the parties got together and

17   determined that instead of sending everyone's information to

18   all direct lenders we would create one schedule, remain

19   consistent with the plan, file it with the court, distribute

20   it among the committees, and then each individual direct

21   lender would get an individual schedule --

22             THE COURT:  Okay.

23             MR. GARMAN:  -- pursuant --

24             THE COURT:  Okay.

25             MR. GARMAN:  -- to which they --

1          THE COURT:  All right.

2          MR. GARMAN:  -- get objected.

3          THE COURT:  So I'll sign that order.  I certainly

4     agree for privacy concerns that everybody -- you know,

5     because we see that people mine the Internet and get

6     information.

7          MR. GARMAN:  Right.

8          THE COURT:  So I don't have a problem with that.

9     It's just why should it even be filed.  That's all.

10         MR. STRONG:  And, also, for mailing costs.

11         THE COURT:  Sure.

12         MR. STRONG:  That would have been a huge --

13         THE COURT:  Exactly.

14         MR. STRONG:  Yeah.

15         MR. JUDD:  If I may for a moment?  Spencer Judd

16    with Albright, Stoddard, Warnick & Albright.  We represent a

17    number of direct lenders.

18      I have not seen any mechanism for those direct lenders

19    that dispute.  Some of those have already gone out with the

20    list of the percentage of the servicing fees that are going

21    to be assessed which they dispute, and I haven't seen any

22    mechanism for them to dispute that.  Is there something

23    contemplated --

24         THE COURT:  I think you --

25         MR. JUDD:  -- for them?

1          THE COURT:  -- can deal with that with them.  The

2     only question I have -- I mean, I'm not suggesting that

3     there shouldn't be a mechanism.

4        I'm just saying that my only concern was just whether

5     or not that document should be even sealed, and that was the

6     order before me.

7        So I think that's a good question, but it's something I

8     can't answer today, and I think you need to either get an

9     answer from counsel.  And if you need to file a motion, file

10    a motion.

11             MR. JUDD:  Great.

12             THE COURT:  Okay?

13             MR. STRONG:  Thank you --

14             THE COURT:  Thank you.

15             MR. STRONG:  -- your Honor.

16             THE COURT:  And then the other issue was just on

17    objections to claims.  We had set the hearing on the 15th

18    for telephonic, originally, because we thought we'd need to

19    clean some things up.  Unfortunately, people who filed --

20    unfortunately.

21        There's been a need for people to file an order

22    shortening time on things like objections to claims and

23    rights to vote.

24             MR. STRONG:  Right.

25             THE COURT:  It seems to me the only day we can set

1    those hearings is for the 15th.

2              MR. STRONG:  Yeah.  And we're happy to agree to

3    that.  We hadn't finished our internal discussions, but the

4    only question there was whether we should have that hearing

5    after the vote comes in and the tally is known to know

6    whether some of these things are relevant or not or whether

7    we should proceed on the 15th, and --

8              THE COURT:  Well, do you want to then move that to

9    the 18th?

10             MS. CARLYON:  This is Candace Carlyon on behalf of

11   the First Trust Deed Fund Committee.  I had had some

12   discussions with Susan Scann who I think has the largest or

13   one of the largest issues --

14             THE COURT:  Um-h'm.

15             MS. CARLYON:  -- relative to estimation, and the

16   discussion was in the nature of permitting a vote, hold in

17   abeyance the issue of whether it needs to be estimated, or

18   whether it won't make a difference.  And, in fact, it seems

19   very possible that it won't make a difference.

20        We will not have until the Monday after the 15th the

21   tabulation.  What makes sense to me is I don't know if the

22   Judge has any time prior to confirmation to take it up.

23        If necessary, that we can reserve or if it makes sense

24   just to hold this issue in abeyance to see whether it makes

25   a difference knowing that if we go through the confirmation

1    process, and there's a swing in the vote that we'll need to

2    face the estimation issue.

3              THE COURT:  So do you think I should go ahead and

4    -- we have the 15th reserved for the -- now, I had said it's

5    telephonic.

6         Do you think we should move that to the 18th or --

7    well, we don't have all the parties here.  Let's go ahead

8    and put her motions on for the 15th.  If it makes --

9              MS. CARLYON:  For a --

10             THE COURT:  For a status.

11             MS. CARLYON:  For a status.

12             THE COURT:  If it makes sense then to defer it to

13   the 18th, we can set that hearing.

14             MS. CARLYON:  Your Honor, that makes a lot of

15   sense to set it for the 15th for a status --

16             THE COURT:  Okay.

17             MS. CARLYON:  -- to see whether the parties feel

18   that we need to go forward with estimation or whether by the

19   18th at noon that we're supposed to get the report.

20             THE COURT:  Okay.

21             MS. CARLYON:  And it will take us awhile to digest

22   it to know whether those votes will make a swing in the

23   tabulation.

24             THE COURT:  Okay.  Fine.  All right.  So I'll do

25   that.  I'll sign the order in that regard.  And at the

1    conclusion of this hearing, just talk among yourselves

2    about --

3         (Colloquy not on the record.)

4         THE COURT:  Well, we'll keep the 15th for a

5    telephonic.  We now have a system by which attorneys can

6    participate by phone.

