ELECTRONICALLY FILED
JANUARY 29, 2007

| STUTMAN, TREISTER & GLATT, P.C | SHEA & CARLYON, LTD. |
|---|---|
| FRANK A. MEROLA | CANDACE C. CARLYON |
| (CA State Bar No. 136934) | (Nevada State Bar No. 002666) |
| EVE H. KARASIK | SHLOMO S. SHERMAN |
| (CA State Bar No. 155356) | (Nevada State Bar No. 009688) |
| 1901 Avenue of the Stars, 12th Floor | 233 South Fourth Street, Second Floor |
| Los Angeles, CA 90067 | Las Vegas, Nevada 89101 |
| Telephone: (310) 228-5600 | Telephone: (702) 471-7432 |
| E-mail: fmerola@stutman.com | E-mail: ccarlyon@sheacarlyon.com |
| ekarasik@stutman.com | ssherman@sheacarlyon.com |

*Counsel for the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY<br>　　Debtor | BK-S-06-10725-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>　　Debtor | BK-S-06-10726-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>　　Debtor | BK-S-06-10727-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>　　Debtor. | BK-S-06-10728-LBR<br>Chapter 11 |
| In re:<br>USA SECURITIES, LLC,<br>　　Debtor. | BK-S-06-10729-LBR<br>Chapter 11 |
| Affects<br>☐ All Debtors<br>☐ USA Commercial Mortgage Co.<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed<br>☒ USA Capital First Trust Deed Fund, LLC | Date: January 31, 2007<br>Time: 9:30 a.m. |

### REPLY IN SUPPORT OF OBJECTION OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF USA CAPITAL FIRST TRUST DEED FUND, LLC TO PROOF OF CLAIM FILED BY STANDARD PROPERTY DEVELOPMENT, LLC (CLAIM #120) (AFFECTS USA CAPITAL FIRST TRUST DEED FUND, LLC)

The Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC (the "FTDF Committee") hereby files its reply in support of the Objection to the Proof of

Claim[1] filed by Standard Property Development, LLC (the "Objection").

## I. BACKGROUND

On January 24, 2007, Standard filed a response and opposition to the Objection (the "Opposition").[2] Standard did not submit any evidentiary support for its opposition, and neither conducted nor requested discovery relative to the Objection.

While the background is generally set forth in the Objection and the Opposition, it should be noted that the material facts are undisputed. The Claim alleges breach of a purported obligation to loan on behalf of certain direct lenders,[3] including USA Capital First Trust Deed Fund, LLC ("FTDF"). However, the Construction Loan Agreement ("Loan Agreement") governing the transaction, attached to the Claim as Exhibit 2, recites at §3.1 that the amount of the loan is $8,240,000. It is undisputed that this amount (the "Original Loan") was actually funded by USACM, utilizing Direct Lender investments.

1. The Loan Agreement also provides, at §3.2:

> <u>Increases in Loan Amount</u>  From the Effective Date through and including January 31, 2007, Lender and USA shall have the exclusive right, <u>but not the obligation</u>, to increase the Loan Amount to an amount not to exceed Seventeen Million Seven Hundred Fifty Thousand Dollars ($17,750,000)…Upon each increase in the Loan Amount, Borrower shall execute amendments to the Note and the Mortgage which shall memorialize the increase in the Loan Amount, <u>the change in the identity of persons and entities which comprise Lender</u> and their respective undivided interests.

(Emphasis Added.) The language of the Loan Agreement is unequivocal; there is no obligation

---

[1] This matter relates to the Proof of Claim filed on November 8, 2006, by Standard Property Development, LLC ("Standard"), as claim no. 120 (the "Claim").
[2] Standard does concede that it does not hold a "secured" claim against FTDF. See Opposition, p. 17.
[3] Standard has instituted a suit in Florida against the non-debtor direct lenders. This Court has enjoined prosecution of that suit (see Adversary No. #06-01179), and denied Standard's Motion for Relief From the Stay to add USACM and FTDF to that litigation. Standard has dismissed its appeal of the denial of relief from the stay; its appeal from the injunction order remains pending.

