# Exhibit   B

# Exhibit   B

*From Seller*

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (hereinafter referred to as the "Agreement"), dated for identification purposes only as of the 22 day of May, 2006 (the "Effective Date"), is made by and between **HMA SALES, LLC**, a Nevada limited liability company ("Seller"), and **PACIFIC OCEAN MANAGEMENT** ("Buyer").

To the extent any capitalized term is not otherwise defined herein, refer to Section 12 of this Agreement for the definitions of those capitalized terms.

### RECITALS

**WHEREAS:**

1. Seller is the owner of that certain real property located in the County of Clark, State of Nevada, and known as APN #162-09-812-002 ("Parcel 1") and APN # 162-09-812-003 ("Air Space Lot") which is described on the Record of Survey (the "Record Survey") which is recorded at File 148 of Surveys, page 35, Clark County Official Records.

2. The second (2nd) through eighth (8th) floors of the Royal Hotel Casino are situated on the Air Space Lot, and the first (1st) floor is located on a portion of Parcel 1 (collectively herein referred to as the "Hotel"). Two (2) timeshare regimes have been established within the Air Space Lot: Royal Vacation Suites, a timeshare club membership program, and Royal Vacation Suites II, a fee simple timeshare project (collectively the "Timeshare Programs").

3. Seller desires to sell the Property (as defined in Section 1.2) to Buyer and Buyer desires to purchase the Property from Seller, in accordance with the terms of this Agreement.

### A G R E E M E N T

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and in the other documents referred to herein relating to the purchase and sale of the Property and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

ARTICLE 1.    PURCHASE AND SALE OF PROPERTY.

1.1    Agreement.  Seller hereby agrees to sell the Property to Buyer, and Buyer hereby agrees to purchase the Property from Seller, on the terms and conditions and for the purposes set forth in this Agreement.  Seller represents and warrants that Seller owns fee simple title to Parcel 1, the Air Space Lot and Improvements (subject to the intervals sold in the Timeshare Programs as described in this Agreement). Except for the representations and warranties expressly set forth in this Agreement, Buyer is purchasing the Property "AS-IS", in reliance upon its own inspection of the Property and its own investigation of such matters affecting the Property as it deems relevant.

1.2    Definition of Property.  As used in this Agreement, the term Property means:

(a)    Parcel 1 and the Air Space Lot (subject to the intervals previously sold in the Timeshare Programs as described in this Agreement);

15

(b)    All easements and rights appurtenant to Parcel 1 and Air Space Lot;

(c)    All buildings, structures, parking areas and other improvements located on the Parcel 1 and Air Space Lot, if any, together with an assignment of the leasehold interest in the Hotel sign from Young Electric Sign Company ("Improvements"); and

(d)    All of Seller's right, title and interest in all applications, fixtures, equipment, machinery, furniture, carpet, decorations, drapes, and other personal property located on or about Parcel 1 and Air Space Lot or used exclusively in the operation and maintenance thereof ("Tangible Personal Property"), a non-exclusive list of which Tangible Personal Property is more particularly described in Exhibit "B-1" attached hereto. The personal property listed in Exhibit "B-2" attached hereto is expressly excluded from and shall not be a part of the Tangible Personal Property. Seller hereby discloses that the furniture, fixtures and equipment located in the units in the Improvements on the Air Space Lot that have been dedicated to the Timeshare Programs are owned by the respective timeshare owners associations.

(e)    All of Seller's right, title and interest in any intangible personal property which is necessary or useful in connection with the ownership, improvement or operation of Parcel 1 and Air Space Lot.

(f)    All of Seller's right, title and interest in all plans, specifications, reports, surveys and maps.

(g)    All of Seller's right, title and interest in all transferable licenses (including any hotel, casino and liquor licenses), franchises, permits and entitlements.

(h)    All of Seller's rights as the developer under the Timeshare Programs.

(i)    All of Seller's rights to receivables generated from the sale of timeshare interests under either Timeshare Program that are in default and are not currently Pledged Receivables (as defined below), including, without limitation, those identified on Exhibit "S" attached hereto and by this reference made a part hereof.

    1.3    No Back-Up Offers. While this Agreement remains in full force and effect, Seller shall not have the right to continue to market the Property, or any portion thereof, for sale, negotiate with potential buyers, or enter into agreements to sell all or any portion of the Property.

ARTICLE 2.    PURCHASE PRICE AND FEASIBILITY.

    2.1    Purchase Price. The purchase price for the Property ("Purchase Price") shall be Twenty-Nine Million and 00/100 Dollars ($29,000,000.00) with the allocation between real property and personal property to be determined by the parties in good faith prior to Close of Escrow. In the event the parties do not mutually agree upon the allocation prior to the Close of Escrow, each party shall make its own determination of the correct allocation of the Purchase Price between real and personal property.

    2.2    Deposit. Buyer shall deposit the sum of One Million and 00/100 Dollars ($1,000,000.00) as an earnest money deposit (said deposit, with all interest accrued thereon, is herein referred to as the "Deposit") with First American Title Insurance Company in Clark County, Nevada ("Escrow Holder"), no later than one (1) day after the opening of escrow. The Deposit may be applied by the Buyer towards the Closing Payment at

the Close of Escrow.

2.3　　Seller Financing.　Seller agrees that Thirteen Million Dollars ($13,000.000.00) of the Purchase Price may be paid at the Close of Escrow by delivery of a promissory note (the "Seller Note") containing the following items:

    (a)　$13,000,000.00 principal;
    (b)　Interest accrues at 8.5% per annum;
    (c)　Accrued interest due and payable monthly in arrears;
    (d)　Maturity date Sixty Days (60) days from the Close of Escrow;
    (e)　May be prepaid without penalty; and
    (f)　Secured by a first priority deed of trust on Parcel 1 and the Air Space Parcel (the "Seller Trust Deed").

2.4　　Closing Payment.　Upon Close of Escrow, Buyer shall pay to Seller an amount ("Closing Payment") equal to Sixteen Million Dollars ($16,000,000.00) less any portion of the Deposit paid to Seller at or prior to the Close of Escrow, and subject to various prorations set forth in this Agreement. The Closing Payment shall be payable at Close of Escrow by wire transfer of funds.

ARTICLE 3.　　ESCROW.

3.1　　Escrow Instructions.　The purchase and sale of the Property shall be consummated through an escrow ("Escrow") to be established at Escrow Holder. The Escrow shall be opened on the Effective Date of this Agreement by delivery to Escrow Holder of a fully executed copy of this Agreement, which shall constitute Escrow Holder's instructions. The Effective Date shall be the date which the Escrow Holder has received a fully executed copy of this Agreement, and which date the Escrow Holder is authorized and directed to write on the first page of this Agreement where indicated. Seller and Buyer agree to execute and deliver to Escrow Holder such additional and supplemental instructions as Escrow Holder reasonably may require in order to clarify Escrow Holder's duties under this Agreement; provided, however, that in the event of any conflict or inconsistency between this Agreement and any instructions delivered to Escrow Holder, the terms of this Agreement shall govern the duties of Escrow Holder and the rights and obligations of Seller and Buyer.

3.2　　Definition of "Close of Escrow" and "Recorded."　For purposes of this Agreement, the term "Close of Escrow" shall mean the time when Escrow Holder shall have Recorded all of the instruments to be Recorded as set forth in Section 6.4 below. "Record" "Recorded" and "Recordation" shall mean, with respect to any document, the recordation of such document in the Office of the County Recorder of Clark County, Nevada.

ARTICLE 4.　　CONDITION OF TITLE.

4.1　　Permitted Exceptions.　Seller shall convey the Property to Buyer, subject only to the matters of record identified on Exhibit "C" attached hereto and by this reference made a part hereof and the rights of timeshare holders as described Exhibits "L", "M", "N" and "O" of this Agreement ("Permitted Exceptions").

4.2　　Title Insurance Policy.　At Close of Escrow and as a condition thereto, Escrow Holder shall issue to Buyer an ALTA Owner's Policy of title insurance for Parcel 1 and the Air Space Lot ("Title Policy") with a limit of liability in an amount equal to the real estate portion of the Purchase Price, subject only to the Permitted Exceptions. In the event Buyer desires to obtain ALTA extended coverage in connection with the Title Policy, Buyer shall, at its sole cost and expense, take all steps required to obtain such coverage, including, without limitation, obtaining the necessary survey for such ALTA extended coverage and paying any

additional premiums for such ALTA extended coverage. In the event Escrow Agent is not able to deliver the Title Policy in the manner set forth above, and provided that Buyer has delivered all materials to the Escrow Holder related to the issuance of the Title Policy as required in this Agreement, Buyer may, at its option, (i) waive this requirement and proceed to closing, or (ii) terminate this Agreement, whereupon Escrow Holder and Seller shall immediately return the Deposit to Buyer. At Close of Escrow and as a condition thereto, Escrow Holder shall issue to Seller an ALTA Lender's Extended Coverage Policy of Title Insurance, with coverage in the amount of the Seller Note, insuring the lien of the Seller Trust Deed as a first lien, subject only to Permitted Exceptions (the "Seller Title Policy").

