E-filed on February 7, 2007

Andrew M. Brumby, Esq.
Florida Bar No. 0650080
Lee D. Mackson, Esq.
Florida Bar No. 435929
Shutts & Bowen LLP
300 South Orange Avenue, Suite 1000
P.O. Box 4956
Orlando, Florida 32802-4956
Telephone:  407-423-3200; Facsimile:  407-425-8316
E-mail:  abrumby@shutts-law.com

and

R. Vaughn Gourley, Esq.
Nevada Bar No. 0503
Stephens, Gourley & Bywater
3636 North Rancho Drive
Las Vegas, Nevada  89130
Telephone:  702-656-2355; Facsimile:  702-656-2776
E-mail:  vgourley@1vcm.com
Attorneys for Standard Property Development, LLC

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

In re:

USA COMMERCIAL MORTGAGE COMPANY,
     Debtor.

_____/

In re:

USA CAPITAL REALTY ADVISORS, LLC,
     Debtor.

_____/

In re:

USA CAPITAL DIVERSIFIED TRUST DEED
FUND, LLC,
     Debtor.

_____/

In re:

USA CAPITAL FIRST TRUST DEED FUND, LLC,
     Debtor.

_____/

In re:

USA SECURITIES, LLC
     Debtor.

_____/

Case No. BK-S-06-10725 LBR
Case No. BK-S-06-10726 LBR
Case No. BK-S-06-10727 LBR
Case No. BK-S-06-10728 LBR
Case No. BK-S-06-10729 LBR

Chapter 11
Jointly Administered Under
Case No. BK-S-06-10725 LBR

E-filed on February 7, 2007

Affects:

☐ All Debtors
☐ USA Commercial Mortgage Co.
☐ USA Securities, LLC
☐ USA Capital Realty Advisors, LLC
☐ USA Capital Diversified Trust Deed
☒ USA First Trust Deed Fund, LLC

/

## STANDARD PROPERTY DEVELOPMENT, LLC'S AMENDED RESPONSE AND OPPOSITION TO THE OBJECTION OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF USA CAPITAL FIRST TRUST DEED FUND, LLC TO PROOF OF CLAIM FILED BY STANDARD PROPERTY DEVELOPMENT, LLC (CLAIM NO. 120)

COMES NOW Standard Property Development, LLC ("Standard" or "Borrower"), and files this its Amended Response and Opposition (the "Response") to the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC to Proof of Claim Filed by Standard Property Development, LLC (Claim Number 120) (the "Objection"). This Response is based upon the pleadings, papers and records on file in these related Chapter 11 cases, including the Affidavit of George Venturella filed simultaneously herewith, the pleadings, papers, records, affidavits and other documents filed in Adversary Proceeding No. 06-1179 brought by USA Commercial Mortgage Company ("USACM") against Standard, and such other evidence and oral argument as may occur at the time of the hearing on the Objection.

## I.    STATEMENT OF BACKGROUND FACTS AND PROCEDURAL HISTORY

1.    Standard is a Florida limited liability company formed for the purpose of acquiring certain real and personal property in Orange County, Florida, then utilized as a motel (the "Property"). After closing on the funding of the Initial Amount (as hereafter defined) and the initial construction funding on March 15, 2006, Standard began the process of converting the Property from its former utilization as a motel to that of condominium. That construction has now ceased.

E-filed on February 7, 2007

2.     In order to finance both the acquisition of the Property, and its conversion/ construction to a condominium, Standard obtained a loan to finance such acquisition and construction through USACM as agent for a group of actual lenders comprised of a variety of individuals, entities and other interests (the "Direct Lenders").  In other words, the loan to Standard solicited and originated by USACM was actually funded by the Direct Lenders, a group consisting of in excess of 100 different people and entities.  A percentage of the loan was retained by a related entity, USA Capital First Trust Deed Fund, LLC (the "Fund").

3.     The lending arrangement referenced in the preceding paragraph was evidenced in part by a document entitled Construction Loan Agreement dated as of February 27, 2006, and entered into by and between Standard and the Direct Lenders (the "Construction Loan Agreement").  In addition, a Promissory Note Secured by Mortgage dated February 27, 2006, in the original stated principal amount of Seventeen Million Seven Hundred Fifty Thousand Dollars ($17,750,000.00) (the "Note") was duly executed by Standard in favor of the Direct Lenders.  In order to provide collateral for the Note, among other documents, Standard executed in favor of the Direct Lenders that certain Mortgage, Security Agreement and Assignment of Rents dated February 27, 2006 (the "Mortgage"), granting and conveying to the Direct Lenders (collectively) a first priority mortgage lien upon and security interest in the Property (together with all the documents evidencing the loan, the "Loan Documents").

4.     That the intent of, and purpose of, the lending arrangement between Standard and the Direct Lenders was to finance not just the acquisition of the Property, but its conversion and rehabilitation as well, cannot seriously be disputed.  Standard would never have entered into the loan at all without assured funds needed for the completion of the project; a circumstance well known to the representatives of USACM through the loan underwriting process and discussions

3

E-filed on February 7, 2007

among other things.  Moreover, the Direct Lenders themselves well knew that the loan was for the entire acquisition and construction amount, as reflected by an attachment to an affidavit of one of the Direct Lenders, C. Nicholas Pereos, filed in the Orange County Action (as defined below).  That solicitation letter expressly states that the loan was for $17,750,000, and further states that "[o]ur loan will be used for the acquisition of the property and conversion of the existing hotel property to for sale condominiums."  There is not one item in that document suggesting the loan was, would be, or even could be, capped at any lesser amount, or that the loan was for a more limited (i.e., acquisition only) purpose.

