E-Filed February 7, 2007

Andrew M. Brumby, Esq.
Florida Bar No. 0650080
Lee D. Mackson, Esq.
Fla. Bar No. 435929
Shutts & Bowen LLP
300 South Orange Avenue, Suite 1000
P.O. Box 4956
Orlando, Florida 32802-4956
Telephone: 407-423-3200; Facsimile: 407-425-8316
E-mail: abrumby@shutts-law.com

and

R. Vaughn Gourley, Esq.
Nevada Bar No. 0503
Stephens, Gourley & Bywater
3636 North Rancho Drive
Las Vegas, Nevada 89130
Telephone: 702-656-2355; Facsimile: 702-656-2776
E-mail: vgourley@1vcm.com

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>    Debtor.<br>_____/ | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>    Debtor.<br>_____/ | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>    Debtor.<br>_____/ | Chapter 11<br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>    Debtor.<br>_____/ | |
| In re:<br>USA SECURITIES, LLC,<br>Debtor.<br>_____/ | |

Affects:
    ☐ All Debtors
    ☐ USA Commercial Mortgage Co.
    ☐ USA Securities, LLC
    ☐ USA Capital Realty Advisors, LLC
    ☐ USA Capital Diversified Trust Deed
    ☒ USA First Trust Deed Fund, LLC
_____/

E-Filed February 7, 2007

STATE OF FLORIDA           )
                           )
COUNTY OF ORANGE           )

### AFFIDAVIT OF GEORGE VENTURELLA

CAME BEFORE the undersigned officer duly authorized to administer oaths George Venturella ("Venturella"), who, after first being duly sworn, stated that the following facts are true and correct and within his personal knowledge.

1. My name is George Venturella, and I am over the age of 18. I am the managing member of Standard Property Development LLC ("Borrower" or "Movant"), and am authorized to give this affidavit on its behalf.

2. Borrower is a Florida limited liability company, formed for the purpose of acquiring certain real and personal property in Orange County, Florida, as more specifically described on the attached **Exhibit "1"** (the "Property"). After closing on the funding of the Initial Amount (as defined below) and the initial construction funding on March 15, 2006, Borrower began the process of converting the Property from its former utilization as a hotel to that of a condominium. That construction has now ceased.

3. In order to finance both the acquisition of the Property, and its conversion/ construction to a condominium, Borrower obtained a loan to finance such acquisition and construction through USA Commercial Mortgage Company ("USACM") as agent for a group of actual lenders comprised of a variety of individuals, entities and other interests (the "Direct Lenders"). In other words, the loan to Borrower solicited and originated by USACM was actually funded by the Direct Lenders, a group consisting of in excess of 100 different people and entities. A percentage of the loan was retained by USA First Capital Trust Deed Fund, LLC (the "Fund").

2

4. The lending arrangement referenced in the preceding paragraph was evidenced in part by a document entitled Construction Loan Agreement dated as of February 27, 2006, by and between Movant and the Direct Lenders (the "Construction Loan Agreement"). In addition, a Promissory Note Secured by Mortgage dated February 27, 2006, in the original stated principal amount of Seventeen Million Seven Hundred Fifty Thousand Dollars ($17,750,000.00) (the "Note") was duly executed by Movant in favor of the Direct Lenders. In order to provide collateral for the Note, among other documents, Movant executed in favor of the Direct Lenders that certain Mortgage, Security Agreement and Assignment of Rents dated February 27, 2006, granting and conveying to the Direct Lenders (collectively) a first priority mortgage lien upon and security interest in the Property (together with all the documents evidencing the loan, the "Loan Documents"). A true and correct copy of the Construction Loan Agreement, the Note and the Mortgage are attached hereto and incorporated herein as **Exhibits "2", "3" and "4"**, respectively.

5. That the intent of, and purpose of, the lending arrangement between Borrower and the Direct Lenders was to finance not just the acquisition of the Property, but its conversion and rehabilitation as well, cannot seriously be disputed. Borrower would never have entered into the loan at all without assured funds needed for the completion of the project; a circumstance well known to the representatives of USACM, through the loan underwriting process and discussions, among other things. Moreover, the Direct Lenders themselves well knew that the loan was for the entire acquisition and construction amount, as reflected by Exhibit A to the Affidavit of C. Nicholas Pereos filed in the Orange County Action (as defined below), a copy of which is attached hereto as **Exhibit "5"**. According to Mr. Pereos, that solicitation letter is the only document he received regarding the loan, expressly states that the loan was for $17,750,000 and

further states that "[o]ur loan will be used for the acquisition of the property and conversion of the existing hotel property to for sale condominiums." There is not one item in that document suggesting the loan was, or even could be, capped at any lesser amount, or that the loan was for a more limited (i.e., acquisition only) purpose.

