**LEWIS AND ROCA LLP LAWYERS**

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169
Facsimile (702) 949-8321
Telephone (702) 949-8320

40 North Central Avenue, Suite 1900
Phoenix, Arizona 85004-4429

Susan M. Freeman AZ State Bar No. 004199
Email: sfreeman@lrlaw.com
Rob Charles NV State Bar No. 006593
Email: rcharles@lrlaw.com

Attorneys for Official Committee of Unsecured Creditors

E-Filed on February 13, 2007

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| **In re:** | Jointly Administered |
| **USA Commercial Mortgage Company**<br>**06-10725 – Lead Case** | Chapter 11 Cases |
| | Judge Linda B. Riegle Presiding |
| **USA Capital Realty Advisors, LLC**<br>**06-10726** | **Affecting:**<br>¨ All Cases<br>**or Only:** |
| **USA Capital Diversified Trust Deed Fund, LLC**<br>**06-10727** | × USA Commercial Mortgage Company<br>¨ USA Capital Realty Advisors, LLC<br>¨ USA Capital Diversified Trust Deed Fund, LLC |
| **USA Capital First Trust Deed Fund, LLC**<br>**06-10728** | × USA Capital First Trust Deed Fund, LLC<br>¨ USA Securities, LLC |
| **USA Securities, LLC**<br>**06-10729** | |
| **Debtors.** | |

**Response to Motion to Enforce Debtors' Third Amended Joint Chapter 11 Plan of Reorganization As It Relates to Allocation of Sale Proceeds [DE 2574]**

Seeking a windfall, the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC misreads the Plan and moves this Court to grab 85% of the value of the USACM assets sold to Compass Partners, LLC that were not included in the Silver Point Capital offer. The language the FTDF Committee cites governs the allocation of additional bids for the specifically defined assets Silver Point originally sought to buy. Read in context with the Plan and Bid Procedures (as well as an allocation Stipulation), the phrase "at least the same property" in the Bid Procedures merely required

214781.3

potential bidders to bid on all of the Silver Point defined assets rather than simply cherry pick assets. The phrase did not authorize (nor did the parties contemplate) adding assets to the bidding. The decision to include those additional assets in the bidding came later, after the Bid Procedures and Stipulation were finalized.

At a minimum, the seized-upon phrase is ambiguous such that this Court should consider parole evidence to decide whether the phrase includes the USACM Additional Assets. It doesn't, as the parole evidence (like an email on point) confirms. But even if it does, this Court should use its equitable powers to correct the inequity of allowing the FTDF Committee a windfall.

For these and other reasons, the Official Unsecured Creditors' Committee for USA Commercial Mortgage Company asks that the Court deny the FTDF Committee's motion.

## MEMORANDUM

### Factual Background

**Silver Point Transaction.** This Court is aware that after marketing, the FTDF Committee and Mesirow Interim Financial Management ("Mesirow") as FTDF's[1] and USACM's[2] management determined it was appropriate to sell:

- FTDF's proportionate interests in 47 different loans (the "FTDF Assets") as well as
- the "Stalking Horse USACM Assets" which were
    - Personal property associated with loan servicing,
    - the right of USACM as Servicing Agent to service the bulk of the USACM Loan Portfolios (and so give up the right to collect loan servicing fees under the Loan Servicing Agreements (the "LSAs")) after the closing, and
    - the right to collect default rate interest on the FTDF Assets.[3]

---

[1] USA Capital First Trust Deed Fund, LLC.

[2] USA Commercial Mortgage Company.

[3] Asset Purchase Agreement dated as of October 19, 2006 with SPCP Group, LLC [DE 1603], definition of "Commercial Mortgage Assets" at 6.

2

214781.3

The FTDF Assets were originally scheduled as worth $66 million (notes receivable)[4] and $963,000 (accounts receivable),[5] for a total face amount of $67 million.

