**LEWIS AND ROCA LLP LAWYERS**

E-Filed on February 13, 2007

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169
Facsimile (702) 949-8321
Telephone (702) 949-8320

40 North Central Avenue, Suite 1900
Phoenix, Arizona 85004-4429

Susan M. Freeman AZ State Bar No. 004199
Email: sfreeman@lrlaw.com
Rob Charles NV State Bar No. 006593
Email: rcharles@lrlaw.com

Attorneys for Official Committee of Unsecured Creditors

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| **In re:** | Jointly Administered |
| **USA Commercial Mortgage Company**<br>    **06-10725 – Lead Case** | Chapter 11 Cases |
| **USA Capital Realty Advisors, LLC**<br>    **06-10726** | Judge Linda B. Riegle Presiding |
| **USA Capital Diversified Trust Deed Fund, LLC**<br>    **06-10727** | **Affecting:**<br>¨ All Cases<br>**or Only:**<br>× USA Commercial Mortgage Company<br>¨ USA Capital Realty Advisors, LLC<br>¨ USA Capital Diversified Trust Deed Fund, LLC<br>× USA Capital First Trust Deed Fund, LLC<br>¨ USA Securities, LLC |
| **USA Capital First Trust Deed Fund, LLC**<br>    **06-10728** | |
| **USA Securities, LLC**<br>    **06-10729** | |
| **Debtors.** | |

**Declaration of Edward M. Burr in Support of Response to Motion to Enforce Debtors' Third Amended Joint Chapter 11 Plan of Reorganization As It Relates to Allocation of Sale Proceeds [DE 2574]**

I, Edward M. Burr, hereby declare under penalty of perjury that:

1.  I am a principal with Sierra Consulting Group, LLC ("Sierra"). Sierra is one of the leading providers of restructuring advisory and litigation support services in the Southwest. Sierra is a leading national consulting firm comprised of experienced CPAs and other financial professionals.

2.  I submit this declaration on behalf of the Response of the Official Unsecured Creditors' Committee for USA Commercial Mortgage Company (the "Committee") to the

214871.1

Motion to Enforce Debtors' Third Amended Joint Chapter 11 Plan of Reorganization As It Relates to Allocation of Sale Proceeds. Except as otherwise noted, I have personal knowledge of the matters set forth herein.

3. I participated extensively with representatives of Mesirow Interim Financial Management for Debtors and with representatives of the Equity Committee for USA Capital First Trust Deed Fund, LLC ("FTDF Committee"), as well as with representatives of the other official committees in these cases, in connection with the proposed sale of assets by USA Commercial Mortgage Company ("USACM") and USA Capital First Trust Deed Fund, LLC ("FTDF").

4. **Silver Point Transaction.** This Court is aware that after significant marketing efforts, the FTDF Committee and Mesirow Interim Financial Management ("Mesirow") as FTDF's and USACM's management determined it was appropriate to sell:

- FTDF's proportionate interests in 47 different loans (the "FTDF Assets") as well as
- the "Stalking Horse USACM Assets" which were
    - Personal property associated with loan servicing,
    - the right of USACM as Servicing Agent to service the bulk of the USACM Loan Portfolios (and so give up the right to collect loan servicing fees under the Loan Servicing Agreements (the "LSAs")) after the closing, and
    - the right to collect default rate interest on the FTDF Assets.[1]

5. The FTDF Assets were originally scheduled as having a book value of approximately $66 million (notes receivable)[2] and $963,000 (accounts receivable),[3] for a total face value of $67 million.

---

[1] Asset Purchase Agreement dated as of October 19, 2006 with SPCP Group, LLC [DE 1603], definition of "Commercial Mortgage Assets" at 6.
[2] Schedule B-16-A.
[3] Schedule B-16-A.

2

214871.1

6. As a loan servicer, the USACM bankruptcy estate included the right to collect accrued and future servicing fees, late charges, default rate interest and success fees, although these rights are largely not listed on USACM's balance sheet or its schedules of assets filed with this Court.[4] Substantial sums were owed on the date of bankruptcy, and additional amounts accrued during the course of these bankruptcy cases. USACM also held participation interests in certain Loans and other notes and accounts receivable.

