ELECTRONICALLY FILED
February 21, 2007

STUTMAN, TREISTER & GLATT, P.C.
FRANK A. MEROLA
(CA State Bar No. 136934)
EVE H. KARASIK
(CA State Bar No. 155356)
ANDREW M. PARLEN
(CA State Bar No. 230429), Members of
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
Email:    fmerola@stutman.com
          ekarasik@stutman.com
          aparlen@stutman.com

SHEA & CARLYON, LTD.
JAMES PATRICK SHEA
(Nevada State Bar No. 000405)
CANDACE C. CARLYON
(Nevada State Bar No. 002666)
SHLOMO S. SHERMAN
(Nevada State Bar No. 009688)
228 South Fourth Street, First Floor
Las Vegas, Nevada 89101
Telephone: (702) 471-7432
Facsimile: (702) 471-7435
Email: jshea@sheacarlyon.com
       ccarlyon@sheacarlyon.com
       ssherman@sheacarlyon.com

Counsel for the Official Committee Of
Equity Security Holders Of USA Capital First Trust Deed Fund, LLC

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | BK-S-06-10725-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | BK-S-06-10726-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>Debtor. | BK-S-06-10727-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | BK-S-06-10728-LBR<br>Chapter 11 |
| In re:<br>USA SECURITIES, LLC,<br>Debtor. | BK-S-06-10729-LBR<br>Chapter 11 |
| Affects<br>☐ All Debtors<br>☒ USA Commercial Mortgage Co.<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed<br>☒ USA First Trust Deed Fund, LLC | Date: March 1, 2007<br>Time: 9:30 a.m. |

**REPLY IN SUPPORT OF MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 1141 AND 1142 TO ENFORCE CONFIRMED DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION AS IT RELATES TO ALLOCATION OF SALE PROCEEDS (AFFECTS DEBTORS USA COMMERCIAL MORTGAGE COMPANY AND USA CAPITAL FIRST TRUST DEED FUND, LLC)**

409109v4

The Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC (the "FTDF Committee") appointed in the above-captioned bankruptcy cases, hereby sets forth its reply to the "Response to Motion to Enforce Debtors' Third Amended Joint Chapter 11 Plan of Reorganization as it Relates to Allocation of Sale Proceeds" (the "Response"),[1] in support of the FTDF Committee's "Motion for Order Pursuant to Bankruptcy Code Sections 1141 and 1142 to Enforce Confirmed Debtors' Third Amended Joint Chapter 11 Plan of Reorganization as it Relates to Allocation of Sale Proceeds" (the "Motion").[2]

The Plan provides, in unambiguous terms, that "the Overbid Allocation shall be 85% to FTDF and 15% to USACM for <u>any overbid consideration</u>," as part of a global compromise between FTDF and USACM, subject only to an exception which the USACM Committee acknowledges is irrelevant to the present matter. *See* Plan at 58 (emphasis added). The Plan was confirmed without objection by the USACM Committee, and the USACM Committee is bound by its terms. The fact that the Compass bid included additional assets was well-known to all parties as early as a few days before the December 7 Auction. Indeed, the Confirmation objection deadline was still approximately one week away and no objection to the 85/15 Allocation provided for in the Plan was interposed by the USACM Committee. Likewise, the USACM Committee remained silent on this issue throughout two days of Confirmation hearings in late December and through subsequent hearings in January 2007 on the Confirmation Order. Despite more than ample opportunities, the USCAM Committee elected not to object to the Allocation contained in the FTDF/USACM compromise in the Plan. It now asserts the Court should unilaterally modify the Allocation by presenting the absurd argument that the requirement of the Bid Procedures that qualified bidders must purchase "at least" the property included in the

---

[1] On Feb. 21, 2006, the Official Committee of Equity Interest Holders of USA Capital Diversified Trust Deed Fund, LLC (the "DTDF Committee") filed a joinder to the USACM Committee Reply (the "Joinder"). The FTDF Committee respectfully requests that this Joinder be striken, as the DTDF Committee has failed to comply with the response deadline of February 13, 2006, as established by the Local Rules of Civil Procedure and Third Amended Order Establishing Case Management Procedures, dated January 29, 2007. However, to the extent the Court considers the DTDF Joinder, the FTDF Committee also submits its response to the Joinder by this Reply.

[2] Capitalized terms not otherwise defined herein have the meanings set forth in the Motion.

