Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
E-mail: ajarvis@rqn.com

Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, NEVADA Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-mail: bkfilings@s-mlaw.com

Attorneys for Appellees-Debtors and Debtors-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA – LAS VEGAS

| | |
|---|---|
| THE LENDERS PROTECTION GROUP; CHARLES B. ANDERSON TRUST; RITA P. ANDERSON TRUST; BLATES CO.; KEHL FAMILY MEMBERS; MOJAVE CANYON, INC., <br><br> Appellants, <br><br> v. <br><br> USA COMMERCIAL MORTGAGE CO., et al., <br><br> Appellees. | Case No. 2:07-CV-00072-RCJ <br><br> **DECLARATION OF SUSAN M. SMITH IN SUPPORT OF APPELLEE-DEBTORS' OPPOSITION TO "MOTION FOR LIMITED APPELLANTS' STAY PENDING APPEAL"** |
| In re: <br><br> USA COMMERCIAL MORTGAGE CO.; USA CAPITAL REALTY ADVISORS, LLC; USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC; USA CAPITAL FIRST TRUST DEED FUND, LLC, and USA SECURITIES, LLC, <br><br> Debtors. | Case No. BK-S-06-10725 LBR <br> Case No. BK-S-06-10726 LBR <br> Case No. BK-S-06-10727 LBR <br> Case No. BK-S-06-10728 LBR <br> Case No. BK-S-06-10729 LBR <br><br> Chapter 11 <br><br> Jointly Administered Under Case No. BK-S-06-10725 LBR |

1

I, Susan M. Smith, hereby declare and state as follows:

1. On April 13, 2006 ("Petition Date"), USA Commercial Mortgage Company ("USACM"), USA Capital Realty Advisors, LLC, USA Capital Diversified Trust Deed Fund, LLC ("DTDF"), USA Capital First Trust Deed Fund, LLC ("FTDF" and together with DTDF, the "Funds"), and USA Securities, LLC (collectively, the "Debtors") filed petitions seeking relief under Chapter 11 of the Bankruptcy Code. By order entered on June 9, 2006, the Court approved the joint administration of the Debtors' Chapter 11 cases.

2. Effective as of the Petition Date, Mesirow Financial Interim Management, LLC ("Mesirow") has been employed as crisis managers for the Debtors, and Thomas J. Allison of Mesirow has served as the Debtors' Chief Restructuring Officer. I am employed by Mesirow as a Senior Vice President, and I have worked extensively for the Debtors and have overseen substantial aspects of these cases under Mr. Allison's direction.

3. This Declaration is based on my personal knowledge or, if so stated, upon information and belief. Thus, all matters set forth in this Declaration are based on (a) my personal knowledge, (b) my review of relevant documents and records, (c) my view, based upon my experience and knowledge of the Debtors' business and financial condition, and/or (d) as to matters involving United States bankruptcy law or rules, my reliance on advice of bankruptcy counsel to the Debtors. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## CASE BACKGROUND

4. The Debtors' Plan of Reorganization (the "Plan") was confirmed by the Bankruptcy Court by an order entered January 8, 2007 (the "Confirmation Order").

5. The closing of the sale of assets of FTDF and USACM to Compass Partners, LLC ("Compass") pursuant to the Plan and Confirmation Order took place on February 16, 2007. The "Effective Date" of the Plan has not yet occurred.

6. Prior to April, 2006, USACM regularly made payments to the Funds and Direct Lenders (collectively, the "Lenders") each month regardless of whether the particular loans

2

relating to each Lender were performing or nonperforming. Prior to the Petition Date, Lenders received approximately $39.5 million in interest and/or principal payments that they were not entitled to receive at the time the payments were made (defined as "Prepaid Interest" in the Plan). As more fully set forth in prior declarations of Thomas J. Allison filed in the Debtors' jointly administered case, the money to make these wrongful payments came from a variety of commingled sources, including, among other sources, from principal payments made, but not remitted by USACM, on certain loans ("Unremitted Principal").

7. After Mr. Allison's appointment as the Chief Restructuring Officer of the Debtors, Mr. Allison directed that I and other Mesirow professionals work on behalf of the Debtors to reconstruct the books and records of the Debtors, which, as set forth in Mr. Allison's prior declarations, were incorrect and incomplete, and which appeared, in certain circumstances, to be intentionally inaccurate.

