1

1      UNITED STATES BANKRUPTCY COURT

2         DISTRICT OF NEVADA

3         LAS VEGAS, NEVADA

4   In re:  USA COMMERCIAL MORTGAGE     )   JANUARY 31, 2007
        COMPANY,                        )   E-Filed:  03/18/07
5                                       )
                Debtor.                 )   Case No.
6                                       )   BK-S-06-10725-LBR
        _____)   Chapter 11
7

8           PARTIAL TRANSCRIPT OF PROCEEDINGS
                        OF
9           (06-10725) MOTION TO ENFORCE ORDER
        GRANTING DEBTOR'S MOTION TO DISTRIBUTE FUNDS, 2350
10                      AND
            OMNIBUS OBJECTION TO CLAIM OF
11          IN THE AMOUNT OF CLAIMS ON EQUITY
            MISFILED AS CREDITOR CLAIMS, NO. 2353
12                      AND
            OBJECTION TO CLAIM 79
13       OF PENSION BENEFIT GUARANTY CORPORATION
            IN THE AMOUNT OF $884,389,
14    CLAIM 80 OF PENSION BENEFIT GUARANTY CORPORATION
            IN THE AMOUNT OF 1,068,233,4
15   AND CLAIM 81 OF PENSION BENEFIT GUARANTY CORPORATION,
                      NO. 2252
16                      AND
            OBJECTION TO CLAIM 83
17       OF PENSION BENEFIT GUARANTY CORPORATION
            IN THE AMOUNT OF $884,389,
18    CLAIM 84 OF PENSION BENEFIT GUARANTY CORPORATION
            IN THE AMOUNT OF $1,068,233,
19   AND CLAIM 85 OF PENSION BENEFIT GUARANTY CORPORATION,
                      NO. 2255
20                      AND
            APPLICATION FOR COMPENSATION, NO. 2316
21                      AND

22

23

24

25   Proceedings recorded by electronic sound recording;
        transcript produced by transcription service.

```
 1              OMNIBUS OBJECTION TO CLAIM OF
                  IN THE AMOUNT OF MISFILED
 2        AGAINST USA CAPITAL FIRST TRUST DEED FUND, LLC,
         BY DANIEL O. CARLTON & TAKEKO CARLTON REVOCABLE TRUST
 3              DATED 04/30/97, CLAIM NO. 43;
           DANIEL O. CARLTON & TAKEKO CARLTON REVOCABLE TRUST
 4              DATED 04/30/97, CLAIM NO. 44;
           DANIEL O. CARLTON & TAKEKO CARLTON REVOCABLE TRUST
 5              DATED 04/30/97, CLAIM NO. 45;
           DANIEL O. CARLTON & TAKEKO CARLTON REVOCABLE TRUST
 6              DATED 04/30/97, CLAIM NO. 46;
           DANIEL O. CARLTON & TAKEKO CARLTON REVOCABLE TRUST
 7              DATED 04/30/97, CLAIM NO. 49;
        LAWRENCE J. ARONSON & HENRIETTA ARONSON, CLAIM NO. 50;
 8        MOLLIE SHOICHET & HENRIETTA ARONSON, CLAIM NO. 51;
        BUCKWALD REVOCABLE TRUST DATED 02/11/92, CLAIM NO. 52;
 9    PHILLIP DARIN GOFORTH & FRANCESCA M. GOFORTH, CLAIM NO. 54;
              MELINDA ESTEVEZ & RICHARD DAVID ESTEVEZ,
10                ACCT. NO. 2, CLAIM NO. 57;
              MELINDA ESTEVEZ & RICHARD DAVID ESTEVEZ,
11                ACCT. NO. 1, CLAIM NO. 58;
              MELINDA ESTEVEZ & RICHARD DAVID ESTEVEZ,
12                ACCT. NO. 3, CLAIM NO. 59;
        THE EVO E. ZEPPONI AND BILLIE D. ZEPPONI FAMILY TRUST
13          UNDER AGREEMENT DATED 02/09/83, CLAIM NO. 60;
                IONA PETE BAKAS HALLIDAY, CLAIM NO. 61;
14        LAUREN J. GILBERT & ERIN M. GILBERT, CLAIM NO. 62;
                  LAUREN J. GILBERT, CLAIM NO. 63;
15        MICHAEL W. CARLTON & HELEN I. CARLTON, CLAIM NO. 67;
             SONDRA SKIPWORTH REVOCABLE TRUST DATED 11/28/01,
16                   CLAIM NO. 74;
                DONNOLO FAMILY TRUST DATED 08/24/88,
17         JOSEPH & LORETTA DONNOLO, TRUSTEES, CLAIM NO. 75;
                  RICHARD L. YOUNGE IRA, CLAIM NO. 76;
18        EDWIN C. HANSEN & RACHEL M. HANSEN, CLAIM NO. 78;
              CENTER STATE BEVERAGE, INC., CLAIM NO. 79;
19      LAYNE FAMILY TRUST, BRUCE & SHERRY LAYNE, CLAIM NO. 81;
        KAREN PETERSEN TYNDALL TRUST DATED 03/09/94, CLAIM NO. 86;
20         KPT IRREVOCABLE TRUST DATED 07/16/99, CLAIM NO. 87;
           KPT IRREVOCABLE TRUST DATED 07/16/99, CLAIM NO. 88;
21        ROBERT CAROLLO AND BEVERLEY CAROLLO, CLAIM NO. 92;
                  ARNOLD ROSENTHAL, CLAIM NO. 93;
22                 VICTORIA SMITH, CLAIM NO. 95;
                 L. KANANI COHUME, CLAIM NO. 101;
23                MICHAEL BAGINSKI, CLAIM NO. 113;
        KAREN PETERSEN TYNDALL TRUST DATED 03/09/94, CLAIM NO. 116;
24         KPT IRREVOCABLE TRUST DATED 07/16/99, CLAIM NO. 117;
                JAMES J. LEE, ESQ., CLAIM NO. 121;
25                 JAMES J. LEE, CLAIM NO. 122;
                WILLIAM CHAD BERRY, CLAIM NO. 126;
```

```
 1                RDJ INVESTMENTS, CLAIM NO. 130;
                    RICHARD N. ANDERSON TTE,
 2      RICHARD N. ANDERSON SEPARATE PROPERTY, CLAIM NO. 131;
                  CRAIG ZAGER SEP IRA, CLAIM NO. 132;
 3          CURTIS R. & TERRI L. COLAGROSS, CLAIM NO. 139
                            NO. 2286
 4                             AND
                     OBJECTION TO CLAIM 120
 5          OF STANDARD PROPERTY DEVELOPMENT, LLC,
                   IN THE AMOUNT OF, NO. 2299
 6                             AND
           OMNIBUS OBJECTION TO CLAIM 115 OF BRIAN M. ADAMS
 7                    IN THE AMOUNT OF;
                  CLAIM 118 OF HERMAN M. ADAMS;
 8            CLAIM 118 OF BRIAN ANTHONY G. ADAMS;
        CLAIM 118 OF ANTHONY G. ADAMS OLYMPIA CAPITAL MANAGEMENT,
 9                         CLAIM 119;
           KANTOR NEPHROLOGY CONSULTANTS, LTD, 401(K) PSP,
10             GARY KANTOR, TRUSTEE, CLAIM 123;
                  DR. GARY KANTOR, CLAIM 124;
11            LYNN M. KANTOR, CLAIM 125, NO. 2301
                             AND
12           MOTION FOR PROTECTIVE ORDER, NO. 2441
                             AND
13          OBJECTION TO CLAIM 819 OF SPECTRUM FINANCIAL
                 IN THE AMOUNT OF $49,581
14           AND CLAIM 821 OF ROLLAND P. WEDDELL
                 IN THE AMOUNT OF $13,081, NO. 2067
15                           AND
                   ORDER SHORTENING TIME
16             RE: APPLICATION TO EMPLOY
        DIAMOND, McCARTHY, TAYLOR, FINLEY & LEE, LLP,
17         AS SPECIAL LITIGATION COUNSEL APPLICATION
     PURSUANT TO FEDERAL RULES OF BANKRUPTCY PROCEDURE 2014(A)
18      FOR ORDER UNDER SECTION 1103 OF THE BANKRUPTCY CODE
              AUTHORIZING THE EMPLOYMENT AND RETENTION
19      OF DIAMOND, McCARTHY, TAYLOR, FINLEY & LEE, LLP,
                 AS SPECIAL LITIGATION COUNSEL
20          TO THE OFFICIAL UNSECURED CREDITORS COMMITTEE
           FOR USA COMMERCIAL MORTGAGE COMPANY, NO. 2505
21                           AND
         HEARING RE: EMPLOYMENT APPLICATION EXTENSIONS (CONT.)
22                        NO. 2402
                             AND
23       STATUS HEARING RE: INVOLUNTARY PETITION, NO. 8
                             AND
24                 ORDER SHORTENING TIME
            RE: MOTION TO ENFORCE AUTOMATIC STAY
25                 TO PREVENT FORECLOSURE
        BY WESTERN UNITED LIFE ASSURANCE COMPANY, NO. 2561
```

4

1               VOLUME 2
        BEFORE THE HONORABLE LINDA B. RIEGLE
2          UNITED STATES BANKRUPTCY JUDGE

3           Wednesday, January 31, 2007

4                9:30 a.m.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Court Recorder:        Joanne Lloyd

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

5

```
 1    APPEARANCES:

 2    For the Debtor and        ANNETTE W. JARVIS, ESQ.
      Debtor in Possession:     Ray, Quinney & Nebeker, P.C.
 3                              36 South State Street
                                Suite 1400
 4                              Salt Lake City, Utah 84145

 5                              JEANETTE E. McPHERSON, ESQ.
                                Schwartzer & McPherson Law Firm
 6                              2850 South Jones Boulevard
                                Suite 1
 7                              Las Vegas, Nevada 89146

 8    For the First Trust       CANDACE C. CARLYON, ESQ.
      Deed Committee:           Shea & Carlyon, Ltd.
 9                              233 South Fourth Street
                                Suite 200
10                              Las Vegas, Nevada 89101

11    For the Direct            GREGORY E. GARMAN, ESQ.
      Lenders Committee:        Gordon & Silver, Ltd.
12                              3960 Howard Hughes Parkway
                                Ninth Floor
13                              Las Vegas, Nevada 89109

14    For the Unsecured         SUSAN M. FREEMAN, ESQ.
      Creditors Committee       Lewis and Roca, LLP
15    of USA Commercial         40 North Central Avenue
      Mortgage Company:         Phoenix, Arizona 85004
16
                                ALLAN B. DIAMOND, ESQ.
17                              Diamond, McCarthy, Taylor, Finley
                                  & Lee, LLP
18                              Two Houston Center
                                909 Fannin
19                              Suite 1500
                                Houston, Texas 77010
20
                                ERIC D. MADDEN, ESQ.
21                              Diamond, McCarthy, Taylor, Finley
                                  & Lee, LLP
22                              1201 Elm Street
                                34th Floor
23                              Dallas, Texas 75270

24

25
```

```
1    APPEARANCES (Cont.):

2    For USA Commercial          JEFFREY R. SYLVESTER, ESQ.
     Real Estate Group:          Sylvester & Polednak, Ltd.
3                                7371 Prairie Falcon Road
                                 Suite 120
4                                Las Vegas, Nevada 89128

5    For Standard Property       ANDREW M. BRUMBY, ESQ.
     Development, LLC:           Shutts & Bowen, LLP
6                                300 South Orange Avenue
                                 Suite 1000
7                                Orlando, Florida 32801

8    For Diversified Trust       ANNE M. LORADITCH, ESQ.
     Deed Fund Committee:        Beckley Singleton, Chtd.
9                                530 Las Vegas Boulevard South
                                 Las Vegas, Nevada 89101
10
     For Diversified Trust       JEFFERY D. HERMANN, ESQ.
11   Deed Fund Committee:        Orrick, Herringon & Sutcliffe, LLP
                                 777 South Figueroa Street
12                               Suite 3200
                                 Los Angeles, California 90017
13
     For Western United         NILE LEATHAM, ESQ.
14   Life Assurance Company:     Kolesar & Leatham, Chtd.
                                 3320 West Sahara Avenue
15                               Suite 380
                                 Las Vegas, Nevada 89102
16
                                 MICHAEL W. ANGLIN, ESQ.
17                               Fulbright & Jaworski, LLP
                                 2200 Ross Avenue
18                               Suite 2800
                                 Dallas, Texas 75201
19
     For Johnny Clark            WILLIAM L. McGIMSEY, ESQ.
20   and the McGimsey            William L. McGimsey, P.C.
     Creditors:                  601 East Charleston Boulevard
21                               Las Vegas, Nevada 89104

22   For Rolland P. Weddell      ELISSA F. CADISH, ESQ.
     and Spectrum Financial      Hale, Lane, Peek, Dennison
23   Group:                        & Howard
                                 3930 Howard Hughes Parkway
24                               Fourth Floor
                                 Las Vegas, Nevada 89109

25
```

