1 | **WILDE HANSEN, LLP**
  | GREGORY WILDE, ESQ.
2 | Nevada Bar No. 4417
  | MARIANNE GATTI, ESQ.
3 | Nevada Bar No. 7717
  | 208 South Jones Blvd.
4 | Las Vegas, Nevada 89107
  | TEL: (702) 258-8200
5 | FAX: (702) 258-8787

E-filed 4-2-07

6 | Attorneys for Sierra Liquidity Fund, LLC

7

**IN THE UNITED SATES BANKRUPTCY COURT**

8

**DISTRICT OF NEVADA**

9

| 10 | In Re: USA COMMERCIAL MORTGAGE COMPANY, | Case No. BK-S-06-10725 LBR |
| 11 | Debtor. | Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR |

| 12 | In Re: | Chapter 11 |
| 13 | USA CAPITAL REALTY ADVISORS, LLC, Debtor. | Jointly Administered Under |
| 14 | | Case No. BK-S-06-10725 LBR |

| 15 | In Re:<br>USA CAPITAL DIVERSIFIED TRUST DEED | |
| 16 | FUND, LLC,<br>Debtor. | **RESPONSE TO CLARIFY**<br>**TERMS AND CONDITIONS OF** |
| 17 | | **SIERRA LIQUIDITY FUND,**<br>**LLC'S BID FOR PLACER** |
| 18 | In Re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC, | **VINEYARDS COMMERCIAL**<br>**MORTGAGE ASSETS AND** |
| 19 | Debtor. | **TERM SHEET** |

| 20 | In Re: | |
| 21 | USA SECURITIES, LLC,<br>Debtor. | |
| 22 | | |

| 23 | Affects:<br>■ All Debtors | |
| 24 | ☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC | Hearing Date: April 9, 2007 |
| 25 | ☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC | Hearing Time:1:30 p.m. |
| 26 | ☐ USA Capital First Trust Deed, Fund, LLC | |

27

Sierra Liquidity Fund, LLC ("Sierra"), by and through its counsel Marianne Gatti, Esq. of Wilde

28

1

1  Hansen, LLP, hereby files its Response to Clarify Terms and Conditions of Sierra Liquidity Fund, LLC's

2  Bid for Placer Vineyards Commercial Mortgage Assets (the "Sierra Bid Response").

3        The Sierra Bid Response adopts all of the defined terms contained in the Motion to Sell Under

4  Section 363 All Commercial Mortgage Assets of Debtor USA Commercial Mortgage Company in the

5  Placer Vineyards Loans to Compass USA SPE, LLC (the "Motion to Sell Placer Vineyards CMA's").

6        Sierra is an Assignee of certain Direct Lenders' Fractional Interests in certain Promissory Notes

7  Secured by Deed of Trusts, underwritten, originated, and serviced by USA Commercial Mortgage

8  Company ("USACM"), including $910,000 principal amount, or 2.89% of the total loan amount, due

9  and owing by Placer Vineyards Land Speculators, LLC (the "Borrower") on the Placer Vineyards Senior

10  Note (as defined in the Motion to Sell Placer Vineyards CMA's). Therefore, Sierra's interests are

11  commonly aligned with the interests of its fellow Direct Lenders on the Placer Vineyards Senior Note,

12  and Sierra is financially motivated to preserve the value of the collateral and fulfill the fiduciary duty

13  owed to the Direct Lenders as a potential Successor Servicer.

14        Sierra is also well qualified to negotiate with the Borrowers and the Direct Lenders. Jim Riley,

15  the Managing Director of Sierra Asset Management, LLC, the Managing Member of Sierra Liquidity

16  Fund, LLC, has 20 years development and entitlement experience in California. This experience

17  includes, as President of Riley Bower, Inc., obtaining entitlement for over 2,000 residential units,

18  including apartments, condominiums and single family residents, on over 14 projects in Northern and

19  Southern California. This gives Sierra unique experience in analyzing the ongoing entitlement process

20  for the Placer Vineyard Specific Plan ("PVSP"), asserting the rights and role of the Direct Lenders (if

21  the notes are not cured and the property is foreclosed) in the PVSP Development Group, and overseeing

22  the marketing and disposition of the property, if required.

