# EXHIBIT A

http://biz.yahoo.com/prnews/070216/nyf106.html?.v=33
PR Newswire - Press Release
Compass Partners Announces the Closing of USA Capital Mortgage Deal
02.16.07, 3:50 PM ET

Compass Partners closes deal on significant Las Vegas non-casino real estate property LAS VEGAS.

Feb. 16 /PRNewswire/ -- NYC's private equity based. Compass Partners (http://www.compass-partners.net). announced today they have closed the deal on a non-casino real estate investment in Nevada. the bankrupt assets of USA Commercial Mortgage Company's (USACM) First Trust Deed Fund. Co-Founder and Partner David Blatt of Compass Partners LLC. a NY based private equity firm, entered the highest and best bid for the USA Commercial Mortgage Company (USACM) at the December 7th U.S. Nevada Bankruptcy auction. The $67 million bid set precedent as a largely significant non-casino real estate project in Las Vegas.

Compass Partners researched the assets, and as a result. when bidding came up for USACM. they grabbed the corporation for $67 million, despite the companies' actual value of more than $150 million. Other bidders could not match up to the research and planning conducted by Compass Partners.

"The process was exciting, and at times, frustrating," explained Blatt. "Yet. the work is just beginning as we set to deal with the investors, the lenders. the loans and the assets attached to them. Compass Partners' strategy is to maintain its relationship with those who put their faith and money in USA Capital."

"Our approach was to provide the highest quality loan servicing experience. and now we are set to do just that." Blatt continued. "Compass Financial Partners. LLC has officially been launched last month, and we expect great opportunities here."

Boris Piskun, Co-Founder and Partner said. "We intend to stabilize the affairs of USACM and restore the borrower and investor relationships for Compass' future goals."

About Compass Partners
Compass Partners is a private equity firm that acquires and services distressed mortgage loans. The company seeks to deploy over $100 million annually to acquire companies and assets involving such mortgage loans. Compass Partner's analysis of any investment opportunity is underpinned by rigorous due diligence and a focus on value. The company has a full-time dedicated team responsible for monitoring the strategic. operational. and financial performance of its portfolio investments. It is this disciplined, value-oriented approach that serves investors well. even in a distressed environment over the holding period of an investment.

Press Contact: 5W Public Relations
Alyssa Miller: 212.584.4290 / Alison Crisci: 212.584.4305
amiller@5wpr.com / acrisci@5wpr.com
SOURCE Compass Partners -0- 02/16/2007 /CONTACT: Alyssa Miller, +1-212-584-4290.
amiller@5wpr.com. or Alison Crisci. +1-212-584-4305, acrisci@5wpr.com, both of 5W Public Relations,
for Compass Partners/ /Web site: http://www.compass-partners.net / CO: Compass Partners: USA
Commercial Mortgage Company ST: Nevada IN: FIN RLT CNO SU: RLE RM -- NYF106 -- 9481
02/16/2007 15:48 EST http://www.prnewswire.com
Copyright © 2004 PR Newswire All rights reserved.

# EXHIBIT B

## LOAN SERVICING AGREEMENT

This Loan Servicing Agreement ("Agreement") is made as of the _____9ᵗʰ_____ day of ____NoVEmBEr____ , 2004, between USA Commercial Mortgage Company ("USA") and _Patrick F. Fenlon and Angela B. Fenlon, husband and wife as joint tenants with the rights of survivorship_ ("Lender")

RECITALS

A.     USA is a mortgage broker and loan servicer in Clark County, Nevada.

B.     Lender lends, or wishes to lend, money to various borrowers (the term "Borrower" includes single and married persons, corporations, trusts, partnerships and all other legal entities) from time to time, which loans are arranged by USA and are secured by interests in real and/or personal property.

C.     Lender wishes to retain the services of USA in connection with making and servicing a loan or loans ("Loan" or "Loans" as the context requires), including all Loans heretofore or hereafter placed by Lender through USA, all upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     _Services in Connection with Arranging the Loans._ USA will perform the following services in connection with arranging each Loan:

(a)     Obtain a promissory note or notes secured by the trust deed referred to in Section 1(b) below, executed by Borrower in a form customarily used by USA and approved by USA's counsel.

(b)     Obtain a deed of trust, assignment of rents and security agreement executed by Borrower in form customarily used by USA and approved by USA's counsel, and cause the same to be properly recorded.

(c)     Obtain one or more personal or corporate guaranties, if applicable and as determined by USA to be necessary, executed by such guarantors, as USA shall deem appropriate, in form customarily used by USA.

(d)     If USA deems it appropriate or necessary, obtain, at Borrower's expense, an appraisal of the property to be encumbered, prepared and executed by an appraiser reasonably satisfactory to USA.

(e)     Obtain from a reputable title insurance company, at Borrower's expense, a fully-paid ALTA lender's policy of title insurance, showing Lender as an insured, in an amount at least equal to the initial principal amount of the note and showing as exceptions only those items approved by USA and its counsel.

v.1 Rev. 8/04                              1

(f)    Cause the Borrower to obtain, where applicable, casualty insurance policies in amounts at least equal to the principal amount of the note or the full insurable value of the improvements on the encumbered real property, whichever is less, containing a mortgage or loss payee clause naming Lender, or USA (as agent for Lender), as an additional insured or loss payee

(g)    Obtain from the Borrower and each guarantor such recent financial statements and information as USA shall deem appropriate.

(h)    Obtain, with respect to any and all encumbrances of record to which Lender's deed of trust will be subject, documentation verifying the principal balance thereof within a reasonable time prior to the making of the Loan and specifying any then existing defaults thereunder.

(i)    Obtain such other documents in connection with the Loan, as USA may deem appropriate in order to protect the Lender's interest

(j)    All documents which USA obtains from borrower in connection with arranging or servicing any Loan, so long as such Loan is outstanding, shall be kept on file in USA's corporate office and be available to Lender upon request.    Notwithstanding the foregoing, USA shall have no obligation or responsibility to obtain any original documents in connection with any Loan serviced by USA, but not arranged or originated by USA.

(k)    Prepare and deliver to escrow closing instructions to effectuate the Loan closing in accordance with the Loan Agreement and the Fee Agreement.

2.    Services of USA in Connection with Servicing the Loans.    Subject to and in accordance with the terms and conditions set forth in this Agreement, and all applicable laws, Lender instructs and authorizes USA to, and USA will perform the following services in connection with servicing each of the Loans:

(a)    Verify, where applicable, that the property encumbered by Lender's deed of trust is insured (at the Borrower's expense) by a sufficient casualty insurance policy and that Borrower has sufficient liability insurance coverage.  USA will hold for the Lender's account such policies and renewals thereof

(b)    Keep appropriate accounting records on each note and the sums collected thereon, which records will reflect the amounts collected as to principal, interest and late charges, and, if applicable, insurance, taxes and other specified amounts.  Those records will be available for review by the Lender during regular business hours at USA's corporate office.

(c)    Until the total amount due under each note is paid in full:

(i)    Proceed diligently to collect all payments due under the terms of the note and promptly pay the proper parties, when and if due, principal, interest, late charges, insurance and other specified funds

(ii)    In the event the Borrower fails to make any payment to USA as required by the terms of the note, USA will take steps to collect the payment including

but not limited to delivering default notices, commencing and pursuing foreclosure procedures, and obtaining representation for Lender in litigation and bankruptcy proceedings as deemed necessary or appropriate by USA in its business judgment to fully protect the interests of the Lender, and of all Lenders in the loan.

(iii)    In its sole discretion, USA may pay off any Lender at any time by paying the then outstanding balance of Lender's interest in the principal of the Loan, plus all accrued interest and any prepayment penalty or fee, if applicable. Any Lender so paid off shall concurrently execute and deliver therewith to USA an assignment, in a form acceptable to USA, of all of such Lender's right, title, and interest in the Loan (including all documents evidencing the Loan) and in the deed of trust securing the Loan.

(iv)    In its sole discretion, USA may waive late payment charges, assumption fees, charges for returned checks due to insufficient funds, or other fees which may be collected in the ordinary course of servicing the Loans.

