Dean T. Kirby, Jr.     Calif. Bar No. 090114
Leonard J. Ackerman Calif. Bar No. 171073
KIRBY & McGUINN, A P.C.
600 B Street, Suite 1950
San Diego, California 92101-4515
Telephone: (619) 685-4000  Facsimile:  (619) 685-4004
dkirby@kirbymac.com
lackerman@kirbymac.com

Michelle L. Abrams     Nev. Bar No. 5565
MICHELLE L. ABRAMS, LTD.
7201 West Lake Meade Blvd., Suite 210
Las Vegas, NV 89128
Telephone: (702) 233-5040 Facsimile (702) 233-2209
mabrams@mabramslaw.com

Attorneys for Creditor
Debt Acquisition Company of America V

# UNITED STATES BANKRUPTCY COURT

## District of Nevada

| | |
|---|---|
| In re | Case No. BK-S-06-10725 LBR |
| USA COMMERCIAL MORTGAGE COMPANY | MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF COMPASS FINANCIAL |
| Debtor. | PARTNERS LLC FOR ORDER ENFORCING CONFIRMATION ORDER |
| In re | AND DETERMINING NO SURVIVING SECTION 3 RIGHT EXISTS WITH |
| USA CAPITAL REALTY ADVISORS, LLC | RESPECT TO THE FIESTA OAK VALLEY LOAN |
| Debtor. | |
| In re | [AFFECTS DEBTOR USA COMMERCIAL MORTGAGE COMPANY] |
| USA CAPITAL DIVERSIFIED TRUST FUND, LLC | |
| Debtor. | DATE: April 26, 2007 |
| In re | TIME:  9:30 a.m. |
| USA CAPITAL FIRST TRUST DEED FUND, LLC | |
| Debtor. | |
| In re | |
| USA COMMERCIAL MORTGAGE COMPANY | |
| Debtor. | |
| Affects: | |
| ☐ All Debtors | |
| ☒ USA Commercial Mortgage Company | |
| ☐ USA Capital Realty Advisors, LLC | |
| ☐ USA Capital Diversified Trust Fund, LLC | |
| ☐ USA Capital First Trust Deed Fund, LLC | |
| ☐ USA Securities, LLC | |

1

# TABLE OF CONTENTS

2

3    I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4
5    II.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

6    III.  NEVADA LAW GIVES THE DIRECT LENDERS THE UNCONDITIONAL
      RIGHT TO DESIGNATE THEIR SERVICING AGENT . . . . . . . . . . . . . . . . . . . . . . . . . . 8
7

8    IV.   ALL CONDITIONS REFERRED TO IN THE LOAN SERVICING
      AGREEMENT HAVE BEEN MET REGARDLESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
9

10   V.    VINDRAUGA'S PROPOSAL IS IN THE BEST INTERESTS
      OF THE DIRECT LENDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
11

12   VI.   THE COMPASS MOTION CONTAINS NO EVIDENCE AND
      CONTEMPLATES "SANDBAGGING" IN A REPLY . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
13

14   VII.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>TABLE OF AUTHORITIES</u>

2

FEDERAL CASES

3

*Docusign, Inc. v. Sertifi*,
    468 F.Supp.2d 1305 (W.D.Wash. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

4

*In re Calvert,*
    135 B.R. 398 (Bankr. S.D.Cal. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

6

*In re Lucas,*
    312 B.R. 407 (Bankr. D. Nev. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

7

*United States v. Patterson,*
    230 F.3d 1168 (9th Cir.2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

9

NEVADA CASES

10

*Colello v. Administrator of Real Estate Division of the State of Nevada,*
    100 Nev. 344, 683 P.2d 15 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

11

*Federated American Ins. Co. v. Granillo,*
    108 Nev. 560, 835 P.2d 803 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

13

*Jory v. Bennight,*
    91 Nev. 763, 542 P.2d 1400 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

14

*LeMon v. Landers,*
    81 Nev. 329, 402 P.2d 648 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

16

*Neal's Estate v. Farmers Ins. Exchange,*
    93 Nev. 348, 566 P.2d 81 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

17

*Obstetrics and Gynecologists William G. Wixted, M.D. v. Pepper,*
    101 Nev. 105, 693 P.2d 1259 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

19

*Welfare Div. v. Washoe Co. Welfare Dep't.,*
    88 Nev. 635, 503 P.2d 457 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

21

*Young v. Nevada Title Company,*
    103 Nev. 436, 744 P.2d 902 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

22

*Holland Realty Investment Co. v. Nevada,*
    84 Nev. 91, 436 P.2d 422 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

23

NEVADA STATUTES AND REGULATIONS

24

Nevada Admin. Code § 645B.073 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

25

Nevada Rev. Stats §645B.0127   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

26

Nevada Rev. Stats §645B.060  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

27

Nevada Rev. Stats §645B.330   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28

I.    <u>INTRODUCTION</u>

This is the first motion to come before this Court in which Compass Financial has challenged an attempt by the Direct Lenders to exercise what the Plan calls a "Surviving Section 3 Right."  Under compromise language agreed to between Compass and the Direct Lender Committee during the confirmation proceedings, the Direct Lenders retained under the Plan the right to designate a new servicing agent, if they had that right on the Petition Date.

In its motion, Compass does not dispute that an overwhelming majority of the 227 Direct Lenders (both a 65% majority in number, even counting DACA as a single Direct Lender, and 75% in beneficial interest, including DACA's 22%) have now voted to substitute Vindrauga Corporation as the new loan servicer.  The motion only argues one point, that on the Petition Date USACM was not in breach of Loan Servicing Agreement and had acted as a "reasonably prudent loan servicer."  The motion does not make one specific argument nor does it include one piece of evidence to support this highly questionable proposition.  While it delayed the change in servicing agent by filing its bare bones motion, Compass attempted to buy out the Direct Lender's interests in the loan at a substantial discount.

In fact, on the Petition Date USACM (whose principals also have an equity interest in the borrower) had failed to commence a foreclosure notwithstanding that no interest had been paid on the loan for about 15 months.  Further, it appears that USACM violated the Loan Servicing Agreement by extending the maturity date of the loan by one year without the Direct Lenders' informed consent.  USACM violated its fiduciary duty to the Direct Lenders by concealing the interest default from them at the time that the loan was extended.

Vindrauga contends that the terms of the Loan Servicing Agreement that purport to impose conditions on the Direct Lenders' right to substitute the servicing agent (a right which is mandated by Nevada Administrative Code section 645B.073) are unenforceable.   Neither the Plan nor the Confirmation Order  are intended to override Nevada's consumer protection statutes.  But even if the right to change the servicing agent, as it existed on the Petition Date, were subject to the condition that USACM have "failed to act," or that it had committed a breach of the Loan Servicing Agreement, those conditions are fully satisfied in the case of Fiesta Oak Valley.  If the "Surviving Section 3 Right" negotiated by the Direct Lenders Committee means anything at all, it must apply in this case.

II.    STATEMENT OF FACTS

The subject loan was originally funded on about June 15, 2004, in the principal amount of $20,500,000.  (Declaration of Howard Justus submitted herewith ("Justus Decl.") ¶ 11 p. 3;  Exhs 15, 16, 17)  The borrower named in the promissory note and first deed of trust is "Oak Mesa Investors, LLC."   The loan was originally syndicated to a group of 227 beneficiaries, and was referred to by USACM as "Fiesta Oak Valley."   The trust deed encumbers 1,540 acres of land in Calimesa, California.

According to a recent status report prepared by Compass (Justus Decl. ¶ 16 p. 5; Exh 21), the borrower is a "joint venture" between Fiesta Development and USA Investment Partners, LLC ("USAIP").  As this Court knows, USAIP is an entity controlled by the Debtors' principals, Messrs Milanowski and Hantges.

