THE LIMITED LIABILITY COMPANY MEMBERSHIP INTEREST UNITS PURCHASED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). SUCH INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON AT ANY TIME IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT COVERING SUCH UNITS UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQUIRED. IN ADDITION, IN NO EVENT MAY UNITS BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON WHO IS NOT A RESIDENT OF NEVADA FOR A PERIOD OF NINE MONTHS FROM THE DATE OF THE LAST SALE THEREOF BY THE FUND.

## SUBSCRIPTION AGREEMENT AND POWER OF ATTORNEY

### USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,
a Nevada limited liability company

The undersigned hereby applies to become a Member of USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, a Nevada limited liability company (the "Company"), and subscribes to purchase the number of Units herein indicated in accordance with the terms and conditions of the Operating Agreement attached as Exhibit A to the Offering Circular dated March 1, 2000, as amended or supplemented from time to time (the "Offering Circular").

       1. **REPRESENTATIONS AND WARRANTIES.** The undersigned represents and warrants as follows:

       (a)    I have received, read and fully understood the Offering Circular and in making this investment I am relying only on the information provided in the Offering Circular. I have not relied on any statements or representations inconsistent with those contained in the Offering Circular.

       (b)    I understand that the Units are being offered and sold without registration under the Securities Act of 1933, as amended, in reliance upon the exemption from such registration requirements for intrastate offerings. I acknowledge and understand that the availability of this exemption depends in part upon the accuracy of the representations and warranties contained herein, which I hereby make with the intent that they may be relied upon by the Manager.

765401/154660.2

**EXHIBIT A**

(c) My principal residence is in the State of Nevada. Except as hereafter provided, if I am acting as the trustee of a trust or on behalf of any other business entity, both the principal office <u>and</u> the principal place of business of such trust or other entity are located in the State of Nevada. If I am acting as the trustee or custodian of a Keogh plan, Individual Retirement Account or other retirement plan and I am not a resident of Nevada, then all of the following requirements are satisfied: (i) all participants or beneficiaries of such retirement plan have their principal residence in Nevada; (ii) all investment decisions regarding such plan are made by such resident participants and/or beneficiaries; and (iii) I perform only ministerial functions with respect to the investment of plan assets, with no independent authority or discretion to make investment decisions.

(d) I understand that Units may not be sold or otherwise disposed of without the prior written consent of the Manager, which consent may be granted or withheld in its sole discretion, and that any such transfer is also subject to other restrictions described in the Offering Circular and in the Operating Agreement. I have liquid assets sufficient to assure myself (i) that investment in these Units will not cause me undue financial difficulties and (ii) that I can provide for my current needs and possible personal contingencies or, if I am the trustee of a retirement trust, that the limited liquidity of the Units will not cause difficulty in meeting the trust's obligations to make distributions to plan participants in a timely manner.

(e) I understand that an investment in the Units involves certain risks.

(f) I am 18 years of age or older.

(g) By virtue of my own investment acumen and experience or financial advice from my independent advisors (other than a person receiving commissions by reason of my purchase of Units), I am capable of evaluating the risks and merits of an investment in the Units.

(h) I am purchasing the Units solely for my own account, and not with a view to or for a sale in connection with any distribution of the Units.

(i) Either (i) I have a net worth (exclusive of home, furnishings and automobile) of at least $50,000 and an annual gross income of at least $50,000; or (ii) I have a net worth (exclusive of home, furnishings and automobile) of at least $100,000; or (iii) I am purchasing as a trustee or other fiduciary for an individual that meets the requirements of (i) or (ii) above or for an account or plan whose donor or plan participant meets the requirements of (i) or (ii) above.

