Adam M. Starr
Greenberg Traurig, LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, California  90404
Telephone:  (310) 586-7700
Facsimile:  (310) 586-7800
Email:  starra@gtlaw.com

Ronald D. Green
Greenberg Traurig, LLP
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89169
Telephone:  (702) 792-3773
Facsimile:  (702) 792-9002
Email:   greenr@gtlaw.com

Matthew T. Gensburg
Nancy A. Peterman
Sherri Morissette
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 2500
Chicago, Illinois 60601
Telephone: (312) 456-8400
Facsimile: (312) 456-8435
Email:   gensburgm@gtlaw.com
          petermann@gtlaw.com
          morissettes@gtlaw.com

Attorneys for Mesirow Financial Interim Management, LLC,
the Debtors' Chief Restructuring Officer and Crisis Managers

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br><div align="right">Debtor.</div><hr>In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br><div align="right">Debtor.</div><hr>In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br><div align="right">Debtor.</div> | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR<br><br>Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |

_____

In re:

USA CAPITAL FIRST TRUST DEED FUND, LLC,

Debtor.

_____

In re:

USA SECURITIES, LLC,

Debtor.

_____

Affects:

☒ All Debtors
☐ USA Commercial Mortgage Company
☐ USA Securities, LLC
☐ USA Capital Realty Advisors, LLC
☐ USA Capital Diversified Trust Deed Fund, LLC
☐ USA First Trust Deed Fund, LLC

**APPLICATION FOR ENTRY OF ORDER (I) FINALLY ALLOWING AND APPROVING ALL COMPENSATION AND EXPENSES INCURRED BY MESIROW FINANCIAL INTERIM MANAGEMENT, LLC IN ITS CAPACITY AS DEBTORS' CRISIS MANAGERS AND CHIEF RESTRUCTURING OFFICERS FOR THE PERIOD APRIL 13, 2006 THROUGH MARCH 12, 2007; (II) ALLOWING AND APPROVING A SUCCESS FEE (III) AUTHORIZING APPLICATION OF THE RETAINER AGAINST THE ALLOWED FEES AND EXPENSES; AND (IV) AUTHORIZING PAYMENT OF THE BALANCE DUE**

Mesirow Financial Interim Management, LLC ("**MFIM**") presents this application (the "**Final Application**")[1] for entry of an Order (i) finally allowing and approving compensation in the amount of $11,389,203.09 for 27,417.60 hours of services rendered and expenses in the amount of $1,117,168.74 incurred by MFIM, in its capacity as the crisis managers and chief restructuring officers for USA Commercial Mortgage Company ("**USACM**"), USA Capital Realty Advisors, LLC ("**USA Realty**"), USA Capital Diversified Trust Deed Fund, LLC ("**DTDF**"), USA Capital First Trust Deed Fund, LLC ("**FTDF**") and USA Securities, LLC ("**USA Securities**", and collectively, the "**Debtors**"), debtors and debtors-in-possession in these chapter 11 cases (the "**Cases**") for the time period beginning on April 13, 2006 and ending on March 12, 2007[2] (the "**Application Period**"), (ii) approving a success fee in the amount of $2,500,000.00; (iii) authorizing application of the $150,000 retainer against finally allowed fees and expenses; and (iv) authorizing payment of $14,856,371.83

---

[1]    MFIM intends to file declarations in support of this Final Application shortly and hereby expressly reserves the right to file such documents.

[2]    MFIM has included time spent preparing this Final Application and Reviewing final fee applications for other professionals in these Cases incurred after March 12, 2007. The remainder of post-Effective Date time billed by MFIM will be paid by the Debtors in the ordinary course of their business and in accordance with the Plan. MFIM has also included $350,000 in estimated fees and expenses related to this Final Application that are expected to be incurred after filing this Final Application in connection with responding to objections, reviewing the Committee professionals' fee applications and preparing for and attending the court hearing on the Final Fee Application. MFIM will file a supplement to this Final Application with detail to support the estimated fees and expenses in advance of the hearing on the Final Application.

(after application of the Retainer and net of voluntary reductions totaling $360,769.91) (the "**Total Requested Compensation**").  In support of the Final Application, MFIM states the following:

## SUMMARY OF APPLICATION

MFIM was engaged as the Debtors' crisis manager and chief restructuring officer (**"CRO"**) as of April 13, 2006 (the **"Petition Date"**).  On the Petition Date, Thomas Allison, the Debtors' CRO and an employee of MFIM, along with other employees of MFIM, assumed management of the Debtors and found companies that were replete with fraud.  The Debtors, who managed more than 12,000 investor accounts, had engaged in a massive fraud on their creditors and investors, including diverting principal and interest payments from investors, transferring assets to affiliated entities, commingling funds that should have been held in trust in accordance with Nevada law, and failing to keep adequate books and records.  One of the Debtors, FTDF, was the subject of an ongoing investigation by the Securities and Exchange Committee (the **"SEC"**) and another Debtor, USACM, was under investigation by the Nevada State Mortgage Lending Division.

MFIM also found companies with no clear ability to generate the cash necessary to fund their ongoing business operations.  Prior to the Petition Date, USACM did not collect the servicing fees in accordance with the loan servicing agreements ("**LSAs**") on the approximately 12,000 investor accounts they managed.  Furthermore, USACM had no formal collections department to collect their nearly $1 billion loan portfolio.  Due to the massive fraud, USACM's mortgage broker license was restricted thereby preventing USACM from originating any new loans.  The loans serviced by USACM were generally non-performing.  With no more than $400,000 in USACM's bank account[3] on the Petition Date, MFIM, along with the Debtors' other professionals, took on the monumental task of sorting out the fraud and trying to create a recovery for the creditors and investors who were the victims of the Debtors' actions.

With little cash in the bank and with no ability to generate cash through loan originations, MFIM focused their efforts on the only avenue available to generate cash -- collecting the nearly $1

---

[3]    Although DTDF possessed in excess of $800,000 in its accounts on the Petition Date, those funds were property of the DTDF estate and could not be used to fund payroll and other expenses at USACM.

billion loan portfolio of which nearly 60% of such loans were non-performing on the Petition Date. MFIM succeeded in this task and as of the Effective Date of the Plan (as defined herein), a mere eleven months after assuming control of the Debtors, MFIM had collected $347.7 million on account of the largely non-performing loan portfolio.

In addition to the proceeds from the sale of the loan portfolios, MFIM collected $227.2 million in principal, $46.6 million in interest and $6.9 million in fees on account of the loans. MFIM also marketed certain assets for sale and generated a competitive auction process, with three qualified bidders attending the Court supervised auction that generated another $67 million. Ultimately, at the conclusion of the auction on December 7, 2006, Compass Partners, LLC ("**Compass**") was selected as the highest and best bidder and purchased FTDF's 37 loans (with a current principal balance of approximately $45.2 million), all of the loans in which USACM held interests and USACM's loan servicing business (collectively, the **"Compass Assets"**) for $67 million. MFIM's ability to generate interest in the Compass Assets is miraculous given that upon commencement of these Cases, a mere eight months earlier, the Debtors had no clear ability to service the loans. This successful sale is a testament to the work performed by MFIM and the accounting systems and controls instituted by them throughout these Cases. MFIM was able to create accurate investor statements, distribute those statements to investors, distribute more than $231.9 million to the investors during the Cases and communicate with the investors to keep them informed and involved in the process. All of these accomplishments demonstrated the value of the servicing business created by MFIM in a short eight months and the market clearly responded as evidenced by the $67 million offer from Compass.

MFIM's collection efforts, including the sale efforts, kept the Debtors' businesses afloat for the period of time needed to confirm the Third Amended Joint Plan of Reorganization (the "**Plan**") which approved the sale to Compass, was supported by all four Committees (as defined herein) and approved by all classes of creditors and equity interests entitled to vote. These Cases were also kept afloat by the Debtors' and Committee professionals -- all of whom had to forgo payment of their fees and expenses until there was a clear exit strategy for these Debtors from Chapter 11. As a result, professionals did not see any significant payment on their outstanding fees and expenses until January 2007. With MFIM responsible for operating the Debtors' businesses (or, rather, creating the

a business to be operated by the Debtors after sorting out the massive fraud), MFIM carried more than $8.1 million of fees and expenses through these Cases until receiving a significant payment in January 2007. Therefore, MFIM effectively financed these Cases and worked on a contingency basis, which was clearly not the understanding when MFIM accepted this engagement.

Throughout these Cases, MFIM had to make hard choices on whether to pursue litigation, including against former management and against affiliates, such as USA Investment Partners (**"Investment Partners"**). Due to the urgency of generating cash to fund the Cases and the Plan, MFIM carefully picked those battles necessary to protect the value of the business that was created during these Cases. MFIM did much of the forensic accounting leg work required to position the USACM Trust (which was established under the Plan) to pursue litigation for the benefit of its constituents.

Notwithstanding the dire circumstances facing MFIM on the Petition Date, MFIM generated major financial recoveries for the creditors, equity holders and Direct Lenders in the eleven months leading up to the Plan's Effective Date as discussed in more detail below:

A.    *MFIM Created the Loan Servicing Business Through Its Forensic Work and Proven Collection Abilities*

As part of this engagement, MFIM assumed control of the Debtors' accounting and finance departments, assuming all accounting responsibilities for the loan portfolio activity, as well as, the financial planning, analysis and reporting functions of the Debtors. In this role, MFIM discovered that the Debtors' books were "cooked" and with each day, discovered evidence of additional fraud. The Debtors' accounting irregularities were widespread. MFIM discovered checks totaling $18.9 million payable to DTDF in a desk drawer. These checks related to collected interest due to DTDF; however, there was no money in the bank account to cover the checks. USACM did not properly maintain historical accounting data -- essentially erasing any audit trail. The historical accounting data would have enabled a complete review and analysis of activity in the 12,000 individual loan and investor accounts starting with the initiation of each loan. This type of historical financial information is generally maintained by lenders and was critical information in a situation involving

circumstances such as those encountered here. Approximately $54 million of principal collections on loans serviced by USACM had not been paid to the rightful owners -- DTDF and certain of the Direct Lenders -- and instead had been diverted by USACM to other investors whose loans were not performing in order to perpetuate the ongoing fraud and maintain the appearance that their loans were performing loans. It was only when the Debtors ran out of money and could not make the interest payments due in April 2006 that the fraud stopped.

Because of the Debtors' lack of appropriate prepetition record keeping, MFIM was forced to completely reconstruct the Debtors' loan servicing and accounting systems. MFIM began by researching deposits slips, checks, bank statements, correspondence and other source documents to verify transactions. Borrower payments were documented by MFIM with check copies and bank statements to verify the date of receipt and amount of payment. Previous management used the Debtors' check stock in such a way to circumvent the audit trail and perpetuate the fraud by, among other things, using check numbers out of sequence or using the same check number multiple times. This added another layer of complexities to the forensic work.

MFIM was required to review each loan agreement to determine (i) the terms on which regular interest was charged, (ii) when and if default interest was to be charged, (iii) when payments were due and to be applied to the loan balance, and (iv) the amount or applicability of late fees, origination fees or exit fees. Prepetition, the Debtors had not administered the loans in accordance with the applicable loan documents.

Using all of this information, MFIM reconstructed the USACM loan ledgers for each loan and calculated proper accruals for interest and service fees. All of this data was loaded onto a structured query language ("**SQL**") database, a new version of the internally developed loan servicing program (the "**iTrack System**"), in order to automate the loan reporting and process the holdbacks and nettings required by various orders of this Court. During the transition period to the SQL database,

MFIM had to maintain manual loan ledgers for each month, and then load the data into the SQL database in order to issue the borrower monthly interest statements, the loan summaries by month, the weekly collection reports, the monthly collection reports and other data needed or requested by the loan collections team, the Committees, potential buyers and other constituents.

By performing the above services, MFIM was able create a business foundation that facilitated the achievements detailed in this Final Application, including the collection of $280.7 million in loans, a sale price of $67 million for USACM's loan servicing business, USACM's interests in certain loans and the FTDF loans, and a business platform by which DTDF is now able to pursue collection of their remaining loans post-confirmation (with a current principal balance of approximately $96 million as of the Effective Date).

> **B.** **MFIM Achieved $280.7 Million of**
> **Loan Collections for the USACM Estates**

As of the Petition Date, USACM serviced 115 loans with an aggregate principal balance of $960 million.  These loans were made by over 3,600 Direct Lenders, as well as FTDF and DTDF (collectively, the "**Funds**") and were high-risk bridge facilities entered into with a minimal amount of underwriting and due diligence.  As of the Petition Date, the vast majority of these loans were nonperforming.  Upon its engagement, MFIM discovered that USACM had no loan servicing group to collect the non-performing loans.   In an effort to conceal these problems, USACM regularly made monthly interest payments to the Direct Lenders regardless of whether the borrower of the particular loans in which the Direct Lenders had an interest were paying USACM.  The funds used to make these payments were diverted principal and interest from loans owned by other Direct Lenders.  For example, during the first three months of 2006, USACM collected approximately $5.3 million per month in interest payments, but paid out on average $9.7 million per month to the Direct Lenders from the diverted funds.  MFIM determined that as of the Petition Date, USACM had made

approximately $39.5 million in such advance payments of principal and interest to the Direct Lenders from diverted funds.

USACM also routinely acquiesced to the borrower's inability to pay in exchange for large fees or equity interests in the projects, all of which were diverted to Investment Partners. Due to these diversions of property from the Debtors to Investment Partners, MFIM engaged in extensive discussions throughout these Cases with the SEC concerning the commencement of an SEC receivership as to Investment Partners.

During its engagement, MFIM performed rigorous collection activity in order to collect amounts due and owing to the Debtors. As of March 12, 2007, MFIM's efforts resulted in collections of approximately $280.7 million, consisting of $227.2 million in principal, $46.6 million in current interest, and $6.9 million in fees. Of this amount, MFIM distributed approximately $231.9 million to the Direct Lenders (including the Funds) during these Cases.

C.     **MFIM Successfully Achieved a $67 Million Purchase Price for USACM's Loan Servicing Business, Certain USACM Loans and the FTDF Loans**

During its engagement, MFIM explored various alternatives for concluding these Cases, including liquidation, reorganization or sales options. By August 2006, after extensive discussions with the Committees, it became clear that a sale of assets was the best alternative for the Debtors. MFIM developed a marketing strategy to target the most likely buyers of the Debtors' assets, primarily strategy focused on finding a stalking horse bidder to create market credibility, value and structure for the sale process. Overall, MFIM's sale efforts resulted in a vibrant solicitation process with 30 interested buyers signing confidentiality agreements, 20 interested buyers conducting due diligence, 5 offers being submitted and 3 potential buyers participating in the auction process. SPCP Group, LLC ("**SPCP**" or the "**Stalking Horse Bidder**") was selected as the Stalking Horse Bidder

with a bid of $46 million (the "**Stalking Horse Bid**").  Ultimately, Compass' $67 million bid was the winning bid at the Court supervised auction on December 7, 2006.

The success of the auction process conducted by MFIM is demonstrated by the fact that the winning bid of $67 million was $20.5 million (44%) greater than the stalking horse bid.  In addition, USACM retained three loans (Placer Vineyards, Placer Vineyards 2nd and Marquis Hotel) with a current principal balance of $51.5 million, which, while originally included in the stalking horse bid, which were carved out of the sale to Compass and may provide additional proceeds to USACM.  Currently, FTDF has received $32,796,436 of the sale proceeds net of $15,273,564 from principal collected prior to closing and USACM has received $4,914,553 of the net sale proceeds (plus an additional $1,769,780 in additional fees collected between the auction date and the closing date).  The Debtors have escrowed an additional $8,250,000 in net sales proceeds, which is subject to the allocation dispute between FTDF and USACM.  Finally, additional amounts have been escrowed for items disputed between Compass, USACM and FTDF.

> D.     *MFIM Successfully Collected Approximately $20 Million On Delinquent Loans and Netted Approximately $17 Million To Rectify the Debtors' Fraudulent Payments of Diverted Principal*

Prior to the Petition Date, USACM made regular monthly interest payments (and sometimes principal payments) to the Direct Lenders and regular distributions to the Funds (on account of purported borrower interest payments to those who invested through the Funds), even when the borrowers on their particular loans were not making payments to USACM on account of their loans (the "**Prepaid Interest**").  USACM had a "collection account" which was established as a trust account for funds collected from the borrowers (the "**Collection Account**").  Before the filing of the bankruptcy petitions, monies (including funds directly loaned to USACM, fees earned by USACM, principal and interest paid to USACM by borrowers and monies diverted from DTDF) were commingled in the Collection Account.  In confirming the Plan, the Court determined that based on

uncontroverted evidence (from MFIM's forensic investigation), no single deposit into or payment from the commingled Collection Account was capable of being traced to any single Direct Lender or creditor.  Through its forensic accounting work, MFIM determined that as of the Petition Date, USACM had made approximately $39.5 million in such advance payments of principal and interest to the Direct Lenders by diverting principal and interest payments belonging to other lenders (the **"Diverted Principal"**).  As a result, during these Cases and with the approval of the Court, MFIM collected and held approximately $19 million of principal and interest collected on loans whose lenders had been paid in full through the use of Diverted Principal and withheld approximately $17 million of recoveries on loans in which lenders, who had received Prepaid Interest, held an interest. MFIM and the Debtors' other professionals implemented these collection and "netting" procedures early in the Cases, with this Court's approval, in order to equitably address the fraudulent business activities of the Debtors' prepetition management.

### E.    *MFIM Succeeded in Confirmation of A Consensual Plan*

All of the above activities culminated in a confirmed Plan within eight months after commencing the Cases.  The Plan became effective on March 12, 2007 (the "**Effective Date**"), eleven months from the Petition Date.  On the Effective Date, USACM held sufficient funds to pay all administrative and priority claimants in full. In addition, USACM turned over to the USACM Trust (established under the Plan), approximately $23,192,000, which would be a 37.6% recovery to the creditors and investors if such funds were distributed today.  FTDF likewise held sufficient funds to pay all administrative and priority claims in full, in cash on the Effective Date.  FTDF currently holds approximately $50,308,000 for distribution to the investors, which would be an 82% recovery for the investors if distributed today and if all prior distributions were included in this calculation. Finally, DTDF held sufficient funds to pay all administrative and priority claims in full, in cash on

the Effective Date.  It currently holds loans with a principal balance of approximately $96 million, which DTDF is now pursuing collection of, along with potential litigation recoveries.

The above results are even more impressive when considering the complexities of these Cases.  MFIM was able to generate substantial value for all of the parties in interest while addressing the unique circumstances of these Cases, including:

- *Case Administration/Competing Interests:*  On May 10, 2006, the United States Trustee appointed four Committees in these Cases, (a) the Official Committee of Unsecured Creditors appointed in the USACM case (representing the interests of the unsecured creditors of the USACM estate, including the Direct Lenders with claims for Diverted Principal or other claims against USACM), (b) the FTDF Committee (representing the interests of approximately 950 members of FTDF), (c) the official equity security holder committee for DTDF (representing the interests of approximately 1,350 members of DTDF) and (d) an official committee of Direct Lenders (representing the interests of the approximately 3,600 individual Direct Lenders) (the "**Direct Lender Committee**", collectively, the "**Committees**"). Each of the Committees represented parties in interest in these Cases with competing concerns.  MFIM responded to the various requests for information from the four official Committees, as well as, questions from constituents of the Committees on almost a daily basis, including counsel, financial advisors and individual committee members, and also fulfilled numerous due diligence requests for documents and information.  At the same time, MFIM was communicating with the more than 3,600 Direct Lenders. In this regard, MFIM logged, reviewed, researched and responded to over 1,600 requests from the Direct Lenders.

- *Regulatory Overlay:*  MFIM also had to effectively comply with the various regulations governing the Debtors' businesses.  Shortly after the time of filing, MFIM was in direct communication with the SEC concerning FTDF, whose business activities and filings were under investigation.  These discussions continued throughout the Cases.  In addition, MFIM engaged in extensive discussions concerning an SEC receivership for Investment Partners, a non-debtor affiliate of the Debtors and the main target of substantial litigation.  On behalf of USACM, MFIM was in communication with the Nevada Mortgage Licensing Commission.  In order to service and collect the loans, USACM needed to maintain the mortgage broker license.  In order to do so, Thomas Allison, in his capacity as USACM's CEO, had to sign personally for such license.  Without maintenance of the mortgage broker license, the Debtors would have been unable to perform any loan collections.

- *The Authorities:*  MFIM, along with Debtors' counsel, provided substantial information to the criminal authorities concerning the Debtors' businesses.  During these Cases, MFIM met with the FBI, responded to Grand Jury subpoenas issued by the U.S. Attorney's Office and met with state and county criminal authorities.

In light of all that was accomplished during these Cases, it is clear that the scope and depth of the work performed by MFIM was unprecedented and the results were exceptional. MFIM was able, within a short period of time, to create a stable loan servicing business that could be sold at a significant value and resolved outstanding issues as to the amount and validity of other assets, primarily loan receivables. Without these efforts by MFIM, the overall results of these Cases would have been much less - in fact, the Cases may have been converted to Chapter 7 without MFIM's herculean efforts. MFIM managed this process and generated a significant recovery for the creditors, investors and Direct Lenders in these Cases without access to a financing facility - instead financing these Cases by assuming a significant payment risk on their own fees. Given the exceptional results and the significant risks assumed by MFIM throughout this process, MFIM respectfully requests allowance of not only $12,506,371.83 in fees and expenses but allowance and payment of a $2.5 million success fee, as discussed herein.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this Final Application under 28 U.S.C. § 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157.

2.     The statutory predicates for the relief requested herein are sections 327, 328, 330, 331, 363(b), 503 and 507(a)(2) of the Bankruptcy Code.

## BACKGROUND

**A.**     ***Descriptions of the Debtors and Their Business***

        *i.*     *USA Commercial Mortgage Company*

3.     USACM, which sometimes did business under the trade name "USA Capital," is a Nevada corporation. Public records of the Nevada Secretary of State indicate that USACM was organized as of February 28, 1989. Prior to the Petition Date, USACM was in the business of underwriting, originating, brokering, funding and servicing commercial loans primarily secured by residential and commercial developments, both on behalf of investors and for its own account. USACM has been a licensed as a mortgage broker by the State of Nevada since January 11, 1990,

although its license was limited by the Mortgage Lending Division of the State of Nevada after the Petition Date to exclude raising investment funds from individual investors.

4.    The primary shareholders of USACM were Thomas A. Hantges, Joseph D. Milanowski and Paul S. Hamilton (either in their own names or through trusts in their control) who also managed USACM as officers and directors prior to the Petition Date.   As of the Petition Date, they relinquished management authority to Thomas J. Allison of MFIM, who became the President and CRO of USACM on that date.  Mr. Allison served in those capacities throughout these Cases.

5.    As of the Petition Date, the loan portfolio that USACM serviced consisted of approximately 115 loans having a combined outstanding principal balance of approximately $960 million.  Since the Petition Date, MFIM has aggressively engaged in efforts to collect outstanding loan amounts.  As of March 12, 2007, MFIM had collected a total of approximately $347.7 million, consisting of principal, interest and the net sale proceeds.  Loan summary spreadsheets created by MFIM providing information concerning each of the serviced loans as of  April 26, 2006; May 26, 2006; June 30, 2006; July 31, 2006; August 31, 2006; September 30, 2006; October 31, 2006; November 30, 2006; December 31, 2006; January 31, 2007 and February 28, 2007 are available for review on USACM's website at www.usacapitalcorp.com.

