ELECTRONICALLY FILED
April 26, 2007

STUTMAN, TREISTER & GLATT, P.C.
FRANK A. MEROLA
(CA State Bar No. 136934)
EVE H. KARASIK
(CA State Bar No. 155356)
ANDREW M. PARLEN
(CA State Bar No. 230429), Members of
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
Email:    fmerola@stutman.com
          ekarasik@stutman.com
          aparlen@stutman.com

SHEA & CARLYON, LTD.
JAMES PATRICK SHEA
(Nevada State Bar No. 000405)
CANDACE C. CARLYON
(Nevada State Bar No. 002666)
SHLOMO S. SHERMAN
(Nevada State Bar No. 009688)
228 South Fourth Street, First Floor
Las Vegas, Nevada 89101
Telephone: (702) 471-7432
Facsimile: (702) 471-7435
Email:    jshea@sheacarlyon.com
          ccarlyon@sheacarlyon.com
          ssherman@sheacarlyon.com

Counsel for the Official Committee Of
Equity Security Holders Of USA Capital First Trust Deed Fund, LLC

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | | |
|---|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | ) ) ) ) | BK-S-06-10725-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | ) ) ) | BK-S-06-10726-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>Debtor. | ) ) ) | BK-S-06-10727-LBR<br>Chapter 11 |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | ) ) ) | BK-S-06-10728-LBR<br>Chapter 11 |
| In re:<br>USA SECURITIES, LLC,<br>Debtor. | ) ) ) | BK-S-06-10729-LBR<br>Chapter 11 |
| Affects<br>☐ All Debtors<br>☐ USA Commercial Mortgage Co.<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed<br>☒ USA First Trust Deed Fund, LLC | ) ) ) ) ) ) ) ) ) | Date:   June 22, 2007<br>Time:  9:30 a.m.<br>Place:  Courtroom #1 |

**FINAL APPLICATION OF STUTMAN, TREISTER & GLATT P.C., AS COUNSEL FOR THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF USA CAPITAL FIRST TRUST DEED FUND, LLC, FOR ALLOWANCE AND PAYMENT OF FEES AND EXPENSES FOR THE PERIOD FROM MAY 10, 2006 THROUGH MARCH 12, 2007 (AFFECTS USA CAPITAL FIRST TRUST DEED FUND, LLC)**

413652v2

Stutman, Treister & Glatt Professional Corporation ("ST&G"), counsel for the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC (the "FTDF Committee") in the above captioned chapter 11 cases (the "Chapter 11 Cases"), hereby submits its Final Fee Application (the "Application"). By this Application, ST&G applies to this Honorable Court for an order: (a) granting final approval for the allowance and payment of fees in the amount of $2,159,529.95 and expenses in the amount of $92,573.35 incurred by ST&G as counsel to the FTDF Committee from May 10, 2006 through and including March 12, 2007 (the "Full Fee Period")[1]; and (b) directing payment of that portion of the unpaid balance of ST&G's allowed fees and expenses for the Full Fee Period in the amount of $357,398.50 in fees and $1,294.77 in costs.

This Application is made pursuant to section 330 of Title 11 of the United States Code ("Bankruptcy Code"), Rule 2016(a) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule"), Rule 2016 of the Local Rules of Bankruptcy Practice, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330 (the "UST Guidelines"), the "Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals" (the "Interim Compensation Order") [Docket No. 1199], the "Stipulation and Order re Modification of Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals" [Docket No. 2275], the "Second Stipulation and Order re Modification of Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals" [Docket No. 2708], and the "Third Stipulation and Order re Modification of Administrative Order Establishing

---

[1] This Court has allowed on an interim basis $559,263.50 of the fees and $31,599.14 of the expenses incurred by ST&G for the period from May 10, 2006 through and including July 31, 2006 (the "First Fee Period"). ST&G has been paid those amounts in full. See "First Application of Stutman, Treister &Glatt, P.C. as Counsel for the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC for Allowance and Payment of Fees and Expenses for the Period from May 10, 2006 Through July 31, 2006" (the "First Interim Fee Application") [Docket No. 1209]; "Order Approving First Interim Fee Application of Stutman, Treister & Glatt, P.C." (the "First Interim Fee Order) [Docket No. 1493].

1    Procedures for Interim Compensation and Reimbursement of Expenses of Professionals"

2    [Docket No. 3001], and is based upon the points and authorities which follow, the Declaration of

3    Andrew M. Parlen (the "Parlen Declaration") in support hereof, the exhibits annexed to the

4    Parlen Declaration, the pleadings referenced by docket number herein, judicial notice of which is

5    respectfully requested, and any oral argument of counsel to be presented at the time of the

6    hearing on this Application.

7                This Court has jurisdiction to consider this Application pursuant to 28 U.S.C. §§

8    157 and 1334.  Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408

9    and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

10

11                                Respectfully submitted:

12

13    Dated:  April 26, 2007                /s/ *Andrew M. Parlen*_____

14                                          Andrew M. Parlen, Esq.
                                            Stutman, Treister & Glatt
15                                          Professional Corporation
                                            Counsel to the Official Committee of Equity
16                                          Security Holders of USA Capital First Trust Deed
                                            Fund, LLC
17

18

19

20

21

22

23

24

25

26

27

28

# SUMMARY OF APPLICATION

## A.      Summary of Fees Incurred from May 10, 2006 through March 12, 2007[2]

| Name | Position | Hours Billed in the First Fee Period | Total for First Fee Period | Hours Billed in the Second Fee Period[3] | Total for Second Fee Period | Hours Billed in the Full Fee Period | Rate[4] | Total for Full Fee Period |
|---|---|---|---|---|---|---|---|---|
| Jeffrey H. Davidson | Shareholder | 61.1 | $39,715.00 | 0.6 | $390.00 | 61.7 | $650.00 | $40,105.00 |
| George C. Webster | Shareholder | 4.0 | $2,560.00 | 0.0 | $0.00 | 4.0 | $640.00 | $2,560.00 |
| Frank A. Merola | Shareholder | 105.7 | $60,777.50 | 440.9 | $256,464.50 | 546.6 | $580.39 | $317,242.00 |
| Ronald L. Fein | Shareholder | 0.8 | $580.00 | 0.0 | $0.00 | 0.8 | $725.00 | $580.00 |
| Eve H. Karasik | Shareholder | 436.0 | $238,800.00 | 1,121.4 | $625,935.00 | 1,557.4 | $555.88 | $865,735.00 |
| K. John Shaffer | Shareholder | 0.0 | $0.00 | 15.9 | $9,408.50 | 15.9 | $591.73 | $9,408.50 |
| George M. Treister | Shareholder | 0.7 | $507.50 | 0.0 | $0.00 | 0.7 | $725.00 | %507.50 |
| Mark S. Wallace | Of Counsel | 0.0 | $0.00 | 194.5 | $112,945.00 | 194.5 | $580.69 | $112,945.00 |
| Christine M. Pajak | Associate | 353.3 | $123,655.00 | 814.3 | $288,270.50 | 1,167.6 | $352.80 | $411,925.50 |
| Gina M. Najolia | Associate | 16.5 | $5,362.50 | 113.7 | $39,682.50 | 130.2 | $345.97 | $45,045.00 |
| Andrew M. Parlen | Associate | 250.2 | $73,809.00 | 829.0 | $251,683.25 | 1,079.2 | $301.62 | $325,492.25 |
| Gabriel I. Glazer | Associate | 0.0 | $0.00 | 7.8 | $1,599.00 | 7.8 | $205.00 | $1,599.00 |

[2]    As is set forth herein, pursuant to the interim compensation procedures governing these cases, the U.S. Trustee has objected to $5,869.30 in fees for services rendered by ST&G in May through August and October 2006.  ST&G has elected to permanently forego payment of such fees.  Because, however, the U.S. Trustee's objections to ST&G's fees are not itemized, ST&G cannot reduced the amount billed by a particular attorney or the amount allocated to a particular billing category.  Accordingly, the total amount of fees billed by ST&G 's attorneys exceed the total amount of fees requested by this Application by $5,869.30 .  Similarly, the total amount of fees allocated to the billing categories set forth herein exceed the total amount of fees requested by this Application by $5,869.30.

[3]    The Second Fee Period is the period from August 1, 2006 through March 12, 2007.

[4]    Effective January 1, 2007, the rates of ST&G's professionals were changed as set forth in the "Notice of Change in Guideline Hourly Rates of Stutman, Treister & Glatt" [Docket No. 2627].  As the Full Fee Period spans from May 10, 2006 through March 12, 2007, the rates of ST&G's professionals listed herein reflect each respective professional's blended hourly rate for services rendered during the Full Fee Period.

413652v4                                          4

| Name | Position | Hours Billed in the First Fee Period | Total for First Fee Period | Hours Billed in the Second Fee Period[3] | Total for Second Fee Period | Hours Billed in the Full Fee Period | Rate[4] | Total for Full Fee Period |
|---|---|---|---|---|---|---|---|---|
| Alexander F. Porter | Law Clerk | 2.3 | $345.00 | 5.9 | $936.00 | 8.2 | $156.22 | $1,281.00 |
| David M. Telfer | Law Clerk | 1.3 | $195.00 | 0.0 | $0.00 | 1.3 | $150.00 | $195.00 |
| Tessa M. Raisin | Law Clerk | 0.0 | $0.00 | 10.9 | $1,635.00 | 10.9 | $150.00 | $1,635.00 |
| Kendra A. Johnson | Paralegal | 70.2 | $12,636.00 | 43.6 | $7,901.00 | 113.8 | $180.47 | $20,537.00 |
| Jeff M. Fleiss | Paralegal | 0.1 | $18.00 | 1.4 | $263.00 | 1.5 | $187.33 | $281.00 |
| Case Clerk | Case Clerk | 56.3 | $3,378.00 | 81.0 | $4,947.50 | 137.3 | $60.63 | $8,325.50 |

| Period | Total Hours Including Paraprof. Time | Total Fees Including Paraprof. Time | Blended Rate Including Paraprof. Time | Total Hours Excluding Paraprof. Time | Total Fees Excluding Paraprof. Time | Blended Rate Excluding Paraprof. Time |
|---|---|---|---|---|---|---|
| First Fee Period | 1,358.5 | $563,338.50 | $414.68 | 1,228.3 | $546,766.50 | $445.14 |
| Second Fee Period | 3,680.9 | $1,602,060.75 | $435.24 | 3,554.9 | $1,588,949.25 | $446.97 |
| **Full Fee Period** | **5,039.4** | **$2,165,399.25[5]** | **$429.69** | **4,783.2** | **$2,135,715.75[6]** | **$446.50** |

**Fees Written Off in First Fee Period:** $132,946.50
**Fees Written Off in Second Fee Period:** $133,965.05
**Total Fees Written Off: $266,911.55**

---

[5]  See footnote 3 supra.

[6]  See footnote 3 supra.

**B.**     **Summary of Expenses Incurred from May 10, 2006 through March 12, 2007**

| Expense | Rate | First Fee Period | Second Fee Period | Total |
|---------|------|------------------|-------------------|-------|
| Air Fare | Actual costs (coach class) | $2,292.70 | $5,941.90 | $8,234.60 |
| Air Freight | Actual costs | $179.17 | $231.75 | $410.92 |
| Airport Transportation | Actual costs | $400.00 | $800.00 | $1,200.00 |
| Business Meals | Actual costs | $183.19 | $677.22 | $860.41 |
| Car Rental | Actual costs | $359.14 | $1,899.06 | $2,258.20 |
| Computer Research Expense | Actual costs | $2,253.95 | $11,056.45 | $13,310.40 |
| Copy Production | $0.25 per page | $19,910.50 | $21,997.00 | $41,907.50 |
| Fax In/Fax Out | $0.50 per page | $86.00 | $118.50 | $204.50 |
| Hotel | Actual cost | $2,273.17 | $4,619.71 | $6,892.88 |
| Long Distance Telephone | Actual cost | $2,011.07 | $10,120.33 | $12,131.40 |
| Parking Expense | Actual cost | $157.32 | $745.62 | $902.94 |
| Parking Validation | Actual cost | $48.00 | $240.00 | $288.00 |
| Postage | Actual cost | $1,347.93 | $2,132.67 | $3,480.60 |
| Taxi | Actual cost | $55.00 | $339.00 | $394.00 |
| Travel Expenses | Actual cost | $0.00 | $55.00 | $55.00 |
| UCC Search | Actual cost | $42.00 | $0.00 | $42.00 |
| **Total** | | **$31,599.14** | **$60,974.21** | **$92,573.35** |

**Expenses Written Off in First Fee Period:** $4,944.32

**Expenses Written Off in Second Fee Period:** $7,970.72

**Expenses Written Off in Full Fee Period: $12,915.04**

**POINTS AND AUTHORITIES**

**I.    STATEMENT OF FACTS**

**A.    General Background**

1.    On April 13, 2006 (the "Petition Date"), USA Commercial Mortgage Company ("USACM"), USA Securities, LLC ("USA Securities"), USA Capital Realty Advisors, LLC ("USA Realty"), USA Capital Diversified Trust Deed Fund, LLC (the "DTDF"), and USA Capital First Trust Deed Fund, LLC (the "FTDF" and collectively with USA Mortgage, USA Securities, USA Realty, and the DTDF, the "Debtors") filed voluntary petitions for relief under chapter 11 the Bankruptcy Code.

