1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Marc A. Levinson (California Bar No. 57613)
Jeffery D. Hermann (California Bar No. 90445)
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, CA  95814-4497
Telephone:  (916) 447-9200
Facsimile:  (916) 329-4900
Email:  malevinson@orrick.com; jhermann@orrick.com

Attorneys for the Official Committee of Equity Security Holders of
USA Capital Diversified Trust Deed Fund, LLC

E-filed on April 26, 2007

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br><div align="right">Debtor.</div> | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br><div align="right">Debtor.</div> | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br><div align="right">Debtor.</div> | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725-LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br><div align="right">Debtor.</div> | **ORRICK, HERRINGTON &<br>SUTCLIFFE LLP'S FINAL FEE<br>APPLICATION** |
| In re:<br>USA SECURITIES, LLC,<br><div align="right">Debtor.</div> | **(JUNE 1, 2006 – MARCH 12, 2007)** |
| Affects:<br>☐   All Debtors<br>☐   USA Commercial Mortgage Company<br>☐   USA Securities, LLC<br>☐   USA Capital Realty Advisors, LLC<br>☒   USA Capital Diversified Trust Deed Fund, LLC<br>☐   USA First Trust Deed Fund, LLC | Date:   June 22, 2007<br>Time:   9:30 a.m.<br>Place:   Courtroom #1 |

1    Orrick, Herrington & Sutcliffe LLP ("Orrick"), counsel to the Official Committee of

2    Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC ("DTDF Committee"

3    for "DTDF"), hereby submits its final fee application ("Application") and seeks an order of this

4    Court: (1) allowing Orrick's professional fees in the amount of $2,228,780.60 and expenses

5    incurred in the amount of $42,914.58 for the period of June 1, 2006 through March 12, 2007; and

6    (2) authorizing revested debtor USA Capital Diversified Trust Deed Fund, LLC ("Revested

7    DTDF") to pay such amounts upon entry of an order approving this Application.   The fees

8    sought represent over 4,250 hours of service rendered by Orrick professionals.[1]

9    This Application is supported by the Declaration Of Marc A. Levinson in support of

10   Orrick, Herrington & Sutcliffe LLP's First Interim Fee Application ("Levinson Decl.") and the

11   Declaration of Robert Worthen in support of Orrick, Herrington & Sutcliffe LLP's First Interim

12   Fee Application ("Worthen Decl.") filed contemporaneously herewith.

## I.

## INTRODUCTION/BACKGROUND

15   1.    On April 13, 2006, the five above-captioned debtors (collectively, "Debtors") filed

16   voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

17   §§ 101-1330 (as amended, the "Bankruptcy Code") initiating the "Chapter 11 Cases."  The

18   Debtors continued to operate their businesses as debtors and debtors-in-possession pursuant to

19   Bankruptcy Code sections 1107(a) and 1108 until the Effective Date (defined below).

20   2.    On May 10, 2006, the Office of the United States Trustee ("UST") appointed four

21   official committees:  (i) the DTDF Committee; (ii) the Official Committee Of Holders Of

22   Executory Contract Rights Through USA Commercial Mortgage Company ("Direct Lenders

23   Committee"); (iii) the Official Unsecured Creditors Committee For USA Commercial Mortgage

24   Company ("Unsecured Creditors Committee" for "USACM"); and (iv) the Official Committee Of

25   Equity Security Holders Of USA Capital First Trust Deed Fund, LLC ("FTDF Committee" for

26   "FTDF").  The UST filed an amended notice of appointments to the DTDF Committee on or

---

[1]  In its reply pleading, if any, to be filed in June, Orrick may seek compensation for the time spent in April preparing this Application and for the time in June spent responding to any objection and appearing at the hearing on the Application.

1    about June 1, 2006.  As of the Confirmation Date (defined below), there were six members of the

2    DTDF Committee plus one *ex officio* member.  Levinson Decl., ¶ 3.

3            3.        Although Stutman Treister & Glatt PC initially sought to be employed to represent

4    each of the Direct Lenders Committee, the DTDF Committee and the FTDF Committee, in

5    response to certain interested parties' objections and concerns about the propriety of having a

6    single law firm represent three committees that may have different or competing interests in the

7    Chapter 11 Cases, the Court determined that each of the four committees should employ and

8    retain its own separate counsel.  On June 1, 2006, the DTDF Committee retained Orrick to serve

9    as its counsel in these Chapter 11 Cases.  Levinson Decl., ¶ 4.

10           4.        On or about June 9, 2006, the Debtors filed an Application for Administrative

11   Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of

12   Professionals (Docket No. 570) ("Interim Fee Procedures Motion") which requested that the

13   Court approve procedures for the interim compensation and reimbursement of expenses of

14   professionals whose employment had been approved by order of the Court.

15           5.        On June 12, 2006, the DTDF Committee filed both its application to employ

16   Orrick and a supporting declaration of Marc A. Levinson.[2]  Levinson Decl., ¶ 5.  On June 22,

17   2006, this Court entered an order approving the DTDF Committee's employment of Orrick as its

18   counsel, *nunc pro tunc* as of June 1, 2006. [Docket No. 775].

19           6.        At the August 4, 2006, omnibus hearing, the Court granted the Interim Fee

20   Procedures Motion.  On August 29, 2006, the Court entered the Administrative Order

21   Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of

22   Professionals (Affects All Debtors) ("Interim Fee Procedures Order").  [Docket No. 1199]

23   Pursuant to the Interim Fee Procedures Order, Orrick sent monthly fee statements for each of the

24   months of June 2006 through January 2007, along with copies of its billing statements for such

25   months, to the Debtors, the UST, the Direct Lenders Committee, the FTDF Committee and the

26   Unsecured Creditors Committee.  Levinson Decl., ¶ 6.

27   ───────────────────

28   [2] Orrick filed a supplemental Levinson declaration and a second supplemental Levinson declaration
     regarding Orrick's employment on June 16, 2006 and August 11, 2006, respectively. Levinson Decl., ¶ 5.

7.      Because Orrick knew that DTDF needed to husband its cash following confirmation of the Plan and that Revested DTDF would need to husband its cash at the outset of its existence after the Effective Date, it did not file and serve monthly fee statements for the month of February or the period March 1 through 12, 2007.  Levinson Decl., ¶ 7.

8.      On August 31, 2006, Orrick filed its first interim fee application, which covered the period June 1, 2006 through July 31, 2006 ("Interim Fee Application") [Docket No. 1214].  A hearing on the Interim Fee Application (and on the interim fee applications of numerous other estate professionals) was held on September 28, 2006, and this Court's order approving the Interim Fee Application was entered on October 6, 2006 ("Interim Fee Order") [Docket No. 1457].   The Interim Fee Order approved, on an interim basis, compensation in the amount of $467,794.50 and reimbursement of expenses in the amount of $8,173.54, for a total of $475,968.04.

9.      The Court confirmed the Debtors' Third Amended Joint Plan of Reorganization ("Plan") in an order filed on January 8, 2007 ("Confirmation Order") [Docket No. 2376], and, as described in the Notice of Effective Date of Confirmed Plan [Docket No. 3083], the effective date of the Plan occurred on March 12, 2007 ("Effective Date").  Since the first day of Revested DTDF's existence, March 13, 2007, Orrick has represented Revested DTDF.

