1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Michael A. Tucker
Chas E. Harvick
FTI CONSULTING, INC.
Two North Central Avenue, Suite 1200
Phoenix, AZ 85004
Telephone: (602) 744.7100
Facsimile: (602) 744.7110
Email:    michael.tucker@fticonsulting.com;
          chas.harvick@fticonsulting.com

Financial Advisors for the Official USA Diversified Committee
of Equity Security Holders of USA Capital Diversified Trust
Deed Fund, LLC

Electronically Filed April 26, 2007

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>                                    Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>                                    Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>                                    Debtor. | Chapter 11 |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>                                    Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725-LBR |
| In re:<br>USA SECURITIES, LLC,<br>                                    Debtor. | **FIRST AND FINAL FEE APPLICATION OF FTI CONSULTING, INC. AS FINANCIAL ADVISORS TO THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS** |
| Affects:<br> ☐  All Debtors<br> ☐  USA Commercial Mortgage Company<br> ☐  USA Securities, LLC<br> ☐  USA Capital Realty Advisors, LLC<br> ☒  USA Capital Diversified Trust Deed Fund, LLC<br> ☐  USA First Trust Deed Fund, LLC | **OF USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC (JUNE 9, 2006 – MARCH 12, 2007)**<br><br>Hearing Date:      June 22, 2007<br>Hearing Time:      9:30 a.m.<br> Hearing Place:      Courtroom #1 |

**APPLICATION PERIOD**:  June 9, 2006 – March 12, 2007
**INTERIM APPLICATION NUMBER**:  First and Final

**TOTAL FEES REQUESTED**:  $    1,613,380.50
**TOTAL EXPENSES REQUESTED**:  $    30,951.02
**TOTAL APPLICATION REQUESTED**:  $    1,644,331.52

**I.**

**INTRODUCTION**

1.     FTI Consulting, Inc. ("FTI"), as financial advisors to The Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC (the "USA Diversified Committee"), hereby makes its First and Final Application for Allowance of Compensation and Reimbursement of Expenses (the "Application") for the period from June 9, 2006 through March 12, 2007 (the "Application Period").

2.     During the Application Period, FTI spent **4,033.0** hours in its assistance to the USA Diversified Committee.  Based upon FTI's hourly rates in effect at the time said services were rendered, FTI's total fees for this Application Period are $**1,613,380.50**.  The total blended hourly rate for FTI's professionals is $**400.04**.  During the Application Period, FTI incurred $**30,951.02** of out-of-pocket expenses.  Two payments have been made on Interim Monthly Statements, as detailed below, that total $937,606.15.  Additional compensation and expense reimbursement requested by FTI for the Application Period totals $**706,725.37**.

**II.**

**BACKGROUND**

3.     On April 13, 2005 (the "Petition Date"), USA Capital Diversified Trust Deed Fund, LLC ("USA Diversified"), USA Commercial Mortgage Company ("USA Mortgage"), USA Securities, LLC ("USA Securities"), USA Capital Realty Advisors, LLC ("USA Realty") and USA Capital First Trust Deed Fund, LLC ("USA First" and, collectively with USA Mortgage, USA Securities, USA Realty and USA Diversified, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code").

4.      On June 9, 2006, the USA Diversified Committee met telephonically and decided to engage FTI as their Financial Advisor.

5.      On June 14, 2006, the USA Diversified Committee filed both its application to employ FTI Consulting and a supporting declaration of Michael A. Tucker.  On June 22, 2006, this Court entered an order approving the USA Diversified Committee's employment of FTI as its financial advisor, *nunc pro tunc* as of June 9, 2006. (Docket No. 776).

6.      At the August 4, 2006 omnibus hearing, the Court granted the Interim Fee Procedures Motion.  On August 29, 2006, the Court entered the Administrative Order Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals (Affects All Debtors) ("Interim Fee Procedures Order"), Docket No. 1199.

7.      This is FTI's First and Final Application for compensation which covers the period from June 9, 2006 through March 12, 2007.  FTI has made no application to the Court for payment of fees and expenses prior to the filing of this application.

8.      On November 28, 2006, FTI submitted an interim monthly invoice to Debtors, Committee Professionals and the Office of the US Trustee for the period from June 9, 2006 through June 30, 2006, for professional fees in the amount of $94,033.50 and costs in the amount of $2,737.40.  On January 26, 2007, FTI received payment of 100% of the fees and the costs for a total in the amount of $96,770.90.

9.      On November 28, 2006, FTI submitted an interim monthly invoice to Debtors, Committee Professionals and the Office of the US Trustee for the period from July 1, 2006 through July 31, 2006, for professional fees in the amount of $195,194.00 and costs in the amount of $3,089.21.  On January 26, 2007, FTI received payment of 100% of the fees and the costs for a total in the amount of $198,283.21.

10.      On November 28, 2006, FTI submitted an interim monthly invoice to Debtors, Committee Professionals and the Office of the US Trustee for the period from August 1, 2006 through August 31, 2006, for professional fees in the amount of $205,779.50 and costs in the amount of $3,902.22.  On January 26, 2007, FTI received payment of 80% of the fees in the amount of $164,623.60 and 100% of the costs in the amount of $3,902.22.

11.     On November 28, 2006, FTI submitted an interim monthly invoice to Debtors, Committee Professionals and the Office of the US Trustee for the period from September 1, 2006 through September 30, 2006, for professional fees in the amount of $178,124.25 and costs in the amount of $1,736.05.  On January 26, 2007, FTI received payment of 80% of the fees in the amount of $142,499.40 and 100% of the costs in the amount of $1,736.05.

12.     On November 28, 2006, FTI submitted an interim monthly invoice to Debtors, Committee Professionals and the Office of the US Trustee for the period from October 1, 2006 through October 31, 2006, for professional fees in the amount of $132,851.25 and costs in the amount of $1,370.24.  On January 26, 2007, FTI received payment of 80% of the fees in the amount of $106,281.00 and 100% of the costs in the amount of $1,370.24.

13.     On December 26, 2007, 2006, FTI submitted an interim monthly invoice to Debtors, Committee Professionals and the Office of the US Trustee for the period from November 1, 2006 through November 30, 2006, for professional fees in the amount of $140,009.00 and costs in the amount of $1,490.45.  On January 26, 2007, FTI received payment of 80% of the fees in the amount of $112,017.88 and 100% of the costs in the amount of $1,490.45.

14.     On January 25, 2007, FTI submitted an interim monthly invoice to Debtors, Committee Professionals and the Office of the US Trustee for the period from December 1, 2006 through December 31, 2006, for professional fees in the amount of $135,789.00 and costs in the amount of $2,030.55.  On February 28, 2007, FTI received payment of 80% of the fees in the amount of $108,631.20 and 100% of the costs in the amount of $2,030.55.

