Adam M. Starr
Greenberg Traurig, LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, California 90404
Telephone: (310) 586-7700
Facsimile: (310) 586-7800
Email: starra@gtlaw.com

Ronald D. Green
Greenberg Traurig, LLP
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002
Email: greenr@gtlaw.com

Matthew T. Gensburg
Nancy A. Peterman
Sherri Morissette
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 2500
Chicago, Illinois 60601
Telephone: (312) 456-8400
Facsimile: (312) 456-8435
Email: gensburgm@gtlaw.com
        petermann@gtlaw.com
        morissettes@gtlaw.com

Attorneys for Mesirow Financial Interim Management, LLC,
the Debtors' Chief Restructuring Officer and Crisis Managers

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br><div align="right">Debtor.</div> | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br><div align="right">Debtor.</div> | Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br><div align="right">Debtor.</div> | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR<br><br>**DECLARATION OF SUSAN SMITH IN<br>SUPPORT OF APPLICATION FOR ENTRY** |

1    In re:
     USA CAPITAL FIRST TRUST DEED FUND, LLC,
2                                                Debtor.
     _____
3    In re:
     USA SECURITIES, LLC,
4                                                Debtor.
5    _____
6    Affects:
     ☒ All Debtors
7    ☐ USA Commercial Mortgage Company
     ☐ USA Securities, LLC
8    ☐ USA Capital Realty Advisors, LLC
     ☐ USA Capital Diversified Trust Deed Fund, LLC
9    ☐ USA First Trust Deed Fund, LLC

**OF ORDER (I) FINALLY ALLOWING AND APPROVING ALL COMPENSATION AND EXPENSES INCURRED BY MESIROW FINANCIAL INTERIM MANAGEMENT, LLC IN ITS CAPACITY AS DEBTORS' CRISIS MANAGERS AND CHIEF RESTRUCTURING OFFICERS FOR THE PERIOD APRIL 13, 2006 THROUGH MARCH 12, 2007; (II) ALLOWING AND APPROVING A SUCCESS FEE; (III) AUTHORIZING APPLICATION OF THE RETAINER AGAINST THE ALLOWED FEES AND EXPENSES; AND (IV) AUTHORIZING PAYMENT OF THE BALANCE DUE**

10

11        I, Susan Smith, hereby declare, verify and state as follows:

12        1.    I make this Declaration in support of the application (i) finally allowing and

13   approving compensation in the amount of $11,389,203.09 for 27,417.60 hours of services

14
15   rendered and expenses incurred in the amount of $1,117,168.74 by Mesirow Financial Interim

16   Management ("**MFIM**"), in its capacity as the crisis managers and chief restructuring officers for

17   USA Commercial Mortgage Company ("**USACM**"), USA Capital Realty Advisors, LLC ("**USA**

18   **Realty**"), USA Capital Diversified Trust Deed Fund, LLC ("**DTDF**"), USA Capital First Trust

19   Deed Fund, LLC ("**FTDF**") and USA Securities, LLC ("**USA Securities**", and collectively with

20   USACM, USA Realty, DTDF and FTDF, the "**Debtors**"), debtors and debtors-in-possession in

21   these chapter 11 cases (the "**Cases**"), for the time period beginning on April 13, 2006 and ending

22

23   on March 12, 2007[1] (the "**Application Period**"); (ii) approving a success fee in the amount of

24

25        [1]   MFIM has included time spent preparing the Final Application and reviewing the final fee applications for
     other professionals in these Cases incurred after March 12, 2007.  The remainder of post-Effective Date time billed
26   by MFIM will be paid by the Debtors in the ordinary course of their business and in accordance with the Plan.
     MFIM has also included $350,000 in estimated fees and expenses related to the Final Application that are expected
27   to be incurred after filing the Final Application in connection with responding to objections, reviewing the
     Committee professionals' fee applications and preparing for and attending the court hearing on the Final Fee
28   Application.  MFIM will file a supplement to the Final Application with detail to support the estimated fees and
     expenses in advance of the hearing on the Final Application.

$2,500,000.00; (iii) authorizing application of the $150,000 retainer against finally allowed fees and expenses; and (iv) authorizing payment of $14,856,371.83 (after application of the Retainer and net of voluntary reductions totaling $360,769.91) (the "**Final Application**").

2.    I am Senior Vice President of Mesirow Financial Interim Management, LLC ("**MFIM**").    Attached as **Exhibit B** to the Final Application is information regarding my qualifications and industry experience.

3.    Unless otherwise defined, any capitalized terms not defined herein has the meaning set forth in the Final Application.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and my knowledge of the Debtors' operations and financial condition.

4.    MFIM was employed in these bankruptcy cases to serve as crisis manager and chief restructuring officer of the Debtors.  I have worked on the Debtors' Cases since the engagement of MFIM by the Debtors and have been primarily responsible for the tasks described herein.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

5.    Part I of the Declaration describes the background and the significant events in these cases.  Part II sets forth the relevant facts in support of the Final Application filed by MFIM.

## I.    BACKGROUND

6.    On April 13, 2006 (the "**Petition Date**"), the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.  By order entered June 9, 2006, the Court approved the joint administration of the Cases.

7.      On the Petition Date, the Managers and Boards of Directors of the Debtors executed an agreement with MFIM (the "**MFIM Agreement**") setting forth the terms and conditions for the retention of MFIM as crisis managers for the Debtors.  The MFIM Agreement outlined the designation of Thomas J. Allison as Chief Restructuring Officer for the Debtors (the "**CRO**"), as well as the assignment of other employees of MFIM to assist Mr. Allison as temporary employees.  Contemporaneously, the Managers and Boards of Directors of the Debtors appointed Mr. Allison as President, Vice-President, Secretary and Manager for the Debtors.

8.      On April 14, 2006, the Debtors filed an application (the "**Employment Application**") for authorization of (i) the employment and retention of MFIM as crisis managers to the Debtors, and (ii) the designation of Thomas J. Allison of MFIM as Chief Restructuring Officer of the Debtors and the employment of certain temporary employees provided by MFIM. [Docket no. 6]  On April 14, 2006, Mr. Allison filed a Declaration in Support of the Employment Application (the "**Allison Declaration**") [Docket no. 7].

9.      Four Committees were appointed in the Debtors' Cases by the Office of the United States Trustee -- the Official Unsecured Creditors' Committee for USACM, the Official Committee of Holders of Executory Contract Rights Through USACM, the Official Committee of Equity Security Holders of DTDF and Official Committee of Equity Security Holders of FTDF (collectively, the "**Committees**").

10.      On April 19, 2006, August 11, 2006, October 31, 2006, January 11, 2007 and April 2, 2007, this Court entered Orders authorizing the Debtors to (i) employ and retain MFIM as crisis managers to the Debtors, (ii) designate Thomas J. Allison of MFIM as CRO of the Debtors and (iii) employ certain MFIM employees as the Debtors' temporary employees until March 31, 2007 [Docket nos. 26, 1137, 1708, 2402, and 3325].

4

11.    On September 15, 2006, the Debtors filed their initial Disclosure Statement and Joint Chapter 11 Plan of Reorganization ("**Plan**") [Docket nos. 1309 and 1310]. The Debtors subsequently amended their Plan after substantial and nearly continual negotiations with and among the four Committees on October 18, 2006 [Docket no. 1576] and on November 7, 2006 [Docket no. 1742]. On November 15, 2006, the Court held a hearing on the adequacy of the disclosure statement and entered an order approving the First Amended Disclosure Statement [Docket no. 1795], as filed, with the Court's required amendments [Docket no. 1798]. On the same day, the Debtors also filed their Third Amended Plan [Docket no. 1799]. On December 19-20, 2006, this Court held a confirmation hearing on the Third Amended Plan and on January 8, 2007 entered its findings of facts, conclusions of law and order confirming the Debtors' Third Amended Plan of Reorganization as modified [Docket nos. 2376 and 2377], which included a sale of certain of USACM's assets and FTDF's assets to Compass.

12.    The sale to Compass closed on February 16, 2007. The Plan's Effective Date occurred on March 12, 2007.

## II.    FINAL APPLICATION

13.    In its Final Application, MFIM is seeking (a) final allowance and payment of fees for services rendered by MFIM to the Debtors in the amount of $11,389,203.09 and (b) final allowance and reimbursement of actual and necessary expenses in the amount of $1,117,168.74. MFIM expended a total of 27,417.6 hours during the Application Period at an average blended hourly rate of approximately $415.40. Fees and expenses incurred during the Application Period on behalf of each of the Debtors are outlined in the table below:

| | Hours | Fees | Expenses | Total |
|---|---|---|---|---|
| USA Commercial Mortgage Company | 21,916 | $9,264,912.20 | $880,893.11 | $10,145,805.31 |
| USA Capital Diversified Trust Deed Fund, LLC | 2,427.8 | 1,111,888.10 | 105,716.55 | 1,217,604.65 |
| USA Capital First Trust Deed Fund, LLC | 2,836.1 | 1,286,924.10 | 122,358.70 | 1,409,282.80 |
| USA Capital Realty Advisors, LLC | 112.2 | 40,846.50 | 3,883.62 | 44,730.13 |
| USA Securities, LLC | 125.4 | 45,402.09 | 4,316.76 | 49,718.85 |
| Subtotal | 27,417.6 | $11,749,973.00 | 1,117,168.74 | $12,867,141.74 |
| Less: Voluntary Reduction | | 360,769.91 | - | 360,769.91 |
| **Total** | **27,417.6** | **$11,389,203.09** | **1,117,168.74** | **$12,506,371.83** |

14.    During this engagement, I supervised and participated in the tasks described in this Declaration.  Therefore, if I were called upon to testify, I could competently testify to the tasks performed by MFIM as described below.

## A.    Forensic Loan Accounting

15.    At the inception of its engagement, MFIM discovered that the Debtors' records were inaccurate and could not be relied upon.  The records were incomplete and, in some instances, appeared to be deliberately falsified.  Thus, one of the sizable tasks facing MFIM in this engagement was to reconstruct the Debtors' financial records.

16.    More significantly, the accounting for loans was separate and distinct from the general accounting process and the two systems were not reconciled. In essence, the Debtors used two different sets of books, each arguably designed for the unique expectations of the various recipients of accounting data.   One set of loan figures was (ostensibly) the "real" accounting and was used for communicating with the borrowers; the second set of figures concealed the diversion of funds and was used for correspondence with the investors.

17.    MFIM implemented a full scale forensic review process in order to compile the required financial data necessary to reconstruct the Debtors' financial records. MFIM initially analyzed the information in the Debtors' iTrack System (the software system used by USACM to track collections of loans and payouts to the Direct Lenders and Funds) which contained data

from 2004 to 2006. MFIM's analysis of the data revealed many financial irregularities, including: (i) certain borrower payments were not historically entered into the iTrack System, but instead maintained on separate Excel spreadsheets; (ii) interest receipts were posted on a date prior to the distribution of the funds, not when the receipts were actually received from borrowers; (iii) payments from borrowers were not applied pursuant to the requirements in the loan documents; (iv) invoices to the borrowers were incorrectly calculated; (v) checks to investors were not numbered in sequence, and/or check numbers were used multiple times; (vi) the Direct Lenders were paid a rate of interest which was not the interest specified in the loan documents, and (vii) the "spread" between what the Direct Lenders were paid and what the borrower paid to the USACM was retained in lieu of the service fees specified in the LSAs.

18.    MFIM soon discovered that the data for transactions occurring prior to 2004 was even more unreliable to the extent it even existed. The Debtors' loan servicing information for this period was maintained in Access or Excel databases which are easily manipulated and the computer files were overwritten each month, obliterating any loan transaction history or audit trail of the accounts. MFIM was also unable to locate a ledger or other record of the assignments and reassignments of the ownership of the loan interests between Direct Lenders and USACM.

19.    MFIM was left with no alternative but to reconstruct the loan transaction accounting from the Debtors' source documentation to verify transactions. This process required researching deposits slips and checks from investors to verify investments by the Direct Lenders and tracing that information to the available bank statements; reviewing assignment documentation to verify entry into the loans by the Debtors; verifying the borrowers' payments by reviewing check copies and bank statements; comparing the Direct Lender payment information to the available bank statements to match check numbers or ACH remittances; and matching cleared checks to issued checks by amount and payee to correct the check numbers in

Debtors' records.  Further, each loan agreement was reviewed by MFIM to determine if the interest on the loan compounded, when and if default interest was to be charged to the borrower, when payments were to be applied, and the correct determination of late fees, origination fees or exit fees.

