Adam M. Starr
Greenberg Traurig, LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, California 90404
Telephone: (310) 586-7700
Facsimile: (310) 586-7800
Email: starra@gtlaw.com

Ronald D. Green
Greenberg Traurig, LLP
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002
Email: greenr@gtlaw.com

Matthew T. Gensburg
Nancy A. Peterman
Sherri Morissette
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 2500
Chicago, Illinois 60601
Telephone: (312) 456-8400
Facsimile: (312) 456-8435
Email:  gensburgm@gtlaw.com
        petermann@gtlaw.com
        morissettes@gtlaw.com

Attorneys for Mesirow Financial Interim Management, LLC,
the Debtors' Chief Restructuring Officer and Crisis Managers

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR<br><br>**DECLARATION OF WILLIAM J. FASEL IN SUPPORT OF APPLICATION FOR ENTRY** |

| | |
|---|---|
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor.<br><br>In re:<br>USA SECURITIES, LLC,<br>Debtor.<br><br>Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA First Trust Deed Fund, LLC | OF ORDER (I) FINALLY ALLOWING AND APPROVING ALL COMPENSATION AND EXPENSES INCURRED BY MESIROW FINANCIAL INTERIM MANAGEMENT, LLC IN ITS CAPACITY AS DEBTORS' CRISIS MANAGERS AND CHIEF RESTRUCTURING OFFICERS FOR THE PERIOD APRIL 13, 2006 THROUGH MARCH 12, 2007; (II) ALLOWING AND APPROVING A SUCCESS FEE; (III) AUTHORIZING APPLICATION OF THE RETAINER AGAINST THE ALLOWED FEES AND EXPENSES; AND (IV) AUTHORIZING PAYMENT OF THE BALANCE DUE |

I, William J. Fasel, hereby declare, verify and state as follows:

1. I make this Declaration in support of the application (i) finally allowing and approving compensation in the amount of $11,389,203.09 for 27,417.60 hours of services rendered and expenses incurred in the amount of $1,117,168.74 by Mesirow Financial Interim Management ("**MFIM**"), in its capacity as the crisis managers and chief restructuring officers for USA Commercial Mortgage Company ("**USACM**"), USA Capital Realty Advisors, LLC ("**USA Realty**"), USA Capital Diversified Trust Deed Fund, LLC ("**DTDF**"), USA Capital First Trust Deed Fund, LLC ("**FTDF**") and USA Securities, LLC ("**USA Securities**", and collectively with USA Realty, USACM, DTDF and FTDF, the "**Debtors**"), debtors and debtors-in-possession in these chapter 11 cases (the "**Cases**"), for the time period beginning on April 13, 2006 and ending on March 12, 2007 (the "**Application Period**"); (ii) approving a success fee in the amount of $2,500,000.00; (iii) authorizing application of the $150,000 retainer against finally allowed fees and expenses; and (iv) authorizing payment of $14,856,371.83 (after application of the Retainer and net of voluntary reductions totaling $360,769.91) (the "**Final Application**").

2. I am a Managing Director at MFIM. Attached as **Exhibit 1** is a true and correct copy of my resume and engagement list.

3. Unless otherwise defined, any capitalized terms not defined herein have the meaning set forth in the Final Application. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and my knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

4. Part I of the Declaration sets forth the relevant facts in support of the Final Application filed by MFIM and Part II supports MFIM's request of the Success Fee.

## I. FINAL APPLICATION

5. Although some preliminary information was gathered by MFIM in July 2006 regarding a possible sale, from August 2006 until the closing on the sale in February 2007, I was the primary person from MFIM responsible for and otherwise supervised all efforts to auction the Debtors' assets.

6. In an effort to coordinate a disciplined, organized course of action that would maximize the return to all of the creditor and investor constituents, beginning in August 2006, MFIM initiated an extensive sales process structured to provide a viable restructuring alternative for the Debtors.

7. In coordination with the Committees, MFIM developed a marketing strategy to target the most likely buyers of the Debtors' assets, utilizing MFIM's market intelligence, industry experience and market presence to identify strategic and financial buyers (such as private equity and hedge funds) which understood the dynamics of the loans at issue, had a portfolio of similar loans, or otherwise had experience servicing the same. This marketing

strategy was focused on finding a stalking horse bidder to create necessary market credibility, value and structure for the sale process. The prospective assets initially offered were packaged into three proposed groups associated with DTDF, FTDF and USACM, respectively. The initial sale process consisted of MFIM confirming with each of the Committees an acceptable bid range, including defining potential contingencies that needed to be considered throughout the sale process. MFIM contacted approximately 60 prospective bidders during the entire process.

