Adam M. Starr
Greenberg Traurig, LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, California 90404
Telephone: (310) 586-7700
Facsimile: (310) 586-7800
Email: starra@gtlaw.com

Ronald D. Green
Greenberg Traurig, LLP
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002
Email:  greenr@gtlaw.com

Matthew T. Gensburg
Nancy A. Peterman
Sherri Morissette
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 2500
Chicago, Illinois 60601
Telephone: (312) 456-8400
Facsimile: (312) 456-8435
Email:  gensburgm@gtlaw.com
        petermann@gtlaw.com
        morissettes@gtlaw.com

Attorneys for Mesirow Financial Interim Management, LLC,
the Debtors' Chief Restructuring Officer and Crisis Managers

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR<br><br>**DECLARATION OF THOMAS J. ALLISON<br>IN SUPPORT OF APPLICATION FOR** |

| | |
|---|---|
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor.<br><br>In re:<br>USA SECURITIES, LLC,<br>Debtor.<br><br>Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA First Trust Deed Fund, LLC | **ENTRY OF ORDER (I) FINALLY ALLOWING AND APPROVING ALL COMPENSATION AND EXPENSES INCURRED BY MESIROW FINANCIAL INTERIM MANAGEMENT, LLC IN ITS CAPACITY AS DEBTORS' CRISIS MANAGERS AND CHIEF RESTRUCTURING OFFICERS FOR THE PERIOD APRIL 13, 2006 THROUGH MARCH 12, 2007; (II) ALLOWING AND APPROVING A SUCCESS FEE; (III) AUTHORIZING APPLICATION OF THE RETAINER AGAINST THE ALLOWED FEES AND EXPENSES; AND (IV) AUTHORIZING PAYMENT OF THE BALANCE DUE** |

I, Thomas J. Allison, hereby declare, verify and state as follows:

1.      I make this Declaration in support of the application (i) finally allowing and approving compensation in the amount of $11,389,203.09 for 27,417.60 hours of services rendered and expenses incurred in the amount of $1,117,168.74 by Mesirow Financial Interim Management ("**MFIM**"), in its capacity as the crisis managers and chief restructuring officers for USA Commercial Mortgage Company ("**USACM**"), USA Capital Realty Advisors, LLC ("**USA Realty**"), USA Capital Diversified Trust Deed Fund, LLC ("**DTDF**"), USA Capital First Trust Deed Fund, LLC ("**FTDF**") and USA Securities, LLC ("**USA Securities**", and collectively with USACM, USA Realty, DTDF and FTDF, the "**Debtors**"), debtors and debtors-in-possession in these chapter 11 cases (the "**Cases**"), for the time period beginning on April 13, 2006 and ending on March 12, 2007[1] (the "**Application Period**"); (ii) approving a success fee in the amount of

---

[1]      MFIM has included time spent preparing the Final Application and reviewing final fee applications for other professionals in these Cases incurred after March 12, 2007. The remainder of post-Effective Date time billed by MFIM will be paid by the Debtors in the ordinary course of their business and in accordance with the Plan. MFIM has also included $350,000 in estimated fees and expenses related to the Final Application that are expected to be incurred after filing the Final Application in connection with responding to objections, reviewing the Committee professionals' fee applications and preparing for and attending the court hearing on the Final Fee

$2,500,000.00; (iii) authorizing application of the $150,000 retainer against finally allowed fees and expenses; and (iv) authorizing payment of $14,856,371.83 (after application of the Retainer and net of voluntary reductions totaling $360,769.91) (the "**Final Application**").

2.    I am the Chief Restructuring Officer ("**CRO**") of the Debtors.  I am also an Executive Vice President and Senior Managing Director of MFIM. Attached as **Exhibit B** to the Final Application is information regarding my qualifications and industry experience.

3.    Unless otherwise defined, any capitalized terms not defined herein have the meaning set forth in the Final Application.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and my knowledge of the Debtors' operations and financial condition.   If I were called upon to testify, I could and would testify competently to the facts set forth herein.

4.    Part I of the Declaration describes the background and the significant events in these Cases;  Part II sets forth the relevant facts in support of the Final Application filed by MFIM; Part III sets forth the relevant facts in support of the expenses requested by MFIM; and Part IV describes the events in support of the Success Fee requested by MFIM.

## I.    BACKGROUND

### A.    *Descriptions of the Debtors and Their Business*

#### i.    *USA Commercial Mortgage Company*

5.    USACM, which sometimes did business under the trade name "USA Capital," is a Nevada corporation.  Public records of the Nevada Secretary of State indicate that USACM was organized as of February 28, 1989.  Prior to the Petition Date, USACM was in the business of

---

Application.  MFIM will file a supplement to the Final Application with detail to support the estimated fees and expenses in advance of the hearing on the Final Application.

underwriting, originating, brokering, funding and servicing commercial loans primarily secured by residential and commercial developments, both on behalf of investors and for its own account. USACM has been a licensed as a mortgage broker by the State of Nevada since January 11, 1990, although its license was limited by the Mortgage Lending Division of the State of Nevada after the Petition Date to exclude raising investment funds from individual investors.

6.    As of the Petition Date, the loan portfolio that USACM serviced consisted of approximately 115 loans having a combined outstanding principal balance of approximately $960 million.  Since the Petition Date, MFIM has aggressively engaged in efforts to collect outstanding loan amounts.  As of March 12, 2007, MFIM had collected a total of approximately $347.7 million, consisting of principal, interest and the net sale proceeds.  Loan summary spreadsheets created by MFIM providing information concerning each of the serviced loans as of April 26, 2006; May 26, 2006; June 30, 2006; July 31, 2006; August 31, 2006; September 30, 2006; October 31, 2006; November 30, 2006; December 31, 2006; January 31, 2007 and February 28, 2007 are available for review on USACM's website at www.usacapitalcorp.com.

7.    As of the Petition Date, approximately 3,600 investors appeared as a "lender" in the documents for one or more of the serviced loans.  In the Debtors' Cases and in the Disclosure Statement, the loan investors have been referred to as "Direct Lenders."  Many of the Direct Lenders invested in more than one of the serviced loans, with the average being approximately 3 to 4 loans for each Direct Lender.  Along with its role as the servicer, USACM was itself a Direct Lender having an aggregate investment of approximately $2 million as of June 30, 2006, in the serviced loans.  Two of the other Debtors, DTDF and FTDF, are also Direct Lenders having interests in certain of the serviced loans, as explained below.

*ii.*    *USA Capital Diversified Trust Deed Fund, LLC*

8.    DTDF is a Nevada limited liability company organized as of February 3, 2000. A copy of DTDF's Operating Agreement is on file with the Court at Docket no. 1590. DTDF was a fund organized to allow USACM to offer investors who were residents of Nevada the opportunity to invest in loans that USACM originated by purchasing membership interests, which were then invested in various loans, rather than (or in addition to) the investor investing directly in the loans. Because DTDF was not a fund registered with the SEC, it could not solicit investors beyond the State of Nevada. DTDF's stated purpose was to make or purchase entire or fractional interests in acquisition, development, construction, bridge or interim loans that were secured by first deeds of trust on, among other things, undeveloped land and residential and commercial developments located primarily in the United States. There was a continuous offering of membership interests (known as "**units**") in DTDF from May 2000 to July 2004. In July 2004, DTDF stopped offering the sale of units, and on September 27, 2005, the investors were notified that DTDF would liquidate. DTDF had approximately 1,350 members as of the Petition Date. The aggregate outstanding balance owed to DTDF on its loan investments as of the Petition Date, was approximately $103 million, consisting of 24 loans in which DTDF invested as a Direct Lender. The loans were all originated by USACM. Although the DTDF loans were supposed to be secured by first deeds of trust and have other protections for DTDF investors, USACM did not generally provide these protections.

9.    Prior to the Petition Date, the nominal manager of DTDF was USA Realty (described below), also a Debtor. USACM serviced the loans in the DTDF portfolio. The management duties included investing funds, hiring and paying professionals, preparing tax returns, and other duties.

