Kaaran Thomas (State Bar No. 7193)  
McDonald Carano Wilson, LLP  
2300 West Sahara Avenue  
No. 10, Suite 1000  
La Vegas, Nevada 89102  
Telephone No.: 702.873.4100  
Fax No.: 702.873.9966  

Electronically Filed on May 11, 2007

Attorneys for Kreg Rowe, et. al.

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEVADA

In re

USA COMMERCIAL MORTGAGE COMPANY,

USA CAPITAL REALTY ADVISORS, LLC,

USA CAPITAL DIVERSIFIED TRUST DEED FUND LLC,

USA CAPITAL FIRST TRUST DEED FUND LLC,

USA SECURITIES, LLC,

　　　Debtors.

Affects:  
☒ All Debtors  
: USA Commercial Mortgage Company  
: USA Capital Realty Advisors, LLC  
: USA Capital Diversified Trust Deed Fund, LLC  
: USA Capital First Trust Deed Fund, LLC  
: USA Securities, LLC

Case No. BK-S-06-10725-LBR  
Case No. BK-S-06-10726-LBR  
Case No. BK-S-06-10727-LBR  
Case No. BK-S-06-10728-LBR  
Case No. BK-S-06-10729-LBR  

CHAPTER 11

(Jointly Administered Under  
Case No. BK-S-06-10725-LBR)

**MOTION OF KREG ROWE ET. AL, TO QUASH SUBPOENAS (INSOFAR AS SUBPOENA SEEKS RECORDS OF THE ABOVE LISTED ENTITIES AND INDIVIDUALS) DIRECTED TO WELLS FARGO BANK, N.A., WELLS FARGO BANK OF NEVADA, NEVADA STATE BANK, JP MORGAN CHASE, BANK OF THE WEST, OPPENHEIMER FUNDS, BANK OF AMERICA, CITY BANK, KREG ROWEW, BRETT SEABERT, OR IN THE ALTERNATIVE, MOTION FOR PROTECTIVE ORDER**

Hearing Date:　June 15, 1007  
Hearing Time:　1:30 p.m.

///  
///  
///  
///  
///

Kreg Rowe et. al.[1] ("the Movants") file this Motion seeking to quash Subpoenas directed to Wells Fargo Bank, N.A., Wells Fargo Bank of Nevada, Nevada State Bank, JP Morgan, Bank of the West, Oppenheimer Funds, and Bank of America ("the Banks") and Kreg Rowe and Brett Seabert (the "Individuals"). This Motion is supported by the Declaration of Brett Seabert in support of the Motion, the pleadings previously filed in this case identified herein, the points and authorities below, and the exhibits attached hereto.

I.  FACTUAL BANKGROUND

1.  On January 8, 2007 this Court entered its Order Confirming the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization as Modified[2]. Pursuant to paragraphs 10 and 28 of the Plan on the Effective Date, all assets of the USACM Estate not collected or disposed of on or prior to the Effective date,

---

[1] McDonald Carano Wilson LLP's additional clients and Movants to this motion are: Brett Seabert, B & L Investments, Inc., Cabernet Highlands, LLC, Caughlin Club Management Partners, LLC, Caughlin Club Real Property Investors, LLC, CCRE Investors, LLC, Chardonnay Village Investors, LLC, Classic Residences, LLC, Comstock Village Investors, LLC, DDH Financial Corp, Diamond Village Investors 11, LLC, Diamond Village Investors 1 & 12, LLC, Double Diamond Homes, LLC, Double Diamond Management Company, LLC, Emigh Investments, LLC, Equus Management Group, Inc., Foothill Commerce Center, LLC, Homewood Village Investors I, LLC, La Hacienda Land Investors, Inc., Longley Town Centre, LLC, Longley Professional Campus, LLC, The Meadows Investors, LLC, Miners Village Investors, LLC, Monticello Investors, LLC, Mountainview Campus Investors, LLC, MP Tanamera, LLC, Pioneer Village Investors, LLC, Preserve at Galleria, LLC, Reno Corporate Center, LLC, Reno Design Center, LLC, Rowe Family Trust, RTTC Communications, LLC, Sandhill Business Campus, LLC, Sierra Vista Investors, LLC, South Meadows Commercial Property, LLC, South Meadows Office Investors, LLC, Sparks Galleria Investors, LLC, Sparks Galleria Investors II, LLC, Tanamera Commercial Development, LLC, Tanamera Corporate Center, LLC, Tanamera Development, LLC, Tanamera Homes, LLC, Tanamera Resort Condominiums, LLC, Tanamera Resort Partners, LLC, TCD Financial Corp, TCD Land Investments, LLC, Vineyard Highlands, LLC, The Vineyard Investors, LLC, Vineyard Professional Campus, LLC, Waterford Partners, LLC, Wyndgate Partners II, LLC, Wyndgate Village Investors, LLC, Michael Efstratis, Kraig Knudsen and Joe Lopez.

