George A. Davis
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Telephone No.:    (212) 504-6000
Facsimile No.:    (212) 504-6666

**E-Filed on May 25, 2007**

Peter Bernhard (State Bar No. 734)
Bullivant Houser Bailey PC
3980 Howard Hughes Parkway, Suite 550
Las Vegas, Nevada  89169
Telephone No.    (702) 650-6565
Facsimile No.    (702) 650-2995
E-Mail:          peter.bernhard@bullivant.com

Counsel for Compass Financial Partners LLC

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND,<br>LLC,<br>Debtor. | **EMERGENCY MOTION OF COMPASS<br>FINANCIAL PARTNERS LLC FOR<br>ORDER PURSUANT TO 11 U.S.C. §§ 105<br>AND 1141 ENFORCING<br>CONFIRMATION ORDER AND FOR<br>CIVIL CONTEMPT SANCTIONS** |
| In re:<br>USA SECURITIES, LLC,<br>Debtor. | |
| Affects:<br>☐ All Debtors<br>☒ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund,<br>LLC<br>☐ USA First Trust Deed Fund, LLC | Date:  May [xx], 2007<br>Time:  9:30 a.m. |

USActive 8729667.5

Compass USA SPE LLC, and its servicer, Compass Financial Partners LLC (together, "Compass"), the purchaser of substantially all of the assets of USA Capital First Trust Deed Fund, LLC ("FTDF") and certain assets of USA Commercial Mortgage Company ("USACM"), by and through its counsel, submits this emergency motion (the "Emergency Motion") pursuant to sections 105 and 1141 of chapter 11, title 11 of the United States Code (the "Bankruptcy Code") for an order enforcing the Order Confirming the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization (the "Confirmation Order") and for civil contempt sanctions.  In support hereof, Compass respectfully represents as follows:[1]

## SUMMARY OF RELIEF REQUESTED
## AND NEED FOR EXPEDITED HEARING

1.      In willful disregard for the chapter 11 process, the authority of this Court, and the express language within the very Loan Servicing Agreements they each executed, a group of individuals labeling themselves the "Lenders Protection Group" (the "LPG") has attempted to take the law into their own hands in direct contravention of the Confirmation Order in a coordinated, systematic campaign based upon misrepresentation and deception to re-write the terms of their contracts, wrongfully terminate Compass without the requisite notice or showing of cause, and take for themselves servicing rights and fees for which Compass paid the estates approximately $67 million.  If this conduct sounds familiar to the Court, it is for good reason.  Donna Cangelosi and the LPG have a long history of attempting to disrupt the Debtors' chapter 11 cases and seeking to

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Confirmation Order.

interrupt Compass's efforts to acquire the Loan Servicing Agreements and service the Loans for which it paid fair value.

        2.     By letters dated May 18, 2007 (collectively, the "Threat Letters"), LPG advised each and every borrower under not fewer than fifty (50) of the Loans that "**Compass is not authorized to act on behalf of the lenders of the Loan for any purpose whatsoever**" and warned the borrowers that, notwithstanding their payment obligations under the Loans, "**All payments made to Compass shall be at your own peril.**"[2] In the Threat Letters, Cangelosi directed borrowers under the Loans to make all future payments to Lender 2 Lender, LLC ("L2L"), a Nevada limited liability company established by Cangelosi to realize the very servicing fees and rights acquired by Compass, and to contact L2L for all information regarding the Loans.[3]

        3.     Contemporaneously with sending the Threat Letters, Cangelosi sent to Compass letters advising Compass of the purported termination of its rights to service the applicable Loans (collectively, the "Termination Letters"). According to the Termination Letters, the termination of Compass's rights under the Loan Servicing Agreements is purportedly based on Nevada Administrative Code 645B.073 and not pursuant to the terms of the Loan Servicing Agreements themselves.

        4.     In anticipation of sending the Threat Letters and Termination Letters, the LPG, Cangelosi, Hansen and counsel for the LPG caused to be formed as new Nevada LLCs approximately fifty (50) entities (collectively, the "Direct Lender LLCs"),

---

[2] These letters are only the most recent and most damaging tactic the LPG has employed to attack the Plan, and render the Loan Servicing Agreements valueless.

