# EXHIBIT A

```
Type to search the Web
```

# USA Capital Lenders Protection Group



Home

Alan Smith_Attorney                April 29, 2006

Recent Comments/Blog

Direct Lenders

Legal Filings

Loan Servicing Agreement and POA

Loan by Loan Analysis

Fees From Our Principal?

LOAN CAPTAINS AND FAX #s

Tax Help

Volunteers Needed

Contact Us

How to Join the LPG

Conference Call Schedule

WE ARE NOT ALONE

- MAXIMUM IMPORTANT: On approximately April 26th it was announced that Compass Partners withdrew its brokerage application with the Nevada Mortgage Lending Division. The rumor is that they will be moving the operation out of Nevada and possibly to New York. They apparently decided that customer service and ongoing relationships with lenders was less of a priority than they previously publicised. This comes as no suprise to anyone except to some dedicated readers of the Las Vegas Review Journal. Scott Bice, Director of the Nevada Mortgage Lending Division has an opportunity to deny Compass' flight from Nevada if he only had the will to do so. It was his office that failed to do annual audits while continuing to give USACM a clean bill of health. He has the chance to intercede here but has passed the buck to the Attorney General who has passed it back. Meanwhile here we sit watching bureaucrats pass the hot potato back and forth while Compass packs up its bags. It is imperative that we write to the Attorney General and the Director of the Mortage Lending Division urging them to protect our interests.

The Attorney General's website is at www.ag.state.nv.us and the Assistant to the Attorney General who advises the Mortgage Lending Division (Scott Bice, Director) is Catherine Cortez Masto. She can be e-mailed at aginfo@ag.state.nv.us.

Scott Bice can be contacted at sbice@mld.nv.gov The website is http://www.mld.nv.gov/

We need to pepper these bureaucrats with our concerns and specifically urge them to deny Compass' flight from Nevada. Did I say pepper? Deluge them with your e-mails, letters and phone calls.

- Mesirow Financial our "crisis management team" led by Tom Allison, and hired by Hantges and Milanowski has terminated its relationship with Compass Partners and USACM, and has submitted its billing demands to the estate. It is about $14,850,000 plus or minus. (Click to View) Rumor has it that there was a rift between Mesirow and Compass Partners. At any rate abysmal accounting services seems to demand a high premium within the world of the bankruptcy professionals. Mesirow also has immodestly requested a success fee of $2,500,000. Anybody want to take a secret ballot on that issue? The Lust for Lucre is boundless with these people.

- LPG's legal team will appear in front of the Bankruptcy Appeal Panel on May7th, 2007. We will be attempting to stay (freeze) the money now in the USACM operating account, that was previously in the USACM Collection Account, that was previously in our pocketbooks, that was previously distributed by USACM as interest payments to the Lenders, who first had their principal stolen by Hantges and Milanowski to maintain a facade of rectitude and to pay their own bills on projects in which they had ownership or were the guarantors. Does that make sense? If not, stand by and wait for the outcome. This is the "pre-paid interest" scheme engineered by the Comittee attorneys and we are attempting to keep this money from being distributed until this can get untangled. The distribution of these funds likely would render this element of our Appeal moot, as the funds would be, "Gone with the Wind" This appearance by all concerned parties may also confirm whether oral arguments will be heard going forward or if the judges will decide the merits of our Appeal based upon written briefs.

- Vindrauga Corporation a loan servicer, affiliated with Debt Acquisition Corporation of America (distressed debt purchaser) motioned to substitute themselves as the new Loan Servicer of Fiesta Oak Valley about a month ago. Compass Partners alleged that it was Vindrauga's burden to prove that the Sevicer was in pre-petition breach of contract and that the Loans were in default. This delaying tactic was so transparent that we felt that Judge Riegle would throw the Compass Motion out of court and allow Vindrauga to move the loan...thus paving the way for similar expedited substitutions by other loans that had pre-petiton breaches. True to form, Judge Riegle granted another extension for another month. This is now allowing Compass partners to invoke the Section 2 rights of the LSA to selectively buyout lenders. The terms of the "call" are all principal and back interest as Section 2 demands, but they are only being offered to enough lenders to allow Compass to gather 51% of the monetary value of the outstanding interests thereby thwarting Vindrauga's attempt at substitution. The other 49% will twist in the wind. If you have a 3% LSA you likely did not receive this offer since you are a major revenue source going forward. Expect more of the same.

