HARRY W. JESSUP
HELEN B. JESSUP
2009 West Lund
Las Vegas, NV 89102
(702)
In Proper Person

RECEIVED AND FILED

2007 MAY 29 P 3:48

U.S. BANKRUPTCY COURT
PATRICIA GRAY, CLERK

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY<br>Debtor. | ) Case No. BK-S-06-10725 LBR<br>) Case No. BK-S-06-10726 LBR<br>) Case No. BK-S-06-10727 LBR<br>) Case No. BK-S-06-10728 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | ) Case No. BK-S-06-10729 LBR<br>) **Chapter 11**<br>) |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>Debtor. | ) Jointly Administered Under<br>) Case No. BK-S-06-10725 LBR<br>) |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC.,<br>Debtor. | ) **JESSUPS' RESPONSE IN<br>) OPPOSITION TO<br>) OMNIBUS NOTICE OF<br>) APPLICATION FOR** |
| In re:<br>USA SECURITIES, LLC.,<br>Debtor. | ) **COMPENSATION AND<br>) REIMBURSEMENT OF<br>) EXPENSES** |
| Affects:<br>ALL DEBTORS | )**(ALL DEBTORS)**<br>) |

COMES NOW HARRY W. JESSUP and HELEN B. JESSUP, in Proper Person, and files this Response in Opposition, indicating as follows:

That said Creditors object to disbursement of compensation and reimbursement of expenses at the time for the causes set forth herein.

Dated this 29th day of May, 2007.

*/s/ Harry W. Jessup*
HARRY W. JESSUP
In Proper Person

*/s/ Helen B. Jessup*
HELEN B. JESSUP
In Proper Person

## FACTS/HISTORY

HARRY W. JESSUP and HELEN B. JESSUP (hereinafter collectively referred to as "the JESSUPS"), respond in opposition to Omnibus Notice of Hearings Regarding Application for Compensation and Reimbursement of Expenses.

The JESSUPS, together with numerous other investors, invested their savings in what were supposed to be extremely save investments. However, it has come to light that, in fact, the investments were not as represented, backed by first deeds of trust, and in fact, the Las Vegas Review Journal acknowledged, "USA Capital was a "Ponzi-like scheme" at least as far back as 2001." See Exhibit "1". Investors were being paid interest with there own money. In fact, the fraud uncovered to this point is as unlawful as the Enron scam. The fraud occurred before the Jessups invested their money, and as such, all monies taken under these pretenses are fraud, and should not be dischargable in bankruptcy. The Jessups have been informed there were creditors paid: allegedly connected to the mob; however, many investors, including the Jessups, who are senior citizens, have not received any monies whatsoever since the involuntary bankruptcy, in spite of their investments of over $200,000. As set forth in Exhibit "1", the Review Journal article, over $60 million was to be paid, with another $9 million to be considered later. The article was written in August, 2006, yet, the Jessups never received any of these disbursements.

Exhibit "2" is a letter from USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, Chairman of the Board, Robert G. Worthen, updating the creditors about DTDF's emergence from Chapter 11 bankruptcy. While it is indicated DTDF emerged from Chapter 11 bankruptcy, still not funds were disbursed. The letter from DTDF, dated May 10, 2007 "hopes for 4th quarter 2007 distributions." However, prior promises of "hopes" for distributions never occurred.

In fact, in a letter dated January 16, 2007, information was provided to creditors indicating "Although neither the Debtors nor the FTDF Committee can guarantee that the Sale will close, there is a strong likelihood that it will close prior to February 16, 2007. In the event is does close, shortly thereafter (and most likely sometime in March 2007), FTDF members will likely receive an estimated recovery greater than 67% to 70% of their investment." See Exhibit "3". Again, this never occurred.

Even *prior* to the January 16, 2007 letter, on or about November 16, 2006, a BALLOT was mailed to accept or reject debtors third amended joint chapter 11 plan, which would disburse a portion of the investments. See Exhibit "4". Jessups have heard no more about disbursement of the sums set forth in the BALLOTS either.

Over objections, at a hearing on September 28, 2006, the court made disbursements to attorneys and accountants involved in the litigation. The entities currently involved are now again seeking disbursement for payment of their fees and costs.

The Jessups again object to these disbursements in general, because the creditors should see some return on the promised funds before continued disbursements for promises made, and not kept.

Moreover, the Jessups object to the failure of the appropriate entities to release requested information under the Freedom of Information Act (FOIA). See Exhibit "5". This was the request of the Jessups; and Exhibit "6", the unacceptable response to this request.

The Jessups believe it is appropriate that payments for these services be stayed until completion of the work, or at the very least, until the creditors see performance on the work.

