1   ALAN R. SMITH, ESQ.
    Nevada Bar No. 1449
2   KEVIN A. DARBY, ESQ.                    **Electronically Filed May 30, 2007**
    Nevada Bar No. 7670
3   Law Offices of Alan R. Smith
    505 Ridge Street
4   Reno, Nevada  89501
    Telephone (775) 786-4579
5   Facsimile (775) 786-3066
    *Email:* mail@asmithlaw.com
6
    Attorney for Lenders Protection Group
7   and Donna Cangelosi

8

9                    UNITED STATES BANKRUPTCY COURT

10                         DISTRICT OF NEVADA

11                            —ooOoo—

12  In Re:                              Case Nos.:
    USA    COMMERCIAL    MORTGAGE        BK-S-06-10725-LBR
13  COMPANY, et al.                      BK-S-06-10726-LBR
                                         BK-S-06-10727-LBR
14           Debtors.                    BK-S-06-10728-LBR
    _____/    BK-S-06-10729-LBR
15
                                        JOINTLY ADMINISTERED
16                                      Chapter 11
    Affects:
17  ☐ All Debtors                       **OPPOSITION TO EMERGENCY**
    ☒ USA Commercial Mortgage Company   **MOTION OF COMPASS FINANCIAL**
18  ☐ USA Capital Realty Advisors, LLC  **PARTNERS LLC FOR ORDER**
    ☐ USA Capital Diversified Trust Deed Fund, LLC  **PURSUANT TO 11 USC §§ 105 AND**
19  ☐ USA Capital First Trust Deed Fund, LLC  **1141 ENFORCING CONFIRMATION**
    ☐ USA Securities, LLC               **ORDER AND FOR CIVIL**
20                                      **CONTEMPT SANCTIONS**

21                                      Hearing Date: May 31, 2007
                                        Hearing Time: 2:30 p.m.
22  _____/

23          Donna Cangelosi ("Cangelosi") and the Lenders Protection Group (the "LPG"), a

24  group of investors/lenders in USA Commercial Mortgage Company ("USACM") which

25  represent 60% of the outstanding beneficial interests in USACM loans and 62% of the total

26  number of investors, through their counsel, Alan R. Smith, Esq., hereby oppose the

27  *Emergency Motion of Compass Financial Partners LLC For Order Pursuant To 11*

28  *U.S.C. §§ 105 and 1141 Enforcing Confirmation Order And For Civil Contempt Sanctions*

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd

1   (the "Motion").  In addition, the Cangelosi and the LPG move to strike the improper Notice

2   of Removal filed herein on May 25, 2007, which purportedly removes United States

3   District Court, District of Nevada, Case No. 07-CV-00241-ECR-VAC (the "District Court

4   Action") to this Court.

5
                                        **I.**
6                                 **INTRODUCTION**

7       Compass' Motion must be denied because: (1) Compass lacks standing to obtain the

8   relief sought in its Motion; and (2) this Court lacks subject matter jurisdiction to adjudicate

9   the issues Compass has raised.

10      Compass' Motion seeks injunctive relief against the LPG and Cangelosi under 11

11  U.S.C. § 105.  However, Ninth Circuit case law is clear that Compass, as a non-debtor

12  party, lacks standing to seek and obtain injunctive relief under § 105.  Therefore, Compass'

13  Motion should be summarily denied by this Court based on a lack of standing.

14      Moreover, this Court lacks subject matter jurisdiction to entertain the Motion

15  because: (1) Compass has not properly initiated an adversary proceeding, which is

16  universally recognized prerequisite to obtaining injunctive relief; and (2) Compass raises

17  issues that do not have the requisite "close nexus" to the Debtor's Chapter 11 Plan.

18      The essence of the issue raised in Compass' Motion is whether an overwhelming

19  majority of direct lenders properly terminated the Loan Servicing Agreements with

20  Compass based on: (1) direct lenders' post-confirmation and post-closing contractual and

21  state law rights; and (2) post-confirmation and post-closing acts of Compass, and Compass

22  alone.  Specifically, an overwhelming majority of direct lenders (60% of beneficial interests

23  and 62% of direct lenders in number) exercised their rights under NAC 645B.073 and the

24  Loan Servicing Agreements to terminate Compass by executing written elections.  The

25  termination of Compass based on its post-confirmation conduct was not the work of a

26  "dissident minority group" as potrayed by Compass.  It was the action of the majority of

27  direct lenders on an loan-by-loan basis.

28      The termination was not based upon, and had absolutely nothing to do with, any

Law Offices of
**ALAN R. SMITH**
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd                    - 2 -

1    prior act of USACM.  Rather termination was, among other things, based upon: (1) post-

2    confirmation misrepresentations and material concealments by Compass; and (2) numerous

3    post-confirmation violations of Nevada law by Compass, which culminated in a cease and

4    desist order being entered by against Compass by the Nevada State Mortgage Lending

5    Commission.

6            The determination of whether direct lenders properly terminated the Loan Servicing

7    Agreements based on their **post-confirmation** rights and the **post-confirmation** acts of

8    Compass is well beyond the limited jurisdiction retained by this Court in the Debtor's Plan

9    Confirmation Order.  The Confirmation Order is clear that <u>this Court only retained</u>

10   <u>jurisdiction to hear disputes regarding termination of Compass based on pre-petition acts</u>

11   <u>of USACM</u>, defined as "Surviving Section 3 Rights."  Compass entirely misplaces reliance

12   on an overly broad interpretation of the limited jurisdiction retained by this Court over

13   "Surviving Section 3 Rights."  Those rights have been narrowly defined as "any right that

14   existed and was matured and exercisable, as of the Petition Date, to effect a substitution of

15   USACM as loan servicer…" based on the pre-petition actions or inactions of USACM.

16   Here, direct lenders did not terminate Compass based upon any pre-petition acts of

17   USACM.  USACM and its prior actions or inactions are entirely irrelevant to the actions

18   of the direct lenders.  Compass was terminated based on its own post-confirmation conduct,

19   as well as independent rights that direct lenders enjoy under state law.

