# Exhibit "C"

**STATE OF NEVADA**

**DEPARTMENT OF BUSINESS AND INDUSTRY**

**DIVISION OF MORTGAGE LENDING**

* * *

In re:

USA COMMERCIAL
MORTGAGE COMPANY,
a licensed mortgage broker,

    Respondent.

**ORDER REVOKING MORTGAGE BROKER LICENSE
AND NOTICE OF RIGHT TO REQUEST HEARING**

    The licensing and regulation of mortgage brokers and mortgage agents in the State of Nevada is governed by Chapter 645B of the Nevada Revised Statutes (hereinafter, "NRS") and Chapter 645B of the Nevada Administrative Code (hereinafter, "NAC"). The State of Nevada, Department of Business and Industry, Mortgage Lending Division (hereinafter, the "DIVISION") has the general duty to exercise supervision and control over mortgage brokers and mortgage brokering activity. *See*, NRS 645B.060(1), NRS 645B.690 and NRS 645B.670. Pursuant to that authority, the DIVISION makes the following Findings of Fact, Conclusions of Law, and Order as follows:

**FACTUAL ALLEGATIONS**

    1.    USA COMMERCIAL MORTGAGE COMPANY (hereinafter, "RESPONDENT") is a licensed mortgage broker operating within the State of Nevada. RESPONDENT was issued a mortgage broker's license pursuant to Chapter 645B of the Nevada Revised Statutes on January 11, 1990. The DIVISION currently classifies RESPONDENT'S license as active.

////

EXHIBIT "*C*"

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-1-

2.      On April 13, 2006, RESPONDENT filed for protection pursuant to Chapter 11 of the United States Bankruptcy Code.   RESPONDENT was accompanied into bankruptcy by several of its related entities (hereinafter, the "USA ENTITIES").    Said bankruptcy was commenced in the United States Bankruptcy Court for the District of Nevada, Las Vegas Division and is being administered, on behalf of RESPONDENT and the USA ENTITIES as Case No. 06-10725-LBR.

3.      On December 8, 2006, RESPONDENT and the USA ENTITIES entered into an "Asset Purchase Agreement" with COMPASS PARTNERS, LLC and its affiliated entities (hereinafter, "COMPASS") wherein RESPONDENT and the USA ENTITIES agreed to sell, and COMPASS agreed to purchase the entirety of RESPONDENT'S and the USA ENTITIES' respective interests in their portfolio of commercial loans.

4.      Pursuant to said agreement, COMPASS also agreed to purchase RESPONDENT'S and the USA ENTITIES' respective interests in the servicing agreements and related contracts attached to each commercial loan within said portfolio.

5.      Said agreement further specified that RESPONDENT, the USA ENTITIES and COMPASS were to close this transaction on or before February 16, 2007.

6.      Said agreement further recognized that COMPASS' contemplated purchase of the loans and the servicing rights for said loans would then necessarily cause it to engage in licensable activity as regulated by the DIVISION under either Chapter 645A or 645B of the Nevada Revised Statutes.   For this reason, the "Asset Purchase Agreement" between the parties also required that COMPASS make application with the DIVISION for an appropriate license.

7.      As called for under said agreement, COMPASS did, in fact, make application with the DIVISION.  However, as February 16, 2007 approached (i.e., the designated closing date for the COMPASS purchase to be consummated), it became clear that it was logistically

impossible for COMPASS to complete the approval process with the DIVISION and acquire its license before said date.

8.    Because both COMPASS, RESPONDENT and the USA ENTITIES recognized this fact, the respective parties entered into a "Subservicing Agreement" in mid-February 2007, wherein COMPASS would essentially "subcontract" its servicing duties (for which a license was required) to RESPONDENT (which still maintained the appropriate license).  Said arrangement allowed the planned purchase to continue, albeit with an extended closing date.

9.    Thus, because of the "Subservicing Agreement" referenced above, it has been incumbent upon RESPONDENT to maintain its current licensure under Chapter 645B of the Nevada Revised Statutes.

10.    Pursuant to NRS 645B.060, the DIVISION is charged with conducting "…such investigations as may be necessary to determine whether any person has violated any provision of this chapter, a regulation adopted pursuant to this chapter or an order of the Commissioner." *See*, NRS 645B.060(2)(b).

