George A. Davis
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Telephone No.:     (212) 504-6000
Facsimile No.:     (212) 504-6666

**E-Filed on June 11, 2007**

Peter Bernhard (State Bar No. 734)
Bullivant Houser Bailey PC
3980 Howard Hughes Parkway, Suite 550
Las Vegas, Nevada  89169
Telephone No.     (702) 650-6565
Facsimile No.     (702) 650-2995
E-Mail:          peter.bernhard@bullivant.com

Counsel for Compass Financial Partners LLC

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND,<br>LLC,<br>Debtor. | **SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION OF COMPASS FINANCIAL PARTNERS LLC FOR ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 1141 ENFORCING CONFIRMATION ORDER AND FOR CIVIL CONTEMPT SANCTIONS** |
| In re:<br>USA SECURITIES, LLC,<br>Debtor. | |
| Affects:<br>☐   All Debtors<br>☒   USA Commercial Mortgage Company<br>☐   USA Securities, LLC<br>☐   USA Capital Realty Advisors, LLC<br>☐   USA Capital Diversified Trust Deed Fund,<br>      LLC<br>☐   USA First Trust Deed Fund, LLC | Date:  June 20, 2007<br>Time:  10:30 a.m. |

This brief supplements the emergency motion (the "Emergency Motion")[1] Compass USA SPE LLC and Compass Financial Partners LLC (together "Compass") filed in this Court on May 25, 2007 (Docket #3773) and is responsive to the opposition (the "Opposition") to the Emergency Motion filed by Donna Cangelosi and the Lenders Protection Group (together, the "LPG") on May 30, 2007 (Docket #3853).

In this brief, Compass will demonstrate the following:

(1) Paragraphs 3 and 8 of the form Loan Servicing Agreement (the "LSA"), which condition replacement of the servicer upon both a demonstration of cause and 30 days prior written notice, were critical components of the assets Compass acquired from these chapter 11 estates for cash consideration of approximately $67 million;

(2) The Plan, the Asset Purchase Agreement (the "APA") and the Confirmation Order unequivocally require all Direct Lenders to comply with the express terms of the LSAs;

(3) Paragraphs 3 and 8 of the LSA are consistent with applicable Nevada law;

(4) If a court of competent jurisdiction were to enter an order finding that Paragraphs 3 and 8 of the LSA are not binding upon the Direct Lenders, Compass would be entitled to exercise a right of rescission and seek revocation of the Confirmation Order under section 1144 of title 11 of the United States Code (the "Bankruptcy Code") in order to obtain the return of its $67 million in cash consideration; and

(5) This Court has subject matter jurisdiction to determine issues relating to its own Confirmation Order (i.e., the issues raised above), which directly impact the Plan, the debtors in these jointly administered cases (collectively, the "Debtors"), creditors and parties in interest.

---

[1] Undefined capitalized terms used in this brief have the meanings given to them in the Emergency Motion.

# DISCUSSION

## A.    The Right To Terminate Compass Only Upon A Showing Of Cause And On 30 Days Notice Was Key To Compass's Payment Of $67 Million To These Estates

Compass paid approximately $67 million in reliance on four key facts: (1) Compass would be paid loan servicing fees as long as it remained servicer of the loans; (2) Compass could not be removed as servicer unless it failed to act or meet its obligations under the LSAs;[2] (3) no termination could take place absent 30 days' prior written notice; and (4) even in the event Compass were terminated, no replacement servicer would have the right or ability to compromise, subordinate, or impair any rights, claims, or interests purchased by Compass from these estates. Compass was confident, based on the APA, the Plan, the Confirmation Order, and its ability to service the loans, that it would not be terminated for cause (and certainly not without notice and an opportunity to cure). As a result, Compass paid substantial consideration to these estates for the Acquired Assets (as such term is defined in the Confirmation Order), which benefited creditors of the estates.

On the day Compass funded the purchase price for the Acquired Assets, it was clear that a substantial portion of Direct Lenders did not want Compass appointed as their loan servicer. So why consummate the purchase? Because the APA, the Plan and this Court's order approving the entire sale transaction made clear that the Direct Lenders were obligated to comply with the terms of the LSA. Indeed, not long after Compass appeared in these chapter 11 cases, it became well aware of the fundamental understanding among the Court and all parties in interest that the LSAs "are what they are," and were not being modified in any respect. The hearing transcripts, Confirmation

---

[2] Subject to a "Surviving Section 3 Right," as such term is defined in the Confirmation Order. In its purported termination of Compass, the LPG made clear that its termination is not pursuant to any Surviving Section 3 Right, effectively waiving any such entitlement.

Order, Plan and APA are replete with statements to this effect.[3]  In reliance upon this principle, Compass knew it was purchasing the Debtor's rights in LSAs which expressly contained "for cause" and "30-day notice" termination requirements.  If Compass thought it could be terminated simply by a majority vote of the Direct Lenders mere moments after confirmation of the Plan, neither it nor any other party would have paid substantial money for the servicing rights.

Further evidencing the well recognized fact that the LSAs could only be terminated for cause is the substantial debate at the Confirmation Hearing among Compass and the Direct Lenders over whether pre-petition "breaches" of the LSAs committed by USA Commercial Mortgage Company could be used as an independent basis for demonstrating "cause" required to terminate Compass as servicer.  It was agreed by all parties that only certain pre-petition breaches would survive, and thus form the basis for any "Surviving Section 3 Right" under the Confirmation Order.

The cause and notice requirements, embodied in Paragraphs 3 and 8 of the LSA, were critical components of the Acquired Assets that Compass purchased.  Paragraph 3 provides for termination of the loan servicer with approval of at least 51% of the beneficial interest holders only:

> if for any reason [Compass] fails to act on Lender's behalf
> as authorized herein . . . ..

LSA § 3.  Similarly, Paragraph 8 provides:

> Lender may, by 30 days written notice to [Compass],
> terminate this agreement . . . if [Compass] fails to perform
> its obligations hereunder.

LSA § 8.  Absent the express provisions of the LSA as set forth above, and the enforceability of the language in the Plan and Confirmation Order that Direct Lenders are

---

[3] In fact, on pages 6 and 7 of its Opposition, the LPG itself offers three quotes from the Confirmation Hearing to the effect that the express terms of the LSAs are unaffected by the assignment.

bound to comply with the terms of the LSAs, Compass cannot receive the benefit of its bargain for which it paid these estates approximately $67 million.

