# EXHIBIT A

**RAY QUINNEY & NEBEKER**

May 22, 2007

Richard Dreitzer
Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

**Annette W. Jarvis**
ATTORNEY AT LAW

PO Box 45385
Salt Lake City, Utah
84145-0385

36 South State Street
Suite 1400
Salt Lake City, Utah
84111

801 532-1500 FIRM
801 323-3321 DIRECT
801 532-7543 FAX
ajarvis@rqn.com
www.rqn.com

Re: Order Revoking Mortgage Broker License and Notice of Right to Request Hearing of USA Commercial Mortgage, signed by the Commissioner of the Mortgage Lending Division for the State of Nevada, dated May 2, 2007

Dear Richard:

I am writing to apprise you and the Mortgage Lending Division for the State of Nevada (the "MLD") of further information and certain inaccuracies respecting the Order Revoking Mortgage Broker License and Notice of Right to Request Hearing of USA Commercial Mortgage (the "Order"), signed by the Commissioner of the Mortgage Lending Division (the "MLD") for the State of Nevada ("Mr. Bice"), dated May 2, 2007, and to ask for further clarification regarding the Order. USACM does not object to the revocation of its license as it is winding down and is no longer operating as a loan servicer. However, USACM does object to the findings and conclusions contained in the Order and wishes to inform the MLD that several such findings and conclusions are in direct violation of previous orders entered by the United States Bankruptcy Court for the District of Nevada (the" Bankruptcy Court") and of the injunction contained in the Order Confirming Debtors Third Amended Joint Plan of Reorganization as Modified Herein (the "Confirmation Order").

Let me initially point out that the Order does not clearly distinguish between actions taken by the pre-bankruptcy USACM, which operated under the control of Joe Milanowski and Tom Hantges, and post-bankruptcy USACM, which was operated by Tom Allison, as the Bankruptcy Court appointed Chief Restructuring Officer (the "CRO"), under the supervision and control of the Bankruptcy Court. For purposes of these findings, we believe this distinction is important.

With respect to the background recitations in paragraph 3, where it says that "COMPASS agreed to purchase the entirety of RESPONDENT'S and the USA ENTITIES' respective interest in their portfolio of commercial loans," this is inaccurate. "USA ENTITIES" is defined as including all of the affiliates that filed Chapter 11 Cases with USACM. However, the only entities selling assets to Compass under the Asset Purchaser Agreement were USACM and USA Capital First Trust Deed Fund LLC. Further, USACM retained certain assets, including some servicing rights and some interests in commercial loans, as set forth in the final Asset Purchase Agreement (the "APA"). Those assets have now been transferred to the USACM Liquidating Trust pursuant to the

Debtors Third Amended Joint Plan of Reorganization (the "Plan") confirmed by the Bankruptcy Court pursuant to the Confirmation Order.

The preliminary finding in paragraph 6 is also inaccurate. The APA did not contemplate that Compass "would then necessarily cause it to engage in licensable activity as regulated by the DIVISION under either Chapter 645A or 645B of the Nevada Revised Statutes." Rather, the APA required Compass to either obtain a license or be exempt from licensing. As the MLD knows, the original proposed purchaser, Silver Point Capital, obtained an exemption from licensing by the MLD. Compass originally opted to make application with the MLD for an appropriate license, although this was not required under the APA.

While in paragraphs 12 and 13, the MLD cites a 14-day investigation of USACM's loan servicing operations as the basis of this Order, as the MLD is well aware, since the advent of Mr. Allison as USACM's CRO, USACM has cooperated fully with the MLD, responded to numerous requests made by the MLD, repeatedly met in person and by phone with Mr. Bice and other MLD employees, turned over numerous documents and information to the MLD, and served the MLD with virtually every pleading filed by USACM in its Chapter 11 bankruptcy case. Since Mr. Allison and USACM have worked with the MLD for over a year now in uncovering and documenting the wrongdoing of pre-bankruptcy USACM and in keeping the MLD informed of all post-bankruptcy operations of USACM, the timing and content of this Order is surprising.

