Electronically filed June 11, 2007

| | |
|---|---|
| Marc A. Levinson (California Bar No. 57613) | Bob L. Olson (Nevada Bar No. 3783) |
| Jeffery D. Hermann (California Bar No. 90445) | Anne M. Loraditch (Nevada Bar No. 8164) |
| ORRICK, HERRINGTON & SUTCLIFFE LLP | BECKLEY SINGLETON, CHARTERED |
| 400 Capitol Mall, Suite 3000 | 530 Las Vegas Boulevard South |
| Sacramento, California 95814-4497 | Las Vegas, Nevada 89101 |
| Telephone: (916) 447-9200 | Telephone: (702) 385-3373 |
| Facsimile: (916) 329-4900 | Facsimile: (702) 385-5024 |
| Email: malevinson@orrick.com; | Email: bolson@beckleylaw.com; |
| jhermann@orrick.com | aloraditch@beckleylaw.com |

*Attorneys for Post-Effective Date USA Capital Diversified Trust Deed Fund, LLC*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>　　　　　　　　　　　　　　　Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>　　　　　　　　　　　　　　　Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>　　　　　　　　　　　　　　　Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725-LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>　　　　　　　　　　　　　　　Debtor. | |
| In re:<br>USA SECURITIES, LLC,<br>　　　　　　　　　　　　　　　Debtor. | |
| Affects:<br>☐ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☒ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA First Trust Deed Fund, LLC | |

**POST-EFFECTIVE DATE USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC's FIRST REPORT OF ACTION TAKEN AND PROGRESS TOWARDS CONSUMMATION OF CONFIRMED PLAN OF REORGANIZATION**

Post-Effective Date USA Capital Diversified Trust Deed Fund, LLC ("Diversified" or "Revested Debtor"), a revested debtor in the above-captioned chapter 11 cases (the "Chapter 11

Cases"), by and through its counsel noted above,[1] hereby submits this First Report of Action Taken and Progress Towards Consummation of Confirmed Plan of Reorganization (the "First Report"), pursuant to the Court's "Order Confirming the "Debtors' Third Amended Joint Chapter 11 Plan of Reorganization,' as Modified Herein" [Docket No. 2376] (the "Confirmation Order") entered January 8, 2007.[2] *See* Confirmation Order, ¶ 74. The Debtors' Third Amended Joint Chapter 11 Plan of Reorganization (the "Plan") went effective on March 12, 2007 (the "Effective Date"). Thus, this First Report is for the period from the Effective Date through June 10, 2007. This First Report, and all subsequent reports made pursuant to the Confirmation Order, shall provide the information contemplated by the report described in Rule 3020(a) of the Court's Local Rules of Bankruptcy Practice, which is as follows:

(A)  A schedule of personal property costing more than $5,000 and any real property acquired, sold or disposed of and the price paid for each:

   Personal property costing more than $5,000:     None.
   Real property acquired, sold or disposed of:    None.
   Total:                                          $0.00

(B)  A schedule listing each debt, the total amount required to be paid under the Plan, the amount required to be paid to date, the amount actually paid to date, and the amount unpaid:

> Due to the nature of its operations as an investment fund with contracted services through intercompany debtor entities and no employees, Diversified had only a relatively small number of claims filed against it in the Chapter 11 Cases. Such claims included general unsecured claims (many of which were misfiled as creditor claims by holders of equity interests in Diversifed) and administrative expense claims related to professional fees accrued during the Chapter 11 Cases. The Court is scheduled to hear the professionals' fee applications on June 22, 2007. Prior to the Effective Date, Diversified objected to many of the general

---

[1] Counsel was retained by the Revested Debtor as of March 13, 2007, after serving as counsel to the Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC, during the Chapter 11 Cases from June 2006 through March 12, 2007.

[2] This First Report is timely filed pursuant to Rule 9006 of the Federal Rules of Bankruptcy Procedure. Fed.R.Bankr.P. 9006(a).

