

**Entered on Docket**
**July 02, 2007**

_____
**Hon. Linda B. Riegle**
**United States Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| In re: | ) | Case No. BK-S-06-10725-LBR |
| | ) | Case No. BK-S-06-10726-LBR |
| USA COMMERCIAL MORTGAGE | ) | Case No. BK-S-06-10727-LBR |
| COMPANY, | ) | Case No. BK-S-06-10728-LBR |
| Debtor. | ) | Case No. BK-S-06-10729-LBR |
| _____ | ) | |
| In re: | ) | |
| | ) | |
| USA CAPITAL REALTY ADVISORS, LLC | ) | Chapter 11 |
| Debtor | ) | |
| _____ | ) | |
| In re: | ) | Jointly Administered Under |
| | ) | Case No. BK-S-06-10725 |
| USA CAPITAL DIVERSIFIED TRUST | ) | |
| DEED FUND, LLC | ) | |
| Debtor | ) | |
| _____ | ) | |
| In re: | ) | Date:   June 20, 2007 |
| | ) | Time:   10:30 a.m. |
| USA CAPITAL FIRST TRUST DEED | ) | |
| FUND, LLC | ) | |
| Debtor | ) | |
| _____ | ) | |
| In re: | ) | |
| | ) | |
| USA SECURITIES, LLC | ) | |
| | ) | |
| Debtor | ) | |
| _____ | ) | |

Affects: All Debtors

1

1
2

### ORDER ON EMERGENCY MOTION TO ENFORCE CONFIRMATION AND FOR SANCTIONS AND ORDER ON SUBJECT MATTER JURISDICTION

3
4

Compass Partners (and its affiliates and designees) was the purchaser of loan servicing

5

rights from the debtor under an asset purchase agreement pursuant to a confirmed plan of

6

reorganization. On May 25, 2007, Compass USA SPE LLC, and Compass Financial Partners

7

LLC (together "Compass") filed an emergency motion for this court to enforce its confirmation

8

order and for contempt ("Motion to Enforce Confirmation," Docket # 3773). In its Motion,

9

Compass states that Ms. Donna Cangelosi and others (collectively referred to as the "Lenders

10

Protection Group")[1] seek to wrongfully terminate Compass as the loan servicer and take for

11

themselves the servicing rights and fees. The Motion to Enforce Confirmation alleges that the

12

Lenders Protection Group mailed at least fifty letters to borrowers of loans stating that Compass

13

was not authorized to act on behalf of the lenders and that "all payments made to Compass

14

would be made at your own peril." The letters directed borrowers to make all payments to

15

"Lender 2 Lender, LLC," a Nevada limited liability company established by Ms. Cangelosi.

16

Compass argued in its Motion to Enforce Confirmation that these acts were a direct violation of

17

the asset purchase agreement with the debtor and the confirmed plan, as well as a collateral

18

attack on the provisions of this court's orders.  The "debtor" filed a joinder to the motion.

(Docket 3999.)

19
20

The motion was opposed (Docket 3853) on the stated grounds that the members of the

21

Lenders Protection Group had terminated Compass as the servicer on each of the loans in

22

accordance with the loan servicing agreements and that it had the right to do so without notice

23

and without cause. Alternatively, the Lenders Protection Group contended that if the loan

24

servicing agreements required cause to terminate Compass as servicer, then they had the cause to

25
26
27

[1]Ms. Cangelosi established what she called the "Lender Protection Group." This group was never recognized as a formal committee, and is apparently a collection of individuals represented by Mr. Smith.

28

2

1 | do so. The Lenders Protection Group also argued that this court did not have subject matter

2 | jurisdiction.

3 | This court entered an order preserving the status quo as of the day before the

4 | termination letters were sent. The court further ordered supplemental briefing on the issue of

5 | subject matter jurisdiction, and it continued the matter to June 20, 2007.

6 | For the reasons set out herein, this court finds that it has subject matter jurisdiction

7 | pursuant to 28 U.S.C. § 1334 as to a number of the issues raised, and supplemental jurisdiction

8 | with respect to the remaining issues. However, because the resolution of these issues will involve

9 | the determination both core and non-core matters under 28 U.S.C. § 157, this court recommends

10 | that the reference be withdrawn.[2]

**FACTS**

11

12 | *A. The Business of USCAM and the Loan Servicing Agreements.*

13 | One of the debtors, USACM Capital Mortgage ("USACM") was in the business

14 | of underwriting, originating, brokering, funding, and servicing mortgage loans. It solicited

15 | individuals and entities to invest in fractional interests in loans, and also originated and serviced

16 | those loans. As of the date of the filing of the bankruptcy petition, USACM was servicing 115

17 | loans involving 3,600 investors. ("Debtors' First Amended Disclosure Statement," Docket

18 | # 1798,  pp. 22-24.) Two separate debtors, USACM Capital Diversified Trust Deed Fund, LLC,

19 | ("DTDF")  and USACM First Trust Deed Fund ("FTDF") were also investors in the

20 | fractionalized loans brokered by USACM.  These funds were comprised of a number of

21 | members who invested in the funds, with the funds then investing in loans. As of the date of the

22 | petition, DTDF had approximately 1,350 members and FTDF had 950 members. ("Debtors' First

23 | Amended Disclosure Statement, Docket # 1798, pp. 25-26.)

