UNITED STATES BANKRUPTCY APPELLATE PANEL
OF THE NINTH CIRCUIT

RECEIVED
AND FILED

Sep 10   8 54 AM 07

US BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

BAP NO.: NV-07-1067-RBS

BK NO.:  S-06-10725-LBR
         S-06-10726-LBR
         S-06-10727-LBR
         S-06-10728-LBR
         S-06-10729-LBR

REF NO.: 07-06

In re: USA COMMERCIAL MORTGAGE COMPANY; In re: USA CAPITAL
REALTY ADVISORS, LLC; In re: USA CAPITAL FIRST TRUST DEED
FUND, LLC; In re: USA SECURITIES, LLC; In re: USA CAPITAL
DIVERSIFIED TRUST DEED FUND, LLC

**FILED**

AUG 1 5 2007

HAROLD S. MARENUS, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

              Debtor
-------------------------

MARGARET B. MCGIMSEY TRUST; BRUCE MCGIMSEY; JERRY MCGIMSEY;
SHARON MCGIMSEY; JOHNNY CLARK

         Appellant

    v.

USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC; OFFICIAL
COMMITTEE OF EQUITY SECURITY HOLDERS OF USA CAPITAL
DIVERSIFIED TRUST DEED FUND LLC

         Appellee

                    JUDGMENT
    --------------------------------------------------
         ON APPEAL from the United States Bankruptcy Court for

    the District of Nevada.

         THIS CAUSE came on to be heard on the record from the

    above court.

         ON CONSIDERATION WHEREOF, it is ordered and adjudged by

    this Panel that the judgment of the Bankruptcy Court is REVERSED.

FOR THE PANEL,

Harold S. Marenus,
BAP Clerk

By: Vincent J. Barbato
    Deputy Clerk

BANKRUPTCY APPELLATE PANEL
OF THE NINTH CIRCUIT
A True Copy
Attest:

Harold S. Marenus, Clerk

Deputy Clerk
9-6-07

FILED

NOT FOR PUBLICATION

AUG 15 2007

HAROLD S. MARENUS, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

## UNITED STATES BANKRUPTCY APPELLATE PANEL

### OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No.   NV-07-1067-RBS |
| USA COMMERCIAL MORTGAGE COMPANY; USA CAPITAL REALTY ADVISORS, LLC; USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC; USA CAPITAL FIRST TRUST DEED FUND, LLC; USA SECURITIES, LLC, | Bk Nos.:   06-10725 LBR<br>06-10726 LBR<br>06-10727 LBR<br>06-10728 LBR<br>06-10729 LBR |
| | Ref. No.   07-06 |
| Debtors. | |
| MARGARET B. McGIMSEY TRUST; BRUCE McGIMSEY; JERRY McGIMSEY; SHARON McGIMSEY; and JOHNNY CLARK, | |
| Appellants, | |
| v. | MEMORANDUM[1] |
| USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC; OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, | |
| Appellees. | |

BANKRUPTCY APPELLATE PANEL
OF THE NINTH CIRCUIT
A True Copy
Attest:

Harold S. Marenus, Clerk

by Deputy Clerk

Argued and Submitted on July 26, 2007
at Las Vegas, Nevada

Filed - August 15, 2007

---

[1]    This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value.  See 9th Cir. BAP Rule 8013-1).

1

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Linda B. Riegle, Bankruptcy Judge, Presiding

———————————————————

Before:  RUSSELL,[2] BRANDT and SMITH, Bankruptcy Judges.

The Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC, filed objections to the proofs of claim of appellants.  The Committee asserted that appellants' proofs of claim are duplicative of their respective proofs of interest, and in any event, that the claims should be subordinated pursuant to 11 U.S.C. § 510(b)[3].  After holding two separate hearings, the bankruptcy court disallowed appellants' claims.  The appellants appealed.

We REVERSE.

### I.  FACTS

USA Capital Diversified Trust Deed Fund, LLC ("Diversified" or "Debtor") is a Nevada limited liability company organized as of February 3, 2000.  The apparent purpose of Diversified was to provide a vehicle for Nevada investors to invest in loans originated by co-Debtor USA Commercial Mortgage Company ("USACM").  Investors purchased membership interests in Diversified, which then invested in various

———————————————————

[2]    Hon. Barry Russell, United States Bankruptcy Judge for the Central District of California, sitting by designation.

[3]    Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated as of October 17, 2005, the effective date of most of the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") (Pub.L. 109-8, 119 Stat. 23).

1  loans.[4]  Diversified's stated purpose was to make or purchase entire

2  or fractional interests in acquisition, development, construction,

3  bridge or interim loans that were secured by first deeds of trust on,

4  among other things, undeveloped land and residential commercial

5  developments.  Although Diversified loans were supposed to be secured

6  by first deeds of trust and have other protections for Diversified

7  investors, these protections were not generally provided by USACM.

8       There was a continuous offering of membership interests (known as

9  "units") in Diversified from May 2000 to July 2004.  In July 2004,

10  Diversified stopped offering the sale of membership units, and on

11  September 27, 2005, the investors were notified that Diversified would

12  be liquidating.  Diversified, USACM, USA Capital Realty Advisors, USA

13  Capital First Trust Deed Fund, LLC ("FTDF"), and USA Securities, LLC

14  ("Debtors")[5] all filed for bankruptcy protection on April 13, 2006

15

---

16       [4]     According to its Prospectus, Diversified registered the sale
17  of its membership units with the Nevada Securities Division, and
    strictly limited its offering to Nevada residents in order to avoid
18  having to register its securities with the SEC.

