RECEIVED
AND FILED

ORDERED PUBLISHED

OCT 2  2 09 TR 07

**FILED**

AUG 15 2007

HAROLD S. MARENUS, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

UNITED STATES BANKRUPTCY APPELLATE PANEL
MARY A. SCHOTT, CLERK

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No.   NV-07-1067-RBS |
| USA COMMERCIAL MORTGAGE COMPANY | Bk Nos.   06-10725 LBR |
| USA CAPITAL REALTY ADVISORS, LLC; | 06-10726 LBR |
| USA CAPITAL DIVERSIFIED TRUST DEED | 06-10727 LBR |
| FUND, LLC; USA CAPITAL FIRST TRUST | 06-10728 LBR |
| DEED FUND, LLC; USA SECURITIES, | 06-10729 LBR |
| LLC, | |
| | Ref. No.   07-06 |
| Debtors. | |

MARGARET B. McGIMSEY TRUST; BRUCE
McGIMSEY; JERRY McGIMSEY; SHARON
McGIMSEY; JOHNNY CLARK,

Appellants,

v.

**O P I N I O N**

USA CAPITAL DIVERSIFIED TRUST DEED
FUND, LLC; OFFICIAL COMMITTEE OF
EQUITY SECURITY HOLDERS OF USA
CAPITAL DIVERSIFIED TRUST DEED
FUND, LLC,

Appellees.

Argued and Submitted on July 26, 2007
at Las Vegas, Nevada

Filed – August 15, 2007
Ordered Published – October 10, 2007

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Linda B. Riegle, Bankruptcy Judge, Presiding

Before:   RUSSELL,[1] BRANDT and SMITH, Bankruptcy Judges.

---

[1]    Hon. Barry Russell, United States Bankruptcy Judge for the Central District of California, sitting by designation.

RUSSELL, Bankruptcy Judge:

The Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC, filed objections to the proofs of claim of appellants.  The Committee asserted that appellants' proofs of claim are duplicative of their respective proofs of interest, and in any event, that the claims should be subordinated pursuant to 11 U.S.C. § 510(b)[2].  After holding two separate hearings, the bankruptcy court disallowed appellants' claims.  The appellants appealed.

We REVERSE.

## I.    FACTS

USA Capital Diversified Trust Deed Fund, LLC ("Diversified" or "Debtor") is a Nevada limited liability company organized as of February 3, 2000.  The apparent purpose of Diversified was to provide a vehicle for Nevada investors to invest in loans originated by co-Debtor USA Commercial Mortgage Company ("USACM").  Investors purchased membership interests in Diversified, which then invested in various loans.[3]  Diversified's stated purpose was to make or purchase entire or fractional interests in acquisition, development, construction, bridge or interim loans that were secured by first deeds of trust on, among other things, undeveloped land and residential commercial

---

[2]    Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated as of October 17, 2005, the effective date of most of the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") (Pub.L. 109-8, 119 Stat. 23).

[3]    According to its Prospectus, Diversified registered the sale of its membership units with the Nevada Securities Division, and strictly limited its offering to Nevada residents in order to avoid having to register its securities with the SEC.

1  developments.  Although Diversified loans were supposed to be secured

2  by first deeds of trust and have other protections for Diversified

3  investors, these protections were not generally provided by USACM.

4      There was a continuous offering of membership interests (known as

5  "units") in Diversified from May 2000 to July 2004.  In July 2004,

6  Diversified stopped offering the sale of membership units, and on

7  September 27, 2005, the investors were notified that Diversified would

8  be liquidating.  Diversified, USACM, USA Capital Realty Advisors, USA

9  Capital First Trust Deed Fund, LLC ("FTDF"), and USA Securities, LLC

10 ("Debtors")[4] all filed for bankruptcy protection on April 13, 2006

11 ("Petition Date").  After the Petition Date, with a change in

12 management for the Debtors, the abject failure of Diversified's former

13 insiders to invest Diversified's monies properly became apparent.  As

14 time wore on, the scope of the wrongs inflicted upon Diversified by

15 the insiders came sharply into focus.  For example, the largest loan

16 in the Diversified portfolio was found to be a complete fiction and a

17 subterfuge employed by the insiders as part of a scheme to fund their

18

19      [4]   Debtors are affiliated financial service entities that
20 operated out of the State of Nevada.  USACM was in the business of
   underwriting, originating, brokering, funding and servicing commercial
21 loans that were primarily secured by residential and commercial
   developments.  As of the Petition Date, the loan portfolio that USACM
22 was servicing consisted of approximately 115 loans having a combined
   outstanding balance of approximately $960 million.

23      FTDF is very similar to Diversified.  Its apparent purpose
   was to allow USACM to offer investors throughout the United States
24 (not just in Nevada, as was the case with Diversified) the opportunity
   to invest in loans that USACM originated.  Investors purchased
25 membership interests in FTDF, which then invested in various loans.

