Marc A. Levinson (California Bar No. 57613)
Jeffery D. Hermann (California Bar No. 90445)
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, CA 95814-4497
Telephone: (916) 447-9200
Facsimile: (916) 329-4900
Email: malevinson@orrick.com
      jhermann@orrick.com

Robert Kinas (Nevada Bar No. 6019)
Claire Y. Dossier (Nevada Bar No. 10030)
SNELL & WILMER LLP
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Telephone: (702) 784-5200
Facsimile: (702) 784-5252
Email: rkinas@swlaw.com
      cdossier@swlaw.com

*Attorneys for USA Capital*
*Diversified Trust Deed Fund, LLC*

### UNITED STATES BANKRUPTCY COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>                               Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>                               Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR<br><br>Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>                               Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725-LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>                               Debtor. | **MOTION TO ESTABLISH<br>DISPUTED CLAIM RESERVE** |
| In re:<br>USA SECURITIES, LLC,<br>                               Debtor. | |
| Affects:<br>☐ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☒ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA First Trust Deed Fund, LLC | Hearing Date: December 5, 2007<br>Hearing Time: 9:30 a.m. |

     USA Capital Diversified Trust Deed Fund, LLC ("Diversified"), a revested debtor in the above-captioned cases, by and through its counsel, hereby submits this Motion to Establish Disputed Claim Reserve.

/ / /

## I. INTRODUCTION

The 1,300 plus members/equityholders of Diversified invested in excess of $150 million in Diversified. Now, more than a year and a half since Diversified filed its bankruptcy case and nine months since approval of its reorganization plan, Diversified is prepared to make an initial, limited distribution to these equityholders.

The only obstacles standing in the way of the contemplated distribution are claims asserted against Diversified by Salvatore Reale and by several affected investors collectively referred to as McGimsey. Because none of their claims has any basis in fact or law or even token value, Diversified asks that this Court determine that no reserve is required or that it establish a nominal reserve for these claims so that the contemplated distribution can proceed unaffected.

The Reale claim for approximately $4.9 million is both untimely and wholly contrived. Despite being properly noticed of the November 13, 2006, bar date on September 18, 2006, Reale did not file his proof of claim until September 17, 2007. Indisputable evidence establishes that Reale was well-aware of the facts giving rise to his putative claim long ago, and Diversified believes that he can proffer no sufficient justification for his delay.

Reale's claim fares no better on the merits. It appears to be based on his 2003 sale of a distressed loan to Diversified. The very evidence submitted by Reale shows that Diversified performed under that agreement and paid the purchase amounts in accordance with Reale's written directions. That Reale waited four full years to first assert a claim simply confirms that the claim is unfounded.

The McGimsey claims already have been the subject of an objection, disallowance and a subsequent appeal. In the appeal, the BAP expressly recognized that the McGimsey claims must be subordinated to claims of Diversified's equityholders. Accordingly, these claims have nominal value, at best. Because even that nominal value stands behind the interests of the equityholders, there is no need for a cash reserve.

Lastly, even if the Reale or McGimsey claims were not completely baseless, Diversified is expecting future cash infusions, which would protect the interests of such claimants.

## II. STATEMENT OF CASE

### A. Procedural Facts

On April 13, 2006 (the "Petition Date"), USA Commercial Mortgage Company ("USACM"), USA Securities, LLC ("USA Securities"), USA Capital Realty Advisors, LLC ("USA Realty"), USA First Trust Deed Fund, LLC ("FTDF"), and Diversified (collectively with USACM, USA Securities, USA Realty, and the FTDF, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

Diversified is owned by approximately 1,350 equityholder members (the "Diversified Members") who purchased membership interests in Diversified, a limited liability company. The Diversified Members are the Debtors' only class of investors, and they have not received a cash distribution since prior to the Petition Date.

On May 9, 2006, the Court entered its Order Regarding Joint Administration Without Substantive Consolidation [Docket No. 184] linking the Debtors' chapter 11 cases for joint administration under the USACM case name and number, BK-S-06-10725-LBR.

On May 10, 2006, the Office of the United States Trustee appointed four separate committees, including one representing the interests of Diversified's equityholders (the "Diversified Committee").

