# Exhibit A





FEB 0 3 2000

# ARTICLES OF ORGANIZATION

## FOR

## USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC
### (A Nevada Limited Liability Company)

The undersigned, to form a Nevada limited liability company under Chapter 86, of the Nevada Revised Statutes, certifies that:

### ARTICLE I

The name of the company shall be "USA Capital Diversified Trust Deed Fund, LLC."

### ARTICLE II

The name and address of the resident agent is:

Thomas Rondeau
4484 South Pecos Road
Las Vegas, Nevada 89121

### ARTICLE III

The organizer of the company is:

Thomas Rondeau
4484 South Pecos Road
Las Vegas, Nevada 89109

### ARTICLE IV

The company shall be managed by a manager. The name and address of the manager is:

USA Capital Realty Advisors
4484 South Pecos Road
Las Vegas, Nevada 89121.

1

The undersigned hereby executes these Articles of Organization for
USA Capital Diversified Trust Deed Fund, LLC.

_Thomas Rondeau_
_____
Thomas Rondeau

STATE OF NEVADA )
        ) ss.
COUNTY OF CLARK )

  This instrument was acknowledged before me on this 3ʳᵈ day of February,
2000 by Thomas Rondeau.



_Sheila R Delk_
_____
NOTARY PUBLIC
(My commission expires: 11/16/03 )

Certificate of acceptance of appointment as resident agent:  I, Thomas Rondeau, hereby
accept appointment as resident agent for the above-named limited liability company.

_Thomas Rondeau_
_____
Thomas Rondeau

2 - 3 - 0 0
_____
       Date

2



SECRETARY OF STATE

STATE OF NEVADA

## LIMITED-LIABILITY COMPANY CHARTER

I, DEAN HELLER, the Nevada Secretary of State, do hereby certify that **USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC** did on **FEBRUARY 3, 2000,** file in this office the Articles of Organization for a Limited-Liability Company, that said Articles are now on file and of record in the office of the Nevada Secretary of State, and further, that said Articles contain the provisions required by the laws governing Limited-Liability Companies in the State of Nevada.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office in Las Vegas, Nevada, on **February 3, 2000.**

Secretary of State

By

Certification Clerk



# Exhibit B

THE LIMITED LIABILITY COMPANY MEMBERSHIP INTEREST UNITS REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("THE ACT"). SUCH UNITS MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON AT ANY TIME WITHOUT SUCH REGISTRATION UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQUIRED. THERE ARE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFER, AS SET FORTH IN THIS OPERATING AGREEMENT. IN ADDITION, IN NO EVENT MAY UNITS BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON WHO IS NOT A RESIDENT OF NEVADA FOR A PERIOD OF NINE MONTHS FROM THE DATE OF THE LAST SALE THEREOF BY THE FUND.

## OPERATING AGREEMENT

### OF

### USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

THIS OPERATING AGREEMENT (this "Agreement") is made and entered into effective as of February 10, 2000, by and among USA Capital Realty Advisors, a Nevada corporation ("Manager"), USA Capital Realty Advisors, a Nevada corporation, as the initial Member, (the "Initial Member"), and such other persons as may be added as members pursuant to the terms hereof ("Members").

### ARTICLE I
### DEFINITIONS

Unless stated otherwise, the terms set forth in this Article I shall, for all purposes of this Agreement, have the meanings as defined herein:

1.01    "Affiliate(s)" shall mean, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting securities of such Person, (iii) any officer, director or general partner of such Person, or (iv) any Person who is an officer, director, general partner, trustee or holder of ten percent (10%) or more of the voting securities of any Person described in clauses (i) through (iii) of this sentence. "Affiliates" of the Manager include, without limitation, USA Commercial Mortgage Company (doing business as USA Capital), USA Commercial Real Estate Group, and other entities or funds sponsored by USA Commercial Mortgage Company.

1.02    "Agreement" shall mean this Operating Agreement, as the same may hereafter be amended from time to time.

1.03    "Articles" shall mean the Articles of Organization for the Company originally filed with the Nevada Secretary of State and as amended from time to time.

1.04    "Capital Account" shall mean, with respect to any Member, the Capital Account maintained for such Member in accordance with the following provisions:

(a)    To each Member's Capital Account there shall be credited such Member's capital contributions (as provided in Section 4.01), such Member's distributive share of Profits, and any items in the nature of income or gain (from unexpected adjustments, allocations or distributions) that are specially allocated to a Member and the amount of any Company liabilities that are assumed by such Member or that are secured by any Company property distributed to such Member.

(b)    To each Member's Capital Account there shall be debited the amount of cash or the fair market value of property distributed to the Member, such Member's distributive share of Losses, and any items in the nature of expenses or losses that are specially allocated to a Member and the amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company.

In the event any interest in the Company is transferred according to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

The provisions of this Section 1.04 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such regulations. In the event it is necessary to modify the manner in which the Capital Accounts are computed in order to comply with such regulations, the Manager shall make such modifications. The Manager shall adjust the amounts debited or credited to the Capital Accounts with respect to (i) any property contributed to the Company or distributed to any Member and (ii) any liabilities that are secured by such contributed or distributed property or that are assumed by the Company in the event the Manager shall determine that such adjustments are necessary or appropriate pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv). The Manager shall also make appropriate modifications if unanticipated events cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

1.05    "Cash Available for Distribution" shall mean an amount of cash equal to the excess of accrued income from operations and investment of, or the sale or refinancing or other disposition of, Company assets during any calendar month over the accrued operating expenses, depreciation and amortization of the Company during such month, including any adjustments for bad debt reserves or deductions (including reasonable reserves) as the Manager may deem appropriate.

1.06    "Code" shall mean the Internal Revenue Code of 1986, as amended, and corresponding portions of any subsequent federal revenue laws.

1.07    "Company" shall mean USA Capital Diversified Trust Deed Fund, LLC.

1.08    Intentionally Deleted.

1.09    "Economic Interest" shall mean the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit and similar items from the Company pursuant to this Agreement and the Act (as defined in Section 2.01), but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company, or any right to information concerning the business and affairs of the Company.

1.10    "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

1.11    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

1.12    "Fiscal Year" shall mean a calendar year ending December 31.

1.13    Intentionally Deleted.

1.14    "Members" shall mean the Initial Member and the purchasers of Units admitted to the Company as Members, and "Member" shall mean any one of the Members.

1.15    "Membership Interest" shall mean a Member's entire interest in the Company and all rights, benefits and privileges pertaining thereto.

1.16    "Minimum Percentage of Interests" shall mean one or more Percentage Interests of Members, or a specified group of Members, which taken together equal at least seventy-five percent (75%) of the aggregate of all Percentage Interests, or of all Percentage Interests held by such specified group of Members, on the first and sixteenth days of the current calendar month.

1.17    "Manager" shall mean USA Capital Realty Advisors, a Nevada corporation, or any person or entity substituted in place thereof pursuant to this Agreement.

1.18    "Net Assets Under Management" means the total Company's capital, including cash, notes (at book value), real estate owned (at book value), accounts receivable, advances made to protect loan security, and any other Company assets valued at fair market value, less Company liabilities.

1.19    "NRS" means the Nevada Revised Statutes, as amended or otherwise modified.

1.20    "Percentage Interest" shall mean the respective percentage interest of a Member determined as of the first and sixteenth days of each calendar month by dividing a Member's current Capital Account by the total outstanding Capital Accounts of all Members.

1.21    "Person" shall mean both natural and legal persons, including any unincorporated association or entity, as the context may require.

1.22    "Profits" and "Losses" shall mean, for each Fiscal Year or other period, the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with accounting principles employed under the method of accounting at the close of each Fiscal Year on the Company's information tax return filed for federal income tax purposes.

1.23   "Units" shall mean the Membership Interests in the Company issued to Members upon their admission to the Company, pursuant to the Company's Offering Circular dated March 1, 2000 and any supplements, amendments or restatements thereof ("Offering Circular") or pursuant to any subsequent private or public offering of Membership Interests in the Company.

## ARTICLE II
## ORGANIZATION OF THE COMPANY

2.01   Formation.  The parties hereto hereby agree to form a limited liability company, pursuant to the provisions of Chapter 86 of NRS, as the same may be amended from time to time (the "Act").

2.02   Name.  The name of the Company shall be "USA Capital Diversified Trust Deed Fund, LLC ."

2.03   Place of Business.  The principal place of business of this Company shall be located c/o USA Capital Realty Advisors, 4484 South Pecos Road, Las Vegas, Nevada 89121, until changed by designation of the Manager, with notice to all Members.

2.04   Purpose.  The primary purpose of this Company shall be to make or purchase entire or fractional interests in acquisition, development, construction and bridge, or interim, loans secured by first deeds of trust on undeveloped land and residential and commercial developments located in the United States, and to do any and all things relating or incidental thereto.  The Company intends to leverage its loan portfolio by obtaining a revolving credit facility from a third party lender.  This credit facility will be used primarily, but not exclusively, to fund new loan opportunities that arise prior to the maturity of then-existing Company loans. This credit facility would be repaid primarily from loan payoffs as then-existing Company loans mature.  The Company will assign portions or all of the Company's loan portfolio as security for this credit facility.  The total amount outstanding under this credit facility will not at any time exceed 25% of the Company's total loan portfolio. The Company will only obtain a credit facility if the terms and conditions of the credit facility are acceptable in the Manager's sole discretion.  The activities of the Company are described in greater detail in the Offering Circular.

