1          UNITED STATES BANKRUPTCY COURT

2              DISTRICT OF NEVADA

3              LAS VEGAS, NEVADA

4    In re:  USA COMMERCIAL MORTGAGE  )  E-Filed:  01/25/08
     COMPANY,                         )
5                                     )
             Debtor.                  )  Case No.
6                                     )  BK-S-06-10725-LBR
     _____ )  Chapter 11

7

8

9

10

11            TRANSCRIPT OF PROCEEDINGS
                       OF
12              ^ (phonetic)
                  VOLUME 1
13    BEFORE THE HONORABLE LINDA B. RIEGLE
         UNITED STATES BANKRUPTCY JUDGE
14
         Thursday, December 20, 2007
15
                 9:30 a.m.
16

17

18

19

20

21

22

23

24    Court Recorder:       Helen C. Smith

25    Proceedings recorded by electronic sound recording;
      transcript produced by transcription service.

2

```
 1   APPEARANCES:

 2   For the Debtor:        JOHN C. HINDERAKER, ESQ.
                            Lewis and Roca, LLP
 3                          One South Church Avenue
                            Suite 700
 4                          Tucson, Arizona 85701

 5   For the Riegers:       PATSY RIEGER
                            2615 Glen Eagles Drive (phonetic)
 6                          Reno, Nevada 89523

 7   For the United States  AUGUST B. LANDIS, ESQ.
     Trustee:               Office of the United States Trustee
 8                          300 Las Vegas Boulevard South
                            Suite 4300
 9                          Las Vegas, Nevada 89101

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Court previously convened at 09:48:26 a.m.)

2          (Partial transcript at 10:50:12 a.m.)

3              THE CLERK:  All rise.  Bankruptcy court is now in

4     session.

5          (Colloquy not on the record.)

6              THE COURT:  Be seated.

7              THE CLERK:  (Indiscernible) are back on the

8     (indiscernible).

9              THE COURT:  Okay.  All right.  So that takes care of

10    Docket 22.  Now we have Docket 23 which is the Binford which I

11    know it's continued.  But just for the record, why don't you

12    indicate where we are on that one.

13             MR. HINDERAKER:  Your Honor, let's do -- I think we

14    still have to do 21 and 22, but do you want to do Binford while

15    we're on it?

16             THE COURT:  No, no, no.  That's fine.  Oh, you're

17    right.  I skipped.  I apologize.  So we just did --

18             THE CLERK:  22.

19             MR. HINDERAKER:  Okay.  I'm looking at the Gunderson

20    claim.  I have it on my list as 21.

21             THE COURT:  Did I skip?  I must have skipped a page,

22    didn't I.

23             THE CLERK:  Yes.

24             THE COURT:  Okay.  So Docket No. 20 first.  Was he --

25    no.  I'm sorry.  Docket No. 20 related to the summary judgment.

1    That was it.  Okay.

2        Docket 21 on Gunderson.

3        MR. HINDERAKER:  Your Honor, this is another one of

4    the direct lenders that filed a secured claim.  I've gone back

5    and looked at the response filed by Mr. Gunderson.  It's a

6    DE-5332 (phonetic).

7        His claim is like all the others in that he's alleging

8    fraudulent handling of the loan in a Ponzi-like manner, and so

9    we would ask because it's like the other ones that it be

10   treated the same, and that the secured claim be denied, and

11   that it be reclassified as an unsecured claim.

12       THE COURT:  Okay.  And, again, he is not like Mr. --

13   this is not a case in which he had received money, and there

14   was a check in the mail.  This is just alleged fraudulent

15   handling, correct?

16       MR. HINDERAKER:  Yes, your Honor.

17       THE COURT:  All right.  So that judgment's sustained.

18   Okay.

19       Now, on the motion for summary judgment, was there any

20   besides Mr. -- on item 22, was Mr. --

21       THE CLERK:  Frame (phonetic)?

22       MR. HINDERAKER:  There's Frame.

23       THE COURT:  Uh-huh.

24       MR. HINDERAKER:  And we're done with that.  And

25   Gunderson, we're done with that, and then there's also Rieger.

1          THE COURT:  And that was a part of No. 22?

2          MR. HINDERAKER:  Yes.  As I understood it, there's

3     22, and then there's also --

4          THE COURT:  No.  26 is the one on Rieger, isn't it?

