LEWIS AND ROCA LLP LAWYERS

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169-5996
Facsimile (702) 949-8321
Telephone (702) 949-8320

Susan M. Freeman AZ State Bar No. 004199
Email: sfreeman@lrlaw.com
Rob Charles NV State Bar No. 006593
Email: rcharles@lrlaw.com
John Hinderaker AZ State Bar No. 018024
Email: jhinderaker@lrlaw.com

Attorneys for USACM Liquidating Trust

E-Filed on 2/29/08

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

USA Commercial Mortgage Company,

USA Capital Realty Advisors, LLC,

USA Capital Diversified Trust Deed Fund, LLC,

USA Capital First Trust Deed Fund, LLC,[1]

USA Securities, LLC,[2]

Debtors.

**Affects:**
☐All Debtors
☒ USA Commercial Mortgage Company
☐ USA Capital Realty Advisors, LLC
☐ USA Capital Diversified Trust Deed Fund, LLC
☐ USA Capital First Trust Deed Fund, LLC
☐ USA Securities, LLC

USACM Liquidating Trust,

Plaintiff,

v.

Compass USA SPE, LLC, a Delaware limited liability company, and Compass Partners, LLC, a Delaware limited liability company, and Republic Title of Texas, Inc.,

Defendants.

Case No. BK-S-06-10725-LBR
Case No. BK-S-06-10726-LBR
Case No. BK-S-06-10727-LBR
Case No. BK-S-06-10728-LBR[1]
Case No. BK-S-06-10729-LBR[2]

CHAPTER 11

Jointly Administered Under Case No. BK-S-06-10725 LBR

**Adv. No.**

**Complaint**

---

[1] This bankruptcy case was closed on October 12, 2007.

[2] This bankruptcy case was closed on December 26, 2007.




The USACM Liquidating Trust (the "USACM Trust") alleges:

**Introduction**

The USACM Trust seeks to recover sums that Compass improperly required to be held in escrow when it closed the sale of the assets of USA Commercial Mortgage Company to Compass, to extend a deadline that would result in the USACM Trust's forfeiture of a portion of Compass' purchase price, and to recover Prepaid Interest that Compass elected not to collect from Lenders.

**Parties, Jurisdiction, Venue**

1. USACM Trust was created pursuant to the Third Amended Joint Chapter 11 Plan of Reorganization (the "Joint Plan") filed by USA Commercial Mortgage Company ("USACM") and the other four debtors in Case No. 06-10725 (Docket No. 1799). The Joint Plan was confirmed by the Bankruptcy Court on January 8, 2007, and became effective on March 12, 2007.

2. The Joint Plan expressly retained USACM's causes of action for enforcement by the USACM Trust, pursuant to 11 U.S.C. § 1123(b)(3)(B). The Joint Plan also transferred all assets of USACM on the Effective Date to the USACM Trust. The USACM Trust, therefore, has standing to bring this action against the Defendants.

3. The USACM Trust is a liquidating trust organized under Nevada law. The USACM Trust's beneficiaries are the holders of allowed unsecured claims against USACM. Geoffrey L. Berman serves as the trustee of the USACM Trust.

4. Compass USA SPE, LLC is a Delaware limited liability company that engaged in a transaction with USACM in connection with this bankruptcy case. Compass Partners, LLC is a Delaware limited liability company that engaged in a transaction with USACM in connection with this bankruptcy case. (Compass USA SPE, LLC and Compass Partners, LLC are collectively referred to as "Compass").

5. Republic Title of Texas, Inc. is a corporation serving as Escrow Agent pursuant to the agreements described below.

6. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 157 and 1334 and 11 U.S.C. § 523. This is an adversary proceeding pursuant to Fed. R. Bankr. P. 7001(6) and a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

7. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

**General Allegations**

8. This action concerns the Asset Purchase Agreement, dated December 8, 2006, by and among USACM, USA Capital First Trust Deed Fund, LLC ("FTDF," and together with USACM, "Sellers"), Compass, and the acknowledging parties thereto (the "APA"). A copy of the Compass APA was filed with the Court on December 18, 2006, as Docket No. 2164.

9. The Compass APA was approved by this Court as part of the Confirmation Order for the Debtors' Third Amended Joint Plan of Reorganization. See Order Confirming the "Debtors' Third Amended Joint Chapter 11 Plan of Reorganization," As Modified Herein, docketed by the Court on January 8, 2007, as Docket No. 2376 ("Confirmation Order"), and Findings of Fact and Conclusions of Law in Support of the "Order Confirming the "Debtors' Third Amended Joint Chapter 11 Plan of Reorganization, As Modified Herein," docketed by the Court on January 8, 2007, as Docket No. 2377.

10. The sale of the assets covered by the Compass APA to Buyer closed on February 16, 2006 (the "Closing"). Prior to the Closing, disputes arose between Buyer and Sellers with respect to Buyer's entitlement to certain disputed price adjustments claimed by the Buyer under the Compass APA.

LEWIS AND ROCA LLP LAWYERS

11. In order to complete the Closing by the deadline outlined in the Compass APA, Buyer and Sellers entered into two escrow agreements whereby a total of $2,565,666.45 was placed into escrow, pending determination by this Court with respect to Buyer's entitlement to the disputed price adjustments that Buyer claimed under the Compass APA.

12. By the assignment made pursuant to the Confirmed Debtors' Third Amended Joint Chapter 11 Plan of Reorganization, as of March 12, 2007, USACM as seller assigned all of its rights under the Escrow Agreement to the USACM Trust.

13. Pursuant to a stipulation between the USACM Liquidating Trust and the Official Committee of Equity Security Holders of FTDF that was approved by an order of the Bankruptcy Court entered on June 12, 2007 (Docket No. 2958), FTDF has assigned to the USACM Liquidating Trust, and the USACM Liquidating Trust has agreed to assume all responsibility for the litigation or settlement of, all of FTDF's rights with respect to the escrow agreements addressed herein.

