Israel Goldowitz, Chief Counsel
Karen L. Morris, Deputy Chief Counsel
James L. Eggeman, Assistant Chief Counsel, VA Bar No. 37101*
Frank A. Anderson, Attorney, D.C. Bar No. 478234**
Erika E. Barnes, Attorney, Cal. Bar No. 197309**
PENSION BENEFIT GUARANTY CORPORATION
Office of the Chief Counsel
1200 K Street, NW, Suite 340
Washington, D.C.  20005-4026
Tel: (202) 326-4020, ext. 3759
Fax: (202) 326-4112
anderson.frank@pbgc.gov and efile@pbgc.gov

and

Gregory A. Brower
United States Attorney, District of Nevada, NV Bar No. 5232
Carlos A. Gonzalez
Assistant United States Attorney
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada 89101
Tel:  (702) 388-6336
Fax:  (702) 388-6787
Carlos.Gonzalez2@usdoj.gov

Attorneys for Pension Benefit Guaranty Corporation

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| In re: ) | Case No. BK-S-06-10725 LBR |
| USA COMMERCIAL MORTGAGE COMPANY, ) | Case No. BK-S-06-10726 LBR |
| Debtor.) | Case No. BK-S-06-10727 LBR |
| In re: ) | Case No. BK-S-06-10728 LBR |
| USA CAPITAL REALTY ADVISORS, LLC ) | Case No. BK-S-06-10729 LBR |
| Debtor.) | |
| In re: ) | Chapter 11 |
| USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, ) | |
| Debtor.) | Jointly Administered Under |
| In re: ) | Case No. BK-S-06-10725 LBR |
| USA CAPITAL FIRST TRUST DEED FUND, LLC, ) | |
| Debtor.) | |
| In re: ) | Hearing Date:  April 17, 2008 |
| USA SECURITIES, LLC ) | Hearing Time: 9:30 a.m. |
| Debtor.) | |

---

*  Motion to permit appearance of government attorney pending.

**  Admitted pro hac vice.

## PBGC'S RESPONSE TO THE SUPPLEMENTAL OBJECTION
## OF THE USACM LIQUIDATING TRUST TO CLAIM NO. 791 OF THE PBGC

### TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.   FACTUAL BACKGROUND. ................................................................... 2

III.  STATUTORY BACKGROUND. ............................................................ 3

IV.   ARGUMENT. ............................................................................................ 5

    A.    The Court should reject the Liquidating Trust's attempts to treat
        the liquidation of USACM as a reorganization for purposes of
        the Special Rule. ............................................................................... **5**

    B.    Under the Supreme Court's functional analysis, termination premiums
        are taxes and are entitled to administrative priority. ..................... 10

        1.    Termination premiums are an involuntary pecuniary burden.. ........ 11

        2.    Termination premiums were imposed by the U.S. Congress. ............ 12

        3.    Termination premiums were imposed for public purposes,
            including defraying expenses of a U.S. federal agency and
            the U.S. government. ............................................................... 12

        4.    Termination premiums were imposed under the taxing
            power of the state. ................................................................... 14

        5.    No similarly situated creditor can be hypothesized under the
            termination premium statute. ................................................. 15

    C.    Termination premiums are not a penalty. ..................................... 16

V.    CONCLUSION. ...................................................................................... 20

# TABLE OF AUTHORITIES

## Cases Cited

*Adventure Res., Inc. v. Holland (In re Adventure Res.)*,
   137 F.3d 786 (4th Cir.), *cert denied*, 142 L.Ed.2d 328 (1998) . ................................. 11, 19

*Allen Oil Co. v. Comm'r of Internal Revenue*,
   614 F.2d 336 (2d Cir. 1980)........................................................................... 9

*Auer v. Robbins*,
   519 U.S. 452 (1997)..................................................................................... 7

*In re Bayly Corp.*,
   163 F.3d 1205 (10th Cir. 1998). .................................................................... 17

*Beck v. Pace Int'l Union*,
   127 S.Ct. 2310 (2007)................................................................................... 7

*In re Bethlehem Steel Corp.*,
   2004 WL 601656 (Bankr. S.D.N.Y.). .............................................................. 19

*In re Callahan*,
   304 B.R. 743 (W.D. Va 2004). ....................................................................... 19

*In re Camilli*,
   94 F.3d 1330 (9th Cir. 1996). ................................................................... 18, 19

*In re Chateaugay Corp.*,
   115 B.R. 760 (Bankr. S.D.N.Y. 1990),
   *aff'd*, 130 B.R. 690 (S.D.N.Y. 1991),
   *vacated by consent of the parties*, 17 Employee Benefits Cas. (BNA) 1102,
   1993 WL 388809 (S.D.N.Y. 1993)................................................................. 18

*In re Chateaugay*,
   53 F.3d 478 (2d Cir. 1995)...................................................................... 11, 19

*Chevron, U.S.A. v. National Resource Defense Council, Inc.*,
   467 U.S. 837 (1984)..................................................................................... 7

*City of New York v. Feiring*,
   313 U.S. 283 (1941)........................................................................ 10, 16, 18

*In re George*,
   361 F.3d 1157 (9th Cir. 2004). ............................................................... 11, 16

*In re Kent Plastics Corp.*,
    183 B.R. 841 (Bankr. S.D.Ind. 1995). ............................................................................ 18

*In re Lorber Indus. of Cal.*,
    373 B.R. 663 (9th Cir. BAP 2007)................................................................................ 18, 19

*In re Lorber Indus. of Cal.*,
    675 F.2d 1062 (9th Cir. 1982). ......................................................................................... 11

*Nachman Corp. v. PBGC*,
    446 U.S. 359 (1980)............................................................................................................ 12

*Oneida Ltd. v. PBGC*,
    __ B.R. __, 2008 WL 516493 (Bkrtcy.S.D.N.Y. Feb. 27, 2008)..................................... 10

*PBGC v. LTV Corp.*,
    496 U.S. 633 (1990)............................................................................................................. 4

*In re Sunnyside Coal Co.*,
    146 F.3d 1273 (10th Cir. 1998). ....................................................................................... 19

*United States v. Reorganized CF&I Fabricators of Utah, Inc.*
    518 U.S. 213 (1996)............................................................................. 1, 10, 11, 16, 18

*United States v. Ron Pair Enterprises*,
    488 U.S. 235 (1989)............................................................................................................. 9

*Yoder v. Ohio Bureau of Workers' Comp. (In re Suburban Motor Freight, Inc. I)*,
    998 F.2d 338 (6th Cir. 1993). ........................................................................................... 11

## United States Codes Cited

Title 11
    Section 503(b)(1)(B). ................................................................................................ 10, 15
    Section 507(a)(8). ............................................................................................................. 15
    Section 1141(d)(3). ............................................................................................................. 8

Title 26
    Section 4971...................................................................................................................... 16
    Section 9712(d)(1)(A)........................................................................................................

