E-Filed on 04/12/08

**DIAMOND MCCARTHY LLP**
6504 Bridgepoint Parkway, Suite 400
Austin, Texas 78730
Telephone: (512) 617-5200
Facsimile: (512) 617-5299
William T. Reid, TX State Bar No. 00788817
Email: wreid@diamondmccarthy.com
Lisa S. Tsai, TX State Bar No. 24046999
Email: ltsai@diamondmccarthy.com

909 Fannin, Suite 1500
Houston, Texas 77010
Telephone (713) 333-5100
Facsimile (713) 333-5199
Allan B. Diamond, TX State Bar No. 05801800
Email: adiamond@diamondmccarthy.com
Eric D. Madden, TX State Bar No. 24013079
Email: emadden@diamondmccarthy.com

Special Litigation Counsel for USACM Liquidating Trust and DTDF

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br><br>Debtor. | Case Nos.:<br>BK-S-06-10725-LBR<br>BK-S-06-10726-LBR<br>BK-S-06-10727-LBR<br>BK-S-06-10728-LBR<br>BK-S-06-10729-LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br><br>Debtor. | |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br><br>Debtor. | JOINTLY ADMINISTERED<br>Chapter 11 Cases |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br><br>Debtor. | Judge Linda B. Riegle |
| In re:<br>USA SECURITIES, LLC,<br><br>Debtor. | |
| Affects:<br>☐ All Debtors<br>☒ USA Commercial Mortgage Company<br>☐ USA Capital Realty Advisors, LLC<br>☒ USA Capital Diversified Trust Deed Fund, LLC<br>☒ USA Capital First Trust Deed Fund, LLC<br>☐ USA Securities, LLC | |

<u>**PLAINTIFFS' ORIGINAL COMPLAINT**</u>                                          **Page - 1**

1

2

3

4

5

6

7

USACM LIQUIDATING TRUST,
USA CAPITAL DIVERSIFIED
TRUST DEED FUND, LLC, and USA CAPITAL FIRST
TRUST DEED FUND, LLC,

    Plaintiffs,

v.

WELLS FARGO BANK, N.A.,

    Defendant.

Adversary No. 08-_____

**PLAINTIFFS' ORIGINAL
COMPLAINT**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Plaintiffs USACM Liquidating Trust (the "USACM Trust"), as the duly authorized successor-in-interest to USA Commercial Mortgage Company ("USACM"), USA Capital Diversified Trust Deed Fund, LLC ("DTDF"), and USA Capital First Trust Deed Fund, LLC ("FTDF") (collectively, "Plaintiffs"), hereby file this action against Defendant Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant"), and would respectfully show as follows.

## I. INTRODUCTION

1.    Plaintiffs seek to recover damages against Wells Fargo for its knowing and substantial assistance in a massive ponzi scheme that defrauded investors out of hundreds of millions of dollars and ultimately bankrupted USACM, DTDF, and FTDF in April 2006. Wells Fargo's involvement in the scheme arose from its longtime banking relationship with a group of Nevada companies called "USA Capital," which included USACM, DTDF, and FTDF.

2.    USACM was a mortgage broker and loan servicing company, and DTDF and FTDF were real estate investment funds. From 2000 to 2006, Wells Fargo provided banking services to at least fifteen different companies under the USA Capital umbrella, and maintained more than thirty accounts that were opened and managed by the USA Capital entities and their culpable insiders,

most notably including Joseph D. Milanowski ("Milanowski") and Thomas A. Hantges ("Hantges") (collectively, "the Culpable Insiders").

3.      Most importantly, Wells Fargo opened and maintained two trust accounts for USACM:  (a) a direct lenders' trust account to be used as a mechanism to pool lender deposits and make distributions to borrowers ("Investors Trust Account"); and (b) a collection trust account to collect interest and principal payments made by borrowers and to distribute these payments to direct lenders ("Collection Trust Account").  Payments made out of the Investors Trust Account and the Collection Trust Account should have been directly traceable to the actual payments made into these accounts, less applicable fees.  However, the Culpable Insiders commingled funds belonging to both trust accounts with funds belonging to USACM, and used such funds to fuel their scheme.

4.      With Wells Fargo's assistance, Milanowski and Hantges used these accounts to perpetrate their fraud.  In order to conceal non-performing loans from direct lenders, Milanowski and Hantges employed a massive ponzi scheme under which USACM always timely made interest payments to the direct lenders, even when borrowers had defaulted on their loans.  Milanowski and Hantges siphoned off the money in various ways, including by withholding fees owed to USACM and by directly looting DTDF and FTDF.

5.      Critical to the scheme was the ability to move large amounts of money with frequency and ease between the various USA Capital accounts, including the two USACM trust accounts that separately held funds for investors and borrowers as required by Nevada law.  The most critical aspect of the scheme was to create enough liquidity within the Collection Trust Account to fund each month's interest payments to the direct lenders that the borrower-developers were supposed to

have paid.  Because the Culpable Insiders knew that their scheme would end if interest payments were not made, they forced USACM to take on the borrowers' obligations and fund the payments. Throughout the course of the scheme, Wells Fargo provided substantial wire transfer and banking services that facilitated the wrongful and suspicious transfers of funds that flowed in and out of the USA Capital accounts – particularly the two trust accounts.

6.    In January 2003, Wells Fargo manually processed a circular transfer of $11.425 million that was looted from DTDF.  The $11.425 million was transferred into the Investors Trust Account and then directly into the Collection Trust Account and then back to DTDF.  Leaving aside the fact that money should never have been transferred from the Investors Trust Account to the Collection Trust Account because it should only have been placed in an investment, this particular set of transactions did not go smoothly from the banking side.  Wells Fargo rejected the Culpable Insiders' first two attempts to accomplish the circular wire transfer of DTDF's money.  Although Wells Fargo ultimately processed the circular wire transfer in violation of internal policies, the Las Vegas business bankers recognized that these were atypical, unusual, and suspicious transactions. In fact, Wells Fargo commented to a USA Capital employee at the time that the Las Vegas branch and the USA Capital accounts were "being watched" for not following procedures in handling the $11.425 million transaction.

7.    Notwithstanding these events, Wells Fargo continued to provide banking and wire transfer services to and from the USA Capital accounts.  In March 2003, Wells Fargo opened accounts for 10-90, Inc. ("10-90) and Mountain Vista, Inc. ("Mountain Vista"), two shell corporations that were set up by borrower-developer David A. Fogg ("Fogg") at Milanowski's

direction for the sole purpose of laundering money from DTDF to USACM and USA Investment Partners ("USAIP"), a holding company that was used by the Culpable Insiders as their personal slush fund. From March 2003 to November 2004, Wells Fargo processed $23.328 million in atypical and unusual wire transfers that were structured like textbook money laundering transactions. Each of these transfers involved large, whole dollar amounts that were circulated through several Wells Fargo and other accounts in very short time periods. On their face, these wire transfers were blatantly suspicious, unusual, atypical, and circular, and Wells Fargo deliberately ignored the fact that these transfers had no legitimate business purpose.

8.    In fact, just three months after the 10-90 and Mountain Vista accounts were opened, a Wells Fargo branch manager questioned Fogg about the business purpose of the transfers to make sure that nothing inappropriate was taking place. Despite receiving a wholly inadequate and vague response from Fogg – specifically, that Fogg "believed" the transfers were for real estate transactions – Wells Fargo deliberately ignored Fogg's woefully lacking explanation and continued to process tens of millions of dollars in circular wire transfers without asking any further questions, or conducting any further due diligence, including requesting financial statements, loan documents, or any other support for the transactions.

9.    In continuing to blindly process transactions in and out of 10-90 and Mountain Vista, Wells Fargo knowingly and consciously violated its own internal policies and obligations under federal banking law to monitor, investigate, and report suspicious activity and/or terminate the accounts. By knowingly permitting shell companies with virtually no money and no known legitimate business purposes to run such large dollar and high volume wire transfers, Wells Fargo, at

a bare minimum, deliberately ignored atypical, suspicious banking activities that are well known, tell-tale signs of money laundering.

10.    Wells Fargo's knowledge and suspicions about USA Capital were also evidenced when Milanowski applied for a $1 million loan on USACM's behalf sometime in late 2004. Although USA Capital was one of Wells Fargo's top business banking relationships in Las Vegas and Nevada, Wells Fargo atypically rejected USACM's credit request without conducting *any* financial analysis to determine the company's creditworthiness.

11.    Wells Fargo's Relationship Manager for the USA Capital accounts at the time, Eileen T. Sechrist ("Sechrist"), obtained and reviewed USACM's audited consolidated financial statements for 2003 and 2004 and grew concerned about a footnote to the financial statements regarding a pending RICO lawsuit brought against USACM and its Culpable Insiders seeking $10 million. Even though USA Capital was one her top five customers, Sechrist and her superiors decided to reject USACM's loan request based solely on the fact that the lawsuit was still pending and without performing any further underwriting analysis. By rejecting out of hand otherwise lucrative business from one of its main customers, something that is also atypical in the banking business, Wells Fargo demonstrated that its prior non-credit dealings with USA Capital had created internal concern.

