E-filed on 5/16/08

**DIAMOND MCCARTHY LLP**
6504 Bridgepoint Parkway, Suite 400
Austin, Texas 78730
Telephone: (512) 617-5200
Facsimile: (512) 617-5299
William T. Reid, TX State Bar No. 00788817
Email: wreid@diamondmccarthy.com
P. Jason Collins, TX State Bar No. 24040711
Email: jcollins@diamondmccarthy.com

**LEWIS AND ROCA LLP**
3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169-5996
Telephone (702) 949-8320
Facsimile  (702) 949-8321
Rob Charles, NV State Bar No. 006593
Email: rcharles@lrlaw.com

Counsel for USACM Liquidating Trust

909 Fannin, Suite 1500
Houston, Texas 77010
Telephone (713) 333-5100
Facsimile (713) 333-5199
Allan B. Diamond, TX State Bar No. 05801800
Email: adiamond@diamondmccarthy.com
Eric D. Madden, TX State Bar No. 24013079
Email: emadden@diamondmccarthy.com

Special Litigation Counsel for USACM Liquidating Trust and
USA Capital Diversified Trust Deed Fund, Inc.

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br><br>Debtor. | Case Nos.:<br>BK-S-06-10725-LBR<br>BK-S-06-10726-LBR<br>BK-S-06-10727-LBR<br>BK-S-06-10728-LBR<br>BK-S-06-10729-LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br><br>Debtor. | |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND,<br>LLC,<br><br>Debtor. | JOINTLY ADMINISTERED<br>Chapter 11 Cases<br><br>Judge Linda B. Riegle |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br><br>Debtor. | |
| In re:<br>USA SECURITIES, LLC,<br><br>Debtor. | |
| Affects:<br>☐ All Debtors<br>☒ USA Commercial Mortgage Company<br>☐ USA Capital Realty Advisors, LLC<br>☒ USA Capital Diversified Trust Deed Fund, LLC<br>☒ USA Capital First Trust Deed Fund, LLC<br>☐ USA Securities, LLC | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

USACM LIQUIDATING TRUST; and
USA CAPITAL DIVERSIFIED TRUST DEED FUND,
LLC;

                        Plaintiffs,

      v.

BEADLE, MCBRIDE, EVANS & REEVES, LLP,
REEVES, EVANS, MCBRIDE & ZHANG, LLP, TG
MCBRIDE CPA LTD., and T. GARTH MCBRIDE,

                    Defendants.

**Adversary No. 08-___**

**PLAINTIFFS' ORIGINAL
COMPLAINT**

Hearing Date:  n/a
Hearing Time:  n/a

# TABLE OF CONTENTS

I.     **SUMMARY OF THIS ACTION** ................................................................ 5

A.     **USACM's Background** ........................................................................... 6

B.     **The Investment Funds' Background** ..................................................... 7

C.     **BMER's Role in the Scheme** ................................................................ 8

II.     **JURISDICTION AND VENUE** ........................................................... 11

III.     **PARTIES AND OTHER RELEVANT ENTITIES** ............................. 12

A.     **Plaintiffs** ............................................................................................ 12

    *1.    USACM Trust* ................................................................................. 12

    *2.    DTDF* ............................................................................................... 12

B.     **Defendants** .......................................................................................... 13

C.     **Other Relevant Entities** .................................................................... 14

    *1.    The Other USA Capital Debtors* ..................................................... 14

    *2.    USAIP* ............................................................................................. 15

IV.     **FACTUAL BACKGROUND** ............................................................... 16

A.     **USA Capital's Origins and Business Model** ...................................... 16

B.     **The Establishment of the Investment Funds** ..................................... 18

C.     **The Culpable Insiders' Fraudulent Scheme** ...................................... 20

    *1.    The Trust Accounts* ......................................................................... 20

    *2.    The Culpable Insiders' Basic Scheme* ............................................ 22

    *3.    The Culpable Insiders' Additional Looting of DTDF* ................... 25

    *4.    The Culpable Insiders Self-Dealing and Looting of USACM* ....... 28

    *5.    Additional Facets of the Scheme* ................................................... 30

D.     **BMER's Role in USACM's and the Investment Funds' Collapse** ..... 32

    *1.    BMER Knew of Significant Red Flags in USACM's Accounting Records, but Failed to Plan Its Audits Accordingly* ....................... 35

    *2.    BMER Did Not Obtain Sufficient Support for Its Audit Opinions* .......................... 43

    *3.    BMER Knew the Culpable Insiders were Looting DTDF Through Related Party Transactions* ................................................................ 44

    *4.    BMER Had a Duty to Communicate the Existence of the Fraud and Its Impact on USACM's Financial Statements* ........................... 47

    *5.    BMER Lacked Sufficient Independence to Appropriately Audit DTDF and FTDF's Financial Statements* ......................................... 49

    *6.    BMER's Audit and Reporting Failures Allowed the Culpable Insiders to Continue Their Scheme* ................................................ 50

E.     **USACM, DTDF, and FTDF's Damages** ............................................ 52

F.     **The Culpable Insiders Acted Exclusively Adverse to USACM and the Investment Funds' Interests, but Their Innocent Stakeholders Could and Would Have Acted to Prevent the Wrongdoing** ................................ 54

V.      **Tolling of Claims Against BMER** ............................................................ **57**

VI.     **CAUSES OF ACTION** ................................................................................ **58**

A.      **DTDF's Claims Against BMER** ................................................................ **58**

*Count 1: Aiding and Abetting/Participation in Breaches of Fiduciary Duty* ................ 58

*Count 2: Accounting Malpractice/Professional Negligence* ............................................ 61

*Count 3: Breach of Contract* ........................................................................................ 63

B.      **FTDF's Claims Against BMER** ............................................................... **65**

*Count 1: Aiding and Abetting/Participation in Breaches of Fiduciary Duty* ................ 65

*Count 2: Accounting Malpractice/Professional Negligence* ............................................ 68

*Count 3: Breach of Contract* ........................................................................................ 70

C.      **USACM's Claims Against BMER** ........................................................... **72**

*Count 1: Aiding and Abetting/Participation in Breaches of Fiduciary Duty* ................ 72

VII.    **JURY TRIAL DEMAND** .......................................................................... **75**

VIII.   **PRAYER FOR RELIEF** ............................................................................ **75**

## PLAINTIFFS' ORIGINAL COMPLAINT

1.     Plaintiffs USACM Liquidating Trust (the "USACM Trust"), as the duly authorized successor-in-interest to USA Commercial Mortgage Company ("USACM") and to certain claims of USA Capital First Trust Deed Fund, LLC ("FTDF"), and USA Capital Diversified Trust Deed Fund, LLC ("DTDF"), on behalf of itself and as the duly authorized successor-in-interest to certain claims of FTDF, bring this action against Defendants Beadle, McBride, Evans & Reeves, LLP Reeves, Evans, McBride & Zhang, LLP, TG McBride CPA Ltd., and T. Garth McBride (collectively, "BMER") for, *inter alia*, accounting malpractice, aiding and abetting breaches of fiduciary duty, breach of contract, and other wrongful conduct that caused losses of many millions of dollars by USACM, DTDF, FTDF, and their creditors in general.  USACM and DTDF also object to the proofs of claim filed by BMER.

## I.     SUMMARY OF THIS ACTION

2.     In April 2006, USACM and its related companies collapsed under the weight of the massive fraud perpetrated on them by certain Culpable Insiders, namely Thomas A. Hantges ("Hantges") and Joseph D. Milanowski ("Milanowski") (collectively, the "Culpable Insiders"). With BMER's substantial assistance, the Culpable Insiders employed a pervasive fraudulent scheme in which they looted and/or misappropriated tens of millions of dollars from USACM, DTDF, and FTDF.

3.     The Culpable Insiders scheme caused USACM, DTDF, and FTDF to lose many millions of dollars and left USACM exposed to millions of dollars in additional liability to direct lenders and others.  As a result of these wrongful activities and staggering losses, USACM, DTDF,

and FTDF, along with certain of their affiliates, filed for bankruptcy protection and relief on April 13, 2006, in the United States Bankruptcy Court for the District of Nevada.

### A.    USACM's Background

4.    USACM was a mortgage broker and loan servicing company whose primary business activities were: (a) "originating" short-term loans by direct lenders to commercial real estate developers; and (b) servicing the loans that it originated by collecting principal and interest from borrowers and distributing those payments to direct lenders.  USACM earned revenue by charging various fees for these services, including origination, servicing, and extension fees.  Between 1997 and 2006, USACM originated and serviced more than $2.6 billion in loans to real estate developers.  At the time of its bankruptcy filing in April 2006, $960 million of these loans remained outstanding.

5.    The Culpable Insiders turned USACM's loan servicing operations into a massive fraudulent investment scheme, by misallocating and/or commingling available funds within the "USA Capital" group of companies to ensure that the direct lenders received regular interest and principal payments, even for non-performing or uncollectible loans.  The Culpable Insiders' wrongful acts were all to USACM, DTDF, and FTDF's detriment.

6.    The Culpable Insiders were able to lull direct lenders into a false sense of security by causing USACM to make timely interest payments and principal repayments to direct lenders on behalf of non-performing borrowers.  Indeed, the Culpable Insiders continually publicized the fact that no direct lender had ever lost money on a loan serviced by USACM, suggesting that USACM-serviced loans never defaulted.  This was far from reality.  This false representation induced existing direct lenders to maintain or increase their investments with USACM, DTDF, and FTDF and

enticed new direct lenders or investors to entrust their money to USACM, DTDF, and FTDF, thereby providing the Culpable Insiders with liquidity to fuel their scheme, and new funds to loot from the USACM, DTDF, and FTDF.

### B.    The Investment Funds' Background

7.    In order to gain access to more investors' funds and less scrutiny over each loan, the Culpable Insiders established DTDF and FTDF (collectively, the "Investment Funds"). DTDF and FTDF were both real estate investment funds that offered membership interests to investors (the "Investors"), many of whom were also USACM direct lenders, and that used these funds to purchase interests in loans originated and serviced by USACM. DTDF and FTDF earned interest as direct lenders and distributed profits to their Investors on a periodic basis. DTDF and FTDF were managed by USA Capital Realty Advisors, LLC ("USACRA"), which was in turn owned and operated by USA Investment Partners, LLC ("USAIP"). Through their positions with USACRA and USAIP, the Culpable Insiders served as de facto managers and officers of DTDF and FTDF.

8.    DTDF was founded in 2000, and FTDF was established in 2001. DTDF was registered with the Nevada Securities Division ("NSD") and offered membership interests only to Nevada Investors. FTDF was registered with the U.S. Securities & Exchange Commission ("SEC") and offered Investors in multiple states (in which FTDF was registered under the respective state's Blue Sky laws) the opportunity to purchase membership interests in the fund.

9.    The Culpable Insiders used the Investment Funds, particularly DTDF, to facilitate and perpetuate their fraud. The Culpable Insiders directly and indirectly looted money from the Investment Funds to keep their scheme afloat and to fund their various side ventures. The Culpable

Insiders used the Investment Funds as a source of liquidity for their misdeeds, which significantly harmed these funds and their Investors.

### C.    BMER's Role in the Scheme

10.    BMER materially assisted in this scheme by issuing unqualified audit opinions on the Investment Funds' false and misleading financial statements.  In issuing these opinions, and later failing to withdraw inaccurate opinions, BMER wholly failed to follow Generally Accepted Auditing Standards ("GAAS").  If BMER had followed proper standards and had issued accurate audit opinions, other directors, the Investors, officers, employees, shareholders, as well as direct lenders who entrusted their money to USACM for placement into various loans, and various regulatory authorities that were charged with policing USACM and the Investment Funds (collectively, the "Stakeholders") would have learned of the Culpable Insiders' misdeeds long before USACM and the Investment Funds' eventual bankruptcies.  The Investment Funds, their Stakeholders, and ultimately their creditors, relied upon BMER's false audit opinions to their detriment, proximately causing the Investment Funds' losses.

11.    BMER also failed to fulfill its statutory, contractual, and professional obligations to inform the Investment Funds' Stakeholders of the Culpable Insiders' fraudulent scheme.  During the course of its audit work, BMER discovered multiple instances of illegalities, improper accounting, poor to non-existent internal controls, and other financial wrongdoing at the Investment Funds.  Upon discovery, BMER had both a professional and contractual duty to report these findings to various Investment Fund Stakeholders, including its innocent management and the Investors, who held membership interests in DTDF and FTDF.

12.     Among other things, BMER specifically knew that the Culpable Insiders were looting DTDF.  At least as early as its 2001 audit, BMER discovered that the Culpable Insiders withheld approximately $7 million from DTDF in order to pay borrowers on non-performing USACM loans.

13.     By the time BMER began its 2003 audit, that figure had grown to $17 million.  During its 2003 audit, BMER learned that the Culpable Insiders looted approximately $42 million from DTDF and masked it as loan to a sham entity known as 10-90, Inc. ("10-90").  In addition to being a prohibited intercompany transaction, the 10-90 Loan was not secured by a deed of trust, as required by DTDF's prospectus.  BMER learned of numerous additional breaches of the DTDF prospectus during the course of its 2003 audit field work.  These discoveries led to BMER's eventual dismissal as DTDF's auditor, but would not take BMER out of the picture.

14.     BMER never concluded its 2003 DTDF audit.  Having discovered that the 10-90 Loan was actually a prohibited intercompany transfer, BMER began to ask the Culpable Insiders and their legal counsel questions about the transactions.  BMER raised numerous questions in 2004 while conducting its 2003 audit field work.  Ultimately, in the Fall of 2004, Garth McBride informed Joe Milanowski that based on the numerous problems BMER encountered during the 2003 audit field work that BMER could not issue a favorable audit opinion on the financial statements as they stood at that point.

15.     Within days of informing Milanowski that he would be unable to issue a favorable audit opinion on DTDF's financial statements, Milanowski thereafter informed BMER that DTDF no longer required audited financial statements.  Essentially, BMER had uncovered a massive fraud

occurring within DTDF, yet McBride accepted this unusual instruction from Milanowski and BMER simply discontinued all work on the DTDF audit.

