E-Filed on 07/15/08

1

**DIAMOND MCCARTHY LLP**
6504 Bridgepoint Parkway, Suite 400
Austin, Texas  78730
2   Telephone: (512) 617-5200
Facsimile: (512) 617-5299
William T. Reid, TX State Bar No. 00788817
3   Email: wreid@diamondmccarthy.com

4   909 Fannin, Suite 1500
Houston, Texas 77010
Telephone (713) 333-5100
Facsimile (713) 333-5199
5   Allan B. Diamond, TX State Bar No. 05801800
Email:  adiamond@diamondmccarthy.com
Eric D. Madden, TX State Bar No. 24013079
6   Email:  emadden@diamondmccarthy.com

7   Special Litigation Counsel for USACM Liquidating Trust and DTDF

**LEWIS AND ROCA LLP**
3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169-5996
Telephone (702) 949-8320
Facsimile  (702) 949-8321
Rob Charles, NV State Bar No. 006593
Email: rcharles@lrlaw.com

Counsel for USACM Liquidating Trust

8

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

9

| | |
|---|---|
| 10   In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>11<br>Debtor. | Case Nos.:<br>BK-S-06-10725-LBR<br>BK-S-06-10726-LBR<br>BK-S-06-10727-LBR |
| 12   In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>13<br>14   Debtor. | BK-S-06-10728-LBR<br>BK-S-06-10729-LBR |
| 14   In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND,<br>15   LLC,<br>16   Debtor. | JOINTLY ADMINISTERED<br>Chapter 11 Cases |
| 17   In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>18<br>19   Debtor. | Judge Linda B. Riegle |
| 19   In re:<br>USA SECURITIES, LLC,<br>20<br>21   Debtor. | |
| 22   Affects:<br>☐All Debtors<br>☒USA Commercial Mortgage Company<br>23   ☐ USA Capital Realty Advisors, LLC<br>☒ USA Capital Diversified Trust Deed Fund, LLC<br>24   ☐ USA Capital First Trust Deed Fund, LLC<br>25   ☐ USA Securities, LLC | |

26

<u>**PLAINTIFFS' ORIGINAL COMPLAINT**</u>                                                          Page - 1

1

2

3

4

5

6

| USACM LIQUIDATING TRUST and USA CAPITAL DIVERSIFED TRUST DEED FUND, LLC,<br><br>                    Plaintiffs,<br><br>        v.<br><br>DAVID A. FOGG,<br><br>                    Defendant. | Adversary No. 08-___<br><br>**PLAINTIFFS' ORIGINAL COMPLAINT**<br><br>Hearing Date:  n/a<br>Hearing Time:  n/a |

7    Plaintiffs USACM Liquidating Trust (the "USACM Trust"), as the duly authorized

8    successor-in-interest to USA Commercial Mortgage Company ("USACM"), and USA Capital

9    Diversified Trust Deed Fund, LLC ("DTDF") (collectively, "Plaintiffs"), hereby file this action

10    against Defendant David A. Fogg ("Fogg"), and would respectfully show as follows.

11

12                              **I.    INTRODUCTION**

13    1.    Plaintiffs seek to recover damages against Fogg for his knowing and substantial

14    assistance in the widespread looting of USACM and DTDF and a related Ponzi scheme employed

15    by certain principals of USACM to perpetuate that looting.  Fogg played a pivotal role in facilitating

16    the looting by setting up sham corporations to serve as waypoints to launder the looted funds and by

17    overseeing a vast network of California entities affiliated with USACM's culpable insiders, most

18    notably Joseph D. Milanowski ("Milanowski") and Thomas A. Hantges ("Hantges") (collectively,

19    "the Culpable Insiders").

20

21    2.    USACM was a mortgage broker and loan servicing company, and DTDF was a real

22    estate investment fund.  Through insider loan originations and pervasive looting, the Culpable

23    Insiders used these entities to fund dozens of real estate development and land acquisition entities in

24    which they stood to personally profit.  In addition, the Culpable Insiders extensively looted USACM

25

26

and DTDF to cover millions of dollars of operating losses of many other entities affiliated with the Culpable Insiders, including time-share hotels and technology companies.  Fogg was integrally involved in the nearly two dozen such entities that constituted the Culpable Insiders' extensive holdings in California.

3.    In order to induce fresh capital infusions to fuel their scheme, the Culpable Insiders concealed non-performing loans from direct lender investors in the loans brokered by USACM by employing a massive Ponzi scheme under which USACM always timely made interest payments to the direct lenders, often before the borrowers had made interest payments on their loans and even when borrowers had defaulted on their loans.  Milanowski and Hantges siphoned off the money to make these payments in various ways, including withholding fees owed to USACM and directly looting USACM and DTDF.

4.    Critical to perpetuating the Culpable Insiders' misconduct was the ability to conceal the pervasive looting and massive Ponzi scheme from regulatory agencies, direct lenders, DTDF's members, and USACM's innocent officers, directors, owners, and employees.  To that end, Fogg assisted the Culpable Insiders by creating 10-90, Inc. ("10-90") and Mountain Vista, Inc. ("Mountain Vista"), two shell corporations set up for the sole purpose of laundering money from DTDF to USA Investment Partners, LLC ("USAIP"), a holding company that was used by the Culpable Insiders as their personal "piggy bank."  From March 2003 to November 2004, Fogg used 10-90 and Mountain Vista to launder $23.328 million of looted funds to USAIP through a series of wire transfers.

5.    The wire transfers from DTDF to 10-90 to Mountain Vista to USAIP were booked as loan fundings on a purported loan from DTDF to 10-90.  In addition, more than $30 million of additional looting of DTDF was booked as advances on a loan from DTDF to 10-90, even though the funds were sent directly to the Culpable Insiders' affiliates.  Fogg executed back-dated loan documents — dated more than eight months before 10-90 was even formed — to account for the full extent of the looting,.

6.    In addition to covering up both past and ongoing looting to fund the Culpable Insiders' side ventures, the sham 10-90 loan was used to perpetuate the Ponzi scheme.  Specifically, in January 2003, the Culpable Insiders sent $11.425 million from DTDF through the USACM Investor Trust Account ("Investor Trust") to the USACM Collection Trust Account ("Collection Trust") to cover shortfalls owed to direct lenders and DTDF.  Similar transfers of funds from DTDF to the Collection Trust were also sent through 10-90 and Mountain Vista.

7.    Fogg's assistance in setting up 10-90 and Mountain Vista and in fraudulently documenting the sham loan from DTDF to 10-90 was integral to the fraud.  Fogg, moreover, was handsomely rewarded for his role in the fraud.  By consciously assisting the fraud and breaches of fiduciary duty, Fogg enjoyed a lucrative business relationship with the Culpable Insiders through his extensive involvement in their California operations.

## II.    JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action, which arises under, arises in, and relates to a case under Title 11, pursuant to 28 U.S.C. § 1334(b).  This action is, in part, a core proceeding and, in part, a non-core proceeding under 28 U.S.C. § 157(b).

9.     This Court has personal jurisdiction over Fogg based upon Fogg's general contacts within the State of Nevada and Fogg's specific contacts within the State of Nevada. Fogg, *inter alia*, purposely availed himself of the privileges and benefits of conducting business in Nevada and has committed certain torts in Nevada that are the subject of this proceeding.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

### III.     PARTIES AND OTHER RELEVANT ENTITIES

**A.**     **Plaintiffs**

*USACM Trust*

11.     USACM Trust was created pursuant to the Third Amended Joint Chapter 11 Plan of Reorganization (the "Joint Plan") filed by USACM and the four other debtors in the bankruptcy cases described below. The Joint Plan was confirmed by the bankruptcy court on January 8, 2007, and became effective on March 12, 2007.

12.     The Joint Plan expressly retained USACM's causes of action for enforcement by the USACM Trust, pursuant to 11 U.S.C. § 1123(b)(3)(B). The USACM Trust, therefore, has standing to prosecute the claims set forth herein against Fogg.

13.     The USACM Trust is a liquidating trust organized under Nevada law. The USACM Trust's beneficiaries are the holders of allowed unsecured claims against USACM. Geoffrey L. Berman serves as the trustee of the USACM Trust.

*DTDF*

14.     DTDF is a limited liability company organized under Nevada law on or about February 3, 2000. DTDF offered Nevada investors the opportunity to purchase membership

interests in a fund and thereby invest in loans that USACM originated and serviced on behalf of DTDF. At the time of its bankruptcy filing, DTDF was managed by USA Capital Realty Advisers, LLC ("USACRA"), which in turn was wholly owned and managed by USAIP.

15.    The Joint Plan expressly retained DTDF's causes of action for enforcement by DTDF, pursuant to 11 U.S.C. § 1123(b)(3)(B). DTDF, therefore, has standing to prosecute the claims set forth herein against Fogg. DTDF is now managed by Michael Tucker.

**B.    Defendant**

*Fogg*

16.    Fogg is an individual residing in the State of California at 32191 Via Bejarano, Temecula, California 92592-3894. Defendant Fogg can be served by personal service at the address listed above or wherever he may be found.

**C.    Other Relevant Entities**

*The USA Capital Debtors*

17.    On April 13, 2006 (the "Petition Date"), USACM, DTDF, USACRA, USA Capital First Trust Deed Fund, LLC ("FTDF"), and USA Securities, LLC ("USA Securities") (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"). The bankruptcy cases were jointly administered before the Honorable Linda B. Riegle under Case No. BK-S-06-10725-LBR.

