E-filed: August 20, 2008

Marc A. Levinson (California Bar No. 57613)
Jeffery D. Hermann (California Bar No. 90445)
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, California 95814-4497
Telephone: (916) 447-9200
Facsimile: (916) 329-4900
Email: malevinson@orrick.com
       jhermann@orrick.com

Robert Kinas (Nevada Bar No. 6019)
Claire Dossier (Nevada Bar No. 10030)
SNELL & WILMER LLP
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
Telephone: (702) 784-5200
Fax: (702) 784-5252
Email: rkinas@swlaw.com
       cdossier@swlaw.com

*ATTORNEYS FOR USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br><br>USA CAPITAL REALTY ADVISORS, LLC,<br><br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br><br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br><br>USA SECURITIES, LLC,<br>         Debtors | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR<br><br>Chapter Number: 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| Affects:<br>☐ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☒ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA First Trust Deed Fund, LLC | **USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC'S FIFTH QUARTERLY REPORT** |

**POST-EFFECTIVE DATE USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC's FIFTH REPORT OF ACTION TAKEN AND PROGRESS TOWARDS CONSUMMATION OF CONFIRMED PLAN OF REORGANIZATION**

Post-Effective Date USA Capital Diversified Trust Deed Fund, LLC ("Diversified" or "Revested Debtor"), a revested debtor in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), by and through its counsel noted above, hereby submits this Fifth Report of Action Taken and Progress Towards Consummation of Confirmed Plan of Reorganization (the "Fifth Report"), pursuant to the Court's "Order Confirming the 'Debtors' Third Amended Joint Chapter 11 Plan of Reorganization,' as Modified Herein" [Docket No. 2376] (the "Confirmation

8865016.3

Order") entered January 8, 2007. *See* Confirmation Order, ¶ 74. The Debtors' Third Amended Joint Chapter 11 Plan of Reorganization (the "Plan") went effective on March 12, 2007 (the "Effective Date").

This Fifth Report is for the period from March 14, 2008 through June 12, 2008. This Fifth Report incorporates the requirements and structure of former Rule 3020(a) of the Court's Local Rules of Bankruptcy Practice, abrogated in May 2006, which were as follows:

(A) **A schedule of personal property costing more than $5,000 and any real property acquired, sold or disposed of and the price paid for each:**

| | |
|---|---|
| Personal property costing more than $5,000: | None. |
| Real property acquired, sold or disposed of: | None. |
| Total: | $0.00 |

(B) **A schedule listing each debt, the total amount required to be paid under the Plan, the amount required to be paid to date, the amount actually paid to date, and the amount unpaid:**

Due to the nature of its operations as an investment fund with contracted services through intercompany debtor entities and no employees, Diversified had only a relatively small number of claims filed against it in the Chapter 11 Cases. Such claims included general unsecured claims (many of which were misfiled as creditor claims by holders of equity interests in Diversified) and administrative expense claims related to professional fees accrued during the Chapter 11 Cases.

(C) **A schedule of executory contracts entered into:**

Pursuant to the Plan, Diversified entered into agreements, as of March 13, 2007, retaining professionals to provide legal and financial advisory services necessary to conduct Diversified's affairs. Those agreements are detailed in previous quarterly reports filed with the Court. In addition, Diversified retained Diamond McCarthy LLP as litigation counsel on or about April 9, 2008. On or about June 11, 2008, Diversified retained Christopher Nolland as special settlement and negotiations counsel.

(D) **A statement listing each postpetition tax (i.e., income, payroll, property, sales), payee, and the amount actually paid:**

| | |
|---|---|
| Federal Unemployment taxes: | None. |
| Federal Payroll taxes: | None. |
| Nevada Unemployment taxes: | None. |
| Total: | $0.00 |

(E) **Progress toward completion of the Plan and a list and status of any pending adversary proceedings or motions and resolutions expected:**

1. **General Progress**

The major terms of the Plan with respect to Diversified have all been accomplished. The Operating Agreement of Diversified has been amended, USA Capital First Trust Deed Fund, LLC has made certain payments and assignments to Diversified, and Diversified is operating in the post-confirmation realm.

