**DIAMOND MCCARTHY LLP**
909 Fannin, Suite 1500
Houston, Texas 77010
Telephone (713) 333-5100
Facsimile (713) 333-5199

Allan B. Diamond, TX State Bar No. 05801800
Email:  adiamond@diamondmccarthy.com
Eric D. Madden, TX State Bar No. 24013079
Email:  emadden@diamondmccarthy.com

Special Litigation Counsel for USACM Liquidating USACM Trust

**LEWIS AND ROCA LLP**
3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169-5996
Telephone (702) 949-8320
Facsimile  (702) 949-8321

Rob Charles, NV State Bar No. 006593
Email: rcharles@lrlaw.com

Counsel for USACM Liquidating USACM Trust

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br><br>Debtor. | Case Nos.:<br>BK-S-06-10725-LBR<br>BK-S-06-10726-LBR<br>BK-S-06-10727-LBR<br>BK-S-06-10728-LBR<br>BK-S-06-10729-LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br><br>Debtor. | |
| In re:<br>USA CAPITAL DIVERSIFIED USACM TRUST DEED FUND, LLC,<br><br>Debtor. | JOINTLY ADMINISTERED<br>Chapter 11 Cases<br><br>Judge Linda B. Riegle |
| In re:<br>USA CAPITAL FIRST USACM TRUST DEED FUND, LLC,<br><br>Debtor. | |
| In re:<br>USA SECURITIES, LLC,<br><br>Debtor. | |
| Affects:<br>☐ All Debtors<br>☒ USA Commercial Mortgage Company<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified USACM Trust Deed Fund, LLC<br>☐ USA Capital First USACM Trust Deed Fund, LLC<br>☐ USA Securities, LLC | |
| USACM LIQUIDATING USACM TRUST<br><br>Plaintiff,<br><br>v.<br><br>FERTITTA ENTERPRISES, INC.<br>Defendant. | **Adversary No. 08-1121**<br><br>**FIRST AMENDED COMPLAINT**<br><br>Hearing Date:   n/a<br>Hearing Time:  n/a |

Plaintiff USACM Liquidating USACM Trust (the "USACM Trust"), as successor to USA Commercial Mortgage Company, hereby complains as follows:

## I.    NATURE OF THIS ACTION

1.    In April 2006, USA Commercial Mortgage Company ("USACM"), USA Capital Diversified Trust Deed Fund, LLC ("DTDF"), and certain related entities were forced to file for bankruptcy protection as a result of the gross misconduct by certain insiders, namely Thomas A. Hantges ("Hantges") and Joseph D. Milanowski ("Milanowski") (collectively, the "Culpable Insiders"). The Culpable Insiders engaged in a pervasive looting and self-dealing scheme in which they: (a) obtained more than fifty real estate development, time-share, and technology entities; and (b) misappropriated nearly $100 million from USACM and DTDF to acquire and/or provide funding to these entities.

2.    In this adversary proceeding, the USACM Trust seeks to recover approximately $5.5 million in fraudulent transfers from USACM to Fertitta Enterprises, Inc. ("Fertitta") that were made in furtherance of this looting and self-dealing scheme. Specifically, these transfers—as well as the underlying invalid, unenforceable promissory note to which they relate—facilitated the Culpable Insiders' acquisition of the Palm Springs Marquis Villas Condominiums, located in Palm Springs, California (the "Marquis Villas"). Neither USACM nor its creditors received any benefit whatsoever from the making of the promissory note, the transferring of $5.5 million to Fertitta pursuant to that invalid note, or the Culpable Insiders' acquisition of the Marquis Villas.

## II.    JURISDICTION / VENUE

3.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334(b) in that this action arises under, arises in, and/or relates to this bankruptcy case.

**FIRST AMENDED COMPLAINT — PAGE 2**

4.      This action is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), and (O).

5.      This is an adversary proceeding pursuant to Fed. R. Bankr. P. 7001.

6.      This Court has personal jurisdiction over Fertitta based upon the following: (a) Fertitta's general contacts with the State of Nevada, as Fertitta is a Nevada corporation with its principal place of business in Nevada; and (b) Fertitta's specific contacts with the State of Nevada, including the business dealings with USACM and the Culpable Insiders discussed below.

7.      This proceeding is properly venued here pursuant to 28 U.S.C. § 1409(a).

### III.      PARTIES AND OTHER RELEVANT ENTITIES

### A.      Plaintiff

8.      Plaintiff USACM Trust was created pursuant to the Third Amended Joint Chapter 11 Plan of Reorganization (the "Joint Plan") filed by USACM, USA Capital Diversified Trust Deed Fund, LLC ("DTDF"), and three other debtors in Bankruptcy Case No. 06-10725 (Docket No. 1799).  The Joint Plan was confirmed by the Bankruptcy Court on January 8, 2007, and became effective on March 12, 2007.

9.      The Joint Plan expressly retained USACM's causes of action for enforcement by the USACM Trust, pursuant to 11 U.S.C. § 1123(b)(3)(B).  The USACM Trust, therefore, has standing to bring this action against Fertitta.

10.     The USACM Trust is a liquidating trust organized under Nevada law.  The USACM Trust's beneficiaries are the holders of allowed unsecured claims against USACM.  Geoffrey L. Berman serves as the Trustee of the USACM Trust and may be served through undersigned counsel.

**FIRST AMENDED COMPLAINT — PAGE 3**

11.     In the time period since the plan became effective on March 12, 2007, the USACM Trust has conducted an investigation into the misconduct of the Culpable Insiders and the third-party wrongdoers that ultimately led to USACM's collapse in April 2006.   As a result of this investigation, the USACM Trust has learned of the fraudulent transfers and misconduct described herein.  Neither USACM nor the USACM Trust discovered or could have discovered the fraudulent transfers and misconduct prior to April 2006.

**B.     Defendant**

12.     Defendant Fertitta Enterprises, Inc. ("Fertitta") is a Nevada corporation with its principal place of business in the State of Nevada.  Defendant Fertitta can be served through its registered agent, K. Michael Leavitt, at 601 East Bridger Avenue, Las Vegas, Nevada  89101.

**C.     Other Relevant Entities**

*The USA Capital Debtors*

13.     On April 13, 2006 (the "Petition Date"), USACM (or "Debtor"), DTDF, USA Capital Realty Advisers, LLC ("USACRA"), USA Capital First Trust Deed Fund, LLC ("FTDF"), and USA Securities, LLC ("USA Securities") (collectively, the "USA Capital Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court").  The bankruptcy cases were jointly administered before the Honorable Linda B. Riegle under Case No. BK-S-06-10725-LBR.

