# EXHIBIT "1"

DIAMOND MCCARTHY LLP
909 Fannin, Suite 1500
Houston, Texas 77010
Telephone (713) 333-5100
Facsimile (713) 333-5199

Allan B. Diamond, TX State Bar No. 05801800
Email: adiamond@diamondmccarthy.com
Eric D. Madden, TX State Bar No. 24013079
Email: emadden@diamondmccarthy.com

Special Litigation Counsel for USACM Liquidating Trust and
USA Capital Diversified Trust Deed Fund, LLC

LEWIS AND ROCA LLP
3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169-5996
Telephone (702) 949-8320
Facsimile (702) 949-8321

Rob Charles, NV State Bar No. 006593
Email: rcharles@lrlaw.com

Counsel for USACM Liquidating Trust and
USA Capital Diversified Trust Deed Fund, LLC

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br><br>Debtor. | Case Nos.:<br>BK-S-06-10725-LBR<br>BK-S-06-10726-LBR<br>BK-S-06-10727-LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br><br>Debtor. | BK-S-06-10728-LBR<br>BK-S-06-10729-LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br><br>Debtor. | JOINTLY ADMINISTERED<br>Chapter 11 Cases<br><br>Judge Linda B. Riegle |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br><br>Debtor. | |
| In re:<br>USA SECURITIES, LLC,<br><br>Debtor. | |
| Affects:<br>☐All Debtors<br>☒USA Commercial Mortgage Company<br>☐ USA Capital Realty Advisors, LLC<br>☒ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA Capital First Trust Deed Fund, LLC<br>☐ USA Securities, LLC | |

| | |
|---|---|
| USACM LIQUIDATING TRUST and USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>MARY PETERSEN, INDIVIDUALLY AND AS TRUSTEE OF THE MARY PETERSEN FAMILY TRUST DTD 8/12/98; MICHAEL PETERSEN INDIVIDUALLY AND AS TRUSTEE OF THE MICHAEL D. PETERSEN FAMILY TRUST DTD 8/12/98; KATHRYN PETERSEN INDIVIDUALLY AND AS TRUSTEE OF THE KATHRYN L. PETERSEN LIVING TRUST AND THE KLP TRUST DTD 7/15/99,<br><br>Defendants. | Adversary No. 08-___<br><br>**USACM LIQUIDATING TRUST'S AND DTDF'S ORIGINAL COMPLAINT AND CLAIM OBJECTION**<br><br>Hearing Date:    n/a<br>Hearing Time:    n/a |

Plaintiffs USACM Liquidating Trust ("USACM Trust"), as successor to USA Commercial Mortgage Company ("USACM") and USA Capital Diversified Trust Deed Fund, LLC ("DTDF")(collectively the "Plaintiffs"), hereby complain as follows:

## I.    NATURE OF THIS ACTION

1.    In April 2006, USACM, DTDF, and certain related entities were forced to file for bankruptcy protection as a result of the gross misconduct by certain insiders, namely USACM's former Chairman and CEO Thomas A. Hantges ("Hantges") and its former President Joseph D. Milanowski ("Milanowski"), (collectively, the "Culpable Insiders").    Among other wrongful conduct, the Culpable Insiders systematically looted USACM and DTDF to fund USA Investment Partners, LLC ("USAIP"), an entity that functioned as their personal "piggy bank," as well as other entities in which they stood to reap substantial personal profits.

2.    In the aggregate, the Culpable Insiders misappropriated tens of millions of dollars from USACM and DTDF in order:  (a) to fund the negative cash flow operations of USAIP and its

**ORIGINAL COMPLAINT**                                                    Page -- 2

vast network of affiliated entities; (b) to pay USAIP's obligations to third parties; and (c) to perpetuate the "Ponzi-like" scheme that enabled multiple forms of looting to occur.

3.    In this adversary proceeding, Plaintiffs seek to recover damages for the losses that USACM and DTDF sustained as a result of the Defendants continuously and willfully giving material assistance to the Culpable Insiders in perpetrating their fraudulent scheme. In addition, Plaintiffs seek to recover the value of the unjust enrichment conferred upon Defendants as a result of the Culpable Insiders' misconduct. Finally, Plaintiffs seek to recover more than $12.8 million that the Culpable Insiders misappropriated from USACM and DTDF and fraudulently transferred to Defendants as part of their scheme.

## II.    JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334(b) in that this action arises under, arises in, and/or relates to this bankruptcy case.

5.    This action is a core proceeding under 28 U.S.C. § 157(b)(2)(A),(C), (H), and (O).

6.    This is an adversary proceeding pursuant to Fed. R. Bankr. P. 7001.

7.    The Defendants are all subject to personal jurisdiction in this Court.

8.    This Court has venue over this proceeding pursuant to 28 U.S.C. § 1409(a).

## III.    PARTIES

### A.    PLAINTIFFS

9.    Plaintiff USACM Trust was created pursuant to the Third Amended Joint Chapter 11 Plan of Reorganization (the "Joint Plan") filed by USACM, DTDF, and three other debtors in Bankruptcy Case No. 06-10725 (Docket No. 1799). The Joint Plan was confirmed by the

**ORIGINAL COMPLAINT**                                        **Page -- 3**

Bankruptcy Court on January 8, 2007, and became effective on March 12, 2007. The Joint Plan expressly retained USACM's causes of action for enforcement by the USACM Trust, pursuant to 11 U.S.C. § 1123(b)(3)(B). The Joint Plan also transferred certain causes of action belonging to USA Capital First Trust Deed Fund, LLC ("FTDF") to the USACM Trust. The USACM Trust, therefore, has standing to bring this action against the Defendants. The USACM Trust is a liquidating trust organized under Nevada law. The USACM Trust's beneficiaries are the holders of allowed unsecured claims against USACM. Geoffrey L. Berman serves as the trustee of the USACM Trust and may be served through undersigned counsel.

10.    Plaintiff DTDF is a limited liability company organized under Nevada law on or about February 3, 2000. DTDF offered Nevada investors the opportunity to purchase membership interests in a fund and thereby invest in loans that USACM originated and serviced on behalf of DTDF. Upon confirmation of the Joint Plan, the DTDF Amended Operating Agreement was enacted and became effective. The Joint Plan expressly retained DTDF's causes of action for enforcement by DTDF pursuant to 11 U.S.C. § 1123(b)(3)(B) upon the effective date of the Joint Plan.

**B.    DEFENDANTS**

11.    Defendant, Mary Petersen, individually, and as trustee of the Mary Petersen Family Trust DTD 8/12/98, is an individual residing in the State of Nevada. Defendant can be served by personal service at 8913 Players Club, Las Vegas, Nevada 89134 or wherever she may be found. The Mary Petersen Family Trust DTD 8/12/98 is a trust organized under the laws of the state of

Nevada and can be served by personal service on its trustee, Mary Petersen, at the address listed above.

12.     Defendant, Michael D. Petersen, individually, and as trustee of the Michael D. Petersen Family Trust DTD 8/12/98, is an individual residing in the State of Nevada. Defendant can be served by personal service at 9005 Grove Crest Lane, Las Vegas, Nevada 89134 or wherever he may be found. The Michael D. Petersen Family Trust DTD 8/12/98 is a trust organized under the laws of the state of Nevada and can be served by personal service on its trustee, Michael D. Petersen at the address listed above.

13.     Defendant, Kathryn L. Petersen, individually, as trustee of the Kathryn L. Petersen Living Trust, and as trustee of the KLP Trust DTD 7/15/99 ("Petersen") is an individual residing in the State of Nevada. Defendant can be served by personal service at 900 Granger Farm Way, Las Vegas, Nevada 89145 or wherever she may be found. The Kathryn L. Petersen Living Trust is a trust organized under the laws of the state of Nevada and can be served personal service on its trustee, Kathryn L. Petersen at the address listed above. The KLP Trust DTD 7/15/99 is a trust organized under the laws of the state of Nevada and can be served personal service on its trustee, Kathryn L. Petersen at the address listed above.

## IV.    FACTUAL ALLEGATIONS

### A.    BACKGROUND OF USACM, DTDF, AND THEIR DEMISE

14.     In April 2006, USACM and certain related companies collapsed due to the fraud perpetrated on them by Culpable Insiders. Beginning as early as 1997, the Culpable Insiders employed a pervasive "Ponzi-like" scheme that enabled them to loot and/or misappropriate tens of

**ORIGINAL COMPLAINT**                                                    **Page -- 5**

millions of dollars from USACM and DTDF. As a result of these wrongful activities, USACM was insolvent at least as early as December 31, 2001, if not earlier. Eventually USACM and DTDF (the "Debtor") filed for relief under Chapter 11 of the Bankruptcy Code on April 13, 2006 (the "Petition Date").

15.     USACM was a mortgage broker and loan servicing company whose primary business activities were: (a) "originating" short-term loans from investors to real estate developers; and (b) servicing the loans that it originated by collecting principal and interest from borrowers and distributing those payments to the investors through use of the USA Commercial Mortgage Company Collection Trust Account (the "Collections Account"). USACM earned revenue by charging various fees for these services, including origination, servicing, and extension fees, although these fees often went uncollected.

16.     A significant portion of the fee revenues that USACM actually received was subsequently misappropriated by the Culpable Insiders. Specifically, the Culpable Insiders misappropriated USACM's money to fund entities in which they held an indirect ownership interest through USA Investment Partners, LLC ("USAIP"), including time-share hotels, real estate development entities, and technology companies. The Culpable Insiders often earmarked USACM funds and used USAIP as a conduit for fraudulently transferring these funds to such entities. In other instances, the Culpable Insiders caused USACM to directly transfer funds to entities in which USAIP and the Culpable Insiders had an interest. In the aggregate, the Culpable Insiders misappropriated tens of millions of dollars from USACM to fund their outside business ventures.

**ORIGINAL COMPLAINT**                                         **Page -- 6**

17.    In addition, the Culpable Insiders caused USACM to make scores of other payments for which it received no benefit and for which it had no underlying obligation.  Routinely, the Culpable Insiders commingled USACM's operating funds with funds held in the Collections Account and other funds to make regular interest and principal payments to investors in non-performing loans.  These payments were made to conceal delinquent and defaulted loans from other USACM directors, officers, employees, shareholders, as well as the investors and regulatory authorities.  In turn, the Culpable Insiders used this to induce existing investors to maintain or increase their investments with USACM and entice new investors to entrust their money to USACM, thereby providing the Culpable Insiders with liquidity to fund their scheme, and thus, future sources of funds to loot from USACM.

