E-Filed On _01/15/09_

**DIAMOND MCCARTHY LLP**
909 Fanin, Suite 1500
Houston, Texas 77010
Telephone (713) 333-5100
Facsimile (713) 333-5199

Allan B. Diamond, TX State Bar No. 05801800
Email: adiamond@diamondmccarthy.com
Barbara Balliette. TX State Bar No. 00788660
Email: bballiette@diamondmccarthy.com
Eric D. Madden, TX State Bar No. 24013079
Email: emadden@diamondmccarthy.com

Special Litigation Counsel for USACM Liquidating Trust

**LEWIS AND ROCA LLP**
3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169-5996
Telephone (702) 949-8320
Facsimile (702) 9490-8321

Rob Charles, NV State Bar No. 006593
Email: rcharles@lrlaw.com

Counsel for USACM Liquidating Trust

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No. BK-S-06-10725-LBR |
| | Case No. BK-S-06-10726-LBR |
| USA COMMERCIAL MORTGAGE COMPANY, | Case No. BK-S-06-10727-LBR |
| | Case No. BK-S-06-10728-LBR |
| USA CAPITAL REALTY ADVISORS, LLC, | Case No. BK-S-06-10729-LBR |
| | |
| USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, | CHAPTER 11 |
| | Jointly Administered Under Case No. |
| USA CAPITAL FIRST TRUST DEED FUND, LLC, | BK-S-06-10725 LBR |
| | |
| USA SECURITIES, LLC, | |
| Debtors. | |

Affects:
☐ All Debtors
☒ USA Commercial Mortgage Company
☐ USA Capital Realty Advisors, LLC
☐ USA Capital Diversified Trust Deed Fund, LLC
☐ USA Capital First Trust Deed Fund, LLC
☐ USA Securities, LLC

Date: February 20, 2009
Time: 9:30 a.m.

**DECLARATION OF LISA M. POULIN IN SUPPORT OF MOTION SEEKING THE APPROVAL OF THE SETTLEMENT AGREEMENT BY AND BETWEEN THE USACM LIQUIDATING TRUST, USA INVESTMENT PARTNERS, LLC, TOBLAK, LLC, DDH FINANCIAL CORP., AND TANAMERA COMMERCIAL DEVELOPMENT, LLC**

I, Lisa M. Poulin, hereby declare as follows:

1.      I am over the age of eighteen (18) and am mentally competent.  I have personal knowledge of the facts in this matter and if called upon to testify, could and would do so.

2.      I am the duly-appointed Chapter 11 trustee for USA Investment Partners, LLC

("USAIP") and I make this declaration in support of the <u>Motion Seeking The Approval Of The</u> <u>Settlement Agreement By And Between The USACM Liquidating Trust, USA Investment</u> <u>Partners, LLC, Toblak, LLC, DDH Financial Corp., And Tanamera Commercial Development,</u> <u>LLC</u> (the "Motion").[1]

3. On April 4, 2007, USA Capital Diversified Trust Deed Fund, LLC ("DTDF"), the USACM Trust, and Alabruj Investments, LLC filed an involuntary Chapter 11 petition against USAIP, thereby commencing bankruptcy case number BK-S-07-11821-LBR (the "USAIP Bankruptcy Case") also pending before this Court. Two days after the commencement of the USAIP Bankruptcy Case, on April 6, 2007, the Bankruptcy Court appointed me as USAIP's interim Chapter 11 trustee. Thereafter, on May 9, 2007, an order for relief was entered in the USAIP Bankruptcy Case, with me becoming USAIP's permanent Chapter 11 trustee.

4. USAIP is a limited liability company created to hold ownership interests in and manage the affairs of other companies, the majority of which are involved in the acquisition, construction, lease, and sale of real estate properties. Consistent therewith, USAIP is the sole member and manager of Toblak.

5. Upon information and belief and as explained in the Second Amended Parks Agreement attached hereto as Exhibit "A," prior to the USAIP Petition Date, on September 8, 1998, the Reno City Council approved an agreement (the "Parks Agreement") between the City of Reno (the "City"), Double Diamond Ranch, LLC ("Double Diamond"), and Double Diamond Ranch Master Association (the "Association") relating to the design, construction, and maintenance of five neighborhood/community parks in the South Meadows Properties Planned Unit Development, Phase III, also known as Double Diamond Ranch. Under the Parks Agreement, the City agreed to construct one park on what was defined as Park Parcel 34, and Double Diamond agreed to construct four additional parks on what were defined as Parcels 42, 43, 44, and Parcel B (collectively the "Park Sites").

6. Upon information and belief, on or about April 13, 1999, the City and Double

---

[1] Unless otherwise expressly stated herein, all undefined, capitalized terms shall have the meaning ascribed to them in the Motion.

Diamond approved an amendment to the Parks Agreement (the "Amended Parks Agreement"), which allowed Double Diamond to also design and construct the park improvements on Parcel 34.

7.    On or about May 18, 2004, the District Court entered a <u>Stipulation And Order For Limited Stay Pending Appeal</u> (the "Stipulation") which, pending the outcome of the Lowe Appeal, among other things, authorized USACM to form Toblak as an affiliated entity to take title to the remaining Park Sites, and to enter into an agreement with the City to dedicate these Park Sites to the City with or without their construction.    A true and correct copy of the Stipulation is attached hereto as Exhibit "B."

8.    The Stipulation further provided that any proceeds paid by the City upon dedication of the Park Sites were to be held in escrow with Ticor Title Company ("Ticor Title") pending the outcome of the Lowe Appeal, with such proceeds being distributed to the prevailing party after entry of an order from the Bankruptcy Court.

9.    Upon information and belief, in anticipation of the pending Stipulation, on April 29, 2004, USAIP, rather than USACM, filed Toblak's Articles of Incorporation and formed said entity.    As previously stated, Toblak is owned solely by USAIP and is therefore an asset of USAIP's estate in the USAIP Bankruptcy Case.

10.    Upon information and belief, on or about December 7, 2004, Toblak, the City, Double Diamond, and the Association entered into the Second Amended Parks Agreement, which agreement related to the development of three (3) of the Park Sites, Parcels 42, 43, and 44 (the "Remaining Park Sites"), to be constructed, maintained, and conveyed to the City, in addition to certain other improvements.    Beyond enumerating the rights and obligations related to the development, maintenance, and conveyance of the Remaining Park Sites, as well as certain additional improvements, through the Second Amended Parks Agreement, the City provided its consent to Double Diamond's assignment of the duties and obligations set forth in the Amended Parks Agreement to Toblak.    Thus, the Second Amended Parks Agreement effectuated the transfer of Double Diamond's rights and obligations under the Amended Parks Agreement to Toblak, subject to the modifications set forth in the Second Amended Parks Agreement itself.

11.     Upon information and belief, M.P. Tanamera, LLC, USACM, DDH, and USAIP entered into that certain Amended And Restated Pledge Agreement (the "Amended Pledge Agreement"), attached hereto as Exhibit "C," effective January 1, 2006, which agreement provided in relevant part as follows:

> Toblak, LLC, an affiliate of Pledgee [USACM] entered into a Second Amended Double Diamond Ranch Parks Agreement ("Parks Agreement") with the City of Reno and Double Diamond Ranch, LLC which is expected to result in net profits to Toblak, LLC in excess of the legal fees outlined in Recital D above, indirectly benefiting Pledgee [USACM]. Pledgee [USACM] agrees that Kreg Rowe was instrumental in providing this opportunity to Pledgee and agrees that any profits stemming from the Parks Agreement will first be applied to any unreimbursed legal costs associated with obtaining the Parks Agreement, including the associated litigation and appeal, then to unreimbursed legal fees outlined in Recital D, third to any remaining balance under the Guaranteed Debt with any remaining amount split 50% with DDH and 50% with Pledgee [USACM] Pledgee [USACM] agrees to provide an accounting of the legal fees and application for reimbursement filed with the court along with a copy of the court's award with reasonable supporting information.

12.     In order to minimize the cost and expense of litigation, as well as the extensive time that must be dedicated to such a proceeding, and in view of the risk inherent in proceeding to trial, the parties have engaged in substantial settlement negotiations to resolve the Disputes. These settlement discussions, which have been at arms-length and in good faith, have culminated in the Settlement Agreement.

13.     The Settlement Agreement represents that culmination of arms-length negotiations undertaken with an appreciation of the extensive time and expense required to try the issues necessary for the Court to render a determination as to the proper distribution of the Park Funds under the terms of the Amended Pledge Agreement.  This is particularly true as the parties have reached this compromise prior to having commenced an adversary proceeding, having undertaken discovery, or having retained any experts.  The expense, inconvenience, and delay inherent in any adversary proceeding undertaken to resolve the Disputes weighs heavily in favor of approval of the Settlement Agreement.  Further, as an adversary proceeding has not yet been commenced, the prompt resolution of the Disputes through the contemplated Settlement Agreement is not only economically beneficial for the parties, but also judicially economical.

14.     The prompt resolution of the Disputes also resolves the USACM Trust's alleged

4

1   claim against USAIP arising therefrom and will permit USAIP to distribute Toblak's proceeds

2   and wind-up and dissolve Toblak, thereby precluding any subsequently incurred liability from

3   flowing-up to USAIP from Toblak.    USAIP and the USACM Trust will also receive an

4   invaluable release from the parties with regard to any potential claims relating to the Park Sites

5   and/or Park Funds that may be asserted against them.

6           15.    I believe that the probability of success is outweighed by the costs and inherent

7   delays to be incurred in litigating the Disputes.

8           16.    After a thorough evaluation of all available information, I have determined that

9   approval of the Settlement Agreement is fair and equitable and in the best interest of USAIP's

10  creditors.

11          17.    Additionally, efficient resolution of the Disputes is in the best interest of USAIP's

12  creditors, because it efficiently alleviates an ongoing dispute and eliminates potential subsequent

13  liability to Toblak and/or USAIP.

14          DATED this __15th__ day of January, 2009.

15                                                    _____

16                                                    Lisa M. Poulin, the Chapter 11 trustee for
                                                      USA Investment Partners, LLC

17

18

19

20

21

22

23

24

25

26

27

28

156987/USACM poulin declaration in support of motion to approve Toblak settlement

# EXHIBIT A

## SECOND AMENDED PARK DEVELOPMENT AGREEMENT BETWEEN DOUBLE DIAMOND RANCH, L.L.C., TOBLAK, L.L.C., DOUBLE DIAMOND RANCH MASTER ASSOCIATION, AND THE CITY OF RENO

THIS AMENDED AND RESTATED PARK DEVELOPMENT AGREEMENT (the "Agreement") is entered into this _____ day of _____, 2004 ("Effective Date"), by and between the DOUBLE DIAMOND RANCH, L.L.C., a Delaware limited liability company (hereinafter "Owner"), TOBLAK, LLC, a Nevada limited liability company (hereinafter "Toblak"), DOUBLE DIAMOND RANCH MASTER ASSOCIATION, a Nevada non-profit corporation (hereinafter "Association"), and CITY OF RENO, a Nevada municipal corporation (hereinafter the "City") (collectively the "Parties").

