E-filed on 02/02/09

**DIAMOND MCCARTHY LLP**
909 Fannin, Suite 1500
Houston, Texas 77010
Telephone (713) 333-5100
Facsimile (713) 333-5199

**LEWIS AND ROCA LLP**
3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169-5996
Telephone (702) 949-8320
Facsimile  (702) 949-8321

Allan B. Diamond, TX State Bar No. 05801800
Email:  adiamond@diamondmccarthy.com
Eric D. Madden, TX State Bar No. 24013079
Email:  emadden@diamondmccarthy.com

Rob Charles, NV State Bar No. 006593
Email: rcharles@lrlaw.com

Special Litigation Counsel for USACM Liquidating Trust

Counsel for USACM Liquidating Trust

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br><br>Debtor. | Case No.:  BK-S-06-10725-LBR<br>Chapter 11<br><br>Judge Linda B. Riegle |
| USACM LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>EAGLE RANCH, LLC; EAGLE RANCH RESIDENTIAL, LLC; WILLOWBROOK RESIDENTIAL, LLC; BRENTWOOD 128, LLC; RAVENSWOOD APPLE VALLEY, LLC; ANTHONY MONACO; SUSAN K. MONACO; and MONACO DIVERSIFIED CORPORATION.<br><br>Defendants. | **Adversary No. 08-01125**<br><br>**USACM LIQUIDATING TRUST'S SECOND AMENDED COMPLAINT**<br><br>Hearing Date: N/A<br>Hearing Time: N/A |

Plaintiff USACM Liquidating Trust (the "Trust"), as successor to USA Commercial Mortgage Company, hereby complains as follows:

## I.    NATURE OF THIS ACTION

1.    In April 2006, USA Commercial Mortgage Company ("USACM"), USA Capital Diversified Trust Deed Fund, LLC ("DTDF"), and certain related entities were forced to file for bankruptcy protection as a result of the gross misconduct by certain insiders, namely Thomas A. Hantges ("Hantges") and Joseph D. Milanowski ("Milanowski") (collectively, the "Culpable Insiders").  Among other wrongful conduct, the Culpable Insiders systematically looted USACM

154753-1

and DTDF to fund USA Investment Partners, LLC ("USAIP"), an entity that functioned as their personal "piggy bank," as well as other entities in which they stood to reap substantial personal profits.

2.      In the aggregate, the Culpable Insiders misappropriated tens of millions of dollars from USACM and DTDF in order: (a) to fund the negative cash flow operations of USAIP and its vast network of affiliated entities; and (b) to pay USAIP's obligations to third parties.  In this adversary proceeding, the Trust seeks to recover more than three million dollars misappropriated from USACM and fraudulently transferred to Defendants and the unjust enrichment conferred upon Defendants as a result of these and other misappropriations of USACM funds.

## II.      JURISDICTION / VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334(b) in that this action arises under, arises in, and/or relates to this bankruptcy case.

4.      This action is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), and (O).

5.      This is an adversary proceeding pursuant to Fed. R. Bankr. P. 7001.

6.      All of the Defendants are subject to personal jurisdiction in this Court.

7.      This Court has venue over this proceeding pursuant to 28 U.S.C. § 1409(a).

## III.      PARTIES

### A.      PLAINTIFF

8.      Plaintiff Trust was created pursuant to the Third Amended Joint Chapter 11 Plan of Reorganization (the "Joint Plan") filed by USACM, DTDF, and three other debtors in Bankruptcy Case No. 06-10725 (Docket No. 1799).  The Joint Plan was confirmed by the Bankruptcy Court on January 8, 2007, and became effective on March 12, 2007.  The Joint Plan expressly retained USACM's causes of action for enforcement by the Trust, pursuant to 11 U.S.C. § 1123(b)(3)(B).

The Joint Plan also transferred certain causes of action belonging to USA Capital First Trust Deed Fund, LLC to the Trust. The Trust, therefore, has standing to bring this action against the Defendants. The Trust is a liquidating trust organized under Nevada law. The Trust's beneficiaries are the holders of allowed unsecured claims against USACM. Geoffrey L. Berman serves as the trustee of the Trust and may be served through undersigned counsel.

