SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA CLARA

ALBERT LEE, et al.,

       Plaintiffs,

    vs.

PALM TERRACE, LLC, a Nevada
Limited Liability Company,
etc., et al.,

       Defendants.

No.  1-06-CV-057298

---

DEPOSITION OF ANDREW J. HANTGES

Los Angeles, California

Friday, October 12, 2007

Volume 1

Reported by:
GINA CANGIAMILA
CSR No. 10256

JOB No. 73284

EXHIBIT ß

ANDREW J. HANTGES                          10/12/07

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                      COUNTY OF SANTA CLARA

3

4     ALBERT LEE, et al.,

5               Plaintiffs,

6          vs.                          No.  1-06-CV-057298

7     PALM TERRACE, LLC, a Nevada
      Limited Liability Company,
8     etc., et al.,

9               Defendants.

10

11

12     _____

13

14

15          Deposition of ANDREW J. HANTGES, Volume 1,

16      taken on behalf of Defendants, at 515 South Flower

17      Street, Los Angeles, California, beginning at 10:57

18      a.m. and ending at 5:30 p.m. on Friday, October 12,

19      2007, before GINA CANGIAMILA, Certified Shorthand

20      Reporter No. 10256.

21

22

23

24

25

**ANDREW J. HANTGES**                    10/12/07

1    APPEARANCES:

2

3    For Plaintiffs:

4          TERRA LAW, LLP
           BY:    MARK W. GOOD
5          Attorney at Law
           177 Park Avenue, Third Floor
6          San Jose, California 95113
           (408) 299-1200
7

     For Defendants Palm Terrace, etc., et al.:

8
           ROPERS, MAJESKI, KOHN & BENTLEY
9          BY:    JON A. McMAHON
           Attorney at Law
10         80 North First Street
           San Jose, California 95113
11         (408) 287-6262

12   For Defendant Andrew Hantges:

13         GREENWALD, PAULY, FOSTER & MILLER
           BY:    ANDREW J. HALEY
14         Attorney at Law
           1299 Ocean Avenue, Suite 400
15         Santa Monica, California 90401
           (310) 451-8001

16

17

18

19

20

21

22

23

24

25

3

ANDREW J. HANTGES

10/12/07

```
 1                         INDEX
 2   WITNESS:                          EXAMINATION
 3   ANDREW J. HANTGES
     Volume 1
 4
              BY MR. McMAHON          7, 217, 232
 5
              BY MR. GOOD              143, 229
 6
 7
 8                        EXHIBITS
 9
     DEPOSITION                            PAGE
10
     1    Rent Rolls; 9 pages              45
11
     2    Palm Terrace Rent Worksheets; 10 pages   48
12
     2A   Palm Terrace Rent Worksheet; 1 page      73
13
     3    E-mail, attachments; 15 pages    64
14
     4    E-mail, attachments; 18 pages    66
15
     5    E-mail, attachments; 6 pages     68
16
     6    E-mail, attachments; 6 pages     68
17
     7    E-mail, attachments; 6 pages     68
18
     8    Rent Rolls; 10 pages             72
19
     9    Income and Expense Statements; 9 pages   76
20
     10   Documents entitled "Explanation for lack of
21        historical information; 4 pages  78
22   11   Appraisal of Real Property; 57 pages     81
23   12   Collateral Information Questionnaires;
          10 pages                          87
24
     13*  E-mail, attachment (Confidential); 3 pages   93
25
```

