1  Dean T. Kirby, Jr.     Calif. Bar No. 090114
   KIRBY & McGUINN, A P.C.
2  707 Broadway, Suite 1750
   San Diego, CA 92101
3  Telephone: (619) 685-4000  Facsimile:  (619) 685-4004
   dkirby@kirbymac.com
4
   Michelle L. Abrams     Nev. Bar No. 5565
5  ABRAMS & TANKO LLP
   3085 South Jones Blvd., Suite C
6  Las Vegas, NV  89146
   Telephone: (702) 369-3724 Facsimile (702) 369-0651
7  mabrams@mabramslaw.com

8  Attorneys for Debt Acquisition Company of America V, LLC

9

10                    UNITED STATES BANKRUPTCY COURT

11                          District of Nevada

12  In re                                    )
                                             )   Case No. BK-S-06-10725-LBR
13  USA COMMERCIAL MORTGAGE COMPANY          )   Case No. BK-S-06-10726-LBR
                               Debtor.       )   Case No. BK-S-06-10727-LBR
14  In re                                    )   Case No. BK-S-06-10728-LBR
                                             )   Case No. BK-S-06-10729-LBR3
15  USA CAPITAL REALTY ADVISORS, LLC         )
                               Debtor.       )   CHAPTER 11
16  In re                                    )   Jointly Administered Under Case No.
                                             )   BK-S-06-10725 LBR
17  USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC )
                                             )   REPLY MEMORANDUM IN
18                             Debtor.       )   SUPPORT OF MOTION
    In re                                    )   TO APPROVE SETTLEMENT WITH
19                                           )   DEBT ACQUISITION COMPANY OF
    USA CAPITAL FIRST TRUST DEED FUND, LLC   )   AMERICA V, LLC
20                                           )
                               Debtor.       )   DATE:  February 20, 2009
21  In re                                    )
                                             )   TIME:  9:30 a.m.
22  USA COMMERCIAL MORTGAGE COMPANY          )
                               Debtor.       )   PLACE: Foley Federal Building, 300
23  Affects:                                 )          Las Vegas Boulevard South,
           □ All Debtors                     )          Courtroom 1, Las Vegas,
24         ☒ USA Commercial Mortgage Company )          Nevada
           □ USA Capital Realty Advisors, LLC )
25         □ USA Capital Diversified Trust Fund, LLC )
           □ USA Capital First Trust Deed Fund, LLC )
26         □ USA Securities, LLC             )

27

28

1    Debt Acquisition Company of America V, LLC ("DACA") submits the following reply to

2  the Opposition filed February 13, 2009 by Carol Mortensen (Docket No. 6818).  Due to scheduled

3  downtime in the PACER system for the Nevada Bankruptcy Court, the opposition was not accessible

4  to counsel for DACA until Tuesday, February 17.

5

6  I.    DISMISSAL OF THE APPEAL CONFERS A SUBSTANTIAL BENEFIT ON
       THE TRUST AND DIRECT LENDERS

7    The District Court's Order dismissing DACA's appeal as moot was timely appealed to the

8  Ninth Circuit and was scheduled for oral argument on March 12.  As required by Ninth Circuit rules,

9  counsel for DACA notified the Ninth Circuit that a settlement had been reached, subject to

10  Bankruptcy Court approval, and that a hearing on the settlement was scheduled for February 20.

11  The Ninth Circuit responded by vacating the submission of the appeal pending the outcome of the

12  motion to approve the settlement.  If the settlement is not approved, the matter will be resubmitted

13  and argument rescheduled.

14    DACA obviously disputes that its appeal is moot.  A copy of DACA's opening brief in the

15  appeal is attached as Exhibit 1.  As the brief indicates, the appeal is presently confined to narrow,

16  specific provisions of the Confirmation Order which, DACA argues, are in excess of the scope of

17  section 363(m).  If the appeal were successful, reversal of the Confirmation Order in part might give

18  rise to claims on the part of the Asset Purchaser, Compass Financial Partners, or its successor in

19  interest Silar Advisors, L.P. In the highly charged and litigious situation that swirls in the District

20  Court at this time, such claims should not be discounted.

21    It is not surprising that counsel for the Liquidating Trust should argue in the District Court

22  that DACA's appeal of the District Court's own ruling is not meritorious.  However, DACA's appeal

23  was made and continues to be pursued in good faith.  While some would regard it as strange were

24  the appeal to be sustained, "stranger things have happened" in the Court of Appeals.

25    DACA believes that the appeal, if successful, would have benefitted its position as successor

26  in interest to the Direct Lenders by removing restrictions on its post-confirmation rights vis a vis

27  Compass, and now Silar.  However, as the Opposition correctly points out, the Liquidating Trust is

28

1    not concerned directly with the rights of Direct Lenders under their deeds of trust.  The Liquidating

2    Trust is presumably vitally concerned, however, with the integrity of the Confirmation Order and the

3    litigation which might occur if that order is reversed even in part.  Avoiding that chance is a material

4    benefit of the settlement from the Trust's point of view.

5

6    II.    <u>DACA HAS COLLECTED NO PREPAID INTEREST</u>

7         The Opposition asserts that DACA has collected $1.5 Million in Prepaid Interest from Direct

8    Lenders and withheld it from the Trust.  DACA denies collecting any Prepaid Interest from Direct

9    Lenders.  Had it done so, the Trust would presumably have made claims against DACA long ago.

10         DACA has never been the servicer for any USACM loan and has not collected any money on

11    account of any USACM loan.  If it had, DACA would have been subject to the obligation to

12    withhold Prepaid Interest and remit it to the Liquidating Trust.  As the Court well knows, substantial

13    legal barriers existed and continue to exist to the replacement of Compass as loan servicer.  All

14    parties, including DACA, remain subject to a Preliminary Injunction Order entered by the District

15    Court which prevents any party other than Compass (and now perhaps Silar) from collecting the

16    loans or acting to replace the servicer.

17         When DACA purchased the interests of Direct Lenders, a portion of the purchase price <u>paid</u>

18    <u>by DACA</u> for those interests were set aside in an escrow established with an independent escrow

19    company.  The reason for establishment of the escrow was because of the possibility that prepaid

20    interest would be netted by the servicer on a lender by lender basis rather than a loan by loan basis.

21    in other words it was possible, and still is possible, that prepaid interest owing in relation to one loan

22    might be collected from the proceeds of another loan.  Under the escrow arrangement, if prepaid

23    interest was withheld by the servicer from payments otherwise due to DACA as assignee, then

24    DACA would be entitled to the escrowed funds.  If the prepaid interest was withheld in relation to

25    other loans held by the Direct Lender, or if the Direct Lender was otherwise required to pay the

26    prepaid interest, the Direct Lender would be entitled to receive the escrowed funds.  The Opposition

27    itself recognizes that the money withhheld by DACA from the purchase price was not collected from

28

1  Direct Lenders but instead was paid into escrow <u>by DACA</u>.  The Opposition does not state how Ms.

2  Mortensen came up with $1.5 Million as the amount of "Prepaid Interest" allegedly collected by

3  DACA.  The total deposited by DACA with the escrow agent is a small fraction of that amount.

4      The escrow arrangement referred to above was a consensual arrangement between DACA

5  and the Direct Lenders, the purpose of which was to allocate between the parties the responsibility to

6  remit Prepaid Interest to the Liquidating Trust once the loans were collected.  The money held by the

7  escrow agent was paid into escrow by DACA.  It was not collected from any borrower nor could it

8  have been.

9

10 III.    DACA IS PAYING REASONABLY EQUIVALENT VALUE

11     The Opposition states that DACA proposes to purchase rights to collect Prepaid Interest

12 totaling in excess of $7 Million.  In fact, the amounts which might be collected by DACA are much

13 less.  The Opposition fails to take into account the fact that as part of the settlement DACA has

14 agreed not to sue any Direct Lender to recover Prepaid Interest, except those who received more

15 than $200,000.00.  DACA is aware of only one of the orignal Direct Lenders who received more

16 than $200,000.00 in Prepaid Interest.  The Opposition further fails to take into account the costs and

17 risks of any litigation to recover Prepaid Interest.

18     Further, the DACA's purchase price takes into account the time value of money and the risk

19 of noncollection or nonremittance of Prepaid Interest by the loan servicer.  The Opposition, on the

20 one hand, accuses Compass and Silar of failing to remit Prepaid Interest to the Liquidating Trust,

21 and chides the Trust for not litigating against the apparently defunct Compass to recover those

22 allegedly lost amounts.  At the same time, the Opposition assumes that Prepaid Interest will be

23 collected in the future from all loans, and represents virtual "money in the bank" for DACA once it

24 purchases the Liquidating Trust's position.

25     In fact, the future collection of Prepaid Interest on these loans by the servicer, and the

26 servicer's remittance of those funds, has proven to be risky business.  Economic conditions affecting

27 the subject properties and loans have changed drastically since the confirmation order.  The legal

28

1   and practical uncertainty as to who will service the loans has, with the demise of Compass,

2   increased.  It seems likely now that few if any of these loans will be collected in cash.  DACA

3   therefore believes that it has offered reasonably equivalent value in cash to the Trust.

4

5   DATE: February 18, 2009                           KIRBY & McGUINN, A P.C.

6

7                                                     By: /s/ Dean T. Kirby, Jr.
                                                      Dean T. Kirby, Jr. Attorneys for
8                                                     Debt Acquisition Company of
                                                      America V, LLC
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### No. 07-16796

In Re:

USA COMMERCIAL MORTGAGE CO.; USA CAPITAL REALTY ADVISORS, LLC; CAPITAL DIVERSIFIED TRUST DEED FUND, LLC; USA CAPITAL FIRST TRUST DEED FUND, LLC; and USA SECURITIES, LLC.

Debtors,

DEBT ACQUISITION COMPANY, OF AMERICA V, LLC,

Appellants,

v.

USA COMMERCIAL MORTGAGE CO., et al.

Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

Case No. CV-07-00160-RCJ
The Honorable Robert C. Jones and Philip M. Pro, United States District Judges

On Appeal from the United States Bankruptcy Court for the District of Nevada
Consolidated Case No. BK-S-06-10725 LBR
The Honorable Linda B. Riegle, United States Bankruptcy Judge

## OPENING BRIEF OF APPELLANT
## DEBT ACQUISITION COMPANY OF AMERICA V, LLC

Dean T. Kirby, Jr. (SBN 090114)
KIRBY & McGUINN, A P.C.
600 B Street, Suite 1950
San Diego, California 92101-4515
Telephone: (619) 685-4000
Facsimile:  (619) 685-4004

**Exhibit 1 Page 1 of 58**

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Ninth Circuit Rule 28-2.6, Appellants state that they do not

know of any related cases pending in this Court.

Date: February 14, 2008                KIRBY & McGUINN, A P.C.


