1

1          UNITED STATES BANKRUPTCY COURT

2                  DISTRICT OF NEVADA

3                  LAS VEGAS, NEVADA

4    In re:  USA COMMERCIAL MORTGAGE   )  FEBRUARY 23, 2009
     COMPANY,                         )  E-Filed:  03/03/09
5                                     )
              Debtor.                 )  Case No.
6                                     )  BK-S-06-10725-LBR
     _____)  Chapter 11
7    USACM LIQUIDATING TRUST and      )
     USA CAPITAL DIVERSIFIED TRUST    )
8    DEED FUND, LLC,                  )
                                      )
9              Plaintiffs,            )
                                      )
10        vs.                         )  Adversary No.
                                      )  08-01134-LBR
11   MARY PETERSEN, Individually,     )
     and as Trustee of the           )
12   MARY PETERSEN FAMILY TRUST       )
     DATED 08/12/98;                  )
13   MICHAEL D. PETERSEN,             )
     Individually, and as Trustee of )
14   the MICHAEL D. PETERSEN FAMILY   )
     TRUST DATED 08/12/98;            )
15   KATHRYN L. PETERSEN,             )
     Individually, and as Trustee of )
16   the KATHRYN L. PETERSEN          )
     LIVING TRUST and KLP TRUST       )
17   DATED 07/15/99,                  )
                                      )
18             Defendants.            )
     _____)
19   USA CAPITAL DIVERSIFIED TRUST    )
     DEED FUND, LLC,                  )
20                                    )
               Plaintiff,             )
21                                    )
          vs.                         )  Adversary No.
22                                    )  08-01132-LBR
     STANLEY E. FULTON,               )
23                                    )
               Defendant.             )
24   _____)
     Proceedings recorded by electronic sound recording;
25   transcript prepared by transcription service.

```
1    USA CAPITAL DIVERSIFIED TRUST    )
     DEED FUND, LLC,                  )
2                                     )
               Plaintiff,             )
3                                     )
          vs.                         )    Adversary No.
4                                     )    08-01133-LBR
     KATHRYN L. PETERSEN,             )
5                                     )
               Defendant.             )
6    _____ )

7

                    TRANSCRIPT OF PROCEEDINGS
8                            OF
              (08-01134) ORDER SHORTENING TIME
9                 RE: MOTION TO COMPEL,
       (1), PLAINTIFFS' RESPONSES TO DEFENDANTS' REQUEST
10               FOR PRODUCTION OF DOCUMENTS,
             AND, (2), TO AMEND DISCOVERY PLAN,
11         MEMORANDUM OF POINTS AND AUTHORITIES,
          DECLARATION OF TIMOTHY R. O'REILLY, ESQ.,
12            AND STEVEN J. KATZMAN, ESQ.,
               IN SUPPORT THEREOF, NO. 79
13                          AND
     (08-01132) MOTION TO COMPEL DEFENDANT STANLEY E. FULTON'S
14         MOTION TO, (1), COMPEL PLAINTIFF'S RESPONSES
        TO DEFENDANT'S REQUEST FOR PRODUCTION OF DOCUMENTS,
15           AND, (2), TO AMEND DISCOVERY PLAN, NO. 33
                            AND
16   (08-01133) MOTION TO COMPEL DEFENDANT STANLEY E. FULTON'S
           MOTION TO, (1), COMPEL PLAINTIFF'S RESPONSES
17      TO DEFENDANT'S REQUEST FOR PRODUCTION OF DOCUMENTS,
             AND, (2), TO AMEND DISCOVERY PLAN, NO. 52
18                        VOLUME 1
            BEFORE THE HONORABLE LINDA B. RIEGLE
19             UNITED STATES BANKRUPTCY JUDGE

20              Monday, February 23, 2009

21                    1:30 p.m.

22

23   Court Recorder:        Geraldine Quinonez

24

     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

```
 1    APPEARANCES:

 2    For USACM Liquidating  ERIC D. MADDEN, ESQ.
      Trust and USA Capital  Diamond McCarthy, LLP
 3    Diversified Trust      1201 Elm Street
      Deed Fund, LLC:        Suite 3400
 4                           Dallas, Texas 75270

 5                           MICHAEL YODER, ESQ.
                             Diamond McCarthy, LLP
 6                           Two Houston Center
                             909 Fannin Street
 7                           Suite 1500
                             Houston, Texas 77010
 8
      For Kathryn L. PetersenSTEVEN J. KATZMAN, ESQ.
 9    Living Trust,          Bienert, Miller, Weitzel & Katzman, PLC
      Kathryn L. Petersen,   115 Avenida Miramar
10    KLP Trust,             San Clemente, California 92672
      Mary Petersen Family
11    Trust, Mary Petersen,
      Michael D. Petersen
12    Family Trust, and
      Michael D. Petersen:
13
                             JOHN F. O'REILLY, ESQ.
14                           TIMOTHY R. O'REILLY, ESQ.
                             O'Reilly Law Group, LLC
15                           325 South Maryland Parkway
                             Las Vegas, Nevada 89101
16

17

18

19

20

21

22

23

24

25
```

4

```
 1          (Court convened at 01:33:11 p.m.)

 2          THE COURT:  Okay.  In USA versus Mary Petersen,

 3    et al.

 4       Appearances, please.

 5          MR. MADDEN:  Good afternoon, your Honor.  Eric Madden

 6    for the USACM Liquidating Trust and USA Capital Diversified

 7    Trust Deed Fund.

 8          MR. YODER:  Michael Yoder for the USACM Liquidating

 9    Trust and USA Capital Diversified Trust Deed Fund.

10          MR. KATZMAN:  Good afternoon, your Honor.

11    Steve Katzman with Bienert, Miller, Weitzel & Katzman on behalf

12    of the defendants and movants, the Petersens and Mr. Fulton.

13          MR. J. O'REILLY:  Your Honor, John O'Reilly,

14    O'Reilly Law Group, on behalf of the defendants, Petersens and

15    Fulton.

16          MR. T. O'REILLY:  Good morning, your Honor.

17    Tim O'Reilly also present on behalf of the movants.

18          THE COURT:  Okay.  Just to clarify, even though you

19    stuck in that order shortening time the comment about

20    procedurally consolidated, these matters aren't procedurally

21    consolidated.  I'll certainly hear argument on all three, but

22    that's not to mean that it's procedurally consolidated.

