E-Filed on 5/15/09

**DIAMOND MCCARTHY LLP**
William T. Reid, IV, TX 00788817
Lisa S. Tsai, TX 24046999
Joshua J. Bruckerhoff, TX 24059504
6504 Bridgepoint Parkway, Suite 400
Austin, Texas 78730

Allan B. Diamond, TX 05801800
Michael J. Yoder, TX 24056572
909 Fannin, Suite 1500
Houston, Texas 77010

Eric D. Madden, TX 24013079
Elisaveta Dolghih, TX 24043355
1201 Elm Street, 34th Floor
Dallas, Texas 75270

Special Litigation Counsel for
USA Capital Diversified Trust Deed Fund, LLC

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br><br>Debtor. | Case Nos.:<br><br>BK-S-06-10725-LBR<br>BK-S-06-10726-LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br><br>Debtor. | BK-S-06-10727-LBR<br>BK-S-06-10728-LBR<br>BK-S-06-10729-LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND,<br>LLC,<br><br>Debtor. | JOINTLY ADMINISTERED<br>Chapter 11 Cases |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br><br>Debtor. | Judge Linda B. Riegle |
| In re:<br>USA SECURITIES, LLC,<br><br>Debtor. | |
| Affects:<br>☐ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Capital Realty Advisors, LLC<br>☒ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA Capital First Trust Deed Fund, LLC<br>☐ USA Securities, LLC | |

| USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, | **Adversary No. 08-01135** |
|---|---|
| Plaintiff, | |
| v. | **PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |

Plaintiff USA Capital Diversified Trust Deed Fund, LLC ("**DTDF**") hereby files this action against Defendant Wells Fargo Bank, N.A. ("**Wells Fargo**"), and would respectfully show as follows.

## I.    INTRODUCTION

1.    DTDF seeks to recover damages against Wells Fargo for its knowing and substantial assistance in a massive looting, self-dealing, and related Ponzi scheme that defrauded DTDF out of tens of millions of dollars, and ultimately caused it to file for bankruptcy protection in April 2006.

2.    Wells Fargo had a pervasive banking relationship with USA Commercial Mortgage Company ("**USACM**") and related Nevada companies doing business as "USA Capital" that informed Wells Fargo's understanding of these schemes.  In at least one instance, Wells Fargo openly questioned the co-conspirators of this scheme regarding their suspicious conduct.  On several other occasions, Wells Fargo was so familiar with certain core aspects of the scheme that it actually suggested to certain USACM insiders that they commit additional felonious acts.  In the end, Wells Fargo provided hundreds of millions of dollars of wire transfer and banking services to various USACM affiliated entities through which DTDF's funds were laundered and/or misappropriated.

3.     Wells Fargo knowingly and substantially assisted certain culpable insiders — namely Joseph D. Milanowski ("**Milanowski**") and Thomas A. Hantges ("**Hantges**") (collectively, the "**Culpable Insiders**") — in perpetuating a massive fraud on DTDF.  These Culpable Insiders, their cronies, and their "slush fund" USA Investment Partners, LLC ("**USAIP**"), formed a racketeering enterprise (the "**Enterprise**") that, with Wells Fargo's assistance, ultimately pillaged tens of millions of dollars from DTDF.

4.     DTDF was a real estate investment fund established in 2000.  Prior to the creation of DTDF, the Culpable Insiders solicited individual direct lenders to invest in loans related to specific real estate projects.  USACM was the mortgage broker and loan servicing company that brokered and serviced these loan investments.  But with the direct-lender model, the Culpable Insiders did not have sufficient control over the invested funds, which became a problem as the scheme gained momentum.

5.     Consequently, in order to gain greater control over the invested funds, the Culpable Insiders decided to create a fund — DTDF — which they managed through USA Capital Realty Advisors ("**USACRA**").   The Culpable Insiders used USACRA to solicit hundreds of millions of dollars from DTDF's investors, who believed that USACRA would actually use DTDF's funds to invest in legitimate mortgage loans originated and serviced by USACM.  After the creation of DTDF, the Culpable Insiders made investment decisions through USACRA and performed loan servicing and origination through USACM.

6.     The Culpable Insiders misappropriated DTDF's funds and used them to perpetuate their scheme for years.  _First_, instead of investing all of DTDF's funds in secured, third-party

mortgage loans, as required by DTDF's prospectus, the Culpable Insiders often used them to obtain and support dozens of real estate development and land acquisition entities in which they held an ownership interest (often through their holding company, USAIP). The Culpable Insiders also extensively looted DTDF to cover millions of dollars of operating losses of many other entities affiliated with the Culpable Insiders, including time-share hotels and technology companies. In sum, the Culpable Insiders used DTDF as their personal "piggy bank."

7.    <u>Second</u>, the Culpable Insiders misappropriated DTDF's funds and employed a Ponzi scheme within USACM's loan servicing operations to conceal non-performing loans from DTDF's members and USACM's individual direct lenders. Nevada law required USACM to open and maintain two <u>*trust accounts*</u> to originate and service loans: (a) a trust account to be used as a mechanism to pool lender deposits and make distributions to borrowers (the "**Investors Trust Account**"); and (b) a trust account to collect interest and principal payments made by borrowers and to distribute these payments to direct lenders and DTDF (the "**Collection Trust Account**") (collectively, the "**Trust Accounts**"). The Culpable Insiders opened these accounts at Wells Fargo, and Wells Fargo knew, at the very least, that the Trust Accounts held monies for the benefit of borrowers and direct lenders, including DTDF.

8.    The Culpable Insiders employed their Ponzi scheme so that USACM could always make timely interest payments to the direct lenders and DTDF's members, often before the borrowers had made interest payments on their loans, and even when borrowers had defaulted on their loans. To make these payments, however, the Culpable Insiders: (a) misappropriated funds from DTDF's operating account at Nevada State Bank ("**NSB**"); (b) used principal (including funds

received from new DTDF members) to make "interest" payments to all of DTDF's members; and (c) systematically failed to remit repayments of principal and interest owed to DTDF when there were insufficient funds in the Collection Trust Account. The Culpable Insiders also took funds from the Investor Trust Account at Wells Fargo, deposited them in the Collection Trust Account, and distributed these funds to direct lenders and DTDF's members as if they comprised earned interest.

9.    These payments allowed the Culpable Insiders to continue to claim that no direct lender or DTDF member ever failed to receive an interest payment, thereby ensuring that direct lenders and DTDF investors would continue to provide fresh capital to fund the scheme and the Culpable Insiders' personal endeavors. Furthermore, these payments and the related Ponzi scheme enabled the Culpable Insiders to conceal their looting from DTDF's members — who always believed they were receiving actual principal and interest repayments from borrowers on performing loans. In addition, because many DTDF members elected to automatically "reinvest" their funds in DTDF, and therefore would not have received repayment checks each month, they did not know that the Culpable Insiders were actually looting millions of dollars from DTDF. At bottom, these "reinvestments" were illusory because DTDF did not actually have any money to reinvest.

10.    Over the course of several years, Wells Fargo acquired knowledge of both the Culpable Insiders' Ponzi scheme and self-dealing scheme, and played a critical role in enabling and prolonging these schemes to DTDF's detriment. From 2000 to 2006, Wells Fargo opened and maintained more than thirty accounts for the Culpable Insiders and their related entities, including an _inactive account_ that was opened in DTDF's name in December 2004.

11.     In January 2003, Wells Fargo manually processed a circular transfer of $11.425 million that was looted from DTDF's account at NSB.  The $11.425 million was transferred into the Investors Trust Account, then directly into the Collection Trust Account, and then back to DTDF's account at NSB.  Not only was a transfer between the two Trust Accounts suspicious on its face (given the respective purposes for these accounts), this particular set of transactions set off alarms within Wells Fargo.

12.     Wells Fargo rejected the Culpable Insiders' first two attempts to accomplish the circular wire transfer of DTDF's money.  Although Wells Fargo ultimately processed the circular wire transfer in violation of Nevada law and internal policies, its Las Vegas business bankers recognized that these were atypical, unusual, and suspicious transactions.  In fact, a Wells Fargo banker commented to a USA Capital employee at the time that the Las Vegas branch and the USA Capital accounts were "being watched" for not following procedures in handling the $11.425 million transaction.

13.     This was not the only suspicious incident involving these accounts.  Throughout 2003 and beyond, the Collection Trust Account and the Investors Trust Account exhibited erratic banking activity — at times receiving and transferring millions of dollars in a day and at other times running negative balances into the hundreds of thousands and even millions of dollars.  The problem was caused by the ever increasing monthly interest payments due to the direct lenders and DTDF's members, which reached several million dollars per month, as USACM's loan portfolio grew.

14. As problems with the loan portfolio increased, the Culpable Insiders covered the shortfalls in the Collection Trust Account by transferring funds out of the Investors Trust Account, in violation of Nevada law. For example, in March 2003, the Culpable Insiders transferred a total of $700,000 from the Investors Trust Account (which held money that was only supposed to be used to fund loans) to the Collection Trust Account (which was only supposed to receive actual repayments from borrowers on loans) to cover actual and anticipated shortfalls in the Collection Trust Account. Without these wire transfers, the Collection Trust Account would have had a negative account balance of over $1 million.

15. In fact, transfers from the Investors Trust Account to the Collection Trust Account happened often enough that when the Collection Trust Account was overdrawn to the tune of $1.689 million in July 2005, one of the Wells Fargo bankers who regularly serviced the USA Capital accounts called Victoria Loob Hessling ("**Loob**"), one of the account signatories who frequently handled USACM's banking issues, and asked her if Wells Fargo should cover the shortfall by transferring funds out of the Investors Trust Account *as usual*. This was not the first time that Loob had received such a call from a Wells Fargo banker. Without multiple wire transfers of funds from the Investors Trust Account to the Collection Trust Account to cover actual and anticipated shortfalls, the Collection Trust Account would have had a negative account balance of over $4.8 million in July 2005.

16. These wire transfers between the two Trust Accounts were not only highly suspicious, but also illegal under Nevada law. Under Nevada Revised Statute ("**NRS**") 645B.175, USACM was required to keep money in the two Trust Accounts entirely separate from one another.

Violations of NRS 645B.175 involving more than $1,000 are felonies which carry a maximum penalty of four years in prison. Wells Fargo's suggestion to Loob in July 2005 demonstrates that it knew of the criminal conduct occurring within USACM's loan servicing operations. Even worse, Wells Fargo's suggestion that Loob and the Culpable Insiders engage in further criminal conduct, and Wells Fargo's sometimes manual execution of the transfers, was nothing less than overt criminal conduct.

17.     Leaving aside Wells Fargo's "Know Your Customer" policies, which required Wells Fargo to engage in minimum procedures to know its customers and safeguard against fraud, the account title alone informed Wells Fargo that the Trust Accounts held investors' funds, including DTDF's funds. Consequently, Wells Fargo knew that the Culpable Insiders were engaged in illegal conduct with respect to DTDF's funds, yet consciously or recklessly assisted the Culpable Insiders in making prohibited transfers between the Investors Trust Account and the Collection Trust Account. Furthermore, upon information and belief, Wells Fargo deliberately ignored the fact that multi-million dollar deficiencies in the Collection Trust Account were clearly indicative of trust withdrawals for non-trust purposes.

18.     Notwithstanding these illegal transfers between the two Trust Accounts, Wells Fargo continuously provided banking and wire transfer services that assisted the Culpable Insiders. In March 2003, Wells Fargo opened accounts for 10-90, Inc. (**"10-90"**) and Mountain Vista, Inc. ("**Mountain Vista**"), two shell corporations that were set up by the Culpable Insiders' stooge and co-conspirator David A. Fogg ("**Fogg**"), for the sole purpose of laundering money from DTDF to USAIP. From March 2003 to November 2004, Wells Fargo processed $23.328 million in atypical

and unusual wire transfers that were structured like textbook money laundering transactions. Each of these transfers involved large, whole dollar amounts that were circulated through several Wells Fargo and other accounts in very short time periods.

