EXHIBIT 1

Case 06-10725-gwz    Doc 7157-1    Entered 05/29/09 12:14:45    Page 1 of 19

1962760.1

| Docket No. CV 07 5014454S | : | SUPERIOR COURT |
|---|---|---|
| USA CAPITAL DIVERSIFIED TRUST DEED FUND, L.L.C., et al., | : | JUDICIAL DISTRICT OF HARTFORD |
| v. | : | AT HARTFORD |
| COLT GATEWAY, LLC, et al., | : | January 8, 2008 |
| | : | |

### ANSWER TO COMPLAINT BY DEFENDANTS COLT GATEWAY, LLC AND HOMES FOR AMERICA HOLDINGS, INC.

Defendants Colt Gateway LLC ("Colt") and Homes for America Holdings, Inc. ("HFAH") (collectively, the "Colt Parties"), by their attorneys, Rogin, Nassau, Caplan, Lassman & Hirtle, LLC and Moses & Singer, LLP, as and for their answer to the Complaint (the "Complaint") of Fertitta Enterprises, Inc. ("Fertitta"), USA Capital Diversified Trust Deed Fund, LLC ("Diversified") and Daniel Tabas Trust ("Tabas") (collectively, "Plaintiffs") and counterclaims, hereby respond as follows:

FIRST COUNT – Foreclosure of the Mortgage

1. Deny the allegations set forth in paragraph "1", except admit that Colt executed the Promissory Note Secured By Mortgage dated December 22, 2002.

2. Deny the allegations set forth in paragraph "2".

3. Deny the allegations set forth in paragraph "3", except admit that Colt executed the Mortgage Deed And Security Agreement dated December 22, 2002.

4. Deny the allegations set forth in paragraph "4", except admit that Colt and HFAH executed the First Amendment to Loan Documents.

5. Deny the allegations set forth in paragraph "5".

6. Deny the allegations set forth in paragraph "6", except that Colt executed the First Modification of Mortgage Deed and Security Agreement and First Modification of Promissory Noted Secured By Mortgage Deed.

7. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "7".

8. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "8".

9. Deny the allegations set forth in paragraph "9", except admit that Colt and HFAH executed the Loan Extension Amendment attached as Exhibit G to the Complaint.

10. Deny the allegations set forth in paragraph "10".

11. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "11".

12. Deny the allegations set forth in paragraph "12".

13. Deny the allegations set forth in paragraph "13".

14. Deny the allegations set forth in paragraph "14", except admit that Plaintiffs have made demand upon Colt.

15. Deny the allegations set forth in paragraphs "15", except admit that: (a) USACM, Diversified, Daniel Tabas and Fertitta executed that certain Partial Release of Mortgage Deed and Security Agreement, dated September 25, 2003, and refer to that partial release for a full and complete statement of its contents; (b) USACM, Diversified, Daniel Tabas and Fertitta executed that certain Partial Release of Mortgage Deed and Security Agreement, dated February 12, 2004, and refer to that partial release for a full and complete statement of its contents; and (c) USACM, Diversified, Fertitta and Robert R. Tabas, Linda Tabas Stemple and Nicholas Randazzo, as executors of the estate of

Daniel M. Tabas, executed that certain Partial Release of Mortgage Deed and Security Agreement, dated April 26, 2005, and refer to that partial release for a full and complete statement of its contents.

16. Deny the allegations set forth in paragraph "16".

17. Admit the allegations set forth in paragraph "17".

18. Deny the allegations set forth in paragraph "18".

19. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "19".

20. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "20", but deny that the interest referred to in paragraph "20" is subordinate to the interests of the plaintiffs.

21. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "21", but deny that the interest referred to in paragraph "21" is subordinate to the interests of the plaintiffs.

22. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "22", but deny that the interest referred to in paragraph "22" is subordinate to the interests of the Plaintiffs.

23. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "23", but deny that the interest referred to in paragraph "23" is subordinate to the interests of the Plaintiffs.

24. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "24", but deny that the interest referred to in paragraph "24" is subordinate to the interests of the plaintiffs.

25. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "25", but deny that the interest referred to in paragraph "25" is subordinate to the interests of the plaintiffs.

26. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "26".

27. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "27".

28. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "28", except admit that a copy of a Notice of Lis Pendens is attached as Exhibit N to the Complaint.

SECOND COUNT- Claim under the Note

1. Deny the allegations set forth in paragraph "1", except admit that Colt executed the Promissory Note Secured by Mortgage dated December 22, 2002.

2. Deny the allegations set forth in paragraph "2", except admit that Colt and HFAH executed the First Amendment to Loan Documents.

