# EXHIBIT "1"

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Agreement"), dated as of August 29, 2005, is made by and between ASHBY USA, LLC, a California limited liability company ("Borrower"), and OHIO SAVINGS BANK, a federal savings bank ("Lender").

## RECITALS

A.    Borrower is the owner of certain real property to be legally subdivided pursuant to a map to be approved by Lender and recorded in Riverside County, California, consisting of Planning Areas 13 through 32, inclusive in the Roripaugh Ranch subdivision, located east of Butterfield Stage Road in Riverside County, California (the "A Land").

B.    Borrower is either the current owner or the previous owner of certain real property known as Planning Areas 1A, 1B, 2, 3, 4A, 4B, 5, 6, 7A, 7B, 7C, 8, 9A, 9B, 10, 12, 33A and 33B in the Roripaugh Ranch subdivision, Riverside County, California (the "B Land"), portions of which are to be encumbered by a deed of trust in favor of Lender as defined in Section 18.V below. As to the portions of the B Land not currently owned by Borrower, in connection with Borrower's prior sale of such portions of the B Land to third parties, Borrower holds either a purchase money note and deed of trust or certain interests under escrow arrangements, referred to in Section 18.V below. The A Land and such portions of the B Land as are described in a deed of trust executed by Borrower in favor of Lender, are collectively referred to as the "Land." The A Land and the B Land are more particularly described on Exhibits A-1 and A-2 to this Agreement.

C.    Borrower has applied to Lender, and Lender has agreed to grant to Borrower, a revolving line of credit land acquisition and development loan in the principal amount of One Hundred Six Million Five Hundred Thousand and No/One-Hundredths Dollars ($106,500,000.00) (U.S.) (the "Land Loan") to be used by Borrower to refinance the acquisition of the A Land and finance the construction of the Improvements (defined below) on the A Land necessary to complete one thousand one hundred two (1,102) detached residential building sites (sometimes collectively referred to as the "Lots" and individually as a "Lot") (the Improvements and the Land are collectively referred to as the "Premises"), subject to the terms of this Agreement.

D.    The Land Loan is evidenced by a Revolving Deed of Trust Note, of the same date as this Agreement, from Borrower to Lender in the principal amount of the Land Loan (the "Land Note") and secured by a first priority position Construction Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (the "Deed of Trust"), one or more Uniform Commercial Code Financing Statements (the "Financing Statements"), and other documents related to the Land Loan. This Agreement, the Land Note, the Deed of Trust, the Financing Statements and all other documents or instruments evidencing and/or securing the Land Loan are collectively referred to as the "Land Loan Documents" in this Agreement.

E.    Borrower has applied to Lender for a letter of credit facility providing for a standby letter of credit in the maximum face amount of Six Million and No/One-hundredths Dollars ($6,000,000.00) (the "L/C Facility").

Exhibit 1

F.      The L/C Facility is evidenced by a Deed of Trust Note, of the same date as this Agreement, from Borrower to Lender in the amount of the L/C Facility (the "L/C Note") and secured by the Deed of Trust, the Financing Statements, and other documents related to the L/C Note. This Agreement, the L/C Note, the Deed of Trust, the Financing Statements, and all other documents or instruments evidencing and/or securing the L/C Facility are collectively referred to as the "L/C Facility Documents" in this Agreement.

G.      The Deed of Trust secures repayment of the Land Note and the L/C Note. The Land Loan and the L/C Facility are sometimes severally and collectively referred to as the "Loan" in this Agreement. The Land Note and the L/C Note are sometimes severally and collectively referred to as the "Note" in this Agreement. The Land Loan Documents, the L/C Facility Documents, and all other documents or instruments evidencing and/or securing the Loan are sometimes collectively referred to as the "Loan Documents" in this Agreement.

H.      The Loan is guaranteed, evidenced and secured by, among other things, an Unconditional and Continuing Guaranty and Indemnity Agreement, of the same date as this Agreement, executed by Guarantor and evidencing Guarantor's agreement to guaranty the payment and performance of all of Borrower's obligations and liabilities contained in the Loan Documents.

I.      Borrower and Lender have negotiated the provisions of, and desire to enter into, this Agreement in order to set forth with particularity their agreements and their rights and obligations with respect to the Loan.

NOW, THEREFORE, in consideration of the Loan and the premises, and of the mutual covenants and agreements contained in this Agreement, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Borrower and Lender agree as follows:

1.    DEFINITIONS.

As used in this Agreement, the terms listed below shall have the following meanings, unless the context requires otherwise:

A.      A Land. The A Land is defined in Recital A above.

B.      A Lot. An A Lot means a Lot located in the A Land.

C.      Advance. A Land Loan Advance and/or a draw under the L/C Facility.

D.      Affiliate. As to any Person, (I) the spouse, parent, child, grandchild or sibling of any individual Person, or any other relative who lives in the same house with, or is a dependent of (under the Internal Revenue Code), such Person; (II) any general or limited partnership in which such Person or any individual identified in clause (I) or entity identified in clauses (III), (IV), (V) or (VI) is a general partner or in which any such Person, individual or entity owns, beneficially or of record, 10% or more of the limited partnership interest; (III) any limited liability company of which any such Person or any individual or entity identified in clauses (I), (II), (IV), (V) or (VI) is a member or owns, beneficially or of record, 10% or more of the equity

459461_11.DOC

-2-

Exhibit 1

interest; (IV) any corporation in which such Person or any individual identified in clause (I) is a director or officer, or of which any such Person, or any individual or entity identified in clauses (I), (II), (III), (V) or (VI) is the owner, beneficially or of record, of 10% or more of its outstanding voting stock; (V) any trust of which any such Person, or any individual or entity identified in clauses (I), (II), (III), (IV) or (VI) is a trustee or co-trustee or is the holder, beneficially or of record, of a beneficial interest of 10% or more; or (VI) any corporation, partnership, trust, limited liability company or other entity controlled by, controlling, or under common control, either directly or indirectly, with, such Person or any of the individuals or entities identified in clauses (I) through (V) above.

E.    Affiliated Ashby Entities.  The term is defined in Section 19.A.

F.    B Land.  The term is defined in Recital B of this Agreement.

G.    B Land First Deed of Trust and B Land First Deed of Trust Loan Documents. The terms are defined in Section 18.V below.

H.    B Land Security Documents.  The term is described in Section 18.V below.

I.    Business Day.  Any day on which Lender is open for business, other than Saturday, Sunday, and any day on which federal savings banks in the State of California and/or in the State of Ohio are authorized or required to be closed under applicable federal law.

J.    Commitment.  A letter dated June 23, 2005, including all attached Exhibits and Schedules, from Lender and addressed to Borrower, signed and accepted by Borrower and Guarantor, containing the commitment of Lender to make the Loan, and including all modifications and amendments to, and extensions of, such letter.

K.    Deed of Trust.  The Construction Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated of even date with this Agreement and encumbering the Land, together with each other deed of trust at any time delivered by Borrower to Lender encumbering all or any portion of the B Land which recites that it is security for the Note, as the same may be modified, renewed, or extended.

L.    Engineer.  Van Dell and Associates, Inc., a California professional corporation, and any successor engineer approved in writing by Lender.

M.    Final Map.  A map legally subdividing the A Land into the Planning Areas approved by Lender and recorded in the Official Records of Riverside County, California.

N.    Fontana Tax Increment Assignment and Fontana Tax Increment Payment.  The terms are defined in Section 18.W below.

O.    Fontana Tax Increment Pledge Account.  The term is defined in Section 18.W below.

P.    General Contract.  The general construction contract between Borrower and the General Contractor for construction of the Improvements.

459461_11.DOC

-3-

Exhibit 1

Q.     General Contractor. Ashby Financial Company, Inc., a California corporation, and any successor general contractor for the Improvements that Lender may approve in writing.

R.     GRC. GRC Development Company, L.P., a California limited partnership.

S.     GRC Percentage Price. An amount equal to the gross sales price of portions of the Property that are sold to third party buyers as follows: (a) (if applicable) an amount equal to 1.8% of the sales prices for completed residential dwelling units, commercial and other buildings; (b) an amount equal to 3.6% of the sales prices of fully improved finished lots (residential, commercial, industrial land); or (c) (if applicable) an amount equal to 1.8% of the total fair market value of fully improved lots with buildings that are leased to third parties, based on an independent appraisal.

T.     Guarantor. Severally and collectively, if more than one, Richard K. Ashby and Justin Ashby.

U.     Improvements. All earthwork, infrastructure and other improvements necessary to develop an estimated one thousand one hundred two (1,102) single-family residential building sites on the A Land in accordance with the KB Option Agreement, including all work necessary to achieve "Completion of Seller Work" as defined in the KB Option Agreement, which may include, without limitation, clearing, filling to grade, compacting and grading of the A Land, installation and paving of roads, curbs and sidewalks, installation of a drainage system, installation and dedication of water and sewer lines and other utilities to each individual building site, and landscaping, and related off and onsite improvements, including, but not limited to, "site improvements" as defined in California Civil Code Section 3102.

V.     Improvement Costs. The Improvement costs in accordance with the Improvement Plans and this Agreement, which costs are more particularly described in the schedule attached to this Agreement as Exhibit B, as the same may be revised by Lender in accordance with this Agreement.

W.     Improvement Plans. The plans and specifications for the construction and installation of the Improvements, prepared by the Engineer and examined and approved by Lender, and all amendments and modifications to such plans and specifications that Lender approves in writing as approved by KB Homes in accordance with the KB Option Agreement.

X.     Inspector. Any inspector appointed or employed by Lender from time to time, in its discretion, to visit and inspect the Premises for the benefit of Lender, which inspections shall be at the expense of Borrower.

Y.     Insured. The term is defined in Section 7.U.

Z.     Junior Deeds of Trust. The term is defined in Section 18.M below

AA.     Junior Lender. Collectively, USAIP, GRC and KB Homes, the holders of the Junior Deeds of Trust.

BB.     KB Home. KB Home Coastal Inc., a California corporation.

459461_11.DOC

Exhibit 1

CC.    KB Option Agreement. The Option Agreement and Agreement for Purchase and Sale of Real Property and Escrow Instructions dated as of July 11, 2005 between Borrower as optionor and KB Home as optionee, as amended by the First Amendment to the Option Agreement and Agreement for Purchase and Sale of Real Property and Escrow Instructions dated August 28, 2005, with respect to the A Land.

DD.    KB Option Land. All Lots to be located within Planning Areas 13 through 24 and 31 of the A Land.

EE.    Key-Man Policy. The term is defined in Section 7.U.

FF.    L/C Facility. This term is defined in Recital D.

GG.    L/C Pledge Account. The deposit account described in Section 3.F.IV below, pledged to Lender as additional collateral for the L/C Facility.

HH.    Land Loan Advance. A disbursement by Lender of a portion of the proceeds of the Land Loan pursuant to, or as authorized by, this Agreement.

II.    Land Loan Documents. The executed originals of all documents and instruments evidencing and/or securing the Land Loan, and all documents and instruments incidental or collateral to such executed originals, including, without limitation, this Agreement, the Land Note, the Deed of Trust recorded or to be recorded against the Premises in conjunction with the execution of this Agreement, any and all assignments of permits, assignments of contracts, assignments of rents, performance bonds, applications, loan commitments, guarantees, security and loan agreements, financing statements, disclosure statements, loan settlement statements, letters of credit, legal opinions, certificates and affidavits, correspondence applicable to the Land Loan, and any and all other documents pertaining to the foregoing documents and instruments, and the documents referred to in this Agreement or in the Commitment, and related security agreements, all as the same now exist and may hereafter be amended, and any and all such documents or instruments executed and delivered after the date of this Agreement, all of which must be satisfactory to Lender in form and substance.

