1

1          UNITED STATES BANKRUPTCY COURT

2                DISTRICT OF NEVADA

3                LAS VEGAS, NEVADA

4   In re:  USA COMMERCIAL MORTGAGE  )  OCTOBER 19, 2009
        COMPANY,                    )  E-Filed:  10/27/09
5                                    )
            Debtor.                 )  Case No.
6                                    )  BK-S-06-10725-LBR
    _____ )  Chapter 11
7   In re:  USA INVESTMENT PARTNERS, )
        LLC,                        )
8                                    )
            Debtor.                 )  Case No.
9                                    )  BK-S-07-11821-LBR
    _____ )  Chapter 11
10  In re:  THOMAS A. HANTGES,       )
                                     )
11          Debtor.                 )  Case No.
                                     )  BK-S-07-13163-LBR
12  _____ )  Chapter 11
    USACM LIQUIDATING TRUST,         )
13                                   )
            Plaintiff,              )
14                                   )
        vs.                         )  Adversary No.
15                                   )  08-01125-LBR
    EAGLE RANCH, LLC, et al.,        )
16                                   )
            Defendants.             )
17  _____ )
    USACM LIQUIDATING TRUST, et al., )
18                                   )
            Plaintiffs,             )
19                                   )
        vs.                         )  Adversary No.
20                                   )  08-01135-LBR
    WELLS FARGO BANK, N.A.,          )
21                                   )
            Defendant.              )
22  _____ )

23

24

    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

2

```
 1   USACM LIQUIDATING TRUST,              )
                                           )
 2                Plaintiff,               )
                                           )
 3        vs.                              )    Adversary No.
                                           )    08-01127-LBR
 4   AMESBURYPORT CORPORATION,             )
                                           )
 5                Defendant.               )
     _____)
 6   LISA M. POULIN, TRUSTEE,              )
                                           )
 7                Plaintiff,               )
                                           )
 8        vs.                              )    Adversary No.
                                           )    09-01120-LBR
 9   PAUL JOSEPH MARRON, et al.,           )
                                           )
10                Defendants.              )
     _____)
11   USA CAPITAL DIVERSIFIED TRUST         )
     DEED FUND, LLC,                       )
12                                         )
                  Plaintiff,               )
13                                         )
          vs.                              )    Adversary No.
14                                         )    08-01041-LBR
     THOMAS A. HANTGES,                    )
15                                         )
                  Defendant.               )
16   _____)
     USACM LIQUIDATING TRUST,              )
17                                         )
                  Plaintiff,               )
18                                         )
          vs.                              )    Adversary No.
19                                         )    08-01042-LBR
     THOMAS A. HANTGES,                    )
20                                         )
                  Defendant.               )
21   _____)

22

23

24

25
```

```
1   ROBERT J. KEHL,                    )
                                       )
2           Plaintiff,                 )
                                       )
3       vs.                            )   Adversary No.
                                       )   08-01040-LBR
4   THOMAS A. HANTGES,                 )
                                       )
5           Defendant.                 )
    _____)
6
```

TRANSCRIPT OF PROCEEDINGS
OF
HEARING RE: MOTIONS
VOLUME 1
BEFORE THE HONORABLE LINDA B. RIEGLE
UNITED STATES BANKRUPTCY JUDGE

Monday, October 19, 2009

3:00 p.m.

Court Recorder:         Liberty Ringor

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

4

```
1    APPEARANCES:

2    For USACM Liquidating    ROB CHARLES, JR., ESQ.
     Trust:                   Lewis and Roca, LLP
3                             3993 Howard Hughes Parkway
                              Suite 600
4                             Las Vegas, Nevada 89169

5                             JOHN C. HINDERAKER, ESQ.
                              Lewis and Roca, LLP
6                             One South Church Avenue
                              Suite 700
7                             Tucson, Arizona 85701
                              (Telephonic)
8
     For Certain Direct       JANET L. CHUBB, ESQ.
9    Lenders:                 Jones Vargas
                              100 West Liberty Street
10                            Twelfth Floor
                              Reno, Nevada 89501
11
     For USA Commercial       MARC A. LEVINSON, ESQ.
12   Mortgage Company and     Orrick, Herrington & Sutcliffe, LLP
     USA Capital Diversified  400 Capitol Mall
13   Trust Deed Fund, LLC:    Suite 3000
                              Sacramento, California 95814
14
     For USACM Liquidating    ALLAN B. DIAMOND, ESQ.
15   Trust,                   J. MAXWELL BEATTY, ESQ.
     Geoffrey L. Berman,      STEPHEN T. LODEN, ESQ.
16   Michael W. Carmel:       (Telephonic)
                              Diamond McCarthy, LLP
17                            Two Houston Center
                              909 Fannin Street
18                            Suite 1500
                              Houston, Texas 77010
19
     For the United States    AUGUST B. LANDIS, ESQ.
20   Trustee:                 Office of the United States Trustee
                              300 Las Vegas Boulevard South
21                            Suite 4300
                              Las Vegas, Nevada 89101
22
     For Asset Resolution,    RANDOLPH L. HOWARD, ESQ.
23   LLC:                     Kolesar & Leatham, Chtd.
                              3320 West Sahara Avenue
24                            Suite 380
                              Las Vegas, Nevada 89102
25
```

```
 1    APPEARANCES (Cont.):

 2                              KATHERINE M. WINDLER, ESQ.
                               Bryan Cave, LLP
 3                             120 Broadway
                               Suite 300
 4                             Santa Monica, California 90401

 5    For Marron                JEROME P. BURGER, ESQ.
      & Associates:            Marron & Associates
 6                             320 Golden Shore
                               Suite 410
 7                             Long Beach, California 90802

 8    For Wells Fargo Bank,    KENT F. LARSON, ESQ.
      N.A.:                    Smith, Larsen & Wixom
 9                             1935 Village Center Circle
                               Las Vegas, Nevada 89134
10
      For the Trustee,         TALITHA B. GRAY, ESQ.
11    Lisa M. Poulin:          Gordon & Silver, Ltd.
                               3960 Howard Hughes Parkway
12                             Ninth Floor
                               Las Vegas, Nevada 89169
13
      For Amesburyport         ROGER DOWD, ESQ.
14    Corporation:             Law Office of Roger Dowd
                               615 Concord Street
15                             Framingham, Massachusetts 01702
                               (Telephonic)
16
      For Thomas A. Hantges:   JASON C. FARRINGTON, ESQ.
17                             Timothy S. Cory & Associates
                               8831 West Sahara Avenue
18                             Las Vegas, Nevada 89117

19    For the Trustee,         ROBBIN L. ITKIN, ESQ.
      Michael W. Carmel:       Steptoe & Johnson, LLP
20                             2121 Avenue of the Stars
                               Suite 2800
21                             Los Angeles, California 90067
                               (Telephonic)
22
      Also Present:            GEOFFREY L. BERMAN
23                             Trustee
                               Development Specialists, Inc.
24                             Wells Fargo Center
                               333 South Grand Avenue
25                             Suite 4070
```

6

1    APPEARANCES (Cont.):

2    Also Present:            MICHAEL TUCKER
                              Manager
3                             USA Capital Diversified
                                Trust Deed Fund, LLC
4
                              MICHAEL W. CARMEL
5                             Chapter 11 Trustee

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

```
1              (Court convened at 03:03:28 p.m.)

2              THE COURT:  Be seated.  Okay.  USA Commercial.

3         Appearances, please.

4              MR. CHARLES:  Good afternoon, your Honor.

5    Rob Charles from Lewis and Roca on behalf of the

6    USACM Liquidating Trust.  Geoffrey Berman, the Trustee, is

7    present with us.

8              MS. CHUBB:  Good afternoon, your Honor.  Janet Chubb

9    of Jones Vargas for certain direct lenders.

10             THE COURT:  Okay.

11             MR. LEVINSON:  Good afternoon, your Honor.

12   Marc Levinson appearing on behalf of USA Commercial,

13   Capital Diversified Trust Deed Fund, LLC, the revested debtor.

14   Michael Tucker, the manager of Diversified, is in the courtroom

15   as well.

16             THE COURT:  Okay.

17             MR. DIAMOND:  Good afternoon, your Honor.

18   Allan Diamond with Diamond McCarthy on behalf of the

19   USACM Liquidating Trust and Mr. Berman.

20             MR. LANDIS:  Good afternoon, Judge.  Augie Landis,

21   Assistant United States Trustee.

22             MR. HOWARD:  Good afternoon, your Honor.

23   Randolph Howard, Kolesar & Leatham, appearing of behalf of

24   Asset Resolution, LLC, only.

25             MR. BEATTY:  Good afternoon, your Honor.  Max Beatty
```

1    of Diamond McCarthy on behalf of the USACM Liquidating Trust.

2              MR. CARMEL:  Good afternoon, Judge.  Michael Carmel,

3    the Chapter 11 Trustee in the Hantges case.

4              THE COURT:  Okay.

5              MR. BURGER:  Good afternoon, your Honor.

6    Jerome Burger on behalf of Marron & Associates.

7              THE COURT:  Okay.

8              MR. LARSON:  Good afternoon, your Honor.  Kent Larson

9    on behalf of Wells Fargo Bank in the matter which is matter

10   No. 37.

11             THE COURT:  All right.

12             MS. GRAY:  Good afternoon, your Honor.  Talitha Gray

13   on behalf of Lisa Poulin, the Chapter 11 Trustee for

14   USA Investment Partners.

15             THE COURT:  All right.

16             MR. DIAMOND:  Your Honor, I forgot.  Allan Diamond.

17   I may also be here on behalf of Mr. Carmel as the trustee in

18   the Hantges case.

19             THE COURT:  Okay.  Before I forget, this not on our

20   calendar, but I need to get something straightened out.  In the

21   USA versus Fulton matter, I rendered findings of fact and

22   conclusions of law on the record, and I don't have an order on

23   that, yet.

24       Now, maybe it was because the other party should have been

25   preparing it, but if you could check on that because we need to

9

1    get that to the district court.

2            MR. BEATTY:  Your Honor, it was my understanding that

3    it is in the hands of the defendant right now.  I'll go ahead

4    and make sure to contact them and advise them that the Court is

5    expecting an order --

6            THE COURT:  Yes.

7            MR. BEATTY:  -- and findings of fact shortly.

8            THE COURT:  Thank you very much.

9            MR. BEATTY:  No problem.

10           THE COURT:  All right.  So the first thing I have is

11   item No. 2, the Trust vs. Eagle Ranch, et cetera.  Is anybody

12   here on that?  Technically, that --

13           THE CLERK:  Oh.

14           THE COURT:  Sorry.

15           THE CLERK:  No.  They had called me earlier today and

16   just stated they wouldn't be showing up due to the settlement

17   on the Eagle Ranch part only.

18           THE COURT:  Okay.

19           THE CLERK:  So --

20           THE COURT:  I think I certified this matter to the

21   district court to go forward on the Monaco portion.

