```
  1                UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF NEVADA
  2                     LAS VEGAS, NEVADA
       In re:  USA COMMERCIAL MORTGAGE    )  JANUARY 17, 2007
  3    COMPANY,                           )  E-Filed:  05/11/10
                                          )
  4           Debtor.                     )  Case No.
                                          )  BK-S-06-10725-LBR
  5    _____)  Chapter 11
       TREE MOSS PARTNERS,                )
  6                                       )
              Debtor.                     )  Case No.
  7                                       )  BK-S-06-13758-LBR
       _____)  Chapter 7
  8    USA INVESTORS VI, LLC,             )
                                          )
  9           Debtor.                     )  Case No.
                                          )  BK-S-06-13925-LBR
 10    _____)  Chapter 7
       USA COMMERCIAL MORTGAGE COMPANY,   )
 11                                       )
              Plaintiff,                  )
 12                                       )
          vs.                             )  Adversary No.
 13                                       )  06-01201-LBR
       Gateway Stone Associates, LLC,     )
 14                                       )
              Defendants.                 )
 15    _____)
       USA COMMERCIAL MORTGAGE COMPANY,   )
 16                                       )
              Plaintiff,                  )
 17                                       )
          vs.                             )  Adversary No.
 18                                       )  06-01212-LBR
       BINFORD MEDICAL DEVELOPERS, LLC,   )
 19                                       )
              Defendants.                 )
 20    _____)
       USA COMMERCIAL MORTGAGE COMPANY,   )
 21                                       )
              Plaintiff,                  )
 22                                       )
          vs.                             )  Adversary No.
 23                                       )  06-01179-LBR
       STANDARD PROPERTY DEVELOPMENT,     )
 24    LLC,                               )
              Defendant.                  )
 25    _____)
```

```
 1                PARTIAL TRANSCRIPT OF PROCEEDINGS
                                OF
 2                  (06-10725) STATUS HEARING
                 RE: MOTION TO EXCLUDE DEBTORS
 3           FROM HAVING TO FILE INTERCOMPANY CLAIMS
              AGAINST EACH OTHER BY THE BAR DATE,
 4                     OR, ALTERNATIVELY,
         FOR THE APPROVAL OF THE IMMEDIATE APPOINTMENT
 5           OF SPECIAL COUNSEL TO FILE AND PURSUE
          THE INTERCOMPANY DEBTOR CLAIMS, NO. 2113
 6                             AND
              MOTION FOR PROTECTIVE ORDER, NO. 2352
 7                             AND
                        STATUS HEARING
 8          RE: MOTION FOR APPROVAL OF PROCEDURES
       REGARDING ASSIGNMENTS OF DIRECT LENDERS' INTERESTS
 9                    IN LOANS, NO. 1806
                               AND
10        OBJECTION TO CLAIM 819 OF SPECTRUM FINANCIAL
                IN THE AMOUNT OF $49,581,000
11           AND CLAIM 821 OF ROLLAND P. WEDDELL
           IN THE AMOUNT OF $13,081,000, NO. 2067
12                             AND
        OBJECTION TO CLAIM 1099 OF DEL AND ERNESTINE BUNCH
13        IN THE AMOUNT OF $11,358,661.28, NO. 2061
                               AND
14      OBJECTION TO CLAIM 784 OF BINFORD MEDICAL DEVELOPERS,
                          NO. 2065
15                             AND
        OBJECTION TO CLAIM 155 OF Gateway Stone Associates, LLC,
16          IN THE AMOUNT OF $3,630,000, NO. 2063
                               AND
17            MOTION FOR RELIEF FROM STAY, NO. 2098
                               AND
18    OBJECTION TO CLAIM 1660 OF ROBERT J. KEHL AND RUTH ANN KEHL
           IN THE AMOUNT OF $12,841,580.13, NO. 2140
19                             AND
            MOTION TO WITHDRAW AS ATTORNEY OF RECORD
20      FOR R&N REAL ESTATE INVESTMENTS AND ROBERT VERCHOTA,
                          NO. 2231
21                             AND
          (06-01201) PARTIAL MOTION FOR SUMMARY JUDGMENT
22             RE: DECLARATORY RELIEF, NO. 15
                               AND
23        (06-01212) PARTIAL MOTION FOR SUMMARY JUDGMENT
         ON COUNTERCLAIM FOR DECLARATORY RELIEF, NO. 23
24                             AND
        (06-01201) SCHEDULING CONFERENCE RE: COMPLAINT, NO. 24
25                             AND
```

1              (06-01179) SCHEDULING CONFERENCE RE: AMENDED COMPLAINT,
                                    NO. 30
2                                    AND
                    (06-13758) ORDER SHORTENING TIME
3              RE: TRUSTEE'S APPLICATION TO EMPLOY GUY DEIRO
        OF ROBERT DEIRO & ASSOCIATES AS REAL ESTATE EXPERT
4              PURSUANT TO 11, USC, SECTION 327(A), NO. 33
                                    AND
5                   (06-13925) ORDER SHORTENING TIME
               RE: TRUSTEE'S APPLICATION TO EMPLOY GUY DEIRO
6        OF ROBERT DEIRO & ASSOCIATES AS REAL ESTATE EXPERT
               PURSUANT TO 11, USC, SECTION 327(A), NO. 24
7                                    AND
        (06-01179) MOTION FOR PARTIAL SUMMARY JUDGMENT
8                   RE: DECLARATORY RELIEF, NO. 42,
                    EXCLUDING PARTIAL JUDGE'S RULING
9                              VOLUME 2
               BEFORE THE HONORABLE LINDA B. RIEGLE
10              UNITED STATES BANKRUPTCY JUDGE

11                   Wednesday, January 17, 2007

12                           9:30 a.m.

13

14

15

16

17

18

19

20

21

22

23   Court Recorder:            Helen C. Smith

24

     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

```
1    APPEARANCES:

2    For Robert Verchota:        JEFFREY A. COGAN, ESQ.
                                 3990 Vegas Drive
3                                Las Vegas, Nevada 89108

4    For the Debtor             ANNETTE W. JARVIS, ESQ.
     and Debtor in             Ray, Quinney & Nebeker, P.C.
5    Possession:               36 South State 1400
                               Salt Lake City, Utah 84145
6
                               LENARD E. SCHWARTZER, ESQ.
7                              Schwartzer & McPherson Law Firm
                               2850 South Jones Boulevard
8                              Suite 1
                               Las Vegas, Nevada 89146
9
     For the First Trust       CANDACE C. CARLYON, ESQ.
10   Deed Fund Equity          Shea & Carlyon, Ltd.
     Holders Committee:        233 South Fourth Street
11                             Suite 200
                               Las Vegas, Nevada 89101
12
     For the Unsecured         SUSAN M. FREEMAN, ESQ.
13   Creditors Committee       Lewis and Roca, LLP
     of USA Commercial         40 North Central Avenue
14   Mortgage Company:         Phoenix, Arizona 85004

15   For Diversified Trust     ANNE M. LORADITCH, ESQ.
     Deed Fund Equity          Beckley Singleton, Chtd.
16   Holders Committee:        530 Las Vegas Boulevard South
                               Las Vegas, Nevada 89101
17
     For Dr. Stanley           ROBERT C. LePOME, ESQ.
18   Alexander and Others      Law Offices of Robert C. LePome
     Previously Identified:    330 South Third Street
19                             Suite 1100-B
                               Las Vegas, Nevada 89101
20
     For Gateway Stone         R. VAUGHN GOURLEY, ESQ.
21   Associates, LLC, and      Stephens, Gourley & Bywater, P.C.
     Standard Property         3636 North Rancho Drive
22   Development, LLC:         Las Vegas, Nevada 89130

23   For Binford Medical       SUSAN WILLIAMS SCANN, ESQ.
     Developers:               Deaner, Deaner, Scann, Malan
24                                & Larsen
                               720 South Fourth Street
25                             Suite 300
```

```
 1    APPEARANCES (Cont.):

 2    For Leo G. Mantas and      ERVEN T. NELSON, ESQ.
      Related Creditors:         Nelson & Associates
 3                               10091 Park Run Drive
                                 Suite 200
 4                               Las Vegas, Nevada 89145

 5    For Dayco Funding          NILE LEATHAM, ESQ.
      Corporation:               Kolesar & Leatham, Chtd.
 6                               3320 West Sahara Avenue
                                 Suite 380
 7                               Las Vegas, Nevada 89102

 8                               ANDREW K. ALPER, ESQ.
                                 Frandzel, Robins, Bloom
 9                                 & Csato, L.C.
                                 6500 Wilshire Boulevard
10                               Seventeenth Floor
                                 Los Angeles, California 90048
11
      For the Direct            GERALD M. GORDON, ESQ.
12    Lenders Committee:         Gordon & Silver, Ltd.
                                 3960 Howard Hughes Parkway
13                               Ninth Floor
                                 Las Vegas, Nevada 89109
14
      For the Debt              DEAN T. KIRBY, ESQ.
15    Acquisition Company        Kirby & McGuinn, P.C.
      of America V, LLC:         600 B Street
16                               Suite 1950
                                 San Diego, California 92101
17
      For Sierra Liquidity      DAVID T. COHEN, ESQ.
18    Fund, LLC:                 Warner Stevens, LLP
                                 301 Commerce Street
19                               Suite 1700
                                 Fort Worth, Texas 76102
20
      For Hall Financial        RICHARD F. HOLLEY, ESQ.
21    Group, Limited, and        Santoro, Driggs, Walch, Kearney,
      Del Bunch and               Johnson & Thompson
22    Ernestine Bunch:          400 South Fourth Street
                                 Third Floor
23                               Las Vegas, Nevada 89101

24

25
```

6

```
1    APPEARANCES (Cont.):

2    The Gap Trustee          JAMES F. LISOWSKI, ESQ.
     for Tree Moss Partners,  Lisowski Law Firm, Chtd.
3    LLC, and USA Investor    1771 East Flamingo Road
     VI, LLC:                 Suite 115-B
4                             Las Vegas, Nevada 89119

5    For the Jones Vargas     JANET L. CHUBB, ESQ.
     Direct Lenders:          Jones Vargas
6                             100 West Liberty
                              Twelfth Floor
7                             Reno, Nevada 89501

8    For the United States    AUGUST B. LANDIS, ESQ.
     Trustee:                 Office of the United States Trustee
9                             300 Las Vegas Boulevard South
                              Suite 4300
10                            Las Vegas, Nevada 89101

11   For Compass Partners,    GEORGE A. DAVIS, ESQ.
     LLC:                     TYSON M. LOMAZOW, ESQ.
12                            Weil, Gotshal & Manges, LLP
                              767 Fifth Avenue
13                            New York, New York 10153
                              (Telephonic)
14
     For the First Trust      EVE H. KARASIK, ESQ.
15   Deed Committee:          Stutman, Treister & Glatt, P.C.
                              1901 Avenue of the Stars
16                            Twelfth Floor
                              Los Angeles, California 90067
17                            (Telephonic)

18   Also Present:            THOMAS J. ALLISON
                              Mesirow Financial Interim
19                              Management, LLC

20

21

22

23

24

25
```

1          (Court convened at 09:45:33 a.m.)

2              THE COURT:  Be seated.

3      (Colloquy not on the record.)

4              THE COURT:  Okay.  USA.

5      Appearances, please.

6      (Colloquy not on the record.)

7              MR. COGAN:  Your Honor, if I may?  I have a motion to

8  withdraw in this case on the bottom of page 5.  It's unopposed.

9              THE COURT:  All right.

10             MR. COGAN:  And, basically --

11             THE COURT RECORDER:  Your appearance, please --

12             MR. COGAN:  Jeffrey Cogan for Robert --

13             THE COURT RECORDER:  -- Counsel.

14             MR. COGAN:  Jeffrey Cogan for Robert Verchota.

15  Basically, when the petition was filed, he wanted somebody to

16  go over the things as this is a pretty complicated bankruptcy,

17  and now he's satisfied as to how the case is progressing and no

18  longer needs my services.

19             THE COURT:  Okay.  So that's granted.

20             MR. COGAN:  Thank you.

21             THE COURT:  All right.  Then appearances, then, in

22  the main case.

23             MS. JARVIS:  Annette Jarvis of Ray, Quinney & Nebeker

24  on behalf of the debtors and debtors in possession.

25             MS. CARLYON:  Good morning, your Honor.

1    Candace Carlyon of Shea & Carlyon on behalf of the

2    First Trust Deed Fund Equity Holders Committee.

3         (Colloquy not on the record.)

4              MS. FREEMAN:  Good morning.  Susan Freeman from

5    Lewis and Roca for the Unsecured Creditors Committee of

6    USA Commercial Mortgage.

7         (Colloquy not on the record.)

8              MS. LORADITCH:  Good morning, your Honor.

9    Anne Loraditch of Beckley Singleton, Chartered, on behalf of

10   Diversified Trust Deed Fund Equity Holders Committee.

11             MR. LePOME:  Robert LePome for Dr. Stanley and others

12   previously identified.

13             MR. GOURLEY:  Vaughn Gourley on behalf of

14   Gateway Stone and Standard Property Development.

15             MS. SCANN:  Good morning, your Honor.  Susan Scann on

16   behalf of Binford Medical.

17             MR. NELSON:  Good morning, your Honor.  Erven Nelson

18   on behalf of Leo Mantas and the related creditors.

19             MR. LEATHAM:  Good morning, your Honor.  Nile Leatham

20   for Dayco Funding.  Co-counsel, Andy Alper, also here.

21             MR. ALPER:  Good morning --

22             THE COURT:  Okay.

23             MR. ALPER:  -- your Honor.  Andrew Alper,

24    Frandzel, Robins, Bloom & Csato, on behalf of

25    Dayco Funding Corporation on item 8.

1          MR. GORDON:  Gerald Gordon of Gordon & Silver on

2    behalf of the Direct Lenders Committee.

3          MR. KIRBY:  Dean Kirby, Kirby & McGuinn, for

4    Debt Acquisition Company of America V.

5          MR. COHEN:  Good morning, your Honor.

6    David T. Cohen, Warner Stevens, on behalf of Sierra.

7        (Colloquy not on the record.)

8          MR. HOLLEY:  Good morning, your Honor.

9    Richard Holley on behalf of Hall Financial Group, Limited, and

10   also on behalf of Mr. and Mrs. Bunch.

11         MR. LISOWSKI:  Good morning, your Honor.

12   James Lisowski, the Gap Trustee, for Tree Moss Partners, LLC,

13   and the Gap Trustee for USA Investors VI, LLC.

14         MS. CHUBB:  Good morning, your Honor.  Janet Chubb

15   for the Jones Vargas Direct Lenders.

16       (Colloquy not on the record.)

17         MR. LANDIS:  Good morning, your Honor.  Augie Landis,

18   Assistant United States Trustee.

19         THE COURT:  Okay.  All right.  So do you want to

20   start with a little summary of where we are or we'll kind of

21   like in the middle, the middle of things, so --

22         MR. DAVIS:  Your Honor, this is George Davis at

23   Weil, Gotshal.  Did you want appearances for those on the

24   telephone?

