UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA
LAS VEGAS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO:  06-10725 |
| | ) | CHAPTER 11 |
| | ) | |
| USA COMMERCIAL MORTGAGE COMPANY, | ) | Las Vegas, Nevada |
| | ) | |
| | ) | Thursday, May 18, 2006 |
| Debtor. | ) | ( 9:49 a.m. to 12:22 a.m.) |
| | ) | (12:32 p.m. to  1:11 p.m.) |

| | | |
|---|---|---|
| IN RE:  USA CAPITAL REALTY | ) | |
| ADVISORS, LLC., | ) | CASE NO:  06-10726 |
| | ) | |

| | | |
|---|---|---|
| IN RE:  USA CAPITAL DIVERSIFIED | ) | |
| TRUST DEED FUND, LLC., | ) | CASE NO:  06-10727 |
| | ) | |

| | | |
|---|---|---|
| IN RE:  USA CAPITAL FIRST TRUST | ) | |
| DEED FUND, LLC., | ) | CASE NO:  06-10728 |
| | ) | |

| | | |
|---|---|---|
| IN RE:  USA SECURITIES, LLC., | ) | CASE NO:  06-10729 |
| | ) | |

MOTIONS HEARING

BEFORE THE HONORABLE LINDA B. RIEGLE,
UNITED STATES BANKRUPTCY JUDGE

| | |
|---|---|
| Calendared Motions: | See pages 2, 3 |
| Appearances: | See pages 3, 4, 5 |
| Court Recorder: | Araceli Catu |
| Transcribed by: | Exceptional Reporting Services, Inc |
| | 14493 South Padre Island Drive, #A-400 |
| | Corpus Christi, TX 78418-5940 |
| | 361 949-2988 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**CALENDARED MOTIONS:**

**06-10725:**        USA COMMERCIAL MORTGAGE COMPANY

1    MOTION OF THE DEBTORS PURSUANT TO SECTIONS 363(b) AND
105(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO PAY
PREPETITION WAGES, COMPENSATION AND EMPLOYEE BENEFITS;

2    APPLICATION TO EMPLOY SCHWARTZER & MCPHERSON LAW FIRM
AS COUNSEL UNDER GENERAL RETAINER;

3    MOTION AUTHORIZING DEBTOR, PURSUANT TO 11 U.S.C. 105
AND 363(b)(1), TO ACCEPT LOAN PAYMENT PROCEEDS AND PROVIDE
PARTIAL RELEASES OR FULL RELEASES IN CONNECTION WITH THE SALE
OF PROPERTIES SECURING LOANS ORIGINATED BY THE DEBTOR TO
THIRD-PARTY BORROWERS, AND TO RATIFY PARTIAL RELEASES
PREVIOUSLY PROVIDED BY THE DEBTOR;

**06-10726:**        USA CAPITAL REALTY ADVISORS, LLC

1    MOTION OF THE DEBTORS PURSUANT TO SECTIONS 363(b)
AND 105(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO PAY
PREPETITION WAGES, COMPENSATION AND EMPLOYEE BENEFITS;

2    APPLICATION TO EMPLOY RAY QUINNEY & NEBEKER P.C. AS
COUNSEL FOR THE DEBTORS

**06-10727:**        USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC

1    MOTION OF THE DEBTORS PURSUANT TO SECTIONS 363(b) AND
105(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO PAY
PREPETITION WAGES, COMPENSATION AND EMPLOYEE BENEFITS;

2    MOTION TO LIMIT NOTICE AND APPROVE MASTER SERVICE LIST FOR
LIMITED NOTICE

**06-10728:**        USA CAPITAL FIRST TRUST DEED FUND, LLC

1    MOTION OF THE DEBTORS PURSUANT TO SECTIONS 363(b) AND
105(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO PAY
PREPETITION WAGES, COMPENSATION AND EMPLOYEE BENEFITS;

2    MOTION TO LIMIT NOTICE AND APPROVING MASTER SERVICE LIST
FOR LIMITED NOTICE

3

<u>CALENDARED MOTIONS:</u>        (CONTINUED)


<u>06-10729:</u>        USA SECURITIES, LLC

1    MOTION OF THE DEBTORS PURSUANT TO SECTIONS 363(b) AND
105(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO PAY
PREPETITION WAGES, COMPENSATION AND EMPLOYEE BENEFITS;

2    MOTION TO LIMIT NOTICE, MOTION APPROVING MASTER SERVICE
LIST FOR LIMITED NOTICE



<u>COURTROOM APPEARANCES FOR:</u>


Debtors:                  P.O. Box 45385
                          Salt Lake City, UT 84145

                          LENARD SCHWARTZER, ESQ.
                          Schwartzer & McPherson Law Firm
                          2850 S. Jones Boulevard
                          Suite 1
                          Las Vegas, NV 89146

Official Committee of     FRANK MEROLA, ESQ.
USA Capital First Trust   EVE KARASIK, ESQ.
Deed Fund, LLC, et al.:   JEFFREY DAVIDSON, ESQ.
                          Stutman Treister & Glatt, P.C.
                          1901 Avenue of the Stars
                          12th Floor
                          Los Angeles, CA 90067

Official Committee of     CANDACE CARLYON, ESQ.
Equity Security Holders   Shea & Carlyon, Ltd.
of USA Capital First      701 Bridger Avenue
Trust Deed Fund, LLC:     Suite 850
                          Las Vegas, NV 89101

Stanley Alexander Trust,  ROBERT LE POME, ESQ.
et al.:                   10120 S. Eastern Ave., #200
                          Henderson, NV 89052




<u>COURTROOM APPEARANCES FOR:</u>    (CONTINUED)

4

```
Interstate Commerce        PAUL CONNAGHAN, ESQ.
Center, LLC, et al.:       SUSAN SCANN, ESQ.
                           Deaner Deaner Scann, et al.
                           720 S. Fourth St. #300
                           Las Vegas, NV 89101


Fortress Credit Corp.:     JOEL SAMUELS, ESQ.
                           SIDLEY AUSTIN, LLP
                           (No address provided)


Canepa Group:              LAUREL DAVIS, ESQ.
                           Fennemore Craig, P.C.
                           300 S. Fourth Street, #1400
                           Las Vegas, NV 89101


Dr. Gary Kantor, et al.: RICHARD J. MASON, ESQ.
                           McGuire Woods
                           130 Pinetree Lane
                           Riverwoods, IL 60015
Aspen Square Management,  ROBERT KINAS, ESQ.
Inc., et al.:              Snell & Wilmer, LLP
                           3883 Howard Hughes Parkway, #1100
                           Las Vegas, NV 89169


Buckalew Trust, et al.:  GREG GARMAN, ESQ.
                           Morgan Silver
                           3960 Howard Hughes Parkway
                           9th Floor
                           Las Vegas, NV 89169


Bank of America:           SCOTT FLEMING, ESQ.
                           Hale Lane, et al.
                           3930 Howard Hughes Parkway
                           4th Floor
                           Las Vegas, NV 89169


Margaret McGimsey,         WILLIAM MCGIMSEY, ESQ.
et al.:                    3017 W. Charleston Blvd., #30
                           Las Vegas, NV 89102


Harvey Family Trust,       DONNA OSBORN, ESQ.
date April 13, 1987:       MARK ORBACH, ESQ.
                           Wright, Finlay & Zak, LLP
                           5532 S. Fort Apache Road
                           Suite 110
                           Las Vegas, NV 89148
COURTROOM APPEARANCES FOR:    (CONTINUED)
```

```
Project Disbursement      MATTHEW CALLISTER, ESQ.
Group:                    823 Las Vegas Blvd South
                          Suite 500
                          Las Vegas, NV 89101


U.S. Trustee:             AUGIE LANDIS, ESQ.
                          Assistant United States Trustee
                          (No address provided)

Shauna M. Walch, et al.: GREGORY J. WALCH, ESQ.
                          400 S. Fourth St.
                          3rd Floor
                          Las Vegas, NV 89101


Roam Development Group,   MARJORIE GUYMON, ESQ.
LP, et al.                Goldsmith & Guymon, P.C.
                          2055 Village Center Circle
                          Las Vegas, NV 89134



TELEPHONIC APPEARANCE FOR:

Group of Direct Lenders: JANET CHUBB, ESQ.
                          Jones Vargas
                          100 W. Liberty Street
                          12th Floor.
                          P.O. Box 281
                          Reno, NV 89504
```

1          **Las Vegas, Nevada; Thursday, May 18, 2006; 9:49 a.m.**

2                              **(Call to Order)**

3          **THE COURT:**  Okay.  *USA Commercial Mortgage Company*

4    and related companies.  Appearances by attorneys, please.

5          **THE CLERK:**  And we have one the phone.

6          **MS. JARVIS:**  Annette Jarvis and Lenard Schwartzer on

7    behalf of the debtors.

8          **MR. MEROLA:**  Good morning, your Honor; Frank Merola,

9    Eve Karasik, Jeffrey Davidson, members of Stutman Treister and

10   Glatt, Professional Corporation, on behalf of the official

11   committee of USA Capital First Trust Deed Fund, LLC, the

12   unofficial committee of USA Capital Diversified Trust Fund,

13   LLC, and the official committee of executory contract holders

14   of USA Commercial Mortgage Company, the investor committees

15   from here on in.

16         **MS. CARLYON:**  Good morning, your Honor, Candace

17   Carlyon of Shea and Carlyon, proposed special Nevada counsel

18   for the investor committees.

19         **MR. LE POME:**  Robert LePome for Dr. Stanley and

20   twenty other direct lenders.

21         **MR. CONNAGHAN:**  Paul Connaghan with Susan Scann of

22   Deaner Deaner Scann Malan and Larsen, on behalf of the seven

23   borrower entities I listed on the sign-in sheet.

24         Do you need me to name those?

25         **THE COURT:**  Yes.

7

1      **MR. CONNAGHAN:**  Interstate Commerce Center, LLC, ISCC

2  Phase Two, LLC, Copper Sage Commerce Center, LLC, I-40 and

3  Gateway West, LLC, Rio Rancho Executive Plaza, LLC, Franklin

4  Stratford Investments, LLC, Boise Gala Ninety-Three, LLC.

5      **THE COURT:**  Okay.  And these are borrowers?

6      **MR. CONNAGHAN:**  Yes, your Honor.

7      **THE COURT:**  Okay, thank you.

8      **MR. CONNAGHAN:**  Thank you.

9      **THE COURT RECORDER:**  Excuse me, sir; can you spell

10  your name for me?  Thank you.

11      **MR. CONNAGHAN:**  C-o -- Paul -- C-o-n-n-a-g-h-a-n.

12      **THE COURT RECORDER:**  Thank you.

13      **MR. SAMUELS:**  Good morning, your Honor; Joel Samuels

14  of Sidley Austin, LLP, for Fortress Credit Corporation.

15      **MS. DAVIS:**  Good morning, your Honor; Laurel Davis on

16  behalf of the Canepa Group.

17      **MR. MASON:**  Good morning, Judge Riegle.  For the

18  record, my name is Richard J. Mason.  I'm with a law firm

19  called McGuire Woods, and we represent Dr. Gary Kantor and

20  certain related employee benefit plans which in the aggregate

21  are one of the large --

22      **(A cell phone rings)**

23      **THE COURT:**  All cell phones must be off.  Take time

24  now and turn them off.

25      Sorry.

8

1          **MR. MASON:**  As I was saying, one of the larger

2   investors in the USA Commercial group.

3          **MR. KINAS:**  Good morning, your Honor; Robert Kinas of

4   Snell and Wilmer, for a variety of the direct lenders.

5          **MR. GARMAN:**  Greg Garman with Morgan Silver on behalf

6   of Higgins and Buckalew Trust which are both direct lenders.

7          **MR. FLEMING:**  Good morning, your Honor; Scott Fleming

8   of Hale Lane on behalf of Bank of America.

9          **MR. MCGIMSEY:**  William McGimsey on behalf of Margaret

10  McGimsey and others, investors in the Diversified Trust Deed

11  Fund.

12         **MS. OSBORN:**  Donna Osborn and Mark Orbach (phonetic)

13  on behalf of Rodrick Harvey and Pauline Harvey, trustee of the

14  Harvey Family Trust, direct lenders.

15         **MR. CALLISTER:**  Good morning, your Honor; Matthew

16  Callister on behalf of Project Disbursement Group.

17         **MR. LANDIS:**  Good morning, your Honor; Augie Landis,

18  Assistant United States Trustee.

19         **MR. WALCH:**  Good morning, your Honor; Gregory Walch

20  on behalf of the Gregory J. and Shauna M. Walch Family Trust.

21         **MS. GUYMON:**  Good morning, your Honor; Marjorie

22  Guymon appearing on behalf of Roam Development Group, LP,

23  borrower.  Also appearing on behalf of Mountain West Mortgage

24  in relation to Larren Hills (phonetic) Project and the Marlton

25  (phonetic) Square Project, direct lenders, and individual

1  Michael Gortz.

2          **THE COURT:**  Okay.  And on the telephone?

3          **MS. CHUBB:**  Janet Chubb of Jones Vargas for a group

4  of direct lenders.

5          **THE COURT:**  And Ms. Chubb called back in, right?

6  This is not --

7          **THE CLERK:**  Yes.

8          **THE COURT:**  Okay.  And just to make -- I know you're

9  aware, your participation is just to monitor only.  I'm not

10  going to allow any representations or comments.

11          **MS. CHUBB:**  I understand.

12          **THE COURT:**  We were hoping to have a phone system in,

13  but due to some errors on my part trying to arrange the

14  contracts, we don't have that yet.  But in any case, just for

15  clarification, I think this case is going to be impossible to

16  have any -- to allow phone participation where there are

17  objections that one argues.  It's just too hard to do.  But in

18  light of the need for people to monitor, I don't have a problem

19  with you monitoring.

20          Okay, just a few comments before we start.  First,

21  just to remind all those people who are not attorneys who may

22  be investors or who may be members in the various companies,

23  this is not the same thing as a 341 meeting.  This is not the

24  time that you raise objections or ask questions.  I'm here to

25  hear and determine the issues that are brought before me by

10

1    pleadings and motions, and those are the only issues that we're

2    hearing and deciding today, so, please understand that.

3         Now, just some procedural matters.  I am serious

4    about late oppositions and courtesy copies.  For example, I

5    received one opposition yesterday, and I was told the attorney

6    was going to bring me the courtesy copy this morning.

7         Now, I don't know how anybody expects this case to

8    progress, if you want me to be well-informed and want me to

9    review it, if you think you can file your opposition at the

10   last minute and not give us any copies.  And this motion was

11   properly served, so this opposition was late by any standards.

12        So I've entered an order in this case and it's

13   already out there, that says that any opposition must be filed

14   the earlier of fifteen days after service or five days before

15   the hearing.  I am going to enforce that.  From now on, any

16   late opposition is subject to being stricken and three hundred

17   dollars payable to the movant.  If you don't provide a reply

18   copy within twenty-four -- sorry, a courtesy copy within

19   twenty-four hours after the filing, I will impose a sanction of

20   seventy-five dollars payable to the Court.

21        Now, this may seem harsh, but as you can see, there

22   are hundreds of pleadings in this case, and the only way that I

23   can be informed, the only way that people can respond to

24   objections meaningfully and intelligently is to have it on a

25   timely basis.  And unfortunately, Mr. Kinas wasn't in the room

11

1  when I explained all this.

2          Mr. Kinas, no more late oppositions.

3          **MR. KINAS:**  I understand, your Honor.  We are

4  contacted almost hourly by many direct lenders with sensitive

5  issues.  To the extent that they would like to bring those to

6  your attention, we will certainly request permission to file

7  those.  But we were very sensitive to the Court's earlier order

8  on scheduling.

9          **THE COURT:**  Okay.

10         All right, so let's go to the first motion we have.

11  The first motion that was already dealt with; that shouldn't

12  have been on calendar.  The motion to pay wages, that's

13  correct, there was nothing left in that regard?

14         **MR. SCHWARTZER:**  Yes, your Honor.  You've already

15  entered an order on that on April 17th.

16         **THE COURT:**  All right.  So next we have --

17         **THE COURT RECORDER:**  Stay closer to the microphone.

18  Thank you.

19         **MR. SCHWARTZER:**  I will.

20         **THE COURT:**  Oh, and just for clarification.  Because

21  our transcription works only by virtue of the microphone, what

22  happens is the person here is only taking notes.  All we have

23  is a tape recording.  If anybody wants a transcript, you need

24  to order a transcript from the Court transcriber or the Court

25  personnel, and they will then order a transcript from the

12

1    company that provides transcripts.

2         Alternatively, you can receive a tape or a CD of the

3    proceedings for a cost.  So we don't have a system whereby

4    somebody is automatically going to come out with notes.

5    Therefore, it's vitally important that, because someone sitting

6    in Nampa, Idaho, is transcribing this, that's why it's

7    important that you always speak into the microphone and speak

8    very clearly.

9         For that reason, either be at the podium speaking

10   into the microphone.  If you're at the desk, I very appreciate

11   the protocol in standing and rising before the Court, but I

12   will excuse that because, unfortunately, the protocol must --

13   good transcripts have to trump protocol, so I will understand

14   if you remain seated while you're at the desk.

15        Probably the best thing is if you're just speaking

16   yourself is to come to the podium, but if you're just making a

17   comment, I'll allow you to remain seated.

18        Okay, the first thing we have is the application to

19   employ the attorneys.

20        **MS. JARVIS:**  If I may, your Honor, I'd like to make

21   the legal arguments both on behalf of Ray Quinney and

22   Schwartzer and McPherson and then have Mr. Schwartzer add to

23   that afterwards, because it involves the same issues.

24        **THE COURT:**  Right.

25        **MS. JARVIS:**  These applications have been noticed to

13

1    all investors and creditors.  They went out to the entire

2    mailing matrix.  Only two objections were filed plus one

3    limited objection that I believe we have resolved.

4         The major objection in this case was filed by the

5    U.S. trustee, and the U.S. trustee claims that Ray Quinney and

6    Nebeker and Schwartzer and McPherson are disqualified to

7    represent all the debtors because they claim there is an actual

8    conflict of interest that exists between the various estates,

9    or, if not actual, a potential conflict of interest that

10   prohibits the retention of the two law firms by all of the

11   debtors.

12        There are no actual conflicts of interest between

13   these estates, and to the extent there may be potential

14   conflicts of interest, these do not prohibit our retention

15   under the law.

16        The trustee cites the definition of actual conflict

17   of interest from the *Mercury* case, which is a case from the

18   Southern District of New York, as, quote, 'an actual competing

19   -- an active, competing title between two interests in which

20   one interest can be served only at the expense of the other.'

21        The *Roberts* case which is also cited in the *Mercury*

22   case, the *Roberts* case from Utah, which is actually a very oft-

23   cited case, provides perhaps even a more complete statement of

24   what the test is with respect to adverse interest.  In that

25   case, the Court explained an adverse interest is where two or

14

1    more entities, quote, 'possess or assert mutually exclusive

2    claims to the same economic interest', close quote, which

3    creates a dispute between rival claimants as to which of them,

4    quote, 'the disputed right or title to the interest in question

5    attaches under applicable law.'  So in other words, there is a

6    situation where only one or the other can win with respect to

7    the same economic interest or the same property.

8            The U.S. trustee raises two situations that it claims

9    create an actual conflict of interest.  The first is that there

10   are amounts purportedly due from the funds to Commercial

11   Mortgage for overpayments due to non-performing loans; and the

12   second is the loan servicing fees issue.

13           As to the first issue, even the U.S. trustee admits

14   that this is purportedly owed and acknowledges at this point in

15   time this is really only a potential conflict of interest

16   because it is not yet determined whether anything is owed, and

17   that is part of the ongoing investigation of Mr. Alison that

18   has been allowed for ninety days.

19           And I think as your Honor hopefully read in our reply

20   brief, we are limiting at this point our application to be

21   hired consistent with what the Court has already allowed

22   Mr. Alison to be retained.  So for the ninety days, pending the

23   further report of the Court and the further looking at the

24   issues to see in fact if in that case whether there are any

25   unexpected conflicts that -- potential or actual conflicts that

15

1    might arise to be dealt with at that point in time.

2              Now, there is one fact or one piece of progress that

3    has been made in this case that was reported yesterday at the

4    341 meeting that actually is relevant to this situation.

5    Mr. Alison has already collected -- I think your Honor knows

6    that previously we've reported that there was $50 million

7    dollars of past-due interest that had not been collected and

8    that had been paid out.  Mr. Alison has been working hard at

9    collecting that interest, and to date has either commencements

10   or collected $12 million dollars of that outstanding amount,

11   and therefore that would be almost twenty-five percent of the

12   past-due interest.

13             Now, this is relevant because of course if he is

14   successful in collecting all this past-due interest, then this

15   issue of overpayment is completely resolved, because the money

16   would have come in and there is no remaining issue with respect

17   to that.

18             But even if some amount is determined to be owing, it

19   is really an accounting determination; it's not one that's

20   going to be subject to dispute, and that is not -- would not

21   fit within the definition of adverse interest as set forth in

22   the *Roberts* case.  So at most this raises a potential conflict

23   of interest, but that does not even look likely that it's going

24   to ripen into an actual conflict of interest.

25             The fact I think that the fund committee counsel that

16

1    did file limited opposition does not raise this issue

2    reinforces the position that the debtor is taking, that these

3    are not actual conflicts of interest.

4           With respect to the loan servicing fee, that exists

5    between the funds and USA Mortgage.  There is no evidence

6    before the Court that there is a dispute with respect to that

7    fee.  Both Commercial Mortgage and the funds have a common

8    interest, and that common interest is to collect on all the

9    non-performing loans and to make sure that the loans that are

10   performing continue to pay for the benefit of those funds and

11   other investors.

12          And those collection actions are facilitated and

13   allowed by the existence of the loan servicing agreement which

14   allows Commercial Mortgage to act on behalf of the hundreds of

15   investors that are in each loan.

16          It's mere speculation that is raised that there is

17   some conflict or that there would be a dispute or conflict that

18   is raised by the U.S. trustee's office, and mere speculation is

19   not sufficient to disqualify Ray Quinney and Nebeker and

20   Schwartzer and McPherson from representing the debtors.  Nor is

21   this a type of lucrative contract which was referred to in the

22   *Interwest Business* case (phonetic) that is cited in the U.S.

23   trustee's objection.  These are sophisticated investors that

24   agreed to loan servicing fee, and no one has raised the issue

25   that these fees are anything unusual in the industry or

17

1    unreasonable.

2            The budget approved by the Court two weeks ago I

3    think kind of evidences that because, of course, the budget,

4    which is based solely on the servicing fees for the many

5    services that need to be performed in order to collect on these

6    loans is very slim with respect to the many things that the

7    servicer needs to do for the funds.

8            I would like further to note that the *Interwest* case,

9    which is out of the Tenth Circuit and therefore is a case I'm

10    very familiar with, that it involved a view on whether there

11    can be representations of affiliate debtors.  And that case has

12    not been followed by any other circuit.  And in fact, in the

13    Tenth Circuit itself, it has been quite liberally interpreted,

14    as it needs to be, even though the fact that it exists out

15    there, frankly is a problem for us in the Tenth Circuit with

16    respect to having any complex cases filed in our circuit.

