UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA
LAS VEGAS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO:  06-10725 |
| | ) | CHAPTER 11 |
| | ) | |
| USA COMMERCIAL MORTGAGE COMPANY, | ) | Las Vegas, Nevada |
| | ) | |
| | ) | Thursday, June 15, 2006 |
| Debtor. | ) | |
| | ) | (10:16 a.m. to 2:04 p.m.) |

MOTIONS HEARING

BEFORE THE HONORABLE LINDA B. RIEGLE,
UNITED STATES BANKRUPTCY JUDGE

Calendared Motions:      See page 2

Appearances:            See page 3

Court Recorder:         Helen Smith

Transcribed by:         Exceptional Reporting Services, Inc
                        14493 South Padre Island Drive, #A-400
                        Corpus Christi, TX 78418-5940
                        361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**CALENDARED MOTIONS:**

1    MOTION FOR RELIEF FROM STAY PROPERTY:  LOAN SERVICING AGREEMENT FOR DIRECT LOAN TO BOISE/GOWAN, LLC;

2    MOTION REGARDING PDG's DISBURSEMENT OF INTEREST PAYMENTS TO DEBTOR;

3    MOTION FOR RELIEF ROM STAY PROPERTY:  VARIOUS REAL PROPERTY (AFFECTS USA COMMERCIAL MORTGAGE CO.)

4    MOTION TO COMPEL DEBTOR TO CONTINUE TO FORWARD LENDER PAYMENTS TO DIRECT LENDERS; MOTION TO DELAY OR PROHIBIT APPRAISALS ON PERFORMING LOANS (AFFECT USA COMMERCIAL MORTGAGE CO);

5    MOTION TO TEMPORARILY HOLD FUNDS PENDING A DETERMINATION OF THE PROPER RECIPIENTS, AND MEMORANDUM OF POINTS AND AUTHORITIES (AFFECTS ALL DEBTORS);

6    MOTION FOR ORDER AUTHORIZING RETURN OF NON-INVESTED FUNDS;

7    MOTION FOR AUTHORIZING RETURN OF NON-INVESTED FUNDS;

8    APPLICATION TO EMPLOY LEWIS AND ROCA, LLP AS ATTORNEY;

9    JOINT MOTION FOR NUNC PRO TUNC ORDER CLARIFYING REQUIREMENT TO PROVIDE ACCESS TO INFORMATION

<u>APPEARANCES FOR:</u>

Debtor:                          ANNETTE JARVIS, ESQ.
                                 P.O. Box 45385
                                 Salt Lake City, UT 84145

                                 LENARD SCHWARTZER, ESQ.
                                 Schwartzer & McPherson Law Firm
                                 2850 S. Jones Boulevard
                                 Suite 1
                                 Las Vegas, NV 89146

Official Committee of            FRANK MEROLA, ESQ.
USA Capital First Trust          EVE KARASIK, ESQ.
Deed Fund, LLC, et al.:          Stutman Treister & Glatt, P.C.
                                 1901 Avenue of the Stars
                                 12th Floor
                                 Los Angeles, CA 90067

Official Committee of            ANNE LORADITCH, ESQ.
Equity Security Holders          Fox Rothschild, LLP
of USA Capital                   3800 Howard Hughes Parkway
Diversified Trust Deed           Suite 500
Fund, LLC:                       Las Vegas, NV 89169

                                 MARC LEVINSON, ESQ.
                                 Orrick Herrington & Sutcliffe, LLP
                                 400 Capitol Mall
                                 Suite 3000
                                 Sacramento, CA 95814

Official Committee of            GERALD GORDON, ESQ.
Executory Contract               GREG GARMAN, ESQ.
Holders of USA                   Gordon Silver
Commercial Mortgage              3960 Howard Hughes Parkway
Company:                         9th Floor
                                 Las Vegas, NV 89169

Canepa Group, et al.:            LAUREL DAVIS, ESQ.
                                 Fennemore Craig, P.C.
                                 300 S. Fourth Street, #1400
                                 Las Vegas, NV 89101

Boise-Gowan, LLC:                SUSAN SCANN, ESQ.
                                 Deaner Deaner Scann, et al.
                                 720 S. Fourth St. #300
                                 Las Vegas, NV 89101

4

<u>APPEARANCES FOR</u>:      (CONTINUED)


Stanley Alexander Trust,   ROBERT LE POME, ESQ.
et al.:                    10120 S. Eastern Ave., #200
                           Henderson, NV 89052


Official Committee of      SUSAN FREEMAN, ESQ.
Unsecured Creditors for    Lewis & Roca, LLP
USA Commercial Mortgage    3993 Howard Hughes Parkway
Company:                   Suite 600
                           Las Vegas, NV 89169


J.V. Direct Lenders:       JANET CHUBB, ESQ.
                           Jones Vargas
                           100 W. liberty Street
                           12th Floor.
                           P.O. Box 281
                           Reno, NV 89504


U.S. Trustee:              AUGIE LANDIS, ESQ.
                           Assistant United States Trustee
                           (No address provided)


Donna Cangelosi:           DONNA CANGELOSI, ESQ., PRO SE

Norman Kiven:              MARK KONRAD, ESQ.
                           Snell & Wilmer, LLP
                           3883 Howard Hughes Parkway, #1100
                           Las Vegas, NV 89169


Leo Mantas, et al.:        ERVEN NELSON, ESQ.
                           10785 W. Twain Avenue
                           Suite 200
                           Las Vegas, NV 89135


Project Disbursement       MATTHEW CALLISTER, ESQ.
Group:                     Callister & Reynolds
                           823 Las Vegas Blvd South
                           Suite 500
                           Las Vegas, NV 89101


Mountain West Mortgage,    MARJORIE GUYMON, ESQ.
LLC:                       Goldsmith & Guymon, P.C.
                           2055 Village Center Circle
                           Las Vegas, NV 89134

5

1        <u>**Las Vegas, Nevada; Thursday, June 15, 2006; 10:16 a.m.**</u>

2                        **(Call to Order)**

3            **THE CLERK:** All rise.  Bankruptcy court is now in

4    session.

5            **THE COURT:** Be seated.

6            Okay.  *USA Commercial*.  Appearances, please, in the

7    courtroom.

8        **(Pause; voices and whispers off the record)**

9            Go ahead.

10           **MS. JARVIS:** Annette Jarvis and Lenny Schwartzer on

11   behalf of the debtors.

12           **MR. MEROLA:** Good morning, your Honor.  Frank Merola

13   and Eve Karasik, members of Stutman, Triester, and Glatt,

14   Professional Corporation, on behalf of the First Trustee

15   Committee.

16           **MS. LORADITCH:** Good morning, your Honor.  Anne

17   Loraditch of Beckley Singleton on behalf of -- or proposed

18   counsel for Diversified Trust Fund Committee.

19           **MR. LEVINSON:** Good morning, your Honor.  Marc

20   Levinson, Orrick, also proposed counsel for the Diversified

21   Trust Fund Committee.

22           **MR. GORDON:** Gerald Gordon and Greg Garman of Gordon

23   Silver on behalf of the Official Committee of Direct Lenders.

24           **MS. DAVIS:** Good morning, your Honor.  Laurel Davis

25   appearing on behalf of Scott Canepa and the Canepa Group.

6

1          **MS. SCANN:**  Good morning, your Honor.  Susan Scann

2   appearing on behalf of Boise-Gowan, LLC.

3          **MR. LE POME:**  Robert LePome for Dr. Stanley Alexander

4   and 14 others.

5          **MS. FREEMAN:**  Good morning, your Honor.  I'm Susan

6   Freeman, Lewis and Roca, for the Unsecured Creditors Committee.

7          **MS. CHUBB:**  Good morning, your Honor.  Janet Chubb of

8   Jones Vargas for what we are now designating, pursuant to your

9   directive, as the J.V. Direct Lenders.

10         **THE COURT:**  What's that stand for, junior varsity?

11  Or --

12      **(Laughter)**

13         **MS. CHUBB:**  I hope not.

14         **MR. LANDIS:**  Augie Landis for United States Trustee,

15  Judge.

16         **MS. CANGELOSI:**  Donna Cangelosi representing herself

17  as a direct lender for the Boise-Gowan Scott Canepa motion.

18         **COURT RECORDER:**  May I ask Counsel to spell your name

19  for the record, please?

20         **MS. CANGELOSI:**  Yes.  C-A-N-G-E-L-O-S, as in "Sam,"

21  I.

22         **COURT RECORDER:**  Thank you.

23         **MR. KONRAD:**  Mark Konrad from Snell and Wilmer on

24  behalf of Direct Lender Norman Kiven.

25         **MR. NELSON:**  Erven Nelson on behalf of Direct Lender

7

1  Leo Mantas and his group.

2       **MR. CALLISTER:**  Matthew Callister, Callister and

3  Reynolds, on behalf of Project Disbursement Group, your Honor.

4       **MS. GUYMON:**  Marjorie Guymon appearing on behalf of

5  Mountain West Mortgage, Direct Lenders, Power of Attorney.

6       **THE COURT:**  Okay.  Before we start, you know, I don't

7  really like doing this, but I think this is the only way I'm

8  going to get people's attention on pleadings and procedural

9  matters.  I've got a number of pleadings that my staff had to

10  print off this morning, and I'm going to ask each of you --

11  that we had to print off -- when you delivered your courtesy

12  copy, and if you didn't, I'm going to sanction you $75.  So,

13  the first form I happen to have is the reply.

14       Ms. Jarvis, when was that submitted?  Reply in

15  support of the motion to temporarily hold.  When was that --

16  when was the courtesy copy delivered?  Or was one?  And this

17  morning doesn't count.

18       **MR. SCHWARTZER:**  Your Honor, what day was it filed?

19       **THE COURT:**  June 13th.

20       **MR. SCHWARTZER:**  It should have been filed the same

21  day.

22       **COURT RECORDER:**  Will counsel make his appearance,

23  please?

24       **MR. SCHWARTZER:**  Lenard Schwartzer.  Lenard

25  Schwartzer, local counsel.

8

1          Your Honor --

2          **THE COURT:**  We've got --

3          **MR. SCHWARTZER:**  -- my office has instructions to

4   file them every day.  I can't personally verify that it has,

5   but if the mistake was made, it wasn't Ms. Jarvis's mistake; it

6   was my office's mistake.

7          **THE COURT:**  Okay.  Well, I don't have any courtesy

8   copy for the replies for the motion to temporarily hold, nor

9   your response to joint motion.  So, unless you can show me that

10  they -- that you have a runner slip that shows that they

11  delivered that by -- it should have been within 24 hours, but

12  same thing; 24 hours would be yesterday at noon, so that will

13  be $75 for each pleading.

14         **MR. SCHWARTZER:**  I understand, your Honor.  We will

15  either send a check or send a copy of the runner slip --

16         **THE COURT:**  Because I understand; sometimes -- you

17  know, we're trying to get our system -- we're now going to have

18  up in the clerk's office -- all courtesy copies are either,

19  unless they're mailed timely to direction of Court Services,

20  they're to be delivered to the clerk's office upstairs.  They

21  have a separate box.  That box is -- we then check that box, I

22  think, three times a day, and, of course, it's crucial in the

23  day before the hearing because that's the only way I can be

24  prepared, so --

25         **MR. SCHWARTZER:**  Yes, your Honor.  Is there going to

9

1   be a time stamp for us to -- so we can make a copy --

2             **THE COURT:**  You know, we could put one up there, I

3   think.  Couldn't we, Eileen?

4             **THE CLERK:**  Sure.

5             **THE COURT:**  Yeah.  Just a little -- a self little

6   time stamp?

7             **MR. SCHWARTZER:**  Yes.

8             **THE COURT:**  We get one for the casinos, for the

9   parking garages.

10        **(Laughter)**

11            **MR. SCHWARTZER:**  Well -- I must have one from one of

12  my old casino cases --

13            **THE COURT:**  Right.

14            **MR. SCHWARTZER:**  -- in the garage.

15            **THE COURT:**  Okay.  Great.  All right.

16        **(Laughter)**

17            **THE COURT:**  Mr. Gilloon, when did you submit your

18  opposition to joint motion?  When did I get a courtesy copy of

19  that?  Is Mr. Gilloon here?

20            **THE CLERK:**  I don't believe he's here.

21            **THE COURT:**  He hasn't signed in.

22            **THE CLERK:**  He didn't make an appearance.

23            **THE COURT:**  All right.

24            Mr. LePome, when did I get a courtesy copy of your

25  supplement to motion?

10

1        **MR. LE POME:**  Your Honor, my office was supposed to

2   hand deliver those after our last conversation within five

3   days, but I will double check on that.

4        **THE COURT:**  All right.  Seventy-five dollars if it

5   wasn't.

6        Lewis and Roca, you're safe.  I have "copy" stamped

7   on here.

8        I've got also the fourth supplemental declaration of

9   Mr. Allison.  We just got that today.  I recognize that was

10   just filed yesterday, but, you know, it needs to get here.

11        And, then, I have another of Mr. Gilloon's

12   supplemental brief.  Excuse me.  On Mr. Gilloon's opposition to

13   joint motion I have a courtesy copy timely delivered.  So, that

14   was fine.  I do not see a supplemental brief in opposition, so

15   that's the one I'm concerned about.

16        All right.  Now, going to the substantive matters.

17   Let's do first the motion to employ counsel; application to

18   employ Lewis and Roca -- and Beckley.  I'm sorry.  That's on

19   for the next hearing.  It's the Lewis and Roca application.

20        Yes.  Go ahead.

21        **MS. FREEMAN:**  Your Honor, Susan Freeman on behalf of

22   Lewis and Roca.

23        There have been no objections to our application.  We

24   did, however, file a supplement last night, and I hope that it

25   got to you; it was supposed to have been delivered to you; just

1    a supplemental disclosure.  When the Orrick application was

2    filed, they disclosed that they had a relationship with an

3    entity that they thought had interned a relationship with Lewis

4    and Roca.  It is an entity that does calculations of amounts

5    for purposes of our municipal bond clients, and we refer our

6    clients to that entity.  And, so, we've disclosed that we have

7    that referral system where we sometimes refer clients.  Lewis

8    and Roca is not a direct client of Orrick, but that's it.

9         **THE COURT:**  Okay.

10        **MS. FREEMAN:**  So --

11        **THE COURT:**  Now, and this is -- I'm trying to get a

12   grasp, and I recognize the U.S. Trustee appoints the

13   committees, and I recognize that it's their -- you know, in

14   their discretion.  But I'm trying to get a grasp on who the

15   unsecured creditors are on this committee in light of the

16   unusual nature of this case.

17        So, who are the -- not particularly who; what kinds

18   of claims are we talking about?

19        **MS. FREEMAN:**  The kinds of claims?  Some claims are

20   vendor claims.  Some claims are note claims.

21        **THE COURT:**  By that what do you mean?

22        **MS. FREEMAN:**  Mr. Walker?

23        I'm sorry.  I was not prepared to answer this

24   particular question with respect to the nature of all of their

25   claims.

12

1           **THE COURT:**  Do you mean note claim in the sense of

2   somebody who had a loan but it never got secured?

3           **MS. FREEMAN:**  Yes, your Honor.  An unsecured

4   promissory note.

5           **THE COURT:**  Okay.  So, they were never -- they never

6   received an interest in a deed of trust.

7           **MS. FREEMAN:**  Correct, your Honor.

8           **THE COURT:**  Okay.  As opposed to maybe receiving one,

9   but it was paid off.

10          **MS. FREEMAN:**  Correct.  I do believe that there are

11  some out there who probably were direct lenders who end up

12  being unsecured creditors and are constituents of this

13  committee, but we don't have any on this committee to my

14  knowledge.

15          **THE COURT:**  Okay.  Okay.  All right.

16          Any comments?  Any -- Mr. Landis?

17          **MS. FREEMAN:**  You probably know more about my clients

18  than I do.

19          **MR. LANDIS:**  I can help a little, Judge.  The

20  individuals who are selected for the unsecured creditors

21  committee -- and there are only five at this juncture -- are,

22  in fact, either vendors or, as was suggested here, an unsecured

23  noteholder.  One gentleman was a consultant who was not paid

24  for his services.  There are -- there is still room for a

25  seven-member committee to add individuals who may be

13

1    representative of just the kind of claim you touched on.  We're

2    cognizant that those exist, but until very recently we didn't

3    know who they were.

4              THE COURT:  Well, I'm not even sure -- and it's

5    something you'll have to seriously think about, based upon the

6    definitions that you've chosen for your committees -- I'm not

7    so sure that somebody who wasn't a direct lender, that is,

8    somebody who had the relationship whereby USA Commercial was

9    the servicer and they were given a power of attorney to

10   service, even if their loan was paid in full, I'm not so sure

11   why they wouldn't be on the other committee.

12             MR. LANDIS:  Your Honor, that's --

13             THE COURT:  I recognize that presents problems for

14   Mr. Gordon in the sense of maybe a conflict in a sense, because

15   it's not a unified position, but maybe that's good as well.

16             MR. LANDIS:  It is.  And also the fact that, to the

17   extent that we have been able to identify the lenders involved

18   in the loans that have been identified as being paid off, they

19   don't -- they are not constituents of the existing executory

20   contract, but -- that's wrong -- they are not members of the

21   existing executory contract; but we are taking a close look at

22   that, Judge.  I just simply wanted to let the Court know what

23   the existing members --

24             THE COURT:  Sure.

25             MR. LANDIS:  -- of the unsecured committee are and

14

 1  that we're aware of the other issue.

 2          **THE COURT:**  Okay.  Fine.  Thank you.

 3          All right.  So, that's approved.

 4          **MS. FREEMAN:**  Would you like me to upload an order

 5  or --

 6          **THE COURT:**  Yes, please.

 7          **MS. FREEMAN:**  -- a hand-writtend order?  I will do

 8  that.  Thank you.

 9          **THE COURT:**  Okay.  And just sequence of events, after

10  we finish the calendar, I want to discuss next week's hearings

11  and indeed hear any objections to some or all of the matters

12  that may have been put on a shortened time to understand fully

13  if they really need to be on the next hearing.  Then, after

14  that I want to discuss some procedural matters on setting

15  hearings for July 25th and the telephone number issue.  So,

16  just remind me at the end as we talk about sequence.

17          Okay.  Go ahead, Mr. Allison.

18          **MS. JARVIS:**  Your Honor, if I could just add that the

19  issue that you just raised with respect to those, the direct

20  lenders that are also unsecured creditors, because they do

21  hold -- or some of their loans were paid off pre-petition and

22  they were not paid for that, most of those do also hold other

23  direct lender interests.  And that issue is an issue that's not

24  before the Court at this time, but it may be raised, because we

25  are in discussion with the U.S. Trustee respecting that group

15

1   of direct lenders.

2           **THE COURT:**  Okay.  Why don't you give us an update as

3   to where we are, getting ready for our schedules, your

4   analysis, what (indiscernible) analysis shows of the status of

5   loans, et cetera.  And I recognize this will all fit in later,

6   and, of course, to the extent anybody needs testimony, we can

7   handle it that way, but I just want to get an overview now.

8           **MS. JARVIS:**  We are completing our statements and

9   schedules today.  They will be ready to be filed.  It's been a

10  monumental effort, and I think Mesereaux (phonetic) has done a

11  great job of trying to be as accurate as possible, has had to

12  recreate basically most of the records of the debtor, and those

13  statements and schedules will be based on that recreation.

14          They also will be sending out initial --

15          **THE COURT:**  When you say "ready to be filed," what

16  day will they be filed?

17          **MS. JARVIS:**  Today.

18          **THE COURT:**  Today.  Okay.

19          **MS. JARVIS:**  Today.  So, it will be this afternoon.

20          **THE COURT:**  And I forgot; when is the creditors

21  committee meeting, the continued one?

22          **MS. JARVIS:**  It is --

23          **MR. LANDIS:**  July 12th.

24          **MR. MEROLA:**  July 12th.

25          **MR. UNIDENTIFIED:**  July 12th.

16

1    **THE COURT:**  Oh, July 12th.  Okay.  Good.

2    **MS. JARVIS:**  They will also be sending out investor

3    statements with respect to the lenders' interests in each loan.

4    Those, however, will only be up through the petition date

5    because that, of course, is what was done in order to prepare

6    the statements and schedules since that is, you know, kind of a

7    snapshot as of the petition date.  Those will be further

8    updated; further work needs to be done on that.  And by around

9    July 1st those will be updated so that we can bring them

10   current for as close to possible through the end of June.

11   There have been significant collections that have been made by

12   the debtors since the petition was filed, and that would

13   impact, then, the initial statements that would be sent out to

14   the investors.  So, by early July we should have an idea of an

15   investor-by-investor reconciliation as well as the loan-by-loan

16   reconciliation.

17   **THE COURT:**  Generally speaking, have we found more

18   loans performing or have moved -- which category have they

19   moved into, or has it stayed the same?

20   **MS. JARVIS:**  Well, some of them have been collected

21   by the debtors post-petition.  Those -- we have several loans

22   that have been collected, those that would be performing,

23   because they would have been paid off.

24   **THE COURT:**  Oh, you mean as in paid off.

25   **MS. JARVIS:**  Yes.

17

1          THE COURT:  Okay.

2          MS. JARVIS:  Where they have actually -- you know,

3    for instance, loans were past due and the debtor has been, you

4    know, vigorous in meeting with borrowers and collecting those,

5    and in some instances they have been able to collect the entire

6    amount of the loan.  And that money is sitting in the

7    collection account waiting to be disbursed.  As we indicated,

8    we will file a motion to have that heard on the 25th so we can

9    disburse all that money.  There have been in other instances

10   past due interest that had been collected --

11         THE COURT:  You mean July -- to the July 25th date.

12         MS. JARVIS:  Yeah, July 25th.  Sorry.

13         THE COURT:  Uh-huh.

14         MS. JARVIS:  Yes.  There also has been some instances

15   of past due interest collected, which would bring the loans, in

16   some cases --

17         MS. UNIDENTIFIED:  Performing.

18         MS. JARVIS:  -- in some cases performing from non-

19   performing, so there has been some change in that.  There

20   were -- there also has been identified -- I think it's four

21   loans that were paid off pre-petition that were not -- the

22   money was not paid over to the investors, so, that -- you know,

23   on the schedule that we looked at last week there were a lot of

24   to-be-determineds on there. Those now have been -- are able to

25   be filled in with respect to where they were at the petition

18

1    date.  By early July those will be brought up to where they

2    are, you know, currently, or towards the end of June.

3             THE COURT:  Okay.

4             MS. JARVIS:  So, that has been done.

5             One other thing that we have to mention to your Honor

6    is your Honor did grant us a motion allowing us to return the

7    funds on the Bundy Canyon situation, and I would just state

8    that we have -- it's been very frustrating for us, frankly,

9    because we've had difficulty in getting these, you know, escrow

10   companies, other companies, to -- basically, to not violate the

11   stay and to obey court orders.  And there has been -- I think

12   part of it is, it's our guess, that maybe they're getting

13   pressure or calls from investors who probably don't -- you

14   know, have their own issues and don't really understand, you

15   know, what is going on, but it's delayed things.  And it's my

16   understanding that finally we've broken the locker jam and that

17   Orange Coast Title, who was the escrow agent holding that Bundy

18   Canyon money that the Court ordered to be disbursed, will be

19   disbursing, I believe, today.

20            THE COURT:  Okay.  And remind me.  That money goes

21   back to -- this was a loan that was going to be made, then

22   wasn't made, so it's going back to those people who invested

23   it.

24            MS. JARVIS:  That is correct.

25            THE COURT:  Okay.

1          **MS. JARVIS:**  That is correct.  It was one that the

2     money was put in escrow but the loan was never actually made

3     prior to the petition date, and we had sought and received an

4     order to allow that money to go back.  So, there has been some

5     delay because of the difficulties in getting the escrow agent

6     to do what the Court has ordered to do, so that, however, I

7     believe, has been resolved finally without having to come back

8     and --

9          **THE COURT:**  Okay.

10         **MS. JARVIS:**  -- get another order from the Court.

11         **THE COURT:**  All right.  Let's go next -- skip the

12    Canepa motion for a moment and go to the PDG Disbursement

13    motion.

14         **MR. CALLISTER:**  Yes, your Honor.  Once again, Matthew

15    Callister on behalf of Project Disbursement Group, also known

16    as PDG.  This is a --

17         **THE COURT:**  Now, has this been -- the stipulation

18    that was filed -- you're still -- so that I'm clear -- you're

19    still willing to abide by the stipulation; it was just --

20         **MR. CALLISTER:**  We are.  We just have not received it

21    back, your Honor.  That's the difficulty.  So, our motion was

22    actually set before the stipulation was circulated by all

23    parties.

24         **THE COURT:**  It's now been signed, hasn't it?

25         **MR. CALLISTER:**  I have not received an executed copy,

20

1    and I noticed that in the response filed by Mr. Schwartzer they

2    indicate that it's still being circulated.  You'll recall the

3    Court --

4          **THE COURT:**  Right.

5          **MR. CALLISTER:**  -- wanted it passed by the various

6    committees, and my suspicion is just because it's taken some

7    time to get the committees formed, that's why it has not been

8    returned.

9          **THE COURT:**  Okay.  All right.

10         So, does anybody have any objection to that stip --

11   and you might as well go through again what you were intending

12   to do.

13         **MR. CALLISTER:**  Essentially, your Honor, we had

14   executed a stipulation agreeing to -- against the -- as counsel

15   just indicated, there were a number of complaints beginning in

16   March from individual investors saying, "Hey, don't remit the

17   interest reserves, because it hasn't been disbursed out to us."

18   And, so, that was the cause of the delay.  We appreciate the

19   Court's direction, and we haven't really received an objection,

20   just kind of a comment saying, "Yeah, we'd like to have that

21   four million released."  We're happy to do so.  That four

22   million, approximately, that we're holding represents some 22

23   projects, your Honor, and we're just seeking permission from

24   the Court to --

25         **THE COURT:**  And that gets turned back to the

```
 1   debtor -- I mean to USA --

 2          MR. CALLISTER:  Well, there's monthly -- Project

 3   Disbursement Group would make disbursements as appropriate to

 4   various third-party contractors, materialmen, subcontractors,

 5   et cetera.  That -- we've done that.  We've continued to do

 6   that.  It's the interest reserve portion that became a

 7   controversy, and, presumably, if the Court grants the motion

 8   today, then we will resume releasing the interest reserve as so

 9   ordered by the debtor, but that goes back, as I understand it,

10   to just another arm of the debtor for ultimate distribution out

11   to the --

12          THE COURT:  Correct.

13          MR. CALLISTER:  -- individual --

14          THE COURT:  In accordance with the contracts.

15          MR. CALLISTER:  Correct.

16          THE COURT:  Okay.

17          Any comments?

18          MS. JARVIS:  I would just add an explanation, your

19   Honor.  There are two parts of this escrow.  One is the --

20   there was basically pre-funded interest that is to be paid out

21   of these escrow accounts on a monthly basis; so, for instance,

22   some of the loans in the schedule we initially had marked them

23   as non-performing.  They were non-performing because the escrow

24   agent was not -- or the disbursing agent was not disbursing the

25   interest once the bankruptcy was filed.  In the last schedule
```

1    we actually just footnoted those and said they would performing

2    if the interest was released.  So, once this is signed, that

3    interest will be released and those loans that have that

4    interest escrow will then become performing loans.

