UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA
LAS VEGAS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO:  06-10725 |
| | ) | CHAPTER 11 |
| | ) | |
| USA COMMERCIAL MORTGAGE COMPANY, | ) | Las Vegas, Nevada |
| | ) | |
| | ) | Friday, August 4, 2006 |
| Debtor. | ) | ( 9:39 a.m. to 11:05 a.m.) |
| | ) | (11:21 a.m. to  1:15 p.m.) |

MOTIONS HEARING

BEFORE THE HONORABLE LINDA B. RIEGLE,
UNITED STATES BANKRUPTCY JUDGE

Calendared Motions:        See page 2

Appearances:               See pages 3, 4

Court Recorder:            Helen Smith

Transcribed by:            Exceptional Reporting Services, Inc
                           14493 South Padre Island Drive, #A-400
                           Corpus Christi, TX 78418-5940
                           361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>CALENDARED MOTIONS:</u>


1    A    MOTION TO TEMPORARILY HOLD FUNDS PENDING
A DETERMINATION OF THE PROPER RECIPIENTS, AND MEMORANDUM OF
POINTS AND AUTHORITIES (AFFECTS ALL DEBTORS, DE #173);

2    B    MOTION FOR RELIEF FROM STAY PROPERTY:  VARIOUS REAL
PROPERTY WITH CERTIFICATE OF SERVICE (AFFECTS USA COMMERCIAL
MORTGAGE CO., DE #208);

3    C    MOTION TO COMPEL DEBTOR TO CONTINUE TO FORWARD LENDER
PAYMENTS TO DIRECT LENDERS; MOTION TO DELAY OR PROHIBIT
APPRAISALS ON PERFORMING LOANS (AFFECT USA COMMERCIAL MORTGAGE
CO., DE #215);

4    D    APPLICATION TO EMPLOY SIERRA CONSULTING GROUP, LLC.
AS FINANCIAL ADVISORS TO THE OFFICIAL UNSECURED CREDITORS'
COMMITTEE FOR USA COMMERCIAL MORTGAGE COMPANY PURSUANT
TO FED.R.BANKR.P. 2014(A) FOR ORDER UNDER SECTION 1103
OF THE BANKRUPTCY CODE, DE #878;

5    E    MOTION DIRECTING PAYMENTS TO DIRECT LENDERS, DE #336;

6    F    MOTION TO USE CASH COLLATERAL (CONTINUED) THROUGH
JULY 29, 2006 PURSUANT TO SECOND REVISED BUDGET (AFFECTS ALL
DEBTORS), DE #407;

7    G    APPLICATION FOR ADMINISTRATIVE ORDER ESTABLISHING
PROCEDURES FOR INTERIM COMPENSATION AND REIMBURSEMENT
OF EXPENSES OF PROFESSIONALS (AFFECTS ALL DEBTORS), DE #570;

8    H    MOTION FOR ORDER APPROVING CONTINUED USE OF CASH
THROUGH OCTOBER 29, 2006 PURSUANT TO THIRD REVISED BUDGET
(AFFECTS ALL DEBTORS), DE #846;

9    I    MOTION TO DISTRIBUTE FUNDS AND TO GRANT ORDINARY-
COURSE RELEASES AND DISTRIBUTE PROCEEDS (AFFECTS USA COMMERCIAL
MORTGAGE, USA CAPITAL DIVERSIFIED TRUST DEED FUND, AND USA
CAPITAL FIRST TRUST DEED FUND), DE #847;

10   J    MOTION FOR RELIEF FROM STAY PROPERTY:  LITIGATION
PENDING IN U.S. DISTRICT COURT, DISTRICT OF NEVADA WITH
CERTIFICATE OF SERVICE.  SPECTRUM FINANCIAL GROUP, DE #863

3

**APPEARANCES FOR:**


Debtors:                          ANNETTE JARVIS, ESQ.
                                  P.O. Box 45385
                                  Salt Lake City, UT 84145

                                  LENARD SCHWARTZER, ESQ.
                                  Schwartzer & McPherson Law Firm
                                  2850 S. Jones Boulevard
                                  Suite 1
                                  Las Vegas, NV 89146

Official Committee of             CANDACE CARLYON, ESQ.
Equity Security Holders           Shea & Carlyon, Ltd.
of USA Capital First              701 Bridger Avenue
Trust Deed Fund, LLC:             Suite 850
                                  Las Vegas, NV 89101

Official Committee of             GERALD GORDON, ESQ.
Executory Contract                GREG GARMAN, ESQ.
Holders of USA                    Gordon Silver
Commercial Mortgage               3960 Howard Hughes Parkway
Company:                          9th Floor
                                  Las Vegas, NV 89169

Highland Capital:                 CICI CUNNINGHAM, ESQ.
                                  2831 St. Rose Parkway
                                  Suite 200
                                  Henderson, NV 89052

Official Committee of             MARC LEVINSON, ESQ.
Equity Security Holders           Orrick Herrington & Sutcliffe, LLP
of USA Capital                    400 Capitol Mall
Diversified Trust Deed            Suite 3000
Fund, LLC:                        Sacramento, CA 95814

                                  JEFF HERMAN, ESQ.
                                  (No address provided)

                                  BOB OLSON, ESQ.
                                  Greenberg Traurig, LLP
                                  3773 Howard Hughes Parkway
                                  Suite 500
                                  Las Vegas, NV 89169

                                  PATTY SINGLETON, ESQ.
                                  (No address provided)

4

**APPEARANCES FOR:**          (CONTINUED)


J.V. Direct Lenders:          JANET CHUBB, ESQ.
                              Jones Vargas
                              100 W. Liberty Street
                              12th Floor
                              P.O. Box 281
                              Reno, NV 89504

Stanley Alexander Trust,  ROBERT LE POME, ESQ.
et al.:                   10120 S. Eastern Ave., #200
                          Henderson, NV 89052

Official Committee of     ROB CHARLES, ESQ.
Unsecured Creditors for   Lewis & Roca, LLP
USA Commercial Mortgage   3993 Howard Hughes Parkway
Company:                  Suite 600
                          Las Vegas, NV 89169


Group of Direct           PETER SUSI, ESQ.
Investors:                Michaelson Susi & Michaelson
                          7 West Figueroa Street
                          2nd Floor
                          Santa Barbara, CA 93101

Dr. Gary Kantor, et al.:  MICHAEL SCHMAHL, ESQ.
                          McGuire Woods, LLP
                          77 W. Wacker Drive
                          Suite 4100
                          Chicago, IL 60601


Official Committee of     FRANK MEROLA, ESQ.
USA Capital First Trust   CHRISTINE PAJAK, ESQ.
Deed Fund, LLC, et al.:   Stutman Treister & Glatt, P.C.
                          1901 Avenue of the Stars
                          12th Floor
                          Los Angeles, CA 90067

Norman Kiven:             MARK KONRAD, ESQ.
                          Snell & Wilmer, LLP
                          3883 Howard Hughes Parkway, #1100
                          Las Vegas, NV 89169


Standard Property         LEE MACKSON, ESQ.
Development, LLC:         Shutts & Bowen, LLP
                          1500 Miami Center
                          201 South Biscayne Blvd
                          Miami, FL 33131

5

**APPEARANCES FOR:**          (CONTINUED)


Canepa Group:              LAUREL DAVIS, ESQ.
                           Fennemore Craig, P.C.
                           300 S. Fourth Street, #1400
                           Las Vegas, NV 89101

U.S. Trustee:              AUGIE LANDIS, ESQ.
                           Assistant United States Trustee
                           (No address provided)

McKnight 2000 Family       THOMAS GALLOON, ESQ.
Trust:                     (No address provided)

1        **Las Vegas, Nevada; Friday, August 4, 2006; 9:39 a.m.**

2                        **(Call to Order)**

3            **U.S. MARSHAL:**  --turned off in the courtroom.  Thank

4   you.

5            **THE COURT:**  If any of the attorneys, I guess you've

6   got enough room, if any attorneys would like to sit in the jury

7   box there's some room.

8            Okay, all right *USA Commercial*, appearances please.

9            **THE COURT RECORDER:**  I can't hear you very well, your

10  Honor.

11           **THE COURT:**  So I'm sorry, did you say you couldn't

12  hear?

13           **THE COURT RECORDER:**  Yes.

14           **MS. JARVIS:**  Annette Jarvis and Lenny Schwartzer on

15  behalf of the Debtors.

16           **MS. CARLYON:**  Good morning, your Honor, Candace

17  Carlyon of Shea Carlyon on behalf of the first Trust Deed

18  Committee.

19           **MR. GORDON:**  Good morning, your Honor.  Gerald Gordon

20  and Greg Garman of Gordon Silver on behalf of the Direct

21  Lenders Committee.

22           **MS. CUNNINGHAM**  Good morning, your Honor,  Cici

23  Cunningham on behalf of Highland Capital.

24      **(The Court and clerk confer.)**

25           **MR. LEVINSON:**  Good morning, your Honor.  Mark

7

1   Levinson and Jeff Herman on behalf of the Diversified Trust

2   Deed Fund Committee.

3         **MR. OLSON:**  Good morning, your Honor.  Bob Olson

4   Patty Singleton (phonetic) local counsel for the Diversified

5   Trust Deed Fund Committee.

6         **MS. CHUBB**  Good morning, Janet Chubb, Jones Vargas

7   for the JV Direct Lenders.

8         **MR. LEPOME:**  Robert LePome for Alexander and others

9   and also in association with Nancy Allf.

10        **MR. CHARLES:**  Rob Charles from Lewis and Roca and we

11  represent the Unsecured Creditors Committee of USA Commercial

12  Mortgage Company.

13        **MR. SUSI:**  Susi and Michaelson, Susi and Michaelson.

14  I represent a group of direct investors from Santa Barbara.

15        **MR. SCHMAHL:**  Good morning, Michael Schmahl,

16  represent Dr. Gary Kantor and various affiliates.

17        **MR. MEROLA:**  Good morning, your Honor.  Frank Merola

18  and Christine Pajak members of Stutman Treister and Glatt

19  Professional Corporation on behalf of the First Trust Deed

20  Committee.

21        **MR. KONRAD:**  Good morning, your Honor.  Mark Konrad

22  of Snell Wilmer on behalf of Direct Lender Norman Kiven.

23        **MR. MACKSON:**  Good morning, your Honor.  Lee Mackson

24  on behalf of Standard Property Development.

25        **MS. DAVIS:**  Good morning, your Honor.  Laurel Davis

8

1   appearing on behalf of the Canepa Group.

2           **MR. LANDIS:**  Good morning, your Honor.  Auggie Landis

3   on behalf of the United States Trustee.

4           **THE COURT:**  Okay.

5           **MR. GALLOON:**  Thomas Galloon your Honor, on behalf of

6   the McKnight 2000 Family Trust and (indiscernible).

7           **THE COURT:**  All right.

8           **MS. DAVIS:**  Your Honor, may I address one quick

9   housekeeping matter?  As you will recall at the last hearing we

10  resolved the order on my client's Relief from Stay Motion

11  regarding Boise Gowan, that's docket 292.  We have reached a

12  stipulation with Debtor's counsel to move that hearing from

13  today's calendar to August 31st at 9:30.  We've submitted a

14  stipulation.  I noticed that it's gotten lost on the calendar,

15  so I just wanted to make sure we put that on the record here

16  today.

17          **THE COURT:**  Yes.  And it was signed yesterday.

18          **MS. DAVIS:**  Great.  Thank you very much.

19          **MR. SCHWARTZER:**  Yes, we agreed, your Honor.

20          **MS. DAVIS:**  Thank you.  And we wanted to advise the

21  Court that we did the continuance for two reasons.  One, we

22  received the declaration of the borrower that the loan will be

23  paid in full on its maturity which is August 31, 2006.  And we

24  support the Distribution Motion to the extent that it's been

25  modified by the reply submitted by the Debtors and we have

1    joined the position of the Direct Lender Committee.

2         So in light of those representations, your Honor, I'd

3    like to make my appearance and then also be excused.

4         **THE COURT:**  All right.  Fine.  Thank you.

5         **MS. DAVIS:**  Thank you.

6         **THE COURT:**  All right, so let's go first to status.

7    It's my intent, subject to your thoughts, is to go status and

8    then go directly to the Direct Lender -- the Motion to

9    Distribute since that involves what most people would be

10   interested in and then we'll pick up on some of the more --

11   everything from the administrative matters on CR to the cash

12   collateral and professional compensation and then the other

13   clean up matters as well.

14        **MS. JARVIS:**  Your Honor, a couple of status updates.

15   The Debtors did say at the last hearing that they intended to

16   file a plan at the end of the July, obviously that did not

17   happen.  But we have been moving towards the goal of getting

18   prepared to file a plan and after consultation with the

19   committees and the committees' joint requests that we continue

20   this further, we have actually reached an agreement with them

21   which Mr. Schwartzer will address in just a minute, with

22   respect to a short extension of exclusivity.

23        We do intent to move this matter forward.  As we have

24   said, we do believe that the plan must be filed quickly

25   because, you know, this case cannot bear the administrative

10

1    expenses much longer.  We do need to get this pushed towards a

2    conclusion.  But we are working what the committees to get that

3    done.

4          One other update before I turn this over to

5    Mr. Schwartzer to address that agreement, of importance is to

6    know that because of the massive accounting work that we

7    described to the Court at the last hearing, done by Mesereaux,

8    the Debtors have now finished reconstructing the loan ledgers

9    and that has enabled them now to have sent out revised borrower

10   statements, demand letters on the various loans and also

11   default notices on delinquent loans.  In addition it has put

12   them in a place where, as we'll talk about later, in the budget

13   where we are prepared now to commence foreclosure actions where

14   appropriate.  Thank you, your Honor.

15         **THE COURT:**  Okay, thank you.

16         **MR. SCHWARTZER:**  Just to add to the scope of the

17   status, your Honor.  Since the June 30th notices went out to

18   all the parties showing what the status of their loans was,

19   besides $4 million of interest being collected in July, three

20   loans were paid off, the Midvale loan for about 2 million; the

21   Fiesta Beaumont (phonetic) loan for about 4 million; and what's

22   called the Rome (phonetic) loan for about 26 million.  So there

23   has been substantial collection efforts and some results to

24   those efforts as well.

25         With regard to the exclusivity, that's going to end

11

1   in the next couple of weeks.  There is an agreement in

2   principle with the committees that there will be an extension

3   of exclusivity.  There are some conditions that were mentioned

4   in the -- that -- in the form of an email that's gone between

5   the parties that will be incorporated into a stipulation.

6            However, it's our understanding that an extension of

7   exclusivity has to be done on Motion with Hearing and Notice,

8   so what we're going to ask the Court to do is if we can get

9   this filed in the next -- by the 10th, that it be set on the

10  hearing of the 30 -- August 31st.  We understand that in the

11  Ninth Circuit a motion filed beforehand basically acts as a

12  continuation of the exclusivity period until the Court hears

13  the Motion for Extension of Exclusivity.

14           The alternative would be the Court entering some kind

15  of interim order saying, I am extending exclusivity based upon

16  this motion ex parte until the hearing on the 31st.  And I

17  think we'll decide which is the appropriate thing to do and

18  present that to the Court.  But it will be presented with the

19  concurrence of all the official committees in this case.

20           **THE COURT:**  Okay.  And I --

21           **MR. SCHWARTZER:**  And we wouldn't be --

22           **THE COURT:**  -- would be inclined to do the cautionary

23  road because since we're dealing with the '06 amendments, you

24  know, why have one more thing to have to look up.  I mean I

25  think you're right but -- and without looking at the language,

12

1   it probably makes sense.  So --

2          **MS. CARLYON:**  I'm sorry, you'd be --

3          **THE COURT:**  Inclined to do an order which extended it

4   till the actual hearing date without prejudice.

5          **MS. CARLYON:**  And I think that would be our

6   preference too on behalf of the committees that conditioned

7   upon representatives of all the committees signing the

8   stipulation and order, what we would propose is submitting an

9   ex parte order both shortening time and on an interim basis

10  until August 31st extending exclusivity.  And of course that is

11  conditioned upon reaching financial agreement with all the

12  committees.

13         **THE COURT:**  Okay.

14         **MR. SCHWARTZER:**  Okay.

15         **MS. CARLYON:**  Thank you, your Honor.

16         **MR. SCHWARTZER:**  One other housekeeping matter, the

17  last item on the calendar, the Widdell (phonetic) Motion to

18  Lift Stay, that was continued to August 16th.

19         **THE COURT:**  Yes, I believe that's right.

20         **MR. SCHWARTZER:**  And I believe there's an order

21  entered with regard to that, but I still saw it on the

22  calendar.

23         **THE COURT:**  Yes, yes that's correct.

24         **MR. SCHWARTZER:**  Okay.  Your Honor, we agree with --

25  your right.  We would just suggest there's one almost

13

1    uncontested matter that might be handled quickly, that's the

2    employment of Sierra Consulting as financial advisors.  We

3    thought that might go first and then we would go to the Motion

4    to Distribute.  Because the Motion to Distribute really takes

5    over, includes --

6            THE COURT:  Correct.

7            MR. SCHWARTZER:  Items 1, 2, 3, 5 and 11 on the

8    calendar.

9            THE COURT:  But there was opposition to Sierra

10   though.

11           MR. SCHWARTZER:  Yes, I don't know --

12           MR. CHARLES:  Mr. Schwartzer, why don't we start with

13   the Distribution Motion?

14           MR. SCHWARTZER:  Okay, we'll do the distribution.

15           THE COURT:  Okay, so we can not have to keep people

16   sitting around.

17           MR. SCHWARTZER:  Okay.

18           THE COURT:  Okay.  All right and on the Distribution

19   Motion?  Now again as I indicated to counsel informally, it's

20   not my intent to take testimony, rather to have argument.

21   We've got the declarations.  If someone believes it's necessary

22   to do some cross examination, we can go from there.  I think

23   these are mainly legal arguments as opposed to factual so I

24   don't think -- we have the declarations on file.

25           MS. JARVIS:  And we believe that procedures

14

1    appropriate, your Honor.

2              The Debtors intent in filing this motion is to get

3    money out to the investors.  We've been in communication with

4    some of the investors and we understand well the need to get

5    money distributed to these investors who rely on these funds

6    for their livelihood basically.

7              However, in making this proposal we're also well

8    aware, as we've repeatedly told this Court, that because of the

9    actions of the former management there are certain investors

10   who have been formed, through no fault of it own, by unremitted

11   principal and who, without considering the possible remedies to

12   correct that, improperly paid interest would be left unfairly

13   as the arbitrary losers in this case.

14             The Debtor considered both of these competing

15   interests in making its proposal and made a proposal that was

16   based on what the Debtors felt was the most legally defensible

17   and practical solution considering the economics of the -- and

18   the legality of the alternatives as well.

19             Interestingly, objections to the motions -- the

20   motion on both sides of the position that the Debtor has taken

21   in this motion, some objections say that the Debtor's proposal

22   goes too far while others say it doesn't go far enough.

23   Further, because the objections to the Debtor's proposal to

24   continue ongoing monthly payments, distributions are a little

25   more complex.  The Debtors have elected to continue that

1    portion of the motion until August 31st in order to discuss the

2    objections of the various committees to this portion of the

3    relief requested at more length.

4          And the Debtors have agreed to do this because it

5    will not delay, at all, the projected timing of these

6    continuing monthly payments if allowed as the accounting would

7    not be ready to reinstate these monthly payments any earlier

8    than early September in any case.

9          Finally preliminarily, before I go through the

10   various objections, let me also address agreed deferrals with

11   respect to two other aspects of the motion.  First, with

12   respect to the reserve amount to be set for the funds, and

13   really we're talking about the First Trust Deed Fund because

14   they would be the one at this point to get the first interim

15   distribution, we're also asking that this issue, meaning the

16   setting of the reserve amount prior to distributions to fund

17   members, be held over to August 31st in order to allow the

18   claims objections filed by the First Trust Deed Committee,

19   which they did with the agreement -- they filed those

20   objections with the agreement of the Debtor and in which the

21   Debtor will probably file a joinder, to go forward and to allow

22   for the bills of the First Trust Deed Fund professionals and

23   the allocated bills of the Debtor's professionals to be

24   considered when setting that reserve amount.

25          By that time the Debtors will ask for the setting of

16

1    the reserve then based on what we can show are the actual

2    reserve claims with the understanding that the distribution

3    that is proposed in this fund is still only a small part of the

4    overall funds that will eventually be distributed in that fund.

5    So there's a lot more money that would come in, for instance

6    there would be other claims of creditors that come up later on.

7            And I believe this -- with this agreement this should

8    take care of the Highland Crusaders Fund objection because no

9    funds are proposed to be, nor will they be distributed to fund

10   members until an adequate reserve is set by this Court on

11   August 31st.  And again, while this motion is carried over to

12   the 31st we do intend to be prepared to go forward immediately

13   once this reserve amount is set.

14           The other issue, modification is with respect to the

15   $9 million that was in the collection account upon the

16   bankruptcy filing.  Because the Diversified Trustee Committee

17   has asked for more time to understand and comment on the

18   accounting that determined the distribution of that portion of

19   funds, the distribution -- this portion will also be deferred

20   to August 31st, only that portion.  This will actually cause

21   some delay in the distribution of that portion of the funds.

22   And while we are confident in the accounting Mesereaux has

23   done, we do want to make sure that the Diversified Committee,

24   since they raised this issue, is fully satisfied before this

25   distribution is made.

17

1          Let me turn then to the rest of the objections.  One

2     of the --

3          **THE COURT:**  Well let me back up a little bit.  You've

4     -- in your pleadings, but for Mr. Mesereaux and the statements

5     in your points and authorities, you've done an excellent job

6     explaining what you're doing, but let me go through it so that

7     we all have the exact same framework and so we don't have any

8     misunderstanding about what's happening.

9          **MS. JARVIS:**  Okay.