7        Normally, I don't like anything that's argued on the

8    phone because it's too hard to hear.  But in this case to

9    reduce the expense, and I said it would be telephonic, we

10   could do a telephonic on the 15th if it's just especially

11   going to be a status, so that's certainly an option --

12        MS. CARLYON:  I --

13        THE COURT:  -- because this Court Call system

14   allows phone participation, right?  I mean, you can more

15   than listen in.  You can talk --

16        MR. CHARLES:  Exactly.

17        THE COURT:  -- or listen in?

18        MR. CHARLES:  Rob Charles.  In the Delphi case,

19   there were I believe 1,000 on the phone and probably

20   20 spoke, and then the rest -- when you register, you can

21   register to talk or just to listen.

22        THE COURT:  Okay.  Good.  All right.  So we'll

23   keep that for the 15th for a listen.

24        MS. CARLYON:  Thank you.  I think having that

25   option makes a lot of sense.

```
 1                THE COURT:  I mean a telephonic.  Okay.  Great.
 2                MS. CARLYON:  Thank you.
 3                MR. STRONG:  Okay.  We agree, your Honor.
 4                THE COURT:  All right.  Thanks.
 5                MR. STRONG:  Thank you.
 6                THE COURT:  Those are the housekeeping issues --
 7                MS. CARLYON:  And --
 8                THE COURT:  -- I had.
 9                MS. CARLYON:  And it's my assumption people do not
10      need to make a particular request to appear by phone, then,
11      for the 15th because you've already told them they could.
12                THE COURT:  That's right.
13                MS. CARLYON:  Thank you very much, your Honor.
14                MR. STRONG:  Thank you.
15                THE COURT:  Okay.  Those are the housekeeping
16      issues I had.
17           (Thereupon, the housekeeping transcript
18           concluded at 03:52:42 p.m.)
19                MR. MEROLA:  Their 20 minutes starts now,
20      your Honor.
21                THE COURT:  Okay.  Thank you.
22           (Colloquy not on the record.)
23                THE COURT:  So at ten after we'll -- I'm sorry.
24      And we had left off with?
25                MR. MEROLA:  Silver Point.
```

149

```
 1            THE COURT:  Silver Point was next; is that
 2    correct?
 3            MR. MEROLA:  Yes.
 4            THE COURT:  Okay.
 5        (Colloquy not on the record.)
 6            THE COURT:  So at no later than ten after, we'll
 7    recommence.
 8        (Colloquy not on the record.)
 9            THE COURT:  All right.
10            THE CLERK:  All rise.
11        (Recess at 03:53:00 p.m.)
12        (Court reconvened at 04:06:19 p.m.)
13            THE CLERK:  Bankruptcy court is now in session.
14        (Colloquy not on the record.)
15            THE COURT:  Be seated.  Okay.
16        (Colloquy not on the record.)
17            THE COURT:  And we were at --
18            MR. MEROLA:  Silver Point, your Honor.
19            THE COURT:  -- Silver Point.  Okay.
20        (Colloquy not on the record.)
21            THE COURT:  All right.
22        (Colloquy not on the record.)
23            MR. McCARROLL:  Yes, your Honor.  Silver Point
24    passes preserving its right to rejoin the bidding.
25        (Colloquy not on the record.)
```

1          MR. MEROLA:  Under the bid procedures, a pass --

2          THE COURT RECORDER:  I'm sorry --

3          MR. MEROLA:  -- does not --

4          THE COURT RECORDER:  -- Counsel.  You need to

5    speak --

6          MR. MEROLA:  I'm sorry.

7          THE COURT RECORDER:  -- into the microphone.

8          MR. MEROLA:  Under the bid procedures, a pass is

9    not a withdrawal.

10         THE COURT:  Okay.  Originally, it was, wasn't it?

11         MR. MEROLA:  It was, and your Honor asked us to

12   change it.

13         THE COURT:  All right.  Good.

14     (Colloquy not on the record.)

15         THE COURT:  Well, when I reread it, I thought, oh,

16   they didn't change it.  All right.  You did.  Okay.

17     Compass.

18         MR. BLATT:  Compass bids -- where are we?

19         UNIDENTIFIED SPEAKER:  We're at --

20         UNIDENTIFIED SPEAKER:  Sixty-five-five.

21         UNIDENTIFIED SPEAKER:  -- sixty-five-five.

22         MR. BLATT:  66.

23         THE COURT RECORDER:  And I'm sorry, Counsel.  Will

24   you give your name for the record?

25         MR. BLATT:  David Blatt of Compass Partners, and

1    we bid 66,000,000.

2                    THE COURT:  Okay.

3                    THE COURT RECORDER:  Thank you.

4                    THE COURT:  Capital.

5         (Colloquy not on the record.)

6                    MR. CONNOP:  Your Honor, Desert Capital bids

7    66,250,000.

8                    THE COURT:  So it now goes back to Compass,

9    correct?

10                   UNIDENTIFIED SPEAKER:  No.  No.

11        (Colloquy not on the record.)

12                   MR. MEROLA:  No.

13                   MR. BLATT:  It's --

14                   MR. MEROLA:  Silver Point.

15                   MR. BLATT:  It was --

16                   THE COURT:  Silver Point.  That was a dumb idea.

17   I wonder whose idea that was.

18        (Colloquy not on the record.)

19                   MR. MEROLA:  It wasn't mine.

20                   MR. McCARROLL:  Your Honor, James McCarroll for

21   Silver Point.  Silver Point passes preserving its right to

22   rejoin the bidding.