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

2

to increase the Loan Amount beyond the original funded amount. Further, the Loan Agreement contemplates that any discretionary further advance is likely to involve different lenders then the group that made the Original Loan.

It is also undisputed that an additional advance of $1,400,000 (the "Second Advance") was made, and that, as provided by §3.2 of the Loan Agreement, the parties executed a "First Amendment to Loan Documents," a copy of which is attached to the Claim as Exhibit 6. As reflected therein, 13 new Direct Lenders were added. Several Direct Lenders, including FTDF, increased their investment in an amount disproportionate to their original interest.

While the Promissory Note executed by Standard recites a principal amount of $17,750,000 "in favor of those persons listed on Exhibit "A" attached hereto ("Lender")," Exhibit A lists the specific amount owed to each of the 103 original lenders, with a total amount of $8,240,000, the amount of the Initial Loan, shown on page 5 of that document.

## II. LEGAL ARGUMENT

### A. Standard Has Failed to Satisfy its Burden of Proof

Standard's initial complaint, that the FTDF Committee "is seeking a declaratory judgment," misconceives the purpose and the mechanics of the claims adjudication process.

Although a proof of claim is initially given the effect of establishing, *prima facia*, the validity and amount of the claim:

> If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." In re Consol. Pioneer, 178 B.R. at 226 (quoting In re Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir.1992)). The ultimate burden of persuasion remains at all times upon the claimant. See In re Holm, 931 F.2d at 623.

Lundell v. Anchor Const. Specialists, Inc., 223 F.3d 1035, 1039 (9th Cir. 2000).

Standard filed its Claim for damages arising from FTDF's alleged breach of contract.

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

3

However, **the very documents used to support the claim establish the lack of such liability,** such that the burden of proof reverts to Standard. In response, Standard has utterly failed to meet its evidentiary burden, having submitted absolutely no evidence in support of its Claim.[4] The Loan Agreement itself establishes a lack of liability, to which no evidentiary response is made, and Standard fails to establish any evidentiary basis for the Claim.

"The plaintiff bears the burden of proving he was damaged and of proving the extent of those damages. Chicago Title Agency v. Schwartz, 851 P. 2d 419, 421 (Nev. 1993); Bergstrom v. Estate of DeVoe, 854 P. 2d 860, 861 (Nev. 1993)." Here, not only has Standard failed to submit any evidence of any damages having been sustained,[5] but Standard does not even provide a dollar figure for the amount of its claim, either in the Proof of Claim itself or in the Opposition. Although Standard claims to have "incurred substantial damages," its Claim is replete with qualifiers such as "reservations are now…*at risk*"; "the project is *likely* to be subject of construction lien (sic)"; or "the Property is *at risk* of being subject to lien claims."

Although it has now been over nine months since these cases were filed (during which time the Debtors have obviously not provided Standard with additional funding), Standard also makes no mention (let alone an evidentiary showing) of any attempt to mitigate its damages by securing another loan in order to complete its project. Thus, the already

---

[4] See LR 9014(d)(1): "An opposition must be supported by affidavits or declarations that conform to the provisions of subsection (c) of this rule." To the extent that the Opposition makes unsupported assertions of fact, FTDF contests such assertions based, as a threshold matter, upon the lack of evidentiary basis therefor.

[5] While, as discussed above, Standard has neither conducted nor requested any discovery relative to its FTDF Claim, any evidence with regard to its purported damages (such as) evidence that Standard has been unable to procure another loan; evidence of any bills that have been unpaid due to the lack of funding; evidence that Standard has suffered actual pecuniary losses due to the cancellation of any unit reservations due to conduct of FTDF; or evidence that Standard has been forced to pay higher prices for construction materials) would be wholly within Standard's custody and control.

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

4

speculative and unsupported nature of Standard's claims for damages is made even more whimsical by its failure to diligently pursue other options. See, e.g., McAlister v. Citibank (Arizona), a Subsidiary of Citicorp, 829 P.2d 1253 (Ariz. App. 1992) (consequential damages unavailable for bank's breach of contract to loan money, even if bank knew of or could foresee customer's use of loan money, where customer could procure loan from another source).