    4.3    Condition of Title. Seller covenants that Seller shall not permit any new matter to encumber or affect title to the Property from and after the date hereof that will survive the Close of Escrow unless Buyer has approved the same in writing, which approval may be granted or withheld in Buyer's sole and absolute discretion. Without limiting the foregoing, Seller shall not, without Buyer's prior written consent, which may be granted or withheld in Buyer's sole and absolute discretion (i) sell, convey, or grant any rights to any parties under either Timeshare Program nor modify any existing rights, nor (ii) convert any interest in Royal Vacation Suites to Royal Vacation Suites II, nor (iii) sell, convey, grant, or assign the Property or any portion of the Property or any interest in the Property. Buyer and Seller shall, prior to the Close of Escrow, negotiate an agreement regarding the Pledged Receivables or any timeshare intervals taken back or held by Seller (or any affiliate) after the Close of Escrow whereby Buyer shall have the absolute right to acquire such intervals at the prices set forth in Exhibit "R" attached hereto and by this reference incorporated herein.

ARTICLE 5.    CONDITIONS PRECEDENT TO CLOSE OF ESCROW.

    5.1    Conditions Precedent to Seller's Obligations. Each of the following shall be a condition precedent to the obligation of Seller to close the Escrow and may be waived only by a written waiver executed by Seller and delivered to Escrow Holder:

    (a)    Representations and Warranties. All of Buyer's representations and warranties contained in this Agreement are true and correct in all material respects as of the Close of Escrow. Buyer's representations and warranties contained herein and in any certificate or document delivered to Seller pursuant hereto shall be deemed to have been made again at and as of the Close of Escrow and shall then be true and correct in all material respects.

    (b)    Funds. Buyer shall have deposited with Escrow Holder immediately available funds in the amount of the Closing Payment by the Close of Escrow.

    (c)    Default. Buyer shall not have committed a Buyer Event of Default (hereinafter defined in Section 12.1) and not cured the same within five (5) business days after receipt of written notice from Seller; provided, however, that no such cure shall extend the Closing Date and further provided that no cure period shall be allowed for any failure of Buyer to timely close by the Closing Date.

    (d)    Delivery of Documents. Buyer shall have delivered to Escrow Holder all documents required to be delivered under Section 6.3(b) of this Agreement.

    (e)    Title Policy. Escrow Holder shall be committed to issue the Seller Title Policy subject to the same exceptions as described in Buyer's Title Policy.

5.2    <u>Buyer's Conditions</u>.  In addition to any other conditions precedent set forth in this Agreement, each of the following shall be a condition precedent to the obligation of Buyer to close the Escrow and may be waived only by a written waiver executed by Buyer and delivered to Escrow Holder:

(a)    <u>Representations and Warranties</u>.  All of Seller's representations and warranties contained in this Agreement are true and correct in all material respects as of the Close of Escrow. Seller's representations and warranties contained herein and in any certificate or document delivered to Buyer pursuant hereto shall be deemed to have been made again at and as of the Close of Escrow and shall then be true and correct in all material respects.

(b)    <u>Performance</u>.  Seller shall have performed and complied with all material covenants and agreements that Seller is required to perform or with which it is required to comply prior to or at the Close of Escrow.

(c)    <u>Default</u>.  Seller shall not have committed a Seller Event of Default (hereinafter defined in Section 12.2).

(d)    <u>Delivery of Documents</u>.  Seller shall have delivered to Escrow Holder all documents required to be delivered under Section 6.3(a) of this Agreement.

(e)    <u>Title Policy</u>.  Escrow Holder fails to deliver the Title Policy to Buyer at the Close of Escrow as required under Section 4.2 of this Agreement.

(f)    <u>No Adverse Conditions</u>.  There shall be no material pending or written threat of litigation actually received by Seller, environmental, zoning or other land use regulation proceeding which, if adopted, would in Buyer's reasonable opinion, detrimentally and materially affect the use or operation of the Property as a hotel, the Timeshare Programs, Buyer's right to construct new the improvements on the Property or Buyer's right, title and interest in and to the Property. Any adverse conditions that cumulatively affect the value of the Property by Two Million Dollars ($2,000,000) or more shall be deemed material.

(g)    <u>Possession</u>.  Except for (i) owners of timeshare interests under either Timeshare Program ("Timeshare Owners") and transient guests staying at the Property as of the Close of Escrow, and (ii) the Permitted Exceptions (which shall include, without limitation, any recorded and unrecorded lease or contractual rights affecting the Property and the lease of the main Hotel sign), Seller shall deliver possession of the Property to Buyer, free and clear of any and all leases, management contracts, or other parties claiming a right to occupy or lease the Property, or any part of it;

(h)    <u>Continued Operations</u>.  Through the Close of Escrow, Seller shall have continued to operate the hotel operations at the Property in the ordinary course of business in a manner substantially similar to the manner in which Seller operated same on the Effective Date; and

(i)    <u>Hazardous Materials</u>.  The introduction on the Property after the Effective Date of any toxic or hazardous substances, materials or wastes not stored, utilized or disposed of in accordance with applicable laws and regulations.

(j)    <u>Termination of Marketing Agreement</u>.  Seller shall deliver to Escrow Agent at least one (1) business day prior to the Close of Escrow, the written termination of the Listing, Marketing and Fee Agreement between HMA Sales, LLC and Blue River Advisors, Inc., as assigned to National

Real Estate Funding, Inc. (the "NREF Agreement") with instructions to hold the same in escrow until the Close of Escrow.

(k)    Bankruptcy Court Orders.  Seller shall have received such final and unappealable orders from the United States Bankruptcy Court, District of Nevada (Las Vegas), in the case of In Re USA Mortgage Company ("Debtor"), Bankruptcy Petition # 06-10725-lbr, as the Buyer and the Escrow Holder (in its capacity as a title company) reasonably require to assure Buyer and Escrow Holder that Buyer will receive good and marketable title to the Property, free and clear of any claims or encumbrances other than the Permitted Exceptions (the "Bankruptcy Court Orders"). If the Seller has not received the Bankruptcy Court Orders by the 270th day following the Effective Date, the Buyer may, in its sole and absolute discretion, at any time thereafter and upon ten days prior written notice ("Termination Notice") to Seller terminate this Agreement and cancel the Escrow. Immediately upon the end of the tenth day following delivery of the Termination Notice to Seller, this Agreement shall be deemed terminated and the Escrow Holder shall cancel the Escrow and return the Deposit to the Buyer without any other instructions from the Buyer or Seller.  If any application to the Bankruptcy Court for the Bankruptcy Court Orders is denied by the Bankruptcy Court (which Seller shall pursue in good faith), Seller shall have the right to terminate this Agreement by written notice to Buyer and Escrow Holder.

ARTICLE 6.    CLOSE OF ESCROW.

*SEVENTEENTH*

6.1    Date of Close.  Provided that all of the conditions precedent to Close of Escrow set forth in Article 5 of this Agreement have been satisfied or waived in writing, the parties agree that Escrow shall close and Escrow Holder is instructed to close the Escrow on the date selected by Buyer upon at least three business days notice to Seller and Escrow Holder, but in no event later than the latter to occur of (i) tenth (10th) day (*17th*) (*June 9th, 2006*) following the Effective Date and (ii) five (5) business days after obtaining the Bankruptcy Court Orders ("Closing Date"), unless otherwise agreed to in writing by the parties to this Agreement.  Notwithstanding the foregoing, if Closing Date would otherwise fall on Saturday, Sunday, Monday or legal holiday when federal banks are closed, the Close of Escrow shall fall on the next business day thereafter.  Escrow Holder, by closing the Escrow, shall be deemed to have irrevocably committed to cause the issuance of the Title Policy.

6.2    Escrow Cancellation.

(a)    If the Escrow fails to close by reason of a Buyer Event of Default (as defined in Section 12.1), Buyer shall pay Escrow Holder's normal and customary escrow cancellation charges and Escrow Holder shall deliver the remaining Deposit to Seller as liquidated damages, as provided in Section 12.3 below.

(b)    If the Escrow fails to close by reason of a Seller Event of Default (as defined in Section 12.2), Seller shall pay Escrow Holder's normal and customary escrow cancellation charges and Escrow Holder and Seller shall deliver the Deposit to Buyer.

6.3    Items to be Delivered into Escrow.

(a)    By Seller.  On the date set for the Close of Escrow, and provided Buyer has deposited all items to be deposited in Escrow pursuant to Section 6.3(b), Seller shall deposit in the Escrow the following documents:

      (1)     A grant bargain and sale deed ("GBS Deed") conveying Parcel 1 and Air Space Lot to Buyer, substantially in the form of <u>Exhibit "D"</u> attached hereto, duly executed and acknowledged by Seller and in Recordable form.

      (2)     A non-foreign transferor declaration ("Non-foreign Transferor Declaration"), substantially in the form of <u>Exhibit "E"</u> attached hereto, duly executed by Seller.

      (3)     A bill of sale conveying the Tangible Personal Property to Buyer substantially in the form of <u>Exhibit "F"</u> attached hereto.

      (4)     A general assignment of all applicable and transferable service contracts, licenses, permits, franchises and rights to the name "Royal Resort". An assignment in the form of <u>Exhibit "G"</u> attached hereto (the "General Assignment").