5.      Notwithstanding the dating of the documents, a closing did not actually occur (i.e., no monies were disbursed, nor was the Property acquired by Standard) until March 15, 2006.  As set forth on the Loan Closing Statement, on March 15, 2006 the sum of Eight Million Two Hundred Forty Thousand Dollars ($8,240,000.00) was advanced (the "Initial Amount").  In addition to closing costs, such sum funded the amount necessary for acquisition of the Property (approximately $6.9 Million), together with an origination fee ($887,500.00) based upon the entire amount (i.e., $17,750,000.00) to be borrowed under the Note, and established an interest reserve (purportedly through August, 2006) in the amount of Three Hundred Seventy-five Thousand Dollars ($375,000.00).

6.      Notwithstanding the documents being dated February 27, 2006, and that no monies were disbursed to Standard until March 15, 2006, USACM later notified Standard that it claimed interest was due from February 10, 2006, and that the interest reserve was effectively depleted by July 1, 2006.

7.      In accordance with the Control Account, Escrow Agreement and Security Agreement executed by Standard and Project Disbursement Group, Inc. ("PDG"), dated

E-filed on February 7, 2007

February 27, 2006 (the "Control Agreement"), the interest reserve was deposited with PDG and was to be disbursed to the Direct Lenders, in care of USACM, as billed by USACM monthly. In addition, PDG was to fund subsequent construction draws pursuant to the terms of, and in accordance with, the applicable provisions of the Construction Loan Agreement and the Control Agreement.

8.    Also, on March 15, 2006, the Direct Lenders funded the initial monthly construction amount of $1.4 million, in accordance with, and as reflected upon, Exhibits "B" and "C" to the Construction Loan Agreement.

9.    Standard and the Direct Lenders, as then identified on Exhibit A to the First Amendment to Loan Documents, executed a First Amendment to Loan Documents on March 15, 2006 to evidence the initial construction advance of $1.4 million on the construction funding. The Fund portion of the advanced amount ($9,640,000) is $671,000.00, or approximately 7%.

10.    All Loan Documents were drafted and prepared by USACM, and Standard was not permitted to make any changes thereto.

11.    Less than 30 days subsequent to the closing and disbursement of the Initial Amount, and the initial month's construction funding, on April 13, 2006, USACM, the Fund, and certain affiliated entities (the "Debtors"), filed voluntary Chapter 11 cases in this Court. It is highly unlikely that the Debtors did not know that the filing of bankruptcy was imminent at the time of execution of the applicable loan documents on February 27, 2006, and almost certainly by the time the initial loan proceeds were disbursed on March 15, 2006. Standard did not learn of the filing until much later, by which time the operating motel on the Property had been closed, the building substantially gutted, and the furniture and fixtures removed.

E-filed on February 7, 2007

12.    Subsequent to the acquisition of the Property, and the initial construction loan disbursement, Standard, acting in reliance upon what it believed to be the good faith of USACM, and its principals, the Direct Lenders, commenced the construction required to convert the Property from its then use to an alternative use as a condominium. That construction required a substantial demolition of the then buildings and improvements to the Property, with an intended subsequent renovation and remodeling of such improvements.

13.    In good faith, Standard commenced such demolition and construction, only to learn after substantial demolition of the applicable improvements had occurred that the Debtors had in fact filed these bankruptcy cases, and that notwithstanding, among other things, (i) the terms of the Construction Loan Agreement, the Note, and the Mortgage, and the construction and interpretation placed thereon by Standard; (ii) the acts and conduct of the authorized agents and representatives of USACM, itself the authorized agent and representative of the Direct Lenders; (iii) the representations to George Venturella; (iv) the solicitation letter to the Direct Lenders; (v) the historical lending practices of USACM with respect to its originated loans generally that, absent borrower default, the construction portion of loans was always funded; (vi) the actual commencement of construction funding, or put differently, the decision to advance funds beyond the Initial Amount; and (vii) the clear intent and purpose of the loan, that the Direct Lenders were not intending to fund future construction draws. Mr. Venturella has stated that Standard did not believe any construction of the Loan Documents, taken together, and in the context of USACM's historical business practices and circumstances, could permit or result in other than funding of both acquisition and construction, and certainly not considering the commencement of construction-funding virtually simultaneous – i.e., the same day – as disbursement of the Initial Amount.

E-filed on February 7, 2007

14.    In or about June, 2006, Standard submitted a construction draw request to PDG in accordance with the terms of, and as contemplated by, the Construction Loan Agreement and the Control Agreement.  Notwithstanding the requirement to fund such draw request on or within five days of its submission, neither USACM, the Direct Lenders, nor PDG responded at all - verbally or otherwise – to such draw request, much less funded it.