6. Notwithstanding the dating of the documents, a closing did not actually occur (i.e., no monies were disbursed, nor was the Property acquired by Movant) until March 15, 2006. As set forth on the Loan Closing Statement, a true and correct copy of which (as executed by Movant) is attached hereto as **Exhibit "6"**, on March 15, 2006 the sum of Eight Million Two Hundred Forty Thousand Dollars ($8,240,000.00) (the "Initial Amount") was advanced. In addition to closing costs, such amount funded the amount necessary for acquisition of the Property (approximately $6.9 Million), together with an origination fee ($887,500.00) based upon the entire amount (i.e., $17,750,000.00) to be borrowed under the Note, and established an interest reserve (purportedly through August, 2006) in the amount of Three Hundred Seventy-five Thousand Dollars ($375,000.00).

7. Notwithstanding the documents being dated February 27, 2006, and that no monies were disbursed to Borrower until March 15, 2006, USACM has notified me that it claims interest is due from February 10, 2006, and that the interest reserve was effectively depleted by July 1, 2006.

8. In accordance with the Control Account, Escrow Agreement and Security Agreement executed by Movant and Project Disbursement Group, Inc. ("PDG"), dated February 27, 2006 (the "Control Agreement"), the interest reserve was deposited with PDG and was to be disbursed to the Direct Lenders, in care of USACM, as billed by USACM monthly. In addition,

PDG was to fund subsequent construction draws pursuant to the terms of, and in accordance with, the applicable provisions of the Construction Loan Agreement and the Control Agreement.

9. Also on March 15, 2006, the Direct Lenders funded the initial monthly construction amount of $1.4 million, in accordance with, and as dictated by, Exhibits "B" and "C" to the Construction Loan Agreement.

10. Attached hereto and incorporated herein as **Exhibit "7"** is a true and correct copy of the First Amendment to Loan Documents by and between Borrower and the Direct Lenders, as then identified on Exhibit A to the First Amendment to Loan Documents. The purpose of the First Amendment to Loan Documents was to evidence the initial construction advance of $1.4 million on the construction funding under the earlier loan commitment made by the Direct Lenders to Borrower. After the initial construction funding, the Fund's portion of the outstanding loan amount was $671,000.00 of the total of $9.54 million, or approximately 7%.

11. All Loan Documents were drafted and prepared by USACM, and Standard was not permitted to make any changes thereto.

12. Less than 30 days subsequent to the closing and disbursement of the initial loan proceeds, and the initial month's construction funding, on April 13, 2006, USACM, the Fund, and certain affiliated entities (the "Debtors"), filed voluntary Chapter 11 cases in this Court. It is highly unlikely that the Debtors did not know that the filing of bankruptcy was imminent at the time of execution of the applicable loan documents on February 27, 2006, and almost certainly by the time the initial loan proceeds were disbursed on March 15, 2006. Standard did not learn of the filing until much later, by which time the operating motel on the Property had been closed, the building substantially gutted, and the furnishings and fixtures removed.

13.     Subsequent to the acquisition of the Property, and the initial construction loan disbursement, Borrower, acting in reliance upon what it believed to be the good faith of USACM, and its principals, the Direct Lenders, commenced the construction required to convert the Property from its then use to an alternative use as a condominium. That construction required a substantial demolition of the then buildings and improvements to the Property, with an intended subsequent renovation and remodeling of such improvements.

14.     In good faith, Borrower commenced such demolition and construction, only to learn after substantial demolition of the applicable improvements had occurred that the Debtors had in fact filed these bankruptcy cases, and that notwithstanding, among other things, (i) the terms of the Construction Loan Agreement, the Note, and the Mortgage; (ii) the acts and conduct of the authorized agents and representatives of USACM, itself the authorized agent and representative of the Direct Lenders; (iii) the representations to me; (iv) the solicitation letter to the Direct Lenders; (v) the historical lending practices of USACM with respect to the originated loans generally that, absent a borrower default, the construction portion of loans were always funded; (vi) the actual commencement of constructing funding beyond the Initial Amount; and (vii) the clear intent and purpose of the loan, that the Direct Lenders were not intending to fund future construction draws. It never occurred to me that anyone could or would interpret the Construction Loan Agreement, the Note, Mortgage and other Loan Documents, collectively, to permit a cessation of funding whenever USACM or the Direct Lenders wanted or so decided, and certainly not that the documents, collectively, would be so interpreted given the simultaneous – i.e., same day – funding of the Initial Amount and the first construction draw. Put differently, I always believed the Loan Documents, collectively, had to be interpreted to

require funding, and certainly had to be so interpreted once the initial construction draw was simultaneously funded.