As a loan servicer, the USACM bankruptcy estate included the right to collect servicing fees, late charges, default rate interest and success fees, although these rights are largely not valued in USACM's schedules of assets filed with this Court.[6] Substantial sums were owed on the date of bankruptcy, and additional amounts accrued during the course of these bankruptcy cases. USACM also held participation interests in certain Loans and other notes and accounts receivable. While the FTDF Assets were marketed for sale, there was little or no marketing of these additional USACM assets by Debtors or Mesirow. For these and other reasons, while the FTDF Assets generated significant market interest, there was relatively little interest in the additional USACM assets.

Silver Point Capital, through its affiliate SPCP Group, LLC, was selected as Lead Bidder under an Asset Purchase Agreement (the "Stalking Horse APA") for a bankruptcy auction. Silver Point agreed to pay FTDF $46 million for the FTDF Assets, and agreed to pay USACM 50% of the net profits it received on post-closing loan servicing fees up to a cap of $500,000, plus 50% of the net profits it received on collection of default rate interest on the FTDF Assets up to $50,000.[7] Thus, the total conditional purchase price Silver Point offered for the Stalking Horse USACM Assets was a maximum of $550,000. Silver Point did not agree to buy and USACM did not agree to sell any other USACM assets.

---

[4] Schedule B-16-A.

[5] Schedule B-16-A.

[6] Schedule B lists "extension fees" of $6.2 million.

[7] Asset Purchase Agreement [DE 1603], filed October 19, 2006; Revised First Amended and Restated Asset Purchase Agreement [DE 1750], filed November 7, 2006.

214781.3

**Bid Procedures.**  Debtors sought higher and better bids for the Stalking Horse Assets pursuant to the Court's November 8, 2006 Bid Procedures Order.[8]  The Bid Procedures did not provide for any additional assets to be included in the sale.  The FTDF Committee cites a single phrase in its Motion to support its current contention that the Bid Procedures contemplated additional assets being sold.  It says the Bid Procedures provided that qualified bidders must purchase "at least the same Property being purchased in the Purchase Agreement," which it contends meant that everyone understood additional assets could be included in responsive bids and that the overbid allocation would encompass all such assets.[9]

In fact, however, the Bid Procedures specifically applied to the auction of "certain assets (the 'Property')", with a definition of "Property to be Sold" that in turn was defined as "comprised of the First Trust Deed Property and the Commercial Mortgage Property (as those terms are defined in the Purchase Agreement)."  The Bid Procedures required that any Potential Bidder submit an executed asset purchase agreement, and black-lined version compared with the APA "which shall contain terms and conditions for the purchase of the Property that are substantially similar to or better than those contained in the Purchase Agreement…."  The Bid Procedures authorized two or more parties to collectively "submit a bid for all of the Property," with the specific direction that any such bid "must comply with the requirements of a Qualified Bid…including, without limitation, that the Joint Bid (a) be made for all of the Property…."  The disclosure to be provided by Potential Bidders included the following language, which the FTDF Committee seizes upon in its Motion:

> …a disclosure of the proposed purchase price, which must be at least equal to the Total Asset Purchase Price (as defined in the Purchase Agreement)

---

[8] Order (A) Scheduling an Auction for the Sale of Certain Assets; (B) Appointing SPCP GROUP LLC, as Lead Bidder; and (C) Approving Bid Procedures and Protections [DE 1761].

[9] Motion at p. 4 ¶ 3.

offered by Stalking Horse Bidder on a basis no less favorable than the Purchase Agreement, and provided further that the assets being purchased must include at least the same Property being purchased in the Purchase Agreement, and that the proposed cash consideration must be equal to the cash component of the Total Asset Purchase Price (as defined in the Purchase Agreement), ….[10]

As indicated in Section III of this Response, if the Court concludes the Bid Procedures are ambiguous and takes evidence with respect to the meaning of the words, the USACM Committee will provide evidence including an e-mail from the FTDF Committee's counsel when the Bid Procedures were being negotiated, contending that the auction should not include any additional assets (a position in which the other Committees and Debtors acquiesced), and that the language cited by the FTDF Committee was to address the FTDF Committee's concern that potential buyers not be able to cherry pick among the FTDF Assets.