7. While the FTDF Assets were aggressively marketed for sale, there was little or no marketing of these additional USACM assets by Debtors or Mesirow. For these and other reasons, while the FTDF Assets generated significant market interest, there was relatively little interest in the additional USACM assets.

8. Silver Point Capital, through its affiliate SPCP Group, LLC, was selected as Lead Bidder under an Asset Purchase Agreement (the "Stalking Horse APA") for a bankruptcy auction. Silver Point agreed to pay FTDF $46 million for the FTDF Assets, and agreed to pay USACM 50% of the net profits it received on post-closing loan servicing fees up to a cap of $500,000, plus 50% of the net profits it received on collection of default rate interest on the FTDF Assets alone up to $50,000.[5] Thus, the total conditional purchase price Silver Point offered for the Stalking Horse USACM Assets was a maximum of $550,000. Silver Point did not agree to buy and USACM did not agree to sell any other USACM assets.

---

[4] Schedule B lists "extension fees" of $6.2 million.

[5] Asset Purchase Agreement [DE 1603], filed October 19, 2006; Revised First Amended and Restated Asset Purchase Agreement [DE 1750], filed November 7, 2006.

9. **Bid Procedures.** Debtors sought higher and better bids for the FTDF Assets and the Stalking Horse USACM Assets pursuant to the Court's November 8, 2006 Bid Procedures Order.[6]

10. I participated in the negotiation of the Bid Procedures. A proposal was made that the Bid Procedures should allow for proposed bidders to purchase assets in addition to those in the Silver Point APA. Counsel for the FTDF Committee responded in an email dated September 21, 2006:

> **Sale of Other Assets**
>
> We believe that the ability of bidders to include additional assets in this single auction is very problematic. No one knows what else is being sold nor the floor price for such assets. It would make the auction process very difficult. How will the parties be able to evaluate non-comparable bids? How will the pricing be allocated? How do the parties evaluate overbids? We believe that the potential inclusion of additional assets opens up an entire hornet's nest of issues that needlessly complicate the process and fails to maximize the value of any Debtor's estate. As an alternative, we do not oppose a separate simultaneous auction being conducted so long as the assets that are being sold are clearly identified, along with a minimum floor price.[7]

11. The request to have the Bid Procedures accommodate the possibility of bids for other assets was withdrawn. Accordingly, the Bid Procedures did not provide for a mechanism for any additional assets to be included in the sale.

12. In contrast, I understood that the FTDF Committee and its advisers did not want potential buyers cherry picking among the FTDF Assets and only bidding for some of the more valuable FTDF Assets. I understood that was the reason why the FTDF Committee insisted on inclusion of the following language requiring competing bids to set forth:

---

[6] Order (A) Scheduling an Auction for the Sale of Certain Assets; (B) Appointing SPCP GROUP LLC, as Lead Bidder; and (C) Approving Bid Procedures and Protections [DE 1761].

[7] Excerpt from email from Christine Pajak, CPajak@Stutman.com dated September 21, 2006.

a disclosure of the proposed purchase price, which must be at least equal to the Total Asset Purchase Price (as defined in the Purchase Agreement) offered by Stalking Horse Bidder on a basis no less favorable than the Purchase Agreement, and provided further that the assets being purchased must include at least the same Property being purchased in the Purchase Agreement, and that the proposed cash consideration must be equal to the cash component of the Total Asset Purchase Price (as defined in the Purchase Agreement), ....[8]

13. The FTDF Committee insisted that competing bids be in the aggregate for the FTDF Assets and the Stalking Horse USACM Assets. Debtors, the FTDF Committee and USACM Committee discussed but did not agree on an allocation of potential overbids for the FTDF Assets and Stalking Horse USACM Assets when the Bid Procedures Order was presented to and entered by the Court. Rather, to avoid potential bidders allocating Overbids to one estate's assets over the other the Bid Procedures provided as follows:

> To clarify, during the Auction, bidders shall make Increased Bids with respect to the Total Asset Purchase Price and shall not allocate any Overbid Increment, including the Minimum Incremental Overbid, between the First Trust Deed Property and the Commercial Mortgage Property. The allocation of any such Overbid Increment, including the Minimum Incremental Overbid, shall be made in accordance with the terms of the Plan or subsequent order of the Bankruptcy Court.[9]