409109v4                                   2

Stalking Horse Bid does not mean "at a minimum," but instead means essentially "equivalent to, but not more than" the property included in the Stalking Horse Bid, and thus the USACM Committee is not bound by the express terms of the confirmed Plan. This position is untenable.

There is no issue here — the terms of the Plan control and all "overbid consideration" is subject to the Allocation contained in the Plan compromise. Notwithstanding the USACM Committee's attempts to muddle this determination by citing to irrelevant extrinsic evidence, the terms of the confirmed Plan control and the USACM Committee cannot now come in after the fact to request that the Court change those terms. Indeed, it is the USACM Committee that seeks the windfall in this instance now that there is meaningful overbid consideration. Therefore, the FTDF Committee respectfully requests that the Court enter an order directing that the Plan and the Allocation contained therein be implemented as confirmed.

## ARGUMENT

### A.   THE PLAN OF REORGANIZATION

1. On November 15, 2006, the Debtors filed the "Debtors' Third Amended Joint Chapter 11 Plan of Reorganization." The Plan provides for the approval of the Sale, as well as several key compromises, including a global compromise between USACM and FTDF (the "Compromise"). An integral component of the Compromise was the agreement between USACM and FTDF as to the allocation of any overbid sale proceeds.

2. Section IV(E)(2)(i) of the Plan provides that:

> <u>The Overbid Allocation shall be 85% to FTDF and 15% to USACM for any overbid consideration</u>, and any incurred break-up fee or expense reimbursement obligation (as those terms are used in the Asset Purchase Agreement) shall be allocated in the same percentages, except as otherwise provided in the Stipulation memorializing the agreement between USACM and FTDF on the Overbid Allocation filed by the USACM Committee and the FTDF Committee with the Court, under seal, and served on the Debtors as confidential information, no later than ten (10) days prior to the Auction.

*See* Plan at 58 (emphasis added). Thus, the *only* possible exception to the application of this Allocation to *any* overbid consideration is as provided in the Stipulation. Yet, the USACM

409109v4                                                  3

1. Committee acknowledges in its Response, that the Stipulation does not apply to this dispute. Response at 7.[3] Thus, both parties agree that the terms of the Stipulation are not relevant to the application of the Plan to the overbid proceeds. However, it is clear that the Plan Allocation provides for no other reservation of rights or deference to a later determination.

3. Moreover, contrary to the USACM Committee's implication in its Response, the limited scope of the Stipulation does not in any way limit the scope of the Allocation provision in the Plan. The Stipulation merely provided an opportunity for the USACM Committee to carve out exceptions to the Allocation, and the USACM Committee failed to carve out any exception relating to an overbid that included additional assets. The Allocation as set forth in the Plan controls here without exception.

4. The Plan was confirmed by order dated January 8, 2007, after hearings held on December 19 and 20, 2006. Despite myriad opportunities as the nature of the Compass bid was known to all parties the week before the Auction, neither USACM nor the USACM Committee objected to any provisions of the Plan or to confirmation of the Plan. In fact, the USACM Committee supported confirmation of the Plan.[4] Further, the USACM Committee did not appeal the Confirmation Order.

5. The USACM Committee has allowed each opportunity it had to raise objection or carve out an exception to the Allocation set forth in the Compromise under the Plan to pass without taking any action whatsoever. There exists no avenue now for it to belatedly attack the fairness of this Allocation simply because with hindsight it believes it was a mistake not to utilize those opportunities when it had the chance. Any modification of the Allocation at this stage to unilaterally alter a single aspect of the Compromise to expand

---

[3] Despite the USACM Committee's contrary statements, the Stipulation has not been unsealed. Accordingly, the FTDF Committee did not cite to its contents in the Motion. Since both parties believe that the Stipulation is not relevant to the dispute, the unsealing of the Stipulation is no longer an issue.

[4] See, e.g., USACM Unsecured Committee's (sic) Reply Brief in Support of Plan Confirmation..., filed with this Court on December 15, 2006 [Docket No. 2136].

409109v4                                    4

1. USACM's rights would be procedurally improper,[5] and categorically unfair to all of the Debtors' constituencies who voted in favor of the Plan in reliance on its plain terms.