8. As a result of the reconstruction of the books and records of the Debtors, on or around late June and early July 2006, investor statements were sent to all Lenders setting forth the amount of "Prepaid Interest" paid to each Lender and the amount of Unremitted Principal for each Lender, which also have been referred to as "Lender Statements."

9. As a further result of the reconstruction of the books and records of the Debtors, pursuant to the Debtors' Motion to Hold Funds and Motion to Distribute filed, heard and granted by the Court, the Debtors held back and continue to hold back from all distributions made to Lenders after the Petition Date interest collected from Borrowers that had already been paid to the Lenders on the loans pre-petition, and netted amounts to recoup Prepaid Interest paid to the Lenders pre-petition from collections made post-petition on performing loans that would otherwise payable to the Lenders (the "Prepaid Interest Collections"). Under the Asset Purchase Agreement approved in the Confirmation Order, Compass is required to continue the Prepaid Interest Collections for the benefit of the USACM estate after the closing of any sale to Compass.

10. The Disclosure Statement and Plan provided notice that the Prepaid Interest Collections would, as part of the confirmation of the Plan and the compromises with the Direct Lenders incorporated in the Plan, be determined to be property of the USACM estate for distribution to all creditors in that estate in accordance with the priorities set forth in the Bankruptcy Code and that if any Direct Lender objected to this treatment, they would have to file and prevail on an objection to the Plan.

11. Appellants did not request any discovery as to the issues surrounding the Prepaid Interest Collections, the treatment of the Prepaid Interest Collections in the Plan, the compromise involving the Prepaid Interest Collections included in the Plan, or any alleged claim that any of the Appellants might make to any portion of the Prepaid Interest Collections.

12. Appellants did not present any evidence as to the issues surrounding the Prepaid Interest Collections, the treatment of the Prepaid Interest Collections in the Plan, the compromise involving the Prepaid Interest Collections included in the Plan, nor did Appellants identify or present evidence on any claim that any of the Appellants might have to any portion of the Prepaid Interest Collections. Consequently, when Appellants refer to "Segregated Funds" held on their behalf, I am unsure as to what funds this refers other than the entire amount of USACM's $37.1 million held in the USACM Collection Account that is recognized as property of the USACM estate under the terms of the confirmed Plan and the Confirmation Order, as described below.

### IDENTITIES OF APPELLANTS

13. I am familiar with and have custody of the Debtors' books and records, including all records related to the identity of Direct Lenders and the identity of entities holding membership interests in FTDF and DTDF.

14. I have reviewed (1) the Statement of the Law Offices of Alan R. Smith Pursuant to Bankruptcy Rule 2019 filed December 6, 2006 in the Bankruptcy Court, including the Exhibit A thereto ("Initial 2019 Statement"); and (2) the First Amended Statement of the Law Offices of Alan R. Smith Pursuant to Bankruptcy Rule 2019 filed December 18, 2006, including Exhibit A thereto ("Amended 2019 Statement") (collectively, the "Statements").

4

15. There were only approximately 111 names listed on the Initial 2019 Statement, but the Amended 2019 statement contains approximately 295 names, including 12 duplicate names.

16. No account numbers are provided for any of the entities listed in the Statements. The Initial 2019 Statement does not purport to identify entities by a legal "vesting name," and although Exhibit A to the Amended 2019 Statement makes reference to "Account/Vesting Name," many of the entities listed therein are not identified by their respective legal vesting names. "Vesting names" are the names of the actual parties to the governing legal documents through which investors invested in loans serviced by USACM and/or in membership interests in DTDF and/or FTDF, and are the names by which USACM's investor records are kept. As a result, it is very difficult to ascertain with any certainty the exact relationship to the Debtors (if any) of many of the entities listed in the Statements. For example, in many instances, only an individual's name is listed in the Statements and the Debtors have no record of that individual name being a current Direct Lender on any loan serviced by USACM. Some individual names may potentially be associated with several vesting names. The ability to identify the entities listed in the Statements is complicated by the fact that Mr. Smith states in the Amended 2019 Statement that the entities listed in Exhibit A thereto "are not limited to the names listed therein, but may also include various other entities in which those members own or control, and/or their successors and assigns." For all of these reasons, the Debtors cannot conclusively identify many of the entities listed in the Statements.