7

```
1    APPEARANCES (Cont.):

2    For Project              MATTHEW Q. CALLISTER, ESQ.
     Disbursement Group,      Callister & Reynolds
3    Inc.:                    823 Las Vegas Boulevard South
                              Las Vegas, Nevada 89101
4
     For Sondra Skipworth:    AARON R. DEAN, ESQ.
5                             McCullough & Associates, Ltd.
                              601 South Rancho Drive
6                             Suite A-10
                              Las Vegas, Nevada 89106
7
     For the United States    AUGUST B. LANDIS, ESQ.
8    Trustee:                 Office of the United States Trustee
                              300 Las Vegas Boulevard South
9                             Suite 4300
                              Las Vegas, Nevada 89101
10
     For the Jones Vargas     JANET L. CHUBB, ESQ.
11   Direct Lenders,          Jones Vargas
     Joseph Donnolo, and      100 West Liberty
12   Loretta Donnolo:         Twelfth Floor
                              Reno, Nevada 89501
13                            (Telephonic)

14   For John A. Godfrey:     JAMES D. GREENE, ESQ.
                              Schreck Brignone
15                            300 South Fourth Street
                              Suite 1200
16                            Las Vegas, Nevada 89101

17   For Karen Petersen       KELLY J. BRINKMAN, ESQ.
     Tyndall:                 Goold, Patterson, Ales & Day
18                            4496 South Pecos Road
                              Las Vegas, Nevada 89121
19                            (Telephonic)

20   For USA Investment       RUSSELL S. WALKER, ESQ.
     Partners, LLC, and       Woodbury, P.C.
21   Joseph Milanowski:       265 East 100 South
                              Suite 300
22                            Salt Lake City, Utah 84111

23   For the Trustee:         ANTHONY M. ZMAILA, ESQ.
                              Santoro, Driggs, Walch, Kearney,
24                              Johnson & Thompson
                              400 South Fourth Street
25                            Third Floor
                              Las Vegas, Nevada 89101
```

8

```
 1   APPEARANCES (Cont.):

 2   Also Present:          THOMAS J. ALLISON
                            Mesirow Financial Interim
 3                            Management, LLC

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        (Court previously convened at 09:38:25 a.m.)

2        (Thereupon, the portion requested to be transcribed

3        commence at 10:09:04 a.m.)

4            THE COURT:  And now Ms. Tyndall's.

5            MS. LORADITCH:  Ms. Tyndall's claim, there were

6    two claims that arose from her investments as a direct

7    lender, and it was unclear at the time we filed the

8    objection because we didn't have more information from the

9    debtors.

10       Since having gotten that, we conferred with

11   Ms. Tyndall's counsel together with Mesirow Financial, and

12   they confirmed after doing an investigation that those two

13   claims in question were, in fact, arising from her

14   investments as a direct lender and had no connection to

15   Diversified Fund.

16       And so we were asking that those claims 84 and 85 be

17   disallowed in their entirety as well as their duplicates

18   which were claim Nos. 118 and 119.

19           THE COURT:  Okay.  And, Ms. Brinkman, do you have

20   any comments?

21           MS. BRINKMAN:  This is Ms. Brinkman.  No.  I don't

22   have any comments in light of the Court's ruling --

23           THE COURT:  Okay.

24           MS. BRINKMAN:  -- on McGimsey.

25           THE COURT:  So those objections will be sustained

1    as well.

2            MS. LORADITCH:  Thank you.

3            MR. McGIMSEY:  I --

4            THE COURT:  Okay.

5            MR. McGIMSEY:  I have one concern --

6            THE COURT:  Um-h'm.

7            MR. McGIMSEY:  -- with what counsel just stated.

8    Your Honor indicated to me just at the end that you were

9    ruling that I did not have a creditors claim, and I think

10   that I don't want from what she said for that ruling to

11   change or at least I want to understand it.

12           MS. LORADITCH:  I apologize.  I don't know what I

13   may have said that was inconsistent with what the Court

14   ruled.

15           THE COURT:  I sustained the objection to the

16   claim.

17           MS. LORADITCH:  Correct.  And we had requested

18   that creditor claims be disallowed that had been filed by

19   equity interest holders --

20           THE COURT:  Right.

21           MS. LORADITCH:  -- because their claim against

22   Diversified Fund arises from their equity interest, and

23   they'll be distributed on a pro rata basis according to that

24   interest.

25           THE COURT:  Right.

1          MR. McGIMSEY:  Well, my concern was, your Honor,

2  is you indicated I was not being subordinated.  I did not

3  have a claim, a creditors claim, under 510(b).

4          THE COURT:  Under --

5          MS. LORADITCH:  I think that's --

6          THE COURT:  510(b) controls.  The distribution is

7  in accordance with that, so it's filed as an equity claim

8  and not a creditors claim.

9          MR. McGIMSEY:  I don't have a creditors claim.

10          THE COURT:  All right.  You don't have a creditors

11  claim.

12          MR. McGIMSEY:  That's --

13          THE COURT:  Okay.

14          MR. McGIMSEY:  That's the ruling not that I want.

15          THE COURT:  I know.  I understand, so you need it

16  for clarity.

17          MR. McGIMSEY:  Yes.

18          THE COURT:  I appreciate that.

19          MR. McGIMSEY:  Thank you.

20          MS. LORADITCH:  Thank you.

21          THE COURT:  Okay.  Next, we have the PBGC which

22  has been withdrawn.

23      Then on page 4, we've got Mr. Callister's application

24  for compensation.

25          (Colloquy not on the record.)

1          MR. CALLISTER:  Matthew Callister on behalf of

2   PDG, your Honor.  Good morning.  This is our application

3   under Section 503(b) on behalf of Project Disbursement

4   Group.  I'm sure the Court's familiar with --

5          THE COURT:  Well, under what --

6          MR. CALLISTER:  -- the pleadings.

7          THE COURT:  -- under 503(b)?

8          MR. CALLISTER:  Well --

9          THE COURT:  You never quite told anybody --

10          MR. CALLISTER:  -- Under --

11          THE COURT:  -- what section --

12          MR. CALLISTER:  -- the --

13          THE COURT:  -- you were seeking.

14          MR. CALLISTER:  I guess as pointed out in the

15   opposition, your Honor, we believe that we provided

16   substantial beneficial interest to the estate.  I understand

17   the opposition.  The Court will recall the scenario.

18          We submitted a stipulation.  We executed it.  The

19   debtor executed it, and then the Court decided that it

20   needed to be provided and executed, signed off on by the

21   various committees.  That never came back.

22          We're having threats of litigation against individual

23   investors who are saying there have not been a distribution

24   of interest payments since March.  Don't you dare do that.

25   You're controlling millions of dollars of money.  We don't

1    know what's going on.

2         So we sought the protection of an order and finally got

3    it and have been honoring that order and the contract

4    obligation since that time.

5              THE COURT:  Okay.

6              MR. CALLISTER:  We simply don't think we did

7    anything, other than what we should have done under the

8    circumstances, thought it was in the best interest of both

9    the estate, obviously, than my clients, your Honor.

10             THE COURT:  Okay.  All right.  Opposition.

11             MS. McPHERSON:  Your Honor, Jeanette McPherson on

12   behalf of the debtors.  PDG or Callister & Reynolds simply

13   don't come within the express statutory language of 503.

14        They're not creditors.  They're not professionals for

15   creditors, and they didn't provide any substantial

16   contribution to the estate.

17        In fact, we think their actions were detrimental to the

18   estate, and that they weren't abiding by the disbursement

19   agreement which caused several issues.

20        We did finally reach a stipulation, but the fact is

21   they weren't abiding by the agreement that existed between

22   them and the debtors.

23             THE COURT:  Okay.

24             MR. CALLISTER:  Oh, I'm sorry.

25             MS. FREEMAN:  Susan Freeman for the Unsecured

1    Creditors Committee.  We joined in the debtor's objection.

2    There really has been no substantial contribution here and

3    no meeting of the requirements, and there has been no reply

4    to our response that raised all these points.

5              THE COURT:  Right.

6              MR. CALLISTER:  Again, just to be brief,

7    your Honor, as they point out in the in re Christian Life

8    Center case, the test that's operable here --

9              THE COURT:  Well, but wait.

10             MR. CALLISTER:  -- is --

11             THE COURT:  You're not a creditor.

12             MR. CALLISTER:  I understand.  We're not a

13   creditor.

14             THE COURT:  So how do you fit in?

15             MR. CALLISTER:  We think under the 503(b)(3)(D)

16   referenced in the --

17             THE COURT:  Right.

18             MR. CALLISTER:  -- in re Christian Life Center --

19             THE COURT:  It says, "A creditor, indenture

20   trustee, or equity security holder, or a committee, other

21   than --

22             MR. CALLISTER:  I understand.

23             THE COURT:  -- a committee in making substantial

24   contributions."  It's a two-part test.

25             MR. CALLISTER:  I understand, your Honor.

1          THE COURT:  So how do you fit the first part of

2   the test?

3          MR. CALLISTER:  I don't think we fall squarely

4   within the first part of the test.  I understand that, but,

5   nevertheless, I think the response was the appropriate one

6   given the millions of dollars that we were holding, being

7   told by individual investors that they had not been paid,

8   and then threatening us with litigation if we should go

9   forward without some blessing or order of the Court.

10      So we executed the -- entered negotiations, got the

11   stipulation, and the problem was the creditors committee,

12   the same ones who are here opposing us today, simply did not

13   sign off on the stipulation.

14      I asked counsel what their position was when they were

15   sitting on that stipulation from May until nearly the end

16   June, the time of the hearing.

17          THE COURT:  Okay.  Well, I'm going to deny the

18   request.  I mean, in order to be allowed administrative

19   expenses, one must fit themselves within the provisions of

20   503.

21      And then 503(b)(3) under certain circumstances will

22   allow one who makes a substantial contribution to receive

23   fees.

24      And, first of all, I don't think it was a substantial

25   contribution.  It has to be more than -- I mean, the

1  circuits recognize that substantial contribution can include

2  your own self-interest, but it has to be "substantial

3  contribution".  Both words must be taking effect.

4      And, more importantly, it has to be done by a creditor,

5  indenture trustee, equity security holder, or committee,

6  other than an official committee, so I'll deny the request.

7           MR. CALLISTER:  Thank you, your Honor.

8           THE COURT:  Okay.  Thank you.  Okay.

9      Next, we have the omnibus objections to the misfiled

10 claims.

11          MS. CARLYON:  Thank you, your Honor.

12 Candace Carlyon on behalf of the First Trust Deed Committee.

13 This is our objection to a number of claims that while filed

14 in the First Trust Deed Fund -- excuse me -- relate either

15 to investments in the Diversified Trust Deed Fund or to

16 direct-lender interests as to particular loans.

17     The one exception is claim No. 138 to which our

18 objection has been withdrawn, and the Court approved that,

19 previously.

20     We have had no filed response.  We received a letter

21 with regard to claims 86, 87, 88, 116, 117 requesting that

22 there be an evidentiary showing which we complied with and

23 have had no further communication.  And, in fact, no

24 opposition was filed to the motion.

25     So we would request that the Court disallow those

1    claims as set forth on Exhibit 2, Docket No. 2285.  I can

2    read the numbers into the record if you like.  I don't know

3    that it's necessary --

4             THE COURT:  I don't think we need to.

5             MS. CARLYON:  -- with the exception, of course, of

6    138.

7             THE COURT:  Okay.  All right.  Anyone here on any

8    of those objections?

9        (No affirmative response.)

10            THE COURT:  All right.  Those objections are

11   sustained.

12       And you've checked to make sure we're not as my concern

13   before cross-whipsawing?

14            MS. CARLYON:  We have, your Honor.  And, in fact,

15   I appreciate the opportunity to clarify the position on

16   that.

17       As to claims which are clearly USACM claims, we have

18   agreed with the debtors and the committees that the order

19   will provide that those will be deemed filed in that case

20   without prejudice to the right to object as of the date they

21   were filed in First Trust Deed Fund to make sure that that

22   doesn't happen to any of these investors who may have been

23   just confused by the number of debtors.

24            THE COURT:  Okay.  Thank you.

25            MS. CARLYON:  All right.