23        Moreover, Sierra understands the rights and protections afforded to the Borrower, Direct

24  Lenders, and the Servicer under the terms of the Placer Vineyards Loans (as defined in the Motion to

25  Sell Placer Vineyards CMA's and the Loan Servicing Agreements (See Exhibit B).

26        Please see the attached Declaration by Scott D. August, CFA on behalf of Sierra Liquidity Fund,

27  LLC for qualifications and background of Sierra Liquidity Fund, LLC.

28

The purpose of Sierra's Bid Response, per the Honorable Judge Riegle's request, as a bidder and potential successor Servicer for the Placer Vineyards Loans, is to clarify certain unresolved positions, conditions, and criteria regarding the status and sale of the Placer Vineyards CMA's. The four main uncertainties are:

1.      The successor Servicer's intent and policy regarding the allocation, or waterfall, of all proceeds collected, whether the source of proceeds are from payments made by the Borrower or from proceeds gained by the Deed of Trust through the sale of collateral upon foreclosure; specifically, will the Direct Lenders receive principal and accrued interest before the servicer receives default interest (believed to exceed $3,544,274 as of March 21, 2007 - See Exhibit D).

2.      The contractual right and duties of the servicer under the existing agreements relative to payment of taxes and development fees and the proposed duties under the offers.

3.      Whether or not the terms of the Debtors' Confirmed Third Amended Joint Chapter 11 Plan of Reorganization and the Order Confirming the "Debtors Third Amended Joint Chapter 11 Plan of Reorganization" as Modified Herein should apply to the sale of the Placer Vineyards CMA's.

4.      Whether or not the signed Loan Servicing Agreements are valid and exist for at least approximately 70% of the Lenders on the Placer Vineyards Senior Note and the Placer Vineyards Junior Note, as represented to Sierra by Mesirow Financial. The number of Direct Lenders and the % of direct lender interests bound to the Loan Servicing Agreements is essential to evaluating the value of the Debtors assets being sold.

## **ALLOCATION OF PROCEEDS**

Sierra asserts that the allocation of proceeds due on the Placer Vineyards Loans is simple, clear, and consistent with the loan documentation (Promissory Note, Deed of Trust, and Loan Agreement), the Loan Servicing Agreements, the intent of the loans, and industry standards and practice. However, unfortunately, a great deal of fear and skepticism has developed, amongst the Direct Lenders, Sierra, and lending industry practitioners, as to Compass Partners, LLC's ("Compass Partners") intended allocation of proceeds collected from the collateral if the Borrower does not cure the delinquent loan and bring the loan current, the duty of Compass to timely foreclose on the collateral, and the general fiduciary duty

1  Compass has to the Direct Lenders.

2      While Sierra does not wish to cause undue harm, Sierra, as an Assignee to millions of dollars

3  of Direct Lender Fractional Interests in various loans believes it is necessary to bring to this Honorable

4  Court's attention the potential harm that Compass may inflict on the Direct Lenders, not only if they are

5  successful in purchasing the Placer Vineyards CMA's, but for all the USACM loans for which they now

6  purport to service. Sierra's premise regarding Compass' intended mal or misfeasance is founded on

7  discussions that Sierra has had with former employees of USACM and Mesirow Financial who are now

8  employed by Compass (Mark Olson and James Reed), conversations with professionals at Mesirow

9  Financial (Robert Koe) and Ray Quinney & Nebeker P.C. (Steve Strong), conversations the Lender

10  Protection Group has had with Compass, and the Compass Press Release dated February 16th, 2007

11  whereby Compass stated that the actual value of the assets purchased from USACM and the USA First

12  Trust Deed Fund, LLC are worth more than $150 million (See Exhibit A).

13      Based on the fact that many of the underlying loans remain in default, the assumption that many

14  of the Borrowers have little or no remaining equity in the properties, and, therefore, that foreclosure will

15  be required on the vast majority of the loans; in conjunction with the fact that the principal amount of

16  fractional interests in loans held by the USA First Trust Deed Fund, LLC was no more than $62,652,742[1]

17  at the time the Compass Sale closed, it can be deduced that Compass is valuing the USACM Servicing

18  Rights that were purchased pursuant to the Compass APA to be worth at least $87,347,258. As the total

19  principal loan amounts at closing for all loans that USACM sold the related Servicing Rights to

20  Compass was no more than $588,540,585[2]. it can be concluded that Compass believes the Servicing

21  Rights are worth at least 14.8% of the total principal loan amounts! This calculation, however, assumes

22  that the loans are worth par!