(d)    Provide the Lender with regular statements regarding loan collections, but in no event less frequently than quarterly.

(e)    Without limiting the generality of anything contained herein, Lender hereby authorizes and empowers USA, on Lender's behalf, to: (1) execute and deliver demands for payoff and beneficiary's / lender's statements of condition and the like; (2) execute and deliver any and all instruments if satisfaction or cancellation, or of partial or full release, discharge, or reconveyance, or authorizations in connection therewith, with respect to any Loans paid in full and with respect to the related real or personal property securing such Loans; (3) execute and deliver any and all other documents with respect to any Loans that are customary and consistent with loan servicing practices pertaining to such loans; (4) consent to modifications of the Loans if the effect of any such modification will not materially or adversely affect the security provided by the real or personal property in connection therewith; (5) institute foreclosure proceedings (judicial or non-judicial), obtain a deed-in-lieu thereof, engage in settlement discussions, and enter into forbearance and other settlement-related agreements (which agreements may contain provisions that release or waive claims against a Borrower or Guarantor); and (6) take title in the name of Lender (in proportion to its interest in the Loan) to any real property upon a foreclosure or delivery of a deed-in-lieu thereof. Notwithstanding the foregoing or any other provision contained herein, USA may not permit any modification to any Loan that would change the interest rate, forgive the payment of any principal or interest (expressly excluding late charges or the difference between default and non-default interest), change the outstanding principal amount, or extend the maturity date, without Lender's prior consent; provided, however, if Lender fails to grant or deny its consent within three (3) business days after notice from USA, Lender shall be deemed to have conclusively given its consent.

3.    **Rights of Lender if USA Fails to Act.**    Pursuant to NAC 645B.073, in the event of default, foreclosure, or other matters that require action, if for any reason USA fails to act on Lender's behalf as authorized herein, then Lender may, with approval of fifty-one percent (51%) or more of all of the holders of the beneficial interest of record in the Loan, act on behalf of all such holders of beneficial interest of record. These actions may include, but are not limited to:

v.1 Rev. 8/04                                3

(a)    the designation of the mortgage broker, servicing agent or other person to act on behalf of the holders of the beneficial interests in the loan; and

(b)    the sale, encumbrance or lease of real property owned by the holders resulting from a foreclosure or the receipt of a deed in lieu of a foreclosure.

4.    Legal Proceedings    USA will assist the Lender in any necessary foreclosure proceedings to protect the Lender's interest in the note and deed of trust. Where necessary, in USA's business judgment, USA may retain attorneys on Lender's behalf  Any legal proceeding instituted by USA pursuant to this Agreement may be pursued in USA's name only or as agent for Lender.  Upon demand by USA, Lender agrees to promptly pay, either in advance or to reimburse USA, for its pro rata portion of the out-of-pocket expenses incurred, including attorney's fees, trustee's fees and foreclosure costs.  In the event that Lender fails to pay such sums to USA upon demand or request thereof, or if USA elects to advance such sums, USA may, in its discretion, advance such fees, including trustee's fees, attorney's fees, and costs of foreclosure; provided, however, that any fees advanced by USA shall be paid back from the proceeds of the foreclosure (whether by reinstatement or sale), or from any other monies collected with respect to such Loan, before any payments are made to Lender.  In the event of any litigation concerning the Loan, Lender hereby appoints USA as its agent to accept service of any summons and complaint, naming Lender as a party.

5.    Compensation to USA for Loan Servicing    Lender authorizes USA to retain monthly, as compensation for services performed hereunder, (a) one-twelfth (1/12th) of its annual servicing fee, which shall not exceed three percent (3%) per annum of the maximum principal amount of each of the Loans, (b) any late charges collected from the Borrower pursuant to the terms of the Note, and (c) all default interest collected from the Borrower pursuant to the terms of the Note.  Notwithstanding the foregoing, it is agreed and acknowledged that USA derives the bulk of its revenues from charging loan fees ("points") to the Borrower.  Certain Borrowers, however, may prefer to pay a higher rate of interest in exchange for a reduction in loan fees payable in advance to USA, the higher interest rate comprising a deferred loan fee  USA will notify Lender when such a case arises, and advise Lender of what portion of the interest is payable to USA as a deferred loan fee.

Should Lender desire to sell all or any part of its interest in the note and deed of trust, USA will assist Lender in finding potential buyers and completing the necessary documentation for the transaction. A fee of 5% of the remaining balance of Lender's undivided interest in the note amount will be deducted from the selling price and paid to USA on all such assignments for which USA locates the Assignee.

In the event an extension of a Loan is negotiated, USA shall be entitled to charge a fee therefor from the Borrower pursuant any separate fee agreement between USA and the Borrower.

6.    USA's Right to Delegate.    Notwithstanding anything contained herein, USA may in its sole discretion delegate specific loan arranging and servicing obligations to credit bureaus, real estate tax service companies, real estate brokers or agents, appraisers, attorneys, trustees, or others, provided that USA shall remain responsible for all action taken or not taken by such companies, agents, representatives, and others throughout the term of this Agreement

7    No Legal Advice    Lender acknowledges that USA will not act as Lender's attorney or provide legal advice to Lender, and that Lender is encouraged to seek independent counsel in connection with any

v.1 Rev. 8/04                                              4

questions Lender may have concerning this agreement, any Loan, USA's form loan documents, or any other matter

8.    Termination. Lender may, by 30 days written notice to USA, terminate this agreement, and the power of attorney granted, if one is granted, under Section 11 of this Agreement, if USA fails to perform its obligations hereunder.

9    Lender's Registration.  Lender(s) name as listed in the first paragraph of this Agreement is the exact form for registration of Lender's interest and for reference to Lender in the Loan Documents.

10.    Integration Clause.  This Agreement contains the entire agreement between the parties hereto and cannot be modified except by a written amendment signed by both parties. The invalidity of any portion of this agreement shall in no way affect the balance thereof.  This Agreement shall remain in effect until Lender's interest in all notes and deeds of trust with respect to Loans arranged and/or serviced by USA is completely liquidated (unless sooner terminated in accordance with the terms hereof)

11.    Limited Power of Attorney.  With respect to each loan, Lender hereby agrees that USA shall have full power and authority, and Lender hereby appoints USA as its true and lawful attorney-in-fact to (a) hold the original note(s), and (b) to do all things and take all actions on behalf of Lender which are necessary or convenient to effectuate this Agreement and its intent and to protect Lender's interest under any note, deed of trust, guaranty, security agreement or other document pertaining to any Loan   Upon USA's request, Lender hereby agrees to execute and deliver, in the presence of a notary public, a "Declaration of Agency and Limited Power of Attorney", in a form consistent with Chapter 645B of the Nevada Revised Statutes, pursuant to which Lender shall further evidence the appointment of USA as Lender's true and lawful attorney-in-fact to undertake the duties of USA hereunder.  No one shall be required to look beyond such Declaration of Agency and Limited Power of Attorney for evidence of USA's authority hereunder   All Declarations of Agency and Limited Powers of Attorney may include the language: This document may be executed with counterpart signature pages, and the document with all counterpart signature pages shall constitute one and the same instrument.

12 Notices.  All notices, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been given (i) when personally delivered, or (ii) on receipt, when deposited with a recognized overnight courier service such as Federal Express or DHL, or (iii) three (3) business days after the date when deposited in the United States mail and sent postage prepaid by registered or certified mail, return receipt requested, addressed as follows:

       If to USA:       USA Commercial Mortgage Company
                      4484 S. Pecos Road
                      Las Vegas, Nevada 89121-5030
                      Attention:

       If to Lender:

                      Attention:

v.1 Rev. 8/04                5

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice

13.    Governing Law.  This Agreement shall be construed in accordance with the laws of the State of Nevada, without regard to the conflict of laws or rules thereof, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws,

14    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

15.    Attorney's Fees.  In the event any party hereto brings an action to enforce any of the provisions of this Agreement, the party against whom judgment is rendered in such action shall be liable to the other for reimbursement of its costs, expenses and attorneys' fees, including such costs, expenses and fees as may be incurred on appeal,

16.    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors and assigns.