The Note provides for monthly payments of interest only at 12%[1] per annum and a term of 18 months, such that it would have become all due and payable on about December 18, 2005.  Based on the amount of interest which has accrued on this loan, it appears that the borrower defaulted in interest payments beginning in January, 2005.  (Justus Decl. ¶ 12 p. 3-4; Exhs 18, 19)  The default rate of interest provided for in the Note is 20% per annum.   As in the other USACM loans, the Fiesta Oak Valley investors signed a Loan Servicing Agreement which provided among other things that all default interest and late charges collected would be retained by the servicing agent as part of its fee.

On about December 7, 2005, the Direct Lenders received a letter from Milanowski stating: "The borrower approached USA Capital regarding extending this loan for an additional twelve months. . . . The Oak Mesa Investors first trust deed investment will have a new maturity date of December 18, 2006.  Your interest checks will continue to arrive around the 10th of every month."  This announcement did not disclose that the loan was in default for failure to pay interest.  At the time of the extension,  the Direct Lenders were unaware that the borrower was already seriously in default.  (Declaration of Robert S. Speckert submitted herewith ("Speckert Decl.") ¶ 2 p. 1 Exh 1)

---

[1]    The copy of the Note obtained by Vindrauga provides for interest at 12% per annum. However, the original solicitation sent to investors by USACM refers to a 13% loan, and all reports and loan summaries since then refer to the 13% rate.  It is unclear to Vindrauga whether the 12% - 13% variance was a discrepancy in the original documentation or the result of some extension agreement which Vindrauga has not been provided with.

1    The Direct Lenders continued to be unaware of the interest default because USACM continued

2    to forward payments to them without revealing the true source of those payments.  Finally, in about

3    March, 2006, payments ceased.  (Speckert Decl. ¶ 2 p. 1)  USACM filed its chapter 11 petition on April

4    13, 2006.

5    On the Petition Date, the Fiesta Oak Valley loan had been in "interest default" for about 15

6    months.  However, USACM had not commenced foreclosure proceedings  to force repayment of the

7    loan.  USACM's failure to act at this point could be attributed to: (i) the fact that insiders Milanowski

8    and Hantges had an equity interest in the borrower; (ii) the fact that Milanowski and Hantjes had

9    personally guaranteed the loan; and (iii) the fact that under the Loan Servicing Agreement authored by

10    USACM, the accrual of default interest entirely benefitted  USACM and the Direct Lenders.

11    Following the filing of the chapter 11 petition, the extent of the fraud and mismanagement

12    perpetrated by USACM became known.  Mr. Thomas J. Allison  testified that "On the Petition Date, as

13    I took over as Chief Restructuring Officer of USACM . . . I found that USACM had not been fulfilling

14    its obligations . . . as the loan servicing agent for the direct lenders.  I also found that the books and

15    records of the companies were inaccurate, incomplete and misleading, and that no collection efforts had

16    been undertaken with respect to delinquent borrowers."  (Declaration of Thomas J. Allison in

17    Opposition to U.S. Trustee's Motion to Convert Cases (Docket No. 1698, ¶ 7 p. 5) In his Declaration

18    filed in support of plan confirmation, Mr. Allison presented detailed evidence of commingling and

19    accounting irregularities which violated the requirement of the Loan Servicing Agreement that USACM

20    "keep appropriate accounting records."   (Declaration of Thomas J. Allison in Support of the

21    Confirmation of the Debtors' Third Amended Joint Plan of Reorganization (Docket No. 2147) ¶¶ 59-87,

22    pp. 31-35).

23    By its Order entered January 8, 2007 (Docket No. 2376), this Court confirmed the joint chapter

24    11 plan filed  on behalf of USACM and its affiliates.  That order also confirms the sale of the

25    "Commercial Mortgage Assets" of USACM to Compass Partners, LLC.  The assets sold included "all

26    Servicing Agreements and Personal Property including without implied limitation, Default Rate Interest,

27    Accrued Servicing Fees, Late Charges, Success Fees and other sums due the loan servicer under any of

28    the Servicing Agreements.. . ." (Docket No. 2164 Asset Purchase Agreement dated December 8, 2006,

p. 2) The Plan (Docket No.1799) states that the sale of these assets was to be "free and clear of all liens, Claims, encumbrances, rights of third parties and interests." The Confirmation Order (Docket No. 2376) states in part (at ¶ 14 pp. 5-6):

> The Acquired Assets shall be transferred to the Asset Purchaser on the terms and conditions set forth in the Asset Purchase Agreement, and upon Closing shall be, free and clear of all liens, claims, interests, obligations and encumbrances whatsoever, including, but not limited to, (A) all monetary and non-monetary defaults and rights that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Sellers' or the Asset Purchaser's interest in, or rights in or under, the Acquired Assets, or any similar rights, based in any way on any action taken (or failed to be taken) by any of the Debtors or any other matter or occurrence relating to the period prior to the Closing (*other than any right that existed and was matured and exercisable, as of the Petition Date, to effect a substitution of USACM as loan servicer under Section 3 of any Loan Servicing Agreement, as well as any defenses of the loan servicer thereto (a "Surviving Section 3 Right")*) [*emphasis* added]

The Confirmation Order then provides procedures for the exercise of a "Surviving Section 3 Right":

> [I]n connection with any attempted post-Closing exercise of a Surviving Section 3 Right: (a) the Direct Lenders must provide Compass at least thirty (30) days prior written notice of the intended exercise of such right in accordance with section 8 of the Loan Servicing Agreement, (b) Compass shall have the right to challenge the exercise of such Surviving Section 3 Right by filing a motion with this Court prior to the expiration of such thirty (30) day period to determine whether such Surviving Section 3 Right has been properly and validly exercised (the "Compass Motion") and the Court shall retain jurisdiction to adjudicate any such disputes, (c) in the event Compass timely files such Compass Motion, the effectiveness of the attempted exercise of such Surviving Section 3 Right shall be stayed pending this Court's entry of an order in respect of the Compass Motion . . . ."

Beginning in September, 2006, before the Plan was filed, DACA began purchasing the interests of Direct Lenders in the Fiesta Oak Valley loan. (Justus Decl. ¶ 5 p. 1) In its opposition to plan confirmation (Docket No. 2050) DACA objected in part that the Plan impermissibly assigned the Loan Servicing Agreements and modified the rights of the Direct Lenders who were counterparties to those agreements. DACA appealed the Confirmation Order, and that appeal is still pending before the United States District Court.

///
///
///
///

On February 11, 2007, the sale of loan servicing rights to Compass was completed. Six weeks passed, but Compass took no action to commence a foreclosure under the Fiesta Oak Valley Trust Deed. On March 27, the United States District Court for the Central District of California entered a temporary restraining order and order appointing a receiver for USAIP. The TRO (now a preliminary injunction) does not contain any provisions which could reasonably be interpreted as enjoining the foreclosure of the Fiesta Oak Valley Trust Deed.[2]   In any case, Compass has apparently not taken any action to foreclose, or to seek clarification or relief from the TRO to allow a foreclosure.

In contrast to the inaction of Compass, the USACM Liquidating Trust immediately took action to obtain relief from the TRO, and obtained permission to file an involuntary bankruptcy petition against USAIP. That proceeding is now pending as Case No. 07-11821- lbr. This Court has already appointed an interim trustee. Although the automatic stay in that involuntary bankruptcy case does not enjoin foreclosure of the Fiesta Oak Valley Trust Deed,[3] Compass has to date still taken no action to commence foreclosure.

In January, 2007, Vindrauga corporation, an affiliate of DACA, began soliciting those Direct Lenders who had not sold their interests to sign Designation forms stating their election to substitute Vindrauga as the new servicing agent in place of USACM / Compass. A decisive majority of the Direct Lenders (both in number and beneficial interest), have now signed the Designation form. (Justus Decl. ¶ 9 p. 3)

/ / /

---

[2]   On April 1, 2007, counsel for the USACM Liquidating Trust filed in this bankruptcy case a "Notice of Order of United States District Court Appointing a Receiver for USA Investment Partners, Llc, and Possibly Staying These Proceedings" (Docket No. 3323). This Notice attaches a copy of the District Court's receivership order and states that "the Receiver Order includes broad stay provisions relating to entities in which USAIP has an ownership interest and for which USAIP is the manager." The only language in the TRO which this could refer to is paragraph 12 (page 11) which enjoins "foreclosure activities . . . to the extent such actions "interfere with this Court's exclusive control over USAIP or any of its Assets . . ." The term "Assets" is not defined in the TRO, which in all other places refers to USAIP's Property. The term "Property" is defined in paragraph 1 on page 6 of the TRO as "the assets of Defendant (the "Property"). This Order has been continued as a preliminary injunction by minutes of the District Court entered April 4, 2007).