2. **POWER OF ATTORNEY.** I hereby irrevocably constitute and appoint the Manager as my true and lawful attorney-in-fact, with full power and authority for me, and in my name, place and stead, to execute, acknowledge, publish and file:

(a) The Operating Agreement, the Articles of Organization of the Company and any amendments thereto or cancellations thereof required under the laws of the State of Nevada;

765401/154660.2

(b)     Any other certificates, instruments and documents as may be required by, or may be appropriate under, the laws of any state or other jurisdiction in which the Company is doing or intends to do business; and

(c)     Any documents which may be required to effect the continuation of the Company, the admission of an additional or substituted Member, or the dissolution and termination of the Company.

The power of attorney granted above is a special power of attorney coupled with an interest, is irrevocable, and shall survive my death or the delivery of an assignment of Units by me; provided, that where the assignee of Units has been approved by the Manager for admission to the Company as a substituted Member, such power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Manager to execute, acknowledge, file and record any instrument necessary to effect such substitution.

3.      **ACCEPTANCE.** This Subscription Agreement and Power of Attorney (this "Agreement") will be accepted or rejected by the Manager within fifteen (15) days of its receipt by the Company. Upon acceptance, this subscription will become irrevocable, and will obligate the undersigned to purchase the number of Units indicated below, for the purchase price of $25,000 per Unit. The Manager will return a countersigned copy of this Agreement to accepted subscribers, which copy (together with my cancelled check) will be evidence of my purchase of Units.

4.      **PAYMENT OF SUBSCRIPTION PRICE.** The full purchase price for Units is $25,000 per Unit, payable in cash concurrently with delivery of this Agreement. I understand that my subscription funds will not bear interest until I am admitted to the Company.

[ALTERNATIVE PARAGRAPH 4 - to be used if units are purchased through the contribution of an existing loan:

"The full purchase price for Units is $25,000 per Unit, payable by the undersigned's contribution to the Company of an existing real estate secured loan in exchange for Units. This loan contribution is subject to all of the terms and conditions of the Offering Circular and Operating Agreement. This loan contribution, and the undersigned's purchase of Units in exchange therefor, will be consummated when all documents and acts required by the Manager to transfer the loan to the Company have been signed, recorded and taken. These documents and acts include, without limitation, an endorsement of the original note that evidences the loan, a recorded assignment of the deed of trust that secures the loan and an endorsement to the lender's title insurance policy whereby the underlying title company recognizes the transfer of the note and deed of trust to the Company. The amount of Units sold in exchange for the loan contribution shall be equal to the outstanding principal balance of the loan, together with any accrued but unpaid interest."]

5. THE UNDERSIGNED AGREES TO INDEMNIFY, DEFEND (BY COUNSEL REASONABLY ACCEPTABLE TO THE INDEMNIFIED PARTY) AND HOLD THE COMPANY, ITS MANAGER, MEMBERS AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS, AND EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, AND DAMAGES (INCLUDING, WITHOUT LIMITATION, ALL ATTORNEYS' FEES WHICH SHALL BE PAID AS INCURRED) WHICH ANY OF THEM MAY INCUR, IN ANY MANNER OR TO ANY PERSON, BY REASON OF THE FALSITY, INCOMPLETENESS OR MISREPRESENTATION OF ANY INFORMATION FURNISHED BY THE UNDERSIGNED HEREIN OR IN ANY DOCUMENT SUBMITTED HEREWITH.

6. **INVESTOR INFORMATION.** (Please print or type)

Name and Address of Investor or Beneficial Owner:

Bruce McGimsey

7650 North Jones

Las Vegas, Nevada 89131
City                 Zip Code

702-656-8235        ( )
Telephone (Home)    Telephone (Office)

(1) My net worth (exclusive of home, furnishings and automobile) is at least $50,000 and my annual gross income in the prior year was at least $50,000:     [X] Yes    ___ No

OR

(2) I have a net worth (exclusive of home, furnishings and automobile) of at least $100,000:     ___ Yes    ___ No

OR

If I am purchasing as a trustee or other fiduciary, the individual donor, or plan participant meets the requirements of (1) or (2) above:     ___ Yes    ___ No