6.    As of the Petition Date, approximately 3,600 investors appeared as a "lender" in the documents for one or more of the serviced loans.   In the Debtors' Cases and in the Disclosure Statement, the loan investors have been referred to as "Direct Lenders."  Many of the Direct Lenders invested in more than one of the serviced loans, with the average being approximately 3 to 4 loans for each Direct Lender.  Along with its role as the servicer, USACM was itself a Direct Lender having an aggregate investment of approximately $2 million as of June 30, 2006, in the serviced loans.  Two of the other Debtors, DTDF and FTDF, are also Direct Lenders having interests in certain of the serviced loans, as explained below.

ii.    *USA Capital Diversified Trust Deed Fund, LLC*

7.    DTDF is a Nevada limited liability company organized as of February 3, 2000.  A copy of  DTDF's Operating Agreement is on file with the Court at Docket no. 1590.  DTDF was a fund organized to allow USACM to offer investors who were residents of Nevada the opportunity to invest

in loans that USACM originated by purchasing membership interests, which were then invested in various loans, rather than (or in addition to) the investor investing directly in the loans. Because DTDF was not a fund registered with the SEC, it could not solicit investors beyond the State of Nevada. DTDF's stated purpose was to make or purchase entire or fractional interests in acquisition, development, construction, bridge or interim loans that were secured by first deeds of trust on, among other things, undeveloped land and residential and commercial developments located primarily in the United States. There was a continuous offering of membership interests (known as "**units**") in DTDF from May 2000 to July 2004. In July 2004, DTDF stopped offering the sale of units, and on September 27, 2005, the investors were notified that DTDF would liquidate. DTDF had approximately 1,350 members as of the Petition Date. The aggregate outstanding balance owed to DTDF on its loan investments as of the Petition Date, was approximately $103 million, consisting of 24 loans in which DTDF invested as a Direct Lender. The loans were all originated by USACM. Although the DTDF loans were supposed to be secured by first deeds of trust and have other protections for DTDF investors, USACM did not generally provide these protections.

8.    Prior to the Petition Date, the nominal manager of DTDF was USA Realty (described below), also a Debtor. USACM serviced the loans in the DTDF portfolio. The management duties included investing funds, hiring and paying professionals, preparing tax returns, and other duties. Pursuant to an order of the Court entered shortly after the Petition Date, Mr. Allison served as the CRO of DTDF.

<div align="center">

*iii.    USA Capital First Trust Deed Fund, LLC*

</div>

9.    FTDF is a Nevada limited liability company organized as of February 16, 2001. A copy of the Second Amended and Restated Operating Agreement of FTDF, dated as of June 1, 2003, (the "**FTDF Operating Agreement**") is on file with the Court at Docket no. 1591. As a fund registered with the Securities and Exchange Commission, FTDF was able to allow USACM to offer investors throughout the United States (not just in Nevada, as was the case with DTDF) the opportunity to invest in loans that USACM originated by purchasing membership interests in a FTDF that invested in various loans, rather than (or in addition to) the investor investing directly in the loans. Prior to the Petition Date, FTDF filed reports and disclosures with the SEC. FTDF's stated purpose was to make

or purchase entire or fractional interests in acquisition, development, construction, bridge or interim loans that were secured by first deeds of trust on, among other things, undeveloped land and residential and commercial developments located primarily in the United States.    FTDF had approximately 950 members as of the Petition Date.    The aggregate outstanding balance owed to FTDF on its loan investments, as of the Petition Date, was approximately $67 million, consisting of 53 loans in which FTDF invested as a Direct Lender.    The loans were all originated by USACM.

10.    FTDF offered four classes of membership, Class A, B, C and D.    Class A members agreed to commit their capital contributions for a period of twelve (12) months and were to receive the "Class A Preferred Return" defined as nine percent (9%) per annum, or such other percentage determined by the manager from time to time, in its sole and absolute discretion, without reinvesting."    *See* FTDF Operating Agreement, ¶¶ 1.13, 1.14, & 1.15.    Class B members agreed to commit their capital contributions for a period of twenty-four (24) months and were to receive the "Class B Preferred Return" defined as "ten percent (10%) per annum, or such other percentage determined by the manager from time to time, in its sole and absolute discretion, without reinvesting."    *See* FTDF Operating Agreement ¶¶ 1.16, 1.17, & 1.18.    Class C members agreed to commit their capital contributions for a period of thirty-six (36) months and were to receive the "Class C Preferred Return" defined as eleven percent (11%) per annum, or such other percentage determined by the manager from time to time, in its sole and absolute discretion, without reinvesting."    *See* FTDF Operating Agreement ¶¶ 1.19, 1.20, & 1.21.    The Class D member of FTDF is USA Securities (see below), and does not receive the returns described above for Class A members, Class B members, or Class C members.

11.    Prior to the Petition Date, the nominal manager of FTDF was USA Realty (described below), also a Debtor.    USACM served as the servicer of the loans in the FTDF portfolio.    The management duties included investing funds, hiring and paying professionals, preparing tax returns, and other duties.    Pursuant to an order of the Court entered shortly after the Petition Date, Mr. Allison served as the CRO of FTDF.

*iv.      USA Securities, LLC*

12.  USA Securities is a Nevada limited liability company organized as of March 3, 1999. USA Securities is a registered broker-dealer under SEC Rule 15c3-1(a)(2)(vi) and was a member of the National Association of Securities Dealers (the "**NASD**").   The primary business of USA Securities was to sell membership interests in DTDF.  USA Securities is dormant and has conducted no business on or after the Petition Date.

13.  Prior to the Petition Date, the sole members and co-managers of USA Securities were Joseph Milanowski and Paul Hamilton.  On and after the Petition Date, and pursuant to resolutions filed with USA Securities' bankruptcy petition, Thomas J. Allison of MFIM became the sole manager of USA Securities.  Pursuant to an order of the Court, Mr. Allison served as the CRO of USA Securities.

*v.      USA Capital Realty Advisors, LLC*

14.  USA Realty is a Nevada limited liability company organized as of January 18, 2001.  It is the manager of FTDF and DTDF.  USA Realty is owned by Investment Partners, and prior to the Petition Date USA Realty's sole managing member was Joseph Milanowski.  Based on records in possession of the Debtors, Investment Partners is owned by Thomas Hantges, Joseph Milanowski, and Paul Hamilton, either directly or through trusts controlled by these individuals.

15.  On and after the Petition Date, and pursuant to resolutions filed with USA Realty's bankruptcy petition, Thomas J. Allison of MFIM became the sole manager of USA Realty.  Pursuant to an order of the Court, Mr. Allison also served as the CRO of USA Realty.

*vi.      Other Related Entities*

16.   Attached hereto as **Exhibit A** is a chart showing relationships among the five Debtors, the non-debtor entity Investment Partners, and certain related non-debtor entities.

**B.    *Case Background***

17.  On April 13, 2006, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.  By order entered June 9, 2006, the Court approved the joint administration of the Debtors' bankruptcy cases.

18.  The Debtors commenced these Cases for several reasons.  Prior to April 2006, USACM regularly made monthly interest payments to Direct Lenders regardless of whether the borrowers of the corresponding loans in which the Direct Lenders had an ownership interest were paying as agreed under the controlling loan agreements.  This resulted in a severe cash loss, since most of the loans were not making payments as agreed, yet the payments to Direct Lenders were being made.  As a result, for example, during the first three months of 2006, USACM collected on average approximately $6 million per month in interest payments on the serviced loans from the borrowers but paid out on average approximately $9.7 million per month to the Direct Lenders, using, among other sources, principal paid on loans from other borrowers to make these interest payments.  MFIM determined that as of the Petition Date, USACM had made approximately $39.5 million in such advance payments of principal or interest to Direct Lenders.  Because USACM did not have sufficient funds in April 2006, it did not make the monthly March interest payments to all Direct Lenders that were due to be paid.  USACM's inability to continue making monthly payments to all Direct Lenders was a significant contributing factor to the Debtors' decision to file for bankruptcy protection.  In addition, USACM and FTDF received notice from the SEC that they were the subject of a regulatory investigation. FTDF and USACM believed that reorganization under Chapter 11 of the Bankruptcy Code would result in a quicker return to creditors of USACM, the FTDF investors and the Direct Lenders than would a potential receivership under the SEC.

19.  Four Committees were appointed in the Debtors' Cases by the US Trustee's office on May 10, 2006 -- the Official Unsecured Creditors' Committee for USACM, the Official Committee of Holders of Executory Contract Rights Through USACM, the Official Committee of Equity Security Holders of DTDF and Official Committee of Equity Security Holders of FTDF.

20.  On September 15, 2006, the Debtors filed their initial Disclosure Statement and Joint Chapter 11 Plan of Reorganization [Docket nos. 1309 and 1310].   The Debtors subsequently amended their Plan after substantial and nearly continual negotiations with and among the four Committees on October 18, 2006 [Docket no. 1576] and on November 7, 2006 [Docket no. 1742]. On November 15, 2006, the Court held a hearing on the adequacy of the Disclosure Statement and entered an order approving the First Amended Disclosure Statement [Docket no. 1795] as filed with

the Court's required amendments [Docket no. 1798].  On the same day, the Debtors also filed their Third Amended Plan [Docket no. 1799].  On December 19-20, 2006, this Court held a confirmation hearing on the Third Amended Plan and on January 8, 2007 entered the its findings of facts and order confirming the Debtors' Third Amended Plan of Reorganization as modified [Docket nos. 2376 and 2377] which included a sale of USACM and FTDF's assets to Compass.

21.  The sale of certain of the Debtors' assets to Compass closed on February 16, 2007 and the Effective Date of the Plan occurred on March 12, 2007.

C.    *MFIM'S Employment History*

22.  On the Petition Date, the Managers and Boards of Directors of the Debtors executed an agreement with MFIM (the "**MFIM Agreement**") setting forth the terms and conditions for the retention of MFIM as Crisis Managers and Interim Managers for the Debtors.  The MFIM Agreement provided for the designation of Thomas J. Allison as CRO for the Debtors, as well as, the assignment of other employees of MFIM to assist Mr. Allison as Temporary Employees.  Contemporaneously, the Managers and Boards of Directors of the Debtors appointed Mr. Allison as President, Vice-President, Secretary and Manager for the Debtors.

23.  MFIM is a firm with substantial experience in providing interim management services to financially distressed and troubled companies.  The Debtors selected MFIM because of the firm's diverse experience and extensive knowledge in the field of insolvency and reorganization cases. MFIM is a wholly-owned subsidiary of Mesirow Financial Holdings, Inc., a diversified financial services firm which also offers financial consulting, investment management, insurance services, investment banking and real estate services. The MFIM professionals have extensive knowledge and experience in performing the requisite services, including experience in connection with bankruptcy cases and restructurings. MFIM employs highly credentialed professionals that include Certified Public Accountants ("**CPAs**"), Chartered Financial Analysts, Certified Turnaround Professionals, Certified Insolvency and Restructuring Advisors, Certified Fraud Examiners, Certified Valuation Analysts, and numerous other experienced business professionals.  MFIM professionals have provided services in some of the largest and most complex bankruptcy cases in the United States including UAL Corporation, Delta Airlines, Inc., Delphi Corporation, and many other cases.  MFIM

professionals are experienced in serving in interim management capacities including the role of Chief Restructuring Officer in many cases.   In addition, the MFIM professionals are familiar with the Debtors' businesses and the issues in these Cases.   For additional background, attached as **Exhibit B** is information about the MFIM professionals who worked on the Debtors' Cases.

24.  On April 14, 2006, the Debtors filed an application (the "**Employment Application**") for authorization of (i) the employment and retention of MFIM as crisis managers to the Debtors, and (ii) the designation of Thomas J. Allison of MFIM as Chief Restructuring Officer of the Debtors and the employment of certain temporary employees provided by MFIM.  On April 14, 2006, Mr. Allison filed a Declaration in Support of the Employment Application (the "**Allison Declaration**").  On April 19, 2006, this Court entered an order (the "**First Interim Employment Order**") authorizing the Debtors to (i) the employ and retain MFIM as crisis managers to the Debtors, and (ii) designate Thomas J. Allison of MFIM as Chief Restructuring Officer of the Debtors and the employment of certain temporary employees for an interim period until July 27, 2006, pursuant to a hearing held on April 17, 2006.

25.  On August 11, 2006, this Court entered an order (the "**Second Interim Employment Order**") authorizing the Debtors to (i) employ and retain MFIM as crisis managers to the Debtors, and (ii) designate Thomas J. Allison of MFIM as Chief Restructuring Officer of the Debtors and the employment of certain temporary employees for an interim period until October 2, 2006, pursuant to a hearing held on July 25, 2006.

26.  On October 31, 2006, this Court entered an order (the "**Third Interim Employment Order**") authorizing the Debtors to (i) employ and retain MFIM as crisis managers and (ii) designate Thomas J. Allison of MFIM as Chief Restructuring Officer of the Debtors and the employment of certain temporary employees for an interim period until December 15, 2006, pursuant to a hearing held on September 28, 2006.

27.  On January 11, 2007, this Court entered an order (the "**Fourth Interim Employment Order**") authorizing the Debtors to (i) employ and retain MFIM as crisis managers and (ii) designate Thomas J. Allison of MFIM as Chief Restructuring Officer of the Debtors and the employment of

certain temporary employees for an interim period until January 31, 2007, pursuant to a hearing held on December 15, 2006.

28. On April 2, 2007, this Court entered an order (the "**Fifth Interim Employment Order,**" and collectively the "**Employment Orders**") authorizing the Debtors to (i) employ and retain MFIM as crisis managers and (ii) designate Thomas J. Allison of MFIM as Chief Restructuring Officer of the Debtors and the employment of certain temporary employees for an interim period until March 31, 2007, pursuant to a hearing held on January 31, 2007.

29. The Employment Application, the Allison Declaration, the First Interim Employment Order, the Second Interim Employment Order, the Third Interim Employment Order, the Fourth Interim Employment Order and the Fifth Interim Employment Order state the terms and conditions of MFIM's employment and are incorporated herein by reference.

## FEES AND EXPENSES INCURRED DURING THE APPLICATION PERIOD

30. MFIM submits this Final Application for final allowance and payment of hourly fees for professional services rendered in the amount of $11,389,203.09 for services performed on behalf of the Debtors and for reimbursement of actual and necessary expenses in the amount of $1,117,168.74. MFIM expended a total of 27,417.6 hours during the Application Period at an average blended hourly rate of approximately $415.40. Fees and expenses incurred during the Application Period on behalf of each of the Debtors are outlined in the table below:

| | Hours | Fees | Expenses | Total |
|---|---|---|---|---|
| USA Commercial Mortgage Company | 21,916 | $9,264,912.20 | $880,893.11 | $10,145,805.31 |
| USA Capital Diversified Trust Deed Fund, LLC | 2,427.8 | 1,111,888.10 | 105,716.55 | 1,217,604.65 |
| USA Capital First Trust Deed Fund, LLC | 2,836.1 | 1,286,924.10 | 122,358.70 | 1,409,282.80 |
| USA Capital Realty Advisors, LLC | 112.2 | 40,846.50 | 3,883.62 | 44,730.13 |
| USA Securities, LLC | 125.4 | 45,402.09 | 4,316.76 | 49,718.85 |
| Subtotal | 27,417.6 | $11,749,973.00 | 1,117,168.74 | $12,867,141.74 |
| Less: Voluntary Reduction | | 360,769.91 | - | 360,769.91 |
| **Total** | **27,417.6** | **$11,389,203.09** | **1,117,168.74** | **$12,506,371.83** |

MFIM has allocated their fees and expenses based upon whether the time spent benefited a particular Debtor, as described within each of the category descriptions below. As this Court is aware, under

the Plan, USACM and FTDF have reached an agreement whereby FTDF has capped their exposure for the fees and expenses of the Debtors' professionals at $125,000 per month through January 31, 2007. As a result, prior to payment of any allowed fees and expenses to Debtors' professionals by USACM and FTDF, this agreement will be implemented.

31. MFIM is applying a voluntary reduction to fees incurred during the Application Period. Such fees are primarily associated with necessary attendance and participation of multiple professionals at certain meetings, for certain case administration time, and for time preparing MFIM's monthly invoices and fee applications. Accordingly, MFIM has applied a voluntary reduction of $360,769.91 to the fees incurred in this Final Application.

32. In accordance with paragraph 19 of the Allison Declaration, the Debtors paid a retainer to MFIM for postpetition services of $150,000 (the "**Retainer**"). By this Final Application, MFIM seeks permission to apply this Retainer to the final amounts approved for payment.

33. The standard hourly rates charged by professionals providing services in this Chapter 11 matter were previously disclosed in the Employment Application (*see* paragraph 16 in the Allison Declaration) and subsequently approved by the Court in the First Interim Employment Order, Second Interim Employment Order, Third Interim Employment Order, Fourth Interim Employment Order, and the Fifth Interim Employment Order. The standard hourly rates charged by MFIM for the professionals assigned to this matter are provided below:

|  | Range of Hourly Rates |
|---|---|
| Managing Directors/Senior Managing Directors | $620-$690 |
| Senior Vice Presidents | $530-$590 |
| Vice Presidents | $430-$490 |
| Senior Associates | $330-$390 |
| Associates | $190-$290 |
| Paraprofessionals | $150 |

34. MFIM professionals recorded their time entries contemporaneously with the rendition of services and maintain them by one-tenth of an hour (0.10 hour) increments.

35.  MFIM has not billed for the travel and commuting time its professionals incurred in connection with providing services to the Debtors.  To the extent MFIM professionals were engaged in productive activity (for the benefit of the Debtors) while traveling or commuting, such time was billed.

36.  In circumstances where more than one person may have attended a client meeting or participated in a teleconference, such participation was required as a result of the different projects involved and/or the differing expertise of the persons participating.  Other meetings or discussions may have been required as a result of a primary engagement person obtaining specialized data or information from someone not otherwise assigned to the engagement or as a result of having a more senior person review the work product of a more junior person.  In all cases, such attendance at meetings and/or review of work product was not a duplication of effort, but was necessary to adequately represent the interests of the Debtors' estates.

37.  Fees and expenses, for which MFIM seeks payment, as outlined in the Final Application, are believed to comply with the United States Trustee Guidelines unless specifically noted otherwise.  The compensation MFIM seeks is reasonable and is for actual and necessary services rendered.  The types of services performed by MFIM were previously approved by the Court through MFIM's Employment Orders.  MFIM believes that all of the services performed by it have been beneficial to the Debtors' estates, as well as, to the interested parties in these proceedings, and have substantially contributed to these Cases.  All expenses incurred by MFIM were necessarily incurred.

38.  On August 31, 2006, MFIM filed its "First Interim Application for Compensation and Reimbursement of Expenses for (I) Mesirow Financial Interim Management, LLC as Crisis Managers for the Debtors, and (II) Thomas J. Allison of Mesirow Financial Interim Management, LLC as Chief Restructuring Officer for the Debtors and the Employment of Certain Temporary Employees for the period from April 14, 2006 through July 31, 2006" (Docket no. 1224) ("**First Interim Fee Application**").  The First Interim Fee Application sought allowance of fees in the amount of $3,364,398 and actual and necessary expenses in the amount of $213,812 for services rendered and reimbursement of actual and necessary expenses incurred by MFIM during the period of April 14, 2006 through July 31, 2006.

39. On November 14, 2006, the Court entered an "Order Approving First Interim Application for Compensation and Reimbursement of Expenses for (I) Mesirow Financial Interim Management, LLC as Crisis Managers for the Debtors, and (II) Thomas J. Allison of Mesirow Financial Interim Management, LLC as Chief Restructuring Officer for the Debtors and the Employment of Certain Temporary Employees for the period from April 14, 2006 through July 31, 2006" (Docket no. 1789) ("**First Interim Fee Order**"), approving allowance of the requested fees and actual and necessary expenses in full.

40. The Final Application includes allocations for certain fees incurred related to activities benefiting several of the Debtors or the Direct Lender Committee. Pursuant to the Plan, fees benefiting the Direct Lender Committee have been charged to USACM. Throughout these Cases, MFIM set-up and diligently utilized a process for identifying and tracking the fees and expenses incurred benefiting each of the Debtors. As time or expenses incurred benefited a single Debtor, those fees were billed only to the Debtor receiving benefit. For certain fee categories, MFIM's efforts benefited several of the Debtors and in those instances MFIM allocated a portion of fees to each of the Debtors receiving a benefit. For example, MFIM made several presentations to the Committees appointed in the Cases. Time spent in preparation and during the meetings held for those Committee presentations was allocated equally among the Debtors whose constituencies were represented by the four Committees.

41. Fees and expenses incurred during the Application Period have been assigned to each Debtor utilizing the process previously described. For activities deemed to have benefited several of the Debtors, the following allocations were applied to the following categories (the "**Allocations**"):

| Allocated Categories | USACM | DTDF | FTDF | Realty | Securities |
|---|---|---|---|---|---|
| Financial Analyses | 80% | 10% | 10% | 0% | 0% |
| Cash Flow Model / Analyses | 50% | 20% | 20% | 10% | 10% |
| Analyzing Restructuring and Sale Options | 40.9% | 18.3% | 40.9% | 0% | 0% |
| LSA – Document Review, Extraction and Loan by Loan Classification | 50% | 0% | 50% | 0% | 0% |
| Transition to Compass | 50% | 0% | 50% | 0% | 0% |
| Disclosure Statement / Plan of Reorganization | 33.3% | 33.3% | 33.3% | 0% | 0% |

| | | | | | |
|---|---|---|---|---|---|
| Liquidation Analysis | 80% | 10% | 10% | 0% | 0% |
| Accounts and Notes Receivable Related Activities | 50% | 50% | 0% | 0% | 0% |
| Committee Meetings | 50% | 25% | 25% | 0% | 0% |
| Employment / Fee Applications | 78.9% | 9.5% | 11.0% | 0.3% | 0.4% |
| Court Hearings / Preparation | 50% | 25% | 25% | 0% | 0% |
| Case Administration | 50% | 20% | 20% | 5% | 5% |
| Transition Issues and Activities | 80% | 10% | 10% | 0% | 0% |

For the balance of the categories MFIM charged all time entries to a specific Debtor.

42. For this Final Application, the above Allocations have been applied to all fees incurred since the Petition Date. This Allocation is not the same allocation as approved by the Court at the hearing on the First Interim Fee Application. The allocations approved by the Court at the hearing on the First Interim Fee Application were temporary allocations agreed to by MFIM and the Committee, with all parties reserving their rights to revisit such allocation. Upon review of the time entries, MFIM believes that the above allocations are appropriate for the reasons described herein.

43. There is no agreement or understanding between MFIM and any other person, other than the members, associates and employees of MFIM, for the sharing of compensation received, or to be received, for services rendered in connection with this matter.

44. MFIM has not entered into any agreement, expressed or implied, with any parties-in-interest to these Cases (other than the Debtors), for the purpose of fixing the fees or other compensation to be paid to MFIM for services rendered to the Debtors.

45. Attached as **Exhibit C** hereto are the names, titles, hourly rates, and a summary of hours charged and the total compensation sought for the professionals whose services are being billed during the Application Period.

46. Attached as **Exhibit D** hereto is a summary schedule of the hours and fees incurred for each category of service during the Application Period.

47.  Attached as **Exhibits E1 through E31** hereto are the detailed daily descriptions of services rendered by each professional during the Application Period, including the hours incurred with respect to each task and the resultant fees.