2.    Thereafter, on May 9, 2006, this Court entered its "Order Regarding Joint Administration Without Substantive Consolidation" [Docket No. 184] whereby the Court ordered that the foregoing Chapter 11 Cases be jointly administered under the name of USA Commercial Mortgage Company, bankruptcy case number BK-S-06-10725-LBR.

3.    No trustee or examiner was appointed in the Chapter 11 Cases.  Rather, the Debtors operated their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code through March 12, 2007, which is the date that the "Debtors' Third Amended Joint Chapter 11 Plan of Reorganization" (the "Plan") [Docket No. 1799] became effective (the "Effective Date").

4.    On May 10, 2006, the Office of the United States Trustee (the "U.S. Trustee") appointed four separate committees in these Chapter 11 Cases: (i) the FTDF Committee; (ii) the Official Committee of Holders of Executory Contract Rights through USA Commercial Mortgage Company (the "Direct Lender Committee"); (iii) the Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC (the "DTDF Committee"); and (iv) the Official Unsecured Creditors' Committee for USA Commercial Mortgage Company (the "Unsecured Creditors' Committee").[7]

---

[7]    The FTDF Committee, the DTDF Committee, the Direct Lender Committee, and the Unsecured Creditors' Committee are collectively referred to herein as the "Committees." When referring to the Committees aside from the FTDF Committee, this Application uses the term "Other Committees."  When referring to the Committees aside from the Unsecured

5.      The FTDF Committee represents the interests of those persons who invested in the FTDF (the "FTDF Members"), while the DTDF Committee represented the interests of those persons who invested in the DTDF.  The Direct Lender Committee represented approximately three thousand six hundred (3,600) parties-in-interest (the "Direct Lenders") that have individually lent monies directly to various borrowers, for which USACM is the loan servicer.  Finally, the Unsecured Creditors' Committee represented the interests of those individuals who assert general unsecured claims against USACM.

6.      On January 8, 2007, the Court entered the "Order Confirming the 'Debtors' Third Amended Joint Chapter 11 Plan of Reorganization,' as Modified Herein" (the "Confirmation Order") [Docket No. 2376].  As noted above, the Plan became effective on March 12, 2007.

**B.      ST&G's Employment.**

7.      On May 18, 2006, the Investor Committees filed the "Application by the Official Investor Committees to Employ Stutman, Treister & Glatt P.C. as Counsel for Matters of Common Interest" (the "ST&G Employment Application") [Docket No. 280].  The ST&G Employment Application requested that the Court approve the employment of ST&G as counsel to the Investor Committees in matters of common interest *nunc pro tunc* as of May 10, 2006, or, in the alternative, that the Court approve the employment of ST&G as counsel to the FTDF Committee *nunc pro tunc* as of May 10, 2006.

8.      In light of potential conflicts of interest among the Investor Committees, the ST&G Employment Application was amended on May 26, 2006, which amendment requested that the Court authorize the FTDF Committee to employ ST&G as special bankruptcy counsel *nunc pro tunc* as of May 10, 2006 with compensation at the expense of the FTDF estate in such amount as the Court may allow upon notice and hearing [Docket No. 397].  By order dated June 19, 2006, the Court approved employment of ST&G as special bankruptcy counsel to the FTDF Committee effective May 10, 2006 under the terms set forth in the ST&G

Creditors Committee, this Application uses the term "Investor Committees."

1  Employment Application, as amended [Docket No. 700].

2  **C.    Payments Received by ST&G Since the Petition Date.**

3      9.    On August 29, 2006, this Court entered the Interim Compensation Order,

4  which establishes procedures for interim compensation and reimbursement of expenses of

5  professionals employed at the expense of the Debtors' bankruptcy estates.  In particular, the

6  Interim Compensation Order provides that, upon filing and serving a monthly professional

7  statement and absent timely objection, without further order of the Court, a professional shall be

8  entitled to payment from the Debtor in the amount of eighty percent (80%) of the compensation

9  and one hundred percent (100%) of the expense reimbursement requested in such statement.  The

10  Interim Compensation Order also provides that professionals employed in the Chapter 11 Cases

11  shall filed interim fee applications approximately every four months.

12      **1.    First Fee Period.**

13      10.    On August 31, 2006, pursuant to the Interim Compensation Order and the

14  provisions of 11 U.S.C. 331 and Bankruptcy Rule 2016, ST&G filed the First Interim Fee

15  Application.  By the First Interim Application, ST&G sought interim approval of fees totaling

16  $563,338.50 and expenses totaling $32,336.51 incurred during the First Fee Period.

17      11.    Pursuant to an agreement with the U.S. Trustee resolving "The United

18  States Trustee's Objection to the Initial Monthly Statement of Stutman, Treister & Glatt, P.C.",

19  ST&G deferred its request for allowance and payment of $4,075.00 in fees identified in the U.S.

20  Trustee's objection and wrote off $737.37 in certain costs pertaining to "Airport Transportation"

21  and "Document Processing" identified in the U.S. Trustee's Objection.[8]  No objections were filed

22  to the First Interim Fee Application.  On October 10, 2006, the Court entered the First Interim

23  Fee Order, whereby the Court allowed ST&G (i) $559,263.50 as interim compensation for

24  services rendered during the First Fee Period and (ii) interim reimbursement of costs in the sum

25  of $31,599.14 for the First Fee Period.  ST&G has received payment from FTDF for the full

26  amount of fees and expenses allowed pursuant to the First Interim Fee Order.

27  _____

28  [8]    ST&G's initial monthly statement covered the period from May 10, 2006 through July 31, 2006, which is the same period covered by the First Interim Application.

12.     By this Application, ST&G seeks an order from this Court granting final approval of the fees and costs awarded in the First Interim Fee Order.

**2.     Second Fee Period.**

13.     This Application also contains the total amount incurred by ST&G for services rendered and for reimbursement of expenses incurred as special bankruptcy counsel to the FTDF Committee for the Second Fee Period.  Though the Interim Compensation Order provided that fee applications are to be filed approximately every four months, the Second Fee Period covers more than seven months because the deadline for professionals in the Chapter 11 Cases to file fee applications has been extended by Court-approved stipulations three times.  See Docket Nos. 2275, 2708, and 3001.

14.     Pursuant to the Interim Compensation Order, ST&G has submitted eight monthly fee statements to FTDF for services rendered and costs incurred during the Second Fee Period (the "Second Fee Period Statements"), each of which requested that FTDF pay to ST&G 80% of fees and 100% of expenses incurred in the month covered by the invoice.[9]  By the Second Fee Period Statements, ST&G sought interim allowance and payment of an aggregate total of $1,342,007.17, consisting of: (i) $1,281,648.60 in fees (which represented approximately 80% of ST&G's total fees incurred during the Second Fee Period); and (ii) the full amount of expenses incurred during the Second Fee Period.

15.     The U.S. Trustee objected to certain fees and expenses with respect to the monthly statements for August, September, and October 2006.  After meeting and conferring with the U.S. Trustee, ST&G agreed to write off $453.46 in expenses to which the U.S. Trustee objected.  Additionally, ST&G agreed to forgo payment of all $1,794.30 in fees to which the U.S. Trustee objected, while reserving the right to seek payment of such fees in ST&G's final fee application.  ST&G now has elected to permanently forego payment of such fees, as is set forth on the chart following paragraph 16 below.

---

[9]     The expenses billed to FTDF via monthly fee statements differ slightly from the amount of fees and costs for which ST&G herein seeks approval due to nominal late expense entries and inadvertent accounting errors.

413652v4                                           10

16.    As of the date of this Application, ST&G has received payment from FTDF in the interim amounts requested for August, September, October, November and December 2006 and January and February 2007, which, as set forth in the following chart, leaves an unpaid balance of $358,709.16 for the Second Fee Period.[10]

|  | Fees | Expenses | Total |
|---|---|---|---|
| August statement | $220,022.50 | $12,309.76 | $232,332.26 |
| **LESS** reductions per agreement with the U.S. Trustee | ($1,466.00) | ($438.27) | ($1,904.27) |
| **LESS** interim payment | ($183,444.18) | ($11,871.49) | ($195,315.64) |
| September statement | $215,782.25 | $4,917.76 | $220,700.01 |
| **LESS** reductions per agreement with the U.S. Trustee | N/A | ($5.50) | ($5.50) |
| **LESS** interim payment | ($172,625.80) | ($4,912.26) | ($177,538.06) |
| October Statement | $230,808.50 | $5,441.14 | $236,249.64 |
| **LESS** reductions per agreement with the U.S. Trustee | ($328.30) | ($9.69) | ($337.99) |
| **LESS** interim payment | ($175,364.37) | ($5,431.45) | ($180,795.82) |
| November statement | $218,435.00 | $5,422.68 | $223,857.68 |
| **LESS** interim payment | ($174,748.00) | ($5,422.68) | ($180,170.68) |
| December statement | $268,947.00 | $8,813.51 | $277,760.51 |
| **LESS** interim payment | ($215,157.60) | ($8,813.51) | ($223,971.11) |
| January statement | $203,053.00 | $8,335.72 | $211,388.72 |
| **LESS** interim payment | ($162,442.40) | ($8,335.72) | ($170,778.12) |
| February statement | $198,857.00 | $14,892.33 | $213,749.33 |
| **LESS** interim payment | ($159,085.60) | ($14,892.33) | ($173,977.93) |

---

[10]    ST&G has not yet received interim payment on account of its March 2007 monthly fee statement for the period from March 1, 2007 through March 12, 2007, as such fees and expenses are not yet payable.  Upon receipt of interim payment for its March 2007 pre-Effective Date services and expenses, ST&G will adjust the unpaid balance due accordingly.

413652v4                                                11

| | | | |
|---|---|---|---|
| March statement[11] | $46,155.50 | $225.67 | $46,381.17 |
| **TOTAL** billed for Second Fee Period per Second Fee Period Statements | $1,602,060.75 | $60,358.57 | $1,662,419.32 |
| Late time/expense entries | $0.00 | $1,069.10 | $1,069.10 |
| **TOTAL** reductions per agreements with U.S. Trustee for Second Fee Period | ($1,794.30) | ($453.46) | ($2,247.76) |
| **TOTAL** requested allowance for Second Fee Period | $1,600,266.45 | $60,974.21 | $1,661,240.66 |
| **TOTAL** payments received for Second Fee Period | ($1,242,867.95) | ($59,679.44) | ($1,302,547.39) |
| **TOTAL UNPAID BALANCE** | $357,398.50 | $1,294.77 | **$358,693.27** |

17.    ST&G incurred $1,600,266.45[12] in fees for services rendered during the Second Fee Period, together with costs in the sum of $60,974.21, for a total amount of $1,661,240.66.  As noted, in addition to the amount written off by ST&G prior to circulating each of the Second Fee Period Statements, ST&G has agreed to write off $1,794.30 in fees and $453.46 in expenses in response to the U.S. Trustee's Objections to the Second Fee Period Statements.  Pursuant to the Interim Compensation Order, ST&G has been paid $1,302,547.39 of the fees and costs incurred during the Second Fee Period.

18.    Accordingly, ST&G seeks final allowance of all fees and costs incurred to date from May 10, 2006 through March 12, 2007, in the amount of $2,252,103.30.  ST&G further requests that the FTDF pay ST&G 100% of the unpaid balance of these fees and expenses, which totals $358,693.27.

---

[11]    The March monthly statement includes fees and expenses through the Effective Date.

[12]    ST&G is seeking an additional $1,069.10 in expenses for costs incurred during the Second Fee Period that were not previously included in the Second Fee Period Statements.  Previously, in the First Interim Application, ST&G had an additional $690.00 in fees for services rendered during the First Fee Period that were not previously included in ST&G's Fee Statement for the period from May 10, 2006 through July 31, 2006.