10.      Pursuant to the Plan, the DTDF Committee disbanded on the Effective Date. However, since March 13, 2007, Robert Worthen, the Chair of the DTDF Committee, has served as the Chairman of the Board of Revested DTDF.  Mr. Worthen has reviewed Orrick's billing statements, has found Orrick's fees and costs to be reasonable and necessary, and has approved Orrick's fees and costs for payment by DTDF, subject to Court approval of this Application. Worthen Decl., ¶ 4.

11.      This Application recognizes that the Interim Fee Order is just that, interim, and that the $475,968.04 amount allowed is subject to reconsideration.  Accordingly, it covers the entire time that Orrick represented the DTDF Committee, namely June 1, 2006 through March 12, 2007.  It describes the services rendered by Orrick during that period and the costs incurred by it during that period.  Each of Orrick's monthly statements beginning with June 2006 and ending

January 2007 is attached as a separate exhibit to the Levinson Decl.  Also attached thereto is one statement for the period February 1 through March 12, 2007.

**II.**

**SUMMARY OF FEES**

12.     <u>Summary of Fees by Professionals/Hours/Months</u>.  The chart attached hereto as Exhibit A lists each Orrick professional who billed time to the representation of the DTDF Committee, the number of hours he/she devoted per month, and the extension thereof (in other words, the number of total hours times his/her billing rate).

13.     The blended rate for Orrick attorneys during the Chapter 11 Cases was $527.60 per hour ($2,217,484 divided by 4,203.34 hours).  The blended rate for all Orrick attorneys and paraprofessionals during the Application Period was $522.18 per hour ($2,228,780.60 divided by 4,268.24 hours).

14.     <u>Summary of Hours by Task Codes/Months</u>.  The chart attached hereto as Exhibit B summarizes the number of hours per month devoted by Orrick professionals to the various task code categories.  It also contains an extension reflecting the total number of hours devoted to each task code during the Chapter 11 Cases.

15.     <u>Summary of Fees by Task Codes/Months</u>.  The chart attached hereto as Exhibit C summarizes the amount of fees per month devoted by Orrick professionals to the various task code categories.  It also contains an extension reflecting the total amount of fees devoted to each task code during the Chapter 11 Cases.

16.     <u>Payments received to Date</u>.  The chart attached hereto as Exhibit D summarizes the payments received by Orrick to date.

17.     Orrick's time spent in preparing the Initial Application and the various monthly fee statements amounted to approximately $43,000[3].  Orrick estimates that its time spent on this Application amounted to approximately $20,000 through April 26th.  This sum is not included in the statements for February through March 12, 2007 because it was spent in April.  As noted in

---

[3]   Such estimate includes time spent responding to questions/objections raised by the UST to several of the monthly statements.

1   footnote 1, Orrick may seek compensation for this time and any time spent in June when it files

2   its reply brief, if any, in June.  The $43,000 and the $20,000 add up to $63,000, which is

3   approximately 2.8% of the amount of fees sought in the Application.

4       18.    Voluntary Write-offs; No January 1 Rate Increase:  This Application reflects

5   voluntary write-offs of approximately $77,000 of time billed to this matter, which, in the opinion

6   of the billing partner, were not sufficiently necessary or productive to be passed on to the DTDF

7   estate.  The $2,228,780.60 in total fees sought by Orrick in this final fee application is net of the

8   amount voluntarily written off.  In addition, despite the Orrick having raised its standard billing

9   rates by an average of approximately 6% effective January 1, 2007, no such fee increase is sought

10  herein.  Based on the fees for the period January 1 through March 12, 2007, such concession

11  amounts to an additional discount of approximately $16,600.  Levinson Decl., ¶ 11.

12      19.    Travel Time:  The attorneys representing the DTDF Committee reside in Orrick's

13  offices in Sacramento and Los Angeles.  Attendance at hearings and meetings in Las Vegas

14  generally requires that such attorneys travel by plane or automobile to Las Vegas.  Mindful of the

15  limited resources in this case, Orrick has limited its charges for travel time to and from Las Vegas

16  (as well as to Los Angeles and Salt Lake City) to 2.5 hours each way, although such travel

17  invariably takes much longer.  In fact, due to the delays inherent in air travel today, the actual

18  travel time is no less than approximately 3.5 hours each way, and the maximum time, due to

19  flight delays and the like, can exceed (and has exceeded) six hours for that one and a quarter or

20  one hour flight.  Orrick attorneys almost always work on the plane on this matter while traveling.

21  Levinson Decl., ¶ 12.

**III.**

**SERVICES RENDERED**

**Introductory Statement**.

25      20.    The following summarizes, by billing category, the services rendered by Orrick

26  during the period Orrick was employed in the Chapter 11 Cases, commencing on June 1, 2006,

27  and ending on the Effective Date, March 12, 2007.  Because Orrick professionals account for

28  their time in great detail, the lengthy descriptions authored by the Orrick professionals which are

contained in Orrick's invoices attached to the Levinson Decl. provide the greatest amount of detail and should be considered as the best source documents for the actual services rendered.

21.    The summaries that follow easily could have been two or three times lengthier. But Orrick understands that the Court, the UST, other professionals and DTDF investors and perhaps other investors may be reviewing up to 12 final fee applications.  The summaries attempt to highlight the key tasks undertaken and the results thereof.  What they may not convey to the reader is the incredibly difficult roles played by the estate professionals generally, and the professionals employed by DTDF – including Orrick, FTI and Beckley Singleton – in particular.

22.    Before launching into the summaries, Orrick feels compelled to state what may be the obvious:  The Chapter 11 Cases have been challenging and frustrating, a pressure cooker under which the heat was turned on high from day one due to the universal concern for the victims of the USACM debacle and fraud.  Each of the key professionals receives no fewer than 50 and often more than 100 emails every week day, and each receives numerous emails over the weekend.  An email sent to seven estate professionals at 7:00 p.m. on a week night will prompt three to six responses prior to 9:00 a.m. the next morning.  This pace went on throughout the Chapter 11 Case, with no respite, including holidays – witness the HMA adversary proceeding that was e-filed on Christmas Day (discussed in connection with Category B505 below).

23.    And as difficult and trying as the cases have been, they have been even more so for the DTDF Committee and its professionals.  As described in detail in the DTDF Committee's limited opposition to the distribution motion and in the lengthy supporting declaration [Docket Nos. 987 and 994, respectively], virtually every promise made to potential DTDF investors in the June 2, 2003 prospectus ("Prospectus") was violated:  (i) loans were not secured by conservative loan-to-value real estate secured loans; virtually all of the loans in the $150 million DTDF portfolio were not secured by deeds of trust on real property, and most (in terms of amount) were totally unsecured; (ii) loans were made to USACM insiders despite promises of loans only to arms length third parties; the $55 million 10-90, Inc. "loan" made to USA Investment Partners, LLC ("Investment Partners") was used for real estate investment, among other things, (the current balance approximates $90 million [exclusive of default interest]), and approximately $14 million

1   of loans, including undocumented, potentially unsecured, loans, were made to Colt Gateway, in

2   which Joe Milanowski ("Milanowski") arranged for Investment Partners to have a 50%

3   ownership interest; (iii) loans were concentrated in violation of a promise of no concentration in

4   any borrower; to make matters worse, the concentrated loans were made to insiders; and (iv)

5   USACM used approximately $19 million of DTDF loan collections to pay other direct lenders

6   whose borrowers had defaulted.