15.     On February 26, 2007, FTI submitted an interim monthly invoice to Debtors, Committee Professionals and the Office of the US Trustee for the period from January 1, 2007 through January 31, 2007, for professional fees in the amount of $187,239.50 and costs in the amount of $4,104.75.  To date, FTI has received no payment related to this invoice.

16.     On March 26, 2007, FTI submitted an interim monthly invoice to Debtors, Committee Professionals and the Office of the US Trustee for the period from February 1, 2007 through February 28, 2007, for professional fees in the amount of $256,191.50 and costs in the

1    amount of $9,505.34.  To date, FTI has received no payment related to this invoice.

2        17.    On April 24, 2007, FTI submitted an interim monthly invoice to Debtors,

3    Committee Professionals and the Office of the US Trustee for the period from March 1, 2007

4    through March 12, 2007, (Post Effective Date) for professional fees in the amount of $88,169.00

5    and costs in the amount of $974.13.  To date, FTI has received no payment related to this invoice.

6        18.    No objections have been received by FTI on any of its monthly statements

7    submitted pursuant to the Interim Fee Procedures Order.

8        19.    FTI hereby submits its First and Final Fee Application in the Chapter 11 case for

9    the period June 9, 2006 through November 30, 2006.  Total fees and expenses for this period

10   were $1,644,331.52.  FTI has received two payments totaling $937,606.15 leaving a balance due

11   of **$706,725.37**.  Summaries of the fees incurred through March 12, 2007 are included as

12   Attachment 1, Exhibits "A", "B" and "C".

13       20.    A copy of the monthly interim invoices for this period with support documentation

14   is included as Attachments 2 through 11.

15       21.    This Fee Application seeks Court approval and allowance, pursuant to Section 331

16   of the Bankruptcy Code, of the compensation requested in the period covered by this Fee

17   Application.

18       22.    The names of FTI's professionals requesting fees and the hourly rate charged by

19   each are listed in Attachment 1, Exhibit "A".

20       23.    The Court confirmed the Debtors' Third Amended Joint Chapter 11 Plan

21   Reorganization ("Plan") in an order filed on January 8, 2007 ("Confirmation Order") Docket No.

22   2376, and the Effective Date of the Plan occurred on March 12, 2007.  FTI has continued to

23   represent USA Diversified after the Effective Date and Michael Tucker was selected by the USA

24   Diversified Committee to be its Administrator.

25       24.    Pursuant to the Plan, the USA Diversified Committee disbanded on the Effective

26   Date.  However, since March 13, 2007, Robert Worthen, the Chair of the USA Diversified

27   Committee, has served as the Chairman of the Board of Revested DTDF.  Mr. Worthen has

28   reviewed FTI's billing statements, has found FTI's fees and costs to be reasonable and necessary,

1    and has approved FTI's fees and costs for payment by USA Diversified, subject to Court approval

2    of this Application.

3        25.    Except as FTI may be entitled to receive compensation herein, FTI has no

4    arrangements with any other parties for compensation for the services rendered to the USA

5    Diversified Committee.  The employees of FTI are disinterested persons defined in 11 U.S.C. §

6    101(14) and do not hold or represent any interest adverse to the estate.

7    <center>**III.**</center>

8    <center>**SUMMARY OF PROFESSIONAL SERVICES PERFORMED BY FTI**</center>

9    <center>**BY PROJECT CODES**</center>

10        A.    Pursuant to the U.S. Trustee Guidelines, FTI has established project billing

11    categories for this case.  The following summaries of professional services performed by FTI

12    during the Application Period are set forth by project billing category.

13        The summaries that follow easily could have two or three times longer.  But FTI is aware

14    that the Court, the UST, other professionals as well as USA Diversified investors and perhaps

15    other investors may be reviewing up to 12 final fee applications.  The summaries attempt to

16    highlight the key tasks undertaken and the results thereof.  What they may not convey to the

17    reader is the incredibly difficult roles played by the estate professionals generally and the

18    professionals employed by USA Diversified – including FTI, Orrick and Beckley Singleton – in

19    particular.

20        Before launching into the summaries, FTI feels compelled to state what may be the

21    obvious:  The Chapter 11 Cases have been challenging and frustrating, a pressure cooker under

22    which the heat has stayed on high from day one due to the universal concern for the victims of the

23    USA Commercial debacle and fraud.  Each of the key professionals receives no fewer than 50 and

24    often more than 100 emails every week day, and receives numerous emails over the weekend.  An

25    email sent to seven estate professionals at 7:00 p.m. on a week night will prompt three to six

26    responses prior to 9:00 a.m. the next morning.  And this went on throughout the case, with no

27    respite, including holidays – witness the HMA adversary proceeding that was e-filed on

28    Christmas Day.

And as difficult and trying as the cases have been, they have been even more so for the USA Diversified Committee and its professionals.  As described in detail in the USA Diversified Committee's limited opposition to the distribution motion (Docket No. 987) and in the lengthy supporting declaration of Michael Tucker (Docket No. 994), virtually every promise made to potential USA Diversified investors in the prospectus was violated:  (i) loans were not secured by conservative loan-to-value real estate secured loans; virtually all of the loans in the $150 million USA Diversified portfolio were unsecured; (ii) loans were made to insiders despite promises of loans only to arms length third parties; the $55 million unsecured 10-90, Inc. loan was made to Investment Partners and used for real estate investment, among other things, (the balance approximates $90 million today), and approximately $14 million of undocumented, unsecured loans were made to Colt Gateway, in which Joe Milanowski has a 50% ownership interest; (iii) loans were concentrated in violation of a promise of no concentration in any borrower; to make matters worse, the concentrated loans were made to insiders.

The asset pool owned by Revested DTDF is replete with problems, so much so that no potential plan funder or buyer offered more than nominal value.  No significant loans were collected during the course of the Chapter 11 Cases.  Revested DTDF faces numerous collection problems and litigation with virtually each of its assets, which translates to no payout to USA Diversified investors in the near future.

In short, this case has been a challenge from the outset and will remain a challenge in the months and perhaps years ahead.  It is under these conditions that FTI and the other USA Diversified Committee professionals seek compensation.

1.    Meetings and Communications Involving the Diversified Committee.  FTI participated in USA Diversified Committee meetings in-person and via telephone to keep the USA Diversified Committee apprised of all of the fast-moving events in these Chapter 11 Cases and to advise the USA Diversified Committee in connection with strategic decisions to be made by the USA Diversified Committee.  FTI also addressed individual member's specific questions and/or requests.  FTI provided information through reports, email correspondence and web postings to its members and counsel based on the analyses described herein.  FTI has provided

benefit to the USA Diversified Committee and fund members by keeping members informed of current issues and developments in the case. The foregoing services were necessary and conferred a benefit upon the estate for the reason that these discussions allowed appropriate information to be disseminated to and from the USA Diversified Committee. Keeping the USA Diversified Committee apprised of current issues and developments allowed them to make critical decision in the Chapter 11 Cases.