20.    Using these documents and procedures, MFIM reconstructed the USACM loan ledgers for each loan and calculated proper accruals for interest and service fees. Accrued interest was recalculated based on the correct principal balances and the correct number of days in the month for that principal balance.

21.    As an example of the complexity of this task, given that some of the Debtors' loans had been funded as early as 1999 and had been assigned from time to time to hundreds of different Direct Lenders, a loan ledger could consist of literally thousands of lines of calculations.  The Amesbury loan, for instance, which began funding in 2002, had a reconstructed ledger containing 41,000 lines of calculations through the Petition Date.

22.    After the loan ledgers were properly reconstructed, MFIM discovered that the Debtors' Access database was not powerful enough to run monthly statements and properly account for the information required by this Court.  MFIM had to reload the loan data into a SQL database and direct the development of a new version of iTrack, which allowed the Debtors to have sufficient programming capacity for the holdbacks and netting of performing and non-performing loans by investor account as required by the Court.  During the transition period from the old to new version of iTrack, MFIM manually updated the loan ledgers each month to verify the data loaded into the SQL database.  This manual process by MFIM allowed the Debtors to continue to issue monthly borrower interest statements, monthly loan summaries, weekly collection reports, monthly operating reports and other data needed or requested by the loan

collections team, the Committees and other constituents.  Statements with a complete history of each loan by each Direct Lender were mailed in October 2006.

23.    MFIM reviewed and researched the loans marked on the Debtors' published loan summaries as "Special Situation."  MFIM discovered that these "loans" all had substantial problems requiring follow-up and resolution.  For instance, the Sheraton "loan" was not appropriately reflected on the Debtors' books as a non-performing loan.  Once it became apparent that the loan was non-performing and had problems as to accounting and/or documentation, former management assigned the Sheraton loan from the Direct Lenders to DTDF.  As a result, this loan remained on the Debtors' books as if it was a performing loan.

24.    MFIM also performed various cash tracing exercises and investigated the transfer of funds between related party entities.   These investigations by MFIM allowed the Debtors to perform loan collection activities and institute appropriate avoidance actions, all as described in detail below.

25.    The tasks performed by MFIM in this category have benefited the Debtors by:  (a) providing an accurate accounting for and understanding of the status of each loan; (b) allowing USACM to distribute in excess of $231.9 million to the Direct Lenders while also retaining the various Court ordered holdback amounts for the Debtors; (c) providing a basis for the compromises contained in the Plan; and (d) reconstructing the loan ledgers and thus allowing USACM to issue monthly statements on a timely basis to both investors and borrowers, as well as provide reports and analyses to the various constituents including the Committees, the Court and the various bidders.

26.    MFIM's forensic review allowed the Debtors to provide potential bidders with reliable financial information which was instrumental to a successful sales process.  Before the stabilization of the accounting systems, the Stalking Horse Bidder was unwilling to ascribe a

clear value to the USACM assets (*i.e.*, servicing fees and default interest). The work of MFIM allowed the Debtors to provide the Stalking Horse Bidder with reliable information which resulted in a successful and vibrant auction of the Debtors' assets and an increase to the final purchase price received by the USACM and FTDF estates.

**B.    Loan and Financial Accounting Systems**

27.    MFIM senior accounting personnel directed the redesign and improvement of the iTrack System. Due to the inadequacy of the iTrack System as originally designed and the various holdbacks agreed to among the Committees and ordered by the Court, the system required many programming changes. The iTrack System, like most loan servicing packages, was designed to receive interest on a monthly basis from a borrower and pay interest on a monthly basis to the Direct Lenders. Since USACM did not historically charge the service fees allowed by the LSAs, but instead simply paid the Direct Lender a lower interest rate than it received from the borrower, the system was not designed to calculate the service fees as allowed by the LSAs, nor was the system designed to accommodate the netting of pre-paid interest to performing or repaid loan proceeds; holdbacks or collection costs; accounting for diverted principal; prepaid interest; assignments of loans from one Direct Lender to another Direct Lender when such loan has been partially paid (without the knowledge of the selling or acquiring Direct Lender); accrual of unpaid amounts; and other issues required by the Order Granting Debtors' Motion to Temporarily Hold Funds Pending a Determination of the Proper Recipients and the Interim Distribution Orders (defined below).

28.    MFIM staff, with the assistance of USACM's accounting and IT staff, developed the project plan to reprogram the iTrack System and reload the data. As the data was reloaded month by month into the system, MFIM had to check it against the reconstructed data for errors in the data fields and for proper processing of the calculations. While the data was being

reloaded and rechecked, the system was also being reprogrammed to accommodate the non-standard information requirements and calculations.  For instance, it required nearly six weeks to develop the algorithms to properly calculate the netting of disbursements to borrowers, and to check the data and reports in order to ensure that the netting was calculating properly.  Due to Internal Revenue Service requirements, the system was required to categorize the netting by principal and interest, by loan, and by investor.  In addition, the service fee calculation had to be programmed to allow for multiple contract rates by Direct Lender and by loan.  New fields also had to be created to account for diverted principal, accrued service fees, and accrued and unpaid interest from the borrower to each Direct Lender.

29.    MFIM designed various new reports including the Borrower Loan History Report, the Investor Transaction History Report, the Investor Check Statements (showing the netting and holdbacks), the Borrower Audit Report, the Investor Principal Audit Report, the Investor Interest Audit Report and the Service Fee Audit Report.  Each of these reports required the determination of the fields and calculations by MFIM to direct the IT staff to program the system.  Each report had to be programmed, processed and checked for accuracy and completeness.

30.    Before any distributions could be made to Direct Lenders (including the Funds) certain provisions of the Order (a) granting (i) Debtors' motion to distribute funds; (ii) Debtors' hold funds motion and (iii) the compel motion, and (b) denying (i) the lift stay motion and (ii) McKnight motion (the "**First Interim Distribution Order**") also had to be implemented in the system.  The First Interim Distribution Order required that to the extent funds were received postpetition on a performing loan for an individual vesting name (one account number), such funds would be held to potentially recoup amounts paid to that account number on non-performing loans from diverted principal payments.  Since most Direct Lenders held an average of three to four loans in a vesting name, and some held up to 20 loans, a complicated series of

calculations had to be developed and programmed to allow tracking of how much was withheld from each performing loan and what funds, by loan, could be released to the Direct Lender. These calculations were also complicated by the principal payments that were being received from loan payoffs. It was also necessary to determine the amount of principal and interest actually paid on each loan to track the taxable amounts. The development of the calculations, programming, and verification of the calculations and programming required approximately four weeks of intensive effort by MFIM.

31.    The First Interim Distribution Order also mandated that amounts be held back from the payments to the Direct Lenders to attempt to recover a loan servicing fee that could be up to 3%, depending on the contract. The iTrack System was originally programmed to charge each Direct Lender a 1% servicing fee and had to be reprogrammed once the thousands of LSAs could be researched and matched to an account and a loan. Ultimately, about 6,000 LSAs were reviewed to determine the actual LSAs fees in effect as to the current 3,600 Direct Lenders.

32.    The Modified Order Authorizing Interim Distributions and Holdbacks (the ("**Second Interim Distribution Order**" and collectively, the "**Interim Distribution Orders**") required holdbacks for the appraisal costs to be allocated to each Direct Lender based on the loans in their portfolio, a holdback for any collection costs by outside parties, including Debtors' counsel, and a holdback for prepetition receipts while the nature and commingling of those receipts was being evaluated. All of these holdbacks had to be researched, calculated, programmed and verified.

33.    In addition, the Second Interim Distribution Order required that monthly reports on the proposed distribution be furnished to and approved by the Committees. These monthly reports and other audit reports had to be designed and programmed into the iTrack System. The monthly statements that had previously been furnished to Direct Lenders prepetition were

extremely simple and only showed the amount of the investment and the monthly distribution. The Direct Lenders were never informed about the status of the payments from their borrower or the amount of the servicing fees charged. New monthly statements had to be designed and programmed to show principal and interest owed to each Direct Lender from the borrowers, the monthly service fee charged, interest accrued for that Direct Lender and the status of principal and interest due from or owing to the Collection Account. Principal amounts unpaid as of the Petition Date were also shown on the Investor History Statements. A second statement was developed to be mailed with the checks to show the netting between loans, and the holdbacks required under the Interim Distribution Orders.

34. The following table summarizes the distributions made through March 12, 2007 to the Direct Lenders and FTDF as a result of these efforts:

| Month | Amount |
|---|---|
| June | $ 64,281,686.94 |
| July/August | 61,516,697.71 |
| September | 16,117,766.04 |
| October | 4,793,972.36 |
| November | 22,732,613.71 |
| December | 14,213,975.57 |
| January | 18,496,996.73 |
| February | 29,720,069.44 |
| Total | $231,873,778.50 |

35. MFIM's efforts in this category benefited USACM by correcting the accounting for both borrowers and lenders. Direct Lenders and the Funds received accurate, comprehensive statements relating to their investments. Ultimately, the work performed facilitated the distribution of approximately $231.9 million to the 3,600 Direct Lenders and FTDF. The changes to the Debtors' accounting system were also beneficial to the sales process. Moving from a largely manual process with calculations performed in spreadsheets to an integrated

system increased the value of the Debtors from a going concern perspective and provided the various bidders with a greater comfort level that the financial information was correct.

## C.    *Financial Analyses*

36.    Throughout these Cases, MFIM performed the Debtors' accounting and finance functions.  In this role, MFIM led both the transactional aspect of the accounting department (*i.e.* accounting for loan portfolio activity) as well as the planning, analysis and reporting functions. A list of the reports generated by MFIM, along with their frequency, follows:

- **Loan Summary Report** - MFIM produced a monthly loan summary report detailing the principal and interest outstanding by loan, the status of the loan, the amounts collected, the service fees payable and the recipients of the collections.  This information was initially requested by the Court, and quickly became a source of information to all constituents.  From April to October, 2006, MFIM performed all calculations manually, which required extensive amounts of time in order to determine the application period of the interest received and the service fees derived from that application period as well as principal and interest splits.  Starting in November 2006, MFIM used information generated from reports created by the iTrack System, which substantially reduced the preparation time.

- **Collections Report** - MFIM produced a weekly collections report detailing the amounts collected by loan from the borrowers for that week.

- **Budget vs. Actual Variance Report** - MFIM produced weekly budget vs. actual variance reports at the request of Sierra Consulting, financial advisors to the USACM Committee detailing amounts received and disbursed each week for each Debtor as compared to amounts budgeted for each Debtor.  MFIM sent this report to the Committees' financial advisors only.

- **Service Fees Report** – MFIM performed extensive analysis in order to determine the appropriate service fees.  In the beginning of the Cases, MFIM, with advice from legal counsel, determined that the Direct Lenders' LSAs required payment of a monthly service fee in amounts up to 1% to 3% of the Direct Lenders' principal loan balance.  Since USACM had not historically calculated or collected service fees in this manner, MFIM prepared a service fee calculation as part of the loan reconstruction.  As ultimately approved under the Plan, as part of the Direct Lender compromise, MFIM did not charge higher service fees historically if the borrower had made payments and such payments were paid to the Direct Lenders.  This service fee calculation required substantial work given that borrowers seldom paid interest on a monthly basis in full, but rather interest received often covered only a portion of a month.  Since service fees were a monthly calculation per the LSAs, these fees had to be pro-rated.

14

The Service Fee Report was prepared for the Initial Loan Summary, which was then prepared on a monthly basis in conjunction with the Loan Summary Report. In the First Interim Distribution Order, the Court ordered that an additional 2% service fee be held back from distributions until MFIM could determine which Direct Lenders signed contracts that called for a 1% fee and which Direct Lenders signed loan servicing agreements that called for a 3% fee. For the First Interim Distribution Order, this holdback only applied to the repaid loans. With the Second Interim Distribution Order, the holdback applied to all disbursements. MFIM researched each loan servicing agreement to determine each Direct Lender's service fee percentage. This information was transmitted to the Direct Lenders as an exhibit to the Alternative Dispute Resolution Procedures in connection with the Plan. The new servicing fees were programmed into the computer system and applied as of the Petition Date and forwarded.