8. As a result of the considerable on-going efforts by MFIM to analyze and identify the critical information underlying the various loan portfolios and properties, MFIM understood the key value drivers supporting the Debtors' loan portfolios. Understanding the unique nature of the assets at issue, MFIM determined that in order to elicit interest in the purchase of the assets, they needed analytical data breaking down the loan portfolios in a detailed fashion, including identifying or otherwise modeling the various revenue streams associated with each loan. Therefore, MFIM created spreadsheets that detailed each of the fees and other revenue drivers for the portfolios proposed for sale. These spreadsheets and reports, in various forms, were placed on data disks submitted to interested parties. Initial data disks prepared by MFIM described the loans in a summary fashion. After preparing a confidentiality agreement designed to ensure a competitive sale process, in coordination with the Committees, and after receiving executed copies of the same, a second and more detailed data disk was prepared and forwarded by MFIM to interested parties, creating for each a virtual data room. This information was also incorporated into an actual initial data room designed to attract potential buyers into a competitive auction process. MFIM analyzed and continuously updated the loan files to ensure that they were both complete and in order. This data room allowed bidders to conduct a loan-by-loan analysis of the assets for sale.

9.   In a continuing effort to facilitate an extensive due diligence process, MFIM also participated in presentations in Las Vegas, meetings with the Debtors' various personnel, and facilitated bidder communications with borrowers and other parties-in-interest. During meetings with MFIM, the parties discussed the process that was in place, the investment opportunities associated with the loans, and the dynamics of servicing the same. Approximately ten interested parties spent one to three days at the Debtors' headquarters in Las Vegas reviewing the loan files, compiling questions about what was contained therein, and/or requesting additional information with respect to perceived missing data. MFIM answered each question during the course of the visits, or after necessary research, followed up with the reply. Following the initial due-diligence process (fourteen of the initial parties signed confidentiality agreements and ten interested parties proceeded with more formal due diligence), five of the prospective bidders submitted preliminary proposals for the acquisition of the loans underlying the Funds and USACM's portfolios, as well as, the servicing rights to these assets. However, the preliminary proposals of the bidders did not place a value on the assets of DTDF and USACM sufficient to select a stalking horse bidder. MFIM consulted with the Committees concerning this problem, resulting in a decision by DTDF to remove its assets from the proposed auction. MFIM also determined that none of the bidders were in a position to ascribe a value to the USACM assets that would satisfy the USACM Committee. Therefore, MFIM met with the remaining interested bidders and discussed how the USACM assets should be valued, educating those bidders on possible value drivers that the bidders had discounted or failed to consider. As a result, a pass-through structure was created with respect to USACM fees, thereby allowing MFIM to proceed with a sale.

10.   In anticipation of the actual auction, MFIM initiated a process that allowed for evaluating and comparing preliminary bids. After evaluating each of these proposals with the

Committees (and extensive discussions with each of the interested parties as to an acceptable value and acquisition structure), on October 19, 2006, the Debtors executed an asset purchase agreement with Silverpoint designee, SPCP as the "Stalking Horse Bidder" for a total cash purchase price of $46 million. This asset purchase agreement was amended on November 17, 2006. The identification of SPCP as the Stalking Horse Bidder allowed MFIM to garner the support of the various Committees on what assets should be marketed, a framework for a potential sale of those assets and a minimum threshold that other bidders would need to surpass in a section 363 sale process (with the ultimate objective of attracting additional potential buyers of the Debtors' assets through a competitive process with the reliance on the Court's monitoring of the process to ensure "fairness"). With the credibility gained from the Stalking Horse Bid, MFIM responded to inquiries from over sixty second round potential bidders. After initial conversations with each potential second round bidder regarding the auction process and SPCP bid/structure, approximately 30 potential bidders executed confidentially agreements and proceeded forward with varying degrees of financial and operational due diligence. This extensive second round of due diligence required MFIM to manage numerous daily conference calls; comply with data room document requests, both electronically and through overnight delivery; describe/analyze the various loan portfolios, contracts, servicing agreements and fee schedules; orchestrate on-site visits with over 20 potential bidders; respond to numerous follow-up questions and data requests; and provide further analyses/responses to data inquires. MFIM's continuing contact with the borrowers allowed further information to be available to the bidders. MFIM coordinated additional rounds of due diligence as the bidders requested clarification and additional information.