*iii.*     *USA Capital First Trust Deed Fund, LLC*

10.     FTDF is a Nevada limited liability company organized as of February 16, 2001. A copy of the Second Amended and Restated Operating Agreement of FTDF, dated as of June 1, 2003, (the "**FTDF Operating Agreement**") is on file with the Court. [Docket no. 1591]. As a fund registered with the Securities and Exchange Commission, FTDF was able to allow USACM to offer investors throughout the United States (not just in Nevada, as was the case with DTDF) the opportunity to invest in loans that USACM originated by purchasing membership interests in a FTDF that invested in various loans, rather than (or in addition to) the investor investing directly in the loans. FTDF had approximately 950 members as of the Petition Date. The aggregate outstanding balance owed to FTDF on its loan investments, as of the Petition Date, was approximately $67 million, consisting of 53 loans in which FTDF invested as a Direct Lender. The loans were all originated by USACM.

11.     Prior to the Petition Date, the nominal manager of FTDF was USA Realty (described below), also a Debtor. USACM served as the servicer of the loans in the FTDF portfolio. The management duties included investing funds, hiring and paying professionals, preparing tax returns, and other duties.

*iv.*     *USA Securities, LLC*

12.     USA Securities is a Nevada limited liability company organized as of March 3, 1999. USA Securities is a registered broker-dealer under SEC Rule 15c3-1(a)(2)(vi) and was a member of the National Association of Securities Dealers (the "**NASD**"). The primary business of USA Securities was to sell membership interests in DTDF. USA Securities is dormant and has conducted no business on or after the Petition Date.

> v.    *USA Capital Realty Advisors, LLC*

13.    USA Realty is a Nevada limited liability company organized as of January 18, 2001. It is the manager of FTDF and DTDF.

> vi.    *Other Related Entities*

14.    Attached as **Exhibit A** to the Final Application is a chart showing relationships among the five Debtors, the non-debtor entity Investment Partners, and certain related non-debtor entities.

**B.    *Case Background***

15.    On April 13, 2006 (the "**Petition Date**"), the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code. By order entered June 9, 2006, the Court approved the joint administration of the Cases.

16.    On the Petition Date, the Managers and Boards of Directors of the Debtors executed an agreement with MFIM (the "**MFIM Agreement**") setting forth the terms and conditions for the retention of MFIM as crisis managers for the Debtors. The MFIM Agreement outlined my designation as the Debtors' CRO, as well as the assignment of other employees of MFIM to assist me as temporary employees. Contemporaneously, the Managers and Boards of Directors of the Debtors appointed me as President, Vice-President, Secretary and Manager for the Debtors.

17.    On April 14, 2006, the Debtors filed an application (the "**Employment Application**") for authorization of (i) the employment and retention of MFIM as crisis managers to the Debtors, and (ii) the designation of me as Chief Restructuring Officer of the Debtors and the employment of certain temporary employees provided by MFIM [Docket no. 6]. On April 14, 2006, I filed a Declaration in Support of the Employment Application (the "**Allison Declaration**") [Docket no. 7].

18.    Four Committees were appointed in the Debtors' Cases by the Office of the United States Trustee -- the Official Unsecured Creditors' Committee for USACM, the Official Committee of Holders of Executory Contract Rights Through USACM, the Official Committee of Equity Security Holders of DTDF and Official Committee of Equity Security Holders of FTDF (collectively, the "**Committees**").

19.    On April 19, 2006, August 11, 2006, October 31, 2006, January 11, 2007 and April 2, 2007, this Court entered Orders authorizing the Debtors to (i) employ and retain MFIM as crisis managers to the Debtors, (ii) designate me as CRO of the Debtors and (iii) employ certain MFIM employees as the Debtors' temporary employees until March 31, 2007 [Docket nos. 26, 1137, 1708, 2402 and 3325].

20.    On September 15, 2006, the Debtors filed their initial Disclosure Statement and Joint Chapter 11 Plan of Reorganization ("**Plan**") [Docket nos. 1309 and 1310].  The Debtors subsequently amended their Plan after substantial and nearly continual negotiations with and among the four Committees on October 18, 2006 [Docket no. 1576] and on November 7, 2006 [Docket no. 1742].  On November 15, 2006, the Court held a hearing on the adequacy of the disclosure statement and entered an order approving the First Amended Disclosure Statement [Docket no. 1795] as filed with the Court's required amendments [Docket no. 1798].  On the same day, the Debtors also filed their Third Amended Plan [Docket no. 1799].  On December 19-20, 2006, this Court held a confirmation hearing on the Third Amended Plan and on January 8, 2007 entered its findings of facts, conclusions of law and order confirming the Debtors' Third Amended Plan of Reorganization as modified [Docket nos. 2376 and 2377], which included a sale of certain of USACM's assets and FTDF's assets to Compass.

21.    The sale to Compass closed on February 16, 2007.  The Plan's Effective Date occurred on March 12, 2007.

## II.    FINAL APPLICATION

22.    In its Final Application, MFIM is seeking (a) final allowance and payment of fees for services rendered by MFIM to the Debtors in the amount of $11,389,203.09, and (b) final allowance and reimbursement of actual and necessary expenses in the amount of $1,117,168.74.    MFIM expended a total of 27,417.6 hours during the Application Period at an average blended hourly rate of approximately $415.40.  Fees and expenses incurred during the Application Period on behalf of each of the Debtors are outlined in the table below:

|  | Hours | Fees | Expenses | Total |
|---|---|---|---|---|
| USA Commercial Mortgage Company | 21,916 | $9,264,912.20 | $880,893.11 | $10,145,805.31 |
| USA Capital Diversified Trust Deed Fund, LLC | 2,427.8 | 1,111,888.10 | 105,716.55 | 1,217,604.65 |
| USA Capital First Trust Deed Fund, LLC | 2,836.1 | 1,286,924.10 | 122,358.70 | 1,409,282.80 |
| USA Capital Realty Advisors, LLC | 112.2 | 40,846.50 | 3,883.62 | 44,730.13 |
| USA Securities, LLC | 125.4 | 45,402.09 | 4,316.76 | 49,718.85 |
| Subtotal | 27,417.6 | $11,749,973.00 | 1,117,168.74 | $12,867,141.74 |
| Less: Voluntary Reduction |  | 360,769.91 | - | 360,769.91 |
| **Total** | **27,417.6** | **$11,389,203.09** | **1,117,168.74** | **$12,506,371.83** |

23.    Over the Application Period, MFIM has voluntarily reduced the amount of the Final Application by approximately $1.3 million, including the following:

a.    MFIM has applied a voluntary reduction of $360,769.91 to the fees incurred in the Final Application;

b.    MFIM's professionals incurred approximately 2,232 hours of time spent traveling to and from the Debtors' offices in Las Vegas, as well as attending meetings benefiting the Debtors in other locations.  In many other bankruptcy cases, time spent on travel is allowed to be billed to at one half (50%) of applicable rates.  However, MFIM voluntarily agreed that it would not bill for this

travel time.   Thus, the Final Application was reduced by approximately $500,000.

    c.  Further, MFIM is not requesting reimbursement in the Final Application of fees associated with time spent on the following:

- Professionals added to the team solely for short-term projects;
- Any time considered redundant among MFIM professionals excluding meetings;
- Activities performed by administrative personnel in support of team members; and
- MFIM internal consultation on case strategies.

As a result, the Final Application was reduced by approximately $300.000 by virtue of the absence of a request from MFIM for reimbursement for time spent on these additional tasks benefiting the Debtors; and

    d.  MFIM also voluntarily reduced its expenses by $160,000 as discussed herein.

24.    Attached as **Exhibit C** to the Final Application are the names, titles, hourly rates, and a summary of hours charged and the total compensation sought for the professionals whose services are being billed during the Application Period.

25.    Attached as **Exhibit D** to the Final Application is a summary schedule of the hours and fees incurred for each category of service during the Application Period.

26.    Attached as **Exhibits E1 through E31** to the Final Application are the detailed daily descriptions of services rendered by each professional during the Application Period, including the hours incurred with respect to each task and the resultant fees.

27.     MFIM has also attached to the Final Application as **Exhibits F1 through F5** charts detailing the professional fees charged to each Debtor on a category basis, including the tasks performed in each category and the benefits received by the Debtors from those activities.

28.     As (i) the Debtors' CRO; (ii) the Debtors' President, Vice President, Secretary and Manager; and (iii) the individual in charge of the MFIM crisis management team, I supervised, was responsible for and participated in the work performed by MFIM from the inception of its engagement.  If I were called upon to testify, I could competently testify to the tasks performed by MFIM as described below.