[2] Movants request the Court to take judicial notice of the Order and of the Third Amended Plan pursuant to Federal Rule of Evidence 201.

2

1. including all USACM Litigation Claims, minus any Cash needed to make required payments, vested in the USACM Trust.

2. On March 6, 2007 and April 9, 2007, the attorneys for the USACM Liquidating Trust ("the Trust"), filed several motions for Rule 2004 examinations. Apparently, in response to the various Motions, Special Litigation Counsel for the Trust, executed and served several twenty-four (24) page Subpoenas, containing ninety-three (93) requests for documents maintained at **any** Wells Fargo Bank branch and, upon information and belief, at any branch of Nevada State Bank, JPMorgan Chase Bank, Bank of the West, Bank of Commerce, Desert Community Bank, Oppenheimer Funds Citibank (Nevada), Bank of America, N.A.[3] (the "Banks") relating to **188 different companies/entities** and **36 different individuals,** which included all the Movants. Although the subpoenas were directed to the Banks, the information requested by the Subpoenas includes the personal and private banking information of the Movants. A true and correct copy of the Wells Fargo Subpoena is attached hereto as Exhibit "A" and incorporated herein by reference. On April 26, the Trust filed two additional Motions for 2004 Examinations of Kreg Rowe and Brett Seabert. True and correct copies of the Rowe and Seabert subpoenas are attached hereto as Exhibits "C" and "D".

3. In these motions, true and correct copies of which are attached hereto as Exhibits B-1 through B-12, the Trust fails to explain to the Court, and actually misleads the Court as to the purpose of the Rule 2004 examinations. For example, in the Motion filed for examination of the Bank of America's custodian of records, the Motion merely states:

> The Movant seeks information concerning the *legal services* in performed by BofA on behalf of USACM, the other debtors in the

---

[3] This motion does not seek to quash the subpoenas served upon Citibank, Desert Community Bank, or the Bank of Commerce.

above-captioned cases (together with USACM, the "Debtors"), affiliates, subsidiaries, parents or otherwise related entities. The Movant seeks this information to assist in the collection of the assets of the investigation of the liabilities of the Debtors.

(*Id.*) (Docket No. 3389) (emphasis added).[4] This same paragraph appears eight motions. (*See* Docket Nos. 3381-3389).[5] None of these motions, however, included a copy or draft of the subpoena as an exhibit that was intended to be served in the event the motion(s) were granted.

4.  On April 10, 2007 and April 20, 2007 the Court entered orders granting the Trust's Rule 2004 motions. Thereafter the first ten subpoenas to the banks (the "Bank Subpoenas") were served. Neither the Bank subpoenas nor the Motions and orders were provided to Movants at the time. The Bank subpoenas, as described above – are twenty-four (24) pages, containing ninety-three (93) requests for documents maintained at **any** of the bank branches listed for the various bank and financial institutions, relating to **188 different companies/entities** and **36 different individuals**. These subpoenas, like that subpoena described above, request vast amount of private and personal banking information of the Movants that are entirely unrelated Debtors in this case. In fact, the Subpoenas request *a vast array of records, the majority of which are unrestricted requests as to any subject matter* and *not restricted to anything having to do with the Debtor entities*.