[3] Under the proposed new Loan Management Agreements between the Direct Lender LLCs and L2L, L2L would be entitled to collect servicing fees approximating **four percent** per annum **plus** any late fees and default interest collected after lenders received principal and interest. *See* Blatt Declaration, Exhibit F (sample Loan Management Agreement and Direct Lender LLC operating agreement).

representing that same number of loans whose servicing rights were purchased for substantial value by Compass. The Direct Lender LLCs are formal vehicles for Direct Lenders in each Loan to contribute their loan participation interests in exchange for LLC membership interests and, thereby, attempt to thwart Compass's loan participation repurchase rights under section 2(c)(iii) of the Loan Servicing Agreements.[4]

      5.      As set forth below, the LPG undertook this action without any basis, and in direct violation of the Loan Serving Agreements and the Confirmation Order. This Court's Confirmation Order requires that "**After the Closing, the Direct Lenders are obligated to comply with the terms of the applicable Loan Servicing Agreements . . . .**" Confirmation Order ¶ 47. As this Court has recognized, an attempt to change loan servicer is effectively an effort to terminate the Loan Servicing Agreement, which can be accomplished only (i) with the consent of fifty-one percent (51%) of the holders of the beneficial interests of a loan; (ii) on thirty (30) days written notice to Compass; and (iii) for cause. The Direct Lenders, acting at the behest of the LPG, ignored the requirements of the Loan Servicing Agreements and the Confirmation Order and instead purported to terminate the Loan Servicing Agreements effective immediately, without advanced notice to Compass or any attempt to justify their actions based on purported defaults under the Loan Servicing Agreements.

      6.      Contemporaneously with mailing the Threat Letters and the Termination Letters, certain Direct Lenders, represented by the LPG's attorney, filed a

---

[4] Direct Lenders are being induced to become members of the Direct Lender LLCs based on the false promise of sharing in 50% of all default interest and late charges collected from the applicable borrowers, when Compass's purchased rights to such default interest and late charges are not capable of being compromised, waived, or subordinated by any Direct Lender or subsequent servicer pursuant to this Court's Confirmation Order.

complaint commencing an action in the United States District Court for the District of Nevada (the "District Court Action") that is replete with misrepresentations regarding Compass. Despite the broad grant of exclusive jurisdiction to this Court through the Plan and Confirmation Order, the complaint asks a different court to issue a declaratory judgment that would invalidate provisions of the Confirmation Order and rewrite critical provisions of the Loan Servicing Agreements. Compass has filed a notice of removal regarding the District Court Action and it has been removed to this Court. The District Court Action is yet another attempt by the LPG to unjustifiably deprive Compass of the rights for which it paid fair value pursuant to procedures that were approved by this Court.

7.    Absent immediate intervention by the Court, this latest effort by Cangelosi, the LPG, Hansen and other Direct Lenders to circumvent this Court's jurisdiction is likely to have its intended effect; *i.e.,* to wreak havoc among the borrowers and Direct Lenders and potentially render the Loan Servicing Agreements valueless. Indeed, Compass has already received communications from borrowers expressing confusion as to the legitimacy and effect of the Threat Letters while others have refused to acknowledge Compass as the servicer of their Loans. The situation will surely be exacerbated as borrowers are faced at the beginning of June -- when payments under a significant number of the Loans are due -- with the difficult decision of whether to remit timely payments to Compass or to the newly created L2L entity, or to not remit payment at all.

8.    While contumacious and reckless, the Threat Letters, Termination Letters and commencement of the District Court Action is consistent with the prior

conduct of Donna Cangelosi, Todd Hansen and the LPG.  They have been persistent objectors to the Debtors' efforts to realize value for the estates by, among other things, objecting to the sale of the Loans to Compass, objecting to confirmation of the Plan, and then objecting to the proposed order and findings of fact regarding confirmation of the Plan.  Even after the Court approved the Plan and entered the Confirmation Order, Cangelosi, Hansen and the LPG have persisted: they appealed and then sought a stay of the Confirmation Order.  Outside of this Court, Cangelosi, Hansen and the LPG have actively petitioned for the denial of Compass's application for a Nevada License (all the while objecting to Compass's failure to be licensed in Nevada), and then attempted to prevent Compass from servicing loans outside of Nevada.  In what they regarded as a "test case" for a strategy to remove Compass as servicer for all Loans, Cangelosi, Hansen and the LPG supported removal of Compass as servicer under the Fiesta Oak Valley Loans through a tactic that was rejected by the Court.  Just this past weekend, Cangelosi, Hansen and the LPG conducted eight meetings with Direct Lenders in three states in furtherance of their continued efforts to remove Compass.