- The First Trust Deed Fund continues to wrangle over the proceeds and legal cost associated with its sale to Compass Partners. Until the attorneys are done picking over the bones, the distributions

will come out piecemeal. It is expected that a distribution will be forthcoming soon and will perhaps be another 33% of the total that is eventually due.

- The Diversified Fund is still a seemless black box. No light gets in or out.

April 13, 2007

Since our last update, the range of tasks undertaken and the services demanded by membership and the lender population has grown massively. To members and non-members alike I would like you to understand that these services do not come without a cost. The bulk of the real economic value of what the LPG provides is in contributing to, and coordinating the hundreds of volunteer hours that are expended each and every day. Here is a partial list of the tasks performed on behalf of investors:

- Website updating
- Newsletters
- Website design
- Mailings
- E-mail updating
- Answering Phone Calls (50-150 per day)
- Correspondence (about 350 per day)
- Conference Calls (6 per week)
- Managing the Loan Captain Program
- Data Base Management relative to
- 55 Loans and approximately 3000 Direct Lenders
- 60 Loan Captains and 4000 Election to Terminate Forms
- LPG Membership Enrollment Procedures (recently about 250 NEW memberships)
- Banking and Account Management for Member Contributions
- Address changes, e-mail changes
- Construction of a Customized Data Base Mangement Program
- Interface with LPG Attorney concerning:
- Appeal
- Contract issues
- Individual Loan Situations
- Forms used by LPG and Loan Captains
- Proof of Claims issues
- Tax issues
- Overall Strategy
- Interface with potential Loan Service Providers and Third Party Purchasers of notes
- Borrower liason and information gathering
- Negotiation and coordination with a potential Class Action Law Firms
- Maintaining awareness of issues surrounding the Placer Vineyards servicing sale, Vindrauga's offer to service Fiesta Loans, the USAIP Collateral Agreement and formulating responses where necessary.
- Consulting with Work-out specialists, attorneys and the co-lenders on projects that are facing or are in resolution, foreclosure, bankruptcy or receivership.

As you can readily tell from the above list there is quite a lot to do for all of us, and because the LPG is most intimate with the details of where we are, and how we got here, there is a continuing reliance on our judgement and knowledge. We take the responsibility seriously and feel it is our obligation to the members to distribute information as best we can. We have set up a framework for communications and legal action.

However, please mark well that the LPG can not resolve every defaulting loan, nor is it possible for us to remember the details of each loan with perfect specificity. There are too many of them. Here, the Loan Captains have a good general knowledge of each loan, but remember they are not work-out specialists, they are not attorneys and they are not negotiators. They are the hubs of co-lender communication and as such give you the ability to be in contact with your co-lenders. This communication capability is a key element in protecting your investments.

We do not feel that the current loan servicer will adequately communicate with you or provide transactional transparency. We think they will take actions that are in·direct opposition to your best interests. For the present we are trying to awaken a mostly uninformed lender base to this situation. The awareness is growing day by day and with each conference call, but we need committment, and utimately we need funding from the investor base... and not mere curiousity.

Our conference calls are conducted to educate and to answer questions but utimately they were established to raise money for mutual self defense. We need and want you to fund a group "financial health" policy. Make no mistake about that. To the extent we discuss individual loans it is to illustrate methods and motives that are being applied across the portfolio. In other words, we need everyone to understand that what is happening to Marlton Square is also happening to the Bundys to the Fiestas, to the Collwoods and every other loan in the portfolio. We ask that you consider the global response that is needed by the lenders...en masse... and not be focused entirely on a single loan.

The LPG is MOST concerned with the conflict of interest between ourselves and the loan servicer and we work everyday to resolve this problem. It is for the present our first and most important priority. All attempts to resolve problems at the asset level, i. e., the projects themselves, have been, and continue to be hindered by the loan servicer. This is what we want each of you to come to grips with. We, the lenders have no leverage to direct and influence asset level resolution until the loan servicer will work with us and not against us. They may choose to never work with us, and so in that proves to be the case, the LPG urges you to sign (along with your other co-lenders) an Election to Terminate the Loan Servicer. We hope its use is not necessary, and therefore invite any representative of Compass Partners to contact the LPG for clarification of our understanding  To this date this has not occurred, though we know with certainty that Compass employees have been on the Conference Calls.