Since money should have already been disbursed, this is not an unreasonable request.

Lastly, relating to general objections to disbursements, no detail of accountings have been provided to the Jessups, however, looking at the huge costs and expenses submitted for work, the costs seem excessive. For example, Mesirow Financial Interim Management, LLC, as crisis managers and chief restructuring officers are seeking $12,506,371.83, in additionally requesting a success fee in the amount of $2,500,000.00. The Jessups request to be informed of under what authority there is to be a success fee in the sum of $2.5 million dollars; and what is considered success, given that no monies have been disbursed to the Jessups. The Jessups believe that size bonus should have been voted on, and the definition of success should require 100% reimbursement to members.

Additionally, the Jessups have other specific concerns regarding reimbursement to Treister & Glatt, P.C. in the sum of $2,252,103.30. Reimbursement is requested fro the period of May 10, 2007 through March 12, 2007 - and the document was filed on May 2, 2007. While Treister & Glatt, P.C., will, no doubt, indicate this is a typographical error, it is concerning that there is an issue at all

with figures. It also lends itself to a request to review the charges that amount to such a figure.

CONCLUSION

In summary, it is a very genuine concern that promises are being made, but not appear to be kept. Those involved in the legal and accounting arena are being paid excessive sums of money, but no progress has trickled down to the investors, who have had their monies tied up for years longer than those seeking payment for services.

Dated this 29th day of May, 2007.

_____
HARRY W. JESSUP

_____
HELEN B. JESSUP

# Judge approves initial payment of $60 million

**By JOHN G. EDWARDS**
*REVIEW-JOURNAL*

Bankruptcy Judge Linda Riegle on Friday authorized the interim managers of failed USA Capital, a private lender that controls $962 million in assets, to make an initial payment of about $60 million to some investors.

The $60 mil[...] invested with USA Capital, but the interim management team hopes to obtain approval at an Aug. 31 hearing to make regular monthly payments.

"It's a lot of money, but there's a lot more money to be distributed in the future," said Annette Jarvis, an attorney representing USA Capital and its interim managers.

USA Capital solicited investments from individuals interested in earning double-digit interest rates on loans secured by real estate. USA Capital had about 6,500 investors around the country when it filed for bankruptcy April 13.

The initial distribution will provide relief to retired investors who relied on USA Capital for virtually all of their income. Many of these investors are struggling to pay their home loans or rent, medical bills and other ongoing expenses.

Some investors bought fractional interests directly in short-term mortgage loans also known as trust deeds. Others invested in two trust deed funds managed by USA Capital.

The so-called direct lenders who own fractional interests in trust deeds will receive interest and principle payments that were received after the company filed for bankruptcy.

Also, about $1.6 million will be mailed to investors in the USA Capital First Trust Deed Fund, a mortgage loan pool regulated by the Securities and Exchange Commission.

However, individuals who put money in USA Capital Diversified Trust Fund, a separate rate fund lightly regulated by Nevada, will receive none of the initial distribution.

The Diversified fund held about $150 million in assets, but most of its loans are non-performing or not paying interest. Diversified is owed $108 million.

The loans were unsecured although the interim managers have obtained collateral in the form of partnership interests for some of the loans in the Diversified fund.

"Why is it our fund was looted, and the others weren't looted?" asked Marc Levinson, an attorney representing the committee for Diversified fund investors. "We ought not

## ▶ PAYMENT: *Judge will consider another $9 million later*

CONTINUED FROM PAGE 1D

be the sole victim of the street crime."

Levinson said USA Capital was a "Ponzi-like scheme" at least as far back as 2001. In a Ponzi scheme, money fund from new investors is used to pay earlier investors.

He mentioned the 2001 foreclosure of a Sheraton hotel near a Salt Lake City airport, which the Diversified fund financed. USA Capital later sold the hotel, but only some of the sales proceeds were returned to the Diversified fund.

USA Capital's interim managers plan to start mailing checks to investors in about two weeks. "We can only distribute money that came in on loans that are now paying," Riegle said.

At a hearing on Aug. 16, the judge will consider whether to release another $9 million that was in the USA Capital collection account when it filed for bankruptcy.

The bankrupt private lender retains about $25 million in cash that may be kept or paid out later to investors with disputed claims.

The disputes arise out of the monthly payments that USA Capital was mailing to investors monthly before the bankruptcy filing although many of the loans were past due. Riegle later will decide whether to deduct overpayment sums from distributions made to these investors.

The alternative is to pa[y] investors who were overpai[d] by USA Capital and then allo[w] those who were shortchange[d] to sue other investors.

"The argument is that y[ou] would have to sue. That [is] incredibly expensive, frustra[t]ing and, I think, an unnece[s]sary legal position," Rieg[le] said.