20           The LPG and Cangelosi have not interfered with implementation of the Debtors'

21   Plan.  In fact, contrary to Compass' claims, it is impossible at this point for direct lenders

22   to interfere with the provisions of the Plan involving Compass (i.e. the asset transfer

23   provisions).  The Plan simply provided for the transfer of an asset, the Loan Servicing

24   Agreements, by the USACM Estate to Compass.  That transfer has been completed and,

25   thus, that portion of the Plan has been implemented.  It is impossible for direct lenders to

26   interfere with the transfer because it is already complete.  In fact, even the Debtors have

27   taken the position that the asset transfer portion of their Plan has been fully performed and

28   implemented.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd                    - 3 -

Compass mistakenly believes this Court or the Debtors' Plan has somehow foreclosed the direct lenders' ability to exercise post-transfer rights under the Loan Servicing Agreements. In reality, this Court did not, and could not, guarantee Compass that direct lenders would not exercise their rights based on Compass' post-confirmation conduct, or otherwise exercise their rights (non-Surviving Section 3 Rights). On many, many occasions this Court reiterated that the Loan Servicing Agreements were not being modified and that the Agreements "are what they are." Compass assumed certain risks when it acquired the Loan Servicing Agreements, including the risk direct lenders would exercise their right to terminate the Agreements based on Compass' post-transfer conduct and independent state law right under NAC 645B.073.

As detailed below, Compass is improperly attempting to bring a post-confirmation dispute between two non-debtor parties before this Court. Simply put, this Court cannot and should not monitor the relationship between Compass and direct lenders forever. Ninth Circuit case law is clear that this Court's jurisdiction to adjudicate disputes arising under the Loan Servicing Agreements ended when the transfer to Compass was complete (except for Surviving Section 3 Rights). If Compass believes the direct lenders breached the Loan Servicing Agreements or improperly exercised their rights to terminate the Agreement, Compass must go to a Court with proper jurisdiction over such a dispute. Indeed, a proper forum is already available to Compass, as various direct lenders have properly brought these issues before the United States District Court, District of Nevada, in a Complaint filed by various direct lenders on May 21, 2007 (the "District Court Action").

Compass has improperly attempted to "remove" the District Court Action to this Court. However, Compass' attempted removal must be stricken because: (1) §1452 does not provide a mechanism to remove a district court action down to bankruptcy court; and (2) even if it did, this Court lacks subject matter jurisdiction to hear direct lenders' claims against Compass based on Compass' post-confirmation conduct and direct lenders' post-confirmation rights. If Compass believes the District Court Action can be heard by this Court, it must follow proper procedure and file a motion in the District Court seeking to

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd        - 4 -

1  to refer the District Court Action to this Court.

2

3

## II.
## FACTUAL BACKGROUND

4       1.      On September 22, 2006, USACM filed a *Motion For Order Scheduling An*

5  *Auction For The Sale Of Certain Assets, Appointing SPCP Group , LLC, As Lead Bidder,*

6  *and Approving  Bid Procedures And Protections* herein, in which it sought to establish the

7  parameters for the sale of certain assets in the USA Bankruptcy Cases, primarily consisting

8  of valuable assets of the First Trust Deed Fund.

9       2.      On November 8, 2006, this Court entered and *Order: (A) Scheduling An*

10  *Auction For The Sale Of Certain Assets; (B) Appointing SPCP Group, LLC, As Lead*

11  *Bidder; And (C) Approving Bid Procedures And Protections, Approving Bidding*

12  *Procedures*.  The stalking horse bidder agreed to take on the obligations of USACM under

13  the Loan Servicing Agreements as part of the sale, but did not attribute any of its initial bid

14  price to the Agreements.

15      3.      After the Order Scheduling Auction was entered, but prior to the auction

16  being conducted, Mesirow Financial Interim Management ("MFIM"), the Bankruptcy

17  Court appointed management for USACM, prepared calculations of the default interest to

18  be charged to third-party borrowers on monthly invoices or at the time of payoff.  MFIM

19  determined that default interest could be charged for substantially all of the loans, and as

20  a result, prepared default interest calculations.

21      4.      After the Order Scheduling Auction was entered, but prior to the auction

22  being conducted, Compass submitted a revised Asset Purchase Agreement, which included

23  the sale of additional assets that were not included in the original asset purchase agreement

24  submitted by the stalking horse bidder, specifically, the sale of loan servicing rights, the

25  default rate interest calculated by MFIM, accrued servicing fees, late charges, success fees

26  and other fees due to the loan servicer under the Loan Servicing Agreements.

27      5.      This Court conducted an auction of various assets of the USA Bankruptcy

28  Cases on December 7, 2006.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd          - 5 -

1      6.      Compass was the successful bidder at auction for substantially all of the assets

2  of USACM and related debtors in exchange for at $67 Million.   The Compass bid was

3  broken down by an initial bid of $48 million fo the FTDF assets and $8 million for the loan

4  servicing rights and fees under the Loan Servicing Agreements ("Purchased Assets").   The

5  remaining amounts were to be allocated by an over-bid agreement between FTFD and

6  USCM, which was filed under seal, and a break-up fee of $1.5 million to the stalking horse

7  bidder.    The sale was expressly conditioned upon confirmation of the USACM's Chapter

8  11 Plan of Reorganization.   At the hearings on Plan Confirmation  the following points

9  were clarified regarding the sale of the Loan Servicing Agreements:

10         Mr. Merola:   These agreements are what they are.  I don't think anyone in this room
                          as an investor would have signed these agreements now if they knew
11                        then what they know now, but this is not a place to get declaratory
                          relief as to all of the provisions of these agreements in the hands of a
12                        successor.  All we're doing here is transferring some of these assets.
                          We shouldn't be in the business of interpreting every provision
13                        prospectively on these.  There's just not a declaratory-relief action…
                          The mantra we had in this sales process that has been drilled through
14                        our head by Mr. Gordon and Mr. Garmen is don't touch the
                          agreements.  We can't touch the agreements.  There are things that are
15                        good, and there are things that are bad for the direct lenders in these
                          agreements.  They can't pick and choose.  We have elected not to
16                        touch the agreements.  They are what they are.

17  See *Transcript of Auction Hearing, p.84, lns. 14-25; and p. 85, lns. 1-10,*  filed herein on

18  January 29, 2007, as Docket # 2593.

19         Mr. Gordon:   As Mr. Merola said, the mantra of the Direct Lenders Committee was
                          from the very beginning of this case and became more strident as we
20                        went was we do not mess around with the loan-servicing agreements.
                          We understand that there are issues involving interpretation or issues
21                        that direct lenders have been told.  There are issues that they have with
                          regard to the statements they have received from the debtor in
22                        possession, but those are interpretation.  Those are administrative.
                          They need to work those out.  The very essence of the transactions
23                        before the Court is the loan servicing agreements are taken as is.
                          They're being transferred.  They're not being mucked around with.
24                        Provisions are not being changed.  If they start to change, we have
                          other problems.