11.    Pursuant to NRS 645B.060, the DIVISION is further charged with conducting "…such other examinations, periodic or special audits, investigations and hearings as may be necessary and proper for the efficient administration of the laws of this State regarding mortgage brokers and mortgage agents…" *See*, NRS 645B.060(2)(d).

12.    On March 15 through March 29, 2007, the DIVISION conducted an investigation of RESPONDENT'S loan servicing operations.

////

////

////

////

////

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-3-

13.     Said investigation revealed the following violations:

a.     **RESPONDENT'S Failure To Submit Financials And Audits Required For Its Trust Accounts**

Because RESPONDENT possesses a license under NRS Chapter 645B and maintains trust accounts for client funds, RESPONDENT is obligated to submit audited financial statements and audits for these accounts, to the DIVISION on an annual basis. *See*, NRS 645B.085(3). RESPONDENT has failed to do this and has, thereby, violated NRS 645B.085.

b.     **RESPONDENT'S Commingling, Mishandling And Misuse Of Client Funds**

NRS 645B.175(4) requires that all monies paid to a mortgage broker in the State of Nevada, either in full or in partial payment of a loan secured by a lien on real property must be kept separate from (i.e., not commingled with) monies belonging to the mortgage broker, and maintained in an account named so as to indicate that its contents are not the property of said mortgage broker. *See*, NRS 645B.175(4).

The DIVISION'S investigation revealed that RESPONDENT maintains a bank account where all monies received as loan payments and loan payoffs from borrowers are deposited. Said account is titled, "Debtor In Possession BK-S-06-10725 Operating Account / Collection" (hereinafter, the "ACCOUNT"). The DIVISION'S investigation further revealed that the ACCOUNT is not, in fact, a trust account and inappropriately titled under the above-referenced statute.

The DIVISION'S investigation further revealed that monies received from borrowers are periodically "swept" from the ACCOUNT into a money market account titled, "Debtor In Possession BK-S-06-10725 Operating Account". This was done in order to generate interest on these monies, as they awaited distribution to investors. The DIVISION'S investigation further revealed that this second account was not, in fact, a trust account and was also inappropriately

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

titled.  The DIVISION'S investigation further revealed that this second account has generated THREE HUNDRED EIGHTEEN THOUSAND, THREE HUNDRED NINETY-NINE DOLLARS ($318,399) in interest income, for the month of January 2007 and further revealed that this second account generated ONE MILLION TWO HUNDRED THOUSAND DOLLARS ($1,200,000) for all of calendar year 2006.  RESPONDENT has improperly converted this interest income for its own use, despite the fact that the monies used to generate said interest income were never its property.

The DIVISION'S investigation further revealed that default interest collected on loans from borrowers is deposited directly into RESPONDENT'S operating account and not into either of the collection accounts referenced herein.  It is the DIVISION'S position that RESPONDENT was obligated to deposit said default interest into the collection accounts referenced herein, and then divide the funds as called for under the applicable Loan Servicing Agreements. RESPONDENT'S direct depositing of these funds into its own accounts constitutes impermissible commingling.  *See*, NRS 645B.175(4).

    **c.**    **RESPONDENT'S Impermissible Change Of Principal Location And Branch Office(s)**

NAC 645B.057 states that a mortgage broker in the State of Nevada may not change the location of their principal office or any branch office until the DIVISION approves the location change.  This provision further states that a mortgage broker in the State of Nevada may not close their principal office or any branch office until said broker returns their license to the DIVISION and the DIVISION approves the closure.  *See*, NAC 645B.057(1)(c), (3).

The DIVISION'S investigation revealed that within the previous six (6) months, RESPONDENT has changed locations on two (2) occasions and failed to return its license upon doing so.  The DIVISION'S investigation further revealed that RESPONDENT closed its main location without prior DIVISION approval.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

1

      **d.**      **RESPONDENT'S Impermissible Payment Of Interest To Investors On**

2

**Defaulted Loans**

3

      NRS 645B.250 prohibits the advancement of payments to investors on behalf of a person

4

who has obtained a loan secured by a lien on real property and who has defaulted on the

5

payments related to said property. *See*, NRS 645B.250. The DIVISION'S investigation revealed

6

that prior to its filing for bankruptcy protection, RESPONDENT paid interest to investors on

7

defaulted loans it serviced.