Compass has collected gross servicing fees and revenues totaling only $1.5 million in the few months since the closing of the sale transaction on February 16, 2007. That was not the extent of the benefit Compass bargained for and obtained. Rather, it obtained the rights to continue to act as servicer in accordance with the terms of the LSAs and collect a payment stream over an extended period of time unless and until a Direct Lender established (on notice to Compass) that Compass failed to perform its obligations under the LSAs, or properly exercised a Surviving Section 3 Right.

The LPG is trying to circumvent the Plan and the Court's Confirmation Order by basing its termination *without regard* for the LSAs for which Compass paid significant cash. *See* Opposition, p. 4 and 17-18. The LPG is ignoring the LSAs, ignoring the Plan and ignoring the Confirmation Order, all because of a supposed "independent state law right." *Id.* At the May 31 hearing on the Emergency Motion, the Court cautioned counsel for the LPG against doing exactly that, stating: "Be careful because if you are terminating not in accordance with the contracts, you know this – you're going to be – there's going to be problems. There will be damages."[4]

The LPG argues in its Opposition that its members have a state law right to terminate Compass independent of the LSA, but when pressed on the matter at the May 31 hearing counsel for the LPG conceded that ". . . it is our rights *under the contract* . . . to terminate Compass." (emphasis added). Under either scenario one thing is certain: the LPG is attempting to deprive Compass of the benefit of its $67 million bargain, in direct contravention of the Orders of this Court.

---

[4] An official transcript of the May 31, 2007 hearing was not available at the time of the filing of this brief. The quoted passage is based on an audio recording of the hearing obtained from the Court on an expedited basis.

**B.**     **The Plan And The Confirmation Order Unequivocally**
**Require The Direct Lenders To Comply With The LSAs**

The Plan and the Confirmation Order together require the Direct Lenders to comply with the LSAs. The operative Plan provision obligates the Direct Lenders to comply with the terms of the LSAs after the Effective Date. *See* Plan § IV.F.

The Confirmation Order reinforces the above Plan provision by enjoining the Direct Lenders from pursuing any Interests against Compass or "interfering with [Compass's] title to or use and enjoyment of the Acquired Assets based on or related to such Interest." Confirmation Order 25. The Confirmation Order expressly incorporates Article IV.F of the Plan and orders that "[a]fter the Closing, the Direct Lenders are obligated to comply with the terms of the applicable Loan Servicing Agreements." Confirmation Order ¶ 47.

A confirmed plan acts as a judgment and is binding on the parties in interest. *See, e.g., Beck v. Fort James Corp. (In re Crown Vantage, Inc.)*, 421 F.3d 963, 972 (9th Cir. 2005) ("A confirmed reorganization plan operates as a final judgment with res judicata effect.") (citations omitted); *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995) ("Once a bankruptcy plan is confirmed, it is binding on all parties and all question that could have been raised pertaining to the plan are entitled to *res judicata* effect."). In fact, counsel for the LPG admitted during the May 31 hearing that his clients were bound by the Confirmation Order, stating "that isn't disputed, we are bound by it."

**C.**     **Paragraphs 3 And 8 Of The LSAs Are Consistent With Nevada Law**

Contrary to the LPG's blanket assertion, Paragraphs 3 and 8 of the LSAs are not inconsistent with applicable Nevada law. The Nevada Administrative Code provides that a loan servicing agreement must include provisions to allow the holders of 51% *or a greater specified percentage* . . . to act on behalf of all the holders of the beneficial interests of record" to designate a servicing agent. NAC 645B.073 (emphasis added). The simple language of this administrative code section expressly contemplates

that the provision inserted into any given loan servicing agreement may vary from

agreement to agreement. As a result, a loan servicing agreement may require 51%, 99%

or even 100% agreement among the beneficial holders in connection with the designation

of a new loan servicer.[5] If the Nevada Administrative Code allows such changes, it is

obvious that other changes to such a provision could be made as well. The purpose of the

provision is to require the parties to adopt some mechanism for acting where there is

more than one interest in the loan. By executing the LSAs, each lender agreed to the

mechanism provided in Paragraphs 3 and 8 thereof. *See Miller v. A&R Joint Venture*, 97

Nev. 580, 582 (1981) (plaintiff/lessee bound by exculpatory lease notice provision

requiring advanced written notice by plaintiff/lessee to defendant/lessor of hazardous

sidewalk condition, which provision was a "valid exercise of the freedom of

contract...which was freely contracted to by the parties" and was not inconsistent with the

applicable municipal code (which did not require advance written notice by lessee)). *See

also Ellis v. McDaniel*, 95 Nev. 455, 458 (1979) (recognizing the public "interest in

protecting the freedom of persons to contract, and enforcing contractual rights and

obligations"); *McCall v. Carlson*, 63 Nev. 390, 424 (1946) ("[E]quity respects and

upholds the fundamental right of the individual to complete freedom to contract or

decline to do so, as he conceives to be for his best interest, so long as his contract is not

illegal or against public policy.").

      The statutes and regulations relied upon by the LPG do not create a private

cause of action that can be asserted by a lender or any other private person. The

Commissioner of the MLD was vested by the state legislature with authority to

investigate violations of, among other things, the statutes and regulations applicable to

mortgage brokers. NRS 645B.060. A person may file a complaint with the

---

[5] L2L's proposed management agreement with the Direct Lender LLCs, until recently revised, required 67% agreement among the beneficial holders to replace L2L as servicer. *See* Blatt Declaration, Exhibit F at p. 3.

Commissioner alleging that another person violated NRS Chapter 645B or a regulation promulgated thereunder [NRS 645B.600], but the provisions of the statutes and regulations may only be enforced by the Commissioner and/or the Attorney General. *See* NRS 645B.610, 645B.620, 645B.800, and 645B.810. *Cf. Sports Form, Inc. v. Leroy's Horse & Sports Place*, 108 Nev. 37, 823 P.2d 901 (1992) (absent express language to the contrary, the statutes governing gaming licensees precludes a private cause of action); *Mainor v. Nault*, 120 Nev. 750, 768, 101 P.3d 308 (2004) (violation of a professional rule of responsibility governing attorney conduct does not create a private right of action).