In reviewing the actual determinations made by the Order, USACM responds to the specific alleged violations as follows:

1.  The MLD cites USACM for its failure to submit audited financials on an annual basis pursuant to NRS 645B.085. While post-bankruptcy USACM cannot speak to whether this requirement was complied with prior to the bankruptcy filing, shortly after Mr. Allison took over USACM as CRO, he and his team informed the MLD, including Mr. Bice and Ms. Eckert, that USACM would not be able to submit current audited financials because of the state of and inaccuracy of the company's records. It was explained to Mr. Bice and Ms. Eckert that to try to produce such audited financials, if a reputable CPA firm could even be persuaded to do so under the circumstances, would cost the bankruptcy estate, and thus ultimately the parties wronged by USACM's pre-petition management, an enormous amount of money. Mr. Bice and Ms. Eckert indicated at that time that the MLD understood that audited financials could not be produced and that the MLD would not expect that they would be produced under these unique circumstances. Therefore, it is USACM's position that this requirement has been waived for the post-bankruptcy USACM. To the extent that this violation relates to the pre-bankruptcy USACM, USACM would not contest that finding. Further, with respect to the financial reporting done by post-bankruptcy USACM, it should be noted that, as part of the Chapter 11 bankruptcy case, USACM was required to file certain financial reports

every month and did so. These bankruptcy law mandated financial reports, which are sworn statements and were publicly available to the MLD and to all investors, fairly substituted for the stated required audited financial statements that may have been required in the absence of a bankruptcy case.

2.  The MLD cites USACM for maintaining bank accounts allegedly improperly titled, including USACM's collection trust account entitled "Debtor in Possession BK-S-06-10735 Operating Account/Collection." However, federal law mandates that bankruptcy debtors must designate all accounts as "debtor-in-possession" accounts, thus superseding any state requirement to the contrary. Consequently, the title given this account, which was operated as a collection trust account, was not inappropriate. Further, this account was set up pursuant to first day motions filed and approved by order of the Bankruptcy Court of which the MLD had notice and an opportunity to be heard, but did not object. Further, all transactions handled by USACM were publicly reported in either the monthly financial reports filed with the Bankruptcy Court or in the loan summaries filed each month with the Bankruptcy Court. During the entire pendency of the USACM's Chapter 11 bankruptcy case, the MLD, although it had all of this information openly available to it and although USACM's operations were being supervised and handled by the Bankruptcy Court, never registered any objection. Thus, it is USACM's position that to the extent not specifically superseded by federal law or Bankruptcy Court order, these state requirements were waived by the MLD for post-bankruptcy USACM.

3.  The MLD cites USACM for "improperly convert[ing] interest income for its own use despite the fact that the monies used to generate said interest income were never its property." The MLD does not cite any statute which prohibits USACM from earning interest on funds held pursuant to Bankruptcy Court order (of which the MLD had notice and an opportunity to be heard) pending a final determination by the Bankruptcy Court of the ultimate right to those funds. Further, MLD is not correct when it concludes that "monies used to generate said interest income were never its property." In fact, the monies used to generate that interest income consisted primarily of money that was eventually determined by the Bankruptcy Court in the Confirmation Order to belong to USACM. The fraction of the interest that arguably would not trace back to USACM's funds would be impossible to attribute to any individual direct lender. MLD should also be aware that this interest income has been turned over to the USACM Liquidating Trust for eventual distribution to creditors, including investors who were harmed by the pre-bankruptcy activity of USACM. The position the MLD has taken in both its finding with respect to this issue and its conclusion that this money does not belong to the USACM Liquidating Trust, is in direct violation of the orders of the Bankruptcy Court, including the Confirmation Order.