OHS West:260095880.3

1  unsecured claims filed against Diversified, and the Court sustained Diversified's
2  objections by entry of orders dated January 22, 2007, and February 14, 2007
3  [Docket Nos. 2514 and 2765, respectively], which disallowed such claims in their
4  entirety. On February 14, 2007, an appeal to the Ninth Circuit Court of Appeals
5  Bankruptcy Appellate Panel (the "BAP") was taken by Jerry McGimsey and other
6  members of the McGimsey family (the "McGimsey Claimants") from the Court's
7  order of that same date [Docket No. 2765] disallowing their claims. Post-
8  Effective Date, Diversified drafted and filed its Answering Brief in said appeal,
9  and is awaiting the opportunity to present its oral arguments to the BAP. On June
10 7, 2007, and June 8, 2007, Diversified filed objections to the remaining
11 outstanding unsecured claims, and the Court is scheduled to hear those claims
12 objections on July 27, 2007, at 9:30 a.m.

13 Also prior to the Effective Date, the Court sustained Diversified's
14 objection to the $20 million claim filed by Prospect High Income Fund, *et. al.*
15 (collectively, the "Highland Funds"), by entry of its order dated October 26, 2006
16 [Docket No. 1674]. The Highland Funds appealed the Court's disallowance of
17 their claim. Post-Effective Date, the BAP dismissed the Highland Funds' appeal
18 by its Order of Dismissal dated May 7, 2007 [Docket No. 3665] entered in
19 response to the stipulation by and between the Highland Funds and Diversified,
20 which was solicited and submitted to the BAP by the Highland Funds.

21 Under the Plan, Diversified is required to make payments to any creditors
22 and, after all such payments are made, to distribute its assets to its members
23 holding equity interests, subject to the establishment of reserves. Pursuant to the
24 Plan, Diversified is operating under the "DTDF Amended Operating Agreement,"
25 a copy of which was attached as Exhibit 1 to the Plan Documents Supplement and
26 Notice of Disclosures [Docket No. 2001] filed in the Chapter 11 Cases on
27 December 8, 2006. Further, Diversified is continuing its efforts to recover the
28 ///

{00403254;2}                                                                Page - 3 - of 5

OHS West:260095880.3

greatest amount of assets possible in order to make distributions to its members at the earliest opportunity possible.

(C)  A schedule of executory contracts entered into:

Pursuant to the Plan, Diversified entered into agreements, as of March 13, 2007, retaining professionals to provide legal and financial advisory services necessary to conduct Diversified's affairs. Diversified retained Orrick, Herrington & Sutcliffe LLP, and Beckley Singleton, Chartered, as general counsel and local counsel, respectively, to provide legal services. Diversified also retained FTI Consulting to provide accounting and financial-related advisory services. In addition, on a limited basis, Diversified retained Mesirow Financial Interim Management to assist with financial and administrative-related transitional issues, Ray Quinney & Nebeker, P.C. to assist with transitional issues related to the Chapter 11 Cases, and BMC Group, Inc. for ongoing website hosting and related distribution services. Diversified anticipates that other normal course services will be procured on a contractual, as-needed basis since Diversified has no employees.

(D)  A statement listing each postpetition tax (i.e., income, payroll, property, sales), payee, and the amount actually paid:

| | |
|---|---|
| Federal Unemployment taxes: | None. |
| Federal Payroll taxes: | None. |
| Nevada Unemployment taxes: | None. |
| Total: | $0.00 |

(E)  Progress toward completion of the Plan and a list and status of any pending adversary proceedings or motions and resolutions expected:

SEE EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF for a detailed report on the status of the various collection efforts in which Diversified is currently engaged. On May 10, 2007, through BMC Group, Inc., Diversified mailed such report to all holders of equity interests in Diversified, and posted the same on its website.

1  In addition to the matters addressed in Exhibit A and at paragraph (B)
2  above, Diversified has reached a tentative settlement agreement with certain
3  defendants in the adversary proceeding pending before this Court, case no. BK-S-
4  06-01256 LBR (the "HMA Adversary"). Such settlement is pending final
5  documentation and is subject to Court approval. However, Diversified anticipates
6  that the settlement will be finalized and a motion filed this week seeking Court
7  approval of such settlement. Diversified also has requested from the Court
8  settlement conferences with other defendants in the HMA Adversary. Diversified
9  anticipates additional motions being filed seeking Court approval of settlement
10 agreements, should those subsequent settlement conferences be successful.