24 | As noted, USACM entered into loan servicing agreements with those entities for whom it

25

26

27

    [2]At the request of the court, counsel for Ms. Cangelosi has prepared a recommendation for withdrawal of the reference. It will be separately entered.

28

had brokered loans. Under paragraph 2(e) of the loan servicing agreements, the lender authorized and empowered USACM on it's behalf to, among other things, execute and deliver payoff demands and beneficiary statements, consent to modifications of the loans if the effect would not materially or adversely affect the security provided by the real or personal property, institute foreclosure proceedings, engage in settlement discussions, and enter into forbearance and other settlement-related agreements. USACM, however, could not permit any modification to any loan that would change the interest rate, forgive the payment of any principal or interest (expressly excluding late charges or the difference between default and non-default interest), change the outstanding principal amount, or extend the maturity date, without the lender's prior consent. If the lender failed to grant or deny consent within 3 business days after notice, consent was deemed to have been conclusively been given. ("Motion to Enforce Confirmation, Docket # 3773, "Exhibit A.")[3]

Under paragraph 5 of the loan servicing agreements, USACM was entitled to retain monthly, in connection with those services, a service fee, any late charges collected from the borrower, and default interest collected from the borrower pursuant to the terms of the note. (Motion to Enforce Confirmation, Docket # 3773, "Exhibit A.")

The loan servicing agreements contained two provisions relating to termination. Paragraph 9 provided that the lender:

> [M]ay, by 30 days written notice to USACM, terminate this agreement, and the power of attorney granted, if one is granted, under Section 9 of this Agreement, if USACM fails to perform its obligations hereunder.[4]

---

[3]A sample loan service agreement was attached as "Exhibit A" to the declaration of David Blatt, which was filed as "Exhibit A" in support of the Motion to Enforce Confirmation. (Docket # 3773.)

[4]Section 9 of the Agreement supplied to the court has nothing to do with a power of attorney. Rather, Section 9 merely provides that the lender's name is the exact form for registration. Paragraph 11 deals with a "Limited Power of Attorney." A different version on file with this Court in connection with a separate matter refers to Paragraph 11. (Docket 847, p.19.)

(Motion to Enforce Confirmation, Docket # 3773, "Exhibit A.")

Paragraph 3 provided that:

> Pursuant to NAC 645B.073, in the event of default, foreclosure, or other matters that require action, if for any reason USA fails to act on Lender's behalf . . . then Lender may, with approval of fifty-one percent (51%) or more of all the holders of the beneficial interest of record in the Loan, act on behalf of all such holders of beneficial interest of record.

The actions included the designation of the servicing agent or other person to act on behalf of the holders of the beneficial interests in the loan. (Motion to Enforce Confirmation, Docket # 3773, "Exhibit A.")

### B. Bankruptcy and the Situation Prior to Filing.

USACM and its related affiliates filed a chapter 11 petition on April 13, 2006. USACM's management was replaced with a chief restructuring officer and crisis manager, Thomas Allison and Mesirow Financial Interim Management, LLC. (Docket # 26.)[5] Hence none of the former insiders had a role in administering the case or in the plan negotiations. Indeed, former management appealed the order confirmation the plan. (Docket # 2481.)

The United States Trustee appointed committees for the direct lenders,[6] for creditors of the two separate debtors USACM Capital Diversified Trust Deed Fund, LLC[7] and USACM First

---

[5]While this order was designated as an interim order, the court extended those orders throughout the case.

[6]The United States Trustee denominated this committee the "Official Committee of Holders of Executory Contract Rights"of USACM. (Docket # 202.)  The court, believing that this designation created a legal distinction without a finding that the contracts were executory contracts, denominated these individuals and entities who held  fractionalized interest in unpaid loans as "direct lenders." Under the plan, "direct lenders" are defined as each entity, except USCAM and the Funds, who is a beneficiary under a loan originated and serviced by USACM on behalf of lenders. (Docket # 1799, (1)(A)(42).

[7]Docket #203.

Trust Deed Fund,[8] and for the unsecured creditors.[9] Each of those committees retained counsel and were actively involved in the case.

During the case, it became apparent (and the court ultimately found) that the borrowers on many of the underlying loans were in default and had either not made any payments, or had not made payments in accordance with their notes and deeds of trust. Despite the fact that lenders were only to receive payments in accordance with their contracts and the underlying notes and deeds of trust, the lenders continued to receive payments on their notes as if payments were being made. Obviously, these funds came from sources other than the borrowers and were made from monies that were due to USACM as servicing or other fees, loans which had been paid (but the principal not repaid to the lenders), and money borrowed from third parties. ("Debtors' First Amended Disclosure Statement, Docket # 1798, pp. 28-29; Declaration of Thomas Allison in Support of Confirmation, Docket # 2147, p. 31.)[10] These payments were described in the plan as "pre-paid interest." However, that was only a term of convenience, as the lenders had no right to receive funds that were not paid by the borrower.[11]

As noted above, FTDF owned interests in a number of loans. Some of these loans were performing and many others were in default. These loans were also serviced by USACM. DTDF had also invested in loans brokered and serviced by USACM.