19       [5]     Debtors are affiliated financial service entities that
    operated out of the State of Nevada.  USACM was in the business of
20  underwriting, originating, brokering, funding and servicing commercial
    loans that were primarily secured by residential and commercial
21  developments.  As of the Petition Date, the loan portfolio that USACM
    was servicing consisted of approximately 115 loans having a combined
22  outstanding balance of approximately $960 million.

23       FTDF is very similar to Diversified.  Its apparent purpose
    was to allow USACM to offer investors throughout the United States
24  (not just in Nevada, as was the case with Diversified) the opportunity
    to invest in loans that USACM originated.  Investors purchased
25  membership interests in FTDF, which then invested in various loans.

26       USA Capital Realty Advisors, LLC was the nominal manager of
    Diversified and FTDF.  Finally, USA Securities, LLC, a registered
27  broker-dealer, sold membership interests in FTDF.

28       Diversified is the only Debtor relevant to this appeal.

3

1  ("Petition Date").  After the Petition Date, with a change in

2  management for the Debtors, the abject failure of Diversified's former

3  insiders to invest Diversified's monies properly became apparent.  As

4  time wore on, the scope of the wrongs inflicted upon Diversified by

5  the insiders came sharply into focus.  For example, the largest loan

6  in the Diversified portfolio was found to be a complete fiction and a

7  subterfuge employed by the insiders as part of a scheme to fund their

8  speculative real estate activities with Diversified's funds, rather

9  than utilizing those funds to make non-insider loans secured by first

10  trust deeds as promised in the prospectus.

11      Diversified had approximately 1,300 members as of the Petition

12  Date.  Among these members were the Margaret B. McGimsey Trust, Bruce

13  McGimsey, Jerry McGimsey, Sharon McGimsey, and Johnny Clark

14  (collectively, the "Appellants").  Appellants filed proofs of

15  interest, in the aggregate amount of $592,825.45 plus interest, for

16  their respective equity investments in Diversified.  Appellants also

17  filed proofs of claim, in the very same aggregate amount, against

18  Diversified based on allegations of breach of contract and fraud

19  relating to their purchase of the membership interests in Diversified.

20      On November 30, 2006, the Official Committee of Equity Security

21  Holders of Diversified ("Committee") filed its Omnibus Objection to

22  Claims on Equity Misfiled as Creditor Claims ("Objection").  The

23  Objection objected to 111 of the 137 proofs of claim filed against

24  Diversified at that time.  Included in the Objection were the

25  Committee's objections to the proofs of claim filed by Appellants.[6]

26

27  _____

    [6]    The Committee specifically objected to Claim Nos. 90-1,
    93-1, 94-1, 95-1, 129-1, 130-1, 131-1, and 136-1.  The objections were

28  summarized in the table in Exhibit 1 to the Objection as follows:
                                                    (continued...)

The Committee contended that the Appellants' claims were duplicative of the proofs of interest which Appellants had filed and contended that, in any event, that the claims would necessarily be subordinated pursuant to § 510(b).

An initial hearing was held on January 3, 2007. The bankruptcy court continued the hearing, however, and ordered supplemental, concurrently filed briefing from the Appellants and the Committee on whether § 510(b) applied to Appellants' claims and, if so, whether the statute required Appellants' claims to be subordinated only below other unsecured creditor claims or subordinated such that Appellants' claims are on par with all similarly situated holders of equity interests in Diversified. The continued hearing was held on January 31, 2007. After hearing oral argument from counsel for Appellants and

---

[6](...continued)

| Claim No. | Claimant | Claim Amount | Proposed Disposition |
|---|---|---|---|
| 90-1 | Margaret B. McGimsey Trust | $96,094.75 | Disallow as duplicative of proof of interest already on file |
| 93-1 | Sharon or Jerry McGimsey | $311,091.58 | Disallow as duplicative of proof of interest already on file |
| 94-1 | Johnny Clark | $99,467.90 | Disallow as duplicative of proof of interest already on file |
| 95-1 | Bruce McGimsey | $86,171.22 | Disallow as duplicative of proof of interest already on file |
| 129-1 | Margaret B. McGimsey Trust | $96,094.75 | Disallow as duplicative of Claim no. 90-1 |
| 130-1 | Sharon or Jerry McGimsey | $311,091.58 | Disallow as duplicative of Claim no. 93-1 |
| 131-1 | Johnny Clark | $99,467.90 | Reclassify as proof of interest and duplicative of claim no. 94-1 |
| 136-1 | Bruce McGimsey | $86,171.22 | Disallow as duplicative of Claim no. 95-1 |

5

1   the Committee, the bankruptcy court made the following comments:

2        THE COURT: Okay. Well, I'm going to sustain the
         Funds' objections.  510(b) says, "For purpose of
3        distribution under this title, a claim arising
         from" – let's see.

4
         "A claim for damages arising from the
5        purchase or sale of such security shall be
         subordinated to all claims or interests that are
6        senior or equal to the claim or interest
         represented of a said security, except if it's
7        common stock."