26      USA Capital Realty Advisors, LLC was the nominal manager of
   Diversified and FTDF.  Finally, USA Securities, LLC, a registered
27 broker-dealer, sold membership interests in FTDF.

28      Diversified is the only Debtor relevant to this appeal.

3

1  speculative real estate activities with Diversified's funds, rather

2  than utilizing those funds to make non-insider loans secured by first

3  trust deeds as promised in the prospectus.

4  Diversified had approximately 1,300 members as of the Petition

5  Date.  Among these members were the Margaret B. McGimsey Trust, Bruce

6  McGimsey, Jerry McGimsey, Sharon McGimsey, and Johnny Clark

7  (collectively, the "Appellants").  Appellants filed proofs of

8  interest, in the aggregate amount of $592,825.45 plus interest, for

9  their respective equity investments in Diversified.  Appellants also

10  filed proofs of claim, in the very same aggregate amount, against

11  Diversified based on allegations of breach of contract and fraud

12  relating to their purchase of the membership interests in Diversified.

13  On November 30, 2006, the Official Committee of Equity Security

14  Holders of Diversified ("Committee") filed its Omnibus Objection to

15  Claims on Equity Misfiled as Creditor Claims ("Objection").  The

16  Objection objected to 111 of the 137 proofs of claim filed against

17  Diversified at that time.  Included in the Objection were the

18  Committee's objections to the proofs of claim filed by Appellants.[5]

19

20

---

21  [5]    The Committee specifically objected to Claim Nos. 90-1,
22  93-1, 94-1, 95-1, 129-1, 130-1, 131-1, and 136-1.  The objections were
  summarized in the table in Exhibit 1 to the Objection as follows:

| Claim No. | Claimant | Claim Amount | Proposed Disposition |
|---|---|---|---|
| 90-1 | Margaret B. McGimsey Trust | $96,094.75 | Disallow as duplicative of proof of interest already on file |
| 93-1 | Sharon or Jerry McGimsey | $311,091.58 | Disallow as duplicative of proof of interest already on file |
| 94-1 | Johnny Clark | $99,467.90 | Disallow as duplicative of proof of interest already on file |

(continued...)

4

1   The Committee contended that the Appellants' claims were

2   duplicative of the proofs of interest which Appellants had filed and

3   contended that, in any event, that the claims would necessarily be

4   subordinated pursuant to § 510(b).

5   An initial hearing was held on January 3, 2007. The bankruptcy

6   court continued the hearing, however, and ordered supplemental,

7   concurrently filed briefing from the Appellants and the Committee on

8   whether § 510(b) applied to Appellants' claims and, if so, whether the

9   statute required Appellants' claims to be subordinated only below

10  other unsecured creditor claims or subordinated such that Appellants'

11  claims are on par with all similarly situated holders of equity

12  interests in Diversified. The continued hearing was held on January

13  31, 2007. After hearing oral argument from counsel for Appellants and

14  the Committee, the bankruptcy court made the following comments:

> THE COURT: Okay. Well, I'm going to sustain the
> Funds' objections. 510(b) says, "For purpose of
> distribution under this title, a claim arising
> from" - let's see.
>
> "A claim for damages arising from the
> purchase or sale of such security shall be
> subordinated to all claims or interests that are
> senior or equal to the claim or interest

---

[5] (...continued)

| 95-1 | Bruce McGimsey | $86,171.22 | Disallow as duplicative of proof of interest already on file |
| 129-1 | Margaret B. McGimsey Trust | $96,094.75 | Disallow as duplicative of Claim no. 90-1 |
| 130-1 | Sharon or Jerry McGimsey | $311,091.58 | Disallow as duplicative of Claim no. 93-1 |
| 131-1 | Johnny Clark | $99,467.90 | Reclassify as proof of interest and duplicative of claim no. 94-1 |
| 136-1 | Bruce McGimsey | $86,171.22 | Disallow as duplicative of Claim no. 95-1 |

5

represented of a said security, except if it's common stock."

You know, there's no need to go to the legislative history because it's clear.  It says arising from the purchase or sale.

The only reason they have a claim is because they bought the security, and management didn't do what it's supposed to do.

And the problem with this - a distinction will be made.  Let's assume that, coincidentally, these people sold goods and services to the debtor.  Well, they'd have a creditors claim for that because it's a different level.

I just can't fathom the concept that these creditors could claim a creditors claim for the exact same injury that everybody else has.

And under that theory, they would get their claim paid in full, and I don't know what the amount of the claim would be.  I guess the amount of the claim would be everything they put in the investment.

And then everybody else who suffered the exact same kind of injury and damage would then have to share pro rata after what's left.  That just turns the concept of bankruptcy upside down. I agree.

And if it were the other way, trust me, I would just allow everybody else to claim to be treated as a creditors claim.

There's absolutely no reason for disparate treatment, and that would, in essence, have created an unequal classification, so it was an interesting theory, but I don't agree with it, so --

(Hr'g Tr. 22:5 - 23:6, January 31, 2007.)