On September 14, 2006, the Court entered its Order Setting Deadline to File Proofs of Claim and Proofs of Interest [Docket No. 1280] ("Bar Date Order") setting the deadline of November 13, 2006 (the "Bar Date") to file proofs of claim in the Debtors' chapter 11 cases.

On September 18, 2006, Debtors mailed proof of claim forms, proof of interest forms and notice of the Bar Date Order. *See* Declaration of Rachel Patience Ragni in Support of Motion to Establish Disputed Claim Reserve ("Ragni Decl."), Exh. A. Reale is included as a recipient on the related certificate of service, showing that Reale was served twice with the Bar Date Order and related forms. *Id.*

On November 15, 2006, the Debtors filed the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization (the "Plan") [Dkt. No. 1799] and the Debtors' First Amended Disclosure Statement (the "Disclosure Statement") [Dkt. No. 1798]. The Plan was confirmed by

entry of an order by the Court on January 18, 2007 [Dkt. No. 2376], and the Plan became effective on March 12, 2007.

Section VII of the Plan provides a procedure for distribution of consideration and establishment of a cash reserve (the "Reserve Procedure"). Pursuant to the Plan, before a distribution to investors can be made, the Post Effective Date Entities (as defined in the Plan to include Diversified) must establish an appropriate cash reserve for each disputed claim and equity interest. The Debtors and the Post Effective Date Entities are expressly authorized to file a motion seeking an order from the Court setting a cash reserve in an amount different than claimed in a proof of claim. As to any disputed claim, the Post Effective Date Entities may request that the Court estimate such claim pursuant to § 502(c) and set a cash reserve based on that estimation. Obviously, the Court is free to consider other factors, such as whether monies will become available in the future for payment of the disputed claim, in setting the reserve amount.

**B.    Reale Proof of Claim**

Reale is a Las Vegas businessman with an established and substantial business relationship with the former principals of the Debtors, Tom Hantges ("Hantges"), Joseph Milanowski ("Milanowski") and with companies affiliated with them.

In 2003, Reale agreed to sell to Diversified a loan in the principal amount of $2,050,000 secured by junior deeds of trust upon: (i) the Hotel Marquis in Palm Springs, California, and (ii) a parcel of undeveloped land consisting of 45 acres in Palm Springs, California. For that purpose, Reale entered into an Agreement for Purchase of Loan with Diversified (the "Purchase Agreement"). (Ragni Decl., Exh. B).

Because the loan was in default and the owner of the Hotel Marquis was in bankruptcy at the time of the sale, and because the owner of the 45 acre parcel also was in bankruptcy, the purchase price for the loan was set at the principal amount of $2,050,000 despite the fact that accrued interest also was due and owing in connection with the loan.

The Purchase Agreement contains detailed recitals reflecting the parties' understanding of the factual circumstances giving rise to the transaction. Those recitals include an acknowledgement that the underlying loan was in default, that bankruptcy cases had been filed by

- 4 -

both underlying obligors, and that the underlying debt was in excess of $3.1 million, including accrued and unpaid interest. *Id.* at SR00412-SR00413. The Purchase Agreement also expressly acknowledged that there was a possibility that a third party might purchase the real property collateral for an amount sufficient to repay the note in full or in substantial part. *Id.* at SR00413. Reale confirmed in the Purchase Agreement that he had independently assessed all of the relevant facts in deciding that he wanted to sell his loan position to Diversified for $2.05 million. *Id.*

In connection with the Purchase Agreement, Diversified and Reale also reached specific agreement as to how the proceeds of the sale would be handled. Reale instructed the escrow agent to distribute $2.05 million of the sales proceeds to USA Investment Partners, LLC ("USAIP") and to deliver the remaining $50,000 to USACM. (Ragni Decl., Exh. C). Diversified rendered full performance, and funds were transferred in accordance with these instructions. (Ragni Decl., Exh. D). A promissory note between Reale as lender and Hantges and Milanowski as borrowers was amended to reflect the $2.05 million increase in the amount owed to Reale. (Ragni Decl., Exh. E).