2.05   Term.  The Company shall be deemed to be formed and its term shall commence as of the day the Articles are filed with the Nevada Secretary of State, and shall continue until terminated (i) by the Manager, in its sole discretion, (ii) pursuant to the provisions of this Agreement, or (iii) by operation of law.

2.06   Power of Attorney.  Each of the Members irrevocably constitutes and appoints the Manager, acting by and through any of its executive officers, as his true and lawful attorney-in-fact, with full power and authority for him, and in his name, place and stead, to execute, acknowledge, publish and file:

(a)   This Agreement, the Articles, and any amendments or cancellation thereof required under the laws of the State of Nevada;

(b)   Any certificates, instruments and documents, including, without limitation, fictitious business name statements, as may be required by, or may be appropriate under, the laws of any state or other jurisdiction in which the Company is doing or intends to be business; and

(c)    Any documents which may be required to effect the continuation of the Company, the admission of an additional or substituted Member, the amendment of this Agreement, or the dissolution and termination of the Company.

2.07    Nature of Power of Attorney.  The foregoing grant of authority is a special power of attorney coupled with an interest, is irrevocable, and shall survive the death of the undersigned or the delivery of an assignment by the undersigned of a Membership Interest, provided that where the assignee thereof has been approved by the Manager for admission to the Company as a substituted Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Manager to execute, acknowledge and file any instrument necessary to effect such substitution.

# ARTICLE III
# THE MANAGER

3.01    Management by the Manager, Generally.  Subject to any provisions of the Articles and this Agreement relating to actions required to be approved by the Members, if any, the business, property and affairs of the Company shall be managed and all powers of the Company shall be exercised by or under the direction of the Manager.  In addition to the general management authority provided under this Section and without in any way limiting the generality of the foregoing, the Manager shall have all necessary powers to manage and carry out the purposes, business and affairs of the Company, including, without limitation, the power to exercise and to authorize and direct the Company's or the Manager's officers (if any) to exercise, on behalf and in the name of the Company, all of the powers described in NRS 86.281, including, without limitation, the following powers and authority:

(a)    To expend Company funds in furtherance of the business of the Company and to acquire and deal with assets upon such terms as it deems advisable, from Affiliates and other persons;

(b)    To offer additional Units for sale from time to time to determine the terms of the offering of Units, including the price thereof and the amount of discounts allowable or commissions to be paid and the manner of complying with applicable law;

(c)    To employ, at the expense of the Company, such agents, employees, independent contractors, attorneys and accountants as the Manager deems reasonable and necessary for any Company purpose;

(d)    To effect necessary insurance for the proper protection of the Company, the Manager or Members;

(e)    To prosecute, defend, pay, collect, compromise, arbitrate, or otherwise adjust any and all claims or demands of or against the Company;

(f)    To bind the Company in all transactions involving the Company's property or business affairs, including underwriting loans, preparing and executing all loan documents, funding loans, purchasing and selling notes and extending or restructuring loans;

(g)    To enforce loan documents and to manage, lease, develop and sell property that the Company takes title to through foreclosure, deed in lieu of foreclosure or otherwise;

(h)     To amend this Agreement with respect to the matters described in Subsections 12.04(a) through (g) below;

(i)     To determine the accounting method or methods to be used by the Company, which methods may be changed at any time by written notice to all Members;

(j)     To open accounts in the name of the Company in one or more banks, savings and loan associations or other financial institutions or money market funds, and to deposit Company funds therein, subject to withdrawal upon the signature of the Manager or any person authorized by the Manager;

(k)     To sell from time to time all or any portion of the Company's assets, or any undivided or beneficial interests therein, all upon such terms and conditions as the Manager shall deem appropriate in its sole business judgment; and

(l)     To seek and obtain revolving or other credit facilities from third party lenders to allow the Company to leverage the Company's loan portfolio, including, without limitation, to negotiate and enter into loan agreements, security and pledge agreements, and other documents required by a third party lender as a condition to providing the Company with such a credit facility;

(m)     To retain such advisors and professionals, execute all instruments and documents and do all other things necessary or appropriate in the judgment of the Manager to effectuate any of the foregoing.

3.02    Fiduciary Duty.  The Manager shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Company, and the Manager shall not employ such funds or assets in any manner except for the exclusive benefit of the Company.

3.03    Allocation of Time to Company Business.  The Manager shall not be required to devote full time to the affairs of the Company but shall devote whatever time, effort and skill the Manager may deem to be reasonably necessary for the conduct of the Company's business.  The Manager may engage in any other businesses including businesses related to or competitive with the Company.

3.04    Exculpation and Indemnification.  Neither the Manager, nor its shareholders, officers, directors, employees or agents ("Manager Parties"), shall have any liability whatsoever to the Company or to any Member for any loss suffered by the Company or any Member which arises out of any action or inaction of the Manager or any Manager Parties, so long as the Manager or such other Person, in good faith, determined that such course of conduct was in the best interests of the Company and did not constitute intentional misconduct, fraud, or knowing violation of the law.  The Manager, the Manager Parties, and the employees and agents of the Company shall be entitled to be indemnified and held harmless by the Company, at the expense of the Company, against any loss, expense, claim or liability (including reasonable attorneys' fees, which shall be paid as incurred) resulting from the assertion of any claim or legal proceeding relating to the performance or nonperformance of any act concerning the activities of the Company, including claims or legal proceedings brought by a third party or by Members, on their own behalf or as a Company derivative suit, so long as the party to be indemnified determined in good faith that such course was in the best interests of the Company and did not constitute intentional misconduct, fraud, or knowing violation of the law; provided, that any such indemnity shall be paid solely from the assets of the Company.  Nothing herein shall prohibit the Company from paying in whole or in part the premiums or other charge for any type of indemnity insurance in which the Manager, Manager Parties or other agents or employees of the

Company are indemnified or insured against liability or loss arising out of their actual or asserted misfeasance or nonfeasance in the performance of their duties or out of any actual or asserted wrongful act against, or by, the Company including, but not limited to, judgments, fines, settlements and expenses incurred in the defense of actions, proceedings and appeals therefrom. The Company shall pay the expenses of the Manager, Manager Parties and other agents and employees of the Company incurred in defending a civil or criminal action, suit or proceeding as they are incurred and in advance of the final disposition of the action, suit or proceeding, upon receipt of an undertaking, as required in NRS 86.441 or any successor statute.

3.05    Capital Contribution of the Manager.    The Manager shall contribute the sum of Fifty Thousand Dollars ($50,000) to the capital of the Company as the initial Member, and its Capital Account shall be credited in such amount.

3.06    Removal of the Manager; Election of Successor Manager.    The Manager may be removed upon the following terms and conditions:

(a)    The Manager may be removed by the written consent of a Minimum Percentage of Interests. Members may exercise such right by presenting to the Manager a written notice, which shall be executed by Members representing a Minimum Percentage of Interests, with their signatures acknowledged, to the effect that the Manager is removed effective on the date set forth in such notice.

(b)    Concurrently with delivery of such notice or within ninety (90) days thereafter by written notice similarly given, a Minimum Percentage of Interests may also designate a successor Manager.

(c)    Substitution of a new Manager, if any, shall be effective upon written acceptance of the duties and responsibilities of a Manager by the new Manager. Upon effective substitution of a new Manager, this Agreement shall remain in full force and effect except for the change in the Manager and the business of the Company shall be continued by the new Manager.

3.07    Retirement by Manager.    The Manager may withdraw ("retire") from the Company upon not less than six (6) months written notice of same to the Members. In the event that the Manager retires, the Members shall elect a successor manager by a Minimum Percentage of Interests.

3.08    Accrued Compensation.    If the Manager should be removed as provided in Section 3.06 or should retire as provided in Section 3.07, it shall be entitled to all fees and other compensation earned by it through the effective date of removal or retirement.

## ARTICLE IV
## THE MEMBERS - CAPITAL CONTRIBUTIONS

4.01    Capital Contributions of Members.    The Members shall contribute to the capital of the Company an amount equal to Twenty-Five Thousand Dollars ($25,000) for each Unit subscribed for by each such Member; provided, however, that the Initial Member shall contribute the sum of Fifty Thousand Dollars ($50,000) to the capital of the Company and its Capital Account shall be credited in such amount. The total initial capitalization of the Company shall be a maximum of $100,000,000 and a minimum of $1,000,000; provided, however, the Manager reserves the right to issue additional Units (in excess of $100,000,000) from time to time in the future without approval of the Members. The Company shall not begin doing business until the minimum capitalization of

$1,000,000 is reached. Subscription funds will be placed in an escrow account with an independent title company or a federally or state-insured bank until this minimum capitalization is reached. Until the Company begins doing business, the capital contributions from Members will be invested in short-term certificates of deposit, money market funds or other liquid asset accounts. The capital contributions of Members shall be made in cash, except that Members may, with the consent of the Manager, contribute entire or fractional interests in preexisting loans on the terms and conditions described in Section 4.08 below. Notwithstanding any provision of this Agreement to the contrary, at any time after the minimum of $1,000,000 is received by the Company, the Initial Member may request that the Company redeem its initial Membership Interest for an amount equal to the positive balance in its Capital Account with respect to such initial Membership Interest, which redemption shall be consummated within thirty (30) days after the redemption request is received by the Company.