5          MR. HINDERAKER:  Okay.  So we can --

6          THE COURT:  22's taken care of now, correct?

7          MR. HINDERAKER:  Yes.

8          THE COURT:  So we have all the claims on 22 taken

9     care of, except Mr. --

10          MR. HINDERAKER:  Well, Rieger is a claim on --

11          THE COURT:  Not Rieger.

12          MR. HINDERAKER:  Okay.

13          THE COURT:  We got all claims on No. 22, except the

14     Dutkin (phonetic) claim, isn't that correct, now taken care of?

15          MR. HINDERAKER:  Yes.  And Rieger was also subject to

16     that motion because it not only went against secured claims,

17     but, also, priority claims that were filed by direct lenders.

18          THE COURT:  Okay.  All right.  So on that claim -- so

19     we'll do No. 22 and 26 now.  Okay.  So tell me on your first

20     on, the priority, and then go into the secured, and then I'll

21     have the creditor respond.

22          MR. HINDERAKER:  Okay.  On this one, we're really

23     down to the claim by the Riegers.  It's claim 1739.  It's about

24     a $450,000 claim.

25          Of that amount, I think about $33,000 is a priority claim,

1  and this motion only relates to that $33,000 that is the

2  priority claim, and we're seeking to have it recharacterized as

3  an unsecured claim.

4          THE COURT:  Okay.

5          MR. HINDERAKER:  The Riegers' claim arises out of the

6  Amesbury Hatter's Point loan in this case that it was secured

7  by a condominium development.

8      USACM sought permission from the Court to release three

9  units from the deed of trust and sell those units.  On

10 July 18th, 2006, the Court granted the order releasing those

11 units.

12     They were sold to the tune of about 1.4 million dollars.

13 The Riegers' share of that amount as direct lenders on that

14 loan was $29,722.67.

15     Of that amount, $22,873.96 was applied as prepaid interest

16 against the Amesbury Hatter's Point loan.  In other words, they

17 have been paid funds illegally by USACM.

18     And the remainder of $6,848.72 was applied to the other

19 loans that the Riegers were invested in.  They were invested in

20 several other loans, so it was applied to pay down their

21 prepaid interest on those other loans.

22     The Riegers' response indicated that we had not collected

23 the proceeds of that.  When we filed our reply, we made clear

24 that we had collected the proceeds and clarified exactly how we

25 had distributed the proceeds from the sale of the Amesbury

1   Hatter's Point units.

2       The Riegers then filed an objection to our reply, and they

3   raised a couple of arguments, but, essentially, what it comes

4   down to is they're saying those proceeds should have been

5   distributed as principal and not applied against the balance of

6   prepaid interest that was due to USA Commerecial Mortgage by

7   the Riegers.

8       We supplied a declaration from Ms. Smith, the accountant

9   who worked on this, which explained how she went through and

10  accounted for all of this and came up with the numbers on

11  prepaid interest, how that money was applied to the Riegers'

12  account.

13      The Riegers haven't responded with anything that really

14  undercuts what Ms. Smith says in her declaration.  I think

15  those facts are undisputed, and I think based on those facts

16  we'd ask the Court to grant summary judgment on the priority

17  claim.

18          THE COURT:  And didn't the plan provide that payments

19  that were received go to prepaid interest?  Is that --

20          MR. HINDERAKER:  Yes.  You're correct.  Your Honor,

21  that's Section 4(e)(1)(D) on page 52 of the plan.  It says

22  exactly that.  That the money received that belongs to prepaid

23  interest should be applied in that fashion.

24          THE COURT:  Okay.  Now, as a separate matter, does

25  this, then, take care of all their prepaid interest?

1    MR. HINDERAKER:  No.  I believe there is still

2    prepaid interest on balances on the other loans.  That was not

3    (indiscernible).  But for this loan, yes, it's been completely

4    paid off.

5    THE COURT:  Okay.  So when this loan -- if and when

6    this -- and, again, this has nothing to do with the merits of