**The $1.25 Million Escrow Agreement**

14. The first escrow agreement (the "$1.25 Million Escrow Agreement") is between the Sellers, Buyer, and Republic Title of Texas, Inc. (the "Escrow Agent"), and provides for an escrow amount of $1,250,000 with respect to the Buyer's asserted right to invoke an Individual Asset MAC (as defined in the Compass APA) under Section 9.1(i) of the Compass APA. Recital C of the $1.25 Million Escrow Agreement describes the Section 9.1(i) dispute as follows:

> C. A dispute has arisen between the Buyer and Sellers with respect to Buyer's right to invoke the provisions of Section 9.1(i) of the Purchase Agreement to assert an Individual Asset MAC (as defined in the Purchase Agreement) of $1,250,000 with respect to the following six First Trust Deed Fund Assets (as defined in the Purchase Agreement) identified in Schedule 1 to the Purchase Agreement: (1) Gramercy Court Condos; (2) Shamrock Tower, LP; (3) Brookmere/Matteson $27,050,000; (4) Interstate Commerce Center Phase II; (5) Lake Helen Partners; and (6)

Amesbury/Hatters Point (the "Six Loans"). The specific details of the Buyer's contentions concerning the alleged defaults with respect to the Six Loans and the specific amounts of alleged damages that such alleged defaults will cause to Buyer are outlined in Exhibit "A" attached hereto and incorporated herein. Buyer contends that it is entitled to reduce the First Trust Deed Fund Price (as defined in the Purchase Agreement) by $1,250,000 pursuant to Section 9.1(i) of the Purchase Agreement. Sellers contend that Buyer is not entitled to reduce the First Trust Deed Fund Price by $1,250,000 pursuant to Section 9.1(i) of the Purchase Agreement.

15. Under Exhibit A to the $1.25 Million Escrow Agreement, Compass claims that it is entitled to the following purchase price reductions under the Compass APA (but capped at $1,250,000 pursuant to Section 9.1(i) of the Compass APA) in connection with the following 6 Loans (the "6 Loans"):

| **Loan Name** | **Purchase Price Reduction** | **APA Provision** |
|---|---|---|
| Amesbury Hatter's Point | $330,016.00 | Section 9.1(i) |
| Brookmere Matteson | $152,298.12 | Section 9.1(i) |
| Gramercy Court Condos | $940,175.20 | Section 9.1(i) |
| Interstate Commerce Phase II | $33,039.89 | Section 9.1(i) |
| Lake Helen | $199,870.42 | Section 9.1(i) |
| Shamrock Tower LP | $965,000.00 | Section 9.1(i) |
| Total | $2,620,398.64 | |

16. Although Compass did not state in Exhibit A to the $1.25 Million Escrow Agreement the specific basis for asserting its claim to a Section 9.1(i) price reduction for the 6 Loans, the USACM Trust is informed by Sellers from their pre-Closing negotiations with Compass that Compass claims that the balances stated in Schedule 1 to the Compass APA for the FTDF Ownership of these 6 Loans were overstated by the amounts listed in Exhibit A to the $1.25 Million Escrow Agreement.

17. Schedule 1 to the Compass APA lists the FTDF Ownership in the principal balances of the 6 Loans as follows:

| **Loan Name** | **$ FTDF Ownership** | **Compass Disputed Amount** |
|---|---|---|
| Amesbury Hatter's Point | $330,016.00 | $330,016.00 |
| Brookmere Matteson | $2,021,085.00 | $152,298.12 |
| Gramercy Court Condos | $4,570,500.00 | $940,175.20 |

LEWIS AND ROCA LLP LAWYERS

| Loan Name | $ FTDF Ownership | Compass Disputed Amount |
|---|---|---|
| Interstate Commerce Phase II | $1,603,204.00 | $33,039.89 |
| Lake Helen | $908,908.00 | $199,870.42 |
| Shamrock Tower LP | $3,300,000.00 | $965,000.00 |

18. Section 9.1(i) of the Compass APA, the sole basis for Compass's claim to a price reduction for the 6 Loans, states:

> (i) Additionally, between the Auction Date and the Closing Date, or at any time with respect to the statements set forth in Articles III and IIIA (with the exception of Section 3.4(b)), there will be no adverse change that, through no fault of Purchaser, impairs the value of any one or more First Trust Deed Fund Assets by an amount that is material but does not exceed $1,250,000, provided however, that, the calculation of any impairment in such value shall exclude any payments of principal received by the Debtors after the Cut-Off Date to the extent such principal payments are related to the First Trust Deed Fund Assets (an "Individual Asset MAC"). If an Individual Asset MAC occurs, then Purchaser may, in its sole discretion, proceed to close the transaction, excluding or including the Asset or Assets with regard to which an Individual Asset MAC has occurred, at the previously agreed Total Asset Purchase Price minus the lesser of (a) 0.75% of the cash otherwise payable as part of the Total Asset Purchase Price or (b) the actual value of the Individual Asset MAC; provided however, that the Total Asset Purchase Price shall only be adjusted once pursuant to this provision; and ....

19. Even if it were true that the balances for the FTDF Ownership in the 6 Loans stated in Schedule 1 to the Compass APA were overstated (which is not true, as outlined below), Compass still is not entitled to a purchase price reduction for the 6 Loans. Neither of the Sellers gave any representations or warranties as to the accuracy of the dollar amounts listed in Schedule 1 to the Compass APA for the FTDF Ownership in the 6 Loans. Compass purchased the FTDF Ownership in the 6 Loans on an "as is" basis without any representation or warranty as to the amounts owed to FTDF on the 6 Loans or as to the collectability of those amounts.