Title 29
    Section 1001(a). ............................................................................................................... 12
    Section 1001(b). ............................................................................................................... 12
    Section 1001(c). ............................................................................................................... 12
    Sections 1301-1461............................................................................................................. 4

iii

Section 1302..................................................................................................... 13
Section 1305..................................................................................................... 13
Section 1306................................................................................................ 5, 14
Section 1306(a)(7)................................................................................... 5, 11, 14
Section 1306(a)(7)(A)...................................................................................... 5, 6
Section 1306(a)(7)(B)................................................................... 6, 8, 9, 10, 13
Section 1307................................................................................................ 5, 11
Section 1321................................................................................................. 4, 11
Section 1321(a)................................................................................................... 3
Section 1321(b)................................................................................................... 3
Section 1322....................................................................................................... 4
Section 1342....................................................................................................... 3
Section 1342(a)................................................................................................... 3
Section 1348....................................................................................................... 3
Section 1361....................................................................................................... 4
Section 1362(a)................................................................................................. 11
Section 1362(b)................................................................................................. 11

## Other Authorities Cited

72 Fed. Reg. 71222 (Dec. 17, 2007). ............................................................... 7

151 Cong. Rec. S672 (Jan. 31, 2005). ........................................................... 15

151 Cong. Rec. S12912 (Nov. 16, 2005). ..................................................... 15

H. Con. Res. 95, 109th Cong. §§ 201 (2005). ............................................... 13

H.R. Rep. No. 109-276. ...................................................................... 6, 9, 13, 14

H.R. Rep. No. 109-232, Part 2. ....................................................................... 14

Pub. L. No. 109-171, 120 Stat. 4 (Feb. 8, 2006). .......................................... 12

Pub. L. No. 109-280, 120 Stat. 780 (Aug. 17, 2007). ................................... 12

H. Comm. on Educ. and the Workforce, "House Committee Backs Measure to Place PBGC
    on More Solid Financial Foundation, Help Protect Agency From Massive Taxpayer
    Bailout" (Oct. 26, 2005), http://republicans.edlabor.house.gov/archive/press/
    press109/first/10oct/pbgc102605.htm................................................................ 13

H. Comm. on Educ. and the Workforce, "House Committee Backs Measure to Place PBGC
    on More Solid Financial Foundation, Help Protect Agency From Massive Taxpayer
    Bailout" (Oct. 26, 2005), *available at* http://republicans.edlabor.house.gov/archive/
    press/press109/first/10oct/pbgc102605.htm. ..................................................... 15

PBGC 2007Annual Management Report, http://www.pbgc.gov/docs/2007AMR.pdf............ 4, 13

PBGC 2006 Annual Report, http://www.pbgc.gov/docs/2006_annual_report.pdf. ....................... 5

PBGC 2005 Annual Report, http://www.pbgc.gov/docs/05annrpt.pdf. ...................................... 13

## INDEX OF EXHIBITS

Exhibit

1          Trusteeship Agreement Between PBGC and USA Commercial Mortgage Co.

2          29 U.S.C. Section 1306(a)(7)

**PBGC'S RESPONSE TO THE SUPPLEMENTAL OBJECTION
OF THE USACM LIQUIDATING TRUST TO CLAIM NO. 791 OF THE PBGC**

## I.    INTRODUCTION

The Pension Benefit Guaranty Corporation ("PBGC") hereby submits its Response to the

Supplemental Objection of the USACM Liquidating Trust to Claim No. 791 of the Pension

Benefit Guaranty Corporation ("Objection").[1]  Although the parties have reached a compromise

regarding substantially all of PBGC's claims against USA Commercial Mortgage Company

("USACM"), the USACM Liquidating Trust ("Liquidating Trust") objects to paying the

termination premium that Congress imposed on employers that terminate their pension plans.

The $1,250 per capita termination premium becomes due thirty days after the month following

the month in which a pension plan is terminated, unless the pension plan is terminated during a

bankruptcy reorganization under Chapter 11 of the Bankruptcy Code.  Under a special rule for

bankruptcy reorganizations, the obligation to pay the termination premium does not arise until

the date of discharge or dismissal of the reorganizing debtor.  To avoid paying the termination

premium, the Liquidating Trust contends that the special rule for reorganizations should

technically apply, even though it was abundantly clear early on that USACM had no hope of

reorganizing, and even though the court confirmed a liquidating plan before USACM turned the

pension plan over to PBGC.  But the special rule for reorganizations does not apply in

liquidations, and the termination premiums became due on March 2, 2007, after USACM and

PBGC reached an agreement for termination and trusteeship of the pension plan.  The only issue

remaining for decision is whether PBGC's claim for the termination premium is entitled to

administrative priority under section 503(b)(1) as a tax.  For the reasons that follow, the

---

[1]  Docket # 5927.  All references to docket numbers are to the docket in *In re USA Commercial Mortgage Co.*, Case No. BK-S-06-10725.

termination premium is a tax and the Liquidating Trust's Objection should be overruled in its entirety.[2]

## II.   FACTUAL BACKGROUND

USACM established the USA Commercial Mortgage Company Defined Benefit Pension Plan ("Pension Plan") effective January 1, 1998.  The Pension Plan is a single-employer defined benefit pension plan covered by Title IV of ERISA.  The Pension Plan covers approximately 40 former employees of USACM.[3]

On April 13, 2006, USACM and four of its related entities (collectively "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  On August 31, 2006, USACM appointed itself sole trustee of the Pension Plan, and froze all benefit accruals under the Pension Plan, both effective September 30, 2006.[4]  On October 20, 2006, the Court entered an order recognizing that USACM had the authority to take these measures.[5]

On January 8, 2007, the Court confirmed the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization (the "Plan"), which provided for USACM to liquidate and dissolve.  The confirmed Plan made no provision for the Pension Plan to continue or to be assumed by any

---

[2]  Should the Liquidating Trust raise arguments to support or supplement its objection that were not disclosed to PBGC before the filing of this Response or bring forth any evidence to prove what it believes - but has not disclosed - the value of the claims should be, PBGC reserves its right to supplement this memorandum to address those new arguments and evidence.