12.    Ultimately, Wells Fargo terminated various of the USA Capital related accounts in May 2006, within one month after USACM, DTDF, and FTDF filed for bankruptcy protection. A bankruptcy filing standing alone would not generally cause a bank to terminate an account relationship. Moreover, Wells Fargo also terminated its banking relationship with USAIP in May 2006, even though USAIP had not even filed for bankruptcy at that time. This atypical conduct

1

2

indicates that Wells Fargo's preexisting concerns contributed to its decision to terminate its banking

relationship with the USA Capital entities in May 2006.

3

4

    13.    Wells Fargo facilitated the Culpable Insiders' fraud in several important respects.  At

5

the outset, Wells Fargo failed to "know its customer" as required by its own internal policies and the

6

federal Bank Secrecy Act.  Wells Fargo ignored its own procedures in opening the USA Capital

7

accounts and the 10-90 and Mountain Vista accounts, which would have required Wells Fargo to

8

9

understand the business of each of these entities and place appropriate limits on their wire transfer

10

activities.  By at least early 2003, Wells Fargo discovered suspicious transactions occurring in these

11

accounts, yet it accepted completely inadequate responses to questions that needed answers and

12

intentionally chose to continue to provide banking services to assist the fraudulent activities.

13

14

    14.    Not only did Wells Fargo continue to provide full scale banking and wire transfer

15

services to USA Capital, but it gave the Culpable Insiders the capability to process wire transfers

16

from their desktops with little to no controls.  In fact, Wells Fargo knew that the two trust accounts

17

had specific purposes and that Nevada law controlled how the funds in each of the trust accounts

18

19

were to be used.  Nevada law required the money in the Investors Trust Account to be placed into

20

investments and all money flowing into the Collections Account to be distributed to investors less

21

fees.  In permitting the Culpable Insiders to play a literal shell game with the trust accounts' funds in

22

23

violation of Nevada law and their express purposes, Wells Fargo knew or deliberately ignored the

24

fact that the Culpable Insiders were violating the law, committing fraud, and breaching their

25

fiduciary duties.

26

15.    Wells Fargo's provision of nearly unfettered wire transfer access and deliberate lack of scrutiny over the USA Capital accounts was integral to the fraud.  Moreover, as a large, national bank, Wells Fargo lent inherent credibility to the USA Capital operations, which assisted the Culpable Insiders in attracting fresh capital to continue the ponzi scheme.  By consciously turning a blind eye and assisting the fraud and breaches of fiduciary duty, Wells Fargo enjoyed an extensive and lucrative banking relationship with the USA Capital entities that was only halted following the bankruptcy filings in April 2006.

## II.  PARTIES AND OTHER RELEVANT ENTITIES

### A.    Plaintiffs

*USACM Trust*

16.    USACM Trust was created pursuant to the Third Amended Joint Chapter 11 Plan of Reorganization (the "Joint Plan") filed by USACM and the other four debtors in the bankruptcy cases described below.  The Joint Plan was confirmed by the bankruptcy court on January 8, 2007, and became effective on March 12, 2007.

17.    The Joint Plan expressly retained USACM's causes of action for enforcement by the USACM Trust, pursuant to 11 U.S.C. § 1123(b)(3)(B).  The Joint Plan also transferred to the USACM Trust certain causes of action belonging to FTDF.  The USACM Trust, therefore, has standing to prosecute the claims set forth herein against Wells Fargo.

18.    The USACM Trust is a liquidating trust organized under Nevada law.  The USACM Trust's beneficiaries are the holders of allowed unsecured claims against USACM.  Geoffrey L. Berman serves as the trustee of the USACM Trust.

*DTDF*

19.   DTDF is a limited liability company organized under Nevada law on or about February 3, 2000.   DTDF offered Nevada investors the opportunity to purchase membership interests in a fund and thereby invest in loans that USACM originated and serviced on behalf of DTDF.   At the time of its bankruptcy filing, DTDF was managed by USA Capital Realty Advisers, LLC ("USACRA"), which in turn was wholly owned and managed by USAIP, and USAIP was managed by USACM.

*FTDF*

20.   FTDF is a limited liability company organized under Nevada law on or about February 16, 2001.   FTDF offered investors throughout the United States the opportunity to purchase membership interests in a fund and thereby invest in loans that USACM originated and serviced on behalf of FTDF.   Prior to the Petition Date, FTDF was managed by USACRA.

**B.    Defendant**

*Wells Fargo*

21.   Wells Fargo is a national bank established under the laws of the United States and doing business in the State of Nevada.   Wells Fargo's resident agent for service of process is CSC Services of Nevada, Inc., located at 502 East John Street, Carson City, Nevada 89706.   Wells Fargo provided depositary banking services, treasury management services, escrow services, and/or credit products to over fifteen USA Capital entities during the relevant time period.

## C.    Other Relevant Entities

*The USA Capital Debtors*

22.    On April 13, 2006 (the "Petition Date"), USACM, USACRA, FTDF, and USA Securities, LLC ("USA Securities") (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court").   The bankruptcy cases were jointly administered before the Honorable Linda B. Riegle under Case No. BK-S-06-10725-LBR.

23.    USACM is a corporation organized under Nevada law on or about February 28, 1989. Prior to the Petition Date, USACM was in the business of underwriting, originating, brokering, funding, and servicing commercial loans secured by residential and commercial developments.

24.    USACRA is a limited liability company organized under Nevada law on or about January 18, 2001.  USACRA was formed primarily to manage DTDF and FTDF.  Prior to the Petition Date, USACRA was owned and managed by USA Investment Partners, LLC ("USAIP").

25.    USA Securities is a limited liability company organized under Nevada law on or about March 3, 1999.  USA Securities, which was a registered broker-dealer under SEC Rule 15c3-1(a)(2)(vi), primarily sold membership interests in FTDF.  Prior to the Petition Date, USA Securities was owned and managed by Milanowski and Paul Hamilton ("Hamilton").

*Other USA Capital Entities*

26.    USAIP is a limited liability company organized under Nevada law on or about October 20, 1999.  From that date onward, USAIP served as a holding company for dozens of

entities established by the Culpable Insiders in the time-share hotel, technology, and real estate acquisition and development industries.

27.    USAIP is owned by Hantges and Milanowski, or trusts controlled by them.  Prior to June 17, 2004, USAIP was managed by USACM.  Between June 17, 2004, and April 6, 2007, USAIP was managed by Hantges and Milanowski.  On February 14, 2005, Hantges purportedly resigned his position as a USAIP manager, but nonetheless continued to function as a *de facto* manager until April 2007.

28.    On April 4, 2007, the USACM Trust, DTDF, and another USAIP creditor forced USAIP into bankruptcy by filing an involuntary petition for relief under Chapter 11 of the Bankruptcy Code against USAIP in the Bankruptcy Court.  On April 6, 2007, the Court entered an order approving the appointment of Lisa M. Poulin as USAIP's interim trustee.

29.    On May 9, 2007, the Court entered an order for relief under Chapter 11 of the Bankruptcy Code as to USAIP.  Thereafter, Ms. Poulin became the permanent Chapter 11 trustee.

### III.  FACTUAL BACKGROUND

#### A.    USACM's Background

30.    Formed in 1989, USACM was a mortgage broker and loan servicing company with two primary business activities:  (a) originating short-term loans by direct lenders to commercial real estate developers; and (b) servicing the loans that it originated by collecting principal and interest from borrowers and distributing those payments to direct lenders.  USACM earned revenue by charging various fees for these services, including origination, servicing, and extension fees.  Between 1997 and 2006, USACM originated and serviced more than $2.6 billion in loans to real

estate developers.  At the time of its bankruptcy filing in April 2006, $960 million of these loans remained outstanding.

**B.      DTDF and FTDF's Background**

31.     In 2000, the Culpable Insiders founded DTDF, which was a real estate investment fund subject to Nevada securities laws.  DTDF was managed by USACRA.  In 2001, the Culpable Insiders founded FTDF, which was a real estate investment fund subject to Nevada securities laws.  FTDF was also managed by USACRA

32.     As a practical matter, the Culpable Insiders controlled DTDF and FTDF because they controlled USAIP, USACRA's manager.  DTDF offered membership interests to Nevada investors and used these funds to purchase interests in USACM-serviced loans.  FTDF offered membership interests to investors nationally and used these funds to purchase interests in USACM-serviced loans.  Both DTDF and FTDF earned interest as direct lenders and distributed its profits to the Investors on a periodic basis.  DTDF and FTDF's prospectus restricted their investments in two important ways:  (a) aside from the payment of management fees, their funds could only be used to make investments in loans secured by deeds of trust in real property; and (b) they were not permitted to invest in loans to certain related parties, including USAIP.