16.     At the same time, the USA Capital group of entities in general and Milanowski in particular were one of BMER's largest clients, accounting for a significant portion BMER's annual revenue.  Consequently, BMER could not afford to lose the USA Capital client group and the huge percentage of revenue that was associated with it.  As a result, and despite its knowledge of the fraud, BMER continued to perform all of the other accounting services that Milanowski, the USA Capital group, and all of their affiliated entities required.

17.     Most notably, and again despite the fact that the Culpable Insiders orchestrating the fraud at DTDF were also the managers of FTDF, BMER continued to serve as auditor to FTDF.  In fact, BMER issued clean audit opinions on FTDF's financial statements for both 2003 and 2004, and continued to work on the FTDF audit up until the bankruptcy filings in April 2006.

18.     Based on its findings and dismissal from the DTDF audit, BMER should have: (a) satisfied its obligation in the 2003 audit engagement letter to report fraud to DTDF; (b) withdrawn the 2002 "clean" audit opinion that it had issued on DTDF's financial statements; and/or (c) withdrawn from all USA Capital Group engagements – including the FTDF audit engagement.  Once withdrawn, BMER had the duty to ensure that its previously-issue unqualified opinions were no longer relied on.

19.     Instead of taking any of these steps, BMER remained silent and continued working on its other engagements, including the FTDF audit, through April 2006.  BMER performed accounting services for over fifty other entities related to USACM, DTDF, and FTDF.  BMER's

silence constituted a knowing assistance that allowed the Culpable Insiders to continue looting or otherwise abusing USACM and the Investment Funds, causing the loss of tens of millions of dollars to the companies and their Stakeholders.

20.     The Investors and other Stakeholders could and would have acted to stop the illegal scheme if they were aware of the Culpable Insider's wrongful conduct.  Any one of the Stakeholders could and would have stopped the wrongful course of conduct and/or mitigated their damages immediately by: (a) preventing the inflow of fresh capital that the Culpable Insiders required to continue their wrongful scheme; (b) changing the management of the Investment Funds pursuant to the operating agreements; (c) bringing the misconduct to the attention of the other Stakeholders; (d) acting to remove the Culpable Insiders from active participation in USACM's operations; (e) placing USACM, DTDF, and/or FTDF in bankruptcy or receivership proceedings years earlier; and/or (f) seeking to timely obtain control of the collateral offered by the defaulting borrowers.  Indeed, once the misconduct was eventually discovered, the SEC filed a civil complaint against Milanowski related to various misdeeds, including the 10-90 Loan.

## II.    JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334(b) in that this action arises under, arises in, and/or relates to this bankruptcy case.

22.     This action is, in part, a non-core proceeding and, in part, a core proceeding under 28 U.S.C. § 157(b)(2)(A), (C), and (O).

23.     This is an adversary proceeding pursuant to Fed. R. Bankr. P. 7001.

24.     The Defendants are all subject to personal jurisdiction in this Court.

25.     This Court has venue over this proceeding pursuant to 28 U.S.C. § 1409(a).

### III.  PARTIES AND OTHER RELEVANT ENTITIES

#### A.     Plaintiffs

##### 1.     USACM Trust

26.     Plaintiff USACM Trust was created pursuant to the Third Amended Joint Chapter 11 Plan of Reorganization (the "Joint Plan") filed by USACM and the other four debtors in the bankruptcy cases described below.  The Joint Plan was confirmed by the bankruptcy court on January 8, 2007, and became effective on March 12, 2007.

27.     The Joint Plan expressly retained USACM's causes of action for enforcement by the USACM Trust, pursuant to 11 U.S.C. § 1123(b)(3)(B).  The USACM Trust also retained certain causes of action belonging to FTDF, pursuant to the Joint Plan and 11 U.S.C. § 1123(b)(3)(B).  The USACM Trust, therefore, has standing to prosecute the claims set forth herein against BMER.

28.     The USACM Trust is a liquidating trust organized under Nevada law.  The USACM Trust's beneficiaries are the holders of allowed unsecured claims against USACM.  Geoffrey L. Berman serves as the trustee of the USACM Trust.

##### 2.     DTDF

29.     DTDF is a limited liability company organized under Nevada law on or about February 3, 2000.  DTDF offered Nevada Investors the opportunity to purchase membership interests in a fund and thereby invest in loans that USACM originated and serviced on behalf of DTDF.  At the time of its bankruptcy filing, DTDF was managed by USACRA.

30.     The Joint Plan expressly retained DTDF's causes of action for enforcement by DTDF, pursuant to 11 U.S.C. § 1123(b)(3)(B).  DTDF also retained certain causes of action belonging to FTDF, pursuant to the Joint Plan and 11 U.S.C. § 1123(b)(3)(B).  DTDF, therefore, has standing to prosecute the claims set forth herein against BMER.

31.     DTDF is managed by Michael Tucker, pursuant to the terms of the Joint Plan.

**B.     Defendants**

32.     Defendant Beadle, McBride, Evans & Reeves, LLP is a Nevada Limited Liability Partnership.  Beadle, McBride, Evans & Reeves, LLP's resident agent is Clifford R. Beadle who can be served at 2285 Renaissance Drive, #E, Las Vegas, Nevada 89014.  Beadle, McBride, Evans & Reeves, LLP performed audit and tax services for DTDF for fiscal years 2000 through 2003 and for FTDF for March 29, 2001 and the fiscal years 2001 through 2004.

33.     Defendant Reeves, Evans, McBride & Zhang, LLP is a Nevada Limited Liability Partnership.   Reeves, Evans, McBride & Zhang, LLP's resident agent is Daryl S. Alterwitz who can be served at 88965 S Eastern Avenue, Suite 360, Las Vegas, Nevada 89123.  Reeves, Evans, McBride & Zhang, LLP is the successor entity to Beadle, McBride, Evans & Reeves, LLP.

34.     Defendant TG McBride CPA Ltd. is a Nevada Professional Corporation.  TG McBride CPA Ltd's resident Agent is T. Garth McBride who can be served at 2285 E Renaissance Drive, Las Vegas, Nevada 89119.  TG McBride CPA Ltd. is the entity through which T. Garth McBride held or currently holds his membership interests in Beadle, McBride, Evans & Reeves, LLP and Reeves, Evans, McBride & Zhang, LLP.

35.     Defendant T. Garth McBride is an individual residing in the State of Nevada with his residence located at 4420 Euclid Street, Las Vegas, Nevada 89121-5309.  T. Garth McBride was a principle at Beadle, McBride, Evans & Reeves, LLP, and was the audit partner on both the DTDF and FTDF audits.

36.     Collectively, BMER provided various accounting services to a myriad of entities within the USA Capital Group, including: (a) auditing for both DTDF, FTDF, and other entities; (b) financial statement compilation services for USAIP; and (c) tax services for a multitude of entities including, but not limited to, USACM, DTDF, and FTDF.  In fact, BMER provided the majority of accounting services for the USA Capital Group, with the exception of the USACM audit.   In addition to all the work done for the USA Capital Group, BMER prepared the Culpable Insiders personal tax returns.

### C.     Other Relevant Entities

#### 1.     The Other USA Capital Debtors

37.     On April 13, 2006 (the "Petition Date"), USACM, DTDF, USACRA, FTDF and USA Securities, LLC ("USA Securities") (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court").  The bankruptcy cases were jointly administered under Case No. BK-S-06-10725-LBR.

38.     USACRA is a limited liability company organized under Nevada law on or about January 18, 2001.  USACRA was formed primarily to manage DTDF and FTDF.  Prior to the Petition Date, USACRA was owned and managed by USAIP.

39.     USA Securities is a limited liability company organized under Nevada law on or about March 3, 1999. USA Securities, which was a registered broker-dealer under SEC Rule 15c3-1(a)(2)(vi), primarily sold membership interests in FTDF. Prior to the Petition Date, USA Securities was owned and managed by Milanowski and Paul Hamilton ("Hamilton").

2.     *USAIP*

40.     USAIP is a limited liability company organized under Nevada law on or about October 20, 1999. From 1999 until the present, USAIP has served as a holding company for dozens of entities engaged in land acquisition and real estate development, along with other non-real estate related investments. USAIP is owned by Hantges and Milanowski, or trusts controlled by them. Prior to June 17, 2004, USAIP was managed by the Culpable Insiders, through USACM. Between June 17, 2004, and April 6, 2007, USAIP was managed by Hantges and Milanowski. On February 14, 2005, Hantges purportedly resigned his position as a USAIP manager, but nonetheless continued to function as a de facto manager until at least April 6, 2007.

41.     On April 4, 2007, the USACM Trust, DTDF, and another USAIP creditor forced USAIP into bankruptcy by filing an involuntary petition for relief under Chapter 11 of the Bankruptcy Code against USAIP in the Bankruptcy Court. On April 6, 2007, the Court entered an order approving the appointment of Lisa M. Poulin as USAIP's interim trustee.

42.     On May 9, 2007, the Court entered an order for relief under Chapter 11 of the Bankruptcy Code as to USAIP. Thereafter, Ms. Poulin became the permanent Chapter 11 trustee.

IV.     **FACTUAL BACKGROUND**

    A.     **USA Capital's Origins and Business Model**

43.     In May 1987, Hantges and David Berkowitz ("Berkowitz") founded the USA Capital group of entities with the creation of USA Capital Management Group, Inc. ("USA Capital Management Group"), a full-service securities broker-dealer.  Loob joined as an employee in 1987, and served as an accountant.  Milanowski joined USA Capital Management Group as a part-time employee in 1991, and became a full-time employee in 1993.

44.     On February 28, 1989, Hantges and Berkowitz founded USACM, which they originally used as a mortgage company.  By the mid-1990s, Hantges, Milanowski, and Berkowitz began using USACM as a mortgage broker to originate commercial real estate loans.

45.     USACM's early brokerage model consisted of arranging commercial loans secured by real property on the direct lenders' behalf.  Direct lenders obtained partial interests in loans being offered by USACM, and were listed as beneficiaries on the related promissory note and mortgage or deed of trust recorded against the underlying property.  The loans were typically short-term with a higher yield than the direct lenders could receive through more traditional investments.

46.     In July 1995, Hantges acquired 100% of USACM's outstanding stock.  He became USACM's Chairman, Chief Executive Officer, President, Secretary, and a member of USACM's board of directors.  In February 1997, Hantges appointed Milanowski and Loob to serve as USACM's Treasurer and Secretary, respectively.   In September 1997, Hantges appointed Milanowski as USACM's President and a member of USACM's board of directors.   Hantges transferred 40% of his USACM stock to Milanowski in late 1997.

47.    This transition in management led to an increase in loan originations.  Having originated only eight loans in 1995, USACM originated seventeen loans in 1996 and thirty-one loans in 1997.

48.    In mid-1997, USACM began servicing the loans that it originated.  Each month, USACM was allowed to pay itself a servicing fee out of the monthly interest payments made by borrowers, while remitting the balance of the payments to direct lenders.  This servicing fee was generally equal to between one-quarter of one percent and four percent of the principal balance of the loan per annum.  Under the typical arrangement, USACM was also entitled to origination fees, points, late fees, extension fees, default interest, and other fees and expenses paid or reimbursed by the borrower.

49.    Hantges and Milanowski assigned oversight of loan servicing operations and collection of fees to Loob.  Loob kept records of the flow of funds to and from borrowers and direct lenders separate from USACM's general accounting records.  As a result, these records were not readily accessible by the USACM agents soliciting investments in new loans and from some of the USACM officers, directors, and shareholders who assumed key roles in the company.

50.    The size of USACM's non-performing loans grew exponentially in the late 1990s with the financial demise of two key USACM borrowers: (a) Inco Homes Corporation ("Inco"), a California homebuilder to which USACM originated at least eighteen loans;[1] and (b) Robert V. Jones Corp. ("RVJ"), a Nevada homebuilder to which USACM originated at least nineteen loans.  By the end of the decade, Inco had fallen behind on several project loans, including "Fontana" and

---

[1] One of USACM's principals, Thomas Hantges, was a shareholder and a director of Inco Homes.

"Desert Pride," and RVJ had fallen behind on "Canyon Creek West," "Red Hills," and "Double Diamond Ranch" loans.

51.    Inco declared bankruptcy in October 1999, and RVJ lost its Nevada contractor license in early 2000.  These borrower collapses led to a watershed moment in USACM's history, as the Culpable Insiders decided to "take over" many of these projects for themselves and form their own web of real estate development entities using the trade name "Tanamera."

### B.    The Establishment of the Investment Funds

52.    The Culpable Insiders adopted a supplemental "fund" business model with the creation of DTDF and FTDF (collectively, the "Investment Funds") in February 2000 and February 2001, respectively.  Under the "fund" model, Investors could purchase interests in DTDF and/or FTDF. The Investment Funds then acted as the direct lender in loans originated and serviced by USACM.

53.    USACRA managed DTDF and FTDF, and the Culpable Insiders served as directors of USACRA.  In addition, USACRA was wholly owned and managed by USAIP.  At all relevant times, the Culpable Insiders served as officers and directors of USAIP.  This complex structure effectively made the Culpable Insiders managers of DTDF and FTDF.

54.    The Culpable Insiders sold membership interests in DTDF to Nevada residents by registering the fund under Nevada Revised Statutes ("NRS") § 90.211 *et seq*.  Under NRS 90.490, DTDF could sell units in the fund to Investors for one year following the filing of its registration materials.  DTDF's last prospectus was dated June 2, 2003; and thus DTDF was required to stop selling interest in the fund on June 2, 2004.  Although DTDF stopped sales to new Investors in mid-

2004, DTDF allowed members to reinvest their distributions until September 2005, when USA Capital announced that it was liquidating the fund.