18.    USACM is a corporation organized under Nevada law on or about February 28, 1989. Prior to the Petition Date, USACM was in the business of underwriting, originating, brokering,

funding, and servicing commercial loans secured by residential and commercial real estate developments.

19.   FTDF is a limited liability company organized under Nevada law on or about February 16, 2001.  FTDF offered investors throughout the United States the opportunity to purchase membership interests in a fund and thereby invest in loans that USACM originated and serviced on behalf of FTDF.  Prior to the Petition Date, FTDF was managed by USACRA.

20.   USACRA is a limited liability company organized under Nevada law on or about January 18, 2001.  USACRA was formed primarily to manage DTDF and FTDF.  Prior to the Petition Date, USACRA was owned and managed by USA Investment Partners, LLC ("USAIP").

21.   USA Securities is a limited liability company organized under Nevada law on or about March 3, 1999.  USA Securities, which was a registered broker-dealer under SEC Rule 15c3-1(a)(2)(vi), primarily sold membership interests in FTDF.  Prior to the Petition Date, USA Securities was owned and managed by Milanowski and Paul Hamilton ("Hamilton").

*Other USA Capital Entities*

22.   USAIP is a limited liability company organized under Nevada law on or about October 20, 1999.  From that date onward, USAIP served as a holding company for dozens of entities established by the Culpable Insiders in the time-share hotel, technology, and real estate acquisition and development industries.

23.   USAIP is owned by Hantges and Milanowski, or trusts controlled by them.  Prior to June 17, 2004, USAIP was managed by USACM.  Between June 17, 2004, and April 6, 2007, USAIP was managed by Hantges and Milanowski.  On February 14, 2005, Hantges purportedly

resigned his position as a USAIP manager, but nonetheless continued to function as a *de facto* manager until April 2007.

24.    On April 4, 2007, the USACM Trust, DTDF, and another USAIP creditor forced USAIP into bankruptcy by filing an involuntary petition for relief under Chapter 11 of the Bankruptcy Code against USAIP in the Bankruptcy Court.  On April 6, 2007, the Court entered an order approving the appointment of Lisa M. Poulin as USAIP's interim trustee.

25.    On May 9, 2007, the Court entered an order for relief under Chapter 11 of the Bankruptcy Code as to USAIP.  Thereafter, Ms. Poulin became the permanent Chapter 11 trustee.

## IV.    FACTUAL BACKGROUND

### A.    USACM's Background and Business Model

26.    In May 1987, Hantges and David Berkowitz ("Berkowitz") founded the "USA Capital" group of entities with the creation of USA Capital Management Group, Inc. d/b/a USA Capital, a full-service securities broker-dealer.  On February 28, 1989, Hantges and Berkowitz founded USACM.  Milanowski joined USA Capital as a part-time employee in 1991, and became a full-time employee in 1993.

27.    In July 1995, Hantges became USACM's Chairman, Chief Executive Officer, President, Secretary, and a member of USACM's board of directors.  In February 1997, Hantges appointed Milanowski to serve as USACM's Treasurer.  In September 1997, Hantges appointed Milanowski as USACM's President and a member of USACM's board of directors.

28.    After this transition in management, USACM began operations as a mortgage broker in earnest.  USACM's basic business model consisted of arranging commercial loans

secured by real property on the direct lenders' behalf, otherwise known as "originating" a loan. In these transactions, direct lenders obtained partial interests in loans "originated" by USACM, and were listed as beneficiaries on the related promissory note and mortgage or deed of trust recorded against the underlying property. In exchange for originating loans, USACM typically received loan origination fees of three to five percent of the principal amount of the loans.

29.     In mid-1997, USACM began servicing the loans that it originated. Each month, USACM was allowed to pay itself a servicing fee out of the monthly interest payments made by borrowers, while remitting the balance of the payments to direct lenders. This servicing fee was generally equal to between one-quarter of one percent and four percent of the principal balance of the loan per annum. Under the typical arrangement, USACM was also entitled to late fees, extension fees, default interest, and other fees and expenses paid or reimbursed by the borrower.

30.     Between 1997 and 2006, USACM originated and serviced more than $2.6 billion in loans to real estate developers. At the time of its bankruptcy filing in April 2006, $960 million of these loans remained outstanding.

**B.     DTDF's Background**

31.     To provide additional sources of funds, the Culpable Insiders adopted a "fund" business model with the creation of DTDF and FTDF in February 2000 and February 2001, respectively. Under the "fund" model, investors purchased interests in DTDF and/or FTDF, which then acted as lenders in loans originated and serviced by USACM.

32.     DTDF offered membership interests to Nevada investors and used these funds to purchase interests in USACM-serviced loans. DTDF earned interest as a direct lender and

distributed its profits to its investors on a periodic basis. DTDF's prospectus restricted its investments in two important ways: (a) aside from the payment of management fees, its funds could only be used to make investments in loans secured by deeds of trust in real property; and (b) it was not permitted to invest in loans to certain related parties, including USAIP.

33.    DTDF's creation greatly enhanced the Culpable Insiders' ability to defraud USACM, DTDF, and investors by allowing them to secure aggregate funds and misuse them on a continual and "as needed" basis. When shortfalls arose in USACM's loan servicing operations as a result of delinquent or defaulting borrowers, the Culpable Insiders misappropriated money from DTDF to cover the shortfalls. In other instances, the Culpable Insiders simply looted funds from DTDF and sent them to USAIP and/or other side business ventures for their own purposes and no legitimate USACM or DTDF purpose whatsoever. In total, the Culpable Insiders converted tens of millions of dollars belonging to DTDF to fuel their pervasive scheme.

## C.    The Culpable Insiders' Extensive Ponzi Scheme

34.    In order to service loans, USACM was required by Nevada law to open and maintain two separate trust accounts: (a) an "investor trust" to be used as a mechanism to pool direct lender deposits and make distributions to borrowers; and (b) a "collection trust" to collect interest and principal repayments made by borrowers and to make payments to direct lenders. In accordance with Nevada law, USACM opened and maintained two bank accounts for these purposes: (a) "USA Commercial Mortgage Company Investors Trust Account" (the "Investors Trust"); and (b) "USA Commercial Mortgage Company Collection Trust Account" (the "Collection Trust"). These USACM accounts were trust accounts under Nevada law.

35.     Nevada law closely regulated the flow of funds in and out of these accounts. Specifically, Nevada law:  (a) prohibited USACM from making any interest and/or principal payments to direct lenders on behalf of defaulting borrowers; (b) prohibited the commingling of any USACM funds within the Investors Trust and/or the Collection Trust; and (c) required USACM to remit funds it received from borrowers to the applicable direct lenders.  The Culpable Insiders routinely disregarded these provisions, instead transferring funds in and out of the Investors Trust and Collection Trust however necessary to make interest payments to the direct lenders and thereby perpetuate the Ponzi scheme.

36.     Frequently, the Culpable Insiders covered interest shortfalls in the Collection Trust by failing to withdraw fees owed to USACM.  As previously described, USACM was entitled to fees for collecting interest and principal payments from borrowers and distributing them to lenders/investors under its typical loan servicing contract.  These fees were to be collected from the borrowers' payments and remitted to USACM.  Frequently, however, USACM's loan servicing revenues in the Collection Trust were not disseminated to USACM.  In addition, extension fees, late fees, default interest fees, and other fees owed to USACM were often never taken out of the Collection Trust and transferred to USACM's corporate operating account.

37.     The Culpable Insiders also covered shortfalls in the Collection Trust by transferring funds directly from USACM, DTDF, FTDF, and/or other USA Capital entities.  At least as early as 2000, the Culpable Insiders transferred funds directly from USACM's corporate operating account into the Collection Trust to pay interest on behalf of borrowers in default.  The Culpable Insiders made similar transfers from other USA Capital entities, including DTDF and FTDF.

38.     On other occasions, the Culpable Insiders covered shortfalls in the Collection Trust by failing to remit principal payments to direct lenders when the loans in which they had invested were repaid.  DTDF was a regular victim of this practice.  From at least as early as 2002 until the Petition Date, the Culpable Insiders systematically failed to remit principal payments from borrowers to DTDF, whenever the funds were needed to cover a shortfall in the Collection Trust.  In such situations, Victoria Loob ("Loob"), a long time employee of the Culpable Insiders took physical possession of the checks payable to DTDF for monthly interest and principal that had been generated by USACM's automated loan processing system and simply "stuffed" them in her desk drawer.  Internally, the Culpable Insiders referred to the unremitted principal and interest to DTDF as the "held checks."  As of the Petition Date, the outstanding balance of held checks payable to DTDF was at least $18.9 million.

### D.     The Culpable Insiders' Looting of USACM and DTDF

39.     The driving motivation behind this Ponzi scheme was the Culpable Insiders' desire to provide funding for real estate developments and other side business ventures in which they stood to profit personally.  The fraudulent scheme induced existing investors to maintain or increase their investments with USA Capital and enticed new investors to entrust their money to USA Capital, thereby providing the Culpable Insiders with liquidity to fund their scheme, and thus, future sources of funds to pillage.

40.     From at least 1997 onward, Hantges and Milanowski used USACM to originate and service loans to real estate development entities in which they stood to profit.  Initially, these loan originations were made to entities in which Hantges and Milanowski held an ownership interest

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

either personally or through a trust.  Beginning in 2000, the Culpable Insiders caused USACM to originate loans to entities in which USAIP held a membership interest.