On May 19, 2008, Chairman of the Board Robert Worthen issued a letter (the "May Letter") updating investors on the general progress Diversified has made. A copy of the May Letter is attached hereto as Exhibit A. The May Letter provides a summary of the events leading up to and following Diversified's bankruptcy. The May Letter also addresses the recent United States Securities & Exchange Commission civil complaint against Joseph D. Milanowski, and the effect of the failing subprime mortgage industry on Diversified's recovery efforts. *See* Exhibit A.

2. **Nondischargeability Complaint – In re Thomas A. Hantges**

On February 11, 2008, Diversified filed a nondischargeability complaint (the "Hantges Dischargeability Complaint") in the Thomas A. Hantges bankruptcy proceeding. [Docket No. 527 in Bankruptcy Case No. 07-13163; Adversary Case No. 08-01041]. The Hantges Dischargeability Complaint alleges that Mr. Hantges' debts to Diversified should not be discharged under 11 U.S.C. § 523 because Mr. Hantges (1) obtained money and property from Diversified through false pretenses, false representations, and/or actual fraud, (2) Mr. Hantges misappropriated Diversified's

8865016.3

- 3 -

money and property while acting in a fiduciary capacity towards Diversified, and (3) Mr. Hantges obtained Diversified's money and property by means of willful and malicious injury and/or reckless disregard to Diversified. The Hantges Dischargeability Complaint seeks a determination that all of Mr. Hantges' debts to Diversified are non-dischargeable, and a judgment for Diversified in an amount not less than $149,555,735.

Mr. Hantges filed an Answer on March 31, 2008 [Docket No. 8 in Adversary Case No. 08-01041], and a scheduling conference between the parties was held on May 25, 2008 [Docket No. 3 in Adversary Case No. 08-01041]. On August 26, 2008, the Court will hold a scheduling conference, during which Mr. Hantges and Diversified will advise the Court of the status of discovery. [Docket No. 4 in Adversary Case No. 08-01041].

### 3. Nondischargeability Complaint – In re Joseph D. Milanowski

On March 28, 2008, Diversified filed a nondischargeability complaint (the "Milanowski Dischargeability Complaint") in the Joseph D. Milanowski bankruptcy proceeding. [Docket No. 416 in Bankruptcy Case No. 07-13162; Adversary Case No. 08-01090]. The Milanowski Dischargeability Complaint alleges that Mr. Milanowski's debts to Diversified should not be discharged under 11 U.S.C. § 523 because Mr. Milanowski (1) obtained money and property from Diversified through false pretenses, false representations, and/or actual fraud, (2) Mr. Milanowski misappropriated Diversified's money and property while acting in a fiduciary capacity towards Diversified, and (3) Mr. Milanowski obtained Diversified's money and property by means of willful and malicious injury and/or reckless disregard to Diversified. The Milanowski Dischargeability Complaint seeks a determination that all of Mr. Milanowski's debts to Diversified are non-dischargeable, and a judgment for Diversified in an amount not less than $149,555,735. Mr. Milanowski filed an Answer [Docket No. 7 in Adversary Case No. 08-01090] on June 30, 2008. The Court has set a Scheduling Conference for August 26, 2008 [Docket No. 9 in Adversary Case No. 08-01090].

### 4. The McGimsey Adversary Proceeding

On September 24, 2007, Diversified filed an adversary proceeding [Docket No. 4864 in Bankruptcy Case No. 06-10725, Adversary Case No. 07-01165] (the "McGimsey Adversary") requesting subordination of the proof of claim filed by Jerry McGimsey and other members of the McGimsey family (the "McGimsey Claimants") pursuant to 11 U.S.C. § 510(b). The McGimsey Claimants had appealed the Court's February 14, 2007 order disallowing their claims [Docket No. 2765] to the Ninth Circuit Court of Appeals Bankruptcy Appellate Panel (the "BAP"). The BAP reversed the Court's disallowance of the McGimsey Claimants' claims on August 15, 2007 [Docket No. 4726]. The McGimsey Adversary determined whether the McGimsey Claimants' proof of claim must be subordinated.