14.     USACM is a corporation organized under Nevada law on or about February 28, 1989.  Prior to the Petition Date, USACM was in the business of underwriting, originating, brokering, funding, and servicing commercial loans secured by residential and commercial real estate developments.  USACM was owned by Hantges, Milanowski, Jamie Wise, and Paul

**FIRST AMENDED COMPLAINT — PAGE 4**

Hamilton, directly and indirectly through entities and/or trusts. Prior to the Petition Date, the multi-faceted fraud perpetrated by the Culpable Insiders prevented Wise, Hamilton, and other innocent stakeholders from discovering the Culpable Insiders' looting and self-dealing scheme and the fraudulent transfers described herein.

15.    DTDF is a limited liability company organized under Nevada law on or about February 3, 2000. DTDF offered Nevada investors the opportunity to purchase membership interests in a fund and thereby invest in loans that USACM originated and serviced on behalf of DTDF. At the time of its bankruptcy filing, DTDF was managed by USACRA.

### Other USA Capital Entities

16.    USA Investment Partners, LLC ("USAIP") is a limited liability company organized under Nevada law on or about October 20, 1999. From that date onward, USAIP served as a holding company for dozens of entities established by the Culpable Insiders in the time-share hotel, technology, and real estate acquisition and development industries.

17.    USAIP is owned by Hantges and Milanowski, or trusts controlled by them. Prior to June 17, 2004, USAIP was managed by USACM. Between June 17, 2004, and April 6, 2007, USAIP was managed by Hantges and Milanowski. On February 14, 2005, Hantges purportedly resigned his position as a USAIP manager, but nonetheless continued to function as a *de facto* manager until April 2007.

18.    On April 4, 2007, the USACM Trust, DTDF, and another USAIP creditor forced USAIP into bankruptcy by filing an involuntary petition for relief under Chapter 11 of the Bankruptcy Code against USAIP in the Bankruptcy Court. On April 6, 2007, the Court entered an order approving the appointment of Lisa M. Poulin as USAIP's interim trustee.

**FIRST AMENDED COMPLAINT — PAGE 5**

19.     On May 9, 2007, the Court entered an order for relief under Chapter 11 of the Bankruptcy Code as to USAIP.  Thereafter, Ms. Poulin became the permanent Chapter 11 trustee.

## IV.     FACTUAL ALLEGATIONS

### A.     USACM's Background and Business Model

20.     USACM's basic business model consisted of arranging commercial loans secured by real property on direct lenders' behalf, otherwise known as "originating" a loan.  In these transactions, direct lenders obtained partial interests in loans "originated" by USACM, and were listed as beneficiaries on the related promissory note and mortgage or deed of trust recorded against the underlying property.  In exchange for originating loans, USACM typically received loan origination fees of three to five percent of the principal amount of the loans.

21.     USACM also serviced the loans that it originated.  Each month, USACM was allowed to pay itself a servicing fee out of the monthly interest payments made by borrowers, while remitting the balance of the payments to direct lenders.  This servicing fee was generally equal to between one-quarter of one percent and four percent of the principal balance of the loan per annum. Under the typical arrangement, USACM was also entitled to late fees, extension fees, default interest, and other fees and expenses paid or reimbursed by the borrower.

### B.     DTDF's Background

22.     DTDF was created in February 2000.  DTDF was a trust deed investment fund that offered membership interests to Nevada investors.  DTDF used the funds generated through the sale of membership units to purchase interests in loans that were originated and serviced by USACM. DTDF earned interest as a direct lender and distributed its profits to its investors on a periodic basis.

**FIRST AMENDED COMPLAINT — PAGE 6**

23.    DTDF's creation greatly enhanced the Culpable Insiders' fraudulent scheme by allowing them to secure aggregate funds and misuse them on a continual and "as needed" basis. When shortfalls arose in USACM's loan servicing operations as a result of delinquent or defaulting borrowers, the Culpable Insiders misappropriated money from DTDF.  In other instances, the Culpable Insiders simply looted funds from DTDF and transferred them to USAIP and/or other side business ventures for no legitimate purpose whatsoever.

### C.    The Culpable Insiders' Extensive Ponzi-Like Scheme

24.    In order to service loans, USACM was required by Nevada law to open and maintain two separate trust accounts:  (a) an "investor trust" to be used as a mechanism to pool direct lender deposits and make distributions to borrowers; and (b) a "collection trust" to collect interest and principal repayments made by borrowers and make payments to direct lenders.  In accordance with Nevada law, USACM opened and maintained two bank accounts for these purposes:  (a) "USA Commercial Mortgage Company Investors Trust Account" (the "Investors Trust"); and (b) "USA Commercial Mortgage Company Collection Trust Account" (the "Collection Trust").    These USACM accounts were trust accounts under Nevada law.

25.    Nevada law closely regulated the flow of funds in and out of these accounts. Specifically, Nevada law: (a) prohibited USACM from making any interest and/or principal payments to direct lenders on behalf of defaulting borrowers; (b) prohibited the commingling of any USACM funds within the Investors Trust and/or the Collection Trust; and (c) required USACM to remit funds it received from borrowers to the applicable direct lenders.  The Culpable Insiders routinely disregarded these provisions, instead transferring funds in and out of the Investors Trust

and Collection Trust however necessary to make interest payments to the direct lenders, thereby perpetuating a Ponzi-like scheme.

26.    Frequently, the Culpable Insiders covered interest shortfalls in the Collection Trust by failing to withdraw fees owed to USACM.  In addition, extension fees, late fees, default interest fees, and other fees owed to USACM were often not taken out of the Collection Trust and transferred to USACM's corporate operating account.

27.    The Culpable Insiders also covered shortfalls in the Collection Trust by transferring funds directly from USACM, DTDF, and/or other USA Capital entities.  At least as early as 2000, the Culpable Insiders transferred funds directly from USACM's corporate operating account into the Collection Trust to pay interest on behalf of borrowers in default.

28.    On other occasions, the Culpable Insiders covered shortfalls in the Collection Trust by failing to remit principal payments to direct lenders when the borrower repaid the loans in which they had invested.  DTDF was a regular victim of this practice.  The Culpable Insiders systematically failed to remit principal payments from borrowers to DTDF whenever the funds were needed to cover a shortfall in the Collection Trust.

### D.    The Culpable Insiders' Looting and Self-Dealing Scheme

29.    The driving motivation behind this Ponzi-like scheme was the Culpable Insiders' desire to provide funding for a vast network of real estate developments and other side business ventures.  By employing the Ponzi-like scheme within USACM's loan servicing operations, the Culpable Insiders were able to induce existing investors to maintain or increase their investments with USA Capital and entice new investors to entrust their money to USA Capital.  In turn, this

**FIRST AMENDED COMPLAINT — PAGE 8**

1    enabled the Culpable Insiders to fuel a multi-faceted looting and self-dealing scheme to obtain new

2    entities and to provide funding to entities that they already owned.