18.    Ultimately, USACM lost millions of dollars by making principal and interest payments on loan obligations that it did not owe on behalf of defaulting borrowers.  USACM did not receive any benefit from making these "pre-payments" of interest and principal.  Rather, such payments were expressly forbidden by Nevada law, including NRS 645B.250.

19.    To provide additional sources of funds to fuel this "Ponzi-like" scheme, the Culpable Insiders adopted a "fund" business model with the creation of DTDF and USA Capital First Trust Deed Fund, LLC ("FTDF") in February 2000 and February 2001, respectively.  Under the "fund" model, investors purchased interests in DTDF and/or FTDF, which then acted as lenders in loans originated and serviced by USACM.

20.    Beginning at least as early as 2002 and continuing until the Petition Date, the Culpable Insiders created liquidity in the Collections Account by failing to remit principal payments

**ORIGINAL COMPLAINT**                                                  **Page -- 7**

to DTDF when the loan(s) that it had invested in were repaid. In such situations, Victoria Loob ("Loob"), USACM's Secretary and Treasurer, took physical possession of checks payable to DTDF and simply stuffed them in her desk drawer. Internally, the Culpable Insiders referred to the unremitted principal to DTDF as the "held checks." As of the Petition Date, the outstanding balance of the held checks was at least $18.9 million.

21.    The Culpable Insiders also transferred funds directly from DTDF to the Collections Account to cover shortfalls. For example, the Culpable Insiders transferred $11.425 million from DTDF into the Collections Account in January 2003. These transfers were in direct violation of Nevada law and DTDF's Prospectus.[1]

22.    The Culpable Insiders also systematically used DTDF as a vehicle to take certain, preferred investors out of non-performing loans. In these situations, the Culpable Insiders caused DTDF to pay in cash the full face value of the preferred investors' beneficial interests in these distressed loans in exchange for assignments of the beneficial interests. In many cases, the beneficial interests DTDF received through these assignments were only worth pennies on the dollar. In countless examples, the preferred lenders recouped their entire investment while DTDF was left with nothing more than an interest in worthless investment. The Culpable Insiders ultimately used DTDF to make tens of millions of dollars of such assignments, causing tens of millions of dollars in losses.

---

[1] According to the DTDF Prospectus: (i) USACM had sold $121,524,500 worth of units in the Fund prior to June 2, 2003; (ii) investors were not offered a fixed rate of return but rather a "flow-through" of the profits generated by DTDF through DTDF acting as a Direct Lender ins loans generated by USACM; (iii) DTDF would only invest in loans secured by first deeds of trust upon real property; (iv) loan-to-value ratios for the loans in which DTDF would become a Direct Lender would not exceed 75% and may be as low as 60%; and (v) loan diversification restrictions would be imposed upon the loans invested by DTDF such that no loan would exceed $20 million, no loan would exceed 15% of all loans outstanding at any time, and no more than 25% of the loans outstanding at any time would be made to a single borrower or an affiliate of such borrower.

**ORIGINAL COMPLAINT**                                          Page -- 8

23.    In addition to abusing DTDF to fuel their "Ponzi"-like scheme, the Culpable Insiders regularly looted funds from DTDF to fund entities in which they held an indirect ownership interest through USAIP, including time-share hotels, real estate development entities, and technology companies.  In addition, the Culpable Insiders looted DTDF to pay obligations that USAIP owed to third parties.

24.    To conceal their abuses, the Culpable Insiders fabricated a sham loan to 10-90, Inc. ("10-90").  Although 10-90 was not even created until December 31, 2002, the Culpable Insiders booked much of their 2002 looting of DTDF as advances on the sham loan to 10-90.  From January 2003 onward, the Culpable Insiders continued to loot tens of millions of dollars from DTDF, ultimately booking more than $55 million of looting as advances on the loan to 10-90.

**B.    FUNDS WITHIN THE USACM COLLECTIONS ACCOUNT CONSTITUTE AN INTEREST OF THE DEBTOR IN PROPERTY**

25.    The Culpable Insiders commingled funds within the USACM Collections Account. Specifically, principal and interest payments made by borrowers on performing loans were used in conjunction with USACM's servicing fees, USACM operating funds, funds due to USACM from assignments, and investor funds to make interest payments to investors on non-performing and defaulted loans and for other improper purposes.

26.    Where funds were taken from the Collections Account, it is practically, if not wholly, impossible to clearly identify the source of these funds or otherwise trace the funds.

**ORIGINAL COMPLAINT**                                                    **Page – 9**

Accordingly, the Joint Plan provides that certain funds[2] transferred out of the Collections Account are property of the USACM estate.

## C.    THE DEFENDANTS' ROLE IN THE CULPABLE INSIDERS' SCHEME

27.     From the inception of "USA Capital," the Culpable Insiders had extensive dealings with Defendants, the late Dean Petersen, and their associated trusts (collectively, the "Petersen Family").

28.     Dean Petersen was heavily involved in the first real estate deal arranged by the USA Capital entities.  In 1989, USA Capital raised $15 million of equity in a private placement for the Rio Hotel & Casino in Las Vegas, Nevada.  In connection with this deal, Hantges obtained $5 million from Dean Petersen, who, upon information and belief, was Hantges' close personal friend.

29.     Dean Petersen and/or the Petersen Family funded a significant portion of the loans originated and serviced by USACM in the mid 1990s.  Specifically, by the end of 1998, the Petersen Family had more than $23.7 million of outstanding investments in loans originated by USACM.  At the time, this accounted for nearly 40% of USACM's total outstanding loan portfolio of $63.6 million.

30.     As a result of the extensive business dealings between the Petersen Family and the Culpable Insiders and the personal friendship that Dean and Mary Petersen had with Hantges, the Culpable Insiders gave highly preferential treatment to Defendants.

31.     Specifically, the Culpable Insiders ensured that Defendants always recouped their investments in loans originated and serviced by USACM.  When the loans in which the Defendants

---

[2] Specifically, the Joint Plan provides that "Prepaid Interest" is an asset of the USACM estate.

**ORIGINAL COMPLAINT**                                                    **Page -- 10**

invested went into default, the Culpable Insiders would "take out" the Defendants at the full face value of their investments in the distressed loans by: (a) assigning Defendants' interests to other investors; (b) creating a new entity to buy them out and take over the project; and/or (c) using DTDF and/or USACM's funds to buy them out.  Upon information and belief, Defendants recouped virtually every dollar they ever invested in a loan originated and serviced by USACM as a result of such misconduct.

32.    Over time, USACM and DTDF lost millions of dollars as a result of the Culpable Insiders' repeated misuse of USACM and DTDF to pay Defendants the full face value of their beneficial interests in non-performing loans.

33.    By the same token, the Defendants were grossly enriched.  As a result of the preferential treatment they were afforded by the Culpable Insiders, Defendants were able to enjoy the extremely high interest rates offered by the investment opportunities presented by USACM without bearing any of the corresponding risks normally associated with such investments.

34.    In return, Michael Petersen and Mary Petersen willfully and continuously provided material assistance to the Culpable Insiders in carrying out their scheme.  Specifically, they knowingly: (a) provided liquidity, when necessary, to keep the Culpable Insiders' "Ponzi"-like scheme afloat; (b) entered into sham transactions with the Culpable Insiders that concealed the Culpable Insiders' systematic looting; and (c) encouraged further looting by consistently providing financing to the Culpable Insiders' side ventures and accepting payment from USACM in return.

1.    **Buy Outs of Distressed Loans**

**ORIGINAL COMPLAINT**                                        **Page -- 11**

35.    Many of the loans funded by the Petersen Family were to entities affiliated with USACM's two primary borrowers during the mid to late 1990s, Inco Homes Corp. ("Inco") and Robert V. Jones Corp. ("RVJ"). During the 1990s, USACM originated at least eighteen (18) loans to Inco Homes Corp. ("Inco") and at least nineteen (19) loans to Robert V. Jones Corp. ("RVJ"). The Petersen Family also invested several million dollars in loans that USACM originated to American Communities, LLC or affiliated entities (collectively, "American Communities").

36.    Inco, RVJ, and American Communities all fell into financial ruin. In October 1999, Inco filed for Chapter 11 bankruptcy protection. In January 2000, American Communities' outstanding projects were taken over by Principle Centered, Inc. ("PCI"), which subsequently filed for Chapter 11 bankruptcy protection on March 2, 2001. And in February 2000, RVJ lost its Nevada contractor's license.

37.    Nevertheless, the Culpable Insiders ensured that Defendants were able to recoup their investments in loans to the troubled Inco and RVJ affiliates by using USACM and/or DTDF to buy them out of distressed loans.

(a)    Red Hills/Canyon Creek West

38.    On June 7, 1996, USACM originated two loans, one to RVJ, and one to Red Hills at the Pueblo Limited Partnership (the "Red Hills"), an entity managed by RVJ. Upon information and belief, these loans were referred to internally within USACM as the "Canyon Creek West" and "Red Hills" loans, respectively. Upon information and belief, Mary Petersen held an interest in both loans.

**ORIGINAL COMPLAINT**                                                    **Page -- 12**

39.    The Canyon Creek West and Red Hills loans were never fully repaid. Consequently, the Culpable Insiders caused USACM to buy out Mary Petersen's interests in the loans. Specifically, on September 30, 2004, the Culpable Insiders caused USACM to issue a check for $762,549.27 to Mary Petersen (the "Red Hills/CCW Transfer"). This check cleared on October 7, 2004. Of this amount, $367,521.65 and $395,027.62 were allocated to Red Hills and CCW, respectively.

40.    USACM had no obligation to make the Red Hills/CCW Transfer. Nor did USACM receive any benefit in exchange for making the transfer. Rather, upon information and belief, the full amounts allocated to Red Hills and CCW in connection with the transfer were eventually written off as an allowance of bad debt.

41.    Upon information and belief, Mary Petersen willfully accepted these transfers from USACM, even though she knew that the Culpable Insiders breached their fiduciary duties to USACM in causing these fraudulent transfers to be made.