### RECITALS

A.    WHEREAS, on September 8, 1998, the City Council approved an agreement (the "Parks Agreement") between the City, Owner, and Association relating to the design, construction and maintenance of five neighborhood/community parks in the South Meadows Properties Planned Unit Development, Phase, III, (City Case No. 66-92) (the "PUD"), also known as the Double Diamond Ranch ("Ranch"). Under the Parks Agreement, City agreed to construct one park on Park Parcel 34; Owner agreed to construct four additional parks on Parcels 42, 43, 44 and Parcel B; and

B.    WHEREAS, the City has been collecting residential construction tax in the Park District covering the Double Diamond area and these funds are available to fund the obligations as set forth in this Agreement; and

C.    WHEREAS, on April 13, 1999, the City and Owner approved an amendment (the "Amendment") to the Parks Agreement (collectively, the "Amended Parks Agreement") which allowed Owner to design and construct the park improvements on Parcel 34, instead of the City; and

D.    WHEREAS, on October 24, 2001, Owner declared bankruptcy in United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), Case No. BK-N-01-3665 (GWZ); and

E.    WHEREAS, USA Commercial Mortgage Company ("USA") and Lowe Enterprises Residential Investors, LLC ("Lowe") were creditors of Owner, and on July 22, 2003, entered into a settlement agreement with Owner (the "Settlement Agreement") regarding a number of matters that were the subject of the bankruptcy proceeding, including the assignment of the Amended Parks Agreement. The Bankruptcy Court approved the Settlement Agreement; and

F.    WHEREAS, USA subsequently appealed an order from the Bankruptcy Court dated February 27, 2003 to U.S. District Court; the order regarded the assignment of the Amended Parks Agreement to Lowe, instead of USA, and the denial of USA's request to transfer certain park sites to USA as set forth in the Settlement Agreement; and

1

G.    WHEREAS, on March 29, 2004, the District Court reversed the order and remanded the matter back to the Bankruptcy Court for further proceedings; and

H.    WHEREAS, Lowe has appealed the District Court's decision to the Ninth Circuit Court of Appeals; and

I.    WHEREAS, the assignment of the Amended Parks Agreement to any third party requires the consent of the City; and

J.    WHEREAS, the City is willing to consent to an assignment, provided that the assignee agrees to assume all duties and obligations set forth in the Amended Parks Agreement, and further agrees to complete the Phase 2 Trail Improvements as is generally described in the PUD (hereinafter the "Pioneer Trail" or "Trail"); and

K.    WHEREAS, on May 18, 2004, the District Court entered a Stipulation and Order for Limited Stay Pending Appeal ("Stipulation") which, among other things, authorized USA: (1) to form Toblak, LLC, an affiliate entity to take title to the remaining Park Sites; (2) to enter into an agreement with the City to dedicate the Park Sites to the City with or without construction of the Park Sites; and (3) to complete the Pioneer Trail to the satisfaction of the City; and

L.    WHEREAS, the Stipulation also provides that within seven (7) days after notice is given to Lowe indicating there is an approved and executed agreement with the City to complete the Pioneer Trail, Lowe shall assign its rights, title, and interest to certain escrow funds in the amount of $63,591 contributed by Reynen & Bardis Development, LLC ("Reynen") for purposes of completing the Pioneer Trail.

M.    WHEREAS, the parties to this Agreement are relying upon Lowe's timely compliance with the terms of the Stipulation relating to transfer of the Park Sites and to the Pioneer Trail escrow account for purposes of determining appropriate timelines for completion of the Pioneer Trail and Park Sites; and

N.    WHEREAS, Owner is executing this Agreement only for the purpose of consenting to the assignment of its rights, as set forth herein, to Toblak.

NOW, THEREFORE, in consideration of the foregoing recitals, which are fully incorporated into the Agreement by this reference, the parties mutually agree as follows:

1.    GENERAL

1.1    Owner was the developer of a planned unit development consisting of a portion of the residentially zoned area within the PUD.  The PUD includes zoning for commercial and industrial uses.

1.2    The nonresidential portions of the PUD are not a part of this Agreement and all references herein to the Ranch shall mean the residentially zoned portion of the Case No. 66-92, including the multifamily residential property located on the north side of South Meadows Parkway, as shown on Exhibit A.  Any future amendments to the

2

PUD or Ranch affecting the City parks subject to this Agreement shall operate as amendments hereto.

    1.3    Association is a duly formed Nevada nonprofit corporation, created to maintain common area, parks and other property in the Ranch, among other matters, by a certain Master Declaration of Covenants, Conditions and Restrictions for Double Diamond Ranch recorded on June 17, 1996 as Document No. 2004353 ("CC&Rs") in the office of the Recorder of Washoe County, Nevada.

    1.4    As a condition of PUD approval, a Parks, Open Space and Trails Program ("Program"), as amended, has been approved by City. The provisions of the Program are incorporated herein by reference. Any conflict between the provisions of this Agreement and the provisions of the Program shall be governed by the provisions of this Agreement.

    1.5    Nevada Revised Statutes 278.497-4987 is a law relating to the residential construction tax, providing the manner for imposition, establishing its use and setting its rate at one percent (1%) of the valuation of each building permit issued, or $1,000.00 per residential dwelling unit or mobile home, whichever is less, and providing other matters properly relating thereto.

    1.6    City has adopted by ordinance a residential construction tax, pursuant to NRS 278.4983, to impose a tax upon the construction of apartment houses, residential dwelling units and mobile home lots, and a method for its collection ("RCT").

    1.7    Certain private park, open space and private recreational facilities are planned within the Ranch and provided for in the Program. These amenities are not a part of this Agreement. This Agreement only relates to three (3) park sites ("the Park Sites") to be conveyed to the City, constructed and maintained as provided herein, as shown on Exhibit A, consisting of Parcels 42, 43, and 44:

    a.    A ±5.0 acre neighborhood park near the south end on Parkwood Avenue shown as Parcel 42.

    b.    A ±10 acre community park located at the northeast corner of South Meadows Parkway and Wilbur May Boulevard and depicted as Parcel 43 in the PUD.

    c.    A ±5.0 acre neighborhood park near the north end of Wilbur May Boulevard adjacent to a future elementary school site, shown as Parcel 44.

In addition, this Agreement relates to the Pioneer Trail improvements as set forth in the PUD, which are to be constructed by Toblak as set forth herein and maintained by the Association.

    1.8    NRS 278.4979-4982 allows an alternative procedure to payment of the RCT, the required dedication of land for parks by a developer pursuant to an ordinance enacted by the City. The City has enacted Ordinance No. 4916 (the "Ordinance") in order to utilize said alternative for the Ranch.

2.      **CONVEYANCE OF PARK SITES**

2.1     The Park Sites sold or dedicated pursuant to this Agreement shall be used solely for City parks and related purposes.

2.2     The Park Sites, or any portion, shall be conveyed by grant deed to the City upon creation of a legal parcel therefore, as specified herein and in phases at the times as provided in Section 3 below.  The Pioneer Trail has already been conveyed to the Association.

2.3     The description and location of the Park Sites is approximate and shall be determined by mutual agreement of the parties prior to the time of sale or dedication of each Park Site to City.

2.4     Prior to the sale or dedication of each Park Site, City shall have the reasonable right of access thereto for the purpose of conducting surveys, soils tests, staking, inspections or any other activities reasonably related to verifying the planning, engineering, inspection or construction of improvements contemplated by this Agreement.

2.5     City agrees to accept conveyance of title to the Park Sites, subject to compliance by Toblak with the terms and conditions of this Agreement and the Ordinance.

2.6     All Park Sites shall be sold or dedicated to City free and clear of all liens and encumbrances, except non-monetary title exceptions currently of record or title exceptions recorded after the date hereof approved by City.  Any title exceptions of record existing on the date of dedication to City, to which City has not objected and the City has not required removal from title prior to dedication, shall be deemed approved by City.  City may require an escrow and title insurance policy prior to dedication of all or any Park Sites, in City's sole discretion.  If required by City, the cost of title insurance, and any charges or fees related to escrow or transfer of any Park Site, shall be paid by the City.

2.7     After dedication to City, each Park Site shall be open to the public and operated by City, subject to the maintenance provisions contained in Section 4 hereof, pursuant to City policy and procedures.

2.8     City agrees that easements and other title exceptions of record on Park Sites recorded after execution hereof which are reasonably related to development of the PUD and do not unreasonably interfere with the use and enjoyment of Parks Sites shall be approved; and, if requested after sale of any Park Site, shall be granted.

2.9     Within thirty (30) days of the date that the City accepts the Pioneer Trail and the duties set forth in paragraph 3.10 of this Agreement are completed, Park Parcel 43, including land and non-potable water rights, shall be conveyed to the City in its unimproved condition except that all construction debris, if any, shall be removed from the site to the commercially reasonable satisfaction of the Park Manager, in consideration

4

of the sum of $300,000.00.   Further, the conveyance of Parcel 43 is subject to all applicable terms and conditions of this Agreement.   All Parties agree and acknowledge that this sum represents fair and reasonable compensation for the land value and water rights relating to Park Parcel 43.

3.    PARK DESIGN AND CONSTRUCTION

3.1    Except for Park Parcel 43, Toblak shall, subject to the terms and conditions herein, design and construct improvements on the Park Sites.  Nothing in this Section, however, shall restrict or prohibit City from constructing the park improvements on Park Sites in any other manner if Toblak fails to perform its obligations hereunder or after dedication of any Park Site to City.

3.2    Toblak and its subcontractors, in the design and construction of park improvements shall comply with the terms, conditions, and requirements of the Americans with Disabilities Act of 1990 (P.L. 101-136), 42 U.S.C. 12101, as amended, and regulations adopted there under contained in 28 C.F.R. 26.101-36.999, inclusive, and any relevant program-specific regulations.

3.3    Toblak's design, master plan and construction of park improvements shall be performed pursuant to procedures approved by City.  City and Toblak agree that, in addition to the requirements of Section 3.2 of this Agreement, the following guidelines shall apply to these procedures for each Park Site, whether each site is designed and constructed individually or jointly:

a.    Design Phase

(1)    Toblak will hire and pay for a consultant for design and engineering for the park improvements satisfactory to City.

(2)    The consultant hired by Toblak shall meet standard indemnification and insurance requirements as specified by City.   Any changes or deviations from standard requirements shall be approved by the City prior to the changes being effective.   Toblak shall comply with the following, in order:

–    Toblak and consultant shall consult and work closely with City staff, on detailed review for both the conceptual park design and plans and in establishing a construction cost budget prior to the commencement of any construction activities.

–    Toblak and consultant shall work closely with City Staff to present the conceptual park design and plans to applicable neighborhood advisory board and the public shall have notice and an opportunity for a public meeting to provide input on the design plans.

5

      –    Toblak and consultant shall work closely with City Staff to present the conceptual park design to the City Recreation and Parks Commission. For approval.

      –    Thereafter, Toblak shall consult with Staff on the following minimum schedule:

           –    at 50% completion City staff review;

           –    at 90% completion City staff review; and

           –    at 100% completion City staff final approval

(3)    Design shall meet all standards developed by the U.S. Consumer Products Safety Commission and City's guidebook.

(4)    The improvements specified in Exhibit B are intended to be the nature and type of improvements to be designed and constructed by Toblak pursuant to this Agreement for each Park Site.

(5)    The final selection of plant material for the Park Sites will be reviewed and approved by the Association, such approval being timely and not unreasonably withheld, in order that the Association can provide guidance to the City and Toblak as to which types of plant material historically have a greater mortality rate within the PUD.

b.    Construction Phase

(1)    Toblak and any subcontractors hired for the purposes of constructing any of the improvements provided for herein shall meet the standard City indemnification and insurance requirements, including the addition of City as an "insured" and shall provide proof of said coverage prior to the beginning of any construction.

(2)    Changes in the scope or amount of the insurance coverages provided shall be made only with the approval of the City.

(3)    City staff may at any time inspect the construction progress.

(4)    City staff shall work closely with Toblak reviewing and inspecting earthwork, base material and finish material such as concrete and asphalt.

(5)    City staff shall inspect the irrigation system prior to it being covered.

(6)    Park equipment shall be placed based upon standards set by the U.S. Consumer Product Safety Commission.

(7)     Toblak with the assistance of consultant shall provide reproducible as-built drawings at the completion of construction and prior to final payment.

(8)     All change orders must have prior approval of City.

c.     Schedule of Improvements.

In order to allow for the phased construction of Park Site improvements, and to provide for completed Park Sites as needed during build out of the Ranch, the following schedule shall guide the design and construction of Park Site improvements:

**Within Sixty (60) Days of the Effective Date of this Agreement**

Revise the current design for Park Parcel 42 and select consultant for design of Park Parcel 44.

**On or Before April 30, 2005**

Substantial completion of construction of the Pioneer Trail located in Villages 13, 14 & 15 in accordance with the terms and conditions of the PUD. The Park Manager and Park Development Planner, in consultation with one another, shall have the authority to issue a written extension, extending the deadline for this deliverable to no later than June 30, 2005.

**On or Before September 30, 2005**

Substantial completion of construction of Park Parcel 42. The Park Manager and Park Development Planner, in consultation with one another shall have the authority to issue a written extension, extending the deadline for this deliverable to no later than March 31, 2006.