9.     In the time period since the plan became effective on March 12, 2007, the USACM Trust has conducted an investigation into the misconduct of the Culpable Insiders and the third-party wrongdoers that ultimately led to USACM's collapse in April 2006. As a result of this investigation, the USACM Trust has learned of the fraudulent transfers and misconduct described herein. Neither USACM's creditors nor the USACM Trust discovered or could have discovered the fraudulent transfers and misconduct prior to April 2006.

**B.     DEFENDANTS**

10.     Defendant Monaco Diversified Corporation ("Monaco Diversified") is a California corporation, now known as Andravida Corporation, with its principal place of business in the State of California at 42072 Fifth Street, Suite 201, Temecula, California 92593. Defendant Monaco Diversified can be served through its registered agent, Roy T. Codey, 42072 Fifth Street, Suite 201, Temecula, California 92593.

11.     Defendant Anthony Monaco ("Anthony Monaco") is an individual residing in the State of California at 6612 Post Lane, Fontana, California 92336. Defendant Anthony Monaco can be served by personal service at the address listed above or wherever he may be found.

12.     Defendant Susan K. Monaco ("Sue Monaco") is an individual residing in the State of California at 6612 Post Lane, Fontana, California 92336. Defendant Sue Monaco can be served by personal service at the address listed above or wherever she may be found.

13.     Defendant Eagle Ranch Residential, LLC ("ERR") is a California limited liability company with its principal place of business formerly in the State of Nevada at 4484 South Pecos Road, Las Vegas, Nevada 89121.  Defendant ERR can be served through its registered agent, Leon Tuan, Stein & Lubin LLP, 600 Montgomery Street, 14th Floor, San Francisco, California 94111.

14.     Defendant Eagle Ranch, LLC ("Eagle Ranch") is a Nevada limited liability company with its principal place of business in the State of Nevada formerly at 4484 South Pecos Road, Las Vegas, Nevada  89121.  Defendant Eagle Ranch can be served through its registered agent, Victoria S. Loob, 4525 Sandhill Road, Las Vegas, Nevada 89121.

15.     Defendant Willowbrook Residential, LLC ("Willowbrook") is a California limited liability company with its principal place of business in the State of California at 9227 Haven Avenue, Suite 300, Rancho Cucamonga, California 91730.  Defendant Willowbrook can be served through its registered agent, Mike McGarrey, 9227 Haven Avenue, Suite 300, Rancho Cucamonga, California 91730.

16.     Defendant Brentwood 128, LLC ("Brentwood") is a California limited liability company with its principal place of business in the State of California at 28475 Front Street, Suite D, Temecula, California 92590.  Defendant Brentwood can be served through its registered agent, David A. Fogg, 28475 Front Street, Suite D, Temecula, California 92592.

17.     Defendant Ravenswood Apple Valley, LLC ("Apple Valley") is a California limited liability company with its principal place of business in the State of California at 600 Montgomery Street, 14th Floor, San Francisco, California 94111.  Defendant Apple Valley can be served through its registered agent, Dave Fogg at 28475 Front Street, Suite D, Temecula, California 92592.

18.     Monaco Diversified, Anthony Monaco, Sue Monaco, ERR, Eagle Ranch, Willowbrook, Brentwood, and Apple Valley shall collectively be referred to herein as the "Defendants."

## IV.     FACTUAL ALLEGATIONS

### A.     BACKGROUND OF USACM AND ITS DEMISE

19.     In April 2006, USACM and certain related companies collapsed due to the fraud perpetrated on them by Culpable Insiders.  Beginning as early as 1997, the Culpable Insiders employed a pervasive "Ponzi"-like scheme that enabled them to loot and/or misappropriate tens of millions of dollars from USACM.  As a result of these wrongful activities, USACM was insolvent at least as early as December 31, 2001.  Eventually USACM (the "Debtor") filed for relief under Chapter 11 of the Bankruptcy Code on April 13, 2006 (the "Petition Date").

20.     USACM was a mortgage broker and loan servicing company whose primary business activities were: (a) "originating" short-term loans from investors to real estate developers; and (b) servicing the loans that it originated by collecting principal and interest from borrowers and distributing those payments to the investors.  USACM earned revenue by charging various fees for these services, including origination, servicing, and extension fees, although these fees often went uncollected.