4

ANDREW J. HANTGES                                    10/12/07

| | | | |
|---|---|---|---|
| 1 | | EXHIBITS (Continued) | |
| 2 | DEPOSITION | | PAGE |
| 3 | 14 | E-mail; 1 page | 94 |
| 4 | 15* | E-mail, attachment (Confidential); 3 pages | 94 |
| 5 | 16* | E-mail, attachment (Confidential); 6 pages | 94 |
| 6 | 17* | E-mail, attachment (Confidential); 3 pages | 94 |
| 7 | 18* | E-mail, attachment (Confidential); 2 pages | 94 |
| 8 | 19* | E-mail, attachment (Confidential); 6 pages | 94 |
| 9 | 20* | E-mail, attachment (Confidential); 3 pages | 94 |
| 10 | 21 | E-mail chain; 2 pages | 95 |
| 11 | 22* | E-mail, attachment (Confidential); 6 pages | 97 |
| 12 | 23 | E-mail, attachment; 14 pages | 98 |
| 13 | 24 | E-mail, attachment; 24 pages | 99 |
| 14 | 25 | E-mail chain; 2 pages | 104 |
| 15 | 26 | E-mail, attachment; 3 pages | 104 |
| 16 | 27 | E-mail, attachment; 21 pages | 105 |
| 17 | 28 | Closing Statements; 10 pages | 110 |
| 18 | 29* | Borrower/Guarator's Certification and Authorizations (Confidential); 10 pages | 112 |
| 19 | | | |
| 20 | 30 | Initial Loan Disclosures; 33 pages | 114 |
| 21 | 31 | New Loan Registration Forms; 8 pages | 114 |
| 22 | 32 | Letters of Interest; 37 pages | 118 |
| 23 | 33 | Letters from LaSalle Bank; 55 pages | 121 |
| 24 | 34* | Confidential documents (Confidential); 80 pages | 128 |
| 25 | 35 | Fax transmission; 5 pages | 200 |

5

ANDREW J. HANTGES                          10/12/07

1

                    EXHIBITS  (Continued)

2

3    DEPOSITION                                    PAGE

4    36    Closing Points Summary; 1 page          210

5    37    Closing Points Summary; 8 pages         212

6    38    E-mail, attachment; 4 pages             217

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

**ANDREW J. HANTGES**                                    10/12/07

1        Los Angeles, California, Friday, October 12, 2007

2                    10:57 a.m. - 5:30 p.m.

3

4                    ANDREW J. HANTGES,

5    having been first administered an oath, was examined and

6    testified as follows:

7

8                    EXAMINATION

9    BY MR. McMAHON:

10       Q.   Please state your full name for the record.

11       A.   Andrew Joseph Hantges.

12       Q.   Mr. Hantges, have you had your deposition taken

13   before?

14       A.   Yes, I have.

15       Q.   What was the general nature of that?  How many

16   depositions have you participated in?

17       A.   I've had two.

18       Q.   What was the general nature of the first of

19   those depositions?  What was the topic?

20       A.   Topic was with regard to my previous

21   employer.

22       Q.   What employer was that?

23       A.   That was USA Capital.

24       Q.   Was USA Capital a defendant in that case?

25       A.   I cannot answer that with certainty, but I was

7

**ANDREW J. HANTGES**                                    10/12/07

1    same degree of seriousness.  Do you understand?

2         A.   Yes.

3         Q.   Is there any reason you cannot give me your

4    best testimony today?  For example, are you on any

5    medication that might affect your memory?

6         A.   No, I'm not.

7         Q.   Finally, I ask that you don't guess.  If you

8    have absolutely no knowledge or no reason to base your

9    answer on, please just tell me you don't know, and then

10   we can move on.  Do you understand?

11        A.   I do.

12        Q.   I'm going to be asking you questions today

13   about a piece of property known as the Palm Terrace

14   Apartments.  Are you familiar with these apartments?

15        A.   Yes, I am.

16        Q.   Why are you familiar with the Palm Terrace

17   Apartments?

18        A.   I was the mortgage broker on that transaction.

19        Q.   It's my understanding that Palm Terrace is

20   divided into separate buildings, each with a different

21   owner; is that accurate?

22        A.   That is accurate.

23        Q.   Were you the mortgage broker for each of these

24   individual investors?

25        A.   Yes.

9

1      Q.   I want to start with just a bit of your

2   background.

3           What is your present employer?

4      A.   Access Commercial Mortgage.

5      Q.   What is your position at Access Commercial

6   Mortgage?

7      A.   Co-founder.

8      Q.   When was Access Commercial Mortgage founded?

9      A.   Approximately one year ago.

10      Q.   What type of business is Access Commercial

11   Mortgage?

12      A.   Commercial mortgage broker.

13      Q.   Where is Access Commercial Mortgage located?

14      A.   In Henderson, Nevada.

15      Q.   Do you have an ownership interest in Access

16   Commercial Mortgage?

17      A.   Yes.

18      Q.   Do you have any partners in that business?

19      A.   Yes, one other.

20      Q.   What is your other partner's name?

21      A.   Devin Lee.

22      Q.   How many employees does Access Commercial

23   Mortgage have?

24      A.   Two.

25      Q.   Would that be you and Mr. Lee?

ANDREW J. HANTGES                                    10/12/07

1       A.   No.

2       Q.   All right.   So, you have two in addition to you

3   and your partner?