By:_____
Dean T. Kirby, Jr.
Attorneys for Appellant
Debt Acquisition Company
of America V, LLC

i

**Exhibit 1 Page 2 of 58**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)() and Ninth

Circuit Rule 32-1, I certify that the foregoing Appellants' Opening Brief is

proportionately spaced, has a typeface of 14 points or more, and contains no more

than 14,000 words, and 1300 lines of text.

Date: February 14, 2008                    KIRBY & McGUINN, A P.C.


By:_____
Dean T. Kirby, Jr.
Attorneys for Appellant
Debt Acquisition Company
of America V, LLC

ii

**Exhibit 1 Page 3 of 58**

# TABLE OF CONTENTS

I.    STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     A.    THE LOAN SERVICING AGREEMENTS . . . . . . . . . . . . . . . . . . . 5

          1.    THE DEFAULT INTEREST PROVISION . . . . . . . . . . . . . . 5

          2.    DESIGNATION OF SERVICING AGENT . . . . . . . . . . . . . 6

          3.    THE SECTION 8 RIGHT OF TERMINATION. . . . . . . . . . 7

     B.    DACA PURCHASES DIRECT LENDER INTERESTS . . . . . . . . . . 8

     C.    SALE OF THE LSA's UNDER THE PLAN . . . . . . . . . . . . . . . . . . 8

     D.    ADDING THE "COMFORT PROVISIONS" . . . . . . . . . . . . . . . . . 13

V.    SUMMARY OF ARGUMENT AND STANDARD OF REVIEW . . . . . . 19

VI.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     A.    THE "COMFORT PROVISIONS" VIOLATED THE RIGHTS
          OF DACA AND THE OTHER DIRECT LENDERS . . . . . . . . . . 20

          1.    CHANGING THE SERVICING AGENT . . . . . . . . . . . . . . 20

          2.    COMPROMISING DEFAULT INTEREST . . . . . . . . . . . . 24

          3.    TERMINATION RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . 26

iii

**Exhibit 1 Page 4 of 58**

B.    THE EFFECT OF THE "COMPROMISE" . . . . . . . . . . . . . . . . . . . 26

C.    THE LSA's COULD NOT BE SOLD FREE AND CLEAR OF
DIRECT LENDERS' RIGHTS UNDER THE CONTRACTS OR
UNDER NEVADA LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

D.    COMPASS DID NOT DEFEND THE APPEAL . . . . . . . . . . . . . . 34

E.    THE COMFORT PROVISIONS ARE RIPE FOR REVIEW . . . . . 36

F.    THIS APPEAL IS NOT MOOT UNDER 11 U.S.C. §363(m) . . . . . 38

      1.    THE REQUESTED RELIEF WOULD NOT AFFECT
      THE VALIDITY OF THE SALE . . . . . . . . . . . . . . . . . . . . . . 39

      2.    THE REQUESTED RELIEF IS ALSO
      REQUIRED UNDER STATE LAW . . . . . . . . . . . . . . . . . . . 42

            a.    The Right to Designate a New Servicing Agent . . . . . 43

            b.    Collection of Default Interest . . . . . . . . . . . . . . . . . . . 43

            c.    The Right to Terminate the Loan Servicing
               Agreement in the Event of a Breach . . . . . . . . . . . . . 44

VII.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**Exhibit 1 Page 5 of 58**

# <u>TABLE OF AUTHORITIES</u>

## <u>FEDERAL CASES</u>

*Alergan, Inc. v. Advance Ross Corp.,* 759 F.2d 1421 (9th Cir. 1985)  . . . . . . . . . 41

*Browning v. Navarro,* 743 F.2d 1069 (5th Cir.1984)  . . . . . . . . . . . . . . . . . . . . . . 29

*Butner v. United States,*
    440 U.S. 48, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) . . . . . . . . . . . . . . 31

*Cinicola v. Scharffenberger*, 248 F.3d 110 (3d Cir. 2001)  . . . . . . . . . . . . . . . . . 39

*Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP,*
    440 F.Supp.2d 1184 (D. Nev. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Feld v. Zale Corp. (In re Zale),* 62 F.3d 746 (5th Cir.1995) . . . . . . . . . . . . . . . . 29

*Hawaii Newspaper Agency v. Bronster,* 103 F.3d 742 (9th Cir. 1996)  . . . . . . . . 36

*In re BCD Corp.,* 119 B.R. 852 (10th Cir. 1997)  . . . . . . . . . . . . . . . . . . . . . . . . 40

*In re Charlton*, 708 F.2d 1449 (9th Cir. 1983)  . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*In re Coupon Clearing Service, Inc.,* 113 F.3d 1091 (9th Cir. 1997) . . . . . . . . . . 31

*In re David Orgell, Inc.*,117 B.R. 574 (Bankr. C. D. Cal. 1990)  . . . . . . . . . . . . . 33

*In re Digital Impact, Inc.*, 223 B.R. 1 (Bankr. N.D. Okla. 1998)  . . . . . . . . . . . . 29

*In re Ewell,* 958 F.2d 276 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 45

*In re Exennium, Inc.,* 715 F.2d 1401 (9th Cir. 1983)  . . . . . . . . . . . . . . . . . . . . . 45

*In re Filtercorp, Inc.,* 163 F.3d. 570 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 41

*In re Lowenschuss,* 67 F.3d 1394 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 20, 28

v

**Exhibit 1 Page 6 of 58**

*In re Lucas,* 312 B.R. 407 (Bankr. D. Nev. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Mann,* 907 F.2d 923 (9th Cir. 1990)  . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 45

*In re Onouli-Kona Land Co.,* 846 F.2d 1170 (9th Cir. 1988) . . . . . . . . . . . . . . . 41

*In re Osborn,* 24 F.3d  1199 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 40

*In re Oyster Bay Cove, Ltd.,* 196 B.R. 251 (E.D.N.Y. 1996) . . . . . . . . . . . . . . . 20

*In re Rickel Home Centers, Inc.,* 209 F.3d 291 (3d Cir. 2000) . . . . . . . . . . . . . . 39

*In re Roberts Farms, Inc.,* 652 F.2d 793 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . 23

*In re Specialty Equipment Cos.,* 3 F.3d 1043 (7th Cir.1993) . . . . . . . . . . . . . . . 29

*In re Telluride Income Growth, L.P.*, 364 B.R. 407 (10th Cir. 2007) . . . . . . . . . 40

*In re Transcon Lines,* 58 F.3d 1432 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . 31

*In re Trism, Inc.,* 328 F.3d 1003 (8th Cir. 2003)  . . . . . . . . . . . . . . . . . . . . . 40, 42

*Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.,*

141 F.3d 490 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 41

*Matter of Pizza of Hawaii, Inc.,*  761 F.2d 1374 (9th Cir. 1985) . . . . . . . . . . . . . 1

*Myers v. United States,* 297 B.R. 774 (S.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . 30

*Precision Industries, Inc. v. Qualitech Steel SBQ, LLC,*

327 F.3d 537 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Terry Oilfield Supply Co. v. American Sec. Bank, N.A.,*

195 B.R. 66 (S.D.Tex.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*TM Patents, L.P. v. International Business Machines,*

121 F.Supp.2d 349 (S.D.N.Y.,2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

vi

**Exhibit 1 Page 7 of 58**

## FEDERAL STATUTES

11 U.S.C. § 1123(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

11 U.S.C. § 363(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

11 U.S.C. § 365(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

11 U.S.C. § 541 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

11 U.S.C. §363(m) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 42, 46

28 U.S.C. § 157(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 158(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 158(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1334(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## NEVADA CASES

*Bradley v. Nev.-Cal.-Or. Ry.,* 42 Nev. 411, 178 P. 906 (1919) . . . . . . . . . . . . . . . 44

*Colello v. Administrator of Real Estate Division of the State of Nevada,*
  100 Nev. 344, 683 P.2d 15 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Federated American Ins. Co. v. Granillo,*
  108 Nev. 560, 835 P.2d 803 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22,43

*LeMon v. Landers,* 81 Nev. 329, 402 P.2d 648 (1965) . . . . . . . . . . . . . . . . . . . . . 44

*Neal's Estate v. Farmers Ins. Exchange,*
  93 Nev. 348, 566 P.2d 81 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 43

*Welfare Div. v. Washoe Co. Welfare Dep't.,*
  88 Nev. 635, 503 P.2d 457 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Exhibit 1 Page 8 of 58**

*Young Elec. Sign Co. v. Fohrman,*
      86 Nev. 185, 466 P.2d 846, 847 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Young v. Nevada Title Company,*
      103 Nev. 436, 744 P.2d 902 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## **NEVADA STATUTES AND REGULATIONS**

Nevada Admin. Code § 645B.073 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## **OTHER STATE CASES**

*Haley v. Town of Dewey Beach*, 672 A.2d 55 (Del. 1996) . . . . . . . . . . . . . . . . . . 35

*Lozano v. GTE Lenkurt, Inc.,*
      122 N.M. 103, 920 P.2d 1057 (N.M. App. 1996) . . . . . . . . . . . . . . . . . . . 35

## **FEDERAL RULES OF PROCEDURE**

Federal Rule of Appellate Procedure 4(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## **OTHER AUTHORITIES**

3 Collier on Bankruptcy ¶ 363.11 p. 363-86 (15th Ed. Rev. 2007) . . . . . . . . . . . 39

4 C.J.S. Appeal and Error § 325 (West 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**Exhibit 1 Page 9 of 58**

# I.    STATEMENT OF JURISDICTION

The Appellant is Debt Acquisition Company of America V, LLC.   DACA appeals from an order of the United States District Court for the District of Nevada dismissing as moot DACA's appeal from an order of the United States Bankruptcy Court for the District of Nevada.  The Bankruptcy Court order confirmed the sale of certain assets by the Debtor and concurrently confirmed the Debtor's chapter 11 plan.

The District Court had jurisdiction over the bankruptcy case by virtue of 28 U.S.C. § 1334(a).  The bankruptcy case was automatically referred to the Bankruptcy Court under authority of 28 U.S.C. § 157(a) by operation of the District Court's Local Rules, Part IIIA, LR 1001(b)(1).

An order  confirming a chapter 11 plan is a final order.  *Matter of Pizza of Hawaii, Inc.,*  761 F.2d 1374, 1378 (9th Cir. 1985).  An order approving a sale of assets by a chapter 11 debtor in possession is also final for purposes of appeal. *Precision Industries, Inc. v. Qualitech Steel SBQ, LLC,* 327 F.3d 537, 543 (7th Cir. 2003).  DACA appealed to the District Court, which had appellate jurisdiction by virtue of 28 U.S.C. § 158(a).

The order of the District Court affirming the Bankruptcy Court was entered on August 29, 2006.  A Notice of Appeal from that order was timely filed by

1

**Exhibit 1 Page 10 of 58**

DACA on September 27, 2007 under Federal Rule of Appellate Procedure 4(a)(1)(A).   The Ninth Circuit Court of Appeals has appellate jurisdiction by virtue of 28 U.S.C. § 158(d) and § 1291.