23          MR. KATZMAN:  Very well, your Honor.

24          THE COURT:  Okay.  Go ahead.

25          MR. KATZMAN:  Well, your Honor, what we're seeking in
```

5

1    this motion, what it really boils down to, is two things.

2    We're asking for the plaintiffs to respond to the outstanding

3    requests for production of documents in accordance --

4              THE COURT:  Now --

5              MR. KATZMAN:  -- with the federal --

6              THE COURT:  -- there's only a request for production

7    in one case, correct?

8              MR. KATZMAN:  There is a current -- currently, the

9    subject of this motion is one request for production of

10   documents, your Honor.  There are other requests outstanding as

11   a result of what's transpired in this litigation --

12             THE COURT:  But the only --

13             MR. KATZMAN:  -- and the communications.

14             THE COURT:  The only one is in the Mary Petersen

15   case, right?

16             MR. KATZMAN:  The only ones that have been filed are

17   in the Mary Petersen case, your Honor.

18             THE COURT:  Okay.

19             MR. KATZMAN:  And so we're asking for compliance with

20   that in accordance with the Federal Rules of Civil Procedure,

21   and we're asking for it in a manner that we believe is

22   contemplated under the Federal Rules of Civil Procedure and as

23   the plaintiffs themselves had stated early on in the litigation

24   would be provided to us in a TIFF OCR format.

25         The other thing that we're asking, your Honor, is that

1   once we get that data is that we have sufficient time to

2   analyze it, so that we can adequately prepare for the case.

3        And what we've submitted, your Honor, what we think is an

4   eminently-reasonable period of time is 75 days from the point

5   that we get the data successfully migrated onto our systems.

6        And as the Court can see, there's been a lot of discussion

7   here.  There's been a lot of correspondence related to this

8   issue.

9        There has been some disagreement, and we actually did --

10  you know, in some ways, we really shouldn't have to have been

11  here, your Honor, because we submitted a proposal to the other

12  side, and we submitted this proposal to the other side.

13       And we thought about this proposal, and we thought it was

14  an eminently-reasonable proposal, and it was rejected.  They

15  said they're willing to talk to us, but they didn't suggest any

16  counterproposal.

17            THE COURT:  Well, but you say they have to pay for

18  everything.

19            MR. KATZMAN:  Your Honor, I'd say that under the

20  Federal Rules of --

21            THE COURT:  Why is that eminently reasonable as a

22  proposal?

23            MR. KATZMAN:  Well, what I am suggesting, your --

24            THE COURT:  Why is that eminently reasonable as a

25  proposal?

7

1          MR. KATZMAN:  It is eminently reasonable because it's

2    contemplated under the Federal Rules of Civil Procedure.

3          THE COURT:  As a proposal, how is that a settlement

4    proposal when you say you pay for everything?  We're not paying

5    for anything?

6          MR. KATZMAN:  We started this discussion by just

7    talking about the logistics.  They said that they can get it to

8    us, but we have to pay for it all.

9          THE COURT:  And you've never offered to even pay for

10   half, right?

11         MR. KATZMAN:  We just asked them --

12         THE COURT:  You've never even --

13         MR. KATZMAN:  -- to provide the documents.

14         THE COURT:  -- offered to pay one dime --

15         MR. KATZMAN:  Well, no --

16         THE COURT:  -- right?

17         MR. KATZMAN:  -- your Honor.  Partially, the reason

18   is because we didn't know how much that was.

19         THE COURT:  You've never offered to pay one dime.

20         MR. KATZMAN:  That's not accurate, your Honor.

21         THE COURT:  How much have you offered to pay?

22         MR. KATZMAN:  We never got to that point of the

23   discussion.

24         THE COURT:  Okay.

25         MR. KATZMAN:  But we were rejected.  We came off

8

1    there.  We tried to discuss it with them.  They didn't even

2    counterpropose.  They didn't even offer half.

3        They just gave us these wild varying costs that in our

4    view appear to be very exorbitant and, really, out of line, so

5    we didn't even get to the point of talking about half of what.

6    Half of $140,000, your Honor, when we think $140,000 is clearly

7    excessive?

8            THE COURT:  Well, your proposal has been give it to

9    it in our format, end of story, right?

10            MR. KATZMAN:  We believe that that's what --

11            THE COURT:  That's --

12            MR. KATZMAN:  -- the rules require.

13            THE COURT:  -- your proposal been.

14            MR. KATZMAN:  Yes, your Honor.

15            THE COURT:  Why is that a proposal --

16            MR. KATZMAN:  Because it's --

17            THE COURT:  -- as opposed to a demand of the Court?

18            MR. KATZMAN:  It's a proposal because it's what the

19    Federal Rules of Civil Procedure require.

20            THE COURT:  My way or the highway is what you're

21    asking.

22            MR. KATZMAN:  What I'm suggesting, your Honor, is the

23    burden is on them to establish why that shouldn't be complied

24    with, and we need --

25            THE COURT:  How is that a proposal?  How is that a

1    good-faith effort to resolve it when you say give it in the

2    format we want at your cost?

3            MR. KATZMAN:  Well, it's a good-faith proposal

4    because we can't even get a clear understanding as to what that

5    cost were, so we started with the beginning.

6        Give us the documents, and then let's have a colloquy

7    about the costs, but we never got to that point for two

8    reasons.

9        One, we've gotten varying estimates of the costs that are

10   hugely disproportionate to what we believe is a fair cost, and,

11   two, they never even engaged us in the colloquy as we've

12   offered.  I think a starting point --

13           THE COURT:  How is it --

14           MR. KATZMAN:  -- is we --

15           THE COURT:  -- a colloquy when you say give us the

16   documents in our format, and you pay for it?  How is that a

17   colloquy?

18           MR. KATZMAN:  It's a colloquy because it's a starting

19   point, and we use their own representations to us.  They said

20   they would give it to us in that format.

21       They did not mention back in October that they would

22   require us to pay $140,000.  They said they will provide it in

23   accordance with the Federal Rules of Civil Procedure,

24   your Honor.

25           THE COURT:  Where in the rules does it say it has to

1    be in TIFF OCR?

2          MR. KATZMAN:  It has to be done in the -- pursuant to

3    Rule 34, your Honor, it has to be done in the format in which

4    it's maintained by them.

5          THE COURT:  And if it wasn't maintained by them, so

6    it's not TIFF OCR, right?  You're asking them to maintain it in

7    a format differently than how they maintained it.

8          MR. KATZMAN:  I'm asking them to produce it in line

9    with the representations that they made --

10          THE COURT:  You're asking them --

11          MR. KATZMAN:  -- to us.

12          THE COURT:  -- to produce it in a format differently

13    than they maintain it.

14          MR. KATZMAN:  Yes.

15          THE COURT:  Okay.

16          MR. KATZMAN:  They converted it into that format,

17    your Honor.  And as we pointed out in our papers, that's one of

18    the threshold things that this Court should consider in the

19    cost-shifting burden.

20       The burden's on them to establish that the costs should be

21    shifted to us.  The burden's on them.  That's what the case law

22    says.

23          THE COURT:  But they're willing to give it to you in

24    the format they have it, correct?

25          MR. KATZMAN:  No.  No.  The format that they have it

1    is not what they're willing to give us it in.  They have given

2    us -- one, they've only given us partial access to that

3    database.

4        Two, they enjoy privileges on that database that we don't

5    enjoy, and that is the ability to tag and identify documents

6    for later reference.

7                THE COURT:  No.

8                MR. KATZMAN:  So --

9                THE COURT:  That's not the data.  That's the ability

10   to manipulate the data.

11               MR. KATZMAN:  That is the ability, yeah, to utilize

12   the data, your Honor.

13               THE COURT:  That's right.  That's not the same thing

14   as the data.

15               MR. KATZMAN:  Well, opening up the database --

16               THE COURT:  I mean, for example, in the old days,

17   nobody had to give you a file that was nicely marked as to each

18   and every file folder if it wasn't maintained that way, right?

19       In the old days if files were just kept chronological

20   order regardless of topic, you couldn't demand that they

21   divided it by topic, right?

22               MR. KATZMAN:  They could give it to -- regular

23   production could be made in the manner that which they maintain

24   it.

25               THE COURT:  That's right, so you couldn't demand that

1    they then put it in file folders, right?

2             MR. KATZMAN:  We could not demand -- they have an

3    alternative choice the production.  That is --

4             THE COURT:  Okay.

5             MR. KATZMAN:  -- one choice, your Honor.

6             THE COURT:  So you couldn't demand that they say put

7    it in categories.

8             MR. KATZMAN:  If they chose to open up their files in

9    their entirety to us, no.

10            THE COURT:  Okay.

11            MR. KATZMAN:  But that's different, your Honor, for

12   ESI.  ESI's got a different standard.  There's different

13   specific rules for ESI.

14       And the fact is that they maintain it on an OCR, TIFF

15   basis.  If we want to use the word "manipulate" -- I would

16   prefer to use the term "organize" because that's what we're

17   talking about.

18            THE COURT:  And I don't mean manipulate in a

19   pejorative sense.  I mean manipulate meaning in the sense of

20   moving it around in a manner that which you -- I didn't mean to

21   suggest a pejorative context there.

22            MR. KATZMAN:  Yeah.  I mean, if we want to be able to

23   organize it in at least as the same level that they're

24   organizing it, we would have to effectively print out all

25   2,000,000 pages.