19.    Furthermore, Wells Fargo knew that these transfers were linked to DTDF and USA Capital. In each instance, the funds were wire transferred from the DTDF account at NSB to the 10-90's Wells Fargo account, then to Mountain Vista's Wells Fargo account, and then to the USAIP account at Bank of Commerce, and sometimes back to the Collection Trust Account at Wells Fargo. Moreover, in almost every instance, Wells Fargo *manually* processed the wire transfers at Wells Fargo's branch in West Temecula, California.

20.    On their face, these wire transfers were blatantly suspicious, unusual, atypical, and circular, and Wells Fargo deliberately ignored the fact that these transfers had no legitimate business purpose. In fact, just three months after the 10-90 and Mountain Vista accounts were opened, a Wells Fargo branch manager questioned Fogg about the business purpose of the transfers. Despite receiving a wholly inadequate and vague response from Fogg — specifically, that Fogg "believed" the transfers were for real estate transactions — Wells Fargo deliberately ignored Fogg's woefully lacking explanation and continued to process by hand tens of millions of dollars in circular wire transfers without asking any further questions, or conducting any further due diligence, including requesting financial statements, loan documents, or any other support for the transactions whatsoever. Upon information and belief, Wells Fargo chose not to ask further questions about either 10-90 or Mountain Vista because Well Fargo knew that further inquiries would only confirm

that the 10-90 and Mountain Vista accounts were nothing more than a conduit for laundering money from DTDF to USAIP (something Wells Fargo already knew.)

21.    In blindly continuing to process transactions in and out of 10-90 and Mountain Vista, Wells Fargo knowingly and consciously violated its own internal "Know Your Customer" policies and obligations under federal banking law to monitor, investigate, and report suspicious activity and/or terminate the accounts.  By knowingly permitting shell companies with virtually no money and no known legitimate business purposes to run such large dollar and high volume wire transfers, Wells Fargo, at a bare minimum, deliberately ignored atypical, suspicious banking activities that are well known, tell-tale signs of money laundering.

22.    Wells Fargo's knowledge and suspicions about the Culpable Insiders and USA Capital were also evidenced when Milanowski applied for a $1 million loan on USACM's behalf sometime in late 2004.  Although USA Capital was one of Wells Fargo's top business banking relationships in Las Vegas and Nevada, Wells Fargo atypically rejected USACM's credit request without conducting *any* financial analysis to determine the company's creditworthiness.  Instead, Wells Fargo's Relationship Manager for the USA Capital accounts at the time, Eileen T. Sechrist ("**Sechrist**"), allegedly decided to reject the loan request based solely on a lawsuit referenced in USACM's audited consolidated financial statements, without conducting any other underwriting analysis.  By rejecting out of hand otherwise lucrative business from one of its main customers, something that is also atypical in the banking business, Wells Fargo demonstrated that its prior non-credit dealings with USA Capital had created internal concern.

23.     Ultimately, Wells Fargo terminated several of the USA Capital related accounts in May 2006, within one month after USACM and related entities filed for bankruptcy protection. Notably, Wells Fargo terminated its banking relationship with USAIP in May 2006, even though USAIP was not one of the companies placed into bankruptcy at that time.  Wells Fargo's decision to terminate the USAIP account demonstrates that Wells Fargo knew that USAIP fell under the USA Capital umbrella.  Moreover, Wells Fargo's termination of the USAIP account indicates that Wells Fargo was motivated by its prior knowledge about the legitimacy of the Culpable Insiders operations.

24.     Wells Fargo's provision of nearly unfettered wire transfer access and deliberate lack of scrutiny over the 10-90, Mountain Vista, and Trust Accounts was integral to the fraud.  By consciously turning a blind eye and assisting the fraud and breaches of fiduciary duty, and, in some case, actually suggesting that the Culpable Insiders conduct additional illegal transactions, Wells Fargo enjoyed an extensive and lucrative banking relationship with the USA Capital entities that was only halted by the bankruptcy filings in April 2006.  Ultimately, DTDF suffered tens of millions of dollars in losses as a direct result of Wells Fargo's participation in the Culpable Insiders' schemes.

## II.     JURISDICTION

25.     This Court has subject matter jurisdiction over this action, which relates to a case under Title 11 of the United States Code, pursuant to 28 U.S.C. § 1334(b).  This action is a non-core proceeding under 28 U.S.C. § 157(b).

### III.    PARTIES AND OTHER RELEVANT ENTITIES

**A.    PLAINTIFF**

26.     DTDF is a limited liability company organized under Nevada law on or about February 3, 2000.  USACRA offered Nevada investors the opportunity to purchase membership interests in DTDF and thereby invest in loans that USACM originated and serviced on behalf of DTDF.  At the time of its bankruptcy filing, DTDF was managed by USACRA and had approximately 1,400 members.

27.     DTDF maintained its primary operating account at NSB.  Although the Culpable Insiders opened a Wells Fargo banking account entitled "USA Capital Diversified Trust Deed Fund, LLC" in December 2004, there was absolutely _no_ activity in that account during the life of the account.  In fact, the beginning and ending balance in the account was always zero.  Moreover, _none_ of the claims, disputes, or controversies between the parties and _none_ of the facts or allegations giving rise to the causes of action in this Complaint arise out of or relate in any way to any DTDF account held at Wells Fargo.  Instead, this lawsuit complains that Wells Fargo's provision of banking and wire transfer services to _non-DTDF_ customers and entities caused substantial injury and losses to DTDF.

**B.    DEFENDANT**

28.     Wells Fargo is a national bank established under the laws of the United States and doing business in the State of Nevada.  Wells Fargo's resident agent for service of process is CSC Services of Nevada, Inc., located at 502 East John Street, Carson City, Nevada 89706.  Wells Fargo

provided depositary banking services, treasury management services, escrow services, and/or credit products to over fifteen USA Capital entities during the relevant time period.

## C.   OTHER RELEVANT ENTITIES

### (1)   The USA Capital Debtors

29.     On April 13, 2006 (the "**Petition Date**"), USACM, USACRA, USA Capital First Trust Deed Fund, LLC ("**FTDF**"), and USA Securities, LLC ("**USA Securities**") (collectively, the "**Debtors**"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**").   The bankruptcy cases were jointly administered before the Honorable Linda B. Riegle under Case No. BK-S-06-10725-LBR.

30.     USACM is a corporation organized under Nevada law on or about February 28, 1989.   Prior to the Petition Date, USACM was in the business of underwriting, originating, brokering, funding, and servicing commercial loans secured by residential and commercial developments.

31.     USACRA is a limited liability company organized under Nevada law on or about January 18, 2001.   USACRA was formed primarily to manage DTDF and FTDF.   Prior to the Petition Date, USACRA was owned and managed by USAIP.

32.     USA Securities is a limited liability company organized under Nevada law on or about March 3, 1999.   USA Securities, which was a registered broker-dealer under SEC Rule 15c3-1(a)(2)(vi), primarily sold membership interests in FTDF.   Prior to the Petition Date, USA Securities was owned and managed by Milanowski and Paul Hamilton.

33.    FTDF is a limited liability company organized under Nevada law on or about February 16, 2001.  FTDF offered investors throughout the United States the opportunity to purchase membership interests in a fund and thereby invest in loans that USACM originated and serviced on behalf of FTDF.  Prior to the Petition Date, FTDF was managed by USACRA.

### *(2)    Other USA Capital Entities*

34.    USAIP is a limited liability company organized under Nevada law on or about October 20, 1999.  From that date onward, USAIP served as a holding company for dozens of entities established by the Culpable Insiders in the time-share hotel, technology, and real estate acquisition and development industries.

35.    USAIP is owned by Hantges and Milanowski, or trusts managed by them.  Prior to June 17, 2004, USAIP was managed by USACM.  Between June 17, 2004, and April 6, 2007, USAIP was managed by Hantges and Milanowski.  On February 14, 2005, Hantges purportedly resigned his position as a USAIP manager, but nonetheless continued to function as a *de facto* manager until April 2007.

36.    On April 4, 2007, the USACM Trust, DTDF, and another USAIP creditor forced USAIP into bankruptcy by filing an involuntary petition for relief under Chapter 11 of the Bankruptcy Code against USAIP in the Bankruptcy Court.  On April 6, 2007, the Court entered an order approving the appointment of Lisa M. Poulin as USAIP's interim trustee.

37.    On May 9, 2007, the Court entered an order for relief under Chapter 11 of the Bankruptcy Code as to USAIP.  Thereafter, Ms. Poulin became the permanent Chapter 11 trustee.

## IV.    FACTUAL BACKGROUND

### A.    USACM'S BACKGROUND AND BUSINESS MODEL

38.    USACM's basic business model consisted of arranging commercial loans secured by real property on direct lenders' behalf, otherwise known as "originating" a loan.  In these transactions, direct lenders obtained partial interests in loans "originated" by USACM, and were listed as beneficiaries on the related promissory note and mortgage or deed of trust recorded against the underlying property.  In exchange for originating loans, USACM typically received loan origination fees of three to five percent of the principal amount of the loans.

39.    USACM also serviced the loans that it originated.  Each month, USACM was allowed to pay itself a servicing fee out of the monthly interest payments made by borrowers, while remitting the balance of the payments to direct lenders.  This servicing fee was generally equal to between one-quarter of one percent and four percent of the principal balance of the loan per annum.  Under the typical arrangement, USACM was also entitled to late fees, extension fees, default interest, and other fees and expenses paid or reimbursed by the borrower.

### B.    DTDF'S BACKGROUND

40.    DTDF was created in February 2000.  DTDF was a trust deed investment fund that offered membership interests to Nevada investors through USACRA.  USACRA was required to use the funds generated through the sale of DTDF membership units to purchase interests in loans that were originated and serviced by USACM.  DTDF earned interest as a direct lender and distributed its profits to its investors on a periodic basis.

41.     DTDF's prospectus contained several important restrictions governing the type of loans USACRA could make on DTDF's behalf.  Most importantly, DTDF's prospectus stated that USACRA could not make any loans to USACM affiliates.  In addition, DTDF's prospectus required all of DTDF's loans to be secured by first deeds of trust on real property.

42.     DTDF's creation greatly enhanced the Culpable Insiders' fraudulent scheme by allowing them to secure aggregate funds and misuse them on a continual and "as needed" basis.  When shortfalls arose in the Collection Trust Account as a result of delinquent or defaulting borrowers, the Culpable Insiders misappropriated money from DTDF.  In other instances, the Culpable Insiders simply looted funds from DTDF and transferred them to USAIP and/or other side business ventures for no legitimate purpose whatsoever.

C.     **THE CULPABLE INSIDERS' EXTENSIVE PONZI SCHEME**

43.     In order to service loans, USACM was required by Nevada law to open and maintain two separate trust accounts:  (a) the Investors Trust Account, which was used as a mechanism to pool direct lender deposits and make distributions to borrowers; and (b) the Collection Trust Account, which was used to collect interest and principal repayments made by borrowers and to make payments to direct lenders.  USACM opened and maintained these two bank accounts at Wells Fargo — specifically entitled (a) the "USA Commercial Mortgage Company Investors Trust Account"; and (b) the "USA Commercial Mortgage Company Collection Trust Account."  As evidenced by their names, these USACM accounts were trust accounts under Nevada law, and Wells Fargo knew that these trust accounts held monies for the benefit of borrowers and direct lenders, including DTDF.