3. Deny the allegations set forth in paragraph "3".

4. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "4".

5. Deny the allegations set forth in paragraph "5", except admit that Colt and HFAH executed the Loan Extension Amendment attached as Exhibit G to the Complaint.

6. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "6".

7. Deny the allegations set forth in paragraph "7".

8. Deny the allegations set forth in paragraph "8".

665308v2 011106.0103

4

9. Deny the allegations set forth in paragraph "9", except admit that Plaintiffs have made a demand on Colt.

Third Count- Claim Against Guarantor Homes for America Holdings, Inc.

1-9. The Colt Parties repeat and reallege their responses to paragraphs 1-9 of the Second Count as if fully set forth.

10. Deny the allegations set forth in paragraph "10," except admit that HFAH executed the Unconditional Repayment and Completion Guaranty.

11. Deny the allegations set forth in paragraph "11", but admit that Plaintiffs have made a demand upon Colt.

## FIRST SPECIAL DEFENSE (UNCLEAN HANDS AS TO ALL COUNTS)

### THE PARTIES

1. Colt is a Connecticut limited liability company, having its principal place of business at 140 Huyshope Avenue, Second Floor, Hartford, CT 06106.

2. Upon information and belief, Diversified was a Nevada corporation whose mailing address is c/o FTI Consulting, Two North Central Ave., Suite 1200, Phoenix, AZ 85004.

3. Upon information and belief, Fertitta has its principal place of business at 2960 West Sahara Avenue, Suite 200, Las Vegas, NV 89102.

4. Upon information and belief, R. Tabas, as Trustee of the Daniel M. Tabas Living Trust, has his principal place of business at 915 Montgomery Avenue, Narbeth, PA 19072.

5. Upon information and belief, Stempel, as Trustee of the Daniel M. Tabas Living Trust, has her principal place of business at 915 Montgomery Avenue, Narbeth, PA 19072.

665308v2 011106.0103

5

6. Upon information and belief, Randazzo, as Trustee of the Daniel M. Tabas Living Trust, has his principal place of business at 915 Montgomery Avenue, Narbeth, PA 19072.

**Background**

7. The Colt Gateway campus, formerly known as Coltsville, is located in Hartford, Connecticut. The property dates back to the 1850s and was instrumental in the development and rise of the industrial revolution in the United States.

8. In the late 1970s/early 1980s, all operations stopped at Colt Gateway. The site was then under the care of a Federal non-profit development before Colt and Homes for America Holdings, Inc. ("HFAH") (together, the "Colt Parties") became involved in rebuilding the site.

9. The Colt Gateway campus recently received national landmark status and is also an historic site that is listed on the national historic registry.

10. The Colt Gateway campus is comprised of ten buildings:

    a. The L-Shaped Building

    b. The Gymnasium

    c. The Sawtooth Building

    d. The Boilerhouse Building

    e. The South Armory

    f. The East Armory

    g. The North Armory

    h. The U-Shaped Building

    i. The Polishing Building

    j. The Foundry Building (collectively, the "Colt Gateway Campus").

11. On or about July 17, 2002, HFAH entered into an agreement with Coltsville Heritage Park, Inc., to purchase the Colt Gateway Campus (the "Purchase Agreement"). HFAH assigned the Purchase Agreement to Colt in consideration of HFAH's membership interest in Colt.

12. Colt, a special purpose entity, was created, for the purpose of rehabilitating the Colt Gateway Campus through a restoration of the historic interior of the buildings, and the development of the buildings for use and operation as office, commercial and residential building facilities.

13. HFAH and USA Investment Partners, LLC ("USAIP") agreed to enter into a joint venture for the development of the Colt Gateway Campus. To effectuate the joint venture, HFAH agreed to give 50% of the membership interest in Colt to USAIP in exchange for USAIP making an equity contribution of $9,750,000 in Colt.

14. USAIP's equity contribution was fulfilled by USAIP's procuring a loan (the "Equity Loan") from its affiliates, USACM, Diversified, Fertitta and Daniel M. Tabas (the "Equity Lenders").

15. Although the loan was and is secured by a mortgage, the parties also agreed that partial releases would be made in order to permit the development of the individual buildings on Colt Gateway Campus.

16. On or about December 24, 2002, HFAH and USAIP, entered into the Amended and Restated Operating Agreement (the "Operating Agreement") establishing the governance and business operations for Colt. The Operating Agreement reflected that HFAH and USAIP each held a 50% interest in Colt.