JJ.    Person. An individual, or a corporation, partnership, trust, association, governmental agency, limited liability company, or any other entity.

KK.    Planning Area. As applicable, the areas of the A Land containing Lots or other sites, identified on Exhibit A-3, and areas of the B Land as shown on a map recorded in the County of Riverside, California.

LL.    Special Member. A duly appointed member of the relevant entity other than a Guarantor or any of its Affiliates, who shall not have been, at the time of such appointment or at any time while serving as such a member or manager of the relevant entity and may not have been at any time in the preceding five (5) years, (a) a direct or indirect legal or beneficial owner in such entity or any of its Affiliates, (b) a creditor, supplier, employee, officer, director (other than in its capacity as Special Member), family member, manager, or contractor of such entity or any of its Affiliates, or (c) a Person who controls (directly, indirectly, or otherwise) such entity

459461_11.DOC

Exhibit 1

or any of its affiliates or any creditor, supplier, employee, officer, director, family member, manager, or contractor of such Person or any of its Affiliates.

MM.    Special Purpose Entity. The term is defined on Exhibit K attached.

NN.    Temecula CFD. Temecula Public Financing Authority, a joint exercise of powers authority organized and existing under the laws of the State of California.

OO.    Temecula CFD Assignment. The term is defined in Section 18.X below.

PP.    Temecula CFD Bonds. Bonds to be issued by the Temecula CFD, including the 2005 Series A Bonds anticipated to be in the face amount of not less than $52,000,000.00 and any Parity Bonds (as defined in the Temecula CFD Bond Documents).

QQ.    Temecula CFD Bond Documents. The Acquisition Agreement to be entered into between Borrower and Temecula Public Financing Authority, a joint exercise of powers authority organized and existing under the laws of the State of California, and related documents.

RR.    Title Company. First American Title Insurance Company (with reinsurance or an agreement with a coinsurer, as approved by Lender).

SS.    USAIP. USA Investment Partners, LLC, a Nevada limited liability company.

Some of the terms in this Agreement that are capitalized are defined or described in the Recitals or below. Each term that is capitalized, but not defined or described, in this Agreement shall have the meaning given to such term in the Deed of Trust, unless otherwise indicated. Each accounting term not otherwise defined in this Agreement shall be used in accordance with generally accepted accounting principles. Unless the context otherwise requires or unless stated otherwise, the words "herein," "hereunder," "hereto," and "hereof" shall refer to this entire Agreement and not merely to a paragraph, section, subsection or portion of this Agreement. The use of any gender in this Agreement shall include all other genders, and each use of the singular or plural number in this Agreement shall include either singular or plural, as the context may require.

2.    THE LAND LOAN.

A.    Use of Proceeds. Lender shall make the Land Loan to Borrower to pay for, or reimburse Borrower for the payment of, the acquisition of the Land and the Improvement Costs by category, item or purpose, as described in Exhibit B. The amount of the Land Loan proceeds available for each such category, item or purpose, as set forth in Exhibit B, shall not exceed the amount of Land Loan proceeds allocated therefor in Exhibit B. Upon the written request of Borrower, Lender, in its sole and absolute discretion, shall have the right, but shall not be obligated, to increase, decrease, reallocate or reapply the amount of the Land Loan to be disbursed for each category, item or purpose. Any and all such changes shall be subject to such conditions and qualifications as Lender may prescribe. In no event shall the maximum principal amount outstanding at any time exceed the lesser of (a) $103,500,000.00 (in addition to the $3,000,000.00 set aside in connection with issuance of a letter of credit as described in Section 2.F below), or (b) fifty-one percent (51%) of the then "as-is" value of the A Land according to

459461_11.DOC

-6-

Exhibit 1

(i) at closing, an appraisal acceptable to Lender in form and substance at closing, and (ii) after closing, updated appraisals, acceptable in form and content to Lender (obtained by Lender at Borrower's expense at intervals of six (6) months or more), nor shall Lender be obligated to disburse more, over time, than an aggregate amount of $146,400,000.00 of Land Loan proceeds. The Land Loan shall be disbursed in Land Loan Advances, upon and subject to the terms and conditions of this Agreement and in reliance on the representations and warranties contained in this Agreement. Borrower shall take the Land Loan and expressly agrees to comply with and perform all of the terms and conditions of this Agreement, the Land Note, the Deed of Trust, and all of the other Land Loan Documents.

      B.    Land Loan Debt Service Reserve: So long as no Event of Default (defined below) has occurred, Lender shall reserve $16,330,000.00 of Land Loan proceeds for the sole and express purpose of paying $1,894,612.00 in interest due under the B Land First Deed of Trust Loan Documents plus $14,435,388.00 for paying the regular monthly installments of interest on the Land Note in accordance with the terms and conditions of the Land Note (the "Land Loan Debt Service Reserve" or "Land Loan Interest"), and Lender is authorized to and shall apply the Land Loan Debt Service Reserve to the payment of such monthly installments as and when the same become due and payable, automatically and without further request or authorization. Each such amount shall be disbursed by a bookkeeping entry on Lender's records, shall be added to the outstanding principal balance of the Land Note, and shall be deemed paid to and received by Borrower. No interest shall accrue upon the Land Loan Debt Service Reserve until its disbursement by Lender. Upon the occurrence of a default or an Event of Default, or an event which, with notice or the lapse of time or both, would constitute a default or an Event of Default, under any of the Loan Documents, Lender shall have the right, but not the obligation, to continue to apply the Land Loan Debt Service Reserve to the payment of the monthly installments of interest on the Land Note. If at any time the Land Loan Debt Service Reserve is insufficient to pay in full the next due and payable monthly installment or any portion thereof, Borrower shall then cause such monthly installments to be paid in full, as and when due, from funds other than Loan proceeds.

      C.    Borrower's Obligation to Pay Costs in Excess of Land Loan Amount. Borrower and Lender expressly agree that at all times the Land Loan shall be "In balance." For the purposes of the Land Loan, "In balance" means that the unadvanced portion of the Land Loan and amounts which may be re-advanced in accordance with the Exhibit B and the limitations on disbursement provided herein, together with any required Borrower equity funds, in the aggregate and in each category, item or purpose, as described in Exhibit B (as Lender may revise Exhibit B in accordance with this Agreement), equals or exceeds the estimated remaining cost, in the aggregate and per each such category, item or purpose, to complete the Improvements and to pay for all other items described in Exhibit B. Lender's estimate of the remaining cost shall be determinative and binding upon Borrower. If Lender determines that the Land Loan is not In balance, Lender shall have no further obligation to make an Advance unless, within thirty (30) days after the date of a demand by Lender, Borrower deposits with Lender such cash amounts as are required to cause the Land Loan to be In balance or, at Lender's election, delivers to Lender satisfactory evidence of Borrower's ability to pay all amounts required to place the Land Loan In balance. All amounts deposited with Lender under this Subsection 2.C. shall be held in an interest bearing account maintained with and pledged to Lender as security for the Loan, which Lender shall disburse, in the same manner as a Land Loan Advance, toward the Improvement

459461_11.DOC

-7-

Exhibit 1

Costs. Lender will disburse such Borrower equity funds before any further Land Loan Advance for the payment of Improvement Costs.

      D.    Right to Withhold Land Loan Advances. In addition to its right to require additional Borrower funds under Subsection 2.C. of this Agreement, Lender may elect to withhold any Land Loan Advance if Lender determines at any time that the actual Improvement Costs differs materially from that as shown on Exhibit B, or that the percentage of progress of the installation of the Improvements differs materially from that as shown on the requisition for a Land Loan Advance for the period in question. Furthermore, if any instrument or document submitted by Borrower in connection with any Land Loan Advance requisition shall not, in the opinion of Lender, comply in all respects with the conditions and requirements of this Agreement, then Lender may amend, reduce or withhold the funding of a Land Loan Advance requisition, as Lender, in its discretion, may deem appropriate or desirable, until Borrower corrects the non-compliance.

      E.    Limitation on Advances. Notwithstanding any other term of this Agreement:

      I.    Unless and until, on or before December 30, 2005, the Temecula CFD Bonds shall have been formally authorized, issued, and sold, and Lender shall have received and approved opinion letters from attorneys, or other qualified experts, acceptable to Lender, opining that the Temecula CFD was authorized to issue and sell the Temecula CFD Bonds and enter into the Acquisition Agreement with Borrower and the other Temecula CFD Bond Documents, Advances under the Land Loan shall be limited to the following:

      (a)    the amount, not to exceed $35,714,000.00, necessary to release the A Land from the lien of the existing deed of trust in favor of Bank Midwest, to be advanced at closing, as identified in the column entitled "Bank Midwest Loan" reflected on Exhibit B to this Agreement;

      (b)    at closing, the Loan fee of $1,830,000.00, identified on Exhibit B to this Agreement as "Loan Fee";

      (c)    at closing, Advances in the aggregate amount of up to $32,000.00 toward appraisal expenses, Lender's legal expenses, and premiums and expenses related to the issuance of the Title Policy (as described in Section 7.A of this Agreement), identified on Exhibit B to this Agreement as "Appraisal", "Legal", and "Title" line items;

      (d)    Advances in the aggregate amount of up to $20,000,000.00 for installation of the Improvements, pursuant to "Development Costs" line items set forth on Exhibit B to this Agreement; and

      (e)    exclusive of the amounts to be disbursed from the Land Loan Debt Service Reserve to pay interest accrued under the B Land First Deed of Trust Loan Documents included in item (a) above, in an aggregate amount not to exceed $560,000.00 of Debt Service Reserve to be disbursed in accordance with Section 2.B. of this Agreement.

459461_11.DOC

-8-

Exhibit 1

An Event of Default shall occur if the Temecula CFD Bonds shall have not been formally authorized, issued, and sold on or before December 30, 2005, and/or if Lender shall have not received and approved, on or before December 30, 2005, opinion letters from attorneys, or other qualified experts, acceptable to Lender, opining that the Temecula CFD was authorized to issue and sell the Temecula CFD Bonds and enter into the Acquisition Agreement with Borrower.

II.    If the funding conditions described in clause I shall have been satisfied, as determined by Lender, and if no Event of Default shall have occurred, until the Final Map for the A Land shall have been recorded in the Official Records of Riverside County, California, Lender will make available no more than an additional $8,000,000.00 in aggregate Loan proceeds for installation of the Improvements, and other purposes in accordance with Exhibit B to this Agreement; and

III.    Notwithstanding clause II preceding, in the event the Temecula CFD issues Temecula CFD Bonds prior to December 30, 2005 but in an amount less than $52,000,000.00, Borrower may provide additional cash collateral or other collateral acceptable to Lender in its sole discretion to be pledged to Lender in an amount equal to not less than $40,000,000.00 less the net payments Borrower has demonstrated to Lender's satisfaction, Borrower is or will be (on completion of the Facilities, as described in the Temecula CFD Bond Documents) entitled to receive pursuant to the Temecula CFD Bond Documents, which collateral shall be held by Lender until sufficient additional CFD Bonds are issued. In such event, the foregoing conditions shall be deemed to have been satisfied as to issuance of the Temecula CFD Bonds.

F.    Standby Letter of Credit Facility.

I.    Availability. On the terms, and subject to the conditions, contained in this Agreement, Lender agrees to either issue, or arrange for the issuance of, one or more standby letters of credit under the L/C Facility for the benefit of the City of Temecula, California at the written request of the Borrower for the account of the Borrower, from time to time, on any Business Day during the period commencing on the closing of the Loan and ending three hundred sixty-five (365) days from the date hereof.