22           MR. BEATTY:  Your Honor, that is correct --

23           THE COURT:  Okay.

24           MR. BEATTY:  -- on the Monaco portion.  I believe you

25   did certify that to go.  The matter that was on the docket

1   related to Eagle Ranch --

2           THE COURT:  Which was settled --

3           MR. BEATTY:  -- should have been mooted --

4           THE COURT:  -- correct?

5           MR. BEATTY:  -- by the settlement.

6           THE COURT:  Okay.

7           MR. BEATTY:  Yes.

8           THE COURT:  Thank you.  All right.

9       First, we have the 21st objection to proofs of claim.  And

10  when I say first, I'm going by my calendar docket, necessarily.

11  Obviously, the 21st isn't the first.

12          MR. CHARLES:  And I apologize.  I wish we could

13  come up with a cleverer way to relate these things to the

14  Court.

15      But as you can tell from the court file, we filed an

16  omnibus objection, and we have not received a response from

17  Norman and Karen Kibbon (phonetic), and we would ask that the

18  objection be sustained with respect to those folks.

19          THE COURT:  And was it continued because there was a

20  problem with notice to them?

21          MR. CHARLES:  Let me ask my partner, Mr. Hinderaker,

22  who I think is on the telephone.

23          THE COURT:  Okay.

24          MR. HINDERAKER:  Yes, your Honor.  This is

25  John Hinderaker.  It was continued because of a notice issue

1    that was corrected.

2          THE COURT:  Okay.  All right.  So that's sustained.

3    All right.

4        Next, we have the 22nd objection.

5          MR. CHARLES:  Let's just make Mr. Hinderaker

6    perform --

7          THE COURT:  All right.

8          MR. CHARLES:  -- for a while.

9          THE COURT:  That's fine, and he asked for permission

10   to appear since you were going to be here, so --

11         MR. CHARLES:  Thank you.

12         THE COURT:  All right.  So on the 22nd omnibus

13   objection for lack of documentation.

14         MR. HINDERAKER:  Again, this is an objection where

15   there was no documentation for the claims.  We requested

16   documentation from the claimants, and then when we didn't get

17   it we filed the motion.

18       There was one claimant who then supplied the information

19   to document their claim.  That's Don Marshall (phonetic), so we

20   would ask that the Court sustain the objection as to all of the

21   claimants, except for Mr. Marshall.

22         THE COURT:  All right.  So that's sustained.  Let me

23   skip the distribution motion for a moment and go to the less

24   controversial matters.

25       Next, we have the objection to claim of Rocklin/Redding.

1      MR. HOWARD:  Yes, your Honor.  The Rocklin/Redding,

2  LLC, filed 11 claims total.  The first ten claims related to

3  individual loans.  The 11th claim was sort of a catchall that

4  related to all of the same loans, and it was for $2,000,000.

5      Accordingly, we have objected to that last claim for

6  $2,000,000 as duplicative, and we would ask that the Court

7  sustain the objection as there was no response filed.

8      THE COURT:  All right.  That's sustained.

9      Next, we have the double-counted claims.

10      MR. HINDERAKER:  There's quite a few omnibus

11  objections related to double-counted claims.  Your Honor, if

12  you had a chance to look at one of the objections, essentially,

13  there were 300-plus claimants who filed claims where on the

14  proof-of-claim form they inserted an amount for secured claims,

15  the same amount for unsecured claims, and then the same amount

16  again for total claims.

17      And I've talked to some of these claimants.  What they

18  were trying to do was cover all of their bases.  The practical

19  effect of this, however, was that the claims agent inserted

20  into the claims registry two separate claims for the same

21  amount.

22      So now that those secured claims have been converted into

23  unsecured claims, essentially, all of these claims are for

24  double the intended amount of the claim.

25      THE COURT:  Okay.  So they'll still have the one part

1   of it.  In other words, we're just taking out the duplicative

2   part, correct?

3            MR. HINDERAKER:  Yes.  And to explain further on some

4   of these, we have objected.  You know, they'll be multiple-loan

5   claims, and we will have objected to part of the claim that was

6   related to a particular loan.  And in those cases, the double

7   amount has been removed, so we are accounting for that.

8        When this process is completed, they'll have one amount

9   which corresponds to the actual amount of a remaining

10  unresolved claim for that particular claimant.

11           THE COURT:  Okay.  So that takes care of the 1st

12  through 7th objection, and that's calendar matters 8 through

13  14.

14       And then No. 15 the mailing list wasn't attached.  Both

15  exhibits were of the notice of hearing.  I assume that's just a

16  -- you've got a corrected certificate of malling on the 8th

17  omnibus objection?

18           MR. HINDERAKER:  I am not sure.  I'll have to check

19  that, your Honor.

20           THE COURT:  Okay.  So maybe you could have somebody

21  check that even while we're looking.  In other words,

22  Docket 7509 was supposed to have the mailing list attached, but

23  it had had the notice of hearing as opposed to the mailing

24  list.

25           MR. HINDERAKER:  Right.  And I think there were a

1   number of these that we did correct, but I just want to go and

2   check that to make sure this was the one.

3              THE COURT:  Okay.  So we'll come back on that one.

4              MR. HINDERAKER:  Yes.

5              THE COURT:  And the 9th objection is also the double

6   claims, correct?

7              MR. HINDERAKER:  Yes, your Honor.

8              THE COURT:  All right.  And that's sustained.

9         And then No. 17 the same problem as we had with No. 8.

10             MR. HINDERAKER:  Yes.

11             THE COURT:  So --

12             MR. HINDERAKER:  I'll double-check that.

13             THE COURT:  Okay.  And the 11th objection is

14  sustained.

15        And the 12th and the 13th, you amended the mistake,

16  correct, in your --

17             MR. HINDERAKER:  I believe that's correct.

18             THE COURT:  Okay.

19             MR. HINDERAKER:  But why don't you let me

20  double-check that and come back when we come back --

21             THE COURT:  Okay.

22             MR. HINDERAKER:  -- on all these.

23             THE COURT:  All right.  And the 14th is a double

24  count as well, correct?

25             MR. HINDERAKER:  Yes.  That's correct, your Honor.

1          THE COURT:  All right.  So that's sustained.

2      The 15th is sustained.

3      The 16th is sustained.

4      The 17th, Court No. 24 has the same problem on the notice,

5  so you can check that as well.

6      The 18th is sustained.

7      The 19th, why don't you discuss that for a moment because

8  I understand there's a stipulation here.

9          MR. HINDERAKER:  Yes.  There was a stipulation with

10  the Roches (phonetic).  They contacted us and gave us

11  additional documentation related to the claim.

12      And what they demonstrated to us was that the intended

13  amount of their claim was equal to the doubled amount of their

14  claim, and, therefore, we're withdrawing the objection as to

15  the Roche claim which is claim No. 2294.

16          THE COURT:  Okay.  So --

17          MR. HINDERAKER:  So we would ask that the Court

18  sustain the remainder of the objections.

19          THE COURT:  All right.  The rest are sustained.

20      Then we have the 20th, and that's an amendment was there,

21  and that's granted.

22      And the 21st is sustained.

23      The 22nd is sustained.

24      The 23rd is sustained.

25      Now, we have the Caret No. 31, the omnibus objection to

16

1    proofs of claim based upon Arapahoe Land.

2          MR. HINDERAKER:  Yes, your Honor.  This relates to a

3    claim that was transferred to Silar for servicing, and our

4    understanding from the servicer is that this claim was paid,

5    and the claimants were paid, and there was no response to our

6    objection.

7          THE COURT:  All right.  So it's sustained.

8       And the 24th double counted is the same as the previous

9    ones we have discussed, correct?

10          MR. HINDERAKER:  Yes, your Honor.

11          THE COURT:  All right.  That's sustained.

12       And the 25th is sustained.

13       Now, we have No. 34, the objection to proofs of claim

14    based on Rio Rancho.

15          MR. HINDERAKER:  Yes, your Honor.  This was a

16    $2,000,000 loan.  The loan was performing at the time that it

17    was transferred to Compass for servicing.

18       It's our understanding that the direct lenders were paid

19    because the borrower paid the loan, and, consequently, we filed

20    the objection, and there was no response to the objection.

21          THE COURT:  All right.  That's the same.  Sustained.

22       Then we have the 26th which is double counted.  That's

23    sustained.  All right.  That's all of yours for the moment,

24    correct?

25          MR. HINDERAKER:  Yes, your Honor.

1          THE COURT:  Okay.  So, next, let's go to item No. 36

2     on the calendar, the Trust versus Amesbury, the motion to

3     approve settlement.

4          MR. DOWD:  Yes.  Roger Dowd for

5     Amesburyport Corporation is here, your Honor.

6          MR. BEATTY:  Max Beatty on behalf of the

7     Liquidating Trust, your Honor.

8          THE COURT:  Okay.

9          MR. BEATTY:  Your Honor, in this matter, the Trust

10    filed suit against Amesburyport seeking to recover

11    approximately 2.8 million dollars in funds transferred to

12    Lawyers Title for the benefit of Amesburyport Corporation.

13        After settlement negotiations, the parties came to a

14    mutually-agreeable settlement wherein Amesburyport would enter

15    into a stipulated judgment for the full 2.8 million dollars.

16        And, in turn, the USACM Liquidating Trust would drop the

17    remainder of its claims, and we would come to the end of this

18    litigation as well as releasing the estate of Mr. Sullivan.

19          THE COURT:  Okay.  And I have forgotten.  Are there

20    payment terms set out in there?

21          MR. BEATTY:  Your Honor, there are not payment terms

22    set out.  In particular, the issue that we've run across with

23    Amesburyport is Amesbury provided the Trust with financial

24    information to accompany the settlement discussion wherein the

25    Trust learned that, essentially, Amesburyport holds but one

1    asset.  That asset is land which is subject to a lien right

2    now.  It's fully liened.

3        The stipulated judgment itself provides protection to the

4    Trust in the offhanded situation which this one asset is sold

5    for a value that exceeds the amount of the liens.

6        The Trust would then be able to take its share from the

7    estate and winding up the affairs of Amesburyport which is the

8    reason why we've taken this path to settlement.

9            THE COURT:  Okay.  So you have a judgment, so you can

10   execute on it.

11           MR. BEATTY:  Yes.  That's correct, your Honor, and it

12   would --

13           THE COURT:  Okay.

14           MR. BEATTY:  -- also allow us --

15           THE COURT:  A lien.

16           MR. BEATTY:  -- where fit to take postjudgment

17   discovery to see if we can find any other assets --

18           THE COURT:  Okay.

19           MR. BEATTY:  -- that Amesbury had.

20           THE COURT:  All right.  There has been no opposition,

21   so I find that makes the test of A&C Properties weighing the

22   cost of the litigation with the results and approve that one.