25         THE COURT:  All right.  I guess --

```
 1              THE CLERK:  We have to --

 2              THE COURT:  Right.  But I hadn't really -- nobody had

 3    asked me about live on this one, but that's okay.

 4              THE CLERK:  Well, I can tell the operator that you

 5    want to have listen only.

 6              THE COURT:  I'll go ahead and have you make your

 7    appearances, although I assume all of you are just listening,

 8    though?

 9              MR. DAVIS:  I --

10              THE COURT:  Mr. Davis, you might I suppose since

11    you're with Compass might need to appear.

12              MR. DAVIS:  Yeah.  We might have to speak.

13    Hopefully, the need won't arise, but it may be possible.

14              THE COURT:  All right.  Well, I'll let the four of

15    you go ahead and appear, then.

16              MR. DAVIS:  Okay.  Your Honor, this George Davis.

17    Tyson Lomazow is with me from Weil, Gotshal & Manges on behalf

18    of Compass Partners.

19              MS. KARASIK:  Your Honor, Eve Karasik,

20    Stutman Treister & Glatt, on behalf of the First Trust Deed

21    Committee.

22              THE COURT:  Okay.  Anyone else?  Okay.  All right.

23        Go ahead.

24              MS. JARVIS:  Your Honor, since we've been here last,

25    we have moved forward on moving the Compass transaction towards
```

1    closing.  We hope that that will be closed next week.

2        As provided in the confirmation order, the effective date

3    of the plan will actually lag behind that as we continue to

4    work through the transition issues that will become effective

5    on the effective date of the plan, so that process is moving

6    forward.

7        One other development that has happened in the last two

8    weeks is we were able to collect the Fiesta/McNaughton loan.

9    This is a loan in the Diversified estate.

10       So there is money now that has come into the Diversified

11   estate, and we will move forward to distribute that money

12   pursuant to the provisions of the plan when it becomes

13   effective.

14           THE COURT:  Okay.  All right.  Okay.  Should we go by

15   the agenda or let's -- let's use our calendar, instead.  The

16   first item on our calendar is No. 1, the motion to exclude

17   debtors from having to file intercompany claims.

18           MS. JARVIS:  And, your Honor, I think this was

19   noticed up as a status report.

20           THE COURT:  Yes.

21           MS. JARVIS:  At this point, all of the intercompany

22   claims have been settled in the plan except for two claims, and

23   that is the claims of the First Trust Deed Fund against

24   Commercial Mortgage and the claims of Diversified against

25   Commercial Mortgage.

1      Both of those were disclosed in the plan as being issues

2    that either will be resolved or will be brought before this

3    Court for a final determination.  So at this point, there

4    really is no need for the filing of intercompany claims.

5      In consultation with the committees, we would therefore

6    ask that this motion simply be continued without a date

7    allowing the committees the opportunity to have it heard on,

8    probably, 15-days' notice if they deem it to be needed.

9      I doubt that that's going to occur because it looks like

10   these last two claims will simply either be resolved through

11   agreement or will be brought to this Court for a determination

12   after a hearing.

13      And, of course, your Honor, part of the reason we

14   continued this as well is we did disclose in the disclosure

15   statement the various potential claims.  And like I said --

16           THE COURT:  Right.

17           MS. JARVIS:  -- all of them were resolved except for

18   these two.

19           THE COURT:  I don't disagree with the logic of what

20   you're saying.  The procedural aspect is what my concern is.

21           MS. CARLYON:  Candace Carlyon for the

22   First Trust Deed Committee.  We had contemplated just taking

23   this off calendar knowing that no distributions could be made

24   to unsecureds in the main case until these claims are filed.

25           THE COURT:  Well, should I --

1          MS. CARLYON:  And we (indiscernible) --

2          THE COURT:  -- just grant --

3          MS. CARLYON:  -- are (indiscernible).

4          THE COURT:  -- an extension of the bar date?

5          MS. CARLYON:  If you would prefer, your Honor.  The

6    thought amongst professionals was there's no need to set a bar

7    date because we will one way or another resolve or dispute and

8    have the Court resolve these claims.  If it makes more sense

9    procedurally to set a bar date out a few months, that's fine,

10   too.

11         MS. JARVIS:  Also, your Honor, when we filed this, we

12   asked for either an extension or a ruling by the Court that

13   they were simply excluded from the bar date.

14      So we could also just have the Court procedurally

15   determine that the intercompany claims are not subject to the

16   bar date.

17         THE COURT:  That probably would be the easiest

18   procedural mechanism, then.

19         MS. JARVIS:  Yes.

20         THE COURT:  All right.

21         MS. CARLYON:  Let's --

22         THE COURT:  So what I'll do --

23         MS. CARLYON:  Let's do that.

24         THE COURT:  -- is grant the motion and exclude the

25   debtors from having to file intercompany claims or --

14

1          MS. JARVIS:  Okay.

2          MS. CARLYON:  Thank you, your Honor.

3          MS. JARVIS:  Great, your Honor.  We'll submit an

4     order.

5          THE COURT:  -- by a bar date.  In other words, to get

6     the process rolling, you'd have to file a claim, but --

7          MS. CARLYON:  Exactly, your Honor.  And one of the

8     issues faced by the debtors was the potential conflicts, and I

9     think that the committees are now taking the lead on the claims

10    analysis, so that will work itself out.

11         THE COURT:  Okay.  And then if you need to establish

12    a bar date to get the thing rolling at some point you can bring

13    that on as a separate motion.

14         MS. CARLYON:  Yes.  Thank you, your Honor.

15         THE COURT:  Okay.  Next, we have the motion for a

16    protective order.

17         MS. FREEMAN:  Your Honor, Susan Freeman for the

18    Unsecured Creditors Committee.  We filed a brief status report

19    that advised the Court we have been negotiating an agreed

20    resolution of this.  We're not quite there, yet, but we're

21    substantially closer.

22         I received an E-mail back that I was able to look at on my

23    BlackBerry this morning that had some additional comments back

24    from Mr. Breen (phonetic), counsel for IP and Milanowski.

25         They're things that Ms. Munson (phonetic) and I were able

1  to talk through briefly here.  We're not quite there, but we

2  are closer.

3       And we would like the Court to reschedule this hearing for

4  the 31st in the hope that we will be able to provide an agreed

5  protective order before then.

6          THE COURT:  Okay.  Now, by doing this, we're not

7  delaying anybody else's discovery are we by the fact that

8  there's some protective order out there?

9          MS. FREEMAN:  Well, I --

10         THE COURT:  I mean --

11         MS. FREEMAN:  I --

12         THE COURT:  -- the motion's out there.  That's true.

13  Discovery will go forward until there is an order, but I just

14  want to be sure that we're not impacting other discovery.

15         MS. JARVIS:  Your Honor, we do have outstanding the

16  2004 exams and documents requests against IP, Mr. Milanowski,

17  and a couple of the IP entities.

18       We have received some documents.  We also received a

19  response that they would produce more documents once we've

20  sorted through these documents, and we're able to reach

21  agreement on this protective order.  We factored this in in

22  agreeing to an extension.  We don't --

23         THE COURT:  Okay.

24         MS. JARVIS:  We believe we can wait or work through

25  that issue during this period, the extra period of time --

```
1           THE COURT:  Oh --

2           MS. JARVIS:  -- through the 31st.

3           THE COURT:  -- okay.  So then we'll continue this to

4    the 31st, then.

5           MS. FREEMAN:  Thank you.

6           THE COURT:  Okay.  Next, we have the status hearing

7    on the procedures motion.

8        (Colloquy not on the record.)

9           THE COURT:  That's our Docket 3, your item No. 1.

10       (Colloquy not on the record.)

11          MS. JARVIS:  Your Honor, we had continued this in

12   order to be able to consult with Compass Partners because the

13   assignment (indiscernible) was filed, originally.

14       I think we had discussed with your Honor the issues, the

15   difficulties in the claims trading and dealing with kind of the

16   assignment issues with respect to the direct lenders.

17       And this motion was filed, but it was continued first

18   because the plan itself would impact this and to decide certain

19   issues that were raised in this motion.

20       And they continued it again, so that we could consult with

21   Compass about, you know, their viewpoint on it since they would

22   then be taking over the servicing going forward.

23       I think your Honor probably saw that Compass did file a

24   response as well, and we are prepared to go forward and argue

25   that today if your Honor --
```

```
 1              THE COURT:  You know --

 2              MS. JARVIS:  -- would prefer that.

 3              THE COURT:  -- let me suggest this in the procedures

 4    motion.  The thing that troubles me is sort of like Compass

 5    said its reply.

 6         This is good you're doing this, so the whole thing is

 7    smoothed out, but I don't see any legal issues for me to decide

 8    in this.  I mean, the best I would be doing is acting as a

 9    mediator.

10         May I suggest that, perhaps, Judge Markell or somebody

11    could help you mediate a process because unless I'm wrong I --

12    you know, the agreements say what they say.  The agreements

13    were assigned to Compass.  I don't know what legal issue there

14    is for me.

15              MS. JARVIS:  I think that a couple legal issues have

16    already been decided.  The netting has been made permanent.

17              THE COURT:  Right.

18              MS. JARVIS:  And that, you know, is in the plan, and

19    all we're seeking by this motion is to make it clear that the

20    netting applies whether, you know, direct lenders assign loans

21    or not.  In other words, they can't get out --

22              THE COURT:  But the plan --

23              MS. JARVIS:  -- of the netting --

24              THE COURT:  -- says that.

25              MS. JARVIS:  -- by assigning that, right, because the
```

1    plan has made the netting permanent.

2           THE COURT:  Okay.

3           MS. JARVIS:  So I think that issue is resolved.  Of

4    course, there also were some issues raised on executory

5    contracts.  That's been resolved by the plan as well.

6           So, really, the only, you know, issues are just basically

7    confirming with respect to the distributions because the

8    distributions are made monthly.

9           The debtor has been, you know, taking the assignments on a

10   monthly basis, in other words, the month that the assignment

11   comes in.

12          And then the next month the payments are made to the new

13   -- or in the next month, the payments that are due are made to

14   the new assignee.

15          And it's just, you know, verifying that that is the proper

16   procedure in doing that because it's impossible, really, to

17   kind of bifurcate it and really, I mean, within a month.

18          And it's really an issue between the claims buyer and the

19   seller with respect to what they do with that past amount that

20   has paid for the month in which the transfer occurs.

21          The other issue is the percentage fees, and I think that's

22   what you're saying is with respect what servicing fee is owed.

23   That you're suggesting to us that, perhaps, that is an issue

24   that should be mediating, I mean, is that correct, because, I

25   mean, that's only, really, the only remaining issue.

19

1          THE COURT:  I mean, on the percentage fees, the

2     contract provides what it provides.

3          MS. JARVIS:  What --

4          THE COURT:  And that's what the --

5          MS. JARVIS:  And I think the issue, your Honor, is

6     that, normally, the way this would have been done prepetition

7     is that when you had a new lender come in that takes an

8     assignment they would sign a new servicing, a loan-servicing

9     agreement, with the company, so that you had now a new lender

10    in the group, and they would have a single loan-servicing

11    agreement that would cover whatever interest they bought in

12    whatever loans.

13         And because in the bankruptcy process this has gone kind

14    of outside that process, the assignments have been taken

15    without signing a loan-servicing agreement through simply the

16    buying of claims.

17         And this is filed to clarify with respect to those claims

18    that a servicing fee, you know, is owed and what that servicing

19    fee, you know, is, whether it is taking over stepping in the

20    shoes of the lender that the claim was purchased from and their

21    servicing fee or requiring a new servicing contract.

22         And if you require just stepping into the shoes of the

23    current lender, what happens is then you have a lender that the

24    claims trader who now could have multiple loan-servicing

25    amounts that would be due that would make it very difficult

1    administratively to deal with which is why we suggested that we

2    simply have them sign a new loan-servicing agreement

3    acknowledging that they owe this.

4        And, originally, we had asked consistent with the past

5    practice within the past few years that they sign a

6    loan-servicing agreement, three percent, which is what was

7    signed in the last several years before the bankruptcy.

8        In our reply brief, we indicated that, you know, from the

9    debtor's point of view we would be willing to agree to a

10    one-percent which is the lowest that it would be in any case.

11        Although Compass as you know in their reply disagreed with

12    that and believes that it should be the three percent, so that

13    really is the remaining issue that needs to be resolved.

14        THE COURT:  Well, okay.  I'm having a hard time

15    understanding how the issue is teed up legally, but I'll hear

16    argument on it, so I don't even know where we are in the last

17    procedures.  What's the last draft of it?

18        MS. JARVIS:  Well, I think the last draft, it has not

19    changed.  It's just there's been now, you know, a -- certain

20    issues have been resolved by the plan.

21        So when we first filed this, we asked for, you know,

22    certain procedures with respect to netting because the netting

23    at that point had not become permanent.  It had not been ruled

24    on by the Court.  It now has been.

25        There also were some issues raised in response dealing

1    with the executory contracts.  That issue also has been ruled

2    on as part of the plan.

3        So I think the remaining issues are just simply the

4    confirmation that the way these funds are distributed, you

5    know, meaning that the -- from the debtor's point of view, the

6    distributions are done month by month.

7        So it's the following month in which the transfer occurs

8    that the payments are made to the new transferee and then,

9    also, this issue with respect to the percentage of the

10   loan-servicing fee, whether it is stepping into the shoes of

11   the current lender and paying that servicing fee or signing a

12   new servicing agreement with a uniform servicing fee as it was

13   done prepetition.

14            THE COURT:  Okay.  All right.  Well, let me hear from

15   the assignees.

16       (Colloquy not on the record.)

17            MR. GORDON:  Do you want to hear from Compass or --

18            THE COURT:  I thought you were still on-board with

19   this.  You're --

20            MR. GORDON:  Your Honor --

21            THE COURT:  Oh.

22            MR. GORDON:  -- a number of our issues are gone.  And

23   when we filed it, it was before plan confirmation, so we kind

24   of middled it.  We talked about executory

25   contracts --

1          THE COURT:  You know what?

2          MR. GORDON:  -- transferability.

3          THE COURT:  This is silly.  Rather than us trying to

4    figure it out, I want a new motion filed, so we get everybody

5    where on I'm -- I don't want to have to figure out what the

6    issues are, and you guys don't even know what the issues are.

7          MR. GORDON:  Your Honor, we believe that as the Court

8    said just generally saying it is what it is.  They were

9    transferred, so there's no executory-contract issue.  The Court

10   has approved netting in the plan, so that's set.

11       And we just believe that what the Court's being asked to

12   do is decide issues subsequent to the transferability dealing

13   with loan-servicing agreements that if there's -- and I think

14   Compass is right.

15       We should not be required.  It should not be required to

16   reduce from three to one percent the same as no one should be

17   required to increase from one to three percent if that's not in

18   the document.  It is what it is.

19       I think that it is being placed to this Court to take a

20   role or any Court that just simply is not there.  These are

21   third-party contracts.

22       They're being assigned, transferred, as is.  They're

23   between third parties, direct lenders and now Compass, and that

24   has to be resolved between them.  If the direct lenders

25   transfer it, it's subject to the netting, and then that's a

1    Compass issue.

2        (Colloquy not on the record.)

3        MR. GORDON:  If there are more than one

4    loan-servicing agreement, that's what Compass got, and it's

5    between Compass and these people to resolve.  That's it.  I

6    don't think there's anything for this Court to decide any

7    longer or get involved with.

8        THE COURT:  Okay.  Ms. Chubb.

9        MS. CHUBB:  Your Honor, Janet Chubb for the

10   Jones Vargas direct lenders, and I agree with what Mr. Gordon

11   has said.  Please don't invite another motion to do something

12   that this Court really shouldn't be addressing at all.

13       Everybody stood up here and said there is no modification

14   of the loan-servicing agreements, and you confirmed the plan

15   based on that representation.