17            But it does not even say that absolutely even in the

18    most -- because it is the most extreme case, that you can't

19    have one counsel representing affiliate debtors.  It simply

20    says that you have to look at this on a case by case basis.  It

21    does not say that it is per se prohibited.  So even that most

22    extreme case would not support not allowing Ray Quinney and

23    Nebeker and Schwartzer and McPherson to represent all these

24    debtors.

25            Nor does the *Wheatfield* (phonetic) case, which is

18

1    also cited by the U.S. trustee in their objection, because it

2    deals with actual conflicts of interest which are not present

3    in this case.  And it recognizes that potential conflicts of

4    interest come in enormously varying degrees, and that those

5    have to be looked at on a case by case basis, and it's only if

6    a potential conflict is sufficiently important and there is

7    more than a sufficient likelihood that it will ripen into an

8    actual conflict that potential conflicts become a problem with

9    respect to retention of counsel for more than one debtor.  And

10   that has not been shown to be the case here.

11            The third case cited by the U.S. trustee in their

12   response which is also out of the Central District of

13   California, that case as well actually does not -- besides in a

14   footnote, it simply addresses the issue of whether in a

15   substantive consolidation situation, it would have been better

16   to have a single counsel or several counsel, and the Court

17   simply expresses an opinion about that, but it wasn't confirmed

18   by the Ninth Circuit because it's in footnote, it's dicta, so

19   that was not, you know, accepted, and it's also factually

20   distinguishable from our case here.

21            The application of Ray Quinney and Nebeker and

22   Schwartzer and McPherson is consistent with the results in many

23   cases that have been cited in our reply brief.  The *OPM Leasing*

24   case, the *Wheatfield Village* case, the *International Oil* case,

25   the *Global Marine* case, all of these recognize when you have

1   any kind of debtor where you have several affiliates, which is

2   often the way debtors are organized and they have common cash

3   management systems, that these kind of ordinary course,

4   undisputed, inter-company debts that they do not prohibit the

5   joint representation of those debtors by a single counsel.

6           And again, we've asked for this to be limited to

7   ninety days while Mr. Alison does continue his investigation.

8   We'll file a report to the Court, and at that point in time, if

9   something unexpected comes up, something that we don't know at

10  present, that obviously will be revisited both with respect to

11  Mr. Alison and with us.

12          And of course Mr. Alison now is trying to go through

13  this, and for him to have to report to more than one counsel, I

14  don't know that he could even figure out which counsel he'd

15  have to report to because the issues at present are common and

16  there are no actual conflicts of interest.

17          Let me finally just address the issue with potential

18  conflicts of interest, because there is one more issue that was

19  raised.  Again, there is not a case which says potential

20  conflicts of interest are absolutely disqualifying nor inter-

21  company debt.  And in fact when you look at Section 327(c),

22  because it says that, you know, a counsel can represent a

23  creditor and also represent the debtor unless there is an

24  objection and the Court determines an actual conflict, that in

25  and of itself I think clearly says that the mere existence of

20

1    an inter-company debt does not disqualify counsel unless there

2    is an actual conflict of interest, which there is not in this

3    case.

4            The only other potential conflict of interest that

5    was raised by the U.S. trustee is that in Mr. Alison's

6    declaration it says there is a $58 million dollar inter-company

7    receivable which is owed by a non-debtor entity, USA Investment

8    Partners, to USA Commercial Mortgage, and in his declaration he

9    says 'and possibly to other debtors'.

10           As Mr. Alison testified yesterday in the 341 meeting,

11   he is currently unaware of any other debtors having debts owed

12   to them by IP other than Commercial Mortgage.  However, that is

13   obviously subject to careful tracing of disbursements from all

14   the debtors, and if those amounts, if there are other debts

15   owed by this non-debtor entity, those obviously will be

16   documented and pursued.  But if that happens, it's not an issue

17   where you are fighting about who has which debt or who has this

18   $58 million dollar debt.  That is established.  It is whether

19   there are additional debts that may be owed that are separate

20   and distinct from that, and that does not create a potential

21   conflict of interest.

22           In fact, with respect to the negotiations that

23   Mr. Alison has been having with Investment Partners to secure

24   the $58 million dollar debt in recognition that as these

25   investigations continue, there may be more debts discovered,

1    the documents that he has negotiated do recognize in the UCC

2    filing the possibility that it would be filed in essence on

3    behalf of all the debtors just in case there is something else

4    that would arise from another debtor in order to protect all of

5    their interests.

6         So here I think where we have no actual conflicts of

7    interest that have been demonstrated, and that if there are

8    potential conflicts of interest, they are, as said in the *OPM*

9    case, decidedly more apparent than real.  This does not provide

10   a basis for not allowing the retention by all of the debtors

11   for Ray Quinney and Nebeker and Schwartzer and McPherson for

12   the ninety-day period pending a further report to the Court by

13   Mr. Alison.

14        Let me also state that the debtor has contacted

15   Mr. Houston, who is here in this court, and if it looks like

16   that would be a solution, he is willing to serve, and we may

17   actually just go ahead and file an application to have him

18   serve as conflicts counsel, in order to deal with any problems

19   that might arise in the future in the event that, you know,

20   just as a way of anticipating things rather than waiting to see

21   if anything unexpected arises.

22        I think this deals with the objection of Mr. McGimsey

23   as well.

24        Let me finally just say that the first Trust Deed

25   Fund committee counsel did file an objection, and let me just

22

1    clarify on that.  We are not seeking -- Ray Quinney and Nebeker

2    is not seeking nor is Schwartzer and McPherson seeking an order

3    under 328 which establishes our rates as reasonable and not

4    subject to court review.  That is not intended.  They clearly

5    are subject to court review.  I understand that in the Ninth

6    Circuit, you need to be careful with respect to that.  And

7    whether that means that we are not retained under 328 or there

8    is a clear expression that we are retained but this does not

9    mean that our rates are not subject to court review as

10   reasonable.  However it needs to be done, we are -- that was

11   clearly our intention.

12           THE COURT:  Okay.

13           MS. JARVIS:  And I think that resolves that.

14           THE COURT:  I just had a question.  This was not

15   raised with the U.S. trustee, but I think it's probably

16   appropriate that I raise it.  You indicate that you received a

17   payment -- that you billed some pre-petition and received a

18   payment on account of that through the retainer.

19           You were not the counsel for the debtor up until

20   Mr. Mesereaux (phonetic) was involved, correct?

21           MS. JARVIS:  We became counsel for the debtor merely

22   in looking towards filing for the bankruptcy, so this --

23           THE COURT:  Okay.  So this is all in connection with

24   the bankruptcy --

25           MS. JARVIS:  Yes.

23

1          **THE COURT:**  -- as opposed to past-due services?

2          **MS. JARVIS:**  Exactly.  And we have agreed that in our

3    first fee application we will go ahead and disclose all of

4    that, you know, and account for it so that if anyone has any

5    objections, that can be raised at that time.

6          **THE COURT:**  Okay.  I just want to clear that so we

7    don't have a preference problem, because it was clearly in the

8    context of the bankruptcy.

9          **MS. JARVIS:**  Yes, it was.

10         **THE COURT:**  Okay.

11         **MS. JARVIS:**  There was nothing done other than

12   preparing for the bankruptcy.

13         **THE COURT:**  Okay.  All right, I don't think you need

14   to do anything, unless you want to, Mr. Schwartzer; opposition

15   or comments?

16         Before you start, Mr. Landis, and I was remiss in

17   probably not doing a little status before we started, but some

18   of this is more appropriate for you.  Tell me what happened at

19   the 341 meeting vis-à-vis committees so that I understand

20   exactly where we are on committees and who represents who.

21         **MR. LANDIS:**  Thank you, Judge.  And actually,

22   yesterday was a very busy day in connection with all of these

23   matters.

24         With respect to committees, there were four that have

25   been formed.  There is an unsecured creditors committee for

24

1   sort of the mother-ship, USA Commercial Mortgage Company.

2   There is an executory contract holder group through USA

3   Commercial Mortgage Company, and those would be people I think

4   in your prior hearing that you referred to as direct lenders.

5           **THE COURT:**  Okay.  So these are the direct lenders?

6           **MR. LANDIS:**  Yes.  And the reason that they're

7   identified as executory contract holders is their rights as

8   direct lenders accrue through their loan servicing agreements

9   with USA Commercial Mortgage, their rights and their

10  obligations.  That's the reason why they've been characterized

11  in the fashion that they have.  We think it's appropriate under

12  the Code to appoint a group to represent those folks because

13  they are a significant component of the overall investor

14  universe that you're dealing with here.

15          **THE COURT:**  I may quarrel with the title; I don't

16  quarrel for the need for such a committee.

17          **MR. LANDIS:**  Fair enough.

18          With respect to the two fund committees, one equity

19  security holder committee for each fund.  And that is the sum

20  and substance of the committees that have been appointed in

21  these cases.

22          The two remaining entities, it was clear from the

23  341, don't continue to operate, have no employees and no

24  substantive debt that would need to be represented by a

25  committee, and that's the reason why there weren't committees

25

1  appointed in those cases.

2          The organizational meeting of all of the committees

3  I've just identified for you occurred yesterday morning prior

4  to the 341 meets.  I can tell you that there have been -- well,

5  there was essentially a beauty contest if you will for all the

6  attorneys, various financial folks, probably some accountants.

7  There was a number of people who wanted to meet with the

8  committees yesterday.  The committees did a great job of being

9  organized and allowing people to come in after their committee

10 work was established.

11          Had there been a longer period of time, I think they

12 would have gotten to see everyone.  I think they got to see

13 plenty of folks, and they are well under way in terms of their

14 operations.

15          I think you've heard appearances now, at least from

16 one set of counsel, who have appeared on behalf of --

17          **THE COURT:**  At least think they won the beauty

18 contest.

19          **MR. LANDIS:**  Well, the application is not here but I

20 expect it will be coming in the near term.

21          **MR. MEROLA:**  It was filed this morning, your Honor.

22          **THE COURT:**  Okay.

23          **MR. LANDIS:**  Well, there you have it.  So I'm sure

24 we'll visit about that, I believe, probably on shortened time

25 at the end of June hearing that's coming up next.

26

1          But bottom line, Judge, is we think that the

2     committees are well-organized, they're motivated, they have

3     looked at, seriously, retention of counsel and other

4     professionals.  I think they're going to do an excellent job in

5     connection with this case, and I think it's important that they

6     do.

7          **THE COURT:**  Okay.

8          All right, so, go ahead with the opposition.  I just

9     needed that kind of background.

10         **MR. LANDIS:**  Thanks, Judge.  And we did file this

11    opposition in connection with the applications by Ray Quinney

12    and Nebeker and also Schwartzer and McPherson.

13         I want to make it very clear for the Court there's

14    one thing that's not on the table here.  The United States

15    trustee's office is not challenging the credentials of these

16    firms to represent the debtors in these cases.  That's not on

17    the table and it's not something that's a substance of our

18    opposition.

19         With respect to the pre-petition payments, I would

20    say that at paragraph twelve in the Ray Quinney matter, we did

21    point out the fact of the payment, but because we don't have

22    schedules or any additional information, it was very hard for

23    us to raise the issue that you have.  We'll address that in the

24    context of a fee application at a later time.

25         What is on the table before the Court right now

27

1    though is not the caliber of the attorneys, but whether they

2    can bring those substantial skills that they have to bear for

3    each of the clients that they would like to represent.  And any

4    time an attorney undertakes to represent multiple parties, the

5    risk of conflicts of interest is attendant to that effort, and

6    that's the essence of our objection.

7            I think you've had a good overview of the nature of

8    our objection.  I want to be specific because really there are

9    two items that you need to focus on in resolving this

10   opposition.  The first is whether or not there is an actual

11   conflict of interest based upon the representation of the

12   multiple debtors by the proposed counsel.  If you resolve that

13   issue and determine that there is an actual conflict of

14   interest right now, then 327 says that that cannot be

15   countenanced, and, as a result, it can't be permitted in the

16   context of the multiple representations that are sought.

17           If, however, you find that there is not an actual

18   conflict of interest, the question becomes whether there is a

19   potential conflict of interest that would warrant denial of the

20   application.  What we've pointed out here is that it is

21   presumptively invalid to represent multiple bankruptcy estates

22   where one debtor entity is owed debts by others.

23           **THE COURT:**  But we do cases that are jointly

24   administered with inter-company receivables all the time.

25           **MR. LANDIS:**  And that very well may be the case.

1          **THE COURT:**  With one counsel.

2          **MR. LANDIS:**  And that very well may be the case, your

3    Honor, but that's not -- it's not just the potential for the

4    fees that we're talking about, and I'll get more into detail

5    about that as we move forward.

6          Ultimately the question as to whether or not that

7    potential conflict will ripen sufficiently to warrant

8    disqualification is in the Court's discretion, but we pointed

9    out in our papers that any time that there is a question as to

10   whether or not a conflict exists, that question has to be

11   resolved in favor of disqualification.

12         I'll walk through the analysis that I've just laid

13   out for you as best I can.  I think we've done a good job in

14   the papers, Judge, and I know there are a lot of other motions

15   pending, so I'll try to be brief.

16         First, with respect to the existence of debt between

17   the entities.  You've heard the testimony, or you've heard the

18   arguments I should say, of counsel with respect to the

19   potential pre-petition debts that give rise to the actual

20   conflict we've pointed out.  I didn't hear anybody say that

21   there aren't loan servicing agreements between the two fund

22   debtors and USA Commercial Mortgage.  Those exist.

23         **THE COURT:**  But if they're not disputed, if everybody

24   agrees that, yes indeed, the fund has a servicing agreement and

25   the fund is owed monies through the conduit of the servicing

29

1   agreement, then what's the dispute?

2           **MR. LANDIS:**  It's the other way.  The funds owe money

3   to USA Commercial Mortgage through the servicing agreement.

4   And --

5           **THE COURT:**  Well, but those are -- Nobody disputes

6   that, right?

7           **MR. LANDIS:**  There isn't any dispute, and that's

8   exactly what my point is, your Honor, is that the fact of the

9   existence of the loan servicing agreement isn't even an issue.

10  They do exist, and as --

11          **THE COURT:**  But what is the dispute?

12          **MR. LANDIS:**  The dispute is whether or not the

13  obligations of the funds to make payments to USA Commercial

14  Mortgage generate an actual conflict of interest.

15          You have five estates before you.  This is not a

16  substantively consolidated case.

17          **THE COURT:**  No, I understand that.

18          **MR. LANDIS:**  So you have three funds or three

19  different estates at issue with respect to loan servicing.  You

20  have the first Trust Deed Fund, Diversified Fund, and they're

21  having servicing through USA Commercial Mortgage.  They pay USA

22  Commercial Mortgage for those loan servicings.

23          And yesterday at the 341 hearing, to supplement my

24  earlier comments, it's about $200,000.00 through one fund and

25  about a hundred thousand, a hundred and seven I believe the

1    testimony was, monthly that goes out of the funds and to USA

2    Commercial Mortgage in connection with those loan servicing

3    obligations.

4         THE COURT:  Well, it's really the opposite isn't it?

5    In other words, the money comes in, it's deducted from the top

6    and then it goes back?

7         MR. LANDIS:  Actually --

8         THE COURT:  No money goes directly from the fund to

9    USA Commercial; it goes the other way.  The money comes in from

10   the borrower, the servicing fees are taken from the top, and

11   the rest goes to the fund, correct?

12        MR. LANDIS:  And to the extent that that's right,

13   then the question is: How else does USA Commercial Mortgage get

14   paid by the funds?  And the testimony was $300,000.00 a month

15   comes from the funds back to USA Commercial Mortgage.

16   Regardless of which direction it flows, the obligation is

17   owed --

18        THE COURT:  Well, how is that any different from

19   being serviced by somebody else?

20        MR. LANDIS:  You're right; it's not, and that's the

21   next thing, your Honor.  It's in USA Commercial Mortgage's best

22   interest to make absolutely certain that the funds do nothing

23   to eliminate those servicing agreements because that's how they

24   get paid.  And USA Commercial Mortgage, pursuant to the loan

25   servicing agreements, expects to receive money as a result of

31

1    those servicing contracts.

2            The bottom line is, is that if an attorney for USA

3    Commercial Mortgage says to the funds, 'You've got to keep

4    going', and the funds believe that they're giving him

5    independent advice --

6            **THE COURT:**  Well, the funds can't stop.  The point is

7    the funds have what they have; they're not collecting any more

8    money.   And the point is the funds are lenders of money to

9    various borrowers either as a percentage interest in some other

10   loan or, in a few cases, a hundred percent.

11           **MR. LANDIS:**  True.

12           **THE COURT:**  Okay.  So if there's no monies coming

13   from the fund, there's nothing to stop.

14           **MR. LANDIS:**  Your Honor, the point really is: Is

15   there in fact a debt owed by the funds to USA Commercial

16   Mortgage pursuant to the loan servicing agreement?  And the

17   answer, I believe, is yeah, there are obligations between the

18   funds and USA Commercial Mortgage that --

19           **THE COURT:**  And why in the world do we want to add

20   one more layer of expense when we now have a committee?  Why in

21   the world?  I mean I understand what you're saying; you're

22   talking about whether or not there's actual.  But let's get to

23   the practical.  Why do you want to make this case DOA by adding

24   one more layer of expense?

25           **MR. LANDIS:**  I don't know necessarily that it becomes

32

1   DOA by adding --

2        **THE COURT:**  Why wouldn't it be?

3        **MR. LANDIS:**  Well why would --

4        **THE COURT:**  How could it possibly afford one more

5   layer of expense?

6        **MR. LANDIS:**  In terms of having separate counsel for

7   each of the entities?

8        **THE COURT:**  Right.

9        **MR. LANDIS:**  The answer is because ultimately then,

10  each of the entities has independent advice as to what's in

11  their best interest in all these cases.  They can communicate

12  amongst themselves.

13       **THE COURT:**  Why can't that be done through -- Since

14  the only -- there are no creditors of the funds for the most

15  part, right, in the usual trade creditor sense?  They're all

16  investors, right?

17       **MR. LANDIS:**  Right.

18       **THE COURT:**  So why -- And it's unusual, but why is

19  it, assuming Mr. Merola is counsel, why isn't that need

20  satisfied by Mr. Merola?

21       **MR. LANDIS:**  The answer to your question is when

22  we're examining the representation of the debtors, we're

23  looking at the statutory obligations between the debtors and

24  their counsel.  That's what we're examining.  The fact that the

25  committees have representation and can give them independent

33

1   advice, assuming that they do get that, and we'll cross that

2   bridge I suspect at a later date.

3           THE COURT:  Well wouldn't we in essence be having two

4   counsel representing the same interest if you -- again, in a

5   case in which you have no trade creditors?

6           MR. LANDIS:  Well, USA Commercial Mortgage of course

7   does have that.

8           THE COURT:  I know; we're talking about the funds.

9           MR. LANDIS:  Right.

10          THE COURT:  Because that's where you claim the

11  conflict is.  In a case in which you have no trade creditors,

12  then why do you want two counsel, one for the debtor and one

13  for the equity holders, the investors?

14          MR. LANDIS:  They are always going to have one

15  counsel for the debtor.  The question is who is it going to be,

16  right?

17          THE COURT:  Well, but --

18          MR. LANDIS:  I mean isn't that the essence of it,

19  Judge?  The question is: Who is going to be counsel for the

20  debtors?  Because whether it be Ray Quinney and Nebeker or

21  someone else, in each of these cases there's still going to be

22  an attorney for the debtor and there's still going to be an

23  attorney for the unsecured creditors committee.

24          THE COURT:  But why wouldn't it be duplication?  I

25  mean again, counsel for the fund, as a debtor counsel, owes his

34

1  duties to the estate.  Well, as it turns out, the estate's

2  interest, the only people are the investors.

3          Now, I guess, you know arguably I guess you could say

4  we don't have a debtor's counsel, but that doesn't make sense.

5          **MR. LANDIS:**  I agree.

6          **THE COURT:**  But why would Mr. Merola's presence

7  obviate, if there's a conflict, he can recognize it and/or he's

8  going to articulate those interests?

9          **MR. LANDIS:**  Well, A, he hasn't yet been retained, so

10  we're assuming that --

11          **THE COURT:**  Well, someone will be.  You have

12  appointed a committee; someone will be retained.

13          **MR. LANDIS:**  Fair enough.

14          **THE COURT:**  Okay.

15          **MR. LANDIS:**  And equally true is the fact that there

16  is debtor's counsel, and they're seeking to be retained too.

17  And we can't ignore the fact that there always will be debtor's

18  counsel.  The question in this matter on this opposition is who

19  the debtor's counsel is going to be.

20          **THE COURT:**  So what do you claim the actual conflict

21  is today?

22          **MR. LANDIS:**  I have laid it out in paragraph twenty

23  of our opposition, your Honor.

24          **THE COURT:**  Okay.

25          **MR. LANDIS:**  The loan servicing fees that run between

35

1   the debtor entities in this case and also --

2          THE COURT:  But they're undisputed.

3          MR. LANDIS:  But the fact of the matter is that those

4   loan servicing arrangements establish obligations between the

5   parties.

6          THE COURT:  Okay.  Let's go back.  Let's assume we

7   have two affiliated debtors.  Parent company makes widgets; the

8   subsidiary company sells the widgets.  Okay, executory contract

9   between the parties in no way suggests the terms of the

10  contract are out of the ordinary course of business, there's

11  money due and owing.  Are you saying you couldn't have one

12  counsel for both cases where there's not a dispute as to the

13  contract?

14         MR. LANDIS:  I have cited for the Court the *Interwest*

15  *Business Equipment* case.

16         THE COURT:  So you're saying that you could never

17  have -- under that theory you could never have one debtor --

18  one attorney for jointly administered debtors under any

19  circumstance as long as there's any contractual relationship

20  between the parties?

21         MR. LANDIS:  What I'm saying, your Honor, is this:

22  We're only in the first phase of the conflicts analysis under

23  Section 327(a), and 327(a) says with respect to this retention

24  that is proposed:

25  'In a case under Chapter 11 of this Title, a person is not

36

1  disqualified for employment under this section solely because

2  of such person's employment or representation of a creditor

3  unless there is an objection by another creditor' -- and there

4  was -- 'or the United States trustee' -- and there is -- 'in

5  which case the Court shall disapprove such employment' --

6      **THE COURT:**  Wait a minute, wait.  What creditor

7  objected?

8      **MR. LANDIS:**  Three twenty -- 327(c).

9      **THE COURT:**  What creditor objected?

10      **MR. LANDIS:**  It was a limited opposition to the

11  debtor's application to employ and retain Ray Quinney, and the

12  objection was filed by Jeffery Davidson, Frank Merola, Eve

13  Karasik of Stutman Treister and Glatt, and I believe there is

14  also an additional limited objection on behalf of Mr. McGimsey.

15  So those matters were in fact on file.  I think in the summary

16  that's before the Court with respect to these issues, you can

17  identify that pleading.

18      And certainly at a minimum, there was an objection by

19  our office, and that's what gets us here today.

20      **THE COURT:**  Okay.

21      **MR. LANDIS:**  The status and agenda for the May 18th,

22  2006, hearing.

23      **THE COURT:**  No, no, I appreciate that -- Oh, you're

24  right, Mr. McGimsey did object.  Okay, you're correct.

25      **MR. LANDIS:**  McGimsey Family Trust, May 2, docket

37

1   number 68.

2           **THE COURT:**  You're right, correct.