5         The second part of it is the disbursing agent

6    actually holds some construction funds that are released to

7    borrowers on a basis, you know, in accordance with the loan

8    agreement and as agreed to by the debtors.  Those also have

9    been held up.  You know, those are essential for the borrowers

10   to continue to be able to pay their, you know, vendors and

11   other, you know, construction claims.  So, both of those would

12   be released, then, to the debtors to be held in their

13   collection account with respect to the interest escrow net of

14   whatever servicing fee that they're entitled to and to the

15   borrowers with respect to the construction funds that are held.

16        **THE COURT:**  Okay.  All right.  And I assume the

17   committees had no objection and U.S. Trustee had no objection.

18   That was my only concern before.  I wanted to make sure that

19   everybody either -- it was a stipulation, everybody agreed to

20   it, this procedure of just bringing on probably saves in the

21   long run.

22        **MR. LANDIS:**  United States Trustee has no objection,

23   your Honor.

24        **THE COURT:**  All right.  So, that's approved.

25        **MR. CALLISTER:**  Thank you, your Honor.

23

1          **THE COURT:** Uh-huh.

2      **(Pause)**

3          All right.  Let's next go to -- I happen to have

4   first on here Ms. Davis's motion to lift stay.

5          **MS. DAVIS:** Yes.  Thank you, your Honor.  I need to

6   make a few adjustments.  I'm not nearly as tall as the rest of

7   the people who have been here before me.  Whoops.

8          **THE COURT:** It's counter-intuitive.

9          **MS. DAVIS:** Up or down.

10     **(Laughter)**

11         There.  That's better.  I'll try not to deafen the

12  Court and counsel while I get myself set up.  Thank you, your

13  Honor.

14         As your Honor is aware, this is the motion for relief

15  from the automatic stay to terminate the loan servicing

16  agreement with respect to the direct loan to the Boise-Gowan 93

17  LLC.  This is a motion brought in the name of Scott Canepa only

18  because he is a direct lender in this loan and none of the

19  other members of the Canepa Group are.  As evidenced by

20  Exhibit L to the supplemental declaration of Mr. Canepa, this

21  motion has the support of ten of the 17 direct lenders on this

22  loan, holding total beneficial interest in the amount of

23  $1.9 million of the $2,425,000 loan.

24         In order to decide this motion, your Honor, we need

25  to focus on specifics, not generalities.  This case has a swirl

24

1    of generalities and possibilities and connections that connect

2    the dots and you're there.    There has been a tremendous effort

3    by USA Commercial to, in fact, connect the dots among people,

4    circumstances, events that really don't connect.    They do this

5    to demonstrate the alleged complexity of the case and to

6    provide some justification for the, quote, "confidential

7    negotiations" that have been undertaken with borrowers as a

8    justification to withhold information and reports.    Indeed,

9    there has been great efforts made to create relationships among

10    borrowers through their principals that, frankly, don't exist.

11            The largest connection that we have with the borrower

12    is the USA Investment Partners, LLC, entity.    The two members

13    of this entity are Tom Hantges and John -- and Joe Milanowski.

14    Now, they're not part of this loan, but they are the former

15    management of USA Commercial and the other four debtors here.

16    And they've certainly been vilified in the press, and they are

17    the men responsible for the alleged pre-petition irregularities

18    that we have heard so much about here in these proceedings.

19            This entity and these two men are also the subject of

20    the June 21st motion to approve a security agreement on a

21    previously unsecured loan of $57 million.    That motion is set

22    to be heard next Wednesday.    Now, of course, that motion fails

23    to address the impact of eliminating $57 million of these

24    persons' assets from the pool of assets that would be available

25    to satisfy the personal guarantees that were made by

25

1    Mr. Hantges and Milanowski for the loan portfolio here.  And

2    those guarantees were a significant component of the loan

3    solicitations made on the loan portfolio here.

4           Meanwhile, USA Commercial continually seeks to expand

5    the scope of the case and the related debtor cases, to expand

6    the Court's jurisdiction over third parties who are not

7    creditors, to find connections everywhere.  We have 115 loans

8    and a billion-dollar loan portfolio.  They relate to 93

9    projects.  We have 3,600 individual direct lenders.  I

10   represent 13 of them; 13 different persons and entities.  They

11   are not all Scott Canepa.  There are a whole bunch of different

12   people.  They were all fully disclosed in our 2019 disclosures

13   required by the Court.

14          So, not enough complexity?  Let's look at the two

15   funds.  We have the Capital First fund.  We have 53 loans;

16   1,300 members.  The Diversified Fund:  It has a participation

17   in 23 loans; it has seven loans in which it's the single

18   lender; 1,900 members in that fund.

19          We had lots of talk in this case about estate

20   revenues from the loan servicing agreements.  There have been

21   some really big numbers mentioned in the motions and some big

22   numbers mentioned in the declarations and the budgets.  Curious

23   that we have a $15 million budget for administrative costs set

24   for a hearing on June 21st.  That dollar amount is absolutely

25   breathtaking.  And what is absolutely overwhelming is the fact

26

1   that there is no corresponding motion to pay the direct lenders

2   and the direct investors any of the money that's being held on

3   their behalf before the debtor's current management seeks the

4   disbursements -- seeks to obtain court approval of disbursement

5   of funds for administrative costs.  That's simply outrageous,

6   your Honor.

7           There have been efforts to infer that the entire

8   billion dollars is property of the estate, which, of course, it

9   is not.  The legal question of what is and is not property of

10  the estate has been exhaustively briefed in my points and

11  authorities, and I will not repeat it now.

12          Focusing on this Boise-Gowan loan, the only possible

13  property of the estate for the loans funded by the direct

14  lenders, which are evidenced by notes and deeds of trusts in

15  their name specifically identified to them with funds

16  identifiable held in a separate designated account post-

17  petition by the debtor's management -- and there is also some

18  of this money on deposit with PDG as part of the motion that

19  your Honor just heard there as well; they are handling the

20  disbursement of the interest reserve and some of the funds for

21  the borrower, as well.  So, the rest of the direct lender money

22  in USA's interest -- excuse me -- in USA's bank accounts is

23  limited to their possession of money that belongs to a bunch of

24  other people; the direct lenders.

25          Of course, USA has never squarely addressed the

27

1    executory contracts issue.  The briefs establish that the loan

2    servicing agreements are, in fact, executory.  We have

3    repeatedly pointed out that you can't rely upon these

4    agreements as property of the estate until you formally assume

5    them as required under the bankruptcy code.

6            I need to clarify one more issue that really wasn't

7    fully briefed in my points and authorities.  There is some

8    concern that the non-monetary breaches that occurred under

9    these agreements pre-petition may not be susceptible of cure

10   under the *Claremont* case such that they could be assumed post-

11   petition.

12           But still we have more and more generalities in the

13   case.  What we need to do now is have some focus and

14   specificities.  These alleged connections, they just don't hang

15   together.  The numbers that we're talking about for Boise-

16   Gowan, they're just not that large.  They demonstrate the minor

17   impact of this small, short-term loan of one year that was made

18   in August of 2005, matures in August of 2006, has a current

19   principal balance of $2,425,000.  It's a land acquisition loan

20   for real property located in Boise, Idaho.  That's the Boise-

21   Gowan loan.

22           We have 17 investors -- excuse me -- direct lenders,

23   your Honor.  These are persons and entities who have absolutely

24   no connection to the debtors in possession other than their

25   loan servicing agreements and possible other investments in

1    other loans.  What we don't have is we don't have USA

2    Commercial as a direct lender; we don't have either one of the

3    funds as a direct lender.  This is the only loan that Scott

4    Canepa made in his name only.

5              **THE COURT:**  But how do I lift the stay -- I recognize

6    you say that he has no other loans, so he can't be charged

7    with -- "charged" meaning you can't -- or one can't argue that

8    he would owe the estate money by virtue of being overpaid.  But

9    what about the other ten people?  Or what about the other

10   people?

11             **MS. DAVIS:**  Well, you know, that argument supposes --

12   presupposes that USA Commercial has the right to unilaterally

13   withhold the funds --

14             **THE COURT:**  Well --

15             **MS. DAVIS:**  -- based upon some setoff or other --

16             **THE COURT:**  Why --

17             **MS. DAVIS:**  -- inchoate argument.

18             **THE COURT:**  Think about it.  What if I'm the

19   servicing agent for Countrywide Mortgage and Ms. Jarvis makes a

20   payment on her loan and I attribute it to your loan?  It seems

21   to me just common sense that I, as a servicing agent, would

22   have the absolute right to, when your payment comes in,

23   attribute it to Ms. Jarvis's loan, or at least do some offset.

24   And if we send the servicing loan out, you lose the ability to

25   offset those rights.  I mean, let's assume it was a mistake.  I

29

1    think clearly in the contracts you've got -- they've got the

2    right to withhold.  Well, there's definitely to withhold.  It

3    says pay where proper.  So, presumably, it wasn't properly

4    paid.  Why don't they have the right of offset and -- I want to

5    say "retrofit."  Uh --

6              MS. DAVIS:  Recoupment, is your Honor thinking?

7              THE COURT:  Recoupment.

8              MS. DAVIS:  Well, your Honor, the way that we have

9    analyzed this issue -- and I appreciate your Honor's position,

10   and I know that's the position that's been espoused by the

11   debtors in this case -- they have never really articulated the

12   facts and circumstances that give rise to this alleged setoff

13   right.  And we're also talking about the dichotomy of pre-

14   petition versus post-petition.  You know, there are many

15   principles in the bankruptcy code that draw a straight line

16   between things that happened pre-petition and things that

17   happened post-petition.

18             THE COURT:  Well, all these things would have

19   happened pre-petition.  So, in other words, if they were

20   overpaid pre-petition, they need to preserve that right to set

21   it off against maybe other parties, because if they're not

22   being paid -- that's your complaint; they haven't been paid --

23   wouldn't they have a right to offset that?  Or recoupment

24   doesn't require -- recoupment is a broader doctrine.  It

25   doesn't require that one to one.

30

1          **MS. DAVIS:**  Yes, absolutely.  I understand that, your

2    Honor.  But they are defensive strategies, not affirmative

3    claims.  Plus, they need to be asserted in the context of an

4    adversary proceeding.  You don't just file a motion and say,

5    "Judge, let me hold everybody's money until we figure out what

6    to do with it."

7          Second of all, most of the declarations that have

8    been filed by Mr. Allison admit that these errors were made by

9    former management of the debtors.  Why is it, then, that based

10   upon their mistakes, they are now going to take money that

11   they're holding in trust as a res for direct lenders and other

12   parties, they're somehow able to, you know, adjust the equities

13   of that money when it's not their money?

14          **THE COURT:**  Well, no, they're not.  I mean, the point

15   is, and what I meant to say was, that if a particular lender

16   was overpaid, why wouldn't that lender not be entitled to

17   receive a payment on that lender's particular loan until such

18   time as it was adjusted?  I mean, if they were overpaid, they

19   don't have a right to receive any more payments.

20          **MS. DAVIS:**  But your Honor is assuming that the facts

21   that have been alleged and not proved are true.  I mean --

22          **THE COURT:**  But I don't have any evidence from the

23   rest of those ten people or the rest of the people on those

24   loans that they have absolutely nothing due to them --

25          **MS. DAVIS:**  No, you don't --

1      **THE COURT:**  -- but they don't owe anything.

2      **MS. DAVIS:**  That is true, your Honor.  I have not

3  provided that information.

4      **THE COURT:**  And the problem is you can't just say,

5  okay, so, fine; the one person goes out and gets another

6  servicer.  It doesn't work that way.  The whole loan has to go

7  that way.

8      **MS. DAVIS:**  Yes; and that's why we did solicit and

9  obtain the support of so many persons holding so many --

10      **THE COURT:**  Right.  So, if I'm number -- if I -- now,

11  let's see; you've got ten out of the 17.  If I'm number 12 and

12  I know I'm owed a lot of money, I'm safe.  I have now been

13  whisked out of this process --

14      **MS. DAVIS:**  But, you know, your Honor, with all due

15  respect, as I briefed in my points and authorities regarding

16  this motion, the motion to hold funds, and pretty much

17  everything that I filed before your Honor, I have a real

18  problem with the procedural posture of these allegations.  Why

19  don't they just have a cause of action that arose pre-petition

20  to sue people to recover this back?  Why do they have the

21  unilateral right to withhold their money and set off?  You

22  know, somebody has to establish that.  You don't just sit there

23  and hold all the money until you figure it out.

24      **THE COURT:**  But they're saying they're going to have

25  this filed by July 25th.

1      **MS. DAVIS:**  Right, your Honor; but these bankruptcy

2  cases were filed on April 13th.  And I --

3      **THE COURT:**  Well, it's two months.

4      **MS. DAVIS:**  I appreciate that, your Honor, but some

5  of these people depend on this money to live; not specifically

6  Scott Canepa, but certainly some of the other folks who are in

7  these direct investments and direct loans.

8      **THE COURT:**  I understand that.  But how is that any

9  different from the person who has a deed of trust on the

10  shopping center?

11      **MS. DAVIS:**  Well, your Honor, I would respectfully

12  disagree that they have a unilateral right to withhold the

13  funds.  I understand that what your Honor is saying is that you

14  are perhaps recognizing some sort of a possessory right or

15  interpreting the loan servicing agreement such that they would

16  have some entitlement to do so.  My points and authorities and

17  the position we have taken respectfully disagree.  We strongly

18  believe, your Honor, that as a fiduciary, under both the loan

19  servicing agreements and under Nevada law, in a regulated

20  industry, with a limited license --

21      **THE COURT:**  Well, but what if your clients -- what if

22  it turns out that this loan is only being paid because the

23  interest reserve is there?  And, so -- or let's assume one of

24  the other ten people, or Mr. Canepa on another loan -- let's

25  assume he on another loan is not performing.

33

1          **MS. DAVIS:**  Okay.  Can I start with that one, your

2     Honor?  First of all, Scott Canepa holds only one loan in his

3     own name.

4          **THE COURT:**  Okay.  So, his member -- the other people

5     you represent; and you represent 13 people, so those people

6     have loans in other things.

7          **MS. DAVIS:**  They do.

8          **THE COURT:**  Now, when the one person like Mr. Canepa

9     comes along and says he wants to lift stay and send the

10     mortgage out, aren't you going to say, "No, I want it to stay

11     here because I want my people to be offset for what they didn't

12     get by the person who was overpaid"?

13          **MS. DAVIS:**  Your Honor, I appreciate that this is a

14     complex and difficult issue.

15          **THE COURT:**  I mean, isn't that a position that you

16     probably want to take?

17          **MS. DAVIS:**  No, your Honor.  No one has demonstrated

18     that these people aren't judgment proof.  They have a

19     continuing relationship.  No one has demonstrated that if they

20     make a demand the payments won't be made back.

21          **THE COURT:**  Well, but some of these people supposedly

22     depend upon the payments.  I mean, they've got a million

23     dollars in loans.  Presumably, some of those loans are payable.

24     If you've got a million dollars in -- if you put a -- deposit a

25     million dollars with USA Capital, you've got to have some

34

1    money.

2         **MS. DAVIS:**  I understand.  And I respectfully

3    disagree, your Honor.  I mean, I hear what you're saying, and I

4    think I know where your Honor is going with this, but with all

5    due respect, the direct lenders in the Boise-Gowan loan have

6    negotiated a specific transaction with USA Commercial and with

7    the borrower, Boise-Gowan, and the rights and obligations under

8    those respective contracts.  And the Nevada law statutory

9    obligations of a mortgage broker and a mortgage servicing agent

10   require that the money not be held.  I mean, there seems to me

11   that there has to be more of an affirmative demonstration that

12   they're entitled to do what they're claiming to do.

13         It's one of the points I was making at the beginning

14   of my argument, your Honor, and that is, is that -- you know,

15   there is a big morass here.  There is a bunch of confusion,

16   there's connections, there's possibilities, and whatever.  If

17   you'll recall, your Honor, on the first day of this case, I

18   believe the debtor's counsel walked in here and told you that

19   this case was similar to the Lemon's (phonetic) case.  Now

20   they're backing off that position.  I understand and appreciate

21   that they have to do forensic accounting.  Where I disagree and

22   where the arguments break down is that I don't agree that they

23   have to hold the money until they do that, and I don't agree

24   that in the process of holding the money they get to breach the

25   contracts.

1          Now, let's talk about the breaches of the loan

2     servicing agreement here.  We have two post-petition payments

3     that haven't been made.  This is a performing loan.  And, yes,

4     your Honor, it does have an interest reserve with PDG that we

5     just talked about.  Again, it was a loan takedown for raw land.

6     It matures on August 26th.  So, we have the two post-petition

7     breaches of payment.  But let's talk about the loan servicing

8     fee for a moment.

9          **THE COURT:**  Well, what happens on August 22nd if the

10    loan doesn't perform?

11         **MS. DAVIS:**  Twenty-sixth.  They're in default.

12         **THE COURT:**  And then what are you going to do?

13         **MS. DAVIS:**  Well, initiate a foreclosure proceeding

14    just like any other loan servicing agent would.  And, in fact,

15    your Honor, the loan -- excuse me -- the foreclosure

16    proceedings in Boise, Idaho, are the same as they are here in

17    Las Vegas, Nevada.  They have a power of sale, non-judicial

18    sale, it's a 120-day time period, and they have a one action

19    rule issue as well.  Those are --

20         **THE COURT:**  And, so, of course, your clients would be

21    charged with the expenses of doing that.

22         **MS. DAVIS:**  Yes, your Honor.  And they don't object

23    to valid charges.  What they object to is not getting paid.

24    And what they have concerns about are the other two breaches

25    that I'd like to talk about.

36

1       We had on October 6th, 2005, an increase of the loan

2  balance without the consent of the direct lenders, which is

3  required under the loan servicing agreement.  On March 6th,

4  2006, we had another increase of a loan amount with the consent

5  or knowledge of the direct lenders.  That also is a violation

6  of the loan servicing agreement.  Now we're up to $2,425,000.

7       There is a reference in the deed of trust that says

8  the maximum amount that could be secured by the deed of trust

9  is $2,550,000.  However, the loan agreement says further

10  advances under 3.2 and three point -- 3.1 and 3.2 -- the loan

11  amounts that -- under 3.1 is the $2.1 million amount that was

12  originally in the note.  Under 3.2 it says that any increase of

13  the principal amount would be discretionary and voluntary, not

14  mandatory.  However, Mr. Allison's declaration -- to which I

15  filed my objection and motion to strike, which I hope your

16  Honor did receive this morning -- and his motion that's set for

17  June 21st seem to make an effort to fund the balance of

18  $125,000 that he somehow thinks is due and payable to this

19  borrower under the loan documents, in violation of the language

20  of the loan agreement.  We have an even more serious problem

21  with that, your Honor.

22       Exhibit K to my submission is the Nevada Lending

23  Institution Commissioner Bice's May 1st, 2006, order that

24  conditions USA Mortgage's license to broker loans to loans only

25  funded by institutional lenders.  Now, that limitation doesn't

37

1    include funding a loan from your operating cash for $125,000.

2    Mr. Bice is present here in the courtroom, and he will stand up

3    and tell your Honor, if you choose to ask him, that that loan

4    is in violation of their license.  They cannot do it under the

5    regulations that govern their license.  However, the proposed

6    new loan servicing agreement -- the proposed new loan servicing

7    agent -- I'm sorry, your Honor; it's been a long week -- can

8    broker that loan.  They have no similar limitations on their

9    license to broker loans.

10               Let's talk about the loan servicing fee for a moment.

11   The loan servicing agreement that was entered into between

12   Scott Canepa and USA Commercial provides for a loan servicing

13   fee not to exceed one percent.  Mr. Allison's declarations have

14   provided agreements that indicate that the "not exceeding"

15   language goes up to three percent.  So, there is potentially a

16   maximum of between one and three percent of a loan servicing

17   fee.  But specific to the Boise-Gowan loan here, what has, in

18   fact, been charged is a half a percent.  The note rate is 12

19   and a half percent.  The return on investment to the direct

20   lenders is 12 percent.  USA Commercial has, in fact, been only

21   taking that half a percent.  That works out to $12,125 a year,

22   slightly over a thousand dollars and ten per month.  We're

23   fighting over $2,020 for loan servicing fees from July and

24   August.  With the blended rate of the lawyers in this

25   courtroom, I don't think that would even buy you a minute of

38

1   legal services.  That is how insignificant the impact is on the

2   estate.

3           Now, these calculations and the representations that

4   were made by Mr. Allison with respect to his ability to fund

5   the $125,000 loan lead me to believe that maybe the

6   calculations under the budget on loan servicing fees, which are

7   projected out for 13 weeks to be about $1.2 million, might be

8   wrong.  Maybe they're just looking at the agreements and

9   calculating what they might be entitled to.  But you've got to

10  remember when the loan servicing agreement was signed.  It was

11  signed at the very beginning of the relationship -- does your

12  Honor need to take a break?

13      **(Voices and whispers off the record)**

14          **THE COURT:**  Oh.  So, you need to dial back in.

15          **MS. UNIDENTIFIED:**  Yes.  If we get a break for a

16  minute, I can do it.

17          **THE COURT:**  Okay.  Well, people apparently got

18  disconnected from the phone system.

19          **MS. DAVIS:**  Okay.

20          **THE COURT:**  Uh --

21          **MS. DAVIS:**  Did you want to take a break, your Honor?

22          **THE COURT:**  Yeah.  We'll need to --

23          **MS. DAVIS:**  Or do you want to just hang loose for a

24  minute?

25          **THE COURT:**  Yeah.  We might as well.

39

1        **(Off record discussion regarding setting up conference**

2            **THE COURT:**  This company might not win the

3    procurement award.

4        **(Laughter)**

5            Okay.  I guess we're on again.

6            **MS. DAVIS:**  Are we back on?

7            **THE COURT:**  All right.  Sorry.  Go ahead, Ms. Davis.

8            **MS. DAVIS:**  Thank you, your Honor.

9            During break Mr. LePome and Ms. Chubb gave me the

10   benefit of some information that has been briefed by them in

11   response to other motions that your Honor is going to hear.

12           **THE COURT:**  Well, and I think that kind of points out

13   the slippery slope of this whole thing.

14           **MS. DAVIS:**  Well, not exactly --

15           **THE COURT:**  I now have no loans left.

16           **MS. DAVIS:**  No, no, no.  That's not the issue they

17   pointed out to me.  What they --

18       **(Laughter)**

19           I am sure that you're shocked and surprised to hear

20   that.

21           No; on the recoupment issue.  What they represented

22   to me is contained in their briefs that will be addressed

23   later -- and your Honor might want to hold the recoupment issue

24   in reserve if you so choose -- is that the First, Second,

25   Third, Fifth, Sixth, and Seventh and Tenth Circuits have held

1  that there is no right to recoupment.

2         THE COURT:  I don't hear Ninth in there.

3         MS. DAVIS:  That's because there is no Ninth Circuit

4  opinion.

5         THE COURT:  Oh, I think there is.  I think Ninth

6  Circuit has got a lot of issues on recoupment; all the Medicare

7  issues.

8         MS. DAVIS:  Um --

9         THE COURT:  There was a whole bunch of BAP cases back

10  in the seventies on recoupment.

11         MS. DAVIS:  Okay.

12         THE COURT:  I can't tell you what they said, quite

13  frankly; I haven't thought about it.  I know I was always

14  amazed by it, but, yeah, there is a whole series of BAP cases

15  on recoupment back in the late eighties, early nineties.

16         MS. DAVIS:  Your Honor, I know that with respect to

17  some of the other motions in this case I did look at setoff and

18  recoupment; I just simply wasn't prepared to address them

19  today.

20         THE COURT:  Sure.

21         MS. DAVIS:  To the extent that that is a critical

22  component, I would like the opportunity to submit a

23  supplemental brief.

24         THE COURT:  Okay.

25         MS. DAVIS:  However, to the extent that your Honor

41

1   might want to hear a little more on it before you rule on my

2   motion, Mr. LePome and Ms. Chubb have represented to me that

3   they have more to tell you on those issues.

4              **THE COURT:**  Okay.

5              **MS. DAVIS:**  I would simply go back to my original

6   point, which is, your Honor, I think it's apples and oranges.

7   I think that they have to perform their obligations under these

8   agreements, that they're going to somehow seize the revenue

9   that comes from them as servicing agreements as property of the

10  estate.  We have to focus on the fact that this supposedly

11  billion-dollar loan portfolio, most of that money is not

12  property of the estate, especially as it pertains to direct

13  lenders.  We're talking about only the loan servicing fees.

14  And with specific reference to the Boise-Gowan loan, even

15  though they might be entitled -- USA Commercial might be

16  entitled to take a loan servicing fee between one and three

17  percent, they have taken only a half a percent.  The impact of

18  this motion is $2,020.

19             **THE COURT:**  Well, I assume there is a no-waiver

20  clause.

21             **MS. DAVIS:**  I beg your pardon?

22             **THE COURT:**  I assume there is a no-waiver clause.

23             **MS. DAVIS:**  Well, your Honor, but we also have these

24  competing fiduciary obligations.  When you have an investment

25  that you solicit out to individuals who are protected by Nevada

42

1    law, you give them a particular return on their investment,

2    which in this investment is 12 percent --

3          **THE COURT:**  How in the world can you guarantee a

4    return on your investment when the loan rate is different?

5          **MS. DAVIS:**  Because the difference is their fee.

6    They have a 12 and a half percent loan.  They tell the

7    investors they're going to get 12 percent.  The math, half a

8    percent, is their fee.

9          **THE COURT:**  But how can you -- how can you guarantee

10   them -- I mean, that's --

11         **MS. DAVIS:**  Well, and --

12         **THE COURT:**  That's the whole problem.  You can't

13   guarantee investors a rate of return.

14         **MS. DAVIS:**  -- perhaps that's a poor choice of words,

15   your Honor, but certainly the promissory note rate is 12

16   percent, and -- excuse me -- is 12 and a half percent, and the

17   arrangement with the direct lenders was that they would receive

18   12 percent of that amount and that a half a percent of it would

19   be used for the loan servicing fee.

20         **THE COURT:**  Okay.

21         **MS. DAVIS:**  Mr. Canepa's declaration demonstrates

22   factual issues and concerns which are really more in the nature

23   of business decisions or what you might call the business

24   judgment of a direct lender and why this loan should be moved

25   to a new loan servicing agent.  I'm just going to summarize a

43

1    few of them.