10          **THE COURT:**  So let me give you an example and tell me

11     if I'm right or wrong as we go.  Let's assume we've got Joan

12     Rowe, she has four loans in her name, two which the borrowers

13     had stopped paying before bankruptcy, indeed are not paying

14     now, and two which the borrowers had made the payments and

15     indeed are making payments.  And let's assume she also has an

16     account, Joan Rowe IRA.  As I understand it, her distribution

17     would take the amount that is in the collection -- that has

18     been collected post-petition on her performing loans --

19          **MS. JARVIS:**  Right, the two performing loans.

20          **THE COURT:**  -- two performing loans and subtract out

21     the payments -- what's subtracted out, the payments she

22     received over time?

23          **MS. JARVIS:**  The payments that she received on the

24     two nonperforming loans pre-petition for interest that was

25     never collected.

1         **THE COURT:**  For interest never collected?  Okay.

2         **MS. JARVIS:**  And then the net would be paid to her.

3         **THE COURT:**  Okay.

4         **MS. JARVIS:**  Or if it was a negative balance then it

5  would simply be held back.

6         **THE COURT:**  Okay.  What if she was paid principal --

7  was there anybody who was paid principal on a loan that indeed

8  the loan hadn't been paid off?  I guess that was never a case,

9  correct?

10        **MS. JARVIS:**  No.

11        **THE COURT:**  It was the converse.  Some people paid

12 off the loan, the borrower paid off the loan but rather than

13 getting the payoff those people kept getting interest only?

14        **MS. JARVIS:**  That is correct.

15        **THE COURT:**  Okay.

16        **MS. JARVIS:**  And as to those payments, I think we

17 explained last time that where they had received what were

18 designated as interest payments but in fact the principal had

19 been paid off prepetition and wasn't remitted, those interest

20 payments had been re-characterized as principal payments so,

21 you know, in many cases there would still be principal owed but

22 that would reduce the amount of principal owed and would be re-

23 characterized.

24        **THE COURT:**  Okay.  So conversely, for those people

25 who are objecting, let's assume Joan Rowe was objecting, and

19

1  says you can't subtract what I've already been paid.  What

2  would be the effect of that on those people whose loans were

3  performing, are performing and are scheduled to get payments?

4  And I guess the reality is if you don't net out what she's been

5  paid there's less to pay the people who are entitled to the

6  money, right?

7         **MS. JARVIS:**  Well, your Honor, it's not exactly -- it

8  wouldn't effect the distributions.  For instance, if you had

9  another investor that had performing loans, they would still

10 get, under this proposal, paid out on those performing loans.

11 And holding back from Jane Rowe wouldn't affect them one way or

12 the other, what it would affect is we have a variety of claims

13 by various investors that arose prepetition from unremitted

14 principal.  And because -- and there are also other, you know,

15 claims as well and so it wouldn't then allow for monies to be

16 held back in order to then be able to deal with potentially the

17 prepaid interest that was paid by the Debtors but never

18 collected and therefore be able to be recovered by the estate

19 for the benefit of all the creditors, those with unremitted

20 principal and unsecured creditors, etcetera.

21        **THE COURT:**  Okay.  And all these monies were put into

22 one collection account prepetition, correct?

23        **MS. JARVIS:**  That is correct.

24        **THE COURT:**  So it wasn't -- and when anybody received

25 a statement, Joan Rowe would have gotten one statement for her

20

1    four loans as -- in other words there would have been -- what

2    would her statement have looked like on her four loans that she

3    got each month?  Or didn't she get a statement each month?

4         **MS. JARVIS:**  She would get a statement each month.  I

5    think it would just show the amount that was owed.  I don't

6    have one with me, but it was a lot less detailed than the

7    statements that we sent out.

8         **THE COURT:**  It would just show an amount she

9    received, --

10        **MS. JARVIS:**  Yes.

11        **THE COURT:**  -- kind of like a 1099, I guess almost.

12   It didn't break it down by loan?

13        **MS. JARVIS:**  Oh it was -- yeah, there were loan

14   entries, by loan entries.  It would show what amount was being

15   remitted by loan.

16        **THE COURT:**  But she got one statement on that?

17        **MS. JARVIS:**  I think, yes.

18        **THE COURT:**  Okay.  And then Joan Rowe IRA we're not

19   netting, you're taking all those separately, correct?

20        **MS. JARVIS:**  Yes, we're not netting against --

21        **THE COURT:**  Okay.

22        **MS. JARVIS:**  We're not netting against  --

23        **THE COURT:**  Where it's a different name?

24        **MS. JARVIS:**  Right, exactly.

25        **THE COURT:**  Even though it may be the same person --

21

1          **MS. JARVIS:**  Right, exactly.

2          **THE COURT:**  -- that controls it?

3          **MS. JARVIS:**  Right, exactly.

4          **THE COURT:**  Okay.

5          **MS. JARVIS:**  And they were bunched, you know, within

6    the -- you know, the system of the Debtors.  We can -- we have

7    client ID numbers that bunched together, you know, individuals

8    and trusts and IRAs but there is no netting proposed, holdback

9    netting proposed across those various vesting names.

10          **THE COURT:**  And we've now determined, haven't we,

11    that to the extent people were paid on loans for which no

12    payments were made by that particular borrower, the money

13    wasn't merely coming from USA servicing fees?

14          **MS. JARVIS:**  That's correct, there was a variety of

15    sources.  Everything was in the collection account, it was

16    comingled.  There was money from servicing fees that were never

17    remitted to USA Capital, there were -- was you know, unremitted

18    principal in there, there was I think money that came in from

19    unsecured creditors that went in that fund.  So it's a variety

20    of sources that was in that fund that paid out these amounts.

21          **THE COURT:**  So then it's possible that Joan Rowe

22    received, on those two non-performing loans, principal which

23    should have gone to John Doe in repayment of his loan?

24          **MS. JARVIS:**  Well there's no way to trace it.  What

25    she got is paid out of something and it -- you know, it is a

22

1  variety of commercial mortgage money, unremitted principal

2  money, you know, and like I said, in some cases there was money

3  put into the collection account from, you know, from unsecured

4  creditors, for instance, when they loaned money.

5          THE COURT:  Okay.  And it wasn't an even significant

6  amount of -- about what was the amount that was paid into the

7  collection account in principal that was unremitted or I guess

8  for that matter money that wasn't remitted out to the funds?

9          MS. JARVIS:  There was 46 -- about 46 million that --

10  of principal that was paid and that was not remitted,

11  prepetition.  Now some of that -- of course there was the 9

12  million that I mentioned that was in the account when the

13  bankruptcy was filed so --

14          THE COURT:  And we have no idea -- but that's

15  separate, we're not paying out that --

16          MS. JARVIS:  Well right --

17          THE COURT:  -- we're just paying post-petition

18  collections?

19          MS. JARVIS:  -- we have proposed to pay that, we're

20  deferring that till later.

21          THE COURT:  Deferring it.

22          MS. JARVIS:  But that would also cover, you know,

23  some -- in some instances there is some principal in that.

24          THE COURT:  Okay.  Okay.

25          MS. JARVIS:  And the statements that went out to the

1    investors did indicate when there was money from principal that

2    was in the account at the time of the filing.

3              **THE COURT:**  Okay.  Okay, go ahead.  I just wanted to

4    make sure that I was -- sorry.

5              **MR. LEVINSON:**  Mark Levinson for the Diversified

6    Fund.  Let me just add one other number to that and that is the

7    1090 loan that was made by the Diversified Fund also was looted

8    to the extent of over $11 million.  And that $11 million also

9    went into the general pot and then disappeared out into the

10   Ethernet to various investors, presumably to pay loans that

11   were underperforming.

12             **THE COURT:**  Okay.

13             **MS. JARVIS:**  That is correct.  And thank you for

14   reminding me of that.  That is true, it was about 11 million

15   that we know absolutely went into the collection account --

16             **THE COURT:**  Okay.

17             **MS. JARVIS:**  -- and again, was comingled with respect

18   to -- that's where then the prepaid interest was paid out of.

19             **THE COURT:**  Okay.

20             **MS. JARVIS:**  One of the objections filed

21   misunderstands what is being proposed and so let me also just

22   clarify what the Debtors are proposing.  This is a motion for

23   an initial interim distribution and for continuing monthly

24   interim payments.  And by interim the Debtors mean that the

25   motion does not request a conclusive or final determination on

24

1    whether the proposed netting, including equitable recoupment,

2    502(d), the other issues raised is appropriate or allowed.

3    Rather, with respect to the funds asked to be held back it

4    simply asserts that the estate has an unadjudicated claim to

5    these funds and asks that the Court allow that these funds to

6    remain with the estate until a final determination can be made

7    by this Court with respect to the rights in those funds.  And

8    that will be requested by separate either motion or adversary

9    proceeding, as appropriate.

10           So the motion really in essence is seeking to hold

11   back money, only sort of like an administrative freeze on the

12   funds, pending you know, the further determination by the Court

13   by separate proceeding.  And in that case I think it also deals

14   with a lot of the objections that were raised.  In fact part of

15   the reason that this was requested by the Debtors in this

16   fashion, so that the Debtors could continue to collect past

17   interest from the borrowers, because the Debtors are continuing

18   to do that, because these issues may change.

19           For instance, if now we're asking to holdback money

20   from a particular lender because the borrower has not paid the

21   interest and therefore we cannot collect the prepaid interest

22   currently from the borrower, so we're holding back funds to be

23   able to collect it from the lender.  But if in this next month

24   the borrower then pays all of that prepaid interest that is

25   due, then at that point in time we would ask to be able to

1   distribute that money to the lender, because we now have

2   recovered it from the borrower.  So this gives us the chance in

3   the interim to be able to retain these funds while we sort

4   through these claims to make sure that one way or the other the

5   funds that were improperly paid out can be brought back into

6   the estate for the Diversified Fund, for other creditors, for

7   the other direct lenders that had unremitted principal, to be

8   able to pay those claims and deal with them.

9           And that is consistent because even -- and the

10  Debtors have consistently said it would go after the borrowers

11  first to try to collect this prepaid interest but it does need

12  to be able to make sure that there's a source of recovery from

13  that.

14          In that vain, the Diversified Trust Deed Committee

15  raised an issue claiming that the Debtors improperly failed to

16  consider the prepetition unremitted principal payments and

17  offset that amount against the prepaid interest, that is the

18  subject of the amount sought to be held back in this motion.

19  And in clarification of the point, the Debtors are not saying

20  that they may not ultimately agree that this claimed offset to

21  all investors with unremitted principal may eventually be

22  sought through the court.

23          So we are not taking the position that that is not an

24  appropriate offset.  We may very well get to that point but

25  rather what we're saying is that this type of offset that

1   they're talking about is a permanent determination or setting

2   of a claim and this motion does not seek any permanent

3   determinations.  Those would be sought by later motion or by

4   adversary proceeding.  And it's anticipated that probably the

5   Debtors would seek to have these -- any permanent adjustments,

6   such as what is being requested by the Diversified Trust Deed

7   Committee, at the same time as the rights -- the ultimately

8   rights to the holdback are determined, but that's not requested

9   in this motion.

10          Several objectors object to the Debtors requested

11   distributions because they claim it is too much.  And to

12   respond, let me explain why the Debtors made the proposal that

13   they did.  While it's set forth in the Unsecured Creditors

14   Committee brief, the Debtors could have possibly picked one of

15   the three proposals that we talked about, netting loan by loan,

16   netting between investor by vesting and which is the proposal

17   we took, and netting between grouped investors.

18          The Debtor researched the legal issues as well as

19   considered the practical issues in choosing the approach to a

20   proposed netting for holdback purposes between loans by vesting

21   name, by investor.  That -- because if to do it a different way

22   actually requires a lot more legal analysis and factual

23   analysis.

24          And let me just elaborate on that a little bit.

25   Leaving the Diversified Trust Deed Committee's objection to

1   holdback more which is the one extreme to a little bit later,

2   the next position in is the Unsecured Creditors Committee that

3   asserts the Debtors requested distribution to the investors is

4   too much claiming that the amount should be held back for

5   netting of loans among the related investors and the client

6   IDs, so that would be in a situation where they would ask for

7   us to -- the Debtors to net between -- in the example you gave,

8   Jane Rowe personally and Jane Rowe IRA.

9          And while the Debtors can see that approach, they did

10  not feel that such approach was legally or practically

11  warranted given the different types of entities that are

12  included in the client ID group and in fact the limited

13  objection filed by the Kantor Group is illustrative of just

14  this situation.  As pointed out in that limited objection, the

15  entities including the net client ID group in those grouped

16  entities, are Dr. Kantor as the trustee of the Kantor

17  Nephrology 401(k) plan which benefits a number of individuals

18  and employees of Kantor Nephrology and Dr. Kantor personally.

19         In the Debtor's view, to have a reasonable claim for

20  a netting across those separate vesting names, the Debtors

21  would have had to be able to prove that under the law Dr.

22  Kantor and the 401(k) plan should be treated as one entity.

23  And we -- and that would require a very fact and legally

24  specific valuation for each vesting name in the group.  As a

25  practical matter this type of detailed analysis, especially

1   given the small difference between -- on this initial

2   distribution between netting by investor and netting by client

3   ID, by the broader analysis just didn't make sense, didn't seem

4   to be cost effective, and I think would have been difficult.

5          And further, as the Debtors in this motion were

6   confirming -- or confining the relief sought to carefully

7   identifiable claims that it was asserting against each

8   investor.  Where no such carefully considered claim could be

9   asserted as between the vesting names without a detailed and

10  individual analysis, the Debtor did not feel and does not feel

11  that that approach is warranted.

12         And again, we would emphasize that while this

13  distribution is a large distribution, in the overall scheme of

14  things you know, the potential distributions eventually, this

15  is less than 10 percent of what eventually will be distributed.

16  And that also factored into the consideration.

17         In the middle of where these -- the various parties

18  came out is the First Trust Deed Committee who asked for an

19  additional unspecified amount to be held back for appraisal,

20  collection and administrative costs.  The Debtors did not

21  propose this additional holdback back this, again, is an

22  interim distribution on loans which with the exception of the

23  nine loans, noted in Mr. Allison's declaration, have subsequent

24  distributions available in which to resolve these issues.  And

25  in fact that's why we determined to hold back the continued

29

1    distributions until August 31st to have -- to try to work out

2    these issues.

3          But in the meantime it has been four months since the

4    investors have received payments and in light of this it was

5    the Debtors intent not to either reduce or hold up these

6    payments to resolve these disputes, to get this initial

7    distribution out to investors because we felt like it was

8    important to do it where there were other avenues to deal with

9    those issues later on.

10         With respect to the nine paid off loans, only the Goy

11   (phonetic) property had an appraisal which was based on the

12   allocation done by Mr. Allison in his declaration and that

13   would -- the allocation would be about $5,000.  And the Debtor,

14   because this is a specific identifiable claim, the Debtor would

15   modify its motion to hold back -- to keep back an additional

16   $5,000 on that loan.  And again --

17         **THE COURT:**  Let me

18         **MS. JARVIS:**  -- we're not claiming that we can

19   collect that at this point in time, because I think any type of

20   claim or surcharge under the loan servicing agreements against

21   these loans we do intend to get Court approval of it.  So we're

22   just saying we'll keep it back so it stays in the door, pending

23   a determination.

24         **THE COURT:**  So among these distributions are

25   distributions on the loans that have been paid off post-

1    petition in accordance with the particular person's rights,

2    etcetera?

3            **MS. JARVIS:**  That's correct.

4            **THE COURT:**  Okay.

5            **MS. JARVIS:**  Nine loans, as shown in Mr. Allison's

6    declaration, have been collected post-petition and they are --

7    it is proposed to distribute those funds to the investors.

8            **THE COURT:**  Okay, and you're not holding --

9            **MS. JARVIS:**  And they would be subject to --

10           **THE COURT:**  -- anything back for attorneys fees,

11   etcetera?  I'm not saying you could -- I'm not saying that you

12   have the right to, I'm just asking the question.

13           **MS. JARVIS:**  Yeah, we are not --

14           **THE COURT:**  Okay.

15           **MS. JARVIS:**  -- proposing to do that.  And I think

16   that it is --

17           **THE COURT:**  Because these weren't foreclosures, these

18   were just --

19           **MS. JARVIS:**  Yeah, or just collections.

20           **THE COURT:**  Ordinary payoff?

21           **MS. JARVIS:**  Right.  And we did, you know, we have

22   collected the servicing fees out of those or will collect them.

23   I think there are some servicing fees held in the collection

24   account, but those would be collected before there -- the

25   amounts are paid out.

1          **THE COURT:**  Okay.

2          **MS. JARVIS:**  It is an unresolved question as to what,

3    you know, collection costs or administrative costs planned can

4    be collected from the lenders, you know, above and beyond the

5    loan servicing fees.  And so, consistent with the Debtor's

6    proposal not to hold back anything except claims that had

7    specifically determined what exists with respect to the

8    investor, the Debtors don't feel it's appropriate to add which

9    would only be an unsupported guess of a holdback to possibly

10   cover collection costs that might be then assessed against that

11   particular investor.

12          In line with the Debtors is the Executory Contracts

13   Committee's position, which -- and that has been joined by

14   Mr. Canepa as well, which while disagreeing that the Debtors

15   will be able to recover the money eventually that's held back,

16   they recognize and support the position taken by the Debtors on

17   this interim basis only.  So, eventually we will probably have

18   a dispute with them as to whether these amounts can actually be

19   determined to be the property of the estate and collected.  But

20   in the interim, as we are not making any final determination,

21   they are supportive of this proposal.

22          Turning last to the Diversified Committee's

23   objections, the issues surrounding the Debtor, Diversified

24   Trust Deed Fund had been carefully considered by the Debtors

25   and their professionals.  While it is noted early in the case,

32

1   the Debtor considered and researched whether substantive

2   consolidation or re-characterization of the debt was in the

3   best interest of the creditors and equity holders.  The Debtors

4   have proceeded forward not seeking that remedy.

5          Now I don't want to discuss that in detail at this

6   time because that's not before the Court and I don't want to

7   prejudice the rights or -- of the Diversified Committee to take

8   that position.  So I just simply wanted to say that we've

9   proceeded forward on this motion the way we have only after the

10  Debtors have concluded that there were factual differences with

11  the limits and simply -- and other similar cases that would

12  make this re-characterization, equitable lien a very difficult

13  case to win.  And after determining, in his business judgment,

14  Mr. Allison determined in his business judgment that the best

15  course of action to remedy the wrongs if Diversified was to

16  proceed to recapture assets back into that portfolio, that is

17  the course of action that we have taken.

18         In that vein, the Debtor's professionals filed a UCC

19  on the 1090 loan which had not been filed when the debt -- when

20  the case was filed, to secure it by a security interest and

21  certainly equity interest at IP.  The Debtors have also pursued

22  successful negotiations to secure a debt owed by IP and that IP

23  receivable that your Honor approved about a month ago, actually

24  as we told you as to where that money would go, it would be

25  determined by tracing but the Debtors do believe that a

1   significant amount of that money would go back to Diversified

2   because we have started that tracing and believe, as

3   Mr. Levinson pointed out for instance, that we can trace

4   monies, you know, directly into IP and therefore will be

5   returned to the Diversified estate.

6           Nor does Mr. Allison believe that the ultimate value

7   of the Diversified portfolio is as bleak as the Diversified

8   Trust Deed Committee paints.  Certainly these loans have

9   problems and they're not kind of the normal loans, but the

10  Debtor has been pursuing getting assets voluntarily returned to

11  the Diversified estate from IP and otherwise collecting on

12  these nontraditional loan situations.

13          I think while the Diversified Trust Deed Committee

14  and the Debtors can disagree on the wisest and strongest course

15  of action to pursue to maximize the return to the Diversified

16  members, both the Debtor and the Diversified Trust Committee

17  agree that the wrongs done to the Diversified Debtor must be

18  remedied.  And we have been working with them to pursue that.

19  So again, that issue is not before the Court at this time, but

20  we would just -- wanted the Court to understand our position

21  with respect to that and why.

22          And further, while the Diversified Trust Committee,

23  based on it's assertion that the possibility of the limits

24  approach should be considered in the amount held back on the

25  distribution, the Debtors have rejected this approach because

1    unless and until these loans and lenders are re-characterized

2    or otherwise judicially altered, the Debtors believe that under

3    applicable law these monies must be passed on to investors.

4        And further, as with the holdback, the kind of

5    undetermined holdback for potential administrative costs, these

6    claims are not quantifiable at this point in time and therefore

7    don't meet the criteria that the Debtor used in limiting the

8    holdbacks on this first distribution.  And again, the Debtor

9    would emphasize this is only -- it's a large distribution but

10   in the whole scheme of things it's not -- you know, there is a

11   lot -- there are a lot more monies to be distributed in the

12   future.

13       With respect to the other objections, the Debtors are

14   now seeking -- are not seeking either restitution or

15   recoupment, as determined by the Court, making the objection of

16   Mr. LePome premature.  Nor does the holding back of the

17   property now in possession of the Debtors require an adversary

18   proceeding as argued on behalf of Mr. Kiven because we are not

19   seeking that determination at this time.  Rather, holding back

20   money in which the Debtors have an identifiable claim pending a

21   future determination is consistent with what is allowed under

22   Section 362(a)3 in preserving this potential asset currently in

23   possession of the Debtor until a Court determination can be

24   made of the issue.

25       In, I believe, resolving the limited objection of Dr.

35

1   Kantor, the Debtors also have agreed to clarify on the record

2   that the monies held back will be kept in the collection

3   account.  They will be segregated by accounting entries,

4   meaning we know where each -- where the source of money was,

5   you know, who it can be traced to.  So they will be segregated

6   by those accounting entries and they will not be used without

7   further order of the Court.