23        (Colloquy not on the record.)

24                   THE COURT:  Compass.

25                   UNIDENTIFIED SPEAKER:  Wait a minute.

1          (Colloquy not on the record.)

2               MR. DAVIS:  Your Honor, may we have a minute,

3     please?

4               THE COURT:  Yes.

5          (Colloquy not on the record.)

6               THE COURT:  Would you like to take your 20 minutes

7     or was just a couple of minutes fine?

8          (Colloquy not on the record.)

9               MR. DAVIS:  Not necessary, your Honor.  We can

10    proceed.

11              THE COURT:  All right.  Thank you.

12         So, Compass.

13              MR. BLATT:  Do I need to reintroduce myself here?

14              THE COURT:  Sorry.  I couldn't hear you.

15              MR. BLATT:  Do I need to say my name again or --

16              THE CLERK:  No.

17         (Colloquy not on the record.)

18              MR. BLATT:  Okay.  Compass Partners bids

19    67,000,000.

20              THE COURT:  Desert.

21              MR. CONNOP:  Your Honor, Desert Capital will pass.

22              THE COURT:  Okay.  Silver Point.

23         (Colloquy not on the record.)

24              MR. KHAN:  Your Honor, Silver Point would request

25    a 20-minute recess.

```
1                THE COURT:  Okay.

2          (Colloquy not on the record.)

3                THE COURT:  So we'll recommence at 20 minutes from

4    now.

5          (Colloquy not on the record.)

6                THE CLERK:  All rise.

7          (Recess at 04:09:53 p.m.)

8          (Court reconvened at 04:23:30 p.m.)

9                THE CLERK:  All rise.

10         (Colloquy not on the record.)

11               THE CLERK:  Bankruptcy court is now in session.

12         (Colloquy not on the record.)

13               THE COURT:  Be seated.  Okay.

14               MR. MEROLA:  Silver Point.

15         (Colloquy not on the record.)

16               MR. McCARROLL:  James McCarroll, your Honor.

17   Silver Point passes.

18               THE COURT:  Okay.  And we had Desert.  They had

19   passed before.  Let's see.  It was Compass, pass, pass,

20   correct?

21               UNIDENTIFIED SPEAKER:  Yeah.  It sounds right.

22               THE COURT:  So all parties have passed, so I don't

23   believe Desert has the opportunity to bid again.

24         (Colloquy not on the record.)

25               MR. MEROLA:  There is an ambiguity in the
```

154

1    procedures, your Honor.  We take --

2             THE COURT:  We'll always go --

3             MR. MEROLA:  We take --

4             THE COURT:  -- for more money?

5             MR. MEROLA:  -- money.  We take money.

6             THE COURT:  All right.  Does Desert have a bid?

7         (Colloquy not on the record.)

8             MR. CONNOP:  Your Honor, I want to thank the Court

9    for allowing us to bid here today.  I appreciate your taking

10   our emergency motion this morning, and I'm going to resolve

11   the ambiguity.  We pass.

12            THE COURT:  Okay.  All right.  So thus far, the

13   bid is at 67,000,000 by Compass.  As we know, that in and of

14   itself doesn't mean they were the successful bidder because

15   the committees need to confer --

16        (Colloquy not on the record.)

17            THE COURT:  -- to determine if that was the

18   highest and best offer.

19            MR. MEROLA:  To review the record, your Honor --

20        (Colloquy not on the record.)

21            MR. MEROLA:  -- the high bid was submitted by

22   Compass at 67,000,000.  The last bid submitted by

23   Silver Point adding in the 1.5 million dollars of the

24   breakup fee was 63.1 million, and the last bid submitted by

25   Desert was 66.250 million.

```
1        Your Honor, the parties will confer for a while and

2    decide whether this is something we can resolve tonight

3    while everyone's here or whether we need some additional

4    time.

5            THE COURT:  All right.  So we're going to take a

6    recess for the benefit of the bystanders here or the

7    investors, et cetera.

8        Under the agreement, we have a price.  And as we

9    alluded to earlier in the day, the committees get together

10   and determine what is the highest and best offer considering

11   all of the advantages of each of the entities.

12       Compass has at this stage bid the highest number.

13   Arguably, there are benefits of one of the other bidders

14   that the committees have the right to evaluate to determine

15   what's the highest and best.

16       (Colloquy not on the record.)

17           THE COURT:  They'll make that determination.  If

18   there's any disagreement if it's I assume for one of the

19   other bidders --

20       (Colloquy not on the record.)

21           THE COURT:  -- we'll review that, so we need to

22   know from the committees and the debtor -- well, the debtors

23   with the consultation of the committees --

24           MR. MEROLA:  Um-h'm.

25           THE COURT:  -- what their view of the highest
```

1   bidder is, and we'll come out with that today if we can.

2            MR. WATERMAN:  Your Honor, and I would suggest

3   that the debtors and the committees go to the courtroom down

4   the hall to make that determination.

5        (Colloquy not on the record.)

6            MR. WATERMAN:  We would also ask if any of the

7   other bidders wish to be considered as the next highest

8   bidder.

9            THE COURT:  Okay.

10        (Colloquy not on the record.)

11            MR. MEROLA:  The --

12            THE COURT:  So do you not need to make the other

13   determination first, though?