These claims for damages are made even more absurd by the statement in Standard's Opposition that "the damages incurred by Standard from the failure of the Direct Lenders to fund the entire loan amount might well be in excess of simply the unfunded portion of the Loan." It is difficult to conceive of a construction project that is capable of such a tragic demise as to cause damage that exceeds the entire cost of the project.

In short, Standard has failed to demonstrate, by a preponderance of the evidence (and, in fact, by any evidence), liability, damages, or causation.

B. **As a Matter of Law, There is No Funding Obligation on the Part of FTDF**

1. Additional Advances are Optional; The Loan Agreement and the Promissory Note Are Neither Inconsistent Nor Ambiguous

Standard attempts to argue "ambiguity" in order to escape the clear provisions of the parol evidence rule. Again, its effort is devoid of the submission of any evidence, and should be rejected summarily. However, even if this Court chooses to consider the rough allegations of the Opposition, it is clear that, as a matter of law, FTDF had no funding obligation.

As set forth in the Objection, the Loan Agreement states, clearly and unambiguously, that, through January 3, 2007, the lenders have "the right, but not the obligation" to fund subsequent advances. Loan Agreement, §3.2.

Standard attempts to create an issue of fact by pointing out that the promissory note

5

utilizes the maximum loan amount of $17,750,000. As a preliminary matter, it bears mentioning that, as between the Note and the Loan Agreement, the Loan Agreement is the only Loan Document to which the FTDF is a party. The Note is a document executed solely by Standard, and reflects a unilateral promise on Standard's part to pay; it does not create any reciprocal obligation on the part of FTDF. Indeed a promissory note is almost universally regarded as a unilateral contract, creating no obligation on the part of the promisee. See, e.g., Minor v. Minor, 7 Cal. Rptr. 455 (Cal. App. 1960) ("[i]n the case of an ordinary money contract, such as a promissory note, or a bond, the consideration has passed; there are no mutual obligations"), citing Roehm v. Horst, 178 U.S. 1, 17 (1900); Collins v. Parsons College, 203 N.W.2d 594 (Iowa 1973) ("A promissory note for a consideration is valid, though no mutuality appear thereon. This is true of all unilateral contracts which are supported by a consideration"); OCI Mortg. Corp. v. Marchese, 774 A.2d 940 (Conn. 2001) (promissory notes are unilateral contracts).

If the Note is to hold any relevance for FTDF at all, it must be considered within the context of the Loan Agreement, to which FTDF *is* a party. Contrary to Standard's suggestion, the Loan Agreement does not in any way ignore the Note; in fact, on page 4 of the Loan Agreement, "Note" is defined as:

> [T]he promissory note of even date herewith, in the original principal amount of...($17,750,000) executed by Borrower in favor of Lender to evidence the Loan, either as originally executed or as it may from time to tome be supplemented, modified or amended.

On the other hand, the "Loan" is defined on page 3 of the Loan Agreement as "the loan to be made by Lender to Borrower pursuant to Section 3 hereof." Section 3, of course, again defines the "Loan" and the "Loan Amount" as the "loan to Borrower in a principal amount of

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

6

up to… ($8,240,000)", and then confirms that "Lender and USA shall have the exclusive right, but not the obligation, to increase the Loan Amount to an amount not to exceed … ($17,750,000)."

The two documents are wholly consistent with one another. The principal under the Note is acknowledged by the Loan Agreement to be in the amount of $17,750,000. However, the Loan Agreement makes clear that this amount does not reflect the amount that the Direct Lenders are *obligated* to fund – it merely reflects the *maximum* amount that the Lenders *have the right* to fund. Moreover, the Note expressly provides that the Note amount would be "disbursed in accordance with Exhibit "B" of the construction loan agreement." In turn, that disbursement schedule expressly makes "all advances after closing…subject to Section 3.2 of the Loan Agreement" which disclaims any obligation on the part of the Direct Lenders to make any further advances.