      (5)     An assignment and transfer of all of Seller's rights as the "Developer" under the Timeshare Programs in the form of <u>Exhibit "H"</u> attached hereto (the "Timeshare Assignment"). In the Timeshare Assignment, (i) Buyer shall affirmatively accept all obligations of Seller under the Timeshare Programs arising after the effective date of the Timeshare Assignment, and shall indemnify Seller from any failure of Buyer to perform such obligations, and (ii) Seller shall indemnify Buyer from any and all matters related to the Timeshare Programs that arose prior to the effective date of the Timeshare Assignment. In the event Seller or an affiliate leases the Hotel from Buyer at the Close of Escrow, the Timeshare Assignment shall be addressed in the lease document.

      (6)     An assignment of all of the receivables held by Seller arising from the sale of timeshare interests in the Timeshare Programs that are not Pledged Receivables in the form of <u>Exhibit "U"</u> attached hereto (the "Receivables Assignment"), together with the original documents evidencing and securing all such receivables.

      (7)     Such affidavits, resolutions and certificates pertaining solely to actions of Seller or its affiliates as required by Escrow Holder in order to issue the Title Policy.

      (8)     A payoff letter from any existing lender whose loan is secured by the Property.

      (9)     Such surveys, site plans, plans and specifications, and other matters relating to the Property as are in the possession of Seller, if any, to the extent not theretofore delivered to Buyer.

      (10)    Such certificates of occupancy, operating permits and licenses as are then in Seller's possession, if any;

      (11)    All boxes, records, materials, filings, registrations, and other matters related to the Timeshare Programs.

      (12)    All books and records of the hotel operations applicable to the post-Closing operation of the Property.

      (13)    The original documents of all Service Contracts assumed by Buyer at the Close of Escrow.

(14)    A ledger of all guests staying at the Property as of the Close of Escrow.

(15)    A list of all reservations for rooms at the Property which apply from and after the Close of Escrow.

(16)    A Settlement Statement prepared by Escrow Holder and signed by Seller.

(17)    The written termination of any Service Contracts that Buyer does not agree to assume.

(18)    Escrow of the written termination of the NREF Agreement on or before one (1) business day prior to the Close of Escrow.

(19)    An update of the disclosures provided in Exhibits "K", "L", "M", "N" and "O" of this Agreement.

(20)    Two (2) counterparts of the agreement to sell re-acquired timeshare intervals as described in Section 4.3 above.

(21)    Two (2) counterparts of an agreement to convey, at Buyer's election, any timeshare interval that Seller or any affiliate of Seller obtains after the Close of Escrow to Buyer (or its designee) in exchange for an interest in or right to use units in a new building to be constructed on or adjacent to the Property (a "New Unit") upon the same terms as the majority of timeshare owners or the respective timeshare associations in the applicable Timeshare Program have agreed, provided that Seller will not be required to pay additional consideration to Buyer for such exchange. The form of this agreement is attached hereto as Exhibit "V" and by this reference made a part hereof (the "Interval Exchange Agreement"). By way of illustration, if the majority of timeshare owners in the Royal Vacation Suites II have agreed to exchange their fee simple interest in a timeshare interval for a contractual right-to-use a New Unit plus a payment of $2,500.00 to Buyer for the upgrade, then Seller will agree to the same but not be required to pay the $2,500.00.

(22)    Such other documents as shall be reasonably required by Buyer's counsel or Buyer's title insurance company that is customary for a transaction of this type and that is not materially detrimental to Seller, in form and substance reasonably satisfactory to Seller and Buyer.

(b)    By Buyer.  On or before the Closing Date, Buyer shall deposit in Escrow the following:

(1)    No later than one (1) business day before the Closing Date, immediately available collected funds in the form of a wire transfer to the account of Escrow Holder in an amount equal to the Closing Payment.

(2)    The Seller Note substantially in the form of Exhibit "I" attached hereto.

(3)    The Seller Trust Deed.  A deed of trust substantially in the form of Exhibit "J" attached hereto.

(4)     The General Assignment.

(5)     The Timeshare Assignment.

(6)     A Settlement Statement prepared by Escrow Holder and signed by Buyer.

(7)     Two (2) counterparts of the agreement to sell re-acquired timeshare intervals as described in Section 4.3 above.

(8)     A written commitment to allow Seller (or its designee approved by Buyer) to participate in Buyer's co-brokerage program for the sale of condominium units, for up to 25% of the condominium units to be developed on the Property not to exceed 600 units, on such terms and conditions as generally made available to qualified Nevada real estate brokers in Seller's co-brokerage program, provided that Seller develops and constructs whole ownership condominium units on the Property which is for sale to the public.  Buyer hereby approves National Real Estate Holdings, Inc. as a permitted designee of the foregoing right (the Co-Broker Commitment").

6.4     Escrow Holder's Instructions.  At such time as the conditions precedent to Close of Escrow have been satisfied or waived, Escrow Holder shall perform the acts set forth below in the following order:

(a)     Date, as of the date of Close of Escrow, all instruments calling for a date.

(b)     Prepare a Declaration of Value in such form as required by Nevada Revised Statutes ("NRS") 375.060 ("Real Property Transfer Tax Declaration").

(c)     Record the GBS Deed.

(d)     Record the Seller Trust Deed.

(e)     Record the Timeshare Assignment to Buyer.

(f)     Deliver the Receivables Assignment (and all original documents in Escrow Agent's possession evidencing or securing the same) to Buyer.

(g)     Deliver the Title Policy to Buyer.

(h)     Deliver the original Seller Note and Seller's Title Policy to Seller.

(i)     Deliver the Bill of Sale and General Assignment to Buyer.

(j)     Prepare and submit to the Internal Revenue Service the information return and statement concerning the Close of Escrow of the Escrow ("Information Return") required by Section 6045(e) of the Internal Revenue Code of 1986, unless the Information Return is not required under the regulations promulgated under Section 6045(e).

(k)     Deliver to Buyer and Seller one (1) original of the agreement to sell re-acquired timeshare intervals as described in Section 4.3 above.

(l)     Deliver the original Co-Broker Commitment to Seller and a copy to Buyer.

(m)    Deliver the original Interval Exchange Agreements to Buyer and a copy to Seller.

6.5    Post-Closing Matters. Following the Close of Escrow, the instruments that are required to be Recorded under this Agreement shall provide that the Recorder shall return them to Escrow Holder after Recordation, and upon receipt thereof, Escrow Holder shall deliver the following:

To Seller :

(1)    One (1) copy of the GBS Deed showing all recording information.

(2)    One (1) copy of the Real Property Transfer Tax Declaration.

(3)    One (1) copy of the Seller's Settlement Statement.

(4)    One (1) copy of the Bill of Sale.

(5)    One (1) copy of the General Assignment.

(6)    One (1) copy of the Receivables Assignment.

(7)    The original Seller Trust Deed showing all recording information.

To Buyer:

(1)    The original GBS Deed showing all recording information.

(2)    One (1) copy of the Real Property Transfer Tax Declaration.

(3)    One (1) copy of the Buyer's Settlement Statement.

(4)    One (1) copy of the Seller Trust Deed showing all recording information.

(5)    One (1) copy of the Seller Note.

ARTICLE 7.    COSTS AND PRORATIONS.

7.1    Property Taxes; Transient Occupancy Taxes. All real and personal property ad valorem taxes, if any, whether payable in installments or not, for the tax year in which the Close of Escrow occurs shall be prorated to the date of the Close of Escrow, based on the latest available tax rate and assessed valuation, to be re-prorated based on actual tax rates and valuations at the time such actual amounts become known. Seller shall pay all hotel and transient occupancy taxes arising from the Property prior to the Close of Escrow, and Buyer shall be responsible for all transient occupancy taxes arising after the Close of Escrow. This Section 7.1 shall survive the Close of Escrow.

7.2    Utilities. Seller shall have the utility companies prepare final bills for utility service to the Property as of 11:59 P.M. on the day immediately preceding the Close of Escrow, and Seller shall be responsible for such bills. Buyer shall have the utility companies put the billings for utilities to the Property in the name of Buyer as of the Close of Escrow. In the event that the utility companies do not prepare new bills for the Property as of the Close of Escrow, Seller and Buyer shall prorate the utility costs for the Property based

at the Close of Escrow on the most recent bills, and they shall make any further adjustment within sixty (60) days after the Close of Escrow as may be appropriate.

7.3    Service Contracts.  Subject to Section 9.8 of this Agreement, Seller shall bear the cost of terminating any Service Contract that Buyer does not expressly agree to assume at the Close of Escrow.

7.4    Hotel Operations.  All room revenues and other revenues derived from the hotel operations and all expenses related to the operation of the hotel (including, without limitation, transient occupancy taxes) shall be prorated as of 11:59 P.M. on the day immediately following the Close of Escrow so that Seller retains all the benefits and burdens of revenues and expenses related to the hotel operations prior to the Close of Escrow, and Buyer receives all the benefits and burdens of revenues and expenses related to the hotel operations from and after the Close of Escrow.  All funds on hand at the Property (i.e., cash in petty cash accounts, in cash registers or otherwise) shall be transferred to and become the property of Buyer at the Close of Escrow, and Seller shall receive a credit for such funds.