15.    After the cessation of funding, and as detailed in the Affidavit of George Venturella filed simultaneously herewith, Standard undertook numerous efforts to locate funding sources, both directly and through mortgage brokers.  However, because of the existing first lien held by the Direct Lenders, taken in conjunction with the then state of the Property, Standard was unable to find a lender willing either to lend sufficient monies both to fund construction on a subordinated (i.e., second position) basis, or to lend sufficient funds to both pay the first mortgage indebtedness (assuming such was owed without any offset or damage recovery by Standard), plus sufficient funds for the required construction.  Most of the prospective lenders willing to consider loaning a sufficient amount to pay off the first at a discount and final fund construction, required an abandonment of the condominium project and the return to a motel use.

16.    In July 2006, Standard initiated an action against the Direct Lenders, other than any of the applicable Debtors, in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida (the "Orange County Action"), seeking damages for breach of the applicable agreements, and a breach of the implied covenant of good faith and fair dealing.

17.    By letter dated August 4, 2006, from USACM, as the agent for the Direct Lenders, to Standard, the Direct Lenders declared a default under the terms of the Note and other Loan Documents.  Such letter suggested that should the amount claimed to be due—an amount

nowhere stated—not be paid as demanded, the Direct Lenders, acting through their agent, USACM, intended to institute legal action against Standard and/or its members.

18.     On November 8, 2006, Standard filed Proof of Claim Number 120 (the "Claim") in the Fund's bankruptcy case, a true and correct copy of which (without exhibits) is attached hereto as **Exhibit "1"**. On December 26, 2006, the Fund filed the Objection.

19.     As a result of the unilateral cessation of funding by USACM and the Direct Lenders, and the failure to fund the remaining loan amount of $8,135,000.00, Standard has incurred substantial damage.  In reliance upon the existence of the loan, and the ability to conclude the project, Standard incurred the following costs and expenses, totally; at least $52,865,347.20, and the cost to return the Property to its pre-construction condition is $11,685,355.60.  Standard has incurred consequential damages in the amount of $10,000,000.00.

## II.    **ARGUMENT AND CITATION OF AUTHORITIES**

### A.    **The Loan Documents Do Not Preclude the Claim**

The Fund (like USACM in the adversary proceeding brought by it against Standard [the "USACM Adversary"] now pending before this Court) seeks a final adjudication, without any party having an opportunity to undertake discovery, of Standard's rights against the Direct Lenders, including the Fund.  As Standard has asserted in opposition to the Motion for Partial Summary Judgment in the USACM Adversary, such is premature until discovery has been undertaken.  Indeed, it would make practical sense, and presumptively lessen the cost burden to all, to consolidate the Fund's objection to the Claim with the USACM Adversary, as the two raise substantially similar issues.

On the merits, and contrary to what the Fund asserts, however, the Loan Documents are not clear on their face, are in fact ambiguous, and internally inconsistent, and are not a complete expression of the parties' intent.

E-filed on February 7, 2007

Under Nevada law, parol evidence is admissible to interpret any ambiguous provision of a contract. See, Ringle v. Bruton, 86 P.3d 1032, 1039 (Nev. 2004). In allowing the trier of fact to consider extrinsic evidence in interpreting ambiguous provisions of a contract, the Ringle court stated, "[i]n determining the parties' intent, the trier of fact must construe the contract as a whole, including consideration of the contract's subject matter and objective, the circumstances of its drafting and execution, and the parties' subsequent conduct." Id. A contract is ambiguous if it is reasonably susceptible to more than one interpretation. Shelton v. Shelton, 78 P.3d 507, 510 (Nev. 2003). The best approach for interpreting an ambiguous contract is to delve beyond its express terms and examine the circumstances surrounding the parties' agreement in order to determine the true mutual intentions of the parties; such examination includes not only the circumstances surrounding the contract's execution, but also subsequent acts and declarations of the parties. Id. See also Russ v. General Motors Corp., 906 P.2d 718 (Nev. 1995) (suggesting all evidence concerning intentions are admissible to determine if ambiguity exists). In addition, any ambiguity in a written contract is to be construed against the party who prepared the agreement or selected the language used. Caldwell v. Consolidated Realty and Mgt. Co., 668 P.2d 284, 286 (Nev. 1983). An interpretation which results in a fair and reasonable contract is preferable to one that results in a harsh and unreasonable contract. Dickenson v. Nevada, 877 P.2d 1059, 1061 (Nev. 1994).

There are, at least, two reasonably plausible constructions of the applicable agreements. Indeed, taking into account the identity of the author the documents (USACM), and the unequivocal purpose of the transaction (to acquire and construct), the proposed construction placed upon the documents by the Fund would create an unfair and unreasonable interpretation and negate the overall loan agreement's purpose in its entirety. The Fund, like USACM in the

USACM Adversary, asserts that the Construction Loan Agreement required no funding beyond the Initial Amount, and that it was USACM's and the Direct Lender's decision whether to fund beyond the Initial Amount. Even if that is correct, however, one simple truth remains: they did so decide when the first construction funding occurred, so the decision had been made and funding was required.

The Fund makes much of the first sentence of paragraph 3.2 of the Construction Loan Agreement. However, the Fund ignores the last sentence of the very same paragraph which states: "Nothing herein shall be deemed to be a commitment by Lender or USA to fund to Borrower any more than the initial Loan Amount." The reasonable interpretation of that sentence is that while the Direct Lenders and USACM may not have had an obligation to fund beyond the initial "Loan Amount" (the initial acquisition portion of $8.24 million), once the decision was made to progress beyond the initial "Loan Amount," the full loan had to be funded. As set forth above, there is no dispute that the first construction advance was, in fact, funded – on the very same day as the acquisition advance; therefore, the reasonable interpretation of the last sentence of paragraph 3.2 would be that full funding of the entire $17,775,000.00 was then required.