15. In or about June, 2006, Movant submitted a construction draw request to PDG in accordance with the terms of, and as contemplated by, the Construction Loan Agreement and the Control Agreement. Notwithstanding the requirement to fund such draw request on or within five days of its submission, neither USACM, the Direct Lenders, nor PDG have responded at all - verbally or otherwise – to such draw request, much less funded it.

16. In July, 2006, the Borrower initiated an action against the Direct Lenders, other than any of the applicable Debtors (USACM and the Fund), in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida (the "Orange County Action"). A true and correct copy of the Complaint (without exhibits) in the Orange County Action is attached hereto and incorporated herein as **Exhibit "8"**.

17. Attached hereto and incorporated herein as **Exhibit "9"** is a true and correct copy of a letter dated August 4, 2006 from USACM, as the agent for the Direct Lenders, to Movant declaring a default under the terms of the Note and other Loan Documents. Such letter suggests that should the amount claimed to be due—an amount nowhere stated—not be paid as demanded, the Direct Lenders, acting through their agent, USACM, intended to institute legal action against Borrower and/or its members.

18. Because of the cessation of funding, and the inability to find construction, all of our sales contracts and reservations for purchase of condominium units – representing total sales amounts of $16,247,300.00 – have now been cancelled, and the deposits returned.

19. After USACM and the Direct Lenders ceased funding, Standard undertook a variety of efforts to attempt to obtain alternative financing to complete construction of what by

then was a gutted, unfurnished shell of a building. In addition to my own direct efforts to find funding sources through my own contacts, Standard sought the assistance of numerous mortgage brokers, including Hampton-Meridian Group, Inc., Northlake Networks, inc. and Signature Financial Group, Inc. Through one or more of the above mortgage brokers, and/or my own efforts, potential funding was discussed or sought from several sources, including Point Center Financial, Inc., Beal Bank, Bank of America, HVS, Sterling Capital, Capital Source and HSBC. Because, however, of the existing first lien (i.e., that held by the Direct Lenders), and the then condition of the Property, Standard could not locate a lender willing to fund a sufficient amount to both take out the first lien holder, and fund the required construction, nor could Standard find a lender willing to fund the construction portion on a subordinate basis to the existing first mortgage. Further, most of those potential lenders willing to fund a payout (i.e., on a discounted basis) of the first position and remaining construction, required an abandonment of the condominium project and a return to the Property's use as a hotel – i.e., a return to its pre-construction state.

20. As a result of the unilateral cessation of funding by USACM and the Direct Lenders, and the failure to fund the remaining loan amount of $8,135,000.00, Standard has incurred substantial damage. In reliance upon the existence of the loan, and the ability to conclude the project, Standard incurred the following costs and expenses, at a minimum, beyond the cost of the Property acquisition itself:

    (a)    Prorated origination fee for the unfunded portion    $408,250.00
of the loan:

    (b)    Retained construction and property management staff in order to resume construction upon funding and

facility reopening upon completion (recently let go):

| | | |
|---|---|---:|
| $9,000 week for 48 weeks: | | $432,000.00 |
| (c) | Marketing expenses incurred to Stirling/Sotheby's International Realty (See Exhibit 10-A) | $47,597.20 |
| (d) | Stirling/Sotheby's termination fee (See Exhibit 10-B) | $20,000.00 |
| (e) | Additional Marketing Expenses (See Exhibit 10-C) | $557,500.00 |
| (f) | Construction Advance per First Amendment | $1,400,000.00 |
| | TOTAL | $2,865,347.20 |

Alternatively, the estimated the cost and expense to Standard to return the Property to its condition post acquisition but prior to construction, is $11,685,355.60, as itemized on Exhibit 10-D.

21. Finally, the project build out and sales performance, upon which the loan was premised, anticipated total revenue from sell out of $36,509,700, at a cost of $26,650,526, for a profit of approximately $10,000,000.00 (as shown on Exhibit 11).

FURTHER AFFIANT SAYETH NOT.

*[signature]*
GEORGE VENTURELLA

Sworn to and subscribed before me this ___7th___ day of __FEB_____, 2007 by George Venturella, to me personally known or who has produced __D.L.___ as identification and who did/did not take an oath.

_____Jamie Strzechowski_____
NOTARY PUBLIC

__JAMIE STRZECHOWSKI__
Typed or Printed Name of Notary
My commission expires: __2009 AUG 26__
Serial No., if any: _____

ORLDOCS 10845888 1