The FTDF Committee insisted that competing bids be in the aggregate for the FTDF Assets and the Stalking Horse USACM Assets. Debtors, the FTDF Committee and USACM Committee discussed but did not agree on an allocation of potential overbids for the FTDF Assets and Stalking Horse USACM Assets when the Bid Procedures Order was presented to and entered by the Court. Rather, the Bid Procedures provided as follows:

> To clarify, during the Auction, bidders shall make Increased Bids with respect to the Total Asset Purchase Price and shall not allocate any Overbid Increment, including the Minimum Incremental Overbid, between the First Trust Deed Property and the Commercial Mortgage Property. The allocation of any such Overbid Increment, including the Minimum Incremental Overbid, shall be made in accordance with the terms of the Plan or subsequent order of the Bankruptcy Court.[11]

The "First Trust Deed Property" and "Commercial Mortgage Property" were defined terms in the APA, and defined by reference to it in the Bid Procedures. The Bid Procedures did not address allocation of any Overbid Increment to any assets other than those defined in the Silver Point APA.

---

[10] Bid Procedures § 4.iv at 2.

[11] Bid Procedures, page 4, note 1.

5

214781.3

**Plan of Reorganization.** On November 15, 2006, Debtors filed their Third Amended Chapter 11 Plan of Reorganization [DE 1799] (the "Plan"). The Plan provided for an "Overbid Allocation":

> "Overbid Allocation" means the allocation agreed to between USACM and FTDF for the overbid, breakup fee, and expense reimbursement (as those terms are used in the Bid Procedures Order) as described in section E.2. of Art. IV of the Plan.[12]

The language referenced in the Plan is:

> **Overbid/Break-up Fee/Expense Reimbursement Allocation**: The Overbid Allocation shall be 85% to FTDF and 15% to USACM for any overbid consideration, and any incurred break-up fee or expense reimbursement obligation (as those terms are used in the Asset Purchase Agreement) shall be allocated in the same percentages, except as otherwise provided in the Stipulation memorializing the agreement between USACM and FTDF on the Overbid Allocation filed by the USACM Committee and the FTDF Committee with the Court, under seal, and served on the Debtors as confidential information, no later than ten (10) days prior to the Auction.[13]

The Plan thus refers to the overbid provisions to be included in the Stipulation to be filed, which in turn agreed only upon allocation of a higher bid for the assets Silver Point sought to buy.

**Disclosure Statement.** In the First Amended Disclosure Statement, without any bid more than Silver Point's offer, Debtors estimated that Silver Point's $46 million offer and pre-closing collections would net FTDF equity holders between 67-70%.[14] In contrast, USACM unsecured creditors could expect a distribution of between 8 to 33%.[15]

**Allocation Stipulation.** The total consideration offered by Silver Point to FTDF was $46 million, while the maximum consideration offered to USACM by Silver Point was $550,000. In a stipulation filed on November 27, 2006 (the "Stipulation") before any additional bids were received, the FTDF Committee and the USACM Committee agreed

---

[12] Plan at 16, def. 103.

[13] Plan § IV(E)(2)(i), at 55-56.

[14] Debtors' First Amended Disclosure Statement For Debtors' Third Amended Joint Plan Of Reorganization [DE 1798] filed November 15, 2006 at 7.

[15] Id. at 5.