14. The Bid Procedures did not address the possibility of a bid for additional USACM Assets.

15. **Plan of Reorganization.** On November 15, 2006, Debtors filed their Third Amended Chapter 11 Plan of Reorganization [DE 1799] (the "Plan"). The Plan provided:

"Overbid Allocation" means the allocation agreed to between USACM and FTDF for the overbid, breakup fee, and expense reimbursement (as those terms are used in the Bid Procedures Order) as described in section E.2. of Art. IV of the Plan.[10]

16. The language referenced in the Plan is:

---

[8] Bid Procedures § 4.iv at 2.

[9] Bid Procedures, page 4, note 1.

[10] Plan at 16, def. 103.

5

214871.1

1  **Overbid/Break-up Fee/Expense Reimbursement Allocation**: The Overbid Allocation shall be 85% to FTDF and 15% to USACM for any overbid consideration, and any incurred break-up fee or expense reimbursement obligation (as those terms are used in the Asset Purchase Agreement) shall be allocated in the same percentages, except as otherwise provided in the Stipulation memorializing the agreement between USACM and FTDF on the Overbid Allocation filed by the USACM Committee and the FTDF Committee with the Court, under seal, and served on the Debtors as confidential information, no later than ten (10) days prior to the Auction.[11]

17. The Plan refers to an overbid, which is a higher bid for the same assets Silver Point sought to buy, and a contemplated Stipulation.

18. **Disclosure Statement.** In the First Amended Disclosure Statement, Debtors estimated that Silver Point's $46 million offer and pre-closing collections would net FTDF equity holders between 67-70%, without any overbid.[12] In contrast, USACM unsecured creditors could expect a distribution of between 8 to 33%.[13]

19. **Allocation Stipulation.** The total consideration offered by Silver Point to FTDF was $46 million, while the maximum consideration offered to USACM was $550,000, if all contingencies occurred. In a stipulation filed on November 27, 2006 (the "Stipulation"), the FTDF Committee and the USACM Committee agreed as to allocation of overbids for the FTDF Assets and the Stalking Horse USACM Assets, as well as liability for the Silver Point Break-up Fee. (The Bid Procedures did contemplate the potential for two bidders making a combined offer for the Stalking Horse Assets, with one offering to buy the Stalking Horse USACM Assets and one offering to buy the FTDF Assets.)

NOW, THEREFORE, USACM, through the USACM Committee, and FTDF, through the FTDF Committee, hereby stipulate and agree that the Overbid Allocation shall be 85% to the FTDF and 15% to USACM; provided, however, in the event there is a joint bid for the Acquired Assets made by at least two unaffiliated entities and the value placed on the

---

[11] Plan § IV(E)(2)(i), at 55-56.

[12] Debtors' First Amended Disclosure Statement For Debtors' Third Amended Joint Plan Of Reorganization [DE 1798] filed November 15, 2006 at 7.

[13] Id. at 5.

USACM assets sold pursuant to the Auction and Plan by one of the joint bidders materially exceeds 15% of the total Acquired Assets (with a minimum bid allocation of $46,500,00 plus the Minimum Incremental Overbid as defined in the Bid Procedures Order), then the FTDF Committee and the USACM Committee shall try to reach a commercially reasonable adjustment to the 85%/15% Allocation, and if the parties are unable to agree to such an adjustment, the adjustment dispute will be resolved by the Court. It shall not be commercially reasonable for either FTDF or USACM to attempt to influence any joint bidder as to their respective bid amount or the allocation of any bid.[14]

20. The Stipulation did not address the possibility of a bid for additional USACM Assets.

21. **Compass Partners' Offer For Additional Assets.** After an auction was scheduled and notice to creditors and potential bidders, on November 30, 2006, shortly before 4:00 p.m. Pacific Standard Time, Compass Partners, LLC ("Compass") submitted a competing offer. Compass offered to increase the bid price of the FTDF Assets by $2 million to $48 million. Compass agreed to pay the additional $1.5 million Break-Up Fee due to Silver Point. Finally, Compass offered $8 million for <u>both</u> the Stalking Horse USACM Assets <u>and</u> for the following "USACM Additional Assets":