6. Indeed, another official committee in these cases attempted to challenge the applicability of a Plan provision at the close of the Confirmation hearings after not objecting to the provision during the Confirmation process and the Court summarily refused to acknowledge the purported reservation of rights as follows:

> The Court: Okay. Sorry, Mr. Herman[n]?
>
> Mr. Herma[n]: Your Honor, hopefully by way of just a housekeeping point of view, but the Diversified Fund is a direct lender. The Diversified Fund did not sign up for the compromise embodied in the plan. And we still have outstanding issues with Mr. Charles and Miss. Freeman. We continue to try and work out those issues.
>
> The Court: Well, you're bound to the plan like everybody else is. Okay.
>
> Mr. Herman[n]: That's exactly right, Your Honor, but we are not a party to the compromise. So I would just like some clarification that the Court's rationale was really in support of approving the compromise and not things that are binding on other parties in the case who –
>
> The Court: But you're in that class. You're bound like everybody else. You're in that class. I know you said you wouldn't agree to it unless you objected. That's why I asked the question yesterday.
>
> Mr. Herman[n]: By the terms of the plan, Your Honor.
>
> The Court: Yes, You're bound by the terms of the plan.
>
> Mr. Herman[n]: Diversified Fund is not a member of the A-5 class.
>
> The Court: But to the extent of those claims you are.
>
> Mr. Herman[n]: That's not the way the plan is drafted, Your Honor. This is not a controversial issue.

---

[5] Only the plan proponent or the reorganized debtor may seek modification of a confirmed plan. See 11 U.S.C. § 1127.

409109v4    5

| | | |
|---|---|---|
| 1 | The Court: | It is. |
| 2 | Mr. Herman[n]: | We've already, well, amongst the professionals it's not. |
| 3 | The Court: | Well, it is. If you want to be treated differently, you're no different than Mr. Smith's client. |
| 5 | Ms. Jarvis: | [omitted] |
| 6 | The Court: | Right, to the extent that they had a claim as a direct lender, I think they are. You can find it out later if you want, but. |
| 8 | Mr. Merola: | [omitted] |
| 9 | Mr. Herman[n]: | We have additional facts to present to the Court. There are additional arguments, there are differences to the foreclosure – |
| 11 | The Court: | But the point is to the extent you're a direct lender and fit within A-5, whether you loan or not, you're bound by the plan like everybody else. |
| 13 | Mr. Herman[n]: | Of course, but I think that we can demonstrate that that wasn't the intent of the plan. That's all I'm asking, is the Court's rationale for approving the compromise is not binding upon the party who is not a part of the compromise. |
| 16 | The Court: | It is. That was Mr. Smith's problem. Mr. Smith said, "I'm not a part of this compromise. I didn't agree to it." It is. |
| 18 | Mr. Herman[n]: | Let me rephrase, your Honor. A party who is not under the plan purported to be bound by the compromise. I'm not trying to change anything, I'm not trying to change anything in the plan, I'm not trying to change anything in the form of orders. |
| 21 | The Court: | It seems to me if you are someone whose claim fits within A-5, you are bound just like every class member. Maybe you are going to litigate it later, but that's my view. |
| 24 | Mr. Herman[n]: | We understand that's your view. |
| 25 | The Court: | But you're here and you didn't file an objection to the plan. |
| 27 | Mr. Herman[n]: | And we're willing to live by the terms of the plan, it's just that – |

409109v4                                    6

| | | |
|---|---|---|
| 1 | The Court: | So don't ask me for clarification of what you think the |
| 2 | plan does for you. | |
| 3 | Ms. Jarvis: | [omitted] |
| 4 | The Court: | The plan says whatever it is. |

Confirmation Hearing Transcript, December 20, pp. 42 – 46. The USACM Committee's attempts to not be bound by the Plan are much more egregious then the scenario above given that, unlike the DTDF Committee, it does not dispute that it is party to the FTDF/USACM Compromise contained in the Plan. As the Court refused to acknowledge the DTDF's Committee's requested clarification as it did not object to the Plan, so should the Court refuse to permit the USACM Committee to avoid being bound by an integral part of the Compromise to which it is a party in a Plan where such Committee failed to object to despite ample opportunity.

### B. UNAMBIGUITY OF THE PLAN LANGUAGE

7. The USACM Committee argues that the Allocation should be reconsidered to mean something other than an 85%/15% allocation with regard to the overbid consideration, asserting that the language is ambiguous. However, the Plan Allocation is in no way ambiguous, and is binding on the USACM Committee as written. Extrinsic evidence is thus wholly irrelevant to this dispute.