17. Some of the entities listed in the Statements that Mesirow can identify are actually not Direct Lenders, but rather are members only having equity interests in FTDF or DTDF. Further, as noted above, it appears that some of the entities listed in the Statements are neither current Direct Lenders nor members of either of the Funds.

18. Mesirow reconstructed the Debtors' records, and on or about June 30, 2006, USACM mailed to each Direct Lender an initial "Lender Statement." Following the transmission of the initial Lender Statements, Lender Statements were mailed to each Direct Lender generally on a monthly basis. In each of these Lender Statements, the Debtors itemized for each Direct

5

Lender the amount of "Prepaid Interest" (as defined in the Plan) that was attributed to their respective accounts, and if applicable, and the amount of "Unremitted Principal" attributed to the Direct Lender (not all Direct Lenders had Unremitted Principal). A procedure was set up for Direct Lenders to inquire if they believed that any information in their Lender Statements was inaccurate. All such inquiries were followed up on by employees of USACM or Mesirow personnel serving as financial consultants to USACM.

19. The Statements do not indicate which entities listed thereon have "Unremitted Principal" claims, or which such entities received improper prepetition payments from USACM. But, based on the limited information that has been provided in the Statements, upon information and belief, I believe that Appellants include both Direct Lenders with Unremitted Principal claims and Direct Lenders who received Prepaid Interest yet do not have Unremitted Principal claims, as well as Direct Lenders who have neither.

20. I am familiar with and have reviewed the two Affidavits filed by the Debtors' balloting agent, BMC Group, regarding the ballots that were cast to accept or reject the Plan (Docket nos. 2165 and 2243). The Statements, which purport to list names of parties who desire to appeal the Confirmation Order, include names of at least fourteen entities who voted to accept the Plan.

21. I attended the hearing in the U.S. District Court on the Debtors' emergency motion to quash the temporary stay pending appeal that had been granted by the Ninth Circuit Bankruptcy Appellate Panel before this appeal was transfer to the District Court. After the hearing, at which the District Court vacated the stay, the Debtors' counsel, Annette Jarvis, and I approached counsel for the Appellants and informed them, among other things, that the Debtors could not identify many of the entities listed in the Statements because, in many instances, vesting names had not been used, and Ms. Jarvis and I requested that Appellants' counsel, Mr. Alan Smith, provide the Debtors with further information on the appealing parties. Despite this request, no information regarding the identities of those who purportedly are part of the "Lenders Protection Group" has been provided to the Debtors. Also, no formal or informal discovery has been served on the

6

Debtors by Mr. Smith or his firm relating his assertion in the Statements that the total loans made by the entities listed in the Statements is unknown "due to incomplete records received from the Debtors[,]" and that he is in the "process of gathering as much information as possible concerning the loans made by the members of the group. . . ."

## THE ALLEGED "SEGREGATED FUNDS"

22.     Appellants have incorrectly asserted that the following three categories of funds, defined by Appellants as "Segregated Funds," are being held by USACM in its Collection Account: "(A) a 1 % servicing fee to USACM's [sic] and other fees and costs it is entitled to charge; (B) an additional 2 % of principal on all loans that were fully paid off post petition; and (C) an amount equivalent to the Prepaid Interest each Direct Lender received." Motion for Limited Stay Pending Appeal at 5. Appellants' definition of "Segregated Funds" does not accurately track the actual language of the "Distribute/Hold Order" that they attempt to paraphrase, and in any event, the 1% servicing fees indisputably belong to USACM. Furthermore, USACM is not holding the 1 % servicing fees it is entitled to charge in the Collection Account, because subsequent rulings and orders of the Court, such as the Court's "Order Approving Debtors' Continued Use of Cash" (Docket no. 1282) entered September 14, 2006, have authorized USACM to transfer these loan servicing fees from its Collection Account to its Operating Account and to use such funds in the post-petition operation of its business and administration of its estate, and USACM has done so.