```
 1              THE COURT:  Comment --
 2              MS. CARLYON:  (Indiscernible).
 3              THE COURT:  -- someone had?
 4              MR. DEAN:  Aaron -- excuse me.  Aaron Dean on
 5     behalf of Sondra Skipworth.  I'm a little confused.  I was
 6     just curious if this objection applied to claim No. 74.  I
 7     know you said you were going to list those.
 8              THE COURT:  It's on the docket.  Is there any
 9     reason it shouldn't?
10              MS. CARLYON:  Yes, your Honor.  Claim No. 74 is
11     one of the claims as to which we objected based on it being
12     misfiled.
13         And, in fact, claim No. 74, the claimant is not an FTD
14     member.  It appears to be based on a loan made to
15     Hacienda Estate, LLC, which I assume would be a
16     direct-lender claim.
17              MR. DEAN:  That's potentially correct, your Honor.
18     I just received the file this morning.  Ms. Skipworth has
19     been doing this on her own.  Apparently, she did misfile her
20     claim into another case.
21         I'm here this morning to see if I can find out exactly
22     which case it should have actually been filed to to see if
23     we can make the proper amendments to get this claim filed --
24              THE COURT:  Okay.
25              MR. DEAN:  -- where it needs to be.
```

1          THE COURT:  Why don't you just meet with counsel

2    afterwards because it sounds like that everybody -- the

3    point being, everybody's willing to let it be nunc pro tunc

4    back to the case that it should have been filed in, so

5    nobody's adversely affected.

6          MR. DEAN:  Thank you, your Honor.

7          THE COURT:  Thank you.

8          MR. DEAN:  I'll wait 'til afterwards.

9          MS. CARLYON:  Thank you.

10         MS. FREEMAN:  Just to confirm from the perspective

11   of the Unsecured Creditors Committee, we do agree that the

12   claim can be treated as if it was filed in the USA

13   Commercial Mortgage estate on the date that it was filed.

14         THE COURT:  Okay.  Thank you.

15      Let me skip a moment to -- oh, here's another one

16   that's unopposed, page 7, Docket 8, the omnibus objection,

17   Brian Adams, et al.

18         MS. CARLYON:  Candace Carlyon on behalf of the

19   First Trust Deed Fund.  Your Honor, we stipulated to

20   continue the objection as to claims 123, 124, and 125.  We

21   have had no opposition on claims No. 115, 118, and 119, and

22   would ask that the objection be sustained.

23         THE COURT:  All right.  And, again, they'll relate

24   back if they're in a different case, and you've checked

25   that?

1          MS. CARLYON:  Yeah.  Your Honor, I will check

2     that.  I don't think that was an issue with these claims,

3     but I'll make sure.

4          THE COURT:  Okay.

5          MS. CARLYON:  Thank you.

6          THE COURT:  All right.  So with that, those three

7     are sustained.  The other, do you want to continue to our

8     next date?

9          MS. CARLYON:  I believe we continued to the

10    March 31st date.

11         THE COURT:  Okay.

12         MS. CARLYON:  And that order was already entered.

13         THE COURT:  Okay.

14         MS. CARLYON:  Let me just --

15         THE COURT:  Thank you.

16         MS. CARLYON:  -- make sure.

17         THE COURT:  Let me skip to page 9, the application

18    to employ Diamond, McCarthy.

19         MS. CARLYON:  I'm sorry, your Honor.  If I could

20    just clarify?  Docket No. 2559 is this Court's order

21    approving the continuance to March 1st --

22         THE COURT:  March 1st.

23         MS. CARLYON:  -- at 9:30 --

24    (Colloquy not on the record.)

25         THE COURT:  Okay.

1          MS. CARLYON:   -- on the Kantor claims.

2          MS. FREEMAN:   Susan Freeman, your Honor, on behalf

3    of the Official Unsecured Creditors Committee in USA

4    Commercial Mortgage Estate.

5          MR. DIAMOND:   Good morning, your Honor.

6    Alan Diamond with Diamond, McCarthy.

7          MS. FREEMAN:   This is a matter, your Honor, where

8    we have asked that the special litigation counsel that the

9    USACM trust has decided to employ be employed on an interim

10   basis on behalf of the committee, so they can get up to

11   speed, deal with getting books and records, making sure that

12   there is no break in chain of custody, and those kinds of

13   problems get started on the litigation that we intend to

14   pursue.

15      We agreed with the U.S. Trustee we would make it very

16   clear here on the record that there is not a request to seek

17   compensation from this estate.  The only compensation that

18   will be paid will be paid from the trust after the effective

19   date of the plan.

20         MR. DIAMOND:   Yeah.  And, your Honor, I might say

21   that it's a pleasure, indeed, to be back before your Honor

22   in this court.

23      Just to confirm our role that we're being asked to

24   provide as special litigation counsel to the Unsecured

25   Creditors Committee, the USACM, is to get in there,

1  investigate, analyze, and commence if necessary and

2  appropriate any litigation claims.

3      Ultimately, of course, we have been selected by

4  Mr. Berman as the trustee of the postconfirmation trust as

5  special litigation counsel once that trust becomes effective

6  under the plan.

7          THE COURT:  Okay.  All right.  Mr. Landis, any

8  comments?

9          MR. LANDIS:  Very briefly, your Honor.  We did

10  have the opportunity to visit with counsel for the Unsecured

11  Creditors Committee.

12      Our only concern was we're sort of in a gap period now

13  because we're waiting for the effective date of the plan.

14  They have addressed those concerns.

15      Now, with the statements on the record that the estates

16  will not be charged for these fees, I think we got quality

17  counsel who will do the job well.  I'm familiar with their

18  involvement in prior cases before the Court.

19          THE COURT:  Okay.  Thank you.  All right.

20      So that's approved.

21          MS. JARVIS:  Yes.

22          MS. FREEMAN:  Thank you.

23          THE COURT:  Let me --

24          MS. FREEMAN:  We have a form of order that's been

25  approved --

```
 1              THE COURT:  Oh, sorry.

 2              MS. FREEMAN:  -- by everyone.  We will upload it.

 3              MS. JARVIS:  Your Honor --

 4              THE COURT:  Okay.  Thank you.

 5              MS. JARVIS:  Your Honor, if I could just say?  The

 6    debtors are working with them, and we believe this makes

 7    sense.  It would make a smooth transition.

 8              THE COURT:  Yes.  All right.  Let me go back to

 9    item 10, the Spectrum Financial.

10         (Colloquy not on the record.)

11              THE COURT:  Appearances.

12              MS. McPHERSON:  Jeanette McPherson on behalf of

13    the debtors.

14              MS. CADISH:  Good morning, your Honor.

15    Elissa Cadish on behalf of Rolland Weddell and Spectrum

16    Financial Group.

17              THE COURT:  On a housekeeping matter, did your

18    office send my office courtesy copies of your responses?

19              MS. CADISH:  The answer is I don't know,

20    your Honor, and I apologize --

21              THE COURT:  My notes --

22              MS. CADISH:  -- if we did not.

23              THE COURT:  -- indicate we had to print them all

24    out, and I have sanctioned Ms. Carlyon's firm and other

25    firms who are -- not sanctioned -- had them offset their
```

1    fees for not having provided documents, so that's $75

2    payable to the court.

3             MS. CADISH:  Yes, your Honor.

4             THE COURT:  And that --

5             MS. CADISH:  I'll take care of that, and I

6    apologize for the oversight.

7             THE COURT:  And you can understand with the

8    filings like this it's just the only way we can keep up.

9             MS. CADISH:  I do, and, again, it was an

10   oversight, and I'll make sure it doesn't happen again.

11            THE COURT:  On this one, it seems to me we

12   (indiscernible) just going to have to set this for an

13   evidentiary hearing, right?

14      Have you done a -- do you want to just do a discovery

15   plan and do it in that context or postpone it until we see

16   happens in this case?  What's your thinking?

17            MS. McPHERSON:  Well, your Honor, during this

18   transition period, I thought if we set it over for 30 days.

19   In the meantime, we can discuss a discovery plan and

20   scheduling and then maybe set this again for the

21   March 1st --

22            THE COURT:  Okay.

23            MS. McPHERSON:  -- omnibus hearings, and then we

24   can pick dates at that time.

25            THE COURT:  Sure.  Is --

```
 1              MS. CADISH:  I agree with that.

 2              THE COURT:  Okay.  So we'll set this over to

 3   March 1st.  Is that soon enough for you -- too soon I mean

 4   or about right?  It's about a month away.

 5              MS. McPHERSON:  I think --

 6              MS. CADISH:  That's fine.

 7              MS. McPHERSON:  -- that's fine.

 8              THE COURT:  Okay.  Good.  Okay.

 9        Thank you.

10              MS. McPHERSON:  Thank you.

11              MS. CADISH:  Thank you, your Honor.

12              THE COURT:  Okay.  Now, let's go to one other

13   matter on the employment extensions on item No. 12.

14              MS. JARVIS:  Your Honor, we have filed a motion to

15   extend the employment of Mesirow and Mr. Allison as the

16   interim crisis managers for the debtors, Ray, Quinney &

17   Nebeker, and Schwartzer McPherson as counsel for the debtors

18   and debtors in possession through March 31st or earlier if

19   we are able to conclude our role by then.

20        Hopefully, we will finish that before March 31st.  If

21   there is some delay, then we would come back to the Court

22   and ask for a further extension.