23      If, as Sierra estimates, the collateral, on average, only supports an 80% recovery on the loans,

24  then Compass is valuing the Servicing Rights at 21.2% of Sierra's estimate for the market value of the

25

26  ————————————

27  [1] Source: Compass Asset Purchase Agreement; Schedule 1; FTDF Ownership

28  [2] Source: Compass Asset Purchase Agreement; Schedule 1

1 │ collateral securing the loans. on average. [3]

2 │      How can this be possible if many of the loans will require foreclosure, and distributing the value

3 │ of the collateral back to the Direct Lenders, net only of valid and accrued servicing fees? This value for

4 │ Compass can only be possible if Compass deducts accrued default interest and late fees prior to

5 │ distributing the remaining collateral value to the Direct Lenders, even in the event of a foreclosure where

6 │ the default interest and late fees are not collected from the Borrower. This is why Compass is "not liked"

7 │ by the Lenders who are now allegedly bound to the Loan Servicing Agreements. despite their retention

8 │ of Section 3 rights.

9 │      Section 5 of the Loan Servicing Agreement states: "Lender authorizes USA to retain..... as

10 │ compensation for services performed hereunder....... and (c) and default interest *collected from the*

11 │ *Borrower pursuant to the terms of the Note." It is an affirmative statement: "collected from the*

12 │ ***Borrower". The Servicer is only authorized to retain default interest if collected from the Borrower.***

13 │ (See Exhibit B, Section 5 (c)). In the event of a foreclosure, and a credit bid of principal only, or less,

14 │ by the Lenders that is not over-bid, there is no interest. nor default interest. and the property is simply

15 │ taken back by the Lenders. and if sold, the proceeds are delivered pro-rata to the Lenders who hold title

16 │ to the property through the Deed of Trust.

17 │      To further illuminate the grabbing of Direct Lender assets that Compass is trying to effect,

18 │ consider the following:

19 │      If, as Sierra estimates the collateral securing the loans is only worth, on average 80% of the

20 │ principal amount, then the proceeds available for the secured Direct Lenders would only be

21 │ $470.832,468. If Compass. as Sierra and many direct Lenders expect, and Compass has never refuted,

22 │ then deducts all servicing fees, default interest and late fees prior to distributing the remaining net

23 │

24 │     [3] Calculation: First discount the First Trust Deed Fund by 20%. 80% of $62.652,742 = $50.122.193. Next
25 │ subtract this discounted value of the First Trust Deed Fund from Compass $150 million estimated value of the USACM and
    FTDF assets disclosed in the Compass Press Release (Exhibit A) to calculate Compass' estimated value of the Servicing
26 │ Rights alone. Compass Value of Servicing Rights = $150,000.000 - $50.122.193 = $99.877.807. Then discount the entire
    loan pool by 20% to arrive at the discounted value of the underlying collateral. 80% of $588.540,585 = $470.832,468. Then
27 │ Divide the Compass estimated Servicing Rights Value by the Discounted Loan Pool Value to arrive at the % of Servicing
    Rights Value as a % of the Discounted Loan Pool. $99,877.807 / $470,832.468 = 21.2%.

28 │

1  proceeds to the secured Direct Lenders; and Compass believes the Servicing Rights are worth at least

2  $87,347.258, then there would only be $383,485,210 remaining for the secured Direct Lenders. This

3  would only represent a recovery on principal for the Direct Lenders of 65%, while Compass would be

4  earning a return of 359%, or $68,347,258 on the Servicing Rights. [4]

5        Compass' misguided strategy to extract value from the collateral pledged by the Borrowers to the

6  Direct Lenders, by attempting to deduct un-paid default interest and late fees from the collateral proceeds

7  prior to remitting amounts due to the Direct Lenders is in conflict with the loan documentation

8  (Promissory Note, Deed of Trust, and Loan Agreement), the Loan Servicing Agreements, the intent of

9  the loans, and long established lending industry standards and practice. As Judge Riegle herself said at

10  the hearing on March 27th, 2007, "How can there be any default interest if there is not enough value to

11  cover the note?" Why did Compass decline to answer Judge Riegle's question? Why has Compass

12  failed to directly answer this question when asked by the Direct Lenders to whom they owe a fiduciary

13  obligation?

14        Regarding the Placer Vineyards Loans, specifically, the total accrued default interest and late fees

15  as of March 21, 2007 for the Placer Vineyards Senior Loan alone was $3,746,087.25 (Exhibit D). The

16  Placer Vineyards collateral consists of 338.2 acres of two, non-contiguous undeveloped lots in Placer

17  County, CA. **Mesirow has reported to the USACM Trust that a broker approached Mesirow with**

18  **an offer of $120,000 per acre. The $3,746,087.25 of accrued default interest and late fees as of**

19  **March 21, 2007 represents a per acre value of only $11,076! If indeed the Servicer is entitled to**

20  **default interest and late fees senior in right of payment to the Direct Lenders in the event of**