17.    Headings.  Sections headings used in this Agreement are for convenience only and shall not affect the meaning or interpretation of this Agreement.

18    Authority.  Each party represents and warrants to the other party that it is duly authorized to execute, deliver and perform this Agreement

IN WITNESS WHEREOF, the parties hereto have signed, sealed, acknowledged and delivered this instrument the day and year first above written

LENDER: Patrick F. Fenlon and Angela B. Fenlon, husband and wife as joint tenants with the rights of survivorship

By: _____
Name: Patrick F. Fenlon
Title:  Husband

By: _____
Name: Angela B. Fenlon
Title:  Wife

USA COMMERCIAL MORTGAGE COMPANY

By: _____
Joseph D. Milanowski, President

v.1 Rev 8/04                                        6

# EXHIBIT C

-----Original Message-----
**From:** Smith, Susan Marie [mailto:smsmith@mesirowfinancial.com]
**Sent:** Monday, March 26, 2007 2:14 PM
**To:** saugust@sierrafunds.com
**Cc:** Koe, Robert
**Subject:** USA Capital Servicing Fees


Scott,  the accrued and unpaid service fee for Placer Vineyards is $462.6K, and Placer 2 is $72.5K

Susan M. Smith
Senior Vice President
Mesirow Financial Consulting

2 S. Biscayne Blvd., Suite 1800
Miami, FL  33131

o:  305-416-3313
c:  305-968-9007
e: smsmith@mesirowfinancial.com

# EXHIBIT D

-----Original Message-----
**From:** Koe, Robert [mailto:rkoe@mesirowfinancial.com]
**Sent:** Friday, March 23, 2007 10:46 AM
**To:** saugust@sierrafunds.com
**Subject:** FW: Placer Vineyards - payoff

---

**From:**  Steele, Sarah
**Sent:**  Friday, March 23, 2007 1:16 PM
**To:**    Koe, Robert
**Subject:**    Placer Vineyards - payoff

Hi Bob -

I received your message and have attached the payoff summary I prepared and sent a couple of days ago.  Let me know if you need me to update it or if you have any questions about it.

<<Placer and Placer 2nd Payoffs (3.21.07).xls>>

Thanks -

Sarah M. Steele
**Mesirow Financial Consulting**
Vice President

2828 Routh Street, Suite 650
Dallas, TX 75201

o:  214-954-1453
c:  817-706-7852
e: ssteele@mesirowfinancial.com

As of 3/21/07
Maturity Date                        Dec-05

**Placer Vineyards**

Principal                31,500,000.00

Regular Interest         5,873,461.97

Default Interest         3,544,274.38

Late Fees                201,812.87
Other Fees                                  -
                         _____

**Total**               **41,119,549.22**


Per Diem (Regular)       12,882.96

Per Diem (Default)       7,729.77

**Placer Vineyards
2nd**

Principal                6,500,000.00

Regular Interest         1,509,722.39

Default Interest         379,657.93

Late Fees                54,305.03
Other Fees                                  -
                         _____

**Total**               **8,443,685.34**


Per Diem (Regular)       3,526.96
Per Diem (Default)        881.74



                         49,563,234.56

# EXHIBIT E

# EXCERPT TAKEN FROM THE DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENTS AND FIXTURE FILING FOR THE PLACER VINEYARDS SENIOR NOTE

*Recorded in Placer County, CA on 12/20/04*

    1.16   Advances.  If Trustor shall fail to perform any of the covenants herein contained or contained in any other Loan Document, the Beneficiary may, but is not obligated to, pay any and all amounts necessary to perform same or cause same to be performed on behalf of Trustor, and all sums so expended by Beneficiary for payment of any item whatsoever, including, but not by limiting the generality of the foregoing, payment of taxes, insurance premiums, lien claimants or assessments shall be secured by this Deed of Trust and each such payment shall be and all such payments shall be collectively referred to herein as an "Advance."  The Trustor shall repay to Beneficiary on demand each and every Advance and the sum of each such Advance shall accrue interest at the Default Rate, as that term is defined in the Note, from the date of each Advance until repaid to Beneficiary.  Nothing herein contained, including the payment of such amount or amounts by Beneficiary, shall prevent any such failure to perform on the part of Trustor from constituting an Event of Default as defined herein.  Any such advance shall be deemed made under an obligation to do so.

# EXHIBIT F

-----Original Message-----
From: Robert Coldren [mailto:rcoldren@hkclaw.com]
Sent: Friday, March 30, 2007 10:56 AM
To: Geoffrey Berman; Douglas Monson; Scott August; Charles, Robert;
jriley@sierrafunds.com; mgatti@wildelaw.com
Cc: tyson.lomazow@weil.com; Koe, Robert; Smith, Susan Marie; Annette Jarvis;
Steven Strong; Kevin Glade
Subject: RE: Placer Vineyards

Thanks--I understand you work for the liquidating trustee, and we appreciate the
response

-----Original Message-----
From: Geoffrey Berman [mailto:gberman@dsi.biz]
Sent: Friday, March 30, 2007 11:36 AM
To: Robert Coldren; Douglas Monson; Scott August; Charles, Robert;
jriley@sierrafunds.com; mgatti@wildelaw.com
Cc: tyson.lomazow@weil.com; Koe, Robert; Smith, Susan Marie; Annette Jarvis;
Steven Strong; Kevin Glade
Subject: RE: Placer Vineyards

Gentlemen:

I can not make that representation. You know what I know, no more.

Geoff

---

From: Robert Coldren [mailto:rcoldren@hkclaw.com]
Sent: Fri 3/30/2007 11:30 AM
To: Douglas Monson; Geoffrey Berman; Scott August; Charles, Robert;
jriley@sierrafunds.com; mgatti@wildelaw.com
Cc: tyson.lomazow@weil.com; Koe, Robert; Smith, Susan Marie; Annette Jarvis;
Steven Strong; Kevin Glade
Subject: RE: Placer Vineyards

So are we correct in concluding from both of your responses that compass and the
debtor had no involvement whatsoever, direct or indirect, in the funding of the
tax payment?

-----Original Message-----
From: Douglas Monson [mailto:dmonson@RQN.COM]
Sent: Friday, March 30, 2007 10:36 AM
To: Geoffrey Berman; Scott August; Charles, Robert; Robert Coldren;
jriley@sierrafunds.com; mgatti@wildelaw.com
Cc: tyson.lomazow@weil.com; Koe, Robert; Smith, Susan Marie; Annette Jarvis;
Steven Strong; Kevin Glade
Subject: RE: Placer Vineyards

Mr. August:  When I contacted the Placer County Treasurer's office on Wednesday
about the tax payments, they were not able to tell me at that time who had made
the payments.  I just called the Treasurer's office again this morning.  The
checks that come in for payment of taxes are imaged by the Treasurer's office so
that they can keep a record of who makes a tax payment, but their computers were
down yesterday, and I was told that the image of the check for these tax payments
would not be available until Monday or Tuesday of next week.  If you would like to

check yourself on Monday or Tuesday, the phone number is 530-889-4120, and the Parcel Numbers are 023-200-010-000, 023-200,012-000, and 023-200-013-510.  The Debtor did not make these tax payments.

Doug Monson

Douglas M. Monson
Ray Quinney & Nebeker P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Direct: 801-323-3345
Fax: 801-532-7543
www.rqn.com

IRS Rules of Practice require us to inform you that advice, if any, in this email (including any attachments) concerning federal tax matters is not intended to be used, and cannot be used or relied upon for the purpose of avoiding penalties under the Internal Revenue Code, nor for promoting, marketing or recommending any transaction or matter addressed herein.

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

-----Original Message-----
From: Geoffrey Berman [mailto:gberman@dsi.biz]
Sent: Friday, March 30, 2007 11:27 AM
To: Scott August; Charles, Robert; rcoldren@hkclaw.com; jriley@sierrafunds.com; mgatti@wildelaw.com
Cc: Douglas Monson; tyson.lomazow@weil.com
Subject: RE: Placer Vineyards

Mr. August:

We are advised that the funds came from Mr. Milanowski through a distribution from another LLC in which he and/or USAIP was involved.