[3]   The Fiesta Oak Valley property is owned by Oak Mesa Investors, LLC, a California limited liability company (erroneously described in Compass's latest report as a "joint venture") in which both USAIP and Fiesta Development apparently hold ownership interests. The automatic stay does not apply to foreclosure activities against limited liability companies in which the debtor or alleged debtor is a member. See generally, *In re Calvert*, 135 B.R. 398 (Bankr. S.D.Cal. 1991).

---

Copies of the Designation form (Justus Decl. Exh. 13) and of the Loan Servicing Agreement (Justus Decl. Exh. 14) are attached to this brief for the Court's convenience.  The Designation modifies the existing Loan Servicing Agreements in several ways, including:

**Elimination of Activities for Which License Required**.  Paragraph 2 of the Designation states that Vindrauga will not undertake to find substitute investors to purchase the interests of the Direct Lenders, because this would require a Nevada mortgage loan broker's license.[4]

**Power of Attorney**.  The existing power of attorney contained in the Loan Servicing Agreement does not contain the limiting provisions required by Nevada Revised Statutes section 645B.330.  The Designation adds these provisions.

**Reduction of Loan Service Fees**.  In those cases in which the original Loan Servicing Agreement called for a 3% fee, paragraph 5 of the Designation reduces the fee to 1%.

**Purchase of Direct Lenders' Interest Upon Foreclosure.**  Paragraph 6 of the Designation provides that in the event that the loan is not paid in full and a foreclosure is completed, Vindrauga will purchase the Direct Lenders' interests in the property within 30 days after the foreclosure for 100% of principal and interest (not including default interest).

**Uncollected Default Interest, Late Charges and Loan Servicing Fees.**  As this Court is aware, a dispute exists as to the interpretation of article 5 of the Loan Servicing Agreement which states in part that USACM is entitled to: "*retain monthly*, as compensation for services provided hereunder, (b) any late charges *collected* from the Borrower pursuant to the terms of the Note, and (c) any default interest *collected* from the Borrower pursuant to the terms of the Note. [*italics* added]"  It is Compass' interpretation of this provision that it is entitled, as part of its fee, to payment of any default interest and

---

[4]  Nevada Revised Statutes section 645B.0127 defines "mortgage broker" as "a person who, directly or indirectly: (a) Holds himself out for hire to serve as an agent for any person in an attempt to obtain a loan which will be secured by a lien on real property; (b) Holds himself out for hire to serve as an agent for any person who has money to lend, if the loan is or will be secured by a lien on real property; (c) Holds himself out as being able to make loans secured by liens on real property; (d) Holds himself out as being able to buy or sell notes secured by liens on real property; or (e) Offers for sale in this state any security which is exempt from registration under state or federal law and purports to make investments in promissory notes secured by liens on real property."  No license is required to simply administer an existing loan on behalf of the beneficiaries.  A license is required to act as an agent for others in buying and sellling interests in loans, as Compass is doing in buying up the interests of Direct Lenders in the Fiesta Oak Valley loan for 91% of principal on behalf of an "unrelated third party."  See, Speckert Decl. ¶ 7 Exh 6;  Justus Decl ¶¶ 15-16,  Exhs 20-21)

---

late charges which *accrued* during the tenure of USACM and Compass as loan servicer, whether these sums are "*collected*" by Compass or not.[5] Compass has also maintained that if any payment is accepted which is less than 100% balance of the loan, Compass is entitled to receive first from the Direct Lenders all of the default interest and late charges before the Direct Lenders receive their principal and regular interest. These disputes as to the interpretation of the Loan Servicing Agreement were not resolved under the Plan and would not be resolved in the context of this Motion. Section 7 of the Designation gives DACA full authority to pay, dispute or compromise any claim made against the Direct Lenders by Compass.

**Rights of Lender to Designate New Servicing Agent.** Section 3 of the existing Loan Servicing Agreement purports to restrict the rights of the Direct Lenders to designate a new servicing agent in the event of a default under the loan, to situations in which USACM "fails to act on Lender's behalf." Section 8 of the Designation changes that provision to substitute the language required by Nevada Administrative Code section 645B.073:

> Except as otherwise provided in subsection 3, if a mortgage broker acts on behalf of investors on a matter related to a mortgage loan, and if the beneficial interest in the loan belongs to more than one natural person, the documentation of the matter must include provisions to allow the holders of 51 percent or a greater specified percentage of the beneficial interests of record to act on behalf of all the holders of the beneficial interests of record in the event of a default or foreclosure for matters that require the direction or approval of the holders of the beneficial interests in the loan, including, without limitation:
>
> (a)    The designation of the mortgage broker, servicing agent or other person to act on the behalf of the holders of the beneficial interests in the loan; and
>
> (b)    The sale, encumbrance or lease of real property owned by the holders resulting from a foreclosure or the receipt of a deed in lieu of a foreclosure.

/ / /

/ / /

---

[5] This contention is highly suspect, as it resolves an alleged ambiguity in the Loan Servicing Agreement in favor of the servicer which prepared it, and against the consumer. See generally, *In re Lucas*, 312 B.R. 407, 410-12 (Bankr. D. Nev. 2004).

1    In compliance with the Confirmation Order, the Designation states clearly that it does not take

2    effect until the expiration of the stay provided for in the Plan.  As required by the Plan, Vindrauga gave

3    electronic notice to Compass by letter dated March 2, 2007 that it had achieved the required 51% vote

4    of the Direct Lenders to designate Vindrauga as the servicing agent.  At the end of the 30 day period,

5    Compass filed this Motion seeking to invalidate the Direct Lender's election of Vindrauga as the

6    servicing agent.

7
8    III.    NEVADA LAW GIVES THE DIRECT LENDERS THE UNCONDITIONAL
            RIGHT TO DESIGNATE THEIR SERVICING AGENT

9    Nevada Administrative Code section 645B.073,[6] quoted directly above, requires that in a case

10   where any mortgage broker acts on behalf of more than one natural person, "the documentation of the

11   matter must include provisions to allow the holders of 51 percent . . . of the beneficial interests of record

12   to act on behalf of all the holders . . . in the event of a default or foreclosure . . .  including. . .

13   designation of the mortgage broker, servicing agent or other person" to act on their behalf.  The Loan

14   Servicing Agreement drafted by USACM violates this statute by attempting to condition the right of the

15   Direct Lenders to designate their servicing agent.  The Loan Agreement states that "Pursuant to

16   NAC645B.073  . . . if for any reason USA fails to act on Lender's behalf . . .then Lender may, with

17   approval of fifty-one percent . . . act on behalf of all such holders of beneficial interests.  These actions

18   may include . . . the designation of the mortgage broker, servicing agent or other person to act on behalf

19   of the holders. . ."

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27

28       [6]  Regulations adopted by the Commissioner of Mortgage Lending under authority of Nevada
     Revised Statutes section  645B.060.

---

1      The Regulation is obviously intended for the protection of individual persons who are placed in

2 fractionated trust deed investments by mortgage brokers. "Statutes with a protective purpose should be

3 liberally construed in order to effectuate the benefits intended to be obtained. *Welfare Div. v. Washoe*

4 *Co. Welfare Dep't.*, 88 Nev. 635, 503 P.2d 457 (1972)." *Colello v. Administrator of Real Estate*

5 *Division of the State of Nevada,* 100 Nev. 344, 347, 683 P.2d 15 (1984).