765401/154660.2

Please complete the following, as applicable. (Investments by more than one of the following entities, even if related to each other or controlled by the same person, require completion of separate Subscription Agreement.)

| Identifying Information | Monthly Income to Be:[1] |

Individual:

Name Bruce McGimsey          Compounded        X X
Address 7650 N. Jones         or Distributed
Las Vegas, NV  89131
Soc.Sec.No.  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

Individual Retirement Account ("IRA"):

Trustee _____         Compounded    _____
_____                  or Distributed _____
Address _____
_____, NV _____
Acct.No. _____         Tax I.D. No. _____

Pension or Profit Sharing Trust ("ERISA Plan"):

Trustee _____         Compounded    _____
_____                  or Distributed _____
Address _____
_____, NV _____
Acct.No. _____         Tax I.D. No. _____

Corporation, Trust or Other:

Trustee _____         Compounded    _____
_____                  or Distributed _____
Address _____
_____, NV _____
Acct.No. _____         Tax I.D. No. _____

[1] The election whether to receive monthly cash distributions, or to allow earnings to compound, is irrevocable and no changes by the investor will be allowed for the first year after an investor's admission to the Company. Thereafter, an investor may, on an annual basis and subject to the terms and conditions contained in the Offering Circular and Operating Agreement, elect to switch how distributions are treated. The Manager, however, reserves the right to immediately commence making cash distributions to previously compounding investors to ensure that the Company remains exempt from the application of the Plan Asset Regulations. Investors have the right to withdraw from the Company, subject to certain limitations. (See discussion in Offering Circular under "ERISA Considerations," "Summary of Operating Agreement" and "Withdrawal from Company.")

Number of Units to be Purchased: ___1___

Total Purchase Price ($25,000 per Unit): $ 25,000

Make check payable to "USA Capital Diversified Trust Deed Fund, LLC" and return with this Subscription Agreement to c/o USA Commercial Mortgage Company, 4484 South Pecos Road, Las Vegas, Nevada 89121.

IN WITNESS WHEREOF, the undersigned hereby agrees to become a Member in USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, a Nevada limited liability company, upon the terms and conditions set forth in the Operating Agreement.

Dated: This __31__ day of __July__, 2002

_____Bruce M. Hinsey_____       _____
(signature of Investor or              (signature of Investor or
Beneficial Owner)                       Beneficial Owner)


_____           _____
(signature of Trustee, if any)    (signature of Trustee, if any)


[IF IRA OR ERISA PLAN, THEN BOTH TRUSTEE AND BENEFICIAL OWNER(S) MUST SIGN.]

765401/154660.2

## ACCEPTANCE

The foregoing Subscription Agreement is hereby accepted by USA Capital Diversified Trust Deed Fund, LLC.

Dated: _____ 8/1_____, 2002

USA Capital Diversified Trust Deed Fund, LLC,
a Nevada limited liability company

By:     USA Capital Realty Advisors, LLC
        a Nevada limited liability company
        Its Manager

By: _____

Its: _____

connection with the issuance of any new instruments or certificates for any Units which are presented to the Manager for transfer during the nine-month period described in subparagraph (3) above.

Instruments or certificates shall bear the following legends:

THE MEMBERSHIP INTEREST UNITS PURCHASED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). SUCH INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON AT ANY TIME IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT COVERING SUCH UNITS UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS, OR AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE FUND TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQUIRED. IN ADDITION, IN NO EVENT MAY UNITS BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON WHO IS NOT A RESIDENT OF NEVADA FOR A PERIOD OF NINE MONTHS FROM THE DATE OF THE LAST SALE THEREOF BY THE FUND.