48.  In accordance with the Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals entered by this Court on August 29, 2006 (the "**Administrative Order**"), all professionals retained in these Cases were authorized to seek, on a monthly basis, interim compensation for professional services rendered and reimbursement of expenses incurred.  In the absence of any objection to the monthly fee statement, the Debtors were authorized to pay 80% of the professional fees requested and 100% of the expenses incurred. Applicant has requested in its previous monthly statement payment of 80% of fees and 100% of expenses net of fee and expense adjustments during the interim period as outlined below.

| Period Covered | Fees | 80% of Fees | Expenses | Total | Balance Due |
|---|---|---|---|---|---|
| April 14, 2006 - July 31, 2006 | $3,364,398.00 | $ 2,691,518.40 | $ 213,812.00 | $ 3,578,210.00 | $ 44,727.62 |
| August 1, 2006 - August 31, 2006 | 1,405,948.07 | 1,124,758.46 | 60,128.00 | 1,466,076.07 | 283,965.73 |
| September 1, 2006 -September 30, 2006 | 1,248,981.00 | 999,184.80 | 92,825.29 | 1,341,806.29 | 252,659.53 |
| October 1, 2006 - October 31, 2006 | 1,199,425.00 | 959,540.00 | 68,643.22 | 1,268,068.22 | 245,766.48 |
| November 1, 2006 - November 30, 2006 | 1,090,397.00 | 872,317.60 | 63,284.56 | 1,153,681.56 | 220,186.18 |
| December 1, 2006 - December 31, 2006 | 985,242.00 | 788,193.60 | 51,837.90 | 1,037,079.90 | 197,944.28 |
| January 1, 2007 - January 31, 2007 | 980,035.00 | 784,028.00 | 49,171.43 | 1,029,206.43 | 321,608.62 |
| February 1, 2007 - February 28, 2007 | 794,408.00 | 635,526.40 | 43,204.81 | 837,612.81 | 235,305.39 |
| March 1, 2007 - March 12, 2007 | 176,099.00 | 140,879.20 | 14,621.01 | 190,720.01 | 190,720.01 |
| March 13, 2007 - April 23, 2007 | 187,557.00 | | 459,640.52 | 647,197.52 | 647,197.52 |
| Estimate of Future Time | 200,000.00 | | - | 200,000.00 | 200,000.00 |
| Additional Voluntary Reduction | (243,286.98) | | - | (243,286.98) | (243,286.98) |
| **Total** | $11,389,203.09 | $ 8,995,946.46 | $    1,117,168.74 | $ 12,506,371.83 | $2,596,794.38 |

1

2

## <u>SUMMARY OF SERVICES PROVIDED</u>

3   49.  During the Application Period, the services provided by MFIM to the Debtors included:

4
- Reconstructing the Debtors' financial records;

5
6
- Researching and reconstructing all of the loan transactions from bank records, loan documentation, assignments of ownership, other paper documents in the loan files, old Excel spreadsheets and archived computer files;

7
8
9
10
- Constructing a loan history ledger for each loan, including the initial funding from the Direct Lenders, the initial funding to the borrower, and each subsequent transaction including accruals of interest, transfers of ownership, payments of principal or interest by the borrower, payments of principal or interest to the Direct Lender and any additional fundings;

11
12
- Leading the USACM accounting and IT staff with the redesign of the Debtors' iTrack System to provide an automated loan services software package;

13
14
15
- Developing and implementing a reporting framework for the loans serviced by USACM allowing for reports summarizing the status of the loans and monthly reports on the Direct Lender disbursements, the payoffs of loans, the collection of fees and the payment of ordinary course professionals;

16
17
18
- Maintaining the loan history ledgers in order to issue the borrower monthly interest statements, the loan summary by month, the weekly collection reports, the monthly operating reports and other data needed or requested by the loan collections team, the Committees, and other constituents;

19
20
- Preparing and analyzing weekly cash forecasts for each of the Debtors to manage cash needs during the Cases;

21
22
23
- Servicing USACM's loan portfolio through preparing and sending appropriate statements of account, pursuing the collection of the outstanding loans through correspondence, meetings and conversations with borrowers.  MFIM reviewed and analyzed settlement proposals and other correspondence received from borrowers and other interested parties;

24
25
26
- Assuming the investor inquiry duties due to insufficient staffing at USACM to provide this function.  MFIM logged, reviewed, researched and responded to over 1,600 requests from Direct Lenders.  MFIM held "town hall" meetings with the Direct Lenders to give a presentation on how to read the new statements and explain the netting of loan payments as required by the interim distribution orders entered by the Bankruptcy Court;

27

28

- Obtaining valuations of the assets belonging to the estates, as well as, the assets serving as collateral for the loan for which USACM serves as loan servicer through ad hoc analyses and the retention of an appraisal firm;

- Managing the Debtors as ongoing businesses during the entirety of the Cases;

- Reviewing the Debtors' businesses, business environment and current strategic position to identify potential alternatives for restructuring, including evaluating the implementation risks and likely outcomes;

- Marketing and selling the assets of USACM and FTDF;

- Digitizing and organizing over 12,000 individual investor LSAs and matching each LSA with the relevant loan for that investor;

- Managing the closing of the sale to Compass including the negotiation and calculation of the final purchase price and related escrow accounts, transitioning of borrower negotiations to Compass, participation in meetings related to the mortgage license of Compass and related options;

- Planning and implementing the transition of assets to Compass as detailed in the Plan;

- Assisting Debtors' counsel in drafting and negotiating the Plan and the supporting Disclosure Statement, including the liquidation analysis, through lengthy negotiations with and among the Committees;

- Coordinating the collection efforts on the various receivables owed to the Debtors, including the negotiation of a $58 million pledge agreement from former management for amounts owed to USACM and the 10-90, Inc. loan owed to DTDF;

- Tracing funds in USACM's Collection Account to document various payments received by non-Direct Lenders from the Collection Account. This work led to various preference actions against entities who had received funds from the Debtors;

- Assisting counsel with various ancillary litigation matters, including the involuntary bankruptcy filings of Tree Moss Partners, LLC and USA Investors VI, LLC;

- Preparing financial and operating information designed to assist the Committees' analysis and assessment of the Debtors' financial condition, operations, and transactions;

- Responding to questions and requests from constituents of the Committees, including counsel, financial advisors and individual committee members;

- Initiating and participating in various conference calls and meetings with the Committees;

- Preparing MFIM's Employment Application and fee applications, including meetings with the U.S. Trustee to discuss any fee issues;

- Providing factual back-up for the motions and declarations as needed in support of motions filed by the Debtors' counsel;

- Preparing the Debtors' statements of financial affairs and schedules, as well as, the monthly operating reports;

- Conducting negotiations to obtain debtor-in-possession financing for the Debtors;

- Implementing an employee retention and severance plan to retain the small number of employees remaining at the Debtors after terminations and resignations;

- Preparing for and attending court hearings;

- Locating and cataloging the Debtors' leases and executory contracts at the onset of these Cases. MFIM performed various analyses of executory contracts and related cure amounts and estimated/calculated lease rejection damages in association with certain lease agreements. MFIM identified contracts for rejection including contracts signed for the benefit of related parties and prepared analyses pertaining to the Debtors' motion to reject certain leases;

- Reviewing the Debtors assorted tax issues, including the review of the loan portfolios of DTDF and FTDF for potential write-downs;

- Facilitating the claims review process with the Debtors' counsel and the claims agent, The BMC Group, Inc. ("**BMC**"), including the review of proofs of claim filed against each of the Debtors and reconciliation of those claims against the scheduled claims; and

- Transitioning information to post-Effective Date DTDF and the USACM Trust, as well as addressing other winddown issues;

50.  The following is a summary of the categories used to identify the professional services rendered by MFIM during Application Period.  MFIM has also attached as **Exhibits F1 through F5** charts detailing the professional fees charged to each Debtor on a category basis, including the tasks performed in each category and the benefits received by the Debtors from those activities, which summarize the narratives below.

### A.    Forensic Loan Accounting

51.   Accurate historical information is generally maintained by any lender, but is especially critical in a situation involving circumstances such as encountered here.  However, as described below, the Debtors' records were inaccurate and could not be relied upon.  Thus, one of the sizable tasks facing MFIM in this engagement was to reconstruct the Debtors' financial records.

52.   The records at the inception of the proceedings were incomplete, inaccurate and, in some instances, appeared to be deliberately falsified.  The loan files were replete with problems, including missing or unexecuted documents, incomplete title work and missing appraisals.

53.   More significantly, the accounting for loans was separate and distinct from the general accounting process and the two systems were not reconciled. In essence, the Debtors used two different sets of books, each arguably designed for the unique expectations of the various recipients of accounting data.  One set of loan figures was (ostensibly) the "real" accounting and was used for communicating with the borrowers; the second set of figures concealed the diversion of funds and was used for correspondence with the investors.

54.   MFIM implemented a full scale forensic review process in order to compile the required financial data necessary to reconstruct the Debtors' financial records. MFIM initially analyzed the information in the Debtors' iTrack System (the software system used by USACM to track collections of loans and payouts to the Direct Lenders and Funds) which contained data from 2004 to 2006. MFIM's analysis of the data quickly revealed many financial irregularities, including: (i) certain borrower payments were not historically entered into the iTrack System, but instead maintained on separate Excel spreadsheets; (ii) interest receipts were posted on a date prior to the distribution of the funds, not when the receipts were actually received from borrowers; (iii) payments from borrowers were not applied pursuant to the requirements in the loan documents; (iv) invoices to the borrowers were incorrectly calculated; (v) checks to investors were not numbered in sequence, and/or check numbers were used multiple times; (vi) the Direct Lenders were paid a rate of interest which was not the interest specified in the loan documents, and (vii) the "spread" between what the Direct Lenders were paid and what the borrower paid to the USACM was retained in lieu of the service fees specified in the LSAs.

55. MFIM soon discovered that the data for transactions occurring prior to 2004 were even more unreliable to the extent it even existed. The Debtors' loan servicing information for this period was maintained in Access or Excel databases which are easily manipulated and the computer files were overwritten each month, obliterating any loan transaction history or audit trail of the accounts. MFIM was also unable to locate a ledger or other record of the assignments and reassignments of the ownership of the loan interests between Direct Lenders and USACM.

56. Accounting irregularities were widespread. For example, the initial analysis of the USACM's database showed that interest receipts were posted on a date selected prior to the distribution of the funds, and not when the receipts were actually received. Payments from borrowers were not applied pursuant to the requirements in the loan documents. Invoices to the borrowers were not calculated correctly. Checks to investors were not numbered in sequence, or check numbers were used multiple times. Direct Lenders were paid at a rate of interest which was not the rate specified in the loan documents, and the spread between what they were paid and what the borrower paid was retained in lieu of the service fees specified in the LSAs.

57. MFIM was left with no alternative but to reconstruct the loan transaction accounting from the Debtors' source documentation to verify transactions. This process required researching deposits slips and checks from investors to verify investments by the Direct Lenders and tracing that information to the available bank statements; reviewing assignment documentation to verify entry into the loans by the Debtors; verifying the borrowers' payments by reviewing check copies and bank statements; comparing the Direct Lender payment information to the available bank statements to match checks number or ACH remittances; and matching cleared checks to issued checks by amount and payee to correct the check numbers in Debtors' records. Further, each loan agreement was reviewed by MFIM to determine if the interest on the loan compounded, when and if default interest was to be charged to the borrower, when payments were to be applied, and the correct determination of late fees, origination fees or exit fees.

58.  Using these documents and procedures, MFIM reconstructed the USACM loan ledgers for each loan and calculated proper accruals for interest and service fees.  Accrued interest was recalculated based on the correct principal balances and the correct number of days in the month for that principal balance.

59.  As an example of the complexity of this task, given that some of the Debtors' loans had been funded as early as 1999 and had been assigned from time to time to hundreds of different Direct Lenders, a loan ledger could consist of literally thousands of lines of calculations.  The Amesbury loan, for instance, which began funding in 2002, had a reconstructed ledger containing 41,000 lines of calculations through the Petition Date.

60.  After the loan ledgers were properly reconstructed, MFIM discovered that the Debtors' Access database was not powerful enough to run monthly statements and properly account for the information required by this Court.  MFIM had to reload the loan data into a SQL database and direct the development of a new version of iTrack, which allowed the Debtors to have sufficient programming capacity for the holdbacks and netting of performing and non-performing loans by investor account as required by the Court.  During the transition period from the old to new version of iTrack, MFIM manually updated the loan ledgers each month to verify the data loaded into the SQL database.  This manual process by MFIM allowed the Debtors to continue to issue monthly borrower interest statements, monthly loan summaries, weekly collection reports, monthly operating reports and other data needed or requested by the loan collections team, the Committees and other constituents.  Statements with a complete history of each loan by each Direct Lender were mailed in October 2006.

61.  As part of MFIM's tasks in this category, MFIM reviewed and researched the loans marked on the Debtors' published loan summaries as "Special Situation."  MFIM discovered that these "loans" all had substantial problems requiring follow-up and resolution.  For instance, the Sheraton "loan" was not appropriately reflected on the Debtors' books as a non-performing loan.  Once it became apparent that the loan was non-performing and had problems as to accounting and/or documentation, former management assigned the Sheraton loan from the Direct Lenders to DTDF.  As a result, this loan remained on the Debtors' books as if it was a performing loan.

62. Finally, as part of its engagement, MFIM also performed various cash tracing exercises and investigated the transfer of funds between related party entities. These investigations by MFIM allowed the Debtors to perform loan collection activities and institute appropriate avoidance actions, all as described in detail below.

63. **Benefits to the Debtors:** The tasks performed by MFIM in this category have benefited the Debtors by: (a) providing an accurate accounting for and understanding of the status of each loan; (b) allowing USACM to distribute in excess of $231.9 million to the Direct Lenders while also retaining the various Court ordered holdback amounts for the Debtors; (c) allowing the Debtors to trace their cash and thereby providing a basis for the compromises contained in the Plan; and (d) reconstructing the loan ledgers and thus allowing USACM to issue monthly statements on a timely basis to both investors and borrowers, as well as, provide reports and analyses to the various constituents including the Committees, the Court, and the various bidders.

64. MFIM's forensic review allowed the Debtors to provide potential bidders with reliable financial information which was instrumental to a successful sales process. Before the stabilization of the accounting systems, the Stalking Horse Bidder was unwilling to ascribe a clear value to the USACM assets (fees, default interest, etc.) The work of MFIM allowed the Debtors to provide the Stalking Horse Bidder with reliable information which resulted in a successful and vibrant auction of the Debtors' assets and increase to the final purchase price received by the USACM and FTDF estates.

65. **Allocation of Fees:** MFIM incurred a total of 5,313.8 hours and $1,967,965 of fees with regard to Forensic Loan Accounting during the Application Period. MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $1,967,965 | $0 | $0 | $0 | $0 |
| Hours | 5,313.8 | 0 | 0 | 0 | 0 |
| Percentage | 100% | 0% | 0% | 0% | 0% |

MFIM allocated the fees in this manner because these activities were related to the requirements in the LSAs and under Nevada state law (requiring USACM to maintain accurate accounting records).

### B.    Loan and Financial Accounting Systems

66.  MFIM senior accounting personnel directed the redesign and improvement of the iTrack System.  Due to the inadequacy of the iTrack System as originally designed and the various holdbacks agreed to among the Committees and ordered by the Court, the system required many programming changes.  The iTrack System, like most loan servicing packages, was designed to receive interest on a monthly basis from a borrower and pay interest on a monthly basis to the Direct Lenders.  Since USACM did not historically charge the service fees allowed by the LSAs, but instead simply paid the Direct Lender a lower interest rate than it received from the borrower, the system was not designed to calculate the service fees as allowed by the LSAs, nor was the system designed to accommodate the netting of pre-paid interest to performing or repaid loan proceeds; holdbacks or collection costs; accounting for diverted principal; prepaid interest; assignments of loans from one Direct Lender to another Direct Lender when such loan has been partially paid (without the knowledge of the selling or acquiring Direct Lender); accrual of unpaid amounts; and other issues required by the Order Granting Debtors' Motion to Temporarily Hold Funds Pending a Determination of the Proper Recipients and the Interim Distribution Orders (defined below).

67.  MFIM staff, with the assistance of USACM's accounting and IT staff, developed the project plan to reprogram the iTrack System and reload the data.  As the data was reloaded month by month into the system, MFIM had to check it against the reconstructed data for errors in the data fields and for proper processing of the calculations.  While the data was being reloaded and rechecked, the system was also being reprogrammed to accommodate the non-standard information requirements and calculations.  For instance, it required nearly six weeks to develop the algorithms to properly calculate the netting of disbursements to borrowers, and to check the data and reports in order to ensure that the netting was calculating properly.  Due to Internal Revenue Service requirements, the system was required to categorize the netting by principal and interest, by loan, and by investor.  In addition, the service fee calculation had to be programmed to allow for multiple

contract rates by Direct Lender and by loan. New fields also had to be created to account for diverted principal, accrued service fees, accrued and unpaid interest from the borrower to each Direct Lender.

68. MFIM designed various new reports including the Borrower Loan History Report, the Investor Transaction History Report, the Investor Check Statements (showing the netting and holdbacks), the Borrower Audit Report, the Investor Principal Audit Report, the Investor Interest Audit Report and the Service Fee Audit Report. Each of these reports required the determination of the fields and calculations by MFIM to direct the IT staff to program the system. Each report had to be programmed, processed and checked for accuracy and completeness.

69. Before any distributions could be made to Direct Lenders (including the Funds) certain provisions of the Order (a) granting (i) Debtors' motion to distribute funds; (ii) Debtors' hold funds motion and (iii) the compel motion, and (b) denying (i) the lift stay motion and (ii) McKnight motion (the "**First Interim Distribution Order**") also had to be implemented in the system. The First Interim Distribution Order required that to the extent funds were received postpetition on a performing loan for an individual vesting name (one account number), such funds would be held to potentially recoup amounts paid to that account number on non-performing loans from diverted principal payments. Since most Direct Lenders held an average of three to four loans in a vesting name, and some held up to 20 loans, a complicated series of calculations had to be developed and programmed to allow tracking of how much was withheld from each performing loan and what funds, by loan, could be released to the Direct Lender. These calculations were also complicated by the principal payments that were being received from loan payoffs. It was also necessary to determine the amount of principal and interest actually paid on each loan to track the taxable amounts. The development of the calculations, programming, and verification of the calculations and programming required approximately four weeks of intensive effort by MFIM.

70. The First Interim Distribution Order also mandated that amounts be held back from the payments to the Direct Lenders to attempt to recover a loan servicing fee that could be up to 3%, depending on the contract. The iTrack System was originally programmed to charge each Direct Lender a 1% servicing fee and had to be reprogrammed until the thousands of LSAs could be

1   researched and matched to an account and a loan.  Ultimately, about 6,000 LSAs were reviewed to

2   determine the actual LSAs fees in effect as to the current 3,600 Direct Lenders.

3        71. The Modified Order Authorizing Interim Distributions and Holdbacks (the ("**Second**

4   **Interim Distribution Order**" and collectively, the "**Interim Distribution Orders**") required

5   holdbacks for the appraisal costs to be allocated to each Direct Lender based on the loans in their

6   portfolio, a holdback for any collection costs by outside parties, including Debtors' counsel, and a

7   holdback for prepetition receipts while the nature and commingling of those receipts was being

8   evaluated.  All of these holdbacks had to be researched, calculated, programmed and verified.

9        72. In addition, the Second Interim Distribution Order required that monthly reports on the

10  proposed distribution be furnished to and approved by the Committees.  These monthly reports and

11  other audit reports had to be designed and programmed into the iTrack System.  The monthly

12  statements that had previously been furnished to Direct Lenders prepetition were extremely simple

13  and only showed the amount of the investment and the monthly distribution.  The Direct Lenders

14  were never informed about the status of the payments from their borrower or the amount of the

15  servicing fees charged.  New monthly statements had to be designed and programmed to show

16  principal and interest owed to each Direct Lender from the borrowers, the monthly service fee

17  charged, interest accrued for that Direct Lender and the status of principal and interest due from or

18  owing to the Collection Account.  Principal amounts unpaid as of the Petition Date were also shown

19  on the Investor History Statements.  A second statement was developed to be mailed with the checks

20  to show the netting between loans, and the holdbacks required under the Interim Distribution Orders.

21       73. The following table summarizes the distributions made through March 12, 2007 to the

22  Direct Lenders and FTDF as a result of these efforts:

| Month | Amount |
|-------|--------|
| June | $ 64,281,686.94 |
| July/August | 61,516,697.71 |
| September | 16,117,766.04 |
| October | 4,793,972.36 |
| November | 22,732,613.71 |
| December | 14,213,975.57 |
| January | 18,496,996.73 |
| February | 29,720,069.44 |
| Total | $231,873,778.50 |

74. **Benefits to the Debtors**:  MFIM's efforts in this category benefited USACM by correcting the accounting for both borrowers and lenders.  Direct Lenders and the Funds received accurate, comprehensive statements relating to their investments.  Ultimately, the work performed facilitated the distribution of approximately $231.9 million to the 3,600 Direct Lenders and FTDF.  The changes to the Debtors' accounting system were also beneficial to the sales process.  Moving from a largely manual process with calculations performed in spreadsheets to an integrated system increased the value of the Debtors from a going concern perspective and provided the various bidders with a greater comfort level that the financial information was correct.  It is evident that MFIM created value in these Cases by the $20.5 million increase in the purchase price from the Stalking Horse Bidder to the auction price of $67 million paid by Compass.

75. **Allocation of Fees:**  MFIM incurred a total of 1,118.9 hours and $517,937 of fees with regard to Loan and Financial Accounting Systems during the Application Period.  MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $517,937 | $0 | $0 | $0 | $0 |
| Hours | 1,118.9 | 0 | 0 | 0 | 0 |
| Percentage | 100% | 0% | 0% | 0% | 0% |

MFIM did not allocate the fees in this category.  Instead, MFIM allocated all time entries to a specific Debtor.  The activities in this category were required of USACM as a loan servicer under the LSA's and Nevada law.  Therefore, all fees have been charged to USACM.

### C.    *Financial Analyses*

76. Throughout these Cases, MFIM performed the Debtors' accounting and finance functions.  In this role, MFIM led both the transactional aspect of the accounting department (i.e. accounting for loan portfolio activity) as well as the planning, analysis and reporting functions.  A list of the reports generated by MFIM, along with their frequency, follows:

- **Loan Summary Report** - MFIM produced a monthly loan summary report detailing the principal and interest outstanding by loan, the status of the loan, the amounts collected, the service fees payable and the recipients of the collections. This information was initially requested by the Court, and quickly became a source of information to all constituents. From April to October, 2006, MFIM performed all calculations manually, which required extensive amounts of time in order to determine the application period of the interest received and the service fees derived from that application period as well as principal and interest splits. Starting in November 2006, MFIM used information generated from reports from the iTrack System, which substantially reduced the preparation time.

- **Collections Report** - MFIM produced a weekly collections report detailing the amounts collected by loan from the borrowers for that week.

- **Budget vs. Actual Variance Report** - MFIM produced weekly budget vs. actual variance reports at the request of Sierra Consulting, financial advisors to the USACM Committee detailing amounts received and disbursed each week for each Debtor as compared to amounts budgeted for each Debtor. MFIM sent this report to the Committees' financial advisors only.

- **Service Fees Report** – MFIM performed extensive analysis in order to determine the appropriate service fees. In the beginning of the Cases, MFIM, with advice from legal counsel, determined that the Direct Lenders' LSAs required payment of a monthly service fee in amounts up to 1% to 3% of the Direct Lenders' principal loan balance. Since USACM had not historically calculated or collected service fees in this manner, MFIM prepared a service fee calculation as part of the loan reconstruction. As ultimately approved under the Plan, as part of the Direct Lender compromise, MFIM did not charge higher service fees historically if the borrower had made payments and such payments were paid to the Direct Lenders. This service fee calculation required substantial work given that borrowers seldom paid interest on a monthly basis in full, but rather interest received often covered only a portion of a month. Since service fees were a monthly calculation per the LSAs, these fees had to be pro-rated.

    The Service Fee Report was prepared for the Initial Loan Summary, which was then prepared on a monthly basis in conjunction with the Loan Summary Report. In the First Interim Distribution Order, the Court ordered that an additional 2% service fee be held back from distributions until MFIM could determine which Direct Lenders signed contracts that called for a 1% fee and which Direct Lenders signed loan servicing agreements that called for a 3% fee. For the First Interim Distribution Order, this holdback only applied to the repaid loans. With the Second Interim Distribution Order, the holdback applied to all disbursements. MFIM researched each loan servicing agreement to determine each Direct Lender's service fee percentage. This information was transmitted to the Direct Lenders as an exhibit to the Alternative Dispute Resolution Procedures in connection with the Plan. The new servicing fees were programmed into the computer system and applied as of the Petition Date and forwarded.

    MFIM also prepared an estimate of the service fees that would be collected at the increased percentages. Various potential buyers requested this information in order to estimate future revenues that would be generated by USACM as a loan servicer.

- **Default Interest Report** - MFIM prepared calculations of the default interest to be charged to the borrower on monthly invoices or at the time of payoff. In order to prepare such reports, MFIM, along with legal counsel, had to determine whether default interest could be charged under the applicable loan documents. Assuming default interest could be charged, MFIM then had to determine the appropriate calculations and methods for calculating such interest in accordance with the loan agreements and applicable accounting rules and methodology. During the course of the Cases, MFIM determined that default interest could be charged for substantially all of the loans, and as a result prepared default interest calculations as appropriate.