**D.       Case Narrative**

19.      These are complex, emotionally charged chapter 11 cases in which the FTDF Committee has been intimately involved from their commencement.  ST&G, along with Shea & Carlyon Ltd. ("S&C"), the FTDF Committee's Nevada counsel, and Alvarez & Marsal LLC ("A&M"), the FTDF Committee's financial advisor, have worked zealously to assist the FTDF Committee in fulfilling its fiduciary duties in these cases, to respond promptly and effectively to events relating to the FTDF's chapter 11 case, and to achieve the highest possible recovery for FTDF Members.  ST&G, along with S&C, has also worked diligently to avoid unnecessary duplicative efforts.

20.      In the early stages of the case, ST&G devoted much of its time simply to understanding what had caused the Chapter 11 Cases and where such events left FTDF and the approximately 950 FTDF Members.  It soon became clear that while FTDF's loan portfolio had a face amount of approximately $64 million, nearly half of the loans in which FTDF had invested were currently non-performing, and perhaps never would perform.  On the other hand, it was also clear that the FTDF loan portfolio was worth far more, in absolute dollars and in percentage of face value, than the loans held by other constituencies in the Chapter 11 Cases.  Furthermore, based on the number of performing loans in the FTDF portfolio, it was apparent that FTDF Members could expect a higher return, at least initially, than unsecured creditors of USACM, DTDF members, and many of the Direct Lenders.

21.      Accordingly, the FTDF Committee quickly realized both that FTDF Members had an opportunity to recover a significant amount of their investments in FTDF and that the FTDF estate held much of the value of the Debtors' estates.  Additionally, because each of the five debtor estates was represented by the same group of professionals (the "Debtors' Professionals") and because the estates were bound to have numerous potential and actual conflicts over the course of the Chapter 11 Cases, the FTDF Committee, and therefore ST&G, took a very active, forward-looking role in the Chapter 11 Cases.  ST&G understood and made clear to the FTDF Committee early in the Chapter 11 Cases that the FTDF Committee often would have to be the main representative of the FTDF estate during the pendency of the Chapter

1    11 Cases.

2    22.    After a barrage of information gathering and administrative tasks early in

3    the Chapter 11 Cases, the FTDF Committee applied pressure on the Debtors to swiftly resolve

4    the Chapter 11 Cases.  Comprised of six investors in FTDF, the FTDF Committee was keenly

5    aware of the toll the Chapter 11 Cases were exacting on FTDF Members, many of whom had

6    invested a significant amount of their life savings in FTDF and whom depended on income from

7    FTDF for a substantial portion of their living expenses.  Taking the urgency of the situation to

8    heart, ST&G, in concert with S&C and A&M, immediately began exploring exit strategies that

9    would maximize FTDF's value in an expedient manner.  Given the exigencies of these cases,

10    ST&G and the FTDF Committee were very concerned that the value of FTDF would be drained

11    by other constituencies if the FTDF case was not rapidly resolved.

12    23.    ST&G guided the FTDF Committee through various alternatives that the

13    FTDF Committee could pursue as an exit strategy.  While the FTDF Committee did consider

14    having the FTDF loan portfolio serviced by a replacement loan servicer, the FTDF Committee,

15    with ST&G recommendation, ultimately determined that the value of FTDF's assets and the

16    return to FTDF Members could be maximized through a sale of the FTDF loan portfolio.  ST&G

17    shared this concept with the Debtors and the Other Committees, who agreed with this approach.

18    In fact, it was decided that the sale of the FTDF loan portfolio, coupled with the sale of certain

19    assets of USACM (collectively, the "Purchased Assets"), would form the basis for a joint chapter

20    11 plan of reorganization.

21    24.    In late July and early August 2006, less than four months into the Chapter

22    11 Cases and less than three months after ST&G became employed as counsel to the FTDF

23    Committee, the Debtors and the Committees began dedicating much of their efforts to

24    formulating a joint term sheet (the "Joint Term Sheet") premised on the sale of FTDF's loan

25    portfolio and certain assets of USACM.  ST&G took a leading role in this process, drafting the

26    initial and multiple versions of the Joint Term Sheet and facilitating the negotiation of its terms

27    among the Other Committees and the Debtors.

28    25.    Contemporaneously with beginning the plan process, ST&G, with A&M,

413652v4                                        14

worked diligently to secure a stalking horse bidder for the prospective asset sale.  After negotiations with several entities, the FTDF Committee elected to proceed with SPCP Group, LLC ("Silver Point").  Over the course of several weeks, ST&G drafted a term sheet with Silver Point, that became the foundation for a letter of intent filed with the Court by Silver Point (the "Silver Point LOI") and, in turn, for an asset purchase agreement between Silver Point and the Debtors (the "Silver Point APA").  ST&G was instrumental in both negotiating and drafting the terms of the Silver Point APA, under which Silver Point agreed to purchase the FTDF loan portfolio for $46,500,000.00, subject to certain purchase price adjustments.  Such a purchase price represented over 70% of the face value of the FTDF loan portfolio.

26.    Once Silver Point had committed to being the stalking horse bidder, the FTDF Committee then drove the process of establishing and obtaining approval of bid procedures.  Moreover, ST&G assisted the Debtors in soliciting  and analyzing additional bids on the Purchased Assets.  These efforts culminated in an auction on December 7, 2006 (the "Auction") at which Compass Partners, LLC ("Compass") emerged as the winning bidder with a bid of $67 million, at least $48 million of which was on account of FTDF assets.[13]

27.    Because the sale of the Purchased Assets to Compass (the "Compass Sale") was conditioned on the confirmation of a joint plan of reorganization, it was imperative that the plan process proceed simultaneously with the sale process.  To that end, ST&G drafted a joint plan of reorganization that was based on the Joint Term Sheet.  ST&G's draft plan formed the template for what became, after intensive negotiations, the Plan, which was filed on November 15, 2006.

28.    In the face of several objection to the Plan, ST&G, along with S&C, worked with the Debtors and the Other Committees to provide legal justification for the Plan. ST&G contributed heavily to the pleadings in support of the Plan, particularly the confirmation memorandum [Docket No. 2151] and the reply brief filed by the Debtors on December 16, 2006 [Docket No. 2148].  With all classes entitled to vote voting in favor of the Plan and with sound

---

[13]    Approximately $9,500,000 of the Compass overbid remains in escrow pending resolution of the dispute to allocation of such funds between the FTDF and USACM estates.

legal and factual justification, the Plan was orally confirmed by the Court on December 20, 2006.
ST&G then took a lead role in drafting the Confirmation Order [Docket No. 2376] and the
findings of fact and conclusions of law in support thereof (the "Confirmation Findings and
Conclusions") [Docket No. 2377].

29.     As the Debtors, the Committees, and Compass worked towards closing the
Compass Sale, three appeals to the Confirmation Order were filed.  The Lender Protection Group
(the "LPG"), a group of appellants in one of the appeals, filed a motion with the Bankruptcy
Appellate Panel for the Ninth Circuit (the "BAP") to stay the Confirmation Order (the "First Stay
Motion").  Unexpectedly and without explanation, the BAP granted a temporary stay.  With the
Compass Sale and the Plan hanging in the balance and after the Debtors had transferred the LPG
appeal to the United States District Court for the District of Nevada (the "District Court"), ST&G
drafted a motion to quash the temporary stay and have the First Stay Motion remanded to the
Bankruptcy Court, which was granted by the District Court.  Concurrently, ST&G assisted the
Debtors in drafting an opposition to the First Stay Motion.  Tellingly, immediately after such
opposition was filed, the LPG withdrew the First Stay Motion.

30.     During January, 2007, ST&G was also assisting the Debtors in attempting
to dismiss the three appeals of the Confirmation Order on standing grounds.  These efforts
resulted in the dismissal of the appeal filed by USA Investment Partners, LLC ("USAIP").

31.     Without a stay in place, the Debtors and Compass were free to
consummate the Compass Sale.  Accordingly, on February 13, 2006, the Compass Sale closed,
and Compass assumed ownership of the FTDF loan portfolio.

32.     In the month following the closing of the Compass Sale, ST&G worked
diligently to represent the FTDF estate's interest in the two remaining appeals of the
Confirmation Order and to ensure that the Plan became effective.  On February 20, 2007, the
LPG again attempted to obtain a stay pending appeal of the Confirmation Order (the "Second
Stay Motion").  Once again, ST&G collaborated with the other professionals in the Chapter 11
Cases to successfully prevent a stay from being instituted, as this Court denied the Second Stay
Motion.  While the LPG then filed a motion in the District Court for a stay pending appeal of the

Confirmation Order (the "Third Stay Motion"), the Debtors and the Committees succeeded in making the Plan effective on March 12, 2007.

33.    Ultimately, the FTDF Committee, with ST&G's guidance, played an instrumental role in bringing about an extremely successful outcome for FTDF Members.  It is estimated that the  FTDF Members will recover in excess of 70% of their investments in FTDF within slightly more than a year of the filing of the Chapter 11 Cases.  As such, ST&G's contribution was key to both the significant return realized by the FTDF Members and the expediency of the resolution of the Chapter 11 Cases.

**E.    Professional Services Rendered**

34.    Set forth below is a chart that summarizes the fees that ST&G has incurred in providing services to the FTDF Committee during the Chapter 11 Cases and is organized by the categories established by the UST Guidelines for billing in these Chapter 11 cases.[14]

| Billing Category | Amount during First Fee Period | Amount during Second Fee Period | Total Amount |
|---|---|---|---|
| Case Administration – 010 | $109,866.00 | $109,757.00 | $219,623.00 |
| Meetings and Communications with Creditors – 020 | $169,906.00 | $136,294.00 | $306,200.00 |
| General Business Operations – 030 | $7,595.00 | $17,574.00 | $25,169.00 |
| Fee/Employment Applications – 040 | $33,024.50 | $55,388.50 | $88,413.00 |
| Fee/Employment Objections – 050 | $16,452.00 | $21,686.25 | $38,138.25 |
| Financing – 060 | $33,668.50 | $5,419.00 | $39,087.50 |
| Claims Administration & Objections – 070 | $11,685.50 | $94,055.50 | $105,741.00 |
| Asset Analysis and Recovery – 080 | $51,367.00 | $104,709.50 | $156,076.50 |
| Asset Disposition – 090 | $51,246.00 | $331,235.50 | $382,481.50 |

---

[14]    Some of the services rendered could reasonably be categorized in more than one of the billing categories.  Consequently, different attorneys sometimes billed their services on the same matter in different categories.  In no event were any time entries for a single task by one attorney duplicated.

413652v4                                                    17

| Billing Category | Amount during First Fee Period | Amount during Second Fee Period | Total Amount |
|---|---|---|---|
| Plan/Disclosure Statement – 100 | $45,388.00 | $685,511.50 | $730,899.50 |
| Employee Benefits/Plans – 110 | $0.00 | $6,197.50 | $6,197.50 |
| Litigation - 120 | $29,212.00 | $31,926.00 | $60,508.00 |
| Relief from Stay Proceedings – 125 | $3,928.00 | $2,306.50 | $6,234.50 |
| **Total** | **$563,338.50** | **$1,602,060.75** | **$2,165,399.25**[15] |

Detailed statements of professional services rendered and reimbursable expenses incurred for the Second Fee Period are attached respectively to the Parlen Declaration as Exhibits "1" and "2" and incorporated herein by reference.[16]  These statements are organized by the categories set forth below, and a narrative description of each such category as it relates to the Full Fee Period follows:

1. **Case Administration – 010**

35.     The "Case Administration" category includes services rendered in connection with organization, coordination, and compliance activities.  These activities include the planning and coordination among the FTDF Committee and its professionals, communications between ST&G and other parties in interest, and internal communications between professionals, regarding the status of the numerous matters encountered in these cases, the maintenance of administrative information and files, the rules governing the FTDF Committee, the prevention of conflicts of interest, and other miscellaneous necessary tasks that do not clearly fit within the scope of other activity categories.

---

[15] See footnote 3 supra.

[16] Such statements for the First Fee Period were attached to the First Interim Application as Exhibits 1 and 2.  So as not to burden the Court with unnecessary filings and in order to minimize the costs of this Application, they are not refiled along with this Application.

36.     ST&G diligently monitored the progress of the Chapter 11 Cases and kept the FTDF Committee organized and well-prepared throughout the Chapter 11 Cases.  In so doing, ST&G carefully monitored the dockets of the Chapter 11 Cases and maintained an internal case calendar and a comprehensive task list.  ST&G also conferred frequently with S&C and counsel for the Debtors and the Other Committees regarding the status of pending matters.

37.     ST&G was also responsible for serving nearly all of the pleadings filed by the FTDF Committee, and, as such, spent time in this category preparing for and executing service of dozens of pleadings and updating the Master Service List per numerous requests for special notice.  Moreover, ST&G has spent time in this category working with S&C to coordinate the filing of pleadings that ST&G has drafted on behalf of the FTDF Committee.