7          24.    The asset pool owned by Revested DTDF is replete with problems, so much so

8   that no potential plan funder or buyer offered more than nominal value.  Hardly any significant

9   DTDF loans were collected during the course of the Chapter 11 Cases – only the "low hanging

10  fruit" was harvested.  Revested DTDF faces numerous collection problems and litigation with

11  virtually each of its assets, which translates to no payout to DTDF investors in the near future.

12         25.    The DTDF Committee and its professionals have been particularly frustrated by

13  the fact that while the DTDF portfolio of troubled loans was in dire need of collection, restructure

14  and workout efforts, the ultimate authority to take any such action for DTDF rested solely with

15  the Debtors and their professionals, and those professionals were far too busy dealing with

16  hundreds of other loans, issues and disputes during the pendency of the Chapter 11 Cases

17  to aggressively work the DTDF portfolio. While the professionals for the Debtors and the DTDF

18  Committee had regular conversations regarding the possibility of the DTDF Committee taking

19  any number of actions on behalf of DTDF directly, the Debtors' professionals were extremely

20  reluctant to unleash the DTDF Committee on DTDF's borrowers because many of the DTDF

21  borrowers also were borrowers on multiple other loans in the USACM portfolio and the Debtors'

22  professionals undoubtedly were concerned about the possibility of inconsistent actions being

23  taken with respect to and conflicting demands being made upon these common borrowers. Rather

24  than force the issue at a time when the DTDF Committee and the Debtors were working

25  cooperatively on many projects, not the least of which was the Plan, the related sale and a quick

26  exit from chapter 11, the DTDF Committee operated in a support role for DTDF, and attempted at

27  every opportunity to advance the DTDF loan portfolio issues to the top of the agenda for the

28  Debtors' professionals.

26.     In short, this case has been a challenge from the outset and will remain a challenge in the months and perhaps years ahead.  It is under these conditions that Orrick and the other DTDF Committee professionals seek compensation.

**Category B110 - Case Administration**.  Orrick devoted 306.90 hours to tasks encompassed in this category, representing $155,945 of fees.  As described below, the matters handled by Orrick that have been classified under this category are diverse and wide-ranging, and include numerous services which do not neatly fit under the other task billing categories established by Orrick.  Thus, while they all fall under the heading of Case Administration for purposes of this Application, many of the services classified here are substantive matters.  Almost half of such services were rendered during June 2006, the first month of Orrick's employment, in an attempt to "hit the ground running," since other professionals had been in the Chapter 11 Cases for a month or two by the time Orrick was retained.  Thereafter, much of the time was spent by associates reviewing the countless pleadings filed in this case and describing and electronically forwarding them to other Orrick attorneys and other professionals employed by the DTDF Committee.  The services rendered in this category break down into several subgroups, described as follows:

- Learning About The Case And The Business.  Getting up to speed on the cases, the companies, the loan portfolios, background and issues since the case had been progressing for almost two months before Orrick was retained.

- Retaining Other Professionals.  Locating and retaining Nevada counsel and a financial advisor to assist the DTDF Committee and Orrick.

- Corporate Governance.  Dealing with corporate governance matters, including drafting of DTDF Committee bylaws and negotiating the terms of joint defense/common interest agreement and/or confidentiality agreements with the Debtors and the other official committees.

- Joint Protocols Motion.  Reviewing, analyzing and providing input on the committees' joint motion to establish protocols for communications with investors, including negotiation of confidentiality provisions in light of Bankruptcy Code section 1102(3).

- Other Miscellaneous Motions.  Attending meetings, reviewing, analyzing and drafting responses to the "hold funds" motion, the motion to disqualify Fertitta from the Direct Lenders Committee, motions relating to loans in which DTDF had a small interest or no interest but could set a precedent for loans in which DTDF hand an interest, the motion to freeze pension funds and other various motions.

- **Attendance at Hearings**.  Attendance at the portions of those omnibus hearings that did not fall into other tasks (i.e., hearings not devoted to matters in which the DTDF Committee had a stake or a role but which were attended by Orrick attorneys because a DTDF Committee-related matter was on calendar for later in the hearing.

- **Conferences Among Professionals**:  Conferences among DTDF Committee professionals in preparation for DTDF Committee meetings, hearings or meetings with other interested parties, where multiple topics were covered.

- **Due Diligence Request**.  Reviewing and providing input on the committees' joint due diligence request to the Debtors.

- **Analysis of Key Agreements**.  Reviewing and analyzing DTDF operating and servicing agreements and research regarding motion to terminate same.

- **DTDF Committee Email Account**:  Establishing an email account for communicating with individual DTDF investors.

- **DTDF Website**.  Attention to the DTDF website, one of the primary ways of reaching out to DTDF investors.  The tasks included establishing the website, updating it and monitoring it.  After Confirmation, time was spent transitioning the website to Revested DTDF.

**Category B120 – Asset Analysis and Recovery**.  Orrick devoted 576.70 hours to this category, representing $315,660 of fees.  Much of Orrick's time in this category was devoted to investigating and learning about DTDF's assets.  The time has been substantial, in no small part because of the sad and disorganized state of the Debtors' loan files, books and records and the lack of cooperation, if not obstructionism, from the recipients of DTDF's funds.  As has been described in many other pleadings filed in these cases, each of the major loans/investments from DTDF is a complicated and unnerving tale of use and abuse by the former managers of DTDF.  Each of such loans and investments, summarized below, is already or may become the subject of one or more law suits.  Several fit into this Category B120.  Others are described in Category B503 (Litigation), Category B504 (EPIC Loan) and Category B505 (10-90 Loan).  The services rendered during the Application Period in this category break down into several subgroups, described as follows:

- **Loan Analysis**.  Extensive review and analysis of documentation for loans in which the DTDF is a lender, including multiple on-site visits to Debtors' offices in Las Vegas, conference calls and meetings.

- **Asset And Recovery Analysis**:  Extensive analysis of collateral securing DTDF loans, and review and analysis of collection options and strategies for enforcement of DTDF loans; review and analysis of DTDF schedules and statement of financial

affairs; review Prospectus and analysis regarding potential causes of action and recovery options.

- <u>Investment Partners Settlement And Security Agreement</u>.  Review and analysis of Debtors' proposed security agreement with Investment Partners, including extensive meetings with DTDF professionals and others, drafting and revising limited opposition to motion to approve Investment Partners agreement and attending the hearing on such motion.