The persons providing services on these matters and the associated fees are summarized in Attachment 1, Exhibit "B" and supporting time detail is provided for each individual in Attachments 2 through 11.

2.     Collection Account Distributions and Related Disputes. This category included, but was not limited to, efforts related to the Debtors' motion to distribute $65 million to direct lenders including reviewing, analyzing and strategizing regarding possible responses for the USA Diversified Committee's opposition to the distribution motion (including substantive consolidation, recharacterization of debt, netting of interim distributions, among other theories), drafting Michael Tucker's Declaration in support of the USA Diversified Committee's limited opposition to the distribution motion, reviewing and analyzing the Debtors' supplement to their distribution motion and the objections to the distribution motion filed by other interested parties in these Chapter 11 Cases.

To understand the ramifications of the proposed motion to distribute funds and to evaluate the various strategic alternatives, FTI met with the Debtors' to understand the past operations, cash flow and accounting of the Debtors' businesses, reviewed USA Diversified's operating agreement, servicing agreement, prospectus, corporate records, and transaction/loan documentation and investigated various transactions including but not limited to: USA Diversified's diverted principal of approximately $18.9 million , amount of prepaid interest and principal or approximately $5 million and various USA Diversified loans to USA Investment Partners and related entities.

FTI also devoted a significant amount of time in analyzing the various financial impacts based on different distribution scenarios, verification of the calculations and results of the

holdfunds report provided by the Debtor and the research, analysis and tracing of the approximately $10 million held in the Collection Trust Account by USA Mortgage at the petition date that was not disclosed but included in the proposed distributions.

Prior to interim distributions by USA Mortgage, FTI reviewed and analyzed the Interim Distribution/Holdfunds reports, including testing of data, setoff calculations and distribution amounts, meeting with Debtors to discuss observations/findings and reporting to Diversified Trust Deed Fund Committee.

Given the fact that the Debtors' distribution motion did not provide for any payment to the USA Diversified Committee, FTI believes that the substantial time and effort it expended with respect to the distribution motion was of critical importance. While the Court ultimately did not adopt the USA Diversified Committee's position regarding the amount of funds that should be held back from the proposed distribution given the uncertainties in the case, the USA Diversified Committee's opposition to the distribution motion (including Michael Tucker's Declaration) provided the Court with extensive information about the looting of USA Diversified and misrepresentations to USA Diversified investors at the hands of USA Capital's former principals. The opposition to the distribution motion further provided the Court with the USA Diversified Committee's arguments why USA Diversified, as a victim of the former principals' Ponzi-like scheme, should not be left out in the cold while other direct lenders, who by chance were lucky enough not to have been looted themselves, obtain substantial recoveries of principal and interest.

The USA Diversified Committee's opposition to the distribution motion thus put front and center some of the key issues facing USA Diversified in these Chapter 11 Cases and provide the basis for Plan negotiations between USA Diversified and the Debtors. Furthermore, as a result FTI's identification of the approximately $10 million balance in the Collection Trust Account at the Petition Date, analysis of these commingled funds also held in the Collection Trust Account resulted in approximately $2 million being deemed property of USA Mortgage. But for FTI's analysis, the commingled funds would have been distributed out of the USA Mortgage estate. Accordingly, FTI submits that the substantial time it spent on matters in this category during the Application Period were reasonable and necessary and conferred a benefit to the estate.

The persons providing services on these matters and the associated fees are summarized in Attachment 1, Exhibit "B" and supporting time detail is provided for each individual in Attachments 2 through 11.

3.      Asset Analysis and Recovery. This category included, but was not limited to, investigating and learning about USA Diversified's assets and take action to collect/monetize USA Diversified's assets.  The time has been substantial, in no small part because of the sad and disorganized state of the Debtors' books and records and the lack of cooperation, if not obstructionism, from the recipients of USA Diversified's funds.  As has been described in many other pleadings filed in these cases, each of the major loans/investments from USA Diversified is a complicated and unnerving tale of use and abuse by the former managers of USA Diversified. Each of such loans and investments, summarized below, is already or may become the subject of one or more law suits.  The services rendered during the Application Period in this category break down into several subgroups, described as follows:

- Loan Analysis:  Extensive review and analysis of documentation for loans in which the USA Diversified is a direct lender, including multiple on-site visits to Debtors' offices in Las Vegas, conference calls and meetings regarding same; verification of outstanding loan balances provided by the Debtor including comparison to USA Diversified financial statements; preparation of loan history reports and reconciliation to Debtor schedules noting discrepancies, reviewing documentation prepared by Debtor and resolving discrepancies.

- Asset And Recovery Analysis:  Extensive analysis of collateral securing USA Diversified loans and review and analysis of collection options and strategies for enforcement of USA Diversified loans; prepare list of 2004 exam candidates and general information about the candidates; discuss strategy with counsel regarding timing of 2004 exams; review and analysis of USA Diversified and Debtors schedules of assets and liabilities and statement of financial affairs; investigate USA Diversified borrower monies held at Project Disbursement Group; review USA Diversified prospectus and analysis regarding potential causes of action and recovery options; prepare summary list of status of USA Diversified loans, outstanding balances, collateral, guarantors, etc. and various recovery scenario analysis for the USA Diversified Committee.

- Review of USA Diversified Audits and Analysis of USA Diversified Financial Statements:  Extensive analysis of the bookkeeping and financial reporting of USA Diversified by the Debtor, including meeting with Debtor's Controller regarding same, reviewing final and draft audits and workpapers and understanding various transactions to aid in plan and settlement

negotiations with Debtors and other parties and identify additional recovery sources. USA Diversified now has the audit firm's audit and tax files for the 2004 exam of Beadle McBride to assess courses of action against it and review additional USA Diversified historical activity for other recoveries.

▪ <u>Appraisal Review and Communication with Debtor, Borrowers and Investors</u>: Review and analyze the appraisals of collateral securing the USA Diversified loans, review borrower and investor statements and communicating with the Debtors and others regarding the status of the collection efforts, collection issues and collection strategy.

▪ <u>Debtors' Proposed Forbearance Transactions</u>: Analysis of various transactions proposed by Debtors involving loans and collateral in which USA Diversified has an interest, meetings, telephone conferences and reviewing/commenting on responses to motions (i.e. Franklin Stratford, Amesbury Hatterspoint, HFA, Boise/Gowan). Some of this work has allowed borrowers such as Franklin Stratford to repay its loans where USA Diversified had a $1 million investment.