MFIM also prepared an estimate of the service fees that would be collected at the increased percentages. Various potential buyers requested this information in order to estimate future revenues that would be generated by USACM as a loan servicer.

- **Default Interest Report** - MFIM prepared calculations of the default interest to be charged to the borrower on monthly invoices or at the time of payoff. In order to prepare such reports, MFIM, along with legal counsel, had to determine whether default interest could be charged under the applicable loan documents. Assuming default interest could be charged, MFIM then had to determine the appropriate calculations and methods for calculating such interest in accordance with the loan agreements and applicable accounting rules and methodology. During the course of the Cases, MFIM determined that default interest could be charged for substantially all of the loans, and as a result prepared default interest calculations as appropriate.

- **Pre-Paid Interest Report** - MFIM generated a Pre-Paid Interest Report detailing Pre-Paid Interest by investor and by loan, which was required for the schedules of assets and liabilities and had to be derived from analyses of the reconstructed loan ledgers. Pre-Paid Interest represents the amount of interest a Direct Lender received on account of a particular loan in excess of the amount of interest actually paid by the borrower on the loan. As discussed herein, USACM had historically made interest payments to Direct Lenders even if the borrowers were not making their interest payments to USACM. The amount of Pre-Paid Interest by the Direct Lender by loan was furnished to each Direct Lender on their initial statements in June 2006, and then on the Loan History Report each month after these reports were developed and sent beginning with the September 2006 distribution. The Pre-Paid Interest Reports have been sent to various government agencies upon their request.

- **Impairment of Loan Assets Report** - MFIM performed an analysis of the loan assets held by each of the Funds using GAAP guidelines on impairment of assets and the valuation and liquidation reports prepared by other MFIM employees. MFIM CPAs researched the appropriate accounting literature, including FASB 5 and FASB 114 and the guidance prepared by FASB on the application of these FASBs, to loan portfolios and used this guidance to evaluate the loan portfolios of the Funds. These

impairment adjustments were made to the books and records of the Funds in November 2006 as part of the year end review of the financial statements.

- **Cash Reconciliations Report** - MFIM produced an internal cash reconciliations report to reconcile the cash in the Collection Account to the cash received by the loan portfolio from the distribution reports generated by the iTrack System. Since Direct Lenders sometimes assigned their loans, one loan could have Direct Lenders who had received Pre-Paid Interest (negative cash) as well as Direct Lenders who were owed money due to Diverted Principal (positive cash) (as defined herein). The Collection Account also contained the funds held pursuant to the Second Interim Distribution Order such as the holdback for appraisal costs, collection costs, service fees at 2% and the pre-petition balances. These amounts changed monthly as each distribution may have paid both uncollected prior months holdbacks as well as the current month's holdbacks. MFIM had to perform all of these calculations to determine the amounts actually owed to the Direct Lenders.

- **Diverted Principal Report** - MFIM generated a Diverted Principal Report listing the diverted principal by loan and by investor. The information in the Diverted Principal Report was required for the schedules of assets and liabilities (the "**Schedules**") and is detailed on Schedule F for USACM. Diverted Principal is the amount of principal paid by the borrowers that was neither paid to the Direct Lenders nor remaining in the Collection Account as of the Petition Date. The Direct Lenders were furnished this information on their June 2006 statements. As the data was loaded into the iTrack System, corrected and refined, the Direct Lenders also received this information as part of their monthly Loan History Reports. Revised Schedules were filed in February 2007 to reflect updated Diverted Principal amounts. The Diverted Principal Report was furnished to several government agencies at their request.

- **Prepetition Receipts Report** - As of the Petition Date, the Collection Account had a balance of $8.9 million. MFIM accountants researched the deposits and disbursements in the Collection Account for the months immediately prior to the Petition Date. Based upon these reports, MFIM prepared analyses and research allowing for the release of the identifiable funds to the appropriate Direct Lenders and the retention of the Pre-Paid Interest and other unidentifiable funds to USACM.

- **Recoupment or "Netting" Report** - MFIM prepared reports on the amounts of funds withheld from a Direct Lender's performing loans to offset those amounts pre-paid on that Direct Lender's loans. The Plan required MFIM to identify all such funds thus held at the Effective Date.

- **Holdback Report** - MFIM calculated the amount of holdback required to cover the cost of the appraisals from each Direct Lender in a loan, which was programmed into the iTrack System. MFIM prepared an analysis each month, as part of the Distribution Report which was sent to the various Committees' financial advisors, which detailed the holdbacks for appraisal costs, collection costs, prepetition receipt holdbacks, and service fee holdbacks. Holdbacks could only be collected to the extent a Direct Lender was otherwise entitled to a distribution so, in many cases, partial holdbacks were collected. In order to implement the Plan and release any

necessary holdbacks, an analysis had to be performed to determine the amount of funds to be released for prepetition collections and the additional service fees held by investor, along with assessing a surcharge to the 1% LSAs. This release/charge amount was then programmed into the iTrack System for the Effective Date distribution.

- **Insolvency Analysis** - In connection with some of the proposed and pending litigation, MFIM researched and prepared preliminary analyses of the insolvency of USACM in the years prior to the filing. MFIM analyzed the impact of accounting for the Diverted Principal and the Pre-Paid Interest in the Collection Account on the books of USACM as the party responsible for these loan servicing liabilities.

37.    A few examples of the above reports are attached hereto as **Exhibit 1**.

38.    In addition to those reports described above, MFIM also performed various *ad hoc* analyses in support of the auction, the loan collections process and the Plan, as well as analyses related to the ongoing operation of the Debtors.

## D.    *Cash Flow Model/Analyses*

39.    When MFIM was appointed, MFIM discovered that the Debtors were operating without a model for forecasting short-term cash flows. Therefore, MFIM constructed a financial model to estimate the Debtors' cash flows on a weekly basis for up to four months into the future. To obtain the inputs for this model, MFIM performed the following tasks:

- Researched bank balances to be used as the starting point for the cash flow forecasts;
- Reviewed the Debtors' historical financial records as a basis for projecting operating expenses for the Debtors;
- Analyzed the portfolio of loans serviced by USACM to estimate the amounts of principal, interest and fees to be collected;
- Requested fee budgets from the various professional firms in the Cases to project payments to be made to those firms; and
- Utilized experience from other cases to project other costs of the Debtors' Cases (for example, fees due to the U.S. Trustee).

40.    In preparing the liquidation analysis that ultimately supported the Plan, MFIM developed the "recovery model" that estimated the value of the Debtors' assets in liquidation, including estimated cash receipts from collection of the loan portfolio. MFIM used these

estimated collection numbers in the cash flow model. Those fees incurred for developing the recovery model are included in the "Liquidation Analysis" category of the Final Application. The forecasts produced by this model were used to manage the Debtors' cash and as exhibits for motions filed with the Court to use cash collateral.

41.    In addition, MFIM recorded time in this category for weekly meetings with employees of the Debtors to identify those payments to be made in the upcoming week. This activity was critical to ensure that the Debtors would achieve their cash forecasts and maintain liquidity sufficient to continue as going concerns.

42.    MFIM's efforts in this category benefited the Debtors by: (a) establishing a framework for forecasting the Debtors' cash flows, (b) increasing the understanding of the Debtors' cash needs, and (c) managing cash disbursements of the Debtors to ensure sufficient liquidity throughout these Cases.

**E.    *Investor Issues and Requests***

43.    MFIM was required to take over the investor inquiry function after the loss of a significant number of USACM employees. These activities were critical to provide necessary information to an important group, the Direct Lenders. In addition, this function was required under the LSAs entered into by USACM and the Direct Lenders.

44.    Since assuming the function, MFIM has logged, reviewed, researched and responded to over 1,600 requests from Direct Lenders. MFIM began this task at the time the Direct Lenders began receiving monthly statements from USACM's reconstructed loan ledgers in 2006. These statements were quite different from the information sent to the Direct Lenders previously. The prepetition statements listed only their investment and their monthly interest. The new statements attempted to show the Direct Lenders their Pre-Paid Interest and Diverted Principal as well as amounts owed by the borrower to them. These new statements confused and

upset many Direct Lenders who did not understand the new information.  MFIM received a second large round of inquiries when MFIM generated the first check statements showing the netting of performing loans to non-performing loans.  Since the netting was not permanent each month, but only a holdback, many Direct Lenders thought they were being charged this amount every month instead of realizing that this was a carryover from the prior month.  Issues and questions raised by the Direct Lenders and explained by MFIM included:

- An overall description of new statements;
- The process by which Direct Lenders could update their addresses;
- An update with regards to DTDF;
- Updates and explanations regarding FTDF payments made in August 2006 and November 2006;
- Timing of payments to Direct Lenders, as well as Fund members;
- Explanation of Diverted Principal;
- Explanation of Pre-Paid Interest;
- The process by which Direct Lenders could assign their loans;
- Service fee calculations and explanations;
- Explanation as to why certain loans were designated as performing or non-performing;
- Discrepancies with 1099 information;
- Proof of claim and proof of interest inquiries;
- Foreclosure proceedings;
- Netting calculations and explanations;
- Hilco (appraisal firm) holdbacks;
- Collection costs;
- Amounts held-back generally; and
- Detailed information regarding Investor History Reports.

45.    In addition, MFIM conducted two "town hall" meetings for the Direct Lenders to explain the new statements, explain how the "netting" worked and how it was presented on their

statements and answer questions. Several hundred Direct Lenders attended the two presentations.

46. MFIM delegated the responses to these investor inquiries to more junior professionals (where appropriate) in order to respond to these requests as efficiently as possible. After MFIM had processed a sufficient number of investor inquiries to understand the most common requests and issues, MFIM prepared more standard explanations for these issues, speeding up the reply process considerably. Requests for copies of statements and loan documents were handled by USACM staff, if possible. Requests for copies of property appraisals required the execution of a confidentiality agreement and were prepared in conjunction with the Debtors' attorneys.

47. MFIM's efforts in this regard benefited the Debtors by increasing the information flow to the Direct Lenders and thereby increasing their understanding of the Cases. MFIM also was ensuring that USACM performed its duties under the LSAs. These investor inquiries facilitated the correction of the Debtors' books and records by highlighting any problems or issues for the accounting staff. Furthermore, the sale and plan process were facilitated by keeping the investors informed and involved in the process.

**F.    *LSA – Document Review, Extraction and Loan by Loan Classification***

48. In a four to five day period, MFIM staff digitized and organized over 12,000 individual investor LSAs at the request of the Stalking Horse Bidder for certain assets of USACM and FTDF. In order to complete this due diligence request, MFIM matched each LSA with the relevant loan for that investor, as requested. As this category required a lower skill level than many of the other categories, the task was largely delegated to employees with lower billing rates. Certain management level employees were required to supervise the process.

49.     This process was vital to the sale process given that the Stalking Horse Bidder demanded this information.  It also proved useful during the due diligence process with other potential buyers and in connection with the sale transaction itself.

**G.     *Compass Sub-Servicing***

50.     As part of the sale of certain assets to Compass, USACM and Compass USA SPE LLC entered into a sub-servicing agreement (the "**Sub-Servicing Agreement**") attached to the Final Application as **Exhibit G**.  USACM  entered into the Sub-Servicing Agreement in order to close the sale of assets to Compass by February 16, 2007 -- the date required by the sale agreement.  The Sub-Servicing Agreement was necessary because Compass had not yet received approval for its Nevada mortgage broker license.  After discussions with the Nevada Mortgage Lender Division and after obtaining the appropriate Court approval, USACM, as the license holder, agreed to enter into this Sub-Servicing Agreement.  The Sub-Servicing Agreement provides that USACM remains as the loan servicer post-closing for the benefit of Compass.  Compass is required to cover the costs of this arrangement.  The arrangement enabled the timely closing of the sale.

51.     Pursuant to the Sub-Servicing Agreement, the services to be performed by USACM are as follows:

- Ownership and control of trust account(s);
- Issuance of funds to Direct Lenders;
- Accounting of funds held in trust account(s);
- Reporting to the Mortgage Lending Division and all other applicable regulatory bodies;
- Maintenance of books and records relating to the loans; and
- Maintenance and delivery to Compass of complete and accurate records of costs and expenses incurred in performing the services.