11. Overall, MFIM's initial sale efforts resulted in a vibrant solicitation process which introduced a sale alternative as part of the reorganization considered by the Debtors, creditors of

the Debtors, Direct Lenders and members of the Funds. In accordance with the Debtors' motion, the Court approved bid procedures designed by MFIM and the Committees to solicit competing offers to the stalking horse bid for the purchase of substantially all of the Debtors' assets. The process included a determination of a potential bidder's qualifications based on an assessment of the bidder's financial ability to close a transaction and their intentions and qualifications with respect to servicing the loans and performing the obligations under the LSAs.

12.     Under the section 363 sale process, MFIM worked closely with interested bidders to ensure that each focused not only on an evaluation of the various loan portfolios and underlying asset valuations, but on determining the potential "strategic" value that could be realized through a revitalization of certain aspects of the Debtors' businesses (*i.e.*, the value creation possibilities of returning the Debtors to a potential going concern operation). As such, MFIM was able to identify and engage in active discussions with several potential bidders who would continue to operate the Debtors as a going concern and maintain the ongoing relationships with its lenders and investors. These negotiations ultimately enabled MFIM to conduct an auction process with the goal of securing the highest value possible for the Debtors' assets. In the end, MFIM received three qualified bids to purchase a substantial portion of the Debtors' assets (bids from SPCP, Compass and Desert Capital REIT) which then required the Debtors to hold a competitive auction supervised by the Court, MFIM and the Committees.

13.     This process culminated in Compass' $67 million bid at the Court supervised auction on December 7, 2006. This amount was $20.5 million higher than the Stalking Horse Bid of SPCP. In addition, three loans (Placer Vineyards, Placer Vineyards 2nd, and Marquis Hotel) included in the Stalking Horse Bid were isolated from the sale to Compass, which may provide additional proceeds to USACM. The results of the auction have been widely hailed as a success both among the Committees, other parties of interest to the Cases, and the press.

## II.  SUCCESS FEE

14. I am a senior financial professional with over 20 years of business experience and if called to testify regarding the Success Fee requested by MFIM, I would testify that typically, investment banker's fees have two components: (i) a retainer paid in one lump sum at the beginning of the engagement or a monthly fee structure paid in regular intervals over the course of the engagement; and (ii) a success fee. The success fee is typically based on either a flat percentage of gross sale proceeds, or a increasing amount of said proceeds based on the incremental value achieved by the investment banker. For example, it would not be unusual for an investment banker to receive a certain percentage of the stalking horse bid, and a higher percentage of an incremental value obtained at the final auction. Success fees can typically range from 1% to 4%+ of the total transaction value, depending on the complexity of the transaction, perceived risk(s) involved and the overall competitive environment.

15. The retainer or monthly fee structure typically requested by a investment banker is either tied to a portion of the firm's fixed costs or overhead related to executing a potential transaction, or alternatively, is a fixed sum, *e.g.*, $50,000 to $150,000 per month, created to insure client commitment to the sale process. Firms that provide multidisciplinary consulting and/or business advisory services frequently will calculate the retainer or monthly fee structure on the estimated number of hours the investment banker and his staff will expend on the project multiplied by a discounted hourly rate. This retainer or fixed monthly fee is often partially or fully credited against any success fee earned. The size of the requested retainer or fixed monthly fee, as well as the degree in which such fees are credited against any eventual success fee is normally predicated on the perceived risk of the engagement, complexities of the work, and the uncertainties associated with the assets and the market demand.

16. As an investment banker I would have considered these Cases to be a very risky engagement based on (i) the initial inadequacy of the Debtors' loan and financial accounting systems; (ii) the existence of incomplete, inaccurate and, in some instances, deliberately falsified books and records; (iii) loan files replete with missing and/or unexecuted documents; (iv) the Debtors' historic use of two separate and distinct accounting processes; (v) the existence of state and federal investigations concerning the creation and mismanagement of the loan portfolios; and (iv) the general taint of fraud which permeated the Debtors' operations and assets. As a result, in these Cases, an investment banker might be expected to request a success fee at the higher end of the above-mentioned rates, as well as only crediting a portion of the retainer or monthly fee structure against the success fee earned.

I declare, under penalty of perjury, that, to the best of my knowledge, information and belief, that the foregoing is true and correct.