## A.    *Loan Portfolio*

29.     Throughout the Application Period, MFIM professionals worked diligently to collect on the outstanding loans in the portfolio.  For many of the loans, this collection effort proved to be an arduous task.  The difficulties frequently encountered can be explained by the nature of the loans and how they were managed prior to MFIM's retention.  Most if not all of the loans were short-term facilities (up to 24 months) and were largely bridge loans or other construction type facilities, in which no payments were due prior to loan maturity (other than, from time to time, interest payments advanced by the Direct Lenders and paid periodically out of escrow).  Therefore, the ability to deal proactively with problems in advance of loan maturity did not exist.  Further, the loans were higher-risk facilities, reflected by interest rates which ranged between 12% and 18%, the various fees charged on each loan, and the minimal amount of underwriting conducted, as reflected in the lack of due diligence documents in each loan file.

30.     These problems were compounded by a lack of a loan servicing or workout group to collect non-performing loans before the arrival of MFIM.  Instead, former management simply provided loan extensions to defer collections and/or, alternatively, would pay interest on non-performing loans from other sources.  In addition, MFIM discovered that management frequently

acquiesced to borrowers' delinquencies in exchange for equity in the project, or for an agreement to pay additional fees.  Further, while USACM monitored its loans utilizing Excel spreadsheets which detailed payments made, the data was generated from USACM's iTrack System which, as has been noted in the Final Application, was inaccurate and incomplete.  No log book was maintained with respect to calls, inquiries or collection efforts.

31.    Upon MFIM's appointment, it reviewed and inventoried each loan file. Documentation reviewed, other than the actual loan agreements, included appraisals, maps, financial information, and projections.  MFIM also initiated a process of obtaining new or updated appraisals on all of the collateral (*See* "Valuation Analysis/Appraisal" category description). MFIM refined and implemented procedures to ensure that accurate payment records were maintained and otherwise preserved appropriate accounting records on each loan and the sums collected thereon.  In addition, MFIM performed certain calculations related to default letters, payoff demands, and other *ad hoc* loan related requests.  Until the loans were satisfied, MFIM proceeded diligently to collect all payments due under the terms of the notes.  MFIM identified loans with past due payments and/or documentation problems, which often included missing or unexecuted documents.  MFIM created, supervised, and implemented a process of establishing a work-out strategy for each loan and MFIM personnel held numerous daily meetings and conference calls to work with borrowers to collect on the portfolio. MFIM reviewed and analyzed settlement proposals and other correspondence received from borrowers and other interested parties.  These efforts resulted in substantial collections of principal and interest for the Direct Lenders, including the Funds, as well as collections of fees owed to USACM.

32.    As these Cases progressed, the loan portfolio grew continually more difficult to collect.  MFIM collected many of the higher quality loans in the early stages of these Cases as

12

they matured.   Soon after the filing, nearly all of the loans in the portfolio were either past maturity or were not currently paying interest.  The loans collected during the Application Period represented many loans that required significant effort as borrowers became more recalcitrant.  The impending sales process also increased the difficulty in collections as many borrowers apparently hoped to extract discounts from the successful bidder.  Due to the public nature of the auction process, the borrowers were well aware that the successful bidder would be purchasing the assets of FTDF at a discount.   Furthermore, many borrowers were under the mistaken impression that USACM actually owned the loans and were selling the entire portfolio at a discount.  As MFIM could not accept less than 100% payoffs without the approval of all of the Direct Lenders in the corresponding loan, the relevant Committees, and the Court, many borrowers apparently decided that it was beneficial to delay payments in the hope of extracting discounts from the new loan servicer, who would not be as hindered by the bankruptcy process.  The unavailability of debtor-in-possession financing also made it impossible for USACM to foreclose on the delinquent loans due to the lack of cash necessary to fund any carrying costs related to the collateral supporting the loans (nearly all of which were cashflow negative).  Because USACM could not foreclose, many borrowers determined that delaying payment until after the auction would not carry much downside risk.

33.    As of March 12, 2007, MFIM collected approximately $280.7 million, consisting of $227.2 million in principal, $46.6 million in interest, and $6.9 million in fees.  Every loan payoff under MFIM's direction collected the principal and interest owed to the Direct Lenders in full.  A large percentage of the interest collected by MFIM was past due.  Loans fully paid off during the Application Period include:

| Loan Name | Transaction Date | Payoff Amount |
|---|---|---|
| 5252 Orange, LLC | 6/9/2006 | $ 3,800,000.00 |
| Ashby Financial  $7,200,000 | 9/1/2006 | 7,200,000.00 |
| Boise/Gowen 93 | 9/7/2006 | 4,831,004.82 |

| | | |
|---|---|---|
| Cloudbreak LV | 12/21/2006 | 3,800,000.00 |
| Copper Sage Commerce Center, LLC | 6/22/2006 | 176,947.19 |
| Cottonwood Hills, LLC | 10/11/2006 | 4,000,000.00 |
| Del Valle Isleton | 5/23/2006 | 6,520,000.00 |
| Elizabeth May Real Estate | 1/18/2007 | 10,050,000.00 |
| Fiesta Development $6.6 | 12/15/2006 | 6,600,000.00 |
| Fiesta Development McNaughton | 1/12/2007 | 6,000,000.00 |
| Fiesta/Beaumont $2.4m | 7/21/2006 | 2,400,000.00 |
| Franklin - Stratford Investments, LLC | 2/13/2007 | 5,225,000.00 |
| Gateway Stone | 2/28/2007 | 13,185,000.00 |
| Gilroy | 6/30/2006 | 4,950,000.0 |
| Glendale Tower Partners | 8/21/2006 | 6,500,000.00 |
| Golden State Investments II | 6/5/2006 | 2,850,000.00 |
| Goss Road | 1/2/2007 | 1,000,000.00 |
| Hasley Canyon | 11/14/2006 | 11,700,000.00 |
| HFA- North Yonkers | 5/26/2006 | 24,000,000.00 |
| HFA- Riviera 2nd | 5/26/2006 | 8,000,000.00 |
| I-40 Gateway west | 2/14/2007 | 4,530,000.00 |
| I-40 Gateway West, LLC 2nd | 2/14/2007 | 1,065,000.00 |
| Interstate Commerce Center Phase II | 3/6/2007 | 1,856,848.86 |
| J. Jireh's Corporation | 9/6/2006 | 8,825,000.00 |
| Meadow Creek Partners, LLC | 11/8/2006 | 8,250,000.00 |
| Midvale Marketplace, LLC | 7/13/2006 | 4,075,000.00 |
| Opaque/Mt. Edge $7,350,000 | 4/27/2006 | 4,827,970.00 |
| Preserve at Galleria, LLC | 9/27/2006 | 4,430,500.00 |
| Riviera - Homes for America Holdings, L.L.C. | 5/26/2006 | 5,000,000.00 |
| Roam Development Group | 12/19/2006 | 26,566,256.72 |
| Slade Development | 3/8/2007 | 3,525,000.00 |
| Urban Housing Alliance - 435 Lofts | 8/21/2006 | 8,150,000.00 |
| **Total** | | **$213,889,527.59** |

34.    MFIM's efforts in this regard benefited the Debtors by facilitating maximum recovery of principal, interest and fees due from borrowers.  Also, as part of the sale process, MFIM had negotiated less than a dollar for dollar purchase price adjustment in the purchase agreement with the Stalking Horse, and Compass agreed to this term.  As of the closing date of the sale to Compass, MFIM had collected $17.3 million in loans that translated into a $15.2 million purchase price adjustment (or a $2.1 million benefit for FTDF).

**B.**    *Valuation Analyses / Appraisal*

35.    During the first few weeks of their engagement, MFIM discovered that 99 commercial real estate projects/developments served as collateral for the loans serviced by USACM and that 23 of the loan files did not contain any appraisals.  Approximately 32 of the appraisals were obtained prior to the year 2005 and were not considered to be reliable.  These appraisals were provided by a number of different entities, and therefore, it was uncertain if the appraisals were based on common valuation methods or common criteria.  As a result, MFIM retained and supervised the work of an appraisal firm.  During the retention process, MFIM interviewed three appraisal firms, evaluated the firms' proposals and negotiated the final agreement with the winning firm.  The Court entered an order allowing the retention of  Hilco Real Estate LLC/Hilco Real Estate Appraisal, LLC, as the Debtors' appraisal firm on June 20, 2006 [Docket no. 747].