---

[4] It is unlikely that any of these banks provided "legal services" to USACM, which is the basis of the documents and the Rule 2004 examinations requested. Each of these entities is either a bank or banking institution.

[5] Note that Trust filed a Second Amended Motion regarding the Wells Fargo 2004 Examination, and that motion sought an examination regarding "financial services, wire transfers and other services." (Ex. B). Such amended motions were not filed with regard to the other financial institutions which are recipients of the abusive subpoenas.

5. For example, among other documents being sought, these Subpoenas seek the following documents related to individuals, including from the Movants:

> 3. Any and all documents evidencing any and all accounts at Wells Fargo held in the name of or for the benefit of any of the Individuals,
> 9. Any and all documents evidencing the transactions and/or activity in the accounts at Wells Fargo held in the name of or for the benefit of any of the Individuals.
> 12. Any and all documents evidencing the history of the relationship between any of the Individuals and Wells Fargo.
> 43. Any and all documents evidencing loans or other forms of credit extended to any person or company affiliated with the Debtors, Entities, and/or Individuals by Wells Fargo and the terms thereof.
> 54. Any and all documents evidencing wire transfers received or sent by Wells Fargo with reference to any accounts at Welts Fargo held in the name of or for the benefit of any of the Individuals.
> 66. Any and all documents evidencing Wells Fargo's knowledge of the sources and uses of funds deposited into any accounts at Wells Fargo held in the name of or for the benefit of any of the Individuals.
> 69. Any and all documents evidencing Welts Fargo's knowledge of the business activities of any Individuals.
> 81. Any and all documents evidencing any participation by Wells Fargo in any loans extended by any Individuals to a third party.

(*See, for example*, Wells Fargo Bank, N.A. subpoena, attached hereto as Ex. A) (each of the other subpoenas is identical in language and content).

6. The scope of the documents requested from the various banks and financial institutions as to companies/entities, is equally as broad, including, for example, the following:

> 2. Any and all documents evidencing any and all accounts at Wells Fargo held in the name of or for the benefit of any of the Entities.
> 8. Any and all documents evidencing the transactions and/or activity in the accounts at Wells Fargo held in the name of or for the benefit of any of the Entities.
> 11. Any and all documents evidencing the history of the relationship between any of the Entities and Wells Fargo.

5

> 46. Any and all documents evidencing correspondence and communications between any of the Entities and Wells Fargo....
> 50. Any and all documents evidencing meetings between Wells Fargo and any Entities.
> 53. Any and all documents evidencing wire transfers received or sent by Wells Fargo with reference to any accounts at Wells Fargo held in the name of or for the benefit of any of the Entities.
> 65. Any and all documents evidencing Wells Fargo's knowledge of the sources and uses of funds deposited into any accounts at Wells Fargo held in the name of or for the benefit of any of the Entities.
> 68. Any and all documents evidencing Wells Fargo's knowledge of the business activities of any Entities.
> 80. Any and all documents evidencing any participation by Wells Fargo in any loans extended by any Entities to a third party.

(*Id.*)

7. As already indicated, these Bank subpoenas are not restricted to documents and records pertaining to transactions related to the five Debtor entities.

8. The subpoenas to Kreg Rowe and Brett Seabert (the "Individual subpoenas") which were not even mentioned in the 2004 Motions, treat Row and Seabert as "Corporate Representatives" and require them to produce documents for the same 188 entities. None of the entities were subpoenaed.

9. The Debtors never had an ownership interest in any of the Movant companies. (Brett Seabert Decl., Ex. C). Rather, USA Investment Partners, LLC ("USAIP"), which is not a Debtor in this action, has or had an ownership interest (directly or indirectly) in only 13 of the 51 Movant companies.[6] USAIP is an

---

[6] Movants are informed and believe that USAIP has pledged such membership interests to USACM as collateral for a note which is currently not in default.