9.    Cangelosi, Hansen and the LPG's continued disregard of this Court's orders and efforts to retaliate against Compass on account of rights properly granted to Compass pursuant to agreements approved by this Court must not be countenanced, particularly given that the latest victims are not only Compass, but also the borrowers in at least fifty (50) Loans and the Direct Lenders that are not part of the LPG. Compass therefore asks this Court to enforce the Confirmation Order by ordering that the effectiveness of the Threat Letters and the Termination Letters will be stayed pending an evidentiary hearing before this Court at which Direct Lenders will be given the

opportunity to demonstrate that the purported termination of the Loan Servicing

Agreements is proper procedurally and substantively under the terms of the relevant Loan

Servicing Agreements.  Compass requests the Court to maintain the *status quo* in the

interim, allowing Compass to remain the servicer under the Loans until further order of

this Court.   Further, in light of the willful disregard of the Court's orders, civil contempt

sanctions should be issued against Cangelosi, the LPG, and Hansen.

## FACTUAL BACKGROUND

### The Debtors' Bankruptcy Cases

10.     On April 13, 2006 (the "Petition Date"), USACM, FTDF, and their

affiliated debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "Debtors") filed petitions for relief under chapter 11 of the Bankruptcy

Code.  By order dated June 9, 2006, the Court approved the joint administration of the

Debtors' chapter 11 cases.

11.     On September 22, 2006, the Debtors filed a Motion for Order

Scheduling an Auction for Sale of Certain Assets, Appointing SPCP Group, LLC, as

Lead Bidder, and Approving Bid Procedures and Protections (the "Sale Motion"),

seeking approval of, among other things, the procedures for the sale of substantially all

USACM and FTDF's assets through an auction, with SPCP Group, LLC as the stalking

horse bidder.  On November 8, 2006, the Court entered an order approving the Sale

Motion and scheduled an auction for the sale of the assets.

12.     On November 15, 2006, the Debtors filed their Third Amended

Joint Chapter 11 Plan of Reorganization (the "Plan").

13.     On January 8, 2007, the Court entered the Confirmation Order,

confirming the Plan and approving certain documents filed in conjunction with the Plan,

including the USACM Trust Agreement, and the Asset Purchase Agreement, dated December 8, 2006, with Compass (the "APA"). The APA sets forth the terms of Compass's acquisition of the Acquired Assets from USACM and FTDF for cash consideration of $67 million, subject to certain purchase price adjustments (the "Sale"). The Sale closed on February 16, 2007 (the "Closing Date").

14.    Pursuant to the APA, Compass acquired, among other things, the right to act as loan servicer with respect to a portfolio of approximately 65 loans (the "Loans," and the individual lenders thereto, the "Direct Lenders"), as well as, without limitation, Default Rate Interest, Accrued Servicing Fees, Late Charges, Success Fees, other fees and sums due the loan servicer (as each such term is defined in the APA) under any of the Loan Servicing Agreements. Compass also purchased USACM and FTDF's participation interest in certain of the Loans.

15.    Although the Confirmation Order provides that the Sale is "free and clear of all liens, claims, interests, obligations and encumbrances," the Order specifically preserves "any right that existed and was matured and exercisable, as of the Petition Date, to effect a substitution of USACM as loan servicer under Section 3 of any Loan Servicing Agreement, as well as any defenses of the loan servicer thereto (a 'Surviving Section 3 Right')." Confirmation Order ¶ 14.

16.    In addition to authorizing the Sale of the Acquired Assets to Compass, and setting forth the procedures for the exercise of Surviving Section 3 Rights, the Confirmation Order provides that "After the Closing, the Direct Lenders are obligated to comply with the terms of the applicable Loan Servicing Agreements . . . ." Confirmation Order ¶ 47. The Confirmation Order also protects Compass's ability to

8

realize, use and enjoy the Acquired Assets. Specifically, paragraph 25 of the Confirmation Order provides "[f]ollowing the Closing, no holder of an Interest in the Sellers shall interfere with the Asset Purchaser's title to or use and enjoyment of the Acquired Assets based on or related to such Interest" and in the same paragraph expressly enjoins them from doing so. Confirmation Order ¶ 25. The parties holding an "Interest in the Sellers" include, but are not limited to, "Direct Lenders . . . and their respective successors or assigns." *Id.*

**Cangelosi and the LPG's Efforts to Derail this Reorganization and Deter Compass**

17.   Cangelosi is the founder and chairperson of the LPG. As the Court is aware, the LPG consists of a minority group of Direct Lenders, including Robert Ulm and Todd Hansen, that have been active in the Debtors' bankruptcy cases and continue to (i) disregard orders of this Court, (ii) attempt to replace Compass as the servicer under the Loans, and (iii) foment frustration among the Direct Lenders and borrowers based on misinformation and half-truths.

18.   Cangelosi and the LPG have been vocal objectors throughout much of the Debtors' bankruptcy cases. When the Court approved the Sale Motion, Cangelosi and the LPG attempted to derail the Sale to Compass with their vigorous opposition. Cangelosi and the LPG thereafter objected to the Plan, both by filing an objection on December 11, 2006, and at the plan confirmation hearing. Following the Court's approval of the Plan, Cangelosi and the LPG opposed the proposed order and proposed findings of fact with respect to the Court's approval of the Plan.