The response you make as a co-lender to bankruptcy actions, foreclosures and potential Lender Liability lawsuits effecting your particular loan will fall to you as a co-lender. You as a group will decide, and you as a group will bear the consequences of inaction or lack of representation. You must be willing to act in concert with one another. It will take money, but as the old aphorism notes "a stitch in time saves nine." You must be willing to defend your own interests sooner rather than later, because delay will only make the consequences more dire. The LPG will help and will provide the overall framework for such action, but we can not fund these individual litigations. There are likely to be far too many of them.  You as an individual lender must communicate with your co-lenders and decide together what action is appropriate.

Let us take up for a minute the concept of "throwing good money after bad."  This is a frequent rationalization we hear from people who are hesitant to contribute a modest 1/2% of their portfolio value to the LPG. It implies that contributing is a further "waste" of money.  Nothing could be further from the truth.  If you as an investor can be spared the worry, the hassle and the cost, of even one Borrower Bankruptcy, one Foreclosure and Sale, or most ominously and significantly, the potential holocaust of a Lender Liability Suit, then contributing to the Lenders Protection Group will be the best and cheapest financial decision of your life. If you were forwarned that a tidal wave was appoaching your village would you buy flood insurance? We think it would be prudent to do so and for now you are being forewarned. There is the potential here for a true Financial Tsunami and only your contributions can protect against it.

Thank you for your continued support and interest.

Robert

---

April 02, 2007

We continue to draw 80 to 100 callers per conference call.  The response to our "Strenghth Through Unity" message has been very robust and  we have had to hire a temporary bookkeeper to keep up with new memberships.  We are having a Conference Call nearly every night now so please check our schedule which extends until the end of April.  Please join us as often as you like. The discussion is never quite the same from night to night.

We have achieved 51% Agreement on a significant number of Loans via the Election to Terminate.  We continue to work towards arriving at a majority on every loan.  If you have not recieved the Election to Terminate from your Loan Captain please contact them for a copy of the document, and send it off to your Loan Captain right away.  Please do not delay for even another minute.

March 15, 2007

Over the last two weeks we have mailed our message to 3900 parties. Donna and I have held a conference call almost every evening during this period.  The Loan Captains have now had two conference calls as well.  Each Conference lasts about two hours.  The level of investor awareness is very high on these calls and we have gained new members from each one.

We have revised our contribution schedule dramatically given what we percieve our financial/litigation requirements will be going forward. For members that joined prior to this revision we may have to ask you for additional contributions.  The original membership contributions have carried us through the Appeal as planned but the situation that is occurring with Compass Partners is nothing that we knew about back in December.  Please consider that the playing field has tilted against us considerably since then.

At 5:00 Eastern Time yesterday the Standard Property Loan failed to refinace and payoff as anticipated.

The Final Confrimation of the Plan of Reorganization. Reorganization (??)  passed on March 14th I am told. We will be Appealing this Plan in about a month.  The mootness issue is one that we are addressing at this point.

Please contact your Loan Captains if you have not done so.  They are you best source of up to the minute information on your Loans.

Robert

March 3, 2007

Allan Smith has been engaged preparing our response to USACM's Answer to our Opening Brief with the Bankruptcy Appeal Panel. You can read these items in our "Legal Filings" section here on this website.

We are recruiting more contributing members to the LPG using both postal mailing, e-mails and direct telephone contact. We are making progress with the Loan Captain program. Both Donna and Robert are conducting Telephone Conference calls with the Loan Captains and our potential new members.

It is our understanding that the Diversified Fund, the First Trust Deed Fund and the Unsecured Creditors are now arguing over which one of them gets how much of the Compass overbid. Compass is arguing how much of the overbid should be payable at all, given changing circumstances, and they are trying to include Placer Vineyards in the purchase now. Bill Bullard the ECC chairman is still arguing that he should have the right to pull his loans (Fertitta Enterprises) from USACM/Compass because he was given an exemption from the Asset Purchase Agreement. What?? Why?? Who??

Our motion to Stay the Plan was denied....what's new?

We are off to the Bankruptcy Appeals Panel within a month, which is a very fast track.