EXHIBIT "1"

# USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC
Robert G. Worthen, Chairman of the Board

May 10, 2007

Dear USA Capital Diversified Trust Deed Fund, LLC Investor:

I am writing on behalf of the Board of Directors of USA Capital Diversified Trust Deed Fund, LLC ("DTDF") to update you about DTDF's emergence from chapter 11 bankruptcy, to discuss DTDF's efforts to collect assets, and to address the questions on the mind of each investor. The letter explains that while the Board and DTDF's professionals are working around the clock to recover assets and make a distribution to investors, we cannot at this time predict how much will be distributed or when the first distribution will be made. We assure you that our goal is to obtain the highest possible recovery for investors within the shortest period of time, but caution you that there is no quick or easy solution.

### Who Controls Post-Bankruptcy DTDF?
DTDF emerged from chapter 11, according to the confirmed plan of reorganization ("Plan"), on March 12, 2007. During the chapter 11 case, DTDF was controlled by Tom Allison of Mesirow Consulting as Chief Restructuring Officer, who answered to the bankruptcy court. During the bankruptcy, the U.S. Trustee appointed an official committee of Diversified investors ("DTDF Committee") to represent our collective interests as fund members, however, the DTDF Committee had no authority to act for or to manage DTDF. Rather, we did our best to influence Tom Allison and the Court.

On March 12th, Tom Allison ceased his role as Chief Restructuring Officer of DTDF, and DTDF's chapter 11 counsel, Ray Quinney & Nebeker and Schwartzer & McPherson, no longer represented DTDF. Pursuant to the amended operating agreement approved as part of the plan confirmation process, on March 12th, with the approval of the DTDF Committee, Michael Tucker of FTI Consulting became DTDF's new manager. He is the equivalent of the Chief Executive Officer. Mr. Tucker answers to the Board of Directors, which is comprised of five DTDF investors: myself, as Chairman of the Board, Robert Hardy, Charles Nichols, Bob Fitzner and Richard Kreps. Three of us were members of the DTDF Committee. Mr. Tucker, on behalf of DTDF, has retained as lead counsel Orrick, Herrington & Sutcliffe LLP, and as Nevada counsel, Beckley Singleton Chtd. DTDF also is being advised by financial professionals at FTI Consulting, which served as financial advisor to the DTDF Committee.

### When Will There Be Distributions To DTDF Members?
The true and simple answer is we do not know. Looking at our assets and doing our best to forecast when some of those assets can be turned into cash, we hold hopes for 4th quarter 2007 distributions, but I am not counting on it.

As you continue to read this letter and the attached addendum, it should become clear why cash distributions are impossible to predict at the current time. There will be distributions once there are sufficient funds recovered and we have established adequate reserves to cover the cost of

Diversified Trust Deed Fund Investors
May 10, 2007
Page 3

nonstop to collect assets. We promise to communicate more frequently in the future. We will do so through quarterly newsletters such as this one and through updates on the DTDF website. The website may be accessed at http://usacapdtdf.bmcgroup.com.

As it is very expensive to communicate with our professionals, who bill hourly fees, I offer to receive your phone calls and answer questions about our status to the best of my ability. My personal cell phone number is (702) 239-4222. Also, you may send us email inquiries at diversifiedfund@orrick.com. For address changes, please send a written request with your legal vesting name and account number to DTDF at the following address:

> USA Capital Diversified Trust Deed Fund
> C/O FTI Consulting, Inc.
> Two North Central Avenue
> Suite 1200
> Phoenix, Arizona 85004

**Information We Are Unable To Provide To DTDF Members.**
While one of our goals is to keep DTDF members as informed as possible, please understand that details about litigation strategies are both confidential and privileged. A good football team does not make its plays public before the center hikes the ball. Once we determine that DTDF will take official action, such as entering into a settlement or pursuing legal remedies, DTDF will make the information available to its members.

DTDF will provide you with information regarding your personal investments. Please contact us through the website or e-mail address given in the previous section of this letter. Please note that we are unable to provide you with individualized legal or financial advice because the DTDF professionals represent the company, not members individually. In other words, the Board and the DTDF professionals are looking out for the interests of DTDF and its members as a whole. If you need personal legal or financial advice, you ought to retain your own attorney or financial advisor.

**Conclusion.**
The Board understands how frustrating DTDF's chapter 11 was, and further understands that you are eager for both information and payments. We ask for your patience, and want you to know that we and the DTDF professionals are working our hardest to obtain the best and the swiftest recovery for you. But we want you to continue to remember the uphill battle that we face, and for you to understand that the struggle will not be over soon.

Best Regards,
Robert G. Worthen
Chairman of the Board

...