25  *Id., p. 86, lns. 12-25; p. 87, lns. 1-5.*

26         Mr. Gordon    There was a lot of statements made, but the documents speak for
                         themselves.  This is not the time or place to deal with interpretation,
27                       et cetera.  We want them transferred in their entirety subject to their
                         terms.  That's the deal.
28

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579
H:\LPG\OPP to Compass Motion FINAL.wpd          - 6 -

1   *Id., p. 87, lns. 18-22.*

2         Court:         Well, but the point is the contract says what it is, and its being

3                        transferred…. The contract says what is says about – and I think the plan suggests – does not the plan say that after – I mean, there is no

4                        stay after confirmation, and they're free to do whatever their remedies are under the contract. The contract is what it is. There is no stay

5                        post confirmation. It's the new entity. I mean, there's no stay to prevent the enforcement of the servicing agreements.

6   *Id., p. 89, lns. 10-25.*

7        7.     On January 8, 2007, this Court entered an Order confirming the Debtors'

8 Joint Chapter 11 Plan (the "Confirmation Order").

9        8.     In the Confirmation Order, this Court reserved very limited jurisdiction to

10 adjudicate any attempt by direct lenders to terminate the Loan Servicing Agreements based

11 on pre-petition conduct of USACM. *Confirmation Order, ¶ 14.* The Confirmation did not

12 retain jurisdiction to adjudicate a termination of the Loan Servicing Agreements based on

13 post-confirmation conduct of Compass and independent state law rights under NAC

14 645B.073. Compass never received a guarantee that direct lenders would never attempt to

15 terminate the Agreements, and this Court never asked and never offered to retain

16 jurisdiction over all post-confirmation disputes between Compass and direct lenders.

17        9.     On February 16, 2007 (the "Closing Date"), the transfer of the Debtors'

18 assets, including the Loan Servicing Agreements closed and the transfer to Compass was

19 completed.

20        10.     As noted by this Court on numerous occasions, the Loan Servicing

21 Agreements were transferred to Compass without any other modification whatsoever.

22        11.     On February 16, 2007, Compass issued a press release in which it stated that

23 the actual value of the assets purchased from USACM and FTDF was more than $150

24 million. A copy of the Press Release is attached to the *Declaration of Donna A. Cangelosi*

25 as Exhibit A. Compass through their own actions causing this press released to be issued

26 is what created the initial concerns for the direct lenders and the actions of Compass are

27 now causing the fears of direct lenders to be realized.

28        12.     On the very first loan addressed by Compass as loan servicer, the "Standard

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd    - 7 -

Property Loan", Compass struck an undisclosed deal with the borrower to receive a secret payment of $859,368.14, while direct lenders received none of their accrued interest. *See Declaration of Robert Bender,* filed contemporaneously herewith. Specifically:

a. Prior to Compass talking over as servicer, the borrower on the USACM loan commonly known as the Standard Property Loan offered to pay direct lenders 100% of their principal investment in full satisfaction of the Loan. *See Declaration of Robert Bender,* filed contemporaneously herewith.

b. On February 2, 2007, Compass sent a letter to direct lenders, which sought investors approval to accept 90% of their principal investment in full satisfaction of the Standard Property Loan, while the borrower remained willing to pay 100% of principal. See Exhibit A to Declaration of Robert Bender. Evidently, Compass planned to pocket 10% of the buyers payoff for itself. However, direct lenders voted to reject this offer.

c. As a result of the direct lenders' rejection a 90% payoff, Compass chose to disclose all money actually offered by the borrower and, on March 7, 2007, Compass sent a letter to all direct lenders in the Standard Property Loan. See Exhibit B to Declaration of Robert bender, filed contemporaneously herewith. In this letter, Compass sought the approval of 100% of the direct lenders in the Standard Property Loan of an agreement Compass reached with Standard Property to pay off the Standard Property Loan. According to that letter, the terms of the payoff were:

i. The Direct Lenders in the loan receive 100% of their unpaid Standard Property Principal Balance;

ii. The Direct Lenders do not receive any accrued interest; and

iii. Compass shall release the security interest against Standard Property's real property.

d. In reliance on the representations of Compass, direct lenders constituting 100% of the beneficial interest in the Standard Property Loan approved the payoff in accordance with the specific terms of the March 7, 2007, letter. See Declaration of Robert Bender, filed contemporaneously herewith.

e. On or about March 13, 2007, USACM, through Mark L. Olson, COO,

Law Offices of
**ALAN R. SMITH**
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd                    - 8 -

1   issued a Payoff Statement to Standard Property (the "Standard Property Payoff Statement").

2   See Exhibit C to Declaration of Robert Bender.  The Standard Property Payoff Statement

3   directs Standard Property to make a payoff, as of March 15, 2007, in the amount of

4   $10,499,068 with a per diem interest accrual of $2,205.74 for every day after March 15,

5   2007.  The $10,499,068.15 payoff consisted of:

6           i.     Standard Property Principal Balance:   $9,640,000.00

7           ii.    Late Fees:    $   47,694.43

8           iii.   Other Fees:    $  267,164.11

9           iv.   Default Interest    $  544,509.60

10       f.    The Standard Property Payoff Statement revealed that Compass had a

11   secret agreement with Standard Property, undisclosed to the Standard Property Loan Direct

12   Lenders, whereby Compass received Late Fees, Other Fees and Default Interest from

13   Standard Property, without collecting accrued contractual interest owed to the Direct

14   Lenders.

15       g.    On or about March 15, 2007, Standard Property paid off the Standard

16   Property Loan pursuant to the terms of the Standard Property Payoff Statement.  At the

17   time the Standard Loan was paid off, Compass did not pay the Standard Property Loan

18   direct lenders any of the accrued interest they were owed, but took the available funds pay

19   themselves default interest, late fees and other fees totaling $859,368.14.  See Declaration

20   of Robert Bender.

21       13.   As detailed in the Complaint filed in the District Court Action, direct lenders

22   have filed a suit for damages against Compass and sought declaratory relief based on,

23   among other reasons, Compass has committed numerous violations of Nevada law since

24   taking over as servicer under the Loan Servicing Agreements, including:

25       a.    Compass has refused to disclose any money it is receiving, in violation

26   of Nevada law.  *See Declaration of Donna Cangelosi.*

27       b.    Compass is not acting under a valid power of attorney as required by

28   NRS 645B.330 because the power of attorneys granted by direct lenders to USACM

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd

- 9 -

expired by operation of law when the underlying loans fully matured.  At the time the Loan Servicing Agreements were transferred to Compass, many of the loans in the USACM loan portfolio were in term default, and others have since gone into term default.  Compass has not obtained a written extension of the expired powers of attorney. *See Declaration of Donna Cangelosi.*

   c. In the three months have passed since Compass closed on the asset purchase transaction, Compass has failed to failed to provide monthly reports as required by Nevada law and has only generated a total of seven (7) loan status reports.  *See Declaration of Donna Cangelosi.*

   d. Compass has negotiated with borrowers for its own benefit, and to the detriment of Direct Lenders, in violation of Nevada law and its fiduciary duties.  *See Declaration of Robert Bender,* filed contemporaneously herewith.