8

      **e.**      **RESPONDENT'S Failure To Report On The True Performance Status**

9

**Of Its Outstanding Loans**

10

11

      NRS 645B.260 and NAC 645B.070 require monthly reporting by all licensees under

12

Chapter 645B regarding delinquencies and/or defaults in connection with any loans serviced by

13

any such licensees. These provisions further detail the contents of the mandatory reporting in

14

question and indicate that the DIVISION may refuse to renew the licensure of any mortgage

15

broker who has failed to submit the required reports for any of the previous twelve (12) months.

16

*See*, NRS 645B.260 and NAC 645B.070.

17

18

      The DIVISION'S investigation revealed that RESPONDENT failed to provide a single

19

report to the DIVISION and/or the beneficial owners of the loans it serviced, as to the true

20

performance status, whether prior to or after RESPONDENT'S filing for Chapter 11 bankruptcy

21

protection.

22

      **f.**      **RESPONDENT'S Failure To Post Its License As Required**

23

      NRS 645B.025 requires that mortgage brokers in the State of Nevada must post their

24

licenses in a "…conspicuous place in the office to which it pertains…" *See*, NRS 645B.025. The

25

DIVISION'S investigation revealed that RESPONDENT'S license was not posted as required by

26

statute.

27

28

*////*

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

g.    **RESPONDENT'S Other Servicing "Irregularities"**

NRS 645B.670 subjects Chapter 645B licensees to discipline for engaging in "material misrepresentation in connection with any transaction governed by this chapter…or [engaging] in any other conduct constituting a deceitful, fraudulent or dishonest business practice…": *See* NRS 645B.670(3)(b), (h).

As demonstrated through the following excerpts from the Investigative Report created in this matter, the DIVISION'S investigation revealed the following additional irregularities in the RESPONDENT'S loan servicing practices:

**Interest and fees calculations:**

In summary, the Division found minor errors, in some instances, in the calculation of interest earned by investors, and fees earned by the licensee. The dollar amounts of the errors made were small, as shown by the examples below. In addition, the errors appear to have been in the investors' favor, i.e., they were paid more than they should have.

For investors Phillip E. McMullin & Rosemarie L. McMullin Trustees, who had a $50,000 investment in the Goss Road loan ($1,000,000), the interest earned for the period 1/1/07 to 1/02/07 as calculated by the licensee was $46.42, whereas the Division's calculations indicated that it should actually have been $42.14. So, in this instance, the investor was underlined overpaid by $4.28 (The Goss Road loan paid off on 01-02-07, hence there was only two day's interest).

For the same investor for the same loan above, the loan service fee calculated by the licensee was $3.74, whereas it should have been $2.78.

No interest was calculated for investor Joyce E. Smith, Trustee of the Joyce E. Smith Trust. This investor had a $50,000 investment in the Goss Road loan, and hence would have earned $41.67 in interest for January. The licensee's Controller, LeAnn Weese, stated that Joyce Smith was indeed paid the interest after they discovered the error. This was verified by the investigators.

Investor Byrne E. Falke Trustee of the Byrne Falke Living Trust, who had a $62,500 investment in the Goss Road loan, was paid $58.02 in interest for the period 1/1/07 – 1/2/07. Division calculations indicate that the interest for the 2-day period should

have been $53.35. Hence, in this case, the investor was overpaid by $4.67. In addition, this investor was charged $4.67 in loan servicing fee for Jan '07; Division calculations indicate that it should have been $3.36.

These errors were shown to the licensee's Controller, LeAnn Weese. Ms. Weese reviewed the Division's calculations and acknowledged that errors appeared to have been made. She also stated that some of the differences between our figures and the figures calculated by the licensee's computer system could have been due to rounding: apparently, the licensee's computer carried out calculations to 10 decimal places. However, the Division believes that the dollar amounts, although small, were greater than just due to rounding alone.

Although the error for *each* investor was small, the cumulative effect of the combined errors could total a significant amount.

The Division sampled the calculations for interest and fees for the Goss Road for December, and found those to be correct. Hence, the errors appear to have been made in January 2007. Controller LeAnn Weese stated that a change to the computer system's calculations was made in January, and that probably caused the errors.

The transactions on two other loans that paid off in January '07 were also reviewed: the Fiesta Development McNaughton loan, which paid off on 01-12-07, and the Elizabeth May Real Estate loan, which paid off on 01-18-07.

The Fiesta Development McNaughton loan had only one investor: the USA Capital First Trust Deed Fund. The interest paid to the investor and the loan servicing fee charged calculated by the licensee's system agreed with Division calculations.