The LPG itself has acknowledged that NAC 645B.073 cannot be used as a basis for a private right of action to terminate Compass as its servicer. In its objection to the Plan (the "Objection"), filed December 11, 2006 (Docket #2042), the LPG stated that "[a]s NRS 645B.250 is primarily a criminal provision governing mortgage agents, which is exclusively enforced by the Nevada Attorney General, it provides no recovery mechanism for the Prepaid Interest against lenders." Objection, p. 9: 10-12. Just as the LPG stated "**there is no provision in Chapter 645B that provides for a private cause of action . . . ,**" the LPG has in turn admitted that it cannot use 645B.073 as a basis to terminate Compass as loan servicer. *Id.* at 9:7-9 (emphasis in original). Rather, the LPG is bound by the terms of the LSA it executed.

It is incredible that the LPG would send out termination letters to *borrowers* (without any advance notice to Compass) based on their own interpretation of such an open-ended section of an administrative code and in the face of the plain language of the LSAs, Plan and Confirmation Order. This reckless and irresponsible action has damaged Compass as well as all Direct Lenders in each loan.

**D.**    **If A Court Of Competent Jurisdiction Enters An Order Finding Paragraphs 3 And 8 Of The LSA Are Not Binding On The Direct Lenders, Compass Would Be Entitled To Exercise Its Rights Of Rescission, Seek To Revoke The Confirmation Order, And Obtain The Return Of Its $67 Million In Cash Consideration**

Compass desires to stand behind its purchase of the Acquired Assets. Compass does not want to rescind the APA and undo the Plan or seek revocation of the Confirmation Order. However, if a court of competent jurisdiction were to find that the extensive protections Compass bargained for in the APA, Plan and Confirmation Order, including the "for cause" and notice provisions in Paragraphs 3 and 8 of the LSAs, were ineffectual, Compass would have no choice but to take such action in order to recover the $67 million paid to these estates.

Compass would not have entered into the APA if all parties to that agreement and the proceeding (including the Direct Lenders Committee) did not believe that the LSAs were valid on their face and applicable in the situation at hand. To the extent none of the parties realized that the LSAs might be contrary to the law (as the LPG now contends), there was a mutual mistake of law and mutual mistake of fact, such that there could be no deal between the parties. The entire purpose of the transaction would be defeated because the assets promised in the APA, Plan and Confirmation Order could not be delivered.

In addition to rescission and restitution, Compass would request this Court to revoke the Confirmation Order under section 1144 of the Bankruptcy Code. Section 1144 provides for revocation of a confirmation order when such order has been procured by fraud. There is no requirement in section 1144 that the fraud be committed by the debtor or a plan proponent.[6] A request for such relief must be made within 180 days of the entry of the order confirming the plan. Here, the time for such a request has

---

[6] The predecessor Bankruptcy Act section 386 specifically required that the debtor either committed the fraud or was aware of it. Section 1144 of the Bankruptcy Code dropped that requirement.

not yet expired.  A request for revocation is a "core" matter.  *See* 28 U.S.C.
§ 157(b)(2)(L).

The members of the LPG are creditors in these cases. They were active
participants in the Plan confirmation process.  They not only had an opportunity to raise
any and all objections to the Plan and Confirmation Order, they did in fact raise many
such objections.  Rather than making all their arguments during the Plan process, when
Compass, the Court, the Debtors and other parties in interest could respond, the LPG
lenders waited.  They allowed Compass, the Court, the Debtors and other parties in
interest to value an asset based on incomplete information, only to spring a "gotcha"
argument on Compass months after entry of the Confirmation Order and Compass's
funding of $67 million to the estates.  This amounts to fraud.

It is not Compass's intent to argue its case for rescission or revocation
under section 1144 of the Bankruptcy Code in this brief.  Those arguments are reserved
for this Court to consider on another day (and of course will only be raised if this Court
or another court of competent jurisdiction, if any, determines that the Direct Lenders are
not bound by Sections 3 and 8 of the LSA, and the related provisions of the Confirmation
Order, Plan and APA are ineffectual).  In such a circumstance,  Compass would have
funded the Plan with $67 million in cash consideration and received nothing of value in
return as a result of fraud, mistake of fact, mistake of law, failure of consideration, and
other reasons.

E.    **This Court Has Subject Matter Jurisdiction Over Its Own Confirmation
      Order And Implementation Of The Plan**

Under 28 U.S.C. § 1334(b) the Court has subject matter jurisdiction over
three types of bankruptcy proceedings: (i) proceedings "arising under" title 11; (ii)
proceedings "arising in" a bankruptcy case; and (iii) proceedings "related to" a

bankruptcy case.[7] If the Court finds it has jurisdiction under *any one* of these three independent grounds, the issue is resolved.

The Opposition concludes, without analysis or support and in direct contrast to their acknowledgement at the Confirmation Hearing,[8] that (1) "the only relevant jurisdiction to consider [here] is 'related to' jurisdiction," *see* Opposition, p. 13, and (2) the bankruptcy court's jurisdiction over an asset ends once the sale has closed. Those simplified conclusions are wrong.

In the first three sections that follow below, Compass will demonstrate that this Court may exercise subject matter jurisdiction based on "arising in," "arising under," *and* "related to" grounds. In the fourth section below, Compass will discuss the Court's independent ancillary jurisdiction over its own orders and decrees. In the fifth and final section, Compass will address the LPG's faulty contention that this Court's subject matter jurisdiction to resolve post-confirmation disputes must come to an end following the transfer of assets.

---

[7] While admonishing that a bankruptcy court's "related to" jurisdiction is "not limitless," the Supreme Court wrote that "choice of words [in the statute] suggests a grant of some breadth." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307-08 (1995). Furthermore, the Supreme Court added that "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." 514 U.S. at 308 (*quoting Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (overruled on other grounds)). As discussed below, this Court has "arising under," "arising in" and "related to" jurisdiction over the Emergency Motion and the LPG's attempt to unwind the Confirmation Order.