4.  The MLD cites USACM for "impermissible commingling" of default interest with principal and interest collected on loans for direct lenders. As the MLD admits later

3

on in the Order and as determined by the Bankruptcy Court, the default interest collected belongs to USACM under agreement with investors pursuant to the Loan Servicing Agreements (the "LSAs"). Further, the rights to most of the default interest were sold to Compass as part of the sale conducted under the supervision of the Bankruptcy Court and as confirmed by the Confirmation Order entered by the Bankruptcy Court. Consequently, there can be no "impermissible commingling" where the funds deposited into USACM's operating account (as opposed to the trust account) belonged to USACM. Nor can there be any violation when, both as part of the sale to Compass and as allowed during the course of the Chapter 11 bankruptcy case of USACM, the Bankruptcy Court determined, without objection from the MLD who was properly noticed on all matters in the case, that the default interest was property of USACM. Any attempt to make a determination as to the ownership of default interest by the MLD to the contrary is in direct violation of the prior orders of the Bankruptcy Court, including the Confirmation Order.

5.   The MLD cites USACM for impermissibly changing its principal location allegedly on two occasions. USACM consolidated its operations into one of the two buildings it leased after rejecting one of its lease after notice and a hearing and by order of the Bankruptcy Court. The second move came after the second lease was also rejected by USACM through motion and order entered by the Bankruptcy Court. Thus, both moves were sanctioned by the Bankruptcy Court, after notice and an opportunity to be heard, but without objection from the MLD. Further, NAC 645B.057(2)(c) only applies if a person acquires stock or ownership of the broker as a result of a change of control. NAC 645B.057(3) only applies to the "closing" of the principal office, which has not yet closed, but will soon do so pursuant to a dissolution of the company. Thus, neither of these administrative provisions even applies to USACM's situation. To the extent that they may apply, permission for the move was obtained from the Bankruptcy Court pursuant to the rejection of the leases, without objection from the MLD, thus satisfying any such requirement.

6.   The MLD cites USACM for impermissible payment of interest to investors on defaulted loans pursuant to NRS 645B.250. This finding relates solely to pre-bankruptcy USACM. USACM does not contest that pre-bankruptcy USACM impermissibly paid interest to investors in this matter. In fact, it was the post-bankruptcy CRO and his management team that brought this violation to the MLD's attention and provided the MLD with evidence documenting the same. Despite the evidence presented to the MLD on this issue by post-bankruptcy management and post-bankruptcy management's repeated requests that this information be used to take appropriate action against the pre-bankruptcy principals of USACM, to our knowledge, neither the MLD nor the State has taken any action against the pre-bankruptcy principals to date.

7.   The MLD cites USACM for failure to report on the true performance status of outstanding loans. If the cited violation refers to pre-bankruptcy USACM, post-bankruptcy management of USACM has inadequate information on this and will not

contest that this may have occurred. However, post-bankruptcy USACM filed monthly reports on the status of loans in the Bankruptcy Court, which were then made available to everyone at no cost through the BMC Group's website set up by USACM and by the posting of these reports on USACM's own website. These reports were likewise made available to the MLD. While at the very beginning of the case, there was a delay in getting the initial monthly reports done, this was due to the inaccuracy of the records of USACM that post-bankruptcy USACM management inherited. These records, including loan histories, had to be reconstructed and corrected before an accurate report could be generated. Thus, the MLD's finding that USACM "failed to provide a single report to the DIVISION and/or the beneficial owners of the loans it serviced as to the trust performance status . . . after RESPONDENT'S filing for Chapter 11 bankruptcy protection" is wrong. Reports were provided for every month since the Chapter 11 bankruptcy filing up until the servicing assets were sold to Compass pursuant to the Confirmation Order entered by the Bankruptcy Court.

8.      The MLD cites USACM's failure to post its license as required under NRS 645B.025. This is something Mr. Bice would have known since the Chapter 11 cases were first commenced and thereafter, having visited the offices of USACM numerous times after the Chapter 11 bankruptcy filing. During all of this time, nothing was said by Mr. Bice or anyone at the MLD as to the location of the posted license. To the extent this finding was based on the investigator's visit, the investigation was conducted in late March of 2007, after the plan of reorganization confirmed by the Bankruptcy Court had gone effective. USACM was in wind down and was in the process of packing up all of its documents prepatory to moving out of its facility pursuant to a Bankruptcy Court approved rejection of its lease. It should further be noted that post-bankruptcy USACM regularly reported to the Bankruptcy Court in open court, which was a proceeding open to all investors and the MLD (and which Mr. Bice attended on several occasions), as to the status of the license. Thus, as to post-bankruptcy USACM, this requirement to openly make all aware of USACM's license was either complied with or compliance was waived by the MLD by its acquiescence.