11 On May 29, 2007, Diversified, together with USACM Liquidating Trust
12 and Nevada State Bank (collectively, the "Petitioning Creditors"), initiated
13 involuntary bankruptcy cases against Joseph D. Milanowski (BK-S-07-13162
14 LBR) and Thomas Hantges (BK-S-07-13163 LBR). By its orders entered June 7,
15 2007 [Hantges Docket No. 30] and June 8, 2007 [Milanowski Docket No. 30], in
16 response to emergency motions filed by the Petitioning Creditors, the Court
17 ordered the Office of the United States Trustee (the "UST") to appoint an interim
18 trustee in each of the involuntary cases.

19 (F)  A statement regarding the status of payment of UST quarterly fees:
20 All UST fees have been paid in full through the date of this First Report.
21 DATED this 11th day of June 2007.

**BECKLEY SINGLETON, CHTD.**

By:    /s/ Anne M. Loraditch
   Bob L. Olson (Nevada Bar No. 3783)
   Anne M. Loraditch (Nevada Bar No. 8164)
       and
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
Marc A. Levinson (California Bar No. 57613)
Jeffery D. Hermann (California Bar No. 90445)
*Attorneys for Post-Effective Date USA Capital*
*Diversified Trust Deed Fund, LLC*

# EXHIBIT A

# USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC
Robert G. Worthen, Chairman of the Board

May 10, 2007

Dear USA Capital Diversified Trust Deed Fund, LLC Investor:

I am writing on behalf of the Board of Directors of USA Capital Diversified Trust Deed Fund, LLC ("DTDF") to update you about DTDF's emergence from chapter 11 bankruptcy, to discuss DTDF's efforts to collect assets, and to address the questions on the mind of each investor. The letter explains that while the Board and DTDF's professionals are working around the clock to recover assets and make a distribution to investors, we cannot at this time predict how much will be distributed or when the first distribution will be made. We assure you that our goal is to obtain the highest possible recovery for investors within the shortest period of time, but caution you that there is no quick or easy solution.

### Who Controls Post-Bankruptcy DTDF?
DTDF emerged from chapter 11, according to the confirmed plan of reorganization ("Plan"), on March 12, 2007. During the chapter 11 case, DTDF was controlled by Tom Allison of Mesirow Consulting as Chief Restructuring Officer, who answered to the bankruptcy court. During the bankruptcy, the U.S. Trustee appointed an official committee of Diversified investors ("DTDF Committee") to represent our collective interests as fund members, however, the DTDF Committee had no authority to act for or to manage DTDF. Rather, we did our best to influence Tom Allison and the Court.

On March 12th, Tom Allison ceased his role as Chief Restructuring Officer of DTDF, and DTDF's chapter 11 counsel, Ray Quinney & Nebeker and Schwartzer & McPherson, no longer represented DTDF. Pursuant to the amended operating agreement approved as part of the plan confirmation process, on March 12th, with the approval of the DTDF Committee, Michael Tucker of FTI Consulting became DTDF's new manager. He is the equivalent of the Chief Executive Officer. Mr. Tucker answers to the Board of Directors, which is comprised of five DTDF investors: myself, as Chairman of the Board, Robert Hardy, Charles Nichols, Bob Fitzner and Richard Kreps. Three of us were members of the DTDF Committee. Mr. Tucker, on behalf of DTDF, has retained as lead counsel Orrick, Herrington & Sutcliffe LLP, and as Nevada counsel, Beckley Singleton Chtd. DTDF also is being advised by financial professionals at FTI Consulting, which served as financial advisor to the DTDF Committee.

### When Will There Be Distributions To DTDF Members?
The true and simple answer is we do not know. Looking at our assets and doing our best to forecast when some of those assets can be turned into cash, we hold hopes for 4th quarter 2007 distributions, but I am not counting on it.

As you continue to read this letter and the attached addendum, it should become clear why cash distributions are impossible to predict at the current time. There will be distributions once there are sufficient funds recovered and we have established adequate reserves to cover the cost of

Diversified Trust Deed Fund Investors
May 10, 2007
Page 2

future litigation and other recovery efforts. Please understand that the recoveries of assets are based on our ability to fund the future litigation required.

### Why Is It Such A Struggle To Recover DTDF's Assets?

Despite the promises made in its prospectus, most of DTDF's loans are not secured by first trust deeds, and did not have conservative loan-to-value ratios. Almost all of the loans are nonperforming, meaning that borrowers are not making payments on them. The largest loans were made to entities controlled by Messrs. Milanowski and Hantges, including USA Investment Partners, LLC ("Investment Partners") and Colt Gateway LLC, which is 50% owned by Investment Partners. With interest, the Investment Partners loan balance is over $120 million as of the end of April 2007, and the Colt Gateway LLC loans exceed $17 million.