During negotiations with the debtor (through Mesirow Financial) and the four committees, it was determined that in light of the costs of attempting to service the loans, including commencing foreclosure or otherwise realizing on the collateral of loans in default,

---

[8]Docket #204.

[9]Docket #201.

[10]This court made certain oral findings of fact on the record in accordance with FED. R. BANKR P. 7052, which included the adoption of the facts set forth by Mr. Allison.

[11]See N.R.S. § 645B.250, which provides that a mortgage broker is prohibited from advancing payments to an investor on behalf of a person who has obtained a loan and is in default.

and given that there was no ability to continue as a mortgage broker, the only way in which creditors could receive payment was through an asset purchase agreement and plan.  (*See generally*, "Debtors' First Amended Disclosure Statement, Docket # 1798, pp. 79-80.)

### C. The Asset Purchase Agreement, the Plan, and the Confirmation Order .

#### 1. Asset Purchase Agreement.

The debtors, with the concurrence of the committees, filed a motion to sell the servicing rights, including the fees to which USACM was entitled as servicer, and the loan portfolio of FTDF at auction with SPCP Group, LLC ("Silver Point") as the stalking horse bidder. (Docket # 1352.) Other bidders qualified, but ultimately Compass was the successful bidder.[12]

The closing of the sale to Compass was conditioned upon confirmation of a plan with provisions consistent with the terms of the asset purchase agreement. ("Asset Purchase Agreement," § 5.3, filed as "Exhibit A" to Docket # 2164.)

Under the Asset Purchase Agreement, Compass purchased the First Trust Deed Fund Assets and the Commercial Mortgage Assets. The "Commercial Mortgage Assets" were defined as:

> [A]ll Servicing Agreements . . . for all of the Serviced Loans . . . including, without limitation, Default Rate Interest, Accrued Servicing Fees, Late Charges, Success Fees, other fees and sums due the loan servicer under any of the Servicing Agreements" [and USCAM's rights in the loans].[13]

"Default Rate Interest" was defined as the "amount of interest payable upon default under each Serviced Loan at any time."  "Accrued Servicing Fees" was defined, with certain exceptions  as "all servicing fees and servicer advances accrued, but unpaid, as of the of the Closing

---

[12]See Docket # 2147, Allison Declaration in Support Confirmation, pp. 25-28, for a description of the sale process.

[13]USACM held a fractionalized interest in some loans.

7

Date. . . . ." "Late Charges" was defined as the amount of late charges payable upon default under each Serviced Loan at any time." ("Asset Purchase Agreement," § 1.1, filed as "Exhibit A" to Docket # 2164.)  The asset purchase agreement, at Section 5.2, also required the Sale Approval Order to contain certain provisions. In further provided the following:

> Sec. 7.3.  Servicing Agreements.  Nothing contained in the Agreement shall modify the obligations owed to the Lenders by the loan servicer or rights of the Lenders against the loan servicer (or the rights of the loan servicer against the Lenders) under the applicable Servicing Agreements and otherwise applicable law . . . . [U]nder no circumstance shall any pre-Closing Date liability assertable by any party attach to Purchase, or to any Asset acquired by purchaser . . . . [N]otwithstanding any other provision herein, or any order which may in the future be entered by the Bankruptcy Court, all servicing fees due pursuant to the terms stated in the Servicing Agreements, and all interest due on the First Trust Deed Fund Assets, shall continue to be due and payable, and Purchaser shall collect such servicing fees and interest for its sole benefit on and after the Closing Date.

### 2. The Plan.

The plan provided for the compromise of Direct Lender claims in that  claims for the recharacterization[14] of loans as property of the estate were released. While rights  to recover principal or interest paid in advance were preserved, lenders would continue to receive monies paid on the loan after the pre-paid amounts were netted.  (Debtor's Third Amended Plan, Docket # 1799, Section  II (C)(1)(e).)  In connection with this provision, the liquidating trust would receive the amounts netted on account of the pre-paid interest, and the asset purchaser and any subsequent purchaser were required to continue to net these sums. (Section IV(E)(1).)

Because the plan affected the direct lenders by virtue of the compromise discussed above,

---

[14]While under 11 U.S.C. § 541(d), property in which the debtor holds only equitable title is not property of the estate, the commingling of funds received from all sources and payments on loans in default may result in the characterization of such loans as property of the estate. *See, e.g; In re Lemons & Assoc.,* 67 B.R. 198 (Bankr. D. Nev. 1986).