8        You know, there's no need to go to the
         legislative history because it's clear.  It says
9        arising from the purchase or sale.

10       The only reason they have a claim is because
         they bought the security, and management didn't do
11       what it's supposed to do.

12       And the problem with this – a distinction
         will be made.  Let's assume that, coincidentally,
13       these people sold goods and services to the
         debtor.  Well, they'd have a creditors claim for
14       that because it's a different level.

15       I just can't fathom the concept that these
         creditors could claim a creditors claim for the
16       exact same injury that everybody else has.

17       And under that theory, they would get their
         claim paid in full, and I don't know what the
18       amount of the claim would be.  I guess the amount
         of the claim would be everything they put in the
19       investment.

20       And then everybody else who suffered the
         exact same kind of injury and damage would then
21       have to share pro rata after what's left.  That
         just turns the concept of bankruptcy upside down.
22       I agree.

23       And if it were the other way, trust me, I
         would just allow everybody else to claim to be
24       treated as a creditors claim.

25       There's absolutely no reason for disparate
         treatment, and that would, in essence, have
26       created an unequal classification, so it was an
         interesting theory, but I don't agree with it, so
27       --

28  (Hr'g Tr. 22:5 – 23:6, January 31, 2007.)

6

1    An interesting colloquy followed between the court and counsel

2  for the Appellants regarding what exactly the court had ruled:

3           MR. McGIMSEY: Well, can I ask you exactly what
            you've done, your Honor?  Have you said I have no
4           claim?

5           THE COURT: No.  I said you have a claim as an
            equity holder.
6
            MR. McGIMSEY: Well, do you say I have no -
7
            THE COURT: Well, no.
8
            MR. McGIMSEY: I -
9
            THE COURT: You may have a claim, but it's going to
10          be treated equally.

11          MR. McGIMSEY: So you are subordinating my claim.

12          THE COURT: It's going to be treated equally to all
            other claims, the equity claims, in the same
13          interest.

14          MR. McGIMSEY: So I'm being subordinated; is that
            correct?
15
            THE COURT: You're going to be treated like
16          everybody else.  You're going to be treated
            exactly in accordance with what everybody else is
17          being treated.

18          MR. McGIMSEY: So -

19          THE COURT: It's not subordinated.

20          MR. McGIMSEY: Well, then -

21          THE COURT: You're asking -

22          MR. McGIMSEY: You're -

23          THE COURT: - to be elevated.  You're asking to be
            elevated.  That's what you were asking to do.
24
            MR. McGIMSEY: I'm not asking to be elevated.
25
            THE COURT: You were.
26
            MR. McGIMSEY: I'm not asking -
27
            THE COURT: But you were saying -
28

7

1    MR. McGIMSEY: - to be elevated.

2    THE COURT: - by filing that you were saying I'm
     going to categorize my equity interest different
3    by filing a creditors claim; ergo, I am being
     elevated, so it's not that you're being
4    subordinated.  You're being treated exactly what
     you're supposed to be.

5
          Oh, and in the 7001, I think only a - it
6    says, "Except as provided in a Chapter 11 plan."
     I think 7001 only applies when you're seeking
7    subordination, equitable subordination, the bad-
     conduct kinds of equitable subordination, as
8    opposed to looking at what the nature has, so I
     just disagree.

9
          I mean, it's an interesting argument.  I just
10   disagree so, you know, your claim will be treated
     like everybody else's.

11
     MR. McGIMSEY: Well, I don't understand that.  My
12   claim has been - they filed an objection to the
     claim, and I would just like it clear, your Honor
13   -

14   THE COURT: Yeah.

15   MR. McGIMSEY: - you were saying that 510(b) says I
     don't have a claim.

16
     THE COURT: No.  It says that it's to be - well, it
17   says that it was subordinated, but I think in this
     case it's senior to or equal, or equal.

18
     MR. McGIMSEY: No one's claimed these -

19
     THE COURT: What are your damages?  Your damages
20   are exactly what you put in, right?

21   MR. McGIMSEY: Exactly.

22   THE COURT: Okay.

23   MR. McGIMSEY: That I haven't -

24   THE COURT: So why -

25   MR. McGIMSEY: - gotten back.

26   THE COURT: - should your clients be paid their
     25,000, 50,000, whatever it is and in full before
27   everybody else gets their share or, more
     importantly, they have to share it pro rata?
28   That's what you're asking.

1    MR. McGIMSEY: I'm asking that because we -

2    THE COURT: And I'm saying no.  I'm saying that's not the law.

3
     MR. McGIMSEY: So these people - anybody can file a late claim.  We no longer have a -
4

5    THE COURT: That has nothing to do with it.

6    MR. McGIMSEY: We no longer have a late claim -

7    THE COURT: It's not a creditors claim.

8    MR. McGIMSEY: So that is what I wanted you to say, your Honor.

9

10   (Hr'g Tr. 23:17 - 26:15, January 31, 2007).

11       On February 14, 2007, an order sustaining the objections to

12   Appellants' claims was entered.  The order reads, in pertinent part,

13   as follows:

14           IT IS HEREBY ORDERED that the Objection is
             sustained.
15
                 IT IS FURTHER ORDERED that the claims listed
16           on Exhibit A, attached hereto and made a part
             hereof, shall be disallowed in their entirety, as
17           they are creditor claims filed by holders of
             equity interests in USA Capital Diversified Trust
18           Deed Fund, LLC ("Diversified Fund") who are not
             entitled to any distribution from Diversified Fund
19           on the basis of such claims but who shall recover
             from Diversified Fund on a pro rata basis
20           according to their respective equity interests.