An interesting colloquy followed between the court and counsel for the Appellants regarding what exactly the court had ruled:

MR. McGIMSEY: Well, can I ask you exactly what you've done, your Honor?  Have you said I have no claim?

THE COURT: No.  I said you have a claim as an

6

1      equity holder.

2      MR. McGIMSEY: Well, do you say I have no –

3      THE COURT: Well, no.

4      MR. McGIMSEY: I –

5      THE COURT: You may have a claim, but it's going to
6      be treated equally.

     MR. McGIMSEY: So you are subordinating my claim.
7

8      THE COURT: It's going to be treated equally to all
     other claims, the equity claims, in the same
     interest.
9

10      MR. McGIMSEY: So I'm being subordinated; is that
     correct?

11      THE COURT: You're going to be treated like
     everybody else.  You're going to be treated
12      exactly in accordance with what everybody else is
     being treated.
13

14      MR. McGIMSEY: So –

     THE COURT: It's not subordinated.
15

16      MR. McGIMSEY: Well, then –

     THE COURT: You're asking –
17

18      MR. McGIMSEY: You're –

     THE COURT: – to be elevated.  You're asking to be
19      elevated.  That's what you were asking to do.

20      MR. McGIMSEY: I'm not asking to be elevated.

21      THE COURT: You were.

22      MR. McGIMSEY: I'm not asking –

23      THE COURT: But you were saying –

24      MR. McGIMSEY: – to be elevated.

25      THE COURT: – by filing that you were saying I'm
     going to categorize my equity interest different
26      by filing a creditors claim; ergo, I am being
     elevated, so it's not that you're being
27      subordinated.  You're being treated exactly what
     you're supposed to be.
28

1    Oh, and in [Rule] 7001, I think only a - it
says, "Except as provided in a Chapter 11 plan."

2    I think 7001 only applies when you're seeking
subordination, equitable subordination, the bad-

3    conduct kinds of equitable subordination, as
opposed to looking at what the nature has, so I

4    just disagree.

5    I mean, it's an interesting argument.  I just
disagree so, you know, your claim will be treated

6    like everybody else's.

7    MR. McGIMSEY: Well, I don't understand that.  My
claim has been - they filed an objection to the

8    claim, and I would just like it clear, your Honor
--

9
THE COURT: Yeah.

10
MR. McGIMSEY: - you were saying that 510(b) says I

11   don't have a claim.

12   THE COURT: No.  It says that it's to be - well, it
says that it was subordinated, but I think in this

13   case it's senior to or equal, or equal.

14   MR. McGIMSEY: No one's claimed these -

15   THE COURT: What are your damages?  Your damages
are exactly what you put in, right?

16
MR. McGIMSEY: Exactly.

17
THE COURT: Okay.

18
MR. McGIMSEY: That I haven't -

19
THE COURT: So why -

20
MR. McGIMSEY: - gotten back.

21
THE COURT: - should your clients be paid their

22   25,000, 50,000, whatever it is and in full before
everybody else gets their share or, more

23   importantly, they have to share it pro rata?
That's what you're asking.

24
MR. McGIMSEY: I'm asking that because we -

25
THE COURT: And I'm saying no.  I'm saying that's

26   not the law.

27   MR. McGIMSEY: So these people - anybody can file a
late claim.  We no longer have a -

28

8

1    THE COURT: That has nothing to do with it.

2    MR. McGIMSEY: We no longer have a late claim –

3    THE COURT: It's not a creditors claim.

4    MR. McGIMSEY: So that is what I wanted you to say,
     your Honor.

5

6  (Hr'g Tr. 23:17 – 26:15, January 31, 2007).

7      On February 14, 2007, an order sustaining the objections to

8  Appellants' claims was entered.  The order reads, in pertinent part,

9  as follows:

10         IT IS HEREBY ORDERED that the Objection is
           sustained.

11
               IT IS FURTHER ORDERED that the claims listed
12         on Exhibit A [including appellants'], attached
           hereto and made a part hereof, shall be disallowed
13         in their entirety, as they are creditor claims
           filed by holders of equity interests in USA
14         Capital Diversified Trust Deed Fund, LLC
           ("Diversified Fund") who are not entitled to any
15         distribution from Diversified Fund on the basis of
           such claims but who shall recover from Diversified
16         Fund on a pro rata basis according to their
           respective equity interests.

17

18      Appellants timely filed a Notice of Appeal the same day.

                        **II.   ISSUES**

20  A.   Whether the bankruptcy court correctly sustained the Committee's

21  Objection on the basis that the Appellants' proofs of claim were

22  duplicative of their proofs of interest.

23  B.   Whether the bankruptcy court correctly sustained the Committee's

24  Objection on the basis that the Appellants' proofs of claim should be

25  statutorily subordinated pursuant to § 510(b).