In September of 2006, Reale was served with notice of the Bar Date. (Ragni Decl., Exh. A). Still, Reale asserted no claim prior to the Bar Date.[1]

On September 17, 2007, Reale filed a proof of claim in the amount of $4,869,310.57 (the "Reale Proof of Claim"). Such filing occurred 10 months after the Bar Date and over six months after the Effective Date. A copy of the Purchase Agreement and related documents is attached to the Reale Proof of Claim.

The Reale Proof of Claim is devoid of any legal theory of liability against Diversified, and is similarly devoid of any factual basis for Reale to have any dispute or dissatisfaction whatsoever with Diversified. The stated basis for the claim, as set forth by checked box in section 1, is "Money loaned". However, there is not even a suggestion that Reale ever loaned any money to Diversified. Not only is there no apparent basis for the Reale Proof of Claim, but Diversified had no notice during the plan of reorganization formulation process that

---

[1] Reale was also a defendant in two adversary proceedings related to the Debtors' bankruptcy case beginning in December 2006.

Reale may have a creditor claim and was therefore unable to plan accordingly.

Concurrently with this Motion, Diversified has filed an objection to the Reale Proof of Claim on the grounds that the Reale's Proof of Claim is untimely, unenforceable and baseless under applicable law, which objection is incorporated herein by reference.

### C. McGimsey Proof of Claim

The Margaret B. McGimsey Trust, Bruce McGimsey, Jerry McGimsey, Sharon McGimsey and Johnny Clark (collectively "McGimsey") are Diversified Members. McGimsey filed proofs of interests in the aggregate amount of $592,825.45 plus interest, for their respective equity investments in Diversified. McGimsey also filed proofs of claim against Diversified (collectively, the "McGimsey Proof of Claim"), in the very same aggregate amount, based upon allegations of breach of contract and fraud relating to their purchases of the membership interests in Diversified.

On November 30, 2006, the Diversified Committee filed its Omnibus Objection to Claims on Equity Misfiled as Creditor Claims (the "Omnibus Objection")[2]. The Omnibus Objection contended that the McGimsey Proof of Claim was duplicative of the proofs of interests which McGimsey had filed, and contended that, in any event, the Proof of Claim should be subordinated pursuant to § 510(b). On February 14, 2007, the Court sustained the objections to the McGimsey Proof of Claim, disallowing the McGimsey Proof of Claim in its entirety as a creditor claim filed by holders of equity interests in Diversified. McGimsey filed a Notice of Appeal that same day (the "McGimsey Appeal").

On August 15, 2007, the Bankruptcy Appellate Panel of the Ninth Circuit (the "BAP") issued a memorandum decision in the McGimsey Appeal. (Ragni Decl., Exh. F). The BAP found that the McGimsey Proof of Claim could not be subordinated in the procedural context of a claim objection, but any subordination would instead have to be accomplished in the procedural context of an adversary proceeding. It thus reversed this Court's ruling on that basis.

In reversing, however, the BAP independently analyzed whether § 510(b) would subordinate the McGimsey claim once Diversified filed an adversary proceeding against

---

[2] Jerry McGimsey was a member of the Diversified Committee throughout its existence.

1  McGimsey. The BAP found that it was *clear* that § 510(b) would subordinate the McGimsey
2  claim to a level below the Diversified Members' interests.
3       On September 24, 2007, Diversified filed an adversary proceeding against
4  McGimsey, initiating Adv. No. 07-1165 LBR.