4.02    Admission to Company; Subscription Account. To purchase Units an investor must deliver to the Company a Subscription Agreement in the form attached to this Agreement as Exhibit A, together with his or her cash contribution or the appropriate transfer documents, as required by the Manager, if the investor is contributing a preexisting loan. Cash subscription funds received by the Manager shall be held by it in a non-interest bearing account until being transferred to the Company. To facilitate the Company's record keeping, investors will only be admitted into the Company on the first and sixteenth day of each month. Generally, subscription funds shall be considered for transfer to the Company on a first-in, first-out basis; however, the Manager reserves the right to admit non-ERISA plan investors before ERISA plan investors in order for the Company to remain exempt from the application of Title 29 of the Code of Federal Regulations Part 2510 relating to the definition of plan assets for purposes of ERISA (the "ERISA Plan Asset Regulations.").

4.03    Election to Compound Earnings or Receive Cash Distributions. Upon subscription for Units, a subscribing Person must elect whether to receive monthly cash distributions from the Company or to allow his or her earnings to compound, which election is irrevocable by the subscribing Person until the first anniversary of admission. Commencing on the first anniversary after a Member's admission to the Company and on each anniversary thereafter (provided that the Member has given the Manager at least 30 days' prior written notice of its intentions), such Member may elect to either receive cash distributions (or if the Member previously had elected to receive cash distributions, such Member may elect not to receive cash distributions and to compound earnings provided that there is on file with the Nevada Securities Division an effective registration statement for the Units, and the Units are registered under the Securities Act of 1933, as amended (the "Securities Act"), or are exempt from registration, and provided further that such Member shall have received the most current version of the Company's Offering Circular). Notwithstanding the foregoing, the Manager at any time shall have the right to immediately commence making monthly distributions to one or more ERISA plan Members who previously had elected to compound earnings if necessary in order for the Company to remain exempt from the application of the ERISA Plan Asset Regulations. Income allocable to Members who elect to compound their earnings will be retained by the Company for purposes of making or investing in further mortgage loans or for other proper Company purposes, and the amount of such allocable income will be credited to their Capital Accounts.

4.04    No Participation in Management. Except as expressly provided herein, the Members shall take no part in the conduct or control of the Company business and shall have no right or authority to act for or bind the Company. Economic Interest Owners shall have no voting rights whatsoever.

4.05    Rights and Powers of Members. Members shall have the right to vote upon the following matters, and no others, provided that a Minimum Percentage of Interests approve such matters:

(a)    dissolution and termination of the Company;

(b)    amendment to this Agreement, provided that the Manager has also approved such amendment and provided, further, that this Subsection (b) shall not apply to the matters set forth in Section 12.04 below, with respect to which matters the Manager alone may amend this Agreement without the vote of the Members;

(c)    merger or consolidation of the Company pursuant to Section 9.03 below; and

(d)    Removal of the Manager and election of a successor Manager, in the manner and subject to the conditions described in Sections 3.06 and 3.07 above.

4.06    Meetings.  The Company will hold annual meetings for all Members on a date established by the Manager.  The Manager shall provide each Member with at least 30 days' prior written notice of each annual meeting, which shall be held at such date, time and location as shall be specified in the notice.  The Manager reserves the right to call special meetings of the Members on at least 30 days' prior written notice, which notice shall state, in addition to the date, time and location of the meeting, the general purpose(s) of the special meeting.  A majority of the Membership Interests shall constitute a quorum at Company meetings. Members may vote in person or by proxy with respect to those matters in which Members have, under this Agreement, approval rights.

4.07    Limited Liability of Members.  Units are non-assessable, and no Member shall be personally liable for any of the expenses, liabilities, or obligations of the Company or for any of the losses thereof beyond the amount of such Member's agreed upon Capital Contribution to the Company and such Member's share of any undistributed net income and gains of the Company; provided, that each Member shall remain liable to return to the Company any distributions that such Member is obligated to return pursuant to the Act; and provided further, that upon dissolution and termination of the Company each Member shall be liable to pay to the Company the amount of any deficit remaining in such Member's Capital Account, if and to the extent required under Subsection 9.02(e) below.

4.08    Contributions of Existing Loans.  At the discretion of the Manager, Members may be allowed to contribute to the Company in exchange for Units entire or fractional interests in preexisting loans that are secured by first deeds of trust and that otherwise satisfy the then-applicable investment guidelines of the Company.  Any such loans that are contributed to the Company shall not be in default at the time of contribution, shall satisfy the lending guidelines described in the Offering Circular and must have been originated by the Manager or its Affiliates (including, without limitation, USA Commercial Mortgage Company).  For purposes of crediting a contributing Member's Capital Account and for determining the number of Units that will be issued to such contributing Member, the fair market value of any preexisting loan (or interest therein) contributed to the Company shall be deemed equal to the then-outstanding principal balance of the loan, together with any accrued but unpaid interest (the "Loan Balance") (or a proportionate share of the Loan Balance with respect to the contribution of a fractional loan interest).

4.09    Fractional Units.  A Member may purchase fractional Units only under the following circumstances:

(a)    When a Member has elected and is allowed to compound earnings as provided in Section 4.03, then such compounded earnings will be applied to purchase a fractional Unit whose value shall

be determined by dividing the amount of compounded earnings by 25,000. For example, if a Member has $1,000 of earnings in a month, that Member has elected to compound his or her earnings, and the conditions set forth in Section 4.03 above have been satisfied, then the Member will be deemed to have purchased in the following month 1/25th of a Unit ($1,000 divided by $25,000 per each Unit).

(b)    When a Member has, with the prior written approval of the Manager, contributed entire or fractional interests in preexisting loans that are secured by first deeds of trust in exchange for Units as provided in Section 4.08. The value of the fractional Unit(s) being purchased by such Member shall be equal to the Loan Balance (or a proportionate share of the Loan Balance with respect to the contribution of a fractional loan interest) divided by 25,000. For example, if a Member has, with the prior written approval of the Manager, contributed a loan with a par value (i.e., principal plus accrued interest) of $710,000, then the Member will be deemed to have purchased 28.4 Units ($710,000 divided by $25,000 per Unit).

## ARTICLE V
## PROFITS AND LOSSES: CASH DISTRIBUTIONS

5.01    Losses.  Losses shall be allocated among the Members as of the last day of each calendar month in accordance with their respective Percentage Interests; provided, however, that if any Membership Interest is purchased, transferred, increased or decreased prior to the end of such calendar month, then Losses for such month shall be allocated among all individuals and entities who were Members during such month (assuming a 30 day month) and based on a prorated portion of each Member's Percentage Interest (i.e., based on the number of days during such month that the individual or entity was a Member, assuming a 30 day month).

5.02    Profits.  Profits shall be allocated among the Members as of the last day of each calendar month during any Fiscal Year in the following order of priority:

(a)    First, to all of the Members in the same proportions as the Losses, if any, that were previously allocated to them pursuant to Section 5.01 above, until all such Losses have been recouped;

(b)    Thereafter, to the Members in accordance with their respective Percentage Interests; provided, however, that if any Membership Interest is purchased, transferred, increased or decreased prior to the end of such calendar month, then profits shall be allocated among all individuals and entities who were Members during such month (assuming a 30 day month) based on a prorated portion of each Member's Percentage Interest (i.e., based on the number of days during such month that the individual or entity was a Member, assuming a 30 day month).

5.03    Cash Available for Distribution.  Cash Available for Distribution shall be distributed only to those Members who elect in writing to receive such distributions during the term of the Company in accordance with Section 4.03. Cash Available for Distribution distributable to those Members who elected to receive cash distributions as aforesaid shall be distributed to them in cash as soon as practicable after the end of each calendar month; and Cash Available for Distribution allocable to the remaining Members who have elected to compound, or reinvest, distributions (subject to the conditions imposed in Section 4.03 above) shall be retained by the Company and credited to their respective Capital Accounts as of the first day of the succeeding calendar month. Total Cash Available for Distribution as of the close of business on the last day of each calendar month during any Fiscal Year shall be allocated among and promptly distributed or credited to the Members in accordance with their respective Percentage Interests; provided, however, that if any Percentage Interest increases or decreases prior to the end

of such calendar month, then total Cash Available for Distribution shall be allocated among all individuals and entities who were Members during such month (assuming a 30 day month) and who elected to receive distributions, based on a prorated portion of each Member's Percentage Interest (i.e., based on the number of days during such month that the individual or entity was a Member, assuming a 30 day month).

5.04    Cash Distributions Upon Dissolution.  Upon dissolution and termination of the Company, all Cash Available for Distribution shall thereafter be distributed to Members in accordance with the provisions of Article IX below.

5.05    Special Allocation Rules.

(a)    For purposes of this Agreement, a loss or allocation (or item thereof) is attributable to non-recourse debt which is secured by Company property to the extent of the excess of the outstanding principal balance of such debt (excluding any portion of such principal balance which would not be treated as an amount realized under Code Section 1001 and Paragraph (a) of Code Section 1.001-2 if such debt were foreclosed upon) over the adjusted basis of such property. This excess is herein defined as "Minimum Gain" (whether taxable as capital gain or as ordinary income) as more explicitly set forth in Treasury Regulation 1.704-1(b)(4)(iv)(c).  Notwithstanding any other provision of Article V, the allocation of loss or deduction (or item thereof) attributable to non-recourse debt which is secured by Company property will be allowed only to the extent that such allocation does not cause the sum of the deficit Capital Account balances of the Members receiving such allocations to exceed the minimum gain determined at the end of the Company taxable year to which the allocations relate.  The balance of such losses shall be allocated to the Manager.  Any Member with a deficit Capital Account balance resulting in whole or in part from allocations of loss or deduction (or item thereof) attributable to non-recourse debt which is secured by Company property shall, to the extent possible, be allocated income or gain (or item thereof) in an amount not less than the minimum gain at a time no later than the time at which the minimum gain is reduced below the sum of such deficit capital account balances.  This Section is intended and shall be interpreted to comply with the requirements of Treasury Regulation Section 1.704-1(b)(4)(iv)(e).