7    this right now, but just to bring us up to date.

8    If and when this loan pays, they'll receive whatever their

9    pro rata share is without deduction on this loan.  Is that a

10    fair statement?

11    MR. HINDERAKER:  Yes.  That's correct, your Honor.

12    THE COURT:  Okay.  All right.  Opposition.

13    MS. RIEGER:  Your Honor, this is Patsy Rieger.  Thank

14    you for letting me appear telephonically in regard to this

15    claim.

16    I believe that the facts that were just set forth were not

17    exactly correct.  Number one, the prepaid interest on our

18    account was satisfied long before this Amesbury situation came

19    up, and so the moneys that were paid to us for the Amesbury

20    loan we feel were misappropriated.

21    THE COURT:  Well, now what --

22    MS. RIEGER:  It is those --

23    THE COURT:  What evidence have you supplied to show

24    that it was paid long before that?

25    MS. RIEGER:  In Docket No. 4940, our response, I sent

1    in copies of our statements showing that we have satisfied the

2    prepaid-interest obligation with other payments that were made

3    to us on other loans.

4              THE COURT:  Okay.

5              MS. RIEGER:  That prepaid interest --

6              THE COURT:  I don't have a 4940 on the list, and then

7    that's not your fault.  But on the list of -- oh, it's on the

8    summary-judgment aspect.  Okay.

9              MS. RIEGER:  Yes.

10             THE COURT:  Okay.  So you think you've satisfied.

11   But if it hasn't been satisfied, as a factual matter, do you

12   agree that it wouldn't be priority if you haven't already

13   satisfied it?  You don't disagree with his proposition.

14             MS. RIEGER:  I'm sorry.  I believe I do.  I'm kind of

15   confused at this point --

16             THE COURT:  And I --

17             MS. RIEGER:  -- because --

18             THE COURT:  I asked a bad question.  I apologize.

19   Assuming that he is right, and you're wrong, from a factual

20   standpoint -- and that's something we'll have to I think set

21   for a hearing -- I guess is that your only argument, the

22   factual argument, that it had already paid, that you had

23   already paid that off?

24             MS. RIEGER:  No.  That is not our only argument.

25             THE COURT:  On the priority.  Okay.

1          MS. RIEGER:  Our point here was that payments were

2     received from the borrower on the Amesbury loan, and they were

3     misappropriated, not paid to us as principal, so it was to the

4     tune of $15,000,000 overall that this happened, and our

5     collateral --

6          THE COURT:  Well, this is before bankruptcy,

7     though --

8          MS. RIEGER:  -- is severely --

9          THE COURT:  -- right?

10         MS. RIEGER:  Pardon?

11         THE COURT:  Before bankruptcy.

12         MS. RIEGER:  Yes.  Before bankruptcy was the majority

13    of that, and our claim is for the entire amount that we feel

14    that our funds were misappropriated.

15       And this $34,000 is the amount on the units that were

16    released postpetition, so we believe this was misappropriated

17    by the postpetition debtor.

18         THE COURT:  Okay.  All right.  So on the priority,

19    now -- and does this also go to your arguments on the secured

20    status?

21         MS. RIEGER:  No.

22         THE COURT:  Okay.

23         MS. RIEGER:  This is just on the priority portion --

24         THE COURT:  Okay.  So let's --

25         MS. RIEGER:  -- of this unsecured claim.

1          THE COURT:  All right.  So on the priority, I think

2    we have a factual issue as to whether or not were satisfied

3    before.

4       Did you respond to their Document 4940, Counsel?

5          MR. HINDERAKER:  We haven't filed any kind of a

6    response to that.  I don't think Document 4940 raised any

7    factual issues, however, your Honor.

8       I think the declaration of Susan Smith walks through it

9    very carefully.  If I can, I can discuss what's in their --

10          THE COURT:  Okay.

11          MR. HINDERAKER:  -- Docket 4940 with you briefly, and

12    it's a little -- I'm not sure I entirely understand it, but

13    what I understand them to be saying is that there was some

14    amount, $200,000, applied from the Yonkers loan.