20. Section 9.1(i) requires an "adverse change" "between the Auction Date and the Closing Date" that "impairs the value of any one or more First Trust Deed Fund Assets by an amount that is material" in order for Compass to be entitled to an Individual Asset

LEWIS AND ROCA LLP LAWYERS

MAC (assuming that Compass is not relying upon the Sellers' statements in Articles III and IIIA of the Compass APA, discussed below). There was no adverse change to any of the 6 Loans between the Auction Date and the Closing Date upon which Compass can claim an Individual Asset MAC. The principal balances for the FTDF Ownership in the 6 Loans were the same on the Closing Date (February 16, 2007) as they were on the Auction Date (December 7, 2006).

21. Section 9.1(i) also states that Compass may rely at any time upon an "adverse change" with respect to the Sellers' statements in Articles III and IIIA of the Compass APA (with the exception of Section 3.4(b) of the Compass APA) that "impairs the value of any one or more First Trust Deed Fund Assets by an amount that is material" as the basis for an Individual Asset MAC. However, there was no "adverse change" with respect to the Sellers' statements in Articles III and IIIA of the Compass APA (excluding Section 3.4(b) of the Compass APA) upon which Compass can rely for a purchase price reduction for the 6 Loans.

22. The Statements of USACM in Article III of the Compass APA (excluding Section 3.4(b) of the Compass APA, which is expressly excluded as the basis for an Individual Asset MAC by Section 9.1(i) of the Compass APA), deal with the following topics:

3.1 USACM's due incorporation.

3.2 USACM's authority and capacity to enter into and perform under the Compass APA.

3.3 To USACM's knowledge, there is no pending or threatened Litigation not disclosed in Schedule 3.3 of the Compass APA that could have a material adverse effect upon the Assets being sold to Compass.

3.4(a) With respect to the Commercial Mortgage Assets, USACM has the authority to sell the Commercial Mortgage Assets to Compass.

LEWIS AND ROCA LLP LAWYERS

3.4(b) [This subsection was expressly excluded as a basis for an Individual Asset MAC under Section 9.1(i).][3]

3.4(c) With respect to the Commercial Mortgage Assets, USACM will assign the Mortgages to Compass.

3.4(d) With respect to the Commercial Mortgage Assets, USACM and FTDF have taken no action to render the Notes invalid or unenforceable, and they are legal, valid and binding obligations of the makers thereof.

3.4(e) With respect to the Commercial Mortgage Assets, USACM has not modified any Loans or released any collateral in any way not authorized by Sections 6.2 and 9.1(g) of the Compass APA.

3.4(f) With respect to the Commercial Mortgage Assets, no pending or threatened Litigation that could have a material adverse effect upon the Loans.

3.4(g) With respect to the Commercial Mortgage Assets, USACM has not received any written notice that any collateral for the Loans is in violation of any laws.

3.4(h) With respect to the Commercial Mortgage Assets, there is no pending or threatened condemnation of the collateral for the Loans, and such collateral complies with all environmental laws.

3.4(i) With respect to the Commercial Mortgage Assets, the FTDF Loans are term loans and have been fully advanced by FTDF and the other Direct Lenders.

There has been no "adverse change" with respect to USACM's statements in Article III of the Compass APA (excluding Section 3.4(b) of the Compass APA) upon which Compass can rely for a purchase price reduction for the 6 Loans.

23. The Statements of FTDF in Article IIIA of the Compass APA deal with the following topics:

---

[3] Section 3.4(b) of the Compass APA states: "(b) The outstanding principal balance with regard to each of the Loans, as set forth in Schedule 1 attached hereto, is each borrower's outstanding balance as of the Cut-Off Date." By expressly excluding Section 3.4(b) as the basis for a Section 9.l(i) Individual Asset MAC, the parties expressly agreed that the Sellers gave no representations or warranties as to the principal balances listed in Schedule 1 to the Compass APA, and any inaccuracies in those principal balances could not used to reduce the purchase price under the Compass APA.

LEWIS AND ROCA LLP LAWYERS

3A.1 FTDF is duly organized in Nevada.

3A.2 FTDF's authority and capacity to enter into and perform under the Compass APA.

3A.3 To FTDF's knowledge, there is no pending or threatened Litigation not disclosed in Schedule 3.A3 of the Compass APA that could have a material adverse effect upon the Assets being sold to Compass.

3A.4(a) With respect to the First Trust Deed Fund Assets, FTDF has the authority to sell the First Trust Deed Fund Assets to Compass.

3A.4(b) With respect to the First Trust Deed Fund Assets, FTDF will assign the Mortgages for the First Trust Deed Fund Assets to Compass.

3A.5 No Prepaid Interest will remain due from FTDF after such Prepaid Interest previously netted by USACM has been transferred to USACM pursuant to the Plan.

There was no "adverse change" with respect to FTDF's statements in Article IIIA of the Compass APA upon which Compass can rely for a purchase price reduction for the 6 Loans.

24. Compass also improperly relies upon Section 9.1(i) to sweep together alleged principal balance overstatements for 6 Loans into a single Individual Asset MAC. Section 9.1(i) makes it clear that it is only a single event constituting an adverse change that can be relied upon as the basis for an Individual Asset MAC. If for whatever reason the Court concludes that the Sellers overstated FTDF's Ownership of all 6 Loans in Schedule 1 of the Compass APA, each of the six overstatements would be a separate event and a separate "adverse change." Compass is only entitled to assert one of those overstatements as its Individual Asset MAC, not six separate events as a single "adverse change."

25. As outlined below, Compass's assertion that the FTDF Ownership of the 6 Loans in Schedule 1 of the Compass APA was overstated is without merit.



**Amesbury/Hatter's Point Loan**

26. Schedule 1 to the Compass APA lists the FTDF Ownership in the Amesbury/Hatter's Point Loan at $330,016. Compass claims that there is no documentation that FTDF has any interest in the Amesbury/Hatter's Point Loan, and therefore evidently disputes the entire $330,016 listed for FTDF's Ownership in the Amesbury/Hatter Point Loan.