[3]  The USACM Liquidating Trust recently provided additional documentation to PBGC indicating that there were 40 participants, rather than the 30 participants that USACM had previously disclosed to PBGC.

[4]  *See* Exhibit B to USA Commercial Mortgage Company's Motion for Approval of Appointment of a Successor Trustee for its Defined Benefit Pension Plan and to Freeze the Plan Effective September 30, 2006, Docket No. 1251.

[5]   Order Granting Debtor's Motion to Freeze Pension Plan and Appoint Successor Trustee, Docket No. 1612.

other entity – the Pension Plan would simply have been abandoned after the liquidation of

USACM.  Because neither USACM nor the liquidating Plan made any arrangement for

terminating the Pension Plan, PBGC initiated termination under 29 U.S.C. § 1342(a) and issued

an administrative notice of determination on January 12, 2007, that the Plan must be terminated.

On January 26, 2007, USACM and PBGC entered into the Agreement for Appointment of

Trustee and Termination of Plan (the "Trusteeship Agreement").[6]  Under the Trusteeship

Agreement, the Pension Plan was terminated, PBGC was appointed statutory trustee, and the

plan termination date was established as January 15, 2007.  USACM confirmed in the

Trusteeship Agreement that it was the contributing sponsor of the Pension Plan on January 15,

2007, and that the Pension Plan "is an employee pension benefit plan to which 29 U.S.C.

§ 1321(a) applies and is not exempt under 29 U.S.C. § 1321(b).  The [Pension] Plan is therefore

covered by Title IV of ERISA."[7]

On September 11, 2007, the Liquidating Trust filed objections to PBGC's initial and amended

claims.[8]  The parties subsequently settled all PBGC claims against USACM, except the

termination premium claim, the sole issue in controversy remaining between the parties.  On

February 21, 2008, at a status hearing on the matter, the Court requested that the parties brief the

issue.


### III.    STATUTORY BACKGROUND


---

[6]  A copy of the Trusteeship Agreement is attached as Exhibit 1.

[7]  Trusteeship Agreement, ¶¶ D, 1-3.  *See also* 29 U.S.C. §§ 1342, 1348.

[8]  Objection, Docket No. 4728.  On November 9, 2006, PBGC timely filed claims against
USACM, including Claim No. 791 for premiums, as well as Statements in Support thereof.  On
April 23 and 25, 2007, PBGC amended its claims against USACM, to reflect updated
calculations for the claim in connection with the termination of the Pension Plan and additional
documentation received after PBGC filed the initial claims.

3

PBGC is the United States government agency that administers the nation's pension plan termination insurance program established by Title IV of ERISA.[9]  When a pension plan covered by Title IV terminates without sufficient assets to pay all of its promised benefits, PBGC typically becomes trustee of the plan and pays participants their benefits, up to the statutory limits.[10]

PBGC guarantees the pension benefits of nearly 44 million participants in more than 30,000 pension plans, and is the trustee of more than 3,700 failed pension plans.[11]  In November 2007, PBGC reported a deficit of over $14 billion.[12]  The pension insurance program acts as a backstop for American workers, and is directly responsible for the future benefits of 1.3 million workers whose defined benefit pension plans have failed.[13]

In Nevada alone, PBGC protects the defined benefit pensions of about 190,000 workers and retirees living in the state.  In 2006, PBGC paid approximately $35.7 million in retirement benefits to more than 3,300 retirees and beneficiaries living in Nevada.[14]

PBGC is self-financed, and obtains its revenues exclusively from five sources:  (i) premiums paid by employers sponsoring ongoing plans; (ii) investment income; (iii) the assets in terminated plans; (iv) recoveries, if any, from employers whose underfunded plans have terminated; and (v) termination premiums.[15]  As is true of the annual flat-rate and variable-rate

---

[9]  29 U.S.C. §§ 1301-1461; *see generally PBGC v. LTV Corp.*, 496 U.S. 633, 636-39 (1990).

[10]  *See* 29 U.S.C. §§ 1321, 1322, 1361.

[11]  *See* PBGC 2007 Annual Management Report, at 6, 7, *available at* http://www.pbgc.gov/docs/2007AMR.pdf.

[12]  *See id.* at 4.

[13]  *Id.*, at 7.

[14]  http://www.pbgc.gov/media/key-resources-for-the-press/content/page13438.html.

[15]  PBGC 2006 Annual Report, at inside cover, 13, *available at* http://www.pbgc.gov/docs/2006_annual_report.pdf.

premiums owed under Title IV of ERISA,[16] the termination premium is owed to PBGC, and does

not affect the amount of benefits to which pension plan participants are entitled.

## IV.    ARGUMENT

### A.        The Court should reject the Liquidating Trust's attempts to treat the liquidation of USACM as a reorganization for purposes of the Special Rule.

As part of the Deficit Reduction Act of 2005, Congress added a new termination premium

under ERISA that is payable to PBGC.[17]  Effective in 2006, the termination premium is imposed

on employers who terminate their defined benefit pension plans under certain distress criteria or

when PBGC initiates and effects termination of pension plans.  In general, the termination

premium is $1,250 multiplied by the number of participants in the plan immediately before the

---

[16]  *See* 29 U.S.C. §§ 1306, 1307.

[17]  29 U.S.C. § 1306(a)(7)(A).  29 U.S.C. § 1306(a)(7) provides, in part:

> (7) Premium rate for certain terminated single-employer plans
>
> (A) In general
>
> If there is a termination of a single-employer plan under clause (ii) or (iii) of section 1341(c)(2)(B) of this title or section 1342[] of this title, there shall be payable to the corporation, with respect to each applicable 12- month period, a premium at a rate equal to $1,250 multiplied by the number of individuals who were participants in the plan immediately before the termination date.  Such premium shall be in addition to any other premium under this section.
>
> (B) Special rule for plans terminated in bankruptcy reorganization
>
> In the case of a single-employer plan terminated under section 1341(c)(2)(B)(ii) of this title or under section 1342 of this title during pendency of any *bankruptcy reorganization proceeding* under chapter 11 of Title 11, or under any similar law of a State or a political subdivision of a State (or a case described in section 1341(c)(2)(B)(i) of this title filed by or against such person has been converted, as of such date, to such a case in which reorganization is sought), subparagraph (A) shall not apply to such plan until the date of the discharge or dismissal of such person in such case.