33.     The Funds' creation greatly enhanced the Culpable Insiders' fraud by allowing them to secure aggregate funds and misuse them on a continual and "as needed" basis.  When shortfalls arose in certain of the USACM accounts as a result of delinquent or defaulting borrowers, the Culpable Insiders misappropriated money from the funds and often laundered the money through Wells Fargo accounts before they ultimately reached USAIP and/or USACM.  In other instances,

the Culpable Insiders simply looted funds from DTDF and FTDF and sent them to USAIP for no

business purpose whatsoever.  In total, the Culpable Insiders converted tens of millions of dollars

belonging to DTDF and FTDF to fuel their pervasive ponzi scheme.

       **C.**       **USA Capital's Origins and Business Model**

       34.       In May 1987, Hantges and David Berkowitz ("Berkowitz") founded the "USA

Capital" group of entities with the creation of USA Capital Management Group, Inc. d/b/a USA

Capital, a full-service securities broker-dealer.  On February 28, 1989, Hantges and Berkowitz

founded USACM.  Milanowski joined USA Capital as a part-time employee in 1991, and became a

full-time employee in 1993.

       35.       Throughout the late 1980s and early 1990s, more than a dozen other entities sprung

up under the USA Capital organizational umbrella.  All of these entities operated out of one office,

shared employees, and used "USA Capital" letterhead.  In addition, all of these entities maintained

bank accounts at the same Wells Fargo's branch in Las Vegas, Nevada.  Practically speaking, all of

the entities functioned as one company – USA Capital – and were viewed as such by the outside

world, including by Wells Fargo.

       36.       In July 1995, Hantges acquired 100% of USACM's outstanding stock.  He became

USACM's Chairman, Chief Executive Officer, President, Secretary, and a member of USACM's

board of directors.  In February 1997, Hantges appointed Milanowski and Victoria Loob ("Loob")

to serve as USACM's Treasurer and Secretary, respectively.  In September 1997, Hantges

appointed Milanowski as USACM's President and a member of USACM's board of directors.

Hantges transferred 40% of his USACM stock to Milanowski in late 1997.  Despite the shift in

management and Berkowitz's eventual departure, USACM maintained the right to use the trade name USA Capital.

37.    After this transition in management, USACM began operations as a mortgage broker in earnest.  USACM's basic business model consisted of arranging commercial loans secured by real property on the direct lenders' behalf, otherwise known as "originating" a loan.  In these transactions, direct lenders obtained partial interests in loans "originated" by USACM, and were listed as beneficiaries on the related promissory note and mortgage or deed of trust recorded against the underlying property.  In exchange for originating loans, USACM typically received loan origination fees of three to five percent of the principal amount of the loans.

38.    In mid-1997, USACM began servicing the loans that it originated.  Each month, USACM was allowed to pay itself a servicing fee out of the monthly interest payments made by borrowers, while remitting the balance of the payments to direct lenders.  This servicing fee was generally equal to between one-quarter of one percent and four percent of the principal balance of the loan per annum.  Under the typical arrangement, USACM was also entitled to late fees, extension fees, default interest, and other fees and expenses paid or reimbursed by the borrower.

39.    Hantges and Milanowski assigned oversight of loan servicing operations and collection of fees to Loob.  Internal loan servicing allowed the Culpable Insiders to conceal non-performing loans from the direct lenders.  The Culpable Insiders caused USACM to make "prepayments" of principal and interest to direct lenders on non-performing loans.  The Culpable Insiders drew upon various USA Capital bank accounts at Wells Fargo to fund these prepayments, including USACM's general corporate operating account.

40.    To provide additional sources of funds, the Culpable Insiders adopted a "fund" business model with the creation of DTDF and FTDF in February 2000 and February 2001, respectively.  Under the "fund" model, investors purchased interests in DTDF and/or FTDF, which then acted as lenders in loans originated and serviced by USACM.  To the outside world, including Wells Fargo, the funds were just another extension of the USA Capital companies, which had already become a major player in the Las Vegas business community and a major client of Wells Fargo.  Through its extensive relationship with USA Capital and the funds, Wells Fargo understood that the monies held by DTDF and FTDF were investor funds, not USACM funds.

**D.    The Culpable Insiders' Extensive Ponzi Scheme**

41.    In order to service loans, USACM was required by Nevada law to open and maintain two separate trust accounts:  (a) an "investor trust" to be used as a mechanism to pool direct lender deposits and make distributions to borrowers; and (b) a "collection trust" to collect interest and principal repayments made by borrowers and to make payments to direct lenders.  In accordance with Nevada law, USACM opened and maintained two bank accounts at Wells Fargo for these purposes:  (a) "USA Commercial Mortgage Company Investors Trust Account"; and (b) "USA Commercial Mortgage Company Collection Trust Account."  As evidenced by their names, these USACM accounts were trust accounts under Nevada law, and Wells Fargo knew that these trust accounts held monies for the benefit of borrowers and the Funds.

42.    Nevada law closely regulated the flows of funds in and out of these accounts.  Specifically, Nevada law:  (a) prohibited USACM from making any interest and/or principal payments to direct lenders on behalf of defaulting borrowers; (b) prohibited the commingling of any

USA Capital funds with the Investors Trust Account and/or the Collection Trust Account; and (c) required USACM to remit funds it received from borrowers to the applicable direct lenders. The Culpable Insiders routinely disregarded these provisions, instead transferring funds in and out of the Investors Trust Account and Collection Trust Account however necessary to make interest payments to the direct lenders and thereby perpetuate the ponzi scheme. Not only were these transfers atypical and highly suspicious, but Wells Fargo turned a blind eye to account transactions that were obviously and wholly inconsistent with Nevada law and the purposes for which the trusts were created.

43.     Frequently, the Culpable Insiders covered interest shortfalls in the Collection Trust Account by failing to withdraw fees owed to USACM. Under its typical loan servicing contract, USACM was entitled to fees for collecting interest and principal payments from borrowers and distributing them to lenders/investors. These fees were to be collected from the borrowers' payments and remitted to USACM. Frequently, however, USACM's loan servicing revenues in the Collection Trust Account were not disseminated to USACM. In addition, extension fees, late fees, default interest fees, and other fees owed to USACM were sometimes never taken out of the Collection Trust Account and transferred to USACM's corporate operating account.

44.     The Culpable Insiders also covered shortfalls in the Collection Trust Account by transferring funds directly from USACM, DTDF, FTDF, and/or other USA Capital entities. At least as early as 2000, the Culpable Insiders transferred funds directly from USACM's corporate operating account into the Collection Trust Account to pay interest on behalf of borrowers in default. The Culpable Insiders made similar transfers from other USA Capital accounts.

45.     On other occasions, the Culpable Insiders covered shortfalls in the Collection Trust Account by failing to remit principal payments to direct lenders when the loans that they had invested in were repaid.  DTDF was a regular victim of this practice.  From at least as early as 2002 until the Petition Date, the Culpable Insiders systematically failed to remit principal payments from borrowers to DTDF, whenever the funds were needed to cover a shortfall in the Collection Trust Account.  In such situations, Loob took physical possession of the checks payable to DTDF for monthly interest and principal that had been generated by the automated accounting system and simply stuffed them in her desk drawer.  Internally, the Culpable Insiders referred to the unremitted principal to DTDF as the "held checks."  As of the Petition Date, the outstanding balance of the held checks was at least $18.9 million.

**E.     The Culpable Insiders' Looting of USACM and DTDF**

46.     The driving motivation behind this ponzi scheme was the Culpable Insiders' desire to provide funding for real estate developments and other side business ventures in which they stood to profit personally.  The fraudulent scheme induced existing investors to maintain or increase their investments with USA Capital and enticed new investors to entrust their money to USA Capital, thereby providing the Culpable Insiders with liquidity to fund their scheme, and thus, future sources of funds to pillage.

47.     From at least 1997 onward, Hantges and Milanowski used USACM to originate and service loans to real estate development entities in which they stood to profit.  Initially, these loan originations were made to entities in which Hantges and Milanowski held an ownership interest either personally or through a trust.  Beginning in 2000, the Culpable Insiders caused USACM to

originate loans to entities in which USAIP held a membership interest, and the Culpable Insiders

began transferring funds directly from USACM's operating account to some of these real estate

development entities. Throughout 2002, the Culpable Insiders transferred millions of dollars from

USACM to time-share hotel and technology entities. These advances were completely unsecured

and in some cases interest free. USACM had no ownership in these entities and did not stand to

profit in any way. Furthermore, these advances directly violated the DTDF Prospectus because they

were not secured by an interest in real property and were made to entities affiliated with USACRA.