55.     FTDF was an SEC registered entity that sold membership interests under various stats' Blue Sky Laws.[2]  FTDF's last prospectus was dated December 22, 2004.  FTDF, however, stopped selling membership units in September 2005 due, in part, to the SEC's investigation into USA Securities, the Investments Funds, and USACM.[3]

56.     The creation of FTDF and DTDF provided the Culpable Insiders with more immediate access to greater funds, while simultaneously limiting investors' oversight of the Culpable Insiders' actions.  This was so because the Culpable Insiders not only ran the Investment Funds, but also managed the Investment Funds' loans through USACM as the mortgage servicer.

57.     The fund business model drastically increased the number of loans that the Culpable Insiders could originate, both to independent borrowers and to themselves.  Under Nevada Revised Statutes § 645B.175, USACM was only permitted to hold lenders' funds for forty-five days before either funding the underlying loan or returning the lenders' money, and USACM was not permitted to partially fund a loan—*i.e.,* on a $10 million loan, USACM was required to fund the entire $10 million all at once.  Taken together, these regulations made it difficult for the Culpable Insiders to timely obtain enough lenders for: (a) very large loans (because they needed all of the money up

---

[2] In terms of the initial Blue Sky registrations of FTDF, the fund either registered or exempted the offering in 21 states and the District of Columbia.

[3] The SEC initiated an examination of USA Securities in early 2005.   This examination revealed numerous other problems and possible violations of securities laws by USACM and the Investments Funds.  In the summer of 2005, the SEC informed Milanowski that it was going to conduct further investigations into all the USA entities, and in the fall of 2005, the SEC began a formal investigation.  The SEC has recently filed a complaint against Milanowski alleging numerous violations of federal securities laws.

front); and (b) "bad" loans (because direct lenders would have the ability to look at the terms of the specific transaction).

58.    The use of DTDF and FTDF as "gap-filler" direct lenders in loans, coupled with pervasive use of assignments to replace DTDF and/or FTDF with direct lenders as they became available, enabled the Culpable Insiders to evade certain hurdles of the regulatory framework. Specifically, if USACM was unable to solicit sufficient investments within the 45-day window to fully fund a loan, the Culpable Insiders simply used DTDF and/or FTDF as additional direct lenders to make up the shortfall. As additional direct lenders were found, DTDF and FTDF were taken out of their position in these loans through assignments.

59.    The Culpable Insiders used FTDF and DTDF as gap-fillers in this way on many loans, making up for tens and possibly hundreds of millions of dollars of loan principal shortfalls. Not surprisingly, this coincided with a drastic increase in the number of loans originated by USACM from 2001 through 2005. Some of these loans were made to borrowers owned and/or controlled by the Culpable Insiders, many of which ultimately defaulted on their obligations. Coupled with the extensive looting of USACM, these insider loans contributed to USACM's eventual collapse in April 2006.

## C.    The Culpable Insiders' Fraudulent Scheme

### 1.    The Trust Accounts

60.    In order to service loans, USACM was required by Nevada Revised Statutes §645B.175 to open and maintain two separate trust accounts: (a) a direct lenders' trust account to be used as a mechanism to pool lender deposits and make distributions to borrowers ("Investors Trust

Account"); and (b) a collections trust account to collect interest and principal payments made by borrowers and to distribute these payments to direct lenders ("Collections Trust Account"). Payments made out of the Investors Trust Account and the Collections Trust Account should have been directly traceable to the actual payments made into these accounts, less applicable fees. However, the Culpable Insiders commingled funds belonging to both trust accounts with funds belonging to USACM, and used such funds to fuel their scheme.

61.    The Investors Trust Account was designed to collect funds from direct lenders for eventual distribution to borrowers.  As a loan originator, USACM was entitled to origination fees for its efforts in assisting borrowers to locate qualified investors and collecting the funds for the loan. Nevada law required USACM to deposit the direct lenders' funds directly into the Investors Trust Account.  Nevada law also required USACM to collect 100% of the loan amount from direct lenders prior to closing the loan.  Once the full amount was collected, USACM transferred the money to an escrow agency for closing, and received its origination fees from the escrow company. Upon information and belief, USACM did not always receive its origination fee.  The money was instead deposited in one of the trust accounts and used to further the Culpable Insiders' scheme.

62.    In some instances, USACM took a partial interest in a loan as an investor rather than a cash payment for its origination fee.  The Culpable Insiders directed this activity so that USACM could act as a gap-filler to make up for shortfalls in the amounts needed to fund the loan, thereby side-stepping the Nevada statutory requirements.  When this occurred, USACM did not receive the regular interest payments that it was entitled to as a direct lender.  Rather, the Culpable Insiders

directed USACM to enter into these transactions on a zero interest basis.  As new direct lenders were located, USACM would transfer its rights in the loan to the lender via assignment.

63.     Under its servicing contract, USACM was entitled to fees for collecting interest and principal payments from borrowers and distributing them to lenders/investors.  These fees should have been collected from the borrowers' payments and remitted to USACM.  Frequently, however, USACM's servicing revenues in the Collections Trust Account were not disseminated to USACM.  As a result, many fees earned by USACM were never even booked as revenue or taken out of the Collections Trust Account.  Instead, these fees were used to maintain the scheme, as discussed below.

64.     Both the Investors Trust Account and the Collections Trust Account were utilized in the assignment process.  USACM would frequently transfer original direct lenders' interests in loans to new ones, USACM itself, DTDF, or FTDF when the original direct lender wanted out of a loan.  This was generally accomplished by depositing the new funds into the Investors Trust Account, transferring those funds to the Collections Trust Account, and then disseminating the funds to the original direct lender.  Upon information and belief, the funds used to buy out USACM's interest in loans were not always withdrawn from the Collections Trust Account, but instead were used in the Culpable Insiders' scheme.

### 2.     The Culpable Insiders' Basic Scheme

65.     The Culpable Insiders routinely disregarded the Nevada regulatory framework for loan servicing.   The Culpable Insiders misappropriated USACM's service fees and funds in the Collections Trust Account, including money belonging to DTDF, and USACM's operating account

for their own purposes.  These funds were regularly used to disguise loans that were either in default or had been taken over by USACM or its affiliates.  Exclusively adverse to the interests of USACM, this enabled the Culpable Insiders to continue to use USACM as a source of funds for their independent ventures.

66.    Having USACM service loans meant that direct lenders would only discover that their loans were not performing if they did not receive a payment or if USACM notified them of a default.  Under Nevada law and under the terms of USACM's agreement with the direct lenders, USACM was required to notify direct lenders of non-performing loans.  However, the Culpable Insiders prevented USACM from providing such notice.  With Loob's assistance, the Culpable Insiders caused USACM to make payments of principal and interest to direct lenders on non-performing and/or worthless loans (hereinafter, "prepayments").

67.    The Culpable Insiders commingled funds within the USACM Collections Trust Account.  As a result of the commingling, it is practically, if not wholly, impossible to clearly identify the source of the funds taken from the Collections Trust Account.  Specifically, principal and interest payments made by borrowers on performing loans were used in conjunction with USACM's servicing fees, USACM operating funds, funds due to USACM from assignments, and direct lender funds, including DTDF's funds, to make interest payments to direct lenders on non-performing and defaulted loans.  These prepayments allowed the Culpable Insiders to continue to claim that no direct lender ever failed to receive a payment, thereby ensuring that direct lenders would continue to provide fresh capital to fund the scheme and the Culpable Insiders' personal endeavors.

68.     These acts were completely adverse to USACM's interests.  USACM had no financial

obligation to the direct lenders for these payments, although USACM had the duty to inform the

lenders of borrower non-performance or default.  USACM and DTDF suffered losses for which it

received no benefit to the extent that USACM used its own operating funds or money owed to

DTDF to fund principal and interest payments.  In addition, these payments exposed USACM to an

ever-increasing liability to those direct lenders or to the Investment Funds whose monies were

commingled and misappropriated by the Culpable Insiders in order to make payments on behalf of

defaulting borrowers to other direct lenders.

69.     The Culpable Insiders set up USACM's loan servicing department to cut checks to the

direct lenders on a fixed date each month, regardless of whether or not the borrowers made payment

on their obligations to the Collections Trust Account.  For certain loans, this meant that the

accounting system cut checks to direct lenders prior to the date that the borrowers made monthly

payments.  As such, some direct lenders were paid before it could even be determined if the

underlying loan or loans were performing.  There were no checks and balances in USACM's loan

servicing department or elsewhere to determine if interest was ever improperly paid.  This system

was designed to ensure that no direct lender missed a payment, which was consistent with the

Culpable Insiders' marketing plan.

70.     Among other things, DTDF was a regular victim of the automated check creation

system.  When shortfalls existed within the Collections Trust Account, the Culpable Insiders

directed Loob to withhold payments to DTDF.  The Culpable Insiders saw DTDF as a source of

funds to perpetuate their scheme because they served as de facto managers and officers of DTDF

through their ownership of and positions in USAIP, USAIP's ownership and management of USACRA, and their positions on the board of USACRA. This activity began at least as early as 2002 and continued up until USACM and DTDF's eventual bankruptcy.

71. These acts were completely adverse to both USACM and DTDF's interests. From DTDF's perspective the "held checks" represented unsecured loans that were inconsistent with its stated business purpose (to make real estate loans secured by deeds of trust). From USACM's perspective, the held checks represented an increasing liability to DTDF for the payment of obligations on the defaulting borrowers' behalf – obligations that USACM did not have.

72. Predictably, the scheme eventually ended. Years of using "new" investors' money and USACM's funds to make payments on behalf of defaulting borrowers to "old" investors created millions of dollars of shortfalls and directly contributed to the collapse of USACM in April 2006. Had the Culpable Insiders' scheme been exposed and stopped earlier, USACM would have avoided millions of dollars in losses.

### 3. The Culpable Insiders' Additional Looting of DTDF

73. The Culpable Insiders structured and operated the scheme so that DTDF could generate funds that the Culpable Insiders could squander for their own personal benefit. The Investment Funds also provided the Culpable Insiders with additional money that they could use to fund affiliates and their side ventures.

74. As BMER learned, the Culpable Insiders looted money from the DTDF by directing it to make loans to USACM affiliates in direct violation of its prospectuses. Many of these "loans" and advances have not been repaid. Not only has DTDF suffered losses from the Culpable Insiders'

fraudulent use of Investors' money, the Investment Funds, DTDF in particular, made it easier for the Culpable Insiders to hide their looting of USACM.

75.     The most glaring example of this practice was a so-called 10-90 Loan.  In late 2002, the Culpable Insiders created 10-90 as a means to conceal their systematic abuse of DTDF.  By creating a sham loan from DTDF to a purported third-party, the Culpable Insiders could simultaneously: (a) eliminate accounting issues posed by prior looting of DTDF; and (b) provide a seemingly legitimate explanation for future looting of DTDF.

76.     In December 2002, Milanowski directed David Fogg ("Fogg") to establish 10-90 to serve as the purported "independent" borrowing entity for the sham loan.  The 10-90 Loan first appeared on DTDF's books on December 31, 2002.  The initial $6.5 million balance represented reclassifications of accounts that represented looting of DTDF that had occurred in 2002, including: (a) approximately $2.775 million sent to a time-share hotel affiliated with the Culpable Insiders; (b) $700,000 sent to a technology company affiliated with the Culpable Insiders; and (c) approximately $2.95 million sent directly to lenders to pay obligations owed by USAIP and/or borrowers.  DTDF's governing documents did not allow for related party loans, so the creation of 10-90 as a pass through entity represented the Culpable Insiders' effort to legitimize previous wrongful transfers.  Despite the materiality of the loan, BMER largely ignored its existence, devoting little to no effort to ensuring that the 10-90 Loan was accurately stated or even disclosed.  As a result, the 10-90 Loan was included with other legitimate real estate loans in DTDF's 2002 financial statements.

77.     The Culpable Insiders also used the 10-90 Loan to partially eliminate held checks.  On January 2, 2003, the Culpable Insiders wrote an $11.425 million check from DTDF to USACM's

Investors Trust Account, which was used to pool lender monies prior to funding loans. The same day, the Culpable Insiders wrote an $11.425 million check from the Investors Trust Account to the Collection Trust Account. Subsequently, the Culpable Insiders released the checks the Collections Trust Account had withheld from DTDF, which totaled approximately $10 million. Without the $11.425 million funding from DTDF, the Collections Trust Account did not have sufficient funds to cover the held checks. The Culpable Insiders designed this circular transaction to eliminate the entire balance of the held checks owed to DTDF as of the end of December 31, 2002, and reclassify the amount as a third-party loan.

78.    The Culpable Insiders continued to loot DTDF throughout 2003. For example, from January 3, 2003 to March 14, 2003, the Culpable Insiders sent approximately $2 million from DTDF directly to a time-share hotel and a technology company, both affiliated with the Culpable Insiders. Each of these transfers was booked as a loan funding on the purported loan from DTDF to 10-90, even though 10-90 never actually received any of the cash.

79.    Later that year, the Culpable Insiders began sending money from DTDF directly to 10-90. On March 7, 2003, Fogg opened a bank account for 10-90 at Wells Fargo Bank. Prior to this period, 10-90 could not receive funds directly from DTDF, as it had no bank accounts. From the time this account was opened until April 1, 2004, the Culpable Insiders made wire transfers from DTDF to 10-90 several times per month. In the aggregate, the Culpable Insiders wire transferred $23.328 million from DTDF to the 10-90 Wells Fargo account. Combined with the prior transfers,

the 10-90 Loan totaled approximately $43 million by December 31, 2003, and grew to nearly $56 million by December 31, 2004.[4]

80.    BMER initially learned about the 10-90 Loan during the audit of DTDF's 2002 fiscal year-end financial statements.    As of December 31, 2002, the 10-90 Loan balance was approximately $6.5 million.  By mid-2003, the 10-90 Loan grew to over $20 million and 15% of DTDF's loan portfolio, thus violating DTDF's prospectus, which stated that DTDF could not make a loan in excess of $20 million.  Regardless of its size, the 10-90 Loan violated other important restrictions in DTDF's prospectuses as it was actually a loan to an affiliate and was not secured by any interest in real property.

### 4.    The Culpable Insiders Self-Dealing and Looting of USACM

81.    The Culpable Insiders structured and operated the scheme so that USACM could generate funds that the Culpable Insiders could squander for their own personal benefit.