41.    At least as early as 1998, the Culpable Insiders began transferring funds directly from USACM's operating account to some of these real estate development entities.  For example, from 1998 through 2005, the Culpable Insiders looted more than $8 million to fund the sagging operations of the Tanamera Apartments near Reno, Nevada.  In 2000 and 2001, they misappropriated more than $3.0 million to fund Eagle Ranch, LLC, which owned real estate in Victorville, California.  The Culpable Insiders also transferred millions of dollars from USACM's operating account to the Royal Hotel is Las Vegas, Nevada.  These advances were completely unsecured.  USACM had no ownership in these entities and did not stand to profit in any way from these advances.

42.    The Culpable Insiders also misappropriated funds from DTDF to fund their real estate entities, to fund other entities affiliated with the Culpable Insiders, to re-pay USAIP obligations to third parties, and to repay and the Culpable Insiders' obligations to third parties.  These advances were completely unsecured and in some cases interest free.  Furthermore, these advances directly violated DTDF's various Prospectuses because the advances were not secured by an interest in real property and were made to entities affiliated with USAIP.

43.    In late 2002, Milanowski and Fogg hatched an audacious plan to conceal the Culpable Insiders' looting and other systematic abuses of DTDF.  By creating a sham loan from DTDF to a purported third party, the Culpable Insiders could simultaneously:  (a) eliminate

inevitable accounting problems posed by the extensive looting of DTDF that occurred in 2002; and (b) provide a seemingly legitimate explanation for any future looting of DTDF.

44.    Sometime prior to December 2002, Milanowski conspired with Fogg to establish 10-90 to serve as the purported "independent" borrowing entity for the sham loan, and to set up Mountain Vista to serve as an additional waypoint for funds that Milanowski intended to loot from DTDF in the future.   The Culpable Insiders used the sham 10-90 loan for several fraudulent purposes, including to eliminate evidence of the held checks and to loot DTDF.   In total, the Culpable Insiders' looted more than $55.9 million from DTDF under the guise of the 10-90 loan; $23.328 million of these monies were laundered through the 10-90 and Mountain Vista accounts. All of these transfers violated the terms of the DTDF Prospectuses, and none of these transfers benefited DTDF in any way whatsoever.

**E.    Fogg's Knowing and Substantial Assistance in the Fraudulent Scheme**

*Fogg's Introduction to USA Capital and Extensive Involvement in the Culpable Insiders' California Operations*

45.    Upon information and belief, Fogg met Hantges in 1997 when USACM originated several loans to Century Homes, Fogg's then employer.   Shortly thereafter, Hantges arranged for Fogg to become CFO of Inco Homes Corp. ("Inco").   At the time, Fogg knew that: (a) Hantges' was an officer and director of USACM; (b) Hantges served on Inco's board of directors; (c) Hantges, together with Milanowski, held approximately eleven percent (11%) of Inco's outstanding stock at the time; and (d) Hantges caused USACM to originate more than a dozen loans to Inco. Fogg therefore knew of Hantges' actual and/or potential conflict of interest in his dealings with Inco. Accordingly, from virtually the inception of Fogg's relationship with "USA Capital," Fogg was

cognizant of the Culpable Insiders' willingness to blatantly disregard the duties they owed to USACM.

46.    Fogg served as Inco's CFO from 1997 until shortly before Inco filed for bankruptcy protection in October 1999.  During this time period, Hantges called Fogg on a regular (if not nightly) basis to inquire into Inco's activities and the status of the multiple real estate projects to which USACM had originated loans.

47.    Several of these Inco projects went into default on the loans that they received from USACM.  But rather than foreclose on the underlying properties on behalf of the applicable Direct Lenders, the Culpable Insiders employed their Ponzi scheme to pay off the Direct Lenders' entire investments and then seize the properties for themselves.  In taking over some of these projects, the Culpable Insiders turned to Fogg for assistance.  For example, upon leaving Inco in 1999, Fogg oversaw the "Desert Pride" development in La Quinta, California until its completion.

48.    In connection with the Desert Pride development and other projects, Fogg worked with the Culpable Insiders in an informal business relationship as a "consultant."  In doing so, Fogg carried USA Capital business cards that described his position as "Director - California Operations," and functioned as Milanowski's right hand man, representing in a June 6, 2001 e-mail to Merrill Lynch that "Joe and I speak every day."

49.    On August 28, 2000, the Culpable Insiders created Eagle Ranch Residential, LLC ("ERR") for the purpose of developing the lots owned by Eagle Ranch, an entity which received several million dollars in advances from USACM.  Anthony Monaco and Sue Monaco (collectively, the "Monaco's") held a collective fifty percent (50%) membership interest in ERR.

ERR's manager was USA Investors II, LLC ("USA Investors II), which in turn was managed by USAIP.

50.     Upon information and belief, ERR began developing the lots that it had received from Eagle Ranch in late 2000.  As these lots were built out, Eagle Ranch conveyed additional lots to ERR as additional capital contributions.  In late 2001 and early 2002, Fogg helped the Culpable Insiders secure third-party financing for the development.

51.     As the Eagle Ranch build-out enjoyed early success, Fogg, the Monaco's, and the Culpable Insiders formed a home-building company doing business in California as Tanamera Homes.  In addition, they formed several entities to acquire and "flip" real estate for development by major homebuilders.  Typically, these entities employed the same basic structure: split ownership between USAIP and the Monaco's, and management by USA Investors II.  The Culpable Insiders, through USAIP, ultimately acquired equity ownership interests in more than a dozen such entities associated with Fogg and the Monaco's (collectively, the "Tanamera Group").  Several of these entities were funded through loans originated by USACM and/or infusions of funds looted from USACM and/or DTDF.

52.     Within the Tanamera Group, Fogg "played Joe [Milanowski]'s role," according to Anthony Monaco.  Specifically, Fogg: (a) arranged virtually all land purchases and sales; (b) arranged all construction loans from third party lenders; (c) made strategic decisions and attended virtually all meetings of the members; (d) coordinated inter-company accounting reconciliations between the various Tanamera Group entities and USAIP; (e) assisted in circulating cash across and between the various Tanamera Group entities and USAIP; (f) secured and/or drafted operating

agreements for several entities; and (g) served as a liaison between the Monaco's and the Culpable Insiders.

53.      In connection with his role in the Tanamera Group, Fogg materially assisted the Culpable Insiders in usurping corporate opportunities available to USACM.  For example, Fogg arranged and papered the transaction through which USAIP ultimately acquired its membership interest in Aware TM 30850, LLC ("Aware").  Even though USACM (not USAIP) originated two loans to Aware and was thus the entity that rightfully could and should have received the membership interest in Aware, Fogg and the Culpable Insiders diverted the corporate opportunity to USAIP.  Ultimately, USAIP received more than $10 million through this usurped investment.

54.      In late 2005, Fogg's managerial role was finally formalized by a change of USA Investor II's manager from USAIP to Twin Leaf Homes, LLC ("Twin Leaf"), an entity owned and controlled by Fogg and his cousin, Ken Rose.

55.      In addition to Fogg's Tanamera Group responsibilities, Fogg did "a lot of other running around for Joe [Milanowski]," functioning as "Joe's ears and eyes in California," according to Anthony Monaco.  Fogg left his footprint on almost every California project affiliated with USAIP and the Culpable Insiders, including: (a) the Palm Springs Marquis condo and Hotel Zoso in Palm Springs, California; (b) the Placer Vineyards development near Sacramento, California, and (c) several real estate development joint ventures formed with Richard Ashby (and affiliated entities) to develop portions of the Roripaugh Ranch, near Temecula, California.  These entities received tens of millions of dollars in loans originated by USACM; most of these loans today are in

default; some of the loans have been foreclosed on by third-party lenders. In addition, these entities received additional millions of dollars in looted funds from USACM and DTDF (through USAIP).

56. In exchange for the array of services that Fogg provided to the Culpable Insiders in connection with their vast network of California real estate entities, Builders Capital, an entity owned and controlled by Fogg, received substantial commissions. Fogg described the importance of these commissions in a June 6, 2003 e-mail to Milanowski, in which Fogg wrote:

> [T]he [L]oan side of the business pays my bills and allows me to work on your account exclusively. I would anticipate turning this over to an in-house function at some point in the future, but [I] set a 3 year term that gives me time to transition into other duties for [USA] Capital.

57. In addition, Fogg received membership interests in certain real estate entities affiliated with USAIP and the Culpable Insiders and/or the right to "participate" in deals through release fees.

*Fogg's Early Knowledge of the Culpable Insiders' Misconduct and Vast Network of Side Ventures*

58. Through his relationship with the Culpable Insiders and through arranging loans from third-party lenders to entities affiliated with the Culpable Insiders, Fogg learned of much of the Culpable Insiders' misconduct.

59. First, by mid-2001 at the latest, Fogg was aware that the Culpable Insiders' paid direct lenders interest and principal on defaulted loans, in direct violation of Nevada law. As discussed above, Fogg was aware that the Culpable Insiders' took over failed projects given that he assisted the Culpable Insiders in taking over certain failed Inco projects. Yet, in a June 2001 e-mail,

Fogg wrote: "[I]n their twelve years in business, [USA Capital has] never lost any of their investors['] money."