The McGimsey Adversary went to trial on May 8, 2008. After oral argument by both Diversified and the McGimsey Claimants, the Court found in favor of Diversified. On June 16, 2008, the Court entered its Amended Judgment Subordinating Claims Under Bankruptcy Code § 510(b) [Docket No. 40] (the "Judgment"). The Judgment provides that the McGimsey Claimants' proofs of claims are subordinated below equity. Accordingly, Diversified may make distributions to its investors without holding back funds on account of the McGimsey Claimants.

### 5. Rule 2004 Examinations

Diversified requested examination of various entities and individuals pursuant to Federal Rule of Bankruptcy Procedure 2004. On March 11, 2008, the Court entered orders permitting the Rule 2004 examinations of the following: Stein & Lubin, LLP [Docket No. 5963]; Robert Russell [Docket No. 5960]; Russell AD Development Group, LLC [Docket No. 5959]; Unser / Central Partners, LLP [Docket No. 5958]; Interstate Commerce Center, LLC [Docket No. 5961], and AD Albuquerque Development LLC [Docket No. 5962].

Diversified has been informally provided with documents from the above-referenced entities, and has not yet taken a formal Rule 2004 examination of them.

### 6. New Complaints Filed

Diversified and USACM have filed a number of complaints to recover assets through their litigation counsel, Diamond McCarthy LLP.

- *USACM Liquidating Trust and USA Capital Diversified Trust Deed Fund, LLC v. Deloitte & Touche, LLP and Victoria Loob (Case No. 08-00461)*: This Complaint was filed in United States District Court, District of Nevada, on April 11, 2008. It contains claims by Diversified against Deloitte & Touche, LLP for Aiding and Abetting/Participation in Breaches of Fiduciary Duty. It also contains claims by Diversified against Ms. Loob for Aiding and Abetting/Participation in Breaches of Fiduciary Duty, and for Conversion. Deloitte & Touche, LLP has filed a motion to dismiss [Docket No. 22], and the USACM/Diversified response is due August 15, 2008. A scheduling conference is set for August 26, 2008.

- *USA Capital Diversified Trust Deed Fund LLC v. Stanley E. Fulton (Adversary Case No. 08-01132)*: This Complaint was filed as an adversary proceeding in Jointly Administered Bankruptcy Case No. 06-10725 on April 11, 2008. It contains fraudulent transfer, unjust enrichment, and NRS 41.580 claims against Mr. Fulton based on his involvement in several loans, including the "Camino Al Norte," "Sheraton Hotel," "Double Diamond Ranch/Reno," "Mason Goodrich Land," and "Amblamo-The View" loans. See Complaint, at ¶ 23. Defendant answered on June 30, 2008 [Docket No. 8]. A scheduling conference is set for August 26, 2008.

- *USAC Liquidating Trust and USA Capital Diversified Trust Deed Fund, LLC v. Mary Petersen, individually and as Trustee of the Mary Petersen Family Trust Dtd 8/12/98; Michael Petersen individually and as Trustee of the Michael D. Petersen Family Trust Dtd 8/12/98; Kathryn Petersen individually and as Trustee of the Kathryn L. Petersen Living Trust and the KLP Trust Dtd 7/15/99 (Adversary Case No. 08-01134)*: This Complaint was filed as an adversary proceeding in Jointly Administered Bankruptcy Case No. 06-10725 on April 12, 2008. It contains fraudulent transfer, unjust enrichment, aiding and abetting breach of fiduciary duty, and NRS 41.580 claims against the defendants related to the preferential treatment they received from the "Culpable Insiders," as defined in the Complaint. On June 30, 2008 the defendants answered. A scheduling conference is set for August 26, 2008.

- *USA Capital Diversified Trust Deed Fund v. Kathryn L. Petersen, individually and as Trustee of the Kathryn L. Petersen Living Trust and Trustee of KLP Trust Dtd 7/15/99 and Specialized Development Tahoe, LLC (Adversary Case No. 08-01133)*: This Complaint was filed as an adversary proceeding in Jointly Administered Bankruptcy Case No. 06-10725 on April 12, 2008. It contains fraudulent transfer, unjust enrichment claims against the defendants related to certain wire transfers detailed in paragraphs 23 – 31 of the Complaint. Defendants answered on June 30, 2008, and a scheduling conference is set for August 26, 2008.