3        30.    *First*, the Culpable Insiders used USACM to originate and service loans to real estate

4    development entities in which they stood to profit.  Initially, the Culpable Insiders caused USACM

5    to originate loans to entities in which the Culpable Insiders held a direct ownership interest, either

6    personally or through a trust.  Eventually, the Culpable Insiders caused USACM to originate loans

7    to entities in which they held an indirect ownership interest through USAIP.  In total, the Culpable

8    Insiders caused USACM to originate hundreds of millions of dollars of loans to entities in which

9

10   they held an ownership interest.

11

12       31.    *Second*, the Culpable Insiders employed USACM's loan origination and servicing

13   business as a means of acquiring real estate projects.  Specifically, the Culpable Insiders: (a) took

14   over real estate projects when borrowers went into default on their USACM-originated loans,

15   employing the Ponzi-like scheme to pay off the Direct Lenders' interests in the loan; and (b)

16

17   extracted equity interest "kickers" in the projects as a condition for USACM originating the loan.

18   The Culpable Insiders obtained more than a dozen real estate development entities through these

19

20   methods.

21       32.    *Third*, the Culpable Insiders "borrowed" money from USACM's operating account

22   to cover the operating costs of their side business ventures.  For example, from 1998 through 2005,

23   the Culpable Insiders advanced more than $8 million from USACM to fund the sagging operations

24

25   of the "Tanamera Apartments" near Reno, Nevada.  In 2000 and 2001, they advanced more than

26   $3.5 million to fund Eagle Ranch, LLC ("Eagle Ranch"), which owned real estate in Victorville,

California.

**FIRST AMENDED COMPLAINT — PAGE 9**

33.     None of these "advances" were in USACM's interest, nor were they supported by any legitimate business purpose whatsoever.  The "advances" were completely unsecured, and neither interest nor principal was timely paid.  Moreover, the advances constituted a significant portion of USACM's assets, yet the Culpable Insiders did not afford USACM any upside in the underlying projects.  In reality, the "advances" made to Eagle Ranch, Tanamera Apartments, and similar entities amounted to nothing more than a roll of the dice with a substantial portion of USACM's assets, solely for the personal benefit of the Culpable Insiders and their cronies.

34.     But because of the Culpable Insiders' efforts to conceal the true nature of these advances, these advances appeared to be legitimate, arms-length transactions from the perspective of regulatory authorities, direct lender investors, and USACM's innocent owners, directors, officers, and employees (collectively, the "Stakeholders").  For example, the Culpable Insiders created two sham entities, HBM Holdings, LLC and Reno South Meadows, LLC, to disguise the advances that were made from USACM to the Tanamera Apartments.

35.     *Fourth*, the Culpable Insiders systematically looted USACM funds to: (a) acquire equity interests in additional entities; (b) make capital contributions to entities in which they already held an ownership interest, either directly or indirectly through USAIP; and (c) cover operating costs of their entities.  The Culpable Insiders often used USAIP as a conduit for fraudulently transferring USACM's funds to these entities, effectively concealing the fraudulent nature of the transfers out of USACM from USACM's innocent Stakeholders by making the transfers appear to be legitimate, related-party advances to USAIP.  In other instances, the Culpable Insiders caused USACM to directly transfer funds to their entities.  In the aggregate, the Culpable Insiders looted tens of millions of dollars from USACM to fund their outside business ventures.

**FIRST AMENDED COMPLAINT — PAGE 10**

36.     In addition, the Culpable Insiders looted tens of millions of dollars from DTDF.  For example, more than $13.7 million alone was looted from DTDF to fund the operations of the Royal Hotel in Las Vegas, Nevada, a time-share owned by the Culpable Insiders.  Funds transferred out of DTDF were frequently laundered through two sham companies — 10-90, Inc. ("10-90") and Mountain Vista, Inc—in order to conceal the fraudulent nature of the transfers.  In other instances, funds were advanced directly from DTDF to USAIP or to one of the Culpable Insiders' related entities, but were booked to a sham loan to 10-90 to conceal the true nature of the advances.

37.     The end result of this well-disguised looting and self-dealing scheme was two-fold: (a) USACM, DTDF, and the other USA Capital entities collapsed in financial ruin; and (b) the Culpable Insiders' obtained more than fifty time-share hotels, real estate development entities, and technology companies.  But because of the Culpable Insiders' and other wrongdoers' multi-faceted efforts to conceal their scheme, none of their gross misconduct was discovered or could have been discovered by USACM's innocent Stakeholders prior to the Petition Date.

38.     The Culpable Insiders' fraudulent scheme was exclusively adverse to USACM's interests.  In carrying out their looting and self-dealing scheme, the Culpable Insiders' sole intention was to benefit themselves at the expense of USACM and its creditors.

**E.     The Marquis Villas**

*The USACM-Originated Loan from DTDF*

39.     In the spring of 2000, Salvatore Reale introduced the Culpable Insiders to Thomas F. Flatley ("Flatley"), the principal of Epic Resorts, LLC ("Epic Resorts").  Epic Resorts owned Epic Resorts – Marquis Villas, LLC ("Epic-PS Marquis") (collectively, with Epic Resorts, "Epic"),

which owned the Marquis Villas at the time. Epic-PS Marquis and other wholly owned subsidiaries of Epic Resorts constituted what Milanowski understood to be an "integrated time share company."

40.    At the time, Flatley was interested in obtaining a "general working capital" loan for the global Epic Resorts family of entities. Ultimately, the Culpable Insiders agreed to cause USACM to originate an $11.5 million loan for this purpose. Epic-PS Marquis was made the borrower on the loan, even though the Culpable Insiders knew that the proceeds of the loan were to be used for general working capital purposes of the entire Epic Resorts family of entities, rather than directed toward the Marquis Villas. Specifically, in an April 30, 2002 bankruptcy court hearing, Milanowski testified that at the time USACM originated the loan, he was aware that:

- The loan was to be used for "general working capital" purposes;

- The wiring instructions to the title company provided that the proceeds were to be wired directly into an account in the name of Epic Resorts, rather than to Epic-PS Marquis;

- The Marquis Villas was completely built out, and there was no potential for build-out, construction, or significant maintenance; and

- The proceeds of the loan were not going to be used for the construction, maintenance, or build-out of the Marquis Villas.

In addition to making Epic-PS Marquis the borrower, the Culpable Insiders insisted upon receiving a leasehold deed of trust on the Marquis Villas as collateral for the loan. Upon information and belief, the Culpable Insiders made Epic-PS Marquis the borrower and took the leasehold deed of trust on the Marquis Villas as collateral for the loan—a general working capital loan to Epic Resorts—because the Culpable Insiders were interested in obtaining the Marquis Villas for their own personal benefit.