(b)    M.P.D.D. Ranch, LLC

42.    In 1996, the Petersen Family invested as a direct lender in USACM-originated loans to RVJ or certain RVJ affiliates related to real estate projects near Reno, Nevada. By 2000, the loans were non-performing.

43.    Upon information and belief, the Culpable Insiders and Mary Petersen agreed to form M.P.D.D. Ranch, LLC ("MPDD") in order to take over the underlying real estate projects. MPDD was formed on May 24, 2000. Upon information and belief, Mary Petersen created MPDD, although, it was owned and managed by the Culpable Insiders.

**ORIGINAL COMPLAINT**                                          **Page -- 13**

44.     On August 3, 2000, MPDD made and delivered a $635,000 promissory note in favor of Mary Petersen (the "MPDD Note").  Given the close relationship between the Culpable Insiders, and Mary Petersen, there was little activity on the note for several years.  But when the Culpable Insiders began to see the inevitable, they caused USACM to pay down the MPDD Note on behalf of MPDD.

45.     On March 4, 2005, the Culpable Insiders caused USACM to issue a $135,000 check to Mary Petersen (the "MPDD Early Transfer") as a payment on the MPDD Note.  The check cleared on March 7, 2005.

46.     On June 3, 2005, the Culpable Insiders caused USACM to issue a $100,000 check to Mary Petersen (the "MPDD Transfer").  The check cleared on June 6, 2005.

47.     Finally, on August 19, 2005, the Culpable Insiders caused $398,577.20 to be directly deposited via ACH from the Collections Account to Mary Petersen (the "MPDD Collection Transfer") as a payment on the MPDD Note.  Within days thereafter, the Culpable Insider caused USACM to issue a check in the same amount to the Collections Account.  This check cleared on August 24, 2005.

48.     USACM had no obligation to make the MPDD Early Transfer, the MPDD Transfer, or the MPDD Collection Transfer.  Nor did USACM receive any benefit in exchange for making these transfers.  Rather, upon information and belief, these transfers were eventually written off as an allowance for bad debt.

**ORIGINAL COMPLAINT**                                    **Page -- 14**

49.    Upon information and belief, Mary Petersen willfully accepted these transfers from USACM, even though she knew that the Culpable Insiders breached their fiduciary duties to USACM in causing these fraudulent transfers to be made.

(c)    **Saddleback**

50.    On January 27, 1999, USACM originated a $500,000 loan to Saddleback Handcrafted Homes, Ltd. ("Saddleback"). USACM participated as the original lender in the loan, but then assigned its interest to the Petersen Living Trust on July 14, 1999. The Kathryn Petersen Trust and Michael Petersen each succeeded to one-third interests on October 29, 1999. Ultimately, Saddleback defaulted on the loan and declared bankruptcy.

51.    On April 2, 2004, the Culpable Insiders caused USACM to issue a $125,000 check to the Kathryn Petersen Living Trust (the "Kathryn Saddleback Transfer") to buy out her interest in the Saddleback loan. The check cleared on April 23, 2004.

52.    Similarly, on June 25, 2004, the Culpable Insiders caused USACM to issue a $125,000 check to Michael Petersen (the "Michael Saddleback Transfer") for the same purpose. This check cleared on June 28, 2004.

53.    USACM had no obligation to make either the Kathryn Saddleback Transfer or the Michael Saddleback Transfer. Nor did USACM receive any benefit in exchange for making these transfers. Upon information and belief, the full amounts of these sham loan repurchases were eventually written off as an allowance of bad debt.

**ORIGINAL COMPLAINT**                                                    **Page -- 15**

54.     Upon information and belief, Mary Petersen willfully accepted these transfers from USACM, even though she knew that the Culpable Insiders breached their fiduciary duties to USACM in causing these fraudulent transfers to be made.

(d)     **B&J Investments**

55.     On September 17, 1999, USACM originated a $1.25 million loan (the "B&J Loan") to B & J Investments, LLC ("B&J"). The sole lender in the loan was USA Investors III, LLC ("Investors III"). Upon information and belief, Mary Petersen later acquired the entire interest in the loan and currently serves as the managing member of Investors III.

56.     B&J ultimately went bankrupt and was unable to re-pay the loan. Consequently, on September 7, 2005, the Culpable Insiders caused USACM to issue a check for $378,125 to Mary Petersen on September 7, 200 5(the "B&J Transfer") as a repayment on the B&J Loan. The check cleared on September 8, 2005.

57.     Upon information and belief, USACM had no obligation to make the B&J Transfer and USACM received no benefit in exchange for making that transfer.

58.     Upon information and belief, Mary Petersen willfully accepted these transfers from USACM, even though she knew that the Culpable Insiders breached their fiduciary duties to USACM in causing these fraudulent transfers to be made.

(e)     **Green Valley- First**

59.     On November 30, 1999, USACM originated a $3.25 million loan on behalf of Mary Petersen to American Communities (the "GV1 Loan"). The GV1 Loan's original maturity date was December 14, 2000.

**ORIGINAL COMPLAINT**                                           **Page — 16**

60.     As was the case for many of the loans originated by USACM to American Communities, the GV1 Loan went into default. Specifically, it was in default on interest at least as early as March 1, 2000. Nevertheless, upon information and belief, the Culpable Insiders caused USACM to make monthly interest payments to Mary Petersen on the borrower's behalf.

61.     On October 31, 2000, approximately six weeks before the maturity date of the loan, Mary Petersen, as trustee for the Mary Petersen Trust, assigned the entire $3.25 million interest in the loan to DTDF. Then on November 1, 2000, the Mary Petersen Trust subscribed to DTDF in the amount of $3.25 million, equating to 130 membership units. Upon information and belief, DTDF conveyed $3.25 million in membership interests in exchange for the (in)ability to collect the $3.25 million defaulted GV1 Loan.

62.     Upon information and belief, the Culpable Insiders' sole purpose of this transaction was to ensure that Mary Petersen was repaid on a distressed loan. Although she theoretically would be exposed to a proportionate share of the resulting risk in DTDF's loan portfolio as a member of DTDF, the Culpable Insiders could completely eliminate this risk by redeeming her entire $3.25 million membership interest in DTDF. For a period of several years, Mary Petersen remained a member in DTDF and received regular member distributions.

63.     On November 1, 2004, less than two weeks before they caused the final wire transfer to be made from DTDF to 10-90, the Culpable Insiders caused DTDF to write Mary Petersen a check for $3.25 million as a purported redemption of her entire membership interest (the "DTDF Transfer"). Upon information and belief, this sham redemption was made with the actual intent to hinder, delay, and defraud DTDF's creditors.

**ORIGINAL COMPLAINT**                                    **Page -- 17**

### 2.    The Convertible Debenture

64.    On March 1 2000, the Culpable Insiders caused USACM to issue an unsecured Convertible Debenture (the "Debenture") in favor of Mary Petersen and Michael Petersen. The Debenture carried a face amount of $5 million, of which Mary Petersen held a seventy percent (70%), or $3.5 million, interest and Michael Petersen held a thirty percent (30%), or $1.5 million, interest.

65.    The face amount of the Debenture equaled the aggregate face amount of six assignments of beneficial interests in deeds of trust made by Mary Petersen or Michael Petersen to USACM in April 2000 (collectively, the "Debenture Assignments").

66.    The Debenture Assignments each corresponded to one of six distinct loans: Triple Five/Grand Canyon (the "Triple Five Loan"), American Communities Harmony A&D (the "Harmony Loan"), American Communities Unit 2 (the "Black Mountain Loan"), South Meadows Apartments (the "SMA Loan"), Fiesta Development (the "Fiesta Loan"), and Green Valley 2nd (the "GV2 Loan"). The assignments corresponding to the Triple Five Loan, Harmony Loan, Black Mountain Loan, SMA Loan, and the Fiesta Loan were each dated April 1, 2000. The assignment corresponding to the GV2 Loan was dated April 24, 2000.

67.    Upon information and belief, the Debenture Assignments were made to further the Culpable Insiders' "Ponzi-like" scheme by knowingly providing the Culpable Insiders with the liquidity necessary to take investors out of certain troubled loans. In exchange for knowingly providing assistance to this scheme, Mary Petersen recouped her entire $2.55 million investment in a distressed loan.

**ORIGINAL COMPLAINT**                                              **Page — 18**

(a)   **The Harmony Loan and Black Mountain Loan Assignments Made by Mary Petersen**

68.   In February 1999, USACM originated the Harmony Loan and the Black Mountain Loan to American Communities.  The original principal amounts of these loans were $2.65 million and $1.9 million, respectively.  Mary Petersen was not involved in the Black Mountain Loan or the Harmony Loan in any way prior to March 1, 2000, the date the Debenture was issued.

69.   Upon information and belief, both the Black Mountain Loan and the Harmony Loan were non-performing by late 1999 or early 2000.

70.   In order to maintain investor confidences and to perpetuate their self-dealing and systematic looting of USACM, the Culpable Insiders endeavored to ensure that the investors in the Black Mountain Loan and the Harmony Loan were fully repaid from non-borrower sources.  At this point in time, however, the Culpable Insiders were unable to do so through the typical "Ponzi-like" mechanisms employed in later years to perpetuate the Culpable Insiders' schemes.

71.   Specifically, given the nearly simultaneous financial collapses of Inco, RVJ, and American Communities, the number of non-performing loans within USACM's outstanding loan portfolio was simply too high in relation to the number of performing loans to allow the Culpable Insiders to make all payments on the non-performing loans by simply misallocating incoming payments from performing borrowers and USACM fee revenues.

72.   In addition, DTDF was not yet operational, meaning the Culpable Insiders could not create liquidity in the Collections Account by looting funds from DTDF and/or holding checks payable to DTDF.

**ORIGINAL COMPLAINT**                                        **Page – 19**

73.     Accordingly, the Culpable Insiders turned to a long-time ally, Mary Petersen, to assist them in perpetuating their scheme.  On March 7, 2000, the Culpable Insiders deposited a $3.455 million check from Mary Petersen into the USA Commercial Mortgage Company Investors Trust Account (the "Investor Account"), a portion of which was to be used for the purpose of buying out other investors' positions in troubled loans.

74.     On March 8, 2000, the Culpable Insiders caused six investors to assign their interests in the Black Mountain Loan to Mary Petersen.  A seventh investor assigned its interest on March 17, 2000.  In exchange, each investor received a check from the Investor Account in the amount of the face value of its interest in the loan.   The aggregate amount of the face value of these assignments was $535,000.