**On or Before December 31, 2005**

Substantial completion of construction of Park Parcel 44. The Park Manager and Park Development Planner, in consultation with one another shall have the authority to issue a written extension, extending the deadline for this deliverable to no later than March 31, 2006.

Toblak may advance the proposed schedule at any time without approval of City. If in the unlikely event that Lowe does not timely comply with the terms of the Stipulation specifically pertaining to the transfer of title to the Park Sites and the Pioneer Trail escrow account, Toblak may request that the Park Manager and Park Development Planner, in consultation with one another, modify the above timelines. Prior to requesting a modification of the timelines under this paragraph, Toblak shall take reasonable steps to require compliance by Lowe with the Stipulation, which may include seeking appropriate remedies relating to compliance with the Stipulation. Any such modification shall be in writing and signed by Toblak and either the Park Manager or

7

Park Development Planner on behalf of the City, and approved as to form by the Office of the City Attorney.

3.4     For purposes of establishing the values of RCT funds, the value of Park Site improvements for Parcels 42 and 44 are hereby established in the amount of $750,000.00 each (includes $200,000 for land value and non-potable water rights for each Park Site).  The budgets for Park Parcels 42 and 44 shall include a fixed value for land, water rights and improvements, and a project administration fee not exceeding five percent (5%) of the actual costs of construction, as approved pursuant to Subsection 3.9 of this Agreement, excluding land and water rights.  If the Director of Parks, Recreation & Community Services determines that it is advisable and that there is available residential construction tax to increase the construction budget for amenities at a given park site, the Director shall have authority to increase the fixed budgets for the park sites accordingly.  Any such increase by the Director shall be in writing, and no services shall be performed or costs incurred prior to receiving written approval of the increase to the fixed price budget.

3.5     Toblak shall submit to City monthly progress invoices based on the actual amount of work completed.   Toblak shall receive payments from the City based upon approved invoices within thirty (30) days of invoice postmark date. Toblak acknowledges and agrees that City is in no event obligated to make payments in excess of the available RCT Funds, i.e., at no time shall Toblak's cumulative total progress payments exceed the cumulative total expenditure permitted by the available RCT Funds collected in furtherance of this Agreement.  Payment of any amounts included in an invoice which are in excess of the available RCT Funds shall be deferred until such deferred amounts can be paid without aggregate payments exceeding the total RCT Funds.  Toblak shall not be required to commence construction at a Park Site until the amount of the RCT funds necessary to pay for the construction of improvements pursuant to the last fixed budget for a given Park Site are collected by the City.

3.6     With the exception of Park 43, on or about the date of dedication or conveyance of any Park Site, Toblak shall prepare and submit a proposed Application for Final Payment to City showing the proposed total amount due Toblak. The Application for Final Payment shall list all outstanding or pending Notices of Intent to Claim and all Subcontractor claims, Liens and stop notices, including any notices filed or to be filed with the Affidavit of Final Completion, stating the amount at issue associated with each such notice, and the purchase price for land and non-potable water rights. The Application for Final Payment shall be accompanied by: (a) complete and legally effective releases or waivers of Liens and stop notices satisfactory to City, from all persons legally eligible to file Liens and stop notices in connection with the Work; (b) consent of any other Surety(ies) to final payment, if any; (c) an executed release satisfactory in form and content to City; (d) evidence of recordation of a Notice of Completion; and (e) such other documentation as City may reasonably require.  Prior applications and payments shall be subject to correction in the proposed Application for Final Payment.   City shall have 30 days from receipt of the Application for Final Payment to issue a Certificate of Final Completion, which shall indicate the City's acceptance as completed all work performed by Toblak as required in this Section 3 of

8

the Agreement subject to the warranties by Toblak as set forth in Subsection 4.1, or to provide notice to Toblak of any deficiencies in said work. After receipt of notice of any deficient work and correction of same by Toblak, Toblak shall re-submit the Application for Final Payment as provided in this Subsection.

3.7     If the Application for Final Payment shows no outstanding or pending Notices of Intent to Claim or Subcontractor claims, Liens or stop notices, and provided that no Notice of Intent to Claim or Subcontractor claim, Lien or stop notice is thereafter filed, and provided the Application for Final Payment has been approved, City, in exchange for an executed release meeting the requirements of Section 1.6 and otherwise satisfactory in form and content to City, will pay the entire sum found due on the approved Application for Final Payment is subject to the availability of RCT funds collected for the PUD area. To the extent possible and with the exception of the portion of the purchase price for land and water rights that is subject to being held as security in accordance with the provisions of Section 5, such payment shall be made no later than 30 days after issuance of the Certificate of Final Acceptance.

3.8     If the Application for Final Payment lists any outstanding or pending Notices of Intent to Claim or Subcontractor claims, Liens or stop notices, or if any Notice of Intent to Claim or Subcontractor claim, Lien or stop notice is thereafter filed, Final Payment will be made 30 days after issuance of the Certificate of Final Acceptance. City, in exchange for an executed release meeting the requirements of Section 1.6 and otherwise satisfactory in form and content to City, will pay the entire sum found due on the approved Application for Final Payment, subject to the availability of RCT funds as set forth above. City may, however, withhold from the Final Payment the amounts as City deems advisable to cover any Subcontractor claims, Liens or stop notices.

3.9     Invoicing for reimbursement shall be for only actual costs of construction, and administration fees as set forth above and each invoice shall include all supporting documentation and shall be submitted monthly for processing to the Park Manager who will consult with the Park Development Planner. The Park Manager shall review the requested invoices to determine if they comply with the terms and conditions of this Agreement and are consistent with the park design and specifications, and are properly reimbursable.

3.10    In regards to and upon completion of the Pioneer Trail, Toblak shall notify City and the Association of the completion of the Pioneer Trail, and City and the Association shall inspect and in writing either accept, or detail the deficiencies relating to, the Trail improvements, within 30 days from receipt of the notice from Toblak. The acceptance of the Trail improvements by the City and the Association shall not be unreasonably delayed or withheld. WITHIN THIRTY (30) DAYS OF ACCEPTANCE OF THE TRAIL BY CITY AND ASSOCIATION, CITY SHALL PAY TOBLAK $89,000, AND CITY SHALL RELEASE TO TOBLAK ANY CLAIMS TO FUNDS DEPOSITED BY REYNEN & BARDIS DEVELOPMENT COMPANY ON THE PIONEER TRAIL IN THE AMOUNT OF $63,591, PLUS ANY INTEREST, WHICH ARE HELD IN ESCROW FOR THE SOLE BENEFIT OF THE CITY OR ITS ASSIGNEE. CITY SHALL EXECUTE THE APPROPRIATE DOCUMENTS, IF

9

NECESSARY, IN ORDER TO ENABLE TOBLAK TO WITHDRAW OR TRANSFER SAID FUNDS. SUCH PAYMENT AND RELEASE IS INTENDED AS A FULL SETTLEMENT OF ALL CLAIMS REGARDING THE PARTIES' LIABILITY FOR CONSTRUCTION OF THE PIONEER TRAIL AS IDENTIFIED IN THE PUD. EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, TOBLAK, ASSOCIATION AND CITY WAIVE, RELEASE, HOLD HARMLESS AND FOREVER DISCHARGE WITH PREJUDICE THE OTHER PARTIES, ITS MEMBERS, OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, SUCCESSORS AND ASSIGNS, FROM ANY AND ALL CLAIMS FOR REIMBURSEMENT, COSTS OR DAMAGES, WHETHER KNOWN OR UNKNOWN, THAT ANY PARTY EVER HAD, OR NOW HAS, UNDER ANY LEGAL THEORY OR CAUSE OF ACTION RELATING TO THE CONSTRUCTION OF THE TRAIL; PROVIDED, HOWEVER, THAT SAID RELEASE SHALL IN NO WAY OPERATE TO RELIEVE CITY, OWNER, TOBLAK OR ASSOCIATION OF ANY APPLICABLE DUTY OR OBLIGATION SET FORTH IN THE PUD OR THIS AGREEMENT.

3.11    At the option of Toblak, each Park Site may be appraised to determine its fair market value at the time of its dedication to the City. In the event the appraised value is greater than the fixed budget amount, the City will agree to set a value equal to the appraised value, provided that any difference between the fixed budget and the appraised value will be a donation from Toblak to the City.

3.12    Toblak has the reasonable right to approve the design of all improvements to be constructed, but City has final approval authority over each phase specified in Subsections 3.3(a) and 3.3(b). City and Toblak shall cooperate with each other in good faith to approve design and construction for each Park Site which is within the fixed budget amounts specified in Subsection 3.4 above.

3.13    If not already installed, Toblak agrees, at its sole cost and expense, to install and construct non-potable laterals from the non-potable water transmission lines, to each Park Site property line, in order to irrigate each Park Site, to the extent possible, with non-potable water, subject to state and local water quality standards. Said costs shall not be included in the fixed budget amounts specified in Subsection 3.4, above. To the extent that Toblak obtains a water service commitment from the applicable water authority to supply non-potable water for Park Site irrigation needs (subject to water quality restrictions, if any), the requirement of Toblak to dedicate water rights shall be satisfied. If not already installed to each Park Site and if such lines are requested by the City, water lines for potable water and domestic sewer service may be included in the fixed budget amounts specified in Subsection 3.4, above. Further, if amenities, such as restrooms and water play areas, requiring potable water are requested by the City, the City has the option of supplying the needed potable water rights or including the potable water rights in the fixed budget amounts specified in Subsection 3.4, above. Finally, the non-potable water transmission lines in the street right of way are believed to be installed; however, if not installed or if not functioning, the correction of such is not the responsibility of Toblak. If there is such an event, this shall not be deemed a default of the City of the terms and conditions of this Agreement.

10

3.14  If Toblak is delayed at any time in the construction of Park Site improvements by an act or neglect of the City, or of a separate contractor employed by the Toblak, or by changes ordered by City, or by labor disputes, fire, inclement weather, unusual delay in deliveries, unavoidable casualties or other causes beyond Toblak's control, or by delay authorized by the City, then Toblak shall not be in default for failure to substantially complete the improvements for a Park Site in a timely manner if Toblak substantially completes the improvements within the time period of delay caused by the circumstances.

## 4.  MAINTENANCE OF PARK SITES

4.1  Toblak shall provide all maintenance to Park Site improvements for a period of ninety (90) days after issuance of the Certificate of Final Completion and shall warrant all plant materials and irrigation installed by Toblak for a one (1) year period after acceptance of the park site by the City.  In regards to the warranty for all plant materials and installation, the Association agrees to utilize, and pay the costs of, the sub-contractor that used by Toblak to install such improvements, for the purpose of maintaining the plant materials and irrigation improvements through the warranty period. Toblak shall have complied with its duty to warranty the plant materials and irrigation installed by Toblak if such sub-contractor expressly assumes the warranty duties of Toblak and provides a direct warranty therefore to the City.  The time periods referred to in the preceding sentence will commence on the date that written verification indicating there is a letter affirming the acceptance of the park site and substantial completion of construction is mailed to Toblak by the Park Manager and/or Park Development Planner, in consultation with one another.

*[handwritten margin note: MAKE sure our BIDS include 1 year warranty]*

4.2  Except as specified in Section 4.1 above, after dedication of each Park Site to City, maintenance of the Park Site and all improvements thereon shall not be the responsibility of Toblak.

4.3  There are up to five park sites that have been or will be dedicated the City pursuant to the original Parks Agreement, Amended Agreement, and this Agreement. Two of the park sites already dedicated have been dedicated to the City and are currently named Comstock Park and Evergreen Park, for identification purposes only.  The two five acre park sites identified in this Agreement will be dedicated upon acceptance of the improvements as set forth herein.  As to the 10 acre park site, the land and water rights will be dedicated as set forth herein, and the improvements will be constructed at a later date.  The Association shall, at Association's sole cost and expense, comply with the provisions of Subsection 4.1 applicable to it, and shall perform the following maintenance tasks for all park sites identified in this Subsection 4.3:

(a)  repair and replacement of turf, trees and shrubs;

(b)  seasonal planting of flowers, if any;

(c)  trim mowing, edging and shrub pruning (City shall perform weekly field mowing);

11

     (d)     garbage removal, pickup of trash and debris for all park areas, parking lot and restroom cleaning;

     (e)     seasonal fertilizing, as needed;

     (f)     weed control;

     (g)     landscape irrigation repair and maintenance; and

     (h)     all general upkeep and maintenance of landscaping not mentioned above.