21.     A significant portion of the fee revenues that USACM actually received was subsequently misappropriated by the Culpable Insiders.  Specifically, the Culpable Insiders misappropriated USACM's money to fund entities in which they held an indirect ownership interest through USA Investment Partners, LLC ("USAIP"), including time-share hotels, real estate development entities, and technology companies.  The Culpable Insiders often earmarked USACM funds and used USAIP as a conduit for fraudulently transferring these funds to such entities.  In other instances, the Culpable Insiders caused USACM to directly transfer funds to

entities in which USAIP and the Culpable Insiders had an interest.  In the aggregate, the Culpable Insiders misappropriated tens of millions of dollars from USACM to fund their outside business ventures.

22.    It was completely adverse to USACM's interests for the Culpable Insiders to misappropriate USACM's funds for the benefit of USAIP.  USACM owed no obligation, and received no benefit for the money provided to USAIP and/or on its behalf. The Culpable Insiders did not charge and/or collect interest on any of these transfers of USACM's funds, thereby precluding USACM from using this money in legitimate investments.  In addition, the Culpable Insiders rarely repaid transfers of USACM's funds for USAIP's benefit.   In the aggregate, USACM transferred at least $58 million to USAIP to fund USAIP's investments and pay its obligations.[1]  Prior to the Petition Date, USAIP's obligation to repay USACM was undocumented and appeared only as an enormous intercompany receivable to USACM.  In at least some instances, the Bankruptcy Court has already found that USACM did not receive reasonably equivalent value when it transferred funds to USAIP in exchange for incremental increases to this intercompany receivable.  USAIP's failure to repay such transfers and its ultimate bankruptcy has prevented any possibility of USACM fully recovering on such obligations.

23.    Transfers to USAIP and similar transfers to other entities owned or controlled by the Culpable Insiders were recorded as intercompany receivables and investments in business ventures.  This gave the transactions the appearance of legitimacy, and disguised the true nature of the transactions from the perspective of regulatory authorities, direct lender investors, creditors, and USACM's innocent owners, directors, officers, and employees (collectively, the "Stakeholders"), preventing the Stakeholders of learning of the Culpable Insiders' wrongful acts.

---

[1]   The $58 million obligation is in part or in whole reflected in the note between USACM and USAIP dated May 15, 2006. The Bankruptcy Court approved the note by order dated July 24, 2006.

In reality, the USAIP receivable and other receivables and "investment" accounts represented the misappropriation of USACM's assets. Because of the Culpable Insiders' multi-faceted efforts to conceal their scheme, the true nature of these transfers was only discoverable through the detailed investigations performed by the Trustee subsequent to the Petition Date.

24.    In addition, the Culpable Insiders caused USACM to make scores of other payments for which it received no benefit and for which it had no underlying obligation. Routinely, the Culpable Insiders commingled USACM's operating funds with funds held in the USACM Collections Trust Account and other funds to make regular interest and principal payments to investors in non-performing loans. These payments were made to conceal delinquent and defaulted loans from other USACM directors, officers, employees, shareholders, as well as the investors and regulatory authorities. In turn, this induced existing investors to maintain or increase their investments with USACM and enticed new investors to entrust their money to USACM, thereby providing the Culpable Insiders with liquidity to fund their scheme, and thus, future sources of funds to loot from USACM.

25.    Ultimately, USACM lost millions of dollars by making principal and interest payments on loan obligations that it did not owe on behalf of defaulting borrowers. USACM did not receive any benefit from making these "pre-payments" of interest and principal. Rather, such payments were expressly forbidden by Nevada law, including NRS 645B.250.

26.    The Culpable Insiders also misappropriated USACM's funds directly for their personal benefit. USACM frequently made unsecured, interest-free "advances" directly to the Culpable Insiders. In other instances, the Culpable Insiders misappropriated USACM funds to pay for professional services rendered solely for the benefit of the Culpable Insiders and/or one of their outside business ventures.

27.    Ultimately, USACM lost tens of millions of dollars through the myriad of ways in which the Culpable Insiders' systematically misappropriated USACM funds.[2]  Additionally, the Culpable Insiders also systematically looted DTDF to fund USAIP and its affiliated entities. Approximately $55 million was taken from DTDF and sent to USAIP and related entities, either directly or indirectly through two sham companies — 10-90, Inc. ("10-90") and Mountain Vista, Inc.