4       A.   Yes.

5       Q.   Where were you employed prior to Access

6   Commercial Mortgage?

7       A.   USA Capital.

8       Q.   What were the dates of your employment with USA

9   Capital?

10       A.   Approximately August 2000 until one year ago.

11       Q.   What was your position at USA Capitol?

12       A.   There was no official title, but I was a

13   commercial mortgage broker.

14       Q.   Did you have an ownership interest in USA

15   Capital?

16       A.   No.

17       Q.   Do you know who did own USA Capital?

18       A.   I could not say with certainty, so I cannot

19   answer.

20       Q.   I've also seen reference in documentation to

21   USA Commercial Mortgage.   Are you familiar with that

22   entity?

23       A.   Yes, I am.

24       Q.   What is that business?

25       A.   To the best of my knowledge, they're one and

                                                        11

ANDREW J. HANTGES

10/12/07

1    the same.

2        Q.   Prior to USA Capital where were you employed?

3        A.   College.

4        Q.   Which leads into my next questioning.   Where

5    did you attend college?

6        A.   University of Nevada Reno.

7        Q.   Did you get a degree from UNR?

8        A.   Yes, I did.

9        Q.   What degree is that?

10       A.   Finance.

11       Q.   When did you graduate from UNR?

12       A.   Around August 2000.

13       Q.   Do you hold any other degrees?

14       A.   Degrees, no.

15       Q.   Do you have any real estate licenses?

16       A.   Yes.

17       Q.   What are those licenses?

18       A.   I do have a real estate license.

19       Q.   Is that -- sorry.   Is that an agent or a broker

20   or a salesperson?

21       A.   I am now a broker.

22       Q.   When did you become a broker?

23       A.   Approximately one year ago.

24       Q.   Did you have to take any courses to obtain your

25   broker's license?

12

**ANDREW J. HANTGES**

1    updates, if tenants had moved vacated or anything of the

2    like.

3        Q.  Did she, in fact, provide you with those

4    updates?

5        A.  She did.

6        Q.  How were those updates transmitted to you?

7        A.  Typically via fax.

8        Q.  And during this process, how often did she

9    update you with regard to the rent at Palm Terrace?

10       A.  Occasionally.

11       Q.  Do you have a ballpark of how many updates she

12   gave you?  Are we talking hundreds or --

13       A.  We're talking under a dozen.  A dozen or

14   under.

15       Q.  Were these updates from Penny something that

16   you specifically requested her to provide you with?

17       A.  Yes.

18       Q.  How did you ask Penny to provide you with

19   updates with regard to the rent at Palm Terrace?

20       A.  To the best of my knowledge, I faxed her over

21   the rental forms that the bank required, and asked her

22   to review them for accuracy.

23       MR. HALEY:  Before we get into documents, let's

24   take a quick break.

25       MR. McMAHON:  Sure.

44

**ANDREW J. HANTGES**                                    10/12/07

1                          (Recess.)

2                  (Deposition Exhibit 1 marked.)

3        MR. McMAHON:  Back on the record.

4              We've marked as Exhibit 1, some documents with

5   the title "Multifamily Rent Roll."

6        Q.  Mr. Hantges, do you recognize these

7   documents?

8        A.  I do.

9        Q.  Do you recognize these documents?

10       A.  This is LaSalle Bank's standard rental rolls.

11       Q.  And are these the rent rolls, if you can just

12  flip through -- first can you just flip through these

13  and verify that that's your signature on the bottom,

14  where it says "Broker"?

15       A.  Okay.

16       Q.  Is that your signature?

17       A.  That is.

18       Q.  These are rent rolls on LaSalle Bank's form for

19  each of the buildings for the plaintiffs in this

20  particular case; is that correct?

21       A.  Yes.

22       Q.  What is the purpose of this rent roll?

23       A.  To outline who is currently occupying the

24  unit.

25       Q.  Did someone at LaSalle Bank provide you with

45

**ANDREW J. HANTGES**

1    this form of rent roll?

2        A.   Yes.

3        Q.   Do you know who it was that did that?

4        A.   No.

5        Q.   Was this form something that you had in your

6    files because of previous dealings with LaSalle Bank, or

7    was this sent out specifically for this transaction?

8        A.   This was not specifically for this transaction.

9    This is a rent roll used for every deal that they did

10   during these years.