## II.    STATEMENT OF ISSUES PRESENTED

The following issues are presented in this appeal:

*The "Comfort Provisions"*   Were certain provisions of the Bankruptcy Court's Order confirming a sale of the Debtor's contracts to a third party, which provisions were not referred to in the purchase agreement, or in the motion to confirm the sale, or in the chapter 11 plan, properly added to the Bankruptcy Court's Order?

*The Effect of the Compromise.*   Did the Bankruptcy Court's Order bind DACA to a "compromise" waiving certain of its rights under the LSA's and Nevada law, even though the compromise was not agreed to by DACA?

*Sale Free and Clear of Contract Rights.*   May the Debtor sell contract rights under the LSA's to a third party "free and clear" of any of the rights of DACA under those contracts or under Nevada law?

*Ripeness*.   Are the Comfort Provisions of the Bankruptcy Court's Order ripe for review on appeal?

2

**Exhibit 1 Page 11 of 58**

***Mootness.***  Did the District Court err in ruling that DACA's appeal must be dismissed as moot because a stay pending appeal was not obtained?

## III.  STATEMENT OF THE CASE

The chapter 11 Debtor was a mortgage loan broker that arranged for individual investors (referred to as the "Direct Lenders") to obtain assignments of fractionated interests in high interest loans secured by deeds of trust.  Before the sale was completed and before the chapter 11 plan was confirmed, DACA acquired the interest of several of the Direct Lenders.

The Bankruptcy Court order appealed from confirmed the sale of a group of loan servicing agreements (referred to as the  "LSA's") which had been entered into pre-bankruptcy between the Debtor and hundreds of Direct Lenders.   In confirming the sale of the LSA's to a third party, the Bankruptcy Court added provisions to the Order which were not called for by the purchase agreement or referred to in the chapter 11 plan or motion to confirm the sale.  These provisions, which are referred to in this brief as "Comfort Provisions" purported to restrict the rights of the Direct Lenders to rescind or terminate the loan servicing agreements due to both pre-bankruptcy and post-bankruptcy defaults.  The Comfort Provisions also restricted the Direct Lenders' right, provided for under the LSA's and guaranteed under Nevada law, to designate a new servicing agent.  The Comfort

**Exhibit 1 Page 12 of 58**

Provisions also forbade the Direct Lenders from instructing their servicing agent to compromise or waive default interest and late charges due under their loan in an effort to collect it.

DACA timely appealed from the Bankruptcy Court order, as did a large number of Direct Lenders calling themselves the Lender's Protection Group.  The Lenders Protection Group attempted and failed to obtain a stay pending appeal to prevent the closing of the sale of the LSA's.  The District Court heard argument on the two appeals at the same time and issued a single consolidated opinion granting a motion to dismiss the appeals as moot.   DACA has timely appealed from the District Court's Order.

## IV.  STATEMENT OF FACTS

The Debtor, USA Commercial Mortgage Co., ("USACM") was engaged in the business of originating and managing mortgage loans.  Money was received from investors (referred to in the Plan as "Direct Lenders") in exchange for fractionated beneficial interests in notes payable by third parties and secured by recorded trust deeds (referred to in the Plan as the "Loans").   Interests in some of the Loans were held by an affiliate Debtor, USA Capital First Trust Deed Fund, LLC ("FTDF").  ( AER No. 1798  pp. 4758-59)  USACM entered into a pre-petition Loan Servicing Agreement with each Direct Lender.  USACM

4

**Exhibit 1 Page 13 of 58**

continued to service the loans, distribute funds to the Direct Lenders and retain

servicing fees, under the authority of interim orders of the Bankruptcy Court. (AER

No. 1798 pp.4764-68).

A.    THE LOAN SERVICING AGREEMENTS

USACM's Loan Servicing Agreements (the "LSA's" AER No. 293 pp.

4535-4540) contained many provisions which were, and continue to be, the subject

of disputes.

1.    The Default Interest Provision

One of the most important issues relates to the compensation of the servicing

agent.  Article 5 of the LSA's (AER No. 293 p. 4538) provides in relevant part:

> 5.    Compensation to USA for Loan Servicing
> Lender authorizes USA to retain monthly, as
> compensation for services performed hereunder, (a)
> one-twelfth (1/12th) of its annual servicing fee, which
> shall not exceed three percent (3%) per annum of the
> maximum principal amount of each of the Loans, (b) any
> late charges collected from the Borrower pursuant to the
> terms of the Note, and (c) the  default interest collected
> from the borrower pursuant to the terms of the Note.

This provision placed USACM in a direct conflict of interest with the

investors to whom it owed a fiduciary duty.   Most of the loans administered by

USACM on the petition date were non-performing.  Under the provisions of the

LSA's, USACM benefitted from not taking any steps to foreclose on a delinquent

5

**Exhibit 1 Page 14 of 58**

loan, if the value of the underlying property was sufficient to secure the ultimate payment of default interest.

2.    Designation of Servicing Agent

In many cases, the provisions of the LSA's are inconsistent with specific provisions of Nevada consumer protection statutes and regulations.  For example, Nevada Administrative Code section 645B.073 states:

> Except as otherwise provided in subsection 3, if a mortgage broker acts on behalf of investors on a matter related to a mortgage loan, and if the beneficial interest in the loan belongs to more than one natural person, the documentation of the matter must include provisions to allow the holders of 51 percent or a greater specified percentage of the beneficial interests of record to act on behalf of all the holders of the beneficial interests of record in the event of a default or foreclosure for matters that require the direction or approval of the holders of the beneficial interests in the loan, including, without limitation:
>
> (a)    The designation of the mortgage broker, servicing agent or other person to act on the behalf of the holders of the beneficial interests in the loan; and
>
> (b)    The sale, encumbrance or lease of real property owned by the holders resulting from a foreclosure or the receipt of a deed in lieu of a foreclosure.
>
> [underlining added]

6

**Exhibit 1 Page 15 of 58**

In violation of this regulation, Section 3 of the LSA's (AER No. 293 pp. 4737-4538) modifies the above provision, by adding a restricting condition on the Direct Lenders' right to change the servicing agent when a loan is in default:

> 3.      Rights of Lender if USA Fails to Act. Pursuant to NAC 645B.073, in the event of default, foreclosure, or other matters than require action, <u>if for any reason USA fails to act on Lender's behalf as authorized herein</u>, then Lender may, with approval of 51% or more of all the holders of the beneficial interests of record in the Loan, act on behalf of all such holders of beneficial interest [sic] of record. These actions may include, but are not limited to:
>
> (a)      the designation of the mortgage broker, servicing agent or other person to act on behalf of the holders of the beneficial interests in the loan; and
>
> (b)      the sale, encumbrance or lease of real property owned by the holders resulting from a foreclosure or the receipt of a deed in lieu of foreclosure.
>
> [<u>underlining</u> added]

3.      <u>The Section 8 Right of Termination</u>.

In addition to the right to designate a new servicing agent under section 3, the LSA's provide in section 8 (AER No. 293 p 4539):

> 8.      Termination. Lender may, by 30 days written notice to USA, terminate this agreement, and the power of attorney granted, if one is granted, under section 11 of this Agreement, if USA fails to perform its obligations hereunder.

**Exhibit 1 Page 16 of 58**

B.    DACA PURCHASES DIRECT LENDER INTERESTS

Beginning in September, 2006, DACA acquired the interests of about 50 Direct Lenders in loans managed by USACM.  (AER No. 2032 ¶ 2 at p. 5200) These beneficial interests in the Loans were not treated as claims under the Plan, and properly so.  They represent debts owing by third party borrowers to the Direct Lenders.

Pre-petition, USACM failed to remit to some of the Direct Lenders payments received from borrowers.  Those investors whose funds were misappropriated by USACM are referred to in the Plan as "Unremitted Principal Direct Lenders."  (AER No. 1799 ¶¶ 130, 131 p. 4961)  In addition to interests in Direct Loans, DACA had purchased from Direct Lenders 15 Unremitted Principal Claims totaling about $399,222.50.  (AER No. 2032 p. 5201)

C.    SALE OF THE LSA's UNDER THE PLAN

Pursuant to the Bankruptcy Court's Order entered November 8, 2006, the Debtors in Possession offered for sale at auction: (i) the interest of FTDF in the Loans; and (ii) the rights of USACM under the Loan Servicing Agreements.  (AER No. 1761 pp. 4713-4731)  The auction was held on December 7, 2006, and Compass Partners LLC was the successful bidder.  (AER No. 2137 p. 5239) The Asset Purchase Agreement between Compass and USAMC  was filed with the Bankruptcy Court on December 18, 2006 (AER No. 2164 pp. 5364-5418) and is a

8

**Exhibit 1 Page 17 of 58**

part of the record on appeal designated by DACA. The Asset Purchase Agreement

contains the following detailed provision (AER NO. 2164 pp. 5384-5385)

concerning the contents of any order approving the sale:

> **Section 5.2  Sale Approval Order.**  The Sale
> Approval Order shall be reasonably acceptable in form
> and substance to Purchaser and shall include provisions,
> among others (i) providing that Purchaser shall not incur
> any liability as a successor to the Sellers unless such
> liability is expressly assumed, (ii) approving the sale of
> the Assets to Purchaser on the terms and conditions set
> forth in this Agreement, or such higher and better terms
> and conditions offered at the Auction, and authorizing
> Sellers to proceed with this transaction, (iii) stating that
> any objections timely filed with respect to the sale of the
> Assets, which have not been withdrawn, are overruled or
> the interests of such objections have been otherwise
> satisfied or adequately provided for by the Bankruptcy
> Court, (iv) finding that the Total Asset Purchase Price
> represents fair value for the Assets, (v) finding that the
> sale is in the best interests of the Debtors' estates and
> creditors, (vi) finding that Purchaser is a good faith
> purchaser of the Assets under Section 363(m) of the
> Bankruptcy Code and that the provisions of Section
> 363(m) of the Bankruptcy Code have not been violated,
> (vii) providing that the sale of the Assets to Purchaser
> shall be free and clear of all liens, claims, interests,
> obligations and encumbrances whatsoever under Section
> 363 of the Bankruptcy Code and any other applicable
> sections of the Bankruptcy Code, (viii) providing that the
> Bankruptcy Court shall retain jurisdiction for the purpose
> of enforcing the provisions of the Sale Approval Order
> including, without limitation, compelling delivery of the
> Assets to Purchaser and protecting Purchaser against any
> liens, claims, interests, obligations and encumbrances
> against Sellers or the Assets, (ix) finding that there are no
> brokers involved in consummating the sale and no

9

**Exhibit 1 Page 18 of 58**

brokers' commissions are due, (x) authorizing and directing Sellers to execute, deliver, perform under, consummate and implement this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing, and (xi) determining that Purchaser is not a successor to Sellers or otherwise liable for any liabilities not expressly assumed and to the extent permitted by applicable law permanently enjoining each and every holder of any claim for such liabilities from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against Purchaser or the Assets related thereto, and (xiii) [sic] finding that, pursuant to Section 1146(c) of the Bankruptcy Code, the within transaction is "in contemplation of a plan or plans of reorganization to be confirmed in the Bankruptcy Cases," and as such shall be free and clear of any and all transfer tax, stamp tax, or similar taxes; provided, however, that Purchaser's obligations hereunder shall not be conditioned on the findings set forth in this clause (xiii). Sellers shall use commercially reasonable efforts to obtain entry of the Sale Approval Order in the form described hereto. Purchaser's obligations to consummate the transactions contemplated herein shall be conditioned upon the Bankruptcy Court's entry of the Sale Approval Order in form and substance satisfactory to Purchaser. To the extent that there is any inconsistency between this paragraph and the Sale Approval Order, the Sale Approval Order shall govern.