```
 1              THE COURT:  So.
 2              MR. KATZMAN:  Well, your Honor --
 3              THE COURT:  That's what you'd have to do in the old
 4    days.
 5              MR. KATZMAN:  The access -- well, I would submit to
 6    your Honor that that's a highly -- because of the way the
 7    system's used, it's a highly-inefficient way to go about this.
 8              THE COURT:  But if they're using that data in that
 9    manner --
10              MR. KATZMAN:  They aren't, your Honor.
11              THE COURT:  Well, they must be.
12              MR. KATZMAN:  No.  They have the ability to tag.
13    You're saying that that's not an issue in terms of access.  For
14    us to have the same ability, we would have to go on-line, print
15    out all 2,000,000 pages which would be -- I don't even think we
16    could do it at the rate that the download of these documents
17    take place.  We could do it within the time parameters even
18    before trial.
19         But even if we did, we'd have to download it, rescan it,
20    use an OCR program, and then load it up onto our Concordance
21    system just to have it at the same level that they currently
22    enjoy it.
23              THE COURT:  But in the old days, the same thing was
24    true.  If it was kept in a file chronologically as opposed by a
25    topic, each side would then have to organize it in their own
```

14

1    manner, right?

2              MR. KATZMAN:  That's right --

3              THE COURT:  Okay.

4              MR. KATZMAN:  -- if they chose to open up their files

5    in their entirety to us.

6              THE COURT:  Right.  They haven't --

7              MR. KATZMAN:  But --

8              THE COURT:  -- told you --

9              MR. KATZMAN:  But --

10             THE COURT:  -- you're not getting --

11             MR. KATZMAN:  But --

12             THE COURT:  -- any data.

13             MR. KATZMAN:  But the way they're opening up the

14   files -- if you're suggesting, your Honor, that that's a

15   sufficient way to access the documents or produce the

16   documents, there's two fundamental flaws with that.

17        That's sort of like suggesting we're going to open the

18   files to you, but you can only open one little file and put one

19   page --

20             THE COURT:  There's suggestion --

21             MR. KATZMAN:  -- out at a time.

22             THE COURT:  -- they have altered the way the

23   documents were kept, correct?

24             MR. KATZMAN:  Yes, they have.  They scanned the

25   documents that they have and put them onto their system.

1     They've altered the format of the documents.

2             THE COURT:  Well, but not for this case.  That's the

3     way they were kept throughout this entire bankruptcy, correct?

4             MR. KATZMAN:  And they did that in -- yeah.  But they

5     did that, your Honor, in contemplation of knowing that there

6     would be litigation.  They took this database and put it on the

7     system knowing that they would file lawsuits.

8             THE COURT:  This database has been used for a lot of

9     things.  It's used through five adversaries we've been through,

10    already.

11            MR. KATZMAN:  Exactly.

12            THE COURT:  And the other people could manage to use

13    it.

14            MR. KATZMAN:  Well, your Honor, you know, I don't

15    know about those other lawsuits.  I don't know whether those

16    clients were being sued for $40,000,000, and I don't know

17    whether they were --

18            THE COURT:  Well, maybe those clients --

19            MR. KATZMAN:  -- being --

20            THE COURT:  -- didn't get $40,000,000.  They were

21    sued for 13,000,000 at least.

22            MR. KATZMAN:  Your Honor --

23            THE COURT:  Mr. Reale was sued for 13,000,000.

24            MR. KATZMAN:  Okay.  I don't represent --

25            THE COURT:  Mr. Abolafia was sued for 2,000,000.

1    This is not peanuts.

2           MR. KATZMAN:  I don't represent Mr. Reale.  I --

3           THE COURT:  I understand.  But if your clients

4    receive $40,000,000 rightfully or wrongfully, they should be

5    able to deal with the data as well.

6           MR. KATZMAN:  They haven't received $40,000,000,

7    your Honor.  That's the point.  The plaintiffs are arguing that

8    we aided and abetted the Ponzi scheme and are seeking treble

9    damages on a fraudulent-conveyance claim.

10      To defend against that, we have to look at -- we can't

11   take for granted what they refer to as tangentially-related

12   issues such as was there a fraud, when was there a fraud, was

13   there insolvency, when was there insolvency, was this a

14   Ponzi-like scheme, when was it a Ponzi-like scheme.

15          THE COURT:  They don't have to do the work for you.

16          MR. KATZMAN:  No, they don't.

17          THE COURT:  You're, in essence, asking for their work

18   product by asking that it be done with the tagging ability.

19   Why isn't that their work product?

20          MR. KATZMAN:  I don't want their tags, your Honor.

21          THE COURT:  But if you want --

22          MR. KATZMAN:  I don't --

23          THE COURT:  -- the ability to do that, why isn't it

24   if you just (indiscernible) the documents and in the format

25   they have it?

1          MR. KATZMAN:  I just want the documents in the same

2    format that they enjoy it and they promised to give it to us

3    which is TIFF OCR format.

4          THE COURT:  But they don't have it in TIFF OCR

5    format, apparently, now.

6          MR. KATZMAN:  Yes, they do.  The way it works,

7    your Honor, is when it's on their database it's on TIFF OCR

8    format.

9       When it magically comes off their database unless they

10   give us the load files that are associated with it, it's no

11   longer TIFF OCR format.

12      And, in fact, it's not even not TIFF OCR format.  It's

13   basically without the load files just 2,000,000 pages with no

14   start and stop.

15      It's like someone handing you 2,000,000 pages of documents

16   without being a stack of 2,000,000 pages of documents without

17   being able to distinguish between what documents.

18          THE COURT:  Well --

19          MR. KATZMAN:  So --

20          THE COURT:  -- when did they ever promise to give you

21   the load files?

22          MR. KATZMAN:  They promised to give it to us in

23   OCR, TIFF format.

24          THE COURT:  But you just told me they were going to

25   do that.  It was just you didn't have the load files.

1        MR. KATZMAN:  That's right, and they promised to do

2   that back in October.

3        THE COURT:  When did they say that?

4        MR. KATZMAN:  In October, your Honor.

5        THE COURT:  It says nothing but the --

6        MR. KATZMAN:  It's in --

7        THE COURT:  It just says TIFF OCR.

8        MR. KATZMAN:  That's right.

9        THE COURT:  It doesn't say with the load files.

10       MR. KATZMAN:  You can't have TIFF OCR without the

11  load files, your Honor.  It's like giving you 2 -- all right.

12  Let me put it to you this way.

13      The load files give you a start and a stop of a document.

14  Would you agree with me, your Honor?  If they just handed me

15  2,000,000 pages, a stack of 2,000,000 pages, without any

16  demarkation as to each document, would that be an acceptable

17  production?

18       THE COURT:  If that's the way they kept it, yes.

19       MR. KATZMAN:  Well, it's not the way they keep it,

20  first of all.  But if they gave it to me that way without the

21  load files, that's what I would get.  The load files --

22       THE COURT:  And you're not willing --

23       MR. KATZMAN:  -- separate --

24       THE COURT:  -- to pay anything for that.

25       MR. KATZMAN:  That's not true, your Honor.

1           THE COURT:  What are you willing to pay?  Are you

2   willing to share the cost?

3           MR. KATZMAN:  We're willing to --

4           THE COURT:  Apparently, you've said no so far.

5           MR. KATZMAN:  No, your Honor.  What we're willing to

6   do is talk with them to first find out --

7           THE COURT:  Well --

8           MR. KATZMAN:  -- what is --

9           THE COURT:  -- then why didn't you talk before?

10          MR. KATZMAN:  Because we tried, your Honor, and they

11  have rejected us.

12          THE COURT:  No, you haven't.

13          MR. KATZMAN:  Yes, we have, your Honor.  I

14  respectfully disagree.  And if the record -- you could look at

15  the pleadings, your Honor.

16       And if you look at the exhibits, we made an offer.  We

17  offered.  We asked them to sit down with us and talk about the

18  issues, and they said there's nothing to talk about.

19          THE COURT:  But you have never offered to pay a dime

20  of it.  You've just told me that before.

21          MR. KATZMAN:  I wasn't willing to pay $140,000,

22  your Honor.  I was willing to talk about what are the costs and

23  how can we reasonably do this.

24          THE COURT:  So we're going to spend 50 hours printing

25  documents, three hours in hearings with three attorneys because

1    you refuse to sit down and talk about how much money you want

2    to spend.  We're going to spend $10,000 to avoid spending

3    $10,000.

4            MR. KATZMAN:  With all due respect, that

5    mischaracterizes the record and the evidence, your Honor,

6    because we did offer to sit down and talk.

7       And the fact that we didn't come up -- when they promised

8    to produce this in OCR and TIFF format from the beginning, and

9    we didn't come up, and the federal rules require that, and we

10   didn't come up and say notwithstanding your promise,

11   notwithstanding the federal rules we'll agree to pay for some

12   of it, the fact that we didn't come off the bat and offer that

13   I don't think --

14           THE COURT:  Well, let's go back.

15           MR. KATZMAN:  -- it's unreasonable.

16           THE COURT:  The federal rules do not require a

17   particular kind of format, so please don't tell me that,

18   anymore.

19           MR. KATZMAN:  All right, your Honor.  The federal

20   rules do not specifically say TIFF OCR format.  I'll agree with

21   you on that.

22       They do say in the format ordinarily maintained, and they

23   do maintain it in a TIFF OCR format, so I guess it's a two-step

24   analysis, your Honor, and I apologize if I misinterpreted the

25   rule.  I'm not suggesting that it specifically says TIFF OCR

1    format.

2        I'm inferring that since they maintain it on their

3    database in TIFF OCR format that would be the production that

4    should be made and, frankly, your Honor, what they represented

5    to us would be made in writing back in October.

6        So that's where we were, initially, your Honor, when we

7    started this colloquy, and we attempted, and it's kind of

8    ironic I think, your Honor, because we attempted to cooperate

9    with them from the outset.  We said let's work together.  Give

10   us access to the database.

11       Back in August, we asked for it.  Give us access to the

12   database, so we can see if this works.  Let's see if we can use

13   this database.

14       They said no.  They asserted alleged privacy concerns

15   which in our pleadings -- and I addressed it, your Honor, back

16   in October.

17       We said that we were willing to ensure the procedural

18   safeguards under the new Federal Rules of Civil Procedure and

19   the Proposed 502 to protect, protect, these alleged privacy

20   concerns.  That's illusory, your Honor.

21       We were willing to talk with them back in August about

22   this.  They said, no, go propound discovery, and then at that

23   point they said we'll produce OCR, TIFF when you propound

24   discovery, so we did.

25       And it was only in late November when they finally got

1   around to saying, okay, we'll give you access to the database,

2   so we didn't even have an opportunity, your Honor.

3       We were trying to work with them on a cooperative informal

4   basis, and we tried to use the database.  We don't want them to

5   incur more costs if it was unnecessary.  We don't want to

6   reduplicate databases if it was unnecessary.  We wanted to work

7   with them.

8       So I think it's ironic, your Honor, that our attempts to

9   work with them and get information is now being turned around

10  as somehow the onus and burden being on us to show that we're

11  not cooperating in good faith when I think the record clearly

12  establishes as early back in August that we tried to work with

13  them on a cooperative basis to facilitate this discovery.

14      The fact that we tried to use the database, and the

15  database turned out to be unsuccessful -- and I might add,

16  your Honor, another concern here is the fact that they at least

17  have some partial monitoring of this database when we access

18  it.

19      They reported to this Court how many hours we've logged

20  onto that database.  This was after we were assured that the

21  plaintiffs would not have our work product, but we now know

22  that they know how long we log on for.  I think that's a

23  serious concern, your Honor.

24      I think another serious concern is we propounded requests

25  for production of documents, and they give us access to the

1    database and then say, oh, and, by the way, there is these

2    confidentiality agreements.

3         And there are documents out there that might or might not

4    be responsive to your requests that we have possession of that

5    are subject to confidentiality documents.

6         We're not going to look through this to see if they're

7    responsive.  You've got to go figure it out with the third

8    parties.  That isn't access, your Honor, to the documents.

9    That's not a reasonable production.

10        And, yes, your Honor, there is the issues with the

11   database itself.  In my experience, in my firm's experience, in

12   my experience with the Justice Department, I have never come

13   across a database that had such few features and inabilities --

14             THE COURT:  Well, we all know --

15             MR. KATZMAN:  -- to use the documents.

16             THE COURT:  -- how bad government data systems are,

17   so I don't know if that would be the --

18             MR. KATZMAN:  Your Honor, when I was at the

19   Justice Department in the U.S. Receipt program, we used the

20   Concordance database for some of our larger litigation.

21        And I found the Concordance database to be far more

22   efficient than this cornerstone database, and, look, I'm not

23   telling them they have to use it.

24             THE COURT:  So what?

25             MR. KATZMAN:  Well, I'm just telling your Honor that

1    we cannot --

2         THE COURT:  I mean, it just goes to show me that you

3    want a database you prefer as opposed to their database.

4         MR. KATZMAN:  What it goes to, your Honor, is that --

5    why I bring this point up isn't to say that they have to

6    produce it to us for our database.

7         What it goes to is the reasonable good-faith belief that I

8    have tried to earnestly use this database expecting it would be

9    just like Concordance or at least somewhat like Concordance or

10   somewhat like Summation.

11        It's not, so I'm not suggesting that because of that they

12   should turn this over into Concordance.  I'm not suggesting

13   that.

14        I'm suggesting that they formed this database.  They put

15   all their documents on this database.  They did it in such a

16   manner that only if it's on this database is it in TIFF OCR

17   format.  If we give it to somebody else, it's renders the OCR

18   unrecognizable.  They decided unilaterally to do that.

19        That's fine, but I think they have to live with the