44.    Nevada law closely regulated the flows of funds in and out of these accounts. Specifically, Nevada law:  (a) prohibited USACM from making any interest and/or principal payments to direct lenders on behalf of defaulting borrowers; (b) prohibited the commingling of any USA Capital funds with the Investors Trust Account and/or the Collection Trust Account; and (c) required USACM to remit funds it received from borrowers to the applicable direct lenders (including DTDF).  The Culpable Insiders routinely disregarded these provisions, instead transferring funds in and out of the Investors Trust Account and Collection Trust Account however necessary to make interest payments to the direct lenders and DTDF's members, and thereby perpetuate a Ponzi scheme.  Not only were these transfers atypical and highly suspicious, but Wells Fargo turned a blind eye to account transactions that were obviously and wholly inconsistent with Nevada law and the purposes for which the trusts were created.

45.    In order to make payments from the Collection Trust Account to DTDF and individual direct lenders, the USACM accounting system automatically generated checks on a monthly basis.  The accounting system generated these checks payable to all direct lenders regardless of the performance on the underlying investments.  Because many of the loans that USACM was servicing were nonperforming or otherwise in default, the funds that USACM received in the Collection Trust Account were not sufficient to fund each month's payments, thus creating a shortfall in the Collection Trust Account.  In order to fund this shortfall in the Collection Trust Account, the Culpable Insiders regularly withheld the checks made payable to DTDF.  In such situations, Loob took physical possession of the checks payable to DTDF for monthly interest and principal that had been generated by the automated accounting system and simply stuffed them in

her desk drawer.  Internally, the Culpable Insiders referred to the unremitted principal to DTDF as the "held checks."  This "held-check" activity began at least as early as 2002 and continued up until DTDF's bankruptcy, at which time the outstanding balance of the held checks was at least $18.9 million.[1]

46.    The Culpable Insiders also covered shortfalls in the Collection Trust Account by misappropriating funds from DTDF's account at NSB.  For example, in January 2003, Wells Fargo manually processed a circular transfer of $11.425 million that was looted from DTDF's account at NSB.  The $11.425 million was transferred into the Investors Trust Account then directly into the Collection Trust Account, and then back to the DTDF account at NSB.  As explained in more detail below, the Culpable Insiders used this circular transfer to "pay" previously held checks.  Yet, from DTDF's perspective, the Culpable Insiders merely used new DTDF funds to make "principal" and "interest" payments to other DTDF members.

47.    Furthermore, in January 2004, when there was a large shortfall in the Collection Trust Account, the Culpable Insiders wire transferred $1.5 million from DTDF to 10-90, then to Mountain Vista, then to USAIP, and finally to the Collection Trust Account.  Instead of investing DTDF's money in actual mortgage loans, the Culpable Insiders used this $1.5 million to make payments to direct lenders, including DTDF members, on behalf of defaulting borrowers.

48.    The Culpable Insiders also covered shortfalls by transferring funds from the Investors Trust Account to the Collection Trust Account beginning at least by 2003.  These negative

---

[1]  As described in more detail below, this amount does not include over $11 million in funds that the Culpable Insiders, through a circular transaction involving Wells Fargo accounts, "reclassified" as part of the sham loan to 10-90.

balances ran anywhere from hundreds of thousands of dollars to several million dollars, and should have raised major red flags with the bank.   Furthermore, these transfers constituted a felony under Nevada law, which prohibited commingling between these Trust Accounts.

49.     Nevertheless, Wells Fargo so actively and routinely concealed these shortfalls that a Wells Fargo banker called Loob in July 2005 to ask whether the bank should remedy a multi-million dollar, negative balance in the Collection Trust Account by transferring a total of $7 million out of the Investor Trust Account.  After Loob agreed, Wells Fargo, manually processed several multi-million dollar wire transfers from the Investors Trust Account to the Collection Trust Account on July 7, 8, 18, and 20.  Then, on July 21, Wells Fargo returned the $7 million to the Investors Trust Account.  According to Loob, July 2005 was not the first time that Wells Fargo had contacted her requesting permission to cover shortfalls in the Collection Trust Account with funds from the Investor Trust Account.  Thus, Wells Fargo facilitated the Culpable Insiders in violating Nevada law and playing a literal shell game with direct lenders' and DTDF's funds.

**D.    THE CULPABLE INSIDERS' OVER-ARCHING LOOTING AND SELF-DEALING SCHEME**

50.     The driving motivation behind this Ponzi scheme was the Culpable Insiders' desire to provide funding for a vast network of real estate developments and other side business ventures. By employing the Ponzi scheme within USACM's loan servicing operations, the Culpable Insiders were able to induce existing investors to maintain or increase their investments with USA Capital and entice new investors to entrust their money to USA Capital.  In turn, this enabled the Culpable

Insiders to fuel a multi-faceted looting and self-dealing scheme to obtain new entities and to provide funding to entities that they already owned.

51.   The Culpable Insiders used USACM to originate and service loans to real estate development entities in which they stood to profit.  Initially, the Culpable Insiders caused USACM to originate loans to entities in which the Culpable Insiders held a direct ownership interest, either personally or through a trust.  Eventually, the Culpable Insiders caused USACM to originate loans to entities in which they held an indirect ownership interest through USAIP.

52.   In total, the Culpable Insiders caused USACM to originate hundreds of millions of dollars of loans to entities in which they held an ownership interest.  The Culpable Insiders routinely used DTDF as an investor in these "insider" loans, both as direct lender at the time of loan fundings and through assignments.  All of these insider loans violated DTDF's prospectus, and DTDF sustained millions of dollars of losses as a result of its investments in these loans, many of which are in default.

53.   Even more egregiously, the Culpable Insiders directly looted DTDF's funds to:  (a) acquire equity interests in additional entities; (b) make capital contributions to entities in which they already held an ownership interest, either directly or indirectly through USAIP; and (c) cover operating costs of their entities.  The Culpable Insiders often used USAIP (as well as 10-90 and Mountain Vista) as a conduit for fraudulently transferring DTDF's funds to these entities.

54.   In late 2002, the Culpable Insiders hatched an audacious plan to conceal their looting and other systematic abuses of DTDF.  Knowing that DTDF's prospectus forbade DTDF's manager (USACRA) from making loans to affiliates, the Culpable Insiders created a sham loan

from DTDF to a purported third-party, 10-90.  In reality, that transaction (the "**10-90 Loan**") was actually not a loan to 10-90 at all.  Instead, the 10-90 Loan represented both:  (a) the withheld funds that the Culpable Insiders did not remit to DTDF in order to make principal and interest payments on nonperforming loans; and (b) funds that the Culpable Insiders looted from DTDF to finance numerous entities they owned or controlled.  By creating the sham 10-90 Loan in late 2002, the Culpable Insiders could simultaneously:  (a) eliminate inevitable accounting problems posed by the extensive looting of DTDF that occurred in 2002; and (b) provide a seemingly legitimate explanation for the intended future looting of DTDF.

55.    Initially, the 10-90 Loan had a $6.5 million balance that consisted of funds looted from DTDF in 2002, including:  (a) approximately $2.775 million sent to a time-share hotel affiliated with the Culpable Insiders; (b) $700,000 sent to a technology company affiliated with the Culpable Insiders; and (c) $2.95 million sent directly to lenders to pay obligations owed by USAIP and/or borrowers.

56.    The Culpable Insiders also used the 10-90 Loan to conceal the "held-check" problem.  On January 2, 2003, the Culpable Insiders used a circular transaction (described in more detail below) to eliminate the entire balance of the held checks owed to DTDF as of the end of December 31, 2002.   From DTDF's perspective, however, this circular transaction merely reclassified the held checks as the purported third-party loan to 10-90.

57.    The Culpable Insiders continued to loot DTDF throughout 2003.  For example, from January 3, 2003 to March 14, 2003, the Culpable Insiders sent approximately $2 million from DTDF directly to a time-share hotel and a technology company, both affiliated with the Culpable

Insiders.  Each of these transfers was booked as loan funding for the purported loan from DTDF to 10-90, even though 10-90 never actually received any of the cash.

58.    Also in 2003, the Culpable Insiders began sending money directly from DTDF to 10-90.  A critical component of this looting was the creation of two sham entities that had no other purpose than to launder money from DTDF.  Sometime prior to December 2002, Milanowski directed Fogg to establish 10-90 to serve as the purported "independent" borrowing entity for the sham loan, and to set up Mountain Vista to serve as an additional waypoint to launder the looted funds.  On March 7, 2003, Fogg opened bank accounts for 10-90 and Mountain Vista at Wells Fargo Bank.  Prior to this period, 10-90 could not receive funds directly from DTDF, as it had no bank account.  From the time the Wells Fargo Bank account was opened until April 2004, the Culpable Insiders made large, suspicious wire transfers from DTDF to 10-90 several times per month.

59.    In total, the Culpable Insiders looted more than $55.9 million from DTDF under the guise of the 10-90 Loan.   More than $23 million of these monies flowed through the 10-90 and Mountain Vista accounts at Wells Fargo.  All of these transfers violated the terms of the DTDF Prospectus, and none of these transfers benefited DTDF in any way whatsoever.

60.    The end result of the Culpable Insiders' well-disguised looting and self-dealing scheme was two-fold: (a) DTDF and the other USA Capital entities collapsed in financial ruin; and (b) the Culpable Insiders' obtained more than fifty time-share hotels, real estate development entities, and technology companies.  However, because of the Culpable Insiders' and their co-conspirators' multi-faceted efforts to conceal their scheme, none of their gross misconduct was

discovered or could have been discovered by DTDF's innocent Stakeholders prior to the Petition Date.

E.    **WELLS FARGO'S KNOWING AND SUBSTANTIAL ASSISTANCE IN THE FRAUDULENT SCHEME**

   *(1)    Wells Fargo's Relationship With and Extensive Knowledge of USA Capital*

61.    Wells Fargo provided comprehensive banking services to USA Capital virtually from the moment of USA Capital's inception until the Petition Date, including substantial services to the Investors Trust Account and Collection Trust Account.  During this time period, Wells Fargo provided extensive depository bank account services, escrow services, treasury management services, and credit services to numerous entities under the USA Capital umbrella.  In the aggregate, the Culpable Insiders opened more than thirty accounts at Wells Fargo, through which hundreds of millions of dollars ultimately flowed.

62.    USA Capital was one of Wells Fargo's top business banking customers in Las Vegas and Nevada.  Wells Fargo's Relationship Manager for the USA Capital accounts typically held quarterly meetings and made frequent calls to USA Capital.  USACM was an integral part of Wells Fargo's lucrative relationship with USA Capital, transferring hundreds of millions of dollars through its corporate operating account, the Investors Trust Account, and the Collection Trust Account.

63.    Through its course of dealings with USA Capital, Wells Fargo knew the principal players in USA Capital and understood the interrelationship between the USA Capital entities.  For example, Wells Fargo opened and maintained a checking account in the name of USAIP and knew

that it was managed by USA Capital's principals.  In rendering banking and wire transfer services, Wells Fargo repeatedly dealt with the same signatories and principals from the USA Capital side, including Milanowski and Hantges.

64.    As part of its extensive relationship with and knowledge of USA Capital, Wells Fargo, through its Corporate Trust Services Department, served as the subscription escrow agent for FTDF beginning in 2002.  In this capacity, Wells Fargo opened and maintained an escrow account that held investor monies prior to being released to capitalize FTDF.  In connection with these escrow services, Wells Fargo obtained a copy of the FTDF and DTDF prospectuses.  These prospectuses described the relationship between these investment funds and the other USA Capital entities, and importantly, the DTDF prospectus described the lending restrictions.  Although the escrow services were performed in various states, Wells Fargo understood the connection between FTDF and USA Capital.  In fact, the Corporate Trust Services Department contacted Sechrist to facilitate the banking aspects of the deal, which included opening and maintaining the escrow account, and the Las Vegas business bankers requested that the Corporate Trust Services Department explain the purpose of the account.