17. As set forth in the Operating Agreement, the Colt Gateway Campus, which is an urban revitalization project, would be funded, in part, by historic tax credits

from the City of Hartford and State of Connecticut upon completion of the redevelopment of each building located on the Premises. Historic tax credits provide economic incentives for urban developers to redevelop and restore to use historic structures that otherwise would be economically infeasible to develop.

18. The Colt Gateway Campus was qualified to receive the historic tax credit under the Federal Tax Code because: (1) the site is listed on the National Register to qualify as a certified historic structure; and (2) a substantial rehabilitation was to be performed to the certified structures which would materially extend the useful life of the buildings, significantly upgrade the buildings' usefulness, or preserve them in a manner that significantly improves the condition or enhances historical value of the site.

19. On or about September 22, 2003, HFAH, USAIP and CG Operating Company, LLC, a Connecticut limited liability company ("Chevron"), entered into the Second Amended and Restated Operating Agreement ("Second Amended Operating Agreement"). In consideration of admission as a member of Colt under the Second Amended Operating Agreement, Chevron purchased the historic tax credits from Colt and was given a 1% interest in Colt. HFAH's and USAIP's respective interests in Colt were reduced to 49.5%. Chevron purchased the historic tax credits for approximately $20 million (the "Tax Credit Payment") by way of obligating itself to make equity capital contributions to Colt in the amount of the purchased credits.

20. Under an agreement with Chevron, Chevron would review the construction costs proposed with respect to a particular building on the Colt Gateway Campus and, if the construction budget was approved, Chevron agreed to release the equity capital immediately in an amount equal to 31% of the tax credits for each building based on the construction costs. Chevron would release the remaining tax credits for

665308v2 011106.0103                     8

each building on the following schedule: (a) 31% when the construction of the building achieved 50% completion; (b) 31% when the construction of the building achieved 100% completion; and (c) 7% upon completion of construction of the entire Colt Gateway Campus.

21. The Chevron equity capital provides critical funds constituting a necessary source for the balancing of the construction budget, qualification for institutional construction financing, and the completion of each building, and the failure of Colt to qualify for or obtain such capital contributions for the entire Colt Gateway Campus would make it unlikely that Colt could complete the restoration project or to pay the mortgage. Accordingly, the Equity Lenders agreed to release the mortgage, as amended and/or modified, on a building by building basis in order to permit the construction and development of the Colt Gateway Campus.

22. Pursuant to that agreement, the Equity Lenders and Colt would agree that when Colt was ready to commence construction on a building on the Colt Gateway Campus, the Equity Lenders would release the mortgage that was on said building. After the Equity Lenders released their mortgage on a building, Colt would finalize the construction financing for that building. Only after construction began would Colt receive in the initial Tax Credit Payment on the building of 31% from Chevron. Upon receipt of that initial Tax Credit Payment, Colt would pay the initial Tax Credit Payment to the Equity Lenders.

23. The Equity Lenders properly fulfilled their agreement to release the mortgage on a building-by-building basis in three separate occasions: (1) the foregoing procedure was followed for the L-Shaped Building, the Gymnasium, and the Boiler

House Building, (2) the foregoing procedure was followed for the Sawtooth Building, and (3) the foregoing procedure was followed for the South Armory and East Armory.

24. First, in accordance with the Equity Lenders' and Colt's agreement, on September 25, 2003, the Equity Lenders released their lien of the mortgage on the L-Shaped Building, the Gymnasium and the Boilerhouse. (*See* Exhibit H to the Complaint)

25. Thereafter, Colt obtained construction financing and construction began on the L-Shaped Building Building.

26. After Colt obtained construction financing on the L-Shaped building, Colt received a payment of $2,312,538 from Chevron, representing 31% of the Tax Credit Payment on the L-Shaped building. On September 20, 2003, Colt paid $2,312,538 to the Equity Lenders in partial repayment of the principal on the Equity Loan.

27. Second, in accordance with the Equity Lenders' and Colt's agreement, on February 11, 2004, the Equity Lenders released their lien of the mortgage of the Sawtooth Building. (*See* Exhibit I to the Complaint)

28. Thereafter, Colt obtained construction financing and construction began on the Sawtooth Building.

29. After Colt obtained construction financing on the Sawtooth building, Colt received a payment of $1,275,290 from Chevron, representing 31% of the Tax Credit Payment on the Sawtooth building. On February 13, 2004, Colt paid $1,275,290 to the Equity Lenders in partial repayment of the principal on the Equity Loan.