Lender shall be under no obligation to issue, or to arrange for the issuance of, any letter of credit if, after the issuance of such letter of credit if an Event of Default shall have occurred or the aggregate amount available to be drawn under all issued and outstanding letters of credit would exceed $6,000,000.00. At the time of the issuance of each letter of credit and as an essential condition to each such issuance, the Lender shall reserve and place a "hold" on unadvanced Land Loan proceeds in an amount equal to the difference between funds held in the L/C Pledge Account and the amount available under such letter of credit (as the same may be reduced from time to time). This hold will constitute a limitation or "freeze" on Advances of Land Loan proceeds subject to such hold, unless and until Borrower provides Lender with additional collateral to secure the obligations of Borrower to Lender under the L/C Facility, or the letter of credit is cancelled and released, or expires and is not renewed or extended.

459461_11.DOC

-9-

Exhibit 1

Lender shall be under no obligation to issue, or arrange for the issuance of, any letter of credit if: (v) the term of the letter of credit would exceed twelve (12) months; (w) all fees due in connection with one or more previously issued letters of credit have not been paid; (x) the Borrower has requested that such letter of credit be issued in a form that is not acceptable to Lender; (y) as of the date of issuance of such letter of credit, any one or more of the warranties and/or representations of Borrower contained in this Agreement, and/or in any other Loan Document, would be untrue, incorrect, or incomplete in any material respect, any covenant, term, or condition of this Agreement would be unsatisfied, the Land Loan would not be "In balance", or any Event of Default, or circumstance or event which, upon the lapse of time, the giving of notice, or both, could become an Event of Default, shall have occurred; or (z) any order, judgment, or decree of any governmental authority or arbitrator shall purport by its terms to enjoin or restrain Lender from issuing such letter of credit, or any legal requirement applicable to Lender or any request or directive (whether or not having the force of law) from any governmental authority with jurisdiction over Lender shall prohibit, or request that Lender refrain from, the issuance or guaranty of letters of credit generally or such letter of credit in particular, or shall impose upon the Lender, with respect to such letter of credit, any restriction, reserve, or capital requirement (for which Lender is not otherwise compensated) that is not in effect on the date of this Agreement, or result in any unreimbursed loss, cost, or expense (for which Lender is not otherwise compensated) that was not applicable, in effect, or known, to Lender as of the date of this Agreement and that Lender, in good faith, deems material to Lender.

II.     Reimbursement Obligation.   The Borrower shall pay Lender (a) the amount of each draft drawn, or purporting to be drawn, under any letter of credit (whether drawn before, on, or after the expiration date stated in the respective letter of credit); (b) all other amounts, if any, payable to Lender pursuant to the terms of this Agreement (including, without limitation, those costs itemized in Subsection 2.F.III below) or any other document or instrument related to any letter of credit; and (c) any amount by which Lender's cost of payment under or pursuant to any letter of credit exceeds the amount paid by the Borrower. Each foregoing Advance shall be deemed an extension of credit for the account of the Borrower, which extension of credit shall be evidenced, for all purposes, by the L/C Note and this Agreement, and all such Advances shall accrue interest at the adjustable rate stated in the L/C Note. The Borrower agrees to pay to the Lender, in immediately available funds (in United States currency), the amount of all reimbursement obligations owing to Lender under or pursuant to any letter of credit issued for the account of Borrower, on the next succeeding Business Day after the Borrower shall have received written notice from Lender that payment has been made under such letter of credit (the "Reimbursement Date"), irrespective of any claim, set-off, defense or other right that the Borrower may have, at any time, against Lender, against any issuer or confirmer of the letter of credit, against the beneficiary of the letter of credit, or against any other Person. If demand for payment in full is not so made, all amounts payable pursuant to the reimbursement obligation for any issued letter of credit, and all accrued interest thereon, if any, shall be due and payable on the earliest of (x) the date the letter of credit expires and is not renewed, (y) the date the letter of credit is returned to the Lender, or any issuer of the letter of credit, with instructions from the

459461_11.DOC

Exhibit 1

beneficiary to cancel the letter of credit or (z) the maturity date of the L/C Note (as the same may be extended from time to time). The Borrower acknowledges that time is of the essence hereof, and Borrower agrees that any failure of the Borrower to pay all amounts due pursuant to the terms of this Subsection 2.F. by 3:00 PM (Cleveland, Ohio time) on the Reimbursement Date shall constitute an Event of Default under this Agreement. If the Borrower fails to pay any amount due pursuant to this Agreement on any date when the same is due and payable, the total amount due the Lender under this Agreement shall thereafter, until paid in full, bear interest at a rate equal to the Default Rate (as defined in the L/C Note), regardless of whether the Lender elects to waive the related Event of Default. The Borrower's reimbursement obligations under this Subsection 2.F. shall be absolute, unconditional, and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement, under any and all circumstances whatsoever, including the occurrence of any Event of Default, and irrespective of: (i) any lack of validity or enforceability of any letter of credit or any Loan Document, or any term or provision therein; (ii) any amendment or waiver of, or any consent to depart from, all or any of the provisions of any letter of credit or any Loan Document; (iii) the existence of any claim, set off, defense, or other right that the Borrower, any other party guaranteeing, or otherwise obligated with, the Borrower, any Affiliate or any other Person may at any time have against the beneficiary under any letter of credit, the Lender, any issuer or confirmer of a letter of credit, or any other Person, whether in connection with this Agreement, any other Loan Document, or any other related or unrelated agreement or transaction; (iv) any draft or other document presented under a letter of credit proving to be forged, fraudulent, invalid, or insufficient in any respect, or any statement therein being untrue or inaccurate in any respect; (v) payment by the Lender under a letter of credit against presentation of a draft or other document that does not comply with the terms of such letter of credit; and (vi) any other act, omission to act, or delay in acting, of any kind, of the Lender or any other Person or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Agreement, constitute a legal or equitable discharge of any obligation of the Borrower under this Agreement.

        III.    <u>Fees, Costs, and Expenses</u>. The Borrower will pay to Lender: (a) an issuance fee equal to the greater of one and one-half of one percent (1.50%) of the face amount of the letter of credit, or the issuance fee charged by the issuer of the letter of credit (if not Lender) and any fees charged by the confirming bank (if applicable), which letter of credit fee shall be payable upon issuance of the respective letter of credit with respect to the initial twelve (12) month term of such letter of credit; (b) an annual fee per each issued letter of credit, and the annual fee for each issued letter of credit shall be equal to the greatest of $250.00, or one-half of one percent (.50%) of the face amount of the letter of credit, or the annual fee charged by the issuer of the letter of credit (if not Lender) or the confirming bank (if applicable), payable upon each renewal, if any, of the respective letter of credit with respect to the succeeding twelve (12) month period following the initial term; provided, however, that nothing in this Agreement shall obligate the Lender to renew, or arrange for the renewal of, any issued letter of credit and (c) on demand, all costs and expenses that Lender incurs in connection with any letter of credit or this Agreement, including, without limitation: (i) reasonable attorneys' fees and disbursements (whether or not litigation has been commenced and in all trial, bankruptcy,

459461_11.DOC

-11-

Exhibit 1

and appellate proceedings if litigation is commenced with respect to any letter of credit) and other dispute resolution expenses to indemnify and hold harmless Lender, and/or to protect or enforce Lender's rights or remedies, under or in connection with any letter of credit, this Agreement, or any separate security agreement, guaranty, or other agreement or undertaking supporting this Agreement, or to respond to any notice of forgery, fraud, abuse, or illegality in connection with this Agreement, any letter of credit, any presentation under any letter of credit, or any transaction underlying the letter of credit (including, without limitation, an active defense by Lender or any issuer or confirmer of a letter of credit in any action in which an injunction is sought or obtained against presentation or honor), (ii) costs and expenses incurred to obtain, preserve, perfect, or enforce any security interest in any collateral securing the obligations of the Borrower under this Agreement or to maintain, insure, audit, collect, preserve, repossess, and/or dispose of any property that is subject to such security interest (iii) costs and expenses incurred by Lender and/or by any issuer or confirmer of a letter of credit in connection with any requested amendment to, or waiver under, any letter of credit or this Agreement, (iv) any stamp taxes, recording taxes, or similar taxes or fees payable in connection with any letter of credit or this Agreement, and (v) fees and expenses charged by any adviser, confirmer, or other nominated Person to Borrower or Lender.  References in this Agreement to attorneys' fees and disbursements shall include all reasonably allocated costs of internal or "in-house" counsel for the Lender.

      IV.    Collateral. In consideration of, and as security for, each letter of credit and the reimbursement obligations of the Borrower with respect to each letter of credit, the Borrower assigns, pledges, and grants a security interest in, and a lien upon, all property belonging to Borrower, of every kind and nature whatsoever, that is now being, or at any time hereafter will be, delivered, conveyed, transferred, assigned, or paid to Lender, or that is coming into the possession of Lender, or into the possession of any Person acting as agent for Lender, in any manner whatsoever, whether expressly as security for any obligations or liability of the Borrower to Lender, or for safe-keeping or otherwise, including, without limitation, all items received for collection or transmission and the proceeds thereof, whether or not such property is in whole or in part released by the Borrower on trust or bailee receipt. The word "property" as used in this Subsection 2.F. includes goods, merchandise, securities, funds, choses in action, and all other forms of property, whether real, personal, or mixed, and all right or interest therein. The Borrower acknowledges and agrees that all obligations of the Borrower under, or with respect to, any letter of credit or this Agreement are secured by the Premises and all other collateral that may from time to time secure the L/C Facility.

      As additional security for the payment of all obligations of Borrower to Lender under the L/C Facility, Borrower must deposit with, and pledge to, Lender $3,000,000.00 in additional Equity Funds no later than the earlier of (a) forty-five (45) calendar days after the date hereof or (b) three (3) Business Days prior to issuance of a letter of credit under this Agreement, which shall be held by Lender in an interest bearing account at Lender (the "L/C Pledge Account"). Borrower shall pledge and assign the L/C Pledge Account, and all deposits in and to the L/C Pledge Account, to Lender, and interest earned on such deposits, in a written assignment that is satisfactory to Lender in form and content, in the sole and absolute discretion of Lender. If and when the City of Temecula,

459461_11.DOC

-12-

Exhibit 1

California shall have returned any letter of credit issued to the City of Temecula pursuant to the L/C Facility, to the issuer or confirmer (if any) of such letter of credit, without having drawn on such letter of credit, and released such issuer and confirmer (if any) from all liability under such letter of credit, and if the Loan is not then in default, Lender will then will turn over up to $3,000,000.00 of the balance of the L/C Pledge Account to Borrower plus interest actually earned thereon, with Lender applying any remaining balance of the L/C Pledge Account to the outstanding balance of the Loan, as Lender deems appropriate.

In furtherance and extension, and not in limitation, of the specific provisions set forth above, the Borrower agrees that all obligations of the Borrower under, or with respect to, each letter of credit and/or this Agreement may be secured, from time to time, by one or more deposit accounts maintained by the Borrower with the Lender for such purpose including the L/C Pledge Account, and in connection therewith, the Borrower hereby pledges, assigns, grants a continuing security interest in, and lien upon, and transfers to the Lender, all right, title, and interest of the Borrower in and to such deposit account(s) and all substitutions for, replacements of, and additions to, said deposit account(s), together with all earnings thereon and the proceeds thereof (collectively referred to as the "Pledged Assets"). At any time and from time to time after any non-performance of any term, provision, condition, or agreement contained in this Agreement, the Lender is granted full power, in addition to all other rights and/or remedies that the Lender may have, to apply the Pledged Assets to Borrower's reimbursement obligations to Lender under the Loan Documents, in such order as the Lender, in its sole discretion, deems desirable, all without notice, presentment, demand, or dishonor, all of which are hereby expressly waived, and without regard to any other security, right or remedy to which the Lender may be entitled.