23   Did we have a trial set on that?  We did not, did we?

24           MR. BEATTY:  No, we didn't, your Honor.

25           THE COURT:  Okay.  Thank you.

1          MR. BEATTY:  Thank you.

2          THE COURT:  Next, we have the Trust versus

3     Wells Fargo.

4          MR. LARSON:  Good afternoon, your Honor.  Kent Larson

5     on behalf of Wells Fargo Bank.

6          THE COURT:  Okay.  I guess is there an -- there's no

7     opposition to file the amended document; is that correct?

8          MR. LARSON:  That's my understanding, your Honor.

9          THE COURT:  Okay.  So that's granted.

10     While I have you all here, we need to get that order

11     finished in -- I don't know when I set that show-cause hearing,

12     but I've got dueling orders, so let's just take a moment and

13     discuss that if we can.

14     Who drafted that order?  Is he -- no.  I think Mr. Yoder

15     drafted that.  Anybody know the dueling order in the

16     Wells Fargo matter?

17          MR. LARSON:  I don't know, your Honor.  I saw them.

18     I saw the dueling orders, but I don't know the status that

19     they're presently in, so --

20          THE COURT:  Okay.  This is the one where nobody gave

21     me an order.  You appealed it which is fine.

22          MR. LARSON:  That's right.

23          THE COURT:  But nobody gave me an order, and I needed

24     an order.

25          MR. DIAMOND:  Allan Diamond on behalf of the Trust,

1    your Honor, and I apologize.  I think one of my partners,

2    Lisa Tsai, was supposed to be on the line who was handling it.

3        But I don't know if she is because I haven't heard

4    anything, so I think the answer to the Court's question is that

5    we did submit --

6            THE COURT:  Well, you did submit one.

7            MR. DIAMOND:  Right.  And it --

8            THE COURT:  But you put all the findings and

9    conclusions in.

10           MR. DIAMOND:  Okay.

11           THE COURT:  What I really needed was just an order,

12   so we could short-circuit the order to show cause that's set

13   for a hearing and short-circuit this all by just putting an

14   order in that says the Court having made its findings and

15   conclusions on the record, and that rules -- I think it was

16   like arbitration was not appropriate.  In other words, just put

17   the bottom line in.  Don't try --

18           MR. DIAMOND:  We'll get --

19           THE COURT:  -- and recite findings and conclusions.

20           MR. DIAMOND:  We'll get that to you immediately.

21           THE COURT:  Okay.  And I think that will take care of

22   Wells Fargo's problem.  I think that was --

23           MR. LARSON:  I --

24           THE COURT:  -- their objection --

25           MR. LARSON:  I would think --

```
 1            THE COURT:  -- as well.

 2            MR. LARSON:  -- it would, yes.

 3            THE COURT:  Okay.

 4            MR. LARSON:  Thank you, your Honor.

 5            THE COURT:  Thank you very much.

 6            MR. DIAMOND:  Thank you, your Honor.

 7            THE COURT:  All right.  Next, we have -- that's

 8    USA Investment Partners, so let me go back now to the motion to

 9    distribute, item No. 6.

10            MR. CHARLES:  Your Honor, Rob Charles from

11    Lewis and Roca on behalf of the Trust.  The motion presented

12    some things that I thought might be complicated, but not

13    controversial, and then there is an objection.

14        What I'd like to do if it's all right with you and be

15    brief about it is kind of work you through what I thought was,

16    perhaps, complex, but not controversial --

17            THE COURT:  Let me ask --

18            MR. CHARLES:  -- and then deal --

19            THE COURT:  -- a question --

20            MR. CHARLES:  -- with the objection.

21            THE COURT:  -- before we start.  I see there's a

22    notice of filing bankruptcy by Asset --

23            MR. CHARLES:  Asset Resolution --

24            THE COURT:  -- Resolution.

25            MR. CHARLES:  -- Corporation.
```

1          THE COURT:  Does anybody contend that I can't go

2     forward on this motion because of that bankruptcy?  I'm not

3     suggesting that I do or don't.  I just want to know if anybody

4     contends that.

5          MR. HOWARD:  Your Honor --

6          MR. CHARLES:  We do --

7          MR. HOWARD:  -- I'm Randolph Howard on behalf of

8     Asset Resolution, LLC, the debtor.  My application to be

9     admitted as special counsel for Nevada has not been completed.

10    It is not before the Court.  I am very tentative to give away

11    anything.  I'm not authorized to speak for the debtor.

12         It strikes me that the debtor's claim is property of the

13    estate in the Southern District of New York, that it should all

14    other things being equal probably be litigated before you, and

15    that there's an automatic stay there.  I'm not at liberty to

16    tell you much more about that bankruptcy case.

17         THE COURT:  Okay.  So I guess there is not a -- it's

18    really up to you, Mr. Charles, because, you now, the problem

19    with stay violations is nothing happens to me.

20         The problem is if somebody contends it's a stay violation,

21    and I'm not saying it is because it's so tangential on whether

22    or not it's property of the estate.

23         So it seems to me it's just up to you to decide whether or

24    not we're going to go forward because the point is I don't know

25    what the Second Circuit law is in this area.

1           MR. CHARLES:  Right.

2           THE COURT:  Secondly, if the Second Circuit law is

3   that somehow some claim the property of the debtor may have is

4   property of the estate and stayed even though it's the debtor

5   seeking the recovery and/or I don't know what the

6   Second Circuit law as to void or voidability is as to

7   lift-stays, either, so I'll just leave it to you.

8           MR. CHARLES:  We're comfortable with proceeding.

9           THE COURT:  Okay.

10          MR. CHARLES:  I write the Norton Annual Survey on the

11  automatic stay, and I can't pretend to keep that in my

12  short-term memory.

13      But to my mind, this is just the same as plaintiff files a

14  bankruptcy petition.  You know, the best that you can get out

15  of those kinds of cases is if there is a counterclaim against a

16  plaintiff that's a claim against the debtor under 362(a)(1).

17      But a claim by the debtor that the debtor can prosecute or

18  not is not protected by the stay, and Courts are free to

19  dispose of claims asserted by debtors.

20          THE COURT:  Okay.  And in any case, only one of the

21  movants or the objectors --

22          MR. CHARLES:  Correct.

23          THE COURT:  -- is in bankruptcy, correct?

24          MR. CHARLES:  Correct.  And I'm not familiar enough

25  with its corporate structure to know how exactly it's related

```
 1    to --
 2              THE COURT:  Okay.
 3              MR. CHARLES:  -- the economic interest it asserts.
 4              THE COURT:  Okay.  All right.
 5              MR. CHARLES:  So --
 6              THE COURT:  Go ahead.
 7              MR. CHARLES:  So just --
 8              THE COURT:  On the motion, then.
 9              MR. CHARLES:  -- real quickly, and I'll then let
10    Silar speak for its objection, and then I'll address their
11    objection, but let me kind of work you through the why did we
12    send out a gigantic notice to all the creditors kinds of
13    issues.
14         This is the first interim request for distribution
15    authority from the Court.  It's clearly within your
16    postconfirmation jurisdiction.
17         Whatever else you might think about postconfirmation
18    jurisdiction, distributions to creditors are within that scope.
19    I know because there's because concern you'd also want to have
20    a sense of the dollars as opposed to the process.
21         And as a result of objections that either have been ruled
22    upon or are being ruled upon today, it's our understanding --
23    and let me just give you kind of a round number, a round number
24    round to the nearest million numbers.
25         About $936,000,000 in claims were filed.  As a result of
```

1    the process that has gone on to date, about 464,000,000 of

2    claims have been disallowed.

3        Another 80,000,000-ish were in various other baskets that

4    were disallowed because it has parts of multiple loans, and we

5    think that about 165,000,000 in claims should be allowed.

6        Part of this motion says here is a schedule.  We want to

7    allow the claims the way this schedule says.  And, for example,

8    there's a small claim of the Diversified Trust Deed Fund of

9    $128,000,000 and the First Trust Deed Fund which is assigned to

10    DTDF of like $7,000,000, so ish 135 of $165,000,000 in claims

11    are represented here before you, but those are filed claims.

12        We then have unresolved claims which are primarily direct

13    lenders whose loans we have not decided what position to take

14    with respect to an objection or not or it hasn't been ruled

15    upon by the Court.  The unresolved claims are rounded

16    $226,000,000, so that's out of filed claims.

17        You'll also recall from the schedules amended and amended

18    and amended in the Commercial Mortgage case there were rounded

19    $59,000,000 in scheduled claims.

20        The bulk of that is stolen principal in that $38,000,000

21    range, and we end up with out of the process of scheduled and

22    filed claims a total of 181,000,000.  So if this -- and we'll

23    true up the numbers after this hearing and after the order's

24    entered.

25        But in rounded numbers, we think there's $181,000,000 of

1    allowed claims, and we have not yet resolved rounded

2    $226,000,000 of claims, the vast bulk of which are direct

3    lenders.

4        So the first step of this motion says to you could we

5    please treat the claims that are set forth in the exhibit as

6    allowed and disallowed, and you would say, hey, tell me about

7    notice and due process.

8        A notice was sent to every lender on every loan that had a

9    little tear-sheet amount that said here is what we think your

10   claims were, here's what we think has been disallowed, here's

11   what we think should be allowed, and here are some that are

12   unresolved.

13       And we've gotten calls, and Mr. Berman gets the calls, I

14   do, and we answer every call.  And in some respects, we've

15   actually agreed with claimants whose claims had been disallowed

16   earlier that there was a mistake made.

17       And we've asked to have some of those claims brought back

18   into the allowed pot.  And in other circumstances, we've just

19   answered their questions.  Obviously, no one is here before you

20   today.

21       So from the perspective of giving creditors, particularly,

22   the direct lenders, notice that here is how we think your

23   claims play out, we think we have given that notice.

24       We have some anecdotal evidence from the calls back that

25   that notice was received, and it was precisely designed to try

1    and tell them here is the claims you're talking about.

2        We're still getting calls. I got a very nice call from a

3    lady today. She's got $1100, and why is it in this bucket or

4    that bucket, and a paralegal will call her back and answer that

5    questions.

6        So we think that you should be comfortable with the idea

7    of allowing the claims as requested, disallowing the claims

8    that you've already determined to be disallowed, and leaving

9    the other bucket as unresolved.

10       The second step, then, under the plan is how do you

11   distribute, and there are cases where they've gone through

12   complexities about how do you reserve for disputed claims.

13   This plan does not do that, and our proposal is we reserve for

14   every unresolved claim as if it were an allowed claim.

15       So instead of $1 going out to a creditor out of the

16   $20,000,000 pot, $1 going to allowed claims, we're going to

17   hold back that $1 if it's attributable to an unresolved claim.

18       So the math if you will between allowed and unresolved

19   claims is about 44-and-a-half percent of the pot appears to be

20   allowed and about 55-and-a-half percent of the pot appears to

21   be still unresolved.