16       To say that these aren't modifications is really

17   disingenuous.  I mean, to say each third-party investor has to

18   execute a three-percent agreement, that's so far beyond the

19   pale that we shouldn't even be hearing another motion.  I'll

20   show up if you do, but this is not anything to do with this

21   Court.

22       I mean, how can you possibly think about modifying

23   contracts that are gone now?  It just shouldn't happen, so --

24       THE COURT:  Well, and I'm not disagreeing.  But just

25   in retrospect for everybody's benefit and, perhaps, my own as

1    well, in a sense, this started from a concern I raised because

2    I was seeing on the docket sheet purported transfers of claims

3    just like -- I don't know if eCAST was one of the people.

4        But it's just like eCAST buys all the credit-card company

5    debt, and this was happening in the case, and it was obvious

6    that that was -- I don't know if they meant to do that or not.

7        But the point was it was confusing the docket and the

8    record because they were purportedly I guess direct-lender

9    claims, so they weren't really claims.

10       So I suggested it because the agreement required this, and

11   we know, too, that there is ways of assigning notes and deeds

12   of trust.

13       I suggested during the process of the case, so that the

14   Mesirow wasn't in the position of having to decide who in the

15   world do I pay on these faulty or nonfaulty assignments, so it

16   was much the assignee/assignor's fault in being imprecise when

17   they purported to do this in the beginning.

18               MS. CHUBB:  Yes.

19               THE COURT:  And that's where that started.

20               MS. CHUBB:  Okay.  Well, this might be a good

21   place --

22               THE COURT:  Stop it.

23               MS. CHUBB:  -- to abandon it.  Yes.

24               THE COURT:  Okay.

25               MS. CHUBB:  And I would ask that the Court just do

1    that --

2              THE COURT:  All right.

3              MS. CHUBB:  -- and let the --

4              THE COURT:  Let's do this.

5              MS. CHUBB:  Let the chips --

6              THE COURT:  It's a --

7              MS. CHUBB:  -- fall where they may.

8              THE COURT:  Mr. --

9              MR. HOLLEY:  Well, your Honor, Richard Holley on

10   behalf of Hall Financial Group.  I really don't have anything

11   else to add other than I agree with the Court's comments and

12   with the comments of Mr. Gordon and Ms. Chubb.

13             THE COURT:  Okay.

14             MS. CHUBB:  So you were going to say something.

15   Sorry.  Oh, it's all right.

16             MR. KIRBY:  Dean Kirby, Debt Acquisition Company of

17   America.  Your Honor, we're happy to come back if a new motion

18   is filed which clarifies what relief is being sought now.

19       We also don't believe that there's any basis for granting

20   the existing motion.  We think that the existing motion is an

21   invitation to the Court to micromanage a lot of procedures,

22   many of which when you get down to specifics my client thinks

23   are unfair or unreasonable.

24       And if we were arguing all of those things here today,

25   we'd have a lot more to say.  And if that's the direction that

1   we're going, we'd ask the opportunity to talk about those

2   things.

3        But if that's not the case, then we're content to go back,

4   wait for a better motion to be filed, wait for the sale to

5   Compass to be closed.

6        In which case, this will be an issue between the assignees

7   and Compass it seems to me, any of those things, so I don't

8   want to stand here and argue the details of a motion that the

9   Court --

10            THE COURT:  Sure.

11            MR. KIRBY:  -- might not want to entertain.

12            THE COURT:  Okay.  Mr. Davis, since you're somebody

13   who's interested in this, do you have any comments?

14            MR. DAVIS:  Your Honor, I'm okay, you know, not

15   proceeding today.  I think that the debtor's motion was an

16   attempt to try to clarify some issues that undoubtedly will

17   need clarifying at some point, some of which were clarified by

18   the plan.

19        In terms of, you know, what rate should be charged to

20   assignees and whether they should get the benefit of whatever

21   rate the assignor had or sign a new contract, I mean, we can

22   deal with those issues in the future.

23        I suspect just given people's positions that have been

24   articulated in pleadings before the Court, we'll probably have

25   some disagreements on that, but, you know, this is not

1    something that your Honor necessarily needs to determine today.

2              THE COURT:  Okay.

3              MR. COHEN:  Your Honor, Sierra concurs in the Court's

4    comments and Mr. Gordon's comments that, perhaps, we should

5    come back and with a new motion that lays out what the status

6    is and how the situation has changed between the prior motion

7    and the current motion and what relief they really want going

8    forward.

9              THE COURT:  Okay.  All right.  So what I'm going to

10   do is take off this motion.  It's now moot.  We have a whole

11   sequence of events.  If it is appropriate and if it's something

12   that might fall within my jurisdiction, the motion can be

13   refiled.

14        So, Ms. Chubb, I'm sort of following your position.  I'm

15   not inviting it.  I'm making it clear that --

16             MS. CHUBB:  I feel so good.

17             THE COURT:  Yeah.  See.

18        (Colloquy not on the record.)

19             THE COURT:  You're right.  So we won't continue this.

20   We'll take it off calendar.  It's become moot.  The parties are

21   probably correct.  I may not have jurisdiction, anyway.

22        But I would offer, though, that if you do get in a status

23   where you've got these kind of like little natty procedural

24   kind of things, and you're trying to figure out how to make it

25   smooth it's possible that Judge Markell could serve as kind of

1    a mediator just to suggest suggestions back and forth, so that

2    you all don't waste time litigating these kinds of issues.  It

3    may not be possible, but I just make that as a suggestion.

4            MS. JARVIS:  And, your Honor, there's just one thing.

5    I think no one disagrees, and there hasn't been any objection

6    with respect to how we've -- you know, because we've sought an

7    order making sure we were doing the distributions correctly

8    with the monthly.

9            And maybe if we can get an order just approving that that

10   we, you know, correctly distributed, I don't think there's been

11   any disagreement with that.

12           THE COURT:  Well, but there's no motion pending doing

13   that.

14           MS. JARVIS:  No.  There is.  That was part of what

15   the relief we asked for in this motion, and that was one aspect

16   that I think that was not controversial.

17           With respect to the percentage fees, I think we will have

18   to be back unless we can reach agreement because as of the

19   effective date we have to make a final determination as to what

20   amounts from the holdback remain in the estate and what amount

21   is remitted.

22           And, right now, I mean, the reason this was filed is

23   because it's unclear with respect to those, you know, assignees

24   as to what percentage servicing fee will apply to them.

25           MR. KIRBY:  Your Honor --

1           MS. JARVIS:  And --

2           MR. KIRBY:  -- I wish to be heard --

3           THE COURT RECORDER:  I'm sorry, Counsel.

4           MR. KIRBY:  -- on the distribution.

5           THE COURT RECORDER:  I need you to come --

6           THE COURT:  You need to be at --

7           THE COURT RECORDER:  -- to the microphone --

8           THE COURT:  -- a microphone.

9           THE COURT RECORDER:  -- please, so that we can

10   record.

11       Thank you.

12       (Colloquy not on the record.)

13           THE COURT RECORDER:  And your appearance again,

14   please.

15           MR. KIRBY:  Your Honor, we do disagree about the

16   proposal for distribution procedures, and we're happy to

17   mediate or even discuss with counsel outside of this courtroom.

18   But if that's going to be submitted for a decision today, we

19   want --

20           THE COURT:  All right.

21           MR. KIRBY:  -- to argue it.

22           THE COURT:  So I'm going to take this motion off

23   entirely.  If there is a motion that needs to be brought up to

24   clarify something on a legal issue, then bring it, and that way

25   we can focus on what the issues are.  I'm not even clear you

1    all are disagreeing on certain things.  I don't think you're

2    clear.

3        And, again, I don't -- certainly, the motion was, in

4    essence, brought at my invitation.  It was brought awhile ago.

5    We've clarified some things, but now it's this particular

6    motion as drafted is moot.

7        MS. JARVIS:  Your Honor, just to give some

8    background, I think we probably will refile a motion just

9    because we need this determination made by the effective date

10   if we can't agree, and then we'll try to mediate and work this

11   out in the interim.  But because of the 25-day period, it will

12   probably be filed while we try to work it out.

13       MS. CHUBB:  Your --

14       THE COURT:  Okay.

15       MS. CHUBB:  Your Honor, I would ask that if the

16   amounts that the parties contracted to pay is going to be

17   brought before this Court that it be with respect to specific

18   contracts.

19       It has to be the contract that people sign.  You can't

20   just make a broad order that says X, Y, and Z.  So if they're

21   going to do it, they need to include us.

22       THE COURT:  Maybe there probably is some procedure

23   you could work out where you could send out a notice saying

24   this is what our contract shows your interest payment should

25   have been.  Do you agree or disagree?

1        If you disagree, then you file a motion to challenge it.

2        (Colloquy not on the record.)

3            THE COURT:  And maybe that's the way to --

4            MS. JARVIS:  And --

5            MS. CHUBB:  Well, there's already --

6            MS. JARVIS:  And --

7            MS. CHUBB:  -- an arbitration --

8            MS. JARVIS:  Yeah.

9            THE COURT:  Right.

10           MS. JARVIS:  Well, and --

11           MS. CHUBB:  -- procedure.

12           MS. JARVIS:  Yeah.  In essence, that's what we did

13    with the loan-servicing fee schedule that we sent out pursuant

14    to the plan --

15           THE COURT:  Right.

16           MS. JARVIS:  -- and the asset purchase agreement.  So

17    with respect to the direct lenders, that procedure has been

18    done.

19        So I think the only issue is with respect to those buying

20    claims from those direct lenders.  You know, are they bound by

21    that percentage which has been --

22           THE COURT:  Why wouldn't --

23           MS. JARVIS:  -- you know --

24           THE COURT:  -- they be?

25           MS. JARVIS:  -- or do they need a new percentage fee

1    that I think that's a -- a new loan-servicing agreement.  That

2    I think is the sole issue.

3                THE COURT:  Well, that's --

4                MS. JARVIS:  And it's --

5                THE COURT:  Yeah.  But that --

6                MS. JARVIS:  Yeah.

7                MS. CHUBB:  But --

8                THE COURT:  That's clearly a new legal issue.

9                MS. CHUBB:  The Court can't make a new contract for

10   people.

11               MS. JARVIS:  And --

12               MS. CHUBB:  So what good --

13               MS. JARVIS:  And we --

14               MS. CHUBB:  -- would that do?

15               MS. JARVIS:  We need to discuss this further I think

16   with Compass --

17               THE COURT:  Yeah.

18               MS. JARVIS:  -- giving their response, and we will

19   file something.

20               THE COURT:  Okay.

21               MS. CHUBB:  Okay.

22               THE COURT:  All right.

23               MS. JARVIS:  Thank you.

24               MS. CHUBB:  I trust there won't be --

25               THE COURT:  Thank you.

```
 1              MS. CHUBB:  -- a you have to respond, you know,
 2    within three days or you are opted out because in all fairness
 3    if somebody's going to try and change our contracts we need to
 4    be here, we need to be parties, we need to know what they're
 5    asking for, and we need to have a hearing date --
 6              MS. JARVIS:  And that's why we already --
 7              MS. CHUBB:  -- truly.
 8              MS. JARVIS:  I mean, the servicing-fee schedule, that
 9    issue has already been resolved --
10              THE COURT:  Oh, okay.
11              MS. JARVIS:  -- in the plan.  But with respect to
12    this motion, that's why I'm saying that in order to give the
13    25-days' notice we would file something --
14              THE COURT:  All right.
15              MS. JARVIS:  -- right away even if -- even though
16    we're trying to mediate it --
17              THE COURT:  Okay.
18              MS. JARVIS:  -- we'll work it out.
19              MS. CHUBB:  Okay.  Thank you.
20              THE COURT:  Thank you.  All right.
21         Now, on the motion to enforce the order to distribute
22    funds.
23         (Colloquy not on the record.)
24              MS. JARVIS:  Your Honor, I think this --
25              THE COURT:  It's No. --
```

```
 1            MS. JARVIS:  I think this --

 2            THE COURT:  Oh, I'm sorry.

 3            MS. JARVIS:  This actually --

 4            THE COURT:  Excuse me.

 5            MS. JARVIS:  -- was supposed to be on the

 6   January 31st calendar.  The Court ordered us to file a

 7   supplemental brief by tomorrow.  We are prepared, and we'll do

 8   that.

 9        And so I don't know.  I think it accidently got on the

10   calendar this week, but it was intended to be --

11            THE COURT:  It --

12            MS. JARVIS:  -- continued --

13            THE COURT:  It --

14            MS. JARVIS:  -- until the 31st.

15            THE COURT:  Oh, it was not.  It's probably -- it's

16   not on our calendar.  It was on their status and agenda.  I

17   happened to look at the wrong sheet.  Sorry.  Okay.

18        Next, we have objection to claim of Spectrum.  That's the

19   one I believe that you've continued; is that right?

20            MR. SCHWARTZER:  Yes.  Lenard Schwartzer for the

21   debtor.  At the request of Spectrum and Mr. Weddell's counsel,

22   we continued this to January 31st.  There is a stipulation that

23   was filed with the docket, but there's no order entered in it.

24            THE COURT:  It was signed yesterday.

25            MR. SCHWARTZER:  Okay.
```

```
 1              THE COURT:  But it does in one docket, so --
 2              MR. SCHWARTZER:  Yeah.
 3         (Colloquy not on the record.)
 4              THE COURT:  I need to remind them.  They didn't
 5    provide us any courtesy copies of all their pleadings, so I'm
 6    going to impose sanctions unless they tell us that they did
 7    deliver them timely.
 8         Next, we have the Bunch objection to claim.
 9              MR. SCHWARTZER:  That will be argued, your Honor.
10              THE COURT:  Okay.
11         (Colloquy not on the record.)
12              THE COURT:  I wonder if I should -- I guess
13    everybody's interested in both of these matters.  There's no
14    sense taking things out of order or --
15              MR. SCHWARTZER:  Well, we have several things that
16    probably can be taken off calendar quickly, your Honor.
17              THE COURT:  All right.
18              MR. SCHWARTZER:  If you look at No. 6, that's the
19    objection to the Binford Medical Developers claim.  That's the
20    objection to claim, not the adversary proceeding.
21         With regard to that, that basically is going to be turned
22    into a contested matter.  I think the best way of dealing with
23    it would be to set a status hearing about 30 days -- I wouldn't
24    say 30 -- 45 days from now like March 2nd, so that a discovery
25    plan can be submitted, and we could tell the Court how much
```

1    time we think we need in order to litigate that issue.

2            THE COURT:  Okay.  Don't we already have -- did you

3    then file a preference action?  No.