3           **MR. LANDIS:**  So there were objections by creditors.

4   There was an objection by our office.  That then brings into

5   play the last clause of Section 327(c), in which case the Court

6   shall disapprove such employment if there is an actual conflict

7   of interest.

8           So what we're dealing with at this point in our

9   discourse, your Honor, is simply this: Does an actual conflict

10  of interest exist?  Because if an actual conflict of interest

11  exists, then the employment shall be disallowed.  That's what

12  the Code says.  That's the fundamental premise of our argument.

13  The question of whether or not it's disputed or not that the

14  loan servicing agreements doesn't impact on that; the question

15  is whether or not there is an actual conflict.

16          We've provided you the two factual bases upon which

17  we premised that argument, and the factual premise comes from

18  Mr. Alison's declaration itself.  And we asked the Court in

19  connection with its consideration of this opposition to look at

20  that application closely, because it establishes the existence

21  of a loan servicing fee obligation and it also establishes that

22  USA Commercial Mortgage believes that people were paid interest

23  on non-performing loans, and as a result, they got paid money

24  that they should pay back to USA Commercial Mortgage.

25          That makes a claim against folks who got interest

38

1    payments on non-performing loans, and the two funds got paid

2    money in connection with non-performing loans.  Certainly, at a

3    very minimum, they hold a bunch of non-performing loans.  That

4    isn't disputed either.

5              So to the extent that there is --

6         **THE COURT:**  Well, though if I find today -- if you

7    make me find that or suggest that I have to find that the

8    attorneys are disqualified, doesn't that also mean that we then

9    have to disqualify Mr. Mesereaux as to the other entities?  And

10   now we really do have a multiplication of fees?

11        **MR. LANDIS:**  Well, your Honor, that's an issue that

12   we can certainly address at another time, but what the question

13   is here is counsel, because counsel gives legal and substantive

14   advice to these debtors, whereas Mr. Alison's function as a

15   general proposition, A, has been the subject of a first-day

16   motion that this Court allowed on a limited basis, and I think

17   providently so; and B, really what he has done and he is doing

18   is forensic efforts to determine just what dollars are owed

19   where.  The question of what advice he gives then to the

20   various entities that he represents may in fact create a

21   conflict of interest, but that's a fight for another day.

22             What we're talking about here is who ought to

23   represent the debtor entities, and will they really get

24   independent advice from that entity?  And that's the focus of

25   our objection.  We believe that in this particular case, an

39

1   actual conflict does exist based on what we agree are

2   undisputed facts.  If you agree with our position in that

3   regard, your Honor, then under Section 327(c) the applications

4   cannot be permitted.

5          Now, it's true, and you heard in the argument from

6   counsel for the debtors, proposed counsel for the debtors, that

7   it's not necessarily always a hard and fast rule.  It is hard

8   and fast if there's an actual conflict, and we believe there is

9   and we ask the Court to so hold.  If you disagree, then the

10  question becomes: Is there a potential conflict that would be

11  sufficiently serious and is likely to ripen at some point in

12  the future such that the proposed retention would be improper?

13         We've given you the case law that says it's

14  presumptively, not absolutely or per se, improper for the same

15  attorney to be general counsel for related debtors where one

16  debtor is a creditor of a related debtor.

17         And you asked me the question, and it was a good one:

18  Are you telling me that in every single case where there's a

19  parent and a subsidiary that it's absolutely impossible for

20  there to be joint representation?  If there is the absence of

21  an actual conflict, Judge, and if the -- if in fact the Court

22  doesn't find that a potential conflict is enough to warrant

23  disqualification, the Court has that much discretion.

24         So in other words, the first question you have to

25  answer is, is there an actual conflict?  And if there is, the

40

1    inquiry ends.  If there's not, you have to determine whether or

2    not there's a potential conflict that would warrant denial.

3    Because of the presumptive of improper representation where

4    there is a common debt owed between multiple estates, we

5    believe that in this particular case, even potential conflicts

6    of interest that exist would warrant disqualification.

7            The two types of pre-petition debts we've covered.

8    As a result, the presumptive kicks in.  At an absolute minimum,

9    a potential conflict exists between the interests of USA

10   Commercial Mortgage Company and those of the funds, especially,

11   your Honor, with respect to how much money was paid to the

12   funds on non-performing loans and whether and to what extent

13   USA Commercial Mortgage is going to seek to recover that money.

14           Additional potential conflicts of interest we

15   identified are the $58 million-dollar inter-company receivable

16   that was owed by USA Investment Partners, LLC, to USA

17   Commercial Mortgage in a very carefully crafted declaration

18   that said, quote, 'And possibly other debtors'.  Well, if that

19   particular loan transaction wasn't properly documented, and

20   there's the potential interest in that loan transaction in

21   relation to other debtors in addition to USA Commercial

22   Mortgage, the difficulty in one counsel giving independent

23   advice to all interested parties, it's incredible, it's

24   massive.

25           Because how can you be certain, if it's not

41

1    documented but you know how much it is, and it's possible that

2    some of the interests go to the other debtors, who's to be sure

3    that the other debtors get a fair shake?  The attorney for USA

4    Commercial Mortgage?  If that's not a potential conflict that

5    warrants this Court's careful consideration in the context of

6    whether or not this particular application ought to be denied,

7    I don't know what would be.

8           Two things, your Honor, in closing.  The existence of

9    a potential conflict of interest may require disqualification

10   of a professional if, in the judgment of the Court, the

11   conflict is sufficiently important and there is a sufficient

12   likelihood that it will ripen into actual conflict.

13           **THE COURT:**  Now --

14       **MR. LANDIS:**  That's the scope of this Court's

15   discretion.

16           **THE COURT:**  Are you saying -- I just need to clarify.

17   You're not suggesting they couldn't continue to represent USA

18   Commercial, for example?  We just have to have new counsel for

19   the funds?

20       **MR. LANDIS:**  If you find that there is an actual

21   conflict of interest, it's prohibited.  If you find that there

22   is not an actual conflict but the potential conflicts going

23   forward are such that continued representation is not an issue,

24   at that point in time then I think the debtor's counsel have a

25   decision to make from a professional standpoint.

42

1            I don't believe that it would be appropriate or

2    provident to remain in a case where a conflict of interest has

3    been identified.  However, that's an issue that we will have to

4    address in the event that counsel decides to try to remain in

5    the case for one of the parties that it represented.

6            The real concern, Judge, is this: To the extent that

7    they've already represented all three debtors, an awful lot of

8    information has to have been made available to one set of

9    attorneys, and that information is in large part financial, and

10   is in large part the kind of information that can be used to

11   the detriment of the other entities, and in particular, the

12   funds.

13        **THE COURT:**  But how can any of this be used to the

14   detriment of the funds at this stage?  It's all been open

15   information.  This is not a case in which there is anything

16   hidden; how is it possible?  That's not the usual -- that may

17   be a usual case but that's not the case here.

18        **MR. LANDIS:**  I'm going to respectfully disagree with

19   the Court about the fact that there's been full disclosure.  We

20   don't even have schedules.  As a matter of fact, all we've got

21   is information that says what loans are performing and what

22   loans aren't.  When you look at the information that says what

23   loans aren't and you identify Mr. Alison's declaration as

24   saying that gives rise to a claim in favor of USA Commercial

25   Mortgage against people who received interest payments on non-

43

1    performing loans and you see the magnitude of the non-

2    performing loans held by the funds, I would respectfully

3    disagree with the idea that there has been full disclosure or

4    that there is a lack of conflict based on the record before the

5    Court.

6           The bottom line, Judge, is this: If you disagree with

7    our position that there is an actual conflict of interest, the

8    question changes then to whether there is a potential conflict

9    that would warrant denial of the application.  We've pointed

10   you to the presumptive requirement for disqualification.  We

11   recognize the Court's discretion.  But we also would ask the

12   Court to consider that the standard under Section 327 for

13   retention of counsel is very high.  If there is any doubt as to

14   the existence of a conflict, the doubt should be resolved in

15   favor of disqualification.

16          Judge, again, we're not adding layers of

17   administration here because there's only going to be one lawyer

18   for the funds, or one --

19          **THE COURT:**  Right, but you have all that work that's

20   going to have to be done to get that person up to speed;

21   hundreds of thousands of dollars.

22          **MR. LANDIS:**  And if that is --

23          **THE COURT:**  You concede that, right?

24          **MR. LANDIS:**  Your Honor, I can't argue the facts on

25   dollars, but what I can argue is this: If you don't get

44

1   independent counsel involved for each of the independent

2   entities in the five cases that are before you now, when the

3   conflict do come up, and they will, if you think the cost

4   attendant to getting up to speed in the first -- with respect

5   to cases that have been on the docket for only thirty days is

6   significant, the level of cost attendant to having new counsel

7   appear six months or a year into the case is significantly

8   higher.

9           This matter needed to be brought to the Court's

10  attention.  That's the reason for the opposition.

11          **THE COURT:**  And I appreciate that.

12          **MR. LANDIS:**  And for those reasons, your Honor, and

13  understanding that there are many other substantive matters

14  relating dollars and cents on this Court's docket, you know

15  what we're asking your Honor.

16          **THE COURT:**  Right.

17          **MR. LANDIS:**  That the applications be denied.

18          **THE COURT:**  Thank you, and I appreciate it.  I've

19  asked you a lot of questions.

20          Anybody have any other opposition or comments before

21  I reply?  Wait, wait.

22          **MR. MCGIMSEY:**  I would like to make two, your Honor.

23          William McGimsey.  I also filed an opposition, and I

24  believe that the conflicts are blatant and already

25  acknowledged.  I won't repeat anything that Mr. Landis said, I

45

1  would join in him, but a couple of things that have come out

2  through the brief 341 meetings at which, admittedly, because of

3  time constraints, we couldn't go into everything.  But for

4  instance, USA Capital Diversified Trust Deed Fund apparently

5  has no creditors.  Probably had it had its own counsel, would

6  not be in this Chapter 11 proceeding.

7         USA Capital Diversified Trust Deed Fund is managed by

8  its managing member, USA Capital Realty Advisers, who simply

9  hired USA Commercial Mortgage to service the loan agreements.

10        There is no dispute that there are loan agreements or

11  servicing agreements in place, but there is, or should be, a

12  significant dispute whether or not those loan servicing

13  agreements should stay in place.  I believe there is a real

14  chance -- in fact, more than that -- that USA Capital Realty

15  Advisers breached its agreement to properly manage the affairs

16  of Diversified Trust Deed Fund.

17        Mr. Alison has identified the fact that USA Capital

18  Diversified Trust Deed Fund has twenty-three loans, twenty of

19  which are non-performing.  And, as far as I can tell from

20  whatever has been so far presented, in not one of those twenty

21  instances is there any foreclosure proceeding going on, is

22  there any legal particular whatsoever to attempt to collect

23  those monies.

24        What is happening is that every month USA Capital

25  Diversified Trust Deed Fund is now paying what we figure is

46

1    either a hundred and five thousand or a hundred and seven

2    thousand which goes to USA Commercial Mortgage, which is now

3    funding its -- partially funding its operations through that

4    hundred and five thousand dollars.  That hundred and five

5    thousand dollars has nothing to do with what kind of job USA

6    Commercial Mortgage or USA Capital Realty Advisers does for the

7    fund.  It is based as a percentage of the funds that are being

8    managed.  So --

9              **THE COURT:**  But that was the agreement?

10             **MR. MCGIMSEY:**  That was the agreement, that was the

11   agreement, and I don't question that, but I think the funds

12   have been totally mismanaged, and so there is a real question,

13   one, why is USA Capital Diversified Trust Deed Fund in this

14   proceeding at all?  And, if it has its own attorney, under the

15   limited liability company agreement, it could change its

16   manager, it could change, you know, I mean it could bring an

17   action to get out of this loan servicing arrangement.

18             Now, that might not be the best thing, but that's

19   going to be -- But these attorneys, you know, how do they say

20   it?  I mean how do you give advice to Mr. Alison as to whether

21   or not this $58 million dollars which he's attempting to

22   collateralize from the former principals, as far as I've heard,

23   that's going to be collateralized in favor of USA Commercial

24   Mortgage.  Well, maybe it should be collateralized in favor of

25   Diversified Trust Fund or Capital First Trust Deed.  How do we

47

1   decide that?

2          And one of the things that with regard to that $58

3   million dollars that Ms. Jarvis indicated, she said, well, it's

4   an accounting issue.  When that comes out, it won't be subject

5   to dispute.  Well, it won't be subject to dispute if they all

6   have the same attorney.

7          **MR. GARMAN:**  Your Honor, I didn't file an opposition,

8   so with the Court's indulgence I'll be brief, because

9   circumstances have changed in the last twelve hours that have

10  changed our position on what's happening.

11         Your Honor, let me tell you -- I represent a couple

12  of --

13         **THE COURT:**  Tell me again who you represent.

14         **MR. GARMAN:**  I represent a couple of direct lender

15  clients who are long-standing clients of the firm Higgins and

16  Buckalew.  In addition to that, we were contacted by hundreds

17  of direct lenders, representations we have never accepted, who

18  actually provided us hundreds of thousands of dollars in order

19  to represent their interests.

20         We didn't think an official committee of direct

21  lenders could be formed in this case initially.  We support the

22  fact that it has now been formed, and we've told those people

23  we think that the collective wisdom of the committee is where

24  you need to be led now, and as such, we are in the process --

25  excuse me, of returning all of those retainers that were

48

1    provided to us.  And again, we didn't accept the

2    representation.

3            That was premised upon an assumption that the direct

4    lenders would have an independent voice, and it's Mr. Merola

5    and Stutman's employment application for both the direct

6    lenders and the funds that now cause our existing clients

7    grief.

8            We had anticipated that there were potential

9    conflicts of these debtors.  At the end of the day, we can all

10    talk about accounting now, but I remember you told me very

11    early in my career: Follow the money.  And in this case, $950

12    million dollars is at stake.  Eight hundred million of it is

13    the direct lenders' money.

14            The question everyone is dancing around at the moment

15    is 541; is it property of the estate?  If you read the debtor's

16    motion to hold the funds, they have headings, and in four pages

17    of points and authorities, they may argue it's their money in

18    the future, but they haven't decided to do so.  Thus, the

19    potential conflict that exists between fund members and direct

20    lenders.

21            At the end of the day, is the direct lenders' money

22    going to be brought into this estate to pay the claims on a

23    pro-rata basis, as the debtor insinuates may happen?  That's

24    the conflict we've seen, and that's the conflict we've been

25    concerned about.  That's why I didn't think an official

49

1   committee of direct lenders was possible, because we thought

2   the direct lenders would come to court, as our clients have

3   insinuated, and say, 'No, we're the lender, we're not in

4   bankruptcy, the borrower is not in bankruptcy; only the

5   servicer is, and as such, this isn't property of the estate.'

6   Well, if they're not property of the estate, I don't know how

7   you talk out of the other side of your mouth and decide that

8   you're going to get paid from the estate.  That's been

9   resolved, and we think that it was resolved to the benefit of

10  direct lenders, because we think they should speak with a

11  common voice.  Otherwise, this process breaks down.

12         Having said that though, ninety days from now we're

13  fighting between the fund members who have a disproportionate

14  number of bad loans, because there was no oversight by direct

15  lenders on those loans.  Hant Ges and Milanowski had free rein

16  to invest those funds in what they wanted, and the direct

17  lenders who did their own due diligence on each of these

18  projects.  If the direct lenders' counsel is able to advocate

19  that their property, the loans, their direct funds, did not

20  constitute property of the estate, we envision that that was a

21  scenario in which these potential conflicts could be addressed

22  and that you would have adequate representation on all sides.

23         The problem is, is that we anticipate it's fairly

24  likely that the debtor is going to advocate that the direct

25  lenders' proceeds constitute property of the estate.  And if

50

1  you have one set of counsel representing both fund members

2  whose interest it is to bring in those direct loans and

3  representing the direct lenders, you don't have that

4  independent voice speaking to this critical -- it will be the

5  key issue in this case.  Do the direct lenders' funds

6  constitute property of the estate?  Every decision you make is

7  going to be premised upon that.

8         And let me give you an example.  The term sheet that

9  you have before you today contemplates all property of the

10 estate will be a super priority --

11     **MS. JARVIS:**  Your Honor.

12     **THE COURT:**  Uh-huh?

13     **MS. JARVIS:**  If I can interrupt?  I really think this

14 goes -- the argument goes not to what's before the Court today,

15 it goes to dealing with the committees, their representation,

16 their, you know, their formation and --

17     **MR. GARMAN:**  Your Honor --

18     **MS. JARVIS:**  -- I think this really is better

19 reserved for, you know, a later time.

20     **MR. GARMAN:**  I saw a potential conflict that I

21 thought could be resolved through a mechanism.  That potential

22 conflict exists and now it's given rise over the last twelve

23 hours to --

24     **MR. LANDIS:**  Your Honor, the matter before the Court

25 though is only the question regarding retention of debtors'

1    counsel in multiple entities.

2         **MR. GARMAN:**  Right; I acknowledge that.

3         **MR. LANDIS:**  We are not only faced with nothing on

4    file, but now we're far afield from the issues.

5         **THE COURT:**  So --

6         **MR. GARMAN:**  So my concern is this: Is -- There is a

7    potential conflict here, and that conflict, I think, comes down

8    to what constitutes property of the estate, and there's going

9    to be a fight someday between fund members and the direct

10   lenders.

11        **THE COURT:**  Okay, thank you.

12        **MR. GARMAN:**  And -- and these debtors, with one set

13   of counsel, cannot receive independent advice as to what's in

14   the best interest of their constituents.  And in the case of

15   USA Capital, those may be the direct lenders.  In certain

16   instances of the funds, they may be hearing conflicting

17   positions.  The fund members are going to want to bring all

18   these assets in.  I think that goes without saying.

19        It arises in issues you're dealing with today.  It

20   arises in issues that the debtors are undertaking now.  As an

21   example, the debtors are going out trying to get secure loans

22   from Hant Ges and Milanowski for unsecured loans they were

23   provided.  That sounds like a great idea.  I think that it

24   supports and is in the best interest of many of the

25   constituents they represent.  But many of the direct lenders

52

1    were specifically induced into loans because they were provided

2    personal guarantees on identifiable loans by Hant Ges and

3    Milanowski.  Well, it may benefit the funds to bring these

4    assets into the estate, and it may benefit certain creditors

5    and/or direct lenders, but at the end of the day, people need

6    to have independent advice as to what constitutes the best

7    interest for each of the constituents.  Now --

8         **THE COURT:**  Well, that's why they get their own

9    attorneys.

10        **MR. GARMAN:**  I agree.

11        Now, nobody wants to tack on millions of dollars of

12   additional fees, but, your Honor, we're dealing with nearly a

13   billion dollars.  An additional one million dollars, which is a

14   sizable sum --

15        **THE COURT:**  But you and all your clients are claiming

16   it's not a billion.  You and your clients are all claiming

17   that's my money.

18        **MR. GARMAN:**  Well, that's seven --

19        **THE COURT:**  All we get is --

20        **MR. GARMAN:**  That's $800 million --

21        **THE COURT:**  No, but the point is your clients are

22   saying that billion dollars, of that billion, only, what is it,

23   twelve percent belongs to the estate.  The billion belongs to

24   your clients.

25        **MR. GARMAN:**  That's right, your Honor, but it's still

53

1    a billion dollars that's being -- that people are fighting

2    about.

3        **THE COURT:**  So are your clients willing to be

4    surcharged?

5        **MR. GARMAN:**  I don't think anybody wants to be

6    surcharged, but it's a dialogue that has to take place.  And

7    when we're talking about sizable numbers like that, a million

8    dollars out of a billion is one tenth of one percent.  And it's

9    still a million dollars of course, and it's a large sum of

10   money.

11       But the problem comes down to you can't have a

12   situation where the funds and those who are supposed to

13   represent the direct lenders, and in this case those are two of

14   the debtors, or three of the debtors, aren't getting advice

15   specific to the creditors or direct lenders of their group.

16       **THE COURT:**  Okay, we need to move on.  It's 11:00

17   o'clock, I've got four more hearings.

18       **MR. GARMAN:**  Sure.

19       **THE COURT:**  I've got a noon meeting.

20       **THE COURT RECORDER:**  Say your name.

21       **MR. MASON:**  Richard J. Mason on behalf of Dr. Gary

22   Kantor who is one of the substantial investors.  Judge, I'll

23   try to be very brief.

24       **THE COURT:**  Is he an investor in the fund or is he

25   what we call a direct lender or both?

54

1          **MR. MASON:**  All, all of the above, your Honor.

2          And it's Dr. Gary Kantor's judgment that to the

3    extent that the Court has discretion in this matter, that we

4    would be better off with a single counsel for the debtors, a

5    single chief executive or restructuring officer for the

6    debtors.

7          We recognize the arguments of the United States

8    trustee.  Mr. Landis is doing a very good job of trying to keep

9    an eye on the conflicts here.  I am confident that if an actual

10   conflict arises, he will be the first to bring it to the

11   Court's attention.

12         Counsel for the debtor has indicated that at the end

13   of the ninety days when Mr. Alison has a better view of the

14   financial condition of each of these debtors, if there are

15   conflicts, either conflicts counsel will have to be appointed

16   or there will have to be some kind of a new arrangement.

17         Your Honor, as you well know, if you deny this

18   motion, we'll have to have multiple lawyers, multiple

19   executives, multiple -- the disputes in this case will increase

20   geometrically.  To the extent that your Honor has discretion,

21   and I believe even the United States trustee has acknowledged

22   that you have discretion, because the conflicts are potential

23   conflicts only, we would urge your Honor to grant the motion

24   with the protections that have already been offered by debtors'

25   counsel.  Thank you.

55

1         **THE COURT:**  Okay.  All right, reply?

2         How do you intend to deal with this motion that's

3    coming up on the 5th -- sorry; yes, the motion that's coming up

4    on the 5th -- to temporarily hold funds?  Wouldn't that motion

5    -- wouldn't the fund perhaps have a different view point than

6    the mortgage company?

7         Now, on one hand you could say the fund would want

8    that to happen because, while they may want their monies, by

9    the same token they don't want the direct lenders to get their

10   monies until we sort it all out.  So, you know, you can't say

11   'Don't take mine but -- Give me mine but don't take theirs.'

12   But doesn't that sort of present a problem?

13        **MS. JARVIS:**  Well, it applies across the board, you

14   know, in the sense that it's a temporary request, just while we

15   sort things out.  And again, through that ninety days, to see

16   if there are actually any conflicts or any problems that would

17   cause some divergent interests.

18        I mean the issues that were just raised with respect

19   to the direct lenders really are not issues that are between

20   the debtors.  They're between the debtors and the direct

21   lenders, but the direct lenders are not being represented, you

22   know, by the debtor.  I mean they have separate counsel.  So

23   he, you know, raised some possible conflicts, but they're not

24   between the debtor entities themselves.  I don't think they're,

25   you know, that the issues that have been raised so far with

1    respect to the motion to hold the funds have been all raised by

2    the direct lenders, not by the funds themselves.

3         But again, it's temporary.  It's not, you know, we've

4    raised some possible, you know, solutions or end games that may

5    come out in this case.  We're hoping that the end game is

6    everybody just gets their principal and interest as they

7    anticipated, and that certainly is our goal to move towards

8    that.  We raised that only for purposes of, you know, we just

9    need some time to sort that out.  And I think in the interim,

10   there is, you know, no conflict that has been identified.  What

11   we're talking about now is a lot of speculation, a lot of

12   speculation, but no real actual dispute that currently exists

13   that would cause disqualification.