2         I have mentioned the two pre-petition breaches in

3    increasing the loan amount.  I've mentioned Mr. Allison's

4    current motion to try and fund $125,000, which appears to be an

5    effort to do so post-petition, and Mr. Bice's statement is, is

6    that that can't be done under the current limits on their loan

7    broker's license.  We have concerns that USA's current

8    management can't move quickly enough to foreclose and realize

9    upon the collateral.  Statements and schedules are being filed

10   now.  It's taken a long time just to get that done.

11        We also have the concern that USA Management might

12   extend the loan maturity, which would also be in violation of a

13   loan servicing agreement.  There is a very real concern that

14   the direct lenders of Boise-Gowan will become involuntary

15   lenders to the bankruptcy estate by a charge back, surcharge,

16   or other method.  That was certainly tiptoed around on the

17   Hillco (phonetic) motion and, quote, "reserved for another

18   day," close quote, as to whether or not there would be a

19   surcharge or a charge back.

20        From the perspective of direct lenders, they're

21   getting more and more entranced in the bankruptcy proceedings

22   at very significant cost.  The proposed new loan servicing

23   agreement would not have any of these problems, limitations,

24   issues, concerns.

25        This loan has the personal guarantee of Tom Hantges

44

1    and Joe Milanowski.  The direct lenders would prefer to move

2    this loan to a non-debtor-in-possession loan servicing agent

3    for these reasons.

4            Finally, because of the fact that USA Commercial's

5    broker's license is limited to just institutional loans, they

6    can't broker any additional advance even if it's needed.

7            **THE COURT:**  Well, what are you going to tell your

8    clients who have non-performing loans; that USA Commercial

9    can't go ahead and foreclose on their non-performing loans,

10   your other clients, because there is no money left because all

11   the good investors have gone off and found other servicing

12   companies.

13           **MS. DAVIS:**  Your Honor, first of all, that is --

14           **THE COURT:**  You're just trying to starve -- you're

15   trying to starve the debtor.

16           **MS. DAVIS:**  I am not; with all due respect, I am not.

17           Let's talk about starvation.  Two thousand twenty

18   dollars from this loan.

19           **THE COURT:**  Why is your loan any different than

20   Ms. Chubb's or anybody else's?

21           **MS. DAVIS:**  I can't speak to the merits of

22   Ms. Chubb's.

23           **THE COURT:**  And the point is --

24           **MS. DAVIS:**  I've found my hands full with my own.

25           **THE COURT:**  -- how could I differentiate?

**EXCEPTIONAL REPORTING SERVICES, INC**

1      **MS. DAVIS:**  But that's the point.  They are separate

2   loans; they are separate borrowers; they are separate

3   transactions.

4      **THE COURT:**  But that means all the good loans go out

5   and all those people who aren't performing, your other clients

6   who have non-performing loans, they are left with a debtor who

7   can't perform on the agreement anymore because there's no

8   assets to go out and foreclose.

9      **MS. DAVIS:**  Let's talk about this for a moment, your

10  Honor.  Your argument assumes that if they got foreclosed

11  they'd get title to the property and they get to keep the

12  property.  They don't.

13     **THE COURT:**  No, no, no, no.  It does not at all.  My

14  point is:  If there's no monies coming in from performing loans

15  because they have all -- lift stay has been lifted, and now

16  it's time to go foreclose on the non-performing, they're going

17  to have to -- because they have no monies left in the estate --

18  they're going to have to go in and immediately assess every one

19  of those borrowers to say, "Pony up some money so -- because we

20  can foreclose, because we have no servicing fees left."

21     **MS. DAVIS:**  Your Honor --

22     **THE COURT:**  Right?

23     **MS. DAVIS:**  No.  I respectfully disagree.  That is

24  the slippery slope argument that Mr. Allison would like you to

25  believe.

46

1          **THE COURT:**  Why isn't that true?

2          **MS. DAVIS:**  Because when you look at the specific

3    facts, they are different.  The specific facts of this case are

4    very different.

5          **THE COURT:**  I understand, but if I allow your loan to

6    go because it's performing, that's your argument, my loan is

7    performing, let me go.

8          **MS. DAVIS:**  No, that's not my argument, with all due

9    respect.  My argument is there have been breaches prepetition

10   on this Loan Servicing Agreement and post-petition.

11         **THE COURT:**  Right.  So that's true of every loan in

12   this portfolio --

13         **MS. DAVIS:**  Right --

14         **THE COURT:**  -- right?

15         **MS. DAVIS:**  -- but what --

16         **THE COURT:**  That means that nobody, every loan should

17   go out, and that means that those people who are stuck with

18   nonperforming loans, there are no assets left to cover their

19   loans back, because the one or two big loans or the ten big

20   loans, you're out of here.

21         **MS. DAVIS:**  With all due respect, your Honor, the fly

22   in that argument is the assumption that this $2,020 is somehow

23   going to be --

24         **THE COURT:**  It's not your 2,020, it's the 50 other

25   ones.  There is no legal --

1          **MS. DAVIS:**  There aren't 50, okay?  First of all, the

2    only motion, the only loan before you --

3          **THE COURT:**  So how could I --

4          **MS. DAVIS:**  -- is Boise-Gowan.

5          **THE COURT:**  So how could I not -- how could I grant

6    your motion and not somebody else's arguably  because you're

7    one client and the one loan.  But then you're telling me that I

8    let the whole portion -- all of them go, even though they may

9    have nonperformance.

10         **MS. DAVIS:**  I don't mean to be argumentative with

11   your Honor, but I do need to be --

12         **THE COURT:**  And I appreciate the rhetorical

13   questions.

14         Okay, let's go on.  I'm sorry.

15         **MS. DAVIS:**  And I do appreciate that you do

16   appreciate that I'm an advocate for my client.

17         **THE COURT:**  No, exactly.  Exactly, I appreciate that.

18         **MS. DAVIS:**  And basically where we are, your Honor,

19   is from start to finish we disagree with the strategy and the

20   analysis and the basis upon which the funds are being held.  We

21   believe that a deal is a deal is a deal and it should be

22   enforced.  The Loan Servicing Agreement has duties and

23   obligations.  It is really a trust agreement with respect to

24   the collection and disbursement of money that belongs to other

25   people and the collection of a small fee.  This whole concept

48

1    that it somehow gets expanded to something larger than what it

2    is is something that we respectfully disagree with.

3         What we are asking the Court to do is focus on the

4    Boise-Gowan loan and the breaches that we have demonstrated to

5    you and the business matter concerns that have been expressed

6    by the lenders here.  We believe that if you're going to

7    recognize some set off recoupment or otherwise there needs to

8    be something more before you than what's before you.  I

9    understand respectfully if you disagree.

10        In conclusion, your Honor, we feel that based upon

11   the case authority that's been cited that we have established a

12   colorable claim to terminate this agreement and move the loan

13   to a new loan servicing agreement.

14        We have also received an opinion from

15   Commissioner Bice (phonetic) that indicates that based upon the

16   conduct in this case, pre and petition, and that's our Exhibit

17   O, we are entitled to in fact terminate our agreement.  Now, if

18   we were in a non-bankruptcy outside context we would be able to

19   do so and the Commissioner's office would be out there helping

20   us terminate this Loan Servicing Agreement.  But we're not.

21   We're in bankruptcy.  And because the Debtor has possession

22   of --

23        **THE COURT:**  Unfortunately they weren't there before

24   this case filed.

25        **(Laughter)**

49

1          **MS. DAVIS:**  I'll let Mr. Bice respond to that one.

2      **(Laughter)**

3          What we're asking you to do today is adopt Mr. Bice's

4  opinion and grant our motion.  Let my people go.

5          **THE COURT:**  All right.

6          **MS. DAVIS:**  Let them find a new servicing agreement,

7  permit Mr. Canepa to exercise his right to terminate, recognize

8  that, you know, nine other direct lenders have joined him and

9  want to do so as well, that's 75 percent of the loan amount

10 here, enter an order that facilitates the transfer of the loan

11 documents, accounting records, and funds, because part of the

12 funds are held by the PDG, and allow us to move on, get out of

13 the bankruptcy case.

14         **THE COURT:**  All right.

15         **MS. DAVIS:**  Thank you, your Honor.

16         **THE COURT:**  Okay, let's hear the other Motion for

17 Relief From Stay and then have all the oppositions at once,

18 since they're sort of the same kind of legal arguments, there's

19 definitely different factual predicates, but --

20         So we've got Ms. Chubb.

21         **MS. CHUBB:**  Thank you, your Honor.

22         I'm not going to do the usual presentation on stay

23 relief because you've outlined the issues that are concerning

24 you.

25         **THE COURT:**  On your loans, at least I didn't have

50

1  before and I don't know if you've supplemented and if you have

2  I missed it, are all of the entities for which you seek relief

3  from stay, are they all in performing loans?

4          **MS. CHUBB:** No.

5          **THE COURT:** No, they're not.  Okay.

6          **MS. CHUBB:** Absolutely not.  No.  And I'm not

7  premising the stay relief on the fact that they are performing,

8  because I think the principle goes to both performing and

9  nonperforming loans and I have clients here with nonperforming

10 loans that want to get them out of here so the estate isn't

11 going to be stuck with those.  I can't tell you that every

12 nonperforming loan would go out, but I can tell you that some

13 of them would.

14         **THE COURT:** And with respect to each of these

15 properties, are these lenders 51 percent of each of those

16 loans?

17         **MS. CHUBB:** No, and we acknowledge that we don't have

18 51 percent now, but it seems silly to go out and --

19         **THE COURT:** So than how can I even consider it?

20         **MS. CHUBB:** Well, you can say, and what we're trying

21 to find out is, if we get to 51 percent then do we get to do

22 it, because going out and getting the 50 percent is not an

23 inexpensive proposition and if the Court is going to say now

24 anyway I'd recommend they do not spend the money.

25         **THE COURT:** Well, why isn't it -- you're going out

1    and getting the 51 percent, why isn't it in the nature of

2    almost like a disclosure statement and unlawful prepetition

3    disclosures?

4            MS. CHUBB:  I'm sorry, what?

5            THE COURT:  Well, if you are going to solicit people

6    for your lift stay --

7            MS. CHUBB:  Right --

8            THE COURT:  -- why isn't that in the nature of a

9    disclosure violation?

10           MS. CHUBB:  Well, if you're saying that's the chicken

11   and the chicken has to come first, we'll do that.  But we

12   didn't know and I don't think it --

13           THE COURT:  Okay.

14           MS. CHUBB:  -- should have to come first.  If the

15   underlying allows 51 percent of people to get out, then we can

16   get the 51 percent and we could bring that information to the

17   Court.  But to get the 51 percent first, and as has happened,

18   and then you still can't get out means it was useless to get

19   the 51 percent.

20           So we're here because we don't have the 51 percent

21   and if you are going to let people out when they do have the

22   51 percent we'll get it.  But if you're not going to let

23   anybody out there's no reason to get it.

24           So does that answer that question?

25           THE COURT:  Uh-huh.

52

1        **MS. CHUBB:**  Okay.  This is the way we see it:  We

2   acknowledge that we don't have the 51 percent.  We know that

3   the loans are in -- I mean the servicing agreements are being

4   breached.  And it's not just prepetition, because post-petition

5   they're being breached also.  And that somehow doesn't seem

6   right.  You know, once you get new management and you're in a

7   Chapter 11 you should be conforming to the law.

8        And if you look at NRS 645B.175 --

9        **THE COURT:**  Well, how do you -- especially in your

10  case, you know, Ms. Davis is a little different.  How in the

11  world -- some of your clients have loans that are

12  nonperforming --

13       **MS. CHUBB:**  Yes.

14       **THE COURT:**  -- how in the world -- and so other

15  people have been -- and so they've been paid and they shouldn't

16  have been, and other people probably are in the reverse

17  situation --

18       **MS. CHUBB:**  No, everybody --

19       **THE COURT:**  -- they weren't paid.

20       **MS. CHUBB:**  Everybody was getting paid, your Honor.

21  Everybody was getting paid.

22       **THE COURT:**  Well, okay, so some of the loans are

23  nonperforming, some are performing --

24       **MS. CHUBB:**  Right.

25       **THE COURT:**  -- some are performing.

53

1          MS. CHUBB:  Yes.

2          THE COURT:  Okay.  So on the performing loans your

3     clients will -- well, even if they're nonperforming loans what

4     if somebody hasn't paid in four years --

5          MS. CHUBB:  What if somebody hadn't paid --

6          THE COURT:  -- in one loan --

7          MS. CHUBB:  What if somebody --

8          THE COURT:  Wait, now listen.

9          MS. CHUBB:  Okay.

10         THE COURT:  You've got three sets of clients.  What

11    if one client, A, his loan hadn't been paid for four years,

12    Client B's loan hadn't been paid for two months; the point is

13    Client A has been way overpaid.  Now how do you adjust that

14    process?

15         MS. CHUBB:  Well, the way you adjust that process is

16    because we don't know exactly whose money it was that paid, but

17    the Debtor made a lot of money and the Debtor may well have

18    used its own money to pay, in which even the Debtor might

19    want --

20         THE COURT:  The Debtor has no right -- had no right

21    to do that and no obligation to do that.

22         MS. CHUBB:  Of course it didn't, but it did it.

23         THE COURT:  But how would you do an adjustment?

24         MS. CHUBB:  This is what --

25         THE COURT:  What procedure would you use to do that

54

1   adjustment?

2           **MS. CHUBB:**  This is the way I would do the

3   adjustment:  The adjustment would be start paying out on money

4   that belongs to the lenders, because it doesn't belong and

5   there's no creditor/debtor relationship between the Debtor

6   here, USA --

7           **THE COURT:**  All right.

8           **MS. CHUBB:**  -- and people who have been overpaid.

9   There may be a cause of action that would have to be brought by

10  an adversary to collect money --

11          **THE COURT:**  Who's going to bring it, with what money?

12          **MS. CHUBB:**  Well --

13          **THE COURT:**  The loan's gone.  The estate has no

14  interest in bringing an adversary anymore.

15          **MS. CHUBB:**  Yes, they do.

16          **THE COURT:**  No, they don't.  The loan is gone.

17          **MS. CHUBB:**  No, no.  No, no.  I'm saying if the --

18  actually --

19          **THE COURT:**  They're only the servicing agent.  Why is

20  that?

21          **MS. CHUBB:**  Excuse me, you have a Debtor here who

22  you're saying, I don't necessarily agree with this, but you're

23  saying the Debtor may have paid out money to people when they

24  weren't entitled to it --

25          **THE COURT:**  Right.

55

1          **MS. CHUBB:**  -- but that in fact was an advance to the

2    borrowers.  And I think --

3          **THE COURT:**  Right.

4          **MS. CHUBB:**  -- well I think maybe the Debtor is

5    probably going to embrace that and try and get money from the

6    borrower, because they advanced to the lender.

7          **THE COURT:**  Then live with it.

8          **MS. CHUBB:**  Why?

9          **THE COURT:**  This is my analogy before --

10          Couple in the front, please stop that.

11          **THE CLERK:**  They're supposed to be on mute.

12          **THE COURT:**  My same analogy, I'm a servicing agent

13    for Countrywide.

14          **MS. CHUBB:**  Yes.

15          **THE COURT:**  Ms. Jarvis pays -- and you don't pay a

16    dime for five years.  Mr. Jarvis pays faithfully.  I apply all

17    the loans to your account.

18          **MS. CHUBB:**  But we know that nobody's established

19    that that's what happened and what you're not taking into

20    account with that --

21          **THE COURT:**  Well, how would do the adjustment?

22          **MS. CHUBB:**  Okay, well, listen.  You're saying there

23    are only two payments that came in and one payment got applied

24    to somebody else's account.  But that's not probably what

25    happened, although we don't have access to this information.

1    On $900 million in loans there was $100 million that

2    belonged --

3            **THE COURT:**  Then how would you do the adjustment?

4            **MS. CHUBB:**  This is what I would do:  You would --

5    the money that was paid back to the lender would be kept by the

6    lender.  The borrower has not paid that money.  The borrower

7    still owes that money.

8            **THE COURT:**  He paid it.  The borrower made faithful

9    payments.  What, the borrower stopped paying.

10           **MS. CHUBB:**  No.  No -- yes, the borrower didn't make

11   faithful payments.

12           **THE COURT:**  Okay, so the borrower stopped paying.

13           **MS. CHUBB:**  Yes, but the lender got paid.

14           **THE COURT:**  But now the property is in foreclosure

15   and it's been foreclosed.

16           **MS. CHUBB:**  And --

17           **THE COURT:**  How do you adjust your one client having

18   got ten times what they would have gotten and the other person

19   got nothing?  No jurisdiction here --

20           **MS. CHUBB:**  Wait, wait, wait.

21           **THE COURT:**  -- so the loan is gone.

22           **MS. CHUBB:**  Wait.  If in fact the Debtor wants to sue

23   because it doesn't get it back from the borrower the Debtor can

24   sue.

25           **THE COURT:**  No, ab initio (phonetic).  The servicing

57

1  agreement's is gone.

2        **MS. CHUBB:**  It can --

3        **THE COURT:**  The stay is lifted, the servicing

4  agreement is gone.

5        **MS. CHUBB:**  No, if you're talking about unjust

6  enrichment, it doesn't need the stay lifting.

7        **THE COURT:**  Sure it does.

8        **MS. CHUBB:**  No, it doesn't.  Why does it?

9        **THE COURT:**  Well, that's --

10        **MS. CHUBB:**  You're saying there's been a wrong.

11        **THE COURT:**  What's the nexus?  It's (indiscernible)

12  longer property of the estate.

13        **MS. CHUBB:**  Wait.  If in fact it was the Debtor's

14  money --

15        **THE COURT:**  Two claims inner se (phonetic).

16        **MS. CHUBB:**  -- if in fact it was the Debtor's money

17  and they voluntarily enriched somebody --

18        **THE COURT:**  The Debtor's got --

19        **MS. CHUBB:**  -- I'm sure the Debtor's counsel can find

20  a way to do it.  But I don't think that's what they're looking

21  at.  I think they're looking at --

22        **THE COURT:**  So you -- and that's what you think would

23  have to be done here?

24        **MS. CHUBB:**  Yes, and it has to be done through an

25  adversary.  You can't just go around saying --

58

1          THE COURT:  Okay.

2          MS. CHUBB:  -- we have rights of set off when there

3  are no rights of set off.

4          THE COURT:  So you've talked to all your clients to

5  make sure that if I rule there's no jurisdiction once the

6  loan's gone that's what they want to do if they were underpaid.

7          MS. CHUBB:  No, of course I haven't.  You just raised

8  that issue, so -- I mean I could turn around and talk to

9  people.

10          THE COURT:  Well, that's something you've got to

11  think about.  We've been talking about this for three months

12  now.  If you're underpaid or overpaid, how do you do those

13  adjustments inner se?

14          MS. CHUBB:  Well, you don't do it by keeping the

15  money that you know belongs to somebody else and trying to

16  offset it.  You don't do it that way.  This money clearly has

17  to be paid out now and --

18          THE COURT:  You don't -- how many performing loans do

19  you have, your clients have?

20          MS. CHUBB:  I don't know off the top of my head.  I

21  mean it doesn't matter, this is --

22          THE COURT:  So in the nonperforming loans your

23  clients have no rights to any money right now, right?

24          MS. CHUBB:  They don't, but --

25          THE COURT:  So then why would you lift stay --

1          **MS. CHUBB:**  -- this is a stay --

2          **THE COURT:**  -- when you have no rights to any money?

3          **MS. CHUBB:**  -- termination motion.

4          **THE COURT:**  They have no rights to any money.

5          **MS. CHUBB:**  This is a stay termination motion.

6     They --

7          **THE COURT:**  If they have no rights to any money what

8     is the basis for terminating the stay if they're loans are not

9     performing?

10         **MS. CHUBB:**  So they can go and control the loan.  And

11    if there's some basis for somebody getting money back from

12    them, sue us.

13         **THE COURT:**  Okay.

14         **MS. CHUBB:**  I mean it's just -- I mean statutorily,

15    the statute says except as otherwise provided in this section,

16    and I don't see anything else in the section, the amount held

17    in trust that is the amount collected from the borrowers must

18    be released upon the deduction and payment of any fee or

19    service charge due the mortgage broker --

20         **THE COURT:**  Upon.

21         **MS. CHUBB:**  Yes, they're taking the fees out.

22         **THE COURT:**  But they haven't handled debtor fees.

23    The foreclosure fees, how about adjustments inner se?

24         **MS. CHUBB:**  No, no.  No, no.  This is money that's

25    paid in by the borrower and these are monies that are sitting

60

1    there that belong and must be paid --

2            THE COURT:  You just told me a bunch of your loans

3    are nonperforming.  There is no money sitting there.

4            MS. CHUBB:  On the monies that are sitting there we

5    want them paid.  This is the other motion, but, yeah, I'm happy

6    to say that.  Yes, we want monies that are --

7            THE COURT:  But you don't know how many loans you

8    have that are performing?

9            MS. CHUBB:  It doesn't matter, your Honor.

10           THE COURT:  Of course it does.

11           MS. CHUBB:  No, it doesn't.

12           THE COURT:  If there's no money sitting there what

13   are they going to pay?

14           MS. CHUBB:  They're not going to pay money that isn't

15   sitting there.  Pay the money that's sitting there.  On the

16   loans where they've collected money, pay the money out.  That's

17   the motion to pay.  Pay it out now because the statute says if

18   you took the services fees out you have to pay the money to the

19   lender.  That's the rule.  And it's now being violated post-

20   petition.  It's different from the stay relief, but they are

21   intertwined.

22           THE COURT:  Again, do all of your clients realize

23   that if that's the case there's no -- that you can't do

24   adjustments?  After the money is paid out you're going to have

25   to sue them to get the adjustment.

61

1          Once the money is paid out you're going to have to

2     sue those people to get the money back, right?

3          **MS. CHUBB:**  Sue the -- who has to sue?  The Debtor?

4          **THE COURT:**  Somebody.

5          **MS. CHUBB:**  Well --

6          **THE COURT:**  So you would rather, all of your clients

7     say I would rather be paid now and sue tomorrow?

8          **MS. CHUBB:**  Yes.

9          **THE COURT:**  Than doing a recoupment?

10         **MS. CHUBB:**  Yeah.  Take the money and run, yeah.

11         **THE COURT:**  And your clients who are underpaid want

12    you to say don't let them do an adjustment so I get even; I

13    want the estate to spend money to sue them?

14         **MS. CHUBB:**  That was just --

15         **THE COURT:**  All your clients are saying that?

16         **MS. CHUBB:**  I can't tell you all my clients are

17    saying that.  I'm saying there's a principle of law here

18    involved and the borrower got advances and if the Debtor didn't

19    use its own money or did use its own money and wants some

20    overpayments, fine, figure out a legal theory and sue on that,

21    but don't hold up -- you know if there were no funds this

22    wouldn't be an issue, because what's happening is the direct

23    lender funds and fees are being used so the Debtor can

24    reorganize --

25         **THE COURT:**  No, as I understand it the monies coming

**EXCEPTIONAL REPORTING SERVICES, INC**

1    in are not being -- they're being held separately.  They are

2    not being used.

3             **MS. CHUBB:**  Not the fees, it's only --

4             **THE COURT:**  That's right, the fees --

5             **MS. CHUBB:**  -- you could never use that money.

6             **THE COURT:**  -- the fees, I want to be sure, are you

7    saying the fees are paid to the borrowers?

8             **MS. CHUBB:**  No.

9             **THE COURT:**  Okay.

10            **MS. CHUBB:**  I'm saying that the money that belongs to

11   the lenders can't be used --

12            **THE COURT:**  Right, and then --

13            **MS. CHUBB:**  -- for any reason except to pay the

14   lenders, so pay them.

15            **THE COURT:**  And it's not being used right now.

16            **MS. CHUBB:**  I know --

17            **THE COURT:**  No, it isn't.

18            **MS. CHUBB:**  -- I want it to be used to pay the people

19   it belongs to because --

20            **THE COURT:**  Without any offsets or recoupments or any

21   adjustments if --

22            **MS. CHUBB:**  That's right.

23            **THE COURT:**  -- somebody is overpaid.

24            **MS. CHUBB:**  That's right.

25            **THE COURT:**  And you want them to go be sued,

63

1   including your client.  You want Client A to sue Client B.

2           **MS. CHUBB:**  No, I don't know.  I mean if somebody got

3   money --

4           **THE COURT:**  Your position is that Client A could sue

5   Client B, right?

6           **MS. CHUBB:**  No, I don't have to take that position.

7           **THE COURT:**  How --

8           **MS. CHUBB:**  Somebody else can figure that out.  I'm

9   not going to say my clients are suing each other and should be,

10  no.

11          **THE COURT:**  But they could be, right?

12          **MS. CHUBB:**  They could be.  Or the Debtor could sue

13  people.  It's just that this money, according to the statute,

14  has to be paid out and has to be paid out --

15          **THE COURT:**  So what is the problem with --

16          **MS. CHUBB:**  -- when it's been received by the Debtor.

17          **THE COURT:**  What is the problem with waiting till

18  like for example August 1st?

19          **MS. CHUBB:**  Well, let me address that, as long as

20  we're on that topic.  I have a motion to pay on calendar.  I

21  understand that the Debtor, based on Mr. Allison's supplemental

22  declaration, is going to file a motion to pay.  Well, let's

23  just use mine.  We don't have to go through another month of

24  briefing and oppositions and every Committee weighing in.

25          **THE COURT:**  Well, you apparently are unwilling to

64

1   agree on a date that they be paid, the parties weren't.

2            **MS. CHUBB:**  What?

3            **THE COURT:**  If they were going to file a motion to

4   pay on July 25th and you want to proceed today --

5            **MS. CHUBB:**  I'm saying you don't need another motion,

6   you don't need all that briefing.  Say they're going to pay if

7   they have something --

8            **THE COURT:**  But you all could agree to a date.

9            **MS. CHUBB:**  To pay?

10           **THE COURT:**  Yeah.

11           **MS. CHUBB:**  Pay funds on the 25th.

12           **THE COURT:**  But you apparently haven't talked about

13  it.

14           **MS. CHUBB:**  I've tried.  And maybe they'll agree to

15  it.  I don't know.

16           **THE COURT:**  You've spent three hours here and you

17  guys haven't even talked about what date --

18           **MS. CHUBB:**  We have --

19           **THE COURT:**  All of you.

20           **MS. CHUBB:**  -- Ms. Jarvis and I have been talking and

21  we -- and I talked about just using our motion and her

22  expressing her concerns.

23           **THE COURT:**  Well, let's take ten minutes and we'll

24  talk about it, you guys --

25           **MS. CHUBB:**  Okay --

65

1          **THE COURT:**  -- this is nonsense.