8          Finally, let me just note -- and I think this also

9   deals with the Motion for a Leave from Stay filed by Miss Chubb

10  for the Motion to Pay Direct Lenders by Mr. Knight, and of

11  course the Motion to Hold Funds is now subsumed in this motion,

12  because we are agreeing to distribute to lenders with what we

13  believe is a justifiable holdback.  We also believe that with

14  respect to the Motion for a Leave from Stay filed by Miss

15  Chubb, as we argued a month ago, there -- they have not shown

16  that either the conditions for seeking 51 percent of lenders to

17  change the loan servicer have been met, or that they have 51

18  percent and therefore we would ask that that Motion for Leave

19  from Stay be denied as part of allowing the Motion to

20  Distribute Funds.

21         And then finally let me note that there were no

22  objections to the Debtor's Motion to Grant Ordinary Course

23  Releases and Distribute Proceeds.  The only clarification

24  sought was by counsel for Boise Gowan that the wording of the

25  request -- that we clarify the wording of the request did not

36

1   intend to affect any prepetition releases granted, and that's

2   true.  I mean the issue -- the language with respect to

3   prepetition releases was the issue that we discussed with the

4   Court early on when we sought permission to do these partial

5   releases with respect to nine specific loans.  And that is that

6   if there are outstanding releases that were signed prepetition,

7   they cannot be used and will not be used to then allow a post-

8   petition partial release.  Those would have to be newly created

9   and that's -- what that issue deals with isn't saying that

10  anything that was done prepetition as far as the releases given

11  are invalid.  And this is consistent -- the position we've

12  taken with that is consistent with what the court had approved

13  with respect to the nine loans earlier.  And we would ask for

14  permission to go ahead and be able to do that.

15           So with those clarifications or modifications, we

16  would ask that the Motion to Distribute Funds be allowed.  We

17  do believe that we can get, if the Court grants this motion, we

18  can get these distributions out to lenders within two weeks.

19  And we would like permission to go ahead and do that.

20           **THE COURT:**  Okay.

21           **MS. JARVIS:**  Thank you, your Honor.

22           **THE COURT:**  All right, opposition?

23           **MR. GALLOON:**  Your Honor, Thomas Galloon representing

24  the --

25           **THE COURT RECORDER:**  I'm sorry, you need to have you

37

1    speak into one of the microphones, please.

2              **MR. GALLOON:**  Yes.

3              **THE COURT RECORDER:**  Thank you.

4              **MR. GALLOON:**  Sorry.  Your Honor, Thomas Galloon

5    representing the McKnight 2000 Family Trust.  I think at this

6    stage of the game our motion is the one that goes to the

7    question of whether the distribution is too little and should

8    probably logically be heard before the others say it's too

9    much.

10             **THE COURT:**  Well, I don't care who goes first.

11             **MR. GALLOON:**  One thing I can do is count votes and

12   it seems apparent to me that --

13             **THE COURT:**  Well votes don't have a thing to do with

14   this, Mr. Galloon.

15             **MR. GALLOON:**  Excuse me?

16             **THE COURT:**  Votes don't have anything to do with

17   this.

18             **MR. GALLOON:**  I understand that.

19             **THE COURT:**  You need to speak into that microphone a

20   little more, please.

21             **MR. GALLOON:**  At this stage of the game we of course

22   are not conceding the position that the estate was able -- was

23   entitled to withhold funds in the first instance.  I understand

24   that may be at odds with the Court's earlier determination, but

25   given the magnitude of the dollars involved in this case, we

38

1    would request that the Court make some sort of written decision

2    or written findings on the motion and address the *Golden Plan*

3    case, it's application to whether this is property of the

4    estate.

5            And necessarily I think with that you have to make

6    some perimeter determinations with respect to the *Flame* case

7    which in that instance permitted the estate to charge funds for

8    the expenses of the sale of -- in joint ownership in property.

9    And I think that's what we're talking about here.  But, we

10   think that that needs to be put in the record and the Court to

11   make a decision so that the record is clear as to what we're

12   doing or have been doing down here.

13           I have a response to the Equity Security Holders

14   request for an additional holdback as well.  I'd like to speak

15   on that later.

16           **THE COURT:**  Okay.  All right, Mr. Merola?

17           **MR. MEROLA:**  Your Honor, Frank Merola on behalf of

18   the First Trust Deed Committee.  Today's hearing reminds me of

19   what my father always says that if you invite too many lawyers

20   to a party it begins to look like a wake.  This is a happy

21   occasion, and lets not lose sight about that.  The mechanics

22   and the details are paralyzing, they're mind-numbing and

23   they're boring but the really important thing about this

24   hearing is essentially every economic party and interest, and

25   there's a lot of them, there's a squadron of lawyers here,

1    every economic party and interest agrees to turn the spigot

2    back on right now.

3          Now most of this phone book of pleadings that I have

4    in front of me is about two issues.  It's about reservation of

5    rights and posturing on the issues that will eventually be

6    resolved on the final distribution, because god forbid lawyers

7    would not reserve their rights in ten pages.  But it's also

8    about how fast we turn the spigot on and that's the only real

9    dispute between any of these parties is how hard do we turn the

10   water back on.  Everything else is easy.

11         **THE COURT:**  Well that's kind of interesting.  When I

12   read these quote "limited oppositions" I don't think they're so

13   limited, because some of the people would say, I still get all

14   my money, I don't care about the rest of you.  It seems to me,

15   I don't see if they're right that I can't make this

16   determination, that anybody gets any money today.  So even

17   though they're going to title it "limited opposition" I don't

18   see it as a limited opposition.

19         **MR. MEROLA:**  Well your Honor, with due respect I

20   think you're wrong.  I think a lot of people, especially a lot

21   of the direct investors are saying you can never -- you have to

22   give me everything, but I think at the end of the day, because

23   of the doctrine of interim distribution -- we can't lose focus

24   of what this is, this is a one time interim distribution

25   without prejudice to anyone's rights.

40

1    **THE COURT:**  So don't you think Mr. Galloon by asking

2    that I make these full fledged determinations means that this

3    whole thing has to stop?

4    **MR. MEROLA:**  No, your Honor.  I think you have

5    discretion as to make whatever refinings you need.  The issue

6    of making an interim distribution in a bankruptcy case is

7    directed to your discretion.  And the only issue, from the

8    extreme from the individual direct investors that may not

9    understand the complexities or the nuances of the whole case,

10   who are saying give me everything now and you can't take

11   everything all the way down to the Unsecureds and the

12   Diversifieds who are saying, you know, we don't get any

13   distribution out of this so leave the biggest possible reserve

14   so there's a pool to fight, all of that is in your discretion.

15   And the only issue before your Honor on the issue of an interim

16   distribution, keep in mind on an interim distribution no one is

17   entitled to anything outside your discretion.  There's no

18   confirmed plan here, so you can exercise your discretion on

19   this issue to make the interim distribution.

20       Now, what did the Debtor do?  The Debtor had a

21   thousand different considerations, they were trying to balance

22   all kinds of issues.  Do we think the solution the Debtor came

23   up with is perfect?  No.  But again, rather than spend tens of

24   hundreds of thousands of dollars to decide whether the

25   distribution should be 69 or 67 or 62 or 51, turn the spigot

41

1    back on and then let's deal with the rest of it.

2              Now contrary, you know, to this happiness I do have

3    one small disagreement with the Debtor and I have to point it

4    out and because it was raised just in their rely last night, so

5    we weren't aware of it.  The Debtor, for the first time,

6    suggests that the distribution to the First Trust Deed people

7    would be delayed until there can be determinations on

8    objections to claims.  That's simply unnecessary.

9              This issue is raised in the opposition of Highland

10   Capital, which filed a $20 million unsecured claim.  That claim

11   is based on the fact that our Debtor is a co-defendant in state

12   court litigation.  It is a disputed, contingent, un-liquidated

13   litigation claim in state court litigation.  But our fund and

14   Mr. Levinson's fund are in a little different position because

15   all of our interest and all of our loans are property of our

16   estates.  So the issue and the niceties of establishing the

17   most perfect reserves is not really necessary because the

18   entire corpus of the estate remains before your Honor in rem

19   jurisdiction and you can make disposition.

20             So let's just go through it real quickly.  We have,

21   as of June 30th about $66 million in loans.  The entire

22   distribution that's being contemplated after this August is

23   $2.4 million for our fund.  Of that $2.4 million, $800,000 will

24   stay in reserve and that's okay with us.  So the total

25   distribution will be $1.6 million.  There are a total of about

42

1    $800,000 in scheduled unsecured claims and -- against our

2    estate.  Those claims fall into two categories one is inter-

3    company debt between the Debtors and the second is members that

4    received checks but didn't cash them, so the NSF checks came

5    back and the Debtors scheduled them as creditors.

6         But there's no -- now add to this Miss Cunningham's

7    client's claim which is $20 million un-liquidated, even if that

8    claim were allowed in full and we don't think it will be, we

9    don't think it may not even be asserted against the right

10   Debtor, we don't think there's any liability, it might have

11   other problems, but even if assume it were allowed in full,

12   there's $61 million worth of loans in our estate which we don't

13   have the problem the direct investors have that when the money

14   goes out we won't see it again, those loans are still there.

15   They're not subject to anybody claiming that they're their

16   property they can pull out, those loans are still there.

17         So the need to calculate to the penny and resolve

18   objections to claims is unnecessary.

19         **THE COURT:**  Well now the Debtor said it wanted to

20   defer that part of the motion, but query, could not I direct

21   that the money go to the fund but whether or not it gets

22   distributed to the members would have to wait a separate

23   motion?

24         **MR. MEROLA:**  But again, your Honor, you could do that

25   of course but when you look at the resolution of the motion on

43

1   -- what they're asking -- the Debtor's asking to do is to

2   resolve objections to claims --

3           **THE COURT:**  Right, but you've got a problem here

4   because unlike direct loans your problem is you've got an

5   unsecured claim which have to be paid before members received

6   anything, that's your problem.

7           **MR. MEROLA:**  No, your Honor I understand that

8   problem, but I also have $61 million worth of assets and I have

9   fewer than $20 million in asserted claims.

10          **THE COURT:**  Well couldn't we solve that problem

11  though by just allowing the funds to go to the fund and then

12  you make a separate motion to distribute to the members?

13          **MR. MEROLA:**  Your Honor, that -- again I don't

14  understand -- if her claim --

15          **THE COURT:**  Well I would be here forever with Miss

16  Cunningham's objection if we don't do it that way.

17          **MR. MEROLA:**  I don't think so, your Honor.

18          **THE COURT:**  She's sitting right behind you lurking

19  there.

20          **MR. MEROLA:**  I know, I see her with the back -- with

21  the eyes in the back of my head.

22          **MS. CUNNINGHAM:**  And we have no objection to the

23  money going directly --

24          **THE COURT RECORDER:**  Also, could you speak directly

25  into a microphone.  Thank you.

44

1         **MS. CUNNINGHAM:**  Cici Cunningham, on behalf of

2   Highland Capital.  We have no objection to the money going

3   directly to First Trust Deed Fund, your Honor.  And my

4   understanding is that there is an objection to our claim

5   actually currently scheduled for the end of this month, which

6   my understanding is why the Debtor has deferred that to

7   establish the reserve amount.  And my understanding is we are

8   in the process of trying to resolve this.  So I suggest this

9   may be premature.

10        **MR. MEROLA:**  It's not premature for people that have

11  to pay their rent next month, your Honor.  It's not premature

12  for the investors and the funds that have to make payments on

13  their mortgages.

14        **MS. JARVIS:**  And let me just clarify, your Honor,

15  just so we aren't -- don't waste any time.  We -- the Debtor is

16  not taking a position that money should not go to the fund

17  members.  The Debtor wants the money to go to the fund members,

18  the Debtor was just saying we've got to make sure that we've

19  got an adequate reserve, that's it.  So the -- I mean we are

20  very supportive of getting money out to fund members.

21        **THE COURT:**  Well does Highland Capital object to the

22  money going to the fund, this small amount going to the fund

23  members, just so that I know where we are?

24        **MS. CUNNINGHAM:**  Right now?

25        **THE COURT:**  Yes.

45

1          **MS. CUNNINGHAM:**  My understanding, actually to

2     clarify your Honor, is that the hearing on the 31st is not

3     going to delay the money going to the fund members.  Did I

4     misunderstand?

5          **MS. JARVIS:**  It might.  Well -- unlike with the

6     direct lenders it's a two step process --

7          **THE COURT:**  Right, exactly.

8          **MS. JARVIS:**  -- when it goes to -- so we have to

9     first distribute to the funds which would happen mid August and

10    then we have to, from there distribute -- set the reserve and

11    then distribute to the fund members.  And you know, it may

12    slightly delay it by August 31st, probably not significantly

13    delay it but it would be some delay.

14         **MS. CUNNINGHAM:**  What Highland has proposed, and I'm

15    not trying to get into settlement stuff, but this is what

16    Highland has proposed, that we either -- that we permit the

17    distribution but reserve all rights, because the problem is

18    this is just such a convoluted case.  That way the members can

19    get their distribution.  And if there -- if you're correct, if

20    there's plenty of money then we -- then there should be plenty

21    of money to go around.

22         On the other hand, if we were entitled to this money

23    in the first place then -- and I know that's what -- that's why

24    we haven't had -- we haven't been able to work something out.

25    So that's what we had been proposing initially is that we

46

1    permit the distribution, Highland Capital reserves all rights,

2    we proceed you know, and determine the value of its claim and

3    then we go from there.

4         MR. MEROLA:  Your Honor, that's acceptable to us and

5    we'll work with Miss Cunningham for reservation of rights line

6    with regarding the immediate distribution to fund members.

7         MS. CUNNINGHAM:  But let me make that clear, if in

8    fact it comes up later that the fund members were not entitled

9    to this money over us, we reserve the right, if any that we

10   had, to get that later.

11        MR. MEROLA:  Completely clear, your Honor.  That's

12   the concept of the interim distribution with reservation of

13   full rights.

14        THE COURT:  Okay.  All right, so we got that

15   collateral issue resolved then?

16        MS. CUNNINGHAM:  For only this distribution.

17        THE COURT:  For this hearing.  That's correct.

18        MR. MEROLA:  For this distribution.  Yes, your Honor.

19        THE COURT:  For this distribution.

20        MS. CUNNINGHAM:  And only not pertaining to future

21   ones.

22        THE COURT:  Exactly.

23        MS. CUNNINGHAM:  Thank you.

24        MR. MEROLA:  With that specific issue for us being

25   resolved, let me tell you where we viewed everything else.  If

47

1    you line them up like, thank God, Ms. Pajak does for me about

2    where everyone is, we're in the middle.  We've agreed and have

3    sided with the Debtor and their distribution scheme.  On the

4    far side, you have the individually represented direct

5    investors saying we want it all, no holdback, no surcharge.

6    Next to them you have the Direct Investors Committee saying

7    you're not entitled to a surcharge.  We think all these

8    arguments are garbage.  You'll never get a surcharge.  These

9    are our property but for the concept of an interim

10   distribution, it's okay but they want a bigger distribution.

11          On the other extreme are the Unsecured Committee and

12   the Diversified Committee.  Your Honor, again, we could spend

13   hours deciding what the right number is and at the end of the

14   day, the Debtor has done a good job at trying to balance all

15   these various interests and come up with a number and we would

16   suggest to your Honor after everything you're going to hear,

17   the Debtor's number and the Debtor's strategy for dealing with

18   this is as good as anybody else's.  It's rational.  It doesn't

19   appear that Mr. Allison or the Debtor have an ax to grind.

20   It's not as if their favoring one person and, your Honor, where

21   in a world were the Diversified Committee that under this

22   mechanic gets no distribution supports the distribution?  We

23   can't let the details and the minutia drag down the result that

24   all the parties want.

25          Please approve the interim distribution without

48

1    prejudice to any parties as the Debtor has requested and

2    there's no need an exercise of your discretion in making that

3    interim distribution to make specific findings regarding

4    parties' legal rights for the eventual resolution of these

5    disputes.  Thank you.

6              THE COURT:  Uh-huh.

7              MS. JARVIS:  Before Mr. Levinson, are you -- so let

8    me just clarify one point.  This is a dynamic situation.  We've

9    been talking back and forth a lot and I misspoke that, you

10   know, with respect to the $9 million that's -- the prepetition

11   amount that was in there.  We don't want to delay -- and if we

12   hold it over to the 31st, we don't want to delay distribution.

13   Mr. Levinson agrees that we can -- if there is a dispute -- if

14   they don't agree after we walk them through the accounting and

15   feel comfortable with it that that can be dealt with on the

16   calendar for the 16th.  That would not delay the distribution

17   and therefore we would propose and would still push forward on

18   the 16th, ask for that $9 million also be distributed to

19   members -- or to lenders but with the agreement of

20   Mr. Levinson, we would give some additional time for them to

21   look at that.

22             THE COURT:  Okay.

23             MS. JARVIS:  Thank you, your Honor.

24             MR. LEVINSON:  Turning to some of the side issues

25   first starting with the 9 million since you just heard it, I

1   think my committee understands the 9 million perfectly.  I

2   think the Debtor doesn't understand it.  That's the difference

3   and we're delighted to talk about it at the next hearing and

4   not take up more of the Court's time but we think we've got it

5   right and the Debtor has got it wrong.  The Debtor in its reply

6   brief says, trust me, we've got it right.  We've got evidence

7   in our declaration.  We think we've got it right.  So we'll be

8   back and we'll talk about that on the 16th.

9            At the outset, your Honor, I find it kind of amazing

10  that Ms. Jarvis stands up here and says the Debtors think this

11  and the Debtors think that.  My Debtor, the Diversified Capital

12  Fund, is taking the position that our argument isn't so good.

13  That strikes me as, kind of, an odd position for my Debtor to

14  take in a case where the investors are the sole victims of this

15  scheme that we've laid out in our pleadings and I won't -- I'll

16  spare everyone the details of going over it again although I do

17  want to hit some of the highlights.

18           And it just amazes me when the Debtor is acting --

19  when Ms. Jarvis says the Debtors.  It's like the Debtors are

20  somehow the judge or the arbitrator or the mediator.  If my

21  Debtor was looking out for me, my Debtor would be taking, I

22  think, a significantly different position and that troubles me

23  and we may have more about that at some other time.

24           We agree with a lot of what Mr. Merola said.  I think

25  you do have the discretion and the duty to consider exercising

1    that discretion to allow an interim distribution.  I also

2    strongly agree that making findings now is unnecessary and, in

3    fact, premature.  The basic premise of our limited opposition,

4    which as you know is more than limited, is that the direct

5    lenders do not have what the direct lenders think they have and

6    we want the opportunity to be able to prove this.  You've heard

7    undisputed evidence and, in fact, much of --

8         **THE COURT:**  Well, but -- no.  So I understand that

9    but are you -- you tell me it's limited opposition but you say

10   they're not entitled to the money.  So are you just trying to

11   take cover so everybody's not mad at you?  I mean, aren't you

12   saying you're not supposed to distribute because we want you to

13   make this finding?

14        **MR. LEVINSON:**  No.  No, no, because we're talking

15   about the Debtor sitting on 90-plus million dollars.  If we

16   were to take this all the way to where it may end up going, we

17   don't believe that -- if you were to distribute our number

18   which we calculated about 25 or $30 million, that would be no

19   skin off of our nose because there would still be enough money

20   to give us the ratable distribution to which we'd be entitled

21   if we win everything.  So we're saying that's -- it's silly for

22   the Debtor to be earning 2 percent interest on $93 million when

23   30 of it can go and there's no prejudice to us.

24             The problem that we have with making the distribution

25   of principal is that once the money is gone, in order to get it

51

1    back if we turn out to be successful, we're going to have to

2    start chasing people all over the state and all over the world

3    and all over the country and that makes no sense but there is

4    some number and we've done our best to try to calculate a real

5    number which even if we were to take this to the mat and win,

6    the direct lenders would still be entitled to that money as

7    their ratable share as unsecured creditors along with us of

8    some consolidated estate or estates.  That's why we think it

9    makes no sense to sit back and hold back everything.

10            We also -- you know, Mr. Merola talked about

11   paying --

12            THE COURT:  Well, aren't you asking the holdback to

13   be such that the distribution is meaningless?

14            MR. LEVINSON:  Thirty million dollars?

15            THE COURT:  Well, among 3,500 people -- not even

16   3,500 people over four months.

17            MR. LEVINSON:  Well, to me, that's not a meaningful

18   -- that is a meaningful number.

19            THE COURT:  Well, it's only one-third of what the

20   Debtor wanted to --

21            MR. LEVINSON:  That's correct but, again, the basic

22   premise of our argument is that we ought to be in the same

23   position as the direct lenders and the Diversified Fund.  We

24   shouldn't be the sole victim of this crime.

25            THE COURT:  But you didn't have a direct loan.

1          **MR. LEVINSON:**  Well, we had some direct loans but not

2     many direct loans but we believe that we will be able to prove

3     when we get the discovery, which we've asked and when we probe

4     this further, that the direct loan is really a myth.

5     Ms. Jarvis has talked about and it's uncontested that the funds

6     were commingled when they came in.  There were no trust

7     accounts set up.  We have the -- over a thousand -- perhaps up

8     to 1,400 direct lenders whose loans were sold.  They were lied

9     to about the fact that the loans were paid off.  They were lied

10    to about that.  They continued to get monthly interest payments

11    and their principal is gone and somehow they're victims as

12    well.

13          We have the obvious rip-off of our estate and the

14    lies that were perpetrated on our people and we believe that

15    when the evidence comes in and we show that the direct loans

16    are really a myth, that yes, you've got a deed of trust but do

17    we know -- is there any evidence before you, for example, that

18    when a promissory note has 35 names that half of those people

19    hadn't traded out before the filing of the case and their names

20    haven't been changed out and assignments of the deeds of trust

21    recorded?  There's no evidence before you to that effect.

22          We believe, like in *Lemons* (phonetic), we might be

23    able to prove and I say "might" because we don't know.  We

24    might be able to prove that toward the end, the Debtor wasn't

25    doing the kinds of things that it was supposed to do in order

53

1   to make these direct loans legal, binding obligations and as in

2   *Lemons*, you've got a lot of people out there who think they may

3   be in a direct loan who aren't.  We just don't know that.  We

4   haven't seen the evidence.