14            MR. MEROLA:  I think we do, your Honor.

15            THE COURT:  I think --

16            MR. MEROLA:  The only other --

17            THE COURT:  -- you do.

18            MR. MEROLA:  The other issue I'd like to -- if any

19   of the bidders have any noneconomic, nonmonetary

20   modifications to their contract that they want us to

21   consider in conjunction with highest and best, now is the

22   time.  Don't let us pick the highest and best and then say,

23   oh, I would have done that.

24        (Colloquy not on the record.)

25            MR. McCARROLL:  Your Honor, Silver Point would

1   like to increase its last bid to 65,000,000.

2            THE COURT:  Can we now --

3        (Colloquy not on the record.)

4            THE COURT:  Well --

5        (Colloquy not on the record.)

6            THE COURT:  So it's --

7        (Colloquy not on the record.)

8            THE COURT:  Oh, so the last bid is 65,000,000.

9        (Colloquy not on the record.)

10           THE COURT:  Does Desert wish to -- are we -- well,

11  I guess --

12           MR. MEROLA:  It's not --

13           THE COURT:  -- we're still bidding.

14           MR. MEROLA:  -- a topping bid.

15           THE COURT:  Okay.

16       (Colloquy not on the record.)

17           THE COURT:  And Desert I assume still wishes to

18  pass.  Is that a fair statement?

19           MR. CONNOP:  It is.

20           THE COURT:  All right.  Does Compass wish to

21  increase its bid?

22           UNIDENTIFIED SPEAKER:  No.  Thank you.

23           UNIDENTIFIED SPEAKER:  No.  Thank you.

24           MR. DAVIS:  Your Honor, I believe we're still the

25  highest bidder at this point, so --

```
 1            THE COURT:  Okay.  The only reason I mentioned
 2    that was because of the highest-and-best aspect.
 3         (Colloquy not on the record.)
 4            MR. DAVIS:  Well, I would expect that if someone
 5    were going to say that we were not the highest and best --
 6         (Colloquy not on the record.)
 7            MR. DAVIS:  -- we can revisit whether we're
 8    prepared to bid against ourselves.  But at this point --
 9            MR. MEROLA:  You're not --
10            MR. DAVIS:  -- we're not.
11            MR. MEROLA:  You're not going to foreclose anyone.
12    We are going to wring every concession we can out of them.
13            THE COURT:  Okay.
14         (Colloquy not on the record.)
15            THE COURT:  So we'll --
16         (Colloquy not on the record.)
17            THE COURT:  We will leave it open, then, such that
18    if it --
19         (Colloquy not on the record.)
20            MR. DAVIS:  I --
21            THE COURT:  Well, I would certainly allow you if
22    they suggested that because of that -- I realize you're the
23    highest monetary.  We're getting to highest and best, so
24    I'll allow that.
25            MR. DAVIS:  I understand, your Honor.
```

1          Thank you.

2               THE COURT:  And I --

3          (Colloquy not on the record.)

4               THE COURT:  Yeah.  I know I seem anomalous, so --

5          (Colloquy not on the record.)

6               MR. McCARROLL:  Your Honor, as further

7     modification to Silver Point's last bid, we would like --

8          (Colloquy not on the record.)

9               MR. McCARROLL:  -- to remove rights to any

10    payments in respect to the Marquis or Placer loans

11    postclosing.

12               THE COURT:  Okay.  I guess we should take on the

13    record any other nonmonetary modifications to either bid for

14    the committees to consider.  And if you wish some time to do

15    that, you certainly may.

16          (Colloquy not on the record.)

17               MR. DAVIS:  Your Honor, until someone tells us

18    that there is a bid that's better than ours at this point, I

19    would, you know, simply reserve the right to do it.

20               THE COURT:  All right.  That's how we'll leave it,

21    then.

22               MR. MEROLA:  Thank you, your Honor.

23               THE COURT:  Okay.  Just let -- I'm sorry.

24          Desert.  Mr. Connop.

25          (Colloquy not on the record.)

1           MR. CONNOP:  Yes, your Honor.  Thank you.  Since

2    we are the only ones not continuing, may I ask to be

3    excused?

4           THE COURT:  Yes.  If you wish.  I mean --

5           MR. CONNOP:  Thank --

6           THE COURT:  -- I assume you don't wish to be --

7           MR. CONNOP:  No, we don't.

8           THE COURT:  -- the next.

9           MR. CONNOP:  No, we do not.

10          THE COURT:  Okay.

11          MR. CONNOP:  Thank you, your Honor.

12          THE COURT:  All right.  Thank you for

13    participating.  All right.

14       We'll take a recess for the committees.  Just let us

15    know when you're ready.

16       (Colloquy not on the record.)

17          THE COURT:  I thank Desert for their

18    participation.  If it looks like you can't come to a

19    resolution this evening, let me know, but I --

20       (Colloquy not on the record.)

21          THE COURT:  Hopefully, you can the more we do it.

22    Okay.

23       Thank you.

24       (Colloquy not on the record.)

25          THE CLERK:  All rise.

1          (Recess at 04:29:13 p.m.)

2          (Court reconvened at 05:30:18 p.m.)

3              THE COURT:  Be seated.  Okay.

4          (Colloquy not on the record.)

5              THE COURT:  The committees met and made a

6     decision?

7              MR. MEROLA:  We have not made a decision, yet,

8     your Honor.  We are going to make a decision tonight.  We

9     would ask the Court for a little more time.