This is also entirely consistent with Nevada law, which provides a "safe harbor" for lien priority for future advances where, *inter alia*, the maximum amount of the loan is stated. See NRS 106.360(2)(b); In re Resort at Summerlin Litigation, 127 P.3d 1076, 1079-80 (Nev. 2006).

Standard's argument is that it "never would have entered into the loan at all without assured funds needed for the completion of the project." Opposition at p. 3. While Standard undoubtedly regrets entering into a loan agreement for which the lenders had the option, but not the obligation, to fund construction advances, there is no factual dispute that this is what

///

///

///

7

the contract expressly provides.[6]

### 2. Under Nevada Law, USACM Had no Right to Bind Direct Lenders to Additional Loans

Chapter 645B of the Nevada Revised Statutes gives notice of the restrictive nature of a mortgage broker's ability to act on behalf of investors. For example, NRS 645B.035 provides that "[a] license as a mortgage broker entitles a licensee to engage only in the activities authorized by this chapter." A mortgage broker acts for investors in accordance with a power of attorney. Nevada law specifies strict limitations as to the scope of such power of attorney.

Further, NRS 645B.175 (1)(a) requires that investor funds to be loaned be kept in a segregated bank account or escrow account. Clearly Standard was aware that no such fund had been created and reserved in excess of $17 million. The claim of "apparent agency" is simply inconsistent with the limitations applicable to mortgage brokers such as USACM.

### 3. USACM Did Not Have Actual or Apparent Authority to Bind FTDF

Standard argues that "[w]hatever, if any, express limitations or (sic) USACM's authority may have existed as between USACM and the Direct Lenders in the Loan Servicing Agreements, USACM had, at a minimum, apparent authority to bind the Direct Lenders."

This is not the case; nor could it be, for then the concept of a mortgage brokering business would be a practical impossibility. If such apparent authority existed, then by merely

---

[6] In the context of arguing that the Loan documents are ambiguous and that consideration of parol evidence is warranted, Standard spends several pages in the Opposition alleging that the intent of the Direct Lenders was to loan the full $17,750,000. As noted above, no actual evidence was actually submitted by Standard -- on the issue of intent or otherwise – merely unsubstantiated allegations are included. In particular, Standard references a statement from one Direct Lender – Nicholas Pereos – stating that he understood that he was being bound to loan the full amount of the Loan (a copy of this statement has not been provided). Clearly, whether or not Mr. Pereos believed he had this obligation has no bearing on the intent of the 102 other Direct Lenders on the Loan. Further, Standard argues that its origination fee was based on the maximum loan amount, so that USACM and the Direct Lenders must have intended to fund the full amount. Standard neglects, however, to admit that USACM charged large origination fees because it could -- it was a lender of last resort. High risk borrowers and borrowers with high risk projects that could not obtain traditional financing comprised the USACM borrowers, with fees comparable to such market demand.

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

8

authorizing the mortgage broker to act on behalf of a group of investors on a one-time basis, the investors would have subjected themselves to Standard's perceptions of USACM's apparent authority for all time. There would be no mechanism by which the investors could limit the mortgage broker's authority. Indeed, such an approach would eviscerate the usefulness of a limited power of attorney, since that power – once exercised – would then have created sufficient apparent authority for the agent to bind the principal in all of its subsequent acts.

Fortunately, the law takes a far more common-sense approach to apparent authority. Thus, in <u>Nevada Power Company v. Monsanto Company</u>, 891 F. Supp. 1406, (D. Ct. Nev. 1995), the court explained that:

> Under Nevada law, an apparent agency is created when there is "authority which *a principal holds his agent out as possessing* or permits him to exercise or to represent himself as possessing, *under such circumstances as to estop the principal from denying its existence.*" …(quoting <u>Dixon v. Thatcher</u>, 103 Nev. 414, 742 P.2d 1029, 1031 (1987).