7.5    Costs to be Paid by Seller at the Close of Escrow.  Seller shall pay the following costs ("Seller's Closing Costs"):

(a)    One-half (1/2) of the real property transfer tax imposed on the GBS Deed, pursuant to NRS Chapter 375.

(b)    One-half (½) of the Escrow fee.

(c)    The costs of a standard form CLTA owner's policy of title insurance for the Property in the amount of the Purchase Price.

7.6    Costs to be paid by Buyer at the Close of Escrow.  Buyer shall pay the following costs ("Buyer's Closing Costs"):

(a)    (a)    One-half (1/2) of the real property transfer tax imposed on the GBS Deed, pursuant to NRS Chapter 375.

(b)    All fees for Recording the GBS Deed, the Seller Trust Deed and the Timeshare Assignment.

(b)    One-half (½) of the Escrow fee.

(c)    Buyer's share of the property tax described in Section 7.1, as reasonably calculated by Escrow Holder.

(d)    Any premium charged by Escrow Agent for Seller's Title Policy, for ALTA and/or extended coverage on Buyer's Title Policy, and any title endorsements desired and obtained by Buyer.

7.7    Other Costs.  All other costs associated with the Close of Escrow of this Agreement shall be borne by the parties in accordance with custom in the state and county in which the Property is located as determined by Escrow Agent, unless otherwise specified in this Agreement.

## ARTICLE 8.    BUYER'S REPRESENTATIONS.

As a material inducement to Seller to enter into this Agreement, Buyer covenants, represents and warrants to Seller as of the date hereof and as of Close of Escrow, as follows:

8.1    Authority; Qualification.  Buyer is a duly formed, validly Nevada limited liability company and is duly qualified to do business in the State of Nevada. Each of the individuals executing this Agreement has the full right, power and authority to enter into and carry out the transactions contemplated by this Agreement. The entering into of this Agreement and the carrying out of the transactions contemplated hereby does not and will not constitute a default (or an event which, with the giving of notice or the passage of time, would constitute a default) under any agreement to which Buyer or any individual executing this Agreement is a party.

8.2    Indemnity.  Buyer hereby agrees to indemnify, defend and hold harmless Seller for any breach of the Buyer's representations, warranties, covenants and conditions set forth in this Agreement.

8.3    Binding Agreement.  Upon Buyer's execution of this Agreement, this Agreement shall be binding and enforceable against Buyer in accordance with its terms. Upon Buyer's execution of the additional documents contemplated by this Agreement, the additional documents shall be binding and enforceable against Buyer in accordance with their terms.

8.4    Consents.  Neither the execution and the delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement is subject to any requirement that Buyer obtain any consent, approval or authorization of, or make any declaration or filing with, any governmental authority or third party which cannot be obtained prior to the Close of Escrow or which, in any case or in the aggregate, if not obtained or made would render such execution, delivery or consummation illegal or invalid, or would constitute a default under, or result in the creation of any lien, charge or encumbrance upon the Property.

8.5    Litigation.  There is no litigation, arbitration or administrative proceeding pending or threatened against Buyer with respect to the Property or this Agreement.

8.6    Bankruptcy.  Buyer has not made a general assignment for the benefit of creditors, filed any voluntary petition in bankruptcy or received notice of the filing of any involuntary petition in bankruptcy against Buyer.

## ARTICLE 9.    SELLER'S REPRESENTATIONS AND DISCLOSURES.

As a material inducement to Buyer to enter into this Agreement, Seller covenants, represents and warrants to Seller as of the date hereof and as of Close of Escrow, as follows:

9.1    Authority.  Seller is a duly formed, validly existing limited liability company and is duly qualified to do business in the State of Nevada. Each of the individuals executing this Agreement has the full right, power and authority to enter into and carry out the transactions contemplated by this Agreement. The entering into of this Agreement and the carrying out of the transactions contemplated hereby does not and will not constitute a default (or an event which, with the giving of notice or the passage of time, would constitute a default) under any agreement to which Seller or any individual executing this Agreement is a party.

9.2    Title.  To the best of Seller's knowledge, and except as disclosed in this Agreement, there are no material unrecorded agreements, liens or encumbrances which may affect the Property after the Close of

Escrow.

9.3    Binding Agreement. Upon Seller's execution of this Agreement, this Agreement shall be binding and enforceable against Seller in accordance with its terms. Upon Seller's execution of the additional documents contemplated by this Agreement, the additional documents shall be binding and enforceable against Seller in accordance with their terms.

9.4    Consents. Neither the execution and the delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement is subject to any requirement that Seller obtain any consent, approval or authorization of, or make any declaration or filing with, any governmental authority or third party which cannot be obtained prior to the Close of Escrow or which, in any case or in the aggregate, if not obtained or made would render such execution, delivery or consummation illegal or invalid, or would constitute a default under, or result in the creation of any lien, charge or encumbrance upon the Property.

9.5    Litigation. There is no litigation, arbitration or administrative proceeding pending or threatened against Seller with respect to the Property or this Agreement except for the threat of litigation from National Real Estate Funding. Seller agrees to indemnify and hold Buyer harmless from and against any and all loss, cost, damage liability or expense that Buyer may suffer or incur (including, without limitation, attorney's fees and court costs) arising from or related to any claim or litigation by National Real Estate Funding.

9.6    Bankruptcy. Seller has not made a general assignment for the benefit of creditors, filed any voluntary petition in bankruptcy or received notice of the filing of any involuntary petition in bankruptcy against Seller.

9.7    Compliance with Governmental Requirements. Seller warrants:

(a)    Violations. Seller has not received any written notice from a governmental agency that the Property or the Improvements thereon violate or are not in compliance with any law or regulation governing the protection of lands or other laws or regulations.

(b)    Licenses. A certificate of occupancy and all licenses, permits, authorizations and approvals required from all governmental agencies have been issued for the operation of the Hotel.

(c)    No Agreements. Except as otherwise disclosed in this Agreement (including the exhibits hereto), there are no agreements with governmental authorities, agencies, utilities or quasi-governmental entities or other third parties with respect to the Property which would bind the Property following the Close of Escrow.

(d)    Timeshare Programs. The Timeshare Programs have been validly registered in and approved by the State of Nevada and any other state where registration may be required, and all such registrations are current. Seller has not received any notice of any alleged violation of any law related to the sales, marketing or operation of either Timeshare Program.

9.8    Service Contracts. Except as set forth on Exhibit "K" attached hereto, there are no contracts or agreements with any third party for the maintenance, service, sales or management or the Property or other matter related to the Property (the "Service Contracts") that will survive the Close of Escrow. In the event the contract with National Real Estate Funding is not terminated by the Close of Escrow, the same shall not constitute a default by Seller, but Buyer shall have the absolute right to terminate this Agreement and receive an immediate refund of the Deposit from Seller and Escrow Holder.

9.9    No Pending Proceedings/Assessment.  There is no pending, or to the best of Seller's knowledge, threatened condemnation, environmental, zoning or other land-use regulation proceeding against the Property or any portion thereof, nor does Seller or its agents have any knowledge or notice of any public request, plans or proposals for changes in road grade, access or other municipal improvements that may affect the Property or result in a tax, levy or assessment against the Property or otherwise detrimentally affect the use, operation or value of the Property.

9.10    No Roll-Back Taxes.  Seller has not received written notice that the Property has been classified under any designation authorized by law to obtain a special low ad valorem tax rate or to receive a reduction, abatement or deferment of ad valorem taxes which, in such case, would result in additional, catch-up or roll-back ad valorem taxes in the future in order to recover taxes for any prior year.

9.11    On-site Employees.  There are no employment, collective bargaining, or similar agreements or arrangements between Seller and any other party which will be binding on Buyer.  Seller shall be solely responsible for any and all matters related to its employees before and after the Close of Escrow, including, without limitation, payment of wages, compliance with the WARN Act and required notifications related to continuing insurance coverage.

9.12    Governmental Investigations.  To the best of Seller's knowledge, there are no actions, proceedings or governmental investigations pending or threatened in writing against Seller or the Property which could affect the Property or the purchase, use or enjoyment thereof by Buyer and there is no law or regulation of any governmental authority having jurisdiction which might require the Property to be improved beyond its present state or which might restrict the use and enjoyment of the Property.

9.13    Timeshare Owners/Contracts.  The following Exhibits contain a true, complete and accurate account of the applicable information as of the Effective Date:

Exhibit "L"    List of Timeshare Owners under the Royal Vacation Suites Timeshare Programs, including term of membership, good standing status of owner, type of interest owed (annual, biennial, suite type, etc).

Exhibit "M"    List of Timeshare Owners under the Royal Vacation Suite II Program, including good standing, rights of owner and type of interest owed.

Exhibit "N"    List of all outstanding contracts for the sale of any timeshare intervals under either Timeshare Program.

Exhibit "O"    List of Timeshare Owners or contract purchasers promised a free conversion from Royal Vacation Suites to Royal Vacation Suites II.