Second, paragraph 3.3 of the Construction Loan Agreement provides as follows: "Of the Loan Amount, $1,175,000.00 shall be disbursed . . . to be held as an interest reserve." As earlier stated, "Loan Amount" is defined in paragraph 3.2 to be the initial sum of $8.24 million. The term, however, clearly has a different meaning in paragraph 3.3. Exhibit C to the Construction Loan Agreement makes clear that the initial deposit to the interest reserve was the sum of $375,000.00, not $1,175,000.00, and that only after a full funding of the loan (i.e.,

$17,750,000.00) does the interest reserve deposits. Consequently, the term "Loan Amount" as used in paragraph 3.3 means $17,775,000.00.

Further, it is the paragraph 3.3 use of the term "Loan Amount" (i.e., $17,775,000.00) which is consistent with the amount actually stated in the Note. At no point does the Note suggest that any amount other than $17,775,000.00 is to be advanced or repaid, as there is no language to the effect of "$17,775,000.00, or such lesser amount as is actually advanced." In short, the contradiction between the definition and usage of "Loan Amount" in two consecutive paragraphs in the Construction Loan Agreement, only one of which is consistent with the Note, in conjunction with the circumstances surrounding the loan generally, and taking into account applicable rules of contract construction, at worst, creates an ambiguity in the documents which permits the introduction of parol evidence.

Next, the Affidavit of one of the Direct Lenders, C. Nicholas Pereos (the only Direct Lender which to this point has provided any evidence of his intention), expressly notes that the only information he had with respect to the loan was that it was in an amount of $17,775,000.00, and that at no point did anyone suggest or state a lesser amount. Indeed, the solicitation information provided to Mr. Pereos does not even recite the acquisition amount, or indeed any other amount other than $17,775,000.00. There simply can be no argument that, with respect to the Direct Lenders, there was an intention and a belief that a Loan Amount of $17,775,000.00 was what was being done; no more, no less.

If Standard's interpretation is not adopted, parol evidence must be admissible to resolve the ambiguity for at least three reasons: 1) the Construction Loan Agreement is in clear and direct conflict with the Note, making the overall terms ambiguous. Indeed, the Construction Loan Agreement is even inconsistent within its own terms; 2) USACM is the party that drafted

all of the Loan Documents and as such, any and all ambiguities should be construed against USACM and its principals, the Direct Lenders (including the Fund); and 3) all representations made by Joseph D. Milanowski ("Mr. Milanowski") and Mr. Doug Esteves, were 100% *consistent* with the Note – and they (together with USACM generally) are the agents of the Direct Lenders, not Standard -- and therefore the parol evidence rule should not apply.

In Caldwell, the court found that a real estate listing agreement contained an ambiguity and therefore construed it against the author. 668 P.2d at 286. The Court reasoned that because is was the broker's decision to use a form listing agreement, the agreement should be strictly construed against him, as the author of the instrument. Here, as in Caldwell, the Loan Documents were USACM's forms. Accordingly, under Nevada law, any ambiguity or contradiction in these agreements must be construed against USACM and its principals.

In addition, all fraudulent representations made by Mr. Milanowski or Mr. Esteves are admissible as they are consistent with the Note. The parol evidence rule only precludes evidence which varies or contradicts an unambiguous and consistent contract. See Ringle v. Bruton, 86 P.3d 1032, 1037 (2004). As discussed above, the Loan Documents are in fact ambiguous and inconsistent among themselves and capable of at least two plausible constructions. Just as importantly, however, even if this Court were to find otherwise, all of Milanowski's and Esteves' statements are consistent with the Promissory Note, and thus their statements would not be varying or contradicting any term of the Note. Therefore, the parol evidence rule does not preclude Milanowski's statements that the Loan was for $17,750,000.

Second, without evidence of circumstances and conduct, the Court cannot at this time determine whether the Direct Lenders breached the covenant of good faith and fair dealing. Mitchell v. Bailey and Selover, Inc., 605 P.2d 1138, 1139 (Nev. 1980). It is well established

Nevada law that an implied covenant of good faith and fair dealing exists in all contracts. A.C.

Shaw Constr., Inc. v. Washoe County, 784 P.2d 9, 10 (Nev. 1989). The question of good faith is

a question of fact. Mitchell, 605 P.2d at 1139. Where terms of the contract are literally

complied with but one party to the contract deliberately contravenes the intention and spirit of

the contract, that party can incur liability for breach of the implied covenant of good faith and

fair dealing. Hilton Hotels Corp. v. Butch Lewis Productions, Inc., 808 P.2d 919, 922 (Nev.

1991). When one party performs a contract in a manner that is unfaithful to the purpose of the

contract and the justified expectations of the other party are thus denied, damages may be

awarded against the party who does not act in good faith. Id. at 923.

For example, in Mitchell, the Court reversed a district court's entry of summary judgment

made in favor of the movant storage company, reasoning that the issue of good faith presents a

genuine issue of material fact. 605 P.2d at 1139. There, the Court stated that, "the obligation of

good faith attaches to every provision of the contract," and thus, the determination of whether a

customer is insecure with regards to a debt on a storage contract is a determination that must be

made in good faith. Id. The Court then concluded that because the question of good faith is a

question of fact, summary adjudication – without a complete evidentiary presentation is

inappropriate. Id. Accordingly, the case was remanded for trial. Id.