6

214781.3

as to allocation of overbids for the FTDF Assets and the Stalking Horse USACM Assets which were the subject of the Bid Procedures Order, as well as liability for the Silver Point Break-up Fee.  The Stipulation recitals made that clear, referencing the Bid Procedures Order, the Auction for the Acquired Assets, and the sharing between the USACM and FTDF estates "in any overbid for the Acquired Assets," as defined in the Plan.[16]  It addressed the potential for a Joint Bid where the allocation of the purchase price between the FTDF Assets and the Stalking Horse USACM Assets could not be manipulated, because different entities were acquiring different assets:

> NOW, THEREFORE, USACM, through the USACM Committee, and FTDF, through the FTDF Committee, hereby stipulate and agree that the Overbid Allocation shall be 85% to the FTDF and 15% to USACM; provided, however, in the event there is a joint bid for the Acquired Assets made by at least two unaffiliated entities and the value placed on the USACM assets sold pursuant to the Auction and Plan by one of the joint bidders materially exceeds 15% of the total Acquired Assets (with a minimum bid allocation of $46,500,00 plus the Minimum Incremental Overbid as defined in the Bid Procedures Order), then the FTDF Committee and the USACM Committee shall try to reach a commercially reasonable adjustment to the 85%/15% Allocation, and if the parties are unable to agree to such an adjustment, the adjustment dispute will be resolved by the Court. It shall not be commercially reasonable for either FTDF or USACM to attempt to influence any joint bidder as to their respective bid amount or the allocation of any bid.[17]

The Stipulation did not address the possibility of a bid for additional USACM Assets outside the scope of the Asset Purchase Agreement and Bid Procedures.

**Compass Partners' Offer For Additional Assets.**  After an auction was scheduled and noticed to creditors and potential bidders, Compass submitted a competing offer. Compass offered to increase the bid price of the FTDF Assets by $2 million to $48 million.  Compass agreed to pay the additional $1.5 million Break-Up Fee due to Silver Point.  Finally, Compass offered $8 million for <u>both</u> the Stalking Horse USACM Assets <u>and</u> for the following "USACM Additional Assets":

---

[16] **"Acquired Assets"** means the FTDF Assets and the USACM Assets, described as "Assets" in the Asset Purchase Agreement.  Plan § I(A)(2), at 2.

[17] The Stipulation was originally filed under seal and has been released.

> Default Rate Interest, Accrued Servicing Fees, Late Charges, Success Fees, other fees and sums due the loan servicer under any of the Servicing Agreements and all proceeds of all Serviced Loans and Serviced Loan participations and receivables related solely to these purchased Serviced Loans and Serviced Loan participations owed to Commercial Mortgage, to the extent of Commercial Mortgage's interest therein, as set forth in the Serviced Loan Schedule"[18]

Unlike the Silver Point bid, no portion of the Compass payment was conditional; it was to be paid entirely in cash at closing.

Mesirow attempted to compare the Silver Point offer with the Compass offer by determining the book value of the USACM Additional Assets. Mesirow determined that the book amount of the USACM Additional Assets could have included the following:

- uncollected default interest with a projected balance as of December 31, 2006 of $27.8 million,
- interests in serviced loans, called short-term investments on the USACM balance sheet, $1.4 million,
- Exit Fees, $14.6 million,
- uncollected loan extension fees, $6.1 million,
- uncollected pre-petition servicing fees $3.1 million,[19]
- uncollected post-petition servicing fees $6.2 million,
- late fees of $1.8 million,
- origination fees of $1.4 million, and
- property, plant and equipment with a gross book value of $1.2 million.[20]

Some rights to fees for loans serviced by USACM, principally those related to DTDF loans, were withheld from the sale. Based upon Mesirow's data, after deducting

---

[18] December 8, 2006 Compass Partners, LLC Asset Purchase Agreement [DE 2164], p. 2 (definition of "Commercial Mortgage Assets").

[19] USACM did not collect or charge pre-petition loan servicing fees in a substantially greater amount than was reflected on the balance sheet.

[20] Declaration of Ted Burr ¶ 23.

1  Additional Assets that were not being sold, a rough estimate of the book value of the
2  USACM Additional Assets sought by Compass is **about $64 million**.