> Default Rate Interest, Accrued Servicing Fees, Late Charges, Success Fees, other fees and sums due the loan servicer under any of the Servicing Agreements and all proceeds of all Serviced Loans and Serviced Loan participations and receivables related solely to these purchased Serviced Loans and Serviced Loan participations owed to Commercial Mortgage, to the extent of Commercial Mortgage's interest therein, as set forth in the Serviced Loan Schedule"[15]

22. Unlike the Silver Point bid, none of the Compass payment to USACM was conditional; it was to be paid in cash at closing.

23. Mesirow attempted to compare the Silver Point offer with the Compass offer by determining the book value of the USACM Additional Assets. Mesirow determined that the book amount of the USACM Additional Assets could have included the following:

---

[14] The Stipulation was originally filed under seal and has been released.

[15] December 8, 2006 Compass Partners, LLC Asset Purchase Agreement [DE 2164], p. 2 (definition of "Commercial Mortgage Assets").

- uncollected default interest with a projected balance as of December 31, 2006 of $27.8 million,
- interests in serviced loans, called short-term investments on the USACM balance sheet, $1.4 million,
- Exit Fees, $14.6 million,
- uncollected loan extension fees, $6.1 million,
- uncollected pre-petition servicing fees $3.1 million,[16]
- uncollected post-petition servicing fees $6.2 million,
- late fees of $1.8 million,
- origination fees of $1.4 million, and
- property, plant and equipment with a gross book value of $1.2 million.

24. Some rights to fees for loans serviced by USACM, principally those related to DTDF loans, were explicitly withheld from the sale. Based upon Mesirow's data, after deducting Additional Assets that were not being sold, a rough estimate of the book value of the USACM Additional Assets sought by Compass is **about $64 million**.

25. Mesirow advised other bidders of the Compass offer for USACM Additional Assets available for sale. The other bidders were encouraged to bid for them as well, to enable an "apples to apples" bidding process, despite the absence of any provision for a sale of such assets in the Stalking Horse APA.

26. I had personal conversations with numerous potential buyers of the assets sold at the auction, including without limitation, Silver Point Capital, and its affiliate SPCP Group, LLC, Compass, and Desert Capital REIT, Inc. ("Desert").

27. It was clear to me from the negotiations with bidders that each bidder was allocating a substantial amount of consideration to the USACM Additional Assets.

---

[16] USACM did not collect or charge pre-petition loan servicing fees in a substantially greater amount than was reflected on the balance sheet.

8

214871.1

28. Silver Point, Desert Capital REIT and Compass all bid on not only the original Stalking Horse Assets but also the USACM Additional Assets. Compass was the winning bidder with a bid that netted $9.5 million over its original bid to FTDF and USACM, excluding its $1.5 million payment for the Break-Up Fee.

29. FTDF contends that it is entitled to 85% of the Additional Bid. If the FTDF equity interests are assumed to be $63 million, then the $48 million Compass offer ($2 million above the original Silver Point offer) for the FTDF Assets (without any overbid) would result in 76.2% recovery of the value of the FTDF portfolio. So in order for the FTDF to recover 100% of the face value of the portfolio, only about an additional recovery $17.6 million was required, if FTDF's argument that it was entitled to 85% of the Overbid for any assets, including the USACM Additional Assets, is accepted.[17] An overbid in that amount, if allocated 15% to USACM, would result in the USACM Estate receiving only 16.6%[18] of the book value of all the USACM Assets being sold, in contrast.

30. The original Compass offer of $8 million for perhaps $64 million of USACM Additional Assets is approximately only 12.5% of book value. If USACM was entitled to 100% of the $9.5 million overbid, this would still only equate to a 27% recovery of book value (vs. the 76% book value recovery for the FTDF Assets at $48 million).

Dated February 13, 2007.

By /s/ Edward M. Burr
Edward M. Burr

---

[17] ($17.6 X 85%) + $48 = $63.
[18] (($17.6 X 15%) + $8) / $64