8. The USACM Committee does not propose what supposed reasonable alternative interpretation may be given to the Allocation language with regard to the overbid consideration. Instead, the USACM Committee suggests that the overbid proceeds somehow fall outside of the scope of the 85%/15% allocation because it does not believe the Bid Procedures contemplated that the Auction might include an overbid covering assets not included in the original Stalking Horse Bid.

9. This far-fetched ambiguity argument hinges first on the Court's acceptance of the ridiculous proposition that the Bid Procedures' contemplation that qualified overbidders would bid for "at least" the same assets as included in the Stalking Horse Bid does not mean that the Bid Procedures provided for overbids that included additional assets. If reference to common

409109v4                                    7

sense alone were not sufficient, Merriam-Webster's Dictionary defines the term "at least" to mean "at the minimum." Yet, the USACM Committee would have the Court believe that in spite of this language, the Bid Procedures should be read to govern only overbids for the same assets, but no additional assets (in other words, treating the Stalking Horse Bid assets as both a minimum *and* a maximum).

10. In support of this untenable position, the USACM Committee states that it would submit as evidence an email from Ms. Christine Pajak, counsel for the FTDF Committee, regarding the "Sale of Other Assets," which allegedly demonstrates that the FTDF did not believe that additional USACM assets would be sold under the Stalking Horse Bid. The problem with this "evidence" (which is wholly irrelevant to the present dispute) is that the USACM Committee has failed to disclose the full context of the email; the email was in response to the DTDF Committee's desire to potentially include unspecified DTDF assets into the pot of assets to be sold. Given that no party had provided an expression of interest in the DTDF assets palatable to the DTDF and the DTDF had not decided whether to keep or sell its assets, it made sense not to include in the auction the DTDF assets since it could create confusion at the auction. The pertinent excerpt of the email[6] from Mr. Marc Levinson of the Diversified Committee to which Ms. Pajak responds is as follows:

> In the attached, we accepted all of the changes proposed by the FTDF committee (discussed in Christine's email below.) The changes address our desire that overbidders be permitted to bid on assets in addition to those contained in the Silver Point purchase agreement (defined as the "Property"), and are shown in track changes and also are highlighted in yellow. The first yellow highlighting, in paragraph 3.iv. of the bid procedures on page 2, already was a part of the procedures. Subsequent yellow highlighting shows language we added to address the issue.
>
> Seems to us that while it may be unlikely that a new bidder would enter the fray and bid for the DTDF assets – whether in combination with the Property or without purchasing the Property (letting Silver Point or some

---

[6] The FTDF Committee expressly reserves, and does not waive, the joint interest privilege of the Committees and the Debtors with respect to their negotiation of the Bid Procedures Order or any other aspect of the sale or these bankruptcy cases. This email is only included to address the specific allegations made by the USACM Committee in its Response with regard to the import of the email.

409109v4                                    8

Overbidder do that) – the Bid Procedures ought to accommodate that possibility. Two potential overbidders have expressed interest in the quirky DTDF assets.

September 21, 2006 from Marc Levinson. A copy of the full email string is attached as Exhibit "A" to the Declaration of Christine M. Pajak, filed concurrently herewith. It is clear now that the email exchange between Ms. Pajak and Mr. Levinson, placed into its true context, had nothing to do whatsoever with which USACM assets would be sold to Silver Point or any overbidder and is wholly irrelevant to the parties' intent in that regard.

10. Moreover, the USACM Committee's argument then requires, as a second step, that the Court conclude the USACM Committee's asserted interpretation of the Bid Procedures somehow restricts the plain language of the later-confirmed Plan. If the USACM Committee truly believed that the additional assets included in the approved Sale to Compass were not within the scope of the Bid Procedures and should thus be excluded from the scope of the Plan Allocation, it should have objected to the terms of the Compromise contained in the Plan. It failed to do so. It cannot now collaterally attack the scope of the Allocation, which expressly applies to "any overbid proceeds."