23.     The funds addressed by the "Distribute/Hold Order" that remain in USACM's Collection Account are: (a) approximately $4.8 million, representing a 2 % servicing fee and cost holdback above and beyond the 1 % servicing fee indisputably belonging to USACM, which holdback is to be distributed to Direct Lenders and USACM on the Effective Date of the Plan according to the terms of the Plan; (b) approximately $15.9 million that has been collected from borrowers post-petition on loans for which Direct Lenders received improper pre-petition payments from USACM; and (c) an additional amount of approximately $16.4 million that has been collected from borrowers post-petition and netted against improper pre-petition payments

7

that Direct Lenders received on other loans pre-petition from USACM (categories (b) and (c) are what constitute the "Prepaid Interest Collections" defined above). Because of the broad definition of "Segregated Funds" used in the Stay Motion and the Appellants' failure to provide information that would allow the Debtors to identify the Appellants with any certainty, it appears that they are seeking to have the entire sum of these three categories, approximately $37.1 million, frozen by USACM throughout the duration of their appeal. The failure of the Appellants to provide information that allows the Debtors to identify them with any certainty also prevents the Debtors from attempting to ascertain what, if any, ownership interest any one Appellant is claiming to any of the "Segregated Funds."

## DEVASTATING IMPACT OF REQUESTED STAY

24. Thus, the "limited stay" requested by Appellants, if granted, would likely stay the distribution of approximately $37.1 million in cash under the terms of the Plan, which will have a devastating impact on the Debtors and all parties in interest in these Chapter 11 cases.

25. If the distribution of this cash is delayed, the Plan will not be able to go effective, which will create a serious threat of conversion of the Debtors' Chapter 11 bankruptcy cases to Chapter 7 liquidation cases.

26. Now that the sale to Compass has closed, USACM no longer has a regular source of income and cash on hand will not be sufficient to fund continued administration of the estate, including the necessary payment of professionals for the Debtors and the Committees (which are not dissolved until the Effective Date of the Plan, and will continue to need to employ professionals until their dissolution so as to meet their duties and attend to the myriad of problems that will result as a result of the stay), the skeletal crew of employees, and rent.

27. Further, USACM will not be able to fund the USACM Trust, one of the two post-effective date entities, that is charged under the Plan with pursuing litigation against and recovery of assets from the Debtors' former insiders.

8

28. Moreover, since the compromise between FTDF and DTDF in the Plan provides for the funding of litigation for DTDF through funds loaned by FTDF from its sale proceeds, DTDF might not receive funds to pay administrative and other expenses in order to make the Plan effective as well as funds to commence litigation for creditor recoveries.

29. I believe, because of the intertwined compromises by and among the Debtors' estates under the Plan, and the need for funding in these estates, if the Prepaid Interest Collections are frozen as Appellants request and are not available to fund the Plan, the entire Plan would unwind and could result in a conversion to Chapter 7.

30. Without the occurrence of the Plan Effective Date and the consummation of the Plan (including the use of the Prepaid Interest Collections) within a short period of time, the Debtors do not have sufficient funds to continue operations (excluding professional fees) beyond 60 days.

31. Finally, in the event of a stay, the Debtors' estates would continue to incur substantial administrative fees at the average rate of more than $1 million per month, which the estates cannot pay long term. As set forth in a prior Declaration of Thomas J. Allison in connection with a motion to convert the Debtors' cases to Chapter 7 liquidation cases as well as Mr. Allison's Declaration in support of the confirmation of the Plan, Chapter 7 conversion would result in drastically reduced or nominal recoveries, if any, for creditors and investors.

32. A stay of the distribution of the Prepaid Interest Collections pursuant to the terms of the Plan threatens to unravel the entire Plan. The Debtors' use of the Prepaid Interest Collections pursuant to the terms of the compromise with the Direct Lenders as set forth in the Plan is intertwined with all other compromises set forth in the Plan. Modification or elimination of even one of these interdependent compromises would threaten to unwind and eviscerate the foundation of the Plan.

33. Accordingly, while the harm caused to the debtors would be so substantial that it may be impossible to quantify, in my judgment a bond in the amount of $37.1 million would be

needed to ensure a source of compensation to the Debtors and their constituents for the substantial harm that would be caused by the granting of a stay pending appeal. Alternatively, Mesirow estimates that the expenses of continuing the operations and administration of USACM during the pendency of this appeal would be approximately $12.5 million, and therefore any bond would have to be in at least that amount.

I declare, under penalty of perjury, that the foregoing statements are true and correct to the best of my knowledge and belief.

EXECUTED this 28th day of February, 2007.

*Susan M. Smith* (signature)
Susan M. Smith

10