23              THE COURT:  Okay.  All right.  I note the

24   trustee's prior objections, and I'll overrule them and

25   continue the employment.  It certainly makes no sense at
```

1    this time to change horses.  All right.

2         Now, the first one, going back to the first matter on

3    calendar, the motion to enforce.

4              MR. SYLVESTER:  Good morning again, your Honor.

5    Jeffrey Sylvester of Sylvester & Polednak on behalf of

6    USA Commercial Real Estate Group.

7         Your Honor, this is the third time we've been back on

8    this same motion.  You may recall at the last hearing the

9    Court requested additional briefing with respect to the

10   effect, if any, of the confirmed plan with respect to the

11   claim of USA Commercial Real Estate Group, and I think both

12   sides have fully briefed that issue.

13        I will tell you that last night -- actually, on Monday,

14   an adversary complaint was amended to include a claim

15   against USA Commercial Real Estate Group alleging a

16   fraudulent transfer and also alleging setoff and recoupment

17   as it relates to the $180,000.

18        Last evening, there was a motion for a writ of

19   attachment filed that is I believe set for the end of March,

20   and that's what's transpired since the last hearing.

21             THE COURT:  You need to move your microphone a

22   little bit closer to your face or you can move the stand --

23             MR. SYLVESTER:  Or my face --

24             THE COURT:  -- if you wish.

25             MR. SYLVESTER:  -- closer --

1              THE COURT:  Your --

2              MR. SYLVESTER:  -- to the microphone --

3              THE COURT:  That's right.

4              MR. SYLVESTER:  -- either one.

5              THE COURT:  Either one.  Either one.

6              MR. SYLVESTER:  I can do both.

7         Thank you, your Honor.

8              THE COURT:  The podium does go up and down.  It's

9    counterintuitive, but it does go up and down.

10             MR. SYLVESTER:  Okay.  Is that better?

11             THE COURT:  Yes.  That's fine.

12             MR. SYLVESTER:  All right.  Let me just address

13   very briefly the debtor position as it relates to

14   subordination because at the last hearing that was,

15   apparently, the primary argument that was made or asserted

16   in opposition to the release of the funds.

17        In essence, what the debtor has argued is that the plan

18   ipso facto subordinated the claim of USA Commercial Real

19   Estate Group to those of the unsecured creditors.

20        And I think that the analysis begins and ends with I

21   think what the debtor will now concede is fact, and that is

22   that the moneys that are being held do not constitute

23   property of this bankruptcy estate.  They just simply don't.

24        There's nothing in the terms of the plan that would

25   suggest that those funds that are being held are, in fact,

1     property of the estate.

2         The terms of the plan as it relates to distribution to

3     insiders provides that no insider shall receive a

4     distribution under the terms of the plan.

5         But it does not affect -- it does not expressly or

6     impliedly state that they are transmuting funds that are not

7     property of the estate into property of estate and

8     distributing those funds to creditors, and that's the

9     fundamental flaw in the argument.

10        Their brief specifically states that as a result of the

11    confirmed plan no entity may receive any payment or assert

12    any right to payment against assets of USA Commercial

13    Mortgage, and that's not what we have.

14        I think that the debtor will concede.  At least, I hope

15    that academically they'll concede that the funds that they

16    hold under Section 541 do not constitute property of the

17    estate.

18        They don't constitute property of the estate under the

19    Ninth Circuit decision of in re Golden Triangle.  They don't

20    constitute property of the estate under the terms and

21    conditions of the loan-servicing agreement.  They're just

22    simply not property of the estate.

23        There is no claim or right to payment that

24    USA Commercial Real Estate Group could have asserted for the

25    return of those funds.

1    And if we acknowledge that those funds are held in

2  trust, then the United States Supreme Court tells us that

3  those funds cannot be distributed to anybody, other then the

4  trust beneficiaries, and that is the trust beneficiaries

5  being USA Commercial Real Estate Group.

6    If you look at the terms of the implementation of the

7  plan as set forth in the disclosure statement, there is no

8  express or implied suggestion that they are going to take

9  the funds that belong to the direct lenders and make those

10  funds property of the estate, and that those funds will be

11  available for distribution to the unsecured creditors or to

12  any creditors in this estate.

13    Now, remember how we got here is is that there was an

14  implicit acknowledgment by the debtors that the funds that

15  they were collecting pursuant to these loan service

16  agreements belonged to the direct lenders.

17    And that is why they came to this Court in July of 2006

18  and asked for permission to distribute those funds to those

19  who are entitled to receive them.  The Court allowed that

20  subject to some modifications that relates to the netting of

21  the loan service fees.

22    But the $60,000,000 that belonged to the direct lenders

23  were disbursed to the direct lenders because those funds

24  were held in trust.

25    Then the order was amended to allow additional

1    disbursements, another $60,000,000 or a total of

2    $120,000,000, that were disbursed because they weren't funds

3    that belonged to the estate.   Those were funds that belonged

4    to the direct lender.

5        The debtor will concede that my client is a direct

6    lender and is not to be treated any different than any other

7    direct lender.

8        The plan confirmed, identified, or articulated the

9    compromise that the debtor reached with the direct lenders,

10    and the direct lenders and the debtors agreed that those

11    funds that are being held in trust and collected pursuant to

12    the loan service agreements would continue to flow to the

13    direct lenders.

14        In essence, they incorporated the terms and conditions

15    of the prior protocols as it relates to the disbursements of

16    the funds held in trust.

17        The debtor has to concede it, although they haven't

18    said that, but they have to concede that the funds are held

19    in trust and don't belong to this debtor and cannot be

20    distributed pursuant to the plans because they have now

21    sought a writ of attachment.

22        And if, in fact, that they believe their argument that

23    the terms of the plan precluded distribution of those funds

24    there would be no need for a claim of recoupment or setoff

25    to be asserted.

1              THE COURT:  Well, but isn't that just a

2      belt-and-suspenders argument?  I mean, you got to make --

3              MR. SYLVESTER:  I --

4              THE COURT:  -- both arguments.

5              MR. SYLVESTER:  I don't.  Well, I don't know.  I

6      mean, they filed this pleading under Rule 11.  And in the

7      pleading that they have filed with this court, what they are

8      saying very expressly is that they are holding these funds

9      for USA Commercial Real Estate.  They cited that both in

10     their claim of recoupment in the adversary complaint and,

11     specifically, at paragraph 25.

12             THE COURT:  Well, but the federal rules allow you

13     to plead in the alternative, clearly.

14             MR. SYLVESTER:  Yes.  But you can plead in the

15     alternative, but you can't plead alternative factual bases.

16     You can plead alternative legal theories.

17         But you can't say on the one hand it's held in trust

18     and the other hand it's not held in trust.  Or on the one

19     hand, it's property of the estate.  On the other hand, it's

20     not property of the estate.  That is a factual statement

21     that doesn't fall within the alternative-pleading rules

22     under the federal rules.

23         And they have said in their motion that they are

24     collecting these funds as the servicer of the loan, and that

25     it is anticipated that additional sums will be collected by

1    the debtor on loans in which Commercial Real Estate Group is

2    a lender.  They are collecting these funds on behalf of or

3    for the benefit of USA Commercial Real Estate Group.

4            THE COURT:  Well, let me ask this.  Let's just

5    suppose that since it was your clients that were not paying

6    out your -- the people that own the company you represent

7    were the same people who weren't paying out money on loans,

8    and let's assume somebody sued them for not distributing

9    funds, and they said, no, I don't have the money or whatever

10   reason.  Your next recourse if you were the third party is

11   to sue them, right?

12           MR. SYLVESTER:  To sue the company --

13           THE COURT:  Right.

14           MR. SYLVESTER:  -- for nondistribution?

15           THE COURT:  Right.

16           MR. SYLVESTER:  Okay.  I believe that's -- if I

17   follow your analogy, if they --

18           THE COURT:  So in other words --

19           MR. SYLVESTER:  -- breached --

20           THE COURT:  -- you're asking for a motion to

21   distribute.  Isn't your remedy a suit for breach of

22   contract?

23       In which case the suit for breach of contract, they

24   then raise all of the various defenses that they have.  I

25   mean, where is that -- I mean, we've done this motion to

1    distribute, and I --

2              MR. SYLVESTER:  Correct.

3              THE COURT:  -- understand that, and we've never

4    really visited, well, the procedure, but isn't the real

5    point that you'd have to sue for breach of contract?

6              MR. SYLVESTER:  To the extent that I suffered

7    damages as a result of the breach of the contract.  But

8    under your analysis, is the company holding the funds as a

9    trustee for the benefit of the third parties or is it simply

10   they breached the contract because they haven't serviced the

11   loans or they haven't collected the funds?

12             THE COURT:  Both.

13             MR. SYLVESTER:  Well, I think it makes a

14   difference because, yeah, you would have --

15             THE COURT:  I mean, your client held the funds and

16   didn't turn them over.

17             MR. SYLVESTER:  Sure.  And they don't belong to

18   them, and the right I guess would be to claim conversion if

19   you will or to seek some other remedies --

20             THE COURT:  So isn't your remedy --

21             MR. SYLVESTER:  -- under law.

22             THE COURT:  I mean, don't you have to file a

23   claim?  And once you had to file a claim for breach of

24   contract, doesn't that fit you within the terms of the plan?

25             MR. SYLVESTER:  I don't think so.  That's true if

```
1    the debtor was taking the position that they owned the funds
2    that they weren't held --
3              THE COURT:  Even if they --
4              MR. SYLVESTER:  -- in trust.
5              THE COURT:  -- didn't turn them over.  All right?
6    Let's assume this is outside bankruptcy.  All right?
7              MR. SYLVESTER:  Um-h'm.
8              THE COURT:  A loan mortgage company didn't turn
9    the funds over.
10             MR. SYLVESTER:  Right.
11             THE COURT:  You can't go to court and say compel
12   them to disburse.  You file a complaint for breach of
13   contract, the remedies among which are declaratory relief,
14   damages, accounting, and turnover, right?
15             MR. SYLVESTER:  I think that's fair.
16             THE COURT:  So since you have to file the
17   complaint, doesn't that fit you within the provisions of the
18   plan?
19             MR. SYLVESTER:  I don't think so because the
20   provisions of the plan don't -- and I guess that's the
21   primary difference between a state court action and property
22   of the estate under Section 541.  This debtor is not coming
23   before this Court and saying that they own these funds.
24             THE COURT:  All right.
25             MR. SYLVESTER:  This debtor has come before this
```

1    Court on four different occasions and said we don't own

2    these funds.  In essence, these funds belong to the direct

3    lenders.

4        We're going to service those, and we're going to take

5    our two percent or whatever, our loan-services fee, but

6    those aren't our money.  We're not going to utilize those

7    funds to fund our plan of reorganization.

8        And if you look, in fact, in the disclosure statement,

9    there is no suggestion that they are taking the direct

10   lenders' funds held in trust to fund this plan of

11   reorganization.

12       If the debtor had come before this Court in their

13   disclosure statement, one of many, or their plan, one of

14   many, and said we are going to transmute these funds that we

15   acknowledge are held in trust, and they're going to now

16   become property of the estate, and I didn't object, then,

17   perhaps, I'm precluded.

18       Perhaps, I'm concluded because, frankly, I don't think

19   this Court would have the authority to enter an order

20   modifying the nature of the property.

21       For instance, you can't sell property under Section 363

22   that the debtor doesn't own, and you couldn't allow the

23   debtor to fund a plan of reorganization with proceeds of a

24   trust that --

25                THE COURT:  But you'd still have to file a