21  **foreclosure, then the estate should not sell the servicing rights for less than the full market value**

22  **of such rights, which should be at least the face amount of such accrued interest and late fees,**

23  **which is currently $3,7460,087.25, because 1) there would purportedly exist an abundance of**

24  **collateral coverage and 2) the default interest spread is continuing to accrue at 7.5% per annum**

25  **(spread between 20% default interest rate and 12.5% coupon rate).**

26        **As the court can clearly see, without clarifying the priority of payments vis-à-vis default**

27

28    [4] Calculation: $87,347,258/ $19,000.000 - 1 = 359%

1    interest and late fees versus the secured lien rights of the Direct Lenders, particularly in the event

2    of foreclosure, it is impossible for the Estate and potential bidders to make an informed decision

3    about whether or not to sell the servicing rights and at what price.

4        If Sierra's assertion of Compass' position regarding Compass' presumed right as the Loan

5    Servicer to receive accrued default interest senior in right of payment to the first lien held by the Direct

6    Lenders, in the event of a foreclosure, is inaccurate, then Sierra challenges Compass to clarify their

7    position, if for no other reason then to appease the fears of so many Direct Lenders, including Sierra.

8        Sierra further attests that per Exhibit G (The Debtors objection to Sierra's administrative claim

9    and the Sierra administrative claim, as filed), the Debtor (and apparently Compass) assent that this Court

10   has authorized USACM, as the Servicer, and Compass as the successor Servicer, to sit on collateral for

11   numerous loans, for approximately one year (and possibly much longer going forward), purportedly

12   racking up default interest and late fees, which the Servicer could then rake off the top of any foreclosure

13   proceeds, leaving the Direct Lenders cash investments significantly diminished in value, if not virtually

14   worthless, depending on how long these delinquent loans are allowed to continue to accrue default

15   interest and late fees without being foreclosed upon.  Surely this diminution of value to the Direct

16   Lenders is not what this Court envisioned nor intended - that the Servicer could "earn" exorbitant

17   compensation on the backs of the Direct Lenders, by asserting absolution from inquiry per the confirmed

18   Plan and then claim the "business judgment rule" in the face of a massive conflict of interest".

19       Sierra represents there should be no confusion and that the clear priority of payments as written

20   and intended by the loan documents (Promissory Note, Deed of Trust, Loan Agreement, and Loan

21   Servicing Agreements) is as follows, under three distinct scenarios:

22   **Application of Payments (Waterfall)**

23

24   **Scenario A)**  Borrower never makes another payment, property is foreclosed on by $5 M first lien credit

25   bid. The collateral is then marketed and sold by Servicer, as Agent for Direct Lenders, for $20 million.

26   1.        Servicer deducts and retains accrued servicing fee of $462,500 as of 3/26/07 on the Placer Senior

27

28

1   Note. [5]

2   2.      Remaining balance of $19,537,500.00 is distributed to Direct Lenders on the Placer Vineyards

3   Senior Note.

4   3.      No additional Funds available for any other parties.

5   4.      Senior Note Holders and Junior Note Holders may pursue deficiency judgments against the note

6   guarantor for remaining principal, interest, and fees.  If a deficiency judgment is collected from the

7   guarantor, then the Servicer may be entitled to servicing fees, late fees and default interest, provided that

8   certain amounts to interest and fees are not forgiven by the Lenders.

9

10  **Scenario B)**  Borrower remits partial payment of $3 million, but fails to bring loan current.  The Direct

11  Lenders elect to forgive interest, but 3 months later Borrower becomes delinquent again, the loans goes

12  into default and the Direct Lenders, through the Servicer as their agent, foreclose on the property with

13  a first lien credit bid of $10 million.  The collateral is then marketed and sold by the Servicer, as Agent

14  for Lenders, for $20 million.

15  1.      Servicer deducts and retains from the initial $3 million payment the accrued servicing fee of

16  $462,500 as of 3/26/07 on the Placer Vineyards Senior Note.

17  2.      Since Direct Lenders forgave interest, remaining balance on the $3 million payment of

18  $2,537,500 is distributed to Direct Lenders of the Placer Vineyards Senior Note as principal, and the

19  principal balance of the loan is reduced accordingly.

20  3.      After the property is sold, Servicer deducts and retains from the initial $20 million of sale

21  proceeds the accrued servicing fee from the date of the last collection of servicing fees.

22  4.      Remaining balance, which would be slightly less than $20 million, would be distributed to Direct

23  Lenders on the Placer Vineyards Senior Note.

24  5.      No additional Funds available for any other parties.