Geoff Berman

_____

From: Scott August [mailto:saugust@sierrafunds.com]
Sent: Fri 3/30/2007 11:12 AM
To: 'Charles, Robert'; rcoldren@hkclaw.com; jriley@sierrafunds.com; mgatti@wildelaw.com
Cc: Geoffrey Berman; 'Monson, Douglas'; tyson.lomazow@weil.com
Subject: RE: Placer Vineyards

Our counsel has suggested we contact you regarding the source of payment on the taxes.  Counsel has informed us that as a bidder we have a right to know who paid the taxes.

Specifically did the Debtor or Compass fund the taxes?  Or do the Debtor or Compass know anything about anyone that had anything to do with the payment?

If we do not get a clear answer on this, this may be another issue that we may need to ask Judge Riegle for clarity on.

Thank you.

Regards,

Scott D. August, CFA
Sierra Liquidity Fund, LLC
2699 White Road, Ste. 255
Irvine, CA 92614
PH:  949-660-1144, ext. 17
Cell:  310-529-2447
Fax: 949-660-0632
Email:  saugust@sierrafunds.com
www.sierrafunds.com

-----Original Message-----
From: Charles, Robert [mailto:RCharles@lrlaw.com]
Sent: Thursday, March 29, 2007 10:59 AM
To: kluu@suncal.com; dkirby@kirbymac.com; dcooney@silverpointcapital.com;
bankruptcy@rocgd.com; saugust@sierrafunds.com; jriley@sierrafunds.com;
rcoldren@hkclaw.com; mark@nevadainvestors.com
Cc: Berman, Geoff; Sorenson, Matthew; Monson, Douglas
Subject: FW: Placer Vineyards

You have expressed interest in the Placer Vineyards loan servicing rights.  I
enclose information obtained by RQN indicating that a portion of the back taxes
have been paid, apparently by or on behalf of Mr. Milanowski for the owner.  We do
not know if the bill from the ownership group for legal, engineering and other
costs was paid or not.

Rob

---

From: Douglas Monson [mailto:dmonson@RQN.COM]
Sent: Thursday, March 29, 2007 10:59 AM
To: dturetsky@reedsmith.com; Karides, Constantine; tyson.lomazow@weil.com
Cc: Koe, Robert; Charles, Robert; Annette Jarvis; Steven Strong; Kevin Glade;
Berman, Geoff
Subject: FW: Placer Vineyards

Dear Debra, Constantine, and Tyson:

Pursuant to Debra's e-mail to me earlier this morning, and to update Tyson, I have
attached some information that I gathered yesterday on the current status of the
real property taxes on the Placer Vineyards Project.  I have tried to find some
updated information from the Placer County Treasurer's website this morning to
determine if there were any additional payments that have been posted to the
$297,107.88 in Default Taxes that were still owing as of yesterday, but the tax
payment inquiry feature of the website was not functioning this morning.  Bob Koe
was told that $380,000 was paid towards the taxes rather than the $353,765.38 that
was posted yesterday, but I have not yet been able to verify that actually
occurred.

Doug Monson

Douglas M. Monson
Ray Quinney & Nebeker P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Direct: 801-323-3345
Fax: 801-532-7543
www.rqn.com <http://www.rqn.com/>

IRS Rules of Practice require us to inform you that advice, if any, in this email (including any attachments) concerning federal tax matters is not intended to be used, and cannot be used or relied upon for the purpose of avoiding penalties under the Internal Revenue Code, nor for promoting, marketing or recommending any transaction or matter addressed herein.

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

---

From: Douglas Monson
Sent: Wednesday, March 28, 2007 5:31 PM
To: 'Charles, Robert'; Koe, Robert
Cc: Berman, Geoff; Annette Jarvis; Steven Strong; Kevin Glade
Subject: RE: Placer Vineyards

Rob:  I checked the public records for the Placer County Treasurer this afternoon, and I also called and spoke to an Assistant Treasurer in that office.  There are 3 parcels involved, 023-200-010-000, 023-200-012-000, and 023-200-013-510.  The Current Taxes (2006 Taxes) for all 3 parcels were paid today and were posted as paid this afternoon, including both the Late 1st Installments for all 3 parcels that were late on 12/10/06, and the Due 2nd Installments for all 3 parcels that were due on 2/1/07, and would have been late on 4/10/07. The total amount of 2006 Current Taxes on all 3 parcels that was paid today was $353,765.38.

The Default Taxes (taxes owing from prior years) on all 3 parcels are still showing as unpaid, as indicated on the attached taxroll inquiries I printed off of the Treasurer's website.  The total amount of the Default Taxes for all 3 parcels is $297,107.88 ($50,953.67 for Parcel No. 023-200-010-000, $112,409.61 for Parcel No. 023-200-012-000, and $133,744.60 for Parcel No. 023-200-013-510).

The Assistant Treasurer that I spoke to asked if anyone in her office knew who had paid the Current Taxes.  No one knew that information.  The Assistant Treasurer also said that it is possible that there could have been another check(s) for the Default Taxes that had not yet been posted.  She suggested that I check back, which I will do tomorrow.

Doug Monson

Douglas M. Monson
Ray Quinney & Nebeker P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Direct: 801-323-3345
Fax: 801-532-7543
www.rqn.com <http://www.rqn.com/>

IRS Rules of Practice require us to inform you that advice, if any, in this email (including any attachments) concerning federal tax matters is not intended to be used, and cannot be used or relied upon for the purpose of avoiding penalties under the Internal Revenue Code, nor for promoting, marketing or recommending any transaction or matter addressed herein.

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

----
For more information about Lewis and Roca LLP, please go to www.lewisandroca.com
<http://www.lewisandroca.com/> .

Phoenix (602) 262-5311
Tucson (520) 622-2090
Las Vegas (702) 949-8200
Reno (775) 770-2600
Albuquerque (505) 764-5400

This message is intended only for the use of the individual or entity to which it
is addressed. If the reader of this message is not the intended recipient, or the
employee or agent responsible for delivering the message to the intended
recipient, you are hereby notified that any dissemination, distribution or copying
of this message is strictly prohibited. If you have received this communication in
error, please notify us immediately by replying to the sender of this E-Mail by
return E-Mail or by telephone.

In accordance with Internal Revenue Service Circular 230, we advise you that if
this email contains any tax advice, such tax advice was not intended or written to
be used, and it cannot be used, by any taxpayer for the purpose of avoiding
penalties that may be imposed on the taxpayer.


This message is intended for the person to whom it was addressed. If you have
received this message in error please return it to sender. In addition, please be
aware that this message is from an employee of the law firm of Hart King & Coldren
("the Firm") sent using the Firm's e-mail system and computer equipment. You are
hereby advised that all such e-mail belong to the Firm and that the Firm's e-mail
and internet policy states that any electronic mail being received from or sent to
any employee of the Firm using the Firm's e-mail system may be monitored by
someone other than the recipient and that each employee of the Firm has
acknowledged a "no confidentiality and privacy" waiver for such e-mail in this
regard.