6      The Loan Servicing Agreement, drafted by USACM for its own benefit, modifies the provision

7 that the Regulation required them to include in the loan servicing documentation. The Regulation says

8 that the documentation "must include provisions" to allow the holders of 51% to act to designate their

9 servicing agent. The Loan Servicing Agreement purports to limit that right to situations in which "for

10 any reason USA fails to act on Lender's behalf . . . ." This change in the language prescribed by the

11 Regulation was made by USACM to protect its own interest in remaining the servicing agent, at the

12 expense of the investors' right to change servicing agents which is provided by the Regulation. Where

13 a statute requires that a certain provision be included in a contract, provisions which are inconsistent

14 with that requirement cannot be enforced. See, e.g., *Federated American Ins. Co. v. Granillo,* 108 Nev.

15 560, 562, 835 P.2d 803 (1992); *Neal's Estate v. Farmers Ins. Exchange,* 93 Nev. 348, 350, 566 P.2d

16 81 (1977).

17      Compass has represented to this Court that it is a national firm with over 200 employees which

18 acquires over $100 Million in loan interests every year. See generally, Declaration of David Blatt of

19 Compass Partners LLC in Support of Confirmation of Debtors' Third Amended Joint Plan of

20 Reorganization fld 12/05/2006 (Docket No. 2137). Compass has been represented by counsel from the

21 beginning. Compass assumed the risk that certain of the provisions of the Loan Servicing Agreement

22 prepared by USACM are inconsistent with Nevada consumer protection statutes. Compass is not

23 shielded from that risk by anything that this Court has done.

24      The chapter 11 plan does not interpret the Regulation nor decide the issue of whether any

25 conditions can be imposed on the rights of the Direct Lenders to change their loan servicer -- other than

26 the Regulation's requirement that this action be taken by "51 percent . . . of the beneficial interests of

27 record ." Compass, in an effort to remain as servicing agent by legal force (rather than performance and

28 persuasion), wants to turn any attempted exercise of this right into a factual dispute to be resolved by

1   this Court – viz., whether the replacement of USACM would have been warranted or justified on the

2   Petition Date.  To the contrary, neither the Regulation, nor the Plan, nor the Confirmation Order impose

3   any condition that the Direct Lenders' right to designate a servicing agent  must be justified by a breach

4   of the Loan Servicing Agreement.[7]

5         What can Compass do in order to continue as the servicing agent for as many loans as possible,

6   in order to realize the profit that it anticipated when it bid to acquire the servicing rights?  Compass can,

7   by performance and communication with the Direct Lenders, gain their confidence.  Compass can also

8   act quickly to collect each loan.  If foreclosure were even commenced, it  would be substantially less

9   likely that the Direct Lenders would see the need to designate a new servicing agent.  If a loan were

10  actually collected, the need to designate a new servicing agent disappears entirely, and all of the fees

11  Compass claims will be indisputably owing.  Enforcing the Regulation[8] will have the effect of

12  motivating Compass to act quickly to collect the loans and to communicate with the Direct Lenders.

13
14  IV.   ALL CONDITIONS REFERRED TO IN THE LOAN SERVICING
      AGREEMENT HAVE BEEN MET REGARDLESS

15        It may not be necessary for this Court to decide the issue raised in the preceding section of this

16  brief, because the conditions referred to in the Loan Servicing Agreement have clearly been satisfied

17  in this case.  The Loan Servicing Agreement, in violation of the Regulation, purports to condition the

18  right of the Direct Lenders to replace the servicing agent only "if for any reason USA fails to act . . . ."

19  In its motion, Compass attempts to broaden this basic, clear condition.  The motion does not mention

20  "fails to act" and instead refers to the condition that USACM have been in breach of the Loan Servicing

21  Agreement or that "USACM failed to act as a reasonably prudent servicer. . . ." (Motion, p.4).

22
23        [7]  The only restrictions on this right imposed by the Plan is that the right to change servicng
      agents "existed and was matured and exercisable, as of the Petition Date." (Confirmation Order (Docket
24  No. 2376) p. 5 ln. 16), and that the change will be stayed for a period of 30 days to allow Compass to
      challenge it in the Bankruptcy Court.  Although DACA contested these provisions, that is a subject of
25  its appeal of the Confirmation Order.  DACA does not contest these provisions for purposes of this
      motion.  It has abided by the notification and stay provisions and it agrees that for purposes of this
      motion the right to change loan servicers is to be evaluated as of the Petition Date.
26

27        [8]  Because the Confirmation Order defines a "Surviving Section 3 Right" as one arising under
      section 3 of the Loan Servicing Agreement, the Direct Lenders' rights under the Regulation are not,
28  strictly speaking, "Surviving Section 3 Rights" subject to the procedural restrictions set forth in the Plan.
      Without waiving that argument,, Vindrauga has complied with those restrictions by giving notice and
      honoring the stay referred to in the Confirmation Order.

1    Such an interpretation is inconsistent with the language of the Loan Servicing Agreement, that

2    purports to authorize the replacement of USACM "if *for any reason* [USACM] fails to act [*italics*

3    added]."  This broad language allows the majority of the Direct Lenders to replace USACM even if it

4    fails to act because of some purported exercise of its business judgment.  This is an important right of

5    the Direct Lenders because of the conflicts of interest inherent in USACM's position.  Its principals had

6    an equity interest in the borrower and guaranteed the loan.  Also, under the fee structure contained in

7    the Loan Servicing Agreement, USACM stood to benefit from inaction because default interest and late

8    charges were part of its fee.  The latter conflict of interest has not gone away.  It is inherent in the

9    relationship between the Direct Lenders and Compass, to this day.

10    As a standardized contract drafted by USACM and offered to consumers without the realistic

11    opportunity to negotiate its form provisions, any ambiguity in the contract must be resolved in favor of

12    the consumer and against the drafter.  See, e.g., *In re Lucas,* 312 B.R. 407, 410-12 (Bankr. D. Nev.

13    2004); *Obstetrics and Gynecologists William G. Wixted, M.D. v. Pepper,* 101 Nev. 105, 107-8, 693 P.2d

14    1259 (1985).  In this case, the Loan Servicing Agreement must be interpreted as allowing a majority of

15    the Direct Lenders to designate a new loan servicer if USACM fails to act *for any reason*.

16    Whether one adopts the simple standard of "failure to act for any reason" or one adopts the

17    interpretation which Compass proposes (that USACM was not a "reasonably prudent loan servicer),"

18    that standard is satisfied in this case.  USACM clearly "failed to act" when it had not commenced

19    foreclosure  after the Fiesta Oak Valley loan had been *in interest default for 15 months*.

20    This failure to act was also a breach of the express terms of the Loan Servicing Agreement,

21    section 2(c)(i), which required USACM to "proceed diligently to collect all payments due under the

22    terms of the note."  Section 2(c)(ii) of the Loan Servicing Agreement further provides  that "in the event

23    the Borrower fails to make any payment to USA as required by the terms of the note, [USACM] will

24    take steps to collect the payment, including but not limited to delivering default notices, commencing

25    and pursuing foreclosure procedures, and obtaining  representation for Lender in litigation and

26    bankruptcy proceedings as deemed necessary or appropriate by [USACM] in its business judgment to

27    fully protect the interests of the Lender, and of all Lenders in the loan."  (LSA section 2(c), pp. 2-3)

28    These provisions, requiring USACM to "proceed diligently" and to "take steps to collect" were

1   particularly important where the fee structure entitled USACM to keep the default interest, *creating a*
2   *disincentive to quickly resolve a default.*

3          USACM was also in breach of that provision of the Loan Servicing Agreement which states that
4   USACM "may not permit any modification to any Loan that would . . . extend the maturity date, without
5   Lender's prior consent; provided however, if Lender fails to grant or deny its consent within three (3)
6   business days after notice from [USACM], Lender shall be deemed to have conclusively given its
7   consent."  (LSA section 2(e) p. 3)

8          The Fiesta Oak Valley loan was to have matured on about December 18, 2005.  On about
9   December 7, 2005, USACM sent a letter to the Direct Lenders stating "the Oak Mesa Investors first trust
10  deed will have a new maturity date of December 18, 2006." (Speckert Decl. ¶ 2 Exh 1)  This
11  communication presented the one year maturity extension to the Direct Lenders as fait accompli.  It did
12  not advise the Direct Lenders of any three day right to object to the extension, but instead stated that the
13  extension had already taken place.  Also, the December 7 letter purported to present a report of the
14  borrower's progress justifying the extension *while concealing that interest payments had been in default*
15  *for a year*.  The interest default was concealed by USACM until shortly before the Petition Date, when
16  payments to the Direct Lenders stopped.  Even if actual or implied consent had been obtained by
17  USACM (and it appears that it was not), that consent was not *informed* consent.