## LENDING STANDARDS AND POLICIES

### General Standards for Mortgage Loans

The Fund will engage in the business of making or purchasing entire or fractional interests in acquisition, development, construction and bridge, or interim, loans secured by first deeds of trust on undeveloped land and residential and commercial developments located in the United States. The Fund's loans will not be insured or guaranteed by any governmental agency or private mortgage insurance company. Fund loans will be selected for investment pursuant to a set of guidelines set forth below, which guidelines are designed to set standards for the quality of the real property security given for the loans. Certain of these guidelines can be changed by the Manager, as described below.

1. **Priority of Deeds of Trust**. All Fund loans will be secured only by first deeds of trust that encumber the property which the Fund loans are being used to acquire, develop, construct or otherwise finance. In some states, a mortgage is used to create a security interest in real property, rather than a deed of trust. For purposes of this Offering Circular, the term "deed of trust" means both a deed of trust and a mortgage.

2. **Geographic Area of Lending Activity**. The Fund will make loans secured by property located throughout the United States, although it is contemplated that many of the Fund's loans will be secured by property located in the western United States.

3. **Loan-to-Value Ratios**. The amount of a Fund loan will generally not exceed the following percentages, based on the appraised value of the security property as determined by an independent written appraisal at the time the loan is made.

13

**EXHIBIT B**

| Type of Property/Loan | Maximum Loan to Value Ratio (subject to increase by the Manager) |
|---|---|
| Residential Subdivisions (loans to land developers and residential builders) | 75% |
| Commercial Property (including but not limited to multi-unit residential property, office buildings, industrial and warehouse facilities, retail stores, shopping centers, motels, self-storage facilities, and senior housing) | 75% |
| Unimproved Land | 60% |

These loan-to-value ratios may be increased if, in the sole discretion of the Manager, a given loan is supported by credit adequate to justify a higher loan-to-value ratio or if mortgage insurance is obtained; however, the Manager does not anticipate obtaining or requiring the borrowers to maintain mortgage insurance. In addition, the maximum loan to value ratio for unimproved land may be increased, in the Manager's discretion, to 75% if the unimproved land is already entitled (e.g., a final subdivision map has been recorded on the land), a tentative map has been approved for the unimproved land, or the Manager believes that the borrower is likely to secure key entitlements. Appraisals and loan-to-value ratios may be determined on an as-completed basis for construction loans (i.e., the value of property as determined by the appraiser assuming that all of the improvements for which the loan is being sought are completed). Finally, the foregoing loan-to-value ratio will not apply to purchase-money financing offered by the Fund to sell any real estate owned (acquired through foreclosure) or to refinance an existing loan that is in default at the time of maturity. In such cases, the Manager shall be free to accept any reasonable financing terms that it deems to be in the best interests of the Fund, in its sole discretion.

The Fund will receive an appraisal for each property on which it will make a mortgage loan. Generally, appraisers retained by the Fund shall be certified by the American Institute of Real Estate Appraisers (M.A.I. or S.R.A.), although appraisals from appraisers holding other credentials (e.g., who meet the minimum qualifications prescribed by local laws or are of the type generally used by commercial lenders in the state the property is situated) may be used with respect to some Fund loans. The Manager will review each appraisal report

4. **Terms of Loans.** Fund loans will have a term of between one (1) and three (3) years although the Fund may make loans that have a shorter maturity if the Manager believes in its sole discretion that the loans represent a sound investment opportunity. Most loans will require payments of interest only during the loan term, and the borrower will have to make a substantial "balloon payment" at the end of the term. Many borrowers do not have funds sufficient to make this balloon payment and, consequently, must refinance or sell the underlying property. (See "Risks and Other Important Factors -- Loan Defaults and Foreclosures".)

5. **Escrow Conditions.** Fund loans will be funded through an escrow account handled by either a qualified title insurance or escrow company or other qualified company performing similar functions. The escrow agent will be instructed not to disburse any of the Fund's funds out of the escrow for purposes of funding the loan until:

14

(a)  Satisfactory title insurance coverage has been obtained for all loans, with the title insurance policy naming the Fund as the insured and providing title insurance in an amount equal to the principal amount of the loan. Title insurance insures only the validity and priority of the Fund's deed of trust, and does not insure the Fund against loss by reason of other causes, such as diminution in the value of the property, over-appraisals, borrower's defaults, etc.