- **Pre-paid Interest Report** - MFIM generated a Pre-Paid Interest report detailing Pre-Paid Interest by investor and by loan, which was required for the schedules of assets and liabilities and had to be derived from analyses of the reconstructed loan ledgers. Pre-Paid Interest represents the amount of interest a Direct Lender received on account of a particular loan in excess of the amount of interest actually paid by the borrower on the loan. As discussed herein, USACM had historically made interest payments to Direct Lenders even if the borrowers were not making their interest payments to USACM. The amount of Pre-Paid Interest by the Direct Lender by loan was furnished to each Direct Lender on their initial statements in June 2006, and then on the Loan History Report each month after these reports were developed and sent beginning with the September 2006 distribution. The Pre-Paid Interest Reports have also been sent to various government agencies upon their request.

- **Impairment of Loan Assets Report** - MFIM performed an analysis of the loan assets held by each of the Funds using GAAP guidelines on impairment of assets and the valuation and liquidation reports prepared by other MFIM employees. MFIM CPAs researched the appropriate accounting literature, including FASB 5 and FASB 114 and the guidance prepared by FASB on the application of these FASBs, to loan portfolios and used this guidance to evaluate the loan portfolios of the Funds. These impairment adjustments were made to the books and records of the Funds in November 2006 as part of the year end review of the financial statements.

- **Cash Reconciliations Report** - MFIM produced an internal cash reconciliations report to reconcile the cash in the Collection Account to the cash received by the loan portfolio from the distribution reports generated by the iTrack System. Since Direct Lenders sometimes assigned their loans, one loan could have Direct Lenders who had received Pre-Paid Interest (negative cash) as well as Direct Lenders who were owed money due to Diverted Principal (positive cash). The Collection Account also contained the funds held pursuant to the Second Interim Distribution Order such as the holdback for appraisal costs, collection costs, service fees at 2% and the pre-petition balances. These amounts changed monthly as each distribution may have paid both uncollected prior months holdbacks as well as the current month's holdbacks. MFIM had to perform all of these calculations to determine the amounts actually owed to the Direct Lenders.

- **Diverted Principal Report** - MFIM generated a Diverted Principal Report listing the diverted principal by loan and by investor. The information in the Diverted Principal

Report was required for the schedules of assets and liabilities (the "**Schedules**") and is detailed on Schedule F for USACM. Diverted principal is the amount of principal paid by the borrowers that was neither paid to the Direct Lenders nor remaining in the Collection Account as of the Petition Date. The Direct Lenders were furnished this information on their June 2006 statements. As the data was loaded into the iTrack System, corrected and refined, the Direct Lenders also received this information as part of their monthly Loan History Reports. Revised Schedules were filed in February 2007 to reflect updated diverted principal amounts. The Diverted Principal Report was also furnished to several government agencies at their request.

- **Prepetition Receipts Report** - As of the Petition Date, the Collection Account had a balance of $8.9 million. MFIM accountants researched the deposits and disbursements in the Collection Account for the months immediately prior to the Petition Date. Based upon these reports, MFIM prepared analyses and research allowing for the release of the identifiable funds to the appropriate Direct Lenders and the retention of the Pre-Paid Interest and other unidentifiable funds to USACM.

- **Recoupment or "Netting" Report** - MFIM prepared reports on the amounts of funds withheld from a Direct Lender's performing loans to offset those amounts pre-paid on that Direct Lender's loans. The Plan required MFIM to identify all such funds thus held at the Effective Date.

- **Holdback Report** - MFIM calculated the amount of holdback required to cover the cost of the appraisals from each Direct Lender in a loan, which was programmed into the iTrack System. MFIM prepared an analysis each month, as part of the Distribution Report which was sent to the various Committees' financial advisors, which detailed the holdbacks for appraisal costs, collection costs, prepetition receipt holdbacks, and service fee holdbacks. Holdbacks could only be collected to the extent a Direct Lender was otherwise entitled to a distribution so, in many cases, partial holdbacks were collected. In order to implement the Plan and release any necessary holdbacks, an analysis had to be performed to determine the amount of funds to be released for prepetition collections and the additional service fees held by investor, along with assessing a surcharge to the 1% LSAs. This release/charge amount was then programmed into the iTrack System for the Effective Date distribution.

- **Insolvency Analysis** - In connection with some of the proposed and pending litigation, MFIM researched and prepared preliminary analyses of the insolvency of USACM in the years prior to the filing. MFIM analyzed the impact of accounting for the Diverted Principal and the Pre-Paid Interest in the Collection Account on the books of USACM as the party responsible for these loan servicing liabilities.

77. In addition to those reports described above, MFIM also performed various *ad hoc* analyses in support of the auction, the loan collections process and the Plan, as well as analyses related to the ongoing operation of the Debtors.

78. **Benefits to the Debtors:**  MFIM's efforts in this category benefited the Debtors by allowing for a better understanding of financial and operating performance of the Debtors on an historic and prospective basis.  This knowledge allowed the Debtors and other parties-in-interest in these Cases to make decisions and to take actions to maximize the return to all constituencies.  In addition, MFIM's calculation of default interest increased the value of the loan servicing portfolio during the sale process.

79. **Allocation of Fees:**  MFIM incurred a total of 2,229.2 hours and $930,226 of fees with regard to Financial Analyses during the Application Period.  MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $744,180.80 | $93,022.60 | $93,022.60 | $0 | $0 |
| Hours | 1,783.4 | 222.9 | 222.9 | 0 | 0 |
| Percentage | 80% | 10% | 10% | 0% | 0% |

MFIM allocated the fees in this manner because the majority of the activities in this category related to USACM's role as loan servicer under the LSAs and Nevada law.  However, certain activities were necessary for and benefited FTDF and/or DTDF.  Therefore, small amounts were allocated to the Funds.

### D.    *Cash Flow Model/Analyses*

80.  When MFIM was appointed, MFIM discovered that the Debtors were operating without a model for forecasting short-term cash flows.  Therefore, MFIM constructed a financial model to estimate the Debtors' cash flows on a weekly basis for up to four months into the future.  To obtain the inputs for this model, MFIM performed the following tasks:

- Researched bank balances to be used as the starting point for the cash flow forecasts;
- Reviewed the Debtors' historical financial records as a basis for projecting operating expenses for the Debtors;

- ■ Analyzed the portfolio of loans serviced by USACM to estimate the amounts of principal, interest and fees to be collected;

- ■ Requested fee budgets from the various professional firms in the Cases to project payments to be made to those firms; and

- ■ Utilized experience from other cases to project other costs of the Debtors' Cases (for example, fees due to the U.S. Trustee).

81.   In preparing the liquidation analysis that ultimately supported the Plan, MFIM developed the "recovery model" that estimated the value of the Debtors' assets in liquidation including estimated cash receipts from collection of the loan portfolio.  MFIM used these estimated collection numbers in the cash flow model.  Those fees incurred for developing the recovery model are included in the "Liquidation Analysis" category of this Final Application. The forecasts produced by this model were used to manage the Debtors' cash and as exhibits for motions filed with the Court to use cash collateral.

82.   In addition, MFIM recorded time in this category for weekly meetings with employees of the Debtors to identify those payments to be made in the upcoming week.  This activity was critical to ensure that the Debtors would achieve their cash forecasts and maintain liquidity sufficient to continue as going concerns.

83.   **Benefits to the Debtors:**  MFIM's efforts in this category benefited the Debtors by: (a) establishing a framework for forecasting the Debtors' cash flows, (b) increasing the understanding of the Debtors' cash needs, (c) managing cash disbursements of the Debtors to ensure sufficient liquidity throughout these Cases.

84.   **Allocation of Fees:**  MFIM incurred a total of 333.0 hours and $153,405 of fees with regard to Cash Flow Analysis and Monitoring during the Application Period.  MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $76,702.50 | $30,681 | $30,681 | $7,670.25 | $7,670.25 |
| Hours | 165.5 | 66.6 | 66.6 | 16.7 | 16.7 |
| Percentage | 50% | 20% | 20% | 5% | 5% |

Page 41 of 112

MFIM allocated the fees in this manner because a cash flow forecast was required for each Debtor. The different allocations represent the varying complexities among the Debtors of their cash flow forecasts.

### E.    *Loan Portfolio*

85.   Throughout the Application Period, MFIM professionals worked diligently to collect on the outstanding loans in the portfolio.  For many of the loans, this collection effort proved to be an arduous task.  The difficulties frequently encountered can be explained by the nature of the loans and how they were managed prior to MFIM's retention.  Most if not all of the loans were short-term facilities (up to 24 months) and were largely bridge loans or other construction type facilities, in which no payments were due prior to loan maturity (other than, from time to time, interest payments advanced by the Direct Lenders and paid periodically out of escrow).  Therefore, the ability to deal proactively with problems in advance of loan maturity did not exist.  Further, the loans were higher-risk facilities, reflected by interest rates which ranged between 12% and 18%, the various fees charged on each loan, and the minimal amount of underwriting conducted, as reflected in the lack of due diligence documents in each loan file.

86.   These problems were compounded by a lack of a loan servicing or workout group to collect non-performing loans before the arrival of MFIM.  Instead, former management simply provided loan extensions to defer collections and/or, alternatively, would pay interest on non-performing loans from other sources.  In addition, MFIM discovered that management frequently acquiesced to borrowers' delinquencies in exchange for equity in the project, or for agreement to pay additional fees.  Further, while USACM monitored its loans utilizing Excel spreadsheets which detailed payments made, the data was generated from USACM's iTrack System which, as has been noted in this Final Application, was notoriously inaccurate and incomplete.  No log book was maintained with respect to calls, inquiries or collection efforts.

87.  Upon MFIM's appointment, it reviewed and inventoried each loan file.  Documentation reviewed, other than the actual loan agreements, included appraisals, maps, financial information, and projections.  MFIM also initiated a process of obtaining new or updated appraisals on all of the

collateral (*See* "Valuation Analysis/Appraisal" category description). MFIM refined and implemented procedures to ensure that accurate payment records were maintained and otherwise preserved appropriate accounting records on each loan and the sums collected thereon. In addition, MFIM performed certain calculations related to default letters, payoff demands, and other *ad hoc* loan related requests. Until the loans were satisfied, MFIM proceeded diligently to collect all payments due under the terms of the notes. MFIM identified loans with past due payments and/or documentation problems, which often included missing or unexecuted documents. MFIM created, supervised, and implemented a process of establishing a work-out strategy for each loan and MFIM personnel held numerous daily meetings and conference calls to work with borrowers to collect on the portfolio. MFIM reviewed and analyzed settlement proposals and other correspondence received from borrowers and other interested parties. These efforts resulted in substantial collections of principal and interest for the Direct Lenders, including the Funds, as well as collections of fees owed to USACM.

88.    As these Cases progressed, the loan portfolio grew continually more difficult to collect. MFIM collected many of the higher quality loans in the early stages of these Cases as they matured. Soon after the filing, nearly all of the loans in the portfolio were either past maturity or were not currently paying interest. The loans collected during the Application Period represented many loans that required significant effort as borrowers became more recalcitrant. The impending sales process also increased the difficulty in collections as many borrowers apparently hoped to extract discounts from the successful bidder. Due to the public nature of the auction process, the borrowers were well aware that the successful bidder would be purchasing the assets of FTDF at a discount. Furthermore, many borrowers were under the mistaken impression that USACM actually owned the loans and were selling the entire portfolio at a discount. As MFIM could not accept less than 100% payoffs without the approval of all of the Direct Lenders in the corresponding loan, the relevant Committees, and the Court, many borrowers apparently decided that it was beneficial to delay payments in the hope of extracting discounts from the new loan servicer, who would not be as hindered by the bankruptcy process. The unavailability of debtor-in-possession financing also made it impossible for USACM to foreclose on the delinquent loans due to the lack of cash necessary to fund any carrying

1  costs related to the collateral supporting the loans (nearly all of which were cashflow negative).

2  Because USACM could not foreclose, many borrowers determined that delaying payment until after

3  the auction would not carry much downside risk.

4      89.  As of March 12, 2007, MFIM collected approximately $280.7 million, consisting of

5  $227.2 million in principal, $46.6 million in current interest, and $6.9 million in fees.  Every loan

6  payoff under MFIM's direction collected the principal and interest owed to the Direct Lenders in full.

7  Loans fully paid off during the Application Period include:

| Loan Name | Transaction Date | Payoff Amount |
|---|---|---|
| 5252 Orange, LLC | 6/9/2006 | $ 3,800,000.00 |
| Ashby Financial  $7,200,000 | 9/1/2006 | 7,200,000.00 |
| Boise/Gowen 93 | 9/7/2006 | 4,831,004.82 |
| Cloudbreak LV | 12/21/2006 | 3,800,000.00 |
| Copper Sage Commerce Center, LLC | 6/22/2006 | 176,947.19 |
| Cottonwood Hills, LLC | 10/11/2006 | 4,000,000.00 |
| Del Valle Isleton | 5/23/2006 | 6,520,000.00 |
| Elizabeth May Real Estate | 1/18/2007 | 10,050,000.00 |
| Fiesta Development $6.6 | 12/15/2006 | 6,600,000.00 |
| Fiesta Development McNaughton | 1/12/2007 | 6,000,000.00 |
| Fiesta/Beaumont $2.4m | 7/21/2006 | 2,400,000.00 |
| Franklin - Stratford Investments, LLC | 2/13/2007 | 5,225,000.00 |
| Gateway Stone | 2/28/2007 | 13,185,000.00 |
| Gilroy | 6/30/2006 | 4,950,000.00 |
| Glendale Tower Partners | 8/21/2006 | 6,500,000.00 |
| Golden State Investments II | 6/5/2006 | 2,850,000.00 |
| Goss Road | 1/2/2007 | 1,000,000.00 |
| Hasley Canyon | 11/14/2006 | 11,700,000.00 |
| HFA- North Yonkers | 5/26/2006 | 24,000,000.00 |
| HFA- Riviera 2nd | 5/26/2006 | 8,000,000.00 |
| I-40 Gateway west | 2/14/2007 | 4,530,000.00 |
| I-40 Gateway West, LLC 2nd | 2/14/2007 | 1,065,000.00 |
| Interstate Commerce Center Phase II | 3/6/2007 | 1,856,848.86 |
| J. Jireh's Corporation | 9/6/2006 | 8,825,000.00 |
| Meadow Creek Partners, LLC | 11/8/2006 | 8,250,000.00 |
| Midvale Marketplace, LLC | 7/13/2006 | 4,075,000.00 |
| Opaque/Mt. Edge $7,350,000 | 4/27/2006 | 4,827,970.00 |
| Preserve at Galleria, LLC | 9/27/2006 | 4,430,500.00 |
| Riviera - Homes for America Holdings, L.L.C. | 5/26/2006 | 5,000,000.00 |
| Roam Development Group | 12/19/2006 | 26,566,256.72 |

| | | |
|---|---|---|
| Slade Development | 3/8/2007 | 3,525,000.00 |
| Urban Housing Alliance - 435 Lofts | 8/21/2006 | 8,150,000.00 |
| **Total** | | **$213,889,527.59** |

90. **Benefits to the Debtors** - MFIM's efforts in this regard benefited the Debtors by facilitating maximum recovery of principal, interest and fees due from borrowers (total collections through March 12, 2007 have been approximately $280.7 million). Also, as part of the sale process, MFIM had negotiated less than a dollar for dollar purchase price adjustment in the purchase agreement with the Stalking Horse, and Compass agreed to this term. As of the closing date of the sale to Compass, MFIM had collected $17.3 million in loans that translated into a $15.2 million purchase price adjustment (or a $2.1 million benefit for FTDF).

91. **Allocation of Fees:** MFIM incurred a total of 2,466.2 hours and $1,276,608 of fees with regard to Loan Portfolio during the Application Period. MFIM assigned the hours and fees as follows:

| | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $1,276,608 | 0 | 0 | 0 | 0 |
| Hours | 2,466.2 | 0 | 0 | 0 | 0 |
| Percentage | 100% | 0% | 0% | 0% | 0% |

MFIM did not allocate the fees in this category. Instead, MFIM charged all time entries to a specific Debtor. The activities in this category were required of USACM as a loan servicer under the LSAs. Therefore, all fees have been charged to USACM.

### F.    *Investor Issues and Requests*

92. MFIM was required to take over the investor inquiry function after the loss of a significant number of USACM employees. These activities were critical to provide necessary information to an important group, the Direct Lenders. In addition, this function was required under the LSAs entered into by USACM and the Direct Lenders.

93.  Since assuming the function, MFIM has logged, reviewed, researched and responded to over 1,600 requests from Direct Lenders.  MFIM began this task at the time the Direct Lenders began receiving monthly statements from USACM's reconstructed loan ledgers in 2006.  These statements were quite different from the information sent to the Direct Lenders previously.  The prepetition statements listed only their investment and their monthly interest.  The new statements attempted to show the Direct Lenders their Pre-Paid Interest and Diverted Principal as well as amounts owed by the borrower to them. These new statements confused and upset many Direct Lenders who did not understand the new information.  MFIM received a second large round of inquiries when MFIM generated the first check statements showing the netting of performing loans to non-performing loans.  Since the netting was not permanent each month, but only a holdback, many Direct Lenders thought they were being charged this amount every month instead of realizing that this was a carryover from the prior month.  Issues and questions raised by the Direct Lenders and explained by MFIM included:

- An overall description of new statements;
- The process by which Direct Lenders could update their addresses;
- An update with regards to DTDF;
- Updates and explanations regarding FTDF payments made in August 2006 and November 2006;
- Timing of payments to Direct Lenders, as well as, Fund members;
- Explanation of Diverted Principal;
- Explanation of Pre-Paid Interest;
- The process by which Direct Lenders could assign their loans;
- Service fee calculations and explanations;
- Explanation as to why certain loans were designated as performing or non-performing;
- Discrepancies with 1099 information;
- Proof of claim and proof of interest inquiries;
- Foreclosure proceedings;
- Netting calculations and explanations;
- Hilco (appraisal firm) holdbacks;
- Collection costs;

- Amounts held-back generally; and
- Detailed information regarding Investor History Reports.

94.  In addition, MFIM conducted two "town hall" meetings for the Direct Lenders to explain the new statements, explain how the 'netting" worked and how it was presented on their statements and answer questions.  Several hundred Direct Lenders attended the two presentations.

95.  MFIM delegated the responses to these investor inquiries to more junior professionals (where appropriate) in order to respond to these requests as efficiently as possible. After MFIM had processed a sufficient number of investor inquiries to understand the most common requests and issues, MFIM prepared more standard explanations for these issues, speeding up the reply process considerably.   Requests for copies of statements and loan documents were handled by USACM staff, if possible.  Requests for copies of property appraisals required the execution of a confidentiality agreement and were prepared in conjunction with the Debtors' attorneys.

96.  **Benefits to the Debtors:**  MFIM's efforts in this regard benefited the Debtors by increasing the information flow to the Direct Lenders and thereby increasing their understanding of the Cases.   MFIM was also ensuring that USACM performed its duties under the LSAs and the Nevada Mortgage Lending statutes.   These investor inquiries also facilitated the correction of the Debtors' books and records by highlighting any problems or issues for the accounting staff. Furthermore, the sale and plan process were facilitated by keeping the investors informed and involved in the process.

97.  **Allocation of Fees:**  MFIM incurred a total of 2,611.2 hours and $870,603 of fees with regard to Investor Issues and Requests during the Application Period.  MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $870,603 | $0 | $0 | $0 | $0 |
| Hours | 2,611.2 | 0 | 0 | 0 | 0 |
| Percentage | 100% | 0% | 0% | 0% | 0% |

MFIM did not allocate the fees in this category. Instead, MFIM charged all time entries to a specific Debtor. The activities in this category were required of USACM as a loan servicer under the LSA's. Therefore, all fees have been charged to USACM.

### G.    *Valuation Analyses / Appraisal*

98. During the first few weeks of their engagement, MFIM discovered that 99 commercial real estate projects/developments served as collateral for the loans serviced by USACM and that 23 of the loan files did not contain any appraisals. Approximately 32 of the appraisals were obtained prior to the year 2005 and were not considered to be reliable. These appraisals were provided by a number of different entities, and therefore, it was uncertain if the appraisals were based on common valuation methods or common criteria. As a result, MFIM retained and supervised the work of an appraisal firm. During the retention process, MFIM interviewed three appraisal firms, evaluated the firms' proposals and negotiated the final agreement with the winning firm. The Court entered an order allowing the retention of  Hilco Real Estate LLC/Hilco Real Estate Appraisal, LLC, as the Debtors' appraisal firm on June 20, 2006.

99. The retention of an appraisal firm was necessary for the Debtors in order to:

- obtain sufficient information to best determine how to proceed in connection with each serviced loan (*i.e.*, should the collateral be foreclosed, should a loan extension be considered, is there sufficient equity in the property such that another lender may want to re-finance the loan, etc.);

- provide appraisals on all of the properties that were current and based on common valuation methods;

- assist in the development of the Plan and to provide the requisite information that would be required in the Disclosure Statement;

- provide a more complete response to requests for information from parties in interest about the properties/developments and the status of the serviced loans;

- facilitate negotiations with borrowers, and, in particular, those borrowers with delinquent loans or loans that might become delinquent in the near future;

- ascertain the validity and accuracy of appraisals obtained on properties in which the former principals of the Debtors are investors; and

- obtain appraisals on properties securing loans serviced by USACM for which there were currently no appraisals in the loan files.

100. **Benefits to the Debtors:**  MFIM's efforts in this category benefited the Debtors by providing a source of updated and reliable information used for purposes of making collection decisions, settlement negotiations, pursuing the sale of the Debtors' assets and during the Plan process.

101. **Allocation of Fees:**  MFIM incurred a total of 158.5 hours and $62,749 of fees with regard to Valuation Analyses/Appraisal during the Application Period.  MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $62,749 | $0 | $0 | $0 | $0 |
| Hours | 158.5 | 0 | 0 | 0 | 0 |
| Percentage | 100% | 0% | 0% | 0% | 0% |

MFIM did not allocate the fees in this category.  Instead, MFIM charged all time entries to a specific Debtor.  The activities in this category were required of USACM as a loan servicer under the LSAs.  Therefore, all fees have been charged to USACM.

### H.    Company Administration[4]

102. As noted herein, Thomas Allison of MFIM was employed as the Debtors' CRO throughout these Cases.  MFIM supplied additional temporary employees to the Debtors so that the Debtors' business would continue to operate.  MFIM's activities in this category include the time incurred to operate the Debtors' businesses.

103. As part of those duties, MFIM attended meetings with the SEC, the U.S. Attorney and the Nevada Mortgage Lending Division.   MFIM spent considerable time preparing for these

---

[4]    In MFIM's First Interim Fee Application, MFIM included categories called "Management of the Estates By CEO/CRO" and "Strategic Management."  As the Cases progressed, MFIM combined these categories and renamed them "Company Administration."  All of the time included in the "Management of the Estates By CEO/CRO" category and the "Strategic Management" category from the First Interim Fee Application is included in this category now called "Company Administration."

meetings, as well as, fulfilling information requests in order to provide the entities with the most recent information.  At the start of the Cases, these meetings often occurred on a weekly basis.

104.  Additional issues addressed by MFIM and included in this category are:

- Termination of the USACM's defined benefit plan with the PBGC;
- Definition and implementation of project management and strategies;
- Management of corporate insurance coverages;
- Treasury functions including management of new bank accounts and disbursements;
- Creation of 1099 statements;
- Coordination the Debtors' auditors;
- Management of employees, including the termination of the CFO and the resignation of the CIO;
- Conduct employee meetings to communicate the status of the Debtors and the Cases;
- Analysis of office space requirements for the Debtors; and
- Monitoring professional fees for the Cases.

105. An additional $50,000 has been included in this category as an estimate of fees to review the Final Application for the other professionals in these Cases.

106. **Benefits to the Debtors** – MFIM's efforts in this category benefited the Debtors by allowing them to continue successfully as going concerns through the Effective Date of the Plan.  As of the Petition Date, it was critical that the Debtors' senior management be terminated and replaced. MFIM was able to step in and assume management of the Debtors' businesses.