38.     Additionally, members of the ST&G team periodically conducted internal strategy or status conferences, as needed, to coordinate their efforts, update others on the status of pending matters and allocate responsibilities.  The frequency of such internal conferences varied depending on the fluctuating demands of the Chapter 11 Cases.  Because different matters that arose in the Chapter 11 Cases were assigned to different ST&G attorneys, status conferences were needed to ensure that all tasks were properly assigned and that no duplication of effort occurred.  In addition, status and strategy conferences enabled junior attorneys (with low billing rates) to coordinate with senior attorneys (with higher billing rates) to ensure that all attorneys were performing services appropriate to their respective billing rates.

39.     Some of the more time intensive tasks in this category also included assisting in the analysis of the Debtors' schedules and monthly operating reports and analyzing comprehensive memos drafted by S&C pertaining thereto.  Another time intensive task within this category is ST&G's participation in frequent conference calls hosted by the Debtors and in meetings among the Other Committee and Debtors.

40.     Furthermore, ST&G spent substantial time preparing for, traveling to, and appearing at omnibus hearings.[17]  Members of ST&G prepared for, and appeared at, omnibus

---

[17]     ST&G has not billed the FTDF Committee for non-working travel time.  During the First Fee Period, ST&G wrote off $19,067.50 in non-working travel time.  During the Second Fee

hearings typically twice each month.  A ST&G professional personally appeared at a particular hearing only when the active participation of that professional with respect to one or more matters at such hearing was required.  Preparation for such hearings included organizing and reviewing voluminous pleadings, conceptualizing oral arguments, and general strategizing about desired results.

41.     In the First Fee Period, ST&G spent a total of 318.4 hours rendering services in this category, for which it seeks compensation of $109,866.00.  In the Second Fee Period, ST&G spent a total of 348.8 hours rendering services in this category, for which it seeks compensation of $109,757.00.  In the Full Fee Period, ST&G spent a total of 667.2 hours rendering services in this category, for which it seeks compensation of $219,623.00.  It should be noted that in order to minimize fees, ST&G utilized associates, paralegals, law clerks, and file clerks to perform these services to the fullest extent possible.

**2.     Meetings and Communications with Creditors – 020**

42.     The "Meetings of and Communications with Creditors" category relates primarily to communications with the FTDF Committee, individual FTDF Committee members, individual members of FTDF, and counsel for the Other Committees.  When the subject matter of such communications is not predominantly or specifically attributable to another category, ST&G bills the related time expended to this category.

43.     During the Full Fee Period, ST&G spent a relatively significant amount of time communicating with members of the FTDF Committee because of its role as counsel to the FTDF Committee.  ST&G organized and attended (usually telephonically) frequent meetings of the FTDF Committee during the Full Fee Period, in addition to exchanging frequent telephone calls and correspondence with individual FTDF Committee members.  Additionally, ST&G communicated with FTDF Committee members as needed in between meetings to discuss matters that required immediate attention and could not be delayed until the next scheduled meeting.

---

Period, ST&G wrote off $50,270.00 in non-working travel time.

44.    During the First Fee Period, ST&G also attended two general meetings of creditors.  First, on May 17, 2006, ST&G attended the first meeting of creditors in Las Vegas, Nevada, along with a member of S&C.  Subsequently, on July 12, 1006, a member of ST&G prepared for and attended the Section 341(a) meeting of creditors in Las Vegas, Nevada.

45.    ST&G also spent a substantial amount of time in this category communicating with at-large members of FTDF.  Understandably, FTDF Members have had grave concerns throughout the Chapter 11 Cases about the status of their investments in FTDF. The overwhelming majority of FTDF Members have no legal background and are not represented by counsel in connection with the Chapter 11 Cases.  Such FTDF Members have initiated contact with ST&G to seek clarification on a wide range of issues, including but not limited to the timing and amount of distributions, information about the Compass Sale, the status of the Plan, tax issues relating to their investments in FTDF, and general information about the Chapter 11 Cases.  ST&G has channeled nearly all such communications to Andrew Parlen, the lowest billing ST&G attorney with substantial knowledge of the Chapter 11 Cases.

46.    Similarly, ST&G spent a substantial amount of time during the Full Fee Period communicating and attending meetings with the Other Committees' professionals.  Such communications were often driven by the FTDF Committee's desires to efficiently resolve issues in the Chapter 11 Cases (including the formulation and implementation of the Plan) and to coordinate activities among the various professionals in the Chapter 11 Cases so as to avoid duplication of effort and unnecessary administrative expenses.

47.    In a task that demanded substantial effort, ST&G, on behalf of the FTDF Committee, spearheaded the effort to negotiate and draft a joint motion seeking an order setting forth procedures by which the Committees could ensure that they were in compliance with the information access requirements 11 U.S.C. § 1102(b)(3)(A).  Initially, ST&G drafted such motion so as to apply only to the FTDF Committee, but when it became apparent that the Other Committees would likely be requesting similar relief and in accordance with this Court's directive not to duplicate efforts among the Committees, ST&G revised its draft motion to apply to all the Committees.  Substantial negotiations followed among the Committees and the Debtors

and, ultimately, on June 7, 2006, the FTDF Committee filed the "Joint Motion Of Official Committee Of Equity Security Holders Of USA Capital First Trust Deed Fund, LLC, The Official Committee Of Holders Of Executory Contract Rights Through USA Commercial Mortgage Company, The Official Committee Of Equity Security Holders Of USA Capital Diversified Trust Deed Fund, LLC, And The Official Unsecured Creditors' Committee For USA Commercial Mortgage Company Pursuant To 11 U.S.C. §§ 105(a), 107(b), 1102(b)(3)(A) And 1103(c), For Nunc Pro Tunc Order Clarifying Requirement To Provide Access To Information" (the "Joint Information Motion") [Docket no. 521]. In response to several oppositions to the Joint Information Motion, ST&G drafted, coordinated the revision of, and served a joint reply on behalf of the Committees [Docket no. 649]. Following a hearing on June 21, 2006, at which the Court orally granted the Joint Information Motion, ST&G drafted and coordinated the revision of the proposed order granting the Joint Information Motion, which order was entered by the Court on June 27, 2006 [Docket no. 803].

48.     Under the order granting the Joint Information Motion, the FTDF Committee was required to maintain a website providing access to certain information about the Chapter 11 Cases. ST&G was primarily responsible for maintaining website, which includes drafting summaries of major events in the Chapter 11 Cases and responding to FTDF Member inquiries. During the Full Fee Period, ST&G drafted and posted to the FTDF Committee website more than 25 case updates. These updates included posting summaries of the FTDF loan portfolio, notifying FTDF Members of pending distributions, explaining how to file proof of interest forms, conveying the rationale for the FTDF Committee's support of the sale of the FTDF loan portfolio, explaining the contours of the Plan in laymen's terms, summarizing the results of the Auction, and providing information about the Appeals, among other things.

49.     In the First Fee Period, ST&G spent a total of 364.6 hours rendering services in this category, for which it seeks compensation of $169,906.00. In the Second Fee Period, ST&G spent a total of 308.0 hours rendering services in this category, for which it seeks compensation of $136,294.00. In the Full Fee Period, ST&G spent a total of 672.6 hours rendering services in this category, for which it seeks compensation of $306,200.00.

**3.      General Business Operations – 030**

50.      Advocating for the interests of the FTDF Members has required ST&G's limited involvement in some of the Debtors' general business operations, particularly related to tax issues.  Among other things, ST&G spent time in this category analyzing various agreements that are critical to the operations of the FTDF, including the servicing agreement between the FTDF and USACM, the FTDF's operating agreement, and the FTDF's subscription agreements. Additionally, ST&G dedicated efforts to understanding the general business model of the Debtors and how the Debtors' management planned to operate the Debtors during the Chapter 11 Cases.  ST&G also conferred internally, with members of the FTDF Committee and with the Debtors regarding the need for the Debtors to provide statements to investors and the form such statements should take.

51.      Much of time spent by ST&G in this category relates to the tax treatment to be afforded to FTDF in light of its chapter 11 bankruptcy expenses, the potential write down of individual loans, the sale of its loan portfolio, and its dissolution.  Such services were necessary in order to ensure that FTDF Members received properly prepared and timely K-1 forms for 2006.  ST&G also spent time in this category negotiating the amount of management fees that FTDF was required to pay on account of services rendered by Mesirow Financial Interim Management, LLC, the Debtors' crisis manager in the Chapter 11 Cases.

52.      In the First Fee Period, ST&G spent a total of 14.1 hours rendering services in this category, for which it seeks compensation of $7,595.00.  In the Second Fee Period, ST&G spent a total of 30.4 hours rendering services in this category, for which it seeks compensation of $17,574.00.  In the Full Fee Period, ST&G spent a total of 44.5 hours rendering services in this category, for which it seeks compensation of $21,169.00.

**4.      Fee/Employment Applications – 040**

53.      This category includes services rendered in connection with preparing and/or reviewing applications to employ professionals in the Chapter 11 Cases and preparing/reviewing fee applications and monthly fee statements.

54.      During the First Fee Period, ST&G prepared the ST&G Employment

1   Application, the amendment thereto, and the order granting the ST&G Employment Application

2   as amended.[18]  Additionally, ST&G assisted S&C in the preparation of pro hac vice applications

3   and prepared monthly fee statements on its own behalf.  Subsequently, ST&G also worked with

4   Debtors' counsel to draft an application by which the FTDF requested that the Court employ

5   ST&G as special counsel to the FTDF in connection with an interpleader action brought by

6   USACM in which the FTDF was a defendant.

7       55. ST&G also assisted in the FTDF Committee in selecting a firm to act as

8   financial advisor to the FTDF Committee.  Once the FTDF Committee elected to employ

9   Alvarez & Marsal LLC ("A&M") as its financial advisor, ST&G assisted in the preparation of

10  A&M's retention documents, employment application, and employment order.

11      56. Additionally, ST&G spent time in this category reviewing the employment

12  applications and terms of retention of the other professionals in the Chapter 11 Cases.  To the

13  extent that the FTDF Committee elected to respond to or oppose any employment application,

14  time was billed in the "Fee/Employment Objections" category, which category is summarized

15  below.

16      57. Also included in this category is time related to analyzing the "Debtors'

17  Application for Administrative Order Establishing Procedures for Interim Compensation and

18  Reimbursement of Expenses of Professionals" [Docket no. 570], assisting the DTDF Committee

19  in drafting a joint response to such motion, and in negotiating the proposed interim compensation

20  procedures with the Debtors.

21      58. Most of the time spent by ST&G in this category related to preparing and

22  reviewing interim fee applications and monthly fee statements.  ST&G prepared and filed the

23  First Interim Application and assisted A&M in drafting and filing its first interim fee application

24  [Docket No. 1210].  Additionally, ST&G reviewed all of the other interim fee applications filed

25  by professionals in the Chapter 11 Cases, paying particular attention to the fee applications filed

26  by the Debtors' Professionals and how such applications allocated fees and expenses to the FTDF

27  _____

28  [18] ST&G has not billed for any time spent negotiating the joint retention of ST&G by the three
  Investor Committees.

413652v4     24

estate.  Furthermore, ST&G prepared the "First Interim Application of the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC for Reimbursement of Expenses of Committee Members for the Period from May 10, 2006 Through July 31, 2006" [Docket No. 1240], by which the FTDF Committee sought to have the FTDF estate reimburse FTDF Committee members for expenses incurred in connection with services rendered as FTDF Committee members.

59.     Similarly, beginning in July 2006, ST&G prepared its monthly fee statements on a monthly basis, while also assisting A&M in the preparation of its monthly statements.  On several occasions, the U.S. Trustee objected to one of these monthly statements, and, in turn, ST&G negotiated and documented resolutions with the U.S. Trustee to such objections. Additionally, on a monthly basis, ST&G also analyzed the monthly fee statements of other professionals in the Chapter 11 Cases, paying particular attention to the monthly fee statements submitted by the Debtors' Professionals and how such statements allocated fees and expenses to the FTDF estate.

60.     Time spent was also spent within this category with respect to preparing and analyzing various pleadings related to employment of professionals in the Chapter 11 Cases. For example, ST&G prepared supplemental Rule 2014 statements for ST&G [Docket No. 1976] and for A&M [Docket No. 1724], and analyzed numerous 2014 statements filed by counsel for other parties in interest, particularly those filed by Alan R. Smith [Docket Nos. 1967 and 2196] and Jones Vargas [Docket Nos. 1204, 1275, 2320, and 2695].  Similarly, ST&G prepared three stipulations modifying the Interim Compensation Order [Docket Nos. 2275, 2708, and 3001].