- <u>USA Investors VI ("Investors VI")</u>.  While some of the time devoted to Investment Partners was billed to Category B505 (10-90 Loan), the obligation owing by Investors VI, an affiliate of Investment Partners, which obligation relates to the Hotel Zoso in Palm Springs, is not related to the 10-90 Loan.  Orrick and the other DTDF professionals devoted a great deal of time to uncovering the transactions that led them to conclude that DTDF had a claim against Investors VI.  That involved delving into a number of transactions related to Investors VI, to a DTDF loan related to the former Sheraton Hotel at the Salt Lake City airport, to the foreclosure of the property securing that loan, and to the deficiency judgment against the makers of the note.  They also familiarized themselves with the Hotel Zoso, which is owned by Investors VI, and the efforts by Investors VI and Joe Milanowski to sell the same – after placing a lien thereon in favor of the Salvatore Reale Trust ("Reale") to collateralize a loan made to Milanowski and Tom Hantges ("Hantges").  After much effort, they convinced DTDF's postbankruptcy management and its counsel to initiate an involuntary chapter 7 case against Investors VI, which occurred on December 15, 2006, and to seek the appointment of an interim trustee.  The involuntary likely was not filed sooner because USACM was the loan servicer of a direct lenders' loan the unpaid balance of which was approximately $20 million in late 2006, and a bankruptcy filing would mean the delay in the payment thereof.  Moreover, USACM was in negotiations with Milanowski to provide a portion of the sale proceeds to USACM/DTDF.  Since the filing of the involuntary case and the appointment of the interim trustee, DTDF Committee professionals have been monitoring the case, working toward the entry of an order for relief, and attempting to work with the interim trustee to sell the Hotel Zoso.  Investors VI has contested almost every move by DTDF and the interim trustee, requiring the expenditure of a great deal of time by DTDF Committee professionals.

- <u>Interim Distribution Analysis</u>.  In anticipation of Debtors' motion to distribute funds to direct lenders, research and analysis regarding options and strategies for interim distributions, meetings and communications with Debtors and other committees regarding statements to be provided to investors.

- <u>Ashby And Investment Partner Loans</u>.  Review, analysis and multiple meetings with DTDF professionals and borrowers (including Messrs. Ashby, Redman and Milanowski) regarding loans, assets and related issues.  Some of the time devoted to Ashby-related loans was billed to Category B505 (10-90 Loan) because approximately $10.4 million of the proceeds of such loan were invested in Ashby-related projects.

- <u>Debtors' Proposed Transactions</u>.  Analysis of various transactions proposed by Debtors involving loans and collateral in which DTDF has an interest, meetings, telephone conferences and drafting responses to motions (i.e. Franklin/Stratford, Amesbury/Hatterspoint, HFA, Boise/Gowen).

- **Colt Loans**. DTDF was involved in a loan to Colt Gateway, a limited liability company in Hartford, Connecticut, that is 50% owned by Investment Partners. As of the Effective Date, the total Colt obligation to DTDF, exclusive of default interest, approximated $17 million. The Colt real estate project is comprised of many phases, and is quite complex. The DTDF/Colt relationship is likewise quite complex, in that DTDF is one of three direct lenders that are the beneficiaries of a promissory note secured by a first trust deed on one portion of the Colt project. DTDF made three additional advances to Colt, which the DTDF Committee contends are likewise secured by the first deed of trust. But the three loans are "undocumented," which means that Colt has claimed that they were not loans at all, but rather were infusions of equity. While Colt has been uncooperative in sharing information with the DTDF Committee, the DTDF Committee professionals did receive and review documents provided by Colt to the two other direct lenders. Although no agreement was reached with Colt prior to Confirmation, the lack of resolution was not due to a lack of time or effort on the part of the DTDF Committee professionals. Following Confirmation, DTDF became the servicer of such loan, stepped up its involvement in the process, received information from Colt and continues to press Colt to reach agreement. Subsequent to Confirmation, though, the other two direct lenders sought relief from the automatic stay to change loan servicers, and then objected to and subsequently agreed to a settlement with Colt. But Colt did not perform, leading Revested DTDF to devote its efforts to collecting the various loans for the two direct lenders and for itself. DTDF also has been working with the USACM Trust, which is the payee of a note secured by a second deed of trust.

- **The BySynergy Obligation**. BySynergy is a 53-acre, 104 single family development is Sedona, Arizona. A $4.4 million unsecured loan to BySynergy is owned 52% by DTDF, 35% by FTDF and 13% by USACM. As described in Category B320, as a result of a Plan compromise, the 35% FTDF interest has been transferred to DTDF. The BySynergy obligation represents the amount of outstanding fees and charges of a previous loan to BySynergy (of $11.6 million) that were not paid when such loan was repaid in February 2006. The Debtors' efforts to obtain financial and other information from BySynergy prompted the DTDF Committee to obtain an order for a Rule 2004 examination and document subpoena. That resulted in both cooperation and documents, as well as a promise to deliver more documents in the future. No such documents have been delivered, so Revested DTDF is moving forward with the Rule 2004 examination.

- **Disputes with the USACM Committee Over the DTDF Claims against USACM**. As the Court is well aware, prior to the Effective Date, DTDF and USACM were managed by the same Chief Restructuring Officer and were represented by the same financial advisor and the same two law firms. None of them could become involved in the disputes between those two debtors over their claims against one another, so early on they properly delegated responsibility to the two committees. The disputes are multiple and complex, and professionals for the two committees spent numerous hours analyzing the claims, conducting factual and legal research regarding them, and attempting to settle them, including attendance at meetings in Los Angeles and in San Francisco and at a mediation before Judge Glover in Las Vegas on December 12, 2006. No resolution was reached despite the hours spent, and the Plan preserves all such disputes. Based on the education about their claims against one another, the two revested parties will attempt to consensually resolve their disputes in the future, but in the meantime, they have been pooling their efforts towards their joint goal of recovering assets for the two estates – including their discussing the filing of an involuntary chapter 11 case against USA Investment Partners LLC prior to the Effective Date and joining as petitioning

creditors on April 4th after they collectively beat back the filing of a U.S. District Court receivership action engineered by Investment Partners as a means of avoiding this Court's oversight.

**Category B130 – Asset Disposition**.  Orrick devoted 41.30 hours to this category, representing $18,042 of fees.  The services rendered in this category generally involved efforts related to the Debtors' motion to distribute funds to direct lenders, including research and analysis of interim distribution options, strategies for interim distribution to benefit constituents of the DTDF and drafting argument outlines for the DTDF Committee's anticipated response to the interim distribution motion.  Orrick is aware that other time it spent on this analysis was billed to Category B120, and believes that such work is properly categorized under either.

**Category B152 – Meetings And Communications With Other Committees**.  Orrick devoted 133.60 hours to this category, representing $72,445 of fees.  Most of the time spent by Orrick in this category was spent in the weekly (and sometimes more-frequent) all-hands meetings involving the Debtors and the other committees to discuss global case issues and issues of interest to all constituencies, such as the Debtors' distribution motion, fee procedures motion, plan alternatives and the like.  Most of the all-hands meetings were conducted via telephone, but there were meetings in Las Vegas and Los Angeles.  Time spent in this category also included initial discussions with the various other committees following Orrick's retention to represent the DTDF Committee, regarding case background and issues of common interest among the various committees.  As the Chapter 11 Cases developed, less time was billed to this category and more to other, more specific, with Category B320 (Plan and Disclosure Statement) getting the lion's share of the time.

**Category B153 – Meetings And Communications The Committee Or Members**.  Orrick devoted 243.60 hours to this category, representing $122,007 of fees.  The time spent by Orrick in this category consisted primarily of several in-person meetings in Las Vegas and many, many telephonic meetings of the DTDF Committee necessary to keep the DTDF Committee apprised of all of the fast-moving events in these Chapter 11 Cases and to advise the DTDF Committee in connection with strategic decisions to be made by the DTDF Committee.  This category also includes time spent by Orrick reporting on various case events and Orrick's

1    recommendations to the DTDF Committee via numerous email memoranda and in

2    communicating with individual members of the DTDF Committee.