▪ <u>EPIC (Tree Moss) And Sheraton (Investors VI) Loan Recovery Analysis</u>: Review and analysis of the EPIC and Sheraton loan files, court filings and analysis prepared by the Debtor; prepare loan history reports and supporting documentation for recovery efforts; review proposed escrow assignment, security documents and marketing agreement and participate in settlement and negotiation meetings with Debtor and Joe Milanowski; analysis of USA Diversified's involvement/activity regarding EPIC and Sheraton loans and Tree Moss and Investors VI; search, compile and analysis of documents (agreements, title reports, financials, loan documents, etc.) to facilitate involuntary filings of USA Investors VI and Tree Moss Partners discussed below; review various pleadings filed by USA Investors VI and Tree Moss; meet with USA Investors VI and Tree Moss Partners' Interim Trustee (James Lisowski) to share USA Diversified's knowledge of the entities and their assets and determine how we can work together.

▪ <u>USA Investors VI</u>: FTI and the other USA Diversified professionals devoted a great deal of time (specifically mentioned above) to uncovering the transactions that led them to conclude that USA Diversified had a claim against USA Investors VI. That involved delving into a number of transactions related to the USA Investors VI, to a USA Diversified loan related to the former Sheraton Hotel at the Salt Lake City airport, to the foreclosure of the property securing that loan and to the deficiency judgment against the makers of the note. FTI also familiarized themselves with the assets of USA Investors VI which is solely the Hotel Zoso and the efforts by USA Investors VI and Joe Milanowski to sell the same – after placing a lien thereon in favor of the Salvatore Reale Trust to collateralize a loan made to Joe Milanowski and Tom Hantges. After much effort, FTI, Orrick and Beckley convinced USA Diversified's post bankruptcy management and its counsel to initiate an involuntary chapter 7 case against USA Investors VI, which occurred on December 15, 2006, and to seek the

appointment of an interim trustee.  The involuntary likely was not filed sooner because USA Mortgage was the loan servicer of a direct lenders' loan (the unpaid balance of which was approximately $20 million in late 2006) and a bankruptcy filing would mean the delay in the payment thereof and USA Mortgage was in negotiations with Joe Milanowski to provide a portion of the excess sale proceeds of Hotel Zoso to USA Mortgage/USA Diversified.  Since the filing of the involuntary case and the appointment of the interim trustee, FTI has been monitoring the case, working toward the entry of an order for relief and attempting to work with the interim trustee to sell the Hotel Zoso.  USA Investors VI has contested almost every move by USA Diversified and the interim trustee, requiring the expenditure of a great deal of time by USA Diversified Committee professionals.  All of these efforts have preserved potential value for USA Diversified by tying up a sale that may not have been at market with no proceeds likely going to USA Diversified.

▪    Tree Moss Partners:  Through research and analysis (specifically mentioned above), USA Diversified Committee professional learned the following: Tree Moss Partners, LLC is owned by USA Investment Partners, which is in turn beneficially owned by Hantges and Milanowski.  USA Diversified had an outstanding loan in excess of $20 million to EPIC.  The collateral for the EPIC loan consisted of 63 condominium units in the Marquis Villas resorts in Palm Springs, California.  USA Diversified foreclosed on those condominium units in 2003 and took title to the same.  Yet at the time of the foreclosure Tree Moss took control of the property and in February of 2006, Milanowski executed a quitclaim deed transferring the condominium units from USA Diversified to Tree Moss for no consideration.

USA Diversified Committee professionals, as well as the Debtors' professionals, had participated in protracted negotiations with Milanowski and his counsel in late summer and fall of 2006 in connection with a proposed sale of the 63 condominium units by Tree Moss.  The hope was that Milanowski would agree to arrangements that ensured that essentially all of the net sale proceeds of the 63 condominium units would be paid over to the USA Diversified.  However, when those negotiations reached deadlock, the Debtors and the USA Diversified Committee professionals determined that an involuntary bankruptcy petition, coupled with an immediate motion for the appointment of an interim trustee, was the most acceptable course of action.  With the cooperation and assistance of FTI and Orrick and the USA Diversified Committee, USA Diversified filed an involuntary bankruptcy petition against Tree Moss on December 7, 2006, serving as the sole petitioning creditor was the Diversified Fund debtor.  A motion for the appointment of an interim trustee and seeking to restrict Milanowski's operating authority was filed that same day, and the court orally ruled that the UST should appoint an interim trustee at a hearing held on December 15, 2006.  On December 19th, the UST appointed James Lisowski as the interim trustee.

Tree Moss eventually consented to the entry of an order for relief, and Lisowski attempted to administer the 63 condominium units.  The USA Diversified Committee disagreed with many of his actions and tactics, and was

compelled to object to a proposed sale procedure and sales agreement. The Trustee ultimately invited USA Diversified Committee professionals to participate in the screening of potential buyers, but as of the date hereof, no sale proposal acceptable to the USA Diversified Committee (and now Revested DTDF) has surfaced. In addition, the Tree Moss Trustee has been unable to fund or control the homeowners association, which may continue to be dominated by Milanowski. And he has not made peace with the owner of the remaining 38 condominium units that share the common areas of the complex. Some very recent developments may be positive ones, but to date, the USA Diversified Committee (and now Revested DTDF) has been compelled to expend a great deal of time and energy in an attempt to liquidate this asset. All of these efforts though have preserved potential value for USA Diversified who is the single largest creditor of the Tree Moss Estate and should receive a significant dividend from the sale of the 63 units.

▪    Colt Loan Recovery: Colt Loans. Through research and analysis, USA Diversified Committee professional learned the following: USA Diversified was involved in a loan to Colt Gateway, a limited liability company in Hartford, Connecticut, that is 50% owned by USA Investment Partners. The other 50% is owned by HFA which was a borrower of many other loans serviced by USA Commercial. As of the Effective Date, the total obligation to USA Diversified, exclusive of default interest, approximated $17 million. The project is comprised of many phases, and is quite complex. The USA Diversified/Colt relationship is likewise quite complex, in that USA Diversified is one of three direct lenders that are the beneficiaries of a promissory note secured by a first trust deed on one portion of the Colt project. USA Diversified made three additional advances to Colt, which the USA Diversified Committee contends are likewise secured by the first deed of trust. But the three loans are "undocumented," which means that Colt has claimed that they were not loans at all, but rather were infusions of equity. Colt has been uncooperative in sharing information with the USA Diversified Committee, however, the USA Diversified Committee professionals did receive and review Colt documents provided to the other direct lenders by Colt. Although an agreement was not reached with Colt prior to the plan confirmation date it was not due to a lack of time and effort expended by USA Commercial and USA Diversified negotiating with Colt. Following Confirmation, USA Diversified became the servicer of such loans, stepped up its involvement in the process, received information from Colt and continues to press Colt to reach a settlement agreement. Subsequent to Confirmation, though, the other two direct lenders sought relief from the automatic stay to change loan servicers, and then objected to and subsequently agreed to a settlement with Colt. But Colt did not perform, leading Revested DTDF to devote its efforts to collecting the various loans for the two direct lenders, and for itself. USA Diversified has also been working with the USA Commercial Trust, which is the payee of a note secured by a second deed of trust. These efforts move USA Diversified closer to collecting on controversial loans made to Colt.