52.     As interim management, MFIM personnel continued to manage these activities on behalf of USACM in accord with the Sub-Servicing Agreement.  The agreement provides that

"Compass shall be liable for, and shall advance to the Company sufficient funds to pay all costs and expenses of the Company in performing services under this Agreement…" Therefore, the fees requested for this category will be "passed through" USACM to Compass resulting in a net zero cost to USACM.   However, MFIM is entitled to be paid directly by USACM and is therefore requesting compensation for the work performed under the Sub-Servicing Agreement in the Final Application.

**H.     Transition to Compass**

53.     A critical task performed by MFIM was the management of the closing of the sale transaction and transition of the purchased assets from the Debtors to Compass.  As part of the transition, MFIM calculated and negotiated the final purchase price and related escrow accounts, transitioned the borrower negotiations to Compass and participated in meetings related to the mortgage license of Compass and related options.  MFIM also archived thousands of pages of the Debtors' records in order to ensure that all parties (the USACM Trust, Compass and the post-Effective Date Debtors) retained sufficient records to perform their respective post-closing responsibilities.   This transition should allow Compass to efficiently collect the remaining monies owed to the Direct Lenders and allow the USACM Trust to pursue the retained litigation and the collection of the remaining loans.

**I.     Disclosure Statement/Plan of Reorganization**

54.     During the Cases, MFIM along with the Debtors' counsel, spent significant time formulating and negotiating a confirmable plan.  Faced with the expiration of the 120-day exclusivity deadline, MFIM along with the Debtors' counsel, began negotiating with the Committees to extend the deadline to file a plan of reorganization.  In order to reach agreement on the extension, the Committees required that a draft plan of reorganization be circulated to the

interested parties.    The Debtors fulfilled the Committees' requirement, and the Debtors' exclusive period was extended to November 15, 2006.

55.    On September 15, 2006, the Debtors filed their initial Disclosure Statement and Joint Chapter 11 Plan of Reorganization [Docket nos. 1309 and 1310].    The Debtors subsequently amended their Plan after substantial and nearly continual negotiations with and among the four Committees on October 18, 2006 [Docket no. 1576] and on November 7, 2006 [Docket no. 1742].    On November 15, 2006, the Court held a hearing on the adequacy of the Disclosure Statement and entered an order approving the First Amended Disclosure Statement [Docket no. 1795] as filed with the Court's required amendments [Docket no. 1798].    On the same day, the Debtors also filed their Third Amended Plan [Docket no. 1799].    On November 20, 2006, a "Solicitation Package" was served, in accordance with the Solicitation Procedures that were approved by the Court in the Disclosure Statement order. Within four months of the filing of the first draft plan, MFIM achieved a plan which was supported by the major parties in interest.    On December 19-20, 2006, this Court held a confirmation hearing on the Third Amended Plan and on January 8, 2007 entered its findings of facts, conclusions of law and order confirming the Third Amended Plan, as modified [Docket nos. 2376 and 2377].    Plan confirmation was achieved within eight months of the April 13, 2006 bankruptcy filing.

56.    MFIM participated in the nearly four months of negotiations with the Committees, which culminated in confirmation of the Third Amended Plan.  These negotiations included resolutions of issues such as a) whether to substantively consolidate assets with a pro-rata distribution to creditors; b) collection of Pre-Paid Interest from borrower proceeds; c) service fees payable under the LSAs; d) payment and classification of creditors; and e) authority for litigation and pursuit of insiders.  MFIM reviewed and provided comments on the class structure, analyzed the voting results of each class, reviewed various inter-committee

agreements, calculated potential recovery analyses under both liquidation and plan recovery scenarios, and prepared declarations in support of these documents. Mr. Allison's declaration in support of the Plan was the only evidence submitted to the Court in support of confirmation. Upon the entry of the confirmation order, three appeals were filed by the Lender Protection Group, the equityholders (led by Joe Milanowski) and DACA Group, on behalf of four parties. MFIM worked with Debtors' counsel on the appeals, including providing affidavits.

**J.    *Avoidance Actions / Preference Analysis***

57.    As part of MFIM's duties, MFIM conducted an examination of the Debtors' books and records to assist counsel in analyzing potential avoidance or preferences actions under the Bankruptcy Code. MFIM reviewed the Debtors' available books and records from 2003 to the Petition Date and assisted counsel with the preparation and analysis of various preference actions against entities who had received funds from the Debtors. MFIM's analysis of the Collection Account documented that several individuals or entities were paid from the Collection Account, but were not Direct Lenders. As a result of MFIM's work, two preference actions were filed against certain defendants.

58.    On January 23, 2007, USACM initiated an adversary proceeding against Salvatore J. Reale, individually and as trustee for the Salvatore J. Reale Revocable Trust, case no. 06-01251 in the United States Bankruptcy Court for the District of Nevada. The complaint alleges that $6 million was transferred during the 90 days before the Petition Date from the Collection Account to Salvatore J. Reale or his trust. The preference and fraudulent transfer action against the Salvatore J. Reale Revocable Trust, if successful, will net the USACM estate over $9 million.

59.   The Debtors also filed a preference action against Del Bunch.   Mr. Bunch received two payments by electronic deposit from USACM in the amounts of $217,000 and $196,000 during the preference period.

60.   Other creditors of USACM were also paid from these commingled funds and the USACM Trust will review and determine whether to pursue any further action.

### K.   Litigation Matters

61.   MFIM assisted counsel with various litigation matters, stemming from the investigations described in the "Accounts and Notes Receivable" category.   Specifically, MFIM utilized the information researched in the Accounts and Notes Receivable category to assist with the involuntary bankruptcy filings of Tree Moss Partners, LLC and USA Investors VI, LLC.

62.   MFIM's efforts in this regard benefited the Debtors by ensuring that assets of the Debtors were not removed inappropriately, thereby preserving the value of those assets for the Debtors.   MFIM's thorough research and action protected the Debtors' estates from loss of valuable assets.

### L.   Committee Requests

63.   MFIM responded on almost a daily basis to questions from constituents of the Committees, including counsel, financial advisors and individual committee members, and also fulfilled numerous due diligence requests for documents and information. MFIM received approximately 200 requests for information (including one for 96 separate reports or files) from the Committees and their advisors, as well as 11 individual requests and four requests from a related corporate entity. A majority of the requests received contained numerous individual items and various subparts.   Requests were made for appraisals, loan agreements, loan monitoring reports, SEC filings, financial documents, tax documents, origination summaries, interest documents and various summary reports, among others.

64.     In order to further assist the Committees' analyses and assessment of Debtors' financial condition, operations, and transactions, MFIM also prepared and presented financial and operating information for their use. MFIM prepared various PowerPoint presentations and other summary reports to provide the Committees with information in a clear and concise format. MFIM professionals also met with the individual Committees and/or their advisors as requested on an ongoing basis in order to directly address their concerns in a timely fashion.

**M.     Employment/Fee Applications**

65.     At the beginning of these Cases, MFIM prepared retention papers including the affidavit of Tom Allison in support of his appointment as CRO.   MFIM also prepared and issued fee statements on a monthly basis.  During the Application Period, MFIM prepared and filed the First Interim Fee Application and the Final Application, as well as prepared monthly statements for July, August, September, October, November and December 2006, as well as January, February and March 2007.  Although MFIM prepared a Second Interim Fee Application, that application was not filed in lieu of the Final Application.

66.     MFIM held various meetings with the U.S. Trustee and the Committees to resolve the objections to MFIM's retention and its First Interim Fee Application.   One of the largest issues concerning fees was the allocation of MFIM's fees among the five Debtors' estates. MFIM spent significant time negotiating the issue of the allocation of professional fees with the Committees.

67.     This category includes $656,245 for the activities described above, as well as $150,000 of additional estimated time relating to the Final Application.   MFIM has voluntarily reduced its fees in this category by $360,769.91.   As a result, MFIM's fee application time is approximately 3% of the requested fees.

### N.    *Bankruptcy Motions/Filings*

68.    MFIM planned, reviewed and analyzed numerous motions with the Debtors' counsel.   In support of the Debtors' pleadings, MFIM prepared a detailed analysis of the facts supporting the motions and provided declarations as requested by counsel. MFIM assisted Debtors' counsel with preparation several motions and other papers including:

- Orders Approving Debtors' Use of Cash.  If the Debtors were not able to use the cash in the Debtors' bankruptcy estates, the Debtors would have been unable to collect amounts owed from borrowers on outstanding loans and would have been unable to continue other business operations essential in attempting to maximize the return to creditors, the Direct Lenders and the Fund members in these Cases.  In response to periodic motions made by the Debtors requesting permission to continue using cash for the essential operations and administrative expenses of the Debtors, the Court entered orders on April 19 [Docket no. 32], May 9, May 22 [Docket no. 315], July 25 [Docket no. 974], and September 14, 2006 [Docket no. 1282], allowing Debtors to continue using cash in the bankruptcy estates pursuant to proposed cash budgets prepared by MFIM.  On October 5, 2006, Debtors filed a Motion for Order Approving Continued Use of Cash Through January 31, 2007 Pursuant to Fourth Revised Budget [Docket no. 1451].  This Motion was approved by the Court at the October 30, 2006 hearing.

- Approval of Motion to Hold Funds.  On May 8, 2006, USACM filed a motion requesting permission to temporarily hold funds pending a determination of the proper recipients and proper holdback amounts [Docket no. 173].  USACM filed this motion, as directed by the Court, to obtain permission from the Court to continue holding funds in USACM's loan servicing Collection Account until USACM could complete its review and restatement of the Debtors' loan servicing records.  After considering all of the responses and oppositions to the motion, the Court granted USACM's motion in an order entered July 6, 2006 [Docket no. 836].

- $64 Million Distribution Approved by Court and Mailed to Investors.  One of the primary goals of MFIM as Debtors' post-petition management was to distribute to investors, as promptly as possible after the initial accounting work and reconstruction of the loan records was completed, a significant portion of the funds USACM had collected and was holding.  MFIM accomplished this goal through the Motion to Distribute Funds [Docket no. 847], which elicited numerous responses and oppositions but which the Court approved at a hearing held on August 4, 2006.  The Court's order granting the motion was entered on August 24, 2006 [Docket no. 1184], and distributions, totaling approximately $64.3 million and representing approved distributions on loan collections through June 2006 (after Court-approved holdbacks), were mailed to Direct Lenders on August 25, 2006.  Shortly thereafter, FTDF distributed the approved portion of the payments it received (after an appropriate reserve for claims) to its Fund Members.

- Order Granting Proposed Procedures for Distributions on a Monthly Basis.  On August 29, 2006, MFIM filed a motion for Modification to Motion to Distribute Funds and

Proposed Procedures for Ongoing Distributions [Docket no. 1203] in which they sought to extend and modify the relief requested in the Motion to Distribute Funds and to propose specific procedures by which future interim distributions could be made to Direct Lenders and Fund Members on a monthly basis. On October 2, 2006, the Court entered a Modified Order Authorizing Interim Distributions and Holdbacks [Docket no. 1424] setting forth the procedures for future monthly distributions less certain holdbacks. Pursuant to this Order, a second interim distribution of approximately $61.3 million from the USACM Collection Account was mailed to Direct Lenders on or about October 20, 2006, representing approved distributions on loan collections during July and August 2006. Shortly thereafter, FTDF distributed the approved portion of the payments it received (after an appropriate reserve for claims) to its Fund members. Monthly distributions were made to Direct Lenders each month on the basis of this Order.

- Order Denying Motion to Convert Case to a Chapter 7. On October 24, 2006 the United States Trustee (the "**U.S. Trustee**") filed a Motion to Convert Case to Chapter 7 (the "**Conversion Motion**") [Docket no. 1661]. The U.S. Trustee argued that the requirements were met for the Cases to be converted under 11 U.S.C. § 1112(b). The Conversion Motion was strongly opposed by the Debtors and all four of the Committees appointed by the U.S. Trustee who argued that conversion to a liquidating Chapter 7 at this point would be disastrous and not in the best interest of creditors and the estates. At a hearing on October 30, 2006, the Court denied the Conversion Motion, and the written order denying the motion was entered November 1, 2006 [Docket no. 1711].