Mesirow Financial Interim Management, LLC

By: /s/ William J. Fasel
William J. Fasel
Managing Director
Mesirow Financial Interim Management, LLC
321 North Clark Street, 13th Floor
Chicago, IL 60610

# EXHIBIT 1

# WILLIAM J. FASEL

445 Heather Lane
Lake Forest, Illinois 60045
Cell: (312) 286-7825
Email: faselwj@aol.com

## SUMMARY

Senior finance professional with over 20 years of business experience, providing a unique blend of corporate restructuring, investment banking, business development and investor relations expertise across multiple industries serving both multi-national and middle-market clients worldwide.

## PROFESSIONAL EXPERIENCE

**2004 – 2006**  **BBK LTD.**  *Chicago, IL*
*Managing Director*

- Co-Leader of BBK's national Corporate Advisory Group (CAG) practice, head of the Chicago office, responsible for originating and managing corporate restructuring, crisis management, M&A advisory and due diligence engagements.
- Principal focus on company/debtor financial advisory roles, as well as representing leading private equity companies and hedge funds.
- Key member of the firm's Executive Committee with responsibility for managing the company's strategic repositioning efforts in the marketplace and overall new business development efforts.

**2002 – 2004**  **HURON CONSULTING GROUP LLC**  *Chicago, IL*
*Managing Director*

- Responsible for originating and executing a variety of financial consulting services, including corporate finance, litigation support / expert testimony, as well as serving as financial advisor to debtors, creditors, troubled companies, and lenders with a particular focus in the area of distressed M&A advisory. Clients ranged from stable, well-capitalized entities to financially distressed companies, both Fortune 500 and middle-market.
- Managed the day-to-day operations of the Corporate Advisory Services (CAS) practice, including development and implementation of the CAS business plan and strategy, financial reporting, oversight of the practice's policies & procedures, as well as the hiring and staffing efforts across six national offices.
- Developed and managed the firm's corporate finance activities. Engagements include M&A, sales/divestitures, sourcing private debt and equity, and recapitalizations.

**2001 – 2002**  **ANDERSEN CORPORATE FINANCE LLC**  *Chicago, IL*
*Managing Director*

- Responsible for delivery of M&A and corporate finance advisory services to a variety of middle-market and multi-national corporate clients worldwide. Primary focus on new business development activities within the consumer products, industrial and retail sectors.
  - Senior member of the firm's "Key Account" team designed to provide a broad range of M&A advisory services for large companies on a global basis.
  - Instrumental in the origination of $2.5 million in corporate finance revenues in FY'02.

| | | |
|---|---|---|
| 1997 – 2001 | **VLASIC FOODS INTERNATIONAL**<br>*Vice President – Corporate Development & Investor Relations* | **Cherry Hill, NJ** |

- Developed and managed the firm's business development and financial communication efforts.
  - Responsible for identifying, evaluating and pursuing potential merger, acquisition, joint venture and divestiture opportunities; managed the due-diligence, negotiation and closing activities in the marketplace; acted as key internal financial advisor to senior management and Board.
  - Led efforts to sell three global businesses comprising over $425 million in sales; managed internal efforts to issue a $200 million public debt offering; prepared Company for its eventual sale in 2001.
  - Served as the primary financial spokesperson in the communication of the firm's operating performance and business strategies to the research analyst and institutional investor communities; ensured investor information was consistent with SEC disclosure guidelines; prepared financial press releases, annual report and management presentations.
  - Assisted in managing various strategic / financial planning and treasury functions.
- Extensively involved in many aspects of the firm's development process resulting from the 1998 spin-off from Campbell Soup Company, including business establishment, constructing business unit operating plans, crisis management, capital raising and corporate restructuring activities.

| | | |
|---|---|---|
| 1994 - 1997 | **AON CORPORATION**<br>*Vice President & Corporate Secretary* | **Chicago, IL** |

- Managed global investor relations activities; developed and maintained relationships with institutional shareholders, research analysts, rating agencies, investment bankers and other members of the investment community.
  - Primary corporate spokesperson to the Wall Street community; responsible for planning and implementing investor relations strategies, policies and procedures; conducting buy-side and sell-side analyst meetings; preparing external communications including major corporate announcements, earnings releases, and development of the annual report and investor presentations.
- Managed certain capital markets initiatives and involved in major corporate development activities.
  - Developed and managed a Guaranteed Investment Contract (GIC) funding program, issuing over $700 million in GICs; provided senior management and the Board with business and financial evaluations for two major corporate divestitures ($1.4 billion in proceeds) and the acquisitions of three global insurance brokerage businesses ($1.6 billion in transaction value).

| | | |
|---|---|---|
| 1989 - 1994 | **LEHMAN BROTHERS**<br>*Vice President* | **New York, NY / Chicago, IL** |

- Responsible for executing numerous corporate finance and M&A assignments; maintained broad industry client base with primary focus on major publicly traded consumer and industrial companies.

| | | |
|---|---|---|
| 1985 - 1988 | **FIRST CHICAGO**<br>*Corporate Finance Officer* | **Los Angeles, CA / Chicago, IL** |

- Co-managed client relationships totaling $400 million in credit facilities within the Real Estate and Financial Institutions groups.