36.    The retention of an appraisal firm was necessary for the Debtors in order to:

- obtain sufficient information to best determine how to proceed in connection with each serviced loan (*i.e.*, should the collateral be foreclosed, should a loan extension be considered, is there sufficient equity in the property such that another lender may want to re-finance the loan, etc.);

- provide appraisals on all of the properties that were current and based on common valuation methods;

- assist in the development of the Plan and to provide the requisite information that would be required in the Disclosure Statement;

- provide a more complete response to requests for information from parties in interest about the properties/developments and the status of the serviced loans;

- facilitate negotiations with borrowers, and, in particular, those borrowers with delinquent loans or loans that might become delinquent in the near future;

- ascertain the validity and accuracy of appraisals obtained on properties in which the former principals of the Debtors are investors; and

- obtain appraisals on properties securing loans serviced by USACM for which there were currently no appraisals in the loan files.

37.    MFIM's efforts in this category benefited the Debtors by providing a source of updated and reliable information used for purposes of making collection decisions, settlement negotiations, pursuing the sale of the Debtors' assets and during the Plan process.

## C.    Company Administration

38.    As noted herein, I was employed as the Debtors' CRO throughout these Cases. MFIM supplied additional temporary employees to the Debtors so that the Debtors' business would continue to operate.    MFIM's activities in this category include the time incurred to operate the Debtors' businesses.

39.    As part of those duties, MFIM attended meetings with the SEC, the U.S. Attorney and the Nevada Mortgage Lending Division.  MFIM spent considerable time preparing for these meetings, as well as fulfilling information requests in order to provide the entities with the most recent information.  At the start of the Cases, these meetings often occurred on a weekly basis.

40.    Additional issues addressed by MFIM and included in this category are:

- Termination of the USACM's defined benefit plan with the PBGC;

- Definition and implementation of project management and strategies;

- Management of corporate insurance coverages;

- Treasury functions including management of new bank accounts and disbursements;

- Creation of 1099 statements;

- Coordination the Debtors' auditors;

- Management of employees, including the termination of the CFO and the resignation of the CIO;

- Conduct employee meetings to communicate the status of the Debtors and the Cases;

- Analysis of office space requirements for the Debtors; and

- Monitoring professional fees for the Cases.

41.    An additional $50,000 has been included in this category as an estimate of fees to review the Final Application for the other professionals in these Cases.

42.    MFIM's efforts in this category benefited the Debtors by allowing them to continue successfully as going concerns through the Effective Date of the Plan.    As of the Petition Date, it was critical that the Debtors' senior management be terminated and replaced. MFIM was able to step in and assume management of the Debtors' businesses.

**D.    *Analyzing Restructuring and Sale Options***

43.    When these Cases were filed, MFIM considered the possibility of restructuring the Debtors' operations, thereby maintaining its going concern value.    During that process, MFIM sought debtor-in-possession financing ("**DIP Financing**") which resulted in the first introduction of the Debtors' business, including its challenges and opportunities, to the marketplace.    When the DIP Financing processes ended, MFIM was forced to consider other strategic alternatives.  From June to August, 2006, MFIM examined the various options available for maximizing recoveries to creditors, investors and DTDF and FTDF's members.    MFIM conducted formal Committee presentations on or about June 29, 2006, July 11, 2006 and August 8, 2006, during which time it discussed reorganization options, including challenges associated with each.  In an effort to coordinate a disciplined, organized course of action that would maximize the return to all of the constituents, beginning in August 2006, MFIM initiated an extensive sales process structured to provide a viable restructuring alternative for the Debtors.

44.    In coordination with the Committees, MFIM developed a marketing strategy to target the most likely buyers of the Debtors' assets, utilizing MFIM's market intelligence, industry experience and market presence to identify strategic and financial buyers (such as

private equity and hedge funds) which understood the dynamics of the loans at issue, had a portfolio of similar loans, or otherwise had experience servicing the same. This marketing strategy was focused on finding a stalking horse bidder to create necessary market credibility, value and structure for the sale process. The prospective assets initially offered were packaged into three proposed groups associated with DTDF, FTDF and USACM, respectively. The initial sale process consisted of MFIM confirming with each of the Committees an acceptable bid range, including defining potential contingencies that needed to be considered throughout the sale process. MFIM contacted approximately 60 prospective bidders during the entire process.

45.    As a result of the considerable on-going efforts by MFIM to analyze and identify the critical information underlying the various loan portfolios and properties, MFIM understood the key value drivers supporting the Debtors' loan portfolios. Understanding the unique nature of the assets at issue, MFIM determined that in order to elicit interest in the purchase of the assets they needed analytical data breaking down the loan portfolios in a detailed fashion, including identifying or otherwise modeling the various revenue streams associated with each loan. Therefore, MFIM created spreadsheets that detailed each of the fees and other revenue drivers for the portfolios proposed for sale. These spreadsheets and reports, in various forms, were placed on data disks submitted to interested parties. Initial data disks prepared by MFIM described the loans in a summary fashion. After preparing a confidentiality agreement designed to ensure a competitive sale process, in coordination with the Committees, and after receiving executed copies of the same, a second and more detailed data disk was prepared and forwarded by MFIM to interested parties, creating for each a virtual data room. This information was also incorporated into an actual, initial data room designed to attract potential buyers into a competitive auction process. MFIM analyzed and continuously updated the loan files to ensure

that they were both complete and in order.  This data room allowed bidders to conduct a loan-by-loan analysis of the assets for sale.

46.    In a continuing effort to facilitate an extensive due diligence process, MFIM also participated in presentations in Las Vegas, meetings with the Debtors' various personnel, and facilitated bidder communications with borrowers and other parties-in-interest.  During meetings with MFIM, the parties discussed the process that was in place, the investment opportunities associated with the loans, and the dynamics of servicing the same.  Approximately ten interested parties spent one to three days at the Debtors' headquarters in Las Vegas reviewing the loan files, compiling questions about what was contained therein, and/or requesting additional information with respect to perceived missing data.  MFIM answered each question during the course of the visits, or after necessary research, followed up with the reply.  Following the initial due-diligence process (fourteen of the initial parties signed confidentiality agreements and ten interested parties proceeded with more formal due diligence), five of the prospective bidders submitted preliminary proposals for the acquisition of the loans underlying the Funds and USACM's portfolios, as well as, the servicing rights to these assets.  However, the preliminary proposals of the bidders did not place a value on the assets of DTDF and USACM sufficient to select a stalking horse bidder.  MFIM consulted with the Committees concerning this problem, resulting in a decision by DTDF to remove its assets from the proposed auction.  MFIM also determined that none of the bidders were in a position to ascribe a value to the USACM assets that would satisfy the USACM Committee. Therefore, MFIM met with the remaining interested bidders and discussed how the USACM assets should be valued, educating those bidders on possible value drivers that the bidders had discounted or failed to consider.  As a result, a pass-through structure was created with respect to USACM fees, thereby allowing MFIM to proceed with a sale.

47.     In anticipation of the actual auction, MFIM initiated a process that allowed for evaluating and comparing preliminary bids.  After evaluating each of these proposals with the Committees (and extensive discussions with each of the interested parties as to an acceptable value and acquisition structure), on October 19, 2006, the Debtors executed an asset purchase agreement with Silverpoint designee, SPCP as the "Stalking Horse Bidder" for a total cash purchase price of $46 million.  This asset purchase agreement was amended on November 17, 2006.  The identification of SPCP as the Stalking Horse Bidder allowed MFIM to garner the support of the various Committees on what assets should be marketed, a framework for a potential sale of those assets and a minimum threshold that other bidders would need to surpass in a section 363 sale process (with the ultimate objective of attracting additional potential buyers of the Debtors' assets through a competitive process with the reliance on the Court's monitoring of the process to ensure "fairness").  With the credibility gained from the Stalking Horse Bid, MFIM responded to inquiries from over sixty second round potential bidders. After initial conversations with each potential second round bidder regarding the auction process and SPCP bid/structure, approximately 30 potential bidders executed confidentially agreements and proceeded forward with varying degrees of financial and operational due diligence. This extensive second round of due diligence required MFIM to manage numerous daily conference calls; comply with data room document requests, both electronically and through overnight delivery; describe/analyze the various loan portfolios, contracts, servicing agreements and fee schedules; orchestrate on-site visits with over 20 potential bidders; respond to numerous follow-up questions and data requests; and provide further analyses/responses to data inquires.  MFIM's continuing contact with the borrowers allowed further information to be available to the bidders. MFIM coordinated additional rounds of due diligence as the bidders requested clarification and additional information.