6

alleged debtor in an involuntary Chapter 11 proceeding, Case No. 07-11821-LBR, filed before this court.[7]

10. For example, Seabert Declaration identifies many Movant entities that never received a loan or any type of funding from USACM and many entities in which USAIP has never been an owner or member.

11. However, regardless of their relationship with USACM or USAIP, none of the Movants should not be subject the intrusive subpoenas into their personal financial data.[8]

12. The subpoenas also go so far as to seek the personal financial records of several employees of the Movant entities. Movants Kreg Rowe, Brett Seabert, Kraig Knudsen, Joe Lopez and Mike Efstratis are employed by Tanamera Commercial Development. (*Id.*).

13. Despite a history of negotiations and cooperation between Movants' representatives Mssrs. Brett Seabert and Kreg Rowe and counsel for the Trust, none of the Movants were notified that records related to Movants were the subject of a Subpoena in Nevada nor were courtesy copies provided to the Movants' counsel. (*Id.*).

14. After Movants learned of the subpoenas Movants offered to meet with the Trust representatives to discuss any known transfers of funds from USACM or the Diversified Trust Deed Fund into the subject bank accounts and

---

[7] USAIP did not seek the subpoenas. The subpoenas are an attempt to exercise control over USAIP's assets, and such conduct is stayed by 11 U.S.C. Section 362.

[8] Only two currently have loans outstanding: Cabernet Highlands, LLC and Tanamera Commercial Development, LLC. (*Id.*). However, Tanamera Commercial Development, LLC has been informed that its loan was transferred to USAIP. (Ex. C).

provide records. This response was met with silence. Instead, the Trust representatives sent a letter to one or more of the banks purporting to "modify" their subpoena. The proposed unilateral modification does not remove the force of the subpoenas and it requires the Banks to determine in which of the accounts USACM, the Diversified Trust Deed Fund or USAIP has an interest or is "manager". A true and correct copy of a sample letter is attached hereto as Exhibit "E". Following further attempts to resolve their disputes the Trust unilaterally filed the April 26 Motions against the Individuals. Upon information and belief the Trust continues to file Motions for Rule 2004 exams relating to Movants.

II.  LEGAL ARGUMENT

   A.  <u>Standard For Review Of A Motion To Quash 2004 Examinations</u>.

   15. Movants seek an order quashing the Rule 2004 examination subpoenas because: (1) such motions and subpoenas are not proper after the USACM plan of reorganization has been confirmed and all of the Debtors' assets have been transferred to the Trust; (2) such discovery would be beyond the scope of a 2004 examination even if the USACM case were still a Chapter 11 because it bears o apparent relationship to property that was once owned by the Debtors other than premature post-judgment discovery; (3) the Movant's personal, confidential financial records have no relation to the Debtors or this bankruptcy proceeding; (4) Rowe and Seabert are not the proper persons to subpoena for the corporate records of 188 entities – the Trust must subpoena the entities and their custodians of records; (5) the subpoenas are abusive and harassing; (6) the Rule 2004 motions filed by the Trust were improper and the subpoenas issued do not accurately reflect the information sought and ordered by the Court; and (6) the Movants' interest in the privacy of their financial

records far exceeds the Trust's need for this information. See Fed. R. Bankr. P. 2004; Fed. R. Civ. P. 45(c). Thus, the motion to quash should be granted.

16. In the context of a Rule 2004 examination, once a motion to quash has been filed, the burden is placed in the examiner to prove that "good cause exists" for taking the required discovery. *In re Dinubilo*, 177 B.R. 932, 943 (Bankr. E.D. Cal. 1993). "Good cause" may be established if the party seeking the examination can show that it is "necessary" or that denial of the subpoena will cause the examiner undue hardship or injustice. *Id.* Here, there is no good cause.