19.   The LPG then filed an appeal of the Confirmation Order on January 16, 2007. The following day, the LPG obtained from the United States Bankruptcy Appellate Panel for the Ninth Circuit a stay of the Confirmation Order

pending appeal, but that stay was quashed, and the Debtors and Compass proceeded to consummate the Sale.

20.    Undeterred, the LPG filed a Motion for Limited Stay Pending Appeal on February 20, 2007, after the Sale had closed.  That motion was denied and the Confirmation Order is fully effective and not stayed.

21.    Cangelosi, Hansen, the LPG, and others have been equally active outside of the Bankruptcy Court.  For example, the LPG has created a website on which various statements critical of the Debtors, the Debtors' bankruptcy cases, the Court and Compass have been published.  *See* Declaration of Boris Piskun, dated as of May 25, 2007 (the "Piskun Declaration"), Exhibit A (screenshots of LPG Webpage).  A copy of the Piskun Declaration is annexed hereto as Exhibit A.

22.    Cangelosi has also published letters to members of the LPG and other Direct Lenders in which she disparages the Court.  *See, e.g.* Piskun Declaration, Exhibit B (Letter to Fellow Investors, *This Mother's Day Weekend Marks the 2nd Annual Mother's Day Memo Regarding USA Capital* (the "Mother's Day Letter") ("Judge Riegle made some interesting statements in court on Friday . . . . ").

23.    The LPG has also hosted regular conference calls for Direct Lenders.  Compass, as a Direct Lender under certain Loans, has monitored several of the conference calls and has learned of the statements made by Cangelosi and others in the LPG.  For example, despite entry of the Confirmation Order, the LPG continues to raise and discuss with Direct Lenders alleged pre-petition defaults under the Loan Servicing Agreements and steps the LPG intends to take against Compass on account of such alleged defaults.  *See* Piskun Declaration ¶ 8.  In addition to the conference calls, the LPG

organizes meetings, including eight meetings in three states this past weekend, to promote its strategy of removing Compass under the Loans.

24.    Even after Compass determined that its only option was to service the Loans from outside of Nevada and withdrew its application for a Nevada license, Cangelosi and the LPG continued to attempt to block Compass from servicing the Loans from outside the state. Cangelosi and the LPG, through emails and other communications, solicit and encourage Direct Lenders to contact the Commissioner of the MLD and persuade him to influence Compass's ability to obtain a license outside of Nevada. *See* Piskun Declaration, Exhibit E (copies of email messages from LPG members).

25.    Cangelosi and the LPG supported the removal of Compass as the servicer in the Fiesta Oak Valley Loans, and indeed saw the dispute relating to that loan as the "test case" to determine whether Compass could be removed as servicer from more Loans based on alleged defaults that had existed as of the petition date in these chapter 11 cases. In a letter to other Direct Lenders regarding the attempt by the Fiesta Lenders to replace Compass with Vindrauga Corporation as servicer under the Fiesta Oak Valley Loan, Cangelosi stated, "This was a great loan to test terminating Compass using the Process defined in the 'Confirmation Order.'" Piskun Declaration, Exhibit B (Mother's Day Letter).

26.    A hearing on the Fiesta Motion was held on May 11, 2007, during which the Court determined that the Fiesta Lenders had not acquired the requisite 51% of the beneficial interests in the Fiesta Loan for the Fiesta Lenders to exercise any Surviving Section 3 Right. The Court specifically noted the history surrounding the procedures

under the Confirmation Order governing the exercise of any purported Surviving Section

3 Right, and recognized that Compass had made a compromise to allow such a right to

survive, but that the exercise of such right is subject to certain safeguards.

27.    Aware of the Court's determination relating to the exercise by any

Direct Lender of any Surviving Section 3 Right, Cangelosi and the LPG have now

embarked on a concerted, systematic effort to replace Compass as the servicer under a

substantial number of the Loans, without making any attempt to comply with the relevant

Loan Servicing Agreements or the Confirmation Order.

**The Mischief of Direct Lender Todd Hansen**

28.    Hansen is a Direct Lender holding interests in the Loan commonly

known as "HFA Windham" either in his individual capacity or through a limited liability

company he founded and currently manages.  Declaration of David Blatt, dated as of May

25, 2007 (the "Blatt Declaration") ¶ 25.  A copy of the Blatt Declaration is annexed

hereto as Exhibit B.  Compass has learned that Hansen has initiated contacts with the

HFA Windham Borrower that have severely undermined Compass's ability to service the

HFA Windham Loan.  *Id.*  For example, Hansen has represented to the Borrower that he,

and not Compass, has the authority to speak on behalf of the Direct Lenders in the HFA

Windham Loan, and has threatened legal action if the Borrower does not cooperate with

him.  These contacts have had a chilling effect on this Borrower's willingness to

negotiate with Compass, thereby also undermining the purpose and intent of the Sale, to

the detriment of the Direct Lenders.