1. Our attorney Allan Smith has advised us to take the following precautions:Do not sign ANYTHING that you recieve from Compass until he has had a chance to review the documents. This includes <u>but is not limited to:</u>
    a. A new Power of Attoney
    b. A new Loan Servicing Agreement
    c. A Loan Modification (beware of the 3-day window)
Doing so will only erode your rights.

2. Support your Loan Captains, and/or volunteer to become a Loan Captain. Not all loans are represented yet so please check our roster and take responsibility for this important task.

3. We are stressing the fact that each of us has a moral obligation to protect one another from the predator in our midst. A chain is no stronger than its weakest link and we must all contribute.

4. As Lenders you had $41 Milion "diverted" by Hantges and Milanowski, you had $29Million removed from your accounts by the "prepaid interest" scheme. As bad as that is we are now facing another $100 Million haircut resulting from the Compass Partners default interest and late fees claims (which does not include another $150-$300 Million erosion of project values which may result from Compass' asserting claims adverse to ours and obstructing resolution)

5. Our original goal was to contest USACM within the BK court but our battle has widened considerably and we feel we will have to contest Compass at every turn. The funds required to do so have increased five fold. . We have strategies and solutions but the cost of implementation is high...but so are the returns.

---

February 23, 2007

I thought you might want to take a look at the addendum that the Standard Lenders attached to a recent proposed Loan Modification sent out by USACM Compass Partners. The Lenders were given a 72 hour window to vote one way or the other. Failure to vote within the time frame was "conslusive evidence" that the Lender had accepted the proposal. I personally spoke with people who were never notified that a proposal was made because they did not recieve anything in the mail OR by courier.

<u>This is the addendum.</u> The Lenders placed an X in the reject box and placed a second sheet to the proposal.

Needless to say this modification was not accepted. A further critical thing to consider is that this modification was made with full disclosure of the fees to be withheld from the payoff proceeds. We feel that it was done THIS time because USACM was still in Bankruptcy and was abundantly cautious. We also feel that the Borrower was insistent to finish this up because he had his his financing in place...with a deadline. Otherwise we would still be waiting for the changeover...March 1st or thereabouts.

Once Compass takes over without oversight we feel that Loan modifications or payoffs of any other variety will not state the fees that they intend to deduct from the proceeds. We may expect to see this with Lerin Hills in the near future. A loan modification to the Lerin loan was approved nearly three months ago for 96% of the principal. Recently Mark Olsen of USACM told a Lerin Lender to expect a net 90% of the principal. I think you can judge what is happening here for yourself. I am in this loan and I know I didn't sign off on 90%.

We are working on ways to address this. The Loan Captain Program is being implemented (refer to my last e-mail) and there are only a few loans left undone. Please check the Google chat room for a listing under Pages. You may contact the Captains or me to assist.

Our second attempt at staying distributions from the Collection Account into the waiting hands of "the Army" of BK attorneys was filed (see Legal Filings tab/Stay Pending Appeal)

We are mailing thousands of investors this week. Hopefully our numbers, and ability to withstand the onslaught of Allison's wrecking crew will be more richly funded.

We have clear and convincing evidence that there were pre-petion reciepts that were not distributed.

Industry standard for Loan servicing contract is "the spread." not the hocus pocus Tom and Joe inserted into the Loan Servicing Agreements.

The denizens at USACM are now trying to sell the servicing rights to Placer Vineyards to Compass in a last minute negotiation. Wasn't this the "gem" of the Collateral Agreement that was exempted from the Asset Sale? That leaves two loans that I can remember that are not subject to the Compass Servicing contract. Notably one such loan is Colt Industries, funded by the Fertitta Brothers, as represented by Bill Bullard, who coincidently was the Direct Lenders Committee Chairman.

Scott Bice of the Nevada Mortgage Lending Division denied licensing to Compass Partners, but Judge Judy once again saved the day, allowing our new "quality" service provider to operate temporarily under the license of of our technically defunct previous "quality" servicer. Does a circus have this many high wire acts going at once?

Thank you for your continued support. We have been in contact with experts in the field of mortgage law, real estate law and an collateral backed secutiries. They are well aware of industry practices and the context of the Loan Servicing Agreements, none of which seemed to be taken into the slightest consideration within this Kangaroo Court. The BK lawyers, the judge and the caretakers at USACM appear to have no industry background and have accordingly cited case law that is irrelevant by most measures. . The tortured rulings concerning executory/non-executory contracts are the ruling of a judge reacting to the personalities surrounding her.