Attachment to Letter of May 10, 2007
Page 2

avoid having to face the music in Las Vegas, where they had done their damage. Investment Partners opposed the emergency motion, arguing that a receivership run out of Riverside was the appropriate vehicle for a recovery by DTDF investors and USACM creditors. The judge disagreed, and at the conclusion of the hearing, signed an order presented by Diversified and the USACM Trust. The involuntary petition was electronically filed that afternoon, as were the motion for the appointment of a trustee and a supporting declaration. Judge Riegle conducted a hearing the next morning, granting the trustee motion. The next day, the United States Trustee appointed Lisa Poulin of Corporate Revitalization Partners to serve as interim trustee. Both Diversified and the USACM Trust strongly supported such appointment. Ms. Poulin immediately took control of Investment Partners' assets, and, along with her counsel, has been working night and day since that time. At the conclusion of a hearing on May 4th, Judge Riegle agreed with Diversified and the USACM Trust and overruled the objections filed by Messrs. Milanowski and Hantges to the involuntary petition, ruling that Investment Partners would stay in bankruptcy. Ms. Poulin is now the permanent, rather than the interim, trustee in control of Investment Partners' assets.

- <u>Ashby Real Estate Projects, Including Roripaugh Ranch</u>. A large portion of the proceeds of the 10-90 Loan were used to fund Investment Partners and its primary members, Messrs. Hantges and Milanowski, as a source of funds for projects and other Investment Partners-related deals. The 10-90 Loan is secured by the assignment of membership interests in Ashby USA, LLC, IP, Capital Land Investors, LLC and Random Developments, LLC. It is not secured by deeds of trust that encumber real property interests. Accordingly, collateral securing the 10-90 Loan is not as readily recoverable in foreclosure or otherwise as it would be were deeds of trust properly in place. During the course of the chapter 11 bankruptcy cases, DTDF Committee professionals met with Ashby representatives in Riverside County on one occasion and in Los Angeles on another. They participated in a number of conference calls with business people and attorneys and have reviewed numerous documents. Despite that, none of the assets were liquidated, and in fact Mr. Milanowski, without notice to the Debtors and contrary to his prior representations to them, entered into an agreement with an Ashby entity in November that the DTDF Committee professionals believe transferred substantial value for no consideration. After March 12th, DTDF, working with the USACM Trust and the new Investment Partners Trustee, have begun taking steps to monetize the Ashby assets. The first step was an all-day, in-person meeting with Ashby representatives in Las Vegas in early May.

- <u>Colt Loans</u>. DTDF was involved in a loan to Colt Gateway, a limited liability company in Hartford, Connecticut, that is 50% owned by Investment Partners. As of March 12, 2007, the total Colt obligation to DTDF, exclusive of default interest, approximated $17 million. The Colt real estate project is comprised of many phases, and is quite complex. The DTDF/Colt relationship is likewise quite complex, in that DTDF is one of three direct lenders that are the beneficiaries of a promissory note secured by a first trust deed on one portion of the Colt project. DTDF made three additional advances to Colt, which DTDF contends are likewise secured by the first deed of trust. But the three loans are "undocumented," which means that Colt has claimed that they were not

Attachment to Letter of May 10, 2007
Page 4

proceeds of the 63 condominium units would be paid over to the DTDF. However, when those negotiations reached deadlock, the Debtors and the DTDF Committee professionals determined that an involuntary bankruptcy petition, coupled with an immediate motion for the appointment of an interim trustee, was the most acceptable course of action. With the cooperation and assistance of the DTDF Committee professionals, DTDF filed an involuntary bankruptcy petition against Tree Moss on December 7, 2006, serving as the sole petitioning creditor. A motion for the appointment of an interim trustee and seeking to restrict Mr. Milanowski's operating authority was filed that same day, and the Court orally ruled that the UST should appoint an interim trustee at a hearing held on December 15, 2006. On December 19th, the UST appointed James Lisowski as the interim trustee.

- (EPIC Loan) Subsequent Developments In The Tree Moss Bankruptcy Case. Tree Moss eventually consented to the bankruptcy filing, and Mr. Lisowski attempted to administer the 63 condominium units. The DTDF Committee disagreed with many of his actions and tactics, and was compelled to object to a proposed sale procedure and sales agreement. The Trustee ultimately invited DTDF Committee professionals to participate in the screening of potential buyers, but no sale proposal acceptable to the DTDF Committee (and now DTDF) has surfaced. In addition, the Tree Moss Trustee has been unable to fund or control the homeowners association, which may continue to be dominated by Mr. Milanowski. Mr. Lisowski was unable to make peace with the owner of the remaining 38 condominium units that share the common areas of the complex.