   e. Compass has taken the position that it is entitled to be paid default interest and other fees, prior to Direct Lenders being paid principal and interest, which is in direct conflict with the terms of the promissory notes and other loan documents.  *See Email from Compass,* attached to the *Declaration of Donna Cangelosi* as Exhibit B.

   f. Compass has applied principal and interest payments made by borrowers to pay itself so-called loan origination fees, which is in direct conflict with the terms of the promissory notes and other loan documents.

   g. Compass has engaged in reckless conduct, which has subjected Plaintiffs and other direct lenders to an increased exposure to lender liability lawsuits.

   h. Compass has refused to process direct lender/borrower settlement agreements.

   i. Compass has initiated legal proceedings in 21 loans, on behalf of direct lenders, without a valid power of attorney, subjecting lenders to legal fees, borrower defenses and lender liability claims.

   14. On May 9, 2007, the State of Nevada, Division of Mortgage Lending, entered a formal *Order Imposing Fine And Order To Cease And Desist And Notice of Right To*

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd     - 10 -

1  *Request Hearing,* pursuant to which Compass was ordered to cease and desist all mortgage

2  lending/agent activities in Nevada, a copy of which is attached to the Declaration of Donna

3  Cangelosi as Exhibit C.  According to that Order, an investigation by the State of Nevada

4  revealed that Compass had "engaged in a minimum (of) seven (7) distinct instances of

5  escrow agency activity in the State of Nevada without a license to do so, thereby violating

6  NRS 645A.020 and NRS 645A.210."  *Id., Exhibit C,* p. 8.

7        15.    Based on independent rights under NAC 645B.073, and various acts  by

8  Compass, and Compass alone, Direct Lenders constituting over 51% of the beneficial

9  interests in loans serviced by Compass have executed written elections to: (1) terminate any

10  rights that Compass may have to service their various Loan; and (2) to appoint an alternate

11  servicing agent for loans.  *See Declaration of Donna Cangelosi, Exhibit D*.  Specifically

12  **60%** of all outstanding beneficial interests, and **62%** of the total number of direct lenders

13  executed written elections to terminate Compass.  The percentage of beneficial interests

14  voting to terminate Compass on a loan-by-loan basis exceed **96%** on certain loans.  Id.

15        16.    On May 3, 2007, Compass acknowledged jurisdiction lies elsewhere when it

16  filed a lawsuit against six (6) direct lenders/LPG members in the District Court for the State

17  of Nevada, County of Clark as Case No. 07-A-540604-C, which sought damages and

18  injunctive relief against those direct lenders based on their communications with fellow

19  direct lenders about Compass.  A copy of the Complaint is attached to the Declaration of

20  Donna Cangelosi as Exhibit E.

21        17.    On May 18, 2007, Compass again Compass acknowledged jurisdiction lies

22  elsewhere when it filed a lawsuit against Donna Cangelosi in the District Court for the State

23  of Nevada, County of Clark as Case No. 07-A-541428-C, which sought damages and

24  injunctive relief her based on her communications with fellow direct lenders.  A copy of

25  the Complaint is attached hereto as Exhibit F.

26        18.    On May 18, 2007, the direct lenders sent Notices of Termination to Compass

27  and its attorneys, which were delivered on May 21, 2007.  A sample copy of a Notice of

28  Termination, which is identical to all other Notices, is attached to the Declaration of Donna

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd                - 11 -

1  Cangelosi as Exhibit G.

2          19.    On May 18, 2007, the direct lenders also sent Notices To Borrowers

3  informing them that Compass had been terminated as loan servicer and directing them to

4  forward future payments to direct lenders new loan servicer, as permitted in the promisory

5  notes and loan documents between direct lenders and borrowers.

6          20.    On May 21, 2007, various direct lenders filed a *Complaint For Declaratory*

7  *Relief and Damages* in the United States District Court, District of Nevada, as case No. 07-

8  CV-0224-ECR-VAC (the "District Court Action").    That District Court Action seeks

9  declaratory relief regarding certain post-confirmation rights of direct lenders under the Loan

10  Servicing Agreements and damages against Compass and other parties, based on their post-

11  confirmation conduct and actions.    A copy of the Complaint is attached to the Declaration

12  of Donna Cangelosi as Exhibit H.

13          21.    On May 23, 2007, Compass voluntarily dismissed its state court action against

14  LPG members and Cangelosi.    *See Exhibit I* to the Declaration of Donna Cangelosi.

15          22.    On May 25, 2007, after abandoning its State Court cases two (2) days prior,

16  Compass filed its instant Motion in this Court.

17                                              **III.**
                              **LEGAL AUTHORITY AND ANALYSIS**
18

19  **A.    Compass Lacks Standing To Obtain The Relief Sought In Its Motion.**

20          Only a debtor, debtor in possession or a trustee has standing to seek and obtain an

21  injunction under 11 U.S.C. §105.    In re Consolidated Pioneer Mortg. Ent., 205 B.R. 422

22  (9th Cir. B.A.P. 1997).    A non-debtor third-party lacks standing to bring a motion for

23  injunctive relief under §105(a).    Id.    Indeed, the purpose of §105(a) is to empower

24  injunctive relief for the purpose of protecting the debtor, not third parties, such as

25  Compass. In re Rohnert Park Auto Parts, Inc., 113 B.R. 610, 614 (9th Cir. B.A.P. 1990).

26          Here, Compass' Motion seeks various forms of mandatory and prohibitive

27  injunctions against Cangelosi and the LPG purportedly under 11 U.S.C. §105.    Compass

28  has cited no authority under which it has standing to obtain such relief.    Instead, Compass

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd          - 12 -

1    ignores on point case law from within the Ninth Circuit, such as <u>Consolidated Pioneer</u>,

2    which expressly holds that a non-debtor, such as Compass, has no such standing to seek and

3    obtain an injunction under §105.  As Compass is not the debtor in this case, it lacks standing

4    to bring the instant Motion and, in turn, this Court lacks the power to enter the relief

5    Compass' requests.  Moreover, as detailed below, Compass has failed to properly initiate

6    an adversary proceeding under FRCP 7001, et. seq., which is a prerequisite to obtaining

7    injunctive relief under §105.  <u>In re Graves</u>, 279 B.R. 266, 272 (9th Cir. B.A.P. 2002).  For

8    these reasons, Compass' Motion should be summarily denied based on a lack of standing

9    under §105.