The Division reviewed a sample of investors in the Elizabeth May Real Estate loan, and tested the interest paid and the loan servicing fees charged. This loan paid off on Jan 18, '07. The Division found that the borrower had been charged interest for 19 days, and not 18 days. The extra days' interest was distributed to investors. However, the servicing fee appears to have been calculated for 17 days, and not 18 days; hence the investors were <u>undercharged</u> the servicing fee in Jan '07 for this loan.

The Division additionally sampled some loans that were <u>not</u> payoffs and tested the interest and servicing fees, for Jan '07. The Division found small errors in this instance, too. But again, they were in the investor's favor.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-8-

Prior to Jan '07, our testing indicates that interest and loan servicing fees appear to have been calculated correctly.

**"Netting" of interest:**

Prior to the bankruptcy filing, USA Capital was paying interest to investors on defaulted loans. The bankruptcy court has allowed the new management of USA Capital (debtor in possession) to "net" the interest paid on defaulted loans against interest collected *after* the bankruptcy. For example, assume that an investor was paid $2,000 on a defaulted loan prior to the bankruptcy. After the bankruptcy, for example if USA Capital collected $3,000 in interest that has to be distributed to this investor. The investor would only receive the "net" amount, which is $1,000.

The Division did not have sufficient time to verify if the "netting" calculations were correct, because it is based on the interest received by the investor on defaulted loans, going back several years. It should also be noted that NRS 645B and NAC 645B does not specifically allow for the concept of netting as it is a violation of State law to commingle funds which was the basis for netting.

**Servicing Fees**

The Loan Servicing Agreements signed by investors had varying amounts for the servicing fee, from 0% to 3%, with one investor at 4%. The breakdown is as follows:

| Servicing Fee % | % of investors |
|---|---|
| 0% | 2.1% |
| 0.25% | 0.2% |
| 0.50% | 1.2% |
| 1.00% | 72.1% |
| 1.50% | 0.2% |
| 2.00% | 0% |
| 3.00% | 24.2% |
| 4.00% | One investor - Steven Frankel |

The Loan Servicing Agreement (LSA) could not be located for 15% of the investors.

The bankruptcy court allowed USA Capital to charge a 1% servicing fee *and hold back an additional 2%* until the licensee could accurately determine, for each investor, what servicing fee should be charged, per their LSA.

The total of this "hold back" amount is around $605,000.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

This amount will be distributed back to those investors whose LSA does indicate that their servicing fee is less than 3%. The distribution was made in March 2007, towards the end of the investigation, so there was insufficient time to test it to see if it was correct.

## Appraisal Fees and Assignment Fees

After the bankruptcy, the new management of USA Capital ordered an appraisal on all loans, in order to determine what the value was in each of the underlying properties.   These appraisal fees were charged back to investors, on a pro-rata basis.  We were able to verify only a few of the appraisal fees charged, but did not have sufficient time to verify a good sample.

Assignment fees were also charged back to investors.  This is in cases where an investor was able to get another investor to take his place in a loan.

## Interest charged to borrowers

Interest charged to the borrower is compounded interest, not simple interest.  In other words, if a borrower does not make his interest payment one month, the interest owed the next month is based on interest on the outstanding principal balance plus interest on the interest owed the previous month.  For example:

| Month 1: | $100,000 @ 13% | 1,083.33 | interest owed |
| Month 2: | $101,083.33 @ 13% | 1,095.07 | interest owed |

This is very unusual.  The Division has not come across any other 'hard money' brokers who charge compound interest.

The Division reviewed a sample of promissory notes and found that, in each instance, the borrower has signed the note agreeing to pay compound interest.

## Default interest and late fees

Per the sample of Loan Servicing Agreements reviewed, the licensee is allowed to retain default interest and late fees.

This appears to have been a considerable amount.   For example, in Jan 2007, a total of $734,693 was collected in default interest, and $48,009 in late fees.  These funds go directly into the licensee's operating account.  The borrower's history report does not show the default interest collected.  It does show the late fees;

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-10-

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

however, the Division was informed by the Controller LeAnne Weese that the late fees should not be on the borrower's history report, either. Based upon this information it is doubtful whether USA Capital has ever properly reported interest, etc to the IRS either pre or post bankruptcy.