[8] At the Confirmation Hearing, Alan Smith (counsel for the LPG) asked the following question: "[I]s this Court retaining jurisdiction over those issues if somebody wants to terminate the servicing agreement." Transcript of December 20, 2006 Hearing, p. 33:22-24. In response, Gerald M. Gordon (counsel for the Direct Lenders Committee) stated that if a dispute arises over the LSA, this Court would be the forum for resolution. *See id.* at p. 34:9-14. The Court then clarified that this would be put in the Plan. *See id.* at p. 34:20-21. Mr. Smith, then asked whether this would also include the rights in Paragraph 8 of the LSA. *See id.* at p. 34:24-25. The Court and Mr. Gordon each responded by stating that "the entire agreement survives." *Id.* at p. 35:2-3. Mr. Smith's one word response is telling. He consented to this Court's retention of jurisdiction by saying, "Okay." *Id.* at p.35:4.

1.    **The Court has "Arising Under" Subject Matter Jurisdiction**

When a cause of action is one which is created by title 11, then that civil proceeding is one "arising under" title 11. Confirmation of a plan under chapter 11 and the sale of assets free and clear of liens are examples of actions that trigger "arising under" jurisdiction. *See* 11 U.S.C. §§ 1129 and 363.

Nothing could be more "core" to a chapter 11 case than implementation of a confirmed plan, the possible revocation of that plan under section 1144, and the unwinding of a sale of substantially all of a debtor's assets under section 363 of the Bankruptcy Code.[9] Accordingly, the Court has jurisdiction over the disputes raised in the Emergency Motion and the Opposition because they "arise under" the Bankruptcy Code.

2.    **The Court has "Arising In" Subject Matter Jurisdiction**

This Court has "arising in" jurisdiction over the Emergency Motion and the LPG's attempt to unwind the Confirmation Order given that, in response to the concerted efforts of the LPG to interrupt and interfere with the Sale and Compass's servicing of the Loans, Compass is seeking to "implement, gain the fruits of, and to enforce orders of the bankruptcy court." *In re Ames Dep't Stores, Inc.*, 317 B.R. 260 (Bankr. S.D.N.Y. 2004).

In *Ames* the chapter 11 debtor was a retailer that decided to liquidate its lease portfolio under the Bankruptcy Code. The debtor obtained a Designation Rights/Sale Order authorizing Stop & Shop Supermarket Company to designate which leases would be assigned. The debtor subsequently delivered a notice to the landlord, Eden, announcing its intention to assign a leasehold to NWL Holdings, Inc. ("NWL"). The bankruptcy court entered an order approving the assignment of that leasehold.[10]

---

[9] The fact that a proceeding raises state law issues does not require a determination that the matter does not fall within the core jurisdiction of the bankruptcy court. *In re Lazar*, 200 B.R. 358, 372 (Bankr. C.D. Cal. 1996); 28 U.S.C. § 157(c).

[10] The assignment order retained the bankruptcy court's jurisdiction "to enforce the provisions of this Order, the Designation Rights Order, and the Assumption and Assignment of the [store] Lease." 317 B.R. 264.

Even though the Designation Rights Order allowed NWL to make alterations and remodel the store, Eden declared a breach of the lease due to the remodel. Although the debtor was not involved in the dispute, and not affected by the outcome, the bankruptcy court found that it had jurisdiction over the post-confirmation litigation. 317 B.R. at 269. The court determined that it had "arising in" jurisdiction "by reason of the Court's earlier orders in the case (which, without dispute were entered in connection with a core function), and the need to enforce them." *Id.*

The *Ames* court, relying on Second Circuit precedent in *In re Petrie Retail, Inc.*, 304 F.3d 223 (2d Cir. 2002), found that it had jurisdiction over the post-confirmation dispute based on two of the three factors that existed in *Petrie Retail*, both of which are also present here.[11] *Id.* In *Ames*, the dispute was based on rights established in a bankruptcy court order (*Petrie Retail* factor #1); here it arises from the Confirmation Order (given that the Confirmation Order incorporates approval of the sale order within its terms). As in *Petrie Retail* and *Ames*, Compass's rights with regard to the LSAs were established as part of the core bankruptcy functions of approving the sale of the agreements to Compass under section 363 of the Bankruptcy Code. Moreover, separate and apart from the Surviving Section 3 Right established in the Confirmation Order, the Confirmation Order also provides that:

> In the event of a proper exercise of remedies under Section 3 of the Loan Servicing Agreement, (i) neither the Direct Lenders nor any replacement servicer selected by such Direct Lender shall have the right or ability to compromise, subordinate, or impair, in any respect, any rights, claims or interests purchased by Compass from the Estates for default

---

[11] The third factor addressed in *Petrie Retail*, which was neither present in *Ames* nor here, is that the post-confirmation dispute involved issues of claims against the estate that had already been before the bankruptcy court. While the present dispute does not raise a claim against the estate, Compass may seek to rescind the APA or revoke the Confirmation Order if the assets are not conveyed to Compass as contemplated by the APA, the Plan and the Confirmation Order. It should also be noted that many of the lenders in the LPG have filed proofs of claim in these bankruptcy cases and it is unclear whether the disputes raised now will impact those claims and, in turn, the assets of the estates.

> interest, accrued servicing fees, late charges, success fees,
> or other amounts under the Loan Servicing Agreement, and
> (ii) this Confirmation Order shall be binding upon such
> replacement servicer regardless of whether such
> replacement servicer actually received such copy of the
> Confirmation Order.

Confirmation Order ¶ 14.  As a result of this provision in the Confirmation Order,

Compass was given certainty that such accrued servicing fees and amounts could not be

compromised, subordinated or impaired by any Direct Lender or replacement servicer,

and that the Confirmation Order is binding on any replacement servicer under the LSAs.

This right granted to Compass would not exist but for the Court's order.  The

Confirmation Order also requires Direct Lenders to comply with the terms of the

applicable LSAs.  Confirmation Order ¶ 47.  Apart from the most basic rights granted to

Compass pursuant to section 363 of the Bankruptcy Code, the rights set forth above are,

as in *Petrie Retail* and *Ames*, "rights specifically established by the [court's] order." 317

B.R. at 272.  Therefore, the dispute is "inextricably linked" to the bankruptcy court's

order (here, the Confirmation Order). *Id.*

　　　　The second factor from *Petrie Retail* and *Ames* is also present here; that is,

the Court's need to interpret and enforce its own orders.  As the *Ames* court stated, "a

bankruptcy court retains jurisdiction to interpret and enforce its own orders." 317 B.R.