9.      Most troublesome of all of the determinations is that the MLD cites post-bankruptcy USACM for "engaging in 'material misrepresentation in connection with any transaction governed by this chapter . . . or [engaging] in any other conduct constituting a deceitful, fraudulent or dishonest business practice . . .'" under NRS645B.670(3)(b) and (h). The only foundation for this baseless determination, however, then consists of nothing more than actions taken by post-bankruptcy USACM pursuant to Bankruptcy Court order, minor accounting errors in favor of investors, and the enforcement of contract provisions not disputed by the MLD and which were determined by the Bankruptcy Court to be proper. Thus, as more fully set forth below, any determination that these actions constituted "material misrepresentation" or a "deceitful, fraudulent or dishonest business practice" is in direct violation of Bankruptcy Court orders, including the Confirmation Order. Further, many of these alleged "violations" are also

5

acknowledged by the MLD to be "unusual" but not in fact violations of the law. We therefore specifically ask MLD to clarify that it does not intend to, and cannot and did not, make any determination contrary to prior bankruptcy court orders, and that no determination has been made by the MLD that any of these actions cited violate the law. We would ask that this determination be withdrawn in its entirety. The improper determination of wrongdoing made by the MLD in the Order is based on the following allegations.

   a) The MLD cites "minor errors, in some instances, in the calculation of interest earned by investors and fees earned by the licensee," admitting that the "dollar amounts of the errors made were very small" and that "the errors appear to have been in the investors' favor..." All of these errors occurred in the January sampling. The MLD concluded that for December, in sampling the calculations, the MLD "found those to be correct," and concluded that "the errors appear to have been made in January 2007," which were explained to be the result of a change to the computer systems by the current controller of post-bankruptcy USACM. As such, no determinations were made in this category that could support an alleged violation of NRS 645B.70(3)(b) and (h).

   b) The MLD acknowledges that the Bankruptcy Court has ordered and allowed the netting of interest previously paid to lenders on nonperforming loans from interest paid after the bankruptcy as proper. Notwithstanding that acknowledgement, the MLD, in direct violation of the order of the Bankruptcy Court determining this issue, of which the MLD had notice and an opportunity to be heard, finds that "NRS 645B and NAC 645B does not specifically allow for the concept of netting as it is a violation of State law to commingle funds which was the basis for the netting." As the MLD knows, certain amounts were netted pursuant to the Confirmation Order and paid over to the USACM Liquidating Trust for the benefit of all creditors of USACM, including investors with claims against USACM. Further, pursuant to the Confirmation Order, the Bankruptcy Court ordered Compass to continue the netting and to pay all netted amounts over to the USACM Liquidating Trust. Thus, the MLD's finding violates the Order of the Bankruptcy Court properly interpreting the law. The netting allowed by the Bankruptcy Court further is not based on "commingling," but is based on post-bankruptcy USACM properly collecting all amounts in its trust account, keeping those amounts in the trust account per the Bankruptcy Court's Order until the Bankruptcy Court could finally determine the proper recipients of those funds, which included, as to the netted payments, post-bankruptcy USACM. As this practice has already been sanctioned by Bankruptcy Court order to be legal and in accordance with the law, an alleged violation of NRS 645B.70(3)(b) and (h) cannot have occurred based on these practices.