### DTDF's Actions To Collect Assets And The Non-Performing DTDF Loans.

As noted above, during the course of the chapter 11 cases, DTDF was run by Mr. Allison and was represented by the Ray Quinney & Nebeker and Schwartzer & McPherson firms. The debtor-in-possession and its counsel were responsible for collection of DTDF's loans, and the DTDF Committee lacked the legal power to sue a borrower, to institute a foreclosure, to agree on a discounted payment, or to take other collection actions. Instead, those powers were vested in the debtor-in-possession. That said, the DTDF Committee and its professionals spent a great deal of time reviewing documents, discussing the loans – both with Mesirow and DTDF's counsel – and met with several borrowers. But until the March 12th effective date, we lacked the power to enforce DTDF's rights. Following March 12th, DTDF took a number of actions, several of which began earlier under the former administration, but none of which were pursued with the vigor we believe was necessary.

The following loans and claims are DTDF's major assets. While all the loans are nonperforming, and while the claims are hotly contested by the adverse parties, many of these assets have substantial value. We have gained control or are attempting to gain control of these assets in order to maximize the return for DTDF investors. The current status of each is summarized on the attached addendum. Please understand that the status of almost every one of these each changes on a daily basis.

- 10-90, Inc. loan – Investment Partners
- Ashby real estate projects
- Colt Gateway LLC loans – The Colt Armory in Hartford, Connecticut
- BySynergy obligation – Sedona, Arizona
- Tree Moss Partners/EPIC Loan – The Marquis Villas in Palm Springs
- USA Investors VI – The Hotel Zoso in Palm Springs
- HMA litigation – Royal Hotel in Las Vegas
- Claims against USA Commercial Mortgage ("USACM")

### Communication With DTDF Members.

The Board recognizes that information has not been conveyed to DTDF members as often and as promptly as the members would have preferred. Since March 12th, we have been working

OHS West:260228981.1

Diversified Trust Deed Fund Investors
May 10, 2007
Page 3

nonstop to collect assets. We promise to communicate more frequently in the future. We will do so through quarterly newsletters such as this one and through updates on the DTDF website. The website may be accessed at http://usacapdtdf.bmcgroup.com.

As it is very expensive to communicate with our professionals, who bill hourly fees, I offer to receive your phone calls and answer questions about our status to the best of my ability. My personal cell phone number is (702) 239-4222. Also, you may send us email inquiries at diversifiedfund@orrick.com. For address changes, please send a written request with your legal vesting name and account number to DTDF at the following address:

> USA Capital Diversified Trust Deed Fund
> C/O FTI Consulting, Inc.
> Two North Central Avenue
> Suite 1200
> Phoenix, Arizona 85004

**Information We Are Unable To Provide To DTDF Members.**
While one of our goals is to keep DTDF members as informed as possible, please understand that details about litigation strategies are both confidential and privileged. A good football team does not make its plays public before the center hikes the ball. Once we determine that DTDF will take official action, such as entering into a settlement or pursuing legal remedies, DTDF will make the information available to its members.

DTDF will provide you with information regarding your personal investments. Please contact us through the website or e-mail address given in the previous section of this letter. Please note that we are unable to provide you with individualized legal or financial advice because the DTDF professionals represent the company, not members individually. In other words, the Board and the DTDF professionals are looking out for the interests of DTDF and its members as a whole. If you need personal legal or financial advice, you ought to retain your own attorney or financial advisor.

**Conclusion.**
The Board understands how frustrating DTDF's chapter 11 was, and further understands that you are eager for both information and payments. We ask for your patience, and want you to know that we and the DTDF professionals are working our hardest to obtain the best and the swiftest recovery for you. But we want you to continue to remember the uphill battle that we face, and for you to understand that the struggle will not be over soon.