8

the direct lenders voted on the plan. The direct lenders, along with all other classes entitled to vote, voted by majority and amount to accept the plan. An order confirming the plan was entered on January 8, 2007. (Docket #2376.) Findings of fact and conclusions of law were also entered on January 8, 2007, as modified herein. (Docket # 2377.)[15]

At the time of confirmation, the issue arose as to the meaning of the acquisition of the loan serving agreements free and clear of claims and the rights of a lender to terminate on account of pre-petition defaults by USACM. Compass agreed that a lender had the right to effect a substitution of USACM as a loan servicer under Section 3 of any loan servicing agreement (and Compass had the right to any defenses) to the extent that such right was matured and exercisable as of the petition date. Such rights were denominated as "Surviving Section 3 Right." Such rights were, however, only exercisable in accordance with certain procedures which included a 30 day notice of an intent to exercise such right, the right of Compass to challenge the exercise by filing a motion within thirty days, and that this court should retain jurisdiction to adjudicate any such disputes. (Findings of Fact, Docket # 2377 at ¶ KK,; Confirmation Order, Docket # 2376, at ¶ 14.)[16]

Other relevant provisions of the Findings of Fact include the following, at ¶ KK:

> The transfer of the Acquired Assets . . . will be a legal, valid, and effective transfer of the Acquired Assets, and will vest the Asset Purchaser with all right, title, and interest of the Sellers to the Acquired Assets free and clear of all liens, claims, interest, obligations and encumbrances whatsoever, including, but not limited to, (A) all monetary and non-monetary defaults and rights that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Sellers' or the Asset Purchasers's interest in, or rights in or under,

---

[15]Despite the failure to cross out the parenthetical "proposed" designation, the court adopted the findings and conclusions (Docket # 2377) and the confirmation order (Docket #2376) and entered them as the court's orders.

[16]The Lenders Protection Group asserts that it is not claiming any rights to terminate based upon defaults by USACM.

the Acquired Assets, or any similar rights, based in any way on any action taken (or failed to be taken) by any of the Debtors or any other matter or occurrence relating to the period prior to the Closing [other than the surviving section 3 rights] . . . © . . . (ii) all debts arising in any way in connection with any agreements, acts, or failures to act, of any of the Sellers or any of the Sellers' predecessors or affiliates; all claims (as that term is defined in the Bankruptcy Code), obligations, liabilities, rights of recoupment or setoff, demands, guaranties, options, rights, restrictions, interest and matters of any kind and nature in any way relating to the existence, ownership, management or servicing of the Acquired Assets prior to Closing, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of these cases . . . and whether imposed by agreement, understanding, law, equity, or otherwise . . . .

Paragraph KK also provided that:

In the event of a proper exercise of remedies under Section 3 of the Loan Servicing Agreement, (I) neither the Direct Lenders nor any replacement servicer selected by such Direct Lender shall have the right or ability to compromise, subordinate, or impair, in any respect, any claims purchased by Compass from the Estates for default interest, accrued servicing fees, late charges, success fees, or other amounts under the Loan Servicing Agreement, and (ii) the Confirmation Order shall be binding upon such replacement servicer. . . [17]

### 3. Confirmation Order.

The confirmation order contained the following additional potentially relevant provisions:[18]

The provisions of the Plan and this Confirmation Order shall bind . . .   (f) all Direct Lenders. (¶ 8.)

–   –   –   –

---

[17]These provisions were also contained in paragraph 14 of the Confirmation Order except that the last sentence includes the phrase "rights, claims or interests purchased by Compass."

[18]The court makes no determination as to the interpretation of any of these provisions as it relates to the issue presently before the court.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

11

The transfer . . . constitutes a legal, valid and effective transfer of the Acquired Assets, and shall vest the Asset Purchaser with all right, title, and interest of the Sellers . . . free and clear of all Claims and Interests of any kind or nature whatsoever. (¶ 17.)

−   −   −   −

This court retains jurisdiction as set forth in Section VIII. D of the Plan, including the jurisdiction to enforce and implement the terms and provisions of this Confirmation Order and the Asset Purchase Agreement . . . including, but not limited to, retaining jurisdiction . . . (b) to protect the Asset Purchaser against any Interests against the Sellers or the Acquired Assets. (¶ 23.)

−   −   −   −

All Persons holding Interests against or in the Sellers or the Acquired Assets of any kind or nature whatsoever (including but not limited to . . . Direct Lenders . . . shall be, and are,  forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests of any kind or nature whatsoever against the Asset Purchaser . . . or the Acquired Assets . . . with respect to any Interest of any kind or nature whatsoever such Person or entity had, has, or may have against or in the . . . Acquired Assets. Following the Closing, no holder of an Interest in the Sellers shall interfere with the Asset Purchaser's title to or use and enjoyment of the Acquired Assets based on or related to such Interest, or any actions that the Sellers may take in their Chapter 11 Cases.  (¶ 25.)

−   −   −   −

After the effective date . . . the Direct Lenders . . .  shall be entitled to distributions from the Direct Lender Loans in accordance with the related Loan Servicing Agreements, the applicable loan and security documents, and applicable Nevada law, by the Asset Purchaser, as the third party servicer.  . . . . [T]he Asset Purchaser is authorized and directed to net Prepaid Interest sums due from the Direct Lenders and Collect Prepaid Interest from Borrowers, and remit those amounts to . . . the USACM Trust. . . . After the Closing, the Direct Lenders are obligated to comply with the terms of the applicable Loan Servicing Agreements including the obligation to pay the fees at the rate expressed as a percentage specified in Section 5 thereof[.] (¶ 47.)

−   −   −   −

Nothing in the Plan or this Confirmation Order shall be deemed to modify, in any respect, the Direct Lenders' notes or the deeds of trust securing such notes. (¶ 48.)