21       Appellants timely filed a Notice of Appeal the same day.

22                            II.  ISSUES

23   A.   Whether the bankruptcy court correctly sustained the Committee's

24   Objection on the basis that the Appellants' proofs of claim were

25   duplicative of their proofs of interest.

26   B.   Whether the bankruptcy court correctly sustained the Committee's

27   Objection on the basis that the Appellants' proofs of claim should be

28   statutorily subordinated pursuant to § 510(b).

### III.   STANDARD OF REVIEW

In reviewing a bankruptcy court's decision on appeal, an appellate court reviews findings of fact under a clearly erroneous standard.   Conclusions of law, including a bankruptcy court's interpretation of a statute, are reviewed *de novo*.   See <u>Lundell v. Anchor Constr. Specialists, Inc.</u>, 223 F.3d 1035, 1039 (9th Cir. 2000).

### IV.   DISCUSSION

The bankruptcy court disallowed Appellants' claims because it felt that allowing Appellants to assert their claims would be unfair. According to the bankruptcy court, because all investors in Diversified had been defrauded as a part of the same fraud, all investors were equally wronged and had or should have the same rights. The idea that Appellants could jump in line ahead of the other investors seemed unacceptable.   Although the bankruptcy court's concern for the other Diversified investors was laudable and although its approach has a certain appeal on the surface, for the reasons discussed below the actions of the bankruptcy court were not proper under the Bankruptcy Code or Federal Rules of Bankruptcy Procedure.

The bankruptcy court's analysis ignored the state of the record as it existed at the time of the hearings on the Objection.   The Appellants were the only investors to timely file proofs of claim based on their claims for breach of contract and fraud.   *Assuming arguendo* that all other interest holders could file proofs of claim, they did not do so.   Whether they would at some later point is pure speculation.   If the other Diversified investors were, instead, trade creditors with equal rights, those trade creditors who did not file proofs of claim would simply not have claims.

1    Further, there was no real indication that there was anything
2    wrong with Appellants' claims.  Although the bankruptcy court seemed
3    to think that the proofs of claim were duplicative of the proofs of
4    interest, they are not.  A proof of interest is based on mere equity
5    ownership; a proof of claim is based on a right to payment.
6    Appellants have proofs of interest by virtue of their ownership of
7    membership interests in Diversified, and proofs of claim based on
8    their claims against Diversified for breach of contract and fraud.  It
9    is clear that Appellants are entitled to assert both claims and
10   interests, even though they cannot be paid on both.  The fact that the
11   bankruptcy court felt uncomfortable with the idea that Appellants
12   could potentially jump in line ahead of other Diversified investors
13   was not a basis for disallowing Appellants' claims.
14       As to § 510(b), although there was extensive discussion by the
15   parties at the hearings and in the briefs at the trial level, as well
16   as in the briefs on appeal, as to whether Appellants' claims should be
17   subordinated, the bankruptcy court never subordinated Appellants'
18   claims.  It merely disallowed them.  In any event, it is clear that
19   subordination under § 510(b) would first require an adversary
20   proceeding pursuant to Rule 7001(8).
21   A.    Whether the Claims and Interests are Duplicative
22       The core of the Committee's objection to Appellants' claims is
23   that these claims are duplicative of Appellants' proofs of interest.
24   We disagree.  The proofs of claim and the proofs of interest are not
25   duplicative.  Although both Appellants' respective proofs of claim and
26   proofs of interest relate to their membership interests in Diversified
27   and are for the exact same amount, this does not make the proofs of
28   claim and proofs of interest duplicative.  The Committee's arguments

1    relating to equity and fairness do not change this result.  As they

2    themselves admit, Appellants are not entitled to a double recovery.

3    Further, the issue of relative priority relates to whether Appellants'

4    claims should be subordinated, not whether they should be allowed.

5        A proof of claim asserted by an equity holder for breach of

6    contract and fraud relating to the purchase of a security is simply

7    not duplicative of the equity holder's proof of interest.  Unlike most

8    of the other claims subject to the Objection, Appellants were not mere

9    equity holders who filed proofs of claim out of confusion.  Had that

10   been the case, Appellants' claims could easily have been challenged

11   and properly disallowed.[7]  See § 502(b)(1)("[I]f such objection to a

12   claim is made, the court . . . shall allow such claim in such amount,

13   except to the extent that - (1) such claim is unenforceable against

14   the debtor and property of the debtor, under any agreement or

15   applicable law for a reason other than because such claim is

16   contingent or unmatured.").  It is axiomatic that an allowed proof of

17   claim requires something more than mere equity ownership.  A proof of

18   claim for breach of contract and fraud relating to the purchase of a

19   security is clearly something more than mere ownership, and as such

20   cannot be considered duplicative of a proof of interest.  See BLACK'S

21   LAW DICTIONARY 541 (8th ed. 2004)(defining "duplicative" as, *inter alia*,

22   "[h]aving or characterized by having overlapping content, intentions,

23   or effect").  Here, Appellants' proofs of interest are based purely

---

24

25   [7]    It is true that the Committee argued that Appellants' claims
     should be disallowed as they are derivative claims that belong to
26   Diversified and not to equity holders individually.  Similarly, the
     Committee argued that Appellants could not have a claim based on
27   breach of contract as a matter of law.  However, as the bankruptcy
     court did not rule on these arguments and instead based its entire
28   ruling on the argument that the proofs of claim and the proofs of
     interest are duplicative, we decline to address them.

upon their membership interests in Diversified.  Their proofs of
claim, by contrast, are based upon their potential causes of action
against Diversified for breach of contract and fraud relating to their
purchase of those membership interests.  Hence, Appellants' proofs of
interest and proofs of claim are clearly not duplicative.