26                  **III.   STANDARD OF REVIEW**

27      In reviewing a bankruptcy court's decision on appeal, an

28  appellate court reviews findings of fact under a clearly erroneous

                              9

1  standard.   Conclusions of law, including a bankruptcy court's

2  interpretation of a statute, are reviewed <u>de novo</u>.   <u>See</u> <u>Lundell v.</u>

3  <u>Anchor Constr. Specialists, Inc. (In re Lundell)</u>, 223 F.3d 1035, 1039

4  (9th Cir. 2000).

**IV.   DISCUSSION**

6       The bankruptcy court disallowed Appellants' claims because it

7  felt that allowing Appellants to assert their claims would be unfair.

8  According to the bankruptcy court, because all investors in

9  Diversified had been defrauded as a part of the same fraud, all

10 investors were equally wronged and had or should have the same rights.

11 The idea that Appellants could jump in line ahead of the other

12 investors seemed unacceptable.   Although the bankruptcy court's

13 concern for the other Diversified investors was laudable and although

14 its approach has a certain appeal on the surface, for the reasons

15 discussed below the actions of the bankruptcy court were not proper

16 under the Bankruptcy Code or Federal Rules of Bankruptcy Procedure.

17      The bankruptcy court's analysis ignored the state of the record

18 as it existed at the time of the hearings on the Objection.   The

19 Appellants were the only investors to timely file proofs of claim

20 based on their claims for breach of contract and fraud.   <u>Assuming</u>

21 <u>arguendo</u> that all other interest holders could file proofs of claim,

22 they did not do so.   Whether they would at some later point is pure

23 speculation.   If the other Diversified investors were, instead, trade

24 creditors with equal rights, those trade creditors who did not file

25 proofs of claim would simply not have claims.

26      Further, there was no real indication that there was anything

27 wrong with Appellants' claims.   Although the bankruptcy court seemed

28 to think that the proofs of claim were duplicative of the proofs of

10

1   interest, they are not.  A proof of interest is based on mere equity
2   ownership; a proof of claim is based on a right to payment.
3   Appellants have proofs of interest by virtue of their ownership of
4   membership interests in Diversified, and proofs of claim based on
5   their claims against Diversified for breach of contract and fraud.  It
6   is clear that Appellants are entitled to assert both claims and
7   interests, even though they cannot be paid on both.  The fact that the
8   bankruptcy court felt uncomfortable with the idea that Appellants
9   could potentially jump in line ahead of other Diversified investors
10  was not a basis for disallowing Appellants' claims.

11      As to § 510(b), although there was extensive discussion by the
12  parties at the hearings and in the briefs at the trial level, as well
13  as in the briefs on appeal, as to whether Appellants' claims should be
14  subordinated, the bankruptcy court never subordinated Appellants'
15  claims.  It merely disallowed them.  In any event, it is clear that
16  subordination under § 510(b) would first require an adversary
17  proceeding pursuant to Rule 7001(8).

18  A.   Whether the Claims and Interests are Duplicative

19      The core of the Committee's objection to Appellants' claims is
20  that these claims are duplicative of Appellants' proofs of interest.
21  We disagree.  The proofs of claim and the proofs of interest are not
22  duplicative.  Although both Appellants' respective proofs of claim and
23  proofs of interest relate to their membership interests in Diversified
24  and are for the exact same amount, this does not make the proofs of
25  claim and proofs of interest duplicative.  The Committee's arguments
26  relating to equity and fairness do not change this result.  As they
27  themselves admit, Appellants are not entitled to a double recovery.
28  Further, the issue of relative priority relates to whether Appellants'

claims should be subordinated, not whether they should be allowed.

A proof of claim asserted by an equity holder for breach of contract and fraud relating to the purchase of a security is simply not duplicative of the equity holder's proof of interest. Unlike most of the other claims subject to the Objection, Appellants were not mere equity holders who filed proofs of claim out of confusion. Had that been the case, Appellants' claims could easily have been challenged and properly disallowed.[6] See § 502(b)(1) ("[I]f such objection to a claim is made, the court . . . shall allow such claim in such amount, except to the extent that -- (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured[.]"). It is axiomatic that an allowed proof of claim requires something more than mere equity ownership. A proof of claim for breach of contract and fraud relating to the purchase of a security is clearly something more than mere ownership, and as such cannot be considered duplicative of a proof of interest. See BLACK'S LAW DICTIONARY 541 (8th ed. 2004) (defining "duplicative" as, inter alia, "[h]aving or characterized by having overlapping content, intentions, or effect"). Here, Appellants' proofs of interest are based purely upon their membership interests in Diversified. Their proofs of claim, by contrast, are based upon their potential causes of action against Diversified for breach of contract and fraud relating

---

[6]    It is true that the Committee argued that Appellants' claims should be disallowed as they are derivative claims that belong to Diversified and not to equity holders individually. Similarly, the Committee argued that Appellants could not have a claim based on breach of contract as a matter of law. However, as the bankruptcy court did not rule on these arguments and instead based its entire ruling on the argument that the proofs of claim and the proofs of interest are duplicative, we decline to address them.