5  **III.   ARGUMENT**

6       Under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the
7  "Bankruptcy Rules") a claim may not be paid through the estate unless allowed. *See, e.g.*,
8  11 U.S.C. §§ 726 and 1129. A claim will not be allowed and paid unless scheduled by the debtor
9  as undisputed non-contingent, or liquidated, or a proof of claim is separately filed by the creditor
10 (or certain other parties in interest) and there is no objection to such claim or any objection is
11 overruled. *See, e.g.*, 11 U.S.C. §§ 1111(a) and 502; Fed. R. Bankr. P. 3003.
12      Pursuant to the Reserve Procedure adopted by the Plan, Diversified asks the Court to
13 establish a cash reserve different than the amounts Reale and McGimsey seek, namely at zero.
14 Under the Reserve Procedure, the Court estimates the disputed claims pursuant to § 502(c).
15 Section 502(c) provides estimation for purposes of allowance of a claim or interest for any
16 contingent or unliquidated claim, the fixing or liquidation of which, would unduly delay the
17 administration of the case or any right to payment arising from a right to an equitable remedy for
18 breach of performance. Estimation under § 502(c) serves two purposes: first, to avoid the need to
19 await the resolution of outside lawsuits to determine issues of liability and second, to promote a
20 fair distribution to creditors through a realistic assessment of uncertain claims. *See In re Enron*
21 *Corp.*, 2006 WL 538552 *3 (Bankr. S.D.N.Y. 2006). Because the Bankruptcy Code and the
22 Bankruptcy Rules are silent as to applicable procedures governing the estimation hearing, courts
23 are granted wide discretion, using whatever method is best suited to the circumstances. *See*
24 *Addison v. Langston* (*In re Brints Cotton Marketing, Inc.*), 737 F.2d 1338, 1341 (5th Cir. 1984);
25 *See also In re Thomson McKinnon Securities, Inc.*, 191 B.R. 976, 979 (Bankr. S.D.N.Y. 1996).
26      Two primary methods of estimation have been developed by courts confronting
27 unliquidated claims that were the subject of litigation. *See Thomson McKinnon*, 191 B.R. at 989-
28 990. Some courts adopt a probability approach that determines the value of the claim by whether

the claimant's factual assertions will be accepted and whether the claimant's legal arguments are correct as matter of governing law. *See In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771 (Bankr. S.D.N.Y. 1996). Alternatively, other courts adopt an all or nothing approach, estimating the claims' value at either zero or 100%, depending on the likelihood the claimant will succeed as a matter of law. *See Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 136-139 (3rd Cir. 1982).

Regardless of which § 502(c) method is applied, the Court should estimate both the Reale Proof of Claim and McGimsey Proof of Claim at zero. First, the Reale Proof of Claim is untimely, and even if the claim was not filed ten months late, the basis of the claim is completely erroneous. Second, as laid out by the BAP's memorandum decision, the McGimsey Proof of Claim will *clearly* be subordinated below the Diversified Members' interests.

A. **The Reale Proof of Claim is Untimely and Baseless Warranting no Cash Reserve**

1. **Reale's Proof of Claim is Untimely.**

Reale's claim is untimely and thus should be disallowed. Pursuant to Bankruptcy Rule 3003, a bankruptcy court *shall* fix and for cause shown may extend the time within which proofs of claim or interest may be filed. If the fixed date has passed, the court may enlarge the time to file a proof of claim in a chapter 11 case only upon a showing of "excusable neglect." Fed. R. Bankr. P. 9006(1); *In re Dix*, 95 B.R. 134, 137 (9th Cir. B.A.P. 1988). To determine excusable neglect, the court must evaluate "all relevant circumstances," including: (1) danger of prejudice to the debtor; (2) length of delay and its potential impact on proceedings; (3) the reason for the delay and (4) whether the movant acted in good faith. *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 385 (1993).

Reale has offered no excuse, let alone excusable neglect, for his failure to file a proof of claim by the Bar Date. Reale was well aware of the Bar Date, the Debtors' bankruptcy cases and the related adversary proceedings, but he chose to wait ten months past the Bar Date to assert a purported claim that matured four years prior to the filing of the Reale Proof of Claim. Diversified can only speculate as to why Reale waited so many months past the Bar Date to file his $4.9 million proof of claim. Diversified would be prejudiced if the Reale Proof of Claim

were allowed, as the Plan and the Disclosure Statement anticipated few unsecured claims, let alone a claim for $4.9 million. This unexpected claim would drastically affect the timing and amount of a distribution to the Diversified Members, who have not received a single distribution since the filing of bankruptcy cases almost 18 months ago, would undoubtedly have altered Diversified's strategy in negotiating and promoting a plan of reorganization, and would likely have affected the voting of the Diversified Members on the existing Plan of Reorganization. Lastly, prior to receiving the Reale Proof of Claim, Diversified planned to distribute $3 million to Diversified Members in October of 2007, but after reserving funds for the Reale Proof of Claim, Diversified lacks adequate capital to make any distribution. After examining the "relevant circumstances," this Court should not enlarge the time to file a proof of claim, and the Reale Proof of Claim should be disallowed as untimely.