(b)    In the event any Member receives any adjustments, allocations or distributions, not covered by Section 5.05(a), so as to result in a deficit Capital Account, items of Company income and gain shall be specially allocated to such Members in an amount and manner sufficient to eliminate the deficit balances in their Capital Accounts created by such adjustments, allocations or distributions as quickly as possible.  This Section shall operate as a qualified income offset as utilized in Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

# ARTICLE VI
## ACCOUNTING AND REPORTS

6.01    Books and Records.  The Manager shall cause the Company to keep the following books and records, which shall be maintained at the Company's principal place of business and shall be available for inspection and copying by, and at the sole expense of, the Members, or their duly authorized representatives, during reasonable business hours and upon at least five (5) business days' prior written notice to the Manager:

(a)    A current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner;

(b)     A current list of the full name and business or residence address of each Manager;

(c)     A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

(d)     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(e)     A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

(f)     Copies of the financial statements of the Company, if any, for the six most recent Fiscal Years; and

(g)     The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four Fiscal Years.

6.02    <u>Financial Reports and Returns</u>.  The Manager shall cause to be prepared and distributed to each Member the following:

(a)     Within ninety (90) days after the end of each Fiscal Year of the Company, an annual report which shall contain a balance sheet of the Company as of the end of each Fiscal Year, an income statement and a report of the activities of the Company during such Fiscal Year, including a statement of changes in financial position for that Fiscal Year, which financial statements shall be audited by an independent certified public accounting firm in accordance with generally accepted auditing standards.

(b)     Within ninety (90) days after the end of each Fiscal Year of the Company, such other information which the Members may need for preparation of their federal income tax returns.

6.03    <u>Tax Matters Partner</u>.  In the event the Company is subject to administrative or judicial proceedings for the assessment or collection of deficiencies for federal taxes or for the refund of overpayments of federal taxes arising out of a Member's distributive share of profits, the Manager shall act as the Tax Matters Partner ("TMP") and shall have all the powers and duties assigned to the TMP under Sections 6221 through 6232 of the Code and the Treasury Regulations thereunder.  The Members agree to perform all acts necessary under Section 6231 of the Code and Treasury Regulations thereunder to designate the Manager as the TMP.

# ARTICLE VII
## TRANSFER OF COMPANY INTERESTS

7.01    <u>Restrictions on Transfers</u>.  Notwithstanding any provision to the contrary contained herein, the following restrictions shall apply to any and all proposed sales, assignments or transfers of Membership Interests and Economic Interests, and any proposed sale, assignment or transfer in violation of same shall be void <u>ab initio</u>:

(a)     No Member shall make any transfer or assignment of all or any part of its Membership Interest without the prior written consent of the Manager, which consent may be withheld in the sole discretion of the Manager.

(b)    No Member shall make any transfer or assignment of all or any part of its Economic Interest without the prior written consent of the Manager, which consent shall not be unreasonably withheld.

(c)    No Member shall be entitled to sell, assign, transfer or convey his Membership Interest or Economic Interest to any person or entity other than a bona fide resident of the State of Nevada for a period of nine months after the termination of the offering of Units pursuant to which such Membership Interest (or the Membership Interest associated with such Economic Interest) was acquired.

(d)    Instruments evidencing a Membership Interest or Economic Interest shall bear and be subject to a legend condition in substantially the following form:

> THE UNITS REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("THE ACT"). SUCH UNITS MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON AT ANY TIME WITHOUT REGISTRATION UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS, OR AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQUIRED. THERE ARE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFER, AS SET FORTH IN THIS OPERATING AGREEMENT. IN ADDITION, IN NO EVENT MAY UNITS BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON WHO IS NOT A RESIDENT OF NEVADA FOR A PERIOD OF NINE MONTHS FROM THE DATE OF THE LAST SALE THEREOF BY THE FUND.

7.02    Transfer of Membership Interests and Substitution.  No assignee of the whole or any portion of a Membership Interest in the Company shall have the right to become a substituted Member in place of his assignor unless the following conditions are first met:

(a)    The assignor shall designate such intention in the instrument of assignment;

(b)    The written consent of the Manager to such substitution shall be obtained, which consent may be withheld in the sole discretion of the Manager and which, in any event, shall not be given if the Manager determines that such sale or transfer may jeopardize the status of the original sale of said interest pursuant to the non-public and intrastate offering exemptions from registration under the Securities Act;

(c)    The instrument of assignment shall be in a form and substance satisfactory to the Manager;

(d)    The assignor and assignee named therein shall execute and acknowledge such other instruments as the Manager may deem necessary to effectuate such substitution, including but not limited to a power of attorney with provisions more fully described in this Agreement;

(e)    The assignee shall accept, adopt and approve in writing all of the terms and provisions of this Agreement as the same may have been amended;

(f)    Such assignee shall pay or, at the election of the Manager, obligate himself to pay all reasonable expenses (including reasonable attorneys' fees) connected with such substitution; and

(g)    The Company has received, if requested, a legal opinion in form and substance satisfactory to the Manager that such transfer will not violate the registration provisions of the 1933 Act, which opinion shall be furnished at the Member's expense.

Any assignment permitted under this Section 7.02 shall become effective as of the end of business on the last day of the month in which the conditions described in this Section 7.02 have been satisfied.

7.03    Repurchase of Membership Rights Upon Transfer of Economic Interest.    Upon and contemporaneously with any transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with the Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company, for a purchase price equal to $1.00 per Unit of Membership Interest, the Economic Interest of which has been transferred, all remaining rights and interests retained by the Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest.  Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member.  Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member is not unreasonable under the circumstances existing as of the date hereof.

For example, if a Member who holds twenty (20) Units of Membership Interest assigns the Economic Interests pertaining to five (5) Units in accordance with this Article VII, and if the transferee is not admitted as a substituted Member for any reason, such transferee shall hold the five (5) Units of Economic Interest so transferred as an Economic Interest owner and the transferring Member shall sell the balance of the rights associated with the Membership Interest transferred to the Company for an amount equal to five dollars ($5.00) (i.e., $1.00 per Unit of Membership Interest the Economic Interest of which has been transferred).  The transferring Member shall retain fifteen (15) Units of Membership Interest.

## ARTICLE VIII
## WITHDRAWAL FROM COMPANY

8.01    Withdrawal by Members.  No Member shall have the right to withdraw from the Company or otherwise obtain the return of all or any portion of his Capital Account balance for a period of one (1) year after the date of the initial purchase of Units and admission to the Company of such Member or its predecessor in interest (the "Holding Period"), except for monthly distributions of Cash Available for Distribution, if any, to which such Member may be entitled pursuant to Section 5.03 above.  After the expiration of said Holding Period, a Member may withdraw, or partially withdraw, from the Company upon the following terms:

(a)    On the first anniversary of a Member's admission to the Company and on each anniversary thereafter, a Member may withdraw all or part of such Member's Capital Account from the Company by providing written notice of such Member's election to withdraw at least thirty (30) days but not sooner than sixty (60) days prior to each anniversary of such Member's admission to the Company.  Within sixty (60) days following such

anniversary, the Manager will, to the extent of available Company cash flow, commence to return the Member's capital account. Members seeking to withdraw their capital from the Company must do so by submitting to the Manager a Withdrawal Notice in the form attached hereto as Exhibit B.

(b)    Commencing with the end of the calendar month in which such Withdrawal Notice is given, any Cash Available for Distribution allocable to the Capital Account (or portion thereof) being withdrawn shall also be distributed in cash to the withdrawing Member in the manner provided in Section 5.03 above.

(c)    Notwithstanding any provision herein to the contrary, in certain situations, as discussed herein, the Company may give priority to the return of the Capital Accounts of certain Members and may return such Capital Accounts prior to the expiration of the Holding Period, as follows:

(i)    First, upon the death of the sole beneficiary of a corporate pension or profit-sharing plan, Individual Retirement Account or other employee benefit plan subject to ERISA or upon the death of a Member (the "Deceased Member"), the return of such Deceased Member's Capital Account shall have priority over the return of other withdrawing Members' and may be returned prior to the expiration of the Holding Period in the Manager's sole and absolute discretion. If the administrator, executor or other personal representative of the estate of the Deceased Member gives the Manager a Withdrawal Notice, the Company shall, within 30 days thereafter, commence to return the entire Capital Account of the Deceased Member from Cash Available for Distribution.

(ii)    .Second, the Manager, at its sole and absolute discretion, shall have the right, at any given time to immediately return all or a portion of the Capital Account of one or more ERISA plan investors (the "ERISA Plan Investors") in order to ensure that the Company remains exempt from the ERISA Plan Asset Regulations. The return of such ERISA Plan Investors' Capital Accounts shall have priority over the return of all other withdrawing Members' Capital Accounts, including those of Deceased Members, and may be returned prior to the expiration of the Holding Period.