15       The timing on that simply doesn't work because according

16    to the reply they say the proceeds from that loan were received

17    on May 26th, 2006, and the proceeds from this loan were

18    received later, number one.

19       Number two, there is nothing in the record here that

20    indicates that that $200,000 was ever applied if it was paid.

21    I don't even know exactly what they're referring to.

22       But there's nothing to indicate that it was applied to pay

23    down their prepaid-interest accounts on any of these, and I

24    don't think that's accurate.

25          THE COURT:  Okay.  So what evidence do you show,

1    Ms. Rieger, show that it was used to pay down your prepaid

2    interest?

3              MS. RIEGER:  I'm sorry.  Are you addressing me,

4    your Honor?

5              THE COURT:  Yes.  Ms. Rieger.

6              MS. RIEGER:  Well, I did send in proof that our

7    prepaid-interest obligation was satisfied prior to, and I have

8    proof in our statements showing what dates that the borrowers

9    paid and the amount that was netted back against our payment.

10             THE COURT:  And that's supposedly in Docket 4940?

11             MS. RIEGER:  Yes.  It's in the supporting

12   documentation behind my letter.

13             THE COURT:  You know, I don't recall seeing anything

14   but a letter.

15             MS. RIEGER:  Yeah.  There were several pages of

16   supportive documentation --

17             THE COURT:  Let's see.

18             MS. RIEGER:  -- behind that letter.

19             THE COURT:  Let me look again.  I have Docket 4548.

20   I have 4548.

21             MS. RIEGER:  And this is 4940.

22             THE COURT:  Do you have a copy, Counsel, handy?

23             MR. HINDERAKER:  I do have a copy, your Honor, and

24   I'll give it to you.

25             THE COURT:  Does yours have attachments?

1          MR. HINDERAKER:  I have -- yes.  But it's my copy,

2     but I'm just going to --

3          THE COURT:  No.  Let me --

4          MR. HINDERAKER:  -- just --

5          THE COURT:  I'll look it up.

6          MR. HINDERAKER:  Okay.

7          THE COURT:  That's fine.

8          MR. HINDERAKER:  I apologize for not having --

9          THE COURT:  No, no.

10          MR. HINDERAKER:  -- (indiscernible).

11          THE COURT:  That's fine.  I mean, you said your copy

12     doesn't have any --

13          MR. HINDERAKER:  If I said that --

14          THE COURT:  -- factual --

15          MR. HINDERAKER:  -- I misspoke.  There are some

16     documentation.  There's some documentation attached to it.

17     It's 24 pages total.

18          THE COURT:  All right.  Well, then, don't --

19          MR. HINDERAKER:  Well, if -- no.  Let me go through

20     it, then.  There's a statement from HFA related to the

21     HFA Yonkers loan, and that doesn't relate to the Amesbury

22     Hatter's Point.

23        So any interest that that shows to the extent it shows

24     that prepaid interest was netted out, that doesn't impact the

25     Amesbury Hatter's Point loan.

1    THE COURT:  Well, but --

2    MS. RIEGER:  But it does.

3    THE COURT:  -- why wouldn't it?  I mean, the point is

4  if you're netting --

5    MR. HINDERAKER:  But we're netting loan by loan.  So

6  if we show that there was prepaid interest -- that the prepaid

7  interest --

8    THE COURT:  But you netted moneys they got in

9  Amesbury Hatter against other loans.

10   MR. HINDERAKER:  But not against the Yonkers loan,

11 and that's in the declaration of Susan Smith.  We say precisely

12 what loans we netted against, and it wasn't the Yonkers loan.

13   MS. RIEGER:  I'm sorry, your Honor, but that's just

14 incorrect.

15   THE COURT:  Well, let's have an evidentiary hearing.

16 I don't want to have to go through this.  We'll have an

17 evidentiary hearing.  You'll have to come down for that,

18 Ms. Rieger, on the priority aspect.

19     Let me hear the summary judgment next because I think we

20 can resolve that issue, and we'll just have left the priority

21 issue.

22     So on the summary judgment on Docket 26.

23   MR. HINDERAKER:  I believe that's it.  I think the

24 only portion of that we were objecting to was the priority

25 portion of the claim.