27. The Investor History Report for FTDF for the Amesbury/Hatter's Point shows that FTDF received an assignment of an interest in the Amesbury/Hatter's Point Loan for $15,000 on 6/13/05, and that FTDF then funded the following amounts for the Amesbury/Hatter's Point Loan: $141,000 on 7/6/05, $25,000 on 11/8/05, $50,000 on 12/12/05, $66,500 on 2/9/06, and $53,000 on 3/24/06. The Investor History Report for FTDF also reflects that FTDF assigned to other parties the following amounts for the Amesbury/Hatter's Point Loan: $13,378 on 2/16/06, $5,000 on 3/1/06, and $2,106 on 3/6/06. The net FTDF interest in the Amesbury/Hatter's Point Loan after all of these transfers is $330,016, consistent with Schedule 1 to the Compass APA.

**Brookmere/Matteson Loan**

28. Schedule 1 to the Compass APA lists the FTDF Ownership in the Brookmere/Matteson Loan at $2,021,085.00. Compass claims that this amount is overstated by $152,298.12.

29. The Investor History Report for FTDF for the Brookmere/Matteson Loan lists the FTDF interest in the Brookmere/Matteson Loan on 7/31/06 at $2,021,085, which is the same amount listed on Schedule 1 to the Compass APA.

30. USACM assumes that Compass is challenging the FTDF Ownership balance for Brookmere/Matteson Loan because of an error in the last recorded loan document for the Brookmere/Matteson Loan, which was the Fifth Amendment to Construction Loan




Agreement, Promissory Note, Mortgages and Security Agreements, Assignments of Rents and Leases and Other Loan Documents dated March 25, 2005, and recorded on April 25, 2005 (the "Fifth Amendment"). FTDF is listed as Direct Lender No. 202 for $4,742,909 on the Fifth Amendment.

31. The FTDF Investor History Report for the Brookmere/Matteson Loan states that there was a $250,000 funding by FTDF for the Brookmere/Matteson Loan on March 22, 2005, which increased the FTDF interest in the Brookmere/Matteson Loan at that time to $4,893,238.50. That same amount is shown on the FTDF Investor History Report for the FTDF interest in the Brookmere/Matteson Loan three days later on March 25, 2005, the date of the Fifth Amendment. This balance for FTDF stated in the Investor History Report as of March 25, 2005, is $150,329.50 higher than the $4,742,909 balance for FTDF shown in the Fifth Amendment for the same date (March 25, 2005). This difference ($150,329.50) is approximately the same as the overstated balance claimed by Compass ($152,298.12). The FTDF Investor History Report reflects that the true balance of the FTDF interest in this Loan on March 25, 2005, was $4,893,238.50. Therefore, the balance of the FTDF interest on March 25, 2005 that is shown for that date in the Fifth Amendment ($4,742,909) was in error.

**Gramercy Court Condos Loan**

32. Schedule 1 to the Compass APA lists the FTDF Ownership in the Gramercy Court Condos Loan at $4,570,500, which is 13.10% of the 7/31/06 Loan Balance for the Gramercy Court Loan of $34,884,500. Compass claims that the FTDF Ownership in the Gramercy Court Loan is overstated by $940,175.20.

33. Page 11 of the Fourteenth Amendment to Deed of Trust for the Gramercy Court Loan that was recorded on 2/14/06 shows the FTDF Ownership interest in the Gramercy Loan as of the 2/14/06, the date of the Fourteenth Amendment, at $4,070,500.



34. A subsequent advance of $500,000, which was all funded by FTDF, was made by FTDF on the Gramercy Court Loan on March 28, 2006. USACM has a copy of the $500,000 wire sent on March 28, 2006 by FTDF to GT Leach, the contractor for the Gramercy Project, along with the wire transfer confirmation. (The wire transfer confirmation shows: "FBO [For Benefit Of] Gramercy/T Suttles"). The total of the $4,070,500 FTDF Ownership balance reflected in the Fourteenth Amendment and the $500,000 additional advance wire transfer on March 28, 2006 corresponds to the $4,570,500 Ownership balance for FTDF for the Gramercy Loan listed on Schedule 1 to the APA, which also corresponds to the FTDF Investor History Report for the Gramercy Loan. Page 5 of FTDF Investor History Report for the Gramercy Loan confirms that the FTDF Investment balance in the Gramercy Loan was increased from $4,070,500 to $4,570,500 on March 28, 2006 as a result of the $500,000 additional advance wire transfer.

35. The $500,000 wire on March 28, 2006, is clearly secured by the Gramercy Deed of Trust. The first page of the Gramercy Deed of Trust includes dragnet clauses that clearly secure the $500,000 additional advance. The front page of the Gramercy Deed of Trust states that the Deed of Trust is "for the purpose of securing, in such priority as Beneficiary may elect, each of the following:

> 1. The due, prompt and complete payment . . . of each and every obligation, covenant and agreement contained in Trustor's promissory note of even date herewith in the initial principal amount of Ten Million Four Hundred Sixty-Two Thousand Five Hundred Dollars . . . together with interest thereon specified therein, payable to the order of Beneficiary and any and all modifications, extensions or renewals thereof, whether hereafter evidenced by the Note or otherwise, and whether advanced now or in the future; and
>
> 2. The payment of all other sums, with interest thereon at the rate of interest provided for herein or in the Note, becoming due or payable under the provisions of this Deed of Trust, the Loan Agreement or any other instrument or instruments heretofore or hereafter executed by Trustor having

LEWIS AND ROCA LLP LAWYERS

reference to or arising out of or securing the indebtedness represented by the Note; and