(Emphasis added).  For the Court's convenience, a copy of 29 U.S.C. § 1306(a)(7) is attached as
Exhibit 2.

termination date with respect to each "applicable 12-month period."[18]   Under the general rule, the "applicable 12-month period" means the 12-month period beginning with the first month following the month in which the termination date occurs, and each of the next two 12-month periods immediately following the first 12-month period.  In this case, there were 40 participants just before the termination date, which, if multiplied by $1,250, results in a termination premium of $50,000 for each 12-month period, for a total of $150,000.

Congress also provided a special rule explicitly limited to entities reorganizing in bankruptcy. When pension plans are terminated during bankruptcy reorganizations, the termination premium obligation "shall not apply to such plan until the date of the discharge or dismissal" of the employer.[19]   If the special rule for bankruptcy reorganizations applies, the termination premium is calculated on the same basis, i.e., number of participants immediately before the termination date multiplied by $1,250, but the first 12-month period does not commence until the month following the month in which the liable employer is discharged or dismissed.  Thus, in cases where a reorganizing employer terminates its pension plan in Chapter 11 reorganization proceedings, Congress sought to impose the termination premiums as a post-emergence expense of the reorganizing employer for PBGC's financial support and to prevent the termination premium from being discharged as a bankruptcy claim.[20]

The special rule is inapplicable in this case because the so-called Debtors' Third Amended Joint Chapter 11 Plan of Reorganization was explicitly a plan of *liquidation*, not reorganization. The Disclosure Statement[21] emphasizes that the Plan is an organized liquidation of all Debtors:

---

[18]   29 U.S.C. § 1306(a)(7)(A).

[19]   29 U.S.C. § 1306(a)(7)(B).  If the contributing sponsor is a member of a controlled group, each member of that group is jointly and severally liable for the termination premiums.

[20]   *See* H.R. Rep. No. 109-276, at 347-348.

[21]   Debtors' First Amended Disclosure Statement for Debtors' Third Amended Joint Plan of Reorganization ("Disclosure Statement"), Docket # 1798 (Nov. 15, 2006).

- General Plan Summary:  The Plan contemplates the liquidation of each Debtor's estate and the distribution of the liquidation proceeds . . . .[22]

- The Debtors have carefully considered all reasonable alternatives to the organized liquidation that was selected and is set forth in the Plan.[23]

- The Debtors believe that the structure set forth in the Plan . . . provides a feasible framework for the recovery of certain claims and assets held by Debtors and an orderly, phased liquidation of the Debtors and their assets . . . .[24]

The confirmed Plan similarly provides for the liquidation of assets and dissolution of all

Debtors,[25] specifying that:

- The Plan will be implemented and consummated . . . including by: . . . the transfer of certain assets of USACM to the USACM Trust . . ., the *liquidation of those assets* by the USACM Trust, the disbursement of Cash to holders of Allowed USACM

---

[22]  *Id.*, Art. IV.A (General Plan Summary).  Even the disclosure statement to the original Debtor's Joint Plan of Reorganization characterized the plan as "the organized liquidation alternative that was selected and set forth in the Plan," explaining that within months of filing their bankruptcy petitions, Debtors abandoned any attempt to seek "post-petition financing that might have allowed USACM to reorganize . . . ."  Disclosure Statement for Debtors' Joint Plan of Reorganization Dated September 15, 2006, Docket # 1309 (Sept. 15, 2006), Art. X.A.

Even if Debtors could argue they were initially in reorganization proceedings, any reorganization efforts were abandoned long before confirmation, and the relevant period for the special rule is when the pension plan is terminated.  *See* 72 Fed. Reg. 71222, 71226 (Dec. 17, 2007).  Pursuant to notice and comment rule-making procedures under the Administrative Procedure Act, PBGC has issued regulations to implement the provisions governing the termination premium.  *Id.*  The foregoing analysis is consistent with PBGC's regulatory interpretation of the statute and, to the extent that the court finds that the statute is "silent or ambiguous," the court should defer to PBGC's "reasonable interpretation."  *See Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984); *Beck v. Pace Int'l Union*, 127 S.Ct. 2310, 2317-2318 (2007) ("We have traditionally deferred to the PBGC when interpreting ERISA.") (adopting PBGC's permissible construction of statute); *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (agency interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation") (internal citations and quotations omitted).

[23]  Disclosure Statement, Art. V.A. (Liquidation Analysis).  The liquidation analysis in the Disclosure Statement simply contrasted the organized liquidation under the Plan with a "hypothetical liquidation under Chapter 7."  *Id.*

[24]  *Id.*, Art. XI (Plan Feasibility).

[25]  *See e.g.*, Plan, Arts. IV.A.3, IV.A.5-IV.A.7, VIII.L.1-VII.L.3, Docket # 1799 (Nov. 15, 2006).

Unsecured Claims as USACM Trust beneficiaries in accordance with the Plan and the USACM Trust Agreement, and the *dissolution of USACM*.[26]

And the confirmation order provides for the dissolution of all Debtors.[27]  As such, the Plan was a plan of reorganization in name only, because it expressly provided for the liquidation of USACM and all Debtors.

Yet the Liquidating Trust contends that the special rule for reorganizing employers applies here, even though the Liquidating Trust has failed to cite any provision of the Plan, or indeed *any* evidence, that USACM was in "bankruptcy reorganization proceedings" when the Pension Plan terminated, as is required for the termination premium's special rule to apply.[28]  The Liquidating Trust cites only the portion of the Plan that provides "Pursuant to section 1141(d)(3) of the Bankruptcy Code, the confirmation Order shall not discharge Claims against or Equity Interests in the Debtors."[29]  The Liquidating Trust admits that this Code provision relates in part to the liquidation of all or a substantial portion of the debtor's estate.[30]  Indeed, in its original objection to PBGC claims, the Liquidating Trust itself emphasized that "the Plan was a liquidating chapter 11 plan."[31]  Although its current objection now attempts to characterize the

---

[26]  *Id.*, Art. IV.A.3 (emphasis added).  As evidenced on the Nevada Secretary of State's website, USACM has already officially dissolved pursuant to the Plan.  *See* https://esos.state.nv.us/SOSServices/AnonymousAccess/CorpSearch/CorpDetails.aspx?lx8nvq=ZtfjH%252byalor0nsXdHcTUSA%253d%253d.