48.    In late 2002, Milanowski hatched an audacious plan to conceal the Culpable

Insiders' looting and other systematic abuses of DTDF. By creating a sham loan from DTDF to a

purported third party, the Culpable Insiders could simultaneously:    (a) eliminate inevitable

accounting problems posed by the extensive looting of DTDF that occurred in 2002; and (b)

provide a seemingly legitimate explanation for intended future looting of DTDF.

49.    Sometime prior to December 2002, Milanowski directed Fogg to establish 10-90,

Inc. to serve as the purported "independent" borrowing entity for the sham loan, and to set up

Mountain Vista, Inc. to serve as an additional waypoint for funds that Milanowski intended to loot

from DTDF in the future. The Culpable Insiders used the sham 10-90 loan for several fraudulent

purposes, including to eliminate evidence of the held checks and to loot DTDF. In total, the

Culpable Insiders' looted more than $55.9 million from DTDF under the guise of the 10-90 loan,

and $23.328 million of these monies flowed through the 10-90 and Mountain Vista accounts, which

were both accounts that were maintained by Wells Fargo. All of these transfers violated the terms

of the DTDF Prospectus, and none of these transfers benefited DTDF in any way whatsoever.

**F.**     <u>**Wells Fargo's Knowing and Substantial Assistance in the Ponzi Scheme**</u>

*Wells Fargo's Relationship With and Extensive Knowledge of USA Capital*

50.     Wells Fargo provided comprehensive banking services to USA Capital virtually from the moment of USA Capital's inception until the Petition Date, including substantial services to the Investors Trust Account and Collection Trust Account. During this time period, Wells Fargo provided extensive depository bank account services, escrow services, treasury management services, and credit services to numerous entities under the USA Capital umbrella, including USACM, USAIP, DTDF, and FTDF. In the aggregate, USA Capital opened more than thirty accounts at Wells Fargo, through which billions of dollars ultimately flowed.

51.     USA Capital was one of Wells Fargo's top business banking customers in Las Vegas and Nevada. Wells Fargo's Relationship Manager for the USA Capital accounts typically held quarterly meetings and made frequent calls to USA Capital. USACM was an integral part of Wells Fargo's lucrative relationship with USA Capital, transferring billions of dollars through its corporate operating account, the Investors Trust Account, and the Collection Trust Account. Wells Fargo also viewed DTDF as a valued customer that was part and parcel of the USA Capital relationship. Wells Fargo opened and maintained a deposit account in the name of DTDF, and Wells Fargo grouped and evaluated the DTDF account alongside the Investors Trust Account, the Collection Trust Account, the USACM corporate operating account, and other USA Capital accounts.

52.     Through its course of dealings with USA Capital, Wells Fargo also understood the interrelationship between certain of the USA Capital entities. For example, Wells Fargo opened and

maintained a checking account in the name of USAIP and knew that it was controlled by USA Capital's principals. Wells Fargo was also very familiar with the funds, and knew or should have known that DTDF's prospectus restricted DTDF from making loans to related entities, including USAIP.

*Wells Fargo Serves as Escrow Agent for FTDF*

53.    As part of its extensive relationship with and knowledge of USA Capital, Wells Fargo, through its Corporate Trust Services Department, served as the subscription escrow agent for FTDF beginning in 2002. In this capacity, Wells Fargo opened and maintained an escrow account that held investor monies prior to being released to capitalize FTDF (the "FTDF Escrow Account"). On at least some occasions, the FTDF Subscription Booklet that went to all FTDF prospective investors required the investors to make payments to "Wells Fargo Bank fbo USA Capital First Trust Deed Fund." Thus, Wells Fargo knowingly agreed to assist USA Capital in raising funds for FTDF in exchange for escrow fees, and the effect of Wells Fargo's assistance was that it enhanced FTDF's credibility and the likelihood of attracting potential investors.

54.    In connection with these escrow services, Wells Fargo obtained a copy of the FTDF Prospectus, which described the relationship between FTDF and other USA Capital entities. As part of its due diligence, Wells Fargo also obtained a copy of DTDF's offering circular. Although the escrow services were performed by Wells Fargo entities in various states, the Corporate Trust Services Department contacted the bank's Relationship Manager for the USA Capital entities at the time, Eileen Sechrist, to facilitate the banking aspects of the deal, which included opening and maintaining the FTDF Escrow Account. In response, the Las Vegas business bankers requested a

letter from the Corporate Trust Services Department, asking them to explain the purpose of the account.

*Wells Fargo's Role in the Circular $11.425 Million Transaction*

55.    Wells Fargo knowingly and substantially assisted the Culpable Insiders in accomplishing a fraudulent, circular transaction that flowed from DTDF to Investors Trust Account to Collection Trust Account.  On January 2, 2003, the Culpable Insiders wrote an $11.425 million check from DTDF to the Investors Trust Account at Wells Fargo (the "DTDF 10-90 Check").  The same day, the Culpable Insiders wrote an $11.425 million check from the Investors Trust Account to the Collection Trust Account (the "Investors Trust 10-90 Check").  Both checks were deposited on January 2, 2003.   Subsequently, the Culpable Insiders transferred more than $10 million from the Collection Trust Account back to DTDF.

56.    The driving motivation behind this completely circular transaction was to eliminate the entire balance of the held checks owed to DTDF as of the end of December 31, 2002.  When the Collection Trust Account finally sent funds back to DTDF, the transaction was booked as if the Collection Trust Account had merely released the held checks.   This erased evidence that repayments of principal owed to DTDF had been misappropriated to fuel the Culpable Insiders' fraudulent scheme.

57.    However, the transfers and deposits of funds from DTDF to the Investors Trust Account experienced a few glitches.  On January 7, 2003, Wells Fargo returned the DTDF 10-90 Check.  The Culpable Insiders then attempted to wire transfer $11.425 million from DTDF into the Investors Trust Account.  However, on January 8, 2003, Mike Marcellette, one of Wells Fargo's

business bankers who serviced the USA Capital accounts at the time, returned the wire. Later that same day, the Culpable Insiders again wire transferred $11.425 million from DTDF into the Investors Trust Account.

58.    Wells Fargo was keenly aware of the improprieties surrounding these deposits and the related fiasco. In fact, a Wells Fargo employee even communicated the bank's concerns about the activities to a USA Capital employee: "As she put it, the branch is being watched and our accounts specifically for not following procedures in handling the $11 million dollar deposit."

59.    Furthermore, the nature of the transaction itself should have alerted Wells Fargo to suspicious activity. The simultaneous timing, identical amounts, and circular structure of the transaction, smacked of fraudulent activity. In this instance, Wells Fargo processed the deposit of the DTDF 10-90 Check into the Investors Trust Account *and* the deposit of the Investors Trust 10-90 Check into the Collection Trust Account on the same day, and upon information and belief, both checks were deposited during the course of a single trip to Wells Fargo.

60.    There also was no legitimate business explanation for the transaction in light of the $11.425 million transfer from the Investors Trust Account to the Collection Trust Account. The sheer size of the transfer deviated from the typical account activity and negated any real possibility that the purpose of the transaction was to fund an interest reserve. As such, Wells Fargo knew or should have known that this large, same-day transfer from DTDF to the Investors Trust Account to the Collection Trust Account was fraudulent, or at the very least, the type of suspicious activity that warranted further scrutiny by the bank.

*Wells Fargo's Role in the Sham 10-90 Loan*

61.    Despite the January 2003 incident, Wells Fargo continued to provide full scale banking and wire transfer services to the USA Capital accounts.  Commencing in March 2003, Wells Fargo's participation in the scheme expanded with the opening of two new Wells Fargo accounts in the names of 10-90, Inc. and Mountain Vista, Inc., two dummy corporations that were set up by Fogg at Milanowski's direction for no other purpose than to pillage DTDF.

62.    On March 7, 2003, Fogg opened business banking accounts for both 10-90 and Mountain Vista at the Wells Fargo's branch in West Temecula, California:   (a) Account No. 5525221528 for 10-90 (the "10-90 Account"); and (b) Account No. 55252215376 for Mountain Vista (the "Mountain Vista Account").  Beginning on March 17, 2003 and continuing until April 1, 2004, Fogg made large, whole dollar wire transfers within days of each other from 10-90 to Mountain Vista to USAIP and/or USACM several times per month.  On November 12, 2004, the Culpable Insiders made one final wire transfer of $1 million from DTDF to 10-90.  In the aggregate, the Culpable Insiders wire transferred $23.328 million from DTDF to the 10-90 Account.  In turn, Fogg wire transferred $22.545 million from the 10-90 Account to the Mountain Vista Account to USAIP and/or USACM.  Each of these transactions is detailed in "Table A."