82.    First, the Culpable Insiders utilized USACM and Collections Trust Account funds to gain, increase, or otherwise fund their equity interests in real estate entities that borrowed money through USACM-originated loans.  In addition to real estate ventures, the Culpable Insiders looted and/or misappropriated USACM's funds for use in other business ventures, for which USACM received no benefit.  The Culpable Insiders systematically looted and/or misappropriated money from USACM and the Collections Trust Account and funneled it to USAIP and its affiliates.  In turn, USAIP used this money to buy equity interests in entities that borrowed money through

---

[4] The 10-90 loan, with interest, now exceeds $100 million.

USACM loans.  As stated above, these funds were used by the Culpable Insiders for their own purposes exclusively adverse to the interests of USACM.

83.    In the aggregate, the Culpable Insiders looted and/or misappropriated millions of dollars to fund these real estate development entities and projects in which USAIP or an affiliate held an equity interest.  Transfers from USACM and the Collections Trust Account to USAIP continued up until USACM filed for bankruptcy in April 2006.  Although USACM funds were used for many of USAIP's projects, USACM received no benefit as USAIP did not pay interest on the loans or share any profits with USACM.

84.    Second, the Culpable Insiders also took money from USACM and the Collections Trust Account to pay USAIP's obligations to third parties.  In 2004, for example, the Culpable Insiders took more than $3 million from the USACM operating account and the Collections Trust Account to repay a $5 million loan that USAIP had obtained from a third party.  In addition, the Culpable Insiders looted and/or misappropriated hundreds of thousands of dollars from USACM and the Collections Trust Account to make USAIP's monthly interest payments to third parties.

85.    These payments on USAIP's behalf were completely adverse to USACM's interests.  USACM owed no obligation, and received no benefit for the money provided to USAIP.  The Culpable Insiders did not charge and/or collect interest on these transfers, thereby precluding USACM from using this money in legitimate investments.  In the aggregate, USACM transferred at least $58 million to USAIP to fund USAIP's investments and pay its obligations.[5]  USAIP's failure

---

[5] The $58 million is in part or in whole reflected in the note between USACM and USAIP dated May 15, 2006.  The bankruptcy court approved the note by order dated July 24, 2006.

to repay the transfers and its ultimate bankruptcy has prevented any possibility of USACM fully recovering on the obligations.

86.    Third, in addition to using USACM as a source of funding for their side business ventures, the Culpable Insiders looted and/or misappropriated USACM funds and usurped opportunities available to USACM in other ways.  For example, Milanowski directed USACM to transfer $2.8 million to USAIP on March 13, 2006, in order to make a partial repayment on a personal loan made from Salvatore Reale to the Culpable Insiders.

87.    The Culpable Insiders also arranged to receive personal payments out of actual loan proceeds and usurped USACM's business opportunities.  For instance, the Culpable Insiders caused USACM to originate certain loans on the condition that the borrower would convey an equity interest in the borrowing entity to USAIP or an affiliate.  These usurpations deprived USACM of millions of dollars in profits.  This was improper since the equity interest was provided to the Culpable Insiders based on the loan's origination, and was thus the fruit of USACM's efforts. The Culpable Insiders also used USACM as a personal, interest-free revolving credit line.  USACM funds were repeatedly transferred to the Culpable Insiders without any supporting documentation, but were merely booked as an account receivable.  Many of these receivables remain outstanding today.

### 5.    Additional Facets of the Scheme

88.    In addition to their misuse of the Investors Trust Account and the Collections Trust Account, the Culpable Insiders employed several other methods to ensure that direct lenders on non-performing loans were repaid including: (a) assigning direct lenders' interests in bad loans to entities

owned or controlled by the Culpable Insiders; (b) creating new entities to take over the position of

the defaulting borrower; (c) soliciting other direct lenders to purchase interests in bad loans without

the appropriate disclosures, thereby refinancing a nonperforming loan; and/or (d) granting

extensions to borrowers without disclosing pertinent facts to the direct lenders.  This allowed the

Culpable Insiders to continue their scheme while minimizing scrutiny of bad loans.

89.    A standard tactic to repay principal was to direct USACM or the Investment Funds to

buy out direct lenders at par in a non-performing loan through assignments.  In these types of

assignments, a direct lender would be replaced in a given loan by having USACM or the Investment

Funds return the lender's full principal investment in exchange for the legal rights in the loan.  Thus,

USACM or the Investment Funds would assume the direct lender's interest in the loan.  Neither

USACM nor the Investment Funds had any obligation to make such assignments or to take the

place of any direct lender in a loan.  These assignments were harmful to USACM and/or the

Investment Funds, as the assignments were related to non-performing loans and represented

squandering of assets.

90.    The Culpable Insiders also created new entities, funded by USACM, for the purpose of

paying interest on behalf of defaulting borrowers.  For example, the Culpable Insiders created

Housing Partners, LLC, owned and managed by the Culpable Insiders, for the purpose of paying

interest on behalf of certain borrowers with otherwise non-performing loans, as well as a vehicle to

own numerous other real estate ventures within the Tanamera framework.  The formation of these

entities did nothing to benefit USACM, as the Culpable Insiders held the upside of the transactions

while USACM absorbed the risk where it had no obligation to do so.

91.     Finally, the Culpable Insiders removed borrowers from nonperforming loans through what effectively constituted a refinancing or granted extensions to borrowers without disclosing the pertinent facts to Investors.  The Culpable Insiders repeatedly solicited funds from new Investors to lend to nonperforming borrowers without disclosing the facts the borrowers had stopped making payments.  Once funded, the Culpable Insiders used the new direct lenders to pay off the borrowers' obligations to the old direct lenders.  As the alternative, the Culpable Insiders extended loans without informing the direct lenders or disclosing the loans' nonperformance.  In either case, the Culpable Insiders' omissions caused direct lenders to assume undisclosed risks and subjected USACM to potential liability.

92.     Predictably, the scheme eventually ended.  Years of using "new" Investors' money and USACM's funds to make payments on behalf of defaulting borrowers to "old" Investors created millions of dollars of shortfalls and directly contributed to the collapse of USACM in April 2006.  Had the Culpable Insiders' scheme been exposed and stopped earlier, USACM and DTDF would have avoided millions of dollars in losses.

### D.     BMER's Role in USACM's and the Investment Funds' Collapse

93.     BMER served as the auditor for DTDF for the fiscal years 2000 through 2003 and for FTDF for March 29, 2001 and the fiscal years 2001 through 2005.  BMER's work on DTDF's 2003 financial statements continued through October of 2004, when it was informed DTDF no longer required audit services.

94.     For each year that DTDF and FTDF issued audited financial statements, BMER issued an unqualified audit opinion in which it certified that DTDF and FTDF's financial statements were

fairly stated. These "Clean" audit opinions were false because the accompanying financial statement in no way fairly reflected DTDF or FTDF's true financial condition. Throughout its tenure, BMER regularly violated GAAS and its duty to the Investment Funds and their Stakeholders by ignoring multiple red flags and other evidence of the Culpable Insiders' scheme.

95.    Throughout its service to the Investment Funds, BMER found their records to be replete with inconsistencies, inaccuracies, errors, and false statements. BMER actually knew that: (a) the Culpable Insiders directed the Collections Trust Account to make interest and principal payments to direct lenders on non-performing loans; (b) DTDF funds were being used to fund short falls in the Collections Trust Account; (c) the Culpable Insiders were looting DTDF by sending money to related parties without proper loan collateral and in violation of DTDF's governing documents; (d) the Culpable Insiders created sham entities to cover up their misdeeds; and (e) the Culpable Insiders were directing the Investment Funds to make loans without appropriately determining the value of the underlying loan collateral.

96.    In addition to the facts that BMER actually knew, if BMER had conducted its audits appropriately, it would have known that: (a) both DTDF and FTDF drastically understated their loan loss reserves; (b) the principal and interest payments that the Culpable Insiders withheld from DTDF had actually never been repaid, but were merely replaced by newly held checks; (c) both DTDF and FTDF's net worth for the fiscal years which BMER audited were materially overstated.

97.    In connection with its audit and other professional services provided to the Investment Funds, BMER knowingly assisted and facilitated the wrongful and illegal activities of the Culpable Insiders to the detriment of USACM, DTDF, and FTDF by issuing clean audit opinions on the

Investment Funds' materially false and misleading financial statements. BMER had contractual and professional obligations to inform certain Stakeholders upon the discovery of any fraud, wrongful activities, or insolvency. Moreover, BMER's knowledge of the illegalities, inaccuracies, and underlying scheme should have prevented BMER from issuing any opinion on the Investment Funds' financial statements.

98.    Even if BMER had not known that its audit reports were false at the time that they were issued, BMER still had a duty to withdraw its unqualified opinions once it learned of their inaccuracies. BMER's audit opinions and the accompanying financial statements were included in the Investment Funds' prospectuses, and were the basis on which Investors made their decision to invest money into DTDF and FTDF. Furthermore, both the NSD and the SEC relied on BMER's opinions in determining whether or not the Investment Funds complied with applicable security laws.

99.    BMER's inaccurate audits, inappropriate advice, and failure to fulfill its duties precluded the Stakeholders from discovering the Culpable Insiders' scheme. Had BMER fulfilled its duties, the Stakeholders would have been able to act, thus saving the Investment Funds, USACM, and their general creditors millions of dollars in losses from looting, misappropriations, and third-party liabilities. Furthermore, the Investment Fund Stakeholders could and would have prevented the further inflow of funds into USACM and/or acted to take control of their collateral, thereby saving millions of dollars in losses if BMER would have acted in accordance with its professional duties

1

2

       *1.*     *BMER Knew of Significant Red Flags in USACM's Accounting Records, but Failed to Plan Its Audits Accordingly*

3

100.     In each year BMER audited the accounts of DTDF and FTDF, it knew of significant red

4

flag issues that posed a risk that the Investment Funds' financial statement were materially

5

misstated. Those red flags included, but were not limited to the following: (a) lack of compliance

6

with the Investment Funds' governing documents; (b) lack of adequate internal controls; (c) pre-

7

payments of principal and/or interest on non-performing loans; (d) lack of underlying documents

8

and audit evidence concerning transactions; (e) the presence of significant undocumented and

9

irregular related party transactions; and (f) the Culpable Insiders lacked integrity. Each of these

10

issues resulted in material misstatements in the Investment Funds financial statements. In addition

11

to these concerns, BMER was aware of serious questions concerning the Culpable Insiders'

12

13

integrity. Despite BMER's awareness of the significant and serious problems, BMER failed to plan

14

its audits properly to assess and test the scope of these accounting issues.

15

16

      a.     <u>BMER was Aware that the Investment Funds were Subject to Lending Requirements Based on Their Governing Documents</u>

17

18

101.     BMER was aware that both DTDF and FTDF had a detailed prospectus that contained

19

specific loan and portfolio requirements that governed the Investment Funds. As part of its audit

20

and other responsibilities related to the Investment Funds, BMER reviewed the governing

21

documents. Amongst the many requirements, BMER was aware that the Investment Funds: (a)

22

could not make loans to related parties; (b) were required to obtain deeds of trust as security for their

23

loans; (c) were required to ascertain the value of underlying collateral, normally through the use of a

24

25

26

third-party appraisal; (d) had loan-to-value guidelines; (e) were subject to diversification requirements.

102. BMER was also aware that the Culpable Insiders regularly ignored these requirements on a recurring basis. Specifically with regard to DTDF, BMER was aware that the Culpable Insiders made loans to related parties, made loans without appropriate collateral, under diversified DTDF's portfolio, and failed to obtain appraisals in many cases. For FTDF, BMER was aware that from the outset of operations, the Culpable Insiders regularly made loans based on their own speculation of the value of collateral or otherwise without third-party appraisals. In addition, BMER was aware the Culpable Insiders caused FTDF to violate its loan-to-value guidelines. Despite its knowledge, BMER failed to plan or undertake the required auditing procedures.

              b.      <u>BMER Knew that the Investment Funds Lacked Sufficient Internal Controls</u>

103. BMER knew that the Investment Funds lacked necessary internal controls to prevent fraud and material misstatements in their financial statements. For example, BMER was aware that: (a) the Investment Funds had "no significant segregation of duties"; (b) the Investment Funds failed to retain adequate documentation or formally monitor the loans; and (c) there was "no formal loan approval process protocol." Furthermore, BMER was aware that management had the authority to override the existing controls. As a result of these deficiencies, the Culpable Insiders entered into transactions that caused millions of dollars in losses to the Investment Funds. BMER determined that it could not rely on internal controls based on its findings. However, BMER still failed to take appropriate steps to compensate for the lack of controls.

104.    For instance, FTDF's governing documents stated that loans would generally be made based upon independent third-party appraisals of the underlying collateral.    But the Culpable Insiders regularly directed the Investment Funds to make loans based on internal valuations of the underlying loan collateral.    During 2003, FTDF's first year of lending activity, 32% of all FTDF loans were made without a third-party appraisal of the underlying property value.    By December 31, 2004, that figure grew to 52% of FTDF's loans.    FTDF lost millions of dollars on loans that failed and had insufficient collateral to recover on FTDF's investment.    Had BMER appropriately addressed this issue in 2003 and required FTDF to accurately book loan loss reserves, the innocent members of FTDF could have taken action to stop the Culpable Insiders from continuing to enter into these bad investments.

105.    BMER clearly recognized that this issue was significant.    According to BMER's workpapers, "[t]he critical audit issue is obvious, the ultimate realization of loans."    This became such a concern that BMER's draft audit opinion dated March 28, 2005 contained the following paragraph concerning the topic:

> As stated in Note 1 to the financial statement, investments in mortgage loans are recorded at cost and management make estimates as to the allowance for loan loss based on its evaluation. We were unable to obtain independent audit evidence to support the adequacy of management's estimate of allowance for loan loss at December 31, 2004, and were unable to satisfy ourselves through alternative procedures.