60.    In addition, beginning by early 2003 at the latest, Fogg routinely obtained and analyzed USAIP's general ledger trial balance in connection with securing third-party financing. A trial balance obtained by Fogg in February 2003 reflected that as of December 31, 2002, USAIP owed more than $6 million to the Collection Trust. Even though USAIP had failed to pay the interest and principal it owed into the Collection Trust, upon information and belief, Fogg knew that all of the investors whom were owed money by USAIP still received the corresponding amount of principal and interest.

61.    Second, at least as early as 2001, Fogg's dealings with the Culpable Insiders made him aware that the Culpable Insiders routinely misappropriated funds from USACM to make unsecured advances to their vast network of affiliated entities. For example, Fogg served as a consultant for Eagle Ranch (described above), which received millions of dollars from USACM in 2000 and 2001. In addition, in late 2001, Fogg sought to arrange a loan to the Tanamera Apartments, to which the Culpable Insiders had transferred millions of dollars from USACM. Upon information and belief, Fogg reviewed Tanamera Apartments' financial statements and projected cash flows in connection with the proposed refinancing, which would have indicated that the Tanamera Apartments was wholly dependent on capital infusions from USACM to stay afloat.

62.    Fogg also reviewed USAIP's trial balance as of December 31, 2002, which reflected that more than $10 million had already been transferred from USACM to USAIP. In addition, it

**ORIGINAL COMPLAINT**                                                   **Page - 19**

reflected the existence of a vast network of technology companies, real estate developments, and time-share condos and hotels to which funds had been siphoned through USAIP.

63.     Despite his extensive knowledge of the Culpable Insiders' misconduct and vast network of side businesses, Fogg remained callously indifferent.  Instead, Fogg continued to work closely with the Culpable Insiders in order to earn commissions by securing loans from third parties to the Culpable Insiders' affiliated entities.

64.     For example, in a June 5, 2003 e-mail to Milanowski, Fogg provided updated personal financial statements for Milanowski and Hantges and wrote: "[I]f you are going to e[-]mail this file to a third party, you decide whether they should have all the detail on the [USAIP] trial balance.  [T]hat entity has so many investments that it will take some time to explain."

65.     Even when the Culpable Insiders' conduct threatened USACM's solvency, Fogg's primary focus was on obtaining third-party financing and the attendant commissions he continued to earn.  For example, in a March 4, 2002 e-mail to Milanowski, Fogg wrote: "[T]he [USA] [C]ommercial net worth has declined to just over $1M.  [T]he more net worth we show the better our pricing, line limits[,] and approvals are."   In other words, so long as Fogg could earn commissions by arranging loans, he didn't care if USACM was in dire financial straights as a result of the Culpable Insiders' gross misconduct.

*Fogg's Pervasive Role in the Sham 10-90 Loan*

66.     Despite his extensive knowledge of the Culpable Insiders' misconduct and vast network of side businesses, Fogg willingly became a critical participant in a sham loan from DTDF that was designed to conceal much of the Culpable Insiders' misconduct.  Sometime prior to

December 2002, Milanowski conspired with Fogg to establish 10-90 to serve as the purported "independent" borrowing entity for the sham loan, and to set up Mountain Vista to serve as an additional waypoint for funds that Milanowski intended to loot from DTDF in the future. On December 30, 2002, Fogg wrote a gloating e-mail to Milanowski with the subject line "[F]ogg corporate empire" to inform Milanowski that Fogg had formally created 10-90 and Mountain Vista.

67. Three days later, on January 2, 2003, the Culpable Insiders commenced transferring $11.425 million from DTDF to the Investors Trust to the Collection Trust. Subsequently, the Culpable Insiders transferred more than $10 million from the Collection Trust Account back to DTDF.

68. The driving motivation behind this completely circular transaction was to eliminate the entire balance of the held checks owed to DTDF as of the end of December 31, 2002. When the Collection Trust Account finally sent funds back to DTDF, the transaction was booked as if the Collection Trust Account had merely released the held checks. This erased evidence that repayments of principal owed to DTDF had been misappropriated to fuel the Culpable Insiders' fraudulent scheme — the held checks were simply replaced on the books by a purported $11.425 million advance on the 10-90 loan.

69. With this accounting clean-up out of the way, the Culpable Insiders proceeded to loot DTDF over the course of the first few months of 2003. For example, from January 3, 2003 to March 14, 2003, the Culpable Insiders sent approximately $2 million from DTDF directly to a time-share hotel and a technology company, both of which were affiliated with the Culpable Insiders.

Each of these transfers was simply booked as a loan funding on the purported loan from DTDF to 10-90.

70.      Eventually, Fogg and Milanowski began laundering the money looted from DTDF before transferring it to USAIP and/or other the Culpable Insiders' other side businesses.  On March 7, 2003, Fogg opened bank accounts for 10-90 and Mountain Vista for this purpose.

71.      Beginning on March 17, 2003 and continuing until April 1, 2004, Fogg made substantial wire transfers within days of each other from 10-90 to Mountain Vista to USAIP, several times per month.  On November 12, 2004, the Culpable Insiders made one final wire transfer of $1 million from DTDF to 10-90.  In the aggregate, the Culpable Insiders wire transferred $23.328 million from DTDF to 10-90.  In turn, Fogg wire transferred $22.545 million from 10-90 to Mountain Vista to USAIP.  Each of these transactions is detailed in "Table A," as follows:

**Table A**

| Date of Wire from DTDF to 10-90 | Amount ($) | Date of Wire from 10-90 to Mt. Vista | Amount ($) | Date of Wire Mt. Vista to USAIP | Amount ($) |
|---|---|---|---|---|---|
| 03/17/2003 | 195,000 | 03/18/2003 | 195,000 | 03/19/2003 | 195,000 |
| 03/24/2003 | 325,000 | 03/25/2003 | 320,000 | 03/26/2003 | 320,000 |
| 03/27/2003 | 325,000 | 03/28/2003 | 320,000 | 03/28/2003 | 320,000 |
| 04/04/2003 | 200,000 | 04/08/2003 | 200,000 | 04/08/2003 | 200,000 |
| 04/15/2003 | 2,375,000 | 04/15/2003 | 2,375,000 | 04/16/2003 | 2,375,000 |
| 04/16/2003 | 605,000 | 04/16/2003 | 765,000 | 04/17/2003 | 765,000 |
| 04/16/2003 | 150,000 | | | | |
| 04/25/2003 | 783,000 | N/A | N/A | N/A | N/A |
| 04/30/2003 | 300,000 | 05/01/2003 | 300,000 | 05/02/2003 | 300,000 |
| 05/02/2003 | 125,000 | 05/06/2003 | 125,000 | 05/06/2003 | 125,000 |
| 05/09/2003 | 1,850,000 | 05/12/2003 | 1,850,000 | 05/13/2003 | 1,850,000 |
| 05/14/2003 | 395,000 | 05/15/2003 | 395,000 | 05/15/2003 | 395,000 |
| 05/22/2003 | 295,000 | 05/27/2003 | 295,000 | 05/27/2003 | 295,000 |
| 05/28/2003 | 410,000 | 05/29/2003 | 410,000 | 05/29/2003 | 410,000 |
| 06/04/2003 | 205,000 | 06/05/2003 | 205,000 | 06/05/2003 | 205,000 |
| 06/11/2003 | 460,000 | 06/12/2003 | 460,000 | 06/12/2003 | 460,000 |
| 06/18/2003 | 125,000 | 06/20/2003 | 125,000 | 06/20/2003 | 125,000 |
| 06/26/2003 | 465,000 | 06/27/2003 | 465,000 | 06/27/2003 | 465,000 |
| | | | | 07/03/2003 | 1,900,000 |
| 07/01/2003 | 2,495,000 | 07/02/2003 | 2,495,000 | 07/03/2003 | 225,000 |
| | | | | 07/10/2003 | 370,000 |
| 07/18/2003 | 800,000 | 07/21/2003 | 800,000 | 07/22/2003 | 800,000 |
| 07/31/2003 | 720,000 | 08/01/2003 | 720,000 | 08/01/2003 | 720,000 |
| 08/06/2003 | 250,000 | 08/08/2003 | 250,000 | 08/08/2003 | 250,000 |
| 08/13/2003 | 925,000 | 08/15/2003 | 925,000 | 08/18/2003 | 925,000 |
| 08/28/2003 | 500,000 | 08/29/2003 | 500,000 | 08/29/2003 | 500,000 |
| 09/04/2003 | 400,000 | 09/05/2003 | 400,000 | 09/05/2003 | 400,000 |
| 09/25/2003 | 500,000 | 09/26/2003 | 500,000 | 09/26/2003 | 500,000 |
| 10/14/2003 | 550,000 | 10/15/2003 | 550,000 | 10/15/2003 | 550,000 |
| 10/29/2003 | 560,000 | 10/29/2003 | 560,000 | 10/30/2003 | 560,000 |
| 11/06/2003 | 225,000 | 11/07/2003 | 225,000 | 11/07/2003 | 225,000 |
| 11/13/2003 | 460,000 | 11/14/2003 | 460,000 | 11/14/2003 | 460,000 |
| 11/25/2003 | 500,000 | 11/26/2003 | 500,000 | 11/26/2003 | 500,000 |
| 12/03/2003 | 315,000 | 12/05/2003 | 315,000 | 12/05/2003 | 315,000 |
| 12/12/2003 | 350,000 | 12/15/2003 | 350,000 | 12/15/2003 | 350,000 |
| 01/08/2004 | 300,000 | 01/08/2004 | 300,000 | 01/08/2004 | 300,000 |
| 01/12/2004 | 1,500,000 | 01/13/2004 | 1,500,000 | 01/13/2004 | 1,500,000 |
| 01/14/2004 | 175,000 | 01/14/2004 | 175,000 | 01/14/2004 | 175,000 |
| 01/22/2004 | 150,000 | 01/23/2004 | 150,000 | 01/26/2004 | 150,000 |
| 01/29/2004 | 150,000 | 02/02/2004 | 150,000 | 02/02/2004 | 150,000 |
| 02/09/2004 | 125,000 | 02/11/2004 | 125,000 | 02/11/2004 | 125,000 |
| 02/13/2004 | 150,000 | 02/17/2004 | 150,000 | 02/17/2004 | 150,000 |
| 03/04/2004 | 275,000 | 03/04/2004 | 275,000 | 03/05/2004 | 275,000 |
| 04/01/2004 | 365,000 | 04/05/2004 | 365,000 | 04/07/2004 | 365,000 |
| 11/12/2004 | 1,000,000 | 11/12/2004 | 1,000,000 | 11/15/2004 | 1,000,000 |

72.     On their face, these transfers made clear that 10-90 and Mountain West were simply being used as conduits to launder funds from DTDF to USAIP.  With few exceptions, funds wire transferred into each account were nearly simultaneously wire transferred out in identical amounts, often on the same day and always within a few days of the first wire transfer.  In short, there was no legitimate business purpose behind these transfers.