- *USACM Liquidating Trust, USA Capital Diversified Trust Deed Fund, LLC, and USA Capital First Trust Deed Fund, LLC v. Wells Fargo Bank, N.A. (Adversary Case No. 08-01135)*: This Complaint was filed as an adversary proceeding in Jointly Administered Bankruptcy Case No. 06-10725 on April 12, 2008. It includes claims against Wells Fargo Bank, N.A. for Aiding and Abetting/Participating in Breaches of Fiduciary Duty, and for Negligence. Wells

Fargo Bank, N.A. filed a motion to dismiss [Docket No. 8], and plaintiffs filed a response on July 21, 2008 [Docket No. 18]. Wells Fargo Bank, N.A.'s reply is due August 13, 2008. A scheduling conference is set for August 26, 2008.

- *USACM Liquidating Trust and USA Capital Diversified Trust Deed Fund, LLC v. Beadle, McBride, Evans & Reeves LLP, Reeves, Evans, McBride & Zhang, LLP, TG McBride CPA Ltd., and T. Garth McBride (Adversary Case No. 08-01134)*: This Complaint was filed as an adversary proceeding in Jointly Administered Bankruptcy Case No. 06-10725 on May 16, 2008. It contains claims by Diversified against the defendants for Aiding and Abetting/Participation in Breaches of Fiduciary Duty, Accounting Malpractice/Professional Negligence, and Breach of Contract. On July 18, 2008, the parties entered a stipulation to extend the defendants' deadline to answer until September 18, 2008, and noted that "[t]he Parties have reached a tentative settlement of this action and are continuing their dialogue in order to finalize the settlement terms." *See* Stipulation to Extend Deadline to Respond to Complaint [Docket No. 16], at ¶ 3. A scheduling conference is set for September 24, 2008.

### 7. Court Disallows Reale Claim

Salvatore J. Reale filed a proof of claim against Diversified for $4,869,310.57 (the "Reale Proof of Claim") on or about September 17, 2007. Diversified objected to the Reale Proof of Claim, and on March 20, 2008 the Court disallowed the Reale Proof of Claim in its Entirety. *See* Order Disallowing Proof of Claim of Salvatore J. Reale [Docket No. 126 in Case No. 06-10727].

**(F)** **A statement regarding the status of payment of UST quarterly fees:**

All UST fees have been paid in full through June 12, 2008, the final date covered by this Fourth Report.

Dated this 18th day of August, 2008.

SNELL & WILMER L.L.P.

By: _____
Robert R. Kinas (Nevada Bar No. 6019)
Claire Y. Dossier (Nevada Bar No. 10030)
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169

And

ORRICK, HERRINGTON & SUTCLUFFE LLP
Marc A. Levinson
Jeffery D. Hermann
400 Capitol Mall, Suite 3000
Sacramento, California 95814-4497
*Attorneys for USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC*

# EXHIBIT A

# EXHIBIT A

4128525.1

# USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC ("DTDF")
Robert G. Worthen, Chairman of the Board

May 19, 2008

Dear DTDF Investor,

Previous DTDF newsletters have been detailed and lengthy, reviewing each significant loan and its underlying collateral, if any, and describing claims against third parties. Those letters represent "legal and complete disclosure," and the attorneys and financial advisors representing DTDF and its investors did much of the drafting. The professionals had far less of a role in the drafting of this letter, which I write on behalf of the Board in an attempt to boil down the events of the past several years in a concise narrative, and to discuss the future in plain and simple language.

USA Commercial Mortgage Company ("USA") and all its related entities were participants in a fraud perpetrated by Joseph Milanowski and Thomas Hantges, which fraud could not have been conducted without active and passive participation by numerous third parties (such as accountants, attorneys, some borrowers, some lenders, and even banks). At the time of the USA bankruptcy filing on April 13, 2006, this fraud had been ongoing for years.

After the USA chapter 11 filing, Mesirow Financial Consulting operated USA and its affiliates, including DTDF, charged with sorting out the numerous USA entities, reconstructing records for these entities, and identifying, preserving, and recovering investor assets under Bankruptcy Court supervision.