**FIRST AMENDED COMPLAINT — PAGE 12**

41.     On June 26, 2000, Milanowski and Flatley executed a Loan Agreement between DTDF as lender and Epic-PS Marquis as borrower (the "DTDF-Epic Loan Agreement"). The principal amount of the loan was $11.5 million, of which $1.5 million was an "interest reserve." The DTDF-Epic Loan Agreement provided that the remaining $10 million was to be disbursed in two $5 million disbursements, one "no later than June 30, 2000" and the other "on or about July 31, 2000." The maturity date of the loan was twenty-four months after the deed of trust securing the loan was recorded, or July 5, 2002.

42.     The entire $11.5 million balance of the loan from DTDF to Epic-PS Marquis (the "Epic Loan") was secured by a leasehold deed of trust (the "Marquis Deed of Trust"), which was recorded on July 5, 2000 in favor of DTDF. In addition, the Epic Loan was secured by an Assignment of Permits, Licenses, Franchises and Authorizations (the "Assignment of Permits"). Milanowski required Epic-PS Marquis to execute the Assignment of Permits so that, "[i]n case [the Culpable Insiders] ever had to take over the property [] [the Culpable Insiders] would have in place … agreements that were necessary to run the property."

43.     Upon information and belief, the Culpable Insiders used DTDF as the direct lender for the entire balance of the loan in order to facilitate a potential take-over of the Marquis Villas for their own personal benefit. Specifically, the Culpable Insiders could foreclose on the property and then simply defraud DTDF by causing it to transfer its interest in the property directly to one of their affiliated entities without receiving any consideration in exchange. In contrast, if the Culpable Insiders instead foreclosed on the property on behalf of direct lenders, the Culpable Insiders would presumably need to pay the direct lenders (through their Ponzi-like scheme or otherwise) for the direct lenders to relinquish their rights to the underlying collateral.

**FIRST AMENDED COMPLAINT — PAGE 13**

*The Fertitta Note*

44.     In June and July of 2000, using DTDF as a direct lender posed a minor obstacle to the Culpable Insiders' scheme: a nascent DTDF lacked sufficient capital to fund the entire loan amount.  As such, the Culpable Insiders eventually turned to Fertitta in an effort to secure $5 million for the July 31, 2000 disbursement described in the DTDF-Epic Loan Agreement.

45.     In order to persuade Fertitta to transfer $5 million to Epic, Milanowski, purporting to act on behalf of USACM, executed a $5 million promissory note dated July 31, 2000 in favor of Fertitta (the "Fertitta Note").  The interest rate on the Fertitta Note was fifteen percent (15%), and the note expressly prohibited USACM from pre-paying any portion of the principal balance prior to the maturity date.  The original maturity date was January 31, 2001.  Fertitta, however, had the right to *unilaterally* extend the maturity date to July 31, 2001.

46.     The Fertitta Note was secured by a Collateral Assignment of Beneficial Interest in Mortgage dated July 31, 2000 and given by USACM in favor of Fertitta (the "Collateral Assignment").  The Collateral Assignment provided that:

> Assignor hereby grants, assigns, sets over and transfers to Assignee, and grants a security interest to Assignee in, Assignor's Five Million Dollar ($5,000,000) undivided beneficial interest in the Mortgage, together with (i) the promissory notes described or referred to in the Mortgage, the money due or to become due thereon, together with interest and rights accrued or to accrue under said promissory notes or notes and Mortgage, (ii) any and all other security for aid promissory note or notes; (iii) any and all guarantees of the indebtedness described in said note or notes; and (iv) the benefit of any and all indemnities relating to said indebtedness, including environmental indemnities.

Accordingly, Fertitta received a $5 million interest in the Marquis Deed of Trust and in the underlying promissory note that was very much like the interest that Fertitta would have received had it merely replaced DTDF as the lender through an ordinary assignment.  But here, Fertitta

**FIRST AMENDED COMPLAINT — PAGE 14**

received the Fertitta Note as well, placing it in a far better position than a typical assignee of an interest in a loan and deed of trust, as shown in "Figure A."

**Figure A**



47.    In stark contrast, the Fertitta Note was completely adverse to USACM's economic interests.  USACM did not receive any cash or other assets from Fertitta in exchange for incurring the $5 million obligation.

48.    Nor did USACM receive any economic benefit whatsoever by virtue of Epic receiving $5 million from Fertitta.  Specifically, (1) USACM had no ownership interest in Epic Resorts or Epic-PS Marquis, entities that were wholly unrelated to USACM; (2) USACM did not owe any antecedent debt to Epic Resorts or to Epic-PS Marquis; (3) USACM did not receive the use and enjoyment of the Marquis Villas; (4) USACM did not acquire any potential profit upside in the Marquis Villas, in Epic Resorts, or in Epic-PS Marquis; and (5) USACM received no enforceable contractual right to repayment from Epic Resorts or Epic-PS Marquis.

49.    Moreover, the $5 million obligation incurred as a result of the Fertitta Note was quite significant in relation to both USACM's net worth and gross assets.  USACM's balance sheet as of

**FIRST AMENDED COMPLAINT — PAGE 15**

June 30, 2000 reflected that USACM only had approximately $22.1 million of gross assets and $4.2 million of net worth, and these figures were significantly inflated. In actuality, USACM's assets were so overstated that USACM was already insolvent by June 30, 2000, making this $5 million "gift" obligation all the more financially disastrous for USACM and its creditors.

50. In short, there was simply no legitimate business purpose whatsoever for USACM to incur the $5 million obligation evidenced by the Fertitta Note. Rather, the Culpable Insiders' executed the Fertitta Note in furtherance of their pervasive looting and self-dealing scheme, just like the other substantial debts that the Culpable Insiders had caused USACM to incur in the preceding months to obtain some of their other entities. For example, on March 31, 2000, April 30, 2000, May 31, 2000, June 30, 2000, USACM had approximately $3.0 million, $9.0 million, $11.2 million, and $17.7 million in total liabilities, respectively, due to the increasing willingness of the Culpable Insiders to cause USACM to incur debts in furtherance of their scheme.

51. Fertitta knew or should have known that the Culpable Insiders were not acting for USACM's benefit when they executed the Fertitta Note.

52. Specifically, Fertitta knew: (a) that the Culpable Insiders executed the Fertitta Note in order to provide $5 million to Epic, given that Fertitta actually sent the proceeds to Epic; and (b) of the existence and structure of the underlying loan transaction between Epic-PS Marquis and DTDF, given that the loan transaction and collateral were described in the Collateral Assignment. As such, Fertitta had notice of facts that should have caused it to inquire into the relationship between USACM and Epic and to ask what benefit, if any, USACM would receive from $5 million being transferred to Epic. In turn, Fertitta should have known that USACM would receive no economic benefit from Epic receiving $5 million from Fertitta.