75.     On March 8, 2000, six investors assigned their interests in the Harmony Loan to Mary Petersen.  Three additional investors assigned their interests in March 2000.  In exchange, each investor received a check from the Investor Account in the amount of the face value of its interest in the loan.  The aggregate amount of the face value of these assignments was $865,000.

76.     All sixteen of these assignments were recorded on March 31, 2000.

77.     Then on April 1, 2000, Mary Petersen assigned her entire accumulated aggregate interest in the Black Mountain Loan, and $425,000 of her aggregate $865,000 interest in the Harmony Loan[3] to USACM.  At the same time, the aggregate face value of these assignments was then credited to the Debenture in USACM's accounting records.

_____

[3] On April 21, 2000, three additional investors assigned their interests in the Harmony Loan to Mary Petersen.  These assignments were recorded April 26, 2000.  In exchange, each investor received a check in the amount of the face value of its assigned interest. The aggregate amount of the assigned interests was $110,000.

**ORIGINAL COMPLAINT**                                                          **Page – 20**

78.    The net effect of this transaction was simply to delay the eventual misappropriation of USACM funds to repay obligations that USACM did not owe. With Mary Petersen's assistance, the Culpable Insiders were able to ensure that certain investors recouped the full $950,000 value of their investments in distressed loans without needing to misappropriate USACM funds to do so at the time. Instead, the Culpable Insiders would simply misappropriate USACM funds in the future to pay these obligations, which USACM never really owned in the first place, to Mary Petersen.

79.    In essence, this transaction amounted to a "re-financing" of the underlying "Ponzi-like" scheme.

80.    Mary Petersen was a willing participant in this scheme. Specifically, within a one-month span, she provided funds to buy out other investors' aggregate $925,000 interest at face value, assigned this aggregate interest to USACM, and received a Debenture from USACM that purportedly obligated USACM to pay her: (a) the $925,000 face value of this assigned interest and (b) the face value of her $2.55 million interest in the GV2 Loan, which un-coincidentally was in default at the time.

### (b)    The GV2 Loan Assignment

81.    On May 7, 1999, USACM originated the GV2 Loan to American Communities. The principal amount of the loan was $2.55 million and the only investor in the loan was the Petersen Living Trust. Upon information and belief, Mary Petersen later succeeded to the entire $2.55 million interest in the loan.

82.    The GV2 Loan went into default at least as early as March 1, 2000.

On March 1, 2001, Mary Petersen assigned the remainder of her interest in the Harmony Loan ($440,000 from the assignments made in March and $110,000 from the assignments made in April) in the Harmony Loan to DTDF.

**ORIGINAL COMPLAINT**                                                    **Page -- 21**

83.    In early 2000, the Culpable Insiders met with PCI and several other parties in an effort to restructure and workout several non-performing loans that PCI had assumed from American Communities, including the GV2 Loan.  On April 21, 2000, they executed a Debt Restructuring Agreement.  Pursuant to this restructuring agreement, Tom Gonzales was to purchase the GV2 Loan at face value.

84.    On April 24, 2000, Mary Petersen assigned her entire $2.55 million interest in the GV2 Loan to USACM.  Immediately thereafter, the Culpable Insiders assigned the interest to Housing Partners, LLC ("Housing Partners"), which they owned and managed.  From Housing Partners, the Culpable Insiders then assigned the interest to Tom Gonzales.

85.    As part of this transaction, the Culpable Insiders caused USACM to credit the Debenture for $2.55 million.  Upon information and belief, USACM never ultimately received any cash or other consideration in exchange for crediting the Debenture in this amount.

86.    Upon information and belief, Mary Petersen expected to be taken out of this non-performing loan at the face value of her $2.55 million interest when she agreed to provide the Culpable Insiders with the liquidity necessary to buy out the other investors in the other non-performing loans.  Specifically, the overall timeline for the transaction was as follows:

> ☒ March 1st:  The Culpable Insiders caused USACM to issue the Debenture, of which Mary Petersen held a $3.5 million interest payment;

> ☒ March 7th:  The Culpable Insiders deposited funds provided by Mary Petersen for the purpose of buying other investors out of non-performing loans;

> ☒ March 8th: Mary Petersen took assignments of twelve investors' interests, at face value, in two non-performing loans to American Communities;

**ORIGINAL COMPLAINT**                                    Page -- 22

¤  March 10th to 16th: Mary Petersen took assignments of four additional investors' interests, at face value, in two non-performing loans to American Communities;

¤  April 1st: Mary Petersen assigned an aggregate $0.95 million interest in the two non-performing American Communities loans to USACM; and

¤  April 24th: Mary Petersen assigned a previously outstanding $2.55 million interest in a different American Communities loan to USACM.

Upon information and belief, Mary Petersen provided the funds necessary for the Culpable Insiders to take out certain investors in two non-performing loans in exchange for being taken out of her own interest in a third non-performing loan at face value.

87.    In doing so, she knowingly and substantially assisted the Culpable Insiders in perpetuating their "Ponzi-like" scheme, thereby enabling their systematic looting and self-dealing to continue well into the future.

(c)    The Michael Petersen Assignments to USACM

88.    On April 1, 2000, Michael Petersen assigned his interests in the Triple Five Loan, Fiesta Loan, and SMA Loan to USACM in exchange for his $1.5 million share of the Debenture. The aggregate face value of these assignments was $1.5 million, consisting of: $1,100,000 of his total $1,666,666.67 investment in the Triple Five Loan, his entire $360,000 interest in the Fiesta Loan, and his entire $40,000 (as of April 1, 2000) interest in the SMA Loan.

89.    Upon information and belief, Michael Petersen made each of these assignments because: (a) he had inside knowledge into the financial affairs of the borrower; (b) the assignment was in furtherance of interconnected Culpable Insider misconduct; and/or (c) the face value of the interest exceeded its actual market value at the time because of the borrower's past performance, the

**ORIGINAL COMPLAINT**                                      **Page -- 23**

borrower's ability to completely or timely repay the loans, and/or the market value of the underlying collateral, among other reasons.

90.    USACM originated the Triple Five Loan on March 9, 2000.  The principal amount of the loan was $19.15 million.  A substantial portion of this amount was used to refinance two previous loans that USACM had originated to the borrower.  Specifically, the aggregate amount refinanced was approximately $14.65 million.

91.    Upon information and belief, the market value of a $1.1 million interest in the Triple Five Loan as of April 1, 2000 was less than its face value.  Specifically, the loan was merely a refinancing of earlier loans that the borrower was unable to pay as the loans neared maturity.  Moreover, the Triple Five Loan was not ultimately repaid until long after its maturity date.

92.    USACM originated the Fiesta Loan on November 22, 1999.  The principal amount of the loan was $1.7 million and its original maturity date was November 22, 2000.

93.    Upon information and belief, the market value of Michael Petersen's $360,000 interest in the loan was substantially less than $360,000 on April 1, 2000.  The loan was not ultimately repaid until several years after its original maturity date.

94.    On February 2, 1998, USACM originated the SMA Loan on February 2, 1998 to an entity managed and partially owned by the Culpable Insiders.  The principal amount of the loan was eventually increased to $5.54 million, of which Michael Petersen held a $1.04 million interest.

95.    The SMA Loan was part of an interconnected, continuous series of transactions involving the Culpable Insiders' development of the Tanamera Apartments.  As discussed below,

**ORIGINAL COMPLAINT**                                            **Page – 24**

the continuous chain of events involved severe breaches of the fiduciary duties that the Culpable Insiders owed to USACM.

96.    Upon information and belief, Michael Petersen's assignment of $40,000 of his interest in SMA Loan to USACM was made in connection with and in furtherance of the other misconduct related to the Tanamera Apartments, as discussed below.    Specifically, Michael Petersen exchanged his other $1 million interest in the SMA Loan for a membership interest in SMA on the same day that he made the assignment of his $40,000 interest to USACM.

97.    USACM had absolutely no obligation to assume Michael Petersen's positions in these loans, especially at face value.    Upon information and belief, the Culpable Insiders caused USACM to give the $1.5 million portion of the Debenture to Petersen in exchange for his continuing assistance in perpetuating their scheme.

(d)    **Transfers Made on the Fraudulent Debenture**

98.    In 2004, the Culpable Insiders caused USACM to issue Mary Petersen: (a) a check for $500,000, dated July 1, 2004 and (b) a check for $500,000, dated September 17, 2004 to pay down her portion of the Debenture (collectively, the "Debenture Paydowns").    Both of these checks cleared on October 7, 2004.

99.    On June 3, 2005, the Culpable Insiders caused USACM to issue a check for $2.5 million to Mary Petersen to pay off the remaining balance on her share in the sham Debenture (the "Debenture Payoff").    The check cleared June 6, 2005.

100.    Upon information and belief, the Culpable Insiders caused USACM to pay Mary Petersen more than $3.5 million in monthly interest payments from USACM's corporate operating

**ORIGINAL COMPLAINT**                                                   **Page -- 25**

account and the Collections Account during the period from April 13, 2002 through the Petition

Date.

101.    Of this aggregate amount, the Culpable Insiders specifically identified $586,249.97

of ACH transfers out of the Collections Account as interest payments on Mary Petersen's $3.5

million share of the Debenture, as follows:

| DATE | AMOUNT |
|---|---|
| May 6, 2002 | $42,194.44 |
| June 7, 2002 | $40,833.33 |
| August 7, 2002 | $42,194.44 |
| September 6, 2002 | $40,833.33 |
| October 4, 2002 | $42,194.44 |
| November 6, 2002 | $40,833.33 |
| December 6, 2002 | $42,194.44 |
| February 9, 2004 | $39,472.22 |
| April 7, 2004 | $40,833.33 |
| May 7, 2004 | $42,194.44 |
| June 7, 2004 | $40,833.33 |
| July 8, 2004 | $36,166.67 |
| August 6, 2004 | $36,166.67 |
| November 15, 2004 | $29,166.67 |
| December 8, 2004 | $30,138.89 |
| TOTAL | $586,249.97 |

Upon information and belief, significant portions of the other interest payments made to Mary

Petersen from April 13, 2002 through the Petition Date were also attributable to Mary Petersen's

interest in the Debenture (together with the transfers identified in the table above, the "Mary

Debenture Interest Transfers").    Upon information and belief, the Culpable Insiders caused

USACM to make at least $1.5 million of Mary Debenture Interest Transfers in the course of paying

her more than $2.45 million in total interest on the Debenture from the time of its inception.