All maintenance performed by the Association shall be to the minimum maintenance standards currently utilized by the City and as may be amended in the future for maintaining park properties. Attached as Exhibit "C" is a copy of the current minimum maintenance standards which is incorporated by this reference. The Association shall assess it members within Ranch for the costs of Park Site maintenance specified in this Subsection, pursuant to its CC&Rs.

     4.4     Maintenance shall be to standards required by all applicable laws and ordinances and shall be at least equal to actual maintenance performed by City for similar parks as set forth in Exhibit C, as amended, which is referenced above. Subject to the provisions of Subsection 4.5 below, City shall have such remedies as provided by law to enforce the Association's maintenance responsibilities hereunder, including the right to have a receiver appointed to levy and collect assessments under the CC&Rs, and fulfill the Association's maintenance responsibilities. Such remedies shall include the obtaining of a mandatory injunction and the right of City to affect such maintenance as may be required and collect the cost thereof, together with attorneys' fees and court costs, from Association.

     4.5     In the event City determines landscaping maintenance of Association is inadequate, it shall give the Association written notice to such effect, describing in detail the claimed deficiencies. The Association shall remedy the defects within thirty (30) days of receipt of such notice unless the Association disputes such claim, in which case the matter shall be arbitrated as described below. The determination by the arbitrators shall be binding on the City and the Association. In the event of three (3) deficiency notices in any twelve (12) month period in which the Association is deficient in meeting its maintenance responsibilities, City may in such event require the Association to post a bond in favor of City in the amount of one (1) year's reasonable maintenance costs, such bond to remain until the Association has satisfactorily performed its maintenance responsibilities for a period of at least two (2) years thereafter or until City consents to termination of the bond, whichever first occurs.

     4.6     The Association shall indemnify, defend and hold City harmless of and from any and all liability or damage arising from or caused by the failure of the Association to fulfill its maintenance obligations as required by this Agreement.

     4.7     The Association shall maintain liability insurance in connection with the Association's duties under this Section naming City as an additional insured, and shall provide the City Parks, Recreation and Community Services Director evidence of such

insurance at least annually or on request. Liability limits per occurrence shall be not less than $1,000,000.00.

4.8    In the event of arbitration under this Section, within the thirty day (30) period mentioned above in Subsection 4.5, if the Association dispute City's claim of deficient maintenance, the Association shall notify City of its dispute. Each party shall pick an arbitrator. Within fifteen (15) days of selection of the first two arbitrators, the third one shall be selected by the arbitrators. The three arbitrators shall gather such evidence as they believe is necessary and render their decision within thirty (30) days of selection of the third arbitrator. In the event of a dispute among the arbitrators as to procedures to follow, the Rules of the American Arbitration Association shall be followed. The non-prevailing party shall pay costs of arbitration, including expenses and attorneys' fees.

4.9    The City shall repair, replace, and maintain all improvements which are not assumed by the Association under this Section 4 or by Toblak under Subsection 4.1, on the park sites identified in Subsection 4.3 if already dedicated or upon dedication thereof to the City. The City's maintenance includes but not limited to all utilities; lighting, repairs of parking lots, restrooms, playground areas and equipment, walkways, group shelters, drinking fountains, fitness clusters; and any other improvements not maintained by Association under this Agreement.

4.10    Association may assume obligations of City to repair and maintain the Park Sites, subject to prior approval of City, and City shall reimburse Association for its reasonable costs and expense of performing City's obligations hereunder, provided Association obtains City approval of said costs prior to incurring the expenditures.

5.    **PERFORMANCE/DEFAULT BY TOBLAK**

5.1    With the exclusion of the Pioneer Trail which security is separately provided for in Subsection 5.2, as security to assure compliance with each five acre park site and the related terms and conditions of this Agreement, and also for any and all other obligations and/or liabilities, absolute or contingent, due or to become due, which are now, or at any time hereafter due to the City as a result of Toblak's default in completing such five acre park site as set forth in this Agreement, City shall be entitled to retain and draw up to $150,000 from the amount set forth in this Agreement for the purchase price for land and water rights costs on each five acre park site ("Security"). The Security shall be applied toward the payment of all or any costs or expenses, including but not limited to prevailing wage expenses, and attorney's fees and costs, which may be projected or incurred in connection with Toblak's default in any term and condition of this Agreement as to the five acre park site and the City's costs of completion of the five acre park site. The security for each five acre park site ($150,000) shall be reduced to $50,000 upon the issuance of a Certificate of Final Acceptance for the applicable park site. The $50,000 security shall be applicable to the 90 day warranty period set forth in Subsection 4.1, above. The City shall process any request for release in security under this subsection within thirty (30) days after receipt.

13

5.2    As to the Pioneer Trail, the City shall retain the $89,000 it is to pay as security until such time as the trail has been substantially completed in accordance with paragraph 3.10 of this Agreement.

5.3    The security set forth in this Agreement is only for the benefit of the City and no·other person shall have any claim against any portion of said sum or sums or against the City.

5.4    It is expressly understood that the City shall have the right to withdraw whatever sums it deems necessary from the available security in the event of Toblak's, or any successor thereto, default in any term and condition of this Agreement as to each five acre park site and/or the City's build out of one or both of the five acre park sites. It is further understood and agreed that said sum or any part of said sum designated herein may be drawn by the City prior to actually incurring costs or expenses, and further that if the sum or sums drawn do not exceed the actual cost and expenses so incurred, then such excess, if there be any, shall be returned to Toblak.

5.5    In the event Toblak defaults in the performance of its obligations under this Agreement, City shall have (subject to the provisions of Section 5) without limitation any or all of the following nonexclusive remedies:

   (a)    terminate this Agreement;

   (b)    cease issuance of any building permits for main residential units on lots within the Ranch until the default is cured;

   (c)    demand and receive transfer of all remaining Park Sites, including non-potable water rights. Any purchase price associated therewith automatically shall be reduced by the provisions of Subsections 5.1, 5.3 and 5.4 of this Agreement relating to security requirements.

   (d)    retain the security set forth in this Agreement, or any portion thereof, as referenced above; and

   (e)    avail itself of any other remedy allowed by law or equity.

5.6    Prior to utilizing a remedy specified in Subsection 5.5, City shall deliver in written notice of default to Toblak specifying in detail the circumstances of Toblak's default, and Toblak shall have sixty (60) days from the date of delivery of the notice to cure said default.

6.    **MISCELLANEOUS PROVISIONS**

   6.1    Time is of the essence of this Agreement.

   6.2    Any notices, requests or instructions by a party to be given to another party shall be in writing, by personal delivery or are to be mailed by certified mail with return receipt requested; as follows:

14

**Double Diamond Ranch, L.L.C.**
9460 Double R Blvd., Suite 200
Reno, Nevada 89521

Attn: Kreg D. Rowe, Managing Member


**Double Diamond Ranch Master Association**
800 South Meadows Parkway, Suite 100
Reno, Nevada 89511

Attn: Rick Gardner, Association Manager

**City of Reno**
c/o Director, Parks, Recreation and Community Services Department
P.O. Box 1900
Reno, Nevada 89501

**Toblak, LLC**
C/o USA Commercial Mortgage Company
4484 S. Pecos Road
Las Vegas, NV 89121

Attn: Thomas Rondeau, Esq.

Any party may change its address by written notice to all other parties.

6.3     Except as otherwise set forth herein, service of any notice or demand made by mail shall be deemed completed on the day of actual delivery or upon personal delivery.

6.4     This Agreement contains the entire agreement between the parties hereto and supersedes any and all prior agreement, arrangements or understandings regarding the same subject matter as this Agreement, which are null and void.

6.5     The representations, covenants, agreements and warranties contained herein shall not be discharged or dissolved upon transfer of the Park Sites, but shall survive the same.

6.6     This Agreement shall be construed and enforced in accordance with the laws of the State of Nevada and venue of any such action shall be in Washoe County, Nevada.

6.7     This Agreement may not be modified, amended, altered or changed in any respect whatsoever except by further agreement in writing, duly executed by the parties.

6.8     This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, subcontractors, personal representatives, and assigns; provided that no assignment of the rights or obligations of Toblak shall take place by the mere transfer of title of all or any portion of the Ranch.  Only an express,

15

written assignment approved by City shall operate to assign any rights or obligations of Toblak to a third party. If a Court of competent jurisdiction issues an order that USA and/or Toblak must transfer the Park Sites or assign this Agreement to another entity which is not affiliated with USA or Toblak, then the City will not unreasonably withhold its consent to assignment provided that the entity receiving the Park Sites agrees to comply with the terms and conditions of this Agreement.

6.9     The prevailing party in any dispute concerning this Agreement shall be entitled to reasonable attorney's fees and costs.

6.10    All periods of time referred to in this Agreement shall include all Saturdays, Sundays, and state or national holidays, unless the period of time specifies business day, provided that if the day to perform any act or give any notice with respect to this Agreement shall fall on a Saturday, Sunday, or state or national holiday, such act or notice may be timely performed or given on the next succeeding day which is not a Saturday, Sunday, or state or national holiday.

6.11    The parties hereto acknowledge and agree that each has been given the opportunity to review this Agreement with legal counsel independently, and has the requisite experience and sophistication to understand, interpret, and agree to the particular language of the provisions hereof. The parties have equal bargaining power and intend the plain meaning of the provisions herein. In the event of an ambiguity in or dispute regarding interpretation of terms, the interpretation of this Agreement shall not be resolved by any rule of interpretation providing for interpretation against the party who causes the uncertainty to exist of against the draftsman.

6.12    Each party hereby agrees to indemnify, defend, and hold the other parties harmless against any and all liability, claims, costs, or expenses of third parties arising directly or indirectly out of a breach of the obligations, covenants, representations, and warranties by the indemnifying party to the other parties to this Agreement.

6.13    This Agreement shall terminate only upon mutual consent by the parties. The Association shall not voluntarily terminate its existence without City's express written approval. Prior to the termination of the corporate existence of the Association, City and Association shall negotiate provisions for future maintenance of all facilities required to be maintained by the Association hereunder to the satisfaction of City.

6.14    This Agreement may be executed in duplicate counterparts, and when combined such counterparts shall form a fully executed agreement. An executed copy of this Agreement provided via facsimile shall be deemed an original counterpart for all purposes.

/ / /

/ / /

/ / /

16

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

CITY OF RENO, a Nevada municipal corporation

By: _____
Robert A. Cashell, Sr.
Mayor

TOBLAK, LLC

By: _____
Managing Member

DOUBLE DIAMOND RANCH MASTER ASSOCIATION, a Nevada nonprofit corporation

APPROVED AS TO FORM

By: _____
Deputy City Attorney

By: _____
President

ATTEST:

By: _____
Lynnette R. Jones
City Clerk

**OWNER SIGNATURE LINE**

Owner is executing this Agreement only for the purpose of consenting to the assignment of its rights and obligations to Toblak LLC.

DOUBLE DIAMOND RANCH, L.L.C., a Delaware limited liability company

By: _____
Its: _____

17

# ("Park Sites")



## PARK FACILITIES PROGRAM

The following elements may be included in the respective park development programs, approved by City in its master plan for these Park Sites.

### 5-ACRE NEIGHBORHOOD PARK (PARCELS 34, 42 AND 44)

- Single parking area (10-20 parking stalls)
- Portable or prefabricated restrooms (one men's, one women's)
- Childrens' play structures (min. 900 – 1500 sf area required)
- Drinking fountain
- Family group shelter (3-4 tables, barbecue)
- Multi-purpose open, level, lawn area (min. 1 acre)
- Horseshoe pits
- Sport Court (1600-2400 sf area)
- Various walkways/multi-use trails
- Tree, shrub, and ground cover planting with irrigation.