**B.    THE RELATIONSHIP BETWEEN THE CULPABLE INSIDERS AND THE DEFENDANTS**

28.    In the mid-1990s, USACM provided financing to Inco Homes Corp. ("Inco") for a residential development within the Mesa Verde Specific Plan in Victorville, California known as the Eagle Ranch project.  In 1997, a group of investors that included entities and trusts affiliated with the Culpable Insiders acquired that property for development.  In December 1999, these investors formed Eagle Ranch.  Eagle Ranch's initial manager was USA Commercial Real Estate Group, an entity solely owned and managed by the Culpable Insiders.

29.    On August 28, 2000, the Culpable Insiders created ERR for the purpose of developing the lots obtained by Eagle Ranch.  At the time of ERR's creation, Eagle Ranch conveyed several lots to ERR as a capital contribution.  Anthony Monaco and Sue Monaco held a collective fifty percent (50%) membership interest in ERR.  Eagle Ranch held the remaining fifty (50%) membership interest in ERR.  ERR's manager was USA Investors II, LLC, which in turn was managed by USAIP.

30.    Upon information and belief, ERR began developing the lots that it had received from Eagle Ranch in late 2000.  As these lots were built out, Eagle Ranch conveyed additional

---

[2] A more detailed discussion of the fraudulent scheme leading to USACM's demise and bankruptcy may be found in the USACM Liquidating Trust's Complaint Against Deloitte & Touche, LLP and Victoria Loob.  *See* Docket No. 1 in Cause No. 2:08-cv-00461-PMP-PAL, pending in the United States District Court, District of Nevada, Las Vegas Division.

lots to ERR on June 28, 2001, June 3, 2002, December 23, 2002, and November 20, 2003 as additional capital contributions.

31.    Throughout this time period, the Culpable Insiders caused USACM to make regular advances to Eagle Ranch.  All tolled the Culpable Insiders sent more than $3.6 million from USACM to Eagle Ranch.  The funds that the Culpable Insiders misappropriated from USACM to fund Eagle Ranch were ultimately used to fund ERR's development activities.  On information and belief, USACM also advanced funds directly to ERR, Willowbrook, Brentwood and Apple Valley (collectively the "Sub-Developments").

32.    Both Eagle Ranch and the Sub-Developments relied on this influx of funds transferred by the Culpable Insiders to remain in operation.  Specifically, without USACM's advances Eagle Ranch and the Sub-Developments would not have been able to obtain third party financing and, in turn, would not have been able to successfully develop their projects.  In turn, the advances provided a significant benefit to the Culpable Insiders and certain of their associates, including the Monaco Defendants, by enabling them to extract profits from real estate developments that otherwise would have failed.

33.    In making these advances, the Culpable Insiders breached their fiduciary duties of loyalty to USACM by risking its financial security solely in an effort to gain profits for themselves (and the Monaco Defendants).  Specifically, the advances: (a) were completely unsecured; (b) constituted a significant enough portion of USACM assets to render the company insolvent if Eagle Ranch or the Sub-Developments fell through; and (c) were not at all contingent on periodic interest payments (interest was accrued).  In addition, there was no meaningful time period for Eagle Ranch or the Sub-Developments to repay the advances, as the Culpable Insiders repeatedly extended the time for repayment over a period of several years.  In short, *none* of these

Transfers were in USACM's interest at the time they were made, nor were they supported by any legitimate business purpose whatsoever.

34.    At least in part as a result of these advances, ERR successfully developed the underlying property.  As a result of their success, Anthony Monaco, Sue Monaco, and Monaco Diversified (collectively, the "Monaco Defendants") entered into a series of real estate joint ventures with the Culpable Insiders.  Typically, the membership interest in these entities was split evenly between the Monaco Defendants and USAIP.  For example, Anthony and Sue Monaco held a collective fifty percent (50%) membership interest in Willowbrook, as did USAIP.

35.    In June 2004, the Culpable Insiders and the Monaco Defendants formed Tanamera Homes, LLC ("Tanamera Homes") to act as a holding company for their real estate ventures. Monaco Diversified and USAIP each held a fifty percent (50%) membership interest in Tanamera Homes.  In turn, Tanamera Homes held one hundred percent membership interests in joint ventures between the Monaco Defendants and the Culpable Insiders.  For example, Tanamera Homes held one hundred percent ownership interests in Brentwood and in Apple Valley.