11       Q.   There's various information contained in this

12   form with regard to the tenant's name and the current

13   rent in place, et cetera.  Who provided you -- or strike

14   that.

15            Who filled out this form?

16       A.   Me.

17       Q.   Where did you get the information to fill out

18   this form?

19       A.   It was provided to me.

20       Q.   Who provided you with that information?

21       A.   Either Carol Gray or Penny Trombi.

22       Q.   I guess then we should just walk through all

23   the information contained here.

24            Do you see the column where it says "Tenant's

25   Name"?

46

**ANDREW J. HANTGES**

1      A.   It's been years, but they look familiar.

2      Q.   And it looks like there are some handwritten

3  notes on the rent rolls; is that correct?

4      A.   That is correct.

5      Q.   Do you know what these handwritten notes

6  represent?

7      A.   That represents changes I was told to make to

8  the rent roll forms.

9      Q.   And was this -- you testified earlier, correct,

10  about Penny Trombi providing with you updates; is that

11  right?

12      A.   Yes.

13      Q.   Would this be one of those updates that you

14  were talking about?

15      A.   This is an update, yes.

16      Q.   Was this something that you specifically

17  requested from anyone, or did this come unsolicited to

18  you?

19      A.   This was in response to Exhibit 3, when I said,

20  have a reliable person review these for accuracy, is

21  what I believe.

22      Q.   If you can look at the handwritten notes that

23  are on the rent rolls, do you know who actually made

24  those notations?

25      A.   I don't.

67

ANDREW J. HANTGES

10/12/07

1    Q.   Throughout your years of dealing with processes

2  like these, what is typical in this situation of who

3  updates the rent rolls?

4    A.   It ranges from property managers to borrowers

5  themselves.

6    Q.   Do you recall having any specific conversations

7  with anyone about the changes that are reflected here in

8  these rent rolls?

9    A.   Conversation, no.

10   Q.   And what did you then do with the information

11  that was being provided to you with regard to changes in

12  the rent rolls?

13   A.   I made the updates, and then disseminated the

14  new forms to the plaintiffs for their approval.

15   MR. McMAHON:   Let's go ahead and mark this as

16  Exhibit 5.

17            (Deposition Exhibit 5 marked.)

18   MR. McMAHON:   And then at the same time, this as

19  Exhibit 6.

20            (Deposition Exhibit 6 marked.)

21   MR. McMAHON:   And one more, Exhibit 7.

22            (Deposition Exhibit 7 marked.)

23   MR. McMAHON:   We've just marked as Exhibits 5, 6

24  and 7, three separate e-mails with attachments.

25            If you can flip through these e-mails and

68

ANDREW J. HANTGES

1    attachments, and let me know if you recognize them.

2        THE WITNESS:   I do.

3    BY MR. McMAHON:

4        Q.   What are these e-mails?

5        A.   These are e-mails with rent rolls.

6        Q.   You mentioned earlier when we were looking at

7    Exhibit 4, that you updated the rent rolls based on the

8    handwritten notes that were in the rent rolls in Exhibit

9    4; is that correct?

10       A.   I updated rent rolls, yes.   I'd have to compare

11   the documents specifically to say those were the

12   specific forms I updated to these forms.   It's been two

13   or three years.   There's a lot of fax copies and e-mails

14   coming my way.

15       Q.   So we can sort of verify that, if you look at

16   the document or the page in Exhibit 4 that's Bate

17   stamped 17397 --

18       A.   Yep.

19       Q.   -- and then if you go to Exhibit 7, which is

20   the rent rolls e-mail, and if you turn to the last page

21   of that document --

22       A.   Okay.

23       Q.   -- now, comparing the two, these are both for

24   the Nash's building at 2417 Wengert; is that right?

25       A.   Yes.

69

ANDREW J. HANTGES                                    10/12/07

1          Q.   And then if we look at 17397 in Exhibit 4, do

2     you see the handwritten notes where it says "Aquino" and

3     "Ceballos"?

4          A.   I do.

5          Q.   And then if we look at Exhibit 7, you see in

6     the last page of that exhibit, that Ceballos and

7     Esquedo, I guess, I pronounced that wrong, are now

8     reflected in that rent roll in Exhibit 7; is that

9     right?