Although a motion was filed and granted approving bidding procedures as to the asset sale (AER No. 1352 pp. 4648-4699), no separate motion for approval of the sale to Compass was ever filed, and no order approving the sale to Compass was ever entered, apart from the Sale Order.

**Exhibit 1 Page 19 of 58**

The Plan contained the following provision (AER No. 1799 pp. 4891-4892)

with respect to the sale of USACM's rights under the Loan Servicing Agreements:

### C.    Asset Sale Transaction.

The Plan will be implemented in part by the Asset Sale Transaction. In implementation of the Asset Sale Transaction, USACM and FTDF, as sellers, DTDF, USA Securities and USA Realty, as acknowledging parties, and SPCP Group, LLC, as purchaser, have entered into the Asset Purchase Agreement. The Asset Purchase Agreement and the Bid Procedures Order provide that the Acquired Assets are sold to SPCP Group, LLC or, as part of the Auction, to a Third Party Bidder making a Higher and Better Offer. Pursuant to the Asset Sale Transaction, the Asset Purchaser (either SPCP Group, LLC or a Third Party Bidder as determined by the Auction) will purchase the following Acquired Assets:

1.    FTDF's proportional interest in 44 different Loans for Cash consideration of $46 million, subject to certain adjustments; and

2.    USACM's post-Closing rights to service Loans pursuant to the Loan Servicing Agreements for the Loans and related personal property for Cash consideration based on the future (A) collection of servicing fees, (B) collection of default rate interest, and (C) other payments and obligations set forth in the Asset Purchase Agreement.

Except as expressly agreed to otherwise by the Debtors and the Asset Purchaser, the Acquired Assets will be sold free and clear of all liens, Claims, encumbrances, rights of third parties and interests.  The Sale Order shall constitute an Order pursuant to section 363(b) and (f) of the Bankruptcy Code authorizing the sale of the Estates' interests in the Acquired Assets to the

11

**Exhibit 1 Page 20 of 58**

Asset Purchaser. The Sale Order shall provide that the Asset Purchaser is a good faith purchaser of Except as set forth in the Asset Purchase Agreement and the Plan, the Asset Purchaser shall have no liability for Claims or Equity Interests against the Debtors (whether or not currently known) based on its purchase of Acquired Assets.

After the Auction, the Asset Sale Transaction shall be approved in connection with Confirmation of the Plan. The Allocated Net Sale Proceeds from the Asset Sale Transaction shall be distributed to FTDF and USACM Trust, respectively, on the Effective Date of the Plan.

[bold as in original; underlining added]

One other important provision purporting to affect the rights of the Direct Lenders under the Loan Servicing Agreement was provided for in the Plan under the moniker "USACM / Direct Lender Compromise." This provision (AER No. 1799 pp. 4895-4898) states in relevant part:

**1.    The USACM / Direct Lender Compromise.**

If the Plan is confirmed, all Direct Lenders will be bound to the compromise provisions set forth herein, regardless of whether they vote to accept or reject the Plan, or Class A- 5 votes to accept or reject the Plan; all such objections must be made by objecting to Plan confirmation.

*a.    Release:* USACM releases all Claims against Direct Lenders, including but not limited to surcharge, recharacterization of Direct Lender Loans, and the collection of prepetition accrued annual loan servicing fees due under the Loan Servicing Agreements

12

**Exhibit 1 Page 21 of 58**

but unpaid as of the Effective Date, but excluding all causes of action to recover principal or interest payments USACM paid in advance to the applicable Direct Lender(s) before the Petition Date.

> ***b.*** ***Loan Servicing Agreements***: All rights of USACM as servicer under the Loan Servicing Agreements transferred without modification pursuant to the Plan and the Asset Purchase Agreement shall be free and clear of all liens, Claims, interests, obligations and encumbrances whatsoever under sections 363 and 1123 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code.

[**bold** and ***bold italics*** as in original; <u>underlining</u> added]

D.    ADDING THE "COMFORT PROVISIONS" TO THE ORDER

The Plan Sale Order confirms the sale of the Loan Servicing Agreements to Compass, providing in relevant part (AER No. 2376 pp. 5791-5793) as follows:

> **C.    Asset Sale Transaction**
>
> 12.    The Asset Purchase Agreement, dated and effective as of December 8, 2006 [Docket No. 2164] (the "Asset Purchase Agreement"), made by and between USACM and FTDF (together with USACM, the "Sellers") and DTDF, USA Realty and USA Securities, as acknowledging parties, and Compass is hereby approved.
>
> 13.    The Debtors and Compass, as may be mutually agreed by such parties, are hereby authorized to consummate the Asset Purchase Agreement at any time following ten (10) days after entry of this Sale Order, which may occur prior to the Effective Date of the Plan.

**Exhibit 1 Page 22 of 58**

14.    Except as expressly permitted or otherwise specifically provided for in the Asset Purchase Agreement or this Sale Order, pursuant to sections 105(a), 1123, and 363(f) of the Bankruptcy Code, the Acquired Assets shall be transferred to the Asset Purchaser on the terms and conditions set forth in the Asset Purchase Agreement, and upon Closing shall be, free and clear of all liens, claims, interests, obligations and encumbrances whatsoever, including, but not limited to, (A) all monetary and non-monetary defaults and rights that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Sellers' or the Asset Purchaser's interest in, or rights in or under, the Acquired Assets, or any similar rights, based in any way on any action taken (or failed to be taken) by any of the Debtors or any other matter or occurrence relating to the period prior to the Closing (other than any right that existed and was matured and exercisable, as of the Petition Date, to effect a substitution of USACM as loan servicer under Section 3 of any Loan Servicing Agreement, as well as any defenses of the loan servicer thereto (a "Surviving Section 3 Right")); (B) taxes arising under or out of, in connection with, or in any way relating to the existence, ownership, management or servicing of the Acquired Assets prior to the Closing; and (C) (i) all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership and (ii) all debts arising in any way in connection with any agreements, acts, or failures to act, of any of the Sellers or any of the Sellers' predecessors or affiliates; all claims (as that term is defined in the Bankruptcy Code), obligations, liabilities, rights of recoupment or setoff, demands, guaranties, options, rights, restrictions, interest and matters of any kind and nature in any way relating to

14

**Exhibit 1 Page 23 of 58**

the existence, ownership, management or servicing of the Acquired Assets prior to Closing, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of these cases pursuant to chapter 11 of the Bankruptcy Code, and whether imposed by agreement, understanding, law, equity or otherwise, including but not limited to claims otherwise arising under doctrines of successor liability (collectively, "Interests"); provided, however, that, in connection with any attempted post- Closing exercise of a Surviving Section 3 Right: (a) the Direct Lenders must provide Compass at least thirty (30) days prior written notice of the intended exercise of such right in accordance with section 8 of the Loan Servicing Agreement, (b) Compass shall have the right to challenge the exercise of such Surviving Section 3 Right by filing a motion with this Court prior to the expiration of such thirty (30) day period to determine whether such Surviving Section 3 Right has been properly and validly exercised (the "Compass Motion") and the Court shall retain jurisdiction to adjudicate any such disputes, (c) in the event Compass timely files such Compass Motion, the effectiveness of the attempted exercise of such Surviving Section 3 Right shall be stayed pending this Court's entry of an order in respect of the Compass Motion, and (d) the post-Closing survival of such Surviving Section 3 Right shall not impair in any respect any rights or interests of Compass under the Loan Servicing Agreements, including, without limitation, its rights under Section 2(c)(iii) of the Loan Servicing Agreement. In the event of a proper exercise of remedies under Section 3 of the Loan Servicing Agreement, (i) neither the Direct Lenders nor any replacement servicer selected by such Direct Lender shall have the right or ability to compromise, subordinate, or impair, in any respect, any rights, claims or interests purchased by Compass from the Estates for default interest, accrued servicing fees, late charges, success fees, or other amounts under the Loan Servicing Agreement, and (ii)

15

**Exhibit 1 Page 24 of 58**

this Sale Order shall be binding upon such replacement
servicer regardless of whether such replacement servicer
actually received such copy of the Sale Order.

15.    Any and all such Interests whatsoever shall
attach to the net proceeds of the Asset Sale Transaction in
the order of their priority, with the same validity, force
and effect which they now have as against the Acquired
Assets, subject to any claims and defenses that the Sellers
may possess with respect thereto.
[**bold heading** as in original; underlining added]

None of the language underlined above, restricting specific rights of the

Direct Lenders under the Loan Servicing Agreements, appeared in the Compass

Purchase Agreement, in the Plan or in the Disclosure Statement.

DACA's appeal to the District Court was limited to two issues.  First,

DACA  contended that the "Comfort Provisions" were not a part of Compass'

bargain as expressed in its Purchase Agreement or in the Plan, exceeded the Court's

authority under the Bankruptcy Code, and could be reversed without affecting the

consummation of the Plan or the validity of the sale.   On this score, DACA

requested only the following specific relief:

DACA requests that the Sale Order be reversed to the
extent that it may be interpreted as restricting or limiting
any right of the Direct Lenders . . . to designate a new
servicing agent in place of Compass.

DACA submits that the Sale Order should be reversed to
the extent that it may be interpreted as forbidding the
Direct Lenders to exercise any right which they may have
under Nevada law to direct the servicing agent to

16

**Exhibit 1 Page 25 of 58**

compromise with the borrower the amount of default
interest or late charges in order to collect the loan.

The Sale Order should be reversed to the extent that it
may be interpreted as restricting any right which the
Direct Lenders may have under Nevada Law to terminate
or rescind the Loan Servicing Agreement.

The second issue on DACA's appeal to the District Court related to its

contention that the LSA's were executory contracts which could not have been

assigned without having been assumed as required by 11 U.S.C. § 365(f)(2).