20   consequences of that, and the consequences are that if they

21   convert this, and it becomes ESI the obligation, typically,

22   under the law is that the burden is on them to produce the ESI

23   in the manner that they maintain it.  They maintain it

24   internally on their database in OCR format.

25        The burden is on them to produce it at their expense.

1    That's what the case law says.  If they want to shift the

2    burden, your Honor, they should have come to this Court and

3    sought a protective order.

4        If they want to say, hey, this is too expensive for us to

5    meet our obligations here -- and they acknowledge that this is

6    a cost-shifting issue.

7        And if it's a cost-shifting issue, the presumption is on

8    them to produce it at their cost.  And if they wanted to do it,

9    they had to come to this Court and seek the relief.  And if

10   they did seek the relief, your Honor, there's a couple of

11   thresholds that they'd have to meet.

12       One is that they have to show that they did not render

13   this data in an unusable format.  Well, by loading it onto the

14   system -- I don't know whether they have the actual hard copies

15   or not.  I don't know that.  All I know is that they've got

16   2,000,000 pages of documents on the system.

17       By placing it onto the system where it's only in OCR

18   format there, they have rendered it inaccessible in any other

19   format, already.  And as we said in our reply papers, that's

20   already a threshold level to prevent cost-shifting.

21       But, additionally, your Honor, you have to go through a

22   six-factor test to shift the costs, none of which they went

23   through.

24       And we went through some of that in our reply, and we've

25   pointed out that they haven't met their burden even though it's

1    their burden.

2        So, you know, am I sitting here and saying go pound sand?

3    That we're not going to work with you in light of the fact that

4    you failed to meet your burden?  No, I'm not.

5        I'm sitting here saying that we were willing to work with

6    them and had a colloquy about this and come up with some

7    reasonable arrangement.

8        But to come back to us and say, oh, it's $144,000, you

9    have to pay for it just ignoring the burden that's on them and

10    just tell us that we have to go ahead and comply or else or

11    you're just stuck with this database that you agreed to try,

12    provisionally, wholly is insufficient, and it does not comply

13    with 7034, so that's where we stand today.

14        We have submitted evidence, your Honor.  Independent of

15    their analysis, independent of their $144,000 estimate, we went

16    ahead and tried to figure out, gee, is there a less-expensive

17    way to do this, and we went ahead and found some less-expensive

18    ways that we submitted.

19        I could tell your Honor that based on our experience the

20    costs of what they're suggesting to convert this on I think it

21    ran into 60-some-odd cents a page is astronomically outrageous.

22    We have done this in similar cases for less than a penny a

23    page.

24        But even beyond that, your Honor, we've submitted

25    estimates of how you can get a program that could automatically

1    convert this.

2        If they just gave us the load files, the load files to put

3    this on Concordance which we were told by their vendor was

4    $15,000, and they gave us those documents or if they bought

5    this other program that costs another 15,000, the whole thing

6    could be done for $30,000.

7                THE COURT:  Well, I guess --

8                MR. KATZMAN:  So --

9                THE COURT:  -- that's why I'm mystified.  You're

10   gladly charging your clients $30,000 for you to appear and

11   argue this motion as opposed to just paying the money and

12   dealing with it later.

13               MR. KATZMAN:  Your Honor, no.  That is not true.  We

14   have met resistance time and time again, and it was during the

15   course of this that we tried to find alternatives.

16       We've been working on dual tracks, your Honor.  We've been

17   working on three tracks, actually, one, if the Court in my view

18   unreasonably denies this motion; two, trying to find suitable

19   alternatives to the Court saying, hey, you guys, why can't you

20   work it; and the third is really the first one is where have

21   they met their burden.  Where have they met their burden that

22   the cost should be shifted to us?  Where is that?

23       So, your Honor, if it's unreasonable for me to hold their

24   feet to the fire and have them comply with Rule 7034, I would

25   submit to you it's not.  I think that's a reasonable position

1    to take, but that doesn't mean we're not willing to work with

2    them and negotiate with them.

3        Again, we tried to keep that colloquy open.  They didn't

4    even counter with us.  If they had said to us, well, gee,

5    Steve, that's not -- you know, we said give us the documents

6    and give us 75 days, and they said, Steve, you know, wait a

7    minute, it's $144,000, let's talk about this, I would have

8    talked to them.  They didn't even say that.  They said, no,

9    your request is unreasonable, end of story.

10       So I don't think under those circumstances seeking a

11   relief from this Court was unreasonable at all, your Honor, and

12   I think that if you look through the reply papers we have

13   addressed point by point.

14       You know, they come at us, and they'll accuse us of

15   gamesmanship.  They accuse us of manipulating the system.

16   your Honor, I have got more weight than I could carry to

17   Las Vegas here of pleadings and correspondence showing

18   good-faith efforts to try to work with them on discovery.

19       This isn't somebody that's blowing off discovery.  This

20   isn't somebody that's walking away from the case.  We have

21   spent a lot of time on this case, and we want to try this case,

22   and we want to negotiate with them, and, frankly, we want to

23   share with them our expert reports, but we want to be able to

24   do it with information.

25       And the fact is that they've had the information for two

1    years, and we've had it on a limited basis for like two months.

2    That's just not right.  That's not fair.

3         What's fair is to give us some more time and give us a

4    mechanism to get the documents, so that we can respond and

5    intelligently dialogue with them.  We honestly want to do that.

6    That's what we want to do.

7         We don't want to play games.  I think the pleadings

8    reflect that we're not playing games.  I think our sincere

9    efforts and, frankly, our communications show that we're not

10   playing games.

11        Back in November -- and it's an exhibit, your Honor,

12   there.  Back in November, we submitted to them.  A month before

13   the expert disclosures were made, we said to them,

14   specifically, that we may need more time after we get your

15   expert reports and their company documents.  We told them that

16   in writing in November.

17        To say that we manipulated the system and waited to bring

18   this motion until after we got the expert reports is completely

19   undermined by that representation.  I can't see how they can

20   honestly say that.

21        And, frankly speaking, it's not even a close call as to

22   whether there's gamesmanship or not, you know, and it's not

23   something that I typically would even -- you know, it's a far

24   cry for me to accuse opposing counsel of gamesmanship and

25   manipulating the system.

1          I do that very rarely.  I do it sparingly in my 21 years

2     as a lawyer, and I certainly would never have done it in this

3     case.

4          So, frankly, your Honor, it's somewhat offensive to even

5     make that suggestion here because we have and earnestly tried,

6     tried to comply with their requirements.

7          And to suggest to us that we can't examine the, quote,

8     "hundreds of boxes of documents" that they admit are relevant,

9     there's no question that the hundreds of boxes of documents on

10    that system used to establish the fraudulent scheme, used to

11    establish the Ponzi-like nature, used to establish insolvency.

12    You can't say that's irrelevant.  It's the whole case.

13         If they can't prove insolvency, if they can't prove a,

14    quote, "Ponzi-like scheme," if they can't prove the massive

15    looting that they're alleging, I'm not going to take that for

16    granted, your Honor.

17         I don't care what happened in other cases.  My client is

18    entitled to due process, and due process allows us to examine

19    those documents.

20         And we intend to examine those documents and challenge

21    them on that because that's an element they need to establish,

22    and --

23              THE COURT:  Okay.

24              MR. KATZMAN:  And maybe other lawyers have done this,

25    and maybe they've done it well, and maybe they haven't.  I

1  don't know, your Honor.  I don't know how good those cases were

2  tried, and I don't know whether the facts of the cases were

3  similar.

4      They're alleging my clients have gone and engaged in fraud

5  and alleged issues of insolvency going back years.  I don't

6  know if that was in the Reale case.

7      And I certainly don't know whether Mr. Reale was accused

8  of being involved in fraud as early as the mid '90s like my

9  clients are being accused.

10      So it's far more reaching.  It's far more expansive,

11  and, frankly, we're talking about people's lives here,

12  your Honor.

13      We're talking about an elderly woman who is facing

14  financial ruination by these allegations.  And to give us

15  two-and-a-half months, it's not only eminently reasonable.

16          THE COURT:  Well --

17          MR. KATZMAN:  It's fair.

18          THE COURT:  -- why did you insist on expedited

19  discovery in the first place, then?

20          MR. KATZMAN:  For the very reasons of these

21  allegations.  For two reasons.  The first reason is my client's

22  innocent.

23      There is no -- you know, maybe there's some

24  fraudulent-conveyance actions here.  Maybe there's some

25  constructive fraud.

1    We have to examine the solvency.  We have to examine

2    reasonably-equivalent value.  We have to examine identity

3    interests.  That's what lawyers do.  They litigate those

4    things, but they have gone so far beyond that.

5         They are accusing my clients as really being part and

6    parcel and are the masterminds of a multimillion-dollar scheme,

7    and my clients wanted their day in court.  They still want --

8              THE COURT:  Well, isn't part --

9              MR. KATZMAN:  -- their day in court.

10             THE COURT:  -- part of the problem from your trying

11   to tie the three defendants together who have different

12   alleged even in the complaints levels of culpability, and why

13   are you insisting on doing that?

14             MR. KATZMAN:  Well, for the very reason that we're

15   seeking consolidation with the Deloitte action, your Honor,

16   because as this Court knows there is much, much overlap in

17   these transactions, and I could go into that with respect to

18   the discovery, but what we've gathered thus far is there's

19   much, much overlap.

20        And besides of which, your Honor, they want to distinguish

21   the Kathryn Petersen and the Fulton actions.  Honestly, I don't

22   understand why they charged Kathryn Petersen.

23        Since DTDF was a plaintiff in both the Kathryn Petersen

24   action and what I refer to as the main action, the

25   Mary Petersen action, I don't see why they did two adversary

1    proceedings, anyway.  Judicial economy really screams for that

2    to be tried as one.

3        But, secondly, your Honor, both the Kathryn Petersen case

4    and the Stanley Fulton case rely on actual fraud, and what is

5    the basis of the actual fraud?

6        The basis of the actual fraud if I understand it correctly

7    is that DTDF paid some money that it wasn't owed, that it

8    didn't owe.  It paid Kathryn Petersen some money, and it paid

9    Stanley Fulton some money.  That's the actual fraud as I

10   understand it.

11       To me, that's really a reasonably-equivalent-value

12   analysis if they're suggesting that the mere fact that I pay

13   something that facially does appear that appears that I don't

14   owe contractually doesn't make it fraudulent, your Honor.  You

15   got to jump through a lot more hoops to establish fraud than

16   that.

17       And, frankly speaking, to establish the fraud and to

18   establish our defenses to that fraud which is the relationship

19   between DTDF and USACM and the relationship between DTDF and

20   USAIP requires a comprehensive analysis similar to what the

21   Petersen case has.

22       In the Stanley Fulton case -- I'll give you an example,

23   your Honor.  The Stanley Fulton case, USACM guaranteed the

24   obligation, so it was a USAIP obligation guaranteed by USACM.

25       If USACM guaranteed the obligation, and a payment was

1   made, arguably, it was for the benefit of USACM, was it not?

2   At least, that argument can be tendered.

3       We have to examine the relationship of all these entities,

4   your Honor, to determine whether there are viable defenses to

5   this fraud claim, so that's why we're seeking for that.  And,

6   besides, there's economies of scale.  There's judicial

7   efficiency in having these things consolidated.

8           THE COURT:  Okay.  As just a side note, you have

9   rejected the settlement-conference idea, correct?

10          MR. KATZMAN:  No.  No.

11          THE COURT:  Didn't --

12          MR. KATZMAN:  We want it.

13          THE COURT:  Didn't we set it?

14          MR. KATZMAN:  We --

15          THE COURT:  And wasn't it vacated?

16          MR. KATZMAN:  We want it.  We suggested that we have

17  a settlement conference in front of a judge who has been used

18  by them in another case dealing with some of these similar -- I

19  think it was for the Beadle, McBride, wasn't it not?

20          MR. T. O'REILLY:  As set forth, yeah --

21          UNIDENTIFIED SPEAKER:  What?  (Indiscernible).

22          MR. T. O'REILLY:  -- (indiscernible).

23          MR. MADDEN:  Yeah.  It was Beadle I think.

24          MR. KATZMAN:  Yeah.

25       (Colloquy not on the record.)

1           MR. KATZMAN:  It was from Beadle, your Honor.

2           MR. J. O'REILLY:  It was Beadle, McBride --

3           MR. KATZMAN:  Yeah.

4           MR. J. O'REILLY:  -- before him.

5           MR. KATZMAN:  It --

6           UNIDENTIFIED SPEAKER:  Private (indiscernible).

7           MR. KATZMAN:  We suggested that that person would be

8    a good person to use, and it was in our proposal.  It's in our

9    motion.  We --

10          THE COURT:  That's not a judge.  It was a JAMS

11   person, wasn't it?

12          MR. KATZMAN:  Yes, your Honor.

13          THE COURT:  All right.

14          MR. KATZMAN:  That's correct.

15          THE COURT:  So don't tell me it was a judge --

16          MR. KATZMAN:  I am sorry, your Honor.  I --

17          THE COURT:  -- I mean --

18          MR. KATZMAN:  I'm not --

19          THE COURT:  -- because we have a judge who comes down

20   and does settlement conferences, and we tried to arrange one,

21   and, apparently, it was rejected.

22          MR. KATZMAN:  Well, your Honor, there's two issues

23   with respect to that if I may?  First of all, I wasn't trying

24   to mislead the Court.  I wasn't familiar with this individual

25   from JAMS.  I didn't know whether he was a retired judge --