### (2)    *Wells Fargo's Role in the Circular $11.425 Million Transaction*

65.    Wells Fargo knowingly and substantially assisted the Culpable Insiders in accomplishing a fraudulent, circular transaction that flowed to and from DTDF's operating account at NSB to the Investors Trust Account and Collection Trust Account at Wells Fargo.  On January 2, 2003, the Culpable Insiders wrote an $11.425 million check from the DTDF account at NSB to the Investors Trust Account at Wells Fargo (the "**DTDF 10-90 Check**").  The same day, the Culpable

Insiders wrote an $11.425 million check from the Investors Trust Account to the Collection Trust Account (the "**Investors Trust 10-90 Check**").  Both checks were deposited on January 2, 2003.  Subsequently, the Culpable Insiders transferred more than $10 million from the Collection Trust Account back to DTDF.

66.    The driving motivation behind this completely circular transaction was to eliminate the entire balance of the held checks owed to DTDF as of the end of December 31, 2002.  When the Collection Trust Account finally sent funds back to DTDF, the transaction was booked as if the Collection Trust Account had released the held checks.  This erased evidence that repayments of principal owed to DTDF had been misappropriated to fuel the Culpable Insiders' fraudulent scheme.  From DTDF's bookkeeping perspective, however, this circular transaction merely reclassified the $11.425 million as part of the sham 10-90 Loan.

67.    The Culpable Insiders' circular transaction experienced more than just a few glitches on the banking side.  On January 7, 2003, Wells Fargo returned the DTDF 10-90 Check.  The Culpable Insiders then attempted to wire transfer $11.425 million from DTDF into the Investors Trust Account.  However, on January 8, 2003, Mike Marcellette, one of Wells Fargo's business bankers who serviced the USA Capital accounts at the time, returned the wire.  Later that same day, the Culpable Insiders again wire transferred $11.425 million from DTDF into the Investors Trust Account.

68.    Wells Fargo was keenly aware of the improprieties surrounding these deposits and the related fiasco.  In fact, a Wells Fargo employee even communicated the bank's concerns about

the activities to a USA Capital employee: "As she put it, the branch is being watched and our accounts specifically for not following procedures in handling the $11 million dollar deposit."

69.    Furthermore, the nature of the transaction itself should have alerted Wells Fargo to suspicious activity. These transfers between the Investors Trust Account and the Collection Trust Account, on their face, violated Nevada law that mandated these trust monies be kept separate from one another. The simultaneous timing, identical amounts, and circular structure of the transaction, smacked of fraudulent activity. In this instance, Wells Fargo processed the deposit of the DTDF 10-90 Check into the Investors Trust Account *and* the deposit of the Investors Trust 10-90 Check into the Collection Trust Account on the same day, and upon information and belief, both checks were manually deposited during the course of a single trip to Wells Fargo.

70.    There also was no legitimate business explanation for the transaction in light of the $11.425 million transfer from the Investors Trust Account to the Collection Trust Account. As an initial matter, Wells Fargo understood that both of these accounts held monies "in trust" for their respective beneficiaries, and Wells Fargo should have inquired into the legitimate business purpose behind *any* transfers between these accounts. In this particular instance, the sheer size of the transfer deviated from the typical account activity and negated any real possibility that the purpose of the transaction was to fund an interest reserve. As such, Wells Fargo knew that this large, same-day transfer from the DTDF account at NSB to the Investors Trust Account and Collection Trust Account at Wells Fargo was fraudulent, or at the very least, the type of suspicious activity that warranted further scrutiny by the bank.

### (3)    *Wells Fargo's Knowledge of Other Red Flags Arising From the Culpable Insiders' Abuse of the Trust Accounts*

71.    Beginning at least as early as 2003 and continuing through 2005, Wells Fargo became aware of and deliberately ignored many other red flags.  In March 2003, if not earlier, the Culpable Insiders began to overdraw the Collection Trust Account.  For example, the Collection Trust Account had a negative account balance of more than $600,000 in both March and April 2003.  The Culpable Insiders often covered shortfalls in the Collection Trust Account by illegally making transfers out of the Investors Trust Account.  Some of these illegal transfers are detailed in "Table A."

**Table A**

| Date | Investors Trust Account | | Collection Trust Account | |
|---|---|---|---|---|
| | Deposits ($) | Debits ($) | Deposits ($) | Debits ($) |
| 3/7/2003 | | 225,000 | 225,000 | |
| 3/11/2003 | | 250,000 | 250,000 | |
| 3/13/2003 | | 100,000 | 100,000 | |
| 3/14/2003 | | 150,000 | 150,000 | |
| 3/17/2003 | 500,000 | | | 500,000 |
| 3/18/2003 | 225,000 | | | 225,000 |
| March 2003 Totals | 725,000 | 725,000 | 725,000 | 725,000 |
| 1/9/2004 | | 500,000 | 500,000 | |
| 1/9/2004 | | 200,000 | 200,000 | |
| 1/20/2004 | 350,000 | | | 350,000 |
| 1/21/2004 | 350,000 | | | 350,000 |
| January 2004 Totals | 700,000 | 700,000 | 700,000 | 700,000 |
| 7/7/2005 | | 2,000,000 | 2,000,000 | |
| 7/8/2005 | | 1,000,000 | 1,000,000 | |
| 7/18/2005 | | 2,000,000 | 2,000,000 | |
| 7/20/2005 | | 2,000,000 | 2,000,000 | |
| 7/21/2005 | 7,000,000 | | | 7,000,000 |
| July 2005 Totals | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 |

72.    For instance, in March 2003, the Culpable Insiders transferred a total of $725,000 from the Investors Trust Account to the Collection Trust Account to cover shortfalls in the latter

account. Specifically, on March 7, 2003 (a few days before USACM typically made payments to direct lenders and investors), the Culpable Insiders wire transferred $225,000 from the Investors Trust Account to the Collection Trust Account. Without that transfer, the Collection Trust Account would have been over $100,000 in the red. Then, on March 11, 2003, the Culpable Insiders transferred another $250,000 into the Collection Trust Account from the Investor Trust Account. Yet, even with this transfer, the ending balance on March 11 was negative $634,730.70. Once the Collection Trust Account received additional funds from actual loan repayments, the Culpable Insiders returned the $725,000 to the Investors Trust Account via wire transfer.

73.    Again, in January 2004, the Culpable Insiders wire transferred hundreds of thousands of dollars from the Investors Trust Account to the Collection Trust Account in order to cover anticipated and actual shortfalls in the Collection Trust Account. On January 9, 2004, the Culpable Insiders made two wire transfers totaling $700,000 from the Investors Trust Account to the Collection Trust Account. Without the $700,000, the Collection Trust Account would have been overdrawn by over $200,000. Once the Collection Trust Account was replenished with actual loan proceeds (and, as described below, with $1.5 million looted from DTDF), the Culpable Insiders returned the $700,000 to the Investors Trust Account in late January.

74.    Further, in July 2005, there were several, large shortfalls in the Collection Trust Account. Upon information and belief, Wells Fargo noticed the shortfalls and contacted USACM to ask if USACM wanted to cover the shortfalls with money from the Investors Trust Account. A Wells Fargo representative spoke with Loob, who approved the wire transfers. According to Loob, this was not the first time that Wells Fargo contacted her about covering a shortfall in the Collection

Trust Account by transferring funds from the Investors Trust Account — an express violation of Nevada law.

75.     In the aggregate, Wells Fargo (upon Loob's approval) transferred a total of $7 million from the Investors Trust Account to the Collection Trust Account and, later that month, transferred the money back to the Investors Trust Account.  Upon information and belief, after getting Loob's approval, Wells Fargo — *not* a USACM employee — initiated these wire transfers.  Then, on July 21, in a single wire transfer, Wells Fargo returned the $7 million to the Investors Trust Account.  According to Loob, not only did Wells Fargo provide the wire transfer services to complete these illegal, circular transactions, Wells Fargo knew that the purpose of the transfers was to cover shortfalls in the Collection Trust Account.

76.     All of these transfers between the Investors Trust Account and the Collection Trust Account were expressly prohibited by Nevada law and were thus clear red flags.  Importantly, the Collection Trust Account, which held repayment monies in trust for direct lenders, never should have been overdrawn.  Under Nevada law, USACM was only permitted to make payments to direct lenders (including DTDF in its capacity as a direct lender) using money received from borrowers who actually made principal and interest payments on their loans.  When the Culpable Insiders, with Wells Fargo's assistance, wire transferred millions of dollars from the Investors Trust Account to the Collection Trust Account to cover shortfalls in the latter account, they were effectively using funds from new investors to make payments to previous investors — the essence of a Ponzi scheme.

77.     In addition, the account deficits in the Collection Trust Account indicated that the Culpable Insiders were using funds for non-trust purposes in violation of Nevada law.  From a

banking perspective, these red flags should have raised alarms and triggered investigation by Wells Fargo. Wells Fargo, however, not only failed to investigate these red flags, but actually called the Culpable Insiders and suggested that they commit a felony by covering shortfalls in the Collection Trust Account with funds from the Investors Trust Account as usual. Upon information and belief, many of these funds were held in trust for DTDF. The Culpable Insiders breached their fiduciary duty to DTDF by using DTDF's funds in a Ponzi scheme and, more specifically, to cover account deficits in the Collection Trust Account.

### (4)    *Wells Fargo's Role in the Sham 10-90 Loan*

78.    Despite these events, Wells Fargo continued to provide full scale banking and wire transfer services to the USA Capital accounts. Commencing in March 2003, Wells Fargo's participation in the scheme expanded with the opening of two new Wells Fargo accounts in the names of 10-90 and Mountain Vista, two dummy corporations that were set up by Fogg for no other purpose than to assist the Culpable Insiders in their pillaging of DTDF.

79.    On March 7, 2003, Fogg opened business banking accounts for both 10-90 and Mountain Vista at the Wells Fargo's branch in West Temecula, California: (a) Account No. 5525221528 for 10-90 (the "**10-90 Account**"); and (b) Account No. 55252215376 for Mountain Vista (the "Mountain Vista Account"). Beginning on March 17, 2003, and continuing until April 1, 2004, Fogg made large, whole dollar wire transfers within days of each other from the DTDF operating account at NSB (the "**DTDF Account**") to the 10-90 Account to the Mountain Vista Account to the USAIP account at Bank of Commerce (the "**USAIP Account**") and/or USACM several times per month. On November 12, 2004, the Culpable Insiders made one final wire

transfer of $1 million from the DTDF Account to the 10-90 Account.  In the aggregate, the Culpable

Insiders wire transferred $23.328 million from the DTDF Account to the 10-90 Account.  In turn,

Fogg wire transferred $22.545 million from the 10-90 Account to the Mountain Vista Account to

USAIP.  Each of these transactions is detailed in "Table B."