30. Third, in accordance with the Equity Lenders' and Colt's agreement, on April 26, 2005, the Equity Lenders released their lien of the mortgage on the South Armory Building and the East Armory Building. (*See* Exhibit J to the Complaint)

31. Thereafter, Colt obtained construction financing and construction began on the South Armory Building.

32. After Colt obtained construction financing on the South Armory Building, Colt received a payment of $1,598,103 from Chevron, representing 31% of the Tax Credit Payment on the South Armory Building. On June 15, 2005, Colt paid $1,598,103 to the Equity Lenders in partial repayment of the principal on the Equity Loan.

**Equity Lenders Wrongful Refusal To Release The Mortgage**

33. In or about April 13, 2006 (the "Petition Date"), USACM, Diversified and other related entities (collectively, the "Debtors") filed for protection under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court, District of Nevada (the "Bankruptcy Court"). On the Petition Date, the Board of Directors of the Debtors appointed Thomas J. Allison of Mesirow Financial Interim Management, LLC, as President, Chief Executive Officer and Chief Restructuring Officer of USACM, and as Manager and Chief Restructuring Officer of the other Debtors. Mr. Allison's first action was to terminate the pre-petition principal officers and management of USACM.

34. In May, 2006, Colt received a loan commitment from Cathay Bank for the construction of the North Armory.

35. Thereafter, in accordance with the parties' past practice and agreement, Colt requested that the Equity Lenders release the mortgage with respect to the North Armory in order to permit construction to take place on the North Armory and to receive a portion of the tax credits attributable to the North Armory. The Equity Lenders refused to release the Mortgage on the North Armory.

36. In February, 2007, Colt received another loan commitment from Cathay Bank for construction of the North Armory. Thereafter, in accordance with the parties'

past practice and agreement, Colt again requested that the Equity Lenders release the mortgage with respect to the North Armory in order to permit construction to take place on the North Armory and to receive a portion of the tax credits attributable to the North Armory. Again, the Equity Lenders refused to release the mortgage on the North Armory.

37. The Equity Lenders' refusal to provide a partial release of the mortgage with respect to the North Armory in order to permit construction to take place on the North Armory constituted a breach of the parties' agreement.

38. As a result of the Equity Lenders' breach of the parties' agreement to release the mortgage in order to permit construction of the remaining buildings on the Colt Gateway Campus, Colt has been unable to develop the remaining buildings of the Colt Gateway Campus.

39. In addition, as a result of the Equity Lenders' breach of the parties' agreement to release the mortgage in order to permit construction of the remaining buildings on the Colt Gateway Campus, construction on the South Armory Building ceased.

40. Thus, the Equity Lenders' claims are barred by the doctrine of unclean hands because they refused to release the mortgage for the remaining portions of the Colt Gateway Campus, thereby preventing Colt from completing the development of the Colt Gateway Campus, even though, based on the Equity Lenders' prior behavior, the Equity Lenders knew and had agreed that the release of their mortgage was a prerequisite for allowing Colt to develop the Colt Gateway Campus and repaying the Equity Lenders.

## SECOND SPECIAL DEFENSE (ESTOPPEL AS TO ALL COUNTS)

41. . The Colt Parties incorporate by reference paragraphs 1-39 of the First Special Defense.

42. The Equity Lenders' claims are barred by the doctrine of equitable estoppel because Colt executed the Equity Loan in reliance on the Equity Lenders' agreement to release the mortgage as required to permit development of the Colt Gateway Campus, and despite having released the mortgage on certain portions of the Colt Gateway Campus, the Equity Lenders wrongfully refused to release the mortgage on the remaining portions of the Colt Gateway Campus, thereby preventing Colt from completing the construction of the Colt Gateway Campus and, accordingly, causing injury to Colt.

43. The Equity Lenders' claims are barred by the doctrine of promissory estoppel because Colt relied to its detriment on the Equity Lenders' promises and representations that they would release the liens on the mortgages of each of the remaining buildings on the Colt Gateway Campus so that Colt could complete construction of the remaining buildings on the Colt Gateway Campus.

## THE COUNTERCLAIMS

Defendants/Counterclaim Plaintiff Colt Gateway LLC ("Colt") bring the following counterclaims against Plaintiffs/Counterclaim Defendants USA Capital Diversified Trust Deed Fund, LLC ("Diversified"), Fertitta Enterprises, Inc. ("Fertitta") and Robert R. Tabas ("R. Tabas"), Linda Tabas Stempel ("Stempel") and Nicholas Randazzo ("Randazzo"), as Trustees of the Daniel Tabas Trust ("Tabas") (collectively, "Plaintiffs" or the "Lender Group").