Lender shall not be obligated to discharge, release, or satisfy the Deed of Trust, or any other deed of trust or mortgage given to secure the Loan and/or the obligations of the Borrower pursuant to this Agreement, unless and until (a) all issued letters of credit are cancelled and released, or expire and are not renewed or extended, or (b) Borrower provides Lender with additional collateral to secure all letter of credit obligations of the Lender and of all issuers and confirmers of the letters of credit, which additional collateral shall be of a type and nature, and in an amount, satisfactory to Lender in the sole and absolute discretion of the Lender. As a condition to reconveyance of the Deed of Trust or payment in full of the Land Loan, while the Letter of Credit remains outstanding, Lender may require, in its sole discretion, that the undisbursed Land Loan proceeds equal to the difference between the stated amount of any Letter of Credit and amounts held in the L/C Pledge Account be disbursed into the L/C Pledge Account or that Borrower provide additional equity funds in such amount in either case to be held in the L/C Pledge Account as security for Borrower's reimbursement obligation under this Section.

Any requirement of reasonable notice mandated by the Uniform Commercial Code and applicable to the Lender shall be met if such notice is given at least ten (10) Business Days before the time of sale, disposition, or other event or thing giving rise to such requirement of notice.

459461_11.DOC

-13-

Exhibit 1

V.     Request for Letter of Credit. In connection with the issuance of each letter of credit pursuant to this Section, the Borrower shall give the Lender at least two (2) Business Days' prior written notice, in substantially the form of Exhibit C (or in such other written or electronic form as the Lender may require), of the requested issuance of such letter of credit (a "Letter of Credit Request"). Each Letter of Credit Request shall be irrevocable and shall specify the stated amount of the letter of credit requested, the requested date of issuance of such letter of credit (which day shall be a Business Day), the date on which such letter of credit is to expire (which date shall be a Business Day), and the Person for whose benefit the requested letter of credit is to be issued. Each Letter of Credit Request, to be effective, must be received by the Lender not later than 10:00 A.M. (Cleveland, Ohio time) on the second Business Day before the requested date for the issuance of such letter of credit.

VI.     Borrower Responsible for Content of Each Issued Letter of Credit. The Borrower is responsible for submitting to the Lender, and approving before issuance, the text of each letter of credit issued or arranged by Lender, including, without limitation, responsibility for all terms and conditions thereof, if any, that are ineffective, ambiguous, inconsistent, unduly complicated, or reasonably impossible to satisfy. The ultimate responsibility of the Borrower for the final text of each letter of credit issued or arranged by the Lender shall not be affected by any assistance Lender may provide related to such letter of credit, such as drafting text, recommending text, or the use of text, or refusal to use text, by Lender or any issuer or confirmer of a letter of credit, that was submitted by the Borrower. Lender does not represent or warrant to any Person that any issued letter of credit will satisfy the requirements or intentions of the Borrower or any beneficiary of a letter of credit. The Borrower is responsible for the suitability of each letter of credit for the purposes of the Borrower and the purposes of the beneficiary of such letter of credit. Borrower acknowledges that Federal regulations mandate that the obligation of the Lender to advance funds under a letter of credit must be solely dependent upon the presentation of conforming documents, as specified in the letter of credit, and not upon the factual performance or nonperformance of the parties to the underlying transaction. Accordingly, the Lender, as an issuer, will not question the veracity of a beneficiary's statement that such beneficiary is entitled to draw under a letter of credit, or any other facts or circumstances related to the underlying transaction, and the Lender will not look beyond the face of the documents being presented to the Lender by the beneficiary in approving or disapproving any presentation by such beneficiary. All issued letters of credit shall be subject to the International Standby Practices 1998.

VII.     Expiration Date of Issued Letters of Credit. In no event shall the expiration date of any letter of credit (a) be more than one year after the date of issuance thereof, or (b) be less than five (5) calendar days before the scheduled maturity date of the L/C Note (as the same may be extended from time to time); provided, however, that any letter of credit with a one-year term may, in the sole and absolute discretion of Lender, provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the maturity date of the L/C Note, as the same may be extended from time to time).

459461_11.DOC

-14-

Exhibit 1

VIII.    Modifications and Extensions of any Letter of Credit.  The Borrower agrees that, in the event of any extension of the expiration date, or the time for presentation of drafts or documents, with respect to any issued letter of credit, or any increase in the amount of any letter of credit, or any other modification of the terms of any letter of credit, made at the request of the Borrower, this Agreement shall be binding upon Borrower with regard to the letter of credit so extended, increased, or otherwise modified, as to drafts and documents covered thereby, and to any action taken by Lender, or any correspondent of Lender, in accordance with such extension, increase, or other modification.

IX.    Further Assurances.  If requested by the Lender before the issuance of any letter of credit, and as a condition of such issuance, the Borrower shall have delivered to Lender a letter of credit application and reimbursement agreement, in such form as the Lender may employ in its ordinary course of business, signed by the Borrower, and such other documents or items as may be required pursuant to the terms thereof.

X.    Lender's Standard of Conduct with Respect to any Letter of Credit.  With respect to any letter of credit issued by Lender pursuant to this Agreement, Lender and, as applicable, its correspondents: (a) may rely upon any oral, telephonic, telegraphic, facsimile, electronic, or written communication, or other communication, believed by Lender or its correspondents, in good faith, to have been authorized by the Borrower, whether or not given or signed by a Person so authorized by Borrower; (b) shall not be responsible for any act or omission on the part of, or the solvency of, any beneficiary, any nominated Person or any other Person; (c) shall not be responsible for the validity, sufficiency, or genuineness of documents, even if such documents should in fact prove to be in any or all respects invalid, insufficient, fraudulent, or forged; (d) shall not be responsible for any deviation from instructions, or any delay, default, or fraud, by the beneficiary of any letter of credit; (e) shall not be responsible for any breach of any contract between the beneficiary of any letter of credit and the Borrower; (f) shall not be responsible for failure of any Person to note the amount of any draft on the reverse of any letter of credit, or to surrender or take up any letter of credit; (g) shall not be responsible for any error, omission, interruption, or delay, in the transmission or delivery of any message by mail, cable, telegraph, telephone, wireless, facsimile, or otherwise, whether or not such message be in cipher; (h) may honor any presentation or drawing under any letter of credit that appears on its face to  substantially comply with the terms and conditions of such letter of credit; (i) may disregard any requirement of any letter of credit that presentation be made to the Lender, or one of its correspondents, at a particular place or at or before a particular time of day (but not any requirement for presentation on or before a particular day), or that notice of dishonor be given in a particular manner, and Lender may amend or specify any such requirement in any letter of credit; (j) may accept, as a draft, any written or electronic demand or request for payment under any letter of credit, even if nonnegotiable or not in the form of a draft, and may disregard any requirement that such draft, demand, or request bear any reference, or adequate reference, to the related letter of credit; (k) may honor, before or after its expiration, a previously dishonored presentation under any letter of credit, whether pursuant to court order, or to settle or compromise any claim that is wrongfully dishonored or otherwise, and shall be entitled to reimbursement to the same extent (if any) as if such presentation had been

459461_11.DOC

-15-

Exhibit 1

initially honored, plus reimbursement of all interest paid by the Lender or any correspondent of Lender; (l) may honor, upon receipt, any drawing that is payable upon presentation of a statement advising negotiation or payment (even if such statement indicates that a draft or other document is being separately delivered), and shall not be liable for any failure of any draft or document to arrive or to conform to the draft or the document referred to in the statement, or to any underlying transaction; (m) may retain the proceeds of any letter of credit based on a valid exercise of set off rights by the Lender or an apparently applicable attachment order or blocking regulation; (n) may select any branch or affiliate of Lender, or any other financial institution, to act as an advising, transferring, confirming and/or nominated bank under the law and practice of the place where the Lender or such other financial institution is located; and (o) shall not be responsible for any other action or inaction taken or suffered by Lender or its correspondents under or in connection with any letter of credit, with any presentation or with any collateral, if required or permitted under any applicable law or letter of credit practice.

XI.    Release and Indemnification. The Borrower hereby releases Lender from, and indemnifies and holds harmless Lender for, all claims, if any, of the Borrower, or any other Person, for damages or loss caused by any action by any Person and arising out of, or in any way relating to, any letter of credit, whether by omission or commission, and whether based upon any error of judgment or mistake of law or fact.

G.    Assurance of Funds for Mandated Improvements. Subject to the terms and conditions of this Subsection, and upon Borrower's written request, Lender will provide the City of Temecula or any other authority having jurisdiction over the Premises (an "Authority") or a bonding company providing a payment and performance bond (a "Bonding Company") in favor of an Authority for all or a portion of the Improvements, with a written agreement to retain and set aside Land Loan proceeds (a "Set-Aside Agreement"). The Set-Aside Agreement must be satisfactory to Lender in form, substance, and amount (but under no circumstance shall the amount be greater than that portion of the Land Loan amount allocated to the Improvements, as set forth in Exhibit B, which are the subject matter of such Set-Aside Agreement). Lender will execute a Set-Aside Agreement for the purpose of assuring and enabling the construction and installation of those Improvements required by the applicable mapping and/or subdivision rules and regulations of such Authority (the "Mandated Improvements") only if (I) sufficient Land Loan proceeds allocated to the Improvements are available for the Mandated Improvements, (II) the Authority will accept the Set-Aside Agreement in substitution for a payment and performance bond, (III) at the request of Lender, Lender is named as a dual obligee on any and/or all payment and performance bonds which are the subject matter of the Mandated Improvements (including, but not limited to, any and all payment and performance bonds issued by a Bonding Company), which such payment and performance bonds must be satisfactory to Lender in form, substance and amount and issued by an acceptable surety, bonding the full, faithful and prompt completion and payment of such Mandated Improvements, and (IV) the Authority or Bonding Company, as applicable, agrees that the potential amount available under the Set-Aside Agreement shall automatically reduce simultaneously with, and in an amount equal to, each Land Loan Advance for the Mandated Improvements, or such other amount as Lender may require. Land Loan proceeds that Lender makes available for the Mandated Improvements under a Set-Aside Agreement shall be subject to Lender's Land Loan Advance

459461_11.DOC

-16-

Exhibit 1

procedures, as described in this Agreement. Lender will not honor a request to execute a Set-Aside Agreement if all or any portion of the proceeds of the Set-Aside Agreement will assure the maintenance of any Mandated Improvement.

3.    CONSTRUCTION AND INSTALLATION OF THE IMPROVEMENTS.

A.    Commencement and Completion.    Borrower shall begin construction and installation of the Improvements on or before the 30th day after the closing of the Land Loan, and prosecute such construction and installation with diligence and dispatch, and without interruption, so that the Improvements are installed in and upon the A Land, substantially complete and in accordance with the Improvement Plans, on or before the earliest of (a) the one hundred twentieth (120th) day prior to the maturity date, (b) September 30, 2006 (as such date may be extended pursuant to the KB Option Agreement), or (c) any earlier date as may be required pursuant to the KB Option Agreement (the "Completion Date"). On the Completion Date, the Improvements shall be free and clear of all liens and claims for materials, labor, services, and/or other items furnished in connection with the construction and installation of the Improvements. The Improvements shall be constructed and installed in a good and workmanlike manner and in full compliance with all building, zoning, land use, environmental, safety, health and other applicable laws, statutes, ordinances, rules and regulations, and with all restrictive covenants or subdivision improvement agreements that affect the Premises. In the event of any dispute between Lender and Borrower as to the interpretation of the Improvement Plans or the compliance of the Improvements with the foregoing, the determination and judgment of Lender shall be binding and conclusive.