22       And so DSI working with someone who's going to write a lot

23   of checks -- I think Mr. Berman is probably going to pass

24   writing checks this time, but, perhaps, I'm wrong -- would be

25   sending out interim distributions to the folks in the allowed

1    pot as long as the check is at least I think $5.  We're trying

2    to save transaction costs there, and so that to us is the

3    complex, but not contested part of this process.

4         And so, really, the question before you is the trustee

5    says he has $20,000,000 available for distribution.  That's

6    over what he reasonably estimates is necessary to fund the

7    Trust, including the ongoing litigation to try and recover the

8    balance of the assets.

9         And we have asked you for authority to distribute that

10   $20,000,000.  And as to that, Silar has objected, and what I

11   would do is turn it over to them to talk about their objection.

12             THE COURT:  Okay.

13        (Colloquy not on the record.)

14             MR. HOWARD:  Your Honor, Randolph Howard again

15   representing only Asset Resolution, LLC --

16             THE COURT:  Oh --

17             MR. HOWARD:  -- not either --

18             THE COURT:  -- you don't represent Silar?

19             MR. HOWARD:  We did when we filed the opposition, but

20   the interim filing of the Chapter 11 by Asset Resolution and

21   our pending application as special counsel I believe prevents

22   us from representing the two Silar entities --

23             THE COURT:  But Silar --

24             MR. HOWARD:  -- because --

25             THE COURT:  I don't think Silar even filed.

1          MR. HOWARD:  The opposition was filed for three

2     clients, your Honor.

3          THE COURT:  Right.

4          MR. HOWARD:  Silar, Silar Advisors, and

5     Asset Resolution.

6          THE COURT:  But I didn't see Silar Advisors or

7     Silar Special Opportunities on that list.  Were they?  Does

8     anybody have that list with them?

9          MR. HOWARD:  I'm sorry.  What list?

10          THE COURT:  The notice of filing.

11          MR. CHARLES:  I think what Mr. Howard is saying is

12     Asset Resolution, the debtor, has elected to hire him, and so

13     he can't represent Silar, and your question is, well, then who

14     is representing Silar.

15          MR. HOWARD:  And the answer is there's no one here

16     today representing Silar, your Honor.

17          THE COURT:  Okay.  All right.

18          MR. HOWARD:  It --

19          THE COURT:  So go ahead as to Asset Resolution, then,

20     I guess.

21          MR. HOWARD:  It is our position that the filing of

22     our adversary complaint presents this Court with a

23     postconfirmation breach of the asset purchase agreement that we

24     believe is attributable, in part, to the Trust.  That the Trust

25     has a responsibility for that to the entire extent of the

1    breach.

2        It would be, first off, I think distributing or affecting

3    an asset of the Asset Resolution Chapter 11 case, a

4    dually-scheduled asset, to distribute its portion of that fund

5    with prejudice to that claim.

6        And I believe it would be imprudent to tell the magnitude

7    of the claim has been at least determined to the satisfaction

8    of the trustee to go ahead and make a distribution faced with

9    that postconfirmation claim.

10       Your Honor, I don't believe that today's proceeding can go

11   forward not because of any automatic-stay issue, but only

12   because property of the Asset Resolution, LLC, Chapter 11 case

13   would be distributed or disposed of or made unavailable as a

14   result of any ruling distributing proceeds today.

15           THE COURT:  Okay.  Anything else?  All right.

16   Thank you.

17           MR. CHARLES:  You have read our reply, and so I'm not

18   going to regurgitate it for you, but let's start back with an

19   experience that you and I and Mr. Levinson and Mr. Tucker share

20   and Mr. Howard does not which is the auction with respect to

21   the servicing rights and the order confirming the plan.

22       And there are two things that are patent from that record

23   available to Mr. Howard or anyone else who wants to look at

24   that record.

25       One is the direct lenders were screaming like hell about

1    having their servicing rights transferred and, in particular,

2    because they didn't trust Compass, and they had concerns about

3    how servicing fees were going to be dealt with.

4        For that reason -- and we have quoted to you, for example,

5    from the plan --  there are explicit protections in the

6    documents that essentially reserve the issues of who is right

7    as between Compass and the direct lenders over a variety of

8    issues.

9        You'll recall there were the Section 3 termination rights,

10   and there were concerns about the waterfall, and all sorts of

11   concerns.  Those were known.  They are reserved in the

12   confirmation documents for another day.

13       When the order confirming the plan was affirmed -- and

14   we've cited this to you in our brief -- the district court

15   said, essentially, one of the reasons why I'm confirming the

16   plan over the direct-lenders' appeal and their objections is

17   you're not affected.

18       Your forum, your day, is in court with Compass somewhere

19   else, but that's not what is determined by the confirmation of

20   this plan.

21       The premise of the argument that Mr. Howard makes which is

22   that the trustee should reserve some amount for a claim by

23   Asset Resolution Corporation as the -- I don't know how --

24   successor to Compass is that we have a claim.

25       Where would you get a claim?  You'd get a claim out of the

1    asset purchase agreement.  You probably don't remember because

2    you weren't as amused by it as I was.

3        But you were pretty critical with some of the provisions

4    in the asset purchase agreement and added some very good

5    suggestions with respect to that document.

6        Well, one of the things that you can see when you read

7    it -- and it's again in this Court's record -- is there isn't a

8    darn thing that these folks can rely on that would be in the

9    nature of a representation or a warranty by Commercial Mortgage

10   that says here is how much money you're going to get out of the

11   servicing rights or here is some position as to the validity of

12   the servicing rights.

13       There is nothing like that in that asset purchase

14   agreement, and you know that from two reasons.  One is read it.

15   You can't find it.

16       And the second reason is because the district court in the

17   order affirming the order confirming the plan said that's not

18   what's happened here.

19       We did not leverage the direct lenders through the asset

20   purchase agreement as approved by the order confirming the

21   plan.

22       Another way that I didn't realize until I reread their

23   objection today that you get that is the only provision in the

24   asset purchase agreement they cite is a provision in

25   Section 7.3 which they went -- if you read their response,

1   there's a little snip from Section 7.3 that they say that means

2   we were getting valuable servicing rights.  You must have

3   breached your contract to get us there.

4         Well, 7.3 are in the covenants of purchaser.  In other

5   words, in the Compass covenants, there is this language that

6   they say creates an obligation of Commercial Mortgage to sell

7   it which intuitively makes no sense.

8         And if you read the first sentence of the section that

9   they are stripping some language out of, it says, "Nothing

10  contained in this agreement shall modify the obligations owed

11  to the lender by the loan servicer or rights of the lenders

12  against the loan servicer or the rights of the loan servicer

13  against the lenders under the applicable servicing agreements

14  and otherwise applicable law."

15        So whatever that covenant's provision dealt with, it

16  certainly isn't the Commercial Mortgage representing a

17  warranting to Compass here is how much you're getting out of

18  selling servicing rights or here is how much or here is some

19  representation as to the nature and the quality of the

20  servicing rights.  We did not know.

21        So at a substantive level, there isn't anything that

22  you could touch and say a basis for a breach of

23  contract.

24        At a procedural level, we point out that whatever this

25  claim is it appears to run square into the plan injunction

1    which essentially says you can't be taking actions against the

2    postconfirmation entities.  And by suing the Trust, they run

3    clearly into Section 4(h) of the plan injunction.

4        It was suggested by Mr. Howard just now words to the

5    effect of it's not exactly clear how.  But to some extent, the

6    Trust has some liability for the obligations of

7    Commercial Mortgage.  In fact, that's not true, and the plan

8    and the confirmation order say exactly the opposite.

9        The Trust's obligations are under the plan to the

10    unsecured creditors as beneficiaries, so what do you have ARC

11    or Silar?  You have at best an expense of administration.

12        Well, what should you have done with that?  You should

13    have filed an expense of administration.  What was the deadline

14    for that?  30 days after the effective date.  It's in the order

15    confirming the plan.

16        And you'll remember Silar's counsel from New York,

17    George -- I'm blanking on his last name -- signed off on that

18    confirmation order.  There was a deadline to file expenses of

19    administration.  Did they do that in 2007?  No.  2008?  No.

20        Now, just before the $20,000,000 is to be distributed,

21    whatever else is true, it's clear that this alleged

22    administrative expense is untimely because it does not fall

23    within the parameters of the confirmation order which also pick

24    up the plan as to the deadline to file expenses of

25    administration.

1        And the reason why that deadline is there is for just this

2    problem.  We do not want a situation where someone says, well,

3    back in December before the plan was confirmed I signed an

4    agreement, and now I've decided two-and-a-half years later I

5    have a claim.  It's too late.  You could have made your claim,

6    and you chose not to.

7        Their argument that there was unjust enrichment flows I

8    think from a serious misreading of the asset purchase

9    agreement.

10        You are told in the objection Compass paid sellers

11    $67,000,000 for these collective rights in an unallocated

12    Section 363 asset sale.

13        And if you keep it in your short-term memory which you

14    don't because you're a judge, and you're too busy, you know

15    that's just not true.

16        There was an FTDF portion of the purchase price for

17    $48,000,000.  There was a Commercial Mortgage portion for

18    $8,000,000 which included the sale of interests in notes that

19    Commercial Mortgage had.

20        And there was an $11,000,000 overbid that Mr. Merola and I

21    had a big fight about, and you eventually confirmed a

22    settlement where those were split between Commercial Mortgage

23    and the FTDF committee.

24        There is no claim against FTDF for the sale of

25    Commercial Mortgage servicing rights, but that's who they've

1    sued in their complaint along with the Trust.

2         And it makes no sense that whatever you'd estimate their

3    claim at which I would say on a substantive level and a

4    procedural level is zero that the numerator or the denominator

5    they're staring off with, $67,000,000, is just wrong, and it's

6    pretty close to a misrepresentation to you with respect to the

7    nature of that agreement.

8         So for these reasons, the trustee did consider the

9    Asset Resolution Corporation and Silar objection, and he did

10   consider to what extent would it be prudent to reserve funds to

11   deal with this objection.

12        And our reaction is it would be prudent for whoever filed

13   this objection to consider their obligations under Rule 11, but

14   it is not necessary for the Trust to hold back money from the

15   beneficiaries who have not received a penny on their claims

16   since the Commercial Mortgage bankruptcy case was filed in

17   March of 2006.  We'd ask that you approve the distribution.

18              THE COURT:  Okay.

19              MR. HOWARD:  Your Honor, if I might?

20              THE COURT:  All right.

21              MR. HOWARD:  Mr. Charles, notwithstanding his pointed

22   jab at me, has asked this Court, essentially, to prejudge our

23   complaint without a motion to dismiss, without the benefit of

24   briefing from our side.  I don't believe that is the

25   appropriate function here --

1          THE COURT:  Well --

2          MR. HOWARD:  -- today.

3          THE COURT:  -- but you're asking for a verdict in

4     your favor without even filing a preliminary injunction.