4            MR. SCHWARTZER:  No.  We did not file a preference

5    action in Binford, and --

6            MS. SCANN:  We filed the adversary --

7            MR. SCHWARTZER:  It --

8            THE COURT:  You --

9            MS. SCANN:  -- proceeding --

10           THE COURT:  Yeah.

11           MR. SCHWARTZER:  -- on --

12           THE COURT:  The adversary --

13           MS. SCANN:  -- behalf --

14           THE COURT:  -- is filed, right?

15           MR. SCHWARTZER:  There is an adversary, and there's a

16   motion for summary judgment in the adversary --

17           THE COURT:  Right.

18           MR. SCHWARTZER:  -- that's to be filed, but that

19   adversary does not deal with their claim.  That adversary deals

20   with taking --

21           THE COURT:  Well, it's related.

22           MS. SCANN:  It is related, actually.

23           THE COURT:  Yeah.  I mean, I know --

24           MR. SCHWARTZER:  Okay.

25           THE COURT:  I know what your adversary --

```
1              MS. SCANN:  Maybe --

2              THE COURT:  Your adversary says you've got to give us

3      the money.

4              MS. SCANN:  Right.

5              THE COURT:  But --

6              MS. SCANN:  And we're damaged because you didn't give

7      us the money --

8              THE COURT:  Right.

9              MS. SCANN:  -- and the same thing with the claim, so

10     maybe a status to try to figure out maybe the two could be

11     consolidated or something.

12             MR. SCHWARTZER:  Maybe we should set the status

13     hearing on the -- make sure the status hearing on the objection

14     to claim.

15         And the status hearing for setting a discovery schedule on

16     the adversary should be set on the same date, and I would

17     suggest that.

18             THE COURT:  Okay.

19             MS. SCANN:  Yeah.

20             THE COURT:  So we'll do that after we argue the -- is

21     your summary judgment -- yeah.  Your summary judgment's

22     today --

23             MR. SCHWARTZER:  Yes.

24             THE COURT:  -- isn't it?

25             MS. SCANN:  Right.
```

```
 1              MR. SCHWARTZER:  That's today.

 2              MS. SCANN:  A partial summary judgment --

 3              THE COURT:  Yes.

 4              MR. SCHWARTZER:  Yes.

 5              MS. SCANN:  -- is today.

 6              MR. SCHWARTZER:  It's today.

 7              MS. SCANN:  Right.

 8              MR. SCHWARTZER:  That one is going forward.

 9              MS. SCANN:  Right.

10              MR. SCHWARTZER:  So we should set that some date.

11  Do --

12              THE COURT:  All right.

13              MR. SCHWARTZER:  I would --

14              THE COURT:  So let's wait 'til we argue the summary

15  judgment and go from there.

16              MR. SCHWARTZER:  Right.

17              MS. SCANN:  Okay.

18              MR. SCHWARTZER:  Okay.  So we'll hold off on that.

19        The next one is item No. 7.  That is the Gateway Stone,

20  objection to the Gateway Stone Associates.

21        That is going to be continued to March 2nd.  That

22  stipulation was filed as Docket No. 2422, and there's --

23              THE CLERK:  And March 2nd is at 1:30.

24              MR. SCHWARTZER:  At 1:30.  And there's also further

25  on in the calendar the --
```

1           THE COURT:  Right.

2           MR. SCHWARTZER:  The adversary is continued to that

3     day, too.

4           THE COURT:  So it says March 2nd at 9:30 on item

5     No. 11, so that should be changed to 1:30 as well?

6           THE CLERK:  Well, (indiscernible) March 2nd at 1:30

7     (indiscernible).

8           THE COURT:  I understand, but it says stipulation and

9     order filed to continue matter to March 2nd at 9:30 --

10          THE CLERK:  (Indiscernible).

11          THE COURT:  -- on item No. 11.

12       (Colloquy not on the record.)

13          THE CLERK:  Oh, they probably asked for that

14    (indiscernible).

15          THE COURT:  All right.

16          THE CLERK:  It should be at 1:30.

17          THE COURT:  So it should be 1:30, so we'll put both

18    of those at the same time.

19          MR. SCHWARTZER:  Okay.  Okay.  The next item that

20    could be taken care of is item No. 9.  That's the objection to

21    the Kehl claim.

22       And the Kehls also filed an adversary.  We would suggest

23    that the objection to the claim be consolidated with the

24    adversary.

25          THE COURT:  Okay.

1          MS. CHUBB:  That's fine, and we have signed a

2    stipulation to that effect, and I think it's been uploaded.  I

3    don't know if the Court's had --

4          THE COURT:  Okay.

5          MS. CHUBB:  -- a chance to look at it.

6          THE COURT:  It wasn't there yesterday, but --

7          MS. CHUBB:  Okay.

8          THE COURT:  That's not a problem.  When?  Do you know

9    when that date was?

10         MS. CHUBB:  Well, we were going to ask the Court to

11   -- Mr. Charles suggested that in view of what's going to happen

12   on the effective date of the plan and that the

13   Liquidating Trust will be looking at these loans on a

14   loan-by-loan basis to determine what they find out might have

15   happened in the loans that we just ask the Court to set a

16   status hearing in say 45 days, so we can come back and tell

17   you --

18         THE COURT:  So does the March date --

19         MS. CHUBB:  -- what's --

20         THE COURT:  -- work for you, too?

21         MS. CHUBB:  Sure.  It --

22         THE COURT:  It doesn't make --

23         MS. CHUBB:  It's probably not --

24         THE COURT:  -- any --

25         MS. CHUBB:  I --

41

```
1              THE COURT:  -- difference.
2              MS. CHUBB:  I mean, I don't know.  Ms. Freeman might
3     know how long it's going to take for them to be looking at that
4     for the trustee --
5              THE COURT:  Well, I hate to say anything, but
6     March 2nd is 45 days from now.
7              MS. FREEMAN:  It --
8              MS. CHUBB:  That was just --
9              MS. FREEMAN:  Yes.  We may --
10             MS. CHUBB:  -- a suggestion.
11             MS. FREEMAN:  We may need --
12             THE COURT RECORDER:  I'm sorry, Counsel.
13             MS. FREEMAN:  Sure.
14             THE COURT RECORDER:  Thank you.
15             MS. FREEMAN:  Susan Freeman on behalf of the
16    committee.  If we could have that with an agreement that we
17    could continue it further if we need to as we are evaluating
18    claims --
19             MR. SCHWARTZER:  Or we could --
20             THE COURT:  Okay.
21             MR. SCHWARTZER:  Or we could set it on March 15th,
22    your Honor.  I --
23             MS. CHUBB:  It doesn't matter.
24             THE COURT:  Okay.  Whichever one you want.
25             MS. CHUBB:  Okay.  I'm going to --
```

```
1          MR. SCHWARTZER:  Which one --

2          THE COURT:  So March 15th --

3          MR. SCHWARTZER:  -- do you want?

4          MS. CHUBB:  If I could --

5          THE COURT:  -- is what you prefer?

6          MS. CHUBB:  -- just check my calendar?

7          MR. SCHWARTZER:  I would suggest -- I know the Court

8    has an omnibus hearing on March 15th.

9       (Colloquy not on the record.)

10          MR. SCHWARTZER:  I have it at 9:30, yes.

11          THE COURT:  The thinking --

12          MS. CHUBB:  Either date --

13          THE COURT:  -- would have been --

14          MS. CHUBB:  -- is fine, your Honor.

15          THE COURT:  Okay.  So the 15th at 1:30.  The thinking

16   had been we're setting adversaries in the afternoon.  So if

17   you're only involved in adversaries, you only have to come in

18   the afternoon.

19          MR. SCHWARTZER:  Okay.  So that would be --

20          THE COURT:  As things if --

21          MR. SCHWARTZER:  -- when --

22          THE COURT:  It probably looks like we won't need the

23   morning hearings as much, so we can eventually switch them back

24   to 9:30, but that's where we are now.

25          MR. SCHWARTZER:  Okay.
```

```
 1              THE COURT:  So there's general rules.  If it's an
 2    adversary, it goes in the afternoon.  If it's a matter in the
 3    case, it goes in the morning.
 4              MS. CHUBB:  That's fine, and this will just be a
 5    status-check --
 6              THE COURT:  Right.
 7              MS. CHUBB:  -- report --
 8              THE COURT:  Correct.
 9              MS. CHUBB:  -- to the Court.  Okay.
10              MR. SCHWARTZER:  Okay.
11              MS. CHUBB:  We'll be happy to do that, and we'll
12    upload an order --
13              THE COURT:  Right.
14              MS. CHUBB:  -- to that effect --
15              THE COURT:  Thank you.
16              MS. CHUBB:  -- taking today's hearing off calendar.
17              MS. CARLYON:  So I'm sorry.
18              MS. CHUBB:  And so --
19              THE COURT:  Okay.
20              MS. CARLYON:  03/15 at 1:30?  Is that --
21              MR. SCHWARTZER:  Yes.
22              MS. CARLYON:  -- the continued date?
23              MS. CHUBB:  Yes.
24              THE COURT RECORDER:  Counsel, I'm sorry.
25              MS. CARLYON:  Okay.
```

1          THE COURT RECORDER:  Could you speak closer to a

2     microphone?

3          MS. CARLYON:  I'm sorry.

4      Thank you.

5          THE COURT RECORDER:  Thank you.

6          THE COURT:  Okay.

7          MS. CHUBB:  Okay.

8          MR. SCHWARTZER:  Okay.

9          MS. CHUBB:  Thank you, your Honor.

10          THE COURT:  Um-h'm.

11          MR. SCHWARTZER:  No. 10 has been taken care of.

12     No. 11 is the Gateway Stone adversary.

13          THE COURT:  Right.

14          MR. SCHWARTZER:  So that's --

15          THE COURT:  We took care of that.

16          MR. SCHWARTZER:  -- continued to March 2nd at 1:30.

17     No. 12 will be argued today.

18          THE COURT:  Um-h'm.

19          MR. SCHWARTZER:  No. 13 is the USA --

20          THE COURT:  It is continued.

21          MR. SCHWARTZER:  It is the Gateway Stone scheduling

22     conference.  That also will be continued to March 2nd at 1:30.

23          THE COURT:  Okay.

24          MR. SCHWARTZER:  By the way, your Honor, the reason

25     why is because Gateway may pay off the loan and solve the

1    problem.

2        No. 14 is the Standard Property adversary proceeding, and

3    we have agreed to continue that to March 15th.  I think in the

4    stipulation --

5            THE COURT:  Are you sure it wasn't March 29th?

6    That's what my notes indicate.

7            MR. SCHWARTZER:  I thought it was March -- you know,

8    you're right, your Honor.  I take it back.  You're right.  The

9    29th.

10           THE COURT:  And that one is at 9:30 because we only

11   have a half day that day.

12           MR. SCHWARTZER:  Yes.

13           THE COURT:  Okay.  Good.

14           MR. SCHWARTZER:  No. --

15           THE COURT:  And then the rest -- oh, 9:30.  That's

16   right.  Tree Moss is this morning.

17           MR. SCHWARTZER:  Then we have -- well, that's

18   Mr. Lisowski's --

19           THE COURT:  Right.  Mr. Lisowski's --

20           MR. SCHWARTZER:  -- motions.

21           THE COURT:  -- USA Investors.

22       And then, finally -- oh, 1:30.  The 1:30 matter is being

23   continued as well, correct?

24           MR. SCHWARTZER:  Yes.  The 1:30 matter in

25   Standard Property is also being continued --

1           THE COURT:  Okay.

2           MR. SCHWARTZER:  -- to March 29th.

3           THE COURT:  Okay.  Good.  All right.  Thank you.

4       So all we have left is the lift of stay and Ms. Scann's --

5           MR. SCHWARTZER:  And Bunch.

6           THE COURT:  -- and Bunch.  Okay.  So should we take

7   -- is there anybody interested in leaving that would not want

8   to bother with the other motions?  Okay.

9       Well, let's take the motion for relief from stay first.  I

10  have it as item No. 8.

11      (Colloquy not on the record.)

12          MR. LEATHAM:  Good morning, your Honor.  Nile Leatham

13  for Dayco.  Mr. Alper is here in the courtroom.  He has been

14  admitted pro hac vice and will be arguing the motion.

15          THE COURT:  Okay.

16          MR. ALPER:  Good morning, your Honor.  Andrew Alper

17  on behalf of the moving party.

18      (Colloquy not on the record.)

19          THE COURT:  Well, let me get to the -- the

20  bottom-line question raised in the reply, in essence, is,

21  presumably, the stay will be lifted in a very short period of

22  time, anyway, by operation of law, so why not just wait 'til

23  that time period ends?

24          MR. ALPER:  Well, we're hopeful that that's the case.

25  But if it doesn't go effective or if the plan craters, then, by

1    February 16th, then my client is back to square one again.

2        And it's unfortunate that, you know, Dayco has absolutely

3    no relationship with this estate or this debtor.  It just

4    happens to be subject to that second deed of trust on the

5    property in which the debtor has that 1.25-percent

6    fractionalized interest.

7        And so in the reply papers, Dayco said, fine, we'll agree.

8    Why don't you just lift the stay on February 1st?  We'll agree

9    to the two weeks that both the committee and the debtor

10   indicated the plan should be effective on January 31.

11       So if that's the case, Dayco's agreeable.  Lift the stay

12   on February 1, so that if it's effective it's already lifted,

13   anyway.  And if it isn't effective, then Dayco will have relief

14   from the stay.

15       The other alternative that we had suggested to the debtor

16   to kind of preserve the status quo and not injure my client is,

17   well, okay, I'll tell you what, why don't we just allow the

18   stay to lift, so that my client can record its notice of

19   default and election to sell.

20           THE COURT:  So you haven't even recorded the notice

21   of default and election to sell, yet?

22           MR. ALPER:  Well, actually, we did, and I'll tell

23   you --

24           THE COURT:  Oh, okay.

25           MR. ALPER:  -- what happened.

1      My client bought the loan and recorded its notice of

2   default and election to sell and then got a letter from the

3   Ray, Quinney firm saying, hey, wait a minute, there's a

4   bankruptcy that affects the property.  Well, that's the first

5   time my client found out about the bankruptcy, so it's a void

6   recordation.

7              THE COURT:  Okay.  So you'd have --

8              MR. ALPER:  So --

9              THE COURT:  -- to start over.

10             MR. ALPER:  -- we have to start over, so --

11             THE COURT:  Is it four months in California?

12             MR. ALPER:  Well, it's 90 days to record the notice

13  of default and election to sell, and then after the 90 days

14  runs it's a 21-day publication, so then you have to notice a

15  trustee sale by publishing it.

16      So what my suggestion is is, okay, we'll record our notice

17  of default now, and we'll let the 90 days start running.  By

18  that time, we'll long since know whether or not this plan is

19  effective, and, you know, it's long since over.  If it isn't,

20  then we'll refile our motion at that point, but then nobody's

21  prejudiced by that.

22             THE COURT:  Okay.  And what do you claim the values

23  are again?

24             MR. ALPER:  We don't claim it at all.  This motion

25  was brought under (d)(1), and the reason we didn't do that is

1    we recognized that there was some equity in the property.

2         The debtor has indicated in its papers that there is some

3    appraisal out there that we've never seen by Hilco saying it's

4    worth 2.95.

5         And when you start looking at the numbers, what's really

6    holding up my client, then, at this point is the debtor's

7    interest of $12,000 in this property.

8         And the way that works out is my client is owed today

9    roughly $1,750,000.  If you assume that, you know, there's

10   going to be costs of sale for this property at eight percent if

11   somebody would market it, six percent for commissions, two

12   percent for costs, that's $236,000.

13        So we're talking about the debtor's loan.  Whether it's

14   2.3 or 2.8, I'm not certain because the deed of trust says 2.3.

15   The debtor says it's 2.8.  It really doesn't matter because the

16   entirety is 4.7, and the property's only worth 2.95.

17        So, really, what the debtor's talking about is a $900,000

18   second at this point based on what the value of the property

19   is, and the debtor has a 1.25-percent interest in that $900,000

20   second based on its valuation.

21        So, really, we're talking about 12- to $13,000 that's

22   holding up my client from foreclosing on the property of its

23   borrower who's not part of this bankruptcy, and that's what's

24   doing it --

25              THE COURT:  Okay.

1          MR. ALPER:  -- at this point.

2          THE COURT:  But the rest of the loan is made up of

3    direct lenders.  Now, I recognize that doesn't create a stay,

4    but the rest of the loan is made up of direct lenders through

5    USA Commercial, right?

6          MR. ALPER:  Well, all I know is, apparently, they're

7    servicing the loan.