14        And, you know, we have offered to, and maybe we'll

15   just go forward in order to try to kind of move this along and

16   anticipate in case there is any problems, you know, hiring

17   conflicts counsel that could separately advise the funds to the

18   extent there are some issues that come up between us.  But I

19   think where there has been, you know, no actual conflict, no

20   actual dispute, it's all speculation, that it's not appropriate

21   for disqualification in this instance.

22        And remember that we talked about this case.  This is

23   really a case about a hundred and fifteen loans.  And, as your

24   Honor noted, the vast majority of those are like Dr. Kantor, or

25   the vast majority of the investors in this case are like Dr.

57

1    Kantor in that they are in all three investments.  And when you

2    look at those a hundred and fifteen loans, because they involve

3    everyone, there is a common interest, and that really doesn't

4    create a conflict to deal with, you know, pursuing collections

5    and facilitating those loans which are being serviced by

6    Commercial Mortgage for 200 to 300 investors per loan.

7            So the fact that there are, you know, some, again,

8    speculations that there could be some differences is not basis

9    for disqualification.

10           And even with respect to the *Interwest* case; like I

11   said, this is not in this district, but even that case does not

12   say that when you have, you know, debts between affiliates,

13   which frankly almost all affiliates have some debts.  Usually

14   they have a common cash management system where they are not

15   disputed, and right now that's all we've got is not disputed,

16   you know, ordinary course transactions between the debtors.

17   That does not require disqualification.

18           And that's recognized by 327(c), because, if there

19   was -- if the existence of those inter-company debts in and of

20   itself was a disqualification, which is I think what the U.S.

21   trustee is arguing, then the Court wouldn't have to make the

22   determination that there was an actual conflict of interest.

23   And that's what 327(c) says, is that that only is disqualifying

24   if there's an actual conflict of interest, and no actual

25   conflict has been identified.

1          There's no dispute, you know, as was recognized under

2     the authorities that define actual conflicts of interest.  It's

3     all speculation, and that is not an appropriate basis at this

4     point in time to disqualify us.

5          **THE COURT:**  Okay.

6          Mr. Merola, do you have a comment; I forgot to ask?

7     I mean if you don't, that's fine.

8          **MR. MEROLA:**  Your Honor, the issue about 327 versus

9     328 we think has been adequately addressed and we'll deal with

10    the comments of Mr. Garman a little later on the calendar.

11         **THE COURT:**  Okay.

12         **THE COURT:**  All right, I'm going to grant the motion

13    to retain for ninety days -- Well, let me go back.  I find

14    there is no actual conflict of interest, so they shall not be

15    disqualified.  But I want to review this at the end of the

16    ninety days because I do see potential conflicts on the

17    horizon.

18         For example, I mentioned the potential conflict on

19    this temporarily hold funds.  But again, I don't think that's a

20    conflict because I said on one hand, it represented the fund,

21    you could argue -- one could argue, no, I don't want you to

22    hold the monies back; I want the money now.  But the opposite

23    part of the motion is that if that's the case, then that means

24    all the direct lenders have to be paid their money too, and it

25    may well be the direct lenders got paid more than they should

59

1   have gotten paid.  Nobody knows at this stage.  We're all

2   speculating.

3           I think there will be conflicts in the future, and I

4   think that we need to look forward to getting separate counsel

5   for the funds.

6           Another reason I don't find -- Well, there are no

7   actual conflicts now.  I don't find the fact that there's a

8   servicing agreement to create an actual conflict.  And

9   potential conflicts, we are a stage now where, you know, for

10  example, just by the very nature of a servicing agreement, the

11  point is you all act together to get the money in, and then

12  maybe later you're going to fight about who gets the money.

13          Let's just assume, for example, we had just USA

14  Commercial Mortgage with nothing but direct lenders, and let us

15  assume that we had one of those situations where it was a 120

16  percent.  The point is everybody wants the money and now

17  there's no conflict, but then there might be fights inter se as

18  to who got the money.  So I don't find there's the conflicts

19  now; I do see potential.

20          And I am concerned, just to give the U.S. trustee a

21  heads up, I am concerned about one committee representing the

22  direct lenders as well as the investors and the members in the

23  LLCs.  I don't know enough about it; I'm concerned.  Maybe

24  that's not the case.

25          The other anomaly is it's on one hand easy.  I was

60

1    thinking, well, you know what, let's just do get separate

2    counsel for the funds now.  Let's assume it wouldn't cost that

3    much.  But I'm thinking wait a minute, who are they going to

4    report to?  Mr. Alison is only one person, so we're operating

5    in the fiction that they represent a debtor but they'd have

6    nobody to report to.  They would in essence be the philosopher

7    king, which all the attorneys want to be anyway, but, so it

8    would be a fiction, and an expensive fiction most importantly.

9            I think significantly we do have -- we will have

10   committees that represent these very interests, so we'll have a

11   side view.  I do think it is very important to review at the

12   conclusion of the ninety days for the very reason we said

13   Mr. Mesereaux and the comments of the U.S. trustee's office

14   before.  There may well be, but by that time we're going to

15   know whether or not there are conflicts and what the issue are.

16   At least hopefully we'll know.

17           I appreciate the U.S. trustee, and even though I gave

18   Mr. Landis a hard time, I appreciate the fact that, A, it's his

19   job, and this is an important -- you know, it's important to

20   keep professionalism, it's important to keep these interests so

21   that everybody's interests are adequately represented.  So it's

22   an issue you needed to bring, and it's an important issue, and

23   you certainly -- there's room for disagreement in this area.

24           Let's take a short break and then we'll go back and

25   finish up the calendar.

61

1          **THE CLERK:**  All rise.

2          **(Recess from 11:01 a.m. to 11:15 a.m.)**

3          **THE CLERK:**  All rise.  Bankruptcy Court is now in

4   session.

5          **THE COURT:**  Be seated.

6          Excuse me.  I probably shouldn't tell you this

7   because it'll encourage everybody to talk longer, but I'm going

8   to skip my noon meeting, unless everybody would prefer to come

9   back at 1:30.  I assume you'd just as soon go through, correct?

10          **MR. SCHWARTZER:**  Please.

11          **THE COURT:**  It's okay; it's a judge's meeting, it's

12   okay.

13          **(Laughter)**

14          **MR. SCHWARTZER:**  No, I just may ask permission to

15   withdraw at around a quarter to noon because I'm supposed to be

16   one of the speakers at the SNABA (phonetic) luncheon today.

17          **THE COURT:**  Oh, that's right, okay.

18          Oh, so can you --

19          **MR. SCHWARTZER:**  But that's not a real problem.  It's

20   a Chapter 7 panel of trustees, and there are six other guys

21   who --

22          **THE COURT:**  Right.

23          **MR. SCHWARTZER:**  -- are more experienced than I am.

24          **THE COURT:**  And I'm sure nobody cares what you have

25   to say anyway?

1          **MR. SCHWARTZER:** Right.

2      **(Laughter)**

3          **MR. SCHWARTZER:** Except in this courtroom where, of

4   course, I know you wait on every word.

5          **THE COURT:** Okay, the next one's a little less

6   controversial I hope.  It's the motion concerning notice.

7          **MR. SCHWARTZER:** Yes, your Honor.  This is pretty

8   much a standard motion for an order limiting notice.  And

9   basically what it says is that we want to provide notice to the

10  committees, committees' counsel, to the government agencies

11  involved, and anyone who files a request for notice.  So any of

12  these investors who want to get notice of every single paper we

13  file, they can get it.

14          On the other hand, we're hoping, because there are

15  like some 6,900 entities involved in this case, that by

16  limiting notice to only this group, the standard group, plus

17  people who specifically request, it will be a cost-saving

18  matter for this bankruptcy estate.

19          **THE COURT:** I would also like to see you add, and

20  maybe it's covered, is that if you have a motion that affects a

21  particular loan, that all the individuals, all the entities

22  and/or individuals who are lenders on that loan be noticed.

23          So for example, today's motion, since you've had all

24  those particular loans involved, you would have had to notice

25  those people.  But I think that, A, is a due process issue, and

63

1   -- well, more importantly, a due process issue affecting a

2   specific loan.

3          **MR. SCHWARTZER:**  Okay.  With regard to -- I see.  You

4   mean like on the motion that we're saying we want to have

5   authority to give releases on loans --

6          **THE COURT:**  Yes.

7          **MR. SCHWARTZER:**  -- and we don't know which ones?

8          **THE COURT:**  If it affects a specific loan.

9          **MR. SCHWARTZER:**  Okay.  Yes, your Honor, I could

10  amend the order -- to prepare an order that provides where we

11  have a motion that affects a specific loan, that all the

12  investors in that loan be noticed.

13         **THE COURT:**  Right.  And I saw some limited

14  opposition.  Did you work out those additional --

15         **MR. SCHWARTZER:**  Well, actually, the committee --

16         **THE COURT:**  -- or comments?

17         **MR. SCHWARTZER:**  The committee wanted us to limit

18  notice even more.  We included in the people we were giving

19  notice to each party who was on the list of twenty largest

20  investors for the fund -- for each of the two funds and for the

21  direct lenders.  The committee said as long as there's a

22  committee, you don't have to do that.  It's up to the

23  discretion of the Court on that.

24         **THE COURT:**  I think you might as well; it's just

25  forty more notices.

64

1       **MR. MEROLA:**  It's eighty more, your Honor, of

2  everything.

3       **THE COURT:**  Oh, eighty more.

4       **MR. SCHWARTZER:**  And it's written notice because

5  these people don't necessarily have e-mail addresses, so

6  they're not getting their notice automatically.

7       **THE COURT:**  And there are committees for each of

8  these three now?

9       **MR. SCHWARTZER:**  Yes, there are.

10      **THE COURT:**  Okay.  All right, so we can eliminate

11  that then.

12      **MR. SCHWARTZER:**  Okay.

13      **THE COURT:**  Because of course any individual can file

14  a request for special notice.

15      May I suggest that when you send -- Now, you're going

16  to send this out to everybody, right?

17      **MR. SCHWARTZER:**  Yes, your Honor.

18      **THE COURT:**  Why don't you prepare a form so that it's

19  one form, and let's have -- Is Mary Ann still in here?  Mary

20  Ann Street still in here?

21      **THE CLERK:**  No, I don't see her, your Honor.

22      **THE COURT:**  Should we have BMC, because it's going to

23  affect the mailing matrix?

24      **MR. SCHWARTZER:**  That's correct.

25      **THE COURT:**  Does BMC monitor the mailing matrix?

65

1          **MR. SCHWARTZER:**  Actually we create and file the

2    master mailing matrix, and we're continually updating it, and

3    we provide it to BMC Group when there's going to be a mailing.

4          **THE COURT:**  Okay.  Let me suggest this in a request

5    for special notice; that you put in there -- if they request

6    special notice A and B, does this address supersede any prior

7    addresses.

8          **MR. SCHWARTZER:**  And could we also ask them if they

9    can get the notice by e-mail?

10         **THE COURT:**  Yeah.

11         **MR. SCHWARTZER:**  Because that really does save a lot

12    of --

13         **THE COURT:**  I don't think there's a problem with

14    that.

15         **MR. SCHWARTZER:**  -- a lot of effort, and in this

16    group of investors, I think there's a lot of computer-savvy

17    people.

18         **THE COURT:**  Yeah.  And I think -- I don't think

19    there's any problem with the federal rules that prohibit that.

20         So we could accomplish two things here.  Now, let me

21    just give you my view of a request for special notice.  My view

22    of a request for special notice, all that means is if you're

23    entitled to notice, that's the address it goes to.  My view of

24    the rule is not that if you weren't entitled to the notice,

25    you'd get it anyway.  But if the debtor feels it's easier just

66

1    to send it to everybody regardless of -- without thinking about

2    who has to get the notice, that's fine by me.

3              MR. SCHWARTZER:  That's what we've been doing, your

4    Honor.

5              THE COURT:  Okay.

6              MR. SCHWARTZER:  That would be the intent of this

7    order, would be if you file a request for notice, you will get

8    notice of every -- every paper that we file, we will send out

9    to those people, either by electronically, if they've given us

10   an electronic address preferably, or by first-class mail.

11             THE COURT:  Now, let's see, they would not have filed

12   their proofs of claim or interests yet.

13             MR. SCHWARTZER:  No, they would not, your Honor.

14             And one of the things you have to recall in this

15   case, until we do the accounting --

16             THE COURT:  Right.

17             MR. SCHWARTZER:  -- we don't want to send people the

18   forms to spell out their notice.

19             THE COURT:  That's right.  We've extended the bar

20   date on this, have we not?

21             MR. SCHWARTZER:  Yes, we have.

22             THE COURT:  So that's true.  So when you send out

23   those forms, you could indicate in those forms, you know, is it

24   really this address you wanted, the request for special notice,

25   so we have -- so we don't have all these duplicates.

67

1      **MR. SCHWARTZER:**  Right.

2      **THE COURT:**  I don't think anybody wants duplicates of

3  anything.

4      **MR. SCHWARTZER:**  As a matter of fact, we got some

5  pretty nasty letters about 'You must be wasting our money

6  because we got five copies', and the problem was on the first

7  mailing we did not have joint administration, so we were

8  required to send five copies if we didn't know which entity --

9      **THE COURT:**  If you had asked, I would have let you

10  send one copy.

11      **MR. SCHWARTZER:**  I am -- And we sent one notice.

12      **THE COURT:**  Okay.

13      **MR. SCHWARTZER:**  We created one notice, but --

14      **THE COURT:**  Well, you've also got the problem on some

15  of these loans, these people are wearing different hats.

16      **MR. SCHWARTZER:**  That's right.  For example, we have

17  a lot of people who have the investment in their own name, a

18  family trust, an IRA, a 401-K, and some Keogh plan, so they're

19  getting five notices because they're five separate entities.

20      **THE COURT:**  So, may I suggest --

21      **MR. SCHWARTZER:**  We hope we're going to limit that.

22      **THE COURT:**  So I suggest in your request for a

23  special notice form, give some thought to devising the form

24  such that you get as much information as you can so that you're

25  not doing more duplicates than you need to and you find out

68

1   what -- you know, maybe people do want it sent to two separate

2   addresses if they're wearing different hats.

3            **MR. SCHWARTZER:**  Okay.  We'll do that, your Honor.

4            **THE COURT:**  And any form is acceptable to me.

5            Okay, so that is approved.  So the list will be --

6   Notice will be limited to the U.S. trustee, unsecured creditors

7   committee's counsel, any other committee.  Well, it would be

8   the specific committees now.

9            **MR. SCHWARTZER:**  Yes.

10           **THE COURT:**  Secured creditors and their counsel.

11           Are we still doing -- We're not doing that to

12  unsecured twenty anymore?

13           **MR. SCHWARTZER:**  No.

14           **THE COURT:**  Nor the top twenty in Diversified Capital

15  or USA Commercial; governmental entities, those who file

16  request for notice, and those entities who have an interest in

17  a specific piece of property which is affected specifically by

18  a motion.

19           **MR. SCHWARTZER:**  Okay.

20           **THE COURT:**  And I apologize for too many 'specifics'.

21           **MR. SCHWARTZER:**  I will make something that I think

22  everybody can use.

23           **THE COURT:**  Okay, great.  Okay, thank you.

24           All right, the next one we have is the return to the

25  investors in the Bundy Canyon Project?

1          **MR. SCHWARTZER:**  Yes, your Honor.  And with regard to

2   that, we didn't receive any objections, but I just want to make

3   --

4          **THE COURT:**  I do have an opposition; Mr. Kinas'.

5          **MR. SCHWARTZER:**  I thought it was a joinder that I

6   saw.  If there's an opposition, it must be late-filed, your

7   Honor.

8          **THE COURT:**  Maybe I misread it.

9          **MR. SCHWARTZER:**  Oh, that's right.  Mr. Kinas is

10  withdrawing his opposition.

11         **THE COURT:**  Oh, okay.

12         **MR. KINAS:**  Yes.  Your Honor, Robert Kinas for Snell

13  and Wilmer on behalf of JM (phonetic).  We had received some

14  information from a direct lender thirty-eight hours ago,

15  brought that to the debtor's attention; they have provided us

16  with additional documents, and they're in a different Bundy

17  loan and some funds might be sequestered, so we're withdrawing

18  the objection at this point.

19         **THE COURT:**  Okay.

20         **MR. KINAS:**  Thank you.

21         **THE COURT:**  All right.  So --

22         **MR. SCHWARTZER:**  Let me -- I just want -- Even though

23  it's not opposed, I want the Court to understand.

24         **THE COURT:**  Right, exactly what's going on.

25         **MR. SCHWARTZER:**  The Bundy Canyon loan was -- it's

1    actually the phase six Bundy Canyon loan.  The money was raised

2    from investors.  It was actually put with a title company in

3    California.  It went through the investor trust account to this

4    account, and these loans were collected for this specific loan.

5    They're completely identifiable; there's no question.

6            We are suggesting in this that what we'll do is just

7    return these monies to these investors.  We know exactly who

8    they are.  The money has never been invested.

9            **THE COURT:**  And indeed you're required to by Nevada

10   law, correct?

11           **MR. SCHWARTZER:**  We believe that's -- we believe we

12   are, but I want to make sure that you understand that it's

13   slightly different than the situation we have with other people

14   who have money that are in the investor trust account.

15           If you recall at the beginning of this case, we had

16   that chart, and it had one chart showing the investor trust

17   account with money coming in, and then we had the --

18           **THE COURT:**  Right.

19           **MR. SCHWARTZER:**  -- collection account on the other

20   side?  This is the investor account.  We have about one -- And

21   besides this money, the Bundy Canyon money is at a title

22   company, but in the investor trust account, there is about $1.9

23   million dollars.  That money is there because there are some

24   investors who are buying other investors' positions and loans

25   and there's money owed to investors who sold their positions

71

1   and loans and in theory transferred it to other investors.

2          The problem we have is when you file the Chapter 11

3   and stop it, you stop it in mid-stream.  So we have two groups

4   of people asking for the money in that.  We have people who

5   said 'I sold my interest; I want my money out', and there are

6   people who have said 'I bought an interest but I didn't get it

7   yet; I want my money out'.  The problem is that means you have

8   $3.8 million dollars in claims against this $1.9 million

9   dollars.

10         At some point in time, this Court is going to have to

11  determine, after we file the appropriate motion and have done

12  the appropriate investigation, who gets that money, whether --

13  and in which situation; which investors who already should get

14  the money out and which investors still have the investment in

15  the loans; are still direct lenders and still have an interest

16  in loans that are outstanding.

17         That situation, we're not asking you to rule on that.

18  We're just saying on the specific money that was raised for

19  Bundy Canyon, that is very clear, no question about it, we know

20  it was a loan that wasn't made; therefore, the money is

21  required to be returned under Nevada law.

22         **THE COURT:**  Right.  And I understand that from the

23  pleadings.  Again, this money is money that's specifically

24  identified in a trust account -- a separate trust account at a

25  title company?

72

1          **MR. SCHWARTZER:**  Yes.

2          **THE COURT:**  All right, so that's approved.

3          **MR. SCHWARTZER:**  Thank you, your Honor.

4          **THE COURT:**  Just as a collateral issue on what you

5     just suggested; may I suggest what you may need to think about

6     to tee that other issue up is just to file an adversary

7     proceeding, because it's in essence in the nature of an

8     interpleader, rather than sticking these things on a motion.

9          **MR. SCHWARTZER:**  It may be.  First of all, we have to

10    get enough facts to see --

11         **THE COURT:**  Right; it's premature.

12         **MR. SCHWARTZER:**  What we have is a situation, some

13    people, there may be signed documents doing the transfer for

14    some people; there may be signed and recorded documents for

15    some people; there may be people who thought they bought

16    something but there are no signed documents at all, and this

17    Court is going to have to determine how to treat each and every

18    one of those individual systems before we could determine who

19    gets that $1.9 million dollars.

20         **THE COURT:**  Okay.

21         Okay, next we have the partial release motion.  Let's

22    see, let's do something simple first.  Let's skip that.  Let's

23    go to Fidelity.

24         **MR. SCHWARTZER:**  Oh --

25         **THE COURT:**  I have a stipulation on Fidelity.

73

1    **MR. SCHWARTZER:**  Yes, your Honor.  And Fidelity is --

2  basically, Fidelity Title Company was a construction control

3  that said we don't know if we should follow your instructions,

4  and they wanted a comfort order.  And the stipulation and order

5  that was submitted, and I believe has already been entered,

6  completely solved that issue.  But basically it was a comfort

7  order to allow the debtor to operate in the ordinary course of

8  business.  There's 40 loan funds at Fidelity.  They're just

9  going to continue to disburse them as they would as basically a

10  construction control.

11    **THE COURT:**  Okay.  I have now signed that.

12    **MR. SCHWARTZER:**  Thank you.

13    **THE COURT:**  That was just a glitch in my office.

14  What I did was I transferred to my judicial assistant so she

15  would take it off calendar.  And then she didn't realize I had

16  it in there and so she forgot to transfer it back to me.  So I

17  was trying to be efficient and that was the problem.

18    **MR. SCHWARTZER:**  Okay.  But it's --

19    **THE COURT:**  Okay.  Now, let's go back to the 105 and

20  363 motion.

21    **MR. SCHWARTZER:**  Ms. Jarvis will handle that motion.

22    **THE COURT:**  Okay.  And Mr. Schwartzer, if you need to

23  leave to do that seminar, I don't have an objection.  I would

24  think that -- well, it's up to you two.

25    **MS. JARVIS:**  Okay.  I think it would be helpful first

74

1    to make sure we clarify what it is that we're asking for in

2    this motion.  What we have here is there are nine specific

3    loans where these are loans made on projects that have

4    condominium developments, I think timeshare developments;

5    whereas these are resold in the documents itself, in the loan

6    documents themselves, as these developments are sold to the

7    ultimate buyers there is, you know, a release -- a partial

8    release given so that the sales can go forward and those monies

9    can come in.  And then there is a mechanism in the loan

10   agreement with respect to those monies coming back into or

11   being collected by Commercial Mortgage as the servicer and then

12   distributed.  In the absence of a bankruptcy it would be

13   distributed then to the lenders on that loan.

14          What is asked for is the ordinary course practice,

15   which has occurred in the past, which is that Commercial

16   Mortgage as the loan servicer can give these partial or full

17   releases in exchange for these monies that come in that are

18   defined by the loan agreement in order to enable the property

19   to be sold and the money to be collected.

20          We are not asking for anything other than this money

21   to be collected and put in the collections account.  As we've

22   previously explained to your Honor, we do have a segregated

23   collections account where all monies collected on loans are

24   put.  They are accounted for separately, as those monies go

25   into that account so we can identify them by loan as to what

75

1   went in.  Nothing has been or will be taken out of that account

2   except with respect to what was authorized in the cash

3   management motion, and that involved the servicing fees and

4   other fees that Commercial Mortgage is allowed.

5          So by bringing this money in and putting it in this

6   account no investors' rights are being affected because this

7   money is collected and basically accounted for.  And so there

8   is no intent to affect those rights.