2          **MS. CHUBB:**  -- great.

3          **MS. JARVIS:**  We did talk about it and we intend to

4     pay immediately after July 25th, after we get the motion on.

5     The reason why there's a motion to pay right now, but as your

6     Honor points out it's very complicated about who gets paid what

7     and if we say grant the motion to pay, pay what?  We need to

8     set out what we figured out between, you know, who got paid

9     when and, you know, prepetition overpaid, who needs to be paid

10    what, that schedule is what we've worked on and which we will

11    be prepared --

12         **THE COURT:**  But you haven't even talked to them about

13    it yet, that schedule?

14         **MS. JARVIS:**  Well, we don't have it yet.

15         **MS. CHUBB:**  They don't have it yet.

16         **MS. JARVIS:**  We finished the initial --

17         **MS. CHUBB:**  But there's an easy way to do this.  My

18    motion to pay stays on calendar.  They file whatever it is

19    they'd be filing in support of their motion as a response to my

20    motion.  We get that in ten days or so.  And then everybody has

21    a chance to look at this instead of having this frantic

22    briefing schedule where they bring out a new motion and

23    everybody has to reply to it.  Let's just move forward.  We

24    need to get it resolved.  And it's going to go out even longer

25    if we have a separate motion.  We should stay with this motion

66

1   and we'll see what they have to say and we'll come back here on

2   the 25th and you can decide --

3          **THE COURT:**  Of July you mean.

4          **MS. CHUBB:**  Yes, of July.  And we'll decide who to

5   pay.  But we're not going to start from scratch.  I mean we

6   just don't need another motion to pay.  We have a motion to

7   withhold payment and a motion to pay and now we're going to get

8   another motion to pay.  That's silliness.

9          **THE COURT:**  Okay.  All right, any other on the lift

10  stays?

11         **MS. CHUBB:**  Is there any way you can be persuaded on

12  this issue?  I mean….

13      **(Laughter)**

14         Because I've tried pretty much everything and I'm not

15  making any progress here.  So if you -- I mean if you've got

16  any hint I could have about --

17         **THE COURT:**  Let's hear from Mr. LePome.

18         **MS. CHUBB:**  All right.

19         **MR. LePOME:**  Thank you, your Honor.

20         The Courts generally give debtors' counsel a great

21  deal of deference during the initial 120 days and I know that

22  the Courts listen very carefully to debtor's counsels'

23  positions and their paperwork.  Mr. Schwartzer and I both have

24  gray hair.  We both have beards.  If we can just ask for the

25  Court's attention as though it were Debtor's counsel making the

67

1    proposal.

2              **THE COURT:**  I resent that, Mr. LePome.

3              **MR. LePOME:**  Oh, I'm sorry, your Honor.  All right, I

4    take that back.

5              **THE COURT:**  I listen to all of you very carefully and

6    you know that.

7              **MR. LePOME:**  All right, then this is the most

8    important thing I'm going to say today.  My briefing is in

9    Document Number 281, which you have a copy of.  I have another

10   copy if you didn't get a courtesy copy.  And it's extremely

11   clear.

12             We go through the _Builder's_ case, which is

13   Mr. Schwartzer's case that he seeks reliance on.  I went

14   through it in my brief word for word, paragraph for paragraph,

15   sentence by sentence.  And then we reached one problem, and

16   that is the Debtor has an obligation to recoup money from the

17   people who were paid on nonperforming loans.  No case is cited.

18   That's the only thing, the only proposition for which no cases

19   were cited.

20             I did some research.  The law starts on Page 9 of my

21   brief and it cites _Chase Manhattan v. Burton_ (phonetic).

22   Escrow agent paid from its own account prior mortgages on

23   company properties secured to mortgage refinance loans

24   purchased by the lender on secondary mortgage market.  They

25   sued the lender for unjust enrichment.

68

1        Your Honor, in this particular case, which was *Chase*

2 *Manhattan Bank*, Burton was really a limited partner and he

3 asked his bank to pay the limited partner what the limited

4 partner was entitled to.  His trust account received money from

5 the general partner.  The general partner's check bounced.  He

6 wanted reimbursement.  He wanted recoupment.  The District of

7 Columbia Appellate Court looked at this very carefully.  They

8 cited the Seventh Circuit case in *Hayden v. Stone* (phonetic),

9 and that's in my -- that's in the case itself:

10 "The voluntary nature of the transfer and its having been made

11 in the normal course of business indicates there's been no

12 conversion, there's not right for recoupment."

13        And then they looked at it and said:

14        "This Court, this insured, like the *Hayden Stone*

15        case, does not involve the unlawful control of the

16        transfer used of someone else's property.  Our

17        conclusion is consistent with the holdings of other

18        Courts that no conversion occurs when a transferee

19        takes property to which he is entitled."

20        And here's where we have to take a careful look.  The

21 people who were paid on nonperforming loans were entitled to

22 those payments.

23        **THE COURT:**  Why?

24        **MR. LePOME:**  Let me tell you why they were entitled

25 to those payments.  Because they were the payee on the notes

69

1    they were entitled to those payments.

2              THE COURT:  Wait a minute.  If the borrower didn't

3    make any payments on the loan --

4              MR. LePOME:  Correct, they were nevertheless entitled

5    to those payments.

6              THE COURT:  No, because no payments were made.  You

7    were using Joe Blow's money to pay it.

8              MR. LePOME:  Your Honor, that is exactly what

9    happened here.

10             THE COURT:  Tell me exactly -- wait a minute.

11             MR. LePOME:  What happened was --

12             THE COURT:  Wait a minute, if I'm the borrower --

13             MR. LePOME:  -- Mr. Greenwald (phonetic) used his

14   money to pay it from his own trust account.  This attorney was

15   denied the right to seek reimbursement.

16             THE COURT:  But you just told me the borrower had the

17   right to the payment.  He didn't --

18             MR. LePOME:  Under the note --

19             THE COURT:  -- if the borrower is not performing --

20             MR. LePOME:  No, that's the point.  The obligation to

21   make the payment, the right to receive it has nothing to do

22   with whether the loan was actually performing or not.  It's a

23   right.

24             THE COURT:  Well, that's just says Ponzi scheme with

25   a giant "P."

EXCEPTIONAL REPORTING SERVICES, INC

70

1          **MR. LePOME:**  No, it isn't.  I understand --

2          **THE COURT:**  How could it not be?

3          **MR. LePOME:**  I have another case too exactly the same

4    way the Judge ruled --

5          **THE COURT:**  But that's why the finding is different,

6    because it was his money.  This is like loans -- that's the

7    whole point, when the money -- in fact all of these cases,

8    where the money comes in and they're using somebody else's

9    money to make the payments.

10         **MR. LePOME:**  That's what happened.  Mr. Greenwald

11   used his money to make the payments and now he wants recoupment

12   and the Court says it would first appear that he's entitled to

13   it.  But then after they examined every statement, they

14   examined all the other Circuits, they come up with an

15   interesting situation, just as though --

16         **THE COURT:**  But we don't know that it was USA

17   Commercial's money.  It could well have been the money from

18   your other client's loan that came in --

19         **MR. LePOME:**  Your Honor --

20         **THE COURT:**  -- and was paid and that money was used

21   to pay your other client and then when the next guy's loan came

22   in it was used to pay that person's loan in typical Ponzi

23   fashion.

24         **MR. LePOME:**  Your Honor, I have to respectfully

25   disagree because the focus of the Court obviously is towards

71

1   equality and fairness.  And those are laudable qualities in

2   every Bankruptcy Court and they have lot of equitable power.

3   But we have --

4           THE COURT:  Every one of your clients have loans that

5   were performing all the way along?

6           MR. LePOME:  No.  And they have hired me to say put

7   those loan performers -- the nonperforming ones out of

8   Bankruptcy Court jurisdiction, we're going to foreclose, we'll

9   order our own appraisals, and we'll see where we are.

10          THE COURT:  And they don't care about adjustment if

11  the other client was paid too much.

12          MR. LePOME:  They don't care at all.

13          THE COURT:  They don't want to be --

14          MR. LePOME:  Because there is not a right to

15  adjustment, and you won't let me finish.

16          THE COURT:  Okay, I'm sorry.

17          MR. LePOME:  If my son owes Chase Manhattan Bank and

18  I make the payment, Chase Manhattan Bank when I sue because I

19  made a mispayment because they both have the same name is going

20  to say no, we had a right to the payment.  No, they had a right

21  to collect from my son.  Guess what, Chase Manhattan Bank wins.

22  And that's the second case.  Decisions on both sides of these

23  cases, and I'll go to the second case in a minute.

24          The first case again, which is _Chase Manhattan v._

25  _Burton_, says, and here's what the Court says:

72

1    "In situations of endless variety (endless variety) Courts have

2    denied restitution because money paid by one party was received

3    in good faith by the other in satisfaction of or as security

4    for a valid claim against a third person."

5            **THE COURT:**  So you're saying your clients that

6    received money -- didn't receive money because somebody else

7    was paid have no remedy.

8            **MR. LePOME:**  I'm not saying they have no remedy.

9            **THE COURT:**  Isn't that what you just told me?

10           **MR. LePOME:**  Excuse me a moment, state that again.

11           **THE COURT:**  The clients that were underpaid because

12   somebody else got the money, they're without a remedy.

13           **MR. LePOME:**  Oh, no, they certainly have a remedy.

14   The person who signed the promissory note owes them the money.

15           **THE COURT:**  But what if the property has been

16   foreclosed and it's undervalued?  What if the property is only

17   worth a million and it's a five million loan?

18           **MR. LePOME:**  That's what they contracted for.  They

19   contracted as a loan secured by this property, it will have to

20   be satisfied out of the property.  If it was a nonperforming

21   loan that someone else got, that doesn't affect their rights as

22   regard to their note and their collateral.  Does it?  Of course

23   not.

24           **THE COURT:**  But what if, you know, the property --

25   what if the property has declined in value?  It was worth a

1    million five, there was 500,000 made in payments a year ago --

2    there was $500,000 made in payments, okay, and it was a

3    $5 million loan.  They didn't get the 500,000 because somebody

4    else got it.  They stopped payment with 500,000 reserves.  The

5    property is now worth a million.  They're short money and

6    they've got no recourse to get it back from the person who

7    received their money where the property had been actually

8    foreclosed on.  We've got some cases where the property is

9    gone.

10          **MR. LePOME:**  The person who received their money

11   received it from a third party.  They were entitled, however,

12   to receive it under their note.  It's not an unlawful receipt.

13   They got the money in good faith.  Those people who were

14   improperly paid, here's the point, have a right to keep it as

15   between the Debtor in this case --

16          **THE COURT:**  Okay --

17          **MR. LePOME:**  -- and themselves.

18          **THE COURT:**  -- so your clients that were underpaid

19   have no remedy against a party that was overpaid.

20          **MR. LePOME:**  Oh, of course we don't.  We only have

21   remedies --

22          **THE COURT:**  Do your clients all know that's their

23   position?

24          **MR. LePOME:**  Absolutely.  I sent them a letter --

25          **THE COURT:**  Okay.

1      **MR. LePOME:**  -- dated the 6th of June and when I was

2   first hired we sent -- I sent out a four-page letter on all of

3   the possibilities and yes, they do know that, and I'll provide

4   a copy, of course --

5            **THE COURT:**  No, that's fine --

6            **MR. LePOME:**  -- there's an attorney-client privilege

7   here.

8            **THE COURT:**  -- I'm just concerned, you know, it's --

9            **MR. LePOME:**  But I have to get a waiver of the

10  attorney-client privilege.

11           **THE COURT:**  -- this case has a real problem, who's ox

12  is getting  gored.  And I'm a little concerned because a lot of

13  attorneys are representing a lot of different people and just

14  for the very problems with the various interests, I'm just

15  concerned that everybody knows that what they're attorney says

16  today may not necessarily be in their best interests.  And if

17  you're fully aware of that, that's fine.  And I'm not saying

18  you, I'm just saying that's --

19           **MR. LePOME:**  Yes, I am fully aware of that,

20  your Honor.

21           **THE COURT:**  -- the problem with multiple

22  representation in a case with all the variables we've got.  And

23  I'm not suggesting --

24           **MR. LePOME:**  We're very --

25           **THE COURT:**  -- anybody's proceeding in bad faith.  I

75

1    know you're all doing the best job you can.

2          **MR. LePOME:**  Your Honor, let's take a look at the

3    person who received the money, interest money, that he thought

4    was from a performing loan but it turns out not to have been a

5    performing loan.  That's what you're focusing on.

6          **THE COURT:**  Okay.

7          **MR. LePOME:**  At 271 Fed Reporter, which is the

8    second -- it's the same one, it's the *Greenwald* case.  The

9    first one was *Chase Manhattan v. Burton* and the second one is

10   *Greenwald v. Chase Manhattan*.  But take a look at this.  Here's

11   what the Court says:

12   "Although the Defendant (and the Defendant is the one who

13   received the money) may have been seemed to have benefited from

14   Plaintiff's mistake it was not enriched thereby and certainly

15   not unjustly enriched."

16          The Court also said that the unjust enrichment claim

17   was defective for lack of contractual and implied relationship

18   that would lead to a duty to indemnify the Plaintiff.

19          Let me give you the facts in this *Greenwald* case.

20   Chase received notes and other documents on March 22nd.  On

21   March 23rd and 24th the Greenwald firm received uncertified

22   checks, pays on those mortgages.  The Greenwald firm learns

23   that the check is bad on the 28th of March, tries to stop the

24   check to the prior mortgagee, but they already cleared.

25   Greenwald wants to seek reimbursement.

76

1          Just like we think the Debtor here has a right to go

2     to those nonperforming loan holders who received money.  They

3     had a right to receive money and it doesn't matter whether the

4     serial number on the dollar bill came from their lender.  It

5     could come from a third person.  It doesn't matter.  They have

6     a right to receive the money.  This is a difficult thing to

7     fathom and Judge Reid (phonetic) had a very difficult time with

8     it in Massachusetts.

9          Incidentally --

10         **THE COURT:**  I guess -- I'm sorry, I've gone over it

11    three times but I don't get it.  If the loan is not paying,

12    being paid, you're still saying they have the right to receive

13    that money?

14         **MR. LePOME:**  That's what the law says in all eight

15    Circuits that have examined this and there are none in the

16    Ninth Circuit.  And I have researched this as recently as

17    yesterday.  The Third Circuit came out in _Blood_ (phonetic) in

18    May of this year, citing these cases by the way.

19         **THE COURT:**  Okay.  All right.

20         **MR. LePOME:**  One last thing, here's the test, and

21    it's in (indiscernible) statement.

22              "Where there's a real debt to the creditor (there is

23              a real debt to the creditor) the person now seeking

24              restitution chose to pay it off and the creditor got

25              only what was due him.  A close case perhaps, but the

77

1          close cases have to be decided one way or the other."

2          And they cite the Reid statement.  And Judge Reid had

3    a difficult time, but all Circuit Judges on appeal approved

4    what she did.  First she was going to do the opposite because

5    it doesn't seem intuitive that that should be the law.  But

6    that is the law.  And it protects those who receive money in

7    good faith from later having suits against them when they're

8    really owed money.

9          My clients who had nonperforming loans were owed

10   money.  They got money.  They are not in a position, nor does

11   the law allow them -- of course they're in a position to pay it

12   back, they're all millionaires.  We did not (indiscernible) if

13   they weren't millionaires.  Fifty have tried to hire me, 15

14   did.

15         So the bottom line is for those who received money on

16   nonperforming loans there is no cause of action against them in

17   any Circuit and any Judge that has ever examined this, and I've

18   gone back 25 years.

19         **THE COURT:**  Okay.  I'm going to -- I assume -- I'm

20   going to hear the pros and then I'll take a break and hear the

21   opposition.

22         **MR. GORDON:**  Thank you, your Honor.

23         I've listened to the arguments presented and

24   obviously we represent the Direct Lenders.  It reminds me of a

25   statement my wife has told me for the last 35 years at various

78

1    times, and that is remember the first rule of holes, if you're

2    in a hole and you want to get out, stop digging.  And with that

3    I'll try to stop digging and put some perspective in this.

4         There really is -- this is -- what's going on right

5    now with regard to these motions is really the other side of

6    the coin from the motion to hold and there's really two issues

7    that are before the Court right now.  There are some factual

8    statements I'd like to correct and make clear here.  There's

9    two real issues.  One is the concept of the rejection and

10   termination of executory contracts and there's also the concept

11   of 362 relief from stay.  And I think that in some ways it's

12   captured best by the opposition filed to the Canepa motion by

13   the Debtor.  Because the Debtor says first Canepa has not shown

14   that they are entitled to terminate the executory contracts,

15   and number two, even if they do they're not entitled to relief

16   from the stay, because they either haven't shown cause or

17   they're adequately protected.

18        The Direct Lenders' position, the Committee's

19   position, is very clear.  I want to make it very succinct.  We

20   support the rights of Direct Lenders to terminate the service

21   agreement and terminate the Debtor, USA Capital Mortgage, as a

22   servicing agent as provided for in the servicing agreement.  In

23   essence, we support both the democratic process and as provided

24   for in the services agreements and by Nevada law and

25   regulations.

79

1         **THE COURT:**  So your clients want this case to be

2  over.

3         **MR. GORDON:**  No.  We want the ability of the Direct

4  Lenders to enforce their rights under the servicing agreement.

5         Now, the Court said performing versus nonperforming.

6  I would submit that -- well, first of all I think the statement

7  made two weeks ago, and I thought this was a sea change and

8  where the Court is right now is not anything that we did not

9  believe the Court would be, and that was when the Debtor got up

10  and said sometime by July -- by June 15th we're going to file a

11  statement showing due to/due froms up to the petition date and

12  then sometime around July 1 we'll file it for a later date up

13  through whatever date is the closest to that date post-

14  petition.  And obviously I don't anticipate we're going to see

15  any due to/due from changes from the petition date to today.  I

16  just can't imagine that.  And then we're going to file a motion

17  which would come on on July 25th when the Court gets back.  My

18  statement was that sounds good, the devil's in the details.

19  And I believe -- and where the Court's position is now is not a

20  surprise to the Committee or to me.

21         However, I'd like to clear up a couple things and put

22  them out there, because some of the statements that have been

23  made and some of the positions that the Court seems to be

24  talking about or thinking about don't make a lot of logical

25  sense to me.

1              First, I would assume that the due to's, if you want

2    to put it in this context, are most likely the performing loans

3    because the performing loans produced income that would have

4    been available.  The nonperforming loans most likely have not

5    produced income; that's why they're nonperforming.  I would

6    assume the primary source of the money that went to the -- that

7    the due to's went to the due froms are most likely those four

8    loans that were paid off and the properties reconveyed and the

9    money never paid to those Direct Lenders.  That would seem to

10   be logical sense.  How can the nonperforming be due funds.

11            **THE COURT:**  So you're going to dump the people who --

12            **MR. GORDON:**  No, I'm not saying that.

13            **THE COURT:**  -- in good faith made loans and were

14   secured --

15            **MR. GORDON:**  I'm not saying that.

16            **THE COURT:**  -- because you're not -- you're going to

17   say you're not going to represent them.

18            **MR. GORDON:**  I'm not saying that.  Oh, those people?

19            **THE COURT:**  Yeah.

20            **MR. GORDON:**  Your Honor, they fit somewhere, those

21   people who didn't get paid.  The problem is is that, to be

22   candid, and obviously the Court asked before, their interests

23   are substantially different in that since they don't have

24   collateral their source of repayment are two-fold; one, the

25   Debtor, which violated the service agreement, violated state

81

1   law, violated both contractual and fiduciary duties to these

2   people clearly, and I would submit they're the largest

3   unsecured class; and they also most likely have a cause of

4   action against those parties who received the money.

5          THE COURT:  So how do you see this case going?  The

6   servicing agreements are all gone, this Court loses

7   jurisdiction, and you're left to go fight it in State Court,

8   and if you want to do that, I guess that's fine.

9          MR. GORDON:  Your Honor, can I --

10         THE COURT:  I mean that's where you're headed.

11         MR. GORDON:  No.

12         THE COURT:  How can you not be?

13         MR. GORDON:  Your Honor, here's part of the

14  problem --

15         THE COURT:  If all the servicing agreements are gone

16  what jurisdiction is there?

17         MR. GORDON:  Here's part of the problem, to the

18  extent that the -- USA Capital Mortgage is, was only a

19  servicing company.  No question.  And by virtue of the order

20  entered by the division, the mortgage division, they're only

21  capable going forward of doing new loans with institutional

22  lenders.  And that may be where they wish to go.  But by virtue

23  of their prepetition actions they've created a large pool of

24  liability.  They're both primarily and secondarily liable for

25  all these problems.

82

1          When we first got involved in this I thought about

2   this case from the standpoint of what's the best mechanism to

3   try to deal with these due to/due froms.  Clearly these due

4   froms -- or due to's have causes of action against the due

5   froms in State Court.  Thirty-six hundred or whatever number of

6   lawsuits is nuts.  It doesn't make sense.  I've always

7   considered that possibly the best mechanism, the best place to

8   resolve that, if it can be brought into this, is this Court.

9          **THE COURT:**  But how?.

10          **MR. GORDON:**  I have also thought how to do it, given

11   the limitations of _American Hardwares_ (phonetic), given the

12   limitations of _Orchards_ (phonetic), how do we do it?  We don't

13   have the same type of expansive jurisdiction in the Ninth

14   Circuit that we have elsewhere.  I thought possibly obviously

15   the loans with regard to the funds who are in bankruptcy give

16   the Court some jurisdiction.  I played with that.  I don't

17   know.  I just know that I'm not here on behalf of the Direct

18   Lenders Committee saying that anything other than we support

19   the right under agreement to enforce your rights.  And what I'm

20   saying is I would expect --

21          **THE COURT:**  So that means --

22          **MR. GORDON:**  -- I would expect --

23          **THE COURT:**  -- if all the contracts go, there are no

24   funds left to pay you, there are no funds left to pay anybody

25   else, and there's no funds to do any sort of relationship

83

1   between the parties.  You understand that?

2           **MR. GORDON:**  Your Honor, ultimately that may be the

3   outcome.  I don't think it is.

4           **THE COURT:**  Why not?

5           **MR. GORDON:**  I am trying -- your Honor, that's --

6           **THE COURT:**  How do I let one go and not everybody

7   else?

8           **MR. GORDON:**  May I just complete, because I'm not

9   trying to get to that, nor am I prepared to say this is where

10  we need to be.  What we're addressing right now is executory

11  contracts and 362, and the reverse side of that is holding the

12  funds.

13          Let's just focus on -- and what I'm trying to say is

14  I think the Court coming to the conclusion or the initial

15  preliminary idea or conclusion that it's a performing versus

16  nonperforming I think may be wrong.  I think that the ones that

17  are more troublesome are the nonperforming, because they're

18  more likely to be the ones who owe money from -- who owe money.

19  Number two, I would submit that in my years of experience the

20  ones who are more likely to come before the Court to try to

21  terminate their rights probably would be the nonperforming

22  loans to the extent the lenders, borrowers, the lenders,

23  because why are they nonperforming?  What we know from the

24  report and we know from Mr. Allison is prepetition it was

25  hidden from these people.  They were either extended without

84

1    their approvals or whatever happened, et cetera.

2            If I am them I may have faith and confidence in

3    Mr. Allison and if he can establish that this is not the old

4    Debtor.  On the other hand, I think that my one action is

5    probably to foreclose or to take that route or to try to

6    reorganize --

7            **THE COURT:**  And you then give up the rights to

8    recover anything from somebody else that was overpaid.

9            **MR. GORDON:**  No, I'm not saying that.

10           **THE COURT:**  How would you do it?

11           **MR. GORDON:**  What I'm saying is --

12           **THE COURT:**  How would you do it?

13           **MR. GORDON:**  Let me continue on and I'll tell you

14   where we're going.  I'm just trying to say to the Court it's

15   not a simple answer.  It's not a conclusion you can reach at

16   this time with due to/due froms based on

17   performing/nonperforming.

18           **THE COURT:**  I know, but you are.

19           **MR. GORDON:**  No, I'm not.

20           **THE COURT:**  You're telling me these stays should be

21   lifted.

22           **MR. GORDON:**  No, what I'm saying is I did not say

23   that.

24           **THE COURT:**  That's the implication.

25           **MR. GORDON:**  I did not say that.

85

1          **THE COURT:**  That's certainly the implication.

2          **MR. GORDON:**  May I go on?

3          **THE COURT:**  Where does it stop?  I mean where -- what

4    I mean is where -- you're saying you support the right to lift

5    stay in all those, then I don't understand.

6          **MR. GORDON:**  No, I didn't say that.  What I said was,

7    let me repeat again, the Committee supports the right of those

8    parties -- two issues before the Court.  There's the issue of

9    executory contracts and the issue of lift stay.  The Debtors

10   recognize those are two separate issues.

11         **THE COURT:**  Sure.

12         **MR. GORDON:**  We agree.  We support the right that if

13   51 percent come before this Court they should be entitled to

14   terminate the executory contract if they establish the basis

15   for that termination, give that notice, the servicing agent.

16   Then the question comes down to, and I think where the Court

17   is, is I have reports being filed today, I have reports being

18   filed July 1, and I have a hearing July 25th at which this may

19   all go away because there will be a motion we haven't seen, we

20   don't know the standards in it, but they're going to seek to

21   distribute funds.

22         What I'm saying to the Court is is that we support

23   the right and the Courts have recognized that as a matter of

24   state law and as a matter of contractual law that if each

25   direct loan obtains the necessary approval that they're

1    entitled to terminate their contract.  Then the issue becomes

2    what do I do in terms of lifting stay to let them do that.  And

3    what the Court is troubled with and groping with and what

4    counsel has basically said is we wait until July 25th because

5    the motions will be out and we expect to make distributions, I

6    believe their last pleading yesterday said we want to make

7    distributions by the end of July.

8         What we do know is the following --

9         **THE COURT:**  So do all of the Committees support

10   waiting for July 25th as far as lifting the stay?

11        **MR. GORDON:**  Ah, I didn't say we didn't.

12        **(Laughter)**

13        **THE COURT:**  If I have spent three hours listening to

14   all of you and you all agree --

15        **MR. GORDON:**  But if -- but, your Honor --

16        **THE COURT:**  -- that we can put this over to July 5th,

17   I've had it.

18        **MR. GORDON:**  But, your Honor, I can't control what

19   other parties say;, I can only represent my committee, and I'm

20   up here now and I'm trying to propose a solution that will get

21   us to that answer, if I may.

22        What is happening between now and then, and we keep

23   talking about the Debtor, monies are being put aside.  I don't

24   have any problem with that.  But it's not all being put aside.

25   One of the things that's happening here is that servicing fees,

87

1    according to the latest budget filed which will be on calendar

2    on the 21st that was filed I believe on -- the revised budget

3    on June 9th, and it's for 13 weeks, from 6/4/2006 now to

4    8/27/2006, contains a number of income items which trouble me.