5         The Debtor has been cooperating and providing us

6   evidence but we don't have it all.  We're new to this case and

7   we just haven't had the chance to do it and we believe that

8   we're entitled to the opportunity to be able to show to this

9   Court through the obvious procedurally protected ways to do it

10  that we have -- indeed, the direct loans are no different than

11  investments in the fund.

12        We also, your Honor, simply can't sit back and say

13  we're the sole victims.  Particularly look at our fund and

14  Mr. Merola's fund and, you know, their reply says we deserved

15  it because we took risks and we're regulated by the State of

16  Nevada rather than the SEC.  So therefore you're entitled to be

17  ripped off but if you look at the chart we put in our pleading,

18  $95 million out of our hundred and ten million-, hundred and

19  twelve million-dollar loan portfolio is unsecured.  Much of it

20  was unsecured for years.  The monthly statements that went out

21  to our investors told us we had secured loans and we didn't and

22  so 85 percent of our portfolio is without security.

23        Now, Ms. Jarvis said that the Debtors -- or maybe she

24  meant my Debtor -- are working hard to recover assets from the

25  bad guys and that everything isn't as bleak as we paint it in

54

1   our pleading and I will tell you we didn't paint it as bleak

2   because we didn't attempt to ascribe our opportunities to

3   recover and what amounts we've recovered in our pleading.

4   However -- and we have been working with the Debtors to attempt

5   to make our pie, collectively and my fund, bigger but we don't

6   know at this point in time whether our hundred and ten million

7   dollars of loans -- and by that, there's a hundred and fifty

8   million dollars of investment in our fund -- whether the

9   hundred and ten million will be collected out in full, in part

10  or only a few million dollars.

11       We simply don't know because of the nature of our

12  unsecured loans and our collateral and, yes, it was helpful to

13  get liens on the 1090 investment properties -- Investment

14  Partners' properties but what do we have?  We have a lien on an

15  equity interest in a real estate partnership that's developing

16  thousands of acres in southern California.  We believe the

17  other parties to those partners -- in those partnerships are

18  real people.  We believe that those are real projects but it's

19  real estate.  It takes time to develop.  It's not the same as

20  having what our people thought they were investing in, what

21  they were promised they would be investing in, namely deeds of

22  trust on real property.

23       So we just don't know how deep our hole is.  If it

24  turns out that we were able to quickly monetize this and

25  recover $95 million, then obviously I wouldn't be as passionate

55

1  and my people wouldn't be as passionate but when Mr. Merola

2  talks about people not paying their mortgage, understand that

3  this proposal proposes to pay us nothing.  We have 1,900

4  investors.  They too have mortgages and they too have to live

5  on the income.

6          THE COURT:  Well, since we're not distributing any

7  prepetition assets here and the new management has carefully

8  examined -- knows exactly what money came in and what loan it

9  came from, how can you, as to those funds at least, claim any

10  right to those funds?

11          MR. LEVINSON:  Well, your Honor, that's all --

12          THE COURT:  I mean, it's all different as between the

13  various lenders and USA Commercial, I think, but as to you

14  since you're a different fund and --

15          MR. LEVINSON:  Well, your --

16          THE COURT:  -- what would our theory be?

17          MR. LEVINSON:  -- your conclusion is that the direct

18  lenders do, indeed, have this separate property that belongs to

19  them and I'm telling you.  I don't think you can make that

20  finding today.

21          THE COURT:  Well, what evidence do you have to the

22  contrary?

23          MR. LEVINSON:  What evidence do you have to support

24  that?  I mean --

25          THE COURT:  Well, it's unlike -- I mean, the --

56

1   Mr. Mesereaux.  It's unlike *Lemons*.  The problem in *Lemons* was

2   that there were either a hundred and twenty percent

3   beneficiaries to a loan or they weren't assigned any loan and

4   here, what evidence do you have that the direct lenders weren't

5   assigned a specific -- including your client as well.  Your

6   client was assigned a specific part of a note, right?

7           **MR. LEVINSON:**  Well, we don't know and I don't think

8   Mr. Mesereaux has testified to this, that he has reviewed every

9   note and matched that against the investors and reviewed to see

10  whether those notes --

11          **THE COURT:**  What evidence do you have to the

12  contrary, even one?

13          **MR. LEVINSON:**  Oh, we don't.  We don't.

14          **THE COURT:**  So you don't have anything?

15          **MR. LEVINSON:**  We don't but I'm saying he doesn't

16  have anything --

17          **THE COURT:**  So how would you get, for example, an

18  injunction?

19          **MR. LEVINSON:**  Well, what we -- first what we need to

20  do is to develop the proof to see if, in fact, how close to

21  *Lemons* is this.  I mean, you're right and of course Mr. Merola

22  is right that this is not *Lemons*.  Presumably Mr. Hanges

23  (phonetic), Mr. Malanowski (phonetic) and their Counsel

24  reviewed *Lemons* and their scheme is better than *Lemons*.  It's

25  not clear as far as it's not going on reserve.  Every time

57

1    there's a new scheme, there's a variation on it.  Every time

2    the Courts move and squash one scheme, something else comes up.

3    You know, why is it that our fund was looted and the others

4    weren't looted?  We don't know and obviously Mr. Malanowski

5    isn't talking about that.

6         But we honestly don't know whether the deeds of

7    trusts, the notes and all were complied with and the way that

8    we would test this is by doing the discovery, getting the

9    evidence which we're supposed to be getting in the near future

10   -- it's been requested jointly by all parties -- and then

11   determining whether we have that kind of a claim.  Once the

12   money goes out on principal, it doesn't matter.  We're not

13   going to be able to get it back but, again, the premise of this

14   motion -- and we're not saying that we have the evidence to

15   disprove it now but we're saying you don't have the evidence to

16   find now that these are all direct loans, that all the T's were

17   crossed and all the I's were dotted.

18        **THE COURT:**  Well, there's only what, nine loans that

19   the principal is going out on; is that right?

20        **MR. LEVINSON:**  I believe that's correct.

21        **THE COURT:**  So why aren't you in a position that

22   you've looked at those nine loans?

23        **MR. LEVINSON:**  We haven't been provided with the

24   information.  The joint -- the discovery request has gone out.

25   It hasn't been responded to yet and we don't know but, again,

58

1   our premise is bigger than that, your Honor.  It's that the

2   entire scheme -- I mean, we go back to 2000 --

3            **THE COURT:**  So you don't want any money paid out?

4   Don't tell me it's a limited opposition.

5            **MR. LEVINSON:**  No, no, we do because, again --

6            **THE COURT:**  Because if your theory is right, then no

7   money goes out.

8            **MR. LEVINSON:**  No, no, it --

9            **THE COURT:**  So don't tell me it's a limited

10  opposition.

11           **MR. LEVINSON:**  It's a limited opposition, your Honor.

12  If the money goes out --

13           **THE COURT:**  You're just trying to prevent the

14  pitchforks in the back but I'm telling you --

15           **MR. LEVINSON:**  No, no --

16           **THE COURT:**  -- don't con me.

17           **MR. LEVINSON:**  -- I think there's more people angry

18  with me than you.  I think that -- our position, I think, is an

19  unpopular position with the direct lenders and everyone else.

20  So if we're counting heads, I think I'm in trouble here.

21           We picked a number that we believe that if we -- if

22  the evidence turns out the way we believe it may -- because I

23  can't say it will but we believe it may based on what we've

24  seen based on the fact that this has been a Ponzi-type scheme.

25  It's not a Ponzi scheme.  A Ponzi scheme was different.  Of

59

1    course, they evolve but the evidence is that -- and I think

2    it's undisputed that as far back as 2001, the Sheraton loan was

3    in trouble and it was transferred from direct lenders to our

4    fund, paid for in full and the direct lenders were paid for in

5    full.  I don't fault the direct lenders.  They didn't know

6    about it.

7            Shortly thereafter, the loan was foreclosed upon by

8    the Diversified Fund and you know what, then the loan -- then

9    the hotel was turned over to management by an affiliated group

10   of Mr. Hanges and Mr. Malanowski and then a few years later it

11   was sold and the proceeds -- some of the proceeds went to us

12   and some of the proceeds disappeared.  That's as far back as

13   2001 that there was an effort, we believe, to hide this fraud.

14   And then it went on after that and we've cited it again in the

15   Tucker declaration and in our brief that the 1090 loan was

16   made.  It was a 55 million-dollar unsecured loan.  Eleven and a

17   half of it immediately went to fund this beast.

18           So the people investing in the new fund in the first

19   -- in Mr. Merola's fund, people making new direct loans would

20   continue to make loans and all along the investors in the

21   Diversified Fund were being lied to.  In the monthly statements

22   they received, it showed, here's our collateral and we've got

23   this.  We've got that.  We've got that and all of it was a lie

24   and each month, no matter whether the loan was performing or

25   not, all the investors got their interest payments and for this

60

1    at least four-year period, our fund was the primary funder of

2    this but not the sole funder of it and we point out in our

3    pleading that there are over a thousand direct lenders who were

4    unlucky enough to have their loans paid off and now they're on

5    Mr. Charles' committee.

6            And to us, that attacks the entire integrity of this

7    thought that somehow the direct lenders are different and we'd

8    like to show that when Mr. Malanowski and Mr. Hanges had the

9    power because of the broad discretion they were afforded in the

10   servicing agreement to take the money and misspend it, that we

11   ought to be treated the same as those people and that we ought

12   not to be the sole victims of the street crime, that there

13   ought to be and that you have the power to equalize the harm.

14           So we don't have a problem with distributing what I

15   consider to be a lot of money, $30 million, just like I

16   consider the $24 million that was stolen from the direct

17   lenders to be a lot of money and one of the Counsel whom I like

18   too much to name said to me, "It was only $24 million and we've

19   got $980 million of loans here."  Well, $24 million -- and

20   Mr. Merola doesn't make that in two years.  I mean, that is a

21   lot of money and our fund was looted for over $40 million.  So

22   you just can't say at this point in time -- you can't find at

23   this point in time because Mr. Allison says we've done the --

24   we've reconstructed the accounting -- and they've done a heroic

25   job to do it -- that all of the T's were crossed and all of the

61

1   I's are dotted and that they shouldn't be treated the same as

2   us.

3          But if we were successful on this quest that we hope

4   we never have to fight because it'll turn out that the hole

5   isn't deep enough and that we can agree on some sort of a plan

6   to solve this with the other constituents that even if you were

7   to distribute out $30 million, that is no skin off of our nose

8   because that's 30 million we're never going to get under a

9   ratable distribution and we see no reason that even though

10  we're not getting anything now that other folk ought not to get

11  it.  So that's why we take that position.

12          **THE COURT:**  Okay.  All right, next.

13          **MR. GORDON:**  Your Honor, as Mr. Merola stated, it is

14  discretionary with the Court but in some ways it is not

15  discretionary with the Court.  I'm going to walk a middle

16  ground.  When this bankruptcy first started way back in April,

17  the Court was sensitive to the issue involved in direct

18  lenders.  It was sensitive to the fact that they're a unique

19  animal in this case and they're not necessarily creditors as

20  direct lenders and the issue was property of the estate.  We're

21  not property of the estate.

22          At that time, the Court instructed the Debtor, if you

23  wish to hold funds, file a motion and bring it before the

24  Court.  It did but ultimately all of that is now coalesced at

25  this time before the Court.  The Debtor has filed a motion

62

1    which provides for the distribution of $68 million.  The Direct

2    Lenders Committee, while it is extremely sensitive to the

3    issues involved of netting, et cetera and while obviously as

4    direct lenders they would like to see all of the proceeds

5    distributed, not simply a netting as proposed on the investor

6    basis but should be only on a loan by loan, the Direct Lenders

7    Committee has taken a position of clearly supporting the

8    Debtor's motion and the reason being, as Mr. Merola said, this

9    is a matter of discretion and we need to get the tap opened.

10   Money needs to go out to these direct lenders.  Their property

11   is being held.

12          The Court previously has refused to allow loan

13   servicing agreements to be terminated under the automatic stay

14   and as such, they're in control and given that we're here --

15   the direct lenders are here, the direct lenders are saying, we

16   support this motion because it's a start.  In addition, enough

17   is being reserved that we can deal with issues later on.

18          I sympathize clearly with Mr. Levinson's clients, the

19   investors in Diversified but they're one level removed and

20   they're not the same as direct lenders.  Diversified is a

21   direct lender but their investors are not.  Clearly they have

22   been treated horribly by Mr. Hanges and Mr. Malanowski.

23   Clearly the acts that have been committed are egregious, not

24   only probably tortuous but may even be of a criminal nature.

25   clearly there are deep pockets hopefully that they will recover

63

1    from, that Mr. -- the efforts of Mr. Allison and Mesereaux to

2    obtain collateral for them or obtain notes or assets for them,

3    recover on what's happened to them comes to fruition.  However,

4    they are not entitled in this situation to, in essence, obtain

5    at this moment what would, in essence, be a preliminary

6    injunction.

7            What they're really asking for when everything is

8    said and done is that 75 percent of principal be held back.

9    Ignore the interest because -- but 75 percent of principal.  At

10   the beginning of this case, it was -- Mr. Allison reported to

11   the Court there's approximately $960 million of outstanding

12   loans -- some have been collected, et cetera -- represented by

13   the 93 million-dollar number but where we are is even if you

14   take that 968 and you reduce it to 800 million of principal --

15   800 million in principal and you apply the Diversified formula,

16   you would be holding back $600 million of principal.  Once you

17   start at 25, you've got to take -- that's the problem when you

18   start using examples.  You can't just look at it in isolation.

19   You have to take it to its logical conclusion.

20           So what happens?  We now have -- when the next 80

21   million comes forward for distribution, we hold back another 60

22   million?  That's the problem.  The holdback right now is $25

23   million.  That is more than adequate and also, your Honor, I

24   want to point out.  We support the motion.  We support the

25   reply that was filed yesterday in support of the motion.  We do

64

1    not support nor did we know about until this morning this

2    concept of holding back an additional 9 million.

3           I went back through my notes and looked at the

4    pleadings and I believe the basis for that is asserted it may

5    -- it may be a fraudulent transfer, either a constructive

6    fraudulent transfer in a 548 or an intentional fraudulent

7    transfer.  Huh-uh.  It's money that was in the collection

8    account.  It was money that was recovered from borrowers.  It

9    is not property of the estate.  It has not yet been determined

10   to be property of the estate and as *Golden Plan* said -- because

11   the same argument was raised in *Golden Plan*.  The Court said

12   you can't do that without an adversary, without an injunction,

13   without going forward.  There's nothing before this Court.

14          There's no difference between that 90 million as

15   being -- other than it was collected prepetition from borrowers

16   versus post-petition from borrowers and we vehemently opposed

17   that holdback which would take it to 59 million distribution

18   and the commensurate 35 million-dollar holdback.  That was a

19   surprise to us and we do not support it.  We support the

20   motion.

21          Your Honor, and I appreciate the fact that the Court

22   knows the *Lemons* case very well since the Court was involved in

23   that case but just a couple things, facts that are before the

24   Court that have been brought out in evidence that have been

25   brought out through this history.  What we know is that USA

65

1    located borrowers.  It located lenders.  We know it caused

2    lenders to fund specific loans through escrows.  We know that

3    notes and deeds of trust were executed directly by borrowers to

4    lenders.  We know the sole right of USA Commercial Mortgage was

5    for fees for servicing loans.

6            That's pursuant to the loan servicing agreement and

7    that USA did receive certain ups, incentives and other fees but

8    that was between them and borrowers but where the lenders came

9    from, direct lenders is they received directly interest in the

10   notes and deeds of trust.  They're beneficiaries.  They're

11   payees. They're listed on these notes.  What we -- and we also

12   know that a collection account was established and the source

13   of funds into the collection account was from the borrowers.

14           Now, we do know that some of these funds once they

15   came into the collection account were misappropriated,

16   misapplied, misused but the fact is that these funds came in

17   from borrowers and that subsequently they were misused by USA

18   CM, part of the reason why we're here.  We also know --

19           THE COURT:  Well, wasn't -- apparently the funds that

20   came from Diversified, didn't they go to the collection

21   account?

22           MR. LEVINSON:  They may have but don't forget.

23   Diversified also was a direct lender.  Sometimes they were a

24   participant.  Most likely they were a sole direct lender.

25           THE COURT:  But didn't they go to the collection

66

```
1    account --

2              MR. LEVINSON:  Yeah, yeah --

3              THE COURT:  -- as opposed to going to the investor

4    escrow account?

5              MR. LEVINSON:  -- that's correct.  So they may have

6    actions as an unsecured creditor.  Vis-à-vis USA Capital, they

7    do but the issue is can they on that basis seek to

8    re-characterize -- is what they're seeking to do -- all the

9    monies so that it's one big pool and I point out to the Court

10   that what's not present in this case, what didn't happen here

11   is that there wasn't a pooling of funds from direct lenders

12   waiting for loans to take place.  There wasn't guaranteed

13   interest returns to direct lenders.  Diversified guaranteed the

14   returns to its investors but the direct lenders we're talking

15   about did not receive guaranteed returns.

16             The returns were not separate and apart from the

17   loans themselves.  There wasn't oversubscription as there was

18   in Lemons.  There wasn't a clear finding by the -- there wasn't

19   a clear determination that from the very moment Lemons came

20   into existence it was intended as a fraud and that's what Judge

21   Jones found.  From the very first go, Lemons was intended to be

22   a fraud.

23             We also know that USA did not make the loans

24   themselves and then assign off interest.  We also know that USA

25   did not make the loans themselves and then grant a security
```

1    interest in the notes and deeds of trust which was the issue in

2    *Staff Mortgage* and *First Trust -- First TD*.  We don't have that

3    and the issues in those two cases was the perfection of a

4    security interest in notes and deeds of trust that's not here.

5    We know that the direct lenders controlled their loans subject

6    to the rights granted under the loan servicing agreement.  All

7    that is known.

8         That separates us from *Lemons*.  There's not this

9    pervasive fraud from day one.  There's not this

10   oversubscription.  There's not this guaranteed return.  There's

11   not this putting money into this 500 account waiting for loans

12   to come available when we can put them in these loans and then

13   without regard to the maturity dates or tie into the loans, pay

14   interest and pay guaranteed returns which had nothing to do

15   with the function of the loans.  *Lemons* was a scam.  It was a

16   scam from day one.  That's why Judge Jones said 541(d) applies

17   to these loans.

18        However, by virtue of the scam -- by virtue of what's

19   taking place, I'm going to disregard that but that whole

20   determination and what Diversified is trying to do is for

21   another day.  That's not before the Court.  What is before the

22   Court are the basic facts that these are direct loans to direct

23   lenders and there's a problem with them being property of the

24   estate but in the meantime as we try -- attempt to go forward,

25   the distribution is appropriate because ultimately the

68

1    holdbacks -- and we'll deal with that as we go -- should be

2    more than adequate at least temporarily to deal with this issue

3    because the Court cannot simply say, I'm going to distribute 25

4    percent or 30 percent, hold back 75 percent and then go to the

5    logical conclusion that is a grant of a preliminary injunction

6    that this Court should not ever go to nor can it go to.

7         Your Honor, I don't believe I need to address any

8    further points set forth in Diversified's points and

9    authorities other than to point out the *Golden Plan* is clearly

10   applicable despite their claim that it's not by virtue of it

11   not being mentioned in *First Trust* and in *Staff* because it had

12   nothing to do with *Staff* and *First Trust*.  That was with regard

13   to a security interest in California law.  We believe based on

14   *Lemons* and based on *Golden* that at this moment initially

15   exercising the Court's discretion, the Court should determine

16   that there's no finding that this is property of the estate.

17   There may be at some point in time but there's enough reserve

18   set aside that the 68 million as proposed should be made.

19        **THE COURT:**  Okay.  All right.  You're probably going

20   to be a while, Mr. LePome.  Let's take a ten-minute break.  Let

21   me just ask the question.  Does everybody want to -- we're not

22   going to take our recess now but does everybody just want to go

23   straight through lunchtime or do you want to take a noon break

24   or what do you want to do -- just for staff instructions?

25        **MR. MEROLA:**  I'd prefer to go right through, your

69

1    Honor.

2              **MR. UNIDENTIFIED:**  Yeah, let's go.

3              **THE COURT:**  Okay. That's what we'll do.  So we'll

4    take a ten-minute break and just go straight through?

5              **(A recess was taken from 11:05 a.m. to 11:21 a.m.)**

6              **THE COURT:**  Be seated.  Okay, Mr. LePome, you were

7    next.

8              **MR. LEPOME:**  Robert LePome representing Dr. Alexander

9    and about 20 others.  Your Honor, our -- I've looked at the

10   agenda.  I guess our earliest opposition occurred in Number 281

11   and the most recent was in Docket Number 905.  Missing from

12   that is, of course, the *Golden Triangle* case, which is property

13   of the estate.

14             Our position -- well, first of all, we're not going

15   to oppose today's distribution, with the limitations that the

16   holdback money be sequestered on an administrative -- in an

17   administrative way in the trust account.  I call it the trust

18   account, the investor account, and that doesn't -- has no

19   problem with me, after all I'm an attorney and I have all kinds

20   of peoples' money in my trust account, but I can't use it for

21   myself, of course, and the same is true for the debtor as I

22   understand their offer here and that's acceptable to my clients

23   at this point.

24             So with that in mind, I'll be very, very brief.  We

25   have before us Docket Number 987, which is -- and I've looked

70

1   at a lot of these -- this is an appellate brief.  It's an

2   appellate brief by Diversified.  We have 1042, which is the

3   Direct Lenders Committee's appellate brief, but it doesn't say

4   table of cases and everything else on it.  But the issue, of

5   course, will be decided and the Court now has the benefit of

6   both sides.  I'd like to just add one item because I spent a

7   lot of time in the library and I'd hate to pass this

8   opportunity.  *Nielsen versus Chang* (phonetic), which is a Ninth

9   Circuit case, doesn't overrule and he was wrong when he said

10  certain direct lenders may raise an argument that overrules

11  *Lemons* (phonetic).  No, it doesn't.  He knew what I was going

12  to say, but it doesn't.  It just indicates that *Lemons* is

13  inapplicable.