10          It's very difficult to get all of these parties

11     together, not just the professionals, but the actual

12     committee representatives.

13          And just to tell you what's going on is, one, at the

14     very end of the bid there was an offer to take the servicing

15     related to the three loans known as Placer and Marquis off

16     the table.

17          We're trying to value the differential of one bid now

18     has Placer and Marquis.  One does not.  Some of the

19     committees have different views of the valuation.  We're

20     working on that issue.

21          Unfortunately, the lead bidder when the auction closed

22     has taken the understandable position that they don't want

23     to talk about any adjustments or concessions unless we don't

24     tell them they're the highest bidder.

25          (Colloquy not on the record.)

1          MR. MEROLA:  In the meantime, in the other

2     conference rooms, both the other bidders have been busy

3     sharpening their pencils making noneconomic fine --

4     developing authority to make noneconomic concessions that

5     would improve the certainty of close.

6          I certainly realize it's late, and it's an imposition

7     on the Court and their staff, but I anticipate that we will

8     have a decision here by 6:00 o'clock.

9          THE COURT:  Okay.  I don't have a problem with it.

10    I was just told I was supposed to come in.

11         (Colloquy not on the record.)

12         THE COURT:  I just work here.

13         MR. DAVIS:  Your Honor, I apologize.  It is I that

14    asked you to come in, and I'll explain why.  We are very

15    concerned about the process that has been transpiring since

16    the conclusion of the in-court auction.

17         Your Honor, the bidding procedures are quite clear.

18    The bidding is to continue until all parties pass.  At that

19    point, the bidding is over, the auction is done, and it is

20    up to the debtor and the committees to make a determination

21    as to who is the highest and best.

22         Your Honor said that we did not have to bid against

23    ourselves.  And to the extent that notwithstanding that we

24    have the highest economic bid, if they chose a different

25    bid, we would have the opportunity to increase our bid.

1          What has been going on is that there's been a lot of

2     shuttle diplomacy as among the various bidders to try to get

3     them to make noneconomic tweaks and then to come back to us

4     and to ask us to make a number of concessions.

5          As far as we are concerned, the auction pursuant to the

6     bidding procedures is done.  The only thing that should be

7     occurring right now is the debtors and the committee should

8     be huddling in a room and determining who won, not speaking

9     to the other bidders.

10          I now understand that one of the bidders, Desert

11     Capital, is now resubmitting their bid having asked

12     your Honor for permission to leave, and this is not the

13     process that should be occurring.

14               THE COURT:  Okay.

15               MR. DAVIS:  And we are very troubled by it.

16               THE COURT:  I assume that nobody has -- well, why

17     don't you tell me what's going on, Mr. Merola.

18               MR. MEROLA:  I hate to make the same speech twice

19     in one day.  The reason competing bidders have limited

20     standing in cases of bankruptcy regarding bid procedures is

21     because they're only incentive is to have themself declared

22     the winner.

23          There is nothing in the procedures about what the

24     parties can consider in highest and best offer.  There is no

25     prohibition about dealing with noneconomic terms for

164

1    concessions.  The only thing the bid procedures say is that

2    the monetary bidding ends when the auction concludes.

3            THE COURT:  Well, I think probably the fairest

4    way -- and let me toss this out -- is the committees

5    consider which is the highest and best offer.

6        I see no problem if you say -- if, for example, you

7    chose Silver Point, you say we've done this because of

8    something that's already on the table, and then Compass gets

9    the right --

10           MR. MEROLA:  Your Honor, I --

11           THE COURT:  -- to say --

12           MR. MEROLA:  I will --

13           THE COURT:  -- we want to do this.

14           MR. MEROLA:  I will make the same speech I made on

15   the record.

16       (Colloquy not on the record.)

17           MR. MEROLA:  I am not interested in playing ah-hah

18   with anyone.  If we pick someone else as the higher and

19   better bidder, rather than the highest bidder, we will go

20   back --

21           THE COURT:  The highest --

22           MR. MEROLA:  -- to the high --

23           THE COURT:  -- numeric --

24           MR. MEROLA:  We will --

25           THE COURT:  -- monetary bidder.

MR. MEROLA: -- go back to the highest numeric bidder, and we will enable them to improve their bid.

(Colloquy not on the record.)

MR. MEROLA: My job is to get as much as I can for this estate with the highest certainty of close. If I'm not dotting every I and crossing every T to the liking of Compass, I really don't care.

I'm going to continue this process until the bidders give up with me or say, Frank, there's nothing else we can give.

THE COURT: But, I mean, so what are you doing with the bidders?

(Colloquy not on the record.)

THE COURT: Are you asking anything from them or are you just considering by yourself?

MR. MEROLA: Well, for example, I will tell you a discussion I had with one of the bidders, so it's not hypothetical.

(Colloquy not on the record.)

MR. MEROLA: And the discussion I had was you are X dollars apart from the monetary bidding. In order for you to be considered a higher and better bid, I would think you would have to do the following, and I laid out the following. They are now waking up people in New York and now London to determine whether they can do the following.

1     It's not a -- what Compass wants me to do is they want

2     me to engage in the arithmetic exercise that says 67 is

3     higher than 65.  What's taking you so long?

4     There are qualitative issues in addition to

5     quantitative, and I want a certainty of close for whatever

6     number I get.

7     (Colloquy not on the record.)