<u>Id</u>. at 1418-21 (emphasis added). "[A]pparent authority cannot be created by acts of the supposed agent alone; the principal itself must have created the appearance of authority in order to be held liable." <u>State v. Cook</u>, 104 S.W.3d 808, 813 (Mo. App. W.D. 2003). The doctrine of apparent authority "rests on appearances created by the principal and not by agents who often ingeniously create an appearance of authority by their own acts." <u>Taco Bell of Calif. v. Zappone</u>, 324 So. 2d 121, 124 (Fla App. 1975).

In this case, Standard's own admissions establish that FTDF took no action to create the appearance of authority. As Standard has repeatedly stated throughout its pleadings, Standard's only contact with respect to the loan was with USACM. Nor do any of the Loan

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

9

Documents bear the signatures of any of the Direct Lenders. Indeed, in its Opposition, Standard appears to disclaim any knowledge of the contents of the Loan Servicing Agreement entered into between USACM and FTDF – the document actually signed by FTDF.[7] Accordingly, Standard's perception of USACM's authority flows – not from any act by FTDF – but solely from USACM's actions, which does not create binding apparent authority under applicable law. See also Casco Northern Bank, N.A. v. Edwards, 640 A.2d 213, 215 (Me. 1994) (The court rejected the defendants' argument that the mortgage broker had apparent authority to discharge their commercial mortgage, noting that "[a]pparent authority exists 'only when the conduct of the principal leads a third person to believe that a given party is his agent…' The only conduct engaged by Casco was the execution of the power of attorney to BBMC, clearly limited by its terms to home mortgages") (internal citations omitted).

Moreover, Standard's asserted belief that USACM had the authority to commit the original 103 Direct Lenders to approximately $9 million more than the original amount funded is not objectively reasonable. Standard must have been aware that, in order for USACM to sign the loan documents on behalf of the Direct Lenders, there must have been some document authorizing it to do so – particularly given the nature and the size of the transaction. At that point, it would have been reasonable for Standard to inquire as to the source of USACM's authority.

> A party claiming apparent authority of an agent as a basis for contract formation must prove…(2) that his subjective belief in the agent's authority was objectively reasonable…As previously noted by this court, "the party who claims reliance must not have closed his eyes to warnings

---

[7] See Opposition, p. 15: "[T]he Loan Servicing Agreement…was a document between those parties: no one suggests that Standard either knew anything about any such limitation, or even should have know about any such claimed limitation."

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

10

of inconsistent circumstances." Tsouras v. Southwest Plumbing and Heating, 94 Nev. 748, 751, 58 P.2d 1321, 1322 (1978).

Great American Ins. Co. v. General Builders, Inc., 934 P.2d 257, 261 (Nev. 1997).

Furthermore, the Loan Document itself contemplates that any future advances would be made by a different group of Direct Lenders. (Loan Agreement, section 3.2, "Upon each increase in the Loan Amount, Borrower shall execute amendments to the Note and the Mortgage which shall memorialize the increase in the Loan Agreement, the change in the identity of persons and entities that comprise the Lender . . . ." (Emphasis added.) It is not reasonable to believe that the original lenders would be bound for additional loans where new lenders were contemplated for future advances. Likewise, it is hard to fathom that not yet identified future lenders could have bound themselves to make a loan they knew nothing about.

Having read the Construction Loan Agreement which expressly disclaims any obligation on behalf of the Direct Lenders to increase the loan amount; which expressly provides for changes to the Direct Lender pool; and knowing that a retiree that can afford to invest $25,000 may not necessarily have authorized USACM to commit him to a multi-million dollar obligation; Standard was certainly on notice that USACM's authority to bind the Direct Lenders was limited. Standard cannot now "close its eyes to the warnings of inconsistent circumstances." Great American Insurance Company, 934 P.2d at 261.