9.14    Obligations to Timeshare Owners.  Seller has no obligation to any Timeshare Owner other than as described in the timeshare governing documents listed on Exhibit "P" attached hereto.  Neither Seller nor any of its employees, agents or salespeople have made any representations, promises or warranties to any Timeshare Owner that has not been fulfilled or that would be binding upon Buyer.

The truth of the foregoing representations and warranties in all material respects on and as of the date hereof and on and as of the Close of Escrow shall be a condition precedent to the Close of Escrow and Buyer's obligation to otherwise perform under this Agreement.  If any of the foregoing representations or warranties shall be found to be untrue prior to the Close of Escrow, Buyer may, at Buyer's election and as Buyer's sole

remedy, either (a) waive such condition and close escrow, or (b) terminate this Agreement and exercise its rights under Section 12.4 of this Agreement. All representations and warranties by Seller set forth in this Agreement shall survive the execution and delivery of this Agreement, the recordation of the Deed and the Close of Escrow, for a period of one (1) year. Any action after Close of Escrow for inaccuracy of any representation and/or warranty contained in this Agreement will be preserved only if (a) written notice of the claim is given to Seller within said one (1) year period after the Close of Escrow, and (b) an action is filed and served within eighteen (18) months after the Close of Escrow. Any such actions or claims that are not asserted in writing within the one (1) year period or filed and served within said eighteen (18) month period shall be null and void; provided however, that Buyer need not serve said action within this deadline unless Seller has an agent for service of process who is immediately susceptible to service of process during regular business hours.

ARTICLE 10.   SELLER'S COVENANTS.

So long as Buyer is not in default of this Agreement, Seller agrees as follows:

(1)    Service Contracts.  Seller shall remain liable for all obligations under each Service Contract that occurred prior to Closing. Seller shall not enter into any other service contract or other agreement affecting the Property that will survive the Close of Escrow without the prior written consent of Buyer.

(2)    No Modification of Agreements.  While this Agreement is in effect, Seller will not, without the prior written consent of Buyer, enter into any contract for or on behalf of or affecting the Property which cannot be terminated at the Close of Escrow without cost, penalty or premium and shall not enter into any new operating agreement or equipment lease, or any amendment, modification or termination of any existing agreement or lease which cannot be terminated by Buyer at or any time after the Close of Escrow.

(3)    Alteration of Property.  Without Buyer's prior written consent, after the date of this Agreement and prior to the Close of Escrow, Seller shall not materially alter the condition of the Property or make any material changes or alterations to the Improvements.

(4)    Encumbrance of Real Property.  During the term of this Agreement, Seller shall not, without the prior written consent of Buyer, grant or otherwise create or consent to the creation of any easement, restriction, lien, assessment, or encumbrance that will affect the Property after the Close of Escrow.

(5)    Repair of Defects.  Seller shall manage and maintain the Property through the Close of Escrow so that the Property is in as good a condition and state of repair as that existing at the date of this Agreement, normal wear and tear and damage caused by events of force majeure excepted.

(6)    Insurance.  Seller shall maintain adequate property damage and personal injury insurance covering the Improvements on the Property and the Personal Property through the Close of Escrow.

(7)  .  Operation of Property.  Subject to Section 4.3 of this Agreement and the limitations set forth herein, Seller agrees, through the Close of Escrow, to (i) operate, manage and maintain the Property substantially as presently being operated (subject to the restrictions set forth in item (8) below); (ii) maintain reasonable levels of inventories at the Property; (iii) timely pay all accounts payable and operating expenses; and (iv) deliver to Buyer copies of any operating statements prepared through the Close of Escrow.

(8)    Timeshare Sales and Conversions.  During the term of this Agreement, Seller shall not sell any new timeshare intervals from the unsold inventory; however, Seller may complete the sale of timeshare intervals that are under contract on the date hereof which are identified on Exhibit "T" attached hereto and by this reference made a part hereof.

(9)   Reservations.  Seller shall only accept room reservations for transient rental from and after the date hereof which are at the standard rates charged for such room and which are otherwise in the ordinary course of business.  Any deposits for reservations at the Hotel after the Close of Escrow shall be transferred to Buyer at the Close of Escrow.

(10)   Due Diligence Materials.  At all times prior to the Close of Escrow, Seller shall provide full and complete access (upon one (1) business day's advance notice and during normal business hours) to all books, records, reports, studies, plans, surveys, title policies and other matters related to the Property that Buyer may request, and Buyer shall be entitled at Buyer's expense to make copies of the same.

(11)   Indemnity.  Seller shall indemnify and hold Buyer harmless from and against any and all loss, cost, damage, liability or expense (including, without limitation, attorney's fees and court costs) arising from or related to claims, whether meritorious or not, by Timeshare Owners, occupants of the Property or other third parties that arise from events that occurred at any time prior to the Close of Escrow and during the term of the Lease.  This indemnity shall survive the Close of Escrow.  Buyer shall indemnify and hold Seller harmless from and against any and all loss, cost, damage, liability or expense (including, without limitation, attorney's fees and court costs) arising from or related to claims, whether meritorious or not, by Timeshare Owners, occupants of the Property or other third parties that arise from events that occurred at any time after the termination of the Lease. This indemnity shall survive the Close of Escrow.

ARTICLE 11.   RISK OF LOSS.

(1)   Condemnation.  If, between the date hereof and the Close of Escrow, action is initiated to take any material portion of the Property by eminent domain proceedings or by deed in lieu thereof, Buyer may either (a) terminate this Agreement, or (b) consummate the Close of Escrow, in which latter event the award of the condemning authority shall be assigned to Buyer at the Close of Escrow or, if previously paid to Seller, credited against the Purchase Price.

(2)   Casualty.  Seller shall retain all risk and liability for damage to or injury occurring to the Property by fire, storm, accident, or any other casualty or cause until the Close of Escrow has been consummated.  If, between the date hereof and the Close of Escrow, the Improvements are "materially damaged" (as defined below), Seller shall promptly, and in any event prior to the Close of Escrow, notify Buyer of same.  Buyer may elect, by written notice delivered to Seller by the Close of Escrow, terminate this Agreement without further liability to Buyer, and neither party shall have any further obligation to the other hereunder except as may be expressly provided herein.  The Close of Escrow shall be extended as necessary to permit Buyer the full fifteen (15) days.  "Materially damaged" means damage costing in Buyer's reasonable judgment $2,000,000.00 or more to repair.  If Buyer does not so terminate, in the case of material damage, or if the Improvements suffer damage which is not material, Seller shall assign to Buyer at the Close of Escrow its right to recover under any insurance policies covering such damage and shall credit to Buyer at the Close of Escrow the amount of the insurance proceeds previously collected plus any deductible or other self-insured retention or uninsured claim.

ARTICLE 12.  DEFAULT AND REMEDIES.

12.1   Buyer's Events of Default.  The occurrence of any of the following prior or subsequent to Close of Escrow, shall be a "Buyer Event of Default" hereunder:

(a)   The failure by Buyer to deliver (i) the Deposit, or (ii) the Closing Payment;

(b)   The filing of a petition or the institution of proceedings of, by, or against Buyer pursuant to the Bankruptcy Reform Act of 1978, as amended, or any successor statute or pursuant to any state bankruptcy, insolvency, moratoria, reorganization, or similar laws which is not dismissed

within ninety (90) days; or Buyer's making a general assignment for the benefit of its creditors or the entering by Buyer into any compromise or arrangement with its creditors generally; or Buyer's becoming insolvent in the sense that Buyer is unable to pay its debts as they mature or in the sense that Buyer's debts exceed the fair market value of Buyer's assets;

(c)      Any of Buyer's representations and warranties set forth in Article 8 above shall be untrue in any material way as of the date hereof and as of the Closing Date, and not be cured within five (5) business days after notice to Buyer; provided that no cure shall extend the Closing Date.

(d)      The failure of Buyer to perform any material act to be performed by it, to refrain from performing any material prohibited act or to fulfill any material condition to be fulfilled by it under this Agreement.

12.2      Seller's Events of Default.  The occurrence of any of the following prior or subsequent to Close of Escrow, shall be an "Seller Event of Default" hereunder:

(a)      Any of Seller's representations and warranties set forth in Article 9 above shall be untrue in any material way as of the date hereof or as of the Closing Date, unless cured by the Closing Date.

(b)      The failure of Seller to perform any material act to be performed by it, to refrain from performing any material prohibited act or to fulfill any material condition to be fulfilled by it under this Agreement.

(c)      Seller, or any member or manager of Seller, makes a general assignment for the benefit of creditors, files any voluntary petition in bankruptcy or receives notice of the filing of any involuntary petition in bankruptcy against such party.