As discussed in paragraphs 19 and 20 of the Introduction, Standard incurred substantial

damage as a direct result of its reliance on what it believed to be USACM's and the Direct

Lender's good faith in executing its contractual obligations – including their "decision" to

commence funding construction. The Direct Lenders' duty to act in good faith arises out of the

Construction Loan Agreement and the Note. See A.C. Shaw Constr., Inc. v. Washoe County,

784 P.2d 9, 10 (Nev. 1989) (noting that the covenant of good faith and fair dealing is implied

into every commercial contract); <u>Mitchell v. Bailey and Selover, Inc.</u>, 605 P.2d 1138, 1139 (Nev. 1980) (holding that the obligation of good faith attaches to every provision of the contract). USACM's (and therefore the Direct Lenders, as USACM's principal) breach of this duty is demonstrated by its failure to fund the entire amount stated in the Note notwithstanding, (i) the terms of the Construction Loan Agreement, the Note, and the Mortgage and the construction and interpretation placed thereon by Standard (and, at least as a practical matter, all other parties); (ii) the acts and conduct of the authorized agents and representatives of USACM, itself the authorized agent and representative of the Direct Lenders; (iii) the representations to George Venturella; (iv) the solicitation letter to the Direct Lenders; (v) the historical lending practices of USACM with respect to the originated loans generally that, absent borrower defaults, the construction portion of loans were always funded; (vi) the actual "decision" to commence construction funding; and (vii) the clear intent and purpose of the loan. Indeed, as stated in the Introduction, USACM (the agent of the Direct Lenders) induced Standard into the loan to, among other things, obtain the origination fee, knowing full well that the loan would never be funded in its entirety. Nothing could be further from good faith.

For the foregoing reasons, Standard vigorously contends that proceedings with respect to the Objection should be consolidated with proceedings in the USACM Adversary (currently continued until March 15, 2007). At a minimum, a scheduling conference and a schedule for conducting discovery with respect to the Objection should be ordered in order to bring the Claim issues to an evidentiary conclusion.

### B.    Standard Has Incurred Substantial Damages, and Undertook Efforts to Mitigate to the Extent Required.

As reflected in the Affidavit of George Venturella, Standard has incurred substantial and ongoing damage as a result of the Direct Lenders' – including the Fund's – failure to fund the

Standard loan. Mr. Venturella states, in addition to the amount of the loan not funded ($8,135,000.00), Standard has incurred substantial reliance damages in connection with the commencement of construction, sales marketing, and staff expenses (exclusive of its approximate $600,000 in legal and accounting fees) in an amount of $2,865,347.00, and the costs and expense to Standard to return the Property to its pre-commencement of construction state (i.e., the damages arising from reliance on the commitment to fund the entire construction portion of the loan) are in the amount of $11,685,355.00, for a total of $14,550,702.00. Finally, Standard has incurred substantial consequential damages – damages that were reasonably contemplated and foreseeable by the parties at the time of execution of the Loan Agreements – in the approximate amount of $10,000,000.00.

As Mr. Venturella's Affidavit likewise explains, Standard has undertook numerous efforts to seek alternative funding. Mr. Venturella's Affidavit explains the efforts undertaken, and the various institutions contacted or approached (both directly and through mortgage brokers) with respect to seeking such a loan, and even the request by certain, if not most, prospective lenders, that the condominium project be abandoned and the Property returned to its use as a motel. However, Standard was not able to find a lender willing to loan sufficient funds to complete construction on what would otherwise be a subordinate basis (i.e., second priority), nor was Standard able to find a lender willing to fund sufficient monies (assuming Standard was liable therefore) to both discharge the existing first mortgage, and complete construction of the unfinished improvements, given the then current state of the Property and the amount of the existing first mortgage. Under the circumstances, that was more than sufficient attempt at mitigation. See generally Conner v. Southern Nevada Paving, Inc., 741 P.2d 800, 801 (Nev. 1987). As important for this purpose, however, it is the Fund that bears the burden of persuasion

with respect to whether or not there was a failure to mitigate – not Standard to demonstrate that it

had, in fact, sufficiently mitigated. <u>See, e.g.</u>, <u>Cobb v. Osman</u>, 433 P.2d 259, 263 (Nev. 1967);

<u>Montgomery Ward & Co. v. Stevens</u>, 109 P.2d 895 (1941).

### C.    USACM Could Bind the Direct Lenders.

Whatever, if any, express limitations or USACM's authority may have existed as

between USACM and the Direct Lenders in the Loan Servicing Agreements, USACM had, at a

minimum, apparent authority to bind the Direct Lenders.

First, whatever limitation there may have been, if any, upon USACM's authority to bind

the Direct Lenders pursuant to the Loan Servicing Agreement (the "LSA") was a document

between those parties:  no one suggests that Standard either knew anything about any such

limitation, or even should have known about any such claimed limitation.  In point of fact, there

is nothing contained in paragraph 1 of the LSA that so provides; that section simply refers to

obtaining promissory notes and other loan documents that are otherwise consistent with USACM

practices.  Moreover, that portion of the LSA quoted by the Fund in the Opposition (paragraph

2(e)) seems to deal with post-default matters.  Nonetheless, paragraph 2(e) itself refers to a

"Loan" which, in this instance was, at least according to the only documents between the Direct

Lenders and USACM discussing the Loan (the exhibit to the Affidavit of Mr. Pereos) in the

amount of $17,750,000.00.  There was then no alteration of the principal amount inconsistent

with the information previously provided to the Direct Lenders, including the Fund: it was

$17,750,000.00.