3  Mesirow advised other bidders of the Compass offer for USACM Additional
4  Assets. The other bidders were encouraged to bid for them as well, to enable an "apples to
5  apples" bidding process.

6  The fact of bidding for a substantial amount of additional USACM assets,
7  materially altering the respective percentages of assets being sold between the USACM
8  and FTDF estates, led the USACM Committee and Debtors to question the applicability of
9  the overbid allocation that was based on the Stalking Horse Assets alone to the Compass
10 bid. The FTDF Committee and USACM Committee did not reach an agreement on the
11 appropriate allocation before the December 7, 2006 auction. At the auction, the FTDF
12 Committee agreed that it did not claim that the Stipulation applied to the $8 million
13 opening offer allocated to USACM by Compass.[21] The FTDF Committee reserved its
14 right to argue that it should receive 85% of any additional bids. The USACM Committee
15 requested allocated additional bids from Compass, Silver Point, and Desert Capital REIT,
16 to avoid any argument about allocation. The Court declined to require allocated bidding
17 and reserved determination of claims to the additional bids for a later date.[22]

18 Silver Point, Desert Capital REIT and Compass all bid at the auction. Compass
19 was the winning bidder with a bid that netted $9.5 million over its original bid to FTDF
20 and USACM, excluding its $1.5 million payment for the Break-Up Fee. Thus, the issue
21 before the Court is how the $9.5 million Additional Bid should be allocated.

22 The FTDF Committee contends that the Stipulation applies to the USACM
23 Additional Assets as well as the Stalking Horse Assets, and claims the FTDF Estate is
24 entitled to 85% of the Additional Bid. Interestingly, if the FTDF equity interests are

---

[21] December 7, 2006 transcript [DE 2593] at 101, 102.
[22] December 7, 2006 transcript at 102, 103, 106.

9                                                                                          214781.3

assumed to be worth all of their $63 million book value, then the $48 million initial Compass offer would result in 76.2% recovery of the value of the FTDF portfolio. So in order for the FTDF to recover 100% of the face value of the portfolio, only about an additional recovery $15 million was required. Using FTDF's argument that it was entitled to 85% of the bid for any assets, including the USACM Additional Assets, it would have recovered 100% of the face amount of the FTDF portfolio at an overbid of only $17.6 million.[23]

The USACM Committee anticipates that the Direct Lenders Committee and the Diversified Equity Committee both agree that the Plan does not apply to the extent that the additional bid was for new assets – the USACM Additional Assets. In other words, while FTDF and USACM Committees agreed to split overbids for the Stalking Horse Assets – the existing assets that Silver Point had offered to purchase, the Plan and Stipulation concerning allocation of bids over the Silver Point offer did not address consideration paid for new assets. The Plan and Stipulation are simply silent with respect to consideration for the new assets.

The original Compass offer of $8 million for perhaps $64 million of USACM Additional Assets is approximately only 12.6% of book value. If USACM was entitled to 100% of the $9.5 million additional bid, this would equate to a 27% recovery of book value (vs. the 76% book value recovery for the FTDF Assets at $48 million).

Based upon negotiations with each of the bidders, the financial advisers at Sierra Consulting have determined that the additional value which drove the Auction for the additional $9.5 million was primarily the USACM Additional Assets.

---

[23] ($17.6 X 85%) + $48 = $63.