11. In attempt to circumvent the fact that it did not object to the Allocation set forth in the Plan, the USACM Committee argues that "[t]he Plan was confirmed in light of the express stipulation and reservation[7] on the record at the Auction about the allocation dispute," Response at 12, and presumably, therefore, the scope of the Plan Allocation is somehow rendered ambiguous or altered by the parties' decision not to address the dispute at the Auction. However, the USACM Committee is not allowed to sit back quietly and let the Debtors' creditors and voting equityholders approve the Plan as written, without objection, expecting later to request that the Court alter a single term of the Plan to shift the balance reached by the

---

[7] It is not surprising that the allocation issue was not determined at the Auction—a main purpose of the allocation settlement was to avoid permitting potential purchasers from attempting to try to woo one debtor at the expense of the other by eliminating the possibility of a bidder-directed allocation during the auction hearing. However, this is in no way inconsistent with the fact that when the settled allocation was implemented by confirmation of the Plan, the allocation was conclusively determined.

409109v4                                    9

Compromise, based on some extrinsic alleged agreement made outside of, prior to, and not referenced in the Plan confirmation process.[8]

12.     Finally, the USACM Committee attempts to muddle the Court's examination of whether the Plan Allocation language is unambiguous by making numerous improper factual allegations regarding the valuation of the sale assets. In fact, the FTDF Committee has filed evidentiary objections to the Burr Declaration in support of the USACM Committee Response concurrently herewith.[9] First, these allegations have no bearing on the Court's determination regarding the unambiguous nature of the Plan. Secondly, valuations of the sale assets are not determinative of the mutual intent of the parties with regard to the terms of the Compromise. To the contrary, the Allocation was included in good faith as a component of the Compromise in order to prevent the burden to the estates posed by an extensive valuation battle. Indeed, the FTDF Committee could have insisted on a strict asset value allocation which would have resulted in an approximate 98/2 allocation under the Stalking Horse Bid, but agreed in good

---

[8] "A reorganization plan resembles a consent decree and therefore, should be construed basically as a contract. . . . [S]tate law . . . governs our interpretation of [the debtor's] plan." *Hillis Motors, Inc. v. Hawaii Automobile Dealers' Assoc.*, 997 F.2d 581, 588 (9th Cir. 1993) (citations omitted), *superceded by statue on other grounds*. "In Nevada, . . . [w]here . . . a written contract is clear an unambiguous on its face, extraneous evidence cannot be introduced to explain its meaning." *Land Am. Lawyers Title v. Metropolitan Land Dev., LLC*, No. 2:05-CV-1388-PMP-PAL, 2006 U.S. Dist. LEXIS 58129, at *19-20 (D. Nev. Aug. 14, 2006) (quotations omitted).

[9] Furthermore, the FTDF Committee submits that contrary to the Burr Declaration, all of the USACM assets were adequately marketed and USACM received proposals for these assets but just not at an acceptable purchase price to the USACM Committee. *See, e.g.,* Declaration of Thomas J. Allison in Support of Motion for Order Scheduling an Auction for the Sale of Certain Assets, Appointing SPCP Group, LLC as Lead Bidder, and Approving Bid Procedures and Protections [Docket No. 1578] at, *inter alia*, ¶7; Supplemental Declaration of Thomas J. Allison in Support of Motion for Order Scheduling an Auction for the Sale of Certain Assets…[Docket No. 1633], at 2; Declaration of Thomas Allison in Support of the Confirmation of the Debtors' Third Amended Joint Plan of Reorganization [Docket no. 2147] ("Allison Confirmation Declaration") at ¶27. Further, the Court knows that "book value" of assets has absolutely no bearing on the market value of the assets and is no barometer for value. Indeed, the USACM Committee admits that many of the USACM assets were assigned no value in the USACM Schedules. There is no admissible testimony that either Mesirow or Sierra can provide that will demonstrate that it was additional USACM assets that generated the overbid in this Sale – it was the synergy of both the FTDF and the USACM assets sold that generated the value. Given this synergy, the 85/15 Allocation was negotiated by the parties and incorporated into the Plan Compromise that was approved by all voting parties.

409109v4                                    10

1  faith to provide USACM with the 15% share as well as agreeing to permit USACM to keep all of
2  the $8 million of the initial Compass bid. Moreover, the 85/15 Allocation is abundantly fair –
3  the value of initial Compass bid $8 million for USACM assets and $48 million for FTDF assets
4  results in an 86/14 split based on the total $56 million bid.