```
 1    complaint for conversion.
 2            MR. SYLVESTER:  If they claimed an interest in it,
 3    and they don't.
 4            THE COURT:  No.  Conversion is -- or even --
 5            MR. SYLVESTER:  The wrongful --
 6            THE COURT:  -- embezzlement.
 7            MR. SYLVESTER:  -- dominion and control over
 8    somebody else's property.
 9            THE COURT:  Right.
10            MR. SYLVESTER:  And --
11            THE COURT:  You can't --
12            MR. SYLVESTER:  And that's --
13            THE COURT:  -- just --
14            MR. SYLVESTER:  -- true.
15            THE COURT:  -- file a motion to do that.  You have
16    to file a complaint, right?
17            MR. SYLVESTER:  I don't -- well, in bankruptcy
18    court, I think you'd probably have to file an adversary
19    complaint to have them --
20            THE COURT:  Yeah.
21            MR. SYLVESTER:  -- turn over --
22            THE COURT:  By adversary.
23            MR. SYLVESTER:  -- the funds.
24            THE COURT:  Um-h'm.
25            MR. SYLVESTER:  I think that's probably true.  And
```

1    if your analogy was that or hypothetical was that this

2    debtor claimed to own those funds, then I think that I would

3    have to protect myself.

4            THE COURT:  No.  Let's just assume they refuse to

5    turn it over.  Assume somebody outside bankruptcy, your

6    client, refused to turn it over.

7            MR. SYLVESTER:  Outside of bankruptcy.

8            THE COURT:  Right.  Outside of bankruptcy.

9            MR. SYLVESTER:  I think I would have to -- if I

10   can't exercise self-help, I have to file an action.  I'd

11   have to get somebody to compel them to turn it over or I

12   have to go to the --

13           THE COURT:  I mean, under the contract even.

14   Under the various loan-servicing contracts, they had the

15   right to terminate.

16           MR. SYLVESTER:  But they don't have --

17           THE COURT:  But they didn't have --

18           MR. SYLVESTER:  -- the right --

19           THE COURT:  -- the right --

20           MR. SYLVESTER:  -- to hold the funds.

21           THE COURT:  -- to go in and demand the money.

22   They had the right to sue.

23           MR. SYLVESTER:  Right.

24           THE COURT:  But they didn't have the right to go

25   in.  And, in essence, what you're doing is asking them to

1    attach the money.  You're asking them to do that by taking

2    it.

3              MR. SYLVESTER:  Well, you asked them to do that,

4    candidly, to file a writ of attachment.

5              THE COURT:  No, no, no.  No.  It goes both

6    directions.

7              MR. SYLVESTER:  Sure.

8              THE COURT:  The point is if it's not property of

9    the estate they may have to do a writ of attachment.  My

10   point is, in essence, isn't that what you're doing under

11   your motion as opposed to a complaint?  How can you get that

12   -- let's assume it was --

13             MR. SYLVESTER:  And --

14             THE COURT:  -- your money.

15             MR. SYLVESTER:  And --

16             THE COURT:  Let's assume there were absolutely no

17   claims against your clients.

18             MR. SYLVESTER:  Right.

19             THE COURT:  Let's assume there was --

20             MR. SYLVESTER:  Right.

21             THE COURT:  -- no setoff.  Let's assume there was

22   no recoupment.  Let's just assume somebody says we don't

23   want to pay you today.

24             MR. SYLVESTER:  Right.  And I think the direct

25   answer to your question is under these facts in this case I

1  didn't have to --

2          THE COURT RECORDER:  I'm sorry, Counsel.

3          MR. SYLVESTER:  -- file a --

4          THE COURT RECORDER:  Would you move closer --

5          MR. SYLVESTER:  Sure.  Under these --

6          THE COURT RECORDER:  -- to the microphone?

7          MR. SYLVESTER:  -- facts in this case --

8          THE COURT RECORDER:  Thank you.

9          MR. SYLVESTER:  -- I didn't have to file because

10  you had ordered that the funds that they had collected on

11  behalf of the direct lenders be distributed to the direct

12  lenders.  That's the order of this Court on not one, on not

13  two, but now three occasions.

14      And so what I have done is asked to enforce the order

15  of the Court, and we did that preconfirmation because that's

16  what the Court ordered.

17      To the extent that they -- and, remember, your Honor,

18  it's not their position that these funds don't belong to my

19  client.

20      Their initial opposition was that we just want a

21  comfort order because, you know, we may have claims against

22  USA Commercial Real Estate Group.

23      They have never claimed not to this day an interest in

24  those funds.  They don't claim to own those funds.  And if

25  they don't claim to own those funds and if this Court has

1    already previously ordered now on three occasions that they

2    be disbursed, then the proper forum is in this court today

3    under this motion to seek to enforce the order.

4        What you are suggesting and what the debtor is

5    suggesting is that, well, there should have been a claim.

6    Well, if that's true, then every direct lender in order to

7    be entitled to receive payment should have filed a proof of

8    claim.

9        But this Court may recall that the direct lenders were

10    not permitted to file proofs of claim in this bankruptcy

11    estate save and except for claims of unremitted principal or

12    claims that related to some fraud that gave rise to a claim

13    outside of the service agreement itself.

14        We weren't even authorized to file a proof of claim,

15    and I think that you were hearing objections by the various

16    committees to the proof of claims that the direct lenders

17    did file.

18        Getting back to the issue of subordination, there is

19    nothing in the disclosure statement, the first one or the

20    second one or the third one or the proposed plan, that

21    suggests that my client is going to be treated any

22    differently than any direct lender.  They could have done

23    that, and they didn't.

24        They could have said that USA Commercial Real Estate

25    Group even though it's a direct lender they have to file a

1   proof of claim because we have rights of setoff or they have

2   to file a proof of claim because we have transmuted the

3   trust asset to an asset of the bankruptcy estate, and they

4   didn't.

5        They simply said you've got a general subordination

6   provision that says if you're going to get a distribution

7   from the estate, then it's subordinated.

8        But their plan does not provide for distribution of the

9   funds held in trust to anybody.  It just doesn't, except

10  that the compromise with the direct lenders states that the

11  funds that they receive in trust will be distributed, and I

12  am not treated any differently.

13       And for those reasons, I think that the Court is

14  compelled, respectfully, to issue an order allowing those

15  funds to be released.  Now, I understand that there's a

16  motion for a writ of attachment pending, but that's for

17  another day.

18            THE COURT:  Okay.

19            MR. SYLVESTER:  Thank you, your Honor.

20            THE COURT:  All right.  Opposition.

21            MS. JARVIS:  Your Honor, first, I think we need to

22  understand who USA Real Estate Group is.  It's an entity

23  that's wholly owned by Tom Hantges and Joseph Milanowski.

24       It has no employees.  And other than HMA which is

25  currently the subject of an adversary proceeding, it has no

1    other clients or customers.

2          It is supposedly a real estate brokership.  Tom Hantges

3    is the only broker that they have had since at least over a

4    year.

5          Further, since the filing of their motion to

6    distribute, we have discovered through 2004 examinations

7    that have been taken, actually, since the last hearing on

8    this before the Court that USA Real Estate Group has

9    received $435,000 from the Royal Hotel closing after

10   Mr. Milanowski told Mr. Allison that Diversified Fund would

11   be paid millions of dollars from the proceeds after we had

12   traced I think it's 4.6 million dollars directly from

13   Diversified into the Royal Hotel and 9,000,000 indirectly.

14         There is no evidence that we have been able to

15   ascertain that USA Real Estate did any services for

16   Royal Hotel, and, yet, they were paid ahead of the claims of

17   Diversified Trust Fund that have direct claims on the

18   Royal Hotel.

19         It's argued that we concede that this is not property

20   of the estate, this money that is to be distributed, and

21   that is not correct, your Honor.

22         We did reserve our rights in the plan.  The plan is

23   very clear that with respect to these nondebtor insiders

24   they are subordinated claims.  They are not part of the

25   direct-lender groups.

1          If you look at paragraph 81 of the confirmation

2    order --

3              THE COURT:  I need -- hang on one second.  You

4    need to point me to that.  It's in your pleading, right?

5              MS. JARVIS:  Yeah.  81 of the confirmation order.

6    I'm not sure that that's attached.

7              THE COURT:  Oh, it's not?

8          (Colloquy not on the record.)

9              MS. JARVIS:  Let me preliminarily say, your Honor,

10   that it's very clear that the nondebtor insider definition

11   was --

12             THE COURT:  Oh, there's no question of that.

13             MS. JARVIS:  It's --

14             THE COURT:  I --

15             MS. JARVIS:  Yeah.  It's --

16             THE COURT:  And I don't --

17             MS. JARVIS:  It's in there, so --

18             THE COURT:  Now, just so we're clear, this is

19   money to which we've already applied.  Let's be clear what

20   money we're talking about, too.  As I understand it, this is

21   money that USA Realty purportedly was a direct lender in.

22             MS. JARVIS:  That is correct, your Honor.

23             THE COURT:  And moneys had been paid back on those

24   loans.  And after recoupment and netting applicable to

25   everybody else, there is still some sum of money which but

1    for everything else would go to them.

2              MS. JARVIS:  That is correct, your Honor.

3              THE COURT:  Okay.  And if they weren't insiders in

4    other words --

5              MS. JARVIS:  Yeah.

6              THE COURT:  -- it would clearly go to them.  Okay.

7              MS. JARVIS:  And, you know, your Honor --

8              THE COURT:  So we've already applied --

9              MS. JARVIS:  Okay.

10             THE COURT:  -- the netting that everybody else

11   is --

12             MS. JARVIS:  Right.

13             THE COURT:  -- subjected to.

14             MS. JARVIS:  And as you recall, your Honor, in the

15   motions to distribute that we did on an interim basis, we

16   never conceded, and the issue was avoided on whether this

17   was property of the estate or not.

18             THE COURT:  That's right.

19             MS. JARVIS:  It was left to be determined in the

20   plan of reorganization, and that determination is part of

21   the releases granted to direct lenders.

22        But the nondebtor insiders including USA Real Estate

23   Group were specifically excepted out of the releases given

24   to the direct lenders.

25             THE COURT:  For (indiscernible) any reason I

1    didn't bring those particular pleadings in the

2    (indiscernible).

3        What docket number is the plan?

4        (Colloquy not on the record.)

5            THE COURT:  Or maybe it's easier if you point --

6            MS. JARVIS:  It --

7            THE COURT:  You say --

8            MS. JARVIS:  -- would be --

9            THE COURT:  Did you refer --

10           MS. JARVIS:  It was --

11           THE COURT:  -- to it?

12           MS. JARVIS:  -- January 8th that it was entered.

13           THE COURT:  Okay.

14       (Colloquy not on the record.)

15           MS. CARLYON:  Your Honor, I'm passing up a copy of

16   the plan with the direct-lender --

17           THE COURT:  Oh, good.

18           MS. CARLYON:  -- releases --

19           THE COURT:  Thank you.

20           MS. CARLYON:  -- provision now.

21           THE COURT:  Okay.  All right.  Go ahead.

22           MS. JARVIS:  Okay.  In paragraph 81 of the

23   confirmation order, it says, "Notwithstanding that," and

24   there's a whole list of insiders.  It's very broad and

25   includes --

```
 1                THE COURT:  Wait, wait, wait.

 2                MS. JARVIS:  -- specifically --

 3                THE COURT:  Paragraph --

 4                MS. JARVIS:  -- U.S. --

 5                THE COURT:  -- 81.

 6                MS. CARLYON:  Your Honor, I'm sorry.

 7                MS. JARVIS:  Paragraphs --

 8                MS. CARLYON:  What --

 9                MS. JARVIS:  Oh.  Oh, no.  It's not in the plan.

10      It's in the confirmation order that I'm now citing to, so --

11                MS. CARLYON:  And, unfortunately, your Honor, I

12      didn't have an extra copy of that with me.

13                MS. JARVIS:  Yeah.  And --

14                MS. CARLYON:  But there was --

15                THE COURT:  Oh, so you don't have that here.

16      Okay.

17                MS. CARLYON:  Right.  There was a prior mention of

18      the scope of releases under the plan.  I did happen to have

19      that, so I passed it up.

20                THE COURT:  That's all right.  I've got the

21      findings of fact.  Okay.  88, you said?