25  6.      Senior Note Holders and Junior Note Holders may pursue deficiency judgments against the note

26

27  ─────────────

[5] $462,500 is the accrued servicing fee represented by Mesirow Financial to Sierra on the Placer Senior Note only.

28  as of 3/26/07.  This figure would continue to accrue from 3/26/07 and could ultimately be higher.  SEE EXHIBIT B

1    guarantor for remaining principal, interest, and fees. If a deficiency judgment is collected from the

2    guarantor, then the Servicer may be entitled to servicing fees, late fees and default interest, provided that

3    certain amounts to interest and fees are not forgiven by the Direct Lenders.

4

5    **Scenario C)** Borrower Pays off all amounts due on the matured loan in the amount of $49,563,234.56,

6    including all principal, past due interest (at the default interest rate), late fees, and any other fees required

7    to pay off the Placer Vineyards Loans. [6] (See Exhibit D)

8    **Distributions payable on account of Placer Vineyards Senior Note:**

9    1.        Servicer deducts and retains accrued servicing fee of $462,500 as of 3/26/07 on the Placer

10   Vineyards Senior Note.

11   2.        Net Interest After Servicing Fees of $5,410,961.97 is distributed to Direct Lenders

12   ($5,873,461.97 of contract interest less $462,500 of accrued servicing fees).

13   3.        Principal of $31,500,000 distributed to Direct Lenders.

14   4.        Default Interest of $3,544,274.38 retained by Servicer pursuant to the terms of the Loan

15   Servicing Agreement as "default interest collected from the Borrower."

16   5.        Late Fees of $201,812.87 retained by Servicer pursuant to the terms of the Loan Servicing

17   Agreement as "late fees collected from the Borrower."

18   6.        No other funds due or owing to Direct Lenders on Placer Vineyards Senior Note or to the

19   Servicer of the Placer Vineyards Senior Note. Total Proceeds allocated to Direct Lenders and Servicer

20   on account of Placer Vineyards Senior Note = $41,119,549.22. Remaining proceeds collected from the

21   Borrower are due to Direct Lenders and Servicer of Placer Vineyards Junior Note.

22   **Distributions payable on account of Placer Vineyards Junior Note:**

23   1.        Servicer deducts and retains accrued servicing fee of $72,500 as of 3/26/07 on the Placer

24   Vineyards Junior Note. [7]

25   _____

26        [6] Total amount due on the Placer Senior Note and Junior Note, including all principal, interest and fees is
$49,563,234.56 as represented by Mesirow Financial as of 3/21/07. SEE EXHIBIT D

27        [7] $72,500 is the accrued servicing fee represented by Mesirow Financial to Sierra on the Placer Junior Note only,

28   as of 3/26/07. This figure would continue to accrue from 3/26/07 and could ultimately be higher. SEE EXHIBIT B

2.      Net Interest After Servicing Fees of $1,437,222.39 is distributed to Direct Lenders ($1,509,722.39 of contract interest less $72,500 of accrued servicing fees).

3.      Principal of $6,500,000 distributed to Direct Lenders.

4.      Default Interest of $379,657.93 retained by Servicer pursuant to the terms of the Loan Servicing Agreement as "default interest collected from the Borrower."

5.      Late Fees of $54,305.03 retained by Servicer pursuant to the terms of the Loan Servicing Agreement as "late fees collected from the Borrower."

6.      No additional Funds available for or due to any other parties. Total Proceeds allocated to Direct Lenders and Servicer on account of Placer Vineyards Junior Note = $8,443,685.35.

Even in Scenario C. where Servicer may receive proceeds for default interest and late fees, the Direct Lenders have the right under the loan documents to A) forgive any and all interest and/or fees or B) change the allocation of payments first to principal and then to interest. if so desired. [8]    The key is that the Direct Lenders have these rights pursuant to the terms of the Note, not the Servicer.

**Advancement of Funds to Pay Past Due Property Taxes and Late Fees**

Sierra has been informed that $353,765.38 has been paid in recent days for certain 2006 property taxes, and that $297,107.88 remains due for past due defaulted property taxes and $375,000 for a development fee. The Debtor has indicated that they had no involvement in the payment of the taxes, while Mr. Geoffrey Berman of Development Specialists, Inc. has indicated that the source of funds was from "from Mr. Milanowski through a distribution from another LLC in which he and/or USAIP was involved." (See Exhibit F). However, prior to closing, Sierra would need to verify the source of these tax payments, and Sierra seeks the Court's assistance in determining exactly who is the source for the

---

[8]  Section 4 of the Placer Vineyards Senior Note states, "Application of Payments: All payments on this Note, shall, at the option of the Lender hereof. be applied first to the payment of accrued interest then payable.  Section 9 of the Placer Vineyards Senior Note states, "From and after the Maturity Date or. if an y Event of Default occurs and is not timely cured. from the date the payment was due regardless of any cure period provided in the notice of default. through and including the date such default is cured, at the option of the Lender hereof. all amounts owing under the Note and all sums owing under all of the Loan Documents shall bear interest at a default rate equal to twenty percent (20%) per annum ("Default Rate"). Such interest shall be paid on the first day of each month thereafter. or on demand if sooner demanded."