# **Exhibit G**

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 • Fax: (702) 892-0122

1   Annette W. Jarvis. Utah Bar No. 1649
    Steven C. Strong, Utah Bar No. 6340
2   RAY QUINNEY & NEBEKER P.C.
    36 South State Street. Suite 1400
3   P.O. Box 45385
    Salt Lake City. Utah 84145-0385
4   Telephone: (801) 532-1500
    Facsimile: (801) 532-7543
5   Email: ajarvis@rqn.com
6
7   Lenard E. Schwartzer. Nevada Bar No. 0399
    Jeanette E. McPherson, Nevada Bar No. 5423
8   SCHWARTZER & MCPHERSON LAW FIRM
    2850 South Jones Boulevard, Suite 1
9   Las Vegas. Nevada  89146-5308
    Telephone:  (702) 228-7590
10  Facsimile:  (702) 892-0122
    E-Mail:  bkfilings@s-mlaw.com
11
12  Attorneys for Debtors and Debtors-in-Possession

E-FILED ON MARCH 29, 2007

13              UNITED STATES BANKRUPTCY COURT
14                    DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY.<br>                                        Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC.<br>                                        Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR<br><br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>                                        Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND. LLC.<br>                                        Debtor. | **OBJECTION OF USA<br>COMMERCIAL MORTGAGE<br>COMPANY TO THE<br>ADMINISTRATIVE EXPENSE<br>CLAIM OF SIERRA LIQUIDITY<br>FUND, LLC** |
| In re:<br>USA SECURITIES, LLC,<br>                                        Debtor. | |
| Affects:<br>☐  All Debtors<br>☒  USA Commercial Mortgage Company<br>☐  USA Securities, LLC<br>☐  USA Capital Realty Advisors. LLC<br>☐  USA Capital Diversified Trust Deed Fund. LLC<br>☐  USA First Trust Deed Fund. LLC | **(Affects USA Commercial Mortgage<br>Company)**<br><br><br>Hearing Date: April 26. 2007<br>Hearing Time: 9:30 a.m. |

1

1   USA Commercial Mortgage Company ("USACM"), by and through its counsel, hereby

2   files its Objection to the Administrative Expense Claim of Sierra Liquidity Fund, LLC

3   ("Objection") and moves this Court, pursuant to section 502 of title 11 of the United States Code

4   (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the

5   "Bankruptcy Rules"), for an order granting the relief sought by this Objection.

6                          **I.    FACTUAL BACKGROUND**

7        1.    On April 13, 2006 ("Petition Date"), USACM, USA Securities, LLC ("USA

8   Securities"), USA Capital Realty Advisors, LLC ("USA Realty"), USA Capital Diversified Trust

9   Deed Fund, LLC ("DTDF"), USA Capital First Trust Deed Fund, LLC ("FTDF" and together with

10  DTDF , the "Funds") (collectively the "Debtors"), filed voluntary petitions for relief under chapter

11  11 of the Bankruptcy Code.  From the Petition Date through March 12, 2007 (the "Effective

12  Date"), the Debtors continued to operate their businesses, if any, as debtors-in-possession pursuant

13  to sections 1107(a) and 1108 of the Bankruptcy Code.  Post-petition management of the Debtors

14  was under the direction of Thomas J. Allison of Mesirow Financial Interim Management, LLC

15  ("Mesirow"), who served as the Chief Restructuring Officer.

16       2.    USACM is a Nevada Corporation that, prior to the Petition Date, was in the

17  business of underwriting, originating, brokering, funding and servicing commercial loans

18  primarily secured by real estate, both on behalf of investors and for its own account.

19       3.    This business included the solicitation of individual investors to purchase fractional

20  interest in loans that USACM originated and then serviced.  These investors, totaling

21  approximately 3,600 as of the Petition Date, are referred to as "Direct Lenders" in USACM's

22  bankruptcy case and in this Objection.

23       4.    Although USACM serviced and sometimes originated the loans in which the Direct

24  Lenders invested, USACM was not a borrower on these loans.

25       5.    Beginning in Summer 2006, USACM's post-management began sending investor

26  statements to Direct Lenders that indicated, among other things, whether the loans in which they

27  had invested were performing.

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

2

6.    On October 19. 2006. USACM filed with the Court a copy of the Asset Purchase Agreement among the Debtors and SPCP Group. LLC (the "Silver Point APA") [Docket No. 1603]. Attached to the Silver Point APA is a schedule listing the status as of July 31. 2006. of most of the loans USACM serviced as performing or non-performing.

7.    Pursuant to Section 2.2(b) of the Silver Point APA. parties in interest were on notice that USACM intended to transfer the servicing of the loans to a different entity.

8.    On December 7. 2006, an auction was held whereby Compass Partners LLC ("Compass") agreed to purchase, among other things, most of USACM's assets.

9.    On December 18. 2006, USACM filed with the Court a copy of its Asset Purchase Agreement with Compass (the "Compass APA") [Docket No. 2164]. Attached to the Compass APA was a schedule listing the status as of July 31, 2006. of most of the loans USACM serviced as performing or non-performing.

10.    Section 2.3(i) of the Compass APA further stated that the purchase price for USACM's assets would be "reduced dollar for dollar by the amount of any payoff or reduction of [USACM's assets] from [December 7. 2007] to the Closing Date." Therefore. USACM was obligated to obtain approval from Compass before commencing any foreclosures.

11.    On January 8. 2007. this Court entered its Order Confirming the "Debtors' Third Amended Joint Chapter 11 Plan of Reorganization" [Docket No. 2376].

12.    Debtors' Third Amended Chapter 11 Plan of Reorganization (the "Plan") [Docket No. 1799] provides the following deadlines for objections to Claims:

(A) for any and all Claims and Equity Interests to which the General Bar Date applies. ninety (90) days after the Effective Date; (B) for any and all Claims to which the Administrative Claims Bar Date or the Professionals Administrative Bar Date applies. thirty (30) days after the expiration of the respective Bar Date: and (C) for any and all Claims to which the Bar Date applicable under section B.3 of Art. V of the Plan applies. thirty (30) days after the expiration of that Bar Date.

13.    Under the Plan, the USACM Liquidating Trust exists as of the Effective Date. which was March 12. 2007. Geoffrey L. Berman is the Trustee.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

3

14.    On March 14, 2007. Sierra Liquidity Fund. LLC ("Sierra") filed an administrative expense claim and a request for payment thereof (the "Claim") [Docket No. 3088]. Sierra did not assert a specific amount that it seeks to have paid as an administrative expense. but it appears the Claim is in excess of $660.000.

15.    Sierra asserts that it is the assignee of various interests in nine separate loans serviced by USACM (the "Loans"). which interests it received from former Direct Lenders. According to Exhibit "A" attached to its Claim. these interests were allegedly assigned to Sierra beginning on November 20. 2006. after USACM had filed with the Court the Silver Point APA, and continuing into March 2007.

16.    For the reasons discussed below, USACM objects to Sierra's Claim and asserts that it should be disallowed in its entirety.

## II.    ARGUMENT

Section 503 of the Bankruptcy Code permits entities to file a request for payment of administrative expenses. *See* 11 U.S.C. § 503(a). Such an expense is allowed only after a notice and a hearing. *See* § 503(b). A claim filed for an administrative expense. "unlike a proof claim is not deemed allowed in the absence of an objection and does not constitute prima facie evidence of the validity and amount of the request." *In re Silvus*, 329 B.R. 193, 205 (Bankr. E.D. Va. 2005) (internal quotations omitted); *see also Fullmer v. United States (In re Fullmer)*, 962 F.2d 1463, 1467 (10th Cir. 1992) (no presumption for administrative expense claims). Therefore, a claimant seeking the payment of an administrative expense enjoys no presumption of validity and bears the burden at all times of proving an entitlement to payment as an administrative expense.

USACM objects to Sierra's Claim and asserts that it should be disallowed in its entirety. The Claim. which is based on unsupported allegations of breaches the occurrence of which USACM denies, has been waived and superseded by the Plan. Furthermore, Sierra has presented no evidence in support of its alleged damages. Therefore. Sierra has not met its burden of showing that it is entitled to payment of its claim as an administrative expense, and the Court should disallow its Claim entirely.