18         When a mortgage broker acts as a servicing agent, it is indeed acting as the agent of the lenders.
19  See generally, *Young v. Nevada Title Company*, 103 Nev. 436, 439, 744 P.2d 902 (1987).  "An agent
20  . . . owes to the principal the highest duty of fidelity, loyalty and honesty in the performance of the
21  duties by the agent on behalf of the principal."  *LeMon v. Landers*, 81 Nev. 329, 402 P.2d 648 (1965).
22  A mortgage broker "is charged with the duty of fullest disclosure of all material facts concerning the
23  transaction that might affect the principal's decision."  *Holland Realty Investment Co. v. Nevada,* 84
24  Nev. 91, 97, 436 P.2d 422 (1968);  Accord, *Jory v. Bennight,* 91 Nev. 763, 542 P.2d 1400 (1975).

25         USACM breached its contract with the Fiesta Oak Valley investors when it extended the
26  maturity of the loan while in the process actively concealing with them that the loan had been in default
27  for a year.  Its conduct was a gross violation of the fiduciary duty that USACM owed to the Direct
28  Lenders.  This breach was incurable (the extension was given), and USACM took no remedial action

prior to the Petition Date. Compass cannot realistically contend that USACM was not in breach of the Loan Servicing Agreement on the Petition Date, or that it was acting as a "reasonably prudent loan servicer" at that time.

If any conditions can be imposed on the Direct Lenders in exercising their right to designate a new servicing agent, those conditions are satisfied in this case. USACM had "failed to act," (the standard set forth the Loan Servicing Agreement) by failing to foreclose on a loan which was in interest default for 15 months. USACM had "failed to act as a reasonably prudent loan servicer," and had breached the Loan Servicing Agreement (the standard proposed by Compass in its Motion) because it: (i) failed to "proceed diligently to collect " the loan as required by section 2(c); (ii) extended the maturity of the loan without the Direct Lenders consent in violation of section 2(e); (iii) failed to "keep appropriate accounting records" in violation of section 2(b); and (iv) failed to provide Direct Lenders with an accurate statement "regarding loan collections" as required by section 2(c), instead concealing the existence of the default from the Direct Lenders in violation of its fiduciary duties under Nevada law. This is therefore a clear case in which a majority of the Direct Lenders were entitled to change loan servicers on the Petition Date.

## V.    VINDRAUGA'S PROPOSAL IS IN THE BEST INTERESTS OF THE DIRECT LENDERS

If the Direct Lenders, acting through a majority vote, are permitted to chose their servicing agent then they may consider the offer of competing servicers. This means that to retain the Direct Lenders as clients in the long run, Compass must obtain their trust and confidence by accessibility, full disclosure and diligence in collecting the loan. Compass has not yet done so in the case of Fiesta Oak Valley, and Vindrauga has now offered them terms which are more favorable than the Loan Servicing Agreement. As discussed above in more detail, Vindrauga's Designation form:

- Reduces the servicer's fee from 3% to 1%.

- Includes the limitations on the power of attorney which are required by Nevada Revised Statutes section 645B.330, but which were omitted from the Loan Servicing Agreement.

/ / /

/ / /

1    ● Includes Vindrauga's promise that if the foreclosure process does not produce payment in full

2    with interest, Vindrauga will buy the Direct Lender's interest within 30 days after completion

3    of the foreclosure for the *full amount of principal and interest* owing.

4    ● Includes the right to change loan servicers again, by incorporating the exact language of Nevada

5    Administrative Code section 645B.073.

6    There is no question that these Direct Lenders benefit from the substitution of Vindrauga as

7    servicing agent.  If it can be done consistent with Nevada law and the Confirmation Order, the Court

8    must allow them to take this action.

9
10   VI.   THE COMPASS MOTION CONTAINS NO EVIDENCE AND
         CONTEMPLATES "SANDBAGGING" IN A REPLY

11   Compass is privy to more information about this loan and its pre-petition administration than is

12   Vindrauga.  Compass presumably intends to show that on the Petition Date USACM was acting as a

13   "reasonably prudent loan servicer."  Yet the Compass motion consists of only three and one half pages

14   of text, and Compass has chosen to submit no evidence to support its position.  Tellingly, the Motion

15   concludes with the statement "Compass reserves the right to supplement this Compass Motion at a later

16   date."

17   The Confirmation Order provides that the Direct Lenders must provide Compass at least thirty

18   (30) days prior written notice of the intended exercise of a "Surviving Section 3 Right" and that

19   Compass "shall have the right to challenge the exercise of such Surviving Section 3 Right by filing a

20   motion with this Court . . . ."   Nothing in the Confirmation Order suggests that the burden is on the

21   Direct Lenders to submit evidence to Compass that USACM breached the Loan Servicing Agreement.

22   It was up to Compass to file this Motion and demonstrate, in its moving papers, that no Surviving

23   Section 3 Right exists.

24   Compass already knew what its arguments and evidence would be, but chose to omit these from

25   its moving papers in order to sandbag Vindrauga and the Direct Lenders by filing a lengthy reply.  The

26   Court should not permit this.  "It is well established that new arguments and evidence presented for the

27   first time in Reply are waived.  E.g., *United States v. Patterson,* 230 F.3d 1168, 1172 (9th Cir.2000)."

28    *Docusign, Inc. v. Sertifi*, 468 F.Supp.2d 1305, 1307 (W.D.Wash. 2006).

1  Compass delayed until the last possible day to file this motion on 28 days notice.  It is anticipated

2  that Compass will argue at the hearing that further delay is required in order to consider all of the

3  matters  expected to be raised in its reply.  Compass benefits from delay under the terms of the Loan

4  Servicing Agreement.   The Direct Lenders are injured by every day of further delay.  In this case in

5  particular, the Court should continue to enforce what has been its practice throughout this case and

6  refuse to consider a reply which raises arguments and refers to evidence that could have been presented

7  with the Motion.  If the Court enforces its rules, it can decide this Motion quickly.

8  VII.    UNDERLINE_CONCLUSION

9

10  Compass has not even attempted in its four page motion to carry the impossible burden of

11  showing that USACM was not in breach of the Loan Servicing Agreement on the Petition Date, or that

12  USACM had acted, up the Petition Date, as a "reasonably prudent loan servicer." The Motion is nothing

13  more than a delaying tactic.  Compass has used the additional month which it bought by filing this

14  motion to solicit the Direct Lenders to purchase their interests at unfavorable terms on behalf of "an

15  unrelated third party."  .

16  Nevada's consumer protection laws, and even the one-sided Loan Servicing Agreement itself,

17  preserve a right in the Direct Lenders to change servicing agents.  The Plan preserves that right as it

18  existed on the Petition Date.  That right could be no more clear than in the case of Fiesta Oak Valley.

19  This Court should deny Compass' motion so that the Direct Lenders may proceed, through the servicing

20  agent of their choice, to take steps to collect their loan.

21

22  DATE: April 16, 2007                              KIRBY & McGUINN, A P.C.

23

24                                                        By:__/s/_____
                                                          Dean T. Kirby, Jr. Attorneys for
25                                                        Debt Acquisition Company of America V

26

27

28

1       Compass delayed until the last possible day to file this motion on 28 days notice. It is anticipated

2   that Compass will argue at the hearing that further delay is required in order to consider all of the

3   matters  expected to be raised in its reply.  Compass benefits from delay under the terms of the Loan

4   Servicing Agreement.   The Direct Lenders are injured by every day of further delay.  In this case in

5   particular, the Court should continue to enforce what has been its practice throughout this case and

6   refuse to consider a reply which raises arguments and refers to evidence that could have been presented

7   with the Motion.  If the Court enforces its rules, it can decide this Motion quickly.