(b)  Satisfactory fire and casualty insurance has been obtained for all loans, which insurance shall name the Fund as loss payee in an amount equal to the principal amount of the Fund's loan. Fire insurance will not be required where a loan is secured by unimproved land. (See "Risk Factors -- Uninsured Losses.")

6.  **Absence of Mortgage Insurance.** The Manager does not intend to arrange for mortgage insurance, which would afford some protection against loss if the Fund foreclosed on a loan and there were insufficient equity in the property to repay all sums owed.

7.  **Fund as Payee.** All loan documents (notes, deeds of trust, etc.) and insurance policies will name the Fund as payee and beneficiary. Loans will not be written in the name of the Manager or any other nominee, although loans that the Fund purchases or are contributed by investors in exchange for Units (as described below) will originally be written in the name of the original lender or investor. Such loans will be assigned to the Fund when they are purchased or contributed.

8.  **No Loans to Manager.** No loans will be made by the Fund to the Manager or to any of its affiliates, except for any financing extended as part of a sale of real estate owned as a result of foreclosure. (See "Conflicts of Interest -- Sale of Real Estate Owned to Affiliates".)

9.  **Purchase of Loans from Manager or Affiliates.** Preexisting loans, or fractional interests therein, that are secured by first deeds of trust may be purchased from the Manager, Affiliates or other third parties; provided that any such loan is not in default and otherwise satisfies the foregoing lending guidelines. The purchase price to the Fund for any such loan will be equal to the then-outstanding principal balance of the loan, together with any accrued but unpaid interest (the "Loan Balance") (or a proportionate share of the Loan Balance with respect to the purchase of a fractional loan interest).

10. **Contributions of Loans.** At the sole discretion of the Manager, Members may be allowed to contribute entire or fractional interests in preexisting loans that are secured by first deeds of trust in exchange for Units. Any such loans that are contributed to the Fund shall not be in default at the time of contribution, shall satisfy the foregoing lending guidelines and must have been originated by the Manager or its Affiliates. The amount of Units sold to a Member in exchange for such a contribution shall be equal to the Loan Balance (or a proportionate share of the Loan Balance with respect to the contribution of a fractional loan interest).

11. **Loan Diversification.** Until such time as $100,000,000 in Units have been sold, no Fund loan (or Fund interest in a loan) will exceed $20,000,000. Once $100,000,000 in Units have been sold, (i) no Fund loan (or Fund interest in a loan) will exceed fifteen percent (15%) of total Fund loans outstanding at the time of the loan, and (ii) no more than twenty-five (25%) of the Fund's loans outstanding at any time shall be made to a single borrower, together with any affiliates of such borrower.

15

| | |
|---|---|
| Asset Management and Loan Servicing Fee to the Manager | 1/12 of 1% of Assets Under Management, payable monthly (i.e., 1.0% per year). [1] |
| No Profits of the Fund to Manager; No Part of Cash Available for Distribution | Although a 1% promotional interest in profits and distributions is commonly accorded to the general partner or manager of mortgage pools similar to the Fund, the Manager has waived any such 1% interest in profits or distributions of the Fund. The Manager has purchased two Units as the initial investor of the Fund. Additionally, the Manager may purchase Units, with respect to which it shall have the same rights and benefits as any other Member. |
| Legal Fees to USA Commercial Mortgage Company | Documentation of some of the Fund's loans will be prepared by the general counsel for USA Commercial Mortgage Company, which is the sole stockholder of the Manager. Those legal fees will be paid by the borrower under such loans. |
| Real Estate Commissions to USA Commercial Real Estate Group upon resale of any property acquired through foreclosure | If the Fund acquires property through foreclosure, USA Commercial Real Estate Group may, in some circumstances, serve as the listing broker in the sale of such property. USA Commercial Real Estate Group would earn a competitive brokerage commission. |