107. **Allocation of Fees:**  MFIM incurred a total of 850.4 hours and $507,344 of fees with regard to Company Administration during the Application Period.  MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $507,344 | $0 | $0 | $0 | $0 |
| Hours | 850.4 | 0 | 0 | 0 | 0 |
| Percentage | 100% | 0% | 0% | 0% | 0% |

MFIM did not allocate the fees in this category. Instead, MFIM charged all time entries to a specific Debtor. The activities in this category were primarily related to employee, pension, and related issue all of which were related to USACM. All company personnel were employees of USACM.

### I.    *Analyzing Restructuring and Sale Options*[5]

108. When these Chapter 11 Cases were filed, MFIM considered the possibility of restructuring the Debtors' operations, thereby maintaining its going concern value. During that process, MFIM sought debtor-in-possession financing ("**DIP Financing**") which resulted in the first introduction of the Debtors' business, including its challenges and opportunities, to the marketplace. (*See* further detail in that section of the Final Application entitled "DIP Financing/Cash Collateral") When the DIP Financing processes ended, MFIM was forced to consider other strategic alternatives. From June to August, 2006, MFIM examined the various options available for maximizing recoveries to creditors, investors and DTDF and FTDF's members. MFIM conducted formal committee presentations on or about June 29, 2006, July 11, 2006 and August 8, 2006, during which time it discussed reorganization options, including challenges associated with each. In an effort to coordinate a disciplined organized course of action that would maximize the return to all of the creditor constituents, beginning in August 2006, MFIM initiated an extensive sales process structured to provide a viable restructuring alternative for the Debtors.

109. In coordination with the Committees, MFIM developed a marketing strategy to target the most likely buyers of the Debtors' assets, utilizing MFIM's market intelligence, industry experience and market presence to identify strategic and financial buyers (such as private equity and hedge funds) which understood the dynamics of the loans at issue, had a portfolio of similar loans, or otherwise had experience servicing the same. This marketing strategy was focused on finding a stalking horse bidder to create necessary market credibility, value and structure for the sale process.

---

[5]    In MFIM's First Interim Fee Application, MFIM included a category called "Analyzing/Evaluating Restructuring Options." As the Cases progressed, MFIM renamed that category "Analyzing/Evaluating Restructuring and Sale Options." All of the time included in the "Analyzing/Evaluating Restructuring Alternatives" category from the First Interim Fee Application is included in the category now called "Analyzing/Evaluating Restructuring and Sale Options."

1   The prospective assets initially offered were packaged into three proposed groups associated with

2   DTDF, FTDF and USACM, respectively. The initial sale process consisted of MFIM confirming

3   with each of the Committees an acceptable bid range, including defining potential contingencies that

4   needed to be considered throughout the sale process. MFIM contacted approximately 60 prospective

5   bidders during the entire process.

6           110. As a result of the considerable on-going efforts by MFIM to analyze and identify the

7   critical information underlying the various loan portfolios and properties, MFIM understood the key

8   value drivers supporting the Debtors' loan portfolios. Understanding the unique nature of the assets

9   at issue, MFIM determined that the information that would elicit interest would be analytical data that

10  broke down the loan portfolios in a detailed fashion, identifying or otherwise modeling the various

11  revenue streams associated with each loan. Therefore, MFIM created spreadsheets that detailed each

12  of the fees and other revenue drivers for the portfolios proposed for sale. These spreadsheets and

13  reports, in various forms, were placed on data disks submitted to interested parties. Initial data disks

14  prepared by MFIM described the loans in a summary fashion. After preparing a confidentiality

15  agreement designed to ensure a competitive sale process, in coordination with the Committees, and

16  after receiving executed copies of the same, a second and more detailed data disk was prepared and

17  forwarded by MFIM to interested parties, creating for each a virtual data room. This information was

18  also incorporated into an actual initial data room designed to attract potential buyers into a

19  competitive auction process. MFIM analyzed and continuously updated the loan files to ensure that

20  they were both complete and in order. This data room allowed bidders to conduct a loan-by-loan

21  analysis of the assets for sale.

22          111. In a continuing effort to facilitate an extensive due diligence process, MFIM also

23  participated in presentations in Las Vegas, meetings with the Debtors' various personnel, and

24  facilitated bidder communications with borrowers and other parties-in-interest. During meetings with

25  MFIM, the parties discussed the process that was in place, the investment opportunities associated

26  with the loans, and the dynamics of servicing the same. Approximately ten interested parties spent

27  one to three days at the Debtors' headquarters in Las Vegas reviewing the loan files, compiling

28  questions about what was contained therein, and/or requesting additional information with respect to

perceived missing data.  MFIM answered each question during the course of the visits, or after necessary research, followed up with the reply.  Following the initial due-diligence process (fourteen of the initial parties signed confidentiality agreements and ten interested parties proceeded with more formal due diligence), five of the prospective bidders submitted preliminary proposals for the acquisition of the loans underlying the Funds and USACM's portfolios, as well as, the servicing rights to these assets.  However, the preliminary proposals of the bidders did not place a value on the assets of DTDF and USACM sufficient to select a stalking horse bidder.  MFIM consulted with the Committees concerning this problem, resulting in a decision by DTDF to remove its assets from the proposed auction.  MFIM also determined that none of the bidders were in a position to ascribe a value to the USACM assets that would satisfy the USACM Committee. Therefore, MFIM met with the remaining interested bidders and discussed how the USACM assets should be valued, educating those bidders on possible value drivers that the bidders have discounted or failed to consider.  As a result, a pass-through structure was created with respect to USACM fees, thereby allowing MFIM to proceed with a sale.

112. In anticipation of the actual auction, MFIM initiated a process that allowed for evaluating and comparing preliminary bids.  After evaluating each of these proposals with the Committees (and extensive discussions with each of the interested parties as to an acceptable value and acquisition structure), on October 19, 2006, the Debtors executed an asset purchase agreement with Silverpoint designee, SPCP as the "Stalking Horse Bidder", for a total cash purchase price of $46 million.  This asset purchase agreement was amended on November 17, 2006.  The identification of SPCP as the Stalking Horse Bidder allowed MFIM to garner the support of the various Committees on what assets should be marketed, a framework for a potential sale of those assets and a minimum threshold that other bidders would need to surpass in a section 363 sale process (with the ultimate objective of attracting additional potential buyers of the Debtors' assets through a competitive process with the reliance on the Court's monitoring of the process to ensure "fairness") With the credibility gained from the Stalking Horse Bid, and as part of the section, MFIM responded to inquiries from over sixty second round potential bidders. After initial conversations with each potential second round bidder regarding the auction process and SPCP bid/structure, approximately

30 potential bidders executed confidentially agreements and proceeded forward with varying degrees of financial and operational due diligence. This extensive second round of due diligence required MFIM to manage numerous daily conference calls; comply with data room document requests, both electronically and through overnight delivery; describe/analyze the various loan portfolios, contracts, servicing agreements and fee schedules; orchestrate on-site visits with over 20 potential bidders; respond to numerous follow-up questions and data requests; and provide further analyses/responses to data inquires. MFIM's continuing contact with the borrowers allowed further information to be available to the bidders. MFIM coordinated additional rounds of due diligence as the bidders requested clarification and additional information.

113. Overall, MFIM's initial sale efforts resulted in a vibrant solicitation process which introduced a sale alternative as part of the reorganization considered by the Debtors, creditors of the Debtors and members of the Funds. In accordance with the Debtors' motion, the Court approved bid procedures designed by MFIM and the Committees to solicit competing offers to the stalking horse bid for the purchase of substantially all of the Debtors' assets. The process included a determination of a potential bidder's qualifications based on an assessment of the bidder's financial ability to close a transaction and their intentions and qualifications with respect to servicing the loans and performing the obligations under the LSAs.

114. Under the section 363 sale process, MFIM worked closely with interested bidders to ensure that each focused not only on an evaluation of the various loan portfolios and underlying asset valuations, but on determining the potential "strategic" value that could be realized through a revitalization of certain aspects of the Debtors' businesses (*i.e.,* the value creation possibilities of returning the Debtors to a potential going concern operation). As such, MFIM was able to identify and engage in active discussions with several potential bidders who would continue to operate the Debtors as a going concern and maintain the ongoing relationships with its lenders and investors. These negotiations ultimately enabled MFIM to conduct an auction process with the goal of securing the highest value possible for the Debtors' assets. In the end, MFIM received three qualified bids to purchase a substantial portion of the Debtors' assets (bids from SPCP, Compass and Desert Capital

REIT) which then required the Debtors to hold a competitive auction supervised by MFIM and the Committees.

115. This process culminated in Compass' $67 million bid at the Court supervised auction on December 7, 2006. This amount was $20.5 million higher than the Stalking Horse Bid of SPCP. In addition, three loans (Placer Vineyards, Placer Vineyards 2nd, and Marquis Hotel) included in the Stalking Horse Bid were isolated from the sale to Compass, which may provide additional proceeds to USACM. MFIM caused DTDF to file an involuntary bankruptcy petition against USA Investors VI, LLC, which is the borrower on the Marquis Hotel loan. The ultimate recovery on this loan will be determined by the bankruptcy proceedings. The results of the auction have been widely hailed as a success both among the Committees, other parties of interest to the Cases, and the press. FTDF will pay creditors in full, and may have returns approaching the 85% range for the FTDF members from the sale proceeds alone. USACM received certain sale proceeds, which facilitated consummation of the Plan, as well as, $23 million which was transferred to the USACM Trust pursuant to the Plan.

116. **Benefits to the Debtors:** MFIM's efforts in this regard benefited the Debtors by identifying alternatives to restructure the Debtors thereby maximizing the return to the creditors and other constituencies of these Cases. The successful $67 million bid was $20.5 million over the Stalking Horse Bid, which many parties considered a fully valued bid. In addition, the Debtors retained three loans which had originally been included in the Stalking Horse Bid and potentially will result in additional recoveries to the estate. These incremental amounts can be attributed largely to the work and results of MFIM including the successful recreating of the books and records, the major improvements to the financial systems, the successful collection of loans, the continued dialogue with investors, and the vibrant auction process. It should be noted that this sales process was completed without an additional investment bank being retained. Such retention would have resulted in additional fees to the Debtors.

117. **Allocation of Fees:** MFIM incurred a total of 1,983.7 hours and $1,039,263 of fees with regard to Analyzing Restructuring and Sale Options during the Application Period. MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $424,673.03 | $189,916.93 | $424,673.03 | $0 | $0 |
| Hours | 806.9 | 369.9 | 806.9 | 0 | 0 |
| Percentage | 40.7% | 18.6% | 40.7% | 0 | 0 |

MFIM allocated the fees in this manner because the time generally related to the sale of USACM and FTDF's assets. In addition, MFIM marketed DTDF's assets. The allocations were changed monthly based on the time spent on each Debtor's assets.

### J.    LSA – Document Review, Extraction and Loan by Loan Classification

118. In a four to five day period, MFIM staff digitized and organized over 12,000 individual investor LSAs at the request of the Stalking Horse Bidder for certain assets of USACM and FTDF, in order to complete this due diligence request, MFIM matched each LSA with the relevant loan for that investor, as requested. As this category required a lower skill level than many of the other categories, the task was largely delegated to professionals with lower billing rates. Certain management professionals were required to supervise the process.

119. **Benefits to the Debtors** - This process was vital to the sale process given that the Stalking Horse Bidders demanded this information. It was also proved useful during the due diligence process with other potential buyers and in connection with the sale transaction itself.

120. MFIM incurred a total of 583.1 hours and $147,435 of fees with regard to LSA – Document Review, Extraction and Loan by Loan Classification during the Application Period. MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $73,717.50 | $0 | $73,717.50 | $0 | $0 |
| Hours | 291.6 | 0 | 291.6 | 0 | 0 |
| Percentage | 50% | 0% | 50% | 0% | 0% |

MFIM allocated the fees in this manner because this project was required by the Stalking Horse Bidder for due diligence related to the sale of the assets of USACM and FTDF.

### K.    Compass Sub-Servicing

121. As part of the sale of certain assets to Compass, USACM and Compass USA SPE LLC entered into a sub-servicing agreement (the "**Sub-Servicing Agreement**").  USACM  entered into the Sub-Servicing Agreement in order to close the sale of assets to Compass by February 16, 2007 -- the date required by the sale agreement.  The Sub-Servicing Agreement was necessary because Compass had not yet received approval for its Nevada mortgage broker license and after discussions with the Nevada Mortgage Lender Division and after obtaining the appropriate Court approval, USACM, as the license holder, agreed to enter into this Sub-Servicing Agreement.  The Sub-Servicing Agreement provides that USACM remains as the loan servicer post-closing for the benefit of Compass (Compass is required to cover the costs of this arrangement).  The arrangement enabled the timely closing of the sale.

122. Pursuant to the Sub-Servicing Agreement, the services to be performed by USACM are as follows:

- Ownership and control of trust account(s);
- Issuance of funds to Direct Lenders;
- Accounting of funds held in trust account(s);
- Reporting to Mortgage Lending Division and all other applicable regulatory bodies;
- Maintenance of books and records relating to the loans; and
- Maintenance and delivery to Compass of complete and accurate records of costs and expenses incurred in performing the services.

123. As interim management, MFIM personnel continued to manage these activities on behalf of USACM in accord with the Sub-Servicing Agreement.  The agreement provides that "Compass shall be liable for, and shall advance to the Company sufficient funds to pay all costs and expenses of the Company in performing services under this Agreement…" Therefore, the fees requested for this category will be "passed through" USACM to Compass resulting in a net zero cost to USACM.  However, MFIM is entitled to be paid directly by USACM and is therefore requesting compensation

for the work performed under the Sub-Servicing Agreement in this Final Application. Compass has no independent requirement to pay any funds to MFIM on account of its services in these Cases. The Sub-Servicing Agreement is attached hereto to as **Exhibit G**.

124. **Benefits to the Debtors:** Although there is no net cost to the Debtors related to this category, MFIM's continued involvement in the servicing of the loan portfolio ensured a successful close of the Compass transaction, as well as, aided the collection of amounts owed to the Debtors for their fractional loan interests.

125. **Allocation of Fees:** MFIM incurred a total of 52.6 hours and $28,553 of fees with regard to Compass Sub-servicing Agreement during the Application Period.   MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $28,553 | $0 | $0 | $0 | $0 |
| Hours | 52.6 | 0 | 0 | 0 | 0 |
| Percentage | 100% | 0% | 0% | 0% | 0% |

MFIM allocated the fees in this manner because the time relates to USACM's Sub-Servicing Agreement with Compass.   USACM will be reimbursed for this expenditure by Compass in accordance with the Sub-Servicing Agreement.

### L.    Transition to Compass

126. A critical task performed by MFIM was the management of the closing of the sale transaction and transition of the purchased assets from the Debtors to Compass.  As part of the transition, MFIM calculated and negotiated the final purchase price and related escrow accounts, transitioned the borrower negotiations to Compass and participated in meetings related to the mortgage license of Compass and related options.  MFIM also archived thousands of pages of the Debtors' records in order to ensure that all parties (the USACM Trust, Compass and the post-Effective Date Debtors) retained sufficient records to perform their respective post-closing responsibilities.  This transition should allow Compass to collect the remaining monies owed to the

Direct Lenders efficiently.  This transition should also allow the USACM Trust to pursue the retained litigation and the collection of the remaining loans.

127. **Benefits to the Debtors:**  These activities benefited the Debtors by ensuring the successful closing of the Compass transaction.  These activities also ensured that the USACM Trustee and the post-Effective Date Debtors maintained the documentation needed to continue to winddown the estates and pursue additional recoveries.

128. **Allocation of Fees:**  MFIM incurred a total of 424.8 hours and $208,964 of fees with regard to Transition to Compass during the Application Period.  MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $104,482 | $0 | $104,482 | $0 | $0 |
| Hours | 212.4 | 0 | 212.4 | 0 | 0 |
| Percentage | 50% | 0% | 50% | 0% | 0% |

MFIM allocated the fees in this manner because this category related to the sale of the assets of USACM and FTDF.

### M.    *Disclosure Statement/Plan of Reorganization*

129. During the Cases, MFIM spent significant time formulating and negotiating a confirmable plan.  Faced with the expiration of the 120-day exclusivity deadline, MFIM began negotiating with the Committees to extend the deadline to file a plan of reorganization.  In order to reach agreement on the extension, the Committees required that a draft plan of reorganization be circulated to the interested parties.  The Debtors fulfilled the Committees' requirement, and the Debtors' exclusive period was extended to November 15, 2006.

130. On September 15, 2006, the Debtors filed their initial Disclosure Statement and Joint Chapter 11 Plan of Reorganization [docket nos. 1309 and 1310].  The Debtors subsequently amended their Plan after substantial and nearly continual negotiations with and among the four Committees on October 18, 2006 [docket no. 1576] and on November 7, 2006 [docket no. 1742].  On November 15,

2006, the Court held a hearing on the adequacy of the Disclosure Statement and entered an order approving the First Amended Disclosure Statement [docket no. 1795] as filed with the Court's required amendments [docket no. 1798].  On the same day, the Debtors also filed their Third Amended Plan [docket no. 1799].  On November 20, 2006, a "Solicitation Package" was served, in accordance with the Solicitation Procedures that were approved by the Court in the Disclosure Statement Order. Within four months of the filing of the first draft plan, MFIM achieved a plan which was supported by the major parties in interest.  On December 19-20, 2006, this Court held a confirmation hearing on the Third Amended Plan and on January 8, 2007 entered its findings of facts, conclusions of law and order confirming the Third Amended Plan, as modified [docket nos. 2376 and 2377].  This confirmation was obtained within eight months of the April 13, 2006 bankruptcy filing, which MFIM believes is an extraordinarily time frame in light of the complexities of these Cases. The confirmation leaves the Debtors' estates with the means for achieving a recovery for the creditors and investors.

131. MFIM was instrumental in the successful confirmation of the Plan.  MFIM pursued the sale of certain of USACM's assets and FTDF's loans resulting in the sale to Compass.  The sale was a major part of the Plan to give the Direct Lenders assurance that the loans would be collected pursuant to the LSAs and to liquidate FTDF loan portfolio.

132. Finally, MFIM participated in the nearly four months of negotiations with the Committees, which culminated in confirmation of the Third Amended Plan.  These negotiations included resolutions of issues such as a) whether to substantively consolidate assets with a pro-rata distribution to creditors; b) collection of Pre-Paid Interest from borrower proceeds, c) service fees payable under the LSAs, d) payment and classification of creditors, and e) authority for litigation and pursuit of insiders.  MFIM reviewed and provided comments on the class structure, analyzed the voting results of each class, reviewed various inter-committee agreements, calculated potential recovery analyses under both liquidation and plan recovery scenarios, and prepared declarations in support of these documents.  Mr. Allison's declaration in support of the Plan was the only evidence submitted to the Court in support of confirmation.  Upon the entry of the confirmation order, three appeals were filed by the Lender Protection Group, the equityholders (led by Joe Milanowski) and

DACA Group, on behalf of four parties.  MFIM worked with Debtors' counsel on the appeals, including providing affidavits.

133. **Benefits to the Debtors:** MFIM's efforts in this category benefited the Debtors by the successful completion and approval of both the Disclosure Statement and Plan.  This allowed the Debtors to emerge from bankruptcy in less than one year.

134. **Allocation of Fees:**  MFIM incurred a total of 461.6 hours and $261,773 of fees with regard to Disclosure Statement/Plan of Reorganization during the Application Period.    MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $87,257.67 | $87,257.67 | $87,257.67 | $0 | $0 |
| Hours | 153.9 | 153.9 | 153.9 | 0 | 0 |
| Percentage | 33.3% | 33.3% | 33.3% | 0% | 0% |

MFIM allocated the fees in this manner because these three Debtors were the primary beneficiaries of the successful Disclosure Statement and Plan.

### N.    *Liquidation Analyses*

135. In connection with the Plan and Disclosure Statement and in accordance with Section 1129(a)(7) of the Bankruptcy Code, MFIM prepared a detailed liquidation analyses for each of the Debtors.  In order to prepare the liquidation analyses, MFIM created a complex financial model based upon discussions with USACM personnel, review of various collateral and asset appraisals, and the input of MFIM's business judgment.  MFIM revised and updated the liquidation analyses for all Disclosure Statements filed with the Court.

136. For the valuation of the loan related assets (principal, interest, fees, etc.), MFIM valued each loan separately and allocated the estimated value among the Debtors and the Direct Lenders based on the "waterfall" provisions, as provided by Debtors' counsel.  Although MFIM used the Hilco appraisals as a baseline for the estimated recoveries on the loans it adjusted these valuations for

1) the current status of loan negotiations with borrowers, 2) more recent project updates, 3) strength of loan guarantees, and 4) other information MFIM had gained through other work streams.

137. MFIM also investigated and valued the various properties that supported the equity interests pledged by Investment Partners to secure the $58 million note to USACM and the 10-90 loan. Again, MFIM analysts used the Hilco appraisals as a baseline and adjusted them based on more recent and more detailed information.

138. MFIM also prepared detailed estimates of potential claims to be filed against each of the Debtors, including estimates of the various intercompany claims among the Debtors. This information was critical to the formulation and confirmation of the Plan.

139. In addition to fulfilling the requirements of section 1129 of the Bankruptcy Code, the financial model that supported the liquidation analysis had additional uses. For example, one of the main inputs into the cash flow model was the cash receipts forecast. In addition, MFIM used the model to value and analyze the various bids received on the assets, including a comparison of the Stalking Horse Bid and the revised asset purchase agreement submitted by Compass. Furthermore, the liquidation analysis became a repository of information that was an integral part of the loan collections and due diligence processes.

140. **Benefits to the Debtors**: MFIM's efforts in this regard benefited the Debtors by providing an assessment of the potential recoveries in the liquidation of the Debtors. This assessment was useful for comparison with other alternatives, including the ultimate sale of certain assets to Compass. The liquidation analyses were also required as part of the Disclosure Statement.

141. **Allocation of Fees:** MFIM incurred a total of 541.2 hours and $246,908 of fees with regard to Liquidation Analysis during the Application Period. MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $197,526.40 | $24,690.80 | $24,690.80 | $0 | $0 |
| Hours | 433.0 | 54.1 | 54.1 | 0 | 0 |
| Percentage | 80% | 10% | 10% | 0% | 0% |

Page 62 of 112

MFIM allocated the fees in this manner because the liquidation analyses were necessary to confirm the Plan for these three Debtors.  However, most of the time spent in this category related to the analysis of the loan portfolio, for which USACM, as loan servicer, was responsible.

### O.    *Accounts and Notes Receivable Related Activities*

142.  During the course of these Cases, MFIM, along with Debtors' counsel and with the cooperation and support of the Committees, negotiated with the Debtors' former insiders in an attempt to recover the $58 million intercompany transfer to Investment Partners and the $55 million 10-90 loan.  MFIM sought to improve the Debtors' ability to collect these monies, while avoiding the expense of litigation at a time when cash was scarce.  As a result of these negotiations, a $58 million secured note was executed to document repayment of intercompany transfers to Investment Partners (the "**IP Note**").  In addition, a security agreement was executed which provided collateral for the IP Note and the 10-90 loan.  By entering into these the IP Note with appropriate payment terms, interest rates and events of default, and the pledge agreement, MFIM documented instruments which, if not paid according to their terms could be effectively enforced.  Unfortunately, the Debtors had to enforce the IP Note and pledge agreement

143.  Under the direction of MFIM's senior accounting team which included CPAs and former auditors, MFIM researched and traced the journal entries that comprised the $58 million intercompany receivable from Investment Partners to USACM. As of January 1, 2003, the intercompany balance was $8 million and the records prior to 2003 were incomplete.  As a result, MFIM primarily focused its research on source documents from transactions after January 2003.  The entries reviewed consisted of cash transferred, journal entries, recorded intercompany transactions, including diverted principal due to DTDF, that were booked as a liability of Investment Partners. From 2003 to the Petition Date, MFIM identified $20 million in cash transferred to Investment Partners from USACM, $11 million in entries in USACM's journal entries (including payments of amounts due by Investment Partners and other intercompany transfers to Investment Partners) and $18.9 was diverted principal of DTDF.  MFIM's analysis also included an investigation of Investment Partners' records that were made available to the Debtors.