61.     To minimize fees, most of the time billed in this category on account of fee statements/applications was incurred by associates.  In the First Fee Period, ST&G spent a total of 78.6 hours rendering services in this category, for which it seeks compensation of $33,024.50.  In the Second Fee Period, ST&G spent a total of 150.4 hours rendering services in this category, for which it seeks compensation of $55,388.50.  In the Full Fee Period, ST&G spent a total of 229 hours rendering services in this category, for which it seeks compensation of $88,413.00.

5.       **Fee/Employment Objections – 050**

62.      During the First Fee Period, ST&G closely reviewed the employment applications of the professionals in the Chapter 11 Cases and, when necessary, provided comments early to engage the Debtors and/or applicable Other Committee in a process aimed at eliminating the need for the FTDF Committee to file formal objections.  Although these efforts do not appear on the Court's docket, they reduced the total fees incurred by the Debtors' estates.  In the few instances in which professional applicants did not amend the proposed terms of their employment or otherwise alleviate the FTDF Committee's concerns, ST&G prepared oppositions and/or responses to the employment applications of such professionals.  In particular, ST&G drafted limited oppositions to the employment applications of (1) Hilco Real Estate LLC as the Debtors' real estate appraiser [Docket no. 379] and (2) Gordon & Silver, Ltd. as counsel to the Direct Lender Committee [Docket no. 447].

63.      In another example of the FTDF Committee working together with the Other Committees to streamline efforts and minimize costs when possible, ST&G drafted a joint omnibus response to the continued employment of the Debtors' professionals on behalf of the FTDF Committee, the DTDF Committee, and the Direct Lender Committee [Docket no. 944].

64.      ST&G also spent time in this category analyzing and responding to objections to the ST&G Employment Application.

65.      During the Chapter 11 Cases, ST&G spent much of the time in this category analyzing and negotiating the portion of the fees of the Debtors' Professionals that were properly allocable to the FTDF estate.  In particular, the USACM Committee, in the "Official Unsecured Creditors' Committee's Objection to Debtors' Professionals' Fee Applications" [Docket No. 1307], took the position that the interim fee applications of the Debtors' Professionals did not allocate enough of the fees and expenses of the Debtors' Professionals to estates other than the USACM estate, including the FTDF estate.  Indeed, the USACM Committee sought to allocate at least $300,000 of the Debtors' Professionals' fees and expenses per month to FTDF.  ST&G, on behalf of the FTDF Committee, conducted an in depth analysis of the Debtors' Professionals fees that revealed flaws in the USACM Committee's approach and

then drafted a reply brief in support of the FTDF Committee's position that the USACM

Committee's approach should not be adopted.  After intense negotiations, the USACM

Committee agreed not to seek reallocation of the Debtors' Professionals' fees at the September

27, 2006 hearing on the matter, but rather, to resolve its issues in the context of plan

negotiations.  The parties ultimately reached a resolution of this issue that was incorporated into

the Plan whereby FTDF agreed to pay $125,000.00 of the Debtors' Professionals' fees and costs

from the Petition Date through January 31, 2007.

66.     In a related matter, during October 2006, ST&G also spent time in this

category negotiating, analyzing, and revising drafts of the orders approving the first interim fee

applications of the Debtors' Professionals.

67.     To minimize fees, most of the time billed in this category was incurred by

associates.  In the First Fee Period, ST&G spent a total of 45.1 hours rendering services in this

category, for which it seeks compensation of $16,452.00.  In the Second Fee Period, ST&G spent

a total of 57.8 hours rendering services in this category, for which it seeks compensation of

$21,686.25.  In the Full Fee Period, ST&G spent a total of 102.9 hours rendering services in this

category, for which it seeks compensation of $38,138.25.

**6.     Financing – 060**

68.     This category includes services rendered by ST&G in analyzing the

Debtors' financing.

69.     During the First Fee Period, the Debtors sought approval of three different

cash management budgets.  ST&G, on behalf of the FTDF Committee, evaluated each budget

filed by the Debtors and discussed potential deficiencies with the FTDF Committee's financial

advisor.  After consultation with counsel for the DTDF Committee, ST&G took the lead in

preparing joint objections to each of these three budgets.  In response to the objections raised by

the Fund Committees, the Debtors revised their budgets to reflect the fact that no monies that

were collected on account of "pre-paid interest" would be used by the Debtors without a further

Court order.  In addition, the Debtors also revised their budgets to reflect appropriate accruals

and payments to professionals of the Debtors' estates, among other line items.

70.     Also, during the First Fee Period, the Debtors sought to obtain debtor-in-possession financing ("DIP Financing").  In connection therewith, the Debtors first requested Court authority to pay the due diligence expenses of various parties who had expressed an interest in providing the Debtors with DIP Financing.  ST&G, on behalf of the FTDF Committee, opposed this relief and the Court did not allow the Debtors to pay these due diligence expenses.  The Debtors, then, filed a motion seeking Court approval of DIP Financing.  ST&G, working together with S&C, filed an opposition to this motion, in which it argued that the Debtors had yet to prove any need for DIP Financing and had failed to finalize any terms of the proposed DIP Financing.  The Court did not approve the Debtors' proposed DIP Financing and continued the hearing thereon.  The Debtors subsequently abandoned their efforts to seek approval of DIP Financing.

71.     During the Second Fee Period, the Debtors sought approval for the continued use of cash through October 29, 2006 [Docket No. 846] and, subsequently through January 31, 2007 [Docket No. 1451] pursuant to budgets filed by the Debtors.  ST&G, on behalf of the FTDF Committee, evaluated each budget filed by the Debtors and discussed potential deficiencies with the FTDF Committee's financial advisor.  With respect to the motion seeking approval of the use of cash through January 31, 2007, ST&G drafted a limited response pointing out deficiencies in the Debtors' motion and budget, particularly concerning professional and management fees to be paid by FTDF.  The Court granted the motion subject to the parties resolving their issues in the proposed order, which has not yet been submitted to the Court.

72.     In the First Fee Period, ST&G spent a total of 71.3 hours rendering services in this category, for which it seeks compensation of $33,668.50.  In the Second Fee Period, ST&G spent a total of 11.4 hours rendering services in this category, for which it seeks compensation of $5,419.00.  In the Full Fee Period, ST&G spent a total of 82.7 hours rendering services in this category, for which it seeks compensation of $39,087.50.

**7.     Claims Administration & Objections – 070**

73.     The "Claims Administration & Objections" category refers to services ST&G rendered in its analysis of claims against the FTDF and in filing objections to such

1    claims.  In order to minimize the delay that the claims objection process would have on making

2    distributions to FTDF Members upon the closing of the Compass Sale, ST&G, in conjunction

3    with S&C, took the initiative of objecting to proofs of claim and proof of interest filed in the

4    FTDF case well before the Effective Date.  ST&G knew that this task had particular importance

5    in the FTDF case because under the Plan, general unsecured claims against FTDF would be paid

6    in full.  As a part of this process, ST&G frequently and copiously reviewed FTDF's claims

7    register and analyzed all scheduled and filed proofs of claim and proofs of interest in the FTDF

8    case.

9            74.    During the Full Fee Period, the ST&G prepared eight omnibus

10   claim/interest objections, as follows:

- Omnibus Objection of the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC to Misfiled Claims [Docket No. 1064];

- Omnibus Objection of the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC to Claims Based on Prepetition Equity Security Interests of USA Capital First Trust Deed Fund, LLC [Docket No. 1066];

- Second Omnibus Objection of the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC to Misfiled Claims [Docket No. 2285];

- Omnibus Objection of the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC to Claims Superseded by Compromise Contained in Debtors' Third Amended Joint Chapter 11 Plan of Reorganization [Docket No. 2295];

- Fifth Omnibus Objection of the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC – Misfiled Claims [Docket No. 2745];

- Sixth Omnibus Objection of the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC – Claims Based on Prepetition Equity Security Interests of USA Capital First Trust Deed Fund, LLC [Docket No. 2748];

- Seventh Omnibus Objection of the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC – Amount of Proofs of Interest [Docket No. 2754]; and

- Eighth Omnibus Objection of the Official Committee of Equity Security

Holders of USA Capital First Trust Deed Fund, LLC – Proofs of Claim and Proofs of Interest Filed by Members of USA Capital First Trust Deed Fund, LLC Who Filed Both Proofs of Claim and Proofs of Interest [Docket No. 2758].

75.     Additionally, ST&G also prepared a claim objection to a litigation claim filed against the FTDF for $20 million [Docket No. 1068], and the claim was subsequently withdrawn.  Furthermore, ST&G conducted research and assisted the Debtors' Professionals' in objecting to the three claims totaling at least $2 million filed by the Pension Benefit Guaranty Corporation ("PBGC") against FTDF.  Following FTDF's objection to the PBGC's claims, ST&G drafted a joinder thereto [Docket No. 2419].  Subsequently, the PBGC withdrew its claims against FTDF.

76.     Preparing each of these objections and the notices thereof was an extremely time intensive task.  In addition to drafting the actual pleadings, ST&G spent time conferring with the Debtors' Professionals and BMC Group about each of the claims filed against FTDF, researching various legal issues, and ensuring that service of the objections was properly effected.  On account of ST&G's efforts, all but three proofs of claim and proofs of interest in the FTDF case that merited objection were resolved as of March, 2007.

77.     Within this category, ST&G also spent a substantial amount of time corresponding and conferring with various claimants and interest holders about the status of the various claim objections as well as the process for filing proofs of claim and proofs of interest.  Indeed, in order to assist FTDF Members in this process, ST&G drafted instructions explaining how to file proofs of claim in the Chapter 11 Cases and posted such instructions on the FTDF Committee website.

78.     To minimize fees, most of the time billed in this category was incurred by associates, law clerks, and paralegals.  In the First Fee Period, ST&G spent a total of 43.4 hours rendering services in this category, for which it seeks compensation of $11,685.50.  In the Second Fee Period, ST&G spent a total of 240.9 hours rendering services in this category, for which it seeks compensation of $94,055.50.  In the Full Fee Period, ST&G spent a total of 284.3 hours rendering services in this category, for which it seeks compensation of $105,741.00.

413652v4

30

1

    **8.    Asset Analysis and Recovery – 080**

2        79.    This category includes services rendered in connection with ST&G's

3    investigation and review of the assets of the FTDF and, at times, the other Debtors, to the extent

4    such activities did not at the time relate to potential litigation.  One of the tasks to which ST&G

5    devoted substantial time in this category was with respect to the collection and analysis of

6    information relative to the FTDF loan portfolio in order to assess the size and nature of the

7    FTDF's assets.  Similarly, ST&G spent time in this category discussing proposals to provide

8    additional funding to certain borrowers with the FTDF Committee, as well as the Debtors and the

9    Other Committees.

10        80.    Additionally, ST&G dedicated effort in this category to reviewing,

11    analyzing, and, when necessary, responding both formally and informally to, among other

12    motions and related pleadings, the "Countermotion for Sequestering or Alternatively for Release

13    of Funds and for Revocation of Power of Attorney" [Docket No. 58], the "Debtors' Motion to

14    Temporarily Hold Funds Pending a Determination of the Proper Recipients" [Docket No. 173],

15    the "Debtors' Motion for Order Approving Agreement with Investment Partners" [Docket No.

16    575], and the "Motion for Authority to Forbear and Provide Further Funding for Certain

17    Outstanding Loans" [Docket No. 592].  In particular, ST&G sought to determine the impact that

18    such motions, if granted, would have on the FTDF's assets and, in turn, worked diligently to

19    ensure that the relief requested, if granted, would either benefit or have no impact upon the

20    FTDF's assets.

21        81.    ST&G spent substantial time analyzing and conducting legal research with

22    respect to the loan servicing agreements governing the relationship between Direct Lenders and

23    USACM (the "Loan Servicing Agreements") and the proper treatment thereof under the

24    Bankruptcy Code and applicable state law.  This analysis and research was shared with the

25    Debtors and the Other Committees and became the basis for the treatment of the Loan Servicing

26    Agreements under the Plan.  Indeed, ST&G's internal legal memorandum on the legal

27    characterization of the Loan Servicing Agreements became an integral part of the Debtors'

28    pleadings in support of the Plan.

413652v4                                    31

82.     This category also contains a significant amount of time related to analyzing and researching the proper tax treatment of the FTDF portfolio in light of its non-performing loans and its disposition through the Compass Sale.  The FTDF Committee strongly believed that it needed to be fully informed as to the tax ramifications that various courses of action would have on FTDF Members.  To that end, ST&G analyzed the federal income tax consequences to FTDF and its members of various alternative plan structures.  In addition, ST&G analyzed the federal income tax consequences of distributions made by FTDF to its members during the course of 2006 under the terms of the FTDF operating agreement.  ST&G evaluated the propriety of claiming a partial bad debt deduction with respect to loans in the FTDF portfolio and provided tax advice and guidance in that regard.