3    **Category B154 – Meetings And Communications With Creditors Or Equity Holders**.

4    Orrick devoted 124.40 hours to this category, representing $59,350 of fees.  The time spent by

5    Orrick in this category primarily was geared towards improving communication with and access

6    to information by the approximately 1,300 investors in the DTDF.  Among other things, Orrick

7    worked to establish and maintain a DTDF Committee website for communications with DTDF

8    investors.  But much of Orrick's time in this category was spent communicating directly with

9    investors seeking information about the Chapter 11 Cases, both by telephone and via email

10    utilizing the DTDF email account established by Orrick.

11    Most of the emails were returned by Orrick associates Lynn Trinka Ernce (until she left on

12    maternity leave in early December) and Rachel Ragni.  They fielded most of the telephone calls

13    as well.  But many emails were returned by and calls taken/made by Marc Levinson.  There are

14    several reasons why Orrick did not train a legal assistant or secretary to do so, but the primary one

15    is that DTDF investors have been immeasurably harmed by the fraud perpetrated upon them and

16    by the cessation of payments to them.  Virtually each had a horror story to tell and/or anger to

17    vent.  And they deserve the right to speak to a person who understands their predicament, who

18    knows what is happening in the Chapter 11 Cases, and who can give honest, albeit perhaps

19    painful, advice and counsel.  Generally speaking, neither a legal assistant nor a secretary fit that

20    bill.  Ernce and Ragni do, but Levinson also has been involved because often emails were

21    addressed to him or because he picked up the phone and an investor was on the line.   Many calls

22    and emails were forwarded to Ernce or Ragni, but many were taken and returned.  It was and is

23    the right thing to do.

24

25

26

27

28

**Category B160 – Fee/Employment Applications**.  Orrick devoted 154 hours to this category, representing $71,209 of fees.  As described in paragraph 17 of the Application, approximately $43,000 of the fees relate to time spent on Orrick's monthly statements, on the Interim Fee Application and in responding to inquires and objections from the UST related to the monthly statements.  The services break down into several subgroups, described as follows:

- Retention of DTDF Professionals.  Drafting employment applications and supporting pleadings and attending hearings to approve employment of DTDF Committee professionals, Orrick, Beckley Singleton, and FTI Consulting.

- Retention of Professionals for Debtors and Other Committees.  Reviewing applications, commenting on proposed orders and attending hearings regarding professionals being employed to represent the Debtors or other committees, and the Debtors' multiple requests to continue the employment of the Debtors' professionals for an additional 60 days.

- Retention of Tax Accountants.  Reviewing the applications to employ Beadle McBride and KPMG as tax accountants to the estates to prepare the 2006 K-1's for DTDF and FTDF investors.

- Interim Fee Procedures Motion.  Communicating with Debtors and other committees regarding the propriety of establishing interim fee procedures in these Chapter 11 Cases and reviewing, analyzing and responding to Debtors' interim fee procedure motion.

- Amended Interim Fee Procedures Motions.  Working with the Debtors and the other committees to amend the order approving the initial fee procedures motion so as to avoid preparing second interim fee applications when Confirmation was on the horizon and the Effective Date would follow thereafter.

- Billing Procedures and Bill Review.  Establishing billing categories and protocols for use by Orrick timekeepers and reviewing and editing Orrick's time records for purposes of interim fee requests and future fee applications to ensure compliance with guidelines, among other things.

- The Interim Fee Application and this Final Fee Application.  Orrick prepared the Interim Fee Application, and Levinson attended the September 28, 2006, hearing thereon.  Thereafter Orrick worked with other estate professionals on the form of order approving all fee applications.

**Category B170 – Fee/Employment Objections**.  Orrick devoted 53.7 hours to this category, representing $27,340 of fees.  Such services include the review and analysis of objections to the Debtors' various motions to continue the employment of its professionals and drafting a joint response to the Debtors' motion.  The DTDF Committee objected to the proposed employment of Beadle McBride as a tax account due to that firm's prior and current representation of insiders of the Debtors.  Ultimately, such application was withdrawn.  Time also

1   was spent in this category on the limited objection to proposed counsel for the Tree Moss interim

2   trustee, which objection ultimately was resolved consensually.  The time spent reviewing final fee

3   applications filed by other estate professionals will be billed to Revested DTDF, as will the time

4   objecting thereto, if any.

5          **Category B210 – Business Operations**.  Orrick devoted 3.40 hours to this category,

6   representing $1,600 of fees.  This time related primarily of working with FTI in connection with

7   the Debtors' budgets, communications with the DTDF Committee's financial advisors, preparing

8   a joint response to the cash collateral motion with the FTDF Committee and reviewing objections

9   to the motion filed by other committees and constituents.

10         **Category B230 – Financing/Cash Collections**.  Orrick devoted 30.60 hours to this

11  category, representing $16,265 of fees.  The services rendered in this category include review and

12  analysis of the Debtors' various motions for use of cash collateral and for debtor-in-possession

13  financing, meetings with the Debtors and/or other committees regarding debtor-in-possession

14  motion and term sheets, filing or joining in responses to such motions and attending the hearings

15  on the motions.

16         **Category B310 – Claims Administration/Objections**.  Orrick devoted 67.90 hours to

17  this category, representing $30,568 of fees.  The bulk of Orrick's services in this category relate

18  to the $20 million proof of claim filed against the DTDF and other Debtors by Prospect High

19  Income Fund and five other bondholders, and research and analysis regarding possible responses

20  to that proof of claim.  As disclosed in the second supplemental declaration of Marc A. Levinson

21  filed in this case, during the Application Period, Orrick discovered that the six bondholders

22  collectively referred to themselves as "Highland Capital," which turned out to be an Orrick client.

23  Although Orrick had not represented Highland Capital in connection with the DTDF or any of the

24  other debtors, out of an abundance of caution, Orrick promptly transferred all responsibility for

25  the matter to the DTDF Committee's Nevada counsel, Beckley Singleton.  That firm also took

26  primary responsibility for objecting to the numerous proofs of claim erroneously filed by DTDF

27  investors against DTDF, including the proof of claim filed by DTDF Committee member Jerry

28  McGimsey and his family members (collectively, "McGimsey Claims").  The McGimsey Claims

1    allege that DTDF defrauded the claimant/investors and that therefore the McGimsey claimants

2    should have fraud claims against rather than equity interests in DTDF.  Orrick worked with

3    Beckley in opposing such claim, which this Court disallowed in February, 2006.  The McGimsey

4    claimants have since taken an appeal to the BAP.