▪    BySynergy Loan Recovery:  Through research and analysis, USA Diversified Committee professional learned the following: BySynergy is a 53 acre, 104 single family development in Sedona Arizona.   The BySynergy unsecured loan of $4.4 million is owned 52% by USA Diversified, 35% by First Trust Deed Fund ("FTDF") and 13% by USA Commercial.   As mentioned through Plan negotiations USA Diversified received FTDF's 35% of the loan. The $4.4 million note was the amount of outstanding fees and charges of the original secured BySynergy loan of $11.6 million that were not paid when the loan was paid off in February 2006.  The Debtors were unsuccessful in getting information regarding the BySynergy project.  As a result USA Diversified filed a Rule 2004 examination and quickly received cooperation from BySynergy.   In February FTI met with the borrower in Sedona and received a partial production of documents with a promise to receive additional documents in-turn we extended the date of the 2004 examination. Although USA Diversified has made many attempts to push the borrower to produce additional documents no additional documents have been produced.  USA Diversified is moving forward with the 2004 examination.  These efforts and communications with this borrower will put USA Diversified in a position to eventually collect on this loan.

▪    Coordination of Electronic and Hardcopy Documents:  Throughout the case FTI continually learned about additional sources/repositories of documents related to the Debtors.  FTI prepared data requests and pressed for the production of documents.  Once received, FTI coordinated the imaging of the documents and shared the documents with the Debtors and Debtors' Committee professionals.  Once images were received FTI electronically searched the images to identify documents that helped our recovery efforts by providing information regarding USA Diversified's assets and related transactions.

FTI is aware that some of the time spent preparing data requests, coordinating imaging and reviewing and organizing support documentation could properly be categorized under additional codes as the documents were used for multiple purposes (i.e., litigation, Plan negotiations, etc.).

Over all, the foregoing services were necessary and conferred a benefit upon the estate by aiding in the collections of USA Diversified and providing the USA Diversified Committee with accurate loan information upon which to base case decisions.  The foregoing services provided the information necessary to comprehend the convoluted and complex relationships between the numerous entities resulting in the involuntary filings against Tree Moss and Investors VI to protect the respective sole assets of each so that disposition could not occur without appropriate compensation to USA Diversified.

The persons providing services on these matters and the associated fees are summarized in Attachment 1, Exhibit "B" and supporting time detail is provided for each individual in Attachments 2 through 11.

4. <u>IP/10-90/Ashby Recovery</u>. This category included, but was not limited to, the services rendered during the Application Period that can be broken down into several subgroups, described as follows:

- <u>Analysis and Factual and Legal Research Relating to the 10-90 Loan</u>. The 10-90 Loan was fiction and a subterfuge employed by Hantges and Milanowski as part of a scheme to fund their speculative real estate activities with USA Diversified investor funds, rather than utilizing USA Diversified funds to make non-insider loans secured by first trust deeds as promised in the Prospectus distributed to investors and potential investors. For example, USA Diversified's books and records reflect that $4.6 million was transferred directly from USA Diversified to HMA Sales, LLC ("HMA"), an entity wholly-owned by Investment Partners. An additional approximately $9 million flowed from USA Diversified to HMA through various entities controlled or owned by Milanowski and Hantges, after being "laundered" through various entities controlled or owned by Milanowski, Hantges, or their accomplice David Fogg, in an apparent attempt to impede any eventual audit of these funds. Eventually, 10-90, Inc. was removed from the transaction as a borrower of USA Diversified and a lender to USA Investment Partners and thereafter, USA Investment Partners became the direct borrower to USA Diversified in the 10-90 Loan. Leveraging off of the work performed by the Debtors, USA Diversified Committee professionals reconstructed the 10-90 Loan and shored up the tracing of recipients of USA Diversified Funds, a painful and time-consuming process due to the sorry state of USA Diversified's books and records, the lack of access to Investment Partners' books and records, and the lack of cooperation from Milanowski and Hantges.

- <u>Investment Partners Security Agreement</u>: Review and analysis of the detailed transactions for the $58 million note and Debtors' proposed security agreement with Investment Partners, including extensive meetings with USA Diversified professionals and others, reviewing/commenting on limited opposition to motion to approve Investment Partners agreement.

- <u>Investment Partners' Assets and Financial Statements</u>: Review and analysis of Investment Partners' financial statements and assets, including meeting with Debtor and Joe Milanowski; investigating Investment Partners' assets; identification of related entities, investigation of intercompany transactions, identify IP related loans from USA Mortgage, prepare analysis of loans guaranteed by Joe Milanowski and Tom Hantges, and review and comment on the Protective Order of IP documents.

- **10-90 Loan Recovery Analysis (accounts for approximately 50% of USA Diversified's portfolio)**:    Review  and  analysis  of  the  10-90  loan, including  on-site  document  review  in  Las  Vegas  and  a  number  of  in-person meetings in Southern California and Las Vegas with the Debtors, borrowers and other interested parties regarding the 10-90 loan, communications and meetings with the Debtors and others regarding developments in the collection of the 10-90 loan (discussed in more detail below); research of underlying assets of USA Investment Partners ("IP") entities pledged as collateral for the 10-90 loan; research  the  history  of  the  10-90  draws/disbursements  to  10-90,  IP  and  other recipients of USA Diversified funds and the assignment of the 10-90 loan from 10-90 Inc. to IP.

- **Ashby/Fiesta  Development  And  Investment  Partner  Loans**: Review, analysis and multiple meetings with USA Diversified professionals and borrowers (including Messrs. Ashby, Redman and Milanowski) regarding loans, assets and related issues; prepare request list and coordinate the production of documents  from  Ashby  and  Fiesta  Development;  review  and  respond  to amendment made to Ashby USA operating agreement; review documents regarding  the  Ashby/Tanamera  Roripaugh  transaction  and  hold  various conference calls with Ashby to protect the dilution of IP's membership interest in Ashby USA which is collateral for  USA Diversified's 10-90 loan; review draft agreements and negotiate the terms of a buyout of  IP's membership interest in Buffalo Land Developments, LLC, Random Developments, LLC, Capital Land Developments, LLC, and Oak Mesa Investors, LLC.  These assets may produce a significant  recovery  based  on  the  IP's  membership  interest  pledge  to  USA Diversified.  As such, significant efforts related to Ashby were incurred.

- **Tanamera Properties, LLC**:  IP's membership interest in Tanamera Properties, LLC is one of the assets pledged as collateral to the $58 million Note. Review and analysis of Tanamera Property documents and draft agreement for the partial buyout of IP's membership interest; prepare for meeting that occurred shortly after Effective Date with Kreg Rowe to discuss buyout agreement and learn about the assets of Tanamera Properties.