- Fixing of Claims Bar Date. The Court set November 13, 2006, as the deadline (the "**Bar Date**") for all creditors and equity interest holders to file proofs of claim and proofs of interest. The Court extended the Bar Date, but only with regard to the filing of claims by Direct Lenders, to January 13, 2007. The Court also extended indefinitely the Bar Date for the filing of intercompany claims between the Debtors. These intercompany claims were never filed as they were settled or determined in accordance with the provisions of the Plan.

69.    MFIM also reviewed and analyzed objections to the Debtors' pleadings and prepared the necessary documentation to allow counsel to file replies to the objections. In addition, MFIM researched and prepared documentation requested by U.S. Trustee's office as well as responded to motions filed by other parties.

70.    MFIM's efforts in this regard benefited the Debtors by moving the Cases forward in a timely manner and allowing the Debtors to perform certain functions necessary to maintain the businesses as a going concern during these Cases. These motions were instrumental in the successful confirmation of the Plan.

### O.    *Bankruptcy Schedules and SOFAs*

71.    On June 15, 2006, each of the Debtors filed its Statement of Financial Affairs ("**Statements**") and Schedules, as required by the Bankruptcy Code [Docket nos. 673-682], and on June 23, 2006, certain amendments to the Statements and Schedules were filed [Docket no. 784]. Given the state of the Debtors' accounting records on the Petition Date, the preparation and filing of the Statements and Schedules represented a major effort by MFIM. The reconstructed loan ledgers provided documentation that enabled MFIM to determine that at least $26.4 million of principal was diverted rather then paid to the Direct Lenders. These Direct Lenders were listed as creditors of USACM on the Schedules. In addition, MFIM's investigation of DTDF showed that $18.9 million in principal was not paid to DTDF by USACM and this too became a liability of USACM as the loan servicer. Since USACM, as the loan servicer, had a policy of paying every Direct Lender each month, regardless of whether the borrower on the loan owned by that lender had made a payment, MFIM determined that about $39.5 million had been paid to Direct Lenders in advance of the borrower payment. These prepayments were listed as assets of the USACM estate.

72.    MFIM's tasks during the preparation and filing of the Statements and Schedules included:

- Analyzing the Debtors' books and records to identify the sources of the requisite information;
- Extracting the necessary information from the Debtors' books and records with the assistance of USACM's accounting personnel;
- Delivering the information for the Statements and Schedules to BMC, the Debtors' noticing agent, for input into the appropriate forms for filing; and
- Reviewing and revising the draft Statements and Schedules produced by BMC.

### P.    Employee Retention and Severance Plan

73.    Upon his appointment as President and CRO for USACM, Tom Allison terminated 19 employees of the Debtors, primarily the brokers soliciting funds from Direct Lenders and the executive management of USACM.   Through September 2006, an additional 22 employees resigned, including USACM's Chief Operating Officer and its Loan Manager (both subsequently returned as full time employees in January, 2007).

74.    In an effort to retain the remaining 11 employees, MFIM drafted, negotiated, and implemented an employee retention and severance plan (the "**Retention Plan**").  The Retention Plan included amounts for the following:

- Bonuses - to encourage the employees to continue their employment with USACM throughout the bankruptcy process;

- Severance Pay - to encourage the employees to stay through the bankruptcy process until it was determined that their services were no longer required by the USACM Trust or, if their services were required by the USACM Trust, to encourage them to stay to assist with the postconfirmation work; and

- Medical Benefits – to provide for medical benefits in the event that USACM terminated the medical plan.

75.    A motion for the Retention Plan was filed with the Court on October 3, 2006 and an order approving the Retention Plan was entered by the Court on November 13, 2006 which approved $343,000 in payments under the Retention Plan.  Retention of these employees was critical to allow the Debtors to continue as going concern entities through the Effective Date of the Plan, thereby preserving and increasing the recoveries for the creditors and members of the Funds.

### Q.    Case Administration

76.    In order to respond effectively to various constituencies' questions during the Cases, MFIM spent time creating a creditor information call line.  MFIM also assisted in the employment of BMC as claims agent and assisted BMC in compiling the mailing matrix to

1    ensure all parties received adequate notice in these Cases. MFIM also approved various

2    communications to investors and press releases in order to keep various parties informed during

3    the Cases.

4        77.    In order to fulfill the various and numerous requests for due diligence from many

5    parties in interest, MFIM took an active role in organizing, indexing and storing the Debtors'

6    records for use during their Cases. Also included in this category are specific tasks necessary to

7    properly administer the Cases including coordination of meetings with parties-of-interest,

8    document management, preparation of budgets and work plans, review of confidentiality

9    agreements, and review of general case filings.

10   

11       78.    The U.S. Trustee took a very active interest in these Cases, MFIM responded to

12   the U.S. Trustee's questions, ensuring that he was adequately informed about the status of the

13   Cases. For example, at the U.S. Trustee's request, MFIM prepared an inventory of assets, a

14   corporate organizational chart, income statement and balance sheets for USACM as of December

15   21, 2005, tax returns, articles of incorporation and certificates of incorporation. MFIM also met

16   with the U.S. Trustee.

17   

18   **R.    *Leases, Executory Contracts and Agreements***

19       79.    From the beginning, MFIM addressed lease and executory contract issues in these

20   Cases. MFIM located and identified the Debtors' leases, LSAs and executory contracts

21   including the loan agreements and all other contracts (executory or otherwise), which were then

22   organized, indexed, and ultimately reported on the Schedules and Statements filed with the

23   Court. In order to complete the sale of the Debtors' assets, MFIM analyzed the executory

24   contracts to determine which contracts were executory, calculated the related cure amounts and

25   estimated any lease rejection damages in association with certain lease agreements. In certain

26   

27   

28

instances, MFIM identified contracts for rejection, including contracts signed for the benefit of related parties, and prepared analyses supporting the Debtors' motion to reject certain leases.

80.    MFIM's efforts in this regard benefited the Debtors by allowing for the identification and rejection of contracts not needed for the efficient operation of the Debtors. These activities also benefited the Debtors during the due diligence process of the various bidders.

**S.    Tax Analysis/Issues**

81.    As part of its engagement, MFIM analyzed the tax issues associated with the impairment of the loan portfolio for the financial statements of the Funds under GAAP and tax regulations.  The FTDF Committee made various requests regarding tax treatment of the loans and related interest income.  As a result, MFIM senior tax accounting staff were required to review the analysis and research to verify that the tax returns were prepared in accordance with the Internal Revenue Service Code and applicable regulations.

82.    MFIM, on behalf of the Debtors, also employed tax accountants in order to prepare the 2006 tax returns and K-1s.  MFIM initially attempted to employ the Debtors' former tax accountant to prepare the 2006 tax returns as the most cost effective and efficient preparer. However, the DTDF Committee objected to their retention and MFIM commenced a search for a replacement tax firm.   In its efforts to find an appropriate tax accountant, MFIM contacted five separate firms, sent appropriate information, and received three proposals, including cost estimates.  MFIM selected KPMG as the firm with the most reasonable cost structure, and the ability to prepare and file the 950 K-1s of FTDF and the 1350 K-1s of DTDF in a timely manner, as well as prepare the returns of the other entities.  None of the Committees objected to the retention of KPMG, and KPMG was employed by the Debtors.

83.    MFIM analyzed the prior tax returns of each Debtor and furnished KPMG with the appropriate information and reconciliations of tax and book data for each entity. MFIM also participated in discussions with KPMG on various tax matters and assisted KPMG with information and explanations of the Debtors' businesses and accounting. MFIM analyzed the professional costs of the bankruptcy filings to determine the costs required to be considered restructuring costs under IRS Reg 1.263(a)5.

84.    MFIM analyzed tax issues including writing down USACM's loan portfolio to net realizable value, assembling information required for Funds 1065's and K-1s, and establishing the size and nature of losses and tax treatment for all the entities.

85.    The K-1s for FTDF members were prepared based on the books and records of FTDF and mailed to fund members in early March 2007, six weeks before the K-1s were required to be mailed to investors. K-1s for DTDF were mailed in a timely manner post-Effective Date. The 2006 form 1065s for the Funds were filed by April 17, 2007 and the other returns are subject to timely filed extensions.

**T.    Monthly Operating Reports**

86.    To assist the Debtors in the performance of their duties under the Bankruptcy Code, MFIM monitored and reviewed the filing of the monthly operating reports. Specifically, MFIM reviewed and analyzed the financial information provided by USACM's staff concerning the Debtors' monthly financial condition.

**U.    Claims Analysis**

87.    MFIM reviewed approximately 2,446 claims received by BMC in the USACM Case and prepared exhibits for potential objections to amended, duplicate and misfiled claims. In particular, MFIM researched eight administrative claims, 127 priority claims and 1,611 secured claims in order to prepared the necessary exhibits and information for objections. For

instance, the majority of the secured claimants were Direct Lenders who filed a claim for their interest in a borrower loan. MFIM researched each Direct Lender to determine their account number for future analysis of any of the Direct Lenders' claims.

88.    MFIM also reviewed the claims filed against the remaining Debtors. MFIM analyzed the 125 claims filed against FTDF in order to develop the claim objections later filed by the FTDF Committee and prepared a declaration in support of the claim objections. MFIM reviewed appropriate documentation and prepared a declaration in support of DTDF's objection to a claim by a Direct Lender, reviewed and prepared two exhibits for USA Securities' objection to 35 claims and prepared three exhibits for USA Realty after review and objection to 57 claims.

## V.    *Transition Issues and Activities*

89.    One of the essential post-confirmation tasks performed by MFIM was ensuring a seamless transition of the Debtors' remaining assets to the post-Effective Date entities established under the Plan. Specifically, pursuant to the Plan, the assets of USACM remaining after the sale were transferred to the USACM Trust and DTDF. As part of the Plan, an Amended Operating Agreement appointing a new DTDF Administrator was executed. In order to complete these tasks, MFIM formulated a transition plan which outlined all the activities necessary for the transitions. Through this transition plan, MFIM planned, managed and implemented the transition as detailed in the Plan and DTDF Amended Operating Agreement.

90.    Under the transition plan, MFIM transitioned USACM's computer systems, including among others, its accounting programs Great Plains, i-Track, Peachtree, as well as its email program and other information stored on the computer systems. MFIM was also responsible for demonstrating the operation of these computer programs to the USACM Trustee and DTDF's Administrator to ensure the seamless transition. MFIM spent considerable time identifying which of the Debtors' documents and agreements should be delivered to the USACM

Trust and DTDF and transferring the appropriate documents or otherwise providing for document storage.

91.    In order to complete this engagement, MFIM was required to not only transition USACM's remaining assets to the USACM Trust and transfer the administration of the DTDF to the new Administrator, but also to wind-down USA Realty, USA Securities and FTDF.  MFIM also addressed any accounting and year end financial issues, including closing the books for year end, preparing the financial statements, determining the amount of the claims reserve, transferring funds to post-Effective Date accounts, and preparing a list of payments required to be made on the Effective Date.  MFIM also transitioned the claims objection and litigation work to the USACM Trust.

92.    MFIM addressed the rejection of USACM's office space.  In order to return the property to the landlord, it was necessary for MFIM to negotiate with former management on the ownership of certain assets in order to vacate the property.   For example, MFIM had to determine ownership of remaining items such as art work and furniture before it could dispose of such items.

93.    Finally, in order to transition USACM and DTDF, MFIM coordinated its activities with the parties in interest in the Cases.  The transition plan included essential meetings with the four Committees, the USACM Trust and the new Administrator of the DTDF.  During these meetings, MFIM briefed the USACM Trustee and DTDF Administrator on the regulatory and governmental investigations being conducted and the Debtors' compliance with such investigations.  MFIM has transferred documentation to the USACM Trustee and DTDF so that the remaining assets of the Debtors can be collected.  MFIM will assist the USACM Trustee with the collection, litigation and claims tasks.  MFIM also continues to winddown the USACM, USA Realty, USA Securities and FTDF estates.

I declare, under penalty of perjury, that, to the best of my knowledge, information and belief, that the foregoing is true and correct.