# EDUCATION

| | | |
|---|---|---|
| 1988 - 1989 | **KELLOGG SCHOOL OF MANAGEMENT** | **Evanston, IL** |

- Masters of Business Administration degree in finance, June 1989.
- Graduated with High Honors. *GPA of 3.9 / 4.0.*

| | | |
|---|---|---|
| 1981 - 1985 | **UNIVERSITY OF MICHIGAN** | **Ann Arbor, MI** |

- Bachelor of Business Administration degree in finance, May 1985.
- Graduated with Distinction. *Dean's List.*

# WILLIAM J. FASEL – ENGAGEMENT LIST

## BBK Ltd.

- *Chapter 11 Financial Advisory Roles:*
    - American Remanufacturing Inc. (Aftermarket Auto Mnfg.) – Debtor's Financial and M&A Advisor
    - Damman Hardware (Regional Hardware Company) – Debtor's Financial and M&A Advisor
    - Precision Tool Company (Tooling Manufacturer) – Debtor's Financial Advisor
- *Corporate Restructuring Advisory Roles:*
    - Auburn Foundry, Inc. (Casting Foundry Manufacturer) – Lender's Financial Advisor
    - Brighton Electric Supply (Electronic Supply Company) – Lender's Financial Advisor
    - Elgin Dairy Foods (Dairy Manufacturer) – Company's Financial / Operational Advisor
    - National Leisure Group (Leisure Travel Company) – Lender's Financial Advisor
    - Turbine Airfoil Design (Aerospace Parts Manufacturer) – Private Equity's Financial Advisor
- *Corporate Finance / Due Diligence Advisory (Transactional & Lender):*
    - Black Diamond Capital Management
    - Stairway Capital
    - Sumitomo Corporation
    - Sun Capital Partners
    - The Carlyle Group
- *Litigation Support Roles:*
    - Bernardaud (Thelen Reid & Priest) – Contract Dispute & Business Valuation Matters
    - Wickes Lumber (Sonnenschein / Miller Canfield) – Corporate Finance & Business Valuation Matters

## Huron Consulting Group

- *Chapter 11 Financial Advisory Roles:*
    - American Commercial Lines (Marine Transportation Company) – Debtor's Financial Advisor
    - Eagle Food Centers (Regional Supermarket Company) – Debtor's Financial and M&A Advisor
    - RHC/Spacemaster (Store Fixture Manufacturer) – Creditor's Committee Financial and M&A Advisor
    - Warnaco Group, Inc. (Apparel Mnfg. / Retailer) – Creditor's Committee Financial and M&A Advisor
- *Corporate Restructuring Advisory Roles:*
    - Archibald Candy (Confectionary Mnfg. / Retailer) – Secured Lender's Financial Advisor
    - Exelon Corporation (Public Utility Holding Company) – Company 's Financial Advisor
- *Litigation Support Roles:*
    - ITW (Mayer Brown) – Corporate Finance / Business Valuation Matters
    - Vlasic Foods (Andrews & Kurth) – Fraudulent Conveyance Matters

1

## Andersen Corporate Finance:

- Divestiture - A&P (Midwest Division) - Undisclosed
- Divestiture - Time Oil Co. (Convenience Store Operations) - Undisclosed
- Exclusive Sale - Wickes Furniture Co. (National Furniture Retailer) - $75 MM
- M&A Advisory - Braes Group (Global Food Ingredient Company) - N/A
- M&A Advisory - Associated British Foods (Global Diversified Food Mnfg.) - N/A
- M&A Advisory - Opta Food Ingredients (U.S. Food Ingredient Company) - N/A

## Vlasic Foods International:

- M&A Advisory - Sale of Vlasic Foods International - N/A
- Divestiture - Swift-Armour (Argentine Beef Producer) - $93 MM
- Divestiture - Campbell / Vlasic Farms (U.S. Fresh Mushroom Producer) - $50 MM
- Divestiture - Kattus (German Specialty Foods Manufacturer/Distributor) - $25 MM
- Public Financing - High Yield Senior Subordinated Note - $200 MM