48.     Overall, MFIM's initial sale efforts resulted in a vibrant solicitation process which introduced a sale alternative as part of the reorganization considered by the Debtors, creditors of the Debtors, Direct Lenders and members of the Funds.  In accordance with the Debtors' motion, the Court approved bid procedures designed by MFIM and the Committees to solicit competing offers to the stalking horse bid for the purchase of substantially all of the Debtors' assets.  The process included a determination of a potential bidder's qualifications based on an assessment of the bidder's financial ability to close a transaction and their intentions and qualifications with respect to servicing the loans and performing the obligations under the LSAs.

49.     Under the section 363 sale process, MFIM worked closely with interested bidders to ensure that each focused not only on an evaluation of the various loan portfolios and underlying asset valuations, but on determining the potential "strategic" value that could be realized through a revitalization of certain aspects of the Debtors' businesses (*i.e.,* the value creation possibilities of returning the Debtors to a potential going concern operation). As such, MFIM was able to identify and engage in active discussions with several potential bidders who would continue to operate the Debtors as a going concern and maintain the ongoing relationships with its lenders and investors.  These negotiations ultimately enabled MFIM to conduct an auction process with the goal of securing the highest value possible for the Debtors' assets. In the end, MFIM received three qualified bids to purchase a substantial portion of the Debtors' assets (bids from SPCP, Compass and Desert Capital REIT) which then required the Debtors to hold a competitive auction supervised by the Court, MFIM and the Committees.

50.     This process culminated in Compass' $67 million bid at the Court supervised auction on December 7, 2006.  This amount was $20.5 million higher than the Stalking Horse Bid of SPCP.  In addition, three loans (Placer Vineyards, Placer Vineyards 2nd, and Marquis Hotel) included in the Stalking Horse Bid were isolated from the sale to Compass, which may

provide additional proceeds to USACM. MFIM caused DTDF to file an involuntary bankruptcy petition against USA Investors VI, LLC, which is the borrower on the Marquis Hotel loan. The ultimate recovery on this loan will be determined by the bankruptcy proceedings. The results of the auction have been widely hailed as a success both among the Committees, other parties of interest to the Cases, and the press. FTDF will pay creditors in full, and may have returns approaching the 85% range for the FTDF members from the sale proceeds alone. USACM received certain sale proceeds, which facilitated consummation of the Plan, as well as, $23 million which was transferred to the USACM Trust pursuant to the Plan.

**E.**     ***Disclosure Statement/Plan of Reorganization***

51.     During the Cases, MFIM, along with the Debtors' counsel, spent significant time formulating and negotiating a confirmable plan. Faced with the expiration of the 120-day exclusivity deadline, MFIM, along with the Debtors' counsel, began negotiating with the Committees to extend the deadline to file a plan of reorganization. In order to reach agreement on the extension, the Committees required that a draft plan of reorganization be circulated to the interested parties. The Debtors fulfilled the Committees' requirement, and the Debtors' exclusive period was extended to November 15, 2006.

52.     On September 15, 2006, the Debtors filed their initial Disclosure Statement and Joint Chapter 11 Plan of Reorganization [Docket nos. 1309 and 1310]. The Debtors subsequently amended their Plan after substantial and nearly continual negotiations with and among the four Committees on October 18, 2006 [Docket no. 1576] and on November 7, 2006 [Docket no. 1742]. On November 15, 2006, the Court held a hearing on the adequacy of the Disclosure Statement and entered an order approving the First Amended Disclosure Statement [Docket no. 1795] as filed with the Court's required amendments [Docket no. 1798]. On the same day, the Debtors also filed their Third Amended Plan [Docket no. 1799]. On November

20, 2006, a "Solicitation Package" was served, in accordance with the Solicitation Procedures that were approved by the Court in the Disclosure Statement Order. Within four months of the filing of the first draft plan, MFIM achieved a plan which was supported by the major parties in interest.   On December 19-20, 2006, this Court held a confirmation hearing on the Third Amended Plan and on January 8, 2007 entered its findings of facts, conclusions of law and order confirming the Third Amended Plan, as modified [Docket nos. 2376 and 2377].   Plan confirmation was obtained within eight months of the April 13, 2006 bankruptcy filing.   The confirmation leaves the Debtors' estates with the means for achieving a recovery for the creditors and investors.

53.    As noted above, MFIM participated in the nearly four months of negotiations with the Committees, which culminated in confirmation of the Third Amended Plan.    These negotiations included resolutions of issues such as a) whether to substantively consolidate assets with a pro-rata distribution to creditors; b) collection of Pre-Paid Interest from borrower proceeds; c) service fees payable under the LSAs; d) payment and classification of creditors; and e) authority for litigation and pursuit of insiders.  MFIM reviewed and provided comments on the class structure, analyzed the voting results of each class, reviewed various inter-committee agreements, calculated potential recovery analyses under both liquidation and plan recovery scenarios, and prepared declarations in support of these documents.  My declaration in support of the Plan was the only evidence submitted to the Court in support of confirmation.  Upon the entry of the confirmation order, three appeals were filed by the Lender Protection Group, the equityholders (led by Joe Milanowski) and DACA Group, on behalf of four parties.  MFIM worked with Debtors' counsel on the appeals, including providing affidavits.

### F.    *Liquidation Analysis*

54.    In connection with the Plan and Disclosure Statement and in accordance with Section 1129(a)(7) of the Bankruptcy Code, MFIM prepared detailed liquidation analyses for each of the Debtors. In order to prepare the liquidation analyses, MFIM created a complex financial model based upon discussions with USACM personnel, review of various collateral and asset appraisals, and the input of MFIM's business judgment. MFIM revised and updated the liquidation analyses for all Disclosure Statements filed with the Court.

55.    For the valuation of the loan related assets (principal, interest, fees, etc.), MFIM valued each loan separately and allocated the estimated value among the Debtors and the Direct Lenders based on their respective ownership interests and the "waterfall" provisions, as provided by Debtors' counsel. Although MFIM used the Hilco appraisals as a baseline for the estimated recoveries on the loans it adjusted these valuations for 1) the current status of loan negotiations with borrowers, 2) more recent project information, 3) strength of loan guarantees, and 4) other information MFIM had gained through other work streams.

56.    MFIM also investigated and valued the various properties that supported the equity interests pledged by Investment Partners to secure the $58 million note to USACM and the 10-90 loan. Again, MFIM analysts used the Hilco appraisals as a baseline and adjusted them based on more recent and more detailed information.

57.    MFIM also prepared detailed estimates of potential claims to be filed against each of the Debtors, including estimates of the various intercompany claims among the Debtors. This information was critical to the formulation and confirmation of the Plan.

58.    In addition to fulfilling the requirements of section 1129 of the Bankruptcy Code, the financial model that supported the liquidation analyses had additional uses. For example, one of the main inputs into the 13 week cash flow model and reporting process was the cash receipts

forecast that was based upon the liquidation analyses. MFIM also used the model to value and analyze the various bids received on the assets, including a comparison of the Stalking Horse Bid and the revised asset purchase agreement submitted by Compass. Furthermore, the financial model that supported the liquidation analyses became a repository of information that was an integral part of the loan collections and due diligence processes.

59.    MFIM's efforts in this regard benefited the Debtors by providing an assessment of the potential recoveries in the liquidation of the Debtors. This assessment was useful for comparison with other alternatives, including the ultimate sale of certain assets to Compass. The liquidation analyses were also required as part of the Disclosure Statement.

**G.    *Accounts and Notes Receivable Related Activities***

60.    During the course of these Cases, MFIM, along with Debtors' counsel and with the cooperation and support of the Committees, negotiated with the Debtors' former insiders in an attempt to recover the $58 million intercompany transfer to Investment Partners and the $55 million 10-90 loan. MFIM sought to improve the Debtors' ability to collect these monies, while avoiding the expense of litigation at a time when cash was scarce. As a result of these negotiations, a $58 million secured note was executed to document repayment of intercompany transfers to Investment Partners (the "**IP Note**"). In addition, a security agreement was executed which provided collateral for the IP Note and the 10-90 loan. By entering into the IP Note with appropriate payment terms, interest rates and events of default, and the pledge agreement, MFIM documented the intercompany transfers and the 10-90 loans which, if not paid according to their terms, could be effectively enforced. Unfortunately, the Debtors had to enforce the IP Note and pledge agreement

61.    Under the direction of MFIM's senior accounting team which included CPAs and former auditors, MFIM researched and traced the journal entries that comprised the $58 million

intercompany receivable from Investment Partners to USACM. As of January 1, 2003, the intercompany balance was $8 million and the records prior to 2003 were incomplete. As a result, MFIM primarily focused its research on source documents from transactions after January 2003. The entries reviewed consisted of cash transferred, journal entries, recorded intercompany transactions, including diverted principal due to DTDF, that were booked as a liability of Investment Partners. From 2003 to the Petition Date, MFIM identified $20 million in cash transferred to Investment Partners from USACM, $11 million in entries in USACM's journal entries (including payments of amounts due by Investment Partners and other intercompany transfers to Investment Partners) and $18.9 Diverted Principal of DTDF. MFIM's analysis also included an investigation of Investment Partners' records that were made available to the Debtors.