B. <u>The 2004 Examinations Are Not A Proper Exercise Of Post-Confirmation Jurisdiction</u>

17. The administration of the Debtors' bankruptcy cases concluded on January 8, 2007 when the Debtors' joint plan was confirmed by the Court. The estate assets were vested in the various post-confirmation entities. It is not clear for what purpose the Trust seeks to use the subpoenaed information. However, given the overly broad scope of the subpoenas and the massive net cast over the various entities and individuals, it can only be presumed that the intended purpose of obtaining this information is to obtain inappropriate pre-litigation discovery.

18. This purpose is not proper. Long ago, the court in Good Hope Refineries noted:

> "Rule 205 [precursor to Rule 2004) is intended to provide the Trustee, generally new to the case, with a very broad discovery device to aid in an efficient and expeditious ingathering of all of the pertinent facts necessary in the effective administration of the estates.
> It is not intended to give the rehabilitated debtor post confirmation a strategic advantage in fishing for potential private litigation. Our basic concept of fair play expressed in the constitutional legalese of equal protection and due process should require all litigants to use the same discovery and procedural rules when not directly engaged in those activities that call for the bankruptcy umbrella, namely, that collection of activities characterized as the administration of the estate." *In re Good Hope Refineries, Inc.*, 9 B.R. 421, 423

(Bankr.D.Mass.1981); In re GHR Energy Corp., 35 B.R. 534, 537 (Bankr.D.Mass.1983).

19. Since enactment of the new bankruptcy rules, courts have continued to hold that examinations of matters having no relationship to the bankrupt's affairs or the administration of the estate are improper. *Keene Corp. v. Johns-Manville Corp.*, 42 B.R. 362, 364 (Bankr.S.D.N.Y. 1984); *Dinublio*, 177 B.R. at 940.

20. If the Rule 2004 examination is attempted post-confirmation, as is the case here, the examination is restricted to the administration of the case post-confirmation – that is to say limited to issues which court at that time still has power to entertain. *Cinderella Clothing Industries*, 93 B.R. 373 (Bkrtcy E.D. Pa. 1988)

21. The 2004 Motions did not even address this requirement. Moreover, the Motions could not meet this requirement because the matters which are the subject of the Motions deal with assets belonging to the Trust not to the estate.

22. There admittedly exists a residue, albeit limited, of court authority over a confirmed chapter 11 case. Courts have recognized the competing interests between retaining jurisdiction after confirmation until entry of the final decree (see Bankr.R. 3020), and ending the 'tutelage' status of reorganization. There is no doubt that the bankruptcy court's jurisdiction continues post confirmation to "protect its confirmation decree, to prevent interference with the execution of the plan and to aid otherwise in its operation." Id., quoting In re Dilbert's Quality Supermarkets, Inc., 368 F.2d 922, 924 (2d Cir 1966). See also 11 U.S.C. § 1142.

23. The proposed examinations do not serve this purpose. Rather – they seek to use a bankruptcy estate's powers to quickly ascertain the estate's assets and liabilities for the benefit of the post-confirmation Trust. There is no legal

basis for this attempt.

24. The court does not have jurisdiction over post-confirmation controversies, even when the basis for those controversies may have been covered in a plan of reorganization. *In re J.T. Gerken Trucking, Inc.*, 10 B.R. 203, 204 (Bankr.N.D.Ohio 1981), the court concluded that "affirmation of the [collective bargaining] agreement in the plan does not confer jurisdiction upon the [bankruptcy] court over post confirmation controversies. A confirming court's jurisdiction is limited to matters concerning the operation of the plan." See also *Hall's Motor Transit*, 889 F.2d 520,522 (3rd Cir. 1989). ("The bankruptcy court's jurisdiction does not follow the property, but rather, it lapses when the property leaves the estate.").

25. Similarly, in *In re Express One International, Inc.*, 217 B.R. 215, 216-17 (Bankr.E.D.Tx.1998)a creditor, which had filed pending administrative claim seeking payment for postpetition maintenance work it performed on the Chapter 11 debtor-in-possession's aircraft, filed a motion for order allowing postconfirmation Rule 2004 examination of the debtor and for production of documents. The Bankruptcy Court examined the scope of Rule 2004 after plan confirmation and held that the examination would be limited in scope to the single issue of whether the debtor was setting funds aside to pay creditor's administrative claim, should creditor ultimately prevail on its claim. (instructing that in a post-confirmation situation, Rule 2004 examination is limited to matters relating to the administration of the case).