29.    Further, Hansen's inappropriate interference with the performance

of Compass's contractual rights and obligations has jeopardized Compass's ability to

consummate a potential refinancing of the HFA Windham Loan, which would have

resulted in a cash recovery to Direct Lenders.  As set forth in the Blatt Declaration, according to the HFA Windham Borrower, Hansen has contacted a potential acquirer of the collateral (the "Windham Buyer") and openly challenged the Borrower's and Compass's ability to assign the HFA Windham Loan free and clear of the Direct Lenders' interests.  Blatt Declaration ¶ 26.

30.    Moreover, Compass has learned that, separate and apart from the Threat Letters, other Direct Lenders have contacted Borrowers and have made misrepresentations to the effect that entities other than Compass are authorized to act on behalf of the Direct Lenders, that Compass lacks the authority to take actions it is expressly authorized to take under the Loan Servicing Agreements, and/or that Borrowers need not pay Default Rate Interest, Accrued Servicing Fees, Late Charges, Success Fees, other fees and sums due the loan servicer to which Compass is entitled pursuant to the APA and Confirmation Order.  In sum, the LPG and certain Direct Lenders, including Hansen, are taking actions which directly contravene the purpose of the APA, the Plan, and the Orders of this Court.

**Cangelosi and the LPG's Latest Conduct Necessitates Emergency Relief**

31.    On May 18, 2007, Cangelosi, as Manager of FDH Management Company, which in turn is the manager of the various Direct Lender LLCs created at the encouragement of the LPG and pursuant to operating agreements and form "Membership Subscription Agreements" that were circulated by LPG to Direct Lenders, sent not fewer than fifty (50) notices to borrowers under the corresponding Loans advising the borrowers that the Direct Lenders holding in excess of 51% of the beneficial interests in such loans had terminated Compass as servicer and replaced Compass with L2L.

Further, pursuant to the Threat Letters, the borrowers are directed to make payments to L2L, and that any payments made to Compass are at the borrowers' peril. *See* Blatt Declaration, Exhibit B (Threat Letters).

32.    According to the Termination Letters, the termination of Compass's rights is purportedly based on Nevada Administrative Code 645B.073, and specifically not pursuant to any Surviving Section 3 Right as defined in the Confirmation Order. *See* Blatt Declaration, Exhibit C (sample Termination Letter). Given their wanton disregard for the thirty-day notice and for cause requirements of the governing Loan Servicing Agreements, it is surprising the Termination Letters do not declare to be 'not pursuant' to the Loan Servicing Agreements themselves, either. As the conduct of Cangelosi, the LPG, and L2L is in direct contravention to such provisions of the Loan Servicing Agreements, it is therefore in violation of paragraph 47 of the Confirmation Order.

33.    Finally, on May 21, 2007, the Direct Lender LLCs created in accordance with the LPG plan to remove Compass as the servicer of the Loans filed an action in the United States District Court for the District of Nevada (the "District Court Action"). A copy of the complaint in the District Court Action is attached to the Blatt Declaration as Exhibit D. The Direct Lender LLCs, represented by Alan Smith, seek a declaratory judgment that, among other things, they have an absolute right to replace Compass as the servicer under the Loans, based solely on Nevada Administrative Code 645B.073, and thus without regard to Compass's rights under the Confirmation Order and Loan Servicing Agreements. The complaint reflects the continuing efforts by the

plaintiffs to undo the decisions of this Court and avoid this Court's jurisdiction with respect to the Loans, the Loan Servicing Agreements and the APA.

## RELIEF REQUESTED

34.     Compass respectfully requests that the Court enter an order (i) directing Cangelosi, Hansen, the LPG, L2L and parties acting in concert therewith to comply with the terms of the Confirmation Order; (ii) directing Cangelosi, Hansen, the LPG, L2L and parties acting in concert therewith to comply with the terms of the Loan Servicing Agreements; (iii) directing Cangelosi, the LPG, L2L, Hansen and parties acting in concert therewith to issue letters immediately to each borrower and Direct Lender indicating that, by order of this Court, the Threat Letters and Termination Letters have no force and effect and that Compass will continue to be servicer of the Loans until further Order of this Court; and (iv) enjoining Cangelosi, the LPG, L2L, Hansen and parties acting in concert therewith from communicating with borrowers under the Loans pending further Order of this Court.