Keep the faith.

Robert

P.S. Kudos to the selfless individuals who have taken on the Loan Captaincy duties. I am sure an e-mail in the appropriate in-box would be appreciated.

---

February 16, 2005

On February 14th Allan Smith and Donna Cangelosi appeared if front of Judge Jones of the Cistrict Court. USACM motioned to have our Appeal thrown out based on several technical considerations. Our right to continue our Appeal was upheld, and will probably be heard by a panel of Judges at the District Court level. We will be presenting our arguments in about five weeks. Should we fail at this level we will proceed to the District Court of Appeals which is in San Francisco. Let us keep our fingers crossed and hope for the earliest possible positive resolution.

On February 15th, There was a Hearing in front of Judge Riegle of the Bankruptcy Court. Allan and Donna were again in attendance. I do not have full derails of what transpired but, it seems as if a *Final Confirmation Order* signed by Riegle is needed for Compass to purchase the Assets of USACM. Compass's ability to act as a loan servicer at all was called into doubt because they failed to make a timely application for licensing to the Nevada Mortgage Lending Division, and at this time are not licensed to do business in Nevada. USACM is willing to cooperate in "lending" its license to Compass in the interim, but USACM will cease to exist as a company after the Sale is confirmed. So in other words neither entity is licensed under Nevada Law without some further accomodation being made.

Compass partners is supposed to close the Purchase Agreement by February 16th, as of the day I am writing this. Will they? Much of our future activities hinge upon this development.

Loan Modifications were sent on short notice last week to the Lenders in Standard Properties. The modification proposed was the payment of all principal, no interest (one year) the release from litigation by the Standard Borrower (based upon misrepresentations made by H and M as agents of the Lenders) AND a 13% reduction in proceeds payable to Compass Partners. This is exactly what we have been suspecting would happen. Here it is in summary:

1. Borrower threatens lawsuit and scares Lenders
2. Compass negotiates a reduction in principal and interest due from borrower (Happy Borrower)
3. Borrower drops lawsuit (Happy Lenders)
4. Compass demands its "Court Granted Fees" from the Lender Proceeds
4. Compass sends out Loan Modification with short time frame (failure to respond deemed to be acceptance)

5. Lenders get reduced principal, zero interest, and pay the Loan Servicer 10-30% of what remains.

To say that many of the Standard Lenders were outraged by this proposal is an understatement. They en masse rejected the proposal due to the coordinating efforts of several of the Lenders who were able to warn their co-lenders of the consequences of inaction. This was a key element in denying passage of this modification.

Herein you can see the elements of another approach we are taking and why:

1. Nevada Mortgage Lending Statutes provide that a Loan Servicer SHALL provide the names and contact information of all fractionalized lenders to a lender upon request. USACM has failed to do so.

2. The Direct Lenders Committee has failed to obtain this information for the people it represents.

3. The DL Committee tried to gain this information through an online registration website which was a complete failure.

4. Volunteers have reconstructed much of the data, but there are gaps and mistakes which need correction. We are generating Lists of Lenders and their contact information for Specific Loans. We are seeking assistance in this.

5. This information is needed because there will be issues that require a 51% majority vote for the issues affecting our loans, and our legal rights.

6. Our Loan Service Agreement provides that no changes to the terms of the loan, or reduction in payout of principal can be made without consent by the Lenders, however the Loan Servicer may notify the Lenders of any proposed changes by mail, and failure by the Lender to reject such modification in writing within 72 Hours of mailing constitutes acceptance by the Lender.

See Section C.1(e)(6) of your Loan Service Agreement.

7. It is of vital importance that we be able to contact our co-lenders immediately upon receipt of a loan modification so that all parties have an opportunity to accept or reject any such proposal based on its merits and not be deemed to have accepted by default.

8. We are asking people for their contact information so that we can alert them of such modifications. The mail can be slow, people are often busy and the 72 hour window is so short that we feel modifications may be proposed that are contrary to the best interest of the Lenders. In fact we expect them.