- Conversion Of The Tree Moss Case To Chapter 11. Investment Partners is the owner and managing member of Tree Moss. DTDF's professionals began meeting with Ms. Poulin, the new trustee for Investment Partners, shortly after her appointment. One of the issues on the agenda was DTDF's belief that the Tree Moss sale process was being mismanaged by Mr. Lisowski. Ms. Poulin later agreed, and moved to convert the Tree Moss bankruptcy case from a liquidation under Chapter 7 to one under Chapter 11. That dispossessed the Chapter 7 trustee and put Ms. Poulin and her real estate advisors and counsel in charge of the sale process. Diversified strongly supported such action.

- USA Investors VI ("Investors VI"). The obligation owing by Investors VI, an affiliate of Investment Partners (controlled by Investment Partners), relates to the Hotel Zoso in Palm Springs, and is not related to the 10-90 Loan. DTDF Committee professionals devoted a great deal of time to uncovering the transactions that led them to conclude that DTDF had a claim against Investors VI. That involved delving into a number of transactions related to Investors VI, to a DTDF loan related to the former Sheraton Hotel at the Salt Lake City airport, to the foreclosure of the property securing that loan, and to the deficiency judgment against the makers of the note. They also familiarized themselves with the Hotel Zoso, which is owned by Investors VI, and the efforts by Investors VI and Mr. Milanowski to sell the same – after placing a lien thereon in favor of the Salvatore Reale Trust ("Reale") to collateralize a loan made to Messrs. Milanowski and Hantges personally. After much effort, the DTDF Committee professionals convinced Mr. Allison and the Debtors' counsel to initiate an involuntary chapter 7 case against Investors VI, which occurred on December 15, 2006, and to seek

and involuntary bankruptcy case or to file a fraudulent transfer action in early December. Beginning in late January, with the confirmation order having been signed and the Effective Date looming, the Diversified Committee professionals took control of the adversary proceeding from DTDF's counsel. Since that time, the adversary has been very hotly contested and has included prejudgment remedies, attachments preserving approximately $7 million, discovery, supporting declarations and the like. The litigation has been time-consuming and costly, and remains so, complicated by Mr. Milanowski's ongoing support of the payment to Reale and his invocation of the Fifth Amendment whenever faced with a question he does not care to answer.

- <u>Disputes Concerning DTDF's Claims Against USACM</u>. Prior to the Effective Date, DTDF and USACM were managed by the same Chief Restructuring Officer, Mr. Allison, and were represented by the same financial advisor and the same two law firms. None of them could become involved in the disputes between those two debtors over their claims against one another, so early on they properly delegated responsibility to the two committees. The disputes are multiple and complex, and professionals for the two committees spent numerous hours analyzing the claims, conducting factual and legal research regarding them, and attempting to settle them, including attendance at meetings in Los Angeles and in San Francisco and at a mediation before Judge Glover in Las Vegas on December 12, 2006. No resolution was reached despite the hours spent, and the Plan preserves all such disputes. Based on the education about their claims against one another, the two revested parties will attempt to consensually resolve their disputes in the future, but in the meantime, they have been pooling their efforts towards their joint goal of recovering assets for the two estates – including their discussing the filing of the involuntary chapter 11 case against Investment Partners discussed above.



LAW OFFICES
**STUTMAN**
**TREISTER**
**& GLATT**
PROFESSIONAL CORPORATION

1901 Avenue of the Stars
Twelfth Floor
Los Angeles, California
90067-6013

Telephone: 310.228.5600
Facsimile: 310.228.5788

Writer's Direct Number:

(310) 228-5705

January 16, 2007

Re:  Information Regarding Sierra Liquidity's Proposal To Buy FTDF Member Interests At A Significant Discount

Dear Member of USA Capital First Trust Deed Fund, LLC:

This office, along with Shea & Carlyon Ltd., represents the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC (the "FTDF Committee") in the USA Capital bankruptcy cases currently pending in the United States Bankruptcy Court for the District of Nevada.

The Debtors in the USA Capital bankruptcy cases have advised the FTDF Committee that Sierra Liquidity Fund, LLC ("Sierra Liquidity") has offered to purchase membership interests in USA Capital First Trust Deed Fund, LLC (the "FTDF") at approximately 35 cents on the dollar.[1] Sierra Liquidity's business is to purchase claims in bankruptcy at a discount. The Debtors and the FTDF Committee are concerned that FTDF members may sell their interests to Sierra Liquidity at a deep discount without understanding the anticipated recovery to FTDF members under the recently confirmed Chapter 11 Plan in the Debtors' cases.