10   **C.    The Bankruptcy Court Lacks Jurisdiction To Decide The Issues Raised In Compass' Motion, Which Boil Down To Whether Direct Lenders Properly Terminated Compass Based On: (1) Post-Confirmation/Post-Closing Contractual And State Rights; And (2) Post-Confirmation/Post-Closing Conduct Of Compass.**

13   Bankruptcy courts are courts of limited jurisdiction.  <u>In re Valdez Fisheries</u>

14   <u>Development Assoc.</u>, 439 F.3d 545, 549 (9th Cir. 2006).  The source of the bankruptcy

15   court's subject matter jurisdiction is neither the Bankruptcy Code, nor the express terms of

16   a Chapter 11 Plan, but, rather, is 28 U.S.C. §§ 1334 and 157.  <u>In re Kroy Ltd.</u>, 222 B.R.

17   345, 347 (D. Ariz. 1998).  Pursuant to 28 U.S.C. § 1334(b), a bankruptcy court has

18   jurisdiction of "all civil proceedings arising under title 11, or arising in or related to cases

19   under title 11.  Here, the only potentially relevant jurisdiction to consider is "related to"

20   jurisdiction.

21   The Ninth Circuit has adopted the "Pacor test" for determining the scope of "related

22   to" jurisdiction, which focuses on whether "the outcome of the proceeding could

23   conceivably have any effect on the estate being administered in bankruptcy."  <u>In re Pegasus</u>

24   <u>Gold Corp.</u>, 394 F.3d 1189, 1193 (9th Cir. 2005).  An action is related to bankruptcy if the

25   outcome could alter the **debtor's** rights, liabilities, options, or freedom of action.  *Id.*

26   Bankruptcy courts have no jurisdiction at all over proceedings that have no effect on the

27   estate of the debtor.  <u>Celotex Corp. v. Edwards</u>, 514 U.S. 300, 309 (1995).

28   The Ninth Circuit has further held that "post-confirmation bankruptcy court

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd                                    - 13 -

1   jurisdiction is necessarily more limited than pre-confirmation jurisdiction…"  <u>Pegasus</u>,

2   1194.   In this regard, the Ninth Circuit applies a more narrow "close nexus" test to

3   determine a bankruptcy court's post-confirmation jurisdiction.  <u>Id.</u>   Under this test, only

4   matters affecting the "interpretation, implementation, consummation, execution or

5   administration of the confirmed plan will typically have the requisite close nexus."  Id.

6   It has long been a settled principle of bankruptcy law that when a Chapter 11 plan

7   involves the sale of the debtor's assets, the jurisdiction of the bankruptcy court over the

8   asset ends once the sale has closed and the unconditional transfer has been executed.  <u>In re</u>

9   <u>Paddock of California,</u> 226 F.Supp. 43 (S.D. Cal. 1964); see also <u>Nixon v. Michaels</u>, 38

10  F.2d 420 (8th Cir. 1930) (once a fund had been paid out to a claimant further disputes over

11  it were outside the interest and jurisdiction of the court.); <u>Henrie v. Henderson</u>, 145 F. 316

12  (4th Cir. 1906), cert. denied, 206 U.S. 563, 27 S.Ct. 795, 51 L.Ed. 1190 (1907) (once

13  certain lands had been sold and the sale was confirmed, the court stated that disputes as to

14  the land were simply not of concern to the bankrupt estate, and there was no jurisdiction.);

15  <u>In re Wesley Corp.</u>, 18 F.Supp. 347 (E.D.Ky.1937) (The court said that it simply had no

16  jurisdiction over the matter once the property was sold. The bankruptcy court would not

17  follow property into the hands of purchasers for the purpose of settling equities in it. The

18  rule of caveat emptor applied, and further disputes were between the buyer and the creditor.

19  It was no longer property of the bankrupt, and the court had no further interest in it.);  <u>In</u>

20  <u>re Oak Park Cleaners & Dryers</u>,  125 F.2d 420 (7th Cir. 1942) (When bankruptcy estate

21  assets are sold and delivered, the bankruptcy court has no duty to protect the purchaser

22  thereafter. The bankruptcy court has no power or authority to extend its protection beyond

23  the sale and delivery of the property.);  <u>In re Krull,</u> 295 F.520 (E.D.N.Y. 1923) (Once

24  rights are assigned, the bankruptcy court has no further control over them, and if the title

25  of the purchaser is attacked in another tribunal, a bankruptcy court has no jurisdiction to

26  prevent that tribunal form proceeding to an orderly determination of the rights of the

27  parties.).

28  <u>Paddock</u>, cited above, involved the transfer of the debtor's franchise agreements.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd                - 14 -

1    The Paddock Court held that once the sale was confirmed and title passed to the buyer "this

2    left the court without subject matter jurisdiction" and, thus, "it could not proceed to

3    adjudicate disputes which later arose over the franchise agreements." Paddock, 226

4    F.Supp. at 48. In this regard, the court lacked jurisdiction to protect the asset purchaser

5    against interference with the rights it obtained. Id. More recently, the Ninth Circuit held

6    that a bankruptcy court has no jurisdiction over post-confirmation disputes regarding rights

7    under contracts approved by the court. Valdez, cited above, at 548.

8        Here, the dispute Compass attempts to bring before this Court in its Motion has no

9    close nexus to this bankruptcy case or the Debtors' Plan. The dispute boils down to

10   whether an overwhelming majority of direct lenders properly terminated Compass based

11   on: (1) direct lenders' post-confirmation and post-closing contractual and state law rights;

12   and (2) post-confirmation and post-closing acts of Compass, and Compass alone. Even

13   applying the broader Pacor test, the determination of this issue could not conceivably have

14   any effect on USACM's estate. This dispute arises from the ongoing post-confirmation

15   contractual relationship between direct lenders and Compass. It is impossible that this

16   action would in anyway alter the debtor's rights, liabilities, options, or freedom of action.

17   Indeed, USACM has not reorganized and is no longer in business. Thus, the dispute

18   between direct lenders and Compass cannot interfere with Debtors' "reorganized business."