The Division's position, once again, is that all funds received as a payment or a payoff on a loan is to be deposited in the Collection trust account and then transferred to the appropriate recipient. By circumventing this step it is doubtful whether any audit of the financial statements of USA Capital have ever been validated or valid. It should be noted that the majority of other 'hard money' brokers pass on the default interest to borrowers.

## Exit Fees

There is no specific reference in the notes or loan servicing agreements with regards to exit fees. A review of the files and financial records indicate that as of July 2006 the exit fees could total well in excess of $6,000,000. These exit fees would be construed as either profit participation(s) or a pre-payment penalty. There was one instance found where the exit fee was contained in an addendum to the note; however, never treated as a pre-payment penalty and never distributed to the direct lenders. The division could find only one investor out of 3,600 who was given the opportunity to participate in the exit fee. This underscores the true nature of the risk and reward on the loans originated by USA Capital. A calculated, self serving deceptive scheme that was enacted to allow the principals to potentially profit with no risk while astronomical risk inured to the unsuspecting lenders. An exit fee is not typical of the mortgage brokerage industry nor is it appropriate compensation for a loan servicing company the monies should be distributed to the lenders who bore **ALL** of the risk although unbeknownst to them.

Taken together, these irregularities in the nature of RESPONDENT'S servicing activities constitute numerous instances of material misrepresentation in connection with a transaction governed by NRS Chapter 645B, and further constitute deceitful, fraudulent or dishonest business practices, in violation of NRS 645B.670. _See_, NRS 645B.670(3)(b), (h).

////

////

////

-11-

////

14.    Pursuant to NRS 645B.670, "...for each violation committed by a mortgage broker, the Commissioner may impose upon the mortgage broker an administrative fine of not more than $10,000, may suspend, revoke or place conditions upon his license, or may do both, if the mortgage broker, whether or not acting as such… [h]as made a material misrepresentation in connection with any transaction governed by this chapter...or [h]as engaged in any other conduct constituting a deceitful, fraudulent or dishonest business practice…": *See*, NRS 645B.670(3)(b), (h).

## VIOLATIONS OF LAW

1.    The DIVISION has determined that, through the above-described conduct, RESPONDENT has violated provisions of the following statutes and regulations:

    a.    NRS 645B.085(3)

    b.    NRS 645B.175(4)

    c.    NAC 645B.057(1)(c)

    d.    NAC 645B.057(3)

    e.    NRS 645B.250

    f.    NRS 645B.260

    g.    NAC 645B.070

    h.    NRS 645B.025

    i.    NRS 645B.670(3)(b)

    j.    NRS 645B.670(3)(h).

## ORDER

**NOW, THEREFORE,** the **COMMISSIONER** of the **DIVISION HEREBY ORDERS** that, pursuant to NRS 645B.720 and NRS 645B.750, the mortgage broker license of RESPONDENT be **REVOKED**.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

**IT IS FURTHER ORDERED** that, pursuant to NRS 645B.750, upon written application to the DIVISION, RESPONDENT shall be entitled to a hearing with regard to the contents of the instant Order.  Should RESPONDENT not request a hearing within **twenty (20) days** of the receipt of the instant Order, the DIVISION will enter a Final Order in this matter, as required by NRS 645B.750(2).

Dated this 2nd day of May, 2007.

**STATE OF NEVADA**
**DEPARTMENT OF BUSINESS AND INDUSTRY**
**DIVISION OF MORTGAGE LENDING**


**By:** _____
        **SCOTT BICE, COMMISSIONER**

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

# Exhibit "D"

**STATE OF NEVADA**

**DEPARTMENT OF BUSINESS AND INDUSTRY**

**DIVISION OF MORTGAGE LENDING**

* * *

In re:

COMPASS FINANCIAL PARTNERS,
LLC, a Nevada limited liability company,

      Respondent.

**ORDER IMPOSING FINE AND**
**ORDER TO CEASE AND DESIST AND**
**NOTICE OF RIGHT TO REQUEST HEARING**

    The licensing and regulation of escrow agencies and agents in the State of Nevada is governed by Chapter 645A of the Nevada Revised Statutes (hereinafter, "NRS") and Chapter 645A of the Nevada Administrative Code (hereinafter, "NAC"). The State of Nevada, Department of Business and Industry, Mortgage Lending DIVISION (hereinafter, the "DIVISION") has the general duty to exercise supervision and control over escrow agencies and agents. *See*, NRS 645A.050, NRS 645A.090 and NRS 645A.110. Pursuant to that authority, the DIVISION makes the following Findings of Fact, Conclusions of Law, and Order as follows:

**FACTUAL ALLEGATIONS**

    1.    Upon information and belief, COMPASS FINANCIAL PARTNERS, LLC (hereinafter, "COMPASS") is a Nevada limited liability company.