272.  In language that is particularly relevant here, the Bankruptcy Court for the Southern

District of New York wrote:

> [T]his Court has subject matter jurisdiction to enforce its
> orders not only because they were entered in proceedings in
> a case under title 11 (and, indeed, in a core function) with
> respect to which it undoubtedly had subject matter
> jurisdiction, but also by reason of the power granted to any
> federal court to enforce its own orders.  That is particularly
> so since this Court twice expressly reserved jurisdiction . . .
> to do so.  This Court has an important interest in ensuring

-13-

> that its orders are not circumvented, and [the landlord's]
> contentions that this Court lacks the jurisdiction to do so,
> by reason of the procedural setting in which [the landlord]
> wishes to circumvent them, are wholly inconsistent with
> the caselaw described above.

317 B.R. 272-73. Here as well, the Court entered the Confirmation Order pursuant to

core bankruptcy functions with respect to which it plainly had subject matter jurisdiction.

This Court, like the *Ames* court, has an important interest in ensuring that its orders are

not circumvented, particularly where it has expressly retained jurisdiction in its order.[12]

In the context of a sale of assets from a debtor, parties like Compass customarily receive

special protections that are incorporated in sale orders - for example, that assets are

conveyed "free and clear."  If there were any basis on which to question whether a

bankruptcy court had the ability to implement and enforce its order, the market for

purchasing assets from a bankruptcy estate would certainly be chilled.  The Court should

invoke its "arising in" jurisdiction to adjudicate the Emergency Motion and related

matters, which implicate rights created by orders of this Court and implicate orders that

were entered pursuant to core bankruptcy functions.

Also relevant to the court's determination in the *Ames* case that the

bankruptcy court had jurisdiction was the court's finding that the landlord's actions in

disputing renovations under the assigned lease were mere pretext to recover the leasehold

the debtor had assigned pursuant to the court approved assignment order.  The court

noted that the landlord had admitted on cross-examination that "what he really wants . . .

is to terminate the . . . lease now, 'for whatever reason,' and to seek to re-let it." *Ames* at

267.

---

[12] The Court also has jurisdiction to enforce its Confirmation Order in order to prevent the
collateral attack on such order sought by the LPG in the District Court Action (since removed to
this Court) as described in Part E.4 below.

The pretext of the landlord in *Ames* is similar to the pretexts of the LPG in this case. Here, Direct Lenders were ordered to abide by the terms of the LSAs. They have ignored those terms and are instead attempting to terminate Compass without cause and in violation of the plain language of the LSAs, the Plan and the Confirmation Order. Unlike Compass, they have paid nothing to the estates. Instead, they are attempting to obtain the benefits of loan servicing without paying a penny. This amounts to fraud. If their attempts are successful, they will set in motion extensive legal proceedings by Compass to rescind and revoke the confirmation of the Plan. This alone is enough to find that the actions give this court "arising in" jurisdiction.

Just as the court in *Ames* recognized the true nature of the landlord's actions as an attempt to undermine the assignment order, this Court should recognize that the LPG's unsupported allegations of post-closing breach are nothing more than an attempt to undermine the Confirmation Order. The Court should therefore exercise its "arising in" jurisdiction to adjudicate the issues in the Emergency Motion.

The facts at bar are also similar to those that were before the Bankruptcy Court for the Southern District of New York in *In re Allegiance Telecom*, 356 B.R. 93 (Bankr. S.D.N.Y. 2006). After confirmation of the plan, the purchaser of Allegiance's assets filed a motion for payment of administrative expenses or of claimed cash and sought resolution of related disputes regarding interpretation of the court approved asset purchase agreement. The court determined that it had jurisdiction over the proceeding notwithstanding consummation of the plan. *Id.* at 98. "Both the order approving Allegiance's entry into the APA and the order confirming the Plan reserved the Court's jurisdiction to decide the disputes addressed herein, and the disputes involve the interpretation and implementation of the APA and the Plan and directly affect distributions to creditors." *Id.* Similarly, the Plan and Confirmation Order here preserved this Court's jurisdiction to decide disputes with respect to the LSAs and the dispute involves interpretation of the APA and the loan servicing rights purchased

-15-

thereunder. Ultimately, the dispute will affect distributions to creditors if Compass is deprived of the use and enjoyment of the assets it purchased and rescinds the APA or obtains relief from the Confirmation Order.

  **3.**    <u>**Even Though This Court Need Not Reach This Question,**</u>
     <u>**"Related To" Jurisdiction Exists Here**</u>

  In addition to "arising in" jurisdiction, the Court's subject matter jurisdiction over the Emergency Motion and the efforts of the LPG to unwind the Confirmation Order is based on its power to adjudicate matters "related to" the Debtors' chapter 11 cases under 28 U.S.C. § 1334(b).

  As acknowledged in the Opposition (*see* Opposition, p. 13-14), the Ninth Circuit Court of Appeals has held that when there is a "sufficiently close nexus" between the proposed action and the original bankruptcy case, subject matter jurisdiction is conferred upon the bankruptcy court. *See In re Pegasus Gold Corp.*, 394 F.3d at 1191 (stating that matters affecting "interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the required close nexus"). Given that the conduct of the LPG is effectively a collateral attack on the APA, the Plan and the Confirmation Order, the issues raised in the Emergency Motion and the related matters have more than a "close nexus" to the bankruptcy case and therefore this Court has "related to" jurisdiction over the matters raised therein.

  Specifically, as in *Pegasus*, the issues here involve **interpretation** and **implementation** of a confirmed bankruptcy plan. In *Pegasus*, a chapter 11 debtor owed environmental compliance and clean-up obligations to the state of Montana. After extensive negotiations between the parties, they agreed that the debtor would form a new corporate entity ("RSC") that would perform reclamation work for the state at the affected mines. The settlement agreement, which was approved by separate order of the bankruptcy court, further provided that the debtor would provide RSC with working capital and other funds to help pay for the reclamation work. The terms of the settlement

agreement were incorporated into the debtor's confirmed chapter 11 plan. Specifically, the plan provided for the formation of RSC and called for the debtors to contribute equity capital thereto. 394 F.3d at 1192.