6

c) The MLD next challenges the servicing fees collected during the Chapter 11 bankruptcy case of USACM, acknowledging that such fees were collected as allowed and ordered by the Bankruptcy Court, but stating that "there was insufficient time to test to see if it was correct." It should be noted that the description of the "hold back" and what was allowed and ordered by the Bankruptcy Court in this section is inaccurate, and the pleadings allowing these actions were properly served on the MLD and the orders of the Bankruptcy Court were made without objection from the MLD. No violation seems to be cited in this paragraph, but to the extent the MLD intends to challenge the servicing fees collected pursuant to Bankruptcy Court Order, this would be a violation of the orders of the Bankruptcy Court. As these fees were collected in accordance with Bankruptcy Court orders, an alleged violation of NRS 645B.70(3)(b) and (h) cannot have occurred based on these practices.

d) The MLD next notes that appraisal fees were changed back to investors as were assignment fees. As to appraisal fee chargebacks, which were specifically allowed by Bankruptcy Court order, the MLD simply says they "did not have sufficient time to verify a good sample." No violation of the law is even alleged by the MLD with respect to either the collection of Court-sanctioned appraisal fees and assignment fees. As these fees were collected in accordance with Bankruptcy Court orders, an alleged violation of NRS 645B.70(3)(b) and (h) cannot have occurred based on these practices.

e) The MLD next notes that in some cases, compound interest was charged to borrowers. While noting that this was "unusual," the MLD also acknowledges that in its sampling of the promissory notes, "in each instance, the borrower has signed the note agreeing to pay compound interest." No violation of the law is even alleged by the MLD with respect to these mutually agreed contractual provisions. As such, an alleged violation of NRS 645B.70(3)(b) and (h) cannot have occurred based on these practices.

f) The MLD then addresses the issue of default interest and late fees, noting that this was a "considerable amount" and was paid into post-bankruptcy USACM's "operating account." Based on no evidence, the MLD gratuitously speculates that "it is doubtful whether USA Capital has ever properly reported interest, etc. to the IRS . . . ." The MLD did not specify any IRC section or any specific violation of the IRC, nor could it have done as there has been no violation. This is nothing more than a baseless speculation on the part of the MLD. Further, while noting that "the majority of other hard money brokers pass on the default interest to borrowers [probably meaning to say investors]," the MLD does not dispute that default interest and late fees belonged to

7

USACM pursuant to the LSAs. Further, the sale made to Compass of the default interest and late fee rights belonging to USACM was made pursuant to Bankruptcy Court order, after notice and an opportunity to be heard having been provided to the MLD with no objection from the MLD. Consequently, this finding, which does not include any finding of wrongdoing and which addresses fees already determined by the Bankruptcy Court to be property of USACM, cannot provide the basis for an alleged violation of NRS 645B.70(3)(b) and (h).

g) Finally, the MLD addresses the exit fees collected by and belonging to USACM. The MLD concludes, citing to no statute prohibiting the same, that "[a]n exit fee is not typical of the mortgage brokerage industry nor is it appropriate compensation for a loan servicing company the monies should be distributed to the lenders who bore ALL of the risk although unbeknownst to them." While we are not commenting on the pre-bankruptcy practices of USACM, the exit fees collected post-bankruptcy and which were sold to Compass were done pursuant to Bankruptcy Court order, as to which the MLD was noticed and interposed no objection. Further, both the proceeds of the Compass sale and the exit fees collected by post-bankruptcy USACM were used to pay claims in the priority allowed under the Bankruptcy Code or were paid over to the USACM Liquidating Trust for the benefit of all of USACM's creditors, including claims held by investors against USACM. Consequently, the post-bankruptcy practices of USACM were sanctioned by the Bankruptcy Court and cannot provide the basis of an alleged violation by post-bankruptcy USACM of NRS 645B.70(3)(b) and (h).