Best Regards,
Robert G. Worthen
Chairman of the Board

OHS West:260228981.1

Attachment to Letter of May 10, 2007
Page 1

- <u>Investment Partners – Analysis And Factual And Legal Research Relating To The 10-90 Loan</u>.  The 10-90 Loan was fiction and a subterfuge employed by Messrs. Hantges and Milanowski as part of a scheme to fund their speculative real estate activities with DTDF investor funds, rather than utilizing DTDF funds to make non-insider loans secured by first trust deeds as promised in the prospectus.  For example, DTDF's books and records reflect that $4.6 million was transferred directly from DTDF to HMA Sales, LLC ("HMA"), an entity wholly-owned by Investment Partners.  An additional approximately $9 million flowed from DTDF to HMA through various entities controlled or owned by Messrs. Milanowski and Hantges, after being "laundered" through various entities controlled or owned by them or by David Fogg in an apparent attempt to impede any eventual audit of these funds.  Eventually, 10-90, Inc. was removed from the transaction as a borrower of DTDF and a lender to Investment Partners.  Thereafter, Investment Partners became the direct borrower to DTDF in the 10-90 Loan.  Leveraging off work performed by the Debtors, DTDF Committee professionals reconstructed the 10-90 Loan and shored up the tracing of the recipients of DTDF funds, a painful and time-consuming process due to the sorry state of DTDF's books and records, the lack of access to Investment Partners' books and records, and the lack of cooperation from Messrs. Milanowski and Hantges.  As of April 30, 2007, the amount owing on the 10-90 Loan exceeded $120 million.

- <u>Investment Partners Receivership Case</u>.  The Board held its first meeting on March 14, two days after the Effective Date.  One of the first agenda items was whether, in light of the complicity of Investment Partners and its owners, Messrs. Milanowski and Hantges in the fraud on DTDF investors, and in light of the defaulted 10-90 Note, DTDF should join with the USACM Trust, which also had emerged from bankruptcy on the Effective Date, in filing an involuntary chapter 11 petition against Investment Partners.  The Board determined to do so, and the DTDF professionals immediately began working with the USACM Trust professionals on the involuntary petition and the other necessary pleadings, including a motion for the emergency appointment of a chapter 11 trustee to immediately take control of Investment Partners and its business.  The pleadings were drafted and other loose ends were tied up, and the filings were scheduled for Thursday, March 29th.  But on March 28th, DTDF and the USACM Trust learned that a United States District Judge in Riverside, California, had entered an order that day appointing a receiver for Investment Partners and prohibiting the filing of any lawsuit against Investment Partners, including the filing of an involuntary bankruptcy case.

- <u>Investment Partners Chapter 11 Case And Trustee</u>   Upon learning about the receivership order – which was granted without *any* notice to DTDF or the USACM Trust – the professionals employed by Diversified and the USACM Trust immediately sprang into action, drafting pleadings until after 1:30 that morning.  The next day, they filed an emergency motion in Riverside seeking permission to file an involuntary and seek the appointment of a trustee.  The pleadings alleged that the receivership action was collusive, and was little more than an attempt by Investment Partners and its owners to

OHS West:260228981.1

Attachment to Letter of May 10, 2007
Page 2

avoid having to face the music in Las Vegas, where they had done their damage. Investment Partners opposed the emergency motion, arguing that a receivership run out of Riverside was the appropriate vehicle for a recovery by DTDF investors and USACM creditors. The judge disagreed, and at the conclusion of the hearing, signed an order presented by Diversified and the USACM Trust. The involuntary petition was electronically filed that afternoon, as were the motion for the appointment of a trustee and a supporting declaration. Judge Riegle conducted a hearing the next morning, granting the trustee motion. The next day, the United States Trustee appointed Lisa Poulin of Corporate Revitalization Partners to serve as interim trustee. Both Diversified and the USACM Trust strongly supported such appointment. Ms. Poulin immediately took control of Investment Partners' assets, and, along with her counsel, has been working night and day since that time. At the conclusion of a hearing on May 4th, Judge Riegle agreed with Diversified and the USACM Trust and overruled the objections filed by Messrs. Milanowski and Hantges to the involuntary petition, ruling that Investment Partners would stay in bankruptcy. Ms. Poulin is now the permanent, rather than the interim, trustee in control of Investment Partners' assets.