−   −   −   −

12

Nothing contained in the Asset Purchase Agreement shall modify the obligations owed to the Lenders by Compass as the loan servicer or rights of the Lenders against Compass as the loan servicer (or the rights of Compass as the loan servicer against the Lenders) under the applicable Loan Servicing Agreements and otherwise applicable law. Compass shall distribute any sums due to Lenders under any of the Loan Servicing Agreements in accordance with the Loan Servicing Agreements, as the same may be modified with consent of the applicable Lenders, and with otherwise applicable law. Compass shall apply all payments and proceeds from Serviced Loans . . . however collected . . . in accordance with the provisions of the notes and/or loan agreements. Further, notwithstanding the foregoing, to the extent the Bankruptcy Court has entered an order, including, but not limited to, this Confirmation Order, which interprets or enforces provisions of the Loan Servicing Agreements or directs the distribution of payments under the Loan Servicing Agreements or payments collected from Borrowers, Compass, the Lenders, and all other affected parties shall abide by the terms of such order(s). If, as between the provisions of the Loan Servicing Agreements and the order(s) of the Bankruptcy Court, it is not clear to Compass how the sums collected shall be distributed, then Compass shall hold the sums payable to the Lender until Compass either receives direction from the Lender . . . regarding disbursement of interest, or is directed by an order from a court of competent jurisdiction. Nothing contained here is intended to waive any defenses of the Lenders . . . under the Loan Servicing Agreements. For the avoidance of doubt, under no circumstance shall any pre-Closing Date liability assertable by any party attach to Compass, or to any asset acquired by Compass, pursuant to the Asset Purchase Agreement. Furthermore, for the avoidance of doubt, notwithstanding any other provision in the Asset Purchase Agreement, this Confirmation Order, or any order which may be in the future be entered by the Bankruptcy Court, all servicing fees due pursuant to the terms stated in the Loan Servicing Agreements, and all interest due on the First Trust Deed Fund Assets . . . shall continue to be due and payable, and Compass shall collect such servicing fees and interest for its sole benefit on and after the Closing Date. (¶ 82.)

### D. Post-Confirmation Events.

Donna Cangelosi and the Lenders Protection Group opposed the confirmation of the plan.[19] Their objections were overruled. The Lenders Protection Group appealed and, rather than seeking a stay on appeal pursuant to the Federal Rules of Bankruptcy Procedure, sought and

---

[19] As noted, this Group was an ad hoc group and although the Court required the filing of statements under Rule 2019, these statements were not always kept up-to-date.

received an ex-parte stay on appeal from the Bankruptcy Appellate Panel. That stay was quashed by the District Court after the case was returned to the District Court when the debtors failed to consent to jurisdiction before the BAP. Rather than seeking a stay in this court, the Lenders Protection Group abandoned that effort prior to the closing.

The closing occurred and Compass paid approximately $67 million for the assets. In its Motion to Enforce Confirmation, Compass contends that Ms. Cangelosi and the Lenders Protection Group have been engaged in a concerted effort, both before and after confirmation of the plan, to derail the reorganization and to deter Compass, and that the letters to borrowers and the termination letters were a part of this scheme as opposed to the exercise of any legitimate rights of the direct lenders to terminate Compass as a servicing agent. (See Docket # 3773, "Exhibit B," Declaration of Boris Piskun.)

Apparently, Ms. Cangelosi and others have caused the formation of limited liability companies, which are described as being comprised of direct lenders who have allegedly assigned their rights to the LLC in exchange for membership interests. A different LLC was formed for each loan. It also appears that the LLC's contemplate that default interest will be paid to them (and shared by the manager and the members) and not to Compass. ("Exhibit F" to Docket # 3830; Docket #3873, "Exhibit A.")

One of the "members" of the LPG, Todd Hansen, has allegedly contacted a borrower and represented that only he has the right to speak on behalf of lenders in that loan.  (Docket 3773, Blatt Declaration.)

On May 18, 2007, Compass filed an action in state court against Ms. Cangelosi and others for intentional interference with contractual relations and prospective economic advantage, defamation, and breach of the covenant of good faith and fair dealing. ("Exhibit F" to Docket # 3854.)  On May 23, 2007, Compass dismissed the lawsuit without prejudice. ("Declaration of Donna Cangelosi, "Docket # 3854.)

14

On or about May 18, 2007, Ms. Cangelosi caused to be sent to each borrower a letter stating that Compass had been terminated and that payments should be made to the "Lender 2 Lender, LLC," an entity apparently managed by Ms. Cangelosi.  (Docket 3854, ¶ 13; Docket #3773, "Exhibit B" to Blatt Declaration.) Simultaneously, Ms. Cangelosi, on behalf of the particular LLC, sent a letter terminating Compass's servicing rights. The letters stated that the agreements were terminated based upon Nevada Adm Code 645B.073 as well as various actions and inactions of Compass Partners. (See "Exhibit C "to Docket # 3830.)