Rather than explain why Appellants' proofs of claim are
unenforceable under § 502(b), the Committee bases its argument on the
perceived unfairness in permitting Appellants to assert both proofs of
claim and proofs of interest.  According to the Committee's brief,
"Appellants are using one pretense or another to attempt to assume the
role of unsecured creditors *in addition to* their role as equity
interest holders and to recover twice under both guises for the same
investment."  The Committee asserts that Appellants' claims are not
distinguishable from the 1,300 potential (although unfiled) claims
held by every other member of Diversified, and that it is unfair to
allow Appellants to assert their claims to the prejudice of other
members of Diversified that hold the exact same claims but have not
filed proofs of claim.  However, the perception of unfairness is an
insufficient basis for the disallowance of a proof of claim.  <u>See</u>
<u>Heath v. American Express Travel Related Servs. Co. (In re Heath)</u>, 331
B.R. 424, 426 (9th Cir. BAP 2005)("Section 502(b) sets forth the
exclusive grounds for disallowance of claims, and Debtors have
introduced no evidence or arguments to establish any of those
grounds.").

It is neither incorrect nor improper for an equity holder to
assert a proof of claim based on breach of contract and fraud relating
to the purchase of a security and also a proof of interest.  The Code
specifically contemplates this.  As discussed below, § 510(b)

1   subordinates certain claims that are necessarily held by equity

2   holders.   Equity holders must *a fortiori* be entitled to assert proofs

3   of claim in addition to proofs of interest or there would be nothing

4   to subordinate under § 510(b).   If, in fact, an equity holder could

5   not assert both a proof of claim and a proof of interest, then

6   § 510(b) in most cases would have little to no meaning. See Tabor v.

7   Ulloa, 323 F.2d 823, 824 (9th Cir. 1963)("'[A] legislature is presumed

8   to have used no superfluous words.'")(citation omitted).

9        The Committee's argument that it is inappropriate for Appellants

10  to be able to assert proofs of claim in addition to their proofs of

11  interest for policy reasons is similarly unfounded.   The Committee

12  contends that allowing Appellants to assert both proofs of claim and

13  proofs of interest effectively would allow Appellants to enjoy a

14  double recovery.   This is not so.   As counsel for Appellants correctly

15  noted during oral argument at the initial hearing on January 3, 2007,

16  any amounts that Appellants receive on their proofs of claim would

17  serve to reduce the amount of their proof of interest ("MR. McGIMSEY:

18  I filed proof[s] of interest because we have proof[s] of interest.   I

19  believe that to the extent that we recovered under our unsecured

20  claim[s] that would go against our proof[s] of interest, you know.")

21       We also disagree with the argument that Appellants' claims should

22  be disallowed because they are not distinguishable from the many other

23  potential, but unfiled claims against Diversified that other

24  Diversified members may hold against it based upon the same general

25  facts.   This argument goes as follows:   If the bankruptcy court

26  extends the claims bar date to allow all other Diversified members to

27  file proofs of claim, and then all other Diversified members do file

28  proofs of claim, then the Appellants would be in the same position

14

1   that they would have been in had they not filed proofs of claim in the

2   first place.  *Ergo*, it makes sense to simply disallow the claims now

3   instead of having to proceed through these many procedural hoops in

4   order to get to the same inevitable result.   This argument fails

5   because it puts the cart way before the horse.   Even if the bankruptcy

6   court hypothetically extended the claims bar date, there is no

7   guarantee that even a significant number of Diversified members, if

8   any, would file proofs of claim.   More significantly, punishing

9   creditors for diligently meeting claims bar dates because other

10  potential creditors have failed to do so is contrary to bankruptcy

11  policy and procedure.   It is not uncommon in chapter 11 cases for a

12  handful of trade creditors to fail to file proofs of claim.

13  Penalizing the trade creditors who timely file proofs of claim because

14  others did not would be clearly erroneous.   It is the same with this

15  case.   Penalizing the Appellants for having filed proofs of claim when

16  other members of Diversified failed to do so, notwithstanding ample

17  notice, is erroneous.

18      In short, there is no basis for finding that Appellants' proofs

19  of claim and proofs of interest are duplicative.   As the bankruptcy

20  court's decision rested on its finding that the proofs of claim and

21  proofs of interest are duplicative, we must reverse.

22  B.   Section 510(b)

23      The bulk of the briefs relate to the applicability and effect of

24  § 510(b).   Indeed, a great deal of the discussion at the trial level

25  also related to § 510(b), and yet the bankruptcy court never

26  subordinated Appellants' claims.   As such, § 510(b) is of limited

27  importance for purposes of this appeal.   Because it appears likely

28  that the Committee will promptly bring an adversary proceeding against

15

1  the Appellants in order to subordinate their claims under § 510(b),

2  the applicability and effect of § 510(b) deserves discussion.