1  to their purchase of those membership interests.  Hence, Appellants'
2  proofs of interest and proofs of claim are clearly not duplicative.
3       Rather than explain why Appellants' proofs of claim are
4  unenforceable under § 502(b), the Committee bases its argument on the
5  perceived unfairness in permitting Appellants to assert both proofs of
6  claim and proofs of interest.  According to the Committee's brief,
7  "Appellants are using one pretense or another to attempt to assume the
8  role of unsecured creditors <u>in addition to</u> their role as equity
9  interest holders and to recover twice under both guises for the same
10  investment."  The Committee asserts that Appellants' claims are not
11  distinguishable from the 1,300 potential (although unfiled) claims
12  held by every other member of Diversified, and that it is unfair to
13  allow Appellants to assert their claims to the prejudice of other
14  members of Diversified that hold the exact same claims but have not
15  filed proofs of claim.  However, the perception of unfairness is an
16  insufficient basis for the disallowance of a proof of claim.  <u>See</u>
17  <u>Heath v. American Express Travel Related Servs. Co. (In re Heath)</u>, 331
18  B.R. 424, 426 (9th Cir. BAP 2005) ("Section 502(b) sets forth the
19  exclusive grounds for disallowance of claims, and Debtors have
20  introduced no evidence or arguments to establish any of those
21  grounds.").
22       It is neither incorrect nor improper for an equity holder to
23  assert a proof of claim based on breach of contract and fraud relating
24  to the purchase of a security and also a proof of interest.  The Code
25  specifically contemplates this.  As discussed below, § 510(b)
26  subordinates certain claims that are necessarily held by equity
27  holders.  Equity holders must <u>a fortiori</u> be entitled to assert proofs
28  of claim in addition to proofs of interest or there would be nothing

1  to subordinate under § 510(b).  If, in fact, an equity holder could

2  not assert both a proof of claim and a proof of interest, then

3  § 510(b) in most cases would have little to no meaning.  See Tabor v.

4  Ulloa, 323 F.2d 823, 824 (9th Cir. 1963) ("'[A] legislature is

5  presumed to have used no superfluous words.'") (citation omitted).

6      The Committee's argument that it is inappropriate for Appellants

7  to be able to assert proofs of claim in addition to their proofs of

8  interest for policy reasons is similarly unfounded.  The Committee

9  contends that allowing Appellants to assert both proofs of claim and

10  proofs of interest effectively would allow Appellants to enjoy a

11  double recovery.  This is not so.  As counsel for Appellants correctly

12  noted during oral argument at the initial hearing on January 3, 2007,

13  any amounts that Appellants receive on their proofs of claim would

14  serve to reduce the amount of their proof of interest ("MR. McGIMSEY:

15  I filed proof[s] of interest because we have proof[s] of interest.  I

16  believe that to the extent that we recovered under our unsecured

17  claim[s] that would go against our proof[s] of interest, you know.").

18      We also disagree with the argument that Appellants' claims should

19  be disallowed because they are not distinguishable from the many other

20  potential, but unfiled, claims against Diversified that other

21  Diversified members may hold against it based upon the same general

22  facts.  This argument goes as follows:  If the bankruptcy court

23  extends the claims bar date to allow all other Diversified members to

24  file proofs of claim, and then all other Diversified members do file

25  proofs of claim, then the Appellants would be in the same position

26  that they would have been in had they not filed proofs of claim in the

27  first place.  Ergo, it makes sense to simply disallow the claims now

28  instead of having to proceed through these many procedural hoops in

14

1  order to get to the same inevitable result.  This argument fails

2  because it puts the cart way before the horse.  Even if the bankruptcy

3  court hypothetically extended the claims bar date, there is no

4  guarantee that even a significant number of Diversified members, if

5  any, would file proofs of claim.  More significantly, punishing

6  creditors for diligently meeting claims bar dates because other

7  potential creditors have failed to do so is contrary to bankruptcy

8  policy and procedure.  It is not uncommon in chapter 11 cases for a

9  handful of trade creditors to fail to file proofs of claim.

10  Penalizing the trade creditors who timely file proofs of claim because

11  others did not would be clearly erroneous.  It is the same with this

12  case.  Penalizing the Appellants for having filed proofs of claim when

13  other members of Diversified failed to do so, notwithstanding ample

14  notice, is erroneous.

15      In short, there is no basis for finding that Appellants' proofs

16  of claim and proofs of interest are duplicative.  As the bankruptcy

17  court's decision rested on its finding that the proofs of claim and

18  proofs of interest are duplicative, we must reverse.