### 2. Reale's Proof of Claim is a Fiction

The Reale Proof of Claim purports to present an unsecured claim of $4,869,310 for "money loaned." While the Reale Proof of Claim provides no explanation of the basis therefor, it appears to have its origin in the September 2003 transaction whereby Diversified purchased from Reale the loan secured by the Hotel Marquis and the 45 acre parcel.

The terms of Diversified's purchase of the subject loan were carefully described in the Purchase Agreement. Pursuant thereto, Reale assigned to Diversified the then-defaulted loan and all collateral rights that had been pledged in connection therewith. In return, Diversified agreed to pay $2.05 million to Reale.

Diversified discharged its purchase obligation in precisely the manner directed by Reale. Reale directed that $2.05 million of the sale proceeds were to be provided to USAIP and expressly acknowledged that he held a note "accounting for this disbursement." Diversified made the transfer as directed by Reale which was its only obligation under the Purchase Agreement.

That Diversified discharged all of its obligations under the Purchase Agreement is confirmed by the fact that Reale did, in fact, assign the loan and collateral to Diversified. Moreover, subsequent to the close of the loan purchase transaction, Reale did not complain that he had not been paid or that Diversified had somehow breached any obligation thereunder.

Indeed, not until almost four years after the close of the transaction, did Reale contend that Diversified had, in some unknown and unexplained manner, failed to perform. This delay not only makes the claim untimely but provides strong contemporaneous evidence that Reale conceded by his conduct that he had no basis for any claim.

In short, Reale's $4.9 million claim for "money loaned" is a complete fiction. It has no basis in fact and does not warrant a reserve of any amount.

### B. The McGimsey Claim will be Subordinated under § 510(b) Warranting No Cash Reserve

Even though the BAP's discussion of Bankruptcy Code § 510(b) was dicta, it provides clear analysis favoring the subordination of the McGimsey claim. As the decision notes, § 510(b) provides for subordination of claims, not disallowance of a claim. Disallowance and subordination of claims are different, "'Disallowance of a claim is a legal determination that the claim under consideration is not allowable by law. On the other hand, subordination of a claim presupposes that the claim is allowed but for equitable reasons must be subordinated to the other allowed claims." (Ragni Decl., Exh. F at 16 (citing *Ford v. Feldman* (*In re Fla. Bay Trading Co.*), 177 B.R. 374, 383 (Bankr. M.D. Fla. 1994)). The BAP memorandum decision notes that even though the effect of subordination under § 510(b), if established, may be functionally equivalent to disallowance, the Court cannot disallow the McGimsey claim under § 510(b).

The McGimsey claim will clearly be subordinated under § 510(b). Section 510(b) provides, in pertinent part, that:

> . . . a claim . . . for damages arising from the purchase or sale of . . . a security [of the debtor' . . . shall be subordinated to all claims or interests that are senior or equal the . . . interests represented by such security, except that if such security is common stock, such claims has the same priority as common stock.

11 U.S.C. § 510(b).

The language of the Bankruptcy Code is clear on its face. The McGimsey Proof of Claim arises from the purchase or sale of the Diversified membership interest; thus, the claim should be subordinated for purposes of distribution to all Diversified Members' interests.

Because the Diversified Members will not be receiving the full amounts of their claims, the subordinated McGimsey claim will receive no distribution. Thus, the Court should reserve nothing for the McGimsey Proof of Claim.

### IV. CONCLUSION

Pursuant to the Reserve Procedure set forth in the Plan, the Court should determine that no reserve is required for either the Reale Proof of Claim or McGimsey Proof of Claim, or alternatively, set a reserve in a nominal amount, thus permitting the $3 million distribution to Diversified members to go forward.

Dated this 2nd day of November, 2007.

SNELL & WILMER LLP

By: _____
Robert Kinas (Nevada Bar No. 6019)
Claire Y. Dossier (Nevada Bar No. 10030)
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Telephone: (702) 784-5200

Marc A. Levinson (California Bar No. 57613)
Jeffery D. Hermann (California Bar No. 904445)
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capital Mall, Suite 3000
Sacramento, CA 95814-4497

*Attorneys for USA Capital Diversified Trust Deed Fund, LLC*