(d)    The withdrawal and return of a Member's Capital Account is subject to the following limitations:

(i)    The Company will not establish a reserve from which to fund withdrawals and, accordingly, the Company's capacity to return a Member's Capital Account is restricted to the availability of Company cash flow in any given calendar quarter. The Company is not required to liquidate any Company loans in order to fund withdrawals. For this purpose, cash flow is considered to be available only after all current Company expenses have been paid (including compensation to the Manager and its Affiliates) and adequate provision has been made for maintaining adequate reserves and for the payment of all monthly cash distributions on a pro rata basis which must be paid to Members who elected to receive such distributions upon subscription for Units.

(ii)    At the sole and absolute discretion of the Manager, the Company shall first apply available cash flow to return all or a portion of the Capital Accounts of ERISA Plan Investors.

(iii)    The Company shall then apply available cash flow to return the Capital Accounts of Deceased Members.

(iv)    If current cash flow in any given calendar quarter is inadequate to return a Member's Capital Account, the Company shall not be required to liquidate any mortgage loans prior to maturity for the purpose of liquidating the Capital Account of a withdrawing Member, but shall be required to pay whatever cash flow is available to withdrawing Members in order of withdrawal requests received.  If Withdrawal Notices in excess of these limitations are received by the Manager, the priority of distributions among Members (but not Deceased Members and ERISA Plan Investors, who shall have first priority) shall be determined by the chronological order in which their respective Withdrawal Notices are received.

(v)    If a Member has purchased Units over time, then such Member shall not be entitled to withdraw any portion of its Capital Account that relates to Units which have not been held by such Member for at least one year.  For example, if a Member purchased two Units at the start of Year 1 and then two more Units at the start of Year 2, then such Member shall be entitled to withdraw $50,000 of capital in Year 2 (which relates to such Member's purchase of its initial two Units), but cannot withdraw the balance of its capital (which relates to such Member's purchase of the second two Units) until Year 3.  The restriction described in this Subsection 8.01(d)(v) shall not apply to the purchase of Units that are made from reinvesting distributions.

(vi)    If a proposed withdrawal would cause a Member's Capital Account to fall below $25,000, then the Member must withdraw its entire capital account from the Company.

(e)    Notwithstanding the foregoing, during the liquidation period the Capital Account of a withdrawing Member shall remain subject to adjustment as described in Section 1.04 above.  Any reduction in said Capital Account by reason of an allocation of Losses, if any, shall reduce all subsequent liquidation payments proportionately.  In no event shall any Member receive cash distributions upon withdrawal from the Company if the effect of such distribution would be to create a deficit in such Member's Capital Account.

(f)    If the Company dissolves pursuant to Section 9.01 below at a time when any Members who have previously given Withdrawal Notices have not yet received the return of their respective full Capital Accounts, then in such event the winding up provisions of Section 9.02 below shall apply and the distribution provisions of Subsection 9.02(c) shall be controlling, such that liquidation payments shall thereafter be made proportionately to all Members pursuant to Subsection 9.02(c) and no further payments shall be made pursuant to this Article VIII.

**ARTICLE IX**
**DISSOLUTION OF THE COMPANY;**
**<u>MERGER OF THE COMPANY</u>**

9.01    <u>Events Causing Dissolution</u>.  The Company shall dissolve upon occurrence of the earlier of the following events:

(a)    The election of the Manager, in its sole discretion, to dissolve the Company; or

(b)    The affirmative vote of a Minimum Percentage of Interests; or

(c)    The failure of a Minimum Percentage of Interests to elect a new Manager within (i) 90 days after the removal of the existing Manager as provided in Section 3.06(b), or (ii) six months after the retirement of the existing Manager as provided in Section 3.07.

9.02    Winding Up.  Upon the occurrence of an event of dissolution, the Company shall not immediately be terminated, but shall continue until its affairs have been wound up.  Upon dissolution of the Company, unless the business of the Company is continued as provided above, the Manager will wind up the Company's affairs as follows:

(a)    No new loans shall be made or purchased.

(b)    Except as may be agreed upon by the Manager and a Minimum Percentage of Interests in connection with a merger or consolidation described in Section 9.03, the Manager shall liquidate the assets of the Company as promptly as is consistent with recovering the fair market value thereof, either by sale to third parties (including the Manager or Affiliates) or by servicing the Company's outstanding loans in accordance with their terms; provided, however, the Manager shall liquidate all Company assets for the best price reasonably obtainable in order to completely wind up the Company's affairs within five (5) years after the date of dissolution.

(c)    Except as may be agreed upon by the Manager and a Minimum Percentage of Interests in connection with a merger or consolidation described in Section 9.03, all sums of cash held by the Company as of the date of dissolution (including liquid assets which shall be converted to cash), together with all sums of cash received by the Company during the winding up process from any source whatsoever, shall be applied and promptly distributed to the Members in proportion to the positive balances in their respective outstanding Capital Accounts, but only after all the Company's debts have been paid or otherwise adequately provided for.

(d)    Upon the completion of the liquidation of the Company and distribution of liquidation proceeds, the Manager shall cause to be filed a Certificate of Dissolution as required by the Act and shall furnish to each of the Members a statement setting forth the receipts and disbursements of the Company during such liquidation, the amount of proceeds from such liquidation distributed and the amount of proceeds paid or distributed to Members.

9.03    Merger or Consolidation of the Company.  The Company may be merged or consolidated with one or more other entities, which may be Affiliates of the Company, provided that the principal terms of any such merger or consolidation are first approved by the Manager and by the affirmative vote of a Minimum Percentage of Interests.  In any such merger or consolidation, the Company may be either a disappearing or surviving entity.

## ARTICLE X
## TRANSACTIONS BETWEEN THE COMPANY,
## THE MANAGER AND AFFILIATES

10.01    Loan Brokerage Commission.  USA Commercial Mortgage Company, an Affiliate of the Company, will receive a brokerage or origination fee for loans made by the Company in an amount determined on a case-by-case basis, provided that the loan brokerage or origination fees are anticipated to average between two percent (2%) and four percent (4%) per annum of the principal amount of each loan, but may be lower depending on market conditions.  Loan brokerage commissions may be paid to USA Commercial Mortgage Company when the loan is funded or may be paid over the life of the loan.  Loan brokerage commissions are underwritten in, and thus will be paid from, Company loans.

10.02  <u>Loan Servicing and Asset Management Fee</u>.  The Manager may act as servicing agent with respect to all Company loans and may manage all of the Company's assets.  In consideration for such collection and management efforts, the Manager shall be entitled to receive a monthly loan servicing and asset management fee equal to one-twelfth (1/12th) of one percent (0.16666%) of the Net Assets Under Management as of the last day of each calendar month, payable on or before the fifteenth (15th) day of the following calendar month.

10.03  <u>Sale of Real Estate to the Manager or its Affiliates</u>.  In the event the Company becomes the owner of any real property by foreclosure on a Company loan, the Company may sell such property to the Manager or an Affiliate of the Manager provided the net purchase price must be not less than any of the following: (i) the amount of any third-party offer received, if any; (ii) the independently appraised value of such property at the time of sale; and (iii) the total amount of the Company's "investment" in the property.  The Company's investment includes, without limitation, the following: the unpaid principal amount of the Company's loan, unpaid interest accrued to the date of foreclosure, expenditures made to protect the Company's interest in the property such as payments for insurance and taxes, costs of foreclosure (including attorneys' fees actually incurred to prosecute the foreclosure or to obtain relief from stays in bankruptcy), and any advances made by the Manager, if any, on behalf of the Company for any of the foregoing.

A portion of the purchase price may be paid by the Affiliate of the Manager executing a promissory note in favor of the Company, secured by a deed of trust on the property being sold.  The note may be in the amount of the entire purchase price of the property paid by the Affiliate or some portion thereof, and the note will otherwise contain terms and conditions comparable to those that would be contained in notes executed by third parties.

(c)  If the Company acquires property through foreclosure, USA Commercial Real Estate Group or some other Affiliate of the Manager may, in some circumstances, serve as the listing broker in the sale of such property.  USA Commercial Real Estate Group or such Affiliate would earn a competitive brokerage commission.

10.04  <u>Legal Fees</u>.  Documentation of some of the Company's loans will be prepared by the general counsel for USA Commercial Mortgage Company, which is the sole shareholder of the Manager.  These legal fees will be paid by the borrower under such loans.

10.05  <u>Sale of Loans to Manager or Affiliates</u>.  The Company may sell existing loans to the Manager or its Affiliates, but only so long as the Company receives net sales proceeds from such sale in an amount equal to the total unpaid balance of principal, accrued interest and other charges owing under such loan.  Notwithstanding the foregoing, the Manager shall be under no obligation to purchase any loans from the Company or to guarantee any payments under any Company loan.

10.06  <u>Purchase of Loans from Manager or Affiliates</u>.  The Company may purchase existing loans from the Manager or its Affiliates, provided that the following conditions are met:

(a)  At the time of purchase the borrower shall not be default under the loan; and

(b)  No brokerage commissions or other compensation by way of premiums or discounts shall be paid to the Manager or its Affiliates by any person by reason of such purchase (except loan origination fees).

10.07  Loan Participations with Affiliates.  Some of the Company's loans may be funded or purchased in participation with other entities or funds that have been sponsored by USA Commercial Mortgage Company or other Affiliates of the Manager or with other investors who are clients of USA Commercial Mortgage Company or other Affiliates of the Manager.

10.08  Change in Manager.  If USA Capital Realty Advisors ceases to be the Manager or is replaced as the Manager, then the affiliated parties specifically identified in this Article X may change.  Such affiliated parties may be replaced by, among other parties, Affiliates of the new Manager.