```
 1              THE COURT:  Oh, I thought you had the objection that
 2    they were claiming secured.
 3              MR. HINDERAKER:  I don't believe that they were
 4    claiming secured on that.  I --
 5              THE COURT:  Oh --
 6              MR. HINDERAKER:  But --
 7              THE COURT:  -- so you've only claimed priority.
 8              MS. RIEGER:  Yes.
 9              THE COURT:  Okay.  So you --
10              MR. HINDERAKER:  That's right.
11              THE COURT:  At one time, you had a claim where you
12    were claiming a secured status.
13              MR. HINDERAKER:  I think there were some -- there's a
14    lot of loans that the Riegers are involved in, and I don't
15    think this is one of them.  I can check the proof of claim --
16              THE COURT:  Okay.
17              MR. HINDERAKER:  -- though --
18              THE COURT:  So --
19              MR. HINDERAKER:  -- if you give me a moment.
20              THE COURT:  So is your understanding, Ms. Rieger, the
21    only claim that you have left is this priority claim for the
22    $30,000?
23              MS. RIEGER:  That's the only priority portion.  We
24    also have unsecured nonpriority claims.
25              THE COURT:  Oh, okay.  So you agree the rest --
```

1    MR. HINDERAKER:  Yes.

2    THE COURT:  -- are unsecured and nonpriority.

3    MR. HINDERAKER:  Yes.  And --

4    MS. RIEGER:  Right.

5    MR. HINDERAKER:  And --

6    MS. RIEGER:  We have no secured claims.

7    THE COURT:  Okay.  Fine.  Because I -- and you're

8    correct as a matter of law, and I'm glad you recognize this.  A

9    lot of people who were claiming these claims were secured from

10   the misunderstanding that they thought because they had a loan

11   that it was secured by assets of this estate, so I just wanted

12   to clarify that.

13   MS. RIEGER:  Right.

14   THE COURT:  You're correct, and they have agreed that

15   it may well be an unsecured claim.

16   MR. HINDERAKER:  Yes.  So it won't impact.  There's

17   $260,000 that's an unsecured nonpriority claim, and that's not

18   impacted here.

19   THE COURT:  Okay.  So the only issue is the effect of

20   the netting.

21   MR. HINDERAKER:  Yes.

22   THE COURT:  I wonder if it makes sense if we appoint

23   an expert to look at this and just see if the netting was

24   appropriately applied, rather than have an evidentiary hearing.

25   MR. HINDERAKER:  Yeah.  If there's a more efficient

1    way to do it, your Honor, we would like to find that way

2    because we'd have to fly Ms. Smith in from Florida.

3            THE COURT:   Exactly.   Do you have any objection to

4    that, Ms. Rieger, if the two of you get together and, you know,

5    just get some accountant, and the accountant looks at how the

6    loans are applied in connection with the plan, and then that

7    expert will make a recommendation to me as to whether or not it

8    was appropriately applied?

9        It may well be that your claim is not as a priority

10   per se, but, rather, a motion for administrative expense

11   because it was postpetition conduct you're talking about, and

12   so, technically, it wouldn't be priority per se, and you'd have

13   to make your motion.

14       But maybe the answer is to cut through all that

15   bureaucracy since administrative enjoy the same level of

16   payment that we appoint a master to look at this and see how

17   they're applied.

18            MS. RIEGER:   I would appreciate that, your Honor.

19            THE COURT:   Okay.   Let's do that.   So I assume you

20   know -- and that could be anyplace.   It could be Reno or Vegas,

21   right?

22       Do you have an --

23            MR. HINDERAKER:   Yes.

24            THE COURT:   Yeah.

25            MR. HINDERAKER:   Yeah.

THE COURT:  So, oh, I know.  Mr. Landis is sitting here.  Maybe he can recommend maybe one of our panel trustees or -- well, do you want to stay out of this, Mr. Landis?

MR. LANDIS:  Well, your Honor, I guess, ultimately, I'm questioning what the statutory basis for the appointment of this person is.

THE COURT:  As an expert.  I'm appointing him as my expert witness.

MR. LANDIS:  As the Court's expert witness?

THE COURT:  As the Court's expert.

MR. LANDIS:  Perhaps, it would --

THE COURT:  So you can't appoint.

MR. LANDIS:  Right.

THE COURT:  I guess I was just going to ask you --

MR. LANDIS:  And --

THE COURT:  -- to be my --

MR. LANDIS:  And it's not that I want to stay out.  As a matter of fact, I like to facilitate because I think what the Court is suggesting makes some sense, but, perhaps, what makes sense would be mediation with someone who actually has that expert input.

THE COURT:  Well, there you go.  We'll do a mediation with an accountant.

MR. LANDIS:  And I'll be honest with you, Judge.  That would allow the parties to agree on an independent --

1        THE COURT:  Any number --

2        MR. LANDIS:  -- third party.

3        THE COURT:  -- they want.

4        MR. LANDIS:  And then the mediator might be able to

5   resolve this issue in advance.  It may save the Court time, and

6   it could save the parties money.  It gives me a lot less

7   headache in terms of trying to come up --

8        THE COURT:  Sure.

9        MR. LANDIS:  -- with a statutory basis to do what I

10  think the Court wants --

11        THE COURT:  Yeah.  And I --