3. The payment of such additional sums and interest thereof which Beneficiary may hereafter loan to Trustor, or to its successors or assigns, whether or not evidenced by a promissory note or notes which are secured by this Deed of Trust;

36. The enforceability of dragnet clauses such as those contained in the Gramercy Deed of Trust has long been recognized under Texas law.[4] In *Moss v. Hipp*, the Texas Supreme Court stated that the indebtedness covered by a dragnet clause must have been reasonably in the contemplation of the parties to the deed of trust at the time that it was executed. That rule clearly applies in this circumstance, because both the Gramercy Promissory Note and the Gramercy Construction Loan Agreement, contemplated that the principal amount of the Gramercy Note and Gramercy Loan could be increased to $37,250,000, which is more than the current principal balance of $34,884,500. The $500,000 additional advance on March 28, 2006 was clearly contemplated by the parties at the time that the Gramercy Deed of Trust was executed. A proof of claim filed by Compass in the bankruptcy case of the Gramercy borrower admits and acknowledges that the $500,000 additional advance was made.

**Interstate Commerce Phase II Loan**

37. Schedule 1 to the Compass APA lists the FTDF Ownership in the Interstate Commerce Phase II Loan at $1,603,204.00. Compass claims that this amount is overstated by $33,039.89.

38. On August 3, 2006 (after the date of the balances listed on Schedule 1 to the Compass APA), the borrower made a partial principal repayment on this loan, and

---

[4] *Moss v. Hipp*, 387 S.W.2d 656 (Texas 1965); *Southwest Title Ins. Co. v. Northland Bldg. Corp.*, 552 S.W.2d 425 (Texas 1977); *Magnum Mach. & Tool Corp. v. First National Bank of Seguin*, 545 S.W.2d 549 (Ct. Civ. App. Texas 1976); *FDIC v. Bodin Concrete Co.*, 869 S.W.2d 372 (Tex. App. 1993); *Nelson v. Citizens Bank & Trust Co. of Baytown, Texas*, 881 S.W.2d 128 (Tex. App. 1994).




$276,230.61 of that repayment was paid to FTDF on account of its ownership interest in the loan. The balance of the Interstate Commerce Phase II Loan was then repaid on March 6, 2007, and $1,325,723.01 of this payoff was paid to Compass on account of FTDF's ownership interest in the loan. The total of these two principal repayments on account of FTDF's interest in the loan was $1,601,953,62, which is only $1,250.38 less that the amount listed on Schedule 1 to the Compass APA. Thus, the $33,039.89 overstatement claimed by Compass is not correct. Further, a $1,250 difference is not a material difference in a $1.6 million obligation and therefore not an independent MAC in and of itself.

**Lake Helen Loan**

39. Schedule 1 to the Compass APA shows the FTDF interest in the Lake Helen Partners loan at $908,908. Compass asserts that the FTDF interest in the Lake Helen loan is overstated by $199,870.42.

40. The Lake Helen Mortgage was recorded on 12/10/04, and reflects the FTDF interest in the Lake Helen loan at $875,000. An Assignment of Beneficial Interest in Deed of Trust was recorded on 2/18/05, and documented a transfer of a $200,000 interest in the Lake Helen loan from USA Capital Diversified Trust Deed Fund ("DTDF") to FTDF, which increased the total FTDF interest in the Lake Helen loan to $1,075,000. This Assignment of Beneficial Interest is consistent with the Investor History Report for FTDF for the Lake Helen Loan as of 1/06/05, which is when the $200,000 transfer from DTDF to FTDF was recorded in the Investor History Report.

41. The FTDF Investor History Report also reflects that the FTDF interest in the Lake Helen loan was paid down to $870,944.09 on 2/17/06, which appears to be the current principal balance of the FTDF interest in the Lake Helen loan. The difference between the Investor History Report balance of $870,944.09 and the $908,908 balance




shown on Schedule 1 to the Compass APA is only $37,963, not $199,870.42 as claimed by Compass. The $870,944.09 amount shown on the Investor History Report is the correct amount rather than the $908,908 amount listed on Schedule 1 to the Compass APA.

**Shamrock Tower LP Loan**

42. Schedule 1 to the Compass APA lists the FTDF interest in the Shamrock Towers Loan at $3,300,000. Compass claims that this amount is overstated by $965,000.

43. The First Amendment to Deed of Trust for the Shamrock Towers Loan recorded on 2/16/05 lists FTDF with a $2,700,000 interest in the Shamrock Towers loan. This First Amendment also increased the principal balance of the Shamrock Towers loan to $10,000,000.

44. The difference between the $3,300,000 amount in Schedule 1 to the Compass APA and the FTDF Ownership interest amount of $2,700,000 stated in the First Amendment to the Shamrock Towers Deed of Trust is $600,000. $500,000 of that amount is accounted for as a result of two additional advances made by FTDF on 11/16/04 and 12/1/04. The USACM files contain a $390,000.00 check request from FTDF on 11/16/04, which states "Shamrock interest," and a $110,000.00 check request from FTDF on 12/1/04, which states "to cover balance of loan funding in the Shamrock loan," for a total of $500,000. The check requests state that the payees of the checks would be USACM, with the vendor address listed as "Collection Trust Acct."

45. The FTDF Investor History Report for the Shamrock Towers Loan, which reflects that this additional $500,000 in funding went into an interest reserve for the Shamrock Towers. The $500,000 additional advance increased the principal balance of the Shamrock Towers Loan to $10,500,000, which is the current principal balance for the Shamrock Tower Loan as set forth on Schedule 1 to the Compass APA. The $10,500,000 principal balance of the Shamrock Towers Loan was agreed to and confirmed by the




Shamrock Towers Borrower and Guarantor in a signed Loan Extension Agreement dated February 6, 2006.