[27]  Order Confirming the "Debtors' Third Amended Joint Chapter 11 Plan of Reorganization," as Modified Herein, Docket #2377 (Jan. 8, 2007), Par. 69-71.

[28]  29 U.S.C. § 1306(a)(7)(B).

[29]  Supp. Objection, Par. 19, citing Plan, Art. IV.H.  The Code provision also requires, in part, that the debtor not engage in business after plan confirmation.  11 U.S.C. § 1141(d)(3).

[30]  *Id.*

[31]  Objections of the USACM Liquidating Trust to Proofs of Claim Filed by the Pension Benefit Guaranty Corp. ("Original Objections"), Docket # 4728, Par. 35.  When PBGC responded that the reorganization rule explicitly did not apply to liquidations, the Liquidating Trust then reversed itself to argue the Plan was a reorganization.  Reply Memorandum of the USACM Liquidating Trust in Support of Objections to Proofs of Claim Filed by the Pension Benefit

Plan as a "liquidating plan of reorganization,"[32] the Liquidating Trust provides no legal or factual

support that it should be considered a reorganization, other than the title of the Plan.

The Liquidating Trust's interpretation of the special rule would frustrate Congress's

purpose in enacting the statute. Congress limited the special rule to bankruptcy *reorganization*,

where the reorganizing entity could continue to shoulder some financial responsibility for its

pension obligations by providing a limited period of financial support to PBGC.[33] Under the

Liquidating Trust's theory, USACM incurred the termination premium through the termination

of the Pension Plan, but PBGC cannot collect the premium because, as a liquidating debtor,

USACM received no discharge under the Plan and will be dismissed only after the Liquidating

Trust distributes all its assets. The Court should reject the Liquidating Trust's interpretation

because it in effect argues that Congress acted in vain in liquidating cases, and Congress is

presumed to act with some effect.[34] In summary, the Plan specifically provides for the

liquidation of USACM and does not constitute "bankruptcy reorganization proceedings" subject

to the special rule of 29 U.S.C. § 1306(a)(7)(B).

**B.      Under the Supreme Court's functional analysis, termination premiums are
         taxes and entitled to administrative priority.[35]**

---

Guaranty Corporation, Docket # 5404, Par. 31. The Supplemental Objection once again changes
course.

[32] Supp. Objection, Par. 19.

[33] 29 U.S.C. § 1306(a)(7)(B). *See* H.R. Rep. No. 109-276, at 347-348.

[34] *See Allen Oil Co. v. Comm'r of Internal Revenue*, 614 F.2d 336, 339 (2d Cir. 1980) ("a statute
must, if reasonably possible, be construed in a way that will give force and effect to each of its
provisions rather than render some of them meaningless"). *See also United States v. Ron Pair
Enterprises*, 488 U.S. 235, 242 (1989) (plain meaning of statute cannot be upheld where it the
result would be "demonstrably at odds with the intentions of its drafters . . . . In such cases, the
intention of the drafters, rather than the strict language, controls")(internal quotations and
citations omitted).

[35] The tax priority of termination premiums in bankruptcy liquidations is a matter of first
impression. The only court to mention termination premiums in the context of bankruptcy
liquidations did so only in dicta, as no issue relating to termination premiums in the context of

Administrative expenses under section 503(b)(1)(B) of the Bankruptcy Code include any "tax" incurred by the estate.[36]  Although the Bankruptcy Code does not define the term tax for purposes of section 503(b)(1)(B), the federal courts have developed a functional approach to determine whether an exaction constitutes a tax within the meaning of the Code.  In *United States v. Reorganized CF&I Fabricators of Utah, Inc.*,[37] the Supreme Court concluded that in determining whether an exaction is a tax within the meaning of the Bankruptcy Code, a court must look behind the label given by the legislature and examine the actual effects of the provision in question.[38]  Thus, the termination premium must be examined under a functional approach to determine whether it qualifies for administrative priority as a tax.

Under *City of New York v. Feiring*, and reaffirmed in *Reorganized CF&I*, taxes are "those pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it."[39]  Before and after the Supreme Court's decision in *Reorganized CF&I*, courts have interpreted these elements as requiring:

(1)    An involuntary pecuniary burden regardless of name, laid upon individuals or property;

(2)    Imposed by, or under the authority of, the legislature;

(3)    For public purposes, including the purposes of defraying expenses of government or undertakings authorized by it;

---

bankruptcy liquidation was briefed, argued, or at issue before that court.  *See Oneida Ltd. v. PBGC*, __ B.R. __, 2008 WL 516493, Bkrtcy.S.D.N.Y. (Feb. 27, 2008).

[36]  The Liquidating Trust does not contest that the termination premiums were incurred by the estate.

[37]  518 U.S. 213 (1996).

[38]  *See* 518 U.S. at 219.

[39]  *City of New York v. Feiring*, 313 U.S. 283, 285 (1941); *Reorganized CF&I*, 518 U.S. at 224.

(4)        Under the police or taxing power of the state.[40]

The Ninth Circuit has added an additional "hypothetical creditor" consideration in *In re George*, holding that a government claim was not a tax "if a creditor similarly situated to the government can be hypothesized under the relevant statute."[41]  As shown below, the termination premium under 29 U.S.C. § 1306(a)(7) is clearly a tax under the *Reorganized CF&I / Feiring* criteria.

### 1.        Termination premiums are an involuntary pecuniary burden.

Under ERISA, an employer who elects to establish a tax-qualified defined benefit pension plan must comply with ERISA's plan termination insurance program, including payment of the statutory premiums imposed by Congress through ERISA.[42]  Beginning in 2006, if an employer's pension plan terminates in an involuntary termination or under certain distress termination provisions, the employer is liable to PBGC for the termination premiums.[43]  Under ERISA, Congress imposed these exactions – these involuntary pecuniary burdens – on all sponsors of defined benefit plans.