**Table A**

| Date of Wire from DTDF to 10-90 | Amount ($) | Date of Wire from 10-90 to Mt. Vista | Amount ($) | Date of Wire Mt. Vista to USAIP | Amount ($) |
|---|---|---|---|---|---|
| 03/17/2003 | 195,000 | 03/18/2003 | 195,000 | 03/19/2003 | 195,000 |
| 03/24/2003 | 325,000 | 03/25/2003 | 320,000 | 03/26/2003 | 320,000 |
| 03/27/2003 | 325,000 | 03/28/2003 | 320,000 | 03/28/2003 | 320,000 |
| 04/04/2003 | 200,000 | 04/08/2003 | 200,000 | 04/08/2003 | 200,000 |
| 04/15/2003 | 2,375,000 | 04/15/2003 | 2,375,000 | 04/16/2003 | 2,375,000 |
| 04/16/2003 | 605,000 | 04/16/2003 | 765,000 | 04/17/2003 | 765,000 |
| 04/16/2003 | 150,000 | | | | |

| 04/25/2003 | 783,000 | N/A | N/A | N/A | N/A |
|---|---|---|---|---|---|
| 04/30/2003 | 300,000 | 05/01/2003 | 300,000 | 05/02/2003 | 300,000 |
| 05/02/2003 | 125,000 | 05/06/2003 | 125,000 | 05/06/2003 | 125,000 |
| 05/09/2003 | 1,850,000 | 05/12/2003 | 1,850,000 | 05/13/2003 | 1,850,000 |
| 05/14/2003 | 395,000 | 05/15/2003 | 395,000 | 05/15/2003 | 395,000 |
| 05/22/2003 | 295,000 | 05/27/2003 | 295,000 | 05/27/2003 | 295,000 |
| 05/28/2003 | 410,000 | 05/29/2003 | 410,000 | 05/29/2003 | 410,000 |
| 06/04/2003 | 205,000 | 06/05/2003 | 205,000 | 06/05/2003 | 205,000 |
| 06/11/2003 | 460,000 | 06/12/2003 | 460,000 | 06/12/2003 | 460,000 |
| 06/18/2003 | 125,000 | 06/20/2003 | 125,000 | 06/20/2003 | 125,000 |
| 06/26/2003 | 465,000 | 06/27/2003 | 465,000 | 06/27/2003 | 465,000 |
| | | | | 07/03/2003 | 1,900,000 |
| 07/01/2003 | 2,495,000 | 07/02/2003 | 2,495,000 | 07/03/2003 | 225,000 |
| | | | | 07/10/2003 | 370,000 |
| 07/18/2003 | 800,000 | 07/21/2003 | 800,000 | 07/22/2003 | 800,000 |
| 07/31/2003 | 720,000 | 08/01/2003 | 720,000 | 08/01/2003 | 720,000 |
| 08/06/2003 | 250,000 | 08/08/2003 | 250,000 | 08/08/2003 | 250,000 |
| 08/13/2003 | 925,000 | 08/15/2003 | 925,000 | 08/18/2003 | 925,000 |
| 08/28/2003 | 500,000 | 08/29/2003 | 500,000 | 08/29/2003 | 500,000 |
| 09/04/2003 | 400,000 | 09/05/2003 | 400,000 | 09/05/2003 | 400,000 |
| 09/25/2003 | 500,000 | 09/26/2003 | 500,000 | 09/26/2003 | 500,000 |
| 10/14/2003 | 550,000 | 10/15/2003 | 550,000 | 10/15/2003 | 550,000 |
| 10/29/2003 | 560,000 | 10/29/2003 | 560,000 | 10/30/2003 | 560,000 |
| 11/06/2003 | 225,000 | 11/07/2003 | 225,000 | 11/07/2003 | 225,000 |
| 11/13/2003 | 460,000 | 11/14/2003 | 460,000 | 11/14/2003 | 460,000 |
| 11/25/2003 | 500,000 | 11/26/2003 | 500,000 | 11/26/2003 | 500,000 |
| 12/03/2003 | 315,000 | 12/05/2003 | 315,000 | 12/05/2003 | 315,000 |
| 12/12/2003 | 350,000 | 12/15/2003 | 350,000 | 12/15/2003 | 350,000 |
| 01/08/2004 | 300,000 | 01/08/2004 | 300,000 | 01/08/2004 | 300,000 |
| 01/12/2004 | 1,500,000 | 01/13/2004 | 1,500,000 | 01/13/2004 | 1,500,000 |
| 01/14/2004 | 175,000 | 01/14/2004 | 175,000 | 01/14/2004 | 175,000 |
| 01/22/2004 | 150,000 | 01/23/2004 | 150,000 | 01/26/2004 | 150,000 |
| 01/29/2004 | 150,000 | 02/02/2004 | 150,000 | 02/02/2004 | 150,000 |
| 02/09/2004 | 125,000 | 02/11/2004 | 125,000 | 02/11/2004 | 125,000 |
| 02/13/2004 | 150,000 | 02/17/2004 | 150,000 | 02/17/2004 | 150,000 |
| 03/04/2004 | 275,000 | 03/04/2004 | 275,000 | 03/05/2004 | 275,000 |
| 04/01/2004 | 365,000 | 04/05/2004 | 365,000 | 04/07/2004 | 365,000 |
| 11/12/2004 | 1,000,000 | 11/12/2004 | 1,000,000 | 11/15/2004 | 1,000,000 |

63.    On their face, these transfers clearly evidenced that the 10-90 Account and the

Mountain Vista Account were simply being used as conduits to launder funds from DTDF to

USAIP.  With few exceptions, funds wire transferred into each account were nearly simultaneously

wire transferred out in identical amounts, often on the same day and always within a few days of the

first wire transfer.

64.    Moreover, with the exception of routine fees collected by Wells Fargo and few isolated incidents,[1] there was absolutely no other activity in the 10-90 Account or the Mountain Vista Account aside from these suspicious wire transfers.  In fact, the daily balances within the 10-90 Account and the Mountain Vista Account were almost always less than $1,500, except for the brief moments during which the accounts held funds en route from DTDF to USAIP.

65.    Wells Fargo knowingly and materially facilitated the looting of DTDF in connection with the sham 10-90 loan.  Specifically, Wells Fargo enabled this looting by, *inter alia*: (a) violating "know your customer" regulations and its own policies and procedures in opening the 10-90 Account and Mountain Vista Account; (b) failing to set any limit on the size of the wire transfers out of these accounts; and (c) manually and routinely processing wire transfer requests made out of these accounts *despite knowing* that these transactions had no legitimate business purpose.

66.    At the outset, Wells Fargo disregarded "know your customer" regulations and its own internal policies and procedures in opening these accounts.  Under the Bank Secrecy Act, the USA Patriot Act, and its own internal policies and procedures, Wells Fargo was required to obtain the following minimum information to open a business account:  (a) description of the business operations; (b) principal line of business; (c) description of the business's primary trade area; (d) anticipated volume of cash sales; (e) names of major suppliers; (f) reason for selecting the bank if

---

[1] The 10-90 Account and the Mountain Vista Account were each opened with $1,000 deposits made March 7, 2003.  On October 29, 2003, $1,000 was deposited into the 10-90 Account; subsequently, a check for $999 cleared the account on October 31, 2003.  Also on October 29, 2003, $2,000 was wired into the Mountain Vista Account; subsequently, checks for $700 and $299 cleared the account on October 31, 2003 and November 4, 2003, respectively.  On May 19, 2004, $2,700 was wired in and out of the Mountain Vista Account.  On June 25, 2004, $1,500,000 was transferred from the Mountain Vista Account to the 10-90 Account to DTDF.

not in the area served by the bank; (g) number of employees; (h) month and year the business started; and (i) types and frequency of anticipated international transactions.

67.     Despite these requirements, Wells Fargo failed to obtain any meaningful understanding of 10-90 and Mountain Vista prior to opening these accounts.  Instead, the Wells Fargo banker who opened the accounts, LucyAnn Englebert ("Englebert"), asked Fogg very few questions, and filled out virtually identical information on the account opening forms for both 10-90 and Mountain Vista.  The only information that Englebert obtained about the nature of the businesses was that 10-90 and Mountain Vista were in the "real estate, rental, leasing" industry and the sales were "regional."  However, there was no information listed under "description of business," and neither account application contained any information regarding "annual gross sales" or "major suppliers/customers."  In short, Wells Fargo knew nothing about 10-90 and Mountain Vista, yet opened these business accounts that allowed Fogg to conduct unlimited wire transfers.  If Wells Fargo had asked for *any* of the specified information, it would have easily discovered that Mountain Vista and 10-90 did not engage in any business, had no legitimate purpose, and were simply shell entities.

68.     Despite *not* knowing its 10-90 and Mountain Vista customers, or the likely volume or nature of its banking transactions, Wells Fargo did not set any limits on the size of the wire transfers that could be made out of the 10-90 and Mountain Vista Accounts.  Again, Wells Fargo's conduct contravened its own policies and procedures, which require the bank to set limits based on the type of account, type of business, the reasons for wire transfer services, and average transfer amounts.  Since Wells Fargo had not obtained any of this information upon opening the Mountain

Vista and 10-90 Accounts, it could not and did not set up appropriate wire transfer limits. As a result, Wells Fargo enabled Fogg to make multimillion dollar wire transfers from 10-90 to Mountain Vista to USAIP, even though Fogg had never provided any legitimate business explanation for such transfers.