This draft opinion was sent to FTDF's attorneys on April 8, 2005.  However, this paragraph was absent from BMER's final audit opinion, which was also dated March 28, 2005.  According to BMER's internal documentation, the final report and opinion was approved for issuance on April 5, 2005 and held until April 17, 2005 pending the receipt of the management representations letter.

Curiously, BMER's issuance documentation made no mention of additional support for the loan loss reserve.

106.    The Public Company Accounting Oversight Board ("PCAOB") reviewed BMER's workpapers related to FTDF, specifically taking issue with the loan loss valuation process. According to a memo dated June 27, 2005 from McBride to Milanowski, the PCAOB staff had concerns about two issues:

> (1) The lack of formal procedures on how [FTDF] develops, applies and documents the methodology for determining loan impairment and the related calculations of periodic allowances for loans losses.
> (2) Concerns over the general quality of the loan collateral supporting fair valuations. Specifically "dated" appraisals without documentation of current conditions and the adequacy of sales contracts and broker's letters.

Subsequent to the PCAOB's inquiry, BMER refused to rely on the Culpable Insiders' internal valuation methodology in its 2005 audit, noting that BMER would instead order independent third-party appraisals on its own. However, the damage was already done. Many of the loans that defaulted were made during 2004.

107.    The lack of sufficient internal controls helped the Culpable Insiders to loot the Investment Funds and otherwise resulted in the loss of millions of dollars on under-secured loans. BMER knew that the lack of internal controls increased the possibility of fraud and/or material misrepresentation, especially when the weak internal controls were combined with insufficient accounting personnel. Therefore, GAAS, including AU §316, required BMER to take appropriate steps to compensate for the associated risk of misstatement. However, BMER failed to either plan for or execute its audit in a manner that compensated for the increased risks.

c.    BMER Knew the Culpable Insiders were Using USA Capital Group
Funds to Pay Direct Lenders on Non-Performing Loans

108.    During the course of its audits, BMER discovered that: (a) DTDF principal and interest payments were being withheld by the Culpable Insiders for use in their scheme; and (b) the Investment Funds were receiving interest and/or principal payments on loans that were not performing.  In either case, this was a red flag that should have alerted BMER to the existence of significant issues within the USA Capital Group, as BMER's findings were direct evidence of the Culpable Insiders' wrongful scheme.

109.    The Culpable Insiders repeatedly used DTDF funds in order to perpetuate their scheme. As stated above, borrowers made principal and interest payments into the Collections Trust Account for distribution to underlying direct lenders, including DTDF.  In order to cover shortfalls in the Collections Trust Account created by their scheme, the Culpable Insiders withheld principal and interest payments from DTDF for use in paying other direct lenders in non-performing loans.  This activity began at least as early as 2002 and continued up until USACM and DTDF's eventual bankruptcy.   When BMER first became aware of the issue during 2002, the aggregate amount of held checks was $7 million.  By December 31, 2005, this figure had grown to $23 million, not including approximately $11 million in held checks that were transferred into the 10-90 Loan.

110.    BMER recognized the importance of this issue from the moment it first discovered the held checks.  During its 2001 audit of DTDF, Garth McBride sent an email to Joe Milanowski stating that BMER "[n]eed[ed] to analyze [the] ability of [USACM] to pay amount due and possibly make sure from BMER that they are not planning to issue either a going concern or negative opinion."   However, BMER failed to contact Deloitte (USACM's auditor) about the issue.

USACM's failure to remit these payments constituted a breach of Nevada law, and should have caused BMER to investigate the matter more fully. If it had, BMER would have discovered that neither the Collections Trust Account nor USACM could have repaid these amounts, and that DTDF's receivable was impaired.

111.    DTDF's 2002 financials stated that the $7 million in held checks was repaid in full along with interest at a rate of 20%. However, this was far from the truth. The Culpable Insiders eventually released the $7 million in held checks, but replaced those held checks with over $11 million in new held checks. The newly held checks were not disclosed in DTDF's 2002 financial statements. Instead, the checks were inappropriately included in the $96.8 million in "Investments in mortgage loans." BMER later recognized their existence in the following year as shown by its 2003 workpapers. Initial client prepared documents evidenced approximately $17 million in held checks. A draft of the financial statements indicated that USAIP had assumed "approximately $12,000,000 of unsecured and non-interest bearing advances" as part of the 10-90 loan. For the remainder, BMER proposed an audit adjustment of $5.9 million as a receivable from USACM. Again, neither USACM nor the Collections Trust Account had sufficient funds to cover the held checks.

112.    DTDF was unlikely to, and never did, collect on the held checks. DTDF's books should have contained a bad debt reserve related to this receivable as it was impaired. In accordance with Generally Accepted Accounting Principles ("GAAP"), receivables must be recorded on their net realizable basis. The Culpable Insiders used these funds to cover shortfalls in the Collections Trust Account that resulted from paying direct lenders in non-performing loans. Moreover, the

existence of the held checks issue indicated a serious problem—the Culpable Insiders were misappropriating funds from DTDF.  BMER largely ignored these issues, despite its awareness of the problem.  Had DTDF's innocent members been alerted to the true nature of the held checks issue, they could have taken action to stop the Culpable Insiders from defrauding and looting DTDF, thereby saving millions of dollars in losses.  Instead, BMER remained silent while DTDF's losses grew.

113.    BMER also discovered that the Investment Funds had received interest payments on non-performing loans.  BMER learned that one of FTDF's loans, "Sunrise International, LLC," had gone into default during its audit of the fiscal year end 2004 financial statements.  Surprisingly, FTDF had received regular interest payments on the loan, despite the fact it was in foreclosure.  According to BMER's workpapers, "USACM submit[ted] interest payment[s] for Sunrise [I]nternational, LLC to [FTDF] when no payment[s] have been received from the borrower."  In response, BMER proposed an adjusting journal entry to reduce income and to show a liability owed to USACM.

114.    Although BMER recognized the issue, it did not appropriately respond to its findings.  The Collections Trust Account did not have assets of its own—by statute, the account could only contain borrower repayments and a small balance in order to pay for bank fees.  As such, BMER should have determined the source of the funds.  Moreover, its knowledge of the DTDF held checks provided BMER with the answer as to the source of the funds—it most likely came from DTDF or another direct lender.

115.    If BMER would have further researched this issue, it would have discovered that prepaying principal and interest from other direct lenders funds was a common practice.  In fact, BMER's own planning documents for its 2004 audit note that:

> [t]he audit team considered the remote possibility that [FTDF] maybe a Ponzi Schemes [sic], which is a type of illegal pyramid scheme that uses the "rob-Peter-to-pay-Paul" principle, as money from new investors [is] used to pay off earlier investors until the whole scheme collapses.  Fraud can occur when new funds from investors are used to pay preferred returns, if net income from operations is not adequate.

Clearly, BMER ignored its findings from the DTDF audit, choosing to book a liability on FTDF's financial statements and continue to earn fees from the USA Capital Group.

                d.    BMER Knew That the Culpable Insiders Were Accused of Fraud, Misrepresentation, and Other Acts That Suggested the Culpable Insiders Lacked Integrity

116.    BMER was aware that the Culpable Insiders and USACM were accused of fraud, securities violations, and other suspicious activity.  According to AU §316.17(a), a "known history of . . . claims against the entity or its senior management alleging fraud or violations of securities laws" represents a fraud risk factor.  Although BMER was aware of these claims, it took no action to compensate for the risk of misstatement in DTDF or FTDF's financial statements.

117.    For instance, BMER was aware that the Culpable Insiders and USACM were accused of violating securities laws.  First, BMER knew the SEC alleged that Hantges violated the registration requirements of the Securities Act in 1998.  Second, BMER knew similar allegations were made in a later action by the NSD.  In this action, the NSD alleged that USACM violated Nevada state registration requirements in the sale of interests in a promissory note.  Finally, BMER knew that the SEC began investigating USA Securities during 2004.  During its investigation, the SEC reviewed transactions involving the sale of FTDF and DTDF's membership interests.

118.    BMER was also aware of claims of fraud, misrepresentation, and other wrongful acts. Either through its work for DTDF or during its March 29, 2001 financial statement audit of FTDF, BMER learned that a group of plaintiffs named DTDF, USACM, and the Culpable Insiders as defendants in a lawsuit.  The suit included claims of misrepresentation, securities laws violations, and violations of state and federal Racketeer Influenced and Corrupt Organizations Acts.   Had BMER reviewed the complaint, it would have learned that the plaintiffs also alleged that the Culpable Insiders attempted to collect the underlying debts through threats of physical violence and other intimidation.

119.    Having identified these issues, GAAS, including AU §316, required BMER to take appropriate steps to compensate for the risk of material misstatement in DTDF and FTDF's financial statements.  At a minimum, BMER should have considered what these accusations suggested about the Culpable Insiders' integrity.  However, BMER failed to either plan for or execute its audit in a manner that compensated for the increased risks.

### 2.    BMER Did Not Obtain Sufficient Support for Its Audit Opinions

120.    In accordance with AU §326.01, BMER was required to obtain sufficient evidence to support its opinion on DTDF and FTDF's financial statements.  However, BMER repeatedly failed to do so in its audits of the Investment Funds.  As a direct result, the Investment Funds' financial statements contained material misstatements.

121.    For Example, BMER failed to obtain sufficient audit evidence regarding the value of loan collateral.  As discussed above, the Culpable Insiders directed the Investment Funds to enter into loans based on their own speculative valuations of the underlying collateral.  Rather than

requiring independent third-party appraisals, BMER largely relied on the Culpable Insiders

assertions as to whether or not the related loans were impaired.  However, BMER should not have

relied on the Culpable Insiders' statements alone because AU §333 states that management's

representations are not a substitute for test work.  As indicated by the PCAOB's review of BMER's

workpapers related to FTDF, BMER should have not issued an audit opinion based on the

alternative valuation methods used by the Culpable Insiders.

122.    Furthermore, BMER failed to obtain sufficient audit evidence related to the 2002 10-90

Loan balance on DTDF's general ledger.  Had BMER requested the underlying loan documents,

supporting bank statements, and other transfer documentation, it would have learned that the 10-90

Loan was actually a series of transactions totaling $6.5 million that were reclassified as a loan to 10-

90. In reality, the loan documents did not even exist at that time.  According to Fogg, 10-90's

manager, the loan documents were created for the 2003 audit and back-dated to reflect the

appropriate time frames for execution.  However, even this would have been evident to BMER if it

would have merely compared the date of the company's formation with the date of the loan

documentation.

### 3.    BMER Knew the Culpable Insiders were Looting DTDF Through Related Party Transactions

123.    Through its audit procedures, BMER learned the 10-90 Loan represented an

impermissible loan for at least two reasons: (a) it was not secured by real property; and (b) the 10-90

Loan was actually a loan to affiliated companies misleadingly masked as a third-party loan.  Despite

a material balance of approximately $6.5 million at December 31, 2002, BMER failed to employ

adequate procedures to test the balance of the 10-90 Loan.

124.    BMER issued a clean opinion on DTDF's 2002 financial statements despite the fact that the 10-90 Loan was materially misstated and its treatment was misleading. The 10-90 Loan should have been subject to a loan loss reserve as 10-90 was unlikely to repay the loan, and its collateral was insufficient to allow DTDF to recover its investment. Furthermore, the 2002 financial statements failed to disclose that the loan was actually made to related parties and was not secured by a deed of trust, both in violation of DTDF's governing documents. The lack of disclosure made the financial statements especially misleading, as the full amount the loan to 10-90 was included in the line item "Investment in Mortgage Loans." This classification was inaccurate. BMER should not have issued an unqualified opinion without appropriate disclosure and an appropriate loan loss reserve. In the alternative, BMER should have refused to issue an opinion on DTDF's 2002 financial statements.

125.    BMER first recognized the issues posed by the 10-90 Loan during its audit of DTDF's 2003 financial statements. Through its work, BMER discovered that: (a) the 10-90 Loan was not mortgage loan secured by a deed of trust on real property; (b) the 10-90 Loan was actually a loan to affiliated parties; and (c) the loan was not performing. Based on these facts, BMER knew that DTDF's governing documents prohibited the Culpable Insiders from making the 10-90 Loan.

126.    DTDF's governing documents required all loans to be secured by a deed of trust on the underlying property. Per an email to Joe Milanowski, BMER noted that the 10-90 loan was "not [a] mortgage loan," but instead a "line of credit." BMER contacted Rob Kim of Kummer, Kaempfer, Bonner, Renshaw & Ferrario ("Kummer Kaempfer"), DTDF's corporate counsel, to determine if DTDF was "allowed to make unsecured advances or loans." Later, BMER would receive loan

documents noting that the 10-90 Loans were secured by USAIP's equity interests in the actual

beneficiaries of the loans. But given that many of these properties in question were subject to other

deeds of trust and the speculative nature of the business deals, collectibility of the 10-90 Loan was a

substantial issue. Many of these projects failed leaving DTDF with no ability to recover on the loan.

127.     BMER discovered the 10-90 Loan was not performing and was extended when 10-90

could not make the principal payment. The lack of payment of both principal and interest was

further evidence of the Culpable Insiders' misappropriation of funds and lack of intent to repay the

"loan." Furthermore, the Culpable Insiders increased the amount of the potential loan funding

during 2003, moving the maximum from $35 million up to $75 million. Clearly, the Culpable

Insiders intended to continue to loot and/or misappropriate funds from DTDF through the 10-90

Loan.

128.     BMER knew that the 10-90 Loan was a sham transaction that actually represented

related party lending. According to Garth McBride, he approached Milanowski and asked if the 10-

90 Loan were loans advances to related parties. Milanowski said they were. BMER knew of the

risk involved with related party transactions. In its 2003 planning memo, BMER noted that "[f]raud

would most likely occur when loans are made to officers/owners or other related parties of the

company." Through an analysis of the bank statements, BMER discovered that many of the

transfers included in the 10-90 Loan went directly to related parties, never touching 10-90's bank

account. During its analysis of the 10-90 Loan, BMER also asked Kummer Kaempfer if DTDF

could "make advances and/or loans to affiliates such as Ashby USA, HMA Sales, TJA Marketing,

USA Investment Partners and the like." These questions were clearly directed toward the 10-90

Loan as these entities were the ultimate recipients of DTDF's funds. Recognizing that 10-90 was not a legitimate entity, the draft financial statements in BMER's workpapers did not list a loan to 10-90, but rather a loan to USAIP. In addition, McBride informed Milanowski that the 10-90 Loan would require a loan loss reserve of at least $10 million.