73.     Moreover, with the exception of routine fees collected by Wells Fargo and few isolated incidents,[1] there was absolutely no other activity in 10-90's and Mountain Vista's bank accounts aside from these wire transfers.  In fact, the daily balances within the accounts were almost always less than $1,500, except for the brief moments during which the accounts held funds en route from DTDF to USAIP.

74.     Fogg knew that the sole purpose of these transfers was to launder money from DTDF to USAIP, given the facially obvious nature of these transactions.  Fogg even e-mailed Milanowski a draft loan agreement in which the very first recital provided: "WHEREAS, [Mountain Vista] has received funding from USA Capital [Diversified] Trust Deed Fund, LLC, through 10-90, Inc., for the sole purpose of making loans to [USAIP]."

75.     Moreover, at the time the vast majority of these wire transfers were made, there was absolutely no documentation to explain the transactions.  Rather, Fogg and Milanowski only began contemplating loan documents after innocent USACM employees started asking questions.  For

---

[1] The 10-90 Account and the Mountain Vista Account were each opened with $1,000 deposits made March 7, 2003. On October 29, 2003, $1,000 was deposited into the 10-90 Account; subsequently, a check for $999 cleared the account on October 31, 2003.  Also on October 29, 2003, $2,000 was wired into the Mountain Vista Account; subsequently, checks for $700 and $299 cleared the account on October 31, 2003 and November 4, 2003, respectively.  On May 19, 2004, $2,700 was wired in and out of the Mountain Vista Account.  On June 25, 2004, $1,500,000 was transferred from the Mountain Vista Account to the 10-90 Account to DTDF.

example, on November 6, 2003, Linda Howe ("Howe") e-mailed Fogg as part of her efforts to validate USAIP's receivables and payables.   Fogg forwarded Howe's e-mail on to Milanowski, simply writing "give me a call."   Shortly thereafter, Fogg and Milanowski began contemplating loan documents and collateral assignments in an effort to cover-up their egregious misconduct.

76.     Upon information and belief, loan documents evidencing the 10-90 loans were not actually executed until sometime after August 17, 2004.  But the "original" loan documents were backdated to April 10, 2002, the time at which the Culpable Insiders began looting DTDF in earnest.  This enabled the Culpable Insiders to book much of their past looting of DTDF as mere loan fundings on the sham 10-90 loan, allowing them to conceal the true nature of these transfers.  Fogg willingly signed the back-dated loan agreements, even though he knew that 10-90 and Mountain Vista were not even created until the end of December 2002.

77.     In addition, the Culpable Insiders and Fogg executed backdated amendments to the loan documents that were inconsistent with the actual wire transfers made in and out of the 10-90 and Mountain Vista bank accounts.  Specifically, amendments back-dated to October 6, 2003 recited that the outstanding principal balance of each loan was $37,982,934.78 as of September 30, 2003.  But as of that date, only $16.178 million and $15.395 million had actually been wire transferred from DTDF to 10-90 and from 10-90 (through Mountain Vista) to USAIP, respectively.  These amendments increased the principal amount of the loans from $40 million to $75 million, essentially giving the Culpable Insiders free rein to loot additional tens of millions of dollars.

78.     As a result of these amendments, Fogg knew that certain funds looted from DTDF were being booked to the 10-90 loan, even though 10-90 never received the funds.  As such, Fogg

knew or should have known that the 10-90 loan had been used to perpetuate the Ponzi scheme by eliminating the outstanding amount of held checks payable to DTDF at the end of 2002. Nevertheless, several of the wire transfers Fogg initiated from Mountain Vista to USAIP were used to prop up the Collection Trust.  For example, on May 13, 2003, Fogg wire transferred $1.85 million from the Mountain Vista to USAIP; instantaneously, the Culpable Insiders wire transferred $1.85 million from USAIP to the Collection Trust Account.  Similarly, on January 13, 2004, Fogg wire transferred $1.5 million from 10-90 to Mountain Vista to USAIP.  From there, the Culpable Insiders wire transferred $1.5 million to the Collection Trust Account on January 15, 2004.

79.    In addition, Fogg knew that the Culpable Insiders were directly looting DTDF and transferring its funds to their vast network of side business ventures, but were fictitiously booking the looting as if the DTDF funds had been transferred to 10-90 as advances on the 10-90 loan.  Fogg knew that 10-90 had not received any funds in connection with these direct transfers, and thus that "the loan" to 10-90 was simply an artifice used to disguise the true destination of DTDF's money.

80.    Finally, Fogg knew that the looted DTDF funds that were actually laundered through 10-90 and Mountain Vista were also being used by the Culpable Insiders to fund the operations of the Culpable Insiders' side business ventures.  For example, in a January 27, 2004 e-mail to Milanowski, Fogg confirmed his knowledge that DTDF's money had been looted when he wrote: "It is my understanding that the funds have been used for Roripaugh Ranch and funding the operations of the timeshare hotel/casino that you guys own in Las Vegas."

81.    In the aggregate, the Culpable Insiders' looted more than $55.9 million from DTDF under the guise of the 10-90 loan.  Approximately $23 million of this amount was laundered

through the 10-90 and Mountain Vista accounts.  All of these transfers violated the terms of the DTDF Prospectus, and none of these transfers benefited DTDF in any way whatsoever.

82.    To the extent that Fogg signed documentation indicating that 10-90 had borrowed over $50 million from DTDF, it was an outright fraud.  In fact, there was no actual loan to 10-90, nor any legitimate purpose behind Fogg's actions.

83.    Recognizing the wrongfulness of the sham loan from DTDF to 10-90, Fogg eventually sought to extract 10-90 (and himself) as the fictitious middle man in December 2005. Specifically, Fogg executed an "Agreement for Transfer of Promissory Note" and other related transactional documents that purportedly assigned 10-90's interest in the 10-90/USAIP loan to DTDF, essentially trying to cut 10-90 out of the picture.  This document was backdated to January 1, 2005.  Despite this agreement, Fogg continued to willingly serve as Milanowski's loyal henchman.

*Fogg's Continuing Assistance*

84.    In the time period leading up to USA Capital's collapse in April 2006, Fogg's driving concern remained his ability to earn commissions, equity interests, and/or other forms of participation in exchange for obtaining financing from third-party lenders for the Culpable Insiders' side businesses.  Fogg remained completely undeterred in providing assistance to the Culpable Insiders, even after he received a copy of a recent *Las Vegas Review-Journal* article stating that USA Capital was under investigation by the Securities and Exchange Commission in May 2005.

85.    Even when questions were asked regarding the sham 10-90 loan, Fogg's focus remained on his ability to earn commissions by presenting USAIP financials in a way that would enable the Tanamera Group to obtain third-party financing.

86.    For example, on July 21, 2005, Milanowski learned that Ken Rose had stated that the "Mtn. Vista" loan reflected on USAIP's books was a scheme to "borrow money from 10-90 and funnel money back to Investment Partners for other investments." On July 22, 2005, Milanowski sent Fogg an e-mail, asking Fogg to "[h]ave a discussion with Ken." In an e-mail response the same day, Fogg wrote:

> I think it would be a good idea for ken and me (or just me, if you wish) to come to [L]as [V]egas…[I] believe we can present an expanded financial statement in a consolidating format that reflects only the southern [C]alifornia holdings in a consolidated manner and all other companies on the "equity" method. [P]lease keep in mind that USAIP is the sponsor entity that banks are looking to for their credit analysis…[W]ith our goal to expand our land development operations, it is imperative that we have a good clean sponsor with financial[] statements that we can walk through with the bank.

As a mere afterthought, Fogg wrote that he would also like to review the 10-90 loan to USAIP as well as the loan from DTDF to 10-90.

87.    Throughout the remaining summer months, Fogg continued to push for consolidated financials for USAIP. By the fall, Fogg began pushing for a more aggressive solution. In a September 21, 2005 e-mail to Milanowski, Fogg wrote:

> [USA] [I]nvestment Partners as a guarantor does not work very well due to its complex nature. [T]he assets are diverse both geographically and operationally. [T]he lack of a consolidated financial statement further adds to the uneasiness by the banks with the lack of cash. [I] urge you to consider a [C]alifornia spin-off whereby USAIP exchanges its llc interest in the southern [C]alifornia entities with a new entity.