DTDF was the most abused and defrauded of the various USA entities, and its mix of assets the most complicated. Unfortunately for DTDF and its investors, the primary focus of the Mesirow efforts was on record restoration of all USA entities, in collecting payments on individual USA loans which were not in default (and were being repaid by the borrowers in a timely manner), and in attempting to sell the USA entities. Due to the prebankruptcy actions of and investments by its former managers, though, DTDF was not an attractive target and no potential buyer was interested in making an offer.

A reorganization plan for all USA entities was approved by an order filed in January 2007, and on the effective date of the plan in mid-March, Mesirow departed, and the former committee of DTDF equity holders was replaced by a newly-constituted DTDF Board of Directors, charged in the revised operating agreement with sorting out the mess. The Board and DTDF's professionals took immediate action, in no small part because prior efforts on behalf of DTDF investors had been virtually nonexistent under Mesirow.

Among the prebankruptcy actions most damaging to DTDF was the diversion by Milanowski/Hantges of more than $80,000,000, which they used in ventures and schemes for their own benefit through various related entities. DTDF, through its Committee counsel, had long maintained to the Bankruptcy Court that Milanowski/Hantges violated securities and other laws in connection with their use of DTDF funds. Recently, the Unites States Securities &

Exchange Commission filed a civil complaint against Milanowski, claiming that many of Milanowski's actions contradicted representations in a DTDF Prospectus and violated securities law. For example, the SEC complaint (like DTDF Committee pleadings filed in the summer of 2006) alleged that not all DTDF loans were secured by first deeds of trust, and that some DTDF loans were made with unclear or unenforceable terms and/or no underlying real estate collateral – all contrary to the promises made in the Prospectus.

To make matters worse for DTDF investors, since the April 2006 bankruptcy filing, DTDF collateral and prospects for recovery have been rocked by the failing subprime mortgage industry, taking down many legitimate borrowers and eroding the value of virtually all underlying DTDF collateral. Unfortunately, the prospects for recovery on the DTDF loans were doubly exposed to a declining real estate market, whereas if the promises of the Prospectus had been fulfilled and DTDF monies were invested in first deeds of trust against income-producing real property with appraisals that demonstrated a conservative loan to value ratio, the DTDF loans would have been relatively immune to the downturn in the real estate market. This dynamic is explained in more detail in the addendum to this letter, which addendum in not included in this letter because it was drafted by DTDF attorneys.

Prospects for significant future recovery now lie with the pursuit of legal claims against Milanowski/Hantges, and those persons and entities that aided and abetted them. The only certainty in these claims is that resolution will take a long time, particularly in light of the fact that Milanowski, Hantges and various of their related companies have been thrown into involuntary bankruptcy cases (with DTDF serving as one of the petitioning creditors). Outcomes are always uncertain in litigation, but the DTDF cause is clear and just.

There is no way to estimate what will be recovered in the future. The small return of approximately 2% of principal to DTDF investors in January, 2008 has frustrated everyone. Future DTDF distributions are expected, but direct recovery is unknown as to how much and when.

DTDF has managed to avoid being responsible for much of the costs in this prolonged litigation by joining with other USA entities under a negotiated agreement. Under the agreement, from this point forward, USA entities other than DTDF have agreed to bear most litigation costs in pursuit of DTDF recovery.

DTDF and the Board also have paid attention to reducing related professional fees since the Board was constituted after DTDF emerged from bankruptcy, and will continue to look for ways to minimize costs. Board Members have a direct stake in maximizing recovery, as each is a DTDF investor.

Many of you have asked about the lack of criminal charges against Milanowski/Hantges. Even though we are pleased that the SEC finally sued Milanowski, everyone on the Board is somewhat mystified by the lack of government action during the past two years. Unfortunately, there is nothing DTDF can do to force the SEC, the U.S. Department of Justice, the Nevada Attorney General or the Clark County District Attorney to file criminal actions against Hantges or Milanowski.

If you have access to the DTDF Website, you can review the SEC complaint filed against Milanowski. You can also review other filings and all previous DTDF Investor letters which contain much detail regarding DTDF loans, collateral, and recovery status. The website may be found by typing http://usacapdtdf.bmcgroup.com/default.aspx into the browser screen at the top of your monitor. I am available to DTDF Investors by telephone; my personal cell phone number is (702) 239-4222.