**FIRST AMENDED COMPLAINT — PAGE 16**

53.     In addition, Fertitta should have known that: (a) it would be extremely rare and highly unusual for a mortgage broker to incur an obligation in connection with a loan that it originated to a third party; and (b) USACM had not previously incurred such an obligation in connection with any of the dozens of loans that it had previously originated.  Moreover, Fertitta knew that the Fertitta Note contained several unusual and oppressive terms, such as the express prohibition on pre-payment coupled with a *unilateral* lender right to extend the maturity date of the loan.  As such, Fertitta should have inquired into the Culpable Insiders' motivation for causing USACM to enter into such a highly unusual transaction.  In turn, Fertitta should have known that the Culpable Insiders were causing USACM to enter into the transaction in order to further their scheme, and not for USACM's benefit.

54.     Finally, Fertitta should have inquired into USACM's financial condition.  A reasonable such inquiry would have required a review of USACM's financial statements.  Accordingly, Fertitta should have known that: (a) $5 million was an unreasonably large obligation in relation to USACM's stated net worth and gross assets at the time of the transaction; (b) a $5 million "gift" obligation that was not tied to a corresponding asset would render USACM insolvent on the face of its (already bloated) financial statements; and (c) USACM had recently incurred other very substantial debts.

*The Culpable Insiders' Efforts to Seize the Marquis Villas*

55.     On April 16, 2001, the Culpable Insiders directed USACM's in-house counsel, Tom Rondeau ("Rondeau"), to write a letter to Flatley, requesting Epic's financial statements and sales information for the Marquis Villas.  On May 1, 2001, Rondeau sent a Notice of Default to Flatley

**FIRST AMENDED COMPLAINT — PAGE 17**

for Epic's failure to provide the financial information requested in the April 16, 2001 letter. A subsequent Notice of Default as sent on July 3, 2001.

56.    By August 2001, the Culpable Insiders began taking more concrete steps to acquire the Marquis Villas. First, they solicited financial projections for a potential take-over. The Culpable Insiders received these initial projections on August 10, 2001. Then on August 14, 2001, the Culpable Insiders directed Rondeau to write a letter to the Bureau of Indian Affairs (the "BIA"), the lessor of the land on which the Marquis Villas was located. This letter stated: "We are preparing a deed in lieu of foreclosure, and anticipate stepping into [Epic-PS Marquis]'s shoes shortly."

57.    Rather than taking a deed in lieu of foreclosure in the name of DTDF, the Culpable Insiders instead decided to seize the property for themselves by taking an assignment in the name of Tree Moss Partners, LLC ("Tree Moss"), an entity solely owned by USAIP. On September 25, 2001, they instructed Rondeau to write a letter to the BIA seeking permission to take the assignment in lieu of foreclosure in the name of Tree Moss. Subsequently, on October 13, 2001, Hantges sent Milanowski an e-mail that stated: "**Once we take over the Marquis**, we need to include an interest reserve and extend it for 2 years." (emphasis added).

58.    Throughout October and into early November of 2001, the Culpable Insiders and Flatley negotiated and drafted the documents necessary to effectuate a transfer of the Marquis Villas to Tree Moss. Eventually, in early November 2001, the Culpable Insiders and Flatley reached a settlement agreement. But before the deal could close, four other creditors of Epic-PS Marquis filed a Chapter 11 involuntary petition, thereby forcing Epic-PS Marquis into bankruptcy on November 9, 2001.

**FIRST AMENDED COMPLAINT — PAGE 18**

59.     Subsequently, on December 1, 2001, Hantges e-mailed Rondeau with the instruction to: "[Please] ask our new [bankruptcy attorney] to ask for an emergency motion to ask the court to allow us to take over the Marquis Villas." On January 17, 2002, DTDF filed a motion for an order granting relief from the automatic stay and directing the debtor to abandon the collateral.

60.     On June 26, 2003, the Bankruptcy Court entered an Order (A) Granting USA Capital Relief from the Automatic Stay; and (B) Authorizing the Trustee to Cause [Epic-PS Marquis] to Turnover USA Capital's Collateral to USA Capital (the "Stay Relief Order"). The Stay Relief Order granted DTDF relief from the Automatic Stay to pursue its rights to foreclose on the collateral securing the Epic Loan, including the Marquis Deed of Trust.

61.     With the automatic stay lifted, the Culpable Insiders proceeded to seize the Marquis Villas for themselves (through Tree Moss). On September 15, 2003, the bankruptcy trustee for Epic-PS Marquis and Milanowski, signing on behalf of Tree Moss, executed a Non-Warranty Assignment and Assumption of Lease that assigned Epic-PS Marquis' rights, title, and interest in certain leases related to the Marquis Villas to Tree Moss. The same day, the Culpable Insiders caused DTDF to execute a quit-claim deed of the condominium units described in the Marquis Deed of Trust to Tree Moss, although the quit-claim deed was not recorded until February 23, 2006. Subsequently, On January 13, 2004, a trustee's sale of the condominium units encumbered by the Marquis Deed of Trust was held. In turn, a trustee's deed in favor of DTDF was recorded on January 15, 2004.

62.     DTDF did not receive any consideration for the transfer of the Marquis Villas to Tree Moss. Rather, this transfer was part of the Culpable Insiders' fraudulent looting and self-dealing scheme. To add insult to injury, the Culpable Insiders subsequently looted hundreds of

**FIRST AMENDED COMPLAINT — PAGE 19**

thousands of dollars from USACM and DTDF to provide operational funding to their newly acquired time-share entity.

63.     The Culpable Insiders improper acquisition of the Marquis Villas was not uncovered until after the Petition Date.  After a more than six-month investigation, DTDF filed an involuntary Chapter 7 petition against Tree Moss on December 7, 2006 in the U.S. Bankruptcy Court for the District of Nevada.  On August 23, 2007, the Bankruptcy Court entered an order approving joint administration of the Tree Moss estate with USAIP's estate (and other estates of entities owned by the Culpable Insiders).  Subsequently, the Court entered an order approving the appointment of Ms. Lisa Poulin as trustee of the Tree Moss estate.

### F.     Repayment of the Fertitta Note

64.     Every single USACM repayment of principal on the Fertitta Note was made within the time period in which the Culpable Insiders were actively scheming to acquire the Marquis Villas for themselves and was in furtherance of their scheme.

65.     On August 8, 2001, the Culpable Insiders caused USACM to wire transfer $2.7 million to Fertitta as a principal reduction on the Fertitta Note (the "August 2001 Transfer").  This wire transfer was made a mere six days before the letter to the BIA that stated that the Culpable Insiders intended to take a deed in lieu of foreclosure, as discussed above.