**ORIGINAL COMPLAINT**                                                    **Page – 26**

102.    Upon information and belief, the Culpable Insiders also caused USACM to pay Michael Petersen more than $600,000 in monthly interest payments from USACM's corporate operating account and the Collections Account during the period from April 13, 2002 through the Petition Date.

103.    Of this aggregate amount, the Culpable Insiders specifically identified $266,583.31 of ACH transfers out of the Collections Account as interest payments on Michael Petersen's share of the Debenture, as follows:

| DATE | AMOUNT |
|---|---|
| May 6, 2002 | $18,083.33 |
| June 7, 2002 | $17,500.00 |
| August 7, 2002 | $18,083.33 |
| September 6, 2002 | $17,500.00 |
| October 4, 2002 | $18,083.33 |
| November 6, 2002 | $17,500.00 |
| December 6, 2002 | $18,083.33 |
| February 9, 2004 | $16,916.67 |
| April 7, 2004 | $17,500.00 |
| May 7, 2004 | $18,083.33 |
| June 7, 2004 | $17,500.00 |
| July 8, 2004 | $18,083.33 |
| August 6, 2004 | $18,083.33 |
| November 5, 2004 | $17,500.00 |
| December 8, 2004 | $18,083.33 |
| TOTAL | $266,583.31 |

104.    Upon information and belief, significant portions of the other interest payments made to Michael Petersen from April 13, 2002 through the Petition Date were also attributable to Michael Petersen's interest in the Debenture (together with the transfers identified in the table

**ORIGINAL COMPLAINT**                                          **Page -- 27**

above, the "Michael Debenture Interest Transfers"). Upon information and belief, the Culpable Insiders caused USACM to make at least $600,000 of Michael Debenture Interest Transfers.

105.    USACM received no benefit for making the Debenture Paydowns, Debenture Payoff, Mary Debenture Interest Transfers, and Michael Debenture Interest Transfers. Rather, the Culpable Insiders caused these transfers to be made in direct furtherance of their fraudulent scheme and with the intent to defraud, hinder, and delay USACM's creditors.

106.    Upon information and belief, both Mary Petersen and Michael Petersen willfully accepted these transfers from USACM, even though she knew that the Culpable Insiders breached their fiduciary duties to USACM in causing these fraudulent transfers to be made.

**3.    Other Participation in the "Ponzi-like" Scheme**

107.    Upon information and belief, the Defendants also knowingly assisted the Culpable Insiders in taking out investors in several other non-performing loans.

108.    In 1999, a borrower on a $1.65 million loan originated by USACM went into interest default. As was often the case, the Culpable Insiders caused USACM to make monthly interest payments on behalf of the defaulting borrower. The Culpable Insiders then took over the underlying apartment project for themselves in November 1999 through Sugartree, LLC ("Sugartree"), an entity in which USAIP held a two-thirds membership interest. The Culpable Insiders then misappropriated several hundred thousand dollars from USACM to fund Sugartree.

109.    In March 2000, the Culpable Insiders turned to Mary Petersen to buy them out of the project. On March 20, 2000 Mary Petersen extended a loan to Sugartree in the exact amount of the original loan (the "Sugartree Loan"), thereby taking out the investors in original loan at the face

**ORIGINAL COMPLAINT**                                          **Page -- 28**

value of their investments.  Upon information and belief, Mary Petersen knowingly provided the loan for the purpose of "taking out" the investors to further the Culpable Insiders' scheme.

110.    The final payoff of the Sugartree loan was made on December 27, 2002 in the amount of $1.3 million.

111.    Upon information and belief, the Culpable Insiders caused this loan payoff to be recognized as a $1.3 million liability owed to Mary Petersen on USACM's books.  The Culpable Insiders had previously made a similar entry by crediting a phantom $1 million liability in favor of Mary Petersen on November 19, 2002

112.    As a result of these accounting irregularities, USACM's financial records as of the end of 2002 reflected that USACM owed a $2.3 million liability to Mary Petersen.  Upon information and belief, this purported $2.3 million liability was pure fiction; USACM did not receive any cash or other consideration at the time each entry was made.

113.    Eventually, USACM's external auditors recognized the fictitious nature of this liability and wiped it from USACM's books through an adjusting entry.  Nevertheless, the Culpable Insiders still caused USACM to pay Petersen $2.3 million to purportedly pay down this phantom obligation.  Specifically, they caused USACM to pay Petersen $900,000 by check that cleared June 6, 2005 (the "June 2005 Sugartree Transfer").  Upon information and belief, they caused USACM to make the following additional payments to Mary Petersen (the "Sugartree Transfers"):

| DATE | AMOUNT |
|---|---|
| February 5, 2003 | $1,000,000.00 |
| July 2, 2003 | $100,000.00 |
| July 17, 2003 | $200,000.00 |
| April 6, 2004 | $55,000.00 |
| July 11, 2004 | $20,000.00 |

**ORIGINAL COMPLAINT**                                    **Page -- 29**

March 1, 2005     $25,000.00
TOTAL    $1,400,000.00

114.    Upon information and belief, USACM had no obligation for making the June 2005 Sugartree Transfer and the Sugartree Transfers.  Nor did it receive any benefit in exchange for making these transfers.

115.    Upon information and belief, Mary Petersen willfully accepted these transfers from USACM, even though she knew that the Culpable Insiders breached their fiduciary duties to USACM in causing these fraudulent transfers to be made.

### 4.    Participation in the Culpable Insiders' Looting and Self-Dealing

116.    Throughout the duration of their relationship with USACM, DTDF, and the Culpable Insiders, Defendants knew that the Culpable Insiders misappropriated funds from USACM to fund the operating costs and financing costs of several private ventures.

117.    Defendants provided financing to several of the insider-affiliated entities, yet regularly accepted payments of principal and interest from USACM.  In each such instance, USACM had no obligation to make the payment on behalf of the insider-affiliated entity.  Nor did USACM ever receive any benefit in exchange for making such payments.

118.    By accepting these payments, Defendants knowingly enabled and encouraged additional looting by the Culpable Insiders.  Had Defendants refused to accept funds misappropriated from USACM and instead only accepted payments from the entities that actually had a valid obligation to repay Defendants, upon information and belief, these entities would not have remained in business.

**ORIGINAL COMPLAINT**                              **Page -- 30**

(a)    **Tanamera Apartments**

119.    On October 13, 1997, the Culpable Insiders created South Meadows Apartments, LLC ("SMA") to develop and operate an apartment complex near Reno, Nevada (the "Tanamera Apartments"). At all times, the Culpable Insiders (or an entity under their control) managed SMA. In addition, the Culpable Insiders held membership interests in SMA through trusts or through other entities in which they held membership interests. At no time did USACM hold any membership interest in SMA or otherwise stand to share in any profits that it might receive.

120.    In 1998, the Culpable Insiders began using USACM to provide financing to SMA. In February 1998, they caused USACM to originate a $4.5 million loan from the Mary Petersen Trust and the Michael Petersen Trust to SMA (the "SMA Loan"). The SMA loan was evidenced by a promissory note dated February 2, 1998 (the "SMA Promissory Note").

121.    Mary Petersen and Michael Petersen recognized the potential conflict of interests involved in the Culpable Insiders participation in the origination of a loan to an entity that they owned and controlled; both signed a written "Acknowledgment" to such effect in connection with the SMA Loan. This "Acknowledgement" stated that Mary and Michael Petersen made the loan because of their "long term relationship with USA and Thomas Hantges."

122.    Not long after the SMA Loan closed, the Culpable Insiders began directly misappropriating USACM funds to make advances to SMA. Upon information and belief, SMA used some of the misappropriated funds to make interest payments on the SMA Loan. Unlike their other investments in loans originated by USACM, Mary Petersen and Michael Petersen frequently

**ORIGINAL COMPLAINT**                                    Page -- 31

received interest payments on the SMA Loan directly from SMA, rather than from the Collections Account.

123.   In order to document these sham "advances" from USACM to SMA, the Culpable Insiders executed a $1.2 million promissory note dated June 3, 1998 and made by Reno South Meadows, LLC ("RSM") in favor of USACM. This promissory note was the only documentation for what essentially functioned as an unsecured line of credit (the "RSM Line"). Although the note provided for interest, unpaid interest was not compounded under the terms of the note. Upon information and belief, USACM rarely if ever collected any monthly interest payments on the RSM Line.

124.   In late 1998, the Culpable Insiders formally filed articles of organization for RSM. RSM was formed for the purpose of serving as a holding company for SMA's original members' ownership interests in SMA. Specifically, SMA's original members transferred their entire membership interests in SMA to RSM, then admitted RSM as a new member in SMA. RSM also functioned as a conduit through which the Culpable Insiders sent misappropriated funds to SMA.

125.   On June 3, 1999, the original maturity date of the RSM Line, the Culpable Insiders executed a replacement note that extended the maturity date for ten years to June 3, 2009. At the same time, the Culpable Insiders increased the RSM Line to $3.0 million. On October 1, 1999, the Culpable Insiders again increased the RSM Line, this time to $4.0 million.

126.   Despite these ongoing misappropriations of USACM funds, the Tanamera Apartments still required additional funding, which the Culpable Insiders obtained from Mary Petersen and Michael Petersen. On October 21, 1999, the SMA Loan was increased to $5 million.

**ORIGINAL COMPLAINT**                                      **Page -- 32**

Then on November 12, 1999, the SMA Loan was increased to $5.54 million, of which the Mary Petersen and Michael Petersen held interests of $4.5 million and $1.04 million, respectively.

127.    By the end of 1999, RSM and SMA were indebted for more than $10 million in accrued, unpaid interest and outstanding principal on the RSM Line and the SMA Loan. Nevertheless, the Culpable Insiders continued to misappropriate funds from USACM to fund the Tanamera Apartments.  On March 1, 2000, the RSM Line was increased by an additional $2 million, raising it to $6 million.