### 10-ACRE COMMUNITY PARK (PARCEL 43)

- One, or two parking areas (totaling 30-60 parking stalls)
- unisex restroom
- One or two play structure(s) (to the area 900-1200 sf, older children 1500-1800 sf)
- Drinking fountain(s) (two if not centrally located)
- larger group shelter (6-10 tables, barbecue units)
- Tennis Courts (2)
- Sports Fields
    - Regulation soccer (±200' x 300')
    - 2 softball diamonds
    - Multi-use open play
    - Night lighting
- Telephone, site lighting (non-sports field)
- Horseshoe pits
- Various walkways and trails
- Sport court
    - Full court non-regulation basketball (approx. 40' x 80')
    - Misc. court games
- Adult fitness cluster – optional
- Tree, shrub, and ground cover planting with irrigation.

### 1.5-ACRE NEIGHBORHOOD PARK (PARCEL B)

- Multi-purpose open, level, lawn area (approx. 1 acre)
- Various walkways/multi-use trails
- Tree, shrub, and ground cover planting with irrigation
- Several picnic tables and barbeque pit

C:\MGWS\M.PUD.D.R\DDRPwk10.y
August 4, 1998

**EXHIBIT "B"**

By~it C

# City of Reno Park Maintenance Standards

## Turf Standard

Turf will be healthy with a smooth surface and uniform green color. Turf will not exhibit bare spots and will be weed and pest free. All turf areas will be maintained to support their designed use.

## Turf Tasks

| Task | Description | Frequency | Season |
|---|---|---|---|
| Mowing | Even height, complete coverage, neat cutting, growth kept off pavement. Height range: 2 1/2 to 3 inches | 1/ week in most facilities (Experiment with variable cutting schedules) | April–October |
| Thatch | Remove dead layer where 1" or more shows in annual core test | 1/year if needed | March |
| Aerate | Core aeration 3" depth, pick up cores if necessary on athletic fields | 3/season on athletic fields 2/season on other high use areas 1/season all others | Early Spring, early Summer and Fall |
| Fertilize | Use balanced or slow release fertilizer at rate of lb. N/1000sq ft | 3/season on athletic fields or heavily used turf areas 2/season other turf areas | Spring, Summer and Fall |
| Irrigate | Proper coverage, regular inspections and maintenance | 2 to 3/week in peak heat 1 to 2 / week cooler periods | March 1/October |
| Pest Control | Correct identification and proper control methods. Use of Chemical, mechanical, cultural or biological when appropriate, determined by supervisor. Chemical applications used according to legal requirements as defined on label. | as needed (typical) weeds; post emergence 1/ week pre-emergence 2/year, Insects: 1/ year Fungus: 1/year | March–October |
| Edge | All turf abutting concrete walks | 2/month in formal, high-use areas 1/month all other areas | March–October |
| Trim | All grass around fences, sprinkler heads, borders, valve boxes, signs, posts etc. No chemical edging. | 1/week or as conditions dictate | March–October |
| Top dress | Soil spread over uneven, rutted areas of turf w/ fine sand or triple mix. Not to exceed 1/4" in one application | 1/ year or as conditions dictate | March 1/October |

All tasks are responsibility of Double Diamond Ranch Master Association unless otherwise noted.
11/30/2004

Page 1

Exhibit C

| Task | Description | Frequency | Season |
|------|-------------|-----------|--------|
| Leaf removal | Remove leaves from turf | 2/year | Spring and Fall |
| Litter Removal | Papers, metal, plastic, glass, etc. removed from lawn. | On a site demand basis | Year round |
| Over seeding | Cover bare or sparse area of turf. Use certified seeds as recommended by supervisor or specialist. | 1/year if needed | March or October |
| Renovation | Establish new lawns or to renovate existing lawns. Use certified seed. Cool season grass blends or single species as recommended. | As conditions require or according to five year renovation plan. | March or October |
| Sod | Use cool season grasses, preferable locally grown to insure hardiness. Used where conditions require instant lawn establishment in renovation of old turf or establishment of new lawns | As conditions require or according to five year renovation plan | March to October |

All tasks are responsibility of Double Diamond Ranch Master Association unless otherwise noted.
11/30/2004

Ex ˗ t C

# Planter Beds Standard

Bedding areas will contain healthy, attractive plants that lend variety, color and interest to the landscape. These areas will be litter, weed and pests free. Planter beds will be maintained to provide secondary functions such as barriers, animal habitat, and dust and erosion control. All trees, shrubs and other plants will be trimmed, pruned or otherwise maintained to achieve natural form.

## Planter Beds Tasks

| Task | Description | Frequency | Season |
|------|-------------|-----------|--------|
| Planting | Plant according to City of Reno plant specifications | As required for replacement plantings | Varies depending on plant |
| Pruning | Prune according to City of Reno Pruning guidelines | Shrubs 1/year Flowers 4-6/season | Shrubs: spring or fall Flowers: Mar to Oct |
| Irrigation | Adequate irrigation to sustain health, vigorous plant growth | 1 to 3/week | March- October |
| Pest control | Correct identification and proper control methods. Use of Chemical, mechanical, cultural or biological when appropriate, determined by supervisor. Chemical applications according to ordinance as defined on label. | Typical: Inspections weekly peak season one/month off season | Year round |
| Fertilize | Use appropriate fertilizer according to plant needs as determined by supervisor 1/year for woody plants | 2/ year for herbaceous perennials and annuals | March tଠ/October |
| Clean-up | Rake leaves, weed, add mulch | Initial spring clean-up and as needed through out the year | Yearly |
| Litter removal | Pick-up all debris when visible | Daily inspections and removal as needed | Yearly |

All tasks are responsibility of Double Diamond Ranch Master Association unless otherwise noted.
11/30/2004

Page 3

Exh. C

## Irrigation Systems Standard

Irrigation systems will deliver optimum water to each plant type at the lowest cost and with maximum resource conservation. Water will be delivered during non-use hours. All systems will comply with legal requirements and will protect safety of the public water system.

## Irrigation Systems Tasks

| Task | Description | Frequency | Season |
|---|---|---|---|
| Repair & Replace Lines | Repair main line and lateral leaks with specified materials. Within one working day for main-line breaks and within two working days for other leaks | As needed | Spring U'fall |
| Repair & Replace Heads | Broken heads replaced before next watering cycle. On a preventative basis, replace all heads at each site with new or reconditioned sprinkler heads. | Based on system inspections, 7-10 years or as required | Spring U'fall |
| Monitor &Adjust system | Observe the system in operation. Make adjustments or repairs; call irrigation specialist for major items as define by supervisor. | Weekly | Spring - fall |
| Adjust Controller | According to schedules and rate approved by supervisor, set irrigation clocks to deliver optimum water supply. | Spring, peak heat period, fall and with significant weather changes | Spring- fall |
| Start-up | Following site specific procedures, restore water service to each site. | Once per year | Mar-Apr |
| Shut-down | Following site specific procedures, terminate water service to each site and winterize all pipe and fixtures. | Once per year | Oct-Nov |
| Backflow | Complete standard backflow test and submit test report to supervisor. | At system startup each spring. | Spring |
| Valves | Repair valves and solenoids when indicated by inspection. Replace valves and solenoids according to manufacturers= specifications | As needed 7-10 years | Spring U'fall |
| Drains | Check drains at site shut down, repair or replace as needed | Once per year | Fall |
| Valve Boxes | Maintain visible lids, replace if broken or missing, insure proper grade in the field and secure bolts. | Weekly in season; monthly off season | Yearly |
| Quick Couplers | Insure proper seating, and placement in valve box, clean from debris | Inspect when in use | March U'October |

All tasks are responsibility of Double Diamond Ranch Master Association unless otherwise noted.
11/30/2004

Page 4

Ex___t C

| Task | Description | Frequency | Season |
|---|---|---|---|
| Drip Systems | Inspect operation of emitters and replace as needed. Inspect placement of distribution tubing, check and clean filter and pressure regulator. Flush end lines. Check, replace and repair lines & fittings. | Inspect, adjust and repair at start-up. In season, observe plant stress or lack of field water. | March D'October |

All tasks are responsibility of Double Diamond Ranch Master Association unless otherwise noted.
   11/30/2004

Ex[  ]C

## Restroom Facilities Standard

Restrooms will function properly, be well stocked and odor-free. These facilities will comply with health department standards.

### Restroom Facilities Tasks

| Task: | Description | Frequency | Season |
|---|---|---|---|
| Clean Sinks/Fixtures and Mirrors | Use proper disinfectant, check for proper function, wash down, and keep graffiti free. | Inspect once daily when open and clean as required | 12 months for open facilities |
| Clean Toilets | Use proper disinfectant, check for proper function, wash down. | Inspect once daily when open and clean as required | 12 months for open facilities |
| Clean Floors | Sweep, disinfect, mop, and wash down. | Inspect once daily and clean as required | 12 months for open facilities |
| Clean Walls and Ceilings | Free of graffiti and debris. Wash as necessary. | As needed | 12 months for open facilities |
| Empty trash containers | Dispose if over 1/2 full, clean barrels when necessary | Inspect once daily and clean as required | 12 months for open facilities |
| Stock Supplies | Replace trash bags, keep disinfectant, cleaning tools, toilet paper in stock. Replace T.P. on holders when less than 10% remaining. | Inspect once daily | 12 months for open facilities |
| Lights Fixtures Repairs are responsibility of City of Reno | Inspect for function, broken lenses, wires, bulbs | Inspect weekly | 12 months for open facilities |
| Structures Repairs are responsibility of City of Reno | Inspect interior/exterior for ware & tear (vandalism), check doors and locks, graffiti free, check skylights and windows. | Inspect weekly | 12 months for open facilities |
| Blood-born Pathogens | Yearly-training required for proper handling and disposal. | 1/year | |

All tasks are responsibility of Double Diamond Ranch Master Association unless otherwise noted.
11/30/2004

Page 6

Ex  t C

## Paved Surfaces Standard

Paved pathways, parking lots and other paved areas will have smooth surfaces, be properly marked or signed and, where night use is intended, be adequately lighted. Pathways and parking lots will be free of litter and graffiti.

### Paved Surfaces Tasks

| Task | Description | Frequency | Season |
|---|---|---|---|
| Clean walks | Keep free of hazards and debris by sweeping, washing or blowing | Inspect weekly and clean as required | Year round |
| Litter Removal | Pick up all debris | Inspect once daily and clean as required | Year round |
| Clean stairs | Keep free of hazards and debris by sweeping, washing or blowing | Inspect weekly and clean as necessary | Year round |
| Clean gutters | Keep free of hazards and debris by sweeping, washing or blowing | Inspect Monthly and clean as required | Year round |
| Graffiti Removal | Remove or paint out any visible graffiti. Report to "Graffiti Hotline" | Inspect daily and treat as needed | Year round |
| Snow Removal | Remove mechanically, physically or chemically as available, according to location priority set by supervisors. | As needed | Seasonal |
| Weed control | Remove all invasive vegetation chemically or mechanically | As needed | Seasonal |

All tasks are responsibility of Double Diamond Ranch Master Association unless otherwise noted.
11/30/2004

Page 7

Exhi _ C

# Unpaved Surfaces Standard

Unpaved surfaces will be clean, graded and compacted for its intended use.

## Unpaved Surfaces Tasks

| Task | Description | Frequency | Season |
|------|-------------|-----------|--------|
| Grade | Maintain smooth and  surfaces as necessary by mechanical means | Inspect twice annually or as needed. | Spring and Fall |
| Rake | Hand raking for small obstructions and debris | Monthly or as needed | Year round |
| Weed Removal | Remove by Chemical (pre-and post emergence) physical or mechanical means | Twice annually | |
| Litter Removal | Pick up all debris | Inspect once weekly and clean as required | Year round |
| Leaf Removal | Rake or blow off as needed | Inspect once daily and clean as required | Fall |

All tasks are responsibility of Double Diamond Ranch Master Association unless otherwise noted.
11/30/2004

Page 8

Ext C

## Playground Standard

Play equipment and structures will be clean, safe and functional. All installed equipment and surfaces will meet the Consumer Product Safety Council's guidelines.