36.    All of these joint venture entities functioned as a single homebuilding company doing business under the trade name of "Tanamera Homes."  As such, all of the entities shared common employees, including a common accounting department and CFO.  The company's accounting department routinely circulated funds between the various entities in order to make deposits for land acquisitions, to cover shortfalls in operational funding, to clean up intercompany receivables, to make distributions of profits to members, to repay loan obligations, and for other purposes.

37.    Over time, the Culpable Insiders repeatedly misappropriated USACM funds and transferred them to several of these entities, as described herein.  In addition, USACM wrongfully transferred millions of dollars to USAIP, thereby enabling the Culpable Insiders and the Monaco

Defendants to employ USAIP as a guarantor on tens of millions of dollars of loans from third parties. USACM had no obligation to transfer funds to any of these entities. Nor did USACM receive any benefit from making these transfers as it did not stand to profit in any way from the underlying projects. Moreover, these transfers were completely unsecured and in some cases interest free advances.

38. These transfers of USACM's funds by the Culpable Insiders conferred material benefits on the Monaco Defendants by enabling them to undertake real estate development activities. Upon information and belief, these transfers were used to aid in the acquisition of profitable real estate, to cover development shortfalls, and to make member distributions to the Monaco Defendants. As a direct result of the spark provided by the transfers of USACM funds to: (1) Eagle Ranch and the Sub-Developments directly; and (2) to USAIP (enabling it to serve as guarantor for third-party financing), the Monaco Defendants ultimately received between $15 to $20 million over the course of their six year partnership with the Culpable Insiders. Had it not been for the wrongful transfers from USACM to Eagle Ranch and the Sub-Developments, Tanamera Homes, and USAIP (enabling USAIP to serve as a corporate guarantor), the Monaco Defendants never would have earned these profits. Indeed, upon USACM's collapse in April 2006, virtually all of the real estate projects involving the Monaco Defendants and USAIP promptly collapsed.

## C.     THE TRANSFERS FROM USACM TO DEFENDANTS

### 1.     The Eagle Ranch Transfers

39. The Culpable Insiders caused USACM to transfer over $3.6 million in capital contributions to Eagle Ranch between 2000 and 2004. In an attempt to conceal their fraudulent scheme, the Culpable Insiders improperly recorded these capital contributions as loans in USACM's financial records.

40.     The following are the transfers to Eagle Ranch (collectively, the "Eagle Ranch Transfers") the Culpable Insiders caused USACM to make from its operating account:

| Date | Amount |
|------|--------|
| January 24, 2000 | $750.00 |
| May 31, 2000 | $19,000.00 |
| November 28, 2000 | $20,727.23 |
| December 4, 2000 | $430,000.00 |
| December 7, 2000 | $5,000.00 |
| December 8, 2000 | $21,000.00 |
| December 14, 2000 | $20,000.00 |
| December 15, 2000 | $10,738.94 |
| January 5, 2001 | $33,000.00 |
| January 17, 2001 | $65,000.00 |
| January 26, 2000 | $275,000.00 |
| January 31, 2000 | $180,000.00 |
| February 20, 2001 | $165,000.00 |
| February 27, 2001 | $160,000.00 |
| February 28, 2000 | $30,000.00 |
| March 23, 2001 | $60,000.00 |
| March 27, 2001 | $100,000.00 |
| March 28, 2001 | $125,000.00 |
| April 6, 2001 | $30,000.00 |
| April 9, 2001 | $75,000.00 |
| April 11, 2001 | $30,000.00 |
| May 25, 2001 | $300,000.00 |
| June 5, 2001 | $250,000.00 |
| June 19, 2001 | $50,000.00 |
| June 20, 2001 | $50,000.00 |
| August 7, 2001 | $25,000.00 |
| August 9, 2001 | $100,000.00 |
| September 7, 2001 | $125,000.00 |
| September 7, 2001 | $185,000.00 |
| September 18, 2001 | $65,000.00 |
| October 1, 2001 | $10,000.00 |
| October 4, 2001 | $40,000.00 |
| December 17, 2001 | $75,000.00 |
| February 6, 2002 | $125,000.00 |
| February 20, 2002 | $20,000.00 |
| May 28, 2002 | $25,000.00 |
| June 3, 2002 | $25,000.00 |
| December 31, 2002 | $6,000.00 |
| December 31, 2003 | $75,000.00 |
| January 5, 2004 | $45,000.00 |
| July 1, 2004 | $211,065.49 |

|                        |                        |
|------------------------|------------------------|
| **Total**              | **$3,662,281.66**      |