10         A.   I see that.

11         Q.   So, looking, then, at comparing these two

12    documents, is it safe to say that you took the

13    handwritten information from Exhibit 4, and then updated

14    it in the rent rolls that we are looking at in Exhibits

15    5, 6 and 7?

16         A.   As of today, yes.

17         Q.   Okay.  The e-mail in 5, 6 and 7, you're sending

18    these rent rolls to Cathi Ciardella; is that correct?

19         A.   Yes.

20         Q.   And why were you sending these to Cathi

21    Ciardella?

22         A.   To the best of my knowledge, and looking at the

23    time line of this as of today, this appears to be the

24    bank asking us for some final updated rent rolls before

25    they moved to closing.

70

ANDREW J. HANTGES

10/12/07

1       Q.   So, then, these rent rolls that you were giving

2   to Cathi were then going to be given to the borrowers

3   for their signature; is that right?

4       A.   For their approval, yes.

5       Q.   And just to clarify, when we look back at

6   Exhibit 1, these were the signed rent rolls from May?

7       A.   Yes.

8       Q.   Were these then submitted to the bank?

9       A.   Oh, yes.

10      Q.   And is that done all as one package, or as you

11  get this information in, are you then sending them to

12  the bank?

13      A.   The package goes out up front, and then as you

14  go, if they ask for further information, they'll send it

15  piecemeal or whatever you must do.

16      Q.   Okay.  So, just so I can get a clear view of

17  the picture, you initially would have sent the May rent

18  rolls in Exhibit 1, then you got more information with

19  regard to people moving in and out, and then you were

20  going to send them an updated one later on; is that

21  correct?

22      A.   That is correct, yes.

23      Q.   Okay.  Other than the changes to the rent rolls

24  that were handwritten in Exhibit 4 --

25      A.   Yes.

71

ANDREW J. HANTGES

1      Q.  -- was there any other information that you

2  relied on when you filled in the data on the rent rolls

3  in Exhibits 5, 6 and 7?

4      A.  I couldn't say as of today.

5      MR. McMAHON:  Let's mark this as Exhibit 8.

6           (Deposition Exhibit 8 marked.)

7      MR. McMAHON:  We've marked as Exhibit 8 some

8  Multifamily Rent Rolls.

9      Q.  Do you recognize these documents?

10     A.  Yes.

11     Q.  And is that your signature there, where it says

12  "Broker" on the bottom of each of these rent rolls?

13     A.  Yes.

14     Q.  What are these particular rent rolls?

15         Let me rephrase that.

16         When we looked at Exhibits 5, 6 and 7, you were

17  sending blank forms out to be signed, and then the

18  borrowers signed them and sent them back to you.  Is

19  this what you received -- is Exhibit 8 what you received

20  back from the borrowers?

21     A.  It's been a long time.

22     Q.  So you don't know?

23     A.  It appears that way with the signatures, yes.

24     Q.  Okay.  If we look here at the first page of

25  Exhibit 8, do you see that it appears that there is one

72

1    previous twelve months, so that actually that figure

2    right there was taken from the previous appraisals for

3    Imperial Bank and the sub-market, which you could, in

4    banker lingo, consider market vacancy.

5         Q.  So, that 95 percent then didn't represent the

6    actual occupancy rate; is that correct?

7         A.  Over the preceding twelve months, are you

8    referring?

9         Q.  Correct.

10        A.  Yes, it couldn't have.  Everyone in the

11   transaction was aware that the property had been closed

12   and --

13        Q.  In the past, had you ever encountered something

14   like this, where the property had been closed and vacant

15   for a period of time, and then you had to fill in the

16   information with regard to occupancy?

17        A.  No.

18        Q.  Did you discuss with anyone the decision to use

19   the market data from the appraisals as that 95 percent

20   figure?

21        A.  With the investor, which would be the bank.

22        Q.  Do you recall who you spoke with at the bank

23   with regard to using that 95 percent figure?

24        A.  I do not.

25        Q.  Did you talk about that 95 percent figure with

75

1    Carol Gray?

2         A.  No.

3         Q.  Other than the person at the bank that you

4    spoke with about the 95 percent figure, did you talk

5    about it with anyone else?

6         A.  No.

7         MR. McMAHON:  Let's mark that as Exhibit 9.

8              (Deposition Exhibit 9 marked.)

9         MR. McMAHON:  We've marked as Exhibit 9 some

10   documents titled "Income and Expense Statement."