DACA argued, before any distributions had been made on account of Unremitted

Principal Claims, that the District Court could grant effective relief as to this

second issue by ordering the Debtor to pay in full those Unremitted Principal

Claims purchased by DACA, which payment would have been required in order to

cure defaults under the contracts.  This second contention has been abandoned by

DACA on this appeal, because the further passage of time is expected to result in

distributions under the Plan being made before this appeal is decided.  In other

words, DACA believes that this aspect of the appeal will indeed become moot.

DACA requested two specific ultimately limited its requested relief specifically to

the effect of the Comfort Provisions.  Quoting from DACA's Opening Brief to the

District Court:

DACA requests that the Sale Order be reversed to the
extent that it may be interpreted as restricting or limiting
any right of the Direct Lenders . . . to designate a new

17

**Exhibit 1 Page 26 of 58**

servicing agent in place of Compass.

DACA submits that the Sale Order should be reversed to the extent that it may be interpreted as forbidding the Direct Lenders to exercise any right which they may have under Nevada law to direct the servicing agent to compromise with the borrower the amount of default interest or late charges in order to collect the loan.

The Sale Order should be reversed to the extent that it may be interpreted as restricting any right which the Direct Lenders may have under Nevada Law to terminate or rescind the Loan Servicing Agreement.

Compass Partners, the buyer of the LSA's, was named as party to the appeal in DACA's Notice of Appeal but chose not to appear and defend the appeal. However, the Debtors and the Liquidating Trust established under the Plan did brief and argue the appeal.

The Lender's Protection Group attempted unsuccessfully to obtain a stay pending appeal by motion made in the District Court.  In turn, the Debtors filed an emergency motion in the District Court to dismiss the appeal, on the grounds that the purchase agreement with Compass required the entry of a *final order* confirming the sale.  The Debtors argued that the sale could be lost if the Compass chose not to proceed with the sale due to the failure of this condition. The District Court denied this first motion to dismiss.  Later, Compass waived the requirement that the Sale Order be final for purposes of appeal and the sale of the LSA's to Compass closed.  Based on the sale closing, USACM made a second motion to

18

**Exhibit 1 Page 27 of 58**

dismiss both appeals (that of DACA and of the Lenders Protection Group) as moot. The District Court heard these second dismissal motions, together with argument on the appeal themselves, in a single hearing as both the DACA and Lender's Protection Group appeals.

The District Court issued a single opinion dismissing both appeals as moot. The opinion went on, however, to consider the merits of each appeal, and conclude that the appeals were not meritorious.

## V.    SUMMARY OF ARGUMENT AND STANDARD OF REVIEW

DACA argues that the Comfort Provisions included in the Sale Order impermissibly altered its rights as a Direct Lender, both as those rights appear in the LSAs, and also their rights under Nevada law. These provisions are not legally permissible as a "compromise" between USACM or Compass and DACA, because DACA did not agree to any compromise. Nor is it legally permissible to sell the LSA's "free and clear" of the rights of DACA and the other Direct Lenders.

DACA argues that the Comfort Provisions of the Sale Order clearly infringe on DACA's rights and that infringement is not a matter of doubt or interpretation. These provisions are therefore ripe for review in this appeal.

Finally, DACA contends that the District Court erred in dismissing its appeal as moot under 11 U.S.C. § 363(m), because the Comfort Provisions do not

**Exhibit 1 Page 28 of 58**

affect the validity of the sale and are in any case contrary to Nevada law.

All of the issues stated above are questions of law and are reviewed by this Court de novo.  As to the standard of review as to whether the provisions of a plan are authorized under the Bankruptcy Code or exceed the power of the Bankruptcy Court, see *In re Lowenschuss,* 67 F.3d 1394, 1401 (9th Cir. 1995).  As to the standard of review of the extent of the Bankruptcy Court's power to sell property "free and clear" of an interest in that property, see *In re Oyster Bay Cove, Ltd.,* 196 B.R. 251 (E.D.N.Y. 1996).

## VI.   ARGUMENT

### A.   THE "COMFORT PROVISIONS" OF THE ORDER VIOLATED THE RIGHTS OF DACA AND THE OTHER DIRECT LENDERS

#### 1.   CHANGING THE SERVICING AGENT

The Comfort Provisions place conditions on the right of the Direct Lenders under Nevada Law to designate a new servicing agent in place of Compass. Critically, the Comfort Provisions stay the effectiveness of any such designation for thirty days, and allow Compass to challenge the effectiveness of the Direct Lenders' action by filing a motion in the Bankruptcy Court.   The restrictions imposed by the Plan on the exercise of the Direct Lenders' rights under Nevada consumer protection law will result (and have already resulted) in confusion and disputes between the Direct Lenders and Compass.  The Bankruptcy Court will be

**Exhibit 1 Page 29 of 58**

(and already has been) trapped in the middle of such disputes.

Nevada Administrative Code section 645B.073, (quoted at length above) requires that in a case where any mortgage broker acts on behalf of more than one natural person, "the documentation of the matter must include provisions to allow the holders of 51 percent . . . of the beneficial interests of record to act on behalf of all the holders . . . in the event of a default or foreclosure . . . including. . . designation of the mortgage broker, servicing agent or other person" to act on their behalf.  The  LSA's violate this statute by attempting to condition the right of the Direct Lenders to choose their servicing agent.  The LSA's state that "Pursuant to NAC645B.073  . . . if for any reason USA fails to act on Lender's behalf . . .then Lender may, with approval of fifty-one percent . . . act on behalf of all such holders of beneficial interests.  These actions may include . . . the designation of the mortgage broker, servicing agent or other person to act on behalf of the holders. . ."

The Regulation is obviously intended for the protection of individual persons who are placed in fractionated trust deed investments by mortgage brokers. "Statutes with a protective purpose should be liberally construed in order to effectuate the benefits intended to be obtained.  *Welfare Div. v. Washoe Co. Welfare Dep't.,* 88 Nev. 635, 503 P.2d 457 (1972)."  *Colello v. Administrator of Real Estate Division of the State of Nevada,* 100 Nev. 344, 347, 683 P.2d 15 (1984).

21

**Exhibit 1 Page 30 of 58**

The LSA's, drafted by USACM for its own benefit, modify the provision that the Regulation required them to include in the loan servicing documentation. The Regulation says that the documentation "must include provisions" to allow the holders of 51% to act to designate their servicing agent. The Loan Servicing Agreement purports to limit that right to situations in which "for any reason USA fails to act on Lender's behalf . . . ."  This change in the language prescribed by the Regulation was made by USACM to protect its own interest in remaining the servicing agent, at the expense of the investors' right to change servicing agents. Where a statute requires that a certain provision be included in a contract, provisions which are inconsistent with that requirement cannot be enforced.  See, e.g., *Federated American Ins. Co. v. Granillo*, 108 Nev. 560, 562, 835 P.2d 803 (1992);  *Neal's Estate v. Farmers Ins. Exchange,* 93 Nev. 348, 350, 566 P.2d 81 (1977).

It is DACA's position that the above-quoted provisions of Nevada Administrative Code section 645B.073 gives Direct Lenders the absolute right to designate a new servicing agent for any reason.  Compass will take  the position that any attempt to change servicing agents, now or in the future, is a "Surviving Section 3 Right" under the Comfort Provisions of the Sale Order.  In the absence of the Comfort Provisions, if 51% of a group of trust deed investors act to designate a new servicing agent, that action could only be undone by subsequent action of 51%

22

**Exhibit 1 Page 31 of 58**

of the investors.  If the exercise of this power by the investors is treated as a "Surviving Section 3 Right" and is stayed pending legal proceedings in the Bankruptcy Court, Compass can attempt to avoid the effect of the designation by requiring the Direct Lenders to sell back enough interests in the loan (by as little as 1% in the case of the example) to bring the replacement "vote" back down below 51%.

DACA requests that the Sale Order be reversed to the extent that it may be interpreted as restricting or limiting any right of the Direct Lenders (to the extent such a right may exist under Nevada law) to designate a new servicing agent in place of Compass.  Without implied limitation, those parts of the Sale Order which stay the effectiveness of any such right, or under which the Bankruptcy Court would exercise continuing jurisdiction over the exercise of any such right, should be reversed.  To do so would not embroil the bankruptcy court in an "uncontrolled, unmanageable situation."  Cf. *In re Roberts Farms, Inc.,* 652 F.2d 793, 797 (9th Cir. 1981).   Instead it would prevent  the Bankruptcy Court from becoming embroiled in disputes between the Direct Lenders and their servicing agent that have nothing to do with the bankruptcy case, and everything to do with trust deed investors' rights under Nevada law.

**Exhibit 1 Page 32 of 58**

## 2.    COMPROMISING DEFAULT INTEREST

As explained above, the LSA's make default interest and late charges accruing under the loans a part of USACM's fee.  It is no coincidence that as the beneficiary of such a  provision, USACM allowed over 70% of the loans it serviced to become non-performing, and took no steps to enforce those loans by foreclosure.  (AER No. 2147 pp. 5273-5279).  The inclusion of such a provision in a mortgage broker's contract, creating a huge conflict of interest between agent and principal, was itself a breach of USACM's fiduciary duty toward the Direct Lenders.

A huge issue between DACA and Compass  is what happens if an amount is collected under the loan (for example, via foreclosure) which is less than that required to pay it in full including default interest and late charges.  This issue was referred to in the bankruptcy case as the "waterfall issue." The waterfall issue was never adjudicated in the Bankruptcy Court and is not resolved under the Plan. However, the Comfort Provisions inserted in the Sale Order contain the following restriction (AER No. 2376 p. 5793): "neither the Direct Lenders nor any replacement servicer selected by such Direct Lender shall have the right or ability to compromise, subordinate, or impair, in any respect, any rights, claims or interests purchased by Compass from the Estates for default interest, accrued servicing fees, late charges, success fees, or other amounts under the Loan

**Exhibit 1 Page 33 of 58**

Servicing Agreement."

This language contained in the Comfort Provisions was intentionally written to endorse the assumption that the servicing agent under the LSA's has earned or accrued, as part of its fee, a right to default interest which it hasn't collected. This issue was never litigated in the Bankruptcy Court and is contrary to the above-quoted provisions of the LSA which say that "Lender authorizes USA to retain monthly . . .  (c) the  default interest collected from the borrower pursuant to the terms of the Note." [underlining added]   The interpretation of this provision which is inherent in the Comfort Provisions is highly suspect, as it resolves an alleged ambiguity in the Loan Servicing Agreement in favor of the servicer which prepared it, and against the consumer. See generally, *In re Lucas,* 312 B.R. 407, 410-12 (Bankr. D. Nev. 2004).

The Comfort Provisions of the Sale Order were written to favor Compass in a dispute which  wasn't resolved by the Bankruptcy Court as part of the confirmation process.  DACA submits that the Sale Order should be reversed to the extent that it may be interpreted as forbidding the Direct Lenders to exercise any right which they may have under Nevada law to direct the servicing agent to compromise with the borrower the amount of default interest or late charges in order to collect the loan.