```
 1              THE COURT:  He's --
 2              MR. KATZMAN:  -- or not.
 3              THE COURT:  -- an attorney.
 4              MR. KATZMAN:  Okay.  I'm sorry --
 5              THE COURT:  Friends with --
 6              MR. KATZMAN:  -- your Honor.
 7              THE COURT:  Friends with your co-counsel.
 8              MR. KATZMAN:  I don't know if he's friends or not,
 9     your Honor.  I do know my co-counsel knows him.  I don't know
10     if they're friends.  I know that they used him in the
11     Beadle, McBride case, so, again, we're open to alternatives as
12     well, your Honor.
13          I'm not suggesting -- we're not trying to get a mediator
14     that's somehow going to be partisan.  We're trying to get an
15     objective person.
16          But two points, your Honor.  We want someone that,
17     frankly, want to do it at the right time.  And in my
18     experience, mediation is most beneficial at or near the close
19     of discovery because there are too many unresolved issues.
20          And, strategically speaking, parties do not want to and
21     front their hands until their discovery is complete, so the
22     timing is one issue, your Honor, as to why we haven't had the
23     settlement judge.
24          Frankly speaking, the other issue is because we've been
25     alleged in aiding and abetting, and we, frankly, thought, gee,
```

1    the other cases were fraudulent-conveyance claims.  Here's a

2    situation where it's far more than fraudulent-conveyance

3    claims.

4        We thought here's somebody who's got some experience from

5    the Beadle, McBride aspects of it of something beyond

6    fraudulent conveyance, so we thought that person would be a

7    good person.

8        And the other thing, your Honor, is it's a logistical

9    thing.  When you use someone from JAMS, they're more flexible

10   because they're getting compensated.

11              THE COURT:  Well, a lot of compensation.

12              MR. KATZMAN:  Yeah.  And we're willing to pay our

13   share.  I think that also shows good faith.  If we weren't

14   willing to engage in good faith, your Honor, we'd be saying

15   bring on the settlement judge.

16       It costs us nothing, and we don't have to do it.  We don't

17   have to agree what the judge says.  I think the fact that we're

18   willing to pay that money is another factor that establishes

19   our good faith.

20       And, you know, frankly, at this point, I don't know

21   whether that's yea or nay from their side.  I don't know

22   whether they say.  We made that proposal.  They haven't come

23   back and said that's a good proposal or a bad proposal.

24              THE COURT:  And it was just a collateral note, so --

25              MR. KATZMAN:  I'm sorry --

1          THE COURT:  I --

2          MR. KATZMAN:  -- your Honor?

3          THE COURT:  It was just a collateral issue in my

4    mind.

5          MR. KATZMAN:  Okay.

6          THE COURT:  It has nothing to do with this motion,

7    but --

8          MR. KATZMAN:  Well, look, if we can have a colloquy

9    with them as to the right person -- and, you know, up until we

10   reached this roadblock, I thought things were going well.

11       I'm sorry.  I'm earnestly sorry that they think that we

12   are engaging in games and manipulating the system because I am

13   not.  We are not.

14       We are trying to do our job to understand and comprehend

15   the issues and then intelligently from a position of equal

16   strength have a colloquy with them.  That's what we're trying

17   to do here today.

18          THE COURT:  Okay.  All right.  Thank you.  Okay.

19       Opposition.

20       (Colloquy not on the record.)

21          MR. MADDEN:  Good afternoon, your Honor.  I think

22   it's important at the outset to note I think as your Honor did

23   that there are three distinct cases here.

24       There is the Stan Fulton case, the Kathy Petersen case,

25   the Mary Petersen case, and the defendants have repeatedly

1    tried to lump all three together as evidenced by the fact that

2    this motion to compel was just filed in the Mary Petersen

3    cases.

4         But these cases are very, very different for a number of

5    reasons, and I think it's important to point out those

6    differences at the beginning here.

7         With respect to the Fulton and Kathy Petersen motion to

8    compel, there is just no basis whatsoever to compel production

9    given the narrowness of these cases.

10         Another point just to make is that the defendants have

11    only recently served requests for production in those cases,

12    and our responses aren't even due.

13         But even if they had, the vast majority of the

14    2.2 million pages of documents on the database are marginally

15    if relevant at all to the allegations --

16              THE COURT:  Well --

17              MR. MADDEN:  -- in those cases.

18              THE COURT:  -- I'm only going to consider the

19    Mary Petersen's because that was the only request for

20    production --

21              MR. MADDEN:  Okay.

22              THE COURT:  -- that was made.

23              MR. MADDEN:  All right.  Thank you, your Honor.  Then

24    as to the Mary Petersen case this really isn't a complicated

25    discovery dispute at all.

1        This is a case where the defendants at the very beginning

2    where Mary Petersen insisted on an aggressive pretrial schedule

3    insisted that the plaintiffs have an early expert-report

4    deadline.

5        But as soon as they had our expert reports in hand, they

6    immediately turned around and asked to extend their own

7    expert-report deadline by two months, to extend the factual

8    discovery-cutoff deadline by two months, to take free discovery

9    from us during that informal settlement conference which we

10   agreed to attend in early January.  That's what we did in lieu

11   of the settlement conferences with Judge Nakagawa.

12       During that conference, Mr. Yoder and I put on a

13   four-hour PowerPoint presentation.  We brought our experts and

14   made our experts available for a question-and-answer session

15   all in the hopes that we could have a meaningful settlement

16   discussion.

17       The joint discovery plan that we all submitted to the

18   court that set up this informal settlement conference required,

19   quote, "the parties to attend."

20       We learned days before the settlement conference that the

21   clients would not be attending.  It would just be the lawyers,

22   and then they apparently had no settlement authority at the

23   settlement conference.

24       Beyond that, once they had our expert reports in hand,

25   after they had extended their own discovery deadline, they

1    enjoyed free access to the database for almost three months

2    now.

3          And then on top of that they've recently filed this motion

4    to withdraw the reference more than eight months late under the

5    local rule of 5011(a).

6          And so now on the eve of their third extension of the

7    expert-report deadline, the defendants are asking this Court to

8    again extend that deadline by two-and-a-half months.  Why?

9          Is it because we haven't produced something?  Not at all.

10   We've given them access to the database in the same form in

11   which we maintain it, but they decided they don't like the

12   database.

13         After they've used it for about three months now, they've

14   decided there are certain features, namely, the ability to tag

15   documents that they don't have access to, and they don't like

16   that, so we offered to produce the underlying documents in

17   TIFF OCR-searchable format, your Honor.

18         The problem is they don't want them with a Summation load

19   file.  They don't want to put it on a Summation database.  They

20   want it on a Concordance database.

21         Well, we then offered, fine, we'll provide it to you in

22   TIFF-image format with an OCR-searchable Concordance load file,

23   but you're going to need to pay the cost of that.

24             THE COURT:  And he claims that you never got back to

25   them on the issue of payment.

1          MR. MADDEN:  Well, yeah.  Yeah.  I guess, yeah,

2    your Honor.  We never did talk about that.  There was such a

3    disagreement about that at the time just we never had a

4    conference about that.

5          But even when we offered to do that, we offered to

6    reformat it for use on their preferred software, but they want

7    us to foot the bill, and that bill is about $120,000,

8    your Honor.

9          The declaration they've submitted to the court indicates

10    it's about $15,000.  There are some mathematical errors there

11    that I'll point out in a second.

12          But the point is they're asking us to pay the entire bill,

13    and that's not what's required under Rule 34.  Rule 34 requires

14    that we either produce it in the manner in which it's kept or

15    in a reasonably-usable format.  We've offered to do both.

16          We have provided it in the manner in which we have it on

17    the database, and then we went above and beyond that and said,

18    well, fine, if you don't like the database, then we'll give you

19    the disks that are TIFF images, OCR-searchable with a Summation

20    load file, and that's reasonably usable.

21          The problem is they really want some other kind of

22    software.  They want it on Concordance, and that's what this

23    hearing's all about.

24          Now, I don't want to rehash the factual background.  I

25    think the briefs have done that fairly well, but there are a

1    couple key points that I need to make just in response to some

2    of the points that were made earlier.

3        I think it's important to note that at the Rule 26(f)

4    conference back in July and August we talked about this

5    database, and we expressed hesitation to just turn it over due

6    to some privilege issues, due to some pending settlements that

7    we were negotiating with some of the professional defendants.

8        We also explained that even if we were to turn that over

9    they're not going to have the ability to tag documents.  They

10   were aware of that limitation.

11       That's the one difference in our access to the database

12   versus theirs, and we explained that to them back in July and

13   August.

14       Despite those issues, despite our hesitation to turn over

15   the database, despite knowing that they wouldn't have the

16   ability to tag, they still came into this court in August and

17   said, Judge, we want an expedited trial.  We want early

18   expert-report deadlines.

19       Then they waited three months after the Rule 26(f)

20   conference to serve any requests for production, and they only

21   served them at that time by Mary Petersen.

22       Then in late November we gave them access to the database.

23   We looked at the breadth of these requests.  There were

24   514 requests, your Honor, requests like documents showing that

25   Geoff Berman is the liquidating trustee, documents showing that

1    USACM was a mortgage broker.

2        I mean, they were just so burdensome that we said, fine,

3    you can have access to the database.  We started negotiating

4    that.  We exchanged drafts of the database-access agreement.

5        And since then, ever since late November, they've had