**Table B**

| Date of Wire from DTDF to 10-90 | Amount ($) | Date of Wire from 10-90 to Mt. Vista | Amount ($) | Date of Wire from Mt. Vista to USAIP | Amount ($) |
|---|---|---|---|---|---|
| 03/17/2003 | 195,000 | 03/18/2003 | 195,000 | 03/19/2003 | 195,000 |
| 03/24/2003 | 325,000 | 03/25/2003 | 320,000 | 03/26/2003 | 320,000 |
| 03/27/2003 | 325,000 | 03/28/2003 | 320,000 | 03/28/2003 | 320,000 |
| 04/04/2003 | 200,000 | 04/08/2003 | 200,000 | 04/08/2003 | 200,000 |
| 04/15/2003 | 2,375,000 | 04/15/2003 | 2,375,000 | 04/16/2003 | 2,375,000 |
| 04/16/2003 | 605,000 | 04/16/2003 | 765,000 | 04/17/2003 | 765,000 |
| 04/16/2003 | 150,000 | | | | |
| 04/25/2003 | 783,000 | N/A | N/A | N/A | N/A |
| 04/30/2003 | 300,000 | 05/01/2003 | 300,000 | 05/02/2003 | 300,000 |
| 05/02/2003 | 125,000 | 05/06/2003 | 125,000 | 05/06/2003 | 125,000 |
| 05/09/2003 | 1,850,000 | 05/12/2003 | 1,850,000 | 05/13/2003 | 1,850,000 |
| 05/14/2003 | 395,000 | 05/15/2003 | 395,000 | 05/15/2003 | 395,000 |
| 05/22/2003 | 295,000 | 05/27/2003 | 295,000 | 05/27/2003 | 295,000 |
| 05/28/2003 | 410,000 | 05/29/2003 | 410,000 | 05/29/2003 | 410,000 |
| 06/04/2003 | 205,000 | 06/05/2003 | 205,000 | 06/05/2003 | 205,000 |
| 06/11/2003 | 460,000 | 06/12/2003 | 460,000 | 06/12/2003 | 460,000 |
| 06/18/2003 | 125,000 | 06/20/2003 | 125,000 | 06/20/2003 | 125,000 |
| 06/26/2003 | 465,000 | 06/27/2003 | 465,000 | 06/27/2003 | 465,000 |
| 07/01/2003 | 2,495,000 | 07/02/2003 | 2,495,000 | 07/03/2003 | 1,900,000 |
| | | | | 07/03/2003 | 225,000 |
| | | | | 07/10/2003 | 370,000 |
| 07/18/2003 | 800,000 | 07/21/2003 | 800,000 | 07/22/2003 | 800,000 |
| 07/31/2003 | 720,000 | 08/01/2003 | 720,000 | 08/01/2003 | 720,000 |
| 08/06/2003 | 250,000 | 08/08/2003 | 250,000 | 08/08/2003 | 250,000 |
| 08/13/2003 | 925,000 | 08/15/2003 | 925,000 | 08/18/2003 | 925,000 |
| 08/28/2003 | 500,000 | 08/29/2003 | 500,000 | 08/29/2003 | 500,000 |
| 09/04/2003 | 400,000 | 09/05/2003 | 400,000 | 09/05/2003 | 400,000 |
| 09/25/2003 | 500,000 | 09/26/2003 | 500,000 | 09/26/2003 | 500,000 |
| 10/14/2003 | 550,000 | 10/15/2003 | 550,000 | 10/15/2003 | 550,000 |
| 10/29/2003 | 560,000 | 10/29/2003 | 560,000 | 10/30/2003 | 560,000 |
| 11/06/2003 | 225,000 | 11/07/2003 | 225,000 | 11/07/2003 | 225,000 |
| 11/13/2003 | 460,000 | 11/14/2003 | 460,000 | 11/14/2003 | 460,000 |

| 11/25/2003 | 500,000 | 11/26/2003 | 500,000 | 11/26/2003 | 500,000 |
|---|---|---|---|---|---|
| 12/03/2003 | 315,000 | 12/05/2003 | 315,000 | 12/05/2003 | 315,000 |
| 12/12/2003 | 350,000 | 12/15/2003 | 350,000 | 12/15/2003 | 350,000 |
| 01/08/2004 | 300,000 | 01/08/2004 | 300,000 | 01/08/2004 | 300,000 |
| 01/12/2004 | 1,500,000 | 01/13/2004 | 1,500,000 | 01/13/2004 | 1,500,000 |
| 01/14/2004 | 175,000 | 01/14/2004 | 175,000 | 01/14/2004 | 175,000 |
| 01/22/2004 | 150,000 | 01/23/2004 | 150,000 | 01/26/2004 | 150,000 |
| 01/29/2004 | 150,000 | 02/02/2004 | 150,000 | 02/02/2004 | 150,000 |
| 02/09/2004 | 125,000 | 02/11/2004 | 125,000 | 02/11/2004 | 125,000 |
| 02/13/2004 | 150,000 | 02/17/2004 | 150,000 | 02/17/2004 | 150,000 |
| 03/04/2004 | 275,000 | 03/04/2004 | 275,000 | 03/05/2004 | 275,000 |
| 04/01/2004 | 365,000 | 04/05/2004 | 365,000 | 04/07/2004 | 365,000 |
| 11/12/2004 | 1,000,000 | 11/12/2004 | 1,000,000 | 11/15/2004 | 1,000,000 |

80.     On their face, these transfers clearly evidenced that the 10-90 Account and the Mountain Vista Account were simply being used as conduits to launder funds from the DTDF Account to the USAIP Account.  With few exceptions, funds wire transferred into each account were nearly simultaneously wire transferred out in identical amounts, often on the same day and always within a few days of the first wire transfer.

81.     Moreover, with the exception of routine fees collected by Wells Fargo and a few isolated incidents,[2] there was absolutely no other activity in the 10-90 Account or the Mountain Vista Account besides these suspicious wire transfers.  In fact, the daily balances within the 10-90 Account and the Mountain Vista Account were almost always less than $1,500, except for the brief moments during which the accounts held funds en route from DTDF to USAIP.

82.     Wells Fargo knowingly and materially facilitated the looting of DTDF in connection with the sham 10-90 Loan.  Specifically, Wells Fargo enabled this looting by, *inter alia*: (a)

---

[2]  The 10-90 Account and the Mountain Vista Account were each opened with $1,000 deposits made March 7, 2003. On October 29, 2003, $1,000 was deposited into the 10-90 Account; subsequently, a check for $999 cleared the account on October 31, 2003.  Also on October 29, 2003, $2,000 was wired into the Mountain Vista Account; subsequently, checks for $700 and $299 cleared the account on October 31, 2003 and November 4, 2003, respectively.  On May 19, 2004, $2,700 was wired in and out of the Mountain Vista Account.  On June 25, 2004, $1,500,000 was transferred from the Mountain Vista Account to the 10-90 Account to DTDF.

violating "know your customer" regulations and its own policies and procedures in opening the 10-90 Account and Mountain Vista Account; (b) failing to set any limit on the size of the wire transfers out of these accounts; and (c) manually and routinely processing wire transfer requests made out of these accounts *despite knowing* that these transactions had no legitimate business purpose.

83.    At the outset, Wells Fargo disregarded "know your customer" regulations and its own internal policies and procedures in opening these accounts. Under the Bank Secrecy Act, the USA Patriot Act, and its own internal policies and procedures, Wells Fargo was required to obtain the following minimum information to open a business account:  (a) description of the business operations; (b) principal line of business; (c) description of the business's primary trade area; (d) anticipated volume of cash sales; (e) names of major suppliers; (f) reason for selecting the bank if not in the area served by the bank; (g) number of employees; (h) month and year the business started; and (i) types and frequency of anticipated international transactions.

84.    Despite these requirements, Wells Fargo failed to obtain any meaningful understanding of 10-90 and Mountain Vista prior to opening these accounts. Instead, the Wells Fargo banker who opened the accounts, LucyAnn Englebert ("Englebert"), asked Fogg very few questions, and filled out virtually identical information on the account opening forms for both 10-90 and Mountain Vista. The only information that Englebert obtained about the nature of the businesses was that 10-90 and Mountain Vista were in the "real estate, rental, leasing" industry and the sales were "regional." However, there was no information listed under "description of business," and neither account application contained any information regarding "annual gross sales" or "major suppliers/customers." In short, Wells Fargo knew nothing about 10-90 and Mountain

Vista, yet opened these business accounts that allowed Fogg to conduct unlimited wire transfers. If Wells Fargo had asked for *any* of the specified information, it easily would have discovered that Mountain Vista and 10-90 did not engage in any business, had no legitimate purpose, and were simply shell entities.

85.     Despite *not* knowing its 10-90 and Mountain Vista customers, or the likely volume or nature of its banking transactions, Wells Fargo did not set any limits on the size of the wire transfers that could be made out of the 10-90 and Mountain Vista Accounts. Again, Wells Fargo's conduct contravened its own policies and procedures, which require the bank to set limits based on the type of account, type of business, the reasons for wire transfer services, and average transfer amounts. Because Wells Fargo had not obtained any of this information upon opening the Mountain Vista and 10-90 Accounts, it could not and did not set up appropriate wire transfer limits. As a result, Wells Fargo enabled Fogg to make multimillion dollar wire transfers from 10-90 to Mountain Vista to USAIP, even though Fogg had never provided any legitimate business explanation for such transfers.

86.     Not only did Wells Fargo fail to impose any wire transfer limits, but Wells Fargo played a substantial role in processing almost all of these fraudulent wire transfers. Unlike USA Capital, Fogg was not set up to conduct online wire transfers until February 2004, so he initiated his wire transfers in person at the Wells Fargo West Temecula branch office in the vast majority of instances. As a result, a Wells Fargo employee, typically a teller, manually approved and processed these wire transfers while Fogg waited at the bank. Despite the clear and prevalent warning signs of

money laundering and fraud, Wells Fargo processed each and every wire transfer request out of the 10-90 and Mountain Vista Accounts.

87.    Moreover, Wells Fargo *knew* that these atypical wire transfers were not legitimate. In early June 2003, the West Temecula branch manager, Laurie Mills ("Mills"), asked to speak with Fogg when he was in the branch to initiate a wire transfer.  During this conversation, Mills told Fogg that her superiors or upper management needed to know the business purpose of the wire transfers.  Fogg responded that he "believed" the transfers were being used for real estate loans or purchases.  Despite Fogg's tentative and vague answer and the fact that Fogg had never conducted any banking activity in his other Wells Fargo accounts involving such high dollar amounts prior to 10-90 and Mountain Vista, Wells Fargo processed the atypical transactions.  In doing so, Mills willfully and blindly accepted inadequate responses to questions that required substantive answers and did not request any loan agreements, promissory notes, or any other documents to support Fogg's insufficient response.

88.    Wells Fargo also *knew* that the 10-90 and Mountain Vista transactions involved USA Capital.  As reflected on Wells Fargo account statements, the monies routinely were wire transferred from the DTDF Account at NSB to the 10-90 Account at Wells Fargo.  Then, Fogg would typically wire transfer the same amount to the Mountain Vista Account and then to the USAIP account at Bank of Commerce.  On at least two occasions, funds that had been wire transferred from the DTDF Account to the 10-90 Account to the Mountain Vista Account to the USAIP Account were subsequently wire transferred *back* to the Collection Trust Account maintained at Wells Fargo.

89.     For example, on May 9, 2003, the Culpable Insiders wire transferred $1.85 million from the DTDF Account to the 10-90 Account. The next banking day, Fogg wire transferred $1.85 million from the 10-90 Account to the Mountain Vista Account. On May 13, 2003, Fogg wire transferred $1.85 million from the Mountain Vista Account to the USAIP Account; instantaneously, the Culpable Insiders wire transferred $1.85 million from the USAIP Account to the Collection Trust Account.

90.     Similarly, on January 12, 2004, the Culpable Insiders wire transferred $1.5 million from the DTDF Account to the 10-90 Account. On January 13, 2004, Fogg wire transferred $1.5 million from the 10-90 Account to the Mountain Vista Account to the USAIP Account. From there, the Culpable Insiders wire transferred $1.5 million to the Collection Trust Account on January 15, 2004.

91.     Given the identical amounts and virtually simultaneous dates of these transfers, Wells Fargo had to have known or consciously disregarded that funds wire transferred from DTDF to 10-90 to Mountain Vista to USAIP and finally to the Collection Trust Account were simply being laundered. Nevertheless, Wells Fargo continued to process millions of dollars in suspicious wire transfers out of 10-90 and Mountain Vista throughout 2003 and 2004, and following the inquiry by Mills in June 2003, Wells Fargo never again questioned the purpose or the legitimacy of these blatantly suspicious, atypical wire transfers.

92.     Under the Bank Secrecy Act, including the amendments made by the USA Patriot Act, and Wells Fargo's own policies implemented pursuant to these federal statutes, Wells Fargo, at a bare minimum, should have reported the suspicious wire transfer activity to the next level of

authority, the bank's Risk Management Department, and the appropriate regulatory agencies, and then terminated the accounts with the suspicious activity. By consciously disregarding the plethora of red flags, and continuing to provide "no-risk" banking and wire transfer services, Wells Fargo substantially assisted Milanowski and Hantges to continue their fraudulent looting and self-dealing scheme until USA Capital finally collapsed in April 2006.