## FIRST COUNTERCLAIM

**Colt's Damages Resulting From The Equity
Lenders' Wrongful Refusal To Release The Mortgage**

1-39. Paragraphs 1 through 39 of the First Special Defense are incorporated by reference as paragraphs 1 through 39 of the First Counterclaim.

40. The aforementioned conduct of the Equity Lenders constitutes a breach of that parties' agreement.

41. The Equity Lenders' conduct in breaching the parties' agreement, has damaged Colt in the amount of approximately $13.5 million by making it impossible for Colt to realize upon the remaining Tax Credit Payment.

42. As a result of the Equity Lenders' breach of the parties' agreement, Colt has been damaged in the amount of approximately $7.2 million by making it impossible for Colt to realize upon the Tax Increment Financing bonds to be issued by the City of Hartford, Connecticut.

43. As a result of the Equity Lenders' breach of the parties' agreement, Colt has been damaged in the amount of approximately $2,052,000 as a result of costs incurred in carrying its loan from Sovereign Bank.

44. By repeatedly refusing to release their liens from the mortgage, Plaintiffs have breached their agreement with Colt and have prevented Plaintiffs from completing the construction of the Colt Gateway Campus.

45. Accordingly, the Equity Lenders' breach of the parties' agreement has caused Colt to incur damages in an amount to be determined at trial, but not less than $22,752,000.

## SECOND COUNTERCLAIM

46-90. Paragraphs 1 through 44 of the First Counterclaim are incorporated by reference as paragraphs 46 through 90 of the Second Counterclaim.

91. The Equity Lenders made representations and promises to Colt, upon which Colt relied to its detriment and which has now caused Colt to suffer damages.

92. The Equity Lenders represented and promised that they would release the lien on the mortgage on each of remaining four buildings on the Colt Gateway Campus to allow Colt to complete construction of all ten buildings on the Colt Gateway Campus.

93. Colt relied on the representations and promises of the Equity Lenders in entering into the Equity Loan.

94. The Equity Lenders initially partially fulfilled their promises and representations, and established a course of conduct and dealings, by releasing the lien of the mortgage on six of the buildings on the Colt Gateway Campus.

95. The Equity Lenders released the lien on the mortgage on the L-Shaped Building, the Gymnasium, the Boiler House Building, the Sawtooth Building, the South Armory Building and East Armory Building.

96. The Equity Lenders reneged on their promises and representations and have refused to release the lien on the mortgages of each of the remaining buildings on the Colt Gateway Campus.

97. Colt relied to its detriment on the Equity Lenders' promises and representations that it would release the liens on the mortgages of each of the remaining buildings on the Colt Gateway Campus so that Colt could complete construction of the remaining buildings on the Colt Gateway Campus.

665308v2 011106.0103                    15

98. Due to the Equity Lenders' failure to uphold its promises and representations that it would release the lien on the mortgage of the remaining buildings, Colt has been unable to complete construction on the remaining buildings on the Colt Gateway Campus.

99. Colt has been damaged by the Equity Lenders' failure to keep its promises.

100. Accordingly, due to the Equity Lenders' conduct, Colt has incurred damages in an amount to be determined at trial, but not less than $22,752,000.

WHEREFORE, Colt and HFAH demands judgment as follows:

A. dismissing the Complaint in its entirety;

B. on the First Counterclaim, in favor of Colt, in an amount to be determined at trial, but not less than $22,752,000;

C. on the Second Counterclaim, in favor of Colt, in an amount to be determined at trial, but not less than $22,752,000;

D. prejudgment interest and costs; and

E. granting Colt and HFAH such other and further relief as the Court deems just and proper.

Dated: January 8, 2008

ROGIN, NASSAU, CAPLAN, LASSMAN & HIRTLE, LLC

By: _____
Lewis K. Wise
CityPlace I - 22nd Floor
185 Asylum Street
Hartford, CT 06103-3460
lwise@roginlaw.com
phone (860) 278-7480
fax (860) 278-2179
lwise@roginlaw.com

and

MOSES & SINGER LLP
Mark N. Parry (*pro hac vice*)
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
(212) 554-7800
mparry@mosessinger.com

Attorneys for Defendants Colt Gateway, LLC and Homes for America Holdings, Inc.

## CERTIFICATION

This is to certify that a copy of the foregoing Answer was mailed by first class mail, postage prepaid on this 8th day of January, 2008 to the following counsel of record:

Thomas A. Gugliotti, Esq.
Updike, Kelly & Spellacy, P.C.
P. O. Box 231277
One State Street
Hartford, CT 06123-1277

Lewis K. Wise