B.    Compliance with and Changes to the Improvement Plans.    Borrower must request in writing any change in the Improvement Plans that involves an expenditure in excess of $50,000.00, or the deletion of any facility, Improvement or expenditure, and any such change shall be contingent upon the written consent of Lender, which consent may be subject to such conditions and qualifications as Lender may prescribe. At all times, Lender has the right to require compliance with the original Improvement Plans, except where such Plans have been modified as provided in this Section.

C.    Right of Lender to Inspect.    Lender and the Inspector, and their agents and representatives, shall have the right to enter the Land for the purpose of inspecting the installation of the Improvements and all materials used or to be used in connection with such installation, to ascertain whether such installation and materials comply with the Land Loan Documents, or for any other reasonable purpose. Lender and the Inspector, and their agents and representatives, shall also have the right to review and examine the Improvement Plans, and the drawings, contracts, books and records relating to the Premises, this Agreement, or the construction of the Improvements. Borrower shall provide Lender with copies of all of the foregoing documents and materials that Lender may request. Such inspections shall occur at reasonable times and shall be conducted so as not to unreasonably interfere with construction work on the Land or the business of Borrower. Borrower shall cause the General Contractor and all suppliers and subcontractors to cooperate with Lender and the Inspector, and their agents and representatives, when Lender, or the Inspector, or their agents, employees, and representatives, exercise their rights under this Agreement. Any inspection of the Premises by Lender or the Inspector, or their agents, employees or representatives, shall be solely for the benefit of the

459461_11.DOC

Exhibit 1

Person or Persons conducting or contracting for such inspection; neither Borrower nor any third Person shall be entitled to obtain any benefit from, or to claim any loss or damages as a result of, or in any way based on or made in connection with, any such inspection or the failure to make any such inspection. This Section shall not impose on Lender any obligation or liability whatsoever, including, without limitation, any obligation to inspect, to correct any defects, or to notify Borrower or any other Person of the existence of a defect. Upon a request by Lender or the Inspector, Borrower shall promptly pay all charges, costs, fees and expenses of the Lender and/or Inspector related to the Premises.

4.      RESERVED.

5.      RESERVED.

6.      RELEASES.

        A.      Partial Releases (A Land). The Deed of Trust provides for the partial release of a Lot upon the satisfaction of the terms and conditions contained in this Agreement and in Section 48 of the Deed of Trust, including, without limitation, the payment of a release price and certain other amounts to Lender. For each Planning Area, or A Lot, of the KB Option Land, which Borrower desires to release from the lien of the Deed of Trust, Borrower must pay to Lender: (a) a principal payment on the Loan (the "Mandatory Principal Payment") consisting of the greatest of : (i) an amount equal to 100% of the Net Proceeds (as hereinafter defined) from the sale of each such Planning Area or A Lot, (ii) an amount equal to 93% of the gross selling price of said Planning Area or A Lot, provided that if the sum of such amount and the GRC Percentage Purchase Price plus the Costs (defined below) exceeds an amount equal to one hundred percent (100%) of Net Proceeds, Borrower shall be solely responsible to pay such excess out of pocket; or (iii) the minimum release price for such Planning Area or A Lot, as shall be set forth in a minimum release price schedule established by Lender and attached as Exhibit ""H" hereto (the "Minimum Release Price Schedule"), plus (b) a $100.00 document processing fee for each Planning Area or A Lot to be so released, plus (c) all costs and expenses incurred by Lender to so release such Planning Area or A Lot. For purposes hereof, the "Net Proceeds" from the sale shall be the amount of cash, in immediately available funds, and the fair market value in cash of any non-cash consideration realized from such sale after deduction of any escrow, closing, recording and title insurance costs (the "Costs") which are paid by Borrower in connection therewith, and the applicable GRC Percentage Purchase Price as such amounts are set forth in the final escrow settlement statement relating to the Lot or Planning Area released. Notwithstanding the foregoing, if KB pays to Lender the Net Proceeds based on the respective purchase price for a Planning Area in the KB Option Land, as set forth in the KB Option Agreement, Lender will release the Deed of Trust from such Planning Area. In addition, if no Event of Default has occurred and is continuing, (i) Lender will release Planning Areas 25, 26, 27, and 32 of the A Land from the lien of the Deed of Trust for no consideration, if Borrower receives no consideration for the conveyance of such Planning Areas, but Borrower must pay all costs, fees, and expenses related to each such release, including, without limitation, a $100.00 document processing fee for each such Planning Area to be so released; (ii) Lender will release Planning Area 30 of the A Land from the lien of the Deed of Trust, for no consideration, if Borrower receives no consideration for the conveyance of such Planning Area 30, and if Lender shall have already released Planning Area 25, 26, 27, and 32 of the A Land from the lien of the Deed of

459461_11.DOC

Exhibit 1

Trust, provided that, notwithstanding the foregoing, Borrower must pay all costs, fees, and expenses related to the release of such Planning Area 30 from the Deed of Trust, including, without limitation, a $100.00 document processing fee for such release; and (iii) Lender will release Planning Areas 28 or 29 of the A Land, as applicable, from the lien of the Deed of Trust upon payment to Lender of the greater of (a) an amount equal to 100% of the Net Proceeds of the sale of the Planning Area to be so released, or (b) an amount equal to 90% of the appraised value of such Planning Area, according to an appraisal that is satisfactory to Lender in form and content, plus a $100 document processing fee for each such Planning Area to be so released.

Notwithstanding anything to the contrary in this Agreement, Lender will release no Planning Area on the A Land, nor any A Lot, from the lien of the Deed of Trust unless Lender is then satisfied, in its sole and absolute discretion, that all future purchasers of any Planning Area on the A Land, or any A Lot, will have the legal right to enjoy all the amenities of the A Land, constructed, or to be constructed, on the A Land, including, without limitation, the recreation center.

B.    Partial Release (B Land). For each Planning Area on the B Land, or each B Lot on the B Land (referred to as a "B Lot"), that Borrower sells or transfers which is encumbered by a Deed of Trust in favor of Lender, Borrower must pay to Lender (a) the greater of (i) the Minimum Release Price for such Planning Area on the B Land or B Lot, if any, as shown on the Minimum Release Price Schedule or (ii) a Mandatory Principal Payment in an amount equal to 100% of the Net Proceeds for such Planning Area or B Lot (after payment of the applicable GRC Percentage Purchase Price), plus (b) a $100.00 document processing fee for each Planning Area on the B Land or B Lot, plus (c) all costs and expenses incurred by Lender to release such Planning Area on the B Land or B Lot from the lien of such Deed of Trust.

C.    Full Release. When (I) Borrower has repaid both the Land Loan and L/C Facility in full, (II) all Set-Aside Agreements and letters of credit issued pursuant to this Agreement have been terminated (or cash collateral in an amount not less than the stated principal amount of all outstanding Set-Aside Agreements and letters of credit have been deposited by Borrower with, and pledged to, Lender), and (III) Borrower has complied with all of the other terms, conditions and requirements of this Agreement, the Deed of Trust and all other Loan Documents, and all of the obligations of Lender to disburse further funds under this Agreement and all other Loan Documents have terminated, then upon Borrower's payment of applicable fees, the Trustee's reconveyance fees, all filing or recording fees or other costs incurred by or charged to Lender in connection with such release, Lender agrees to release the Deed of Trust in full in accordance with Section 35 in the Deed of Trust.

7.    CONDITIONS TO LENDER'S OBLIGATIONS TO MAKE THE LOAN AND TO FUND ADVANCES.

The conditions listed below are precedent to each obligation of Lender under this Agreement, if any, and, unless otherwise specifically excepted below, shall be satisfied or observed, as applicable, before the first Loan Advance or issuance of a letter of credit, whichever is earlier, in a manner satisfactory to Lender in form and substance:

459461_11.DOC

-19-

Exhibit 1

A.    Title Insurance.    Borrower shall have delivered to Lender an irrevocable commitment from the Title Company to issue an American Land Title Association ("ALTA") Extended Coverage Loan Policy of Title Insurance in the original principal amount of the Loan, insuring the validity and priority of the Deed of Trust. The commitment must include copies of all of the documents and instruments that are exceptions to the commitment and listed in Schedule B-2 of the commitment. The Title Company and two or more reinsurance companies or co-insurers acceptable to Lender in its sole determination must issue the original title policy within a reasonable time after the recording of the Deed of Trust, and the policy must name Lender as the insured under the policy and include an Additional Coverage/Street Assessment Endorsement (ALTA Form 1), an Environmental Protection Lien Endorsement (ALTA Form 8.1), a Comprehensive Endorsement (ALTA Form 9), a Variable Rate Mortgage Endorsement (ALTA Form 6.1), a Contiguity Endorsement, a Revolving Loan Endorsement, an endorsement deleting the creditors' rights exclusion provision from the Title Policy, and such other endorsements as Lender may reasonably require. The title policy shall show full legal and equitable title to the Premises to be vested in Borrower and shall insure the Deed of Trust as a valid first and prior lien encumbering the Premises, subject only to liens, encumbrances, easements, reservations, restrictions and exceptions expressly permitted by the terms of the Deed of Trust or approved in writing by Lender including the Junior Deeds of Trust, as hereinafter defined. The closing and the funding of the Land Loan, and the issuance of any letter of credit under the L/C Facility, are contingent upon the deletion of the standard printed exceptions from the title policy, including the "gap" provision, matters that would be shown by an accurate survey or inspection of the Premises, and matters relating to any lien or right to lien for services, labor and/or materials furnished to the Premises. The title policy may contain only those exceptions that Lender has approved specifically in writing. A title insurance policy meeting the conditions and requirements of this Section is sometimes referred to as the "Title Policy" in this Agreement. If applicable, the form and content of the co-insurance agreement between the Title Company and not less than two co-insurers, and/or reinsurance arrangements with at least one re-insurer, must be acceptable to Lender in form and content, in the sole and absolute discretion of Lender.

B.    Survey.    Borrower shall have delivered to Lender a current "ALTA Survey" of the A Land, prepared by a licensed surveyor and mapper acceptable to Lender in accordance with the Minimum Standard Detail Requirements for ALTA/ACSM (American Congress for Surveying and Mapping) Land Title Surveys. The survey shall be certified, under seal, to Borrower, Lender, and the Title Company, in substantially the form attached to this Agreement as Exhibit E, dated not more than sixty (60) days before the date of this Agreement, and showing the following:

I.    The location of the perimeter boundaries of the Land by courses and distances and perimeter footings in place, and by reference to township, range and section, or by reference to a recorded tract map, as the case may be;

II.    The location, and the identification by reference to recording data, of all easements, rights-of-way, conditions and restrictions on, or appurtenant to, the Premises;

III.    The location of all building setback lines, as shown on the site plan;

459461_11.DOC

-20-

Exhibit 1

IV.     The width and lines of the streets, public rights-of-way and alleys abutting the Premises;

V.      All encroachments, and the extent of each encroachment in feet and inches, upon the Premises;

VI.     All buildings and the Improvements, to the extent installed, and the relation of the buildings and Improvements, by distances, to the perimeter of the Premises, the building setback lines, and the street lines;

VII.    A legend relating the survey of the Land to a map filed in the public records, if the Land is described as being on such a tract map;

VIII.   The legal description of the Land, by metes and bounds, including the acreage, or a reference to a recorded plat of the Land;

IX.     A certification from either the surveyor or the Engineer for the Improvements, stating whether all or any part of the Premises is located in an area identified by the Federal Emergency Management Agency ("FEMA"), or any other governmental authority as having special flood hazards or defined as a "flood hazard," or any other federal, state, county, municipal or other statute, law, ordinance or regulation, and identifying by number the particular map(s) upon which such certification is based;

X.      The availability of utility services, sanitary water supply, and storm sewer and sanitary sewer facilities to the lot line of the Premises, and satisfactory means of access, ingress and egress to the lot line of the Premises; and

XI.     All other matters that Lender may reasonably request.

C.      Contracts. Borrower shall have delivered to Lender copies of the executed General Contract and the executed contract with the Engineer and, if requested, copies of the General Contractor's executed contracts with all subcontractors for the construction and installation of the Improvements, including all amendments and change orders. Borrower hereby assigns, transfers and conveys to Lender all of its right, title and interest in and to all of the aforesaid contracts, provided that Lender shall not exercise any rights under such contracts before the occurrence of a default or an Event of Default under one or more of the Loan Documents.