5          MR. HOWARD:  I'm not asking for anything other than

6     that this Court decide the matter in a measured, timely matter

7     and give due deference to the procedures inherent to someone

8     who came to this court with $67,000,000 and handed it to a

9     Chapter 11 debtor to buy assets.

10         Now, we're asking this Court to review that contract to

11    see if we have the damage claims we think we have.  Contrary to

12    what I understood Mr. Charles to say, the asset purchase

13    agreement says the total asset purchase price shall be valid

14    only with regard to all assets as a whole.  It is not separable

15    to any extent.

16         I don't know that we can tell you what our measure of

17    damages is today exactly, but I'll tell you that we have a

18    schedule that was put together by the chief restructuring

19    officer and the purchaser to reflect adjustments in the various

20    assets and modify the asset purchase agreement dated

21    December 8th, 2006, that includes liquidated sums due for

22    servicing fees as of accrual through 10/31/2006.

23         For example, one of those, the total outstanding

24    postpetition servicing fee and only servicing fee, not the

25    waterfall issue, the other issues, or any of those, is $257,000

1    relating to property that's commonly known as the Gess

2    property.  We recently received only 90-some-thousand dollars

3    in payment on that.

4         Our point is we didn't get what we paid for.  We'd like to

5    have this Court adjudicate how much we are entitled to receive

6    by way of compensation for that breach of contract.

7         We believe the breach-of-contract claim reaches into the

8    hands of the current trust, and I'd ask this Court merely to

9    defer the distribution.

10        Don't make it unavailable until you've had a chance to

11   look at this and deal with it in a measured manner as this

12   Court deals with everything else.

13        I think the Dean versus TWA case suggests -- at least my

14   reading of it infers -- that this Court should wait before

15   taking any action to recognize comity of the pending matter in

16   the Southern District of New York and shouldn't take action

17   without further agreement, leave of that Court, to make binding

18   decisions that would deal with that.

19             THE COURT:  But didn't Compass file an action for

20   breach of contract which was dismissed?

21             MR. HOWARD:  There was an action filed by Compass for

22   recision of the asset purchase agreement that was dismissed,

23   your Honor --

24             THE COURT:  Right.  Okay.

25             MR. HOWARD:  -- not for a breach of the contract.

```
 1            THE COURT:  But it was dismissed.

 2            MR. HOWARD:  It was dismissed, your Honor.

 3            THE COURT:  And it's based on the same facts.

 4       (Colloquy not on the record.)

 5            MR. HOWARD:  I don't believe so.  The facts relating

 6   to this present complaint weren't in existence as of the date

 7   of the dismissal.

 8            THE COURT:  And isn't the only reason you didn't get

 9   the Gess payments because Judge Jones ruled that by virtue of

10   the contract you weren't entitled to them?

11            MR. HOWARD:  And I'm not arguing with Judge Jones,

12   and I don't know --

13            THE COURT:  But that's the reason --

14            MR. HOWARD:  I --

15            THE COURT:  -- you didn't get --

16            MR. HOWARD:  I --

17            THE COURT:  -- the --

18            MR. HOWARD:  I wasn't --

19            THE COURT:  -- Gess payments.

20            MR. HOWARD:  I wasn't there.

21            THE COURT:  Okay.

22            MR. HOWARD:  All I'm saying is the schedule of assets

23   purchased by this Court said we had a $257,000 servicing fee on

24   the Gess property, and Judge Jones ruled we had a $90,000.

25            THE COURT:  Right.  But no contract.  There was never
```

1     a contract that said that.

2           MR. HOWARD:  Oh, I believe quite clearly, your Honor,

3     that the document I'm referring to -- and it's hard to do this

4     piecemeal.

5           THE COURT:  Not the asset purchase agreement.

6           MR. HOWARD:  It's a modification of the asset

7     purchase agreement that I believe is binding on all of the

8     parties to the asset purchase agreement and part of --

9           THE COURT:  But Judge Jones ruled you weren't

10    entitled to that, correct?

11       (Colloquy not on the record.)

12          THE COURT:  That's why you're claiming you weren't --

13          MR. HOWARD:  I'm not certain that Judge Jones ruled

14    that we were not entitled to it as opposed to it wasn't

15    available.  There was only $8,000,000.

16       And for whatever reason, he awarded not the contractual

17    sum, but some other sum.  And since I wasn't there, I really

18    can't --

19          THE COURT:  Okay.

20          MS. WINDLER:  Your Honor, it's Katherine Windler.  I

21    was at that hearing if the Court would like to hear that.

22          THE COURT:  So he ruled, basically, that you weren't

23    entitled to it under his contract interpretation.

24          MS. WINDLER:  I believe that's not correct.

25          THE COURT:  Okay.

1          MS. WINDLER:  I believe Mr. -- or excuse me.

2    Judge Jones said on numerous occasions that he was going to

3    make a ruling on Gess.

4          But that he would withhold a final adjudication because he

5    wasn't sure whether or not Compass and its successors were

6    entitled to them.

7          And that his rulings would be subject to a revision.  It

8    would be subject to an accomodation at trial.  It would be

9    subject --

10          THE COURT:  Well, then how --

11          MS. WINDLER:  -- to setoffs.

12          THE COURT:  -- do we have a breach of contract if he

13    hasn't decided you're not entitled to it?

14          MS. WINDLER:  The essence of the breach of contract

15    in my mind is this.  The trustee by virtue of the asset

16    purchase agreement and the trustee's operating documents which,

17    presumably, Mr. Berman signed when he agreed to take on the

18    duties of a trustee said we will deliver to you, the buyer, A,

19    B, and C.

20          The direct lenders are now taking the position in the

21    district court litigation that the buyer is not entitled to A,

22    B, and C.  The buyer is only entitled to A.

23          With respect to at least one property and potentially

24    others, Judge Jones has said as to this property right now

25    subject to later offsets if I'm wrong -- and on multiple

1    occasions, he said I might be wrong, and I don't know if I'm

2    right because I haven't heard all the evidence.

3        But on this property, all I'm going to give you is this

4    because I don't think that the trustee delivered you B and C.

5    That's not what Judge Riegle's order says.

6        So if, in fact, the seller which here was the debtor who

7    then subsequently became the trustee, and the trustee took on

8    those obligations under the asset purchase agreement and the

9    plan-confirmation order as well as the obligations he took on

10   under his trust, if they, in fact, failed to deliver those

11   items which it appears to be now the ruling or shortly will be

12   the ruling of Judge Jones, it becomes imperative that at that

13   moment we prevent any loss of the potential correct

14   distribution of assets, not stop it forever, but at least delay

15   it until a point in time when the parties can sit down and

16   determine precisely what that is.

17       And it is clear that no one on the Trust's side of the

18   equation has spoken to us about the claim.  We didn't file an

19   administrative claim under the bar date because a bar date for

20   an administrative claim is precisely that.  It's a claim that

21   arises postpetition, preconfirmation.

22       We're not asserting a postpetition of USA preconfirmation

23   claim.  The claim arose at the time of the delivery of the

24   assets and was simply brought more to light.

25       We're not arguing that there was a guarantee as to what

1    those assets would be worth or what the nature of those would

2    be or what value would later be put onto those assets.

3         The argument is that this Court and this Court's ruling

4    and the postconfirmation order says, specifically, we will

5    deliver you these assets.

6         Judge Jones has now said you do not have those assets;

7    therefore, we come back to seeing we probably have a claim

8    against the Trust.

9         And if, in fact, the Trust failed to deliver them, then

10   the Trust would pay the damages related to that failure to

11   deliver which is in the asset purchase agreement.  Mr. Howard

12   has it.

13              THE COURT:  But the Trust --

14              MS. WINDLER:  No.  The other one.

15              THE COURT:  -- never has attempted to take any

16   servicing the Trust -- and I know the answer to this, but I

17   want it clear for the record.

18        The Trust has no part in that litigation, correct?  The

19   litigating trust has never argued in any manner against your

20   rights to any funds in that litigation that's going on.  It's

21   all with the direct lenders, correct?

22              MS. WINDLER:  I can't answer that correct for this

23   reason.  I think you're basically right, but the reason I can't

24   that is because there have been issues with respect to the

25   prepaid-interest rights that the Trust held.

```
 1         And those prepaid-interest rights have come before
 2    Judge Jones, and so the Trust's right to collect those has been
 3    before that Court.
 4              THE COURT:  But as far as --
 5              MS. WINDLER:  So --
 6              THE COURT:  -- anyone, quote, "preventing" you from
 7    getting the funds or receiving the assets, the Trust has had no
 8    part of that, correct?
 9              MS. WINDLER:  I --
10              THE COURT:  It's all the direct lenders are
11    contending that the contracts don't say what you say they said,
12    right?
13              MS. WINDLER:  That's not correct.  The Trust and the
14    trustees may not have taken an affirmative --
15              THE COURT:  They're not parties --
16              MS. WINDLER:  -- open --
17              THE COURT:  -- to --
18              MS. WINDLER:  -- step --
19              THE COURT:  -- that litigation, right?
20              MS. WINDLER:  -- that is correct --
21              THE COURT:  Okay.
22              MS. WINDLER:  -- to try to prevent those assets from
23    being there.
24         But the asset purchase agreement clearly says in
25    paragraph 3.4 that the mortgage notes and the mortgages and
```

1    other legal documents in connection with the plan are valid and

2    binding obligations.

3        And then you go to the breach section which is 8.2 which

4    lays out remedies for a breach only if it occurs preclosing,

5    and that's what Compass brought.

6        What Compass brought when they said we want to rescind

7    under 8.2, Subsection C is a right to rescind or terminate the

8    agreement under certain circumstances.

9        But the facts under which they moved have nothing to do

10   with the facts under which we have moved.  Our position --

11           THE COURT:  And you've been in this litigation for

12   three years now, right?  And you're just now bringing this

13   motion or you just now filed the new complaint.

14           MS. WINDLER:  I believe.  I personally was not, but I

15   do believe that Compass was in the litigation, and Silar was in

16   the litigation from May of '07, and Asset Resolution moved to

17   intervene in that which was held at a hearing in March of 2009.

18           THE COURT:  Right.  But they're all related to Silar.

19   They're all the same people because that's what you've been

20   telling me today that these people are all related.

21           MS. WINDLER:  Well, Asset Resolution was set up as a

22   special-purpose entity to conduct the foreclosure which is a

23   very common way of foreclosing on assets when a secured lender

24   forecloses on a particular pool of assets.

25           THE COURT:  Okay.

1          MS. WINDLER:  And --

2          THE COURT:  So they have been involved.  You've been

3    involved for two-and-a-half years, and this lawsuit was just

4    now filed right after the distribution motion was filed.

5          MS. WINDLER:  The filing of this complaint was not

6    based on the filing of the distribution.  It was based on the

7    ruling of Judge Jones that we did not receive or purchase what

8    the confirmation order says we purchased.