8          THE COURT:  Okay.

9          MR. ALPER:  Right.

10          THE COURT:  Okay.  Mr. Schwartzer.

11          MR. SCHWARTZER:  Your Honor, the debtor's position is

12    that --

13          THE COURT:  Has the debtor started foreclosure, yet?

14          MR. SCHWARTZER:  No.  This is one of the --

15          THE COURT:  Why not?

16          MR. SCHWARTZER:  Well, because the debtor hasn't

17    started foreclosure because one of the things that they would

18    have to worry -- they would have to lay out funds, a

19    foreclosure fee, to a title company which would be a

20    substantial amount of money, and this is one of the loans that

21    is sold to Compass Partners.

22          THE COURT:  Oh, okay.

23          MR. SCHWARTZER:  Okay?  And so it wouldn't make sense

24    for the debtor to do that at this point.

25        Our position is that this movant has not shown cause.

1    There's not a question about equity in the property because,

2    remember, when they talk about equity of the property it's when

3    the owner --

4              THE COURT:  Right.

5              MR. SCHWARTZER:  -- when the debtor is the owner.

6        This is where there is $900,000 at least to protect for

7    the value of the direct lenders among which we have a debtor as

8    one of the direct lenders, a small percentage, but one of the

9    direct lenders, so they have not shown cause.

10       There's no dispute that Mr. Allison as a chief

11   restructuring officer of the debtor which is one of the owners

12   of this deed of trust is in a position to give his analysis of

13   the value, and there is a 1.7-million-dollar first mortgage and

14   a 2.9-million-dollar property.

15       Now, so what we're talking about is a very large equity

16   cushion that under the Ninth Circuit rule in Mellor (phonetic)

17   completely protects this movant.  They have not shown cause.

18       Now, whether they think it's fair or not, that's not a

19   real relevant question.  The statute says cause, and that's

20   what they've not really shown because we have shown that there

21   is a huge equity cushion in this case to protect them.

22       The Mellor case said 20 percent.  Here we're looking about

23   a 70-percent situation of equity value over the amount of their

24   deed of trust.

25       The only thing what they're facing is they're facing

1    delay.  And for that delay, they will get the interest as

2    provided in the note.

3        They will get the late charges as provided in the note.

4    They will get the attorneys fees that are provided in the note,

5    so they're fully protected because of this large value cushion.

6        Mellor uses the word "equity cushion", but, really, the

7    issue here is a value cushion.  Equity is not the issue here.

8    They are protected by their value over and above.

9        And there's just no reason at this point in time to lift

10   the stay knowing that there apparently will be a sale.  The

11   stay will lift, apparently, in a few weeks, probably, sometime,

12   you know, when this loan is purchased by Compass.

13       The percent, the one percent, owned by the estate will

14   no longer be property of the estate, and the stay will

15   disappear.

16       There's really no cause.  I don't even know why the motion

17   was filed when you have that huge value cushion and a short

18   period of time left here.

19           THE COURT:  Okay.

20           MR. SCHWARTZER:  Yes.  There's a possibility that

21   everything could go haywire, and there could be -- but even

22   then if everything went haywire, there's still the huge value

23   cushion, so we would ask the Court to just deny the motion

24   straight out.

25       Nothing further.

1          THE COURT:  Okay.  Ms. Freeman.

2          MS. FREEMAN:  Susan Freeman on behalf of the

3    unsecured committee.  We filed a joinder in the debtor's

4    position on this one.

5          And we do want to reiterate that this is a note that was

6    acquired by this movant postpetition.  The movant says, oh, we

7    didn't know about it, but they certainly had constructive

8    notice, and we would not be surprised if somebody had actual

9    notice.

10         I mean, you could look at the record.  You can find out

11   what this is.  This is a notorious case.  To have someone come

12   in postpetition, acquire a note, and try and foreclose out the

13   ability of this estate to recover money is it's inappropriate.

14         We should let Compass go forward and be in a position to

15   make decisions with respect to the servicing of this loan and

16   the correct actions to be taken with respect to this loan.

17   It's not going to be much longer.

18          THE COURT:  Okay.

19          MS. FREEMAN:  Thank you.

20          MR. ALPER:  Your Honor, with respect to the comments

21   from the committee, I think it's disingenuous to say that my

22   client should have known about the bankruptcy given the fact

23   that it had no relationship with this debtor.

24          THE COURT:  Oh, come on.  You're a sophisticated

25   investor.  I can't believe that you wouldn't have -- on the

1   record was all these deeds of trust and, in fact,

2   USA Commercial Mortgage.

3           MR. ALPER:  There's nothing on the record that says

4   USA Commercial Mortgage is in bankruptcy, not when you're

5   running a PERT or not when you're getting a title report.  It

6   didn't say that.

7           THE COURT:  Well, they're one --

8           MR. ALPER:  They were --

9           THE COURT:  -- of the lenders.

10          MR. ALPER:  -- a second trust deed.  They're a second

11  trust-deed holder.

12      Your Honor, 362(d)(1) says cause, including lack of

13  adequate protection.  "Cause" is a flexible term.  Cause can be

14  for a number of factors.

15      It wasn't defined purposely in the bankruptcy code, and it

16  takes into account situations that are unusual, and I think

17  it's unusual for someone who has a $12,000 interest in property

18  with a junior deed of trust to hold up a foreclosure of someone

19  who's owed a million-seven-fifty and has no relationship with

20  the debtor.

21          THE COURT:  Well, you bought the note when it was in

22  default, right?

23          MR. ALPER:  Correct.

24          THE COURT:  Okay.  All right.  Well, I'm going to --

25  a preliminary matter -- make a preliminary finding that the

1    stay should not be lifted and continue a final hearing for

2    30 days.

3         I find that there's a reasonable likelihood that the

4    estate will prevail because at least in the immediate near

5    future because there's $900,000 in-between the amount of the

6    first and the amount of the second.

7         And while it's true the first is entitled to the entire

8    note, it obviously paid.  I mean, I think it's probably

9    apparent it paid some amount less, so it's certainly not coming

10   out of pocket.

11        And this is not a situation in which this debtor bought a

12   small piece of a loan to prevent a foreclosure.  It's the

13   opposite.

14        This debtor as a part of all the direct lenders had a

15   piece of the loan.  And while the loan was in default, the

16   first bought the note, so I don't think there's any crocodile

17   tears necessary for Dayco here.

18        But by the same token, I'm not going to deny it because if

19   the plan does go awry it would be appropriate to determine at

20   what point they are precluded from starting the process, so

21   we'll continue the final hearing for 30 days which would be the

22   February 15th hearing.

23             MR. SCHWARTZER:  Yes, your Honor.

24             THE COURT:  Okay.  And, of course, if the stay lifts

25   on its own in the meantime, then it does.

56

```
1            MR. ALPER:  Thank you, your Honor.

2            THE COURT:  Thank you.

3            MR. ALPER:  With respect to the 15th date --

4            THE COURT:  Um-h'm.

5            MR. ALPER:  -- I know the Court sets group dates for

6    this case.  I know that I am unavailable on that date.

7            THE COURT:  Would you rather have March 1st?  And if

8    you do, I mean, you'll be waiving --

9            MR. ALPER:  No.  I --

10            THE COURT:  -- the 30-day rule.

11            MR. ALPER:  I understand that.  We'll --

12            MR. SCHWARTZER:  Okay.

13            MR. ALPER:  We'll stick with February 15th.  And if

14    I'm unavailable --

15            THE COURT:  Okay.

16            MR. ALPER:  -- then Mr. Leatham can do it.

17            THE COURT:  I mean, why do I have two, March 1st and

18    March 2nd?  Is that right for USA Commercial?

19            MR. SCHWARTZER:  No.  It --

20            THE CLERK:  Yeah.

21            MR. SCHWARTZER:  The --

22            THE CLERK:  Well, one with -- yeah.  You set this one

23    in the afternoon because this (indiscernible).

24            THE COURT:  Okay.

25            THE CLERK:  And then Spectrum was put on.
```

1          THE COURT:  Oh, I think this was just -- oh, for an

2    adversary.

3          THE CLERK:  Yeah.

4          THE COURT:  Okay.

5          THE CLERK:  (Indiscernible).

6          THE COURT:  I see.

7      Sorry.  Go ahead.

8      (Colloquy not on the record.)

9          MR. SCHWARTZER:  So that would be February 15th --

10          THE COURT:  9:30.

11          MR. SCHWARTZER:  -- at 9:30.

12          THE COURT:  Um-h'm.

13          MR. ALPER:  Thank you.

14          THE COURT:  Okay.  Thank you.  All right.

15      Now, on the Binford matter.

16      (Colloquy not on the record.)

17          THE COURT:  And that's on page 9, Docket 12.

18          MR. SCHWARTZER:  Your Honor, Lenard Schwartzer

19    appearing for the defendant and movant on the motion for

20    partial summary judgment.

21          MS. SCANN:  And Susan Scann appearing for the

22    plaintiff and respondent on the motion for summary judgment.

23          THE COURT:  Okay.

24          MR. SCHWARTZER:  Okay.  Your Honor, we briefed this

25    case pretty well we think, and I don't think we're talking

1  about a lot of issues.  I don't want to repeat all the

2  arguments in the brief.

3          THE COURT:  Right.

4          MR. SCHWARTZER:  But we basically would like to have

5  this Court make a determination that the loan documents that

6  Binford signed basically are enforceable, and there are

7  specific provisions that we're asking.

8      Now, the first one that we talked about was that any

9  action must be brought in Clark County.  In this case, that

10  probably is not a major issue, although it is similar to other

11  ones because Binford did bring their actions in the adversary

12  here, and Binford has filed a claim here, and they have not

13  filed an action in Indiana --

14          MS. SCANN:  Not --

15          MR. SCHWARTZER:  -- to my knowledge.

16          MS. SCANN:  Yeah.  At this point, well --

17          THE COURT:  And you did not --

18          MS. SCANN:  -- except for foreclosures.

19          THE COURT:  -- dispute that.

20          MS. SCANN:  Yeah.  Except for foreclosures.  If

21  there's a foreclosure filed in Indiana, then that would have to

22  take place in Indiana.

23          MR. SCHWARTZER:  We --

24          MS. SCANN:  I think --

25          MR. SCHWARTZER:  And --

1          MS. SCANN:  -- they do judicial foreclosures in

2     Indiana.  At least, that's what I'm told.

3          MR. SCHWARTZER:  And we're not disputing that.

4          MS. SCANN:  So --

5          MR. SCHWARTZER:  We're just saying any action brought

6     by Binford must be brought in Clark County.

7          MS. SCANN:  And we already did that --

8          MR. SCHWARTZER:  Okay.

9          MS. SCANN:  -- so it's really not an issue.

10         THE COURT:  Okay.

11         MR. SCHWARTZER:  That's a nonissue.

12        Then the next issue was the loan agreement, promissory

13    note, and mortgage are governed by the laws of the

14    State of Nevada except with regard to provisions --

15         THE COURT:  And they have agreed --

16         MR. SCHWARTZER:  -- related to foreclosure.

17         THE COURT:  -- to that.

18         MS. SCANN:  And we've agreed that --

19         MR. SCHWARTZER:  Okay.

20         MS. SCANN:  -- that's the case.

21         MR. SCHWARTZER:  Then the next one was there is no

22    obligation by the direct lenders to loan Binford additional

23    funds except at the direct lenders' sole and absolute

24    discretion.

25         THE COURT:  And they've agreed with that.

1        MS. SCANN:  And I think that's what that side

2    agreement says, so, otherwise, I wouldn't agree with that, but

3    we have the side agreement.

4        MR. SCHWARTZER:  The next one, of course, is the

5    direct lenders have the right but not the obligation to fund

6    additional funds to be secured by the mortgage --

7        THE COURT:  Right.  And --

8        MR. SCHWARTZER:  -- not that they want to do it, but

9    they do have the right.

10       THE COURT:  And they have agreed with it, so the only

11   issue --

12       MS. SCANN:  We do.

13       THE COURT:  -- is whether the failure to loan causes

14   a breach of the loan agreement --

15       MR. SCHWARTZER:  Right.

16       THE COURT:  -- and whether or not the failure to loan

17   funds was the basis of any claim by Binford against the direct

18   lenders.

19       MR. SCHWARTZER:  And, basically, what that comes down

20   to, your Honor, is a review of the language of the side

21   agreement and the loan documents.

22       And we think between the two they make it clear that the

23   side agreement that says we're going to do additional loans is

24   made by USA Commercial Mortgage in its own capacity, not as the

25   broker or agent for the direct lenders.

1          They have language in the document which specifically says

2     that.  The language in the side agreement is that -- it's in

3     the side agreement which is attached says, "USA on its own

4     behalf and not in its capacity as a broker has offered to

5     increase the loan."  That clearly indicates they're doing it on

6     their own behalf.

7          The side agreement further provides, "Notwithstanding the

8     foregoing, borrower acknowledges that no such advances need be

9     made when an event of default exists unless the event of

10    default was caused by the USA under this agreement."

11         So there can be a dispute here between USA and Binford on

12    whether USA has an obligation to make that loan, but nothing in

13    there says that the direct lenders are going to have to do

14    something.

15         And then, finally, in the side agreement in paragraph 2 it

16    says, "The borrower" -- which is Binford -- "hereby agrees and

17    acknowledges that its sole remedy shall be an action against

18    USA for damages."

19         So what we want this Court to make the determination is

20    that this language is clear enough at this point on summary

21    judgment that, one, that the fact that the direct lenders have

22    not agreed to make any additional loans is not a breach of the

23    agreement by the direct lenders.

24         And, number two, the failure of USA Commercial Mortgage to

25    make additional loans while it might be -- and we're not

1    consenting that it is -- but while it might be a breach of the

2    side agreement is not a basis for Binford to have any claim

3    against the direct lenders or have any right to any defense to

4    the loan by the direct lenders when they bring their

5    foreclosure action.

6        We want to make this a clean loan from the point of view

7    of the direct lenders, and that's what the purpose of this

8    motion is.

9        And we just don't think that there is, really, a factual

10   dispute that is material to the limited relief that we're

11   seeking here.

12       We're not seeking a determination that USA Commercial

13   Mortgage didn't breach the agreement.  We're just saying we say

14   there is a dispute as to that.

15       We're just saying that even if USA Commercial Mortgage

16   breached the side agreement that doesn't affect the loan, and

17   that is because the side agreement specifically says it's not

18   going to affect the loan.

19       The loan documents, in addition, have provisions that we

20   talked about which says that there are no setoffs against this

21   loan.

22       So whatever else they have, whatever claims Binford may

23   have against USA Commercial, they can't be used against the

24   direct lenders.  That's what this motion seeks.

25       I think the documents are binding on both parties, and

1   there will have to be an ultimate determination at some point

2   of whether there was a breach of the side agreement by

3   USA Commercial Mortgage and whether Binford has claims, but

4   that should not prevent this Court from issuing summary

5   judgment at this time.

6           THE COURT:  Okay.

7           MS. SCANN:  Partial --

8           THE COURT:  All right.  Ms. Scann.

9           MS. SCANN:  -- summary judgment.

10          MR. SCHWARTZER:  Partial.

11          MS. SCANN:  Yeah.  We're asking the Court to look at

12  the whole agreement, the whole side agreement, not just part of

13  the side agreement, the parts that they have cited.