9          There have been several objections filed.

10          **THE COURT:**  Let me ask first.  This may get ahead of

11   the objections.  Let's just go through each of these while

12   we're at it.  I think --

13          **MS. JARVIS:**  And I might say, your Honor --

14          **THE COURT:**  Page 14 is -- Paragraph 14 is that the

15   first loan?  Does that describe the first loan?

16          **MS. JARVIS:**  Yeah.

17          **THE COURT:**  I'm sorry, 13.  It's going to be the same

18   question with respect to each.  Maybe Mr. Allison is the person

19   that could answer.

20          **MS. JARVIS:**  Yes, 13 is the first one.

21          **THE COURT:**  Okay.  So with respect to this loan are

22   we confident that (a) all monies that had been paid -- that all

23   monies that are condition precedent to release had been paid

24   and that the debtor is not otherwise in default?

25          **MS. JARVIS:**  Let me kind of walk you through it.

76

1          **THE COURT:**  Okay.

2          **MS. JARVIS:**  It would be helpful.  It's because the

3    one -- there were several objections filed.  I don't know

4    whether -- the only objector -- well, there are two objectors I

5    could identify that were affected by these nine loans.  I'm not

6    sure about the others, so let me just take the Roam

7    Development, which is 21, because that is the Walch Trust.  I

8    had identified that as one loan that they were involved in.

9          **THE COURT:**  Okay.

10         **MS. JARVIS:**  Okay.  So what that states is you get a

11   partial release -- these are condo units -- and they are

12   required to pay over 90 percent of the proceeds of the sale of

13   the condo, and there's a minimum price that they have to meet

14   for various condos.  And if they do meet that, if they sell for

15   the minimum price and they turn over 90 percent; which would,

16   of course, be put into the title company escrow and 90 percent

17   would be released to us, then they are entitled to the release.

18   And so there is a mechanism for making sure that these

19   conditions are met.

20         **THE COURT:**  But I guess what I'm saying is do we know

21   that, for example, that there haven't been any prior units

22   released for which they hadn't met the conditions precedent?

23         **MS. JARVIS:**  We don't know that for certain.

24         **THE COURT:**  Okay.

25         **MS. JARVIS:**  We do know that anything that's happened

77

1   since Mr. Allison has been in the conditions are being met.

2         **THE COURT:**  So wouldn't you have to check first to

3   make sure that, indeed, they haven't been given a release that

4   they shouldn't have received; or are you asking for any

5   certifications that they're entitled to the release and --

6         **MS. JARVIS:**  Well, the problem is that -- it really

7   sort of goes to benefit the buyer, you know that's buying this

8   condominium unit.  And, therefore, if you don't give the

9   release they can't buy it because they're not going to buy

10  something that's subject --

11        **THE COURT:**  Right.

12        **MS. JARVIS:**  -- to a prior loan.  So the problems

13  that may have arisen in the past -- we have no idea whether

14  there are problems are not, because that just is not something

15  we've been able to figure out yet -- those exist but they're

16  not going to change one way or another.

17        **THE COURT:**  Well, it will in the sense that it's true

18  a buyer can't buy it.  But if, for example, let's assume you've

19  got a development with 100 units and let's assume that 50 units

20  have been released but they were released for prices less than

21  was authorized under the deed of trust.  You still have a

22  security interest in the remaining collateral to the extent of

23  your debt.

24        **MS. JARVIS:**  Right.

25        **THE COURT:**  But if you now release somebody's condo

78

1   unit under the appropriate grounds though, you now have less

2   security than you had before.

3           MS. JARVIS:  Well, you really have maintained the

4   status quo, because in a sense that whatever is done is done.

5   And if the security has been released and the funds haven't

6   been collected, that going forward if you comply with that

7   you're not making the situating any worse because you're not

8   releasing any more security except --

9           THE COURT:  Well, you are.

10          MS. JARVIS:  -- in exchange for the amount of the

11  money.

12          THE COURT:  You are.  If, for example, let's assume

13  the release price is 130,000; but let's assume the unit is now

14  valued at 190,000.  Your collateral would be worth 190,000

15  times 50 as opposed to 130,000 times 50, what your release

16  price it.

17          MS. JARVIS:  But I think what you're saying though is

18  you want to make sure -- well, but the going forward you're

19  paying it for a fair market value.  I mean is that --

20          THE COURT:  Well, I'm just concerned that if you

21  release your collateral -- you know, let's assume worst case

22  scenario, okay?  Let's assume that an insider had this condo

23  project and let's assume that 50 condos were sold and -- so

24  they can be sold and released; but only half the money was paid

25  for the condo instead of the full release price.  So again,

79

1   you're entitled to be paid the whole amount.  But by releasing

2   half your collateral when you should have only released a

3   quarter of the collateral, you've reduced the remainder.

4           **MS. JARVIS:**  Right.  And I recognize that it's

5   possible that could have occurred prior to this time.  But what

6   we're talking about is --

7           **THE COURT:**  Right.  Is there a way though --

8           **MS. JARVIS:**  Is complying with the contract so that

9   anything that is sold, you know, after Mr. Allison has been in

10  the place we are going to make sure --

11          **THE COURT:**  Right.

12          **MS. JARVIS:**  -- that we get what --

13          **THE COURT:**  But isn't there a way though --

14          **MS. JARVIS:**  -- the lenders bargained for.

15          **THE COURT:**  -- that before you issue that new

16  release -- I understand exactly what you're saying, and I'll

17  hear the comments.  But that seems perfectly reasonable.  But

18  isn't there a way that before any of these units are released

19  that you could make the -- it's the project owner is going to

20  want to make sure that these sales go through because they

21  don't get any money, their 10 percent, if you will, until the

22  condo is sold.  Couldn't you require -- Mr. Allison require

23  them to provide evidence that, indeed, they paid -- I mean how

24  hard is that?  You have the checks, the wire transfers, in

25  accordance with the note and deed of trust?

80

1      **MS. JARVIS:**  With respect to all the prior sales?

2      **THE COURT:**  Right, right.

3      **MS. JARVIS:**  I suppose it could be done.  Really the

4   only issue really is that 10 percent.  It's not the 90 percent

5   because we're getting that.  So I think what you're --

6      **THE COURT:**  Well, in the past you wouldn't.

7      **MS. JARVIS:**  -- talking about -- but in the past you

8   know we -- I mean it's not going to be changed one way or the

9   other by this sale --

10      **THE COURT:**  Yeah, because you don't have much

11   collateral any more.

12      **MS. JARVIS:**  Except that you're getting what you

13   bargained for for the collateral that you're now releasing.

14   And if there is some problem in the past, there may be that

15   10 percent but there's not anything that is going to --

16      **THE COURT:**  You want us to talk to Mr. Allison --

17      **MR. SCHWARTZER:**  Your Honor, one of the things we

18   want to point that this Order authorizes Mr. Allison to do the

19   releases.  It doesn't require him to do the releases.  If there

20   is a prior default under the loan agreement with this

21   particular borrower he could enforce the agreement as written.

22      **THE COURT:**  Well.

23      **MR. SCHWARTZER:**  But what we need in this case is a

24   comfort order, in effect, for the title companies to accept his

25   signature on a release.

81

1       **THE COURT:**  Well, can we do this?  Could I authorize

2   his doing that -- and again, I'll hear these comments -- on

3   loans which are not in default upon certification?  And all it

4   requires is a certification by him that it's not in default.

5       **MS. JARVIS:**  He's okay with that.

6       **THE COURT:**  Okay.  All right.  So with that

7   clarification, I want to hear if there's any objections.

8   Because that was my main question on each of these units was my

9   main concern was has there been a default in the past and do we

10  know where we are.

11      **MS. JARVIS:**  Right, okay.  And that's fine; we can do

12  that.  And the one other objection that is filed is -- or the

13  one issue that has been raised is whether these releases can be

14  done without having the --

15      **THE COURT:**  Money actually go.

16      **MS. JARVIS:**  -- borrower go -- or, yeah, the buyer

17  pay the money directly to the lenders rather than to USA

18  Commercial Mortgage as a servicing company.  And, you know, in

19  the past it has all come through Commercial Mortgage; that is

20  the past practice.  And I think we laid out pretty clearly in

21  our brief, our reply brief, why this is in accordance with the

22  loan servicing agreement and the deed of trust, which the deed

23  of trust is referenced even in the power of attorney that has

24  to be done in accordance with that as well as with Nevada

25  statute where everyone would have to be done.

1              Let me just explain to you as a practical matter --

2         **THE COURT:**  Hold on.  I need to let Ms. Jarvis

3    finish.  Sorry, Counsel.

4         **MS. JARVIS:**  Let me just explain to you as a

5    practical matter, you know, looking at this Roam Development,

6    this is held by I think it's 263 lenders, so it's over

7    250 lenders.  The minimum price for one of the condos or for

8    the lowest condo is like around $80,000.  And if you took out

9    the 10 percent, you're down to about $72,000.  If you round it

10   off to 250 investors, you're talking about cutting checks

11   for -- you know, if you -- a similar interest for $288 apiece

12   that we would have to send out to 250 lenders to get this

13   release.

14             That's impractical and it's not consistent with the

15   past practice and understanding between the parties as to how

16   this is done, because it has been done through Commercial

17   Mortgage; nor is it consistent, as we point out, with the loan

18   servicing agreement with the deed of trust as to specifies who

19   is to be paid, you know, directly.  So this is simply not an

20   objection that should be sustained.  And again, these funds

21   will be held in the collection account.  They will be accounted

22   for separately with respect to this loan and the lenders in

23   this loan.

24        **THE COURT:**  Okay.  And your motions to ratify partial

25   release as previously provided -- the point is you would first

83

1    go --

2         **MS. JARVIS:**  Well, we had to -- there were some

3    emergency situations and we had to make a decision about what

4    to do with respect to it.  So there have been a couple of cases

5    where the releases were given in exchange for the money.

6         **THE COURT:**  Okay.  But we don't know whether or not

7    there was a default or not on those.

8         **MS. JARVIS:**  They were not in default, your Honor.

9         **THE COURT:**  They were not in default.

10        **MS. JARVIS:**  No.

11        **THE COURT:**  So you made that determination.

12        **MS. JARVIS:**  Yes.

13        **THE COURT:**  Okay.  Now, I'm sorry.  Opposition or

14   comments?

15        **MR. SANTORO:**  Good morning, Judge.

16        **MS. UNIDENTIFIED:**  Your name, please?

17        **MR. SANTORO:**  My name is Nick Santoro.  And, your

18   Honor, I am an attorney but I am not a bankruptcy attorney and

19   I'm not here in a representative capacity.  I'm here on behalf

20   of my own family trust.  So not being a bankruptcy attorney I'm

21   going to hope that I don't stick my foot in my mouth too badly

22   here, Judge.

23        I filed a joinder in Gregory Walch's opposition.

24   That's what I'd like to talk about.  The debtor's motion on its

25   face seems reasonable enough.  The debtor comes to court and

84

1    says that we want to assure our borrowers that they can make

2    their payments and they can get reconveyances of their deed of

3    trust.  And on its face, as I said, that seems benign enough.

4    We want the borrowers to make the payments and they're entitled

5    to their reconveyances.

6              The problem, your Honor, is where the money goes.

7    The debtor wants to take these principal payments and put them

8    in the debtor in possession collection account.  They do not

9    want to give it to the investors, the direct lenders.

10             **THE COURT:**  No.  I don't think it's going to the

11   collection account.  It's going to the separate -- I'm sorry,

12   it is but the point is it's all going to be held.

13             **MR. SANTORO:**  Right.  But it's --

14             **THE COURT:**  It's not going to be -- they won't even

15   take their administrative expenses.  It's a separate account.

16             **MR. SANTORO:**  I understand, Judge.

17             **THE COURT:**  Okay.

18             **MR. SANTORO:**  But what they're doing is they're

19   taking it in their name as opposed to in the typical deed of

20   trust reconveyance situation the borrower pays off the deed of

21   trust, the lender gets his money back.  That's not what they're

22   suggesting here.  They're saying they take the money in their

23   own name and put it in their own account and not give it to the

24   investors.  And that's where the problem is, Judge.

25             They say in their motion that they are somehow

85

1    entitled under the loan documents to take these principal

2    payments, our money, in their own name.  And I simply beg to

3    differ, Judge.  If we look at the power of attorney, the power

4    of attorney document, and it says:

5            "The services to be performed are described below."

6    Paragraph A is fairly general.  Paragraph B specifically deals

7    with this situation, Judge, which is under the deed of trust --

8    and we're talking about reconveyances -- if you look at sub 3,

9    this is the power that I and other direct lenders granted to

10   the debtor:

11           To execute and deliver full and/or partial

12   reconveyances of the deed of trust -- and that's what they want

13   to do -- upon the payment, therefore, to the undersigned.

14   That's not them; that's us.  That's the direct lenders who

15   signed this power of attorney.  As required by the deed of

16   trust, which payments to the undersigned -- that's us, again --

17   are to be made directly to the undersigned in proportion to

18   their respective interests and not to said attorney in fact.

19   Not to them; to us.  Not to them, Judge.

20           It could not get any plainer.  And the problem I have

21   with their motion is they're coming to court and telling you in

22   a motion -- and counsel just said it -- well, under the loan

23   documents we're entitled to take the money in our name.  Well,

24   I'm here to tell you differently.  That's the authority that I

25   and other direct lenders gave this debtor.  We did not, did

86

1   not, authorize them to take this money and put it in their own

2   name.

3            And here again, I'm not a bankruptcy lawyer but I

4   have some familiarity with contract instruction, and I know

5   that you give words in a contract their ordinary meaning; and

6   where a contract is clear and unambiguous it must be enforced

7   the way it is written.  And it could not get any clearer than

8   that, Judge, in my opinion, that the payments go directly to

9   the undersigned and not to the debtor.

10           What they are really asking the Court to do, Judge,

11   is to re-write this power of attorney and to change the

12   authority that the direct lenders granted to them.  I have

13   serious problems with that.

14           First, it's legally impermissible to simply re-write

15   the contract.  They have cited no authority in their motion

16   that would allow this Court or them to even argue that you can

17   just re-write the contract.  In fact, Judge, what they did was

18   they came to court saying that the contract allowed them to do

19   this, and that is not the case.

20           The second problem I have with this, your Honor, is

21   that it's this very conduct, it's the violation of that

22   provision under the power of attorney that landed this debtor

23   in bankruptcy in the first place.  They took in principal

24   payments.  I believe Mr. Allison testified to this.  They took

25   in about $50 million of principal payments came in.  They did

87

1    not send that to the direct lenders.  They took it in their own

2    name, which they never should have, and then about $50 million

3    in prepetition interest payments on non-performing loans went

4    out the door.  So that was there to protect us from the very

5    thing that landed us in bankruptcy court.

6            The power of attorney was designed to prevent that

7    from happening, to protect the direct lenders from

8    USA Commercial doing exactly what it did.  And I would submit

9    to the Court it was wrong then and it is wrong now to

10   perpetuate that.  That was our main protection.  They violated

11   it before and now they want to say:  Well, you know, it's the

12   status quo.

13           Well, Judge, my position is, you know, the status quo

14   is not always a good thing.  This status quo is a very bad

15   thing and it harmed us.  And now they want to say, well, that's

16   how we did it before; we should continue to do that now, in

17   violation of that special power of attorney.  I completely

18   disagree with that, Judge.

19           The other aspect of this is, the other loan documents

20   are consistent with this power of attorney.  There is a note, a

21   promissory note.  And in the first paragraph it says that the

22   note by the borrower is made in favor of those persons listed

23   on Exhibit A attached hereto, lender.  That's the direct

24   lenders.  There's an schedule attached.  It has everyone

25   according to their investment.

88

1          And then the next paragraph:  For value received

2    borrower promises to pay to lender, okay.  Not to

3    USA Commercial Mortgage, not to anyone else, not to some

4    special segregated account, to lender.  That was the deal both

5    under the power of attorney and under the note.  So the

6    documents are consistent, and I think they're explicit in terms

7    of where that money should go, Judge.

8          Now, the only thing that the debtor relies upon is

9    some general language in the loan servicing agreement.  And I

10   would submit to the Court that there is nothing explicit in the

11   loan servicing agreement as there is in both the note and the

12   power of attorney, which I read to you, which allows them to

13   take this money in their own name.  Sure there's general

14   language about they can collect money; but there's nothing that

15   says this, the note or the power of attorney is vitiated by

16   anything in the loan servicing agreement.

17         And, in fact, Judge, this, (indicating), is the loan

18   servicing agreement.  In Paragraph 11 it talks about the

19   limited power of attorney.  And the highlighted portion says:

20   "No one shall be required to look beyond such declaration of

21   agency and limited power of attorney for evidence of USA's

22   authority hereunder."  And that's what I already read to you.

23         In other words, Judge, the power of attorney trumps

24   any of the general language in the loan servicing agreement.

25   And I've read the power of attorney to you, and it's explicit.

1    So by its own terms whatever general language they want to cite

2    to you in this loan servicing agreement is -- to the extent of

3    any inconsistency is trumped by the power of attorney I read to

4    you.  No matter how they try, Judge, they can't get around that

5    power of attorney.

6          So, in closing -- and I know that this has been a

7    long morning --what to do.  I suggest that it is not -- let me

8    begin by saying this, Judge.  The argument the debtor advances

9    is that this is inconvenient to have this money when

10   reconveyances are given to borrowers be put in separate checks

11   to each of the direct lenders.

12         Well, my response is two-fold to that, Judge.  First,

13   that was the deal.  Under the promissory note the lenders

14   agreed to pay -- I'm sorry, the borrowers agreed to pay the

15   direct lenders.  And under the power of attorney USA agreed not

16   to take the money into their own name.  So that was the deal.

17         Secondly, it seems to me a little bit offensive, the

18   concept that the convenience of the borrower somehow takes

19   precedence over protection of their investors and direct

20   lenders.  The argument is, well, the borrower may have to write

21   200 checks.  Well, and these people in this courtroom are out a

22   lot of money.  They have a lot of money at stake here.  And

23   they want to tie it up in their account contrary to the terms

24   of these documents.  I do not think, Judge, that the

25   convenience of either the borrower or the debtor should

90

1    overcome the contractual rights of the direct lenders.

2          As an alternative, Judge -- and this is where I could

3    really be getting far afield of what I do in state court -- if

4    the Court buys into this argument of convenience, which I

5    don't; but if you want to look at that idea, maybe an

6    alternative would be to open a separate bank account for each

7    loan.

8          My understanding is there's 115 loans that USA has

9    out there to direct lenders such as myself.  So you open up a

10   separate bank account for each one so you don't get into any

11   commingling situation.  The accounts are all for the benefit of

12   each and every benefit lender to the extent of their

13   proportional interest in the note and deed of trust.  It's a

14   trust account.  You change the instructions with the borrower

15   so that he wires his payment every month into that one account.

16   This way the borrower is only making one payment.  There's no

17   inconvenience for the borrower.  And there shouldn't be any

18   other inconvenience to the debtor other than simply setting up

19   115 separate bank accounts.

20         But our point is this, Judge.  There's no way that

21   money should go into any sort of debtor in possession account

22   because they don't have the right to do that, I never agreed

23   that they could do that, they violated that already.  And

24   sitting here today I have no inclination to want to expand upon

25   the authority that we granted to this debtor after everything

1    that's happened in this case.  I do not want to perpetuate a

2    status quo that has been harmful.

3              Thank you, Judge.

4         **THE COURT:**  Okay.  Any opposition?

5         **MS. DAVIS:**  Your Honor, I have a bit of a different

6    issue.  In addition to the partial release loans the motion

7    asks to accept a payoff on a satisfaction of the opaque

8    (phonetic) loan.  Now, two of my clients have beneficial

9    interest in the opaque loan.  And this motion is asking to

10   accept $5,867,000 as apparently a satisfaction of the note.

11   Now, the opaque loan is also something that's been listed by --

12        **THE COURT:**  Isn't it a great name for a loan?

13        **MS. DAVIS:**  I know.

14        **THE COURT:**  I mean it's like --

15        **MS. DAVIS:**  I like the Y (phonetic) names, too.

16        **THE COURT:**  Yes.

17        **MS. DAVIS:**  But getting back to this, your Honor,

18   the --

19        **THE COURT:**  This is on Paragraph 20.  Correct.  Okay,

20   go ahead.

21        **MS. DAVIS:**  Yes, yes.  So the problem we have here is

22   it's been previously listed as a non-performing loan.  And, you

23   know, let's not lose sight of all of the people who are living

24   off of their investments in these loans.  You know, we're not

25   talking about just the borrowers and the servicers.  We're

92

1    talking about potentially 7,000 people who are not getting the

2    money that they previously were entitled to get.

3            We're also -- if you look at it from a bankruptcy

4    analysis -- and I won't repeat any of the contract analysis

5    that Mr. --

6            **MS. UNIDENTIFIED:**  Santoro.

7            **MS. DAVIS:**  I'm sorry, your Honor.  It's been a long

8    week.  Mr. Santoro provided to the Court, but certainly we echo

9    and agree with that analysis as it interprets the various loan

10   documents that were signed by my client.  Now, two of my

11   clients are in the opaque loan and --

12           **THE COURT:**  Now, it says that they're not going to

13   accept the payoff and release until they verify that all

14   amounts have been paid.

15           **MS. DAVIS:**  Correct.  And it would be helpful to know

16   whether or not that has been done.

17           **THE COURT:**  Okay.

18           **MS. DAVIS:**  And second of all, your Honor, we need to

19   look at this in the context of a cash collateral motion as

20   well.  We have collection of other people's money.  The

21   majority of this money is not property of the estate.  The only

22   portion of this money that's property of the estate is the

23   servicing fee.  The rest of it belongs to somebody else.  So if

24   you're going to take away their security interest, you have to

25   give them something.

93

1          Now, I like Mr. Santoro's suggestion that we go ahead

2  and open the separate bank accounts for the various different

3  loans.  I think they should do that for all of the loans.

4  There are too many issues and too many unknowns about what

5  happened in the past that we don't want to have repeated in the

6  future.

7          I would also ask that under the Bankruptcy Code that

8  each -- to the extent that your Honor authorizes the release of

9  any security interest such as the security interest by my

10  clients in the opaque loan, that they be granted a replacement

11  lien in the funds that are placed in the separate account that

12  Mr. Santoro has requested.

13          We have to look at this as a third-party lender being

14  involved with a transaction that's in a bankruptcy case.  We

15  don't have property of the estate.  Primarily, we have only a

16  servicing fee, which is a very small amount of the

17  $5.8 million.

18          In conclusion, your Honor, I would like to re-

19  emphasize that, you know, this is money that people are

20  depending upon.  My clients are only two of the investors in

21  this loan.  There are dozens of other investors in this loan.

22  Many retired persons put their retirement money into these

23  loans.  We really have to come to grips with at some point

24  making current payments to these people.  And while it's

25  laudable that, you know, Mr. Allison and the debtors need to

1    figure out what happened prepetition, in the meanwhile, post-

2    petition something has got to happen for these other folks.

3              Thank you, your Honor.

4              **THE COURT:**  Okay.

5              **MS. GUYMON:**  Your Honor, if I may.  Marjorie Guymon

6    appearing on behalf of Roam Development Group.  I was just

7    recently retained and didn't want to face the wrath of the

8    Court in filing a late responsive pleading.

9              My client doesn't necessarily object to the motion.

10   But to bring in yet another perspective on this issue is the

11   borrower's perspective in acknowledging that there are several

12   named lenders in these documents, none of which are

13   USA Capital, USA Mortgage.  The borrower is concerned that in

14   making the payment to the debtor that the lender is -- and then

15   the lender not receiving the funds what is the lender going to

16   do to the borrower.