5    Those are going to be better addressed next week, but they do

6    go to the effect of a statement the Court made that none of the

7    monies are being touched.  According to this budget as of the

8    week ending 6/11/2006 there is $64,586,700 in the investor fund

9    account.  As of the week ending 7/30/2006 they estimate there

10   will be $173,995,000.  That will be money I assume that's going

11   to be the subject of the motion for distribution.

12          I also note on this document that on the income side,

13   and that is operating account for the Debtor, they anticipate

14   receiving in service fees 311,000 for the week ending 6/11 and

15   then continuing on through 7 -- another 8,000, 228,000, 122,

16   286.  Of special note to me is that they show on 7/2/2006 an

17   interest income from the collections account of $320,000.  That

18   320,000 appears to be money generated as interest on the

19   investors fund.

20          My first question is, response to the Court, I don't

21   know if the Court's statement was correct, assumption was

22   correct, if none of the monies in the investors account, that's

23   money being generated in the investor account, that's money

24   that belongs to the investors.

25          I tried to figure out what the 320 represented and it

88

1   appears to be using a interest rate of 4.75 treasury, that

2   appears to be a 30-day treasury on about a hundred million

3   dollars.

4          **THE COURT:**  But to be absolutely clear, you're not

5   suggesting that any of the monies that came in are being used

6   for any -- they're being put aside.

7          **MR. GORDON:**  No, I'm suggesting --

8          **THE COURT:**  Secondly --

9          **MR. GORDON:**  -- I'm suggesting --

10         **THE COURT:**  -- it's just the interest is all you're

11  talking about.

12         **THE COURT:**  They're saying that the interest earned

13  on that is going from there --

14         **THE COURT:**  Okay.  Okay.

15         **MR. GORDON:**  There is one other item that troubles I

16  know us and the other funds, other Committees, and that is

17  there's an item showing 6/11/2006 of collection of prepaid

18  interest from borrowers of $10,308,800, and then on 6/25

19  another four million eight and then on 7/2 another one million

20  one hundred and two thousand.  We don't know what that is.  We

21  just don't know.  Is that the money we're talking about

22  collecting back?  If it is, it's going into the account.

23         What we would propose on behalf of the Direct Lenders

24  Committee is the following:

25         One, that we separate the two issues.  That it is

89

1  both foolhardy and inappropriate to condone or to allow the

2  Debtor, and I think this is foolhardy on the part of the Debtor

3  to take the position that they're not going to honor or

4  recognize, both pursuant to state law and the contract, that if

5  51 percent join that they should not be able to seek or have

6  the right to terminate the executory contract.

7          This Court doesn't have jurisdiction to violate

8  Nevada law.  My reading of the report from the mortgage -- or

9  the order from the mortgage division basically says that this

10  is what they did previously, I can't believe that the mortgage

11  division would condone or say that you don't have to honor

12  those rights.

13          I would rather focus on the 362.  I look forward to

14  the motion.  I look forward to the reportings.  I look forward

15  to all that information becoming available so we can get a

16  handle on it and we know where everyone stands.

17          What I would propose with specific regard to

18  Mr. Canepa and everyone else with regard to this, that we

19  condition a stay to the July 25th hearing and the provision of

20  adequate protection.  And that adequate protection is as

21  follows:

22          One, that the investor account remain inviolate, that

23  no 320 and no interest be taken out of that fund and be used

24  for general operations of the Debtor.

25          Number two, that with regard to those loans which

90

1   have shown that they're entitled to terminate their document,

2   that no action be taken until July 25th to either renegotiate,

3   extend, seek pari passu loans, such as with the Boise loan,

4   those issues, some of which are before the Court on the 21st.

5   That would be inappropriate for those loans.  If those people

6   theoretically have the right of terminating right now, taking

7   their loans elsewhere, to hold them over until July 25th, they

8   should remain in the same position, they shouldn't be subject

9   to further modifications, provisions, extensions, or anything

10  else.

11        Third, I don't think that any of this, which we need

12  to know, and none of this 60 million, or whatever, should be

13  deemed to be property of the estate.  There's this -- you said

14  a slippery slope.  The slippery slope is working two ways here.

15  One is the Court's concerned that all these funds will -- all

16  these lenders will jump ship, direct lenders get the

17  51 percent, jump ship.  I appreciate that.  I don't think

18  that's going to happen before July 25th.

19        And number two is it's also --

20       **THE COURT:**  Well, let me make something absolutely

21  clear.  I have presumed on both these motions to lift stay, in

22  light of the Debtor's opposition saying we're going to be ready

23  to pay by July 25th that their position is heck no, we're not

24  going to do that.

25       **MR. GORDON:**  Well --

91

1          **THE COURT:**  So I have presumed that the lenders,

2     those movants, are unwilling to negotiate and agree to a

3     July 25th date.

4          **MR. GORDON:**  What I'm saying to the Court is --

5          **THE COURT:**  And so I'm just going to explain that in

6     doing the arguments my questions to them are based upon the

7     assumption they're saying no, we want it now, we don't care

8     when, even if it's tomorrow, we're getting paid.

9          **MR. GORDON:**  And we're a committee which represents

10    3600 of these people and we're trying to figure out the best

11    way of getting there.  And in light of what the Debtor said two

12    weeks ago, to me at that moment and it still remains, I believe

13    it remains to the Committee, that we hold inviolate the

14    contractual right to terminate but we understand that the Court

15    explored about could we fashion some type of relief and we

16    think the relief, until we see the motion and until the Court

17    gets documentation, until we -- that generally, given this

18    overriding, overarching proposal that they're going to file

19    this motion, that we remain everything in the status quo as it

20    relates to these direct lenders, specifically as to Mr. Canepa,

21    who is here with 51 percent.

22         **THE COURT:**  Well, and that's exactly why I was saying

23    ten minutes ago when I was a little upset when I didn't think

24    people had really talked to each other.

25         **MR. GORDON:**  So with that, your Honor, unless the

92

1    Court has any questions, but I think the key here is the

2    adequate protection is provided -- and by the way, with

3    Mr. Canepa, if an interest payment is being received, if he has

4    the 51 percent, which he does, and an interest payment is being

5    received and the Debtor is taking the service fees, clearly

6    they're taking service fees, that at minimum they should make

7    the interest payment to Mr. Canepa.  What difference does it

8    make to make a small interest payment on this or any of the

9    loans theoretically over the next 30 days if there are such

10   fees pooled and most of the loans have collateral, the loans in

11   place.  That goes to the whole motion.  But we can save that

12   for later on, because we'll address that, because I don't think

13   the holding of all the funds is appropriate either.  But we

14   don't know because we don't know what the funds relate to,

15   which loans, and that's a matter that we won't know for another

16   couple week.

17          **THE COURT:**  Okay.  All right, well, let's recess and

18   then I'll hear opposition.

19          **THE CLERK:**  All rise.

20      **(A recess was taken from 12:00 p.m. to 12:11 p.m.; parties**

21   **present)**

22          **THE CLERK:**  All rise.  Bankruptcy Court is now in

23   session.

24          **THE COURT:**  Be seated.  Okay, opposition.

25          **MS. JARVIS:**  Your Honor, if it would please the

93

1    Court, we -- I know there's a pro se opponent and maybe she

2    could go first --

3              **THE COURT:**  Oh, okay.

4              **MS. JARVIS:**  -- and then we'll follow.

5              **THE COURT:**  All right.

6              **MS. CANGELOSI:**  Your Honor, my name is Donna

7    Cangelosi and I'm a direct lender.  I'm going to first ask your

8    indulgence because I'm not an attorney, I'm just a direct

9    lender.

10             **THE COURT:**  And you did file a written response,

11   correct?

12             **MS. CANGELOSI:**  Yes, Your Honor, I did.  I filed a

13   response to the motion.

14             **THE COURT:**  Okay.  Thank you.

15             **MS. CANGELOSI:**  Your Honor, when we first started --

16   or when USA Commercial Mortgage and its entities first went

17   into bankruptcy, and before Mr. Landis had appointed

18   committees, a constituency had gathered around and given me

19   approximately $150 million in proxies, requesting my being a

20   committee representative.  In addition to those proxies, they

21   also gave us the investments for which they were participating

22   in, and as a result we developed a database.  And from that

23   database of the $150 million of investments, 125 million of

24   those investors -- $125 million of those investments were

25   represented by direct investors.  Less than one percent of

94

1    those direct investors had only one loan.  Most of those direct

2    investors had, indeed, more loans, and most of them had five on

3    average.

4         I personally have 17 loans in -- as a direct lender.

5    And of those 17 loans, I will give you the complexion.  I have

6    seven that are performing.  I have two that have been paid pre-

7    petition, so that would put me into the unsecured lender

8    category on those loans.  I have one that has been paid -- two

9    that have been paid post-petition.  And I have six that are

10   non-performing.  So I have a fairly comprehensive portfolio I

11   represent actually every interest that could be represented by

12   the direct --

13        **THE COURT:**  And these are your personal loans?

14        **MS. CANGELOSI:**  These are my personal loans.

15        **THE COURT:**  Okay.

16        **MS. CANGELOSI:**  Absolutely.  Okay.  So the point that

17   I want to make is that Mr. Canepa, having only one loan,

18   represents a unique entity within this bankruptcy.  Most of the

19   lenders -- the direct lenders have multiple loans, such as

20   myself, I said with the average being five.  Now we have a

21   fairly comprehensive database of the $150 million proxies that

22   we have gathered.  So that basically is that.

23        That being said, I want to also make a point that

24   Mr. Canepa solicited myself, as well as other direct lenders,

25   to sign on, if you will, to be part of the party to move the

95

1    loan to a loan servicing agreement -- another loan servicer.

2    And those people who did agree, did so without the knowledge of

3    what their account really looks like yet.  They have not

4    received their accounting statement on behalf of USA Commercial

5    Mortgage.  They don't know where they stand, you know, fully.

6    They could probably have some assumptions, but until you

7    actually --

8          **MS. DAVIS:**  Excuse me, Your Honor.

9          **MS. CANGELOSI:**  -- receive that information --

10         **MS. DAVIS:**  I really hate to interrupt Ms. Cangelosi

11   and object, but she can't be representing people.  She's not a

12   lawyer.  She can't also be making statements based upon hearsay

13   and her communications and her "proxies".  She needs to argue

14   her facts regarding her opposition.

15         **THE COURT:**  That's true.  You can only argue

16   concerning your loan.

17         **MS. CANGELOSI:**  Okay.  Your Honor, I would not agree

18   -- I'll put it in context for Ms. Davis?  Okay.  I would not

19   agree, for example, to sign on with any sort of pulling out a

20   loan or multiple loans, only because I have not had a full

21   accounting of my own activity at this particular point in time.

22   I don't know whether I owe money, I don't know whether I'm owed

23   money, I don't know how my unsecured loan's going to be dealt

24   with yet.  So all I'm saying is, I have nothing -- I do not

25   have sufficient information to make that decision at this point

96

1    in time.

2            The -- a couple of other points I would like to make.

3    Number one is that Milanowski and Hantges are involved in these

4    loans.   I am concerned over moving this loan -- this one loan.

5    They're also involved, I understand in 42 loans.   I'm concerned

6    over moving this one loan and I'm concerned over it having --

7    if foreclosure is required, I'm concerned over the new loan

8    servicing agreement or the new loan servicer foreclosing on

9    this in a fire sale and then looking towards the personal

10   guarantees of Milanowski and Hantges.   This may not necessarily

11   be within the best interest of my particular portfolio.

12   Perhaps more aggressive ways to monetize this loan would be

13   better sought with not looking to tap into those personal

14   guarantees and leaving that available for other more

15   problematic type of activities.

16           Another concern of mine is that the new loan

17   servicing agent has not performed -- at least it is not

18   apparent to me that they've performed any due diligence at this

19   particular point in time.   There was no due diligence

20   represented to me.   Mr. Canepa himself opposed appraisals and

21   you, Your Honor, in your wisdom saw that we have no ability to

22   be able to believe in the current appraisals that are on file.

23   And I'm concerned over any loan servicing agent that would just

24   carte blanche agree to accept a loan to service without due

25   diligence.   It concerns me greatly.

97

1          Give me one minute.  My concern is if the Court

2     determines to back charge me for the over payment of interests

3     that's not performing in my portfolio and I can use my money

4     from Boise-Gowan to offset this, I would prefer to have it that

5     way versus to have my money that is in Boise-Gowan moved to

6     another loan servicing agent and then for USA Capital to pursue

7     me as a debtor of the estate.  I would prefer basically at the

8     end of the day to have this all taken a look at from a

9     standpoint of a total portfolio versus money here in one pool

10    and then money -- in one pot and money there in another point.

11    So that extent, I would prefer to keep my loans together.

12          I'm also concerned that if there is additional money

13    required in order to make this loan -- the money right now

14    that's coming -- that's causing performance is coming out of

15    reserve accounts.  It has been determined that perhaps another

16    $125,000 is required in order to protect the value of this

17    loan.

18          **MS. DAVIS:**  Your Honor, I need to object again.

19    Ms. Cangelosi is getting a little far afield of her concerns

20    and she's starting to testify about matters not in evidence.

21          **THE COURT:**  Well, you talked about the 125, so I'll

22    listen to her point about the 125.

23          **MS. CANGELOSI:**  In addition, Your Honor, it was in

24    the declaration of Mr. Canepa that was filed.  Of that

25    $125,000, that would probably mean that I need to extend the

98

1   loan servicing agreement past -- or the loan past August 25th,

2   otherwise there would be no reason to have additional monies

3   going into that particular borrower.

4           Frankly, Your Honor, I feel safer in the bankruptcy

5   proceedings under your watch than I do moving to a new loan

6   servicing agent.  I just feel safer.

7           **THE COURT:**  All right.  Thank you very much.

8           **MS. CANGELOSI:**  Okay.

9           **THE COURT:**  All right.  Oppositions?

10          **MS. DAVIS:**  Your Honor, if I can just make one

11  clarification?

12          **THE COURT:**  Uh-huh.

13          **MS. DAVIS:**  That the statements by Ms. Cangelosi are

14  unsworn representations as opposed to testimony.

15          **THE COURT:**  Well, she's just representing her

16  position.  I don't think there was really any facts -- and she

17  did file a opposition to the motion.  So I don't think there's

18  any facts here and they were just her position on the issue.

19          **MS. DAVIS:**  Thank you, Your Honor.

20          **MS. JARVIS:**  Your Honor, on behalf of the debtors,

21  I'd like to address first Mr. Canepa's motion for relief from

22  stay.  And we have to focus -- this is with respect to only one

23  loan, which is the Boise-Gowan loan, and it's with respect to

24  this loan that he must demonstrate that cause has been shown

25  for relief from the stay.  This loan is a performing loan, it's

1   fully paid up on principal and interest.  There is some amount

2   being held at PDG, when that is released the money that he

3   complains about is being owed will be in the DIP collection

4   account, March and April, and will be available, and the

5   debtors do intend to have that distributed to him in accordance

6   with a motion to be filed and heard on July 25th.

7           **THE COURT:**  So let me cut to that issue.  When do you

8   anticipate -- and tell me looking forward to this motion, what

9   does this motion -- in essence, what do you anticipate -- when

10  do you anticipate being able and how do you anticipate being

11  able to pay the various categories of loans?  So what do you

12  anticipate?

13          **MS. JARVIS:**  We anticipate at this point distributing

14  what's in the collection account according to how it was

15  accounted for and which loans it came from.  So for instance,

16  on performing loans we have post-petition interest that's been

17  coming in on a regular basis.  That would be distributed to

18  those on the performing loans.  And those -- when you're

19  performing -- the loans are performing, that means that there

20  would not have been any overpayments because -- on that

21  particular loan because it has been paying on a regular basis.

22  On non-performing loans it's a little bit trickier of a

23  situation because in some cases we have collected past due

24  interest, but then of course we have paid out -- the debtors

25  have paid out interest pre-petition.  So we would propose a

1    procedure to deal with that.  At this point, you know, we are

2    still working out the figures because again, you know, we need

3    to look and see exactly how it all plays out and that is not

4    going to be available until -- we'll get a snapshot now, but

5    also the ultimate snapshot will be about July 1st.

6          So we would like at, you know, at the proposal for

7    dealing with those who have been overpaid.  I think at this

8    point they would -- that interest would not be distributed to

9    them.  I think we would take the position -- and there's a

10   variety of ways to look at it.  Your Honor has talked about one

11   way, there's recoupment, there's possible offset, which is

12   between loans and that's a little bit trickier of a situation.

13   There's also the issue we raised, which is being equitably

14   subrogated to their claims against the borrowers, where in

15   essence the debtor then takes the money that it collects from

16   the borrowers that they've already paid out and keeps that

17   because it's already paid that amount out.

18         There also are issues, for instance -- and I hate to

19   complicate this even more, but just raising this issues, which

20   I think Your Honor is aware of because it's not an easy

21   situation.  If there are, for instance, overpayments that were

22   made that, you know, were from a long time ago, one way of

23   dealing with -- possibly dealing with those would be 502(d) as

24   well, which in the _America West_ case in the Ninth Circuit

25   allows you to do that even if there are statute of limitations

1    that have been passed, in essence offset or against claims

2    against the estate.  So there are a lot of varieties.  It's

3    part of the reason why we feel like this needs to be noticed

4    fully, you know, why -- I don't think we can just, you know,

5    respond to a pending motion to pay because these are complex

6    issues and we want to lay it out so everyone clearly

7    understands how each category is being treated, each investor

8    will understand what is being proposed with respect to payments

9    to them, and so there can be objections filed by parties or,

10   you know, input sought if they believe it should be treated in

11   a different way.

12           So it's not just a simple we disburse everything.

13   With performing loans it's a lot more simple, but again, then

14   you've got the issue of the interrelated loans as well, so it

15   is a complex issue.  It's part of the reason why we're asking -

16   - I mean, this is really primarily why we're asking the Court

17   not to grant relief from the stay because under Section

18   362(a)(3), which Mr. Canepa has acknowledged does apply here,

19   this is precisely what the debtors -- what the stay is designed

20   to allow us to do; avoid a grab of assets of the estate or even

21   assets that are not property of the estate, but in possession

22   of the debtor while the debtor sorts out where these assets

23   belong and who they should be paid to.

24           As the Court has noted, you know, both under the loan

25   servicing agreement and under the Nevada statutes, it's

102

1   important that these payments be made to the proper parties.

2   In the past this hasn't always been done and we are attempting

3   to and trying to make sure that this is done in the future and

4   would ask the Court's blessing on this because it isn't an easy

5   situation.

6          THE COURT:  So the debtor's intent is to file this

7   motion so that it will be heard July 25th and then pay,

8   assuming the motion was granted?

9          MS. JARVIS:  Yes.

10         THE COURT:  Pay when?

11         MS. JARVIS:  Right.

12         THE COURT:  Pay immediately thereafter?

13         MS. JARVIS:  Immediately.  Immediately thereafter,

14  yes.

15         THE COURT:  And do you have any sense -- would that

16  just be on -- well, what would you do -- well, I guess we have

17  to deal with it then.

18         MS. JARVIS:  Yeah, it would be -- yeah, it's the

19  monies that are sitting in the collection account right now.

20         THE COURT:  And, of course, it would be just the

21  performings, because there's no money in there from the non-

22  performings.

23         MS. JARVIS:  We have collected some in the past.  For

24  instance, some --

25         THE COURT:  Okay.

1          **MS. JARVIS:**  -- some -- Ms. Cangelosi mentioned that

2    two loans were collected post-petition.  Those would have been

3    non-performing loans that were collected post-petition, so that

4    money would be available, subject to working out the problems

5    of the overpayments to be disbursed to those loan holders.

6          **THE COURT:**  Okay.

7          **MS. JARVIS:**  So yes, there would be some that deals

8    with that.

9          Let me also turn -- there's been a lot of discussion

10   with respect to the 51 percent and let me just put this --

11         **THE COURT:**  Well, Ms. Davis fixed the problem, to the

12   extent there is a problem, because she's now got both number

13   and --

14         **MS. JARVIS:**  Yeah, I'm going to raise a different

15   issue.

16         **THE COURT:**  Oh, okay.

17         **MS. JARVIS:**  Okay.  We keep talking about the --

18   those on performing loans that have 51 percent and want to get

19   out of the estate, but if you look at 51 percent it only comes

20   into play where there is in the event of default, foreclosure

21   or other matters that require action, if for any reason USA

22   fails to act on lenders' behalf.  That means that if it's --

23   and this is default not of the servicing agreement, we're

24   talking about --

25         **THE COURT:**  Where are you reading -- oh, pursuant to

1    --

2          **MS. JARVIS:**  Yeah.

3          **THE COURT:**  -- in the event of default.  Okay.

4          **MS. JARVIS:**  In -- yeah.  We're talking about

5    defaults on the underlying loans.  So performing loans wouldn't

6    even fit under this provision.  It's only non-performing loans

7    and again, if this -- we get to this situation and the USA

8    fails to act.  Now part of this issue, with respect to even the

9    payments post-petition, but also with the failure to act is

10   separating the distinction between the pre-petition debtor's

11   management and the post-petition debtor, because we -- the

12   reason why the stay is in effect is so the debtor can attempt

13   to basically cure and deal with the problems that may have

14   occurred in the past.  The fact that there may not have been

15   any foreclosure actions taken -- and by the way, in a

16   performing loan there wouldn't be any grounds for that, but

17   even if there was a non-performing loan, we need to be given

18   the -- or the debtors need to be given the opportunity to act

19   on that, which is exactly what we've been doing.

20         **THE COURT:**  So you're saying the event of default --

21   you're saying -- what about other matters that require action?

22   You're saying that is just -- and I don't know have the statute

23   in front of me -- or do I?  You're saying that's just default

24   action and that's not payment of monies, et cetera?

25         **MS. JARVIS:**  Well, and even if it's payment of

1    monies, again because the stay protects us and allows us time

2    to sort this out to make sure we stay the proper parties, when

3    you look at, if we fail to act, you have to look at it in the

4    context of failing to act in this bankruptcy case, where we are

5    constrained by, you know, the statute and by making sure that

6    we use the stay properly to make sure the proper parties are

7    paid.

8            And this is important to realize because, again, what

9    this means is this 51 percent, if it is only with respect to

10   non-performing loans, then that means you -- performing loans

11   can't use it, but non-performing loans, which have the

12   overpayment problem, would fall in this category.  So it is

13   significant that the Court, I think, recognize the

14   applicability of the stay and keep it into effect while we sort

15   out the problems because on those non-performing loans the

16   debtors do have some claims -- definite claims because there's

17   been some overpayments.

18           With respect to the Boise-Gowan loan, going back to

19   that, there isn't any harm here that has been shown by

20   Mr. Canepa from waiting because we do have, you know, interest

21   that will be payable to him later on.  And the breaches that

22   have been alleged are all pre-petition breaches and that, under

23   the case law, has been shown not to be sufficient to have cause

24   from relief from the stay.  Further, with all due respect, the

25   opinion offered by the commissioner of the State and Division

1  of Mortgage Lending is inadmissible hearsay and it doesn't

2  relate to this individual loan or to the circumstances of this

3  individual loan and it also invades the purview of this Court

4  as the interpreter of the law.  It doesn't recognize the

5  automatic stay or the jurisdiction of this Court, which

6  combined to sometimes allow the debtor, as in this case, to

7  temporarily have a respite from its contractual duties, its

8  statutory duties when it's in accordance with the intent of the

9  stay.

10         Further, even if this -- we would object to the

11  admissibility of this opinion because it is inadmissible

12  hearsay, but also because even if he could be qualified as an

13  expert, which there's no foundation for that, his expert

14  opinion is not an interpretation of the law, which is this

15  Court's purview.

16         I would just mention real quickly the case of *In Re*

17  *Consolidated Industries*, which Mr. Canepa relies on for asking

18  for relief from stay, saying that he only needs to demonstrate

19  a colorable claim to show relief from the stay, but this isn't

20  precisely what the case says.  What the case does say is the

21  party has to show a colorable claim as opposed to -- in a

22  summary proceeding for relief from stay as opposed to having a

23  definitive determination of the claim in the property held.

24  But that fact where you show a colorable claim that you might

25  be able to base relief from stay on does not discharge the

1  party's obligation to then show that it meets the standard of

2  either cause or lack of equity and not necessary for the

3  reorganization.  So those issues still have to be shown in this

4  case.  He has not shown cause.

5         In the case -- it's important to note as well that

6  even -- that the Court did not allow a wholesale relief from

7  stay on all the insurance policies at issue.  In fact, all --

8  what the Court said is, there's only one policy where there's

9  been harm shown -- ongoing harm to the party shown.  And I'm

10 going to find -- the Court can find relief from stay to that

11 instance.  What the Court did say, when it explained that is,

12 the Court that whether, "cause exists to terminate the stay is

13 discretionary" and that "the Court should base its decision

14 concerning whether cause exists to lift the stay on the

15 hardships imposed on the parties with an eye toward the overall

16 goal of the bankruptcy code."

17        And that's precisely what we're asking the Court to

18 do here.  Mr. Canepa is not harmed by continuing the stay.  He

19 will receive all the payments to which he is entitled when we

20 get the Court's approval, but there is and could be significant

21 harm to the debtor's estate.

22        **THE COURT:**  Is there any reason why the payments on

23 this particular loan couldn't commence immediately?

24        **MS. JARVIS:**  We would -- well, again --

25        **THE COURT:**  Only because we have a motion here, it is

1    one that is performing.

2            **MS. JARVIS:**  It is performing, but again, you have to

3    give it to all -- you have to deal with the issues in a way

4    that the Court and all the parties feel comfortable with, with

5    respect to Mr. Canepa may only have one loan that's held

6    individually, but there are 17 investors and as demonstrated in

7    Mr. Allison's declaration, they have multiple loans in other

8    cases.

9            **THE COURT:**  Okay.

10           **MS. JARVIS:**  So you've got to sort out again all that

11   problem.  And this just shows, you know, the tremendous

12   interrelationship between the estate.  And so, I -- you can't

13   really isolate one situation because it has impacts throughout

14   there.  In fact, I think if you look at the declaration of

15   Mr. Allison, when you look at the borrower who's in this loan,

16   that has, I think, nine other loans with this debtor, and the

17   various investors -- the 17 investors, you're probably

18   affecting about 1,000 investors in this case.  So it's a very

19   interrelated situation.

20           Another issue that actually was raised by Mr. Canepa

21   is that this -- the Boise-Gowan property is half-owned by IP.

22   Investment Partners is something I know that we have mentioned

23   on and off in this Court to Your Honor.  This --

24           **THE COURT:**  And again, you go back and say is the

25   property the borrower is -- what's half-owned?  The loan is

1    half -- the note is half-loaned --

2              **MS. JARVIS:**  The borrower --

3              **THE COURT:**  Is half-owned?