14          But their footnote at the end of their brief says

15  that it's limited because of special California statute.

16  That's a misstatement.  The California statute only says that

17  you don't have to have physical possession of a recorded deed

18  of trust if it's recorded -- if the possession is in the name

19  of the loan servicer -- in the hands of the loan servicer.

20  That's all it says.

21          The law, however, is very clear.  There is an

22  adversary proceeding for avoidance of the security interest

23  brought by a Chapter 7 Trustee.  There was -- and I'll use the

24  words of the case -- there was a scheme.  Defendants took from

25  one investor to pay interest on another, however in that case,

71

1    which was more egregious than ours; there were the group of

2    people who had recorded deeds of trust.  And the upshot of it

3    is, in the Ninth Circuit, if you have a recorded deed of trust,

4    you are a secured creditor.  And so this idea of the expediency

5    of making one big pool isn't going to work in the Ninth

6    Circuit.  We don't have any objection to the distribution as it

7    is presented with the safeguards today.  That other day when

8    this is all going to be decided we hope will be the 31st,

9    because finally I've decided to take the Court's advice or

10   admonition and not just go and oppose things, but make an

11   affirmative motion and that's set for the 31st.

12            And why is it necessary that the Court decide this?

13   Because they have to file a plan.  They have to propose a

14   distribution under the plan.  They need this Court's guidance.

15   I hope we'll get a ruling one way or the other on the 31st.

16   Thank you, Your Honor.

17            **THE COURT:**  Okay.  Anyone else?

18            **MS. CHUBB:**  Your Honor, I can't purport to be the

19   blue bird of happiness, although I will always now think of

20   Mr. Merola in that guise, but I will attempt to be brief.  I

21   would ask that the Court admonish everyone again to distinguish

22   the direct lenders from the investors.  I'm getting a little

23   confused when references are made to investors and not

24   distinguishing between them and the direct lenders.

25            I applaud Mr. Levinson.  He's doing a laudable effort

72

1    to make this little sows ear into a silk purse, but I think

2    Mr. Gordon has correctly pointed out that the direct lenders,

3    to the extent secured and perfected and recorded, own these

4    loans and there's been no evidence to the contrary.  They have

5    -- they're entitled to the proceeds, these are post-petition

6    proceeds, that's the law in Nevada, it's the law in the Ninth

7    Circuit.  USA is a loan servicing agent and that's all USA is,

8    with respect to these direct loans, they're entitled to fees.

9    It remains to be seen what attorneys' fees might be allocated

10   based on foreclosures and so forth.  Under NRS 645, USA has a

11   duty, as soon as fees are taken out, to distribute those fees

12   to the lenders.  They have no right to set off, we haven't seen

13   any right to withhold, we haven't seen an adversary to recoup,

14   none of those things are before you today.

15            However, if the Court is going to grant the debtor's

16   motion, and I would say our motion also, that having been filed

17   on May 11th, the debtor's motion to pay having been filed on

18   July 7th, I don't see how our motion is subsumed by the

19   debtor's motion, both motions would be granted, at least in

20   part.  That if you're going to do that, that it is consistent

21   with what the debtor's have said, without prejudice to the

22   direct lenders and it might be appropriate for the Court to set

23   up a procedure, require that a procedure be set up so that we

24   can determine these issues before we get to plan confirmation.

25            I would, if my motion isn't going to be granted in

1    whole, concur that the distribution and amount suggested by the

2    debtors is appropriate one.  And I think that there is a safe

3    and easy way to do this, and that would be to do just something

4    affirmative, that is to say the distribution of $68 million can

5    be made and that property, which is not property of the estate,

6    released without prejudice to anyone to raise those issues

7    later.  That way we don't get into any findings about property

8    of the estate under 541.  We don't have any determination that

9    there's a right to holdback, there's no prejudice to any

10   claims.  You're doing something that is limited to releasing

11   property to these individuals and entities.

12           With respect to our motion to -- for stay relief, I

13   had asked when we were here earlier to have it continued,

14   hoping that something might change in the meantime and that we

15   would have resolution of some issues we don't.  If you're going

16   to deny that, I'd like it denied without prejudice please.

17           And with respect to the motion to distribute if, in

18   fact, you do allow release of monies, I'd like to submit an

19   order with respect to my motion also.  Thank you.

20           **THE COURT:**  Okay.

21           **MR. SCHMAHL:**  Good morning, Your Honor.  Michael

22   Schmahl on behalf of Dr. Gary Kantor and various affiliates.  A

23   little different than some of the other parties you've heard

24   from this morning.  We have not taken a position on whether or

25   not there should be a distribution.  I'm standing up to --

74

1  really to clarify a couple of issues.  One is, Ms. Jarvis

2  mentioned, my understanding is that any holdback with respect

3  to my clients is going to be -- there's going to be extensive

4  accounting entries.  I just want to be -- have -- clarify that

5  that money is not going to be comingled, used for another

6  purpose and that is -- any holdback should be kept, just so

7  it's very clear that if there's going to be an issue down the

8  road and a final determination whose money that will become in

9  that proceeding.

10        Additionally, with respect to future distributions,

11  especially in light of the fact that that issue is going to be

12  preserved for the 31st, I want to clarify that our objections

13  with respect to the manner in which netting may take place

14  principally, whether or not fiduciary funds are going to be

15  netted against personal funds, in other words, whether a

16  vesting name or account number is going to be used.  Our

17  understanding, and I think Ms. Jarvis has been clear, is that

18  the debtor is only going to be netting on the basis of account

19  -- or excuse me, vesting.  If in the event that were to change,

20  or as some other parties have suggested it should change, I

21  would ask that that be additional notice be given and that our

22  objection remain standing with respect to any future

23  distributions.

24        THE COURT:  Well, it's kind of impossible for us to

25  go back literally 1,200 docket entries and determine who's on

1    first with anything.  So I would ask you, and all the parties

2    in this case, if -- and I know we keep continuing things

3    because they're semi-resolved, but I think for the benefit of

4    everybody if you were just, if nothing else, file a one page

5    sheet that says our position remains the same as set forth in

6    docket number so-and-so, and we oppose, support, whatever, so

7    that everybody knows what your current position is, because

8    everybody's position sort of changes along the way depending on

9    what new information you get.

10           **MR. SCHMAHL:**  Certainly, Your Honor.  I just wanted

11   to be clear that to the extent --

12           **THE COURT:**  And I appreciate what you're saying, yes.

13           **MR. SCHMAHL:**  -- that our objection has been

14   resolved, I don't want it waived.

15           **THE COURT:**  Okay.

16           **MR. SCHMAHL:**  Thank you.

17           **THE COURT:**  Anyone else?

18           **MR. KONRAD:**  Thank you, Your Honor.  Mark Konrad on

19   behalf of one of the single direct lenders, Norman Kiven.  I'll

20   be brief because a lot of these issues have been addressed

21   before in various respects.

22           A couple points, I think, are key to this proposed

23   distribution here today.  First, we're talking about

24   distribution of post-petition assets and the debtor has taken

25   the position that I want to give certain monies that were

76

1   received post-petition back to the direct lenders.  And they've

2   done that with proper -- with all the lawyerly qualifications

3   that are in place.  What they also do however is say, I'm going

4   to give some of it back, I'm going to reserve all my rights as

5   to that, but I'm not going to give it all back because, even

6   though I'm reserving the rights as to everything I'm giving

7   you, I really, really want to reserve my rights by holding it

8   for the part I don't give back to you.

9           **THE COURT:**  Well, let me understand.  Your client

10  received money on loans which he held an interest in, but

11  weren't paid, right?

12          **MR. KONRAD:**  My client, Norman Kiven, is your

13  hypothetical that you went over earlier this morning.

14          **THE COURT:**  Okay.

15          **MR. KONRAD:**  Some performing, some non-performing.

16          **THE COURT:**  Right.  So he received monies on loans

17  that nobody was making any payments on, right?

18          **MR. KONRAD:**  He received --

19          **THE COURT:**  Some of them.

20          **MR. KONRAD:**  -- payments on performing loans,

21  correct.

22          **THE COURT:**  He also received payments on loans that

23  weren't performing, right?

24          **MR. KONRAD:**  In terms of every specific loan, I don't

25  have the detail, because we've asked the detail and haven't --

1          THE COURT:  Well, obviously if there's a holdback --

2          MR. KONRAD:  Sure.

3          THE COURT:  -- then obviously he received payments on

4     some loans --

5          MR. KONRAD:  And that's what they --

6          THE COURT:  -- that weren't performing.

7          MR. KONRAD:  And that's what they claim.

8          THE COURT:  Okay.  And you have no reason to dispute

9     that now, right?

10         MR. KONRAD:  I have no facts -- and again, we've

11    asked for the facts to support.

12         THE COURT:  Okay.

13         MR. KONRAD:  They've asked to hold back $50,000.

14         THE COURT:  All right.  So let's assume that indeed

15    the borrower didn't make the money and --

16         MR. KONRAD:  Sure.

17         THE COURT:  Okay.  Now how is your client going to

18    pay that back?

19         MR. KONRAD:  Well, if I understand what their

20    position is, if they pay -- let's just say they pay a hundred

21    thousand, two hundred thousand, whatever, to my client and

22    they're holding back fifty thousand.  They're still saying I

23    get to go get after the money that I've already paid you, but I

24    still want to just hold some money of it back.

25         THE COURT:  Right.  But is your client going to

78

1    voluntarily pay it back?

2             **MR. KONRAD:**  No.  They have to file an adversary

3    proceeding, and I think everyone agrees about that.

4             **THE COURT:**  So, what was the -- so, it's a gift to

5    your client?

6             **MR. KONRAD:**  No.  It's subject to --

7             **THE COURT:**  Was it a gift?

8             **MR. KONRAD:**  It's subject to a legal determination.

9    And that's --

10            **THE COURT:**  Well --

11            **MR. KONRAD:**  I mean, again --

12            **THE COURT:**  -- you have no basis to say that he had

13   any rights to those monies.

14            **MR. KONRAD:**  Well, we are talking about the post-

15   petition payments, your Honor.  And --

16            **THE COURT:**  But he received payments pre-petition for

17   which he wasn't entitled.

18            **MR. KONRAD:**  That's their assertion, which hasn't

19   been established.

20            **THE COURT:**  You have no evidence to dispute that.

21   Right?

22            **MR. KONRAD:**  Well, your Honor, I don't think that has

23   been established yet.  That's the point.

24            **THE COURT:**  What's your evidence to dispute that he

25   received payments on loans that indeed were performing?

1          **MR. KONRAD:**  Your Honor --

2          **THE COURT:**  I mean, your idea is a wonderful idea --

3          **MR. KONRAD:**  I understand.

4          **THE COURT:**  -- but the point is, it's like all these

5     people who suggest we should net --

6          **MR. KONRAD:**  Sure.

7          **THE COURT:  --** how are you going to pay it back, and

8     was it a gift?  You're obviously arguing it was a gift; I don't

9     have to pay it back; come sue me; you come get me.

10         **MR. KONRAD:**  Our position is, your Honor, is -- and I

11    understand your Honor's position and the difficulty that puts

12    it in.  But that's the process that the law has set up for it.

13         **THE COURT:**  Why -- well, it was a series of

14    transactions.

15         **MR. KONRAD:**  Yeah, but they're unrelated.  There's --

16         **THE COURT:**  It was one account.

17         **MR. KONRAD:**  There's different loans.

18         **THE COURT:**  There was one account.  I mean there was

19    one check made, right?

20         **MR. KONRAD:**  Right.

21         **THE COURT:**  You got one check every month, right?

22         **MR. KONRAD:**  Right.  And, your Honor, for example --

23         **THE COURT:**  So, why should you get a gift?

24         **MR. KONRAD:**  Well, first of all, the theory upon

25    which the debtors are claiming that interest are theories like

80

1    recoupment and theories like restitution.  And --

2            THE COURT:  And what's your theory that he doesn't

3    have to pay it back?

4            MR. KONRAD:  Our theory is the contracts say we're a

5    direct lender on this; we're entitled to this less the fee.

6            THE COURT:  You weren't -- wait a minute.  Wait a

7    minute.  You weren't guaranteed a return on every loan.

8            MR. KONRAD:  No, we were -- we were to be paid

9    pursuant to the contract.

10           THE COURT:  Okay.  So, what about the money that you

11   got paid for which you had absolutely no entitlement?  What's

12   your theory, legal theory, for keeping that money?

13           MR. KONRAD:  Well, the legal theory is they will have

14   to tell us that's what happened, prove that up, let us respond

15   to it, and then --

16           THE COURT:  Okay.

17           MR. KONRAD:  -- if they're entitled to it --

18           THE COURT:  Go sue us even though we know we don't

19   owe that, we owe you that money.

20           MR. KONRAD:  You're assuming, your Honor, that that's

21   been established.

22           THE COURT:  You have no facts, not one fact, to

23   support the position that your client was entitled to that

24   money.

25           MR. KONRAD:  Well, your Honor, again, I --

81

1      **THE COURT:**  Did you do anything to determine whether

2  or not he was or wasn't entitled to the money?

3      **MR. KONRAD:**  We've asked for the facts for that.  We

4  have asked for the basis for the netting and for the reserves.

5  And we haven't been given any of the documentation to support

6  all this.

7      **THE COURT:**  So, your client received how much pre-

8  petition on loans that weren't performing?

9      **MR. KONRAD:**  I won't have that number in front of me,

10  your Honor.

11      **THE COURT:**  Forty thousand?  Fifty thousand?

12      **MR. KONRAD:**  Well, the number that they proposed to

13  withhold is approximately $48,000.

14      **THE COURT:**  So, he received 48,000 for which there

15  was no entitlement, and now he wants to keep receiving money,

16  notwithstanding the fact he got money he wasn't entitled to.

17      **MR. KONRAD:**  Well, your Honor, that 48,000 is, again,

18  based on their estimate, based on their calculation.

19      **THE COURT:**  Okay.  So, if they're correct, then why

20  shouldn't they net?  If that's a correct statement --

21      **MR. KONRAD:**  Sure.

22      **THE COURT:**  -- that he received money he shouldn't --

23      **MR. KONRAD:**  Sure.

24      **THE COURT:**  **--** then he should receive it.

25      **MR. KONRAD:**  Sure.  And that's the entire point, your

1   Honor.  They want to keep this money in reserve, right?

2   Because they're saying:  We have a potential claim, a potential

3   theory.  We have --

4           **THE COURT:**  What's so potential about the fact that

5   he was paid money on a loan that wasn't performing?  What's so

6   potential about that?

7           **MR. KONRAD:**  Well, your Honor --

8           **THE COURT:**  It's not -- it's not a theory such as

9   we're talking a Lemons theory.

10          **MR. KONRAD:**  Sure.  Sure.  I understand.

11          **THE COURT:**  It's a straight -- did he -- was the loan

12  paid?  Did the borrower pay the money --

13          **MR. KONRAD:**  Sure.

14          **THE COURT:**  -- or didn't the borrower pay the money?

15          **MR. KONRAD:**  Sure.  Your Honor --

16          **THE COURT:**  And, so, I guess the point is, too, what

17  if -- what would -- how would you feel if your client hadn't

18  been -- had been one of these people who had been paid on

19  things and shouldn't -- I mean, I'm sorry -- whose loan was

20  paid off and shouldn't have been, and they didn't get paid, and

21  now your client wants it all?  Your client wants everything

22  even though his wasn't paid.

23          **MR. KONRAD:**  Well, I would put it this way, your

24  Honor, respectfully.  My client would like the procedural steps

25  to be, if they believe they're entitled to that claim -- to

83

1   $48,000, correct?  If they believe my client improperly

2   received that monies, that they follow the procedural steps

3   through a proceeding and --

4        THE COURT:  So, you're saying they've got to file a

5   lawsuit against everybody who got extra money.  And you're

6   saying that your client wants to spend the extra money for you

7   to defend a lawsuit and go through a whole adversary

8   proceeding, which would probably cost another $30,000.  That's

9   what you want.

10       MR. KONRAD:  Well, your Honor, one of the things

11  that, frankly, I was confused about in today's argument and the

12  opening statement made by the debtor's counsel is I believe

13  there was some reference made saying that final determinations

14  will necessarily require an adversary proceeding or a motion or

15  some sort of thing --

16       THE COURT:  That's fine.  So, you're saying --

17  really, you're saying no distribution should be made until we

18  know for sure.  Why is it fair?  Why is it fair to let your

19  client have some of the money and really all the money in the

20  meantime?  Why shouldn't we hold up distributions?  How can you

21  claim it's a limited opposition when you're saying the scheme

22  is not right?

23       MR. KONRAD:  Actually --

24       THE COURT:  How can you have your cake and eat it,

25  too?

84

1      **MR. KONRAD:**  Actually, I think the point is we're

2   saying make the full distribution and that there is a

3   determination that --

4          **THE COURT:**  Okay.

5          **MR. KONRAD:**  -- it was overpaid.

6          **THE COURT:**  So, the person who didn't get -- you got

7   paid extra.  And the person who didn't get paid, go come sue

8   me; we'll go fight that lawsuit; you come sue me.  Who's going

9   to pay for that?  Who's going to pay -- how is the estate going

10  to have the money to pay for that?

11         **MR. KONRAD:**  Your Honor --

12         **THE COURT:**  And you're also saying that means,

13  because there is only so much money in the pot, your client

14  gets everything he is owed notwithstanding the fact that

15  everybody else in the exact same position didn't get paid.

16  Right?

17         **MR. KONRAD:**  Well, your Honor, that is the inherent

18  difficulty with this case, because there's different -- I think

19  if you look across the panel here, you've got some saying I

20  should receive all; you see some saying I should get a portion;

21  you see some saying just pretend that -- we'll just take 25

22  percent of the principal, and we -- I mean, you have different

23  reserves and different estimates being played for all these

24  different amounts.  And, again, going back to the rule --

25         **THE COURT:**  Well, the netting amount is a different

85

1    amount.  That's a hard, concrete number based upon what people

2    received before and that they shouldn't have received.

3            **MR. KONRAD:**  And the theory that supports that, as

4    they sit here today, they say:  We're not asking for a

5    determination of what supports that netting number.

6            **THE COURT:**  So, therefore, you're saying we should

7    make no distributions today because we don't have a legal

8    theory.  That's exactly what you're saying.

9            **MR. KONRAD:**  I'm actually saying, your Honor, I

10   believe that --

11           **THE COURT:**  No.

12           **MR. KONRAD:**  -- the --

13           **THE COURT:**  If I go your way --

14           **MR. KONRAD:**  -- the distribution should we go

15   forward --

16           **THE COURT:**  No.  If I go your way, I made the

17   determination and the case is now moot.  I've passed out all

18   the money; there's no holdback; it's now moot.  You're going to

19   argue it's moot.

20           **MR. KONRAD:**  Well, my client's position, your Honor,

21   is that they would like the full distribution.

22           **THE COURT:**  So would everybody in this case.

23           **MR. KONRAD:**  I don't disagree with that statement,

24   your Honor.

25           **THE COURT:**  Okay.  Thank you.

86

1          **MR. KONRAD:**  Thank you, your Honor.

2          **THE COURT:**  Mr. Charles?

3          **MR. CHARLES:**  Mr. Landis always likes to go last

4   because he has new ideas.  I don't want to repeat.  I only want

5   to do, really, two things, but one is to follow up on what

6   you're saying, and in some ways, for the benefit of the larger

7   constituency, to focus just on the netting and why that's

8   important.  And at the risk of taking an extra minute of your

9   life, this is the loan summary that the debtor has produced,

10  and if you can't read it, I can't either, because I have to

11  have my reading glasses on.  But if you --

12         **COURT RECORDER:**  Counsel, could you move the

13  microphone closer to you, please.

14         **MR. CHARLES:**  Sorry.  I apologize.

15         If you look on the columns, the column that's -- the

16  issue in terms of the netting is this column, interest prepaid

17  to direct lenders.  That's the netting issue.  And to give you

18  a sense of the order of magnitude for it, I want to turn to the

19  last page.

20         **MR. LEPOME:**  I blew one up.

21         **MR. CHARLES:**  Mr. LePome has a bigger one.

22         **MR. LEPOME:**  Yeah, I blew mine up.  Maybe you can use

23  that.

24         **MR. CHARLES:**  Because he brought a lighter briefcase.

25  So, again, the column, your Honor, and folks in the audience,

87

1    is interest prepaid to direct lenders.  That's the netting

2    issue.  How big an issue is it?

3           **MS. CARLYON:**  I'm sorry to interrupt.  Just for the

4    benefit of anyone that has the pleadings, this is Docket 1090,

5    Exhibit D, which was filed, I think, yesterday.

6           **MR. CHARLES:**  And it's been on the website for some

7    time now.

8           Same column, last page.  The total today is

9    39 million and change.  That was 41 million and change in the

10   schedules.  Why do I care?  I represent the unsecured creditors

11   committee.  Mr. Levinson says I am his lawyer.  And this is, in

12   our view, one of the few assets of Commercial Mortgage.

13   Parenthetically, frighteningly, this is one of the few assets

14   that may be available to deal with liquidity and professional

15   fees.  And at half a million bucks a week, that's a big --

16   that's a big concern.  But, in any event, that's the netting

17   issue.

18          And what you just described with counsel is -- let me

19   give you a quick example of why -- when an investor says to

20   you, or a counsel says to you, you can't net loan by loan,

21   they're wrong.  And Mr. LePome's chart is great, but I just --

22   it's bigger, and, so, I have to find what I'm looking for.  I'm

23   going to take you to an example of -- they say there's only

24   nine loans paid in full?  True.  And if we could look at this

25   loan -- come on, Rob -- repaid on the far left, Opaque Mount

88

1  Edge (phonetic).  The prepaid interest column for that loan

2  was -- I have to look down -- $778,000.  So, that's -- in the

3  39 million, that's what our committee is looking for as a

4  recovery.