8         MR. MEROLA:  I have three very interested bidders

9     here.  I'm not going to let them go, any of them, until I

10    know I have gotten every concession I can.

11    I'm sorry it's taking a little longer.  I assure the

12    Court we'll try to be concluded by 6:00.  I don't think

13    we're doing anything improper.

14    By the way, we're not the Lone Ranger.  We're going

15    with representatives from multiple committees to these

16    constituencies, and we're working them in groups.  And if

17    it's shuttle diplomacy, call me Henry Kissinger.  I'm not

18    embarrassed.

19        THE COURT:  Oh, please.  I'm sorry.

20    (Colloquy not on the record.)

21        MR. CONNOP:  Your Honor, Tom Connop.  I can

22    appreciate the Court might be surprised I'm still here.  I

23    just wanted to clarify.

24    We have not increased our bid.  We have not changed our

25    bid, and I wanted to correct any misapprehension that we

1    were negotiating a higher offer outside the Court.

2        (Colloquy not on the record.)

3            THE COURT:  Okay.

4            MR. CONNOP:  Thank you, your Honor.

5            THE COURT:  It looks like we're having a huddle

6    here.  Why don't we just take a recess right --

7        (Colloquy not on the record.)

8            THE COURT:  No?

9        (Colloquy not on the record.)

10            MR. MEROLA:  Well, the good news is that our

11    process seems to have borne some fruit.  I understand that

12    our lead bidder is willing to make some noneconomic

13    concessions in their agreement, and we'll yield the podium,

14    so they can explain it.

15            THE COURT:  Okay.

16            MR. DAVIS:  Your Honor, notwithstanding the fact

17    that --

18            THE COURT:  Having said all of that.

19            MR. DAVIS:  Having said all of that and the fact

20    that the auction should be over, and the bidding procedures

21    say the auction is done, and no party has the right to

22    change their bid, I was told by Mr. Allison that if we make

23    two changes we have the support of the debtor and all four

24    committees that we are the highest and best bid, and

25    everything is done.  We can all go home.

1      Those two changes have to do with the estoppel.

2   Your Honor's familiar with that.  Your Honor has expressed

3   discomfort with entering in that order.

4      And there are two loans that, basically, the servicing

5   fees are bifurcated.  The debtor's estate keeps the

6   preclosing fees.  We take the postclosing fees.

7      With respect to those, if I am correct, I would like

8   all the debtor and all the committees to acknowledge this.

9   That if we make those two changes we're done.  And if that's

10  the case, I'm prepared to address that.

11         MR. WATERMAN:  Well, before Mr. Davis leaves, I

12  think they've removed the licensing contingency as well, and

13  it's three loans, the Placer and Marquis loans.

14         MR. ALLISON:  Yeah.  We've got that taken care of,

15  Steven.

16         UNIDENTIFIED SPEAKER:  Yeah.

17         MR. ALLISON:  Yeah.

18     (Colloquy not on the record.)

19         MR. MEROLA:  Your Honor, we have client

20  representatives here.  And if we have -- you can stay on the

21  bench.  I'll just pull my client out in the hallway.

22         THE COURT:  Whatever you prefer.

23         MR. MEROLA:  Or if you want to give us five

24  minutes, but no more than five minutes or ten minutes.

25     (Colloquy not on the record.)

169

1          MR. MEROLA:  Obviously, some of the other bidders

2    are still trying to put stuff together, so this is I think a

3    beautifully-played effort to stop the clock.

4         (Colloquy not on the record.)

5          MR. MEROLA:  So let's see what people are going to

6    do.

7         (Colloquy not on the record.)

8          THE COURT:  All right.  So I'm sorry.

9    Did you want to make --

10          MR. KERIDES:  No, your Honor.  I just --

11          THE COURT:  -- a comment?

12          MR. KERIDES:  On behalf of Silver Point --

13         (Colloquy not on the record.)

14          MR. KERIDES:  -- indeed, on the

15    nonmonetary-factors side, we understood that the

16    bid-procedures motion while contemplating the financial

17    number -- and we're not going to increase that number nor

18    would we expect to -- we do want to be heard.

19         And we think there has been flexibility rightfully

20    shown by this Court on the bid-procedures motion throughout

21    for the purpose of maximizing value to the estate, so it

22    would seem to be odd that with 25 minutes to go that that

23    process couldn't be seen through to its end.

24          THE COURT:  Okay.  I have no objection.

25         (Colloquy not on the record.)

1          THE COURT:  I think it's important, though, that

2     we do discuss this, so we don't have --

3          (Colloquy not on the record.)

4          THE COURT:  -- issues later.  I mean, heaven

5     forbid, we don't want a Debbie Reynolds debacle.

6          MR. KERIDES:  Of course.

7          THE COURT:  So --

8          MR. KERIDES:  No.

9          (Colloquy not on the record.)

10         THE COURT:  That's why I think it's fair to raise

11    the issue.  But having said that, I think everybody knows

12    where we're coming from, and --

13         MR. KERIDES:  Okay.

14         THE COURT:  And the bottom line is getting the

15    best.

16         MR. KERIDES:  Well --

17         (Colloquy not on the record.)

18         THE COURT:  So I have no problem if we take a

19    recess.  If you think it's better I stay here and just stare

20    at everybody, that's fine.

21         (Colloquy not on the record.)