Perceptions of apparent authority cannot trump an executed limited power of attorney. Thus, in Seigworth v. State, 539 P.2d 464, 465 (Nev. 1975), the court noted that "[w]hile ordinarily a general agent may bind his principal in most cases, the authority of a special agent is limited to the area for which authority is granted." See also Fava v. Hammond Company,

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

11

720 P.2d 702, 704 (Nev, 1986) (strictly construing authority granted pursuant to power of attorney). As one court explained:

> Certain principles of law governing disclosed principal situation are well established. One is that a limited power of attorney....creates a special agency and is to be strictly construed. One dealing with any agent must discover at his peril whether the assumed agency is general or special and, if the latter, whether the pretended agent has authority to perform the proposed act.

State v. West, 796 P.2d 1178, 1180 (Ok. Civ. App. 1990) (internal citations omitted). Here, USACM was acting on behalf of FTDF pursuant to a limited power of attorney, which expressly prohibited USACM from changing the amount of the principal of the Loan absent the express consent of the principal. Accordingly, USACM had neither actual or apparent authority to commit the Direct Lenders to loan more than the original $8,240,000; Standard's purported reliance on USACM's "apparent authority" is not objectively reasonable.[8]

### 4. Standard's Interpretation of the Loan Documents is Both Implausible and Impracticable

Standard's claim against the Direct Lenders misconceives the nature, structure, and realities of the loan transaction. When USACM entered into the Loan Agreement on behalf of the Direct Lenders, the Direct Lenders consisted of 103 individual persons or entities, each investing different amounts in the Loan, with an aggregate total of $8,420,000. When Standard suggests that the Direct Lenders – as part of that initial transaction – promised to

---

[8] The legal authority cited by Standard in support of its argument for apparent authority falls short of its stated purpose. In Myers v. Jones, 99 Nev. 91, 657 P.2d 1163 (1983) the court merely reaffirmed the principle of apparent authority as cited above in Nevada Power Company, 891 F. Supp. at 1418-21, and noted that the lower court had based its finding of apparent authority on "ample" and "substantial" evidence. Myers, 657 P.2d at 1164. The second case cited by Standard, Ellis v. Nelson, 68 Nev. 410, 233 P.2d 1072 (1951) is similarly unhelpful to Standard. Indeed, Ellis is cited by Seigworth, 539 P.2d at 465, for the proposition that "if inferences against existence of the agent's authority to act are as reasonable as those in favor of such authority, there can be no reliance on the rule relating to the agent's apparent authority to act for the principal." As discussed above, there were many clear indications of USACM's limited authority of which Standard ought to have been aware.

SHEA & CARLYON, LTD.
233 S. Fourth Street, Suite 200
Las Vegas, Nevada 89101
(702) 471-7432

12

fund an additional $9,330,000, precisely who did Standard think was going to provide the additional funding? Does Standard imagine that when Mr. Pereos decided to contribute $50,000 from his retirement account, he was actually agreeing to invest $17,700,000 more? Or does Standard imagine that when Mr. Pereos responded to USACM's solicitation and offered to contribute $50,000 (0.6% of the initial advance), he was actually agreeing to pay $106,500 (0.6% of $17,750,000)? Is it Standard's position that by joining in the Loan for the Second Advance, the 13 new Direct Lenders were each agreeing to assume liability for the entire $17,750,000? That the original Direct Lenders whose interests in the Loan had been diluted by the new Direct Lenders would now have reduced liability? Does the fact that FTDF increased its contribution in a disproportionate amount to its original investment increase its liability to fund yet more amounts, such that it is to be penalized for its additional funding?

Standard's own proof of claim does not support such a ridiculous interpretation.

Clearly, the Direct Lenders who funded the Initial Loan neither promised nor agreed to fund any more than the amount of their stated investments. If there was to be additional funding, it was understood that USACM would need to obtain additional commitments, as it did in making the Second Advance (which did not match the initial loan in percentage or even universe of investors). This is entirely consistent with the fact that the Loan Agreement clearly affords lenders the option, but not the obligation, of making additional advances.

Many of the Direct Lenders are retirees who invested their savings in loans serviced by USACM. They have neither the ability nor the obligation to make any loans above and beyond their stated investment.[9]

---

[9] Indeed, the ability of FTDF to engage in additional commercial loan transactions at this time would likely be an *ultra vires* act, given the current regulatory posture of the case, the pending bankruptcy proceedings, and the confirmation of a plan which does not permit such activities by the Debtor.