12.3      Seller's Remedies.  In the event of the occurrence of any Buyer Event of Default prior to the Close of Escrow, Seller may pursue the following as its sole and exclusive remedy:

BY WRITTEN NOTICE TO BUYER AND ESCROW HOLDER, TERMINATE THIS AGREEMENT AND RETAIN THE DEPOSIT AS SELLER 'S LIQUIDATED DAMAGES FOR THE BREACH OF THIS AGREEMENT BY BUYER. IT IS EXPRESSLY UNDERSTOOD AND AGREED BETWEEN SELLER AND BUYER THAT SELLER'S DAMAGES FROM A BUYER DEFAULT WOULD BE IMPRACTICABLE OR IMPOSSIBLE TO FIX WITH ACCURACY, AND THAT THE AMOUNT AND VALUE OF THE DEPOSIT IS THE PARTIES' BEST, GOOD FAITH ESTIMATE OF THE AMOUNT BY WHICH SELLER WOULD BE DAMAGED BY BUYER'S DEFAULT UNDER THIS AGREEMENT. IT IS NOT THE INTENT OF THE PARTIES THAT THE FOREGOING LIQUIDATED DAMAGES PROVISIONS SHALL LIMIT SELLER FROM EXERCISING ANY RIGHT OR REMEDY AVAILABLE AT LAW OR IN EQUITY WITH RESPECT TO BUYER'S INDEMNITIES HEREUNDER AND OTHER OBLIGATIONS INTENDED BY THIS AGREEMENT TO SURVIVE THE CLOSE OF ESCROW.

INITIALS:

Seller : _____

Buyer: _____

12.4    Buyer's Remedies. In the event of the occurrence of a Seller Event of Default occurring prior to the Close of Escrow, Buyer's remedy shall be to pursue one, and only one, of the following remedies:

(a)    To waive such default; or

(b)    File a suit for specific performance without diminution of the Purchase Price or damages (except costs, including attorneys' fees, of enforcement); or

(c)    To terminate this Agreement; and on such termination, the Deposit will be returned to Buyer by Escrow Holder and Seller and Buyer shall have no liability or obligation hereunder, and Seller shall reimburse Buyer for (i) all reasonable out-of-pocket expenses to third parties incurred in connection with this Agreement and the due diligence expenditures incurred in connection with the previously terminated Purchase and Sale Agreement between the parties dated December 12, 2005, up to $150,000.00, and (ii) the costs of enforcement of Buyer's rights hereunder, including, without limitation, attorney's fees for enforcement incurred after Seller's default.

(d)    In addition to the above, in the event of a Seller Event of Default under Section 12.2(c), Buyer shall have the right to postpone the Close of Escrow until all appropriate court orders authorizing the sale are signed, entered and finalized and are no longer subject to appeal.

ARTICLE 13.    MISCELLANEOUS.

13.1    Notices. All notices or other communications between Seller and Buyer required or permitted hereunder shall be in writing and personally delivered or sent by certified United States mail, return receipt requested, postage prepaid, to the following address (until a notice of change thereof shall have been delivered as provided in this Article) or by facsimile copy to the number set forth below:

If to Seller:                          HMA Sales, LLC
                                       4484 South Pecos Road
                                       Las Vegas, Nevada  89121
                                       Attention: Joseph D. Milanowski
                                       Facsimile: (702) 734-0163

With a Copy to:                        Barry S. Goold
                                       Goold Patterson Ales & Day
                                       4496 South Pecos Road
                                       Las Vegas, Nevada  89121
                                       Facsimile: (702) 436-2650

If to Buyer:
                                       11150 Olympic Boulevard
                                       Suite 680
                                       Los Angeles, CA  90064
                                       Attention: Steve Sirang
                                       Facsimile: 310/914-5907

With a Copy to:        Schreeder, Wheeler & Flint, LLP
                  127 Peachtree St, NE
                  16th Floor Candler Building
                  Atlanta, GA 30303-1845
                  Attention: Leo Rose, Esq.
                  Facsimile: 404/681-1046

A notice shall be effective on the date of personal delivery if personally delivered before 5:00 p.m., otherwise on the day following personal delivery, or two (2) business days following the date the notice is postmarked, if mailed or, if by facsimile, on the date of actual notice if received before 5:00 p.m. (local time), otherwise on the next business day. Either party may change the address to which notice are to be given to it by giving notice of such change of address in the manner set forth above for giving notice.

13.2    Time of the Essence. Time is of the essence of this Agreement and each and every term and provision hereof.

13.3    Interpretation; Governing Law. This Agreement shall be construed as if prepared by both parties. This Agreement shall be construed, interpreted and governed by the laws of the State of Nevada.

13.4    Jurisdiction and Venue. In the event of any litigation between the parties regarding this Agreement and the transactions contemplated herein, jurisdiction and venue shall only be proper in a court in the County of Clark, State of Nevada and all other jurisdictions and venues are hereby expressly waived.

13.5    Attorneys' Fees. In the event of any litigation between the parties regarding this Agreement and the transactions contemplated herein, the prevailing party shall be entitled to the payment by the losing party of its reasonable attorneys' fees, court costs and litigation expenses, as determined by the court.

13.6    1031 Exchange. Buyer and Seller agree to cooperate with each other if either party intends to effectuate a 1031 exchange, at no cost to the cooperating party. The party desiring to effectuate the tax deferred exchange shall indemnify the cooperating party with respect to claims, loss, costs, liabilities or damages.

13.7    Further Assurances. Each party will, whenever and as often as it shall be requested to do so by the other party, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all such further conveyances, assignments, approvals, consents and any and all other documents and do any and all other acts as may be necessary to carry out the intent and purpose of this Agreement.

13.8    Entire Agreement; Amendments. This Agreement, together with the other written agreements referred to herein, is intended by the parties to be the final expression of their agreement with respect to the subject matter hereof, and is intended as the complete and exclusive statement of the terms of the agreement between the parties. As such, this Agreement supersedes any and all prior understandings between the parties, whether oral or written. Any amendments to this Agreement shall be in writing and shall be signed by both parties hereto.

13.9    No Waiver. A waiver by either party hereto of a breach of any of the covenants or agreements hereof to be performed by the other party shall not be construed as a waiver of any succeeding breach of the same or other covenants, agreements, restrictions or conditions hereof.

13.10   Assignment.  Buyer may assign its interest in this Agreement with Seller's prior written consent, which consent shall not be unreasonably withheld.  Such consent shall be deemed granted if (a) the assignee assumes in writing the obligations of Buyer under this Agreement, and (b) the assignee is collectively owned (50% or more), controlled by or under common control with any of Buyer, Concord Wilshire Partners, LLC, Steve Sirang (or any entity owned or controlled by Steve Sirang), or Jeffery Arnold (or any entity owned or controlled by Jeffery Arnold) or Michael Pashaie (or any entity owned or controlled by Michael Pashaie).  If Buyer desires to assign to a person or entity not described in the previous sentence, in addition to Seller's consent (which shall not be unreasonably withheld), such assignee must (a) agree to pay the entire Purchase Price in cash, so that no Seller Note or Deed of Trust shall be necessary, and (b) have the economic capability to pay the Purchase Price at the Close of Escrow.

13.11   Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and permitted assigns.

13.12   Headings; Exhibits; Cross References.  The headings and captions used in this Agreement are for convenience and ease of reference only and shall not be used to construe, interpret, expand or limit the terms of this Agreement.  All exhibits attached to this Agreement and the Recitals at the front of this Agreement are incorporated herein by the references thereto contained herein.  Any term used in an exhibit hereto shall have the same meaning as in this Agreement unless otherwise defined in such exhibit.  All references in this Agreement to Articles, Sections and Exhibits shall be to Articles, Sections and Exhibits of or to this Agreement, unless otherwise specified.

13.13   Severability.  In the event that any phrase, clause, sentence, paragraph, article or other portion of this Agreement shall become illegal, null or void, or against public policy, for any reason, or shall be held by any court of competent jurisdiction to be illegal, null or void, or against public policy, the remaining portions of this Agreement shall not be affected thereby and shall remain in force and effect to the full extent permitted by law.

13.14   Performance of Acts on Business Days.  Unless specifically stated to the contrary, all references to days herein shall be deemed to refer to calendar days.  In the event that the final date for payment of any amount or performance of any act hereunder falls on a Saturday, Sunday or holiday, such payment may be made or act performed on the next succeeding business day.

13.15   No Third Party Beneficiaries.  This Agreement is intended for the exclusive benefit of Seller and Buyer and their respective permitted assigns and is not intended and shall not be construed as conferring any benefit on any third party or the general public.

13.16   Counterpart Signatures; Facsimile Transmission.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one agreement.  Delivery of this Agreement may be accomplished by facsimile transmission of this Agreement.  In such event, the parties hereto shall promptly thereafter deliver to each other executed counterpart originals of this Agreement.

13.17   Brokers and Agents.  Seller represents and warrants to Buyer, and Buyer represents and warrants to Seller, that no broker, agent or finder has been engaged by it in connection with any of the transactions contemplated by this Agreement, or to its knowledge is in any way connected with any of such transactions.  In the event of any claims for brokers' or finders' fees or commissions in connection with the negotiation, execution or consummation of this Agreement, Buyer shall indemnify, save harmless and defend Seller from and against such claims if they shall be based upon any conduct, statement, representation or

agreement of or made by Buyer, and Seller shall indemnify, save harmless and defend Buyer if such claims shall be based upon any conduct, statement, representation or agreement of or made by Seller.