Consequently, there is no limitation in the LSA with respect to any "modification" of the

"Loan" amount as the "Loan" amount (at least as far as the Direct Lenders were concerned) was

$17,750,000.00.  Nonetheless, even if this Court were to find that the LSA did not give USACM

express authority to bind the Direct Lenders in any manner applicable here, such would not alter

16

the apparent authority of USACM to do so as the Direct Lenders placed USACM in a position to act in such a fashion as to lead Standard to reasonably believe USACM could so bind the Direct Lenders, and the Direct Lenders are estopped at this point to assert to the contrary. See e.g., Meyers v. Jones, 657 P.2d 1163, 1164 (Nev. 1983); Ellis v. Nelson, 233 P.2d 1072, 1076 (Nev. 1951). As a consequence, the Fund's objection on this ground fails as well.

**D.**   **The Pro Rata Liability of the Fund is 7%, not 1.5%.**

If the Court were to determine that the liability of the Direct Lenders for any damage is pro rata and several, the Fund's proposed method for calculating such damage amount is incorrect. The Fund puts its cap on any damage as the unfunded portion of the total loan amount and, for some reason, determines that the Fund's proportionate liability for such amount is derived from a percentage determined by a fraction, the numerator of which is the Fund's portion of the Initial Amount, and the denominator of which is the Initial Amount. The Fund is incorrect. The Fund's percentage portion of the advanced amount is significantly higher than 1.5%. Indeed, the percentage is approximately 7.0% based upon a fraction, the numerator of which is $671,000.00 and the denominator of which is $9.64 million.

**III.    CONCLUSION**

For the foregoing reasons, Standard asserts that further proceedings on the Objection should be consolidated with proceedings in Adversary No. 06-1179, that the Claim be estimated for purposes of distribution pursuant to Section 502(c) of the Bankruptcy Code, and that it have

E-filed on February 7, 2007

such other and further relief as the Court deems just and proper.

Dated this 7th day of February, 2007.

SHUTTS & BOWEN LLP
Attorneys for Standard Property Development, LLC
300 S. Orange Avenue, Suite 1000
Orlando, Florida 32801
*Mailing Address:* Post Office Box 4956
Orlando, Florida 32802-4956
407-423-3200
407-425-8316 (Facsimile)

By: /s/ Andrew M. Brumby
    Andrew M. Brumby, Esquire
    Florida Bar No. 0650080

and

R. Vaughn Gourley, Esq.
Nevada Bar No. 0503
STEPHENS, GOURLEY & BYWATER
3636 North Rancho Drive
Las Vegas, Nevada 89130
Telephone: 702-656-2355
Facsimile: 702-656-2776

ORLDOCS 10845826 1

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| Name of Debtor:<br>**USA Capital First Trust Deed Fund, LLC** | Case No.:<br>**06-10728-LBR** | **PROOF OF CLAIM** |
|---|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| | |
|---|---|
| Name of Creditor:<br>*(The person or entity to whom the debtor owes money or property)*<br><br>**STANDARD PROPERTY DEVELOPMENT, LLC**<br><br>Name and Addresses Where Notices Should be Sent<br>**Andrew M. Brumby, Esq.**<br>**SHUTTS & BOWEN LLP**<br>**P.O. Box 4956**<br>**Orlando, FL 32802-4956       (407) 423-3200** | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. |
| Last four digits of account or other number by which creditor identifies debtor: | Check here<br>if this claim    ☐ replaces<br>☐ amends    a previously filed claim, dated: _____ |

| | |
|---|---|
| 1.  **BASIS FOR CLAIM:**     See Attached Addendum<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☒ Other (Describe briefly): | ☐ Retiree benefits as defined in 11 U.S.C. §1114(a)<br>☐ Wages, salaries, and compensations (Fill out below)<br>Last four digits of your SS#: _____<br>Unpaid compensations for services performed<br>from _____ to _____<br>        (date)                        (date) |
| 2.  **DATE DEBT WAS INCURRED:**     **2006** | 3.  **IF COURT JUDGMENT, DATE OBTAINED:** |

4.  **CLASSIFICATION OF CLAIM.** Check the appropriate box or boxes tht best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

| | |
|---|---|
| **UNSECURED NONPRIORITY CLAIM   See Attached Addemdum**<br>☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority. | **SECURED CLAIM**<br>☒ Check this box if your claim is secured by collateral (Including a right of setoff)<br><br>Brief Description of Collateral:<br>☐ Real Estate  ☐ Motor Vehicle  ☐ Other<br><br>Value of Collateral: |
| **UNSECURED PRIORITY CLAIM**<br><br>☐ Check this box if you have an unsecured priority claim<br>Amount entitled to priority  $_____<br><br>Specify the priority of the claim:<br>☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B)<br><br>☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. §507(a)(3).<br><br>☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(5) | Amount of arrearage and other charges **at time case filed** included in secured claim, if any:   **See Attached Addemdum**<br><br>☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal family, or household use - 11 U.S.C.§507(a)(7)<br>☐ Taxes or penalties of governmental units - 11 U.S.C. §507(a)(8)<br>☐ Other – Specify applicable paragraph of 11 U.S.C. §507(a) (_____).<br>*Amounts are subject to adjustments on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