**Argument**

## I. THE COURT SHOULD INTERPRET THE PLAN UNDER NEVADA CONTRACT LAW

### A.   A Plan Is Interpreted as a Contract

"Although confirmation of a plan generally acts as a final order which binds all parties, regardless of whether they assented to the plan, a plan which is ambiguous as to a material term is subject to interpretation by a reviewing court."[24]

"Like a consent decree, a chapter 11 plan has elements of both a judgment and a contract. Because of a plan's likeness to a consent decree, a chapter 11 plan should generally be interpreted as if it were a contract."[25]

### B.   The Court Should Look To Nevada Contract Law

"The law of the state in which the plan was confirmed governs its interpretation."[26]

### C.   Nevada Courts Would Look To Parol Evidence If The Plan Is Ambiguous

In Nevada, "[w]hen a contract is clear on its face, it will be construed from the written language and enforced as written. Parol evidence is not admissible to vary or contradict the clear and unambiguous terms of a written agreement. However, parol evidence is admissible to determine the true intent of the parties when a contract is ambiguous. Thus, the circumstances surrounding the execution of a contract and the

---

[24] *Miller v. United States*, 363 F.3d 999, 1004 (9th Cir. 2004) ("If indeed Article XI [of the plan] is deemed to have been ambiguous, then the principles of res judicata do not operate to bar the government from asserting its position.").

[25] *In re Bartleson*, 253 B.R. 75, 78-79 (B.A.P. 9th Cir. 2000) (internal quotations omitted) ("This appeal involves the interpretation of terms of a chapter 11 plan of reorganization."); *see also In re Captain Blythers, Inc.*, 311 B.R. 530, 536 (B.A.P. 9th Cir. 2004) ("A chapter 11 plan resembles a consent decree and should be construed as a contract."); *Miller*, 363 F.3d at 1004 ("A Chapter 11 bankruptcy plan is essentially a contract between the debtor and his creditors, and must be interpreted according to the rules governing the interpretation of contracts.").

[26] *Bartleson*, 253 B.R. at 84; *see also Captain Blythers*, 311 B.R. at 536 ("In interpreting the Plan, we look to state law for guidance.").

214781.3



subsequent acts or declarations of the parties may be considered to interpret unclear contractual provisions."[27]

"Whether or not a document is ambiguous is a question of law for the court. A contract is ambiguous if it is reasonably susceptible to more than one interpretation."[28]

## II. THE PLAN APPLIES ONLY TO OVERBIDS, NOT BIDS FOR ADDITIONAL ASSETS

The Plan addressed the allocation of consideration for the Acquired Assets under the Stalking Horse Bid, and was subject to the later Stipulation. Both allowed for an allocated overbid for the same assets by a joint bid, reserving the allocation to a commercially reasonable agreement or determination by this Court.

By the express terms of the Stalking Horse APA, the USACM Additional Assets were not included in the Silver Point Acquired Assets. Compass submitted its initial bid for the USACM Additional Assets and the parties did not stipulate before the Auction as to how consideration for those additional assets would be shared. At the Auction, the FTDF Committee stipulated that the $8 million offered by Compass for the USACM Assets was not subject to any claim by the FTDF Estate. The Court reserved the issue of allocation of any additional bidding over the Compass offer at the request of the FTDF Committee and bidders. The Plan was confirmed in light of the express stipulation and reservation on the record at the Auction about the allocation dispute.

## III. IN THE ALTERNATIVE, THE COURT SHOULD TAKE EVIDENCE ON THE PLAN'S MEANING

If the Court concludes that the few words in the Bid Procedures upon which the FTDF Committee's entire contention hinges are ambiguous, the USACM Committee asks

---

[27] *Sandy Valley Assocs. v. Sky Ranch Estates Owners Ass'n*, 35 P.3d 964, 967-68 (Nev. 2001).

[28] *Margrave v. Dermody Props., Inc.*, 878 P.2d 291, 293 (Nev. 1994) (internal citations omitted); *see also Miller*, 363 F.3d at 1004 ("It is a well-established maxim of contractual interpretation that a contract is ambiguous if it is 'capable of more than one reasonable interpretation.'") (citing California law).