5         13.     In a similar vein, the USACM Committee recites statistics regarding the
6  projected recovery by each Debtors' estate under the Plan, which, again, is irrelevant to the
7  Court's examination of the plain language of the Plan Allocation. Moreover, this projected
8  recovery discussion is wholly fantastic – the USACM Committee argues that if *the overbid had*
9  *been $17 million,* than the FTDF estate would have been paid in full. In fact, the overbid was far
10 short of that amount at a net $9.5 million and FTDF was bound to give 15% away to USACM (as
11 well as to account for the significant administrative expenses of the FTDF) so that the FTDF will
12 not come near to being paid in full under this transaction. This argument simply makes no sense.
13 The USACM Committee struck a deal with the FTDF Committee – the fact the USACM
14 Committee is now unhappy with the deal which was an integral part of the Plan, which was
15 voted on by all parties, does not entitle the USACM Committee to now re-negotiate the
16 compromise.

17        14.     Perhaps the USACM Committee includes these allegations in its Response
18 because it believes that "even if [the 'at least' phrase in the Bid Procedures includes the USACM
19 Additional Assets], this Court should use its equitable powers to correct the inequity of allowing
20 the FTDF Committee a windfall." Response at 2. This position is flatly incorrect. The Plan
21 language provides for what it provides. The USACM Committee slept on its right to object to
22 that language, and is now bound thereby. There is no procedural, legal, or equitable basis for the
23 USACM Committee now to assert that the Court should somehow "correct" perceived inequities
24 in a Plan it supported at confirmation. Having negotiated a deal by which it no longer wishes to
25 abide, it is truly USACM Committee that seeks the windfall in this dispute.

26        15.     Finally, in the unlikely event that this Court accepted the invitation to
27 jettison the agreement insofar as it affects the overbid allocation, the result would be to reopen
28 the issue of allocation of the entire purchase price. *See, e.g., A&A Sign Co. v. Maughan,* 419

409109v4        11

1  F.2d 1152, 1159 (9th Cir 1969)(A court "cannot remove a material part of the stipulation over
2  the objection of one of the parties to it and enforce the rest of the agreement.")
3        **WHEREFORE,** the FTDF Committee respectfully requests that the Court enter its order
4  directing that the Plan, and Allocation contained therein, be implemented as confirmed.

6  Respectfully submitted this 21st day of February, 2007.
7  /s/  Frank A. Merola

8  FRANK A. MEROLA (CA State Bar No. 136934),
   EVE H. KARASIK (CA State Bar No. 155356), and
9  ANDREW M. PARLEN (CA State Bar No. 230429), Members of
   STUTMAN, TREISTER & GLATT, P.C.
10 1901 Avenue of the Stars, 12th Floor
11 Los Angeles, CA 90067
   Telephone: (310) 228-5600
12 COUNSEL FOR THE
   OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
13 OF USA CAPITAL FIRST TRUST DEED FUND, LLC

and

CANDACE C. CARLYON
SHEA & CARLYON, LTD.
228 S. Fourth Street, First Floor
Las Vegas, NV 89101
Telephone: (702) 471-7432
COUNSEL FOR THE
OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
OF USA CAPITAL FIRST TRUST DEED FUND, LLC

409109v4                                12

**EXHIBIT "A"**

## Najolia, Gina

**To:** Karasik, Eve H.
**Subject:** RE: USA Capital: Bid Procedures

**From:** Pajak, Christine
**Sent:** Thursday, September 21, 2006 10:27 AM
**To:** 'Levinson, Marc A.'; Annette Jarvis
**Cc:** Ernce, Lynn Trinka; Tucker, Michael; Karasik, Eve H.; GEG Greg E. Garman; GMG Gerald M. Gordon; Charles, Robert; Allison, Thomas; Freeman, Susan; tburr@sierracgllc.com; Matt Kvarda (E-mail); Steven Strong; Merola, Frank A.
**Subject:** USA Capital: Bid Procedures
**Importance:** High

In response to the comments by the DTDF Committee and Direct Lender Committee, we have the following concerns:

### Other Committee Involvement in the Auction Process
The Auction is designed to obtain the best price for the assets being sold by the USACM and FTDF estates. Accordingly, these 2 estates, along with their Committees, have the greatest interest in ensuring that value is maximized. While we understand that the DTDF Committee and Direct Lender Committee want to have some oversight in making sure that a qualified loan servicer is selected, we don't believe that this interest should give your Committees veto power in determining Preliminary Qualifications, Qualified Bids, or the Successful Bidder. We strongly believe that, while your Committees should be consulted on these issues, the ultimate decision must lie with the Debtors, the USACM Committee and FTDF Committee. In other words, we do not oppose the involvement of the DTDF Committee or Direct Lender Committee but the decision-making should firmly rest with the Debtors, the USACM Committee and FTDF Committee. Finally, we also note that this process does not prejudice the rights of either the DTDF Committee and Direct Lender Committee. If, in the end, the selection of the loan servicer is unacceptable, your Committees still retain the right to oppose the sale. To address this concern, we can include a provision that reserves all of the Committees' rights to oppose the sale.