22                MS. JARVIS:  It's 81, paragraph 81.

23                THE COURT:  Whoops, that's the findings.  Okay.

24                MS. JARVIS:  It's I think the next to the last

25      paragraph.
```

1          THE COURT:  Okay.  Now I'm with you.

2          MS. JARVIS:  Okay.  In paragraph 81, it says,

3    "That notwithstanding that" -- and then there is a whole

4    list of insiders -- "including USA Commercial Real Estate

5    Group have some connection with the debtors or the debtor's

6    estate.

7          And notwithstanding anything in the plan to the

8    contrary or which could be construed to the contrary,

9    nothing in the plan nor this confirmation order shall be

10   construed as providing a release of any claims or causes of

11   action against the insiders, including USA Commercial Real

12   Estate Group."

13         And if you turn to the plan, your Honor, if you'd turn

14   to the plan on -- actually, I think you have -- if you turn

15   on page 51 of the copy that was handed up to you --

16         THE COURT:  Oh.

17         MS. JARVIS:  -- by Ms. Carlyon --

18         THE COURT:  Okay.

19         MS. JARVIS:  -- it's in paragraph -- it's

20   Article 4(b)(1)(A) where it talks about the release given to

21   the direct lenders, so USA Commercial Mortgage, all the

22   nondebtor insiders, are excepted from that release.

23         THE COURT:  This is page 75 --

24         MS. JARVIS:  No.

25         THE COURT:  -- the 207 --

1          MS. JARVIS:  Yeah.  Turn back --

2          THE COURT:  -- of the joint?

3          MS. JARVIS:  -- to page 51.

4          THE COURT:  51.  Okay.  Oh, release.  I have it.

5          MS. JARVIS:  Um-h'm.

6          THE COURT:  Okay.  Releases all claims.

7          MS. JARVIS:  This is the provision which

8     acknowledges that it's not property of the estate because it

9     releases the claims against direct lenders, including, but

10    not limited to surcharge, recharacterization of

11    direct-lender loans.

12         So this is the provision that would acknowledge that

13    it's not property of the estate, but it only extends to the

14    direct lenders receiving a release.

15         The insiders were specifically excepted out of that,

16    and so we --

17          THE COURT:  So the issue as whether or not it's

18    property of the estate is still open --

19          MS. JARVIS:  Exactly.

20          THE COURT:  -- as to the insiders.

21          MS. JARVIS:  Right.  There is no concession to

22    that, and we have specifically provided that the nondebtor

23    insider claims are subordinated and are not to be paid until

24    all their claims in the estate are to be paid.

25         And we contend that this claim -- and by the way,

1    USA Real Estate Group has filed claims for these amounts in

2    this estate, and those claims are subject to subordination

3    and cannot be paid until --

4            THE COURT:  So they have filed claims on behalf as

5    direct lenders?

6            MS. JARVIS:  That's my understanding, your Honor,

7    yes.

8            MR. SYLVESTER:  Your Honor --

9        (Colloquy not on the record.)

10           MR. SYLVESTER:  -- (indiscernible).

11           THE COURT:  Okay.

12           MS. JARVIS:  And even if they didn't, your Honor,

13   it wouldn't matter because it's still the claims that they

14   have are subordinated.  They do not receive --

15           THE COURT:  So --

16           MS. JARVIS:  -- this release.

17           THE COURT:  But what theory would you have to say

18   that the money from the direct lender is property of the

19   estate?

20       And we're talking here -- forget all the defenses,

21   et cetera.  I mean, the analogy would be they had a bank

22   account someplace else, and, perhaps, you'd have a right to

23   attach it, and, perhaps you'd have a right to -- or,

24   perhaps, you'd have a right to attach it.

25       And the other idea would be if they were a member of

1    the fund, clearly, you would have the right to offset that

2    because they were fund members, and their moneys trickled

3    down.

4         But with direct lenders, what would the theory be to

5    do?  That those funds would be property of the estate.  Now,

6    as against everybody else, that's --

7              MS. JARVIS:  Yeah.  That's not --

8              THE COURT:  -- not fair game --

9              MS. JARVIS:  That's --

10             THE COURT:  -- anymore.

11             MS. JARVIS:  That's a done deal.

12             THE COURT:  That's been resolved.

13             MS. JARVIS:  Right.  Well, your Honor, one of the

14   -- I mean, the main issue that we resolved in the plan was

15   this issue of recharacterization because there had been

16   substantial commingling of the funds.

17        And, in fact, the commingling was done by the very

18   parties that are in here that control this entity that are

19   now asking to be paid, you know, ahead of all the other

20   legitimate claims in this estate, so that, you know, is a

21   theory that is still open and very applicable to this.

22   There also are open issues --

23             THE COURT:  Of course, the problem is the money

24   we've collected postpetition clearly was segregated because

25   Mr. Allison was involved.

1          MS. JARVIS:  Right.  But it doesn't, for instance,

2    you know, solve the issue with respect to recharacterizing

3    the loan itself as one that shouldn't be treated as a

4    direct-lender loan.

5       It should be treated as, you know, a unsecured

6    obligation of this debtor because of the commingling that

7    went on prior to this bankruptcy being filed.

8       In addition, we have, you know, recoupment, other, you

9    know, surcharge, you know, claims that we could make, and we

10   haven't settled those.  We haven't said --

11         THE COURT:  Well, I --

12         MS. JARVIS:  -- we aren't --

13         THE COURT:  -- certainly --

14         MS. JARVIS:  -- going to try to recoup additional

15   amounts from them.

16         THE COURT:  I certainly understand recoupment.

17   You know, netting is different because netting is -- the

18   point is they overpaid on those particular loans.

19      Oh, but I guess your point is there may be other loans

20   that they were overpaid on that we don't even know about,

21   yet.

22         MS. JARVIS:  Well, there may be other claims.  I

23   mean, we now know of one claim that we have, you know,

24   coming out of the Diversified estate because they now have

25   just received $430,000 that, you know, we contend belongs

1    first and foremost to Diversified.

2    And, of course, that's, you know, a significant issue

3    because this is a company that has no business, no

4    employees.  And, therefore, if money is paid over to this

5    company, it's going to be difficult to get any money back.

6    We already have outstanding, your Honor, over

7    $110,000,000 in claims against -- you know, the IP entities

8    have not collected a dime, and this is one of the affiliates

9    of IP.

10    And, therefore, there are significant claims that we

11    have that we want to reserve our rights to recoup or offset

12    against these moneys.

13    THE COURT:  And, of course, now, could you recoup

14    if it wasn't property of the estate?

15    MS. JARVIS:  In certain -- yeah.  I mean, you can

16    in the instance where you have a claim that you are allowed

17    to recoup.  I mean, recoupment is just determining what the

18    claim is.

19    In other words, the property of the estate doesn't come

20    out until after you determine the recoupment claim.  I mean,

21    that's essentially what, you know, the Court already has

22    ruled, so it just determines what's owed, so we recoup

23    first, and then you determine what would go, you know, to a

24    direct lender.

25    THE COURT:  Okay.

1          MS. JARVIS:  You know, alternatively,

2   your Honor -- and we did, you know, allege this

3   alternatively just in case the Court ruled that this is not

4   subordinated -- we have filed a complaint against USA

5   Real Estate Group.  We have filed a motion for a prejudgment

6   writ of attachment.

7          We believe that we have a good claim for that, and we

8   would ask that the Court allow that to be heard on its

9   merits before any funds are disbursed to USA Real Estate

10  Group, particularly in light of the fact that it appears

11  that recovery of those funds since this is a company that

12  does no business, has no employees, and is owned by

13  Mr. Milanowski and Mr. Hantges that that not be allowed to

14  be disbursed until we can have that prejudgment writ of

15  attachment heard if the Court rules that the claim is not

16  subordinated.

17          THE COURT:  Okay.  Ms. Freeman.

18          MS. FREEMAN:  Susan Freeman, counsel for the

19  Unsecured Creditors Committee.  We joined in the debtor's

20  objection on this.

21          And I just wanted to emphasize that your Honor is I

22  believe completely accurate in your analysis with respect to

23  them having a claim.

24          Their claim is for failure to distribute these funds,

25  and that claim is certainly subject to setoff and

1    recoupment, and that claim under the plan is subordinated

2    and gets nothing.

3        To the extent that these are funds that are being held,

4    they have a claim for wrongful withholding of those funds,

5    and that is subject to setoff.

6        To the extent that those funds are being held now,

7    certainly, whenever funds come into the hands of the estate,

8    the estate can hold on to those, so that it can offset

9    against them, and so that it can recoup against them.

10        That's part of kind of the underlying analysis of all

11    of the various holdbacks that we've had, and it's a

12    fundamental analysis for the entire plan of reorganization

13    and the basis for holding back the money and allowing it to

14    be distributed back to all of the unsecured creditors.

15        These are people who are quintessential insiders.  And

16    to the extent that they have claims based upon transactions

17    that they entered into, they knew where the money went and

18    how it was being commingled.

19        They knew to the extent that the money that they put in

20    for direct lenders and that was coming back from borrowers

21    was being siphoned off and being sent to other places.  They

22    were the ones who were controlling it.

23        To the extent that there are recharacterization claims

24    that still exist because those were not released against

25    those insiders, those are very much alive and well and

1    available to be pursued.

2            THE COURT:  Okay.

3            MS. FREEMAN:  Thank you.

4            MR. SYLVESTER:  A couple of issues first.  I'm a

5    bit stunned that counsel would state to your Honor that

6    USA Commercial Real Estate Group filed proofs of claims for

7    the funds held.  We set forth in the reply that that's not

8    true.

9        We did file two proof of claims.  One was clearly

10    checked for unremitted principal, and one was clearly

11    checked as there was an unsecured loan by and between

12    USA Commercial Real Estate Group and the debtor.  We have

13    not at any point submitted a proof of claim for the funds

14    that are held in trust.

15        The issue is, ultimately -- and, frankly, it's

16    difficult with this debtor and this committee because the

17    defense has changed each and every time we come back to this

18    Court.

19        The first time we were here, it was simply that, well,

20    we have claims of setoff.  And in opposition or in response

21    to the claim of setoff, I said you don't have setoff.

22        You can't by operation of the law because you don't

23    have mutuality of debt, and you cannot set off funds held in

24    trust because you just simply lack the element of mutuality.

25        They never opposed that.  They never came to this Court

1    and said, yes, we do have mutuality because we have the

2    right to recharacterize this debt because these funds really

3    are property of this bankruptcy estate.

4        There is nothing in the disclosure statement or the

5    plan that suggests that they are going to recharacterize

6    these funds that they hold in trust for the benefit of

7    Commercial Real Estate Group to property of the estate.

8        There is nothing that would provide fair notice to my

9    client that that's what the intent of the plan of

10   reorganization was.

11       And I understand that there is this new argument that

12   what they really want to do is attempt to set out in the

13   future some argument that they could recharacterize this

14   debt.

15       But they haven't given you a scintilla of legal

16   authority, not a case, not a provision in the plan, nothing,

17   in fact, not even an assertion that the funds that they hold

18   are property of this bankruptcy estate.

19       You asked for additional briefing, and their briefing

20   was, well, you're subordinated, and then if you're not

21   subordinated we have issues of setoff and recoupment.

22       And you asked Ms. Jarvis very directly how is it

23   property of the estate, and she started talking about

24   commingling.

25       But that when you pointed out the fact that

1    postpetition they'd collect this money in the service

2    agreement, and they can account for that, and that hasn't

3    been commingled, then there is no response.

4         The resolution of both setoff, recoupment, and whether

5    this claim has been subordinated begins and ends with

6    whether or not this is property of the bankruptcy estate

7    because under subordination if it is not property of the

8    bankruptcy estate which is what the Nevada law says, which

9    is what the loan service agreement says, which is what the

10   Ninth Circuit says, then it cannot be used and cannot be

11   distributed under the terms of a plan of reorganization by

12   operation of law.  They know that.

13        They haven't come to this Court and said this is why

14   it's property of the estate.  And if they don't do that,

15   then the Court has to enforce its prior order where they ask

16   for permission to make these funds available to the direct

17   lenders and to release those to the direct lenders.

18        They could have gone back and modified the prior

19   interim distribution orders to carve out USA Commercial

20   Real Estate Group or they could have put in the plan of

21   reorganization that while it's true that we acknowledge that

22   the funds held for the other direct lenders are not property

23   of the estate we want to focus on and save for a later date

24   the issue that these are.

25        When you asked counsel how is it that they can be

1    property of the estate, there was no response, and this is

2    the third time that we are here.

3        I have cited Nevada law, Ninth Circuit law, the loan

4    service agreement, the Nevada Administrative Code, and it's

5    not property of the estate.

6        I don't have a claim in this bankruptcy for the

7    distribution of those funds.  I have a claim for damages

8    that may result of the conversion.

9        But nothing, nothing that this Court could do, frankly,

10    under a confirmed plan can transmute property that they hold

11    in trust for the beneficiaries to property of the bankruptcy

12    estate.

13        They haven't provided you any authority to support that

14    proposition.  And if they cannot, then subordination doesn't

15    apply.  And if they cannot, then setoff doesn't apply.

16        You want to give them a writ?  Well, let's come back on

17    a date when we can entertain whether or not they can get a

18    writ of attachment on the funds that they hold in trust, and

19    I will come back, and I'll argue another day on that issue.

20        But the order of this Court should be enforced, and,

21    frankly, setoff doesn't apply, and the terms of the

22    confirmed plan don't apply.

23        Thank you.

24            THE COURT:  Okay.  All right.  Thank you.

25        I'm going to deny the motion because we don't have a

1   finding at this stage that it, indeed, is their property as

2   opposed to property of the estate.

3       Now, when I say I deny it, I'm viewing it as a summary

4   judgment, in essence.  The point being we don't know that

5   this is not property of the estate.

6       I think you may have some problems with that analysis

7   because you don't have because -- because Mr. Allison has

8   done what he's supposed to do, those funds haven't been

9   commingled.

10      But by the same time, I'm not willing to try and think

11  through all the ways in which the commingling effectuates

12  the whole process.

13      I understand it's extremely frustrating for you,

14  extremely frustrating for me, to be in a position where

15  you're going to turn over $180,000 to the very wrongdoers.

16      But the problem is, you know, you've got to keep your

17  legal analysis straight or we're all on a very slippery

18  slope here.

19      At least, we now have a plan which the plan says all

20  other direct lenders is not property of the estate, but

21  you're right.

22      You have reserved as against them the issue of whether

23  or not it's property of the estate, and you're absolutely

24  right.

25      Along the way when I was ready to suggest it wasn't

60

1    property of the estate, you all said, no, do not make that

2    determination.

3        And I think in retrospect rightfully so because the

4    commingling issues have become much broader than I think we

5    all thought along the way.

6        But if it was property of the estate, the next step is

7    what happens -- if it wasn't.  Excuse me.  If it wasn't

8    property of the estate, what's the next step that happens,

9    and I do think that you then get thrown into the claim

10   process.

11       What's the remedy?  Well, the remedy isn't just to

12   distribute.  The remedy is to file a complaint or a claim

13   for -- and it would be a claim against the trustee.  It

14   wouldn't be a prepetition claim that's barred or be a

15   postpetition claim.

16       It would be a complaint for a turnover.  In which case,

17   I think the defenses may then arise, but you wouldn't reach

18   that result until you knew whether or not it was property of

19   the estate.

20       If I determine it was property of the estate, I guess

21   the point is I still couldn't order the distribution of the

22   funds.  You'd still have to bring a complaint.  You'd have

23   adjudication.  You'd then bring a complaint.

24       If you want to move up the attachment hearing, so we

25   end the ambiguity at least on that legal theory, we

1    certainly can do that.

2        (Colloquy not on the record.)

3        MR. SYLVESTER:  I sort of can't speak to the

4    attachment theory, but I would request that this Court then

5    treat this as a --

6        THE COURT RECORDER:  I'm sorry, Counsel.

7        MR. SYLVESTER:  I'm sorry.

8        THE COURT RECORDER:  (Indiscernible).

9      Thank you.

10       MR. SYLVESTER:  Again, Jeff Sylvester.  I would

11   request that this Court then treat this as a contested

12   matter and allow us to treat it as an adversary if you will

13   and allow me to do some discovery if necessary and set it

14   for an evidentiary hearing, so we can have that issue

15   resolved.

16       THE COURT:  Okay.  Now, I am not going to -- you

17   know, they may say you've got to file a complaint.  I'm not

18   going to rule on whether or not you have to do it by means

19   of adversary as opposed to a contested proceeding.

20       MR. SYLVESTER:  Well, that's --

21       THE COURT:  But you're right.

22       MR. SYLVESTER:  -- what I'm asking.

23       THE COURT:  Whatever it will require, it's going