1  recent tax payments, and the motivation for making said payments.

2       Unfortunately the Loan Servicing Agreement does not clearly state whether or not a Servicer can
3  advance fees necessary to pay taxes and other fees to protect the value of the collateral. Although the
4  Servicing Agreement does allow for the advancement of funds in a position senior to the Direct Lenders
5  security interest to pay certain foreclosure costs and related attorney fees, it is not explicitly clear on
6  taxes and development fees. Nor does the Loan Servicing Agreement state that a reasonable rate of
7  interest could be earned on the advancement of such funds. (See Exhibit B, Section 4)

8       The terms of the Promissory Note and the Deed of Trust do however allow a Direct Lender to
9  advance such necessary funds. Such an advancement, according to the loan documents would rank pari
10  passu with the other Direct Lenders and would accrue interest at the default rate of interest. (See Exhibit
11  E - Excerpt from the Promissory Note). Of course the Placer Vineyards Loan is already earning interest
12  at the default interest rate, so there is no additional incentive for a Direct Lender to advance these funds,
13  and if the default interest is paid by the Borrower, then the Servicer is entitled to the Default Interest
14  under the terms of the Loan Servicing Agreement. If the property is foreclosed on, then there is no
15  interest *collected from the Borrower*, let alone default interest.

16       To the best of our knowledge, Sierra, as a Direct Lender on the Placer Vineyards Senior Note
17  is in a unique position, vis-à-vis the competing bidders, to be able to advance the necessary funds of
18  $297,107.88 to pay the defaulted real property taxes and the $375,000 owed for development fees,
19  pursuant to the terms of the Note and Deed of Trust. However, because Sierra cannot be assured that
20  the collateral is worth enough to support a par recovery to the Direct Lenders on the Placer Senior Note,
21  Sierra cannot guarantee that we will be able to advance the necessary funds.

22       Sierra suggests either of the following two possibilities as the most pragmatic solutions:

23  1.    Sierra as the Successor Servicer, would organize a meeting with the Placer Vineyards Direct
24  Lenders, whereby we would appease their fears regarding the allocation of any and all proceeds collected
25  on account of the loan. We would also explain to them the importance of paying the past due taxes and
26  fees and the potential indications of market value for the collateral, if the taxes and fees are paid. Sierra
27  would then seek advances from the pool of Direct Lenders to fund the taxes and fees.

28

2.      Sierra would be willing to backstop the Direct Lender commitments, if any, and fund the past due taxes and fees (the "Sierra Advance"), but only with either:

        a.      Proper documentation executed by the majority of Direct Lenders, in dollar amount, allowing the Sierra Advance, if any, to be granted a Senior Security Interest in the collateral, thereby subordinating the Placer Senior Note and the Placer Junior Note to the Sierra Advance, and allowing for the Sierra Advance to earn a reasonable rate of interest, of at least 12% or

        b.      A bankruptcy court order allowing the Sierra Advance, if any, to be granted a Senior Security Interest in the collateral, thereby subordinating the Placer Senior Note and the Placer Junior Note to the Sierra Advance, and allowing for the Sierra Advance to earn a reasonable rate of interest, of at least 12%.

## APPLICATION OF THE DEBTORS' CONFIRMED THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION AND THE ORDER CONFIRMING THE DEBTORS THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION AS MODIFIED HEREIN TO THE SALE OF THE PLACER VINEYARDS CMA'S

      The Confirmed Third Amended Joint Chapter 11 Plan of Reorganization and the Order Confirming the Debtors Third Amended Joint Chapter 11 Plan of Reorganization as Modified Herein bound the Direct Lenders to the Loan Servicing Agreements that were sold to Compass despite any pre or post-petition breaches that may have been committed by USACM. This binding effect served to enhance the value of the Loan Servicing Agreements and the USA Commercial Mortgage Assets (as defined in the Plan and the Compass APA), despite the fact that the Direct Lenders retained their Section 3 right to terminate Compass as Servicer and appoint a replacement servicer. However, under the terms of the confirmed plan, Compass retained the right to collect all fees and interest due and owing by the Direct Lenders under the Loan Servicing Agreements, even if a Section 3 right is successfully exercised.