A.    **The Direct Lenders Waived All Claims Against USACM Under the Plan**

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

4

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    The confirmed Plan resolved various Claims among the Debtors and third-parties including

2    the Direct Lenders.  As part of these compromises confirmed in the Plan, USACM and the Direct

3    Lenders mutually released each other as of the Effective Date from any and all Claims, with a few

4    exceptions not relevant to this Objection.  Specifically, the Plan broadly states in Article VIII,

5    Section A(4) (page 76) that:

6       *As of the Effective Date*, in consideration for the obligations, subordination, modifications
        of rights and accommodations of [USACM] and except as otherwise expressly provided
7       under the Plan, *the Direct Lenders*, pursuant to the settlements embodied in the Plan, on
        their own behalf  (the "Direct Lender Releasors"), *shall be deemed to forever release,*
8       *waive and discharge any and all Claims*, demands, debts, liabilities, obligations, actions,
        causes of action, suits, sums of money, accounts, reckonings, covenants, contracts,
9       controversies, agreements, promises and rights whatsoever, *whenever arising*, whether
        known or unknown, suspected or unsuspected, contingent or fixed, liquidated or
10      unliquidated, matured or unmatured, in law, equity, bankruptcy or otherwise, based upon,
        arising out of, relating to, by reason of, or in connection with, in whole or in part, any act
11      or omission, transaction, occurrence, fact or matter from the beginning of time to the
        Effective Date, including, without limitation, *in any way relating to [USACM]*, the
12      [USACM estate], the USACM and FTDF Chapter 11 Cases, including any causes of
        action, or any other matter which any of the Direct Lender Releasors *or any Person or*
13      *Entity claiming by, from, through, or under any of the Direct Lender Releasors* ever had,
        now has, or hereafter can, shall, or may have against [USACM].
14

15

16    (emphasis added).

17    As stated, Sierra asserts that it is the assignor of various interests that it received from

18    former Direct Lenders.  Thus Sierra is claiming an administrative expense "by, from, through, or

19    under any of the Direct Lender Releasors."  The Order confirming the Plan stated in paragraph 8

20    that the "provisions of the Plan and this Confirmation Order shall bind . . . (f) all Direct Lenders. .

21    . ."  Furthermore, the Order stated in paragraph 64 that "[a]s set forth in Article VIII, Section A. of

22    the Plan, the limitation of liability and release provisions shall be effective and binding upon all

23    applicable Persons and entities to the fullest extent provided in the Plan."  These provisions mean

24    that Sierra's Claim, like all Direct Lender Claims (except as expressly provided in the Plan), has

25    been "forever release[d], waive[d], and discharge[d]" against USACM.  Therefore, the Court

26    should disallow Sierra's Claim in its entirety.

27    / / /

28    / / /

5

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**B.    USACM Appropriately Exercised its Business Judgment in Not Foreclosing on Non-Performing Loans**

Furthermore, in addition to the fact that the Claim was waived and released pursuant to the Plan, USACM has not breached the Loan Servicing Agreements. Sierra asserts that it has been damaged because USACM did not initiate foreclosure proceedings for its Loans. Specifically, Sierra states that USACM "failed to send notices of foreclosure, to commence or pursue foreclosure proceedings, or take such other action as required, thus breaching its duty to Sierra." Sierra erroneously assumes that foreclosure is the only way to service a loan, which is simply not the case.

Sierra's allegation that the Loan Servicing Agreement requires USACM to foreclose on a non-performing loan is inaccurate and contrary to the express language of the Loan Servicing Agreement. Section 2(c)(ii) of the Loan Servicing Agreement states that USACM will take steps necessary to collect payments, including pursuing foreclosure procedures, "as deemed necessary or appropriate by [USACM] *in its business judgment*." (emphasis added). Thus the Loan Servicing Agreement expressly leaves the decision of whether to initiate foreclosure proceedings exclusively to USACM's discretion and to be decided in its "business judgment." Nowhere does the Loan Servicing Agreement require USACM to automatically foreclose on every non-performing loan as Sierra has suggested.

The business judgment rule "is a presumption that in making a business decision the directors of a corporation 'acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.'" *Navellier v. Sletten*, 262 F.3d 923, 946 n12 (9th Cir. 2001) (*quoting Smith v. Van Gorkum*, 488 A.2d 858, 872 (Del. 1985)). The business judgment rule has been applied to bankruptcy proceedings as well with the presumption being that the actions were taken "in the best interests of the bankruptcy estate." *Agarwal v. Pomona Valley Med. Group, Inc. (In re Pomona Valley Med. Group, Inc.)*, 476 F.3d 665, 669 (9th Cir. 2007) (adopting the corporate business judgment rule for bankruptcy proceedings).

USACM appropriately exercised its business judgment in choosing to negotiate with the borrowers for the collection of non-performing loans rather than foreclosing on the collateral.

6

USACM's decision to negotiate rather than foreclose was and is entirely reasonable, and in the best interests of the USACM estate particularly in light of the fact that it appears no negotiations or collection activities took place under USACM's pre-petition management. Therefore, post-petition USACM has not committed a breach of the Loan Servicing Agreements by deciding not to pursue foreclose proceedings since USACM's actions were conducted based on its business judgment and were reasonable under the circumstances.

**C.    Sierra Knew Prior to Acquiring its Interests that the Loans were Non-Performing and that USACM Intended to Transfer the Servicing Obligations**

According to Sierra's Exhibit "A," Sierra acquired most of its interests in the Loans after USACM had filed both the Silver Point APA and Compass APA with the Court, and acquired all of its interests in the Loans after USACM had filed the Silver Point APA. All of the Loans that were included among the assets listed in the Silver Point APA and Compass APA were listed as non-performing. In addition, by the time Sierra claims it first acquired its interests in the Loans, USACM's post-petition management had already sent out investor statements indicating which loans were non-performing. Thus Sierra had full knowledge that the Loans were non-performing and that USACM intended to soon transfer the servicing of such loans to Silver Point or a higher bidder in connection with a plan of reorganization. Sierra knew the problems associated with the Loans when it purchased its interests so it is disingenuous for it to now claim that it has suffered any damage. By filing its Claim, Sierra is simply trying to get favorable treatment from the Court at the expense of USACM's general unsecured creditors.

**D.    Sierra is Either Bound by the Loan Servicing Agreements or it has No Relationship with USACM and Can Assert No Claim**

In its Claim, Sierra does not concede that it is a party to the Loan Servicing Agreements related to the non-performing loans at issue. Sierra has maintained that it is not a party to the Loan Servicing Agreements entered into by the Direct Lender's from whom it purchased its loan interests and has consistently refused to sign new Loan Servicing Agreements with USACM.

Sierra contends that if the Loan Servicing Agreements are not binding on it then USACM owes no contractual obligation to Sierra but does have "fiduciary duties to Sierra in purporting to

7

1  act as servicer of the Loans." This allegation is incorrect. If there is no contractual relationship

2  between USACM and Sierra then there is no relationship at all between the two parties and

3  USACM owes Sierra no duty. USACM, as the former loan servicer, had a contractual not a

4  fiduciary relationship with the Direct Lenders, and in any event owed no duty whatsoever to

5  lenders with which it had no contractual relationship. The relationship between Sierra and

6  USACM is either governed by the binding Loan Servicing Agreements or there is no relationship

7  between the parties and Sierra can assert no claim against USACM.

8           **E.    Sierra has Offered No Evidence that it has Suffered any Damage**

9           Sierra argues that its damages arise from a decline in market values on the properties

10  underlying the Loans. Specifically, it speculates without any evidence in support that "[b]ased on

11  general market declines in value and Sierra's knowledge of the specific properties" the value of

12  the properties underlying the non-performing Loans "has declined by at least 25%." Sierra offers

13  no evidence in support of this speculative decline in value. Sierra does not even clarify the time

14  period for which the value of the properties is alleged to have declined so it is impossible to

15  determine if any decrease in value occurred pre- or post-petition. Sierra's use of such vague and

16  unsupported allegations clearly does not meet the burden placed on it to prove its administrative

17  expense claim.

18           Sierra has claimed further damage based solely on its belief that USACM "will seek to

19  recover from any sale proceeds an amount equal to the default interest that the borrower would

20  have been obligated to pay under the terms of the loan had the borrower made payments as

21  required." The Loan Servicing Agreements and other loan documents speak for themselves in this

22  regard. The servicer of the Loans, which is not USACM after the Effective Date, is bound to

23  comply with the provisions of the loan documents and can only collect default interest in

24  accordance with such provisions. By the same token, Sierra, to the extent it is a party to the loan

25  documents, is also bound by the provisions regarding the collection of default interest and cannot

26  seek to absolve itself of its obligations with respect to these provisions through the filing of an

27  administrative expense claim. Thus Sierra's claim that it will be damaged if default interest is

28  collected is without merit since such collection can only occur in accordance with the properly

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  executed Loan Servicing Agreements and other governing loan documents.