8

VII.   <u>CONCLUSION</u>

9

10       Compass has not even attempted in its four page motion to carry the impossible burden of

11   showing that USACM was not in breach of the Loan Servicing Agreement on the Petition Date, or that

12   USACM had acted, up the Petition Date, as a "reasonably prudent loan servicer." The Motion is nothing

13   more than a delaying tactic.  Compass has used the additional month which it bought by filing this

14   motion to solicit the Direct Lenders to purchase their interests at unfavorable terms on behalf of "an

15   unrelated third party." .

16       Nevada's consumer protection laws, and even the one-sided Loan Servicing Agreement itself,

17   preserve a right in the Direct Lenders to change servicing agents.  The Plan preserves that right as it

18   existed on the Petition Date.  That right could be no more clear than in the case of Fiesta Oak Valley.

19   This Court should deny Compass' motion so that the Direct Lenders may proceed, through the servicing

20   agent of their choice, to take steps to collect their loan.

21

22   DATE: April 16, 2007                 KIRBY & McGUINN, A P.C.

23

24                                 By: _/s/_____

                              Dean T. Kirby, Jr. Attorneys for

25                                 Debt Acquisition Company of America V

26

27

28

## DESIGNATION OF SERVICING AGENT

The undersigned, Donald W. Cook Trustee of the Donald W. Cook Trust (who is referred to in this Designation as the "Lender") is the holder of a beneficial interest in the amount of $100000 under that certain Deed of Trust dated June 15, 2004 executed by Oak Mesa Investors, LLC, Trustor, to Orange Coast Title Company, Trustee, and recorded as Instrument No. 04-467495 on June 17, 2004, Official Records of Riverside County, State of California, and recorded on June 18, 2004 as Instrument No. 04-435051 in the Official Records of San Bernardino County, State of California (which is referred to in this Designation as the "Trust Deed"). The Trust Deed encumbers property described in Exhibit B attached to this document (the Property). The debt secured by the Trust Deed is referred to in this Designation as the "Loan."

The undersigned Lender is also a party to the Loan Servicing Agreement between Lender and USA Commercial Mortgage Company (hereinafter referred to as "USA"). The Loan Servicing Agreement has been assigned, or is in the process of being assigned, to Compass Partners, LLC ("Compass").

Under the provisions of article 3 of the Loan Servicing Agreement and under the provisions of Nevada Administrative Code section 645B.073, the undersigned Lender hereby designates Vindrauga Corporation, a California corporation, 1565 Hotel Circle South, Suite 310, San Diego, CA 92108 ("Vindrauga"), as the new servicing agent under the Loan Servicing Agreement, in place of USA. This replacement will take effect regardless of whether the Loan Servicing Agreement has been previously assigned to Compass.

**THIS "DESIGNATION" SUBSTITUTES VINDRAUGA FOR USA UNDER THE LOAN SERVICING AGREEMENT. IT ALSO MAKES CHANGES TO THE LOAN SERVICING AGREEMENT.**

### WHEN THIS DESIGNATION IS EFFECTIVE

1.  This Designation shall not be effective unless, no later than July 1, 2007:

    a.  The automatic stay in bankruptcy, and any other stay ordered by the Bankruptcy Court, have terminated; and

    b.  The holders of 51% or greater of the beneficial interests of record in the Trust Deed have also designated Vindrauga as the Servicing Agent.

    Vindrauga promises to give notice to the Lender of the date when these two conditions have been satisfied. That date is referred to in this Designation as the "Effective Date." Vindrauga has no duties or responsibilities toward the Lender, and cannot take any action on the Lender's behalf, until the Effective Date.

### EFFECT OF THIS DESIGNATION

2.  Beginning on the Effective Date, Vindrauga assumes all of the rights and duties of USA under the Loan Servicing Agreement, as modified by this Designation. Provided however that Vindrauga cannot locate purchasers for Lender's beneficial interest or perform any other duty for which a mortgage broker's license is required under Nevada law.

### POWER OF ATTORNEY

3

D. Cook

**Exhibit 13 Page 1 of 4**

3.  Article 11 of the Loan Servicing Agreement, titled "Limited Power of Attorney" is changed to provide instead:

> The undersigned Lender agrees that Vindrauga may do the following on the Lender's behalf as its agent and attorney in fact: (i) hold the original note; and (ii) do all things on behalf of the Lender which are necessary to collect the Loan, and protect the Lender's interest under the Trust Deed. These powers include, but are not limited to, signing payoff demands and beneficiary's statements of condition, and authorizations for foreclosure and reconveyance.  Provided however that:

>> Neither Vindrauga nor its agents or employees may subordinate the priority of the Trust Deed without the Lender's specific, prior written approval;

>> Neither Vindrauga nor its agents or employees may use or release any money in which the Lender has an interest for a purpose that is not directly related to providing services for the Loan, without the Lender's specific, prior written approval; and

>> Vindrauga's authority to act as the Lender's agent is effective only for this specific Loan.

## PRIOR VIOLATIONS OF THE LOAN SERVICING AGREEMENT

4.  USA violated the Loan Servicing Agreement.  If the Lender signs this Designation and substitutes Vindrauga as the new servicing agent, the Lender cannot hold Vindrauga responsible, reduce Vindrauga's fees, or terminate the Loan Servicing Agreement because of violations by USA.

## VINDRAUGA'S FEE

5.  The fee of Vindrauga as Servicing Agent shall be computed as provided for in article 5 of the Loan Servicing Agreement, with the exception that if the Loan Servicing Agreement designates a fee of 3%, that fee is hereby reduced to 1% as to fees accruing after the Effective Date.  At the time that the Lender signs this Designation, the Lender may instead elect to change the fee provisions by signing Exhibit A.

## PURCHASE OF LENDER'S INTEREST UPON FORECLOSURE

6.  Within 30 calendar days after a foreclosure under the Trust Deed has been completed by delivery of a Trustee's Deed Upon Sale to the beneficiaries of the Trust Deed, Vindrauga promises to purchase from the undersigned Lender, and the Lender agrees to sell to Vindrauga, the beneficial interest of Lender in the Property for the price provided for in subparagraph 2(c)(iii) of the Loan Servicing Agreement, which price is "the then outstanding balance of [Lender's] interest in the principal of the Loan, plus all accrued interest and any prepayment penalty or fee, if applicable." The term "accrued interest" does not include default interest or late charges except to the extent that the Lender becomes entitled to a portion of these by electing to change the fee provisions (that is, by signing Exhibit A).

## UNCOLLECTED DEFAULT INTEREST LATE CHARGES AND LOAN SERVICING FEES

7.  The Loan Servicing Agreement has provisions under which USA or Compass may claim that default interest under the Loan (that is, interest in addition to the usual rate which may be charged



**Exhibit 13 Page 2 of 4**

because the Loan is in default) and also late charges and loan servicing fees, which were not actually collected or received before the Effective Date of this Designation, are nevertheless still owing to USA or Compass as a loan servicing fee. Vindrauga or the Lender may receive a demand for payment of this money from USA or Compass. The Lender hereby grants to Vindrauga full power and authority to pay, contest, settle or compromise these claims of USA or Compass on behalf of the Lender at any time before purchasing the Lender's interest as provided for under the Loan Servicing Agreement or under this Designation. Vindrauga may only be reimbursed for payment to USA or Compass by deducting it from the amounts collected from the Borrower or from the purchase price of Lender's interest as provided for under the Loan Servicing Agreement or under this Designation.

## LENDER'S RIGHT TO DESIGNATE NEW SERVICING AGENT

8.   Article 3 of the Loan Servicing Agreement is hereby amended by substituting in its entirety the following provisions of Nevada Administrative Code section 645B.073:

> Rights of Lender under Nevada Administrative Code section 645B.073. The holders of 51 percent or a greater specified percentage of the beneficial interests of record shall have the right to act on behalf of all the holders of the beneficial interests of record in the event of a default or foreclosure for matters that require the direction or approval of the holders of the beneficial interests in the loan, including, without limitation:
>
> > (a) The designation of the mortgage broker, servicing agent or other person to act on the behalf of the holders of the beneficial interests in the loan; and
> >
> > (b) The sale, encumbrance or lease of real property owned by the holders resulting from a foreclosure or the receipt of a deed in lieu of a foreclosure.