Footnotes from previous page:

[1]  "Assets Under Management" means the total Fund capital, including cash, notes (at book value), real estate owned (at book value), accounts receivable, advances made to protect loan security, and any other Fund assets valued at fair market value. The Asset Management Fee will be paid on the 15th day of each calendar month with respect to Assets Under Management as of the last day of the immediately preceding month.

## FIDUCIARY RESPONSIBILITY OF THE MANAGER

Under Nevada law, the fiduciary duties of a manager to the limited liability company and to its members are those of a partner to a partnership and to the partners of a partnership. Accordingly, a manager is accountable to a limited liability company as a fiduciary, which means that a manager is required to exercise good faith and integrity with respect to company affairs. This fiduciary duty is in addition to those other duties and

22

**EXHIBIT C**

obligations of, and limitations on, the Manager which are set forth in the Operating Agreement. Pursuant to the terms of the Operating Agreement, during business hours and with five days' prior notice, any Member or his legal representative may inspect the Fund's financial statements and other books and records as they relate to the internal affairs of the Fund.

The Operating Agreement provides that the Manager shall have no liability to the Fund for losses resulting from errors in judgment or other acts or omissions, unless the Manager is guilty of intentional misconduct, fraud, or knowing violation of the law. The Operating Agreement also provides that the Fund shall indemnify the Manager against liability and related expenses (including reasonable attorneys' fees and costs) incurred in dealing with the Fund, Members or third parties, so long as no intentional misconduct, fraud, or knowing violation of the law on the part of the Manager is involved. Therefore, Members may have a more limited right of action than they would have absent these provisions in the Operating Agreement. A successful indemnification of the Manager or any litigation that may arise in connection with the Manager's indemnification could deplete the assets of the Fund as allowed under Nevada law. Members who believe that a breach of the Manager's fiduciary duty has occurred should consult with their own counsel.

## CONFLICTS OF INTEREST

The following is a list of the important areas in which the interests of the Manager or its Affiliates will conflict with those of the Fund. The Members must rely on the general fiduciary standards which apply to a general partner of a limited partnership to prevent unfairness by the Manager or an affiliate of the Manager in a transaction with the Fund. (See "Fiduciary Responsibility of the Manager.") Except as may arise in the normal course of the relationship, there are no transactions presently contemplated between the Fund and its Manager (or its affiliates) other than those listed below.

### Loan Brokerage Commissions

None of the compensation set forth under "Compensation to Manager and Its Affiliates" was determined by arms' length negotiations. It is anticipated that the loan brokerage commissions charged to borrowers by the Manager for most loans will range between 2-4% per annum of the principal amount of each loan. Loan brokerage commissions may be paid to USA Commercial Mortgage Company when the loan is funded or may be paid over the term of the loan. Loan brokerage commissions are paid by borrowers out of loan proceeds. Any increase in such charges will have a direct, adverse effect upon the interest rates that borrowers will be willing to pay the Fund, thus reducing the overall rate of return to Members. Conversely, if the Manager reduced the loan brokerage commissions charged by it, a higher rate of return might be obtained for the Fund and the Members. This conflict of interest will exist in connection with every Fund loan transaction, and Members must rely upon the fiduciary duties of the Manager to protect their interests. The Fund will generally charge borrowers interest at the rate generally prevailing in the geographical areas where the security property is located for loans to comparable borrowers of similar size, duration and security.

### Other Funds or Businesses

The compensation structure applicable to the Manager or its Affiliates in connection with loans that are originated by it or its Affiliates may be different, and depending on the circumstances at a given point in time, may be more lucrative to the Manager than the compensation structure applicable to the Manager in connection

23