144. MFIM researched the ultimate use of $55 million lent under the 10-90 loan. MFIM traced funds from DTDF through an entity known as 10-90 Inc. to Mountain Vista to Investment Partners and from there to various Investment Partner related entities.

145. Based on the information noted in these investigations and due to former management's failure to honor its postpetiton agreements, MFIM caused DTDF to file involuntary bankruptcy proceedings against USA Investors VI, LLC and Tree Moss Partners, LLC in order to prevent the sale of properties that properly belonged to the Debtors and recover funds from assets owned by such entities pledged to repay the IP Note and the 10-90 loan.

146. MFIM also determined that former management caused DTDF to transfer substantial sums of money to an Investment Partner subsidiary or affiliate, HMA Sales, LLC, which owned the Royal Hotel. Investment Partner's equity in this property also serves as collateral for the IP Note due to USACM. During the negotiations with Joe Milanowski, USACM and DTDF learned that the sale of the Royal Hotel was imminent. MFIM, working with Debtors' counsel and the Committees, instituted litigation to protect DTDF's and USACM's interests in these funds and equity in the property which was security for the IP Note and 10-90 loan. Prior to commencement of such litigation, MFIM, working with Debtors' counsel and the Committees, had been working with the SEC to put Investment Partners into a SEC receivership.

147. **Benefits to the Debtors:** As CRO, MFIM lead the negotiations with former management which resulted in the IP Note and the securitization of that Note and the 10-90 loan. These negotiated results provided the estates with negotiated loan instruments that could be enforced. Upon default of such negotiated loan instruments, MFIM provided the forensic accounting support to Debtors' counsel in developing various legal strategies.

148. **Allocation of Fees:** MFIM incurred a total of 1,018.1 hours and $451,016 of fees with regard to Accounts and Notes Receivable Related Activities during the Application Period. MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $225,508 | $225,508 | $0 | $0 | $0 |
| Hours | 509.1 | 509.1 | 0 | 0 | 0 |
| Percentage | 50% | 50% | 0% | 0% | 0% |

MFIM allocated the fees in this manner because the activities in this category related to the pursuit of recoveries on the IP Note and the 10-90 loan, which benefited USACM and DTDF, respectively.

### P.    *Avoidance Actions / Preference Analysis*

149. As part of MFIM's duties, MFIM conducted an examination of the Debtors' books and records to assist counsel in analyzing potential avoidance or preferences actions under the Bankruptcy Code.   MFIM reviewed the Debtors' available books and records from 2003 to the Petition Date and assisted counsel with the preparation and analysis of various preference actions against entities who had received funds from the Debtors. MFIM's analysis of the Collection Account documented several individuals or entities that were paid from the Collection Account, but were not Direct Lenders.   As a result of MFIM's work, two preference actions were filed against certain defendants.

150. On January 23, 2007, USACM initiated an adversary proceeding against Salvatore J. Reale, individually and as trustee for the Salvatore J. Reale Revocable Trust, case no. 06-01251 in the United States Bankruptcy Court for the District of Nevada.  The complaint alleges that $6 million was transferred during the 90 days before the Petition Date from the Collection Account to Salvatore J. Reale or his trust.   The preference and fraudulent transfer action against the Salvatore J. Reale Revocable Trust, if successful, will net the USACM estate over $9 million.

151. The Debtors also filed a preference action against Del Bunch.  Mr. Bunch received two payments by electronic deposit from USACM in the amounts of $217,000 and $196,000 during the preference period.

152. Other creditors of USACM were also paid from these commingled funds and the USACM Trust will review and determine whether to pursue any further action.

153. **Benefits to the Debtors:**  MFIM's efforts in this regard benefited USACM by providing the Debtors' counsel sufficient documentation of the questioned transfers to support the filing of preference actions against Salvatore J. Reale and Del Bunch.  The work of MFIM will result in increased amounts available for distribution to the creditors of the Debtors' estates.

154. **Allocation of Fees:**  MFIM incurred a total of 155.0 hours and $86,433 of fees with regard to Avoidance Actions/Preference Analysis during the Application Period.  MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $86,433 | $0 | $0 | $0 | $0 |
| Hours | 155.0 | 0 | 0 | 0 | 0 |
| Percentage | 100% | 0% | 0% | 0% | 0% |

MFIM did not allocate the fees in this category.  Instead, MFIM charged all time entries to a specific Debtor.  Because all preference actions were filed on behalf of USACM, all fees were charged to USACM's estate.

### Q.    *Litigation Matters*

155. MFIM assisted counsel with various litigation matters, stemming from the investigations described in the "Accounts and Notes Receivable" category.   Specifically, MFIM utilized the information researched in the Accounts and Notes Receivable category to assist with the involuntary bankruptcy filings of Tree Moss Partners, LLC and USA Investors VI, LLC.

156. **Benefits to the Debtors** - MFIM's efforts in this regard benefited the Debtors by ensuring that assets of the Debtors were not removed inappropriately, thereby preserving the value of those assets for the Debtors.  MFIM's thorough research and quick action protected the Debtors' estates from loss of valuable assets.

157. **Allocation of Fees -** MFIM incurred a total of 64.5 hours and $30,006 of fees with regard to Litigation Matters during the Application Period.  MFIM assigned the hours and fees as follows:

|            | USACM | DTDF    | FTDF | USA Realty | USA Securities |
|------------|-------|---------|------|------------|----------------|
| Fees       | $0    | $30,006 | $0   | $0         | $0             |
| Hours      | 0     | 64.5    | 0    | 0          | 0              |
| Percentage | N/A   | N/A     | N/A  | N/A        | N/A            |

MFIM did not allocate the fees in this category.  Instead, MFIM charged all time entries to a specific Debtor.  All litigation efforts have been made on behalf of DTDF.

### R.    Committee Requests[6]

158. Responding to the various requests for information from the Committees in these Cases comprised a significant task for MFIM.  MFIM not only responded on almost a daily basis to questions from constituents of the Committees, including counsel, financial advisors and individual committee members, but also fulfilled numerous due diligence requests for documents and information. MFIM received approximately 200 requests for information (including one for 96 separate reports or files) from the Committees and their advisors, as well as 11 individual requests and four requests from a related corporate entity. A majority of the requests received contained numerous individual items and various subparts.   Requests were made for appraisals, loan agreements, loan monitoring reports, SEC filings, financial documents, tax documents, origination summaries, interest documents and various summary reports, among others.

159.  In order to further assist the Committees' analyses and assessment of Debtors' financial condition, operations, and transactions, MFIM also prepared and presented financial and operating

---

[6]    In MFIM's First Interim Fee Application, MFIM included a category called "Committee Issues and Requests." MFIM renamed that category "Committee Issues" for purposes of this Final Application.  All of the time included in the "Committee Issues and Requests" category from the First Interim Fee Application is included in the category now called "Committee Requests."  In addition, in MFIM's First Interim Fee Application, MFIM included a category called "Meetings/Teleconferences."   For purposes of this Final Application, MFIM has reallocated that time to the two categories called "Committee Meetings" and "Committee Requests."

information for their use. MFIM prepared various PowerPoint presentations and other summary reports to provide the Committees with information in a clear and concise format. MFIM professionals also met with the individual Committees and/or their advisors as requested on an ongoing basis in order to directly address their concerns in a timely fashion.

160. **Benefits to the Debtors:** MFIM's efforts in this regard benefited the Debtors by providing information to the Committees appointed in these Cases so that they could perform analyses and make decisions to benefit the constituencies they represent.

161. **Allocation of Fees:** MFIM incurred a total of 701.3 hours and $281,864 of fees with regard to Committee Requests during the Application Period. MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $118,632 | $91,565 | $71,667 | $0 | $0 |
| Hours | 314.8 | 215.5 | 171.0 | 0 | 0 |
| Percentage | N/A | N/A | N/A | N/A | N/A |

MFIM did not allocate the fees in this category. Instead, MFIM charged all time entries to a specific Debtor. Time spent responding to requests from the Direct Lender Committee has been charged to USACM pursuant to the Plan.

### S.    *Committee Meetings*[7]

162. As mentioned in this Final Application, four Committees were appointed in the Debtors' cases by the U.S. Trustee's office. To address the informational needs and requests from all of these Committees, MFIM spent time communicating with members of each of the Committees and their professionals through phone calls and meetings.

---

[7]    In MFIM's First Interim Fee Application, MFIM included a category called "Meetings/Teleconferences." For purposes of this Final Application, MFIM has reallocated that time to the two categories called "Committee Meetings" and "Committee Requests."

163. MFIM scheduled and prepared presentation materials for five in-person meetings with the Committee members and their professionals.   Information presented during these meetings included:

- A comparison of the Debtors actual performance as compared to the budget;

- Loan workout proposals and recommendations;

- A proposal to fund construction loan shortfalls;

- A summary of the information contained in the Debtors' Statements and Schedules;

- A proposal to distribute funds to Direct Lenders and an overview of the related motion;

- An explanation of the information contained in the Investor Statements;

- Reorganization options for the Debtors;

- Privacy issues relating to the dissemination of information containing the identities of Direct Lenders;

- Professional fee budgets;

- A summary of MFIM's collection efforts;

- Estimates of the recoveries of the Debtors' assets in liquidation;

- Plans for a sale process for the Debtors' assets;

- An overview of the Debtors' liquidity needs;

- Summaries of various bids received for the Debtors' assets; and

- An overview of the auction process for the Debtors' assets.

164. In addition, MFIM conducted *ad hoc* phone calls on nearly a daily basis with the Committees' professionals.   During these calls, MFIM responded to requests and provided information for any issues raised by the professionals or their Committees.

165. MFIM engaged in these meetings and calls in order to communicate the Debtors' positions and disseminate reports and other relevant information on a real-time basis  These ongoing discussions also enabled the Debtors to evaluate issues and make informed decisions in these Cases. These meetings were also instrumental in resolving disagreements among the Committees and the Debtors.

166. **Benefits to the Debtors:**.  MFIM coordinated the Debtors' communications with the four separate Committees.  Through these meetings, MFIM negotiated with the Committees and was able to garner the support of the Committees for many issues in these Cases, including the successful confirmation of the Plan.

167. **Allocation of Fees:**  MFIM incurred a total of 556.8 hours and $276,421 of fees with regard to Committee Meetings during the Application Period.  MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $138,210.50 | $69,105.25 | $69,105.25 | $0 | $0 |
| Hours | 278.4 | 139.2 | 139.2 | 0 | 0 |
| Percentage | 50% | 25% | 25% | 0% | 0% |

MFIM allocated the fees in this manner because the meetings benefited the Committees equally.  Pursuant to the Plan, amounts associated with the Direct Lender Committee have been charged to USACM.

## T.    *Employment/Fee Applications*

168. In order to comply with the Bankruptcy Code, the Bankruptcy Rules, the United States Trustee Guidelines, the Procedures for Interim Compensation and other guidelines governing the payment of professionals in these Cases, MFIM spent significant time in this category.  At the beginning of these Cases, MFIM prepared retention papers including the affidavit of Tom Allison in support of his appointment as CRO.   MFIM also prepared and issued fee statements on a monthly basis.  During the Application Period, MFIM prepared and filed the First Interim Fee Application and the Final Application, as well as prepared monthly statements for July, August, September, October, November, December, January, February, and March.  Although MFIM prepared a Second Interim Fee Application, that application was not filed in lieu of the Final Application.

169. MFIM held various meetings with the U.S. Trustee and the Committees to resolve the objections to MFIM's retention and its First Interim Fee Application.  One of the largest issues

concerning fees was the allocation of MFIM's fees among the five Debtors' estates. MFIM spent significant time negotiating the issue of the allocation of professional fees among the Committees.

170. This category includes $656,245 for the activities described above, as well as $150,000 of additional estimated time relating to this Final Application. MFIM has voluntarily reduced its fees in this category by $360,769.91. As a result, MFIM's fee application time is approximately 3% of the requested fees.

171. **Benefits to the Debtors:** MFIM's efforts in this regard benefited the Debtors by making the U.S. Trustee, the Committees, the Court and other parties-of-interest aware of the work performed, fees generated and expenses incurred by MFIM.

172. **Allocation of Fees:** MFIM incurred a total of 1,895.5 hours and $445,475.09 of fees (net of voluntary reduction) with regard to Employment/Fee Applications during the Application Period. MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $351,259.33 | $42,154.86 | $48,790.97 | $1,548.61 | $1,721.32 |
| Hours | 1,494.6 | 179.4 | 207.6 | 6.6 | 7.3 |
| Percentage | 78.9% | 9.5% | 11.0% | 0.3% | 0.4% |

MFIM allocated the fees in this manner because the time spent preparing the fee applications and monthly statements is deemed to be proportional to the overall hours expended in the Cases for each Debtor.

### U.    *Bankruptcy Motions/Filings*

173. MFIM planned, reviewed and analyzed numerous motions with the Debtors' counsel. In support of the Debtors' pleadings, MFIM prepared a detailed analysis of the facts supporting the motions and provided declarations as requested by counsel. MFIM assisted Debtors' counsel with preparation several motions and other papers including:

- Orders Approving Debtors' Use of Cash. If the Debtors were not able to use the cash in the Debtors' bankruptcy estates, the Debtors would have been unable to collect amounts owed from borrowers on outstanding loans and would have been unable to continue other business

operations essential in attempting to maximize the return to creditors, the Direct Lenders and the Fund members in these Cases. In response to periodic motions made by the Debtors requesting permission to continue using cash for the essential operations and administrative expenses of the Debtors, the Court entered orders on April 19 [docket no. 32], May 9, May 22 [docket no. 315], July 25 [docket no. 974], and September 14, 2006 [docket no. 1282], allowing Debtors to continue using cash in the bankruptcy estates pursuant to proposed cash budgets prepared by MFIM. On October 5, 2006, Debtors filed a Motion for Order Approving Continued Use of Cash Through January 31, 2007 Pursuant to Fourth Revised Budget [docket no. 1451]. This Motion was approved by the Court at the October 30, 2006 hearing.

- Approval of Motion to Hold Funds.   On May 8, 2006, USACM filed a motion requesting permission to temporarily hold funds pending a determination of the proper recipients and proper holdback amounts [docket no. 173]. USACM filed this motion, as directed by the Court, to obtain permission from the Court to continue holding funds in USACM's loan servicing Collection Account until USACM could complete its review and restatement of the Debtors' loan servicing records. After considering all of the responses and oppositions to the motion, the Court granted USACM's motion in an order entered July 6, 2006 [docket no. 836].

- $64 Million Distribution Approved by Court and Mailed to Investors.   One of the primary goals of MFIM as Debtors' post-petition management was to distribute to investors, as promptly as possible after the initial accounting work and reconstruction of the loan records was completed, a significant portion of the funds USACM had collected and was holding. MFIM accomplished this goal through the Motion to Distribute Funds [docket no. 847], which elicited numerous responses and oppositions but which the Court approved at a hearing held on August 4, 2006. The Court's order granting the motion was entered on August 24, 2006 [docket no. 1184], and the distributions, totaling approximately $64.3 million and representing approved distributions on loan collections through June 2006 (after Court-approved holdbacks), were mailed to Direct Lenders on August 25, 2006. Shortly thereafter, FTDF distributed the approved portion of the payments it received (after an appropriate reserve for claims) to its Fund Members.

- Order Granting Proposed Procedures for Distributions on a Monthly Basis.   On August 29, 2006, MFIM filed a motion for Modification to Motion to Distribute Funds and Proposed Procedures for Ongoing Distributions [docket no. 1203] in which they sought to extend and modify the relief requested in the Motion to Distribute Funds and to propose specific procedures by which future interim distributions could be made to Direct Lenders and Fund Members on a monthly basis. On October 2, 2006, the Court entered a Modified Order Authorizing Interim Distributions and Holdbacks [docket no. 1424] setting forth the procedures for future monthly distributions less certain holdbacks. Pursuant to this order, a second interim distribution of approximately $61.3 million from the USACM Collection Account was mailed to Direct Lenders on or about October 20, 2006, representing approved distributions on loan collections during July and August 2006. Shortly thereafter, FTDF distributed the approved portion of the payments it received (after an appropriate reserve for claims) to its Fund members. Monthly distributions were made to Direct Lenders each month on the basis of this Order.

- <u>Order Denying Motion to Convert Case to a Chapter 7</u>.  On October 24, 2006 the United States Trustee (the "**U.S. Trustee**") filed a Motion to Convert Case to Chapter 7 (the "**Conversion Motion**") [docket no. 1661].    The U.S. Trustee argued that the requirements were met for the Cases to be converted under 11 U.S.C. § 1112(b).  The Conversion Motion was strongly opposed by the Debtors and all four of the Committees appointed by the U.S. Trustee who argued that conversion to a liquidating Chapter 7 at this point would be disastrous and not in the best interest of creditors and the estates.  At a hearing on October 30, 2006, the Court denied the Conversion Motion, and the written order denying the motion was entered November 1, 2006 [docket no. 1711].

- <u>Fixing of Claims Bar Date</u>.  The Court set November 13, 2006, as the deadline (the "**Bar Date**") for all creditors and equity interest holders to file proofs of claim and proofs of interest.  The Court extended the Bar Date, but <u>only</u> with regard to the filing of claims by Direct Lenders, to January 13, 2007.  The Court also extended indefinitely the Bar Date for the filing of intercompany claims between the Debtors.  These intercompany claims were never filed as they were settled or determined in accordance with the provisions of the Plan.

174. MFIM also reviewed and analyzed objections to the Debtors' pleadings and prepared the necessary documentation to allow counsel to file replies to the objections. In addition, MFIM researched and prepared documentation requested by U.S. Trustee's office as well as responded to motions filed by other parties.

175. **Benefits to the Debtors:**  MFIM's efforts in this regard benefited the Debtors by moving the Cases forward in a timely manner and allowing the Debtors to perform certain functions necessary to maintain the businesses as a going concern during these Cases.  These motions were instrumental in the successful confirmation of the Plan.

176. **Allocation of Fees:**  MFIM incurred a total of 442.5 hours and $251,613 of fees with regard to Bankruptcy Motions/Filings during the Application Period.   MFIM assigned the hours and fees as follows:

| | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $240,662 | $5,664 | $5,287 | $0 | $0 |
| Hours | 424.0 | 9.6 | 8.9 | 0 | 0 |
| Percentage | N/A | N/A | N/A | N/A | N/A |

MFIM did not allocate the fees in this category. Instead, MFIM allocated all time entries to a specific Debtor.

### V.    *Bankruptcy Schedules and SOFAs*

177. On June 15, 2006, each of the Debtors filed its Statement of Financial Affairs ("**Statements**") and its Schedules, as required by the Bankruptcy Code [docket nos. 673-682], and on June 23, 2006, certain amendments to the Statements and Schedules were filed [docket no. 784]. Given the state of the Debtors' accounting records on the Petition Date, the preparation and filing of the Statements and Schedules represented a major effort by MFIM. The reconstructed loan ledgers provided documentation that enabled MFIM to determine that at least $26.4 million of principal was diverted rather then paid to the Direct Lenders. These Direct Lenders were listed as creditors of USACM on the Schedules. In addition, MFIM's investigation of DTDF showed that $18.9 million in principal was not paid to DTDF by USACM and this too became a liability of USACM as the loan servicer. Since USACM, as the loan servicer, had a policy of paying every Direct Lender each month, regardless of whether the borrower on the loan owned by that lender had made a payment, MFIM determined that about $39.5 million had been paid to Direct Lenders in advance of the borrower payment. These prepayments were listed as assets of the USACM estate.

178. MFIM's tasks during the preparation and filing of the Statements and Schedules included:

- Analyzing the Debtors' books and records to identify the sources of the requisite information;

- Extracting the necessary information from the Debtors' books and records with the assistance of USACM's accounting personnel;

- Delivering the information for the Statements and Schedules to BMC, the Debtors' noticing agent, for input into the appropriate forms for filing; and

- Reviewing and revising the draft Statements and Schedules produced by BMC.

179. **Benefits to the Debtors:**  MFIM's efforts in this regard benefited the Debtors by filing the requisite Schedules and Statements as required and thus providing information relating to the Debtors' operations and financial affairs to interested parties in the Cases, including related party information and potential preference and fraudulent transfer information.

180. **Allocation of Fees:** MFIM incurred a total of 359.1 hours and $133,089 of fees with regard to Bankruptcy Schedules and SOFAs during the Application Period.  MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $86,158 | $12,446 | $12,140 | $8,473 | $13,872 |
| Hours | 223.6 | 33.4 | 37.2 | 25.9 | 39.0 |
| Percentage | N/A | N/A | N/A | N/A | N/A |

MFIM did not allocate the fees in this category.  Instead, MFIM charged all time entries to a specific Debtor.

### W.    *DIP Financing / Cash Collateral*

181. MFIM determined that, in order for the Debtors to continue to operate in chapter 11, an immediate post-petition credit facility was advisable to maintain the Debtors' operations in order to maximize the recoveries for creditors and Direct Lenders by enabling the estates to foreclose on collateral of delinquent loans and have the necessary funds with which to maintain the properties, as well as to provide a variety of options for reorganizing the Debtors under a plan of reorganization.  In addition, certain of the Direct Lenders' loans required additional project funding.

182. Accordingly, MFIM used its database of potential lenders to identify sources for postpetition financing for the Debtors.  MFIM entered into discussions with approximately nine lenders and eight of those firms signed confidentiality agreements.  Due diligence was conducted by these eight firms.  MFIM's tasks during due diligence included:

- Providing:
    - descriptions of collateral,
    - loan documentation,
    - borrower payment performance, and
    - appraisals;

- Conducting conference calls and in person meetings to answer questions and provide information; and

- Facilitating meetings between potential lenders and certain of the borrowers.

183. MFIM received several proposals from the lenders. The terms of those proposals were analyzed and further negotiations were conducted with several of the lenders to improve the terms of their originals proposals. On June 9, 2006, the Debtors filed a motion seeking authorization to obtain postpetition financing from CapSource. Several objections were filed to the motion. The Court ultimately denied the motion during a hearing held on June 21, 2006.

184. After the denial of the Debtors' motion for DIP financing, the Debtors spend significant time managing their cash as described above in the section entitled "Cash Flow Model/Analyses." In essence, the Cases were financed, in part, by the various professionals, who were not paid any fees or expenses prior to October 2006 (and, at that time, only a small portion of the fees), notwithstanding the Court's order allowing interim payment of fees and expenses.

185. **Benefits to the Debtors:** MFIM's efforts in this regard benefited the Debtors by identifying sources of funds that could have allowed the entities to maintain operations as going concerns and allowed for the completion of the Cases through the Plan. In addition, due diligence performed during the DIP process allowed four of the eight lenders to participate in the Debtors' sale process and one of those, SPCP, ultimately became the Stalking Horse Bidder.

186. **Allocation of Fees:** MFIM incurred a total of 129.7 hours and $72,042 of fees with regard to DIP Financing/Cash Collateral during the Application Period. MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $72,042 | $0 | $0 | $0 | $0 |
| Hours | 129.7 | 0 | 0 | 0 | 0 |
| Percentage | 100% | 0% | 0% | 0% | 0% |

MFIM did not allocate the fees in this category. Instead, MFIM charged all time entries to a specific Debtor. Time spent in this category represents MFIM's efforts to allow USACM to continue as a going concern and loan servicer.

### X.    Employee Retention and Severance Plan

187. Upon his appointment as President and CRO for USACM, Tom Allison terminated 19 employees of the Debtors, primarily the brokers soliciting funds from Direct Lenders and the executive management of USACM.   Through September 2006, an additional 22 employees resigned, including USACM's Chief Operating Officer and its Loan Manager (both subsequently returned as full time employees in January, 2007).

188. In an effort to retain the remaining 11 employees, MFIM drafted, negotiated, and implemented an employee retention and severance plan (the "**Retention Plan**").  The Retention Plan included amounts for the following:

- Bonuses - to encourage the employees to continue their employment with USACM throughout the bankruptcy process;

- Severance Pay - to encourage the employees to stay through the bankruptcy process until it was determined that their services were no longer required by the USACM Trust or, if their services were required by the USACM Trust, to encourage them to stay to assist with the postconfirmation work; and

- Medical Benefits – to provide for medical benefits in the event that USACM terminated the medical plan.