83.     Time was also spent in this category analyzing the effect that the Debtors' motion to modify certain loans in which FTDF had an interest [Docket No. 1434].  The FTDF Committee believed that the relief requested in the motion would, if granted, give the Debtors too much authority to modify certain loans.  ST&G drafted a limited objection on behalf of the FTDF Committee [Docket No. 1629], and all of the FTDF Committee's concerns subsequently were addressed.

84.     Finally, in connection with the finalizing the Silver Point APA, ST&G, along with S&C, spent substantial time analyzing the loan documents and title reports relating to the FTDF loan portfolio.  Such diligence was necessary in order to ensure that a stalking horse bid was finalized so that the sale process could move forward. This was an extremely time intensive and laborious task, which was performed almost completely by ST&G associates.

85.     In the First Fee Period, ST&G spent a total of 118.3 hours rendering services in this category, for which it seeks compensation of $51,367.00.  In the Second Fee Period, ST&G spent a total of 240.1 hours rendering services in this category, for which it seeks compensation of $104,709.50.  In the Full Fee Period, ST&G spent a total of 358.4 hours rendering services in this category, for which it seeks compensation of $156,076.50.

**9.     Asset Disposition – 090**

86.     Within this category, ST&G analyzed various documents, pleadings, data,

1   and correspondence and communicated frequently with the FTDF Committee, the Debtors, and

2   the Other Committees concerning the potential disposition of the Debtors' assets.  Most services

3   rendered by ST&G within this category early in the Chapter 11 Cases involved issues pertaining

4   to the treatment of principal and interest payments received by USACM after the Petition Date.

5   Specifically, ST&G spent substantial time researching how such funds should be treated under

6   applicable caselaw, analyzing how the treatment of the funds would affect the FTDF and the

7   FTDF Members, and discussing various alternatives for the treatment of the funds with the

8   FTDF Committee, its professionals, the Debtors, and the Other Committees.

9          87.    On behalf of the FTDF Committee, ST&G shared portions of its research

10   with the Debtors so as to assist the Debtors in drafting the "Debtors' Motion to Distribute Funds

11   and to Grant Ordinary-Course Releases and Distribute Proceeds" (the "Motion to Distribute")

12   [Docket No. 847].  ST&G was also instrumental in negotiating with the Debtors to ensure that

13   the Motion to Distribute included a request that distributions to FTDF Members, as opposed to

14   just the FTDF, be authorized.  In fact, ST&G, along with counsel to the DTDF Committee, took

15   primary responsibility for drafting the argument section on making distributions available to the

16   fund members.  Following the filing of the Motion to Distribute, ST&G drafted a brief in

17   response to the Motion to Distribute and analyzed the numerous responsive pleadings that other

18   parties in interest filed with respect to the Motion to Distribute.  Subsequently, in order to

19   emphasize the importance to the FTDF Committee and its constituency of the relief requested in

20   the Motion to Distribute, ST&G drafted a reply brief addressing the various responsive pleadings

21   that had been filed in opposition to the Motion to Distribute.

22          88.    Thereafter, ST&G assisted in formulating the methodology set forth in the

23   "Debtors' Modification to Motion to Distribute Funds and Proposed Procedures for Ongoing

24   Distributions" [Docket No. 1203].  ST&G's concerted efforts with respect to the Motion to

25   Distribute and the modification thereto helped result in the Court's order granting the Motion to

26   Distribute, which was entered on August 24, 2006 [Docket No. 1124], and the order granting the

27   modification to the Motion to Distribute, which was entered on October 2, 2006 [Docket No.

28   1424].  The relief granted was crucial at the time because it not only allowed USACM to transfer

1  funds to FTDF in its capacity as a Direct Lender, but, more importantly, permitted FTDF to

2  make distributions in August and October 2006 in the aggregate amount of over $1.5 million to

3  FTDF Members, many of whom were in desperate need of the funds.  Notably, before such

4  distributions were made, ST&G worked with A&M and the Debtors to ensure that the proper

5  distribution mechanics under the FTDF Operating Agreement were used in making distributions

6  to FTDF Members.

7          89.     Most of the time spent by ST&G in this category relates to achieving the

8  sale of the FTDF loan portfolio, which ultimately resulted in the Compass Sale.  At the outset,

9  ST&G dedicated its efforts to analyzing and strategizing the ramifications of a potential sale of

10  the FTDF's portfolio.  Once the FTDF Committee determined that selling the FTDF's loan

11  portfolio was a viable exit strategy, ST&G, in conjunction with S&C and A&M and the Debtors,

12  began the process of negotiating with various potential purchasers.  Eventually, the FTDF

13  Committee determined that Silver Point would be the best available stalking horse bidder.  To

14  that end, ST&G, on behalf of the FTDF Committee, negotiated and documented a term sheet

15  with Silver Point.  With a term sheet in place, the Debtors were able to enter the Silver Point

16  LOI, which ST&G negotiated and revised.  Under the Silver Point LOI, FTDF would receive a

17  minimum of $46,500,000 for its loan portfolio, which would represent a return to FTDF of

18  approximately 73%.  ST&G negotiated with Silver Point to provide built-in price increases in the

19  Silver Point LOI that would enhance the recovery to FTDF to the extent that principal payments

20  on FTDF loans were received between August 1, 2006 and the closing of the sale.  These

21  adjustments provided for only a partial reduction in the purchase price (ranging from 65% to

22  95% of the principal collected) for each dollar of principal collected prior to the close of the sale.

23  As a result of these price increases, FTDF received approximately $2 million in additional sale

24  proceeds.

25          90.     The sale of FTDF's loan portfolio was subject to an auction.  In that vein,

26  ST&G drafted the bid procedures to govern the auction of the FTDF assets and assisted in

27  drafting the motion seeking approval of the bid procedures (the "Bid Procedures Motion") and in

28  the reply to objections thereto [Docket Nos. 1352 and 1572].  ST&G devoted a particularly

significant amount of time to conducting research in support of and drafting portions of the reply brief in support of the Bid Procedures Motion.  Shortly after the Bid Procedures Motion was filed, the Silver Point APA (negotiated among the Debtors, Silver Point, and ST&G, on behalf of the FTDF Committee) was finalized and filed [Docket No. 1603].  The Court heard the Bid Procedures Motion at hearings on October 19, 2006 and October 25, 2006, but was unsatisfied with certain aspects of the Silver Point APA.  Accordingly, ST&G, along with S&C and A&M, worked with Silver Point and the Debtors to revise the Silver Point APA.  After extensive negotiations and multiple drafts, a revised version of the Silver Point APA was filed on November 7, 2006 [Docket No. 1750] and, the following day, the Court approved the Bid Procedures Motion; ST&G also assisted in preparing the order granting the Bid Procedures Motion [Docket No. 1761].

91.    Once the bid procedures and the Silver Point APA (on a stalking horse basis) were approved, ST&G became increasingly involved in the effort to solicit other bidders so that there would be a competitive auction for the FTDF loan portfolio.  On November 30, 2006, two additional bidders – Compass and Desert Capital Real Estate Investment Trust, Inc. ("Desert Capital") – submitted bids for the Purchased Assets.  ST&G, with S&C's and A&M's assistance, analyzed the bids to determine whether they were indeed qualifying bids.  Ultimately, both Compass and Desert Capital were determined to have submitted qualifying bids, setting the stage for a competitive auction on December 7, 2006.

92.    Leading up to the December 7, 2006, ST&G was instrumental in working with the Debtors and the potential bidders to ensure that the submitted bids were in conformity with the requirements of the Court-approved bid procedures.  Additionally, when it became clear that Compass was intent on bidding for more assets of USACM than had been included in the Silver Point APA, ST&G worked with Silver Point and Desert Capital to modify their bids and thereby ensure that a competitive auction would take place.

93.    On December 7, 2006, the Auction took place.  At the Auction, ST&G took an active role both on and off the record.  ST&G was instrumental in analyzing and resolving numerous issues arose throughout the day that posed difficult questions as to the

1   relative values of the three bidders' bids. Ultimately, Compass prevailed at the Auction with a bid

2   of $67 million.  ST&G, with S&C's assistance, then assisted in drafting the final asset purchase

3   agreement between Compass and the Debtors [Docket No. 2164].

4      94. Following the Auction, ST&G devoted substantial time to ensuring that

5   the Compass Sale did indeed close.  ST&G's services in this regard related to making sure that

6   purchase price adjustments on account of loan payoffs were made correctly and dealing with

7   issues pertaining to Compass' obtaining the appropriate license from the state of Nevada.  ST&G

8   also reviewed and revised various documents relating to the closing of the Compass Sale.

9   Finally, on February 13, 2007, ST&G participated in meetings in Las Vegas at which ST&G

10  assisted in finalizing the closing of the Compass Sale.

11     95. From the closing of the Compass Sale through the Effective Date, most of

12  ST&G's time in this category was spent addressing how to most expeditiously, yet accurately,

13  distribute the proceeds of the Compass Sale to FTDF Members.  ST&G worked with the Debtors

14  to identify how much of FTDF's funds need to be reserved for post-Effective Date services

15  relating to winding down FTDF, handling claims objections, and representing FTDF in the

16  pending appeals.  Additionally, in response to certain disputes with Compass and the USACM

17  Committee, ST&G has negotiated agreements whereby certain funds have been placed in escrow

18  pending resolution of the underlying issues.  With such accommodations made, approximately

19  $17 million (representing only pre-closing principal and interest collections on FTDF loans) was

20  distributed to FTDF Members shortly after the Effective Date, and ST&G believes that another

21  larger distribution of sale proceeds is imminent.

22     96. In the First Fee Period, ST&G spent a total of 142.3 hours rendering

23  services in this category, for which it seeks compensation of $51,246.00.  In the Second Fee

24  Period, ST&G spent a total of 726.4 hours rendering services in this category, for which it seeks

25  compensation of $331,235.50.  In the Full Fee Period, ST&G spent a total of 868.7 hours

26  rendering services in this category, for which it seeks compensation of $382,481.00.

27    **10.** **Plan/Disclosure Statement – 100**

28     97. The "Plan/Disclosure Statement" category relates to services ST&G

413652v4    36

1  rendered both in participating in the plan process and in planning a resolution to the Chapter 11

2  Cases that will achieve an optimal recovery for the FTDF Members.  ST&G has dedicated

3  substantial resources to identifying and analyzing exit strategies and plan structures that would

4  net the greatest return to FTDF Members.  To that end, ST&G has expended a relatively

5  significant amount of time analyzing prospective plan structures, communicating the resulting

6  theories to the FTDF Committee, and evaluating potential exit strategies.  These efforts have

7  entailed extensive research and collaboration with the FTDF Committee's other professionals.

8  Early in the Chapter 11 Cases, ST&G has also participated in several meetings with other

9  constituencies in the Chapter 11 Cases regarding potential options for resolving the Chapter 11

10  Cases, including meetings on July 11, 2006 and July 20, 2006.

11        98.    As ST&G and the FTDF Committee explored various exit strategies for

12  these cases, including replacement loan servicers for the FTDF loans or all of the Debtors' loans,

13  obtaining financing for an internal reorganization, and sale scenarios, it soon became clear that

14  the sale scenarios (a sale of the FTDF portfolio interests coupled with the USACM servicing

15  operations) would generate the most value for the FTDF Members.  Given this framework, in

16  August 2006, ST&G and the FTDF Committee began formulating a Joint Term Sheet based on

17  this sale scenario.  The FTDF Committee and ST&G finalized a draft of the Joint Term Sheet

18  and initially met with and negotiated the Joint Term Sheet with the Direct Lender Committee.

19  The two Committees (along with their counsel) refined and agreed in principle on the Joint Term

20  Sheet.  This Joint Term Sheet became the basis for the Plan that was ultimately confirmed by the

21  Court.

22        99.    ST&G and the FTDF Committee circulated the Joint Term Sheet to the

23  Debtors, the DTDF Committee and the USACM Committee.  The parties exchanged numerous

24  drafts and engaged in myriad conference calls as well as in person meetings regarding the Joint

25  Term Sheet.  These efforts by ST&G resulted in agreements between the FTDF and every other

26  Debtor constituency in these cases as well as mutual releases with the Direct Lenders as reflected

27  in the confirmed Plan.

28

100.    While the efforts on the Joint Term Sheet were ongoing, the Debtors' initial plan filing exclusivity was due to expire.  In order to ensure that the plan process moved expeditiously, ST&G, on behalf of the FTDF Committee, advised the Debtors that the FTDF Committee would agree to a short extension but that no further extension could occur without consent of all four Committees.  An exclusivity stipulation to this effect was drafted and reviewed by ST&G, and approved by the Court [Docket No. 1728].