5         **Category B320 – Plan And Disclosure Statement.**  Orrick devoted 819.10 hours to this

6    category, representing $454,404 of fees.  The Court is well aware of the Plan, the sale to Compass

7    Partners embodied in the Plan, and the original proposed sale to Silver Point that produced the

8    first filed version of an asset purchase agreement and which later resulted in the Compass overbid

9    and a revised asset purchase agreement.   And the Court is aware that the Compass sale closed on

10   February 16, 2007, and that the Plan went effective on March 12th.  As a result of the Plan

11   negotiations, DTDF will receive from FTDF:  $1 million in cash; FTDF's 35% interest in

12   BySynergy obligation; FTDF's $347,775 unremitted principal claim against USACM and the

13   remainder of FTDF's unsecured claim against USACM.  Despite having received considerable

14   value from FTDF (and having avoided the professional fees that would have resulted from

15   litigation with FTDF), the question is why did Orrick and FTI spend so much time on behalf of

16   DTDF in the plan process when the Plan did not result in the sale of DTDF assets?  The response

17   is many-fold, but the three primary ones are that (i) the DTDF Committee professionals spent a

18   great deal of time attempting to sell their assets to Silver Point and other potential purchasers,

19   meeting with them, exchanging documents, emails and the like, but the prices offered were

20   wholly unacceptable; (ii) the Plan offered the DTDF Committee the opportunity to free DTDF

21   from the control of a Chief Restructuring Officer and professionals who, in the opinion of the

22   DTDF Committee and its professionals, were not acting in DTDF's best interests due to their

23   multiple and conflicting roles; and (iii) the DTDF Committee and its professionals believed that

24   due to the complexity and difficulty of the Chapter 11 Cases and due to the existence of many

25   parties that would attempt to block any plan of reorganization that did not favor their particular

26   interests to the detriment of other interests, a plan of reorganization supported by the Debtors and

27   all four committees had the best chance of being confirmed and consummated.  Thus, DTDF

28   Committee professionals and their client worked with the other committees and the Debtors to

confirm the best plan possible.  That meant, of course, that they also took pains to negotiate the best deal and the best language for DTDF in the process.  Such services break down into several subgroups, described as follows:

- Negotiations with Potential Asset Purchasers.  Discussions and meetings with parties interested in purchasing DTDF's assets, reviewing term sheets, negotiating the same (both via telephone, email and in person).  Ultimately, the DTDF Committee could not reach agreement with the stalking horse buyer acceptable to the Debtors and the other committees.  Nor could it reach agreement with Compass Partners, the successful overbidder.  But much time was spent attempting to achieve a sale.

- Negotiations with the Debtors and the Other Committees.  In addition to the compromises with the FTDF Committee described above, the Plan is replete with compromises among all the parties, including the DTDF Committee.  Orrick and other DTDF Committee professionals participated in a number of in-person meetings and in countless all-hands and smaller group conference calls discussing and negotiating plan provisions that had direct or indirect or potential impact on DTDF and its investors.

- Reviewing and Revising the Asset Purchase Agreement, the Plan, etc.  Orrick review and commented on countless drafts of the Silver Point asset purchase agreement, the Compass Partners asset purchase agreement that replaced it, the Plan, the disclosure statement, the confirmation brief, the responses to objectors, and many, many other pleadings.  Orrick did not take the lead in the drafting, but was compelled to read each draft and comment on each in order to make sure that the interests of DTDF were being preserved and protected, and that no language prejudiced its interests.  Other estate professionals did the same for their constituencies.  The review of the drafts, the commenting on them and the conference calls to discuss them took countless hours, but was necessary.

- Responding to the LPG Solicitation to Investors.  Around Thanksgiving, estate professionals learned that the so-called Lenders Protection Group had sent a lengthy solicitation to an unspecified number of direct lenders and fund members seeking "no" votes on the Plan, and trumpeting vague alternatives.  This without approval from this Court.  Orrick joined the other estate professionals in fashioning a joint response and in obtaining this Court's approval thereof prior to distributing it.

- Preparation for and Attendance at the Confirmation Hearings.  Once again, Orrick did not take the lead, but because the DTDF Committee supported the Plan (and sent a letter to DTDF investors urging an vote in favor of the Plan), Orrick prepared for and attended the confirmation hearings.

- Reviewing and Revising the Findings and the Confirmation Order.  Orrick reviewed and commented on numerous drafts of the Findings and the Confirmation Order, reviewing objections thereto in the process and once again attempting to preserve rights and claims of DTDF.

- Opposition to the Stay and Participation in the Appeals.  Orrick joined with the other estate professionals in responding to the *ex parte* stay granted by the BAP in favor of the LPG, and worked with the others on the subsequent hearings in the U.S. District Court and in this Court.  It also participated in the drafting and review

of motions to dismiss the Investment Partners and other appeals and in the drafting and review of the briefs on the merits.

**Category B330 – Plan Implementation.** Orrick devoted 171 hours to this category, representing $95,320 of fees. Other than 2.3 hours spent in late December, Orrick began the plan implementation process in January, following Confirmation. Broadly stated, the services related to preparing for the Effective Date and for the emergence on such date of Revested DTDF. Such services break down into several subgroups, described as follows:

- <u>Transition Planning</u>. Orrick, working with FTI and Beckley, prepared for the transition from chapter 11 debtor to Nevada limited liability company charged with liquidating its volatile and quirky asset base and distributing the proceeds to the 1,300+ defrauded investors. In addition, DTDF would be moving from a family of companies under the aegis of USACM, to a stand alone entity run by a new CEO/Manager and a new and independent board of directors charged with operating Revested DTDF, preparing financials, managing members, working with borrowers, etc. Finally, Revested DTDF would be stepping into the litigation shoes of DTDF, and strategic decisions had to be made and pleadings filed – above and beyond mere substitutions of counsel. Litigation planning included working with the new USACM Trust to try to capitalize on synergies and avoid duplication of effort. Lists were made, meetings were conducted, and the transition occurred.

- <u>The 1142 Motions and Nevada Regulators</u>. No one can anticipate all problems and issues, and a number of loose ends had to tied up in connection with the Plan. Orrick worked with other estate professionals on two motions pursuant to section 1142 of the Bankruptcy Code, the most important aspect of which for Revested Diversified was the clarification that consistent with Nevada law, Revested DTDF could act as loan servicer for the Colt loans and others, including one in which Revested DTDF had an approximately 98% ownership interest.

- <u>Revised Operating Agreement and Other Organizational Documents</u>. The Plan required DTDF to submit in its Plan Documents Supplement an amended DTDF operating agreement. Orrick worked with Beckley and FTI in drafting the amended operating agreement and related documents, in discussing its provisions with members of the DTDF Committee and in revising the same in accordance with the views of the DTDF Committee members and the DTDF Administrator.

- <u>Selection of DTDF Administrator and DTDF Post-Effective Date Committee</u>. The Plan also required the DTDF Committee to identify the DTDF Administrator (i.e. the manager of Revested DTDF) and the members of the Post-Effective Date DTDF Committee (i.e., the board of directors of Revested DTDF). Orrick assisted the DTDF Committee in identifying and interviewing candidates and in the selection process.

- <u>Preparing for the Initial Post-Effective Date Board Meeting</u>. Orrick, working with Beckley and FTI, prepared for the initial meeting of the board of directors, which included preparing an agenda and dealing with issues that led to the resignation of a board member.