- **The  Royal  Hotel  and  the  HMA  Adversary**.    After  the commencement of the USA Diversified and USA Commercial chapter 11 cases, the two debtors negotiated with Milanowski and obtained a promissory note in the amount  of  $58.3  million  to  evidence  certain  obligations  owing  by  USA Investment Partners to USA Commercial and USA Diversified and for a security agreement  to  secure  it.    One  of  the  assets  pledged  was  Investment  Partners' ownership interest in HMA, which owned the Royal Hotel in Las Vegas.  Around the  same  time  that  Investment  Partners  pledged  its  interest  in  HMA  to  USA Diversified and USA Commercial, Milanowski on behalf of HMA granted a lien on the Royal Hotel in favor of the Salvatore Reale ("Reale") to secure a $12.3 million personal loan that Reale had previously made to Hantges and Milanowski. In  the  fall  of  2006,  Great  White  Investment  NV  Inc.  ("Great  White")  sued Milanowski  and  Hantges  in  Nevada  state  court,  alleging  fraud.    Great  White caused a lis pendens to be recorded against the Royal Hotel even though the

lawsuit had nothing to do with HMA. In meetings thereafter, Milanowski asked that USA Diversified intervene in the law suit and seek the expungement of the lis pendens, claiming it was groundless. All the meanwhile, the Debtors continued negotiations (including review of draft settlement agreement, closing statement etc.) with Joe Milanowski regarding sale of Royal Hotel and distribution of proceed to Debtors. Nevertheless, on December 22, 2006, Hantges and Milanowski caused HMA to sell the Royal Hotel for $24 million in cash and a promissory note or notes for approximately $5 million. The sale escrow paid Reale $9.9 million and Great White $1 million. On December 23rd, USA Diversified and the USA Diversified Committee learned the sale was about to occur or may have occurred, and immediately worked over the Christmas weekend to prepare and e-file an adversary proceeding alleging fraudulent transfer and other claims. USA Diversified again pressed the Debtor to file a fraudulent transfer claim in early December. Beginning in late January, with the Confirmation Order having been signed and the Effective Date looming, Orrick took control of the adversary proceeding from USA Diversified's counsel. Since that time, the adversary has been hotly contested – as the Court is well aware – and has included prejudgment remedies, attachments preserving approximately $7 million, discovery and the like. In support of the litigation FTI, further investigated the fraud and mismanagement of USA Diversified, prepared detailed analysis of the monies traced from USA Diversified to HMA, prepared an insolvency analysis of HMA and incorporated findings in Michael Tucker's Declaration filed in support of the HMA litigation. The litigation has been time-consuming and costly, and remains so, complicated by Milanowski's ongoing support of the payment to Reale and his invocation of the Fifth Amendment whenever faced with a question he does not care to answer.

▪ Coordinate Efforts With USA Commercial Committee: FTI and the other professionals for USA Diversified worked closely with USA Commercial Committee to devise an IP action plan, divide tasks and share knowledge and analysis to maximize the gathering of knowledge while not duplicate efforts and associated costs.

The foregoing services were necessary and conferred a benefit upon the estate by aiding in the collections of USA Diversified assets and providing the USA Diversified Committee with accurate loan information on which to base case decisions.

The persons providing services on these matters and the associated fees are summarized in Attachment 1, Exhibit "B" and supporting time detail is provided for each individual in Attachments 2 through 11.

5. Financing and Cash Flow. This category included, but was not limited to review and analysis of cash collateral, cash budgets/forecasts, monthly operating reports, debtor-in-

1    possession financing and the various motions regarding same.  Furthermore, FTI (i) worked at

2    USA Commercial to analyze the books and records of USA Diversified and USA Commercial to

3    understand past and current operations, liquidity and performance, (ii) participated in meetings

4    with the USA Diversified Committee, discussions with counsel, Debtors and/or other committees

5    regarding debtor-in-possession motion, term sheets, and past financial activity, and (iii)

6    forecasted USA Diversified's assets and cash at plan effective date.  The foregoing services

7    enabled the USA Diversified Committee ability to make informed decisions regarding case

8    issues, ensured the Debtors' were able to continue operations and provided insight into the

9    handling of USA Diversified financial affairs as such the work performed was necessary and

10   conferred a benefit upon the estate.

11        The persons providing services on these matters and the associated fees are summarized in

12   Attachment 1, Exhibit "B" and supporting time detail is provided for each individual in

13   Attachments 2 through 11.

14        6.    <u>Claims Administration and Objections</u>. This category included, but was not limited

15   to, review of proof of claims filed by various creditors, research and analysis pertaining to those

16   claims and prepare support (including Declaration of Michael Tucker) for responding to claims.

17   Work included review and assist in responding to the proof of claims filed against USA

18   Diversified by Diversified Committee member Jerry McGimsey and his family members,

19   Prospect High Income Fund and five other bondholders, as well as professional fee claims on

20   USA Diversified by Debtors' professionals.  The Bankruptcy Court sustained our objection and

21   disallowed the approximate $20 million claim of Prospect High Income Fund and five other

22   bondholders.  The McGimsey claim was also disallowed by the Bankruptcy Court, however the

23   McGimsey claimants have since taken an appeal, and the matter will be argued before the BAP

24   on May 17th.  As such the foregoing services were necessary and conferred a benefit upon the

25   estate.

26        The persons providing services on these matters and the associated fees are summarized in

27   Attachment 1, Exhibit "B" and supporting time detail is provided for each individual in

28   Attachments 2 through 11.

7.    <u>Court Hearings</u>.  This category includes preparation for, attendance at and follow-up discussions for court hearings.  FTI attended court hearings either in person or telephonically, limiting attendance and the corresponding fees to those deemed most vital.  The foregoing services were necessary and conferred a benefit upon the estate for the reason that it provided the USA Diversified Committee with a financial representative to provide assistance and recommendations at the court hearings regarding but not limited to Debtor-In-Possession financing, Investment Partners settlement, asset sale, plan confirmation, employment applications, Tree Moss and USA Investors VI involuntary filings and associated hearings including the need for a trustee and the appointment of same, etc.  Accordingly, FTI submits that the time it spent on matters in this category during the Application Period were reasonable and necessary.

The persons providing services on these matters and the associated fees are summarized in Attachment 1, Exhibit "B" and supporting time detail is provided for each individual in Attachments 2 through 11.

8.    <u>Employment / Fee Applications</u>.  This category includes establishing billing categories and protocols for use by FTI timekeepers, preparation of the Court required employment application, interim monthly statements as specified by the court, court-related fee applications and the review of detailed time narratives.  FTI reviewed the interim fee procedures motion and amended interim fee procedures motions to keep apprised of reporting requirements.  FTI also reviewed various employment applications, allocations of fees to USA Diversified and the numerous fee objections.  The foregoing services were necessary to determine if the amount of fees allocated and charged to USA Diversified was fair and in order to comply with various guidelines and meet all legal requirements relevant to seeking allowance of fees and reimbursement of expenses.   In the execution of these services FTI complied with the requirements of the bankruptcy code, US Trustee and Court.