Mesirow Financial Interim Management, LLC

By _Susan Smith_

Susan M. Smith
Senior Vice President
Mesirow Financial Interim Management, LLC
321 North Clark Street, 13th Floor
Chicago, IL 60610

# EXHIBIT 1

**USA Commercial Mortgage Company, et al.**
Actuals v. Budget Comparison
*($ in thousands)*

| | Actual W/E 8/20/06 Total | Forecast W/E 8/20/06 Total | Variance | % |
|---|---|---|---|---|
| **USA Commercial Mortgage** | | | | |
| **Cash Collections** | | | | |
| Collections | | | | |
| Loan Origination Fees | $ - | $ - | $ - | N/A |
| Reimbursed Expenses from USA Capital Realty | - | - | | N/A |
| Loan Servicing Collections | | | | |
| Service Fees Collected | - | 1.6 | (1.6) | (100.0%) |
| Outstanding Origination, Extension and Closing Fees | - | 50.0 | (50.0) | (100.0%) |
| **Total Cash Collections Operating Accounts** | $ - | $ 51.6 | $ (51.6) | (100.0%) (a) |
| **Cash Disbursements** | | | | |
| Origination Expenses | $ - | $ - | $ - | N/A |
| Loan Servicing Expenses | $ - | $ 50.0 | $ (50.0) | (100.0%) |
| Operating Disbursements | | | | |
| Salaries & Wages | 48.5 | 45.0 | 3.5 | 7.8% |
| Payroll Related Benefits | 7.4 | 7.7 | (0.2) | (3.1%) |
| Rent | - | - | - | N/A |
| Office Operating Disbursements | 10.1 | 15.0 | (4.9) | (32.4%) |
| Other Operating Disbursements | 2.0 | 20.0 | (18.0) | (89.8%) |
| **Total Operating Disbursements** | 68.1 | 137.7 | (69.6) | (50.5%) (b) |
| **Bankruptcy Related Disbursements** | | | | |
| Professional Fees | - | - | - | N/A |
| Trustee Fees | - | - | - | N/A |
| Other | | | | |
| Employee Retention Costs | - | - | - | N/A |
| Noticing Agent (BMC) | - | - | - | N/A |
| Appraisal Fees (Hilco) | - | - | - | N/A |
| Post-Petition Financing | | | | |
| Fees for Post-Petition Financing | - | - | - | N/A |
| Lendor Expenses | - | - | - | N/A |
| **Total Bankruptcy Related Disbursements** | $ - | $ - | $ - | N/A |
| **Total Cash Disbursements Operating Accounts** | $ 68.1 | $ 137.7 | $ (69.6) | (50.5%) |
| **NET CHANGE IN CASH** | $ (68.1) | $ (86.0) | $ 17.9 | (20.8%) |
| **Cash Position - USA Commercial Mortgage Estate** | | | | |
| Total Cash and Cash Equivalents at Beginning of Period | $ 799.4 | $ 3,562.9 | $ (2,763.5) | (77.6%) |
| Net (Decrease) Increase in Cash and Cash Equivalents | $ (68.1) | $ (86.0) | $ 17.9 | (20.8%) |
| **Total Cash DIP Operating Account at End of Period** | $ 731.3 | $ 3,476.9 | $ (2,745.6) | (79.0%) |

**USA Commercial Mortgage Company, et al.**
Actuals v. Budget Comparison
($ in thousands)

| | Actual W/E 8/20/06 Total | Forecast W/E 8/20/06 Total | Variance | % |
|---|---|---|---|---|
| **Additional Accounts** | | | | |
| **USA Capital Realty Advisors - DIP Operating Account** | | | | |
| Beginning Cash Balance | $ 159.9 | $ 167.4 | $ (7.4) | (4.4%) |
| Bank Fees | - | - | - | N/A |
| Office Supplies | - | - | - | N/A |
| Fees & Licenses | - | - | - | N/A |
| Accounting Expenses | - | - | - | N/A |
| Trustee Fees | - | - | - | N/A |
| Management Fees Collected (DTDF) | - | - | - | N/A |
| Receipt of Accounts Receivable from Tanamera Apartments | - | - | - | N/A |
| Expense Reimbursement due USA CMC | - | - | - | N/A |
| Ending Cash Balance | $ 159.9 | $ 167.4 | $ (7.4) | (4.4%) |
| **USA Securities - DIP Operating Account** | | | | |
| Beginning Cash Balance | $ 21.8 | $ 18.2 | $ 3.6 | 19.8% |
| Trustee Fees | - | - | - | |
| Ending Cash Balance USA Securities | $ 21.8 | $ 18.2 | $ 3.6 | 19.8% |
| **Diversified Trust - DIP Operating Account** | | | | |
| Beginning Cash Balance DTDF | $ 383.2 | $ 386.3 | $ (3.1) | (0.8%) |
| Cash Payment for Professional Fees | - | - | - | N/A |
| Interest Income-Banking | - | - | - | N/A |
| Trustee Fees | - | - | - | N/A |
| Management Fees Paid by DTDF | - | - | - | N/A |
| Ending Cash Balance DTDF | $ 383.2 | $ 386.3 | $ (3.1) | (0.8%) |
| **First Trust - DIP Operating Account** | | | | |
| Beginning Balance FTDF | $ - | $ (415.6) | $ 415.6 | (100.0%) |
| Cash Payment for Professional Fees | - | - | - | N/A |
| Management Fees Paid by FTDF | - | - | - | N/A |
| Trustee Fees | - | - | - | N/A |
| Disbursements from Collection Account | | 2,377.2 | (2,377.2) | (100.0%) [b] |
| Ending Cash Balance FTDF | $ - | $ 1,961.6 | $ (1,961.6) | (100.0%) |
| **Collections Account** | | | | |
| Beginning Balance Collections Account (Investor Funds) | 121,335.1 | 106,693.1 | 14,642.0 | 13.7% |
| Interest Payments from Borrowers | 43.9 | 4,000.0 | (3,956.1) | (98.9%) |
| Principal Payments from Borrowers | 47.1 | - | 47.1 | N/A |
| Total Account Collections | $ 91.0 | $ 4,000.0 | $ (3,909.0) | (97.7%) [d] |
| Distribution to Investors | - | (68,155.8) | 68,155.8 | (100.0%) [c] |
| Service Fees to USA CMC | - | (1.6) | 1.6 | (100.0%) |
| Total Disbursements | $ - | $ (68,157.5) | $ 68,157.5 | (100.0%) |
| Ending Balance Collections Account (Investor Funds) | 121,426.1 | 42,535.6 | 78,890.5 | 185.5% |
| Beginning Balance Collections Account (Estate Funds) | 12,420.7 | 12,858.6 | (437.9) | (3.4%) |
| Interest Income to Estate | - | - | - | N/A |
| Ending Balance Collections Account (Estate Funds) | 12,420.7 | $ 12,858.6 | $ (437.9) | (3.4%) |
| Ending Balance Collections Account (Total) | $ 133,846.8 | $ 55,394.2 | 78,452.5 | 141.6% |
| **Investors Account** | | | | |
| Cash Balance Investors Account | $ 1,877.1 | $ 1,877.1 | $ - | 0.0% |
| **Supplemental Schedules - Professional Fees** | | | | |
| **Debtor Professional Fees (as paid)** | | | | |
| Financial Advisor Fees & Disbursements | $ - | $ - | $ - | N/A |
| Legal Counsel Fees & Disbursements | - | - | - | N/A |
| Local Counsel | - | - | - | N/A |
| PR Firm | - | - | - | N/A |
| Other Legal Professionals | - | - | - | N/A |
| **Committee Professionals (as paid)** | | | | |
| Unsecured Creditors Committee | | | | |
| Legal Counsel Fees & Disbursements | - | - | - | N/A |
| Financial Advisor Fees & Disbursements | - | - | - | N/A |
| Cash Payment for Debtor Professionals by USA CMC | $ - | $ - | $ - | N/A |

Variance Notes:
a. Variance attributable to continuing payoff negotiations with borrowers.
b. Variance attributable to lower operating expenses and a decrease in loan servicing expenses due to a delay in the loan recovery process.
c. Variance related to change in timing of Court-approved interim distribution.
d. Variance in collections for the Collections Account is caused by reduced collections due to continuing payoff negotiations with borrowers.

# USA Commercial Mortgage Company, et al.
## Post-Petition Weekly Collection Report

| | Total Collections Week of 11/27/06 to 12/01/06 | Cumulative Post-Petition Collections 12/1/2006 |
|---|---|---|
| 3685 San Fernando Road Partners | $ | $ 174,358.33 |
| 5055 Collwood, LLC | 27,118.27 | $ 687,592.96 |
| 5252 Orange, LLC | - | $ 3,991,976.56 |
| 60th Street Venture, LLC | - | $ 228,225.73 |
| 6425 Gess, LTD | - | $ - |
| Amesbury/Hatters Point | - | $ 1,409,131.90 |
| Anchor B, LLC | - | $ - |
| Ashby Financial $7,200,000 | - | $ 9,210,137.25 |
| B & J Investments | - | $ - |
| BarUSA/$15,300,000 | 331,500.00 | $ 2,157,794.81 |
| Bay Pompano Beach | - | $ 2,286,847.26 |
| Beastar, LLC | - | $ - |
| Beau Rivage Homes/$8,000,000 | - | $ - |
| Binford Medical Developers | - | $ 173,212.50 |
| Boise/Gowen 93 | - | $ 2,576,797.48 |
| Brookmere/Matteson $27,050,000 | - | $ 129,587.49 |
| Bundy Canyon $1,050,000 | - | $ 117,289.86 |
| Bundy Canyon $2,500,000 | - | $ 56,118.61 |
| Bundy Canyon $5,000,000 | - | $ 94,095.70 |
| Bundy Canyon $5,725,000 | - | $ 297,417.74 |
| Bundy Canyon $7,500,000 | - | $ 101,235.21 |
| Bundy Canyon $8.9 | - | $ - |
| BySynergy, LLC $4,434,446 | - | $ - |
| Cabernet | 37,500.00 | $ 342,625.00 |
| Castaic Partners II, LLC | - | $ - |
| Castaic Partners III, LLC | - | $ 168,442.09 |
| Charlevoix Homes, LLC | - | $ 318,844.42 |
| Clear Creek Plantation | - | $ 29,966.67 |
| Cloudbreak LV | - | $ 323,450.86 |
| Colt DIV added #1 | - | $ - |
| Colt DIV added #2 | - | $ - |
| Colt Gateway | - | $ - |
| Colt Second TD | - | $ - |
| Columbia Managing Partners | - | $ 191,063.89 |
| ComVest Capital | - | $ 139,511.22 |
| Copper Sage Commerce Center Phase II | - | $ 84,556.35 |
| Copper Sage Commerce Center, LLC | - | $ 1,159,241.29 |
| Cornman Toltec 160, LLC | - | $ 515,966.68 |
| Cottonwood Hills, LLC | - | $ 4,348,444.45 |
| CREC Building Colt | - | $ - |
| Del Valle - Livingston | - | $ 1,012,689.34 |
| Del Valle Isleton | - | $ 6,773,520.90 |
| Eagle Meadows Development | - | $ 667,636.11 |
| Elizabeth May Real Estate | - | $ 127,882.93 |
| EPIC Resorts | - | $ - |
| Fiesta Development $6.6 | - | $ 583,916.66 |
| Fiesta Development McNaughton | - | $ |