## Aon Corporation:

- Acquisition - Alexander & Alexander Services (Insurance Brokerage) - $1.25 BB
- Acquisition - Bain Hogg Group Plc (Insurance Brokerage) - $260 MM
- Acquisition - Minet Group (Insurance Brokerage) - $75 MM
- Divestiture - Life Insurance Co. of Virginia (Life Insurance) - $960 MM
- Divestiture - Union Fidelity Life Insurance Co. (Life Insurance) - $440 MM
- Public Financing - Preferred Stock Offering - $800 MM

2

## Lehman Brothers:

| | | | |
|---|---|---|---|
| • Acquisition | - | Dean Foods (Philip Morris - Birds Eye Frozen Foods) - | $140 MM |
| • Acquisition | - | Hershey Foods (Heinz Italia - Sugar Confectionery Business) - | $130 MM |
| • Acquisition | - | Canandaigua Wine (Barton Inc - Beer Importer) - | $125 MM |
| • Acquisition | - | Service Corp. International (2 Funeral Service Companies) - | $95 MM |
| • Acquisition | - | Chock Full O'Nuts (Cain's Coffee - Foodservice Business) - | $55 MM |
| • Divestiture | - | IBM Corp. (Typewriter/Keyboard/Printer Operations) - | $1.50 BB |
| • Merger | - | AVX Corp. with Kyocera Corporation - | $620 MM |
| • Divestiture | - | Kellogg Company (3 Food Subsidiaries) - | $250 MM |
| • Divestiture | - | United Biscuits PLC (Confectionery Business) - | $220 MM |
| • Divestiture | - | Harnischfeger Industries (2 Manufacturing Subsidiaries) - | $150 MM |
| • Divestiture | - | Grand Metropolitan PLC (U.K. Foodservice Business) - | $100 MM |
| • M&A Advisory | - | Alco Standard (Office Products/Paper Distribution Business) - | N/A |
| • M&A Advisory | - | Federal Signal (Diversified Industrial Mnfg.) - | N/A |
| • M&A Advisory | - | Pentair Industries (Diversified Industrial Mnfg.) - | N/A |
| • M&A Advisory | - | Shopko Stores (Discount Store Operator) - | N/A |
| • M&A Advisory | - | International Multifoods (Diversified Food Mnfg.) - | N/A |
| • M&A Advisory | - | IMC Global Inc. (Global Agricultural Chemicals Business) - | N/A |
| • M&A Advisory | - | Riddell Corporation (Sporting Goods Company) - | N/A |
| • M&A Advisory | - | Rymer Foods (U.S. Beef Processor) - | N/A |

3

## Lehman Brothers (Continued):

### Public Equity:

| | | |
|---|---|---|
| • Common Stock - | Santa Fe Pacific - | $400 MM |
| • Common Stock - | IMC Global Inc. - | $205 MM |
| • Common Stock - | Dana Corporation - | $175 MM |
| • Common Stock - | Cummins Engine - | $125 MM |
| • Common Stock - | Brunswick Corporation - | $100 MM |
| • Common Stock - | CBI Industries - | $100 MM |
| • Common Stock - | Interlake Corporation - | $50 MM |
| • Initial Public Offering - | Franklin Mint - | $175 MM |
| • Initial Public Offering - | Three Five Systems - | $45 MM |
| • Initial Public Offering - | Davel Communications - | $25 MM |
| • Initial Public Offering - | ElekTek - | $20 MM |
| • Convertible Preferred Stock - | Stone Container - | $100 MM |

### Public Debt:

| | | |
|---|---|---|
| • Senior Debt - | Harnischfeger Industries - | $150 MM |
| • Senior Debt - | CBI Industries - | $75 MM |
| • Medium Term Notes - | Green Tree Financial - | $150 MM |
| • Convertible Subordinate Note - | IMC Global Inc. - | $100 MM |
| • High Yield Senior Debt - | Weirton Steel - | $140 MM |
| • High Yield Senior Debt - | IMC Global Inc. - | $110 MM |

### Private Placement – Equity / Debt:

| | | |
|---|---|---|
| • Senior Debt - | S.C. Johnson Company - | $600 MM |
| • Senior Debt - | Cargill, Inc. - | $100 MM |
| • Senior Debt - | Encyclopaedia Britannica - | $100 MM |
| • Preferred Stock - | Weirton Steel - | $25 MM |

4