62.    MFIM researched the ultimate use of $55 million lent under the 10-90 loan. MFIM traced funds from DTDF through an entity known as 10-90 Inc. to Mountain Vista to Investment Partners and from there to various Investment Partner related entities.

63.    Based on the information noted in these investigations and due to former management's failure to honor its postpetiton agreements, MFIM caused DTDF to file involuntary bankruptcy proceedings against USA Investors VI, LLC and Tree Moss Partners, LLC in order to prevent the sale of properties that properly belonged to the Debtors and recover funds from assets owned by such entities pledged to repay the IP Note and the 10-90 loan.

64.    MFIM also determined that former management caused DTDF to transfer substantial sums of money to an Investment Partner subsidiary or affiliate, HMA Sales, LLC, which owned the Royal Hotel. Investment Partner's equity in this property also serves as collateral for the IP Note due to USACM. During the negotiations with Joe Milanowski, USACM and DTDF learned that the sale of the Royal Hotel was imminent. MFIM, working

with Debtors' counsel and the Committees, instituted litigation to protect DTDF's and USACM's interests in these funds and equity in the property which was security for the IP Note and 10-90 loan. Prior to commencement of such litigation, MFIM, working with Debtors' counsel and the Committees, had been working with the SEC to put Investment Partners into a SEC receivership.

**H.    Litigation Matters**

65.    MFIM assisted counsel with various litigation matters, stemming from the investigations described in the "Accounts and Notes Receivable" category. Specifically, MFIM utilized the information researched in the Accounts and Notes Receivable category to assist with the involuntary bankruptcy filings of Tree Moss Partners, LLC and USA Investors VI, LLC. MFIM's efforts in this regard benefited the Debtors by ensuring that assets of the Debtors were not removed inappropriately, thereby preserving the value of those assets for the Debtors.

**I.    Committee Meetings**

66.    As mentioned in the Final Application, four Committees were appointed in the Debtors' cases by the U.S. Trustee's office. To address the informational needs and requests from all of these Committees, MFIM spent time communicating with members of each of the Committees and their professionals through phone calls and meetings.

67.    MFIM scheduled and prepared presentation materials for five in-person meetings with the Committee members and their professionals. Information presented during these meetings included:

- A comparison of the Debtors actual performance as compared to the budget;

- Loan workout proposals and recommendations;

- A proposal to fund construction loan shortfalls;

- A summary of the information contained in the Debtors' Statements and Schedules:

- A proposal to distribute funds to Direct Lenders and an overview of the related motion;

- An explanation of the information contained in the Investor Statements;

- Reorganization options for the Debtors;

- Privacy issues relating to the dissemination of information containing the identities of Direct Lenders;

- Professional fee budgets;

- A summary of MFIM's collection efforts;

- Estimates of the recoveries of the Debtors' assets in liquidation;

- Plans for a sale process for the Debtors' assets;

- An overview of the Debtors' liquidity needs;

- Summaries of various bids received for the Debtors' assets; and

- An overview of the auction process for the Debtors' assets.

68.    In addition, MFIM conducted *ad hoc* phone calls on nearly a daily basis with the Committees' professionals.    During these calls, MFIM responded to requests and provided information for any issues raised by the professionals or their Committees.

69.    MFIM engaged in these meetings and calls in order to communicate the Debtors' positions and disseminate reports and other relevant information on a real-time basis    These ongoing discussions also enabled the Debtors to evaluate issues and make informed decisions in these Cases.    These meetings were also instrumental in resolving disagreements among the Committees and the Debtors. MFIM coordinated the Debtors' communications with the four separate Committees.    Through these meetings, MFIM negotiated with the Committees and was

able to garner the support of the Committees for many issues in these Cases, including the successful confirmation of the Plan.

### J.    *DIP Financing / Cash Collateral*

70.    MFIM determined that, in order for the Debtors to continue to operate in chapter 11, an immediate post-petition credit facility would be advisable to maintain the Debtors' operations in order to maximize the recoveries for creditors and Direct Lenders by enabling the estates to foreclose on collateral of delinquent loans and have the necessary funds with which to maintain the properties, as well as to provide a variety of options for reorganizing the Debtors under a plan of reorganization.    In addition, certain of the Direct Lenders' loans required additional project funding.

71.    Accordingly, MFIM used its database of potential lenders to identify sources for postpetition financing for the Debtors.  MFIM entered into discussions with approximately nine lenders and eight of those firms signed confidentiality agreements.  Due diligence was conducted by these eight firms.  MFIM's tasks during due diligence included:

- Providing:
  - descriptions of collateral,
  - loan documentation,
  - borrower payment performance, and
  - appraisals;

- Conducting conference calls and in person meetings to answer questions and provide information; and

- Facilitating meetings between potential lenders and certain of the borrowers.

72.    Due diligence performed during the DIP financing process allowed four of the eight lenders to participate in the Debtors' sale process and one of those, SPCP, ultimately became the Stalking Horse Bidder.

73.    MFIM received several proposals from the lenders.  The terms of those proposals were analyzed and further negotiations were conducted with several of the lenders to improve the

terms of their originals proposals.   On June 9, 2006, the Debtors filed a motion seeking authorization to obtain postpetition financing from CapSource.  Several objections were filed to the motion.  The Court ultimately entered an order denying the interim relief requested by the Debtors on July 6, 2006, and the Debtors' withdrew the DIP financing motion on July 21, 2006.

74.    After the denial of the Debtors' motion for DIP financing, the Debtors spend significant time managing their cash as described in the section entitled "Cash Flow Model/Analyses."   In essence, the Cases were financed, in part, by the various professionals, who were not paid any fees or expenses prior to October 2006 (and, at that time, only a small portion of the fees), notwithstanding the Court's order allowing interim payment of fees and expenses.

## K.    *Court Hearings/Preparation*

75.    MFIM prepared for and attended court hearings in these Cases as the Debtors' management. MFIM assisted Debtors' counsel in preparing for hearings before the Court and MFIM personnel were available to provide testimony, if necessary, during the hearings.   Such court hearings included hearings on the first day motions, two regularly scheduled omnibus hearings per month, the disclosure statement hearing, the November 2006 conference call with the Court, the auction and the two day confirmation hearings.   Preparation for these hearings consisted of calls and meetings with the Debtors' counsel, as well as compiling the information and analysis requested by counsel.   MFIM prepared numerous exhibits for use during hearings by the Court and the interested parties.   Further, MFIM prepared declarations supporting the Debtors' pleadings as needed for each hearing.   MFIM personnel also prepared for and testified at the Debtors' 341 meeting, attended depositions and assisted with the auction of the Debtors' assets.

76.    I was required to attend substantially all hearings before the Court in these Cases. Susan Smith, who was responsible for the Debtors' financial information, also attended these hearings.    Additional MFIM personnel were made available for critical hearings before this Court.  In every instance where multiple MFIM personnel participated in court hearings, critical issues were addressed requiring the specialized knowledge of certain MFIM personnel, which were central to the Debtors' Cases and the role of MFIM.