C. <u>The Trust Failed To Specify the Scope and Nature of the Examination</u>

26. The 2004 Motions fail to state how the matters sought relate to post-confirmation jurisdiction. Persons seeking Rule 2004 examinations must specify the scope and nature of the examination. *Enron*, 281 B.R. at 840. See Fed. R. Bankr. P. 9013 requires that a motion shall state with particularity the

grounds therefore, and shall set forth the relief or order sought.

27. The Rule 2004 examinations and related subpoenas violate each of these restrictions. In addition, there is little doubt that the financial privacy interests of the various Movant entities and individuals far outweighs any minimal need for the information sought. Therefore, the Trust cannot meet its burden of establishing "good cause" and the subpoenas must be quashed.

D. <u>The Discovery Requested Is Sought For The Purpose Of Abuse And Harassment.</u>

28. Given the extreme overbreadth of these subpoenas, there is little question that an additional purpose of this discovery is to abuse and harass the Movants and their banks – not to seek relevant information concerning the Debtors or the post-confirmation bankruptcy estate. The abusive and harassing nature of these subpoenas is evidenced by the sheer volume of the information sought which includes *all documents and information* regarding *any account* held at *any time* at *any* of the subject banks or financial institutions **personal and private banking information of fifty Movant entities and individuals**, the vast majority of which have had no involvement with USACM. (*See* Ex. A). These subpoenas specifically seek ninety-three (93) categories of documents and information that range from a variety of items for all of these entities and individuals – without any limitation to the relevancy of the information to the particular entity or individual. (*Id.*). The effect of the subpoenas may well be to damage the relationship of the Movant entities and individuals with their lenders.

29. Moreover, these requests are made for a period of time beginning in January 1997 to the present -- again without any attempt to define or limit the information sought to relevant entities, individuals or information. The abusive nature of these subpoenas does not stop there but is further buttressed by the

12

definitions provided for the subpoenaed entities' compliance. As just one example, "documents" being defined in the subpoenas as:

> All originals, drafts, modifications of originals, of written, printed, typed, graphic, recorded, and visually or orally produced material of any kind, whether or not privileged, and includes but is not limited to, correspondence, business records, telephone records and notations, diaries, calendars, minutes, contracts, agreements, orders, receipts, invoices, bills, pictures, drawings, or sketches, blueprints, designs, notebooks, advertising, and commercial literature, promotional literature, of any kind, cables, telexes, telegrams, recordings, patents, lists, charts, pamphlets, appendices, exhibits, summaries, outlines, logs, journals, agreements, work papers, statements, records of inventory, financial and/or accounting records, catalogues, trade journals, and other documented or recorded information. The term "document" also includes every other manner by which information was recorded or transmitted, including but no limited to, microfilms, punch cards, disks, tapes, computer programs, printouts, all recordings made through data processing equipment to obtain the information recorded by that method. The term "document" refers to copies, duplicates, and/or counterparts only where (i) the copy, duplicate, or counterpart is not exactly identical to the original or (ii) your records only contain a copy, duplicate, or counterpart of the original and not the original itself.

(See Ex. A, pp. 1-2.)

30. The abusive and harassing nature of these subpoenas is fully apparent from the lengthy, confusing and overly inclusive definitions and requests provided by the Trust. Finally, it goes without saying that the time, effort and manpower necessary to comply with such improper subpoenas would be enormous and onerous. In short, these subpoenas go far beyond even a typical Rule 2004 "fishing expedition."

> Instead [the Committee] using rod and reel, or even a reasonably sized net, [the Committee] would drain the pond and collect the fish from the bottom. This exercise goes beyond the bounds set by the discovery rules.