35.     Moreover, the willful disregard for the Court's orders warrants the issuance of civil contempt sanctions against Cangelosi, the LPG, L2L and Hansen, including monetary sanctions of at least the reasonable attorneys fees and expenses associated with the litigation of this Emergency Motion and addressing and responding to the improper Threat Letters and Termination Letters.

## APPLICABLE AUTHORITY

### This Court Has Ample Authority to Enforce the Confirmation Order

36.     The Confirmation Order, the Plan, sections 1141 and 105 of the Bankruptcy Code, and applicable case law provide authority for the Court to issue an order enforcing the Confirmation Order and enjoining Cangelosi, the LPG, L2L and

15

Hansen from continuing to violate the Confirmation Order and taking actions to undermine Compass's ability to realize, use and enjoy the Acquired Assets.

37.    As a preliminary matter, Cangelosi, the LPG, L2L and Hansen are all subject to the Confirmation Order since "[t]he provisions of the Plan and this Confirmation Order shall bind . . . all Direct Lenders [and] all parties in interest." Confirmation Order ¶ 8.  Indeed, the Confirmation Order is in the nature of a final judgment on the merits that is binding on all parties in interest.  *See, e.g. Federated Management Co. v. Latham & Watkins*, 138 Ohio App. 3d 815, 823 ("[i]n the bankruptcy context, an order confirming a plan of reorganization constitutes a judgment and a final adjudication on the merits of a bankruptcy proceeding." (*citing In re Baudoin*, 981 F.2d 736, 740 (5th Cir. 1993)); *Stoll v. Gottlieb*, 305 U.S. 134, 170-71 (1938); *In re French Gardens, Ltd.*, 58 B.R. 959, 962 (Bankr. S.D. Tex. 1986);  *In re Emmer Brothers Co.*, 52 B.R. 385, 390 (Bankr. D. Minn. 1985).  This is consistent with section 1114 of the Bankruptcy Code, which provides:

> (a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

11 U.S.C. § 1141.

38.    This Court has jurisdiction to grant the relief requested.  Section VIII.D of the Plan provides that the Court retains <u>exclusive</u> jurisdiction to hear and determine, among other things, matters related to the transfer of the Acquired Assets to Compass, all matters related to Loan Servicing Agreements, disputes arising in

16

connection with the interpretation, implementation, consummation or enforcement of the APA, and enforcing all orders entered in the chapter 11 cases.  Plan § VIII.D.

39.     Section VIII.D of the Plan provides that the Court retains jurisdiction, among other things, for the purpose of  "[i]ssuing injunctions, entered and implementing other orders, or taking such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, consummation, or enforcement of the Plan, the Asset Purchase Agreement, or the Confirmation Order."  Plan § VIII.D.13.

40.     This Court has ample authority to compel compliance with its Confirmation Order.  Bankruptcy courts are courts of equity, and their proceedings are inherently proceedings in equity. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527, 104 S.Ct. 1188 (1984); *Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238 (1939).  The equitable powers of the bankruptcy courts are codified in Bankruptcy Code section 105, which provides that "[t]he court may issue any order, process, or judgment that is necessary to carry out the provisions" of the Bankruptcy Code . 11 U.S.C. § 105(a).

41.     Courts have held that section 105(a) bestows the power to issue permanent injunctions that operate throughout the post-confirmation period.  *See, e.g, In re A.H . Robins Co. .* 880 F.2d 694, 701-02 (4th Cir. 1988); *In re Johns-Manville Corp.*, 68 B.R. 618, 625 (Bankr. S.D.N.Y. 1986) ("The effect of this equitable power [under Bankruptcy Code section 105(a)] is not limited to the pendency of a reorganization proceeding.  Indeed, bankruptcy courts frequently issue injunctions that limit recourse . . . far beyond the date of confirmation."); *In re Equity Funding Corp. of America*, 396 F. Supp. 1266, 1276-77 (C .D. Cal .1975) (granting injunction under Bankruptcy Act), *aff'd*

*on other grounds,* 519 F, 2d 1274 (9th Cir. 1975).  Moreover, section 105(a) should be

"construed liberally to enjoin [actions] that might impact the reorganization process."

*Momentum Mfg. Corp. v. Employee Creditors Committee (In re Momentum Mfg. Corp.),*

25 F.3d 1132, 1136 (2d Cir. 1994); *see also Keene Corp. v. Acstar Insurance Co. (In re*

*Keene Corp.),* 168 B.R. 285, 292 (Bankr. S.D.N.Y. 1994) (holding that, pursuant to

section 105, a court "can enjoin an activity that threatens the reorganization process or

impairs the court's jurisdiction with respect to a case before it").  The use of section 105

of the Bankruptcy Code is especially appropriate here in conjunction with section 1141 of

the Bankruptcy Code in order to enforce the Plan.