9. If you, or a large proportion of the Lenders in your notes fail to receive notice, or fail to vote you will be deemed to have accepted. This is blatantly exploitive, unfair and extremely dangerous for us, the Lenders.

10. We hope to provide further information concerning the status of specific loans in the future.

11. Please view and download a Loan Servicing Agreement, paying particular attention to Section C.1.(e)(6) which is available on this website.

Today we should find out if Compass is going to close this purchase.

---

January 28, 2007

There was not much evident activity this last week. An Appeal will be filed by Alan Smith in the next couple of weeks, and we will see where that takes us. It may be a little bit quiet for awhile and there may not be much to report. The efforts to protect our interests are ongoing, but may for a time not be evident or public.

The recent distribution "checks" were sent out several days ago. More of the same--debits---against distributions and negative "net check amounts." These two recent e-mails tell the story:

"I just received my statement for December. This one was a little different. It listed, Uncollected Amount, Collection Costs??, and Prepetition Receipts......oh, BTW all three amounts were negative. It is interesting that I am charged a Collection Cost when the Uncollected Amount was negative. The "Net Check Amount" was ($2,105.20) I owe them. I love the wording, "Net Check"..........does anyone know how to cash a negative "Net Check"??? "

---

In one of our vesting accounts - the November 30th statement we had a positive balance (as a matter of fact we received a small check). Now the December 31 statement, all of a sudden we have a negative balance of $12,576.81. There are only 3 accounts under this vesting name -

Eagle Meadows which shows we are owed interest, but nothing received.
Marlton Square - same thing.
The Gardens - principal paid by borrower $1,191 plus interest of
which $1,430 due us.

Then the "check balance" is negative $12,576.81 ????????
Why wouldn't we get a check for the $1,430 instead of the large
negative balance?

The statement shows -
2% service fees (2,778.84)
Collection Costs (5.26)
Prepetition Receipts (12,413.79)
Net Check Amount (12,576.81)

The November statement proves we had no more "Prepaid Interest" to
repay. So what happened in December??
I don't understand.
I have emailed M. Olson regarding this and his response was he would
have someone check it out and he would get back to me.
-------------------------------------------------------------------------

"Robert, We just recieved a statement from USA for December;

2% service fees 985.57

collection costs 27.78

Prepetition Receipts 6,237.48

Net Check Amount 713.60

You talk about a royal s%#& It looks like the professionals are truly pros at daylite robbery.

What is prepitition receipts?"
-------------------------------------------------------------------------

A Short and Very Sketchy explanation of prepetion receipts follows:

USACM has about $3,000,000 in the Collection Account and they can not trace is origin. If you have a loan
that has paid off, or which is being carried on your statement at 100% of your investment but USACM
suspects that part of the $3,000,000 is attributable to a loan (s) in your portfolio then they have
debited from your account a prepetition receipt charge. Its another way of saying that you are not due the
full balance "in" your account because some of it may be "in" the collection account. If they ever unravel
the Collection account then you should get this money credited back to you.

I know this doesn't seem to make much sense, but it is the best explanation I can give you concerning
what they have done. It applies to about three loans. I am not sure which but I think, Amesbury and
Cabernet are two of them and so not everyone is affected by this.


January 23, 2007

This was culled from the Google Chat Room and seems to explain the situation well enough:

Today, I emailed Gordon & Silver to obtain their input on whether the
Committee would seek relief from the Court on our behalves to compel
USA to distribute the December checks.

I did receive their input and was authorized to post the following
response:

"USACM took the position that it was stayed from releasing the December
checks by virtue of the stay order entered by the BAP. This afternoon,
Judge Jones of the US District Court vacated the stay order but ordered
the matter be heard by Judge Riegle on this Wednesday and set a hearing
to review her decision the following day. I am going to assume that
any ambiguities with regard to the release of the checks will be
determined by this Thursday and provided everything goes well the
checks will be issued immediately thereafter."

Subsequently, Gordon & Silver provided further clarity to the above
information.
Judge Jones has lifted the stay for the limited purpose of directing

the parties back to Judge Riegle to hammer out the merits of USA's
interpretation of the how the stay affects their operations pending the
outcome of the appeal. This will include USA's decision to withhold
the December distributions for an indefinite period pending the outcome
of the appeal.

Hopefully, Judge Riegle will issue an order on Wednesday directing USA
to resume with the distribution of the December collections.