As you may be aware, on December 20, 2006, the Bankruptcy Court confirmed the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization (the "Plan"). The order confirming the Plan was entered by the Court on January 8, 2007. The Plan approves a sale of the FTDF loan portfolio (as well as certain assets of USA Commercial Mortgage Company) to a third party buyer (the "Sale").

The Debtors believe that the recoveries to FTDF members from the Sale will be a minimum of 67% to 70% of their investment. (See, Debtors' First Amended Disclosure Statement for Debtors' Third Amended Joint Plan of Reorganization, at page 7.) This 67% to 70% recovery estimate was provided based on the original price for the FTDF loan portfolio, and prior to the auction of such assets that took place on December 7, 2006. At the auction, there

---

[1] Under the FTDF Operating Agreement, transfers of FTDF units and member interests are subject to certain restrictions/requirements, including the approval of the FTDF's manager, USA Realty Advisors, Inc., in its sole discretion. Compliance with such restrictions is the responsibility of the parties to any particular transfer or assignment.

407232v1

EXHIBIT "3"

January 16, 2007
Page 2

was significant overbidding, which will result in recoveries to FTDF members <u>higher</u> than the initial 67% to 70% estimate. The Sale has not yet closed, but is anticipated to close before February 16, 2007.

Although neither the Debtors nor the FTDF Committee can guarantee that the Sale will close, there is a strong likelihood that it will close prior to February 16, 2007. In the event it does close, shortly thereafter (and most likely some time in March 2007), FTDF members will likely receive an estimated recovery greater than 67% to 70% of their investment. <u>This anticipated recovery is significantly more than the approximately 35% being offered by Sierra Liquidity for the FTDF member's interests. The FTDF Committee is concerned that FTDF members may not understand that the anticipated recovery from the Sale is nearly double the Sierra Liquidity proposal and is likely to occur around the end of March 2007.</u>

The FTDF Committee understands that individual FTDF members may have many reasons that compel them to elect to sell their FTDF interest to Sierra Liquidity or any other third party. The FTDF Committee, however, wants to be sure that FTDF members are fully informed when they make a decision to sell their FTDF interests at this stage. Most importantly, prior to selling their interests all FTDF members should be aware of the anticipated minimum recovery of 67% to 70% under the Plan and Sale, which will most likely be made to FTDF members by the close of March 2007.

Sincerely,

Andrew M. Parlen

AMP:hs

407232v1

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE MATERIAL MAILED WITH THIS BALLOT

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br><br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br><br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>Debtor. | *See attached 3 pages* |
| In re:<br><br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | |
| In re:<br><br>USA SECURITIES, LLC,<br>Debtor. | |
| Affects:<br>☐ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Capital Realty Advisors, LLC<br>■ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA Capital First Trust Deed Fund, LLC<br>☐ USA Securities, LLC | |

## BALLOT

### TO ACCEPT OR REJECT DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION (AFFECTS USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC)

### CLASS C-5 EQUITY INTEREST IN USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

EXHIBIT
16845

Item 1. **Amount of your Class C-5 Equity Interest in USA Capital Diversified Trust Deed Fund, LLC**

    Name of Holder: JESSUP, HELEN B

    Amount as of the November 6, 2006 Voting Record Date:   $48,047.32

Item 2. **Vote – Acceptance or Rejection of the Plan:** The Holder of the Class C-5 Equity Interest in USA Capital Diversified Trust Deed Fund, LLC as set forth in Item 1 votes with respect to the proposed treatment of its Claim against the Debtors as follows (check one box only):

*[handwritten: w/ objection + pages attached]*

| ☒ to ACCEPT the Plan | ☐ to REJECT the Plan |
|---|---|

Item 3. **Certifications:** By returning this Ballot, the undersigned certifies and/or acknowledges that:

- the Holder of the C-5 Equity Interest in USA Capital Diversified Trust Deed Fund, LLC set forth in Item 1 above has been provided with a copy of the Disclosure Statement, including the Plan;
- the Holder of the C-5 Equity Interest in USA Capital Diversified Trust Deed Fund, LLC set forth in Item 1 above has full power and authority to vote to accept or reject the Plan;
- the Holder of the C-5 Equity Interest in USA Capital Diversified Trust Deed Fund, LLC set forth in Item 1 above has voted to accept or reject the Plan as set forth in Item 2 above;
- this solicitation of Plan acceptances is subject to all the terms and conditions set forth in the Disclosure Statement and the Plan; and
- by signing and returning this Ballot, the undersigned certifies that (i) this Ballot has been executed on behalf of an entity or individual and (ii) the undersigned has full power and authority to execute this Ballot on behalf of such entity or individual:

Dated: 12-04-06

Name: Helen B Jessup (Print or Type)