19       The relevant provisions of the Debtors' Plan only involved a transfer of the Loan

20   Servicing Agreements by USACM to Compass, together with certain assurances under 11

21   U.S.C. § 363 that the Agreements would be transferred to Compass free and clear of claims

22   direct lenders may have against USACM. The Plan did not provide Compass any guarantee

23   that direct lenders would not, or could not, exercise either: (1) rights under the Agreements

24   to terminate Compass based on Compass' own post-transfer conduct; or (2) rights under

25   state law to terminate Compass with or without cause. When Compass acquired the Loan

26   Servicing Agreements, it assumed the risk that it could perform its duties and obligations

27   under the Agreements, and, in turn, assumed the risk that direct lenders would terminate

28   Compass if Compass did not, or could not, perform.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd                    - 15 -

1      As detailed in the *Declaration of Donna Cangelosi*, on average over **60%** of direct

2   lenders in some 50 loans have simply exercised their contractual and state law rights, which

3   Compass was well aware existed at the time it acquired the rights of USACM under the

4   Loan Servicing Agreements.    This Court has emphasized in open court on countless

5   occasions, including at the Plan Confirmation hearing, that the Loan Servicing Agreements

6   are what they are, and they were not modified by the Debtor's Plan.   In other words, all

7   contractual terms, conditions and rights continue to exist.   This Court never promised

8   Compass any protection beyond what was in the Loan Servicing Agreements.   In fact, as

9   shown above, this Court could not guarantee any such protection to Compass.  At the point

10  the transfer of the Loan Servicing Agreements To Compass was complete, the jurisdiction

11  of this Court over the ongoing relationship between Compass and direct lenders, two non-

12  debtor parties, also ended.  Therefore, Compass' Motion must be denied and Compass must

13  seek relief from a court with subject matter jurisdiction over the ongoing post-confirmation

14  relationship between direct lenders and Compass.

15  **D.    This Court's Limited Surviving Section 3 Right Jurisdiction Is Not Triggered
         By The Direct Lenders Termination of Compass Based Upon Post-Confirmation
16       Rights and Post-Confirmation Acts By Compass.**

17         This Court's Confirmation Order narrowly limits its post-confirmation jurisdiction

18  to "any right that existed and was matured and exercisable, as of the Petition Date, to effect

19  a substitution of **USACM** as loan servicer under Section 3 of any Loan Servicing

20  Agreement," (*emphasis added.*) which the Confirmation Order defined as a "Surviving

21  Section 3 Right." Confirmation Order, ¶ 14.  The Order then provides:

22         …in connection with any attempted post-Closing exercise of a Surviving
           Section 3 Right : (a) the Direct Lenders must provide Compass at least thirty
23         (30) days prior written notice before exercise of such right in accordance with
           section 8 of the Loan Servicing Agreement. (b) Compass shall have the right
24         to challenge the exercise of such Surviving Section 3 Right by filing a motion
           with this Court prior to the expiration of such thirty (30) day period to
25         determine whether such Surviving Section 3 Right has been properly and
           validly exercised and the Court shall retain jurisdiction to adjudicate any such
26         disputes…

27  *Id.*  As is made clear in the Confirmation Order, this Court only retained jurisdiction to

28  adjudicate the exercise of "Surviving Section 3 Rights", which are expressly defined as a

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd          - 16 -

1  termination based on pre-petition conduct of USACM.  It makes sense that this Court

2  reserved jurisdiction on this issue since the Court was familiar with the acts of USACM,

3  and there was a legitimate concern that the Loan Servicing Agreements could be terminated

4  based on <u>USACM'S</u> previous activities.  The Court did not retain any jurisdiction over

5  post-confirmation (non-Surviving Section 3 Rights) disputes among non-debtor parties,

6  including a termination of the Loan Servicing Agreements based on Compass' post-

7  confirmation conduct, or based on independent state law rights.

8  　　　Here, Compass has not been terminated based on "Surviving Section 3 Rights."

9  Rather,  Compass has been terminated based on its own post-confirmation conduct and

10  direct lenders' independent state law right to terminate Compass.  These issue have been

11  put before Judge Reed in the District Court Action filed in the Untied States District Court

12  for the State of Nevada.  That Court has jurisdiction over these issues.

13  　　　Underlying the District Court Action are various post-petition actions and inactions

14  by Compass, which are not within the realm of this Court's jurisdiction.  The issues raised

15  in the District Court Action include:

16

17  　　　1.　　<u>As Asserted By The Plaintiffs In The District Court Action, Direct Lenders
        Have An Absolute Right Under NAC 645B.073 To Terminate Compass If
        51% Of Direct Lenders Elect To Do So And This Court Has No Jurisdiction
        To Adjudicate Whether Compass Has Been Properly Terminated Under NAC
        645B.073.</u>

18

19

20  As submitted to the District Court in the District Court Action, Nevada

21  Administrative Code section 645B.073(1) provides:

22  　　　Except as otherwise provided in subsection 3, if a mortgage broker acts on
        behalf of investors on a matter related to a mortgage loan, and if the

23  　　　beneficial interest in the loan belongs to more than one natural person, the
        documentation of the matter must include provisions to allow the holders of

24  　　　51 percent or a greater specified percentage of the beneficial interests of
        record to act on behalf of all the holders of the beneficial interests of record

25  　　　in the event of a default or foreclosure for matters that require the direction
        or approval of the holders of the beneficial interests in the loan, including,

26  　　　without limitation:

27  　　　　　　　(a) The designation of the mortgage broker, servicing
            agent or other person to act on the behalf of the holders

28  　　　　　　　of the beneficial interests in the loan; and

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd          - 17 -

1          (b) The sale, encumbrance or lease of real property
2      owned by the holders resulting from a foreclosure or the
       receipt of a deed in lieu of a foreclosure.

3    Nevada law is clear that where a statute requires that a certain provision be included in a

4    contract, provisions which are inconsistent with that requirement cannot be enforced. See,

5    e.g., *Federated American Ins. Co. v. Granillo,* 108 Nev. 560, 562, 835 P.2d 803 (1992);

6    *Neal's Estate v. Farmers Ins. Exchange,* 93 Nev. 348, 350, 566 P.2d 81 (1977).  Here, the

7    Loan Servicing Agreements have purportedly modified direct lenders right to terminate the

8    loan servicer under NAC 645B.073 by conditioning direct lenders rights to terminate based

9    only upon a "failure to act" by the servicer.   Such a requirement, however, is

10   unenforceable because there is no "cause" element contained in NAC 645B.073.  Rather,

11   NAC 645B.073 allows termination with consent of 51% of direct lenders with or without

12   cause.

13         As Compass acknowledges in its Motion, the termination of Compass in this case

14   was based on NAC 645B.073, not a "Surviving Section 3 Right."  Because direct lenders

15   exercised their rights to terminate Compass entirely independent of any Surviving Section

16   3 Right, they were not required to provide Compass thirty (30) days notice of the

17   termination, or comply with any other provision of ¶ 14 of the Confirmation Order.

18         2.   Even If Cause To Terminate Compass Under Section 3 Of the Loan Servicing
            Agreements Is Required, Compass Has Been Terminated Based On Its Own
19          Post-Confirmation Conduct, Not Any Pre-Petition Conduct Of USACM,
            Which Is An Issue That This Has Been Brought Before Judge Reed In The
20          District Court Action.