    2.    COMPASS had previously sought, but subsequently withdrew an application for licensure with the DIVISION as a mortgage broker / agent pursuant to Chapter 645B of the Nevada Revised Statutes.

////

EXHIBIT " D "

-1-

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

1   3.      At no time has COMPASS made application for licensure with the DIVISION as

2   an escrow agency pursuant to Chapter 645A of the Nevada Revised Statutes.

3   4.      COMPASS remains unlicensed by the DIVISION under either Chapter 645A and

4   645B of the Nevada Revised Statutes at this time.

5   5.      On April 13, 2006, USA Commercial Mortgage Company (hereinafter, "USA"), a

6   licensed mortgage broker in the State of Nevada pursuant to Chapter 645B of the Nevada

7   Revised Statutes, filed for protection pursuant to Chapter 11 of the United States Bankruptcy

8   Code.  USA was accompanied into bankruptcy by several of its related entities.

9   6.      Said bankruptcy was commenced in the United States Bankruptcy Court for the

10  District of Nevada, Las Vegas Division and is being administered, on behalf of USA and its

11  related entities as Case No. 06-10725-LBR.

12  7.      On December 8, 2006, USA and its related entities entered into an "Asset

13  Purchase Agreement" with COMPASS (hereinafter, "COMPASS") wherein USA and its

14  specified related entities agreed to sell, and COMPASS agreed to purchase the entirety of

15  USA's and its related entities' interests in their portfolio of commercial loans.

16  8.      Pursuant to said agreement, COMPASS also agreed to purchase USA's and its

17  related entities' respective interests in the servicing agreements and related contracts attached

18  to each commercial loan within said portfolio.

19  9.      Said agreement further specified that USA, its related entities and COMPASS

20  were to close this transaction on or before February 16, 2007.

21  10.     Said agreement further recognized that COMPASS' contemplated purchase of the

22  loans and the servicing rights for said loans would then necessarily cause it to engage in activity

23  as regulated by the DIVISION under the appropariate Nevada Revised Statutes.  For this

24  reason, the "Asset Purchase Agreement" between the parties also required that COMPASS

25  make application with the DIVISION for an appropriate license.

-2-

11. Specifically, Article IX of the "Asset Purchase Agreement" between COMPASS, USA and its related entities, stated as follows:

> **Article IX    Conditions to Closing**
>
> **Section 9.1    Conditions Precedent to Obligations of Purchaser.**
> The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):
>
> * * * * * * * * * * * * * * * * * * * * * * * *
>
> **(j)** Purchaser shall have actually obtained an interim license to operate in the State of Nevada or an exemption, satisfactory to Purchaser in all reasonable respects by no later than the Closing Date, from any and all applicable Nevada laws or regulations that would require any licensing of Purchaser and affiliate of Purchaser identified by Purchaser by the State of Nevada in connection with or as a result of consummation of this transaction. Sellers shall provide reasonable cooperation and support to Purchaser in connection with its effort to obtain such interim license or exemption. The condition to the timing of the obtaining of this interim license or regulatory exemption may be extended by the Sellers at their sole discretion.

12. As called for under said agreement, COMPASS did, in fact, make application with the DIVISION. However, as February 16, 2007 approached (i.e., the designated closing date for the COMPASS purchase to be consummated), it became clear that it was logistically impossible for COMPASS to complete its application with the DIVISION and acquire its license before said date.

13. Because both COMPASS, USA and its related entities recognized this fact, the respective parties entered into a "Subservicing Agreement" on February 16, 2007, wherein COMPASS would essentially "subcontract" its servicing duties (for which a license was required) to USA (which still maintained the appropriate license). Said arrangement allowed the planned purchase to continue, albeit with an extended closing date.