After confirmation of the plan in *Pegasus*, the non-debtor liquidating trustee and RSC brought an adversary proceeding against the state alleging a number of contract claims, including allegations that the state had (i) breached the Plan and the settlement agreement; (ii) breached the covenant of good faith and fair dealing with respect to these agreements; and (iii) committed fraud in the inducement at the time it entered into the Plan and the settlement agreement. 394 F.3d at 1194. Among the remedies sought were disgorgement of the amounts paid to the state pursuant to the settlement agreement and rescission of the settlement agreement. *Id.*

As in *Pegasus*, here the terms of the agreement between the Debtors and Compass were the subject of intense negotiations and incorporated into the Plan, in which this Court's exclusive jurisdiction was retained. In *Pegasus*, the plaintiffs were more forthright in their conduct by filing a complaint to invalidate the settlement agreement whereas here, the LPG is seeking to accomplish the same result through their self-help conduct. The result from the perspective of this Court's jurisdiction is the same.

In *Pegasus*, the Ninth Circuit determined that because the post-confirmation claims raised "will likely require interpretation of the [settlement] Agreement and the Plan", and because "these claims - and the attendant remedies sought – could affect the implementation and execution of the Plan itself," the bankruptcy court had jurisdiction to adjudicate the dispute. 394 F.3d at 1194. The same concerns are at issue here. To determine whether the LPG is in compliance with the APA, Plan and Confirmation Order, a court will need to interpret those documents. For example, this Court will need to determine whether the LPG has complied with the Plan and the Confirmation Order by providing notice and demonstrating cause in accordance with the requirements of the LSAs relating to each Loan. Furthermore, if the LPG is successful in

-17-

terminating Compass's rights to each of the Loans without a proper showing of cause and in the absence of notice to Compass, Compass will be left without the assets for which it paid significant consideration, and will seek to rescind the APA and seek damages.[13]

Among other things, *Pegasus* exposes the fallacy of the argument in the Opposition that post-confirmation issues of state law should be adjudicated outside the bankruptcy court. In *Pegasus*, the bankruptcy court retained jurisdiction to consider the state law issues arising under the contracts. 394 F.3d at 1194 (stating that, although "the majority of the claims asserted in the complaint are common state tort and contract claims involving post-confirmation conduct," bankruptcy court jurisdiction was appropriate). *See also In re Lazar*, 200 B.R. 358, 372 (Bankr. C.D. Cal. 1996) ("The fact that the proceeding raises state law issues does not require a determination that the matter does not fall within the core jurisdiction of the bankruptcy court.").

Despite the suggestion in the Opposition that invocation of jurisdiction by the Court would be extraordinary, *Pegasus* is consistent with an apparent trend towards granting bankruptcy court jurisdiction over post-confirmation matters that "relate to" the bankruptcy estate. *See In re Midstate Mortgage Investors Inc.*, No. 03-2153, 2004 WL 1758255 (3d Cir. 2004) (post-confirmation jurisdiction found where court reopened bankruptcy case to hear lawsuit by the debtor's limited partners to enjoin state court litigation by creditors as contrary to the plan release language); *Guttman v. Martin (In re Railworks Corp.)*, No. 03-5781, 2005 WL 1383324 at * 11 (Bankr. D. Md. 2005) (finding "close nexus" where post-confirmation lawsuit involves implementation, execution and/or consummation of the confirmed plan); *Michaels v. World Color Press Inc. (In re LGI Inc.)*, 322 B.R. 95, 102-03 (Bankr. D. N.J. 2005) (same); *Rahl v. Bande*, 316 B.R. 127 (S.D.N.Y. 2004) (post-confirmation jurisdiction found where issue was what actions

---

[13] The impact on the Debtors' estates would be devastating. No further distributions under the Plan could be made until a court of competent jurisdiction entered an order resolving this dispute. Disgorgement may be necessary depending on the funds remaining in the estate.

were conveyed to plan-created trust under plan); *Texas Mexican Rwy. Co. v. Sun Drilling Prod. Corp.*, 2004 WL 2784949 (E.D. La. 2004) (post-confirmation jurisdiction exercised over suit for breach of performance under confirmed plan); *Finger v. County of Sullivan Indus. Dev. Agency (In re Paramount Hotel Corp.)*, 319 B.R. 350 (Bankr. S.D.N.Y. 2005) (post-confirmation jurisdiction found where plaintiff-liquidating trustee alleged defendant interfered with liquidation trust assets).

Thus, as in *Pegasus*, this Court has subject matter jurisdiction over the Emergency Motion and the related matters because the claims are "related to" the original bankruptcy action in that they involve the interpretation and implementation of the confirmed bankruptcy plan.

The LPG's citation on page 15 of the Opposition to *Sea Hawk Seafoods, Inc. v. State of Alaska (In re Valdez Fisheries Development Association, Inc.)*, 439 F.3d 545 (9th Cir. 2006), for the proposition that a bankruptcy court has no jurisdiction over post-confirmation disputes is misleading. The court in *Valdez Fisheries* determined that the bankruptcy court did not have "related to" jurisdiction over an adversary proceeding requiring the interpretation of a settlement agreement where the adversary proceeding between two creditors was brought after the underlying bankruptcy case had been closed and dismissed, and any determination by the court could not conceivably alter the debtors' rights or in any way impact the administration of the bankruptcy estate. Further, the bankruptcy court did not have ancillary jurisdiction to enforce the settlement agreement where the agreement led to the dismissal of the case and the court did not explicitly retain jurisdiction over the agreement. The court expressly conditioned its holding to the circumstances of that case. Indeed, in *Valdez Fisheries* there was no confirmed plan, the court had already entered a final decree and dismissed the case, and there was no retention of jurisdiction in the order approving the settlement, such that the Opposition's suggestion that the post-confirmation aspect of the case is dispositive of the

bankruptcy court's lack of jurisdiction is wholly inapposite. None of the relevant facts in *Valdez Fisheries* are present here.

Moreover, notwithstanding that the whole of the present dispute clearly is at least "related to" the bankruptcy proceedings, the Court can exercise its supplemental jurisdiction over any element of the dispute even if the Court finds such an element to be only tangentially related. In *Pegasus*, the court noted that the assignee's remaining claims not relating to the interpretation of the assignment order were nonetheless properly before the bankruptcy court because they "involve a 'common nucleus of operative facts' and would ordinarily be expected to be resolved in one judicial proceeding." *Pegasus* at 1195. Accordingly, any assertion that the post-closing defaults or other aspects of the present dispute not relating to the interpretation of the Confirmation Order, Plan or APA are too tangential to the bankruptcy proceeding for the Court to exercise its jurisdiction should be dismissed. Those actions involve a "common nucleus of operative facts" governing the LPG's and the Direct Lender LLCs' overall scheme to upset the Confirmation Order and replace Compass as loan servicer under the Loans.