As such, there is no basis whatsoever for MLD to determine that post-bankruptcy USACM has violated NRS 645B.70(3)(b) and (h). In addition, the MLD's motivation in finding such alleged violations committed by USACM in these circumstances is questionable. The practices cited have already been determined and specifically allowed by order of the Bankruptcy Court, after notice and without objection by the MLD. For the MLD to attempt to determine otherwise at this point in time is nothing more than a collateral attack on prior binding orders of the Bankruptcy Court. Please note that an injunction was issued as part of the Confirmation Order which enjoins "all Entities . . . from asserting against any assets that are distributed or to be distributed under the Plan any Claims, rights, causes of action, liabilities or interests based on any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, other than as expressly provided in the Plan or Confirmation Order . . ." and enjoins all Entities from "commencing or continuing in any manner any action or other proceeding on account of such debt, Claims, liability, Equity Interest or right against assets or proceeds thereof that are to be distributed under the Plan, other than to enforce any right to a distribution with respect to any such assets or the proceeds thereof as provided under the Plan. . . ." If this Order is used to interfere with the distributions that

8

have been sanctioned and ordered in the Plan and Confirmation Order and if the determinations made pursuant to NRS 645B.70(3)(b) and (h) based on actions taken by post-bankruptcy USACM that were approved in the Plan and Confirmation Order are not withdrawn, then the Order and the actions of Mr. Bice are in violation of the injunction, subjecting Mr. Bice to being held in contempt of the Bankrutpcy Court.

If Mr. Bice refuses to withdraw these findings and determinations as to the actions of post-bankruptcy USACM and the actions allowed and ordered by the Bankruptcy Court, we understand that the USACM Liquidating Trust, which now acts for the benefit of all unsecured creditors in the USACM Chapter 11 bankruptcy case and which is the recipient of the funds collected which have been questioned by the MLD, is prepared to sue Mr. Bice in Bankruptcy Court for declaratory and/or injunctive relief, as allowed under the Supreme Court's decision in *Ex Parte Young* (208 U.S. 193) and its progeny. To the extent that USACM feels it to be necessary to prevent interference by the MLD in the bankruptcy process, USACM also reserves the right to commence appropriate action against Mr. Bice in the Bankruptcy Court.

Further, in the Order, the MLD threatens to fine USACM for these alleged violations. Please note that any such attempt by MLD would directly violate the injunction set forth in Section IV.H. of the Plan. Further, the bar dates for filing claims against USACM, including fines for both pre- and post-bankruptcy activities of USACM, have passed and thus, no fines can be levied or collected against USACM. As Mr. Bice knows, when it looked like there was some possibility of equity holders (Milanowski and Hantges) receiving a return in the USACM bankruptcy case, Mr. Allison informed him personally of the bar date deadline and asked Mr. Bice to file a claim for penalties that could be assessed against the pre-bankruptcy USACM for its violations of the law and which could be subordinated to the legitimate and allowed claims of investors and other creditors in the case, in order to prevent the principals, who perpetrated the wrongdoing, from getting anything out of USACM's Chapter 11 bankruptcy case. Mr. Bice and the MLD, however, refused to act at that time. Now it is too late to file any such claim, and fortunately, even without Mr. Bice's assistance, post-bankruptcy USACM was able to confirm a plan which did not, in the end, allow the pre-bankruptcy principals to receive anything out of the Chapter 11 bankruptcy case of USACM.

Finally, in connection with this response, we request that the MLD (i) turn over a copy of the Investigative Report that is referenced in this Order, but which has not been served on USACM, (ii) produce all underlying documents that provided the basis for this report or this Order, and (iii) produce all correspondence (in any format, including without limitation, email or any other electronic format or notes of conversations) with and to investors (including, without limitation, the so-called "Lenders Protection Group" and its members), legislators, the governor, the lieutenant governor, USACM or its affiliates, creditors, former principals of USACM or its affiliates, or representatives, agents, or professionals for the forgoing, relating to the USACM Chapter 11 bankruptcy case or that

9

occurred on or after January 1, 2006. We also request a copy of the cease and desist order issued against Compass and any other correspondence (in any format, including without limitation, email or any other electronic format) with Compass or with the foregoing named parties relating to Compass and its obligations to the USACM bankruptcy estate. In the absence of voluntarily receiving these requested documents, either we or the USACM Liquidating Trust will act to require production of these documents, which may include obtaining and serving an order from the Bankruptcy Court for a Rule 2004 Examination of Mr. Bice.

Sincerely,

RAY QUINNEY & NEBEKER P.C.

Annette W. Jarvis

AWJ/pb

928592