- <u>Ashby Real Estate Projects, Including Roripaugh Ranch</u>. A large portion of the proceeds of the 10-90 Loan were used to fund Investment Partners and its primary members, Messrs. Hantges and Milanowski, as a source of funds for projects and other Investment Partners-related deals. The 10-90 Loan is secured by the assignment of membership interests in Ashby USA, LLC, IP, Capital Land Investors, LLC and Random Developments, LLC. It is not secured by deeds of trust that encumber real property interests. Accordingly, collateral securing the 10-90 Loan is not as readily recoverable in foreclosure or otherwise as it would be were deeds of trust properly in place. During the course of the chapter 11 bankruptcy cases, DTDF Committee professionals met with Ashby representatives in Riverside County on one occasion and in Los Angeles on another. They participated in a number of conference calls with business people and attorneys and have reviewed numerous documents. Despite that, none of the assets were liquidated, and in fact Mr. Milanowski, without notice to the Debtors and contrary to his prior representations to them, entered into an agreement with an Ashby entity in November that the DTDF Committee professionals believe transferred substantial value for no consideration. After March 12th, DTDF, working with the USACM Trust and the new Investment Partners Trustee, have begun taking steps to monetize the Ashby assets. The first step was an all-day, in-person meeting with Ashby representatives in Las Vegas in early May.

- <u>Colt Loans</u>. DTDF was involved in a loan to Colt Gateway, a limited liability company in Hartford, Connecticut, that is 50% owned by Investment Partners. As of March 12, 2007, the total Colt obligation to DTDF, exclusive of default interest, approximated $17 million. The Colt real estate project is comprised of many phases, and is quite complex. The DTDF/Colt relationship is likewise quite complex, in that DTDF is one of three direct lenders that are the beneficiaries of a promissory note secured by a first trust deed on one portion of the Colt project. DTDF made three additional advances to Colt, which DTDF contends are likewise secured by the first deed of trust. But the three loans are "undocumented," which means that Colt has claimed that they were not

Attachment to Letter of May 10, 2007
Page 3

loans at all, but rather were infusions of equity. While Colt has been uncooperative in sharing information with the DTDF Committee, the DTDF Committee professionals did receive and review documents provided by Colt to the two other direct lenders. Although no agreement was reached with Colt prior to March 12th, the lack of resolution was not due to a lack of time or effort on the part of the DTDF Committee professionals. Following March 12th, DTDF became the servicer of such loan, stepped up its involvement in the process, received information from Colt and continues to press Colt to reach agreement. In January 2007, though, the other two direct lenders sought relief from the automatic stay to change loan servicers, and then objected to and subsequently agreed to a settlement with Colt. But Colt did not perform, leading DTDF to devote its efforts to collecting the various loans for the two direct lenders and for itself. DTDF also has been working with the USACM Trust, which is the payee of a note secured by a second deed of trust. DTDF currently is engaged in discussions with Colt about the payment of the obligations, and hopes to avoid litigation, but that may not be possible.

- The BySynergy Obligation. BySynergy is a 53.5-acre, 106 single family development in Sedona, Arizona. A $4.4 million unsecured loan to BySynergy is owned 52% by DTDF, 35% by the First Trust Deed Fund and 13% by USACM. As a result of a Plan compromise, the 35% FTDF interest was transferred to DTDF. The BySynergy obligation represents the amount of outstanding fees and charges of a previous loan to BySynergy (of $11.6 million) that were not paid when such loan was repaid in February 2006. The Debtors' efforts to obtain financial and other information from BySynergy prompted the DTDF Committee to obtain an order for a Rule 2004 examination and document subpoena. That resulted in the turnover of some documents in February 2007, as well as a promise to deliver more in the future. When no documents were delivered, DTDF noticed the deposition of BySynergy's Chief Executive Officer and subpoenaed documents in connection with the same. The deposition was taken and documents produced on May 8th. Additional documents will be produced in the near future.

- (EPIC Loan) Analysis And Factual And Legal Research. Through research and analysis, DTDF Committee professionals learned the following: Tree Moss Partners, LLC ("Tree Moss") is owned by Investment Partners, which is in turn beneficially owned by Messrs. Hantges and Milanowski. An uncollected obligation wholly owned by DTDF is owned by the owner of the property that once secured the Epic loan; the loan balance exceeds $20 million. The collateral for the loan consisted of 63 condominium units in the Marquis Villas resorts in Palm Springs, California. DTDF foreclosed on those condominium units in 2004 and took title to the same. Yet following the foreclosure, Tree Moss took control of the condominium units, and in February of 2006, Mr. Milanowski executed a quitclaim deed transferring the condominium units from DTDF to Tree Moss for no consideration.