The Lenders Protection Group filed an action based upon diversity jurisdiction in Federal District Court (#07-CV-000241-ECR-VPC) for declaratory relief as well as for damages on or about May 21, 2007.[20] (Docket # 3854, "Exhibit H".)  The plaintiffs request judgment for declarations that:

> 1. Under the Nevada Administrative Code plaintiffs, together with other direct lenders making up 51% of the beneficial interests of any loan, have the absolute right to terminate Compass as loan servicer and designate a new loan servicer.
>
> 2. Payments made by borrowers are first to be applied to accrued non-default rate interest and then to principal, and then to default interest and late fees, which priority may only be altered by the direct lenders in each loan.
>
> 3. That the plaintiffs and other direct lenders have the absolute right to modify the terms of their promissory note and deed of trust with the third-party borrower to maximize their recovery.
>
> 4. That as a result of the maturity of various loans in the USACM portfolio, Compass has never had a valid power of attorney to act on behalf of plaintiffs on the loans.
>
> 5. Plaintiffs and other direct lenders have the right to determine the priority of allocating payments made by any third-party borrower, and Compass has no such right.
>
> 6. Plaintiffs are entitled to terminate Compass as servicer on any loan based upon Compass's breaches of the loan servicing agreements.
>
> 7. Compass is not entitled to any compensation provided for in Section 5 of the loan servicing agreements.

---

[20]The named plaintiffs are each of the newly formed LLC's.

15

1

*E. Proceedings in this Court.*

2          Compass removed the action to this court. While a motion to strike fugitive

3    pleading and remand has been filed, it has not yet been set for hearing. Compass brought this

4    Motion to Enforce Confirmation to enforce the terms of the confirmation order and for contempt.

5    In its Motion, Compass seeks the following orders against Cangelosi, Hansen, LPG, L2L and

6    parties acting in court:

7               1. An order directing them to comply with the terms of the
                Confirmation Order and the loan servicing agreement.
8
9               2. An order directing them and others to issue letters to the
                borrowers that the prior letters shall have no force and effect and
                that Compass will continue to service until further order of the
10              court.

11              3. An order enjoining them from communicating with borrowers
                under the loans, and sanctioning them.
12
                4.  Sanctioning them for civil contempt.
13

14          The court, as well as the Lenders Protection Group, raised the issue of subject matter

15    jurisdiction and asked for additional briefing. Pending this hearing, the court ordered that the

16    status quo be maintained as of the day prior to the purported termination letters.  However, the

17    Lenders Protection Group could take steps to terminate in accordance with the contracts and if

18    valid, would be recognized.

19                                    **LEGAL DISCUSSION**

20          The court finds that it has subject matter jurisdiction to adjudicate Compass's motion and

21    has supplemental jurisdiction to adjudicate those issues for which it may not directly have

22    subject matter jurisdiction. For those issues for which the court has only supplemental

23    jurisdiction, such issues are, however, "non-core" and subject to either withdrawal to the District

24    Court (absent consent) or this court's making of findings and recommendations to the District

25    Court. Because of the need for expeditious and unified hearings, the court recommends that the

26    reference be withdrawn.

27

28                                            16

1    As the court noted at the prior hearing, the mere fact that a court reserves jurisdiction in

2    it's orders to adjudicate further disputes does not end the question of whether or not the court has

3    subject matter jurisdiction. Rather, subject matter jurisdiction is not given by consent but by

4    statute. A court retains jurisdiction to determine if it has jurisdiction. *In re Harleston*, 275 B.R.

5    546, 549 (B.A.P. 9ʰ Cir. 2002), *aff'd*, 331 F.3d 699 )(9ʰ Cir. 2003).

6    Pursuant to 28 U.S.C. § 1334(b), the district courts (and by referral, the bankruptcy

7    courts) have original but not exclusive jurisdiction of all civil proceedings arising under title 11,

8    or arising in or related to cases under title 11. Bankruptcy Courts may hear and determine all

9    cases under title 11 and all core proceedings arising under title 11, or arising in a case under title

10   11.  11 U.S.C. § 157(b)(1). Core proceedings include matters concerning the administration of

11   the estate, allowance or disallowance of claims against the estate, confirmations of plans, orders

12   approving the sale of property and other proceedings affecting the liquidation of the assets of the

13   estate. 11 U.S.C. § 157(b)(2). The bankruptcy judge may hear a proceeding that is not a core

14   proceeding but that is otherwise related to a case under title 11. In such case, the court may not,

15   without consent, enter a final order, but must submit proposed findings of fact and conclusions of

16   law to the district court that enters the final order. 11 U.S.C. § 157©. Finally, a district court may

17   withdraw, in whole or in part, any case or proceeding referred to the bankruptcy court. 11 U.S.C.

18   § 157(d).

19    Clearly, a court retains jurisdiction to interpret and enforce its own orders. *In re*

20   *Franklin*, 802 F.2d 324, 326 (9ʰ Cir. 1986). "Related to" jurisdiction is a grant of some breadth

21   and includes suits between third parties which have an effect on the bankruptcy estate. *Celotex*

22   *Corp. v. Edwards*, 514 U.S. 300, 308 n. 5 (1995).  *Stratosphere Litigation L.L.C. v. Grand*

23   *Casinos*, 298 F.3d 1137, 1142 (9ʰ Cir. 2002).  The test for pre-confirmation jurisdiction has been

24   broadly formulated such that if the outcome of the proceeding could conceivably have any effect

25   on the estate being administered in bankruptcy, whether or not it be against the debtor or against

26   the debtor's property, then the court has jurisdiction. *In re Fietz*, 852 F.2d 455, 457(9ʰ Cir.1988).