3       It is clear from the transcript of the January 31, 2007 hearing

4  and the language of the order sustaining the objections to Appellants'

5  claims that the court was disallowing Appellants' claims, not

6  subordinating them.  Section 510(b) provides no basis for the

7  disallowance of claims.  Disallowance and subordination are different.

8  "Disallowance of a claim is a legal determination that the claim under

9  consideration is not allowable by law.  On the other hand,

10  subordination of a claim presupposes that the claim is allowed but for

11  equitable reasons must be subordinated to the other allowed claims."

12  Ford v. Feldman (In re Fla. Bay Trading Co.), 177 B.R. 374, 383

13  (Bankr. M.D. Fla. 1994).  Although the bankruptcy court appears to

14  have been heading in the right direction inasmuch as the effect of

15  subordination under § 510(b), if established, may be functionally

16  equivalent to disallowance (i.e., no distribution on the claims), the

17  bankruptcy court's ruling was nonetheless in error.

18       Section 510(b) provides, in pertinent part, that:

19            . . . a claim . . . for damages arising from the
             purchase or sale of . . . a security [of the
20           debtor] . . . shall be subordinated to all claims
             or interests that are senior or equal the . . .
21           interest represented by such security, except that
             if such security is common stock, such claim has
22           the same priority as common stock.

23  11 U.S.C. § 510(b) (emphasis added).[8]

24  —————————————————

25      [8]  The text of the original subsection (b) provided as follows:

26            Any claim for rescission of a purchase
             or sale of a security of the debtor or
27           of an affiliate or for damages arising
             from the purchase or sale of such a
28           security shall be subordinated for

                                                    (continued...)

                                16

There appears to be no dispute between the parties that § 510(b) could apply to subordinate Appellants' claims. The parties appear to agree that the claims asserted by Appellants are based on damages arising from the purchase or sale of a security of the debtor, as the term "security" is defined under § 101(49). Instead, the dispute is over what level these claims are to be subordinated to. Here, the language of the statute is plain on its face. Appellants' claims arising from the purchase or sale of the Diversified membership interests are subordinated for purposes of distribution to all Diversified membership interests. "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 242 (1989)(citation omitted). As such, to the extent that § 510(b) applies, Appellants' proofs of claim are subordinated below all membership interests in Diversified. In short, Appellants' claims may be subordinated below equity.

The history of § 510(b) supports this conclusion. Section 510(b) was enacted as part of the Bankruptcy Reform Act of 1978. "The principles announced in section 510(b) had no established forebear in pre-Code practice. This section clarifies an unsettled area of law under the Act, where some decisions permitted a rescinding security

---

[8](...continued)
purposes of distribution to all claims and interests that are senior or equal to the claim or interest represented by such security.

11 U.S.C. § 510(b)(1978). Section 510(b) was modified into its present form with the enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub L. No. 98-353, 98 Stat. 333.

holder of the debtor to share on a priority with general creditors."
4 COLLIER ON BANKRUPTCY ¶ 510.LH[1], p. 510-32 (rev. 15th ed. 2006).  "The
clear mandate of section 510(b) is that shareholder claimants will not
be allowed to elevate their interests from the level of equity to
general claims. . . . Rescission will lead to subordination below the
interest held before rescission."  4 COLLIER ON BANKRUPTCY ¶ 510.04[1], p.
510-11 (rev. 15th ed. 2006).  For example, suppose a preferred
stockholder holds a claim based upon the rescission of the purchase of
the preferred stock.  In such a case, § 510(b) would clearly
subordinate its claim below the priority of the preferred stock.
Thus, it is clear that inasmuch as § 510(b) applies to Appellants'
claims, those claims may be subordinated below equity.

   An argument could be made that instead of being subordinated
below equity, Appellants' claims should be on par with equity.  (As a
practical matter, this would be of no benefit to Appellants because
the only way they prevail is if they are paid before similarly-
situated interest holders, and they'll get whatever interest holders
get on their proofs of interest.)  This argument is based on the
language of the House Report to the Bankruptcy Reform Act of 1978,
which states that "if the security is an equity security, the damages
or rescission claim is subordinated to all creditors and treated the
same as the equity security itself."  H.R. REP. No. 95-595, at 359
(1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6315.  The problem with
this argument, however, is that version of the bill being described in
the House Report diverged from "the statute that was ultimately
enacted."  See In re Commercial Financial Services, Inc., 268 B.R.
579, 595 & n.23 (Bankr. N.D. Okla. 2001).  The Bankruptcy Reform Act
of 1978, as enacted, included the "equal to" language.  This leads us

1  to the firm conclusion that, except where the Code directs otherwise,

2  Congress intended that claims subordinated under § 510(b) be

3  subordinated to a level below the priority of the securities upon

4  which the claims are based.[9]

5      The changes Congress made to § 510(b) through the enactment of

6  the Bankruptcy Amendments and Federal Judgeship Act of 1984 reinforces

7  our view.   In 1984, § 510(b) was amended to provide that if the

8  applicable security is common stock, then the claims under § 510(b)