19  B.    Section 510(b)

20      The bulk of the briefs relate to the applicability and effect of

21  § 510(b).  Indeed, a great deal of the discussion at the trial level

22  also related to § 510(b), and yet the bankruptcy court never

23  subordinated Appellants' claims.  As such, § 510(b) is of limited

24  importance for purposes of this appeal.  Because it appears likely

25  that the Committee will promptly bring an adversary proceeding against

26  the Appellants in order to subordinate their claims under § 510(b),

27  the applicability and effect of § 510(b) deserves discussion.

28      It is clear from the transcript of the January 31, 2007 hearing

1  and the language of the order sustaining the objections to Appellants'

2  claims that the court was disallowing Appellants' claims, not

3  subordinating them.  Section 510(b) provides no basis for the

4  disallowance of claims.  Disallowance and subordination are different.

5  "Disallowance of a claim is a legal determination that the claim under

6  consideration is not allowable by law.  On the other hand,

7  subordination of a claim presupposes that the claim is allowed but for

8  equitable reasons must be subordinated to the other allowed claims."

9  Ford v. Feldman (In re Fla. Bay Trading Co.), 177 B.R. 374, 383

10  (Bankr. M.D. Fla. 1994).  Although the bankruptcy court appears to

11  have been heading in the right direction inasmuch as the effect of

12  subordination under § 510(b), if established, may be functionally

13  equivalent to disallowance (i.e., no distribution on the claims), the

14  bankruptcy court's ruling was nonetheless in error.

15       Section 510(b) provides, in pertinent part, that:

16            . . . a claim . . . for damages arising from the
             purchase or sale of . . . a security [of the
17            debtor] . . . shall be subordinated to all claims
             or interests that are senior to or equal the . . .
18            interest represented by such security, except that
             if such security is common stock, such claim has
19            the same priority as common stock.

20  11 U.S.C. § 510(b) (emphasis added).[7]

21  _____

22       [7]    The text of the original subsection (b) provided as follows:

23            Any claim for rescission of a purchase
             or sale of a security of the debtor or
24            of an affiliate or for damages arising
             from the purchase or sale of such a
25            security shall be subordinated for
             purposes of distribution to all claims
26            and interests that are senior or equal
             to the claim or interest represented by
27            such security.

28                                              (continued...)

16

1    There appears to be no dispute between the parties that § 510(b)
2    could apply to subordinate Appellants' claims.   The parties appear to
3    agree that the claims asserted by Appellants are based on damages
4    arising from the purchase or sale of a security of the debtor, as the
5    term "security" is defined under § 101(49).   Instead, the dispute is
6    over what level these claims are to be subordinated to.   Here, the
7    language of the statute is plain on its face.   Appellants' claims
8    arising from the purchase or sale of the Diversified membership
9    interests are subordinated for purposes of distribution to all
10   Diversified membership interests.   "The plain meaning of legislation
11   should be conclusive, except in the 'rare cases [in which] the literal
12   application of a statute will produce a result demonstrably at odds
13   with the intentions of its drafters.'"   United States v. Ron Pair
14   Enterprises, Inc., 489 U.S. 235, 242 (1989) (citation omitted).   As
15   such, to the extent that § 510(b) applies, Appellants' proofs of claim
16   are subordinated below all membership interests in Diversified.   In
17   short, Appellants' claims may be subordinated below equity.

18   The history of § 510(b) supports this conclusion.   Section 510(b)
19   was enacted as part of the Bankruptcy Reform Act of 1978.   "The
20   principles announced in section 510(b) had no established forebear in
21   pre-Code practice.   This section clarifies an unsettled area of law
22   under the Act, where some decisions permitted a rescinding security
23   holder of the debtor to share on a priority with general creditors."
24   4 COLLIER ON BANKRUPTCY ¶ 510.LH[1], p. 510-32 (rev. 15th ed. 2006).   "The

25
26   _____

27   [7](...continued)
     11 U.S.C. § 510(b) (1978).   Section 510(b) was modified into its
     present form with the enactment of the Bankruptcy Amendments and
28   Federal Judgeship Act of 1984, Pub L. No. 98-353, 98 Stat. 333.

clear mandate of section 510(b) is that shareholder claimants will not be allowed to elevate their interests from the level of equity to general claims. . . . Rescission will lead to subordination below the interest held before rescission." 4 COLLIER ON BANKRUPTCY ¶ 510.04[1], p. 510-11 (rev. 15th ed. 2006). For example, suppose a preferred stockholder holds a claim based upon the rescission of the purchase of the preferred stock. In such a case, § 510(b) would clearly subordinate its claim below the priority of the preferred stock. Thus, it is clear that inasmuch as § 510(b) applies to Appellants' claims, those claims may be subordinated below equity.