# ARTICLE XI
# ARBITRATION

11.01  Arbitration.  As among the parties hereto, all questions as to rights and obligations arising under the terms of this Agreement are subject to arbitration, and such arbitration shall be governed by the rules of the American Arbitration Association.

11.02  Demand for Arbitration.  If a dispute should arise under this Agreement, any Member may within sixty (60) days make a demand for arbitration by filing a demand in writing with the other.

11.03  Appointment of Arbitrators.  The parties may agree upon one arbitrator, but in the event that they cannot agree, there shall be three, one named in writing by each of the parties within five (5) days after demand for arbitration is given and a third chosen by the two appointed.  Should either party refuse or neglect to join in the appointment of the arbitrator(s) or to furnish the arbitrator(s) with any papers or information demanded, the arbitrator(s) are empowered by both parties to proceed ex parte.

11.04  Hearing.  Arbitration shall take place in Las Vegas, Nevada, and the hearing before the arbitrator(s) of the matter to be arbitrated shall be at the time and place within said city as is selected by the arbitrator(s).  The arbitrator(s) shall select such time and place promptly after his (or their) appointment and shall give written notice thereof to each party at least sixty (60) days prior to the date so fixed.  At the hearing any relevant evidence may be presented by either party, and the formal rules of evidence applicable to judicial proceedings shall not govern.  Evidence may be admitted or excluded in the sole discretion of the arbitrator(s).  Said arbitrator(s) shall hear and determine the matter and shall execute and acknowledge their award in writing and cause a copy thereof to be delivered to each of the parties.

11.05  Arbitration Award.  If there is only one arbitrator, his decision shall be binding and conclusive on the parties, and if there are three arbitrators, the decision of any two shall be binding and conclusive.  The submission of a dispute to the arbitrator(s) and the rendering of his (or their) decision shall be a condition precedent to any right of legal action on the dispute.  A judgment confirming the award of the arbitrator(s) may be rendered by any Court having jurisdiction; or such Court may vacate, modify, or correct the award in accordance with the prevailing sections of Nevada law.

11.06  New Arbitrators.  If three arbitrators are selected under the foregoing procedure but two of the three fail to reach an agreement in the determination of the matter in question, the matter shall be decided by three new arbitrators who shall be appointed and shall proceed in the same manner, and the process shall be repeated until a decision is finally reached by two of the three arbitrators selected.

11.07  <u>Costs of Arbitration</u>.  The costs of such arbitration shall be borne by the losing party or in such proportions as the arbitrator(s) shall determine.

**ARTICLE XII**
**MISCELLANEOUS**

12.01  <u>Covenant to Sign Documents</u>.  Without limiting the power of attorney granted by Sections 2.06 and 2.07 above, each Member covenants, for himself and his successors and assigns, to execute, with acknowledgment or verification, if required, any and all certificates, documents and other writings which may be necessary or expedient in the creation of the Company and the achievement of its purposes, including, without limitation, all such filings, records or publications necessary or appropriate in the judgment of the Manager to comply with the applicable laws of any jurisdiction in which the Company shall conduct its business.

12.02  <u>Notices</u>.  Except as otherwise expressly provided for in this Agreement, all notices which any Member may desire or may be required to give any other Member shall be in writing and shall be deemed duly given when delivered personally or when deposited in the United States mail, first-class postage prepaid, addressed to the Member's address as shown in the books of the Company pursuant to written notification to the Manager.  Notices to the Manager or to the Company shall be delivered to the Company's principal place of business, as set forth in Section 2.03 above or as hereafter charged as provided herein.

12.03  <u>Right to Engage in Competing Business</u>.  Nothing contained herein shall preclude any Member from purchasing or lending money upon the security of any other property or rights therein, or in any manner investing in, participating in, developing or managing any other venture of any kind, without notice to the other Members, without participation by the other Members, and without liability to them or any of them.  Each Member waives any right he may have against the Manager for capitalizing on information received as a consequence of the Manager's management of the affairs of this Company.

12.04  <u>Amendment</u>.  This Agreement is subject to amendment by the affirmative vote of a Minimum Percentage of Interests with the written concurrence of the Manager.  Notwithstanding anything to the contrary contained in this Agreement, the Manager shall have the right to amend this Agreement, without the vote or consent of any of the Members, when:

(a)     There is a change in the name of the Company or the amount of the contribution of any Member;

(b)     A person is substituted as a Member;

(c)     An additional Member is admitted;

(d)     A person is admitted as a successor or additional Manager in accordance with the terms of this Agreement;

(e)     There is a change in the character of the business of the Company;

(f)     There is a false or erroneous statement in this Agreement; or

(g)     A change in this Agreement is required in order that it shall accurately represent the agreement among the Members.

12.05   Governing Law.  This Agreement shall be governed by and shall be interpreted and enforced in accordance with the substantive laws of the State of Nevada.

12.06   Entire Agreement.  This Agreement constitutes the entire agreement between the parties and supersedes any and all prior agreements and representations, either oral or in writing, between the parties hereto with respect to the subject matter contained herein.

12.07   Waiver.  No waiver by any party hereto of any breach of, or default under, this Agreement by any other party shall be construed or deemed a waiver of any other breach of or default under this Agreement, and shall not preclude any party from exercising or asserting any rights under this Agreement with respect to any other breach or default.

12.08   Severability.  If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

12.09   Captions.  Section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference an in no way define, limit, extend or describe the scope of this Agreement.

12.10   Number and Gender.  Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and the word "person" shall include a natural person, firm, partnership, corporation, trust, association of other form of legal entity.  Any consent or action required or permitted to be given or made by a Manager may be given or made by any Manager.

12.11   Counterparts.  This Agreement may be executed in counterparts, any or all of which may be signed by the Manager on behalf of the Members as their attorney-in-fact.

12.12   Legal Representation.

(a)     Counsel to the Company may also be counsel to the Manager or any Affiliate of the Manager.  The Manager may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to any applicable rules of professional conduct or similar rules ("Rules").  The law firm engaged as legal counsel to the Company in connection with the formation of the Company and the offer and sale of Units ("Company Counsel") is not involved in the underwriting, documentation or routine servicing of loans made or acquired by the Company.  Each Member acknowledges that Company Counsel does not and will not represent any Member, and that in the absence of a clear and explicit written agreement Company Counsel shall owe no duties directly to any Member.  Notwithstanding any adversity that may develop, in the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and the Manager (or its Affiliate), on the other hand, then each Member agrees that Company Counsel may represent either the Company or such Manager (or its Affiliate), or

both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

(b)    Each Member further acknowledges that Company Counsel has represented only the interests of the Manager and not the other Members in connection with the formation of the Company and the preparation and negotiation of this Agreement, and each Member acknowledges that it has been afforded the opportunity to consult with independent counsel with regard thereto.

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands the day and year first above written.

MANAGER:         USA CAPITAL REALTY ADVISORS,
a Nevada corporation

By: _____

Its: _____PRESIDENT_____

INITIAL MEMBER:    USA CAPITAL REALTY ADVISORS,
a Nevada corporation

By: _____

Its: _____PRESIDENT_____

MEMBERS:        USA CAPITAL REALTY ADVISORS,
a Nevada corporation

By: _____
Attorney-In-Fact for the persons listed
on Schedule A attached hereto

765401/153254.4

22.

<u>**SCHEDULE A**</u>

<u>**MEMBERS**</u>

| <u>**Name and Address**</u> | <u>**Date of Admission**</u> | <u>**Capital Contribution**</u> |
|---|---|---|

# EXHIBIT A

## FORM OF SUBSCRIPTION AGREEMENT

## EXHIBIT B

## FORM OF WITHDRAWAL NOTICE

USA Capital Realty Advisors
4484 South Pecos Road
Las Vegas, Nevada 89121

Ladies/Gentlemen:

I am an investor in USA Capital Diversified Trust Deed Fund (the "Fund"). I hereby elect to withdraw the following amount of my investment in the Fund:

_____ [specify dollar amount that you seek to withdraw; if your proposed withdrawal would cause your capital account to fall below $25,000, then you must withdraw your entire interest in the Fund]

I understand that this withdrawal election is subject to all of the terms and conditions contained in the Offering Circular and Operating Agreement for the Fund. I understand that the Fund does not maintain reserves to fund investor withdrawals and that my request for withdrawal will be subject to available Fund cash flow, as described in the Operating Agreement. Additionally, I acknowledge that under the Offering Circular and Operating Agreement, certain types of investors seeking withdrawal from the Fund may have priority over my withdrawal request.

All withdrawal payments should be mailed to me at the address given below.

_____
[Name of investor]

_____          _____
[Signature of investor]          [Date]

_____

_____
[Current address of investor]

765401/153254.4                              25.

THE LIMITED LIABILITY COMPANY MEMBERSHIP INTEREST UNITS PURCHASED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). SUCH INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON AT ANY TIME IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT COVERING SUCH UNITS UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQUIRED. IN ADDITION, IN NO EVENT MAY UNITS BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON WHO IS NOT A RESIDENT OF NEVADA FOR A PERIOD OF NINE MONTHS FROM THE DATE OF THE LAST SALE THEREOF BY THE FUND.