12        MR. LANDIS:  -- to do.

13        THE COURT:  And the Court has the ability to appoint

14  expert witnesses.  We can't appoint masters, but that would be

15  a cost, a mediator.  There will be a cost.  The parties would

16  just split the cost.

17        MR. HINDERAKER:  In terms of mediation, I think we're

18  probably going to have to mediate a number of claims with the

19  Riegers.  I don't know, but I think that this should be rolled

20  in with those to the extent that --

21        THE COURT:  Okay.

22        MR. HINDERAKER:  And as I understand it, the claims

23  process calls for mediations to occur --

24        THE COURT:  Oh, you're right.

25        MR. HINDERAKER:  -- disputed claims.

1      THE COURT:  It does.

2      MR. HINDERAKER:  So I think we're going to get there,

3  anyway.  So if the Court's not prepared to grant summary

4  judgment based on the statement from the HFA Yonkers loan, I

5  think the appropriate thing is --

6      THE COURT:  I think, you know, it's a question of

7  fact.  I mean, it's like I understand is there a genuine issue

8  of material fact based upon what Ms. Smith said.

9      But rather than my trying to go through this accounting, I

10  think I would -- either I'm going to appoint an expert for

11  somebody saying, wait a minute, how were these applied or let's

12  just postpone it until you do a mediation process.

13      MR. HINDERAKER:  Yeah.  It's your prerogative.

14      THE COURT:  Okay.  So let's do a mediation process.

15  Let's come back on this in about 90 days.  Is that enough time?

16      MR. HINDERAKER:  Well, can we roll the mediation in

17  with the other claims?

18      THE COURT:  Yes.

19      MR. HINDERAKER:  So you just want a status conference

20  in 90 days?

21      THE COURT:  Yeah.  Do you have any objection to

22  mediating the rest of your claims, too, Ms. Rieger?

23      MS. RIEGER:  I would very much appreciate that.

24  Anything that makes this more efficient.

25      THE COURT:  Okay.  And, you know, Judge Nakagawa is

1    very good --

2            MR. HINDERAKER:  I --

3            THE COURT:  -- and Markell, but that's a legal.  We

4    need an accountant type --

5            MR. HINDERAKER:  Yeah.

6            THE COURT:  -- I think --

7            MR. HINDERAKER:  And I don't --

8            THE COURT:  -- don't you?

9            MR. HINDERAKER:  I don't think we're prepared to

10   mediate all of the Riegers' claims at this point.

11           THE COURT:  So, what, six months?

12           MS. HINDERAKER:  Could we do a status conference in

13   six months?  And if --

14           THE COURT:  Sure.

15           MR. HINDERAKER:  If we're --

16           THE COURT:  Because the point is there's no money

17   that's going to be distributed for a while, yet, anyway.

18           MR. HINDERAKER:  Yes.  And there's a lot of loans yet

19   to work through, and part of the problem is on some of these

20   loans it's going to be very simple to figure out how much the

21   Riegers are due and how much their claims are worth.

22           THE COURT:  And, also, in six months, we'll know how

23   much they were paid or not paid on these other loans and to

24   what extent there are or are not other offsets that are due the

25   estate because of prepaid interest.

1          MR. HINDERAKER:  Or, perhaps, the easier way is just

2    to deny the motion and let this claim --

3          THE COURT:  Oh, okay.

4          MR. HINDERAKER:  -- flow with --

5          THE COURT:  I'll deny the motion for summary

6    judgment.

7          MR. HINDERAKER:  I mean --

8          THE COURT:  I see there's genuine issues of material

9    fact.

10          MR. HINDERAKER:  If --

11          THE COURT:  I'm not ruling on --

12          MR. HINDERAKER:  If --

13          THE COURT:  -- the merits.

14          MR. HINDERAKER:  Yeah.  If that's the conclusion you

15    have reached, your Honor, then maybe it doesn't make sense to

16    come back in six months and have a status conference --

17          THE COURT:  Okay.

18          MR. HINDERAKER:  -- and just let this --

19          THE COURT:  So fine.

20          MR. HINDERAKER:  -- take --

21          THE COURT:  So I'm denying --

22          MR. HINDERAKER:  -- its natural course.

23          THE COURT:  -- the motion on summary judgment merely

24    because there's a genuine issue of material fact and not on the

25    merits.

1          And so the trustee's counsel will be in contact with you

2   at some point, Ms. Rieger, to discuss all your claims together.

3          MS. RIEGER:  I appreciate that, your Honor.

4          THE COURT:  Thank you very much.

5          MS. RIEGER:  Thank you.

6          THE COURT:  Um-h'm.  Okay.  Next, we have -- and if

7   you wish to be excused, you certainly may, Ms. --

8     (Ms. Rieger discontinued telephonic appearance.)

9          THE COURT:  Okay.  She is.

10     (Concluded at 11:09:17 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

24

1          I certify that the foregoing is a correct transcript.

2     from the electronic sound recording of the proceedings in

3     the above-entitled matter.

4

5

6     /s/ Lisa L. Cline                    01/25/08

7     Lisa L. Cline, Transcriptionist           Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25