46. The Shamrock Towers Deed of Trust, which was purchased from Western United Life Assurance Company, states that it secures the "Indebtedness," which is defined as "all principal and interest payable under the Note," and "Note" is defined in the Shamrock Towers Deed of Trust as the original Note dated June 30, 2003, "together with all renewals, extensions, modifications, refinancings, and substitutions for the Note." This language from the Shamrock Towers Deed of Trust is operative to secure the $500,000 additional advance that was acknowledged by the Borrower and the Guarantor in the Loan Extension Agreement dated February 6, 2006.

47. The FTDF Investor History Report for the Shamrock Towers Loan also reflects that an additional $100,000 interest in the Shamrock Towers loan was transferred to FTDF on April 13, 2005. An Assignment of Beneficial Interest in Deed of Trust dated April 11, 2005 was recorded on October 5, 2005 evidencing the assignment to FTDF of the additional $100,000 principal balance in the loan. The transfer of this $100,000 interest along with the $500,000 additional advances outlined above account for the entire $600,000 difference between the First Amendment FTDF Ownership balance listed in the First Amendment to the Shamrock Towers Deed of Trust and the FTDF Ownership balance listed in Schedule 1 to the Compass APA.

**$903,000 Escrow Agreement**

48. The second escrow agreement (the "$903,000 Escrow Agreement") is between the USACM, Buyer, and Republic Title of Texas, Inc. (the "Escrow Agent"), and provides for an escrow amount of $903,000 with respect to the Buyer's asserted right to assert a dollar for dollar reduction of the Commercial Mortgage Price (as defined in the



Purchase Agreement) of $903,000 under Section 2.3(i) of the Compass APA. Recital C of the $903,000 Escrow Agreement describes the Section 2.3(i) dispute as follows:

> C. A dispute has arisen between the Buyer and Seller with respect to Buyer's right to invoke the provisions of Section 2.3(i) of the Purchase Agreement to assert a dollar for dollar reduction of the Commercial Mortgage Price (as defined in the Purchase Agreement) of $903,000 with respect to Buyer's contention that its rights to the Success Fees in connection with the Franklin-Stratford Investments, LLC Loan and the I-40 Gateway West Loan (as identified in Schedule 2 to the Purchase Agreement) (collectively the "Two Loans") have been impaired by Sellers' acceptance of full payoffs of the Two Loans. Buyer contends that it is entitled to reduce the Commercial Mortgage Price by $903,000 in connection with the Two Loans ($603,000 with respect to the Franklin-Stratford Investment, LLC Loan and $300,000 with respect to the I-40 Gateway West Loan) pursuant to Section 2.3(i) of the Purchase Agreement. Seller contends that Buyer is not entitled to reduce the Commercial Mortgage Price by $903,000 in connection with the Two Loans pursuant to Section 2.3(i) of the Purchase Agreement. A dispute has also arisen between the Buyer and Seller with respect to an aggregate amount of $1,031,666 in fees and interest with respect to certain loans serviced by Seller (the "**Exhibit A Loans**") identified on Exhibit "A" attached to this Agreement and incorporated herein. Buyer and Seller have agreed that 40% of such aggregate amount, being $412,666.45, shall be placed in escrow with respect to the open issues on the Exhibit A Loans for disbursement as provided herein.

The additional escrow amount of $412,666.45 described in Recital C of the $903,000 Escrow Agreement is addressed below, and is hereafter referred to as the "Self Liquidating Escrow".

49. USACM was very careful not to impair Compass's rights to the Success Fees for the Franklin-Stratford Investments, LLC Loan and the I-40 Gateway West Loan (the "Two Loans"). Those Success Fees are due upon the sale of the two projects that were financed by the Two Loans. The borrowers refinanced the Two Loans, and paid off the Two Loans with the proceeds of their refinancing loans, but the two projects were not sold in connection with the refinancings. Therefore, the Success Fees were not yet due when USACM accepted the full payoffs of the Two Loans shortly before the closing of the Compass APA.




50. Although USACM had no obligation to do so, USACM negotiated with the borrowers and guarantors of the Two Loans and arranged for them to execute Letter Agreements that preserved Compass's rights to collect the Success Fees in the future when the projects financed by the Two Loans were finally sold.

**Franklin/Stratford Loan Success Fee**

51. The Letter Agreement for the Franklin/Stratford Loan (the "Franklin/Stratford Letter Agreement"), dated February 2, 2007, was executed by Borrower Franklin/Stratford Investments, LLC, Robert Russell as Guarantor ("Guarantor"), and USACM as Servicer.

52. The Success Fee for the Franklin/Stratford Loan, which is outlined in Section 3.12 of the Franklin/Stratford Loan Agreement dated March 30, 2005, is described as follows:

> Borrower shall pay to USA[CM] an exit fee equal to 45% of the net profits from the sale of the Property, payable from the closing of each sale when any or all of the Property is sold.

As outlined in the Franklin/Stratford Loan Agreement, a Success Fee is owed on the Franklin/Stratford Loan only if there are net profits from the sale of the Franklin/Stratford Project, which cannot yet be determined because that Project has not yet been sold.

53. Pursuant to Section 9 of the Franklin/Stratford Letter Agreement, Borrower Franklin/Stratford and Guarantor Robert Russell agreed as follows:

> 9. Borrower and Guarantor hereby acknowledge and agree that USACM has reserved all of its rights with respect to the Exit Fee that might be owed in the future, and that USACM's right and entitlement to the Exit Fee has not been compromised or altered in any way, even if USACM forwards to the Title Company a "clean" payoff statement with no Reservation of Rights Paragraph in the payoff statement. USACM hereby acknowledges and agrees that Borrower and Guarantor have reserved all of their rights and defenses with respect to the Exit Fee that might be owed in the future.