---

[40]  *E.g., In re Lorber Indus. of California, Inc.*, 675 F.2d 1062, 1066 (9th Cir. 1982); *Adventure Resources v. Holland*, 137 F.3d 786, 794 n.9 (4th Cir. 1998); *In re Chateaugay Corp.*, 53 F.23d 478, 498 (2d Cir. 1995) (*citing In re Lorber*); *Yoder v. Ohio Bureau of Workers' Compensation (In re Suburban Motor Freight, Inc. I)*, 998 F.2d 338, 340 (6th Cir. 1993) (same).

[41]  *In re George,* 361 F.3d 1157, 1162 (9th Cir. 2004).

[42]  29 U.S.C. §§ 1307, 1321.

[43]  29 U.S.C. §§ 1306(a)(7), 1362(a), 1362(b).

### 2.    Termination premiums were imposed by the U.S. Congress.

The United States Congress enacted the termination premium through the Deficit Reduction Act of 2005, which was signed into law by President Bush on February 8, 2006.[44]  In August 2006, the Pension Protection Act of 2006 removed a sunset clause from the statute, making the termination premium a permanent aspect of funding for PBGC.[45]  There can be no dispute that the termination premium was imposed by the legislature, and thus meets the second element of the *Reorganized CF&I / Feiring* criteria.

### 3.    Termination premiums were imposed for public purposes, including defraying expenses of a U.S. federal agency and the U.S. government.

ERISA as a whole, and the termination premium specifically, were established by the U.S. Congress for public purposes.  Congress created the financial obligations under ERISA to protect the retirement income of employees under defined benefit plans:

> One of Congress' central purposes in enacting this complex legislation [ERISA] was to prevent the "great personal tragedy" suffered by employees whose vested benefits are not paid when pension plans are terminated . . . .  Congress wanted to correct this condition by making sure that if a worker has been promised a defined pension benefit upon retirement — if he has fulfilled whatever conditions are required to obtain a vested benefit — he actually will receive it.  The termination insurance program is a major part of Congress' response to the problem.[46]

In protecting the retirement income of employees in retirement, Congress's purpose in enacting ERISA was clearly a public one under its taxing authority.[47]

---

[44]  Pub. L. No. 109-171, 120 Stat. 4 (Feb. 8, 2006).

[45]  Pub. L. No. 109-280, 120 Stat. 780 (Aug. 17, 2006).

[46]  *Nachman Corp. v. PBGC*, 446 U.S. 359, 374-75 (1980) (footnotes omitted).

[47]  *See* 29 U.S.C. § 1001(c) (invoking protection of interstate commerce and the taxing power as the basis for ERISA), *accord* 29 U.S.C. § 1001(a) & (b).

Legislative history reflects that a primary purpose of the termination premium was to shore up PBGC's finances and therefore support the continuance of the pension insurance system.[48] PBGC is burdened with a substantial deficit.[49]  Congress feared that if PBGC failed, the shortfall in assets would have to be satisfied with federal tax revenues.[50]  Charged with finding savings as part of the federal budgetary process in 2005,[51] Congressional committees with jurisdiction over pension matters sought to increase the rate of PBGC's existing premiums, and to create a new premium for all entities that terminated plans through certain distress and involuntary distress procedures.[52]  Congress's stated purpose for enacting the termination premium and the increased annual premium was "to provide additional resources to the [PBGC] to ensure that it is on sound

---

[48]  *See* H.R. Rep. No. 109-276, at 62 (characterizing the termination premium as part of a "two-pronged" proposal for pension law changes designed "to put the PBGC on a more secure financial foundation.")

[49]  On November 15, 2005, while the termination premium was under consideration by Congress, PBGC reported its long-term deficit at $23.1 billion.  *See* PBGC 2005 Annual Report, at 14, *available at* http://www.pbgc.gov/docs/05annrpt.pdf.  PBGC reported its deficit at $14.07 billion as of September 30, 2007.  PBGC Annual Management Report Fiscal Year 2007, at 4, *available at* http://www.pbgc.gov/docs/2007AMR.pdf.

[50]  *See* H. Comm. on Educ. and the Workforce, "House Committee Backs Measure to Place PBGC on More Solid Financial Foundation, Help Protect Agency From Massive Taxpayer Bailout" (Oct. 26, 2005), *available at* http://republicans.edlabor.house.gov/archive/press/press109/first/10oct/ pbgc102605.htm (citing PBGC's then-$23 billion deficit, and quoting Rep. Boehner, who proposed an amendment increasing annual premiums and adding the termination premium: "Taxpayers should not be called upon to bail out the PBGC if its financial condition continues to deteriorate and this measure was crafted with that in mind.") The PBGC is not currently backed by the full faith and credit of the federal government.  *See* 29 U.S.C. §§ 1302, 1305.

[51]  H. Con. Res. 95, 109th Cong. §§ 201, 202 (2005); *see also* H.R. Rep. No. 109-276, at 3, 59. The House Committee on Education and the Workforce was tasked with achieving $18.1 billion in savings within mandatory spending programs in its jurisdiction and the Senate Committee on Health, Education, Labor and Pensions was charged with finding $13.65 billion in savings.

[52]  A second purpose, and the impetus behind the special rule of Section 1306(a)(7)(B), was to ensure that entities reorganizing in bankruptcy to shed their pension obligations would continue to bear some financial responsibility and support PBGC.  *See* H.R. Rep. No. 109-276, at 347-348.  When an entity undergoes liquidation, as did USACM, the entity does not re-emerge, and there is no sense that the entity is undergoing bankruptcy in order to rid itself of pensions.

13

financial footing, while at the same time helping . . . satisfy the instructions to reduce direct spending" under the FY2006 budget resolution.[53]  As such, the termination premium was clearly enacted not only for the public purpose of sustaining the pension insurance system established by ERISA, but specifically for defraying the expenses of a U.S. government agency, and thereby defraying the expenses of the federal government.

### 4.    Termination premiums were imposed under the taxing power of the state.

When Congress created PBGC through Title IV of ERISA, it also created a funding system for PBGC based in part on premiums imposed on sponsors of defined benefit plans.  Congress added a termination premium through 29 U.S.C. § 1306(a)(7), the third of PBGC's three premiums.[54]

A House Committee Report addressing the termination premium specifically cites Congress' taxing power for authority for ERISA premium changes, including the termination premium.[55] Therefore the termination premium was imposed under the government's taxing power.