69.    Not only did Wells Fargo fail to impose any wire transfer limits, but Wells Fargo played a substantial role in processing almost all of these fraudulent wire transfers. Unlike USA Capital, Fogg was not set up to conduct online wire transfers until February 2004, such that he initiated his wire transfers in person at the Wells Fargo West Temecula branch office in the vast majority of instances. As a result, a Wells Fargo employee, typically a teller, manually approved and processed these wire transfers while Fogg waited at the bank. Despite the clear and prevalent warning signs of money laundering and fraud, Wells Fargo processed each and every wire transfer request out of the 10-90 and Mountain Vista Accounts.

70.    Moreover, Wells Fargo had to know that these atypical wire transfers were not legitimate. In early June 2003, the West Temecula branch manager, Laurie Mills ("Mills"), asked to speak with Fogg when he was in the branch to initiate a wire transfer. During this conversation, Mills told Fogg that her superiors or upper management needed to know the business purpose of the wire transfers. Fogg responded that he "believed" the transfers were being used for real estate loans or purchases. Despite Fogg's tentative and vague answer, and the fact that Fogg had never conducted any banking activity involving such high dollar amounts prior to 10-90 and Mountain Vista, Wells Fargo processed the atypical transactions. In doing so, Mills willfully and blindly accepted inadequate responses to questions that required substantive answers and did not request

any loan agreements, promissory notes, or any other documents to support Fogg's insufficient response.

71.     Wells Fargo also *knew* that the 10-90 and Mountain Vista transactions involved USA Capital.  As reflected on Wells Fargo account statements, the monies typically were wire transferred from a DTDF account maintained by Nevada State Bank to the 10-90 Account.  Then, Fogg would typically wire transfer the same amount to the Mountain Vista Account and then to a USAIP account maintained by Bank of Commerce.  In several instances, funds that had been wire transferred from DTDF to the 10-90 Account to the Mountain Vista Account to USAIP were subsequently wire transferred *back* to the Collection Trust Account maintained at Wells Fargo.

72.     For example, on May 9, 2003, the Culpable Insiders wire transferred $1.85 million from DTDF to the 10-90 Account.  The next banking day, Fogg wire transferred $1.85 million from the 10-90 Account to the Mountain Vista Account.  On May 13, 2003, Fogg wire transferred $1.85 million from the Mountain Vista Account to USAIP; instantaneously, the Culpable Insiders wire transferred $1.85 million from USAIP to the Collection Trust Account.

73.     Similarly, on January 12, 2004, the Culpable Insiders wire transferred $1.5 million from DTDF to the 10-90 Account.  On January 13, 2004, Fogg wire transferred $1.5 million from the 10-90 Account to the Mountain Vista Account to USAIP.  From there, the Culpable Insiders wire transferred $1.5 million to the Collection Trust Account on January 15, 2004.

74.     Given the identical amounts and virtually simultaneous dates of these transfers, Wells Fargo had to have known or consciously disregarded that funds wire transferred from DTDF to 10-90 to Mountain Vista to USAIP and finally to the Collection Trust Account were simply being

laundered.  Nevertheless, Wells Fargo continued to process millions of dollars in suspicious wire transfers out of 10-90 and Mountain Vista throughout 2003 and 2004, and following the inquiry by Mills in June 2003, Wells Fargo never again questioned the purpose or the legitimacy of these blatantly suspicious, atypical wire transfers.

75.    Under the Bank Secrecy Act, including the amendments made by the USA Patriot Act, and Wells Fargo's own policies implemented pursuant to these federal statutes, Wells Fargo, at a bare minimum, should have reported the suspicious wire transfer activity to the next level of authority, the bank's Risk Management Department, and the appropriate regulatory agencies, and then terminated the accounts with the suspicious activity.  By consciously disregarding the plethora of red flags, and continuing to provide banking and wire transfer services, Wells Fargo substantially assisted Milanowski and Hantges to continue their fraudulent operations and attract fresh capital until USA Capital finally collapsed in April 2006.

*Wells Fargo's Denial of USACM's Loan Request*

76.    Ironically, however, Wells Fargo was not willing to risk any of its own funds with the USA Capital entities.  In late 2004, Sechrist and her superior had a meeting with Milanowski, in which they discussed the possibility of extending a credit line to USACM.  Shortly thereafter, USACM applied for a $1 million loan from Wells Fargo.  Sechrist obtained and reviewed USACM's audited consolidated financial statements for 2003 and 2004, and was concerned about the auditor's note regarding a pending RICO lawsuit that was filed against USACM.  According to Sechrist, she was not especially concerned by the substance of the lawsuit allegations, but rather only the fact that the plaintiffs were seeking $10 million.  Allegedly on this basis alone, and without

1    conducting *any* financial analysis, Sechrist denied USACM's loan request, despite USACM's

2    requests for reconsideration.

3    77.    Sechrist's story flies in the face of typical bank conduct.  Given that USACM was

4    one of the most important customers for the Las Vegas business banking unit and the Nevada

5    region, it is almost unthinkable that Wells Fargo would so cavalierly dismiss USACM's loan

6

7    application and the opportunity to sell profitable credit products without any further underwriting or

8    financial analysis.  Furthermore, banks lend money to companies every day that have substantial

9    contingencies like pending litigation involving high dollar amounts, such that Sechrist's explanation

10   does not comport with industry norms.  Finally, given the large volume of business and transactions

11

12   that flowed in and out of USA Capital's accounts at Wells Fargo, the $1 million loan request was

13   relatively modest.  That Wells Fargo so readily rejected the loan request indicates that Wells Fargo

14   knew that USACM's business was not viable in late 2004.

15

16   *Wells Fargo's Termination of USA Capital Accounts in May 2006*

17   78.    Yet another strange occurrence was Wells Fargo's decision to terminate certain of

18   the USA Capital accounts in May 2006, the month following the bankruptcy filings of USACM,

19

20   DTDF, and FTDF.  Although a bankruptcy filing may have indicated that USACM and the funds

21   were no longer financially viable, it is not industry practice for banks to terminate accounts merely

22   because the underlying business has filed for bankruptcy.  Accordingly, Wells Fargo's abrupt

23

24   termination of the USACM account in May 2006 was unusual if based on the bankruptcy filing

25   alone, and instead indicates that Wells Fargo was terminating the accounts based on its prior

26   suspicions of wrongful activity.

79.     Moreover, by letter dated May 31, 2006, Wells Fargo also terminated its banking relationship with USAIP: "Wells Fargo Bank, N.A has determined that it is no longer in the best interests of the Bank to maintain its banking relationship with USA Investment Partners, LLC." However, USAIP had _not_ filed for bankruptcy at the time of the May 31, 2006 letter, and Wells Fargo did not provide any specific reason for terminating the USAIP relationship.  As an initial matter, the letter clearly demonstrated that Wells Fargo considered USAIP to fall under the USA Capital umbrella.  However, it would not comport with industry standard for Wells Fargo to terminate USAIP's account merely because related USA Capital companies had filed for bankruptcy.  Instead, Wells Fargo's termination of the USAIP account in May 2006 indicates that it was motivated by its prior knowledge about the legitimacy of the USA Capital operations.

**G.     Plaintiffs' Substantial Damages**

80.     USACM, DTDF, and FTDF were substantially harmed by Wells Fargo's wrongful acts.  Wells Fargo's actions proximately caused USACM to suffer massive looting and exposure to third party liabilities that otherwise would not have occurred and caused DTDF and FTDF to lose millions of dollars.  Wells Fargo's wrongful acts and omissions enabled, assisted, and prolonged large scale abuse and looting of USACM, DTDF, and FTDF by the Culpable Insiders. Additionally, Wells Fargo's failure to report the fraud that it had detected and its continued provision of banking services permitted the fraud to continue for many years.

81.     USACM, DTDF, and FTDF suffered many millions of dollars in damages through the Culpable Insiders' looting of USACM's general corporate bank account, USACM loan origination and loan servicing fees in the Collection Trust Account that were never distributed to

1   USACM, as well as DTDF and FTDF funds that were held in the Collection Trust Account.  Over

2   the period in which Wells Fargo provided banking services to USACM and its related entities, the

3   Culpable Insiders looted and/or misappropriated millions of dollars through various transactions up

4   until the filing of bankruptcy.  The Culpable Insiders siphoned funds out of USACM, the Collection

5   Trust Account, and possibly the Investors Trust Account, which contained both USACM and direct

6   lenders' funds, and sent them to various valueless, improper, and self-serving investments either

7   directly or indirectly, through USAIP.