129.    After McBride informed Milanowski that he would not be able to issue a clean audit report, Milanowski soon thereafter informed BMER that its services were no longer required. According to Milanowski, Kummer Kaempfer stated that DTDF did not require audited financial statements if it did not intend to raise additional funds. But even if BMER did not discover the true nature of the 10-90 Loan until the 2003 audit, this did not diminish BMER's duty to prevent reliance on its 2002 audit opinion. This opinion and the related financial statements were provided to investors, creditors, and were included in DTDF's prospectus.

4.    *BMER Had a Duty to Communicate the Existence of the Fraud and Its Impact on USACM's Financial Statements*

130.    BMER had both contractual and professional responsibilities to communicate the results of its audits, and any discovery of fraud, and other reportable conditions to various Stakeholders. BMER knew and intended that certain Stakeholders would rely on the Investment Funds audited financial statements. Specifically, BMER knew that the audited financial statements and related opinions were used in the various registration statements for DTDF and FTDF, and that FTDF's audited financial statements were used in the 10Q and 10K filings with the SEC. In fact, BMER's workpapers contain authorization letters related to the use of the financial statements and related opinions. In addition, BMER was aware that the audited financial statements were used in the

prospectus of both FTDF and DTDF. Investors relied on this information in deciding whether or not to invest or maintain their current investment with the Investment Funds.

131.    BMER also had a professional duty to report findings of fraud under GAAS, including AU §316.36 & .38, but failed to do so. Under the terms of its Engagement Letters, BMER was required to report the existence of fraud to DTDF and FTDF. According to McBride, this would include members of management such as Rob Hilson.

132.    Upon discovering the Culpable Insiders' scheme, looting, and/or any other fraudulent acts, BMER should have reported its findings to certain Stakeholders. Further, when BMER acquired sufficient knowledge to cause it to withdraw as the Investment Funds' auditor or cast doubt upon the accuracy of its previous opinions, it also had the duty to: (a) withdraw its prior audit report under AU §561; and (b) ensure that those relying on the financial statements, including the NSD, the SEC, and the Investors, knew that BMER's opinion(s) could no longer be relied upon under AU §561.06 & .08.

133.    Instead, after being dismissed as DTDF's Auditor, BMER quietly continued its accounting services to the remainder of the USA Capital Group without reporting its concerns regarding DTDF or the Culpable Insiders to anyone or considering the implications in its other engagements, including FTDF. Had BMER fulfilled its reporting duties, the Stakeholders could and would have taken appropriate action to stop DTDF, FTDF, and USACM from incurring additional damages.

5.    *BMER Lacked Sufficient Independence to Appropriately Audit DTDF and FTDF's Financial Statements*

134.    BMER's financial relationship with the USA Capital Group and the Culpable Insiders created independence issues that affected BMER's professional judgment.  According to AU § 220, an auditor must "be without bias with respect to the client since otherwise he would lack that impartiality necessary for the dependability of his findings."  BMER performed audit, tax, and other accounting services for over fifty entities directly or indirectly related to UASCM, DTDF, and/or FTDF.   In many instances, BMER performed services for entities created to further the wrongful scheme, such as Housing Partners, LLC, Reno South Meadows, LLC, HMA Sales, LLC, Amblamo, LLC, South Meadows Apartments, LLC, and many others.  Moreover, this represented a substantial portion of Garth McBride's contribution to the BMER partnership income.

135.    In addition, the Culpable Insiders made it a practice to delay payment to the USA Capital Group's creditors.  BMER became one of these creditors when it performed services that it billed for after the fact.   In an email between McBride and Milanowski dated February 27, 2003, McBride stated "I'd like an idea when our billings will be paid.  We can't carry this anymore.  I'm worried—especially barreling into tax return and audit season.  Our cash flow is suffering due to this."  In an email dated March 13, 2003, McBride expressed his concern related to Tanamera Resort Partners, LLC.  McBride asked Milanowski to pay BMER on an installment basis to eliminate outstanding bills noting that getting on a payment plan "would help to relieve [McBride's] independence problems."

136.    BMER, and more specifically McBride, did not have the independence mandated by GAAS, including AU § 220.  The sheer number of audits performed along with the proportion of

BMER's business that the USA Capital Group represented made BMER beholden to the will of the Culpable Insiders. As such, BMER was not qualified to perform audit services for FTDF or DTDF.

6.    *BMER's Audit and Reporting Failures Allowed the Culpable Insiders to Continue Their Scheme*

137.    The Culpable Insiders' fraud, looting, and violations of governing documents of USACM, DTDF, and FTDF would have ceased long before April 2006 if BMER either: (a) reported the existence of the Culpable Insiders' scheme and/or the looting directly to the innocent Stakeholders; (b) issued a qualified audit opinion of USACM's financial statements; or (c) withdrew its audit report at any time, at the very least when it was removed from the DTDF engagement.

138.    If the innocent members of USACM, DTDF, or FTDF's management or other innocent Stakeholders had known of the Culpable Insiders' scheme, the looting, and the other violations that were taking place, they could and would have taken action to stop the Culpable Insiders. First, they could and would have informed the USA Capital Group's vast network of brokers and direct lenders, thereby crippling the Culpable Insiders' ability to acquire fresh sources of money with which to continue the their scheme. Second, they could and would have informed the appropriate regulatory agencies, including, but not limited to, the NSD or the SEC. Third, they could and would have removed the Culpable Insiders from their management positions at DTDF and FTDF.

139.    If the NSD or the SEC had been aware of the extent of the Culpable Insiders' illegal acts, and had not relied on BMER's unqualified opinions, they would have taken action to stop the Culpable Insiders' scheme. BMER was aware that the NSD and SEC reviewed and relied on the Investment Funds' audited financial statements in determining the Investment Funds' compliance with regulatory requirements. Any revelation of the scheme would have led to the removal of the

Culpable Insiders from positions of authority, thereby ending the scheme and saving USACM, DTDF, FTDF, and their from millions of dollars in losses.

140.    Had BMER taken any action other than issuing an unqualified opinion on DTDF and FTDF's financial statements, the NSD and/or SEC would have been forced to intervene and stop the Culpable Insider's wrongful scheme.  As stated, the SEC had undertaken an investigation of USA Securities related to the sale of the Investment Funds Securities.  If the SEC had learned of other wrongdoing, it would have questioned the Culpable Insiders, USA Capital Group employees, and possibly BMER itself.  In doing so, it would have discovered the true extent of prepayments, looting, and other facets of the scheme and acted to stop the Culpable Insiders.

141.    If DTDF or FTDF's innocent Stakeholders were aware of the scheme, they would have acted to stop further looting and/or misappropriation of DTDF funds.  Moreover, DTDF or FTDF's efforts to recoup their losses after the bankruptcy filings were unsuccessful because of the sharp decline in the real estate markets.  If DTDF or FTDF could have acted to take control of its collateral sooner, it would likely have substantially mitigated its losses.  In addition to action by the NSD or SEC, the Investors or other innocent DTDF or FTDF Stakeholders could and would have prevented further investments in USACM-serviced loans if they had known about the Culpable Insiders' wrongdoings, including the held checks.  Without the liquidity provided by withholding the payments due to DTDF, the Culpable Insiders' scheme would have failed long before 2006 even without the Stakeholders' intervention.

1

### E.    USACM, DTDF, and FTDF's Damages

2

142.    USACM and the Investment Funds were substantially harmed by BMER's wrongful

3

4

acts.  Its actions proximately caused USACM to suffer massive looting and exposure to third-party

5

liabilities that otherwise would not have occurred and caused DTDF and FTDF to lose millions of

6

dollars.  BMER's wrongful acts and omissions enabled, assisted, and prolonged large scale abuse

7

and looting of USACM and the Investment Funds by the Culpable Insiders.  Additionally, BMER's

8

9

myriad of failures to report the fraud that it had detected and its continued certification of financial

10

statements that were wholly inaccurate permitted the fraud to continue for many years.

11

143.    USACM and DTDF suffered many millions of dollars in damages through the Culpable

12

Insiders' looting of USACM's general corporate bank account, USACM loan origination, looting of

13

DTDF through related party transactions, and loan servicing fees in the Collections Trust Account

14

that were never distributed to USACM, and DTDF funds held in the Collections Trust Account.

15

16

144.    Over the period in which BMER served as the Investment Funds auditors, the Culpable

17

Insiders looted and/or misappropriated millions of dollars through various transactions.  Their

18

scheme continued beyond BMER's tenure at DTDF up until USACM and the Investment Funds'

19

20

eventual bankruptcy.

21

145.    The Culpable Insiders siphoned funds out of USACM, the Collections Trust Account,

22

and possibly the Investors Trust Account, which contained both USACM and direct lenders' funds,

23

and sent them to various valueless, improper, and self-serving investments either directly or

24

indirectly, through USAIP.

25

26

146.    The Culpable Insiders also looted and/or misappropriated millions of dollars of USACM and DTDF funds by paying interest on defaulted loans and acquiring worthless loans to perpetuate their scheme.

147.    The Culpable Insiders took excessive and improper compensation and perquisites, defrauding USACM out of several million dollars.

148.    The Culpable Insiders used the Investment funds to make loans to entities they owned and/or controlled that were never repaid.  The Culpable Insiders also ignored the Investment Funds' governing documents and entered into prohibited transactions against the best interests of the company.  Had the Culpable Insiders' scheme been stopped sooner, The Investment Funds would have saved millions of dollars by not investing in loans to entities owned or controlled by the Culpable Insiders or under-secured loans that ultimately defaulted.  The Investment Funds could have instead used these funds to enter into legitimate loan transactions, and thereby earned a profit for its investments.

149.    USACM and the Investment Funds also suffered millions of dollars in costs as a result of the substantial administrative costs of its Chapter 11 bankruptcy, which was so expensive due, in large part, to the disastrous state of the USACM and the Investment Funds' accounting records and the length of time the fraud was allowed to continue.

150.    In addition, USACM and the Investment Funds could have saved millions of dollars in losses had they sought to gain control of the real property underlying their securitized loans at an earlier date.  Due in large part to the recent downturn in the real estate market, many of the properties in question are selling at greatly reduced prices.  Had USACM and the Investment Funds

1  been aware of the scheme and acted to foreclose on these properties or otherwise gain control of the

2  collateral at an earlier date, these properties would have sold for much higher prices, resulting in a

3  substantial increase in the recovery of assets for distribution to USACM, DTDF, and FTDF's

4  creditors.

5

6  151.    BMER's malfeasance was not simply the sine qua non of USACM and the Investment

7  Funds' losses.  Rather, as a direct, proximate result of BMER's acts and omissions described above:

8  (a) USACM suffered many millions of dollars in direct losses and potentially hundreds of millions

9  of dollars in additional damages for liabilities to third parties; (b) DTDF suffered many millions of

10  dollars in damages from related party loans that were never repaid, the Culpable Insiders'

11  looting/misappropriation of DTDF funds, unremitted principal and interest payments from

12  borrowers; (c) both DTDF and FTDF suffered many millions of dollars by making under

13  collateralized loans that were prohibited by their respective governing documents.

14

15  **F.    The Culpable Insiders Acted Exclusively Adverse to USACM and the Investment Funds' Interests, but Their Innocent Stakeholders Could and Would Have Acted to Prevent the Wrongdoing**

16

17  152.    At all relevant times, the Culpable Insiders acted exclusively adverse to USACM and the

18  Investment Funds' interests in connection with the transactions described herein, and in each

19  instance, the Culpable Insiders: (a) placed their own interests ahead of USACM and the Investment

20  Funds' interests; and (b) acted in their own best interests to USACM and the Investment Funds'

21  detriment.

22

23

24

25

26

153.    The Culpable Insiders engaged in these harmful acts to perpetuate the scheme, thereby allowing them to continue to misappropriate and loot assets from USACM and the Investment Funds and their innocent investor-creditors.

154.    At all relevant times, USACM and the Investment Funds had innocent Stakeholders, who had no knowledge of the Culpable Insiders' wrongdoing and who could and would have substantially prevented or otherwise mitigated the losses that occurred had they been properly notified by BMER of the scheme.

155.    The innocent Stakeholders of USACM and the Investment Funds were unaware and had no reason to know about BMER's failure to conduct a proper audit of the Investment Funds' financial statements. Specifically, none of the Stakeholders was aware that BMER had essentially uncovered the fraud in 2004 and silently discontinued its 2003 audit field work. Moreover, BMER deliberately concealed its knowledge of the false nature of the Investment Funds' financial statements, the Culpable Insiders' scheme, and its own failure to properly audit and report on those financial statements from the Stakeholders from 2004 until at least 2007 when Garth McBride's knowledge was revealed to DTDF and USACM's Stakeholders. The deficiencies in BMER's audit work and the false nature of its audit opinion were not revealed to the Stakeholders until well after USACM and the Investment Funds' bankruptcy.

156.    In fact, DTDF's manager and the trustee for the USACM Trust did not discover all of the elements of the cause of action against BMER until they were provided with a copy of Garth McBride's SEC deposition transcript in mid-2007. To wit, none of the Funds Stakeholders or USACM's Stakeholders was aware that BMER had breached its contractual obligation to report

fraud to DTDF, because none of those Stakeholders knew what had happened in 2004 during the course of its DTDF audit field work.

157.     In addition, if BMER had properly carried out the responsibility it undertook in their engagement letters and informed the Investment Funds' management or other innocent Stakeholders of the ongoing scheme, the Culpable Insiders' scheme would have ended years sooner and millions would have been saved.