88.    Eventually, the Culpable Insiders transferred USAIP's interests in several Tanamera Group entities to Housing Partners, LLC ("Housing Partners") by amending the entities' operating agreements.   Although the transfer did not occur until after October 11, 2005, the amended operating agreements were backdated to January 1, 2005.  This asset transfer was soon followed by Fogg becoming the effective manager of these entities.

89.    Even after USA Capital's collapse in April 2006, an unrepentant Fogg continued to seek to procure financing for several Tanamera Group entities.  But with USACM's collapse and changing market conditions in the California real estate market, USAIP no longer was effective as a "sponsor" for the projects.   Eventually, the Tanamera Group entities ceased operations. Nevertheless, on February 9, 2007, Fogg, through Builders Capital, purchased the Monaco's interest in seven separate Tanamera Group entities for one dollar.

90.    In March 2007, Fogg signed a declaration filed in support of a receivership for USAIP that was originally filed in California federal court on March 23, 2007.  Upon information and belief, this receivership was concocted by Milanowski as a means of keeping USAIP's assets outside the reach of its creditors, including USACM and DTDF and out of the jurisdiction of the bankruptcy court for the District of Nevada, where the USACM bankruptcy was being administered.  Despite Fogg's pervasive participation in the Culpable Insiders' fraud, the plethora of negative publicity surrounding the debacle, and even after being deposed by the Securities and Exchange Commission in connection with their investigation of USA Capital, Fogg remained willing to be Milanowski's stooge in supporting the sham receivership.

**ORIGINAL COMPLAINT**                                                                     **Page - 29**

91.    On April 4, 2007, the Court entered an order modifying the receivership order to allow DTDF, the USACM Trust, and another USAIP creditor to file an involuntary bankruptcy petition against USAIP.  Subsequently, on April 17, 2007, the Court entered an order removing the receivership from the Court's active list pursuant to the automatic stay provision of 11 U.S.C.A. § 362.

**F.    Plaintiffs' Substantial Damages**

92.    USACM and DTDF were substantially harmed by Fogg's wrongful acts.  Fogg's actions proximately caused USACM to suffer looting and exposure to third-party liabilities that otherwise would not have occurred, and caused DTDF to suffer massive looting.  Fogg's wrongful acts enabled, assisted, and prolonged large scale abuse and looting of USACM and DTDF by the Culpable Insiders.

93.    USACM and DTDF suffered tens of millions of dollars in damages through the Culpable Insiders' looting of USACM's general corporate bank account and of DTDF to fund USAIP and their other side business ventures.

94.    In addition, USACM and DTDF suffered tens of millions of dollars in damages through the Culpable Insiders' efforts in furtherance of their Ponzi scheme.  Specifically, USACM lost millions of dollars as a result of unremitted fees being (a) commingled with other funds in the Collection Trust and (b) then used to make prepayments of interest and principal on defaulted loans and/or otherwise misappropriated.  DTDF lost at least $18.9 million as a result of the "held checks," *i.e.* the unremitted principal and interest payments from borrowers that DTDF was owed as a result of its investments in several loans originated and serviced by USACM.

95.    The Culpable Insiders also caused USACM and DTDF to lose millions of dollars by causing them to invest in, take over, and/or assume worthless loans that were never repaid. Had the Culpable Insiders' fraudulent scheme been stopped sooner, DTDF and USACM would have saved millions of dollars by not investing in, taking over, and/or assuming these loans, several of which were to entities owned or controlled by the Culpable Insiders. USACM and DTDF could have instead used these funds to enter into legitimate loan transactions, and thereby earned a profit.

96.    In addition, both USACM and DTDF could have saved millions of dollars in losses had they sought to gain control of the real property underlying their positions in securitized loans at an earlier date. Due in large part to the recent downturn in the real estate market, many of the properties in question are selling at greatly reduced prices. Had USACM and DTDF been aware of the scheme and acted to foreclose on these properties or otherwise gain control of the collateral at an earlier date, these properties would have sold for much higher prices, resulting in a substantial increase in the recovery of assets for distribution to USACM and DTDF's creditors.

97.    USACM also lost millions of dollars as a result of lost corporate opportunities usurped by the Culpable Insiders (via USAIP). For example, USACM lost more than $10 million as a result of the Culpable Insiders' usurpation of the opportunity to invest in Aware.

98.    Finally, USACM and DTDF suffered millions of dollars in costs as a result of the substantial administrative costs of its Chapter 11 bankruptcy, which was so expensive due, in large part, to the length of time the fraud was allowed to continue.

99.    Fogg's malfeasance was not simply the *sine qua non* of USACM and DTDF's losses. Rather, as a direct, proximate result of Fogg's acts described above: (a) USACM suffered

ORIGINAL COMPLAINT                                                                Page - 31

many millions of dollars in direct losses and potentially hundreds of millions of dollars in additional damages for liabilities to third parties; and (b) DTDF suffered many millions of dollars in damages from related-party loans that were never repaid, the Culpable Insiders' looting/misappropriation of DTDF funds, and unremitted principal and interest payments.

**G.      The Culpable Insiders Acted Exclusively Adverse to Plaintiffs' Interests, But Their Innocent Stakeholders Could and Would Have Acted to Prevent the Wrongdoing.**

100.    At all relevant times, the Culpable Insiders acted exclusively adverse to Plaintiffs' interests in connection with the transactions described herein, and in each instance, the Culpable Insiders:  (a) placed their own interests ahead of USACM's and DTDF's interests; and (b) acted in their own best interests to USACM's and DTDF's detriment.

101.    The Culpable Insiders engaged in these harmful acts to perpetuate the scheme, thereby allowing them to continue to misappropriate and loot assets from USACM and DTDF.

102.    USACM and DTDF's shareholders, officers, directors, and members, as well as various Nevada and federal regulators (the "Stakeholders") were unaware and had no reason to know about the scheme.  Moreover, numerous regulatory authorities in Nevada and elsewhere stood ready, willing, and able to assist in preventing the ongoing fraud, but for the affirmative actions taken by the Culpable Insiders and Fogg to cover it up and/or mislead the authorities.

103.    DTDF had well over 1,500 investors who held membership interests.  If these investors were informed that the Culpable Insiders were misallocating and/or looting DTDF's funds, they could and would have taken action to stop the Culpable Insiders, including, but not

limited to, replacing USACRA as DTDF's manager and/or removing the Culpable Insiders. Without access to DTDF's liquidity, the Culpable Insiders' fraud would have ended much sooner.

104.    Because of the Culpable Insiders' failure to abide by their fiduciary duties and Fogg's active assistance in concealing their wrongdoing, USACM and DTDF failed to discover the Culpable Insiders' wrongdoings until USACM's and DTDF's eventual bankruptcy in April 2006. After Chief Restructuring Officers were appointed and the Culpable Insiders were removed, a thorough review of the books and records was conducted.  This review led to the discovery of the Culpable Insiders' misdeeds and ultimately to Fogg's misdeeds.

105.    At all relevant times, USACM's and DTDF's innocent Stakeholders had no knowledge of the Culpable Insiders' wrongdoing and could and would have substantially prevented or otherwise mitigated the losses that occurred had they been properly notified of the scheme and/or had Fogg not assisted in concealing the scheme.  Had the innocent Stakeholders been aware of the ongoing scheme, the Culpable Insiders' fraudulent scheme would have ended years sooner and millions would have been saved.

## V.    CAUSES OF ACTION

### A.    Aiding and Abetting Fraud

106.    Plaintiffs re-allege and fully incorporate the allegations pleaded above.

107.    The Culpable Insiders consistently and systematically defrauded DTDF and USACM out of millions of dollars.  In doing so, they exercised dominion and control over funds that they had no legal right or entitlement to, directed that the funds to be used to pay off USAIP's obligations that USAIP incurred as the result of Culpable Insiders using it as their personal "piggy

bank," and otherwise used the funds for the purposes not in the best interest of DTDF and USACM. The scheme was principally conducted through the various ways described above.

108.    Fogg knowingly and substantially assisted the Culpable Insiders in defrauding DTDF of its assets.  Specifically, Fogg created 10-90 and Mountain Vista, opened bank accounts for 10-90 and Mountain Vista, and wire transferred funds received into 10-90 from DTDF to Mountain Vista and USAIP.  Fogg knew that his actions enabled the Culpable Insiders to conceal and launder money taken from DTDF to fund USAIP.

109.    In addition, Fogg executed back-dated loan documents that concealed other diversions of DTDF assets.  Fogg knew that in addition to monies laundered directly through 10-90 and Mountain Vista, the Culpable Insiders diverted other DTDF assets for other illegitimate purposes, including perpetuating their Ponzi scheme and funding their vast network of side ventures.  Fogg was aware of his role in promoting the fraudulent scheme at the time the Culpable Insiders were diverting funds from DTDF.