Best Regards,
Robert G. Worthen
Chairman of the Board


ADDENDUM:

One of the sad realities about the DTDF "loans" (in quotes because some of the DTDF loans are really just speculative investments made by Milanowski and Hantges in their own real estate development business that were later clothed in the documentation of loans, but bearing none of the attributes of a normal loan) is that such "loans" were used to fund the acquisition by USA Investment Partners ("USAIP") of equity interests in real estate development entities (too often involving only raw land). Such development entities purchased land, sought to entitle the land for residential development (or commercial development in the case of Colt Gateway), and to thereafter build homes on the land (or commercial buildings in the case of Colt Gateway). Obviously, such entities did not generate monthly rental income necessary for the payment of monthly interest or dividend payments to DTDF investors, as promised by the DTDF Prospectus. Typically, the real estate development entities borrowed money to finance their activities; in several cases such entities borrowed money from USA Capital direct lenders. So the investments of the development companies were "leveraged" by virtue of such real property secured loans from third party lenders or related USA Capital direct lenders.

The investments in raw land of the development companies were leveraged by another factor - the red hot real estate market - in the following manner. The prices paid for developable land became a function of how much profit could be made by selling residential homes at retail, deducting the costs of entitlement, construction and marketing and reducing the future profit to present value. For example, a property owned by a third party and USAIP purchased for approximately $15mm (financed by a USA Capital Direct Lender loan in the amount of $10mm) soared in value as the red hot real estate market telegraphed that greater and greater profits could be made selling the homes to be built on the property.

Thus, if the price of homes increased by 10%, that may have had a major positive impact upon the value of the land, since a 10% increase in the retail sales price of the homes may constitute, say, a 40% increase in the profit margin which ripples back through the calculation of the value of the land. Conversely, a 10% decrease in the price of the homes could reduce the value of the land to a much greater extent, in the above example, by 40%. Thus, the value of the USAIP investments in development entities was greatly leveraged to the prices of homes in the residential real estate market.

So with the acquisition debt, these USAIP investments (and DTDF's collateral for the 10-90 loan) were "doubly leveraged". This is the antithesis of secured lending wherein the secured lender seeks to be insulated from any such swing in the business fortunes of the borrower and seeks to be in a position to be paid in full regardless of the fortunes of the borrower or the vacillations in the market in which the borrower operates.

Stated another way, not only did the DTDF "loans" depart from the standards for such loans set forth in the Prospectus, the DTDF "loans" funded wildly speculative bets that the then red hot real estate market would continue on its upward trajectory. Such wildly speculative bets would have paid outsized returns (to USAIP) had the market continued its hot streak, but the prospects for losing most or even all of the money invested by USAIP (and "loaned" to USAIP by DTDF) were unusually high. High reward, high risk.

Continuing with the example above, the third party and USAIP had received an offer of approximately $60mm for the property from a developer that owned the adjoining parcel. At that time the direct lender loan had increased by several million dollars since no debt service was being paid, but a $60mm sale would have generated something on the order of $40mm in profit, $20mm or so of which would have come back to USAIP to pay down the 10-90 Loan (income taxes would have reduced the numbers obviously). The third party/USAIP rejected the offer on the rationale that the property (purchased for a mere $15mm or so) was worth over $100mm on a bad day.

As the prices that could be realized for homes built upon the property decreased, the value of the real estate decreased, while the balance on the $10mm USA Capital Direct Lender loan increased. Eventually, despite our efforts to salvage some value out of the property by filing it into its own chapter 11 case, the loan was declared to be in default and the property was foreclosed for the amount of the USA Capital Direct Lender debt just over $20mm.

Because the DTDF portfolio of "loans" largely fell into this category of funding USAIP investments in speculative development entities, the decrease in the expected recoveries on the DTDF loans as a result of the declining real estate market have fallen dramatically while the expected recovery on the Direct Lender loans that remain unpaid may have not fallen as much.

Thus, the decline in the real estate market has had a disproportionate impact upon the ability of DTDF to collect its "loans".