66.     On September 18, 2001, the Culpable Insiders caused USACM to write Fertitta a check for $300,000, which was deposited on September 20, 2001 (the "September 2001 Transfer").  Within a day of the check being deposited, Rondeau sent the Culpable Insiders drafts of various documents needed to effectuate the transfer of the Marquis Villas to Tree Moss.  Shortly thereafter, the Culpable Insiders instructed Rondeau to write the September 25, 2001 letter to the BIA seeking

**FIRST AMENDED COMPLAINT — PAGE 20**

permission to take the assignment in lieu of foreclosure in the name of Tree Moss, as discussed above.

67.     The Culpable Insiders caused USACM to re-pay the remaining balance of the Fertitta Note after Epic-PS Marquis was forced into bankruptcy.  These principal re-payments were as follows (the "2003 Principal Transfers"):

| DATE | AMOUNT |
|---|---|
| January 14, 2003 | $500,000.00 |
| May 30, 2003 | $500,000.00 |
| July 15, 2003 | $250,000.00 |
| September 30, 2003 | $750,000.00 |
| TOTAL | $2,000,000.00 |

By making these principal re-payments, the Culpable Insides reduced the likelihood that Fertitta would seek foreclosure on the $5 million interest in the Marquis Deed of Trust that it acquired through the Collateral Assignment.  Had Fertitta done so, the Culpable Insiders' plans to seize the Marquis Villas through Tree Moss likely would have been thwarted, especially because the Culpable Insiders had not disclosed Fertitta's interest in the Marquis Deed of Trust to the Bankruptcy Court.

68.     Upon information and belief, the Culpable Insiders were acting in furtherance of their scheme to seize the Marquis Villas when they caused USACM to make the August 2001 Transfer, September 2001 Transfer, and 2003 Principal Transfers (collectively, the "Principal Transfers").  Specifically, each of these transfers: (a) were made on or after a point in time when the Culpable Insiders were actively plotting the take-over of the Marquis Villas; and (b) lessened the likelihood that Fertitta would thwart their plans by exercising its foreclosure rights and/or interfering with the ongoing Epic bankruptcy proceedings.

**FIRST AMENDED COMPLAINT — PAGE 21**

69.     But to USACM's innocent Stakeholders, the Principal Transfers merely appeared to be principal repayments on a legitimate loan obligation.  On its face, the Fertitta Note gives no indication whatsoever that the loan proceeds had actually been sent to Epic.  Moreover, USACM's audited financial statements reflected the Fertitta Note as a legitimate obligation, and DTDF's audited financial statements (as well as Milanowski's testimony in the Epic bankruptcy proceedings) indicated that DTDF had actually funded the entire $11.5 million loan.  As such, the innocent Stakeholders did not discover, nor could have discovered, the fraudulent nature of these transfers prior to the Petition Date.

70.     In addition to the Principal Transfers, the Culpable Insiders caused USACM to make regular interest payments to Fertitta at a twenty percent (20%) default interest rate, as follows (collectively, the "Interest Transfers"):

| DATE | AMOUNT |
| --- | --- |
| May 7, 2002 | $33,333.33 |
| June 11, 2002 | $34,444.44 |
| July 7, 2002 | $33,333.33 |
| August 8, 2002 | $34,444.44 |
| September 11, 2002 | $34,444.44 |
| October 11, 2002 | $33,333.33 |
| November 15, 2002 | $34,444.44 |
| December 10, 2002 | $33,333.33 |
| January 8, 2003 | $34,444.44 |
| February 7, 2003 | $29,722.23 |
| March 17, 2003 | $23,333.33 |
| April 11, 2003 | $25,833.33 |
| May 6, 2003 | $25,000.00 |
| June 10, 2003 | $25,277.78 |
| July 8, 2003 | $16,666.67 |
| August 5, 2003 | $14,861.11 |
| September 4, 2003 | $12,916.67 |
| September 30, 2003 | $12,500.00 |
| TOTAL | $491,666.64 |

**FIRST AMENDED COMPLAINT — PAGE 22**

1

2

3    The Culpable Insiders had also previously caused USACM to make an additional several hundred

4    thousand dollars of interest payments on the Fertitta Note prior to May 2002.

5                              **V.    CAUSES OF ACTION**

6    **COUNT 1:    Avoidance of Fertitta Note Pursuant to 11 U.S.C.A. § 544(b) and NRS**
     **112.180(1)(a))**

7

8            71.    The USACM Trust re-alleges and fully incorporates the allegations pleaded above as

9    if fully set forth herein.

10           72.    Pleading further and in the alternative, only if the Court determines as a matter of law

11   that the purported Fertitta Note was an enforceable and valid obligation, the USACM Trust seeks to

12

13   avoid the Fertitta Note under 11 U.S.C.A. § 544(b) and NRS 112.180(1)(a).

14           73.    The Fertitta Note was an obligation incurred by the Debtor.

15           74.    Prior to within one year of the Petition Date, neither USACM nor its innocent

16   Stakeholders and creditors discovered nor could have reasonably discovered the fraudulent nature of

17   the Fertitta Note.  Specifically, they could not have reasonably discovered that: (a) USACM

18   received no economic benefit in exchange for giving the Fertitta Note; (b) USACM was already

19   insolvent at the time Milanowski executed the Fertitta Note and was rendered more so by virtue of

20   the note being given; and (c) the Culpable Insiders gave the Fertitta Note in furtherance of their

21   fraudulent looting and self-dealing scheme.  The Culpable Insiders' scheme was exclusively adverse

22   to USACM's interests, and in giving the Fertitta Note in furtherance of this scheme, the Culpable

23   Insiders' sole concern was their own personal benefit.

24

25

26

**FIRST AMENDED COMPLAINT — PAGE 23**

75.     On the date of the Fertitta Note and the Petition Date, there were creditors with allowable unsecured claims who could have avoided the Fertitta Note pursuant to Nevada state law.

76.     The Debtor made the Fertitta Note with the actual intent to hinder, delay, or defraud creditors of the Debtor.  Specifically: (a) USACM did not receive reasonably equivalent value consideration in exchange for giving the Fertitta Note; (b) USACM was insolvent at the time the note was given, and became more so as a result of the additional obligation that it incurred; (c) the Fertitta Note was given shortly after substantial other debts were incurred; and (d) the Fertitta Note was given in furtherance of the Culpable Insiders' looting and self-dealing scheme.

77.     Accordingly, the Fertitta Note is fraudulent under NRS 112.180(1)(a).

78.     Pursuant to 11 U.S.C. § 544(b), the USACM Trust asks the Court to avoid the Fertitta Note under applicable state law.