128.    Shortly thereafter, the Culpable Insiders restructured some of the debt on the project. On April 1, 2000, the Mary Petersen and Michael Petersen agreed to forgive $3.5 million and $1.0 million portions of the total amounts that they were owed on the SMA Loan in exchange for being admitted as members in SMA.  The amounts forgiven were treated as "capital contributions," which entitled the Mary Petersen Trust and Michael Petersen to membership interests of 25.92% and 7.42%, respectively.

129.    This transaction left a remaining balance of $1.04 million on the SMA Loan, of which $1 million was owed to the Mary Petersen and $40,000 was owed to Michael Petersen.  On April 1, 2000, the day of the debt for equity swap, Michael Petersen assigned his remaining $40,000 interest in the SMA loan to USACM in connection with the issuance of the Debenture, as discussed above.  On July 17, 2000, Mary Petersen was repaid the $1 million that she was owed in connection with an $18,455,500 construction loan that SMA obtained from Newman Financial Services, Inc.

**ORIGINAL COMPLAINT**                                      **Page – 33**

130.    Upon information and belief, the Culpable Insiders were contemplating the possibility of third party financing at the time Mary Petersen and Michael Petersen agreed to forgive a substantial portion of the SMA Loan in exchange for membership interests in SMA.

131.    Upon information and belief, had Mary Petersen and Michael Petersen refused to exchange the aggregate $4.5 million portion of the SMA Loan for an equivalent amount of equity in the form of a capital contribution, SMA would have been too leveraged to obtain the construction loan.    In turn, the Culpable Insiders would not have been able to continue forward with the Tanamera Apartments project, and presumably no additional funds would have been misappropriated from USACM to fund the project.

132.    As it was, the Culpable Insiders continued to secure additional financing for the Tanamera Apartments by misappropriating USACM funds.    Consequently, the RSM Line was increased to $8.0 million on December 1, 2000. As Mary Petersen and Michael Petersen were now members of SMA, these misappropriations inured directly to their benefit.

133.    By February 1, 2002, the outstanding balance of the RSM Line was approximately $7.83 million as a result of nearly four years of systematic Culpable Insider misappropriations of USACM funds.    During this time period, approximately $2.37 million of interest had accrued, as RSM made virtually no interest payments on the RSM Line.

134.    As a direct result of these substantial, interest-free advances, the Culpable Insiders were able to keep the Tanamera Apartments afloat until the Culpable Insiders were able to obtain third-party refinancing.    Ultimately, the Culpable Insiders obtained a $41.25 million loan to refinance the project on February 11, 2002.

**ORIGINAL COMPLAINT**                                    **Page -- 34**

135.    In connection with the February 11, 2002 loan transaction, the Culpable Insiders created HBM Holdings, LLC ("HBM") to buy out the Mary Petersen Trust's entire membership interest in SMA for $3.5 million.   Upon information and belief, the Culpable Insiders misappropriated approximately $3.18 million of USACM funds to accomplish this purpose.

136.    Specifically, approximately $3 million of funds owed to USACM in the third party loan transaction were instead diverted directly to SMA.  This portion of the transaction was booked as if: (a) RSM had paid down approximately $630,000 of outstanding principal and the entire $2.37 million of accrued interest on the RSM Line; and (b) USACM had merely loaned the funds to HBM.  The Culpable Insiders then caused USACM to write a check to SMA for $180,000 on March 14, 2002 to cover the balance necessary to buy out Mary Petersen's interest in SMA.

137.    Upon information and belief, the Mary Petersen Trust ultimately received the $3.18 million that the Culpable Insiders caused to be sent to SMA, as well as an additional $320,000 that had been funded by the Culpable Insiders' cohorts.  Specifically, Palomino Partners, a Nevada Limited Partnership and Thomas A. Hantges, as Trustee of The Lucius Blanchard Irrevocable Children's Trust DTDT 12/1/90 provided $141,000 and $179,000, respectively.

138.    In exchange, USACM received a purported promissory note from HBM dated February 11, 2002 (the "HBM Note").  Like the RSM Line, the HBM Note was unsecured and did not provide for compounding of accrued interest.  The original maturity date was February 11, 2003.

139.    This entire transaction was a sham.  In reality, HBM existed only on paper.  HBM never made monthly interest payments.  Upon information and belief, the Culpable Insiders never

**ORIGINAL COMPLAINT**                                                    **Page -- 35**

even bothered to open a checking account for HMA.  Moreover, as HBM was solely managed by Milanowski, every single time the HBM Note came due, Milanowski unilaterally extended the note by executing an extension agreement on behalf of both HBM and USACM.

140.    This sham transaction allowed the Culpable Insiders to more readily conceal misappropriations of USACM funds.  Specifically, the transaction erased the alarmingly high balance of accrued interest on the RSM Line, effectively transforming it into a seemingly innocuous new loan to HBM.  This had the combined effect of: (a) resetting the clock on the interest on the RSM Line, thereby avoiding the negative attention that would have been garnered had the accrued interest continued to ratchet higher and higher over the ensuing months and years; and (b) splitting the overall amount that USACM was owed into two modest notes which would be less likely to draw scrutiny than a single, larger receivable.

141.    As an added bonus, creating HBM allowed the Culpable Insiders to buy out the Mary Petersen Trust's membership interest in SMA without needing to admit USACM as a member in SMA.  In turn, this enabled the Culpable Insiders to seize more of the potential upside of the project for themselves.

142.    Specifically, had USACM been admitted as a member in SMA, the Culpable Insiders would likely have been forced to account for at least some future transfers of funds from USACM to SMA as capital contributions.  Classification of these advances as capital contributions would have had the effect of diluting the Culpable Insiders' membership interests in SMA, and in turn, their share of its potential profits.

**ORIGINAL COMPLAINT**                                              **Page – 36**

143.    Two years after the initial sham transaction, the Culpable Insiders entered into an equally fraudulent transaction to buy out Michael Petersen's membership interest in SMA.  On February 11, 2004, Milanowski extended the HBM Note and increased the principal amount by $1 million for the purported purpose of "buying out" Michael Petersen's membership interest in SMA.  At the same time, Milanowski caused USACM to: (a) to eliminate a note receivable it held from Michael Petersen for $600,000 and (b) to pay Michael Petersen $400,000 in cash.

144.    On February 12, 2004, the Culpable Insiders caused USACM to wire transfer $140,000 directly to Michael Petersen (the "Michael Petersen Wire Transfer").  The same day, the Culpable Insiders caused USACM to issue a $260,000 check to the Investor Account, where it was deposited and held in trust before ultimately being invested on Michael Petersen's behalf as a $260,000 interest in the "Temescal/Dos Lagos" loan (the "Michael Petersen Investment").  Upon information and belief, Michael Petersen's entire $260,000 investment was repaid on October 20, 2004.

145.    The only consideration that USACM received for making the Michael Petersen Wire Transfer or the Michael Petersen Investment was an increase in the balance of the note receivable due from HBM.  Upon information and belief, a substantial portion of the amount owed from HBM and/or RSM remains unpaid and is now uncollectible in light of the sale of the Tanamera Apartments in March 2006.

146.    The net result of the ongoing and interconnected misconduct surrounding the Culpable Insiders' development and eventual sale of the Tanamera Apartments was twofold: the

**ORIGINAL COMPLAINT**                                                    Page -- 37

Culpable Insiders earned a substantial profit at the time of the sale, while USACM ultimately lost millions of dollars as a result of the Culpable Insiders' continuous looting to fund the project.

147.    Mary Petersen and Michael Petersen played a pivotal role in causing this end result by continuously and knowingly providing substantial assistance to the Culpable Insiders at every turn. Upon information and belief, the Culpable Insiders would not have been able to complete the project had it not been for the assistance provided by Mary Petersen and Michael Petersen in continually accepting misappropriated funds and entering into sham transactions designed to conceal this looting.

(b)    **Palm Springs Marquis Villas**

148.    In June or July 2000, the Culpable Insiders caused USACM to originate an $11.5 million loan to Epic Resorts – Palm Springs Marquis Villas, LLC ("Epic Resorts"). The promissory note evidencing the loan was dated June 26, 2000, and listed DTDF as the sole lender in the loan. DTDF subsequently recorded a leasehold deed of trust on July 5, 2000.

149.    The loan to Epic Resorts closed on July 5, 2000. At closing, only $5 million was originally funded on the loan. DTDF did not actually provide any of this funding. Upon information and belief, Mary Petersen funded $1.7 million of the original $5 million provided to Epic Resorts.

150.    In exchange, the Culpable Insiders caused USACM to recognize a liability of $1.7 million to Mary Petersen, even though Epic Resorts was not owned or managed by USACM or any of its affiliates. Upon information and belief, this liability was given in connection with the Culpable Insiders' fraudulent intent to usurp opportunities for themselves to the detriment of

**ORIGINAL COMPLAINT**                                    **Page -- 38**

USACM and its creditors.  Specifically, the Culpable Insiders ultimately seized the underlying property, the "Marquis Villas" in Palm Springs, California, for their personal benefit in September 2003 via Tree Moss Partners, LLC ("Tree Moss"), an entity managed and wholly owned by USAIP.

151.    Subsequently, the Culpable Insiders caused USACM to repay the entire balance of the sham $1.7 million liability to Mary Petersen.  Several of these transfers were made within four years of the Petition Date.  Specifically, the Culpable Insiders caused USACM to issue a check for $100,000 dated December 10, 2003, and a check for $247,104.68 dated December 17, 2003 (the "Epic Transfers").  These checks cleared on December 12, 2003 and December 19, 2003, respectively.

152.    USACM did not receive any benefit in exchange for making the Epic Transfers, nor was it obligated in any way to make these payments.

(c)    **The Royal Hotel**

153.    In December 2000, the Culpable Insiders established HMA Sales, LLC ("HMA") to acquire and operate the Royal Hotel in Las Vegas, Nevada.  HMA was managed and owned by the Culpable Insiders via their ownership and managerial interests in USAIP.

154.    On March 11, 2002, HMA gave a $2.1 million promissory note in favor of the Mary Petersen Trust and Hans Dorweiler and Arlene Dorweiler, Trustees of the Dorweiler Family Trust (the "HMA Note").  Mary Petersen held a $2 million interest in the HMA Note.  USACM did not receive any benefit from any funds advanced by Mary Petersen to HMA, as USACM did not hold any membership interest in HMA or otherwise stand to share in its profits.