## Playground Tasks

| Task | Description | Frequency | Season |
|---|---|---|---|
| Visual Inspections | Daily for obvious physical defects or hazards. Report broken or unsafe conditions to City of Reno | Daily | Year round |
| Written Inspections Responsibility of City of Reno | Hands-on, thorough investigation of all playground components and site for physical integrity and suitability for intended use. Fill out form legibly and process work orders when needed. | Monthly | Year round |
| Litter Removal | Pick up all debris | Inspect once daily and clean as required | Year round |
| Graffiti Removal Responsibility of City of Reno | Remove and/or paint appropriately | As needed | Year round |
| Repair/Replace Equipment Responsibility of City of Reno | Once problem is detected, repair, replace or post out of use until completed. | Immediate attention required | Year round |
| Install Surface Material (Fibar) Responsibility of City of Reno | To meet CPSC national standards for safety. Repair and or refill as necessary. | Annually and as needed | Year round |
| Maintain Surface Material Responsibility of Association and City of Reno | Spread, till, fluff or clean as necessary. Maintain even, loose surface. | Inspect once daily and clean as required | Year round |

All tasks are responsibility of Double Diamond Ranch Master Association unless otherwise noted.
11/30/2004

Exhibit C

## Park Amenities and Special Features Standard

All park appurtenances will be safe, clean and ready for designed use.

## Park Amenities and Special Features Tasks
All tasks for this Standard are Responsibility of City of Reno

| Task (Maintenance Inspections, Repairs, Replace, etc,) | Description | Frequency | Season |
|---|---|---|---|
| Art/Sculptures | Graffiti free, painted/oiled as needed | Inspected monthly | Year round |
| Backstops | Check for defects, report, repair, chain-link and poles. Check back-boards, paint, replace or repair as needed in conjunction w/ league support. | Monthly | March-October |
| Basket ball Courts | Inspect back-boards, nets, chains, hardware. Report, repair or replace as needed. Inspect and clean court surface. | Monthly | Year round |
| Benches | Graffiti free treat wood surfaces in spring if needed in conjunction w/ Adopt-A-Park. | Monthly | Year round |
| Bike Racks | Graffiti free inspect for integrity. | Monthly | Year round |
| Bleachers | Inspect for integrity, repair or replace planks as needed. See benches. | Monthly | Year round |
| Bollards | Insure visibility and function, Graffiti free. Look in place where applicable | Monthly | Year round |
| Decks | Surface treatment and repair as needed. | Monthly | Year round |
| Drinking Fountains | Spring start up and winterize shut down. Check for function, repair as needed | Daily | March to October |
| Exercise Equipment | Check for integrity. Report, repair, replace or take out of use if unsafe, Graffiti free, Annual surface treatment as needed. | Monthly | Year round |
| Fences and Gates | Inspect integrity, report, repair or replace. | Monthly | Year round |
| Fountains | Spring start up and winterize shut down. Inspect and lube pump, clean filters | Monthly | March to November |
| Horseshoe Pits | Inspect, repair or replace back stops and pegs. Replenish sand or DG as needed. | Monthly | March to November |

All tasks are responsibility of Double Diamond Ranch Master Association unless otherwise noted.
11/30/2004

Page 10

Ex____t C

| Task (Maintenance Inspections, Repairs, Replace, etc.) | Description | Frequency | Season |
|---|---|---|---|
| Light Fixtures | Replace as necessary in response to calls. Routine replacement program on fixed cycle as determined by Park Facility Maintenance Specialist. | Yearly or on cycle | Year round |
| Outbuildings | Graffiti free, structurally sound, clean and painted when needed | Monthly | Year round |
| Railings | Inspect poles and connections for integrity. Report, repair or replace. Paint if needed | Monthly | Year round |
| Retaining Walls | Graffiti free, Check for integrity and hazards. Ensure end caps of Keystone walls are secured. | Monthly | Year round |
| Signs | Graffiti free, legible, reflective (if applicable), properly mounted with solid base and supports. New signs installed to City of Reno Building Codes. | Monthly | Year round |
| Storm Drains | Clean screens and keep free of leaves and debris. | As necessary | Year round |
| Trash containers | Graffiti free, intact and secured if necessary, Cleaned and painted as necessary. | Monthly | Year round |
| Utility boxes | Graffiti free secured and locked, Cleared for servicing. | Monthly | Year round |
| Volleyball Courts | Inspect for hazards and debris, Rototil surface and replenish sand as needed. | Monthly w/ yearly surface treatment | Year round |
| Water features (Ponds, lakes, ditches, creeks) | Clear paths and banks of debris and hazards. Litter removal. Inspect and treat for erosion control by planting or rip-rap (as determined by supervisor). Grade paths for intended use. | Monthly | Year round |

All tasks are responsibility of Double Diamond Ranch Master Association unless otherwise noted.
11/30/2004

Ex. C

# Open Spaces or Natural Areas Standard

Areas intended for nature study or open space enjoyment will be retained in managed for fire protection, noxious weeds and erosion control as appropriate for site use and natural surroundings.

## Open Spaces or Natural Areas Tasks

| Task | Description | Frequency | Season |
|---|---|---|---|
| Litter Removal | | As required | |
| Debris Removal | | As required | |
| Weed Control | | As required | |
| Pruning (Brush Removal) | | As required | |
| Erosion Control | | As required | |

All tasks are responsibility of Double Diamond Ranch Master Association unless otherwise noted.
11/30/2004

# EXHIBIT B



File: Pldgs|2BM
Date: 5|21|04 By NRH

1  JANET L. CHUBB, ESQ.
   Nevada Bar # 176
2  AMY N. TIRRE, ESQ.
   Nevada Bar # 6523
3  JONES VARGAS
   100 West Liberty Street, 12th Floor
4  P.O. Box 281
   Reno, NV 89504-0281
5  Telephone: (775) 786-5000
   Facsimile: (775) 786-1177
6  Email: jlc@jonesvargas.com

7  RALPH H. BLAKENEY, ESQ.
   KENNETH N. RUSSAK, ESQ.
8  PILLSBURY WINTHROP
   725 South Figueroa Street, Suite 2800
9  Los Angeles, CA 90071
   Telephone:  (213) 488-7100
10 Facsimile:  (213) 629-1033
   Email: rblakeney@pillsburywinthrop.com

11
   Attorneys for Lowe Enterprises Residential Investors, LLC
12 and Bohica, LLC, dba DDR Devco, LLC

13

14          UNITED STATES DISTRICT COURT

15             DISTRICT OF NEVADA

16

17 USA COMMERCIAL MORTGAGE          CASE NO. CV-N-03-0156-HDM-VPC
   COMPANY,
18          Appellant,              APPEAL NO. BK-N-03-05

19      vs.                         APPEAL FROM
                                    CASE NO. BK-N-01-3665 (GWZ)
   LOWE    ENTERPRISES    RESIDENTIAL
20 INVESTORS, LLC, BOHICA, LLC dba DDR
   DEVCO,   LLC;   DOUBLE   DIAMOND   STIPULATION AND ORDER FOR
21 RANCH, LLC,                      LIMITED STAY PENDING APPEAL

22          Appellees.

23      Lowe Enterprises Residential Investors, LLC, and Bohica, LLC, dba DDR Devco, LLC

24 (collectively "Lowe"), and USA Commercial Mortgage Company, by and through their

25 respective attorneys, hereby stipulate to and request a limited stay pending the outcome of

26 Lowe's appeal to the Ninth Circuit Court of Appeals, as follows:

27      Whereas, USA Commercial Mortgage Company dba USA Capital ("USACMC")

28 appealed the Bankruptcy Court's Order entered on February 27, 2003, to the United States

                                    1

RECEIVED
MAY 2 1 2004
DOWNEY BRAND LLP

U.S. ...
DISTRICT OF NEVADA
...
MAY 1 2 ...
CLERK ...      ...OURT
BY _____  DEPUTY

FILED
04 MAY 18  AM 10: 26
LANCE S. WILSON
CLERK
BY _____
DEPUTY

34

1  District Court in and for Nevada regarding the assignment of the Parks Agreement (defined
2  below) to Lowe Enterprises Residential Investors, LLC ("LERI"). instead of USACMC, and the
3  denial of USACMC's request to transfer the Park Sites (defined below) to USACMC pursuant to
4  a settlement agreement ("Settlement Agreement") between LERI, USACMC and other parties;

5        Whereas, the District Court entered its Decision on March 29, 2004, reversing the
6  Bankruptcy Court's Order and remanding the matter to the Bankruptcy Court;

7        Whereas, Lowe has appealed the District Court's Decision to the Ninth Circuit Court of
8  Appeals;

9        Whereas, the Parks Agreement with the City of Reno ("City"), entered into on September
10 8, 1998, and amended on April 13, 1999 (collectively referred to herein as "the Parks
11 Agreement" and attached hereto as Exhibits B and C), provides for the construction of public
12 parks at the Double Diamond Ranch;

13        Whereas, three remaining parcels, identified as Parks 42, 43 and 44 (the "Park Sites"), are
14 to be dedicated to the City following construction of the parks according to the sequence set forth
15 in the Parks Agreement, and the owner of the Park Sites is to be paid a total of $750,000 ("the
16 Land Fees") for the real property and water rights: $200,000 each for Parks 42 and 44, and
17 $350,000 for Park 43;

18        Whereas, the assignment of the Parks Agreement requires the consent of the City;

19        Whereas, as of the date of this Stipulation, the City has not yet consented to the
20 assignment of the Parks Agreement to any party, but has indicated to the parties that it will
21 consent to the assignment if certain issues unrelated to the Park Sites (namely, the "Phase 2 Trail
22 Improvements," an improvement also located at the Double Diamond Ranch Project in Reno,
23 Nevada) can be resolved; which resolution is subject to the approval of City Council;

24        Whereas, USACMC has formed an affiliate entity to take title to the Park Sites, Toblak,
25 LLC, which shall submit itself to the jurisdiction of the District Court, the Bankruptcy Court, the
26 Ninth Circuit Court of Appeal and the United States Supreme Court, and shall be bound by any
27 order entered concerning the Settlement Agreement, the Parks Agreement and the Park Sites,
28 including this Stipulation and Order;

1    Whereas, the parties have agreed to a limited stay pending the outcome of Lowe's appeal

2  to the Ninth Circuit Court of Appeals, on the following terms;

3    NOW, THEREFORE, the parties hereto stipulate and agree as follows:

4    1.    The Bankruptcy Court should proceed with entering an order on remand pursuant

5  to the District Court's decision.

6    2.    Bohica, LLC dba DDR Devco, LLC ("Devco"), shall transfer the Park Sites to an

7  affiliate of USACMC, Toblak, LLC, a Nevada limited liability company ("Toblak;" hereafter,

8  Toblak and USACMC shall be referred to collectively as "USA") by way of grant, bargain and

9  sale deeds pursuant to NRS 111.170 and subject to any easements, the Parks Agreement and any

10  other liens and encumbrances of record. Copies of the forms of said deeds are attached hereto as

11  Exhibit D. Devco shall provide Toblak an extended coverage ALTA Owner's Policy with

12  Toblak as a beneficiary of the policy, and upon the issuance and delivery of such policy to USA,

13  Lowe is deemed released from the covenants and warranties pursuant to NRS 111.170 in the

14  grant, bargain and sale deeds and Lowe shall have no further obligation to USA or its successors

15  with respect to title.

16    3.    Simultaneous with Devco's delivery of the grant, bargain and sale deeds set forth

17  in Paragraph 2, Toblak shall deposit grant, bargain and sale deeds for the Park Sites in favor of

18  Devco, pursuant to NRS 111.170 and subject to any easements, the Parks Agreement and any

19  other liens and encumbrances of record for the Park Sites existing at the time of the execution by

20  the parties to this Stipulation and Order, into escrow with instructions that after a decision on

21  appeal by the Ninth Circuit in favor of Lowe and entry of the appropriate Bankruptcy Court

22  order pursuant thereto to transfer the Park Sites to Lowe, the escrow agent shall deliver the

23  deed(s) to Devco subject to any stay that may be entered by a court of competent jurisdiction and

24  subject to Paragraph 7 of this Stipulation and Order. At its option, USA may provide Devco an

25  extended coverage ALTA Owner's Policy with Devco as a beneficiary of the policy. Upon the

26  issuance and delivery of such policy to Devco, USA is deemed released from the covenants and

27  warranties pursuant to NRS 111.170 in the grant, bargain and sale deeds and USA shall have no

28  further obligation to Lowe or its successors with respect to title. If the decision on appeal by the

3

1   Ninth Circuit is in favor of USACMC, and after entry of an appropriate Bankruptcy Court order

2   pursuant thereto, the escrow agent shall return to USA the deed(s) for the Park Sites not

3   dedicated to the City subject to any stay that may be entered by a court of competent jurisdiction.