41.     USACM had no obligation to make any of the more $3.6 million in Eagle Ranch Transfers and did not receive any benefit from making any of the Eagle Ranch Transfers.  The Culpable Insiders caused USACM to make the Eagle Ranch Transfers with the intent to benefit themselves and certain of their associates, including the Monaco Defendants.  Furthermore, the Culpable Insiders and these associates, including the Monaco Defendants, actually benefited from the Eagle Ranch transfers because these transfers enabled the Culpable Insiders and the Monaco Defendants to obtain profits from real estate developments.  Neither the Trustee nor USACM's creditors, independent of the Trustee, could have reasonably discovered the full scope of the Transfers from USACM to Eagle Ranch before October 2008.  The financial records of both Eagle Ranch and USACM were poorly kept and as a result do not accurately reflect the true nature of the Transfers to Eagle Ranch and the purported repayments of those Transfers.  Because of these shoddy and deceptive accounting practices the true nature and amounts of the Transfers between USACM and Eagle Ranch were not reasonably discoverable by the Trustee before October 2008.

### 2.     The ERR Transfers

42.     The Culpable Insiders caused USACM to make the following pre-petition transfers totaling $1,342,163.50 to ERR (or ERR's creditors) (collectively, the "ERR Transfers"):

(a)     $50,000 on August 16, 2001;

(b)     $110,000 on September 18, 2001;

(c)     $285,000, $14,971, and $57,192.50 on November 27, 2001;

(d)     $425,000 on December 17, 2001;

(e)     $400,000 on June 18, 2002; and

(f)     $50,000 on December 6, 2002 to ERR (or ERR's creditors).

43.     USACM had no obligation to make the ERR Transfers to ERR, and USACM received no benefit in exchange for making them.  The Culpable Insiders caused USACM to make the ERR Transfers with the intent to benefit themselves and certain of their associates, including the Monaco Defendants.  Furthermore, the Culpable Insiders and these associates, including the Monaco Defendants, actually benefited from the ERR Transfers because these transfers enabled the Culpable Insiders and the Monaco Defendants to obtain profits from real estate developments.

### 3.      The Willowbrook Transfers

44.     The Culpable Insiders caused USACM to make the following pre-petition transfers totaling $550,000 to Willowbrook (collectively, the "Willowbrook Transfers"):

(a)      $50,000 on June 26, 2002; and

(b)      $500,000 on September 5, 2002.

45.     USACM had no obligation to make the Willowbrook Transfers to Willowbrook, and USACM received no benefit in exchange for making them.  The Culpable Insiders caused USACM to make the Willowbrook Transfers with the intent to benefit themselves and certain of their associates, including the Monaco Defendants.  Furthermore, the Culpable Insiders and these associates, including the Monaco Defendants, actually benefited from the Willowbrook Transfers because these transfers enabled the Culpable Insiders and the Monaco Defendants to obtain profits from real estate developments.

### 4.      The Brentwood Transfer and the Apple Valley Transfer

46.     The Culpable Insiders caused: (a) USACM to transfer $225,000 to USAIP from its operating account on June 18, 2003, which amount was credited to USAIP's account on June 19, 2003; and (b) USAIP to wire transfer $25,000 of USACM's funds to or for the benefit of Brentwood (collectively the "Brentwood Transfer") and $200,000 of USACM's funds to or for the benefit of Apple Valley (collectively the "Apple Valley Transfer") on June 20, 2003.  Upon

information and belief, the Culpable Insiders earmarked and transferred $225,000 to USAIP with the purpose of sending the money directly from USAIP to Brentwood and Apple Valley respectively.  USACM had no obligation to transfers funds to Brentwood and/or Apple Valley and USACM received no benefit in exchange for making the Brentwood Transfer and the Apple Valley Transfer.  The Culpable Insiders caused USACM to make the Brentwood and Apple Valley Transfers with the intent to benefit themselves and certain of their associates, including the Monaco Defendants.  Furthermore, the Culpable Insiders and these associates, including the Monaco Defendants, actually benefited from the Brentwood and Apple Valley Transfers because these transfers enabled the Culpable Insiders and the Monaco Defendants to obtain profits from real estate developments.  On June 23, 2003, Apple Valley wired $200,000 back to USAIP.  Then on June 24, 2003, USAIP wired $200,000 to Aware TM30850, LLC ("Aware") to exercise an option to acquire membership interests in Aware.  In exercising this option, USAIP acquired a one hundred percent membership interest in Aware.  Subsequently, USAIP gave a twenty-five (25%) membership interest to Anthony Monaco and Sue Monaco, collectively.  Ultimately, Anthony Monaco and Sue Monaco received millions of dollars as a result of their membership interest in Aware.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (11 U.S.C. § 544 and NRS 112.180(1)(a))

47.    The Trust re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

48.    The Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer each constitute a transfer of an interest of the Debtor in property.