11        Q.  Can you just flip through these forms, and

12   verify that that's your signature there where it says

13   "Broker's Signature"?

14        A.  Yes, it is.

15        Q.  What is this particular document?

16        A.  This is a LaSalle Bank form, which

17   unfortunately was required for this transaction, but

18   what this form is is an income and expense statement

19   that shows historical income expense and the mortgage

20   payment for that calculation that I showed you that we

21   spoke about earlier with regards to if a property would

22   qualify.

23        Q.  Was this form something that LaSalle Bank

24   provided you specifically for Palm Terrace, or is this

25   something that you already had because of previous

**ANDREW J. HANTGES**                                      10/12/07

1    dealings with the bank?

2         A.   This form, as the rent roll, was used on every

3    deal they probably did in the three year period.

4         Q.   If you see there under the column in Exhibit 9,

5    where it says "Broker Analysis Based on Actual Income,"

6    do you see that column?

7         A.   I do.

8         Q.   And there's various figures there listed in

9    that column.  Who filled in this information?

10        A.   That would be myself, the broker.

11        Q.   And where did you get these figures to fill in

12   this information?

13        A.   These figures, the expenses, as we spoke about,

14   was from a previous appraisal from Imperial Bank, and

15   also reviewing comparables in the sub-market, the income

16   was estimated based upon rent rolls, which we discussed,

17   and the other income was also that laundry figure that

18   we spoke about, too.

19             So up until this point, you've been given and

20   asked me all three elements of this sheet that we've

21   discussed.

22        Q.   When you say previous appraisals from Imperial

23   Bank, which appraisals are you talking about there?

24        A.   They should have a copy, but it was the ones

25   that Carol Gray submitted to me up front.

77

ANDREW J. HANTGES                           10/12/07

1    copy of these appraisals?

2         A.   No.

3         Q.   There's just one figure back on Exhibit 9 that

4    I want to get a little clarity on.   The first line item

5    there says "Vacancy and Collection Percentage."   Do you

6    see that?

7         A.   Yes.

8         Q.   And it says five percent.   Do you see that?

9         A.   I do.

10        Q.   Do you know where that five percent came

11   from?

12        A.   That five percent, which corresponds to the

13   rent roll, was the estimate to everyone in the

14   transaction's knowledge of what is market in that

15   area.

16        MR. McMAHON:   Let's mark this as Exhibit 12.

17        THE WITNESS:   May I back up just one second to

18   refer to the question you just asked on Exhibit 11, or

19   on -- go to 9.

20        MR. McMAHON:   Sure.

21        THE WITNESS:   If you go back to USA 1002, you will

22   notice on the left-hand side, 102, that appraiser used

23   five percent less forecasted vacancy and collection

24   loss.   So that's potentially where that number came

25   from, also.

86

1        MR. McMAHON:   Okay.

2        THE WITNESS:   Thanks.

3        MR. McMAHON:   Let's mark that as Exhibit 12.

4              (Deposition Exhibit 12 marked.)

5   BY MR. McMAHON:

6        Q.  We marked as Exhibit 12 a Collateral

7   Information Questionnaire.  Can you go through this, and

8   just verify that that is your signature under where it

9   says "Broker" for each of these?

10       A.  Yes, they are.

11       Q.  What is this document?

12       A.  This is, as you'll notice with these documents

13  I refer to LaSalle Bank, but -- and a number of these

14  documents, where it says "Multifamily Finance Group" on

15  top, it's LaSalle Bank MFG, and MFG is the Multifamily

16  Finance Group.

17            So to answer your question specifically, this

18  is a questionnaire that -- one of the forms that they

19  required to get a mental snapshot of the property.

20       Q.  So this is a LaSalle MFG form; is that right?

21       A.  Yes.

22       Q.  You'll see here there are check boxes "Yes" and

23  "No"; is that right?

24       A.  I do.

25       Q.  Who checks these particular boxes with regard

87

ANDREW J. HANTGES                                    10/12/07

1    to all of these seventeen items?

2         A.   That would be I.

3         Q.   Where did you get the information to check

4    these particular boxes?

5         A.   I don't recall.

6         Q.   I just want to go through a few of the specific

7    items.  Do you see number 9, where it says, "Does the

8    property have subsidized rental (Section 8)

9    occupancy"?

10        A.   Yes.

11        Q.   And the -- strike that.

12             Did you check then the box "No" with regard to

13   that item?