**Exhibit 1 Page 34 of 58**

3.    <u>TERMINATION RIGHTS</u>

Section 8 of the LSA's (AER No. 293 p. 4539) provides that "Lender may, by 30 days written notice to USA, terminate this agreement, and the power of attorney granted, if one is granted, under section 11 of this Agreement, if USA fails to perform its obligations hereunder."  There is no provision in the Compass Purchase Agreement, the Disclosure Statement, or the Plan which hints that this basic right of the investor to terminate the contract based on the broker's breach, will be in any way affected.  However, the Comfort Provisions of the Sale Order state: that the LSAs are being sold free and clear of "(A) all monetary and non-monetary defaults and rights that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Sellers' or the Asset Purchaser's interest in, or rights in or under, the Acquired Assets . . . ."  (AER No. 2376 p. 5792)

The Sale Order should be reversed to the extent that it may be interpreted as restricting any right which the Direct Lenders may have under Nevada Law to terminate or rescind the Loan Servicing Agreement.

B.    THE EFFECT OF THE "COMPROMISE"

The Plan provides that all members of Class A-5 (which included DACA) were subject to a "compromise" which was said to be binding regardless of whether that member voted for the Plan, and regardless of whether Class A-5 voted

26

**Exhibit 1 Page 35 of 58**

to accept the Plan.  The compromise provided for a release by USACM of various claims against the Direct Lenders, including fraudulent conveyance claims to recover Prepaid Interest and the right to seek a surcharge of the Direct Lenders' interests to pay a portion of the administrative expenses in the bankruptcy case, such as professional fees.

In return for the release, the compromise contained provisions under which Prepaid Interest could be recovered from the Direct Lenders by offset against future payments collected under their loans.  Another provision of the compromise stated simply that "[a]ll rights of USACM as servicer under the Loan Servicing Agreements transferred without modification pursuant to the Plan and the Asset Purchase Agreement shall be free and clear of all liens, Claims, interests, obligations and encumbrances whatsoever under sections 363 and 1123 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code." [underlining added]

This compromise provision of the Plan does not support the Comfort Provisions of the Sale Order which restrict or condition the exercise of rights under the LSA's.  DACA submits that there is nothing in the above-quoted compromise language which can be reasonably interpreted as:  (i) consenting to restrictions on the investors' right under Nevada law to designate a new servicing agent; (ii) agreeing to forfeit any right to collect principal and interest in preference to default

27

**Exhibit 1 Page 36 of 58**

interest and late charges; or (iii) waiving any right or defense which has arisen under the LSAs by reason of a breach by USACM.

Even were this Court to conclude that the "compromise" referred to in the Plan is enforceable, it does not follow that the Comfort Provisions of the Sale Order are an effectuation of that compromise and also enforceable. The Comfort Provisions are simply overreaching "extras" that were included in the Sale Order at the behest of Compass. These provisions were not part of Compass's bargain as expressed in its Purchase Agreement or in the Plan itself.

In any case, the notion that a creditor which does not consent can be bound to a settlement provided for in a chapter 11 plan, where the effect of the settlement is to release or modify that creditor's contract rights vis a vis a third party, finds no support in bankruptcy law. Bankruptcy Code section 1123(b)(3) states that a chapter 11 plan may "provide for - (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate . . . ." [underlining added] This provision does not authorize a plan to compromise or alter a creditor's contract rights in the process of assigning that contract to a third party.

The Ninth Circuit has strictly and consistently held that a plan may not purport to release the rights of creditors against third parties. See, *In re Lowenschuss,* 67 F.3d 1394, 1401-02 (9th Cir. 1995).

28

**Exhibit 1 Page 37 of 58**

In the case of *In re Digital Impact, Inc.*, 223 B.R. 1, 14-15 (Bankr. N.D. Okla. 1998) the plan provided for a release forbidding creditors to pursue claims against the third party plan proponent.  The Court refused confirmation in a carefully reasoned opinion which considers  the idea of creditor consent to settlement provisions contained in chapter 11 plans:

> [T]his Court agrees with the Bankruptcy Court in *In re Arrowmill Development Corp.,* in that in order for a claimant in a chapter 11 case to enter into a contract to release a non-debtor it is not enough for a creditor to abstain from voting for a plan, or even to simply vote "yes" as to a plan.... "[A] creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings."  Rather the "validity of the release ... hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's Sale Order."  Thus, the court must ascertain whether the creditor unambiguously manifested assent to the release of the nondebtor from liability on its debt.  *Arrowmill,* 211 B.R. at 507 (citations omitted).  See also *Feld v. Zale Corp. (In re Zale),* 62 F.3d 746, 757 n. 26 (5th Cir.1995), quoting with approval, *Browning v. Navarro,* 743 F.2d 1069, 1076 n. 20 (5th Cir.1984) (a bankruptcy court "exceeds its power if it enters a consent decree to which there was not actual consent or which was contrary to the public interest or was the result of a jurisdictional defect");  *In re Specialty Equipment Cos.,* 3 F.3d 1043, 1047 (7th Cir.1993) ("[A] consensual release does not inevitably bind individual creditors.  It binds only those creditors voting in favor of the plan of reorganization.")

The Court in *Digital Impact* denied confirmation of the plan because of the lack of creditor consent to the release, in a case in which all creditors voting had voted in favor the plan.  In the case at bar it cannot be said that the vote of Class

29

**Exhibit 1 Page 38 of 58**

5A establishes consent, especially when all creditors in that class were told in the

Disclosure Statement that the compromise would bind them regardless of their

vote.  There is simply no authority for the proposition that a chapter 11 plan can

bind creditors to a settlement in which they give up their contract rights in favor of

a third party.

C.    THE LSA's COULD NOT BE SOLD FREE AND CLEAR OF
      DIRECT LENDERS' RIGHTS UNDER THE CONTRACTS OR
      UNDER NEVADA LAW

There are only two aspects of the Plan from which the Comfort Provisions of

the Sale Order could claim legitimacy.  One is the "compromise" discussed above.

The other is that the LSA's were sold to Compass "free and clear" of DACA's

rights under 11 U.S.C. § 363(f).

Section 363(f) authorizes a bankruptcy trustee or chapter 11 debtor in

possession to "sell property . . . free and clear of any interest in such property of an

entity other than the estate . . ." if certain conditions are met.    Although the statute

refers only to any "interest" in property the mantra "free and clear of claims, liens

and interests" often appears in bankruptcy sale orders.  And indeed, a lien is the

paradigm example of an interest in property which may be subject to a sale free

and clear.  The phrase "interest in property" has been interpreted to also include

protection from monetary claims based upon successor liability.  See, e.g., *Myers v.*

*United States,* 297 B.R. 774 (S.D. Cal. 2003).  In this case, no one disputes that

30

**Exhibit 1 Page 39 of 58**

Compass was able to purchase the contracts without assuming liability for claims for monetary damages that USACM was liable for.

All this notwithstanding, counsel for DACA cannot locate a single case involving the sale of a contract in which the non-monetary rights and defenses of the non-debtor party to that contract are held to be "interests in property" that can be altered or removed by a sale free and clear. The Comfort Provisions of the Sale Order impose conditions on any right that DACA may have under Nevada law or the LSA's to designate a new servicing agent. The Comfort Provisions enjoin the Direct Lenders from waiving interest or charges in order to collect their loan. They prohibit the Direct Lenders from asserting defenses to performance under the LSA's based on breach. None of these rights is an "interest in property" that can be disposed of for the benefit of a buyer under section 363(f).

"Section 541 of the Bankruptcy Code defines the property of the bankruptcy estate. 11 U.S.C. § 541. The nature and extent of a debtor's interest in property is determined by state law, with the estate having no greater rights in property than those held by the debtor prior to bankruptcy. See *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); 11 U.S.C. § 541(d)." *In re Coupon Clearing Service, Inc.,* 113 F.3d 1091, 1099 (9th Cir. 1997). "[N]onbankruptcy law defines the nature, scope, and extent of the property rights that come into the hands of the bankruptcy estate." *In re Transcon Lines,* 58 F.3d

31

**Exhibit 1 Page 40 of 58**

1432, 1438 (9th Cir. 1995).   "Section 541 looks to state law to determine the nature and extent of a debtor's interest in property and transfers such interest intact to the bankruptcy estate. [citation]. Such interests are not enlarged, enhanced, or altered." *In re Shoen,* 193 B.R. 302, 317 (Bankr. D. Ariz. 1996).

In *TM Patents, L.P. v. International Business Machines,* 121 F.Supp.2d 349 (S.D.N.Y.,2000), a creditor purchased a group of patents from Thinking Machines, a chapter 11 debtor .  "The Bankruptcy Court entered an order confirming Thinking Machines' Reorganization Plan, and ¶ 12 of that order provided that all transfers of property to the Plan Entities . . . as provided in the Plan "... shall be legal, valid and effective and shall constitute the transfer to and shall vest in the Plan Entities good title to such property free and clear of all liens, charges, Claims, encumbrances, Administrative Claims, interests and rights of offset, except as expressly provided in the Plan or this Sale Order...." *TM Patents*, supra., 121 F. Supp.2d at 360.  The buyer later sued IBM claiming infringement of a Thinking Machines patent.  In dismissing the action, the District Court held that "The filing of a bankruptcy case does not, and cannot, give a debtor or its creditors greater rights in property than the debtor had prior to bankruptcy. . . . [E]ven a confirmed bankruptcy plan 'cannot furnish anyone rights to what was not property of the debtor's estate.' *Terry Oilfield Supply Co. v. American Sec. Bank, N.A.,* 195 B.R. 66, 73 (S.D.Tex.1996)."   *TM Patents*, supra., 121 F. Supp.2d at 361.

32

**Exhibit 1 Page 41 of 58**

An equally basic principle of bankruptcy law is that the bankruptcy estate cannot rewrite a contract in order to sell the improved version to a third party.  "It is well settled that if a debtor elects to assume an executory contract or unexpired lease, it must assume the entire contract or lease cum onere, except insofar as the rights of the parties are altered by the Bankruptcy Code. [citations]  The debtor may not assume only a favorable portion of an executory lease, and reject or avoid an unfavorable portion."  *In re David Orgell, Inc.*,117 B.R. 574, 575-76 (Bankr. C. D. Cal. 1990).

Applying these principles, if USACM had no right under the LSA's to stay the Direct Lenders from designating a new servicing agent, that right could not be created under a sale order.   That right was not property of the bankruptcy estate.  It was not the Debtor's to sell.  If the LSA's do not prohibit the Direct Lenders from compromising unpaid default interest and late charges in order to collect their loan, USACM had no power under the Bankruptcy Code to insert such a prohibition into the LSA's and then sell the contract.  The Bankruptcy Court had no power to rewrite the LSA's to insert such a provision.