6    access to the database on the exact same terms we have other

7    than the tagging feature, a feature, a limitation, that was

8    explained to them months ago back in July and August.

9        At about that same time in late November, we were coming

10   up on our own expert-report deadline, that early deadline that

11   they had insisted on, and we asked for a short extension.

12       We asked for a two-week extension, your Honor, and we were

13   told no, and the E-mail said, quote, "The dates in the

14   scheduling order were agreed upon after extensive discussions,"

15   unquote, and defendants, quote, "have a strong interest to seek

16   resolution of this matter expeditiously and are not predisposed

17   to extending the time frame."

18       This E-mail also contained a very important clue as to

19   their litigation strategy.  It went on to say, quote, "Please

20   also be advised that until we are provided with your expert

21   reports we will not be able to determine whether or not we will

22   need additional time to prepare our case."

23       So, basically, what they were asking is you meet your

24   deadline, and you've got to stick by it.  And once we see your

25   reports, we'll tell you if we need more time.

1    Well, we eventually did convince them to give us that

2    two-week extension that we needed.  But to do that, we had to

3    promise to present our entire case at that informal settlement

4    conference, bring our experts, lay out that four-hour

5    PowerPoint presentation with notebooks of hot documents to

6    explain our case, and then on top of that they wanted their

7    expert-report deadline.

8    We got the two weeks.  They wanted a month, so that they

9    could come to that conference, hear our case, and then prepare

10   their expert reports.

11   Well, we agreed to all of that.  We produced our expert

12   reports in mid December.  We prepared for a settlement

13   conference that was set for December 18th.

14   As your Honor may remember, there was an ice storm.

15   Flights were cancelled.  We postponed the settlement conference

16   to January 5th.

17   We came out here.  We spent four hours walking through the

18   PowerPoint.  We gave them the notebooks of hot documents.  We

19   presented our experts for the question-and-answer session.  The

20   entire meeting lasted about six hours.

21   And then within days after that presentation and with the

22   notebooks, with our expert reports, and everything the

23   defendants revealed for the first time that they wanted to

24   extend all the pretrial deadlines.

25   And then a few days later, about a week later, on

1    January 16th they told us that they had decided they didn't

2    want to use the database.

3        Now, we were aware that they weren't happy with it.  I

4    mean, we knew that back in early December when they first

5    started using it that they didn't like the ability to tag --

6    they couldn't tag documents and all the other things they say

7    in their motion.

8        But for the first time, January 16th, they said we don't

9    like this database.  We want to talk about alternatives.  We

10   immediately responded by saying as we have always said since

11   October we'll give you the documents in TIFF-image format,

12   OCR-searchable with a Summation load file.  We'll do that.

13   That's reasonably usable under Rule 34.

14       We asked if you don't want it in Summation what software

15   are you going to use.  And when they told us that they were

16   going to use Concordance, we said, fine, we'll work on getting

17   you some estimates.

18       And we got estimates from our vendors, and those estimates

19   range from about $75,000 to $121,000, and we provided those

20   estimates.  Those are set forth in our response.

21       We then traded E-mails.  We had some conference calls

22   about it exactly what it would cost and with the unit.  At the

23   same time, we gave our vendors' contact information to their

24   paralegal.  Their paralegal contacted the vendor.

25       But then with their expert report bearing down on them for

1    I think it was the second or third extension by that point they

2    filed the motion to withdraw reference eight months late trying

3    to get this case into the district court consolidated with the

4    Deloitte case with a much longer pretrial schedule.

5          And then they filed this motion seeking to extend all of

6    the pretrial deadlines by two-and-a-half months at a minimum,

7    and their reason was because they didn't like the database, and

8    they wanted the documents in some other format, their preferred

9    format.

10         Now, before I address any of the substantive arguments,

11   that's just the factual background.  I just want to put into

12   perspective exactly what they're asking for here.

13         First, on the cost, they've badly miscalculated that.  The

14   declaration by Ms. Coles that they have submitted in their

15   reply states that the vendor had quoted them seven-tenths of a

16   cent to convert these TIFF images with a Summation load file

17   into the Concordance load file, and they say that will cost

18   about $15,000 or so given the number of pages on the database.

19         Well, it's not reasonable to believe that anybody could do

20   that work for seven-tenths of a cent.  We spent 14 cents a page

21   just to get the documents in TIFF format with a Summation load

22   file in the first place.

23         And some of the cases they rely on like the Bristol-Myers

24   case refer to a similar rate of about 14 cents a page for that

25   kind of work.

1      But even beyond that, I have a declaration from our vendor

2      that I obtained over the weekend with E-mails that he sent to

3      Ms. Coles showing that he gave her the 7-cents-a-page quote,

4      not seven-tenths of a cent.

5      And when you do the math with the pages on the database,

6      that works out to about $155,000.  She just misplaced the

7      decimal point, so we're talking about real money here.

8      Second, the other common-sense point I want to make is

9      unlike all the cases that they cite this is not a situation

10     where we went in and had existing electronic data on a backup

11     tape or fragmented data somewhere buried, and we went, and

12     we're trying to salvage that or extract it.

13     These were paper documents.  These were paper documents

14     that we at our own expense went in and imaged and made

15     searchable.

16     Now, surely, if we hadn't have done that, this Court

17     wouldn't require us to respond to these requests for production

18     with all these paper documents by doing that work now.

19     So why after we've done that and already spent the money

20     and incurred that expense do we have to now incur the

21     additional expense to make it usable on their preferred

22     software?

23     Summation is a widely-used database-software system.

24     it's not like we chose some obscure system that's just not

25     usable.

1      If anything, the defendants are really getting a windfall

2  here.  They're getting paper documents that we've spent

3  14 cents a page, and we're asking them to spend 7 cents a page

4  to put into their preferred format.  Or if they don't like

5  that, we'll just give you the documents with a Summation load

6  file.  We'll give them to you.

7      The third common-sense point is just let's think about

8  the --

9           THE COURT:  So you will get them a Summation load

10  file.

11           MR. MADDEN:  We will, your Honor.  And by the way,

12  that will cost us $5,000, and we'll do that.

13           THE COURT:  And what's counsel's contention that you

14  wouldn't do that?  Because he just never asked you?

15           MR. MADDEN:  He's never asked.  They've always said

16  we want Concordance.  We want Concordance.  We --

17           THE COURT:  Okay.

18           MR. MADDEN:  We've said this is what they're in.  We

19  have the Summation load file, but they wanted Concordance.

20           MR. KATZMAN:  I don't want to interrupt Mr. Madden,

21  but I do have a response to that --

22           THE COURT:  Okay.

23           MR. KATZMAN:  -- your Honor.

24           MR. MADDEN:  The third common-sense point I want to

25  make, your Honor, is just to consider what effect this would

1    have in other cases, not just this case with all the other

2    adversary proceedings, but, also, other cases where you have

3    liquidating trustees.

4        The federal rules are designed to make discovery

5    efficient, and that would not be the case here if every time a

6    party decides to take paper documents and convert them into

7    some sort of searchable format we then have to face additional

8    costs.

9            THE COURT:  So these weren't even documents that

10   Mesirow put together.  First of all, they weren't documents

11   that the debtor had in some searchable format.

12           MR. MADDEN:  No, your Honor.

13           THE COURT:  These were like paper that you as part of

14   litigation put together in a paper (sic) format.

15           MR. MADDEN:  That's correct, your Honor.

16           THE COURT:  Okay.

17           MR. MADDEN:  They also include --

18           THE COURT:  I mean in an electronic format.

19           MR. MADDEN:  It also includes paper documents

20   produced by parties that we have investigated in the Rule 2004

21   process --

22           THE COURT:  Okay.

23           MR. MADDEN:  -- during our investigation.

24        So, I mean, if you think about the policy concerns here

25   with a trustee, a trustee comes into the case and really

1    doesn't know who the potential defendants are, so it's

2    impossible for the trustee to really coordinate and say, well,

3    gee, guys, do we want a Summation load file, do we want a

4    Concordance load file, what load file should we do.  We chose

5    Summation.  It's widely used.

6        The second point is the trustee would face the prospect of

7    repeatedly having to reformat the data.  What happens when

8    Wells Fargo comes in here and says, your Honor, we want it in

9    Ringtail format?  We don't like Concordance or Summation.

10       Now we're going to have to spend another $100,000 if the

11   Court would order the trust to pay that cost, and so I think

12   the issues before the Court can have a really negative impact

13   not only in this case, but in other cases.  Okay.

14       Substantive arguments, I'll make these quick.  We believe

15   the database is sufficient.  We believe it complies with

16   Rule 34.  It's exactly the same form in which we have them,

17   TIFF images, OCR-searchable.  That's exactly what they have.

18       If they don't like that, again, here are the Summation

19   load files, so that you can put it on your own database.

20   That's definitely reasonably usable under Rule 34, and it's the

21   form in which we maintain it ourselves.

22       The database issue, those are really all red herrings.  I

23   just want to respond to one point.  We do not have the ability

24   to review their searches or look at documents they've printed

25   or anything like that.

1        I want to draw an analogy.  This is like the old days with

2    the paper documents where I make my boxes available in my

3    conference room.  Come by and review them.

4        And then that lawyer goes into court later and says I

5    wasn't able to review the documents, and I submit a declaration