### (5)    Wells Fargo's Denial of USACM's Loan Request

93.    Ironically, however, Wells Fargo was not willing to risk any of its own funds with the USA Capital entities. In late 2004, Sechrist, Wells Fargo's Relationship Manager for the USA Capital accounts at the time, and her superior, had a meeting with Milanowski, in which they discussed the possibility of extending a credit line to USACM. Shortly thereafter, USACM applied for a $1 million loan from Wells Fargo. Sechrist obtained and reviewed USACM's audited consolidated financial statements for 2003 and 2004 and was concerned about the auditor's note regarding a pending RICO lawsuit that was filed against USACM and the Culpable Insiders. According to Sechrist, she was not especially concerned by the substance of the lawsuit allegations, but only the fact that the plaintiffs were seeking $10 million. Allegedly on this basis alone, Sechrist denied USACM's loan request without performing *any* financial analysis, even though USA Capital was one of her top five customers and despite USACM's requests for reconsideration.

94.    Sechrist's story flies in the face of typical bank conduct. Given that USACM was one of the most important customers for the Las Vegas business banking unit and the Nevada region, it is almost unthinkable that Wells Fargo would so cavalierly dismiss USACM's loan application and the opportunity to sell profitable credit products without any further underwriting or

financial analysis. Furthermore, banks lend money to companies every day that have substantial contingencies like pending litigation involving high dollar amounts, such that Sechrist's explanation does not comport with industry norms. Finally, given the large volume of business and transactions that flowed in and out of USA Capital's accounts at Wells Fargo, the $1 million loan request was relatively modest. That Wells Fargo so readily rejected the loan request indicates that Wells Fargo knew that USA Capital's business was not viable in late 2004.

### (6) *Wells Fargo's Termination of USA Capital Accounts in May 2006*

95.    Yet another strange occurrence was Wells Fargo's decision to terminate the USAIP account in May 2006, the month following the bankruptcy filings of USACM and DTDF. By letter dated May 31, 2006, Wells Fargo terminated its banking relationship with USAIP: "Wells Fargo Bank, N.A has determined that it is no longer in the best interests of the Bank to maintain its banking relationship with USA Investment Partners, LLC." However, USAIP had *not* filed for bankruptcy at the time of the May 31, 2006 letter, and Wells Fargo did not provide any specific reason for terminating the USAIP relationship. At a minimum, the letter clearly demonstrates that Wells Fargo considered USAIP to fall under the USA Capital umbrella. Moreover, Wells Fargo's termination of the USAIP account in May 2006 indicates that it was motivated by its prior knowledge about the legitimacy of the USA Capital operations.

### F.    PLAINTIFF'S SUBSTANTIAL DAMAGES

96.    DTDF was substantially harmed by Wells Fargo's wrongful acts. Wells Fargo's actions proximately caused DTDF to lose tens of millions of dollars through: (a) unremitted

principal and interest owed to DTDF (*i.e.*, the "held checks"); (b) looting, in particular the 10-90 Loan; and (c) bad investments in "insider" loans in default.

97.      Wells Fargo's wrongful acts and omissions enabled, assisted, and prolonged the Culpable Insiders' Ponzi scheme within USACM's loan servicing operations.  More than $18 million in principal and interest payments rightfully belonging to DTDF was instead used to fuel the scheme.  Had it not been for Well Fargo's wrongful acts and omissions, these repayment checks never would have been "held" and DTDF would have received the more than $18 million that it was owed in repayments on its investments in performing loans.

98.      Wells Fargo's wrongful acts and omissions also enabled, assisted, and prolonged large scale abuse and looting of DTDF by the Culpable Insiders.  DTDF suffered many millions of dollars in damages through the Culpable Insiders' misappropriations of funds in furtherance of their looting and self-dealing scheme.  In particular, DTDF lost more than $55 million in connection with the fraudulent 10-90 Loan described above.

99.      In addition, DTDF lost millions of dollars by being misused to invest in worthless insider loans and paying interest on defaulted loans in furtherance of the Culpable Insiders' multi-faceted looting and self-dealing scheme.  The Culpable Insiders used DTDF funds to make loans to entities they owned and/or controlled that were never repaid.  Had the Culpable Insiders' scheme been stopped sooner, DTDF would have saved millions of dollars that were wrongfully transferred to entities owned or controlled by the Culpable Insiders that ultimately defaulted.  DTDF could instead have used these funds to enter into legitimate loan transactions, and thereby earned a profit for its investments.

100.    DTDF could also have saved millions of dollars in losses had they sought to gain control of the real property underlying their securitized loans at an earlier date.  Due in large part to the recent downturn in the real estate market, many of the properties in question are selling at greatly reduced prices.  Had DTDF been aware of the scheme and acted to foreclose on these properties or otherwise gain control of the collateral at an earlier date, these properties would have sold for much higher prices, resulting in a substantial increase in the recovery of assets for distribution to DTDF's creditors.

101.    Wells Fargo's malfeasance was not simply the *sine qua non* of DTDF's losses.  Rather, as a direct, proximate result of Wells Fargo's acts and omissions described above, DTDF suffered tens of millions of dollars in damages from the sham 10-90 Loan and related party loans that were never repaid, the Culpable Insiders' looting/misappropriation of DTDF funds, and unremitted principal and interest payments from borrowers.

## H. THE CULPABLE INSIDERS ACTED EXCLUSIVELY ADVERSE TO PLAINTIFF'S INTERESTS, BUT DTDF'S INNOCENT STAKEHOLDERS COULD AND WOULD HAVE ACTED TO PREVENT THE WRONGDOING

102.    At all relevant times, the Culpable Insiders acted exclusively adverse to DTDF's interests in connection with the transactions described herein, and in each instance, the Culpable Insiders:  (a) placed their own interests ahead of DTDF's interests; and (b) acted in their own best interests to DTDF's detriment.  In perpetrating the Ponzi scheme and looting and self-dealing scheme described herein, the Culpable Insiders' sole intention was to benefit themselves.

103.    The Culpable Insiders engaged in these harmful acts to perpetuate the looting and self-dealing scheme, thereby allowing them to continue to misappropriate and loot assets from DTDF and its innocent investor-creditors.

104.    DTDF's investors, members, and various Nevada and federal regulators (collectively, the "**Stakeholders**") were unaware and had no reason to know about the scheme. Moreover, numerous regulatory authorities in Nevada and elsewhere stood ready, willing, and able to assist in preventing the ongoing fraud, but for the affirmative actions taken by the Culpable Insiders and Wells Fargo to cover it up and/or mislead the authorities.

105.    DTDF had approximately 1400 investors who each held membership interests in the fund. Virtually all of DTDF's members had no knowledge of the Culpable Insiders' wrongdoing. DTDF's members had the exclusive power to remove USACRA as DTDF's manager. Thus, if these investors were informed that the Culpable Insiders, with Wells Fargo's assistance, were looting DTDF's funds, they could and would have taken action to stop the Culpable Insiders by, including, but not limited to, replacing USACRA as the manager and/or removing the Culpable Insiders.

106.    In fact, after discovering the Culpable Insiders' fraud in another investment fund, Tanamera Resort Partners, LLC ("**TRP**"), the investors removed the Culpable Insiders from their management position in TRP. Many of TRP's members are also DTDF members. Therefore, if DTDF's members had known about the fraud, there is empirical reason to believe that they would have removed the Culpable Insiders from their management position in DTDF. Moreover, once notified, DTDF's members could have reported the Culpable Insiders' fraud to the appropriate

regulatory agencies, including the Nevada Securities Commission and/or the Securities and Exchange Commission.

107.    In addition, DTDF's manager, USACRA, had at least one innocent shareholder, Paul S. Hamilton ("**Hamilton**").  USACRA was managed by USAIP, which in turn was managed by USACM.  USACM had at least two innocent shareholders — Hamilton and Red Granite, a company owned by Jaime Wise — who could and would have substantially prevented the Culpable Insiders' scheme had they known about it.  Furthermore, USACM had innocent officers, directors, and employees, including without limitation:  Eugene Buckley, a USA Capital director; Rob Hilson, USA Capital's Chief Financial Officer; and Thomas Rondeau, USA Capital's general counsel.  If informed of the Culpable Insiders' scheme, these individuals could and would have taken actions to prevent further harm to DTDF by, *inter alia*, notifying DTDF's Stakeholders of the fraud.

108.    Without access to DTDF's liquidity, the Culpable Insiders' scheme would have ended much sooner, and DTDF would have been able to sustain operations as a prosperous real estate investment fund.

109.    Because of the Culpable Insiders' failure to abide by their fiduciary duties and Wells Fargo's active assistance in concealing their wrongdoing, DTDF failed to discover the Culpable Insiders' wrongdoing until the bankruptcy filings in April 2006.  After Chief Restructuring Officers were appointed and the Culpable Insiders were removed, a thorough review of the books and records was conducted.  This review led to the discovery of the Culpable Insiders' misdeeds and ultimately to Wells Fargo's active and substantial participation in those misdeeds.

110.    At all relevant times, DTDF's innocent Stakeholders had no knowledge of the Culpable Insiders' wrongdoing and could and would have substantially prevented or otherwise mitigated the losses that occurred had they been properly notified of the scheme by Wells Fargo or regulatory authorities.

111.    The innocent Stakeholders were unaware and had no reason to know about the suspicious wire transfers out of 10-90 and Mountain Vista or the suspicious, circular $11.425 million transaction.  Nor did the innocent Stakeholders have knowledge of the "held checks" or the Culpable Insiders improper inter-trust transfers.

112.    If Wells Fargo had informed the innocent Stakeholders of the ongoing Ponzi scheme and looting and self-dealing scheme, the Culpable Insiders' schemes would have ended years sooner and millions of dollars of losses to DTDF would have been prevented.

113.    If Wells Fargo had notified the authorities about the suspicious banking and wire transfer activity, the authorities would have intervened to stop the Culpable Insiders' scheme, thereby allowing DTDF to continue operations and flourish as a prosperous real estate investment fund.

## IV.    CAUSES OF ACTION

### A.    AIDING AND ABETTING FRAUD

114.    DTDF re-alleges and fully incorporates the allegations pleaded above.

115.    The Culpable Insiders consistently and systematically defrauded DTDF out of tens of millions of dollars.  In doing so, they exercised dominion and control over funds that they had no legal right or entitlement to, directed that the funds to be used to pay off USAIP's obligations that

USAIP incurred as the result of Culpable Insiders using DTDF as their personal "piggy bank," and otherwise used the funds for purposes not in the best interest of DTDF.  The scheme was principally conducted through the various ways described above.

116.    Wells Fargo knowingly and substantially assisted the Culpable Insiders in defrauding DTDF of its assets by opening and maintaining the accounts used to conduct systematic transfers of funds out of DTDF's account at NSB, and by facilitating transfers between the DTDF, 10-90, Mountain Vista, and USAIP Accounts.  Wells Fargo knew that the Culpable Insiders were using the 10-90 and Mountain Vista Accounts to divert funds from DTDF.  Wells Fargo knew that: (a) DTDF was a fund that held investor monies for real estate investments because Wells Fargo obtained the DTDF prospectus and provided corporate trust services to FTDF, a virtually identical real estate investment fund created by the Culpable Insiders in 2001; (b) DTDF's funds were transferred to the 10-90 and Mountain Vista Accounts and then transferred out to USAIP; (c) such transfers were inconsistent with DTDF's purpose and prohibited by DTDF's prospectus; (d) there was no documentation supporting the purpose of the transfers; and (e) such transfers were textbook money laundering.