D.      Major Subcontractor's Agreement. Borrower shall have caused to be executed and delivered to Lender a major subcontractor's agreement in the form of Exhibit F to this Agreement, in which each subcontractor performing labor or providing materials under a contract equal to or greater than $250,000.00 ("Major Subcontractor") has agreed that, in the event of a default by Borrower, or the occurrence of an Event of Default, under this Agreement or any other Loan Document, the Major Subcontractor will, as requested by Lender, continue performance under its subcontract until completion of the Improvements, provided that the Major Subcontractor is thereafter paid for all necessary labor, materials and equipment furnished to the Premises in accordance with the applicable subcontract.

459461_11.DOC

-21-

Exhibit 1

E.    Engineer's Agreement. Borrower shall have caused to be executed and delivered to Lender an agreement by the Engineer in the form of Exhibit G to this Agreement, in which the Engineer: (I) agrees, upon Lender's request, to continue performance pursuant to its contract with Borrower or the General Contractor until completion of the Improvements, notwithstanding Borrower's or General Contractor's default under any agreement with the Engineer or a default or Event of Default under the Loan Documents, provided that the Engineer is paid in accordance with said contract for all such services rendered thereafter, (II) assigns the Improvement Plans to Lender at no cost to Lender other than the actual cost of making copies of the Improvement Plans, and (III) consents to the assignment, by Borrower or the General Contractor, to Lender, of the right to use and possess the Improvement Plans. Borrower hereby assigns the Improvement Plans to Lender as additional security for the Loan.

F.    Note. The Land Note and the L/C Note shall have been duly authorized, executed and delivered to Lender by Borrower.

G.    Deed of Trust. The Deed of Trust shall have been duly authorized, executed, acknowledged, and delivered to Lender, and filed for record, and shall be a valid first lien encumbering the Premises, subject only to Permitted Encumbrances (as defined in the Deed of Trust).

H.    Guaranty. An Unconditional and Continuing Guaranty and Indemnity Agreement shall have been executed and delivered to Lender by Guarantor.

I.    Environmental Indemnity Agreement. Borrower and Guarantor shall have executed and delivered to Lender an Unsecured Environmental Indemnity Agreement.

J.    Subordination Agreements. USAIP and Borrower shall have executed and delivered to Lender a Continuing Subordination and Estoppel Agreement satisfactory to Lender in form and substance in Lender's sole discretion (to which KB Homes is also a party); and Lender shall have entered into a Recognition, Attornment and Subordination Agreement among KB, Borrower, and Lender in accordance with the requirements of the Commitment, and an Intercreditor and Subordination Agreement among Borrower, Lender and GRC, all in form and substance acceptable to Lender, in Lender's sole discretion.

K.    Builder's Risk and Hazard Insurance. Before the commencement of the installation of the Improvements, Borrower shall have delivered to Lender written evidence, satisfactory to Lender, of the existence of a builder's risk and hazard insurance policy insuring the Premises and conforming to the requirements of the Deed of Trust.

L.    Public Liability and Workers' Compensation Insurance. Borrower shall have delivered to Lender written evidence, satisfactory to Lender, of the existence of public liability and workers' compensation insurance relating to the Premises and conforming to the requirements of the Deed of Trust. Borrower shall continuously maintain this insurance, or equivalent insurance satisfactory to Lender, in full force and effect, until the Loan is paid in full and each Set-Aside Agreement and letter of credit under the L/C Facility have been terminated.

M.    Flood Insurance. Borrower shall have delivered to Lender written evidence, satisfactory to Lender, that the Premises are not within a hazardous flood area as designated by

459461_11.DOC

-22-

Exhibit 1

any governmental authority, or, if the Premises are within such a hazardous area, that the Premises are insured to the maximum amount available, all as provided in the Flood Disaster Protection Act of 1973, as amended, together with appropriate endorsements to such flood insurance policy providing for Lender's interests in the same manner as in the builder's risk insurance policy described above, including, without limitation, that such flood insurance will not be cancelled or substantially modified without thirty (30) days' prior written notice to Lender. The flood insurance policy must also conform to the requirements for such insurance contained in the Deed of Trust. Borrower shall continuously maintain said insurance, or equivalent insurance satisfactory to Lender, in full force and effect, until the Loan is paid in full and each Set-Aside Agreement and letter of credit under the L/C Facility have been terminated.

N.      Earthquake Zones and Insurance.  Borrower shall have provided the Lender with written evidence, satisfactory to the Lender, in the sole and absolute discretion of the Lender, that no portion of the Land is located in an Alquist-Priolo Earthquake Fault Zone. Moreover, Borrower must obtain an earthquake insurance policy for coverage, in a minimum amount of 100% of the replacement value of the Improvements, on a non-reporting basis, if any one or more of the following conditions apply: (I) the construction consultant furnishing the Lender with a plan and cost review recommends earthquake insurance coverage; (II) any portion of the Land or any Improvement is located in an earthquake zone 1, as delineated on the rate maps of the insurance industry, which earthquake zone 1 is not part of an Alquist-Priolo Earthquake Fault Zone; or (III) any portion of the Land or any Improvement is located in an earthquake zone 2, as delineated on the rate maps of the insurance industry, and any unit to be constructed, on the Land will consist of (a) wood frame over 3 stories high, (b) wood frame with more than one wall faced with brick, or (c) concrete, brick, adobe, or masonry block structure, without seismic reinforcement. Before the closing of the Loan, the Borrower shall have provided the Lender with a copy of such insurance policy, together with a binder or certificate of insurance, evidencing that such insurance policy is in place. Such insurance policy must (i) be satisfactory to the Lender in form and content, in the sole and absolute discretion of the Lender, (ii) be underwritten by an insurer satisfactory to the Lender, (iii) have a loss deductible provision of $10,000 or less, (iv) name the Lender as an additional insured and as loss payee, and (v) provide that such policy may not be cancelled, or amended in any manner adverse to the Lender, without a minimum of 30 days' prior written notice to the Lender.  The Borrower shall continuously maintain said insurance, or equivalent insurance satisfactory to the Lender, in full force and effect, until the Loan is paid in full and each Set-Aside Agreement and letter of credit issued under the L/C Facility has been terminated.

O.      Appraisal.    Lender shall have received an appraisal of the Premises: (I) satisfactory to Lender in form, substance and amount; (II) prepared by an appraiser satisfactory to Lender; (III) prepared in accordance with established appraisal practices and in conformity with all applicable laws and regulations; and (IV) reviewed, at Borrower's expense, by a senior appraiser employed by Lender.  Lender's senior appraiser may adjust any appraisal to conform to Lender's appraisal guidelines.  All appraisals and appraisal reviews, and all updates of such documents, shall be prepared at Borrower's expense.

P.      Governmental Requirements.  Borrower shall have provided to Lender evidence, satisfactory to Lender, that development of the A Land as a residential subdivision consisting of approximately one thousand one hundred two (1,102) detached fully developed single-family

459461_11.DOC

-23-

Exhibit 1

residential building sites has been fully authorized by all governmental authorities having jurisdiction over the Premises, and that development in compliance with such authorizations: (I) is consistent with all land development regulations, adopted general plans, special plans, final tract maps, and other land use plans of Riverside County, California, and every other governmental authority that may have jurisdiction over the Premises; (II) meets all levels of service standards for the public facilities that are necessary to accommodate the impact of such development, including roads, water, sewer, drainage, recreation, mass transportation, and solid waste; (III) is not subject to any limiting conditions or restrictions under any zoning resolution, ordinance, covenant, agreement or the like that could prohibit or frustrate such development; (IV) complies with all Federal, state and local laws, rules, regulations and ordinances, including, without limitation, all zoning, building, fire, safety, health and environmental laws, rules, regulations and ordinances; (V) will meet all conditions precedent to obtaining any permits required to complete the Improvements according to the respective Plans, including without limitation, all environmental and building permits; and (VI) complies with and conforms to the applicable land use, density, structural and architectural design requirements of each governmental authority having jurisdiction over the Premises (collectively referred to as the "Governmental Requirements" in this Agreement). Lender shall have received a certificate, satisfactory to Lender, from the Engineer attesting that the Improvement Plans have been prepared in accordance with all such Governmental Requirements, that the General Contract provides for completion of the Improvements in accordance with the Improvement Plans, and that, upon completion of the Improvements in accordance with the Improvement Plans, the Land and the Improvements shall satisfy all Governmental Requirements.

Q.    Access and Utility Easements. Borrower shall have established such easements as may be necessary (or required by Lender in its sole discretion) to adequately assure access, and the availability of utilities, to the Premises.

R.    Utility Services. Lender must have received written evidence, satisfactory to Lender, that (I) all utility services (including, but not limited to, such drinking water supplies, surface water drainage facilities, sanitary sewage collection and disposal facilities or water treatment plants, and electric, cable television, and telephone facilities) as are necessary to obtain a certificate of occupancy for each completed unit to be included in the Premises are available at the Land and, upon completion of the Improvements, will be available to each Lot within the Premises, (II) all fees and other charges, if any, required to be paid in connection with the reservation and/or connection of such utility services have been paid in full or are included in Lender approved cost itemization and will be paid when due, and (III) each and every provider of utility services has a binding obligation to deliver the necessary utility services to the completed units.

S.    Permits and Authorizations. Lender shall have received written evidence, satisfactory to Lender, that all permits necessary for the commencement of construction of the Improvements have been issued, and not revoked, and can be utilized by the General Contractor and Borrower for the Improvements. In addition, if such permits predate the date of preparation of the Improvement Plans, Borrower shall have furnished such certifications from the applicable issuing authority and such other written evidence of compliance as Lender may reasonably require, demonstrating that such permits are valid and may be lawfully used by the General Contractor and Borrower for the construction of the Improvements pursuant to the Improvement

459461_11.DOC

-24-

Exhibit 1

Plans. Borrower shall have also furnished to Lender a written certification from the Engineer listing all governmental permits required to complete the Improvements in accordance with the Improvement Plans.