9          THE COURT:  Okay.  All right.  Thank you.

10       (Colloquy not on the record.)

11         MR. CHARLES:  If you are troubled by the language of

12   the asset purchase agreement, it's filed at Docket 2164.

13         THE COURT:  Hold on a second.

14         MR. CHARLES:  There was the notice of filing the

15   Compass asset purchase agreement.  Exhibit A is part 1 of that.

16   Exhibit B is part 2.

17         THE COURT:  I should know this.  Oh, there it is.  I

18   should have this case number down by memory now, but --

19         MR. CHARLES:  06- --

20         THE COURT:  25.

21         MR. CHARLES:  -- 10725.

22         THE COURT:  And docket number what?

23         MR. CHARLES:  2164.

24         THE COURT:  64.

25         MR. CHARLES:  It's the first exhibit.

1          THE COURT:  I looked at it earlier today, but I

2     didn't bring it out with me.

3          (Colloquy not on the record.)

4          MR. HOWARD:  Rob --

5          THE COURT:  Oops.

6          MR. HOWARD:  -- is that the December 8th version?

7          MR. CHARLES:  This is the version, the only version,

8     that's been filed with the court.

9          MR. HOWARD:  There was several attached plans.

10         MR. CHARLES:  And this is the Compass asset purchase

11    agreement dated December 8, 2006.

12         MR. HOWARD:  Thank you.

13         MR. CHARLES:  You're welcome, Counsel.

14     And I apologize for taking your time on the bench.  You're

15    probably going to want us -- but if I could just give you sort

16    of the road map, so you can look at it.

17         THE COURT:  2164.  Here we go.  I've got it.

18         MR. CHARLES:  Yes, ma'am.

19         THE COURT:  Exhibit A or the agreement?

20         MR. CHARLES:  The first.  There are two exhibits.

21         THE COURT:  Uh-huh.

22         MR. CHARLES:  And the first one is the first half

23    of --

24         THE COURT:  Exhibit A?

25         MR. CHARLES:  Yes, ma'am.

1           THE COURT:  Okay.

2           MR. CHARLES:  And if you then go into -- what counsel

3     was just referring you to starts in Article 3, Statements of

4     USACM, on page 12.

5           THE COURT:  Okay.  Okay.

6           MR. CHARLES:  These are the reps and warranties --

7           THE COURT:  Um-h'm.

8           MR. CHARLES:  -- of USACM.

9           THE COURT:  Okay.

10          MR. CHARLES:  And what she was particularly referring

11    to is on the next page, Statements Regarding the Assets.

12          THE COURT:  Right.  Got it.

13          MR. CHARLES:  And, for example --

14          THE COURT:  Oh, closing-condition statements.

15          MR. CHARLES:  Absolutely.  And so they're either

16    statements up to or through the closing condition.  They're

17    certainly not after.

18        And, for example, B is the outstanding principal balance

19    with regard to each of the loans.  That's the pieces of

20    interests in loans that Commercial Mortgage was selling.  Those

21    are represented, and they are scheduled.

22        There is no representation, and there is no schedule

23    that says we're giving you this many dollars of servicing

24    rights.

25        And if you are interested in comparing how this agreement

1    treated different pieces of the puzzle -- it is true,

2    Mr. Howard, that there is no allocation agreed to by Compass.

3        But if you'd go back to Section 2.2, Purchase Price, which

4    is a little bit above what you're looking at --

5            THE COURT:  Right.

6            MR. CHARLES:  -- look at how the agreement allocates

7    the purchase price for the debtors, and that's where we get the

8    48,000,000 for First Trust Deed Fund.  If you --

9            THE COURT:  Right.

10           MR. CHARLES:  There is a schedule for First Trust

11   Deed Fund.  And if the numbers are wrong as the amounts change

12   for First Trust Deed Fund, there are amounts that change --

13   excuse me -- change in the purchase price.

14       Look at one more thing because counsel just said something

15   that I thought was amazing.  Look if you would, please, at 8.2

16   which is their remedies provision which was -- this is going to

17   be my summary-judgment motion.  But as long as we've brought it

18   up, what the heck --

19           THE COURT:  Right.

20           MR. CHARLES:  -- let's talk about it.

21       This is the remedies for a breach by sellers is 8.2, so

22   Commercial Mortgage and FTDF are the sellers, and you'll see

23   this is an exclusive-remedies provision.

24       It essentially says if there is a breach you can close,

25   you can proceed for a specific performance, or you can

1    terminate, and those are your remedies.

2        Now, the argument is, well, those are only for preclosing

3    breaches.  If we didn't know there was a breach, then the

4    exclusive-remedies provision won't apply, and I guess we're

5    going to have to brief that.

6        But to me, it's very interesting that they are now looking

7    at their exclusive-remedies provision which doesn't allow for a

8    breach-of-contract provision, and they're trying to argue their

9    way around it.

10        But the last thing that counsel said, it's incredibly

11    important to sit back and look at the parties.  You're told the

12    trustee agreed to do certain things in terms of deliveries.

13    That is not true.

14        This agreement closed in February of 2007 when

15    Commercial Mortgage is the seller, and the documents that they

16    have that are signed are signed by Mr. Allison on behalf of

17    Commercial Mortgage.

18        The Trust comes into effect in March of 2007 on the

19    effective date of the plan.  Mr. Berman did not sign anything.

20    He did not deliver anything.  This was a closed transaction

21    when it was brought to the Trust.

22        And the proposition that the Trust is liable for this

23    alleged liability of Commercial Mortgage just makes no sense to

24    me at all.

25        So, again, with respect -- and I guess maybe last -- I

1    never thought we'd get this far.  But if they're asking you to

2    enjoin a transfer of $20,000,000 -- and we are told by

3    Mr. Howard you should follow the procedures for like a

4    preliminary injunction -- one of those procedures ordinarily

5    would be security, and I am sure the unsecured creditors would

6    like to see a substantial security if you were at all inclined.

7         There is, of course, no offer of any of that.  There's no

8    effort made to talk about any prejudgment remedy under Nevada

9    law or federal law.  There is no procedure being followed here

10   except please hold up a distribution, and we just think that's

11   not appropriate.

12              THE COURT:  Okay.  Thank you.

13              MR. LEVINSON:  Marc Levinson for Diversified.  I want

14   to address the merits, but I did want to talk to your timing

15   issue because that's very important to us.

16         Your Honor knows from having presided over this case for

17   so long that the Diversified investors, all 1200 of them who

18   invested $150,000,000, were the primary victims of this whole

19   scheme.

20         So far to date, we have distributed $13,000,000 on total

21   claims of 150.  And not even counting the lost value of money,

22   we have distributed about 8.7 percent.

23         Finally, the Trust has made this distribution.  We're

24   thankful that it did.  Diamond McCarthy and Mr. Berman and

25   Mr. Charles' firm have done a great job in collecting assets.

1        Our share of this would be at least $5,000,000.  We are

2    one third of the total claims in this case today counting the

3    unallowed or the claims that have not yet been allowed as still

4    up in the air.

5        Of the allowed claims, we're 75 percent of the allowed

6    claims.  We are, in part, the net beneficiaries of this.  This

7    distribution to us would be at least $5,000,000.

8        It would be another 3.34 percent which would get us up to

9    a total of still only 12 percent which is significantly lower

10   than any of the other investors in this case.

11       Compass bought this property and closed the deal as we've

12   heard two-and-a-half years ago and has sat on its rights ever

13   since then.

14       At this last minute to come in now and ask that the

15   Diversified investors and the other creditors, unsecured

16   creditors, of this estate who haven't been paid anything since

17   the filing of the case, and that includes the people, remember,

18   whose moneys was stolen, the stolen principal, seems to me to

19   be just outrageous at this point in time, so we would ask that

20   you approve the distribution.

21           THE COURT:  Okay.  Ms. Chubb, you look like you're

22   anxious to --

23       (Colloquy not on the record.)

24           THE COURT:  -- since I know you're very much involved

25   in the federal court litigation.

1           MS. CHUBB:  Well, I have been here for a long time,

2    and I think what's happening here is that as you may recall I

3    think it was I who at one point stood up and said, your Honor,

4    if all they're buying is whatever USA had can we put that in

5    the order, and it got in the order, and there are a lot of

6    other things that got said in there, but that was the bottom

7    line.

8         And now that Judge Jones has interpreted the

9    loan-servicing agreements, and they're not happy with that,

10   they want to contend that they should have gotten what they

11   thought they were getting or what they hoped they would get,

12   but they didn't.

13        So they want to stay the distribution, but that just

14   doesn't make any sense because they bought what they bought,

15   and we all know that.

16        And if Judge Jones who is the only person who has

17   interpreted the LSAs at this point says they don't get

18   something, they don't get it, and they can't get it some other

19   way by coming here and asking you to stay the distribution.

20           THE COURT:  And let me make it clear again for the

21   record.  The litigation trust is not a party to that litigation

22   whatsoever.  They have done nothing --

23           MS. CHUBB:  That's --

24           THE COURT:  -- in that court to stop, halt, whatever,

25   do anything with respect to the distributions, correct?

```
1           MS. CHUBB:  That's correct.

2           THE COURT:  Okay.

3           MS. CHUBB:  They've missed out on all that fun.

4           THE COURT:  Okay.

5           MS. CHUBB:  Yeah.

6           THE COURT:  All right.  Well, I'm going to grant

7   the motion for a distribution.  Let me make my findings

8   orally.

9        First, we have the big problem that procedurally you can't

10  just move to stop a distribution.  It would have to be brought

11  by a motion for a temporary restraining order or a preliminary

12  injunction, but let's get over that procedural difficulty for a

13  moment, and let's look at the merits.

14       Basically, the objectors are asking me to second-guess and

15  collaterally attack Judge Jones' ruling.  One of two things

16  happened.  Either we don't have a breach of contract, yet,

17  because he hasn't finally decided or if he has decided all he

18  has done is interpreted the contracts.

19       And, Mr. Howard, you don't share in the knowledge that all

20  of us have had about it was quite clear -- and that was part of

21  the appeal -- that all Compass got was whatever rights, so it

22  was almost like a quitclaim.

23       Whatever rights the debtors had in it -- excuse me -- the

24  debtors had to those servicing agreements, USA Commercial

25  Mortgage had, that's what Compass bought was basically it.
```

1          Secondly, with respect to the representations and

2    warranties, I don't see -- they did deliver the documents to

3    you.  You got delivered everything they had.

4          The fact that Judge Jones has interpreted that to

5    mean something than you thought was different is not a

6    breach.

7          Secondly, I find it highly unlikely that you would have

8    any remedy.  Section 8.2 appears to limit all your remedies to

9    -- there are no remedies now based upon the remedy section.

10         Compass was fully aware of these issues before you

11   actually closed because they were brought up at the various

12   hearings we had.  There was even a discussion on the record

13   about the rights to terminate and not terminate.