14      There is also the provisions under 3(a) which says,

15  "During the term of any default by USA hereunder" -- and

16  there's clearly an issue of fact as to whether there's a

17  default there -- "if that default causes an event of default by

18  the borrower under the documents, then USA shall cause the

19  lender" -- who are the direct lenders -- "to fully forbear from

20  exercising their rights and remedies."

21      And it's our contention that that provision that we're

22  entitled to forbearance until USA fulfills its obligation is

23  binding on the direct lenders.

24      USA clearly has expressed authority to bind the direct

25  lenders in this area based on both the power of attorney and

1    the loan-servicing agreement.

2              THE COURT:  But what if they're no longer the

3    servicing agent?

4              MS. SCANN:  Your Honor, we objected to confirmation,

5    and our rights are still preserved under paragraph 78 of the

6    order, so I think we can still make that argument when the new

7    servicing agent comes on.

8         So what my client's trying to do is come up with this

9    other $925,000, and this is the case where the 330,000 is

10   sitting there, and we're getting nowhere on that.

11        So, you know, my client in this case is really stuck in a

12   bind because my client's not able to get the benefit of the

13   last money that was loaned on this thing.

14        Plus, my client's still out there trying to find another

15   $925,000 because we know that USACM isn't going to come up with

16   it, and we also know the direct lenders don't have to come up

17   with it.

18        And that's the reason why my clients are seeking the

19   benefit of that forbearance provision, so that we can go ahead

20   and try to get the rest of that money and then move on down the

21   road, and that's the one thing in that agreement that we are

22   contending is binding.

23        Obviously, we can't get a personal judgment against the

24   direct lenders for money damages because we said in this side

25   agreement that that doesn't apply.

1          That our only claim is against USACM for money damages,

2     but we didn't waive the benefit of this forbearance

3     agreement.

4          And because USACM clearly has the authority to forbear and

5     because they can enter into other settlement-related agreements

6     based upon the loan agreement or the loan-servicing agreement

7     signed by the direct lenders, the direct lenders put USACM in

8     the position to make this agreement.

9          And, therefore, we contend that we're entitled to the

10    benefits of that agreement against the direct lenders and only

11    that.

12         We're not asking for damages against the direct lenders

13    because we know we don't have them, only the forbearance to

14    come up with that extra money.

15         And the cases that were cited by the debtor say, well,

16    once the agency's revoked, then any acts after that are no

17    longer binding.

18         But we're talking about things that happened before the

19    bankruptcy was even filed, so I think the debtor's cases are

20    not applicable in this situation.

21         (Colloquy not on the record.)

22              MS. SCANN:  And, also, based on the confirmation

23    order, I think our defense is preserved, so I would request

24    that the motion be denied, that partial summary judgment be

25    denied, just in that respect.

1       And, you know, we've already stipulated to 1 through -- A

2   through 1 -- the first four.  But as far as the last two are

3   affected by this provision, that's what we're arguing about

4   here today.

5           THE COURT:  Okay.  Any response?

6           MR. SCHWARTZER:  Again, your Honor, it's not a matter

7   of the whole world being here or are there any facts, material

8   facts, in dispute.

9       The documents have very specific language.  Paragraph 2 of

10  the side agreement ends with the provision, "USA's failure to

11  perform under this agreement shall not negate, nullify,

12  invalidate, or in any way excuse or diminish borrower's duties

13  and obligations under the loan agreements."  I think that makes

14  it very clear that they can't do it.

15      Now, the side agreement does have a provision about

16  forbearance, and the language of the forbearance is important

17  because it's the side agreement says that USA -- you know, the

18  agreement is made -- remember, it's made on USA Commercial

19  Mortgage's own behalf, not on behalf of the lenders.

20      And it says, "USA Commercial Mortgage will cause the

21  direct lenders to forbear."  And as servicing agent for the

22  loan, USA Commercial Mortgage will forbear.

23      Well, so far, USA Commercial Mortgage has caused the

24  direct lenders to forbear because that they haven't started the

25  foreclosure.  Now, it may not because of this provision, but

1    they haven't violated that provision.  They haven't.

2        What we're saying is at most if the direct lenders begin

3    foreclosure it is a breach of USA Commercial Mortgage's

4    obligation to cause the direct lenders to forbear.

5        There's nothing in this side agreement that says the

6    direct lenders will forbear, and the direct lenders are never

7    bound by this side agreement because this side agreement is

8    between Binford and USA Commercial Mortgage in its own capacity

9    and not as the agent for the direct lenders.

10        So we're saying again is that there could possibly be a

11    breach of this agreement by USA Commercial Mortgage, but

12    there's nothing in this side agreement that says it binds the

13    direct lenders.  It very specifically says it's not.

14        And that's why we think the partial summary judgment

15    should be granted in this case because the language of the

16    documents is clear enough.  They're not ambiguous, your Honor.

17        And Nevada law which would apply to this contract says you

18    look at the words of the contract, give them their plain

19    meaning, and apply them.  You don't take in, well, the other

20    factors like it's unfair or my guy wishes he could have the

21    $300,000.

22        Remember, USA Commercial Mortgage's position is that

23    $330,000 in escrow is interest that is owed to the direct

24    lenders who haven't received interest in months and months and

25    months on this nonperforming loan.

1           THE COURT:  And as an aside –

2           MR. SCHWARTZER:  So that's why --

3           THE COURT:  -- the 300,000 is still set aside,

4    correct?

5           MR. SCHWARTZER:  It's still --

6           THE COURT:  Okay.

7           MR. SCHWARTZER:  -- in an escrow account at a title

8    company --

9           THE COURT:  Okay.

10          MR. SCHWARTZER:  -- your Honor.  It hasn't been

11   moved.  Yeah.  As a matter of fact, I think there's a prior

12   order from this Court telling us not to do that.

13       But it's our position that that is interest owed to --

14   that's the additional security for the direct lenders and

15   past-due interest owed to the direct lenders.

16          THE COURT:  Okay.

17          MS. SCANN:  Your Honor, if I could just add one thing

18   that I --

19          THE COURT:  Um-h'm.

20          MS. SCANN:  I'm not sure I emphasized it.  Binford --

21          THE COURT RECORDER:  I'm sorry, Counsel.  Will you

22   move closer --

23          MS. SCANN:  Okay.  Right.

24          THE COURT RECORDER:  -- to the microphone, please?

25       Thank you.

1        MS. SCANN:  Binford relied on that provision in the

2    agreement, and the direct lenders put the debtor in a position

3    of authority to make that representation in paragraph 3(a), and

4    I think given those facts the direct lenders are implicated and

5    can be bound.

6            THE COURT:  Okay.

7            MS. CARLYON:  Your Honor, Candace Carlyon for the

8    First Trust Deed Fund.  I just want to note that the direct

9    lenders of whom my fund is the largest are not named in this

10   adversary.

11       I'm sure that they would all echo Mr. Schwartzer's

12   sentiment that USACM was not authorized to act as their agent

13   to grant any forbearance.  In fact, that concept, you know, is

14   foreign to the obligations that USACM has to the investors.

15       But I just wanted the Court to know that any allegations

16   with regard to USACM being the agent for the direct lenders I

17   would believe would have to brought up in the context of an

18   action in which the direct lenders had the opportunity to

19   appear.

20           (Thereupon, the portion requested to be transcribed

21           was concluded at 10:49:59 a.m.)

22           (Thereupon, the portion requested to be transcribed

23           commenced at 10:53:34 a.m.)

24           THE COURT:  Okay.  What else do we have left?

25           MR. SCHWARTZER:  We have the objection to the Bunch

1    claim.

2              THE COURT:  Oh, right.  The objection to the Bunch

3    claim.

4         (Colloquy not on the record.)

5              MR. SCHWARTZER:  Your Honor, Lenard Schwartzer

6    appearing for the debtor.

7              MR. HOLLEY:  Good morning, your Honor.

8    Richard Holley on behalf of Mr. and Mrs. Bunch.

9              MR. SCHWARTZER:  Your Honor, I'm prepared to argue

10   this, and I just want to point out that the Bunches filed a

11   supplemental response on Friday.

12         And we therefore filed a supplemental reply brief

13   yesterday and had it hand-delivered to your chambers before

14   noon, and I just want to make sure the Court was aware that you

15   had that.

16             MS. SCANN:  Excuse me, your Honor.  We were supposed

17   to set a status date --

18             THE COURT:  Oh, excuse me.

19             MS. SCANN:  -- for our objection to proof of claim --

20             THE COURT:  When do you want --

21             MS. SCANN:  -- and --

22             THE COURT:  -- to do it for that --

23             MS. SCANN:  -- our adversary.

24             THE COURT:  -- March 2nd, March 15th?

25             MS. SCANN:  March 15th.

1          MR. SCHWARTZER:  That will be fine.  March 15th.

2          MS. SCANN:  At 1:30 or 9:30?

3          MR. SCHWARTZER:  That's --

4          THE CLERK:  9:30.

5          MR. SCHWARTZER:  -- at 9:30.

6          THE COURT:  9:30 --

7          MS. SCANN:  9:30.

8          THE COURT:  -- on that one.

9          MS. SCANN:  And that will both for the adversary --

10         THE COURT:  Right.

11         MS. SCANN:  -- and for the proof of claim.

12         THE COURT:  Right.

13         MS. SCANN:  Thank you, your Honor.

14     (Colloquy not on the record.)

15         MR. SCHWARTZER:  The Court really has already heard

16   extensive argument on this, already.

17          THE COURT:  Right.

18         MR. SCHWARTZER:  And I'm not going to go over the

19   other issues because the Court has already -- on the issue

20   about the voting, the Court made a determination that we had

21   shown the prima facie case about the preference.

22     And that 502(d) means what it says which is if you have a

23   preference, even if it's $1, you can't get your $1,000,000

24   claim allowed unless you pay back that $1, so I'm not going to

25   argue that.

1     But there is I think an interesting new argument raised by

2     the supplemental briefs, and I would like to just make sure the

3     Court understands our position.

4     The new argument is that since the payment to Mr. Bunch

5     came out of the USA Commercial Mortgage collection account

6     which under state law is supposed to be a trust account,

7     therefore, if it was trust moneys paid to Mr. Bunch, and it was

8     not assets of the debtor; therefore, there was no transfer of

9     property from the debtor to Mr. Bunch.

10    And if there was no transfer of property of the debtor to

11    Mr. Bunch, then there could be no preferential transfer, and

12    that is a very logical argument.

13    But the facts of this case have been described to this

14    Court I think right from the beginning that there has been a

15    lot of "funny" business that went on beforehand, not funny I'm

16    sure to the investors.  That's, probably, a real poor choice of

17    terms.

18    But there was, clearly, a situation where the collection

19    account had funds in it that were not trust funds, was used to

20    pay expenses that were not trust funds, and, in fact, was never

21    treated by -- not never, but at least since 2001 was not

22    treated by the debtor as a trust account.

23    We would point out and we would point out to the Court

24    that we have on file -- and it was filed in connection with the

25    confirmation of the plan -- Mr. Allison's declaration which

1    really went into a great deal of detail with regard to the

2    issue of the trust funds and pointed out that there was

3    commingling of funds from various sources in the trust funds.

4    There was use of the trusts funds at various points.

5        And, in fact, at one point, February 8th which is right in

6    and around the time between the time of the -- in-between the

7    time of the two preferential transfers to Mr. Bunch, there was

8    a negative balance in the trust account because the debtor had

9    written checks against that account that exceeded the amount of

10    funds in the bank by several millions of dollars.

11        We think that based upon the facts of this case it has

12    been shown factually that that trust account was not a trust

13    account, and, therefore, the argument that it was not property

14    of the estate is inapplicable.

15        We have pointed out in our brief -- and we spent a great

16    deal of time researching the issue -- that when you have a

17    situation like this which to some extent is a Ponzi-like

18    scheme, and you have all this money thrown in you wind up in a

19    situation where the Court cannot say these are trust funds,

20    and, therefore, it is presumed that these funds are property of

21    the estate.

22        And there's a series of Ninth Circuit cases that go and

23    make that point as well as from several other circuits, but the

24    Ninth Circuit is, probably, the one that's clearest on that

25    issue of saying there has to be an analysis here.

1          Now, usually, the issue doesn't arise in this situation as

2     a defense to 547.  Usually, it arises when a guy says, well, I

3     put my money into the guise of the investor trust account, and,

4     therefore, those are trust funds, and I should get it back, and

5     the Court then has to do the analysis of whether it's a trust

6     fund or not.

7          And a lot of poor investors don't have their funds in

8     trust because the accounts are not treated as a trust account

9     by the debtor.  This is that situation.

10          The people involved here can't say that their specific

11     funds are in the trust account.  And, in fact, that was one of

12     the bases for this Court reaching the conclusion that the plan

13     was confirmable because it allowed us to treat the collection

14     account as not being a trust-fund account and dealt with the

15     direct lenders under the plan, and that's why the declaration

16     had that extensive information in connection with confirmation.

17          In addition, your Honor, I did find several cases that did

18     hold in regard to 547 cases that just because the account is

19     called a trust account does not mean that you can't have a

20     547(b) action, preference action, if it can be shown that the

21     account labeled a trust account was not a trust account.

22          We have done this in this case.  We would argue,

23     your Honor, that since there was a preferential transfer there

24     should be a denial of the claim.

25               THE COURT:  Okay.

1          MR. SCHWARTZER:  This is not an unfair result.

2    Mr. Bunch got $400,000 out of that collection account.  His

3    best way of putting his argument is I got somebody else's

4    money, but you shouldn't count that because they don't now that

5    I got their money, and somebody else could come after me for

6    the 400,000, but not the debtor.

7          In fact, there are money in there that was misappropriated

8    from direct lenders.  We know at some point in time there was

9    principal payments that were put into that account that were

10   used to pay whatever bills and apparently paid Mr. Bunch

11   interest for many, many years at 20 percent.

12         In all fairness, the small amount we're asking back, the

13   two months of the four years of interest we're asking him to

14   pay back, will only put him in a situation where he is not

15   getting an advantage over the other people who should have been

16   paid with those funds.

17         There are direct lenders out there who had their

18   principals misappropriated.  They are now general unsecured

19   creditors of the estate.

20         It would be only fair that Mr. Bunch be forced to share

21   equally with those people and not have the advantage of the

22   $400,000 in interest he received in the period.

23         He will still have a claim if he repaid it.  But if he

24   absolutely refuses to repay it, 502(d) makes it clear no

25   claim.

1    The claim is disallowed, and we ask the Court at this

2    point since Mr. Bunch has not tendered the payment at this

3    point to disallow his claim.

4         THE COURT:  Okay.  All right.  Response.

5         MR. HOLLEY:  Good morning, your Honor.  I sense a

6    tremendous uphill battle, but there's still some points that I

7    feel like need to be made.

8         THE COURT:  Well, do you disagree with the factual

9    proposition that these moneys were commingled, put in the

10   account by various people, not held as a trust fund?

11        MR. HOLLEY:  Your Honor, this goes to, really, the

12   first argument that I want to make and the premise for my

13   position.

14        In terms of the procedural manner in which the objection

15   to claim -- really, the preference has been litigated in front

16   of the Court.

17        If the Court will recall, the initial objection to claim

18   was really filed as a strategic measure in order to nullify

19   Mr. Bunch's vote against the plan.

20        We then were forced to file a motion for a temporary

21   allowance for voting purposes.  During that proceeding, we're

22   repeatedly told, look, this is just for voting purposes only.