17             **THE COURT:**  Hang on a second.  Ms. Chubb, you've

18   got -- get us off speaker.  We're hearing you rattle your

19   papers.

20             **MS. CHUBB:**  I'm not on the speaker.  I'm sorry, your

21   Honor.

22             **MS. GUYMON:**  Unfortunately, I wasn't able to raise

23   this in writing, and maybe it would be more appropriate to

24   raise it in a separate motion.  But specifically since my

25   client is involved in this particular motion, Roam Development

95

1    Group, for example, the May payment was made into my trust

2    account.  It was timely made into that trust account.  Similar

3    to Fidelity, it would like a comfort order from the Court

4    stating that by paying the debtor it is in compliance with the

5    terms of the loan documents.

6            There is some concern that the borrower would not be

7    in compliance with the terms of the loan documents to the

8    extent that the lenders didn't receive the funds.  And so based

9    on that, if there could be some clarification or comfort order

10   from the Court today as to what I do with those monies,

11   certainly they need to be turned over to somebody and not sit

12   in my non-interest bearing trust account.  But that issue needs

13   to be resolved.

14           **THE COURT:**  Okay.

15           **MS. GUYMON:**  Thank you.

16           **MR. McKNIGHT:**  I agree with --

17           **MS. UNIDENTIFIED:**  Can I get your name, again?

18           **MR. McKNIGHT:**  Richard McKnight on behalf of the

19   McKnight Family Trust.

20           Your Honor, it's not burdensome for them to go to a

21   bank and open a separate account to put this money from Roam

22   Development in.  They have everyone -- all of the lenders'

23   social security number so they can make their 1099 reporting at

24   the end of the year.  The bank is going to have a lot of typing

25   to do to put all the names on the account.  But then the money

96

1    could be put in that account and it's segregated and we know

2    where it is and we know how much it is, and we don't have to

3    put with things such as them reporting that Roam Development

4    loan is a non-performing loan when it was two days late when

5    they reported it.  And now we find out from Ms. Guymon that the

6    money is in her trust account for their May payment.  So it's

7    not non-performing at all.

8           And this would avoid that, because the bank could

9    provide that information in some manner to all of the lenders

10   so they'd be aware that these payments are being made even if

11   we don't decide immediately to distribute.  So I would

12   heartedly agree with the separate account concept.  Thank you.

13          **THE COURT:**  Okay.

14       **MR. MEROLA:**  Your Honor, on behalf of the investment

15   committees, I don't know if I have a solution but I might have

16   another problem.

17          What we're going to crash against in resolving this

18   motion is the debtor's desire to hold all funds temporarily.

19   That matter is not on calendar for today, but it's on for I

20   believe June the 5th.

21          **THE COURT:**  Uh-huh.

22       **MR. MEROLA:**  I don't know how we resolve this motion

23   without resolving or giving a preview on that other motion,

24   which people haven't even filed replies and objections to.

25          **THE COURT:**  And that occurred to me.  But my thinking

1    was, as a practical matter, none of this money is going to be

2    in the debtor's account until after June 5th.  So I, quite

3    frankly, kind of intended to deal with what do I do about the

4    release aspect.

5            **MR. MEROLA:**  Again, I just wanted to flag the issue.

6            **THE COURT:**  Yeah.

7            **MR. MEROLA:**  Because when we see the documents,

8    obviously, that's something we're going to be talking about.

9            **THE COURT:**  Exactly.

10           **MR. MEROLA:**  On the 5th and everyone is going to have

11   a lot to say about it at that time.

12           **THE COURT:**  Exactly.  Okay.  Mr. Landis, you've been

13   very patient.

14       **(Pause)**

15           Are you going to let the Code get in the way of

16   things, Mr. Landis?

17       **MR. LANDIS:**  No, I'm not, your Honor.

18       **(Laughter)**

19           I just like having my security blanket up here at the

20   podium in case I get asked a good and hard question by the

21   Court, and that's often likely.

22           The answer is this.  I didn't have a dog in this

23   fight at all until people started talking about separate

24   accounts.  We need to have limitations on the number of

25   accounts that are maintained by the debtors in this case.

98

1    Because if we start opening bank accounts for every special

2    interest in every single situation we're not only going to have

3    a bazillion accounts, if you're concerned about administrative

4    costs, it's going to get ungainly and unmanageable.

5            I think the appropriate way to address the concerns

6    regarding identification and earmarking is through reporting by

7    the debtor.  We already have a debtor in possession account

8    that is, in fact, receiving all of the money.  The fact of the

9    matter really is this:  What the interested parties have

10   requested is reasonable.  We want to know that our money went

11   into that account and that much of it is ours.

12           I think the obligation of the debtor was to have a

13   debtor in possession account, and they do.  And by reporting on

14   an interim basis all of the parties in interest can have the

15   information that they're seeking.  We would simply request that

16   to the extent that the Court decides to require additional

17   information rather than a whole bunch of segregated accounts

18   for every special interest the debtor just be directed to

19   provide interim reporting in a meaningful way so that the

20   parties can track their funds.

21           **THE COURT:**  What is your thought about -- and, of

22   course, the debtor's one of the biggest comment -- what's your

23   thought about if I required separate accounts only on those

24   loans for which we're providing releases?

25           **MR. LANDIS:**  I don't know how many of those loans

99

1   ultimately will have releases in the near term, Judge.

2           **THE COURT:**  Okay.

3           **MR. LANDIS:**  And the answer is from a practical

4   standpoint that might make some sense.  I just can't address

5   it, in particular, right now.  I can certainly be in a position

6   to do that come June.

7           **THE COURT:**  I forgot to ask you.  How are we dealing

8   with the bond problem since this is over 100,000?  Have you got

9   that all dealt with?  I mean not that there's any problem, but

10  I mean it's a technical -- speaking of the Code, it's in the

11  Code.

12          **MR. LANDIS:**  Internally and through our program, yes,

13  your Honor.

14          **THE COURT:**  Okay.

15          **MR. LANDIS:**  We're satisfied that that's being

16  addressed right now.

17          **THE COURT:**  Okay.  Good, then.  All right.  Any other

18  comments?

19          **MS. UNIDENTIFIED:**  I'm sorry, your name again?

20          **MR. CONNAGHAN:**  Paul Connaghan on behalf of the seven

21  borrowers that I named earlier.  And I just wanted to comment

22  that we do not object and we join in the motion to the extent

23  that we would ask for reconveyances to be executed, whether

24  partial or full.

25          And also, it appears to me that Paragraphs 4 and 5 of

1    the servicing agreement pretty well spell out a means and a

2    method for how much money should be paid for the services for

3    collections for legal fees, and it's 3 percent.  I show the

4    same concern as Ms. Guymon.  Money should be paid accurately

5    and correctly to the investors in accordance with this

6    agreement.  I guess that's going to be addressed in a later

7    hearing.  I just wanted to --

8         THE COURT:  How was it paid in the past?  In your

9    past experience, was it paid if it was a release or did your

10   client not have releases in the past, your clients?

11        MR. CONNAGHAN:  My client has seven loans.  I'm not

12   extremely familiar with them.  I just --

13        THE COURT:  Sure.

14        MR. CONNAGHAN:  We were just retained yesterday.  But

15   monies were paid to the servicer and then, of course, the

16   disbursements were made for interest if everything was done

17   according to the agreements to the investors.

18        THE COURT:  And I assume you would object to having

19   to pay 100 separate checks on a $90,000 --

20        MR. CONNAGHAN:  Yeah.  I think it should continue in

21   the same manner and fashion as in the servicing agreements, and

22   I don't believe it should be broken up.  Beyond that I don't

23   believe that it's proper to take their money and commingle it

24   necessarily.  The investor trust account what that was for

25   certainly was to make sure that the investors' monies were

101

1    properly accounted for.  But I don't think anybody here is

2    arguing that the monies won't be accounted for and distributed

3    for each loan and divided up accordingly.

4            **THE COURT:**  Okay.  Reply?

5            **MS. JARVIS:**  Your Honor, let me first respond kind of

6    generally and then I'll walk through the specifics.

7            I think if it's not clear to these objectors I think

8    it should be made clear that we are not asking to continue past

9    bad act practices.  That is not what is at issue here.  We are

10   not -- Mr. Allison is coming here new.  He is very careful to

11   make sure that everything is done through -- you know, through

12   the court.  We have already indicated that all monies will be

13   held in the collection account.  Nobody's principal is going to

14   be -- or interest in the loans are going to be released with no

15   principal that is taken in or no added value that comes from

16   the release of senior liens, which is contemplated by this.  So

17   we are not talking about the past practices where the debtor

18   could use the money in any way or maybe did use the money in

19   any way we wanted.  It goes into a separate account and this --

20           **THE COURT:**  So, you know, the 90,000 comes in on one

21   condo you just sold.

22           **MS. JARVIS:**  Right.

23           **THE COURT:**  What is the accounting entry?  Is it

24   shown that, for example, Ms. Davis's client gets $16.25?

25           **MS. JARVIS:**  It's accounted for by loan.  And then

1  what we're -- what Messer (phonetic) was working on now is to

2  then account for by investor.  That's what we're talking about

3  by June 15th.  Right now when it comes in I believe it's

4  accounted for by loan.  So we can show that this much came in,

5  it belongs to this particular loan.

6        And this is a procedure, your Honor, that we already

7  addressed and got approval for in the cash management motion

8  where instead of having 115 separate accounts we have one

9  account that there are 115 separate accountings that gone on so

10 when the money comes in, you know, it is identified and traced

11 with respect to the particular loan.

12       THE COURT:  So we would know if that money came in

13 tomorrow we would be able to ascertain exactly how much a

14 particular investor would be entitled to on account of that

15 release.

16       MS. JARVIS:  Right, right.  Not on account of what

17 other, you know, investment --

18       THE COURT:  Right.  Just on account of that release.

19       MS. JARVIS:  -- and loans, but on that account and

20 release.  And, in fact, your Honor, the committee raised the

21 issue of whether we could report that on a monthly basis.  Yes,

22 we can -- we are willing to and we can account for releases and

23 we'll file that along with our monthly reports so parties can

24 see that.  Now, hopefully, you know, we'll be able to get to a

25 point where we can begin releasing money, you know, to

1    investors so this doesn't become such an issue.  But in the

2    interim, that is what we intend to do.

3          **THE COURT:**  Now, going back to the issue concerning

4    defaults.  Another side of that coin is to what extent when

5    you're providing releases is the -- Mr. Allison confident

6    enough that there are no other defenses to the loan?  For

7    example, if the loan was received with the breached warranty, a

8    material warranty such as let's assume -- worst case basis,

9    they submitted an appraisal they knew was false.  You would

10   have then a defense -- you could call a default and you'd also

11   have a defense to the release, the request for a release.

12         To what extent are we at the stage that you're

13   confident that -- you can never be 100 percent confident -- but

14   that the loan was made in accordance with the representations

15   of the lender or the borrower?

16         **MS. JARVIS:**  Well, one of the things that we have on

17   for hearing on June 5th is the retention of Hilco to do

18   appraisals.  And they actually have already started to do that.

19   I think they're about 50, you know, percent through because

20   they were willing to go ahead and do it with the application on

21   file.  That is one protection because he then has independent

22   information with respect to the value of this property and kind

23   of where -- you know, where the loan stands with respect to the

24   value of the property.

25         And not in -- in all cases it isn't necessarily money

1    that's being released because sometimes it's paid off.  In some

2    cases there is a senior lienholder, and so the money is paid

3    off on the senior lienholder, which then instead of money

4    going, you know, to the lenders --

5            THE COURT:  Right.

6            MS. JARVIS:  -- they're actually increasing their

7    value in the property.  But there is that protection that is

8    under way and in place.  And there have been a substantial

9    amount of work done in reviewing each loan file in order to,

10   you know, try to identify, you know, as many issues as we can

11   with respect to dealing with these loans.

12           THE COURT:  I mean, you know, if you release a

13   portion of the collateral, obviously, you're not waiving your

14   defenses.

15           MS. JARVIS:  Right.

16           THE COURT:  But the point is you then have arguably

17   less collateral from which to realize --

18           MS. JARVIS:  Right.  And that's why it's important to

19   get, you know, independent appraisal information so we really

20   have an idea about, you know, the current value of the

21   collateral, whether there are any issues with respect to that.

22   And that is under way and he is working on that with respect to

23   moving forward.

24           THE COURT:  Okay.

25           MS. JARVIS:  Let me address the specifics as well.

1    Let me understand.  When I raise kind of the pragmatic side,

2    I'm not saying that isn't what the documents say.  Because the

3    documents are in accord with that.  I mean what was read to you

4    is just kind of parsing through certain things.  And I think in

5    our reply brief we carefully walked through that with the

6    Court.  Because the loan servicing agreement in Paragraph 2

7    does allow us to collect principal as well as interest and to

8    take whatever actions we need to do to collect that.

9            Now, while in the provision that the -- Paragraph 11

10   of the loan servicing agreement, which was cited to you, the

11   sense just that nobody has to look beyond the declaration of

12   the agency, that actually comes after a description of the

13   powers that Commercial Mortgage has as the loan servicer, which

14   would include giving these releases and doesn't diminish that.

15   In fact, what that says is as between third parties they can

16   look at this power of attorney, but it doesn't change the

17   rights between the loan servicer and the lenders, which is the

18   right to collect these funds and grant releases, which includes

19   collection of principal.

20           In addition, as we have argued, in Paragraph 2 of the

21   loan servicing agreement when it talks about collecting this,

22   it talks about paying the proper parties; and again, that's

23   where we get to the point why we have on file the motion to

24   hold funds, which is not before the Court at this time.  But

25   that is an issue as to why these funds needs to be collected in

1  the way they normally were collected because we can't assure

2  without these total accountings that the proper parties are

3  paid.  Because some people, you know, weren't paid when they

4  were supposed to.  And there are these various issues.  So it

5  is consistent with the loan servicing agreement.

6          In addition, when you look at the power of attorney,

7  the provision that was cited to you also says "in accordance

8  with the deed of trust."  And the deed of trust that was shown

9  you talks about being paid to the lender.  But if you go down

10  the page, it shows you that the lender is identified and the

11  payment is directed to USA Commercial Mortgage.  And that's the

12  address that it is sent to.  So this is -- what we're asking

13  for is in accordance with the documents.  And the fact that the

14  past practices were like that is simply evidence that that is

15  consistent with what the documents say and how it should be

16  accomplished.

17          Now, obviously, you know, we're in the -- you know,

18  we're trying to collect all we can on these loans.  And as we

19  move forward it is -- Mr. Allison is working towards and

20  intends to try to get money out to investors as soon as

21  practical in making sure that everybody gets what they're

22  really entitled to given the difficulties that have arisen from

23  the past practices in this case.

24          And it is important that these documents be complied

25  with, that these practices that are consistent with these

1    documents be adhered to so that money can be collected in the

2    ordinary course and these issues with respect to investors can

3    be sorted out and the proper parties paid.

4          So we do believe that we have shown your Honor

5    through walking through this, this is consistent with the

6    documents.  It's also consistent with the past practice, which

7    I think evidences that is a valid reading of the documents.

8    And it is consistent with what needs to be done for the

9    interest of all of the creditors in this estate as well as the

10   pragmatic, you know, results.

11         **THE COURT:**  Okay.  All right.  I'm going to allow the

12   releases.  I'm going to authorize Mr. Allison to make releases

13   on loans that are not in default and in accordance with the

14   terms of the notes and deed of trust and to the extent that

15   there does not appear to be a significant defense to the note

16   and deed of trust -- to the release.

17         Now, that may put him more in a quandary, but I think

18   certainly, you know, you can accommodate that like we do on

19   secured lender situations.  You know, you ask them for

20   warranties that, yes, indeed, it was not in default; yes,

21   indeed, all representations were true.  Perhaps you can even

22   ask for a warranty that, you know, they warranted that all

23   representations are true and they acknowledge that those

24   representations were not true; that, you know, there's no

25   waiver.  I mean you release that particular property.

108

1          And again, we're talking about third parties buying

2    these condos, so we don't them subject to the deed of trust.  I

3    assume you still have a deed of trust on the common areas and

4    all these properties, in any case.

5          **MS. JARVIS:**  I believe that's true.

6          **THE COURT:**  Now, I will not deal with it today, but

7    as a practical matter, no monies will be coming in before

8    June 5th.  I don't think; will there be?

9          **MS. UNIDENTIFIED:**  They might.

10         **THE COURT:**  Okay.

11         **MS. DAVIS:**  Your Honor, the opaque money was received

12   at the end of April.

13         **THE COURT:**  Okay.  I will hold ruling who gets those

14   monies until June 5th.  I want you -- and I have not focused

15   that motion -- but I want you to specifically address at that

16   hearing the comments raised by Mr. Walch and Mr. Santoro.  And

17   I want to specifically understand whether or not we should make

18   distinctions with a going forward basis, with releases, whether

19   there are any loans in defaults, and with the specific point

20   that he pointed out.

21         I mean you addressed this as far as what the deed of

22   trust requires, but I need a little more focus on, you know, if

23   there's a release is it, indeed, required to be paid to them

24   immediately.  I think it's all right that it be paid to USA

25   Commercial now; that's the only thing that makes sense.  It may

1    make sense, too, to do it a practical diminimis thing; in other

2    words, the monies comes in, they're paid if the checks amount

3    to $200 total.  I mean, you know, to write $12.50 checks to

4    everybody.  You know, for example, 95,000 and 25 million is a

5    pretty small percentage.  And then once you divide that up,

6    that's, you know -- eats more administrative time.

7            While, on one hand, the idea of separate bank

8    accounts is appealing, the U.S. Trustee's comment is well

9    taken; and, of course, we've sort of addressed that before.

10   But it may be appropriate as this case goes along to set up

11   separate accounts in some of these situations.  You know, if

12   you've got a lot of partial releases coming in, it may make

13   some sense.  But I think we can address that in the context of

14   what happens to the money once it comes in.  The June 5th

15   hearing will be very important in that regard.

16           **MS. JARVIS:**  So, your Honor, just to make sure I

17   understand.  You can go ahead and do these releases with these

18   conditions.  And, of course, Mr. Allison is a former banker so

19   he's fully aware of the types of protections he needs to take

20   with respect to getting these releases.  The money that comes

21   in between now and June 5th we can put in our collection

22   account; we will separately account for it.

23           **THE COURT:**  Of course, again --

24           **MS. JARVIS:**  Yes.

25           **THE COURT:**  -- that's relying on the representation

1    being separately accounted.

2            **MS. JARVIS:**  Yes.

3            **THE COURT:**  Et cetera.

4            **MS. JARVIS:**  And then at the June 5th hearing you

5    would like us to address the issue of whether, for instance,

6    once a principal repayment is that a different issue, and an

7    interest payment --

8            **THE COURT:**  In other words, I'm reserving -- and this

9    is the back half of your motion, the motions that have been

10    raised, Mr. Santoro and Mr. Walch and Ms. Davis.  I think

11    they're better all dealt with in the context -- by that time

12    we'll have a better sense, too, of is there a legal difference

13    between, all right, you're entitled to payment; what rights do

14    you have of offset; and are there rights of offset even

15    assuming that some of these people have gotten more than they

16    have.  And those are issues you're just going to have to

17    address in that context.

18            **MS. DAVIS:**  Yes, your Honor.  Will we get the

19    replacement lien that we requested --

20            **THE COURT:**  Oh, yes, I'm sorry.  Excuse me.  Yes.

21    And, of course, all these monies will -- all the liens will

22    attach to the monies in the bank account.

23            **MS. JARVIS:**  That's correct.  We're not --

24            **THE COURT:**  I think it's -- yeah, it's obvious.  But

25    it's a good thing we need to say it's -- to make that obvious.

111

1              **MR. FLEMING:**  Your Honor, I need to ask for --

2              **MS. UNIDENTIFIED:**  Your name, please?

3              **MR. FLEMING:**  Yeah.  Scott Fleming on behalf of Bank

4    of America.

5              Your Honor, the bank has a first priority deed of

6    trust that encumbers two of the properties that were the

7    subject of this motion.  The first is the Parkridge Condominium

8    project in San Diego.  It's owned by 5252 Orange LLC.  And the

9    second is the Glenridge Condominium project owned by 60th

10   Street Venture, LLC.

11             The bank is in a somewhat different situation here,

12   because all proceeds from the sale of these units are first

13   paid to the bank until its loan is satisfied in full, at which

14   point all future payments will then be directed to the debtor

15   or to whomever the lenders are ultimately held to be.

16             I understand you've authorized Mr. Allison to execute

17   reconveyances post-petition.  It has been the practice of the

18   parties all the way back to the beginning of these loans to

19   allow the bank to record the reconveyance on behalf of the

20   debtor.  What happened in this case --

21             **THE COURT:**  This debtor?

22             **MR. FLEMING:**  Yes.

23             **THE COURT:**  USA Commercial?

24             **MR. FLEMING:**  Yes.  What had happened, your Honor,

25   was because the bank was receiving all of the --

1          **THE COURT:**  I mean Bank of America can release its

2    deed of trust, but how in the world can it release

3    USA Commercial?

4          **MR. FLEMING:**  Well, when the loan was funded as a

5    condition to granting the loan the bank required the debtor to

6    provide reconveyances that were executed with the understanding

7    that the bank would then, pursuant to a power of attorney,

8    record those reconveyances as individual units were sold so

9    these things could get closed very quickly and easily.

10          **MS. JARVIS:**  As long as the conditions were met.

11          **MR. FLEMING:**  Of course, yes.  And, in fact, that

12    system has worked beautifully, your Honor.  We have on the

13    5252 Orange property the original principal amount of the loan

14    was $16 million.  And as of today that's been reduced down to

15    about 2.2 million.  So the procedure that we've been --

16          **THE COURT:**  Well, but that's your loan.  How much is

17    the USA -- the debtor's loan?

18          **MR. FLEMING:**  My understanding is that loan has a

19    balance of about 3.8 million.

20          **THE COURT:**  So how much is the property that's not

21    released still worth?

22          **MR. FLEMING:**  I have numbers as of --

23          **THE COURT:**  Isn't that a bigger question?

24          **MR. FLEMING:**  Sure, your Honor.  We understand

25    there's plenty of equity in both these properties.  I have

113

1    numbers that are good as of April 26th.  We understood that as

2    of that date with respect to the 5252 Orange property, 51 of

3    the 104 units have been sold.  Again, as of April 26th of 2006,

4    that the balance of the bank's loan had been reduced to about

5    3.6 million.  And because of the -- even in the three weeks

6    since then it's gone down to 2.2.

7         **THE COURT:**  Well, I don't understand how the bank

8    would have the power to re-convey the debtor's deed of trust

9    especially without -- you know, if that was an executory

10   contract it's -- I don't understand that at all.

11        Mr. Merola had a comment?

12        **MR. MEROLA:**  Yeah.  That is absolutely terrifying,

13   your Honor.  Frank Merola on behalf of the investor committees.

14        To the extent there were prepetition executed

15   reconveyances delivered and delivered either pursuant to a

16   power of attorney that are now being recorded releasing liens

17   by the debtor or the direct investors, that can't happen.