4              **MS. JARVIS:**  Yeah, right the borrower is half-owned

5    by IP.  And as Your Honor knows, we have -- Mr. Allison has

6    testified that we have significant claims against IP.  One of

7    the things that is pending before this Court is a motion to

8    fund that last piece.  And we're not saying that that -- that

9    we're not admitting that we have to -- that we are required to

10   fund that, but we are asking to fund that because that's

11   important to maintain the value of this property.  And, of

12   course, maintaining the value of this property is important

13   because, again going to the kind of circle of how it's all

14   connected, that maintains the value of property that IP has

15   against whom we have a claim.  So again, there is that impact

16   as well.  So it is not isolated incident.

17             If -- I would say that in this case, where there is

18   no harm to Mr. Canepa, and where we are working to fairly

19   balance the interest of all claimants, including those

20   claimants as you have identified, which would include

21   Ms. Cangelosi, who are the claimants who actually, of no fault

22   of their own, had principal diverted pre-petition, it's

23   important to maintain this -- these loans together to give us

24   adequate time to be able to deal with them in an appropriate

25   manner.  We have indicated that we do intend to file a plan of

1  reorganization in July, which would be in the 120 exclusive

2  period.  The issue of this change of servicing fee provision

3  and other provisions will be addressed.  We intend to discuss

4  those with the committees going forward to try to reach a

5  proposal, to put in a plan in a comprehensive way that will

6  fairly balance the interest of all constituencies in the case.

7  Maintaining the automatic stay in effect is exactly what it is

8  -- I mean, this is exactly what the automatic stay is designed

9  to allow the debtors to do, and that's what we're asking the

10  Court to give us the time to be able to do that.

11          Turning to -- just quickly to Ms. Chubb's motion, I

12  would just mention that, with respect to those investors, we're

13  not even sure what the effect would be because while we have --

14  where the investors were identified, or certain investors were

15  identified the day before we filed our response and a 2019

16  statement has been filed, then in the reply brief they're

17  actually are even more investors in that case.  So we don't

18  know, you know, how many investors would be in the category of

19  being overpaid or underpaid or even what the difference is

20  between the performing and non-performing loans.  And that --

21  in order to show cause for relief from the stay, I think that

22  is critical to demonstrate, you know, again that there is some

23  need for that and that their needs outweigh the rights or needs

24  of the debtor, and that has not been established.

25          I can tell you that, for instance, one of the parties

1    that she represents that's a part of this motion for relief

2    from stay is the Fertitta Company.  And I believe that our --

3    when our accounting comes out, from my latest information, they

4    will be -- have been overpaid probably around the amount of

5    $2.1 million.  So this is significant and those factors need to

6    be determined before any relief from stay should be granted

7    because of the substantial harm that it would cause to the

8    estate and because the estate does have some interest.

9         In addition, in both these cases they're trying to

10   ask for the relief from the stay to be granted to terminate the

11   contracts.  The contracts are property of the estate.  You

12   know, maybe that the proceeds that we intend to pay over are

13   not property of the estate, but the contracts are and they are

14   the life blood of this reorganization.  It is important for

15   those creditors -- all the creditors of this estate to have

16   those dealt with in a comprehensive fashion to make sure that

17   the value of this company to the benefit of those -- I guess

18   sort of what I would say, those losers in this case, meaning

19   those that were not paid their principal, those that are in

20   loans that will never fully recover their principal, and that

21   value needs to be maintained.

22        On all these grounds, Your Honor, we would simply --

23        THE COURT:  Any specific comments on Mr. LePome's?

24        MS. JARVIS:  Actually, this is a different issue,

25   because what I'm dealing with --

1          **THE COURT:**  This is interpleader, correct?

2          **MS. JARVIS:**  Yeah, exactly.  What I'm dealing with is

3    the collection account and what he's deal -- talking about is

4    the investor account, and that is the interpleader.

5    Mr. Schwartzer is prepared to deal with that and the debtor is

6    nearly prepared to file an interpleader action in order to have

7    the Court determine that.  So I think that is -- you know, that

8    is an entirely different situation.

9          **THE COURT:**  Okay.  All right, thank you.

10          **MS. JARVIS:**  Thank you, Your Honor.

11          **MS. DAVIS:**  Your Honor, with all due respect to my

12   friend and colleague, Mr. Merola, I don't believe that he filed

13   any response to my motion for relief from stay.

14          **MR. MEROLA:**  Yes, we did, Your Honor.  We filed an

15   omnibus reply to all of the motions for relief from stay and to

16   release funds in conjunction with our support of the motion for

17   a temporary stay holding funds.  It's the same pleading.  It's

18   Document Number --

19          **MR. SCHWARTZER:**  Three-seventy-nine.

20          **MR. MEROLA:**  -- 379.

21          **MS. DAVIS:**  I apologize, Your Honor.  The docket in

22   this case is just a nightmare.

23          **MR. MEROLA:**  I'll be very, very brief, Your Honor.

24   Frank Merola on behalf of the First Trust Deed Committee.  We

25   filed a pleading that supported the debtor's request for a

1    temporary hold on distributing funds and an opposition to the

2    motions that sought to terminate servicing agreements and/or

3    compel immediate payment of funds.

4         The automatic stay is one of the most fundamental

5    protections of bankruptcy law.  And we've heard a lot of the

6    Movants talk about the debtor's various purported obligations

7    under state law or under the contracts.  That's exactly what

8    the automatic stay is about.  It's to give this debtor some

9    breathing room without those obligations so it can sort this

10   mess out.

11        Now I have to admit, I'm kind of surprised by the

12   tenor of some of these motions.  If we were sitting here six

13   months from now, or two years from now, and there had been no

14   cash distributed, I would certainly understand the vehemence.

15   We're here 60 days after a company, with 3,600 investors, have

16   the management walk out and we're trying to reconstruct this

17   from ground zero.

18        Now that's where we are, but we get these motions to

19   terminate the servicing agreement.  That's not what these

20   motions are about.  It's not about the servicing agreement.

21   It's about taking possession of the underlying loans for the

22   benefit of certain well-represented investors, to the detriment

23   of the estate, and to the possible detriment of the other

24   investors in the same loan.  It's about cherry picking and

25   that's what's going on here.

114

1          In terms of relief from stay standards under 362(d)

2     we've heard two arguments, pre-petition breaches of contractual

3     obligations.  The law is clear, pre-petition breaches of the

4     contractual obligations do not constitute cause for relief from

5     stay, otherwise everyone would get relief from the stay because

6     by definition the debtor has been a bad boy and has not done

7     what he's supposed to do, whether paying a bank, whether paying

8     on his car lease, he's breached it.  So the pre-petition breach

9     is not itself grounds for relief from stay.  There is no

10    allegation that there's a post-petition breach of the

11    obligations, except as ordered by this Court.  If the breach is

12    that Mr. Allison is not currently remitting funds based on this

13    Court's order that has told him he doesn't have to remit funds

14    yet, that's not a breach.  So that's where we are.

15         There's no basis for relief.  Interestingly, there is

16    not a mention in any of these motions that people are not

17    adequately protected.  That's what -- that is what relief from

18    stay is about under 363(d).  There is no mention that taking

19    this money, if it's being paid, and putting it in account -- a

20    segregated account, does not adequately protect them, keeping

21    in mind for the short period of time we're talking about.  The

22    debtor hasn't asked to hold this money until confirmation of a

23    plan.  The debtor has asked until the end of July, and given

24    the circumstances, that seems very reasonable.

25         Now I think Ms. Davis did the best factual job of

1    developing her case, but that means it also creates the best

2    example of how complicated all this is.  We're very careful to

3    be told that the Movant, Mr. Canepa, only has one loan, but

4    that's only part of the story, because the Scott K. Canepa

5    Defined Pension Plan and Scott K. Canepa as the trustee for the

6    Evelyn Canepa trust, has nine loans.  And if you look at

7    Paragraph 4 of Mr. Allison's supplemental declaration they come

8    in chocolate, vanilla and strawberry; performing, non-

9    performing and completely repaid.  It strains credulity that

10   Mr. Canepa should be able to take the one loan where he's a

11   direct investor, even though the estate might have claims or

12   causes of action against his in teste trust or his pension plan

13   and leave those behind, that's the kind of cherry picking we're

14   engaged here.

15            But more importantly, and it's brought out by

16   Ms. Cangelosi, you also have to look at the other 17 investors

17   because if he was -- if there were no claims whatsoever against

18   him, you have to look at the other 16 investors in this loan.

19   And to be very honest, in this loan that's fairly easy because

20   there's only 17.  Most of these loans that people are seeking

21   to terminate the stay for have hundreds of investors, that

22   you'd have to go down and look at each of those investors.

23            Now, a lot has been said about whether there's a

24   claim or there's not a claim.  Let me tell you my position on

25   that.  If someone got money that they weren't entitled to,

116

1    there's a claim.  Whether it's a fraudulent conveyance claim,

2    whether it's a common law claim, I like Your Honor's servicer

3    example, I have a slightly different one, that I'm a servicer,

4    no bankruptcy, three people are due checks.  I send one person

5    two checks and I don't send the third person the check.  No one

6    in this courtroom can tell me A, I don't owe the third person

7    the money that I didn't send the check and B, I don't have a

8    remedy against the person that I paid twice.

9         Now there's a lot to be said about whether it's

10   recoupment or whether it's not recoupment and Your Honor's

11   right dead on this.  The *Fireman's Fund* -- *Newbery Corporation*

12   *versus Fireman's Fund*, the Ninth Circuit case written by

13   Kozinski, very broad doctrine of recruitment that allows us to

14   offset these.  And you know what, Your Honor, notwithstanding

15   everything that's been said today, they better hope that

16   there's recoupment, because if there isn't recoupment and

17   there's a claim, what we're going to have to do is we're going

18   to have to file complaints against everyone and start moving

19   for summary judgment and start trying to get prejudgment

20   attachment.

21        That's not the way for this case to get resolved.

22   The way for this case to get resolved is when people have --

23   when the debtor has claims against people and people have

24   claims against the debtor, to have some truing up mechanism in

25   the plan.  And to do it piecemeal with five and ten and fifteen

1    individual investors trying to pull their loans is just going

2    to make a half shot of it.

3            Now if you get around the claim issue that -- which

4    is very complicated because you have to look at not just an

5    individual direct lender, but all of his affiliates.  Most of

6    these people are in under several different hats; it's their

7    trust, their pension fund, their 401(k), their kids' college

8    fund.  You have to look at all those together.  Then you have

9    to look at all the investors in that loan that are not that

10   person, but it's more complicated than that and you have to

11   look at, for example, this borrower.  This borrower in the case

12   of the Canepa loan has 10 other loans.  To allow them to take

13   one loan out and might totally change the negotiation and the

14   structure of how you deal with the other loans.  This loan also

15   has insider guarantors.  And as I said at the last hearing,

16   we're going to have to deal with an issue of how people are

17   going to be going against the insiders, but it doesn't make

18   sense to have 3,600 people all suing the insiders individually.

19           And then finally, this has an insider borrower, which

20   is a real nice asterisk on this one.  That the actual borrower

21   here is somebody that the estate might have causes of action

22   against.  So you really got to raise your eyebrow and wonder,

23   for a loan that's performing, a loan that's current, the cash

24   is there, now we have some borrowers trying to -- some lenders

25   trying to move it out of the purview of this Court when all the

1    parties need to be here for one reason or another.

2            The temporary request by the debtor-in-possession to

3    not pay funds and the opposition to the various motions to

4    terminate servicing agreements or to turn over loans is

5    appropriate in measure.  If this debtor does not live up on its

6    promises to come up with a mechanism to true up these, we're

7    going to have different issues, but for now you've got to let

8    them get their house in order before you let people start

9    ripping things off the shelves and that's what this is.

10           **THE COURT**:  Okay.  Oh, Ms. Scann's back there too.

11   Either one of you, which --

12           **MR. LEVINSON**:  I'm closer.  I'm Marc Levinson,

13   proposed counsel for the Diversified Fund Committee.  I filed

14   no pleadings in connection with this motion because I hadn't

15   been called at that point in time.  I'd just like to say a

16   couple of points on behalf of the thousands of investors in the

17   Diversified Fund who have loaned $110 million -- invested $110

18   million.  And it's just one point, I won't add to Mr. Merola's

19   brief statement.

20           And that is that Ms. Chubb earlier said that if her

21   clients got a chance to take the money they would quote, "Take

22   the money and run."  If money is paid out to the direct

23   investors, they will take the money and run and we'll have to

24   chase them in other courts.  If money is paid out to my fund or

25   Mr. Merola's fund, we can't, we're in this Court, and that

1   would be unfair to our court -- to our investors as well, who'd

2   still be subject to the jurisdiction of the Court, who could

3   not get the money themselves, because the money would go to the

4   fund, and of course we can't distribute until there's a plan.

5   So let the other investors take the money and run and have to

6   be chased in the State Court.

7           So as a matter of equity, at the very least, I join

8   Mr. Merola in saying, let's wait until the end of July, let the

9   debtor perform on its promise to see if there's some sort of an

10  equitable way to deal with these recoupment issues and then

11  we'll see where we are.

12          **THE COURT**:  Okay.  Ms. Scann?

13          **MS. SCANN**:  Good morning, Your Honor, Susan Scann.  I

14  didn't file anything in connection with this either, because I

15  didn't really recognize -- I couldn't find it in the docket

16  initially and then when I got the pleadings.  I represent the

17  borrower, the unheard from party in this case, and I just

18  wanted to make a couple of comments.

19          The borrower, from our point of view, it's premature

20  really to lift the stay on this.  The loan is performing.  We

21  have a loan agreement that is signed by the lenders in this

22  case, that provides for an approved budget of up to a certain

23  amount of money.  So it appears that there may be a conflict

24  between what they signed with the mortgage lender on one part,

25  but the agreement that they signed with us says that there can

120

1    be an increase in the loan to a certain point, so there can't

2    be a breach as to that.

3         And then down the road there's going to be some

4    additional business to be done here because this loan comes due

5    in August.  Mr. Canepa says he wants to foreclose, my client

6    may well be asking for an extension or a development loan.

7    Who's going to broker that loan?  There's going to be some

8    business that's going to go on here.  Is the debtor still going

9    to be viable at that point?  Do we need -- are we going to be

10   going outside the debtor?  I think that there are negotiations

11   that have to take place before it would be appropriate to lift

12   the stay in this case, probably for the benefit of the estate

13   to preserve the business, and for the benefit of the borrower

14   too because the project is ongoing and, you know, there's money

15   to be made here for people.

16         **THE COURT:**  Okay.  Ms. Freeman?

17         **MS. FREEMAN:**  Susan Freeman for the Unsecured

18   Creditors Committee.  I will try not to duplicate, Your Honor.

19   This is very much a matter of the Court's discretion and it

20   seems very clear that the Court has a good handle on the

21   balance of the hardships here.  It is a matter of the loss of

22   the servicing income, which is a contractual right, a property

23   of the estate, and that increases the burden of administering

24   remaining loans and causes inefficiencies and a hardship on the

25   estate overall with respect to all of the loans when the best

121

1    ones go out the door.  And it also results in a real risk of

2    loss of jurisdiction to deal with these loans, which is an

3    enormous hardship on the unsecured creditors of this estate.

4    And on the other hand you have a very brief stay, a very brief

5    delay in their ability to collect.

6            I do want to make a specific point with respect to

7    the proposal of the executory contracts committee, that there

8    be some kind of general abstract adequate protection and that

9    the stay be lifted effective July 25.  With respect to the

10   overall granting of adequate protection across the board, you

11   don't have a motion for such relief.  The Court -- we already

12   have sufficient adequate protection in the sense that the money

13   is there and is in interest bearing accounts and segregated. I

14   specifically disagree with the notion that nothing can be done

15   with these loans by way of adequate protection as a matter of

16   holding on to the status quo, because with respect to the one

17   loan, for example, that we're dealing with here, there is a

18   motion by the debtor that's set for a hearing on the 21st to

19   advance an additional $125,000 for paying engineering fees.

20   Now that kind of additional advance, within the scope of the

21   overall loan budget of this particular borrower, may well

22   result in increased value, presumably they're not putting money

23   out unless they look at it and realize it's going to bring in

24   more than value than they're expending, but that increased

25   value increased the likelihood that the borrowers -- or that

1   the lenders on those particular loans will be paid in full,

2   that in fact the value will be there in the asset by virtue of

3   some additional advance that will result in payment in full.

4          And likewise, it's important for the debtors to be

5   able to take action to secure whatever they can, by way of

6   assets from the investment partners, and yes they're half-

7   borrower on this, and that would affect this particular loan.

8   All of these things can come to the Court bit by bit on

9   specific additional requests, nobody is being harmed, they're

10  not being inadequately protected by virtue of having -- not

11  having a complete freeze.  We should be able to come to the

12  Court -- the debtor should be able to come to the Court and

13  deal with each of these loans on an individual basis and that

14  protection of having the Court here, and the Court looking over

15  each of these loans, is an important component of adequate

16  protection to the direct lenders who are involved and to

17  everybody.  Ms. Cangelosi's comments, I think, brought that

18  home in a very real way from the standpoint of an individual

19  person who is affected.

20         So we would ask that the Court not give a broad

21  advisory opinion as to what's needed to adequately protect

22  anymore than just having the money in the account.  And then

23  with respect to this particular loan, where we have the 51

24  percent of the people, but not a default yet that would make

25  the 51 percent even kick in, the hardships -- the balance of

1    the hardships really warrants continuing the stay, not allowing

2    any termination, not allowing any cherry picking until we can

3    really sort out how everything plays out.

4              **THE COURT:**  Okay.

5              **MS. FREEMAN:**  Thank you.

6              **THE COURT:**  Okay.  Mr. Schwartzer, since you're

7    handling the investor -- Mr. LePome's motion, I just need to

8    understand your position on his motion.

9              **MR. SCHWARTZER:**  Yes.  Your Honor, Mr. LePome's

10   motion on behalf of Ronning and Alexander deal with money

11   that's in the investor account.  That account was used for

12   investors to put money to be made -- to make loans.  It was

13   also used in a different way that may or may not have been

14   appropriate under Nevada law.  When an investor wanted to get

15   out of a loan, the debtor, for a service fee, would agree to

16   find another investor to take over their percentage and

17   basically do an assignment of their percentage of a specific

18   deed of trust.

19             So what would happen is, the money would be paid in

20   by the new investor, would pay money into the investor account,

21   the deed of trust would be assigned to the new investor and

22   then the money would be paid out of the investor account to the

23   old investor who no longer had an interest.  At the date of the

24   filing of the petition there was $1.7 million in that account -

25   - actually, $1.8 million in that account.  There were checks

1    outstanding to various people who had sold their interests and

2    those checks were stopped by the bank because of the filing of

3    the petition, except apparently for one $100,000 check.

4           What we now have a situation is, is that there are

5    people who were going into investments and people coming out of

6    investments are both saying, I just want my cash back.  And in

7    fact, we have a pool of about $1.8 million and $3.6 million in

8    claims because nobody wants their investment, they want the

9    cash.  The --

10          **THE COURT:**  And the estate -- so that I'm clear.  The

11   estate doesn't claim any interest in that money.  The problem

12   is the estate doesn't want to be held liable for --

13          **MR. SCHWARTZER:**  Right.  Well, I shouldn't say the

14   estate.  There is -- I think the Diversified Committee was one

15   of the selling investors.

16          **THE COURT:**  Excuse me, USA Commercial.

17          **MS. FREEMAN:**  USA Commercial Mortgage has no claim on

18   the money.  We are -- we actually have prepared a complaint and

19   interpleader to name all the parties.  It's about 34 -- it's

20   about 30 parties who will be named as defendants.  The issue we

21   had that we're going to deal with, and I think our solution is,

22   are going to ask Mr. Houston, who the Court -- we formally

23   mentioned would be special counsel in case of conflicts to be

24   the Plaintiff's counsel.  And then we realized since there is -

25   - one of the debtors is a defendant in that, what we would do -

1    - probably do -- and I think it's the Diversified -- no, I'm

2    sorry, it's the First Capital -- the First Trustee Fund, we're

3    going to ask the committee for the First Trustee Fund to

4    represent the First Trustee Fund in that case, so we're not in

5    the situation of suing ourselves.

6              **THE COURT:**  Right.

7              **MR. SCHWARTZER:**  We don't want to be on either side

8    of that.  But the problem is, with both the Alexander and the

9    Ronning motion, is that this is a fund and some people were

10   going into investments and some people were going out of

11   investments.  The Court has to make a rule that applies to

12   everybody in those investments.

13             **THE COURT:**  Well, you know, I guess I'm a little

14   confused.  I should have asked Mr. LePome.  He was arguing

15   about lift stays, but your motion was just authorize return,

16   right Mr. LePome?

17             **MR. LE POME:**  Your Honor, we opposed the motion to

18   delay payments, and that's what I was speaking on first.

19             **THE COURT:**  Oh, okay.  So you --

20             **MR. LE POME:**  I haven't spoken on this one yet.

21             **THE COURT:**  Oh, all right.  So -- okay.  So you were

22   talking about -- you were looking ahead to the converse of the

23   motion to withhold?

24             **MR. LE POME:**  Yes.

25             **THE COURT:**  Okay.

1    **MR. SCHWARTZER:**  He was -- that's what I thought he

2  was talking about, the motion to temporarily hold funds.

3    **THE COURT:**  Since they're really the flipside of the

4  same issue.  And I'm not going to have argument on the motion

5  to withhold, because it's just the flipside of the same issue.

6    **MR. SCHWARTZER:**  Right.  With -- he didn't argue

7  about the Alexander or Ronning motions, but that's what they're

8  about.

9    **THE COURT:**  Okay.  All right.  So -- but your point

10  is on Alexander -- now, would you have any objection to --

11  certainly they're authorized to return -- well, he didn't ask

12  for lift stay, so it's just authorizing return.  Okay.

13    **MR. SCHWARTZER:**  Yes.

14    **THE COURT:**  Okay.  All right, Mr. LePome?

15    **MR. LE POME:**  Your Honor, on Ronning, you'll recall

16  on the 5th of June I said I wanted this matter set over to the

17  15th of June.  The reason is that when Mr. Allison filed his

18  reply brief and included the copies of the assignments, that's

19  what they look like.  On June 1st I got a phone call --

20    **THE COURT:**  Well, let me ask you this.  The point is,

21  how can I order the return of the money when there's certainly

22  a -- why isn't the interpleader -- why isn't your being the

23  interpleader sufficient?

24    **MR. LE POME:**  Oh, the interpleader will work

25  beautifully.

1          **THE COURT:**  Okay.

2          **MR. LE POME:**  I want to see the interpleader and I

3    will ask Lenny to send me an advanced copy.  Counsel did that

4    and we got it resolved in record speed.  And the reason -- I'll

5    say this because it's on the record now.  The United States

6    Trustee got an advance notice and so did Scott Bice of what

7    happened here.  This is not Grable Ronning's signature.  The

8    affidavits of forgery were filed two days ago in Number 609.

9    So obviously we need an interpleader to resolve that issue.

10         **THE COURT:**  Okay.  All right, thank you.  Okay, brief

11   reply?

12         **MS. DAVIS:**  Yes, Your Honor.  I'm just going to give

13   you a bit of a laundry list.

14         First of all, I want to make sure I haven't misled

15   you regarding who my clients are and who I represent.  I refer

16   you to my 2019 statement at Document 555, which is somewhat

17   easy to remember.  I represent seven persons and entities who

18   are in thirteen different direct loans, just to make that clear

19   for the record.  One way we might be able to resolve this

20   motion is by my client offering to pay -- compensate the estate

21   for the $2,020 that it potentially might lose from the

22   servicing of this loan in the remaining two months of its life.

23   I would be willing to make that offer as a condition of

24   granting this motion.

25         Now let's focus for a moment about who Mr. Canepa is.

1    Scott Canepa is not a creditor of USA Commercial or any other

2    of the debtors; he's a direct lender to the Boise-Gowan loan.

3    The contracts should be enforced, a deal is a deal.  The loan

4    servicing agreement is no different.  A debtor-in-possession is

5    required to comply with the law.  That means it's fiduciary and

6    other state law obligations and responsibilities as a mortgage

7    loan broker regulated by the State of Nevada.  Mr. Canepa and

8    the nine other direct lenders who have joined his motion, have

9    satisfied the language of a loan servicing agreement regarding

10   the 51 percent.

11             **THE COURT:**  What about --

12             **MS. DAVIS:**  The argument that Ms. Jarvis --

13             **THE COURT:**  Yes, uh-huh.

14             **MS. DAVIS:**  Ms. Jarvis makes the argument based on

15   her underlying assumption that there are no "defaults" under

16   the arrangement between the loan servicing agreement -- the

17   loan servicer -- I'm sorry, let me start over.  There is no

18   breach of a loan servicing agreement itself.  That's wrong;

19   it's been said about five times.  I've said about five times

20   there are breaches.

21             **THE COURT:**  No, her point was, and if you want to put

22   that back up, her point was that that only triggers in if it's

23   a default, not under the loan servicing agreement, but default

24   as between the borrower.  I believe that's your point, right

25   Ms. Jarvis?  You're saying default isn't between -- default

1    between these two parties, but default between the borrower and

2    I don't --

3         **MS. DAVIS:**  She -- with all due respect, that's only

4    the first half of Paragraph 3, and I've cited the full

5    provisions of it.  I don't have it to pull and put up there,

6    Your Honor, but I would respectfully disagree with the

7    interpretation of the contract.

8         **THE COURT:**  Okay.  So you say it applies if there's a

9    -- if they failed to do something?  It's not merely upon

10   failure to start a foreclosure?

11        **MS. DAVIS:**  Absolutely.  And if you look at the rest

12   of Paragraph 3, which is quoted in my brief, you'll see that.

13   Plus, the statute itself is a little more specific as well.

14   And I cited that in one of my briefs, but unfortunately it's

15   not one of the matters that it is before Your Honor.

16        I heard the colloquy between Your Honor and

17   Ms. Jarvis regarding what the solution to the problem is going

18   to be in the terms of the motion to pay funds.  What I heard

19   was no solution.  What I heard was very few people are going to

20   get paid.  They're going to continue to withhold money.  I

21   don't know that we have a solution the problem.  What I think I

22   really heard is that we don't really have a solution the

23   problem until a plan of reorganization is confirmed.  But I

24   think I also heard that based upon Ms. Jarvis' representations,

25   since the Boise-Gowan loan is a performing loan, and we have 51

1    percent of the direct lenders and 51 percent of the beneficial

2    interests, they have our money, we should be entitled to

3    relief.