5           What do we have in the collection account?  That's

6  this top right, collection account.  Now go back to the repaid

7  loan.  In the collection account, we have interest of a little

8  more than the prepaid interest.  Stop and ask your question

9  again of the direct lenders.  The loan -- the interest was

10  prepaid by the borrower -- I'm sorry -- by Commercial Mortgage,

11  by the crooks.  It's now been collected from the borrower.  Do

12  you, borrower, get to keep it?  They can't say yes.  You know;

13  we both know, that's a classic fraudulent transfer.  And,

14  parenthetically, I will be sending Ms. Jarvis the letter today

15  that says, "Hi; if you can't, I guess I should file the

16  fraudulent transfer complaint, because some of this money can't

17  be collected through netting."  But there is no -- the only

18  argument on fraudulent transfer is going to be insolvency.

19  There is no other argument.  And given that we know 11 million

20  was stolen in the beginning of '03 from Diversified, I know how

21  insolvency is going to turn out.  We litigated Boston Chicken;

22  I know how this will happen.

23           So, that's netting, and that's why you're right; on a

24  loan-by-loan basis, and that's why the direct lenders, when

25  they said, "Oh, we reluctantly were dragged to agree to direct

89

1    lend" -- "to lending on a loan basis," no, they weren't.

2    They're dead on that.

3          The slightly harder issue is the investor basis as

4    opposed to loan-by-loan.  And the reason to do it is set forth

5    in the papers, and the practical reason is, if you don't let --

6    net on that basis, then look at a loan where there is a large

7    amount of prepaid interest that's not been collected yet.

8          Go to a non-performing loan.  It's called the Marquis

9    Hotel.  And as you spread across to the right, its prepaid

10   interest is over two million three.  That's putting down into

11   the 39.  I wish it was, but it's not 41 million anymore.  To

12   collect that for the creditors, if what you're saying is,

13   "Please come sue me with a fraudulent transfer complaint," if

14   Annette can't, we can file that on Wednesday if she'll give us

15   the list of the investors and the dates and amounts of the

16   transfers.  And we can have them served within about a week and

17   spend a lot of money.  Thirty thousand is a light estimate for

18   that cost if they all want to fight.  But that's not the right

19   answer either, and that's why we said you should withhold some

20   more.  But on this withholding issue I don't think there is any

21   serious argument.

22         The first question you asked about the IRA's.  The

23   trouble that we have, we would like there to be more data so

24   that we could test at least just the first question.  If you

25   have two different investors with what they call "vesting

90

1   names," are there any that have the same identical human being

2   name?  And Mesereaux says:  We don't know; we haven't been able

3   -- we haven't captured that data yet.  I'm not criticizing; I'm

4   just telling you they have no idea.

5         Do you have some that have identical social security

6   numbers?  We think so; we don't know, and we haven't captured

7   the data in a way you can test.

8         And just as the simplest example, addresses:  Do you

9   have any that are the same -- different vesting names but the

10  same address where the checks go?  We don't know.  Haven't --

11  that data is not searchable in the format that it's in.

12        And that's why it's a limited opposition on the

13  vesting, because we think the debtors have not been careful

14  enough in terms of the netting.  And I do not want to have to

15  sue people.  That seems to me like the wrong answer.  Even if

16  it's a lawsuit that we can win, that's a terrible thing to have

17  to do.

18        And, so, that's why we argued in our response you

19  should net on a broader basis.  It is true that you don't have

20  a basis now that you can prove has identity mutuality kinds of

21  characteristics.  But their account codes are close.  This is

22  the group that we lumped all investors in; that's why we said

23  you should lump by that.  Mr. Merola says:  Don't be an idiot;

24  it's only a million three -- he may not have said "idiot" --

25  but why are you wasting your time on a million-dollar issue?

91

1    Well, because out of $39 million, a million three actually does

2    matter.

3           Second point.  And I'll hurry.  There are embedded

4    issues in the netting that we have not dealt with.

5           Let me give this back to Mr. LePome.

6        **(Pause)**

7           Right now Commercial Mortgage, our estate, is in the

8    bull's eye for the fees of our committee, most of or some

9    substantial part of the debtor's professionals, and presumably

10   the direct lenders.  And we put in our papers:  Those are not

11   small numbers; debtors, have you done anything to reserve for

12   that?  No.

13          What about the $300,000 of Hillco?  Only one of the

14   loans we're sending out now has to do with that, but they have

15   not gotten their hands around netting -- putting out the

16   Hillco.

17          How about, you know, another a couple of million-

18   dollar issue?  In the servicing agreements that are dated 2005

19   and '06 but are in a form that dates back to '04, apparently,

20   Commercial Mortgage can charge up to three percent.  The

21   netting that's proposed and the servicing fee that's being

22   charged is only charged on a one-percent basis.  If you look at

23   all the loans that are made in '05, '06, they're not all to new

24   investors then.  There is some serious coin that is going out

25   to investors who probably could be charged three percent, and

92

1    the debtors have no way today to tell you who they are or to

2    collect it back.  And every dollar that you don't collect back

3    today, when you're sending out principal is gone, how do you

4    know that?  It's only nine loans we're told.  It is only nine

5    loans of principal we're told.  This is Mr. Allison's

6    declaration:  It's only nine loans that total $60 million of

7    principal.  Those are paid out.  When those investors get that

8    money, it's gone.

9              If these little issues don't stop as today -- and I

10   kind of get the it's very complicated; let's make the first

11   interim distribution and then deal with it down the road.  I do

12   not want to have to make these arguments on the 31st.  I want

13   them to say we are charging the right service fee, we have a

14   proposal for dealing with the admins, we're not going to let

15   direct lenders -- yes, innocent -- but also free riders on the

16   backs of the assets of the unsecured creditors.

17             Last topic.  The $9 million that Mr. Gordon just

18   found out about and he's upset about, what we found out about

19   it when we read Mr. Tucker's declaration -- and we're upset

20   about it, too, but for a different reason.  Those are

21   prepetition monies.  There's money in the account on the

22   petition date.  And Ms. Smith, who works incredibly hard, says:

23   I'm pretty sure that I have accounted for it the best that I

24   can and that you contract this money to loans, and so I want to

25   treat this as lender money.

EXCEPTIONAL REPORTING SERVICES, INC

93

1          Mr. Tucker's declaration -- and I could point you to

2    particular paragraphs if you want to read it -- says:  I don't

3    think that's true but they haven't given me the data to prove

4    this.  For example, in his declaration -- let me show it to you

5    because it's a pretty picture -- and when we read it, it scared

6    the hell out of us.

7          This, (indicating), is Mr. Tucker's declaration; and

8    I apologize for not numbering the docket number.  And here's

9    the chart in Paragraph 23 on Page 8.  And he's here.  But what

10   he says is, basically, the stuff that's in the box, those

11   appear to have the same date within the 28th to March 1st.

12   These are borrower principal payments, so this is money that

13   Mesereaux tracked.  And by the way, thank God for Mesereaux we

14   can start getting the records.  I am not complaining that

15   they've not done it.  There's just some more work to be done.

16         On this loan, Delval (phonetic), money that's deemed

17   to be in the account.  So that would be money that we still

18   have that's going to go out in the distribution motion.

19         Roam Development, a different loan, deemed to be in

20   the account not -- deemed to be not in the account.  So that's

21   diverted principal money.  So if you're a Roam Development

22   lender, this check was stolen says Mesereaux, and these

23   weren't.  But they bend, the date bends.

24         And so what we've said in the 9 million -- and it

25   literally comes up when you finally get your hands around

94

1    data -- it's not in the debtors' motion.  They don't say

2    there's $9 million that we had to take some judgment calls at,

3    and they can't put -- at least as of right now they can't put

4    into Mr. Tucker's hands:  Here are the checks, here's the

5    tracing, here's how we know exactly whose money it is.  But you

6    can't be sending prepetition money out of a commingled account

7    in a distribution motion unless you know for sure it's their

8    money.  And Mr. Tucker's declaration explains why he does not.

9          I'm not going to repeat, although I do support

10   Mr. Levinson's arguments on the overall issue, mostly because

11   that you've heard it and I don't want to get beaten up.  But on

12   the netting issue I think our positions make sense, and if

13   they're not accepted today we're not going to appeal.  But I do

14   want answers to those things, please, by the 31st.  And the

15   9 million we need some data.  But Ms. Jarvis said at the

16   beginning show Mr. Tucker -- I'm not even going to ask for

17   another financial -- just take one, show them it works.  If it

18   works, fine; if not, we'll bring it back to you and argue about

19   tracing it.  Thanks.

20          **THE COURT:**  Uh-huh.

21          **MR. LANDIS:**  I brought my Code, your Honor, but I'll

22   be brief.

23          This is a limited opposition.  And the limited nature

24   of the opposition is to make sure that the money that you

25   intend to use to make this interim distribution is identified

95

1    clearly.  And now you know, and I think Mr. Charles laid it out

2    very clearly, that there's a lot of different sources of the

3    money in the collection account that will be used to fund the

4    distribution.

5           But here's what you do know about the collection

6    account.  The money that's in there started out at about

7    $9 million and now it's up to about 93 according to what

8    Mr. Allison tells us.  The real question I had was, well,

9    they're going to distribute about $68 million.

10          What about the plan, Judge?  We've been talking in

11   these cases a lot like it's just --

12          **THE COURT:**  Well, how can you say it's a limited

13   distribution?  You're saying I can't do it except through a

14   plan.

15          **MR. LANDIS:**  Well, I am not going there.  You're

16   ahead of me, and that's anticipating an argument I'm not going

17   to make.  I'm just going to say to you keep in mind it's an

18   eleven.  Because all these discussions talk about giving out

19   money without a plan.  I'm not saying that's improper.  Let's

20   get focused on though is what is it that we're about to send

21   out.

22          What we're about to send out is collections post-

23   petition that have been put into an account commingled, and now

24   we're talking about giving it to the investors who, by the way,

25   richly deserve it, okay.  And I share Mr. Morela's idea that

96

1    the best thing that could happen would be that there would be a

2    distribution in this case.

3        But I say that reorganization word, and here's where

4    it comes into play.  Somewhere along the way the debtor's got

5    to be able to show that it's feasible that they can finance a

6    plan of reorganization.  And that encompasses money that

7    they're supposed to earn by way of servicing fees and so forth

8    from the loans that they collect under the agreement.  That's a

9    component of the money that's in the collection account, too.

10        So here's really what my limited opposition boils

11   down to.  Sorry.

12       **(Pause)**

13           "Property of the estate includes property in which

14           the debtor holds only legal and not an equitable

15           interest and so forth but only to the extent of the

16           debtor's legal title to such property but not to the

17           extent of any equitable interest in such property

18           that the debtor does not hold."

19        All right.  So what are we really talking about here?

20   Some of the money that's in the collection account is arguably

21   service fees, and the debtors think that they're entitled to it

22   and that's why they want to hold it back.  It feels a little

23   bit like an adversary proceeding.  But I'm going to leave that

24   for a moment.

25        The second thing is, is that the debtors want to

1    control the disposition of that money.  They want to say we

2    want to net out so that we don't have problems later on.  The

3    problem is, is that what they want to hold back isn't property

4    of the estate under Section 541(d).

5         So the real question that's left is this one.  If

6    we're going to distribute 67, $68 million to the creditors in

7    this case, are we taking money that will ultimately be needed

8    for purposes of reorganization or are we doing what we really

9    ought to have been doing all along and simply giving property

10   that wasn't property of the estate back to the debtors?

11        And here's the good news.  When I filed my opposition

12   on the 27th I didn't have the benefit of Mr. Allison's

13   affidavit, which was filed on August 2nd, in which he indicates

14   that based on the nine post-petition loans that have been

15   collected there's about just shy of $70 million available as a

16   result of post-petition collections on prepetition loans.  It's

17   a little bit more than the amount of money that's going to be

18   paid out.  And here's the rub:

19        If the money that's going to be used to pay and make

20   this interim distribution is the collections from the post-

21   petition loans and to the extent that that money is enough to

22   make the distributions proposed in the motion and to the extent

23   that it is not property of the estate, there is no reason not

24   to make that distribution.  And that's the position of the

25   United States Trustee.

1          The concern we have is whether or not the holdback is

2    enough.  And I'm not going to address that other than to say if

3    the Court will simply find that the money that is going to be

4    used to fund the interim distribution is post-petition

5    collections and, therefore, not property of the estate, there

6    is no reason not to make the distribution, period.

7          The concern that the United States Trustee has is if

8    you don't make that clear line of distinction, if you don't

9    hold back the $9 million that has been discussed and if you

10   don't hold back enough money to pay the debtors' alleged claims

11   for the loan servicing fees, you compromise perhaps their

12   ability to reorganize.  And what you're really dealing with

13   under this motion is a creeping plan.  And that's the reason

14   for the limited opposition.

15         We don't want money that is estate property to be

16   used to pay investors.  So we need a clear line of distinction

17   as to what the money is that will be used to pay these

18   investors back.  And what we're asking the Court to do is be

19   very careful and clear when it makes distributions from the

20   collection account.  If there's going to be this distribution,

21   be specific that it is not, in fact, property of the estate;

22   that it is going back to the debtors who deserve it; and to the

23   extent that there is a property interest that the debtors hold

24   in that money, you're not compromising it now.  And that's the

25   money that's going to formulate the holdback judgment.

1          And I want to follow up on one observation.  There's

2    been a lot of comments about, well, let's just do this and

3    not -- you know, let's everybody reserve rights.  Well, I think

4    it's better to be clear on what's happening at the time that it

5    occurs so that you don't have difficulties later, Judge.  And

6    like I said, the good news is there is enough in post-petition

7    collections to make the distribution that the debtors propose

8    in the motion.

9          We just simply don't want two things to happen.  We

10   don't want to start because of the commingling that's occurring

11   within the collection account to lose track that only a small

12   portion of that money really is estate property.  We don't want

13   to lose track of the fact that to the extent that that small

14   portion exists it shouldn't be distributed now because it may

15   ultimately need to be paid out as part of a plan if there is,

16   in fact, going to be reorganization here; and because, let's

17   face it, Judge, at some point in time what this case really

18   comes down to is the ability of these debtors to reorganize.

19         And for the first time today I've heard now that

20   there's not going to be a plan filed, and obviously there

21   wasn't by July 31st.  Now I hear that they want to file a

22   motion to August 31st.  And we haven't been asked if that was

23   okay.  We certainly didn't consent to it.  And what I would

24   say, Judge, is this.  If they file a motion within the time for

25   extending the exclusivity period, if the Court awards it, it

1    ought to be done one time.  Because if you allow this to

2    continue to occur, what's going to be happening is they're

3    going to be continuing to use money that comes into the

4    collection account and divvying it out under Section 363(b)

5    over time.  That's not a proper use of Section 363(b).  These

6    debtors are here before you as reorganizing debtors under

7    Chapter 11.  What we would be asking, Judge, is if they do file

8    that motion, if the Court is inclined to grant it, make it very

9    clear that that would be a one-time extension.

10         The bottom line, your Honor, is this.  We'd like to

11   see the blue bird of happiness land on the shoulders of the

12   investors because they richly deserve it.  In the process of

13   doing that make sure that the money that's used to pay them is

14   the proper money.  Make it clear that you're not compromising

15   estate assets for purposes of that distribution.  Hold the

16   debtors' feet to the fire on the reorganization status of this

17   case.  Thank you.

18         **THE COURT:**  Okay.

19         **MR. GALLOON:**  With respect to the request that

20   additional funds be withheld, our position is that they should

21   not be.  There's $30 million that's being withheld right now.

22   The Debtor has already said they can't afford --

23         **MR. UNIDENTIFIED:**  I can't hear you.

24         **MR. GALLOON:**  The Debtor has already said they can't

25   afford the administrative expenses.  So we don't think there

1    should be any further withholding.  I understand that according

2    to some people that they think I've caused a problem in

3    requesting findings.  I don't know how this would ever be an

4    appealable determination prior to an order for confirmation or

5    a judgment in an adversary proceeding.

6          Be that as it may, if the Court simply wants to

7    reserve ruling on the -- my question about the application of

8    the Golden Triangle plan in the *Flynn* (phonetic) case about

9    surcharging for administrative costs, my principal concern is,

10   however, that these order -- this order be entered without

11   prejudice to the rights that people are otherwise entitled to

12   assert.

13         I think that the Court is justified in making a

14   distribution on an interim basis.  The Court -- I'd also like

15   to point out that it may help conceptually to resolve the

16   problem of claims of people that are overpaid or underpaid or

17   something.  I think that the -- they've only balanced half the

18   books here in their recoupment theory.  The case law I've

19   submitted says if you're going to look at this series of

20   transactions, you look at the final accounting.  So there is

21   ample opportunity to make a final accounting of the claims

22   between and among the parties.  Thank you.

23         **THE COURT:**  Okay.  All right, Ms. Jarvis.  Let's do

24   go through the source of the funds and this is, I guess, a

25   basic lesson that's basic and I thought understood but I just

1  want to be clear.  Are checks going to all direct lenders even

2  if their loans post-petition have not been performing?

3          **MS. JARVIS:**  I mean, no.  What we're do --

4          **THE COURT:**  No, okay.

5          **MS. JARVIS:**  -- what we've done is it's the money in

6  the collection account and that is -- it consists of -- if you

7  heard, there's about $9 million that was there when the

8  bankruptcy was filed --

9          **THE COURT:**  Put that aside for a moment.

10         **MS. JARVIS:**  -- and then there is -- the rest of it

11  was -- has all been collected post-petition.  As each

12  collection is made, it is accounted for by loan.  So all that's

13  going to be distributed is money that's been collected on loans

14  to the lenders on that loans including to the funds.

15         **THE COURT:**  Okay.  Well, that's what I thought.  On

16  one hand, you know, obviously the problem is people who made

17  loans in good faith aren't getting money but more importantly,

18  the point is we're not diverting money which was direct lender

19  money to somebody who's not entitled to this money.

20         **MS. JARVIS:**  Yeah, no.

21         **THE COURT:**  Okay.

22         **MS. JARVIS:**  The practice has been -- I mean, we have

23  reconstructed the records, you know, and of course all the

24  post-petition money, you know, we collected it ourselves.  We

25  know exactly where it's accountable to with respect to that

1    pre-petition piece.  Based on a ground-up reconstruction of the

2    records, you know, we feel confident we have allocated it

3    appropriately and let me address that because that issue has

4    come up.  We are not backing off the position of asking for

5    this to be distributed.

6            However, we are -- and let me just say that we did

7    raise this in the initial motion if I can just -- this is from

8    the initial motion.  If you can see on Paragraph 6, we said,

9            "As of the petition date, USA held approximately 9

10           million in its loan servicing collection account.

11           After the petition date, USA established a debtor-in-

12           possession collection account, the collection

13           account, and transferred the funds from the

14           prepetition collection account to the new post-

15           petition collection account."

16           So we did disclose that this was part of -- and if

17   you go down -- said this is combined, the 93 million.  We did

18   disclose when we first filed that that was part of what we were

19   asking to distribute.  However, we are very sensitive to the

20   fact.  We have tried to be, you know, very transparent.  We

21   want to make sure that the committees are comfortable with

22   this.  What we have worked out with the Diversified and the

23   Unsecured Creditors' Committee is that we will immediately walk

24   the financial advisors for the Diversified Committee through

25   our accounting.  We feel confident it is correct.

1        If they -- while -- if the Court orders -- allows us

2   to make this distribution today, we will ask for the full

3   amount we requested in our motion to be distributed but we will

4   walk through -- on early next week -- we're ready on Monday or

5   Tuesday to walk them through it.  If their financial advisors

6   agree that they have no dispute with respect to how it's

7   accounted for, then it will -- the order will simply be

8   submitted to your Honor and it'll -- there will be no other

9   issue to deal with.

10        If they disagree, then we will put on evidence on the

11  16th and ask that your Honor would allow us to distribute that

12  amount as well.

13        **THE COURT:**  Don't you have an objection with

14  Mr. Charles as well though?

15        **MS. JARVIS:**  Mr. Charles and Mr. Levinson worked it

16  out so that if we --

17        **THE COURT:**  Oh.

18        **MS. JARVIS:**  -- satisfy the -- I mean, we're trying

19  to be efficient here --

20        **THE COURT:**  Okay.

21        **MS. JARVIS:**  -- and he has agreed that if we satisfy

22  the financial advisors for the Diversified Committee, he will

23  be satisfied too and therefore neither of them will have

24  objections to that.

25        **THE COURT:**  Okay.

1          **MS. JARVIS:**  Let me also just address a few other

2     issues.  With respect to the Diversified objection, let me

3     just, you know, say I understand Mr. Allison is the CEO of the

4     Diversified Debtor and, you know, the Committee -- I think the

5     Committee and the Debtor both agree with respect to the facts

6     and the problems that arise -- have arisen from the Diversified

7     Trust Fund.

8          I think what I was saying and I -- maybe I didn't

9     articulate it well enough is that currently the Debtor and the

10    Committee may disagree on the remedy that ought to be sought to

11    deal with that.  Certainly the Debtor has been pursuing one

12    remedy.  I know that the Committee is considering this other

13    more drastic remedy.  We're obviously still exchanging

14    information.

15         We're working together but the fact that that remedy

16    may be pursued in the future or they may decide to try to push

17    that remedy versus the remedy that the Debtor is currently

18    pursuing I think should not delay the distribution today

19    because, again, it is a possibility that it will be pursued in

20    the future but the distribution we have asked for has been

21    based on, kind of, identifiable claims at this point in time

22    and we do not believe that it -- that the distribution should

23    be held up, you know, for a potential remedy that might be

24    sought in the future.  This, again, is -- it's an initial

25    distribution.