22         THE COURT:  If you want to take a recess --

23         MR. KERIDES:  Your Honor, I would invite such a

24    recess, and I know I just have to confer with my client,

25    and --

1           THE COURT:  Okay.

2           MR. KERIDES:  And that's been going on, so I

3    appreciate the opportunity --

4           THE COURT:  Okay.

5       (Colloquy not on the record.)

6           MR. KERIDES:  -- for that recess.

7           THE COURT:  I would tell you I could stay as long

8    as I want, but that won't help matters.

9           MR. MEROLA:  In --

10          MR. KERIDES:  Yeah.

11          MR. MEROLA:  In fairness --

12          THE COURT:  So I --

13          MR. MEROLA:  In fairness to everyone, let's set a

14   fixed time for the recess.

15          THE COURT:  All right.

16      (Colloquy not on the record.)

17          UNIDENTIFIED SPEAKER:  No.

18          THE COURT:  So --

19          MR. BLATT:  No, no.

20      (Colloquy not on the record.)

21          MR. BLATT:  We don't want a recess.  We want a

22   determination on this process, right?

23          MR. DAVIS:  Your Honor, this is just going to drag

24   on forever.  This should be done, and I want --

25          THE COURT:  I think you are done.

172

1          MR. DAVIS:  But no.

2          THE COURT:  My point --

3          MR. DAVIS:  But I suspect that with a recess there

4     will be more shuttle diplomacy.

5          MR. BLATT:  Yes.

6          MR. DAVIS:  And we will not be done.

7          MR. GORDON:  Your Honor, a condition for Compass

8     stepping up, the -- at least, I won't speak for Mr. Merola.

9     But our committee, I believe Mr. Charles on behalf of the

10    unsecureds, and Mr. Levinson on behalf of Diversified, we

11    support --

12         THE COURT:  Okay.

13         MR. GORDON:  -- the deal.

14         THE COURT:  Let's do this.  Take five minutes each

15    of your committees, go out in the hall, talk among each

16    committee, and then the four committee reps get together in

17    caucus, and give me an answer.

18       (Colloquy not on the record.)

19         THE CLERK:  Do you want to go off the record,

20    Judge?

21         THE COURT:  No.  That's fine.  I'll stay here.

22         THE CLERK:  (Indiscernible).

23         THE COURT:  I'll just sign orders.  We're off

24    record --

25         THE COURT RECORDER:  (Indiscernible) go --

1           THE COURT:  -- though.

2           THE COURT RECORDER:  -- off the record?

3           THE COURT:  Yes.  We're off record.

4           THE COURT RECORDER:  Off record.

5      (Off the record at 05:40:09 p.m.)

6      (On the record at 05:51:10 p.m.)

7           THE CLERK:  All rise.

8      (Colloquy not on the record.)

9           THE COURT:  Okay.  Be seated.

10     (Colloquy not on the record.)

11          THE COURT:  Before I forget, one other

12     housekeeping matter.

13     (Colloquy not on the record.)

14          THE COURT:  Mr. Merola and Mr. Garman submitted

15     that sealed stipulation regarding allocation.

16          MR. MEROLA:  Yes.

17          THE COURT:  Nobody gave me a copy, so I had to

18     open it, so give us a new --

19     (Colloquy not on the record.)

20          THE COURT:  We need a new envelope that you can

21     put the thing or give me a new copy.

22          MR. MEROLA:  Thank you, your Honor.

23     (Colloquy not on the record.)

24          THE COURT:  I think --

25          MR. WATERMAN:  Your Honor --

```
1              THE COURT:  Aren't we waiting for someone, yet?

2              MR. WATERMAN:  No.

3              THE COURT:  Are you waiting --

4              THE CLERK:  Is anyone here --

5              THE COURT:  -- for Silver Point?

6              THE CLERK:  -- from Silver Point?

7              MR. WATERMAN:  No.

8         (Colloquy not on the record.)

9              MR. ALLISON:  No.

10             MR. MEROLA:  Here they are.  We're done.

11             THE COURT:  Oh, okay.

12             MR. WATERMAN:  I think we're there, your Honor.

13        (Colloquy not on the record.)

14             MR. WATERMAN:  I am pleased to report that under

15    paragraph 6 of the bid procedures the debtors and all four

16    committees have unanimously determined that the successful

17    bid is that bid of Compass Partners for $67,000,000.

18        And Compass has agreed to remove the

19    estoppel-certificate condition of Section 9.1C and has

20    agreed to remove the Marquis and two Placer loans from

21    schedule 2 eliminating all servicing rights and all issues

22    with respect to fee income relative to those two properties,

23    those three loans.

24             THE COURT:  All right.

25             MR. WATERMAN:  And I believe we're done.
```

1                THE COURT:  Oh, how about the licensing?  Wasn't

2      that the other?

3                MR. GORDON:  No.

4                MR. WATERMAN:  No.

5                THE COURT:  No.

6                UNIDENTIFIED SPEAKER:  No.

7                MR. WATERMAN:  Don't mention that.

8                UNIDENTIFIED SPEAKER:  Can I (indiscernible)?

9                MR. GORDON:  Your Honor, the --

10               UNIDENTIFIED SPEAKER:  Don't say license.

11         (Colloquy not on the record.)

12               MR. GORDON:  Your Honor, the four committees

13     support that proposal, and Compass is the highest and best

14     bid.