13

As Standard admits in its Opposition, there is no agreement that the Direct Lenders would be responsible for additional funding on a *pro rata* basis. The Direct Lenders were never intended to be obligated for any amount greater than the amount that each contributed to the Loan. However, even adopting Standard's view, it is difficult to imagine how else $17,750,000 would be apportioned. Standard apparently takes the position that – despite the absence of any agreement that says so – the Loan Documents require each Direct Lender, including the elderly retirees, to be obligated for the full amount of $17,750,000. At the time that the relevant contract, the Loan Agreement, was entered into, FTDF contributed $131,000, representing 1.6% of the Loan Amount. FTDF was therefore a 1.6% owner of the Direct Lender pool that entered in the Loan Agreement. When the Second Advance of $1.4 million was made, FTDF increased its contribution by $540,000, for a total investment of $671,000. This had the effect of increasing FTDF's interest in the overall loan to 7%. As discussed above, these varying contributions did not in any way commit FTDF to fund a penny more than it actually funded. However, even if the original parties to the Loan Agreement (i.e., the initial 103 Direct Lenders) *had* promised to fund the entire amount of $17,750,000, clearly that obligation could not exceed each Direct Lender's respective percentage interest in the Loan *at the time that the promise was made*. Therefore, since at the time the Loan Agreement was entered into FTDF had only a 1.6% interest in the Loan, any promise that it made in that agreement would be limited to its proportionate interest at that moment.[10] As discussed above, it is an absurd notion to suggest that because FTDF later

---

[10] Thus, even if FTDF were responsible for funding 1.6% of $17,750,000, or $284,000, FTDF's actual funding of $671,000 is well in excess of this purported obligation. Even if the Court sustains the FTDF's objection to the Standard proof of claim, FTDF believes that it is likely that Standard will appeal such ruling leaving the Standard Proof of Claim as an obligation of FTDF in an unliquidated amount. This, in turn, would prevent FTDF from determining a fixed reserve amount that would enable it to make a distribution to the FTDF members of the significant funds currently in FTDF's collection account that it would like to disburse to the FTDF members. Accordingly, FTDF proposes that the Court set a reserve for the Standard Proof of Clam in the amount of $671,000, which is also the only liquidated amount referenced in the Claim. Such a reserve would be more than fair to Standard and will permit the FTDF to make significant distribution to the FTDF members, many of whom rely on these funds for their day to day living needs.

14

stepped up to the plate to provide additional funding in an amount that was disproportionate to its original interest, it should be penalized by being liable for a greater percentage of the $17,750,000 alleged to have been promised.

This is not to say that there is **any** obligation on the part of FTDF to fund additional amounts; rather, this discussion illustrates the absurdity of the position advanced by Standard.

There is similarly no liability on the part of FTDF for breach of the implied warranty of good faith and fair dealing; since the Direct Lenders never agreed to fund anything beyond the stated amounts of their respective investments.[11]

### III. CONCLUSION

The FTDF Committee requests that the court disallow the Standard Claim in its entirety. FTDF further requests that the Court set any distribution reserve for the Standard Claim in an amount not to exceed $671,000.

DATED this 29th day of January, 2007.

STUTMAN, TREISTER & GLATT, P.C
FRANK A. MEROLA CA SBN 136934)
EVE H. KARASIK (CA SBN 155356)
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067

and

SHEA & CARLYON, LTD.

CANDACE C. CARLYON, SBN 02666
SHEA & CARLYON, LTD.
CANDACE C. CARLYON
SHLOMO S. SHERMAN SBN 009688
233 South Fourth Street, Second Floor
Las Vegas, Nevada 89101

---

[11] On the other hand, the implied warranty of good faith and fair dealing may well be implicated by the several forms of litigation initiated by Standard against the Direct Lenders seeking to extort additional funds in contravention of the clear and unambiguous provisions of the Loan Documents.