       13.18   Recording. Seller and Buyer acknowledge and agree that this Agreement shall not recorded in the official records of the County of Clark, State of Nevada without the prior written consent of the non-requesting party, which shall be withheld in its sole discretion. In such event either party wishes to record this Agreement, the non-requesting party shall consent to a Memorandum of Purchase and Sale Agreement memorializing the parties and Effective Date of this Agreement.

       13.19   Exhibits. A list of the Exhibits to this Agreement is attached on the page following the signature of the parties. To the extent any exhibit is not attached hereto upon the execution of this Agreement, the same shall be negotiated in good faith by Seller and Buyer and attached to and made a part of this Agreement prior to the Close of Escrow.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

SELLER:

HMA SALES, LLC, a Nevada limited liability
company

By: Investment Partners, LLC
Its: Manager

By: _____
Print Name: Thomas Hantges
Its: Manager

BUYER:

Pacific Ocean Management, LLC

By: _____
Print Name: Michael Pashaie
Its: Manager

_____
DAVID TABAN

    ESCROW HOLDER hereby acknowledges receipt of the foregoing escrow instructions and agrees to
act as Escrow Holder in accordance with the terms and conditions thereof.

FIRST   AMERICAN   TITLE   INSURANCE
COMPANY

By : _____

Print Name: _____

Title: _____

ESCROW HOLDER hereby acknowledges receipt of the foregoing escrow instructions and agrees to act as Escrow Holder in accordance with the terms and conditions thereof.

FIRST    AMERICAN    TITLE    INSURANCE COMPANY

By : _____

Print Name: _____

Title: _____

## LIST OF EXHIBITS

EXHIBIT "A"          [INTENTIONALLY OMITTED]

EXHIBIT "B-1"        TANGIBLE PERSONAL PROPERTY

EXHIBIT "B-2"        EXCLUDED PERSONAL PROPERTY

EXHIBIT "C"          PERMITTED EXCEPTIONS

EXHIBIT "D"          A GRANT BARGAIN AND SALE DEED ("GBS DEED")

EXHIBIT "E"          NON-FOREIGN TRANSFEROR DECLARATION

EXHIBIT "F"          A BILL OF SALE CONVEYING THE PERSONAL PROPERTY TO BUYER

EXHIBIT "G"          GENERAL ASSIGNMENT

EXHIBIT "H"          THE TIMESHARE ASSIGNMENT

EXHIBIT "I"          $11,000,000.00 PROMISSORY NOTE

EXHIBIT "J"          DEED OF TRUST

EXHIBIT "K"          SERVICE CONTRACTS

EXHIBIT "L"          LIST OF TIMESHARE OWNERS – ROYAL VACATION SUITES

EXHIBIT "M"          LIST OF TIMESHARE OWNERS – ROYAL VACATION SUITES II

EXHIBIT "N"          LIST OF TIMESHARE SALE CONTRACTS

EXHIBIT "O"          LIST OF FREE TIMESHARE CONVERSIONS

EXHIBIT "P"          TIMESHARE DOCUMENTS

EXHIBIT "R"          AGREEMENT TO SELL TIMESHARE INTERVALS

EXHIBIT "S"          LIST OF NON-PLEDGED RECEIVABLES

EXHIBIT "T"          TIMESHARE INTERVALS UNDER CONTRACT

EXHIBIT U"           RECEIVABLES ASSIGNMENT (NON-PLEDGED RECEIVABLES)

EXHIBIT "V"          FORM OF AGREEMENT TO EXCHANGE TIMESHARE INTERVALS

EXHIBIT "D"

APN _____

WHEN RECORDED, RETURN TO:

_____
_____
_____
Attention: _____

_____

(Space above line for Recorder's use only)

### GRANT BARGAIN AND SALE DEED

HMA Sales, LLC, a Nevada limited liability company ("Grantor"), does hereby Grant, Bargain, Sell and Convey to _____, a _____ ("Grantee"), the real property in the City of Las Vegas, County of Clark, State of Nevada (hereinafter referred to as the "Land") described on Attachment "A" attached hereto and incorporated herein by this reference.

SUBJECT TO:

1.       General and special taxes and assessments for the current fiscal tax year and any and all unpaid bonds and/or assessments.

2.       All covenants, conditions, restrictions, reservations, rights, rights-of-way, easements and other matters of record.

IN WITNESS WHEREOF, Grantor has caused its name to be affixed hereto and this instrument to be executed on the date herein written.

Dated as of April ___, 2006.

GRANTOR:

HMA SALES, LLC, a Nevada limited liability company

By: _____

Print Name: _____

Its: _____

STATE OF NEVADA

COUNTY OF CLARK

    This instrument was acknowledged before me on _____, by
_____ as _____ of HMA Sales, LLC, a Nevada limited
liability company.

_____
Notary Public

EXHIBIT "E"

NON-FOREIGN TRANSFEROR DECLARATION

Section 1445(a) of the Internal Revenue Code of 1954, as amended (hereinafter referred to as the "Code"), provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.  To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by _____, a _____ (hereinafter referred to as the "Transferor"), the undersigned hereby certifies the following on behalf of the Transferor:

1.    Transferor is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Code and Income Tax Regulations);

2.    The U.S. Employer Identification Number of Transferor is _____; and

3.    Transferor's address is _____.

Transferor understands that this Certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury, I declare that I have examined this Certification and to the best of my knowledge and belief, it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of the Transferor.

Date: _____, 2006.

By: _____, a
    _____

By: _____

Print Name: _____

Its: _____

*Final*

*BUYER Signed*

# FIRST AMENDMENT TO
## PURCHASE AND SALE AGREEMENT

REFERENCE IS MADE to that certain Purchase and Sale Agreement dated May 22, 2006 by and between HMA Sales, LLC a Nevada limited liability company, as seller ("Seller"), and Pacific Ocean Management, LLC, a Delaware limited liability company, as buyer. Pacific Ocean Management, LLC has assigned its rights to Royal Center Associates, LLC, a Nevada limited liability company and Royal Resort Enterprises, LLC, a Nevada limited liability company, as tenants in common, each as to a 50% undivided interest ("Buyer"), for the purchase and sale of Clark County Assessor's Parcels 162-09-812-002 and 162-09-812-003 (the "Agreement"). Capitalized terms which are not defined herein shall have the meaning given them in the Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller hereby agree that the Agreement is amended, as follows:

WITNESSETH:

1. Paragraph 6.1 of the Agreement is modified to provide that the Closing date will be December 23, 2006, or as soon thereafter as Escrow Holder is in a position to close, but in no event later than December 31, 2006.

2. The Purchase Price is increased to $29,100,000. The cash portion of the Purchase Price is increased to $21,849,000. Seller shall credit Buyer $606,000 for the cost of obtaining $5,849,000 of the additional cash to be paid at Closing. $278,000. of this sum shall be a credit against the cash portion of the Purchase Price, and $328,000. of this sum shall be paid by a reduction in the amount of the Seller Note. Escrow Holder shall endorse this credit on the Seller Note immediately after the Closing. Section 2.3(b) of the Agreement is amended to provide that the Seller Note shall be in the principal amount of $5,201,442.17 (before the foregoing $328,000 credit). The interest rate of the Seller Note shall be eight percent (8%) per annum and the term of the Seller Note shall be ninety (90) days. The Seller Note and the Deed of Trust securing it shall be held in an escrow account held by Escrow Holder (Escrow No. TS-235920-LV27-A) ("Post Closing Escrow"). At the maturation of the Seller Note, Buyer and Seller agree that the payoff of the Seller Note, including all interest payments due, shall be paid into the Post Closing Escrow. The Buyer and Seller agree that a second closing (the "Post Closing") shall be conducted and that the parties shall readjust any prorations, calculations, credits and/or adjustments made at the Closing which are found to be inaccurate and shall make such payments as are necessary to correct any such inaccuracies. Buyer and Seller agree that any provision(s) in the Agreement and this Amendment that requires action after the Closing will survive the Close of the Purchase and Sale Agreement and this Amendment.

3. The Seller had agreed with the Timeshare Associations to subsidize them in a sum equal to the difference between the maintenance fees collected by the Associations for the year 2006 and the costs of operating the timeshare facilities in 2006 ("Developer Subsidy"). The Developer Subsidy for calendar year 2006 is approximately $200,000. The Seller has paid a portion of the Developer Subsidy amount throughout the year and the Seller agrees that it will pay to Buyer through Escrow at the Closing, the unpaid balance of the annual Developer Subsidy, prorated as a per diem of $754.72 calculated from the day of closing through the last day of 2006. These funds are to be held in the Post Closing Escrow until the actual costs are determined. At the time the note portion of the purchase price ("Seller Note") is paid, the parties shall recompute the amount

16

of the Developer Subsidy and adjust any difference from the amount prorated at the Closing as part of the payoff of the Seller Note.