5.  **TOTAL AMOUNT OF CLAIM**     ** See Attacheded Addemdum _____ _____ _____     ** See Attached Addemdum
    **AT TIME CASE FILED:**         (Unsecured Nonpriority)         (Secured)      (Unsecured priority)                (Total)

☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim.
Attach itemized statement of all interest or additional charges.                                    ** plus costs and attorneys fees

6.  **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.
7.  **Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. if the documents are not available, attach a summary.
8.  **Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

| The original of this completed proof of claim form must be sent by mail or hand delivered (FAXES NOT ACCEPTED) so that is is actually received on or before 5:00 pm, prevailing Pacific time, on November 13, 2006 for each person or entity (including individuals, partnerships, corporations, joint ventures, trusts and governmental units). | |
|---|---|
| BY MAIL TO:<br>BMC Group<br>Attn: USACM Claims Docketing Center<br>P.O. Box 911<br>El Segundo, CA 90245-0911 | BY HAND OR OVERNIGHT DELIVERY TO:<br>BMC Group<br>Attn: USACM Claims Docketing Center<br>1330 East Franklin Avenue<br>El Segundo, CA 90245 |

FILED
NOV 10 2006

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any.)

Date: **11/8/07**             **STANDARD PROPERTY DEVELOP[...]**

By: _____

                              , as _____

EXHIBIT
"1"

USA FIRST TRUST

1072800120

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both.

10651083.1

**ADDENDUM TO STANDARD PROPERTY DEVELOPMENT, LLC'S PROOF OF CLAIM IN IN RE: USA CAPITAL FIRST TRUST DEED FUND, LLC**
*U.S. Bankruptcy Court For The District Of Nevada (Las Vegas)*
*Case No. Bk-5-06-10728, Jointly Administered Under Case No: Bk-5-06-10725, Chapter 11*

Claimant, STANDARD PROPERTY DEVELOPMENT, LLC ("SPD" or "Claimant"), is a Florida limited liability company formed for the purpose of acquiring the real property described on the attached **Exhibit "1"**, and the related personal property and other improvements (the "Property"), and thereafter converting the property from its then current utilization as a motel to that of a condominium. In order to finance the acquisition of the Property, and the subsequent conversion from its then use as a motel to its proposed future use as a condominium, the Claimant entered into a loan agreement with the Debtor, USA CAPITAL FIRST TRUST DEED FUND, LLC ("USA Capital First"), along with other persons, entities and trusts (the "Direct Lenders"), an arrangement solicited, originated, structured and negotiated by the Debtor's affiliated entity, USA COMMERCIAL MORTGAGE COMPANY ("USACM").

USACM, the duly authorized agent and representative of the Debtor and the other Direct Lenders, fraudulently induced Claimant into a loan arrangement with the Direct Lenders knowing that the entire loan would not be funded, and knowing full well the concomitant damage that would befall Claimant if funding ceased.

The lending arrangement referenced in the preceding paragraph was evidenced in part by a document entitled Construction Loan Agreement dated as of February 27, 2006, by and between SPD and the Direct Lenders (the "Construction Loan Agreement"). Additionally, a Promissory Note Secured by Mortgage dated February 27, 2006, in the original stated principal amount of Seventeen Million Seven Hundred Fifty Thousand Dollars ($17,750,000.00) (the "Note") was duly executed by SPD in favor of the Direct Lenders.

In order to provide collateral for the Note, among other documents, SPD executed in favor of the Direct Lenders that certain Mortgage, Security Agreement and Assignment of Rents

dated February 27, 2006, granting and conveying to the Direct Lenders (collectively) a first priority mortgage lien upon and security interest in the Property (the "Mortgage").

The Construction Loan Agreement, the Note and the Mortgage are hereinafter collectively referred to as the "Loan Documents" and true and correct copies are attached hereto and incorporated herein as **Exhibits "2", "3" and "4"**, respectively.

The intent and purpose of the lending arrangement between the Claimant and the Direct Lenders was to finance not just the acquisition of the Property, but its conversion and rehabilitation as well. The Claimant would never have entered into the loan at all without assured funds needed for the completion of the project -- a circumstance well known to the representatives of the Debtor and Direct Lenders.

Notwithstanding the dating of the Loan Documents, a closing did not actually occur (i.e., no monies were disbursed, nor was the Property acquired by SPD) until March 15, 2006. On March 15, 2006, as set forth on the Loan Closing Statement, a true and correct copy of which (as executed by SPD) is attached hereto and incorporated herein as **Exhibit "5"**, the sum of Eight Million Two Hundred Forty Thousand Dollars ($8,240,000.00) was advanced. In addition to closing costs, such amount funded the amount necessary for acquisition of the Property (approximately $6.9 Million), together with an origination fee based upon the entire amount (i.e., $17,750,000.00) to be borrowed under the Note ($887,500.00), and established an interest reserve (purportedly through August, 2006) in the amount of Three Hundred Seventy-five Thousand Dollars ($375,000.00).

Notwithstanding the documents being dated February 27, 2006, and that no monies were disbursed to SPD until March 15, 2006, USACM claimed interest due from February 10, 2006, and that the interest reserve was effectively depleted by July 1, 2006.