214781.3

that the Court set an evidentiary hearing to resolve the dispute. The Court can consider evidence of the parties' views when the Bid Procedures were negotiated. The USACM Committee will introduce evidence including the following excerpt of an email from the FTDF Committee's counsel, responding to proposal that the Bid Procedures provide for the possibility of bids for additional assets:

> **Sale of Other Assets**. We believe that the ability of bidders to include additional assets in this single auction is very problematic. No one knows what else is being sold nor the floor price for such assets. It would make the auction process very difficult. How will the parties be able to evaluate non-comparable bids? How will the pricing be allocated? How do the parties evaluate overbids? We believe that the potential inclusion of additional assets opens up an entire hornet's nest of issues that needlessly complicate the process and fails to maximize the value of any Debtor's estate. As an alternative, we do not oppose a separate simultaneous auction being conducted so long as the assets that are being sold are clearly identified, along with a minimum floor price.[29]

After that e-mail, the evidence will show that the Committees and Debtors agreed not to include provisions for other assets to be included in overbids. It will show that the language cited by the FTDF Committee about bidders purchasing "at least the same Property" was to address the FTDF Committee's stated concern that potential buyers not be able to cherry pick among the FTDF Assets. It will also include testimony from the Mesirow designee principally responsible for the negotiations with Silver Point and Compass, and expert testimony about the appropriate allocation of the additional bid with respect to the USACM Additional Assets.

## IV. IN THE ALTERNATIVE, THE COURT SHOULD GRANT RELIEF FROM THE STIPULATION

This Court is familiar with the principle that parties should be bound to stipulations made in court. Nevertheless, courts have discretion to grant limited relief from a

---

[29] Declaration of Ted Burr ¶ 10, quoting from September 21, 2006 e-mail from Christine Pajak. The USACM Committee expressly reserves, and does not waive, the joint interest privilege of the Committees and Debtors with respect to their negotiation of the Bid Procedures Order or any other aspect of the sale or these bankruptcy cases. This is included only to address the specific, narrow issue where the two Committees' dispute must be resolved.

stipulation where the circumstances justify, particularly where there are unanticipated changed circumstances.[30]

Here, the Compass bid, which was not received until November 30, 2006, presented a changed circumstance – a bid for the USACM Additional Assets. Granting FTDF a windfall of 85% of the consideration paid for assets owned by the USACM estate makes no sense, and could not be accomplished under any principle of the Bankruptcy Code or Rules.[31]

For example, if the Additional Bid had been only $17.6 million, and if FTDF was entitled to 85% of the entire bid, FTDF would recover more than the unpaid balance of the Loans it was selling, while USACM would get only a fraction of the value of the USACM Assets. Yet FTDF had no claim to the proceeds of any USACM Assets. The Stipulation was made because of the difficulty of allocating overbids for the Stalking Horse Assets between the FTDF loans and the contingent payments offered by Silver Point to USACM for future profits on servicing and collection of FTDF default interest. There is no such difficulty with respect to the USACM Additional Assets.

## Conclusion

The USACM Committee requests that the Court deny the Motion and determine the proper allocation of the Additional Bidding for the USACM Additional Assets.

---

[30] *See In Re Lenox*, 902 F.2d 737, 739-40 (9th Cir. 1990) ("But at the same time bankruptcy courts, as courts of equity, have the power to reconsider, modify or vacate their previous orders so long as no intervening rights have become vested in reliance on the orders.").

[31] *See In re American Resources Mgmt. Corp.*, 51 B.R. 713, 717 (Bankr. D. Utah 1985) ("This Court possesses inherent equitable power to set aside its orders approving the stipulations if the orders contravene the Bankruptcy Code and if the parties can be restored to the positions they occupied before they entered the stipulation."), citing *A & A Sign Co. v. Maughan*, 419 F.2d 1152, 1155 (9th Cir. 1969).

Dated February 13, 2007.

**LEWIS AND ROCA LLP**

By /s/ RC (#006593)
    Susan M. Freeman, AZ 4199 (pro hac vice)
    Rob Charles, NV 6593
*Attorneys for Official Unsecured Creditors' Committee*
for USA Commercial Mortgage Company

214781.3