### Sale of Other Assets
We believe that the ability of bidders to include additional assets in this single auction is very problematic. No one knows what else is being sold nor the floor price for such assets. It would make the auction process very difficult. How will the parties be able to evaluate non-comparable bids? How will the pricing be allocated? How do the parties evaluate overbids? We believe that the potential inclusion of additional assets opens up an entire hornet's nest of issues that needlessly complicate the process and fails to maximize the value of any Debtor's estate. As an alternative, we do not oppose a separate simultaneous auction being conducted so long as the assets that are being sold are clearly identified, along with a minimum floor price.

### Auction Site
In these cases, it is critical that the auction takes place in the courtroom (to the extent Judge Riegle agrees to such a process). If the auction is outside of the courtroom, this leaves open too many opportunities for parties to finagle the auction process. By having the auction in the courtroom, the Judge is readily available to resolve any dispute that parties might have. By having the auction in the courtroom, the auction will be more orderly and efficient.

If you have any questions regarding this matter, please do not hesitate to contact us directly.

Christine

-----Original Message-----
**From:** Levinson, Marc A. [mailto:MALEVINSON@Orrick.com]

2/20/2007

**Sent:** Wednesday, September 20, 2006 9:53 PM
**To:** Annette Jarvis
**Cc:** Ernce, Lynn Trinka; Tucker, Michael; Karasik, Eve H.; Pajak, Christine; GEG Greg E. Garman; GMG Gerald M. Gordon; Charles, Robert; Allison, Thomas; Freeman, Susan; tburr@sierracgllc.com; Matt Kvarda (E-mail); Steven Strong
**Subject:** DTDF comments on the bid procedures

Annette,

In the attached, we accepted all of the changes proposed by the FTDF committee (discussed in Christine's email below). The changes address our desire that overbidders be permitted to bid on assets in addition to those contained in the Silver Point purchase agreement (defined as the "Property"), and are shown in track changes and also are highlighted in yellow. The first yellow highlighting, in paragraph 3.iv. of the bid procedures on page 2, already was a part of the procedures. Subsequent yellow highlighting shows language we added to address the issue.

Seems to us that while it may be unlikely that a new bidder would enter the fray and bid for the DTDF assets -- whether in combination with the Property or without purchasing the Property (letting Silver Point or some Overbidder do that) -- the Bid Procedures ought to to accommodate that possibility. Two potential overbidders have expressed an interest in the quirky DTFD assets.

Comment not addressed in the attached draft: I realize that while the the sale is only of FTDF and USAMC assets, the buyer will be taking over the servicing of the loans of the other direct lenders and of DTDF (at least some), and it seems to me that the Direct Lenders Committee and the DTDF Committee ought to be able to weigh in on the qualification of any Potential Bidder that seeks to take over the servicing. Indeed, a more cynical person would argue that the Direct Lenders Committee and the DTDF Committee ought to have significant input into that aspect of the decision since FTDF and USAMC will be selling their assets and fading from the post confirmation scene.

Finally, I note that the site of the auction remains a mystery. I hope and assume that the sale will be conducted at a place other than the courthouse. If I'm correct, I don't understand how the conclusion of the auction will be "announced by the Bankruptcy Court" as provided in 4.ix.

Marc

---

**From:** Pajak, Christine [mailto:CPajak@Stutman.com]
**Sent:** Wednesday, September 20, 2006 3:30 PM
**To:** Elaine Monson; Gerald M. Gordon Esq. (E-mail); Greg E. Garman Esq. (E-mail); Levinson, Marc A.; Hermann, Jeffery; Ernce, Lynn Trinka; Charles, Robert; Freeman, Susan; Merola, Frank A.; Karasik, Eve H.; Candace Carlyon; tburr@sierracgllc.com; Matt Kvarda (E-mail); Michael.Tucker@FTIConsulting.com
**Cc:** Annette Jarvis; Steven Strong; Allison, Thomas; Smith, Susan Marie; Fasel, Bill; Reed, James
**Subject:** RE: RQNDOCS-#892717-v1-redline_of_891765v4_to_891765v3.DOC

Attached hereto please see the FTD Fund Committee comments. Please note that I purposefully deleted Silver Point's attorney from my communication.