24   to require -- that issue is an evidentiary matter.

25       MS. JARVIS:  And, your Honor, we would be amenable

1    and think it makes sense, actually, to have the motion for a

2    prejudgment writ of attachment done on an expedited basis.

3    We would just need probably some expedited discovery before

4    then as well.

5            THE COURT:  Right.  Because the point is that

6    would moot the issue if I grant the attachment.

7            MS. JARVIS:  Exactly, your Honor.

8        (Colloquy not on the record.)

9            THE COURT:  Oh, I need a calendar, Eileen.

10       (Colloquy not on the record.)

11           MS. JARVIS:  Your Honor, I think it's currently

12   set for March 1st.  I think our next hearing date is

13   February 15th.

14           THE COURT:  Oh, I thought you said March 31st.

15   Sorry.  Does March --

16       (Colloquy not on the record.)

17           THE COURT:  Well, when would you be making the

18   next distributions, anyway?

19       (Colloquy not on the record.)

20           MR. SYLVESTER:  To my client?

21       (Colloquy not on the record.)

22           THE COURT:  No.  When is Mr. Allison -- when were

23   the next distributions being made?

24       (Colloquy not on the record.)

25           MS. FREEMAN:  They're planned for the end of this

1    month, your Honor.

2              THE COURT:  The end of this --

3         (Colloquy not on the record.)

4              THE COURT:  The end of January?

5         (Colloquy not on the record.)

6              THE COURT:  Oh, okay.

7              MS. JARVIS:  Yeah.  Okay.  The January

8    distributions will be next week, then the February

9    distributions would be at the end of February.

10             MR. SYLVESTER:  But I guess that begs the

11   question, your Honor, I mean, for how long and what period

12   of time is this debtor going to claim an interest in the

13   ongoing distributions.  Does it end at --

14             THE COURT:  No.

15             MR. SYLVESTER:  -- the confirmation?

16             THE COURT:  No.  We have to resolve this.  You're

17   right.  I'm not disagreeing with you.

18             MR. SYLVESTER:  Not today, necessarily.

19             THE COURT:  Right.  Just not today.  You're right.

20        Well, do you want to wait 'til March 1st?

21        (Colloquy not on the record.)

22             THE COURT:  I think 30 days would --

23             MS. McPHERSON:  The --

24             THE COURT:  I certainly would be --

25             MS. McPHERSON:  Your Honor --

1          THE COURT:  Certainly, the motion should be

2    delayed for 30 days.

3          MS. McPHERSON:  Your Honor, on March 2nd is

4    another motion.

5          THE COURT:  So do you want to do it on March 2nd?

6          MS. McPHERSON:  Well, it would tie in with the

7    other motion for a writ.

8        (Colloquy not on the record.)

9          THE COURT:  Yeah.

10          MS. McPHERSON:  So you could hear them together.

11        (Colloquy not on the record.)

12          THE COURT:  Okay.  So we'll do it March 2nd at

13    9:30 will be the hearing on the motion for a writ of

14    attachment.

15          MS. JARVIS:  Thank you, your Honor.

16          MR. SYLVESTER:  Very good, your Honor.

17          THE COURT:  And in the meantime, if you want to

18    see if they want to do a discovery plan.  If they disagree

19    and say it has to be done by an adversary, we can address

20    that.

21          MR. SYLVESTER:  Very good.

22          THE COURT:  Okay.

23          MR. SYLVESTER:  Thank you, your Honor.

24          THE COURT:  I mean, because they hadn't raised

25    that issue before, I appreciate that.  Okay.

1         Thank you.

2         I did have a calendar, Eileen -- I apologize -- or did

3    you give me two?

4             THE CLERK:  Well --

5             THE COURT:  Wait.  Oh, this one right here?  No.

6             THE CLERK:  Yeah.

7             THE COURT:  Oh, I think this goes back in this

8    pile, Eileen.  Okay.

9         And do we have anything besides the -- oh, we've got

10   the Western Life.  Let's take a short recess, and then we'll

11   do Western Life and then the protective order, and then

12   we'll go to the Tree Moss issues.

13            MS. CARLYON:  We also have the Standard objection

14   to claim, your Honor.

15            THE COURT:  Oh, Standard.  Right.

16       Thank you.

17            MS. CARLYON:  Thank you.

18            THE CLERK:  All rise.

19       (Recess at 11:06:40 a.m.)

20       (Court reconvened at 11:22:39 a.m.)

21            THE COURT:  Be seated.

22       (Colloquy not on the record.)

23            THE COURT:  Okay.  On the first Western Insurance

24   (sic).

25         Did I misspeak the name?

1          MS. JARVIS:  Which one is this?

2          MR. LEATHAM:  No.  That is correct, your Honor.

3          THE COURT:  Okay.

4          MR. LEATHAM:  Nile Leatham --

5      (Colloquy not on the record.)

6          MR. LEATHAM:  -- for Western United Life

7  Assurance.  Michael Anglin from Fulbright & Jaworski is

8  here.  He will be making the argument --

9          THE COURT:  Okay.

10          MR. LEATHAM:  -- on behalf of our client.

11          THE COURT:  Well, let me just because it's late.

12  I've got a noon conference call.  I don't want to have to

13  bring you back.  Let me just tell you my inclination.

14      The stay is going to end within two weeks because,

15  hopefully, the plan will go effective, so my inclination was

16  to deny as a preliminary matter and continue to a final

17  hearing over for 30 days, so with that in mind.

18      And I understand your arguments, but I do think there's

19  a Ninth Circuit case that indicates that, you know, even if

20  they've got a junior interest that that's property of the

21  estate.

22          MR. ANGLIN:  Your Honor, Mike Anglin for the

23  record.  If the Court does rule that way, we will certainly

24  respect that order, and there is no question about that.

25      If the Court would indulge me just a short presentation

1   of our position, I think I'd rather be able to tell my

2   client I --

3           THE COURT:  Okay.

4           MR. ANGLIN:  -- at least --

5           THE COURT:  Sure.

6           MR. ANGLIN:  -- explained it if you don't mind,

7   but it will not be long, your Honor.

8           THE COURT:  Okay.  Go ahead.

9           MR. ANGLIN:  Oh --

10           MS. JARVIS:  Oh --

11           MR. ANGLIN:  -- I'm sorry.

12           MS. JARVIS:  -- did you want us --

13           THE COURT:  Because it's your motion.

14           MS. JARVIS:  It's our motion.  Right.

15           THE COURT:  Oh, it was your motion.

16           MS. JARVIS:  Yes.

17           THE COURT:  I'm sorry.

18           MS. JARVIS:  It's our motion.

19           THE COURT:  It was a motion to enforce.  I

20   apologize.  I had it converse.  I was thinking you had filed

21   your motion to lift stay.  You hadn't.

22           MS. JARVIS:  Your Honor, I think as, obviously,

23   your Honor has read the papers and I think as you understand

24   Western United has a first lien on certain Montgomery County

25   property.

1      And USA Commercial Mortgage arranged a loan for

2 10.475 million dollars that has a second lien on this same

3 property as well as a first lien on another piece of

4 property.

5      It's important to note the total amount owed at this

6 point on the USA Commercial Mortgage loan is there is

7 10.475 million still owed on the principal.  There's almost

8 $1,000,000 in interest owed.

9      There are late fees of 23-, about almost $24,000, and

10 exit fees of 262, approximately, thousand dollars.  That's

11 important because this ties also into the Compass sale as

12 well.

13      First Trust Deed has a 4.77 interest in the loan.

14 Diversified Trust Deed has a 5.96-percent interest in the

15 loan.  USA Commercial Mortgage has an interest in the late

16 fees and the exit fees.

17      Those are being sold to Compass.  And if there is some

18 impairment of those or if they are not collected or waived,

19 then this could result in a purchase-price adjustment on the

20 Compass loan, so it is very important to the debtors that

21 this not go forward.

22      The Texas Court --

23          THE COURT:  Is this a loan that was then sold to

24 Compass or is this one they --

25          MS. JARVIS:  No.

1          THE COURT:  -- excised out?

2          MS. JARVIS:  Well, the First Trust Deed portion of

3    it is being sold --

4          THE COURT:  Okay.

5          MS. JARVIS:  -- to Compass, and the servicing

6    rights are being sold --

7          THE COURT:  Um-h'm.

8          MS. JARVIS:  -- to Compass, and the Diversified

9    Trust Deed Fund interest is being serviced by Compass as

10   part of this.

11        And, of course, this is critical because even as

12   your Honor pointed out while we're talking about maybe a few

13   weeks where there may not be a stay we, the debtors, are not

14   in a position to adequately protect the interests of

15   USA Commercial Mortgage, Diversified, and First Trust Deed

16   at this point in time.

17        But Compass when they take over, you know, who is

18   well-funded and in a different position would be able to and

19   should be given the time to adequately protect its own and

20   the other direct lenders' interests in this situation.

21        The Texas Court based on a single-asset real estate

22   designation -- so there are those special rules that allow

23   relief from the stay -- has allowed this matter to be

24   noticed up for foreclosure.

25        My understanding is that it's being heard today on a

1    final hearing as to whether that would be allowed to go

2    forward on February 6th.

3         Now, we, the debtors, gave notice to Western United as

4    early as August 15th of the stay and have again reminded

5    them that the stay is in effect, so there is no emergency

6    meaning they could have sought relief from stay for months

7    and months if they had wanted to.

8         They did not seek relief from the stay.  They just went

9    forward and proceeded forcing us now to come in then to ask

10    for the stay to be enforced.

11         There is no question that under Ninth Circuit law,

12    your Honor, that junior liens are property of the estate.

13    They are protected by the stay, and, therefore, they are not

14    entitled to foreclose out those properties or those

15    interests absent getting relief from the stay.

16         I think as your Honor is aware that the Bibo case of

17    the Ninth Circuit BAP which actually interpreted the Bialac

18    case which is a Ninth Circuit case itself in interpreting

19    that property of the estate is being very broad.

20         And the Bibo case in looking at the reasoning of the

21    Ninth Circuit Bialac case said junior liens are definitely

22    property of the estate.  They are protected by the stay.

23         That was confirmed in the Cogar case and, most

24    recently, in the A Partners case in the Eastern District of

25    California, so this is the law in this circuit.

1       And while there may be other circuits that decide

2  differently, this Court is bound by our own circuit's law

3  and not by the law of other circuits.

4       We have asked the Court, you know, for an order

5  enforcing the stay.  If they want to seek relief from stay,

6  they need to do so.

7       But we are entitled to have that hearing and the

8  protections that the stay allows us to be able to have this

9  Court determine whether relief from the stay is appropriate

10  and not just allow them to go forward and try to effect and

11  foreclose out our interests.

12            THE COURT:  Okay.

13            MS. JARVIS:  So we would ask the Court to enforce

14  the stay.

15            MS. CARLYON:  Your Honor, as First Trust Deed Fund

16  is a named lender on the second deed of trust, we also filed

17  a joinder in the debtor's motion to enforce.

18       As far as the procedure going forward, I don't know if

19  a preliminary and final hearing is appropriate since this is

20  a motion to enforce the stay.

21       But it may be appropriate if we needed to set a

22  continued hearing, especially, given the number of matters

23  we have on calendar today simply on the issue of whether the

24  postpetition notice of sale which was filed by this creditor

25  knowing that this bankruptcy estate had an interest in the

1   second itself violated the stay and is, therefore, a void

2   act because it seems to me that unless the creditor agrees

3   that it's going to repost that notice following the stay

4   lifting in this case that issue does remain squarely in

5   play.

6           THE COURT:  Okay.  All right.  Opposition.

7           THE CLERK:  Could you spell your last name for me?

8           MR. ANGLIN:  Yes.  A-n -- excuse me.  A-n-g-l-i-n.

9   Your Honor, obviously, this is a fairly interesting

10  question I think, and I have never seen in 31 years of

11  practicing bankruptcy law this particular question brought

12  to a Court.

13          THE COURT:  Well, I just --

14          MR. ANGLIN:  And --

15          THE COURT:  -- thought it was the law in the

16  Ninth Circuit.  I just thought there was no question that

17  the Bibo and Bialac case said if there was a -- no.  As to

18  USA Commercial Mortgage, that's a little tangential.  But as

19  to the two funds, they have an interest in the deed of

20  trust.

21          MR. ANGLIN:  That's right, your Honor, but the --

22          THE COURT:  So why aren't they protected by the

23  stay?  It's property of the estate.

24          MR. ANGLIN:  It's a question of 362 and a question

25  of 541.  In the United States Supreme Court in Whiting

1    Pools, it tells us that lien interests are not property of

2    the estate, but no date.

3              THE COURT:  Well, that's a footnote.  That

4    wasn't --

5              MR. ANGLIN:  That's true.  It wasn't.  It was

6    dicta, but it was an interesting explanation for why the

7    Supreme Court thought that a debtor's lien interest if it

8    was a junior lien interest in property of a third party was

9    not --

10             THE COURT:  Why didn't you just bring a motion for

11   relief from the stay?

12             MR. ANGLIN:  Well, your Honor, in the

13   Fifth Circuit, that would never be done.  In the Fourth and

14   Seventh Circuits, that would never be done.

15             THE COURT:  Well, that's great, but you're not in

16   the Fifth or Fourth Circuits.

17             MR. ANGLIN:  So wouldn't it be important, then, to

18   understand why -- Bibo and Bialac and A Partners, what were

19   those Courts driving at?

20       And is there any difference between those decisions

21   which may warrant such a decision in the Ninth Circuit not

22   be an appropriate decision when the property is located

23   outside the Ninth Circuit or say outside of California?

24   Foreclosure laws are state laws.

25             THE COURT:  I mean, what if, for example, you had

1    a deed of trust that was owed $1.  Okay?

2              MR. ANGLIN:  Okay.

3              THE COURT:  The property was worth $5,000,000, and

4    you had a debtor that owned 90 percent of a second.

5              MR. ANGLIN:  Your Honor, in Texas --

6              THE COURT:  Under your theory, they're not

7    protected by the stay.

8              MR. ANGLIN:  Your Honor, in Texas, that debtor

9    would show up at the foreclosure and bid $2 and own the

10   property.

11             THE COURT:  But where do they get the money to do

12   that?  They'd have to borrow.

13             MR. ANGLIN:  Well, your Honor, I'm just saying

14   that in Texas the second lienholders have no rights like

15   they do in California that prompted the Bibo and Bialac

16   decisions and A Partners.  Even in the words lifted from the

17   cases and put in --

18             THE COURT:  Well, the Ninth Circuit, the same

19   thing happens.  The second can bid at the sale.

20             MR. ANGLIN:  That's true.  They also have the

21   right of redemption and reinstatement, but those rights are

22   not existent in Texas.

23             THE COURT:  No.  There is no right of redemption

24   and reinstatement in California or Nevada.

25             MR. ANGLIN:  Well, the cases that were quoted and

1    the language planted into the motion that we're hearing

2    today says that it is.  It highlights the redemption and

3    reinstatement rights.

4        In fact, the fears of those Courts were that the rights

5    of redemption and reinstatement were what were being taken

6    away, in other words, the package of rights associated with

7    the junior lien interest that was being taken away by the

8    foreclosure.  Those rights that they were concerned about in

9    those cases --

10            THE COURT:  How --

11            MR. ANGLIN:  -- literally --

12            THE COURT:  I don't --

13            MR. ANGLIN:  -- don't exist --

14            THE COURT:  -- understand --

15            MR. ANGLIN:  -- in Texas.

16            THE COURT:  -- how in the world you can say a

17    junior lien interest isn't property of the estate.  How in

18    the world can you possibly say that?  You can certainly

19    borrow on it, right?

20            MR. ANGLIN:  You can -- excuse me?

21            THE COURT:  Borrow on it.  For example, if I have

22    a two-percent interest in a second deed of trust, I can take

23    that to some lender and get money on it, right --

24            MR. ANGLIN:  You would be --

25            THE COURT:  -- if it's worth anything?

1          MR. ANGLIN:  You would be --

2          THE COURT:  It's a property interest.

3          MR. ANGLIN:  You would be pledging the note --

4          THE COURT:  Right.

5          MR. ANGLIN:  -- your Honor.

6          THE COURT:  Right.

7          MR. ANGLIN:  There's no doubt that the note itself

8   is property of this estate --

9          THE COURT:  Right.

10         MR. ANGLIN:  -- and that that lien position that's

11  granted to secure that note has rights associated with it

12  which it could also be property rights of the estate.  I'm

13  not arguing that it's not.

14      What I'm saying is that we are not foreclosing on the

15  note, and we're not frustrating or in any way impinging upon

16  the rights associated with --

17         THE COURT:  If you foreclose --

18         MR. ANGLIN:  -- that note.

19         THE COURT:  -- the second's wiped out, correct?

20         MR. ANGLIN:  That's by state law.  That's not --

21         THE COURT:  Okay.  So it's wiped out.

22         MR. ANGLIN:  Yes.  It is --

23         THE COURT:  The property interest --

24         MR. ANGLIN:  -- wiped out.

25         THE COURT:  -- is gone.

1          MR. ANGLIN:  That is strictly foreclosed.

2          THE COURT:  Okay.

3          MR. ANGLIN:  So the --

4          THE COURT:  So how can you tell me you're not

5    wiping out a property interest?

6          MR. ANGLIN:  Because what we're doing is we're

7    simply using our right that Judge Clark in Houston I assume

8    today will say that we can go forward with to take legal

9    title to the property, to take legal and equitable title to

10   the property, if we are the --

11         THE COURT:  Well, but the issues of fact --

12         MR. ANGLIN:  -- successful bidder.

13         THE COURT:  The issues are different in front of

14   him.  The issue is as between you and the debtor is there

15   adequate protection like -- well, what's the property worth?

16         MR. ANGLIN:  We don't know.

17         THE COURT:  How can you --

18         MR. ANGLIN:  It's been --

19         THE COURT:  How can you file your motion and not

20   know?

21         MR. ANGLIN:  File a motion to --

22         THE COURT:  And in --

23         MR. ANGLIN:  -- lift the stay?

24         THE COURT:  And in front of Judge Clark.

25         MR. ANGLIN:  Well, there has been -- well, we did