      Sierra petitions the Court that, in order to facilitate the sale of the Placer Vineyards CMA's, the identical terms of the Plan and the Confirmation Order that were granted to Compass should be granted

1    to Sierra, if Sierra is deemed the successful purchaser.

2         To reflect this high degree of uncertainty and volatility in the value of the Placer Vineyards

3    CMA's, Sierra has incorporated a Base Price and Additional Consideration into the Sierra Bid. The Base

4    Price would be paid if the Placer Vineyards CMA's are sold as is. without the application of the Plan and

5    Confirmation Order provisions. The Additional Consideration would only be paid if the terms of the

6    Plan and the Confirmation Order are extended to the sale of the Placer Vineyards CMA's.

7

8    **Only 70% of the Lenders on the Placer Vineyards Loans have executed Loan Servicing**

9    **Agreements**

10        Mesirow Financial has represented to Sierra that for the Placer Vineyards Senior Note only 237

11   out of 343 (69%) Direct Lenders have executed valid Loans Servicing Agreements and for the Placer

12   Vineyards Junior Note only 83 of 118 (70%) Direct Lenders have executed valid Loan Servicing

13   Agreements.

14        It is unclear to Sierra whether or not Sierra will be able to charge a servicing fee to those Direct

15   Lenders who have not executed a Loan Servicing Agreement. Therefore, Sierra's Bid, incorporates

16   additional compensation should the Court enter an order. allowing Sierra as the successful purchaser to

17   charge a 1% Servicing Fee to those Lenders who have not executed a Loan Servicing Agreement.

18        Candidly, Sierra has proffered its bid in some measure to hedge its position as a Direct Lender

19   on certain loans. If Compass is right, and the servicing rights carry with them (per Court Order) these

20   extraordinary perks of default interest priority, immunity from criticism over past and future loan

21   administration. etc.. then Sierra's Direct Lender position is eroded commensurately.

22

23   ///

24

25   ///

26

27   ///

28

1    **Conclusion**

2        Wherefore, Sierra prays that this court consider the merits of Sierra's offer in comparison to

3    competing bids and specifically to the Compass bid. Compass' interpretation of the Loan Servicing

4    Agreement and the loan documents (Promissory Note, Deed of Trust, Loan Agreement) display an

5    aggressive hedge fund engaging in a reckless strategy in the pursuit of yield. Please do not allow this

6    radical firm to turn long established lending standards, financial principles and the bankruptcy code

7    upside down, to insult this court of equity and to rob innocent and captive Direct Lenders of their

8    property rights.

9

10       DATED this 2 day of April , 2007.

11
                                            WILDE HANSEN, LLP
12

13
                                            GREGORY WILDE, ESQ.
14                                          Nevada Bar No. 4417
                                            MARIANNE GATTI, ESQ.
15                                          Nevada Bar No. 7717
                                            208 South Jones Blvd.
16                                          Las Vegas, Nevada 89107

17

18

19

20

21

22

23

24

25

26

27

28

                                            14

**TERM SHEET ON BEHALF OF SIERRA LIQUIDITY FUND, LLC AS PURCHASER AND
USA COMMERCIAL MORTGAGE COMPANY AS SELLER OF THE PLACER
VINEYARDS COMMERCIAL MORTGAGE ASSETS**

Whereas USA Commercial Mortgage Company ("USACM"), et al., has filed a "Motion to Sell Under Section 363 All Commercial Mortgage Assets of Debtor USA Commercial Mortgage Company in the Placer Vineyards Loans to Compass USA SPE. LLC" ("Motion to Sell PVCMAs") and

Whereas Sierra Liquidity Fund. LLC ("Sierra") desires to submit to USACM an offer for the Placer Vineyards Commercial Mortgage Assets. (The Placer Vineyards Loans ("PVL"), the Placer Vineyards Senior Note ("PVSN") and the Placer Vineyards Junior Note ("PVJN") are as defined in the Motion to Sell PVCMAs.)