2  **III.    CONCLUSION**

3      For the reasons discussed above. USACM objects to the administrative expense claim filed

4  by Sierra and requests that the Court disallow this claim in its entirety.  USACM also requests

5  such other and further relief as is just and proper.

6      Dated:  March 29, 2007

7

8

9                      /s/   Jeanette E. McPherson

10                      Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423

11                      SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard. Suite 1

12                      Las Vegas. Nevada  89146

13                      and

14                      Annette W. Jarvis. Utah Bar No. 1649
Steven C. Strong. Utah Bar No. 6340

15                      RAY QUINNEY & NEBEKER P.C.
36 South State Street. Suite 1400

16                      P.O. Box 45385
Salt Lake City. Utah 84145-0385

17                      Attorneys for Debtors

18

19

20

21

22

23  919440v6

24

25

26

27

28

9

David T. Cohen (TX Bar No. 75008424)
Alexandra P. Olenczuk (TX Bar No. 24033924)
**WARNER STEVENS, L.L.P.**
301 Commerce Street, #1700
Fort Worth, TX 76102
Tel:     (817) 810-5250
Fax:     (817) 810-5255
Email:  dcohen@warnerstevens.com
Email:  aolenczuk@warnerstevens.com

*and*

Michelle L. Abrams (NV Bar No. 5565)
**MICHELLE L. ABRAMS, LTD.**
3085 South Jones Blvd., Suite C
Las Vegas, Nevada 89146
Tel:     (702) 369-3724
Fax:     (702) 369-0651
Email:  mabrams@mabramslaw.com

*Counsel for Sierra Liquidity Fund, L.L.C.*

E-FILED ON: MARCH 14, 2007

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>USA COMMERCIAL MORTGAGE COMPANY,<br>    Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In Re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>    Debtor. | Chapter 11 |
| In Re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>    Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In Re:<br>USA CAPITAL FIRST TRUST DEED FUND,<br>LLC,<br>    Debtor. | ADMINISTRATIVE EXPENSE<br>CLAIM OF SIERRA LIQUIDITY<br>FUND, L.L.C., AND REQUEST FOR<br>PAYMENT THEREOF |
| In Re:<br>USA SECURITIES, LLC,<br>    Debtor. | [Affidavit of James S. Riley filed<br>concurrently herewith] |
| Affects: | |



| | | |
|---|---|---|
| □ All Debtors | ) | Hearing Date: April 26. 2007 |
| ■ USA Commercial Mortgage Company | ) | Hearing Time: 9:30 a.m |
| □ USA Securities. LLC | ) | Objection Deadline: March 29, 2007 |
| □ USA Capital Realty Advisors, LLC | ) | |
| □ USA Capital Diversified Trust Deed Fund. LLC | ) | |
| □ USA Capital First Trust Deed Fund. LLC | ) | |
| | ) | |

**If you object to the relief requested herein, you *must* timely file a WRITTEN response to this pleading with the Court. You must also serve your written response on the person who sent you this notice.**

**If you do not timely file a written response with the Court, or if you do not serve your written response on the person who sent you this notice, then:**

- **The Court may *refuse to allow you to speak* at the scheduled hearing; and**
- **The Court may *rule against you* without formally calling the matter at the hearing.**

Sierra Liquidity Fund. L.L.C. ("Sierra"). hereby files this administrative expense claim and request for payment thereof (the "Request"). and respectfully states as follows:

## A.    REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE

1.    These cases were commenced by the filing of voluntary Chapter 11 petitions by the above-entitled Debtors (the "Debtors") on April 13. 2006 (the "Petition Date").

2.    On January 8, 2007, the Bankruptcy Court entered its Order confirming the "Debtors' Third Amended Joint Plan of Reorganization. as Modified Herein" (the "Plan"). The Plan provides that the deadline for the filing of Administrative Expense Claims against the Debtors is 30 days after the Effective Date. See section B.1.c.i. of the Plan. As this deadline has not occurred as of the date of the filing of this Request, this Request is timely filed.

3.      Sierra is the assignee of those notes. deeds of trust and other rights connected therewith as set forth on Exhibit "A" attached hereto (all collectively referred to herein as the "Loans"). Debtor USA Commercial Mortgage Company ("USA Commercial") purports to be the servicer of these Loans under loan servicing agreements (the "Loan Servicing Agreements") between USA Commercial and the assignors of the Loans.

4.      To the extent that Loan Servicing Agreements exist with respect to one or more of the Loans and further that Sierra is bound by the terms of the Loan Servicing Agreements. then USA Commercial has contractual obligations to Sierra. To the extent that the Loan Servicing Agreements do not exist or are not binding on Sierra, yet USA Commercial is nevertheless purporting to service one or more of the Loans. then USA Commercial has fiduciary duties to Sierra in purporting to act as servicer of the Loans.

5.      From and after the Petition Date. one or more of the Loans became non-performing or continued to be non-performing. such that it was the responsibility and obligation of USA Commercial to protect the interests of Sierra. Evidence of the non-performing status of Loans in which Sierra holds an interest is set forth in Exhibit "B" hereto. which consists of USA Commercial's report dated July 31, 2006.

6.      To the extent that Sierra is bound by the Loan Servicing Agreements. then Section 2.(c)(i) and (ii) of the Loan Servicing Agreements provides that USA Commercial is required to:

(i)      Proceed diligently to collect all payments due under the terms of the note and promptly pay the proper parties, when and if due. principal. interest. late charges. insurance and other specified funds.

and

(ii)     In the event the Borrower fails to make any payment to USA [Commercial] as required by the terms of the note, USA [Commercial] will take steps to collect the payment including but not limited to delivering default notices. commencing and pursuing foreclosure procedures. and obtaining representation for Lender in litigation and bankruptcy proceedings as deemed

necessary or appropriate by USA [Commercial] in its business judgment to fully protect the interests of the Lender, and of all Lenders in the loan.

A true and correct sample of what Sierra is informed and believes is a typical Loan Servicing Agreement is attached hereto as Exhibit "C."

7.      Sierra is informed and believes that from and after the Petition Date, USA Commercial failed to take such action as required under the above-quoted sections of the Loan Servicing Agreements. Sierra is informed and believes that with respect to non-performing Loans, USA Commercial failed to send notices of foreclosure, to commence or pursue foreclosure proceedings, or take such other action as required, thus breaching its duty to Sierra.

8.      To the extent Sierra is not a party to or bound by the Loan Servicing Agreements, then USA Commercial's failure to act reasonably as a purported servicer of the Loans is a breach of USA Commercial's fiduciary duty to Sierra as imposed under the law.

B.      **CALCULATION OF ADMINISTRATIVE EXPENSE CLAIM**

9.      The pool of loans serviced by USA Commercial generally falls into two categories:

(1)      Acquisition and pre-development loans to residential and commercial developers ("Predevelopment Loans") on unimproved real property. A typical loan would be on a multi-acre site in which a developer needs a "bridge loan" to acquire property and obtain all entitlements required to build thereon. These are typically one to two year loans, during which time the developer seeks to complete the permit process and fund a construction and development loan from a full service lender.

(2)      Acquisition and improvement loans ("Improvement Loans"). These are loans where a builder purchases improved property and enters into an agreement to increase the loan incrementally as pre-approved improvements are made. A typical

loan may be on an apartment complex with additional funds available for rehabilitating and converting to a for-sale condominium project.

1.    **Damages Due to Decline in Value of the Underlying Real Property.**

10.    During the Chapter 11 cases, several of the Predevelopment Loans held by Sierra have either become non-performing or have continued to be non-performing.  Based on general market declines in value and Sierra's knowledge of the specific properties, Sierra calculates that the value of the real property underlying the non-performing Predevelopment Loans held by Sierra has declined by at least 25%.  USA Commercial's failure timely to foreclose or otherwise to protect the interests of Sierra in these non-performing Predevelopment Loans has damaged Sierra.