The provisions of the Loan Servicing Agreement are otherwise unchanged and are hereby reaffirmed and reinstated by Lender as to Vindrauga. Lender retains all rights and recourses against any claim which USA or Compass may assert against Lender or against Vindrauga as the agent of Lender.

"LENDER"

Donald W. Cook Trustee of the Donald W. Cook Trust

*Donald W. Cook*

_____

VINDRAUGA CORPORATION
A California Corporation

By: *Hawhatnall*

for Howard Justus
President

5

D COOK

**Exhibit 13 Page 3 of 4**

EXHIBIT A

**ELECTION TO CHANGE LOAN SERVICING FEE**

I (We) hereby elect to replace article 5 of the Loan Servicing Agreement with the following:

<u>Compensation for Loan Servicing</u>.  Lender authorizes Vindrauga to retain, from any and all sums collected from Borrower, its fee for services performed hereunder, which fee shall be six percent (6%) of all sums collected from Borrower and paid to Vindrauga on account of the Loan after the Effective Date of this Designation, including principal, interest, late fees and default interest.  Provided however that no fee shall be charged in relation to default interest or late charges collected by Vindrauga if such default interest or late charges accrued before the Effective Date of this Designation and is not paid to the Lender, but instead to USA or Compass.

**YOU ARE NOT REQUIRED TO SIGN THIS EXHIBIT.  DO NOT SIGN IT UNLESS YOU WISH TO CHANGE THE FEE PROVISIONS OF THE LOAN SERVICING AGREEMENT.**

"LENDER"

Donald W. Cook Trustee of the Donald W. Cook Trust

_____

_____

6

**Exhibit 13 Page 4 of 4**

*Client ID=24SMSJ/PS*
*Account ID=2638*

# LOAN SERVICING AGREEMENT

This Loan Servicing Agreement ("Agreement") is made as of the _____ day of 2003, between USA Commercial Mortgage Company ("USA") and *Rocklin / Redding L.L.C.* _____ ("Lender").

## RECITALS

A.     USA is a mortgage broker and loan servicer in Clark County, Nevada.

B.     Lender lends, or wishes to lend, money to various borrowers (the term "Borrower" includes single and married persons, corporations, trusts, partnerships and all other legal entities) from time to time, which loans are arranged by USA and are secured by interests in real and/or personal property.

C.     Lender wishes to retain the services of USA in connection with making and servicing a
loan or loans (Loan" or "Loans" as the context requires), including all Loans heretofore or hereafter placed by Lender through USA, all upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     <u>Services in Connection with Arranging the Loans</u>.  USA will perform the following services in connection with arranging each Loan:

        (a)     Obtain a promissory note or notes secured by the trust deed referred to in Section 1(b) below, executed by Borrower in a form customarily used by USA and approved by USA's counsel.

        (b)     Obtain a deed of trust, assignment of rents and security agreement executed by Borrower in form customarily used by USA and approved by USA's counsel, and cause the same to be properly recorded.

        (c)     Obtain one or more personal or corporate guaranties, if applicable and as determined by USA to be necessary, executed by such guarantors, as USA shall deem appropriate, in form customarily used by USA.

        (d)     If  USA deems it appropriate or necessary, obtain, at Borrower's expense, an appraisal of the property to be encumbered, prepared and executed by an appraiser reasonably satisfactory to USA.

**Exhibit 14 Page 1 of 7**

FROM :SNOPKO                    FAX NO. :7758834539            Nov. 22 2006 03:02PM P3

(e)    Obtain from a reputable title insurance company, at Borrower's expense, a fully-paid ALTA lender's policy of title insurance, showing Lender as an insured, in an amount at least equal to the initial principal amount of the note and showing as exceptions only those items approved by USA and its counsel.

(f)    Cause the Borrower to obtain, where applicable, casualty insurance policies in amounts

at least equal to the principal amount of the note or the full insurable value of the improvements on the encumbered real property, whichever is less, containing a mortgage or loss payee clause naming Lender, or USA (as agent for Lender), as an additional insured or loss payee.

(g)    Obtain from the Borrower and each guarantor such recent financial statements and information as USA shall deem appropriate.

(h)    Obtain, with respect to any and all encumbrances of record to which Lender's deed of trust will be subject, documentation verifying the principal balance thereof within a reasonable time prior to the making of the Loan and specifying any then existing defaults thereunder.

(i)    Obtain such other documents in connection with the Loan, as USA may deem appropriate in order to protect the Lender's interest.

(j)    All documents which USA obtains from borrower in connection with arranging or servicing any Loan, so long as such Loan is outstanding, shall be kept on file in USA's corporate office and be available to Lender upon request. Notwithstanding the foregoing, USA shall have no obligation or responsibility to obtain any original documents in connection with any Loan serviced by USA, but not arranged or originated by USA.

(k)    Prepare and deliver to escrow closing instructions to effectuate the Loan closing in accordance with the Loan Agreement and the Fee Agreement.

2.    <u>Services of USA in Connection with Servicing the Loans</u>.    Subject to and in accordance with the terms and conditions set forth in this Agreement, and all applicable laws, Lender instructs and authorizes USA to, and USA will perform the following services in connection with servicing each of the Loans:

(a)    Verify, where applicable, that the property encumbered by Lender's deed of trust is insured (at the Borrower's expense) by a sufficient casualty insurance policy and that Borrower has sufficient liability insurance coverage. USA will hold for the Lender's account such policies and renewals thereof.

**Exhibit 14 Page 2 of 7**

(b)      Keep appropriate accounting records on each note and the sums collected thereon, which records will reflect the amounts collected as to principal, interest and late charges, and, if applicable, insurance, taxes and other specified amounts. Those records will be available for review by the Lender during regular business hours at USA's corporate office.

(c)      Until the total amount due under each note is paid in full:

(i)      Proceed diligently to collect all payments due under the terms of the note and promptly pay the proper parties, when and if due, principal, interest, late charges,  insurance and other specified funds.

(ii)      In the event the Borrower fails to make any payment to USA as required by the  terms of the note, USA will take steps to collect the payment including but not limited to delivering default notices, commencing and pursuing foreclosure procedures, and obtaining representation for Lender in litigation and bankruptcy proceedings as deemed necessary or appropriate by USA in its business judgment to fully protect the interests of the Lender, and of all Lenders in the loan.

(iii)      In its sole discretion, USA may pay off any Lender at any time by paying the then outstanding balance of Lender's  interest in the principal of the Loan, plus all accrued interest and any prepayment penalty or fee, if applicable.  Any Lender so paid off shall concurrently execute and deliver therewith to USA an assignment, in a form acceptable to USA, of all of such Lender's right, title, and interest in the Loan (including all documents evidencing the Loan) and in the deed of trust securing the Loan.

(iv)      In its sole discretion, USA may waive late payment charges, assumption fees, charges for returned checks due to insufficient funds, or other fees which may be collected in the ordinary course of servicing the Loans.

(d)      Provide the Lender with regular statements regarding loan collections, but in no event less frequently than quarterly.