189. A motion for the Retention Plan was filed with the Court on October 3, 2006 and an order approving the Retention Plan was entered by the Court on November 13, 2006 which approved $343,000 in payments under the Retention Plan.  Retention of these employees was critical to allow the Debtors to continue as going concern entities through the Effective Date of the Plan, thereby preserving and increasing the recoveries for the creditors and members of the Funds.

190. **Benefits to the Debtors:**   MFIM's efforts in this regard benefited the Debtors by successfully retaining the remaining employees at a critical time in these Cases.  The Retention Plan resulted in an increase in employee productivity, as well as, decreased the uncertainty of investors, borrowers and other parties as to the future of the Debtors.  This Retention Plan also resulted in lower professional expenses, as MFIM or other consultants were not required to take on even more responsibilities.

191. **Allocation of Fees:**  MFIM incurred a total of 38.7 hours and $22,083 of fees with regard to Employee Retention and Severance Plan during the Application Period.  MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $22,083 | $0 | $0 | $0 | $0 |
| Hours | 38.7 | 0 | 0 | 0 | 0 |
| Percentage | 100% | 0% | 0% | 0% | 0% |

MFIM did not allocate the fees in this category.  Instead, MFIM charged all time entries to a specific Debtor.  Time for this category relates to retaining USACM's employees.

### Y.    *Court Hearings/Preparation*

192. MFIM prepared for and attended court hearings in these Cases as the Debtors' management. MFIM assisted Debtors' counsel in preparing for hearings before the Court and MFIM personnel were available to provide testimony, if necessary, during the hearings.  Such court hearings included hearings on the first day motions, two regularly scheduled omnibus hearings per month, the disclosure statement hearing, the November 2006 conference call with the Court, the auction and the two day confirmation hearings.  Preparation for these hearings consisted of calls and meetings with the Debtors' counsel, as well as compiling the information and analysis requested by counsel.  MFIM prepared numerous exhibits for use during hearings by the Court and the interested parties.  Further, MFIM prepared declarations supporting the Debtors' pleadings as needed for each hearing.  MFIM personnel also prepared for and testified at the Debtors' 341 meeting, attended depositions and assisted with the auction of the Debtors' assets.

193. Thomas Allison as CRO was required to attend substantially all hearings before the Court in these Cases.  Also, Susan Smith, who was responsible for the Debtors' financial information, also attended these hearings.  Additional MFIM personnel were made available for critical hearings before this Court.  In every instance where multiple MFIM personnel participated in court hearings, critical

issues were addressed requiring the specialized knowledge of certain MFIM personnel, which were central to the Debtors' Cases and the role of MFIM.

194. **Benefits to the Debtors:**  MFIM's efforts in this regard benefited the Debtors by providing declarations and testimony for motions filed by the Debtors and providing information as the Court considered these and other motions presented in the Cases.  MFIM's participation allowed the Court and other constituencies of these Cases to administer and consider these issues effectively.

195. **Allocation of Fees:**  MFIM incurred a total of 608.2 hours and $345,104 of fees with regard to Court Hearings/Preparation during the Application Period.  MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $172,552 | $86,276 | $86,276 | $0 | $0 |
| Hours | 304.1 | 152.1 | 152.1 | 0 | 0 |
| Percentage | 50% | 25% | 25% | 0% | 0% |

MFIM allocated the fees in this manner because the hearings benefited the constituencies represented by the Committees equally.  Pursuant to the Plan, amounts associated with the Direct Lender Committee have been charged to USACM.

## Z.    *Case Administration*

196. MFIM devoted time to ensuring the Debtors' Cases progressed in a timely manner.  For instance, in order to respond effectively to various constituencies' questions during the Cases, MFIM spent time creating a creditor information call line.  MFIM also assisted in the employment of BMC as claims agent and assisted BMC in compiling the mailing matrix to ensure all parties received adequate notice in these Cases.  MFIM also approved various communications to investors and press releases in order to keep various parties informed during the Cases.

197. In order to fulfill the various and numerous requests for due diligence from many parties in interest, MFIM took an active role in organizing, indexing and storing the Debtors' records for use during their Cases.  Also included in this category are specific tasks necessary to properly administer

the Cases including coordination of meetings with parties-of-interest, document management, preparation of budgets and work plans, review of confidentiality agreements, and review of general case filings.

198. The U.S. Trustee took a very active interest in these Cases, MFIM responded to the U.S. Trustee's questions, ensuring that he was adequately informed about the status of the Cases. For example, at the U.S. Trustee's request, MFIM prepared an inventory of assets, a corporate organizational chart, income statement and balance sheets for USACM as of December 21, 2005, tax returns, articles of incorporation and certificates of incorporation. MFIM also met with the U.S. Trustee.

199. **Benefits to the Debtors:** MFIM's efforts in this regard benefited the Debtors by facilitating the efficient management of the businesses and these Cases. The actions by MFIM in this category directly contributed to the successful sale of the Debtors' assets and a distribution to many creditors in the Cases.

200. **Allocation of Fees:** MFIM incurred a total of 910.4 hours and $282,490 fees with regard to Case Administration during the Application Period. MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $141,245 | $56,498 | $56,498 | $14,124.5 | $14,124.5 |
| Hours | 455.2 | 182.1 | 182.1 | 45.5 | 45.5 |
| Percentage | 50% | 20% | 20% | 5% | 5% |

MFIM allocated the fees in this manner based on the relative size and complexity of each Debtor.

### AA.    Leases, Executory Contracts and Agreements

201. From the beginning, MFIM addressed lease and executory contract issues in these Cases. MFIM located and identified the Debtors' leases, LSAs and executory contracts including the loan agreements and all other contracts (executory or otherwise), which were then organized, indexed, and ultimately reported on the Schedules and Statements filed with the Court. In order to complete the sale of the Debtors' assets, MFIM analyzed the executory contracts to determine which contracts

were executory, calculated the related cure amounts and estimated any lease rejection damages in association with certain lease agreements. In certain instances, MFIM identified contracts for rejection, including contracts signed for the benefit of related parties and prepared analyses supporting the Debtors' motion to reject certain leases.

202. **Benefits to the Debtors:** MFIM's efforts in this regard benefited the Debtors by allowing for the identification and rejection of contracts not needed for the efficient operation of the Debtors. These activities also benefited the Debtors during the due diligence process of the various bidders.

203. **Allocation of Fees:** MFIM incurred a total of 408.4 hours and $87,912 of fees with regard to Leases, Executory Contracts and Agreements during the Application Period. MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $87,912 | $0 | $0 | $0 | $0 |
| Hours | 408.4 | 0 | 0 | 0 | 0 |
| Percentage | 100% | 0% | 0% | 0% | 0% |

MFIM did not allocate the fees in this category. Instead, MFIM charged all time entries to a specific Debtor. Time for this category relates to the leases, contracts and agreements of USACM.

### BB. Tax Analysis/Issues

204. As part of its engagement, MFIM analyzed the tax issues associated with the impairment of the loan portfolio for the financial statements of the Funds under GAAP and tax regulations. The FTDF Committee made various requests regarding tax treatment of the loans and related interest income. As a result, MFIM senior tax accounting staff were required to review the analysis and research to verify that the tax returns were prepared in accordance with the Internal Revenue Service Code and applicable regulations.

205. MFIM, on behalf of the Debtors, also employed tax accountants in order to prepare the 2006 tax returns and K-1s. MFIM initially attempted to employ the Debtors' former tax accountant

to prepare the 2006 tax returns as the most cost effective and efficient preparer.  However, the DTDF Committee objected to their retention and MFIM commenced a search for a replacement tax firm.   In its efforts to find an appropriate tax accountant, MFIM contacted five separate firms, sent appropriate information, and received three proposals, including cost estimates.  MFIM selected KPMG as the firm with the most reasonable cost structure, and the ability to prepare and file the 950 K-1s of FTDF and the 1350 K-1s of DTDF in a timely manner, as well as prepare the returns of the other entities.  None of the Committees objected to the retention of KPMG, and KPMG was employed by the Debtors.

206. MFIM analyzed the prior tax returns of each Debtor and furnished KPMG with the appropriate information and reconciliations of tax and book data for each entity.  MFIM also participated in discussions with KPMG on various tax matters and assisted KPMG with information and explanations of the Debtors' businesses and accounting.  MFIM analyzed the professional costs of the bankruptcy filings to determine the costs required to be considered restructuring costs under IRS Reg 1.263(a)5.

207. MFIM analyzed tax issues including writing down USACM's loan portfolio to net realizable value, assembly information required for Funds 1065's and K-1s, and established the size and nature of losses and tax treatment for all the entities.

208. **Benefits to the Debtors:**  The K-1s for FTDF members were prepared based on the books and records of FTDF and mailed to fund members in early March 2007 six weeks before the K-1s were required to be mailed to investors.  K-1s for DTDF were mailed in a timely manner post-Effective Date.  The 2006 form 1065s for the Funds were filed by April 17, 2007 and the other returns are on timely filed extensions.

209. **Allocation of Fees:**  MFIM incurred a total of 95.6 hours and $54,473 of fees with regard to Tax Issues/Analysis during the Application Period.  MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $13,920 | $12,862 | $27,691 | $0 | $0 |
| Hours | 24.4 | 22.7 | 48.5 | 0 | 0 |
| Percentage | N/A | N/A | N/A | N/A | N/A |

MFIM did not allocate the fees in this category. Instead, MFIM charged all time entries to a specific Debtor.

### CC.    *Monthly Operating Reports*

210. To assist the Debtors in the performance of their duties under the Bankruptcy Code, MFIM monitored and reviewed the filing of the monthly operating reports. Specifically, MFIM reviewed and analyzed the financial information provided by USACM's staff concerning the Debtors' monthly financial condition. MFIM provided valuable oversight and review of the monthly reports which supply the Debtors' creditors with critical financial information.

211. **Benefits to the Debtors:** MFIM's efforts in this regard benefited the Debtors by providing information relating to the Debtors to interested parties in these Cases as required by the Bankruptcy Code.

212. **Allocation of Fees:** MFIM incurred a total of 90.8 hours and $38,872 of fees with regard to Monthly Operating Reports during the Application Period. MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $13,834 | $7,578 | $7,288 | $5,367 | $4,805 |
| Hours | 30.8 | 17.8 | 17.0 | 13.7 | 11.5 |
| Percentage | N/A | N/A | N/A | N/A | N/A |

MFIM did not allocate the fees in this category. Instead, MFIM charged all time entries to a specific Debtor.

### DD.    Claims Analysis

213. MFIM reviewed approximately 2,446 claims received by BMC in the USACM Case and prepared exhibits for potential objections to amended, duplicate and misfiled claims.  In particular, MFIM researched eight administrative claims, 127 priority claims and 1,611 secured claims in order to prepare the necessary exhibits and information for objections.  For instance, the majority of the secured claimants were Direct Lenders who filed a claim for their interest in a borrower loan.  MFIM researched each Direct Lender to determine their account number for future analysis of any of the Direct Lenders' claims.

214. MFIM also reviewed the claims filed against the remaining Debtors.  MFIM analyzed the 125 claims filed against FTDF in order to develop the claim objections later filed by the FTDF Committee and prepare a declaration in support of the claim objections.  MFIM reviewed appropriate documentation and prepared a Declaration in support of DTDF's objection to a claim by a Direct Lender, reviewed and prepared two exhibits for USA Securities' objection to 35 claims and prepared three exhibits for USA Realty after review and objection to 57 claims.

215. **Benefits to the Debtors:**  MFIM's efforts in this regard benefited the Debtors by ensuring that only valid claims were allowed to be paid, resulting in a higher recovery for the remaining valid claims against each Debtor.

216. **Allocation of Fees:**  MFIM incurred a total of 611.6 hours and $191,800 of fees with regard to Claims Analysis during the Application Period.  MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $174,672 | $639 | $12,265 | $2,409 | $1,815 |
| Hours | 563.3 | 1.3 | 34.2 | 7.3 | 5.5 |
| Percentage | N/A | N/A | N/A | N/A | N/A |

MFIM did not allocate the fees in this category.  Instead, MFIM charged all time entries to a specific Debtor.

1

*EE.    Transition Issues and Activities*

2

217. One of the essential post-confirmation tasks performed by MFIM was ensuring a

3

seamless transition of the Debtors' remaining assets to the post-Effective Date entities established

4

under the Plan.  Specifically, pursuant to the Plan, the assets of USACM remaining after the sale

5

were transferred to the USACM Trust and DTDF entered into an Amended Operating Agreement

6

which provided for a new DTDF Administrator.  In order to complete these tasks, MFIM formulated

7

a transition plan which outlined all the activities necessary for the transitions.  Through this transition

8

plan, MFIM planned, managed and implemented the transition as detailed in the Plan and DTDF

9

Amended Operating Agreement.

10

218. Under the transition plan, MFIM transitioned USACM's computer systems, including

11

among others, its accounting programs Great Plains, i-Track, Peachtree, as well as its email program

12

and other information stored on the computer systems.  MFIM was also responsible for

13

demonstrating the operation of these computer programs to the USACM Trustee and DTDF's

14

Administrator to ensure the seamless transition.  MFIM spent considerable time identifying which of

15

the Debtors' documents and agreements should be delivered to the USACM Trust and DTDF and

16

transferring the appropriate documents or otherwise providing for document storage.

17

219. In order to complete this engagement, MFIM was required to not only transition

18

USACM's remaining assets to the USACM Trust and transfer the administration of the DTDF to the

19

new Administrator, but also to wind-down USA Realty, USA Securities and FTDF.  MFIM also

20

addressed any accounting and year end financial issues, including closing the books for year end and

21

preparing the financial statements, determining the amount of the claims reserve, transferring funds to

22

post-Effective Date accounts, and preparing a list of payments required to be made on the Effective

23

Date.  MFIM also transitioned the claims objection and litigation work to the USACM Trust.

24

220. MFIM addressed the rejection of USACM's office space.  In order to return the property

25

to the landlord, it was necessary for MFIM to negotiate with former management on the ownership of

26

certain assets in order to vacate the property.  For example, MFIM had to determine ownership of

27

remaining items such as art work and furniture before it could dispose of such items.

28

221. Finally, in order to transition USACM and DTDF, MFIM coordinated its activities with the parties in interest in the Cases. The transition plan included essential meetings with the four Committees, the USACM Trust and the new Administrator of the DTDF. During these meetings, MFIM briefed the USACM Trustee and DTDF Administrator on the regulatory and governmental investigations being conducted and the Debtors' compliance with such investigations. MFIM has transferred documentation to the USACM Trustee and DTDF so that the remaining assets of the Debtors can be collected. MFIM continues to assist them with the eventual winddown of their operations.

222. **Benefits to the Debtors –** MFIM benefited the Debtors by ensuring a smooth transition from the USACM estate to the USACM Trustee and from the DTDF Administrator to the DTDF estate who will continue to pursue additional recoveries. These activities were necessary to implement the Plan and winddown the Debtors' estates. These activities also ensured that the USACM Trust and the post-Effective Date Debtors maintained the documentation needed to continue to winddown the estates and pursue additional recoveries.

223. **Allocation of Fees** - MFIM incurred a total of 203.2 hours and $118,777 of fees with regard to Transition Issues and Activities during the Application Period. MFIM assigned the hours and fees as follows:

|  | USACM | DTDF | FTDF | USA Realty | USA Securities |
|---|---|---|---|---|---|
| Fees | $95,021.60 | $11,877.70 | $11,877.70 | $0 | $0 |
| Hours | 162.6 | 20.3 | 20.3 | 0 | 0 |
| Percentage | 80% | 10% | 10% | 0% | 0% |

MFIM allocated the fees in this manner because of the size and complexity of the records and ongoing activities of each Debtor.

1

## **EXPENSE REIMBURSEMENT REQUESTED BY MFIM**

2        224. The policies employed by MFIM for seeking reimbursement for out-of-pocket expenses

3    are as follows:

4
- **Airfare** - Costs incurred (if any) by personnel when traveling to/from other cities on
5        behalf of the Debtors were incorporated into this Final Application.  To the extent any
        MFIM professional flew first class or business class, the incremental cost of such
6        service upgrade has not been incorporated into the amounts being sought for
        reimbursement;
7

8
- **Ground Transportation** – Expenses incurred by MFIM professionals for local
        transportation while outside of their home cities were incorporated into this Final
9        Application.  Such costs consist primarily of rental car fees shared among two or three
        people to the extent possible and taxi-cab fares to and from the Debtors' offices.  In
10        addition, reimbursement is sought for ground transportation to and from airports
        associated with air travel by MFIM professionals from other cities.  Reimbursement of
11        taxi-cab fares for reasons other than transportation to the office during the engagement
12        (dinner in the evening, etc.) are not being sought in this Final Application;

13
- **Parking** - Parking expenses incurred by MFIM personnel as a result of travel on client
        matters is reimbursed to MFIM personnel.  Costs related to parking at airports while
14        traveling out of town on client matters are also incorporated herein for reimbursement;

15
- **Lodging** - Lodging and related costs, to the extent incurred by personnel while
16        rendering services in connection with these Cases, were incorporated into this Final
        Application.  During the outset of the Cases, MFIM negotiated a discounted rate at a
17        local hotel in an effort to reduce the costs to the Debtors of MFIM's expenses.  To the
18        extent rooms were available at this hotel, all MFIM personnel utilized this rate;

19
- **Meals** – Costs incurred by MFIM professionals for dinners while traveling outside of
20        their home cities (on matters related to these Chapter 11 Cases) are incorporated into
        this Final Application.  MFIM has not sought reimbursement for "luxury meals" in this
21        Final Application (the costs of all dinners were limited to $60 per person).  Also, MFIM
        has not sought reimbursement for breakfasts or lunches for MFIM professionals while
22        traveling outside of their home cities.  Therefore, MFIM is requesting less than $60 per
23        day for each employee.  It should be noted that this daily amount is less than $64 which
        is the maximum per diem amount (meals and incidentals) for Las Vegas, Nevada
24        published by the Internal Revenue Service (IRS Publication 1542, Revision March
        2007);
25

26
- **Communication/Telephone** – MFIM is not seeking the reimbursement for costs
        associated with necessary long distance and wireless phone calls directly related to this
27        matter;

28

- **Postage/Overnight Mail/Couriers** - Costs incurred in connection with same-day and over-night courier and delivery services (for materials directly related to this matter) were incorporated into this Final Application.  MFIM has not sought reimbursement for costs associated with first-class postage incurred in the normal course of its activities in this matter.  However, postage costs incurred in connection with the required servicing of notices and other documents filed with the Court may be included herein; and,

- **Duplication/Reprographics** - To the extent incurred, charges for photocopying jobs performed by a third party were charged at the cost of such services.

- **Legal Fees** - - During the Application Period, MFIM incurred expenses relating to third party legal advice in the amount of $303,359.85.  MFIM has also included in this category an additional $150,000 of estimated expenses in this Final Application for future legal fees.  MFIM expects to require the legal services of Greenberg Traurig, LLP ("**GT**") in responding to any objections and presenting this Final Application to the Court.  MFIM will file a supplement to this Final Application in advance of the hearing to support this estimated amount.

From the Petition Date and forward, MFIM consulted with attorneys from GT on various issues in these Cases.  Specifically, GT assisted MFIM with (a) issues relating to their retention and fees in the Cases, including attending hearings relating to MFIM's retention, attending the hearing on their First Interim Fee Application and working with the U.S. Trustee to address certain objections raised to MFIM's monthly fee statements; (b) corporate governance issues relating to Thomas Allison's position as CRO of the Debtors; (c) issues relating to the Debtors' proposed pension plan freeze and alleged liabilities with respect to such pension plans (especially given that the PBGC alleged that Thomas Allison or other MFIM employees may be liable); (d) plan issues including the plan formulation process to insure the feasibility of the plan structure, payment of MFIM's fees and expenses and address other risk issues for MFIM; (e) discussions with Compass on the asset purchase agreement because Compass required representations and warranties from MFIM; (f) issues relating to the mortgage broker license, including the ability to maintain such license post-sale closing for purposes of serving as the loan servicer for Compass; (g) meetings with the SEC regarding possible receivership for Investment Partners to finalize Thomas Allison's affidavit in support of such receivership; and (h) issues relating to MFIM or its employees.

Given the size, complexities and payment risks involved in these Cases, MFIM required legal counsel and such fees and expenses should be reimbursed as part of this Final Application.  As recognized by other courts, MFIM, as the CRO, should not be required to rely solely on the Debtors' counsel for purposes of representation in these Cases.  Courts have found attorneys fees to be acceptable when the party requesting such fees is not an attorney.  As explained by the court in *In re Geneva Steel Company*:

There is no provision in the Code for a professional appointed pursuant to Section 327 to seek appointment of another professional to represent its interests at a fee hearing. For attorneys this is not a problem because they are usually well equipped to represent themselves at fee hearings, and they are permitted to seek reimbursement for reasonable fees and expenses incurred in the preparation and defense of their fee application. To expect Blackstone, a non-attorney professional, to either accept representation from counsel who may suffer a conflict of interest or absorb the cost of representation itself is fundamentally unfair.

*In re Geneva Steel Company,* 258 B.R. 799, 803 (Bankr. D. Utah 2001).

Courts have also found the basis to pay attorneys' fees when the contract between the parties supports the payment of such fees. *See Geneva Steel Company,* 258 B.R. at 803 (court allows legal fees of financial advisor given that "The engagement agreement specifically provided for reimbursement of such fees. . . ") MFIM's Agreement allowed for the reimbursement of attorneys fees and expenses incurred in connection with fee and retention issues. The April 13, 2006 MFIM Agreement between MFIM and the Debtors specifically states that MFIM will be compensated for "reasonable fees and expenses of its counsel incurred in connection with the preparation, negotiation and enforcement" of the employment of MFIM in these Cases. The indemnification agreement incorporated into the MFIM Agreement states "[t]he Companies also pay the Indemnified Parties for any fees and expenses reasonably incurred by them, including attorneys' fees and expenses, in seeking payment of all amounts owed to it under the Agreement (or any new agreement) whether through the submission of a fee application or in any other manner. . ." MFIM Agreement, ¶ F. The MFIM Agreement is attached to the Declaration of Thomas J. Allison in support of MFIM's Employment Application. *See* Docket no. 7.

Finally, the work performed by GT benefited the Debtors' estates and thus should be reimbursed. *See In re Gillett Holdings, Inc.,* 137 B.R. 462 (Bankr. D. Colo. 1992) (court allowed certain fees and expenses incurred by counsel for the debtor's financial advisor; court disallowed certain fees and expenses because such fees and expenses provided no benefit to the estates and did not comply with U.S. Trustee Guidelines). With MFIM involving their counsel in these Cases, as needed, for those issues creating liability or risks for MFIM, MFIM was able to keep the Cases moving quickly to confirmation. It was imperative and necessary that MFIM have access to their own legal counsel to analyze the complicated and unique issues that often arose in the Cases due to, among other things, the fraudulent activities of the prepetition Debtors.