101.    The Committees and the Debtors were unable to agree on a joint plan before the stipulated exclusivity period expired and the FTDF Committee would not consent to a further extension of exclusivity. Accordingly, the Debtors filed their initial liquidating plan and accompanying disclosure statement (the "Initial Plan" and the "Disclosure Statement") [Docket Nos. 1310 and 1309] prior to the expiration of the plan exclusivity deadline.  ST&G analyzed the Initial Plan and, along with the FTDF Committee, concluded that a plan based on the Joint Term Sheet would be more likely to be supported by the Committees and ultimately confirmed by the Court.  Accordingly, ST&G drafted a plan based on the Joint Term Sheet (the "FTDF Committee Plan Draft").  The FTDF Committee Plan Draft (containing the terms of the Joint Term Sheet) was incorporated in to the Debtors' later plan drafts and became the integral part of the Plan confirmed by the Court.

102.    The Debtors modified their Initial Plan and Disclosure Statement several times.  ST&G analyzed these modifications and made revisions as necessary.  With respect to the Disclosure Statement, ST&G made many suggested revisions, including, in particular to the tax disclosure section, so that the FTDF Members would better understand the tax effects of the Plan and sale transaction.  Further, because the sale transaction was included in the Plan, ST&G worked closely with the Silver Point (the stalking horse bidder) to ensure that the transaction and related approval process was accurately provided for in the Plan.  ST&G solicited and reviewed Plan revisions from Silver Point as well as participating in conference calls with Silver Point on these issues.

103.    In connection with the filing and confirmation of the Plan, ST&G, on behalf of the FTDF Committee, prepared for and participated at the hearing on approval of the

1    Disclosure Statement on November 13, 2006.  ST&G also assisted the Debtors to ensure that

2    functional solicitation and confirmation procedures were proposed and adopted by the Court.  In

3    this regard, ST&G assisted the Debtors in drafting ballots, voting procedures and the Disclosure

4    Statement order, among others tasks.

5              104.    During the time the Debtors were soliciting votes on the Plan, Donna

6    Cangelosi attempted to improperly solicit rejection votes on the Plan (the "Cangelosi

7    Solicitation").  ST&G, along with the counsel for the Other Committees, worked together to

8    approve an additional disclosure to post on the official committee websites and email or mail to

9    parties voting on the Plan in order to clarify the issues raised in the Cangelosi Solicitation.  This

10   joint effort among counsel for all of the Committees involved the drafting of an emergency

11   motion [Docket No. 1850] and related pleadings as well as the actual clarifying disclosure.  The

12   Court approved the clarifying disclosure and the Committees disseminated the disclosure to their

13   various constituencies.

14             105.    As Plan confirmation approached, ST&G reviewed and revised the many

15   Plan exhibits to be filed shortly before the confirmation hearing including the USACM

16   Liquidating Trust Agreement (the "USACM Trust") (since the FTDF Members are beneficiaries

17   of the USACM Trust) as well as drafted the Disbursing Agent Agreement for the USACM Trust

18   to serve as disbursing agent for FTDF Members to the extent there are distributions to the

19   members after FTDF dissolves under the Plan.  ST&G also monitored the Ballot Tabulation

20   Analysis through the Plan voting deadline.

21             106.    ST&G reviewed the many confirmation objections as well as the motions

22   for temporary allowance of claims for voting purposes and other confirmation related pleadings.

23   ST&G worked with counsel for the Debtors to draft the memorandum in support of confirmation

24   and reviewed the draft declarations to be filed in support of confirmation.  In addition, ST&G

25   worked with the Other Committees and the Debtors to prepare a reply brief that responded to all

26   of the objections to confirmation [Docket No. 2148].  This joint effort on behalf of the

27   Committees (as well as many other joint efforts in these cases) resulted in significant cost

28   savings for the estates.

107.    ST&G prepared for confirmation and participated at the two-day confirmation hearings on behalf of the FTDF Committee.  Despite the many objections to the Plan, the Court confirmed the Plan at the close of the confirmation hearing on December 20, 2007.

108.    ST&G also drafted the initial drafts of the Confirmation Order and the related Confirmation Findings and Conclusions [Docket Nos. 2376 and 2377].  These were circulated to the Debtors, the Committees, and Compass, as well as the parties that objected to confirmation of the Plan.  ST&G assisted in the negotiation of the Confirmation Order and the Confirmation Findings and Conclusions with the various parties.  After a hearing (at which ST&G participated), the Court entered and approved the Confirmation Order and the Confirmation Findings and Conclusions on January 8, 2007.

109.    Within the 10-day appeal period, three parties in interest filed notices of appeal of the Confirmation Order: (1) the LPG; (2) USAIP; and (3) Debt Acquisition Corporation of America ("DACA").  The LPG filed the First Stay Motion with the BAP (rather than the Bankruptcy Court) shortly after filing its notice of appeal.  The BAP granted a temporary stay under the LPG Stay Motion and the Debtors and the Committees moved the LPG Appeal to the District Court.  ST&G drafted a motion to quash the First Stay Motion on the grounds that the First Stay Motion should have been filed before the Bankruptcy Court, which the Other Committees and the Debtors reviewed, revised and joined.  After a hearing held by the District Court at which ST&G appeared, the District Court granted the motion to quash and transferred the First Stay Motion to be heard by the Bankruptcy Court.  ST&G drafted the initial version of the substantive brief in opposition to the First Stay Motion [Docket No. 2524].  However, the LPG elected not to pursue the First Stay Motion with the Bankruptcy Court at that time.

110.    ST&G, on behalf of the Committee, analyzed the various pleadings and documents filed regarding the three appeals.  In addition, ST&G suggested that the Debtors and the Committees file a motion to dismiss the USAIP appeal on standing grounds.  ST&G assisted the Debtors with drafting the motion to dismiss the USAIP appeal, and ST&G then appeared at

1    the hearing on the motion to dismiss.  Subsequently, the District Court dismissed the USAIP

2    Appeal.  Similar motions to dismiss were filed for the LPG and DACA appeals.  ST&G reviewed

3    those motions and appeared at the hearings where the District Court declined to grant these

4    motions without prejudice.

5           111.    After the Compass Sale closed, the LPG filed the Second Stay Motion

6    with the Bankruptcy Court and requested the motion be set for hearing on shortened notice

7    [Docket No. 2848].  The Debtors and the Committees prepared a joint opposition to the Second

8    Stay Motion [Docket No. 2915], and ST&G revised the opposition on behalf of the FTDF

9    Committee.  ST&G prepared for and appeared at the hearing on the Second Stay Motion, which

10   the Bankruptcy Court denied.  The LPG filed the Third Stay Motion with the District Court

11   which is set for hearing on May 7, 2007.  The Debtors and Committees again prepared a joint

12   opposition to the Third Stay Motion, which ST&G revised on behalf of the FTDF Committee.

13          112.    The LPG filed its opening brief on appeal on February 13, 2007, and

14   ST&G reviewed the opening brief and prepared the first draft of the appellees' joint responsive

15   brief on appeal.  ST&G worked closely with counsel for the Debtors, the DTDF Committee and

16   the USACM Committee to finalize the joint brief, which was filed on February 28, 2007.

17          113.    ST&G assisted with respect to two motions pursuant to section 1142 of the

18   Bankruptcy Code ("Section 1142") to implement the Plan.  The first motion ST&G drafted with

19   counsel to the Direct Lender Committee to resolve certain licensing issues in connection with the

20   Compass Sale [Docket No. 2768].  The motion was heard on an emergency basis, and ST&G

21   prepared for and attended the hearing where the Bankruptcy Court granted the requested relief,

22   which permitted the Compass Sale to close.

23          114.    The second Section 1142 motion was a negotiated effort among the

24   Debtors and Committees to effect the transition of post-Plan tasks and wind-up projects for the

25   various estates [Docket No. 2869].  ST&G negotiated, reviewed and revised the Section 1142

26   Motion, which the Court approved at a hearing attend by ST&G.  The Plan went effective on

27   March 12, 2007, and ST&G assisted with the drafting of the notices of the Effective Date to be

28   served on all parties pursuant to the Plan.

115.    In the First Fee Period, ST&G spent a total of 88.4 hours rendering services in this category, for which it seeks compensation of $45,388.00.  In the Second Fee Period, ST&G spent a total of 1,475.8 hours rendering services in this category, for which it seeks compensation of $685,511.50.  In the Full Fee Period, ST&G spent a total of 1,564.2 hours rendering services in this category, for which it seeks compensation of $730,899.50.

**11.    Employee Benefits/Plans – 110**

116.    The "Employee Benefits/Plans" category includes time spent by ST&G advising the FTDF Committee with respect to employment issues of the Debtors that were relevant to FTDF.  Much of the time spent by ST&G in this category pertains to analyzing USACM's pension plan and determining whether FTDF had any potential liability on account thereof.  ST&G determined that the PBGC had no basis for asserting that FTDF was liable for any claims that the PBGC may have on account of the termination of USACM's pension plan.  This conclusion and the legal basis in support thereof was communicated to the Debtors, and, in turn, the PBGC withdrew all of its claims against FTDF.

117.    ST&G also spent time in this category analyzing the Debtors' "Motion for an Order Approving Retention Plan of Debtor's Remaining Employees" [Docket No. 1429], by which the Debtors sought to offer bonus payments, severance payments, and medical insurance to certain employees if they remained as employees of the Debtors for certain periods of time.  ST&G reviewed this motion, and the proposed order granting it, in order to ensure that the relief requested would not adversely affect the FTDF estate.

118.    In the First Fee Period, ST&G did not spend any time rendering services in this category.  In the Second Fee Period, ST&G spent a total of 11.4 hours rendering services in this category, for which it seeks compensation of $6,197.50.  In the Full Fee Period, ST&G spent a total of 11.4 hours rendering services in this category, for which it seeks compensation of $6,197.50.

**12.    Litigation – 120**

119.    ST&G provided numerous services to the FTDF Committee in the Litigation category during the Chapter 11 Cases.  Among the tasks that necessitated the most

time from ST&G in this category during the First Fee Period were (1) working with the FTDF

Committee and the Other Committees to create a due diligence list; and (2) exploring various

causes of action that the FTDF Committee could pursue to maximize the recovery to FTDF

Members.  The latter task involved extensive legal research and analysis of data and documents.

Also early in the Chapter 11 Cases, ST&G spent time in this category analyzing and discussing

with the FTDF Committee the complaint to recover property filed by Wells Fargo [Docket no.

733] and the dischargeability complaint filed by Spectrum Financial Group and Roland Weddell

[Docket no. 877].

120.    Among the tasks that necessitated the most time from ST&G in this

category during the Chapter 11 Cases were (1)  analyzing and keeping apprised of the progress

of various adversary proceeding related to the Chapter 11 Cases, including USACM's action

against Standard Property Development, LLC [case no. 06-01179]; USACM's action against

Gateway Stone Associates, LLC [case no. 06-01201]; Binford Medical Developers, LLC's action

against USACM [case no. 06-01212]; Gregory J. Walch's action against USACM [case no. 06-

01245], USACM's action against Salvatore Reale [case no. 06-01251]; and the Kehl Plaintiff's

action against USACM [case no. 06-01247]; and (2) analyzing and keeping apprised of the

various motions requesting Rule 2004 examinations.

121.    ST&G also spent substantial time in this category analyzing and

responding to "The United States Trustees' Motion to Convert Cases to Proceedings Under

Chapter 7" (the "Motion to Convert") [Docket No. 1661].  The Motion to Convert was filed just

as the Debtors and Committees were on the verge of finalizing a consensual joint chapter 11

liquidating plan and during the time in which the Debtors and Committees were seeking to

obtain approval of bid procedures that ultimately resulted in the Compass Sale.  Within three

days of the filing of the Motion to Convert, ST&G, on behalf of the FTDF Committee, drafted

and filed a detailed response along with the declaration of Matthew Kvarda in support thereof,

and appeared at the hearing on the matter.  ST&G prepared for and appeared at the hearing on

the Motion to Convert, which was denied by order of this Court dated November 1, 2007

[Docket No. 1711].