1      **Category B503 – Litigation.**  Orrick devoted 346.30 hours to this category, representing

2    $174,344.50 of fees.  Such services break down into several subgroups, described as follows:

3          •    The Interim Distribution Motion. The Debtors filed a motion to distribute $65
                million to direct lenders (none of which would go to DTDF), and Orrick and other
4               DTDF Committee professionals reviewed, analyzed and strategized regarding
                possible responses and legal theories for the DTDF Committee's response thereto
5               (including substantive consolidation, recharacterization of direct lender interests
                into unsecured debt, netting of interim distributions, among other theories).  They
6               then researched the facts and law, and filed a lengthy partial objection thereto,
                supported by a very lengthy declaration that outlined the promises made to DTDF
7               investors in the Prospectus, the breaching of such promises and the reasons why
                the Chapter 11 Cases might be subject to substantive consolidation or
8               recharacterization of all debts and interests as claims entitled to equal treatment
                across the three primary debtors.  The motion was opposed by the three other
9               committees, which is understandable because their oxen would have been gored
                were the Court to have ruled in favor of the DTDF Committee.  It also was
10              opposed by DTDF.  The Court declined to scale back the interim distribution as
                requested by the DTDF Committee, but as the result of such efforts, the DTDF
11              Committee and the FTDF Committee reached an agreement as part of the Plan
                which resulted in the assignment of FTDF's claims related to the BySynergy
12              obligation and the payment of $1 million to DTDF (half of which was paid to
                Revested DTDF on or about the Effective Date, and the other half will be paid
13              once the disputes between the FTDF Committee and the USACM Committee over
                the allocation of the Compass overbid are resolved).  Moreover, the opposition to
14              the distribution motion provided the Court with extensive information about the
                looting of the DTDF and misrepresentations to DTDF investors at the hands of
15              USACM's former principals and their Ponzi-like scheme. In short, the DTDF
                Committee's opposition to the distribution motion thus put front and center some
16              of the key issues facing the DTDF in the Chapter 11 Cases.

17         •    Potential Claims Against Other Third Parties.  Analysis of potential litigation
                claims against third parties, and of various motions, including the stay relief
18              motion filed by Standard Property Development.

19     **Category B504 – EPIC Loan**.  Orrick devoted 161.20 hours to this category,

20   representing $89,002 of fees.  The EPIC loan is the second largest loan in the DTDF's portfolio.

21   The services rendered break down into several subgroups, described as follows:

22         •    Analysis and Factual and Legal Research.  Through research and analysis, DTDF
                Committee professionals learned the following: Tree Moss Partners, LLC is owned
23              by Investment Partners, which is in turn beneficially owned by Hantges and
                Milanowski.  An uncollected obligation wholly owned by DTDF is owned by the
24              owner of the property that once secured the Epic loan; the loan balance exceeds
                $20 million.  The collateral therefor consisted of 63 condominium units in the
25              Marquis Villas resorts in Palm Springs, California.  DTDF foreclosed on those
                condominium units in 2004 and took title to the same.  Yet following the
26              foreclosure, Tree Moss took control of the condominium units, and in February of
                2006, Milanowski executed a quitclaim deed transferring the condominium units
27              from DTDF to Tree Moss for no consideration.

28

- <u>Filing the Involuntary Case</u>.   DTDF Committee professionals, as well as the debtors professionals, had participated in protracted negotiations with Milanowski and his counsel in late summer and autumn of 2006 in connection with a proposed sale of the 63 condominium units by Tree Moss.  The hope was that Milanowski would agree to arrangements that ensured that essentially all of the net sale proceeds of the 63 condominium units would be paid over to the DTDF.  However, when those negotiations reached deadlock, the Debtors and the DTDF Committee professionals determined that an involuntary bankruptcy petition, coupled with an immediate motion for the appointment of an interim trustee, was the most acceptable course of action.  With the cooperation and assistance of Orrick and the DTDF Diversified Committee, DTDF filed an involuntary bankruptcy petition against Tree Moss on December 7, 2006, serving as the sole petitioning creditor.  A motion for the appointment of an interim trustee and seeking to restrict Milanowski's operating authority was filed that same day, and the Court orally ruled that the UST should appoint an interim trustee at a hearing held on December 15, 2006.  On December 19th, the UST appointed James Lisowski as the interim trustee.

- <u>Subsequent Developments in the Involuntary</u>.  Tree Moss eventually consented to the entry of an order for relief, and Lisowski attempted to administer the 63 condominium units.  The DTDF Committee disagreed with many of his actions and tactics, and was compelled to object to a proposed sale procedure and sales agreement.  The Trustee ultimately invited DTDF Committee professionals to participate in the screening of potential buyers, but as of the date hereof, no sale proposal acceptable to the DTDF Committee (and now Revested DTDF) has surfaced.  In addition, the Tree Moss Trustee has been unable to fund or control the homeowners association, which may continue to be dominated by Milanowski.  And he has not made peace with the owner of the remaining 38 condominium units that share the common areas of the complex.  Some very recent developments may be positive ones, but to date, the DTDF Committee (and now Revested DTDF) have been compelled to expend a great deal of time and energy in an attempt to monetize this asset.

**<u>Category B505 – 10-90 Loan</u>**.  Orrick devoted 1,034.40 hours to this category, representing $525,136 of fees.  The 10-90, Inc. loan ("10-90 Loan"), which is 100% owned by DTDF is, by far, the largest loan in DTDF's portfolio, accounting for approximately 50% of the DTDF portfolio of assets.  The 10-90 Loan is non-performing, with a current investment of $55,113,781 and an interest receivable of $33.4 million (rounded), as of January 31, 2007, bringing the total owed to DTDF from borrower USA Investment Partners to $88.5 million (rounded) as of January 31, 2007.  Interest continues to accrue at approximately $1 million per month.  The foregoing does not include default interest, which will raise the debt much, much higher. The services rendered break down into several subgroups, described as follows:

- <u>Analysis and Factual and Legal Research Relating to the 10-90 Loan</u>.  The 10-90 Loan was fiction and a subterfuge employed by Hantges and Milanowski as part of a scheme to fund their speculative real estate activities with DTDF investor funds,

rather than utilizing DTDF funds to make non-insider loans secured by first trust deeds as promised in the Prospectus.  For example, DTDF's books and records reflect that $4.6 million was transferred directly from DTDF to HMA Sales, LLC ("HMA"), an entity wholly-owned by Investment Partners. An additional approximately $9 million flowed from DTDF to HMA through various entities controlled or owned by Milanowski and Hantges, after being "laundered" through various entities controlled or owned by Milanowski, Hantges, or their accomplice David Fogg, in an apparent attempt to impede any eventual audit of these funds. Eventually, 10-90, Inc. was removed from the transaction as a borrower of DTDF and a lender to Investment Partners and thereafter, Investment Partners became the direct borrower to DTDF in the 10-90 Loan.  Leveraging off work performed by the Debtors, DTDF Committee professionals reconstructed the 10-90 Loan and shored up the tracing of the recipients of DTDF funds, a painful and time-consuming process due to the sorry state of DTDF's books and records, the lack of access to Investment Partners' books and records, and the lack of cooperation from Milanowski and Hantges.