The persons providing services on these matters and the associated fees are summarized in Attachment 1, Exhibit "B" and supporting time detail provided for each individual in Attachments 2 through 11.

9. <u>Case Administration</u>. Tasks in this category are wide-ranging, and generally include a broad range of services which do not neatly fit under the other task billing categories established by FTI.  Thus, while they all fall under the heading of Case Administration for purposes of this Application, many of the services classified here are truly substantive matters. The services rendered during the Application Period in this category cover various topics including getting up to speed on the cases, the companies, the loan portfolio's, background and issues since the case had been progressing for almost two months before FTI was retained; various conferences among USA Diversified and Debtors' professionals in preparation for meetings, hearings or meetings with other interested parties; review of case related news articles; preparation and maintenance of FTI's USA Diversified workplan; review case docket for filing that impact USA Diversified; request and organize Debtor and borrower documents and respond to inquiries and other general case administration matters.  To properly administer this case, it has been necessary for the FTI professionals to travel to Las Vegas and Los Angeles to attend hearings and various Committee and Debtor meetings.

FTI submits that the time it spent on matters in this category during the Application Period were reasonable and necessary.  The persons providing services on these matters and the associated fees are summarized in Attachment 1, Exhibit "B" and supporting time detail is provided for each individual in Attachments 2 through 11.

10. <u>Plan and Other Restructure Related Work</u>.  This category included, but was not limited to the Plan which encompassed Plan negotiations, Plan and Disclosure Statement confirmation, and Plan implementation including transition of USA Diversified management, litigation, recovery action and operations from Debtor to FTI, and general restructure related work such as review of the operations of the Debtors, USA Diversified prospectus and agreements, employee retention plan, Debtors liquidation analysis and various other items.  The Court is well aware of the Plan, the sale to Compass Partners embodied in the Plan and the original proposed sale to Silver Point that produced the first filed version of an asset purchase agreement that resulted in the Compass overbid and the revised asset purchase agreement.  And the Court is aware that the Compass sale closed on February 16, 2007, and that the Plan went

effective on March 12th.  As a result of the Plan negotiations USA Diversified received $1 million from FTDF, FTDF's interest in BySynergy to the tune of $1.5 million, FTDF's unremitted principal claim of $347,775 and FTDF's unsecured USA Commercial claim, which amount is subject to negotiations between both parties.  Although USA Diversified received a considerable amount of value from FTDF, the question is why did Orrick and FTI spend so much time on behalf of USA Diversified in the plan process when the Plan did not result in the sale of USA Diversified assets.  The response is many-fold, but the three primary ones are that (i) the USA Diversified Committee professionals spent a great deal of time attempting to sell their assets to Silver Point and other potential purchasers, meeting with them, exchanging documents, emails and the like, but the prices offered were wholly unacceptable; (ii) the Plan offered the USA Diversified Committee the opportunity to free USA Diversified from the control of a Chief Restructuring Officer and professionals who, in the opinion of the USA Diversified Committee and its professionals, were not acting in USA Diversified's best interests; and (iii) the USA Diversified Committee and its professionals believed that due to the complexity and difficulty of the Chapter 11 Cases and due to the existence of many parties that would attempt to block any plan of reorganization that did not favor their particular interests to the detriment of other interests, a plan of reorganization supported by the Debtors and all four committees had the best chance of being confirmed and consummated.  Thus, USA Diversified Committee professionals and their client worked with the other committees and the Debtors to confirm the best plan possible.  That meant, of course, that they also took pains to negotiate the best deal and language for USA Diversified in the process.  Such services mentioned above break down into several subgroups, described as follows:

- Negotiations with Potential Asset Purchasers.  Discussions and meetings with parties interested in purchasing USA Diversified's assets, reviewing term sheets, negotiating the same (both via telephone, email and in person).  Ultimately, the USA Diversified Committee could not reach agreement with the stalking horse buyer acceptable to the Debtors and the other committees. Nor could it reach agreement with Compass Partners, the successful overbidder. But much time was spent attempting to achieve a sale.

▪ **Negotiations with the Debtors and the Other Committees**. In addition to the compromises with the FTDF Committee described above, the Plan is replete with compromises among all the parties, including the USA Diversified Committee. FTI and other USA Diversified Committee professionals participated in a number of in-person meetings and in countless all-hands and smaller group conference calls discussing and negotiating plan provisions that had direct or indirect or potential impact on USA Diversified and its investors.

▪ **Disputes with the USA Mortgage Committee over the USA Diversified Claims against USA Mortgage**. As the Court is well aware, prior to the Effective Date, USA Diversified and USA Commercial were managed by the same Chief Restructuring Officer and were represented by the same financial advisor and the same two law firms. None of them could become involved in the disputes between those two debtors over their claims against one another, so early on they properly delegated responsibility to the two committees. The disputes are multiple and complex, and professionals for the two committees spent numerous hours analyzing the claims, doing factual and legal research regarding them and attempting to settle them, including attendance at meetings and at a mediation before Judge Glover in Las Vegas on December 12, 2006. For settlement negotiations and in support of the mediation statement FTI analyzed and documented the claims, reviewed USA Commercial's analysis, prepared settlement analysis and Declaration of Michael Tucker filed in support of the Mediation Statement. No resolution was reached despite the hours spent, and the Plan preserves all such disputes. Based on the education about their claims against one another, the two revested parties will attempt to consensually resolve their disputes in the future, but in the meantime, they have been pooling their efforts towards their joint goal of recovering assets for the two estates – including their discussing the filing of an involuntary chapter 11 case against USA Investment Partners LLC prior to the Effective Date and joining as petitioning creditors on April 4th after they collectively beat back the filing of a U.S. District Court receivership action engineered by USA Investment Partners LLC as a means of avoiding this Court's oversight.

▪ **Reviewing and Revising the Asset Purchase Agreement, the Plan, etc**. FTI reviewed and commented on numerous drafts of the Silver Point asset purchase agreement, the Compass Partners asset purchase agreement that replaced it, the Plan, the disclosure statement, the confirmation brief, the responses to objectors, and many, many other pleadings. FTI reviewed the various items to make sure from a financial prospective the interests of USA Diversified were being preserved and protected, and that no language prejudiced its interests. Other estate professionals did the same for their constituencies. The review of the drafts, the commenting on them and the conference calls to discuss them took countless hours, but was necessary.

▪ **Reviewing and Revising the Findings and the Confirmation Order**. FTI reviewed and commented on numerous drafts of the Findings and the Confirmation Order, reviewing objections thereto in the process and once again attempting to preserve rights and claims of USA Diversified.