## USA Commercial Mortgage Company, et al.
### Post-Petition Weekly Collection Report

| | Total Collections Week of 11/27/06 to 12/01/06 | Cumulative Post-Petition Collections 12/1/2006 |
|---|---|---|
| Fiesta Murrieta | - | $ 575,068.56 |
| Fiesta Oak Valley | - | $ - |
| Fiesta USA/Stoneridge | - | $ - |
| Fiesta/Beaumont $2.4m | - | $ 2,519,166.59 |
| Foxhill 216, LLC | - | $ 364,875.04 |
| Franklin - Stratford Investments, LLC | - | $ 631,205.25 |
| Freeway 101 | - | $ - |
| Gateway Stone | - | $ 139,932.08 |
| Gilroy | - | $ 5,444,247.79 |
| Glendale Tower Partners | - | $ 6,942,774.51 |
| Golden State Investments II | - | $ 3,023,041.84 |
| Goss Road | - | $ 103,238.75 |
| Gramercy Court Condos | - | $ 490,442.08 |
| Harbor Georgetown | - | $ - |
| Hasley Canyon | - | $ 14,867,362.11 |
| Hesperia II | - | $ 390,912.21 |
| HFA- Clear Lake | - | $ - |
| HFA- North Yonkers | - | $ 28,168,402.75 |
| HFA- Riviera 2nd | - | $ 10,698,080.00 |
| HFA- Windham | - | $ - |
| HFA-Clear Lake 2nd | - | $ - |
| HFAH/Monaco | - | $ - |
| Huntsville | - | $ 360,777.18 |
| I-40 Gateway West | - | $ 2,306,253.13 |
| I-40 Gateway West, LLC 2nd | - | $ 99,913.58 |
| Interstate Commerce Center | - | $ 1,674,004.81 |
| Interstate Commerce Center Phase II | - | $ 467,470.17 |
| J. Jireh's Corporation | - | $ 9,410,599.50 |
| La Hacienda Estate, LLC | - | $ 505,031.46 |
| Lake Helen Partners | - | $ - |
| Lerin Hills | - | $ 392,448.40 |
| Margarita Annex | - | $ 255,666.56 |
| Marlton Square | - | $ 1,912,137.66 |
| Marlton Square 2nd | - | $ 250,266.74 |
| Marquis Hotel | - | $ - |
| Meadow Creek Partners, LLC | - | $ 8,951,132.53 |
| Midvale Marketplace, LLC | - | $ 4,441,232.33 |
| Mountain House Business Park | - | $ 749,985.88 |
| Oak Shores II | - | $ 472,432.75 |
| Ocean Atlantic | - | $ 172,136.71 |
| Ocean Atlantic $9,425,000 | - | $ 92,276.30 |
| Opaque/Mt. Edge $7,350,000 | - | $ 5,684,584.77 |
| Palm Harbor One | 545,940.00 | $ 4,705,451.92 |
| Placer Vineyards | - | $ 1,009.14 |
| Placer Vineyards 2nd | - | $ - |
| Preserve at Galleria, LLC | - | $ 5,009,770.77 |
| Redwood Properties $269,641 | - | $ - |

Preliminary Analysis-Subject to Revision

DRAFT

## USA Commercial Mortgage Company, et al.
### Post-Petition Weekly Collection Report

| | Total Collections Week of 11/27/06 to 12/01/06 | Cumulative Post-Petition Collections 12/1/2006 |
|---|---|---|
| Rio Rancho Executive Plaza, LLC | 248,813.25 | $ 524,631.10 |
| Riviera - Homes for America Holdings, L.L.C. | - | $ 5,767,361.09 |
| Roam Development Group | | $ 27,733,618.05 |
| Saddleback | - | $ - |
| Shamrock Tower, LP | - | $ - |
| Sheraton Hotel | - | $ - |
| Slade Development | - | $ 98,996.60 |
| Southern California Land 2nd | - | $ 323,944.46 |
| Standard Property Development | - | $ 347,331.02 |
| SVRB $4,500,000 | - | $ 92,343.15 |
| SVRB 2nd $2,325,000 | - | $ 126,066.66 |
| Tapia Ranch | - | $ 3,982.69 |
| Ten-Ninety | - | $ - |
| Ten-Ninety, Ltd./$4,150,000 | - | $ - |
| The Gardens Phase II | - | $ - |
| The Gardens, LLC $2,425,000 | - | $ 597,297.17 |
| The Gardens, LLC Timeshare | - | $ 2,791,061.31 |
| Universal Hawaii | - | $ - |
| University Estates | - | $ 1,046,849.39 |
| Urban Housing Alliance - 435 Lofts | - | $ 8,703,062.24 |
| Wasco Investments | 73,800.12 | $ 79,817.09 |
| **TOTAL** | $ 1,264,671.64 | $ 210,989,272.13 |

Preliminary Analysis-Subject to Revision

DRAFT

USA Capital
LOAN SUMMARY
AS OF February 28, 2007

| Performance Situation | Loan Name | Origination Date | Loan Outstanding at 2/28/07 | Interest Outstanding at 2/28/07 | Interest Prepaid by Investors | February Interest Receipts | February Principal | Service Fee | Due to Lenders | DIV Fund | First Trust | Direct Lenders | No of Investors |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Maturity and Interest Default | North San Fernando Road Partners | 4/2006 | 2,450,000 | 978,643 | | | | | | | | | 83 |
| Performing | 5055 Collwood, LLC | 2/2006 | 964,895 | 13,449 | | 29,790 | | 1,596 | 29,790 | | | 28,200 | 33 |
| Repaid | 5252 Orange, LLC | 1/2006 | - | - | | | | | | | | | 66 |
| Non-Performing | 60th Street Venture, LLC | 1/2006 | 3,700,000 | 411,376 | | | | | | | | | 40 |
| Maturity and Interest Default | 6425 Gess, LTD | 4/14/05 | 26,500,000 | 5,269,551 | 1,672,697 | | | | | | | | 286 |
| Maturity and Interest Default | Amesbury/Hatters Point (Amesburyport Corporation) | 12/16/02 | 19,242,193 | 2,455,555 | | | | | | | | | 363 |
| Maturity and Interest Default | Anchor B, LLC | 5/31/05 | 5,616,427 | 1,337,674 | 517,607 | | | | | | | | 50 |
| Repaid | Ashby Financial $7,200,000 | 5/06/04 | - | - | | | | | | | | | 73 |
| Special Situation | B & J Investments | 9/29/05 | - | - | | | | | | | | | |
| Non-Performing | Bar6 6A/$15,300,000 (Bundle A, LLC) | 11/20/03 | 15,300,000 | 327,236 | | | | | | | | | 221 |
| Maturity Default | Bay Pompano Beach, LLC | 6/25/05 | 14,662,512 | 1,342,224 | | | | 875 | | | | | 407 |
| Repaid | Beastar, LLC | 5/2005 | - | - | | | | | | | | | 84 |
| Repaid | Beau Rivage Homes/$8,000,000 | 1/2003 | - | - | | | | | | | | | 157 |
| Maturity and Interest Default | Binford Medical Developers LLC | 8/31/05 | 7,450,000 | 840,760 | | | | | | | | | 92 |
| Repaid | BosterGowen 93 LLC | 9/26/05 | - | - | | | | | | | | | 17 |
| Maturity and Interest Default | Bowannae/Matanon $27,500,000 | 10/29/03 | 5,964,846 | 580,735 | | | | | | | | | 229 |
| Performing | Bundy Canyon $1,050,000 (Bundy Canyon Land Development, LLC) | 1/6/06 | 1,050,000 | 10,617 | | 11,754 | | 875 | 10,879 | | 10,879 | | 34 |
| Interest Default | Bundy Canyon $2,500,000 (Bundy Canyon Land Development, LLC) | 5/2/05 | 2,300,000 | 259,624 | | | | | | | | | 34 |
| Interest Default | Bundy Canyon $5,000,000 (Bundy Canyon Land Development, LLC) | 9/26/05 | 4,250,000 | 490,684 | | | | | | | | | 43 |
| Maturity Default | Bundy Canyon $5,725,000 (Bundy Canyon Land Development, LLC) | 1/14/05 | 5,725,000 | 470,258 | | | | | | | | | 53 |
| Maturity and Interest Default | Bundy Canyon $7,500,000 (Bundy Canyon Land Development, LLC) | 8/17/05 | 6,450,000 | 788,899 | | | | | | | | | 83 |
| Not Funded | Bundy Canyon $8.9 (Bundy Canyon Land Development, LLC) | 4/5/06 | - | - | | | | | | | | | 117 |
| Special Situation | BySynergy, LLC $4,434,446 | 2/2/06 | - | - | | | | | | | | | 3 |
| Maturity Default | Cabernet Highlands, LLC | 2/17/05 | 2,980,000 | 34,946 | 76,040 | 38,750 | 20,000 | 2,500 | 56,250 | | 56,250 | | 65 |
| Non-Performing | Cardiac Partners III, LLC | 7/11/05 | 5,600,000 | 868,111 | | | | | | | | | 57 |
| Non-Performing | Castaic Partners III, LLC | 9/22/05 | 4,675,000 | 574,534 | | | | | | | | | 65 |
| Performing | Charleston Homes, LLC(Lindsay and Chandler Heights, LLC) | 4/2/06 | 3,600,000 | 42,311 | | 46,844 | | 2,833 | 44,011 | | 44,011 | | 40 |
| Maturity and Interest Default | Clear Creek Plantation (Arapahoe Land Investments, L.P.) | 3/15/05 | 2,900,000 | 339,732 | | | | | | | | | 36 |
| Repaid | Cloudbreak LV (Cloudbreak Las Vegas, LLC) | 12/17/03 | 1,000,000 | 704,568 | 384,583 | | | | | | | | 2 |
| Non-Performing | Colt CREC Building (Colt Gateway LLC) | 9/26/03 | 3,718,777 | 2,326,291 | 565,564 | 24,740 | | 1,842 | 22,868 | | 22,868 | | 1 |
| Non-Performing | Colt DV added #1 (Colt Gateway LLC) | 7/15/03 | 1,590,000 | 1,131,693 | 170,825 | | | | | | | | 1 |
| Non-Performing | Colt DV added #2 (Colt Gateway LLC) | 7/13/03 | 3,100,000 | 1,716,925 | 352,625 | | | | | | | | 1 |
| Non-Performing | Colt Gateway LLC | 1/17/03 | 5,905,051 | 1,787,468 | 819,821 | | | | | | | | 3 |
| Non-Performing | Colt Second TD (Colt Gateway, LLC) | 8/19/03 | 1,000,000 | 384,583 | | | | | | | | | 1 |
| Performing | Columbia Managing Partners, LLC | 9/1/05 | 2,210,000 | 22,346 | | | | | | | | | 1 |
| Interest Default | Comvest Capital (Comvest Capital Satellite Arms Inc) | 1/11/06 | 4,125,000 | 430,268 | | | | | | | | | 56 |
| Non-Performing | Copper Sage Commerce Center Phase II (Copper Sage Commerce Center, LLC) | 3/1/06 | 3,550,000 | 379,731 | | | | | | | | | 51 |
| Repaid | Copper Sage Commerce Center, LLC | 6/9/04 | - | - | | | | | | | | | 28 |
| Maturity Default | Corporate Hills, LLC | 6/24/05 | 6,375,000 | 202,876 | (0) | | | | | | | | 99 |
| Repaid | Cottonwood Hills, LLC | 6/14/05 | - | 0 | 0 | | | | | | | | 21 |
| Maturity and Interest Default | Del Valle - Livingston (Del Valle Capital Corporation, Inc | 8/25/05 | 19,250,000 | 1,475,546 | | | | | | | | | 259 |
| Repaid | Del Valle Nation (Del Valle Capital Corporation, Inc) | 3/22/05 | - | - | | | | | | | | | 76 |
| Interest Default | Eagle Meadows Development | 10/19/05 | 31,550,000 | 4,127,598 | | | | | | | | | 295 |
| Repaid | Elizabeth May Real Estate, LLC | 2/24/06 | - | - | | | | | | | | | 147 |
| Special Situation | EPIC Resorts | Undetermined | 12,970,694 | 8,012,319 | | | | | | | | | 1 |

Prepared by MFM LLC

Preliminary Numbers Subject to Revision

**USA Capital**
**LOAN SUMMARY**
**AS OF February 28, 2007**

| Performance/Explanation | Loan Name | Origination Date | Loan Outstanding at 02/28/07 | Interest Outstanding at 02/28/07 | Interest Prepaid to Investors | February Receipts | February Principal | Service Fee | Due to Lenders | DW Fund | Fast Trust | Direct Lending | No of Investors |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fiesta Development* $6.6 Fiesta Development Inc. | | | | | | | | | | | | |
| Repaid | Fiesta Development McNaughton (Fiesta Development Inc. | 11/4/05 | | | | | | | | | | | 1 |
| Performing | Fiesta McInnIs (Fiesta Development Inc. | 4/14/05 | | | | 72,764 | | 5,417 | 67,347 | | | 66,363 | 68 |
| Repaid | Fiesta Oak Valley (Oak Mesa Investors, LLC | 6/13/04 | 29,100,000 | 65,722 | 3,368,263 | | | | | | | | 222 |
| Interest Default | Fiesta USA/Stoneridge (Capital Land Investors LLC) | 9/22/03 | 10,000,000 | 4,007,906 | 2,372,277 | | | | | | | | 100 |
| Interest Default | Fiesta/Equipment $2.4m (Fiesta Development Inc | 9/17/04 | | | | | | | | | | | 36 |
| Non-Performing | Foxhill 216, LLC* | 2/23/06 | 25,960,000 | 3,729,330 | | | | | | | | | 2 |
| Repaid | Franklin - Stratford Investments, LLC | 3/30/05 | | | | 132,342 | 5,640,589 | 10,201 | 5,182,730 | 997,903 | 4,194,767 | | 57 |
| Repaid | Freeway 101* | 5/8/04 | | | | | | | | | | | 2 |
| Repaid | Gateway Stone Associates, LLC | 11/18/05 | | | | 1,611,598 | 13,185,000 | 120,812 | 14,675,786 | 113,307 | | 14,564,479 | 161 |
| Repaid | Glendale Tower Partners, L P | 6/9/05 | | | | | | | | | | | 95 |
| Repaid | Golden State Investments II, L.P | 6/27/05 | | | | | | | | | | | 37 |
| Repaid | Goss Road (Savannah Homes, LLC | 11/2/04 | | | | | | | | | | | 20 |
| | Gramercy Court Condos (Gramercy Court Ltd | 6/25/04 | 34,884,500 | 4,365,609 | | | | | | | | | 332 |
| Maturity and Interest Default | Harbor Georgetown, L.L.C | 8/16/04 | 8,800,000 | 1,415,202 | 146,785 | | | | | | | | 103 |
| Repaid | Hasley Canyon (Ivis Valley Land & Golf, LLC | 3/9/04 | | | | | | | | | | | 114 |
| Non-Performing | Hesperia III (Southern California Land Development LLC) | 4/1/05 | 4,250,000 | 350,885 | | | | | | | | | 65 |
| Repaid | HFA - Riviera (Riviera-Homes for America Holdings, L.L.C. | 6/24/05 | | 0 | | | | | | | | | 90 |
| Non-Performing | HFA- Clear Lake LLC | 1/6/05 | 16,700,000 | 4,263,854 | 2,140,552 | | | | | | | | 207 |
| Repaid | HFA- North Yonkers (One Point Street, Inc. | 11/1/05 | | | | | | | | | | | 298 |
| Repaid | HFA- Riviera 2nd (Riviera-HFAH LLC | 4/29/04 | | | | | | | | | | | 99 |
| Non-Performing | HFA- Wyndham (HFAH Asylum, LLC | 11/15/04 | 5,550,000 | 1,617,592 | 800,862 | | | | | | | | 74 |
| Non-Performing | HFA-Clear Lake 2nd (HFAH Clear Lake LLC | 6/24/05 | 2,750,000 | 741,011 | 288,935 | | | | | | | | 36 |
| Non-Performing | HFAH/Monaco, LLC | 12/19/03 | 4,000,000 | 1,731,000 | 1,189,500 | | | | | | | | 116 |
| Maturity Default | Huntsville (West Hills Park Joint Venture | 3/31/04 | 10,475,000 | 1,783,179 | 326,728 | 65,403 | 2,561,697 | 5,259 | 2,621,240 | | | 2,621,240 | 46 |
| Repaid | I-40 Gateway West, LLC 1st | 1/1/05 | | | | 39,359 | 1,065,000 | 2,187 | 1,099,172 | | | 1,099,172 | 23 |
| Repaid | I-40 Gateway West, LLC 2nd | 3/7/06 | | | | | | | | | | | 130 |
| Non-Performing | Interstate Commerce Center Phase II (ISCC Phase II, LLC | 8/11/04 | 1,536,666 | 46,562 | | | | | | | | | 105 |
| Performing | Interstate Commerce Center, LLC | 2/23/04 | 800,003 | 0 | | 20,615 | 183,819 | 1,733 | 202,700 | 199,345 | 111 | | 4 |
| Repaid | J. Jireh's Corporation | 9/2/05 | | | | | | | | | | | 105 |
| Non-Performing | La Hacienda Estates, LLC | 11/11/04 | 6,255,000 | 147,924 | 13,456 | | | | | | | | 83 |
| Maturity Default | Lake Helen Partners | 12/7/04 | 3,159,704 | 514,270 | 15,078 | | | | | | | | 35 |
| Repaid | LCO Gilroy, LLC | 11/1/04 | 10,350,000 | 1,279,672 | | | | | | | | | 59 |
| Repaid | Lerin Hills, LTD | 12/7/05 | 12,000,000 | 1,531,195 | | | | | | | | | 105 |
| Interest Default | Margarita Annex* | 7/26/04 | | | | | | | | | | | 4 |
| Non-Performing | Marlton Square (MS Acquisition Company, LLC | 8/11/05 | 30,000,000 | 4,170,997 | | | | | | | | | 272 |
| Non-Performing | Marlton Square 2nd (MS Acquisition Company, LLC | 8/11/05 | 6,000,000 | 1,046,665 | 2,366,244 | | | | | | | | 108 |
| Interest Default | Marquis Hotel (USA Investors VI, LLC | 3/29/05 | 13,500,000 | 4,544,522 | | 177,459 | | 13,270 | 162,757 | | 18,302 | 398,703 | 169 |
| Repaid | Meadow Creek Partners, LLC | 2/2/06 | | | | | | | | | | | 100 |
| Repaid | Midvale Marketplace, LLC | 6/30/05 | | | | | | | | | | | 49 |
| Interest Default | Mountain House Business Park (Pegasus-MH Venture LLC | 6/1/04 | 16,800,000 | 1,521,413 | | | | | | | | | 202 |
| Maturity Default | Oak Shores II (John E. King and Carole D. King | 6/6/05 | 12,150,000 | 1,174,757 | | | | | | | | | 176 |
| Interest Default | Ocean Atlantic $9,425,000 (Ocean Atlantic Chicago, LLC | 1/23/06 | 8,925,000 | 1,031,869 | | | | | | | | | 105 |
| Interest Default | Ocean Atlantic (Ocean Atlantic/FFGWestbury LLC) | 11/1/05 | 2,700,000 | 247,707 | | | | | | | | | 32 |
| Repaid | Opaque/Ajax Edge $7,350,000 (Opaque Land Development, LLC) | 11/5/03 | 24,227,719 | 245,348 | | | | 227,000 | | | | | 208 |
| Performing | Palm Harbor One, LLC | 12/14/05 | 31,530,000 | 5,602,920 | 1,228,292 | | 162,757 | | | | | | 343 |
| Maturity and Interest Default | Placer Vineyards (Placer County Land Speculation, LLC | 12/10/04 | 6,500,000 | 1,435,656 | 259,999 | | | | | | | | 118 |
| Repaid | Placer Vineyards 2nd (Placer County Land Speculation, LLC | 12/10/04 | | | | | | | | | | | 117 |
| Performing | Preserve at Galleria, LLC | 10/6/05 | 269,641 | 50,963 | | | | | | | | | 105 |
| Performing | Reno Redwood (Redwood Drilling Plaza, LLC | 11/16/05 | 2,656,160 | 30,138 | | | | | | | | | 32 |
| Repaid | Rio Rancho Executive Plaza, LLC | 1/11/06 | | | | 36,936 | 616,350 | 1,966 | 654,217 | | 20,353 | 633,864 | |
| Repaid | Roam Development Group, L P | 3/23/05 | | | | (0) | | | | | | | 291 |

Prepared by MFIM, LLC

Preliminary Numbers Subject to Revision

USA Capital
LOAN SUMMARY
AS OF February 28, 2007

| Performance/ Explanation | Loan Name | Origination Date | Loan Outstanding at 02/28/07 | Interest Outstanding at 02/28/07 | Interest Prepaid to Investors | Collection Account | | | Due to Lenders | Due to | | | No of Investors |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | February Interest Receipts | February Principal | Service Fee | | DIV Fund | First Trust | Direct Lenders | |
| Special Situation | Shoshone | Unclassified | | | | | | | | | | | |
| Maturity and Interest Default | Shoshone Town, LP (419 Main, LP | 8/5/04 | 10,500,000 | 2,998,646 | 1,467,168 | - | - | - | - | - | - | - | 87 |
| Special Situation | Sheraton Hotel | 9/28/99 | | | | - | | | | | | - | 1 |
| Interest Default | Siena Development, Inc | 12/9/05 | 3,525,000 | 363,575 | - | - | - | - | - | - | - | - | 40 |
| | Southern California Land 2nd/Southern California | 8/3/05 | 2,860,000 | 37,022 | - | - | - | 2,333 | 38,856 | - | - | 38,172 | 33 |
| Maturity Default | Land Development, LLC | | | | | | | | | | | | |
| Interest Default | Standard Property Development, LLC | 2/21/06 | 9,680,000 | 947,531 | - | - | - | - | - | - | - | - | 115 |
| Interest Default | SVRB $4,500,000 (SVRB Investments, LLC | 4/27/05 | 1,424,982 | 120,115 | - | - | - | - | - | - | - | - | 67 |
| Interest Default | SVRB 2nd $2,325,000 (SVRB Investments, LLC | 4/27/05 | 2,325,000 | 263,288 | - | - | - | - | - | - | - | - | 25 |
| Non-Performing | Tapia Ranch (Gebhol Partners LLC | 9/28/04 | 22,000,000 | 3,467,841 | 358,262 | - | - | - | - | - | - | - | 179 |
| Interest Default | Ten-Ninety, Ltd $4,150,000⁴ | 12/20/02 | 4,150,000 | 2,527,539 | 1,676,535 | - | - | - | - | - | - | - | 18 |
| Interest Default | Ten-Ninety | 4/15/02 | 55,113,741 | 34,292,507 | 1,320,672 | - | - | - | - | - | - | - | 1 |
| Interest Default | The Gardens Phase II (The Gardens, LLC | 3/31/06 | 2,500,000 | 301,850 | - | - | - | - | - | - | - | - | 34 |
| Maturity and Interest Default | The Gardens, LLC $2,425,000 (The Gardens, LLC) | 8/15/05 | 1,925,000 | 168,969 | - | - | - | - | - | - | - | - | 1 |
| Non-Performing | The Gardens, LLC Timeshare (The Gardens LLC | 3/24/04 | 3,577,719 | 64,561 | - | - | - | - | - | - | - | - | 51 |
| Performing | Universal Hawaii² | 8/6/04 | | | | - | - | - | - | - | - | - | 127 |
| Repaid | University Estates, Inc | 4/11/05 | 2,774,623 | 46,420 | - | 103,942 | - | 7,908 | 95,384 | - | 95,384 | (0) | 1 |
| Repaid | Urban Housing Alliance - 455 Lofts (Urban Housing Alliance, LLC | 7/13/05 | 4,650,000 | 297,089 | - | - | - | - | - | - | - | - | 110 |
| Non-Performing | Wasco Investments LLC | 11/23/04 | | | | - | - | - | - | - | - | - | 86 |
| | | | $ 710,857,411 | $ 143,953,515 | 23,886,572 | $ 2,449,685 | $ 22,836,012 | 179,819 | $ 25,106,477 | $ 1,197,308 | $ 4,433,122 | $ 19,472,123 | |

¹ These loans have undetermined amounts outstanding due to bankruptcy, foreclosure, change of ownership, etc.
² Financed payments by borrower not returned to investors.
³ Borrower is Ashby Financial Company, Inc. and R&D Land Investors LLC
⁴ Borrower is Brookmere, LLC and Lord & Essex Mahtomedi LLC
⁵ Borrowers are Fox Hills 165 LLC, Fox Hills River East LLC, Fox Hills 216 LLC, Fox Hills ELL LLC, and Fox Hills 37 LLC.
⁶ Borrower is Obo Life, LLC and Lake Helen Partners, LLC
⁷ Borrowers is John E. King and Carole D. King
⁸ Borrower is Saybrooke, Ltd. And William R. Lewis and Dorothy Z. Lewis, Trustees of the Lewis Family Trust

Prepared by MFIM  LLC

Preliminary Numbers Subject to Revision

Page 3 of 3