### III.    EXPENSE REIMBURSEMENT REQUESTED BY MFIM

77.    The policies employed by MFIM for seeking reimbursement for out-of-pocket expenses are as follows:

- **Airfare** - Costs incurred (if any) by personnel when traveling to/from other cities on behalf of the Debtors were incorporated into the Final Application.  To the extent any MFIM professional flew first class or business class, the incremental cost of such service upgrade has not been incorporated into the amounts being sought for reimbursement;

- **Ground Transportation** – Expenses incurred by MFIM professionals for local transportation while outside of their home cities were incorporated into the Final Application.  Such costs consist primarily of rental car fees shared among two or three people to the extent possible and taxi-cab fares to and from the Debtors' offices.  In addition, reimbursement is sought for ground transportation to and from airports associated with air travel by MFIM professionals from other cities. Reimbursement of taxi-cab fares for reasons other than transportation to the office during the engagement (dinner in the evening, etc.) are not being sought in the Final Application;

- **Parking** - Parking expenses incurred by MFIM personnel as a result of travel on client matters is reimbursed to MFIM personnel.  Costs related to parking at airports while traveling out of town on client matters are also incorporated herein for reimbursement;

- **Lodging** - Lodging and related costs, to the extent incurred by personnel while rendering services in connection with these Cases, were incorporated into the Final Application.  During the outset of the Cases, MFIM negotiated a discounted rate at a local hotel in an effort to reduce the costs to the Debtors of MFIM's expenses.  To the extent rooms were available at this hotel, all MFIM personnel utilized this rate;

- **Meals** – Costs incurred by MFIM professionals for dinners while traveling outside of their home cities (on matters related to these Chapter 11 Cases) are incorporated

into the Final Application. MFIM has not sought reimbursement for "luxury meals" in the Final Application (the costs of all dinners were limited to $60 per person). Also, MFIM has not sought reimbursement for breakfasts or lunches for MFIM professionals while traveling outside of their home cities. Therefore, MFIM is requesting less than $60 per day for each employee. It should be noted that this daily amount is less than $64 which is the maximum per diem amount (meals and incidentals) for Las Vegas, Nevada published by the Internal Revenue Service (IRS Publication 1542, Revision March 2007);

- **Communication/Telephone** – MFIM is not seeking the reimbursement for costs associated with necessary long distance and wireless phone calls directly related to this matter;

- **Postage/Overnight Mail/Couriers** - Costs incurred in connection with same-day and over-night courier and delivery services (for materials directly related to this matter) were incorporated into the Final Application. MFIM has not sought reimbursement for costs associated with first-class postage incurred in the normal course of its activities in this matter. However, postage costs incurred in connection with the required servicing of notices and other documents filed with the Court may be included herein;

- **Duplication/Reprographics** - To the extent incurred, charges for photocopying jobs performed by a third party were charged at the cost of such services; and

- **Legal Fees** - - During the Application Period, MFIM incurred expenses relating to third party legal advice in the amount of $303,359.85. MFIM has also included in this category an additional $150,000 of estimated expenses in the Final Application for future legal fees. MFIM expects to require the legal services of Greenberg Traurig, LLP, in responding to any objections and presenting the Final Application to the Court. MFIM will file a supplement to the Final Application in advance of the hearing to support this estimated amount. From the Petition Date and forward, MFIM consulted with attorneys from Greenberg Traurig on various issues in these Cases. Specifically, Greenberg Traurig assisted MFIM with (a) issues relating to their retention and fees in the Cases, including attending hearings relating to MFIM's retention, attending the hearing on their First Interim Fee Application and working with the U.S. Trustee to address certain objections raised to MFIM's monthly fee statements; (b) corporate governance issues relating to my position as CRO of the Debtors; (c) issues relating to the Debtors' proposed pension plan freeze and alleged liabilities with respect to such pension plans; (d) Plan issues, including the plan formulation process to insure the feasibility of the plan structure, payment of MFIM's fees and expenses and address other risk issues for MFIM; (e) discussions with Compass on the asset purchase agreement because Compass required representations and warranties from MFIM; (f) issues relating to the mortgage broker license, including the ability to maintain such license post-sale closing for purposes of serving as the loan servicer for Compass; (g) meetings with the SEC regarding possible receivership for Investment Partners to finalize my affidavit in support of such receivership; and (h) issues relating to MFIM or its

employees.  **Exhibit H** of the Final Application provides a detailed listing for the fees and expenses incurred by Greenberg Traurig.  Note that the legal fee category includes an estimate of $150,000 for additional fees to respond to objections and participate in the hearing for MFIM's Final Application

78.  Attached as **Exhibit I** to the Final Application is a summary schedule of actual and necessary expenses of MFIM incurred during the Application Period.  Note that the legal fee category includes an estimate of $150,000 for additional fees to respond to objections and participate in the hearing for MFIM's Final Application.

79.  Attached as **Exhibit J** to the Final Application is a detailed description of the actual and necessary expenses incurred by MFIM during the Application Period.

80.  MFIM voluntarily reduced its expenses described in the Final Application by approximately $160,000.  The numbers contained in Exhibits I and J of the Final Application are net of the voluntary reductions

## IV.    SUCCESS FEE REQUEST

81.    Based on the grim circumstances confronting the Debtors on the Petition Date and the exceptional results achieved for the unsecured creditors and Direct Lenders of USACM, as well as, the investors of FTDF and DTDF, as part of its Final Application, MFIM is also seeking the award of a success fee of $2,500,000 (the "**Success Fee**").  The request is based on several factors including the complexity of the Cases, the special skills employed to achieve the final favorable results, the risk of non-payment of accrued fees and expenses, the outcomes achieved and the expedited resolution of the Cases.  A success fee is further warranted in these Cases based on the industry standard of awarding success fees for professionals such as MFIM.   If called to testify, I would testify to the following in support of the Success Fee requested by MFIM:

*A. Novelty and Complexity of the Issues*:  When MFIM assumed the management of the Debtors on the Petition Date, the Debtors were moribund entities subject to pending state and

federal investigations.  With a flat management structure and limited back-office depth, MFIM was required to function as the Debtors' management, accounting and finance departments and to serve in other capacities under very difficult circumstances.  At the start of its engagement, MFIM discovered loan files and other records which were incomplete, inaccurate and, in some instances, appeared to be deliberately falsified.  MFIM discovered the existence of two different sets of books, each arguably designed for the unique expectations of the various recipients of the accounting data.  Accounting irregularities were widespread and have been detailed in Sections entitled *Forensic Loan Accounting* and *Loan and Financial Accounting Systems* of the Final Application.  The problems associated with these irregularities were compounded by the fact that USACM failed to maintain historical accounting data, overwriting the company's Access or Excel files each month as they were updated, thereby obliterating any loan transaction history or audit trail of the accounts.

82.     The situation was equally problematic on the loan servicing side of USACM's business, as is detailed in the Section entitled *Loan Portfolio* of the Final Application.  USACM simply provided loan extensions to defer collection and/or, alternatively, would pay interest on non-performing loans from other sources.  USACM management frequently acquiesced to borrower delinquencies in exchange for equity in the project, or for payment of additional fees.  In an effort to conceal this activity, USACM made monthly regular interest payments to Direct Lenders regardless of whether the borrower of the particular loans in which the Direct Lenders had an interest were paying USACM.  As a result of this activity (and lack of meaningful collection activity), most of the loans serviced by the Debtors were non-performing.

83.     Out of this morass (and, initially, with only $400,000 in USACM's operating accounts), MFIM was able confirm the Plan, which was preceded by a highly successful auction of the loan portfolio of USACM and FTDF, as well as serving rights to these assets.  Yet to reach

that point, MFIM was left with no alternative but to reconstruct the loan transaction accounting from the Debtors' source documentation (deposit slips, checks, bank statements, correspondence and other source documents) to verify and record transactions. MFIM's work ranged from verifying investments by Direct Lenders to documenting borrower payments. MFIM matched cleared checks to issued checks by amount and payee and reviewed each loan agreement to determine if the interest compounded, when and if default interest was to be charged, the agreement on payment application, and the determination of late fees, origination fees or exit fees.

84.    MFIM reconstructed the USACM Loan Ledgers for each loan and calculated proper accruals for interest and service fees, which was loaded into a new SQL database in order to process holdbacks and the netting of performing and non-performing loans. Manual Loan Ledgers were updated each month to verify the data loaded into the SQL database, thereby allowing for the issuance of the borrower monthly interest statements, loan summaries by month, weekly collection reports, monthly operating reports and other data.

85.    MFIM worked to collect the outstanding loans in the various fund portfolios or otherwise serviced by USACM. MFIM (i) reviewed and inventoried each loan file, (ii) performed calculations related to default letters, payoff demands, and other *ad hoc* loan related requests, and (iii) created and implemented a process of establishing work-out strategies for each loan. As part of MFIM's tasks, it reviewed and researched loans marked on the Debtors' published loan summaries as "Special Situations," each of which contained unique problems addressed by MFIM personnel and described in the Final Application. MFIM personnel held daily meetings and conference calls to work with borrowers to collect the portfolio, and reviewed and analyzed settlement proposals and other correspondence received from borrowers and other interested parties.

86.    As a results of these efforts, MFIM provided accurate accountings for and understanding of the status of each loan.  These efforts allowed MFIM to distribute $231.9 million to investors while also retaining various Court ordered holdbacks.  Reconstructed ledgers allowed MFIM to issue monthly statements on a timely basis to both investors and borrowers.  Further, MFIM's work on the loan portfolio resulted in collections, as of March 12, 2007, of approximately $280.7 million, consisting of $227.2 million in principal, $46.6 million in interest, and $6.9 million in fees.  Successful collections since the auction for loans held by FTDF resulted in a purchase price increase under the sale agreement with Compass, as described herein.

87.    MFIM also took over USACM's investor inquiry function, maintaining necessary transparency and providing a ready source of information.   In this regard, MFIM logged, reviewed, researched and responded to over 1,600 requests from Direct Lenders, and responded to the various requests for information from the four official Committees in these Cases, as well as, their professionals.  MFIM, of course, performed a myriad of other tasks, detailed in the Final Application, including but not limited to (i) management of corporate insurance coverages; (ii) termination of the USACM pension plan; (iii) management of employees including the termination of the CFO and risk management officer following the CIO's resignation; (iv) managing employee expectations; (v) analysis of office space requirements; and (vi) monitoring professional fees for the Cases.

88.    Significantly, the above described tasks and accomplishments were the necessary precursor to the ultimate successful sale of the loans portfolios of FTDF and USACM, as well as servicing rights to those assets.  The new systems created by MFIM provided bidders with the reliable financial information necessary for them to consider and bid for the Debtors' assets.  MFIM's successful collection efforts established the viability of the loan portfolios on a go

forward basis. But for these accomplishments, which stabilized the Debtors' operations, SPCP would not have submitted its Stalking Horse Bid and there would not have been an active auction, calling into question whether the assets could have been sold at all, and if sold, whether the sale would have generated the same positive return.

89.    While MFIM's accounting and loan portfolio work stabilized the Debtors' assets, MFIM's marketing strategy, developed in coordination with the Committees, found and enticed the necessary bidders to translate those assets into a monetary return for the Debtors' creditors and investors. As detailed in the Section entitled *Analyzing Restructuring and Sales Options*, this strategy focused on finding a stalking horse bidder to create market credibility, value and structure for the sale process. In an effort to create bidder interest, MFIM analyzed and identified the critical information underlying the various loan portfolios and properties, and focused on the key value drivers supporting the same. MFIM participated in presentations and meeting with the Debtors' various personnel and orchestrated bidder communications with borrowers and other parties-in-interest.

90.    Overall, this process culminated in Compass Partners' $67 million bid at the Court supervised auction held on December 7, 2006. This amount was $20.5 million higher than the Stalking Horse Bid of SPCP. In addition, three loans (Placer Vineyards, Placer Vineyards 2nd, and Marquis Hotel) included in the Stalking Horse Bid were carved out of the sale to Compass, which may provide additional proceeds to USACM.

91.    Furthermore, this process culminated in confirmation of the Plan within eight months of the Petition Date, which was supported by all of the Committees and which was approved by each Class entitled to vote on the Plan.

**B.  Risks Associated with the Engagement:**  All of the aforementioned work was provided notwithstanding the substantial risk that MFIM would not be fully compensated for its

services.  Due to the degraded state of the Debtors' accounting records and loan portfolios, caused either by the Debtors' misfeasance or active malfeasance, an actual possibility existed that some or all of the Cases would be administratively insolvent.  At the inception of the Cases, USACM had available cash of only $400,000 and loan portfolios that were not generating meaningful or reliable revenue streams.

92.    When MFIM's efforts to obtain postpetition financing proved to be unsuccessful, it became clear that the estates would, by necessity, be funded through the time and labor of MFIM, the Debtors' professionals and the Committees' professionals.  Therefore, while the Court allowed monthly interim fee payments, MFIM received no significant payments on its outstanding invoices until January 2007, and through the Confirmation Date, had received on an interim basis compensation equal to no more than 17.7% of its then outstanding fees and expenses.  In the face of this uncertainty and attendant risk, without the contractual right to interest on its outstanding fees and advanced expenses, MFIM nevertheless devoted the skills and resources necessary to restructure the loan portfolios, correct the accounting irregularities, collect over $280 million in outstanding loans, sell marketable assets for in excess of $67 million, and confirm a Chapter 11 Plan that allowed for the controlled bankruptcy exit.

C.   *Special Skills and Experiences of MFIM Personnel*:   MFIM is a wholly-owned subsidiary of Mesirow Financial Holdings, Inc., a diversified financial services firm which also offers financial consulting, investment management, insurance services, investment banking and real estate services.   MFIM professionals retained for this engagement were all highly credentialed and included Certified Public Accountants, Chartered Financial Analysts, Certified Turnaround Professionals, Certified Insolvency and Restructuring Advisors, Certified Fraud Examiners, Certified Valuation Analysts, and numerous other experienced business professionals.  These same professionals have provided services in some of the largest and most

complex cases in the United States including UAL Corporation, Delta Airlines, Inc., Delphi Corporation, and many other cases. Attached as Exhibit B to the Final Application is a summary of the MFIM professionals' information outlining their experience and qualifications in rendering services to the Debtors during the Application Period.

93. With its engagement, MFIM devoted the necessary personnel with the required specialized skills and experience to resolve the Debtors' operating and accounting deficiencies, thereby stabilizing operations, and resulting in the collections and returns experienced by estates' creditors and investors. With MFIM's engagement, the Debtors avoided the need to employ multiple firms, each focused on different tasks. The multi-disciplinary composition of MFIM provided a seamless structure by which tasks were performed, with me as CRO, representing the focal point for purposes of communications and coordination.

D. *Customary Fees for Turnaround Advisors and Investment Bankers*: I am a senior restructuring and turnaround professional with over 27 years of business experience and if called to testify regarding the Success Fee requested by MFIM, I would testify that typically, the fee structure for the employment of a professional turnaround firm, including the appointment of a chief restructuring officer ("**CRO**"), has three components: (i) the CRO is typically paid an hourly, weekly or a monthly fee in regular intervals over the course of the engagement for performance of the duties of the CRO; (ii) other workout professionals and temporary employees who assist with the debtor's engagement are typically paid an hourly fee; and (iii) a success fee is routinely granted.

94. Although success fees are routinely granted to CROs, there is no set formula for computation of such fee. Rather, the success fee tends to be case specific and are based on the unique case demands, risks of the engagement or other factors. When the exit strategy is relatively well defined, such as when a stalking horse bidder has been identified prepetition, the

success fee may be a set amount.  When the exit strategy is less defined, it may be a flat fee or, alternatively, a stepped percentage based on the (i) recovery to creditors, (ii) sale proceeds; (iii) value created, including collections; or (iv) successful completion of the bankruptcy case.  For example, it would not be unusual for a turnaround firm to receive a certain percentage of all disbursements in the plan above a floor amount, or a percentage of the winning bid for a debtor's assets.  CRO's success fee may also be linked to a specific event or chain of events, and in such circumstances, the fee, as a percentage of the recovery, tends to increase with the risk and uncertainty associated with the engagement.

95.    As a turnaround processional and CRO, I considered these Cases to be a very risky engagement based on (a) the risk to MFIM of non-payment of its fees in light of the dire circumstances facing USACM on the Petition Date, *i.e.* USACM only had $400,000 in its bank account on the Petition Date; (b) the Debtors' lack of a viable business including: (i) the initial inadequacy of the Debtors' loan and financial accounting systems, (ii) the existence of incomplete, inaccurate and, in some instances, deliberately falsified books and records, (iii) loan files replete with missing and/or unexecuted documents, (iv) the Debtors' historic use of two separate and distinct accounting processes, (v) the existence of state and federal investigations concerning the creation and mismanagement of the loan portfolios, and (iv) the general taint of fraud which permeated the Debtors' operations and assets; and (c) the Debtors' lack of a clear exit strategy from Chapter 11.  For these reasons, MFIM is requesting a Success Fee in these Cases as described in the Final Application.

1

2          I declare, under penalty of perjury, that, to the best of my knowledge, information and

3    belief, that the foregoing is true and correct.

4

5                                              Mesirow Financial Interim Management, LLC

6                                              By _____

7                                              ---Thomas J. Allison
                                               Executive Vice President and Senior Managing

8                                              Director
                                               Mesirow Financial Interim Management, LLC

9                                              321 North Clark Street, 13th Floor
                                               Chicago, IL 60610

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28