*In Re IBM Peripheral EDP Devices Antitrust Litig.*, 77 F.R.D. 39, 42-43 (Bankr.C.D. Cal. 1977). In fact, it seems that the Trust seeks to drain an *ocean*, to find *possible* fish at the bottom of the sea. This can hardly be seen as anything short of abusive and harassing.

### E. The Motions Filed by the Trust Were Improper and The Subpoenas Seek Information Not Requested Or Stated In Those Improper Motions.

31. Even if such a motion were proper, a Rule 2004 examination may only be taken after a proper motion is filed and granted by the court. Fed. R. Bankr. P. 2004(a). The motion must state with particularity "the grounds for the motion" and "set forth the relief sought." Fed. R. Bankr. P. 9013. Thus, at a minimum, a motion for a Rule 2004 examination must specify the scope and nature of the examination requested. *See* Collier on Bankruptcy, ¶ 2004.01[2] (15th Ed. 2006). These basic requirements were not met.

32. The Trust's motions fail to meet this requirement. The Motions are misleading in what they seek. In all but one of the Bank motions, the Trust simply states as that: "The [Trust] seeks information concerning *legal services* performed by BofA on behalf of USACM, the other debtors in the above-captioned cases . . . ." (*See* Ex. B at p. 2:10-12) (emphasis added). Besides the general statement seeking information about the legal services provided to debtors allegedly by these institutions, there is no explanation by the Trust as to how the information sought is relevant or reasonably related to the debtors or the bankruptcy, much less to the post-confirmation administration of the estate; how the information will be gathered, what information will be requested and what, if any, private or confidential information from third parties may be implicated. In fact, the Trust did not even attach a draft subpoena to any one of these motions. Had the Trust done so – it would have revealed what the Trust was actually seeking -- substantial confidential, private financial information of a multiple different entities and individuals spanning over a decade.[9]

33. Worse still, although the Trust's moving papers sought only

---

[9] In total, these overbroad subpoenas sought private, confidential financial information concerning over **188 different companies/entities** and **36 different individuals** via **93 separate requests** for information. Of those fifty-one represent the Movants.

"information concerning *legal services* performed" by the various banks and financial institutions (*Id.*) the subpoenas issued did not seek any documents or information pertaining to "legal services." (Ex. A). Rather, these subpoenas seek an excessively large amount of financial information, including banking account information, private financial account information from individuals and other like information – which has nothing to do with rendering "legal services." For example, the requests seek "documents and evidence of any and all accounts" at the various banks or documents in the name or for the benefit of the various movant entities and individuals and so on. (*See* Ex. A, p. 13 ¶¶ 2-3). Therefore, as the Trust was granted information to conduct a Rule 2004 examination of these various entities to determine the "legal services" provided to the debtors, the attempt by the Trust to obtain information never requested from the Court is highly improper. Accordingly, the subpoenas issued are procedurally defective and must be quashed.

F.  Rowe and Seabert Are Not Corporate Representatives

34. The Motions for Seabert and Rowe are similarly misleading. The subpoenas disclose that the Trust seeks to examine Seabert and Rowe as corporate representatives – not as individuals. The Motions contain no such disclosure. The Individual motions are a thinly-veiled attempt to avoid paying for 188 corporations to be examined. There is no legal basis for permitting Movants to avoid paying proper costs and expenses associated with discovery.

G.  The Movants' Interests In Privacy Outweighs The Trust's Need For The Discovery Sought.

35. Finally, in determining whether the Trust has established "good cause" as required under Rule 2004, the Court must weigh the competing interests of the parties. *In Re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 712 (Bankr.S.D.N.Y. 1991). Thus, the Court must weigh the need for the requested discovery against the interests of the party seeking to protect

the information. *Id.*

36. Here, the Trust cannot provide any legitimate, good cause basis for the relevancy or the need of the requested information. As detailed above, the information sought and the manner in which it was requested, establishes that there is little, if any, relationship between Movants and the Debtors or the bankruptcy proceedings at issue.

37. The information sought from the Banks is personal, confidential financial information of the Movants. The Movants have legitimate privacy interests in their personal, confidential financial information. *See e.g., Whalen v. Roe*, 429 U.S. 589 589 (1977) (recognizing fundamental constitutional right to privacy includes a right to informational privacy). This legitimate interest of privacy in one's financial information is supported by the overwhelming number of laws which specifically protect these vary privacy interests. *See e.g.* 18 U.S.C. § 1693, 1693m (Electronic Funds Transfer Act); 15 U.S.C. ¶ 1681 *et. seq.* (Fair Credit Reporting Act); 5 U.S.C. ¶ 552 (Freedom of Information Act); 15 U.S.C. § 6801 *et. seq.* (Gramm-Leach-Bliley Act); 5 U.S.C. § 552a (Privacy Act); 12 U.S.C. § 3401 *et. seq.* (Right to Financial Privacy Act).

38. Thus, on balance, there is little question that the privacy interests of the Movants in their personal, confidential information far outweighs the interests of the Trust in collecting this irrelevant information.

39. In sum, the Trust cannot establish the required "good cause" to overcome this motion to quash for all of the reasons listed above.

H. <u>Movants Are Entitled To A Protective Order.</u>

40. Even if this Court disagrees, Movants request that the Court enter a protective order limiting the information sought pursuant to the Trust's requests and entry of an order sealing the personal, confidential financial information and documents received by the Trust. Fed. R. Bankr. P. 9018.

41. The Court may "make an order which justice requires (1) to protect

the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information." Fed. R. Bankr. P. 9018; *see also* In re Drexel Burnham Lambert Group, Inc. 123 B.R. 702, *711-712 (Bankr.S.D.N.Y. 1991) (explaining that a Rule 2004 fishing expedition "can net the dolphins as well as the tuna; however, the net, in the discretion of the Court, can be carefully stitched to limit its catch.").

42. Before, this Court permits the unlimited discovery via these subpoenas, the Movants request that this Court require the Trust to limit their search to only those entities and individuals that may have some relevant information concerning the debtor and/or the bankruptcy proceeding. *See Dinublio*, 177 B.R. at 940 (instructing that, "Third parties subject to examination pursuant to Rule 2004 are 'only [ ] those persons possessing knowledge of the debtor's acts, conduct or financial affairs so far as this relates to a debtor's proceeding in bankruptcy."). Movants further request that the Trust be required to make a showing or offer of proof that there is a financial link between the Debtors and the Movants' personal financial records.

43. Finally, to the extent that the Court permits the information subpoenaed to be provided to the Trust, the Movants request that the Court enter an order compensating Movants for the enormous expense involved in complying with the subpoenas and sealing the personal, confidential financial information of Movants from the public record and forbidding the Trust from sharing or exposing the information to any third party without first obtaining court approval. Recall, the information requested is "commercial information." *See* Fed. R. Bankr. P. 9018. If this information exposed, this private, confidential information would be the subject of the perusal by individuals and entities having no basis or need for such information and who could use the information improper uses – such as identity theft. Moreover, this personal, confidential financial information could be used by Movants' competitors.

44. Thus, at a minimum, Movants request a protective order: (1) limiting the scope of the information that may be requested to only those entities and individuals that have relevant information that bears some rational relationship to the debtors and/or the bankruptcy upon a proper offer of proof; and (2) compensating Movants for the cost and expense of compliance and (3) sealing the personal, confidential financial information of the Movants from the public record and requiring the Trust to obtain court approval before revealing this information to third parties.

III. CONCLUSION

45. Movants respectfully request that the Court grant their Motion to Quash the Subpoenas in its entirety prohibiting the Trust from obtaining personal, confidential financial documents and records from the Banks. In the alternative, Movants request that the Court enter a protective order limiting the information that may be obtained by the Trust and sealing that information from the public record and from disclosure to third parties.

DATED: May 11, 2007        MCDONALD CARANO WILSON, LLP

By: /s/ Kaaran Thomas
Kaaran E. Thomas
Attorneys for Movants

209761.6