> 42.     In addition, the federal courts have inherent power to compel

compliance with their orders.  *In re McLean Indus.,* 68 B.R. 690, 695 (Bankr. S.D.N.Y.

1986) ("The duty of any court to hear and resolve legal disputes carries with it the power

to enforce the order.").

### The Threat Letters, Termination Letters and Related Conduct Violate the Terms of the Loan Servicing Agreements

> 43.     Notwithstanding the assertion in the letters to Compass that the

relevant Direct Lenders can exercise its right to terminate Compass as servicer based

solely on Nevada Administrative Code 645B.073, the Loan Servicing Agreements

expressly require such termination must be: (i) at the direction of fifty-one percent (51%)

or more of all of the holders of the beneficial interest of record in the Loan; (ii) on thirty

(30) days notice to the servicer; and (iii) for cause.[5]  *See* Blatt Declaration, Exhibit A

(Loan Servicing Agreement, §§ 3, 8).

---

[5] Sections 3 and 8 of the Loan Servicing Agreements each require a showing of cause.

44.    An exercise of rights under section 3 of a Loan Servicing Agreement, pursuant to which the requisite percentage of lenders can designate a new servicing agent, must be read together with the requirements of section 8 of the Loan Servicing Agreement.  Thus, designating a new servicer under section 3 requires that the notice provision of section 8 be satisfied as a condition to effectiveness.[6]  The Court has on numerous occasions rebuffed arguments that its conclusions regarding the termination requirements under the Loan Servicing Agreements, and the safeguards included in the Confirmation Order reflecting those conclusions, change the terms of the Loan Servicing Agreements and Nevada Administrative Code 645B.073.

45.    It is manifest that at least two of the three requirements for terminating a servicer under the Loan Servicing Agreements have not been satisfied here. Indeed, advanced notice of the termination was not provided to Compass, nor has there been any showing of a failure by Compass to perform its obligations under any Loan

---

[6] To the extent a Direct Lender is seeking to exercise a Surviving Section 3 Right, the Confirmation Order itself sets forth these requirements:

> [I]n connection with any attempted post-Closing exercise of a Surviving Section 3 Right: (a) the Direct Lenders must provide Compass at least thirty (30) days prior written notice of the intended exercise of such right in accordance with section 8 of the Loan Servicing Agreement, (b) Compass shall have the right to challenge the exercise of such Surviving Section 3 Right by filing a motion with this Court prior to the expiration of such thirty (30) day period to determine whether such Surviving Section 3 Right has been properly and validly exercised (the "Compass Motion") and the Court shall retain jurisdiction to adjudicate such disputes, (c) in the event Compass timely files such Compass Motion, the effectiveness of the attempted exercise of such Surviving Section 3 Right shall be stayed pending this Court's entry of an order in respect of the Compass Motion, and (d) the post-Closing survival of such Surviving Section 3 Right shall not impair in any respect any rights or interests of Compass under the Loan Servicing Agreements, including, without limitation, its rights under Section 2(c)(iii) of the Loan Servicing Agreement."

Confirmation Order ¶ 14.

Servicing Agreement.  LPG cannot write out the notice and cause requirements of the

Loan Servicing Agreement by invoking a section of the Nevada Administrative Code.

Therefore, neither the Threat Letters nor the Termination Letters can validly terminate

Compass as servicer of the Loans.[7]

**The Threat Letters, Termination Letters and Related
Conduct Are in Direct Contravention of the Confirmation Order**

        46.     As set forth above, the Confirmation Order explicitly requires the

Direct Lenders to comply with the terms of the Loan Servicing Agreements.

Confirmation Order ¶ 47.  By issuing immediately effective notices that purport to

terminate Compass as the servicer under not fewer than fifty (50) of the Loans, the Direct

Lenders that have purported to exercise rights under Nevada Administrative Code

645B.073 against Compass have violated the Confirmation Order.  The Direct Lenders

must not be permitted to ignore this Court's binding order and effectively deprive

Compass of the valuable assets it purchased.

        47.     Further, the Confirmation Order protects Compass's ability to

realize, use and enjoy the Acquired Assets.  Specifically, paragraph 25 of the

Confirmation Order provides "[f]ollowing the Closing, no holder of an Interest in the

Sellers shall interfere with the Asset Purchaser's title to or use and enjoyment of the

Acquired Assets."  Confirmation Order ¶ 25.  Through their actions, Cangelosi, the LPG,

L2L and Hansen plainly have interfered with Compass's use and enjoyment of the

Acquired Assets and have potentially impaired the value of those assets.

---

[7] Alternatively, any actions, including the Threat Letters, Termination Letters and related conduct, that are taken on account of a right against or in the Debtors that were discharged by paragraph 51 of the Confirmation Order are void *ab initio*.  *See In re Mariner Post-Acute Network, Inc.*, 303 B.R. 42, 47 (Bankr. D. Del. 2003) ("Actions which violate the discharge injunction, similar to actions which violate the automatic stay, are void *ad initio*.").

48. Accordingly, Cangelosi, the LPG, L2L and Hansen's violation of the Confirmation Order warrants the issuance of an order compelling compliance pursuant to section 105(a) and the Court's inherent authority to enforce its orders.

**Civil Contempt Sanctions Are Appropriate**

49. The power and authority of Bankruptcy Courts to enforce their decrees through orders of civil contempt is well settled. *See In re Chateaugay Corp.*, 920 F.2d 183, 186-87 (2d Cir. 1990); *see also In re Dyer*, 322 F.3d 1178, 1193 (9th Cir. 2003); *In re Terrebonne Fuel & Lube*, 108 F.3d 609, 613 (5th Cir. 1997); *In re Just Brakes Corp. Sys.*, 108 F.3d 881, 885 (8th Cir. 1997); *Cox v. Zale Delaware, Inc.*, 239 F.3d 910, 916-17 (7th Cir. 2001); *Bessette v. Avco Fin. Servs.*, 230 F.3d 439, 445 (1st Cir. 2000); *In re Graham*, 981 F.2d 1135, 1142 (10th Cir. 1992). The standard for determining whether to exercise such contempt powers was well stated by the Bankruptcy Court in *In re Frankel*, 192 B.R. 623, 628 (Bankr. S.D.N.Y. 1996): "[a] court's inherent power to hold a party in civil contempt may be exercised only when (1) the order the party allegedly failed to comply with is clear and unambiguous, (2) the proof of non-compliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply." *Id.*

50. These three requirements are satisfied here. First, the Confirmation Order is clear and unambiguous with respect to the obligation of Direct Lenders to comply with the terms of the applicable Loan Servicing Agreements, and with respect to Compass's right to the use and enjoyment of the Acquired Assets. Second, Cangelosi, the LPG, L2L and Hansen's non-compliance is unmistakable. Third, these parties have not made any attempt (let alone a diligent attempt) to comply with the

Confirmation Order in any manner, and indeed have publicly and repeatedly flouted the
orders of this Court.

      51.    Accordingly, Cangelosi, the LPG, L2L and Hansen's violation of
the Confirmation Order warrants the issuance of an order compelling compliance
pursuant to section 105(a) and the Court's inherent authority to enforce its orders and
awarding Compass sanctions. Compass reserves its right to seek monetary sanctions on
account of the contumacious conduct described herein after this Court has conducted a
hearing on this Emergency Motion.

<b><u>CONCLUSION</u></b>

      52.    In light of the exigencies, Compass respectfully requests that the
Court issue an order (i) directing Cangelosi, Hansen, the LPG, L2L and parties acting in
concert therewith to comply with the terms of the Loan Servicing Agreements; (ii)
directing Cangelosi, Hansen, the LPG, L2L and parties acting in concert therewith to
comply with the terms of the Confirmation Order; (iii) directing Cangelosi, the LPG,
L2L, Hansen and parties acting in concert therewith to issue letters immediately to each
borrower and Direct Lender indicating that, by order of this Court, the Threat Letters and
Termination Letters shall have no force and effect and that Compass will continue to be
servicer of the Loans until further Order of this Court; (iv) enjoining Cangelosi, the LPG,
L2L, Hansen, other Direct Lenders and parties acing in concert therewith from
communicating with borrowers under the Loans (except as provided herein) pending
further Order of this Court; and (v) sanctioning Cangelosi, the LPG, L2L and Hansen for
civil contempt and reserving Compass's rights to seek monetary sanctions against
Cangelosi, the LPG, L2L and Hansen, including recovery of Compass's attorneys fees

22

incurred in connection with seeking compliance with this Court's orders; and (vi)

granting Compass such further relief as is just.

George A. Davis
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Telephone No.:   (212) 504-6000
Facsimile No.:   (212) 504-6666

and

Peter Bernhard (State Bar No. 734)
Bullivant Houser Bailey PC
3980 Howard Hughes Parkway, Suite 550
Las Vegas, Nevada  89169
peter.bernhard@bullivant.com
Telephone No.: (702) 650-6565
Facsimile No.: (702) 650-2995

Counsel for Compass Financial
Partners LLC

23