AG

---

January 22, 2007

Allan Smith will appear in District Court today. Allan was successful in having an Emergency Stay of
Confirmation of the Plan approved and an Order approving the Stay was issued by the Bankruptcy
Appeal Panel on Thursday January 18th.

The Debtor moved to have the validity of the Stay adjudicated by the Las Vegas District Court. You may
read the various motions in our Legal Motions section. The Debtor seeks to overturn the Stay and the
LPG is opposing the Debtor.

As a brief commentary it should be understood that the LPG submitted a very limited and narrowly
focused motion regarding "prepaid interest." It did not anticipate nor request that USACM should cease all
distributions. The BAP ordered the status quo to be maintained. Ceasing distributions was USACMs
interpretation of the Order.

Lastly, the LPG did not seek in anyway to stop or impede the Asset Sale to Compass Partners and they
were informed of this upon their own enquiry on Friday December 19th. . Reference this document for
clarification

---

January 10, 2007

Update Concerning Direct Lenders

The 3rd Amendment to the Asset Purchase Agreement and the
(Proposed) Order of Confirmation of the Plan if left unchallenged pretty
much seal our fate. Under this Proposed Order we have less than 30 days to
apply to the court for substitution of a Loan Servicer. Even if we could
successfully do so, we (or I should say the property itself in many
instances) may become the de facto guarantors for the fees the court
has implied any asset purchaser can collect in compensation for their investment.

Yes, LPG will continue to object to elements in the Confirmation Plan and
we reserve our right to Appeal it. Neither of these steps will in and of themselves
solve our problems.

Here is how it looks to me today.

Speaking of Individual Loans. Can any lender, or group of lenders, working
in concert, deliver 51% of the interests in a particular loan who are willing
to designate a new loan servicer in 30 days? Do you think even the
most dedicated cadre can convince the other fractionalized holders of
a particular note to pay for the costs involved in making more appearances
before Judge Riegle (who has reserved jurisdiction) in order to litigate the
lenders rights to substitute a loan servicer at all? Would these relatively few
lenders then be willing to subsequently litigate against Compass Partners concerning their
retention of fees, even if Reigle allowed them to be replaced as the designated
servicer? Can anyone convince even 51% of the lenders on a particular loan
to pay for the costs of such litigation while the other 49% sit on their behinds? Do we
have a loan servicer willing to take it on? Does even the most dedicated lender
have the time and drive to coordinate the activities of a group of volunteers to assist
in the effort? How will these lenders raise the money? Build consensus?
Contract with a servicer? Interface with a BK attorney? Interface with
a contract attorney? Communicate with the other fractionalized lenders?

Provided we can at last substitute a new loan
servicer at all on financial terms that make sense, can
any small and dedicated group of lenders then
convince the other lenders in the loan to agree on how to liquidate the property?
Hold the property? This is the extreme difficulty in dealing with these properties
as fractionalized lenders.

As daunting as this is, eliminating the first tiers of litigation, concerning the right to substitute a servicer, and the subsequent litigation of what exactly the rights "granted" to an asset purchaser are by Judge Riegle are, is imperative. If we are to have any chance of avoiding the imposition of fees secured by "our" collateral, post BK, we need to object to the very concepts that Judge Reigle has embraced over our bona fide objections. Clarifying those "rights" means also that we do not have to litigate them again in Civil Court later on, if ever Judge Riegle should allow a substitute servicer to begin with.

We have no other choice but to object and reserve the right to Appeal. I can not say what the ultimate cost will be to protect our interests but in my opinion it is well worth it, and if shared by even 20% of the DLs, it amounts to a pittance on a per person basis.

However, only 10 % of the direct lenders have joined the LPG . The other 90% of have as yet not responded due to confusion, parsimony, or disbelief. This has been our biggest obstacle to unified action. In aggregate we are our own worst enemy. This disunity has already been exploited in many ways ways...and 90% of the investors seemingly can not grasp the consequences of this division. The same will almost certainly carry over to individual loan situations. It could well be a collective financial disaster. If only 10% share the burden in fighting for the rights of all it is unfair, but if we don't do it we will most certainly be dragged down by the other 90%. We few don't have much of a choice if we want to protect ourselves.

We plan to object, reserve our rights, and if need be Appeal the Confirmation Plan. Hopefully we will get a ruling in our favor BEFORE any new loan servicer begins to collect fees from us in accordance with Judge Riegle's interpretation of the Loan Servicing Agreements.

All the issues are here in front of us now in one package, and it is best to have them resolved and clarified here and now, if we can, rather than litigating on a loan by loan basis later on... which would be far more expensive and complicated affair for everybody. I hoped that the other 90% of investors might have understood this by now, but as of this date they have not. We will continue our efforts to reach them and get this message out. We want others to join in this effort.

At this point not being part of the solution is being part of the problem. At this time 90% of the Direct Lenders ARE the problem because they simply are not acting in concert with one another.

Robert

All rights reserved

Office Live



# USA Capital Lenders Protection Group

Home

Alan Smith_Attorney

Recent Comments/Blog

**Direct Lenders**

Legal Filings

Loan Servicing Agreement and POA

Loan by Loan Analysis

Fees From Our Principal?

LOAN CAPTAINS AND FAX #s

Tax Help

Volunteers Needed

Contact Us

How to Join the LPG

Conference Call Schedule

WE ARE NOT ALONE

SUBSTANCE OR SCARE TACTICS?

Direct Lenders,

If you have been lazing and complacent, content in the notion that you have collateral securing your promissory notes it's time to heed this

WAKE UP CALL

This defaulting portfolio is currently accruing interest at 20% per year at the default interest rates now in effect. Not all loans are in default and not all of the default interest, fees, exit fees and success fees will be collected, but about $48 million a year annualized (the spread between the "normal" interest of 12% and the incremental 8% due to default, multiplied by a $600 million portfolio) is accruing to Compass Partners benefit, not to you. However YOU are expected to guarantee its payment. It is accruing at $4,000,000 permonth. If you haven't been following along let me ensure you that they fully expect to get paid first. And because the court guaranteed them the right to collect from our collateral they have no incentive other than to carve out their fees wherever they can.

These guys are Buffalo Hunters and they do not care how many they slaughter as long as they get their steak.

The entire portfolio is now subject to the 1-3% Serving Fee interpretation which increase our costs. The problem loans that continue in default will be subject not only to the 1-3% per year servicing fee but attorney fees, taxes, insurance and on, and on. In the meantime you may expect offers to buy most notes at a discount. DEEP Discounts.

If the borrowers haven't paid a dime for months or years, the chances are good that they may not be willing or able to pay interest in arrears at all, and almost certainly can not refinance the added demands of default interest and fees, exit fees and success fees. (all of which Compass is trying to collect)

This presents the very real possibility of the Borrowers declaring bankruptcy to avoid the imposition of the default interest and other substantial demands that Compass will make.

Most Lenders, we think would willingly forbear to collect such back default interest and fees when balanced with the preservation of capital and the cost of going though additional litigation. However Compass stands in conflict with the Lenders because they have been allowed to accrue all late fees and the default interest spread to the benefit of the loan servicer, collectable from the Borrowers if they are able, but also from the COLLATERAL if need be.

What incentive does this provide to Compass to negotiate a speedy workout of the properties. NONE. Additionally the benefit of any bargain concering loan modification is very much in the hands of Compass Partners and as we have seen with the Standard Property impasse they are willing to destroy any deal if they do not get their money off the top.

If its a marginal or poor project we may be forced to pay to foreclose. We may then pay all the carrying costs and then the brokerage fees to subsequently resell the project. What will be left over is then subject to the Asset Purchasers rights.. The court has ruled that they may collect...once again....from the collateral itself, meaning in this case, after foreclosure and subsequent resale of a project. After having had our "prepaid interest" taken by the court to pay the professionals, and our "diverted principal" taken by Hantges and Milanowski, we now have our interests in the collateral subordinated by the Court for the benefit of Compass Partners.

This is our viewpoint.

There is no guarantee that we will prevail in court. There is no guarantee that our interpretation of the rulings are correct and we have no crystal ball. We are not attorneys and we disclaim any professional qualifications to advise you in any way. We have retained counsel for that purpose.

We ask only that you form your own opinions and if consistent with ours, we hope that you will join us in this effort to preserve our contractual rights.

Lenders Protection Group

E-Mail us at **Lenderobjections@Yahoo.com**

All rights reserved

Office Live