Signature: X Helen B Jessup

By: _____ (If Appropriate)

Title: _____ (If Appropriate)

Telephone Number: _____

Street Address: _____

City, State and Zip Code: _____

3
JESSUP, HELEN B
2009 WESTLUND DR
LAS VEGAS, NV 89102-6100

**PLEASE COMPLETE, SIGN AND DATE THE BALLOT AND RETURN IT TO BMC GROUP IN THE ENVELOPE PROVIDED OR VIA FACSIMILE AS INSTRUCTED.**

**THE VOTING DEADLINE IS DECEMBER 11, 2006 AT 4:00 P.M. PREVAILING PACIFIC TIME.**

**ALL BALLOTS MUST BE RECEIVED BY THE VOTING DEADLINE.**

3

16845

Class C-5 Equity Interest

16845

(1)

12/4/06
RE: U.S.A. CAPITAL CHAPTER 11
FROM: HARRY & HELEN JESSUP
APPROVAL OF PLAN, W/OBJECTIONS "PREPAYED INTREST.", ETC.

TO ALL CONCERNED PARTIES:
PLEASE BE ADVISED THAT AFTER READING THE PLAN I MUST DECLARE THE FOLLOWING AND WILL SWEAR TO THESE STATEMENTS IN A COURT OF LAW IF CALLED UPON TO DO SO. I SENT A MEMO TO MR. THOMAS ALLISON & OTHERS, "A REQUEST THROUGH THE FREEDOM OF INFORMATION ACT" (FOIA) WE WANTED TO KNOW WHERE OUR MONEY WAS INVESTED ?? SINCE NOONE COULD DO THAT, I DID GET INFORMATION FROM THE RECENT DOCUMENTS SENT IN THE MAIL, ABOUT THE 3RD. AMMENDED CHAPTER 11 PLAN, THE REASON WHY THE INFORMATION I REQUESTED WOULD NOT BE GIVEN. "THIS IS CALLED A COVER UP."(SEE PAGE 61 BOTTOM, 97 TOP, 1ST. PARAGRAPH) LINE 4 " QUOTE: TRANSFERS FROM DTDF. THEREFORE SINCE APPROXIMATELY JANUARY 2003 THERE WERE A VARIETY OF FUNDS COMMINGLED, IN THE COLLECTION ACCOUNT THAT WERE USED TO MAKE ADVANCE PAYMENTS TO DIRECT LENDERS ON NON PERFORMING LOANS THAT WAS SERVICED BY USACM OR TO INSIDERS.." I ALWAYS WONDERED WHY WHEN I CALLED TO FIND OUT INFORMATION FROM JERRY KATZ(U.S.A. REP.) HE GAVE ME WRONG INFO. ABOUT WHICH ACCOUNT      MY MONEY WAS IN. THE USACM WAS USING MY MONEY TO MAKE PAYMENTS TO OTHERS AND USING MY OWN FUNDS TO PAY ME INTEREST.. THEREFORE THE PAPER TRAIL THAT STATED THAT WE WERE VESTED IN A DTDF, OR A FDTF WAS JUST A PAPER TRAIL . I STRONGLY OBJECT THAT I RECEIVED PREPAID INTEREST THAT I WAS NOT

EXHIBIT
"5"

②

SUPPOSE TO HAVE . I ONLY GOT SOME OF MY OWN MONEY BACK. HOW COULD ANYONE CONTEND THAT I WOULD TAKE MONEY THAT DID NOT BELONG TO ME AND MY WIFE? WE WORKED FOR VERY LOW WAGES AND SAVED, MADE CONTRIBUTUONS TO AN IRA, AND PAID TAXES FOR MORE THAN 35 YEARS . DURING THAT TIME WE RAISED 7 CHILDREN. HOW COULD ANY COURT IN THE LAND SIDE WITH PEOPLE THAT HAD SUPERIOR KNOWLEDGE THAT THEY WERE A FAILING CO., HIDE THE FACTS THAT LOANS WERE NOT PERFORMING, USE OUR LIFE SAVINGS TO COVER UP THIS SCAM. THEN HAVE THE NERVE !! WE OWE THEM MONEY FOR USACM BAD FAITH DEALINGS. THIS WHOLE PROCESS HAS BAD FAITH. HYPOTHETICAL #1- WE WILL LOAN YOU MONEY, DO NOT PAY THE INTEREST, JUST WAIT WE WILL CONTINUE TO COLLECT FROM OTHERS TO KEEP THE MONKEY OFF OUR BACKS, THEN WE WILL HAVE A FRIEND THAT I KNOW COME IN AFTER CHAPTER 11 IS FILED AND BUY OUT AT A BIG DISCOUNT. THE INVESTORS WANT BE HAPPY WHEN WE TELL THEM THAT THE MONEY WE GAVE THEM HAS TO BE PAID BACK AFTER WE PROMISED TO PAY 12-13 % INTEREST . THE LAWYERS WILL HAVE A PARTY CUTTING UP THE MONEY, THEY WILL NOT BE ABLE TO PROVE ANYTHING.. WE HAVE COVERED UP THE RECORDS SO NOT ANYONE CAN MAKE SENSE OF WHAT WE DID.

SOLUTION?? ①WAIVE THIS PREPAID INTEREST THEORY. ②WORK HARD TO FIND BUYERS TO OFFER MORE MONEY FOR THE PROJECTS THAT THE INVESTORS LOANED MONEY TO .. ③MAKE SURE THAT THE $58,000,000 IS PAID TO THE INVESTORS.. ④HAVE A HEART AND REDUCE THESE FEES OF ADMINSTRATION, LEGAL, WHAT EVER AND GIVE TO THE INVESTORS TO HAVE A LARGER RETURN, FOR A PERSON NEARING 70 YEARS OF AGE

(3)

IT'S HARD TO FIND A NEW START IN LIFE. BUT YOUNG LAWYERS, LEGAL, WHATEVER GETS PUSHED OUT OF SHAPE IF SOME OF THEIR TIME IS SPENT ON A PROCEEDING SUCH AS THIS AND THEY DESERVE EVERY DIME .. 100%... ON THE OTHER SIDE OF THE TABLE SITS A PERSON IN HIS LAST FEW YEARS OF HIS LIFE SHOULD BE HAPPY TO ONLY RECEIVE 25% OF MONEY THAT TOOK SOME 35 YEARS WORKING IN THE HOT DESERT SUN. IN CLOSING I WANT ALL OF YOU TO KNOW THAT HELEN AND I WISH YOU ALL A MERRY CHRISTMAS, AND A HAPPY NEW YEAR. WE WILL PUT ALL OF YOU ON OUR PRAYER LIST THAT YOU WILL DO THE RIGHT THING TO COME TO AN END OF THESE PROBLEMS.

SINCERELY,  X Harry W. Jessup   X Helen B. Jessup

P.S. We are sending the approval of the Plan, on the basis that the Plan stated that you must list your objections Now, or they will not be heard. Please send copies to any parties that need these statements, & documents for approval. Thanks!

CC: (1) BMC Group
  (2) U.S. Trustee
      ATT: A.B. Landis Esq.
  (3) Stutman, Treister, & Glatt
      FTDF ATT: Eve H. Karasik, Esq.
  (4) Orrick, Harrington & Sutcliffe
      ATDF ATT: Marc A. Levinson, Esq.
  (5) Clark Court Honorable Linda B. Riegle
      U.S. Bankruptcy Judge

**USA**

Dear Mr. Jessup,

We appreciate your patience while we addressed your concern regarding your investment in the loans with USA Capital. After further research and analysis we have determined the following:

<u>USA Capital Diversified Trust Deed Fund, LLC ("DTDF")</u>
The DTDF was placed into bankruptcy on April 13, 2006. Since that time, a team of accountants has worked diligently to review the books and records and determine the correct accounting for the Fund. We regret to inform you that your prior statements did not reflect the continuing decline in the investments of the DTDF. The decline in the Fund did not happen in six months, but over the course of several years. As a Fund member, you own a portion of the Fund and your investment value increases or decreases based on the value of the Fund. Unfortunately, in this case, the value has declined.

While we have spent time and effort in determining the value at the filing date, we do not have accurate records to show you the changes in the Fund value over time. These records are being reconstructed, but as the process is a long and expensive one, it may be quite some time before additional information is available. We are working to rectify issues created by former management as well as attempting to collect enough money from former management your investment.

<u>USA First Trust Deed Fund, LLC ("FTDF")</u>
The August 4th Motion to Distribute Funds was approved. USACM distributed funds to FTDF shareholders on August 31, 2006. This distribution to FTDF shareholders, of approximately $1.2 million, will be treated as a return of original investment as most of the funds received were from the payoff of loans. Please refer to our website which has additional information pertaining to this distribution and is updated regularly on general information about the Bankruptcy process.

The FTDF loans should be collected or set to be sold and investors should recover a substantial portion of their monies.

We thank you for your inquiry regarding your investment and again appreciate your patience as we are working diligently to respond to investor questions in the order received. Please refer to our website www.usacapitalcorp.com for additional information and updates as well as to submit any future inquiries via our USACM Account Statement Feedback Form. Thank you.

Sincerely,

Investor Relations
USA Commercial Mortgage Company

EXHIBIT "6"