21         As asserted and alleged in the District Court Action, Compass has also been

22   terminated based on its own post-confirmation conduct, independent of any pre-petition

23   conduct of USACM.  The District Court Action seeks declaratory relief and damages based

24   on various post-confirmation conduct by Compass including, but is not limited to, the

25   following:

26         a.   Compass Is Unlawfully Holding Itself Out As Direct Lenders' Agent
            Without A Valid Power of Attorney.
27

28         As asserted in the District Court Action as a basis for damages and declaratory

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd                - 18 -

1  relief, Compass has unlawfully held itself out as Direct Lenders' Agent in violation of

2  Nevada State law.  Section 13 of the Loan Servicing Agreements specifically provides:

> This Agreement shall be construed in accordance with the laws of the State of Nevada, without regard to conflict of laws or rules thereof, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

6  Under Nevada Law, when a mortgage broker acts as a servicing agent, it is indeed

7  acting as the agent of the lenders.  *See generally*, *Young v. Nevada Title Company,* 103

8  Nev. 436, 439, 744 P.2d 902 (1987). "An agent owes to the principal the highest duty of

9  fidelity, loyalty and honesty in the performance of the duties by the agent on behalf of the

10 principal." *LeMon v. Landers*, 81 Nev. 329, 402 P.2d 648 (1965).  A mortgage broker "is

11 charged with the duty of fullest disclosure of all material facts concerning the transaction

12 that might affect the principal's decision." *Holland Realty Investment Co. v. Nevada,* 84

13 Nev. 91, 97, 436 P.2d 422 (1968); Accord, *Jory v. Bennight,* 91 Nev. 763, 542 P.2d 1400

14 (1975).

15 Pursuant to NRS 645B.330, a mortgage broker/agent must act on behalf of direct

16 lenders pursuant to a valid power of attorney, approved by the State of Nevada.  In this

17 regard, Plaintiff executed a power of attorney in favor of USACM when making

18 investments/loans.  NRS 645B.330 requires that the power of attorney "Expressly provide

19 that the power of attorney is effective only for the term of the specific loan unless the

20 mortgage broker obtains written approval from the private investor to extend the term of

21 the power of attorney…"    and "a power of attorney which designates a mortgage broker

22 or mortgage agent as the attorney-in-fact or the agent of a private investor and which

23 violates the provisions of this section is void and must not be given effect with regard to any

24 act or transaction that occurs on or after October 1, 1999, whether or not the power of

25 attorney is or has been executed by the private investor before, on or after October 1,

26 1999."  The Loan Servicing Agreements in this case codify NRS 645B.330 and expressly

27 provide that  the powers of attorney expire on the maturity date of each related loan.

28 Here, numerous loans have matured.  Compass has not obtained a written extension

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd                - 19 -

1  of any of Powers of Attorney as required by NRS 645B.330.  Thus, as a result of the term

2  maturity of various loans in the USACM portfolio, Compass no longer has a valid power

3  of attorney to act on behalf of direct lenders as required under NRS 645B.330.

4          Despite the fact no valid power of attorney exists that authorizes Compass to act on

5  behalf of Plaintiffs and other direct lenders, Compass continues to hold itself out as a

6  representative/agent of Plaintiffs (and other direct lenders) to borrowers, title companies

7  and others.  Such conduct gave direct lenders further cause to terminate Compass as the

8  loan servicer.

9                    b.      <u>Compass Has Adopted A Position Unprecedented In The Industry That
                           It Is Entitled To Receive Default Interest And Late Fees Before Direct</u>
10                         <u>Lenders Receive Principal and Interest.</u>

11         As asserted in the District Court Action, since taking over under the Loan Servicing

12 Agreements, Compass adopted a strategy to extract value from the collateral pledged by

13 third-party borrowers to direct lenders, by attempting to deduct unpaid default interest, late

14 fees, extension fees, and other undisclosed fees, from the collateral proceeds <u>before</u>

15 remitting amounts due to Plaintiffs and other direct lenders, which is in direct conflict with

16 the loan documentation (Notes, deeds of trust and loan agreements), the Loan Servicing

17 Agreements, the intent of the parties to the loans and various related agreements, the

18 historical practices of USACM and long established lending industry standards and

19 practices.

20         As set forth in the April 24, 2007, email from Compass to LPG members, attached

21 to the *Declaration of Donna Cangelosi* as Exhibit B, Compass maintains the Debtors' Plan

22 gave them the first priority to receive default interest from borrowers payments, despite the

23 fact the loan documents give the direct lenders the right to dictate the priority of payment

24 applications, despite the fact that the Court repeatedly said the Loan Servicing Agreements

25 were not modified.  Specifically, in that email Compass states:

26         Principal gets repaid last, hence our point about a  shortfall. I assumed Direct
          Lenders were familiar with the Reorganization Plan they approved that
27         provides for that, but you make a point I will be happy to consider for future
          Loan Status Reports. - Mark Olson

28

1   Compass' strategy and approach for servicing the Loans has created a conflict of interest

2   between Compass and direct lenders, to whom Compass owes fiduciary duties.  This gave

3   direct lenders further cause to terminate Compass based on its own post-confirmation

4   conduct.

5           c.      <u>Compass Has Failed To Make Disclosures To Direct Lenders That
                    Are Required Under Nevada Law.</u>
6

7           Pursuant to NRS 645B.185, a mortgage broker/agent is required to provide each

8   investor a Mortgage Investment Disclosure Form, approved by the Nevada Mortgage

9   Lending Division. As detailed in the Mortgage Investment Disclosure Form, a mortgage

10  broker/agent operating in Nevada is required to inform investors that:

11          a.      "Before you invest in a promissory note by an interest in real
                    property, you should know… the knowledge, experience and integrity
12                  of the mortgage broker with whom you are dealing."

13          b.      "You are entitled to receive information regarding the mortgage
                    broker you are dealing with" more specifically the most recent
14                  financial statements.

15          c.      "You have a right to ascertain from the Division of Mortgage Lending
                    the results of any investigation against the mortgage broker"
16

17          d.      "In many cases, including those cases where the investments consist
                    of "fractionalized" interests, the loan requires servicing by an
                    authorized agent… The mortgage broker with whom you are dealing
18                  is authorized by Nevada law to act as the servicing agent."

19          e.      "A Mortgage Broker performing loan servicing has an obligation to
                    account to the borrower and every investor for money collected and
20                  disbursed in the exercise of that function".

21          f.      When the borrower on a mortgage loan fails to make required
                    payments, the actions and investor can take, or that a servicing agent
22                  can take on behalf of an investor, are determined by provisions of
                    Nevada Law and the documents and instruments evidencing the
23                  mortgage loan.

24  Compass has failed and refused to provide direct lenders the information required in the

25  Mortgage Investment Disclosure Form, which established further cause for direct lenders

26  to terminate Compass.  *See Declaration of Donna Cangelosi.*

27  ///

28  ///

d.  Compass Has Been Ordered By The Nevada Division of Mortgage Lending To Cease And Desist Escrow Activities In Nevada.

The fact the Nevada Division of Mortgage Lending has formally ordered Compass to cease and desist certain activities it is required to perform under the Loan Servicing Agreement also establishes cause for direct lenders to terminate the Agreements for reasons entirely unrelated to the pre-petition conduct of USACM.   According to the State of Nevada, an investigation revealed that Compass had "engaged in a minimum (of) seven (7) distinct instances of escrow agency activity in the State of Nevada without a license to do so, thereby violating NRS 645A.020 and NRS 645A.210."  *See Exhibit C to Cangelosi Declaration,* p. 8.

Compass has since moved to New York in an attempt to escape regulation by the State of Nevada.  However, Compass still violates the Cease and Desist Order by servicing loans for Nevada residents, who make up a large contingency of the Direct Lenders. Moreover, because Section 13 of the Loan Servicing Agreements expressly provides that Compass' duties and obligations are governed by Nevada Law, Compass cannot avoid complying with Nevada Law by relocating to New York.

**E.  The LPG and Cangelosi Have Not Interfered With The Implementation Of The Debtors' Plan And, In Fact, The Only Provisions Relevant To Compass Have Been Fully Consummated and Implemented.**

While Compass fashions its Motion as an effort to enforce the Debtors' Plan, in reality, the relevant Plan provisions have been fully implemented.   The Plan simply provided for the transfer of an asset, the Loan Servicing Agreements, by USACM to Compass.   The transfer of the Loan Servicing Agreements by USACM to Compass has closed, and thus, the Plan has been fully implemented as it relates to Compass.  As the only relevant Plan provisions have been fully performed and implemented, it is impossible for LPG, Cangelosi or any other party to interfere with those Plan provisions.

Moreover, the law is clear that, beyond the very limited jurisdiction retained over Surviving Section 3 Rights, this Court's only role is to ensure the asset transfer is effectuated.  Once effectuated, the Court' s jurisdiction ends and this Court cannot proceed

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd                - 22 -

1   to adjudicate disputes which later arise over the Loan Servicing Agreements.  *See* Paddock,

2   226 F.Supp. at 48.  The issues raised in Compass' Motion do not involve any Debtor and

3   will have no impact on the Debtors' bankruptcy cases.

4

5   **F.    Compass' "Notice Of Removal" of the District Court Action Is Improper And Should Be Stricken From The Record In This Case.**

6       Compass has improperly attempted to "remove" the District Court Action to this

7   Court under 28 U.S.C. § 1452(a).  As acknowledged by the only Court within the Ninth

8   Circuit to address this issue, such a removal "defies logic and common sense."  *See* In re

9   Mitchell, 206 B.R. 204, 209-212 (Bankr. D. Cal. 1997).  *Mitchell* involved an attempted

10  § 1452 removal of an action filed United States District Court to the bankruptcy court

11  sitting in the same district, which was in essence the same court, according to *Mitchell.*

12  The *Mitchell Court* held that "as a matter of logic and common sense, it would not seem

13  to be possible to 'remove' a lawsuit to the very court where the lawsuit is already pending.

14  Removal, both under the nonbankruptcy removal statute, 28 U.S.C. § 1441-1448, and

15  under the bankruptcy removal statute, 28 U.S.C. § 1452, involves moving the lawsuit from

16  the court where it was originally brought--which is usually a state court--to a federal district

17  court. It seems to be a tautology to talk about 'removing' an action already pending in a

18  federal district court to that same federal district court where the action is already pending."

19  Mitchell, at 209-10.

20      28 U.S.C. § 1452(a) speaks of removing a proceeding "to district court". It violates

21  the plain language of 28 U.S.C. § 1452(a) to say that an action can be removed "to district

22  court" when it is already pending in district court, because the words "to district court" by

23  necessity involve the concept of bringing the action to district court from some other forum.

24      The *Mitchell* Court held "that proper procedure for a party to use to request a district

25  court to transfer a lawsuit pending in that district court to a bankruptcy judge of the same

26  district is for the party seeking the transfer to move the district court to refer that lawsuit

27  to the bankruptcy court for further handling." Mitchell, at 210, *citing* Thomas Steel Corp.

28  v. Bethlehem Rebar Indus., 101 Bankr. 16, 19 (Bankr. N.D. Ill. 1989); In re Watson-

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\LPG\OPP to Compass Motion FINAL.wpd                                    - 23 -

1   *Mahaney, Inc.*, 70 Bankr. 578, 581 (Bankr. N.D. Ill. 1987).  The *Mitchell* Court expressly

2   held "that 28 U.S.C. § 1452(a) cannot be used to remove a lawsuit pending in federal

3   district court to the same district court where the lawsuit is already pending."  Id.  The

4   Court explained that "such a reading of Section 1452(a) gives meaning to all parts of that

5   section, and avoids the logically idiotic result of claiming that a lawsuit can be removed

6   from the district court where it is already pending to that very same court."  Id. at 211.

7           Compass has attempted to do exactly what was prohibited in *Mitchell,* namely

8   attempting to use § 1452(a) to remove a case from a District Court for the District of

9   Nevada to the same District Court sitting as this Bankruptcy Court for the District of

10  Nevada.  This is not a proper procedural use of § 1452(a) and, therefore, Compass' Notice

11  of Removal of the District Court Action filed in this Court should be stricken from the

12  record in this case and any "removal" should be nullified.  If Compass has grounds for the

13  District Court to refer the District Court Action to this Court, it must pursue its goals in the

14  District Court through a motion to refer the case to this Court.

15                                              **IV.**
                                          **CONCLUSION**
16

17          For the reasons detailed above, Compass Motion must be denied because: (1)

18  Compass lacks standing to seek and obtain the relief sought in the Motion; and (2) this

19  Court lacks subject matter jurisdiction over the dispute.  In addition, Compass' Notice of

20  Removal of the District Court Action, filed herein, should be stricken from the record and

21  any resulting "removal" of the District Court Action to this Court must be nullified.

22          DATED this 30th day of May, 2007.

23                                    LAW OFFICES OF ALAN R. SMITH

24                                          /s/ Alan R. Smith
                                    By_____
25                                     ALAN R. SMITH, ESQ.
                                       Attorney for the Lenders Protection Group
26

27

28