///

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

Case 3:07-cv-00241-ECR-VPC    Document 1-4    Filed 05/21/2007    Page 19 of 23

14.    Thus, because of the "Subservicing Agreement" referenced above, from February 16, 2007 forward, the responsibility for the servicing of the commercial loans COMPASS had purchased, fell to USA, as a matter of law.  For this reason, COMPASS was obligated to utilize the services of USA to engage in any servicing activity as to the loans in question, or risk violating Chapter 645A of the Nevada Revised Statutes in behaving otherwise.

15.    Despite its contractual arrangement with USA and its legal obligation to rely upon USA in servicing the loans in question, COMPASS has, since February 16, 2007, disregarded this arrangement and represented to borrowers that *it is, in fact*, the servicer of the loans in question.

16.    Proof of COMPASS' decision to engage in servicing activity, notwithstanding its legal arrangement with USA is as follows:

a.    On March 9, 2007, COMPASS' Director of Investor Relations, Mark L. Olson (hereinafter, "OLSON") wrote to all lenders involved in the USA bankruptcy to advise them of the following:   "…We are pleased to announce that as of February 16, 2007, [COMPASS] became the servicer of most of the loan portfolio formerly serviced by [USA]…"

b.    On March 23, 2007, OLSON wrote to one "Larry L. Rieger" and "Larry L. Rieger and Patsy R. Rieger" as "Trustees of the Larry L. Rieger & Patsy R. Rieger Revocable Trust" and represented that "COMPASS has officially taken over as the servicer of the USA Commercial Mortgage portfolio and has been working diligently to resolve all the loans in this distressed portfolio…"  OLSON'S letter further sought to open a dialogue with these lenders so as to effect the sale of  their interest in a property commonly known as "Shamrock Tower, L.P.", in exchange for a yet-to-be negotiated cash sum.

c.    On March 23, 2007, OLSON, on COMPASS' behalf, commenced similar discussions with a "Donald H. Pinsker", with reference to a property commonly known as "Clear Creek Plantation".

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

Case 3:07-cv-00241-ECR-VPC    Document 1-4    Filed 05/21/2007    Page 20 of 23

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

d.    On April 8, 2007, COMPASS generated a "Loan Status Report" regarding a loan commonly known as "Palm Harbor One, LLC". This "Loan Status Report" makes the following representation: "[COMPASS] has been working hard to collect the maximum value possible from each loan it now services from the USA Capital portfolio. [COMPASS] will provide information to the Direct Lenders about the status of their loans and the actions being taken by the Borrowers and [COMPASS] to get the loans repaid…"

e.    On April 12, 2007, COMPASS generated a "Loan Status Report" regarding a loan commonly known as "5055 Collwood, LLC", which contained identical prefatory language concerning COMPASS' role in servicing the loan referenced therein. COMPASS apparently accompanied this "Loan Status Report" with a written solicitation requesting that the lender in question "Consent to Extend 5055 Collwood, LLC Loan for Six Months", and then provided the terms of the offer to extend.

f.    On April 20, 2007, COMPASS generated two (2) additional "Loan Status Report(s)" regarding loans commonly known as "Eagle Meadows Development" and "Fox Hills 216, LLC", both of which also contained identical prefatory language concerning COMPASS' role in servicing the loans referenced therein.

17.    On April 20, 2007, the DIVISION received word that COMPASS had chosen to terminate the "Subservicing Agreement" between itself and USA since USA had experienced difficulties in its own right, in conforming to the DIVISION'S requirements to maintain its licensure with the DIVISION. Thus, from April 20, 2007 forward, COMPASS' affiliation with USA had ended, thereby leaving COMPASS with no licensed entity to service the loans in question.

18.    On May 3, 2007, the DIVISION issued an "Order Revoking Mortgage Broker License and Notice of Right to Request Hearing", because of certain irregularities and improper activities uncovered in USA'S loan servicing system(s).

////

19.    Pursuant to NRS 645A.010, the concept of "escrow" activity is defined as follows:

> 'Escrow' means any transaction where one person, for the purpose of effecting the sale, transfer, encumbering or leasing of real or personal property to another person, delivers any written instrument, money, evidence of title to real or personal property, or other thing of value to a third person until the happening of a specified event or the performance of a prescribed condition, when it is then to be delivered by such third person to a grantee, grantor, promisee, promisor, obligee, obligor, bailee, bailor or any agent or employee of any of the latter. ***The term includes the collection of payments and the performance of related services by a third person in connection with a loan secured by a lien on real property.***

*See*, NRS 645A.010(3)(emphasis added).

20.    Pursuant to NRS 645A.050, the DIVISION is charged with conducting "...such investigations as may be necessary to determine whether any person has violated any provision of this chapter..." *See*, NRS 645A.050(2)(c).

21.    Pursuant to NRS 645A.110, the DIVISION is further charged with conducting an investigation "...if it appears that an escrow agent or agency is conducting business in an unsafe and injurious manner or in violation of this chapter if it appears that any person is engaging in the escrow business without being licensed pursuant to the provisions of this chapter." *See*, NRS 645A.110(1).

22.    As specified above, the documentary evidence brought to the DIVISION'S attention, indicates that COMPASS has engaged in escrow activity in the State of Nevada (as defined in NRS 645A.010(3)) on multiple occasions, despite its lack of licensure to do so.

23.    Pursuant to NRS 645A.020, "...a person who wishes to be licensed as an escrow agent or agency must file a written application in the Office of the Commissioner..." Further, said application must "...be verified [and] be accompanied by the appropriate fee prescribed in NRS 645A.040..." *See*, NRS 645B.020(1), (2).

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

24.    Pursuant to NRS 645A.210, "...it is unlawful for any person, unless exempted under NRS 645A.015, to engage in or carry on, or hold himself out as engaging in or carrying on, the escrow business or act in the capacity of an escrow agent or agency without first obtaining a license as an escrow agent or agency..." *See*, NRS 645A.210.

25.    Pursuant to NRS 645A.090, "...the Commissioner may refuse to license any escrow agent or agency or may suspend or revoke any license or impose a fine of not more than $500.00 for each violation by entering an order to that effect, with his findings in respect thereto, if upon a hearing, it is determined that the applicant or licensee... has violated any provision of this chapter or any regulation adopted pursuant thereto or has aided and abetted another to do so [OR] ...has intentionally or knowingly made any misrepresentation or false statement to, or concealed any essential or material fact from, any principal or designated agent of a principal in the course of the escrow business..." *See*, NRS 645A.090(1)(b), (e).

26.    Pursuant to NRS 645A.110(2), "...if, upon investigation it appears that the agent or agency is so conducting business or an unlicensed person is engaged in the escrow business, the Commissioner may... order the person to discontinue business in an injurious manner or in violation of this chapter..." *See*, NRS 645A.110(2)(a).

## **VIOLATIONS OF LAW**

1.    Having investigated COMPASS' activities, as described hereinabove, it has been determined that COMPASS has engaged in at a minimum seven (7) distinct instances of escrow agency activity in the State of Nevada without a license to do so, thereby violating NRS 645A.020 and NRS 645A.210.

## **ORDER**

**NOW, THEREFORE,** pursuant to NRS 622.080 and NRS 645A.110(2), the **COMMISSIONER** of the **DIVISION HEREBY ORDERS** that COMPASS **CEASE AND DESIST** from conducting any and all unlicensed escrow agency activity in the State of Nevada.

-7-

Case 06-10725-gwz    Doc 3854-5    Entered 05/30/07 17:02:18    Page 23 of 23
May 11 2007   9:42   P.08
Case 3:07-cv-00241-ECR-VPC    Document 1-4    Filed 05/21/2007    Page 23 of 23

Attorney General's Office
555 E. Washington, Suite 3900.
Las Vegas, NV 89101

IT IS HEREBY FURTHER ORDERED that, pursuant to NRS 645A.090, COMPASS will be subject to an administrative fine in the amount of THREE THOUSAND FIVE HUNDRED DOLLARS ($3,500.00), representing a FIVE HUNDRED DOLLAR ($500.00) fine for each of the seven (7) documented instances of unlicensed escrow agency activity in this matter;

IT IS FURTHER ORDERED that the sum of said administrative fine be paid in full within thirty (30) days of entry of the instant Order;

IT IS FURTHER ORDERED that, pursuant to NRS 645A.110(2)(a), upon submission of a verified petition to the DIVISION, COMPASS shall be entitled to a hearing with regard to the contents of the instant Order. Should COMPASS not request a hearing within thirty (30) days of the receipt of the instant Order, the DIVISION will enter a Final Order in this matter.

Dated this 9ᵗʰ day of May, 2007.

STATE OF NEVADA
DEPARTMENT OF BUSINESS AND INDUSTRY
DIVISION OF MORTGAGE LENDING

By: _____
SCOTT BICE, COMMISSIONER