### 4. This Court Has Inherent Jurisdiction Over The Emergency Motion And The LPG's Attempt To Unwind The Confirmation Order

Bankruptcy courts have inherent or ancillary jurisdiction to interpret and enforce their own orders wholly independent of the statutory grant of jurisdiction under 28 U.S.C. § 1334. *Local Loan Co. v. Hunt*, 292 U.S. 234, 239 (1934); *Valdez Fisheries Dev. Assoc. v. State of Alaska (In re Valdez Fisheries)*, 439 F.3d 545, 549 (9th Cir. 2006) (court may maintain jurisdiction to enable a court to vindicate its authority and effectuate its decrees); *Hawaiian Airlines, Inc. v. Mesa Air Group, Inc.*, 355 B.R. 214 (D. Haw. 2006) ("The law is clear that a bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders . . . .") (citations omitted); *LTV Corp. v. Back (In re Chateaugay Corp.)*, 201 B.R. 48 (Bankr. S.D.N.Y. 1996); *Paris Mfg. Corp. v. Ace Hardware Corp. (In re Paris Indus. Corp.)*, 132 B.R. 504, 508 (D. Me. 1991)

-20-

("Bankruptcy Courts must have the ability to enforce prior orders and 'secure or preserve the fruits and advantages of a judgment or decree rendered therein' . . . the proceeding being ancillary and dependent, the jurisdiction of the Court follows from that of the original cause . . . .") (quoting *Local Loan Co.*); *Volvo White Truck Corp. v. Chambersburg Beverage (In re White Motor Credit Corp.)*, 75 B.R. 944, 947-48 (Bankr. N.D. Ohio 1987) (ancillary jurisdiction to interpret and enforce prior orders includes purchasers' action for declaratory and injunctive relief to enforce orders of sale and "may be exercised irrespective of an independent jurisdictional basis"); *In re McLean Indus.*, 68 B.R. 690, 695 (Bankr. S.D.N.Y. 1986) ("The duty of any court to hear and resolve legal disputes carries with it the power to enforce the order.").

The Court simply must be able to preserve the integrity of its own decisions and uphold its orders. Section 105(a) of the Bankruptcy Code makes this point clear:

> No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules . . . .

11 U.S.C. § 105(a).

It is an inaccurate statement of the law to suggest that notwithstanding a bankruptcy court's order approving an asset sale, "the jurisdiction of the bankruptcy court over the asset ends once the sale has closed and the unconditional transfer has been executed." Opposition, p. 14. To the contrary, bankruptcy courts routinely retain authority to enforce their orders, including sale orders pursuant to section 363 of the Bankruptcy Code, even after the sale has closed.[14] *See, e.g., Luan Inv. S.E. v. Franklin*

---

[14] "A Congressional grant of exclusive jurisdiction to the federal courts includes the implied power to protect that grant." *Gonzales v. Parks (In re Gonzales)*, 830 F.2d 1033, 1036 (9th Cir. 1987); *In re McGhan*, 288 F.3d 1172, 1182 (9th Cir. 2002) (same). *See also Birting Fisheries v Huse-Sporsem (In re Birting Fisheries)*, 300 B.R. 489, 499 ("[A] bankruptcy court's original core jurisdiction 'continues in order for it to enforce its orders, even after the case has been closed.'");

*145 Corp. (In re Petrie Retail)*, 304 F.3d 223, 230 (2d Cir. 2002) (holding that bankruptcy court could exercise continuing post-confirmation jurisdiction to enforce provisions of sale order); *NWL Holdings v. Eden Center (In re Ames Department Stores, Inc.)*, 317 B.R. 260 (Bankr. S.D.N.Y. 2004) (same); *United Taconite, L.L.C. v. State of Minnesota (In re Eveleth Mines, LLC)*, 318, 682 (B.A.P. 8th Cir. 2004) (same).

   To eliminate any doubt that the actions of the LPG and the Direct Lender LLCs are in direct contravention of the Confirmation Order, the remedies sought in the District Court Action include a declaratory judgment that:

- Direct Lenders have an absolute right to replace Compass as the servicer under the Loans, based solely on Nevada Administrative Code 645B.073, and therefore in direct contravention of Compass's rights under the Confirmation Order and LSAs, which require notice and cause in order to replace Compass;

- Direct Lenders have the right to modify their Loan documents to alter the application of payments, irrespective of the rights of any third-party servicer, also in direct contravention of Compass's rights under the Confirmation Order and LSAs; and

- Compass is not entitled to any compensation under the LSAs, despite the rights and protections purchased and conferred upon Compass in the Confirmation Order.

   The declaratory judgment sought in the District Court Action would invalidate provisions of the Confirmation Order and rewrite critical provisions of the LSAs. As such, the Court has jurisdiction to enforce the provisions of its Confirmation Order in the face of the LPG's and the Direct Lender LLC's attempt to unilaterally ignore and modify the Confirmation Order.

   Moreover, because the LPG has, by its actions, effectively started to undo the transfer of servicing rights to Compass, it is acting in direct contravention of the Plan,

---

*In re Petrie Retail*, 304 F.3d at 230 (citing *Back v. LTV Corp. (In re Chateaugay Corp.)*, 213 B.R. 633, 640 (S.D.N.Y.1997), *In re Johns-Manville Corp.*, 97 B.R. 174, 179-80 (Bankr. S.D.N.Y. 1989) (same).

which in turn triggers Compass's right to seek rescission or relief from the Confirmation Order as discussed above.

This Court has continuing jurisdiction to consider and determine the issues raised in the Emergency Motion, as well as those raised in the District Court Complaint, by virtue of this Courts inherent jurisdiction to interpret and enforce its own orders and to determine disputes under the Plan.

### 5.    The Bankruptcy Court's Broad Statutory Jurisdiction Continues Post-Confirmation

As an initial matter, contrary to the argument in the Opposition that Compass is somehow too late to invoke the jurisdiction of this Court, 28 U.S.C. § 1334 contains no time limitation on a bankruptcy court's jurisdiction. In support of their argument that bankruptcy court jurisdiction over an asset "ends" once the sale has closed and the unconditional transfer has been executed, the LPG cites six cases, the most recent of which was decided in 1964, more than one decade prior to the enactment of the Bankruptcy Code. The other cases date back to 1906. Opposition, p. 14-15.

Despite the fact that the sale to Compass was effectuated pursuant to section 363 of the Bankruptcy Code, the Opposition does not discuss even one case in which the debtor had sold an asset pursuant to this section. Specifically, *In re Paddock of California*, 226 F.Supp. 43 (S.D. Cal. 1964), involved a petition for an arrangement pursuant to Chapter XI of the National Bankruptcy Act. *Paddock* does not address chapter 11 plans or section 363 of the Bankruptcy Code and stands for a proposition of the law with respect to post-sale jurisdiction that has been squarely rejected by modern day courts. The others cases cited in the Opposition were between five and sixty years *older* than *Paddock* and similarly do not reflect the current state of the law regarding post-sale and/or post-confirmation jurisdiction.

As this Court knows well, cases decided under the Chandler Act of 1938 or the Bankruptcy Act of 1867 have no place under a Bankruptcy Code case. There were

-23-

provisions under both of those former bankruptcy acts relating to a sale of property of the estate. *See* Section 25 of the Bankruptcy Act of 1867, and Section 116(3)[Chapter X] and 313(2)[Chapter XI] of the Chandler Act. However, under both of those former statutes there were severe limitations to the ability to sell assets and the cases that interpreted those sections reflected those limitations. Under the Bankruptcy Act of 1867 there were no reorganization proceedings, and it was required that a sale of assets only be done if the property was perishable. The Chandler Act required a finding of an emergency, or "cause," for a sale. These restrictions led to many other extreme limitations on asset sales in the case law.

This history was well demonstrated under one of the earlier cases decided under the Bankruptcy Code, *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983). After summarizing the historical restraints that the former Acts and courts placed on bankruptcy sales, the *Lionel* court stated that section 363(b) of the Bankruptcy Code "seems on its face to confer upon the bankruptcy judge virtually unfettered discretion to authorize the . . . sale . . . of property of the estate." *Id.* at 1069. Hence, language in any former Act cases that restrict the ability of a Bankruptcy Court in connection with a sale of assets is simply not applicable to a Bankruptcy Code case. Moreover, the powers of the court under Chapter XI cases even on confirmation of a "plan of arrangement" were severely limited, and the powers of the court on confirmation of a plan under Chapter 11 of the Bankruptcy Code were much expanded over those of the former Act.

Thus, it has been properly held in more recent cases that, in determining whether jurisdiction exists, it is irrelevant that the underlying dispute did not arise until after confirmation of a debtor's plan. *Refrigerant Reclamation Corp. of Am v. Todack (In re Refrigerant Reclamation Corp. of Am.)*, 186 B.R. 78, 82 (Bankr. M.D. Tex. 1995); *In re Sultan Corp.*, 81 B.R. 599, 602 (B.A.P. 9th Cir. 1987) ("The confirmation of a plan does not automatically terminate the jurisdiction of the bankruptcy court.").

The jurisdictional analysis under 28 U.S.C. § 1334(b) is the same whether the issue arises before or after confirmation of a plan. *See U.S. Brass Corp. v. Travelers Ins. Group, Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296 (5th Cir. 2002); *Montana v. Goldin (In re Pegasus Gold Corp.)*, 296 B.R. 227 (D. Nev. 2003); *Federated Dep't Stores, Inc. v. White Flint Ltd. Partnership (In re Federated Dep't Stores)*, 240 B.R. 711, 716 (Bankr. S.D. Ohio 1999) (noting that "post-confirmation disputes must be analyzed under 28 U.S.C. § 1334"). As the courts have explained, "there is no dispute that a bankruptcy court's jurisdiction, which is derivative of the jurisdictional grant in §§ 1334(a) and (b), continues post-confirmation 'to protect its [confirmation] decree, to prevent interference with the execution of the plan and to aid otherwise in its operation.'" *Eubanks v. Esenjay Petroleum Corp.*, 152 B.R. 459, 463 (E.D. La. 1993) (quoting *In re Dilbert's Quality Supermarkets, Inc.*, 368 F.2d 922, 924 (2d Cir. 1966)). *Accord Nat'l Convenience Stores, Inc. v. Shields (In re Schepps Food Stores, Inc.)*, 160 B.R. 792, 796 (Bankr. S.D. Tex. 1993); *see In re Johns-Manville Corp.*, 97 B.R. at 180 ("Even without a specific retention provision in a plan, this Court has previously held that jurisdiction of the bankruptcy court continues post-confirmation as to fundamental questions of interpretation and administration of a plan.").


## CONCLUSION

Without obtaining a court order authorizing the replacement of Compass for cause, without having possession of the original notes or the payment history of the Loans necessary to foreclose on collateral, and without the 30 days prior written notice to Compass required by the LSA, the LPG has taken the law into its own hands and notified borrowers that the LPG is now servicing their Loans. The LPG has ignored the terms of the Confirmation Order and the LSA, and has based its actions solely upon a Nevada administrative code provision which it never raised in any of its objections to

confirmation of the Plan, and which the LPG has no standing to enforce. If this Court or another court of competent jurisdiction were to find that the LPG has the right to terminate Compass on a mere 51% vote of the Direct Lenders, without notice or a finding of cause, Compass would have no recourse other than to seek revocation of the Confirmation Order. Because this dispute goes to the heart of these bankruptcy cases and is a core matter, this Court has jurisdiction in accordance with applicable law as set forth above to adjudicate this dispute. Accordingly, Compass requests the Court enter an order enjoining the LPG from taking further actions as the purported loan servicer, which actions have severely damaged Compass and confused the Borrowers, and undermined collection efforts to the detriment of all Direct Lenders.

George A. Davis
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Telephone No.:  (212) 504-6000
Facsimile No.:  (212) 504-6666

and

Peter Bernhard (State Bar No. 734)
Bullivant Houser Bailey PC
3980 Howard Hughes Parkway, Suite 550
Las Vegas, Nevada  89169
peter.bernhard@bullivant.com
Telephone No.: (702) 650-6565
Facsimile No.:  (702) 650-2995

Counsel for Compass Financial
Partners LLC