- (EPIC Loan) Filing The Involuntary Case. DTDF Committee professionals, as well as the Debtors' professionals, had participated in protracted negotiations with Mr. Milanowski and his counsel in late summer and autumn of 2006 in connection with a proposed sale of the 63 condominium units by Tree Moss. The hope was that he would agree to arrangements that ensured that essentially all of the net sale

Attachment to Letter of May 10, 2007
Page 4

proceeds of the 63 condominium units would be paid over to the DTDF. However, when those negotiations reached deadlock, the Debtors and the DTDF Committee professionals determined that an involuntary bankruptcy petition, coupled with an immediate motion for the appointment of an interim trustee, was the most acceptable course of action. With the cooperation and assistance of the DTDF Committee professionals, DTDF filed an involuntary bankruptcy petition against Tree Moss on December 7, 2006, serving as the sole petitioning creditor. A motion for the appointment of an interim trustee and seeking to restrict Mr. Milanowski's operating authority was filed that same day, and the Court orally ruled that the UST should appoint an interim trustee at a hearing held on December 15, 2006. On December 19th, the UST appointed James Lisowski as the interim trustee.

- <u>(EPIC Loan) Subsequent Developments In The Tree Moss Bankruptcy Case</u>. Tree Moss eventually consented to the bankruptcy filing, and Mr. Lisowski attempted to administer the 63 condominium units. The DTDF Committee disagreed with many of his actions and tactics, and was compelled to object to a proposed sale procedure and sales agreement. The Trustee ultimately invited DTDF Committee professionals to participate in the screening of potential buyers, but no sale proposal acceptable to the DTDF Committee (and now DTDF) has surfaced. In addition, the Tree Moss Trustee has been unable to fund or control the homeowners association, which may continue to be dominated by Mr. Milanowski. Mr. Lisowski was unable to make peace with the owner of the remaining 38 condominium units that share the common areas of the complex.

- <u>Conversion Of The Tree Moss Case To Chapter 11</u>. Investment Partners is the owner and managing member of Tree Moss. DTDF's professionals began meeting with Ms. Poulin, the new trustee for Investment Partners, shortly after her appointment. One of the issues on the agenda was DTDF's belief that the Tree Moss sale process was being mismanaged by Mr. Lisowski. Ms. Poulin later agreed, and moved to convert the Tree Moss bankruptcy case from a liquidation under Chapter 7 to one under Chapter 11. That dispossessed the Chapter 7 trustee and put Ms. Poulin and her real estate advisors and counsel in charge of the sale process. Diversified strongly supported such action.

- <u>USA Investors VI ("Investors VI")</u>. The obligation owing by Investors VI, an affiliate of Investment Partners (controlled by Investment Partners), relates to the Hotel Zoso in Palm Springs, and is not related to the 10-90 Loan. DTDF Committee professionals devoted a great deal of time to uncovering the transactions that led them to conclude that DTDF had a claim against Investors VI. That involved delving into a number of transactions related to Investors VI, to a DTDF loan related to the former Sheraton Hotel at the Salt Lake City airport, to the foreclosure of the property securing that loan, and to the deficiency judgment against the makers of the note. They also familiarized themselves with the Hotel Zoso, which is owned by Investors VI, and the efforts by Investors VI and Mr. Milanowski to sell the same – after placing a lien thereon in favor of the Salvatore Reale Trust ("Reale") to collateralize a loan made to Messrs. Milanowski and Hantges personally. After much effort, the DTDF Committee professionals convinced Mr. Allison and the Debtors' counsel to initiate an involuntary chapter 7 case against Investors VI, which occurred on December 15, 2006, and to seek

OHS West:260228981.1

Attachment to Letter of May 10, 2007
Page 5

the appointment of an interim trustee.  The involuntary bankruptcy case likely was not filed sooner because USACM was the loan servicer of a direct lenders' loan the unpaid balance of which was approximately $20 million in late 2006, and a bankruptcy filing would mean the delay in the payment thereof.  Moreover, USACM was in negotiations with Mr. Milanowski to provide a portion of the sale proceeds to USACM/DTDF.  Since the filing of the involuntary case and the appointment of the interim trustee,  DTDF Committee professionals and, after March 12th, DTDF's professionals, monitored the case, working toward the entry of an order for relief so as to keep Investors VI in bankruptcy, and attempting to work with the interim trustee to sell the Hotel Zoso.  Investors VI has contested almost every move in the case by DTDF and the Investors VI interim trustee, requiring the expenditure of a great deal of time by DTDF professionals.

• <u>Conversion To Chapter 11 Of The Investors VI Case</u>.  As with the Tree Moss case described above, Investment Partners is the owner and manager of Investors VI.  And similarly, Diversified and the USACM Trust (which is servicing a first trust deed loan on the Hotel Zoso) were not satisfied with the Chapter 7 trustee's sale efforts.  Ms. Poulin and her advisors agreed, and the matter is now a Chapter 11 case, with Ms. Poulin and her team in control.

• <u>The Royal Hotel And The HMA Adversary</u>.  After the commencement of the DTDF and USACM chapter 11 cases, the two debtors negotiated with Mr. Milanowski and obtained a promissory note in the amount of $58,374,918.81 to evidence certain obligations owing by Investment Partners to USACM and DTDF and for a security agreement to secure that and other obligations (specifically including the obligations under the 10-90 Loan).  One of the assets pledged was Investment Partners' ownership interest in HMA, which owned the Royal Hotel in Las Vegas.  Around the same time that Investment Partners pledged its interest in HMA to DTDF and USACM, Mr. Milanowski on behalf of HMA, granted a lien on the Royal Hotel in favor of the Reale to secure a $12.3 million personal loan that Reale had previously made to Messrs. Hantges and Milanowski.  In the fall of 2006, Great White Investment NV Inc. ("Great White") sued Messrs. Milanowski and Hantges in Nevada state court, alleging fraud.  Great White caused a lis pendens to be recorded against the Royal Hotel even though the lawsuit had nothing to do with HMA or the Royal Hotel.  In meetings thereafter, Mr. Milanowski asked that the Debtors intervene in the law suit and seek the expungement of the Great White lis pendens, claiming it was groundless.  Meanwhile, the Debtors continued negotiations with him regarding the sale of the Royal Hotel and the distribution of the proceeds (which included the review of a draft settlement agreement, closing statement, etc.)   Notwithstanding the ongoing negotiations, on December 22, 2006, Messrs. Hantges and Milanowski caused HMA to sell the Royal Hotel for $24 million in cash and a promissory note or notes for approximately $5 million.  The sale escrow paid Reale approximately $9.9 million.  Great White, in return for releasing its lis pendens, received $1 million.  On December 23rd, DTDF and the DTDF Committee learned the sale was about to occur or may already have occurred, and immediately worked over the Christmas weekend to prepare and e-file an adversary proceeding alleging fraudulent transfer and other claims in an effort to recover as much of the sale proceeds as possible.  DTDF Committee professionals had pressed DTDF to commence

Attachment to Letter of May 10, 2007
Page 6

and involuntary bankruptcy case or to file a fraudulent transfer action in early December. Beginning in late January, with the confirmation order having been signed and the Effective Date looming, the Diversified Committee professionals took control of the adversary proceeding from DTDF's counsel. Since that time, the adversary has been very hotly contested and has included prejudgment remedies, attachments preserving approximately $7 million, discovery, supporting declarations and the like. The litigation has been time-consuming and costly, and remains so, complicated by Mr. Milanowski's ongoing support of the payment to Reale and his invocation of the Fifth Amendment whenever faced with a question he does not care to answer.

- <u>Disputes Concerning DTDF's Claims Against USACM</u>. Prior to the Effective Date, DTDF and USACM were managed by the same Chief Restructuring Officer, Mr. Allison, and were represented by the same financial advisor and the same two law firms. None of them could become involved in the disputes between those two debtors over their claims against one another, so early on they properly delegated responsibility to the two committees. The disputes are multiple and complex, and professionals for the two committees spent numerous hours analyzing the claims, conducting factual and legal research regarding them, and attempting to settle them, including attendance at meetings in Los Angeles and in San Francisco and at a mediation before Judge Glover in Las Vegas on December 12, 2006. No resolution was reached despite the hours spent, and the Plan preserves all such disputes. Based on the education about their claims against one another, the two revested parties will attempt to consensually resolve their disputes in the future, but in the meantime, they have been pooling their efforts towards their joint goal of recovering assets for the two estates – including their discussing the filing of the involuntary chapter 11 case against Investment Partners discussed above.

OHS West:260228981.1