27

28                                    17

1    In the Ninth Circuit, while post-confirmation jurisdiction is more limited than pre-

2    confirmation jurisdiction, the bankruptcy court still retains jurisdiction for matters which have a

3    "close nexus" to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court

4    jurisdiction over the matter. *In re Pegasus Gold Corp.*, 394 F.3d 1189 (9th Cir. 2005). As the

5    Ninth Circuit held, adopting the Third Circuit's test in *In re Resorts Int'l, Inc.,* 372 F.3d 154 (3d

6    Cir. 2004):[21]  Matters affecting "the interpretation, implementation, consummation, execution, or

7    administration of the confirmed plan will typically have the requisite close nexus." *In re Pegasus*

8    *Gold Corp.*, 394 F.3d 1189, 1194 (9th Cir. 2005)(quoting *In re Resorts Int'l, Inc.,* 372 F.3d 154,

9    166-67 (3d Cir. 2004).

10    The Ninth Circuit in *Pegasus* also recognized that bankruptcy courts may properly

11    exercise supplemental jurisdiction over claims which have a more tangential relationship to the

12    underlying bankruptcy court. Hence if the remaining claims involve a "common nucleus of

13    operative fact" and would ordinarily be expected to be resolved in one judicial proceeding, the

14    bankruptcy court has supplemental jurisdiction over the remaining claims. *Pegasus*, 394 F.3d

15    1189, 1195 (9th Cir. 2005).

16    Before addressing the application of the law governing subject matter jurisdiction for

17    post-confirmation issues, it is important to note what this motion is not about. It is, despite the

18    protestations of the Lenders Protection Group, not merely about the determination of whether or

19    not Compass has committed breaches of the Loan Servicing Agreement. Nor is it merely about

20    the interpretation of the contract or the order of the application of the proceeds received from a

21    particular borrower. This Court agrees that if the Lenders Protection Group had sent letters of

22    termination which specified the manner in which Compass had failed to perform in accordance

23

24    

25    [21]The Lender Protection Group states in its opposition that the Ninth Circuit test is the same
      as the Seventh. (Docket #3853.)  This is incorrect.   The Seventh  Circuit test is more limited.

26    *See, e.g.*, *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995); *In re Fietz*, 852 F2d. 455, 457 (9th Cir.
      1988)(pre-confirmation jurisdiction); *In re Fedpak Sys, Inc.*, 80 F.3d 207, 213-14 (7th Cir. 1996),

27    *In re Commercial Loan Corp.*, 363 B.R. 559 (Bankr. N.D. Ill. 2007).

28

1   with the loan servicing agreements and had sought only (or Compass sought) a declaration that

2   the contracts had been validly terminated, then this Court would not have subject matter

3   jurisdiction over the dispute.

4         Rather, the Lenders Protection Group seeks to do a number of additional things. It seeks

5   to void a provision of the loan servicing agreement by declaring that cause is not required to

6   terminate the contract despite the plain language of the agreement.[22]   Additionally, the Group

7   seeks to void the rights of Compass to collect and service based upon a pre-petition claim (at

8   least as to some loans) that the power of attorney expired upon maturity of the loans. It seeks to

9   modify the loans so as to prevent Compass from collecting amounts due it under the loan

10  servicing agreements  and the Asset Purchase Agreement. The Group seeks to deprive Compass

11  of fees purchased under the Asset Purchase Agreement. Finally, it has been suggested that the

12  Lenders Protection Group, and the LLC's and it's manager, Ms. Cangelosi, intend to take the

13  fees that Compass purchased. (Brief of Richard McKnight and attached exhibit, Docket # 3973.)

14        Subject matter jurisdiction is implicated in a number of ways. First, the Lenders

15  Protection Group seeks to void one provision of the contract by a declaration that despite the

16  language of the agreement, the contracts may be terminated even if Compass has not failed to

17  perform any of its duties. Any right to defeat a provision of the contract, by way of damages or

18  equitable relief, would appear to implicate the provisions concerning the Court's powers to

19  adjudicate claims. 11 U.S.C. § 101(5). Similarly, the declaration that the power of attorney was

20  invalid as of the maturation of each note also implicates the claim process.

21        Each of these issues also implicates the sale process. In essence, despite the sale order,

22  the Lenders Protection Group contends that certain assets - either loan servicing rights, or rights

23  to certain fees - were not conveyed. Clearly, this is within the court's jurisdiction. The court has

24  no doubt that it has the power to determine whether or not certain assets were included in it's

---

26      [22]At oral argument, counsel for the Lenders Protection Group indicated that it would waive

27  seeking a declaration as to this issue but only if the Court otherwise found no subject matter
    jurisdiction.   Hence the Court does not view this claim as abandoned.

28                                          19

1    sale order.

2    The most dramatic impact on the sale order was the letter sent to borrowers advising

3    them not to pay Compass. The Lenders Protection Group also seeks to modify the underlying

4    loans to apparently direct that interest to be allocated in a certain manner and to declare that

5    Compass has no rights to the fees it purchased. This directly impacts the sale order and asset

6    purchase agreement because Compass purchased the rights to the loan servicing agreements as

7    well as the fees due to USACM. Even if validly replaced as a servicer, it had the rights to the

8    accrued fees.   Finally, Compass argues that these issues could lead to an action for recission.

9    Furthermore, Compass and any replacement servicer were required to net pre-paid

10    interest and pay it over to the Liquidating Trust. The termination letter sent to borrowers directly

11    impacts the estate, because if the borrowers fail to pay, there is no pre-paid interest to be

12    remitted. While counsel for the Lenders Protection Group indicated they would abide by such

13    provision if they were allowed to proceed, the estates' rights to receive these fees is implicated

14    by a change in servicer. In particular, would the Lenders Protection Group take the position  that

15    it was not required to remit pre-paid interest pending a resolution of it's appeal notwithstanding

16    that it failed to seek a stay?

17    The Lenders Protection Group also argues that it has the right to terminate for cause and

18    the court has no jurisdiction to so determine. It is clear from the various hearings and orders that

19    Compass acquired the loan servicing agreements as written. It gained no greater rights than held

20    by USACM nor any lesser rights. Conversely, the direct lenders each retain their rights,

21    including the right to terminate the contracts in accordance with the terms of the agreement. As

22    noted, if this case were simply about that, the court would decline jurisdiction. However, there is

23    a non-frivolous claim that the alleged terminations were subterfuge for an attempt to interfere

24    with Compass's rights. For example, rather than individual lenders determining whether or not

25    Compass had failed to act, the Lenders Protection Group provided form letters which did not

26    specify any cause, has engaged in a series of communications seeking to stop Compass, and has

27

28    20

1   formed LLC's to acquire all servicing rights. ("Motion to Enforce Confirmation, Docket # 3773,

2   "Exhibit A.") This court believes that where such subterfuge is alleged, it has jurisdiction to

3   determine whether or not the lenders are in good faith exercising their rights under the contract

4   or are attempting to avoid the effect of this court's orders. *See In re Petrie Retail Inc*, 304 F.3d

5   223 (2d Cir. 2002)(court has post-confirmation jurisdiction.) However, even if the court does not

6   have core or related to jurisdiction with respect to this particular dispute, the court has

7   supplemental jurisdiction over this common nucleus of facts.

8   **WITHDRAWAL OF THE REFERENCE**

9       While this court has found that it has subject matter jurisdiction to determine the issues

10  raised by Compass's motion, that does not end the question of the nature and extent of this

11  court's jurisdiction.

12      As stated above, unless the parties consent, this court cannot enter final orders with

13  respect to non-core matters. The issues implicated in this include matters over which this court

14  has only supplemental jurisdiction as well as matters which are within the court's jurisdiction

15  under § 1334, but are non-core under § 157. Hence, the court would be in the position of making

16  only findings and recommendations as to some matters. The issues here are inextricably

17  intertwined, and to attempt to delineate the matters and/or bifurcate hearings would constitute a

18  waste of judicial resources.

19      The court cannot enforce the provisions of the plan without determining whether or not

20  the contracts were validly terminated. Furthermore, this court cannot enforce the provisions of

21  the plan without determining whether Compass is applying the monies received in accordance

22  with the provisions of the notes and deeds of trust and loan servicing agreements.

23      Accordingly, this court believes that the most expeditious way of proceeding is for the

24  District Court to withdraw the reference.

25

26

27

28   21

1

**INTERIM RELIEF**

2          Until the reference is withdrawn, this court retains jurisdiction to enter all orders.

3   FED. R. BANK. P. 5011. It is apparent that interim relief is required so that borrowers will not use

4   this dispute as an excuse not to remit payments and so that funds collected can be distributed to

5   the direct lenders and especially those direct lenders who are not involved in this dispute.

6   However, the rights of the Lenders Protection Group must be preserved such that if it some or all

7   of its members have validly terminated the loan servicing agreements, they can proceed in the

8   manner they wish to proceed.[23] At the prior hearing on June 22, 2007 the parties and the court

9   determined how this should be accomplished. Compass is directed to prepare the order, with the

10  Lender Protection Group to approve or disapprove such order pursuant to the provisions of Local

11  Bankruptcy Rule 9021.

12          **IT IS SO ORDERED.**

13

14  Copies noticed through ECF to:
15          LENARD E. SCHWARTZER      bkfilings@s-mlaw.com
           RICHARD MCKNIGHT     mcknightlaw@cox.net, gkopang@lawlasvegas.com
16          ALAN R SMITH      mail@asmithlaw.com,
                turk@asmithlaw.com;marsh@asmithlaw.com;darby@asmithlaw.com
17          ROB CHARLES     rcharles@lrlaw.com, cjordan@lrlaw.com

18  Copies noticed through BNC to:
            ORRICK HERRINGTON & SUTCLIFFE LLP
19          400 CAPITOL MALL #3000
           SACRAMENTO, CA 95814-4497

20

21

22

23

24

25  _____

26  [23]Despite the fact the loan servicer has the right to foreclose on loans in default (and perhaps
    the duty to do so), the Lenders Protection Group apparently does not want Compass to cause
27  foreclosure of some or all of the defaulted loans.

28                                          22