9  have the same priority as common stock.   Based on the principle of

10  *expressio unius est exclusio alterius* (the express mention of one

11  thing excludes all others), it can be inferred that Congress did not

12  intend for § 510(b) to subordinate claims based on securities other

13  than common stock (*i.e.*, limited partnership interests) to a level on

14  par with those securities.   See <u>Allen v. Geneva Steel Co. (In re</u>

15  <u>Geneva Steel Co.)</u>, 281 F.3d 1173, 1177 (10th Cir. 2002)("In 1984,

16  Congress amended the statute to make clear that fraud claims springing

17  from the purchase or sale of common stock are treated on the same

18  level as common stock.   All other claims are subordinated to their

19  underlying security.").   While Congress likely did not specifically

20  have LLC membership interests in mind when enacting either the

21  Bankruptcy Reform Act of 1978 or the Bankruptcy Amendments and Federal

22

23

24  _____

25      [9]   <u>But see</u> <u>In re Computer Devices, Inc.</u>, 51 B.R. 471, 478-80
   (Bankr. D. Mass. 1985)(holding that, based on the language in the
26  House Report, the intention of Congress was not to subordinate claims
   based on equity securities below equity securities).   <u>Computer Devices</u>
27  is distinguishable because its discussion relates solely to common
   stock, as opposed to other forms of equity securities.   In any case,
28  <u>Computer Devices</u> is of no assistance to Appellants.

1  Judgeship Act of 1984,[10] this does not change the fact that, under the

2  plain meaning of § 510(b), Appellants' claims would be subordinated

3  below the priority of the Diversified membership interests, not given

4  an equal priority with them.   "If Congress enacted into law something

5  different from what it intended, then it should amend the statute to

6  conform it to its intent.   It is beyond our province to rescue

7  Congress from its drafting errors, and to provide for what we might

8  think . . . is the preferred result."   Lamie v. U.S. Trustee, 540 U.S.

9  526, 542 (2004)(quotes omitted).

10     Appellants take the position that notwithstanding the plain

11 language of § 510(b), "a claim should only be subordinated when it

12 will accomplish the purposes of section 510(b)."   American Wagering,

13 Inc. v. Racusin (In re American Wagering, Inc.), __ F.3d. __, 2007 WL

14 1839681, at *3 (9th Cir. 2007).[11]   Appellants specifically rely on our

15

16        [10]        "The limited liability company (LLC) is a new
                  type of entity organized under state law which
17                combines the pass-through attributes of the
                  partnership with the corporate characteristics of
18                limited liability. The first LLC to be given
                  partnership status for tax purposes was organized
19                under the Wyoming Limited Liability Company Act
                  [in 1977]."

20 Craig J. Langstraat & K. Dianne Jackson, Choice of Business Tax Entity
21 After the 1993 Tax Act, 11 AKRON TAX J. 1, 5 (1995).   LLCs have "a
   rather short history (the first IRS partnership status ruling was in
22 1988 and most of the state statutes were approved in 1992 and 1993)."
   Id. at 6.   LLCs did not appear in the State of Nevada until 1994.   See
23 NEV. REV. STAT. ANN. § 86 (Michie 1994).

24        [11]   The above-quoted language in American Wagering relates to
   whether a particular claim falls within the ambit of § 510(b) in the
25 first place.   This situation is distinguishable from the one we have
   here.   Here, Appellants' claims clearly would fall within the ambit of
26 § 510(b).   Given such a circumstance, there is no authority for the
   proposition that application of § 510(b) will depend upon whether the
27 particular facts fit the purported policy objectives of § 510(b).
   Quite the opposite.   See American Broadcasting Sys., Inc. v. Nugent
28                                                      (continued...)

1    dicta in _American Wagering, Inc. v. Racusin (In re American Wagering,_

2    _Inc.)_, 326 B.R. 449 (9th Cir. BAP 2005)[12] for the proposition that

3    § 510(b) was not enacted to protect other equity holders.   In _American_

4    _Wagering_, we stated in dicta as follows:

5               It is not the other equity holders whose interests
            § 510(b) protects. . . . Section 510(b) has much
6               more important work to do-to protect creditors
            from dilution of their claims by equity holders
7               trying to claim creditor status. . . . The purpose
            of § 510(b) is to protect the rights of creditors,
8               not the rights of other shareholders.

9    _Id._ at 458.   Based on this language, Appellants argue that § 510(b)

10   must not subordinate claims based on the purchase of equity interests

11   to a level equal to or below equity because that would go beyond the

12   purported purpose of § 510(b).[13]   To further bolster this argument,

13   Appellants additionally rely on the creditor protection rationales for

14   § 510(b) that are discussed in cases like _American Broadcasting Sys.,_

15

16   _____

17        [11] (...continued)
     _(In re Betacom of Phoenix, Inc.)_, 240 F.3d 823, 828-29 (9th Cir. 2001)
18   (describing subordination under § 510(b) as "mandatory
     subordination").

19        [12]   Our opinion in _American Wagering_ was originally reversed on
     other grounds by _American Wagering, Inc. v. Racusin (In re American_
20   _Wagering, Inc.)_, 465 F.3d 1048 (9th Cir. 2006).   Recently, on June 28,
     2007, the Ninth Circuit vacated its prior decision in _American_
21   _Wagering_ and entered a new one.   _See_ ___ F.3d. ___, 2007 WL 1839681, at
     *3 (9th Cir. 2007).   The holding in this new opinion is the same.
22

23        [13]   Note that had Appellants flipped back a few pages in
     _American Wagering_, they would have seen how little that case actually
24   supports their position.   _See_ 326 B.R. at 452 ("[W]hen a claim for
     damages arises from the purchase or sale of stock, that claim must be
25   subordinated to the claims of general unsecured creditors (as well as
     to any claims of more senior shareholders)."); _see also id._ at 453
26   ("[T]he purpose of § 510(b) would be completely undermined were we to
     allow Racusin to jump into line with the creditors and ahead of the
27   other shareholders merely by filing a lawsuit and limiting his claim
     to damages rather than stock.").   _American Wagering_ made absolutely
28   clear that claims subordinated pursuant to § 510(b) are not merely
     subordinated immediately beneath general unsecured creditors.

1  Inc. v. Nugent (In re Betacom of Phoenix, Inc.), 240 F.3d 823, 828-29

2  (9th Cir. 2001).

3      Appellants confuse the oft-stated rationales for § 510(b) for

4  what the statute actually says.  Here, the statute is clear.  Section

5  510(b) would subordinate Appellants' claims in priority to a level

6  beneath all membership interests.  We note that Appellants' argument

7  principally rests on our observation in a case which the Ninth Circuit

8  has since reversed.

9      In light of the foregoing, it is clear that § 510(b) would

10 subordinate Appellants' claims to a level below the Diversified

11 membership interests.  As noted above, the bankruptcy court appears to

12 have been heading in the right direction inasmuch as the effect of

13 subordination may be functionally equivalent to disallowance (*i.e.*, no

14 distribution on the claims).  However, this is only the case if first

15 there is an adversary proceeding, and then judgment is entered against

16 Appellants.  See Rule 7001(8)(requiring an adversary proceeding for

17 the subordination of an "allowed claim or interest").[14]

18  _____

19      [14]    We disagree with the bankruptcy court's view, quoted above,
   that Rule 7001(8) does not apply to § 510(b).  By its own terms, Rule
20 7001(8) does not distinguish between types of subordination.  Thus,
   all types of subordination fall under this rule.

21      While by its own terms Rule 7001(8) only applies to the
22 subordination of "allowed claim[s]," and, pursuant to § 502(a), a
   claim is no longer deemed allowed if there is an objection, the
23 argument that an adversary proceeding was not required in this
   instance due to the filing of the Objection is uncomfortably circular.
24 After all, the nanosecond before the Committee filed its objection,
   Appellants held allowed claims, and an adversary proceeding would have
25 been required to subordinate those claims.  It is true that Rule 7001
   only deals with allowed claims, but that is because there is no
26 purpose served in subordinating disallowed claims.  Rule 7001 would
   have little meaning if you could avoid it by filing an objection.

27      Arguably, however, the Committee's request that Appellants'
28 claims be subordinated was proper under Rule 3007, which provides in
                                                      (continued...)

                                    22

U.S. Bankruptcy Appellate Panel
of the Ninth Circuit
125 South Grand Avenue, Pasadena, California 91105
Appeals from Central California  (626) 229-7220
Appeals from all other Districts (626) 229-7225

-----------------------------
NOTICE OF ENTRY OF JUDGMENT
-----------------------------

BAP NO.:  NV-07-1067-RBS

RE:      USA COMMERCIAL MORTGAGE COMPANY; USA CAPITAL REALTY ADVISORS,
         LLC; USA CAPITAL FIRST TRUST DEED FUND, LLC; USA SECURITIES,
         LLC; USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC


A separate Judgment was entered in this case on AUGUST 15, 2007.

BILL OF COSTS:
--------------
Bankruptcy Rule 8014 provides that costs on appeal shall be taxed by the
Clerk of the Bankruptcy Court.  Cost bills should be filed with the Clerk
of the Bankruptcy Court from which the appeal was taken.
9th Cir. BAP Rule 8014-1

ISSUANCE OF THE MANDATE:
------------------------
The mandate, a certified copy of the judgment sent to the Clerk of
the Bankruptcy Court from which the appeal was taken, will be issued
7 days after the expiration of the time for filing a petition for
rehearing unless such a petition is filed or the time is shortened or
enlarged by order.  See Federal Rule of Appellate Procedure 41.

APPEAL TO COURT OF APPEALS:
---------------------------
An appeal to the Ninth Circuit Court of Appeals is initiated by
filing a notice of appeal with the Clerk of this Panel.  The Notice
of Appeal should be accompanied by payment of the $455 filing fee
and a copy of the order or decision on appeal.  Checks may be made
payable to the U.S. Court of Appeals for the Ninth Circuit.  See
Federal Rules of Appellate Procedure 6 and the corresponding Rules of
the United States Court of Appeals for the Ninth Circuit for specific
time requirements.

CERTIFICATE OF MAILING
-------------------------------------------------------
    The undersigned, deputy clerk of the U.S. Bankruptcy
Appellate Panel of the Ninth Circuit, hereby certifies that a copy
of the document on which this certificate appears was mailed this date
to all parties of record to this appeal.

                        By: Vincent J. Barbato
                        Deputy Clerk: August 15, 2007