An argument could be made that instead of being subordinated below equity, Appellants' claims should be on par with equity. (As a practical matter, this would be of no benefit to Appellants because the only way they prevail is if they are paid before similarly-situated interest holders, and they'll get whatever interest holders get on their proofs of interest.) This argument is based on the language of the House Report to the Bankruptcy Reform Act of 1978, which states that "[i]f the security is an equity security, the damages or rescission claim is subordinated to all creditors and treated the same as the equity security itself." H.R. REP. NO. 95-595, at 359 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6315. The problem with this argument, however, is that version of the bill being described in the House Report diverged from "the statute that was ultimately enacted." See NationsBank v. Commercial Fin. Servs., Inc. (In re Commercial Fin. Servs., Inc.), 268 B.R. 579, 595 & n.23 (Bankr. N.D. Okla. 2001). The Bankruptcy Reform Act of 1978, as enacted, included the "equal to" language. This leads us to the firm conclusion that, except where the Code directs otherwise, Congress

18

1  intended that claims subordinated under § 510(b) be subordinated to a

2  level below the priority of the securities upon which the claims are

3  based.[8]

4      The changes Congress made to § 510(b) through the enactment of

5  the Bankruptcy Amendments and Federal Judgeship Act of 1984 reinforces

6  our view.  In 1984, § 510(b) was amended to provide that if the

7  applicable security is common stock, then the claims under § 510(b)

8  have the same priority as common stock.  Based on the principle of

9  expressio unius est exclusio alterius (the express mention of one

10  thing excludes all others), it can be inferred that Congress did not

11  intend for § 510(b) to subordinate claims based on securities other

12  than common stock (i.e., limited partnership interests) to a level on

13  par with those securities.  See Allen v. Geneva Steel Co. (In re

14  Geneva Steel Co.), 281 F.3d 1173, 1177 (10th Cir. 2002) ("In 1984,

15  Congress amended the statute to make clear that fraud claims springing

16  from the purchase or sale of common stock are treated on the same

17  level as common stock.  All other claims are subordinated to their

18  underlying security.").  While Congress likely did not specifically

19  have LLC membership interests in mind when enacting either the

20  Bankruptcy Reform Act of 1978 or the Bankruptcy Amendments and Federal

21  Judgeship Act of 1984,[9] this does not change the fact that, under the

22

23      [8]  But see In re Computer Devices, Inc., 51 B.R. 471, 478-80
    (Bankr. D. Mass. 1985) (holding that, based on the language in the
24  House Report, the intention of Congress was not to subordinate claims
    based on equity securities below equity securities).  Computer Devices
25  is distinguishable because its discussion relates solely to common
    stock, as opposed to other forms of equity securities.  In any case,
26  Computer Devices is of no assistance to Appellants.

27      [9]      "The limited liability company (LLC) is a new
              type of entity organized under state law which
28                                          (continued...)

19

plain meaning of § 510(b), Appellants' claims would be subordinated

below the priority of the Diversified membership interests, not given

an equal priority with them.  "If Congress enacted into law something

different from what it intended, then it should amend the statute to

conform it to its intent.  It is beyond our province to rescue

Congress from its drafting errors, and to provide for what we might

think . . . is the preferred result."  Lamie v. U.S. Trustee, 540 U.S.

526, 542 (2004) (quotation marks and citation omitted).

Appellants take the position that notwithstanding the plain

language of § 510(b), "a claim should only be subordinated when it

will accomplish the purposes of section 510(b)."  Racusin v. American

Wagering, Inc. (In re American Wagering, Inc.), 493 F.3d 1067, 1072

(9th Cir. 2007).[10]  Appellants specifically rely on our dicta in

---

[9](...continued)
> combines the pass-through attributes of the
> partnership with the corporate characteristics of
> limited liability. The first LLC to be given
> partnership status for tax purposes was organized
> under the Wyoming Limited Liability Company Act
> [in 1977]."

Craig J. Langstraat & K. Dianne Jackson, Choice of Business Tax Entity After the 1993 Tax Act, 11 Akron Tax J. 1, 5 (1995).  LLCs have "a rather short history (the first IRS partnership status ruling was in 1988 and most of the state statutes were approved in 1992 and 1993)." Id. at 6.  LLCs did not appear in the State of Nevada until 1994.  See Nev. Rev. Stat. Ann. § 86 (Michie 1994).

[10]    The above-quoted language in American Wagering relates to whether a particular claim falls within the ambit of § 510(b) in the first place.  This situation is distinguishable from the one we have here.  Here, Appellants' claims clearly would fall within the ambit of § 510(b).  Given such a circumstance, there is no authority for the proposition that application of § 510(b) will depend upon whether the particular facts fit the purported policy objectives of § 510(b). Quite the opposite.  See American Broadcasting Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.), 240 F.3d 823, 828-29 (9th Cir. 2001) (describing subordination under § 510(b) as "mandatory subordination").

1  <u>American Wagering, Inc. v. Racusin (In re American Wagering, Inc.)</u>,

2  326 B.R. 449 (9th Cir. BAP 2005)[11] for the proposition that § 510(b)

3  was not enacted to protect other equity holders.   In <u>American</u>

4  <u>Wagering</u>, we stated in dicta as follows:

> It is not the other equity holders whose interests
> § 510(b) protects. . . . Section 510(b) has much
> more important work to do--to protect creditors
> from dilution of their claims by equity holders
> trying to claim creditor status.  The purpose of
> § 510(b) is to protect the rights of creditors,
> not the rights of other shareholders.

9  <u>Id.</u> at 458 (citations omitted).  Based on this language, Appellants

10 argue that § 510(b) must not subordinate claims based on the purchase

11 of equity interests to a level equal to or below equity because that

12 would go beyond the purported purpose of § 510(b).[12]  To further

13 bolster this argument, Appellants additionally rely on the creditor

14 protection rationales for § 510(b) that are discussed in cases like

15 <u>American Broadcasting Sys., Inc. v. Nugent (In re Betacom of Phoenix,</u>

16 <u>Inc.)</u>, 240 F.3d 823, 828-29 (9th Cir. 2001).

17      Appellants confuse the oft-stated rationales for § 510(b) for

---

19      [11]   Our opinion in <u>American Wagering</u> was originally reversed on
other grounds by <u>Racusin v. American Wagering, Inc. (In re American
Wagering, Inc.)</u>, 465 F.3d 1048 (9th Cir. 2006).  Recently, on June 28,
2007, the Ninth Circuit vacated its prior decision in <u>American
Wagering</u> and entered a new one.  <u>See</u> 493 F.3d 1067.  The holding in
this new opinion is the same.

      [12]   Note that had Appellants flipped back a few pages in
<u>American Wagering</u>, they would have seen how little that case actually
supports their position.  <u>See</u> 326 B.R. at 452 ("[W]hen a claim for
damages arises from the purchase or sale of stock, that claim must be
subordinated to the claims of general unsecured creditors (as well as
to any claims of more senior shareholders)."); <u>see also id.</u> at 453
("[T]he purpose of § 510(b) would be completely undermined were we to
allow Racusin to jump into line with the creditors and ahead of the
other shareholders merely by filing a lawsuit and limiting his claim
to damages rather than stock.").  <u>American Wagering</u> made absolutely
clear that claims subordinated pursuant to § 510(b) are not merely
subordinated immediately beneath general unsecured creditors.

1  what the statute actually says.  Here, the statute is clear.  Section

2  510(b) would subordinate Appellants' claims in priority to a level

3  beneath all membership interests.  We note that Appellants' argument

4  principally rests on our observation in a case which the Ninth Circuit

5  has since reversed.

6      In light of the foregoing, it is clear that § 510(b) would

7  subordinate Appellants' claims to a level below the Diversified

8  membership interests.  As noted above, the bankruptcy court appears to

9  have been heading in the right direction inasmuch as the effect of

10  subordination may be functionally equivalent to disallowance (*i.e.*, no

11  distribution on the claims).  However, this is only the case if first

12  there is an adversary proceeding, and then judgment is entered against

13  Appellants.  See Rule 7001(8) (requiring an adversary proceeding for

14  the subordination of an "allowed claim or interest").[13]

15  _____

16      [13]    We disagree with the bankruptcy court's view, quoted above,
   that Rule 7001(8) does not apply to § 510(b).  By its own terms, Rule
17  7001(8) does not distinguish between types of subordination.  Thus,
   all types of subordination fall under this rule.

18
       While by its own terms Rule 7001(8) only applies to the
19  subordination of "allowed claim[s]," and, pursuant to § 502(a), a
   claim is no longer deemed allowed if there is an objection, the
20  argument that an adversary proceeding was not required in this
   instance due to the filing of the Objection is uncomfortably circular.
21  After all, the nanosecond before the Committee filed its objection,
   Appellants held allowed claims, and an adversary proceeding would have
22  been required to subordinate those claims.  It is true that Rule 7001
   only deals with allowed claims, but that is because there is no
23  purpose served in subordinating disallowed claims.  Rule 7001 would
   have little meaning if you could avoid it by filing an objection.

24
       Arguably, however, the Committee's request that Appellants'
25  claims be subordinated was proper under Rule 3007, which provides in
   pertinent part that "[i]f an objection to a claim is joined with a
26  demand for relief of the kind specified in Rule 7001, it becomes an
   adversary proceeding."  Even if this were the case, however, the
27  adversary rules would apply.  See Rules 7001-7087.  However, since the
   bankruptcy court did not rule on the subordination issue, we decline
28                                                      (continued...)

1

**V. CONCLUSION**

2   For the reasons stated herein, we conclude that the bankruptcy

3 court erred in disallowing Appellants' claims.

4   Accordingly, we REVERSE.

26   [13](...continued)

to do so here.  Of course, a plan can subordinate claims without the

27 need for an adversary proceeding.  <u>See</u> Rule 7001(8).  This exception

has little relevance here, since the confirmed plan in this case did

28 not purport to subordinate Appellants' claims.