## SUBSCRIPTION AGREEMENT AND POWER OF ATTORNEY

### USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,
#### a Nevada limited liability company

The undersigned hereby applies to become a Member of USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, a Nevada limited liability company (the "Company"), and subscribes to purchase the number of Units herein indicated in accordance with the terms and conditions of the Operating Agreement attached as Exhibit A to the Offering Circular dated _____, 2000, as amended or supplemented from time to time (the "Offering Circular").

1.       **REPRESENTATIONS AND WARRANTIES.** The undersigned represents and warrants as follows:

(a)       I have received, read and fully understood the Offering Circular and in making this investment I am relying only on the information provided in the Offering Circular. I have not relied on any statements or representations inconsistent with those contained in the Offering Circular.

(b)       I understand that the Units are being offered and sold without registration under the Securities Act of 1933, as amended, in reliance upon the exemption from such registration requirements for intrastate offerings. I acknowledge and understand that the availability of this exemption depends in part upon the accuracy of the representations and warranties contained herein, which I hereby make with the intent that they may be relied upon by the Manager.

765401/154660

(c)    My principal residence is in the State of Nevada. Except as hereafter provided, if I am acting as the trustee of a trust or on behalf of any other business entity, both the principal office and the principal place of business of such trust or other entity are located in the State of Nevada. If I am acting as the trustee or custodian of a Keogh plan, Individual Retirement Account or other retirement plan and I am not a resident of Nevada, then all of the following requirements are satisfied: (i) all participants or beneficiaries of such retirement plan have their principal residence in Nevada; (ii) all investment decisions regarding such plan are made by such resident participants and/or beneficiaries; and (iii) I perform only ministerial functions with respect to the investment of plan assets, with no independent authority or discretion to make investment decisions.

(d)    I understand that Units may not be sold or otherwise disposed of without the prior written consent of the Manager, which consent may be granted or withheld in its sole discretion, and that any such transfer is also subject to other restrictions described in the Offering Circular and in the Operating Agreement. I have liquid assets sufficient to assure myself (i) that investment in these Units will not cause me undue financial difficulties and (ii) that I can provide for my current needs and possible personal contingencies or, if I am the trustee of a retirement trust, that the limited liquidity of the Units will not cause difficulty in meeting the trust's obligations to make distributions to plan participants in a timely manner.

(e)    I understand that an investment in the Units involves certain risks.

(f)    I am 18 years of age or older.

(g)    By virtue of my own investment acumen and experience or financial advice from my independent advisors (other than a person receiving commissions by reason of my purchase of Units), I am capable of evaluating the risks and merits of an investment in the Units.

(h)    I am purchasing the Units solely for my own account, and not with a view to or for a sale in connection with any distribution of the Units.

2.    **POWER OF ATTORNEY.**  I hereby irrevocably constitute and appoint the Manager as my true and lawful attorney-in-fact, with full power and authority for me, and in my name, place and stead, to execute, acknowledge, publish and file:

(a)    The Operating Agreement, the Articles of Organization of the Company and any amendments thereto or cancellations thereof required under the laws of the State of Nevada;

(b)    Any other certificates, instruments and documents as may be required by, or may be appropriate under, the laws of any state or other jurisdiction in which the Company is doing or intends to do business; and

(c)    Any documents which may be required to effect the continuation of the Company, the admission of an additional or substituted Member, or the dissolution and termination of the Company.

765401/154660

The power of attorney granted above is a special power of attorney coupled with an interest, is irrevocable, and shall survive my death or the delivery of an assignment of Units by me; provided, that where the assignee of Units has been approved by the Manager for admission to the Company as a substituted Member, such power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Manager to execute, acknowledge, file and record any instrument necessary to effect such substitution.

      **3.**    **ACCEPTANCE.** This Subscription Agreement and Power of Attorney (this "Agreement") will be accepted or rejected by the Manager within fifteen (15) days of its receipt by the Company. Upon acceptance, this subscription will become irrevocable, and will obligate the undersigned to purchase the number of Units indicated below, for the purchase price of $25,000 per Unit. The Manager will return a countersigned copy of this Agreement to accepted subscribers, which copy (together with my cancelled check) will be evidence of my purchase of Units.

      **4.**    **PAYMENT OF SUBSCRIPTION PRICE.** The full purchase price for Units is $25,000 per Unit, payable in cash concurrently with delivery of this Agreement. I understand that my subscription funds will not bear interest until I am admitted to the Company.

[ALTERNATIVE PARAGRAPH 4 - to be used if units are purchased through the contribution of an existing loan:

      "The full purchase price for Units is $25,000 per Unit, payable by the undersigned's contribution to the Company of an existing real estate secured loan in exchange for Units. This loan contribution is subject to all of the terms and conditions of the Offering Circular and Operating Agreement. This loan contribution, and the undersigned's purchase of Units in exchange therefor, will be consummated when all documents and acts required by the Manager to transfer the loan to the Company have been signed, recorded and taken. These documents and acts include, without limitation, an endorsement of the original note that evidences the loan, a recorded assignment of the deed of trust that secures the loan and an endorsement to the lender's title insurance policy whereby the underlying title company recognizes the transfer of the note and deed of trust to the Company. The amount of Units sold in exchange for the loan contribution shall be equal to the outstanding principal balance of the loan, together with any accrued but unpaid interest."]

      **5.**    THE UNDERSIGNED AGREES TO INDEMNIFY, DEFEND (BY COUNSEL REASONABLY ACCEPTABLE TO THE INDEMNIFIED PARTY) AND HOLD THE COMPANY, ITS MANAGER, MEMBERS AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS, AND EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, AND DAMAGES (INCLUDING, WITHOUT LIMITATION, ALL ATTORNEYS' FEES WHICH SHALL BE PAID AS INCURRED) WHICH ANY OF THEM MAY INCUR, IN ANY MANNER OR TO ANY PERSON, BY REASON OF THE FALSITY, INCOMPLETENESS OR MISREPRESENTATION OF ANY INFORMATION FURNISHED BY THE UNDERSIGNED HEREIN OR IN ANY DOCUMENT SUBMITTED HEREWITH.

6.    **INVESTOR INFORMATION**.  (Please print or type)

Name and Address of Investor or Beneficial Owner:

_____
_____
_____
_____
_____
_____
_____, Nevada 9_____
City                                        Zip Code

( )_____        ( )_____
Telephone (Home)   Telephone (Office)

Please complete the following, as applicable.  (Investments by more than one of the following entities, even if related to each other or controlled by the same person, require completion of separate Subscription Agreement.)

<u>Identifying Information</u>        <u>Monthly Income to Be:[1]</u>

Individual:

Name _____        Compounded    _____
                                               or Distributed   _____
Address _____
_____, NV 9_____
Soc.Sec.No. _____

Individual Retirement Account ("IRA"):

Trustee _____        Compounded    _____
                                               or Distributed   _____
Address _____
_____, NV 9_____
Acct.No. _____        Tax I.D. No. 94-_____

Pension or Profit Sharing Trust ("ERISA Plan"):

Trustee _____        Compounded    _____
                                               or Distributed   _____
Address _____
_____

_____, NV 9_____

Acct.No. _____    Tax I.D. No. 94-_____

Corporation, Trust or Other:

Trustee _____    Compounded    _____
_____    or Distributed    _____
Address _____
_____
_____, NV 9_____
Acct.No. _____    Tax I.D. No. 94-_____

[1]    The election whether to receive monthly cash distributions, or to allow earnings to compound, is irrevocable and no changes by the investor will be allowed for the first year after an investor's admission to the Company. Thereafter, an investor may, on an annual basis and subject to the terms and conditions contained in the Offering Circular and Operating Agreement, elect to switch how distributions are treated. The Manager, however, reserves the right to immediately commence making cash distributions to previously compounding investors to ensure that the Company remains exempt from the application of the Plan Asset Regulations. Investors have the right to withdraw from the Company, subject to certain limitations. (See discussion in Offering Circular under "ERISA Considerations," "Summary of Operating Agreement" and "Withdrawal from Company.")

Number of Units to be Purchased:    _____

Total Purchase Price ($25,000 per Unit): $_____

Make check payable to "USA Capital Diversified Trust Deed Fund, LLC" and return with this Subscription Agreement to c/o USA Commercial Mortgage Company, 4484 South Pecos Road, Las Vegas, Nevada 89121.

IN WITNESS WHEREOF, the undersigned hereby agrees to become a Member in USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, a Nevada limited liability company, upon the terms and conditions set forth in the Operating Agreement.

Dated: _____, 20___

_____    _____
(signature of Investor or    (signature of Investor or
   Beneficial Owner)    Beneficial Owner)

_____    _____
(signature of Trustee, if any)    (signature of Trustee, if any)

765401/154660

[IF IRA OR ERISA PLAN, THEN <u>BOTH</u> TRUSTEE <u>AND</u> BENEFICIAL OWNER(S) MUST SIGN.]

_____

<u>ACCEPTANCE</u>

The foregoing Subscription Agreement is hereby accepted by USA Capital Diversified Trust Deed Fund, LLC.

Dated: _____, 20___

USA Capital Diversified Trust Deed Fund, LLC,
a Nevada limited liability company

By:          USA Capital Realty Advisors,
             a Nevada corporation
             Its Manager


             By: _____

             Its: _____

765401/154660

**EXHIBIT B**
Subscription Agreement and Power of Attorney

THE LIMITED LIABILITY COMPANY MEMBERSHIP INTEREST UNITS PURCHASED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). SUCH INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON AT ANY TIME IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT COVERING SUCH UNITS UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQUIRED. IN ADDITION, IN NO EVENT MAY UNITS BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON WHO IS NOT A RESIDENT OF NEVADA FOR A PERIOD OF NINE MONTHS FROM THE DATE OF THE LAST SALE THEREOF BY THE FUND.

## SUBSCRIPTION AGREEMENT AND POWER OF ATTORNEY

### USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,
a Nevada limited liability company

The undersigned hereby applies to become a Member of USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, a Nevada limited liability company (the "Company"), and subscribes to purchase the number of Units herein indicated in accordance with the terms and conditions of the Operating Agreement attached as Exhibit A to the Offering Circular dated _____, 2000, as amended or supplemented from time to time (the "Offering Circular").

1.    REPRESENTATIONS AND WARRANTIES. The undersigned represents and warrants as follows:

(a)    I have received, read and fully understood the Offering Circular and in making this investment I am relying only on the information provided in the Offering Circular. I have not relied on any statements or representations inconsistent with those contained in the Offering Circular.

(b)    I understand that the Units are being offered and sold without registration under the Securities Act of 1933, as amended, in reliance upon the exemption from such registration requirements for intrastate offerings. I acknowledge and understand that the availability of this exemption depends in part upon the accuracy of the representations and warranties contained herein, which I hereby make with the intent that they may be relied upon by the Manager.

(c)    My principal residence is in the State of Nevada. Except as hereafter provided, if I am acting as the trustee of a trust or on behalf of any other business entity, both the principal office and the principal place of business of such trust or other entity are located in the State of Nevada. If I am acting as the trustee or custodian of a Keogh plan, Individual Retirement Account or other retirement plan and I am not a resident of Nevada, then all of the following requirements are satisfied: (i) all participants or beneficiaries of such retirement plan have their principal residence in Nevada; (ii) all investment decisions regarding such plan are made by such resident participants and/or beneficiaries; and (iii) I perform only ministerial functions with respect to the investment of plan assets, with no independent authority or discretion to make investment decisions.

(d)    I understand that Units may not be sold or otherwise disposed of without the prior written consent of the Manager, which consent may be granted or withheld in its sole discretion, and that any such transfer is also subject to other restrictions described in the Offering Circular and in the Operating Agreement. I have liquid assets sufficient to assure myself (i) that investment in these Units will not cause me undue financial difficulties and (ii) that I can provide for my current needs and possible personal contingencies or, if I am the trustee of a retirement trust, that the limited liquidity of the Units will not cause difficulty in meeting the trust's obligations to make distributions to plan participants in a timely manner.

(e)    I understand that an investment in the Units involves certain risks.

(f)    I am 18 years of age or older.

(g)    By virtue of my own investment acumen and experience or financial advice from my independent advisors (other than a person receiving commissions by reason of my purchase of Units), I am capable of evaluating the risks and merits of an investment in the Units.

(h)    I am purchasing the Units solely for my own account, and not with a view to or for a sale in connection with any distribution of the Units.

2.    **POWER OF ATTORNEY.** I hereby irrevocably constitute and appoint the Manager as my true and lawful attorney-in-fact, with full power and authority for me, and in my name, place and stead, to execute, acknowledge, publish and file:

(a)    The Operating Agreement, the Articles of Organization of the Company and any amendments thereto or cancellations thereof required under the laws of the State of Nevada;

(b)    Any other certificates, instruments and documents as may be required by, or may be appropriate under, the laws of any state or other jurisdiction in which the Company is doing or intends to do business; and

(c)    Any documents which may be required to effect the continuation of the Company, the admission of an additional or substituted Member, or the dissolution and termination of the Company.

765401/154660

The power of attorney granted above is a special power of attorney coupled with an interest, is irrevocable, and shall survive my death or the delivery of an assignment of Units by me; provided, that where the assignee of Units has been approved by the Manager for admission to the Company as a substituted Member, such power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Manager to execute, acknowledge, file and record any instrument necessary to effect such substitution.

3.    ACCEPTANCE.  This Subscription Agreement and Power of Attorney (this "Agreement") will be accepted or rejected by the Manager within fifteen (15) days of its receipt by the Company.  Upon acceptance, this subscription will become irrevocable, and will obligate the undersigned to purchase the number of Units indicated below, for the purchase price of $25,000 per Unit.  The Manager will return a countersigned copy of this Agreement to accepted subscribers, which copy (together with my cancelled check) will be evidence of my purchase of Units.

4.    PAYMENT OF SUBSCRIPTION PRICE.  The full purchase price for Units is $25,000 per Unit, payable in cash concurrently with delivery of this Agreement.  I understand that my subscription funds will not bear interest until I am admitted to the Company.

[ALTERNATIVE PARAGRAPH 4 - to be used if units are purchased through the contribution of an existing loan:

"The full purchase price for Units is $25,000 per Unit, payable by the undersigned's contribution to the Company of an existing real estate secured loan in exchange for Units.  This loan contribution is subject to all of the terms and conditions of the Offering Circular and Operating Agreement.  This loan contribution, and the undersigned's purchase of Units in exchange therefor, will be consummated when all documents and acts required by the Manager to transfer the loan to the Company have been signed, recorded and taken.  These documents and acts include, without limitation, an endorsement of the original note that evidences the loan, a recorded assignment of the deed of trust that secures the loan and an endorsement to the lender's title insurance policy whereby the underlying title company recognizes the transfer of the note and deed of trust to the Company.  The amount of Units sold in exchange for the loan contribution shall be equal to the outstanding principal balance of the loan, together with any accrued but unpaid interest."]

5.    THE UNDERSIGNED AGREES TO INDEMNIFY, DEFEND (BY COUNSEL REASONABLY ACCEPTABLE TO THE INDEMNIFIED PARTY) AND HOLD THE COMPANY, ITS MANAGER, MEMBERS AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS, AND EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, AND DAMAGES (INCLUDING, WITHOUT LIMITATION, ALL ATTORNEYS' FEES WHICH SHALL BE PAID AS INCURRED) WHICH ANY OF THEM MAY INCUR, IN ANY MANNER OR TO ANY PERSON, BY REASON OF THE FALSITY, INCOMPLETENESS OR MISREPRESENTATION OF ANY INFORMATION FURNISHED BY THE UNDERSIGNED HEREIN OR IN ANY DOCUMENT SUBMITTED HEREWITH.

6.    **INVESTOR INFORMATION.**  (Please print or type)

Name and Address of Investor or Beneficial Owner:

_____

_____

_____

_____

_____

_____, Nevada 9_____
City                                                    Zip Code

( )_____        ( )_____
Telephone (Home)    Telephone (Office)

Please complete the following, as applicable.  (Investments by more than one of the following entities, even if related to each other or controlled by the same person, require completion of separate Subscription Agreement.)

Identifying Information        Monthly Income to Be:[1]

Individual:

Name _____        Compounded        _____
                                              or Distributed        _____

Address _____

_____, NV 9_____

Soc.Sec.No. _____

Individual Retirement Account ("IRA"):

Trustee _____        Compounded        _____
                                              or Distributed        _____

Address _____

_____, NV 9_____

Acct.No. _____        Tax I.D. No. 94-_____

Pension or Profit Sharing Trust ("ERISA Plan"):

Trustee _____        Compounded        _____
                                              or Distributed        _____

Address _____

_____

765401/154660

_____, NV 9_____

Acct.No. _____     Tax I.D. No. 94-_____

Corporation, Trust or Other:

    Trustee _____     Compounded    _____
                         _____     or Distributed  _____
    Address _____

_____, NV 9_____

Acct.No. _____     Tax I.D. No. 94-_____

[1]  The election whether to receive monthly cash distributions, or to allow earnings to compound, is irrevocable and no changes by the investor will be allowed for the first year after an investor's admission to the Company.  Thereafter, an investor may, on an annual basis and subject to the terms and conditions contained in the Offering Circular and Operating Agreement, elect to switch how distributions are treated.  The Manager, however, reserves the right to immediately commence making cash distributions to previously compounding investors to ensure that the Company remains exempt from the application of the Plan Asset Regulations.  Investors have the right to withdraw from the Company, subject to certain limitations.  (See discussion in Offering Circular under "ERISA Considerations," "Summary of Operating Agreement" and "Withdrawal from Company.")

Number of Units to be Purchased: _____

Total Purchase Price ($25,000 per Unit): $ _____

Make check payable to "USA Capital Diversified Trust Deed Fund, LLC" and return with this Subscription Agreement to c/o USA Commercial Mortgage Company, 4484 South Pecos Road, Las Vegas, Nevada 89121.

        IN WITNESS WHEREOF, the undersigned hereby agrees to become a Member in USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, a Nevada limited liability company, upon the terms and conditions set forth in the Operating Agreement.

Dated: _____, 20___


_____     _____
(signature of Investor or        (signature of Investor or
  Beneficial Owner)                Beneficial Owner)


_____     _____
(signature of Trustee, if any)   (signature of Trustee, if any)

765401/154650

[IF IRA OR ERISA PLAN, THEN <u>BOTH</u> TRUSTEE <u>AND</u> BENEFICIAL OWNER(S) MUST SIGN.]

_____

<u>ACCEPTANCE</u>

The foregoing Subscription Agreement is hereby accepted by USA Capital Diversified Trust Deed Fund, LLC.

Dated: _____, 20___

USA Capital Diversified Trust Deed Fund, LLC,
a Nevada limited liability company

By:        USA Capital Realty Advisors,
           a Nevada corporation
           Its Manager


           By: _____

           Its: _____

765401/154660