54. Paragraph 11 of the Franklin/Stratford Letter Agreement also provides the following, which provides additional protection for Compass's rights to collect the Franklin/Stratford Success Fee in the future:

> 11. Because USACM will no longer be notified of a sale of any portion of the Project in connection with a request for a release of the Trust Deed on the Project, the Borrower agrees that it will provide to USACM or to USACM's assignee a notice of sale immediately after the closing of the sale of the last portion of the Project, along with the necessary information contemplated by the Loan Agreement in order for USACM or its assignee to determine whether or not there are any net profits from the sale of the Project that would give rise to any Exit Fee payment obligation.

**Franklin/Stratford Loan Success Fee**

55. The Letter Agreement for the I-40 Gateway West Loan (the "I-40 Gateway West Letter Agreement"), dated February 2, 2007, was executed by Borrower I-40 Gateway West, LLC, Robert Russell as Guarantor ("Guarantor"), and USACM as Servicer.

56. The Success Fee for the I-40 Gateway West Loan, which is outlined in Section 3.11 of the I-40 Gateway West Loan Agreement dated January 11, 2005, is described as follows:

> Borrower shall pay to USA[CM], as additional Loan fees at the time the Real Property or portions of it are sold, the following amounts ("Exit Fees"): (a) from the first $600,000 (or less if that is all there be) of net profits from the sale of Property, 40% thereof; and (b) from all the remaining net profits from the sale of the Property, 33 1/3% thereof."

As outlined in the I-40 Gateway West Loan Agreement, a Success Fee is owed on the I-40 Gateway West Loan only if there are net profits from the sale of the I-40 Gateway West Project, which cannot yet be determined because that Project has not yet been sold.

57. Pursuant to Section 9 of the I-40 Gateway West Letter Agreement, Borrower I-40 Gateway West and Guarantor Robert Russell agreed as follows:

> 9. Borrower and Guarantor hereby acknowledge and agree that USACM has reserved all of its rights with respect to the Exit Fees that might be owed in the future, and that USACM's right and entitlement to the Exit



> Fees has not been compromised or altered in any way, even if USACM forwards to the Title Company a "clean" payoff statement with no Reservation of Rights Paragraph in the payoff statement. USACM hereby acknowledges and agrees that Borrower and Guarantor have reserved all of their rights and defenses with respect to the Exit Fees that might be owed in the future.

58. Section 11 of the I-40 Gateway West Letter Agreement also provides the following, which provides additional protection for Compass's rights to collect the I-40 Gateway West Success Fee in the future:

> 11. Because USACM will no longer be notified of a sale of any portion of the Project in connection with a request for a release of the Trust Deed on the Project, the Borrower agrees that it will provide to USACM or to USACM's assignee a notice of sale immediately after the closing of the sale of the last portion of the Project, along with the necessary information contemplated by the Loan Agreement in order for USACM or its assignee to determine whether or not there are any net profits from the sale of the Project that would give rise to any Exit Fee payment obligation.

59. Because USACM has fully protected Compass's rights to collect the Success Fees on the Franklin/Stratford Project and the I-40 Gateway West Project in the future, USAM has not impaired Compass's right to these Success Fees, which were sold to Compass pursuant to the Compass APA. USACM is entitled to the turnover of the entire $903,000 set aside in escrow for these Success Fees under the $903,000 Escrow Agreement.

60. Compass's argument that USACM as servicer for the Direct Lenders for the Two Loans should have rejected the full payoffs for the Two Loans that were tendered by the borrowers of the Two Loans and instead insisted upon additional payments for the Success Fees that were not yet due at that time (and may never be due if there are no "net profits" when the two projects are ultimately sold) is illogical. If USACM had followed this dangerous course of action merely to please Compass and avoid a dispute at the Closing with Compass, the full payoffs of the Two Loans probably would not have occurred, which would have caused great damage to the Direct Lenders for the Two Loans, to USACM, and to the borrowers of the Two Loans. USACM took prudent actions



to protect Compass's rights to the Success Fees in the future. Compass is not entitled to any reduction in the purchase price for the Commercial Mortgage Price under the Compass APA, and USACM is entitled to the full $903,000 held in escrow.

**Self-Liquidating Escrow**

61. On April 27, 2007, $177,061.60 of the Self-Liquidating Escrow was released to the USACM Trust.

62. On September 28, 2007, $132,583.06 of the Self-Liquidating Escrow was released to the USACM Trust.

63. Accordingly, the remaining balance of the Self-Liquidating Escrow is $103,021.34.

64. The Self-Liquidating Escrow expires by its terms on February 15, 2008, as the "Collection Deadline Date".

65. This term of the escrow agreement was material.

66. The USACM Trust alleges upon information that this one year term was selected in light of confirmation of the Plan and the expectation that Compass would collect the referenced loans in a reasonably expeditious manner.

67. Compass has been prevented from collecting the remaining Loans due to, to an extent, circumstances within Compass' control in its capacity as servicer.

68. Compass has been prevented from collecting the remaining Loans due, to an extent, to unanticipated changed circumstances, in particular the disputes identified in the litigation pending involving Compass in the United States District Court for the District of Nevada, Case No. 2:07-cv-00892-RCJ-GWF. However, many of the disputes identified in this litigation and the concomitant delays were caused by acts Compass intentionally took knowing that such decisions could delay collection of Loans.

LEWIS AND ROCA LLP LAWYERS

69. Allowing Compass to forfeit the USACM Trust's interest in the balance of the Self-Liquidating Escrow would be unconscionable.

70. Extending the Collection Deadline Date for a reasonable period of time commensurate with the delays caused by Compass' conduct would return the parties to the status quo.

**Prepaid Interest**

71. On October 2, 2006, this Court entered its Modified Order Authorizing Interim Distributions and Holdbacks at Docket 1424. This Holdback Order authorized USACM on an interim basis to withhold from sums due to Lenders (including FTDF and DTDF), among other things, "1.4. any remaining amounts that each Lender received pre-petition from USA on non-performing loans (the "Offsets"), as reflected by the sum of the amounts to be remitted by USA {due from the Lender} as shown on the Direct Lender Statements prepared for each Lender by account number for the month in question."

72. Footnote 1 to ¶ 1.4 of the Holdback Order explained: "For example, if a particular Lender invested in five different loans under a single vesting name, the amounts (which may be positive or negative) shown on Line 12 of each of the five Lender Statements for that vesting name will be netted together and the resulting amount, if positive, will be available for distribution to the Lender."

73. The justification for this interim holdback was USACM's illegal payment to Lenders of amounts that purported to be interest or principal from borrowers in default, generally known as and referred to in this Complaint as "Prepaid Interest."

74. Paragraph 28 of the Confirmation Order confirms that the Prepaid Interest, "including Prepaid Interest collected by [Compass] post-Closing" vests in the USACM Trust.

LEWIS AND ROCA LLP LAWYERS

75. Paragraph 47 of the Confirmation Order provides in part: "In accordance with Article IV, Section E.1.d.ii of the Plan, Section 7.3 of the Asset Purchase Agreement and any other orders of this Court, the Asset Purchaser is authorized and directed to net Prepaid Interest sums due from Direct Lenders and collect Prepaid Interest from Borrowers, and remit those amounts to USACM or the USACM Trust, as applicable."

76. Article IV, Section E.1.d of the Plan provides in pertinent part:

> Prepaid Interest: Claims for Prepaid Interest, offsets, or holdbacks from Direct Lenders under the Plan (whether collected from the Borrowers or the Direct Lenders) shall be property of the USACM Estate free and clear of all liens, Claims and interests, except as otherwise provided in the Plan.
>
> i. Pre-Effective Date Prepaid Interest – Claims for Prepaid Interest, offsets, or holdbacks from Direct Lenders collected through the Effective Date are retained by USACM, and will be used to satisfy Allowed unclassified Claims and Allowed Class A-1, A-2 and A-3 Claims in accordance with the Plan, with any excess being contributed to the USACM Trust.
>
> ii. Post-Effective Date Prepaid Interest – The Prepaid Interest shall be collected post-Effective Date through an assignment of Prepaid Interest to the USACM Trust, which shall survive the Effective Date, so that the Asset Purchaser or any substitute or subsequent servicer will continue to net Prepaid Interest sums due from Direct Lenders in accordance with the Plan and will collect Prepaid Interest from Borrowers, and remit those amounts to the USACM Trust, except as otherwise provided herein.

77. On the Effective Date of the Plan, USACM applied the Prepaid Interest holdback to Lenders' Prepaid Interest obligations to USACM, accounted for the recoupment, and then provided Compass with a schedule of the as yet uncollected Prepaid Interest broken down by Loan and Lender.

78. Thereafter, Compass elected to collect Prepaid Interest on a Loan by Loan, not Lender basis.

79. Compass explains that it was uncertain that it had the authority to collect Prepaid Interest on a Lender basis, particularly where Lenders assigned their Loans to third parties.



80. Paragraph 82 of the Confirmation Order directed Compass with respect to Loan collections: "If, as between the provisions of the Loan Servicing Agreements and the order(s) of the Bankruptcy Court, it is not clear to Compass how the sums collected shall be distributed, then Compass shall hold the sums payable to the Lender until Compass either receives direction from the Lender and, as to items not constituting Commercial Mortgage Assets (as such term is defined in the Asset Purchase Agreement), the Sellers (or their successor or assignee under the Plan) regarding disbursement of interest, or is directed by an order from a court of competent jurisdiction."

81. Instead of withholding Prepaid Interest on a Lender basis and seeking agreement of the Lender or an order of this Court, Compass paid Lenders Prepaid Interest otherwise due to the USACM Trust under the Plan.

82. Although Compass does not provide the USACM Trust with detailed collection information, it has provided enough information for the USACM Trust to determine that Compass failed to collect over $55,000 in Prepaid Interest according to information provided by Compass in January 2008.

83. Despite demand by the USACM Trust, Compass has failed to remit the Prepaid Interest due to the USACM Trust in an amount to be determined at trial.

84. The USACM Trust is indebted to Compass for $237,023.29, which is USACM Liquidating Trust Marquis distribution check No. 1174. As the obligations of Compass the USACM Trust described here are mutual, the USACM Trust seeks to offset its claims against Compass against its debt to Compass.

**Request for Relief**

The Trust respectfully requests that the Court enter judgment against Compass as follows:

LEWIS AND ROCA LLP LAWYERS

A. The Court order that Republic Title of Texas, Inc., the Escrow Agent under the $1.25 Million Escrow Agreement and under the $903,000 Escrow Agreement, turn over to the USACM Trust (as the assignee to USACM's rights under the two Escrow Agreements) the sum of $1,250,000 under the $1.25 Million Escrow Agreement and the sum of $903,000 under the $903,000 Escrow Agreement.

B. The Court extend the Collection Deadline Date under the Self-Liquidating Escrow for a reasonable period of time.

C. The Court order Compass to remit to the USACM Trust all Prepaid Interest that Compass should have but failed to withhold from Lenders.

D. The Court authorize the USACM Trust to offset its debt to Compass against Compass' liability to the USACM Trust as determined in this action.

E. For the USACM Trust's taxable costs incurred in this action.

F. For the USACM Trust's attorneys' fees to the extent permitted by applicable law.

G. For such other relief as is proper.

Dated: February 29, 2008.

LEWIS AND ROCA LLP

By /s/ Rob Charles (#6593)

Susan M. Freeman, AZ 4199 (*pro hac vice*)
Rob Charles, NV 6593
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169
Telephone: (702) 949-8200
Facsimile: (702) 949-8398
E-mail: rcharles@lrlaw.com
*Attorneys for the USACM Liquidating Trust*