---

[53]  H.R. Rep. No. 109-276, at 336.

[54]  The other two premiums are fixed-rate and variable-rate premiums paid to PBGC by sponsors of ongoing pension plans.  29 U.S.C. § 1306.

[55]  *See* H.R. Rep.  No.109-232, Part 2, at 176, citing Art I, Sec 8, Clause 1 (Congressional power to lay and collect taxes, duties, imposts, and excises) and the 16th Amendment (Congressional power to lay and collect taxes on incomes, from whatever source derived).  This Report concerns the same proposed termination premium as part of the Pension Protection Act of 2005. Congress considered the termination premium in dual track legislation during 2005, as part of both the Pension Protection Act of 2005 and the Deficit Reduction Act of 2005.  As noted above, the termination premium was ultimately passed by the Deficit Reduction Act of 2005 and a sunset clause for the premium was later removed by the Pension Protection Act of 2006, the successor legislation to the Pension Protection Act of 2005.

**5.      No similarly situated creditor can be hypothesized under the termination premium statute.**

USACM's obligations also meet the additional *George* prong.  By federal statute, only PBGC may terminate a pension plan and enforce termination premium payments under the statutory scheme.  No private creditor can take similar action or charge a similar premium.  The only voluntary act by the employer is whether to establish a defined benefit plan.  Once such a plan is established, there is no voluntary contract; the obligation to pay the premiums, and even the amount of the premiums, is statutorily mandated.   Therefore there is no similarly situated creditor, hypothetical or otherwise.

The Liquidating Trust asserts that the termination premium is not entitled to priority as a tax.[56] However, the termination premium meets every element to qualify as a tax for the purposes of priority under section 503(b)(1)(B) of the Bankruptcy Code.[57]  The termination premium was imposed by the U.S. Congress, under its taxing power, as an involuntary pecuniary obligation against the former sponsor of the Pension Plan, where PBGC initiated and effected termination of the Pension Plan under Section 4042 of ERISA.  Congress intended the termination premium to help support PBGC's financial condition, thus defraying the expenses or undertakings of PBGC and the federal government as a whole.[58]  The termination premium also easily meets the *George* "hypothetical creditor" prong, as only PBGC can impose a mandatory premium upon

---

[56]  PBGC notes that the Liquidating Trust did not object in its previously filed Objections to the administrative priority for the $72 for flat-rate and variable-rate premiums arising after the petition date.  *See* Original Objection.

[57]  Under the same reasoning, the termination premium also qualifies for priority as a tax under Code Section 507(a)(8).

[58]  *See, e.g*, 151 Cong. Rec. S12912 (Nov. 16, 2005) (remarks by Sen. Levin); H. Comm. on Educ. and the Workforce, "House Committee Backs Measure to Place PBGC on More Solid Financial Foundation, Help Protect Agency From Massive Taxpayer Bailout" (Oct. 26, 2005), *available at* http://republicans.edlabor.house.gov/archive/press/press109/first/10oct/ pbgc102605.htm; 151 Cong. Rec. S672 (Jan. 31, 2005) (remarks by Sen. Grassley).

pension plan termination, where the premium goes toward supporting PBGC's financial condition.[59]  Therefore, the termination premium is entitled to administrative priority as a tax.

### C.        Termination premiums are not a penalty.

The Liquidating Trust asserts that the termination premium is a "penalty" rather than a "tax," stating that a penalty is "'an exaction imposed by statute as punishment for an unlawful act,' while a tax is 'an enforced contribution to provide for the support of the government.'"[60]  But termination of a defined benefit pension plan is not against the law.  Indeed, ERISA specifies the procedures for terminating pension plans insured by PBGC.  Accordingly, the termination premium cannot be a penalty for an illegal act.

Thus, *Reorganized CF&I* fails to support the Liquidating Trust's position.  In *Reorganized CF&I*, the Supreme Court held that the excise tax imposed under the Internal Revenue Code for failing to make minimum funding contributions to a pension plan was a penalty rather than a tax.[61]  Unlike the termination of a pension plan, however, the failure to make minimum funding contributions is contrary to statute, and excise tax in the amount of 10 percent of the missed contribution is imposed under 26 U.S.C. § 4971.  The excise tax increases in proportion to the amount of the missed funding contribution, and the Court in *Reorganized CF&I* concluded that the 10 percent excise tax was a penalty for bankruptcy purposes under the functional analysis.[62]  By contrast, the termination premium is a fixed amount based solely on the number of

---

[59]  *See In re George,* 361 F.3d at 1162.

[60]  Supp. Objection, Par. 22, quoting *Reorganized CF&I*, 518 U.S. at 224.

[61]  518 U.S. at 226.

[62]  *Id.* at 224-26 ("if the concept of a penalty means anything, it means punishment for an unlawful act or omission"; citing as examples of punitive nature of the excise tax at issue: ERISA requires certain statutory funding; the excise tax is based on the level of funding deficiency and imposes an additional tax for failure to correct this deficiency within a certain time; excise tax was separate from and additional to PBGC claim for unfunded benefit liabilities; and legislative history referred to the excise tax as intended to "penalize").

16

participants in the plan immediately before plan termination — itself a lawful act when, as here, all statutory criteria are met.

Consequently, the Liquidating Trust's argument that the termination premium is a penalty designed to discourage pension plan terminations is untenable.  In a liquidation, the sponsor is financially unable to support its pension plan and will cease to exist, as was true in this case.  A termination premium is no deterrent to the termination of the pension plan in a liquidation.

The Liquidating Trust also relies on the unreported district court decision in *In re Bayly Corp.*[63]  There, the court denied tax priority for PBGC's claim for unfunded benefit liabilities, distinguishing between claims for money intended to add to "government coffers," which the court concluded qualify as taxes for administrative priority, and reimbursements, which the Court deemed penalties and not taxes.[64]  The Liquidating Trust's reliance on the unreported decision is misguided.  On appeal, the Tenth Circuit "assumed without deciding that PBGC's claim for unfunded benefit liabilities *can* properly be characterized as a tax claim."[65]  Moreover, because the termination premium is unrelated to the amount of the pension plan's underfunding, the termination premium was not designed to reimburse PBGC for the benefits it pays to

---

[63]  1997 WL 33484011 (D. Colo. Feb. 12, 1997).

[64]  *Id.* at *4.

[65]  *In re Bayly Corp.*, 163 F.3d 1205, 1208 n.4 (10th Cir. 1998) (emphasis added) (denying administrative priority for the claim under the facts of the case on other grounds ).

USACM's employees.[66]  And as noted, the termination premium was created to support the financial stability of PBGC.

But even if the termination premium were viewed as a reimbursement, the Ninth Circuit Bankruptcy Appellate Panel ("BAP") has recently held that a claim to reimburse a government agency under a statutory insurance scheme *does* qualify as a tax for bankruptcy purposes.  Just last year, in *In re Lorber Industries of California*,[67] the BAP concluded that California's claim for the reimbursement of workers' compensation met all four elements under *Reorganized CF&I /Feiring* and the additional *George* requirement, and thus qualified as a tax for bankruptcy purposes.[68]  The Ninth Circuit reached a similar decision in an earlier case concerning a mandatory workers' compensation scheme established by an Arizona state statute.  In *In re Camilli*,[69] the Ninth Circuit held that an employer's statutorily mandated reimbursement of a special fund established by Arizona's statutory scheme qualified as a tax for bankruptcy priority purposes.[70]

---

[66]  The termination premium would remain the same regardless of whether a pension plan was underfunded by $10 million or $10,000.  The premium simply applies whenever a termination occurs under one of the provisions specified under the statute.  The Liquidating Trust's attempts to draw parallels to *In re Chateaugay Corp.*, 115 B.R. 760 (Bankr. S.D.N.Y. 1990), *aff'd*, 130 B.R. 690 (S.D.N.Y. 1991), *vacated by consent of the parties*, 17 Employee Benefits Cas. (BNA) 1102, 1993 WL 388809 (S.D.N.Y. 1993), and *In re Kent Plastics Corp.*, 183 B.R. 841 (Bankr. S.D.Ind. 1995), are similarly unavailing.  The Liquidating Trust cites this *Chateaugay* decision, different from the Second Circuit decision noted elsewhere in this memorandum, only for its discussion of an unfunded benefit liabilities claim, and *In re Kent* only noted that a minimum funding contribution claim did not receive priority to the extent it concerned pre-petition labor. Neither concerns termination premiums.

[67]  373 B.R. 663 (9th Cir. BAP 2007).

[68]  *Id.* at 669 (denying Section 507(a)(8) priority on the facts, but specifically noting that "the Fund's claim might be entitled to priority status" under Section 507(a)(2)).

[69]  94 F.3d 1330 (9th Cir. 1996).

[70]  *Id.* at 1333.  The Court noted consistent decisions from other jurisdictions "where workers' compensation insurance by the state is mandatory, and the state insurance system is monopolistic."  *Id.* at 1335.

18

PBGC's termination premium claim is strikingly similar.  Like the mandatory workers' compensation system established in *In re Lorber* and *In re Camilli*, ERISA's defined benefit termination insurance system is a mandatory insurance program established by statute, and similarly designed to provide a safety net for workers.

Termination premiums are also similar to the statutory premiums required under the Coal Industry Retiree Health Benefit Act ("Coal Act").  The Coal Act is a federal statute that imposes mandatory premiums upon a covered employer that has eligible retirees receiving benefits under a health benefit plan known as the 1992 UMWA Benefit Plan.[71]  Courts have consistently held that Coal Act premiums are involuntary assessments by the federal government for a public purpose, and as such, qualify as taxes entitled to administrative priority under Bankruptcy Code § 503(b)(1)(B), even though they were paid to a private party.[72]  Here, the termination premiums, designed to support PBGC, are simply another of ERISA's statutory premiums enacted by the U.S. Congress, and qualify as taxes for bankruptcy priority purposes.

---

[71]  26 U.S.C. § 9712(d)(1)(A).

[72]  *See In re Sunnyside Coal Co.*, 146 F.3d 1273, 1277, 1278-9 (10th Cir. 1998) ("Coal Act premiums are taxes incurred by the estate and entitled to administrative expense priority under § 503(b)(1)(B)"; characterizing premiums as involuntary assessments for the public purpose of "support[ing] the government in its effort to maintain stability in the coal industry"); *Adventure Resources, Inc. v. Holland (In re Adventure Resources)*, 137 F.3d 786, 795 (4th Cir.), *cert denied*, 142 L.Ed.2d 328 (1998) (Coal Act obligations; "there's no doubt then that the assessments meet this circuit's definition of a tax"); *In re Chateaugay*, 53 F.3d at 498 (Coal Act obligations entitled to administrative expense priority under 503(b)(1)(B) as taxes incurred by the estate); *In re Callahan*, 304 B.R. 743 (W.D. Va 2004) (Coal Act premiums entitled to administrative expense priority as taxes incurred by the estate); *In re Bethlehem Steel Corp.*, 2004 WL 601656, *4 (Bankr. S.D.N.Y.) (administrative priority for Coal Act premiums; premiums occurred upon termination of individual employment health plan; *quoting Sunnyside* description of public purpose).

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the objections of the USACM Liquidating

Trust and allow administrative expense priority of PBGC's claim for termination premiums.

Dated: March 14, 2008                      Respectfully Submitted,

                                  /s/ Frank A. Anderson

Local Counsel:                             Israel Goldowitz, Chief Counsel
Gregory A. Brower,                         Karen Morris, Deputy Chief Counsel
United States Attorney,                    James Eggeman, Assistant Chief Counsel,
District of Nevada,                        VA Bar No. 37101
NV Bar No. 5232                            Frank A. Anderson, Attorney,
Carlos A. Gonzalez,                        D.C. Bar No. 478234
Assistant United States Attorney           Erika E. Barnes, Attorney,
333 Las Vegas Blvd. South, Suite 5000      Cal. Bar No. 197309
Las Vegas, Nevada 89101                    PENSION BENEFIT GUARANTY
Tel:  (702) 388-6336                       CORPORATION
Fax:   (702) 388-6787                      Office of the Chief Counsel
Carlos.Gonzalez2@usdoj.gov                 1200 K Street, NW, Suite 340
                                           Washington, D.C.  20005-4026
                                           Tel: (202) 326-4020, ext. 3460
                                           Fax: (202) 326-4112