8        82.    The Culpable Insiders also looted and/or misappropriated millions of dollars of

9

10  USACM, DTDF, and FTDF funds by paying interest on defaulted loans and acquiring worthless

11  loans to perpetuate their scheme.  The Culpable Insiders used DTDF funds to make loans to entities

12  they owned and/or controlled that were never repaid.  Had the Culpable Insiders' scheme been

13  stopped sooner, DTDF would have saved millions of dollars by not transferring them to the entities

14

15  owned or controlled by the Culpable Insiders that ultimately defaulted.  DTDF could have instead

16  used these funds to enter into legitimate loan transactions, and thereby earned a profit for its

17  investments.

18        83.    In addition, both USACM and DTDF could have saved millions of dollars in losses

19

20  had they sought to gain control of the real property underlying their securitized loans at an earlier

21  date.  Due in large part to the recent downturn in the real estate market, many of the properties in

22  question are selling at greatly reduced prices.  Had USACM and DTDF been aware of the scheme

23

24  and acted to foreclose on these properties or otherwise gain control of the collateral at an earlier date,

25

26

these properties would have sold for much higher prices, resulting in a substantial increase in the recovery of assets for distribution to USACM and DTDF's creditors.

84.     Wells Fargo's malfeasance was not simply the *sine qua non* of USACM and DTDF's losses.  Rather, as a direct, proximate result of Wells Fargo's acts and omissions described above:  (a) USACM suffered many millions of dollars in direct losses and potentially hundreds of millions of dollars in additional damages for liabilities to third parties; and (b) DTDF suffered tens of millions of dollars in damages from the sham 10-90 loan and related party loans that were never repaid, the Culpable Insiders' looting/misappropriation of DTDF funds, and unremitted principal and interest payments from borrowers.

**H.     The Culpable Insiders Acted Exclusively Adverse to Plaintiffs' Interests, but Their Innocent Stakeholders Could and Would Have Acted to Prevent the Wrongdoing.**

85.     At all relevant times, the Culpable Insiders acted exclusively adverse to Plaintiffs' interests in connection with the transactions described herein, and in each instance, the Culpable Insiders:  (a) placed their own interests ahead of USACM, DTDF, and FTDF's interests; and (b) acted in their own best interests to USACM, DTDF, and FTDF's detriment.

86.     The Culpable Insiders engaged in these harmful acts to perpetuate the scheme, thereby allowing them to continue to misappropriate and loot assets from USACM, DTDF, and FTDF and their innocent investor-creditors.

87.     USACM, DTDF, and FTDF's shareholders, officers, directors, and members, as well as various Nevada and federal regulators (the "Stakeholders") were unaware and had no reason to know about the scheme.  Moreover, numerous regulatory authorities in Nevada and elsewhere

stood ready, willing, and able to assist in preventing the ongoing fraud, but for the affirmative actions taken by the Culpable Insiders and Wells Fargo to cover it up and/or mislead the authorities.

88.    DTDF and FTDF had well over 1500 Investors who each held a membership interests.  If these Investors were informed that the Culpable Insiders were misallocating and/or looting DTDF and/or FTDF's funds, they could and would have taken action to stop the Culpable Insiders, including, but not limited to, replacing USACRA as their manager and/or removing the Culpable Insiders.  Without access to DTDF and FTDF's liquidity, the Culpable Insiders' scheme would have ended much sooner.

89.    Because of the Culpable Insiders' failure to abide by their fiduciary duties and Wells Fargo's active assistance in concealing their wrongdoing, USACM, DTDF, and FTDF failed to discover the Culpable Insiders's wrongdoings until their eventual bankruptcy occurring in April 2006.  After Chief Restructuring Officers were appointed and the Culpable Insiders were removed, a thorough review of the books and records was conducted.  This review, along with a review led to the discovery of the Culpable Insiders' misdeeds and ultimately to Wells Fargo's misdeeds.

90.    At all relevant times, USACM, DTDF, and FTDF's innocent Stakeholders, who had no knowledge of the Culpable Insiders' wrongdoing and who could and would have substantially prevented or otherwise mitigated the losses that occurred had they been properly notified of the scheme by Wells Fargo or regulatory authorities.

91.    The innocent Stakeholders were unaware and had no reason to know about the suspicious wire transfers out of 10-90 and Mountain Vista or the suspicious, circular $11.425 million transaction.

92.     If Wells Fargo had informed the innocent Stakeholders of the ongoing scheme, the Culpable Insiders' scheme would have ended years sooner and millions would have been saved.

93.     If Wells Fargo had notified the authorities about the suspicious banking and wire transfer activity, the authorities would have suspended USACM's license, taken possession of USACM's assets, appointed a receiver for liquidation, and/or sought a court order injunction to prevent the Culpable Insiders from misusing the Collection Trust Account.

## IV. CAUSES OF ACTION

### A. Aiding and Abetting Fraud

94.     Plaintiffs re-allege and fully incorporate the allegations pleaded above.

95.     The Culpable Insiders consistently and systematically defrauded FTDF, DTDF, and USACM out of millions of dollars.  In doing so, they exercised dominion and control over funds that they had no legal right or entitlement to, directed that the funds to be used to pay off USAIP's obligations that USAIP incurred as the result of Culpable Insiders using it as their personal "piggy bank," and otherwise used the funds for the purposes not in the best interest of FTDF, DTDF, and USACM.  The scheme was principally conducted through the various ways described above.

96.     Wells Fargo knowingly and substantially assisted the Culpable Insiders in defrauding DTDF of its assets by opening and maintaining the accounts used to conduct systematic transfers of funds out of DTDF's account, and by facilitating transfers between the DTDF and 10-90, 10-90 and Mountain Vista, and Mountain Vista and USAIP accounts.  Wells Fargo knew that the Culpable Insiders were using the 10-90 and Mountain Vista Accounts to divert funds from DTDF.  Wells Fargo knew that:  (a) DTDF was a fund that held investor monies for real estate

investments because Wells Fargo provided corporate trust services to FTDF, a virtually identical real estate investment fund created by the Culpable Insiders in 2001; (2) DTDF's funds were transferred to 10-90 and Mountain Vista Accounts and then transferred out to USAIP; (3) such transfers were inconsistent with DTDF's purpose; (4) there was no documentation supporting the purpose of the transfers; and (5) such transfers were prohibited by DTDF's prospectus.

97.    Wells Fargo knew that the transfers through the 10-90 and Mountain Vista accounts were designed to divert money from DTDF, but did not close the accounts and continued to process the wire transfers at its Temecula branch until November 2004, thus substantially assisting the Culpable Insiders' scheme. Wells Fargo was aware of its role in promoting the fraudulent scheme at the time the Culpable Insiders were diverting the funds from DTDF. Wells Fargo's assistance in making the wire transfers made it easier for the Culpable Insiders to defraud DTDF and USACM of millions of dollars.

98.    Wells Fargo also knowingly and substantially assisted the Culpable Insiders' in defrauding USACM of its assets by opening and maintaining the accounts where DTDF and USACM funds were being commingled and siphoned off for the Culpable Insiders' personal gains and other improper purposes. Wells Fargo knew that: (a) on January 2, 2003, an $11.425 million check drawn on DTDF account was deposited by the Culpable Insiders in the Investors Trust Account at Wells Fargo; (b) on the same day, a check for the same amount was issued from the Investors Trust Account and deposited in the Collection Trust Account, also maintained at Wells Fargo; (c) this transaction between the accounts was unusual  because of their sheer size; (d) the machination involving  a  simultaneous  multi-million  dollar  deposit  and  withdrawal  from  the

Investors Trust account was also suspicious under the bank internal policies; (e) there was no legitimate business purpose for the transactions; (f) as a result of these transactions, the USACM account was put under "watch"; (g) on several other occasions, almost contemporaneous circular wire transfers were made from DTDF to Mountain Vista or 10-90 to USAIP and then to Collection Trust Account; (h) these transfers also qualified as "suspicious activity" under the Bank's internal policy; and (i) there were no documents supporting these transfers.

99.    Wells Fargo knew that the Culpable Insiders commingled the investors funds in the accounts opened at Wells Fargo, but did not close the accounts until after the bankruptcy filing, thus substantially assisting the Culpable Insiders' scheme.  Wells Fargo was aware of its role in promoting the fraudulent scheme at the time the Culpable Insiders were commingling the funds. Wells Fargo's assistance in opening, maintaining and failing to terminate the accounts, made it easier for the Culpable Insiders to defraud FTDF, DTDF, and USACM of millions of dollars.

100.    USACM, DTDF, and FTDF had one or more innocent Stakeholders who:  (a) were not involved in the acts and omissions set forth above; (b) were not aware of the fraud committed by Hantges and Milanowski; and (c) were not aware of Wells Fargo's substantial assistance in commission of the fraud.

101.    One or more of the innocent Stakeholders could and would have terminated or prevented the acts or omissions set forth above if they had actually known, or understood and appreciated, what Hantges and Milanowski were doing to USACM, DTDF, and FTDF and the true adverse impact on the Plaintiffs and their creditors.

102.    The wrongful conduct complained of herein was a direct and proximate cause of Plaintiffs' damages.

**B.    Aiding and Abetting Breaches of Fiduciary Duty**

103.    Plaintiffs re-allege and fully incorporate the allegations pleaded above.

104.    As directors and officers of USACM, USAIP and USACRA, the Culpable Insiders owed FTDF, DTDF, and USACM fiduciary duties to act at all times with the utmost good faith and fair dealing in their best interests.  The Culpable Insiders collectively and individually breached fiduciary duties owed to the USACM, DTDF, and FTDF and their creditors by diverting through systematic transfers more than $20 million of DTDF funds to fund their own side operations, and by commingling and then diverting millions of USACM's funds.  Their fiduciary duties required them not to engage in transactions that were in violation of DTDF prospectus and that were harmful to DTDF.  The Culpable Insiders also had a fiduciary duty not commingle the investors' money entrusted to them and not to divert such fund for improper purposes.  The Culpable Insiders' breaches of those fiduciary duties were the proximate cause of USACM, DTDF, and FTDF's collapse and bankruptcy.

105.    Wells Fargo knowingly provided substantial assistance to the Culpable Insiders in their breaches of fiduciary duties to USACM, DTDF, and FTDF.  As described above, Wells Fargo assisted the Culpable Insiders in their breaches of fiduciary duties by facilitating circular wire transfers of funds from DTDF to USAIP through the 10-90 and Mountain Vista accounts.  By virtue of being the entity that opened the accounts and processed the blatantly suspicious wire transfers, Wells Fargo was aware of its role in promoting the Culpable Insiders' breaches of fiduciary duties at

the times that it provided assistance to them.  At the very least, Wells Fargo made a conscious decision to look away from the conspicuously improper systematic diversion of funds committed by the Culpable Insiders.

106.    Wells Fargo also knowingly provided substantial assistance to the Culpable Insiders in their breaches of fiduciary duties to USACM, DTDF, and FTDF by opening and maintaining accounts where the investors trusts were being commingled.  Wells Fargo was aware of commingling and knew that commingling of investors' funds entrusted to USACM, DTDF, and FTDF was improper, violated Nevada state law, and was in violation of the Culpable Insiders' fiduciary duties.  By virtue of being the entity that opened the accounts and facilitated the transfers in and out of these accounts, by knowing that improper, suspicious and unexplainable transfers were being made between various USACM accounts maintained at Wells Fargo, Wells Fargo was aware of its role in promoting the commingling of funds and the Culpable Insiders' breaches of fiduciary duties.

107.    Wells Fargo's substantial assistance made it easier for the Culpable Insiders to commit their breaches of fiduciary duties.

108.    The conduct constituting breaches of fiduciary duty owed to USACM, DTDF, and FTDF was exclusively adverse to their interests and provided no benefit to them.

109.    Plaintiffs had one or more innocent Stakeholders who:  (a) were not involved in the acts and omissions set forth above; (b) were not aware of the breaches of fiduciary duty owed by the Culpable Insiders and (c) were not aware of Wells Fargo's substantial assistance in such breaches.

110.    Plaintiffs were directly and proximately damaged by Wells Fargo's actions for which damages Plaintiffs now sue.

## C.    Negligence

111.    Plaintiffs re-allege and fully incorporates the allegations pleaded above.

112.    DTDF and USACM maintained depositary accounts with Wells Fargo.  Wells Fargo thus owed their customers, USACM and DTDF, a duty of ordinary care.

113.    Alternatively, Wells Fargo owed a duty of ordinary care to USACM and DTDF because:  (a) the harm to DTDF and USACM was foreseeable; (b) the certainty of injury to DTDF and USACM was great; (c) Wells Fargo's facilitation of transfers closely related to the injury suffered by DTDF and USACM; (d) in light of the obvious signs that the wire transfers were circular and designed to transfer money out of DTDF account to USAIP, the blame attached to Wells Fargo's failure to act is great; and (e) the consequences of imposing a duty of ordinary care on a bank in the face of blatantly obvious and significant suspicious wire activity are not such as to prevent the imposition of such duty.

114.    In addition to DTDF and USACM maintaining accounts with Wells Fargo, the facts giving rise to Wells Fargo's duty of care to USACM and DTDF are extraordinary and specific.  In this case, the circular nature of wire transfers was so blatantly obvious that a bank simply could not ignore the suspicious signals.  The bank was familiar with the entity that received these transfers because USAIP was an affiliate of USACM and because USAIP itself was a customer at Wells Fargo.  The Bank was also familiar with DTDF.  The bank's familiarity with all parties involved in circular wire transfers and the obvious signs of circular wires of substantial amounts created the

extraordinary and specific circumstances necessary to impose the duty of ordinary care on Wells Fargo.

115.    Wells Fargo breached its duty of care by failing to verify the purpose of what could be identified even by a non-banker as repeated circular wire transfers and ignoring the suspicious activity that had occurred as soon as the accounts were opened and continued to occur for more than a year.

116.    Specifically, Wells Fargo failed to:  (a) learn about the purpose of Mountain Vista and 10-90's business as is required its own Know-Your-Customer policies; (b) learn Mountain Vista and 10-90's purpose for sending wire transfers to gauge the propriety of such transfers; (c) monitor Mountain Vista and 10-90 accounts for circular or otherwise suspicious wire transfers; (d) report the suspicious wire transfers and terminate the accounts once suspicious activity was detected.

117.    Wells Fargo allowed the Culpable Insiders to transfer funds through the Mountain Vista and 10-90 accounts under circumstances that would have caused a bank exercising ordinary care to:  (a) notify USACM and DTDF's Stakeholders; or (b) terminate the banking relationship and close the Mountain Vista and 10-90 accounts.  Accordingly, Wells Fargo violated its duty to exercise ordinary care in maintenance and supervision of the bank accounts.

118.    Furthermore, with respect to the Collection Trust Account, Wells Fargo failed to:  (a) learn about the purpose of all USACM entities that opened the accounts with Wells Fargo pursuant to the bank's Know Your Customer Policy; (b) properly open the accounts for USACM related entities, and maintain accurate and updated banking records on each of the USACM related entities

1    reflecting the purpose of each entities; (c) learn the purpose f the circular transfers involving USAIP

2    and the Collection Trust Accounts, USAIP and DTDF accounts, and DTDF and Collections Trust

3    accounts; (d) monitor the activity in the USACM accounts for signs of commingling; and (e)

4    terminate the accounts one the suspicious of commingling had arisen.

5

6          119.    Wells Fargo's acts and omissions constituted negligence that directly and

7    proximately caused the injuries suffered by DTDF and USACM for which Plaintiffs now sue.

8    USACM and DTDF lost over millions of assets through the transaction that that took place in the

9    accounts maintained by Wells Fargo.  Without the ability to perform circular wire transfers through

10   the Mountain Vista and 10-90 accounts at Wells Fargo, and without the ability to commingle the

11   funds in the accounts opened and maintained by Wells Fargo, the Culpable Insiders would not have

12   been able to divert millions of dollars of Plaintiffs' funds, and Plaintiffs would not have suffered the

13   damages for which they now sue.

14

15         **WHEREFORE,** Plaintiffs respectfully request that a judgment be entered on Plaintiffs'

16   behalf against Wells Fargo for the following:

17

18         a.     actual, compensatory, consequential, and all other damages in amount in excess of

19               $25 million (to be quantified later in these proceedings);

20

21         b.     pre-judgment and post-judgment interest at the highest rate allowed by law;

22

23         c.     attorneys' fees and costs; and

24         d.     any and all such further relief to which Plaintiffs are entitled at law and in equity.

25

26

Dated:  April 12, 2008

**DIAMOND MCCARTHY LLP**

By:   /s/ Lisa S. Tsai
William T. Reid, IV, TX 00788817
Lisa S. Tsai, TX 24046999
6504 Bridgepoint Parkway, Suite 400
Austin, Texas 78730
(512) 617-5200 (telephone)
(512) 617-5299 (facsimile)

Allan B. Diamond, TX 05801800
Michael Yoder, TX 24056572
909 Fannin, Suite 1500
Houston, Texas 77010
(713) 333-5100 (telephone)
(713) 333-5199 (facsimile)

Eric D. Madden, TX 24013079
Elisaveta Dolghih, TX 24043355
1201 Elm Street, 34th Floor
Dallas, Texas 75270
(214) 389-5300 (telephone)
(713) 389-5399 (facsimile)

*Special Litigation Counsel for USACM Liquidating
Trust, USA Capital Diversified Trust Deed Fund,
LLC, and USA Capital First Trust Deed Fund, LLC*