158.     Moreover, numerous regulatory authorities in Nevada and elsewhere stood ready, willing, and able to assist in preventing the ongoing fraud, but for the affirmative actions taken by BMER to cover it up and/or mislead the authorities.  BMER was aware of the existence of these authorities, including the NSD and the SEC.

159.     BMER was aware that the NSD and the SEC utilized the Investment Funds' audited financial statements and BMER's audit opinions in determining whether or not the Investment Funds complied with applicable law.  The NSD and/or the SEC could and would have taken action to prevent the Culpable Insiders misdeeds. Indeed, once the misconduct was uncovered after the bankruptcy filing, the SEC filed a civil action against Milanowski related to his misconduct, including the 10-90 Loan.

160.     The Investment Funds had approximately well over 1,000 Investors who each held a membership interest in at least one of the Investment Funds.  If the Investors were informed that the Culpable Insiders were misallocating and/or looting Investment Funds' assets, they could and would have taken action to stop the Culpable Insiders, including, but not limited to, replacing USACRA as

manager of Investment Funds.  Without access to DTDF's liquidity, the Culpable Insiders' scheme would have ended much sooner.

161.    Because of BMER's failure to disclose its findings to the Stakeholders, USACM and Investment Funds failed to discover the wrongdoings of the Culpable Insiders until their eventual bankruptcy occurring in April 2006.  After a Chief Restructuring Officer and new managers were appointed and the Culpable Insiders were removed, a thorough review of the books and records was conducted.  This review, along with a review of BMER's work papers, led to the discovery of the Culpable Insiders' misdeeds, the material misstatements in USACM and the Investment Funds' financial statements, and BMER's failures as auditor.

## V.    Tolling of Claims Against BMER

162.    The USACM Trust, DTDF, and FTDF had the benefit of 11 U.S.C. § 108(a), which tolled all statutes of limitations applicable to their claims for two years following the Petition Date.

163.    In late 2007, the USACM Trust, DTDF, and BMER agreed to participate in a mediation scheduled for February 21, 2008, regarding the claims alleged herein.  In late January 2008, however, BMER's counsel indicated that he needed more time to prepare for the mediation and requested to postpone the mediation until May 2008.  The USACM Trust and DTDF agreed to postpone the mediation, provided that BMER agreed to toll all applicable statutes of limitations until May 30, 2008.

164.    BMER agreed to this proposal.  On or about February 7, 2008, more than two months prior to the expiration of the Section 108 tolling period, the USACM Trust and DTDF entered into a tolling agreement with BMER regarding the claims alleged herein.  Specifically, the USACM Trust,

DTDF, and BMER agreed: (a) to toll all applicable statutes of limitations until May 30, 2008; and (b) to participate in mediation on May 21, 2008, in Las Vegas, Nevada, before a mediator who had already been selected by the parties.  This tolling agreement is valid and enforceable, and tolled all statutes of limitations applicable to the claims herein until May 30, 2008.

165.    Within days after BMER agreed to the tolling agreement, BMER's counsel made arrangements to set up the mediation scheduled for May 21, 2008.  Subsequently, at the request of BMER's counsel, the mediation was continued to May 21, 2008 in Las Vegas, Nevada.

166.    In reliance upon BMER's counsel's tolling agreement, counsel for the USACM Trust and DTDF did not file suit against BMER on or before April 12, 2008, the expiration of the Section 108 tolling period.

167.    On May 15, 2008, counsel for BMER informed counsel for DTDF and the USACM Trust that BMER did not intend to honor the tolling agreement that it had entered into in February 2008.  Consequently, DTDF and the USACM Trust immediately prepared and filed this suit within 24 hours.

## VI.    CAUSES OF ACTION

### A.    **DTDF's Claims Against BMER**

*Count 1: Aiding and Abetting/Participation in Breaches of Fiduciary Duty*

168.    DTDF re-alleges and fully incorporates the allegations pleaded above.

169.    Hantges and Milanowski served as managers of DTDF and played a key role in the transactions described above. As managers of DTDF, Hantges and Milanowski, among others,

owed a fiduciary duty to act at all times with the utmost good faith and fair dealing and in the best interests of DTDF.

170.    Hantges and Milanowski collectively and individually breached fiduciary duties owed to DTDF and its creditors by systematically looting DTDF, diverting DTDF funds in the Collections Trust Account, and making impermissible loans to parties owned or controlled by Hantges and Milanowski and other impermissible loans that violated DTDF's governing documents. Their fiduciary duties required them to keep DTDF fully advised regarding the true nature of the transactions they engaged in and to prevent DTDF from entering into transactions that were harmful to DTDF.

171.    As DTDF's auditor, BMER knew of the breaches of fiduciary duty caused by the acts and omissions set forth above.  Furthermore, BMER's complete access, review, and analysis of DTDF's books and records (including the Collections Trust Account and related-party balances and transactions) and its communications with USACM and the Investment Funds' personnel revealed that the Culpable Insiders were breaching their fiduciary duties to DTDF.  Through its work, BMER was aware that the Culpable Insiders caused DTDF funds to be withheld, looted, and otherwise misused to DTDF's detriment.

172.    BMER knowingly and substantially assisted in the Culpable Insiders' breach of fiduciary duties to DTDF by issuing an unqualified opinion on DTDF's 2000 through 2002 financial statements and remaining silent after being dismissed as DTDF's auditor when BMER knew of the Culpable Insiders' misdeeds that harmed DTDF, including the misappropriation of DTDF's assets represented by the held checks and the 10-90 Loan.  BMER's maintained silence,

continued work on other USA Capital Group engagements, and its previous unqualified opinion affirmatively and intentionally concealed the Culpable Insiders' scheme from DTDF's Stakeholders.  On information and belief, BMER knew that exposing the Culpable Insiders' wrongdoings, including but not limited to the held checks issue and the 10-90 Loan, would have resulted in the Stakeholders taking action to stop the Culpable Insiders' scheme, but BMER remained silent to avoid criticism of their prior audits, the accompanying liability, and in order to continuing earning fees from USA Capital Group engagements.

173.    BMER knew that the Culpable Insiders were managers of DTDF and knew the Culpable Insiders had withheld funds from DTDF and looted DTDF funds through their positions at USACM.  As such, BMER was aware of its role in promoting these breaches of fiduciary duty at the times that it provided assistance to Hantges and Milanowski.

174.    The conduct constituting breaches of fiduciary duty owed to DTDF was exclusively adverse to the interests of, and provided no benefit to, DTDF.

175.    DTDF had one or more innocent Stakeholders who: (a) were not involved in the acts and omissions set forth above; (b) were not aware of the breaches of fiduciary duty owed by Hantges and Milanowski; and (c) were not aware of BMER's substantial assistance in such breaches.

176.    One or more of DTDF's innocent Stakeholders could and would have terminated or prevented the acts or omissions set forth above if they had actually known, or understood and appreciated, what Hantges and Milanowski were doing to DTDF as well as the true adverse impact on DTDF and its creditors.

177.    As a direct and proximate result of the substantial assistance given by BMER to Hantges and Milanowski in connection with their breaches of fiduciary duties owed to DTDF, DTDF suffered damages in an amount to be proven at trial.

*Count 2: Accounting Malpractice/Professional Negligence*

178.    DTDF re-alleges and fully incorporates the allegations pleaded above.

179.    BMER would have known that such a fraud and/or breach of fiduciary duties was being committed if it had conducted its audit in accordance with its contractual and professional obligations, even if it were not so clear that BMER knowingly assisted in the Culpable Insiders' perpetration of a fraud or breach of fiduciary duties,

180.    As DTDF's auditor, BMER owed DTDF a duty to exercise reasonable and professional care in providing audit services to DTDF, including the audit of DTDF's financial statements for fiscal years 2000 through 2002.

181.    Specifically, BMER owed a duty to DTDF to:

   a.    perform its audits of DTDF's financial statements in accordance with generally accepted auditing standards and practices, and in accordance with all applicable professional and regulatory standards;

   b.    exercise the skill and care normally possessed by members of the accounting/auditing profession;

   c.    familiarize itself with DTDF's business, operations, accounting policies, business risks, internal controls (including its information systems, financial controls, and monitoring), and reporting methods;

d.      plan and perform its audits to reduce audit risk to an acceptably low level given its understanding of DTDF's business and its internal workings;

e.      gather adequate and appropriate audit evidence and critically assess the audit evidence upon which to base its audit reports and finalize its audit reports pertaining to DTDF's fiscal year 2000 to 2002 financial statements only after it had conducted all appropriate audit procedures;

f.      determine, based upon sufficient audit evidence, whether there was significant doubt as to whether DTDF could continue as a going concern, including examine whether DTDF complied with regulatory requirements;

g.      determine whether DTDF's fiscal year 2000 to 2002 financial statements provided a true and fair view of DTDF's financial position and of the results of its operations for the relevant period in accordance with generally accepted accounting principles; and

h.      promptly alert DTDF's governing board, management, members, and/or other Stakeholders as to the existence of (a) material weaknesses or failures in the company's internal controls; (b) inadequate management assessments or evaluations of controls; and (c) any irregularities, other illegal acts or identified fraud, or actions by insiders that are indicative of fraudulent financial reporting.

182.    Upon the discovery of new information rendering BMER's previously issued opinions inaccurate, BMER had the duty to prevent future reliance on the financial statements. This

included informing DTDF and its management, members, and/or other Stakeholders of the inaccuracies, and where necessary, taking whatever other step it deemed necessary to ensure that such reliance did not continue, including directly notifying the NSD, the Investors, and other persons known to be relying on DTDF's inaccurate financial statements. During BMER's continuing tenure, BMER found information that suggested that its previously issued audit opinions and the accompanying financial statements were inaccurate and/or misleading. Despite this knowledge, it failed to prevent the Stakeholders, including the NSD and the Investors, from relying on DTDF's materially misstated and inaccurate financial statements, along with BMER's accompanying opinions.

183.    BMER had complete and unfettered access to all the necessary accounting information and records that it needed to fulfill its professional obligations. Upon information and belief, there was never an instance in which BMER requested information that was not provided. As a result of the acts and omissions set forth above, BMER breached its duties to DTDF by failing to exercise reasonable and professional care in performing its audits of DTDF's financial statements for fiscal years 2000 through 2002, and by generally failing to perform audit services for DTDF in a professionally competent manner and in conformity with applicable regulatory and professional standards.

184.    As a direct and proximate result of BMER's breaches of duty, DTDF suffered damages in the millions of dollars in an amount to be proven at trial.

*Count 3: Breach of Contract*

185.    DTDF re-alleges and fully incorporates the allegations pleaded above.

186.    For each year that BMER was employed as independent auditor by DTDF, BMER entered into an engagement letter agreement that described the services that BMER was to provide to DTDF.    The BMER engagement letters for fiscal years 2000 to 2002 (collectively, the "Engagement Letters") were all valid, enforceable contracts.

187.    Under the terms of the Engagement Letters, BMER was contractually obligated to: (a) audit DTDF's year-end financial statements in accordance with GAAS; (b) notify DTDF's management, members, and/or other Stakeholders of any circumstances indicating that BMER may not be able to issue an unqualified audit opinion; (c) inform DTDF's management, member, and/or other Stakeholders of any "reportable conditions"; and (d) inform DTDF's management, members, and/or other Stakeholders of any identified fraud.

188.    BMER billed, and DTDF paid, many thousands of dollars under the terms of the Engagement Letters.    In all respects, DTDF complied with the terms of the engagement letters.

189.    BMER was aware that the financial statements were used by the NSD during their examinations of DTDF.    Accordingly, the clear intent of BMER was that the audit services provided by BMER would be for the benefit of regulatory agencies, creditors, and prospective creditors.

190.    DTDF, the NSD, the Investors, and other creditors of DTDF reasonably relied on BMER's unqualified audit opinions that were issued pursuant to the Engagement Letters.    This reliance was reasonably foreseeable in light of BMER's knowledge of DTDF's registration requirements with the NSD and BMER's written permission to use the audited financial statements for those purposes

191.    BMER breached its duties found in each and every one of the Engagement Letters. BMER failed to inform DTDF's management, members, and/or other Stakeholders of the host of reportable conditions and the ongoing fraud and looting that BMER knew or should have known about as set forth in the allegations above.  Likewise, BMER failed to inform DTDF's Stakeholders, including its innocent Stakeholders, of other circumstances that BMER knew or should have known could impact BMER's ability to issue an unqualified audit opinion, as set forth in the allegations above.  Finally, BMER failed to audit DTDF's year-end financial statements in accordance with GAAS, as set forth in the allegations above.

192.    BMER's breaches of the Engagement Letters caused harm to DTDF and the third-party beneficiaries to the Engagement Letters, including Investors and other creditors of DTDF. Specifically, had BMER complied with the terms and provisions of the Engagement Letter, DTDF would not have suffered the substantial losses and damages resulting from the additional looting and/or misappropriation of DTDF's funds by the Culpable Insiders and the additional liability it incurred as a result of the losses sustained by direct lenders and other creditors through their reasonable reliance upon DTDF's audited financial statements.

**B.    FTDF's Claims Against BMER**

*Count 1: Aiding and Abetting/Participation in Breaches of Fiduciary Duty*

193.    DTDF and the USACM Trust re-allege and fully incorporate the allegations pleaded above.

194.    Hantges and Milanowski served as managers of FTDF and played a key role in the transactions described above. As managers of FTDF, Hantges and Milanowski, among others,

owed a fiduciary duty to act at all times with the utmost good faith and fair dealing and in the best interests of FTDF.

195.    Hantges and Milanowski collectively and individually breached fiduciary duties owed to FTDF and its creditors by making impermissible loans in violation of FTDF's governing documents.  Their fiduciary duties required them to keep FTDF fully advised regarding the true nature of the transactions they engaged in and to prevent FTDF from entering into transactions that were harmful to FTDF.

196.    As FTDF auditor, BMER knew of the breaches of fiduciary duty caused by the acts and omissions set forth above.  Furthermore, BMER's complete access, review, and analysis of FTDF's books and records (including the Collections Trust Account and related-party balances and transactions) and its communications with USACM and the Investment Funds' personnel revealed that the Culpable Insiders were breaching their fiduciary duties to FTDF.  Through its work, BMER was aware that the Culpable Insiders entered into these harmful loans.

197.    BMER knowingly and substantially assisted in the Culpable Insiders' breach of fiduciary duties to FTDF by issuing an unqualified opinion on FTDF's March 29, 2001 and the fiscal years 2001 through 2004 financial statements and remaining silent after being dismissed as DTDF's auditor when BMER knew of the Culpable Insiders' misdeeds, including the misappropriation DTDF's assets represented by the held checks and the 10-90 Loan.  BMER's maintained silence, continued work on other USA Capital Group engagements, and its previous unqualified DTDF opinions affirmatively and intentionally concealed the Culpable Insiders' scheme from FTDF's Stakeholders.  On information and belief, BMER knew that exposing the Culpable

Insiders' wrongdoings, including but not limited to violations of FTDF's governing documents, would have resulted in the Stakeholders taking action to stop the Culpable Insiders' scheme, but BMER remained silent avoid criticism of their prior audits, the accompanying liability, and in order to continuing earning fees from USA Capital Group engagements.

198.    BMER knew that the Culpable Insiders were managers of FTDF and knew the Culpable Insiders were violating FTDF's governing documents.  As such, BMER was aware of its role in promoting these breaches of fiduciary duty at the times that it provided assistance to Hantges and Milanowski.

199.    The conduct constituting breaches of fiduciary duty owed to FTDF was exclusively adverse to the interests of, and provided no benefit to, FTDF.

200.    FTDF had one or more innocent Stakeholders who: (a) were not involved in the acts and omissions set forth above; (b) were not aware of the breaches of fiduciary duty owed by Hantges and Milanowski; and (c) were not aware of BMER's substantial assistance in such breaches.

201.    One or more of FTDF's innocent Stakeholders could and would have terminated or prevented the acts or omissions set forth above if they had actually known, or understood and appreciated, what Hantges and Milanowski were doing to FTDF as well as the true adverse impact on FTDF and its creditors.

202.    As a direct and proximate result of the substantial assistance given by BMER to Hantges and Milanowski in connection with their breaches of fiduciary duties owed to FTDF, FTDF suffered damages in an amount to be proven at trial.

*Count 2: Accounting Malpractice/Professional Negligence*

203.    DTDF and the USACM Trust re-allege and fully incorporate the allegations pleaded above.

204.    Even if it were not so clear that BMER knowingly assisted in the Culpable Insiders' perpetration of a fraud or breach of fiduciary duties, BMER would have known that such a fraud and/or breach of fiduciary duties was being committed if it had conducted its audit in accordance with its contractual and professional obligations.

205.    As FTDF's auditor, BMER owed FTDF a duty to exercise reasonable and professional care in providing audit services to FTDF, including the audit of FTDF's financial statements for March 29, 2001 and the fiscal years 2001 through 2004.

206.    Specifically, BMER owed a duty to FTDF to:

a.    perform its audits of FTDF's financial statements in accordance with generally accepted auditing standards and practices, and in accordance with all applicable professional and regulatory standards;

b.    exercise the skill and care normally possessed by members of the accounting/auditing profession;

c.    familiarize itself with FTDF's business, operations, accounting policies, business risks, internal controls (including its information systems, financial controls, and monitoring), and reporting methods;

d.    plan and perform its audits to reduce audit risk to an acceptably low level given its understanding of FTDF's business and its internal workings;

e.     gather adequate and appropriate audit evidence and critically assess the audit evidence upon which to base its audit reports and finalize its audit reports pertaining to FTDF's financial statements for March 29, 2001 and the fiscal years 2001 through 2004 only after it had conducted all appropriate audit procedures;

f.     determine, based upon sufficient audit evidence, whether there was significant doubt as to whether FTDF could continue as a going concern, including examine whether FTDF complied with regulatory requirements;

g.     determine whether FTDF's financial statements for March 29, 2001 and the fiscal years 2001 through 2004 provided a true and fair view of FTDF's financial position and of the results of its operations for the relevant period in accordance with generally accepted accounting principles; and

h.     promptly alert FTDF's governing board, management, members, and/or other Stakeholders as to the existence of (a) material weaknesses or failures in the company's internal controls; (b) inadequate management assessments or evaluations of controls; and (c) any irregularities, other illegal acts or identified fraud, or actions by insiders that are indicative of fraudulent financial reporting.

207.    Upon the discovery of new information rendering BMER's previously issued opinions inaccurate, BMER had the duty to prevent future reliance on the financial statements. This included informing FTDF and its management, members, and/or other Stakeholders of the

inaccuracies, and where necessary, taking whatever other step it deemed necessary to ensure that such reliance did not continue, including directly notifying the SEC, the Investors, and other persons known to be relying on FTDF's inaccurate financial statements. During BMER's continuing tenure, BMER found information that suggested that its previously issued audit opinions and the accompanying financial statements were inaccurate and/or misleading. Despite this knowledge, it failed to prevent Stakeholders, including the SEC and the Investors, from relying on FTDF's materially misstated and inaccurate financial statements, along with BMER's accompanying opinions.

208.    BMER had complete and unfettered access to all the necessary accounting information and records that it needed to fulfill its professional obligations. Upon information and belief, there was never an instance in which BMER requested information that was not provided. As a result of the acts and omissions set forth above, BMER breached its duties to FTDF by failing to exercise reasonable and professional care in performing its audits of FTDF's financial statements for March 29, 2001 and the fiscal years 2001 through 2004, and by generally failing to perform audit services for FTDF in a professionally competent manner and in conformity with applicable regulatory and professional standards.

209.    As a direct and proximate result of BMER's breaches of duty, FTDF suffered damages in the millions of dollars in an amount to be proven at trial.

*Count 3: Breach of Contract*

210.    DTDF and the USACM Trust re-allege and fully incorporate the allegations pleaded above.

211. For each year that BMER was employed as independent auditor by FTDF, BMER entered into an engagement letter agreement that described the services that BMER was to provide to FTDF. The BMER engagement letters for March 29, 2001 and the fiscal years 2001 through 2004 (collectively, the "Engagement Letters") were all valid, enforceable contracts.

212. Under the terms of the Engagement Letters, BMER was contractually obligated to: (a) audit FTDF's year-end financial statements in accordance with GAAS; (b) notify FTDF's management, members, and/or other Stakeholders of any circumstances indicating that BMER may not be able to issue an unqualified audit opinion; (c) inform FTDF's management, members, and/or other Stakeholders of any "reportable conditions"; and (d) inform FTDF's management, members, and/or other Stakeholders of any identified fraud.

213. BMER billed, and FTDF paid, many thousands of dollars under the terms of the Engagement Letters. In all respects, FTDF complied with the terms of the engagement letters.

214. BMER was aware that the financial statements were used by the SEC during their examinations of FTDF. Accordingly, the clear intent of BMER was that the audit services provided by BMER would be for the benefit of regulatory agencies, creditors, and prospective creditors.

215. FTDF, the SEC, the Investors, and other creditors of FTDF reasonably relied on BMER's unqualified audit opinions that were issued pursuant to the Engagement Letters. This reliance was reasonably foreseeable in light of BMER's knowledge of FTDF's registration requirements with the SEC and their written permission to use the audited financial statements for those purposes

216.     BMER breached its duties found in each and every one of the Engagement Letters. BMER failed to inform FTDF's management, members, and/or other Stakeholders of the host of reportable conditions and the ongoing fraud and looting that BMER knew or should have known about as set forth in the allegations above.  Likewise, BMER failed to inform FTDF's Stakeholders, including its innocent Stakeholders, of other circumstances that BMER knew or should have known could impact BMER's ability to issue an unqualified audit opinion, as set forth in the allegations above.  Finally, BMER failed to audit FTDF's year-end financial statements in accordance with GAAS, as set forth in the allegations above.

217.     BMER's breaches of the Engagement Letters caused harm to FTDF and the third-party beneficiaries to the Engagement Letters, including Investors and other creditors of FTDF. Specifically, had BMER complied with the terms and provisions of the Engagement Letter, FTDF would not have suffered the substantial losses and damages resulting from the additional violations of FTDF's governing documents by the Culpable Insiders and the additional liability it incurred as a result of the losses sustained by direct lenders and other creditors through their reasonable reliance upon FTDF's audited financial statements.

**C.     USACM's Claims Against BMER**

*Count 1: Aiding and Abetting/Participation in Breaches of Fiduciary Duty*

218.     The USACM Trust re-alleges and fully incorporates the allegations pleaded above.

219.     Hantges and Milanowski served as managers of USACM and played a key role in the transactions described above. As managers of USACM, Hantges and Milanowski, among others,

owed a fiduciary duty to act at all times with the utmost good faith and fair dealing and in the best interests of USACM.

220.    Hantges and Milanowski collectively and individually breached fiduciary duties owed to USACM and its creditors by systematically looting USACM, diverting USACM funds in the Collections Trust Account, and making impermissible loans to parties owned or controlled by Hantges and Milanowski.  Their fiduciary duties required them to keep USACM fully advised regarding the true nature of the transactions they engaged in and to prevent USACM from entering into transactions that were harmful to USACM.

221.    As DTDF and FTDF's auditor, BMER knew of the breaches of fiduciary duty caused by the acts and omissions set forth above.  Furthermore, BMER's complete access, review, and analysis of DTDF's books and records (including the Collections Trust Account and related-party balances and transactions) and its communications with USACM and DTDF personnel revealed that the Culpable Insiders were breaching their fiduciary duties to USACM.  Through its work, BMER was aware that the Culpable Insiders caused USACM to be looted and/or misappropriated to its detriment.

222.    BMER knowingly and substantially assisted in the Culpable Insiders' breach of fiduciary duties to USACM by issuing an unqualified opinion on DTDF's 2000 through 2002 financial statements and remaining silent after being dismissed as DTDF's auditor when BMER knew of the Culpable Insiders' misdeeds that harmed DTDF, including the misappropriation DTDF's assets represented by the held checks and the 10-90 Loan.  BMER's maintained silence, continued work on other USA Capital Group engagements, and its previous unqualified opinion

affirmatively and intentionally concealed the Culpable Insiders' scheme from USACM's Stakeholders. On information and belief, BMER knew that exposing the Culpable Insiders' wrongdoings, including but not limited to the held checks issue, the 10-90 Loan, and other wrongdoings at DTDF, would have resulted in the Stakeholders taking action to stop the Culpable Insiders' scheme, but BMER remained silent to avoid criticism of their prior audits, the accompanying liability, and in order to continuing earning fees from USA Capital Group engagements.

223. BMER knew that the Culpable Insiders were managers of USACM and knew the Culpable Insiders were breaching their fiduciary duties to USACM. As such, BMER was aware of its role in promoting these breaches of fiduciary duty at the times that it provided assistance to Hantges and Milanowski.

224. The conduct constituting breaches of fiduciary duty owed to USACM was exclusively adverse to the interests of, and provided no benefit to, USACM.

225. USACM had one or more innocent Stakeholders who: (a) were not involved in the acts and omissions set forth above; (b) were not aware of the breaches of fiduciary duty owed by Hantges and Milanowski; and (c) were not aware of BMER's substantial assistance in such breaches.

226. One or more of USACM's innocent Stakeholders could and would have terminated or prevented the acts or omissions set forth above if they had actually known, or understood and appreciated, what Hantges and Milanowski were doing to USACM as well as the true adverse impact on USACM and its creditors.

227.    As a direct and proximate result of the substantial assistance given by BMER to Hantges and Milanowski in connection with their breaches of fiduciary duties owed to USACM, USACM suffered damages in an amount to be proven at trial.

## VII.    JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the USACM Trust and DTDF requests a trial by jury on all issues so triable.  Pursuant to 28 U.S.C. § 157(e), the USACM Trust and DTDF expressly consent to a jury trial being conducted in this Court.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, the USACM Trust and DTDF respectfully requests that the Court enter judgment against Defendants and grant it the following relief:

(1)    An award of damages for all actual and consequential losses suffered by USACM, DTDF, and FTDF;

(2)    Disgorgement of all fees BMER received from USACM, DTDF and FTDF;

(3)    An award of exemplary, punitive, and treble damages as allowed by law;

(4)    Pre-judgment and post-judgment interest as allowed by law;

(5)    Reasonable attorneys' fees and costs incurred in the prosecution of this action to the extent allowed by law; and

(6)    Such other and further relief at law or in equity as the Court determines is just and appropriate.

1    Dated: May 16, 2008.

2

| **DIAMOND MCCARTHY LLP** | **DIAMOND MCCARTHY LLP** |
|---|---|
| By: _/s/ Allan B. Diamond_ | By:___ _/s/ Eric D. Madden_ |
| Allan B. Diamond, TX 05801800 (pro hac vice) | William T. Reid, IV, TX 00788817 (pro hac vice) |
| J. Maxwell Beatty, TX 24051740 (pro hac vice) | Eric D. Madden, TX 24013079 (pro hac vice) |
| 909 Fannin, Suite 1500 | P. Jason Collins, TX 24040711 (pro hac vice pending) |
| Houston, Texas 77010 | 6504 Bridge Point Parkway |
| (713) 333-5100 (telephone) | Suite 400 |
| (713) 333-5199 (facsimile) | Austin, Texas 78730 |
| _Special Litigation Counsel for USACM Liquidating Trust and USA Capital Diversified Trust Deed Fund, LLC_ | (512) 617-5200 (telephone) |
| | (512) 617-5299 (facsimile) |
| | _Special Litigation Counsel for USACM Liquidating Trust and USA Capital Diversified Trust Deed Fund, LLC_ |
| **LEWIS AND ROCA LLP** | |
| By: _/s/ Rob Charles_ | |
| Rob Charles, NV 6593 | |
| 3993 Howard Hughes Parkway, Suite 600 | |
| Las Vegas, Nevada 89169-5996 | |
| (702) 949-8321 (telephone) | |
| (702) 949-8320 (facsimile) | |
| _Counsel for USACM Liquidating Trust_ | |