110.    Fogg also knowingly and substantially assisted the Culpable Insiders' in defrauding USACM of its assets.  Specifically, Fogg perpetuated the Culpable Insiders' Ponzi scheme by: (a) assisting the Culpable Insiders in taking over projects in default; (b) executing back-dated loan documents for the sham 10-90 loan that concealed the circular $11.425 million transfer out of DTDF to eliminate the held checks at the end of 2002; and (c) wire transferring monies from 10-90 and Mountain Vista that were used to cover shortfalls in the Collection Trust and perpetuate the Ponzi scheme.  Fogg knew that the Culpable Insiders employed a Ponzi scheme given that Fogg: (a) oversaw projects that were in default on loans originated by USACM; (b) reviewed USAIP general

ledger trial balances, which reflected that USAIP owed millions of dollars to the Collection Trust; (c) represented to third parties that USACM's investors were always repaid; and (d) executed back-dated loan documents for 10-90 that included the circular $11.425 million in the outstanding balance reflected in the documents.  Fogg was aware of his role in promoting the fraudulent scheme at the time the Culpable Insiders were running a Ponzi scheme within USACM's loan servicing operations, thereby depriving USACM of its assets.

111.    USACM and DTDF had one or more innocent Stakeholders who:  (a) were not involved in the acts and omissions set forth above; (b) were not aware of the fraud committed by Hantges and Milanowski; and (c) were not aware of Fogg's substantial assistance in commission of the fraud.

112.    One or more of the innocent Stakeholders could and would have terminated or prevented the wrongful acts set forth above if they had actually known, or understood and appreciated, what Hantges and Milanowski were doing to USACM and DTDF and the true adverse impact on the Plaintiffs and their creditors.

113.    The wrongful conduct complained of herein was a direct and proximate cause of Plaintiffs' damages.

**B.    Aiding and Abetting Breaches of Fiduciary Duty**

114.    Plaintiffs re-allege and fully incorporate the allegations pleaded above.

115.    As directors and officers of USACM, USAIP and USACRA, the Culpable Insiders owed  DTDF and USACM fiduciary duties to act at all times with the utmost good faith and fair dealing in their best interests.   The Culpable Insiders collectively and individually breached

fiduciary duties owed to the USACM and DTDF by systematically looting DTDF and USACM funds, and by using monies owed to DTDF and USACM to fuel a Ponzi scheme. Their fiduciary duties required them not to engage in transactions that were in violation of DTDF prospectus and that were harmful to DTDF. The Culpable Insiders also had a fiduciary duty to not commingle funds entrusted to them in the Collection Trust and not to divert such fund for improper purposes. Finally, the Culpable Insiders had a fiduciary duty not to usurp corporate opportunities available to USACM. The Culpable Insiders' breaches of those fiduciary duties were the proximate cause of USACM's and DTDF's collapse and bankruptcy.

116.    Fogg knowingly provided substantial assistance to the Culpable Insiders in their breaches of fiduciary duties to USACM and DTDF.

117.    Specifically, Fogg created 10-90 and Mountain Vista, opened bank accounts for 10-90 and Mountain Vista, and wire transferred funds received into 10-90 from DTDF to Mountain Vista and USAIP. Fogg knew that his actions enabled the Culpable Insiders to launder money taken from DTDF to fund USAIP. In addition, Fogg executed back-dated loan documents that covered up other diversions of DTDF assets. Fogg knew that in addition to monies laundered through 10-90 and Mountain Vista, the Culpable Insiders diverted other DTDF assets for other illegitimate purposes, including perpetuating their Ponzi scheme and funding their vast network of side ventures. Fogg was aware of his role in promoting the Culpable Insiders' breaches of fiduciary duties at the time the Culpable Insiders were diverting funds from DTDF.

118.    Fogg also knowingly and substantially assisted the Culpable Insiders' in breaching fiduciary duties owed to USACM. Specifically, Fogg perpetuated the Culpable Insiders' Ponzi

scheme by: (a) assisting the Culpable Insiders in taking over projects in default; (b) executing back-dated loan documents for the sham 10-90 loan that concealed the circular $11.425 million transfer out of DTDF to eliminate the held checks at the end of 2002; and (c) wire transferring monies from 10-90 and Mountain Vista that were used to cover shortfalls in the Collection Trust and perpetuate the Ponzi scheme. Fogg knew that the Culpable Insiders employed a Ponzi scheme given that Fogg: (a) oversaw projects that were in default on loans originated by USACM; (b) reviewed USAIP general ledger trial balances which reflected that USAIP owed millions of dollars to the Collection Trust; (c) represented to third parties that USACM's investors were always repaid; and (d) executed back-dated loan documents for 10-90 that included the circular $11.425 million in the outstanding balance reflected in the documents. Fogg was aware of his role in promoting the Culpable Insiders' breaches of fiduciary duty at the time the Culpable Insiders were breaching their duties by operating a Ponzi scheme within USACM's loan servicing operations.

119.    Fogg also knowingly and substantially assisted the Culpable Insiders' in breaching fiduciary duties owed to USACM by overseeing their insider entities in California. Fogg created and served as *de facto* manager for several entities in which USAIP held an equity interest.   In connection with these projects, the Culpable Insiders breached duties owed to USACM by: (a) usurping corporate opportunities available to USACM; (b) originating insider loans to the USAIP-affiliated entities; and (c) diverting USACM assets to fund these entities. Fogg was aware of his role in promoting the Culpable Insiders' breaches at the time the Culpable Insiders were breaching their duties.

120.    Fogg's substantial assistance made it easier for the Culpable Insiders to commit their breaches of fiduciary duties.

121.    The conduct constituting breaches of fiduciary duty owed to USACM and DTDF was exclusively adverse to their interests and provided no benefit to them.

122.    Plaintiffs had one or more innocent Stakeholders who: (a) were not involved in the acts and omissions set forth above; (b) were not aware of the breaches of fiduciary duty owed by the Culpable Insiders and (c) were not aware of Fogg's substantial assistance in such breaches.

123.    Plaintiffs were directly and proximately damaged by Fogg's actions for which damages Plaintiffs now sue.

**C.    Federal RICO (18 U.S.C. §§ 1964(c) and 1962(c))**

124.    Plaintiffs re-allege and fully incorporate the allegations pleaded above.

125.    Fogg exercised control over and participated in the management and operation of 10-90 and Mountain Vista and played an extensive role in directing their affairs. Specifically, Fogg: (a) was the promoter for both 10-90 and Mountain Vista; (b) was president of both 10-90 and Mountain Vista; (c) opened bank accounts for both 10-90 and Mountain Vista; (d) signed loan documents on behalf of both 10-90 and Mountain Vista; and (e) directed wire transfers out of 10-90's and Mountain Vista's bank accounts. Fogg, as a natural person, is distinct from both 10-90 and Mountain Vista, both of which are California corporations.

126.    10-90 and Mountain Vista, together and singularly, constitute an enterprise. 10-90 and Mountain Vista are both California corporations formed by Fogg. Both 10-90 and Mountain Vista were used by Fogg and the Culpable Insiders as way points through which Fogg and the

Culpable Insiders laundered money converted, taken, stolen, and/or defrauded from DTDF.  Both 10-90 and Mountain Vista, as validly formed California corporations, had an existence beyond Fogg's and Milanowski's misconduct.

127.    Fogg's dozens of related and continuous acts in the management and operation of 10-90 and Mountain Vista constituted acts of racketeering activity, including: (a) wire fraud in violation of 18 U.S.C.A. § 1334; (b) money laundering in violation of 18 U.S.C.A. § 1956; (c) illegal monetary transactions in violation of 18 U.S.C.A. § 1957; (d) transportation of stolen property in violation of 18 U.S.C.A. § 2314; and (e) receipt of stolen property in violation of 18 U.S.C.A. § 2315.

128.    First, in conducting the operations and affairs of 10-90 and Mountain Vista, Fogg engaged in dozens of acts of wire fraud that are described in detail in "Table A" above.  Fogg conducted the operations of 10-90 and Mountain Vista as part of a scheme to defraud DTDF of its assets.  Specifically, Fogg created 10-90 and Mountain Vista, opened bank accounts for 10-90 and Mountain Vista, and wire transferred funds received into 10-90 from DTDF to Mountain Vista and to USAIP.  In addition, Fogg executed back-dated loan documents that covered up other diversions of DTDF assets.  Fogg knew that his actions enabled the Culpable Insiders to launder money defrauded from DTDF to fund USAIP, and were part of a fraud perpetrated on DTDF and its innocent Stakeholders.

129.    In furtherance of this scheme, Fogg and the Culpable Insiders made dozens of interstate wire transfers over a period of nearly two years from DTDF's bank account in Nevada, to 10-90's bank account in California, to Mountain Vista's bank account in California, and ultimately,

1  to USAIP's bank account in Nevada, as described in "Table A" above.  In addition, Fogg and the

2  Culpable Insiders transmitted the fraudulent loan documents between California and Nevada by

3  means of wire (e-mail and/or facsimile).

4

5  130.    In opening bank accounts for 10-90 and Mountain Vista, making the wire transfers

6  from 10-90 to Mountain Vista and from Mountain Vista to USAIP, and in executing fraudulent loan

7  documents, Fogg acted with the intent to defraud DTDF and its innocent Stakeholders.

8

9  131.    Second, in directing the operations and affairs of 10-90 and Mountain Vista, Fogg

10  orchestrated dozens of acts of money laundering.  Specifically, as described in "Table A," Fogg

11  made dozens of wire transfers of funds from 10-90 to Mountain Vista, and from Mountain Vista's

12  bank account in California to USAIP's bank account in Nevada.  All of these wire transfers were

13  made with the proceeds of illegal activity, namely, funds that had been illegally transferred from

14  DTDF to 10-90.

15

16  132.    Given his prominent role in this scheme, Fogg knew that the funds wire transferred

17  from DTDF to 10-90 were proceeds from illegal activity.

18

19  133.    Fogg wire transferred the looted funds from 10-90 to Mountain Vista to USAIP with

20  the intent of concealing the nature, source, or ownership of the illegal proceeds.  Specifically, these

21  transfers were made to conceal that the funds looted from DTDF and laundered through 10-90 and

22  Mountain Vista to USAIP had first originated from DTDF.

23

24  134.    Third, through directing the operations and affairs of 10-90 and Mountain Vista,

25  Fogg orchestrated dozens of monetary transactions from 10-90 and Mountain Vista that involved

26  property derived from unlawful activity.  In making the dozens of wire transfers described in "Table

A," Fogg knowingly engaged in dozens of monetary transactions.  These wire transfers each involved criminally derived funds in amounts of more than $10,000.  Specifically, each of the wire transfers involved funds that had been unlawfully transferred from DTDF to 10-90 by the Culpable Insiders in furtherance of their scheme.

135.    Fogg knew that the wire transfers from 10-90 to Mountain Vista and from Mountain Vista to USAIP involved criminally derived property.  Specifically, he knew that the funds wire transferred into 10-90's bank account had been unlawfully taken from DTDF by the Culpable Insiders.

136.    Fourth, through directing the affairs of 10-90 and Mountain Vista, Fogg repeatedly transferred stolen funds in violation of 18 U.S.C.A. § 2314.  As described in "Table A," Fogg repeatedly wire transferred money in the amount of more than $5,000 from 10-90 to Mountain Vista to USAIP.  These wire transfers involved interstate commerce, as 10-90's bank account was maintained in California whereas USAIP's bank account was maintained in Nevada.

137.    Fogg knew that these wire transfers involved funds that had been stolen, converted, and/or taken by fraud.  Specifically, Fogg knew that the Culpable Insiders had stolen, converted, and/or taken by fraud funds from DTDF when they made the numerous wire transfers from DTDF to 10-90.

138.    Finally, through directing the operations and affairs of 10-90 and Mountain Vista, Fogg repeatedly caused 10-90 and Mountain Vista to receive stolen funds in violation of 18 U.S.C.A. § 2315.  As described in "Table A," 10-90 and Mountain Vista repeatedly received amounts of money in excess of $5,000.  The amounts that were transferred to 10-90 crossed state

lines, as DTDF's bank account was maintained in Nevada, whereas 10-90's bank account was maintained in California. In addition, all funds that 10-90 and Mountain Vista received had been stolen, unlawfully converted, or taken from DTDF by the Culpable Insiders.

139.    Fogg knew that the funds received by 10-90 and Mountain Vista had been stolen, unlawfully converted, or taken from DTDF.

140.    The dozens of predicate acts described in paragraphs 127 to 139 constitute a pattern of racketeering activity. All of the predicate acts were related to the general scheme to defraud DTDF and its innocent Stakeholders, to loot DTDF, and to conceal past, ongoing, and intended future looting of DTDF. Moreover, the predicate acts described in paragraphs 127 to 139 were part of a continuous pattern of misconduct that occurred over a period of nearly two years.

141.    Fogg's conduct in operating 10-90 and Mountain Vista through the pattern of racketeering activity described herein caused injury to DTDF's business or property. Specifically, DTDF suffered a concrete financial loss by being wrongfully deprived of: (a) the $23.328 million that was laundered through 10-90 directly, and (b) an additional sum in excess of $30 million that was transferred to the Culpable Insiders' side ventures and concealed from DTDF's innocent stakeholders by being booked as advances on the sham loan from DTDF to 10-90. This injury to DTDF was proximately caused by Fogg's conduct in operating 10-90 and Mountain Vista through the pattern of racketeering activity described herein.

142.    Pursuant to 18 U.S.C.A. § 1964(c), DTDF seeks treble damages and costs of suit, including reasonable attorneys' fees.

**D.    Liability of Receiver of Stolen Property (NRS 41.580)**

143.    Plaintiffs re-allege and fully incorporate the allegations pleaded above.

144.    Through the egregious misconduct described above, the Culpable Insiders took more than $23 million from DTDF by theft and/or other offense(s) constituting a crime against property.

145.    Fogg, through his sole ownership and control of 10-90 and Mountain Vista, received and possessed all or a portion of the more than $23 million taken from DTDF.

146.    Fogg, through his sole ownership and control 10-90 and Mountain Vista, received and possessed all or a portion of the more than $23 million taken from DTDF: (a) knowing that the Culpable Insiders misappropriated it from DTDF by theft and/or other offense(s) that constitute a crime against property; or (b) under such circumstances as should have caused a reasonable person to know that the Culpable Insiders misappropriated it from DTDF by theft and/or other offense(s) that constitute a crime against property.

147.    Pursuant to NRS 41.580, DTDF seeks treble damages and costs of suit, including reasonable attorneys' fees.

**E.    Avoidance of Indemnification and Release (11 U.S.C.A. § 548(a)(1)(A))**

148.    Plaintiffs re-allege and fully incorporate the allegations pleaded above.

149.    The Agreement for Transfer of Promissory Note, discussed above, contains certain release and indemnification provisions given by Milanowski, purportedly signing on behalf of DTDF, in favor of Fogg (collectively the "Indemnification and Release").

150.    Only if the Court determines as a matter of law that the purported Indemnification and Release was enforceable and valid, DTDF seeks to avoid the Indemnification and Release under 11 U.S.C.A. § 548(a)(1)(A).

<u>**ORIGINAL COMPLAINT**</u>                                                                  **Page - 43**

151. The Indemnification and Release was an obligation purportedly incurred by DTDF.

152. The Indemnification and Release was an obligation purportedly incurred within one year of the Petition Date.

153. The Indemnification and Release was made with the intent to hinder, delay, or defraud entities to which DTDF was or became indebted to on or after the date the obligation was incurred. Specifically, Milanowski gave the Indemnification and Release with the intent of hindering DTDF and its creditors from recovering damages from Fogg for his egregious misconduct in knowingly and substantially assisting the Culpable Insiders' fraud.

154. Pursuant to 11 U.S.C.A. § 548(a)(1)(A), the Trust asks this Court to avoid the Indemnification and Release.

F. **Avoidance of Release and Indemnification (11 U.S.C.A. § 544 and NRS 112.180(1)(a))**

155. Plaintiffs re-allege and fully incorporate the allegations pleaded above.

156. Only if the Court determines as a matter of law that the purported Indemnification and Release was enforceable and valid, DTDF seeks to avoid the Indemnification and Release under 11 U.S.C. § 544 and NRS 112.180(1)(a).

157. The Indemnification and Release was an obligation purportedly incurred by DTDF.

158. The Indemnification and Release was an obligation purportedly incurred within four years of the Petition Date.

159. On the date of the purported Indemnification and Release, there were creditors with allowed unsecured claims who could have avoided the Indemnification and Release pursuant to Nevada state law.

<u>ORIGINAL COMPLAINT</u>                                                                 **Page - 44**

160.    Milanowski, purportedly acting on behalf of DTDF, made the purported Indemnification and Release with the actual intent to hinder, delay, or defraud creditors of DTDF.

161.    Accordingly, the purported Indemnification and Release is fraudulent and may be avoided under NRS 112.180(1)(a).

162.    Pursuant to 11 U.S.C. § 544(b), DTDF asks the Court to avoid the purported Indemnification and Release under applicable state law.

**WHEREFORE,** Plaintiffs respectfully request that a judgment be entered on Plaintiffs' behalf against Fogg for the following:

a.    actual, compensatory, consequential, and all other damages in an amount in excess of $60 million (to be quantified later in these proceedings);

b.    treble damages under 18 U.S.C.A. § 1964(c) and NRS 41.580;

c.    pre-judgment and post-judgment interest at the highest rate allowed by law;

d.    attorneys' fees and costs;

e.    avoidance of the Indemnification and Release; and

f.    any and all such further relief to which Plaintiffs are entitled at law and in equity.


Dated:  July 15, 2008

| | |
|---|---|
| **DIAMOND MCCARTHY LLP** | **LEWIS AND ROCA LLP** |
| By: ___/s/ Eric D. Madden___ | By: ___/s/ Rob Charles___ |
| William T. Reid, IV, TX 00788817 (pro hac vice) | Rob Charles, NV 6593 |
| 6504 Bridge Point Parkway, Suite 400 | 3993 Howard Hughes Parkway, Suite 600 |
| Austin, Texas 78730 | Las Vegas, Nevada  89169-5996 |
| (512) 617-5200 (telephone) | (702) 949-8321 (telephone) |
| (512) 617-5299 (facsimile) | (702) 949-8320 (facsimile) |
| | |
| Allan B. Diamond, TX 05801800 (pro hac vice) | *Counsel for USACM Liquidating Trust* |
| Michael Yoder, TX 24056572 (pro hac vice) | |
| 909 Fannin, Suite 1500 | |
| Houston, Texas 77010 | |
| (713) 333-5100 (telephone) | |
| (713) 333-5199 (facsimile) | |
| | |
| Eric D. Madden, TX 24013079 (pro hac vice) | |
| 1201 Elm Street, 34th Floor | |
| Dallas, Texas 75270 | |
| (214) 389-5300 (telephone) | |
| (214) 389-5399 (facsimile) | |
| | |
| *Special Litigation Counsel for USACM Liquidating Trust and USA Capital Diversified Trust Deed Fund* | |