**COUNT 2:     Avoidance of Fertitta Note Pursuant to 11 U.S.C.A. § 544(a)(2) and NRS 112.180(1)(a))**

79.     The USACM Trust re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

80.     Pleading further and in the alternative, only if the Court determines as a matter of law that the purported Fertitta Note was an enforceable and valid obligation, the USACM Trust seeks to avoid the Fertitta Note under 11 U.S.C.A. § 544(a)(2) and NRS 112.180(1)(a).

81.     The Fertitta Note was an obligation incurred by the Debtor.

82.     Prior to within one year of the Petition Date, neither USACM nor its innocent Stakeholders and creditors discovered nor could have reasonably discovered the fraudulent nature of the Fertitta Note.

**FIRST AMENDED COMPLAINT — PAGE 24**

83.    A creditor who extended credit to the Debtor at the Petition Date could have voided the Fertitta Note pursuant to Nevada state law.

84.    The Debtor made the Fertitta Note with the actual intent to hinder, delay, or defraud creditors of the Debtor.  Specifically: (a) USACM did not receive reasonably equivalent value consideration in exchange for giving the Fertitta Note; (b) USACM was insolvent at the time the note was given, and became more so as a result of the additional obligation that it incurred; (c) the Fertitta Note was given shortly after substantial other debts were incurred; and (d) the Fertitta Note was given in furtherance of the Culpable Insiders' looting and self-dealing scheme.

85.    Accordingly, the Fertitta Note is fraudulent under NRS 112.180(1)(a).

86.    Pursuant to 11 U.S.C. § 544(a)(2), the USACM Trust asks the Court to avoid the Fertitta Note under applicable state law.

**COUNT 3:    Avoidance of the August 2001 Transfer and September 2001 Transfer Pursuant to 11 U.S.C.A. § 544(b) and NRS 112.180(1)(a))**

87.    The USACM Trust re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

88.    The August 2001 Transfer and September 2001 Transfer were of an interest of the Debtor in property.

89.    Prior to within one year of the Petition Date, neither USACM nor its innocent Stakeholders and creditors discovered nor could have reasonably discovered the fraudulent nature of the August 2001 Transfer and September 2001 Transfer.  Specifically, they could not have reasonably discovered that: (a) the underlying debt for the August 2001 Transfer and September 2001 Transfer was not a valid and enforceable obligation against USACM; (b) USACM was

**FIRST AMENDED COMPLAINT — PAGE 25**

already insolvent at the time the August 2001 Transfer and September 2001 Transfer were made; and (c) the Culpable Insiders made the August 2001 Transfer and September 2001 Transfer in furtherance of their fraudulent looting and self-dealing scheme. The Culpable Insiders' scheme was exclusively adverse to USACM's interests, and in making the August 2001 Transfer and September 2001 Transfer in furtherance of this scheme, the Culpable Insiders' sole concern was their own personal benefit.

90.    On the date of the August 2001 Transfer and September 2001 Transfer and the Petition Date, there were creditors with allowable unsecured claims who could have avoided the August 2001 Transfer and September 2001 Transfer pursuant to Nevada state law.

91.    The Debtor made the August 2001 Transfer and September 2001 Transfer with the actual intent to hinder, delay, or defraud creditors of the Debtor. Specifically: (a) USACM did not receive reasonably equivalent value in exchange for making the August 2001 Transfer and September 2001 Transfer because the Fertitta Note was not a valid, enforceable obligation; (b) USACM was insolvent at the time the August 2001 Transfer and September 2001 Transfer were made; and (c) the August 2001 Transfer and September 2001 Transfer were made in furtherance of the Culpable Insiders' looting and self-dealing scheme.

92.    Accordingly, the August 2001 Transfer and September 2001 Transfer are fraudulent under NRS 112.180(1)(a).

93.    Pursuant to 11 U.S.C. § 544(b), the USACM Trust asks the Court to avoid the August 2001 Transfer and September 2001 Transfer under applicable state law.

**COUNT 4:    <u>Avoidance of the August 2001 Transfer and September 2001 Transfer Pursuant to 11 U.S.C.A. § 544(a)(2) and NRS 112.180(1)(a))</u>**

**FIRST AMENDED COMPLAINT — PAGE 26**

94.    The USACM Trust re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

95.    The August 2001 Transfer and September 2001 Transfer were of an interest of the Debtor in property.

96.    Prior to within one year of the Petition Date, neither USACM nor its innocent Stakeholders discovered nor could have reasonably discovered the fraudulent nature of the August 2001 Transfer and September 2001 Transfer.   Specifically, they could not have reasonably discovered that: (a) the underlying debt for the August 2001 Transfer and September 2001 Transfer was not a valid and enforceable obligation against USACM; (b) USACM was already insolvent at the time the August 2001 Transfer and September 2001 Transfer were made; and (c) the Culpable Insiders made the August 2001 Transfer and September 2001 Transfer in furtherance of their fraudulent looting and self-dealing scheme.  The Culpable Insiders' scheme was exclusively adverse to USACM's interests, and in making the August 2001 Transfer and September 2001 Transfer in furtherance of this scheme, the Culpable Insiders' sole concern was their own personal benefit.

97.    A creditor who extended credit to the Debtor at the Petition Date could have avoided the August 2001 Transfer and September 2001 Transfer pursuant to Nevada state law.

98.    The Debtor made the August 2001 Transfer and September 2001 Transfer with the actual intent to hinder, delay, or defraud creditors of the Debtor.  Specifically: (a) USACM did not receive reasonably equivalent value consideration in exchange for making the August 2001 Transfer and September 2001 Transfer because the Fertitta Note was not a valid, enforceable obligation; (b) USACM was insolvent at the time the August 2001 Transfer and September 2001 Transfer were

**FIRST AMENDED COMPLAINT — PAGE 27**

made; and (c) the August 2001 Transfer and September 2001 Transfer were made in furtherance of the Culpable Insiders' looting and self-dealing scheme.

99.     Accordingly, the August 2001 Transfer and September 2001 Transfer are fraudulent under NRS 112.180(1)(a).

100.     Pursuant to 11 U.S.C. § 544(a)(2), the USACM Trust asks the Court to avoid the August 2001 Transfer and September 2001 Transfer.

**COUNT 5:     Avoidance of the 2003 Principal Transfers Pursuant to 11 U.S.C.A. § 544(b) and NRS 112.180(1)(a))**

101.     The USACM Trust re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

102.     The 2003 Principal Transfers were of an interest of the Debtor in property.

103.     The 2003 Principal Transfers were made within four years of the Petition Date.

104.     On the date of the 2003 Principal Transfers and the Petition Date, there were creditors with allowable unsecured claims who could have avoided the 2003 Principal Transfers pursuant to Nevada state law.

105.     The Debtor made the 2003 Principal Transfers with the actual intent to hinder, delay, or defraud creditors of the Debtor. Specifically: (a) USACM did not receive reasonably equivalent value consideration in exchange for making the 2003 Principal Transfers because the Fertitta Note was not a valid, enforceable obligation; (b) USACM was insolvent at the time the 2003 Principal Transfers were made; and (c) the 2003 Principal Transfers were made in furtherance of the Culpable Insiders' looting and self-dealing scheme.

106.     Accordingly, the 2003 Principal Transfers are fraudulent under NRS 112.180(1)(a).

**FIRST AMENDED COMPLAINT — PAGE 28**

107.    Pursuant to 11 U.S.C. § 544(b), the USACM Trust asks the Court to avoid the 2003 Principal Transfers under applicable state law.

**COUNT 6:    Avoidance of the 2003 Principal Transfers and Interest Transfers Pursuant to 11 U.S.C.A. § 544(b) and 112.180(1)(b)**

108.    The USACM Trust re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

109.    The 2003 Principal Transfers and Interest Transfers each constitute a transfer of an interest of the Debtor in property.

110.    The 2003 Principal Transfers and Interest Transfers were made within the applicable four-year period under NRS 112.180(1)(b).

111.    On the date of the 2003 Principal Transfers and Interest Transfers, there were creditors with allowable unsecured claims who could have avoided the 2003 Principal Transfers and Interest Transfers pursuant to Nevada state law.

112.    The Debtor received less than a reasonably equivalent value in exchange for the 2003 Principal Transfers and Interest Transfers.  Specifically, the 2003 Principal Transfers and Interest Transfers were not made in satisfaction of a valid and enforceable antecedent debt because the Fertitta Note was not valid and enforceable at the time the 2003 Principal Transfers and Interest Transfers were made.

113.    The Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or the transaction.

**FIRST AMENDED COMPLAINT — PAGE 29**

114. The Debtor was engaged in business or a transaction or was about to engage in business or a transaction for which any property remaining with the Debtor was unreasonably small capital.

115. The Debtor intended to incur or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

116. Accordingly, the 2003 Principal Transfers and Interest Transfers are fraudulent transfers under NRS 112.180(1)(b).

117. Pursuant to 11 U.S.C. § 544(b), the USACM Trust asks the Court to avoid the 2003 Principal Transfers and Interest Transfers under applicable state law.

**COUNT 7:**     **Recovery of the Principal Transfers and Interest Transfers Pursuant to 11 U.S.C.A. § 550(a) and NRS 112.220**

118. The USACM Trust re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

119. The Principal Transfers and Interest Transfers are avoidable under 11 U.S.C.A. § 544 (through NRS 112.180(1)(a) and (b)).

120. The USACM Trust may recover the value of the Principal Transfers and Interest Transfers directly from Fertitta as an initial transferee pursuant to 11 U.S.C.A. § 550(a)(1) and NRS 112.220.

**COUNT 8:**     **Unjust Enrichment**

121. The USACM Trust re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

**FIRST AMENDED COMPLAINT — PAGE 30**

122.    By giving the Fertitta Note and making the Principal Transfers and Interest Transfers, USACM conferred a benefit on Fertitta.

123.    Fertitta appreciated the benefit in that it received the Principal Transfers and Interest Transfers made as payments on the Fertitta Note and deposited them in its bank account.

124.    Fertitta retained the benefits that it received as a result of the Principal Transfers and Interest Transfers under circumstances that make retention of these benefits inequitable. Specifically, these Principal Transfers and Interest Transfers were made in furtherance of the Culpable Insiders' looting and self-dealing scheme.

125.    Moreover, Fertitta knew or should have known that the Fertitta Note was not a valid and enforceable obligation.  Specifically, Fertitta knew or should have known that: (a) USACM would receive no economic benefit from Epic receiving $5 million, nor any other economic benefit in connection with the transaction; (b) the Culpable Insiders had ulterior motives for causing USACM to enter into such a highly unusual transaction; (c) $5 million was an unreasonably large obligation in relation to USACM's net worth and gross assets at the time of the transaction; and (d) a $5 million "gift" obligation that was not tied to a corresponding asset would render USACM insolvent.

126.    Prior to the Petition Date, neither USACM nor its innocent Stakeholders and creditors could have reasonably discovered the fraudulent nature of the Fertitta Note, Principal Transfers, and Interest Transfers.  The Culpable Insiders' looting and self-dealing scheme was exclusively adverse to USACM's interests, and in making the Fertitta Note, Principal Transfers, and Interest Transfers in furtherance of this scheme, the Culpable Insiders' sole concern was their own personal benefit.

**FIRST AMENDED COMPLAINT — PAGE 31**

**COUNT 9:**    **Money Had and Received**

127.    The USACM Trust re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

128.    Fertitta received money from the Principal Transfers and Interest Transfers.

129.    The USACM Trust is rightfully entitled to the money.  The Principal Transfers and Interest Transfers were made in furtherance of the Culpable Insiders' looting and self-dealing scheme.  USACM received no economic benefit whatsoever in exchange for making the Principal Transfers and Interest Transfers.

130.    In good conscience and equity, Fertitta has no right to maintain any money that it received in the Principal Transfers and Interest Transfers.

## VI.    PRAYER FOR RELIEF

WHEREFORE, the USACM Trust respectfully requests that the Court enter judgment as follows:

(a)    Avoiding the Fertitta Note and each of the Principal Transfers and Interest Transfers;

(b)    Directing Fertitta to pay the value of the Principal Transfers and Interest Transfers to the USACM Trust;

(c)    Directing Fertitta to pay to the USACM Trust all pre-judgment and post-judgment interest on the Principal Transfers and Interest Transfers at the maximum rate allowable by law and/or equity;

(d)    Directing Fertitta to pay the USACM Trust's costs of court; and

(e)    Awarding the USACM Trust such other relief that this Court deems just and proper.

**FIRST AMENDED COMPLAINT — PAGE 32**

Dated:  August 29, 2008.


**DIAMOND MCCARTHY LLP**          **LEWIS AND ROCA LLP**


By:  _/s/ Michael J. Yoder_               By:  _/s/ Rob Charles_
Allan B. Diamond, TX 05801800 (pro hac vice)   Rob Charles, NV 6593
Eric D. Madden, TX 24013079 (pro hac vice)   3993 Howard Hughes Parkway, Suite 600
Erin E. Jones, TX 24032478 (pro hac vice)   Las Vegas, Nevada  89169-5996
Michael Yoder, TX 24056572 (pro hac vice)   (702) 949-8320 (telephone)
909 Fannin, Suite 1500                    (702) 949-8321 (facsimile)
Houston, Texas 77010
(713) 333-5100 (telephone)
(713) 333-5199 (facsimile)


_Special Litigation Counsel for_          _Counsel for USACM Liquidating Trust_
_USACM Liquidating Trust_

**FIRST AMENDED COMPLAINT — PAGE 33**