**ORIGINAL COMPLAINT**                                        **Page -- 39**

155.    Upon information and belief, HMA was unable to repay the interest due on the HMA Note because of its consistently negative cash flows.  As a result, the Culpable Insiders caused USACM to make several monthly interest payments to the Mary Petersen Trust on behalf of HMA, as follows:

| DATE | AMOUNT |
|---|---|
| May 8, 2002 | $20,000.00 |
| June 26, 2002 | $20,666.67 |
| July 7, 2002 | $20,000.00 |
| August 8, 2002 | $20,666.67 |
| September 24, 2002 | $20,666.67 |
| TOTAL | $102,000.01 |

Upon information and belief, the Culpable Insiders caused USACM to make additional payments on HMA's behalf in an amount to be proven at trial (together with the transfers identified in the foregoing table, the "HMA Direct Transfers").

156.    In addition, the Culpable Insiders caused USACM to make similar interest payments to the Mary Petersen Trust, using USAIP as a mere conduit in the process.  These payments were as follows (collectively, the "HMA Indirect Transfers"):

| DATE (USACM to USAIP) | DATE (USAIP to Mary Petersen) | AMOUNT |
|---|---|---|
| November 4, 2002 | November 7, 2002 | $20,000.00 |
| November 15, 2002 | November 16, 2002 | $100,354.00 |
| December 16, 2002 | December 16, 2002 | $25,636.00 |
| | TOTAL | $145,990.00 |

**ORIGINAL COMPLAINT**                                        Page -- 40

157.    USACM had no obligation to make the HMA Direct Transfers or the HMA Indirect Transfers.  Nor did USACM receive anything in exchange other than a worthless receivable from USAIP.  Rather, the transfers were made for the sole benefit of the Culpable Insiders.

158.    Over the ensuing months and years, the Culpable Insiders transferred more than $10 million dollars from USACM and DTDF to HMA.  Upon information and belief, HMA ultimately used some of these funds to pay interest on the HMA Note.

159.    Upon information and belief, had it not been for Mary Petersen's and Michael Petersen's willingness to accept these fraudulent payments made on HMA's behalf, the Culpable Insiders would not have been able to continue operating the Royal Hotel.

## V.    CLAIM OBJECTION
### (Objection to Claim Nos. 10725-000754 and 10725-01470)

160.    The USACM Trust objects to Claim Nos. 10725-00754 and 10725-01470, because: (a) Michael Petersen, the Claimant, is the recipient of property or a transfer of property that may be avoided, as more fully set forth herein, and is therefore not entitled to a claim until such time as Claimant has paid over such amount to the USACM Trust pursuant to 11 U.S.C. § 502(d); (b) the USACM Trust possesses claims against the Claimant in amounts that may be in excess of those claimed by Claimant, as more fully set forth herein, and is therefore not entitled to payment of a claim until such time as all such matters have been resolved and a determination is made as to the amounts the USACM Trust is entitled to recover from Claimant; and (c) the Claimant has failed to submit sufficient documentation to substantiate the alleged claims.

**ORIGINAL COMPLAINT**                                    **Page -- 41**

161. The USACM Trust expressly reserves the right to further object to and/or modify, supplement, or amend this objection to set forth additional grounds for disallowance of Claim Nos. 10725-00754 and 10725-01470.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (11 U.S.C. § 548(a)(1)(A))

162. The Plaintiffs re-allege and fully incorporate the allegations pleaded above as if fully set forth herein.

163. The following transfers shall collectively be referred to herein as the "548 Transfers": (a) the Debenture Payoff; (b) the B&J Transfer; (c) the MPDD Late Transfer; (d) the June 2005 Sugartree Transfer and (e) the MPDD Collection Transfer.

164. Each of the 548 Transfers constituted a transfer of an interest of USACM in property.

165. Each of the 548 Transfers were made within one year of the Petition Date.

166. Each of the 548 Transfers were made with the intent to hinder, delay, or defraud entities to which USACM was or became indebted to on or after the date these transfers were made.

167. Accordingly, pursuant to 11 U.S.C. § 548(a)(1)(A), the USACM Trust asks this Court to avoid the 548 Transfers.

### SECOND CAUSE OF ACTION
### (11 U.S.C. § 548(a)(1)(B))

168. The Plaintiffs re-allege and fully incorporate the allegations pleaded above as if fully set forth herein.

**ORIGINAL COMPLAINT**                                    **Page -- 42**

169.    The 548 Transfers each constituted a transfer of an interest of USACM in property.

170.    The 548 Transfers were made within one year of the Petition Date.

171.    USACM received less than a reasonably equivalent value in exchange for each of the 548 Transfers.

172.    USACM was insolvent on the date each of the 548 Transfers was made or became insolvent as a result of these 548 Transfers.

173.    As a result of the 548 Transfers, USACM was engaged in business or a transaction or was about to engage in business or a transaction for which any property remaining with the USACM was unreasonably small capital.

174.    As a result of the 548 Transfers, USACM intended to incur or believed that it would incur debts that would be beyond its ability to pay as such debts matured.

175.    Accordingly, pursuant to 11 U.S.C. § 548(a)(1)(B), the USACM Trust asks this Court to avoid the Transfers.

### THIRD CAUSE OF ACTION
### (11 U.S.C. § 544 and NRS 112.180(1)(a))

176.    Plaintiffs re-allege and fully incorporate the allegations pleaded above as if fully set forth herein.

177.    The following transfers shall collectively be referred to herein as the "UFTA Transfers": (a) the Debenture Payoff; (b) the Debenture Paydowns; (c) Mary Debenture Interest Transfers; (d) Michael Debenture Interest Transfers; (e) Michael Petersen Wire Transfer; (f) Michael Petersen Investment; (g) Epic Transfers; (h) HMA Direct Transfers; (i) HMA Indirect Transfers; (j) B&J Transfer; (k) Michael Saddleback Transfer; (l) Kathryn Saddleback Transfer; (m)

**ORIGINAL COMPLAINT**                                            **Page – 43**

Red Hills/CCW Transfer; (n) MPDD Early Transfer; (o) MPDD Late Transfer; (p) the MPDD Collection Transfer; and (q) the Sugartree Transfers .

178.    The UFTA Transfers each constituted a transfer of an interest of USACM in property.

179.    The DTDT Transfer constituted a transfer of an interest of DTDF in property.

180.    The UFTA Transfers and DTDF Transfer were made within the applicable four-year period under NRS 112.180(1)(a).

181.    On the date of the UFTA Transfers and DTDF Transfer and the Petition Date, there were creditors with allowable unsecured claims who could have avoided the UFTA Transfers and DTDF Transfer pursuant to Nevada state law.

182.    The UFTA Transfers and the DTDF Transfer were each made with the actual intent to hinder, delay, or defraud creditors of the USACM and DTDF (respectively).

183.    Accordingly, the UFTA Transfers and the DTDF Transfer (a) are fraudulent under NRS 112.180(1)(a); and (b) may be recovered under NRS 112.220.

184.    Pursuant to 11 U.S.C. § 544(b), the USACM Trust and DTDF asks the Court to avoid the UFTA Transfers and DTDF Transfer under applicable state law.

**FOURTH CAUSE OF ACTION**
**(11 U.S.C. § 544 and NRS 112.180(1)(b))**

185.    The Plaintiffs re-allege and fully incorporate the allegations pleaded above as if fully set forth herein.

**ORIGINAL COMPLAINT**                                      **Page — 44**

186.    The UFTA Transfers each constituted a transfer of an interest of USACM in property.

187.    The UFTA Transfers were made within the applicable four-year period under NRS 112.180(1)(b).

188.    On the date of the UFTA Transfers and the Petition Date, there were creditors with allowable unsecured claims who could have avoided the UFTA Transfers pursuant to Nevada state law.

189.    USACM received less than a reasonably equivalent value in exchange for each of the UFTA Transfers.

190.    USACM was engaged or was about to engage in a business or a transaction for which the remaining assets of the USACM were unreasonably small in relation to the business or the transaction.

191.    USACM was engaged in business or a transaction or was about to engage in business or a transaction for which any property remaining with USACM was unreasonably small capital.

192.    USACM (intended to incur or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

193.    Accordingly, the UFTA Transfers (a) are fraudulent transfers under NRS 112.180(1)(b); and (b) may be recovered under NRS 112.220.

194.    Pursuant to 11 U.S.C. § 544(b), the USACM Trust asks the Court to avoid the UFTA Transfers under applicable state law.

**ORIGINAL COMPLAINT**                                    Page – 45

## FIFTH CAUSE OF ACTION
### (11 U.S.C. § 550(a) and NRS 112.220)

195.    The Plaintiffs re-allege and fully incorporate the allegations pleaded above as if fully set forth herein.

196.    The 548 Transfers are avoidable under 11 U.S.C. § 548(a)(1)(A) and/or § 548(a)(1)(B).

197.    The UFTA Transfers and DTDF Transfer are avoidable under 11 U.S.C. § 544 (through NRS 112.180(1)(a) and/or (b)).

198.    The value of the Debenture Paydowns are recoverable from Mary Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

199.    The value of the Debenture Payoff is recoverable from Mary Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

200.    The value of the Mary Debenture Interest Transfer is recoverable from Mary Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

201.    The value of the Michael Debenture Interest Transfers are recoverable from Michael Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

202.    The value of the Michael Petersen Wire Transfer is recoverable from Michael Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

203.    The value of the Michael Petersen Investment is recoverable from Michael Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

204.    The value of the Epic Transfers are recoverable from Mary Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

**ORIGINAL COMPLAINT**                                                        **Page – 46**

205.   The value of the HMA Direct Transfers are recoverable from Mary Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

206.   The value of the B&J Transfer is recoverable from Mary Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

207.   The value of the Michael Saddleback Transfer is recoverable from Michael Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

208.   The value of the Kathryn Saddleback Transfer is recoverable from Kathryn Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

209.   The value of the Red Hills/CCW Transfer is recoverable from Mary Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

210.   The value of the MPDD Early Transfer is recoverable from Mary Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

211.   The value of the MPDD Late Transfer is recoverable from Mary Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

212.   The value of the MPDD Collection Transfer is recoverable from Mary Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

213.   The value of the 2005 June Ssugartree Transfer is recoverable from Mary Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

214.   The value of the Sugartree Transfer are recoverable from Mary Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

**ORIGINAL COMPLAINT**                                                Page – 47

215.    The value of the DTDF Transfer is recoverable from Mary Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

216.    Upon information and belief, USAIP was merely a conduit through which USACM transferred funds to Mary Petersen in connection with the HMA Indirect Transfers. USAIP, upon information and belief, had no dominion over such funds. As such, the USACM Trust may recover the value of the Transfers directly from Mary Petersen as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220. In the alternative, the USACM Trust may recover the value of the Transfers from Mary Petersen pursuant to 11 U.S.C. § 550(a)(2) and NRS 112.220 as an immediate or mediate transferee who took without good faith, without giving value, and/or with knowledge of the voidability of the HMA Indirect Transfers.

### SIXTH CAUSE OF ACTION
#### (Aiding and Abetting/Participation in Breaches of Fiduciary Duty)

217.    Plaintiffs re-allege and fully incorporate the allegations pleaded above as if fully set forth herein.

218.    Hantges, Milanowski, and Loob served as officers and/or directors of USACM and played a key role in the transactions described above. As officers and directors of USACM, Hantges, Milanowski, and Loob, owed a fiduciary duty to act at all times with the utmost good faith and fair dealing and in the best interests of USACM.

219.    Hantges, Milanowski, and Loob collectively and individually breached fiduciary duties owed to USACM and its creditors, including both the duty of loyalty and the duty of care. Specifically, they systematically and continuously looted USACM, caused USACM to pay and/or assume obligations that it did not owe, engaged in other self-dealing, and caused USACM to

**ORIGINAL COMPLAINT**                                          **Page -- 48**

employ a "Ponzi"-like scheme and engage in other irregularities in the origination and servicing of loans. Fidelity to their fiduciary duties should have compelled them to keep USACM fully advised regarding the true nature of the transactions which perpetuated their scheme and to prevent USACM from entering into such transactions.

220.    Mary Petersen and Michael Petersen knew of the above-described breaches of fiduciary duty. Specifically, Mary Petersen and Michael Petersen knew that Hantges, Milanowski, and Loob were breaching fiduciary duties to USACM, throught, *inter alia*: (a) "buy outs" of their interests in numerous non-performing loans; (b) "pre-payments" of interest on non-performing loans; (c) payments they received on sham obligations and/or other obligations that USACM did not owe; (d) the creation of fictitious entities and transactions; (e) their membership interest in SMA; and (f) circumstance surrounding the Debenture.

221.    Mary Petersen and Michael Petersen knowingly provided substantial assistance to Hantges, Milanowski, and Loob in their continuous breaches of fiduciary duties to USACM. As described above, Mary Petersen and Michael Petersen continuously assisted the Culpable Insiders in their breaches of fiduciary duties by: (a) perpetuating the "Ponzi" scheme; (b) entering into sham transactions that concealed the Culpable Insiders' looting; (c) providing financing to entities affiliated with the Culpable Insiders and accepting payments from USACM in return; (d) accepting payments made by the Culpable Insiders to quietly take them out of non-performing loans; (e) accepting payments from USACM on obligations that it did not owe.

**ORIGINAL COMPLAINT**                                    Page — 49

222.    Upon information and belief, Mary Petersen and Michael Petersen were aware of their roles in promoting breaches of fiduciary duty at all times that they provided assistance to Hantges, Milanowski, and Loob.

223.    The conduct constituting breaches of fiduciary duty owed to USACM was completely adverse to the interests of and provided no benefit to USACM.

224.    USACM had one or more innocent officers, owners, directors, or other principals who, along with investors and regulatory authorities (collectively, the "Stakeholders"), were: (a) not involved in the acts and omissions set forth above; (b) not aware of the breaches of fiduciary duty owed by Milanowski, Hantges, and Loob; and (c) not aware of Mary Petersen's and Michael Petersen's substantial assistance in such breaches.

225.    One or more of USACM's innocent Stakeholders could and would have terminated or prevented the acts or omissions set forth above if they had actually known, or understood and appreciated, what Hantges, Milanowski, and Loob were doing to USACM as well as the true adverse impact on USACM and its creditors.

226.    As a direct and proximate result of the substantial assistance given by Mary Petersen and Michael Petersen to Hantges, Milanowski, and Loob in connection with their breaches of fiduciary duties, USACM suffered damages in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**(Unjust Enrichment)**

227.    Plaintiffs re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

**ORIGINAL COMPLAINT**                                         Page -- 50

228.    By making the 548 Transfers and the UFTA Transfers, USACM conferred a benefit on the Defendants.

229.    Defendants appreciated the benefit in that they: (a) received the 548 Transfers and the UFTA Transfers; and (b) knew or should have known that the Culpable Insiders caused USACM to make the 548 Transfers and the UFTA Transfers in furtherance of their fraudulent scheme.

230.    Defendants retained the 548 Transfers and the UFTA Transfers under circumstances that make retention of the money inequitable.   Specifically, the 548 Transfers and the UFTA Transfers were part of the gross misconduct of the Culpable Insiders in looting USACM and DTDF for the benefit of themselves and their personal "piggy bank", USAIP.  In addition, Defendants willfully accepted the 548 Transfers and the UFTA Transfers, even though: (a) Defendants knew or should have known that USACM had absolutely no obligation to transfers such funds to Defendants and received no benefit from doing so; and (b) the Culpable Insiders had previously misappropriated DTDF and USACM funds to make payments to Defendants on obligations that DTDF and USACM did not owe.

**EIGHTH CAUSE OF ACTION**
**(Money Had and Received)**

231.    Plaintiffs re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

232.    Defendants have received and/or possess more than $12.8 million from the 548 Transfers and the UFTA Transfers

**ORIGINAL COMPLAINT**                                     Page -- 51

233.    USACM Trust is rightfully entitled to the money. The 548 Transfers and the UFTA Transfers were made for USAIP's benefit and were part of the Culpable Insiders' systematic abuse of DTDF.

234.    In good conscience and equity, Defendants have no right to maintain the more than $12.8 million they received in the 548 Transfers and the UFTA Transfers. Moreover, Defendants knew or should have known that: (a) USACM had absolutely no obligation to transfers such funds to Defendants and received no benefit from doing so; and (b) the Culpable Insiders had previously misappropriated DTDF and USACM funds to make payments to Defendants on obligations that DTDF and USACM did not owe. Yet Defendants willfully accepted the 548 Transfers and the UFTA Transfers. The 548 Transfers and UFTA Transfers were part of the gross misconduct of the Culpable Insiders in looting USACM and DTDF for the benefit of themselves and their personal "piggy bank," USAIP.

### NINTH CAUSE OF ACTION
#### (NRS 41.580)

235.    Plaintiffs re-allege and fully incorporate the allegations pleaded above as if fully set forth herein.

236.    In making the 548 Transfers and UFTA Transfers, the Culpable Insiders took $2 million from DTDF and/or USACM by theft and/or other offense(s) constituting a crime against property.

237.    Defendants received, possessed, and/or withheld more than $12.8 million from the 548 Transfers and UFTA Transfers.

**ORIGINAL COMPLAINT**                                                    **Page -- 52**

238.    Defendants received, possessed, and/or withheld more than $12.8 million: (a) knowing that the Culpable Insiders misappropriated the funds from USACM and/or DTDF by theft and/or other offense(s) that constitute a crime against property; or (b) under such circumstances as should have caused a reasonable person to know that the Culpable Insiders misappropriated the funds from USACM and/or DTDF by theft and/or other offense(s) that constitute a crime against property.

239.    Accordingly, Plaintiffs may recover treble damages from Defendants under NRS 41.580.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs USACM Trust and DTDF respectfully request that the Court enter judgment as follows:

(a)    Avoiding each of the 548 Transfers and UFTA Transfers;

(b)    Directing Mary Petersen to repay the value of the following transfers: (i) the Debenture Payoff; (ii) the Debenture Paydowns; (iii) Mary Debenture Interest Transfers; (iv) Epic Transfers; (v) HMA Direct Transfers; (vi) HMA Indirect Transfers; (vii) B&J Transfer; (viii) Red Hills/CCW Transfer; (ix) MPDD Early Transfer; (x) MPDD Late Transfer; (xi) the MPDD Collection Transfer; (xii) June 2005 Sugartree Transfer; (xiii) Sugartree Transfers; and (xiv) DTDF Transfer.

(c)    Directing Michael Petersen to repay the value of the following transfers: (i) Michael Debenture Interest Transfers; (ii) Michael Petersen Wire; (iii) Michael Petersen Investment; and (iv) Michael Saddleback Transfer;

(d)    Directing Kathryn Petersen to repay the value of the Kathryn Saddleback Transfer;

(e)    Directing Defendants to pay to the USACM Trust and/or DTDF all pre- and post-judgment interest on the 548 Transfers, UFTA Transfers, and DTDF Transfer at the maximum rate allowable by law and/or equity;

(f)    Directing Defendants to pay the USACM Trust's and DTDF's costs of court;

**ORIGINAL COMPLAINT**                                                    **Page -- 53**

(g)   Directing Defendants to pay treble damages and reasonable attorney's fees to Plaintiffs in accordance with NRS 41.580; and

(h)   Sustaining the USACM Trust's objection to Claim Nos. 10725-000754 and 10725-01470 ; and

(i)   Awarding Plaintiffs such other relief that this Court deems just and proper.

Dated: April 12, 2008.

DIAMOND MCCARTHY LLP

LEWIS AND ROCA LLP

By: _____ /s/ Erin E. Jones _____
Allan B. Diamond, TX 05801800 (pro hac vice)
Eric D. Madden, TX 24013079 (pro hac vice)
Erin E. Jones, TX 24032478 (pro hac vice)
Michael J. Yoder, TX 24056572 (pro hac vice)
909 Fannin, Suite 1500
Houston, Texas 77010
(713) 333-5100 (telephone)
(713) 333-5199 (facsimile)

*Special Litigation Counsel for USACM Liquidating Trust and USA Capital Diversified Trust Deed Fund, LLC*

By: _____ /s/ Rob Charles _____
Rob Charles, NV 6593
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169-5996
(702) 949-8320 (telephone)
(702) 949-8321 (facsimile)

*Counsel for USACM Liquidating Trust and USA Capital Diversified Trust Deed Fund, LLC*

**ORIGINAL COMPLAINT**

**Page — 54**