4   Copies of the forms of said deeds are attached hereto as Exhibit E, and copies of the title reports

5   for the Park Sites are attached hereto as Exhibit F.

6        4.    During the pendency of Lowe's appeal, USA may enter into an agreement with the

7   City to dedicate the Park Sites to the City, and no other party, without constructing the parks

8   ("dedication to the City without construction of the Park Sites"). Alternatively, USA may

9   construct the parks and then dedicate the Park Sites to the City as contemplated under the Parks

10  Agreement ("dedication to the City with construction of the Park Sites"). USA is expressly

11  prohibited from transferring the Park Sites to any party other than the City. USA is expressly

12  prohibited from voluntarily encumbering the Park Sites during the pendency of the appeal.

13       5.    In the event of dedication to the City with or without construction of the Park

14  Sites, USA may complete the Phase 2 Trail Improvements to the satisfaction of the City and may

15  utilize up to, but not more than, $150,000 from the Land Fees for this purpose. USA may

16  dedicate the Park Sites without Lowe's consent as long as the proceeds from the dedication are

17  equal to or more than $600,000. If USA needs to dedicate the Park Sites to the City for a sum

18  less than $600,000, it shall obtain Lowe's consent. If Lowe does not consent, then the matter

19  shall be submitted to the Bankruptcy Court for a non-appealable determination. The parties

20  acknowledge that in computing the $600,000 limitation the parties shall not include the costs of

21  water rights and closing escrow with the City as set forth in sub-parts (1) and (2) of Paragraph 7,

22  below.

23       6.    Upon dedication to the City with or without construction of the Park Sites, any

24  proceeds paid by the City shall be deposited in the registry of the Bankruptcy Court, if available,

25  or held in escrow with Ticor Title Company ("Ticor") pending the outcome of Lowe's appeal

26  with instructions that after a decision on appeal by the Ninth Circuit in favor of Lowe and entry

27  of the appropriate Bankruptcy Court order pursuant thereto to transfer the proceeds to Lowe, the

28  clerk of the Bankruptcy Court or escrow agent shall transfer the proceeds to Lowe subject to any

4

1  stay that may be entered by a court of competent jurisdiction and subject to Paragraph 7 of this
2  Stipulation and Order. If the decision on appeal by the Ninth Circuit is in favor of USACMC,
3  and after entry of an appropriate Bankruptcy Court order pursuant thereto to transfer the
4  proceeds to USACMC, the clerk of the Bankruptcy Court or escrow agent shall transfer the
5  proceeds to USACMC subject to any stay that may be entered by a court of competent
6  jurisdiction.

7      7.     Upon dedication to the City with or without construction of the Park Sites, the
8  following may be paid from the proceeds out of escrow with the City: (1) customary closing
9  costs to the title company, (2) the costs to USA of providing water rights as required under the
10  Parks Agreement, and (3) reimbursement to USA if it completes the Phase 2 Trail Improvements
11  as set forth in Paragraphs 5 and 14. The costs of water rights and closing escrow with the City,
12  as set forth in sub-parts (1) and (2) in this Paragraph 7, shall not be included in determining the
13  $600,000 limitation in proceeds from dedication of the Park Sites to the City set forth in
14  Paragraph 5.

15      8.     Upon dedication to the City by USA with or without construction of the Park
16  Sites, Toblak's deed to Devco for the specific Park Site dedicated to the City, as provided for in
17  Paragraph 3, shall be returned to USA without further order of the court, as follows: (1) USA
18  shall provide notice by facsimile to Lowe's counsel at the facsimile phone numbers above and to
19  the escrow officer of Ticor of USA's dedication of the dedicated Park Site to the City and of its
20  request to the escrow officer to redeliver to Toblak the deed to Devco, (2) Lowe shall have seven
21  (7) days to notify the escrow officer in writing, with a copy to USA, of any objection to such
22  delivery, (3) if no objection is received, the escrow officer shall immediately redeliver to Toblak
23  the deed to Devco, (4) if an objection is received, the escrow officer shall not redeliver to Toblak
24  the deed to Devco absent further instructions signed by Lowe and USA or a court order. Lowe
25  shall release and relinquish any claim or interest in the dedicated Park Site and release any
26  claims against the City with regard to the dedicated Park Site and related payment therefor.
27  Lowe shall execute the appropriate documents, if necessary, in order to enable USA to transfer
28  title to the dedicated Park Site to the City free and clear of liens and encumbrances by Lowe. In

5

1   the event that (1) USA constructs the Park Sites, (2) Lowe prevails on appeal and USA is

2   required to transfer to the Park Sites to Lowe or Lowe is entitled to the proceeds from dedication

3   of the Park Sites to the City that are in the registry of the Bankruptcy Court or in escrow, and (3)

4   USA exceeds the construction budgets for the Park Sites, then USA shall provide Lowe with all

5   budgets, contracts, subcontracts, invoices, and other documents related to construction for

6   Lowe's inspection and review upon demand.    USA shall retain all budgets, contracts,

7   subcontracts, invoices and other documents until one hundred eighty (180) days after the appeal

8   has concluded.

9       9.    In the event that Lowe prevails on appeal and USA completes the Phase 2 Trail

10  Improvements, Lowe shall be bound by USA's use of the Land Fees for work on the Phase 2

11  Trail Improvements as set forth in Paragraphs 5 and 14 and USA's use of the Additional Deposit

12  (defined below) for work on the Phase 2 Trail Improvements as set forth in Paragraphs 13 and

13  14. Lowe shall be also bound by USA's dedication of the Park Sites to the City, as set forth in

14  Paragraphs 5 through 7, above, for a sale that is less than $750,000.00. In either instance, Lowe

15  shall have no claim for damages or other recourse against USA.

16     10.    Lowe shall pay the costs of any escrow identified in Paragraphs 3 and 6 above

17  opened for purposes of facilitating this limited stay pending appeal. Subject to the provisions of

18  Paragraph 8, the escrow instructions shall provide that the deeds for the respective Park Sites or

19  the proceeds held in escrow may only be released pursuant to an appropriate Bankruptcy Court

20  order or further instructions of the parties.  A copy of the form of said escrow instructions is

21  attached hereto as Exhibit G. The parties acknowledge that the form escrow instructions do not

22  include all of the specific instructions set forth in this Stipulation;  instead, the parties shall

23  prepare and deliver supplemental instructions as each condition set forth herein requires.

24     11.    Lowe, and/or an affiliate of Lowe, shall post a $75,000 bond in favor of

25  USACMC within fourteen (14) calendar days of the date of entry on the docket of the order

26  approving this Stipulation. If Lowe prevails on appeal, the bond shall be released. If USACMC

27  prevails on appeal and is awarded any costs and/or attorney's fees incurred in the appeal to the

28  Ninth Circuit, that award of attorney's fees and costs may be satisfied from the bond.  If

6

1   USACMC is awarded attorney's fees and costs that exceed $75,000, USACMC may seek the

2   balance from Lowe.  By requiring the posting of a bond, USACMC is not precluded from

3   seeking a recovery of its attorney's fees, costs or other losses that were or are incurred while this

4   case was, is or shall be pending before the Bankruptcy Court, the District Court, or the U.S.

5   Supreme Court, or any other loss incurred pending appeal to the Ninth Circuit.  Lowe is not

6   precluded from opposing any motion for attorney's fees, costs or other losses by USACMC, nor

7   is Lowe precluded from seeking any attorney's fees, costs, or other losses that were or are

8   incurred while this case was, is or shall be pending before the Bankruptcy Court, the District

9   Court, or the U.S. Supreme Court, or any other loss incurred pending appeal to the Ninth Circuit,

10  except that Lowe shall be precluded from seeking a recovery of the attorney's fees that the

11  Bankruptcy Court already denied, and any attorney's fees Lowe could have sought at such time,

12  pursuant to the order entered on May 12, 2003, Docket Number 662, which final order Lowe did

13  not appeal.

14       12.    Except as otherwise expressly provided herein, no other proceedings in the

15  Bankruptcy Court or District Court, or other actions by the parties, are stayed pursuant to this

16  Stipulation and Order.

17       13.    As a result of a City-approved design change at the Double Diamond Ranch,

18  developer Reynen & Bardis Development (Nevada), LLC ("Reynen") has agreed to contribute

19  $63,591 towards the Phase 2 Trail Improvements.  Pursuant to the supplemental escrow

20  instructions set forth in a letter dated March 25, 2004 to Ms. Tima Donovan at First American

21  Title Company of Nevada ("FATCON") for Escrow No. NCS-75389 – Reno for Lowe and

22  Reynen, the $63,591 is designated as the "Additional Deposit" for the cost of completing the

23  "Trail Improvements," *i.e.*, the Phase 2 Trail Improvements, which said sum is to be released

24  upon "completion" of the Phase 2 Trail Improvements to the Seller, Devco.  Upon USA's

25  execution of an agreement with the City to complete the Phase 2 Trail Improvements, Lowe shall

26  assign to USACMC all of its right, title and interest to said Additional Deposit, and said sum

27  shall be released to USACMC upon completion of the Phase 2 Trail Improvements according to

28  the terms of the March 25, 2004 letter and supplemental escrow instructions.  A copy of said

7

1    Assignment and the March 25, 2004 letter to Ms. Donovan is attached hereto as Exhibit H.

2    Within seven (7) days of notice by facsimile to Lowe's counsel at the facsimile phone numbers

3    above of USA's execution of an agreement with the City to complete the Phase 2 Trail

4    Improvements, Lowe shall deliver to FATCON the assignment of the Additional Deposit to

5    USACMC. Thereafter, USACMC is expressly prohibited from transferring, assigning, alienating

6    or voluntarily encumbering the Additional Deposit during the pendency of the appeal unless and

7    until the Additional Deposit is released to USA upon completion of the Phase 2 Trail

8    Improvements. From the date of execution of this Stipulation and Order by the parties until the

9    date of such assignment, Lowe is expressly prohibited from transferring, assigning, alienating or

10   voluntarily encumbering the Additional Deposit during the pendency of the appeal.

11       14.    In the event that USA has executed an agreement with the City for the completion

12   of the Phase 2 Trail Improvements and has commenced construction but has not yet completed

13   the same as of the date the Ninth Circuit issues its decision on appeal, (1) the provisions of

14   Paragraph 13 shall still apply, and (2) if Lowe prevails on appeal USA shall, upon completion by

15   USA of the Phase 2 Trail Improvements and acceptance by the City of same, have a right of

16   reimbursement for the Phase 2 Trail Improvements from the $150,000 portion of the Land Fee

17   described in Paragraph 5, which shall be provided to USA in total from the first available closing

18   of a dedication of a Park Site to the City prior to the receipt of any proceeds by Lowe.

19       15.    Except to the extent expressly indicated otherwise herein, the limited stay set forth

20   in this Stipulation and Order shall terminate upon entry of the judgment of the Ninth Circuit by

21   the clerk of the Ninth Circuit Court of Appeals.

22       16.    A memorandum of this Stipulation and Order may be recorded in the Office of the

23   Washoe County Recorder. Upon termination of the limited stay as set forth in this Stipulation

24   and Order the parties agree to execute and record any instruments in the Office of the Washoe

25   County Recorder necessary to evidence the termination of the limited stay as provided in this

26   Stipulation and Order.

27       17.    Pursuant to the parties' stipulation and for good cause shown, the Court hereby

28   holds that Toblak is subject to the jurisdiction of the District Court, the Bankruptcy Court, the

8

1   Ninth Circuit Court of Appeal and the United States Supreme Court, and shall be bound by this
2   Stipulation and Order and any order entered concerning the Settlement Agreement, the Parks
3   Agreement and the Park Sites.   Toblak's consent is attached hereto as Exhibit A and is
4   incorporated herein by this reference.

5       18.   In the event of a dispute over the terms of this Stipulation and Order which has
6   been drafted jointly by the parties, including but not limited to a dispute arising out of an
7   unanticipated event, the terms of this Stipulation and Order should be interpreted in accordance
8   with a rule of reasonableness in light of the parties' intent to proceed with the assignment of the
9   Parks Agreement and dedication of the Park Sites to the City with or without construction,
10  completion of the Phase 2 Trail Improvements, preservation of the Land Fees in the court
11  registry or an escrow until there is a final disposition of the appeal, and preservation of the other
12  rights and obligations as set forth herein.

13  Dated this __12ᵗ__ day of May, 2004.          Dated this __11__ day of May, 2004.

14  JONES VARGAS                                   DOWNEY BRAND LLP
    PILLSBURY WINTHROP
15

16

17  By: _____                   By: _____
18      AMY N. TIRRE, ESQ.                             EDMOND "BUDDY" MILLER, ESQ.

    *Attorneys for Lowe Enterprises Residential*    *Attorneys for USA Commercial Mortgage*
19  *Investors, LLC and Bohica, LLC, dba DDR*        *Company dba USA Capital*
    *Devco, LLC*
20

21

22      IT IS SO ORDERED.

23
        Dated this __12__ day of May, 2004.
24

25

26      _____
        UNITED STATES DISTRICT JUDGE
27

28

                                9

# EXHIBIT C

## AMENDED AND RESTATED PLEDGE AGREEMENT

This AMENDED AND RESTATED PLEDGE AGREEMENT ("Amended Pledge Agreement") effective January 1, 2006 amends and restates that certain Pledge Agreement dated as of the 1st day of August 2002 by and between M.P. Tanamera, LLC, a Nevada limited liability company and USA Commercial Mortgage Company, a Nevada corporation, ("Pledgee"), acting on behalf of and for the benefit of the Lenders, under each of the Loans described in Recital C Below and adds DDH Financial Corp, a Nevada corporation ("DDH") and USA Investment Partners, LLC, a Nevada limited liability company ("USA") as parties hereto, with reference to the following facts:

A.      M.P. Tanamera is a member holding a thirty-three and one-third percent (33 1/3%) membership interest in Tanamera Development, LLC a Nevada limited liability company owned in majority by USA or its affiliates.  The Members of M.P. Tanamera are Emigh Investments (a Nevada limited liability company owned in majority by Linda A. Rowe) and as a minority Member, Greg Gough.  Greg Gough is the Managing Member of M.P. Tanamera.

B.      Under an Agreement dated July 30, 2002 between DDH (a Nevada corporation owned by Kreg D. Rowe and Linda A. Rowe) and Tanamera Commercial Development, LLC ("TCD"), DDH was employed by TCD at a monthly consulting fee, which was initially set at $15,000 per month and was increased to $20,000 per month effective January 1, 2005.  Kreg Rowe and Linda Rowe (hereinafter collectively "Rowe") are husband and wife.  The consulting fees paid to DDH directly benefits Linda Rowe, which M.P. Tanamera acknowledges is adequate consideration for the initial Pledge Agreement and this Amended and Restated Pledge Agreement.  DDH and M.P. Tanamera are hereinafter collectively referred to as "Pledgor".

C.      In the past, Rowe made numerous guarantees pursuant to loans with Pledgee, which have all been paid in full, with the exception of the following two loans ("Guaranteed Debt"):

| Date | Borrower | Original Amount |
|------|----------|-----------------|
| 7-21-00 | Double Diamond Ranch | $550,000 |
| 12-30-97 | Pioneer Village Investors, LLC | $4,000,000 |

D.      Additionally and separately, Rowe is still obligated under the terms of a loan to Double Diamond Ranch ("DDR") (that has since been repaid) to reimburse Pledgee for unreimbursed legal and court costs related to foreclosure proceedings and the subsequent filing for protection under bankruptcy by DDR on October 24, 2001. For purposes of this Agreement, while still an ongoing obligation of Rowe, this obligation is not part of the Guaranteed Debt outlined in Recital C above but will be repaid as discussed in Section 5 of this Agreement below. USA agrees to provide a reasonable accounting and summary of the amount due with copies of the legal bills and supporting documentation showing the amounts expended by USA on these matters with an appropriate deduction for the amount reimbursed by court order.

E.      Upon the sale of the assets underlying the notes outlined in Recital C above, the proceeds were not sufficient to repay the loans in full, thus rendering the guarantors liable.

F.      The parties agree and acknowledge that all other notes listed in the Pledge Agreement dated August 1, 2002 not outlined in Recital C and D above have been paid in full and Rowe, DDH and M.P. Tanamera shall have no further liability pursuant to these repaid notes.

G.      A portion of the Double Diamond Ranch note listed in Recital C above was advanced to Tanamera Homes, LLC, which company was subsequently merged into TCD on January 1, 2003. As of the date of the merger, TCD assumed a portion of the note owed by Tanamera Homes, LLC, which as of that date totaled $785,535.50 including accrued interest.

H.      DDH and Kreg Rowe have generated new business opportunities in Northern Nevada directly and indirectly benefiting Pledgee and its affiliates, including the projects being developed by Sparks Galleria Investors, LLC, Preserve at Galleria, LLC, Cabernet Highlands, LLC, Tanamera Corporate Center, LLC, Tanamera Commercial Development, LLC or its assignee (known as "La Hacienda") and Vineyard Professional Campus, LLC, each of which are entities not owned by Tanamera Resort Partners, LLC ("New Projects").

I.      USA is affiliated with Pledgee through common ownership and acknowledges good and valuable consideration has been received for the agreements included herein.

      NOW THEREFORE, in consideration of the foregoing premises and recitals (which are true and correct) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and with the intent to be legally bound, the parties hereto hereby agree as follows:

1.      The monthly consulting fees that have been paid and continue to be paid to DDH will be treated as a consulting expense to TCD rather than an advance against future distributions from TCD as originally agreed between the parties. Income allocable to the Members of TCD will be calculated after deduction for such expense. The Agreement

dated July 30th 2002 between the parties related to this consulting fee, is hereby rescinded retroactively and shall have no further force or effect.

2.     Pledgee and its affiliate, USA, agree to utilize a portion of any distributions out of the New Projects to match dollar for dollar any payments Pledgor, DDH, Rowe or any other entity owned by Rowe make from distributions from the New Projects on the Guaranteed Debt.  For example, if distributions are made from profits in Tanamera Corporate Center, LLC (by its parent Tanamera Properties, LLC) to USA and to DDH, and DDH uses such distribution to make a payment on the Guaranteed Debt outlined in Recital C above or the remaining Double Diamond Ranch obligation outlined in Recital D above, USA will match such payment up to the amount of the distribution. Notwithstanding the foregoing, any such payment made by USA or its affiliates for the benefit of Pledgor or Rowe, pursuant to the terms of this Section, will be made by way of a special allocation of profits to Rowe or DDH with a corresponding cash distribution, which will immediately be paid by Rowe or DDH to USA to be applied to the Guaranteed Debt outlined in Recital C or Double Diamond Ranch obligation outlined in Recital D, in order to avoid any tax liability for the benefit of USA or its affiliate.

3.     TCD will be solely responsible for payment of the portion of the Guaranteed Debt and associated interest that it assumed in its combination with Tanamera Homes, LLC as discussed in Recital G above (which totals approximately $1,063,000 including accrued interest as of 12-31-05).  This debt will be treated as an obligation of TCD and not of the Guarantors and hence the Guarantors shall have no further obligation pursuant to the repayment of this debt.  The portion of the Double Diamond Ranch note dated 7-21-2000 (approximately $275,000 including interest as of 12-31-05), that was not included in the obligation assumed by TCD will remain the responsibility of the Guarantors, subject to the terms outlined in Section 2 above.

4.     Under the original Pledge Agreement, M.P. Tanamera agreed to pledge any distributions it may otherwise be entitled to receive from Tanamera Development, LLC to the repayment of the Debt owed Pledgee or its Lenders until such debt was fully repaid.  The parties earlier modified the Pledge Agreement verbally requiring that only 50% of such distributions to M.P. Tanamera would be applied to such debt and the other 50% would be paid to M.P. Tanamera, LLC in cash in order for M.P. Tanamera, LLC to pay taxes on such distributions.  There now exists sufficient funding coming from the New Projects and from Toblak, LLC, as outlined in Section 5 below, to provide Pledgee with the comfort that the Guaranteed Debt and any outstanding legal expenses from DDR will be safely repaid and the parties hereby agree that M.P. Tanamera, LLC will hereafter be entitled to full payment of any distributions from Tanamera Development, LLC, without offset by Pledgee or its affiliates.

5      Toblak, LLC, an affiliate of Pledgee entered into a Second Amended Double Diamond Ranch Parks Agreement ("Parks Agreement") with the City of Reno and Double Diamond Ranch, LLC which is expected to result in net profits to Toblak, LLC in excess of the legal fees outlined in Recital D above, indirectly benefiting Pledgee. Pledgee agrees that Kreg Rowe was instrumental in providing this opportunity to Pledgee

and agrees that any profits stemming from the Parks Agreement will first be applied to any unreimbursed legal costs associated with obtaining the Parks Agreement, including the associated litigation and appeal, then to unreimbursed legal fees outlined in Recital D, third to any remaining balance under the Guaranteed Debt with any remaining amount split 50% with DDH and 50% with Pledgee. Pledgee agrees to provide an accounting of the legal fees and application for reimbursement filed with the court along with a copy of the court's award with reasonable supporting information.

6.     In connection with the merger of Tanamera Homes into TCD and the fact that the liabilities assumed exceeded assets received, DDH's equity account was debited $199,143. This transaction has resulted in the equity balances of USA and DDH differing from their ownership interests. USA and DDH agree that equalizing distributions will be made in calendar years 2006 and 2007 to eliminate this difference with half of the difference eliminated through calendar year 2006 distributions made by TCD and the other half of the difference eliminated through distributions payable by TCD in calendar year 2007, such that the equity accounts for the members shall thereafter reflect their ownership percentages.

7.     <u>Miscellaneous:</u>

7.1     <u>Partial Invalidity</u>. If any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each such term and provision of this Agreement shall be valid, and shall be enforced to the fullest extent permitted by law.

7.2     <u>Waivers</u>. No waiver of any breach of any covenant or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof, or of any other covenant or provision herein contained. No extension of time for performance of any obligation or act shall be deemed an extension of time for performance of any other obligation or act except those of the waiving party, which shall be extended by a period of time equal to the period of the delay.

7.3     <u>Governing law:</u>  This Agreement shall be construed in accordance with and governed by the laws of the State of Nevada.

7.4     <u>Professional Fees</u>. If either party commences an action against the other to interpret or enforce any of the terms of this Agreement or because of the breach by the other party of any of the terms hereof, the losing party shall pay to the prevailing party reasonable attorneys' fees, costs and expenses and court costs and other costs of action incurred in connection with the prosecution or defense of such action, whether or not the action is prosecuted to a final judgment. For the purpose of this Agreement, the terms "attorneys' fees" or "attorneys' fees and costs" shall mean the fees and expenses of counsel to the parties hereto, which may include printing, photostating, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals, librarians and others not admitted to the bar but performing services under the supervision of an

attorney. The terms "attorneys' fees" or "attorneys' fees and costs" shall also include, without limitation, all such fees and expenses incurred with respect to appeals, arbitrations and bankruptcy proceedings, and whether or not any action or proceeding is brought with respect to the matter for which said fees and expenses were incurred. The term "attorney" shall have the same meaning as the term "counsel."

7.5    Time of Essence. The parties hereby acknowledge and agree that time is strictly of the essence with respect to each and every term, condition, obligation and provision hereof and that failure to timely perform any of the terms, conditions, obligations or provisions hereof by any party shall constitute a material breach of and a non-curable (but waivable) default under this Agreement by the party so failing to perform.

This agreement supersedes and replaces the Pledge Agreement dated the 1st day of August 2002 and any other oral or written agreements pursuant to these matters between the parties.

PLEDGORS:

M.P. Tanamera, LLC

By: _____
     Greg Gough, Managing Member

Emigh Investments, LLC, Member of M.P. Tanamera, LLC

By: _____
     Greg Gough, Manager

DDH Financial Corp

By: _____
     Kreg Rowe, President

PLEDGEE:

USA Commercial Mortgage Company, Manager

By: _____
     Joseph Milanowski, President

OTHER BENEFICIARY HEREUNDER AND PARTY TO THIS AGREEMENT

USA Investment Partners, LLC

By: _____
     Joseph Milanowski, Manager