49.    The Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer were made within the applicable period as set out in NRS 112.230(1) and 11 U.S.C. § 108(a).

50.    On the date of the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer, and the Petition Date, there were creditors with allowable unsecured claims who could have avoided the such transfers pursuant to Nevada state law.  Furthermore, a creditor who extended credit to the Debtor at the Petition Date could have avoided the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer pursuant to Nevada state law.

51.    Prior to one year of the Petition Date, neither USACM nor its innocent Stakeholders, including its creditors, discovered nor could have reasonably discovered the fraudulent nature of the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and/or the Brentwood Transfer because of USACM's poor pre-petition record-keeping practices.

52.    The Culpable Insiders caused the Debtor to make the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer with the actual intent to hinder, delay, or defraud creditors of the Debtor.

53.    Accordingly, the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer: (a) are fraudulent transfers under NRS 112.180(1)(a); and (b) may be recovered under NRS 112.220.

54.    Pursuant to 11 U.S.C. § 544, the Trust asks the Court to avoid the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer under applicable state law.

## SECOND CAUSE OF ACTION
### (11 U.S.C. § 544 and NRS 112.180(1)(b))

55.    The Trust re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

56.    The Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer each constitute an interest of the Debtor in property.

57.    The Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer were each made within the applicable period as set out in NRS 112.230(2) and 11 U.S.C. § 108(a).

58.    On the date of each of the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer, and the Petition Date, there were creditors with allowable unsecured claims who could have avoided the such transfers pursuant to Nevada state law.  Furthermore, a creditor who extended credit to the Debtor at the Petition Date could have avoided the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer pursuant to Nevada state law.

59.    The Debtor received less than reasonably equivalent value in exchange for each of the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer.

60.    At the time of each of the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or the transaction.

61.    At the time of each of the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer, the Debtor was engaged in

business or a transaction or was about to engage in business or a transaction for which any property remaining with the Debtor was unreasonably small capital.

62.  At the time of each of the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer, the Debtor intended to incur or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

63.  Accordingly, the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer: (a) are fraudulent transfers under NRS 112.180(1)(b); and (b) may be recovered under NRS 112.220.

64.  Pursuant to 11 U.S.C. § 544, the Trust asks the Court to avoid the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer under applicable state law.

### THIRD CAUSE OF ACTION
### (11 U.S.C. § 550 and NRS 112.220)

65.  The Trust re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

66.  The Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and Brentwood Transfer are avoidable under 11 U.S.C. § 544 (through NRS 112.180(1)(a) and (b)).

67.  The Trust may recover the value of the Eagle Ranch Transfers directly from Eagle Ranch as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

68.  The Trust may recover the value of the ERR Transfers directly from ERR as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

69.    The Trust may recover the value of the Willowbrook Transfers directly from Willowbrook as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.

70.    USAIP was merely a conduit through which USACM transferred funds to Brentwood.  USAIP had no dominion over such funds.  As such, the Trust may recover the value of the Brentwood Transfer directly from Brentwood as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.  In the alternative, the Trust may recover the value of the Brentwood Transfer from Brentwood pursuant to 11 U.S.C. § 550(a)(2) and NRS 112.220 as an immediate or mediate transferee who took such transfer without good faith, without giving value, and/or with knowledge of the voidability of the Brentwood Transfer.

71.    USAIP was merely a conduit through which USACM transferred funds to Apple Valley.  USAIP had no dominion over such funds.  As such, the Trust may recover the value of the Apple Valley Transfer directly from Apple Valley as an initial transferee pursuant to 11 U.S.C. § 550(a)(1) and NRS 112.220.  In the alternative, the Trust may recover the value of the Apple Valley Transfer from Apple Valley pursuant to 11 U.S.C. § 550(a)(2) and NRS 112.220 as an immediate or mediate transferee who took such transfer without good faith,  without giving value, and/or with knowledge of the voidability of the Apple Valley Transfer.

72.    The Trust may recover the value of the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and the Brentwood Transfer directly from the Monaco Defendants as the entities for whose benefit such transfers were made, and/or the immediate or mediate transferees who took such transfers without good faith, without giving value, and/or with knowledge of the voidability thereof, pursuant to 11 U.S.C. § 550 and NRS 112.220.  Specifically, the Culpable Insiders caused USACM to make these transfers with the intent to benefit themselves and certain of their associates, including the Monaco Defendants.  Furthermore, the Culpable Insiders and these associates, including the Monaco Defendants,

actually benefited from the Eagle Ranch transfers because these transfers enabled the Culpable Insiders and the Monaco Defendants to obtain profits from real estate developments.

**FOURTH CAUSE OF ACTION**
**(Unjust Enrichment)**

73.     The Trust re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

74.     By making the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, Brentwood Transfer, and other transfers, the USACM conferred a benefit on Defendants.

75.     Defendants appreciated the benefit in that they received the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, Brentwood Transfer and other transfers, and used these funds to make deposits for land acquisitions, to cover shortfalls in operational funding, to clean up intercompany receivables, to make distributions of profits to members, to repay loan obligations, and for other purposes that made "Tanamera Homes" a profitable venture.  The Monaco Defendants ultimately received $15 million to $20 million as a result of these transfers from USACM.

76.     Defendants retained the benefits that they received under circumstances that make retention of these benefits inequitable.  Specifically, these transfers were made in furtherance of the Culpable Insiders' scheme to the benefit of the Defendants and to the detriment of USACM and its creditors.

**FIFTH CAUSE OF ACTION**
**(Money Had and Received)**

77.     The Trust re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

78.     Eagle Ranch, ERR, Willowbrook, Apple Valley, and Brentwood received money from the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and Brentwood Transfer.

79.     The Trust is rightfully entitled to the money.

80.     In good conscience and equity, Eagle Ranch, ERR, Willowbrook, Apple Valley, and Brentwood have no right to maintain any money that it received in the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and Brentwood Transfer.

### VI.    PRAYER FOR RELIEF

WHEREFORE, the Trust respectfully requests that the Court enter judgment as follows:

(a)     Avoiding each of the Eagle Ranch Transfers, ERR Transfers, Willowbrook Transfers, Apple Valley Transfer, and Brentwood Transfer;

(b)     Awarding judgment in favor of the Trust and against: (a) Eagle Ranch and the Monaco Defendants in an amount equal to the value of the Outstanding Eagle Ranch Transfers; (b) ERR and the Monaco Defendants in an amount equal to the value of the ERR Transfers; (c) Willowbrook and the Monaco Defendants in an amount equal to the value of the Willowbrook Transfers; (d) Brentwood and the Monaco Defendants in an amount equal to the value of the Brentwood Transfer; and (e) Apple Valley and the Monaco Defendants in an amount equal to the value of the Apple Valley Transfer;

(c)     Awarding judgment in favor of the Trust and against the Monaco Defendants in an amount equal to the amount they were unjustly enriched as a result of the Transfers complained of herein;

(d)     Awarding the Trust all pre-judgment and post-judgment interest on all damages at the maximum rate allowable by law and/or equity;

(e)     Directing Defendants to pay the Trust's costs of court; and

(f)     Awarding the Trust such other relief that this Court deems just and proper.

Dated:  February 2, 2009.

**DIAMOND MCCARTHY LLP**                    **LEWIS AND ROCA LLP**


By: ____/s/ Michael J. Yoder____                By: ____/s/ Rob Charles____
Allan B. Diamond, TX 05801800 (pro hac vice)    Rob Charles, NV 6593
Eric D. Madden, TX 24013079 (pro hac vice)      3993 Howard Hughes Parkway, Suite 600
Stephen T. Loden, TX 24002489 (pro hac vice)    Las Vegas, Nevada  89169-5996
Michael J. Yoder, TX 24056572 (pro hac vice)    (702) 949-8320 (telephone)
909 Fannin, Suite 1500                          (702) 949-8321 (facsimile)
Houston, Texas 77010
(713) 333-5100 (telephone)
(713) 333-5199 (facsimile)

*Special Litigation Counsel for*                *Counsel for USACM Liquidating Trust*
*USACM Liquidating Trust*