14        A.   Looking at the document, it appears so.

15        Q.   Do you know where you get that information,

16   that it did not have Section 8 occupancy?

17        A.   Do I recall where I received the information?

18   Either through Carol Gray or Penny Trombi.

19        Q.   If you look back at Exhibit 2, the first

20   page --

21        A.   Yes.

22        Q.   -- if you look at the line corresponding on

23   this first page, which is the one for 2401 Wengert

24   Avenue, do you see the notation on the very right, where

25   it appears that one of the units is waiting on Section 8

88

**ANDREW J. HANTGES**                                    10/12/07

1    ever see this particular registration form?

2          A.  It's not a form for the borrowers.  It's a. --

3          MR. HALEY:  Just answer his question.

4          THE WITNESS:  I'm sorry.  Say that again.

5    BY MR. McMAHON:

6          Q.  Do you know if any of the borrowers saw this

7    particular form?

8          A.  No.

9          Q.  What did you do after filling out and signing

10   all but the first one of these forms?

11         A.  Submitted to LaSalle Bank.

12         Q.  Did you show this form to anyone else other

13   than LaSalle Bank?

14         A.  No.

15         Q.  If you look at the second page and then the

16   subsequent pages, it appears that you signed this either

17   on June 15 or June 16 of '05; is that correct?

18         A.  That is correct.

19         Q.  Would you then have provided this to LaSalle

20   Bank shortly thereafter?

21         A.  Uh-huh.  Yes, I would have.

22         Q.  Do you know what LaSalle Bank does with this

23   particular form?

24         A.  I do not.

25         MR. McMAHON:  Let's take a quick break real quick.

117

ANDREW J. HANTGES                              10/12/07

1                        (Recess.)

2              (Deposition Exhibit 32 marked.)

3        MR. McMAHON:  Back on.

4              We just marked as Exhibit 32 what appear to be

5    Letters of Interest for each of the buildings at Palm

6    Terrace.

7        Q.  If you can just flip through this document, and

8    verify that that's your signature on the last page of

9    each of these Letters of Interest.

10       A.  Yes.

11       Q.  What is this particular Letter of Interest that

12   we're looking at here in Exhibit 32?

13       A.  It details the specifics of the loan for the

14   clients.

15       Q.  You testified earlier that after you went

16   through the underwriting process and determined that you

17   would actually then issue a Letter of Interest; is that

18   right?

19       A.  Yes.

20       Q.  Is that, is this document here that we're

21   looking at, Exhibit 32, that Letter of Interest that we

22   were looking at earlier?

23       A.  Yes, sir.

24       Q.  Who drafted the Letters of Interest that are

25   here in Exhibit 32?

118

**ANDREW J. HANTGES**                                                      10/12/07

1          A.   That would be me.

2          Q.   You mentioned earlier that the loan origination

3    fee is negotiated with the borrowers; is that correct?

4          A.   Yes.

5          Q.   Here on this first Letter of Interest, it says

6    the loan origination is to be two percent of the loan

7    amount to Catalyst Funding; is that right?

8          A.   That's what it appears so, yes.

9          Q.   Do you know if that two percent was actually to

10   Catalyst Funding?

11         A.   I can't say.

12         Q.   It also says here on this first Letter of

13   Interest "Zero percent of loan amount to USA Commercial

14   Mortgage"; is that correct?

15         A.   Yes.

16         Q.   If we look back at Exhibit 28, it appears that

17   there was an origination fee paid with respect to these

18   loans; is that correct?

19         A.   That is.

20         Q.   So, am I right in saying that it appears that

21   this Letter of Interest here, Exhibit 32, at least with

22   regard to the loan origination payment, it doesn't match

23   what was in the final statement?

24         A.   That would be correct.

25         Q.   Do you know what happened in between the Letter

119

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand

8    which was thereafter transcribed under my direction;

9    that the foregoing transcript is a true record of the

10    testimony given.

11          Further, that if the foregoing pertains to

12    the original transcript of a deposition in a Federal

13    Case, before completion of the proceedings, review of

14    the transcript [  ] was [  ] was not requested.

15          I further certify I am neither financially

16    interested in the action nor a relative or employee

17    of any attorney or party to this action.

18          IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20

21    Dated:   NOV 0 5 2007

22

23                         _____

                       GINA CANGIAMILA

24                       CSR No. 10256

25