The Comfort Provisions of the Sale Order go beyond the general "free and clear" provisions of the Purchase Agreement and of the Plan, to impose specific conditions and prohibitions which rewrite the LSA's and impair the Direct Lenders' rights under Nevada law.  They don't merely  strip the contracts of extraneous liens

33

**Exhibit 1 Page 42 of 58**

and liabilities.  The Comfort Provisions alter the very nature of what is being sold.

That was beyond the Bankruptcy Court's power under the Code.

 D.  COMPASS DID NOT DEFEND THE APPEAL

 Compass appeared in the Bankruptcy Court and argued through its counsel

George Davis at the hearing on plan confirmation.  (AER  1618-1704).  Compass

was named as a party to the appeal in the Notice of Appeal filed by DACA (AER

No. 2452), and is designated as a party to the appeal on the District Court's Docket.

 DACA has served Compass' attorneys with every pleading it filed in the appeal

before the District Court.   (See District Court Docket Nos.8, 46)  Compass is a

party to this appeal which has chosen not to defend it.

 "Since an appellate court will not consider an appeal unless all of the parties

necessary to a final determination of the controversy are before the court, every

party to the record who has any interest that would be directly affected by a

determination in an appellate review must be made a party to the review

proceedings, and given notice of the proceedings and an opportunity to be heard in

defense of his or her rights." [underlining added]  4 C.J.S. Appeal and Error § 325

(West 2007).   In this case, Compass was designated as an Appellee and notified of

the appeal by the clerk of the Bankruptcy Court and by service of all pleadings

filed in this appeal by DACA.

**Exhibit 1 Page 43 of 58**

> After a party or other interested person has been notified of an
> appeal, the decision whether to join in the appeal is left to them.   See,
> e.g., *State ex rel. Sweet v. Village of Jemez Springs, Inc. City Council,*
> 114 N.M. 297, 303, 837 P.2d 1380, 1386 (Ct.App.1992) (a non-joined
> party "entitled to no more than a fair opportunity to intervene")
> (Hartz, J., concurring);  *Golembieski v. O'Rielly R.V. Ctr., Inc.,* 147
> Ariz. 134, 136, 708 P.2d 1325, 1327 (Ariz.Ct.App.1985) (focus in
> joinder inquiry should be on whether all parties to the litigation who
> would be directly affected by an appeal have been given adequate
> notice of the appeal so they can join in if they choose) . . . .

*Lozano v. GTE Lenkurt, Inc.,* 122 N.M. 103, 107, 920 P.2d 1057 (N.M. App.

1996)

"After receiving notice that an appeal has been filed, any party who does not

participate in the appeal assumes the risk of either having their interests

jeopardized by an adverse appellate ruling or of not benefitting from a favorable

appellate ruling." [underlining added]   *Haley v. Town of Dewey Beach*, 672 A.2d

55, 58 (Del. 1996).

In this case, the Appellees who have chosen to appear have argued that the

Comfort Provisions were of great importance to Compass as buyer, and cannot be

reversed without affecting the validity of the sale itself.  This argument is belied by

the failure of Compass even to appear and defend this appeal.  If one presumes that

these provisions were material terms of the sale, then the only explanation is that

Compass is deliberately playing games by declining to appear in the appeal for

some tactical reason that counsel for DACA, at least, fails to understand.  By doing

**Exhibit 1 Page 44 of 58**

so, Compass, the only affected party, has waived any objections it may have to reversal of the Comfort Provisions. This failure to appear should be taken by this Court as an indication that the Comfort Provisions are not important to Compass.

E.    THE COMFORT PROVISIONS ARE RIPE FOR REVIEW

The requirement that a dispute be ripe for judicial determination is constitutional in origin, stemming from the requirement of article III that the courts of the United States may decide only "cases and controversies" and must not render advisory opinions. One of the prime examples of a ripeness issue relates to the adoption of allegedly illegal regulations by public agencies which are challenged in advance of their application in a particular factual context, as in the cases cited in this paragraph. If a case on appeal was not ripe for judicial determination by the trial court in the first instance, an appellate court may raise the ripeness issue, even sua sponte, because it goes to the jurisdiction of any court (including the appellate court) to decide the case in the first place. See, *Hawaii Newspaper Agency v. Bronster,* 103 F.3d 742, 746 (9th Cir. 1996).

The doctrine of ripeness has nothing to do with appellate review of a decision which the trial court had jurisdiction to enter, even if that decision is vague or susceptible of varying interpretations in the future. Appellant's time and opportunity to challenge the Comfort Provisions is now. Appellant is not required to forego the right to appellate review of the Comfort Provisions in order to wait

36

**Exhibit 1 Page 45 of 58**

and see how they are interpreted and applied by the Bankruptcy Court or by any other state or federal court which considers the issue, after it is too late to obtain relief from those provisions on appeal.

The Comfort Provisions do "restrict or limit any right of the Direct Lenders . . . to designate a new servicing agent in place of Compass" by imposing a 30 day notice requirement on DACA where none exists under Nevada Administrative Code section 645B.073 or under section 3 of the LSA. The Comfort Provisions impose a stay on the effectiveness of that right which could last for months, until the Bankruptcy Court enters an order on any motion filed by Compass to prevent the change in servicers.

The Comfort Provisions state that "neither the Direct Lenders nor any replacement servicer selected by such Direct Lender shall have the right or ability to compromise, subordinate, or impair, in any respect, any rights, claims or interests purchased by Compass from the Estates for default interest, accrued servicing fees, late charges, success fees, or other amounts under the Loan Servicing Agreement." (AER No. 2376 pp. 5792-93) Appellees argue that this language leaves open the issue of whether Compass has any right to accrued default interest which it did not collect while it was still the servicing agent. DACA would agree, but Compass (having failed to appear in this appeal and state its position) is free to assert in other courts that the Comfort Provisions forbid the

**Exhibit 1 Page 46 of 58**

Direct Lenders from waiving uncollected default interest in order to collect the principal of their loan.

The Comfort Provisions do indeed restrict the right of DACA to terminate or rescind the LSA's, because they state that the LSA's are sold to Compass free and clear of all "monetary and non-monetary defaults and rights that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Sellers' or the Asset Purchaser's interest in [the LSA's]."  (AER No. 2376 pp. 5791-92)  The Surviving Section 3 Right, which relates only to pre-petition breaches by the Debtors (and not, for example, to post-petition breaches by the Debtors in Possession, which also failed to commence foreclosure on these loans), is the only limited exception to that provision.

F.     THIS APPEAL IS NOT MOOT UNDER 11 U.S.C. §363(m)

Bankruptcy Code section 363(m) provides:

> (m)    The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property <u>does not affect the validity of a sale</u> or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

> [<u>underlining</u> added]

**Exhibit 1 Page 47 of 58**

The language of section 363(m) does not eliminate the possibility of an appeal of any aspect of a sale order, only those affecting the validity of the sale which were part of the bargain between USACM as seller and Compass as buyer.

1.    THE REQUESTED RELIEF WOULD NOT AFFECT THE VALIDITY OF THE SALE

"[I]t is not a per se rule that every appeal from an order approving a sale must be dismissed.  The  protection applies only if the court, upon reversing or modifying the order authorizing the sale, would affect the validity of the sale."  3 Collier on Bankruptcy ¶ 363.11 p. 363-86 (15th Ed. Rev. 2007).  Several courts have expressed the "validity" condition as the second half of a two part test.  In a series of decisions, the Third Circuit has held:

> The provision's blunt finality is harsh but its certainty attracts investors and helps effectuate debtor rehabilitation.   See 3 Collier on Bankruptcy ¶ 363.11. Nevertheless, we have rejected a per se rule "mooting appeals absent a stay of the sale ... at issue." [quoting *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 498 (3d Cir. 1998)] . . . . Instead, we require the satisfaction of two conditions before an appeal becomes moot under § 363(m): "(1) the underlying sale or lease must not have been stayed pending appeal, and (2) reversing or modifying the authorization to sell <u>would affect the validity of the sale</u> or lease." [quoting *In re Rickel Home Centers, Inc.,* 209 F.3d 291, 298 (3d Cir. 2000)]. [<u>underlining</u> added]
>
> *Cinicola v. Scharffenberger*, 248 F.3d 110, 122 (3d Cir. 2001).

**Exhibit 1 Page 48 of 58**

"By removing those remedies that would affect the validity of a sale to a good faith purchaser, § 363(m) moots some appeals, namely those in cases where the only remedies available are those that affect the validity of the sale. . . . However, where state law or the Bankruptcy Code provides remedies that do not affect the validity of the sale, § 363(m) does not moot the appeal." *In re Osborn*, 24 F.3d 1199, 1203 (10th Cir. 1994). Accord, *In re BCD Corp.,* 119 B.R. 852, 856 (10th Cir. 1997); *In re Telluride Income Growth, L.P.*, 364 B.R. 407 (10th Cir. 2007).

Also in the Eighth Circuit, a party asserting mootness under section 363(m) must establish both that no stay pending appeal was obtained and that "'reversing or modifying the authorization to sell would affect the validity of the sale or lease.'" *In re Trism, Inc.,* 328 F.3d 1003, 1006-07 (8th Cir. 2003) quoting *Cinicola v. Scharffenberger,* 248 F.3d 110, 122 (3d Cir. 2001). The opinion in *Trism* then goes on to define what is meant by the "validity" test:

> We conclude a challenge to a related provision of an order authorizing the sale of the debtor's assets affects the validity of the sale when the related provision is integral to the sale of the estate's assets. A provision is integral if the provision is so closely linked to the agreement governing the sale that modifying or reversing the provision would <u>adversely alter the parties' bargained-for exchange</u>. [underlining added]

*In re Trism, Inc.,* 328 F.3d 1003, 1006-07 (8th Cir. 2003).

40

**Exhibit 1 Page 49 of 58**

There are some Ninth Circuit cases which enforce  mootness under section

363(m), and there are some Ninth Circuit cases which carve out exceptions.  *In re*

*Ewell,* 958 F.2d 276 (9th Cir. 1992);  *In re Mann,* 907 F.2d 923 (9th Cir. 1990)

However, there appears to be no Ninth Circuit authority which directly considers

the meaning of the phrase "validity of the sale" as it is used in section 363(m).

Ninth Circuit opinions which have in the past concluded that the appeal of a sale

order was moot involved requests for relief which would have the effect of voiding

a sale in its entirety.  *In re Filtercorp, Inc.,* 163 F.3d. 570 (9th Cir. 1998);  *In re*

*Onouli-Kona Land Co.,* 846 F.2d 1170 (9th Cir. 1988);  *Alergan, Inc. v. Advance*

*Ross Corp.,* 759 F.2d 1421 (9th Cir. 1985);  *In re Charlton*, 708 F.2d 1449 (9th

Cir. 1983).

    In deciding these Motions, this Court "must see whether a remedy can be

fashioned that will not affect the validity of the sale.  In so doing [the court] must

look to the remedies requested by Appellants."  *Krebs Chrysler-Plymouth, Inc. v.*

*Valley Motors, Inc.,* 141 F.3d 490, 498 (3d Cir. 1998).  The remedies sought by

DACA are set forth precisely in this brief, and consist of reversing portions of the

Sale Order that were not referred to in the Purchase Agreement or Disclosure

Statement, or provided for in the Plan, but which are now drastically and

negatively affecting the rights of DACA vis a vis its servicing agent.

41

**Exhibit 1 Page 50 of 58**

Applying the standard advanced in the above-quoted portion of *In re Trism, Inc.,* 328 F.3d 1003, 1006-07 (8th Cir. 2003), the relief requested by DACA does not "adversely alter the parties' bargained-for exchange," because the Comfort Provisions were not required to be present under the terms of the Purchase Agreement or the Plan.  These types of provisions, which are often included in lengthy Sale Orders, may be beneficial to Compass.  However, these provisions would have been included in the Purchase Agreement or in the Plan had they been "integral" to the sale, or were required in order for Compass to obtain the benefit of its bargain.

> 2.    THE REQUESTED RELIEF IS ALSO REQUIRED UNDER STATE LAW

As explained above, the Ninth Circuit cases interpreting section 363(m) have not required the Court to examine what sort of relief affects the validity of a sale. A few Ninth Circuit cases have applied what were termed as "exceptions" to statutory mootness.  *In re Ewell,* 958 F.2d 276, 280 (9th Cir. 1992) states that "we have recognized only two exceptions to the section 363(m) mootness rule:  (1) where real property is sold subject to a statutory right of redemption, and (2) where state law otherwise would permit the transaction to be set aside.  *In re Mann,* 907 F.2d 923, 926 (9th Cir.1990)."

The first exception mentioned in *Ewell,* supra., is not implicated here,

**Exhibit 1 Page 51 of 58**

because this isn't a sale of real property and there is no right of redemption. The second exception does apply, because the Comfort Provisions of the Sale Order are contrary to Nevada law.

a.    <u>The Right to Designate a New Servicing Agent</u>

As set forth above, Nevada Administrative Code section 645B.073 provides, as a fundamental protection to  trust deed investors, that 51% in interest in any trust deed loan in default may act for the group and designate their servicing agent. *Federated American Ins. Co. v. Granillo*, 108 Nev. 560, 835 P.2d 803 (1992); *Neal's Estate v. Farmers Ins. Exchange,* 93 Nev. 348, 566 P.2d 81 (1977).   The Comfort Provisions impose a stay on the exercise of that right, and also place a time limit on it, such that it may only be exercised with respect to conditions which existed on USACM's bankruptcy petition date.

b.    <u>Collection of Default Interest</u>

As explained above, the Loan Servicing Agreement drafted by USACM created a serious conflict of interest with the Direct Lenders.  Under the Agreement, USACM was entitled to retain as its fee all late charges and default interest accruing on delinquent loans.  Because of this provision, it was in USACM's interest that a well-secured loan remain in default for a substantial period of time, at the expense of the retirees and other investors.

When a mortgage broker acts as a servicing agent, it is indeed acting as the

43

**Exhibit 1 Page 52 of 58**

agent of the lenders.  See generally, *Young v. Nevada Title Company,* 103 Nev. 436, 439, 744 P.2d 902 (1987).  "An agent . . . owes to the principal the highest duty of fidelity, loyalty and honesty in the performance of the duties by the agent on behalf of the principal."  *LeMon v. Landers,* 81 Nev. 329, 402 P.2d 648 (1965). It is a violation of the fiduciary duties of a mortgage broker under Nevada law to place the collection of its fee ahead of the collection of the loan on behalf of its principals.  Yet, this is precisely what the Comfort Provisions of the Sale Order allow Compass to do.  Not only is Compass not required to compromise default interest and late charges if necessary to collect the loan, the investors  are forbidden to compromise with the borrower even through a new servicing agent. This remarkable Comfort Provision is nowhere sought or referred to in the Compass Purchase Agreement or in the Plan.  The Direct Lenders had no notice or warning that these rights would be taken away.

        c.    The Right to Terminate the Loan Servicing Agreement in the Event of a Breach

Under Nevada law, "a material breach by one party to a contract may excuse further performance by another party to the contract. See *Young Elec. Sign Co. v. Fohrman,* 86 Nev. 185, 466 P.2d 846, 847 (1970).  '[T]he party who commits the first breach of a contract cannot maintain an action against the other for a subsequent failure to perform.'  *Bradley v. Nev.-Cal.-Or. Ry.,* 42 Nev. 411, 178 P.

44

**Exhibit 1 Page 53 of 58**

906, 908-09 (1919)." *Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP,* 440 F.Supp.2d 1184 (D. Nev. 2006).

Since the decision in *In re Exennium, Inc.,* 715 F.2d 1401 (9th Cir. 1983), it has been Ninth Circuit law that the statutory mootness protection of 11 U.S.C. § 363(m) applies to a "sale" that is an assignment of an executory contract. In the case of executory contracts, the rights of the counterparties to those contracts under state law are protected by the requirement of 11 U.S.C. § 365(b)(1) that defaults be cured and adequate assurance of future performance provided.

In contrast, the case at bar is one in which USACM obtained a ruling at the plan confirmation hearing that the Loan Servicing Agreements are not executory contracts. Therefore in this case the trust deed investors as counterparties to these contracts were not protected by section 365. The Comfort Provisions of the Sale Order then went beyond the proper scope of a sale of these contract rights "free and clear" to *alter* the contract rights of these investors. In this unusual situation, the exception to the section 363(m) mootness principal should apply, "where state law otherwise would permit the transaction to be set aside." *In re Ewell,* 958 F.2d 276, 280 (9th Cir. 1992); *In re Mann,* 907 F.2d 923, 926 (9th Cir.1990). Applying this exception would not impair the finality of bankruptcy sales or the ability to sell contract rights free and clear of the interference of lienors or adverse claimants. It would preserve the contract rights of counterparties to non-executory contracts

**Exhibit 1 Page 54 of 58**

which are sold without the protection of 11 U.S.C. § 365(b)(1).  It should not

disappoint the reasonable expectations of Compass,  which could hardly have

assumed that by purchasing the contracts it became immune from Nevada law.

## VII. CONCLUSION

There are powerful policy reasons why a buyer at a bankruptcy sale should

be legally protected from challenges which could overturn the sale after the buyer

has paid its money and all parties to the bankruptcy case have relied on the sale's

validity.  Nevertheless, the mootness principle embodied in Bankruptcy Code

section 363(m) should not be without limits.  If any provision, no matter how

illegal and how extraneous to the parties' bargain, can be legitimized and protected

from appeal by its inclusion in a 30 page order confirming the sale, then this is an

invitation to abuse.  This case gives this Court the opportunity for the first time to

delineate the boundaries of the mootness principle in bankruptcy sales, in a case

where the validity of the sale itself is not an issue.  This Court should therefore

grant the narrow and specific relief requested on this appeal.  To quote the specific

relief requested by DACA in its opening brief to the District Court:

>  [T]he Sale Order be reversed to the extent that it may be
> interpreted as restricting or limiting any right of the
> Direct Lenders . . . to designate a new servicing agent in
> place of Compass.

**Exhibit 1 Page 55 of 58**

[T]he Sale Order should be reversed to the extent that it may be interpreted as forbidding the Direct Lenders to exercise any right which they may have under Nevada law to direct the servicing agent to compromise with the borrower the amount of default interest or late charges in order to collect the loan.

The Sale Order should be reversed to the extent that it may be interpreted as restricting any right which the Direct Lenders may have under Nevada Law to terminate or rescind the Loan Servicing Agreement.

KIRBY & McGUINN, A P.C.

DATE: February 14, 2008

By:_____
Dean T. Kirby, Jr.
Attorneys for Appellant
Debt Acquisition Company of
America V, LLC

47

**Exhibit 1 Page 56 of 58**

1  Dean T. Kirby, Jr.     Calif. Bar No. 090114
   Leonard J. Ackerman Calif. Bar No. 171073
2  KIRBY & McGUINN, A P.C.
   600 B Street, Suite 1950
3  San Diego, California 92101-4515
   Telephone: (619) 685-4000  Facsimile:  (619) 685-4004
4  dkirby@kirbymac.com
   lackerman@kirbymac.com
5
   Attorneys for Creditor
6  Debt Acquisition Company of America V

7              UNITED STATES COURT OF APPEALS

8                 FOR THE NINTH CIRCUIT

9
    DEBT ACQUISITION COMPANY OF        )   Case No. 07-16796
10  AMERICA V, LLC,                    )   D.C. No. CV-07-00160-RCJ
                                       )
11                                     )
                            Appellant  )   PROOF OF SERVICE
12                                     )
    v.                                 )
13                                     )
    USA COMMERCIAL MORTGAGE COMPANY;   )
14  et al.                             )
                            Appellees. )
15  _____  )

16

17        I, Gina Sparks, declare under penalty of perjury that the following facts are true

18  and correct:

19        I am a resident of the State of California and over the age of 18 years and not a party to or

20  interested in the within entitled cause.  I am an employee of Kirby & McGuinn, A P.C. and my

21  business address is 600 B Street., Suite 1950, San Diego, CA 92101. On October 15, 2007  I served

22  the following document(s):

23        -    **OPENING BRIEF OF APPELLANT DEBT ACQUISITION COMPANY OF
24             AMERICA V, LLC and**

25        -    **EXCERPTS OF RECORD OF APPELLANT DEBT ACQUISITION COMPANY
26             OF AMERICA V, LLC , VOLUMES I THROUGH XXV**

27  ///

28  ///

**Exhibit 1 Page 57 of 58**

1  By:

2          ■          EXPRESS MAIL: by placing true copies thereof in sealed boxes for personal delivery
                     to Overnite Express, with postage fully prepaid, addressed as per attached.  I am readily
3                    familiar with the business practice at my place of business for collection and processing
                     of express mail with the Overnite Express that same day in the ordinary course of
4                    business.

5  USACM LIQUIDATING TRUST
   Rob Charles
6  Susan M. Freeman
   LEWIS AND ROCA, LLP
7  3993 Howard Hughes Parkway, Ste 600
   Las Vegas, NV 89169-5996
8
   Annette W. Jarvis
9  RAY QUINNEY & NEBREKER, P.C.
   36 South State Street, Ste 1400
10 Salt Lake City, UT 84111

11

12         I declare under penalty of perjury under the laws of the United States that the foregoing is
   true and correct.
13
           Executed on February 14, 2008
14

15                                                 By:
16                                                       Gina Sparks

17

18

19

20

21

22

23

24

25

26

27

28

Debt Acquisition v. USA Commercial Mortgage Co., et al.                              Case No. 07-16796
Proof of Service

**Exhibit 1 Page 58 of 58**