6    to the court, and I say he was in there for eight hours.

7    That's all I've done.

8        They said the database wasn't usable.  We haven't been

9    able to really make use of it.  We submitted information

10   showing they've used it for a number of hours.

11       The last point I guess is just good cause and whether

12   deadlines should be extended.  We haven't prepared any expert

13   reports for the Kathy and the Stan Fulton cases, and that's

14   because those are actual-intent cases.

15       Insolvency's not an issue.  Reasonably-equivalent value

16   isn't an issue.  Those are cases involving the 10-90 loan,

17   your Honor.  We think actual intent is abundantly clear in

18   those cases.

19       Those are limited cases involving loans that Diversified

20   paid for other parties and then accounted for it by recording

21   the money against the 10-90 loan, so I don't think there's any

22   need for any extension as to those cases.

23       If the defendants think that they need to prepare expert

24   reports with respect to value given for a reasonably-equivalent

25   value defense or a 548(c) defense or whatever, those documents

1    should largely be in their own hands.  They should know what

2    value they gave to the debtor in exchange for the transfers.

3         But to the extent that there are other documents that they

4    need to prepare their expert reports whether that's insolvency

5    or whatever, they have had nearly 60,000 pages of our initial

6    disclosures since late September, more than five months before

7    their expert-report deadline.

8         They've had access to our database since late November,

9    about three-and-a-half months before their expert-report

10   deadline, and they've had our expert reports since December,

11   two-and-a-half months before their expert-report deadline.

12        They've engaged in almost no discovery.  They waited three

13   months after the Rule 26(f) conference to serve any requests

14   for production.

15        They would have had the responses.  Had we just given them

16   everything and categorized it or whatever, they would have had

17   those documents three weeks before their expert-report deadline

18   as it stood then.

19        And even when they did serve the requests for production,

20   it was only Mary Petersen that did so, and, again, 514 requests

21   for production were served.

22        They weren't geared at all towards the issues in the case.

23   They really seemed to be geared toward forcing us to give them

24   access to the database.

25        The complications that have been referred to, the

1    unexpected complications I think is how they were described in

2    the brief, don't excuse the lack of diligence.  They've known

3    about the inability to tag documents since July or August.

4        We live with all of the other limitations of the database

5    whether that's how long it takes to download a document or

6    whatever it is, the ability to conduct fuzzy searches.  We're

7    living with that ourselves.

8        They've certainly known about those limitations since

9    December, late November when they got access to the

10   database.

11       They point to or they say in their motion that our expert

12   reports are so deficient that that's somehow caused them

13   complications in the ability to -- I don't understand that.

14       If our expert reports are so bad and so deficient, they

15   ought to just move for summary judgment.  They ought to have no

16   problem preparing their expert reports.

17       In any event, they've known about all of these alleged

18   unexpected complications since they submitted the last round of

19   joint discovery plans, December 16th, which were approved by

20   the Court on December 29th.

21       At that point in time, they had had access to the database

22   for nearly a month.  They had our expert reports in hand.  They

23   were aware of the alleged limitations with the database.

24   What's changed since then, your Honor?

25       What's changed is we came to an informal settlement

1    conference.  We showed them that we were prepared to try this

2    case, and now they want more time.

3        The expert-report deadline has already been extended

4    several times for them.  It's been extended from December 23rd

5    to January 30th to February 13th, and now I think it's now to

6    March 2nd.

7        They've had our expert reports for more than two months,

8    and it's time that the Court holds them to the expedited

9    pretrial schedule that they demanded.

10            THE COURT:  Okay.  Response.

11            MR. KATZMAN:  Thank you, your Honor.  First -- and,

12    actually, this is one of the two points I was inquiring as the

13    Court asked why we asked for an expedited discovery schedule

14    when I was talking about the allegations and Ms. Petersen's

15    age.

16        (Colloquy not on the record.)

17            MR. KATZMAN:  The other reason that we did,

18    your Honor, is we looked at the rules, and we looked at what

19    good cause was.

20        And good cause says that extensions are liberally granted,

21    and they're liberally granted because it wants to encourage

22    counsel -- I'm paraphrasing, your Honor, from the

23    Advisory Committee notes.

24        But it more or less states that it wants to encourage

25    counsel to set expedited schedules and try to adhere to

1    expedited discovery deadlines.

2         Your Honor, Mr. Madden continually says that we agreed to

3    discovery plans and only reversed courses after we got their

4    expert-disclosure reports.  That's not true, your Honor.

5         As I have pointed out, your Honor, that we stated back in

6    writing, and this is from their very own exhibit that we

7    stated.

8         And it was in the context of an E-mail discussing our

9    frustrations on November 17th that, "Please also be advised

10   until we are provided with your expert reports and all

11   documents that which they and you relied to support your

12   numerous allegations we will not be able to determine whether

13   or not we need additional time to prepare our cases."  We said

14   that in November, your Honor, so I don't understand how they

15   say that we're --

16              THE COURT:  Well --

17              MR. KATZMAN:  And --

18              THE COURT:  -- that just relates to the expert

19   report.

20              MR. KATZMAN:  And the --

21              THE COURT:  What about the matters for which an

22   expert report is not required?

23              MR. KATZMAN:  And the documents, your Honor,

24   because --

25              THE COURT:  You didn't say that.  You said the expert

1    report or the documents upon which he relied.

2           MR. KATZMAN:  "And all documents from which they or

3    you relied to support your numerous allegations," your Honor --

4           THE COURT:  Okay.

5           MR. KATZMAN:  -- not just the expert report.

6           THE COURT:  All right.  So then why did you enter

7    into that new discovery plan in December, then?

8           MR. KATZMAN:  Because we were acting in good faith,

9    your Honor.  We were still trying --

10          THE COURT:  Well, you knew then --

11          MR. KATZMAN:  -- to set that.

12          THE COURT:  -- you didn't have it.

13          MR. KATZMAN:  We knew then that we didn't have this

14   informal presentation that we believed would answer the

15   questions.

16       And, frankly, we didn't have at that point in time the

17   supporting documentation, so we were still trying, and we were

18   still trying to use the database, your Honor.

19       A couple other things I want to point out.  The math,

20   Mr. Madden talks about 7 cents per page.  The math by our

21   calculation that their proposal is ranges from 50 to 65 cents

22   per page.

23       And Mr. Madden says that it cost him 7 cents per page to

24   load the file onto their database system, and I presume that

25   includes rendering them OCR-usable.

1           If that's the case, your Honor, we were given the

2      estimate.  Christi Coles was given an estimate not to render it

3      OCR-usable, but just to get the associated load files, so

4      that's where we figured that point-7-cent-a-page was.

5           THE COURT:  So he has all, but the associated load

6      files, and you're not going to pay for those.  You're refusing

7      to pay --

8           MR. KATZMAN:  Well, your Honor --

9           THE COURT:  -- for those.

10          MR. KATZMAN:  No.  That's the most curious argument

11     that I've heard here today, and this is the first time that I

12     have heard the plaintiffs suggest that they would produce the

13     documents to us with the Summation load files.

14          They did produce the initial disclosures with load files

15     that, frankly, for two of the three disks we were able to load

16     onto our Concordance database, and they said they did that as a

17     convenience for us.

18          When I go back to their correspondence, your Honor, of

19     October 10th, 2008, he doesn't specify what manner that he was

20     going to -- what load files he was going to give us.

21          And, frankly, we have not been in a position to even know

22     that they were going to give it to us in Summation load files.

23     This is the first that I've heard of that.

24          THE COURT:  And since these aren't documents that

25     were produced by them in this format, why isn't it work

1    product?  Why can you insist?

2       I mean, Rule 34 seems to me to deal with documents held by

3    an organization, a plaintiff, a party in the ordinary course of

4    that party's business.  These are documents they compiled as a

5    part of their litigation.

6             MR. KATZMAN:  These are documents -- your Honor, I

7    would submit to you that the formation of the database

8    converted hard copies to electronic data.  They transmutated

9    the data into electronic data.

10            THE COURT:  Okay.  So why are you -- so you have to

11   pay for copies.

12            MR. KATZMAN:  Well, certainly, your Honor, that's a

13   possible alternative.  They can go through the 2,000,000 pages

14   and find what's responsive and produce them.

15            THE COURT:  Well, you've asked for enough stuff.  I

16   think all pages will be responsive.

17            MR. KATZMAN:  No.  But that's where we come back to

18   ground zero.  I don't think either side wants that.  I don't

19   think either side --

20            THE COURT:  Okay.

21            MR. KATZMAN:  -- wants that.

22            THE COURT:  All right.  Well, I'm going to deny the

23   motion in part.  I find that they have produced the documents

24   in the format they were kept in.

25       They certainly were -- well, there were no electronic

1    documents kept in the ordinary course of business of USACM or

2    Diversified Trust Fund.  These are now documents that the

3    estate has converted into electronic format.

4         So even if we assume that you've got the right to demand

5    those documents in an electronic form, they have produced them

6    in a manner in which they ordinarily maintained it, and it's a

7    reasonably-usable form or forms, and they need not do it in

8    more than one form.

9         If you want another format, you can pay for it.  If you

10   think the Summation load files are sufficient, you can have

11   that, but you got to pay for it.

12        I'll give you 30 more days -- 40 more days to do your

13   expert report.  That will give you, in essence, ten days to get

14   it converted over and then refer to it.

15        You know, you've known about this problem for a while.

16   You didn't do anything about it except fight about it, file

17   motions, so I really don't have a lot of empathy.

18        Vis-a-vis Fulton, there is no request for production out

19   there, but I'll nonetheless extend the deadline for 30 days,

20   30 days as to Fulton and 30 days as to Kathryn Petersen.

21        I think didn't I previously -- now, I believe that the

22   plaintiffs agreed there was a right to trial, a jury trial, as

23   to all defendants, except Michael Petersen; is that correct?

24             MR. KATZMAN:  Correct, your Honor.

25             THE COURT:  All right.  And didn't I not give you a

1    district court trial date?  I didn't?  That was another case?

2              MR. MADDEN:  I don't --

3              THE COURT:  I --

4              MR. MADDEN:  -- think so.

5              THE COURT:  I understand you've got a motion to

6    withdraw the reference.  But if I'm giving you a district court

7    trial date, that obviates that.

8         You can go over there and still ask for a consolidation if

9    you want to play that game, but I can give you a district court

10   trial date right now.

11        I can give you the week in July 13th.  That should still

12   work out with all the deadlines, shouldn't it?  So that would

13   be February discovery's deadlines.  March.

14        (Colloquy not on the record.)

15             THE COURT:  So I will enter an order transferring the

16   case to district court effective -- let's see.  If I extend it

17   30 more days, that would be -- March 24th plus ten --

18   April 7th, and then what are the deadlines after the expert

19   reports?

20             MR. MADDEN:  We have a discovery cutoff April 14th.

21             THE COURT:  April 14th, so I'll extend that for

22   30 days.  That would be May 14th.

23        And I think it best that any post-discovery motions go

24   ahead and go to the district court, so I will transfer the case

25   to the district court effective May 14th.

1          Trial is set July 13th.  Now, of course, that's subject to

2     the district court's changing an order, and I will note in that

3     order that there's a motion for withdrawal of the reference and

4     a consolidation pending, and my order would moot the

5     withdrawal.  It does not moot the motion for consolidation.

6          Now, what do you want to do about the Michael aspect?

7               MR. MADDEN:  We're set for a hearing I think on

8     March 6th --

9               THE COURT:  Okay.

10              MR. MADDEN:  -- on that issue --

11              THE COURT:  On that motion?

12              MR. MADDEN:  -- the motion to strike the jury demand.

13              THE COURT:  And there is no response to that motion.

14              MR. KATZMAN:  The response will be filed today,

15    your Honor.

16              THE COURT:  Why isn't that way late?

17              MR. KATZMAN:  Because I looked at their notice,

18    your Honor, and they gave us 15 days after the date of the

19    filing of their motion and, actually, filing it today would be

20    early under that.

21              THE COURT:  Okay.

22              THE COURT RECORDER:  Can you speak into a microphone,

23    please?

24              MR. KATZMAN:  Yes.

25              THE COURT RECORDER:  Thanks.

1            (Colloquy not on the record.)

2                  THE COURT:  The motion was filed, when, February 2nd?

3                  MR. KATZMAN:  The 9th.

4                  THE COURT:  Oh, the 9th.  Oh, all right.  So it was

5      really set on too soon of a calendar.  Okay.  Okay.

6                  MR. KATZMAN:  There was some --

7                  MR. YODER:  Well, your Honor --

8                  MR. KATZMAN:  You know --

9                  THE COURT:  Okay.  So we'll --

10                 MR. KATZMAN:  -- there was some --

11                 THE COURT:  We'll deal with Michael, probably, just

12     then on the 6th.

13                 MR. YODER:  Your Honor, if I may?  I could be

14     mistaken, but I think that a couple of status conferences ago

15     you had set a briefing schedule in the Michael Petersen motion

16     to strike.

17                 THE COURT:  Oh, okay.  Then I hadn't entered an order

18     because I had thought you then had agreed they had a right to

19     jury trial.  I didn't realize there was one defendant out there

20     that had filed the proof of claim --

21                 MR. YODER:  Oh, okay.

22                 THE COURT:  -- that obviated that.

23                 MR. YODER:  Yeah.

24                 THE COURT:  So we can move that date if you -- do you

25     want to move it to --

1    MR. YODER:  No.  I think we're fine with --

2    THE COURT:  All right.

3    MR. YODER:  -- the --

4    MR. KATZMAN:  Your Honor --

5    MR. YODER:  -- (indiscernible).

6    THE COURT:  Can you get --

7    MR. KATZMAN:  Your Honor --

8    THE COURT:  -- a response in on that?

9    MR. KATZMAN:  Actually, we had asked them to

10   stipulate.  Just as they had asked us to stipulate to change

11   the date for this hearing, we'd ask them to stipulate the date

12   of March 6th just to move that as well.

13   THE COURT:  Okay.

14   MR. KATZMAN:  If they can move it to the --

15   THE COURT:  Let me see what I can give you.

16      What's the other USA day in March?

17   MR. YODER:  I think it's the 20th, your Honor.

18   THE CLERK:  March 20th.

19   THE COURT:  The 20th?  Okay.  March 20th, then,

20   instead for the Michael Petersen motion.

21   MR. KATZMAN:  With my BlackBerry off, your Honor --

22   THE COURT:  Sure.

23   MR. KATZMAN:  -- I can't check --

24   THE COURT:  Okay.

25   MR. KATZMAN:  -- my calendar.

1          THE COURT:  If you want to turn it on --

2          MR. KATZMAN:  But --

3          THE COURT:  All right.  So March 20th unless we hear

4     to the contrary.

5          MR. KATZMAN:  Thank you, your Honor.

6          THE COURT:  The only thing is if you turn it on you

7     got to walk away from the mike because it interferes with the

8     electronics.  All right.

9        So in sum, I have extended the time for expert reports and

10    extended the time for discovery.  Expert reports extended for

11    40 days in the Mary Petersen case, and discovery extended for

12    30 days in all three cases.  Expert reports continued for

13    30 days in the Kathryn Petersen and Fulton case.

14        There is no reason to have trial the same day for the

15    other three cases because they're not consolidated.  Do you

16    want to (indiscernible) different weeks, of course, subject to

17    the district court deciding that something should be

18    consolidated?

19          MR. MADDEN:  Please.

20          THE COURT:  All right.  So let's do -- what did I

21    just say, June?  July 13th for Mary Petersen.  August 3rd for

22    Fulton.  August 11th, Kathryn Petersen.

23        (Colloquy not on the record.)

24          THE COURT:  And they'll be transferred effective --

25    what did I say -- May --

1           MR. MADDEN:  14th.

2           THE COURT:  That discovery cutoff would then be,

3     what, May --

4           MR. MADDEN:  14th.

5           THE COURT:  -- 14th.  Okay.  They would be

6     transferred effective May 14th, so this moots the motion for

7     withdrawal.  It does not moot your motion for consolidation,

8     and I'll so indicate in the order.

9           MR. J. O'REILLY:  Your Honor, I believe -- and,

10    again, I don't have my calendar on -- that an earlier hearing

11    you set a late June trial date for Fulton.  I would presume

12    this would supersede that which I think would --

13          THE COURT:  Yes.  I --

14          MR. J. O'REILLY:  -- make sense --

15          THE COURT:  I couldn't recall that.

16          MR. J. O'REILLY:  -- given the discovery.

17          THE COURT:  I asked, and nobody seemed to recall --

18          MR. J. O'REILLY:  Well --

19          THE COURT:  -- that we had set one.

20          MR. J. O'REILLY:  -- I was trying to wait for a

21    break --

22          THE COURT:  Oh --

23          MR. J. O'REILLY:  -- in the action, your Honor.

24          THE COURT:  -- I apologize.

25          MR. J. O'REILLY:  So my apologies for not jumping up

1      sooner.

2              THE COURT:  Yes.  Apparently, we did not set that

3      order out, so we will move that, then, to the date that I just

4      indicated.  Did any of you else have that Fulton date down in

5      your calendars?

6              MR. MADDEN:  He thought there might be, but we

7      couldn't remember --

8              UNIDENTIFIED SPEAKER:  Yeah.

9              MR. MADDEN:  -- the specific --

10             MR. J. O'REILLY:  Yeah.  I'm --

11             MR. MADDEN:  -- (indiscernible).

12             MR. J. O'REILLY:  I'm --

13             THE COURT:  Okay.

14             MR. J. O'REILLY:  I'm about 90-percent positive,

15     your Honor, it's that last week in June.

16             THE COURT:  And I think you're right, so we'll move

17     that especially in light of that extension of those dates, so

18     we'll move that to that later date.

19             MR. J. O'REILLY:  Will this be assigned to a

20     particular district court department --

21             THE COURT:  No.  I --

22             MR. J. O'REILLY:  -- or --

23             THE COURT:  As I understand, what happens is it gets

24     assigned.  I give the calendar dates.  When the case gets

25     transferred, it goes on their wheel, then they adjust the wheel

1    accordingly and the actual calendar dates, so that's my

2    understanding of how it works.

3            MR. J. O'REILLY:  So the wheel is sometime after

4    May 14th is when it's sort of responded --

5            THE COURT:  Right.

6            MR. J. O'REILLY:  -- and assigned.

7            THE COURT:  Right.  Right.

8            MR. J. O'REILLY:  Okay.

9            THE COURT:  Right.

10            MR. J. O'REILLY:  Thank you, your Honor.

11            THE COURT:  Okay.  Thank you.  All right.

12            MR. MADDEN:  Can I ask for one --

13            THE COURT:  Yes.

14            MR. MADDEN:  -- clarification point?

15            THE COURT:  Uh-huh.

16            MR. MADDEN:  May 14th is the transfer to the district

17    court.  Does that apply to Michael Petersen or we're waiting to

18    see what happens --

19            THE COURT:  We'll wait --

20            MR. MADDEN:  -- on the jury demand?

21            THE COURT:  -- to see what happens --

22            MR. MADDEN:  Okay.

23            THE COURT:  -- on Michael Petersen.

24            MR. MADDEN:  Thank you.

25            THE COURT:  Okay.  Thank you.

1          MR. J. O'REILLY:  Thank you, your Honor.

2          UNIDENTIFIED SPEAKER:  Thank you, your Honor.

3          UNIDENTIFIED SPEAKER:  Thank you, your Honor.

4          THE CLERK:  All rise.

5      (Court concluded at 02:40:25 p.m.)

1   I certify that the foregoing is a correct transcript

2  from the electronic sound recording of the proceedings in

3  the above-entitled matter.

4

5

6  /s/ Lisa L. Cline       02/27/09

7  _____  _____
   Lisa L. Cline, Transcriptionist   Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25