117.    Wells Fargo knew that the transfers through the 10-90 and Mountain Vista Accounts were designed to divert money from DTDF, but did not close the accounts and continued to process the wire transfers at its Temecula branch until November 2004, thus substantially assisting the Culpable Insiders' scheme.  Wells Fargo was aware of its role in promoting the fraudulent scheme at the time the Culpable Insiders were diverting the funds from DTDF.  Wells Fargo's assistance in

processing the wire transfers made it possible for the Culpable Insiders to defraud DTDF out of tens of millions of dollars.

118.    Wells Fargo's knowledge of the Culpable Insiders' fraud is further demonstrated by its activities with respect to the USACM accounts.  Wells Fargo knew that:  (a) on January 2, 2003, an $11.425 million check drawn on the DTDF account at NSB was deposited by the Culpable Insiders in the Investors Trust Account at Wells Fargo; (b) on the same day, a check for the same amount was issued from the Investors Trust Account and deposited in the Collection Trust Account, also maintained at Wells Fargo; (c) the transfers between the Investors Trust Account and the Collection Trust Account violated NRS 645B.175; (d) this transaction between the accounts was unusual because of their sheer size; (e) the machination involving a simultaneous multimillion dollar deposit and withdrawal from the Investors Trust account was also suspicious under the bank's internal policies; (f) there was no legitimate business purpose for the transactions; and (g) as a result of these transactions, the USACM account was put under "watch."

119.    Wells Fargo knowingly assisted the Culpable Insiders in committing multiple felonies by helping them in transferring money from the Investor Trust Account to the Collection Trust Account to cover shortfalls in the Collection Trust Account.  In fact, Wells Fargo even suggested the Culpable Insiders commit a felony under Nevada law by commingling funds between the two Trust Accounts and then manually affected these transfers.  Wells Fargo also knew that the large overdrafts of the Collection Trust Account were suspicious.  At the very least, Wells Fargo deliberately ignored the fact that the commingling of funds between the Trust Accounts and the negative account balances in the Collection Trust Account were indicative of fraud.

120.    Moreover, Wells Fargo knew that on several other occasions, almost contemporaneous circular wire transfers were made from the DTDF Account to the Mountain Vista Account or the 10-90 Account to the USAIP Account and then to Collection Trust Account.  Wells Fargo knew that there were no documents supporting these transfers and that these transfers also qualified as "suspicious activity" under the bank's internal policy.

121.    Wells Fargo was aware of its role in promoting the fraudulent scheme at the time the Culpable Insiders were commingling the funds.  Wells Fargo's assistance in opening, maintaining, and failing to terminate the accounts, made it easier for the Culpable Insiders to keep their scheme afloat and defraud DTDF out of tens of millions of dollars.

122.    DTDF had one or more innocent Stakeholders who:  (a) were not involved in the acts and omissions set forth above; (b) were not aware of the fraud committed by the Culpable Insiders; and (c) were not aware of Wells Fargo's substantial assistance in commission of the fraud.

123.    One or more of the innocent Stakeholders could and would have terminated or prevented the acts or omissions set forth above if they had actually known, or understood and appreciated, what the Culpable Insiders were doing to DTDF and the true adverse impact on DTDF and its members.

124.    The wrongful conduct complained of herein was a direct and proximate cause of DTDF's substantial damages.

**B.    AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY**

125.    DTDF re-alleges and fully incorporates the allegations pleaded above.

126.    As directors, officers, and managers of USACM, USAIP, and USACRA, the Culpable Insiders owed DTDF fiduciary duties to act at all times with the utmost good faith and fair dealing in DTDF's best interests.  The Culpable Insiders collectively and individually breached fiduciary duties owed to DTDF and its creditors by diverting more than $50 million of DTDF funds to fund their own side operations.  Their fiduciary duties required them not to engage in transactions that were in violation of the DTDF prospectus and harmful to DTDF.  The Culpable Insiders also had a fiduciary duty not to commingle DTDF's money entrusted to them and not to divert such funds for improper purposes.  The Culpable Insiders' breaches of those fiduciary duties were the proximate cause of DTDF's collapse and bankruptcy.

127.    Wells Fargo knew that the Culpable Insiders owed these fiduciary duties to DTDF and its members and investors because they had a longstanding banking relationship with the USA Capital entities and the Culpable Insiders.  Through its services to the USA Capital entities, including its escrow services to FTDF, Wells Fargo understood the relationships between the various USA Capital entities and that the Culpable Insiders were the managers and principals controlling DTDF and therefore owed fiduciary duties to DTDF and its members.  Wells Fargo even obtained DTDF's prospectus, which set out certain of these fiduciary duties that were ultimately and repeatedly violated by the Culpable Insiders.

128.    Wells Fargo knew that the Culpable Insiders were violating their fiduciary duties to DTDF and its members and investors because, *inter alia*, it was aware of and deliberately ignored numerous red flags, including the:  (a) suspicious, illegal transfers between the Investors Trust Account and Collection Trust Account; (b) negative account balances in the Collection Trust

Account that were covered by looting DTDF or illegally transferring money from the Investors Trust Account; and (c) textbook money laundering transactions that originated from the DTDF Account into the 10-90 and Mountain Vista Accounts (as reflected on Wells Fargo's own bank statements and records). Wells Fargo even questioned Fogg about the business purpose of the 10-90 and Mountain Vista transactions, but dropped the issue without conducting any further due diligence or receiving an adequate answer from Fogg.

129.    Wells Fargo knowingly provided substantial assistance to the Culpable Insiders in their breaches of fiduciary duties to DTDF. As described above, Wells Fargo assisted the Culpable Insiders in their breaches of fiduciary duties by facilitating circular wire transfers of funds from DTDF to USAIP through the 10-90 and Mountain Vista Accounts. By virtue of being the entity that opened the accounts and processed the blatantly suspicious wire transfers, Wells Fargo was aware of its role in promoting the Culpable Insiders' breaches of fiduciary duties at the times that it provided assistance to them. At the very least, Wells Fargo made a conscious decision to look away from the conspicuously improper systematic diversion of funds committed by the Culpable Insiders.

130.    Wells Fargo also knowingly provided substantial assistance to the Culpable Insiders in their breaches of fiduciary duties to DTDF by opening and maintaining accounts where DTDF's funds were being commingled. Wells Fargo was aware of commingling and knew that commingling of investors' funds was improper, violated Nevada law, and was in violation of the Culpable Insiders' fiduciary duties. The Culpable Insiders' commingling of funds and use of "new" funds (from the Investors Trust Account) to cover shortfalls in the Collection Trust was not only an

indication of a breach of fiduciary duty — it was, in and of itself, a breach of fiduciary duty to investors, including DTDF.

131.    By virtue of being the entity that opened the USACM accounts and facilitated the transfers in and out of these accounts, by knowing that improper, suspicious and unexplainable transfers were being made between various USACM accounts maintained at Wells Fargo, Wells Fargo was aware of its role in promoting the commingling of funds belonging to direct lenders (including DTDF) and the Culpable Insiders' breaches of fiduciary duties.

132.    Wells Fargo's substantial assistance made it easier for the Culpable Insiders to commit their breaches of fiduciary duties.

133.    The conduct constituting breaches of fiduciary duty owed to DTDF and its members was exclusively adverse to their interests and provided no benefit to them.

134.    DTDF had one or more innocent Stakeholders who:  (a) were not involved in the acts and omissions set forth above; (b) were not aware of the breaches of fiduciary duty owed by the Culpable Insiders; and (c) were not aware of Wells Fargo's substantial assistance in such breaches.

135.    DTDF was directly and proximately damaged by Wells Fargo's actions, and DTDF now seeks to recover these damages.

C.    CIVIL RICO (18 U.S.C § 1962(c))

136.    DTDF re-alleges and fully incorporates the allegations pleaded above.

1

*Enterprise*

2

137.    Collectively, the Culpable Insiders, their cronies, including Fogg, and their slush

3

fund USAIP were an Enterprise engaged in a massive investment plan.  Wells Fargo, as a federally

4

charted financial institution, is a person legally distinct from the Enterprise within the meaning of 18

5

U.S.C. § 1961(3).

6

7

138.    Although Wells Fargo may have originally associated with the Enterprise without

8

any wrongful intent, over time it learned of increasingly suspicious activity and yet made a

9

deliberate choice to continue associating with the Enterprise to achieve their common purpose of

10

financial profit.  In other words, Wells Fargo was happy to generate large monthly fees with no

11

credit risk by continuing to provide banking and wire transfer services despite increasingly criminal

12

conduct on the Enterprise's part.

13

14

139.    To achieve their common purpose of making money, Wells Fargo conducted a

15

pattern of racketeering, willfully turning a blind eye to a massive financial scam, and, in other cases

16

openly suggesting and processing illegal transfers from the investors trust account to the collections

17

trust account.  Without Wells Fargo's assistance in executing millions of dollars worth of fraudulent

18

money transfers, the Enterprise's scheme to loot DTDF would not have been possible.  While being

19

aware of or deliberately ignoring the scheme, Wells Fargo lined its pockets with the fees received

20

from the fraudulent transfers executed by the Enterprise.

21

22

23

140.    Wells Fargo's predicate acts of racketeering included wire fraud, money laundering,

24

and violations of Nevada state law.  Wells Fargo continued to knowingly assist the ongoing fraud on

25

DTDF by manually and routinely processing the Fogg Transfers.  In so doing, Wells Fargo cycled

26

millions of dollars from DTDF through the 10-90 and Mountain Vista Accounts at Wells Fargo and out to USAIP and/or USACM from March 2003 to November 2004.

141.    Wells Fargo also perpetuated the Enterprise's Ponzi scheme by knowingly processing fraudulent transfers from the Investors Trust Account to the Collection Trust Account from 2003 to 2005.  Rather than use DTDF's funds in the Investors Trust Account for investments in mortgages secured by first lien deeds of trust, the Enterprise used funds in the Investors Trust Account to cover shortfalls in the Collection Trust.  The Enterprise could then continue to pay interest to investors on nonperforming loans, the key to maintaining the Ponzi scheme.   Not only did Wells Fargo process these fraudulent transfers, but it solicited them as well by calling Loob and asking her if she wanted the transfers performed *as usual* when there was a shortfall in the Collection Trust Account.  Each of these transfers, are a violation of Nevada law, NRS 645B.175, and are a class D felony punishable by more than one year imprisonment under NRS 645B.960.

142.    This cycling of funds through the 10-90 and Mountain Vista accounts and transfers between the Investors Trust Account and Collection Trust by using United States wires deprived DTDF of property and was done with knowledge of the Enterprise's scheme to deceive and defraud DTDF.

***Conduct or Participation***

143.    Wells Fargo participated, directly or indirectly, in the operation or management of the Enterprise's fraudulent scheme through its acts of money laundering, wire fraud, and violations of Nevada state law in furtherance of the scheme to loot DTDF.

144.    Wells Fargo was aware of or deliberately ignored the fraudulent nature of the Enterprise's scheme.  Wells Fargo had knowledge of the fraudulent nature of the transfers laundering funds from DTDF through the 10-90 and Mountain Vista Accounts and out to USAIP and/or USACM from March 2003 to November 2004.  Wells Fargo also had knowledge of the fraudulent and illegal nature of the transfers between the Investors Trust Account and the Collection Trust Account from March 2003 to July 2005.

145.    Not only is Wells Fargo's knowledge of the Enterprise's scheme demonstrated by the fraudulent and illegal transfers it solicited and/or processed, but also through the concerns that Wells Fargo expressed about the atypical activities in some of the USA Capital related accounts housed at Wells Fargo.

146.    As evidence of this concern, in January 2003, Wells Fargo twice refused an $11.425 million deposit from DTDF to the Investors Trust Account before finally allowing it on the Enterprise's third attempt.  After processing the $11.425 million deposit, a Wells Fargo employee stated that the branch and the USA Capital accounts were being watched because the bank did not follow procedures in handling the deposit.  Yet, in the face of these concerns, Wells Fargo continued to process illegal and/or fraudulent transfers involving these accounts.

147.    Additionally, although Wells Fargo disregarded federal regulation and internal policies when Fogg opened the 10-90 and Mountain Vista Accounts, after three months of the atypical wire transfers, the bank manager questioned Fogg about their business purposes.  Instead of diligently requiring Fogg to provide a legitimate an actual explanation, she accepted the vague answer that Fogg "believed" the transfers were being used for real estate investments, without

asking for any supporting documents or making further inquiry. While being aware of or deliberately ignoring the fraudulent nature of the transfers, the bank took no further action to prevent similar acts.

148.    Wells Fargo was also on notice that certain members of the Enterprise had a pending RICO lawsuit filed against them. In fact, the bank used this information to shield itself from credit exposure by denying a $1 million loan to USACM, but notably did not use this information when deciding whether to process the atypical wire transfers.

149.    Wells Fargo transferred funds using United States wires to deprive DTDF of property. Doing so with knowledge of the Enterprise's scheme, Wells Fargo had a specific intent to deceive and defraud DTDF. These acts constitute wire fraud under 18 U.S.C. § 1343.

150.    Wells Fargo misappropriated DTDF's money by processing the transfers in, out, and through the 10-90 and Mountain Vista Accounts, along with the transfers between the Investors Trust Account and the Collection Trust Account. Wells Fargo did so with the intent to promote the carrying on of the scheme to loot DTDF. Wells Fargo knew the transactions were designed in whole or part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the scheme. These acts constitute money laundering under 18 U.S.C. § 1956.

151.    Wells Fargo knowingly assisted the ongoing fraud on DTDF by processing tens of millions of dollars in fraudulent money transfers. Wells Fargo's acts of racketeering through performance of these transfers were essential to the furtherance of the Enterprise's scheme and therefore had a connection or nexus to the conduct of the Enterprise.

*Pattern of Racketeering*

152.    Wells Fargo conducted multiple acts of racketeering within ten years of one another including wire fraud, money laundering, and violations of Nevada state law.    Wells Fargo committed these acts of racketeering in over forty transfers in, out, and through the 10-90 and Mountain Vista Accounts from March 2003 to November 2004, along with the transfers back and forth between the Investors Trust Account and the Collection Trust Account from March 2003 to July 2005.

153.    Wells Fargo's wire fraud and money laundering through these transfers became its regular way of doing business.

154.    Wells Fargo's acts of racketeering were related and committed knowingly in furtherance of the Enterprise's scheme to loot DTDF.    This constitutes a pattern of racketeering within the meaning of 18 U.S.C. § 1961(5).

*Causation*

155.    Wells Fargo's pattern of racketeering caused DTDF to be looted of millions of dollars and was an essential part of the Enterprise's scheme.

156.    Wells Fargo manually processed fraudulent wire transfers from DTDF's NSB account into the 10-90 and Mountain Vista Accounts, thus laundering tens of millions of dollars for the Enterprise.

157.    Wells Fargo also solicited and processed illegal transfers from the Investors Trust Account to the Collection Trust Account, perpetuating the Ponzi scheme.    Without Wells Fargo's conduct, the Enterprise would not have been able to loot DTDF of millions of dollars.

158.    Wells Fargo is liable to DTDF for actual damages, statutory treble damages, reasonable attorneys' fees, interests, and costs under 18 U.S.C. § 1964(c).

**D.    CIVIL RICO CONSPIRACY (18 U.S.C § 1962(d))**

159.    DTDF re-alleges and fully incorporates the allegations pleaded above.

*Enterprise*

160.    The Enterprise was engaged in a massive investment plan.  The Enterprise conducted a pattern of racketeering acts that constitute violations of 18 U.S.C. § 1962(a), 18 U.S.C. § 1962(b), and 18 U.S.C. § 1962(c).  Wells Fargo knowingly agreed to facilitate a scheme that included the operation or management of the Enterprise.

*Underlying RICO Violations*

161.    The Enterprise received income derived, directly or indirectly, from a pattern of racketeering activity.  That income, or the proceeds of such income, was used or invested, directly or indirectly in the establishment and operation of multiple enterprises engaged in interstate or foreign commerce including time-share hotels, technology companies, and real estate development entities.  These investments are in violation of 18 U.S.C. § 1962(a).

162.    The Enterprise, through a pattern of racketeering gained control in enterprises that engaged in or affected interstate or foreign commerce including, time-share hotels, technology companies, and real estate development entities.  Control of these enterprises through the proceeds of racketeering is a violation of 18 U.S.C. § 1962(b).

163.    The Enterprise, directly or indirectly, conducted or participated in the affairs of the Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

164.    The predicate acts constituting this pattern of racketeering activity include sending fraudulent wire transfers through interstate wires, engaging in money laundering, and violations of Nevada state law.

165.    The Enterprise fraudulently cycled funds from DTDF through the 10-90 and Mountain Vista Accounts and out to USAIP and/or USACM from March 2003 to December 2004. The Enterprise also transferred funds between the Investors Trust Account and the Collection Trust Account in violation of Nevada law, NRS 645B.175  Each of these transfers was in an amount greater than $1000 and therefore was a felony punishable by more than one year imprisonment, NRS 645B.960.  The Enterprise made these illegal transfers in order to continue paying interest to investors on nonperforming loans in furtherance of the Ponzi scheme.  The funds were transferred using United States wires to deprive DTDF of its property.  The Enterprise's scheme had a specific intent to deceive and defraud DTDF. These acts constitute wire fraud under 18 U.S.C. § 1343.

166.    The Enterprise illegally transferred funds between the Investors Trust Account to the Collection Trust Account from 2003 to 2005 and fraudulently transferred funds in, out, and through the 10-90 and Mountain Vista Accounts from March 2003 to November 2004, misappropriating DTDF's money, with the intent to promote the carrying on of the scheme to loot DTDF.  The transactions were designed in whole or part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the scheme.  These acts constitute money laundering under 18 U.S.C. § 1956.

*Conspiracy*

167.    Wells Fargo, as a federally charted financial institution, is a person legally distinct from the enterprise within the meaning of 18 U.S.C. § 1961(3).

168.    Given the clear and unmistakable signs of fraud and illegality that Wells Fargo became aware of or deliberately ignored, Wells Fargo was aware of the essential nature and scope of the Enterprise and intended to participate in it within the meaning of 18 U.S.C. § 1962(d).

169.    Despite knowing the essential nature and scope of the scheme to defraud, Wells Fargo nonetheless objectively manifested an agreement with the Enterprise to participate in the conduct of this scheme within the meaning of 18 U.S.C. § 1962(d).

170.    Specifically, Wells Fargo agreed to open the 10-90 and Mountain Vista Accounts without following "Know Your Customer" regulations and its own policies and procedures by not obtaining vital information regarding both 10-90 and Mountain Vista businesses and providing tens of millions of dollars in wire transfer services.  Wells Fargo's conduct in the opening of these accounts facilitated the Enterprise's scheme to loot millions of dollars from DTDF.

171.    In addition, Wells Fargo agreed to process fraudulent wire transfers from DTDF through the 10-90 and Mountain Vista Accounts and out to USAIP, and in fact, manually processed those transfers from March 2003 to November 2004.  Wells Fargo was aware or deliberately ignored that these transfers constituted money laundering and nevertheless performed them, in furtherance of the Enterprise's scheme.

172.    Wells Fargo also agreed to process, and even unilaterally solicited the Enterprise's approval to process, transfers from the Investors Trust Account to the Collection Trust Account,

sometimes to cover shortages in the Collection Trust Account in violation of Nevada law. This allowed the Enterprise to pay interest to investors on nonperforming loans with DTDF's new investment funds rather than repayments made by the borrowers, an essential aspect of the Enterprise's Ponzi scheme.

173.    Additionally, Wells Fargo expressed concern about the activities in its accounts, specifically regarding the $11.425 million dollar deposit from DTDF to the Investors Trust Account in January 2003 and the atypical wire transfers in the 10-90 and Mountain Vista Accounts in June 2003. Although those concerns were never fully addressed, Wells Fargo continued to transfer money in, out, and through USA Capital accounts, providing essential assistance to the Enterprise's scheme to loot DTDF.

174.    Wells Fargo tacitly agreed to facilitate the commission of the underlying predicate acts of money laundering and wire fraud supporting the scheme that looted DTDF by, *inter alia*, conducting the fraudulent transfers into and through its bank accounts while knowing of, or being deliberately indifferent to, the signs of fraud and other illegality.

175.    There is a nexus between the Enterprise's fraudulent enterprise, Wells Fargo's participation in the facilitation of that enterprise, and racketeering activities of the enterprise.

***Pattern of Racketeering***

176.    The underlying acts of racketeering occurred within ten years of one another, including wire fraud, money laundering, and violations of Nevada state law. The underlying racketeering acts occurred in over forty transfers in, out, and through the 10-90 and Mountain Vista

accounts from March 2003 to November 2004, along with the transfers back and forth between the Investors Trust Account and the Collection Trust Account from March 2003 to July 2005.

177.    Wire fraud, money laundering, and violation of Nevada state law through these transfers became the Enterprise's regular way of doing business.

178.    The acts were related, they shared the same purpose of financial profit and methods of perpetuating the scheme against DTDF, and were committed knowingly in furtherance of the scheme to loot DTDF.  This constitutes a pattern of racketeering within the meaning of 18 U.S.C. § 1961(5).

*Causation*

179.    DTDF was injured in its business and property by reason of Wells Fargo violations of 18 U.S.C. § 1962(d), and as a direct and proximate result of these violations, suffered substantial damages.

180.    Wells Fargo is liable to DTDF for actual damages, statutory treble damages, reasonable attorneys' fees, interests, and costs under 18 U.S.C. § 1964(c).

**WHEREFORE,** DTDF respectfully requests that a judgment be entered on DTDF's behalf against Wells Fargo for the following:

a.    actual, compensatory, consequential, and all other damages in amount in excess of $25 million (to be quantified later in these proceedings);

b.    pre-judgment and post-judgment interest at the highest rate allowed by law;

c.    attorneys' fees and costs; and

d.    any and all such further relief to which DTDF is entitled at law and in equity.

Dated:  May 15, 2009

**DIAMOND MCCARTHY LLP**


By:   */s/ Lisa S. Tsai*
William T. Reid, IV, TX 00788817
Lisa S. Tsai, TX 24046999
Joshua Bruckerhoff, TX 24059504
6504 Bridgepoint Parkway, Suite 400
Austin, Texas 78730
(512) 617-5200 (telephone)
(512) 617-5299 (facsimile)

Allan B. Diamond, TX 05801800
Michael Yoder, TX 24056572
909 Fannin, Suite 1500
Houston, Texas 77010
(713) 333-5100 (telephone)
(713) 333-5199 (facsimile)

Eric D. Madden, TX 24013079
Elisaveta Dolghih, TX 24043355
1201 Elm Street, 34th Floor
Dallas, Texas 75270
(214) 389-5300 (telephone)
(713) 389-5399 (facsimile)

*Special Litigation Counsel for USA Capital
Diversified Trust Deed Fund, LLC*

1

2

### CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of May, 2009, I served a true and correct copy of the foregoing **PLAINTIFF'S FIRST AMENDED COMPLAINT** by ECF transmission to counsel of record for Defendant Wells Fargo Bank, N.A., Dean V. Fleming (dfleming@fulbright.com), Michael W. O'Donnell (modonnell@fulbright.com), and Steve A. Peirce (speirce@fulbright.com), Fulbright & Jaworski, LLP, 300 Convent Street, Suite 2200, San Antonio, Texas 78205-3729.

3

4

5

6

7

8

9

      /s/ Lisa S. Tsai
Lisa S. Tsai

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26