      T.    Opinion(s) of Borrower's Counsel. Borrower shall have caused to be delivered to Lender such opinion(s) of counsel for Borrower and counsel for Guarantor as Lender deems necessary or advisable, each to be satisfactory to Lender in form and substance, including, but not limited to the following:

      (1) the written legal opinion of an attorney who is satisfactory to Lender, opining to Lender that (a) should Borrower become the Debtor or Debtor-in-Possession in a case under the Bankruptcy Code, a court should not be persuaded to grant an order consolidating the assets and liabilities of Borrower with those of any Person affiliated with Borrower or its managing member, and (b) the formation documents of Borrower require, without limitation, the affirmative vote of a Special Member as a condition to the filing of any petition, complaint, or similar document or pleading, by Borrower, to commence any state or federal bankruptcy, reorganizations, receivership, dissolution, liquidation, or insolvency proceeding, or similar proceeding; or

      (2) a written legal opinion, and/or other written opinions of engineers, municipal officials, and/or other professionals, all of whom must be satisfactory to Lender, opining or evidencing to Lender, without limitation,

          a) That the A Land is properly zoned for Borrower's use of the A Land, as described in the KB Option Agreement;

          b) That all necessary planning authorities and other government agencies have approved Borrower's plans for the development of the A Land and the construction of Improvements thereon;

          c) That Borrower has obtained all permits necessary for such development and construction;

          d) That Borrower may enforce that certain existing Development Agreement for the development of the A Land, executed by Borrower and the City of Temecula, California, and recorded in the Official Records of the County of Riverside, California, as Document 2003-018567;

          e) That the Final Map for the A Land is expected to be approved and recorded within 180 days after the closing of the Loan;

          f) That the intended use of the A Land by Borrower has been approved by all federal, state, and local governmental agencies and entities having jurisdiction over the Land, including, without limitation, the U.S, Fish and Wildlife Service and the Riverside County Flood Control and Water Conservation District; and

459461_11.DOC

-25-

Exhibit 1

> g) Such other matters related to the Premises and/or Borrower's intended use of the Premises, as may be requested by Lender before the closing of the Loan.

(3) a written legal opinion, from an attorney acceptable to Lender, opining to Lender that, under California law, the following assignments and other agreements shall be valid and enforceable by Lender against the respective signatories, and that each party to such assignment or other agreement shall receive legally adequate consideration in exchange for such party's execution of such assignment or other agreement: (a) the assignment to Lender of the KB Option Agreement and the KB Home Recognition, Attornment and Subordination Agreement, each described above, (b), and (c) the assignment to Lender of the Key Man Policy, all as referred to herein.

All written opinions required by this Section must be satisfactory to Lender in form and content, in the sole and absolute discretion of Lender. Any attorney providing such a written opinion to Lender, shall also provide Lender with written evidence, satisfactory to Lender, that such attorney and his or her firm are protected by malpractice or professional liability insurance, which must cover such legal opinion for an amount equal to, or greater than, $10,000,000.00, per occurrence. Any other professional providing an opinion to Lender pursuant to this Section must be insured by professional malpractice insurance that covers such opinion in an amount approved by Lender, in its sole and absolute discretion

U.  Assignment of Key-man Life Insurance. Borrower shall have caused to be delivered to Lender a life insurance policy insuring the life of Richard K. Ashby (the "Insured") issued by Massachusetts Mutual Life Insurance Company as Policy No. 11411500 ( (the "Key-man Policy"), together with a written assignment of Borrower's rights under said Policy (including, without limitation, the death benefits payable thereunder), which such insurer, Policy and written assignment must be satisfactory to Lender, and the insurer shall have returned to Lender a duly executed acknowledgment of the written assignment of said Policy. The Key-man Policy shall not be subject to cancellation without at least thirty (30) days prior written notice to Lender. Borrower shall continuously maintain said Policy in full force and effect until the Loan is paid in full.

V.  Fees and Expenses. Borrower shall have paid to Lender a total non-refundable loan fee of $1,830,000.00 for the Land Loan, which may be paid from the proceeds of the first Land Loan Advance, and a letter of credit fee deposit of $90,000.00, to be credited against letter of credit fees as and when due under Section 2.F.III above. Borrower shall pay, from sources other than the Loan, all other fees, costs, expenses and charges then due and payable that Lender incurs in connection with, and/or that are related to, the origination, negotiation, closing, administration, servicing, collection, and enforcement of the Loan, including, by way of illustration but not limitation, all legal (including local and in-house counsel), architectural, engineering, inspection, appraisal, appraisal review, and appraisal update fees and expenses, title insurance and recording premiums and fees, and stamp, transfer, deed of trust, intangible and similar taxes, fees and charges, if any.

W.  Assignment of Rights. Borrower shall have delivered to Lender copies of the executed purchase agreement relating to Borrower's purchase of the Land, and true and correct

-26-

Exhibit 1

copies of all other contracts, agreements, declarations, licenses, permits, easements, leases and other instruments and documents affecting or benefiting the Premises (collectively, the "Collateral Agreements"), together with an assignment of Borrower's rights under the Collateral Agreements to the extent the same may be assigned, all of which must be satisfactory to Lender in form and substance. Borrower shall have delivered such consents, estoppel certificates and/or non-disturbance agreements relating to any one or more of the Collateral Agreements, as Lender may reasonably require. The Collateral Agreements shall include the following:

(1) an Assignment of the KB Option and Borrower's rights under the KB Option Agreement (including the rights to receive option fees, payments of the purchase price and other fees, and to hold and draw on the "*Deposit Letter of Credit*" described in the KB Option Agreement), in form and substance acceptable to Lender;

(2) a pre-acceptance standby letter of credit in the face amount of $39,000,000.00 transferable and assignable to Lender as credit sufficient for KB Homes' obligations under the KB Option Agreement in form acceptable to Lender, issued by a financial institution satisfactory to Lender, in the form of Exhibit "I" attached; and

(3) an assignment by Borrower of its right to be reimbursed directly by the Temecula CFD from the proceeds of sale of the Temecula CFD Bonds in the amount of not less than $43,000,000, in form and substance acceptable to the Lender (the "Temecula CFD Assignment").

X.    RESERVED.

Y.    Fontana Tax Increment Payment.  Borrower shall cause Richard Ashby to have provided Lender with written evidence, satisfactory to Lender in form and content, that the portion of each annual Fontana Tax Increment Payment owned beneficially by Richard Ashby, personally, shall be not less than $650,000.00, that such amount is payable solely to Richard Ashby, personally, no later than May 31 of each year throughout the term of the Loan, as may be extended, and that the total valuation of the portion of the Fontana Tax Increment Payments owned beneficially by Richard Ashby and yet to be assigned to Lender, pursuant to the Fontana Tax Increment Assignment, is not less than $15,000,000.00, and Larry Redman shall have provided Lender with written evidence, satisfactory to Lender in form and content, that the portion of each annual Fontana Tax Increment Payment owned beneficially by Larry Redman, personally, shall be not less than $650,000.00, that such amount is payable solely to Larry Redman, personally, no later than May 31 of each year throughout the term of the Loan, as may be extended, and that the total valuation of the portion of the Fontana Tax Increment Payments owned beneficially by Larry Redman and yet to be assigned to Lender, pursuant to the Fontana Tax Increment Assignment, is not less than $15,000,000.00.

Z.    Subdivision Requirements and Development Fees.  Borrower shall have caused a Tentative Tract Map to have been approved by the City of Temecula in accordance with the requirements of all governmental agencies having jurisdiction over the Premises legally subdividing the A Land into the Planning Areas described in Exhibit A-1 to this Agreement, permitting the development of the A Land in accordance with the Plans and satisfactory to Lender in its sole discretion. Borrower shall have paid in full all impact fees, use fees, and

459461_11.DOC

-27-

Exhibit 1

assessments related to Borrower's development of the Land (and shall have assigned all of the benefits accruing because of their payment of such fees and assessments to Lender), unless such fees or assessments do not cause a lien with priority over the Deed of Trust and are included in the cost breakdown attached to this Agreement as Exhibit B.

AA.     Zoning Change.    Lender shall have received written evidence, satisfactory to Lender, that there are no existing, pending or threatened zoning, building or other moratoria, down zoning or smart growth petitions or proceedings, restrictive allocations, or similar matters, that could affect Borrower's use or development of all or any portion of the Premises.

BB.     Financial Statements.    Lender shall have received the most current annual, semi-annual and quarterly statements, if applicable, pursuant to Section 19 of this Agreement, the financial statement of each Reporting Person (as defined in Section 19 of this Agreement) for the most recent fiscal year of the respective Reporting Person, dated as of the end of said fiscal year, updated for each Reporting Person which is not a natural person through June, 2005 (provided that Lender may accept certain statements and information post-closing, as set forth in a written agreement between Lender and Borrower).   Each financial statement shall be satisfactory to Lender in form and substance.   Each Reporting Person shall deliver to Lender at the closing of the Loan a certificate stating that there has been no material adverse change in the financial statement or in the business or operations of such Reporting Person since the date of his or its financial statement.

CC.     Environmental Site Assessment.    Lender shall have received, at Borrower's expense, a Phase I Environmental Site Assessment, satisfactory to Lender in form and substance, and prepared by an independent environmental engineer or other qualified consultant or expert satisfactory to Lender and in conformance with the scope and limitations of the ASTM (American Society for Testing and Materials) Standard Practice E.1527-00.   The Assessment must indicate that no evidence of Recognized Environmental Conditions (as defined in the Standard) is present in connection with the Premises.   In addition, no high-voltage electric transmission lines or transformers, nor any other source of an electromagnetic field in excess of one (1) milligauss, shall be located on the Land or within 1,200 feet of the perimeter of the Land.

DD.     Soils Report.    Lender shall have received, at Borrower's expense, a geotechnical engineering study, satisfactory to Lender in form and substance and prepared by a geotechnical engineer satisfactory to Lender, which report shall describe the subsurface condition of the Premises, identify the most appropriate foundation system for the proposed construction, and identify necessary site preparation and foundation design criteria.

EE.     B Land Map.    Borrower shall have furnished to Lender a copy of a recorded final tract map legally subdividing the B Land, which map must be satisfactory to Lender in its sole discretion.

FF.     Equity Funds.    The first advance of Loan proceeds shall include funds in the amount of up to $35,714,000.00, to release the A Land from the lien of an existing deed of trust in favor of Bank Midwest (the "Bank Midwest Deed of Trust"), which secures a development loan from Bank Midwest to Borrower (the "Bank Midwest Loan").   Such release shall be a condition precedent to any further advance of Loan proceeds.   Borrower shall deposit the

459461_11.DOC

-28-

Exhibit 1

$3,000,000.00 in equity into the L/C Pledge Account as described in Section 2.F.IV above, and shall provide additional Equity Funds, if necessary, (i) to release the Bank Midwest Deed of Trust if the amount required for such release exceeds the amount permitted by Lender to be advanced after an inspection of the Improvements to the A Land, at the closing of the Loan, and the funding limitations described in this Agreement, and (ii) to pay closing fees and costs in excess of $32,000.00 (which is the maximum amount to be advanced at closing for such purposes as described in Section 2.E above). If, for any reason and at any time, the Land Loan proceeds that Lender has allocated to a certain Improvement but has yet to advance to Borrower are insufficient to complete such Improvement according to the Improvement Plans, Borrower must utilize funds other than Loan proceeds to supplement such Land Loan proceeds and so complete the Improvement, and/or provide additional equity, to Lender's satisfaction.

GG.   Cost Review.   At Borrower's expense, Lender shall have entered into a contract with an independent engineer or other qualified consultant or expert, selected by Lender, to draft a written cost review determining whether Borrower can complete the Improvements in accordance with Borrower's preliminary budget and the cost itemization, and shall have received such cost review, which must be satisfactory to Lender in the Lender's sole and absolute discretion. Lender may modify the preliminary budget and/or the cost itemization based on the cost review.

HH.   UCC Search.   Borrower shall have provided Lender with a Uniform Commercial Code Form 11 ("UCC-11"), or similar written search results, of all appropriate State and County records, disclosing all Uniform Commercial Code financing statements that name the Borrower as a "Debtor." Borrower hereby authorizes the Lender to complete and file for record all Uniform Commercial Code financing statements that Lender requires as additional security for the Loan. Each such financing statement must be satisfactory to Lender in form and substance.

II.   Other Documents.   Borrower shall have delivered to Lender such other documents and information as Lender may reasonably request.

JJ.   Commitment.   All conditions contained in the Commitment shall have been satisfied, in the sole opinion of Lender.

KK.   Legal Lending Limitations:   No change in applicable law or regulations, or in the interpretation of any such law or regulations, which would make it illegal for Lender to perform its obligations under this Agreement, shall have occurred, and the making of any Advance would not cause Lender to exceed the lesser of (i) its current loans-to-one-borrower limitation, as determined by Lender in accordance with Title 12, Section 560.93, of the Code of Federal Regulations (12 C.F.R. §560.93), as amended (the "Statutory LTOB"), or (ii) the amount of $175,000,000.00, representing the aggregate outstanding balances for the Loan (including such Advance) and other Borrower/Affiliate Loans (the "Internal LTOB").

LL.   Ravenswood Loan Modification; Modification to Other Borrower/Affiliate Loans. Lender and Ravenswood Apple Valley, LLC ("Ravenswood"), and such other Persons as Lender may deem necessary or desirable, shall have executed a written modification of that certain revolving line of credit loan from Lender to Ravenswood, bearing loan no. 5754-001 (the "Ravenswood Loan"), in which modification Lender shall, with the consent of Ravenswood and

459461_11.DOC

-29-

Exhibit 1

such other Persons, limit the maximum committed amount of the Ravenswood Loan at any given time to $5,000,000.00, and increase the amount of the legal lending limitation, as set forth in the loan documents for the Ravenswood Loan and the related land development loan from Lender to Ravenswood, to the lesser of the Statutory LTOB or the Internal LTOB (the "Ravenswood Loan Modification"). The Ravenswood Loan Modification must be satisfactory to Lender in form and content, in the sole and absolute discretion of Lender.

MM.    Junior Loan Documents. No event of default shall have occurred under the Junior Deeds of Trust, nor any event which, with notice or the passage of time, would constitute such an event.

Any waiver of any of the above conditions must be in writing, must specify the condition waived, and must be signed by an authorized officer of Lender. Each waiver, if any, shall only waive the specified condition and no other, and shall not be deemed or construed to be a subsequent waiver. Neither the closing of the Loan, nor any Advance for the payment of the costs and expenses of the closing of the Loan, or the acquisition, or development of the Land, shall be deemed a waiver of any of the foregoing conditions precedent.

8.    CONDITIONS TO SUBSEQUENT ADVANCES.

After the initial Advance, subject to the funding limitations set forth in Section 2.E above, Lender shall make advances not more than twice in each calendar month, subject to, and in accordance with, the itemization shown in Exhibit B to this Agreement, as may be revised by Lender, and upon compliance with all of the following conditions, as such compliance is determined by Lender in its sole discretion:

(A)    No Default. As of the date of each Advance, the warranties and representations of Borrower, as contained in this Agreement, shall have remained true, correct, and complete, in all material respects, all covenants, terms, and conditions of this Agreement shall have been satisfied, the Land Loan shall be "In balance," and no Event of Default, or circumstance or event that, upon the lapse of time, the giving of notice, or both, could become such an Event of Default, shall have occurred and be continuing.

(B)    Draw Request Form; Evidence of Improvement Costs and Payment. Lender will make Land Loan Advances for the Improvement Costs only in accordance with the allocations specified in Exhibit B, and always subject to the conditions and requirements of this Agreement. Not later than the seventh (7th) Business Day before the date for an Advance, as such date shall have been requested by Borrower, Borrower shall deliver to Lender, and to the Inspector, a written requisition, in the form approved by the Lender as its "Draw Request Form" (the "Draw Request Form".) The Draw Request Form shall set forth the amount of the Advance sought, and shall constitute a covenant and affirmation of the Borrower that, on and as of the date of the Draw Request Form, the warranties and representations in this Agreement are true, correct, and complete, all the covenants, terms, and conditions of this Agreement shall have been performed and complied with, the Land Loan is "In balance," and no Event of Default, or circumstance or event that, upon the lapse of time, the giving of notice, or both, could become an Event

459461_11.DOC

-30-

Exhibit 1

of Default, shall have occurred and be continuing. The signature of Borrower on each Draw Request Form must be notarized.

In each Draw Request Form, Borrower shall certify that the Improvements for which payment is sought have been completed in accordance with the General Contract, that Borrower has paid all Improvement Costs for which Lender has already made Advances, and that the requested amount for the current Advance represents monies that are now due and owing by Borrower for Improvement Costs.

In addition, each Draw Request Form must be executed and certified by the Engineer. Such certification shall attest that all work performed before the date of the Draw Request Form has been performed in accordance with the General Contract, and that Borrower is entitled to receive an Advance in the amount requested by Borrower. Moreover, each Draw Request Form must be satisfactory to Lender in form and substance.

Each Draw Request Form must be accompanied by a summarization (the "Summarization"), written on a line item-by-line item basis, indicating the budget of Borrower for the Improvements, the amount of the requested Advance, the allocation of the requested Advance to each line item, the amount of all Advances previously made by Lender for the Improvement Costs on a line item-by-line item basis, the amount of all Loan proceeds held by Borrower as retainage, and the amount of Land Loan proceeds required by Borrower to complete the Improvements in accordance with the Plans, as the Plans may have been amended. Each Summarization must be in the form approved by Lender before the closing of the Loan, and must be satisfactory to Lender.

Each Summarization shall list claims for labor and/or materials furnished or supplied to, or for the benefit of, the Land, up to the date of the most recent inspection by the Inspector, and not for labor or materials rendered or furnished thereafter.

Moreover, each Draw Request Form must be accompanied by an inspection report, signed by the Inspector and in the form approved by Lender, indicating the then current percentage of completion of the Improvements (an "Inspection Report"). Borrower shall have provided the Draw Request Form, including the Summarization, to the Inspector in sufficient time for the Inspector to examine such documents, inspect the Improvements, complete the Inspection Report, and remit the Inspection Report to Lender, before the date for the scheduled Advance. In addition, Borrower shall have provided the Inspector with such other evidence as Lender or Inspector shall have requested, from time to time, including, but not limited to, applications, certificates, and affidavits of the Borrower and/or the Engineer, and/or of any contractor, subcontractor, or supplier that shall have furnished labor and/or materials for the Improvements, and/or the Title Company, showing:

459461_11.DOC

Exhibit 1

(I) The then current percentage of completion of the Improvements, and the then current value of the Improvements that have been completed;

(II) That all outstanding claims for labor, materials, and/or fixtures furnished to, or for the benefit of, the A Land, through the date of the last Advance, have been paid, and that liens for such claims have been waived, in writing, except those unpaid claims, if any, permitted by Lender in its sole and absolute discretion;

(III) That there are no liens outstanding against the A Land, other than liens for property taxes not yet due and payable, liens and security interests in favor of Lender, "Permitted Encumbrances" (as that term is defined in the Deed of Trust), and other liens, if any, that Lender may have permitted, in writing, in its sole and absolute discretion;

(IV) That Borrower has complied with all of its obligations under the Loan Documents;

(V) That all work on the Improvements has been performed in a good and workmanlike manner, and in accordance with the Improvement Plans, subject only to amendments, modifications, change orders, and extras, if any, permitted by the terms of this Agreement or approved by Lender, in writing, and in accordance with all applicable laws, statutes, ordinances, rules, regulations, and restrictive covenants (if any);

(VI) That the amount of the Land Loan proceeds available to be advanced in the future is sufficient to pay the cost of completing the installation of the Improvements in accordance with the Improvement Plans, as may have been amended in accordance with this Agreement; and

(VII) That each Advance will be used for the specific category, item, or purpose (as described in Exhibit B) for which the Advance will be made.

(C) Title Insurance. Upon Lender's request, Lender shall receive an endorsement to the Title Policy updating the Title Policy to the date of the requested Land Loan Advance and increasing the insurance coverage to an aggregate amount equal to the sum of all prior Land Loan Advances, all prior L/C Facility Advances (if any) and the requested Land Loan Advance, without additional exceptions or objections to the Title Policy. The Lender shall receive a California Land Title Association ("CLTA") Endorsement Form 122.3, or another form of endorsement acceptable to Lender, whereby the Title Company insures Lender against any loss or damage by reason of, among other things, the lack of priority of the Deed of Trust with respect to such Advance, over any and all mechanics' liens, material supplier liens, laborer liens, professional services liens, and all other liens not reflected in Schedule B of the Title Policy, without additional exceptions or objections to the Title Policy.

459461_11.DOC

Exhibit 1

(D)    Lending Limitations:    As used in this Loan Agreement, a "Borrower/Affiliate Loan" is any loan, or other extension of credit, including, without limitation, the Loan, from Lender to Borrower and/or any one or more Affiliates.

The following shall be conditions precedent to each Advance:

(I)    That no change in any applicable law or regulation, or in the interpretation of any such law or regulation, which would make it illegal for Lender to perform its obligations under this Agreement, shall have occurred, and

(II)    As of the making of such Advance, the sum of the outstanding balances of all Borrower/Affiliate Loans, including such Advance, does not exceed the lesser of $175,000,000.00, or the then current legal limitation, applicable to Lender, on total loans and extensions of credit to "one borrower," under Title 12, Section 560.93, of the Code of Federal Regulations (12 C.F.R. §560.93), as amended, as determined by Lender.

If, at any time and in the sole opinion of Lender, the financial condition, organizational structure, or business operations or performance, of the Borrower or any Guarantor shall have suffered a material adverse change, as determined by Lender, Lender, in its sole discretion, may change the foregoing conditions precedent to each Advance, and/or require additional conditions precedent to each Advance, to protect the interest of the Lender in the Premises.

9.    PAYMENT OF LAND LOAN ADVANCES.

If all conditions precedent to Lender's obligations under this Agreement, and to a Land Loan Advance requested by Borrower, have been satisfied within the sole discretion of Lender, Lender, within seven (7) Business Days after all such conditions have been so satisfied, shall make such Land Loan Advance from its office in Cleveland, Ohio, or such other place as Lender may select, payable to Borrower or jointly to Borrower and the General Contractor, or to any other Person(s) to whom or to which portions of the Land Loan Advance appear payable in accordance with Borrower's requisition or otherwise, as Lender may elect. Lender shall make each Land Loan Advance in the amount justified by the applications, affidavits, certificates and other evidence submitted to Lender under Section 8 above, and subject to Subsection 2.D. above and Section 8 above; but Lender may, at its discretion, retain until completion of the Improvements and satisfaction of all conditions contained in Section 10 of this Agreement: (A) the amount of the Improvement Costs that Borrower or the General Contractor may retain under the General Contract or any subcontract (but not less than ten percent (10%) of the amount disbursed except as otherwise approved by Lender with respect to a particular contract or subcontract); or (B) such amount as may now or hereafter be required by law. Lender shall disburse such retainage with the final Land Loan Advance (as provided for in Section 10 of this Agreement) or when all of the Improvements are completed (as Lender determines within its sole discretion), whichever is later. Lender shall have the right, at any time and from time to time, to withhold an amount of the Land Loan proceeds that is sufficient to cover the unpaid balance of the Improvement Costs and the amount necessary to complete the installation of the Improvements. The Inspector in his or her discretion shall determine the percentage of completion of the installation of the Improvements. The proceeds of each Land Loan Advance shall be applied solely and exclusively to payment, or to the reimbursement of Borrower for the payment, of the acquisition of the Land, closing costs, Land Loan Debt Service Reserve, and
459461_11.DOC

-33-

Exhibit 1