14         I also find it's too late.  I think you suffer from

15   laches.  Also, there's been no showing whatsoever that these

16   objectors had rights to these funds.

17         I mean, you just say that they're the servicers now, but

18   we don't even know for sure who was or was not supposed to be

19   the servicer.

20         I will presume for the moment that you did inherit the

21   rights to Compass.  I'll make that assumption, but that's not

22   showing in your pleadings, but I will make that assumption.

23         But, more importantly, there is nothing that shows that

24   this would be an obligation that would run against the Trust.

25   The Trust did none of these things.

1      There is no breach of contract by the Trust.  It's merely

2  the separate entity that's in charge of disbursing the funds

3  that it has collected.

4      So I find that any kind of likelihood of success is slim

5  to nil, and that no funds should be set aside for the

6  disbursement, and that the trustee may disburse the funds, and

7  those are my oral findings and conclusions.

8      I also find I have subject-matter jurisdiction because

9  this clearly affects the implementation of the plan.  The

10  objection I could rule on because it affects the distribution.

11      They have brought a complaint here, although they have not

12  sued on that complaint in this objection.  All right.  So thank

13  you on that, and we need to have a -- we have a few other

14  matters.

15           MR. HOWARD:  Your Honor --

16           THE COURT:  Um-h'm.

17           MR. HOWARD:  -- just briefly.  I'm not arguing, but

18  will you prefer that we bring on any application for a TRO, a

19  preliminary injunction?  If not, I'm fine with that part of the

20  ruling.  But if that's --

21           THE COURT:  No.  I'm --

22           MR. HOWARD:  -- the --

23           THE COURT:  I find too -- I'll do it in the

24  alternative.

25           MR. HOWARD:  Okay.  Thank you.

1          THE COURT:  I'm not going to make it on the

2     procedural grounds.  I'm going to go to the merits as well to

3     save you that effort, quiet frankly.

4          (Colloquy not on the record.)

5          MR. HOWARD:  And the comments this Court made with

6     respect to our complaint, are they without prejudice to hearing

7     the matter on motion to dismiss, perhaps --

8          THE COURT:  I mean --

9          MR. HOWARD:  -- (indiscernible)?

10         THE COURT:  -- you know, it's a separate motion.  I'm

11    ruling on the distribution.  I've told you what my thinking is

12    this way.

13         If I were to assume this was preliminary injunction -- so

14    it's true.  I mean, anytime, it -- if you had brought it as a

15    preliminary injunction, I could rule this way, and then, later,

16    you could convince me to the contrary just like any motion for

17    a preliminary injunction would be, so, no, it's not.

18         It's, obviously, without prejudice to the merits of your

19    complaint.  You've obviously had the benefit of my thinking

20    now.  I don't know how the law's going to change, but it's

21    without prejudice, obviously.  All right.

22         Thank you.

23         MR. HOWARD:  Thank you --

24         THE COURT:  Mr. --

25         MR. HOWARD:  -- your Honor.

1          THE COURT:  Before we go to the USA Investment

2    Partners, Mr. Hinderaker, are you still on?  Do you want to get

3    back to those claims, so we can finish that up?

4          MR. HINDERAKER:  Yes, your Honor, I am, and I have

5    been through them.  First, I want to apologize for these errors

6    today.

7      They were sort of a systemic issue that arose because we

8    had some new people working on these, and I think we've looked

9    into that and corrected it, and, again, I'm sorry for this, but

10   there was six items that you pointed out --

11          THE COURT:  Now, let me go first --

12          MR. HINDERAKER:  -- on the --

13          THE COURT:  -- to the 8th omnibus.

14          MR. HINDERAKER:  Yes.  On the 8th omnibus, I went

15   back.  We did not file a notice of errata on this one, but you

16   are correct that the notice was filed a second time, instead of

17   the exhibits, so there is I think two ways, perhaps, we could

18   handle this.

19      One would be for me to go back and confirm that the

20   mailing was done properly and provide you with confirmation of

21   that.

22      In which case, I think you could sustain this objection or

23   I could just refile it and have it heard at a future omnibus

24   hearing.

25          THE COURT:  How many -- I'm just concerned about

1   delaying distributions.  How would this affect delaying

2   distributions?

3           MR. HINDERAKER:  I think we could file the notice.

4   And if your Honor could grant or sustain the objection once

5   we've filed the notice confirming that or the notice of errata

6   confirming that the notice was correct --

7           THE COURT:  Okay.

8           MR. HINDERAKER:  -- then it shouldn't delay --

9           THE COURT:  Okay.

10          MR. HINDERAKER:  -- the distribution.

11          THE COURT:  So you're sure it was sent.  It's just

12   that the notice wasn't uploaded.

13          MR. HINDERAKER:  That's right.

14          THE COURT:  Okay.  All right.  So I'll sustain those

15   objections.

16      And then as to No. 17 on my calendar, the 10th objection.

17          MR. HINDERAKER:  Yes.  That's the same situation as

18   the 8th.

19          THE COURT:  Okay.  So those are sustained.

20      And the 13th, No. 20 on my calendar.

21          MR. HINDERAKER:  Yes.  We did file a notice of errata

22   on that one demonstrating that proper notice was given.

23          THE COURT:  All right.  That's sustained.

24      And No. 24.

25          MR. HINDERAKER:  No. 24, again --

1           THE COURT:  That's 17th --

2           MR. HINDERAKER:  -- we did not catch --

3           THE COURT:  -- omnibus objection.

4           MR. HINDERAKER:  -- this one, so we did not file a

5    notice of errata, but it's the same situation where I believe

6    the proper notice was given.

7           THE COURT:  All right.  So that's No. 24 on my

8    calendar, the 17th objection.

9        And was that all?

10          THE CLERK:  That was it, your Honor.

11          THE COURT:  Okay.  Thank you.  All right.

12       Next, we'll go to USA, and anybody that -- USA Investment

13   Partners, and anyone who wants to just leave that -- wants to

14   leave certainly may.  I won't take a recess because we all have

15   places we have to be, so I'll just go straight through.

16       The objection to claim of Chris Pederson and

17   Kevin Everett.

18          MS. GRAY:  Thank you, your Honor.  Talitha Gray on

19   behalf of Lisa Poulin, the Chapter 11 Trustee.  This was a

20   continued claim objection.

21       Mr. Everett had contacted me the night before the prior

22   hearing and had asked for an extension in order to retain

23   counsel and to file a response.  He has not filed a response.

24       We've actually received -- there's been no subsequent

25   communication regarding this, so we'd ask that the objection be

1    sustained.

2              THE COURT:  All right.  Anyone here?  Are

3    Chris Pederson or Kevin Everett here?  All right.

4         The objection's sustained.

5         Next, we have a settlement, 09-1121.

6              MS. GRAY:  Your Honor, this is a very small matter.

7    It was $6,508.  A complaint was filed.  No additional work's

8    been done on the matter at all.  We settled it for $4,000

9    immediately after filing the complaint.

10             THE COURT:  All right.  So that's approved.  I find

11   it meets the A&C Properties test.

12        Let me skip the motion to dismiss for a moment.

13        No. 41 is in the Hantges matter, the Trust Fund versus

14   Hantges.  We've got the Trust Fund and the Trust and Kehl

15   versus Hantges, a status hearing.

16             MR. LODEN:  Yes, your Honor.  Steve Loden on the

17   phone on behalf of the Liquidating Trust.

18             MR. LEVINSON:  Marc Levinson for Diversified.

19             MR. FARRINGTON:  Jason Farrington on behalf of

20   Tom Hantges.

21             MR. BEATTY:  Max Beatty also on behalf of the Trust,

22   your Honor.

23             MS. CHUBB:  Janet Chubb for certain lenders.

24             THE COURT:  All right.  Let's see.  Is this case

25   converted?  No.  Are we still an 11?

```
 1              MR. LEVINSON:  No.  That's what --

 2              THE COURT:  That's --

 3              MR. LEVINSON:  That's what we're here --

 4              THE COURT:  -- our problem --

 5              MR. LEVINSON:  -- to talk about.

 6              THE COURT:  -- right?

 7              MS. CHUBB:  Yeah.

 8              MR. LEVINSON:  Exactly.

 9              MS. CHUBB:  It is.

10              THE COURT:  And Mr. --

11              MR. CARMEL:  Good afternoon again, your Honor.

12   Michael Carmel, the Chapter 11 Trustee.  We've decided that the

13   best way to go at this time is to convert the case to a

14   Chapter 7.

15         There will be a motion that's going to filed.  I've

16   discussed this with Mr. Landis, and I believe that -- as well

17   as with Mr. Berman and Mr. Levinson.

18         I believe that what's going to be occurring is is that the

19   U.S. Trustee's Office if they go through the proper processes

20   will propose that I continue on as the Chapter 7 Trustee.

21              THE COURT:  Okay.  So should we continue this out?

22   Well, you're going to get that done, what, in the next month or

23   so?  The next week, I hope.

24              MR. CARMEL:  Ms. Itkin is on the line, but I believe

25   that within the next week there will be a motion that will be
```

1    filed.  It's --

2           THE COURT:  Okay.

3           MR. CARMEL:  It's a pretty simple motion.

4           MR. DIAMOND:  Allan Diamond for --

5           MS. ITKIN:  Yes, your Honor.

6           THE COURT:  Sorry.  Go ahead and make your

7    appearance.

8           MS. ITKIN:  Hi.  It's Robbin Itkin,

9    Steptoe & Johnson, on behalf of Michael Carmel, the

10   Chapter 11 Trustee.  Yes.  If everyone's in agreement with what

11   we plan to do, we will get a motion on file very quickly.

12          THE COURT:  Okay.

13          MR. DIAMOND:  Yeah.  And Allan Diamond on behalf of

14   Mr. Carmel, your Honor.  As far as the 523 actions, what we

15   would propose in light of the conversion motion that's about to

16   filed is just to carry this one last time.

17      And then it will be the starting of a new running of the

18   clock with respect to any 523 actions.  We all can figure out

19   how that's going to work in the context of a 7.

20          THE COURT:  Okay.  Do you want to put this on for the

21   November 13th date?  Will you be able to get your -- I'll give

22   you an order shortening time if you want to put your motion on

23   for November 13th assuming you can get it filed this week or

24   the first of next week.

25          MS. ITKIN:  Yeah.  Just, h'mm, because of people

1   being out for the conference, that may be a little difficult.

2   We could file it next week.  That would be easier I think,

3   your Honor.

4           THE COURT:  Let's see.

5           MS. ITKIN:  We're also hoping that this will resolve

6   the appeal that's been filed by Mr. Hantges.  We --

7           THE COURT:  Oh, right.

8           MS. ITKIN:  You know, we do feel now it is ripe for

9   the conversion in light of the settlement that's been approved

10  by this Court, and we're hoping.

11      I don't know which counsel is there for Mr. Hantges, but

12  we would like to, hopefully, resolve that appeal in light of

13  the conversion.

14          THE COURT:  Okay.  Well, let's see.  That would you

15  give you three-weeks' notice.  If you filed it Monday, then it

16  would be one, two, almost three weeks.

17      Do you think that's sufficient notice to everybody on the

18  conversion motion?  It sounds like everybody's is in

19  agreement.

20          MR. CARMEL:  I would think that it is, your Honor.

21          THE COURT:  Okay.

22          MR. CARMEL:  What time is that hearing --

23          THE COURT:  Our --

24          MR. CARMEL:  -- on the 15th?

25          THE COURT:  And you can appear telephonically if

1    you'd like.

2              MR. CARMEL:  Thank you.

3              THE COURT:  We have 9:30 that day.

4              MR. CARMEL:  Appearing telephonically would be

5    appreciated, Judge.

6              THE COURT:  That's fine.

7              MS. ITKIN:  Thank you, your Honor.

8              THE COURT:  Thank you.

9              MR. CARMEL:  Thanks, your Honor.

10              THE COURT:  Okay.  All right.  So the only matter --

11              MR. LODEN:  Thank you, your Honor.

12              THE COURT:  Sorry.

13              MR. CARMEL:  Yeah.  I don't know.  I didn't see on

14    the calendar, Judge, that was posted, but I seem to believe

15    that there was an adversary that was filed that was initiated

16    on my behalf by the Diamond McCarthy firm.

17        I think that it's 09-1164 that was set for a status

18    hearing today as well.  It's a lawsuit that I filed against

19    Mr. Hantges for a turnover of items that he may have taken.

20              THE COURT:  Oh, right.  We had a motion on that, and

21    I denied it.

22              MR. CARMEL:  Correct.  And they did file an answer.

23              THE COURT:  Oh, it's not letting me in.

24        (Colloquy not on the record.)

25              MR. CARMEL:  And I could bring the Court up to date

1    as soon as you have that up on your screen.

2             THE COURT:  It's not letting me in.

3        Will it let you in, Darla?

4             THE CLERK:  (Indiscernible) settlement conference is

5    set for --

6             THE COURT:  Oh, here it is.

7             THE CLERK:  -- October 28th.

8             THE COURT:  So let's move that.  Probably, what

9    happened was they didn't ask for a -- that's not an omnibus

10   day, is it?

11            THE CLERK:  No, it's not.

12            THE COURT:  It got stuck on a -- isn't the up-front

13   supposed to fix that or how does it get done?  When you file a

14   complaint with these, you're supposed to ask for a specific

15   omnibus day.

16            THE CLERK:  Well, that's the problem that a lot of

17   the newer people aren't aware of how many cases are related to

18   this case.

19            THE COURT:  Oh, okay.

20            THE CLERK:  (Indiscernible).

21            THE COURT:  So we'll move that to the 30th or do you

22   want the 13th?

23            MR. CARMEL:  Judge, the 13th.  As long as we're going

24   to be on the phone at that time --

25            THE COURT:  Sure.

1          MR. CARMEL:  -- I think that that would be good, and

2     I'll take the responsibility of contacting Mr. Cory who

3     filed --

4          THE COURT:  Great.  Thank you --

5          MR. CARMEL:  -- the answer.

6          THE COURT:  -- very much.  Well, his partner is here.

7          MR. CARMEL:  And --

8          THE COURT:  So --

9          MR. CARMEL:  And just so the Court is aware, I don't

10    know if this would be the proper time of that.  I would like to

11    be able to substitute in as my own counsel in that case and

12    discuss that with the Court on the record, you know, at some

13    point.  I just think that it's unfair to ask, you know, these

14    lawyers to continue to work for nothing, and it's --

15         THE COURT:  No.  We can talk about the U.S. Trustee

16    is the one that has --

17         MR. CARMEL:  That --

18         THE COURT:  -- the biggest say in that as far as I'm

19    concerned, so --

20         MR. CARMEL:  That issue has been discussed with

21    Mr. Landis.

22         THE COURT:  Okay.

23         MR. CARMEL:  And --

24         THE COURT:  So sure.  We can bring that on then if

25    you just want to do a substitution if that's what you decide --

1          MR. CARMEL:  Okay.

2          THE COURT:  -- to do.

3          MR. CARMEL:  Thank you very much, Judge.

4          THE COURT:  All right.  Thank you.

5          THE CLERK:  Your Honor --

6          MR. DIAMOND:  Thank you, your Honor.

7          THE CLERK:  -- I just have a question.  Are you going

8  to amend this summons (indiscernible) back to November 8th

9  (indiscernible)?

10          THE COURT:  Just send --

11          MR. CARMEL:  Amend --

12          THE COURT:  -- a notice --

13          MR. CARMEL:  -- the summons?

14          THE COURT:  -- of continuance, not the summons.  Just

15  set it on a continued date of the pretrial.

16          MR. CARMEL:  I'll file an amended notice of hearing

17  or whatever is appropriate just so that it's in the court

18  record.

19          THE COURT:  Great.

20          MR. CARMEL:  And we'll send a copy to Mr. Cory.

21          THE COURT:  All right.  Great.  Thank you.

22          MR. DIAMOND:  Thank you, your Honor.

23          THE COURT:  Okay.  Then, finally, we have in

24  USA Investment Partners Poulin versus Marron.

25          MR. BURGER:  Good morning (sic), your Honor.

1    Jerome Burger on behalf of Marron & Associates.

2             THE COURT:  Okay.

3             MS. GRAY:  Good afternoon, your Honor.  Talitha Gray

4    on behalf of Lisa Poulin, the Chapter 11 Trustee.

5             THE COURT:  All right.  Thank you.

6        And, again, if any of you want to leave, I won't be

7    offended, so just do it quietly if you do.  All right.

8        Go ahead, Counsel.

9             MR. BURGER:  Okay.  Well, the whole basis of any

10   liability on the part of Marron is the question of whether he

11   received and retained any benefits from any of these transfers.

12       The fact is as the complaint alleges any transfers

13   received were received on behalf of Ms. Tschopik and were, in

14   fact, turned over to Ms. Tschopik as the complaint alleges.

15            THE COURT:  Well, why isn't it the dominion and

16   control issue a defense as opposed to something that they must

17   affirmatively plead?

18            MR. BURGER:  Well, that is the question, your Honor.

19   It was not affirmatively pled --

20            THE COURT:  I'm saying why --

21            MR. BURGER:  -- in the complaint.

22            THE COURT:  -- isn't it a defense as opposed to being

23   something that has to be affirmatively pled.

24            MR. BURGER:  It should be affirmatively pled, but it

25   wasn't, so we raised it.

1          THE COURT:  Okay.  All right.  Ms. Gray.

2          MS. GRAY:  Your Honor, I would disagree that it was

3    not actually pled.  The focus seems to be on one clause taken

4    out of the, you know, ten-plus page complaint.

5          The allegation is that Marron & Associates which

6    Ms. Tschopik was of counsel prepared her bills, submitted them,

7    deposited checks on her behalf, et cetera.

8          The purpose of including this statement was to expand on

9    that relationship.  Certainly, at this point, we don't know

10   what the agreement was with regard to the funds that were given

11   to Marron & Associates.

12         But we have alleged that they were, in fact, transferred

13   to them, that they were deposited, that they received them, and

14   that, subsequently, after that some portion of them were then

15   provided to Ms. Tschopik, and that was as a result of

16   communications we had with her.

17         What their internal agreement looks like, whether

18   Marron & Associates retained half of it as a result of

19   administrative expenses that they were doing on her behalf,

20   whether they retained all of it, we don't know at this point.

21         But, certainly, I think it was clearly pled that they had

22   dominion over the funds and then subsequently transferred some

23   portion of them to Ms. Tschopik.

24         THE COURT:  Okay.  Any reply?

25         MR. BURGER:  In fact, your Honor, the complaint does

1    not say some portion of the funds.  The complaint -- excuse me

2    -- alleges that the funds were received, deposited on behalf of

3    Ms. Tschopik.

4         There are a number of conclusory statements, labels that

5    were applied as a substitute for factual allegations.  In fact,

6    those allegations contain no support whatsoever.

7         There was a private agreement between Ms. Tschopik and

8    somebody else for the (indiscernible) litigation.  Marron was

9    not a party to that.

10        Marron's agreement was with Ms. Tschopik to do her

11   billing, to receive the payments, and forward the payments on

12   to her.

13        There was no dominion over the funds.  Marron had no

14   discretion.  The complaint does not allege that Marron had any

15   discretion whatsoever on what to do with the funds.  Merely,

16   that it was done on her behalf.

17             THE COURT:  Okay.  Well, I'm going to deny the motion

18   to dismiss.  And, of course, I'm fully aware of the

19   Bell Atlantic/Twombly case which seems notwithstanding the

20   protestations of the Supreme Court to get us away from the

21   notice pleading because I think that they have adequately pled

22   that Marron received the money, and it was transferred to this

23   other person.

24        And we know that under 550 a recovery can be had from the

25   initial transferee or an immediate transferee or the person for

1   whose benefit it was made.

2       At this stage, it seems to me it's sufficient to say they

3   received the money.  It's certainly a defense to say we had no

4   dominion or control, so, therefore, we're not an initial

5   transferee despite the fact that we physically got the money.

6       But they physically got the money, so that makes them an

7   initial transferee at least at first blush, and it seems to me

8   dominion and control is a defense.

9       I'm obviously not ruling that they did, indeed, have

10  dominion and control by denying the motion to dismiss.  I am

11  just saying that their complaint is facially sufficient to

12  survive the motion to dismiss.

13      So your answer will be filed within, what, two weeks?

14  Will that work?

15          MR. BURGER:  I think it should, your Honor.

16          THE COURT:  Okay.  And then do your discovery plan.

17      (Colloquy not on the record.)

18          THE COURT:  When do we have a scheduling conference

19  set?

20          MR. BURGER:  I --

21          MS. GRAY:  I --

22          MR. BURGER:  Do --

23          MS. GRAY:  I believe it's the November 13th day, too.

24          THE COURT:  Okay.

25          MS. GRAY:  But I think the two weeks we should be

1    able to get a discovery plan together --

2              THE COURT:  Okay.

3              MS. GRAY:  -- pretty quickly --

4              THE COURT:  Good.

5              MS. GRAY:  -- on this.

6              THE COURT:  All right.

7              MS. GRAY:  So it shouldn't --

8              THE COURT:  Thank you --

9              MS. GRAY:  -- be a problem.

10             THE COURT:  -- very much.  All right.

11         Thanks, everybody.

12             MS. GRAY:  Thank you.

13             THE CLERK:  All rise.

14         (Court concluded at 04:15:51 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1          I certify that the foregoing is a correct transcript

2      from the electronic sound recording of the proceedings in

3      the above-entitled matter.

4

5

6      /s/ Lisa L. Cline                              10/27/09

7      _____              _____
       Lisa L. Cline, Transcriptionist              Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25