23   You know, the --

24        THE COURT:  I mean, I just want to --

25        MR. HOLLEY:  The --

```
1           THE COURT:  I don't understand that you --

2           MR. HOLLEY:  Right.  And so from --

3           THE COURT:  Because if you do, that just puts it if

4    you -- I just want to know if you disagree.  If you do, that's

5    fine.

6           MR. HOLLEY:  Your Honor, I think at this point I have

7    to say that we contest that --

8           THE COURT:  Okay.

9           MR. HOLLEY:  -- simply because we haven't had an

10   opportunity --

11          THE COURT:  Okay.

12          MR. HOLLEY:  -- to conduct our own discovery, and --

13          THE COURT:  So do you --

14          MR. HOLLEY:  And --

15          THE COURT:  But do you disagree with the legal

16   proposition that if the facts are as they say they are that it

17   would no longer be property of the estate?

18          MR. HOLLEY:  Your Honor, we received the papers

19   yesterday morning.  We have scrambled to try to go through and

20   review those cases.

21       I can't say that we've done a thorough analysis of the

22   cases.  On the surface, it appears as though the cases, the

23   legal standard, is fairly set.

24       I don't know if the Court agrees with the legal standard

25   that's been proposed or not in terms of whether this has ever
```

1    been raised with the Court or not.

2        So I would like the additional opportunity to review those

3    cases in further detail --

4            THE COURT:  Well, then why don't we --

5            MR. HOLLEY:  -- to see --

6            THE COURT:  -- continue this, then.

7            MR. HOLLEY:  -- if I do agree.

8            THE COURT:  And let me tell you my inclination.

9    my --

10            MR. HOLLEY:  Okay.

11            THE COURT:  Because I thought about this, quite

12    frankly, in connection with a temporary allowance because, you

13    know, I thought about the proposition, well, yeah, but if it

14    came from that trust account is that really property of the

15    estate, and then I satisfied myself that if -- again, a

16    temporary allowance.

17        If the facts were as they said they were, then as in

18    Bullion Reserve it was property of the estate because it didn't

19    belong to a particular person, and, again, Bullion Reserve was

20    a different context.

21            MR. HOLLEY:  Um-h'm.

22            THE COURT:  But you certainly have the right to

23    examine those facts at this stage, and then, you know, maybe

24    there's degrees along the way.  You know, Bullion Reserve was

25    this end.

```
1              MR. HOLLEY:  H'mm.

2              THE COURT:  Maybe this case is someplace in the

3     middle.

4              MR. HOLLEY:  I --

5              THE COURT:  So do you want --

6              MR. HOLLEY:  I --

7              THE COURT:  -- to do a discovery first?

8              MR. HOLLEY:  I --

9              THE COURT:  What do you --

10             MR. HOLLEY:  I --

11             THE COURT:  -- want --

12             MR. HOLLEY:  I think --

13             THE COURT:  -- to do?

14             MR. HOLLEY:  I really think what we should do,

15     your Honor, and I -- the Court, you know, referenced KF Dairies

16     and to some extent at our last hearing.

17        I went through and took the opportunity to review that

18     case in some detail, and I think that at this point while there

19     may have been a need to rush in terms of the allowance motion

20     for voting purposes because plan confirmation was just around

21     the corner I really think that we're all going to be

22     shortsighted if we're trying to rush through and make the

23     objection to claim a summary proceeding where, really, the

24     basis of it is preference.

25        And so it seems to me under KF Dairies is if I understand
```

1    the procedural aspects of this right where there's no bar date

2    imminent --

3        (Colloquy not on the record.)

4        MR. HOLLEY:  -- and we're not rushing to a result

5    because, I mean, we don't even -- the creditor trust in all

6    likelihood is not going to be making a distribution for quite

7    some time.

8        THE COURT:  I don't care how long --

9        MR. HOLLEY:  I know --

10        THE COURT:  -- we continue it.  I mean --

11        MR. HOLLEY:  Right.

12        THE COURT:  -- I was --

13        MR. HOLLEY:  I --

14        THE COURT:  -- kind of surprised --

15        MR. HOLLEY:  I think --

16        THE COURT:  -- you guys --

17        MR. HOLLEY:  I think --

18        THE COURT:  -- didn't stipulate to continue it.

19        MR. HOLLEY:  Well, your Honor, like I said, we

20    submitted our papers and requested the procedure that we

21    thought would be appropriate, and we simply had no response

22    back.

23        THE COURT:  Oh, okay.

24        MR. HOLLEY:  So I think what we should do maybe is

25    take just a brief recess.  Let us discuss a scheduling order

1    that can be entered here --

2                THE COURT:  Sure.

3                MR. HOLLEY:  -- so that we have an opportunity to do

4    discovery.  We're not rushing to a result.

5        That way everything's going to be in front of the Court.

6    There's not going to be inadvertent appellate issues that are

7    going to be raised.

8        (Colloquy not on the record.)

9                MR. HOLLEY:  And the Court can then make --

10               THE COURT:  Sure.

11               MR. HOLLEY:  -- a firm and full decision, and it may

12   give us an opportunity, your Honor, to go through and look at

13   the underlying facts that support the conclusions that were

14   reached by Mr. Allison and Ms. Smith.

15               THE COURT:  Um-h'm.

16               MR. HOLLEY:  And it may very well be in that process

17   we end up throwing up our hands and say, okay, we agree.  But

18   at this point, we haven't had an opportunity to test --

19               THE COURT:  Sure.

20               MR. HOLLEY:  -- those facts.

21               THE COURT:  And that's why I --

22               MR. HOLLEY:  So I think we --

23               THE COURT:  -- I wanted it because I --

24               MR. HOLLEY:  I think we --

25               THE COURT:  On one hand --

```
 1                    MR. HOLLEY:  -- should do that.

 2                    THE COURT:  Okay.  That's fine.

 3                    MR. SCHWARTZER:  Your Honor, then I would ask it be

 4       continued to March 15th.

 5                    THE COURT:  Do you want to do it some -- why don't we

 6       do it -- why don't we continue this for a status to March 15th.

 7                    MR. HOLLEY:  I think that --

 8                    THE COURT:  In the meantime --

 9                    MR. HOLLEY:  -- would be an excellent idea.

10                    THE COURT:  -- you can do your discovery plan.

11                    MR. HOLLEY:  Yes.

12                    THE COURT:  If you do your discovery plan in the

13       meantime, we can take it off calendar.

14                    MR. HOLLEY:  Yes.

15                    THE COURT:  So that --

16                    MR. HOLLEY:  I --

17                    THE COURT:  -- will be fine.

18                    MR. HOLLEY:  I think that's an excellent idea,

19       your Honor.

20                    THE COURT:  Okay.  Because I --

21                    MR. SCHWARTZER:  I mean, I --

22                    THE COURT:  -- recognize that --

23                    MR. SCHWARTZER:  You know, your Honor, though, I just

24       want to point out that if we're going to go through the process

25       of treating this as a contested hearing and having discovery on
```

```
1    issues that we didn't think they were going to do I think this
2    is almost an invitation to file an adversary to get a judgment
3    for the $400,000 --
4              MR. HOLLEY:  But you --
5              MR. SCHWARTZER:  -- because we're going to do the
6    same amount --
7              THE COURT:  Well, you can --
8              MR. SCHWARTZER:  -- of work.
9              MR. HOLLEY:  But --
10             THE COURT:  -- certainly --
11             MR. HOLLEY:  But, your Honor, I --
12             THE COURT:  -- do that.
13             MR. HOLLEY:  And I don't disagree with that.  I think
14   what should really procedurally happen is either the objection
15   to claim should be converted to an adversary proceeding to
16   recover a preference or there should be a separate adversary
17   proceeding filed to recover the preference, and then we go
18   forward along that trail.
19        (Colloquy not on the record.)
20             MR. HOLLEY:  I --
21             THE COURT:  Yeah.  I don't disagree.  I was --
22             MR. HOLLEY:  Yes.
23             THE COURT:  -- so surprised about KF Dairies.  The
24   only reason I became aware of KF Dairies was I had a case in
25   which -- oh, I think it was Mr. LePome's case.
```

1          I had in which -- no.  It was Mr. Schwartzer who had a

2     case in which they had blown the Statute of --

3                MR. SCHWARTZER:  Um-h'm.

4                THE COURT:  -- or the preference period.

5                MR. SCHWARTZER:  Um-h'm.

6                THE COURT:  And --

7                MR. SCHWARTZER:  Because he'll raise it --

8                THE COURT:  But somebody else --

9                MR. SCHWARTZER:  -- as a defense.

10                THE COURT:  -- had the case before you did.  That was

11     it --

12                MR. HOLLEY:  Exactly.  And --

13                THE COURT:  -- anyway.

14                MR. HOLLEY:  And --

15                THE COURT:  And then I was very surprised about the

16     results of KF, but that's what it says.

17                MR. HOLLEY:  And it was surprising.  But at the

18     bottom line, it seemed like what KF Dairies was saying where

19     the bar date has been blown, really, the recipient gets to make

20     an economic decision.

21          They can either take the distribution from the estate

22     because they can't disgorge in that situation or they can keep

23     the avoidable transfer.

24          But then they go on to discuss, okay, what about where you

25     don't have a bar-date situation involved, so I think it's an

1    excellent idea, your Honor.

2        Let's have a status on March 15th.  In the meantime, we'll

3    get ourselves together.  We'll discuss whether this should

4    really be converted to an adversary which in a sense it sort of

5    is, and then we'll be back before the Court.

6            THE COURT:  Okay.  Does that still work for

7    Ms. Freeman?

8            MR. SCHWARTZER:  Yeah.  I --

9            THE COURT:  Mr. Schwartzer.

10           MR. SCHWARTZER:  I just wanted to make sure because

11   by that time there will be someone else --

12           THE COURT:  Right.

13           MR. SCHWARTZER:  -- (indiscernible) --

14           MR. HOLLEY:  And --

15           MR. SCHWARTZER:  -- the client.

16           MR. HOLLEY:  And that also makes some sense that the

17   trust is going to be taking on -- the trust is assigned the

18   responsibility as I understand it to pursue --

19           THE COURT:  Would you --

20           MR. HOLLEY:  -- avoidance --

21           THE COURT:  -- rather wait --

22           MR. HOLLEY:  -- actions.

23           THE COURT:  -- 'til the March 31st date --

24           MR. HOLLEY:  So --

25           THE COURT:  -- the later date?

1          MS. FREEMAN:  The trust will need to look into it and
2     determine whether it wants to proceed with this portion of the
3     objections to the claim, whether there are other bases for
4     objections to a claim.  I simply don't know, and I'm not in a
5     position to make that determination.
6          (Colloquy not on the record.)
7          MR. HOLLEY:  And I appreciate that.  Maybe that's
8     what --
9          MS. FREEMAN:  March 31st --
10         MR. HOLLEY:  -- we should, your Honor, is --
11         MS. FREEMAN:  -- for a status hearing would be fine.
12         MR. HOLLEY:  Yes.  And --
13         MS. FREEMAN:  But we --
14         THE COURT:  Okay.
15         MS. FREEMAN:  -- don't want to be committed to have a
16    particular adversary --
17         THE COURT:  No.  We'll just have --
18         MS. FREEMAN:  -- on file --
19         THE COURT:  -- a status only.
20         MS. FREEMAN:  -- by --
21         MR. HOLLEY:  That --
22         MS. FREEMAN:  -- (indiscernible) dates.
23         MR. HOLLEY:  That makes sense, your Honor.
24         THE COURT:  And if you do --
25         THE CLERK:  (Indiscernible) March (indiscernible)?

1          THE COURT:  Sorry.

2      (Colloquy not on the record.)

3          THE COURT:  The 29th.

4          MS. FREEMAN:  Thank you.

5          MR. HOLLEY:  Is that --

6          MS. CARLYON:  Is that --

7          MR. HOLLEY:  Is that --

8          MS. CARLYON:  -- 9:30?

9          MR. HOLLEY:  -- at 9:30?

10          THE CLERK:  That's at 9:30.

11          MR. SCHWARTZER:  Thank you, your Honor.

12          THE COURT:  Okay.  Thank you.

13      (Colloquy not on the record.)

14          THE COURT:  Okay.  Now on Tree Moss.  That's all on

15  USA Commercial, correct?

16          MR. SCHWARTZER:  Right.

17          THE COURT:  Okay.  Thank you.

18          MR. SCHWARTZER:  And that was --

19          MR. HOLLEY:  Thank you --

20          MR. SCHWARTZER:  -- (indiscernible).

21          MR. HOLLEY:  -- your Honor.

22          MS. LORADITCH:  Actually, I had one.  Your Honor, I

23  just had one update for the Court on USA Capital.

24      (Colloquy not on the record.)

25          MS. LORADITCH:  At the January 3rd hearing, the

1    Diversified Fund Committee's objection to the wrong-debtor

2    claims, your Honor had asked us to consult with the

3    First Trust Deed Fund Committee's counsel and make sure those

4    claims were not being kind of left out in the cold, so to

5    speak.

6        And I handed up to the Court a chart that indicates all of

7    the claims that we objected to had been filed in other cases

8    and were either disallowed by the First Trust Deed Fund

9    Committee's prior objection or were not objected to because

10   they had no objection to them, but the point being that they

11   were either filed in other cases and objected to or filed in

12   other cases and haven't yet been addressed.

13       THE COURT:  Well, right.  But that's my problem.  I

14   mean, for example, Ms. Moone (phonetic), she filed a claim in

15   the other Fund case, and they disallowed it, and you want to

16   disallow her on this case as well.

17       MS. LORADITCH:  But she filed many claims, and you'll

18   notice, your Honor, the one, claim No. 9, was not included in

19   the Court's order disallowing her claim, so there have been

20   claims by Ms. Moone that have not been disallowed.

21       THE COURT:  Okay.

22       MS. LORADITCH:  But the ones that are duplicative or

23   filed against the wrong debtor in the First Trust Deed Fund

24   case were disallowed.

25       THE COURT:  All right.  Well, this will be on for the

1    31st?

2              MS. LORADITCH:  No, your Honor.  You had ruled that

3    pending our consultation with the First Trust Deed Fund

4    Committee counsel that the wrong-debtor claims would -- our

5    objection would be sustained.

6              THE COURT:  Okay.

7              MS. LORADITCH:  And so I'm just trying to get the

8    order entered --

9              THE COURT:  All right.

10             MS. LORADITCH:  -- and get this matter cleaned up.

11             THE COURT:  All right.  So let me go back, then.  For

12   example, on Ms. Moone, I don't understand.  Just because she

13   had an investment in Bay Pompano Beach, what is that supposed

14   to mean --

15             MS. CARLYON:  Your Honor --

16             THE COURT:  -- to me?

17             MS. CARLYON:  I'm sorry.  Candace Carlyon on behalf

18   of the First Trust Deed Fund Committee.  Ms. Moone is a great

19   example.

20        She filed multiple claims in all of the cases.  One of

21   those claims is actually based on a First Trust Deed Fund

22   investment.  We did not object to that claim.

23        The other claims are based upon her interests as a direct

24   lender, a first trust-deed holder, and we objected to those

25   claims in FTDF.

1          THE COURT:  Okay.

2          MS. CARLYON:  And those objections were sustained.

3          THE COURT:  Oh.

4          MS. CARLYON:  But Ms. Loraditch is right.  The

5   concern was that you didn't want to disallow claims against

6   Diversified, and then the bar date has already run in

7   First Trust Deed or in some other estate where they properly

8   had a claim.

9          And what Ms. Loraditch is pointing out is that these

10  people have actually filed the claims by the bar date in the

11  other cases, and they are being disposed of appropriately in

12  those cases.

13         Again, Moone, a great example, the one that was

14  legitimately FTDF has not been objected to.  The rest which are

15  really direct-lender claims, that objection was already heard,

16  served, and sustained.

17         THE COURT:  Okay.  So when you say it was based on

18  investment in, for example, Gramercy Court, you mean as a

19  direct lender.

20         MS. CARLYON:  Correct.

21         THE COURT:  Okay.

22         MS. JARVIS:  Okay.  And, your Honor, the debtor is

23  working with the committees in looking at these claims.

24  There's a lot of -- I mean, we tried to send out ballots that,

25  you know, were preprinted to, hopefully, minimize the

1    confusion, but there are a lot of claims that are just filed in

2    every case because --

3              THE COURT:  Sure.

4              MS. JARVIS:  Yeah.  And they were trying to be

5    careful, and they didn't really understand the process, so this

6    is, basically, a cleanup to leave the claims, you know, in the

7    proper estates to be dealt with, you know, on their merits in

8    that estate.

9              THE COURT:  Okay.  So where we haven't had the

10    January 12th bar date pass, yet, how can we disallow those

11    claims?

12         (Colloquy not on the record.)

13              MS. LORADITCH:  Those are direct-lender claims.

14              THE COURT:  Right.

15         (Colloquy not on the record.)

16              MS. LORADITCH:  In any event, they're not

17    Diversified.  They're not claims against Diversified Fund.

18    Those are claims that are based upon loans that are not held by

19    Diversified Fund.

20              THE COURT:  Okay.  All right.  Okay.  Then with --

21              MS. JARVIS:  And your --

22              THE COURT:  -- these explanations --

23              MS. JARVIS:  Your Honor, the --

24              THE COURT:  -- I'll sustain those.

25              MS. JARVIS:  The bar date for the direct lenders was

1     January 13th.

2                  THE COURT:  Oh, it was the 13th.

3                  MS. JARVIS:  So we now have all --

4                  THE COURT:  That's right.

5                  MS. JARVIS:  All the claims have been filed now.

6                  THE COURT:  Okay.  Good.  Okay.

7           So now on Tree Moss.

8           (Colloquy not on the record.)

9                  MR. LISOWSKI:  Good morning, your Honor.

10     James Lisowski.  Your Honor, I've been appointed the gap

11     trustee in this case.

12           Your Honor, this is my motion to hire, basically, someone

13     to assist me in the sale on this property.  Currently, there

14     are two interested parties.

15           This property is very complex in that it sits on land that

16     is owned by Native Americans.  Everything is subject to the

17     Bureau of Indian Affairs for any type of transfer.

18           Although there is one building, the building is actually

19     occupied by two different parties.  You have Tree Moss which is

20     63 of the condominium units, and you have Sunterra which

21     occupies 38 of the condominium units pursuant to a previous

22     bankruptcy that had been filed in the state of Maryland.

23           Currently, your Honor, what I'm trying to do is evaluate

24     the offers and assistance, your Honor, in dealing, quite

25     honestly, with the situation with the lease.

1          THE COURT:  Well, now, this is in California, right?

2          MR. LISOWSKI:  Correct.

3          THE COURT:  So does Mr. Deiro have any experience in

4    California?

5          MR. LISOWSKI:  Yes, he does, your Honor.

6          THE COURT:  In what?  In what regard?

7          MR. LISOWSKI:  In selling properties, multifamily

8    properties, and selling hotels.  He's sold several

9    properties --

10          THE COURT:  And --

11          MR. LISOWSKI:  -- before.

12          THE COURT:  And have you looked to see if there's

13   anybody with expertise in this time-share kind of thing?  I'm

14   just kind of concerned in the sense of it --

15          MR. LISOWSKI:  Your Honor --

16          THE COURT:  I have nothing against him.  My point is,

17   you know, you have your best mechanic.  You had a Chevy for

18   years.

19          MR. LISOWSKI:  Correct.

20          THE COURT:  And it was the best mechanic in the

21   world, and then you buy a Mercedes-Benz.  Your Chevy mechanic

22   can't do the Mercedes-Benz.  That's my point.

23      Are we sure that Mr. Deiro is the right person for this

24   particular job and what would be done to investigate?

25          MR. LISOWSKI:  In terms of, your Honor, the

1    legalities which are many in the homeowners association

2    involving the condominium association, Mr. Zmaila's firm has a

3    great deal of experience and is licensed in California and here

4    both in condo law.

5        In fact, somebody -- I think it's Mr. Linstrom -- the

6    Santoro, Driggs firm, actually wrote a book on California law

7    and condominium law.  I'm relying on them more or less on the

8    legalities.

9        But the problems that I have here is when I get the

10   offers.  And, in fact, both of the companies that are

11   interested in making offers have substantial ties and are here

12   in Las Vegas.

13       And so, for example, for me to do some of the due

14   diligence for them, they're here, and I had Mr. Deiro come down

15   to both properties.

16       If you notice, the motion is filed also for the hotel.  I

17   actually had him come down to both properties and give me an

18   evaluation because of the pending offers.

19       And the fact that when I came into the case these offers

20   were there, I'm trying to investigate the source of the funds,

21   if it's the same principals, et cetera, et cetera.

22       What I was trying to get was a valuation of both

23   properties and also things that aren't covered by the two

24   offers that exist, and that's why.

25       And as opposed to hiring him say as a broker paying him a

1    commission, the other thing, your Honor, is at some point in

2    time I'm anticipating there may be an evidentiary hearing on

3    these sales, and there may be opposition brought particularly

4    by Mr. Milanowski, you know, through Mr. Walker.

5         So I'm going to need some type of expert testimony

6    involving the valuations and why it was sold.  Here's all --

7              THE COURT:  Right.  But if it's --

8              MR. LISOWSKI:  -- the various factors.

9              THE COURT:  -- a fractionalized interest, does he

10   know how to value fractionalized interests?

11             MR. LISOWSKI:  I believe so, your Honor, because he

12   has given me a value, and, again, I would not want to present

13   that to the Court at this time.

14        He's given me a value on both properties, and, again, I've

15   checked with other people, and he's right in line with what

16   other brokers --

17             THE COURT:  Okay.

18             MR. LISOWSKI:  -- have told me.

19        The problem is in this case, your Honor, I have a hard

20   time knowing who to trust, quite honestly, because everybody's

21   coming from all angles.

22        And the longer I'm in the case and the more I find out,

23   the more I find out there's ties, for example, between the

24   brokers and the former principals of USA Capital.

25        One thing Mr. Deiro does bring to the party is he has no

1    connection whatsoever --

2            THE COURT:  Right.

3            MR. LISOWSKI:  -- with anybody in this case, and

4    that's important to me because I'm trying to get some kind of

5    an idea, your Honor, as a source who's not tied to anyone, has

6    nothing to gain in this case.

7            THE COURT:  But there's lots of, you know, those

8    companies like Mesirow --

9        (Colloquy not on the record.)

10            MR. LISOWSKI:  I understand, your Honor.

11            THE COURT:  -- or that do this kind of thing all the

12    time.  I'm just wondering if this is -- if this was a shopping

13    center --

14            MR. LISOWSKI:  Um-h'm.

15            THE COURT:  -- no question.  If it was a plain hotel,

16    no question.  I'm just concerned.  Mr. Schwartzer may --

17            MR. LISOWSKI:  Well, time is also of the essence,

18    your Honor, and --

19            THE COURT:  Right.  Okay.

20            MR. LISOWSKI:  And I'm sure Mr. Schwartzer's going to

21    say that.

22        And the problem is, you know, we're presented -- there

23    basically were two offers that were there when I came in, and

24    one of the things I was trying to do was try to get a quick

25    evaluation.

1          THE COURT:  Okay.

2          MR. LISOWSKI:  I called Mr. Deiro on the 27th.  On

3     the 28th, he met me at Palm Springs and spent all day with me.

4          THE COURT:  Okay.

5          MR. LISOWSKI:  Now, I'm not sure how long it would

6     take me for an interview or to get somebody involved or to have

7     them do a report because as everyone here is interested in is

8     if there is a sale let's get it on.  Let's get some money into

9     this estate.  That's why I needed somebody also quickly.

10         And, you know, he was -- within 24 hours, he was in

11    Palm Springs with me writing the report.  In fact, most of what

12    he's done here or going to do, your Honor, he's probably

13    already done to be honest with you.

14         THE COURT:  Okay.

15         MR. SCHWARTZER:  Your --

16         MR. LISOWSKI:  I need something quickly.

17         MR. SCHWARTZER:  Yeah.  Your Honor, the only question

18    we had is whether Mr. Deiro was licensed in California either

19    as a real estate broker or an appraiser because there would be

20    some issue about his testimony --

21         MR. LISOWSKI:  Well --

22         MR. SCHWARTZER:  -- as an expert in any hearing, and

23    I just was not aware that he was licensed.

24         THE COURT:  So he --

25         MR. SCHWARTZER:  That's all.

1          THE COURT:  -- is licensed in California?

2          MR. LISOWSKI:  That's what he has told me, yes,

3     your Honor.

4          MR. SCHWARTZER:  Then I --

5          THE COURT:  Okay.

6          MR. SCHWARTZER:  We have less of a problem.  We want

7     to encourage the trustee to act quickly.

8          MR. LISOWSKI:  Um-h'm.

9          THE COURT:  Okay.

10         MR. SCHWARTZER:  And he's not asking him to be

11    employed as a broker.

12         THE COURT:  Just as a --

13         MR. SCHWARTZER:  So I assume he's not asking him to

14    be employed on a fixed-commission basis.  If he's going to

15    provide expert testimony, I assume that will be at some hourly

16    rate --

17         THE COURT:  So it's --

18         MR. SCHWARTZER:  -- that we'll deal with.

19         THE COURT:  -- an hourly rate?

20         MR. LISOWSKI:  Yes, your Honor.

21         THE COURT:  Okay.

22         MR. LISOWSKI:  And it's an hourly rate expressed in

23    the motion.  It's not on any percentage.  He's not --

24         THE COURT:  Okay.

25         MR. LISOWSKI:  And I'm not asking the Court to hire

1  if -- your Honor, I would definitely hire someone different to

2  market the property and to sell the property.

3      I just need someone to advise me to evaluate the existing

4  offers and, basically, what hoops I have to jump through.  He's

5  got the experience dealing with the Bureau of Indian Affairs,

6  and that's another issue that's going --

7              MR. SCHWARTZER:  That --

8              MR. LISOWSKI:  -- to come up here.

9              MR. SCHWARTZER:  And so based upon that, your Honor,

10  as a petitioning creditor, we would encourage the employment

11  and getting it done because the most important thing in this

12  case is getting this property sold, and there's a couple of

13  offers out there --

14              MR. LISOWSKI:  Um-h'm.

15              MR. SCHWARTZER:  -- that looked very good --

16              THE COURT:  Okay.

17              MR. SCHWARTZER:  -- from the --

18              THE COURT:  All right.  So I'll approve that.

19      And then in the USA Investors.  I have forgotten.  What's

20  the real property in USA Investors?

21              MR. LISOWSKI:  In USA Investors, your Honor, directly

22  across the street --

23              THE COURT:  Okay.

24              MR. LISOWSKI:  -- is a property called the

25  Hotel Zoso.  Again, your Honor, there is an offer.  It's there.

1    It's in escrow.  I've talked to the escrow company.

2        Again, the issue is coming up on the lease with the

3    Bureau of Indian Affairs, and that seems to be what's holding

4    that issue up.

5        Basically, it's the number of years left on the lease and

6    the amount of years that the purchaser wants to get.  In other

7    words, he basically wants to get a higher lease or a longer

8    lease term to amortize out the cost, and that seems to be the

9    problem there.  There are also a lot of issues I'm having with

10   the title company, your Honor.

11           THE COURT:  Okay.

12           MR. LISOWSKI:  And I also wanted again to get some

13   evaluation because there is an offer on the table.  There is an

14   appraisal, but it's old, and I have that.

15       But I also wanted to get an idea because there were

16   substantial upgrades to the property.  A lease was added for

17   $650,000 a year for the spa.  That's going to jack the value

18   up.

19       So I want to be able to rely on someone to give me an idea

20   of what this property should be worth and whether this offer is

21   viable.

22           THE COURT:  Okay.

23           MR. LISOWSKI:  And, again, he's been to the property,

24   and he's already done that.

25           THE COURT:  All right.  So on those representations,

1    then I'll approve that.

2              MR. LISOWSKI:  Thank you, your Honor.

3              THE COURT:  All right.  Thank you.

4         So that takes care of today's calendar, then, correct?

5         (Colloquy not on the record.)

6              MS. JARVIS:  Your Honor, there is some confusion on

7    the agenda that we filed yesterday.  There was a motion to

8    quash filed by the attorneys for IP, Joe Milanowksi,

9    Investor VI, and HMA Sales.

10        We had responded for that.  I didn't see it on the Court's

11   agenda.  We have responded to that and asked that that motion

12   be denied.  You know, if the Court deems that appropriate, we

13   would ask that --

14             THE COURT:  Didn't I --

15             MS. JARVIS:  -- that be done.

16             THE COURT:  That thing's already been denied.  Isn't

17   that the one I already denied saying there was no such thing?

18             MS. JARVIS:  I think that, in essence, when the Court

19   ruled on this issue as part of the confirmation hearing when we

20   raised the issue with respect to the fact that they had not

21   appeared for the 2004 examinations I think, in essence, the

22   Court denied it, but I don't know if there was --

23             THE COURT:  All right.  So I'm going to --

24             MS. JARVIS:  -- any --

25             THE COURT:  Yes.  I know what it is.

1          MS. JARVIS:  -- formal denial.

2          THE COURT:  Yes.  I'll deny the motion.

3          MS. JARVIS:  Thank you, your Honor.

4      (Colloquy not on the record.)

5          MR. SCHWARTZER:  Your Honor, just an update in the

6    litigation between HMA, the USA Commercial Mortgage versus

7    HMA Sales and Salvatore Reale, there was a stipulation --

8          THE COURT:  Right.

9          MR. SCHWARTZER:  -- made on the record.  I can't get

10   Mr. Walker to sign on the stipulated order.

11         THE COURT:  All right.

12         MR. SCHWARTZER:  I'm going to lodge it.

13         THE COURT:  All right.  That's fine.

14         MR. SCHWARTZER:  I'm going to lodge it --

15         THE COURT:  Well, you know, one way --

16         MR. SCHWARTZER:  -- without his signature.

17         THE COURT:  -- of doing it is just sending it.  If he

18   doesn't respond --

19         MR. SCHWARTZER:  Oh, we --

20         THE COURT:  -- send it in.

21         MR. SCHWARTZER:  That's what we'll do.

22         THE COURT:  Yeah.

23         MR. SCHWARTZER:  But I just wanted the Court to be

24   aware that we're going --

25         THE COURT:  Okay.  Fine.

1          MR. SCHWARTZER:  -- to do that.

2          THE COURT:  All right.  Thank you.  All right.

3     Thank you.

4     (Colloquy not on the record.)

5          THE CLERK:  All rise.

6     (Court concluded at 11:22:47 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5

6    /s/ Lisa L. Cline                        05/11/10

7    _____              _____
     Lisa L. Cline, Transcriptionist            Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25