18   That's in violation of the automatic stay.  It's without

19   authority of the debtor in possession.  The only person

20   authorized to issue reconveyances on behalf of this debtor in

21   possession should be Mr. Allison.  And if there are documents

22   out there from the old insiders giving people reconveyance

23   rights that we don't control, that can't happen.  And we would

24   take the position that any of those reconveyances are in

25   violation of the stay and void, per se.

114

1          **MS. JARVIS:**  Let me just step in and explain.  We're

2   not asking to allow them to just record, you know, liens

3   whenever they feel like it.  You would still have to go through

4   the same process where Mr. Allison would say:  Yes, you know,

5   you're authorized; go ahead and release this.

6          And the question for I think us is simply do we allow

7   them to continue to use these partial releases that they hold,

8   or do we have to go through the process of --

9          **THE COURT:**  I don't see how.

10          **MS. JARVIS:**  -- executing new ones.

11          **THE COURT:**  I mean I don't see -- he's absolutely

12   right.  If the bank purported to do it, they're void to the

13   extent they're issued prepetition and not recorded.

14          **MS. JARVIS:**  Right.  Well right and --

15          **THE COURT:**  I mean to the extent they're not recorded

16   prepetition.

17          **MS. JARVIS:**  And all I was raising is as a -- I think

18   for us it's more just a technical issue, you know.  It has to

19   be authorized by Mr. Allison.  The question is just can he do

20   it through saying:  Okay, go ahead, record these.  Or does he

21   need to --

22          **THE COURT:**  I say no, do it himself.

23          **MS. JARVIS:**  -- execute a new one.

24          **THE COURT:**  I mean that's just --

25          **MS. JARVIS:**  Okay.  Okay.  We'll do a new one.

1        **THE COURT:**  Who knows what the agreement is?  Who

2   knows what the indemnity rights are?  That's just one more

3   problem we don't need.  We've got enough in this case.

4        **MR. FLEMING:**  Okay.  Thank you, your Honor.

5        **THE COURT:**  One more comment?

6        **MR. MASON:**  Judge, once again Richard J. Mason on

7   behalf of Dr. Kantor and related interests.

8        Judge, I would hope that the order which you enter

9   will provide that rights of setoff and recoupment will not be

10  affected, impaired, modified in any way by virtue of the fact

11  that the debtor is going to be taking the money into the debtor

12  in possession account.

13       **THE COURT:**  Right.  I think that's a good point.  So,

14  in other words -- and that's kind of a reason I want to wait

15  until June 5 --

16       **MR. MASON:**  Yes.

17       **THE COURT:**  -- to suggest, and that's a good point to

18  actually say that as well.  But whatever rights parties had --

19  someone is calling it a Popeye (phonetic) order.  Whatever it

20  is, it is.  So everybody's rights are preserved with the money

21  coming into the account.

22       **MR. MASON:**  Thank you, Judge.

23       **THE COURT:**  Okay.

24       **MS. JARVIS:**  And, your Honor, I think that actually

25  was stated in our cash management motion --

116

1          THE COURT:  Okay, good.

2          MS. JARVIS:  -- that as we collected -- all rights

3  are preserved in, you know, all the monies that we collect.

4          THE COURT:  Okay, good.  All right.  Let's take one

5  more recess and then we'll go to the DIP financing.

6          THE CLERK:  All rise.

7          **(Recess taken from 12:22 p.m. to 12:32 p.m. / Parties**

8  **present)**

9          THE CLERK:  Court is now in session.

10          THE COURT:  Be seated.  Okay, to the due diligence

11  phase, let me -- I guess we need to wait for everybody to get

12  in.  I guess we've got all Counsel here.

13          Let me tell you what my thoughts are in the beginning

14  of this case.  We're all sick of each other.  So let me just

15  cut a little bit to the chase.  Let me tell you.  I have some

16  real problems with this due diligence and I'll certainly hear

17  from the proponents as well as the opponents.  My problem is

18  the amount of the fee.  First of all, it's not just a hundred

19  and fifty thousand.  It's a hundred and fifty thousand plus the

20  other costs.  It's just a hundred and fifty thousand up front.

21  I'm really not so sure that -- I want to say Force.  That's not

22  it.

23          MS. UNIDENTIFIED:  Fortress.

24          MR. UNIDENTIFIED:  Fortress.

25          THE COURT:  Fortress -- who by the way bought the

1    Michael Jackson loan from B of A -- really would not do it if

2    they didn't get their due diligence fee.  Secondly, they've

3    already done their due diligence.  So I'm not so sure it's

4    necessary now to be in a position later to decide what we're

5    going to do.  The more important concern I have is the slippery

6    slope aspect of this which is interrelated with the cost.  I

7    just don't think this estate can afford to ship out a hundred

8    and fifty grand right now when we're in such a crucial stage of

9    trying to figure out what is going on.

10            Secondly, I have my doubts about whether or not this

11   case really needs DIP financing.  Now, on one hand to the

12   extent you need financing to collect on loans, you told me just

13   two weeks ago that you had enough money to administer this case

14   at least for 90 days and you said you've got enough money from

15   servicing to administer the case.  To the extent that you want

16   to make the new loans, it's certainly premature because we

17   don't know what's going to happen.  It may make more sense for

18   the Debtor to sell its rights to make the loans to somebody

19   else and certainly in any case -- I know the loan is not before

20   me today but it becomes a real slippery slope.

21            I would want to see how in the world it would pencil

22   up.  I can't vision how in the world it will pencil out to pay

23   a hundred and fifty thousand plus the rest of the fees and

24   that's just peanuts in this stage and then pay a million --

25   let's see -- 2.5 million for commitment fees.  Of course, it

1    comes out of what they're going to give you but you're paying

2    interest on the whole thing and the interest is at 10 plus

3    LIBOR.  I don't see how in the world it would ever pencil out,

4    especially in today's market going down.  That's something you

5    could show me later but my problem is if I authorize a hundred

6    and fifty thousand now, I'm on that slippery slope and now when

7    it comes time to authorize the loan, I'm -- well, your Honor,

8    we spent a hundred and fifty thousand dollars.  We've got to go

9    forward.

10           So again -- and since the commitment is already here,

11   I appreciate the fact that the potential lender was ready to

12   show you what they're willing to do but by the same token, I

13   know that they really have done their due diligence already.

14   So -- for the most part.  So this is my thinking.  I am

15   basically not willing to authorize the payment of a due

16   diligence fee at least at this stage until we know more about

17   the case.  Go ahead.

18           **MS. JARVIS:**  Let me just address first a little bit

19   why we're coming at this stage of the case.  There are three

20   reasons --

21           **THE COURT:**  And I'm sorry.  I need one more very

22   important factor and I apologize.  I am unclear -- again this

23   slippery slope aspect -- how in the world we would ascertain

24   what collateral they're getting.  That seems to me to encompass

25   more fights than later.  I mean, let's assume we say, okay,

119

1    fine, you've got a collateral -- you've got a security interest

2    on the Debtor's collateral.  Well, now we have -- when we have

3    our later fights about inter se, who has the rights to the

4    collateral, we've now got a big pocket, a deep pocket in that

5    dog fight and I just don't know if these investors should be

6    subjected to one more dog in the fight.  Sorry, go ahead.

7         **MS. JARVIS:**  There are three reasons why we've gone

8    forward to try to get DIP financing initially or right off the

9    bat and the first is dealing with the operational expenses.

10   Now, while your Honor points out correctly that we have enough

11   for 90 days, you may recall that after that 90-day period, the

12   reason why we've re-noticed this up is because unless we get

13   loan origination fees or we have some other funding, then we

14   don't necessarily have enough funds to continue and so in

15   looking ahead towards that -- and the reason why is clear.

16   It's because we have a loan portfolio we're servicing that is

17   60 percent nonperforming.  In fact, I think it may be 72

18   percent.  Anyway, it's -- no, it's 60 percent.

19        So when you have that many nonperforming loans, your

20   cash flow is strapped and basically what the DIP financing does

21   is fills that gap.  It allows money to come in so you then can

22   use it to make these loans to become performing and then pay

23   back the DIP financing.  So it allows us to go forward to turn

24   the nonperforming into performing loans and then money cash-

25   flows in, of course, on a better basis and of course the

1    interests of the investors are preserved by allowing for money

2    to make sure that these loans can be properly enforced and

3    collected.

4           The second reason -- and that -- there is that 90-day

5    window and so when we're looking out -- well, the reason why

6    we're starting now is because we want to make sure that there's

7    plenty of notice given when we actually get the terms so that

8    people can, you know, argue about it.  We can deal with the

9    collateral issues in discussions with parties so that by the

10   time we get to that, the end of that 90-day period, all of

11   those things have been worked out.  It's been properly noticed

12   and we can hopefully go forward, you know, at that point in

13   time.

14          If we delay, then we get into a situation where it's

15   too late.  So we're looking ahead towards making sure the

16   process works in giving everybody adequate notice and an

17   opportunity to be heard on this.

18          **THE COURT:**  Well, how much cash is there in the

19   servicing account now?  We're talking the servicing-only

20   account.  We're not talking money in the investor accounts --

21   servicing only.

22          **MS. JARVIS:**  You mean the money we've transferred so

23   far in accordance with our budget, you know, that is currently

24   held --

25          **THE COURT:**  Well, what's legitimately yours under a

1    servicing agreement.

2         **MR. UNIDENTIFIED:**  It's not that much.  It's three or

3    four digits between 3 and $400,000 is --

4         **MS. JARVIS:**  About 3 to $400,000.

5         **THE COURT:**  So you're going to pay -- and on 3 or

6    400,000, you're going to pay this lender a hundred and fifty

7    thousand now.  How are you going to operate in the next month?

8         **MS. JARVIS:**  Well, let me -- well, of course there'll

9    be more monies coming in in the next month.  This is what we

10   currently have and let me just address, you know, two issues

11   with that being -- with respect to that.  The first is that

12   hundred and fifty thousand -- one of the things we bargained

13   for when we did this is their due diligence that they do is

14   turned over to us.  So to the extent they do appraisals with

15   it, we get those appraisals.  To the extent they've done, you

16   know, a review of the loans and, you know -- then all of that

17   information becomes our information.  So --

18        **THE COURT:**  But you don't know what that is at this

19   stage.

20        **MS. JARVIS:**  Yeah, but we're trying to accomplish the

21   same thing.  In other words, what happens is that basically

22   this helps us move the process along faster because we now get

23   -- you know, as they're going through and doing this, they're

24   going to turn it over to us.

25        **THE COURT:**  We know Counsel charges three times what

122

1   you're charging.  I mean, I'm serious.  He probably charges

2   $600 an hour.  So it's two times, two to three times.

3        **MS. JARVIS:**  And it's useful for us not -- but it's

4   useful for us not only in working out, you know, our own

5   internal review of the loans but also to the extent that we

6   can't work out this financing and we need to go forward with

7   somebody else, it is useable for us in that vein too.  So it's

8   something we actually are getting some value for, you know,

9   immediately.

10       The second problem that we have is these unfunded

11  requirements and we've got 67 million of those and the -- part

12  of this due diligence would go through and do due diligence on

13  those.  We've prioritized those.  There's some that are very

14  critical because they're projects maybe that are partially

15  done.  You've got a construction project.  If you don't get

16  funding, then you've Mechanic's Liens, potentially a shut-down

17  of the project, a loss of value or in some cases, it's an

18  amalgamation of land in order to make it, you know, more

19  valuable for those currently in those loans and all of those

20  decisions will be made.  This is also why we've gone forward to

21  hire Hilco because they would be made on a commercially

22  reasonable basis.

23       **THE COURT:**  Well, why couldn't you -- I mean, just

24  like in every project -- let's assume this is a construction

25  project.  Let's assume that this was a construction company.

123

 1   What you'd do is you would look at each loan and see whether or

 2   not that particular loan needed financing and you'd get a

 3   borrower like a simple Bank of America or a simple Wells Fargo

 4   as opposed to this fund that's charging these outrageous fees.

 5   I mean, they make their money by charging these outrageous

 6   fees.

 7            **MS. JARVIS:**  Well, I think, your Honor, that with

 8   respect to the unfunded commitments, I mean, what we would get

 9   for that is what we believe would be a commercially reasonable

10   loan on that given the types of projects we've got and these

11   are not the --

12            **THE COURT:**  Ten plus LIBOR?

13            **MS. JARVIS:**  Well, these are, you know, risky -- I

14   mean, there's a reason why these loans --

15            **THE COURT:**  Why do we think that you wouldn't get a

16   loan from somebody else on a particular project?  If the

17   project -- and then second, if you're paying ten plus LIBOR,

18   how in the world do you make the spread?

19            **MS. JARVIS:**  Well, your Honor --

20            **THE COURT:**  How in the world would you possibly --

21            **MS. JARVIS:**  -- well, your Honor, we wouldn't -- I

22   mean, this wouldn't be done unless there is value in the

23   property that we'd be able to cover that.  I mean, it's going

24   to be a commercially reasonable decision.

25            **THE COURT:**  Well, if there's value in the property,

124

1    then you can get the money from Wells Fargo at about half the

2    price -- a Wells Fargo, a Bank of America, a Wachovia.

3          **MS. JARVIS:**  Your Honor, it might be helpful to --

4          **THE COURT:**  Okay.

5          **MS. JARVIS:**  -- have Mr. Allison come up and, kind

6    of, discuss this or put him on the stand because I think, you

7    know, he's looked through this.  He's made a decision and I

8    think maybe he can express better than I can, you know, the

9    reason why we need to go forward on the issues.

10         **THE COURT:**  Well, I'm -- you know, I'm just skeptical

11   about -- it's too early to decide if we're going to go forward

12   or not.  I'm just skeptical why we would need a due diligence

13   fee at this stage and I don't want to get caught in a slippery

14   slope and I --

15         **MS. JARVIS:**  And I -- I can tell your Honor that

16   there hasn't been any legal due diligence done by Fortress.

17   They've done, you know, on-the-ground due diligence but not

18   legal due diligence because they've held off until they -- as a

19   requirement to get this fee to cover part of their costs and

20   let me clarify.  We're not asking for the, you know, hundred

21   and fifty thousand plus more at this point in time.  All we're

22   asking for is the hundred and fifty thousand.  With respect to

23   anything --

24         **THE COURT:**  But then they're entitled to it.  The

25   agreement says once they're -- once you hire them for due

125

1   diligence, they're entitled to the whole thing.

2        MS. JARVIS:  But we sought approval only for the

3   hundred and fifty thousand at this point in time.

4        THE COURT:  What difference does it make?  If you've

5   now entered into a contract, you've got administrative expense

6   for -- let's assume he spends 300,000 -- of course it has to be

7   subject to reasonableness but let's assume I see you reasonably

8   spent the time going through each loan document.

9        MS. JARVIS:  But that would be part of the approval,

10  you know, the loan, the cost of the loan.

11       THE COURT:  The agreement says that he's entitled to

12  due diligence, not only the hundred and fifty but the amounts

13  they also spend subject only reasonableness even if they decide

14  not to lend.

15       MS. JARVIS:  But today we're asking for the hundred

16  and fifty thousand and if we're asking for more --

17       THE COURT:  But aren't you asking me to approve the

18  agreement?

19       MS. JARVIS:  No, we're not asking to approve the

20  agreement.  We're asking to approve the due diligence fee so we

21  can go forward and ask for approval of the agreement.  What we

22  intend on doing is if the Court grants this today, we will file

23  a motion on Monday.

24       THE COURT:  Oh, well, I realize that.  Now to put a

25  term sheet -- well, wait a minute.  If he's ready to do a term

 1    sheet, they've obviously done their due diligence, right?

 2         **MS. JARVIS:**  They've done partial -- well, but they

 3    could have been subject to further due diligence and to the

 4    payment of this due diligence fee.  So they've done an act of

 5    due diligence to give us a commitment with conditions but part

 6    of those conditions are they are finishing off the due

 7    diligence and in particular the legal due diligence and the

 8    payment of the due diligence fee.

 9         **THE COURT:**  Okay.  All right.

10         **MS. JARVIS:**  And -- so -- I mean, the problem we've

11    got here is the timing is critical and we need to move forward

12    in not only making sure that we don't have any shortfalls and

13    be able to manage the -- you know, the nonperforming loans in

14    this portfolio but also in order to start working through these

15    unfunded commitments because some of them are critical.

16    They're coming up right away and we need to be able to deal

17    with those and like I said, each decision will be made on, you

18    know, a commercially reasonable basis looking at does this make

19    sense for the lenders that are currently in there to preserve

20    their value.

21         This is not -- those unfunded requirements are not

22    going to be done just to be originating new loans.  They're

23    going to be done in order to preserve the value of loans that

24    are currently being serviced by Commercial Mortgage but they're

25    coming up soon --

127

1        **THE COURT:**  Okay.

2        **MS. JARVIS:**  -- and to wait on this, you know, puts

3    us in a difficult position.  There is also a third part of this

4    is not part of this --

5        **THE COURT:**  Well, I guess I also wonder, you know --

6    and this is a better question to ask Counsel for the purported

7    lender.  You know, why should we pay for them to decide if they

8    want to make the business decision to make a loan?  Now, I

9    understand that, you know, this is usually done in these big

10   cases but it's because nobody said "No."  I mean, if I go out

11   and I want to buy a house, I don't expect the seller to pay me

12   for looking as whether or not I want to buy their house and how

13   this came about in bankruptcies as being something as ordinary

14   course of business is just strange to me.

15       **MS. JARVIS:**  And this is part of the reason why we

16   took a twist on this and bargained for, you know, getting this

17   due diligence because in the example of the house, if you're

18   paying for them to inspect the house and they turn over the

19   results of the inspection, then there is some benefit to that.

20   So we haven't -- we aren't just paying this and getting nothing

21   for it.  We have bargained, you know, for something that's

22   different than what you see in normal cases and that is that we

23   get the results of their due diligence, if they do appraisals,

24   if they do --

25       **THE COURT:**  Well, but you're going to go ahead and do

128

1   your own appraisals.  Does that mean that you're going to ask

2   that no appraisals be done until they do theirs first?

3        **MS. JARVIS:**  No, they will coordinate with them

4   because we're in the process of prioritizing -- doing

5   appraisals and obviously, you know, we've already said that

6   with respect to, you know, we're looking at appraisals that are

7   in our files.  You know, we're carefully reviewing exactly what

8   we need and that would be something that we would coordinate

9   with them as well.

10        **THE COURT:**  Okay.  All right, any other comments?

11  I'm sorry.  I have to ask your name again.

12        **MR. SAMUELS:**  Joel Samuels of Sidley Austin for

13  Fortress.  I just want to correct some misperceptions your

14  Honor may have based on your initial comments.  We had asked --

15  and, in fact, the term sheet contemplates that the Debtor ask

16  your Honor to approve the term sheet in toto and --

17        **THE COURT:**  Well, I understood the term sheet is not

18  before me today.

19        **MR. SAMUELS:**  Correct.  And it's only the hundred

20  fifty thousand that is before you at this time.

21        **THE COURT:**  But you don't disagree that if I approve

22  that, then we're committed -- the estate is committed to paying

23  you 300,000 if I find that amount is reasonable.

24        **MR. SAMUELS:**  Judge, if you found out that was

25  reasonable, that's right.

1          THE COURT:  Okay.

2          MR. SAMUELS:  If you found that was -- and if I keep

3  having to come back to these hearings over and over again,

4  the --

5          THE COURT:  Well, that's the thing.  You've been here

6  twice and you're going to charge that against the estate and I

7  don't know why it was reasonable that you came the last time

8  but you came.

9          MR. SAMUELS:  Judge, because that was part of the

10 initial due diligence it was, frankly, the only legal due

11 diligence that we've been authorized to do.

12         THE COURT:  Why couldn't you get a transcript?

13         MR. SAMUELS:  Pardon me?

14         THE COURT:  Why couldn't you get a transcript?

15         MR. SAMUELS:  I possibly could have gotten the

16 transcript.  I possibly could have gotten the transcript.

17         THE COURT:  How much did you charge for the trip over

18 here?

19         MR. SAMUELS:  I wrote down eight hours of time.

20         THE COURT:  And that's how much?

21         MR. SAMUELS:  Probably 4 to $5,000.

22         THE COURT:  Transcripts are a hundred and fifty

23 probably.

24         MR. SAMUELS:  I understand that, Judge, but there is

25 something about knowing the people involved in the case and

130

1    getting a feeling of the case and being in the courtroom.

2    There just is.

3         The notion of a due diligence fee is -- has become a

4    standard provision and I'm not going to get into whether it

5    ought to have been but this is not an unusual thing to have a

6    due diligence fee for a DIP financing transaction, number one.

7    Number two, with respect to -- your Honor referred to LIBOR

8    plus ten.  The actual interest rate on the DIP loan, the 25

9    million-dollar DIP loan is LIBOR plus 350.  That's on Page 3 of

10   the term sheet.  I think your Honor was probably looking at

11   Page 4 of the term sheet which is with respect to the so-called

12   additional DIP loans which aren't even agreed to in any way.

13   These are if we agree to it, the rate depending on our --

14        **THE COURT:**  No.  What's the effective interest rate

15   though on the fact that you're not lending 25 million?  You're

16   only going to lend 22 million, whatever.

17        **MR. SAMUELS:**  Well --

18        **THE COURT:**  What's the effective rate --

19        **MR. SAMUELS:**  -- I can go through all the fees,

20   Judge.

21        **THE COURT:**  Wouldn't the effective rate be a lot

22   more?

23        **MR. SAMUELS:**  The effective rate when you advance

24   less obviously goes up a little bit more but this is not.  I've

25   seen --

1          **THE COURT:**  Not just a little, right?

2          **MR. SAMUELS:**  Well, it depends on how much and you've

3     got to do the math but the origination fee, Judge, is one and a

4     half percent of the maximum committed amount and, again, this

5     is not before your Honor right now.

6          **THE COURT:**  I understand.

7          **MR. SAMUELS:**  You seem to be worried about the

8     slippery slopes.  So I at least want to make sure we are --

9          **THE COURT:**  Sure, exactly.

10         **MR. SAMUELS:**  -- all aware of what the fees are.

11         **THE COURT:**  Uh-huh.

12         **MR. SAMUELS:**  So that's 1.5 percent of $25 million,

13    which is $375,000, as I understand it.  Then the unused

14    facility fee is on the unused portion of the maximum committed

15    amount and that's 50 basis points.  So that's if they didn't

16    use it at all, that would be another $125,000, as I understand

17    it.  Then there is the collateral management fee of 10,000 per

18    quarter and there is the due diligence fee.  So your Honor's

19    reference to 2 and a half million dollars of commitment fees, I

20    wasn't quite sure where that number had come from.  That's not

21    the correct number.

22         **THE COURT:**  No, the point was that there's two

23    million -- well, yeah.  You're only lending -- the commitment

24    fee is one half --

25         **MR. SAMUELS:**  I don't think you could --

132

1          THE COURT:  -- is 2 percent --

2          MR. SAMUELS:  I don't think you could add up all the

3   fees.

4          THE COURT:  -- 2 percent on 25 million.

5          MR. SAMUELS:  It's 500,000, Judge.

6          THE COURT:  Oh, okay, sorry.

7          MR. SAMUELS:  Okay.  Also the reference to LIBOR plus

8   ten, I think the only place the term sheet even references that

9   is towards the bottom of Page 4 on the --

10         THE COURT:  So it costs a half a million plus 10,000

11  a quarter --

12         MR. SAMUELS:  It's only half a million if they don't

13  use the money.  If they were to use all of the money, the

14  unused facility fee would be less.

15         THE COURT:  No, no, no.  The origination fee --

16         MR. SAMUELS:  One and a half percent, 375,000, yes.

17         THE COURT:  Okay.  Right.

18         MR. SAMUELS:  Yes.

19         THE COURT:  Then you've got 50 percent on -- oh,

20  that's unused.  So you've got one and a half percent

21  nonrefundable origination fee and they're paying interest on

22  the entire amount.

23         MR. SAMUELS:  That's correct.

24         THE COURT:  Okay.  So they're paying interest on how

25  much?

1          **MR. SAMUELS:**  They're paying the interest -- well,

2     they're paying the interest on the -- it depends -- they're

3     paying interest on the amounts that they draw and they're

4     paying fees.  They're paying a half a percent unused facility

5     fee on the part that they don't draw.

6          **THE COURT:**  So you can anticipate making how much

7     from this?

8          **MR. SAMUELS:**  Well, if they drew all the 25 million

9     immediately less the fees that would be paid at closing --

10    let's say they drew $24 million immediately, LIBOR -- I don't

11    know what LIBOR -- what one month LIBOR is at right now.  Maybe

12    there's somebody in the room who would know that but LIBOR plus

13    350 is the rate and I assume that that rate was negotiated at

14    inception with Mr. Allison.  I assume this term sheet is the

15    product of negotiations that I didn't participate in but I

16    assume that not only did our client negotiate with Mr. Allison

17    over this but we were effectively negotiating with others who

18    were interested in potentially making this DIP loan and they

19    agreed to our loan -- or our term sheet because it was a more

20    favorable fee.

21          But in terms of the fees themselves, Judge, there'd

22    be a 375,000-dollar origination fee.  If they used all of the

23    money, as I understand it, they wouldn't have the unused

24    facility fee.  It's on the unused portion.  The collateral

25    management fee is 10,000 a quarter -- is $40,000 and then you

1    have the reimbursement of the due diligence costs which we

2    would hope to keep to the 150,000 but your Honor's reading of

3    the term sheet is correct.

4            **THE COURT:**  Okay.  All right.

5            **MR. SAMUELS:**  And the last thing I want to say is

6    your reference to LIBOR plus ten percent, that is only on --

7            **THE COURT:**  In the future.

8            **MR. SAMUELS:**  -- future fundings if we assess that

9    it's a particularly risky loan.  This was just our best

10   estimate of what the interest rates on those future loans might

11   be.

12           **THE COURT:**  Now, why in the world will I presume that

13   you're even going to make this loan since there isn't any

14   collateral that this Debtor owns other than --

15           **MR. SAMUELS:**  Well, that's not true, Judge, because

16   the loan will be made to all five of the Debtors and the funds

17   themselves hold mortgages.  So, you know, that I -- my

18   understanding is that the underwriting on this is primarily on

19   loans that are -- on mortgage loans that are already held by

20   the funds.

21           **THE COURT:**  So in essence, you're going to take your

22   collateral on the mortgages held by the funds?

23           **MR. SAMUELS:**  Well, we're going to have a lien on

24   everything that the Debtors have, which is standard.

25           **THE COURT:**  But the question is this and this is,

135

1  kind of, one of those due diligence.  If you really think -- I

2  mean, I, kind of, wonder you're going to make the loans because

3  in reality, USA Commercial owns nothing other than the rights

4  of the servicing agreement.

5        MR. SAMUELS:  It has the right to future servicing

6  fees.  It has a lot of assets but --

7        THE COURT:  Okay.  Well, right to future servicing

8  fees, that's it.  It doesn't have any mortgages.

9        MR. SAMUELS:  No, it also has whatever cash it has in

10  the bank.  It has origination fees on any loans it makes in the

11  future.

12        THE COURT:  So -- but you're also going to claim that

13  entitled to a lien on the loans held by the funds?

14        MR. SAMUELS:  Yes, absolutely.  That's the primary --

15        THE COURT:  Now, why doesn't that create bigger

16  problems?

17        MR. SAMUELS:  For our client?

18        THE COURT:  No, for this estate.

19        MR. SAMUELS:  Your Honor, we're making the loan

20  against collateral.  That's what the whole due diligence

21  process is all about, Judge.

22        THE COURT:  But what makes you think -- I guess

23  you're saying that the funds have the right --

24        MR. SAMUELS:  The funds are themselves direct

25  investors --

1              **THE COURT:**  Right.

2              **MR. SAMUELS:**  -- with respect --

3              **THE COURT:**  So they have a few loans?

4              **MR. SAMUELS:**  They have more than a few loans.  They

5    have a few loans where they are the only direct investors.

6              **THE COURT:**  So this loan then would just be against

7    the collateral of the funds?

8              **MR. SAMUELS:**  It would be against all property of the

9    estate of all five of the Debtors.

10             **THE COURT:**  But it would primarily impact the funds?

11             **MR. SAMUELS:**  Well, no, I won't say that because

12   there may be causes of action that the Debtors may have against

13   third parties.

14             **THE COURT:**  And so you're going to take a security

15   interest in that as well?

16             **MR. SAMUELS:**  Absolutely.

17             **THE COURT:**  Okay, all right.

18             **MR. SAMUELS:**  Absolutely.

19             **THE COURT:**  Okay, opposition?

20             **MR. MEROLA:**  I just briefly want to go over timing,

21   your Honor.  At the May 3rd hearing where Debtor's Counsel

22   indicated they wanted to get this commitment fee approved, your

23   Honor admonished them as to the timing in order to have a

24   hearing on the 18th.  The motion was not filed until the 8th.

25   There was no term sheet with the motion.  On the 10th, my

137

1   office requested in writing that term sheet.  No term sheet was

2   made available, notwithstanding the fact the hearing was on the

3   18th, until the night of the 16th.

4           The committees had their first organizational meeting

5   today -- yesterday.  We agree with you.  You don't pay the

6   commitment fee unless you're going to make the loan.  No one

7   has had the time to evaluate whether this is a good, bad or

8   indifferent loan.  The comments your Honor is making from the

9   bench lead us to indicate that it may not be the best

10  commercial deal for the estates but at a minimum, the payment

11  of this commitment fee should be combined with the request to

12  approve the loan transaction in whole so it can be evaluated so

13  we avoid the whole camels, nose and the tent problem that we

14  have here.

15          **THE COURT:**  Okay.  Any other comments?

16          **MS. DAVIS:**  Mr. Merola basically summarized what I

17  had in my written opposition.  So I certainly agree, your

18  Honor, and I think that we need to look at the whole thing at

19  the same time and not get everything one day before the hearing

20  plus an errata at 5:00 o'clock yesterday afternoon to sit down

21  and try and figure out which loan commitment we're really

22  talking about.

23          **MR. MEROLA:**  And the one thing the errata indicates

24  is that Mr. Samuels' client is very flexible about when the

25  drop-dead date is because the only change between the two

138

1  erratas was the absolute last date that this fee had to be

2  paid.

3        **THE COURT:**  Okay.  Oh, let -- Mr. Landis had a

4  comment first, I think, or else he was just tired of sitting

5  down.  So --

6        **MR. LANDIS:**  A little of both of those, your Honor.

7  I didn't bring the Code this time.  I just brought the --

8        **THE COURT:**  Okay.

9        **MR. LANDIS:**  -- front of my file though because I

10  wanted to inject a pragmatic aspect into your consideration

11  too.  If my notes are right, we're talking about fees here in

12  connection with this potential transaction that could total

13  about $565,000.  We've already paid E&O fees of half a million.

14  Ray Quinney & Nebeker has a 210,000-dollar retainer, some of

15  which has already been applied and now we're talking 75,000 to

16  Schwartzer & McPherson and just doing some quick math, we're

17  talking about a million four going out of these Debtor estates

18  in just fees with no money going back to the investors.

19        And the other thing we're talking now is impairing

20  the mortgages that are held in the funds for the benefit of USA

21  Commercial Mortgage.  Your Honor, I think that with respect to

22  these fees, I would join simply in the prior comments that were

23  made with respect to if we're going to do this, let's do it as

24  an entire motion.  Let's set it for another date.  That's the

25  position of our office.  Thank you.

139

1          THE COURT:  Okay.

2          MR. SAMUELS:  I just want to correct two things.  The

3  errata was at the Debtor's request because they wouldn't have

4  had the time to wire-transfer the fee by the 18th.  They asked

5  us to agree to the 19th to reflect the time of day and when the

6  wire cut off.  So that's the only reason for that.  That was

7  the flexibility that we showed there.

8          The other thing is this assumption that people seem

9  to have that we can do it all as part of the same process and

10  pay the due diligence fee at the back end.  The due diligence

11  isn't going to happen unless it's paid on the front end.  This

12  assumption that the due diligence has already been done is not

13  accurate.  The client has done real property due diligence on

14  certain of the properties but not all of the properties.  The

15  lawyers -- our firm has not done any legal due diligence,

16  hasn't done any drafting of any DIP orders, DIP agreements, any

17  of that and that -- we are not going to be authorized to do

18  that at Fortress' risk.  That's not the way Fortress does

19  business.  That's not the way the term sheet was negotiated.

20          So this notion that we'll be there whenever you set a

21  hearing and you can just do it all at the back end, I'm here to

22  tell you that's not the way it works, Judge.  That's why this

23  was negotiated for an upfront fee so that Fortress wouldn't be

24  taking the risk of bearing all of the expense including legal

25  expense and then at the back end find out that your Honor

140

1    doesn't approve the DIP loan.  That's why it's structured this

2    way and nobody should have any allusions that we can just wrap

3    it all together in a nice, pretty bow and put it on for hearing

4    in July.  We won't get to July.

5              **THE COURT:**  Okay.  Well, notwithstanding that, I'm

6    not going to approve the due diligence fee.  I appreciate the

7    fact that this may mean that Force is not going to make a loan.

8    I fully understand that but these are the problems I see.

9    First of all, this Debtor can't afford to spend a hundred and

10   fifty thousand dollars now and then also face the risk of an

11   even higher fee because once you've committed to allow in the

12   doing due diligence, my heavens, due diligence in a case like

13   this could require the same amount of fees that the Trustee is

14   spending, hundreds of thousands of dollars.

15             And I'm not so sure that I would say it'd be

16   unreasonable for them to figure out what loans to make without

17   having done an analysis of what the fund has and doesn't have

18   which means they would spend hours on the whole issue of which

19   is going to be the ultimate question in this case.  Is it

20   property of the estate or isn't it property of the estate?

21   Secondly, you told me at the last hearing that the Debtor had

22   sufficient funds to process this at least for 90 days.  So we

23   shouldn't have to borrow monies to do this.

24             To the extent that we may need funds in the future,

25   then that's something that the -- you know, Mr. Allison can

1    certainly bring forward.  Perhaps you'll find a lender.

2    Perhaps we won't find a lender.  I'm just willing to say "No."

3    I am tired of these companies saying we're not going to do due

4    diligence unless you pay us up front.  Fine.  If you think it's

5    a good deal, then you do it or you don't do it but there's not

6    any sense in paying the money up front.  Nobody else makes that

7    risk in the real world.  So I don't know why Force should

8    either, especially in light of the fact they're extracting

9    significant interest and other fees.

10            Now, it may well be -- I mean, and the next thing

11   perhaps even more important is quite frankly, I doubt they'd

12   make the loan.  How in the world do you make a loan of $25

13   million in the collateral we have or don't have in this case?

14   And then finally, as I said, I'm -- even if they did -- we'll

15   have to address this at the final hearing but I'd be very

16   concerned about granting them a lien in that thing because

17   again as I said, that puts them in a direct conflict with all

18   these other people about whose loan it is.

19            It may well be this case goes away in the sense that

20   all that's left is the investors fighting inter se.  The Debtor

21   may be long gone.  You know, somebody will be out there

22   collecting money but the big fight in this case is going to be

23   who gets the money.  As you said, hopefully that's not the

24   case.  Hopefully this money will start coming in but I just

25   don't see it.

142

1          So I'm not going to allow the due diligence fee.  I'm

2    quite frankly aware that may, you know, end Mr. Allison's hopes

3    for getting a loan but I think it just -- the estate just can't

4    stand the expenditure of that much money at this time.  If you

5    want to bring the loan on its -- you know, if they're willing

6    to waive that or whatever, that's certainly fine and I

7    understand Force may go away but that's where I think that

8    issue has to lie.

9          **MS. JARVIS:**  Your Honor, I just wanted to correct one

10   -- I think one maybe misunderstanding with respect to whether

11   there is -- there are assets in Commercial Mortgage.  You do

12   recall that we talked this morning about we do have a 58

13   million-dollar receivable due from IP that we are in the

14   process of hopefully securing.

15         **THE COURT:**  Well, as somebody pointed out in the

16   oppositions concerning conflicts, query -- why should

17   Commercial get that collateral as opposed to the fund or some

18   individual lenders?  That's not an easy answer and if we want

19   Sidley and Austin to do that research, let's get Sidley and

20   Austin to be Debtor's Counsel then.

21         **MS. JARVIS:**  I just mentioned that there is that

22   asset as well and that, you know, frankly in -- hopefully in

23   securing this, one of the issues that have been raised is we

24   would insist on the cost of funds interest rate, meaning the

25   same that we would have to pay for getting a third party to,

1    you know, come in and finance this while we're collecting that

2    debt.

3         **THE COURT:**  Sure.  And again, I just urge the

4    question, you know, whether it would pencil out.  So -- now,

5    just looking forward to the next hearing, one thing -- I'm

6    sorry.  Do you have a comment, Mr. Merola?

7         **MR. MEROLA:**  I just have housekeeping matters for

8    you.

9         **THE COURT:**  Yeah, sure.  Well, let me finish my

10   housekeeping first and then we'll do yours.  On the June 5th

11   hearings, Eileen -- well, we've got the big issue is the motion

12   to hold funds.  I would hope by that time Mr. Allison would be

13   able to have spreadsheets that show where we are with respect

14   to each loan because quite frankly, I think people may be

15   taking positions in this case but they don't know they're going

16   their own ox and it's not until you see where your particular

17   loan is that all of a sudden your position changes.  Is that

18   going to be possible to get us a fairly good spreadsheet on an

19   update of what you did the last time,

20   Mr. Allison?

21        **MR. ALLISON:**  Yes, your Honor.

22        **THE COURT:**  Thank you.  If you could, if you could

23   please file that by -- can I ask May 30th?  Is that too early?

24   The reason I wanted to do that was because that way, you know,

25   people's opposition is going to be due five days before but

1    once they see that, this will give them the opportunity to

2    withdraw their opposition, to modify it and I would allow

3    withdrawals or modifications based upon the data you now see.

4    Can we get that done by May 30th or at least as many loans as

5    possible?

6            **MR. ALLISON:**  Yes, your Honor.

7            **THE COURT:**  Okay.  So as many loans as possible.  I

8    think that'll really help in seeing where all these various

9    positions are.  Let us also set Mr. -- the committees' motions

10   to employ --

11           **MR. MEROLA:**  Just--

12           **THE COURT:**  -- and at that time, we could address the

13   issue about what committees -- yeah.

14           **MR. MEROLA:**  -- real quickly, your Honor, Frank

15   Merola on behalf of the investor committees.  We filed the

16   applications this morning for both our firm and the Shea &

17   Carlyon firm.  We've requested an order shortening time to the

18   5th.  The U.S. Trustee and the Debtor has consented.

19           **THE COURT:**  So I'll agree.  That can be set for the

20   5th as well.

21           **MR. MEROLA:**  Your Honor, just briefly because

22   Mr. Garman did not have the benefit of seeing our application

23   for commenting on it.  Our application provides that we will be

24   representing the investor committees solely on issues that they

25   have common interest.  It expressly acknowledged the

1    possibility that conflicts might exist between the investor

2    committees and that conflict Counsel will be in place to handle

3    those conflicts.

4            This was an organic thing, your Honor.  We were

5    contacted by more than one of the committees.  The committees

6    spoke amongst themselves and decided that the key to this case

7    was coordinating the efforts of the investor committees and it

8    was concluded that the best way to coordinate those efforts was

9    through a single law firm on issues of common interest.  We've

10   gone up and down.  You'll see the protocols we have for the

11   conflict issue.  It's not something we take lightly and we're

12   prepared to address it.

13           **THE COURT:**  Well, and again, you know, it's -- and I

14   -- it goes back to my comments to the U.S. Trustee before.  In

15   the perfect world, there would be Counsel for every kind of

16   interest but that means that all the money would go to the

17   professionals and that -- you know, professionals may say,

18   yeah, that's the perfect world and none go to the --

19           **MR. MEROLA:**  Your Honor, after sitting with my

20   partner Mr. Davidson for more hours than I want to admit, I

21   concluded that the only solution to eliminate all the conflicts

22   in this case would be to have 115 lawyers for each of the loans

23   but once you start talking about entities, once you start

24   talking about even individual investors, they're all over the

25   map and you've got to be pragmatic at some point.

1        The other issue I have, your Honor, is now that we

2   have official committees appointed, we will be requesting

3   hopefully here on the record and if we have to in writing and

4   hopefully not through a motion that attorneys that appear on

5   behalf of groups of investors or more than one party comply

6   with Rule 2019 so we know who's out there.  A lot of these

7   alliances are changing.  We have attorneys here today that are

8   making appearances on different groups of investors that they

9   made appearances on previously and if we're going to be -- just

10  in order to keep some order in this -- if you're going to be

11  throwing rocks, we have to know whose rocks they're throwing.

12        **THE COURT:**  Yeah, and, you know, we probably should

13  have included that in the case administration order.  I know I

14  mentioned that at the last hearing.  I didn't think to catch it

15  but let me make it clear that everybody -- I mean, it's in the

16  Rules already but anybody who represents more than one entity

17  -- tell me again the name of that rule so -- the number of that

18  rule so we can just read it.

19        **MS. JARVIS:**  It's 2019.

20        **MR. UNIDENTIFIED:**  2019.

21        **THE COURT:**  2019.

22        **MS. JARVIS:**  And your Honor, we had raised that too.

23  It's a difficulty for us in responding when we can't figure --

24  they just, kind of, say we --

25        **THE COURT:**  Right.

1          **MS. JARVIS:**  -- represent a bunch of people and we

2     don't know who they are.

3          **THE COURT:**  Okay.  So let me just remind the

4     attorneys here that under 2019 in a Chapter 11 except with

5     respect to a committee, every entity or committee representing

6     more than one creditor or equity security holder shall file a

7     verified statement setting forth the name and address of the

8     creditor or equity security holder, nature and amount of the

9     claim or interest and the time of acquisition unless it's more

10    than one year prior to the filing, a recital of the pertinent

11    facts and circumstances in connection with the employment and

12    in the name of the committee, the names of the entities

13    directly or indirectly who arranged the employment and the time

14    of employment.  And I'm just paraphrasing.  Obviously the rule

15    is what you've got to read.

16         **MS. DAVIS:**  Your Honor, if I might be heard briefly?

17         **THE COURT:**  Uh-huh.

18         **MS. DAVIS:**  My clients are direct lenders.  We're not

19    creditors.  We're not equity holders.  I'm happy to comply with

20    the Court's requirement but they're parties of interest and

21    they have claims to get their own property out of this estate.

22         **THE COURT:**  Let me modify and say that I'm going to

23    make it apply to anybody who represents a creditor, equity

24    security holder or a direct lender and the point being, this is

25    more of a way to keep track of who represents who.  If nothing

1   else, it will help everybody to talk beforehand and know what

2   kind of interest they have and if you represent somebody who

3   has more capacities, that will help us understand, you know, in

4   what place their talking.

5            I might mention to all the Counsel out here who

6   represent several different entities and those entities may

7   have -- like, let's say one entity has -- is a direct lender

8   and is also a member of the LLC and the other entity it

9   represents is only a direct lender, you may have to advise your

10  two clients as to potential conflicts there as well.  Again,

11  they're only potential but everybody's got the same problem in

12  this case and I'm not suggesting that everybody get different

13  Counsel but, boy, you've got to be aware of that.

14           Again, I think we'll know more certainly at the next

15  hearing.  Certainly we'll know -- the July 27th hearing is

16  going to be very important.  We'll know a lot more by then.

17  Yeah, go ahead.

18           **MR. MEROLA:**  Your Honor, just to be clear, the OSTs

19  for both our firm and the Shea & Carlyon firm for the hearing

20  on the 5th are approved.

21           **THE COURT:**  Yes.

22           **MR. MEROLA:**  Ms. Carlyon has corrected me.  Her

23  application has not been on file but will be contemporaneously.

24           **THE COURT:**  That's fine.  That's fine.  Does anybody

25  anticipate filing in the next -- I'm sorry.  Let me go back.

1    What else do we have set for the 5th right now?  Does anybody

2    know off the top of their head?

3              **MS. JARVIS:**  The Hilco retention application.

4              **THE COURT:**  Okay.  The Hilco.

5              **MS. DAVIS:**  I believe Mr. LePome filed some motions

6    as well.

7              **THE COURT:**  Okay.

8              **MS. CARLYON:**  There are a number of motions --

9              **THE COURT:**  Oh, Ms. Chubb.

10             **MR. UNIDENTIFIED:**  And Ms. Chubb.

11             **MS. CARLYON:**  -- filed.  Ms. Chubb filed motions to

12   not pay the appraiser.  There are motions to not hold money.

13   There are motions to pay money.  There are other issues related

14   to this.

15             **THE COURT:**  Okay, okay.

16             **MR. MEROLA:**  Countermotions.

17             **THE COURT:**  Exactly, in essence.  As I indicated

18   before, that I was -- I wanted countermotions filed rather than

19   just oppositions just because it's going to make things

20   clearer.  Let me remind all of you again that in your captions

21   if the reply -- indicate what Debtors it applies to.  Just as a

22   little technical thing, it's a lot easier and I know that the

23   name of the cases are hard -- if you could put the caption,

24   somehow work it in.  If you could put the title of your case on

25   the front page so that I know what it is, so the title of the

150

 1   caption and what it is, just so that I can see what it is

 2   easier.  It's no big deal.  It just, you know, helps get

 3   through this stuff a lot quicker.

 4          Eileen, we need -- let's set aside the whole day of

 5   the 5th.  We're going to have to move -- do something about

 6   that trial date.

 7          THE CLERK:  Okay.

 8          THE COURT:  So we'll give you all day the 5th and

 9   we'll take a recess at noon rather than going straight through,

10   just to assist in your planning because I am sure that hearing

11   will just take a long, long time.  I think that's it.

12          MR. SCHWARTZER:  Your Honor, with regard to the case

13   management order, do you want me to prepare a supplemental case

14   management order that refers to the sanctions and to the fact

15   that 2019 will apply to everybody?

16          THE COURT:  Yes, let's do that.  Okay.  Just call it

17   a supplemental.

18          MR. SCHWARTZER:  Okay.

19          THE COURT:  It adopts all the prior provisions and

20   just supplements.  Okay, great.  All right, thank you very

21   much.

22          THE CLERK:  All rise.

23      (This proceeding was adjourned at 1:11 p.m.)

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                        July 9, 2010

              Signed                                        Dated


*TONI HUDSON, TRANSCRIBER*