4           USA did fail to act in this case, both pre-petition

5    and post-petition.  Pre-petition, the irregularities that

6    they've talked about, but more specifically the two increases

7    of the balance -- or excuse me, of the amount due -- I'm sorry,

8    I'm just kind of curious as to what you're looking at, Your

9    Honor.

10          **THE COURT:**  I'm trying to look -- I'm listening at

11   the same time, I really am.  I'm sorry.  I'm trying to figure

12   out the reference in 645(b).

13          **MS. DAVIS:**  Okay.

14          **THE COURT:**  But I am listening at the same time.

15          **MS. DAVIS:**  It is an --

16          **THE COURT:**  I really do multi-task.

17          **MS. DAVIS:**  You know, I found the older I get, the

18   harder that gets.  The problem I had --

19          **THE COURT:**  I grew up watching TV and doing my

20   homework, so --

21      **(Laughter)**

22          **MS. DAVIS:**  It's Nevada Administrative Code, not NRS.

23   I --

24          **THE COURT:**  Oh, you're right.

25          **MS. DAVIS:**  -- trip myself up every time that I try

131

1   to find it in the NRS.

2           **THE COURT:**  Okay.  Go ahead.

3           **MS. DAVIS:**  So I thought maybe that was the problem

4   you were having as well.

5           **THE COURT:**  Okay.  I'm sorry.  Go ahead then.

6           **MS. DAVIS:**  Focusing back on pre-petition, post-

7   petition breaches.  Pre-petition, the dollar amount of the loan

8   was increased twice in violation of the loan agreement and the

9   loan servicing agreement.  Post-petition, Mr. Allison,

10  notwithstanding the restrictions on the loan broker's license,

11  is still poised to make $125,000 loan that Mr. Bice would

12  testify here today he can't make based upon the limitations in

13  the license.  They can't make it from their operating cash,

14  they can't make it from funds from an individual.  They have to

15  use institutional lender funds, which they don't have, and this

16  loan matures at the end of August.

17          Now we heard a lot about general equitable, you know,

18  exceptions, general bankruptcy policies and all that stuff.

19  I've adequately briefed it in my points and authorities, I

20  won't repeat it, but once again, there is no bankruptcy

21  exception to the rule that somehow enlarges state law rights

22  and remedies or federal law rights and remedies or contractual

23  rights and remedies beyond what they actually are.  You can't

24  put a gloss that isn't there.

25          Regarding the allegations that Mr. Bice's opinion is

1    hearsay, with all due respect to Counsel, Mr. Bice is the

2    regulator, he is the commissioner, he is the person who decides

3    whether or not USA Commercial holds a mortgage license.  I

4    requested judicial notice of his opinion and of his orders in

5    my reply points and authorities.

6            **THE COURT:**  See, I question that he can do that.  Has

7    he talked to the AG?

8            **MS. DAVIS:**  He's here.

9            **THE COURT:**  I got to have an AG's opinion.

10           **MS. DAVIS:**  He's here.  His AG is here.

11           **THE COURT:**  In any case --

12           **MS. DAVIS:**  In any case, Your Honor, he's made some

13   factual findings and conclusions of law that we would very much

14   like Your Honor to adopt on facts that are before this Court

15   right now.

16           **THE COURT:**  Well, they're not really relevant to

17   today's hearing.

18           **MS. DAVIS:**  Well, he --

19           **THE COURT:**  They relate to the $125,000 loan,

20   correct?

21           **MS. DAVIS:**  No.  No, look at Exhibit O of my reply

22   points and authorities.  It is specifically relevant to whether

23   or not we can terminate the loan servicing agreement on the

24   Boise-Gowan loan, based upon pre- and post-petition breaches.

25           **THE COURT:**  Oh, okay.

133

1          **MS. DAVIS:**  That's what it --

2          **THE COURT:**  Well, that clearly goes to my purview,

3     not his.

4          **MS. DAVIS:**  And again, I'm just asking that you adopt

5     his findings and conclusions as your own.

6          I also have a lot of problems with these arguments

7     that, you know, somehow because there's a bankruptcy filed,

8     it's okay to breach some of your fiduciary and contractual

9     duties, but not others, and you get to pick and choose, you

10    don't have to make post-petition payments.  You know, like the

11    Section 105 arguments I've mentioned, there's just not a

12    bankruptcy gloss that allows that.  A deal is a deal is a deal.

13    You've got to comply with your agreements.

14         We've talked about the $125,000 issue.  I'll raise

15    that again when it's before Your Honor next week, unless Your

16    Honor moves it to another date.  Mr. Gordon's suggestion that

17    this can all be solved by a continuance, unfortunately is not

18    acceptable to my client.  At the conclusion of my argument, I

19    read to you a whole list of business and other reasons, which I

20    won't read again, those are the bases for cause for relief from

21    the automatic stay here.

22         The 365 issues are not determined.  You cannot just

23    automatically assume that these contracts are property of the

24    estate.  They're executory, they haven't been assumed.  The

25    *Lovett* and other cases that I've cited govern when and how a

1    contract is brought into the bankruptcy estate and when it is

2    and is not property.

3            Again, the equitable arguments that were made,

4    they're all fine and swell under a traditional situation where

5    the person seeking relief from stay is a traditional lender

6    with a security interest in the primary asset of the estate.

7    That's not us here.  We're talking about the very limited

8    question of have we created colorable basis upon which to grant

9    us relief from the automatic stay to exercise our contractual

10   rights under the loan servicing agreement.

11           We're not cherry picking; we have the requisite

12   support; we are supported by state law and the contract.  We

13   are here asking Your Honor to allow us to enforce our rights to

14   recover our property.  Not property of the estate, our

15   property.

16           My motion did raise the question of adequate

17   protection as alternative basis for cause for relief from the

18   stay.  Clearly if the allegation is true that there is some

19   interest being accrued on these funds that is not being paid to

20   the people whose funds are being held, well it certainly should

21   be at minimum as adequate protection for the delay.  And based

22   upon the discussion that most of these issues are not going to

23   be resolved until we get to the confirmation date, we don't

24   know how long the money will be held.

25           And yes, I do represent chocolate, vanilla,

135

1    strawberry, raspberry, whatever, but they are different, they

2    can't be lumped together.  And in response to Mr. Merola's

3    arguments that Scott Canepa wears different hats, he wears

4    different hats and the setoff rights have to be exercised based

5    upon the basis in which he has invested in those loans.  We

6    can't lump them all together and try and set them off against

7    him, even assuming you have the right to do so, and I won't

8    repeat those arguments either.

9            Give me just a second.  I'll make sure that I've

10   covered everything.  Regarding the comment by Ms. Freeman that

11   the Court may lose jurisdiction if the loan goes away, causes

12   of action don't go away just because you lose possession of

13   something.  You still retain your state law rights and

14   remedies.  There is a serious question regarding Bankruptcy

15   Rule 7001 and appropriate due process and other concerns, which

16   have been briefed in my opposition -- excuse me, in my reply

17   points and authorities.

18           In conclusion, Your Honor, we think we've established

19   the basis upon which to grant this motion.  We are very much

20   hopeful that Your Honor will grant it.

21           **THE COURT:**  Okay.

22           **MS. DAVIS:**  Thank you.

23           **THE COURT:**  All right.

24           **MS. CHUBB:**  I know you want us to be brief.  I'm

25   going to incorporate Ms. Davis' legal arguments and try not to

136

1   repeat those.

2          I do want to comment with respect to the jurisdiction

3   that the Court would have over people who got paid.  The Court

4   has jurisdiction over the fund, but it doesn't have

5   jurisdiction over the members of the fund.  Anybody that would

6   be chased would be out there, so I don't see how that can make

7   any difference.  There's --

8          **THE COURT:**  So we have to sue them?

9          **MS. CHUBB:**  Yes.

10         **THE COURT:**  Outside bankruptcy?

11         **MS. CHUBB:**  You could sue them --

12         **THE COURT:**  You can't do recoupment?

13         **MS. CHUBB:**  I don't know that you can't.  Well, you

14  know what the problem is here --

15         **THE COURT:**  So again, all your clients are -- want to

16  be sued?

17         **MS. CHUBB:**  All my clients want their money and what

18  you want is to figure out a theory, which really isn't your job

19  to do, about how the money that they might have gotten can be

20  set off against the money they're entitled to get.

21         **THE COURT:**  I understand, but you understand, under

22  your theory, that all these clients have -- if you say

23  recoupment doesn't apply -- and it may be recoupment doesn't

24  apply --

25         **MS. CHUBB:**  I'm not taking a legal position.

1          THE COURT:  -- but you're saying -- but you

2   understand that lawsuits -- do you disagree with Mr. Merola

3   that lawsuits would have to be brought?

4          MS. CHUBB:  In order to get money back from people

5   who were overpaid?  No, I don't disagree with that.

6          THE COURT:  Okay.

7          MS. CHUBB:  But I think there may be defenses to

8   those.

9          THE COURT:  I understand.

10         MS. CHUBB:  But I'm -- what I'm saying is it's not

11  a --

12         THE COURT:  But you have to go through the procedure

13  of filing a lawsuit against every one of those people and those

14  people defending the lawsuit?

15         MS. CHUBB:  I know, but if you don't have a right to

16  set off, I'm sorry that's what has to happen.

17         THE COURT:  No, I appreciate it.  Okay.

18         MS. CHUBB:  And my recollection, although I don't

19  have as good a memory as Mr. Merola, was not that the Court

20  said that the debtor didn't have to pay.  I remember the Court

21  saying, I don't see why you don't have to pay, but I'll

22  entertain a motion to hold funds, which is the motion that's

23  before you today.  You haven't made any determination that the

24  debtor can hold onto these monies and the debtor shouldn't be

25  able to because it's not the debtor's money and it will never

138

1   be the debtor's money.  This money -- and nobody has cited

2   anything that says this money doesn't belong to the lenders.

3   It absolutely belongs to the lenders and the lenders should be

4   able to get their money.

5           There is a statutory duty to pay now and there's no

6   basis -- nobody has brought forth a legal theory on which to

7   set off or keep the money or not pay the money.  They've taken

8   the fees out, the statute says upon taking out the fees, you

9   have to pay out to the lenders, and that's just not happening.

10  And there is a prejudice that nobody has mentioned.  The money

11  is sitting there that our clients are supposed to be getting 12

12  percent on it, they don't have their money and I don't think

13  they're going to get interest on it, and if they do, since the

14  money is just bearing interest at four-and-three-quarters

15  percent, it's going to be somebody else's money.  It should

16  just be released now, otherwise they do set -- they do suffer a

17  serious prejudice.

18          And even the debtor has said that it's problematic to

19  set off among different loans.  Maybe it's possible in a single

20  loan to do it, although I don't see how that would happen, but

21  among different loans, how can you possibly even think about

22  doing that.  So we should be getting our money right now.  And

23  the motion that is going to be pay is now apparently going to

24  be pay people if they only have performing loans and they have

25  no non-performing loans, so we're not going to be any further

1    ahead than we are right now.

2          It's still going to be the same argument and we're

3    going to go through a triple briefing process because we don't

4    have an agreement to just respond to the motion to pay.  We're

5    going to get a new motion, we're going to have oppositions, and

6    we're going to have replies.  It's going to cost a fortune and

7    it's just unnecessary.

8          And with respect to our adding more people, I'm sorry

9    if I don't add the people that have come onboard since I filed

10   the last document, I think it would be inaccurate.  So we amend

11   our 2019 as -- on a daily basis -- we don't amend it daily, but

12   on a daily basis come in or drop out or whatever.

13          And with respect to Fertitta, if they owe the money

14   somebody has to try and collect the money, but you got to have

15   a legal theory to do it on.  And in the meantime, that money

16   should get paid out right now.  Thank you.

17          **THE COURT:**  All right.  On Ms. Davis' motion, I'm

18   going to deny it as a preliminary matter and continue it until

19   the July 25th hearing.  Her motion has -- at least we have an

20   actual Movant who meet the criteria of being able to even seek

21   relief, because we have the 51 percent.  And I will assume for

22   the moment, as a preliminary matter, that her interpretation is

23   correct, that she could bring such a motion.

24          But as a preliminary matter, I find that it's more

25   that Defendants will succeed at least at this stage, because

1    there is adequate protection.  The monies are coming in.

2    They're kept there.  And based upon the debtor's representation

3    that as of July 25th, or soon thereafter, the funds will start

4    to be disruption, I find that the lifting of the stay outweighs

5    -- the detriment on lifting the stay outweighs all benefit.

6         We have -- and I think it's very important that we

7    have one of the investors on their loan who opposes.  And I

8    think it goes to show that sometimes the larger investors, you

9    know, operate with clout that they really maybe not advise the

10   individual investors that there's a downside to all this.

11        I agree with Mr. Merola and Ms. Jarvis that if you

12   lift a stay as to one person, first of all, you have the loss

13   of income for the executory contracts.  The servicing rights

14   are viable rights.  We know from all these companies that are

15   servicing companies outside of bankruptcy.  They sell a

16   portfolio for a significant amount of money.  It's a valuable

17   asset, the servicing rights.  Secondly, once you start cherry

18   picking these contracts, I seriously question the jurisdiction

19   issue.  Once those servicing contracts are gone, then what do

20   you use for the forum.  And perhaps this court has

21   jurisdiction, but that means one more issue we have to fight

22   over.

23        Whether or not there is a right of recoupment or

24   offset is a legal issue to be determined.  But why in the world

25   would we want to like decide that issue by sending -- allowing

1    those contracts to go someplace else.  By allowing the

2    servicing to go to some other entity pending a determination of

3    whether or not there's the legal right to offsets means you've

4    decided the issue, because if the servicing is gone, you don't

5    have that fund of money to cause the recoupment or the offset.

6    It's gone.  It's been decided for us.

7            But rather than denying the motion, I'm going to

8    continue this just as a final hearing because her arguments are

9    well taken in the sense that she has a -- 51 percent.  It is

10   performing, so there's money coming in.  And so, arguably,

11   there are rights to terminate the contract.  And since I'm not

12   being paid to lift stay to cause that, I'm going to deny

13   Ms. Chubb's motion.  I understand her problem, but that problem

14   to me is fatal.  We don't have a real movant.  We don't have a

15   movant on a particular loan -- or when I say movant, I mean the

16   amalgam of the 51 percent.  And I appreciate Ms. Davis solving

17   my problem of determining what 51 percent meant, holders of

18   claims or claims held, which -- so Ms. Chubb's motion is denied

19   because there is no real movant.

20           Secondly, there's no basis to lift the stay for

21   non-performing loans at least, vis-a-vie, the way the motion

22   was stated, because the motion was, in essence, lift the stay

23   so we can go collect the loan.  Excuse me.  If there's no money

24   coming in, you're not harmed because there's no money coming

25   in.  To the extents -- now to the extent that you say it's

1   non-performing and you want to go foreclose, the motion was not

2   predicated in that manner.  And it may be on a case by case

3   basis that that's a valid motion to bring, and it may well be

4   the debtor will say fine, you take this dog.  But that wasn't

5   the motion that was brought.

6        Vis a vie performing, again, I don't have a movant in

7   her case, and it indicates for the same reasons I've indicated

8   to Ms. Davis.  It is too soon to take the jurisdiction away

9   from the ability to cause these -- to do the adjustments.

10       There's one tent here.  Everybody is invited to the

11  party and once certain people start leaving the party because

12  they think they're better than everybody else in the party,

13  then there's no way of doing the adjustments.  And they may be

14  -- let me caution.  They may be absolutely correct.  They may

15  -- it may well be there's absolutely no legal theory by which

16  these offsets or recoupments could be done.  And it may well be

17  that you're forced to file suits in other jurisdictions.

18       Now one thing for the trustee to look ahead to is

19  I've taken at your word that you will, indeed, start the

20  process and start making the payments as soon thereafter as you

21  get actual authorization.  And I think Ms. Davis is right in

22  the sense that you're going to have to come up with a mechanism

23  by which if you believe that somebody has been overpaid and

24  should not be paid because of that, you're going to have to do

25  a due process -- whether it's -- it still may be lawsuits,

1   because I'm afraid that you have to do -- I don't know that you

2   do recoupment outside of -- assuming that theory is viable over

3   said all, I'm not sure if you have to bring an adversary for

4   that.  That's something you have to look at.

5           Maybe the thing that I would encourage all of you

6   that represent investors to save yourself time and money is

7   agree that it can be done by motion and just adopt the

8   contested proceeding procedures.  I'm just suggesting it.  You

9   have the absolute right, if an adversary is required, to call

10  an adversary, but you also have the absolute right to treat any

11  contested matter as an adversary.  And of course, we can

12  schedule them for early trials.  You know, you'll get done

13  faster if we do it motion wise, because, you know, just by the

14  nature of the way the adversaries work, they don't get set on

15  scheduling conferences for a while.  We could probably do a

16  faster procedure.  I would urge you to, when you're all talking

17  this next month, look at that as a procedure, how you want to

18  go about doing that, because those issues need to be resolved

19  sooner rather than later, and everybody needs to know where

20  they stand in the process.

21          You had a clarification -- question for

22  clarification?

23          **MS. DAVIS:**  I did, Your Honor.

24          **THE COURT:**  Uh-huh.

25          **MS. DAVIS:**  And thank you.  I appreciate your ruling

1   and your findings.  In the meantime, between now and the final

2   hearing on the relief from stay motion by Mr. Canepa, may I

3   also have an order that we will maintain the status quo, there

4   will be no extension of the loan, there will be no increase in

5   the funding.

6           THE COURT:  Unless there's a separate order.  And I

7   guess that's going to be the July -- June 21st hearing.

8           MS. DAVIS:  We will argue that then, Your Honor.

9   But, you know, absent an order --

10          THE COURT:  Yes, exactly, status quo.  And it's clear

11  that everything is a status quo in the meantime.

12          MS. DAVIS:  Thank you.

13          THE COURT:  Uh-huh.

14          MS. SCANN:  Your Honor, I would object to that as

15  representing the borrower.  I think I'd like --

16          THE CLERK:   I'm sorry.  Could you speak closer to

17  the microphone?

18          MS. SCANN:  Susan William Scann.  I'd like to at

19  least keep that on -- it's on for a shortening time next week.

20  I'd like to at least keep it on.

21          THE COURT:  Yes.

22          MS. DAVIS:  No.  I'm sorry --

23          MS. SCANN:  I'm not talking about.

24          MS. DAVIS:  Yeah, I'm --

25          MS. SCANN:  7/25.

145

1          **MS. DAVIS:**  Yeah, I think --

2          **THE COURT:**  June 25.

3          **MS. DAVIS:**  I think that Ms. Scann misunderstood.

4    What we're saying is subject to any ruling at that hearing.

5    Otherwise, status quo maintained.

6          **THE COURT:**  Yes.

7          **MS. DAVIS:**  Thank you.

8          **MS. CHUBB:**  Is that true of all forums?

9          **THE CLERK:**  I'm sorry, Counsel.  Could you speak into

10   one of the microphones, please?

11         **MS. CHUBB:**  I'm sorry.

12         **THE COURT:**  Yes. This presumes that the debtor --

13   what the debtor is saying is -- that the representation is the

14   money comes in, it's put in the account.  It's accounted for.

15   You -- I think you take the position that you can't make any

16   additional advancements, et cetera, without the permission of

17   the investors and/or permission of the Court.  Is that correct?

18         **MS. JARVIS:**  Well, every action we take we look

19   carefully at the loan servicing agreement.  Some of them

20   require consent of the lenders, in which case, you know,

21   additional funding, et cetera, we brought -- we bring to this

22   court.  We're not doing anything that, you know, we can't do

23   normally, that we don't bring to the Court.

24         In addition, as you know, there are some issues that

25   we can do under the contracts, like give the partial releases.

1    But because those were, you know, issues that we wanted to make

2    sure everyone had a chance to be heard on, we brought those to

3    the Court anyway.

4            THE COURT:  Okay.

5            MS. JARVIS:  You know, there are things like, you

6    know -- I mean forbearance, for instance, we don't necessarily

7    have to get permission.  But again, we have filed a motion to

8    bring that to the Court.  So anything of a sensitive nature,

9    even if we have the absolute right to do it under the servicing

10   agreement, we have been careful to follow procedures to bring

11   to this court so that parties have an opportunity to be heard.

12           THE COURT:  Okay.  So just to clarify, vis a vie

13   Ms. Chubb's motion, her motion was denied.  But vis a vie the

14   motion to withhold, that's granted on the condition that the

15   status quo stays the same except to the extent that you are

16   allowed to do something under the loan servicing agreement

17   and/or have a court order.

18           MS. JARVIS:  Correct, and that is exactly what we

19   asked for, Your Honor.  We were not asking for any substantive

20   determinations as to who these funds --

21           THE COURT:  Right.

22           MS. JARVIS:  -- belong to, just merely a maintenance

23   of the status quo.

24           THE COURT:  Right.

25           MS. JARVIS:  And let me just clarify, Your Honor.  We

1    have approximately $65 million in the collection account.  We

2    do intend to -- our motion is intent to distribute that.  I

3    mean this -- you know, it was suggested that we weren't really

4    going to distribute anything and we were just going to say it's

5    gone -- going to go on and on determining -- no.  Our intent is

6    to sort these out, come up with a mechanism to deal with it,

7    and distribute the 65 million to investors that now sits in the

8    collection account.

9              **THE COURT:**  Okay.

10             **MR. MEROLA:**  Your Honor, just real briefly, a

11   housekeeping matter, because I think things are going to thin

12   out after you resolve this one.  And because it's a consumer

13   case and we have a lot of people, I hate to be the ugly voice

14   of reality, but July 25th is shaking up to be Christmas, my

15   birthday, Mardi Gras, and New Year.

16             **THE COURT:**  Yeah.

17             **MR. MEROLA:**  We argued this for three-and-a-half

18   hours.

19             **THE COURT:**  I know.  You've got the whole day.

20             **MR. MEROLA:**  We have another hearing date on August

21   4th.  Now I'm not suggesting anything specific should be moved

22   there.  But it might be better for all concerned, since so many

23   of the investors either listen on the telephone or stay here,

24   that we're more realistic about how much we can accomplish on

25   the 25th, and that there are other matters -- it's just a week.

1   We're not really trying to ruin anyone.  But to be more

2   realistic about how many matters we can handle on the 25th, I

3   have a feeling that the motion to distribute funds, with

4   whatever procedure the debtor comes up with, might be a full

5   day problem.  And then there's lots of other things that keep

6   getting kicked to July 25.

7           **THE COURT:**  Well, you know, there's something to be

8   said for that.  Let me just talk aloud and hear.  I want that

9   motion heard on full notice, if you will, full meaning 30 days,

10  25 days.  It may -- rather than an arguable order for any time,

11  maybe it does make more sense to order that you file that

12  motion by July 7th and then it heard August 4th.  That's not

13  quite 30 days, but we're close enough.  Does that -- I'll let

14  you talk about that during the break, the timing issue.

15          Let me indicate one other thing.  Any other things

16  you want to talk about during the break on this issue?  No.

17  Okay.  Now on -- I know you think it's going to be easy, but I

18  got some problems with the confidential -- well, and of course,

19  there was some fights about it.  I've got some problems with

20  the confidential -- the committee confidentiality.  Let me tell

21  you what my basic concern is, so you can talk about it during

22  the break.  And I've got my list -- my Chapter 13 calendar is

23  not until 2:00 now.  So I moved them until 2:00, but in any

24  case, my concern on the confidentiality agreements and the

25  protocol for how you deal with the committee's -- because of

1    the new amendments to BAPCPA.

2         You know, I appreciate the fact that you copied the

3    order from *Revco*, but this isn't -- I mean *Revco* has similar

4    problems but not quite the same problems.  I am hard pressed to

5    understand what really there is in the way of confidential

6    information.  So one thing I'm going to want to know -- and

7    maybe what we should just do is continue this to next week --

8    is I want to know what in the worlds kind of confidential

9    information are you talking about.  I tend to think that

10   Mr. Gordon's revision of the agreement is probably a bad one,

11   because when you define confidential information in your

12   footnote, in your pleading, it's like everything is

13   confidential.

14        I mean it's a great boiler plate, but we're not

15   talking about a public company.  I mean a public company in the

16   true sense.  Nor are we talking about a company in which you've

17   got trade secrets.  I mean, you know, maybe the trade secret

18   was how in the world they did all this.  But, you know, not

19   legitimate trade secrets.  So that's my concern.  You can talk

20   about that for a few minutes during the break.  If you'd rather

21   just, with those thoughts, continue it.

22        And then I think that's all other than I did want to

23   talk about whether or not we really should hear some of these

24   things on the 25th.  I need to -- I know Mr. Gordon had

25   objected.  Oh, one thing.  I, quite frankly, don't think the

1   attorney's protocol fees should be June 25th.

2           **MS. JARVIS:**  Well, let me -- yeah, let me address

3   that, because we actually -- the only reason we put it there is

4   we need to know for budgeting purposes.  We need to have some

5   -- I mean on an ongoing basis we've got to know where we're

6   heading, because this is very important for budgeting.  What we

7   were going to propose to the committees this afternoon is that

8   the committee counsel and professionals simply agree to submit

9   statements in July, so we can know for budgeting purposes, and

10  we continue the motion until July 25th.

11          **THE COURT:**  Okay.

12          **MS. JARVIS:**  And the reason why we want to do that,

13  we have no intention of asking, you know, for professionals to

14  be paid before we ask for investor funds to be distributed.

15  That's important.  And --

16          **THE COURT:** Okay.  This was just a protocol.  I think

17  that --

18          **MS. JARVIS:**  Yes.

19          **THE COURT:**  Makes more sense.

20          **MS. JARVIS:**  Yes.

21          **THE COURT:**  Okay.  So we'll take a --

22          **MS. SCANN:**  So, Your Honor.

23          **THE COURT:**  Yeah, Ms. --

24          **MS. SCANN:**  One other -- you had indicated at the

25  beginning that you wanted to talk at the end about the order

1   shortening time for next week.  The hearing is on the 21st.

2        **THE COURT:**  That was what I was talking about, these.

3        **MR. MEROLA:**  That was -- right.

4        **MS. SCANN:**  Oh, there were -- so that doesn't apply

5   to the -- there's an application to forbear, that's the one

6   that I'm interested in, the debtor's application to forbear, to

7   allow funds to be used in one of the particular loans, Franklin

8   Stratford.  Those are still going to go forward then on the

9   21st?

10        **THE COURT:**  Well, talk about it on the break and see

11   whether or not it really should.  And Mr. Gordon was the one

12   that raised those objections.  So I guess what I just wanted to

13   say is I was willing to say is I was willing to listen to about

14   -- wait a minute, does this really have to have then, can it be

15   continued as opposed to does it need to be heard then.  And

16   that was my only concern, because --

17        **MS. SCANN:**  Yeah.

18        **THE COURT:**  -- I did sign the order shortening time.

19   And then I'm thinking after the fact, wait a minute, some of

20   these things could wait.  I mean, in essence, I've sort of

21   spoiled you, because you get a two-week turnaround on all this

22   stuff.  Well, you know, normally, it would be 30 days.  You

23   know, everybody has gotten so used to a two-week turnaround.

24   And of course, we've done a lot in the beginning, you know, for

25   example, like hiring the counsel.  We had to put that on for

1   the 25th, because counsel has to know whether or not they're

2   employed.

3          **MS. SCANN:**  Right.

4          **THE COURT:**  So look at what you've got set on this

5   latest order shortening time for the 25th to see if that's

6   something that should --

7          **MS. SCANN:**  You mean for the 21st?

8          **THE COURT:**  21st.  Excuse me.

9          **MS. SCANN:**  Right.

10          **THE COURT:**  I keep messing up those days.  June 21st.

11   I apologize.

12          **MS. SCANN:**  June 21st.

13          **THE COURT:**  All right.  So with that, we'll take

14   about a five --

15          **MS. CHUBB:**  Did you --

16          **THE COURT:**  I'm sorry.

17          **MS. CHUBB:**  Did you rule on the motion to pay and the

18   motion to withholding payment?

19          **THE COURT:**  Yeah.

20          **MR. MEROLA:**  That was ruled.

21          **THE COURT:**  Well, that's what I just said.  I said on

22   the motion to withhold I would grant -- I guess I got

23   interrupted.  I'm sorry.  I -- yes, I'll grant that motion

24   pending -- until July 25th.

25          **MS. JARVIS:**  Well, actually, if you're pushing it

1   back to August 4th, you know, time to extend --

2           THE COURT:  Oh, August 4th, which --

3           MS. JARVIS:  We need to August 4th.

4           THE COURT:  And the reason being, I find there's good

5   reason to withhold the payment, so that the debtor can do the

6   accounting as between the parties to preserve all the rights

7   the debtor may have, if any --

8           MS. CHUBB:  Okay.  Well, may I have my --

9           THE COURT:  -- to recoup but are set off, et cetera.

10          MS. CHUBB:  May I have my motion continued to the 4th

11  of August too then?

12          THE COURT:  Which motion?

13          MS. CHUBB:  My motion to pay.  I have --

14          MR. MORELA:  It was denied.

15          THE COURT:  Yeah, I have no -- you know, the only

16  problem with that is I appreciate exactly what you're saying,

17  but Ms. Jarvis' motion is going to be much more complete.

18          MS. CHUBB:  Well, that's fine, and you can ignore

19  mine on that date if it turns out.  But I haven't seen her

20  motion.  I don't know what it's going to say.

21          THE COURT:  Well --

22          MS. CHUBB:  It may be, you know, to pay two people.

23  I like my motion to pay more.

24          THE COURT:  Well, but I don't have -- I mean the

25  problem with your motion is you don't tell me who you want to

154

1    pay and what the basis is.  You just say you want to pay them,

2    because they're your clients.

3        **MS. CHUBB:**  I say I want to pay them because it's

4    their money.

5        **THE COURT:**  They're your clients.  You don't give any

6    basis what loan they've got, how much they're owed, whether

7    they're performing, whether they're non-performing.

8        **MS. CHUBB:**  You're saying you can withhold until

9    then, and I'm saying on that date I want to know if they have

10   to pay.

11       **THE COURT:**  I guess we can continue it, but --

12       **MS. CHUBB:**  Well --

13       **THE COURT:**  You're going to have to -- the motion as

14   written isn't sufficient.  You decide what you want to do.

15       **MS. CHUBB:**  Okay.  Well, maybe I supplement.  Thank

16   you.

17       **THE COURT:**  I mean we don't know who you want to pay

18   and what basis and what loan.

19       **MS. CHUBB:**  I want every client that I have who is in

20   a performing loan whose --

21       **THE COURT** RECORDER:  I'm sorry.  You're too far away

22   from the microphone again.

23       **MS. CHUBB:**  -- whose money they are holding to get

24   paid.  And they don't want to do it, and that's fine.  But I

25   don't want to just be --

155

1          THE COURT:  That's not what we said.  I don't know

2   where you've been for two hours -- three hours.

3          All right.  Let's take a short recess and we'll talk

4   about the committee issues.

5          THE CLERK:  All rise.

6       **(Recess taken from 1:30 p.m. to 1:46 p.m.)**

7          THE CLERK:  Bankruptcy court is now in session.

8          THE COURT:  Be seated.  You know, I don't think I

9   specifically addressed Mr. LePome's motion which was that

10  motion was denied, however, without prejudice to the defenses

11  that are raised in the interpleader suit.

12          MR. SCHWARTZER:  That would be --

13          MR. LePOME:  Ma'am, I have no problem with getting

14  the interpleader.

15          THE COURT::  Okay.  Thank you.

16          MR. SCHWARTZER:  Okay.  So we'll prepare an order

17  saying denied without prejudice?

18          THE COURT:  Yes.

19          MR. SCHWARTZER:  And there's also, I think, one by a

20  Mr. Ben Encasa (phonetic) on the same basis that he --

21          THE COURT:  I did that the last time.  I don't --

22          MR. SCHWARTZER:  He did it.  I think he filed

23  something else, a new motion and set it -- somehow set it on

24  calendar today too.  So I just want to make sure the new motion

25  is also denied --

1          **THE COURT:**  Right.

2          **MR. SCHWARTZER:**  -- without prejudice.

3          **THE COURT:**  Right.  Okay.

4          **MR. MEROLA:**  Your Honor, based on your comments on

5    the committee protocol, we'd like to kick that over to next

6    week and the debtor wants to file a supplemental declaration to

7    address the confidentiality issue you raised.

8          **THE COURT:**  Okay, good.  Because again, what I'm

9    looking at is it's one thing to say keep confidential

10   information but I have no real sense of what is confidential.

11         **MR. MEROLA:**  And I think that issue is best developed

12   on a complete evidentiary record and we'll let Mr. Allison

13   submit a declaration.

14         **THE COURT:**  Okay, good.

15         **MR. GARMAN:**  Your Honor, on behalf of the direct

16   lenders committee, I'm happy to kick the confidentiality

17   agreement issue over for another week and we can deal with it

18   next week.  But we're at a log jam which is impacting the case

19   and perhaps it's just best to address it now.

20         **THE COURT:**  Hang on a second.  Do -- is security out

21   there?

22         **MR. UNIDENTIFIED:**  Right here.

23         **THE COURT:**  Okay, thanks.  The marshals.

24         **COURT RECORDER:**  And would you make your appearance

25   please for the record?

1          **MR. GARMAN:**  I'm sorry, Greg Garman with Gordon and

2     Silver on behalf of the direct lenders committee.

3          **COURT RECORDER:**  Thank you.

4          **THE COURT:**  Okay, sorry.

5          **MR. GARMAN:**  Your Honor, the direct lenders committee

6     is a different animal, dramatically different in fact.

7          While there may not be a need for typical unsecured

8     creditors, trade creditors, to have access to things likes

9     notes, appraisals, deeds of trust and the like, both under the

10    Nevada Administrative Code and under the Loan Servicing

11    Agreement, these are documents --

12          **THE COURT:**  Right, but are they denying you access to

13    the notes?

14          **MR. GARMAN:**  Yes.  Right now, we've been unable to

15    negotiate a confidentiality agreement with the debtor and I've

16    been unable -- I had to issue a subpoena on Friday to try and

17    get the names, addresses, e-mail, contact information and the

18    identity of the loans that our individual constituents were on.

19          **THE COURT:**  So why is that even possibly

20    confidential?

21          **MS. JARVIS:**  We don't have that, your Honor.  I mean,

22    we've got notes with people's listed -- you have to create

23    somehow a list of each of the investors and figure out their

24    addresses.  We have to take and try to mix and match them

25    ourselves.  I mean, we don't have that information to turn

158

1    over.  We have notes we can turn over but we don't have, you

2    know, kind of the notes with addresses.

3              **MR. GARMAN:**  Okay.

4              **THE COURT:**  Okay.  Well, the motion also -- and the

5    motion dealt with 1108 duties or not 1108, 1106 duties.  It

6    didn't deal with getting information from the debtor.

7              **MR. GARMAN:**  No, your Honor, I --

8              **MS. JARVIS:**  And, your Honor, there actually is a

9    different section between the planning committees who actually

10   are -- they, themselves, are participants in certain loans and

11   the direct lenders committees, who their constituents are

12   participants in certain loans, but the committee itself is not

13   participants in that loan.

14             So those are issues we just need to sort out and, you

15   know, what we would like to do is to have the opportunity this

16   week to identify -- because I think what your Honor is saying

17   is, you know, the confidential -- the confidentiality, I'm just

18   not sure what you're talking about.  We would like to identify

19   what we think is confidential and would like preserved in the

20   -- so the burden shifts to us now to come up with kind of a

21   list of things that we think need to be held confidential and

22   need to be put in that confidentiality agreement.

23             **THE COURT:**  But again though, the motion though dealt

24   with the committees duties to respond, right?  It didn't deal

25   with --

1        **MS. JARVIS:**  What it did -- right.  I mean, you could

2   enter the order on the committees' duties to respond because

3   all it says is that if they get confidential information this

4   is how it's protected given the new changes in the code.

5        What -- the issue we had with this is that we would

6   like to reach an agreement on a single confidentiality

7   agreement so that we don't end up having to live by two

8   different rules.

9        **THE COURT:**  Well, and my concern also went broader.

10   I mean, I was focusing on the committees' duties to its

11   clientele.  I thought quite frankly the confidentiality

12   agreements that the committee wanted to negotiate vis-à-vis

13   their clientele was too broad.  I and let me -- so I think

14   Congress amended that section for a reason and to take it all

15   back again to me without some good reason and/or explanation,

16   "What in the world are you talking about?" is too broad.  All

17   these investors deserve to know --

18        **MR. GARMAN:**  Your Honor, I share your opinion and let

19   me tell you what my opinion of the protocol motion is.

20        **THE COURT:**  Well now, you can do one of two things.

21   We can argue this today or not.

22        **MR. GARMAN:**  Your Honor, I'm happy to go talk with

23   the debtor.  However, the problem is that there are meetings

24   today with the committee members.

25        **THE COURT:**  Well, what do you need between now and

1   then and what -- how are you going to get it and what do you

2   want?

3       **MR. GARMAN:**  We will again attempt to address with

4   the debtor the confidentiality and try to get access to

5   distributory constituents by next week.

6       **THE COURT:**  Well, what do you want between now and

7   then?

8       **MR. GARMAN:**  I'd like access to some information from

9   this debtor.  I'll tell you.  That's what I'd like.

10      **THE COURT:**  Well, what haven't you given them?

11  You've given them notes, right?

12      **MR. GARMAN:**  They've given us nothing.

13      **MS. JARVIS:**  Well, let me tell you, your Honor.  Last

14  week we also had a meeting with the committees because we have

15  been working very hard to try to get these statements done and

16  we did ask the committees, "Give us a break.  Let us please

17  concentrate our efforts on getting this."  There was an

18  agreement among the committees that they would try to give us a

19  list of due diligent stuff that they needed so we could provide

20  it in an orderly manner.  It's very, very difficult to take --

21      **THE COURT:**  Why don't you just let them come in --

22  because the problem is and I know how this works.  If you want

23  File A and the auditor is working on File A, then the file

24  can't work on File A.

25      **MR. GARMAN:**  Oh, of course, I appreciate that, your

1    Honor.

2            THE COURT:  So, I see two separate issues.  Again,

3    one is what does the committee have to disclose to its members

4    and separate and apart which is not before me is any kind of

5    motion to compel or suggestion that they're just not turning

6    things over then.  That's not in any of these motions.  The

7    only motion I have is what is the -- what must be disclosed

8    from committee counsel and the committee to its constituency.

9            MR. GARMAN:  I agree with that.  I think that the

10   issue of the confidentiality was raised in their supplemental

11   pleading they filed yesterday and that was what I was

12   addressing.  So, that's where I came from, your Honor.

13           THE COURT:  Okay.  Well, I'm going to want to know

14   again what in the world is confidential in this case on both

15   sides, from -- going from you to the committees and from the

16   committees to constituency.

17           MR. GARMAN:  So we'll address that, bring it back

18   next week and hopefully we'll work it out.

19           THE COURT:  Okay.  Yes.  Now on -- you know, I didn't

20   bring out that list of what's next week.  I think we agreed

21   that the protocol motion would be continued to the -- on the --

22   excuse me.  The fees will be continued until July 25th,

23   correct?

24           What's the decision on the motion to distribute?

25   Does August 4th make more sense to everyone?

162

1          **MS. JARVIS:**  That's fine.

2          **MR. UNIDENTIFIED:**  Yes.

3          **THE COURT:**  Okay.  So August 4th will be the motion

4   to distribute as long as the motion is filed by July 7th.

5          **MR. MEROLA:**  Your Honor, we had a discussion,

6   Mr. Schwartzer and I.  It seems to me that everything involving

7   payment, whether it's relief from stay, whether it's a motion

8   to suspend --

9          **THE COURT:**  Okay.  I agree.

10          **MR. MEROLA:**   -- whether it's a motion to terminate,

11   should all be on one day and then everything else which by that

12   time will probably be some modifications of loans,

13   administrative stuff, the Knudson (phonetic) procedure, put

14   that all on the other day.

15          **THE COURT:**  Okay.  Now let me indicate to you, if

16   it's not filed by tomorrow nothing is going on that July

17   calendar.  I'm not going to sign -- I'm not going to have

18   anybody sign orders shortening time.  So if you think you want

19   something filed for that July 25th calendar that isn't already

20   filed --

21          **MR. SCHWARTZER:**  No, today is June 15th.

22          **COURT RECORDER:**  I'm sorry, Counselor, could you

23   speak into a microphone please?

24          **MR. SCHWARTZER:**  I'm sorry.  Your Honor, today is

25   June 15th.  To get on the July 25th calendar wouldn't we have

1   until --

2           THE COURT:  Oh, right.

3           MR. SCHWARTZER:  -- June 28th?

4           THE COURT::  Okay.  But what I mean is no order

5   shortening time.

6           MR. SCHWARTZER:  Yes.

7           MR. MEROLA:  I understand.

8           THE COURT:  Sorry.  I'm sorry.  Who does CPR around

9   here?  They've got those little machines hanging on the wall.

10  I apologize.

11          MR. UNIDENTIFIED:  We lost 12 days.

12          THE COURT:  Yes.

13          MR. LePOME:  Your Honor, wished to be reminded about

14  the 21st of June and the order shortening time there.

15          One month ago, I filed notice with the Court and it's

16  been circulated to everybody and of course it's on the internet

17  now that I'm going to be in Hawaii at the bar convention.  I'm

18  partnering on this case with Nancy Allf.  That has to be now

19  signed off on by all of my clients because of a new ethical

20  rule that went into effect May 1st and we can't then respond to

21  everything on these orders shortening times because of those

22  situations.  I can't even appear and neither can -- even if I

23  get my co-counsel on board, she can't appear either.

24          So, we've got a real problem and I wish to address

25  mostly, I'm not going to address it now, but we need a real

164

1    problem in addressing the $58 million proposed loan with no

2    payments for a year at 7 1/2 percent.

3            THE COURT::  Well, get somebody here to represent

4    your client.

5            MR. LePOME:  That's all on short -- of shortening

6    time.

7            THE COURT:  I mean --

8            MR. LePOME:  Can we move that to the 25th?  That's

9    what I --

10           THE COURT:  Which motion is this one?

11           MR. LePOME:  The one that you just shortened the time

12   on to approve an agreement with partners --

13           THE COURT:  Okay.

14           MR. LePOME:  -- that's set for the --

15           THE COURT::  And why does that have to be heard on

16   the 21st as opposed to July 25th?

17           MR. LePOME:  That's what I can't figure out.

18           THE COURT:  That's what I'm asking counsel.

19           MS. JARVIS:  Your Honor, the reason we know it's set

20   for July 21st is there are some transactions pending which

21   would close in the next month on -- that involve the collateral

22   that we've asked for and, therefore, we don't want to lose the

23   opportunity to monetize some of that collateral and bring that

24   back into the estate.  That's our concern as to why we've asked

25   for it to be heard immediately.

1        **THE COURT:**  Okay.  Well, and you're telling me that

2   everything has -- the things have to close by July 25th in the

3   meantime?

4        **MR. SCHWARTZER:**  Well, some things.  For example, on

5   the motion to approve the agreement with investment partners.

6   There are some other -- there are things that will occur

7   between June 21st and July 25th.  We think there's going to be

8   a sale of the Royal Hotel in which there should be -- that

9   portion of the deal will be monetized.

10       We need to have the motion at least on calendar to

11  make sure we have the approval to accept that as a partial

12  payment --

13       **THE COURT:**  Okay.

14       **MR. SCHWARTZER:**  -- under the agreement.

15       **THE COURT:**  All right.  Well, we'll have to keep it

16  on.  Whether or not I grant it or continue it for that day is a

17  different story.  I will give you until three days before -- of

18  course, you know, it's final June 12th.  So 10 days is June 20

19  -- I'm sorry, it's final the 12th, the 21st.

20       **MR. SCHWARTZER:**  Yes.

21       **THE COURT:**  Okay.  So I'll give you until Monday to

22  file your oppositions on that then.

23       Why in the world did you guys wait until June 12th to

24  file those?  You know, you told us you had it on Friday.  It

25  never got submitted until Monday.

1          **MS. JARVIS:**  It was -- on the IP it was barely -- we

2   had a previous agreement that had been offered to us.  It was

3   not acceptable.  It was finally signed up, you know, to be

4   acceptable right before that time.

5          **MR. SCHWARTZER:**  I think the motion was filed on the

6   19th.

7          **THE COURT:**  No.

8          **MR. SCHWARTZER:**  It would have shortened time.

9          **THE COURT:**  None of that ever came through until

10  Monday.  Nothing was uploaded until Monday.

11         **MR. SCHWARTZER:**  I think the order shortening time

12  was not uploaded until Monday, your Honor.

13         **THE COURT:**  Right.  And so --

14         **MR. SCHWARTZER:**  I understand the motion was filed --

15         **THE COURT:**  Well, did anybody know about the motion?

16         **MR. SCHWARTZER:**  The problem is is getting -- trying

17  to get information back from five counsel on a request for a

18  order shortening time.  The rules require us to send something

19  out and we did it by e-mail on that day and then you have

20  committee counsel who then feels on some things they have to

21  speak to their committee chairman.

22         **THE COURT:**  Well, all right.  I'll hear it on the

23  21st but, you know, I may continue it and I may --

24         **MR. SCHWARTZER:**  I -- we understand.

25         **THE COURT:**  -- continue it until July 25th.  I am not

1    going to have a visiting judge hear this and I apologize but,

2    you know, I -- this case came about late.  And again, most

3    cases get heard on 30 days notice.  I mean, two weeks' notice

4    is nuts.  So, you know -- and the only reason I signed it was

5    because of that and I probably shouldn't of because, you know,

6    I shouldn't --

7            **MR. SCHWARTZER:**  Well, we can tell you that it's very

8    important that both that motion and the motion to forbear at

9    least in part be considered on the 21st, your Honor.

10           **THE COURT:**  Well, they're going to be --

11           **MS. JARVIS:**  And the DIP motion.

12           Your Honor, we are meeting with the committees this

13   afternoon to go through in detail with them about these three

14   motions.  That was what we had noticed beforehand because we

15   understand that it is on shortened time.

16           It will be fine with us if the responses -- we prefer

17   that they be by noon on Monday so we have at least one day to

18   reply.

19           **THE COURT:**  Okay.  All right.  So I'll give everybody

20   Monday until noon to file their oppositions.  Everyone must get

21   me immediately their courtesy copies and then file their -- you

22   know, I guess you'll have -- I guess we'll just have to orally

23   hear a reply.

24           **MR. MEROLA:**  Your Honor, as a housekeeping matter,

25   there seems to be a mistake in the case management order.  On

1  these OSTs, I thought it was the Court's order that replies be

2  within three business days not five and the order says five and

3  that's caused a little disconnect about when things are due.

4          THE COURT:  Okay.  So -- I'm sorry, the order says

5  what?

6          MR. SCHWARTZER:  It says that --

7          MR. MEROLA:  Oppositions, I'm sorry.

8          MR. SCHWARTZER:  -- the oppositions --

9          MR. MEROLA:  The oppositions to motions on OSTs.

10         THE COURT:  Well, I probably did originally do --

11  well, no, it should be at least two days before because rarely

12  will I have these ten days and that's what was the problem

13  because you guys didn't get this uploaded to me in time.

14         MS. JARVIS:  Your Honor, can I ask, I know that --

15  you know, he has the problem of dealing with the four different

16  committees and trying to get everybody to agree and

17  orchestrating a time.

18         Is there any way we could simply --

19         THE COURT:  Just obviate that requirement.  Just

20  submit them.

21         MS. JARVIS:  Can we file them, the motion?

22         THE COURT:  Just file them.

23         MS. JARVIS:  That was the problem in the delay.  And

24  then we can --

25         THE COURT:  So just file them.  And again, I normally

169

1  would not sign in less than ten days but I was told this was

2  coming Friday and never got it until Monday, so.  I even looked

3  all weekend for the order and didn't get it.  All right.  So

4  we'll have the 21st but the attorney motion is not -- that will

5  be moved until July 25th.

6          If you, all of you would talk about the calendar of

7  these matters and submit revised notices.

8          **MR. GORDON:**  Your Honor, how much time do we have on

9  the 21st, may I ask?

10         **THE COURT:**  We have all day.

11         **MR. GORDON:**  Okay.  Because I'm -- with regard to the

12 DIP loan and with regard to the --

13         **THE COURT:**  Well, I know, it's going to be

14 controversial.

15         **MR. GORDON:**  I'm going to anticipate that -- that

16 those hearings are going to take all day giving testimony.

17         **THE COURT:**  Yes.  I have all day.  I have two o'clock

18 scheduling conferences but that will take a half an hour.

19         **MR. GORDON:**  So the other matter and we're trying to

20 rush around getting answers -- responses to in these motions is

21 -- the other one is the Fertitta, the motion to disqualify.

22         **THE COURT:**  Oh, that reminds me.  You know, I don't

23 know the answer but I have a concern about committee counsels

24 representing one particular entity and they are voted to stay

25 on the committee.  I only alert you to that because I don't

1   want you to get taken up by the side later when I say, "Wait a

2   minute.  What were you doing representing him, whether or not

3   he wins or loses, as opposed to his counsel?"

4           MR. GORDON:  What I was going to say in this case is

5   the following.  Given the time, given the -- now that issue

6   that the Court has raised which we need to look at, I don't see

7   any reason why this needs to be on for the 21st.  There's no

8   reason for it to be.  Why isn't --

9           THE COURT:  Well, because he's going to be the person

10  then.  If he's on the committee, he's going to dominate as to

11  whether or not what happens on the 25th, that's the problem.

12          MR. GORDON:  He's one of six members on the

13  committee.  He's one vote of six members on the committee.

14          THE COURT:  Well, but that's the -- but the problem

15  is --

16          MR. GORDON:  I'm just saying that --

17          THE COURT:  -- if it's somebody else that should be

18  on there.  That's a real problem.

19          MR. GORDON:  Your Honor, then have it but I'm just

20  saying I anticipate that when we're on the 21st we're not going

21  to hear everything.  I'm just trying to figure out what we can

22  do to get matters continued over so that we're prepared to deal

23  with those issues that need to be dealt with.

24          THE COURT:  Okay.  So -- okay.  So if you provide us

25  revised schedules.  You have all day on the 21st except for a

1    half hour I've got some scheduling conferences.

2              **MS. SCANN:**  Your Honor, we still have that motion to

3    forbear on the 21st.  I had talked to Mr. Gordon.  He doesn't

4    have an objection to the Franklin Stratford portion of its days

5    on the 21st --

6              **THE COURT:**  Okay.

7              **MS. SCANN:**  -- because that's absolutely crucial to

8    Franklin Stratford, my client.

9              **THE COURT:**  Okay.  All right.  So I'll let the

10   parties do a revised schedule.  Just make sure everybody is

11   noticed vis-à-vis a telephone number.  Make sure that telephone

12   number is on the web.

13             Again, I appreciate your doing that.  You know, you

14   have the ability to use those services and you can charge

15   individuals back.  It may be -- that may be more -- harder than

16   what it's worth.

17             Mr. Landis?

18             **MR. LANDIS:**  I've tried not to say very much this

19   whole hearing, your Honor.

20             **THE COURT:**  You've been very good.

21             **MR. LANDIS:**  And I want to make sure that I'm clear

22   on one thing.

23             **THE COURT:**  Yes?

24             **MR. LANDIS:**  There were five motions filed on

25   shortened time last Friday, June 9th.

1           Am I correct in understanding that the parties, as a

2   result of this colloquy, we have until noon on Monday to file

3   resistances --

4           THE COURT:  Yes.

5           MR. LANDIS:  -- to all of those motions?

6           THE COURT:  Yes.

7           MR. LANDIS:  That's all I needed to know.

8           THE COURT:  Thank you.

9           MR. LANDIS:  Thanks, Judge.

10          THE COURT:  And thank you for clarifying that.  All

11  right.

12          MR. LEVINSON:  Your Honor?

13          THE COURT:  Uh-huh?

14          MR. LEVINSON:  Marc Levinson for the diversified

15  committee.

16          Following up on that last colloquy, what about the

17  so-called Knudson motion which is now being kicked to July

18  25th?  Do we still need the responses on Monday for that?

19          THE COURT:  No, no, no.  It's just those things that

20  were set on shortened time.

21          MR. LEVINSON:  They will still be --

22          THE COURT:  By that I mean those things that were

23  filed on June 12th for June 21st.

24          MR. LEVINSON:  That are still on for June 21st?

25          THE COURT:  That are still on for June 21st.

1          **MR. LEVINSON:**  Okay.

2          **MR. MEROLA:**  And, your Honor, many of us would have

3     objected to some of the matters on OSC but your Honor

4     lightening quick entered the orders.  We reserve our right to

5     object to the timing of and the scheduling of those matters on

6     the merits.

7          **THE COURT:**  Yes, exactly, and I apologize.  I didn't

8     look at the schedules and I guess I was too sensitive to the

9     timing and I should have thought about it some more.  But

10    again, you know, if the point is it can't be decided then I may

11    well kick it.  That's one of the reasons I want to address it

12    in advance.  Think hard about if you really think it has to go

13    on that date because if it gets to that date, notwithstanding

14    all your effort, and I say, "Wait a minute, this doesn't need

15    to be decided now," I'll kick it and clearly we've taken care

16    of the attorney issue, so.

17         All right.  Thank you very much.  We'll take a recess

18    while we change people here.

19         **ALL COUNSEL:**  Thank you, your Honor.

20         **THE CLERK:**  All rise.

21      **(Proceeding was adjourned at 2:04 p.m.)**

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    July 9, 2010
                Signed                                            Dated


                        *TONI HUDSON, TRANSCRIBER*