1        We know there are lots of issues that you've heard

2   today with respect to continuing distributions.  The Debtor

3   does intend to pursue its motion to ask for the continuing

4   monthly distributions but we have set that over for August 31st

5   again to allow the committees and the Debtor to continue to

6   discuss this issue to see if there's a way to consensually

7   resolve this.  We do intend to go forward as we currently have

8   asked for this motion to go forward.  However, if we determine

9   -- come to some agreement that is different than that, we would

10  file with the Court a Notice of Modification so that all

11  parties would get, you know, notice that we had potentially

12  modified this.

13       Some of the issues that you've heard today with

14  respect to, you know, potential additional holdbacks, also the

15  3-percent servicing fee -- let me just address the 3-percent

16  servicing fee for a minute.  I think as we explained to your

17  Honor, it's a little bit complex because some of the servicing

18  fee agreements have one percent.  Some have up to 3 percent and

19  generally it depends on when they were signed.  So the ones

20  that are newer, I believe, have 3 percent but the newer loans

21  don't necessarily have all lenders that have 3 percent in them

22  because there was a lot of assignments in and out and I think I

23  explained at the last hearing that in some cases there were

24  hundreds of assignments in and out of loans so that you cannot

25  necessarily match or assume that on any particular loan across

1    the board there's a 3 percent.

2           As Mesereaux has reconstructed these records, it has

3    not been possible to date to feasibly determine -- divide

4    between the lenders on a particular loan as to one percent and

5    3 percent.  However, as they are getting to the point where

6    that may be possible or will be possible, depending on the cost

7    again that we want to deal with because they're getting to the

8    point where they now have moved from the loan -- reconstructing

9    the loan ledgers to moving towards the investor ledgers which

10   is where the 3 percent lies.

11          So that issue can be addressed in the future.  We

12   certainly, you know, can look at that but it could not be

13   determined by this point in time and we do not believe that the

14   distribution to these lenders should be held up, you know,

15   while this is determined.  In fact, your Honor, really the

16   whole point of this is we recognize there are many, many legal

17   issues, you know, that eventually need to be resolved but we

18   have structured something that we think creates a balance among

19   those issues, preserves peoples' rights but gets money out, you

20   know, to lenders because to wait for everything to be resolved

21   would not allow money to go out for a long, long time.

22          And in that vein, one other issue -- Mr. Landis

23   raised the issue of a 541(d) determination.  Both Mr. Gordon on

24   behalf of the Direct Lenders Committee or the Executory

25   Contracts Committee and the Debtor agree we are not seeking

1    again in the context of this interim distribution for any final

2    determination of legal rights by the Court.  We are not asking

3    for a 541(d) determination.  We do not think that one needs to

4    be made at this point.  The Court has the discretion to go

5    ahead and allow this interim distribution and we would ask that

6    that issue be reserved as well.

7            With those explanations, your Honor, we would ask

8    that the Court grant the Debtor's motion.  We do believe this

9    has been a very difficult process in looking at these competing

10   interests and legally and practically deciding what we believe

11   is the right solution and we would ask that the Court grant the

12   Debtor's motion as prayed for.  Thank you, your Honor.

13           **THE COURT:**  Okay, thank you.  I'm going to grant the

14   motion with one minor change and that is -- and I'll explain my

15   reasoning for all this.  With respect to loans that are paid

16   off, I'd authorize the Debtor to hold back an additional 2

17   percent while you investigate whether or not you were entitled

18   to more.  It seems to be on the loans that are paid off you

19   want -- you have a harder time -- you may have a harder time

20   doing adjustments later if it turns out the estate was entitled

21   to that.  Again, it's to be held, not to be spent but held

22   pending that determination.  I won't require the same thing

23   vis-à-vis the ongoing payments on loan because those

24   adjustments could be made later.

25           Now, let me go through my analysis here and let me

109

make some things clear.  Not everybody who invested money
either as a direct lender or with one of the funds is going to
receive a check and that's because we can only distribute those
monies that came in on account of loans that are now paying.
Now, the reason that the one fund will get money is because
they have a loan which is -- they have loan or loans which are
performing, and that's the basis, and then -- then, under their
agreements, that goes out to the members.  The other fund has
no performing loans at this stage, and, so, therefore, there's
no funds available to go to their investors.  As much as we
would all like to change that reality, we can't at this stage,
or perhaps ever.

         Let's go through the analysis as to why these monies
should be distributed as opposed to waiting.  First of all, at
least it appears as if, at this stage, that those -- that
people had direct interests in loans and were actual
beneficiaries on loans and deeds of trust, secured by deeds of
trust, which were governed by a servicing agreement.  Hence,
under the servicing agreement, to the extent the money came in,
they're entitled to be paid those funds out absent a servicing
fee.  So, absent bankruptcy that's what would happen.

         Now, are there questions about whether or not those
funds shouldn't be turned over?  Yes, there are legitimate
questions.  There are legitimate questions which may arise as
to:  Is it truly the lenders' money, or is it -- did it become

1   the estate money because of commingling and all those other

2   legal issues?  Or, are there other equitable legal reasons for

3   which ultimately these cases, all the money should be put in a

4   pot and shared?  But at this stage it appears as if there is no

5   basis for putting the money in an entire pot and sharing it.

6   Each person has their rights under the loans and deeds of

7   trust; hence, the money should be distributed.

8          Now, what, though, about the rights to net?  I think

9   it's appropriate at this stage to net, without making a final

10  legal determination, under doctrine -- I believe recoupment is

11  applicable.  I understand recoupment applies to a single

12  transaction.  But here, notwithstanding the fact there may have

13  been four -- an individual may have had several loans, the

14  point was they got one statement, the money was in one account,

15  and everybody sort of treated it as sort of this flowing thing.

16  So, I think the doctrine of recoupment, at least at the

17  preliminary stage, if I were to view this much like a

18  preliminary injunction weighing the evidence, would allow for

19  the doctrine of netting.  And, again, the money is being held

20  back; it's not being applied.

21          Then, the next issue is that the -- Mr. Levinson

22  argues that you shouldn't distribute these monies -- well, he

23  claims he says you didn't -- shouldn't distribute it but he

24  really is hedging.  He doesn't want to be this subject being

25  running out of town on a rail.  He says that it should be

1  limited distribution; and even though I have given him a hard

2  time, he's doing a good job representing his clients, who, like

3  everybody else, was defrauded in this scheme, and his people

4  are left with nothing.  But, as much as we would all like to

5  see the, I guess, arguably, inequitable concept, the concepts

6  that he argues, it seems to me, are concepts which require

7  attachment, et cetera, and an adversary proceeding.  It's

8  unlike recoupment.  And I apologize for those of you not

9  attorneys with these legal doctrines, but it's very important

10  because, as much as, again, we would all like to see everybody

11  get something, perhaps from a just -- one standpoint, the point

12  is, as some others argued, it's my money, I'm entitled to it,

13  and there is no legal basis for it.  And, so, we have to apply

14  the legal and factual basis.

15          So, weighing those two things, I think it's

16  appropriate to distribute the funds, but it's also appropriate

17  to net, at least until we can get a little better sense of what

18  we're ultimately going to have to do.  Netting makes a lot more

19  sense, too, again, as between the direct lenders -- now, we're

20  not talking about the relationships between the funds and

21  Commercial Mortgage; we're talking about as between the direct

22  lenders -- netting makes much more sense, because otherwise the

23  argument is that you -- it's a fraudulent -- that you would

24  have to sue.  That is an incredibly expensive, frustrating, and

25  unnecessary, I think, legal position.  I am not making a final

112

1    determination, but you can certainly guess what my thinking is

2    on that.

3           I have explained why I think it's appropriate to hold

4    additional monies off for servicing, because under the contract

5    the debtor was entitled to servicing fees, and I think it's

6    better to hold back what you're entitled to rather than -- and

7    especially on the paid-off loans; and, again, on the loans that

8    payments are still going, there is enough room for setoff later

9    if it turns out the estate is entitled to those fees.  And,

10   quite frankly, as much as we talk about we need to get the

11   monies to lenders, the professionals in this case have worked

12   very hard, and, unfortunately, they can't do it for free, and

13   in order to keep this whole thing going and to get back what

14   we've got, we have had to have the professionals.  So, the

15   servicing fees are monies that the investors were never

16   entitled to.  The servicing fees you agreed in the beginning

17   that USA Commercial would get X percent, and that was the

18   agreement, and that's all we're enforcing, is that USA

19   Commercial will get the amount to which they were entitled to

20   be paid under the servicing agreement, and it's better to sort

21   that out later.

22           As to Mr. Landis's argument, to the extent that this

23   is -- I think this is appropriate to make these interim

24   distributions, because at this stage it does not appear to be

25   property of the estate, and, therefore, no plan is required.

1           Now, going next to where we go next in this August

2    31st hearing.  Mr. LePome sort of indicates that he's teed it

3    up for determination as to what this is or isn't.  I'm not

4    convinced -- I'm not so sure it's appropriate -- it probably is

5    appropriately teed up, but I'm not sure.  And I'm not saying

6    that we'll decide on August 31st what the issues are because

7    it's going to have to be briefed and briefed carefully, and I

8    suspect, as Mr. Charles pointed out before, it's not something

9    for which you give an advisory opinion.  You've got to tee it

10   up with the appropriate factual predicate, either perhaps in

11   that case in adversary or at least a motion where everybody

12   agrees we'll do it as a motion and we'll do it as a contested

13   proceeding.  So, that will certainly -- his motion is on

14   calendar.  I would urge all of you to work together so that

15   we're not doing this piecemeal.  I don't want to have to argue

16   this 15 times, waste all this time arguing about what it is or

17   isn't; whether or not it needs to be done now, I don't know, as

18   opposed to what the debtor proposes in a plan.

19           Mr. Landis, you're not going to hear it often, but

20   I've got to admit I think you were right on something.

21       **(Laughter)**

22           You were -- I am very concerned that you were right

23   on the conflict issue.  It's become pretty obvious that as to

24   the fund that Mr. Levinson represents the committee on and as

25   to the estate I think there is a conflict.  Everybody is

1   proceeding in their best face but there's -- I see an issue.

2   I'm not going to require you to do anything now, but you're

3   going to have to face it.  If there was any possible way that

4   we could substitute committee counsel for debtor  counsel -- I

5   don't know if there is any possible way under the code -- that

6   may be one way to handle it.  We certainly don't want to incur

7   any more expenses.  And especially since the debtor here is

8   really not a debtor; it's just some people who were trying to

9   make this thing work.  So, it's an unusual circumstance.

10          **MR. MEROLA:**  Your Honor?

11          **THE COURT:**  Uh-huh.

12          **MR. MEROLA:**  Before we get any broader, can the

13   record please reflect that your comments will serve as findings

14   of fact and conclusions of law under Rule 52 and 7052 in lieu

15   of written findings with regard to the motion before you?

16          **THE COURT:**  Yes.  They will.

17          **MR. MEROLA:**  Thank you, your Honor.

18          **THE COURT:**  But these are like my preliminary

19   findings.  I view this much like a preliminary injunction

20   hearing.  These are preliminary findings.  Yeah, I recognize

21   that I am not making a final determination as to the rights and

22   liabilities of the parties, that everybody has stipulated to

23   that; I think that's appropriate.  But I think, again, one just

24   can't distribute the funds just because it feels good.  You

25   know, I've got to have the legal and factual and equitable

1   basis to do it, and I think that you have presented that.

2           **MS. JARVIS:**  Your Honor, in that vein, the comments

3   you just made with respect to a potential conflict --

4           **THE COURT:**  That's just --

5           **MS. JARVIS:**  Yeah.  That -- we haven't really briefed

6   that and we --

7           **THE COURT:**  No.

8           **MS. JARVIS:**  -- I assume you're just --

9           **THE COURT:**  That's just to summarize as to the other

10  issues.

11          **MS. JARVIS:**  That's not -- but that's not a

12  finding --

13          **THE COURT:**  No.

14          **MS. JARVIS:**  -- because it's not necessary.

15          **THE COURT:**  No.

16          **MS. JARVIS:**  Thank you, your Honor.

17          **THE COURT:**  Thank you.

18          Now, on Ms. Chubb's motion, I think the best way to

19  do it -- because I'm a little -- I will grant her motion to the

20  extent that it is no broader than the order that I'm granting

21  to the debtor.

22          **MS. CHUBB:**  That's very acceptable --

23          **THE COURT:**  Okay.

24          **MS. CHUBB:**  -- and that's what I had in mind, and

25  there were some comments and objections to my motion, and I

1    will have those people sign off.

2              THE COURT:  Okay.

3              MS. CHUBB:  Thank you.

4              THE COURT:  No one has objected to the releases, so

5    that part of the motion is granted as well.

6              Vis-à-vis the motion to hold back, this moots that,

7    but to the extent necessary, I'll grant the motion to hold

8    back, to the extent that it's the converse of you're seeking

9    the holdback on the withheld money.  I think it's the same

10   thing.  But that's now resolved, so that's off calendar.

11             Let's take another ten-minute break, and then we'll

12   go -- your lift stay will be argued next.  Or are you taking

13   that off?

14             MS. CHUBB:  No.  If you want to deny that without

15   prejudice, I think that's appropriate at this point.

16             THE COURT:  All right.  So, on Ms. Chubb's lift stay,

17   I'm going to deny that without prejudice.  It seems to me

18   appropriate that there is no basis to take away the servicing.

19   The harm to the estate is much greater.  Here we have the

20   debtor is making the payments in accordance with the agreement.

21   There is nothing to indicate that the debtor isn't pursuing

22   foreclosure, et cetera, and perhaps I should have said first, I

23   don't -- I haven't been shown that 51 percent of the people

24   support it.  So --

25             MS. CHUBB:  I assumed that was the basis of your

1    denial.

2              **THE COURT:**  Okay.

3              **MS. CHUBB:**  Okay.  Thank you.

4              **MR. GALLOON:**  Your Honor --

5              **THE COURT:**  Mr. Galloon?

6              **MR. GALLOON:**  -- do I assume that our payment -- my

7    motion --

8              **COURT RECORDER:**  Would you speak directly into the

9    microphone, Counsel, please?

10             **MR. GALLOON:**  Do I assume correctly that my motion

11   will be denied?

12             **THE COURT:**  Yes.  I'll deny your motion.

13             **MR. GALLOON:**  Without prejudice to the rights of the

14   parties elsewhere?

15             **THE COURT:**  Yes.

16             **MR. GALLOON:**  Okay.

17             **MR. NELSON:**  Your Honor, could I ask a clarifying

18   question?

19             **COURT RECORDER:**  And would you make your appearance,

20   please, for the record?

21             **MR. NELSON:**  Erven Nelson on behalf of the Leo Mathis

22   Group.

23             In the reply filed by the debtor they basically said

24   they were taking off the table and deferring any of the

25   arguments regarding netting and recoupment?

1          **THE COURT:**  No; that's what we've just argued for

2    three hours.

3          **MR. NELSON:**  Well, but that was in their reply.  And

4    it would be deferred until August 31st.  Is that not right?

5          **MS. JARVIS:**  Your Honor, in our reply and also today

6    what we've argued is we're not -- we're not putting them off;

7    we're saying there is no final determination --

8          **THE COURT:**  Right.

9          **MS. JARVIS:**  -- with respect to recoupment.  We're

10   simply holding back.

11         What we've put off to the 31st is the issue of

12   continuing payments, monthly payments, getting those going

13   again.  That's what will be heard on the 31st.

14         **THE COURT:**  Okay.  Yes.

15         **MR. NELSON:**  Okay.  Thank you.

16         **THE COURT:**  Now, as to -- I forgot one thing.  As to

17   the nine million, I do think that is appropriate to defer that

18   till August 16th both for reasons for Mr. Levinson to look at

19   it.  I would like it back on calendar, because notwithstanding

20   the agreement, this is an important enough issue that I'd like

21   to hear, you know, what both sides say.  So, we'll put that

22   aspect of your motion which seeks the nine million back on

23   calendar.

24         **MR. LANDIS:**  Judge, I'm trying to anticipate what

25   this order is going to look like, and I had a couple of follow-

1    up questions.

2            This is an interim distribution --

3            THE COURT:  Yes.

4            MR. LANDIS:  -- that's going to be made; is that

5    right?  And the interim distribution at this stage, it appears,

6    will be from proceeds that were post-petition collections --

7            THE COURT:  Yes.

8            MR. LANDIS:  -- and are, therefore, not estate

9    property.

10           THE COURT:  Yes.

11           MR. MEROLA:  Your Honor --

12           THE COURT:  Well --

13           MR. LANDIS:  At this stage, right?

14           THE COURT:  Well --

15           MR. LANDIS:  I think that's what she said, Counsel.

16           THE COURT:  I'm saying that -- I don't think we have

17   to say it's not estate property, but it would -- it's property

18   which came in from the loans.

19           MR. LANDIS:  Very well.  And that's the clarity that

20   I was seeking, Judge, because I heard you say it, and I needed

21   to understand it.  And that, as a result, then, the investors

22   are entitled to distribution.  Is that -- I'm, again, just

23   trying to anticipate --

24           THE COURT:  No; exactly.

25           MR. LANDIS:  -- what I'm going to see in the order.

1    **THE COURT:**  The order is that -- see, I've -- you

2    don't need that, because the findings are what do it.  All you

3    need is the order which says it's being made from the

4    collection account.  So, I made the oral finding, at least

5    preliminarily, it does not appear to be estate property.

6    **MR. LANDIS:**  That's what I needed to hear, your

7    Honor.

8    **THE COURT:**  Okay.

9    **MR. LANDIS:**  Thank you.

10   **MS. JARVIS:**  And, your Honor, but there is no final

11   determination --

12   **THE COURT:**  No.

13   **MS. JARVIS:**  -- as, of course, we haven't asked for

14   that --

15   **THE COURT:**  Exactly.

16   **MS. JARVIS:**  -- and the parties agree.

17   **THE COURT:**  Preliminary determination, much like a

18   preliminary injunction.

19   **MR. LANDIS:**  Right.

20   **THE COURT:**  Okay?

21   All right.  We'll take a short recess and take care

22   of the other matters, then.

23   **MR. UNIDENTIFIED:**  Thank you.

24   **THE CLERK:**  All rise.

25   **(Recess was taken from 12:29 p.m. until 12:46 p.m.)**

1          **THE CLERK:**  All rise.

2          **THE COURT:**  Excuse me.  We're ready to start.  Be

3   seated.  Okay.  We've taken care of the motion to temporarily

4   hold, the motion for relief from stay, motion to compel.  Do

5   you want to do the Sierra Consulting next or do you want to go

6   ahead and do the cash collateral?

7          **MR. CHARLES:**  In the words of an angel, let's do the

8   easy one first.

9          **THE COURT:**  Okay.

10          **MR. CHARLES:**  The unsecured creditors committee told

11   me, "No, we do not need a financial advisor," and that was true

12   for a while.  And then, it became clear that it's not possible

13   for the other financial advisors, or even Mesereaux to provide

14   us both with seamless, transparent information as they create

15   it; and also, sometimes you need analysis.

16          So, you'd have issues where there would be data that

17   someone had prepared that they could share with you, but they

18   couldn't do analysis.  For example, Mesereaux -- Ms. Smith

19   again -- and I am not being sarcastic.  I am a sarcastic guy,

20   but I am not being sarcastic.  She has done Herculean things

21   and she put together the data about the netting issues and they

22   coded borrowers, so we wouldn't know borrower names and all

23   sorts of very complex things.  And they said, "Here's the data.

24   Figure it out," which is fine.

25          But at that point, and actually a week before that,

1    the committee realized it needed a financial advisor and so we

2    had interviewed Mr. Burr (phonetic) at Sierra.  He's qualified

3    and we hired him.  But even then, the committee has said,

4    "We're not duplicating.  We're not wasting time."  For example,

5    when that data file was provided to us, Mr. Burr did the

6    analysis that was then shared with the committee and some of

7    the examples that you saw in our papers were shared with the

8    committees.

9            Conversely, we've relied on FTI through Diversified

10   to analyze Investment Partners in 1090, which are incredibly

11   important to our committee's ultimate resolution, but we've not

12   spent a nickel of financial advisor money on that.  And so, we

13   asked the Court to employ Sierra and the direct lenders

14   committee said, "We should avoid duplication.  It looks to us

15   like Sierra is duplicative here."  And since that's what I had

16   already heard from my committee and they've changed their mind,

17   I think I can change Mr. Gordon's mind or, if not, ask you to

18   overrule his objection.

19           **THE COURT:**  Okay.  Any opposition?

20          **MR. GARMAN:**  Your Honor, Greg Garman, on behalf of

21   the direct lenders committee.  Your Honor, this is a practical

22   opposition.  Clearly, Sierra is qualified to do the job, but we

23   have three world class financial advisors in this case.  We

24   have Mesereaux, Alvarez and FTI.

25           **THE COURT:**  Now, the only thing is, I hear what

1   you're saying and understand, but how will the direct lenders

2   be affected?

3           **MR. GARMAN:**  Well, I don't think we've determined at

4   the end of the day where everyone is getting paid, but clearly

5   that was the committee that was formed in the same estate that

6   we're representing.

7           **THE COURT:**  Right.

8           **MR. GARMAN:**  We're the executory contract, so --

9           **THE COURT:**  But you -- I mean, arguably, none of that

10  money -- you know, your lenders are paid as direct lenders and

11  so --

12          **MR. GARMAN:**  Well, we represent the executory

13  contract holders, which are the direct lenders.  We do have the

14  contractual rights and, I mean, this is our estate that we're

15  talking about.  At the end of the day, there are going to be

16  direct lenders whether they fall in our committee or

17  Mr. Charles' committee that have shortfalls.  We're working on

18  ways to gap that so that the shortfalls to direct lenders'

19  undiverted principal is as small as possible.  But I think the

20  operating assumption we're all under at the moment is that

21  there are shortfalls and we clearly don't have an answer for

22  them all.

23          We're $800 million of the 960 out there.  And this

24  case has come down to a case of the haves and have nots.

25  There's the direct lenders and there's the First Trust Deed

1    Fund, which appears to be in pretty solid shape.  And then

2    there's the Diversified fund and, as evidenced today by the

3    arguments, they've both been advancing unsecureds.

4         We've been working pretty closely with the First

5    Trust Deed Fund and Alvarez.  And we have been sharing

6    financial information at the extent feasible and to the extent

7    it doesn't breach requirements of confidentiality and loyalty.

8    And we're simply asking for the same effort from the unsecured

9    creditors committee.

10         To date, the direct lenders committee hasn't needed a

11    financial advisor and simply because that cooperation has

12    worked from our side and, again, Mr. Burr and Sierra are

13    qualified, but now brings four financial advisors in when, you

14    know, we're still in some fairly preliminary stages of trying

15    to get some basic accounting done and, from our perspective,

16    they should be operating under the same parameters we are and

17    be sharing information with the Diversified fund.

18         **THE COURT:**  Okay.

19         **MR. LEVINSON:**  Mark Levinson for the Diversified

20    committee.  We support the application and just stress that our

21    financial advisor, FTI, has worked with Sierra Pacific already

22    to try to avoid duplication.  We spent a great deal of time

23    yesterday with Mr. Charles and Sierra Consulting bringing them

24    up to speed on 1090 and the 1090 loan and the investment

25    partners' loan, where we do share not a unanimity of interest

1    but a lot of interest.  And the accounting work is non-

2    controversial, much as you'll see in Mr. Tucker's declaration,

3    is non-controversial.  So, where we can share, we do.

4            But there's certain things we simply cannot share

5    with them and that's why we have no opposition to their having

6    their own advisor.

7            **THE COURT:**  Okay.  All right.  I'm going to allow the

8    application.  You know, we need to be very careful of

9    administrative expenses in this case.  But it seems to me that

10   committees and the representatives of the committees should be

11   given pretty wide latitude in what they believe.

12           Because the way the finance of this is going to work

13   is -- the point is the direct lenders, if the theory holds up,

14   all those loans which are held by direct lenders and which

15   there are secured loans, that's not property of the estate

16   under that theory and therefore none of those fees -- monies --

17   can be used to pay unsecured creditors or beyond the servicing

18   fees -- professionals.  At least, that's the theory.

19           So, Mr. Gordon and Mr. Garman have no room to

20   complain, although I can see why they wouldn't want a

21   professional, because the point is to the extent that the

22   documents prove they really weren't direct lenders, but rather

23   were a part of this scheme by which everybody should share

24   ratably, that hurts that position.  But the point is the

25   unsecured creditors -- and the unsecured creditors include

126

```
 1   people who invested money and who, through no fault of their
 2   own, the loan was repaid but they didn't get the money.
 3         So, I'll trust the judgment of the unsecured
 4   creditors committee, you know, because you recognize the extent
 5   the professionals get paid that's less that goes to the
 6   unsecureds.
 7         I also trust the representations of everyone that
 8   they're going to do what they can to minimize the costs and, of
 9   course, as you understand, when I review fees, the ultimate
10   conclusion, you know, I will disallow duplication if I feel
11   there's duplication and I'll listen to what you have to say.
12         It seems to me Diversified is the one that would have
13   reason to object because they're, in essence, an unsecured
14   creditor, if you will, of U.S.A. Commercial and if they don't
15   object and they're paid from what's left over, so if they don't
16   object they're the ones that have the ox that's being gored.
17   And I see it more of a tactic on the director lenders committee
18   than I do an actual concern about the money.
19         So, I'll approve the application.
20         Okay, the next we have is motion to use cash
21   collateral and we've dealt with Mr. Mincin's motion, and
22   really, it should be Number 8.  Number 6 is off calendar,
23   because we've dealt with that.  Number 9 is for the --
24         MR. SCHWARTZER:  Your Honor, you have a couple of use
25   of cash collateral --
```

1          **THE COURT:**  No, it's not cash collateral.  It's use

2    of cash, correct.

3          **MR. SCHWARTZER:**  The use of cash motion is one

4    through July 29th and the Courts have already granted that.

5          **THE COURT:**  Uh-huh.

6          **MR. SCHWARTZER:**  And there's been an order allowing

7    the use of cash through August 6.  But of course now we do need

8    to go to the next one, which is the motion for order --

9          **THE COURT:**  So, Item Number 6 should be off calendar.

10   That's been dealt with.

11         **MS. JARVIS:**  I think, your Honor, how that happened

12   was when the first motion was put into place it was continued.

13   But then we wanted to make clear that everyone understood we

14   were asking for continued so we filed the separate motion.

15         **THE COURT:**  Right.  So, I think the way to do it is

16   none of these -- all these motions will be dealt with.  You're

17   just going to bring on a new motion each time to save

18   pleadings.

19         **MS. JARVIS:**  Yeah, I think it's easier for people to

20   keep track of.

21         **THE COURT:**  I do, too.

22         **MR. SCHWARTZER:**  And Number 8 is the one, the use of

23   cash through --

24         **THE COURT:**  Today.

25         **MR. SCHWARTZER:**  October 29th and that's the one you

1   do have to hear today.

2           **THE COURT:**  Yes.

3           **MR. SCHWARTZER:**  And there is a basic agreement.

4           **THE COURT:**  Yes.

5           **MS. JARVIS:**  We have reached agreement with the

6   committees and the U.S. Trustee and basically this is

7   consistent with what we put in our reply brief.  We will

8   provide weekly budgets of actuals -- weekly reports of budget

9   actuals in a form that we can agree on with the financial

10  advisors to the committees.

11          We also agree as set forth in our reply brief that

12  when we forecasted this cash -- and by the way, we keep

13  referring to this as cash collateral, but it's not really cash

14  -- it's cash management.

15          **THE COURT:**  It's not cash collateral.  Yes.

16          **MS. JARVIS:**  Because nobody has an interest in these

17  funds.

18          **THE COURT:**  That's right.

19          **MS. JARVIS:**  But we are not asking for any

20  substantive determinations in putting this budget -- it's for

21  purposes that we, you know, use this cash in the way we've set

22  forth, but subject to, as we have said in our reply brief to

23  the Court, making specific determinations on fees and any other

24  substantive issues in the budget.

25          Third, with respect -- and this kind of goes along

1  with that -- there is, of course, forecasted in this to use

2  some funds that are currently the prepaid interest, meaning the

3  money that Commercial Mortgage already paid out to investors

4  but now has collected from borrowers to fund administrative

5  expenses; that was put in just to show again uses of cash but

6  we will file a separate motion to deal with that.  We are not

7  asking for a determination at that time and I understand with

8  these clarifications, then, the parties are in agreement that

9  this can be granted.

10        **THE COURT:**  Okay.  All right.  So, the cash

11  management order is approved through October 29th.  And next we

12  have the administrative order on procedures for compensation.

13        **MR. SCHWARTZER:**  Yes, your Honor, and this case is a

14  fairly large case and the fees are fairly substantial.  I think

15  you've heard the number from one attorney mention they run

16  approximately $500,000 a week.

17        At this point in time, these -- I guess the

18  administrative expenses of this estate have been borne by the

19  professionals, particularly the Mesereaux Financial interim

20  management company which has provided Mr. Allison, Ms. Smith

21  and numerous other accountants and experts to work on a daily

22  basis, weekly basis, overnight basis, through weekends to get

23  the work done that's had to be done.  And, in fact, Mesereaux's

24  existence probably is why this case is a Chapter 11 case, not a

25  Chapter 7 with a straight liquidation by a Chapter 7 trustee.

1          But that is a financial burden that is not feasible

2     to be continued through the length of this case.  The parties

3     have put together what is a fairly standard application in

4     large cases for interim fees and that is basically that the

5     interim fees that, on a monthly basis, the professionals will

6     submit to the other professional and the U.S. Trustee a bill

7     that reflects what they did in the previous month.  And the

8     details I don't think are important, but I think it's provided

9     by the 25th of the month and if there's no objections, it gets

10    paid 20 days -- if there's no objections for 20 days, it gets

11    paid thereafter that.

12         If there's any objections by anybody, then the

13    disputed amount will not be paid.  But with regard to the

14    undisputed amounts of fees and costs, 80 percent would be paid

15    -- 80 percent of the fees would be paid on a monthly basis and

16    100 percent of the costs would be paid on a monthly basis.  And

17    then, every four months or so, there will be a full-fledged

18    application for fees -- every 120 days, there'll be a full-

19    fledged application for fees filed by each of the professionals

20    and heard by the Court at one time.  That way, the Court will

21    still have absolute control over the amount of fees in the

22    case.

23         **THE COURT:**  And, of course, all the fees are subject

24    to a final review at the end of the case.

25         **MR. SCHWARTZER:**  Right.

1          **THE COURT**:  And disgorgement, as well.

2          **MR. SCHWARTZER**:  All fees would always be subject for

3    final approval and, I guess, most importantly in this case, all

4    fees are going to be subject to this Court making a

5    determination that there are assets available that can be used

6    to pay these fees because, as we said with regard to the

7    previous motion, just because we have dollars in the budget for

8    professionals, you have not authorized the use of those funds

9    for that.  There probably will be and may be with regard to the

10   motion that Mr. LePome brought or it may be some other motion

11   this Court will have to determine whether the prepaid interest

12   which has been collected post-petition is available as a fund

13   to pay administrative expenses.  And that will be one source of

14   funds.

15         There's also a substantial amount of money hopefully

16   will be collected from investment partners, which owes the

17   estate in excess of $50 million.  Those may be available to pay

18   professional fees.  But until there is actually professional --

19   a source of funds, none of the fees will be paid.

20         As a practical matter, this interim measure will go

21   in effect hopefully with regard to next month, but next month

22   is also a time we expect to have a fee application for fees;

23   that is, we have suggested in our reply brief that all

24   professionals prepare fee applications for their fees and costs

25   through July 31st and file it by the end of this month and that

1  would be set for hearing on September 28th.

2          And then, basically, the first set of fees that would

3  be paid under this interim measure would the fees for the month

4  of August that wouldn't get paid until October, because the

5  August bills would be prepared by sometime in September,

6  reviewed and not be paid until October.  So, there won't be any

7  payment to any professional until after this Court hears the

8  fee applications on September 28th.

9          We have also, as debtors' counsel, acknowledged that

10  it's very important for us to be able to allocate our fees

11  among the debtors.  And to that extent, my office and Ray

12  Quinney and Mesereaux keep detailed itemized bills and I know

13  on an ongoing basis, we are marking down whether the fees

14  relate to a particular debtor or a particular group of debtors.

15  It's obvious like we're here all today it involves U.S.A.

16  Commercial Mortgage, the First Trust Deed Fund and the

17  Diversified Trust Deed Fund and we have to allocate our fees to

18  all three of those debtors, even though we're here when we're

19  here.

20          We recognize that and we acknowledge that and we will

21  do that.  In addition, we have been requested to make

22  allocations with regard to the collection efforts on individual

23  loans.  I know my case has probably a very small amount

24  involved here.  There are other counsel, particularly at Ray

25  Quinney, who have spent a lot more time working on collection

1    matters.  While we haven't created separate accounts for each

2    loan, the itemized bill is detailed enough where it shows

3    working on the Rio Rancho loan, for example, where someone

4    could go through the bill and say these many hours

5    (indiscernible).

6         At such time as that there will be a need to seek

7    reimbursement from a debtor for fees expended in the collection

8    work, and by debtor I mean the borrower on a loan, that can be

9    done.  And to the extent that it is feasible to do that, for

10   example, if we were in court and we have a right under the loan

11   documents to collect attorneys' fees for collection work, that

12   will be done.  It hasn't been done up to this point, but I'm

13   not sure that there's been an appropriate time yet to do that.

14   The loans have been collected at this point, have been paid in

15   full with all the accrued interest.  There has not been, as I

16   understand it, additional fees for the time and effort that

17   went into collection, but I'm not sure without the filing of a

18   lawsuit or the filing of a foreclosure there was a right under

19   those documents to collect attorneys' fees and costs of

20   collection.

21        So, basically, a lot of those -- the normal course of

22   collection work, that is, calling up a borrower and saying,

23   "You didn't make your payment this month," that's all that's

24   going to come out of the general estate funds.  It's not going

25   to be necessarily allocated to a particular loan, even though

1    we will have the information in our billings showing yes, we

2    spent time working, calling up this borrower on this loan.

3            MS. JARVIS:  If I could just -- before you finish --

4    just clarify one thing, because -- and I'm sorry to give this

5    disconnect -- but in the budget as we just submitted, the

6    reason why there is a large payment projected in September is

7    because we do -- if the Court grants this interim procedure --

8    we do intent to implement it with respect to bills through July

9    that could be submitted in August that then would be payable on

10   this interim basis in September.

11           So, just to clarify that, that's what we would

12   propose when this would start.

13           MR. SCHWARTZER:  Okay.  I stand corrected.

14           THE COURT:  Okay.  Any comments, et cetera?

15           MR. MEROLA:  Your Honor, the committees filed a joint

16   reply on this procedure and I think with the clarification of

17   the debtor it's mostly acceptable.  The one thing I really want

18   to make clear doesn't need to be in an order.  I want to make

19   clear that nothing in this interim procedure authorizes the

20   payment of professional fees across the states.  We've got to

21   be able to keep these separate because as we keep saying

22   everyone's reserving their rights; everyone might have claims

23   back and forth; but we can't in the guise of a Newtson

24   (phonetic) procedure start paying across procedures.

25           And secondly, I think this order should be entered

135

1  subject to reconsideration in the event investors stop being

2  paid.  Quite simply, right now we've opened up the spigot, but

3  if for any reason that spigot should close in the future, I

4  think people should be entitled to come back and revisit this

5  free of the strictures of Rule 59 or 60; that we all know this

6  is interim and subject to reconsideration.

7         **MS. PAJAK:**  Your Honor, Christine Pajak on behalf of

8  Stutman and the First Trust Deed Fund.  A few housekeeping

9  issues.  I know that we've been dealing with some very larger

10  issues today.  As Mr. Merola mentioned, we don't have any

11  objection to the process; however, we would like to clarify

12  when the deadline is to oppose, you know, raise objections to

13  the people's fees.  In the procedures there is some confusion.

14  Is it the 10th of the next month or the 15th day of the next

15  month?  I just want clarification on that.

16         And also, with regard to the payments that will be

17  coming up with regard to this interim relief, is this tied to

18  the August 11 or different?

19         **MS. JARVIS:**  August 11th is where we have agreed to

20  submit or to exchange with the committees all of our bills and

21  our proposed allocations.

22         **THE COURT:**  So, you're saying as a practical matter,

23  nothing is going to get paid until September as a practical

24  matter?

25         **MS. JARVIS:**  Right.  But the 11th is simply to give

136

1    them a heads up, you know, for everything through June.  Then

2    by the 25th, under this procedure, we would actually submit,

3    you know, kind of the final bills and then, of course, they

4    could be objected to including on allocations.  But they would

5    then go forward on this interim procedure to be paid in

6    September.

7              **THE COURT:**  Okay.

8              **MS. PAJAK:**  Thank you.

9              **THE COURT:**  All right?  All right.  I'm going to

10   approve that interim procedure.  Let me make it clear that it

11   is subject to review.  I don't think that they've asked that it

12   be not subject to review.

13             I'm sorry.  I can't remember whether it's 327 or 328

14   in the modification.  So, forgive me for not quoting the right

15   Code section on that and the right case.  But it's subject to

16   review.

17             I think it's appropriate to establish a procedure.

18   The professionals worked very hard in this case.  They have not

19   received any money, either, but it is a tremendous burden for

20   these firms to do this without any kind of payment.  And

21   obviously, this keeps in mind that to the extent that

22   ultimately it turns out that they were paid erroneously or in

23   the wrong amount, it's subject to final review along the way

24   and, of course, they could be required to disgorge fees.

25   Everybody knows that going into it.  I think it is appropriate

137

1   not to stop the funds under that possibility.  And also, quite

2   frankly, it saves a lot of my time to have to review these fees

3   each time when maybe the issue will go away at the end with any

4   luck.

5          And also, it saves Court time, everybody arguing

6   about fees for hours in court.  So, I think this procedure will

7   save us time and money in the long run.

8          All right.  And then, we had -- it's not on calendar

9   -- but an order shortening time on the Fertitta loan.  I only

10  set that on assuming that there was consent by everybody with

11  respect to this.  So, if there's not, then we need to continue

12  it.  That is called motion for authority --

13          **MS. JARVIS:**  Your Honor, originally this is because

14  this project, the Rio Rancho project, is very time sensitive

15  and they really need to get this loan closed by the 9th.

16  Originally what had been agreed to by the committees -- the

17  four committees and the debtor -- was this could be heard on

18  shortened notice, be heard today.  However, there were some

19  issues that worked out -- that had to be worked out with regard

20  to further negotiations with both the borrower and the lender

21  and so we were not able to file on a Monday, which is what we

22  had hoped and, in addition, the U.S. Trustee objected to having

23  it heard that quickly.

24          I believe the U.S. Trustee has agreed that it could

25  be heard on the 8th.  Mr. Schwartzer indicated that you might

138

1   have some time and wondered if you would be willing to --

2   because we do have a consensus among all the committees and the

3   U.S. Trustee to have it heard on the 8th so that this loan

4   could be closed on the 9th and this project could be safe from

5   irreparable damage.

6           THE COURT:  Well, if there's consensus, why do I have

7   to postpone it 'til the 8th?

8           MS. JARVIS:  Well, let me just say that we sent out

9   notices.  The three-day notices have been sent out to all the

10  direct lenders, but we would need to make sure they had

11  sufficient time --

12          THE COURT:  Oh, so three days had not yet expired?

13          MS. JARVIS:  Yes.  So, that's why we would ask if it

14  could be heard on the 8th and granted on the 8th, then the loan

15  could close on the 9th and that timing is acceptable to all the

16  parties and everyone has agreed to this shortened notice.  And

17  we have already gone ahead and noticed the direct lenders in

18  this loan.

19          THE COURT:  Okay.  What time do we have on the 8th?

20  Just take 15 or 20 minutes?

21      (Court confers with clerk)

22          So, how about 10:30?

23          MS. JARVIS:  That'd be fine, your Honor.  We really

24  appreciate your making time on your calendar for this and we

25  appreciate the committees' cooperation in quickly putting this

139

1   together.

2           **THE COURT:**  Okay.  All right.  So, I think that takes

3   care of our calendar, then, for today.  Is that correct?  No?

4           **MR. LANDIS:**  Time for objections, your Honor?  To be

5   honest with you, I was in South Carolina in training until

6   yesterday night.  I just got back.  Now I've had an opportunity

7   at least to start looking at the pleadings.  I know the Court's

8   sensitive about filing motions on shortened time.  I think

9   you've counseled us on ten different occasions not to do it,

10  but we're here again.  This one has exigencies to it from a

11  financial standpoint.  I would simply like the weekend to have

12  the opportunity to review the pleadings, file any objection by

13  close of business on Monday.  I think that's the agreement I

14  have with counsel.

15          **MR. SCHWARTZER:**  Yes.  That's the agreement.

16          **THE COURT:**  Sure.  That's fine.  And again, normally

17  I would not set such a motion, but I was under the impression

18  that the parties who were directly involved were in agreement

19  and, therefore, it was more or less --

20          **MS. JARVIS:**  And your Honor, the terms were shared

21  with all the committees and when they gave us the agreement to

22  go ahead and go forward on an expedited basis, they had

23  reviewed the terms and those had been agreed upon, as well.

24          **THE COURT:**  Okay.  Just looking ahead at our

25  calendar.  On September 13th, do we just have the afternoon?

1      **(Court confers with clerk)**

2           Do you think you'll need all day on the 13th of

3      September?  Ms. Jarvis?  That make sense, Mr. Schwartzer?  Or

4      is an afternoon all right?

5           **MR. SCHWARTZER:**  Your Honor, the --

6      **(Telephone ringing)**

7           I'm sorry about that.  I need to call them at the

8      break.  I don't know of any major thing that's going to be set

9      on the 13th at this time, but I would -- can't guarantee it.

10          **THE COURT:**  All right.  Well, let's try to move that

11     motion calendar to the 13th -- 14th -- I'm not sure why -- just

12     tell them not to set anything else on the 13th and we'll do it

13     the 14th.

14     **(Court confers with clerk)**

15          All right.  Anything else?

16          **MS. JARVIS:**  Your Honor, I know the hearing was set,

17     you know, has been set for August 16th and we have a pretty

18     light calendar on August 16th.  But with the Court holding over

19     certain issues, Mr. Allison is not going to be available to

20     come on the 16th.  I wonder if maybe we could consider another

21     date, you know, that might be substituted somewhere around that

22     when he is available?

23          **THE COURT:**  I don't have the advantage to a calendar.

24     The 16th was a $9 million.

25          **MS. JARVIS:**  Right.  Because that now has been pushed

141

1    over, you know, we feel like he needs to be here.

2          **THE COURT:**  Well, if you don't have -- what would

3    happen if that went to the 31st?

4          **MR. MEROLA:**  Oh, no, your Honor.

5          **THE COURT:**  Yeah, we need to get the distributions

6    out.  We don't want to hold things up.

7          **MS. JARVIS:**  Well, this is the $9 million.

8          **THE COURT:**  Yeah.  Well, I've got a two-day trial the

9    14th and 15th and --

10         **MR. SCHWARTZER:**  Is it one of mine, your Honor?  Is

11   it one of mine?

12         **MS. JARVIS:**  Your Honor, given your calendar's tight

13   and we need to get this done, we'll go ahead and go forward.

14   Ms. Smith will be here and, basically, act as his substitute.

15         **THE COURT:**  Yeah, I think that's fine.  Again, we

16   didn't need the evidence.  We had the information.  Okay.

17         **MS. JARVIS:**  Thank you, your Honor.

18         **THE COURT:**  All right.  Thank you.  All right.

19   Anything else?  That's it?  All right.  Thank you everybody.

20         **THE CLERK:**  All rise.

21      **(Proceeding was adjourned at 1:15 p.m.)**

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    July 9, 2010
         Signed                                      Dated


                    *TONI HUDSON, TRANSCRIBER*