15               THE COURT:  All right.

16               MR. MEROLA:  Under the bid procedures, your Honor,

17     Compass has 24 hours to have an executed asset purchase

18     agreement comporting with the auction, and thank you for

19     your patience.

20               MS. CARLYON:  I --

21         (Colloquy not on the record.)

22               MR. ALLISON:  Thank you, your Honor.

23               MS. CARLYON:  I do want to put on the record the

24     language changes in the agreement before we all go home

25     happy --

```
 1              THE COURT:  Okay.

 2              MS. CARLYON:  -- on the estoppel condition.

 3              UNIDENTIFIED SPEAKER:  Go ahead.

 4              MS. CARLYON:  Candace Carlyon (indiscernible).

 5         (Colloquy not on the record.)

 6              THE COURT:  Now, before --

 7         (Colloquy not on the record.)

 8              THE COURT:  I know.  Hang on one minute, and

 9    then --

10         (Colloquy not on the record.)

11              THE COURT:  Hang on one minute, please.  Just one

12    minute, please.  All right.  Two minutes, please.

13         (Colloquy not on the record.)

14              THE COURT:  Mr. Cross (sic), you had wanted to --

15    or Gross.  Now --

16              MS. CARLYON:  Oh, so --

17              THE COURT:  Sorry.

18         (Colloquy not on the record.)

19              MS. CARLYON:  Sorry.  The changes that in addition

20    to the change of 9.1 --

21              THE COURT RECORDER:  I'm sorry.  Could you speak

22    into a microphone, please?

23              MS. CARLYON:  Sorry.  Candace Carlyon.  I'm short.

24    In addition to the changes on 9.1 which would delete the

25    last sentence --
```

1          (Colloquy not on the record.)

2              MS. CARLYON:  -- of 9.1C, and we believe there's

3    also the removal of a parenthetical under 8.2, the fourth

4    through sixth line.

5          (Colloquy not on the record.)

6              MS. CARLYON:  I'm advised by counsel for Compass

7    that they need to look over all of the changes because

8    there's been a lot of flowing today.

9          (Colloquy not on the record.)

10             MS. CARLYON:  But I wanted just to make it clear

11   on the record that those are what we're expecting in order

12   to satisfy the change that the estoppel certificates not be

13   a condition to close.

14             THE COURT:  Okay.

15         (Colloquy not on the record.)

16             THE COURT:  Now, I don't want to dampen anything.

17         (Colloquy not on the record.)

18             THE COURT:  But I just want to make it clear --

19         (Colloquy not on the record.)

20             THE COURT:  -- because I know there are people

21   listening besides the attorneys.  I know the press may or

22   may not be here.  A part of the whole process, too, is I

23   assume that confirmation --

24             MR. MEROLA:  I'm --

25             THE COURT:  -- is still --

1          MR. MEROLA:  I'm ready to hand --

2          THE COURT:  -- a condition of close.

3          MR. MEROLA:  Your Honor, this is only the auction.

4    They've been selected as the bidder under the plan.  The

5    actual order approving the sale and the transfer of the

6    servicing rights happens in conjunction with a confirmation

7    hearing and the confirmation order that has been duly

8    noticed.

9          THE COURT:  Correct.  Did Silver Point wish to be

10   the next highest bidder?

11         MR. McCARROLL:  No.

12         MR. MEROLA:  No --

13         THE COURT:  No.

14         MR. MEROLA:  -- they do not.

15         THE COURT:  Okay.  I just wanted to clarify

16   that --

17         MR. MEROLA:  And --

18         THE COURT:  -- for the record.  I think that takes

19   care of everything for now.

20         MR. MEROLA:  I think we're done, your Honor.

21         THE COURT:  All right.  Did you want any more

22   comments?

23         MR. DAVIS:  If you could just so order it,

24   your Honor.

25         THE COURT:  All right.  Well, I guess I so order

1    it in connection with the point that we still have to do

2    confirmation, but --

3              MR. DAVIS:  That's understood.

4              THE COURT:  Okay.

5              MR. DAVIS:  Thank you.

6              THE COURT:  Thank you all very much for your

7    participation.

8              UNIDENTIFIED SPEAKER:  Thank you.

9              THE COURT:  Thank you for everyone.  It's been a

10   long day.

11        (Colloquy not on the record.)

12             THE COURT:  Thank you again.

13             UNIDENTIFIED SPEAKER:  Thank you, your Honor.

14        (Colloquy not on the record.)

15             MS. CARLYON:  Thank you very much, your Honor.

16             THE COURT:  Um-h'm.

17        (Colloquy not on the record.)

18             THE COURT:  All right.  We don't need --

19        (Colloquy not on the record.)

20             THE COURT:  You don't need any hearings tomorrow,

21   right?  We're safe on that regard?

22        (Colloquy not on the record.)

23             THE COURT:  I'm here.  It's just --

24             MS. CARLYON:  Thank you.

25        (Colloquy not on the record.)

180

1          MS. CARLYON:  I don't make promises for this

2    group.  I'm sorry.

3          THE COURT:  Okay.

4       (Colloquy not on the record.)

5          MR. ALLISON:  Your Honor, on behalf of the

6    debtors, thank you.

7          THE COURT:  Okay.  Thank you.

8       (Court concluded at 05:55:27 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5

6    /s/ Lisa L. Cline                              01/29/07

7    _____            _____
     Lisa L. Cline, Transcriptionist                  Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25