4.     Paragraph 10 (8) of the Agreement is revised to provide that the contracts in escrow for timeshare purchases which have not yet closed ("Units") will be terminated and the escrowed funds will be returned to the timeshare buyers. Seller will be responsible for terminating the contracts for the Units. Buyer shall pay Seller through escrow at the Closing $250,000 to defer Seller's costs in connection with these Units. These funds are to be held in the Post Closing Escrow account. Seller will be charged $25.00 per Unit in cancellation fees to be paid to the Escrow Holder. After 20 Units have been cancelled Seller shall be entitled to receive from the Post Closing Escrow a pro rata share the $250,000 represented by Units cancelled to date. After the first 20 Units are cancelled, Seller can request further pro rata disbursements for cancelled Units not more frequently than once per month. If timeshare buyers insist upon closing on their contracts, and Buyer elects to close such transactions, any proceeds of such sales shall be paid to Buyer. Exhibit "T" shall be marked "None".

5.     Seller had agreed to pay certain sums to John Rothman at the Closing to resolve all of his claims, per the Settlement Agreement between Seller and John Rothman. Mr. Rothman has agreed to adjust his claims at the request of the Buyer and accept Buyer's notes in substitution for all of the amounts due him. As a result of this modification Buyer will be credited and Seller charged with the sum equal to the amount due Mr. Rothman under the Settlement Agreement, estimated at $1,763,613.33 plus per diem interest) thereafter through the Closing. Buyer shall credit Seller $45,000. as a contribution to resolving the Rothman claims. Seller will cause Mr. Rothman to release and reconvey all security instruments relating to such claims in a manner that satisfies Title Insurance Company. Mr. Rothman has signed a Revised Settlement Agreement reflecting the changes noted herein.

6.     At the Close of Escrow the Property shall remain subject to the liens of (a) the Deed of Trust, Assignment of Rents and Proceeds, Security Agreement, Financing Statement and Fixture Filing in favor of Liberty Bank as beneficiary which was recorded as Instrument 0002573 in Book 20050708, Clark County Official Records ("Liberty Bank Deed of Trust"), and (b) the Collateral Assignment of Property Rights in favor of Liberty Bank recorded as Instrument 0004788 in Book 20060627, Clark County Official Records (the "Liberty Bank Assignment"). Buyer will elect by written notice to Seller given within 30 days after the Closing to either:

(A)  purchase the residual interest in the notes (equity) held by Liberty as security for its loan to Seller ("Liberty Notes"). If Buyer elects this option, Buyer shall pay Seller through the Post Close Escrow at the date the Seller Note is paid the then outstanding principal balance of all Liberty Notes not in default under the terms of the Liberty loan agreement, less ten percent of the original face amount of the purchased notes, less the principal balance of the Liberty loan. Seller shall pay the interest on the Liberty note and any delinquencies due Liberty through the due date of the Seller Note. Buyer will arrange with Liberty for Buyer's assumption of the Liberty loan and the release of Seller and its principals from their guaranties of the Liberty Loan by the date the Seller Note is paid.

(B)  elect not to buy the residual value of the timeshare notes, in which event Liberty will be paid off by Seller from the proceeds of the sale or refinancing of its timeshare notes. If Buyer elects this option, when Buyer tenders the balance due on the Seller Note to Escrow Holder in immediately available funds, Escrow Holder shall not release the Seller Note proceeds to Seller unless and until Seller has furnished Escrow Holder with such reconveyances, releases, and/or

orders of a court of competent jurisdiction, in recordable form, as will enable Escrow Holder to issue an endorsement to the Title Policy deleting the Liberty Bank Deed of Trust, and the Liberty Bank Assignment from Schedule B of the Title Policy. As additional security for its obligation to pay off the Liberty Note, Seller shall deliver to Buyer a blanket assignment of timeshare notes and the deeds of trust, if any (the "Timeshare Notes"). If for any reason the Liberty Note is not paid by the maturity date of the Seller Note, the Timeshare Notes shall be delivered to Buyer as partial satisfaction of the funds needed to retire the Liberty Note.

7.      Great White Investments NV, LLC has filed a suit against Seller ("Great White Suit") and recorded a lis pendens against the Property. Concurrently with the closing Seller shall settle the Great White Suit and obtain a release of the Property from the lis pendens.

8.      As required by paragraph 2.1 of the Purchase Agreement, the Purchase Price is allocated:

| | |
|---|---|
| Hotel and land | $ 4,820,000 |
| Excess land | 23,000,000 |
| Personal property | 1,280,000 |
| | |
| Total | $29,100,000 |

9.      Pursuant to paragraph 1.2 (i) of the Agreement Seller is transferring to Buyer all defaulted timeshare contracts including all associated notes, the security interest securing the note and all rights of Seller to the timeshare securing the note. For purposes of this agreement "defaulted timeshare contracts" shall be those contracts which on the Closing date have had no payment made for 90 or more days, plus those contracts which on the Closing date have had no payment for less than 90 days which remain in default 90 days after the Closing. At the Closing a list of those contracts more than 90 days in default shall be attached to the Assignment of Promissory Notes, a second list of all contracts less than 90 days in default shall be attached to the Assignment of Promissory Notes. 90 days after the Closing Buyer and Seller shall meet and cross out all contracts on the second list which are then current.

10.     At the Closing Seller shall return to Emil Khalili the $100,000 previously delivered to Seller.

11.     Seller shall have the use of his existing office on the eighth floor of the Premises until January 31, 2006, on the terms of a separate agreement between the parties, as long as the Seller's use does not interfere with hotel operations or hotel guests. Seller shall be accorded reasonable access to the room, to restroom facilities, a copying machine and other amenities of the hotel, in the same manner as would be accorded a hotel guest.

12.     Section 6.3(b) of the Agreement is hereby amended to provide that, in addition to the items listed therein, at the Close of Escrow Buyer shall deposit in Escrow for delivery to Seller certified copies of the insurance policies and endorsements required to be procured and maintained by Buyer pursuant to the provisions of the Seller Trust Deed.

13.     Seller's address in Section 13.1 of the Agreement is hereby changed to HMA Sales, LLC, 4525 Sandhill Road, Suite 114, Las Vegas, Nevada 89121, Attention: Joseph D. Milanowski, Facsimile: (702) 433-2890, with a copy to Barry S. Goold, as provided therein.

14.     Buyer and Seller have finalized the exhibits to the Agreement. Exhibits A and Q have been omitted. Exhibits B-1 through P, and Exhibits R through V, attached to this First Amendment to Purchase and Sale Agreement ("First Amendment") are the true, correct and complete exhibits to the Agreement. Seller represents and warrants to the best of its knowledge to Buyer that the foregoing exhibits are true and correct, and, except as shown on the exhibits there are no leasehold or timeshare interests effecting the Property. Seller shall deliver to Escrow Holder a termination of the lease with Starpoint Resort Group effective as of the Closing. The representations contained in this paragraph shall survive the Closing for one year.

13.     The Effective Date of this First Amendment shall be the latest date set forth under the signatures hereto. Except as modified hereby, the Agreement is hereby ratified and confirmed remains in full force and effect.

14.     This First Amendment may be executed in any number of counterparts. Facsimile copies hereof, and facsimile signatures hereon, shall have the force and effect of originals.

        IN WITNESS WHEREOF, Buyer and Seller have executed this First Amendment as of December 14, 2006:

HMA SALES, LLC

By:_____
        Al Abolafia, Member

By:     USA Investment Partners, LLC,
        its Manager

        By:_____
        Joseph D. Milanowski, Manager

ROYAL CENTER ASSOCIATES, LLC

By:_____
        Michael Pashaie, its Manager

ROYAL RESORT ENTERPRISES, LLC

By:_____
        David Taban, its Manager

13.    Seller's address in Section 13.1 of the Agreement is hereby changed to HMA Sales, LLC, 4525 Sandhill Road, Suite 114, Las Vegas, Nevada 89121, Attention: Joseph D. Milanowski, Facsimile: (702) 433-2890, with a copy to Barry S. Goold, as provided therein.

14.    Buyer and Seller have finalized the exhibits to the Agreement. Exhibits A and Q have been omitted. Exhibits B-1 through P, and Exhibits R through V, attached to this First Amendment to Purchase and Sale Agreement ("First Amendment") are the true, correct and complete exhibits to the Agreement. Seller represents and warrants to the best of its knowledge to Buyer that the foregoing exhibits are true and correct, and, except as shown on the exhibits there are no leasehold or timeshare interests effecting the Property. Seller shall deliver to Escrow Holder a termination of the lease with Starpoint Resort Group effective as of the Closing. The representations contained in this paragraph shall survive the Closing for one year.

13.    The Effective Date of this First Amendment shall be the latest date set forth under the signatures hereto. Except as modified hereby, the Agreement is hereby ratified and confirmed remains in full force and effect.

14.    This First Amendment may be executed in any number of counterparts. Facsimile copies hereof, and facsimile signatures hereon, shall have the force and effect of originals.

IN WITNESS WHEREOF, Buyer and Seller have executed this First Amendment as of December 14, 2006:

HMA SALES, LLC

By: _____
     Al Abolafia, Manager

By:    USA Investment Partners, LLC,
       its Manager

       By:_____
           Joseph D. Milanowski, Manager

ROYAL CENTER ASSOCIATES, LLC

By: _____
     Michael Pashaie, its Manager

ROYAL RESORT ENTERPRISES, LLC

By: _____
     David Taban, its Manager

Z:\PA TRoy\FIRST AMENDMENT.11.wpd

4