In accordance with the Control Account, Escrow Agreement and Security Agreement executed by SPD and Project Disbursement Group, Inc. ("PDG"), dated February 27, 2006 (the "Control Agreement"), the interest reserve was deposited with PDG and was to be disbursed to

- 2 -

the Direct Lenders, in care of USACM, as billed by USACM monthly. In addition, PDG was to fund subsequent construction draws pursuant to the terms of, and in accordance with, the applicable provisions of the Construction Loan Agreement and the Control Agreement.

Also on March 15, 2006, the Direct Lenders funded the initial monthly construction amount of $1.4 million, in accordance with, and as reflected upon, Exhibits "B" and "C" to the Construction Loan Agreement.

Attached hereto and incorporated herein as **Exhibit "6"** is a true and correct copy of the First Amendment to Loan Documents by and between SPD and the Direct Lenders, as then identified on Exhibit A to the First Amendment to Loan Documents. The purpose of the First Amendment to Loan Documents was to evidence the initial construction advance of $1.4 million on the construction funding under the earlier loan commitment made by the Direct Lenders to the Claimant.

On April 13, 2006, less than 30 days subsequent to the closing and disbursement of the initial loan proceeds, and the initial month's construction funding, the Debtor and certain affiliated entities ("Joint Debtors"), filed voluntary Chapter 11 cases in this Court. It is highly unlikely that the Joint Debtors did not know that the filing of bankruptcy was imminent at the time of execution of the applicable loan documents on February 27, 2006, and almost certainly by the time the initial loan proceeds were disbursed on March 15, 2006.

Subsequent to the acquisition of the Property, and the initial construction loan disbursement, Claimant, acting in reliance upon what it believed to be the good faith of the Debtor, its agent and representative, USACM, and the other Direct Lenders, commenced the construction required to convert the Property from its then use to an alternative use as a condominium. That construction required a substantial demolition of the then buildings and improvements to the Property, with an intended subsequent renovation and remodeling of such improvements.

- 3 -

In good faith, Claimant commenced such demolition and construction, only to learn after substantial demolition of the applicable improvements had occurred that the Joint Debtors had, in fact, filed the aforementioned bankruptcy cases, and that notwithstanding (i) the terms of the Construction Loan Agreement, the Note, and the Mortgage; (ii) the acts and conduct of the authorized agents and representatives of the Debtor; (iii) the solicitation letter to the Direct Lenders; and (iv) the clear intent and purpose of the loan, the Direct Lenders were not intending to fund future construction draws.

In or about June, 2006, Claimant submitted a construction draw request to PDG in accordance with the terms of, and as contemplated by, the Construction Loan Agreement and the Control Agreement. Notwithstanding the requirement to fund such draw request on or within five days of its submission, neither the Debtor, its agent and representative, USACM, the other Direct Lenders, nor PDG responded at all - verbally or otherwise – to such draw request.

Due to the failure to fund the ongoing construction at the Property, and based upon the limited time to conclude construction based upon the reservations and hard contracts obtained by Claimant in connection with the project, Claimant is now incurring substantial damages. Construction has been brought to a halt, and the multi-million dollars of deposits and reservations held by Claimant for the sale of units are now at risk. Many have now been cancelled based upon the construction delays. Material costs have increased by at least $700,000.00, if not more, and the project is likely to be the subject of construction lien, and other, litigation. Interest was claimed to be due for 17 days before a document was ever signed, 5 weeks before any funding occurred and the interest reserve - - because of the above - - was effectively depleted by July, 2006.

Since the cessation of construction, various construction, and other bills have gone unpaid. As a result, the Property is at risk of being subject to lien claims of the general contractor and various subcontractors.

This proof of claim is filed under compulsion of the bar date order entered in this case. In executing and filing this claim, the Claimant does not submit itself to the jurisdiction of this Court for any purpose and does not waive any of its respective rights and remedies against any other person or entity who may be liable for all or part of the claim set forth herein, whether an affiliate of the Debtor, an assignee, guarantor or otherwise, or any obligation owed to it, and does not waive any right to any security that may be determined to be held by it or for its benefit. The filing of this proof of claim is not an election of remedies. Claimant expressly reserves its right to amend or supplement this proof of claim in any respect, to include any additional damages, fees, costs and expenses as may be validly recovered under the Bankruptcy Code.

Pursuant to the terms of the Loan Documents, the Debtor contributed $131,000.00 of the initial amount disbursed to Claimant of $8,240,000.00, and, as reflected in Exhibit 3 of the First Amendment to Loan Documents, the Debtor advanced $540,000.00 of the initial construction advance (in the total amount of $1.4 million dollars).

Debtor, like the other Direct Lenders, failed to fund the entire loan pursuant to the terms of the Loan Documents, which has caused substantial and significant, and increasing, damage to Claimant in an as yet unknown total amount. The Debtor is liable, together with the Direct Lenders and USACM, to Claimant for its proportionate share of such damage.

The Debtor asserts that the Claimant is liable to it for the amount advanced by the Debtor to Claimant pursuant to the Note, as modified, in the amount of $671,000.00, plus any interest, charges and other fees it may claim is owed. Therefore, this claim is filed as a secured claim, by way of set off in such amount, with the balance of the claim being unsecured.

10651079.1