Generally speaking, the revisions look good. Below please find comments to some of our suggested changes:

1)    In reading the Bid Procedures again, I noticed that while a Qualified Bid only needs to disclose a purchase price, which must be equal to the Total Asset Purchase Price, the Joint Bid must include a purchase price that has a value of at least the Minimum Incremental Overbid. These 2 should be the same. If parties still want the stalking horse bid of Silver Point to be the Opening Bid under the

Bid Procedures, I would suggest making the conforming change to the requirements of the Joint Bid (which I did in the redline attached hereto). On the other hand, if parties want Qualified Bids to be higher than that of Silver Point's, then we need to change the Bid Procedures so that Silver Point is not the Opening Bid. (It would make little sense to have people submit higher bids and then start the auction with the lowest Qualified Bid)

2)  With respect to the Minimum Incremental Overbids and Overbid Increment, we would suggest that we go back with $500,000 as the initial incremental overbid (over the Break-Up Fee) and stick to our guns on $100,000 for subsequent overbids. We think the lower Overbid Increment will generate a lot more activity and interest at the Auction.

3)  The proviso at the end of Paragraph 4.v. sticks out as leftovers from an earlier draft as it refers to an allocation that's not there. We suggest moving the concept to a footnote -- please see our proposed language.

4)  There is no reason to include the added language that Silver Point wants in the Selection of the Next Highest Bidder. That is something Silver Point can negotiate if it wants to become the Next Highest Bidder, but we don't want every Bidder to back into a drop-dead date to close the transaction. If we're able to get a Next Highest Bidder that will keep its offer open, we should be able to get that benefit and the added language by Silver Point is likely to hinder those efforts.

Finally, we would like to see a copy of the Motion to approve the Bid Procedures as soon as possible so that there is sufficient time for all parties to comment.

If you have any questions or concerns regarding our comments, please do not hesitate to contact us directly.

Christine

-----Original Message-----
**From:** Elaine Monson [mailto:emonson@RQN.COM]
**Sent:** Wednesday, September 20, 2006 12:51 PM
**To:** Gerald M. Gordon Esq. (E-mail); Greg E. Garman Esq. (E-mail); Marc A. Levinson Esq. (E-mail); jhermann@orrick.com; Ernce, Lynn Trinka; Charles, Robert; Freeman, Susan; Merola, Frank A.; Karasik, Eve H.; Pajak, Christine; Candace Carlyon; tburr@sierracgllc.com; Matt Kvarda (E-mail); Michael.Tucker@FTIConsulting.com; jmccarroll@reedsmith.com
**Cc:** Annette Jarvis; Steven Strong; Allison, Thomas; Smith, Susan Marie; Fasel, Bill; Reed, James
**Subject:** RQNDOCS-#892717-v1-redline_of_891765v4_to_891765v3.DOC

All, attached is another red-line version of the bid procedures that incorporates many of the comments I have received. Let me know if you have additional comments.

****************************************************************
This Internet e-mail contains confidential information
which is intended only for the addressee and which may
be privileged under applicable law. Do not read, copy
or disseminate it if you are not the addressee. If you

have received this message in error, please notify the
sender immediately and delete it. Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

===================================================================

IRS Circular 230 disclosure:
To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice contained in this communication, unless expressly stated otherwise, was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any tax-related matter(s) addressed herein.

===================================================================

NOTICE TO RECIPIENT: THIS E-MAIL IS MEANT FOR ONLY THE INTENDED RECIPIENT OF THE TRANSMISSION, AND MAY BE A COMMUNICATION PRIVILEGED BY LAW. IF YOU RECEIVED THIS E-MAIL IN ERROR, ANY REVIEW, USE, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY OF THE ERROR BY RETURN E-MAIL AND PLEASE DELETE THIS MESSAGE FROM YOUR SYSTEM. THANK YOU IN ADVANCE FOR YOUR COOPERATION.
For more information about Orrick, please visit http://www.orrick.com/

2/20/2007