```
1   it because --
2               THE COURT:  Oh, because it's under --
3               MR. ANGLIN:  -- it's a single asset --
4               THE COURT:  -- the single-asset --
5               MR. ANGLIN:  -- a single-asset --
6               THE COURT:  -- real estate.
7               MR. ANGLIN:  -- real estate.
8               THE COURT:  Okay.
9               MR. ANGLIN:  We have been delinquent for
10  two-and-a-half years.  We have not received a single
11  payment.  Judge Clark is tired of it.  We are tired of it,
12  and the time has come --
13              THE COURT:  But the issues --
14              MR. ANGLIN:  -- to foreclose.
15              THE COURT:  -- are totally different.  The issue
16  is as between you and the first can you foreclose, right?
17              MR. ANGLIN:  You're right.
18              THE COURT:  Okay.
19              MR. ANGLIN:  Well, and these debtors actually came
20  to Houston and asked for the --
21              THE COURT:  I mean --
22              MR. ANGLIN:  -- very same --
23              THE COURT:  Excuse me.  You and the owners.
24  Excuse me.  The debtor in bankruptcy there is the owner,
25  right?
```

1           MR. ANGLIN:  The debtor is the owner.

2           THE COURT:  Right.  Because the --

3           MR. ANGLIN:  Yes.

4           THE COURT:  Between you as the first and the

5   owner, those are the issues.

6           MR. ANGLIN:  That's right.

7           THE COURT:  Okay.  So he's not determining whether

8   or not there's any rights in the property as to the

9   second --

10          MR. ANGLIN:  Well --

11          THE COURT:  -- nor can he.

12          MR. ANGLIN:  Judge Letitia Clark, she was asked by

13  USA, the First and Diversified, to make that determination,

14  your Honor.

15      They sent lawyers to Houston to argue that in front of

16  her, and she did not give credence to that argument and did

17  not enforce the stay as they requested, so they came here.

18      (Colloquy not on the record.)

19          THE COURT:  But you never filed a motion to lift

20  stay.

21          MR. ANGLIN:  In this court, we have not,

22  your Honor.

23          THE COURT:  Okay.

24          MR. ANGLIN:  It was our understanding that no stay

25  existed to frustrate the first lienholder's foreclosure --

1              THE COURT:  Why in the world --

2              MR. ANGLIN:  -- just as the Fourth is --

3              THE COURT:  -- would you want to do that when you

4    know the law in the Ninth Circuit is a sale conducted in

5    violation of a stay is void?

6              MR. ANGLIN:  Well, the law in the Ninth Circuit if

7    it's the Bibo case, it's a vacated --

8              THE COURT:  No.

9              MR. ANGLIN:  -- decision --

10             THE COURT:  The other cases --

11             MR. ANGLIN:  -- of the BAP.

12             THE COURT:  -- that say that acts conducted in

13   violation of the stay are void.

14             MR. ANGLIN:  Well, that's true.  We wouldn't want

15   to have -- if we thought that it was in violation of the

16   stay, we would not foreclose.

17             THE COURT:  But why risk it?

18             MR. ANGLIN:  Well, that's what I guess the purpose

19   of this hearing is.  If the stay is in place, and this Court

20   declares that until the note is sold, then we will not

21   foreclose.

22             THE COURT:  Well, we still don't know.  Did you

23   intend to republish?

24             MR. ANGLIN:  Well, in Texas, you can only

25   foreclose on the first Tuesday of a month.  We would have

1    missed the February 6th opportunity, so we would be required

2    to repost, anyway, in February for any March foreclosure.

3            THE COURT:  Okay.

4            MR. ANGLIN:  If the Court would grant us this

5    because of the pending sale and because of the extraordinary

6    circumstances, the fact that this may be over very shortly,

7    we would ask the Court to at least permit us to post in

8    February for a March foreclosure subject to the stay being

9    clearly lifted and permitting a March foreclosure.

10            THE COURT:  Okay.

11            MR. ANGLIN:  Would that be acceptable to the Court

12    or --

13            THE COURT:  If you had stipulated with counsel,

14    that might have been the answer, but it's too late now.

15            MR. ANGLIN:  Okay.  Thank you, your Honor.

16            THE COURT:  Okay.  I'm going to grant the debtor's

17    motion.  I believe that the Ninth Circuit law is clear that

18    the junior lien held by the funds is property of the estate.

19    And, therefore, in order to foreclose on that interest, they

20    had to file a motion for relief from the stay.

21        Now, it probably wouldn't have been a hard case to do

22    since there's such a minor interest held by them and

23    depending upon the values, but they didn't do it.  They

24    didn't follow the rules.

25        I won't make a decision as to whether or not

1    USA Commercial has property of the estate.  That seems a

2    little more tangential to me, the right to exit fees.  I

3    won't go that far.  But as to the two funds, it is property

4    of the estate.

5        I don't make any -- well, I find that it's property of

6    the estate.  So whether or not they can now proceed even

7    when the -- what the effect of the prior notice was, I don't

8    rule on.  Okay.

9        Thank you.

10       (Thereupon, the portion requested to be transcribed

11           was concluded at 11:37:45 a.m.)

1    I certify that the foregoing is a correct transcript

2  from the electronic sound recording of the proceedings in

3  the above-entitled matter.

4

5

6  /s/ Lisa L. Cline                                03/18/07

7  _____                      _____
   Lisa L. Cline, Transcriptionist                   Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25