Whereas, in the Motion to Sell PVCMA's the term Placer Vineyards Commercial Mortgage Assets ("PVCMA") was defined to mean the following:  "All servicing rights with respect to the Placer Vineyard Loans. including, without limitation, the servicing agreements (the "Servicing Agreements") relating to the Placer Vineyards Loans. any and all Default Rate Interest (as defined in the Compass APA) for the Placer Vineyards Loans, any and all Accrued Servicing Fees (as defined in the Compass APA) for the Placer Vineyards Loans, any and all Late Charges (as defined in the Compass APA) for the Placer Vineyards, Loans. any and all Success Fees (as defined in the Compass APA) for the Placer Vineyards Loans, and other fees and sums due the loan Servicer under the Servicing Agreements as well as all proceeds and receivables related solely to USACM's participation interest as a Direct Lender in the Placer Vineyards Loans (if any) but specifically excluding any other assets not specifically identified herein (and without limitation. excluding the excluded types of assets that were excluded in subsections (i) through (v) of the definition of "Commercial Mortgage Assets" in Section 1.1 of the Compass APA)."

Therefore, Sierra submits to USACM an offer to purchase the Placer Vineyards Commercial Mortgage Assets for a base purchase price consisting of cash consideration of $200,000.00. (the "Base Purchase Price").

Sierra's offer is contingent upon USACM validating the accrued amount of all Default Rate Interest (as defined in the Compass APA) for the PVL's, any and all Accrued Servicing Fees (as defined in the Compass APA) for the PVL's, any and all Late Charges (as defined in the Compass APA) for the PVL's, and other fees and sums due the loan servicer under the Servicing Agreements as well as all proceeds and receivables related solely to USACM's participation interest as a Direct Lender in the PVL's (if any) at least five business days prior to the Closing Date, consistent with references in Exhibit C and D by Mesirow Financial (See Attached).

Sierra's offer is also contingent upon USACM representing and warranting that 237 Direct Lenders on the PVSN have executed valid Loan Servicing Agreements and that 83 Direct Lenders on the PVJN have executed valid Loan Servicing Agreements, and USACM will further agree to provide the executed Loan Servicing Agreements to Sierra at least 5 business days prior to closing.

Sierra will pay additional cash consideration in the amount of $150,000 if a Court Order is granted extending the terms of the Plan and the Confirmation Order to the sale of the Placer Vineyards CMA's.

Sierra Term Sheet
April 2nd, 2007
Page 2

such that the Direct Lenders are bound to the Loan Servicing Agreements that are sold to Sierra despite any pre or post-petition breaches that may have been committed by USACM prior to closing (the "Additional Plan Extension Compensation") The Direct Lenders will retain their Section 3 rights to terminate Sierra as Servicer and appoint a replacement servicer, should Sierra commit any post-closing breaches, and the Court grant the Direct Lenders the proper exercise of their Section 3 right. However, under the terms of the confirmed plan, Sierra would retain the right to collect all fees and interest due and owing by the Direct Lenders under the Loan Servicing Agreements, even if a Section 3 right is successfully exercised.

Sierra will pay additional cash consideration in the amount of $25,000 if the Court will enter an order, allowing Sierra as the successful purchaser to charge a 1% Servicing Fee to those Lenders who have not executed a Loan Servicing Agreement. (the "1% LSA Additional Compensation").

Sierra is aware that the property taxes on the property and the development fee to the Placer Vineyard Development Group are delinquent. Sierra will arrange for the property taxes and development fee to be made current, either with funding from their fellow direct lenders, or advancing the funds provided that the direct lenders execute appropriate documentation acknowledging the advance and the priority of repayment of such advance, and the right to earn interest on such an advance, or with similar terms granted by Court Order.

Sierra is aware that the Servicer must collect and reimburse to the bankruptcy estate "prepaid interest" as proscribed by any and all court orders or as required by the Bankruptcy Plan.

Sierra's proposed Subservicer is FCI National Lender Services: http://www.trustfci.com/index.html, one of the largest and most qualified private money Servicers in the United States, and a licensed servicer in the state of Nevada.

Sierra's offer is subject to, and expressly conditioned upon, entry of a final order of the Bankruptcy Court, in form and substance reasonably acceptable to Sierra, pursuant to section 363(f) of the Bankruptcy Code, which provides, among other things, that the Purchased Assets are free and clear of all liens, claims, and encumbrances, that the Bankruptcy Court retains jurisdiction to adjudicate any and all disputes over the Purchased Assets, as well as a finding that Sierra is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code.

Sierra reserves its right to increase the Base Purchase price at an auction sale, if so desired.

Submitted this 2nd day of April, 2007.

s/s Scott August

Scott August, Vice President, Sierra Liquidity Fund, LLC
2699 White Road, Suite 255
Irvine, CA 92614
949-660-1144 ext. 17
saugust@sierrafunds.com