11.    The following is a list of Predevelopment Loans in which Sierra holds an interest and which became non-performing during the Chapter 11 cases or which continued to be non-performing during the Chapter 11 cases.  The list sets forth the principal amount of Sierra's interests and a calculation of Sierra's damages or losses as a percentage of the total principal amount of the loan.  In addition, Sierra assumes that the value of the underlying real property approximately equaled the loan amounts at the time of the origination of the loan.

| Date Listed as Non-Performing | PROPERTY | | PRINCIPAL AMOUNT OF INVESTMENT |
|---|---|---|---|
| Jun-06 | 3685 San Fernando Road | | $235,000.00 |
| Jul-06 | Binford Medical | | $170,000.00 |
| Jun-06 | Brookmere | | $36,987.00 |
| Jun-06 | Hesperia II | | $50,000.00 |
| Jun-06 | Margarita Annex | | $425,000.00 |
| Jul-06 | Oak Shores II | | $239,000.00 |
| Jun-06 | Placer Vineyards | | $810,000.00 |
| Jun-06 | Marquis Hotel | | $45,000.00 |

| | | | |
|---|---|---|---|
| Total | | | $2,010,987.00 |
| Damages | 25% | | $502,746.75 |

12.    Sierra holds one Improvement Loan that has become non-performing or has continued to be non-performing during the Chapter 11 cases. The value of that underlying real property has declined 25%. As a result of USA Commercial's failure to timely foreclose on the Improvement Loan, Sierra has been damaged as follows:

| Date Listed as Non-performing | PROPERTY | | PRINCIPAL AMOUNT OF INVESTMENT |
|---|---|---|---|
| Jun-06 | Gramercy Court | | $650,000.00 |

| | | | |
|---|---|---|---|
| Total | | | $650,000.00 |
| Decline in Value (Damages) | | 25% | $162,500.00 |
| Damages | | | $162,500.00 |

## 2.    Damages Due to the Improper Charge of "Default Interest".

13.    In addition to the decline in value, Sierra is informed and believes that in the event of foreclosure on any non-performing loan, be it a Predevelopment or Improvement Loan, that USA Commercial or Compass will seek to recover from any sale proceeds an amount equal to the default interest that the borrower would have been obligated to pay under the terms of the loan had the borrower made payments as required. The Servicing Agreements, however, do not allow for the collection by USA Commercial of such "default interest" upon foreclosure. Section 5(c) of the Servicing Agreement allows only for payment to the servicer of "default interest collected from the Borrower pursuant to the terms of the Note." (Emphasis added.) Upon a foreclosure, there is no "default interest collected from the Borrower" and so the retention of such amount by USA Commercial or any other purported servicer upon a foreclosure is improper, unlawful and will damage Sierra equal to the amount of such "default interest." Sierra is informed and believes that USA Commercial will take the position that upon foreclosure it is entitled to retain as "default interest" the difference between the default rate of interest and the non-default rate of interest. Sierra is informed and believes that this difference is 8% per year, which is the amount of "default

interest" that USA Commercial will seek to retain from foreclosure sale proceeds. In the event USA Commercial contends that "default interest" is the entire default interest rate, and not just the difference between the default and the non-default interest rate, then Sierra reserves the right to amend this Request to add such amount as additional damages.

14.    In the event that it is determined that USA Commercial is entitled to "default interest" from foreclosure sale proceeds, which entitlement Sierra denies, then Sierra was damaged by USA Commercial's failure to timely foreclose on the underlying real property and thereby incurring the "default interest." Rather than protect Sierra's interests, USA Commercial instead delayed in conducting foreclosure sales in order to incur such "default interest" which it then would seek to collect from foreclosure sale proceeds.

15.    As a result of USA Commercial's failure to promptly foreclose on the non-performing loans, therefore, Sierra has been doubly hurt in that values of the properties have declined and further that such depressed values will be subject to payment of "default interest" to USA Commercial. Had USA Commercial promptly acted, USA Commercial could have foreclosed on the properties when market values were higher and before "default interest" had been incurred.

16.    To summarize, with respect to Predevelopment Loans, Sierra has been damaged as follows:

| Date Listed as Non-Performing | PROPERTY | PRINCIPAL AMOUNT OF INVESTMENT |
|---|---|---|
| Jun-06 | 3685 San Fernando Road | $235,000.00 |
| Jul-06 | Binford Medical | $170,000.00 |
| Jun-06 | Brookmere | $36,987.00 |
| Jun-06 | Hesperia II | $50,000.00 |
| Jun-06 | Margarita Annex | $425,000.00 |
| Jul-06 | Oak Shores II | $239,000.00 |
| Jun-06 | Placer Vineyards | $810,000.00 |
| Jun-06 | Marquis Hotel | $45,000.00 |

| | Total | $2,010,987.00 |
|---|---|---|

| | | |
|---|---|---|
| Decline in Value (Damages) | 25% | $502,746.75 |
| "Default Interest" Delta | 10%[1] | $201,098.70 |
| Total Damages | | $703,845.45 |

17.    With respect to Improvement Loans, Sierra has been damaged as follows:

| Date Listed as Non-performing | PROPERTY | | PRINCIPAL AMOUNT OF INVESTMENT |
|---|---|---|---|
| Jun-06 | Gramercy Court | | $650,000.00 |

| | | |
|---|---|---|
| Total | | $650,000.00 |
| Decline in Value (Damages) | 25% | $162,500.00 |
| "Default Interest" Delta | 10% | $65,000.00 |
| Total Damages | | $227,500.00 |

18.    In addition to the foregoing, Sierra has been damaged by incurrence of additional and continuing loan service fees of between 1-3% per year, lost opportunity costs and legal fees and costs according to proof.

19.    The analysis set forth above assumes that the Loan Servicing Agreements are binding on Sierra. In the event that Sierra is not bound by the Loan Servicing Agreements, Sierra, in addition to the above damages, will hold a damage claim against the Debtors for breach of their fiduciary duty, in an amount to be determined according to proof.

20.    Sierra reserves the right to (i) amend or supplement this Request, and (ii) assert or file additional claims.

21.    All notices respecting this Request should be sent to the following:

David T. Cohen, Esq.
Warner Stevens, L.L.P.
301 Commerce Street, Suite 1700

---

1 While Sierra is informed and believes that the difference between the non-default and the default rate of interest is 8% per year, Sierra further assumes a default pre-foreclosure period of 15 months, equating to 1.25 years, and therefore calculates "Default Interest" Delta damages at 10% (8% x 1.25 = 10%). To the extent that the default pre-foreclosure period is longer than 15 months, then damages on account of improperly retained 'default interest" will be higher and Sierra reserves the right to amend this Request to so reflect.

Fort Worth. Texas 76102
Tel.: (817) 810-5250
Facsimile: (817) 810-5255
e-mail: dcohen@warnerstevens.com

## CONCLUSION

WHEREFORE. Sierra respectfully requests that the Court enter an order (i) granting Sierra

an allowed administrative expense claim pursuant to Section 503 of the Bankruptcy Code in the

amount set forth above or otherwise as determined according to proof. (ii) directing the Debtors to

make payment of such allowed administrative expense claim: and (iii) providing for such other and

further relief that the Court may deem just and proper.

Dated: March 14, 2007                     Respectfully submitted:

By:    /S/ DAVID T. COHEN
David T. Cohen (TX Bar No. 75008424)
**WARNER STEVENS, L.L.P.**
301 Commerce Street, #1700
Fort Worth, TX 76102
Tel:    (817) 810-5250
Fax:    (817) 810-5255
Email:  dcohen@warnerstevens.com

                        *and*

Michelle L. Abrams (NV Bar No. 5565)
**MICHELLE L. ABRAMS, LTD.**
3085 South Jones Blvd., Suite C
Las Vegas. Nevada 89146
Tel:    (702) 369-3724
Fax:    (702) 369-0651
Email:  mabrams@mabramslaw.com

*Counsel for Sierra Liquidity Fund, L.L.C.*