(e)      Without limiting the generality of anything contained herein, Lender hereby authorizes and empowers USA, on Lender's behalf, to: (1) execute and

**Exhibit 14 Page 3 of 7**

deliver demands for payoff and beneficiary's / lender's statements of condition and the like; (2) execute and deliver any and all instruments if satisfaction or cancellation, or of partial or full release, discharge, or reconveyance, or authorizations in connection therewith, with respect to any Loans paid in full and with respect to the related real or personal property securing such Loans; (3) execute and deliver any and all other documents with respect to any Loans that are customary and consistent with loan servicing practices pertaining to such loans; (4) consent to modifications of the Loans if the effect of any such modification will not materially or adversely affect the security provided by the real or personal property in connection therewith; (5) institute foreclosure proceedings (judicial or non-judicial), obtain a deed-in-lieu thereof, engage in settlement discussions, and enter into forbearance and other settlement-related agreements (which agreements may contain provisions that release or waive claims against a Borrower or Guarantor); and (6) take title in the name of Lender (in proportion to its interest in the Loan) to any real property upon a foreclosure or delivery of a deed-in-lieu thereof. Notwithstanding the foregoing or any other provision contained herein, USA may not permit any modification to any Loan that would change the interest rate, forgive the payment of any principal or interest (expressly excluding late charges or the difference between default and non-default interest), change the outstanding principal amount, or extend the maturity date, without Lender's prior consent; provided, however, if Lender fails to grant or deny its consent within three (3) business days after notice from USA, Lender shall be deemed to have conclusively given its consent.

3.      Rights of Lender if USA Fails to Act.        Pursuant to NAC 645B.073, in the event of default, foreclosure, or other matters that require action, if for any reason USA fails to act on Lender's behalf as authorized herein, then Lender may, with approval of fifty-one percent (51%) or more of all of the holders of the beneficial interest of record in the Loan, act on behalf of all such holders of beneficial interest of record. These actions may include, but are not limited to:

(a)      the designation of the mortgage broker, servicing agent or other person to act on behalf of the holders of the beneficial interests in the loan; and

(b)      the sale, encumbrance or lease of real property owned by the holders resulting from a foreclosure or the receipt of a deed in lieu of a foreclosure.

4.      Legal Proceedings.      USA will assist the Lender in any necessary foreclosure proceedings to protect the Lender's interest in the note and deed of trust. Where necessary, in USA's business judgment, USA may retain attorneys on Lender's behalf. Any legal proceeding instituted by USA pursuant to this Agreement may be pursued in USA's name only or as agent for Lender. Upon demand by USA, Lender agrees to promptly pay, either in advance or to reimburse USA, for its pro rata portion of the out-of-pocket expenses incurred, including attorney's fees, trustee's fees and foreclosure costs. In the event that Lender fails to pay such sums to USA upon demand or request thereof, or if USA elects to advance such sums, USA may, in its discretion, advance such fees, including trustee's fees, attorney's fees, and costs of foreclosure;

**Exhibit 14 Page 4 of 7**

provided, however, that any fees advanced by USA shall be paid back from the proceeds of the foreclosure (whether by reinstatement or sale), or from any other monies collected with respect to such Loan, before any payments are made to Lender. In the event of any litigation concerning the Loan, Lender hereby appoints USA as its agent to accept service of any summons and complaint, naming Lender as a party.

5.    Compensation to USA for Loan Servicing.  Lender authorizes USA to retain monthly, as compensation for services performed hereunder, (a) one-twelfth (1/12th) of its annual servicing fee, which shall not exceed one percent (1%) per annum of the maximum principal amount of each of the Loans, (b) any late charges collected from the Borrower pursuant to the terms of the Note, and (c) default interest collected from the Borrower pursuant to the terms of the Note.  Notwithstanding the foregoing, it is agreed and acknowledged that USA derives the bulk of its revenues from charging loan fees ("points") to the Borrower.  Certain Borrowers, however, may prefer to pay a higher rate of interest in exchange for a reduction in loan fees payable in advance to USA, the higher interest rate comprising a deferred loan fee.  USA will notify Lender when such a case arises, and advise Lender of what portion of the interest is payable to USA as a deferred loan fee.

Should Lender desire to sell all or any part of its interest in the note and deed of trust, USA will assist Lender in finding potential buyers and completing the necessary documentation for the transaction.  A fee of 5% of the remaining balance of Lender's undivided interest in the note amount will be deducted from the selling price and paid to USA on all such assignments for which USA locates the Assignee.

In the event an extension of a Loan is negotiated, USA shall be entitled to charge a fee therefor from the Borrower pursuant any separate fee agreement between USA and the Borrower.

6.    USA's Right to Delegate.    Notwithstanding anything contained herein, USA may in its sole discretion delegate specific loan arranging and servicing obligations to credit bureaus, real estate tax service companies, real estate brokers or agents, appraisers, attorneys, trustees, or others, provided that USA shall remain responsible for all action taken or not taken by such companies, agents, representatives, and others throughout the term of this Agreement.

7.    No Legal Advice.  Lender acknowledges that USA will not act as Lender's attorney or provide legal advice to Lender, and that Lender is encouraged to seek independent counsel in connection with any questions Lender may have concerning this agreement, any Loan, USA's form loan documents, or any other matter.

8.    Termination.  Lender may, by 30 days written notice to USA, terminate this agreement, and
the power of attorney granted, if one is granted, under Section 9 of this Agreement, if USA fails to perform its obligations hereunder.

**Exhibit 14 Page 5 of 7**

9.    Lender's Registration. Lender(s) name as listed in the first paragraph of this Agreement is the exact form for registration of Lender's interest and for reference to Lender in the Loan Documents.

10.    Integration Clause. This Agreement contains the entire agreement between the parties hereto and cannot be modified except by a written amendment signed by both parties. The invalidity of any portion of this agreement shall in no way affect the balance thereof. This Agreement shall remain in effect until Lender's interest in all notes and deeds of trust with respect to Loans arranged and/or serviced by USA is completely liquidated (unless sooner terminated in accordance with the terms hereof).

11.    Limited Power of Attorney. With respect to each loan, Lender hereby agrees that USA shall have full power and authority, and Lender hereby appoints USA as its true and lawful attorney-in-fact to (a) hold the original note(s), and (b) to do all things and take all actions on behalf of Lender which are necessary or convenient to effectuate this Agreement and its intent and to protect Lender's interest under any note, deed of trust, guaranty, security agreement or other document pertaining to any Loan. Upon USA's request, Lender hereby agrees to execute and deliver, in the presence of a notary public, a "Declaration of Agency and Limited Power of Attorney", in a form consistent with Chapter 645B of the Nevada Revised Statutes, pursuant to which Lender shall further evidence the appointment of USA as Lender's true and lawful attorney-in-fact to undertake the duties of USA hereunder. No one shall be required to look beyond such Declaration of Agency and Limited Power of Attorney for evidence of USA's authority hereunder. All Declarations of Agency and Limited Powers of Attorney may include the language: This document may be executed with counterpart signature pages, and the document with all counterpart signature pages shall constitute one and the same instrument.

12. Notices. All notices, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been given (i) when personally delivered, or (ii) on receipt, when deposited with a recognized overnight courier service such as Federal Express or DHL, or (iii) three (3) business days after the date when deposited in the United States mail and sent postage prepaid by registered or certified mail, return receipt requested, addressed as follows:

If to USA:    USA Commercial Mortgage Company
4484 S. Pecos Road
Las Vegas, Nevada 89121-5030
Attention:

If to Lender:

Attention:

Exhibit 14 Page 6 of 7

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

13.    Governing Law. This Agreement shall be construed in accordance with the laws of the State of Nevada, without regard to the conflict of laws or rules thereof, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws,

14.    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

15.    Attorney's Fees. In the event any party hereto brings an action to enforce any of the provisions of this Agreement, the party against whom judgment is rendered in such action shall be liable to the other for reimbursement of its costs, expenses and attorneys' fees, including such costs, expenses and fees as may be incurred on appeal,

16.    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors and assigns.

17.    Headings. Sections headings used in this Agreement are for convenience only and shall not affect the meaning or interpretation of this Agreement.

18.    Authority. Each party represents and warrants to the other party that it is duly authorized to execute, deliver and perform this Agreement.

IN WITNESS WHEREOF, the parties hereto have signed, sealed, acknowledged and delivered this instrument the day and year first above written.

LENDER: Rocklin/Redding LLC    USA COMMERCIAL MORTGAGE COMPANY:

By: _Frank Snopko_          By: _[signature]_
Name: Frank Snopko as manager of Rocklin/    Joseph D. Milanowski, President
Title: _____    Redding, LLC

By: _____
Name: _____
Title: _____

Exhibit 14 Page 7 of 7