**Exhibit H** attached hereto provides a detailed listing for the fees and expenses incurred by GT. The fees and expenses charged on a monthly basis are summarized as follows:

| Statement | Fees | Expenses | Total | Travel |
|-----------|------|----------|-------|--------|
| April 2006 | $10,028.50 | $0 | $10,028.50 | $0 |
| May 2006 | $436.00 | $0 | $436.00 | $0 |
| June 2006 | $379.50 | $0 | $379.50 | $0 |
| July 2006 | $9,309.50 | $0 | $9,309.50 | $4,360.00 |
| Aug. 2006 | $1,101.00 | $1,024.89 | $2,125.89 | $0 |
| Sept 2006 | $27,206.50 | $175.72 | $27,382.22 | $4,360.00 |
| Oct. 2006 | $48,509.50 | $1,640.69 | $50,150.19 | $0 |
| Nov. 2006 | $17,564.50 | $344.84 | $17,909.34 | $0 |
| Dec. 2006 | $39,621.50 | $3,075.05 | $42,696.55 | $2,180.00 |
| Jan. 2007 | $13,331.00 | $-9.77 | $13,321.23 | $0 |
| Feb.  2007 | $26,885.50 | $968.09 | $27,853.59 | $2,320.00 |
| March 2007 | $14,586.50 | $603.56 | $15,190.06 | $0 |
| April 2007 | $107,546.00 | $81.78 | $107,627.78 | $0 |
|  | $316,505.50 | $7,904.85 | $324,410.35 | $13,220.00 |

Deductions have been made from the total fees and expenses listed above and in the GT time detail attached as Exhibit H for all travel time and for any prepetition time billed by GT as follows:

| | |
|---|---|
| **Total Fees** | $316,505.50 |
| Minus Travel Time | -$13,220.00 |
| Minus Prepetition Time in April 2006 | -$7,830.50 |
| **Total Fees After Deductions** | **$295,455.00** |
| Plus Total Expenses | +$7,904.85 |
| **Total Fees and Expenses** | **$303,359.85** |
| Plus Estimated Fees To Fee Hearing | **+$150,000.00** |
| **TOTAL FEES AND EXPENSES** | **$453,359.85** |

225.    Attached as **Exhibit I** hereto is a summary schedule of actual and necessary expenses of MFIM incurred during the Application Period.  Note that the legal fee category includes an estimate of $150,000 for additional fees to respond to objections and participate in the hearing for MFIM's Final Application.

226. Attached as **Exhibit J** hereto is a detailed description of the actual and necessary expenses incurred by MFIM during the Application Period.

### **VOLUNTARY REDUCTIONS TAKEN TO FEES AND EXPENSES BY MFIM**

227. Over the Application Period, MFIM has voluntarily reduced the amount of the Final Application by approximately $1.3 million.

228. As noted herein, MFIM has voluntary reduced the fees incurred in preparing fee applications by $360,769.91.

229. MFIM's professionals incurred approximately 2,232 hours of time spent traveling to and from the Debtors' offices in Las Vegas, as well as, attending meetings benefiting the Debtors in additional locations.  In many other bankruptcy cases, time spent on travel is allowed to be billed to at one half (50%) of applicable rates.  However due to the location and special circumstances associated with these Cases, MFIM has voluntarily agreed to not bill for this travel time and the Final Application was reduced approximately $500,000.

230. In addition, MFIM does not request reimbursement in the Final Application of fees associated with time spent on the following:

- Professionals added to the team solely for short-term projects;
- Any time considered redundant among MFIM professionals excluding meetings;
- Activities performed by administrative personnel in support of team members; and,
- MFIM internal consultation on case strategies.

The Final Application was reduced by approximately $300.000 by virtue of the absence of a request from MFIM for reimbursement for time spent on these additional tasks benefiting the Debtors.

231. The total for the voluntary reduction of expenses described above is approximately $160,000.  The numbers contained in Exhibits I and J are net of the voluntary reductions.

**SUCCESS FEE REQUEST**

232.    Based on the grim circumstances confronting the Debtors on the Petition Date and the exceptional results achieved for the unsecured creditors and Direct Lenders of USACM, as well as, the investors of FTDF and DTDF, as part of its Final Application, MFIM is also seeking the award of a success fee of $2,500,000 (the "**Success Fee**").  The request is based on several factors including the complexity of the Cases, the special skills employed to achieve the final favorable results, the risk of non-payment of accrued fees and expenses, the outcomes achieved and the expedited resolution of the Cases.  A success fee is further warranted in these Cases based on the industry standard of awarding success fees for professionals such as MFIM.

233.    Courts have traditionally considered the following factors when evaluating a request for a success fee or fee enhancement: 1) the time and labor required, 2) the preclusion of other employment by the professional due to acceptance of the case, 3) the customary fee, 4) whether the fee is fixed or contingent, 5) time limitations imposed by the client or the circumstance, 6) the amount involved, 7) the "undesirability" of the case, 8) the nature and length of the professional relationship, and 9) awards in similar cases.  *In re One City Centre Associates*, 111 B.R. 872, 876 (Bankr. E.D. Cal. 1990).  Additional factors that support an upward adjustment in fees include: (1) the novelty and complexity of the issues; (2) special skill and experience of counsel or, (presumably, other professionals); (3) the quality of the representation; and (4) the results obtained.  *Id.* at 877.

234.    In the Ninth Circuit, success fees have been awarded when exceptional results were obtained and the professional faced a significant risk of non-payment.  Thus, in *In re Arnold & Baker*, No. 2:86BK01195-RTB, 2005 WL 1213818, *1 (Bankr. D. Ariz. Apr. 27, 2005), the court granted counsel for the debtor a fee enhancement equivalent to 50% of their fees based on two factors: (1) high probability of non-payment; and (2) the exceptional work performed for the benefit all parties.  The *Arnold* Court held:

> There is a strong presumption that payment of one's standard hourly rate constitutes reasonable compensation; however, there remains a possibility than an enhancement will be necessary to make the amount of compensation reasonable and commensurate with the rate for comparable non-bankruptcy services.  In order to justify a bonus, one

must come forward with specific evidence showing why the results obtained were not reflected in either the standard hourly rate or the number of hours allowed. One must also show that the bonus is necessary to make the award commensurate with compensation for comparable non-bankruptcy services.

*Id.* at *1.

235.    Other courts have illustrated what comprises "exceptional results" in awarding a success fee. The court held in *In re Gencor Industries, Inc*., that the debtor's efforts in negotiating a compromise and convincing management to proceed with a Chapter 11 case resulted in a substantial return to the creditors and constituted "exceptional results." Specifically, the plan of reorganization that was ultimately confirmed provided for payment of 100% of all outstanding claims and the equity owners retained their full equity interests in the debtor. The debtor's counsel requested a fee enhancement of $300,000, 27% of the total fees already paid. The court granted the fee enhancement stating:

> Based on the foregoing, fee enhancements are allowed and should be encouraged where the attorney's initiative, perseverance, and skill lead to an extraordinary success quickly, efficiently, and effectively. In considering fee enhancements in a bankruptcy case, courts should examine the way the attorney worked to maximize the value of assets in the case and to increase distributions to all classes of creditors. An attorney's ability to overcome unique and unforeseen obstacles also is relevant. Other important factors to consider include whether the results far exceeded the initial expectations and whether the party paying the fee consents to the additional payment.

*In re Gencor Industries, Inc.* 286 B.R. 170, 179 -180 (Bankr. M.D. Fla. 2002).

236.    MFIM has exhibited the requisite initiative, perseverance and skill, and has achieved the exceptional results, which justify the success fee now requested. The nature of MFIM's engagement, including the complexities confronted and achievements produced, have been described in detail over the course of this Final Application, and are respectfully referred to and incorporated herein by reference. In summary, however, MFIM notes the following:

*A. Novelty and Complexity of the Issues*:  When MFIM assumed the management of the Debtors on the Petition Date, the Debtors were moribund entities subject to pending state and federal investigations.  With a flat management structure and limited back-office depth, MFIM was required to function as the Debtors' management, accounting and finance departments and to serve in other capacities under very difficult circumstances.  At the start of its engagement, MFIM discovered loan files and other records which were incomplete, inaccurate and, in some instances, appeared to be deliberately falsified.  MFIM discovered the existence of two different sets of books, each arguably designed for the unique expectations of the various recipients of the accounting data.  Accounting irregularities were widespread and have been detailed in Sections entitled *Forensic Loan Accounting* and *Loan and Financial Accounting Systems* of this Final Application.  The problems associated with these irregularities were compounded by the fact that USACM failed to maintain historical accounting data, overwriting the company's Access or Excel files each month as they were updated, thereby obliterating any loan transaction history or audit trail of the accounts.

237.    The situation was equally problematic on the loan servicing side of USACM's business, as is detailed in the Section entitled *Loan Portfolio* of this Final Application.  USACM simply provided loan extensions to defer collection and/or, alternatively, would pay interest on non-performing loans from other sources.  USACM management frequently acquiesced to borrower delinquencies in exchange for equity in the project, or for payment of additional fees.  In an effort to conceal this activity, USACM made monthly regular interest payments to Direct Lenders regardless of whether the borrower of the particular loans in which the Direct Lenders had an interest were paying USACM.  As a result of this activity (and lack of meaningful collection activity), most of the loans serviced by the Debtors were non-performing.

238.    Out of this morass (and, initially, with only $400,000 in USACM's operating accounts), MFIM was able confirm the Plan, which was preceded by a highly successful auction of the loan portfolio of USACM and FTDF, as well as serving rights to these assets.  Yet to reach that point, MFIM was left with no alternative but to reconstruct the loan transaction accounting from the Debtors' source documentation (deposit slips, checks, bank statements, correspondence and other source documents) to verify and record transactions.  As has been described in detail in earlier

sections of this Final Application, MFIM's work ranged from verifying investments by Direct Lenders to documenting borrower payments. MFIM matched cleared checks to issued checks by amount and payee and reviewed each loan agreement to determine if the interest compounded, when and if default interest was to be charged, the agreement on payment application, and the determination of late fees, origination fees or exit fees.

239. MFIM reconstructed the USACM Loan Ledgers for each loan and calculated proper accruals for interest and service fees, which was loaded into a new SQL database in order to process holdbacks and the netting of performing and non-performing loans. Manual Loan Ledgers were updated each month to verify the data loaded into the SQL database, thereby allowing for the issuance of the borrower monthly interest statements, loan summaries by month, weekly collection reports, monthly operating reports and other data.

240. MFIM worked to collect the outstanding loans in the various fund portfolios or otherwise serviced by USACM. MFIM (i) reviewed and inventoried each loan file, (ii) performed calculations related to default letters, payoff demands, and other *ad hoc* loan related requests, and (iii) created and implemented a process of establishing work-out strategies for each loan. As part of MFIM's tasks, it reviewed and researched loans marked on the Debtors' published loan summaries as "Special Situations," each of which contained unique problems addressed by MFIM personnel and described in the Final Application. MFIM personnel held daily meetings and conference calls to work with borrowers to collect the portfolio, and reviewed and analyzed settlement proposals and other correspondence received from borrowers and other interested parties.

241. As a results of these efforts, MFIM provided accurate accountings for and understanding of the status of each loan. These efforts allowed MFIM to distribute $231.9 million to investors while also retaining various Court ordered holdbacks. Reconstructed ledgers allowed MFIM to issue monthly statements on a timely basis to both investors and borrowers. Further, MFIM's work on the loan portfolio resulted in collections, as of March 12, 2007, of approximately $280.7 million, consisting of $227.2 million in principal, $46.6 million in current interest, and $6.9 million in fees. Successful collections since the auction for loans held by FTDF resulted in a purchase price increase under the sale agreement with Compass, as described herein.

242.    MFIM also took over USACM's investor inquiry function, maintaining necessary transparency and a ready source of information.  In this regard, MFIM logged, reviewed, researched and responded to over 1,600 requests from Direct Lenders, and responded to the various requests for information from the four official Committees in these Cases, as well as, their professionals.  MFIM, of course, performed a myriad of other tasks, detailed in this Final Application, including but not limited to (i) management of corporate insurance coverages; (ii) termination of the USACM pension plan; (iii) management of employees including the termination of the CFO and risk management following the CIO's resignation; (iv) managing employee expectations; (v) analysis of office space requirements; and (vi) monitoring professional fees for the Cases.

243.    Significantly, the above described tasks and accomplishments were the necessary precursor to the ultimate successful sale of the loans portfolios of FTDF and USACM, as well as servicing rights to those assets.  The new systems created by MFIM provided bidders with the reliable financial information necessary for them to consider and bid for the Debtors' assets.  MFIM's successful collection efforts established the viability of the loan portfolios on a go forward basis.  But for these accomplishments, which stabilized the Debtors' operations, SPCP would not have submitted its Stalking Horse Bid and there would not have been an active auction, calling into question whether the assets could have been sold at all, and if sold, whether the sale would have generated the same positive return.

244.    While MFIM's accounting and loan portfolio work stabilized the Debtors' assets, MFIM's marketing strategy, developed in coordination with the Committees, found and enticed the necessary bidders to translate those assets into a monetary return for the Debtors' creditors and investors.  As detailed in the Section entitled *Analyzing Restructuring and Sales Options*, this strategy focused on finding a stalking horse bidder to create market credibility, value and structure for the sale process.  In an effort to create bidder interest, MFIM analyzed and identified the critical information underlying the various loan portfolios and properties, and focused on the key value drivers supporting the same.  MFIM participated in presentations and meeting with the Debtors' various personnel and orchestrated bidder communications with borrowers and other parties-in-interest.

245.    Overall, this process culminated in Compass Partners' $67 million bid at the Court supervised auction held on December 7, 2006.   This amount was $20.5 million higher than the Stalking Horse Bid of SPCP.   In addition, three loans (Placer Vineyards, Placer Vineyards 2nd, and Marquis Hotel) included in the Stalking Horse Bid were carved out of the sale to Compass, which may provide additional proceeds to USACM.

**B.    Risks Associated with the Engagement:**  All of the aforementioned work was provided notwithstanding the substantial risk that MFIM would not be fully compensated for its services.  Due to the degraded state of the Debtors' accounting records and loan portfolios, caused either by the Debtors' misfeasance or active malfeasance, an actual possibility existed that some or all of the Cases would be administratively insolvent.   At the inception of the Cases, USACM had available cash of only $400,000 and loan portfolios that were not generating meaningful or reliable revenue streams.

246.    When MFIM's efforts to obtain postpetition financing proved to be unsuccessful, it became clear that the estates would, by necessity, be funded through the time and labor of the case professionals.  Therefore, while the Court allowed monthly interim fee payments, MFIM received no significant payments on its outstanding invoices until January 2007, and through the Confirmation Date, had received on an interim basis compensation equal to no more than 17.7% of its then outstanding fees and expenses.   In the face of this uncertainty and attendant risk, without the contractual right to interest on its outstanding fees and advanced expenses, MFIM nevertheless devoted the skills and resources necessary to restructure the loan portfolios, correct the accounting irregularities, collect over $280 million in outstanding loans, sell marketable assets for in excess of $67 million, and confirmed a Chapter 11 Plan that allowed for the controlled bankruptcy exit.

**C.    Special Skills and Experiences of MFIM Personnel**:   The Debtors selected MFIM because of the firm's diverse experience and extensive knowledge base in the field of insolvency and reorganization.   MFIM is a wholly-owned subsidiary of Mesirow Financial Holdings, Inc., a diversified financial services firm which also offers financial consulting, investment management, insurance services, investment banking and real estate services.  MFIM professionals retained for this engagement were all highly credentialed and included Certified Public Accountants, Chartered Financial Analysts, Certified Turnaround Professionals, Certified Insolvency and Restructuring

Advisors, Certified Fraud Examiners, Certified Valuation Analysts, and numerous other experienced business professionals.  These same professionals have provided services in some of the largest and most complex cases in the United States including UAL Corporation, Delta Airlines, Inc., Delphi Corporation, and many other cases. Attached as Exhibit B is a summary of the MFIM professionals' information outlining their experience and  qualifications in rendering services to the Debtors during the Application Period.

247.    With its engagement, MFIM devoted the necessary personnel with the required specialized skills and experience to resolve the Debtors' operating and accounting deficiencies, thereby stabilizing operations, and resulting in the collections and returns experienced by estates' creditors and investors alike.  With MFIM's engagement, the Debtors avoided the need to employ multiple firms, each focused on different tasks.   The multi-disciplinary composition of MFIM provided a seamless structure by which tasks were performed, with Thomas Allison, as CRO, representing the focal point for purposes of communications and coordination.   The resulting efficiencies and capabilities of MFIM explain the positive results in these Cases and the Debtors' expedited exist from bankruptcy.

**D.    Customary Fees for Turnaround Advisors and Investment Bankers**:  Unlike law firms and accounting firms, success fees are a standard component of compensation for turnaround firms, management restructuring consultants and investment bankers.  As noted in *In re Cardinal Indus., Inc.,* 151 B.R. 843 (Bankr.S.D. Ohio 1993) (Chapter 11 operating trustee awarded a fee of $2.1 million plus a success fee of 50,000 shares of stock):

> [P]erformance-based or success-factor bonuses are a normal part of compensation arrangements for management restructure consultants and ... such bonuses generally far exceed the time value of the consultant's services on a lodestar basis. Indeed, the time value component is referred to as the base salary, apparently payable to the consultant even if success is not achieved.

*In re Cardinal Indus., Inc.,* 151 B.R. at 847

248.    The chart attached as **Exhibit K** demonstrates that turnaround firms regularly receive success fees from both pre and post-bankruptcy engagements.  Other reported decisions in which success fees were awarded include *Kaufman v. S and C Corp.,* 171 B.R. 38 (S.D. Texas 1994) (management company that operated hotel entitled to a success fee of $212,417 for fiscal year 1992); *In re Intelogic Trace, Inc.,* 188 B.R. 557 (Bankr. W.D. Texas 1995) (awarding consultant a success fee of $77,500 based on a percentage of the sale price of Debtors' assets plus hourly fees of $24,880 based on a rate of $200 per hour); *In the Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad Co.,* 841 F.2d 789 (7th Cir. 1988) (investment banking firm awarded $1 million success fee).

249.    Although, MFIM's Agreement does not specifically provide for a success fee, such is not required given the positive results achieved by MFIM, especially considering the complexities, difficulties and risks associated with the engagement.  Courts have upheld success fees in circumstances where a success fee was not specifically included as part of the professional's retention.  For example, *In re Gillett Holdings,* while the court refused to approve a success fee in advance until the end of the case to determine whether it had indeed been earned, the court noted in dicta that it "[d]id not consider it at all inappropriate or improper for a professional to ask for a success fee or bonus in an appropriate case, or for a court to award such a fee based upon a showing that it has been earned."  137 B.R. 452, 459 (Bankr.D.Colo.1991). The court in *Interlogic* stated that "[w]ith success fees, especially, we are not bound by whatever arrangements might have been worked out prior to retention-and especially not bound by whatever arrangements made prior to filing. . . . By the same token, we are not limited to a mechanistic "lodestar evaluation."  *In re Interlogic Trace, Inc.*, 188 B.R. 557, 559 (Bankr.W.Tex.1995).  Rather the *Interlogic* court looked "to determine, in retrospect, [whether] the services rendered were both reasonable and necessary, and whether the services in fact conferred a benefit to the estate commensurate with the success fee [requested]."  *Id*. at 560.

1       ***E.   Conclusion***:  As evidenced by the appointment of the Committees on their behalf, the

2 Debtors' claimants included diverse groups of unsecured creditors, members of the Funds and Direct

3 Investors in the loans serviced by USACM.  The exceptional results arising from MFIM's efforts on

4 behalf of the Debtors in these Cases are described in this Final Application.   MFIM's efforts

5 benefited the Debtors, their creditors, investors and Direct Lenders by:

6     •   providing an accurate accounting for and understanding of the status of the loan portfolios,
7         which efforts allowed for a distribution of $231.9 million to investors while also retaining the
        various court ordered holdback amounts for the Debtors;

8     •   allowing USACM to issue monthly statements on a timely basis to both investors and
9         borrowers, as well as, providing reports, analyses and other sources of updated and reliable
10         information to the Debtors' various other constituents (including the Committees, the Court,
        and the various bidders), thereby providing complete transparency in a case clouded by pre-
11         petition fraud;

12     •   ensuring that USACM performed its duties under the LSAs and the Nevada Mortgage
13         Lending statutes;

14     •   establishing a framework for forecasting the Debtors' cash flows, increasing the
        understanding of the Debtors' cash needs, and managing cash disbursement of the Debtors;

15     •   facilitating the maximum recovery of principal, interest and fees due from borrowers, with
16         total collections through March 12, 2007 totaling approximately $281 million collection and
17         further distribution to investors of principal and interest;

18     •   Identifying alternatives to restructure the Debtors thereby maximizing the return to the
        creditors and other constituencies of these Cases;

19     •   Managing a successful auction of the loan portfolios of FTDF and USACM, as well as the
20         servicing agreements related to the same, which auction generated a $67 million bid which
21         was $20.5 million over the Stalking Horse Bid; and

22     •   Successfully negotiating and managing the approval of the Disclosure Statement and Plan,
        thereby allowing the Debtors to emerge from bankruptcy in less than one year.

23 MFIM requests that the Success Fee be allocated as follows:  80% to USACM, 10% to FTDF and

24 10% to DTDF.  This allocation is made based on the benefits received by these three Debtors and the

25 relative amounts of fees charged in this Final Application to these specific Debtors.

26

27

28

**NOTICE**

250. In accordance with the Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals entered by the Court on August 29, 2006, MFIM is serving a copy of the Final Application and the Notice of the Application upon the United States Trustee, the Debtors' counsel, the Official Committee of Unsecured Creditors of USA Commercial Mortgage Company, the Official Committee of Holders of Executory Contract Rights through USA Commercial Mortgage Company, the Official Committee of Security Holders of USA Capital First Trust Deed Fund, LLC and the Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC.

**CONCLUSION**

251. The compensation presently sought by MFIM is final.  Neither MFIM, nor any employees of MFIM, have any agreement or any understanding of any kind or nature to divide, pay over or share any portion of the fees to be awarded MFIM with any other person, except among members and employees of MFIM.  There are no claims against, or interest of, the Debtors in which a beneficial interest has been acquired or transferred by MFIM for its account after being retained in connection with this matter.

252. As outlined herein, MFIM believes that it has facilitated the Debtors' efforts to bring about a resolution to these Cases in a manner which maximized the value of the Debtors.  MFIM's work was a significant undertaking.  Moreover, MFIM attempted to the best of its ability, to render these services efficiently and in accordance with the terms of MFIM's employment, approved by the Court.  MFIM worked closely with the Debtors and the other professionals in these Cases to minimize unnecessary duplication of effort.  Accordingly, MFIM believes its services have been beneficial to the Debtors' estates and the various interested parties, thereby satisfying the requirements provided by Bankruptcy Code §330-331.

1    WHEREFORE, MFIM respectfully requests that the Court enter a final Order:

2       a.   Awarding and finally allowing (i) compensation incurred during the Application Period in the

3            total amount of $11,389,203.09, (ii) a Success Fee of $2,500,000.00; and (iii) actual and

4            necessary expenses incurred during the Application Period totaling $1,117,168.74;

5       b.   Authorizing MFIM to apply the Retainer against the fees and expenses finally allowed by the

6            Court;

7       c.   Authorizing and directing the Debtors to pay to MFIM the balance of all unpaid fees and

8            expenses as allowed by the Court; and

9       d.   Granting such other and further relief as the Court Deems just and appropriate.

1  DATED:          April 25, 2007

2                                                    Respectfully Submitted,

3                                                    **GREENBERG TRAURIG, LLP**

4

5                                                     /s/ Adam M. Starr
                                                     Adam M. Starr
6                                                    Greenberg Traurig, LLP
                                                     2450 Colorado Avenue, Suite 400E
7                                                    Santa Monica, California  90404
                                                     Telephone:  (310) 586-7700
8                                                    Facsimile:  (310) 586-7800
                                                     Email:  starra@gtlaw.com
9

10                                                    /s/ Ronald D. Green
                                                     Ronald D. Green
11                                                   Greenberg Traurig, LLP
                                                     3773 Howard Hughes Parkway
12                                                   Suite 500 North
                                                     Las Vegas, Nevada 89169
13                                                   Telephone:  (702) 792-3773
                                                     Facsimile:  (702) 792-9002
14                                                   Email:    greenr@gtlaw.com
15

16                                                    /s/ Nancy A. Peterman
                                                     Matthew T. Gensburg
17                                                   Nancy A. Peterman
                                                     Sherri Morissette
18                                                   Greenberg Traurig, LLP
                                                     77 West Wacker Drive
19                                                   Suite 2500
                                                     Chicago, Illinois 60601
20                                                   Telephone: (312) 456-8400
                                                     Facsimile: (312) 456-8435
21                                                   Email: gensburgm@gtlaw.com
22                                                          petermann@gtlaw.com
                                                            morissettes@gtlaw.com
23

24                                                   Counsel to Mesirow Financial Interim
25                                                   Management, LLC

26

27

28