122.     ST&G also spent time in this category representing the FTDF Committee, on behalf of FTDF, in an interpleader action (the "Interpleader Action") brought by USACM in which FTDF was one of the defendants laying claim to a portion of the interpleaded funds (case no. 06-1146-lbr).  The Interpleader Action was brought to determine the ownership of the funds in USACMC's Investor Trust Account which contained approximately $1.7 million and against which there were approximately $3.4 million in claims by persons who either sold or purchased fractional interests in direct loan investments.  FTDF had a claim for approximately $150,000.00 against such funds.  In representing FTDF through the FTDF Committee, ST&G obtained standing for the FTDF Committee to act on behalf of the FTDF in the Interpleader Action, analyzed the various iterations of the complaint in the Intepleader Action, answered such complaints, reviewed the relevant underlying facts, communicated with USACM's special counsel on the matter, and, ultimately, negotiated a settlement whereby FTDF received $114,000.00 of the funds subject to interpleader.

123.     In the First Fee Period, ST&G spent a total of 64.4 hours rendering services in this category, for which it seeks compensation of $29,212.00.  In the Second Fee Period, ST&G spent a total of 74.3 hours rendering services in this category, for which it seeks compensation of $31,926.00.  In the Full Fee Period, ST&G spent a total of 138.7 hours rendering services in this category, for which it seeks compensation of $61,138.00.

### 13.     Relief from Stay Proceedings – 125

124.     Time spent in this category represents the review and analysis of several motions for relief from the automatic stay filed by Scott Canepa, certain Direct Lenders represented by Jones Vargas, Standard Property Development LLC, Dayco Funding Corp., and Spectrum Financial Group, and the Debtors' "Motion for an Order Enforcing the Automatic Stay to Prevent Foreclosure by Western United Life Assurance Company" (the "WULAC Motion") [Docket No. 2555].  ST&G also reviewed and analyzed the various responses to such motions, and prepared a joinder to the WULAC motion [Docket No. 2597].

125.     In the First Fee Period, ST&G spent a total of 9.6 hours rendering services in this category, for which it seeks compensation of $3,928.00.  In the Second Fee Period, ST&G

1   spent a total of 5.2 hours rendering services in this category, for which it seeks compensation of

2   $2,306.50.  In the Full Fee Period, ST&G spent a total of 14.8 hours rendering services in this

3   category, for which it seeks compensation of $6,234.50.

4                    **II.      REIMBURSEMENT OF EXPENSES**

5            126.    ST&G incurred $92,573.35 in reimbursable expenses in performing

6   services to the FTDF Committee in the Chapter 11 Cases and seeks final approval of such

7   expenses.  A detailed listing of the expenses for the First Interim Period is included as Exhibit

8   "2" to the First Interim Fee Application.  These expenses in the amount of $31,599.14 were

9   approved by this Court on an interim basis pursuant to the First Interim Fee Order.  Detailed

10  invoices totaling $60,974.21 in reimbursable expenses for the Second Fee Period are annexed as

11  Exhibit "2" to the Parlen Declaration.

12           127.    ST&G bills for expenses, including in-house photocopies ($0.25 per

13  page), facsimile transmissions ($0.50 per page), postage (actual costs), coach airfare (actual

14  cost), airport transportation (actual cost), computer research (actual cost), hotel accommodations

15  in Las Vegas when attending hearings and/or case-related meetings (actual cost), and long

16  distance telephone charges (actual cost).  Such expenses were actually and necessarily incurred

17  by ST&G, and all expenses for which ST&G seeks reimbursement were incurred in the most

18  economical method available under the circumstances.  ST&G wrote off $12,898.54 in expenses

19  during the course of the Chapter 11 Cases.

20                   **III.     REQUEST FOR INTERIM COMPENSATION**

21  **A.      Legal Standard.**

22           128.    Bankruptcy Code section 330(a)(1) allows the Court to award to

23  professionals employed pursuant to section 1103:

24           (A)    reasonable compensation for actual, necessary services
                    rendered by the . . . professional person, or attorney and by
25                  any paraprofessional person employed by any such person;
                    and
26

27           (B)    reimbursement for actual, necessary expenses.

28

11 U.S.C. § 330(a)(1)(B).  In determining the amount of reasonable compensation to be awarded, section 330 directs this Court to consider the nature, extent and value of the services by taking into account all relevant factors which include:

> (i) the time spent on such services; (ii) the rates charged for such services; (iii) whether the services were necessary in the administration of, or beneficial at the time at which the services were rendered toward the completion of, a case under the Bankruptcy Code; (iv) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed; and (v) whether the compensation is reasonable based upon the customary compensation charged by comparably skilled practitioners in cases other than cases under [title 11].

11 U.S.C. § 330(a)(3).

129.    In addition, section 330 prohibits the Court from allowing compensation for "unnecessary duplication of services" or "services that were not . . . reasonably likely to benefit the debtor's estate . . . or . . . necessary to the administration of the case."  11 U.S.C. § 330(a)(4)(A).

130.    In determining the award of compensation, courts generally consider "the nature, the extent, and the value of the professional's services".  In re Auto Parts Club, Inc., 211 B.R. 29, 33 (B.A.P. 9th Cir. 1997).  "The primary method used to determine a reasonable attorney fee in a bankruptcy case is to multiply the number of hours expended by an hourly rate." In re Yermakov, 718 F.2d 1465, 1471 (9th Cir. 1983); In re Powerine. Oil Co., 71 B.R. 767, 772 (B.A.P. 9th Cir. 1986) (holding that the fees calculated by multiplying the number of hours by the hourly rate creates a presumption of reasonableness); In re Montgomery Drilling Co., 121 B.R. 32, 39 (Bankr. E.D. Cal. 1990).

131.    Professional services rendered by ST&G during the Second Fee Period have been itemized by professional, noting each professional's rate, number of hours and total compensation requested.  See First Interim Fee Application, Exhibit "3"; Parlen Declaration, Exhibit "3."  Each duty and task performed by ST&G has been performed by the attorney most qualified to render such services at his or her ordinary hourly rate in the most efficient manner as

1    required by the circumstances of these cases.  ST&G reasonably expended this time in order to

2    adequately represent and protect the interests of the FTDF Committee in these cases.

3    **B.    Reasonableness of Compensation Requested**

4            132.    ST&G requests compensation for attorneys and paralegals at their

5    respective customary hourly rates.  The hourly rate of each professional who rendered services in

6    connection with the Chapter 11 Cases during the Second Fee Period is set forth in Exhibit "3" to

7    the Parlen Declaration.  ST&G regularly conducts a survey of hourly rates charged by law firms

8    that routinely work in large and complex chapter 11 cases.  Based on the results of the most

9    recent survey, ST&G believes that the hourly rates charged for its members, paralegals, and law

10   clerks are reasonable and competitive with the hourly rates charged by law firms of comparable

11   size and quality that have similar expertise and experience level as ST&G.

12           133.    ST&G submits that, based upon the factors to be considered pursuant to

13   section 330 of the Bankruptcy Code, the quality of the services provided and the results that have

14   been achieved to date justify allowance of the amounts requested.

15   **C.    Non-Duplication**

16           134.    Due to the sensitive nature of bankruptcy matters, it is not always possible

17   to delegate authority to persons with lower billing rates.  However, ST&G has worked to avoid

18   duplication.  Where more than one ST&G attorney attended a meeting or hearing, such

19   attendance was not a duplication of effort, but was necessary to adequately represent the interests

20   of the FTDF Committee.  Moreover, the services provided by ST&G during the Full Fee Period

21   were not duplicative of the services provided by any of the Committee's other professionals:

22   ST&G provided advice and services with respect to bankruptcy/reorganization matters, A&M

23   provided financial advice, and S&C provided bankruptcy related services and guidance and

24   insight on legal, economic and contextual matters that are either unique to this District or that

25   ST&G and S&C had determined in advance were to be handled primarily by S&C.

26   **D.    Novelty And Difficulty of Legal Questions/Skill Requisite to Performing
              Legal Services**

27

28           135.    Because of the complex questions of law and fact involved in these

     proceedings, a high degree of skill is necessary to represent adequately the interests of the FTDF

1    Committee.  Expeditious action by ST&G was necessary to maximize and preserve the assets of

2    the FTDF estate for the benefit of unsecured creditors and FTDF Members.  Because of the

3    complex nature of the transactions that were involved in resolving the Chapter 11 Cases and the

4    relationships, and the transactions that provided the factual background of the Debtors' current

5    situation, it was necessary that ST&G exercise considerable skill and expertise in addressing the

6    issues that arose during the pendency of the Chapter 11 Cases.

7    **E.        Experience, Reputation And Ability Of The Attorneys**

8            136.    ST&G has an excellent nation-wide reputation based upon its experienced

9    and capable group of professionals.  ST&G was selected as the FTDF Committee's counsel due

10   to the experience and expertise of its attorneys in the areas of bankruptcy and other insolvency-

11   related law.  ST&G has represented creditors, debtors, creditors' committees and trustees in

12   insolvency cases and adversary proceedings throughout the United States of America, and

13   maintains an active insolvency practice.  The professional services rendered have been

14   performed by attorneys with broad expertise and a high level of skill in the areas for which they

15   have been employed.  A summary of the experience and qualifications of the ST&G

16   professionals who rendered substantial services to the FTDF Committee during the Full Fee

17   Period is attached as Exhibit "4" to the Parlen Declaration.  Such experience and expertise has

18   enabled this case to progress in an efficient manner.

19           137.    ST&G has not entered into any arrangement or agreement with any person

20   or entity with respect to the sharing of fees and expenses for which ST&G is seeking

21   compensation and reimbursement as set forth in this Application, except as permitted by section

22   504(b)(1) of the Bankruptcy Code.  ST&G has not entered into any agreement, express or

23   implied with any other party in interest, or any attorney or other party in interest for the purpose

24   of fixing fees or compensation and reimbursement of expenses incurred.  As of the filing of this

25   Application, ST&G has not received any payment for its professional services nor any

26   reimbursement of its expenses during the pendency of the Chapter 11 Cases.

27           138.    ST&G submits that, based upon the factors to be considered pursuant to

28   section 330 of the Bankruptcy Code, the quality of the services provided, and the results that

1  have been achieved to date more than justify allowance of the amounts requested.  The services

2  of ST&G have resulted in significant benefit to the FTDF Committee, the FTDF Members, the

3  FTDF estate, and its creditors.

4  139.  Attorneys performing services in a bankruptcy proceeding should receive

5  compensation equal to that received by attorneys specializing in other areas.  See, e.g., id. (citing

6  In re UNR Indus., Inc., 986 F.2d 207, 209-210 (7th Cir. 1993); In re Baldwin United Corp., 36

7  B.R. 401 (Bankr. S.D. Ohio 1984); In re Wilson Foods Corp., 36 B.R. 317 (Bankr. D. Okla.

8  1984); In re Atlas Automotive Inc., 27 B.R. 820, 822 (Bankr. E.D. Mich. 1983).

9  140.  In an effort to eliminate fees for inefficient or unnecessary services, ST&G

10  has voluntarily written off 716.55 hours of time billed during the Full Fee Period that it would

11  otherwise have billed at its customary rates in the total amount of $266,911.55 plus costs in the

12  amount of $12,161.17.  Much of fees ($69,337.50) that ST&G has written off pertains to non-

13  working travel time or certain attorney time where multiple attorneys attended the same meeting

14  or hearing, which did not require the participation of all attorneys present.

## IV.    CLIENT REVIEW

16  Pursuant to U.S. Trustee Guidelines § 2.2.2, ST&G has provided the members of

17  the FTDF Committee with a copy of this Application, including the exhibits hereto.  Throughout

18  the case, ST&G has provided the members of the FTDF Committee with full copies of its

19  monthly fee statements.

## V.    CONCLUSION

21  141.  WHEREFORE, ST&G respectfully requests that the Court enter an order:

(A)    Approving this Application;

(B)    awarding final allowance of fees for services rendered and
reimbursement of expenses in the amounts of $2,159,529.95 in fees and
$92,573.35 in expenses, for a total award for the Full Fee Period of
$2,252,103.30;

(C)    Authorizing and directing the FTDF to pay the full amount of fees
and/or expenses incurred by ST&G during the Full Fee Period, including

413652v4                            49

1

$357,398.50 in fees and $1,294.77 in costs outstanding; and

2

(D)    Providing such other and further relief as the Court deems just and

3

appropriate.

4

5

6

Respectfully submitted this 26th day of April, 2007.

7

8

/s/ Andrew M. Parlen_____

9

FRANK A. MEROLA (CA State Bar No. 136934),
EVE H. KARASIK (CA State Bar No. 155356), and

10

ANDREW M. PARLEN (CA State Bar No. 230429), Members of
STUTMAN, TREISTER & GLATT, P.C.

11

1901 Avenue of the Stars, 12th Floor
Los Angeles, CA  90067

12

Telephone:  (310) 228-5600

13

COUNSEL FOR THE
OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

14

OF USA CAPITAL FIRST TRUST DEED FUND, LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28