- Ashby Loans, Including Roripaugh Ranch.  A large portion of the proceeds of the 10-90 Loan were used to fund IP and its primary members, Hantges and Milanowski as a source of funds for projects and other deals of IP and IP-related entities.  The 10-90 Loan is secured by the assignment of membership interests in Ashby USA, LLC, IP, Capital Land Investors, LLC and Random Developments, LLC.  It is not secured by deeds of trust that encumber real property interests. Accordingly, collateral securing the 10-90 Loan is not as readily recoverable in foreclosure or otherwise as it would be were deeds of trust properly in place. During the course of the Chapter 11 Cases, DTDF Committee professionals, including Orrick, have met with Ashby representatives in Riverside County on one occasion and in Los Angeles on another.  They have participated in a number of conference calls with business people and attorneys and have reviewed numerous documents.  Despite that, none of the assets were liquidated, and in fact Milanowski, without notice to the Debtors and contrary to his prior representations to them, entered into an agreement with Ashby in November that the DTDF Committee believes transferred substantial value to Ashby for no consideration. The Effective Date having arrived, Revested DTDF, working with the USACM Trust and perhaps the new Investment Partners Trustee, will be taking steps to monetize the Ashby assets.  The first step will be an in-person meeting with Ashby in Las Vegas in early May

- The Royal Hotel and the HMA Adversary. After the commencement of the DTDF and USACM chapter 11 cases, the two debtors negotiated with Milanowski and obtained a promissory note in the amount of $58,374,918.81 to evidence certain obligations owing by Investment Partners to USACM and DTDF and for a security agreement to secure that and other obligations (specifically including the obligations under the 10-90 Loan).  One of the assets pledged was Investment Partners' ownership interest in HMA, which owned the Royal Hotel in Las Vegas. Around the same time that Investment Partners pledged its interest in HMA to DTDF and USACM, Milanowski on behalf of HMA, granted a lien on the Royal Hotel in favor of the Reale to secure a $12.3 million personal loan that Reale had previously made to Hantges and Milanowski.  In the fall of 2006, Great White Investment NV Inc. ("Great White") sued Milanowski and Hantges in Nevada state court, alleging fraud.  Great White caused a lis pendens to be recorded against the Royal Hotel even though the lawsuit had nothing to do with HMA or the Royal Hotel.  In meetings thereafter, Milanowski asked that DTDF intervene in the law suit and seek the expungement of the Great White lis pendens, claiming it was groundless.  Meanwhile, the Debtors continued negotiations with Milanowski

regarding the sale of the Royal Hotel and the distribution of the proceeds (which included the review of a draft settlement agreement, closing statement, etc.) Nevertheless, on December 22, 2006, Hantges and Milanowski caused HMA to sell the Royal Hotel for $24 million in cash and a promissory note or notes for approximately $5 million. The sale escrow paid Reale approximately $9.9 million and Great White $1 million. On December 23rd, DTDF and the DTDF Committee learned the sale was about to occur or may have occurred, and immediately worked over the Christmas weekend to prepare and e-file an adversary proceeding alleging fraudulent transfer and other claims. DTDF Committee professionals had pressed DTDF to commence and involuntary bankruptcy case or to file a fraudulent transfer action in early December. Beginning in late January, with the confirmation order having been signed and the Effective Date looming, Orrick took control of the adversary proceeding from DTDF's counsel. Since that time, the adversary has been hotly contested – as the Court is well aware – and has included prejudgment remedies, attachments preserving approximately $7 million, discovery, supporting declarations and the like. The litigation has been time-consuming and costly, and remains so, complicated by Milanowski's ongoing support of the payment to Reale and his invocation of the Fifth Amendment whenever faced with a question he does not care to answer.

## IV.

## SUMMARY OF EXPENSES

27.    The total amount of expenses requested by Orrick in performing necessary services for the DTDF Committee during the Chapter 11 Cases is $42,914.58, which amount breaks down as described in Exhibit E hereto.

28.    Orrick generally handles regular and routine photocopying in-house. It is seeking reimbursement of $.20 per page. This amount is less than the amount Orrick customarily charges for photocopying expenses. Orrick's copy machines automatically record the number of pages made when the person that is photocopying enters the client's account number into a device attached to the copy machine. Whenever feasible, Orrick sends large copying projects to outside copy services that charge bulk rates for photocopying. In such instances, Orrick charges clients the same amount that Orrick pays the outside service.

29.    Orrick normally charges its clients $1.50 per page for each outgoing facsimile transmission. However, for purposes of these Chapter 11 Cases, charges for all outgoing facsimile transmissions have been reduced to $1.00 per page. Orrick does not charge its clients for incoming faxes. The use of faxes has been relatively small in light of the extremely heavy use of email.

30.     Orrick bills directly to its clients the cost of transmitting mail.  Postage is logged and billed through a computer system.  Orrick calculates postage costs at a rate set by the postal service for the weight and class of a given mailing.  For large mailings, Orrick occasionally uses an outside mailing house, whose charges are passed on directly to its clients without surcharge of markup.  Orrick also seeks reimbursement for overnight package charges, such as Federal Express, messenger delivery charges without surcharge or markup.

**V.**

**COMPLIANCE WITH GUIDELINES AND ORDER
ESTABLISHING INTERIM COMPENSATION PROCEDURES**

31.     Orrick endeavors to control fees and expenses by providing services in an efficient and effective manner.  To this end, Orrick diligently works to coordinate and facilitate the efficient prosecution of the matters for which it is employed.  Staffing of matters within the case is done with the objective of providing the level of representation appropriate to the significance, complexity, or difficulty of the particular matter.  Due to the sensitive nature and complexity of these Chapter 11 Cases, it is not always possible to delegate authority to persons with lower billing rates.  However, Orrick has made every effort to avoid unnecessary duplication of effort.  When more than one attorney attended a meeting or hearing, such attendance was necessary to adequately represent the interests of the DTDF Committee.

32.     Orrick reviews all client billings for reasonableness and makes adjustments so that the charges are consistent with the value of the services provided.  Orrick charges hourly rates that are similar to those rates charged by comparable law firms for similar legal services.  *See, e.g., In re Ginji Corp.*, 117 B.R. 983, 990 (Bankr. D. Nev. 1990).  Orrick's blended hourly rate, not including paraprofessionals, during the Chapter 11 Cases was $527.60.  Orrick's blended hourly rate, including paraprofessionals, during the Chapter 11 Cases was $522.18.

33.     As described above, Orrick has voluntarily reduced its requested fees by writing off approximately $77,000, and did not seek to increase rates effective January 1, 2007, resulting in an additional discount of $16,600.  Orrick also has limited its charges for travel time by capping travel time at 2.5 hours each way, despite the fact that such travel actually takes longer –

1   often far longer – than 2.5 hours each way.  Plus, Orrick attorneys invariably work en route on the

2   matters that have caused them to travel.

3       34.     Orrick believes that the fees and expenses sought in this Application are

4   appropriate, and were reasonable and necessary in light of the complexity of these Chapter 11

5   Cases and the scope and difficulty of the business and legal issues involved.

6                              **VI.**

7                      <u>**CONCLUSION AND PRAYER**</u>

8       In summary, Orrick has rendered valuable services to the DTDF Committee and

9   now prays that the Court award fees in the sum of $2,228,780.60, and the reimbursement of costs

10  in the sum of $42,914.58, for a total award of $2,271,695.18.

11  Dated: April 26, 2007                  ORRICK, HERRINGTON & SUTCLIFFE LLP

12

13                              By:    */s/Marc A. Levinson*

14                                  Marc A. Levinson (California Bar No. 57613)
                                    Jeffery D. Hermann (California Bar No. 90445)
15                                  ORRICK, HERRINGTON & SUTCLIFFE LLP
                                    400 Capitol Mall, Suite 3000
16                                  Sacramento, CA  95814-4497
                                    Telephone:  (916) 447-9200

17                                  Attorneys for the Official Committee of
                                    Equity Security Holders of USA Capital
18                                  Diversified Trust Deed Fund, LLC

19

20

21

22

23

24

25

26

27

28

OHS West:260220362.1                    - 24 -