▪ <u>Transition Planning</u>. FTI, working with Orrick and Beckley, prepared for the transition from chapter 11 Debtor to Nevada Limited Liability Company charged with liquidating its volatile and quirky asset bases and distributing the proceeds to the 1,300+ defrauded investors. In addition, USA Diversified would be moving from a family of companies under the aegis of USA Commercial, to a standalone entity run by a new CEO/Manager and a new and independent board of directors, charged with operating USA Diversified including, preparing financials, managing members, working with borrowers, etc. Finally, Revested DTDF would be stepping into the litigation shoes of USA Diversified, and strategic decisions had to be made and pleadings filed – above and beyond mere substitutions of counsel. Litigation planning included working with the new USA Commercial Trust to try to capitalize on synergies and avoid duplication of effort. Lists were made, meetings were conducted, and the transition occurred.

▪ <u>Revised Operating Agreement and Other Organizational Documents</u>. The Plan required USA Diversified to submit in its Plan Documents Supplement an amended USA Diversified operating agreement. FTI worked with Orrick and Beckley in drafting the amended operating agreement and related documents, in discussing its provisions with members of the USA Diversified Committee and in revising the same in accordance with the views of the USA Diversified Committee members.

▪ <u>Preparing for the Initial Post-Effective Date Board Meeting</u>. FTI, working with Orrick and Beckley, prepared for the initial meeting of the board of directors, which included preparing an agenda, schedule of assets and cash at Plan effective date and dealing with issues that led to the resignation of a board member.

▪ <u>USA Diversified Agreements</u>: Review of USA Diversified Prospectus, Loan Servicing and Operating Agreement and analyze past and current payments for servicing and management fees.

▪ <u>Employee Retention</u>: Review and analysis of Debtors' proposed Employee Retention Plan, including meeting with Debtor and other Committee professionals and preparing summary and recommendation to USA Diversified Committee.

▪ <u>Debtor Operations and Recordkeeping</u>: Review of Debtors' accounting systems, operations, financial statements and recordkeeping, including meetings with Debtors' financial advisors and employees.

This category also includes time spent in all-hands meetings involving the Debtors and various committees to discuss global case issues and issues of interest to all constituencies, such as the Debtors' distribution motion, plan alternatives, negotiations and the like. Most of the all-

hands meetings were conducted via telephone, but there were some all-hands meetings that were conducted in person in Las Vegas and Los Angeles.

The foregoing services were necessary and conferred a benefit upon the estate as it allowed USA Diversified to exit bankruptcy, prepared USA Diversified for post Effective operations and allowed USA Diversified to obtain various assets in the settlement/plan process.

The persons providing services on these matters and the associated fees are summarized in Attachment 1, Exhibit "B" and supporting time detail is provided for each individual in Attachments 2 through 11.

11.    Asset Sale.    This category included, but was not limited to, discussions and meetings with potential bidders regarding the proposed asset sale and sale of USA Diversified assets, review of auction and bid procedures and related motions, analysis of multiple bid packages and recovery impact, negotiations with bidders, resolving contract matters and presenting recommendations to the USA Diversified Committee.  Also included in this billing category is time spent reviewing and drafting the Asset Purchase Agreement and supplemental schedules.

Although USA Diversified did not participate in the auction, the solicitation and interaction with potential asset purchases provided the USA Diversified Committee with recovery options.  In-addition, as indicated previously, oversight during the sale process was necessary to protect the rights and assets of USA Diversified.  For those reasons, the foregoing services were necessary and conferred a benefit upon the estate.

The persons providing services on these matters and the associated fees are summarized in Attachment 1, Exhibit "B" and supporting time detail provided for each individual is provided in Attachments 2 through 11.

B.    Costs.    The remaining unpaid costs for which FTI seeks reimbursement total $**14,584.22**.  A majority of the costs incurred is attributable to travel related expenses in order to perform necessary services and properly advise the USA Diversified Committee during the bankruptcy process.  FTI kept travel related costs at a minimum by the use of Court Call, conference calls and electronic review of information whenever available and appropriate. The costs incurred are also the type customarily charged to non-bankruptcy clients.

The amount the Firm has disbursed for actual and necessary expenses in connection with the Estate are summarized for the period in Attachment 1, Exhibit "C" and itemized monthly in Attachments 2 through 11.

**IV.**

**EVALUATING STANDARDS**

The fees billed by FTI to the USA Diversified Committee for the professional services rendered during the application period total $**1,613,380.50**.  In accordance with 11 U.S.C. § 330, this amount was calculated using the hourly rate for the professionals involved.

In addition, the provisions of § 330 (a) place a premium on the timeliness of administration of the case.  Compensable services must be "performed within a reasonable amount of time commensurate with the complexity, importance and nature of the problem, issue or task addressed." 11 U.S.C. § 330(a)(3)(A).

FTI has provided financial consulting services for and on behalf of the USA Capital Diversified Trust Deed Fund Committee which services are described above and which are itemized in Attachment 1, Exhibit "B".  FTI maintains daily time records reflecting the actual and necessary time expended per timekeeper in the performance of the services for which compensation is sought.

The results FTI obtained within the time frames of this Application illustrate that FTI:

(a)    Used the skill required to perform the necessary accounting and financial consulting services.

(b)    Provided services necessary to the administration of the case for the benefit of the Debtors; and

(c)    Performed the services within a reasonable amount of time commensurate with the complexity, importance and nature of each task.

FTI and the Committee believe that the fees and expenses sought in this Application are appropriate, and that the fees are reasonable and necessary in light of circumstances of this Chapter 11 case and the scope and difficulty of the business issues involved.  See Worthen Declaration.

**V.**

**COMPLIANCE WITH SECTION 504 OF THE BANKRUPTCY CODE AND**

**BANKRUPTCY RULE 2016**

FTI has not entered into any arrangement or agreement with any person or entity with respect to the sharing of fees and expenses for which FTI is seeking compensation and reimbursement as set forth in this Application,   except as permitted by Bankruptcy Code §504(b)(1).

**VI.**

**CONCLUSION**

WHEREFORE, based upon the foregoing, FTI respectfully requests this Court to enter an Order:

1.    Approving the First and Final Application of FTI Consulting, Inc., Financial Advisors to the USA Capital Diversified Trust Deed Fund Committee and allowing FTI's fees in the sum of *$1,613,380.50* and costs in the sum of *$30,951.02* in their entirety;

2.    Authorizing and directing payment of the remaining unpaid fees in the amount of **$690,099.92** and unpaid costs in the amount of **$14,584.22** by the Chapter 11 Trustee from any and all available funds; and

3.    Granting such other and further relief as this Court deems just and proper.

Respectfully submitted this 26th day of April 2007.

**FTI CONSULTING, INC.**


By___ s/ Michael A. Tucker_____
      Michael A. Tucker
      Two North Central Avenue, Suite 1200
      Phoenix, Arizona  85004
      Telephone:  (602) 744-7100

Financial Advisors for the Official USA Diversified Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC